**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION**

OLIVIA Y., *et al*.                                                    PLAINTIFFS

v.                                              CIVIL ACTION NO.  3:04CV251LN

PHIL BRYANT, as Governor of the State of Mississippi, *et al.*        DEFENDANTS

---

**THE COURT MONITOR'S REPORT TO THE COURT REGARDING
IMPLEMENTATION PERIOD 3 AND THE JUNE 24, 2013 ORDER**

---

**Table of Contents, Report Narrative, Index to Exhibits,
Appendix A: Exhibits 1 - 61, and Appendix B: Exhibits 1 - 62E**

**May 8, 2014**

# TABLE OF CONTENTS

I.      BACKGROUND AND SUMMARY OF FINDINGS ................................................3

        A. Background ............................................................................................................6
        B. Summary of Findings ...........................................................................................12

                Summary Table: Statewide Performance..............................................................24
                Summary Table: Practice Model Performance .....................................................30

II.     METHODOLOGY .............................................................................................38

III.    FINDINGS ...........................................................................................................41

        A.  Statewide Requirements.....................................................................................41

                Period 3 Implementation Plan ("IP") §I.A.1.a. ....................................................41
                Period 3 IP §I.A.1.b. ............................................................................................41
                Period 3 IP §I.A.1.c. ............................................................................................42
                Period 3 IP §I.A.1.d. ............................................................................................43
                Modified Settlement Agreement ("MSA") §§II.A.2.a.8. and II.A.2.a.9.a............44
                MSA §II.A.2.a.9.b.................................................................................................55
                MSA §II.A.2.a.9.c. ...............................................................................................59
                MSA §II.A.2.a.9.d. ...............................................................................................60
                Period 3 IP §I.A.2.a. .............................................................................................61
                Period 3 IP §§I.A.2.b. and I.A.2.c.3. ....................................................................63
                Period 3 IP §I.A.2.c.1. ..........................................................................................67
                Period 3 IP §I.A.2.c.2. ..........................................................................................69
                Period 3 IP §I.A.2.c.4. ..........................................................................................70
                Period 3 IP §I.A.2.c.5............................................................................................72
                Period 3 IP §I.A.2.c.6. ..........................................................................................73
                MSA §II.A.2.c.6.a. ...............................................................................................75
                MSA §II.A.2.c.6.b. ...............................................................................................78
                MSA §II.A.2.c.6.c. ................................................................................................79
                Period 3 IP §I.A.3.a.1. ..........................................................................................82
                Period 3 IP §I.A.3.a.2. ..........................................................................................82
                Period 3 IP §I.A.3.a.3. ..........................................................................................83
                Period 3 IP §I.A.3.a.4. ..........................................................................................83
                Period 3 IP §I.A.3.b.1. ..........................................................................................85
                Period 3 IP §I.A.3.b.2. ..........................................................................................85
                Period 3 IP §I.A.3.c.1. ..........................................................................................86
                Period 3 IP §I.A.3.c.2. ..........................................................................................86
                Period 3 IP §I.A.3.c.3. ..........................................................................................86
                Period 3 IP §I.A.3.c.4. ..........................................................................................87
                MSA §II.A.2.d.2.a. ...............................................................................................87
                MSA §II.A.2.d.2.b. ...............................................................................................88

Period 3 IP §I.A.4. ...............................................................89
Period 3 IP §I.B.1. ...............................................................92
Period 3 IP §I.B.2. ...............................................................93
Period 3 IP §I.B.3. ...............................................................97
Period 3 IP §I.B.4. ...............................................................97
Period 3 IP §I.B.5. ...............................................................97
Period 3 IP §I.B.6. ...............................................................98
Period 3 IP §I.B.7. ...............................................................98
Period 3 IP §I.B.8. ...............................................................98
Period 3 IP §I.B.9. ...............................................................99
Period 3 IP §I.B.10. ..............................................................99
Period 3 IP §I.B.11. ..............................................................99
Period 3 IP §I.B.12. .............................................................100
Period 3 IP §I.B.13. .............................................................100
Period 3 IP §I.B.14. .............................................................100
Period 3 IP §I.B.15. .............................................................101
Period 3 IP §I.B.16. .............................................................101
Period 3 IP §I.B.17. .............................................................101
Period 3 IP §I.B.18.a. ...........................................................101
Period 3 IP §I.B.19. .............................................................103
Period 3 IP §I.C. ................................................................103
MSA §II.A.5.c.1. .................................................................104
MSA §II.A.5.c.2. .................................................................106
MSA §II.A.5.c.3. .................................................................108
MSA §II.A.5.c.4. .................................................................109
Period 3 IP §I.D.1.a.-c. .........................................................111
Period 3 IP §I.D.2. ..............................................................111
Period 3 IP §I.D.3. ..............................................................112
Period 3 IP §I.D.4. ..............................................................112
Period 3 IP §I.E. ................................................................113
Period 3 IP §I.F.1. ..............................................................113
Requirement 1, July 12, 2012 Agreement Regarding Enhancement
of Federal Funding ...............................................................115
Requirement 1a. ..................................................................115
Requirement 1b. ..................................................................116
Step 2, July 12, 2012 Agreement Regarding Enhancement
of Federal Funding ...............................................................117
Requirement 2a. ..................................................................117
Requirement 2b. ..................................................................118
Requirement 2c. ..................................................................118
Requirement 3, July 12, 2012 Agreement Regarding Enhancement
of Federal Funding ...............................................................118
Step 4, July 12, 2012 Agreement Regarding Enhancement of
Federal Funding ..................................................................119
Requirement 4a. ..................................................................119
Requirement 4b. ..................................................................120

Requirement 4c. ...........................................................................121
Step 5, July 12, 2012 Agreement Regarding Enhancement of
Federal Funding .........................................................................121
Requirement 5a. .........................................................................121
Requirement 5b. .........................................................................122
Requirement 6, July 12, 2012 Agreement Regarding Enhancement
of Federal Funding .....................................................................122
Requirements 6 a.-e. ..................................................................123
Period 3 IP §I.F.2. ...........................................................................124
MSA §II.A.6.b.2. .............................................................................124
MSA §II.A.7.e.1. .............................................................................125
Period 3 IP §II.A.1. ..........................................................................127
Period 3 IP §II.A.2.a.-c. ..................................................................128
Period 3 IP §II.A.3.a.-e. ..................................................................128
Period 3 IP §II.A.4. ..........................................................................128
Period 3 IP §II.B.1.a. .......................................................................129
Period 3 IP §II.B.1.b. .......................................................................130
Period 3 IP §II.B.1.c. .......................................................................130
Period 3 IP §II.B.2.a. .......................................................................131
Period 3 IP §II.B.2.b. .......................................................................131
Period 3 IP §II.B.3.a.-d. ...................................................................132
Period 3 IP §II.B.4.a.1.-3. ................................................................133
Period 3 IP §II.B.4.b. .......................................................................135
Period 3 IP §II.B.5.a. .......................................................................140
Period 3 IP §II.B.5.b. .......................................................................141
Period 3 IP §II.B.5.c. .......................................................................141
Period 3 IP §II.B.5.d .......................................................................141
Period 3 IP §II.B.5.e. .......................................................................142
Period 3 IP §II.B.5.f. ........................................................................142
MSA §II.B.1.e.1. ..............................................................................142
MSA §II.B.1.e.2. ..............................................................................144
MSA §II.B.1.e.3. ..............................................................................145
MSA §II.B.1.e.4. ..............................................................................146
MSA §II.B.1.e.5. ..............................................................................147
MSA §II.B.1.e.6. ..............................................................................148
Period 3 IP §II.C.1. ..........................................................................149
Period 3 IP §II.C.2. ..........................................................................151
Period 3 IP §II.C.3.a.-e. ...................................................................152
Period 3 IP §II.C.4. ..........................................................................154
MSA §II.B.2.p.1. ..............................................................................156
MSA §II.B.2.p.2. ..............................................................................157
MSA §II.B.2.p.3. ..............................................................................158
MSA §II.B.2.p.4. ..............................................................................158
MSA §II.B.2.p.5. ..............................................................................159
MSA §II.B.2.p.6. ..............................................................................159
MSA §II.B.2.p.7. ..............................................................................160

MSA §II.B.2.p.8. ..............................................................................160
MSA §II.B.2.p.9. ..............................................................................161
MSA §II.B.2.p.10. ............................................................................161
MSA §II.B.2.p.11. ............................................................................162
MSA §II.B.2.p.12. ............................................................................162
MSA §II.B.2.p.13. ............................................................................163
MSA §II.B.2.p.14. ............................................................................163
MSA §II.B.2.p.15. ............................................................................164
MSA §II.B.2.p.16. ............................................................................165
MSA §§II.B.2.s.1. and II.B.2.t.1. .....................................................165
Period 3 IP §II.D.1. ..........................................................................166
Period 3 IP §II.D.2. ..........................................................................167
Period 3 IP §II.E.1. ..........................................................................168
Period 3 IP §II.E.2. ..........................................................................169
MSA §II.B.3.i.1. ...............................................................................169
MSA §II.B.3.i.2. ...............................................................................170
MSA §II.B.3.i.3. ...............................................................................170
MSA §II.B.3.i.4. ...............................................................................171
MSA §II.B.3.i.5. ...............................................................................172
MSA §II.B.3.i.6. ...............................................................................172
MSA §II.B.3.i.7. ...............................................................................173
MSA §II.B.3.i.8. ...............................................................................174
MSA §§II.B.3.l.1. and II.B.3.m.1. ....................................................174
Period 3 IP §II.F.1. ...........................................................................175
Period 3 IP §II.F.2. ...........................................................................175
Period 3 IP §II.G.1. ..........................................................................177
Period 3 IP §II.G.2. ..........................................................................177
Period 3 IP §II.H.1. ..........................................................................178
Period 3 IP §II.H.2. ..........................................................................179
MSA §II.B.4.b.1. ..............................................................................179
MSA §§II.B.4.e.1. and II.B.4.f.1. .....................................................180
Period 3 IP §II.I.1. ............................................................................182
Period 3 IP §II.I.2. ............................................................................183
MSA §II.B.5.e.1. ..............................................................................184
MSA §§II.B.5.h.1. and II.B.5.i.1. .....................................................184
MSA §II.B.5.e.2. ..............................................................................185
MSA §§II.B.5.h.2. and II.B.5.i.2. .....................................................186
MSA §II.B.5.e.3. ..............................................................................188
MSA §§II.B.5.h.3. and II.B.5.i.3. .....................................................190
MSA §§II.B.7.d. and II.B.7.e. ..........................................................193
MSA §II.C.1.b.1. ..............................................................................194
MSA §II.C.2.b.1. ..............................................................................194

B. Regional Requirements................................................................................196

MSA §III.A.1.a. .............................................................................197
MSA §III.B.1.d.1. ..........................................................................198
MSA §§III.B.1.e.1. and III.B.1.f.1. ...............................................198
MSA §§III.B.1.e.2. and III.B.1.f.2. ...............................................199
MSA §§III.B.2.c.1. and III.B.2.d.1. ..............................................200
MSA §§III.B.2.c.2. and III.B.2.d.2. ..............................................200
MSA §§III.B.3.a.6.a. and III.B.3.a.7.a. .........................................201
MSA §§III.B.3.a.6.b. and III.B.3.a.7.b. .........................................203
MSA §§III.B.3.b.2.a. and III.B.3.b.3.a. .........................................203
MSA §§III.B.3.c.4.a. and III.B.3.c.5.a. .........................................204
MSA §§III.B.3.c.4.b. and III.B.3.c.5.b. .........................................205
MSA §§III.B.3.d.4.a. and III.B.3.d.5.a. .........................................206
MSA §§III.B.3.e.2.a. and III.B.3.e.3.a. .........................................207
MSA §§III.B.3.e.2.b. and III.B.3.e.3.b. .........................................208
MSA §§III.B.4.b.1. and III.B.4.c.1. ...............................................209
MSA §§III.B.5.d.1. and III.B.5.e.1. ...............................................210
MSA §§III.B.6.d.1. and III.B.6.e.1. ...............................................211
MSA §§III.B.6.d.2. and III.B.6.e.2. ...............................................212
MSA §§III.B.7.e.1. and III.B.7.f.1. ................................................213
MSA §§III.B.7.e.2. and III.B.7.f.2. ................................................214
MSA §§III.B.8.d.1. and III.B.8.e.1. ...............................................216
MSA §§III.C.1.a.1. and III.C.1.b.1. ...............................................217
MSA §§III.C.2.a.1. and III.C.2.b.1. ...............................................218

IV.        CONCLUSION...................................................................................219


APPENDICES

Index to Exhibits.......................................................Index-1 – Index-21

Appendix A
        App. A, Ex. 1 – App. A, Ex. 61

Appendix B
        Ex. 1 – Ex. 62E

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

OLIVIA Y., *et al*.                                             PLAINTIFFS


v.                                        CIVIL ACTION NO.  3:04CV251LN


PHIL BRYANT, as Governor of the State of Mississippi, *et al*.          DEFENDANTS

---

**THE COURT MONITOR'S REPORT TO THE COURT REGARDING
IMPLEMENTATION PERIOD 3 AND THE JUNE 24, 2013 ORDER**

---

This report sets forth the Court Monitor's ("Monitor") findings regarding defendants' progress toward meeting the requirements of the Modified Settlement Agreement ("MSA"), including the requirements contained in the Period 3 Implementation Plan ("Period 3 IP").[1]  It also addresses progress related to the June 24, 2013 Order[2] and, to a much more limited extent, progress during Period 4.  A detailed report regarding defendants' progress during Period 4 will be submitted after Period 4 ends.

A draft version of this report was provided to the parties for review and comment on April 15, 2014.  All comments were received by May 5, 2014.  The Monitor has considered the parties' comments, and to the extent appropriate, addressed them in this final report.

---

[1]  The MSA and Period 3 IP were approved by the Court on July 6, 2012.
[2]  Project Schedule for Defendants' Production of Data Reports Required by Appendix C of the Modified Settlement Agreement [hereinafter June 24, 2013 Order], filed June 24, 2013.

The report is divided into five sections. The Background and Summary of Findings section describes how the MSA is structured, presents the relevant procedural history, and provides an overview of the progress that has been made since the start of Period 3, including remedial actions required by the June 24, 2013 Order and the Period 4 Implementation Plans ("Period 4 IPs"). It also includes tabular summaries of statewide and regional performance relative to MSA outcome requirements. The Methodology section explains the process used by the Monitor to evaluate defendants' progress. The Findings section is divided into two parts. The first part addresses Period 3 requirements that defendants were required to implement on a statewide basis and the second part addresses Period 3's regional requirements.

The Conclusion is followed by an Appendix that includes the report's exhibits.[3] The Appendix is divided into two sections. All charts with corresponding tables reflecting the underlying data supporting the Monitor's findings related to the MSA's Period 3 outcome requirements are contained in Appendix A ("App. A").[4] Also included in Appendix A is a summary of the status of the data reports required by the June 24, 2013 Order.[5] Appendix B includes documentary evidence supporting the Monitor's findings.[6]

As explained in more detail in this report, while they did not do so during Period 3, the defendants eventually produced validated data related to Period 3 performance for most, but not all, required reports. However, in many instances these data do not address the complete MSA

---

[3] Certain exhibits have been redacted to delete information that falls within the purview of the August 5, 2004 Confidentiality Order. *See* Confidentiality Order, August 5, 2004.

[4] An index to the exhibits contained in Appendix A follows immediately after the text of this report. All charts and the corresponding tables are included as App. A, Ex. 3A - App. A, Ex. 59B. Included as App. A, Ex. 2B is a guide to reading the performance charts.

[5] App. A, Ex. 2A, Status of Data Reports Required by June 24, 2013 Order, Attachment Two. For the convenience of the Court and the parties, also included in Appendix A is App. A, Ex, 1, Attachment Two to the June 24, 2013 Order.

[6] Unlike the prefix used to denote the exhibits that are included in Appendix A (*i.e.*, "App. A"), the exhibits in Appendix B are simply identified by a sequential number (followed by a letter in some instances) without a prefix (*e.g.*, "Ex. 1" or "Ex. 1A").

requirement.  In some of these instances, the MSA requirement is subject to a qualitative

assessment for which relevant data cannot be captured in a management information system.  In

others, defendants have not yet developed the capacity to either collect and/or report on the

required data.  Nevertheless, the parties have agreed upon remedial actions to address the

remaining gaps in the data.[7]  On an interim basis pending the submission of more complete data,

for some requirements that fall within this category, the Monitor has been able to make findings

regarding defendants' performance relative to the applicable Period 3 standards.  Additionally,

for some requirements for which defendants have not submitted performance data relative to the

complete MSA requirement, the Monitor has assessed defendants' performance using the

submitted data to the extent that the performance data allowed.[8]  As noted above, the Monitor has

summarized her findings in two tables that are included in the next section of this report.


## I.  BACKGROUND AND SUMMARY OF FINDINGS[9]

The Mississippi Settlement Agreement and Reform Plan ("Settlement Agreement"),

which was approved by the Court on January 4, 2008, was intended to ensure the safety and well-

being of children in defendants' custody and their timely placement in permanent and nurturing

homes.  Since January 2008, the defendants have been ordered to implement four annual

implementation plans, a corrective action plan, and a remedial order related to data accuracy,

---

[7]  The Monitor recommends that the parties' agreements be incorporated into a schedule reflected in the Period 5 Implementation Plan [hereinafter Period 5 IP].

[8]  For example, an MSA requirement might have both a timeline requirement and substantive service delivery requirements, but the submitted data might report only on the former.  In these cases, the Monitor assessed defendants' performance as reported, noting the limitations in the data provided.

[9]  This section of the report condenses the discussion of  the procedural background that is presented in the Monitor's January 25, 2013 Status Report. *The Court Monitor's Status Report to the Court Regarding Progress During Period Three* [hereinafter *January 2013 Report*], filed January 25, 2013 [Dkt. No. 580].  For more detailed information, *see January 2013 Report* at 4-13.

3

validation and production.[10]  In July 2012, at the time the Court approved the Period 3 IP, the

MSA was adopted.  As explained in more detail below, the MSA reflects a regionally-based

approach to implementation of the requirements imposed by this lawsuit.  This approach is

designed to reduce, on an interim basis, the number of statewide requirements the defendants

must meet while they phase-in, on a region-by-region basis, a family-centered Practice Model

that serves as the centerpiece of the defendants' reform strategy.

Defendants' performance during Period 3 evidences wide regional variations in progress

implementing MSA requirements.  Generally, albeit not always, regions that implemented the

Practice Model earlier tended to perform better on average than later implementing regions,

relative to MSA regional and statewide requirements.  Nonetheless, broadly speaking, by the end

of Period 3, and in a number of instances through September 2013, the evidence establishes a

substantial gap between reported and required performance levels with respect to both statewide

and regionally-based requirements, for those regions to which the latter applied.  Furthermore,

defendants have not demonstrated consistent regional capacities to implement and sustain reform

efforts.  Given the regionally-based structure of defendants' reform effort, regional capacity is

essential.

The evidence establishes that there are continuing capacity deficits that must be addressed

in order for defendants to satisfy the terms of the MSA.  Human resource management has been a

central concern of this lawsuit since its inception. While defendants have continued to make

progress hiring caseworkers and building the pre-service and in-service staff training programs

during Period 3, it has not been possible to assess whether these efforts have been sufficient.

Indeed, despite repeated requirements to produce complete and accurate data regarding

---

[10]  Defendants are currently working to implement the Period 4 IP, which ends in July 2014.

caseworker workloads, as of May 6, 2014, defendants still had not produced these data. Moreover, the data that have been produced regarding supervisory workloads indicate that despite certain efforts reported herein, the defendants have not been successful in hiring a sufficient number of supervisors.  Absent a sufficient number of supervisors, it is likely that critically needed improvements in case practice will be difficult to achieve and caseworker attrition will continue to impede performance.

In addition, while the evidence shows that required continuous quality improvement ("CQI") activities have been undertaken, corrective action is not consistently timely and accountability mechanisms are not consistently effective.  And while there has been substantial progress building the Mississippi Department of Human Services ("MDHS") Division of Family and Children's Services ("DFCS") data validation and reporting functions, additional progress is necessary before defendants have the capacity to report appropriately on all applicable MSA requirements.  The absence of complete, accurate, and timely data for all applicable requirements will only inhibit defendants' efforts to identify and correct performance deficiencies that have prevented them from meeting MSA requirements.

Finally, like the limitations in data reporting, there are other instances in which defendants have been unable to satisfy MSA requirements that date back to Period 1, most notably the development and implementation of a performance-based contracting system.  When implemented, these initiatives can fuel the reform effort while ensuring the children in defendants' custody and their families receive critically needed support and services.

The data that the defendants have produced bring into sharper focus the need to refine and accelerate the current reform effort.  The children in defendants' custody represent a vulnerable population.  Defendants' burden to protect their safety and ensure their well being is a heavy one,

and the cost of failing to do so can have tragic and lifelong consequences. While progress in every area cannot occur immediately, the current pace of the reform effort must be accelerated. There are many talented and hard-working staff throughout MDHS/DFCS whose efforts must be more effectively harnessed to achieve the goals of the MSA. The parties must work together to identify a focused path forward, setting clear priorities among the broad array of possible remedial strategies. Defendants' progress is described below.

### A. Background

The first implementation plan, referred to as the Period 1 Implementation Plan ("Period 1 IP"), extended from January 4, 2008 through April 30, 2009.[11] The Period 1 requirements focused on building the capacity of MDHS/DFCS to achieve the Settlement Agreement's goals and outcomes, and also addressed interim initiatives related to child safety. The defendants made limited progress meeting Period 1 requirements, and as a result they were required to meet many Period 1 requirements during Period 2. Period 2 began on May 1, 2009 and ended on April 30, 2010. Defendants made efforts to satisfy many Period 2 requirements, but in large part these efforts were belated and, at least in some circumstances, they were not minimally adequate. In certain instances, there was no evidence of credible efforts to satisfy Period 2 requirements, including requirements that dated back to Period 1.

Because of the limitations in defendants' performance, instead of developing a Period 3 IP, the parties finalized an agreement on specific corrective action measures that defendants were required to implement according to a series of deadlines between May 1 and September 1, 2010.[12] This agreement, referred to as the "Bridge Plan," was approved by the Court in an

---

[11] Period 1 was extended on two occasions pursuant to consent orders issued on January 6, 2009 and March 27, 2009.

[12] This four-month period is referred to in the Agreed Order as the "Bridge Period."

Agreed Order issued on June 10, 2010.[13]  It required the defendants to demonstrate the ability to satisfy a very narrow sub-set of unmet Period 1 and Period 2 requirements[14] by supplementing their management and planning capabilities through a contract for technical assistance with the Center for the Support of Families ("CSF").[15]  Defendants satisfied most, albeit not all, of the Bridge Plan's requirements, with substantial technical assistance from CSF.

During October 2010, based on violations of the Settlement Agreement and the Period 2 Implementation Plan ("Period 2 IP"), plaintiffs filed a motion requesting that the Court find defendants in contempt and appoint a general receiver with full authority to administer Mississippi's child welfare system.[16]  On May 17, 2011, following briefing and a hearing,[17] the Court issued an order denying the motion and directing the parties to work toward a modified agreement.[18]  The Court found that plaintiffs had made a *prima facie* showing of contempt, recognizing that the defendants had not complied with most of the Period 1 and Period 2 requirements and also had not complied fully with the Bridge Plan.[19]  Nonetheless, the Court did not issue a finding of contempt because it was "apparent to the court that defendants lacked the capability to comply fully, or even substantially, with all the requirements of the Period Two Plan within the time frame established,"[20] and because the Court determined that a contempt

---

[13]  Conceptually, the Bridge Plan was intended to serve as a bridge between Period 2 and Period 3.

[14]  The Bridge Plan addressed contracting for a fiscal assessment and related strategic plan to maximize federal funding.  Other requirements included policy development, data collection and reporting, staffing, training, and planning activities related to mandated improvements in the array and quality of services and placements available to children in defendants' custody as well as planning for the expansion of the DFCS workforce.  In addition, the Bridge Plan required specified corrective action related to child safety, including mandated training for all DFCS caseworkers assigned to conduct maltreatment investigations.

[15]  As explained *infra* at 8, defendants had an existing contractual relationship with CSF dating to January 2009.

[16]  Plaintiffs' Motion for Contempt and for the Appointment of a Receiver, filed October 5, 2010.

[17]  The hearing was conducted on May 13, 2011.

[18]  Order, filed May 17, 2011, at 10.

[19]  The Court noted it was "undisputed" that defendants had failed to comply with "nearly all" of the Period 1 requirements, *id.* at 5-6, and "most" of the Period 2 requirements, *id.* at 4.

[20]  *Id.* at 7.  The Court indicated that the additional requirements and related time frames for meeting these requirements in the Period 2 IP were "highly ambitious" and seemed to be "ultimately unrealistic."  *Id.*

finding would not "serve any fruitful purpose."[21]  The Court clarified that by denying the contempt motion, it was not excusing defendants' performance or minimizing the gravity of the problems identified in the motion.[22]  Indeed, the Court asserted "that the shortcomings identified by plaintiffs and the Court Monitor must be confronted and rectified."[23]  The Court directed the parties "to work together, in consultation with the Court Monitor, to craft appropriate modifications of their existing agreements."[24]  Among other directives, the Court required the parties to prioritize goals and objectives and establish realistic timelines for their achievement.[25]

Thereafter, the parties negotiated the terms of the MSA, which was approved by the Court on July 6, 2012.  The MSA supersedes the initial Settlement Agreement and incorporates the Period 3 IP.[26]  As noted above, it reflects a very different approach to the remedial process, substantially reducing defendants' obligations to meet many MSA requirements on a statewide basis through Periods 3 and 4.  This new approach aligns the MSA with the sequential, region-by-region implementation schedule that is a cornerstone of defendants' "Practice Model" reform strategy.

Implementation of the Practice Model began in 2009.  During January 2009, defendants contracted with CSF to work with DFCS managers and staff on the development of the Practice Model, which is intended to guide improvements in case practice.[27]  As conceptualized,

---

[21] *Id.* at 10.
[22] *Id.*
[23] *Id.* at 9.
[24] *Id.*
[25] *Id.*
[26] *See* MSA, Appendix B for the text of the Period 3 IP.
[27] The Practice Model has represented a fundamental change in defendants' business policies and practices, incorporating six categories of activities that are designed to promote safety, permanency and the well-being of children and families.  The activities fall within the following categories:  1) safety assurance and risk management; 2) strengths and needs assessments; 3) involving children and families in case planning and decision-making; 4) individualizing case planning; 5) mobilizing appropriate services timely; and 6) preserving and maintaining connections.

implementation of the model is promoted through a data-driven CQI process that is used to monitor each DFCS region's progress.

The introduction of the Practice Model started in January 2010, over the course of a two-year period, at staggered intervals, in each of DFCS's 13 regions. On a regional basis, the Practice Model is phased-in through a multi-stage process: 1) a six-month planning phase;[28] 2) a one-year initial implementation stage;[29] and 3) a one-year full/ongoing implementation stage. These stages are followed by a data-tracking year. The Practice Model implementation schedule as it appears in the MSA is set forth below:

**Practice Model Rollout Schedule**[30]

| Regions | Implementation Phase Dates | | | |
|---------|---------|---------|---------|---------|
| | **Planning (6 months)** | **Initial Implementation (One Year)** | **Full/Ongoing Implementation (One Year)\*** | **Data Tracking (One Year)** |
| I-South, II-West | January – June 2010 | July 2010 – June 2011 | Approx. Sept. 2011 – August 2012 | September 2012 – August 2013 |
| V-West | July – December 2010 | January – December 2011 | Approx. March 2012 – February 2013 | March 2013 – February 2014 |
| IV-North | July – December 2010 | January 2011 – June 2012 (18 months) | Approx. Sept. 2012 – August 2013 | September 2013 – August 2014 |
| I-North, III-South, IV-South | January – June 2011 | July 2011 – June 2012 | Approx. Sept. 2012 – August 2013 | September 2013 – August 2014 |
| V-East | July – December 2011 | January – December 2012 | Approx. March 2013 – February 2014 | March 2014 – February 2015 |
| III-North, VII-East | July 2011 – June 2012 (12 months) | July 2012 – June 2013 | Approx. Sept. 2013 – August 2014 | September 2014 – August 2015 |
| II-East, VI, VII-West | July – December 2012 | January – December 2013 | Approx. March 2014 – February 2015 | March 2015 – February 2016 |

---

[28]  Practice Model implementation starts with the six-month planning phase. Among other activities that are expected to occur during this phase, DFCS staff and stakeholders participate in an orientation program. In addition, barriers to implementation are identified and plans to address the barriers are formulated. A CQI review is conducted at the conclusion of the planning phase to establish baseline performance measures, which serve as the basis for measuring progress.

[29]  A 12-month initial implementation phase follows the planning phase. Among other activities expected to occur in each region during this phase, supervisors and caseworkers are trained on the Practice Model and participate in an intensive coaching program. Following the initial implementation stage, a two-month period is used for a follow-up CQI review and planning for the full implementation stage based on the preliminary results of the review.

[30]  MSA, Appendix A.

The MSA has two sets of requirements related to systemic infrastructure standards, foster care service standards and outcome measures. These requirements are reflected in §§II and III of the MSA. Section II of the MSA includes two types of requirements that defendants must satisfy:[31] 1) requirements that are subject to statewide performance measures; and, to a lesser degree 2) requirements that are subject to both statewide performance measures and regional performance measures.[32] Section III of the MSA relates exclusively to regional performance requirements. With respect to the regional performance measures in §§II and III, there are two performance thresholds triggered at different points. The first is triggered when a region has fully implemented the Practice Model; the second, which institutes higher performance standards, is triggered when a region has reached the 12-month mark following full implementation.[33] For purposes of the regional measurement requirements in §§II and III of the MSA, a region is deemed to have fully implemented the Practice Model at the start of the data-tracking year.[34] Accordingly, at a minimum,[35] during the two and two-third years that a region is undergoing the Practice Model phase-in process, regional performance under the MSA is not measured.[36]

---

[31] In certain instances, defendants are not required to meet the statewide requirements in §II of the MSA until the end of the remedial phase, and thus there are no interim implementation requirements. *See, e.g.,* MSA §II.A.2.b. In other instances, performance related to some but not all implementation periods is specified. *See, e.g., id.* §II.A.2.c. And in some instances, statewide measures as well as separate regional measures related to Practice Model implementation are specified in §II. *See, e.g., id.* §II.B.5.e.-i.

[32] *See, e.g.,* MSA §§II.B.4.a.-f. and II.B.7.a.-e.

[33] MSA §I.A.

[34] According to the MSA, "[a]djustments may be made to the timing of the planning and/or implementation phases based on a region's progress. The two-month period between the end of the Initial Implementation phase and the beginning of the Full Implementation phase is in place to permit the follow-up CQI review after the first 12 months of implementation and an opportunity to revise the Regional Implementation Plan based on preliminary results of the review going into the next phase of implementation." MSA, Appendix A.

[35] In the following three regions, defendants extended the implementation process because a determination was made that additional time was needed for a specific implementation phase: III-North (afforded an additional six months for planning); IV-North (afforded an additional six months for coaching); and VII-East (afforded an additional six months for planning).

[36] The MSA expressly recognizes that for those requirements that must be met from the time that a region has fully implemented the Practice Model, regional compliance is not measured by looking back in time at practice that pre-

The first two DFCS regions introduced to the Practice Model, Regions I-S and II-W, began implementation planning in January 2010 and commenced the data-tracking year in September 2012. The other DFCS regions have been added to the implementation process at intervals of six to twelve months. The last three DFCS regions to implement the Practice Model began the planning phase in July 2012. After all 13 DFCS regions have fully implemented the Practice Model, the MSA requires that all of its standards, benchmarks and outcome measures shall be measured and required statewide and shall no longer be measured on a region-by-region basis.[37]

Period 3 began in July 2012 when the MSA was approved by the Court. Essentially, during Period 3 the defendants were required to implement both a statewide and regional structure to manage the reform effort; address unmet requirements related to the staff training program, performance-based contracting, policy development and other DFCS administrative operations; undertake initiatives related to staffing, focusing on DFCS county offices with particularly substantial staffing deficits; conduct and report on a series of CQI assessments; maximize federal funding for eligible child welfare program components; and undertake other programmatic and remedial activities intended to address child safety, permanency and access to services. The defendants were also required to produce, on a monthly basis, a subset of accurate and validated data reports related to DFCS performance relative to a range of MSA requirements that had been due since Period 1.

Because the defendants failed to satisfy the Period 3 data reporting requirements, a remedial order was issued on June 24, 2013, before the end of Period 3, requiring the defendants

_____

dates full implementation. For requirements that must be met 12 months after full implementation of the Practice Model, compliance is not measured by practice that pre-dates the 12-month period following full implementation. MSA §§II and III.

[37] MSA §III.

to undertake the following, among other actions: export relevant performance data from their existing data system and store it in an independent relational database that could be used to produce data reports responsive to the MSA requirements; establish and implement a data cleansing and validation plan to ensure that all data maintained in the independent database are complete and accurate; develop and finalize report specifications; and complete any indicated gap analyses in order to identify the required data that are not currently collected and/or reported and to implement alternative data collection and reporting methods for certain types of required data elements.

### B. Summary of Findings

The data reporting requirements in the June 24, 2013 Order were identical to the Period 3 reporting requirements that defendants were unable to satisfy. While there were significant limitations in the data produced during Period 3 as well as in some of the data the defendants produced pursuant to the June 24, 2013 Order,[38] by January 15, 2014, defendants submitted data reports responsive to 49 of the 53 reporting requirements included in the June 24, 2013 Order.[39] Thus, over a relatively short time frame in the context of this lawsuit, defendants have made accelerated, albeit long overdue, progress producing more accurate data regarding their performance relative to key elements of many MSA requirements. Given the protracted period during which the Monitor repeatedly reported on defendants' inability to produce these reports,

---

[38] *See January 2013 Report* at 33-38 for relevant background information.

[39] For the remaining four reporting requirements, the parties agreed that either the foster care review [hereinafter FCR] instrument would be modified or a case record review would be conducted on an interim basis. With respect to the reports produced regarding the 49 reporting requirements for which the defendants submitted data, in some cases defendants produced multiple reports in response to a single reporting requirement. In total, defendants submitted 57 reports, many with monthly versions, as required, dating back to the start of Period 3. The Monitor produced final analyses for 53 of the 57 reports submitted by defendants. The Monitor did not produce final analyses for the remaining four reports because of questions or issues regarding the quality of the submitted data, which are detailed in this report. *See also* App. A, Ex. 2A, *supra* note 5, for a tabular summary of the status of the data reports defendants produced pursuant to the June 24, 2013 Order.

this is no small feat, notwithstanding certain remaining limitations in the data that are described in this report.

The changes defendants made to their data collection, storage, and performance report production practices ("data management practices") pursuant to the June 24, 2013 Order have been consequential with respect to the parties' and the Monitor's understanding of defendants' performance. As expected, based on the data cleansing and validation processes defendants implemented pursuant to the order, in numerous instances underlying data regarding core DFCS services or operations changed subsequent to the data cleansing and validation processes. For example, in September 2013, the Monitor reported that the data defendants produced showed that as of April 30, 2013, there were a total of 3,777 children in DFCS custody.[40] The same data report produced pursuant to the June 24, 2013 Order, which went through a data scrubbing and validation process, indicates that as of April 30, 2013, there were 3,809 children in custody, a difference of 32 children.[41] While on its face this number is not large, it is noteworthy that the reported number of children in defendants' custody on a specific date increased by nearly one percent based on changes made to MDHS/DFCS data management practices.

In other cases, changes to data management practices enabled defendants to report on their performance in a manner that was consistent with MSA requirements whereas previously they were not able to do so,[42] as illustrated by the following examples. The MSA requires that for certain children with a permanency goal of reunification, those children will be provided a

---

[40] *See The Court Monitor's Update to the Court Regarding Progress During Period 3 As Reflected in Certain Data Reports Produced by the Defendants* [hereinafter *September 2013 Report*], filed September 5, 2013 [Dkt. No. 591], at Ex. 2.
[41] This is based on Mississippi Automated Child Welfare Information System [hereinafter MACWIS] Report SZ0510.
[42] It is not clear whether or not defendants *could have* produced the reports in question using their prior data management practices. Defendants represented numerous times to the Monitor that significant changes to reporting practices using their existing technology would be unduly burdensome and impractical.

90-day trial home visit, during which time a DFCS caseworker shall meet with the child in the home at least two times per month, and each meeting shall occur without the parent or caretaker present.[43] Prior to the changes required by the June 24, 2013 Order, defendants reported on their performance over one-month periods rather than over the required three-month periods, a substantially lower performance bar.[44] After the changes were made to their data storage and reporting practices, defendants were able to build a report capturing performance as defined by the MSA.[45] Based on the previous one-month period, defendants reported performance as of April 30, 2013 at 52 percent. The revised reports, however, indicate that defendants' performance with respect to the three-month requirement as of the same date was 30 percent, a significant difference in the portrayal of defendants' performance with respect to the related MSA requirement.[46]

Another example of improved performance reporting relates to the MSA requirement that all maltreatment investigations must be initiated within 24 hours and completed within 30 days, with supervisory approval.[47] The Monitor's September 2013 Report presented an analysis of the data defendants produced related to this performance requirement.[48] At that time, the data reports that the defendants had submitted calculated separately whether investigations were initiated timely and whether they were completed timely, but did not assess whether each individual investigation was *both* initiated and completed timely. Furthermore, in a given month, defendants reported initiation and closure rates contingent upon investigations' closure during the reporting month; investigations that remained open at the end of a reporting period were not factored into the calculations. And,

---

[43] *See* MSA §III.B.8.b.
[44] *See September 2013 Report* at Ex. 21A.
[45] *See* App. A, Ex. 3A, chart prepared by the Office of the Court Monitor, During Trial Home Visit Period, Number of Children Who Met With Their Caseworker or Family Preservation Caseworker in the Home Twice in a One-Month Period or At Least Once Monthly if 15 Days or Less for 90 Days, By Practice Model Fully Implemented Date, By Region, One-Month Periods 7/31/12 through 9/30/13; *see also* App. A, Ex. 3B, corresponding table with underlying data.
[46] The Monitor calculated the 30 percent figure based upon the data submitted by defendants in MACWIS Report MWLS54A. That calculation is not explicitly reflected on either App. A, Exs. 3A or 3B.
[47] *See* MSA §II.B.1.e.2.
[48] *See September 2013 Report* at Exs. 6A and 7A.

because the data were reported in a format that was not manipulable (*i.e.*, in PDF format), it was not practical for the Monitor to attempt to use the data to recalculate defendants' performance consistent with MSA requirements.

However, based on the changes that were made to MDHS/DFCS data storage and report production practices, defendants were able to design a report that reflected performance related to this MSA requirement. Whereas the performance reports included in the Monitor's September 2013 Report indicated that among *investigations closed* during April 2013, defendants initiated investigations within 24 hours in 76 percent of cases, and completed investigations within 30 days in 56 percent of cases, the performance reports produced in the wake of the June 24, 2013 Order indicate that among *all investigations initiated* in April 2013, defendants initiated and completed investigations consistent with MSA timeline requirements for 48 percent of investigations.[49]

These are only a few of the important ways in which defendants were able to produce more accurate performance reports because of the changes made in data storage and reporting practices that were required by the June 24, 2013 Order. In fact, when the Monitor compared defendants' reported performance as reflected in 25 performance reports presented in the September 2013 Report with the comparable performance reports defendants produced pursuant to the June 24, 2013 Order, there were differences identified in reported performance relative to MSA requirements in every report.[50]

The availability of high quality data, by itself, will not improve defendants' performance with respect to MSA requirements. It does, however, facilitate problem identification, more efficient resource allocation, and ultimately better decision making. After operating almost six years under the remedial phase of this lawsuit, defendants now have much more usable data that

---

[49] According to the data submitted by defendants subsequent to the June 24, 2013 Order, among all investigations initiated during April 2013, the percentage of investigations initiated within 24 hours was 71 percent and the percentage of investigations completed within 30 days was 60 percent.

[50] A 26th performance report that was addressed in the September 2013 Report could not be included in the comparative analysis because there is an outstanding question related to the data that defendants produced pursuant to the June 24, 2013 Order.

provide a broad view of their performance – both statewide and on a regional basis – across a range of foster care services and outcomes.  Defendants are now at a juncture where they must begin to capitalize on this data to accelerate the rate of improvement.

Based on the performance reports defendants produced pursuant to the June 24, 2013 Order, the Monitor assessed defendants' performance with respect to numerous statewide and regionally-based performance requirements.  The Monitor analyzed reports that defendants produced regarding performance requirements related to the following categories of statewide MSA standards:

- Human Resources Management;
- Child Safety, including Maltreatment in Care;
- Child Placements;
- Physical and Mental Health Care;
- Therapeutic Services;
- Worker Contact and Monitoring; and
- Number of Placements.

As explained in more detail in the Findings section of this report, the performance reports that defendants submitted pursuant to the June 24, 2013 Order did not always include data regarding the full MSA requirement for which performance was reported, and thus in many cases the Monitor was unable to determine whether the related MSA requirement was met.  Nevertheless, with respect to the data that defendants did produce under these seven categories, the Monitor analyzed performance with respect to 33 statewide requirements.  For 23 of these requirements, the Monitor was able to make a finding about some aspect of the defendants' performance relative to the MSA requirement.  For the 10 remaining requirements, the Monitor has reported defendants' performance as indicated by the data submission, but makes no finding because of concerns about data reliability or completeness.

Of the 23 reports for which the Monitor was able to make a finding, defendants demonstrated that they met or exceeded portions of ten of the MSA requirements on which they

reported their performance.  For the remaining 13 requirements, based on the data the defendants submitted, they did not meet the MSA requirement.[51]

The Monitor also analyzed reports that defendants produced regarding performance requirements related to the following categories of regionally-based MSA standards:

- Therapeutic Services;
- Worker Contact and Monitoring;
- Comprehensive Family Assessments;
- Individualized Case Planning;
- Child and Youth Permanency;
- Developing and Maintaining Connections;
- Educational Services;
- Transition to Independent Living;
- Case Closing and Aftercare;
- Reunification; and
- Time to Adoption Finalization.

As with the statewide performance reports that the defendants submitted, in many cases, and for a variety of reasons related principally to inherent limitations in the data that can be collected through the Mississippi Automated Child Welfare Information System ("MACWIS") and/or limitations in the alternative data collection processes and instruments defendants have employed, the performance reports that were submitted related to the regionally-based standards did not include data regarding performance related to the full MSA requirement.[52]  Thus, the Monitor's findings with respect to the data submitted were limited to those portions of the MSA covered by the data submitted.  Nevertheless, with respect to the data that defendants did produce, under these 11 categories, the Monitor analyzed performance data with respect to 26 regionally-based performance requirements using data regarding performance through the point

---

[51] *See* Summary Table: Statewide Performance Based on Reports Received Through February 28, 2014, *infra* at 24-29.  With respect to four requirements, the Monitor was not able to measure performance as of June 30, 2013 because of limitations in the data.  In these cases, a proximate date subsequent to June 30, 2013 was used for the purposes of calculating performance.

[52] The inherent limitations in MACWIS are related to either system functionality or the fact that qualitative data related to MSA requirements cannot be readily collected and extracted through an automated system.

at which each region fully implemented the Practice Model.[53]  Seven of the 13 DFCS regions had fully implemented the Practice Model by September 30, 2013, the date of the last implementation period included in the analyses addressed by this report.  Two of the seven regions had fully implemented the Practice Model for at least 12 months, triggering higher regional performance requirements for those two regions.  For nine of the 26 regionally-based performance requirements, the Monitor was not able to make a finding because of questions regarding the reliability of the data.

Among the seven regions to have fully implemented the Practice Model, the Monitor's analyses revealed the following: Region III-S met or exceeded performance levels established by the MSA for three of 26 requirements as of the date of full implementation of the Practice Model; Regions I-S,[54] V-W,[55] I-N, and IV-N met or exceeded performance levels for five of the 26; Region IV-S[56] met or exceeded performance levels with respect to six of the 26; and Region II-W met or exceeded performance levels for seven of the 26.[57]

Among the two regions that fully implemented the Practice Model for 12 months before the end of the time frame included in the Monitor's analysis, Region II-W met or exceeded performance levels for three of the 26 and Region I-S met or exceeded performance levels for four of the 26 by 12 months following full implementation of the Practice Model.

These point-in-time measurements against fixed performance thresholds paint an incomplete picture of defendants' performance and it would be ill-advised to reach any broad conclusions about progress based solely on the figures cited above.  As the individual analyses

---

[53] This included, in certain instances, multiple performance reports for one MSA reporting requirement.
[54] Defendants did not provide reliable data for one performance requirement.
[55] Defendants did not provide reliable data for one performance requirement.
[56] With respect to one measure, there were no children to whom the associated requirement applied in this region on the date in question.
[57] Defendants did not provide reliable data for one performance requirement.

associated with each performance requirement illustrate, defendants' performance often varied widely by MSA standard, by region, and over time.  In some cases, defendants narrowly missed achieving required performance levels.[58]  In other cases, despite not meeting a required performance standard, defendants' performance improved consistently over time.[59]  Point-in-time summaries of performance against fixed thresholds do not account for these scenarios.

In order to assess whether there was evidence that defendants' implementation of the Practice Model was having a general positive impact on performance in regions that implemented the model earlier, the Monitor analyzed defendants' performance with respect to 26 statewide performance requirements on a comparative regional basis.[60]  Rather than assess strictly each individual region's performance with respect to the statewide standard,[61] each region's performance was assessed against the performance of other regions.  For each of the 26 requirements, each region's performance was ranked against all other regions and then analyzed in terms of the number of times each region performed in the top and the bottom quintile as of June 30, 2013.[62]

The analysis indicates that, in general, regions that implemented the Practice Model earlier tended to perform more frequently in the top quintile and less frequently in the bottom

---

[58]  *See*, *e.g.*, App. A, Ex. 51A, chart prepared by the Office of the Court Monitor, Percentage of Children Turning Three Years Old During the Period Under Review Who Received a Dental Examination Within 90 Calendar Days of Their Third Birthday, by Region, Six-Month Periods Ending 7/31/12 Through 9/30/13; *see also* App. A, Ex. 51B, corresponding table with underlying data.

[59]  *See*, *e.g.*, App. A, Ex. 13A, chart prepared by Office of the Court Monitor, Twice Monthly In-Person Visits With Child by Assigned Caseworkers, by Region, One-Month Periods Ending 7/31/12 through 9/30/13; *see also* App. A, Ex. 13B, corresponding table with underlying data.

[60]  This analysis is consistent with an analysis presented in the Monitor's September 2013 Report. *See September 2013 Report* at 14-15 and Ex. 3.

[61]  For statewide requirements, unless otherwise indicated in the MSA, no specific regions are required to surpass the statewide standard.

[62]  Regions performing in the top quintile performed in the top 20 percent of all regions and regions in the bottom quintile performed in the bottom 20 percent of all regions with respect to a given MSA requirement.

quintile than those regions that implemented the Practice Model later.[63]  Furthermore, the analysis indicated that two regions in particular – III-S and VII-W – stood out for the number of times they performed in the bottom quintile, with respect to 12 and 20 requirements, respectively.

All 26 reports were analyzed a second time, using data regarding performance as of September 30, 2013, three months after the period covered by the initial analysis.  The data showed mixed results.[64]  The single worst performing region showed incremental progress, performing less frequently in the bottom quintile; however, other regions, especially certain later-implementing regions, showed an increased frequency in the number of instances in which they performed in the bottom quintile.

There are some broad observations to be made based on the data defendants have provided pursuant to the June 24, 2013 Order.  As mentioned above and in the Monitor's prior reports, there are substantial regional differences in performance levels with respect to most MSA requirements.[65]  As defendants craft and refine reform strategies, it will become increasingly important to identify different plans for different regions, tailored to each one's specific strengths and weaknesses.  As the Monitor's analyses of relative regional performance illustrate, some regions excel across a wide range of MSA requirements while others consistently struggle in performing with respect to those same MSA requirements.[66]

Defendants must develop the capacity at the regional level to use the data that are now available to design, assess, and revise their implementation efforts.  By creating regular feedback loops of data analysis, plan development, implementation, and analysis of progress, defendants

---

[63]  *See* App. A, Ex. 60, chart prepared by the Office of the Court Monitor, Relative Regional Performance With Respect to 26 Statewide Performance Reports, by Practice Model Fully Implemented Date, as of June 30, 2013.

[64]  *See* App. A, Ex. 61, chart prepared by the Office of the Court Monitor, Relative Regional Performance With Respect to 26 Statewide Performance Reports, by Practice Model Fully Implemented Date, as of September 30, 2013.

[65]  *See, e.g., September 2013 Report* at 10-11.

[66]  *See* App. A, Exs. 60 and 61, *supra* notes 63 and 64.

can make informed management decisions.  But in order to do so, defendants must create or

buttress the regional capacities to perform these functions.  Moreover, there must be a division of

labor among the regions and state executive staff.  Whereas regions are ultimately responsible for

implementation, state management staff must ensure that there are appropriate support and

accountability mechanisms in place to drive progress.  State management staff must ensure that

regional managers have, among other resources, sufficient and qualified staff, adequate training,

appropriate technology, placement resources, and management information.  State-level

managers must also build in appropriate accountability mechanisms to monitor progress at the

regional level and intervene as appropriate.  These needs are not new; however, with improved

and more timely data, resource and accountability gaps will become evident much more quickly

than in the past.

The need to think about reform on a regional basis is perhaps most clearly illustrated in

two specific regions.  In the September 2013 Report, the Monitor noted that two regions in

particular – III-S and VII-W – were struggling to meet MSA requirements.[67]  Furthermore, the

Monitor noted that "Region III-S concluded the full implementation phase of practice model

implementation at the end of August 2013.  This region will likely represent the most challenging

region in which the practice model will have been implemented fully to date."[68]  The analyses of

defendants' performance presented in this report confirm both of these points.  Regions III-S and

VII-W continue to struggle to meet MSA requirements more than other regions and, despite

having fully implemented the Practice Model in August 2013, Region III-S appears to confront

more challenges than the other six regions that implemented the Practice Model fully by

September 30, 2013, the end of the period analyzed for this report.  As stated previously, not only

---

[67] *September 2013 Report* at 11-12.
[68] *Id.* at 11.

did Region III-S meet or exceed only three of the regional MSA requirements analyzed in this report by the date the Practice Model was fully implemented, it also performed in the bottom quintile of all regions more frequently than the other six regions that fully implemented the Practice Model by September 30, 2013.

The Final Period 4 IP[69] required defendants to develop a remediation plan specifically for Regions III-S and VII-W, and they have done so.[70]  It is noteworthy that Region VII-W, the region serving the largest number of children in custody in the state, has certain unique challenges, not the least of which is the rapid growth of the already large number of children in custody in the region.  Between July 31, 2012 and September 30, 2013, the population of children in custody in the region increased by 44 percent from 736 children to 1060 children. This population growth only exacerbates the management challenges in a region already falling short of meeting MSA requirements.

The data defendants submitted also illustrate that, despite repeated attempts, defendants continue to struggle to provide accurate data regarding certain resources that are foundational to their reform efforts.  For example, defendants have not been able to provide complete and accurate data regarding caseloads for caseworkers who carry mixed caseloads, a cohort representing the overwhelming majority of the caseworker workforce.[71]  Appropriate caseload levels are central to defendants' ability to meet the requirements of the MSA.  Defendants' long-standing inability to track and report these data evidences a capacity deficit that has frustrated the remedial process.

---

[69]  Final Period 4 Implementation Plan [hereinafter Final Period 4 IP], filed January 8, 2014, §V.A.3.

[70]  The Monitor makes no finding regarding the sufficiency of defendants' submission and looks forward to discussing it with the parties, informed by defendants' reported performance relative to MSA requirements in these two regions.

[71]  Defendants submitted updated data regarding caseworkers with mixed caseloads in correspondence dated March 31, 2013.  As explained *infra* at 53-54, the Monitor has concerns about the quality of these data that will need to be resolved in the near term.

The safety and well being of children in DFCS custody depend on defendants' ability to meet the MSA requirements. The data that defendants have produced combined with the capacity deficits addressed in this report highlight substantial shortcomings in the defendants' performance that put children at a continuing and unreasonable risk of harm. These findings underscore the need for defendants to act with urgency on identified priorities.

The following tables summarize the Monitor's findings regarding the status of defendants' performance relative to each Period 3 statewide and regional outcome standard.[72] Presentation of the regional findings follow the statewide findings.

---

[72] The summary tables are color coded as a visual guide to assessing defendants' performance against required MSA performance levels. The colors are not an indication of the Monitor's assessment of defendants' performance relative to the full MSA requirement. Rather, cells shaded green indicate where defendants' reported performance met or exceeded required MSA performance thresholds only to the extent that the reported data was responsive to the MSA requirement. Cells shaded red indicate where defendants' reported performance did not meet the required MSA performance threshold. In numerous instances, multiple data reports were submitted to report performance with a single MSA requirement. In these instances, if the performance reflected in one report met or exceeded required MSA thresholds and performance reflected in the other report did not meet required MSA performance thresholds, the cells were shaded half in red and half in green. Additionally, some cells in the tables are shaded gray to indicate that the Monitor cannot make a finding because of unresolved concerns about the accuracy of the data defendants submitted.

**Summary Table:  Statewide Performance Based on Reports Received Through February 28, 2014[73]**
[Prepared by the Office of the Court Monitor Based on DFCS Data]

| Cite | MSA Requirement | Associated DFCS Report | Performance Requirement | Statewide Performance as of June 30, 2013 (unless otherwise specified below) |
|---|---|---|---|---|
| | **MSA II.A.2  Human Resources Management** | | | |
| MSA II.A.2.c.2., II.A.2.c.3., and II.A.2.c.6.b. | The MSA requires that by the end of Period 3 all new caseworkers and supervisors will complete their pre-service training consistent with MSA requirements before they assume their respective responsibilities for carrying cases and supervising. | Manual Report [Training Reports] | 100% | **100%** |
| MSA II.A.2.a.9.b. and II.A.2.a.6. | MSA requires by the end of Period 3, no more than 10% of supervisors who are responsible for supervising caseworkers shall be responsible for directly supervising more than five caseworkers.  Hancock, Harrison, Hinds, and Jackson Counties are exempt during Period 3. | Manual Report [AR2] | < 10% | **Excluding Hancock, Harrison, Hinds, and Jackson Counties, as of 7/31/13:** <br><br> **16.8%** |
| MSA II.A.2.a.9.a. and II.A.2.a.1. | MSA requires by the end of Period 3, at least 75% of caseworkers shall carry a caseload that does not exceed MSA requirements.  No more than 10% of caseworkers shall carry a caseload exceeding twice the MSA requirements.  No caseworkers shall carry a caseload exceeding three times the MSA requirements.  Hancock, Harrison, Hinds, and Jackson Counties are exempt during Period 3. <br><br> [Note:  Defendants report separately on workload data for caseworkers with dedicated and mixed caseloads.  For the purposes of MSA requirements, the workload data must be analyzed together.] | Manual Report [AR3] <br><br> Dedicated Caseload | 75% | **Excluding Hancock, Harrison, Hinds, and Jackson Counties, as of August 31, 2013:** <br><br> **79%** <br> **[30 of 38 caseworkers carrying a caseload not exceeding MSA requirements as of 8/31/13]** <br><br> **8%** <br> **[3 of 38 caseworkers carrying a caseload exceeding twice the MSA requirements]** <br><br> **0%** <br> **[0 of 38 caseworkers carrying a caseload exceeding three times the MSA requirements]** |
| | | Manual Report [AR1] <br><br> Mixed Caseload | 75% | **As of May 6, 2014 fully validated accurate data not received** |

[73] In some instances the data defendants produced do not reflect performance related to the full MSA requirement.  Thus the performance levels set forth above may not be indicative of performance related to the full MSA requirement.

24

| Cite | MSA Requirement | Associated DFCS Report | Performance Requirement | Statewide Performance as of June 30, 2013 (unless otherwise specified below) |
|---|---|---|---|---|
| MSA II.B.1  Child Safety |||||
| MSA II.B.1.e.2. | MSA requires by end of Period 3, 100% of maltreatment investigations shall be initiated within 24 hours and completed with supervisory approval within 30 days. | MWZ1271G | 100% | 36% |
| MSA II.B.1.e.3. | MSA requires by end of Period 3, 100% of children who remain in the same out of home placement following an investigation of maltreatment or corporal punishment in that placement shall be visited by a caseworker two times per month for three months after the conclusion of the investigation. | MWLS55SA | 100% | 87.5% |
| MSA II.B.2  Child Placement |||||
| MSA II.B.2.a. and II.B.2.p.2. | The MSA requires that by the end of Period 3, no foster child shall be placed or remain in a foster care setting that does not meet DFCS licensure standards consistent with MSA requirements, unless so ordered by the Youth Court over DFCS objection. | MWLS319D (originally MWZ0151) | 0 children | 471 children |
| MSA II.B.2.p.2., II.B.2.p.4.-5., and II.B.2.a. | MSA requires by the end of Period 3, 100% of children shall be placed or remain in a foster care setting that meets licensure standards consistent with MSA requirements, unless so ordered by the Youth Court over DFCS objection. | PAD7 | 100% | 90% |
| MSA II.B.2.p.13. and II.B.2.h. | MSA requires by the end of Period 3, 80% of siblings who entered custody at or near the same time be placed together consistent with MSA requirement. | MWLS316 | 80% | 85% |
| MSA II.B.2.p.8. and II.B.2.k. | MSA requires by end of Period 3, no foster children shall remain in an emergency or temporary facility for more than 45 days unless exceptional circumstances and Field Operations Director has granted express written approval. | MWLS50D | 0 children | 24 children |
| MSA II.B.2.p.6. | MSA requires by end of Period 3, no more than 40 children under 10 placed in congregate care unless exceptional needs and/or sibling group member and express written approval by Regional Director. | MWLS52HS | < 40 children | 11 children |

25

| Cite | MSA Requirement | Associated DFCS Report | Performance Requirement | Statewide Performance as of June 30, 2013 (unless otherwise specified below) |
|------|-----------------|------------------------|-------------------------|------------------------------------------------------------------------------|
| MSA II.B.2.m. | MSA requires that sibling groups in which one or more of the siblings are under the age of 10 shall not be placed in congregate care settings for more than 45 days. | MWLS53HS | 0 sibling groups | **13 sibling groups** |
| MSA II.B.2.g. and II.B.2.p.16. | MSA requires that by the end of Period 3 at least 85% of children who entered DFCS custody shall be placed within his/her own county or within 50 miles of the home from which he/she was removed unless one of the exceptions provided in the MSA is documented as applying. | MWLS314 | 85% | **94%** **(excludes sibling exception)** **98%** **(includes sibling exception)** |
| MSA II.B.2.e. and II.B.2.p.11. | MSA requires by the end of Period 3, 60% of children with special needs shall be matched with placement resources that can meet their therapeutic and medical needs. | PAD-8m1m2m3 | 60% | **45%** |
| MSA II.B.2.f. and II.B.2.p.12. | MSA requires by the end of Period 3, 75% of children in custody shall be placed in the least restrictive setting that meets their individual needs, consistent with MSA requirements. | PAD-9 | 75% | **97%** |
| MSA II.B.2.j. and II.B.2.p.15. | MSA requires that by the end of Period 3, at least 35% of children in DFCS custody with a documented indication that they were to be subject to a potential or actual placement disruption during the Period shall receive a meeting to address placement stability consistent with MSA requirements. | PAD-11 | 35% | **62%** |
| MSA II.B.2.i. and II.B.2.p.14. | MSA requires by the end of Period 3, 40% of children placed in a new placement during the period shall have their currently available medical, dental, educational, and psychological information provided to their resource parents or facility staff no later than at the time of any new placement during the period. | PAD-10 | 40% | **19%** |
| **MSA II.B.3  Physical and Mental Health Care** | | | | |
| MSA II.B.3.i.1. | MSA requires by the end of Period 3, 50% of children entering custody receive a health screening evaluation as recommended by American Academy of Pediatrics from a qualified medical practitioner within 72 hours after placement. | MWLS315 | 50% | **28%** |

| Cite | MSA Requirement | Associated DFCS Report | Performance Requirement | Statewide Performance as of June 30, 2013 (unless otherwise specified below) |
|------|-----------------|------------------------|-------------------------|-------------------------------------------------------------------------------|
| MSA II.B.3.i.2. and II.B.3.b. | MSA requires by the end of Period 3, 50% of children entering custody receive a comprehensive health assessment within 30 calendar days consistent with MSA requirement. | MWLS315 | 50% | 34% |
| MSA II.B.3.g. and II.B.3.i.8. | MSA requires by the end of Period 3, 30% of children ages birth through three, and older children if warranted, shall receive a developmental assessment by a qualified professional within 30 days of placement and all needed developmental services. | PAD-26m1m2m3 | 30% | 7% |
| MSA II.B.3.f. and II.B.3.i.6. | MSA requires that by the end of Period 3 at least 50% of children four years old and older entering custody during the Period or in care and turning four years old during the Period shall receive a mental health assessment by a qualified professional within 30 calendar days of foster care placement or their fourth birthday, respectively. | PAD-25 | 50% | 49% |
| MSA II.B.3.e. and II.B.3.i.4. | MSA requires by the end of Period 3, 60% of children three years old and older entering custody or in care and turning three years old during the Period shall receive a dental examination within 90 days of placement or their third birthday. | PAD-27m1m3 | 60% | 47% |
| MSA II.B.3.e. and II.B.3.i.5. | MSA requires that by the end of Period 3, at least 60% of children in custody during the Period shall receive a dental examination every six months consistent with MSA requirements and all medically necessary dental services. | PAD-27m2m3 | 60% | 54% |
| MSA II.B.3.e. and II.B.3.i.4. | MSA requires by the end of Period 3, 60% of children three years old and older entering custody or in care and turning three years old during the Period shall receive a dental examination within 90 days of placement or their third birthday. | PAD-27m2m3 | 60% | 57% |
| MSA II.B.3.d. and II.B.3.i.3. | MSA requires by the end of Period 3, 75% of children in custody shall receive periodic medical examinations and all medically necessary follow-up services and treatment, consistent with MSA requirements. | PAD-24 | 75% | 63% |

27

| Cite | MSA Requirement | Associated DFCS Report | Performance Requirement | Statewide Performance as of June 30, 2013 (unless otherwise specified below) |
|------|-----------------|------------------------|-------------------------|------------------------------------------------------------------------------|
| **MSA II.B.4  Therapeutic Services** | | | | |
| MSA II.B.4.a. and II.B.4.b.1. | MSA requires by the end of Period 3, 60% of children requiring therapeutic and/or rehabilitative services because of a diagnosis of significant medical, developmental, emotional, or behavioral problems shall be provided with a treatment plan and services in accordance with their plan. | PAD-17m1m2m3 | 60% | 66% |
| **MSA II.B.5  Worker Contact and Monitoring** | | | | |
| MSA II.B.5.e.3. and II.B.5.c. | MSA requires by the end of Period 3, 40% of therapeutic resource parents have a worker visit the home monthly consistent with MSA requirements. | MWZPLMB | 40% | 40% |
| MSA II.B.5.c. and II.B.5.e.3. | MSA requires by the end of Period 3, 40% of therapeutic resource parents have a worker visit the home monthly to share relevant information, evaluate the child's safety, needs, and well being, and monitor service delivery and achievement of service goals. | PAD3 | 40% | 70% |
| MSA II.B.5.e.1. and II.B.5.a. | MSA requires by the end of Period 3, 60% of children shall receive documented twice-monthly in-person visits by the assigned caseworker consistent with MSA requirement. | MWZWC5D | 60% | 55% |
| MSA II.B.5.b. and II.B.5.e.2. | MSA requires by end of Period 3, 40% of children with a goal of reunification shall have their assigned DFCS caseworker meet monthly with the child's parents, during the Period, consistent with MSA requirements, and the visit shall be documented in the case record. | MWZWCR3 | 40% | as of 11/30/13 = 29% [Note: Accurate Period 3 data were not available.] |
| MSA II.B.5.c. and II.B.5.e.3. | MSA requires by the end of Period 3, 40% of non-therapeutic resource parents have a worker visit the home monthly consistent with MSA requirements. | MWZPLMC | 40% | 45% |
| MSA II.B.5.c. and II.B.5.e.3. | MSA requires by the end of Period 3, 40% of non-therapeutic resource parents have a worker visit the home monthly to share relevant information, evaluate the child's safety, needs, and well being, and monitor service delivery and achievement of service goals. | PAD2 | 40% | 70% |

| Cite | MSA Requirement | Associated DFCS Report | Performance Requirement | Statewide Performance as of June 30, 2013 (unless otherwise specified below) |
|------|-----------------|------------------------|-------------------------|------------------------------------------------------------------------------|
| MSA II.C  Outcome Measures | | | | |
| MSA II.C.1.b.1. | MSA requires by the end of Period 3, at least 60% of children state-wide in care less than 12 months from the time of latest removal from home shall have had two or fewer placements. | MWZPLM5S | 60% | **77%** |
| MSA II.C.2.b.1. | MSA requires that by the end of Period 3, the rate of abuse or maltreatment in care shall not exceed 1.00%. | MWBRD06 | < 1.00% | **as of 10/31/13 = .98%** |

**Summary Table:  Practice Model Performance Based on Reports Received Through February 28, 2014[74]**
**[Prepared by the Office of the Court Monitor Based on DFCS Data][75]**

| Cite | MSA Requirement | Associated DFCS Report | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S |
| | MSA II.B.4. Therapeutic Services | | | | | | | | | |
| MSA II.B.4.a. and II.B.4.a.1. | MSA requires by the date region fully implements, at least 80% of foster children in that region who are in custody and require therapeutic and/or rehabilitative services because of a diagnosis of significant medical, developmental, emotional, or behavioral problems shall be provided with a treatment plan and services in accordance with their plan. | PAD Report 17 | 80% | 37% (8/31/12) | 91% (8/31/13) | 100% (2/28/13) | 53% (8/31/13) | 47% (8/31/13) | 84% (8/31/13) | 81% (8/31/13) |
| MSA II.B.4.a. and II.B.4.f.1. | MSA requires that by 12 months following the date a Region fully implements, at least 90% of foster children in that region who are in custody and require therapeutic and/or rehabilitative services because of a diagnosis of significant medical, developmental, emotional, or behavioral problems shall be provided with a treatment plan and services in accordance with their plan. | PAD Report 17 | 90% | 72% (8/31/13) | 46% (8/31/13) | | | | | |
| | MSA II.B.5. Worker Contact and Monitoring | | | | | | | | | |
| MSA II.B.5.a. and II.B.5.i. | MSA requires by the date region fully implements, at least 70% of children in custody in that region shall have received documented twice-monthly in-person visits by the assigned DFCS caseworker during the preceding 12-month period, consistent with MSA requirements. | MWZWCSD | 70% | 66% (8/31/12) | 72% (8/31/13) | 38% (2/28/13) | 45% (8/31/13) | 70% (8/31/13) | 65% (8/31/13) | 75% (8/31/13) |
| MSA II.B.5.a. and II.B.5.i. | MSA requires that by 12 months following the date that a Region fully implements, at least 90% of children in custody in that region shall receive documented twice-monthly in-person visits by the assigned DFCS caseworker, consistent with MSA requirements. | MWZWCSD | 90% | 66% (8/31/13) | 79% (8/31/13) | | | | | |
| MSA II.B.5.a. and II.B.5.h. | MSA requires by the date region fully implements, at least 80% of children in that region with a goal of reunification shall have had their assigned DFCS caseworker meet monthly with the child's biological parent(s) with whom the child is to be reunified, consistent with MSA requirements, as documented in the child's case record. | MWZCR3 | 80% | Data unavailable; MACWIS modified in October 2013 and therefore data analyzable as of October 2013 | Data unavailable; MACWIS modified in October 2013 and therefore data analyzable as of October 2013 | Data unavailable; MACWIS modified in October 2013 and therefore data analyzable as of October 2013 | Data unavailable; MACWIS modified in October 2013 and therefore data analyzable as of October 2013 | Data unavailable; MACWIS modified in October 2013 and therefore data analyzable as of October 2013 | Data unavailable; MACWIS modified in October 2013 and therefore data analyzable as of October 2013 | Data unavailable; MACWIS modified in October 2013 and therefore data analyzable as of October 2013 |
| MSA II.B.5.a. and II.B.5.i.1. | MSA requires that by 12 months following the date that a Region fully implements, at least 90% of children in custody in that region with a goal of reunification shall have their assigned DFCS caseworker meet monthly with the child's parent(s) with whom the child is to be reunified, consistent with MSA requirements, as documented in the child's case record. | MWZCR3 | 90% | Data unavailable; MACWIS modified in October 2013 and therefore data analyzable as of October 2013 | Data unavailable; MACWIS modified in October 2013 and therefore data analyzable as of October 2013 | | | | | |

---

[74]  In some instances the data defendants produced do not reflect performance related to the full MSA requirement.  Thus the performance levels set forth above may not be indicative of performance related to the full MSA requirement.

[75]  In the table below, some regional performance levels are reported as zero percent relative to the relevant performance requirement.  Zero percent performance indicates that there were cases in the region to which the performance requirement applied, but defendants did not meet the requirement in any of the cases.

| | | | | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | |
|---|---|---|---|---|---|---|---|---|---|
| Cite | MSA Requirement | Associated DFCS Report | Performance Requirement | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S |
| MSA II.B.5.c. and II.B.5.h.3. | MSA requires by the date region fully implements, at least 80% of foster parents in that region with at least one foster child residing in their home during the preceding 12-month period shall have had a DFCS worker visit the home monthly, consistent with MSA requirements, as documented in the children's case records. | MW2PLMC PAD Report 2 [Non-Therapeutic Placement Setting] | 80% | MACWIS Report: 79% PAD Report: Data unreliable; PAD corrected October 2012 and therefore data analyzable as of April 2013 (8/31/12) | MACWIS Report: 83% PAD Report: Data unreliable; PAD corrected October 2012 and therefore data analyzable as of April 2013 (8/31/13) | MACWIS Report: 79% PAD Report: Data unreliable; PAD corrected October 2012 and therefore data analyzable as of April 2013 (2/28/13) | MACWIS Report: 83% PAD Report: 60% (8/31/13) | MACWIS Report: 83% PAD Report: 71% (8/31/13) | MACWIS Report: 88% PAD Report: 88% (8/31/13) | MACWIS Report: 87% PAD Report: 86% (8/31/13) |
| MSA II.B.5.c. and II.B.5.i.3. | MSA requires that by 12 months following the date that a Region fully implements, at least 90% of resource parents in that region with at least one foster child residing in their home shall have had a DFCS worker visit the home monthly, consistent with MSA requirements, as documented in the children's case records. | MW2PLMC PAD Report 2 [Non-Therapeutic Placement Setting] | 90% | MACWIS Report: 86% PAD Report: 97% (8/31/13) | MACWIS Report: 87% PAD Report: 77% (8/31/13) | | | | | |
| MSA II.B.5.c. and II.B.5.h.3. | MSA requires by the date region fully implements, at least 80% of foster parents in that region with at least one foster child residing in their home during the preceding 12-month period shall have had a DFCS worker visit the home monthly, consistent with MSA requirements, as documented in the children's case records. | MW2PLMB PAD Report 3 [Therapeutic Placement Setting] | 80% | MACWIS Report: 96% PAD Report: Data unreliable; PAD corrected October 2012 and therefore data analyzable as of April 2013 (8/31/12) | MACWIS Report: 79% PAD Report: Data unreliable; PAD corrected October 2012 and therefore data analyzable as of April 2013 (8/31/13) | MACWIS Report: 67% PAD Report: Data unreliable; PAD corrected October 2012 and therefore data analyzable as of April 2013 (2/28/13) | MACWIS Report: 95% PAD Report: 38% (8/31/13) | MACWIS Report: 40% PAD Report: 100% (8/31/13) | MACWIS Report: 50% PAD Report: 100% (8/31/13) | No therapeutic homes with at least one foster child residing in the home (8/31/13) |
| MSA II.B.5.c. and II.B.5.i.3. | MSA requires that by 12 months following the date that a Region fully implements, at least 90% of resource parents in that region with at least one foster child residing in their home shall have had a DFCS worker visit the home monthly, consistent with MSA requirements, as documented in the children's case records. | MW2PLMB PAD Report 3 [Therapeutic Placement Setting] | 90% | MACWIS Report: 100% PAD Report: 100% (8/31/13) | MACWIS Report: 79% PAD Report: 93% (8/31/13) | | | | | |
| | **MSA III.B.1. Comprehensive Family Assessments** | | | | | | | | | |
| MSA III.B.1.a. and III.B.1.e.1. | MSA requires by the date region fully implements, at least 80% of foster children in that region who enter custody shall have a thorough screening and assessment, consistent with MSA requirements, within 30 calendar days of entering custody. | PAD Report 12 | 80% | Data unreliable; PAD corrected October 2012 and therefore data analyzable as of April 2013 | Data unreliable; PAD corrected October 2012 and therefore data analyzable as of April 2013 | Data unreliable; PAD corrected October 2012 and therefore data analyzable as of April 2013 | 13% (8/31/13) | 34% (8/31/13) | 82% (8/31/13) | 73% (8/31/13) |
| MSA III.B.1.a. and III.B.1.f.1. | MSA requires that by 12 months following the date that a Region fully implements, at least 90% of foster children in that region who enter custody shall have a thorough screening and assessment, consistent with MSA requirements, within 30 calendar days of entering custody. | PAD Report 12 | 90% | 74% (8/31/13) | 64% (8/31/13) | | | | | |

31

| | | | | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Cite | MSA Requirement | Associated DFCS Report | Performance Requirement | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S |
| | | | | **MSA III.B.2. Individualized Case Planning** | | | | | | |
| MSA III.B.3.h. and III.B.2.c.3. | MSA requires that by date Region fully implements, 80% of children shall have a family team meeting quarterly, and service plans updated quarterly, as well as within 30 days of any placement or other significant change, consistent with MSA requirement. | PAD Report 20 | 80% | 11% (8/31/12) | 21% (8/31/13) | 2% (2/28/13) | 5% (8/31/13) | 0% (8/31/13) | 13% (8/31/13) | 10% (8/31/13) |
| MSA III.B.2.h. and III.B.2.d.2. | MSA requires that by 12 months following the date that a Region is fully implemented, 90% of children shall have a family team meeting quarterly, and service plans updated quarterly, as well as within 30 days of any placement or other significant change, consistent with MSA requirement. | PAD Report 20 | 90% | 11% (8/31/13) | 19% (8/31/13) | | | | | |
| | | | | **MSA III.B.3. Child and Youth Permanency** | | | | | | |
| MSA III.B.3.h.1. and III.B.3.h.2.a. | MSA requires that by date Region fully implements, 90% of children with the goal of reunification shall have case record documentation reflecting active concurrent permanency planning, consistent with MSA requirement. | PAD Report 22 | 90% | 16% (8/31/12) | 80% (8/31/12) | 43% (2/28/13) | 35% (8/31/13) | 72% (8/31/13) | 50% (8/31/13) | 61% (8/31/13) |
| MSA III.B.3.h.1. and III.B.3.h.3.a. | MSA requires that by 12 months following the date that a Region has fully implemented, 95% of children with the goal of reunification shall have case record documentation reflecting active concurrent permanency planning, consistent with MSA requirement. | PAD Report 22 | 95% | 79% (8/31/13) | 81% (8/31/13) | | | | | |
| MSA III.B.3.x.6.x. and III.B.3.a.3.2. | MSA requires that by date Region fully implements, 90% of children shall have a permanency plan within 30 calendar days of their entry into care consistent with MSA requirement. | MWL5312D PAD Report 19 | 90% | MACWIS Report: 52% PAD Report: 76% (8/31/12) | MACWIS Report: 61% PAD Report: 61% (8/31/12) | MACWIS Report: 57% PAD Report: 66% (2/28/13) | MACWIS Report: 28% PAD Report: 64% (8/31/13) | MACWIS Report: 28% PAD Report: 71% (8/31/13) | MACWIS Report: 86% PAD Report: 98% (8/31/13) | MACWIS Report: 17% PAD Report: 60% (8/31/13) |
| MSA III.B.3.a.7.x. and III.B.3.a.9.2. | MSA requires that by 12 months following the date that a Region has fully implemented, 95% of children shall have a permanency plan within 30 calendar days of their entry into care consistent with MSA requirement. | MWL5312D PAD Report 19 | 95% | MACWIS Report: 76% PAD Report: 60% (8/31/13) | MACWIS Report: 79% PAD Report: 87% (8/31/13) | | | | | |

| Cite | MSA Requirement | Associated DFCS Report | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S |
| MSA III.B.3.c.2. and III.B.3.c.4.a. | MSA requires that by date Region fully implements, 90% of children in custody for at least six months shall have a timely court or administrative case review consistent with MSA requirement. | MWZTACR | 90% | 91% (8/31/12) | 95% (8/31/12) | 97% (2/28/13) | 88% (8/31/13) | 99% (8/31/13) | 97% (8/31/13) | 100% (8/31/13) |
| MSA III.B.3.c.2. and III.B.3.c.5.a. | MSA requires that 12 months following the date a Region has fully implemented, 95% of children in custody for at least six months shall have a timely court or administrative case review consistent with MSA requirement. | MWZTACR | 95% | 95% (8/31/13) | 98% (8/31/13) | | | | | |
| MSA III.B.3.c.2. and III.B.3.c.4.b. | MSA requires that 90% of foster children in that region who have been in custody for at least 12 months shall have a timely annual court review consistent with MSA requirements. | MWZTPHR | 90% | 86% (8/31/12) | 97% (8/31/12) | 94% (2/28/13) | 39% (8/31/13) | 87% (8/31/13) | 81% (8/31/13) | 83% (8/31/13) |
| MSA III.B.3.c.2. and III.B.3.c.5.b. | MSA requires that by 12 months following the date that a Region has fully implemented, at least 95% of foster children who have been in custody in that region for at least 12 months shall have a timely annual court review consistent with MSA requirements. | MWZTPHR | 95% | 89% (8/31/13) | 93% (8/31/13) | | | | | |
| MSA III.B.3.c.3.a. and III.B.3.e.1. | MSA requires that by date Region fully implements, at least 80% of children in that region who have reached the point at which they have spent 17 of the previous 22 months in care shall have a TPR petition filed on their behalf or an available exception under ASFA documented by the end of their 17th month in care. | MW20170 | 80% | 93% (8/31/12) | 85% (8/31/12) | 78% (2/28/13) | 87% (8/31/13) | 94% (8/31/13) | 88% (8/31/13) | 98% (8/31/13) |
| MSA III.B.3.c.3.a. and III.B.3.e.1. | MSA requires that by 12 months following the date a Region has fully implemented, at least 90% of children in that region who have reached the point at which they have spent 17 of the previous 22 months in care shall have a TPR petition filed on their behalf or an available exception under ASFA documented by the end of their 17th month in care. | MW20170 | 90% | 95% (8/31/13) | 89% (8/31/13) | | | | | |

| Cite | MSA Requirement | Associated DFCS Report | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S |
| MSA III.B.3.r.3.b. and III.B.3.r.3. | MSA require that by date Region fully implements, at least 80% of children in that region who have spent more than 17 of the previous 22 months in care without a TPR petition filed or an available ASFA exception documented shall have a petition filed or available exception documented. | MW20170 | 80% | 100% (8/31/12) | 100% (8/31/12) | 18% (2/28/13) | 79% (8/31/13) | 33% (8/31/13) | 60% (8/31/13) | 100% (8/31/13) |
| MSA III.B.3.r.3.b. and III.B.3.r.3. | MSA requires that by 12 months following the date a Region has fully implemented, at least 90% of children in that region who have spent more than 17 of the previous 22 months in care without a TPR petition filed or an available ASFA exception documented shall have a petition filed or available exception documented. | MW20170 | 90% | 50% (8/31/13) | 100% (8/31/13) | | | | | |
| MSA III.B.3.r.3-5. and III.B.3.r.6.b. | MSA requires by the date Region fully implements, at least 90% of foster children in that region shall have a permanency plan that is consistent with MSA requirements. | PAD Report 21 | 90% | 100% (8/31/12) | 100% (8/31/12) | 100% (2/28/13) | 95% (8/31/13) | 100% (8/31/13) | 93% (8/31/13) | 75% (8/31/13) |
| MSA III.B.3.r.3-5. and III.B.3.r.7.b. | MSA requires that by 12 months following the date that a Region fully implements, at least 95% of children in that region shall have a permanency plan that is consistent with MSA requirements. | PAD Report 21 | 95% | 100% (8/31/13) | 100% (8/31/13) | | | | | |
| | MSA III.B.5. Developing and Maintaining Connections | | | | | | | | | |
| MSA III.B.5.d.1. and III.B.5.h. | MSA requires that by date Region fully implements, at least 80% of children be provided with contacts with their parents and any siblings not in the same placement consistent with MSA requirements, unless it is documented that a parent or sibling failed to make himself or herself available. | PAD Report 6 | 80% | 0% (8/31/12) | 0% (8/31/12) | 9% (2/28/13) | 2% (8/31/13) | 26% (8/31/13) | 40% (8/31/13) | 13% (8/31/13) |
| MSA III.B.5.r.1. and III.B.5.h. | MSA requires that by 12 months following the date a Region has fully implemented, at least 90% of children in that region be provided with contacts with their parents and any siblings not in the same placement consistent with MSA requirements, unless it is documented that a parent or sibling failed to make himself or herself available. | PAD Report 6 | 90% | 39% (8/31/13) | 0% (8/31/13) | | | | | |

34

| Cite | MSA Requirement | Associated DFCS Report | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S |
| | | | MSA III.B.6. Educational Services | | | | | | | |
| MSA III.B.6.a. and III.B.6.d.1. | MSA requires that by date Region fully implements, 80% of school-age children shall have their educational records reviewed and their educational needs documented within 30 days of entry into care, consistent with MSA requirement. | PAD Report 15 | 80% | 54% (8/31/12) | 57% (8/31/12) | 69% (2/28/13) | 20% (8/31/13) | 28% (8/31/13) | 89% (8/31/13) | 80% (8/31/13) |
| MSA III.B.6.a. and III.B.6.e.1. | MSA requires that by 12 months following the date that a Region has fully implemented, 90% of school-age children shall have their educational records reviewed and their educational needs documented within 30 days of entry into care, consistent with MSA requirement. | PAD Report 15 | 90% | 90% (8/31/13) | 61% (8/31/13) | | | | | |
| MSA III.B.6.b. and III.B.6.d.2. | MSA requires by the date region fully implements, at least 80% of school-age foster children in that region who enter custody or are subject to a change in schools due to a placement move shall be registered for and attending an accredited school within three business days of the initial placement or placement change, including while placed in shelters or other temporary placements, unless delayed by the Youth Court. | PAD Report 16 | 80% | 78% (8/31/12) | 44% (8/31/12) | 94% (2/28/13) | 54% (8/31/13) | 79% (8/31/13) | 89% (8/31/13) | 83% (8/31/13) |
| MSA III.B.6.b. and III.B.6.e.2. | MSA requires that by 12 months following the date that a Region fully implements, at least 90% of school-age foster children in that region who enter custody or are subject to a change in schools due to a placement move shall be registered for and attending an accredited school within three business days of the initial placement or placement change, including while placed in shelters or other temporary placements, unless delayed by the Youth Court. | PAD Report 16 | 90% | 79% (8/31/13) | 26% (8/31/13) | | | | | |

| Cite | MSA Requirement | Associated DFCS Report | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S |
| | | | | **MSA III.B.7. Transition to Independent Living** | | | | | | |
| MSA III.B.7.b. and III.B.7.c.1. | MSA requires by the date region fully implements, 90% of children who are 14-20 shall be provided with independent Living services as set forth in their service plans. | MWBRD16 / PAD Report 5 | 90% | MACWIS Report: 66% / PAD Report: 76% (8/31/13) | MACWIS Report: 68% / PAD Report: 84% (8/31/13) | MACWIS Report: 64% / PAD Report: 83% (2/28/13) | MACWIS Report: 28% / PAD Report: 50% (8/31/13) | MACWIS Report: 38% / PAD Report: 55% (8/31/13) | MACWIS Report: 74% / PAD Report: 79% (8/31/13) | MACWIS Report: 36% / PAD Report: 35% (8/31/13) |
| MSA III.B.7.b. and III.B.7.f.1. | MSA requires that by 12 months following the date a Region has fully implemented, 95% of children who are 14-20 shall be provided with independent Living services as set forth in their service plans. | MWBRD16 / PAD Report 5 | 95% | MACWIS Report: 63% / PAD Report: 83% (8/31/13) | MACWIS Report: 75% / PAD Report: 87% (8/31/13) | | | | | |
| MSA III.B.7.c. and III.B.7.e.2. | MSA requires by the date region fully implements, at least 80% of foster children in that region who are transitioning to independence shall have available an adequate living arrangement, a source of income, health care, independent living stipends, and education and training vouchers. | PAD Report 23 | 80% | 67% (8/31/12) | 50% (8/31/12) | 91% (2/28/13) | 60% (8/31/13) | 50% (8/31/13) | 100% (8/31/13) | 100% (8/31/13) |
| MSA III.B.7.c. and III.B.7.f.2. | MSA requires that by 12 months following the date that a Region fully implements, at least 90% of foster children in that region who are transitioning to independence shall have available an adequate living arrangement, a source of income, health care, independent living stipends, and education and training vouchers. | PAD Report 23 | 90% | 44% (8/31/13) | 25% (8/31/13) | | | | | |
| | | | | **MSA III.B.8. Case Closing and Aftercare** | | | | | | |
| MSA III.B.8.1. and III.B.8.b. | MSA requires that by date Region fully implements, 70% of children who are reunified and in custody longer than 90 days shall receive a 90-day THV; during the THV the child's caseworker or family preservation caseworker shall meet with the child in the home at least two times per month without parent or caretaker present, consistent with MSA requirements. | MWLSS4A | 70% | 48% (8/31/12) | 45% (8/31/12) | 0% (2/28/13) | 0% (8/31/13) | 33% (8/31/13) | 0% (8/31/13) | 43% (8/31/13) |
| MSA III.B.8.c.1. and III.B.8.b. | MSA requires that by 12 months following the date a Region has fully implemented, 90% of children who are reunified and in custody longer than 90 days shall receive a 90-day THV; during the THV the child's caseworker or family preservation caseworker shall meet with the child in the home at least two times per month without parent or caretaker present, consistent with MSA requirements. | MWLSS4A | 90% | 57% (8/31/13) | 50% (8/31/13) | | | | | |

36

| Cite | MSA Requirement | Associated DFCS Report | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S |
| | | | | MSA III.C. Outcome Measures | | | | | | |
| MSA III.C.1.a.1. | MSA requires that by date Region fully implements, 60% of children who are discharged from custody and reunified with parents or caretakers shall be reunified within 12 months from the latest removal from home. | MWBRD05 | 60% | 56% (8/31/12) | 43% (8/31/12) | 59% (2/28/13) | 73% (8/31/13) | 69% (8/31/13) | 50% (8/31/13) | 62% (8/31/13) |
| MSA III.C.1.b.1. | MSA requires that by 12 months following the date a Region has fully implemented, 70% of children who are discharged from custody and reunified with parents or caretakers shall be reunified within 12 months from the latest removal from home. | MWBRD05 | 70% | 55% (8/31/13) | 44% (8/31/13) | | | | | |
| MSA III.C.2.a.1. | MSA requires that by date Region fully implemented, 25% of children who were discharged upon finalization of an adoption shall have the adoption finalized within 24 months from the latest removal from home. | MWBRD10 | 25% | 42% (8/31/12) | 15% (8/31/12) | 50% (2/28/13) | 9% (8/31/13) | 17% (8/31/13) | 0% (8/31/13) | 8% (8/31/13) |
| MSA III.C.2.b.1. | MSA requires that by 12 months following the date a Region has fully implemented, 30% of children who were discharged upon finalization of an adoption shall have the adoption finalized within 24 months from the latest removal from home. | MWBRD10 | 30% | 29% (8/31/13) | 9% (8/31/13) | | | | | |

## II. __METHODOLOGY__

The Monitor's assessment of defendants' progress toward meeting Period 3 IP requirements included site visits to DFCS's regional and county offices.[76]  In addition, during Period 3, face-to-face interviews were conducted with over 91 MDHS and DFCS managers, supervisors, caseworkers and practice coaches.[77]  Foster and adoptive parents, service providers from private agencies that contract with DFCS, representatives from university social work programs, members of child welfare organizations and advocacy groups, child welfare practice and information technology consultants under contract with the defendants, and other public and private child welfare system stakeholders also were interviewed.  The Monitor and/or her consultants attended state implementation team ("SIT") meetings, meetings of foster parent support groups, regional implementation team ("RIT") and CQI sub-team meetings, permanency roundtables, and pre-service training sessions.

Relevant documents, memoranda and other records maintained by MDHS/DFCS,[78] have been reviewed and analyzed, including the following: meeting agendas and minutes as well as work plans generated by the SIT, its sub-teams, and by regional sub-teams; electronic and paper case records for children in foster care and their families; serious incident reports ("SIRs") concerning reports of maltreatment in care; maltreatment investigation reports and documents associated with the maltreatment in care review process; the CQI plan and annual report as well as reports and tracking documents generated by the CQI process, including FCR and Evaluation

---

[76]  Site visits to DFCS county offices during Period 3 included Hancock, Harrison, Hinds, Rankin, DeSoto, Coahoma and Washington Counties, some of which were visited on multiple occasions.

[77]  Structured face-to-face interviews were conducted between July 24, 2012 and July 6, 2013 with over 91 DFCS staff and managers.  Some staff and managers were interviewed on numerous occasions.  Although some interviews were conducted in less than one hour, many were several hours in duration.  The Monitor has continued to interview MDHS and DFCS managers and staff on an ongoing basis about performance during Period 3 and thereafter.

[78]  These documents, memoranda and other records were either obtained directly by the Monitor from MDHS/DFCS staff or submitted more formally by defendants' counsel.

and Monitoring Unit ("EMU") reports, and corrective action tracking records generated by the "HEAT" system;[79] staffing and personnel data, including organizational charts, records related to hiring and attrition, position descriptions and vacancy postings; requests for proposals ("RFPs") and contracting documents; training records, including testing records, curricula, sign-in sheets, and schedules; data reports generated by the MACWIS and by the FCR process; policies and practice guides; licensure protocols; budget and other fiscal reports related to federal claims and grants; and documents maintained by defendants to track the processing of petitions for termination of parental rights ("TPR").  The Monitor also has evaluated various planning documents and protocols submitted by defendants pursuant to MSA requirements.[80]

As reflected in the September 2013 Report, the Monitor analyzed performance data submitted by defendants during Period 3, covering the period through April 2013.[81]  However, the Monitor acknowledged in the report the known limitations in the data submitted by defendants and indicated that the data might be used to identify trends rather than actual performance levels.[82]  Beginning in September 2013, the Monitor reviewed and analyzed data reports submitted by defendants pursuant to the June 24, 2013 Order.  Each report was reviewed for conformity with the specifications that were agreed upon by the parties and the Monitor.  The specifications were developed collaboratively by the defendants in consultation with plaintiffs'

---

[79]  The Help Desk Expert Automated Tool, referred to as the "HEAT" system, provides detailed information for tracking service issues related to MDHS/DFCS information technology operations.  It has been adapted by the defendants to track corrective actions identified by the CQI process.

[80]  Included among these documents are the required Workforce Development Plan (Period 3 IP §§I.A.2.b. and I.A.2.c.3.), the youth court strategies plan (*id.* §I.A.2.c.4.), the service array plan (*id.* II.F.2.), and the educational protocol (*id.* §II.G.2.).

[81]  The quantitative analysis in this report was conducted by Mark Jordan, a consultant to the Office of the Court Monitor.  Mr. Jordan's academic background and professional experience are summarized in the *September 2013 Report* at Ex. 28.  Mia Caras, Special Assistant to the Court Monitor, also conducted data analysis and provided extensive support to Mr. Jordan.

[82]  *September 2013 Report* at 6.

counsel and the Monitor through a protracted and resource-intensive process that was well-managed by the defendants.[83]

Preliminary tests were conducted by the Monitor on a sample of the data from each report submitted by defendants. A variety of tests of the data were performed, including comparisons of analyzed versions of the data produced by defendants against the same analysis produced independently by the Monitor.

The Monitor identified problems with a number of data reports produced by defendants pursuant to the June 24, 2013 Order, which she communicated to the parties.[84] Based on the Monitor's preliminary reviews, defendants revised and resubmitted data reports and associated analyses for a number of reports.[85] After the Monitor identified problems with a number of defendants' data submissions, defendants reported that they had enhanced the data quality assurance methods that they previously employed in order to promote greater data accuracy. As described in this report, the Monitor was ultimately able to produce final analyses of 53 of the 57 data reports defendants submitted, subject to limitations detailed in this report.

Informal status updates were provided by the defendants and their counsel on a periodic basis. Defendants have cooperated fully with the Monitor and assisted her, in specific circumstances, with information gathering activities. The Monitor also has consulted with child welfare system and information technology experts since the start of Period 3.[86]

---

[83] This process was contemplated by the June 24, 2013 Order. *See* June 24, 2013 Order §VI.A.
[84] Defendants also identified and corrected errors in the data prior to submission to the Monitor and plaintiffs.
[85] The Monitor summarized these issues during the November 8, 2013 status hearing.
[86] In situations in which an expert assisted the Monitor with a specific assessment of defendants' performance during Period 3, the expert is identified in the corresponding text of this report.

## III.  FINDINGS

### A.  Statewide Requirements

> **Period 3 Implementation Plan ("IP") §I.A.1.a.**
> **1.  Management**
> **a.  By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants shall establish a Statewide Implementation Team.  The Statewide Implementation Team will be responsible for prioritizing, managing, and making decisions relating to implementation of the requirements of the Modified Settlement Agreement, this Plan, and the Practice Model.  The Statewide Implementation Team will consist of the MDHS Executive Director, MDHS Deputy Executive Director, DFCS Deputy Administrator, DFCS Director, DFCS Field Operations Director, DFCS CQI Director, and a CSF Officer or designee.**

**Status of Progress, Period 3 IP §I.A.1.a.:**  The defendants established the SIT on a timely basis to coordinate and administer the reform effort.[87]  The team is comprised of MDHS and DFCS executive staff as well as representatives from CSF.[88]  Interviews with MDHS and DFCS managers and staff, as well as periodic reviews of meeting minutes and related materials, indicate that during Period 3 the SIT generally managed the implementation of the MSA and the Practice Model.[89]  While not a Period 4 requirement, defendants continue to use the SIT for these management purposes.

> **Period 3 IP §I.A.1.b.**
> **1.  Management**
> **b.  By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants shall establish the following Statewide Implementation Sub-Teams: CQI, Training, Resource Development, Policy, Legal and Judicial, Resource Parent Recruitment and Retention, and Caseload/Staffing. These Statewide Implementation Sub-Teams will be responsible for designing and guiding the work plans necessary to implement the requirements of the Modified Settlement Agreement and this Plan in their respective functional areas. The Statewide Implementation Sub-Teams will report to and be directed by the Statewide Implementation Team.  The Statewide Implementation Sub-Teams shall meet no less frequently than monthly, with the exception of the CQI Sub-Team and the**

---

[87]  Indeed, the SIT was established before the commencement of Period 3.
[88]  *See January 2013 Report* at 16-17, for additional background information.
[89]  During Period 3, the Monitor regularly reviewed SIT meeting agendas and minutes as well as other documents submitted to the SIT by MDHS/DFCS managers and staff.

> Resource Home Recruitment and Retention Sub-team which
> shall meet at least quarterly, and shall issue progress reports to
> the Statewide Implementation Team no less frequently than
> every three months and which shall discuss accomplishments,
> challenges, and anticipated next steps. The Statewide
> Implementation Sub-Teams' membership will include the Unit
> Director responsible for that Sub-Team's particular function, a
> Regional Director, and such other staff persons the Statewide
> Implementation Team has deemed responsible for carrying out
> the particular Sub-Team's function.  Sub-Teams may also
> include representatives of other state agencies or stakeholders
> the Statewide Implementation Team has deemed necessary to
> carry out the Sub-Team's function.

**Status of Progress, Period 3 IP §I.A.1.b.:**  The defendants established the required sub-teams on a timely basis.  In addition to the specific sub-teams required by the Period 3 IP, defendants established a sub-team to address finance issues and another to address MACWIS and data issues.   A review of work plans, progress reports, scheduling documents, and meeting summaries, combined with interviews with many sub-team members, indicates that most of the sub-teams generally functioned as contemplated by the Period 3 IP.  Nonetheless, as the Monitor has reported previously, certain sub-team work products related to several pivotal Period 3 requirements raise substantial concerns about defendants' capacity to implement several core MSA requirements.[90]

> Period 3 IP §I.A.1.c.
> 1. Management
> c. By 30 days following the Court's approval of the Modified
>    Settlement Agreement, Defendants shall establish Regional
>    Implementation Teams in Regions I-N, I-S, II-W, III-S, IV-N,
>    IV-S, V-E and V-W.  The Regional Implementation Teams will
>    be chaired by the respective Regional Director and the
>    membership will consist of appropriate staff persons and may
>    also include representatives of other state agencies or
>    stakeholders the Statewide     Implementation Team has deemed
>    necessary to carry out the Team's function.  The Regional
>    Implementation Teams shall meet no less frequently than
>    quarterly and shall issue progress reports to the Statewide
>    Implementation Team no less frequently than quarterly.  These
>    reports shall discuss accomplishments, challenges, and
>    anticipated next steps.  The Regional Implementation Teams

---

[90]  The Monitor has reported previously about this issue.  *See January 2013 Report* at 16-20 (describing limitations in the workforce development plan required by §I.A.2.b. of the Period 3 IP); *see also infra* at 89-92 (performance-based contracting).

> **will include Sub-Teams in the following practice areas: CQI and Resource Parent Recruitment and Retention.**

**Status of Progress, Period 3 IP §I.A.1.c.:**  The RITs were established in the targeted eight regions at various points prior to and during Period 3.  Notwithstanding efforts to strengthen the operation of the RITs, many of the teams did not function as intended during Period 3.[91]  The RITs are conceptualized as an important Practice Model implementation tool.  Indeed, a primary purpose of the RITs is to guide implementation of the Practice Model.  The RITs are required to maintain several operable sub-teams, including the Regional CQI Sub-Teams.  The Regional CQI Sub-Teams have the following functions:  1) review regional performance data generated by MACWIS or other sources on a regular basis; 2) review the results of all regional CQI unit reviews; 3) identify regional performance trends that warrant attention; 4) issue recommendations concerning the quality of casework and/or services as well as the region's capacity to implement the Practice Model; 5) participate in the development and monitoring of regional improvement plans; and 6) monitor regional progress.  These functions play a critical role in advancing regional performance; however, there is continuing evidence that the shortcomings in the RITs that were identified during Period 3 have not yet been remedied.[92]

> **Period 3 IP §I.A.1.d.**
> **1. Management**
> **d. Within six (6) months of the start of Implementation Period 3, each of the Statewide Implementation Sub-Teams shall have finalized the work plans as described in I.A.1.b. above.**

---

[91]  *See* Ex. 1, Monthly Status Report – Practice Model Implementation, September 2012, redacted excerpt, at 20-21 (referring to "the struggle that the majority of RDs [regional directors] have shared concerning maintaining active involvement of team members and in the overall creation of functional RIT's" [*sic*]; stating that "[a] number of RDs have reported inconsistent attendance [at team meetings] from members along with uncertainty about how to maintain their involvement in revising and updating the plans"; indicating that "[s]everal RDs have acknowledged that they have not been able to schedule meetings on a quarterly basis and some do not yet have functional CQI and Resource Recruitment sub-teams"; describing efforts to strengthen the RITs, but noting that additional attention to the limitations in the RITs was needed).

[92]  *See* Ex. 21, *infra* note 277, at 7 for additional information about how the RITs are intended to function.

**Status of Progress, Period 3 IP §I.A.1.d.:**  Section I.A.1.b. of the Period 3 IP plainly requires defendants to establish specified sub-teams "responsible for designing and guiding the work plans necessary to implement the requirements of the Modified Settlement Agreement and [the Period 3 Implementation] Plan in their respective functional areas."  In response to the Monitor's request, during February 2013 the defendants submitted a series of documents that they referred to as the work plans generated by the required sub-teams.[93]  With few notable exceptions, the documents that were submitted do not provide the basic detail necessary to guide the work of the sub-teams in their respective functional areas.[94]

> **Modified Settlement Agreement ("MSA") §§II.A.2.a.8. and II.A.2.a.9.a.**
> **2.  Human Resources Management**
>  **a.  Workforce**
>    **8)    Within 90 days following the start of Implementation Period Three, DFCS shall formulate and begin implementing a methodology for producing accurate and validated caseworker and supervisor caseload data reports, if such reports do not currently exist.  Data reports shall be produced in each county monthly.  Within 120 days of the date this Modified Settlement Agreement is filed, DFCS shall provide the Plaintiffs and the Monitor with county-by-county caseload data on a monthly basis.**
>
>    **9)  By the end of Implementation Period Three:**
>     **(a)  At least 75% of DFCS caseworkers shall carry a caseload that does not exceed Modified Settlement Agreement caseload requirements.  No more than 10% of caseworkers shall carry a caseload exceeding twice the Modified Settlement Agreement caseload requirements.**

---

[93]  *See* Ex. 2A, February 14, 2013 e-mail to Grace M. Lopes from Ginger Gibson with redacted attachments (seven documents reported to constitute all of the sub-team work plans except MACWIS and CQI); Ex. 2B, February 23, 2013 e-mail to Grace M. Lopes from Ginger Gibson with redacted attachment (CQI work plan).  A separate document, referred to as the MACWIS work plan, was transmitted to the Monitor on July 8, 2013, *see* Ex. 2C, July 8, 2013 e-mail to Mia Caras from Ginger Gibson with attached document, Requirements Matrix for the Modified Settlement Agreement (MSA) and Year III Implementation Plan (IP).

[94]  As part of their February 14, 2013 submission, defendants transmitted  a document entitled Mississippi Diligent Recruitment of Families for Children, Implementation Plan – Phase II, Version A [hereinafter Diligent Recruitment Plan] and an additional document titled, State Implementation Finance Sub-Team Project Plan [hereinafter Finance Project Plan].  The finance project plan constitutes the equivalent of a work plan crafted to address specific MSA requirements.  However, the finance work plan was not required by this subsection of the MSA.  The Diligent Recruitment Plan was developed to satisfy requirements related to a multi-year federal grant addressed in Appendix "D" to the MSA, *see infra* 182-183 for a discussion of this grant.  While it does not constitute the work plan contemplated by this MSA requirement, it is closer to a work plan than many of the remaining submissions, which, at best, appear to constitute tracking documents.

> **No caseworkers shall carry a caseload exceeding three times the Modified Settlement Agreement caseload requirements. Hancock, Harrison, Hinds, and Jackson Counties (the "Carve Out Counties") are exempt from these requirements during Implementation Period Three.**

**Status of Progress, MSA §§II.A.2.a.8 and II.A.2.a.9.a.:** As explained below, these requirements were not satisfied during Period 3. The ability to report accurately and at regular intervals on caseworker caseloads is a predicate for hiring and maintaining an adequate workforce and for balancing the workload among caseworkers. Caseworker staffing affects the defendants' ability to meet the MSA's core case practice requirements, and as the record in this case demonstrates it can have a significant and tragic impact on the safety and well-being of the children who are in defendants' custody.[95]

The MSA establishes two types of caseload requirements: 1) dedicated caseload requirements, which pertain to caseworkers who are assigned to only one specific type of case such as investigations, adoptions or foster care cases;[96] and 2) generic caseload requirements, which pertain to caseworkers who are assigned to a mixed caseload.[97] Most DFCS caseworkers carry mixed caseloads. For purposes of measuring dedicated caseloads, the MSA specifies eight unique service categories, each with its own caseload requirements.[98] For purposes of measuring mixed caseloads, the MSA identifies 25 distinct service categories.[99] Each service category is

---

[95] *See*, *e.g.*, *infra* at 149-151 (staffing shortages in the county where a two-year old child who died while in custody was placed resulted in the failure to assign a caseworker to the child's case; while different staff reportedly visited the placement, safety issues were not addressed).

[96] MSA §II.A.2.a.1.

[97] *Id.* §II.A.2.a.2.

[98] *Id.* §II.A.2.a.1. The service categories for dedicated caseloads are adoption, child protection, ongoing foster care, new application licensing, in-home protection, in-home dependency/prevention, renewal licensing, abuse and neglect intake.

[99] *Id.* §II.A.2.a.2. The service categories for mixed caseloads are adoption county of service [hereinafter COS], interstate compact for the placement of children [hereinafter ICPC] incoming, outgoing, and application; placement county of responsibility [hereinafter COR], COS, responsibility and service [hereinafter R&S]; prevention COR, COS and R&S; protective services COR, COS and R&S; case management intake; court ordered relative application; investigation level 2, level 3; general intake; resource inquiry; adoption addendum; foster home addendum; resource home study; resource home supervision; resource renewal; and courtesy interviews.

allotted a certain number of minutes or units per month.[100]  Pursuant to the MSA, a caseworker's

mixed caseload may not exceed 6,960 minutes, the equivalent of 100 units of case-related work

per month.[101]

Defendants have been required to produce accurate and validated reports on caseworker

caseloads since the start of Period 1 in 2008.[102]  Notwithstanding the importance of these reports,

they failed to do so.[103]  Accordingly, during Period 3, §II.A.2.a.8. of the MSA required the

defendants to formulate by early October 2012, and to begin implementing by early November

2012, a methodology for producing accurate and validated caseload reports on a county-by-

county basis at monthly intervals.  Pursuant to this subsection, defendants were required to

provide the monthly reports to plaintiffs and the Monitor within 120 days of the filing date of the

MSA or by November 3, 2012.[104]  As explained below, although the defendants made efforts to

satisfy this requirement, the required methodology was not developed and the reports were not

produced, as required.

On December 3, 2012, after almost five months had lapsed in Period 3, the defendants

informed plaintiffs' counsel and the Monitor that the caseload data reports would be delayed due

to many unanticipated difficulties related to implementation of the Family Service Plan

("FSP").[105]  Defendants stated that redesign work would need to be conducted and that the first

---

[100]  Because the minute calculations proved impractical for supervisors and caseworkers to apply on a daily basis, the
MSA modified the caseload requirements by, among other things, converting the minutes allocated for each service
type into units based on a 100-point scale.  *Compare* Settlement Agreement §II.A.2.a.2. *with* MSA §II.A.2.a.2.
[101]  For example, courtesy interviews are allotted 65 minutes or 1.0 units per month.  MSA §II.A.2.a.2.
[102]  Settlement Agreement §§II.A.2.a.7. and II.A.2.a.10.
[103]  *See The Court Monitor's Report to the Court Regarding Defendants' Progress Toward Meeting Period-1
Requirements* [hereinafter *June 2009 Report*], filed June 5, 2009 [Dkt. No. 488], at 25-35 for background related to
defendants' performance.
[104]  MSA §II.A.5.c.2. and App. C at 2.
[105]  The FSP is a key case planning and management tool that is used to facilitate permanency.  For additional
descriptive data related to the FSP, *see* Ex. 3, Mississippi, DFCS Policy, Section D, Foster Care, Revised 7-22-13,
§VII.B.4., at 62-65.

reports would be run by March 5, 2013.[106]  Thereafter, the defendants informed the Monitor that the reports would be delayed even further.

Because defendants failed, during Period 3, to produce accurate and validated caseload reports on a monthly basis, both the June 24, 2013 Order[107] and the Initial Period 4 Implementation Plan ("Initial Period 4 IP")[108] required production of the monthly reports that were due during Period 3 by a date certain and thereafter on an ongoing, monthly basis. Defendants were also required to produce by October 1, 2013, and monthly thereafter, data reports addressing whether caseworkers with mixed and dedicated caseloads carried caseloads that exceeded MSA requirements for each month during the 12-month period beginning July 2012 and ending July 2013.  More specifically, defendants were required to produce by September 1, 2013, and monthly thereafter, data reports addressing whether caseworkers with mixed and dedicated caseloads carried twice the MSA caseload requirements for each month during the 12-month period beginning July 2012 and ending July 2013.

As required by the June 24, 2013 Order, defendants worked collaboratively with the Monitor and plaintiffs' counsel to develop specifications for the caseload reports.  The specifications for both the dedicated caseload and the mixed caseload reports were finalized by late August 2013.[109]  Because the collaborative process related to the development of the specifications was more protracted than the process utilized for other reports, there was an informal agreement to afford some latitude to defendants with respect to the September 1

---

[106]  Ex. 4A, December 3, 2012 correspondence to Miriam Ingber from Kenya Key Rachal.  In subsequent correspondence, defendants clarified this representation, indicating that they *anticipated* the reports would be run by March 5, 2013.  *See* Ex. 4B, January 2, 2013 correspondence to Miriam Ingber from Kenya Key Rachal; Ex. 4C, February 1, 2013 correspondence to Miriam Ingber from Kenya Key Rachal.

[107]  June 24, 2013 Order §VI.E., Attachments One and Two.

[108]  Initial Period 4 IP §II.C.1.a.-c.

[109]  There was agreement to run the report weekly for a three-month period and thereafter for defendants, in consultation with plaintiffs and the Monitor, to determine whether the report should be run less frequently.

deadline.  On September 4, 2013, in response to an inquiry from the Monitor, defendants advised

that the report was being developed and would be produced as soon as it became available.[110]

On October 1, 2013, defendants produced a data report related to the dedicated caseload

requirement for August 31, 2013, a one-day snapshot.[111]  Based on these data, the Monitor has

analyzed defendants' performance with respect to dedicated caseload requirements.  The results

of this analysis are addressed at the conclusion of this section.[112]  At the time that the defendants

submitted the dedicated caseload report, they explained that none of the required dedicated

caseload data for Period 3 could be produced because defendants had learned, presumably after

the June 23, 2013 Order and Initial Period 4 IP were finalized, that MACWIS does not maintain

the data needed to produce historical caseload reports.[113]

Thus far, defendants' efforts to produce accurate mixed caseload reports have proven to

be more challenging.  On November 1, 2013, the defendants reported that they had run the mixed

caseload report as of September 30, 2013, but during the validation process a determination was

made that a number of programming "fixes" were needed.[114]  They indicated that the final fix

had been completed that week, but noted that there was insufficient time to accommodate the

field validation process.[115]  Additionally, they expressed skepticism about the practicality of field

---

[110]  Ex. 5A, September 4, 2013 e-mail to Grace M. Lopes from Kenya Rachal (referencing the parties' previous agreement).

[111]  Defendants have continued to submit monthly reports regarding dedicated caseloads.

[112]  *See infra* at 54.

[113]  Ex. 5B, October 2, 2013 correspondence to Miriam Ingber from Kenya Key Rachal (the dedicated caseload report is referred to in the correspondence as "AR3," the report's designated tracking number); *see also* Ex. 5C, September 3, 2013 correspondence to Miriam Ingber from Ashley C. Tullos (noting, in the context of addressing a data reporting requirement related to supervisory workloads, that during the validation process the defendants discovered the start and end dates of supervisory and caseworker assignments were not recorded in MACWIS).

[114]  Ex. 5D, November 1, 2013 correspondence to Miriam Ingber from Kenya Key Rachal (The mixed caseload report is referred to in the correspondence as "AR1 Detail Report Workload."  AR1 constitutes the mixed caseload report's designated tracking number.).

[115]  The field validation process requires managers and other staff in each DFCS county office to verify the accuracy of the caseload data in the reports.  Defendants reported that it takes eight days to accomplish field validation of the caseload report.  *Id.* at 4.  More recently, in March 31, 2014 correspondence to plaintiffs' counsel, defendants

staff validating historical caseload data.  Thus, defendants stated that they planned to run a new mixed caseload report as of November 1, 2013, and complete a "face validity check" as well as the field validation process.[116]  For this reason, defendants reported that the mixed caseload report would be submitted on December 1, 2013.[117]

On December 2, 2013 defendants disclosed that they had "discovered some data entry errors that impact the location/title of some workers."[118]  They indicated that the errors were "being corrected" and that they expected to produce the mixed caseload report by the end of the week.[119]  Because MACWIS does not maintain the historical caseload data, instead of producing the 16 monthly reports that defendants were required to produce starting in July 2012, defendants produced a November 1, 2013 point-in-time report regarding mixed caseloads on December 6, 2013.[120]  No limitations in the report were identified by the defendants at the time it was produced.[121]  Thereafter, on December 20, 2013, defendants produced an additional point-in-time report dated November 30, 2013.[122]

The Monitor's analysis of the November 1, 2013 point-in-time data for mixed caseloads revealed that over ten percent, or 71 of the 631 DFCS employees listed as carrying cases, were supervisors and not caseworkers.[123]  In light of the fact that the data defendants produced regarding supervisory assignments was inconsistent with other information obtained by the

---

reported that it takes an average of two to three weeks to conduct a 100 percent field validation of the mixed caseload report in each DFCS region.

[116]  The face validity check contemplates a preliminary review of the report to ensure, among other matters, that the data presented conform to the report specifications, and that mathematical calculations are accurate.

[117]  *Id.* at 4.

[118]  Ex. 5E, December 2, 2013 correspondence to Julia Davis from Kenya Key Rachal.

[119]  *Id.*

[120]  Ex. 5F, December 6, 2013 correspondence to Julia Davis from Kenya Key Rachal.

[121]  *Id.*

[122]  Ex. 5G, December 20, 2013 correspondence to Julia Davis from Kenya Key Rachal.

[123]  Ex. 5H, chart prepared by Office of the Court Monitor, Caseworkers with Mixed Caseloads Meeting MSA Requirements, by Region, One-Day Snapshot 11/1/13 (graphically depicting the results of the Monitor's analysis of the November 1, 2013 mixed caseload data submitted by the defendants).

Monitor during the course of Period 3,[124] and the fact that the MSA expressly prohibits the defendants from assigning primary casework responsibility to supervisors (except in extenuating circumstances),[125] the Monitor informed the parties that she had concerns about the accuracy of the data reports that the defendants produced.

Thereafter, on January 8, 2014, the defendants were required by the Final Period 4 IP to take remedial action to correct the mixed caseload data they had submitted.[126] The Final Period 4 IP required that by January 15, 2014, the defendants, in consultation with the Monitor, undertake a process to correct the November 1 and November 30, 2013 mixed caseload data and any subsequent monthly mixed caseload data reports insofar as they addressed supervisory case assignments.[127] It also required that by January 24, 2014, the defendants produce to the Monitor supplemental information to correct the November 1 and November 30, 2013 mixed caseload reports insofar as the supervisory assignments were concerned.[128] Beginning the week of February 1, 2014, it required the defendants to produce mixed caseload reports on a weekly basis for a three-month period, and thereafter to determine reporting intervals for the mixed caseload reports, in consultation with plaintiffs and the Monitor.[129]

The defendants consulted with the Monitor and undertook a process to correct the mixed caseload reports on a timely basis, as required. Thereafter, on January 24, 2014, defendants submitted a narrative explaining why the November 1 and 30, 2013 data reports incorrectly listed

---

[124] As indicated *supra* at 38, the Monitor interviewed members of the DFCS management team as well as a large number of caseworkers and their supervisors in multiple regions during the course of Period 3. The interview data did not suggest supervisory assignments to cases were as widespread as was indicated by the mixed caseload data the defendants produced.

[125] MSA §II.A.2.a.9.d. (prohibiting, by the end of Period 3, supervisors to be assigned primary responsibility for providing direct casework for any cases absent extenuating circumstances and only for a time-limited duration with management approval); *id.* §II.A.2.a.6.

[126] Final Period 4 IP §II.A.1-3.

[127] *Id.* §II.A.1.

[128] *Id.* §II.A.2.

[129] *Id.* §II.A.3.

supervisors as assigned to certain cases as well as spreadsheets itemizing the cause of the errors in each instance.[130]  Spreadsheets with "corrected" November 1 and 30, 2013 case assignments were also provided.[131]

The defendants' January 24, 2014 submission identified several factors that contributed to the inaccuracies in the caseworker/supervisory assignment data that had been reported by MACWIS.[132]  Significantly, defendants explained that 119 cases should not have been included in the reports at all, much less identified as assigned to a supervisor, because they were closed cases, some dating back to 2001, that had not been closed out properly in MACWIS.[133]  The defendants are well aware that the failure to properly close cases in MACWIS is an issue that affects the reliability of caseload data.[134]  Indeed, it is a limitation that the defendants have repeatedly recognized and attempted but failed to correct.[135]  In large part, the June 24, 2013 Order was intended to address these types of shortcomings in defendants' performance.[136]

---

[130]  Ex. 5I, January 24, 2014 correspondence to Grace Lopes from Kenya Key Rachal, redacted, with supplementary data explaining each incorrect supervisory case assignment and "corrected" data.

[131]  *Id.*

[132]  For example, defendants reported that the data report was programmed in a way that extracted data from a data field in MACWIS that was not uniformly populated with the name of the caseworker assigned to a case.  In other instances, cases that were no longer active had not been closed in MACWIS and therefore erroneously appeared on the caseload data report submitted by defendants.  There were an additional number of cases that defendants identified as erroneously appearing on the caseload data report for reasons defendants could not specify at the time they submitted the document.

[133]  *Id.* at DHS 362238-362248.

[134]  *See, e.g., January 2013 Report* at 23-24 and Ex. 2 (stating that the SIT sub-team for caseload and staffing had reported in November 2012 that MACWIS caseload reports did not accurately reflect actual staffing needs, specifically in the carve-out counties, where numerous cases identified in MACWIS as open should have been closed).

[135]  Ex. 5J, Division of Family and Children's Services, Continuous Quality Improvement (CQI) Sub Team Quarterly Report (July 2012 – October 2012), redacted excerpt, at 4 (recognizing that defendants were unable for many years to end the custody date recorded in MACWIS within 60 days of custody termination, and commenting that defendants' failure rate had climbed to 19 percent); Ex. 5K, Continuous Quality Improvement Sub Team Meetings Meeting Minutes, October 2, 2012, redacted, at 2 (recognizing that the problem is worse in some areas, and that there is a  need for improvements in tracking and monitoring); Ex. 5L, Division of Family and Children's Services, Continuous Quality Improvement (CQI) Sub Team Quarterly Report (February 21, 2013 through June 30, 2013), redacted excerpt, at 4 (noting modest improvement in performance, that case "clean up" efforts likely to "escalate" percentage of erroneous data, and that DFCS CQI staff continues to monitor children exiting custody and the reasons that custody terminations are not reflected in MACWIS).

[136]  *See, e.g.*, June 24, 2013 Order §§II., III., and IV.

51

The explanations defendants have provided for the inaccuracies in the caseload data raise very serious concerns about the reliability of DFCS's enhanced data validation process, adopted in the wake of the June 24, 2013 Order. Defendants created a specialized and labor-intensive validation process for the caseload reports that requires face validity checks and a 100 percent validation in the field for all cases and case assignments. This type of process should have identified the incorrect supervisory assignments that were included in the November 1 and 30, 2013 mixed caseload reports, and enabled the defendants to determine on a more timely basis the causes of this shortcoming.

In any event, on February 3, 2014, following defendants' January 24, 2014 submission, they reported that the mixed caseload report that was required by the Final Period 4 IP to be produced on a weekly basis starting the week of February 1, 2014 would be delayed once more.[137] Defendants indicated that while reviewing supervisory caseload assignments, DFCS discovered that some lines of services appeared erroneously in the report.[138] Defendants noted that DFCS was working to address the issue and that the report would be produced as soon as possible.[139] On February 7, 2014, the Monitor asked defendants whether the issue discovered with the mixed caseload data report due at the start of February affected the validity, accuracy and/or completeness of the "corrected" November 1 and November 30, 2013 mixed caseload reports.[140] One week later, on February 14, 2014, defendants responded to this inquiry, advising the Monitor that the identical errors had been found in the "corrected" November 1 and November 30, 2013 caseload reports. Thereafter, on February 24, 2014, defendants advised that the November 1 and 30, 2013 mixed caseload reports could not be corrected. On February 25,

---

[137] Ex. 5M, February 3, 2014 correspondence to Julia Davis from Kenya Key Rachal.
[138] *Id.*
[139] *Id.*
[140] Ex. 5N, February 7, 2014 e-mail to Kenya Rachal from Grace M. Lopes.

2014, defendants reported that they had made a series of changes in MACWIS to improve the accuracy of the mixed caseload reports, and that they would begin to run the reports starting the week of March 3, 2014. Defendants also reported that they would undertake a 100 percent field validation process on a region by region basis in order to identify and decrease data entry errors.[141] On February 27, 2014, plaintiffs submitted a notice of noncompliance related to the mixed caseload reports pursuant to MSA §VII.B., triggering the MSA corrective action and dispute resolution process. On March 31, 2014, in response to plaintiffs' February 27, 2014 correspondence, defendants reported that they were submitting mixed caseload data for March 3, 12, and 20, 2014. The Monitor received these data on April 2, 2014.

In light of the history related to defendants' efforts to produce accurate mixed caseload data, the Monitor assessed the processes defendants implemented to improve the accuracy of the mixed caseload reports that she received on April 2, 2014. During the course of this assessment, DFCS representatives responsible for the mixed caseload validation process reported that a member of the field staff discovered certain data omissions in the mixed caseload data that was produced on April 10, 2014. Upon analysis of the omissions, defendants determined that a report programming error resulted in the exclusion of certain caseload carrying caseworkers from the mixed caseload data report. This programming error reportedly impacted the weekly caseload data that was produced and submitted to the Monitor on April 2, 2014. Defendants reported that they were able to correct the data beginning with the weekly data produced on April 10, 2014. As of May 6, 2014, the Monitor had not received those data.

---

[141] Ex. 5O, February 25, 2014 e-mail to Grace M. Lopes and Julia Davis from Kenya Rachal with annotated February 24, 2014 e-mail to Kenya Rachal and Julia Davis from Grace M. Lopes, redacted.

Because of the continuing limitations in defendants' performance, the Monitor cannot report on defendants' performance relative to the Period 3 caseload requirements.[142]  However, as noted above, the Monitor was able to analyze caseloads for a small subset of DFCS caseworkers – those assigned to a dedicated caseload.  Although defendants were unable to report on performance as of the end of Period 3, the data that were produced show that for the cohort of caseworkers who have dedicated caseloads and excluding the four carve-out counties, as of August 31, 2013, 79 percent of caseworkers with a dedicated caseload carried a caseload that did not exceed MSA requirements; eight percent of this cohort carried a caseload exceeding twice the MSA requirements; and none of the caseworkers in this cohort carried a caseload exceeding three times the MSA requirements.[143]

Understanding caseworker caseloads is fundamental to defendants' ability to assess their performance levels with respect to innumerable MSA requirements.  For many MSA requirements, if performance is lagging, defendants must be able to determine quickly and at a detailed level whether performance levels are being driven by caseworkers with caseloads that are too high.  The importance of the data to defendants hiring and casework assignment practices cannot be overstated.

The Monitor's analysis of caseworker hiring and attrition for the period beginning January 1, 2010 and ending December 31, 2013 indicates that overall defendants had a net gain of 128 caseworkers during this four-year period.  In Period 3, defendants made substantial gains

---

[142]  *See January 2013 Report* at 34. This issue has been addressed in multiple reports filed by the Monitor.  *See. e.g., June 2009 Report* at 29, 32-35; *The Court Monitor's Report to the Court Regarding Defendants' Progress Toward Meeting Period 2 Requirements* [hereinafter *September 2010 Report*], filed September 8, 2010 [Dkt. No. 503], at 19-22; *The Court Monitor's November 23, 2010 Report to the Court Regarding the June 10, 2010 Agreed Order for Corrective Action* [hereinafter *November 2010 Report*], filed November 23, 2010 [Dkt. No. 528], at 22; *January 2013 Report* at 34.

[143]  App. A, Ex. 15A, chart prepared by Office of the Court Monitor, Caseworkers with Dedicated Caseloads Exceeding MSA Requirements, by Region, One-Day Snapshots, 8/31/13 and 9/30/13.

in hiring caseworker staff, gaining a net of 45 new caseworker staff. These findings are presented in the following chart:



*Data were transmitted to the Court Monitor by MDHS human resources staff/management.

This recent progress represents an encouraging development, but it is a poor substitute for actual caseworker caseload data. Defendants must produce complete and accurate caseload data so that the parties and the Monitor can assess, among other things, the impact of defendants' hiring on caseload levels.

> MSA §II.A.2.a.9.b.
> **2. Human Resources Management**
>  **a. Workforce**
>   **9) By the end of Implementation Period Three:**
>    **(b) No more than 10% of supervisors who are responsible for supervising DFCS caseworkers shall be responsible for directly supervising more than five caseworkers. Hancock, Harrison, Hinds, and Jackson Counties are**

55

> exempt from this requirement during Implementation
> Period Three.

**Status of Progress, MSA §II.A.2.a.9.b.:**  As explained below, this requirement was not satisfied during Period 3.  There is a critical need for defendants to more effectively address this pivotal staffing issue.

Like the caseworker caseload reports addressed in the preceding section of this report, defendants have been required to provide accurate and validated reports on supervisory workloads since the start of Period 1.[144]  They failed to do so, and thus during Period 3 the MSA required defendants to begin producing monthly supervisory workload reports to plaintiffs' counsel and the Monitor by November 3, 2012.[145]  Defendants reported that they made efforts to satisfy this requirement, but they were unable to produce the reports during Period 3.[146]

Because defendants failed to produce accurate and validated supervisory workload reports during Period 3, both the June 24, 2013 Order and the Initial Period 4 IP required production of the reports that had been due during Period 3 by September 1, 2013, and thereafter on a monthly basis.[147]  On September 3, 2013 defendants produced a supervisory workload report for July 31, 2013.[148]  They reported that they were unable to produce the reports that were due during Period 3 because MACWIS does not retain historical supervisory workload data.[149] The next day defendants informed the Monitor that there was an issue with the Excel version of the report that they had sent the previous day, but that the PDF version that also had been transmitted had no limitations.  They indicated that they were working to address the issue and

---

[144] Settlement Agreement §II.A.2.a.7.-8.
[145] MSA §II.A.5.c.2. and App. C at 3.
[146] *See* Ex. 4A, Ex. 4B, and Ex. 4C, *supra* note 106 (explaining the report was delayed due to many unanticipated difficulties in implementation of the FSP).
[147] June 24, 2013 Order §VI.E., Attachments One and Two; Initial Period 4 IP §II.C.1.a.-c.
[148] *See* Ex. 5C, *supra* note 113.  The supervisory workload reports are based on point-in-time snapshots.
[149] *Id.*

would send the revised Excel version as soon as it was ready.[150]  Defendants were required by the Initial Period 4 IP to produce the reports in Excel format so the data could be more readily verified, manipulated and analyzed.[151]  On September 18, 2013, defendants transmitted a revised Excel version of the report.  Since that time they have produced the supervisory workload reports at monthly intervals as required.[152]

Pursuant to the MSA, no more than 10 percent of supervisors in the non-carve-out counties who are responsible for supervising caseworkers may supervise more than five caseworkers.[153]  Based on the data defendants produced, as of July 31, 2013, shortly after the end of Period 3, 16.8 percent of supervisors in the non-carve-out counties were supervising more than five caseworkers.[154]  On August 31, 2013, the data indicate that 19.4 percent of supervisors were supervising more than five caseworkers, and one month later, on September 30, 2013, the data show 20.6 percent of supervisors were supervising more than five caseworkers.  This downward trend in supervisory staffing levels is not new.  Indeed, the Monitor has reported on this phenomenon on multiple occasions.[155]

The Monitor analyzed supervisory hiring and separation data over a four-year period from 2010 through 2013.  The data, presented in the chart below, indicate that during Period 3, defendants lost 17 more supervisors than they hired.

---

[150]  *See* Ex. 5A, *supra* note 110.

[151]  Initial Period 4 IP §II.C.1.c.

[152]  Ex. 6A, September 18, 2013 correspondence to Miriam Ingber from Kenya Key Rachal.

[153]  As noted in the narrative related to Period 3 IP §§I.A.2.b. and I.A.2.c.3., *infra* at 63-67 during Period 3, Hancock, Harrison, Hinds, and Jackson Counties were exempted from the MSA requirements because of the parties' shared recognition that long-standing staffing deficits justified subjecting these counties to different requirements.  Hence, they are referred to in the MSA and the Period 3 IP as the "carve-out" counties.

[154]  App. A, Ex. 14A, chart prepared by the Office of the Court Monitor, Number of Supervisors Supervising One to Five and Six or More Case Workers, by Region, One-Day Snapshot, 7/31/13, 8/31/13, and 9/30/13.

[155]  *See, e.g.*, *The Court Monitor's Report to the Court Regarding Findings From the Second Case Record Review And Other Matters Relevant to Defendants' Progress Toward Satisfying the Requirements of the Settlement Agreement* [hereinafter *June 2012 Report*], filed June 29, 2012 [Dkt. No. 570], at 41 (noting net loss of four supervisors between January 2010 and April 2012); *January 2013 Report* at 28-29 (noting net loss of three supervisors during Period 3).



* Data were transmitted to the Court Monitor by MDHS human resources staff/management.

Supervisors are a lynchpin in defendants' reform strategy. In order to change case practice, DFCS must have a sufficient number of qualified supervisors available to support caseworkers and hold them accountable for meeting DFCS policy guidelines and MSA practice standards. The defendants recognize there is a critical need to increase supervisory staffing levels and have undertaken a specific initiative to address this issue. On January 16, 2014, defendants requested an exemption from the Council on Accreditation ("COA")[156] to

---

[156] COA is an independent, non-profit, accrediting organization that accredits human services entities, including public sector child and family services agencies. Like the Settlement Agreement, the MSA requires defendants to obtain COA accreditation. *See* Settlement Agreement §IV; MSA §IV.

accreditation standards that require supervisory staff to have advanced degrees.[157]  The

defendants' request for the exemption cited attrition, a rapid increase in caseworker staffing

levels, and an increase in the number of children in custody as justification for the request.[158]

COA granted a temporary exemption on February 26, 2014, which will be "revisit[ed]" in March

2015.[159]  The exemption, which defendants report was approved by the State Personnel Board

("SPB") on or about April 1, 2014, permits DFCS to hire supervisors without advanced degrees

if they are enrolled in a graduate program and working toward an advanced degree in social work

or a comparable human service field.[160]  The revised job description was posted on the SPB

website on April 14, 2014.

　　　As noted elsewhere in this report,[161]  because of supervisory staffing shortages,

defendants have reassigned staff in other critical positions, on a temporary basis, to supervisory

positions.  This is not a long-term solution.  Moreover, it can impede progress in the program

areas from which the staff are reassigned.[162]

> **MSA §II.A.2.a.9.c.**
> **2.  Human Resources Management**
> **a.  Workforce**
> **9)  By the end of Implementation Period Three:**
> **(c)  Caseworkers shall have access to a supervisor by**
> **telephone 24 hours a day.**

---

[157]  Ex. 6B, January 16, 2014 correspondence to Rebecca Tedesco from Mark A. Smith, redacted, with attached
excerpt from January 2013 Report.  During 2013 COA granted a temporary exemption to the supervisory
educational qualification requirements that was limited to the carve-out counties.
[158]  *Id.*  Defendants also cited the relevant findings regarding ASWS staffing levels reflected in the Monitor's
January 2013 Report.
[159]  Ex. 6C, February 26, 2014 correspondence to Mark Smith from Rebecca Tedesco, redacted.
[160]  *Id.*  According to the terms of the exemption, candidates must be hired with an expected date by which they will
receive the degree.
[161]  *See, e.g., infra* note 172.
[162]  *See also* the narrative related to Period 3 IP §§I.A.2.b. and I.A.2.c.3., *infra* at 62, for a discussion regarding the
temporary reassignments of the practice coaches.

**Status of Progress, MSA §II.A.2.a.9.c.:**  This requirement has been satisfied.  The current ASWS position description requires supervisors to remain on-call on a 24-hour basis.[163] Interviews with DFCS caseworkers and supervisors indicate that this policy is being implemented statewide.  On-call schedules are established periodically on a rotational basis, and they are communicated to county office staff.  The Monitor has interviewed hundreds of caseworkers during her tenure on this case, and with very few exceptions, they have reported no difficulty communicating with their supervisors at all hours of the day and night, including on weekends and holidays.

> MSA §II.A.2.a.9.d.
> 2.  **Human Resources Management**
> a.  **Workforce**
> 9)  **By the end of Implementation Period Three:**
> (d)  **Supervisors will not be assigned primary responsibility for providing direct casework for any cases, unless under the extenuating circumstances exception as described above.**

**Status of Progress, MSA §II.A.2.a.9.d.:**  As reported in the narrative related to MSA §II.A.2.a.8.,[164] defendants failed to report on this requirement during Period 3, and notwithstanding the requirements of the June 24, 2013 Order and the Initial Period 4 IP, they have been unable to produce accurate and validated data related to this requirement.[165] Interviews with supervisors and caseworkers indicate that supervisors have been assigned primary responsibility for cases, particularly in some DFCS regions; however, the Monitor is unable to report on this requirement absent an analysis of validated mixed caseload data which defendants are required to produce pursuant to MSA §II.A.2.a.9.a.[166]  As described in the

---

[163]  Ex. 7, DHS-Area Social Work Supervisor, Position Description for Hancock County, at 5.  While this position description related to an ASWS position in Hancock County, the 24-hour on-call job duty extends statewide.
[164]  *Supra* at 44-54.
[165]  *Id*.
[166]  *See id*. for the narrative related to MSA §II.A.2.a.9.a. regarding the status of the mixed caseload data.

narrative related to MSA §§II.A.2.a.8. and II.A.2.a.9.a.,[167] as of May 6, 2014, defendants had not produced complete and validated caseload data to the Monitor.

> **Period 3 IP §I.A.2.a.**
> **2. Workforce**
> **a. By August 1, 2012, Defendants shall maintain a practice coach in Regions I-N, I-S, II-E, II-W, III-N, III-S, IV-N, IV-S, V-E, V-W, VI, VII-E, and VII-W to facilitate Practice Model implementation.**

**Status of Progress, Period 3 IP §I.A.2.a.:**  As explained below, by the August 1, 2012 deadline, practice coaches were assigned to most but not all DFCS regions; however, there was at least one coach assigned to each of DFCS's 13 regions by January 2013.  While defendants have generally maintained at least one practice coach in each region, the coaches and the DFCS manager charged with oversight of Practice Model implementation have been subject to temporary, and sometimes protracted, reassignments to address staffing deficits in their own or other DFCS regions.

Two types of coaching have been used to promote implementation of the Practice Model. CSF has provided coaches in each DFCS region to train and work with regional directors and supervisors on Practice Model implementation.  Additionally, DFCS has hired employees to serve as Practice Model coaches to train and mentor caseworkers.  The DFCS coaches work one-on-one with the caseworkers.  This requirement targets the DFCS coaches.

Interviews with practice coaches, DFCS managers and CSF contractors responsible for supporting the implementation of the Practice Model, as well as a review of monthly reports related to Practice Model implementation, establish that as of August 1, 2012, at least one DFCS practice coach was assigned to ten of DFCS's 13 regions.[168]  By the August 1 deadline, coaches

---

[167]  *Supra* at 44-54.
[168]  At that time, two practice coaches were assigned to Regions II-W, III-N, and V-E.

had been identified for two of the three regions that did not have a practice coach assigned.[169]  By November 2012, at least one coach had been hired for all 13 regions and all coaches were working in their assigned regions by January 2013.  Since that time, defendants generally have maintained at least one coach in each DFCS region.  In fact, many regions have two coaches and one region has three coaches.[170]

Defendants also have created an administrative management structure for the coaches, requiring them to report to one of two coaching supervisors who in turn report to a DFCS manager responsible for Practice Model implementation statewide.[171]  Unfortunately, since mid-September 2013, the statewide manager for practice coaching has been serving as an acting ASWS, and more recently as an acting regional director, in an understaffed DFCS region.[172]  Moreover, because of staffing deficits, defendants have been reassigning a number of the regional practice coaches on a temporary basis to other positions in their assigned regions as well as in other DFCS regions.  These reassignments undercut defendants' efforts to improve case practice.[173]

---

[169]  The three regions that did not have at least one practice coach as of August 2012 were Regions I-N, VI, and VII-W.

[170]  Region VII-W has three Practice Model coaches.

[171]  The coaching supervisor for the northern half of the state was a former regional practice coach.  She assumed the supervisory position in October 2012 and is based in Region I-S.  The coaching supervisor for the southern half of the state is a former DFCS regional director who is based in Region VI.  She assumed the supervisory position in June 2013, but was resigned effective May 31, 2014.  Defendants report that efforts are ongoing to fill this key position.

[172]  Because of the shortage of supervisory staff in Region VI, the manager was assigned on September 16, 2013 to serve on a temporary basis as an ASWS in Forrest County and thereafter as one of two temporarily assigned regional directors in Region VI.  Defendants report that a new regional director began working in Region VI on April 28, 2014.  Because this manager must participate in the DFCS pre-service training program, defendants plan for the DFCS practice coach manager to remain in Region VI for the near term.

[173]  For example, according to the February 2014 Monthly Status Report on Practice Model Implementation submitted to the Monitor by CSF during February 2014, the practice coach assigned to Region IV-S was deployed to a special assignment in Region VI, leaving Region IV-S without a practice coach.  *Id.* at 7.  Similarly, during February 2014, the practice coach assigned to Region II-E was also on special assignment and unavailable to perform any coaching; however, the practice coaches in an adjacent region were able to provide coaching to a limited number of Region II-E staff.  *Id.* at 11.  Also during February 2014, one of two practice coaches assigned to Region VI was assigned to conduct investigations during the month instead of coaching.  *Id.*

Period 3 IP §§I.A.2.b. and I.A.2.c.3.

2. **Workforce**

b. **Within nine (9) months of the start of Implementation Period 3, Defendants shall have finalized and begun implementing a Workforce Development Plan.  This Workforce Development Plan shall address the recruitment and retention of DFCS professional and support staff as well as bring its current staff into substantial compliance with the worker and supervisor qualification requirements of the Modified Settlement Agreement.  The Workforce Development Plan shall identify the specific steps, strategies, financial resources, and short- and long-term staffing goals with related timeframes that are necessary to meet the staffing requirements of the Modified Settlement Agreement.  The Workforce Development Plan shall be approved by the Monitor as meeting the requirements of this Period 3 Implementation Plan and shall include a section focused specifically on recruitment and retention in Hancock, Harrison, and Jackson Counties ("Coast"), as well as strategies to support staff on the Coast, and shall also include a separate section focused specifically on recruitment, retention, and support strategies in Hinds County.**

c. **Defendants shall actively engage in recruitment and retention activities to address the workload issues in Hancock, Harrison, Hinds, and Jackson Counties as follows:**

    3) **By September 1, 2012, Defendants shall have written the Coast and Hinds County sections of the Workforce Plan as required in Section I.A.2.b above.**

**Status of Progress, Period 3 IP §§I.A.2.b and I.A.2.c.3.:**  Although defendants issued revised versions of the workforce development plan that improved upon earlier versions, as explained below, the Monitor has not been able to approve any of defendants' submissions because they have not satisfied the requirements of this subsection.

Defendants were required to submit and begin implementing a workforce development plan during Period 1.[174]  Because they were unable to do so,[175] the Period 2 IP required development and implementation of the workforce development plan by September 1, 2009.[176]  Defendants submitted a draft plan during Period 2; however, the submission did not meet Period

---

[174] Period 1 IP §I.2.a.
[175] *See June 2009 Report* at 35-36 for background information related to defendants' performance during Period 1.
[176] Period 2 IP §I.2.a.

63

2 requirements.[177]  As a result, the June 10, 2010 Agreed Order required defendants to develop

and begin implementing the plan by August 2, 2010.[178]  The Monitor reported that while

defendants' submission represented a significant improvement over the plan submitted during

Period 2, it had substantial shortcomings.[179]

During Period 3, Hancock, Harrison, Hinds and Jackson Counties were exempted from

the MSA caseload and workload requirements[180] based on the parties' shared recognition that

long-standing staffing deficits justified subjecting these counties to different requirements.[181]  As

the Monitor has reported previously, the carve-out counties have been treated differently because

of chronic understaffing of caseworkers and their supervisors in these specific counties, the

serious problems associated with the failure to maintain adequate staffing levels, and the large

number of children in custody in these counties relative to other counties in the state.[182]  In fact,

as reflected in the pie charts presented below, data produced by DFCS show that as of November

30, 2012, the four carve-out counties accounted for 39 percent of children in DFCS custody; by

January 31, 2014, a little over one year later, that percentage increased to 43 percent of children

in DFCS custody.

---

[177] For example, the draft did not address the number of professional and support staff needed to satisfy caseload requirements.  *See September 2010 Report* at 26-27 for additional background data.
[178] June 10, 2010 Order ¶7.h.
[179] *November 2010 Report* at 59-62.
[180] The exemption also applies to Period 4.  MSA §II.A.2.a.10.a.-b.
[181] *January 2013 Report* at 18, citing MSA §II.A.2.a.9.a.-b. and Period 3 IP §I.A.2.c.
[182] *January 2013 Report* at 18.





Number of Children in Custody, By County
One-Month Period Ending November 30, 2012
[Prepared by the Office of the Court Monitor Based on DFCS Data, MACWIS MWZ0510]
Hinds County
398 Children
11%
Jackson County
255 Children
7%
Hancock County
214 Children
6%
Harrison County
528 Children
15%
78 Non-Carve Out Counties
2192 Children
61%

Number of Children in Custody By County
One-Month Period Ending January 31, 2014
[Prepared by the Office of the Court Monitor Based on DFCS Data, MACWIS MWZ0510]
Hinds County
524 Children
12%
Jackson County
272 Children
6%
Hancock County
350 Children
8%
Harrison County
706 Children
17%
78 Non-Carve Out Counties
2351 Children
56%

During Period 3, the defendants were required to address understaffing in the carve-out counties through informed planning on an expedited timetable.  Thus, defendants were required to complete the sections of the Workforce Development Plan related to the carve-out counties by September 1, 2012.  On September 4, 2012, defendants submitted a workforce development plan for the carve-out counties.[183]  Among other limitations, and notwithstanding the express terms of §I.A.2.b. of the Period 3 IP, the defendants' submission failed to address recruitment activities in the carve-out counties.  The Monitor notified defendants of her concerns regarding the adequacy of their submission on September 12, 2012, and documented her concerns in an October 1, 2012 e-mail memorandum.[184]  On April 8, 2013, following discussions with the Monitor,[185] defendants submitted the complete workforce development plan,[186] which they reported was being implemented.  Due to conflicting priorities stemming in large part from activities related to the development and implementation of the June 24, 2013 Order, the Monitor was unable to make a determination regarding defendants' April 8, 2013 submission before negotiations related to the Period 4 IP commenced.  As a result, §II.A.1. of the Initial Period 4 IP required the Monitor to make a determination regarding approval of the defendants' April 8, 2013 submission by August 15, 2013.

Thereafter, on August 14, 2013, the Monitor informed the parties that the Plan was a substantial and encouraging improvement over previous submissions; however, the Monitor

---

[183]  Ex. 8A, Mississippi Department of Human Services, Division of Family and Children Services (MDHS/DFCS), Workforce Development Plan, Phase I, Harrison, Hancock, Jackson and Hinds Counties, redacted.  *See January 2013 Report* at note 74 for additional background regarding this document.

[184]  Ex. 8B, October 1, 2013 e-mail to Mark Smith from Grace M. Lopes, redacted.  For additional background regarding the September 12, 2012 meeting, *see January 2013 Report* at note 76.

[185]  The defendants provided the Monitor with a draft of the complete plan on January 1, 2013, which the Monitor reviewed and discussed with defendants' representatives.

[186]  Ex. 8C, Mississippi Department of Human Services, Division of Family and Children Services (MDHS/DFCS), Workforce Development Plan, April 2013, redacted.

reported that she had a number of questions to resolve before making a determination.[187]

Following a series of interviews, site visits and follow up communications with the parties, the

Monitor advised the parties on October 9, 2013 that she could not approve the Plan because in

certain instances clarification and supplementation were necessary to satisfy MSA

requirements.[188]  The Monitor transmitted detailed findings regarding defendants' April 8, 2013

submission to the parties on October 15, 2013.[189]  Essentially, the Monitor reported that she

could not approve the Plan because it failed to address with sufficient specificity the following

requirements of this subsection: strategies, financial resources, short- and long-term staffing

goals and related time frames.  For example, the plan failed to address how many caseworkers,

supervisors and support staff are needed statewide to meet MSA requirements and whether there

was a gap between the number of positions that were funded and the number of positions needed

to satisfy MSA requirements.[190]  Additionally, except for one position in one county, the

defendants' submission did not address recruitment and retention of support staff as required.

Thereafter, on November 6, 2013, defendants submitted a superseding version of the

Workforce Development Plan.[191]  With one exception, the revision did not address the issues

detailed in the Monitor's October 15, 2013 transmission.[192]  Accordingly, on November 18,

2013, the Monitor advised the parties that she could not approve the revision.[193]

> **Period 3 IP §I.A.2.c.1.**
> **2. Workforce**
> **c. Defendants shall actively engage in recruitment and retention**
> **activities to address the workload issues in Hancock, Harrison,**
> **Hinds, and Jackson Counties as follows:**

---

[187] Ex. 8D, August 14, 2013 e-mail to Kenya Rachal and Miriam Ingber from Grace M. Lopes.
[188] Ex. 8E, October 9, 2013 e-mail to Kenya Rachal and Miriam Ingber from Grace M. Lopes.
[189] Ex. 8F, October 15, 2013 e-mail to Kenya Rachal and Miriam Ingber from Grace M. Lopes.
[190] This underscores the need for accurate caseload data.  *See supra* at 44-55 for a discussion of the caseload data.
[191] Ex. 8G, Mississippi Department of Human Services, Division of Family and Children Services (DFCS),
Workforce Development Plan, April 2013, Revised, November 2013, redacted.
[192] Ex. 8H, November 8, 2013 e-mail to Kenya Rachal and Julia Davis from Grace M. Lopes.
[193] *Id.*

1) **By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants shall have defined the role of a case aide to support caseworkers in Hancock, Harrison, Hinds, and Jackson Counties.**

**Status of Progress, Period 3 IP §I.A.2.c.1.:**  As explained below, the case aide role was not defined as required.  Although the Period 3 IP exempted the carve-out counties from the caseload and supervisory work load requirements of the MSA, it required special initiatives in the carve-out counties to address staffing deficits.  Among these initiatives was the requirement to define the role of a case aide to support caseworkers in Hancock, Harrison, Hinds and Jackson counties.

Interviews with DHS and DFCS personnel unit managers and a review of the case aide position description establish that defendants have not revised the job description for case aides employed at DFCS since 2006, except for changing the title from social work aide to case aide and adding to the educational qualifications for the position.[194]  The job description includes clinical duties that should be performed by a caseworker and not a case aide.[195]

Insofar as the Period 3 IP requirement that defendants define the role of case aide in the carve-out counties, interviews with DHS and DFCS personnel managers as well as with management and supervisory staff in the carve-out counties indicate that a written description of the role was not developed.  However, interviews with these staff members as well as with case aides indicate that case aides generally support the work of caseworkers by driving children to appointments, locating records and performing other administrative support tasks that do not constitute casework or otherwise require clinical social work skills.  This is the case not only in

---

[194] *Compare* Ex. 9A, Social Work Aide, Position Description, Rev: 6/06, *with* Ex. 9B, DHS-Case Aide job description, downloaded February 26, 2014 from the Job Seekers section of the Mississippi State Personnel Board website, http://agency.governmentjobs.com/mississippi/default.cfm.

[195] *See, e.g.,* Ex. 9B, *supra* note 194 ("conducts relative or court ordered placement home studies directed by a supervisor" and "[v]isits clients' home and monitors clients' home and interactions" are among the examples listed in the position description of work performed by the case aide that require clinical skills and should be performed by a caseworker).

the carve-out counties but in several other counties as well.[196]  DFCS personnel assignment

records indicate that since the start of Period 3, defendants have hired two case aides in both

Hancock and Hinds Counties[197] and four in both Harrison and Jackson counties.

> **Period 3 IP §I.A.2.c.2.**
> **2.  Workforce**
> **c.  Defendants shall actively engage in recruitment and retention**
> **activities to address the issues in Hancock, Harrison, Hinds, and**
> **Jackson Counties as follows:**
> **2)  By 30 days following the Court's approval of the**
> **Modified Settlement Agreement, Defendants shall have**
> **determined the number of case aides needed in**
> **Hancock, Harrison, Hinds, and Jackson Counties and**
> **shall begin recruiting case aides in those counties.**

**Status of Progress, Period 3 IP §I.A.2.c.2.:**  The Monitor inquired on multiple

occasions during Period 3, but did not identify any written evidence of a determination of the

number of case aides needed for each of the carve-out counties.  During the comment period on

the draft version of this report, the defendants confirmed that a formal assessment was not

conducted, explaining that they could not effectively assess the need for support staff until they

had more caseworkers and supervisory staff on board.  Regardless of the merit of this position, it

would have been incumbent upon defendants to raise this issue with plaintiffs and the Monitor

during Period 3 and, if appropriate, to seek the Court's approval of a modification of this

requirement.

According to data provided by defendants, as of July 1, 2013, there were five case aides

assigned to Hancock County;[198] seven in Harrison County; one in Hinds County;[199] and two in

---

[196]  As of January 31, 2014, records provided by the DHS personnel unit indicate that in addition to the carve-out counties, case aides were assigned to Adams, DeSoto, Forrest, and Rankin counties.

[197]  Unfortunately, there has been a reduction since the start of Period 3 in the number of case aides assigned to Hinds County because the salaries for several case aides who were assigned there were paid by Hinds County itself. During 2013, the County stopped paying those salaries.  These costs have not been assumed by DFCS.

[198]  There were two additional vacant case aide positions as of July 1, 2013.

[199]  There was one additional vacant case aide position as of July 1, 2013.

Jackson County.[200]  There were 13 additional case aides assigned to non-carve-out counties as of

the same date.  Moreover, as of January 31, 2014, there were five case aides assigned to Hancock

County;[201] six in Harrison County;[202] none in Hinds County;[203] and three in Jackson County.[204]

There were 13 additional case aides assigned to non-carve-out counties as of the same date.

> Period 3 IP §I.A.2.c.4.
> 2.  Workforce
> c.  Defendants shall actively engage in recruitment and retention
>     activities to address the workload issues in Hancock, Harrison,
>     Hinds, and Jackson Counties as follows:
>     4)  By July 1, 2012, the Legal and Judicial Statewide
>         Implementation Sub-Team shall develop and begin
>         implementing written strategies for promoting
>         implementation of the Olivia Y. standards in the
>         Mississippi Youth Courts.  These strategies shall be
>         implemented in Regions VII-E, VII-W, and III-S by the
>         end of Implementation Period 3.

**Status of Progress, Period 3 IP §I.A.2.c.4.:**  Defendants have reported that practices in

the Youth Courts in the carve-out counties have adversely impacted implementation of MSA

requirements in two respects.  First, they have claimed that the Youth Courts have had an impact

on staff attrition.  Second, they have reported that certain practices in the Youth Courts violate

MSA requirements and in turn contribute to the challenges defendants have experienced in

attempting to satisfy MSA requirements.  For these reasons, this provision was added to the

Period 3 IP.

On July 2, 2012, the defendants submitted "Strategies for Promoting Implementation of

the *Olivia Y.* Standards in the Mississippi Youth Courts," a document prepared by the DFCS

---

[200]  There were two additional vacant case aide positions as of July 1, 2013.
[201]  There were no vacant case aide positions as of January 31, 2014.
[202]  There was one vacant case aide position as of January 31, 2014.
[203]  There were two vacant case aide positions as of January 31, 2014.
[204]  There was one vacant case aide position as of January 31, 2014.

Legal and Judicial Sub-Team in response to this Period 3 requirement.[205]  Thereafter, on

September 12, 2012, the Monitor advised the defendants of her view regarding the substantial

shortcomings in this submission.[206]  Among other limitations, and contrary to the requirements

of this subsection, the document that defendants submitted did not identify the specific *Olivia Y.*

standards that had not been implemented and it did not address implementation issues.  Further,

it framed many of the initiatives presented in terms of strategies the Youth Courts agreed to

implement instead of strategies that defendants would be required to implement.[207]

      As a result of discussions with the Monitor regarding the limitations in defendants' July

2012 submission, the defendants developed a revised version of the Youth Court strategies

document in consultation with CSF consultants.[208]  The revision was submitted on July 8,

2013,[209] and it represents a substantial improvement over the previous submission in several

respects.  Unlike the initial submission, it identifies specific MSA requirements that implicate

directly the actions of the Youth Court,[210] as well as specific MSA outcome standards which are,

at least in part, dependent upon the actions of the Youth Courts.[211]  Moreover, the revision

summarizes in significant detail the methodology that was utilized to identify issues implicating

Youth Court operations.[212]

---

[205]  Ex. 10, Strategies for Promoting Implementation of the *Olivia Y.* Standards in the Mississippi Youth Court, with attached correspondence to the Honorable Elise Epperson Deano, the Honorable Sanford R. Steckler, the Honorable Sharon Sigalas, the Honorable Margaret Alfonso, and the Honorable William Skinner from Mary Fuller, redacted.
[206]  During the course of a September 12, 2012 meeting with defendants' representatives, the Monitor outlined her concerns regarding this document and several other Period 3 submissions.
[207]  *See* Ex. 11, September 28, 2012 e-mail to Mark Smith from Grace M. Lopes for more detailed information regarding the limitations in this submission.  The submission was mailed on July 2, 2012, and received by the Monitor on July 5, 2012.  Thus it is referred to in Ex. 11 as a July 5, 2012 submission.
[208]  To their credit, the defendants developed the revision on their own initiative.  Unlike certain other Period 3 requirements, the Monitor's approval of the Youth Court Strategies submission was not required by the Period 3 IP.
[209]  Ex. 12, State of Mississippi, Department of Human Services, Division of Family and Children's Services, Youth Court Strategies Plan, redacted.
[210]  *Id.* at 2-4.
[211]  *Id.* at 4-6.
[212]  *Id.* at 7-10.  Defendants report that they convened discussions with DFCS leadership, meetings with judicial officers in the carve-out counties, and focus groups.  They also conducted an electronic survey of DFCS staff, and

Notwithstanding these improvements, however, in many instances the revision does not present the findings from data collection activities with the specificity necessary to understand how the findings relate to implementation of MSA requirements in the Youth Courts. For example, among the revision's 16 findings that defendants conclude "need attention" are the following: 1) "issues with the expedited placement process"; 2) "need for more placement resources"; and 3) "lack of communication and services available to resource parents." [213] The revision does not present the findings in a way that provides insight into how specific Youth Court operations are implicated. For example, the plan presents MACWIS data and survey data related to the expedited placement process in the carve-out counties.[214] However, it does not examine how, if at all, the reported outcomes reflected in the MACWIS data or the conclusions reflected in the survey data implicate Youth Court operations. Absent an understanding of how Youth Court operations have impacted defendants' ability to satisfy MSA standards related to the expedited placement process, the adequacy of placement resources, and communication and services to resource parents,[215] there can be no basis for developing strategies related to these matters.

> **Period 3 IP §I.A.2.c.5.**
> **2. Workforce**
> **c. Defendants shall actively engage in recruitment and retention activities to address the workload issues in Hancock, Harrison, Hinds, and Jackson Counties as follows:**
> > **5) Defendants shall offer starting salaries for employees in the counties of Hancock, Harrison, Hinds, and Jackson, as indicated below:**

---

obtained assistance from CSF to analyze relevant MACWIS and survey data. Moreover, defendants report that they received technical assistance from the National Child Welfare Resource Center on Legal and Judicial Issues, *id.* at 9-10.

[213] *Id.* at 37-38.
[214] *Id.* at 16.
[215] The term "resource parents" is used to refer to both foster and adoptive parents.

| Job Title | Starting Salary |
|---|---|
| Family Protection Worker I | $27,190.12 |
| Family Protection Specialist | $31,757.88 |
| Family Protection Specialist, Senior | $34,557.43 |
| Family Protection Specialist, Advanced | $37,605.49 |
| Area Social Work Supervisor | $43,138.52 |

**Status of Progress, Period 3 IP §I.A.2.c.5.:**  As explained below, this requirement was satisfied.

Among other factors, very low starting salaries have been viewed as an impediment to caseworker and supervisory recruitment as well as a factor that contributes to attrition, particularly in the carve-out counties.  Accordingly, during the latter part of 2011 the defendants applied for authorization from the SPB to increase the starting salary for caseworker and supervisory positions in the carve-out counties.  A 15 percent increase, referred to as a "recruitment flex" increase, for DFCS caseworkers and supervisors in the carve-out counties was approved on December 15, 2011.  Although this elevated the starting salary in the carve-out counties to required levels, defendants determined that it was insufficient.  Accordingly, 13 months later, on January 17, 2013, the defendants received authorization to increase caseworker and supervisory salaries by an additional 20 percent in Harrison, Hancock and Jackson counties.[216]

> **Period 3 IP §I.A.2.c.6.**
> **2. Workforce**
> **c. Defendants shall actively engage in recruitment and retention activities to address the workload issues in Hancock, Harrison, Hinds, and Jackson Counties as follows:**
> > **6)  The counties listed below shall have no fewer than the total number of full time caseworkers assigned to the counties as specified:**

---

[216] This is referred to as a type/duty/location increase.  The salary for regional directors was also increased.

- **Hancock County:**    **16 caseworkers**
- **Harrison County:**    **42 caseworkers**
- **Hinds County:**      **50 caseworkers**
- **Jackson County:**    **34 caseworkers**

**Status of Progress, Period 3 IP §I.A.2.c.6.:**  As reflected in the following bar chart,

personnel data produced by the defendants and analyzed by the Monitor indicate that defendants

exceeded caseworker staffing requirements in the carve-out counties by the end of Period 3.



Moreover, analysis of these data indicates that as of January 31, 2014, with the exception of

Hinds County which lost five caseworkers relative to July 1, 2013 levels, staffing levels in the

carve-out counties have continued to increase.  The January 31, 2014 caseworker staffing levels

that are reflected in the staffing records submitted by the defendants are reflected in the

following chart:

74



MSA §II.A.2.c.6.a.
2.  **Human Resources Management**
   c.  **Training**
      6)  <u>By the end of Implementation Period Three:</u>
         (a)  **Defendants shall establish and maintain a Training Unit,
              headed by a qualified director of training, with sufficient
              staffing and resources to provide or contract for the
              provision of comprehensive child welfare pre-service and
              in-service training to all caseworkers and supervisors.**

   <u>**Status of Progress, MSA §II.A.2.c.6.a.:**</u>  By the end of Period 3, defendants had

established a viable training unit with the capacity to administer the required pre-service training

program.  They had also significantly improved the in-service training program, although

additional progress is needed in that program particularly with regard to monitoring and tracking

staff participation.  The MSA establishes standards for the DFCS pre-service and in-service

training programs in order "to assure that it can provide comprehensive child welfare training to

enable all caseworkers, supervisors, and other child welfare agency employees to comply with the relevant mandates of [the MSA], DFCS policy, and reasonable professional standards."[217] Pursuant to the MSA, caseworkers must receive at least 270 hours of pre-service training before they may assume any case responsibilities.[218]  Similarly, all new caseworker supervisors must receive a minimum of 40 hours of pre-supervisory service training before they may be assigned to supervise caseworkers.[219]  In addition, on an annual basis, caseworkers must receive a minimum of 40 hours, and supervisors must receive a minimum of 24 hours, of ongoing in-service training.[220]

The establishment of an appropriately resourced training unit with the capacity to deliver pre-service and in-service training to caseworkers and their supervisors has been an annual implementation plan requirement since Period 1.[221]  Because progress was limited, the requirements of §II.A.2.c.6.a. of the MSA, among others related to staff training, were included among the Period 3 requirements.[222]

---

[217]  MSA §II.A.2.c.1.
[218]  *Id.* §II.A.2.c.2.  According to the MSA, pre-service training must include both instructional and field training.
[219]  *Id.* §II.A.2.c.3.
[220]  *Id.* §II.A.2.c.4.
[221]  Settlement Agreement §II.A.2.c.4.  Although there was some progress, defendants failed to satisfy this requirement during Period 1.  (For additional background information *see June 2009 Report* at 39-41; *see also id.* at 42-48 for information concerning defendants' progress toward meeting other Period 1 requirements related to the delivery of pre-service training to newly hired staff, competency-based testing for trainees, the development of an in-service training curriculum, and implementation of a system to track all required staff training.)  As a result, the Period 2 implementation plan included requirements that were intended to address the shortcomings in defendants' performance.  *See* Period 2 IP §§I.2.d.1-7 (requiring development and implementation of a written plan to provide comprehensive pre-service and in-service training for caseworkers and supervisors as well as development of a revised training curriculum to reflect Settlement Agreement requirements; directing that supervisors should not be detailed to the training unit to provide training; requiring caseworkers and supervisors to complete their respective pre-service training programs before being assigned to cases or staff supervision; mandating that all caseworkers and supervisors participate in a minimum number of hours of in-service training annually; and requiring competency-based testing and implementation of a system to track staff participation in all required training).
[222]  *See September 2010 Report* at 30-49 for a detailed description of defendants' performance during Period 2.

A review of relevant DFCS records,[223] observation of training sessions, interviews with contract trainers and staff from the DFCS training unit as well as with caseworkers and their supervisors, establish that by the end of Period 3 defendants had developed a viable training unit with the capacity to administer the required pre-service training program.[224]  Moreover, defendants made significant improvements during Period 3 in developing the in-service training program; however, additional progress, particularly with respect to monitoring and tracking staff participation in the program, is necessary.  These matters are explained more fully below.

Pre-service training for caseworkers is based on a 270-hour curriculum that is delivered during an eight-week period, alternating on a weekly basis between classroom and on-the-job training ("OJT") sessions.  Since the start of 2012, the classroom component of the pre-service training program has been conducted by trainers from the University of Mississippi.[225]  On alternating weeks, DFCS trainers are assigned to work with trainees on the OJT components of the pre-service training curriculum – a helpful innovation that has strengthened the OJT component of the program.[226]

---

[223]  Among other documents, service contracts, curricular materials, training schedules, sign-in records, and testing reports were reviewed.

[224]  The Monitor's assessment of the DFCS training program was informed by an ongoing evaluation of the program conducted during Period 3 by Linda Southward, Ph.D., M.S.W., ACSW.  Dr. Southward currently serves as Research Professor and Coordinator of the Family and Children Research Unit at Mississippi State University.  Her credentials and experience are summarized in her curriculum vitae, included in the *September 2010 Report* at Ex. 1A.

[225]  In early October 2011, the defendants contracted with the University of Mississippi to revise the pre-service training curriculum.  By the end of the 2011 calendar year, the curriculum was revised and it has been used since early 2012 for training newly hired caseworkers and supervisors.

[226]  In addition to the DFCS trainer, the OJT training involves the caseworker's supervisor as well as a "training buddy" who is typically a more experienced DFCS caseworker.  Depending on the size of the training class, DFCS trainers typically work in small group sessions with new caseworkers during the OJT segments of the pre-service training.  During Period 2, there was evidence that the OJT component of the pre-service training had not been implemented uniformly, and in some instances it was not being implemented at all in various regions throughout the state.  Some supervisors, who were at that time responsible for providing the OJT training to newly hired caseworkers, reported that they were unaware of the existence of the training manual that they were expected to follow.  *See September 2010 Report* at notes 145-146 for additional background information related to shortcomings in the OJT program.

The pre-service supervisory training is based on a 40-hour curriculum that is delivered in a classroom setting by University of Mississippi contractors.[227]  The classroom component is followed by a 24-week OJT program, during which trainers from the University of Mississippi are assigned to mentor new supervisors.[228]

In February 2013, defendants hired a qualified training director who began working under the supervision of the director of the DFCS professional development unit.[229]  Although defendants did not hire any new trainers during Period 3, by the end of Period 3 the training unit was staffed with nine trainers supported by three administrative staff members.[230]  Shortly thereafter, the staffing levels in the training unit increased and by mid-September 2013 the unit had a complement of 13 full-time trainers.  Currently, defendants report that they are recruiting to fill six additional training coordinator positions.[231]  Defendants indicate that they have had difficulty in the past filling these positions, which are needed to expand the in-service training program and launch a specialized training program for resource and adoption workers.[232]

> MSA §II.A.2.c.6.b.
> 2.  **Human Resources Management**
>  c.  **Training**
>   6)  **By the end of Implementation Period Three:**
>    (b)  **All new caseworkers and supervisors will complete their pre-service training consistent with the Modified Settlement Agreement requirements before they assume**

---

[227]  If a newly hired supervisor has not received the updated 270-hour pre-service caseworker training, s/he is required to complete it before attending the pre-service supervisory training.  Unlike the curriculum that was in use before 2012, the new supervisory training curriculum focuses primarily on child welfare supervision for the first three days followed by a two-day administrative component.

[228]  Supervisors may be assigned to supervise caseworkers after the 40-hour classroom component of the pre-service training has been completed.  Like the use of DFCS trainers for the OJT component of pre-service caseworker training, the use of University of Mississippi consultants as mentors for newly appointed supervisors has helped to promote a much more structured approach to the OJT aspect of the supervisory training program.

[229]  The director of the professional development unit also served as the training director between January 2011 and February 2013.

[230]  The administrative staff include a secretary-principal and two special projects officers.

[231]  Defendants plan for one of the positions to be staffed by a specialist in resource licensure and adoption. There is a critical need for specialized training for this cohort, which defendants are beginning to address.  *See infra* note 246 for information regarding the newly introduced coaching labs for resource and adoption staff.

[232]  Resource workers recruit and license foster homes.

> their respective responsibilities for carrying cases and
> supervising.

**Status of Progress, MSA §II.A.2.c.6.b.:**  According to data provided by defendants, between July 1, 2012 and June 30, 2013, 322 caseworkers[233] began pre-service training, 313 of whom (97 percent) completed the training.[234]  According to defendants, none of the individuals who began pre-service training performed any casework prior to completing the training.

According to data provided by defendants, between July 1, 2012 and June 30, 2013, 18 supervisors completed pre-service training consistent with MSA requirements before assuming supervisory responsibilities.[235]  In addition to these 18 supervisors, 18 additional DFCS staff members completed the pre-service caseworker supervisor training despite the fact that they did not hold supervisory positions.  According to the director of the DFCS professional development unit, DFCS allows some non-supervisory staff to complete the caseworker supervisor training, which qualifies these staff members to serve in an acting capacity as caseworker supervisors.  Interviews with several DFCS managers and non-supervisory staff who received the caseworker supervisory training confirm that DFCS allows non-supervisory staff to supervise caseworkers if they have received the requisite training.[236]

> MSA §II.A.2.c.6.c.
> **2.  Human Resources Management**
>   **c.  Training**
>     **6)  By the end of Implementation Period Three:**

---

[233]  This total includes some supervisory staff who were not already employed by the agency.

[234]  App. A, Ex. 16A, chart prepared by Office of the Court Monitor, Number of Individuals Who Started Caseworker Pre-Service Training, by Quarter and Training Completion Status, Three-Month Periods Ending September 2012 through December 2013 and App. A, Ex. 16B, corresponding table with underlying data.

[235]  App. A, Ex. 17A, chart prepared by the Office of the Court Monitor, Number of Individuals Who Started Pre-Service Caseworker Supervisory Training, by Quarter and Training Completion Status, Three-Month Periods Ending September 2012 through December 2013 and App. A, Ex. 17B, corresponding table with underlying data.  One of the 18 supervisors was a regional director and not an ASWS.

[236]  Not all of the non-supervisory caseworkers who received caseworker supervisory staff training meet the qualification standards for caseworker supervisors.  Additionally, not all non-supervisory caseworkers who received supervisory caseworker training ultimately supervised caseworkers.

(c) **The in-service training curriculum for caseworkers and supervisors will be developed and in-service training will have been initiated.**

**Status of Progress, MSA §II.A.2.c.6.c.:**  The MSA establishes in-service training requirements.  On an annual basis, caseworkers must receive a minimum of 40 hours and their supervisors must receive a minimum of 24 hours of in-service training.  Prior to Period 3, the defendants had not developed an in-service training program that satisfied MSA requirements.[237]  However, defendants have made significant progress.  The evidence shows that by the end of Period 3, the defendants developed an in-service training curriculum and initiated the related training program for caseworkers and supervisors.  As explained below, additional progress is warranted, particularly with respect to managing and tracking staff participation in the program.

Defendants, in collaboration with contract staff from the University of Mississippi, began to develop the curriculum for a structured in-service training program during May 2012, shortly before the start of Period 3.[238]  Following a planning and development stage, the program was introduced to DFCS staff on July 1, 2013.  According to defendants, at least half of the annual in-service training hours for caseworkers and their supervisors must be obtained through participation in a DFCS training class.[239]  The remaining in-service training hours may be obtained through participation in external programs.  In order to qualify for in-service training

---

[237]  *See, e.g., June 2009 Report* at 44-45 and *September 2010 Report* at 30-38 for more detailed background information regarding defendants' past performance.

[238]  Starting in May 2012, DFCS trainers received instruction on curriculum development from University of Mississippi consultants.  Thereafter, DFCS trainers were tasked with developing curriculum for a series of in-service training topics, including individual case planning; facilitating groups and team meetings; advanced non-violent crisis intervention; appropriate and quality documentation; and parenting skills.

[239]  Thus, caseworkers must participate in at least 20 hours, and supervisors must participate in at least 12 hours, of DFCS in-service training sessions on an annual basis.

credit, enrollment in any external training program must be approved by a DFCS supervisor or regional director.[240]

In-service training sessions are conducted by both DFCS trainers and University of Mississippi consultants. The curriculum is intended to integrate DFCS policy and Practice Model principles, building on the pre-service training curriculum. Defendants report that the curriculum has evolved in response to feedback from pre-service training participants, a review of CQI data, staff survey data,[241] and consultation with external consultants.[242] As expected in these circumstances, the refinement of the curriculum is described by DFCS managers as an ongoing process.[243]

Additionally, since the start of Period 3, defendants have supplemented in-service offerings with specialized training initiatives, including a training program related to Practice Model implementation,[244] and a clinical training program for supervisors developed by defendants in collaboration with CSF.[245] These sessions represent important additions to the DFCS in-service training program. As appropriate, in response to identified performance concerns, specialized in-service training initiatives have continued during Period 4.[246]

Notwithstanding this progress, defendants must improve the system for tracking whether DFCS staff have satisfied in-service training requirements. As addressed in the narrative related

---

[240] *See* Ex. 13 for the description of the in-service training program provided to DFCS employees on the MDHS MACWIS internal portal at http://dfcsmacweb/DFCSWEB/PDF/ProfessionalDevelopment/Year%203-2013%20OJT%20Manual%20Final%20Copy%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.pdf, last visited on March 10, 2014.

[241] For example, caseworker and supervisors consistently point to the need for more MACWIS training. In response, refresher training sessions related to MACWIS were added to the in-service curriculum.

[242] Defendants report that CSF and University of Mississippi consultants have suggested training topics.

[243] *See* Ex. 14, for a redacted copy of the in-service training topics offered by the DFCS training unit at the end of Period 3 through June 30, 2014.

[244] *See, e.g., infra* at 86-87 regarding the Practice Model training conducted during Period 3.

[245] Defendants refer to this supervisory training as the level two clinical supervision training. It consists of three modules tied to administrative, educational and supportive supervisory functions. Defendants, in collaboration with CSF, are in the process of finalizing a level three supervisory training, which focuses on safety and risk assessments.

[246] For example, during Period 4, in collaboration with CSF, defendants launched a safety assessment coaching lab for resource and adoption caseworkers and their supervisors. The need for this type of training was underscored by the findings of the F.M. fatality review, addressed *infra* at 149-151 in the narrative related to Period 3 IP §II.C.1.

to Period 3 IP §I.A.3.a.4., defendants recognize this limitation and indicate that they are working to address it.[247]

> **Period 3 IP §I.A.3.a.1.**
> **3. Training**
>  **a. Pre-Service Training**
>    **1) By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants shall have a revised pre-service training curriculum. The revised training shall include training on the quality, frequency, purpose, and structure of meetings with foster children, parents, and foster care providers and address communicating with, interviewing, and observing foster children.**

**Status of Progress, Period 3 IP §I.A.3.a.1.:**  As noted above, defendants contracted with the University of Mississippi during the latter part of 2011 to revise the pre-service training curriculum.  The revised curriculum was implemented by early 2012.  Each of the topics required by this sub-section of the Period 3 IP are addressed in the revised curriculum,[248] which incorporates MSA requirements, updated DFCS policy guidance, and Practice Model principles. During 2013, defendants added a full week of MACWIS instruction to the pre-service training curriculum.  These modifications have strengthened the pre-service training program.

> **Period 3 IP §I.A.3.a.2.**
> **3. Training**
>  **a. Pre-Service Training**
>    **2) By July 1, 2012, Defendants shall maintain nine (9) full-time trainers.**

**Status of Progress, Period 3 IP §I.A.3.a.2.:**  As reported in the narrative related to MSA §II.A.2.c.6.a.,[249] by the end of Period 3 the training unit was staffed with nine full-time trainers, and since mid-September 2013, there have been 13 full-time trainers assigned to the unit.  As of mid-April 2014, defendants were attempting to fill six additional training coordinator positions.

---

[247]  *See infra* at 83-85.
[248]  Defendants bolstered the OJT component of the pre-service training program by revising the curriculum, and integrating it more closely with the curriculum used in the classroom.
[249]  *See supra* at 75-77.

DFCS managers report that these vacancies must be filled in order to provide specialized training to resource and adoption staff and to expand the array of in-service training classes.

> **Period 3 IP §I.A.3.a.3.**
> **3.  Training**
>   **a.  Pre-Service Training**
>       **3)  By September 1, 2012, Defendants shall strengthen the competency-based testing to ensure that trainees have acquired adequate competencies in the areas of interviewing, critical thinking skills, and documentation skills related to child safety assessments and to preparing case summaries for submission to the Youth Court.**

**Status of Progress, Period 3 IP §I.A.3.a.3.:**  As noted above,[250] the pre-service training program for caseworkers includes four weeks of classroom instruction.  At the conclusion of each week of classroom instruction, trainees are tested.  The tests, which are in multiple choice format, do not fully address the acquisition of the skills required by this sub-section of the Period 3 IP.  This is especially true with respect to critical thinking, interviewing, and child safety documentation skills.  There are opportunities during the classroom and OJT components of the pre-service training to assess and provide feedback on these specific skills; however, the assessment and feedback process is not incorporated into the competency-based testing that is administered to trainees.

> **Period 3 IP §I.A.3.a.4.**
> **3.  Training**
>   **a.  Pre-Service Training**
>       **4)  Defendants shall have implemented an accurate and reliable system to track staff participation in all required training.**

**Status of Progress, Period 3 IP §I.A.3.a.4.:**  Defendants did not implement an accurate and reliable system to track staff participation in all required training during Period 3.  Thereafter, as explained below, a tracking system for all required pre-service training was implemented, which appears to be reliable.  Moreover, a functional tracking system for in-service

---

[250]  *See supra* at 76.

training was not established during Period 3. Defendants report that they subsequently developed a system to track all required in-service training; however, even if the system is adequate, the evidence shows it is not being implemented as intended.

Pursuant to the June 24, 2013 Order, defendants were required to report by November 1, 2013 and quarterly thereafter[251] on whether caseworkers and supervisors received required pre-service training during Period 3.[252]  On November 1, 2013, defendants produced training data for July and August 2013, but not for Period 3. At that time, defendants notified plaintiffs' counsel and the Monitor that they had failed to track caseworker participation in the OJT hourly requirements for the training program during Period 3, but began to do so starting in October 2013.[253]  Thereafter, defendants produced the caseworker pre-service training reports for Period 3 on December 11, 2013 and the supervisory pre-service training reports for Period 3 on January 14, 2014.[254]

As a preliminary test of the training data's completeness, the Monitor attempted to cross reference two independent data sources: hiring data and pre-service training records. Preliminarily, the Monitor identified what appeared to be gaps in the training data (*i.e.*, names of individuals who appeared to be newly hired caseworkers who did not appear in the training database); however, after additional data gathering and discussions with defendants, all of the discrepancies that were identified were accounted for. The Monitor will conduct a deeper review of individual training records, as indicated, and report to the parties and the Court as appropriate.

---

[251]  The June 24, 2013 Order required defendants to report on Period 3 performance in quarterly reports to be submitted by October 1, 2013. *Id.* at Attachment One and Attachment Two, Report 12. However, the October 1, 2013 deadline was erroneous because it did not account for quarterly reporting. *See* Ex. 15A at 2, October 3, 2013 correspondence to Miriam Ingber from Kenya Key Rachal, redacted (explaining the error in the schedule specified by the June 24, 2013 Order).

[252]  June 24, 2013 Order §VI.E., Attachment One, and Attachment Two, Report 12.

[253]  Ex. 15B, November 1, 2013 correspondence to Miriam Ingber from Kenya Key Rachal.

[254]  Defendants produced training data for July through August 2013 on November 1, 2013, but failed to produce the data related to performance during Period 3. After the Monitor brought this omission to defendants' attention, they produced the required Period 3 data on December 11, 2013 for caseworkers and January 14, 2014 for supervisors.

In addition, as noted above, defendants did not maintain a functional system for tracking in-service training during Period 3. While efforts were made to initiate a tracking system starting on July 1, 2013,[255] the evidence establishes that the system is not working as intended. Indeed, as of March 12, 2014, a review of the tracking data required to be submitted by DFCS managers indicates that managers in only three of DFCS's 13 regions have submitted any information whatsoever regarding staff participation in in-service training sessions since July 2013.[256]

> **Period 3 IP §I.A.3.b.1.**
> **3. Training**
>   **b. Supervisor Training**
>     **1) By 30 days following the Court's approval of the Modified**
>       **Settlement Agreement, Defendants shall have a newly**
>       **developed clinical supervisory training curriculum.**

**Status of Progress, Period 3 IP §I.A.3.b.1.:** The clinical supervisory training was developed during the spring of 2013, and delivered through the summer of 2013 to DFCS supervisors.[257] It represents a significant improvement in the supervisory training program.

> **Period 3 IP §I.A.3.b.2.**
> **3. Training**
>   **b. Supervisor Training**
>     **2) All Area Social Work Supervisors (ASWSs) hired between**
>       **January 1, 2012 and April 1, 2013 shall have received**
>       **training pursuant to the newly developed clinical**
>       **supervisory training curriculum.**

**Status of Progress, Period 3 IP §I.A.3.b.2.:** Defendants undertook a comprehensive training initiative related to this requirement. The Monitor will report on defendants' performance after reconciling DFCS hiring and training records related to the clinical supervisory training.

---

[255] *See* Ex. 13, *supra* note 240 (addressing the in-service training approval process and tracking process).
[256] Ex. 16, DFCS tracking spreadsheets for in-service training, redacted, downloaded from DFCS internal network on March 12, 2014 (showing spreadsheets for 10 regions completely blank and very limited entries for two of the remaining three regions).
[257] *See supra* at 81 for additional information regarding the training.

**Period 3 IP §I.A.3.c.1.**
**3. Training**
  **c. Other Training**
    **1) By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants shall have provided training to all Foster Care Review and Evaluation and Monitoring staff employed with Defendants as of January 1, 2012 on data indicators of the six (6) practice model components and systemic factors to measure and evaluate improvement efforts.**

**Status of Progress, Period 3 IP §I.A.3.c.1.:** A review of sign-in sheets and interviews with staff and managers indicate that the required training was provided to FCR and EMU staff on February 27, 2012, before the start of Period 3.

**Period 3 IP §I.A.3.c.2.**
**3. Training**
  **c. Other Training**
    **2) By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants shall have provided training on the Use of Data in Management to all DFCS State Office staff employed with Defendants as of January 1, 2012, who hold the position of Bureau Director II, Bureau Director I, Division Director II, Division Director I, Office Director II, or Office Director I, as well as to all Regional Directors.**

**Status of Progress, Period 3 IP §I.A.3.c.2.:** Defendants required the managers identified in this sub-section to attend a one-day training session related to this requirement. Two training sessions were conducted with the assistance of representatives from the National Resource Center for Child Welfare and Data Technology on March 19 and 20, 2012, before the start of Period 3. The documentation the Monitor has reviewed indicates that 46 DFCS staff members and four consultants attended the training sessions.

**Period 3 IP §I.A.3.c.3.**
**3. Training**
  **c. Other Training**
    **3) By July 1, 2012, Defendants shall have provided training for Region V-E on the six (6) components of the practice model.**

**Status of Progress, Period 3 IP §I.A.3.c.3.:** The training program related to the components of the Practice Model is delivered in four one-day sessions. Defendants conducted

multiple sessions for Region V-E staff between February 27, 2012 and April 5, 2012.  It appears

that with limited exceptions, the staff and managers assigned to Region V-E received the

required training.[258]

> **Period 3 IP §I.A.3.c.4.**
> **3.  Training**
>   **c.  Other Training**
>     **4)  By the end of Implementation Period 3, Defendants shall
>     have provided training for Regions II-E, III-N, VI, VII-E
>     and VII-W on the six (6) components of the practice model.**

**Status of Progress, Period 3 IP §I.A.3.c.4.:**  DFCS records and interviews with DFCS

managers, DFCS staff and CSF consultants indicate that the required training was conducted for

staff in the five targeted regions by the end of Period 3.[259]

> **MSA §II.A.2.d.2.a.**
> **2.  Human Resources Management**
>   **d.  Contract Agency Requirements**
>     **2)  By the end of Implementation Period Three:**
>       **(a)  All therapeutic resource parents who have one or more
>       foster children residing in the home shall be visited in the
>       home at least once per month by their private agency
>       caseworker.  These visits shall be in addition to the
>       monthly home visit conducted by DFCS. Beginning in
>       Implementation Period Three, all contracts executed
>       between Defendants and  private agencies that provide
>       services to foster children shall require that the private
>       caseworker (1) share all relevant and legally disclosable
>       information concerning the foster child; (2) evaluate the
>       foster child's safety, needs, and well-being; and (3)
>       monitor service delivery and the achievement of service
>       goals.  DFCS shall require that such visits occur, that
>       they are documented in the child's case record, and that
>       remedial action is taken if such visits are not taking place.**

**Status of Progress, MSA §II.A.2.d.2.a.:**  Because the Monitor was not confident that she

had obtained all Period 3 contracts between defendants and private agencies that provide services

to foster children, she requested that defendants identify all contracts that fall within the purview

of this subsection during the comment period on the draft version of this report.  Defendants

---

[258]  According to records submitted by the defendants, 63 staff members in Region V-E received the training on a
timely basis and five participated in make-up sessions that were completed by August 31, 2012.
[259]  Available records indicate that supervisors and caseworkers in each of the regions were trained between July 31,
2012 and June 18, 2013.

submitted all of the applicable contract documents by May 7, 2014.  The Monitor's preliminary

review of these documents has identified limitations in some of the contracts, which the Monitor

intends to discuss and resolve with the parties in the near term.  Thereafter, the Monitor will

report to the Court as appropriate.

> **MSA §II.A.2.d.2.b.**
> **2.  Human Resources Management**
>   **d.  Contract Agency Requirements**
>     **2)  By the end of Implementation Period Three:**
>       **(b)  Beginning in Implementation Period Three, all contracts executed between Defendants and private agencies that provide protective, preventive, foster care, or adoption case work services shall require the contract agencies to abide by all related terms of the Modified Settlement Agreement, including, but not limited to, provisions regarding training curricula, minimum training hours, and caseload standards, with the exception that contract agency caseworkers shall not be required to undertake the hours of pre-service training required of DFCS caseworkers that pertain to MACWIS instruction and DFCS-specific workplace procedures.  The training requirement of the Modified Settlement Agreement shall apply only to contract agency caseworkers and supervisors responsible for making case planning decisions and/or recommendations.**

**Status of Progress, MSA §II.A.2.d.2.b.:**  In an effort to satisfy this requirement, during

Period 3, the defendants incorporated terminology in the contracts between MDHS and private

agencies that provide protective, preventive, foster care, or adoption case work services.  A

review of the applicable contracts that were finalized during Period 3 indicates that the

terminology intended to satisfy the requirements of this subsection does not require the contract

agency to abide by all related terms of the MSA.[260]  The same is true for contracts that have been

in effect during Period 4.[261]

---

[260]  During November 20, 2012, a member of the Court Monitor's staff requested that the responsible DFCS staff member from the Administration Unit, (a unit which is responsible for all DFCS contracts), provide all contracts entered into by defendants since July 5, 2012 with private agency providers of protective, preventive, foster care, or adoption case work services.  Ex. 17A, November 20, 2012 e-mail to Wendy Benoit from Mia Caras and November 20, 2012 e-mail to Mia Caras from Wendy Benoit.  In response, defendants transmitted seven subgrant agreements with private providers for the various services described in this sub-section of the MSA.  Each contract covered the identical performance period, October 1, 2012 – September 30, 2013, and each contains the following terminology

Period 3 IP §I.A.4.
4. **Contract Agency Requirements**
    **Defendants shall work with Casey Family Programs, or**
    **another consultant approved by the Monitor, for technical**
    **assistance with developing a plan with specific action steps and**
    **timeframes for a performance based contracting system with**
    **the capacity to monitor and enforce contract performance.**

---

related to the MSA: "Subgrantee shall provide, perform, and complete, in a reasonable manner as determined by MDHS, the services and activities described in the 'Scope of Services' attached hereto as Exhibit A and incorporated herein by reference and the 'Modified Settlement Agreement and Reform Plan,' attached hereto as Exhibit . . . ." *See* Ex. 17B, Agreement Between the Mississippi Department of Human Services and Catholic Charities, Inc., redacted, §I. (community-based child abuse prevention services); Ex. 17C, Agreement Between the Mississippi Department of Human Services and Starkville School District, §I. (prevention services); Ex. 17D, Agreement Between the Mississippi Department of Human Services and Southern Christian Services for Children and Youth, Inc., redacted, §I. (independent living services); Ex. 17E, Agreement Between the Mississippi Department of Human Services and Mississippi Children's Home Society, §I. (family preservation and reunification services); Ex. 17F, Agreement Between the Mississippi Department of Human Services and Family Resource Center of Northeast Mississippi, §I. (forensic interviewing); Ex. 17G, Agreement Between the Mississippi Department of Human Services and Southern Christian Services for Children and Youth, Inc., §I. (permanency/post adoption services); Ex. 17H, Agreement Between the Mississippi Department of Human Services and Catholic Charities, Inc., §I. (therapeutic foster homes, therapeutic group homes and independent living home placements).

[261] Some of the more recent contracts incorporate certain specific MSA requirements, *see. e.g.,* Ex. 18A, State of Mississippi, Mississippi Department of Human Services, Contract for Personal or Professional Services between the Division of Family and Children's Services, Mississippi Department of Human Services and Sunnybrook Children's Home, Inc., July 1, 2013-June 30, 2014, §3. and in the attached Scope of Services, §§A.- C. (reflecting some specific MSA requirements, including requirements related to group homes, sibling placements, placement proximity, and medical, dental and mental health care). However, the more recent contracts that the Monitor has reviewed do not specifically incorporate all applicable MSA requirements and each contract contains the following provisions in the scope of services section: "[t]he Independent Contractor shall perform and render the following services, attached hereto as 'Exhibit A' and the *Modified Mississippi Settlement Agreement*, attached hereto as 'Exhibit B'." This language does not require the contractor to abide by all applicable provisions of the MSA. *Id.* §3. *See also* Ex. 18B, State of Mississippi, Mississippi Department of Human Services, Contract for Personal or Professional Services between the Division of Family and Children's Services, Mississippi Department of Human Services and Pine Vale Children's Home, July 1, 2013-June 30, 2014, §3; Ex. 18C, State of Mississippi, Mississippi Department of Human Services, Contract for Personal or Professional Services, between the Division of Family and Children's Services, Mississippi Department of Human Services and Impact Missions, Inc., July 1, 2013-June 30, 2014, §3; Ex. 18D, State of Mississippi, Mississippi Department of Human Services, Contract for Personal or Professional Services between the Division of Family and Children's Services, Mississippi Department of Human Services and Gardner-Simmons Home for Girls, Inc., July 1, 2013-June 30, 2014, §3; Ex. 18E, State of Mississippi, Mississippi Department of Human Services, Contract for Personal or Professional Services between the Division of Family and Children's Services, Mississippi Department of Human Services and Berean Children's Home, Inc., July 1, 2013-June 30, 2014, §3; Ex. 18F, State of Mississippi, Mississippi Department of Human Services, Contract for Personal or Professional Services between the Division of Family and Children's Services, Mississippi Department of Human Services and Christians in Action, Inc., July 1, 2013-June 30, 2014, §3; Ex. 18G, State of Mississippi, Mississippi Department of Human Services, Contract for Personal or Professional Services between the Division of Family and Children's Services, Mississippi Department of Human Services and Sally Kate Winters Family Services, July 1, 2013-June 30, 2014, §3; Ex. 18H, State of Mississippi, Mississippi Department of Human Services, Contract for Personal or Professional Services, between the Division of Family and Children's Services, Mississippi Department of Human Services and Mississippi Children's Home Society, July 1, 2013-June 30, 2014, §3; Ex. 18I, State of Mississippi, Mississippi Department of Human Services, Contract for Personal or Professional Services between the Division of Family and Children's Services, Mississippi Department of Human Services and Hope Village for Children, Inc., July 1, 2013-June 30, 2014, §3; Ex. 18J, State of Mississippi, Mississippi Department of Human Services, Contract for Personal or Professional Services, between the Division of Family and Children's Services, Mississippi Department of Human Services and Faith Haven, Inc., July 1, 2013-June 30, 2014, §3.

89

> That plan shall be complete by the end of Implementation
> Period 3.

**Status of Progress, Period 3 IP §I.A.4.:**  This requirement was not satisfied during Period 3.  Indeed, a performance-based contracting plan has not yet been developed.  As explained below, although the defendants made efforts to develop the required plan for a performance-based contracting system, they failed to do so.  Defendants recognize the limitations in their performance and report that they plan to obtain additional technical assistance in order to complete the plan.

Performance-based contracting is a contracting method used by public human services agencies to procure services with private providers.  Essentially, these types of contracts are designed to promote accountability and improvements in service delivery by correlating required performance outcomes to financial incentives.[262]  Defendants were required to design and implement a performance-based contracting system by the end of Period 1.[263]  Because they did not meet this requirement,[264] the Period 2 IP required the defendants to work with a qualified independent consultant to begin developing a performance-based contracting system with the capacity to monitor and enforce contract performance relative to all applicable requirements established by this lawsuit.[265]  As the Monitor has reported previously, the defendants did not engage the consultant or begin to develop the plan during Period 2.[266]

---

[262]  For background information related to performance-based contracting in the context of public child welfare agencies, see MARK F. TESTA & JOHN POERTNER, FOSTERING ACCOUNTABILITY: USING EVIDENCE TO GUIDE AND IMPROVE CHILD WELFARE POLICY 291-327 (Oxford University Press 2010).
[263]  Period 1 IP §I.2.d.
[264]  For additional background information about defendants' performance during Period 1, *see June 2009 Report* at 48-49.
[265]  Period 2 IP §I.2.e.
[266]  *September 2010 Report* at 50-51.

At the start of Period 3, Casey Family Programs[267] and the American Public Human Services Association ("APHSA")[268] agreed to provide technical assistance to DFCS related to development of a performance-based contracting plan. Thereafter, DFCS managers and staff participated in a series of meetings and conference calls with an APHSA consultant and convened a working group within DFCS staff to develop the plan. Defendants also conducted an introductory session with private providers during February 2013.[269]

In response to requests from the Monitor,[270] on December 10, 2013, the defendants produced a document that they maintained was the performance-based contracting plan required by this sub-section.[271] The document the defendants produced includes an 11-page summary of activities, which generally describes various meetings or planning activities for meetings, most but not all of which appear to be related in some way to performance-based contracting. In addition to the summary, the document includes a table that is titled, "Action Plan," which lists 21 items referred to as general remedies with corresponding tasks, responsible groups, anticipated completion dates, and status notes.[272] While the action plan does not constitute the required plan for performance-based contracting, it refers to documents that might constitute or

---

[267] Casey Family Programs is a private foundation that focuses on foster care and promoting improvements in the child welfare system by providing research and technical assistance to child welfare system managers and legislators. For more information about the foundation, *see* http://www.casey.org/AboutUs/. Casey Family Programs also has provided technical assistance and support to DFCS on the permanency roundtable initiative required by Period 3 IP §II.B.1.a., addressed *infra* at 129-131.

[268] APHSA is a non-profit membership organization that represents state and local human services agencies. For more information, *see* http://www.aphsa.org/content/APHSA/en/the-association.

[269] The preliminary meeting included a presentation to private providers that was made by, among others, a CSF consultant with substantial experience overseeing implementation of performance-based contracting in the public sector child welfare agency context. The meeting was conducted on February 12, 2013, as part of a two-day strategic planning conference. Providers report that the introductory session was informative and constructive, but that there has been no follow through by DFCS staff.

[270] The Monitor received contradictory information about the status of the plan, and did not have an opportunity to follow up on this matter until early December 2013.

[271] Ex. 19A, Performance Based Contracting, May 31, 2013 PBC Plan, redacted.

[272] *Id.* at Appendix B: Action Plan.

be part of the required plan. For this reason, on January 16, 2014, the Monitor requested many of the documents listed in the plan.[273]

In early February 2014, defendants transmitted the documents that the Monitor requested. None of the documents satisfy the requirements of this sub-section.[274] The Monitor has discussed her concerns regarding defendants' performance with defendants' counsel. It appears that defendants recognize the shortcomings in their performance and report that they recently engaged a consultant to assist them with the development of this plan.

The history of defendants' performance related to this requirement indicates that defendants do not have the capacity to complete the required plan even when they have engaged external consultants to provide technical assistance. Threshold questions that are prerequisites for developing a performance-based contracting plan remain unrecognized and unaddressed, including the choice of an operational model, the selection of a funding model, and the outcomes and key performance indicators that will become terms of the contracts.

> **Period 3 IP §I.B.1.**
> **B. Continuous Quality Improvement**
>   **1. By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants shall finalize and begin implementing the Evaluation and Monitoring instrument that was submitted in draft form during the Bridge Period.**

**Status of Progress, Period 3 IP §I.B.1.:** This requirement was satisfied. The evaluation and monitoring instrument was finalized over one year before the start of Period 3, in May 2011.[275] Thereafter, it was piloted on a very limited number of cases in Region I-N. It was implemented more broadly during June 2011 in Regions I-S and II-W, the first two regions to

---

[273] Ex. 19B, January 16, 2014 e-mail to Debbie Brewer from Grace M. Lopes; December 10, 2013 e-mail to Grace M. Lopes from Debbie Brewer.

[274] These documents are voluminous. Accordingly, the documents that defendants produced in response to the Monitor's request have not been included in the appendix to this report.

[275] Ex. 20, MDHS Division of Family and Children's Services, Safety, Permanency, and Well-Being, Continuous Quality Improvement Review Instrument (copy downloaded May 1, 2012).

implement the Practice Model. Defendants began to use the automated version of the instrument routinely starting in March 2012 in Region V-E. Since that time, the defendants report that the instrument has undergone minor modifications.[276]

> **Period 3 IP §I.B.2.**
> **B. Continuous Quality Improvement**
>    **2. By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants, in conjunction with CSF or another consultant, shall revise and begin implementing a written plan to implement a continuous quality improvement (CQI) system. That written plan shall explicitly specify the resources and staffing necessary to adequately operate the CQI unit in both the state and regional offices.**

    **Status of Progress, Period 3 IP §I.B.2.:** This requirement was satisfied; however, as explained below, there are shortcomings related to the implementation of the CQI plan that must be addressed.

    Defendants finalized the CQI plan in collaboration with CSF consultants during July 2012. The plan was transmitted to plaintiffs' counsel and the Monitor on August 6, 2012.[277] The plan provides a conceptual and structural framework for implementation of an appropriate CQI system with ongoing quality assurance and quality improvement processes.[278]

    By design, the CQI system reflected in the plan is aligned with the Practice Model, which in turn reflects core practice-related requirements of the MSA.[279] The plan includes an initial implementation schedule. As explained below, the plan could benefit from a clearer and more

---

[276] The instrument is used by the DFCS CQI unit to conduct case reviews. It is comprehensive, eliciting data about a wide range of case practices related to Practice Model implementation.

[277] Ex. 21, Mississippi Division of Family and Children's Services, Continuous Quality Improvement Plan, July 2012, redacted.

[278] According to the plan, quality assurance [hereinafter QA] processes are designed to measure child welfare practice relative to the goals, mission and values of MDHS/DFCS as well as conformity with the standards that guide the agency's work with children and families. In contrast, quality improvement processes lead to improvements over time in the delivery of services based on data obtained through quality assurance activities. *Id.* at 3.

[279] The Practice Model incorporates six categories of activities: mobilizing appropriate services timely; safety assurance and risk management; involving families and children in case planning and decision-making; strengths and needs assessments for families and children; preserving connections and relationships; and individualized and timely case planning. *Id.* at 4.

detailed description of staffing levels and resources, not all of which were addressed with sufficient specificity in defendants' Period 3 submission.

Essentially, through ongoing review, evaluation, analysis, and reporting processes, the CQI system is intended to identify strengths and limitations in performance. The data that are generated from these processes are used to inform corrective action processes, which, in turn, can advance accountability, promote systemic improvements in performance, and also address shortcomings in case practice. An adequately resourced CQI process is essential to promoting the reforms required by the MSA.

The CQI plan that defendants submitted in August 2012 addresses the structure of the CQI unit in the MDHS State Office. The unit is structured to administer statewide CQI functions, including evaluation and monitoring, foster care review, MACWIS, COA coordination, and Court improvement.[280] An organizational chart that addresses staffing levels for many but not all of these functions is included in the plan.[281] For example, while the plan recognizes that additional staff would be necessary to manage the accountability process in the regions associated with the maltreatment in care reviews,[282] the staffing level needed to support this function is not addressed by the plan. Moreover, while the plan recognizes that the

---

[280] *Id.* at 9.

[281] *Id.* at 10 (organizational chart specifying, among other matters, the number of foster care reviewers and supervisors as well as the number of evaluation and monitoring liaisons and supervisors). The chart neither specifies staffing levels for reviewers of in-care maltreatment investigations nor for complaints. *Id.* However, the plan indicates that among other planned activities for defendants to accomplish during 2012 are the following: "[d]etermine the number of staff needed, hire and train the additional CQI staff to implement the reviews of investigations." *Id.* at 29. Defendants initially determined that two reviewers were needed to complete the MIC reviews; however, defendants report that they plan to hire an additional reviewer. See the narrative related to Period 3 IP §II.C.4., *infra* at 154-156 for a discussion of performance related to the MIC review process. The CQI plan is silent with respect to the staffing levels needed to address complaints.

[282] *Id.* at 27

MACWIS unit is a critical component of the CQI program,[283] and that its staff provide initial validation and periodic revalidation of the data reports used by the CQI program,[284] the plan does not address staffing levels for the MACWIS data validation team.[285]

These omissions are noteworthy, especially in light of the limitations that have been revealed in defendants' CQI program. While defendants have, to their credit, designed, staffed and made demonstrable progress implementing a CQI program since the start of Period 3,[286] neither the accountability process nor the data validation and analyses processes have been appropriately staffed with sufficient numbers of staff with the experience and qualifications needed to perform these functions. With regard to the accountability process, the CQI Plan contemplates that when deficiencies in case practice are identified through CQI reviews and evaluations, they are documented, reported to the appropriate managers, tracked, followed up and resolved.[287] The Monitor's review of the Period 3 corrective action process related to the findings from CQI reviews identified substantial limitations in the timeliness and efficacy of the corrective action process.[288] As a result, the Final Period 4 IP required defendants to address the

---

[283] *Id.* at 9 (explicitly stating that the State Office CQI Unit includes the MACWIS Unit); *see also id.* at 10 (including MACWIS Unit as a component of the CQI Unit on the organizational chart); *id.* at 17 (recognizing "many of [the MACWIS Unit's] functions and reports are directly related to the CQI Office functions and needs").

[284] *Id.* at 17-18.

[285] *Id.* at 11.

[286] Defendants failed to hire a supervisor for the safety review unit, and experienced many challenges maintaining staffing levels for the reviewers assigned to the foster care review unit and the liaisons assigned to the evaluation and monitoring units. As of March 21, 2014, the FCR unit had four vacancies out of a staffing complement of 14 reviewers as well as a vacancy in the sole program manager position, and the EMU unit had two reviewer vacancies. Defendants expected one of the two EMU vacancies to be filled by April 1, 2014.

[287] The CQI plan specifically describes this corrective action process when issues of concern that affect the immediate safety of a child are identified through CQI processes, including through EMU functions and the foster care review process, *see, e.g., id.* at 16. A more detailed corrective action process is outlined in the plan with respect to findings from the maltreatment in care review process. *Id.* at 19. This process also falls within the purview of §II.C.2. of the Period 3 IP, addressed *infra* at 152.

[288] Interviews with DFCS managers and a review of tracking records established that as of the latter part of the 2013 calendar year, the defendants had not built an effective tracking infrastructure that could be used to hold staff and managers accountable for taking corrective action on a timely basis. *See, e.g.,* Ex. 22, November 5, 2013 e-mail to Grace M. Lopes from Robert Hamrick (transmitting CQI Corrective Action Open and Closed Heat Ticket Report as of November 4, 2013 [November 2013 Tracking Report]). According to the November 2013 tracking report, there were 72 open corrective action matters that had been assigned to DFCS regional managers for corrective action as a

process and to report on a monthly basis to plaintiffs and the Monitor documenting the timeliness of corrective actions.[289]

Additionally, while the CQI plan recognizes that it is "imperative for the CQI system to have access to aggregate data to monitor and evaluate indicators and outcomes[,]"[290] the plan does not assess staffing needs related to data validation and analyses. Defendants' capacity in these areas is limited and must be bolstered.

Ultimately, a CQI system is intended to track progress and fuel improvement in service delivery. To become an effective mechanism for driving a rapid reform process, the system must provide managers responsible for implementing the Practice Model with frequent and comprehensive reports on their progress so that they can assess the strengths and weaknesses of their programmatic activities and make course corrections as needed. Managers also will need more targeted data to help them understand the factors that may be affecting performance in order to design and implement effective solutions. In the same way that agency executives require regular reports on agency performance, regional directors require access to frequent, periodic regional performance data to inform resource allocation and other management

---

result of findings from the maltreatment in care review process. Fifty-six of the 72 open corrective actions were overdue for between 126 and one day (*i.e.*, no corrective action taken after more than five days had lapsed in situations in which a safety issue was identified and no corrective action taken after 20 business days had lapsed in situations in which a practice issue was identified). The median number of days the 56 corrective action matters were overdue was 29 days and the distribution, by region, insofar as days overdue was as follows: Region I-N, 13 overdue (17, 19, 28, 29, 37, 51, and 77 days and two for 16, 48, and 65 days); Region II-W, seven overdue (one, three, eight, 23, 27, 29, and 36 days); Region III-N, one overdue (22 days); Region V-E, four overdue (14 and 54 days and two for 22 days); Region VI, 20 overdue (12, 18, 26, 39, 50, 65, 67, 82, 119, and 121 days, two for eight, 70, and 126 days, and four for 36 days); and Region VII-W, 11 overdue (eight, 28, 36, 57, and 65 days and two for three, 23, and 29 days). Additionally, there were 26 open corrective action matters that had been assigned to DFCS regional managers for corrective action as a result of findings from the foster care review process. Twenty of the 26 open corrective actions were overdue for between 125 and 3 days for a median of 29 days and the distribution, by region, insofar as days overdue was as follows: Region II-E, two overdue (69 and 125 days); Region III-N, one overdue (12 days); Region III-S, two overdue (35 and 75 days); and Region VII-W, 15 overdue (three, five, six, 11, 27, and 34 days, two for 29, 43, and 68 days, and three for nine days). Some regions had no open corrective actions during this period.

[289] Final Period 4 IP §II.B.2.
[290] Ex. 21, *supra* note 277, at 17.

decisions.  To actualize such a system, defendants must ensure that the appropriate resources are available to regional management teams to guide and support their efforts.

> **Period 3 IP §I.B.3.**
> **B.  Continuous Quality Improvement**
> > **3.  By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants shall maintain one (1) Program Administrator, Sr. to work in the Evaluation and Monitoring Unit.**

**Status of Progress, Period 3 IP §I.B.3.:**  This requirement was satisfied during Period 3.  According to the organizational chart in the CQI Plan, two senior Program Administrators should be assigned to the Evaluation and Monitoring Unit.[291]  As of March 1, 2012, there were two senior program administrators assigned to the EMU unit.  However, one of the positions became vacant on June 1, 2013 and remained vacant until September 1, 2013.

> **Period 3 IP §I.B.4.**
> **B.  Continuous Quality Improvement**
> > **4.  By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants shall complete a baseline CQI Review for Region V-E.**

**Status of Progress, Period 3 IP §I.B.4.:**  This requirement was satisfied.  The baseline CQI review for Region V-E was initiated in March 2012.  A report reflecting on-site case review findings, foster care review data, and the results of a stakeholder survey was issued on June 19, 2012 based on a comprehensive review instrument.

> **Period 3 IP §I.B.5.**
> **B.  Continuous Quality Improvement**
> > **5.  By 30 days following the Court's approval of the Modified Settlement Agreement Defendants shall complete a follow-up CQI Review for Region I-N.**

**Status of Progress, Period 3 IP §I.B.5.:**  This requirement was satisfied.  The follow up on-site review in Region I-N was conducted between May 22 and 25, 2012.  Defendants

---

[291]  *Id.* at 10.  These positions are referred to as EMU supervisors in the organizational chart.

completed the related report on August 1, 2012, and submitted it to counsel for the plaintiffs and

the Monitor on August 6, 2012.

> Period 3 IP §I.B.6.
> **B.  Continuous Quality Improvement**
>> 6.  **By 45 days following the Court's approval of the Modified Settlement Agreement, Defendants shall hire three (3) Evaluation and Monitoring Unit liaisons.**

**Status of Progress, Period 3 IP §I.B.6.:**  This requirement was not satisfied.  As noted

above,[292] defendants have had difficulty maintaining the full staffing complement for the EMU

Unit.[293]  According to data provided by the defendants only two liaisons were hired during 2012

following approval of the MSA, and only one of the hires was timely.[294]

> Period 3 IP §I.B.7.
> **B.  Continuous Quality Improvement**
>> 7.  **By 45 days following the Court's approval of the Modified Settlement Agreement, Defendants shall complete an annual CQI report covering June 1, 2010 through June 30, 2011.**

**Status of Progress, Period 3 IP §I.B.7.:**  This requirement was satisfied.  Defendants

submitted the completed annual report to plaintiffs' counsel and to the Monitor on August 24,

2012.[295]

> Period 3 IP §I.B.8.
> **B.  Continuous Quality Improvement**

---

[292]  *See supra* note 286.

[293]  Defendants reported that at least two factors have contributed to the challenges they have experienced staffing these positions.  First, they have had difficulty identifying candidates who satisfy the qualification criteria for these positions, *i.e.,* licensed social workers with at least four years of experience.  Second, defendants report that during at least part of Period 3, official recruitment notices did not list the correct counties to which the positions were assigned and the notices erroneously described the jobs as front line social work positions.  *Compare,* Ex. 23A, Vacancy Announcement from the State Personnel Board website, DHS-Family Protection Spec, Adv (describing job in evaluation and monitoring unit with closing date of April 18, 2012 as front line social work position in Hinds County) *with* Ex. 23B, memorandum, Mississippi Department of Human Services, April 11, 2012, In-House Promotional Opportunities, (internal notification to MDHS staff of three positions in the Evaluation and Monitoring Unit with closing date of April 18, 2012, noting that the candidates do not need to be housed in the county that is advertised, but must be housed in one of three specific DFCS regions).

[294]  A liaison hired for Region V-W was hired effective August 1, 2012, and a liaison hired for Region V-E was hired effective September 1, 2012.

[295]  Ex. 24, Mississippi Department of Human Services, Division of Family and Children's Services, Continuous Quality Improvement [CQI] Annual CQI Report, redacted.

> **8.  By July 1, 2012, Defendants shall complete a second follow-
> up CQI Review for Regions I-S and II-W.**

**Status of Progress, Period 3 IP §I.B.8.:**  This requirement was satisfied.  The second

follow up on-site reviews in Regions I-S and II-W were conducted between June 12 -15, 2012

and June 26, 29, 2012, respectively.  Defendants completed the related report for Region I-S on

September 5, 2012, and submitted it to counsel for the plaintiffs and the Monitor on September 7,

2012.  The related report for Region II-W was completed on September 8, 2012 and submitted to

counsel for plaintiffs and the Monitor on September 12, 2012.

> **Period 3 IP §I.B.9.**
> **B.  Continuous Quality Improvement**
> **9.  By August 1, 2012, Defendants shall complete a base-line
> CQI Review for Region III-N.**

**Status of Progress, Period 3 IP §I.B.9.:**  This requirement was satisfied.  The baseline

on-site review in Region III-N was conducted between July 24 and 27, 2012.  The related report

was completed on October 17, 2012 and submitted to counsel for the plaintiffs and the Monitor

on October 23, 2012.

> **Period 3 IP §I.B.10.**
> **B.  Continuous Quality Improvement**
> **10.  By September 1, 2012, Defendants shall complete a
> follow-up CQI Review for Region IV-S.**

**Status of Progress, Period 3 IP §I.B.10.:**  This requirement was satisfied.  The follow up

on-site review in Region IV-S was conducted between August 21 and 24, 2012.  The related

report was completed on November 14, 2012 and submitted to counsel for the plaintiffs and the

Monitor on November 16, 2012.

> **Period 3 IP §I.B.11.**
> **B.  Continuous Quality Improvement**
> **11.  By October 1, 2012, Defendants shall complete a follow-up
> CQI Review for Region III-S.**

**Status of Progress, Period 3 IP §I.B.11.:** This requirement was satisfied. The follow up on-site review in Region III-S was conducted between September 18 and 21, 2012. The related report was completed on December 10, 2012 and submitted to counsel for the plaintiffs and the Monitor on December 11, 2012.

> **Period 3 IP §I.B.12.**
> **B. Continuous Quality Improvement**
>     **12. By November 1, 2012, Defendants shall complete a baseline CQI Review for Region VII-W.**

**Status of Progress, Period 3 IP §I.B.12.:** This requirement was satisfied. The baseline on-site review in Region VII-W was conducted between October 23 and 26, 2012. The related report was completed on January 25, 2013 and submitted to counsel for the plaintiffs and the Monitor on January 31, 2013.

> **Period 3 IP §I.B.13.**
> **B. Continuous Quality Improvement**
>     **13. By December 1, 2012, Defendants shall complete a baseline CQI Review for Region VI.**

**Status of Progress, Period 3 IP §I.B.13.:** This requirement was satisfied. The baseline on-site review in Region VI was conducted between November 13 and 16, 2012. The related report was completed on February 5, 2012 and submitted to counsel for the plaintiffs and the Monitor on February 8, 2012.

> **Period 3 IP §I.B.14.**
> **B. Continuous Quality Improvement**
>     **14. By February 1, 2013, Defendants shall complete a baseline CQI Review for Region II-E.**

**Status of Progress, Period 3 IP §I.B.14.:** This requirement was satisfied. The baseline on-site review in Region II-E was conducted between January 22 and 25, 2013. The related report was completed on April 5, 2013 and submitted to counsel for the plaintiffs and the Monitor on April 9, 2013.

Period 3 IP §I.B.15.
**B.  Continuous Quality Improvement**
**15.  By March 1, 2013, Defendants shall complete a second**
**follow-up CQI Review for Region V-W.**

**Status of Progress, Period 3 IP §I.B.15.:**  This requirement was satisfied.  The second

follow up on-site review in Region V-W was conducted between February 12 and 15, 2013.  The

related report was completed on May 13, 2013 and submitted to counsel for the plaintiffs and the

Monitor on May 17, 2013.

Period 3 IP §I.B.16.
**B.  Continuous Quality Improvement**
**16.  By April 1, 2013, Defendants shall complete a follow-up**
**CQI Review for Region V-E.**

**Status of Progress, Period 3 IP §I.B.16.:**  This requirement was satisfied.  The follow up

on-site review in Region V-E was conducted between March 26 and 29, 2013.  The related report

appears to have been completed on June 24, 2013[296] and submitted to counsel for the plaintiffs

and the Monitor on June 28, 2013.

Period 3 IP §I.B.17.
 **B.  Continuous Quality Improvement**
**17.  By June 1, 2013, Defendants shall complete a follow-up**
**CQI Review for Region VII-E.**

**Status of Progress, Period 3 IP §I.B.17.:**  This requirement was satisfied.  The follow up

on-site review in Region VII-E was conducted between May 14 and 17, 2013.  The related report

was completed on August 14, 2013 and submitted to counsel for the plaintiffs and the Monitor on

August 16, 2013.[297]

Period 3 IP §I.B.18.a.
**B.  Continuous Quality Improvement**
**18.  Within 60 days of completing each CQI Review,**
**Defendants shall complete a report regarding that review.**

---

[296]  Unlike most of the other evaluation and monitoring reports generated by the EMU unit, the report is not dated;
however, a member of EMU management staff reports that it was completed on June 24, 2013.
[297]  Pursuant to a gubernatorial proclamation, July 5, 2013 was a holiday.  Thus, the report was completed in 60
business days as required by Period 3 IP §I.B.18.a.

a. **Within five (5) business days thereafter, Defendants will provide the completed report to Plaintiffs and to Monitor.**

**Status of Progress, Period 3 IP §I.B.18.a.:**  As indicated in the narratives related to Period 3 IP §§I.B.4, 5, 8-17,[298] defendants conducted the required CQI reviews on a timely basis and all of the 12 required CQI reports were finalized within 46 to 60 business days.  All required reports were submitted to counsel for the plaintiffs and the Monitor within five days following completion.[299]

The CQI reviews are conducted by the liaisons assigned to the Evaluation and Monitoring Unit.  The reviews track the Practice Model implementation schedule.  A baseline review is conducted as each DFCS region begins the initial implementation phase of the Practice Model.  Approximately twelve months following the baseline review, after each region completes the initial Practice Model implementation phase, a follow up review is conducted.  Thereafter, reviews are scheduled on an annual basis.  The reviews are designed to combine qualitative data – obtained through case reviews, stakeholder interviews, and surveys – with quantitative data reflected in MACWIS reports, in order to assess performance related to each of the six components of the Practice Model.  According to the CQI Plan, reports must be issued within 60 days of each on-site baseline and annual review.[300]

As noted above,[301] the review instrument is comprehensive.[302]  The reviews conducted in each region are limited to a random sample of 24 cases.[303]  Fourteen cases in each sample

---

[298] *Supra* at 97-101.
[299] All of the reports were submitted to plaintiffs' counsel and the Monitor within one to four days following their completion.
[300] Ex. 21, *supra* note 277, at 15.
[301] *Supra* at 97.
[302] In addition to assessing case practice, the process is also designed to evaluate systemic factors, including training, the service array, placement resources, caseloads, oversight and monitoring, court processes and data quality and usage.  *See* Ex. 21, *supra* note 277, at 14 for descriptive information regarding these factors.
[303] The sample size is based on the Federal Child and Family Services Review process.

concern class members, *i.e.*, children in foster care.  The reports are submitted to DFCS

management and the regional director in the targeted region, and are used in combination with

aggregate data to inform regional CQI activities.[304]

In light of the fact that, by design, the sample size of class members is small, the intervals

between reviews extend for a one-year period, and much more aggregate performance data has

become available in the wake of the June 24, 2013 Order, the CQI reviews serve a narrow, albeit

important, function in defendants' CQI architecture.[305]

> Period 3 IP §I.B.19.
> **B.  Continuous Quality Improvement**
> > **19.  Defendants shall have hired the staff and obtained the resources required as specified in the CQI Plan developed pursuant to Section I.B.2. of the Period 3 Implementation Plan.**

**Status of Progress, Period 3 IP §I.B.19.:**  As noted above in the narrative related to

Period 3 IP §I.B.2.,[306] defendants made substantial progress in hiring staff to perform some but

not all of the CQI functions contemplated by the CQI Plan.  Moreover, defendants must bolster

DFCS capacity to perform certain CQI activities, including ongoing data validation and analyses.

> Period 3 IP §I.C.
> **C.  Legal and Regulatory Compliance**
> > **By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants shall have implemented the policies and procedures necessary to comply with the public child fatality reporting requirements of the Child Abuse Prevention and Treatment and Adoption Reform Act.**

**Status of Progress, Period 3 IP §I.C.:**  The Child Abuse Prevention and Treatment Act

("CAPTA"), as amended, 42 USC §5101, *et seq.*, provides for public disclosure of findings or

---

[304]  *See id.* at 15-16 for more information about the design of the regional CQI process.  Among other measures, regional directors are required to update their Practice Model implementation plans based on the findings reflected in the CQI reports.  *Id.* at 15.

[305]  For examples of the types of reports generated by the CQI review process, s*ee, e.g.,* Ex. 25A, Region 3-South, Continuous Quality Improvement Baseline Report, August 2011, redacted; Ex. 25B, Region 3-South, Continuous Quality Improvement Annual Follow-Up Report, September 2012, redacted; Ex. 25C, Region 3-South Continuous Quality Improvement Annual Report, October 2013, redacted.

[306]  *Supra* at 93-97.

information about a case in instances of child abuse and/or neglect resulting in a fatality or near fatality of a child.[307]  Section 43-21-261 of the Mississippi Code provides for an exception to the confidentiality of MDHS/DFCS records in these circumstances, permitting the release of the child's name, address or location, and verification from MDHS/DFCS of case status.  If a case that falls within the purview of CAPTA exists, the statute provides for disclosure of the type of report or case, intake date(s), investigation(s), and whether the report was substantiated or unsubstantiated.[308]  The relevant DFCS policy restates the statutory exception and indicates that the information reflected in the exception should immediately be provided by the county supervisor to the DFCS deputy director, who has authority to release the information.[309]  The policy directive does not include clear procedures related to disclosure of the exempted information, which appear to be contemplated by this Period 3 requirement.  In the Monitor's view, the policy would benefit from clarification about the circumstances that would trigger the transmission of the information to the deputy director, the relevant timeline, and the deputy director's obligations with respect to release of the information that falls within the statutory exception.

> MSA §II.A.5.c.1.
> **5. Information Management and Use**
>   c. <u>**By the end of Implementation Period Three:**</u>
>     1) **DFCS shall provide to all county agency staff with child welfare responsibilities access to basic computer services, consisting of access to MACWIS, word processing, and electronic mail.**

**<u>Status of Progress, MSA §II.A.5.c.1.</u>:**  At the outset of the remedial process, the DFCS inventory of computer equipment in county offices was old and at times unreliable.  Staff

---

[307]  For purposes of CAPTA, a near fatality exists when a physician determines that a child is in "serious" or "critical" condition.  CAPTA, as amended, 42 U.S.C. §§ 5106a(b)(2)(B)(x) and (b)(4)(A).
[308]  Miss. Code. Ann. § 43-21-261(18) (2014).
[309]  *See* Ex. 46, *infra* note 453, at 59-60.

reported substantial delays in procuring replacement equipment and as a result access to basic computer services was unduly limited.[310]  During the latter part of 2009 and 2010, defendants initiated a replacement process, upgrading many DFCS users.[311]  More recently, although there have been some exceptions that the Monitor has identified, caseworkers and their supervisors in county offices have generally had access to basic computer services.[312]

However, DFCS staff with child welfare responsibilities in county offices continue to report system problems that undercut their ability to access MACWIS on a consistent basis, including lengthy delays logging into MACWIS; difficulty remaining logged on to MACWIS; loss of data entered into MACWIS; very slow response times; and system freezes and shut downs.[313]  Defendants have been working to address these issues, although progress has been slow.  At the start of the 2010 calendar year, defendants contracted with a vendor to address login and connectivity issues.[314]  Nonetheless, these problems continued, and in early 2012 the defendants contracted for an assessment of the DFCS information technology infrastructure. During May 2012, an assessment report was issued.[315]  The report identified system performance deficits and presented both short- and long-term recommendations for ameliorating them. Shortly after the assessment was conducted, defendants began to implement the recommendations as well as other strategies intended to improve the access DFCS staff have to MACWIS.[316]  Notwithstanding defendants' efforts, as the Monitor has reported previously, login

---

[310]  *June 2009 Report* at 52.
[311]  *September 2010 Report* at 60-61.
[312]  These exceptions have been limited.  However, interviews with DFCS county staff during the second half of 2013 identified several caseworkers in Region VII-W who did not have access to a computer until several months after they were hired and completed training.
[313]  *January 2013 Report* at 31-32; *September 2010 Report* at 61-62.
[314]  *See September 2010 Report* at 62-63 for a more detailed description of defendants' efforts to address these problems.
[315]  For a copy of the assessment report, *see January 2013 Report* at Ex. 20.
[316]  For a more detailed description of the actions undertaken by the defendants, *see id.* at 32-33.

and connectivity problems persisted throughout Period 2 and Period 3.[317]  In January 2013, the Monitor found that these limitations adversely affected both the reliability of MACWIS case records and defendants' ability to use data about system performance to make the changes in case practice required by the MSA.[318]

These and other MACWIS-related issues were addressed by the parties and the Monitor during the February 21, 2013 status hearing, leading to the issuance of the June 24, 2013 Order. The June 24, 2013 Order includes requirements related to the remediation of the log-in and connectivity issues,[319] and while progress in some related areas has not been as timely as expected, defendants report that key requirements will be satisfied according to timelines required by the June 24, 2013 Order.[320]  The Monitor will report in more detail about this matter in a subsequent report.

> MSA §II.A.5.c.2.
> 5.  **Information Management and Use**
>   c.  **By the end of Implementation Period Three:**
>     2)  **Consistent with the schedule set forth in Appendix "C", data related to compliance with the Modified Settlement Agreement's Foster Care Service Standards will be collected, analyzed, and disseminated at least monthly to DFCS regional and county staff.**

**Status of Progress, MSA §II.A.5.c.2.:**  This requirement was not satisfied.  While defendants disseminated data to DFCS regional and county staff during Period 3, in many instances the data that was disseminated did not conform to the requirements of Appendix C.

As noted above,[321] in many instances, the defendants did not produce accurate and validated data relating to MSA requirements during Period 3.  Accordingly, the Court issued the

---

[317] *September 2010 Report* at 63; *January 2013 Report* at 29-33.
[318] *January 2013 Report* at 31.
[319] June 24, 2013 Order §VI.D.1. (requiring defendants to submit and implement a written plan to improve, on an expedited basis, the hardware and network infrastructure that support MACWIS).
[320] Defendants encountered an unanticipated problem implementing a necessary software upgrade, which they have been working to solve.  Except for this issue, defendants report that the plan is on track.
[321] *See*, *e.g.*, *supra* at 11-12.

June 24, 2013 Order to remedy the shortcomings in defendants' performance. The Period 3 IP required the defendants to produce a discrete set of "accurate and validated reports . . . that reflect county-by-county performance" related to specific MSA requirements.[322] The reports, delineated in Appendix C of the MSA ("Appendix C reports"), include reports derived from case record data collected in MACWIS and reports derived from data collected during the periodic and structured reviews of case records that are conducted for each child in DFCS custody at six month intervals as part of the foster care review process ("FCR reports").[323]

In the Monitor's January and September 2013 reports, the Monitor addressed defendants' performance with respect to the data reporting requirements established by the Period 3 IP.[324] The reports defendants produced in Period 3 evidenced significant limitations in the information management systems and data validation processes utilized by DFCS.[325] For example, during Period 3, defendants did not produce certain validated and accurate reports that have been required but not produced since Period 1.[326] Moreover, in a number of the instances in which defendants produced reports in response to the Period 3 IP, the reports did not reflect performance relative to the MSA's actual requirements.[327] Additionally, although in some

---

[322] Period 3 IP §I.D.1.a.-c. The specific reports are itemized in the MSA in Appendix C.

[323] FCR reports represent an alternative data collection method that relies upon the "foster care review." *See infra* at 108 for additional information regarding the foster care review process.

[324] *January 2013 Report* at 33-38; *September 2013 Report* at 2-6.

[325] *January 2013 Report* at 33; *September 2013 Report* at 3-4.

[326] *January 2013 Report* at 34 (noting that defendants were unable to produce accurate and validated reports on caseworker workloads); *September 2013 Report* at 3-4.

[327] *January 2013 Report* at 34-35 (describing several examples, including, the following: for children with the goal of reunification, the assigned DFCS caseworker is required to meet with the child's parent(s) with whom the child is to be reunified at least once each month to assess service delivery and achievement). MSA §§II.B.5.b. and II.B.5.e.2. Although defendants were required to report on this requirement during Period 3, *see* Period 3 IP §I.D.1.a.-c., MSA, App. C at 1, MACWIS MWZWCR3, defendants informed the Monitor that they were unable to report on this requirement accurately because MACWIS did not enable DFCS staff to identify and track with sufficient specificity those cases in which a child is to be reunified with only one parent.). *See also September 2013 Report* at 3-4, 17 (MSA §II.B.1.e.3. requires that for children who remain in an out-of-home placement following a maltreatment investigation, a DFCS worker must visit the child two times per month for three months; data produced by defendants was limited to visits during one-month periods instead of three-month periods, likely overstating performance).

instances MACWIS captured the data the defendants were required to report on,[328] the reports

that defendants produced during Period 3 did not report on the MSA requirement because they

were not designed to do so.[329]  Defendants disseminated these reports to DFCS staff and they

were used to draw conclusions about agency performance and service quality.  To advance the

reforms required by the MSA, defendants will need to use performance data to guide

management decisions, and it is essential that the data be timely, complete, and accurate.

> MSA §II.A.5.c.3.
> 5.  Information Management and Use
>  c.  <u>By the end of Implementation Period Three</u>:
>     3)  **Defendants shall automate the DFCS foster care review**
>         **instrument to include the foster care review data indicators**
>         **as listed on Appendix "C".  The child's foster care review**
>         **record shall become part of the child's case file.**

**<u>Status of Progress, MSA §II.A.5.c.3.</u>:**  The  foster care review ("FCR") represents an

administrative case review process that is conducted at six-month intervals for all children who

have been in foster care at least six months.  Foster care reviewers, who are assigned to the FCR

section of the DFCS CQI Unit, conduct these structured reviews using an automated instrument

that was developed during 2012 in response to the requirements of this subsection and the MSA's

data reporting requirements.[330]  The defendants refer to the automated instrument as the periodic

administrative determination ("PAD").

Because of the limitations associated with data reports derived from individual case

records generated by MACWIS, and as an alternative to the data collected through the MACWIS

case record, the defendants expanded the data collected during the FCR process in an attempt to

---

[328]  As noted above, some MSA requirements are subject to qualitative assessment which cannot be captured by a MACWIS report.

[329]  *January 2013 Report* at 36-37 (listing a series of examples, including data reports limited to caseworker visits with children on a single month basis despite requirements for caseworker visits with children at least twice each month for three months).  In addition, as explained in the Monitor's January 2013 Report, during Period 3 the defendants produced some Appendix C reports with obvious calculation errors, raising concerns about the reliability of the MDHS/DFCS data validation process.  *Id.* at 37-38.

[330]  *See* MSA, Appendix C at 3-5.

capture specified data elements relevant to performance under the MSA.  Foster care reviewers

began to collect data with an expanded version of the PAD in February 2012.  Starting July 2012,

defendants began to collect data in MACWIS using a revised and automated version of the

PAD.[331]  Defendants began producing the MSA-required FCR data reports to the Monitor and

plaintiffs' counsel during April 2013.

Additional sets of FCR reports were submitted throughout the balance of Period 3 and

during Period 4.  There are limitations in the instruction guide used by the reviewers to interpret

the questions included in the PAD, and the instrument has undergone several revisions.[332]  Most

recently, as part of the report specification development process required by the June 24, 2013

Order,[333] defendants have collaborated with plaintiffs' counsel and the Monitor both on

modifications to the PAD and on revisions to the written guidance.  Because of the need to

bolster PAD reviewer training and the guidance provided to reviewers related to several specific

MSA requirements concerning health care, during February 2014 the parties agreed that pending

a determination that the FCR process can report accurately on the targeted requirements,

performance would be reviewed in a special case record review.[334]

> **MSA §II.A.5.c.4.**
> **5.  Information Management and Use**
>  **c.  By the end of Implementation Period Three:**
>    **4)  The Director of the Foster Care Review Division of the CQI
>    Unit of DFCS ("FCR Director") shall regularly review the
>    documentation of the foster care reviews to ensure that the
>    foster care reviewers are appropriately utilizing the foster
>    care review protocol.  When the FCR Director identifies
>    concerns regarding foster care reviews, DFCS shall
>    remediate the concerns.**

---

[331]  The PAD was automated by July 2012.  Additional modifications were made to the instrument in October 2012.
[332]  PAD reviewers must have a deep knowledge of DFCS policy, case practice, and MSA standards.
[333]  June 24, 2013 Order §VI.A.
[334]  *See*, *e.g.*, *infra* at 179-180 for narrative related to MSA §II.B.4.b.1.

**Status of Progress, MSA §II.A.5.c.4.:** All children in DFCS custody for at least six months are subject to the foster care review process at six-month intervals throughout the time period they remain in custody. The purpose of the review is to expedite the process of moving children out of foster care and into permanent and nurturing homes. The DFCS CQI program relies in part on the foster care review process to identify issues of concern that affect the immediate safety of children.[335] According to the DFCS CQI Plan, issues of concern that are identified during the FCR reviews are required to be reported to the FCR director who provides a written report to DFCS management for follow up.[336] The CQI Plan requires that the concerns are tracked by the FCR Unit for the purpose of continuous quality assurance and accountability.[337]

Interviews with DFCS CQI managers and staff indicate that during Period 3 the FCR director regularly reviewed the instruments completed by the FCR reviewers as well as tracked and reported to DFCS managers the case-specific concerns, including safety concerns, identified during the reviews. Indeed, during Period 3, the FCR director maintained a spreadsheet to track the initiation and resolution of corrective actions undertaken by DFCS management in response to the specific issues identified during the foster care reviews conducted in each region. A review of these spreadsheets indicates that as a general matter, and contrary to the requirements of this subsection, the remedial process was not timely even in instances when serious safety concerns were identified.[338]

---

[335] Ex. 21, *supra* note 277, at 16.
[336] *Id.*
[337] *Id.*
[338] *See, e.g.,* Ex. 26A, FCR Corrective Action Spreadsheet, redacted, submitted by defendants on February 13, 2013 in response to the Monitor's request (indicating no data available with respect to corrective action in many instances); Ex. 26B, FCR Corrective Action Spreadsheet, redacted, submitted by defendants on July 29, 2013 in response to Monitor's request (indicating no data available with respect to corrective action in many instances).

As noted above, the Monitor reported informally to the parties on the shortcomings in this and other aspects of the CQI corrective action process. As a result, the Final Period 4 IP includes remedial action.[339] The Monitor will report on defendants' progress in a forthcoming report.

> **Period 3 IP §I.D.1.a.-c.**
> **D. Information Use and Management**
> 1. **Defendants shall produce accurate and validated reports as identified in Appendix "C" to the Modified Settlement Agreement that reflect county-by-county performance.**
>    a. **The reports that are noted as available in Appendix "C" as of the beginning of Implementation Period 3 shall be produced beginning one month from the beginning of Implementation Period 3 and every thirty (30) days thereafter.**
>    b. **Defendants shall begin producing those reports that do not exist as of the beginning of Implementation Period 3 by the dates set forth in Appendix "C."**
>    c. **Data reports shall be provided to the Monitor and the Plaintiffs within thirty (30) days of the date the report becomes available and every thirty (30) days thereafter, with the exception of the data report on training of DFCS caseworkers which shall be produced quarterly.**

**Status of Progress, Period 3 IP §I.D.1.a.-c.:** As explained above,[340] and in the Monitor's January and September 2013 reports,[341] defendants did not meet these MSA reporting requirements for Period 3 and, consequently, the Court issued an order on June 24, 2013 requiring remedial action.

> **Period 3 IP §I.D.2.**
> **D. Information Use and Management**
> 2. **Defendants shall ensure that the computer and electronic access problems identified in Dkt. No. 502, ps. 68-72 of the Court Monitor's September 8, 2011 report to the Court are remedied.**

---

[339] *See* Final Period 4 IP §II.B.3.
[340] *See, e.g., supra* at 11-12.
[341] *See January 2013 Report* at 33-38 and *September 2013 Report* at 2-6.

**Status of Progress, Period 3 IP §I.D.2.:**  Although there was progress, this requirement was not satisfied during Period 3.  Defendants' performance with respect to this Period 3 requirement is addressed above in the narrative related to MSA §II.A.5.c.1.[342]

> **Period 3 IP §I.D.3.**
> **D.  Information Use and Management**
>   **3.  Consistent with the schedule set forth in Appendix "C," Defendants shall collect, analyze and disseminate data, related to compliance with the Foster Care Service Standards set forth in Sections II.B and III.B of the Modified Settlement Agreement, at least monthly, to DFCS regional and county staff.**

**Status of Progress, Period 3 IP §I.D.3.:**  This requirement was not satisfied during Period 3.  Defendants' performance with respect to this Period 3 requirement is addressed above in the narrative related to MSA §II.A.5.c.2.[343]

> **Period 3 IP §I.D.4.**
> **D.  Information Use and Management**
>   **4.  Defendants shall provide training for all foster care reviewers on the foster care review instrument and on processes related to addressing concerns identified during a foster care review.**

**Status of Progress, Period 3 IP §I.D.4.:**  DFCS managers and staff report that the required training was provided during the first half of 2012 and prior to the last quarter of 2012 in anticipation of several modifications to the instrument.  More recently, in response to the PAD report specification development process contemplated by the June 24, 2013 Order, a CSF consultant has provided additional training to the reviewers.  In large part, the additional training is intended to clarify MSA requirements.

---

[342]  *Supra* at 104-106.  This subsection of the Period 3 IP refers to the Monitor's findings related to Period 2 IP §I.5.a., which required defendants to provide to all county agency staff with child welfare responsibilities access to basic computer services, consisting of access to MACWIS, word processing, and electronic mail.  These findings are reflected in the Monitor's *September 2010 Report* [Dkt. No. *503*] at 68-72.  The reference in this subsection to the Monitor's  September 8, 2011 Report [Dkt. No. 502] appears to represent a transcription error.
[343]  *See supra* at 106-108.

Period 3 IP §I.E.
E. **Case Recordings and Information**
   Defendants shall revise the Supervisory Administrative Review process to require a review of whether DFCS child welfare case records are current, complete, made by the appropriate caseworker, and signed and dated by supervisors.

**Status of Progress, Period 3 IP §I.E.:** Defendants revised the Supervisory Administrative Review process as required during Period 3. According to DFCS policy, the supervisory administrative review of the case record is completed on all open cases by the assigned supervisor within 90 calendar days of a child's placement into DFCS custody and thereafter at established intervals.[344] The review is completed in MACWIS using a structured evaluation tool. In response to the requirements of this subsection, effective July 8, 2013, defendants introduced a revised tool in MACWIS, which, among other changes, incorporates documentation of an assessment by the supervisor about whether the case record is current, complete, and documented by the assigned caseworker. [345]

Period 3 IP §I.F.1.[346]
F. **Financial Management**
   1. By the end of Implementation Period 3, Defendants shall have implemented and shall maintain implementation of those recommendations made by Hornby Zeller Associates ("HZA") and the Center for Support of Families negotiated and agreed to by the Parties, and filed with the Court by July 14, 2012. The recommendations negotiated and agreed to by the Parties and filed with the Court shall become an enforceable part of this Period 3 Implementation Plan.

**Status of Progress, Period 3 IP §I.F.1.:** The evidence shows that the defendants have implemented most, but not all, of the requirements of the July 14, 2012 agreement. Indeed,

---

[344] Ex. 27A, Mississippi, DFCS Policy, Section D, Foster Care, Revised 7-22-13, §VII.D.1., at 109. The policy was revised during 2013 to require supervisory administrative reviews at 12-month intervals after the required 15th month review.

[345] Ex. 27B, MACWIS Technical Assistance Bulletin, July 22, 2013, Issue #16, redacted (providing instructions to MACWIS users on the revised supervisory administrative review tool).

[346] *See also* MSA §II.A.6.b.1. (requiring the defendants to satisfy a requirement that is, in effect, identical to the requirement set forth in Period 3 IP §I.F.1.).

guided by their fiscal management team, defendants have made encouraging progress building their capacity to increase federal revenue. These accomplishments are outlined below.

The Settlement Agreement required defendants to conduct an external assessment of actual and anticipated federal funding levels during Period 1, and to develop an implementation program for MDHS/DFCS to increase federal funding.[347] Because the Period 1 requirement was not satisfied,[348] the defendants were required during Period 2 to contract for an external assessment of actual and anticipated funding levels as well as for the development of a plan to establish the resources and infrastructure necessary to maximize the amount of federal funds received by the agency.[349] Defendants took steps to satisfy the Period 2 requirement, but there were limitations in their performance.[350] Ultimately, in order to promote efficiencies and maximize the efficacy of the assessment, the June 10, 2010 Agreed Order for Corrective Action ("Agreed Order") required defendants to contract with CSF for the fiscal assessment required by the Period 2 IP.[351]

Consistent with the terms of the Agreed Order, CSF subcontracted with Hornby Zeller Associates, Inc., an organization with substantial expertise in financial/fiscal assessments in the public sector human services context,[352] to conduct the assessment and develop an implementation plan to guide revenue maximization efforts.[353] Assessment activities began in early September 2010. A report presenting the assessment's findings with recommended steps for enhancing federal revenue was issued by Hornby Zeller in May 2011.[354] The report's

---

[347] Settlement Agreement §II.A.7.a.
[348] *See June 2009 Report* at 56 for the Monitor's Period 1 findings.
[349] Period 2 IP §I.7.a
[350] *See September 2010 Report* at 68-69 for a summary of defendants' performance during Period 2.
[351] June 10, 2010 Agreed Order ¶5.
[352] *See* http://www.hornbyzeller.com for background data regarding Hornby Zeller.
[353] *See June 2009 Report* at 16 for additional details related to the scope of services.
[354] Ex. 28, Financial Assessment Findings and Recommendations, May 2011, Hornby Zeller Associates, Inc. under contract to Center for the Support of Families, Inc.

recommendations formed the basis for the parties' agreement regarding the steps defendants would be required to implement by the end of Period 3 to enhance federal funding.  The agreement was approved by the Court in an order issued on July 12, 2012.[355]  Defendants' performance with respect to each of the agreement's requirements is addressed below.

> **Requirement 1, July 12, 2012 Agreement Regarding Enhancement of Federal Funding**
> **Career Preparation and Development Training Program.  Title IV-E funding shall be sought for eligible expenditures of the "career preparation and development training program" through the Master of Social Work and Bachelor of Social Work cohort partnerships with the University of Mississippi, University of Southern Mississippi and Jackson State University.**

**Background**:  Historically, defendants have used state funds to subsidize some DFCS staff participation in degree programs leading to a Master of Social Work ("MSW").  Because these expenditures are eligible for federal funding reimbursement under Title IV-E of the Social Security Act, Hornby Zeller's May 2011 report recommended that the defendants seek federal reimbursement for various types of expenditures associated with DFCS employee participation in MSW programs.[356]  The report recognized the possibility of an expansion to Bachelor of Social Work ("BSW") programs,[357] and outlined the steps necessary for implementation of its recommendations with respect to both MSW and BSW programs.  These steps were incorporated into the July 2012 Agreement, became Period 3 requirements, and are addressed below.[358]

> **a.    Update the Child and Family Service Plan ("CFSP") to describe the Master of Social Work and Bachelor of Social Work partnerships with the universities.  The method of funding shall be included in the CFSP update.**

---

[355] Ex. 29, Agreement Regarding the Enhancement of Federal Funding, July 12, 2012 [Dkt. No. 573].

[356] *See* Ex. 28, *supra* note 354, at 18-24.

[357] *Id.* at 23.

[358] The Monitor engaged Judith Meltzer, the co-director of the Center for the Study of Social Policy in Washington, D.C., to provide consultative services related to defendants' performance implementing the requirements of the July 2012 Agreement.  *See* www.cssp.org for additional information related to Ms. Meltzer's qualifications and experience.  Ms. Meltzer also has served as a consultant to the Monitor on other aspects of child welfare practice since Period 1.

**Status of Progress, Requirement 1a.:**  The evidence shows that consistent with the Hornby Zeller recommendations, the defendants updated the Child and Family Service Plan ("CFSP")[359] to describe the MSW partnerships with universities.[360]   However, defendants report that DFCS management decided it was "not feasible" to pursue partnerships with BSW programs.[361]

     b.   Utilize the Reimbursement Calculator created by HZA to facilitate retroactive claims for reimbursement of expenditures eligible for federal Title IV-E funding.

          i.   Utilize the Reimbursement Calculator created by HZA to analyze and maximize allowable IV-E reimbursement of MSW or BSW coursework reimbursed by DFCS to its current and prospective staff.

          ii.   Utilize the Reimbursement Calculator created by HZA to facilitate quarterly filing for federal reimbursement on a retroactive basis for the Title IV-E eligible expenditures.

**Status of Progress, Requirement 1b.:**  Hornby Zeller developed the reimbursement calculator for the defendants,[362] and this tool was used by MDHS/DFCS staff to compute a reimbursement claim related to MSW coursework for the first quarter of the 2013 calendar year. Defendants report that they have continued to use the calculator to prepare claims related to MSW coursework.  The revenue generated by these claims through the end of the 2013 calendar

---

[359] The updated CFSP is a prerequisite that must be met in order for a state to claim costs in this area.

[360] *See* Ex. 28, *supra* note 354, at 22-24 for a description of the relevant recommendations made in the May 2011 Hornby Zeller report; *compare* Ex. 30A, State of Mississippi, Department of Human Services, Division of Family and Children's Services, Mississippi FY 2011, submitted June 30, 2012, Annual Progress and Services Report, at 69 (excerpt) *with*  Ex. 30B, State of Mississippi, Department of Human Services, Division of Family and Children's Services, Mississippi FY 2012, submitted June 26, 2013, Annual Progress and Services Report, redacted, at 49 (excerpt) (describing MSW Partnerships with universities).

[361] Defendants disclosed this matter to plaintiffs' counsel and the Monitor in a July 8, 2013 submission.  *See* Ex. 31A, July 8, 2013 correspondence to Miriam Ingber from Kenya Key Rachal with attached Report on Impact of Hornby Zeller Associates' (HZA) Recommendations, Agreement Regarding Enhancement of Federal Funding, Responses to Requirements of the Modified Settlement Agreement (MSA) and Implementation Plan for Period 3 (Y3IP), Status Report on Implementation of Agreement Regarding the Enhancement of Federal Funding Filed with the Court on July 12, 2012 [Status Report], and State Fund Appropriations by Year, redacted.  The disclosure is included in the Status Report [DHS 345523-345527] at 1 [DHS345523].  In comments submitted to the Monitor on the draft version of this report, defendants have explained that an unanticipated change in legislation related to state funding for DFCS staff participation in BSW programs led defendants to conclude that the BSW partnerships were no longer feasible.

[362] The reimbursement calculator is essentially a customized software tool in Microsoft Access that is used to compute reimbursement claims in this context.

year has been itemized by the defendants and is reflected in the appendix to this report.[363]  As noted in the narrative related to Requirement 1a. of the July 2012 Agreement,[364] the defendants have elected not to pursue partnerships with university BSW programs.

> **Step 2, July 12, 2012 Agreement Regarding Enhancement of Federal Funding Pre-service Training Program for New Caseworkers and Supervisors.  Title IV-E funding shall  be sought for eligible expenses of the "pre-service training program for new caseworkers and supervisors" through the sub-grant with the Child Welfare Training Academy at the University of Mississippi.**

**Background:**  As described above,[365] defendants have bolstered the pre-service training program provided for new case workers and supervisors through, among other changes, a contract with the Child Welfare Training Academy at the University of Mississippi.  Because many of the costs associated with the pre-service training program are eligible for federal funding reimbursement, the Hornby Zeller report recommended that the defendants implement specified steps to maximize reimbursement.[366]  The required performance by the end of Period 3 is described below.

> **a.   Update the CFSP to describe the state's training program and costs which are to be funded with Title IV-E monies.**

<u>**Status of Progress, Requirement 2a.**</u>**:**  The CFSP is updated through submissions of the Annual Progress and Services Report ("APSR").  Interviews with MDHS/DFCS fiscal division managers and a review of the June 2012 and June 2013 versions of the APSR submitted by the defendants to the U.S. Department of Health and Human Services Administration for Children

---

[363]  Ex. 31B, spreadsheet submitted on January 8, 2014 in response to Monitor's request by MDHS/DFCS division of budget and financial planning (reflecting the amount of both current and retroactive claims for federal reimbursement and revenue received for calendar years 2009-2013 as of January 8, 2014).  Defendants report that the "2013 to date" column in the far right of this spreadsheet represents revenue for one quarter in 2013 for the MSW cohort, one quarter for tuition, one quarter for the pre-services training university contract, three quarters for the in-house pre-service training staff, and for pre-service training for workers and supervisors, one quarter for administrative technical assistance, and three quarters for supportive services.  Among other matters, the table reflects that as a result of implementing the Hornby Zeller recommendations, current claims for training have increased from $59,398 in calendar year 2011 to $694,279 in calendar year 2013.

[364]  *Supra* at 115-116.

[365]  *Supra* at 77-78.

[366]  Ex. 28, *supra* note 354, at 26-31.

and Families ("ACF") establishes that the defendants updated the CFSP[367] as recommended by

Hornby Zeller to describe the training program and costs eligible for reimbursement.[368]

      **b.**   **Update the CFSP to specify that new caseworkers will not carry a caseload until all pre-service training has been completed; the work experience component of the training is an integral component of the plan; that staff will receive more intensive supervision during the on-the-job training period; and that the trainees' performance is closely monitored and assessed.**

      <u>**Status of Progress, Step 2b.:**</u>  Interviews with MDHS/DFCS fiscal division managers

and a review of the June 2012 and June 2013 versions of the APSR submitted by the defendants

to ACF establish that the defendants updated the CFSP as recommended by Hornby Zeller in

response to this requirement.[369]

      **c.**   **Assign new caseworkers to the training cost pool for the first eight weeks so that the appropriate portion of the costs will be eligible for Title IV-E reimbursement.**

      <u>**Status of Progress, Requirement 2c.:**</u>  Defendants report that this has been

accomplished through the implementation of new accounting procedures.  As a result of the

changes, MDHS/DFCS can now identify casework staff in their first eight weeks of employment

with time billable to Title IV-E training.

      **Requirement 3, July 12, 2012 Agreement Regarding Enhancement of Federal Funding**
      **Supervisory Learning Labs and Administrative Technical Assistance.  All eligible expenses of the Supervisory Learning Labs and Administrative Technical Assistance established by sub-grant with the University of Southern Mississippi shall be allocated to the administrative cost pool, which will be eligible for Title IV-E reimbursement.**

---

[367] *See infra* note 369 and related text.

[368] Ex. 32, State of Mississippi, Department of Human Services, Division of Family and Children's Services, Mississippi FY 2012, submitted June 26, 2013, Annual Progress and Services Report, redacted, at 49-53 (excerpts) (describing the training program and costs eligible for reimbursement).

[369] Ex. 32, *supra* note 368, at 50.  The update is consistent with each of the specifications in this subsection except in one respect:  it is not consistent with the requirement that the CFSP be updated to specify that new caseworkers will not carry a caseload until *all* pre-service training has been completed.  Instead, the relevant text in the APSR update states:  "New caseworkers will carry no caseload *during non-classroom training.*"  *Id.*

**Status of Progress, Requirement 3.:**  Defendants report that they did not implement this requirement because of the administrative burden that would have been imposed if they began to track reimbursable activities.  As described above,[370] defendants restructured the supervisory training program.  As a result, effective June 30, 2013, they no longer maintained a contractual arrangement with the University of Southern Mississippi for supervisory learning labs and administrative technical assistance.  In light of these circumstances, defendants' explanation for the failure to implement this requirement appears reasonable.[371]

> **Step 4, July 12, 2012 Agreement Regarding Enhancement of Federal Funding**
> **In-House Training.  Title IV-E funding shall be sought for eligible in-house training costs.**

**Status of Progress, Requirement 4.:**  The Hornby Zeller assessment report addressed the expansion of the DFCS in-house training program and made recommendations for capturing federal revenue for eligible training expenditures.[372]  Defendants' performance with respect to the recommendations incorporated into the June 2012 Agreement is addressed below.

> a.  **Develop and implement a process for ensuring that the PINS of full-time trainers are assigned to the proper cost pools.**

**Status of Progress, Requirement 4a.:**  Every position at DFCS is assigned a PIN, or personnel identifier number.  PINS are assigned to cost pools.  Cost pools are used to track expenses, by category, for a range of accounting purposes, including to allocate appropriately staff time and expenses eligible for federal reimbursement.  The Hornby Zeller report identifies two general issues related to assigning PINS to proper cost pools.  First, Hornby Zeller's assessment report found that actual staff duties were not always connected properly to the

---

[370] *See supra* at 78, 81.

[371] *See* Ex. 31A, *supra* note 361.  Defendants disclosed this matter to plaintiffs' counsel and the Monitor in their July 8, 2013 submission.  *See id.* at Status Report [DHS 345523-345527], at 3 [DHS345525].  This was disclosed to the Monitor earlier, during a June 27, 2013 meeting with DFCS managers and Ms. Meltzer.  Nevertheless, timely notice to plaintiffs' counsel and the Monitor was indicated.

[372] Ex. 28, *supra* note 354, at 33.  Moreover, the Hornby Zeller report indicates that the defendants did not file a claim for in-house training costs eligible for federal reimbursement during the 2010 fiscal year and it recommends that the defendants file a retroactive claim for eligible in-house training costs.  *Id.* at 34.

assigned PIN.  The MDHS/DFCS process of reassigning an employee's PIN to the correct cost

pool when job functions change is labor intensive and as a result the reassignment is not always

timely, and it may not occur at all.[373]  The Hornby Zeller report notes that this affects the

accuracy of the cost pool and may impede proper claiming in certain circumstances.[374]  Second,

the report states that the defendants have not updated the DFCS cost allocation plan to reflect

newly created administrative units within the agency such as the CQI or Resource Development

Units.[375]  As a result, the report points out that PINS are assigned to either broad categories (*e.g.*,

DFCS) or on an *ad hoc* basis to incorrect categories, which can result in a loss of federal funds.

Accordingly, the report recommended that the full-time trainers be properly assigned to PINS

that are associated with the proper cost pools.

The defendants reported that they were unable to realign the PINS for the full time

trainers, as recommended by Hornby Zeller.  Nevertheless, they have reported that procedures

have been implemented to ensure that the allowable costs associated with the full-time trainers

can be tracked and charged appropriately.[376]  The evidence of increased cost-claiming for trainers

and other training costs suggests that defendants' approach has worked.

> **b.  Develop and implement a process for ensuring that all expenditures associated with training (including meeting rooms, staff travel, and related expenses) are charged to Title IV-E training when the subject of the training is relevant.**

**Status of Progress, Requirement 4b.:**  Defendants report that the appropriate procedures

have been implemented.  The reported claims made and federal revenue received for in-house

---

[373] *Id*. at 4.
[374] *Id*.
[375] *Id*.
[376] *See id*. at 6-8 for a discussion of this issue.

training expenses between the 2009 and 2013 calendar years indicate that defendants have made significant improvements in the tracking and claiming process.[377]

> **c.    Ensure that all costs for trainers (excluding office space) are allocated to the training pool, which will be eligible for Title IV-E reimbursement.**

**Status of Progress, Requirement 4c.:**  Defendants report that appropriate procedures have been implemented.  As noted in the preceding narrative related to Requirement 4b.,[378] the federal revenue received for in-house training expenses between the 2009 and 2013 calendar years indicates that defendants have made significant improvements in the tracking and claiming process.[379]

> **Step 5, July 12, 2012 Agreement Regarding Enhancement of Federal Funding Supportive Services Expenditures.  Title IV-E funding shall be sought for eligible supportive services expenditures.**

**Status of Progress, Requirement 5.:**  The Hornby Zeller assessment determined that defendants were subsidizing the costs associated with expenditures for supportive services for children and families with state funds as well as with funds from two federal grant programs: Temporary Assistance for Needy Families ("TANF") and the Social Services Block Grant ("SSBG").  The Hornby Zeller report points out that both TANF and SSBG funds are capped and fully expended on an annual basis.  Because Title IV-E or Title XIX represent alternative and uncapped funding streams, Hornby Zeller recommended that defendants should not rely on TANF and SSBG and should seek to reduce the amount of state funds required to fund support services for those cases in which the child is Title IV-E or Title XIX eligible.[380]

> **a.    Where allowable, use the Support Services Calculator created by HZA to discontinue the use of TANF and SSBG funding for support services for Title IV-E (or Title XIX) eligible children, and begin charging those services as a Title IV-E (Or Title XIX) maintenance or cost.**

---

[377]  *See* Ex. 31B, *supra* note 363 (showing very substantial increases in federal reimbursement for the DFCS in-house professional development unit between the 2009 and 2013 calendar years).
[378]  *Supra* at 120-121.
[379]  *Id.*
[380]  Ex. 28, *supra* note 354, at 14.

**Status of Progress, Requirement 5a.:**  As of January 2014, this process had not been implemented.  Defendants have explained that the process would require a determination of whether the costs relate to Title IV-E eligible children before the expenditure is made.[381] Eligibility is a pre-requisite to claiming Title IV-E funds.  Defendants report that, because they cannot currently determine a child's eligibility upfront, they are filing retroactive claims once eligibility is determined.  It appears that improvements in MACWIS and implementation of a planned but not yet initiated statewide accounting system are necessary prerequisites in order to support Title IV-E claiming for supportive services on the front end.

  b. **Institute a process for the quarterly filing of retroactive Title IV-E eligible expenditure claims.**

**Status of Progress, Requirement 5b.:**  Defendants report that they implemented procedures to file retroactive claims pursuant to Title IV-E on a quarterly basis prior to the start of Period 3.  An initial claim covering eight quarters was filed before the start of Period 3 in March 2011.  Subsequent retroactive claims were made quarterly between March 2012 and March 2013.  According to the data reported by defendants, over $1.5 million has been received as the result of the retroactive quarterly Title IV-E claims that have been filed since March 2011.[382]

  **Requirement 6, July 12, 2012 Agreement Regarding Enhancement of Federal Funding**
  **Random Moment Sampling Process.  Restructure the random moment sampling (RMS) process to require workers and supervisors to define activity codes separately from case types. This shall be implemented by collaboration between HZA, MDHS, and Interactive Voice Associates, MDHS' implementation partner for its new RMS system.**

---

[381] Ex. 31A, *supra* note 361, Status Report at 4 [DHS 345526].
[382] *Id.*, Report on Impact at 4 [DHS 345512] (includes table listing quarterly claim filed, period covered, number of quarters covered by claim, amount of claim, and amount of revenue received).  There has been a decrease in claiming for supportive services since 2011.  Defendants attribute this phenomenon to changes in accounting practices.

**Status of Progress, Requirement 6.:** MDHS/DFCS uses the Social Worker Random

Moment Survey ("RMS") process as the basis for measuring the federal share of personnel and

other indirect costs charged to multiple federal funding sources for the agency's child welfare

program. The RMS is a component of the DFCS cost allocation plan and it is subject to federal

approval. The Hornby Zeller assessment identified limitations in the RMS process utilized by

DFCS, finding that in certain instances it did not permit staff to report accurately on the activities

they were engaged in at the time that the random sample was conducted.[383] Accordingly, the

Hornby Zeller report recommended specific modifications in the RMS process and associated

revisions to the cost allocation plan.[384] These recommendations are reflected in Requirements 6

a.-e. of the July 2012 Agreement, which state:

> a. **Define a set of activities, case- and non-case specific, to be used for the new RMS.**
> b. **Using DFCS' current definitions and case practices, as well as those of agencies of other states, develop a set of activities and their definitions.**
> c. **Identify case types.**
> d. **Prepare a matrix that maps activities to case types.**
> e. **Amend the cost allocation plan to reference the new RMS system in sufficient detail to obtain federal approval.**

Defendants' progress is described below.

**Status of Progress, Requirements 6 a.-e.:** The defendants report that they revised the

RMS process as required and began implementing the new process starting in April 2012. The

revised process is reflected in an amended cost allocation plan,[385] which was submitted for

federal approval on July 19, 2012 and approved on February 13, 2013.[386] Approval of the plan

was contingent upon the defendants submitting an updated allocation plan following the issuance

of a final report related to a pilot administrative cost review conducted by federal officials in May

---

[383] Ex. 28, *supra* note 354, at 4-5.
[384] *Id.*
[385] Ex. 33, State of Mississippi, Department of Human Services Cost Allocation Plan, Effective July 1, 2012, excerpt, Appendix C: Random Moment Sampling.
[386] Ex. 34, February 13, 2013 correspondence to Earl D. Walker, Director, Division of Budgets and Accounting, Mississippi Department of Human Services from Arif Karim, Director, Division of Cost Allocation, United States Department of Health and Human Services (approving the amended cost allocation plan).

2012.  The final report was issued on March 27, 2013.  The revised RMS process was not

evaluated during the pilot review.  However, the final report requires the defendants to submit a

revised cost allocation plan describing the new RMS process.[387]  Defendants report the revised

plan was submitted on March 4, 2013, amended over one year later on March 11, 2014, and is

currently undergoing a federal review process.

> **Period 3 IP §I.F.2.**
> **F.  Financial Management**
>     **2.  Defendants shall issue a written report on the impact of**
>        **HZA's recommendations on Defendants' ability to**
>        **increase federal funding and any barriers to**
>        **implementation.  Defendants shall share the report with**
>        **the Monitor and Plaintiffs.**

    **Status of Progress, Period 3 IP §I.F.2.:**  As noted above,[388] the report was provided to

plaintiffs' counsel and the Monitor on July 8, 2013.  The report represents a thoughtful and

informative summary of the impact of the recommendations on the defendants' ability to increase

federal revenue.[389]

> **MSA §II.A.6.b.2.**
> **6.  Financial Management**
>   **b.  By the end of Implementation Period Three:**
>     **2)  Funds realized as a result of revenue maximization activities**
>       **shall not supplant appropriated state funds but shall be used**
>       **in furtherance of the reforms and outcome measures**
>       **provided for herein and to improve child welfare services.**

    **Status of Progress, MSA §II.A.6.b.2.:**  There is no evidence that since 2011, federal

funds received through Title IV-E have supplanted DFCS's state funded budget.[390]

---

[387]  Ex. 35A, March 27, 2013 correspondence to Richard A. Berry from Joseph J. Bock, redacted (transmitting findings from pilot administrative cost review); Ex. 35B, U.S. Department of Health and Human Services Administration for Children and Families, Mississippi Title IV-E Foster Care Program Administrative Cost Review Pilot Final Report On-Site Review May 7-11, 2012 (excerpt) at 41.

[388]  *Supra* note 361.

[389]  *See* Ex. 31A, *supra* note 361.

[390]  It is noteworthy that during the five fiscal years between 2009 and 2013, the only year in which there was an annual decrease in the state funded portion of the DFCS budget was fiscal year 2011, which experienced a two percent decrease in state funds.  There is no evidence that this decrease in state appropriations was made in anticipation of increased federal revenues stemming from the anticipated Title IV-E funds.

MSA §II.A.7.e.1.
7. **Recruitment and Retention of Foster Families and Therapeutic Service Providers**
   e. **By the end of Implementation Period Three:**
      1) The rate structure recommended by the consultant for foster care providers to special needs children and for facilities providing congregate care, as agreed upon by the Parties or determined by the Court, shall be fully implemented. Defendants shall determine the funding source for this rate structure.

**Status of Progress, MSA §II.A.7.e.1.:**  As explained below, during Period 3, in response to this requirement, the parties reached an agreement regarding the rate structure for foster care providers for children in therapeutic group homes.  Moreover, consistent with the consultant's recommendations, defendants increased the per diem rate paid to emergency shelter providers on July 1, 2013.

During Period 1, defendants were required to engage a consultant to assess whether board payment rates paid by DFCS to foster care providers for children with special needs and to congregate care facilities satisfied federal statutory requirements and reflected the actual costs of caring for children with special needs and children in congregate facilities.[391]  Because the assessment report was not completed during Period 1,[392] it was required to be completed during Period 2.[393]  In fact, the Settlement Agreement also required that the rate structure recommended by the consultant, as agreed upon by the parties or determined by the Court, be fully implemented by the end of Period 2.[394]

CSF, which had been engaged to conduct the required assessment, issued a final assessment report, Mississippi Rate Setting Final Report ("Rate Setting Report") on September

---

[391]  Settlement Agreement §§II.B.13.g.-h.
[392]  The report was not completed due to a delay in engaging the consultant.  *See June 2009 Report* at 90.
[393]  Period 2 IP §II.14.a.
[394]  Settlement Agreement §II.B.13.i.

25, 2009.[395]  Among other matters, the Rate Setting Report addressed the adequacy of foster care maintenance payments made to foster care providers serving special needs children and facilities providing congregate foster care relative to federal statutory requirements.  In addition, it included recommended rates for foster care providers serving special needs children and for facilities providing congregate foster care.

In a December 1, 2009 letter, plaintiffs' counsel objected to the Rate Setting Report's finding regarding the per diem rate calculation for therapeutic group homes.[396]  This matter was the subject of protracted negotiations culminating in a November 2012 agreement between the parties regarding the rate schedule for therapeutic group homes.[397]  The agreement required defendants to raise the per diem foster care maintenance payments to therapeutic group homes to $95.11, on an interim basis, beginning on July 1, 2013.[398]  Defendants report and providers confirm that the rate was raised to the required interim level in a timely manner.

According to the parties' November 2012 agreement, defendants will determine the final per diem foster care maintenance rate for therapeutic group homes by July 2015.  That determination will be based on an analysis of cost reporting and accounting data that defendants report they will receive from therapeutic group home providers in response to contracting requirements that were instituted at the conclusion of the December 2013 calendar year.[399]

The November 2012 agreement also specifies that pending approval from the Centers for Medicare and Medicaid Services ("CMS"), therapeutic group homes compliant with Mississippi

---

[395]  Mississippi Rate Setting Final Report, September 25, 2009, Center for the Support of Families, Inc.  The report was submitted to the Monitor and counsel for the plaintiffs on November 2, 2009.

[396]  *See September 2010 Report* at 129-130 for additional background data regarding plaintiffs' objections.

[397]  *See* Ex. 36, November 2, 2012 correspondence to Miriam Ingber from Ashley Christin Tullos (setting forth the terms of a proposal that was agreed upon by the parties).

[398]  The per diem rate through June 2013 was $72.

[399]  The November 2012 agreement anticipates that the defendants would satisfy Period 3 requirements related to the development of a performance-based contracting plan.  Ex. 36, *supra* note 397, at 2.  However, as described in the narrative of this report related to Period 3 IP §I.A.4., *supra* at 90-92, these requirements were not satisfied.

Division of Medicaid ("DOM") requirements would also be eligible to receive a treatment foster

care per diem rate of $131 from DOM for the delivery of therapeutic services to children in

DFCS custody.[400]  There was a substantial delay in the CMS application and approval process

during Period 3.[401]  As a result, the Initial Period 4 IP requires the defendants to make all

reasonable efforts to seek CMS approval of the $131 per diem rate for treatment foster care.[402]

Defendants report that, until that approval is granted, therapeutic group homes will remain

eligible for an intensive outpatient services rate of roughly $122 daily from DOM.[403]  Providers

were notified of the availability of the intensive outpatient services rate in a notice issued

pursuant to a Period 4 requirement.[404]

> **Period 3 IP §II.A.1.**
> **A. Policy**
> 1. **Defendants shall have completed all revisions to the DFCS policies and practice guides as necessary to reflect the COA foster care services standards and the requirements set forth in Sections II.B and III.B of the Modified Settlement Agreement, and shall assess what training is necessary in order to effectuate any new and revised policies and develop training curricula.**

**Status of Progress, Period 3 IP §II.A.1.:**  The revisions to the DFCS policies and

practice guides,[405] were completed during Period 3.  Additionally, there is evidence that training

curricula have been developed in response to new and revised policies.  The training curriculum

was assessed, as required, and defendants report that they continue to assess the curriculum on an

ongoing basis in light of newly introduced modifications to DFCS policies and practices.

---

[400] *Id.*
[401] *See* Ex. 37, June 20, 2013 correspondence to Miriam Ingber from Ashley Christin Tullos (reporting on the chronology related to this matter in response to an inquiry from plaintiffs' counsel).
[402] Initial Period 4 IP §III.B.1.
[403] *See* Ex. 37, *supra* note 401, at 2.
[404] *See* Initial Period 4 IP §III.B.2.
[405] The revisions in DFCS policies were initially required during Period 1.  *See* Period 1 IP §II.

**Period 3 IP §II.A.2.a.-c.**
**A. Policy**
    **2. Service Planning and Monitoring: The revised policies shall require that each service plan, and revision of such plan, meet the requirements of Section III.B.2 of the Modified Settlement Agreement and:**
        **a. are based on the assessment required by Section III.B.1 of the Modified Settlement Agreement;**
        **b. include: service goals, desired outcomes, and timeframes for achieving them; services and supports to be provided, and by whom; and the signature of the parent(s) with whom reunification is planned and, when appropriate, the child or youth; and**
        **c. address, as appropriate: unmet service and support needs that impact safety, permanency, and well-being; maintaining and strengthening relationships; educational needs and goals; and the need for culturally responsive services and the support of the family's informal social network.**

**Status of Progress, Period 3 IP §II.A.2.a.-c.:** Defendants revised DFCS policy to conform to these requirements during Period 3.[406]

**Period 3 IP §II.A.3.a.-e.**
**A. Policy**
    **3. Permanency Plan: The revised policies shall require that Individual or Family Service Plans the following:**
        **a. how the permanency goal will be achieved;**
        **b. what services are necessary to make the accomplishment of the goal likely;**
        **c. who is responsible for the provision of those services;**
        **d. when the services will be provided; and**
        **e. the date by which the permanency goal is likely to be achieved.**

**Status of Progress, Period 3 IP §II.A.3.a.-e.:** DFCS policy was revised to reflect these requirements during Period 3.[407]

**Period 3 IP §II.A.4.**
**A. Policy**
    **4. Defendants shall develop a process for the Foster Care Review Unit to assess and report on whether permanency plans contain all of the elements listed in Section II.A.3 above.**

---

[406] *See* Ex. 3, *supra* note 105.
[407] *Id.*

**Status of Progress, Period 3 IP §II.A.4.:** Interviews with DFCS supervisory staff responsible for the administration of the PAD and a review of the PAD establish that the required process was not developed during Period 3.[408]

> **Period 3 IP §II.B.1.a.**
> **1. Permanency Roundtables**
>   **a. In addition to Regions II-W, 5-W, and VII-E, which have already conducted permanency roundtables, by July 1, 2012, Defendants, with the assistance and support of Casey Family Programs, shall have conducted permanency roundtables in Regions I-N, I-S, and II-E. The permanency roundtables will target a population of children who have been in Defendants' custody for at least thirty-six (36) months with the goal of moving these children toward permanency.**

**Status of Progress, Period 3 IP §II.B.1.a.:** Defendants introduced the permanency roundtable process in 2010, with substantial support from Casey Family Programs.[409] Permanency roundtables are an intervention intended to promote permanency for targeted children in custody for 36 months or longer.[410] The roundtables constitute structured case consultations involving the assigned caseworker, her/his supervisor, and a designated scribe, facilitator, and master practitioner.[411] The roundtables result in strategies for accelerating permanency in individual cases, which are incorporated into an action plan. They are also used to identify and address systemic barriers to permanency. DFCS staff receive two days of training before participating in the roundtable process.[412]

---

[408] The PAD was not revised in response to this requirement. Guided by the PAD, reviewers evaluate the following elements of Period 3 IP §II.A.3. in circumstances in which the FSP has been developed within 30 days of custody: whether it includes a permanency goal as well as timeframes and activities to achieve/support permanency. Although defendants report that the PAD Reference Guide was updated during Period 3, the updates did not address the requirements in this subsection. *Compare* Ex. 38A, PAD Q11, cut and pasted from the automated version of the PAD on July 25, 2012 *with* Ex. 38B, FCR Periodic Administrative Determination Reference Guide (excerpt), Q11, revised May 1, 2013 and submitted to the Monitor on July 29, 2013.

[409] For additional information about the permanency roundtable process *see* http://www.casey.org/Resources/Initiatives/PermanencyRoundtables/default.htm.

[410] MACWIS reports identifying all children in custody for three years or more are generated and validated by regional staff in order to identify the cohort of children whose cases will be subject to review.

[411] Consultants from the Casey Family Foundation participate on the teams.

[412] Defendants report and the Monitor's office has observed that each roundtable session takes at least two hours.

Interviews with DFCS regional staff and managers, as well as a review of sign-in sheets and scheduling data, establish that roundtables were conducted in Regions I-N, I-S and II-E during April 2012 as required by this subsection.  According to defendants, by the end of Period 3, 10 of DFCS's 13 regions had participated in roundtables involving 341 cases.  Defendants continue to implement the roundtable process.  They have reported a need to refine processes for monitoring the implementation of action plans, which are especially challenging because roundtable team members include participants from many different DFCS regional offices.

> **Period 3 IP §II.B.1.b.**
> **1.  Permanency Roundtables**
>   **b.  By 45 days following the Court's approval of the Modified Settlement Agreement, Defendants, in consultation with Casey Family Programs, shall develop a schedule for permanency roundtables in four(4) additional regions and those roundtables shall be conducted prior to the end of Implementation Period 3.**

**Status of Progress, Period 3 IP §II.B.1.b.:**  This requirement was satisfied.  Interviews with DFCS regional staff and managers as well as a review of sign-in sheets, scheduling data, and observations of roundtables establish that roundtables were conducted in Regions V-E and VI during October 2012 and Regions IV-N and IV-S during November 2012.[413]

> **Period 3 IP §II.B.1.c.**
> **1.  Permanency Roundtables**
>   **c.  Each permanency roundtable shall be conducted in accordance with Section II.B.6.a.2 of the Modified Settlement Agreement.**

**Status of Progress, Period 3 IP §II.B.1.c.:**  MSA §II.B.6.a.2. requires that permanency roundtables be conducted by a team that consists of a master practitioner and/or a permanency consultant, a scribe, a neutral facilitator, a caseworker and the caseworker's supervisor. Additionally, this subsection requires that participating DFCS staff, court personnel and community stakeholders receive training on the roundtable process.  The evidence indicates that

---

[413]  Roundtables were observed on October 17, 2012, involving cases from Regions V-E and VI (Pearl River, Forrest, Lincoln and Copiah counties).

the roundtable teams were comprised of the required participants who received the requisite

training.  As a general matter, neither court personnel nor community stakeholders participated in

the roundtable process.  According to the defendants, DFCS management and representatives

from Casey Family Programs made a joint decision to conduct the roundtables without

representatives from external stakeholder groups.[414]

> **Period 3 IP §II.B.2.a.**
> **2.  Permanency Planning Updating and Review**
>   **a.  Within six (6) months of the start of Implementation Period 3,
>   Defendants shall develop a system for tracking the annual
>   court reviews for each child in care.  Defendants' policy shall
>   require that the Youth Court with jurisdiction is provided with
>   a detailed up-to-date report on the current status of the child's
>   placement, visitation, permanent plan progress, and service
>   needs.  Defendants shall begin implementing that system before
>   the end of Implementation Period 3.**

**Status of Progress, Period 3 IP §II.B.2.a.:**  The defendants did not implement the

required system during Period 3; however, DFCS policy was revised to require the submission of

a detailed and up-to-date report to the Youth Court with jurisdiction over the child.[415]

> **Period 3 IP §II.B.2.b.**
> **2.  Permanency Planning Updating and Review**
>   **b.  The child's assigned caseworker or supervisor shall attend
>   every child's annual court review unless there are exceptional
>   circumstances that do not allow attendance.**

**Status of Progress, Period 3 IP §II.B.2.b.:**  Based on interviews with DFCS managers

and staff, the assigned caseworker, and in many instances the supervisor, attend the hearings as a

matter of routine practice.  However, DFCS policy lists the assigned worker and supervisor

among those who *may* have relevant testimony and *may* be invited.[416]  It appears the policy

would benefit from clarification to closely conform to the requirements of this subsection.

---

[414]  External stakeholders, including Youth Court judges and court personnel, were introduced to the roundtable process during a Permanency Summit that was sponsored by Casey Family Programs.  The Summit was held during November 2010 in Natchez, Mississippi.
[415]  Ex. 39, Mississippi, DFCS Policy, Section D, Foster Care, Revised 7-22-13, §VII.D.4.d.-e., at 118-121.
[416]  *Id.* §VII.D.4.e.3., at 120.

Period 3 IP §II.B.3.a.-d.
3. Service Array
   In order to build the capacity of Defendants to begin meeting
   the needs identified in the "Foster Care Services Reunification
   Needs Assessment," Defendants shall, by the end of
   Implementation Period 3:
   a. develop a Foster Care Unit;
   b. hire a Division Director II to lead the Foster Care Unit;
   c. hire a Medical-Mental Health Specialist; and
   d. hire six (6) workers to build the resource service array.

**Status of Progress, Period 3 IP §II.B.3.a.-d.:**  As explained below, defendants met each

of the requirements in this subsection except for hiring the required number of workers to build

the resource service array.  The defendants established a foster care unit and hired a division

director II to lead the unit on April 16, 2012, before the start of Period 3.  Thereafter, the unit was

staffed with a program manager on November 1, 2012 and two program specialists.  The

program specialists began working in the unit on November 16, 2013.  The foster care unit is

responsible for tracking expedited unlicensed relative placements and coordinating permanency

roundtables.  The unit also responds, as needed, to inquiries from DFCS staff and foster parents.

On February 1, 2012 a nurse IV program director began working in the DFCS Resource

Development Unit.[417]  This program director is responsible for assessing and addressing

availability of medical, dental and mental health providers statewide; promoting the use of an

electronic health record to assure timely access to medical, dental and mental health records for

children in foster care; and assessing and addressing systemic issues related to the use of

psychotropic medications.  Starting in January 2013, the program director was also assigned to

serve as the chief DFCS liaison with Magnolia Health Care, the primary Medicaid provider for

children in foster care.[418]  The program director resigned on September 9, 2013.  Although

---

[417] This employee has a Bachelor of Science in Nursing as well as a background in hospital and school nursing.  *See
also* narrative related to Period 3 IP §II.F.2., *infra* at 175-177, for a discussion of requirements related to this
management position.

[418] Magnolia is one of two Medicaid-managed care providers in Mississippi.  It became the primary provider of
health services for foster children in January 2013.  According to the defendants, they have been relying on

defendants report that efforts have been made to fill this critical position, it has been vacant since that time.

Prior to the start of Period 3, in December 2010, a division director II was hired to manage a staff of six resource coordinators.  According to DFCS managers and staff, the coordinators are responsible for developing resource guides for each county in DFCS's 13 regions, to facilitate referrals in individual cases, and to work on county-based and regional initiatives to expand the service array.   Defendants were required to hire six workers to serve as resource coordinators.  They failed to do so.[419]

> Period 3 IP §II.B.4.a.1.-3.
> **4.  Termination of Parental Rights/Special Permanency Reviews**
> **a.  Within six (6) months of the start of Implementation Period 3, Defendants, in conjunction with a qualified independent consultant, shall develop a remedial plan with related action steps and time frames necessary to address the deficiencies found by the TPR Assessment in case practice and documentation related to the timely filing of termination of parental rights on behalf of children who have spent 17 of the previous 22 months in foster care, and for whom an available exception under the Adoption and Safe Families Act ("ASFA") has not been documented. The issues that the remedial plan shall address include:**
> **1)  accurately identifying children for whom the ASFA TPR requirements apply;**
> **2)  adequate training for caseworkers regarding the circumstances that qualify as exceptions to filing TPRs pursuant to ASFA; and**
> **3)  appropriately documenting exceptions.**

**Status of Progress, Period 3 IP §II.B.4.a.1.-3.:** As explained below, during Period 3, defendants developed a remedial plan, albeit not within the required six-month time frame, to

---

Magnolia to develop the electronic health record, which they expected to introduce by January 2014. Implementation has been delayed.  Defendants have been unable to provide a precise count of the number of foster children who have been enrolled in Magnolia; however, as of February 2014 they estimate 2,800 children were enrolled.  Defendants report that Magnolia relies on a network of 15,000 providers statewide.

[419]  Initially, two resource coordinators were hired, one in April and the other in May 2012.  A third resource coordinator started in July 2012, but left the agency before the end of the year.  Thus, the Resource Development Unit was staffed with only two of the six required coordinators from December 2012 through February 2014, when an additional coordinator was hired.  The manager responsible for the resource coordinators started working in the position during December 2010, but from December 2012 through August 2013, she was temporarily reassigned to a management assistance team in Region VII-W.

correct the deficiencies in case practice and documentation addressed by this subsection.  The plan satisfies the requirements of this subsection.

Pursuant to the Period 2 IP, defendants engaged CSF to conduct a TPR assessment for the purpose of identifying children in custody for 15 of the previous 22 months for whom the defendants had not filed a TPR petition or documented an applicable exception for not doing so under the federal Adoption and Safe Families Act ("ASFA").[420]  The findings from the assessment were documented in a report that was issued in November 2009.[421]  Essentially, the assessment found substantial limitations and inaccuracies in the data recorded in MACWIS, which affected the defendants' ability to accurately identify the appropriate cohort of children in custody.[422]  Moreover, the assessment indicated that the circumstances which qualify as ASFA exceptions to filing timely TPR petitions were not documented in the case records; there was no evidence of a reliable and uniform process for determining when TPR petitions were filed; and there was an absence of systemic monitoring to ensure timely filing of petitions and appropriately documented exceptions.  The TPR Assessment Report presented a series of remedial recommendations to address the deficiencies identified during the assessment.

In response to the requirements of this subsection, on May 28, 2013, the defendants submitted the requisite remedial plan.[423]  The plan was developed with substantial assistance from CSF consultants.  It addresses the major recommendations in the November 2009 assessment report.  In addition, it describes how defendants have addressed the recommendations

---

[420]  Period 2 IP §II.2.e.

[421]  For a copy of the report, *see September 2010 Report* at Ex. 35, Termination of Parental Rights Assessment, Final Report, November 24, 2009, Center for the Support of Families, Inc. (redacted) [hereinafter TPR Assessment Report].

[422]  *See September 2010 Report* at 74-79 for a more detailed summary of the findings reflected in the TPR Assessment Report.

[423]  Ex. 40, May 28, 2013 e-mail to Miriam Ingber and Grace M. Lopes from Gwen Long with attached Termination of Parental Rights Remediation Plan, May 2013, redacted.

in the assessment report, and in instances in which remedial action was not taken, it outlines the action needed, action steps, persons responsible, and anticipated completion dates.

> Period 3 IP §II.B.4.b.
> **4. Termination of Parental Rights/Special Permanency Reviews**
>   **b. Defendants shall have begun implementing the TPR remedial plan by the end of Implementation Period 3.**

**Status of Progress, Period 3 IP §II.B.4.b.:** Interviews with DFCS managers and staff and a manager in the Office of the Attorney General ("OAG") with responsibility for tracking and coordinating the TPR process, as well as a review of records that are maintained by the defendants related to remedial activities indicate that the defendants began to implement the remedial plan by the end of Period 3.[424] However, as explained below, the evidence also shows that the corrective action process is not working as intended due to an apparent failure to hold managers in certain DFCS regions accountable for remedying processing delays, to provide sufficient support to managers, or some combination of these factors. Moreover, the evidence also indicates that defendants must improve DFCS tracking of the petition process.

As noted, the evidence shows that defendants began to implement the remedial plan during Period 3 and have continued implementation activities. For example, the remedial plan includes a recommendation with a related action step and timeline for the defendants to strengthen DFCS policy related to TPR petitions by addressing in more detail the statutory exceptions to filing petitions as well as the required documentation and approval process.[425] The defendants revised the DFCS TPR policy on July 22, 2013.[426] Consistent with the remedial plan, the revision modifies the presentation of the statutory exceptions in several respects and it adds

---

[424] Among the records the Monitor reviewed are the following: MACWIS reports; DFCS policy directives; tracking documents issued by the OAG and posted on the internal DFCS network; tracking documents maintained by the DFCS TPR Coordinator; Overdue TPR packet reports compiled by the FCR unit; training schedules; and Legal and Judicial Subteam meeting minutes and quarterly reports.

[425] Ex. 40, *supra* note 423, at 5-6.

[426] Ex. 41A, Mississippi, DFCS Policy, Section D, Foster Care, Revised 7-22-13, §VII.D.5., Termination of Parental Rights, at 121-134.

approval and documentation requirements.[427]  Moreover, consistent with the remedial plan,

before the end of Period 3, the defendants developed and began delivering training to DFCS staff

on the TPR process and related documentation requirements.[428]

In order to promote improvements in the accuracy of the MACWIS reports generated to

track the TPR status of children in defendants' custody, the remedial plan recommended that

defendants undertake two distinct initiatives.  First, the plan recommended that the CQI subteam

develop and implement a formalized plan to distribute findings related to untimely submissions

to the field and to track corrections.  While a written plan was not developed, defendants have

explained that they have relied on the findings from the FCR process to distribute findings to the

field.  During the last quarter of 2012, defendants report that they began publishing a spreadsheet

on the internal DFCS network that listed all overdue TPR petitions identified during the FCR

process.  Thereafter, during November 2013, defendants began using the HEAT process for

notification to regional managers of overdue petitions identified through the FCR process and for

tracking corrective action.  In addition to the fact that the defendants have not demonstrated an

ability to use the HEAT system to promote accountability and prompt corrective action,[429] the

approach defendants have adopted has substantial limitations given that the FCR process cannot

provide timely data about overdue TPR petitions.  There is a critical need for defendants to

address this issue.

Second, the remedial plan also recommends additional training and support for the DFCS

staff assigned to validate MACWIS reports related to TPR status in order to achieve increased

---

[427]  *Compare id.* §VII.D.5.d., Exceptions and Compelling Reasons not to File TPR, at 125-126 *with* Ex. 41B,
Mississippi, DFCS Policy, Section D, Foster Care, Revised 5-29-13, §VII.D.5.d., Exceptions and Compelling
Reasons not to File TPR, at 124-125.
[428]  For example, between June 12, 2013 and January 24, 2014, the defendants conducted training on the TPR
process and related documentation requirements for staff in Regions VII-W, V-E and II-W.
[429]  *See, e.g.*, discussion regarding the corrective action process, *supra* at 95.

accuracy in the reports.[430]  This training and support was provided as a remedial strategy implemented pursuant to the June 24, 2013 Order.  As a result, during Period 4 there have been improvements in the quality of the MACWIS data reports that the defendants produced concerning their performance relative to MSA TPR-related requirements.[431]  These data indicate that additional remediation is necessary in order for defendants to meet MSA regional performance requirements concerning the timeliness of TPR processing, particularly in specific DFCS regions.[432]

In addition to the above-recommended initiatives, the TPR remediation plan includes recommendations intended to improve communications related to TPR processing between DFCS and the OAG as well as to improve tracking and corrective action.[433]  While there is evidence of improved communications and implementation of certain tracking processes,[434] the Monitor has not identified evidence that the defendants have implemented an effective corrective action process as contemplated by the remedial plan.

---

[430]  Although defendants produced data reports related to the TPR status of children in defendants' custody during Period 3, because there were substantial questions about the data presented, the Monitor did not conduct an analysis of the data.

[431]  Notwithstanding the improvements in the quality of the data reports that defendants have produced, the Monitor has raised questions about defendants' analysis of the data which have not been resolved.  *See* Ex. 42, December 6, 2013 e-mail to Kenya Key Rachal from Grace M. Lopes with related December 6, 2013 e-mail to Grace M. Lopes from Mark Jordan (describing apparent variance between analysis required by report specification and analysis reflected in the report that was produced).

[432]  *See* App. A, Exs. 34A and 35A for charts regarding TPR processing; *see also*, App. A, Exs. 34B and 35B for corresponding tables with underlying data.

[433]  Ex. 40, *supra* note 423, at 6-10.

[434]  Both the OAG and the DFCS TPR Coordinator generate monthly reports that are posted on the internal DFCS network.  *See, e.g.,* Ex. 43A, October 9, 2013 correspondence to Onetta S. Whitley, Deputy Attorney General, from M. Earl Scales, Assistant Attorney General, redacted, transmittal correspondence summarizing status of all pending TPR requests processed by the OAG by date application received, date petition filed and legal status; Ex. 43B, one of two tracking forms maintained by the DFCS TPR Coordinator, redacted (used to track status of incomplete TPR packets that are submitted to the MDHS State Office).

The Monitor's review of the most current list of overdue TPR packets identified by the FCR process raises very serious concerns about the efficacy of the corrective action process.[435] The list reflects the names of 88 children in six of DFCS's 13 regions whose cases were reviewed between June 2012 and February 2014. According to the list, the TPR packets have been overdue for the 88 children for periods ranging from 20 to 1,638 days, or nearly four and one half years, and the median number of days overdue was 381 days, or over one year. Only six of the 88 packets were overdue for less than 100 days. The FCR data indicate that three of the six DFCS regions with overdue TPR packets have a high number of delayed submissions: Regions III-N, III-S and VII-W.[436] The failure to implement corrective action in a reasonable period of time indicates a failure to hold DFCS regional managers as well as county office supervisors and caseworkers accountable for submitting TPR packets on a timely basis.

Moreover, there are many other milestones in the administrative processing of TPR applications that contribute to delays. According to data maintained by the DFCS TPR Coordinator, there are very substantial delays between the date completed TPR packets[437] are submitted to the OAG and the date TPR petitions are filed in court.[438] Indeed, a review of tracking data maintained by the DFCS TPR Coordinator indicates that between January 29, 2010 and March 14, 2014, 914 TPR packets were submitted to the OAG by DFCS staff. Of that number, 127 TPR petitions were filed as of March 25, 2014. Because five of the filed petitions

---

[435] Ex. 43C, Unresolved FCR Overdue TPR Packets, June 2012 - February 2014, redacted. This list was the list posted on the DFCS Connection website as of March 25, 2014.

[436] Of the 88 children, 3 children in Region II-W had TPR packets overdue for 227 days; 21 children in Region III-S had TPR packets overdue between 121 and 1,473 days; 21 children in Region III-North had TPR packets overdue between 20 and 1,638 days; one child in IV-N had a TPR packet overdue for 591 days; six children in Region VI had TPR packets overdue between 144 and 270 days; and 36 children in Region VII-W had TPR packets overdue between 97 and 1,139 days.

[437] *See* Ex. 41A, *supra* note 426, §VII.D.5.g. for a list of the documents that are submitted as part of the TPR packet.

[438] *See* Ex. 43D, TPR Tracking System at State Office, redacted (spreadsheet maintained by the DFCS TPR Coordinator, updated as of March 25, 2014, and reflecting, among other matters, the date a TPR packet is submitted to the Office of the Attorney General, the date a petition is filed in court, and the date a judgment is received).

had invalid date ranges,[439] the time between submission of the packet to the OAG and the filing of the petition could not be analyzed. Of the remaining 122 TPR petitions that resulted in a filed petition, according to this data, the petitions were filed between five and 642 days following submission of the TPR packet to the OAG, with a median of 49 days.

There were 787 TPR packets listed on the spreadsheet maintained by the TPR Coordinator that had not been filed as of March 25, 2014. The length of time each packet has been pending in the OAG was calculated for 784 of the TPR packets.[440] The Monitor's analysis of the pendency of these packets revealed that 45 percent have been pending for over one year without a petition filed.[441] However, during the comment period on the draft version of this report, defendants indicated that except for a recent six-month period, the data maintained by the TPR Coordinator was incorrect. Defendants reported that they were in the process of revising the tracking system used by the TPR Coordinator and that the records maintained by the OAG constitute the most accurate tool for tracking the TPR petition process. According to defendants, between January 1, 2010 and May 2, 2014, the OAG received a total of 1,839 TPR packets for individual children and filed 769 petitions. Defendants state that many of these petitions have been filed on behalf of multiple children. The TPR processing data maintained by the DFCS TPR Coordinator is published monthly on the DFCS network for DFCS staff to access as contemplated by the TPR remedial plan that defendants developed pursuant to Period 3 IP §II.B.4.a.1.-3.[442] Clearly these data should have been reconciled by the defendants with the TPR processing data maintained by the OAG. The significant disparities between the data reflected in

---

[439] The date the petition was filed that was entered on the spreadsheet was before the date reflected on the spreadsheet that the petition was sent to the Office of the Attorney General.

[440] The length of time that three TPR packets were pending could not be calculated because of an apparent error in the submission date.

[441] Ex. 43D, *supra* note 438.

[442] *See supra* at 133-135 for a discussion of the remedial plan and Ex. 40, *supra* note 423, at 11, DHS 332105.

the tracking documents maintained by the DFCS TPR Coordinator and by the OAG indicate that

defendants are not implementing a key requirement of the remedial plan required by the Period 3

IP.  There is a critical need for accurate tracking data in order to facilitate the timely processing

of TPR petitions.  The Monitor will follow up on this matter and report to the parties and the

Court as appropriate.

> **Period 3 IP §II.B.5.a.**
> **5.  Adoption**
>   **a.  By 30 days following the Court's approval of the Modified
>        Settlement Agreement, Defendants shall implement a process
>        for advising all potential adoptive families, including any
>        resource family caring for a child who has become legally
>        available for adoption, of the availability of adoption subsidies.
>        This notification shall be documented in the child's record, and
>        Defendants shall facilitate the family's access to such subsidies.**

**Status of Progress, Period 3 IP §II.B.5.a.:**  DFCS conducts a training  program for all

foster and adoptive parents.  The curriculum for the training was revised during February 2012

and is designed to provide information about the adoption subsidy program.[443]  DFCS policy

requires the assigned adoption specialist to inform resource families of the possibility of adoption

assistance if it appears the child is eligible.[444]  However, DFCS policy does not require staff to

document the notification in the case record. The relevant DFCS policies and a separate

procedure manual address the process that DFCS staff must follow with respect to processing

applications for adoption subsidies.[445]  These policies and procedures address the eligibility

determination and post-eligibility processes.

---

[443]  Ex. 44A, MDHS Division of Family & Children's Services, Mississippi PATH (Parents as Tender Healers), A
Curriculum for Foster, Adoptive and Kinship Care Parents (Resource Families), redacted excerpt at 2, 125, 132-141.
[444]  Ex. 44B, Mississippi, DFCS Policy, Section D, Foster Care, Revised 7-22-13, §VII.C.5.b., at 106-108.
[445]  *Id.*; *see also* Ex. 44C, Mississippi, DFCS Policy, Section G, Adoption Services, Revised 5-3-12, §V.A., at 39
(requiring that every case of a child legally freed for adoption must be reviewed for determining eligibility for
adoption assistance, and if the child is eligible, DFCS is required to share this information with prospective adoptive
parents); Ex. 44D, Resource Family Procedures Manual, Child's File Checklist and various documents related to
adoption assistance, redacted.

Period 3 IP §II.B.5.b.
5. Adoption
  b. By 45 days following the Court's approval of the Modified
     Settlement Agreement, Defendants shall define the job
     description, responsibilities, and qualifications for the position
     of adoption specialist.  The adoption specialist's responsibilities
     shall include consulting with private and public professionals
     and identifying and ensuring the provision of targeted services
     necessary for the child to be adopted.

**Status of Progress, Period 3 IP §II.B.5.b.:**  The job description for the adoption

specialist position was revised in April 2012, before the start of Period 3.  It addresses the

responsibilities and qualifications for the position and meets the spirit of this requirement.[446]

Period 3 IP §II.B.5.c.
5. Adoption
  c. By 45 days following the Court's approval of the Modified
     Settlement Agreement, Defendants shall revise the protocol for
     adoption meetings such that it provides sufficient information
     to guide case practice on how to review the progress being
     made in achieving the goal of adoption for legally free children.

**Status of Progress, Period 3 IP §II.B.5.c.:**  The required protocol was developed and

issued to DFCS staff in July 2012 at the start of Period 3.[447]

Period 3 IP §II.B.5.d.
5. Adoption
  d. By 45 days following the Court's approval of the Modified
     Settlement Agreement, Defendants shall develop and begin
     implementing a process for making legal risk placements that
     assures that children for whom the permanency plan is
     adoption but who are not yet legally free for adoption are
     placed in appropriate adoptive homes.

**Status of Progress, Period 3 IP §II.B.5.d.:**  The procedures are outlined in DFCS policy

guidance that was revised before the start of Period 3.[448]

---

[446] Ex. 45A, Job Content Questionnaire, Adoption Specialist, MDHS/DFCS; Ex. 45B, MS State Personnel Board, Performance Appraisal Review Report, SPB Form 800-3, Revised April 2012, Adoption Specialist.  *See also* Ex. 44B, *supra* note 444 (DFCS policy guidance addressing specific responsibilities of the adoption specialist in achieving adoption).

[447] Ex. 45C, Initial Planning Meeting (Adoption Status Meeting), DFCS Form 7/10/12 (includes guidance for initial adoption status meeting as well as subsequent meetings).

[448] Ex. 45D, Mississippi DFCS Policy, Section G, Adoption Services, Revised 5-13-12, §IV.C.2.c., at 23-25; *see also* Ex. 45E, Resource Family Procedures Manual (excerpt), Adoptive Placements and Legal Risk Adoptive Placements at 1-5 and Form DHS-SS-4406A, 05-01-12, Legal Risk Adoptive Placement Agreement, redacted.

**Period 3 IP §II.B.5.e.**
**5.  Adoption**
 **e.  By 45 days following the Court's approval of the Modified**
    **Settlement Agreement, Defendants shall have begun to hire**
    **and train adoption specialists.**

**Status of Progress, Period 3 IP §II.B.5.e.:**  Based on hiring data provided by

defendants, the Monitor was unable to identify the number of adoption specialists defendants

hired during the required time period.  In response to a request from the Monitor, during the

comment period on the draft version of this report, defendants reported that they hired 11

adoption specialists who received specialized training during July and September 2012 and

during January and February 2013.  The Monitor has not had an opportunity to confirm

attendance at these training sessions.

**Period 3 IP §II.B.5.f.**
**5.  Adoption**
 **f.  Defendants shall have taken reasonable steps to hire (or**
    **promote) and train a sufficient number of adoption specialists**
    **to meet the adoption requirements of the Modified Settlement**
    **Agreement and adoption status meetings shall have begun to**
    **be held.**

**Status of Progress, Period 3 IP §II.B.5.f.:**  Defendants did not produce accurate and

validated caseload reports during Period 3, and these data are no longer stored in MACWIS.

Accordingly, the Monitor cannot make a determination about whether a sufficient number of

adoption specialists were hired and trained.

**MSA §II.B.1.e.1.**
**1.  Child Safety**
 **e.  By the end of Implementation Period Three:**
    **1)  Defendants shall assure that standardized decision-making**
       **criteria are used for prioritizing, screening, and assessing all**
       **reports of maltreatment, including corporal punishment, of**
       **children in DFCS custody.**

**Status of Progress, MSA §II.B.1.e.1.:**  In order to promote standardized decision-

making regarding the initial screening and prioritization of reports of maltreatment involving

children in DFCS custody, the defendants were required during Period 1 to establish a centralized

142

24-hour statewide hotline for reporting child abuse and/or neglect.[449]  Because this requirement was not satisfied, defendants were required to implement the hotline during Period 2,[450] and to assure the implementation of standardized decision-making criteria for prioritizing, screening and assessing all reports of maltreatment in care.[451]  The hotline was established as required during Period 2.  However, because the Monitor found significant deficiencies in the screening and evaluation process, the MSA required compliance with this subsection during Period 3.[452]

DFCS policy was strengthened during Period 3 to mandate implementation of standardized decision-making criteria for prioritizing and screening all reports of maltreatment involving children in DFCS custody.[453]  An automated tool is used to facilitate the screening process.  All reports of abuse or neglect of children in custody are automatically assigned to the same priority level, requiring that the investigation of the report be initiated within 24 hours by a face-to-face meeting with the child and completed with supervisory approval within 30 calendar days.[454]

The hotline is operated by a private vendor with staff who are trained on and required to follow DFCS intake and screening policies.  As expected, in this context, the implementation of the hotline has proved challenging for DFCS staff and stakeholders.  In an effort to promote improvements in hotline operations and work to ensure standardization of the intake and screening process, the defendants established a new administrative unit in the DFCS state office

---

[449]  Settlement Agreement §II.B.4.a. and d.; Period 1 IP §II.4.
[450]  Period 2 IP §II.6.d.
[451]  *Id.* §II.6.b.
[452]  *See September 2010 Report* at 97-99 for background information regarding the Monitor's findings; *see also June 2009 Report* at 81-83.  Remedial action related to the investigation process was mandated before the start of Period 3, during the Bridge Period.  *See* Agreed Order ¶7.b.
[453]  Ex. 46, State of Mississippi, Department of Human Services, Division of Family and Children's Services, Section B: Intake/Assessment Policy, Revised 7-22-13, at 1-26.
[454]  *Id.* at 19, 27-28.

to perform CQI and training functions.  The Monitor has not had an opportunity to assess the operations of this new unit, but expects to do so.

The Monitor has reported previously on significant limitations in defendants' assessments of maltreatment reports which were identified by CSF consultants as a result of an evaluation conducted pursuant to Period 2 requirements.[455]  The Period 3 IP includes remedial requirements related to these limitations, which are addressed below.[456]

> **MSA §II.B.1.e.2.**
> **1.  Child Safety**
>   **e.  By the end of Implementation Period Three:**
>     **2)  All investigations into reports of maltreatment, including corporal punishment, of children in DFCS custody must be initiated within 24 hours and completed within 30 calendar days, including supervisory approval.  Defendants shall assure that such investigations and decisions are based on a full and systematic evaluation of the factors that may place a child in custody at risk.**

**Status of Progress, MSA §II.B.1.e.2.:**  This requirement was not satisfied.  Defendants were unable to produce validated data reports addressing both initiation and completion of investigations during Period 3.[457]  However, pursuant to the June 24, 2013 Order, during September 2013 the defendants began to produce monthly data responsive to this requirement for performance during Period 3.[458]  The Monitor's analyses of these data indicate that as of June 30, 2013, six days before the end of Period 3, statewide performance related to this requirement was

---

[455]  CSF conducted an assessment of DFCS practices for prioritizing, screening, assessing and investigating reports of child maltreatment to determine the extent to which investigations and decisions are based on a full and systematic evaluation of factors that place children at risk pursuant to Period 2 IP §II.2.f.  The assessment identified key limitations in the investigative process that were consistent with the Monitor's determinations.  *See September 2010 Report* at 74, 76-79.

[456]  *See* narrative related to Period 3 IP §§II.C.3.a.-e. and II.C.4., *infra* at 152-156.

[457]  Defendants produced reports related to initiation of investigations and separate reports related to completion of investigations during Period 3; however, they were unable to produce data reports responsive to the full MSA requirement.  *See September 2013 Report* at 17-18 for background information concerning the data defendants produced during Period 3.

[458]  Data for the one-month period starting May 31, 2012 was produced.

36 percent.[459]  On a regional basis, the analyses show that there is a substantial variation both in the volume of investigations and in performance from one region to the next.  Regions that implemented the Practice Model earlier tended to perform better than later implementing regions.  Six of the seven regions that fully implemented the Practice Model by September 30, 2013 performed above median regional performance levels.  In light of the significant safety concerns implicated throughout the investigative process, there is a critical need for defendants to improve the timeliness of the investigative process on an expedited basis.

> **MSA §II.B.1.e.3.**
> **1. Child Safety**
>   **e.  By the end of Implementation Period Three:**
>     **3)  Any foster child who remains in the same out-of-home placement following an investigation into a report that he or she was maltreated or subject to corporal punishment in that placement shall be visited by a DFCS caseworker twice a month for three months after the conclusion of the investigation to assure the child's continued safety and well-being.**

**Status of Progress, MSA §II.B.1.e.3.:**  This requirement was not satisfied.  The data reports produced by defendants during Period 3 contained data that was limited to one-month performance periods and not three-month performance periods as required.[460]  However, pursuant to the June 24, 2013 Order, defendants now report whether, for each child, required visits were made for three consecutive months rather than only for one month.  Analyses of these data show that as of June 30, 2013, just before the end of Period 3, statewide performance related to this

---

[459]   App. A, Ex. 5A. Maltreatment Investigations Initiated Within 24 Hours and Completed With Supervisory Approval Within 30 Days, by Month Investigation Initiated, One-Month Periods 5/31/12 through 6/30/13.   The chart reflects performance by DFCS region as well as performance statewide.  *See also* App. A, Ex. 5B for corresponding table with underlying data; App. A, Ex. 4A, Total Number of Maltreatment Investigations Open One or More Days During Period, By Region and Month, One-Month Periods 7/1/12 through 9/30/13; App. A, Ex. 4B, table with underlying data corresponding to App. A, Ex. 4A.  The data reflected in App. A. Exs. 4A and 4B present important information about the investigation workload and processing delays on a regional basis.

[460]   *See September 2013 Report* at 17 for background information concerning the data defendants produced during Period 3.

requirement was 87.5 percent.[461]  The number of children to whom this requirement applies in a

given month is relatively low.  Nevertheless, some regions demonstrated consistent problems

meeting this requirement.  Because defendants have not provided accurate caseload data for this

time period, it is not possible to assess the extent to which regional performance may be related

to caseloads.

> **MSA §II.B.1.e.4.**
> **1.  Child Safety**
>   **e.  By the end of Implementation Period Three:**
>     **4)  When a maltreatment investigation involves a resource home, DFCS shall file a copy of the approved final investigative report, and any recommendations and/or corrective actions DFCS has deemed necessary, in the case record of the foster child, in the file of the foster or adoptive parents with a copy of the letter of notification to the foster or adoptive parents, and in the DFCS State Office.  DFCS shall also provide those records to the Youth Court Judge with jurisdiction over the child and to the Monitor.**

**Status of Progress, MSA §II.B.1.e.4.:**  As explained below, defendants did not produce

all investigative reports that fall within the purview of this provision to the Monitor in a timely

manner during Period 3.  DFCS policy requires that a copy of the final approved investigative

report be distributed as indicated by this subsection.[462]  The Monitor has not had an opportunity

to audit whether practices are consistent with this policy directive.

Approximately two months before the start of Period 3, the Monitor informed defendants

that a review of DFCS records for the period October 12, 2010 through March 31, 2012 revealed

---

[461]  App. A, Ex. 6A, Children in Custody Remaining in the Same Placement Following Maltreatment Investigation Who Met Face-to-Face With Worker Twice in a One-Month Period or At Least Once if 15 Days or Less For Three Months Following Completed Maltreatment Investigation, By Region, One-Month Periods Ending 7/31/12 through 9/30/13.  *See also* App. A, Ex. 6B for corresponding table with underlying data.

[462]  Ex. 46, *supra* note 453, §II.F.2.a.14., at 52.  The policy also requires that a copy be provided to the guardian *ad litem*.  However, unlike other directives in DFCS policy, the applicable provision does not indicate what specific category of employee assigned to the case has responsibility for these activities (*e.g.*, the assigned investigator, the assigned caseworker, the supervisor).  In relevant part, the policy states: "[w]hen a maltreatment investigation involves a resource home, *DFCS shall file* a copy of the approved final investigation report, and any recommendations and/or corrective actions DFCS has deemed necessary, in the case record of the foster child, the file of the foster/adoptive parents . . . ." [emphasis added].  *Id*.  Other directives in this section of the policy assign responsibility for specific tasks to specific categories of employees.  *See, e.g., id.* §II.F.2.a.1.-3., 6. and 10., at 50-51.

that defendants had not transmitted over 40 investigative reports involving children in custody to the Monitor.  The Monitor noted that improvements were warranted and that defendants might need to undertake additional efforts to ensure the Monitor received investigative reports in a timely manner.[463]  Defendants produced the missing reports; however, during the latter part of 2012, it appeared to the Monitor and counsel for the parties that an undetermined number of additional investigative reports were not produced during Period 3.  Thereafter, the defendants developed a more rigorous method for identifying and transmitting all required reports to the Monitor.  Starting in early April 2013, the defendants began transmitting investigative reports to the Monitor pursuant to this method,[464] which has undergone further refinement in response to Period 4 requirements.[465]  Thereafter, on June 4, 2013, defendants provided the Monitor with copies of 338 investigative reports that previously had not been submitted, covering the period January 1, 2012 to January 31, 2013.[466]  While applicable requirements during Period 3 did not establish precise time limits within which investigative reports should be submitted to the Monitor, the substantial delay in the submission of these investigative reports was unwarranted under any reasonable standard.

> **MSA §II.B.1.e.5.**
> **1. Child Safety**
>   **e.  By the end of Implementation Period Three:**
>     **5)  When a maltreatment investigation involves an agency group home, emergency shelter, private child placing agency resource home, or other facility licensed by DFCS, a copy of the final investigative report shall be filed in the child's case record, in the DFCS State Office licensing file, and sent to the licensed provider facility.  DFCS shall provide the report to**

---

[463]  Ex. 47, May 4, 2012 e-mail to Kenya Rachal from Grace M. Lopes with attached May 4, 2012 e-mail to Grace M. Lopes from Mia Caras, redacted.  This correspondence also refers to serious incident reports [hereinafter SIRs].  Unlike investigative reports, defendants are not obligated under the MSA to provide SIRs to the Monitor absent a specific request.

[464]  On April 5, 2013, defendants submitted investigative reports for investigations that were completed during February 2013.

[465]  Initial Period 4 IP §III.A.1. and 2.

[466]  Ex. 48, June 4, 2013 correspondence to Grace M. Lopes from Kenya Key Rachal.

the Youth Court Judge with jurisdiction over the child and to
the Monitor.

**Status of Progress, MSA §II.B.1.e.5.:**  DFCS policy requires that a copy of the final

approved investigative report be distributed as indicated by this subsection.[467]  As noted in the

narrative related to MSA §II.B.1.e.4., the Monitor has not had an opportunity to audit whether

practices are consistent with this policy directive.  However, as addressed in the narrative related

to MSA §II.B.1.e.4.,[468] defendants did not produce to the Monitor in a timely manner during

Period 3 all investigative reports that fall within the purview of this requirement.

> MSA §II.B.1.e.6.
> 1.  **Child Safety**
>   e.  **By the end of Implementation Period Three:**
>     6)  **For investigations of agency group homes, emergency
>         shelters, and private child placing agency resource homes,
>         DFCS shall undertake a separate investigation of the contract
>         provider's compliance with DFCS licensure standards.**

**Status of Progress, MSA §II.B.1.e.6.:**  The Monitor has not audited the licensure

investigation process and makes no finding at this time about whether all required investigations

were conducted during Period 3.  In all situations in which a maltreatment report involving a

DFCS licensed group home, emergency shelter, and private child placing agency resource home

has been received, DFCS policy requires that licensure investigations are conducted in addition

to and independent of the maltreatment investigation.[469]  Staff assigned to a congregate

care/licensure unit in the MDHS/DFCS state office are responsible for conducting the

investigations according to the terms of a detailed protocol that was developed during the latter

part of Period 3 and that has been in effect since July 2013.[470]  Staff in the congregate

care/licensure unit track the status of the licensure investigations.  Starting in November 2013,

---

[467] Ex. 46, *supra* note 453, §II.F.2.b., at 53.
[468] *Supra* at 146-147.
[469] *Id.* §II.F.2.b., at 52-54.
[470] Ex. 49, DFCS Licensure Investigations Protocol, redacted.

148

pursuant to the Initial Period 4 IP, defendants began to submit these tracking reports to plaintiffs and the Monitor.[471]

> **Period 3 IP §II.C.1.**
> **C. Child Safety**
>    **1. By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants shall conduct an assessment of the FM fatality, including an assessment of any failings by Defendants in the provision of foster care services, in case practice, and in licensing practice. The written assessment shall be provided to the Monitor and Plaintiffs and shall include recommendations for ways to improve child safety and address any identified failings.**

**<u>Status of Progress, Period 3 IP §II.C.1.:</u>** In order to promote improvements in case practice, defendants must develop the capacity to assess case practices and licensing practices in situations in which a child dies or is seriously injured while in DFCS custody. Accordingly, defendants were required during Period 3 to conduct an assessment related to the death of F.M., a two-year old child who died during 2011 in a relative foster home licensed by DFCS, approximately six months after being placed in DFCS custody. As explained below, the Monitor concluded that defendants' initial submissions in response to this requirement had substantial shortcomings. Accordingly, the Initial Period 4 IP required the defendants to implement remedial recommendations following the Monitor's approval of the recommendations.[472] The evidence shows that during Period 4, the defendants bolstered their assessment capacity and have been working to implement a number of the remedial recommendations included in the assessment report.

At the time of his death, F.M. was living in a relative resource home that had been licensed by DFCS. Because F.M.'s death was characterized by police as suspicious, unusual or unnatural, an autopsy was performed; however, the cause and manner of death could not be

---

[471] Initial Period 4 IP §II.C.2. As required, defendants began producing the licensure investigation reports dating back to the start of Period 4 on November 1, 2013. *Id.* at Appendix 1, Report 1.

[472] Initial Period 4 IP §III.A.3.

determined.  The case record indicates that F.M. was inadequately supervised and drowned in

either a cooler of water[473] or in a toilet in the resource home.[474]  The Monitor's review of the case

record and the various fatality assessment reports defendants have produced, indicate that some

of the most basic safeguards established by the MSA and DFCS policy to protect the children in

defendants' custody from harm were not implemented as required in F.M.'s case.[475]  In addition

to shortcomings related to the licensure process, the case record documents substantial

deficiencies in case practice protocols that are intended to keep children safe.  Chief among them

is that there was no DFCS caseworker assigned to F.M.'s case in the county in which he was

placed.  As a result, several different workers and a supervisor visited or attempted to visit the

---

[473]  According to the case record, the water supply to the home had been disconnected on June 6, 2011, over one week before F.M.'s death.  A cooler was used to store water in the bathroom where F.M. was found.  There were conflicting reports about where F.M. was found: in the toilet, the cooler or the bathtub.

[474]  There were at least three reports of maltreatment by F.M.'s biological mother between July and November 2010 that were screened in and preceded F.M.'s placement in DFCS custody.  Ex. 50A, November 5, 2013 e-mail to Grace M. Lopes from Gwen Long with revised Child Fatality Review [DHS 361609-361636; 345588-345608], redacted, at DHS 361614-361615.  The record related to prior maltreatment reports is not consistently and clearly documented in the case record.  A prevention case was open and DFCS was working with the mother at the time that a custody determination was made.  The mother had left F.M. in the care of a relative for several weeks prior to the determination to place F.M. in DFCS custody.  *Id.* at DHS 361615.  When F.M. entered DFCS custody, his placement became the home of this relative.

[475]  For example, the resource home was licensed by DFCS notwithstanding significant violations of DFCS licensure policy which directly implicate MSA requirements.  <u>First</u>, there were serious safety issues identified during the licensure inspection process.  *Id.* at DHS 361634-361635.  As part of the licensing process for resource homes, a DFCS resource worker conducts a home study.  The home study conducted in this case, dated February 23, 2011 and approved February 24, 2011, lists a series of safety issues related to the condition of the home.  Among other conditions determined by the resource worker to constitute safety issues, it states:  "Worker is also concerned that the children in care [*i.e.*, F.M. and his sibling] have a door that leads to the bathroom.  [Resource parent] said [F.M.] goes to the bathroom alone sometime at night and sometimes he gets her up.  Worker told her he is too young to go to the bathroom by himself especially at night when everyone is sleeping.  Worker pointed out to her the safety risk of [F.M.] falling in the toilet or turning on the water in the tub, and he could drown from too much water in his lungs from both.  Worker advised that she keeps [sic] the door closed and locked for safety measures."  *Id.* at DHS 361615-361616.  According to the case record, F.M. was found unresponsive in a different bathroom, adjacent to the resource parents' bedroom.  There were a series of safety issues observed and documented in the home on the date of F.M.'s. death.  *Id.* at DHS 361634, 345607-345608.  In addition, the defendants found that the licensure process was not conducted in a timely manner, although there is a discrepancy in the case record about the actual date of licensure.  *Id.* at DHS 361618.  <u>Second</u>, the resource parents did not complete training prior to licensure approval.  *Id.*  <u>Third,</u> there was a failure to conduct timely criminal background checks on the resource parents.  *Id.*  <u>Fourth</u>, the number of children in the resource home exceeded licensure standards.  *Id.*  There were five children in the home before F.M. and his sibling were placed there.  The MSA and DFCS licensing standards establish a numerical limitation, for good reason, on the number of children who can be placed in a resource home without supervisory approval for the exception.  *See* MSA §II.B.2.d.; *see also* Mississippi, DFCS Policy, Section D, Foster Care, Revised 7-22-13, §V.G.2.

home during F.M.'s custody episode; however, these efforts fell substantially short of DFCS policy and MSA requirements.[476]

Defendants produced the written assessment report in response to this Period 3 requirement on August 6, 2012.  Among other material shortcomings, the report failed to include any assessment of foster care services, case practice or licensing practice in light of applicable standards, including DFCS policy and MSA requirements.[477]  Thereafter, on July 8, 2013, defendants submitted a revised version of the assessment.[478]  The Monitor was required by the Initial Period 4 IP to determine whether to approve the recommendations in the assessment by September 1, 2013.[479]  On August 30, 2013, the Monitor requested additional information that had not been included in the revised report.[480]  Thereafter, on September 26, 2013, the Monitor notified the parties that she approved the recommendations set forth in the modified assessment subject to specified supplementation to address several categories of omissions.[481]  On November 5, 2013, the defendants submitted a superseding assessment report,[482] with recommendations that the Monitor approved on November 18, 2013.[483]

> Period 3 IP §II.C.2.
> C.  Child Safety
>     2.  **Defendants shall have developed and begun implementing a
>         plan to ensure that DFCS utilizes standardized decision-**

---

[476] Ex. 50A, *supra* note 474, at DHS 361616-361617 (chronology of casework and supervisory visits as summarized by defendants).  The MSA requires the assigned caseworker to meet with the child in person at least twice monthly to assess safety and well-being, service delivery and achievement of permanency goals.  Additionally, at least one visit must be in the placement.  MSA §II.B.5.a.

[477] *See* Ex. 11, *supra* note 207, for a more detailed presentation of the Monitor's evaluation of defendants' August 6, 2012 submission.

[478] Ex. 50B, Child Fatality Review, submitted July 8, 2013 [DHS 345560-345608], redacted.

[479] Initial Period 4 IP §III.A.3.

[480] Based on the Monitor's misunderstanding about the status of the final autopsy report, the Monitor requested a copy of the autopsy report, which had been included in defendants' initial submission.

[481] Ex. 50C, September 26, 2013 e-mail to Kenya Rachal and Miriam Ingber from Grace M. Lopes, redacted (explaining the specific recommendations for which supplementation was indicated).  Among the issues identified by the Monitor was the fact that the recommendations regarding licensure did not address the fact that seven children were in the household in violation of DFCS policy and the MSA.  *See supra* note 475.

[482] Ex. 50A, *supra* note 474.

[483] Ex. 50D, November 18, 2013 e-mail to Kenya Rachal and Julia Davis from Grace M. Lopes.

> making criteria for prioritizing, screening, and assessing all
> reports of maltreatment of children via centralized intake.

**Status of Progress, Period 3 IP §II.C.2.:**  The Monitor requested that defendants

produce the plan developed in response to this requirement.  There is no evidence that the

required plan was developed in written format.  However, as addressed in the narrative related to

MSA §II.B.1.e.1.,[484] the defendants have established an administrative unit in the DFCS state

office to perform CQI and training functions for hotline staff.  The Monitor has not had an

opportunity to assess the unit's operations, but expects to do so.

> Period 3 IP §II.C.3.a.-e.
> **C.  Child Safety**
> 3.  **Defendants shall have developed the training and processes
>     required for:**
>     a.  **review of in-care maltreatment investigations to identify
>         case practice deficiencies;**
>     b.  **identification of remedial actions necessary to ensure the
>         safety of the child who is the subject of the investigation
>         as well as any other child in the home or placement;**
>     c.  **identification of any corrective action that is necessary to
>         address deficiencies in case practice demonstrated by the
>         investigation;**
>     d.  **monitoring of the initiation and completion of the
>         remedial actions regarding individual child safety and
>         notification to the ASWS, Regional Director, and Director
>         of Field Operations when such remedial actions have not
>         been initiated within five (5) days of identification or
>         timely completed; and**
>     e.  **monitoring of the initiation and completion of the
>         remedial actions regarding case practice and notification
>         to the ASWS, Regional Director, and Director of Field
>         Operations when such remedial actions have not been
>         initiated within twenty (20) working days of identification
>         or timely completed.**

**Status of Progress, Period 3 IP §II.C.3.a.-e.:**  This requirement was satisfied.  The

evidence shows that defendants developed the training and processes required by this subsection

of the MSA,[485] hired two reviewers, piloted a review instrument, and began to undertake regular

---

[484]  *Supra* at 142-144.
[485]  *See, e.g.,* Ex. 51A, DFCS CQI Maltreatment in Care Review Process, redacted.

reviews of maltreatment investigations before the end of Period 3.[486]  However, during March

2013, as plans for the maltreatment in care review ("MIC review") unit's operations were

finalized, the defendants elected to forgo hiring a safety review supervisor to oversee the MIC

review process.  Instead, defendants assigned the manager of the CQI EMU unit to oversee the

MIC review unit notwithstanding the fact that separate supervisory positions for each unit are

included in the CQI Plan the defendants are required to implement pursuant to Period 3 IP

§I.B.2.[487]  During February 2014, defendants reported that they planned to hire a supervisor for

the MIC review unit.

As addressed in the narrative related to Period 3 IP §II.C.4., below,[488] there have been

significant shortcomings in the MIC review process, which defendants report that they are

working to address.  The MIC reviews represent a critical safeguard designed to ensure children

in DFCS custody remain safe.  For this reason, and also because of the important role the review

process can play in promoting improvements in the quality of maltreatment investigations, the

Monitor has engaged two expert consultants to assess both the quality of maltreatment

investigations and the efficacy of the remediation strategies that the defendants have

implemented, including the review process required by this subsection of the Period 3 IP.  The

assessment is ongoing.  The Final Period 4 IP contemplates that the assessment will be used by

the defendants to inform additional remediation strategies, which the defendants will be required

to implement.[489]  The Monitor will report on the findings from the assessment in a forthcoming

report.

---

[486] *See* Ex. 51B, Safety Review Unit, Maltreatment in Care Review Instrument, Revised 02-21-2014.
[487] *See* Ex. 21, *supra* note 277, at 10 (requiring both EMU director and Safety Review Supervisor).
[488] *Infra* at 154-156.
[489] Final Period 4 IP §III.A.2.

The shortcomings in the quality of investigations concerning maltreatment reports related to children in DFCS custody are well-documented and long-standing.[490]  Defendants have made efforts to address these deficiencies,[491] but thus far the Monitor has not identified evidence of substantial improvement.  To their credit, the defendants recognize the need to improve the process and have taken several key steps to promote improvements.[492]  Currently, defendants are at work restructuring the investigative process by establishing a centralized special investigations unit that will report directly to the MDHS/DFCS deputy administrator as required by the Final Period 4 IP.[493]

> Period 3 IP §II.C.4.
> **C.  Child Safety**
> **4.  The maltreatment investigation review process shall be fully implemented.**

**Status of Progress, Period 3 IP §II.C.4.:**  This requirement was not satisfied.  As explained below, the MIC review process was not fully implemented during Period 3.  Although defendants indicate they are implementing corrective action strategies, two critical shortcomings must be addressed.

First, defendants failed to review all investigations involving children in custody as required.  The MIC review process is intended to assess case practices associated with all

---

[490]  As noted in the narrative related to MSA §II.B.1.e.2., *supra* at 144-145, during October 2009, in response to Period 2 IP §II.2.f. requirements, CSF conducted a safety assessment that addressed the quality of maltreatment investigations.  (For a copy of the assessment report, *see September 2010 Report* at Ex. 29, Mississippi Foster Care Services Assessments, Final Report, October 13, 2009, Center for the Support of Families, Inc.).  The assessment identified critical limitations in the investigative process which were consistent with the Monitor's independent findings.  For additional background regarding the limitations in the investigative process, *see, e.g., September 2010 Report* at 76-79.

[491]  For example, in an effort to promote improvements in the quality of investigations, a training initiative was undertaken during 2010 pursuant to requirements included in the June 2010 Agreed Order.  June 2010 Agreed Order ¶7.b.

[492]  During February 2012, defendants assigned a staff attorney to assess, review, and track all maltreatment investigations involving children in custody.  The staff attorney is working directly with the MDHS deputy responsible for oversight of DFCS on strategies to reduce the incidence of maltreatment in care and to improve the quality of maltreatment investigations.

[493]  Final Period 4 IP §III.A.3.-4.  As required, defendants have hired a supervisor to lead this specialized unit and are in the process of hiring the unit's investigators.

investigations of reports of maltreatment related to children in custody within 30 days following the completion of the investigation.[494]  In order to identify all completed investigations in a timely manner, defendants developed a special weekly MACWIS report.[495]  Unfortunately, the report failed to capture all maltreatment investigations involving children in custody.  On February 14, 2014, over seven months following implementation of the MIC reviews, the defendants notified the Monitor that the MACWIS report was incomplete and as a result they had failed to review all completed investigations as required.  Defendants report that they notified the Monitor as soon as this problem was identified.  Shortly thereafter, defendants reported that they had identified 147 investigations that should have been reviewed but were not reviewed.

On February 27, 2014 plaintiffs submitted written notice of noncompliance to defendants pursuant to MSA §VII.B., triggering the MSA's dispute resolution and corrective action processes.  In their response, defendants clarified that there were 125 investigations involving 170 children that were completed between July 1, 2013 and February 23, 2014 that were not reviewed through the MIC review process.  On April 30, 2014, during the comment period on the draft version of this report, defendants produced a summary table which indicates that they completed a review of 122 of the 125 investigations that had not been reviewed.[496]  Because of the efforts associated with finalizing this report, the Monitor has not had an opportunity to evaluate defendants' submission, review related documents, and interview key DFCS staff involved in the corrective action process.  The Monitor expects to do so and will report to the parties and as appropriate to the Court on her findings.

---

[494]  Ex. 51A, *supra* note 485, at 4.
[495]  *Id.*
[496]  No explanation for the variance in the reported number of investigations reviewed was provided with defendants' April 30, 2014 submission.

Second, the defendants have failed to ensure on a consistent basis that field managers and staff take timely corrective action. The MIC review process that the defendants developed pursuant to the requirements of Period 3 IP §II.C.3., requires reviewers to catalogue three types of concerns identified during the course of the review: imminent concerns related to child safety; case practice concerns; and case-specific concerns related to permanency and well-being.[497] The time frame within which field supervisors and staff must undertake corrective action is contingent upon the type of concern that has been identified.[498] Moreover, the MIC review process includes guidelines for reporting, tracking and implementing corrective action.[499] Interviews with DFCS managers and staff as well as a review of the documents used by defendants to identify and track corrective actions indicate that the corrective action process is not timely and it is not being implemented as intended.[500]

> **MSA §II.B.2.p.1.**
> **2. Child Placement**
>   **p.  By the end of Implementation Period Three:**
>     **1)  All foster care settings, including relative placements, shall be screened prior to the initial placement of foster children in accordance with this Modified Settlement Agreement.**

**Status of Progress, MSA §II.B.2.p.1.:**  As part of the pre-placement screening process, including for relative placements, DFCS policy requires a home visit as well as criminal and

---

[497] *Id.* at 6.

[498] *Id.* at 6-10.

[499] *Id.*

[500] *See* Ex. 22, *supra* note 288, and related text; *see also* Ex. 51C, January 20, 2014 e-mail to Grace M. Lopes and Mia Caras from Robert Hamrick (transmitting CQI Corrective Action Open and Closed Heat Ticket report as of January 10, 2014 [hereinafter January 2014 Tracking Report]). According to the January 2014 Tracking Report, there were 85 open corrective action matters that had been assigned to DFCS regional managers for corrective action as a result of findings from the maltreatment in care review process. Sixty-seven of the 85 open corrective actions were overdue for between 193 days and one day (*i.e.*, no corrective action taken after more than five days had lapsed in situations in which a safety issue was identified and no corrective action taken after 20 business days had lapsed in situations in which a practice issue was identified). The median number of days the 67 corrective actions were overdue was 48 days and the distribution, by region, insofar as days overdue was as follows: Region II-W, one overdue (94 days); Region III-N, one overdue (17 days); Region III-S, three overdue (five, 27, and 66 days); Region IV-S, one overdue (three days); Region VI, 25 overdue (13, 16, 25, 33, 36, 45, 48, 63, 79, 84, 93, 110, 117, 149, and 186 days and two for six, 53, 103, 115, and 193 days); and Region VII-W, 36 overdue (three, six, nine, 20, 23, 26, 28, 39, 40, 42, 44, 53, 60, 67, 68, 73, 90, 103, 124, and 132 days, two for one, five, 13, 16, 25, and 96 days, and four for 48 days). Some regions had no open corrective actions during this period.

156

child welfare background checks of all members of the household who are at least 14 years old.[501]  Defendants were unable to report on this requirement during Periods 1 and 2, and they were not required to do so during Period 3.  However, pursuant to the Final Period 4 IP, defendants are required to report on their compliance with this requirement on a monthly basis starting June 30, 2014.[502]  Thereafter, the Monitor will report on defendants' performance as appropriate.

> **MSA §II.B.2.p.2.**
> **2.  Child Placement**
> **p.  By the end of Implementation Period Three:**
> **2)  No foster child shall be placed or remain in a foster care setting that does not meet DFCS licensure standards consistent with Modified Settlement Agreement requirements, unless so ordered by the Youth Court over DFCS objection.**

**Status of Progress, MSA §II.B.2.p.2.:**  This requirement was not satisfied.  The data produced by defendants pursuant to the June 24, 2013 Order had some limitations, which are being corrected.[503]  Nevertheless, the data that was produced indicate that this requirement was not met by the end of Period 3.[504]  During the one-month period ending June 30, 2013, analysis of the MACWIS data produced by the defendants indicates that there were 471 children in a foster care setting that did not meet DFCS licensure standards.[505]  Data derived from the FCR process indicate that for the six-month period ending June 30, 2013, 90 percent of the children

---

[501] *See, e.g.,* Ex. 52, Mississippi, DFCS Policy, Section D, Foster Care, Revised 7-22-13, §V.G.1.d., at 37-39 (screenings related to expedited relative placements).

[502] Final Period 4 IP §II.C. and App. 3, Report 5.

[503] On February 7, 2014, the defendants agreed to change the guidance FCR reviewers receive related to collection of one aspect of this data in order to conform the data collected to MSA requirements.

[504] June 24, 2013 Order §VI.E., Attachment One, and Attachment Two, Report 21.

[505] App. A, Ex. 28A, chart prepared by Office of the Court Monitor, Children Placed in Unlicensed Foster Care Settings That Do Not Meet DFCS Licensure Standards and Children Placed in Expedited Pending Relative Resource Homes For More Than 90 Days, One-Month Periods 7/31/12 through 9/30/13; *see also* App. A, Ex. 28B, corresponding table with underlying data.  Over half of these children were in Region VII-W.  The MACWIS data do not indicate whether placements were ordered over DFCS objection.  That information is in the associated PAD report.

who were reviewed through the FCR process were in a foster care setting that either met MSA

licensure standards or was ordered by the Youth Court over DFCS objection.[506]

> MSA §II.B.2.p.3.
> 2. **Child Placement**
>   p. **By the end of Implementation Period Three:**
>     3) **Within 120 days of the start of Implementation Period 3, Defendants shall develop and implement an expedited process for licensing screened relative caregivers to enable a child to be placed quickly with relatives upon entering placement.**

**Status of Progress, MSA §II.B.2.p.3.:** This process was timely developed and is

included in DFCS policy.[507] During Period 3, defendants did not produce data related to this

requirement that could be analyzed. The Initial Period 4 IP required defendants to produce this

data starting on November 1, 2013.[508] Defendants have produced data in response to this Period

4 requirement. Defendants' Period 3 performance is addressed in the narrative related to MSA

§II.B.2.p.5.[509]

> MSA §II.B.2.p.4.
> 2. **Child Placement**
>   p. **By the end of Implementation Period Three:**
>     4) **All unlicensed placements in which foster children are residing as of the date the Court approves this Modified Settlement Agreement that meet the requirements of the licensure process shall be licensed. All children who have been living in any of those unlicensed placements that do not meet the requirements of the licensure process shall have been moved into licensed and appropriate resource home placements, unless the Youth Court orders that the child not be moved.**

**Status of Progress, MSA §II.B.2.p.4.:** The defendants have not produced data for the

requisite time periods that would enable the Monitor to make a finding regarding this

---

[506] App. A, Ex. 29A, chart prepared by Office of the Court Monitor, Children Placed or Remaining In a Foster Care Setting Meeting DFCS Licensure Standards Consistent with MSA Requirements, Unless Ordered by the Youth Court Over DFCS Objections, Six-Month Periods Ending 4/30/13 Through 9/30/13; *see also* App. A, Ex. 29B, corresponding table with underlying data.
[507] *See* Ex. 52, *supra* note 501, at 38-39 for an excerpt of the relevant policy directive.
[508] Initial Period 4 IP §II.C.2. and Appendix 1, Report 2.
[509] *Infra* at 159.

requirement.  Moreover, defendants report that they do not yet track all elements of this Period 3 requirement.

> MSA §II.B.2.p.5.
> **2. Child Placement**
>   **p.  By the end of Implementation Period Three:**
>      **5)  All placements approved for relative placement after the**
>       **date the Court enters this Modified Settlement Agreement**
>       **shall undergo the full licensing procedure within 90 days of**
>       **a child's placement.**

**Status of Progress, MSA §II.B.2.p.5.:**  As noted in the narrative related to MSA §II.B.2.p.3., data related to defendants' performance was not produced during Period 3.[510]  The MACWIS data defendants have produced pursuant to the Initial Period 4 IP indicate that this requirement was not satisfied at the end of Period 3.[511]  Specifically, the data indicate that as of June 30, 2013, there were 277 children in 176 unlicensed relative placements and 185 of these children were in a total of 119 unique court-ordered placements.[512]

> MSA §II.B.2.p.6.
> **2. Child Placement**
>   **p.  By the end of Implementation Period Three:**
>      **6)  No more than 40 children under 10 years of age shall be**
>       **placed in a congregate care setting (including group homes**
>       **and shelters) unless the child has exceptional needs that**
>       **cannot be met in a relative or foster family home or the**
>       **child is a member of a sibling group, and the Regional**
>       **Director has granted express written approval for the**
>       **congregate-care placement.**

**Status of Progress, MSA §II.B.2.p.6.:**  This requirement was satisfied.  The data produced by defendants pursuant to the June 24, 2013 Order[513] indicate that 11 children under 10 were placed in a congregate care setting without an exception and approval of the regional

---

[510]  *Supra* at 158.

[511]  Initial Period 4 IP §II.C.2. and Appendix 1, Report 2.

[512]  Based on analysis of data included in MWLS319D.  *See also* App. A, Ex. 28A, chart prepared by the Office of the Court Monitor, Children Placed in Unlicensed Foster Care Settings That Do Not Meet DFCS Licensure Standards and Children Placed in Expedited Pending Relative Resource Homes For More Than 90 Days, One-Month Periods 7/31/12 though 9/30/13 and App. A, Ex. 28B, corresponding table with underlying data.

[513]  June 24, 2013 Order §VI.E., Attachment One, and Attachment Two, Report 29.  Because MACWIS cannot report on the approval process, the parties have agreed that this information will be captured by a case record review, if indicated.

director; however, the data do not indicate whether the regional director's approval was based on

the relevant MSA criteria.[514]

> MSA §II.B.2.p.7.
> **2.  Child Placement**
>   **p.  By the end of Implementation Period Three:**
>     7)   No more than 180 children shall be placed in more than
>          one emergency or temporary facility within one episode of
>          foster care, unless an immediate placement move is
>          necessary to protect the safety of the child or of others as
>          certified in writing by the Regional Director.

**Status of Progress, MSA §II.B.2.p.7.:**  The MACWIS data produced by defendants

pursuant to the June 24, 2013 Order do not appear to conform fully to this requirement.[515]

Defendants were notified of this issue on February 25, 2014.[516]  On May 5, 2014, in comments

submitted on the draft version of this report, defendants attributed the limitations in the data to

limitations in the report specifications and indicated that a proposed revision to the specifications

would be submitted to plaintiffs' counsel and the Monitor as soon as possible.  Until these data

issues are resolved, the Monitor cannot make a finding regarding defendants' performance.

> MSA §II.B.2.p.8.
> **2.  Child Placement**
>   **p.  By the end of Implementation Period Three:**
>     8)   No foster child shall remain in an emergency or
>          temporary facility for more than 45 calendar days, unless,
>          in exceptional circumstances, the Field Operations
>          Director has granted express written approval for the
>          extension that documents the need for the extension.

**Status of Progress, MSA §II.B.2.p.8.:**  The data produced by the defendants do not

address whether the Field Operations Director granted the requisite approval.  However, the data

that was produced in response to the June 24, 2013 Order indicate that this requirement was not

---

[514]  App. A, Ex. 39A, chart prepared by Office of the Court Monitor, Children Under Age 10 Housed in a
Congregate Care Setting With and Without Exception and Regional Director Approval, By Region, One-Month
Periods Ending 7/31/12 through 9/30/13; *see also* App. A, Ex. 39B, corresponding table with underlying data.
[515]  June 24, 2013 Order §VI.E., Attachment One, and Attachment Two, Report 31.
[516]  Ex. 53, February 25, 2014 e-mail to Kenya Rachal from Mark Jordan with attached redacted specification for
MACWIS report SLS51D.

satisfied at the end of Period 3.[517]  The MACWIS data produced by the defendants indicate that

for the month ending June 30, 2013, there were 24 children in an emergency or temporary facility

for over 45 days without the requisite management approval.[518]

> MSA §II.B.2.p.9.
> **2.  Child Placement**
> **p.  By the end of Implementation Period Three:**
> **9)  No child shall spend more than 12 hours at a time in a DFCS office or other non-residential facility that provides intake functions.  Defendants shall be exempt from maintaining and producing data reports regarding this requirement.**

**Status of Progress, MSA §II.B.2.p.9.:**  DFCS policy includes a prohibition that mirrors

this requirement.[519]  Interviews with DFCS staff in county offices indicate that while it is at times

very challenging and time consuming for staff to identify appropriate placements, as a general

matter, children do not spend more than 12 hours in a DFCS office awaiting placement.

> MSA §II.B.2.p.10.
> **2.  Child Placement**
> **p.  By the end of Implementation Period Three:**
> **10)  No more than 30% of resource homes shall provide care to a number of children in excess of the Modified Settlement Agreement resource home population limitations.**

**Status of Progress, MSA §II.B.2.p.10.:**  Defendants were not required to produce data

related to this requirement during Period 3.  The Initial Period 4 IP requires defendants to begin

producing data related to this requirement on a monthly basis starting on May 31, 2014.[520]

Accordingly, the Monitor will report on defendants' progress in a later report.

---

[517]  June 24, 2013 Order §VI.E., Attachment One, and Attachment Two, Report 28.  The parties have agreed that a case record review will be conducted to capture the unreported data, if indicated.

[518]  App. A, Ex. 38A, chart prepared by Office of the Court Monitor, Children in Emergency Shelter or Temporary Facility for Over 45 Days With and Without Approval, By Region, One-Month Periods Ending 7/31/12 through 9/30/13; *see also* App. A, Ex. 38B, corresponding table with underlying data.  Most of the children were in Region VII-W.

[519]  Ex. 54, Mississippi, DFCS Policy, Section D, Foster Care, Revised 7-22-13, §V.B., at 33.

[520]  Initial Period 4 IP §II.C.2.a. and Appendix 1, Report 5 (noting data availability may be limited initially for fields that require a MACWIS system change).

161

**MSA §II.B.2.p.11.**
**2. Child Placement**
  **p. By the end of Implementation Period Three:**
    **11) At least 60% of children with special needs shall be
matched with placement resources that can meet their
therapeutic and medical needs.**

    **Status of Progress, MSA §II.B.2.p.11.:** The data defendants produced do not address

the full MSA requirement because they are limited to children with developmental and/or mental

health diagnoses.[521] These data, which were produced in response to the June 24, 2013 Order do,

however, indicate this requirement was not satisfied at the end of Period 3.[522] The data produced

by defendants for the six-month period ending June 30, 2013, indicate that 45 percent of children

with special needs who were reviewed through the FCR process were matched with placement

resources that met their therapeutic and medical needs.[523]

**MSA §II.B.2.p.12.**
**2. Child Placement**
  **p. By the end of Implementation Period Three:**
    **12) At least 75% of children in DFCS custody shall be placed
in the least restrictive setting that meets their individual
needs consistent with Modified Settlement Agreement
requirements.**

    **Status of Progress, MSA §II.B.2.p.12.:** The data defendants produced pursuant to the

June 24, 2013 Order[524] are not fully responsive to this MSA requirement.[525] The data produced

by defendants for the six-month period ending June 30, 2013 do, however, indicate that 97

---

[521] The parties have agreed that the data tailored to the full MSA requirement will be collected through a special
case record review.
[522] June 24, 2013 Order §VI.E., Attachment One, and Attachment Two, Report 47.
[523] App. A, Ex. 55A, chart prepared by Office of the Court Monitor, Children With Special Needs Matched to a
Placement That Can Meet Their Therapeutic and Medical Needs, by Region, Six-Month Periods Ending 4/30/13
Through 9/30/13; *see also* App. A, Ex. 55B, corresponding table with underlying data.
[524] June 24, 2013 Order §VI.E., Attachment One, and Attachment Two, Report 48.
[525] MSA §II.B.2.f. states that whether the placement is least restrictive must be determined by a review of all intake,
screening, assessment, and prior placement information on the child available at the time of placement. Defendants
have agreed to revise the guidance provided to FCR reviewers to include this instruction.

percent of children in DFCS custody who were reviewed through the FCR process were placed in the least restrictive setting that met their individual needs.[526]

> MSA §II.B.2.p.13.
> **2. Child Placement**
>   **p.  By the end of Implementation Period Three:**
>     **13)  At least 80% of siblings who entered DFCS custody at or near the same time shall be placed together consistent with Modified Settlement Agreement requirements.**

**Status of Progress, MSA §II.B.2.p.13.:** The data defendants produced do not address the MSA requirement related to the DFCS obligations that are triggered if a sibling group is separated at initial placement.[527]  Nonetheless, subject to this limitation, the data that were produced by the defendants pursuant to the June 24, 2013 Order[528] indicate that for the twelve-month period ending June 30, 2013, 85 percent of siblings who entered  DFCS custody at or near the same time were placed together consistent with MSA requirements.[529]

> MSA §II.B.2.p.14.
> **2. Child Placement**
>   **p.  By the end of Implementation Period Three:**
>     **14)  At least 40% of children in DFCS custody placed in a new placement during the Period shall have their currently available medical, dental, educational, and psychological information provided to their resource parents or facility staff no later than at the time of any new placement during the Period.**

**Status of Progress, MSA §II.B.2.p.14.:** The data produced by defendants pursuant to the June 24, 2013 Order[530] indicate this requirement was not satisfied at the end of Period 3.[531]

---

[526]  App. A, Ex. 56A, chart prepared by Office of the Court Monitor, Children Placed in Least Restrictive Setting That Meets Their Individual Needs, by Region, Six-Month Periods Ending 4/30/13 Through 9/30/13; *see also* App. A. Ex. 56B, corresponding table with underlying data.

[527]  The data defendants produced do not address the following requirement in §II.B.2.h. of the MSA: if a sibling group is separated at initial placement, defendants must make immediate efforts to locate or recruit a family in whose home the siblings can be reunited.  The parties have agreed that these data will be captured in a future case record review, if indicated.

[528]  June 24, 2013 Order §VI.E., Attachment One, and Attachment Two, Report 27.

[529]  App. A, Ex. 37A, chart prepared by Office of the Court Monitor, Sibling Groups Who Entered Custody At Or Around the Same Time Placed Together, By Region, 12-Month Periods Ending 7/31/12 through 9/30/13; *see also* App. A, Ex. 37B, corresponding table with underlying data.

[530]  June 24, 2013 Order §VI.E., Attachment One, and Attachment Two, Report 53.

Although data related to the medical, dental, educational, and psychological information provided *at the time of placement* were not produced, defendants did produce data derived from the FCR process related to whether these categories of information about the child were provided to resource parents or facility staff within 15 days of placement. According to the data that defendants produced for the six-month period ending June 30, 2013, the required information was provided within 15 days of placement to resource parents or facility staff for 19 percent of the children reviewed during the period.[532]

> **MSA §II.B.2.p.15.**
> **2. Child Placement**
> **p.  By the end of Implementation Period Three:**
> **15)  At least 35% of children in DFCS custody with a documented indication that they were to be subject to a potential or actual placement disruption during the Period shall receive a meeting to address placement stability consistent with Modified Settlement Agreement requirements.**

**Status of Progress, MSA §II.B.2.p.15.:**  Defendants have not produced data responsive to this precise requirement.  However, pursuant to the June 24, 2013 Order,[533] defendants have produced FCR data addressing whether DFCS took all reasonable steps to avoid a placement disruption and ensure placement stability in situations in which a placement was identified as at risk of disruption at the time of the FCR conference.[534]  Analysis of these data indicates that for the six-month period ending June 30, 2013, DFCS took all reasonable steps to avoid a placement

---

[531]  *See infra* at 166-167 for the narrative regarding performance related to Period 3 IP §II.D.1. (concerning implementation of related policy).
[532]  App. A, Ex. 59A, chart prepared by Office of the Court Monitor, Children for Whom Their Resource Parents or Facility Staff Were Provided the Foster Care Information Form Within 15 Days of Placement, by Region, Six-Month Periods Ending 7/31/12 through 9/30/13; *see also* App. A, Ex. 59B, corresponding table with underlying data.
[533]  June 24, 2013 Order §VI.E., Attachment One, and Attachment Two, Report 52.
[534]  This method would exclude from the review children whose placement was at risk of disruption prior to the point of the review.  In some cases, those placements may have in fact resulted in disruptions.

disruption for 62 percent of children who were in a placement identified as at risk of disruption when the FCR was completed.[535]

> MSA §II.B.2.p.16.
> **2. Child Placement**
>   p.  **By the end of Implementation Period Three:**
>     16)  **At least 85% of children who entered DFCS custody shall be placed within his/her own county or within 50 miles of the home from which he/she was removed unless one of the exceptions provided in the Modified Settlement Agreement is documented as applying.**

**Status of Progress, MSA §II.B.2.p.16.:**  The data produced by defendants pursuant to the June 24, 2013 Order indicate that defendants satisfied this requirement by the end of Period 3.[536]  Analysis of the MACWIS data produced by the defendants indicates that for the one-month period ending June 30, 2013, 98 percent of the children in DFCS custody[537] were placed within their own county or within 50 miles of the home from which they were removed.[538]

> MSA §§II.B.2.s.1. and II.B.2.t.1.
> **2. Child Placement**
>   s.  **Beginnings by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
>     1)  **At least 80% of the foster children in that region who enter custody or experience a placement change shall be placed in accordance with each of the child placement requirements of Section II.B.2.**
>
>   t.  **Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
>     1)  **At least 90% of the foster children in that region who enter custody or experience a placement change shall be placed in accordance with each of the child placement requirements of Section II.B.2.**

---

[535]  App. A, Ex. 58A, chart prepared by Office of the Court Monitor, Percentage of Children Whose Placement Was at Risk of Disruption at the Time of PAD Completion for Whom DFCS Took All Reasonable Steps to Avoid the Disruption and Ensure Placement Stability, by Region, Six-Month Periods Ending 7/31/12 Through 9/30/13; *see also* App. A, Ex. 58B, corresponding table with underlying data.

[536]  June 24, 2013 Order §VI.E., Attachment One, and Attachment Two, Report 32.

[537]  This percentage includes placing siblings together as a qualifying exception to this requirement.  Plaintiffs disagreed that placing siblings together was a qualifying exception.  The parties resolved to report the data both ways.  As the chart reflects, under either interpretation defendants met the requirement.

[538]  App. A, Ex. 41A, chart prepared by Office of the Court Monitor, Percentage of Children Who Entered DFCS Custody Who Were Placed Within Their Own County or Within 50 Miles of the Home From Which He/She Was Removed Consistent With MSA Requirements, by Region, One-Month Periods 7/31/12 Through 9/30/13; *see also* App. A, Ex. 41B, corresponding table with underlying data.

**Status of Progress, MSA §§II.B.2.s.1. and II.B.2.t.1.:**  Defendants have produced

MACWIS data related to some MSA placement requirements,[539] but not with respect to all of the

numerous child placement requirements reflected in MSA §II.B.2.  The Monitor expects to

finalize with the parties a plan related to ongoing collection and reporting of these data.

> **Period 3 IP §II.D.1.**
> **D.  Child Placement**
>   **1.  By 45 days following the Court's approval of the Modified**
>        **Settlement Agreement, Defendants shall implement policy to**
>        **provide resource parents with all appropriate and available**
>        **information about a child prior to or at the time of placement**
>        **and for supplementing that information as further information**
>        **is gathered.**

**Status of Progress, Period 3 IP §II.D.1.:**  As explained below, the available data

indicate that additional efforts are indicated to promote consistent and timely implementation of

the policy.

DFCS policy requires staff to have a discussion with resource parents or facility staff

when a child is being considered for placement, and to provide sufficient information about the

child to enable the resource parents to make a decision about whether they can accept the

child.[540]  At the time of placement, staff is required to provide the resource parents or facility

staff with the child's currently available medical, dental, educational and psychological

information, including a copy of the child's Medicaid card.  Pursuant to the policy directive, staff

members are required to collect and provide to resource parents or facility staff all additional

information that falls within these categories within 15 calendar days of placement.[541]  In

addition to specified health information, the policy lists the categories of information that should

---

[539] *See*, *e.g.*, *supra* at 156-165.
[540] Ex. 55A, Mississippi, DFCS Policy, Section D, Foster Care, Revised 7-22-13, §VII.A.1., at 51-53.  *See supra* at 163-164 for the narrative regarding performance related to MSA §II.B.2.p.14. (requiring that currently available medical, dental, educational and psychological information be provided to resource parents of facility staff for 40 percent of children in new placement).
[541] Ex. 55A, *supra* note 540, at 51-52.

be shared with resource parents or facility staff.[542]  A Foster Child Information Form, which is signed by the caseworker and the resource parent or facility staff member, is intended to document the information provided to the resource parents or facility staff at the time of placement.[543]  The form is required to be maintained in the case record.[544]

Defendants are monitoring implementation of the policy through the FCR process. According to the data defendants have produced, for the six-month period ending June 30, 2013, the foster child information form was provided to resource parents or facility staff within 15 days of placement in 19 percent of the children's records that were reviewed.[545]  The data defendants have produced do not distinguish between resource homes and facilities.

> **Period 3 IP §II.D.2.**
> **D.  Child Placement**
>   2.  **Defendants shall develop and begin implementing a plan with specific action steps and timeframes to address changes in the State Office's therapeutic placement process identified as necessary to ensure the most appropriate placement for children in need of therapeutic placement.**

**Status of Progress, Period 3 IP §II.D.2.:**  As explained below, the required plan was developed and there is evidence of implementation.  However, progress on certain action steps has been delayed.  Defendants report that these delays were due to staffing shortages, which were recently addressed.

Defendants consider therapeutic placements to be resource or group homes that are licensed by MDHS/DFCS and certified by the Mississippi Department of Mental Health ("DMH") to provide care to children with serious behavioral, psychological, emotional and/or physical impairments.  In order to place a child in a therapeutic placement, the DFCS caseworker

---

[542]  *Id.* at 52-53.
[543]  Ex. 55B, Mississippi, DFCS Policy, Section D, Foster Care, Revised 7-22-13, at Appendix F, sample Foster Child Information form, at 186-187.
[544]  Ex. 55A, *supra* note 540, at 52.
[545]  *See* App. A, Ex. 59A, *supra* note 532.

must submit a referral to the DFCS State Office Permanency Planning and Placement Unit, which is responsible for identifying and approving the therapeutic placement.

The Foster Care Services Assessment,[546] which was conducted in 2009 in response to Period 2 IP requirements,[547] documented significant shortcomings in the therapeutic placement process, finding that the process resulted in neither timely nor appropriate placements.[548]  As a result, during Period 3, the Defendants were required to develop and implement an action plan to address these issues.  The evidence shows that during Period 3 the defendants developed a timely plan with action steps and timelines designed to improve operations in the State Office therapeutic placement process.[549]  The development process was thorough and included work group meetings, structured consultations with providers, polling of regional managers, a targeted provider survey, and a review of the tools and documents used in the process.[550]

While there has been progress implementing some aspects of the plan,[551] defendants report that implementation was delayed due to recently corrected staffing shortages in the administrative unit responsible for processing placements requests.[552]

> **Period 3 IP §II.E.1.**
> **E.  Developing and Maintaining Connections**
>   **1.  Defendants shall ensure caseworkers are provided training that**
>        **addresses case practice associated with parent-child and**
>        **sibling visitation as a component of the Practice Model**
>        **training.**

---

[546]  *See September 2010 Report* at Ex. 29 for a copy of the report; *see also supra* note 490.
[547]  Period 2 IP §II.2.
[548]  *September 2010 Report*, Ex. 29 at 109.
[549]  Ex. 56, Mississippi Department of Human Services, Division of Family and Children's Services, Permanency Planning and Placement Unit/Congregate Care, Changes to the Therapeutic Placement Process, without attachments.
[550]  *Id.* at 2-3.
[551]  For example, tracking logs were developed and the Residential Services Application [hereinafter RSA] was revised and is available to staff in electronic format.
[552]  During 2013, one of the two staff members assigned to the unit that processes these requests died and the other was reassigned, leaving management staff to process the therapeutic placements instead of working to implement the action steps in the plan.

**Status of Progress, Period 3 IP §II.E.1.:**  This is a component of the Practice Model training that has been delivered statewide.

> **Period 3 IP §II.E.2.**
> **E.  Developing and Maintaining Connections**
>  **2.  Defendants shall track the frequency of parent-child and
>       sibling visitation in MACWIS.**

**Status of Progress, Period 3 IP §II.E.2.:**  As addressed in the narrative related to MSA §§III.B.5.d.1. and III.B.5.e.1., below,[553] the defendants are tracking in MACWIS and reporting monthly pursuant to the June 24, 2013 Order on whether children in custody are, within 24 hours of placement, provided with contacts with their parents and with siblings who are not in the same placement.[554]  Additionally, pursuant to the Final Period 4 IP, defendants are required to begin reporting on parent-child and sibling visitation plans by May 30, 2014.[555]

> **MSA §II.B.3.i.1.**
> **3.  Physical and Mental Health Care**
>  **i.  By the end of Implementation Period Three:**
>    **1)  At least 50% of children entering custody during the
>         Period shall receive a health screening evaluation from a
>         qualified medical practitioner within 72 hours after
>         placement that is in accordance with the health screening
>         recommended by the American Academy of Pediatrics.**

**Status of Progress, MSA §II.B.3.i.1.:**  The data produced by the defendants pursuant to the June 24, 2013 Order do not reflect whether the screenings were conducted by a qualified medical practitioner and in accordance with American Academy of Pediatrics ("AAP") standards.[556]  The data that were produced indicate that health screenings were not conducted as required during Period 3.[557]  For the twelve-month period ending June 30, 2013, the data

---

[553] *Infra* at 210-211.
[554] June 24, 2013 Order §VI.E., Attachment One, and Attachment 2, Report 26.
[555] Final Period 4 IP §II.C.2. and Appendix 3, Report 7.
[556] The parties have agreed that these categories of data will be collected by a special case record review.
[557] June 24, 2013 Order §VI.E., Attachment One, and Attachment 2, Report 22.

produced by defendants indicate that 28 percent of children entering custody during the period

received an initial health screening within 72 hours of entering custody.[558]

>MSA §II.B.3.i.2.
>**3. Physical and Mental Health Care**
>   **i. By the end of Implementation Period Three:**
>      **2) At least 50% of children entering custody during the Period shall receive a comprehensive health assessment consistent with Modified Settlement Agreement requirements within 30 calendar days of entering care.**

**Status of Progress, MSA §II.B.3.i.2.:** The data produced by the defendants pursuant to

the June 24, 2013 Order do not reflect whether the screenings were conducted by a qualified

medical practitioner and in accordance with AAP standards.[559] These data do, however, indicate

that comprehensive health assessments were not conducted within required timeframes during

Period 3.[560] For the twelve-month period ending June 30, 2013, the data produced by defendants

indicate that 34 percent of children entering custody during the period received a comprehensive

health assessment within 30 days of entering custody.[561]

>MSA §II.B.3.i.3.
>**3. Physical and Mental Health Care**
>   **i. By the end of Implementation Period Three:**
>      **3) At least 75% of children in custody during the Period shall receive periodic medical examinations and all medically necessary follow-up services and treatment consistent with Modified Settlement Agreement requirements.**

**Status of Progress, MSA §II.B.3.i.3.:** The data produced by the defendants pursuant to

the June 24, 2013 Order indicate that periodic medical examinations and medically necessary

follow-up services were not provided as required during Period 3.[562] The data produced by

---

[558] App. A, Ex. 30A, chart prepared by the Office of the Court Monitor, Children Entering Custody Who Received an Initial Health Screening Within 72 Hours of Entering Custody, 12-Month Periods Ending 7/31/12 Through 9/30/13; *see also* App. A, Ex. 30B, corresponding table with underlying data.

[559] The parties have agreed that these categories of data will be collected by a special case record review.

[560] June 24, 2013 Order §VI.E., Attachment One, and Attachment 2, Report 22.

[561] App. A, Ex. 31A, chart prepared by the Office of the Court Monitor, Children in Custody 30+ Days Who Received a Comprehensive Health Assessment Within 30 Days of Entering Custody, 12-Month Periods Ending 7/31/12 Through 9/30/13; *see also* App. A, Ex. 31B, corresponding table with underlying data.

[562] June 24, 2013 Order §VI.E., Attachment One, and Attachment 2, Report 44.

defendants indicate that, for the six-month period ending June 30, 2013, 63 percent of the

children reviewed through the FCR process received required periodic medical examinations and

medically necessary follow up services and treatment.[563]  The Monitor has concerns about the

reliability of these data, which she has addressed with the parties.[564]  Because of the need to

bolster the training and guidance that the defendants provide to FCR reviewers related to this

requirement, the parties agreed during February 2014 that pending a determination that the FCR

process can report accurately on this requirement, performance related to this requirement will be

reviewed along with other health-related requirements that are not solely timeline related in a

special case record review.

> **MSA §II.B.3.i.4.**
> **3.  Physical and Mental Health Care**
>   **i.  By the end of Implementation Period Three:**
>     **4)  At least 60% of children three years old and older entering**
>         **custody during the Period or in care and turning three**
>         **years old during the Period shall receive a dental**
>         **examination within 90 calendar days of foster care**
>         **placement or their third birthday, respectively.**

**Status of Progress, MSA §II.B.3.i.4.:**  The data produced by defendants pursuant to the

June 24, 2013 Order indicate these requirements were not satisfied during Period 3.[565]  For the

six-month period ending June 30, 2013, the data defendants produced indicate that 47 percent of

children age three and older who entered custody and were reviewed through the FCR process[566]

during the period received a dental examination within 90 days.[567]  The data for the same period

---

[563]  App. A, Ex. 52A, chart prepared by the Office of the Court Monitor, Children Receiving Periodic Medical Examinations and All Medically Necessary Follow-Up Services and Treatment, by Region, Six-Month Periods Ending 4/30/13 Through 9/30/13; *see also* App. A, Ex. 52B, corresponding table with underlying data.

[564]  These concerns stem from limitations in the guidance that was provided by the defendants to the FCR reviewers about how to interpret this requirement.

[565]  June 24, 2013 Order §VI.E., Attachment One, and Attachment Two, Reports 40 and 41.

[566]  The defendants have revised the guidance provided to FCR reviewers in response to concerns raised by the Monitor about the adequacy of the guidance to convey the full MSA requirement.

[567]  App. A, Ex. 49A, chart prepared by the Office of the Court Monitor, Children Age 3 and Older Who Entered Custody and Received a Dental Examination Within 90 Days, by Region, Six-Month Periods Ending 7/31/12 Through 9/30/13; *see also* App. A, Ex. 49B, corresponding table with underlying data.

also show that 57 percent of children who turned three years old during the period and who were reviewed through the FCR process received a dental examination within 90 days of their third birthday.[568]

> MSA §II.B.3.i.5.
> **3. Physical and Mental Health Care**
>   **i. By the end of Implementation Period Three:**
>     **5) At least 60% of children in custody during the Period shall receive a dental examination every six months consistent with Modified Settlement Agreement requirements and all medically necessary dental services.**

**Status of Progress, MSA §II.B.3.i.5.:**  The data produced by defendants pursuant to the June 24, 2013 Order indicate that the part of this requirement that addresses the six-month intervals for dental examinations was not satisfied during Period 3.[569]  For the six-month period ending June 30, 2013, the data defendants produced indicate that 54 percent of children age three and older who were reviewed through the FCR process received a dental exam every six months.[570]

> MSA §II.B.3.i.6.
> **3. Physical and Mental Health Care**
>   **i. By the end of Implementation Period Three:**
>     **6) At least 50% of children four years old and older entering custody during the Period or in care and turning four years old during the Period shall receive a mental health assessment by a qualified professional within 30 calendar days of foster care placement or their fourth birthday, respectively.**

---

[568]  App. A, Exs. 51A and Ex. 51B, *supra* note 58.

[569]  June 24, 2013 Order §VI.E., Attachment One, and Attachment Two, Report 41.  The defendants did not produce data related to whether a child received all medically necessary dental services.  Because of the need to bolster the training and guidance that the defendants provide to FCR reviewers related to this part of the requirement, the parties agreed during February 2014 that, pending a determination that the FCR process can report accurately with respect to whether a child received all medically necessary dental services, performance related to this part of MSA §II.B.3.i.5. requirement will be reviewed along with other specified health-related requirements in a special case record review.

[570]  App. A, Ex. 50A, chart prepared by the Office of the Court Monitor, Children Ages Three and Older at the Start of the Period Under Review Who Were Provided a Dental Exam Every Six Months, by Region, Six-Month Periods 7/1/12 Through 9/30/13; *see also* App. A, Ex. 50B, corresponding table with underlying data.

**Status of Progress, MSA §II.B.3.i.6.:**  The June 24, 2013 Order does not require defendants to report on children turning four during Period 3.[571]  Thus, defendants produced data reports limited to children four years old or older who entered custody during Period 3 and were reviewed through the FCR process.  The data defendants produced indicate that for the six-month period ending June 30, 2013, 49 percent of this cohort of children received a mental health examination within 30 days of placement.[572]

> **MSA §II.B.3.i.7.**
> **3.  Physical and Mental Health Care**
>  **i.  By the end of Implementation Period Three:**
>   **7)  At least 70% of children who received a mental health assessment during the period shall receive all recommended mental health services pursuant to their assessment.**

**Status of Progress, MSA §II.B.3.i.7.:**  The June 24, 2013 Order required defendants to produce monthly data reports responsive to this requirement for Period 3 and thereafter starting on January 1, 2014.[573]  During December 2013, defendants notified plaintiffs' counsel and the Monitor of limitations they had identified in the FCR review process which prevented them from producing data corresponding to this precise requirement.  Accordingly, there was agreement that the available data should not be produced.  Thereafter, in early February 2014, the parties, in consultation with the Monitor, agreed that pending a determination that the FCR process can report accurately on this requirement, performance related to this requirement will be reviewed along with certain other health-related requirements that are not solely timeline related in a special case record review.

---

[571]  June 24, 2013 Order §VI.E., Attachment One, and Attachment Two, Report 39.
[572]  App. A, Ex. 48A, chart prepared by the Office of the Court Monitor, Percentage of Children Four Years Old or Older Entering Custody During the Period Who Received A Mental Health Assessment Within 30 Days of Placement, by Region, Six-Month Periods Ending 7/31/12 Through 9/30/13;  *see also* App. A, Ex. 48B, corresponding table with underlying data.
[573]  June 24, 2013 Order §VI.E., Attachment One, and Attachment Two, Report 43.

MSA §II.B.3.i.8.
3. **Physical and Mental Health Care**
  i. By the end of Implementation Period Three:
     8) **At least 30% of children in custody ages birth through three during the Period, and older children if factors indicate it is warranted, shall receive a developmental assessment by a qualified professional within 30 calendar days of foster care placement and all needed developmental services.**

**Status of Progress, MSA §II.B.3.i.8.:** The data produced by the defendants pursuant to the June 24, 2013 Order indicate that developmental assessments and all needed developmental services for children ages birth through three were not provided as required during Period 3.[574] For the six-month period ending June 30, 2013, the data produced by defendants indicate that seven percent of the children reviewed through the FCR process received a timely developmental assessment and necessary follow up services.[575] The Monitor has concerns about the reliability of these data, particularly with respect to data collected regarding needed developmental services and older children.[576] Because of the need to bolster the training and guidance that the defendants provide to FCR reviewers related to this requirement, the parties agreed during February 2014 that pending a determination that the FCR process can report accurately on this requirement, performance related to this requirement will be reviewed along with other health-related requirements that are not solely timeline related in a special case record review.

MSA §§II.B.3.l.1. and II.B.3.m.1.
3. **Physical and Mental Health Care**
  l. Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:
     1) **At least 80% of foster children in that region who enter custody shall received physical and mental health care in accordance with each of the Modified Settlement Agreement Requirements.**

---

[574] June 24, 2013 Order §VI.E., Attachment One, and Attachment Two, Report 38.

[575] App. A, Ex. 47A, chart prepared by the Office of the Court Monitor, Children Ages 0-3 Receiving a Timely Developmental Assessment and Necessary Follow-Up Services, by Region, Six-Month Periods Ending 7/31/12 Through 9/30/13; *see also* App. A, Ex. 47B, corresponding table with underlying data.

[576] These concerns stem from limitations in the FCR instrument and related guidance.

  **m.** **Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
   **1)** **At least 90% of foster children in that region who enter custody shall receive physical and mental health care in accordance with each of the Modified Settlement Agreement requirements.**

  **Status of Progress, MSA §§II.B.3.l.1. and II.B.3.m.1.:**  Neither the June 24, 2013 Order nor the Initial or Final Period 4 IPs requires defendants to report on these requirements.  The Monitor expects that data related to defendants' performance can be obtained during a forthcoming special case record review.

  **Period 3 IP §II.F.1.**
  **F.  Physical, Dental, and Mental Health**
   **1.  By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants shall maintain a staff person in the Resource Development Unit whose job responsibility it will be to develop and coordinate a broader and more geographically diverse array of physical, dental, and mental health services available to foster children.**

  **Status of Progress, Period 3 IP §II.F.1.:**  As indicated in the narrative related to Period 3 IP §II.B.3.c.,[577] the program director assigned to this position started working at DFCS on February 1, 2012, resigned on September 9, 2013 and has not been replaced.  Defendants report that efforts have been ongoing to fill this position.

  **Period 3 IP §II.F.2.**
  **F.  Physical, Dental, and Mental Health**
   **2.  The physical, dental, and mental health program manager shall have developed a written plan for increasing the array of services available to foster children.**

  **Status of Progress, Period 3 IP §II.F.2.:**  As explained below, this requirement was satisfied by the end of Period 3.

  The defendants produced an initial plan for increasing the array of medical, dental and mental health services to plaintiffs' counsel and the Monitor on July 8, 2013, at the end of Period

---

[577] *Supra* at 132-133.

3.[578]  The plan summarizes relevant MSA requirements, outlines the general steps caseworkers

must take in individual cases to implement those requirements,[579] and describes the initiatives

DFCS has undertaken or plans to undertake in order to expand access to the medical, dental and

mental health services available to children in foster care.

As explained in the plan, in order to expand the service array, on January 1, 2013, the

DOM contracted with the Magnolia Health Plan ("Magnolia"), a managed care organization, to

provide medical, dental and mental health services for foster children.[580]  Defendants report that

Magnolia has providers in each of Mississippi's 82 counties, with a total of approximately 15,000

providers statewide.[581]   Moreover, enrollment in Magnolia also affords foster children access to

out-of-state specialists, if needed.  Consistent with MSA requirements,[582] Magnolia medical

providers are required to use AAP forms, which guide the scope of initial screenings and

comprehensive assessments.[583]

The plan also addresses the electronic health passport, CQI activities related to

monitoring and promoting improvements in the timely delivery of services, and staff training.

Each of these initiatives is intended to promote timely access to necessary services; however,

progress has not kept pace with expectations.  For example, the electronic health passport

consolidates and updates on an ongoing basis a child's health information[584] so that it is available

---

[578]  Ex. 57, Mississippi Department of Human Services, Division of Family and Children Services, Resource Development Unit, Physical, Dental, and Mental Health Services Plan; *see also* Ex. 31A, *supra* note 361, July 8, 2013 correspondence to Miriam Ingber from Kenya Rachal.

[579]  Ex. 57, *supra* note 578, at 1-7.

[580]  Magnolia will provide services for foster children from birth to age 19.  Thereafter, the plan provides that foster children will receive services directly through Medicaid.

[581]  *See id.* at 7-29 for more detailed information about the services provided through the Magnolia managed care program.

[582]  MSA §II.B.3.a.-d.

[583]  Ex. 57, *supra* note 578, at 9.

[584]  The passport contains basic information about the child, including date of birth, Medicaid ID number as well as name and contact information for all health care providers.  It also may include records of visits to health care providers, a list of known health problems, allergies and immunizations.

to providers and others who need access to it in order to make health care decisions.[585]  The plan

relies on Magnolia for implementation of the passport system.  According to the plan,

implementation was expected by January 2014; however, defendants report that implementation

has been delayed.[586]

> Period 3 IP §II.G.1.
> **G.  Educational Services**
>   1.  **By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants shall have hired a staff person in the Resource Development Unit whose job responsibility will be to promote and coordinate educational services including tutoring, preparation for a general equivalency diploma (GED), and college preparation available to foster children.**

**Status of Progress, Period 3 IP §II.G.1.:**  This requirement was satisfied.  The required

staff member was hired on June 15, 2012.

> Period 3 IP §II.G.2.
> **G.  Educational Services**
>   2.  **By September 1, 2012, Defendants shall have developed a protocol and associated caseworker training for conducting a review of a child's educational record for the purpose of identifying the child's general and, if applicable, special educational needs.**

**Status of Progress, Period 3 IP §II.G.2.:** This requirement was satisfied.  The protocol

and associated training were developed and provided to plaintiffs' counsel and the Monitor on

September 4, 2012.[587]

---

[585]  For example, it can be provided to the assigned caseworker, adoptive parents, children who are emancipated, or caregivers when a child is discharged from custody.

[586]  The resignation of the nurse program manager, addressed *supra* at 132-133, has slowed the pace of the intended follow up training for DFCS field staff.  Ex. 57, *supra* note 578, at 29.  Similarly, the plan contemplates that the FCR and EMU processes will capture CQI data necessary to monitor performance and determine where services are needed.  *Id.*  However, not all data related to MSA requirements are currently being captured through the FCR process.  Moreover, while data derived from the EMU process may be helpful, the sample size is far too small to be used as a basis for measuring statewide performance.  It appears that additional consideration of this matter may be warranted in light of these issues and the other issues discussed in the narrative related to Period 3 IP §I.B.18.a., *supra* at 102-103.

[587]  Ex. 58A, Mississippi Department of Human Services, Division of Family and Children Services, Educational Plan (protocol with guide for educational review and training schedule); Ex. 58B, Special Education Advocacy, Children in Foster Care (training materials), redacted.  The training schedule was designed to track, on a regional basis, the Practice Model implementation schedule.

Period 3 IP §II.H.1.

**H. Transition to Independent Living**

    **1. By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants shall develop a current resource guide necessary to assist youth in locating and/or enrolling in educational or vocational programs appropriate to their needs, interests, abilities, and goals, such as high school or GED programs, colleges or universities, vocational training programs, and special education services. This guide shall provide information on resources for all regions.**

**<u>Status of Progress, Period 3 IP §II.H.1.:</u>** The defendants revised the resource guide on a timely basis. The revision expands and improves upon the previous version.[588] However, with the exception of one section which covers three pages of the 89-page guide,[589] there are no descriptions of any of the services provided by the entities included in the guide.[590] This limits the utility of the information provided, making the resource guide more like a telephone directory and less likely to help youth identify and enroll in programs suited to their individual needs.

For example, the "Mississippi Colleges and Universities" category lists 19 institutions, along with their respective contact information.[591] However, no other information is provided, such as general admission requirements or information explaining how to obtain tuition assistance in order to pay for college. Similarly, the "Community Colleges/Technical/Vocational Schools" category lists 35 institutions along with relevant contact information, but it does not include any other information.[592] Moreover, the guide includes approximately 49 pages of "County Resources" that list, by county, the contact information for each county's Department of Human Services, Department of Health, State Extension Services, Community Hospital and

---

[588] Ex. 59A, Mississippi Department of Human Services, Resource Guide for Living Independently in Mississippi, Revised 2012.

[589] *Id.* at 85-87. The "Additional Resources" section represents the only section of the resource guide that includes narrative descriptions of the entities that are listed. These descriptions are helpful and constitute the types of information that might be more appropriately included in other categories.

[590] In some instances, only the name of the organization and a telephone number or a URL for a website is provided.

[591] *Id.* at 78-81.

[592] *Id.* at 81-85.

Regional Medical Center.  However, there is no comparable listing, for all Regions, of educational or vocational training programs.[593]

> Period 3 IP §II.H.2.
> H.  Transition to Independent Living
>   2.  By 45 days following the Court's approval of the Modified Settlement Agreement, all youth ages sixteen (16) and older in DFCS custody shall have been offered a copy of the resource guide.

**Status of Progress, Period 3 IP §II.H.2.:**  Defendants made extensive efforts to offer and deliver the resource guide to all youth in custody ages 16 and older, identifying 747 youths eligible to receive the guide.  Through a combination of efforts, defendants report that the guide was ultimately offered to 571 youths.[594]  The justification for why the guide was not offered to each of the remaining youth has been provided to the Monitor and appears appropriate.[595]

> MSA §II.B.4.b.1.
> 4.  Therapeutic Services
>   b.  <u>By the end of Implementation Period Three</u>:
>     1)  At least 60% of children in custody during the Period requiring therapeutic and/or rehabilitative foster care services because of a diagnosis of significant medical, developmental, emotional, or behavioral problems shall be provided with a treatment plan and services in accordance with their plan.

**Status of Progress, MSA §II.B.4.b.1.:**  This MSA standard includes statewide performance requirements as well as regional performance requirements.  The regional

---

[593]  A visit to the website of the U.S. Department of Health and Human Services, Administration for Children and Families, Children's Bureau, (https://www.childwelfare.gov/outofhome/independent/resources.cfm) provides a resource page, Child Welfare Information Gateway, that links to various resources, including examples of state and local resource handbooks for youth transitioning from foster care to independent living (*i.e.*, resource handbooks from Michigan, Texas, North Carolina, Oregon, Delaware, Florida, New York State, New York City).  These documents illustrate how descriptive information can be included in a directory of resources to provide guidance to youth in order to help them identify and enroll in educational and vocational programs appropriate for their individual needs, interests, abilities and goals. *See, e.g.,* Ex. 59B, Texas Foster Youth Justice Project, A Guide for Those "Aging Out" of Foster Care in Texas, Second Edition, excerpt (descriptive information related to educational and job training programs).

[594]  A summary of the efforts that defendants undertook was provided to the Monitor by the Director of the DFCS Independent Living Program during September 2012, and it is attached hereto as Ex. 59C, Resource Guide Implementation.

[595]  During September 2012, defendants submitted a spreadsheet listing each youth, whether the resource guide was offered, and in instances in which it was not offered, the reason it was not offered.  The spreadsheet illustrates limitations in MACWIS that are well documented, including some children no longer being in custody and others with case records missing current placement data.

requirements, which specify higher performance levels in light of Practice Model implementation timelines, are addressed below in the narrative related to MSA §§II.B.4.e.1. and II.B.4.f.1.[596] The defendants did not produce data related to children with a diagnosis of significant medical problems.[597] Insofar as statewide performance with respect to the other elements of this MSA requirement, the data produced by the defendants pursuant to the June 24, 2013 Order indicate that the requirement was satisfied.[598] These data show that 66 percent of children in custody reviewed through the FCR process for the six-month period ending June 30, 2013, who required therapeutic or rehabilitative services because of a diagnosis of significant developmental, emotional, or behavioral problems, received a treatment plan and were provided with services in accordance with the plan.[599]

The Monitor has concerns about the reliability of these data which she has addressed with the parties.[600] Because of the need to bolster the training and guidance that the defendants provide to FCR reviewers related to this requirement, during February 2014 the parties agreed that pending a determination that the FCR process can report accurately on this requirement, performance related to this requirement will be reviewed along with other health-related requirements that are not solely related to a timeline in a special case record review.

> **MSA §§II.B.4.e.1. and II.B.4.f.1.**
> **4. Therapeutic Services**
>   **e. Beginnings by the date set forth in Appendix "A" that a DFCS**
>      **region has fully implemented the Practice Model:**
>       **1) At least 80% of the foster children in that region who are**
>          **in custody and require therapeutic and/or rehabilitative**

---

[596] *Infra* at 181.

[597] The parties have agreed that data related to children with a significant medical diagnosis will be collected during a special case record review.

[598] June 24, 2013 Order §VI.E., Attachment One, and Attachment Two, Report 37.

[599] App. A, Ex. 46A, chart prepared by the Office of the Court Monitor, Children With a Diagnosis of Developmental and/or Emotional/Behavioral/Mental Health Problems That Were Provided With a Treatment Plan and Services Tied to the Plan, by Region, Six-Month Periods Ending 7/31/12 Through 9/30/13; *see also* App. A, Ex. 46B, corresponding table with underlying data.

[600] These concerns stem from limitations in the guidance that was provided by the defendants to the FCR reviewers about how to interpret this requirement.

foster care services because of a diagnosis of significant medical, developmental, emotional, or behavioral problems shall be provided with a treatment plan and services during that period in accordance with their plan.

f.  **Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
   1)  **At least 90% of the foster children in that region who are in custody and require therapeutic and/or rehabilitative foster care services because of a diagnosis of significant medical, developmental, emotional, or behavioral problems shall be provided with a treatment plan and services during that period in accordance with their plan.**

**Status of Progress, MSA §§II.B.4.e.1. and II.B.4.f.1.:**  The requirements of MSA §II.B.4.e.1. apply to the following seven regions: I-S, II-W, V-W, III-S, I-N, IV-N and IV-S. Given the time frame covered by this report, the requirements of MSA §II.B.4.f.1. apply only to the first two regions to implement the Practice Model: I-S and II-W.  According to the data defendants produced, described in the preceding narrative related to MSA §II.B.4.b.1.,[601] performance for each of the seven targeted regions relative to the 80 percent performance standard established by MSA §II.B.4.e.1. was as follows by the date each region was required to satisfy the standard:[602]  I-S, 37 percent and II-W, 91 percent (as of August 31, 2012); V-W, 100 percent (as of February 28, 2013); III-S, 53 percent, I-N, 47 percent, IV-N, 84 percent, and IV-S, 81 percent (as of August 31, 2013).[603]  Insofar as the performance requirements in MSA §II.B.4.f.1. related to the higher 90 percent standard applicable to DFCS regions 12 months following full implementation, the data produced indicate that as of August 31, 2013, I-S was at 72 percent and II-W was at 46 percent.[604]

---

[601] *Supra* at 179-180.  *See supra* at 180 regarding the Monitor's concerns about the reliability of the statewide data related to this MSA performance standard.  The same concerns apply to the regional data.
[602] *See* Summary Table:  Practice Model Performance Based on Data Received Through February 28, 2014, *supra* at 30-37.
[603] App. A., Ex. 46B, *supra* note 599.
[604] *Id.*

**Period 3 IP §II.I.1.**
**I.  Recruitment and Retention of Resource Families and**
**Therapeutic Service Providers**
**1.  By September 30, 2012, Defendants shall meet the Year 2**
**requirements as set forth in its implementation plan for the**
**Diligent Recruitment of Families for Children as shown in**
**attached Appendix "D." The implementation plan for the**
**Diligent Recruitment of Families for Children shall become**
**an enforceable part of this Period 3 Implementation Plan.**

**Status of Progress, Period 3 IP §II.I.1.:**  During the last quarter of 2010, defendants

were awarded $2 million dollars over five years through a federal grant[605] intended to subsidize

MDHS/DFCS initiatives to recruit families for children in foster care who wait the longest for

permanency.[606]   The implementation plan for the second through the fifth year of the grant was

included in Appendix D to the MSA.[607]  The implementation schedule for many of the initiatives

required by the grant is intended to follow a regional approach introduced on the heels of the

Practice Model phase-in schedule.

The implementation schedule for diligent recruitment activities that is required by this

section of the MSA is structured to address the following topical areas:  recruitment activities;

resource licensure; the customer service model; contracting with licensed child placing agencies;

family/child matching; collaboration/public-private partnerships; the DFCS website; and

evaluation activities.

During Period 3, grant activities were on-going in four regions,[608] including various

general recruitment activities, resource staff training,[609] development of training materials for

---

[605]  *See November 2010 Report* at 41 for additional background information related to the grant.
[606]  This includes children from large sibling groups, children who have been sexually abused, teenagers, pregnant girls who plan to keep their babies, and children with physical, medical, emotional, intellectual and/or severe behavioral challenges.
[607]  Ex. 60A, Appendix "D" Modified Mississippi Settlement Agreement and Reform Plan, Mississippi Diligent Recruitment of Families for Children, Implementation Plan - Phase II, Version A (included in the appendix to this report for the convenience of the Court and the parties).
[608]  Regions I-S, II-W, V-W and IV-N.  Initial grant activities were also undertaken in three additional regions, *i.e.*, IV-S, III-S and I-N.
[609]  This training was delivered by CSF consultants.

prospective resource families, and a limited upgrade to the DFCS website.[610]  Managers have

reported that the pace of implementation varied by DFCS region during Period 3.  Defendants

applied for renewal of the grant in May 2013, shortly before the end of Period 3.[611]  By that time,

there was demonstrable progress, although contracting and several other initiatives required by

this subsection of the MSA were delayed, in part because of limitations in MACWIS.[612]  On

September 18, 2013, defendants received notification from federal authorities that the grant had

been renewed.[613]

> **Period 3 IP §II.I.2.**
> **I.  Recruitment and Retention of Resource Families and Therapeutic Service Providers**
> **2.  In consultation with Mississippi resource parents, Defendants shall identify additions and revisions to the current resource parent training curriculum that are necessary to adequately train resource parents to meet the needs of the children placed in their care.  Resource parent training classes based upon the revised curriculum shall be available in every region.**

**Status of Progress, Period 3 IP §II.I.2.:**  This requirement was satisfied.  The revisions

to the training curriculum for resource parents were completed during February 2012, before the

start of Period 3.[614]  Training classes based on the revised curriculum are periodically conducted

in DFCS regions.[615]

---

[610]  A link was added to the DFCS website to address recruitment.

[611]  Ex. 60B, May 30, 2013 correspondence to Bernard Morgan and Taffy B. Compain from Richard A. Berry, redacted.

[612]  Ex. 60C, Program and Budget Narrative, excerpt from May 30, 2013 grant renewal application, at 2.  The grant-year periods and the MSA implementation periods are not aligned.  Year-Three of the grant began in September 2012 and Year-Four began in September 30, 2013.  The grant application materials list areas of progress and delays, noting, among other things, that implementation in Region III-S was delayed due to "staffing concerns, high caseloads, and other opportunities for improved practice within the region."  *Id.*

[613]  Ex. 60D, Department of Health and Human Services Administration for Children and Families, Notice of Award, September 18, 2013 (notification of renewal for the period September 30, 2013 – September 29, 2014).

[614]  Ex. 61A, Mississippi PATH, Parents as Tender Healers, Resource Applicant Handbook, Revised, February 2012 (cover page and table of contents), redacted; *see also* Ex. 61B, document summarizing the updates to the PATH Handbook distributed to resource supervisors during February 2012, redacted.  At least some of these revisions were also contemplated by the Diligent Recruitment Grant implementation schedule, Ex. 60A, *supra* note 607, §2.B., Resource Family Training.

[615]  The Monitor has not had an opportunity to review systematically the training schedules for each DFCS region. Field staff in some regions have reported that at times scheduling has been affected by staffing limitations.

MSA §II.B.5.e.1.
5.  **Worker Contact and Monitoring**
   e.  <u>By the end of Implementation Period Three</u>:
      1)  **At least 60% of children in custody shall receive documented twice-monthly in-person visits by the assigned DFCS caseworker during the Period, consistent with Modified Settlement Agreement requirements.**

<u>**Status of Progress, MSA §II.B.5.e.1.**</u>**:**  MSA §II.B.5.a. requires that children in foster care placements must be visited in person by their assigned caseworker at least twice monthly, and alone where age-appropriate.  At least one monthly visit must take place in the child's placement.  The purpose of the visit is to assess the child's safety and well-being as well as service delivery and achievement of permanency and other service goals.  This MSA standard includes statewide performance requirements as well as regional performance requirements.  The regional requirements, which specify higher performance levels in light of Practice Model implementation timelines, are addressed below in the narrative related to MSA §§II.B.5.h.1. and II.B.5.i.1.[616]  Insofar as statewide performance, the data produced by the defendants in response to the June 24, 2013 Order do not address whether the child was seen alone if age appropriate.[617]  Nevertheless, these data indicate that this requirement was not satisfied.[618]  For the one-month period ending June 30, 2013, the data show that 55 percent of children in DFCS custody received documented twice-monthly in-person visits from their assigned caseworkers consistent with MSA requirements.[619]

MSA §§II.B.5.h.1. and II.B.5.i.1.
II.  **Requirements to be Implemented Statewide**
B.  **Foster Care Services Standards**
5.  **Worker Contact and Monitoring**
   h.  <u>Beginning by the date as set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model</u>:
      1)  At least 70% of children in custody in that region shall have received documented twice-monthly in-person visits

---

[616] *Infra* at 185.
[617] The parties have agreed that the data report that defendants produce will be modified to include the relevant omitted information.
[618] June 24, 2013 Order §VI.E., Attachment One, and Attachment Two, Report 8.
[619] App. A, Exs. 13A and 13B, *supra* note 59.

by the assigned DFCS caseworker during the preceding
12-month period, consistent with Modified Plan
requirements.

    **i.**  **Beginning by 12 months following the date set forth in
Appendix "A" that a DFCS region has fully implemented the
Practice Model:**
       **1)**  **At least 90% of foster children in custody in that region
shall receive documented twice-monthly in-person visits by
the assigned DFCS caseworker, consistent with Modified
Settlement Agreement requirements.**

    **Status of Progress, MSA §§II.B.5.h.1. and II.B.5.i.1.:**  The requirements of MSA

§II.B.5.h.1. apply to the following seven regions:  I-S, II-W, V-W, III-S, I-N, IV-N and IV-S.  In

light of the time frame covered by this report, the requirements of MSA §II.B.5.i.1. apply to the

first two regions to implement the Practice Model:  I-S and II-W.  According to the data

defendants produced, described in the preceding narrative related to MSA §II.B.5.e.1.,[620]

performance for each of the seven targeted regions relative to the 70 percent performance

standard established by MSA §II.B.5.h.1. was as follows by the date each region was required to

satisfy the standard:[621] I-S, 44 percent and II-W, 72 percent (as of August 31, 2012); V-W, 66

percent (as of February 28, 2013); III-S, 45 percent, I-N, 70 percent, IV-N, 65 percent, and IV-S,

75 percent (as of August 31, 2013).  Insofar as the performance requirements in MSA

§II.B.5.i.1., related to the higher 90 percent standard applicable to DFCS regions 12 months

following full implementation, the data produced indicate that as of August 31, 2013, I-S was at

86 percent and II-W was at 79 percent.[622]

        **MSA §II.B.5.e.2.**
        **5.  Worker Contact and Monitoring**
          **e.  By the end of Implementation Period Three:**
            **2)**  **At least 40% of children with a goal of reunification shall
have their assigned DFCS caseworker meet monthly with
the child's parents, during the Period, consistent with**

---

[620] *Supra* at 184.  The limitations reflected in the statewide data also apply to the regional data.

[621] *See* Summary Table:  Practice Model Performance Based on Data Received Through February 28, 2014, *supra* at 30-37.

[622] App. A, Ex. 13B, *supra* note 59.

> **Modified Settlement Agreement requirements, and this**
> **visit shall be documented in the child's case record.**

**Status of Progress, MSA §II.B.5.e.2.:**  This MSA standard includes statewide

performance requirements as well as regional performance requirements.  The regional

requirements, which require higher performance levels in light of Practice Model implementation

timelines, are addressed below in the narrative related to MSA §§II.B.5.h.2. and II.B.5.i.2.[623]

Insofar as statewide performance, the defendants did not provide data related to Period 3

performance regarding all of the elements of this requirement as required by the June 24, 2013

Order.[624]  Data for the one-month period ending November 30, 2013, the second month for which

validated data were available, indicate that for 29 percent of the children with a goal of

reunification, the assigned DFCS caseworker met with the child's parent(s) with whom the child

was to be reunified at least once consistent with MSA requirements.[625]

> **MSA §§II.B.5.h.2. and II.B.5.i.2.**
> **II.  Requirements to be Implemented Statewide**
>   **B.  Foster Care Services Standards**
>     **5.  Worker Contact and Monitoring**
>       **h.  Beginning by the date as set forth in Appendix "A" that a**
>         **DFCS region has fully implemented the Practice Model:**
>         **2)  At least 80% of children in that region with a goal of**
>           **reunification shall have had their assigned DFCS**
>           **caseworker meet monthly with the child's biological**
>           **parent(s) with whom that child is to be reunified consistent**
>           **with Modified Plan requirements, as documented in the**
>           **child's case record.**
>
>       **i.  Beginning by 12 months following the date set forth in**
>         **Appendix "A" that a DFCS region has fully implemented the**
>         **Practice Model:**

---

[623] *Infra* at 187.

[624] June 24, 2013 Order §VI.E., Attachment One, and Attachment Two, Report 4.  MSA §II.B.5.b. requires that when a child has a permanency goal of reunification, the child's assigned caseworker must meet at least monthly with the child's parent(s) with whom the child is to be reunified for the following purposes: 1) to assess service delivery and achievement of service goals; 2) to keep the family informed and involved in decisions about the child; and 3) to remain current about the family's circumstances.  Because the data that the defendants produced do not address the full MSA requirement related to the content of these required visits, the parties have agreed that the guidance provided to FCR reviewers will be supplemented to address the content of the visits.

[625] App. A, Ex. 7A, chart prepared by Office of the Court Monitor, Children With a Goal of Reunification Whose Assigned Caseworker Met Monthly With the Parent(s) With Whom the Child Was to be Reunified, by Region, One-Month Periods 10/31/13 and 11/30/13; *see also*, App. A, Ex. 7B, corresponding table with underlying data.

    2) **At least 90% of foster children in that region with a goal of reunification shall have their assigned DFCS caseworker meet monthly with the child's parent(s) with whom the child is to be reunified, consistent with Modified Settlement Agreement requirements, as documented in the child's case record.**

**<u>Status of Progress, MSA §§II.B.5.h.2. and II.B.5.i.2.</u>:**  As noted in the narrative related to MSA §II.B.5.e.2., above,[626] the defendants did not provide accurate data for the applicable regions for the various fully implemented time periods and for the 12 months following full implementation time period as required by the June 24, 2013 Order.[627]  The data defendants produced for the one-month period ending October 31, 2013, the first month for which validated data were available, have the same limitations as the corresponding statewide data described in the narrative related to MSA §II.B.5.e.2.[628]  The data indicate that performance in Regions I-S and II-W was 62 percent and 45 percent, respectively.[629]  Pursuant to MSA §II.B.5.i.2., both regions should have reached the 90 percent performance standard by August 31, 2013, 12 months following full implementation of the Practice Model.  Insofar as the five regions for which the 80 percent standard established by MSA §II.B.5.h.2. is applicable, analysis of the data produced for the one-month period ending October 31, 2013 showed Region V-W, which was required to meet the 80 percent standard by February 28, 2013, was at 33 percent.  According to these data, performance for the regions required to meet the 80 percent standard by August 31, 2013 breaks down as follows for the one-month period ending October 31, 2013:  III-S, 22 percent; I-N, 27 percent; IV-N, 44 percent; and IV-S, 26 percent.[630]

---

[626] *Supra* at 186.
[627] June 24, 2013 Order §VI.E., Attachment One, and Attachment Two, Report 4.
[628] *Supra* at 186.
[629] App. A, Ex. 7B, *supra* note 625.
[630] *Id.*

MSA §II.B.5.e.3.
5.  **Worker Contact and Monitoring**
   e.  <u>By the end of Implementation Period Three:</u>
      3)  **At least 40% of resource parents (therapeutic and non-therapeutic) with at least one foster child residing in their home during the Period shall have a DFCS worker visit the home monthly, consistent with Modified Settlement Agreement requirements, and this visit shall be documented in the children's case records.**

**<u>Status of Progress, MSA §II.B.5.e.3.</u>:**  This MSA standard includes statewide

performance requirements as well as regional performance requirements.  The regional

requirements, which specify higher performance levels in light of Practice Model implementation

timelines, are addressed below in the narrative related to MSA §§II.B.5.h.3. and II.B.5.i.3.[631]

The June 24, 2013 Order requires defendants to report separately on caseworker visits to

therapeutic and non-therapeutic resource parents.[632]  Defendants have relied on MACWIS to

produce data regarding the frequency of caseworker visits and the FCR process to produce data

addressing whether the content of the visits satisfies applicable MSA requirements.  The MSA

requires that caseworkers regularly communicate with therapeutic and non-therapeutic resource

parents and visit the home at least monthly for the following purposes: 1) to share all relevant

and legally disclosable information about the child; 2) to evaluate the child's safety, needs, and

well-being; and 3) to monitor service delivery and achievement of service goals.[633]  The data

defendants produced address the frequency of visits; however, there are limitations in the data

regarding the content of the visits.[634]

Insofar as the frequency of caseworker visits to the home of the non-therapeutic resource

parents, the data defendants produced indicate that the defendants exceeded the statewide 40

---

[631]  *Infra* at 190-193.
[632]  June 24, 2013 Order §VI.E., Attachment One, Attachment Two, Reports 5 and 6.
[633]  MSA §II.B.5.c.
[634]  Accordingly, the parties have agreed that defendants will modify the guidance provided to FCR reviewers in order to obtain more complete data regarding the content of the visits.  The parties also have agreed that data related to the "regular communication" requirement will be obtained through a case record review, if necessary.

percent standard. These data show that for the one-month period ending June 30, 2013, 45 percent of non-therapeutic resource parents had a DFCS worker visit the home in that month.[635] As noted above, the FCR data that the defendants produced regarding the content of the caseworker visits during Period 3 has limitations, and it also uses children and not resource parents as the unit of analysis. Moreover, the Period 3 data produced is limited to a six-month period ending June 30, 2013.[636] Analysis of these data indicates that the content of the home visits met MSA requirements for 70 percent of children subject to the FCR process and in non-therapeutic placements during this period.[637]

Insofar as the frequency of caseworker visits to the home of the therapeutic resource parents, the data defendants produced indicate that the defendants met the statewide 40 percent standard. These data show that for the one-month period ending June 30, 2013, 40 percent of therapeutic resource parents had a DFCS worker visit the home in that month.[638] As noted above, the FCR data that the defendants produced regarding the content of the caseworker visits during Period 3 has several significant limitations.[639] Nevertheless, analysis of these data indicate that the content of the home visits met MSA requirements for 70 percent of children subject to the FCR process and in therapeutic placements during this period.[640]

---

[635] App A, Ex. 8A, chart prepared by the Office of the Court Monitor, Non-Therapeutic Placement Setting Contacts, By Region, One-Month Periods Ending 7/31/12 through 9/30/13; *see also* App. A, Ex. 8B, corresponding table with underlying data.

[636] Defendants expanded the FCR process to include these MSA requirements during October 2012.

[637] App. A, Ex. 9A, chart prepared by Office of the Court Monitor, Content of Non-Therapeutic Placement Setting Contacts, By Region, Six-Month Periods Ending 4/30/13 through 9/30/13; *see also* App. A, Ex. 9B, corresponding table with underlying data.

[638] App A, Ex. 10A, chart prepared by the Office of the Court Monitor, Therapeutic Placement Setting Contacts, By Region, One-Month Periods 7/31/12 through 9/30/13; *see also* App. A, Ex. 10B, corresponding table with underlying data.

[639] *Supra* note 634 and related text.

[640] App. A, Ex. 11A, chart prepared by Office of the Court Monitor, Content of Therapeutic Placement Setting Contacts, By Region, Six-Month Periods Ending 4/30/13 through 9/30/13; *see also* App. A, Ex. 11B, corresponding table with underlying data.

MSA §§II.B.5.h.3. and II.B.5.i.3.
II.  Requirements to be Implemented Statewide
 B.  Foster Care Services Standards
  5.  Worker Contact and Monitoring
   h.  <u>Beginning by the date as set forth in Appendix "A" that a
       DFCS region has fully implemented the Practice Model:</u>
    3)  At least 80% of foster parents in that region with at least
        one foster child residing in their home during the
        preceding 12-month period shall have had a DFCS worker
        visit the home monthly, consistent with Modified Plan
        requirements, as documented in the children's case
        records.

   i.  <u>Beginning by 12 months following the date set forth in
       Appendix "A" that a DFCS region has fully implemented the
       Practice Model:</u>
    3)  At least 90% of resource parents in that region with at
        least one foster child residing in their home shall have a
        DFCS worker visit the home monthly, consistent with
        Modified Settlement Agreement requirements, as
        documented in the children's case records.

**<u>Status of Progress, MSA §§II.B.5.h.3. and II.B.5.i.3.</u>:** As required by the June 24, 2013

Order and as noted above regarding the corresponding statewide data, defendants reported the

regional data regarding visits to non-therapeutic and therapeutic placement settings separately

and produced MACWIS data to address the frequency of visits and FCR data to address the

content of the visits.  The regional data addressing the content of visits have the same limitations

as those described above regarding the statewide data.[641]  Each data set related to the regional

requirements reflected in MSA §§II.B.5.h.3. and II.B.5.i.3. is addressed in turn below.

The requirements of MSA §II.B.5.h.3. apply to the following seven regions:  I-S, II-W,

V-W, III-S, I-N, IV-N and IV-S.  According to the regional data defendants produced in response

to this requirement,[642] the performance of the seven regions that fall within the purview of MSA

§II.B.5.h.3., relative to the 80 percent performance standard applicable to the frequency of visits

to the homes of non-therapeutic resource parents, was as follows by the date each region was

---

[641] *Supra* at 188.
[642] These data are described in the preceding narrative related to MSA §II.B.5.e.3., *supra* at 188-189.

required to satisfy the standard:[643] I-S, 73 percent and II-W, 83 percent (as of August 31, 2012); V-W, 75 percent (as of February 28, 2013); III-S, 32 percent, I-N, 43 percent, IV-N, 68 percent, and IV-S, 67 percent (as of August 31, 2013). The requirements of MSA §II.B.5.i.3. apply to the first two regions to implement the Practice Model, I-S and II-W. Insofar as performance related to the 90 percent standard applicable to DFCS regions 12 months following full implementation of the Practice Model, the data related to the frequency of visits to non-therapeutic resource homes indicate that as of August 31, 2013, I-S was at 80 percent and II-W was at 87 percent.[644]

As noted above, the FCR data that the defendants produced regarding the content of the caseworker visits during Period 3 use children and not resource parents as the unit of analysis and is limited to a six-month period ending June 30, 2013.[645] Because of the absence of reliable data through the date of full implementation applicable to the three regions, performance related to the 80 percent standard for the content of visits to non-therapeutic placements at the time of full implementation that is established by MSA §II.B.5.h.3. could not be assessed for three of the seven regions that fall within the purview of this subsection.[646] Performance relative to the 80 percent full implementation standard for the remaining four regions was as follows: III-S, 60 percent, I-N, 71 percent, IV-N, 94 percent, and IV-S, 73 percent.[647] Insofar as the performance requirements in MSA §II.B.5.i.3. related to the higher 90 percent standard applicable to DFCS regions 12 months following full implementation of the Practice Model, analysis of these data indicates that the content of home visits to non-therapeutic placements were conducted in

---

[643] App. A, Ex. 8B, *supra* note 635.
[644] *Id.*
[645] Defendants expanded the FCR process to include these MSA requirements during October 2012.
[646] Performance relative to the content of visits to non-therapeutic resource homes could not be determined for Regions I-S, II-W, and V-W.
[647] App. A, Ex. 9B, *supra* note 637.

accordance with MSA requirements in 97 percent of the visits in Region I-S and 77 percent of the visits conducted in Region II-W for the six-month period ending August 31, 2013.[648]

Insofar as the regional data defendants produced related to the frequency of caseworker visits to therapeutic resource homes, the performance of the seven regions that fall within the purview of MSA §II.B.5.h.3., which requires that a region achieve an 80 percent performance standard at the time of full implementation of the Practice Model, was as follows by the required date: I-S, 54 percent and II-W, 75 percent (as of August 31, 2012); V-W, 67 percent (as of February 28, 2013); III-S, 30 percent, I-N, 40 percent, and IV-N, 50 percent (as of August 31, 2013). IV-S did not have any children in therapeutic placements by its full implementation date.[649] Insofar as performance related to the 90 percent standard applicable to DFCS regions 12 months following full implementation of the Practice Model, the data related to the frequency of caseworker visits to therapeutic resource homes indicate that as of August 31, 2013, I-S was at 100 percent and II-W was at 75 percent.[650]

The FCR regional data[651] defendants produced related to the content of home visits to therapeutic placements could not be assessed for three of the seven regions that achieved full implementation of the Practice Model and fall within the purview of MSA §II.B.5.h.3. because of the absence of reliable data through the date each of the three regions achieved full implementation. Performance related to the 80 percent full implementation standard for the content of visits to therapeutic placements could be analyzed for three of the remaining four regions: III-S, 38 percent, I-N, 100 percent, and IV-N, 100 percent.[652] The fourth region, IV-S,

---

[648] *Id.*
[649] App. A, Ex. 10B, *supra* note 638.
[650] *Id.*
[651] *See supra* at 188, 191 for a discussion of the limitations in the FCR data.
[652] App. A, Ex. 11B, *supra* note 640.

did not have any therapeutic placements as of the date of full implementation.[653]  Pursuant to

MSA §II.B.5.i.3., the first two regions to implement the Practice Model, I-S and II-W, were

required to meet a 90 percent performance standard with respect to the content of visits to

therapeutic resource homes by August 31, 2013, 12 months following full implementation of the

Practice Model.  The data produced indicate that by August 31, 2013, I-S was at 100 percent and

II-W was at 33 percent.[654]

> **MSA §§II.B.7.d. and II.B.7.e.**
> **7. Adoption**
>   d. **Beginnings by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:** At least 90% of children in custody in that region with the primary permanency goal of adoption during the Period shall have an assigned adoption specialist and an adoption plan that identifies the child-specific activities that Defendants will undertake to achieve adoption, and shall receive regular adoption status meetings consistent with Modified Settlement Agreement requirements during the Period.
>
>   e. **Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:** At least 95% of children in custody in that region with the primary permanency goal of adoption during the Period shall have an assigned adoption specialist and an adoption plan that identifies the child-specific activities that Defendants will undertake to achieve adoption, and shall receive regular adoption status meetings consistent with Modified Settlement Agreement requirements during the Period.

**Status of Progress, MSA §§II.B.7.d. and II.B.7.e.:**  Defendants were not required to

produce data related to this requirement during Period 3.  The Initial Period 4 IP requires

defendants to produce monthly data responsive to this requirement starting April 1, 2014.[655]  As

of April 4, 2014, the first report had not been produced.  On May 5, 2014, in their comments on

the draft version of this report, defendants indicated that proposed specifications for this data

report were being drafted and would be submitted to plaintiffs' counsel and the Monitor during

---

[653] *Id.*
[654] *Id.*
[655] Initial Period 4 IP §II.C.2. and Appendix 1, Report 4.

the week of May 18, 2014.  However, an explanation for the delay in developing the

specifications and in turn producing the required data has not been provided.  The Monitor will

report more fully on this matter in a forthcoming report.

> **MSA §II.C.1.b.1.**
> **1. Number of Placements (Temporary breaks in placement for**
> **children who run away, require emergency hospitalization or**
> **respite care not exceeding 14 days, or who are in residential**
> **schools such as schools for the vision or hearing impaired or**
> **colleges and universities, and who return to their immediately**
> **prior placement, shall not count as additional placements.)**
> **b. By the end of Implementation Period Three:**
>     **1) In the last year, at least 60% of children state-wide in care**
>         **less than 12 months from the time of latest removal from**
>         **home shall have had two or fewer placements.**

**Status of Progress, MSA §II.C.1.b.1.:**  Defendants produced data responsive to this

requirement pursuant to the June 24, 2013 Order.[656]  Analysis of the data that was produced

indicates that defendants exceeded the Period 3 performance standard.  The data show that for the

12-month period ending June 30, 2013, 77 percent of children in custody fewer than 12 months

from the time of the latest removal from home had two or fewer placements.[657]

> **MSA §II.C.2.b.1.**
> **II. Requirements to be Implemented Statewide**
>   **C. Outcome Measures**
>     **2. Abuse/Neglect/Maltreatment in Care (This measure shall**
>       **apply to reports of abuse, neglect, or maltreatment of**
>       **children while in DFCS custody.)**
>       **b. By the end of Implementation Period Three:**
>         **1) The rate of abuse or maltreatment in care in the last**
>          **year shall not exceed 1.00%.**

**Status of Progress, MSA §II.C.2.b.1.:**  The defendants produced data responsive to this

requirement pursuant to the June 24, 2013 Order during September 2013.[658]  Because of

limitations in the data identified by the Monitor, defendants resubmitted corrected data during

January 2014 for the following time periods: August 1, 2011 through the 2012 calendar year; the

---

[656]  June 24, 2013 Order §VI.E., Attachment One, and Attachment Two, Report 13.
[657]  App. A, Ex. 18A, chart prepared by the Office of the Court Monitor, Number of Children in Custody Fewer Than 12 Months From Latest Removal From Home, by Number of Placements, 12-Month Periods Ending 7/31/12 through 10/31/13; *see also* App. A, Ex. 18B, corresponding table with underlying data.
[658]  June 24, 2013 Order §VI.E., Attachment One, and Attachment Two, Report 7.

12-month period ending July 31, 2013; and the 12-month period ending October 31, 2013.  The Monitor's analysis of these data revealed substantial inconsistencies between the rate of maltreatment defendants reported to federal authorities for the 2012 calendar year, which was 1.65 percent, and the rate of maltreatment reflected in the data defendants produced to the Monitor and counsel for plaintiffs for the identical period, which was .9 percent.  Accordingly, on January 10, 2014, the Monitor requested that defendants provide information about the reasons for the differences in these data.[659]  This disparity was of significant concern to the Monitor because the specifications that had been agreed upon by the parties for this data report were based on the federal measurement.[660]

During the course of an e-mail exchange and telephone conferences that took place in January and February 2014 involving the parties and the Monitor, defendants provided explanations for the disparity in the data that were reported.  Essentially, defendants explained that the relevant data report provided pursuant to the June 24, 2013 Order was designed to conform to the federal measure, but that the differences in reported rates stemmed from several different causes.[661]

First, defendants explained that the federal data and the data used to produce the report pursuant to the June 24, 2013 Order were extracted from different databases, and defendants

---

[659]  Ex. 62A, January 10, 2014 e-mail to Kenya Rachal and Julia Davis from Grace M. Lopes, without attachments.
[660]  Ex. 62B, Abuse/Neglect/Maltreatment in Care, DHS 356905-356910, at 1 (agreed specifications for rate of maltreatment data report, noting that report is based on federal measuring of rate of maltreatment).  As a result of the collaborative process contemplated by §VI.A. of the June 24, 2013 Order, the parties agreed on the specifications for this data report.
[661]  Defendants reported that they researched this issue and as a result they provided increasingly detailed explanations for the differences between the data used for the calculation supplied to the federal government and the data produced to plaintiffs and the Monitor pursuant to the June 24, 2013 Order.  *See* Ex. 62C, January 17, 2014 e-mail to Grace M. Lopes and Julia Davis from Kenya Rachal; Ex. 62D, February 6, 2014 e-mail to Grace M. Lopes from Kenya Rachal; Ex. 62E, February 28, 2014 e-mail to Grace M. Lopes and Julia Davis from Kenya Rachal, redacted.

believed the data submitted to the federal government contained some errors.[662]  Second,

defendants explained that the federal rate calculation excluded from the denominator children

housed in certain types of facilities.  Third, the methodology used to produce the reports was

different (*i.e.* the federal report aggregated two six-month submissions), which introduced the

potential for more data discrepancies.

     The data that the defendants produced to the Monitor and plaintiffs for the 12-month

period ending June 30, 2013 indicate the rate of maltreatment in care was .72 percent.[663]

However, until all of the discrepancies in the two reported rates are resolved and the parties come

to agreement regarding how the defendants will calculate the rate prospectively, the Monitor

cannot make a finding concerning defendants' performance relative to this requirement.


### B.  Regional Requirements

     In addition to the statewide requirements described above,[664] the MSA requires

defendants to meet certain performance requirements on a regional basis, keyed to the dates on

which each region fully implements the Practice Model.  By the end of the implementation

process, the 13 DFCS regions will have phased in the Practice Model over six implementation

dates between August 2012 and February 2015.  At the point a region has fully implemented the

Practice Model, it is required to meet a specified performance target.  Furthermore, after a region

has fully implemented the Practice Model for 12 months, the region is required to meet a higher

---

[662]  In response to concerns raised by the Monitor and plaintiffs' counsel, defendants discovered errors in the maltreatment rate data that MDHS/DFCS submitted to the federal government for the 2013 Federal Fiscal Year [hereinafter FFY].  Defendants reported that they incorrectly included a cohort of children who were not in custody in the 2013 FFY data.  Accordingly, defendants stated that they planned to investigate further and make corrections to the 2013 FFY submission by March 15, 2014.  *See* Ex. 62E, *supra* note 661.  The 2013 FFY began on October 1, 2012 and ended on September 30, 2013.

[663]  App. A, Ex. 12A, chart prepared by the Office of the Court Monitor, Rate of Maltreatment in Care, by Region, 12-Month Periods 7/31/12 through 10/31/13; *see also* App. A, Ex. 12B, corresponding table with underlying data.

[664]  As indicated in the preceding section of this report, there are corresponding regional requirements for a small number of the statewide requirements.

performance target.  After all 13 regions have fully implemented the Practice Model, all MSA

requirements become statewide requirements, measured on a statewide basis.[665]

The Monitor analyzed defendants' regional performance data covering the period through

September 30, 2013.  By that date, seven regions had fully implemented the Practice Model, two

of which had fully implemented the Practice Model for over 12 months.  Because of the different

performance requirements and dates on which the seven regions were required to meet those

requirements, the Monitor has presented her findings with respect to regional requirements in

tabular format below.

> **MSA §III.A.1.a.**
> **1.  Continuous Quality Improvement**
>     **a.  No later than the date set forth in Appendix "A" by which a region shall have fully implemented the Practice Model, the CQI system shall measure compliance in that region with the foster care service standard requirements of this Modified Settlement Agreement and shall ensure remediation of any identified deficiencies.**

**Status of Progress, MSA §III.A.1.a.:**  As addressed elsewhere in this report, there is a

substantial body of evidence that establishes the CQI system has been measuring compliance

with the foster care service standards of the MSA for regions that have fully implemented the

Practice Model.[666]  However, as evidenced by the data charts and tables included in Appendix A

of this report, substantial gaps remain in performance relative to many regional MSA

requirements in the seven regions that had fully implemented the Practice Model by August 31,

2013.  As a tool to enhance Practice Model implementation, defendants' CQI system relies upon

the existence of well functioning RITs, which are described above.  Among other functions, each

 RIT is charged with having an operational CQI subcommittee, reviewing performance data,

identifying trends, and developing regional improvement plans.  However, many regional

---

[665]  MSA §III.
[666]  *See*, *e.g.*, narrative related to Period 3 IP §I.B.8. (second follow-up CQI Review for Regions I-S and II-W), *supra* at 99; *id.* §I.B.10. (follow-up CQI review for Region IV-S), *supra* at 99; *id.* §I.B.11. (follow-up CQI review for Region III-S), *supra* at 100; *id.* §I.B.15. (second follow-up CQI review for Region V-W), *supra* at 101.

directors are having difficulty maintaining an effective RIT process. Defendants recognize this

limitation and report that they have begun to address it through training and other remedial

measures. The Monitor will report on defendants' progress in a forthcoming report. Unless

defendants can buttress these regional teams, the CQI system will have little force.

> **MSA §III.B.1.d.1.**
> **1. Comprehensive Family Assessments**
>   **d. Beginnings by the date set forth in Appendix "A" that a DFCS region has undergone the Initial Practice Model Implementation Period:**
>     **1) All caseworkers assigned to active cases, and their supervisors, will have undergone training on the family team meeting protocols.**

**Status of Progress, MSA §III.B.1.d.1.:** This training was conducted for all regional

field staff as part of the Practice Model introductory training.

> **MSA §§III.B.1.e.1. and III.B.1.f.1.**
> **1. Comprehensive Family Assessments**
>   **e. Beginnings by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
>     **1) At least 80% of foster children in that region who enter custody shall have a thorough screening and assessment, consistent with Modified Settlement Agreement requirements, within 30 calendar days of entering custody.**
>
>   **f. Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
>     **1) At least 90% of foster children in that region who enter custody shall have a comprehensive family assessment, consistent with Modified Settlement Agreement requirements, within 30 calendar days of entering custody.**

**Status of Progress, MSA §§III.B.1.e.1. and III.B.1.f.1.:** Defendants produced data

responsive to this requirement pursuant to the June 24, 2013 Order.[667] The data that defendants

provided did not measure performance relative to the full MSA requirement.[668] Based on the

data submitted by defendants, the Monitor's findings regarding defendants' performance with

---

[667] June 24, 2013 Order §VI.E. Attachment One, and Attachment Two, Report 45.
[668] The Monitor found that the report did not track whether the comprehensive family assessment was developed with required engagement of children, parents, and foster care providers as required by MSA §III.B.1.a. The parties have agreed that the guidance provided to FCR reviewers will be modified to track the full requirement.

respect to the seven regions that fully implemented the Practice Model, two of which had fully

implemented for at least 12 months prior to September 30, 2013, are summarized in the table

below:[669]

| MSA Requirement | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | |
|---|---|---|---|---|---|---|---|---|
| | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S |
| MSA requires by the date region fully implements, at least 80% of foster children in that region who enter custody shall have a thorough screening and assessment, consistent with MSA requirements, within 30 calendar days of entering custody. | 80% | Data unreliable; PAD corrected October 2012 and therefore data analyzable as of April 2013 | Data unreliable; PAD corrected October 2012 and therefore data analyzable as of April 2013 | Data unreliable; PAD corrected October 2012 and therefore data analyzable as of April 2013 | 13% (8/31/13) | 34% (8/31/13) | 82% (8/31/13) | 73% (8/31/13) |
| MSA requires that by 12 months following the date that a Region fully implements, at least 90% of foster children in that region who enter custody shall have a thorough screening and assessment, consistent with MSA requirements, within 30 calendar days of entering custody. | 90% | 74% (8/31/13) | 62% (8/31/13) | | | | | |

MSA §§III.B.1.e.2. and III.B.1.f.2.
  e.  **Beginnings by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model**:
    2)  In at least 80% of placement cases in that region in which the whereabouts of one or both parents is unknown, DFCS shall immediately institute a diligent search for the parent(s), which shall be documented in the child's case record.

  f.  **Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
    2)  In at least 90% of placement cases in that region in which the whereabouts of one or both parents is unknown, DFCS shall immediately institute a diligent search for the parent(s), which shall be documented in the child's case record.

**Status of Progress, MSA §§III.B.1.e.2. and III.B.1.f.2.:** The defendants were unable to

produce data adequately addressing this requirement during Period 3 or thereafter pursuant to the

---

[669]  *See* App. A, Ex. 53A, chart prepared by the Office of the Court Monitor, Percentage of Children With a Comprehensive Family Assessment Completed Within 30 Days of Being Taken Into Custody With MSA Requirements, by Practice Model Fully Implemented Date, by Region, Six Month Periods Ending 4/30/13 through 9/30/13; *see also* App. A, Ex. 53B, corresponding table with underlying data.

June 24, 2013 Order.[670]  During February 2014, the parties agreed on revisions to the guidance

provided to FCR reviewers, which they expect will elicit data responsive to the requirement.

> **MSA §§III.B.2.c.1. and III.B.2.d.1.**
> **2.  Individualized Case Planning**
>   c.  **Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model**:
>       1)  **At least 80% of foster children in that region who enter custody shall have a family team meeting and service plans shall be developed for both the child and the parents, consistent with Modified Settlement Agreement requirements, within 30 calendar days of entry into foster care.**
>
>   d.  **Beginning by 12 months following the date as set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
>       1)  **At least 90% of foster children in that region who enter custody shall have a family team meeting and service plans shall be developed for both the child and the parents, consistent with Modified Settlement Agreement requirements, within 30 calendar days of entry into foster care.**

   **Status of Progress, MSA §§III.B.2.c.1. and III.B.2.d.1.:**  Defendants did not produce

data responding to these requirements during Period 3 or pursuant to the June 24, 2013 Order.[671]

During February 2014, the parties agreed that the Monitor would assess relevant portions of this

requirement through a case review, if indicated.[672]

> **MSA §§III.B.2.c.2. and III.B.2.d.2.**
> **2.  Individualized Case Planning**
>   c.  **Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model**:
>       2)  **At least 80% of foster children in that region who enter custody shall have family team meetings at least quarterly, and their service plans shall be updated quarterly, as well as within 30 calendar days of any placement or other significant change, consistent with Modified Settlement Agreement requirements.**

---

[670]  June 24, 2013 Order §VI.E., Attachment One, and Attachment Two, Report 50.  The language in the FCR instrument pertaining to this requirement did not conform to the MSA requirement.
[671]  *Id*. at Report 49.
[672]  Among other mandates, MSA §III.B.2.b. requires that defendants review and update service plans "more frequently as needed" than quarterly and within 30 calendar days of any placement or other significant change. Because the MSA does not address the circumstances that would trigger updates to these plans, the parties agreed that a case review might be appropriate.

d. **Beginning by 12 months following the date as set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
2) **At least 90% of foster children in that region who enter custody shall have family team meetings at least quarterly, and their service plans shall be updated quarterly, as well as within 30 calendar days of a placement change, consistent with Modified Settlement Agreement requirements.**

**Status of Progress, MSA §§III.B.2.c.2. and III.B.2.d.2.:**  Defendants produced data responsive to this requirement pursuant to the June 24, 2013 Order.[673]  The Monitor's findings regarding defendants' performance with respect to the seven regions that fully implemented the Practice Model, two of which had fully implemented for at least 12 months prior to September 30, 2013, are summarized in the table below:[674]

| MSA Requirement | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S |
| MSA requires that by date Region fully implements, 80% of children shall have a family team meeting quarterly, and service plans updated quarterly, as well as within 30 days of any placement or other significant change, consistent with MSA requirement. | 80% | 11% (8/31/12) | 21% (8/31/12) | 2% (2/28/13) | 5% (8/31/13) | 6% (8/31/13) | 13% (8/31/13) | 10% (8/31/13) |
| MSA requires that by 12 months following the date that a Region has fully implemented, 90% of children shall have a family team meeting quarterly, and service plans updated quarterly, as well as within 30 days of any placement or other significant change, consistent with MSA requirement. | 90% | 33% (8/31/13) | 19% (8/31/13) | | | | | |

**MSA §§III.B.3.a.6.a. and III.B.3.a.7.a.**
**3. Child and Youth Permanency**
  a. **Permanency Plan:**
    6) **Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
      (a) **At least 90% of foster children in that region who enter custody shall have a permanency plan within 30 calendar days of their entry into care consistent with Modified Settlement Agreement requirements.**

---

[673]  June 24, 2013 Order §VI.E., Attachment One, and Attachment Two, Report 33.
[674]  *See* App. A, Ex. 42A, chart prepared by the Office of the Court Monitor, Children Who Had Family Team Meeting and Service Plan Reviewed and Updated Quarterly, Including Within 30 Days of Placement Change, by Practice Model Fully Implemented Date, by Region, Six-Month Periods Ending 7/31/12 Through 9/30/13; *see also* App. A, Ex. 42B, corresponding table with underlying data.

7) **Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
   (a) **At least 95% of foster children in that region who enter custody shall have a permanency plan within 30 calendar days of their entry into care consistent with Modified Settlement Agreement requirements.**

**Status of Progress, MSA §§III.B.3.a.6.a. and III.B.3.a.7.a.:** Defendants produced data responsive to this requirement pursuant to the June 24, 2013 Order.[675] The data that defendants provided did not measure performance with the full MSA requirement.[676] Based on the data submitted by defendants, the Monitor's findings regarding defendants' performance with respect to the seven regions that fully implemented the Practice Model, two of which had fully implemented for at least 12 months prior to September 30, 2013, are summarized in the table below:[677]

| MSA Requirement | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | |
|---|---|---|---|---|---|---|---|---|
| | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S |
| MSA requires that by date Region fully implements, 90% of children shall have a permanency plan within 30 calendar days of their entry into care consistent with MSA requirement. | 90% | MACWIS Report: 52% PAD Report: 36% (8/31/12) | MACWIS Report: 61% PAD Report: 41% (8/31/12) | MACWIS Report: 57% PAD Report: 36% (2/28/13) | MACWIS Report: 26% PAD Report: 14% (8/31/13) | MACWIS Report: 28% PAD Report: 21% (8/31/13) | MACWIS Report: 36% PAD Report: 58% (8/31/13) | MACWIS Report: 17% PAD Report: 44% (8/31/13) |
| MSA requires that by 12 months following the date that a Region has fully implemented, 95% of children shall have a permanency plan within 30 calendar days of their entry into care consistent with MSA requirement. | 95% | MACWIS Report: 76% PAD Report: 68% (8/31/13) | MACWIS Report: 73% PAD Report: 82% (8/31/13) | | | | | |

---

[675] June 24, 2013 Order §VI.E., Attachment One, and Attachment Two, Report 17.

[676] The Monitor found that the report defendants produced did not track whether service plans "addresse[d] the strengths, needs and services required for both the child and the parents as explored during [the] family team meeting," and as required by MSA §III.B.2.a. The parties have agreed that the FCR instrument will be revised to incorporate this portion of the requirement.

[677] *See* App. A, Ex. 23A, chart prepared by the Office of the Court Monitor, Children With a Permanency Plan By Their 30th Day of Custody, By Practice Model Fully Implemented Date, By Region, 12-Month Periods Ending 7/31/12 through 9/30/13 and App. A, Ex. 23B, corresponding table with underlying data; *see also* App. A, Ex. 24A, chart prepared by the Office of the Court Monitor, Children Who Had a Permanency Plan Developed Within 30 Days of Initial Placement Specifying Permanency Goal, A Timeframe, and Activities to Support the Goal of Permanency, by Practice Model Fully Implemented Date, by Region, Six-Month Period Ending 7/31/12 Through 9/30/13 and App. A, Ex. 24B, corresponding table with underlying data.

MSA §§III.B.3.a.6.b. and III.B.3.a.7.b.
3. Child and Youth Permanency
  a. Permanency Plan:
      6) **Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
        **(b) At least 90% of foster children in custody in that region shall have a permanency plan that is consistent with Modified Settlement Agreement requirements.**

      7) **Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
        **(b) At least 95% of foster children in custody in that region shall have a permanency plan that is consistent with Modified Settlement Agreement requirements.**

**Status of Progress, MSA §§III.B.3.a.6.b. and III.B.3.a.7.b.:** Defendants produced data responsive to this requirement pursuant to the June 24, 2013 Order.[678] The Monitor's findings regarding defendants' performance with respect to the seven regions that fully implemented the Practice Model, two of which had fully implemented for at least 12 months prior to September 30, 2013, are summarized in the table below:[679]

| MSA Requirement | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | |
|---|---|---|---|---|---|---|---|---|
| | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S |
| MSA requires by the date Region fully implements, at least 90% of foster children in that region shall have a permanency plan that is consistent with MSA requirements. | 90% | 100% (8/31/12) | 100% (8/31/12) | 100% (2/28/13) | 95% (8/31/13) | 100% (8/31/13) | 93% (8/31/13) | 75% (8/31/13) |
| MSA requires that by 12 months following the date that a Region fully implements, at least 95% of children in that region shall have a permanency plan that is consistent with MSA requirements. | 95% | 100% (8/31/13) | 100% (8/31/13) | | | | | |

MSA §§III.B.3.b.2.a. and III.B.3.b.3.a.
3. Child and Youth Permanency
  b. Concurrent Planning:
      2) **Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
        **(a) At least 90% of children in custody in that region with the goal of reunification shall have case record documentation reflecting active concurrent**

---

[678] June 24, 2013 Order §VI.E., Attachment One, and Attachment Two, Report 36.

[679] *See* App. A, Ex. 45A, chart prepared by the Office of the Court Monitor, Appropriateness of Permanency Goal for Children with Permanency Goals of DLC Guardianship, APPLA, Living Independently, Long Term Foster Care or Permanent Foster Care, by Practice Model Fully Implemented Date, by Region, Six-Month Periods Ending 7/31/12 through 9/30/13; *see also* App. A, Ex. 45B, corresponding table with underlying data.

permanency planning consistent with Modified
Settlement Agreement requirements.

3) **Beginning by 12 months following the date set forth in
Appendix "A" that a DFCS region has fully implemented
the Practice Model:**
(a) **At least 95% of children in custody in that region with
the goal of reunification shall have case record
documentation reflecting active concurrent
permanency planning consistent with Modified
Settlement Agreement requirements.**

**Status of Progress, MSA §§III.B.3.b.2.a. and III.B.3.b.3.a.:** Defendants produced data

responsive to this requirement pursuant to the June 24, 2013 Order.[680] The Monitor's findings

regarding defendants' performance with respect to the seven regions that fully implemented the

Practice Model, two of which had fully implemented for at least 12 months prior to September

30, 2013, are summarized in the table below:[681]

| MSA Requirement | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | |
|---|---|---|---|---|---|---|---|---|
| | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S |
| MSA requires that by date Region fully implements, 90% of children with the goal of reunification shall have case record documentation reflecting active concurrent permanency planning, consistent with MSA requirement. | 90% | 26% (8/31/12) | 86% (8/31/12) | 43% (2/28/13) | 35% (8/31/13) | 73% (8/31/13) | 50% (8/31/13) | 81% (8/31/13) |
| MSA requires that by 12 months following the date that a Region has fully implemented, 95% of children with the goal of reunification shall have case record documentation reflecting active concurrent permanency planning, consistent with MSA requirement. | 95% | 79% (8/31/13) | 91% (8/31/13) | | | | | |

**MSA §§III.B.3.c.4.a. and III.B.3.c.5.a.**
**3. Child and Youth Permanency**
   **c. Permanency Plan Updating and Review:**
   4) **Beginning by the date set forth in Appendix "A" that a
DFCS region has fully implemented the Practice Model:**
(a) **At least 90% of foster children in that region who have
been in custody for at least six months shall have a
timely court or administrative case review consistent
with Modified Settlement Agreement requirements.**

---

[680] June 24, 2013 Order §VI.E., Attachment One, and Attachment Two, Report 34.
[681] *See* App. A, Ex 43A, chart prepared by the Office of the Court Monitor, Children With a Goal of Reunification Who Have Documentation Reflecting Active Concurrent Permanency Planning, by Practice Model Fully Implemented Date, by Region, Six-Month Periods Ending 7/31/12 Through 9/30/13; *see also* App. A, Ex. 43B, corresponding table with underlying data.

5) **Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
(a) **At least 95% of foster children in that region who have been in custody for at least six months shall have a timely court or administrative case review consistent with Modified Settlement Agreement requirements.**

**Status of Progress, MSA §§III.B.3.c.4.a. and III.B.3.c.5.a.:**  Defendants produced data responsive to this requirement pursuant to the June 24, 2013 Order.[682]  The data that defendants provided did not measure performance with the full MSA requirement.[683]  Based on the data submitted by defendants, the Monitor's findings regarding defendants' performance with respect to the seven regions that fully implemented the Practice Model, two of which had fully implemented for at least 12 months prior to September 30, 2013, are summarized in the table below:[684]

| MSA Requirement | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | |
|---|---|---|---|---|---|---|---|---|
| | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S |
| MSA requires that by date Region fully implements, 90% of children in custody for at least six months shall have a timely court or administrative case review consistent with MSA requirement. | 90% | 91% (8/31/12) | 95% (8/31/12) | 97% (2/28/13) | 86% (8/31/13) | 99% (8/31/13) | 97% (8/31/13) | 100% (8/31/13) |
| MSA requires that 12 months following the date a Region has fully implemented, 95% of children in custody for at least six months shall have a timely court or administrative case review consistent with MSA requirement. | 95% | 95% (8/31/13) | 98% (8/31/13) | | | | | |

**MSA §§III.B.3.c.4.b. and III.B.3.c.5.b.**
**3.  Child and Youth Permanency**
   **c.  Permanency Plan Updating and Review:**
     4) **Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model**:
       (b) **At least 90% of foster children in that region who have been in custody for at least 12 months shall have a**

---

[682]  June 24, 2013 Order §VI.E., Attachment One, and Attachment Two, Report 23.

[683]  The data submitted by defendants did not track whether the required written notice was provided to all parties required by MSA §III.B.3.c.1.  The parties agreed that the FCR instrument will be revised to incorporate this portion of the requirement.

[684]  *See* App. A, Ex. 32A, chart prepared by the Office of the Court Monitor, Children in Custody for Six months or More With an Administrative Review Every Six Months, by Practice Model Fully Implemented Date, by Region, 12-Month Periods Ending 7/31/12 through 9/30/13; *see also* App. A, Ex. 32B, corresponding table with underlying data.

timely annual court review consistent with Modified
Settlement Agreement requirements.

5) **Beginning by 12 months following the date set forth in
Appendix "A" that a DFCS region has fully implemented
the Practice Model:**
   (b) At least 95% of foster children in that region who have
   been in custody in that region for at least 12 months
   shall have a timely annual court review consistent with
   Modified Settlement Agreement.

**Status of Progress, MSA §§III.B.3.c.4.b. and III.B.3.c.5.b.:** Defendants produced data

responsive to this requirement pursuant to the June 24, 2013 Order.[685] The Monitor's findings

regarding defendants' performance with respect to the seven regions that fully implemented the

Practice Model, two of which had fully implemented for at least 12 months prior to September

30, 2013, are summarized in the table below:[686]

| MSA Requirement | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | |
|---|---|---|---|---|---|---|---|---|
| | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S |
| MSA requires that by date Region fully implements, at least 90% of foster children in that region have been in custody for at least 12 months have a timely annual court review consistent with MSA requirements. | 90% | 86% (8/31/12) | 97% (8/31/12) | 94% (2/28/13) | 39% (8/31/13) | 87% (8/31/13) | 81% (8/31/13) | 83% (8/31/13) |
| MSA requires that by 12 months following the date that a Region has fully implemented, at least 95% of foster children in that region who have been in custody in that region for at least 12 months shall have a timely annual court review consistent with MSA requirements. | 95% | 89% (8/31/13) | 93% (8/31/13) | | | | | |

**MSA §§III.B.3.d.4.a. and III.B.3.d.5.a.**
**3. Child and Youth Permanency**
  d. **Reunification Services:**
    4) **Beginning by the date set forth in Appendix "A" that a
DFCS region has fully implemented the Practice Model:**
      (a) **At least 80% of foster children in that region with a
permanency goal of reunification shall have service
plans for their parents that identify those services
DFCS deems necessary to address the behaviors or
conditions resulting in the child's placement in foster
care, and case record documentation that DFCS made**

---

[685]  June 24, 2013 Order §VI.E., Attachment One, and Attachment Two, Report 24.
[686]  *See* App. A, Ex. 33A, chart prepared by the Office of the Court Monitor, Children in Custody for 12 Months or
More With a Timely Permanency Hearing, by Practice Model Fully Implemented Date, by Region, 12-Month
Periods Ending 7/31/12 Through 9/30/13; *see also* App. A, Ex. 33B, corresponding table with underlying data.

those identified services available directly or through referral.

5) **Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
(a) At least 90% of foster children in that region with a permanency goal of reunification shall have service plans for their parents that identify those services DFCS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care and case record documentation that DFCS made those identified services available directly or through referral.

**Status of Progress, MSA §§III.B.3.d.4.a. and III.B.3.d.5.a.:** Defendants were not required to produce this data during Period 3 or pursuant to the June 24, 2013 Order. The Initial Period 4 IP required production of the data by April 1, 2014.[687] The required data has not been produced. In their May 5, 2014 comments on the draft version of this report, defendants indicated that they would submit proposed report specifications to plaintiffs' counsel and the Monitor as soon as possible during the week of May 18, 2014. However, an explanation for the delay in producing the required data has not been provided. The Monitor will report more fully on this matter in a forthcoming report.

MSA §§III.B.3.e.2.a. and III.B.3.e.3.a.
3. Child and Youth Permanency
   e. Termination of Parental Rights:
      2) **Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
         (a) At least 80% of foster children in that region who reach the point at which they have spent 17 of the previous 22 months in foster care shall have a petition to TPR filed on their behalf or an available exception under the federal ASFA documented by the end of their seventeenth month in care.

      3) **Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
         (a) At least 90% of foster children in that region who reach the point at which they have spent 17 of the previous 22 months in foster care shall have a petition to TPR filed on their behalf or an available exception

---

[687] Initial Period 4 IP §II.C.2. and Appendix 1, Report 3.

**under the federal ASFA documented by the last day of
their seventeenth month in care.**

**Status of Progress, MSA §§III.B.3.e.2.a. and III.B.3.e.3.a.:**  Defendants produced data responsive to this requirement pursuant to the June 24, 2013 Order.[688]  The Monitor's findings regarding defendants' performance with respect to the seven regions that fully implemented the Practice Model, two of which had fully implemented for at least 12 months prior to September 30, 2013, are summarized in the table below:[689]

| MSA Requirement | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | |
|---|---|---|---|---|---|---|---|---|
| | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S |
| MSA requires that by date Region fully implements, at least 80% of children in that region who have reached the point at which they have spent 17 of the previous 22 months in care shall have a TPR petition filed on their behalf or an available exception under ASFA documented by the end of their 17th month in care. | 80% | 93% (8/31/12) | 85% (8/31/12) | 78% (2/28/13) | 87% (8/31/13) | 94% (8/31/13) | 88% (8/31/13) | 98% (8/31/13) |
| MSA requires that by 12 months following the date a Region has fully implemented, at least 90% of children in that region who have reached the point at which they have spent 17 of the previous 22 months in care shall have a TPR petition filed on their behalf or an available exception under ASFA documented by the end of their 17th month in care. | 90% | 95% (8/31/13) | 89% (8/31/13) | | | | | |

MSA §§III.B.3.e.2.b. and III.B.3.e.3.b.
   3. Child and Youth Permanency
      e. Termination of Parental Rights:
         2) __Beginning by the date set forth in Appendix "A" that a
            DFCS region has fully implemented the Practice Model:__
            (b) At least 80% of foster children in that region who have
                spent more than 17 of the previous 22 months in foster
                care without a TPR petition filed on their behalf or an
                available ASFA exception shall have such
                a petition filed or an available exception documented.

         3) __Beginning by 12 months following the date set forth in
            Appendix "A" that a DFCS region has fully implemented
            the Practice Model:__
            (b) At least 90% of foster children in that region who have
                spent more than 17 of the previous 22 months in foster

---

[688]  June 24, 2013 Order §VI.E., Attachment One, and Attachment Two, Report 25.
[689]  *See* App. A, Ex. 34A, chart prepared by the Office of the Court Monitor, Children in Custody at Least 17 of the Previous 22 Months For Whom a TPR Petition Was Filed or an Available ASFA Exception Has Been Documented by the Last Day of the Child's Seventeenth Month in Care, by Practice Model Fully Implemented Date and Region, One-Month Periods 7/31/12 through 9/30/13; *see also* App. A, Ex. 34B, corresponding table with underlying data.

care without a TPR petition filed on their behalf or an
available ASFA exception documented shall have such
a petition filed or an available exception documented.

**Status of Progress, MSA §§III.B.3.e.2.b. and III.B.3.e.3.b.:** Defendants produced data

responsive to this requirement pursuant to the June 24, 2013 Order.[690]  The Monitor's findings

regarding defendants' performance with respect to the seven regions that fully implemented the

Practice Model, two of which had fully implemented for at least 12 months prior to September

30, 2013, are summarized in the table below:[691]

| MSA Requirement | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | |
|---|---|---|---|---|---|---|---|---|
| | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S |
| MSA requires that by date Region fully implements, at least 80% of children in that region who have spent more than 17 of the previous 22 months in care without a TPR petition filed or an available ASFA exception documented shall have a petition filed or available exception documented. | 80% | 100% (8/31/12) | 100% (8/31/12) | 18% (2/28/13) | 76% (8/31/13) | 33% (8/31/13) | 60% (8/31/13) | 100% (8/31/13) |
| MSA requires that by 12 months following the date a Region has fully implemented, at least 90% of children in that region who have spent more than 17 of the previous 22 months in care without a TPR petition filed or an available ASFA exception documented shall have a petition filed or available exception documented. | 90% | 50% (8/31/13) | 100% (8/31/13) | | | | | |

    MSA §§III.B.4.b.1. and III.B.4.c.1.
    **4.  Case Recordings**
      **b.  Beginning by the date as set forth in Appendix "A" that a
        DFCS region has fully implemented the Practice Model:**
        **1)  At least 90% of child welfare case records in that region
          will be current and complete.**

      **c.  Beginning by 12 months following the date as set forth in
        Appendix "A" that a DFCS region has fully implemented the
        Practice Model:**
        **1)  At least 95% of child welfare case records in that region
          will be current and complete.**

---

[690]  June 24, 2013 Order §VI.E., Attachment One, and Attachment Two, Report 25.
[691]  *See* App. A, Ex. 35A, chart prepared by the Office of the Court Monitor, Children in Custody at Least 17 of the Previous 22 Months Without a TPR Petition Filed or an Available ASFA Exception by the Last Day of the Child's Seventeenth Month in Care For Whom a TPR Petition Was Filed or an Available ASFA Exception Was Subsequently Documented, by Practice Model Implemented Date and Region, One-Month Periods 7/31/12 through 9/30/13; *see also* App. A, Ex. 35B, corresponding table with underlying data.

**Status of Progress, MSA §§III.B.4.b.1. and III.B.4.c.1.:**  Defendants were not required to produce this data during Period 3 or pursuant to the June 24, 2013 Order.  The Final Period 4 IP indicates these data will be produced pursuant to a case record review.[692]

> **MSA §§III.B.5.d.1. and III.B.5.e.1.**
> **5.  Developing and Maintaining Connections**
>   **d.  Beginning by the date as set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
>     **1)  At least 80% of foster children in that region shall be provided with contacts with their parents and with any siblings not in the same placement consistent with Modified Settlement Agreement requirements, unless it is documented that a parent or sibling failed to make himself or herself available.**
>
>   **e.  Beginning by 12 months following the date as set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
>     **1)  At least 90% of foster children in that region shall be provided with contacts with their parents and with any siblings not in the same placement consistent with Modified Settlement Agreement requirements, unless it is documented that a parent or sibling failed to make himself or herself available.**

**Status of Progress, MSA §§III.B.5.d.1. and III.B.5.e.1.:**  Defendants produced data responsive to this requirement pursuant to the June 24, 2013 Order.[693]  The data that defendants provided did not measure performance with the full MSA requirement.[694]  Based on the data submitted by defendants, the Monitor's findings regarding defendants' performance with respect to the seven regions that fully implemented the Practice Model, two of which had fully implemented for at least 12 months prior to September 30, 2013, are summarized in the table below:[695]

---

[692]  Final Period 4 IP §II.C.2. and Appendix 3, Report 6.

[693]  June 24, 2013 Order §VI.E., Attachment One, and Attachment Two, Report 26.

[694]  The Monitor found that the report did not track whether children were allowed, in certain instances, telephone calls to extended family members as provided for by MSA §III.B.5.b.  The parties have agreed that the FCR instrument will be revised to incorporate this portion of the requirement.

[695]  *See* App. A, Ex. 36A, chart prepared by the Office of the Court Monitor, Child Contacts With Parents/Siblings Within 24 Hours of Custody, By Practice Model Fully Implemented Date, By Region, Six-Month Periods Ending 7/31/12 through 9/30/13; *see also* App. A, Ex. 36B, corresponding table with underlying data.

| MSA Requirement | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | |
|---|---|---|---|---|---|---|---|---|
| | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S |
| MSA requires that by date Region fully implements, at least 80% of children in that region be provided with contacts with their parents and any siblings not in the same placement consistent with MSA requirements, unless it is documented that a parent or sibling failed to make himself or herself available. | 80% | 0% (8/31/12) | 0% (8/31/12) | 9% (2/28/13) | 2% (8/31/13) | 26% (8/31/13) | 40% (8/31/13) | 13% (8/31/13) |
| MSA requires that by 12 months following the date a Region has fully implemented, at least 90% of children in that region be provided with contacts with their parents and any siblings not in the same placement consistent with MSA requirements, unless it is documented that a parent or sibling failed to make himself or herself available. | 90% | 39% (8/31/13) | 0% (8/31/13) | | | | | |

MSA §§III.B.6.d.1. and III.B.6.e.1.

6. **Educational Services**

   d. **Beginning by the date as set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**

      1) **At least 80% of school-age foster children in that region who enter custody shall have their educational records reviewed and their educational needs documented by their DFCS caseworker within 30 calendar days of their entry into foster care.**

   e. **Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**

      1) **At least 90% of school-age foster children in that region who enter custody shall have their educational records reviewed and their educational needs documented by their DFCS caseworker within 30 calendar days of their entry into foster care.**

**Status of Progress, MSA §§III.B.6.d.1. and III.B.6.e.1.:**  Defendants produced data

responsive to this requirement pursuant to the June 24, 2013 Order.[696]  The Monitor had concerns

regarding the validity of the data submitted by defendants.[697]  Based on the data submitted by the

defendants, the Monitor's findings regarding defendants' performance with respect to the seven

---

[696]  June 24, 2013 Order §VI.E., Attachment One, and Attachment Two, Report 46.
[697]  The Monitor found that the guidance provided to the DFCS staff conducting the FCRs did not incorporate the education protocol that defendants were required to implement pursuant to Period 3 IP §II.G.2., addressed *supra* at 177.

regions that fully implemented the Practice Model, two of which had fully implemented for at

least 12 months prior to September 30, 2013, are summarized in the table below:[698]

| MSA Requirement | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | |
|---|---|---|---|---|---|---|---|---|
| | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S |
| MSA requires that by date Region fully implements, 80% of school-age children shall have their educational records reviewed and their educational needs documented within 30 days of entry into care, consistent with MSA requirement. | 80% | 54% (8/31/12) | 57% (8/31/12) | 69% (2/28/13) | 20% (8/31/13) | 28% (8/31/13) | 89% (8/31/13) | 80% (8/31/13) |
| MSA requires that by 12 months following the date that a Region has fully implemented, 90% of school-age children shall have their educational records reviewed and their educational needs documented within 30 days of entry into care, consistent with MSA requirement. | 90% | 90% (8/31/13) | 61% (8/31/13) | | | | | |

**MSA §§III.B.6.d.2. and III.B.6.e.2.**
**6.  Educational Services**
   **d.  Beginning by the date as set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
     **2)  At least 80% of school-age foster children in that region who enter custody or are subject to a change in schools due to a placement move shall be registered for and attending an accredited school within three business days of the initial placement or placement change, including while placed in shelters or other temporary placements, unless delayed by the Youth Court.**

   **e.  Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
     **2)  At least 90% of school-age foster children in that region who enter custody or are subject to a change in schools due to a placement move shall be registered for and attending an accredited school within three business days of the initial placement or placement change, including while placed in shelters or other temporary placements, unless delayed by the Youth Court.**

**Status of Progress, MSA §§III.B.6.d.2. and III.B.6.e.2.:**  Defendants produced data

responsive to this requirement pursuant to the June 24, 2013 Order.[699]  The Monitor's findings

regarding defendants' performance with respect to the seven regions that fully implemented the

---

[698]  *See* App. A, Ex. 54A, chart prepared by the Office of the Court Monitor, Children Who Had Their Educational Record Reviewed Timely for General and Special Education Needs, by Practice Model Fully Implemented Date, by Region, Six-Month Periods Ending 7/31/12 Through 9/30/13; *see also* App. A, Ex. 54B, corresponding table with underlying data.
[699]  June 24, 2013 Order §VI.E., Attachment One, and Attachment Two, Report 51.

Practice Model, two of which had fully implemented for at least 12 months prior to September 30, 2013, are summarized in the table below:[700]

| MSA Requirement | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | |
|---|---|---|---|---|---|---|---|---|
| | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S |
| MSA requires by the date region fully implements, at least 80% of school-age foster children in that region who enter custody or are subject to a change in schools due to a placement move shall be registered for and attending an accredited school within three business days of the initial placement or placement change, including while placed in shelters or other temporary placements, unless delayed by the Youth Court. | 80% | 78% (8/31/12) | 44% (8/31/12) | 94% (2/28/13) | 64% (8/31/13) | 79% (8/31/13) | 89% (8/31/13) | 83% (8/31/13) |
| MSA requires that by 12 months following the date a Region fully implements, at least 90% of school-age foster children in that region who enter custody or are subject to a change in schools due to a placement move shall be registered for and attending an accredited school within three business days of the initial placement or placement change, including while placed in shelters or other temporary placements, unless delayed by the Youth Court. | 90% | 79% (8/31/13) | 26% (8/31/13) | | | | | |

MSA §§III.B.7.e.1. and III.B.7.f.1.

**7. Transition to Independent Living**
   **e. Beginning by the date as set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
      **1) At least 90% of foster children in that region who are 14-20 years old shall be provided with Independent Living services as set forth in their service plan.**

   **f. Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
      **1) At least 95% of foster children in that region who are 14-20 years old shall be provided with Independent Living services as set forth in their service plan during the Period.**

**Status of Progress, MSA §§III.B.7.e.1. and III.B.7.f.1.:** Defendants produced data responsive to this requirement pursuant to the June 24, 2013 Order.[701] The data that defendants

---

[700] *See* App. A, Ex. 57A, chart prepared by the Office of the Court Monitor, Percentage of Children Who Enter Custody Or Change Placements Who Are Registered For And Attending School Within Three Days of Entering Custody or The Placement Change, by Region, Six-Month Periods Ending 7/31/12 Through 9/30/13; *see also* App. A, Ex. 57B, corresponding table with underlying data.
[701] June 24, 2013 Order §VI.E., Attachment One, and Attachment Two, Report 16.

provided did not measure performance with the full MSA requirement.[702]  Based on the data

submitted by defendants, the Monitor's findings regarding defendants' performance with respect

to the seven regions that fully implemented the Practice Model, two of which had fully

implemented for at least 12 months prior to September 30, 2013, are summarized in the table

below:[703]

| MSA Requirement | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | |
|---|---|---|---|---|---|---|---|---|
| | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S |
| MSA requires by the date region fully implements, 90% of children who are 14-20 shall be provided with Independent Living services as set forth in their service plans. | 90% | MACWIS Report: 66% PAD Report: 76% (8/31/12) | MACWIS Report: 68% PAD Report: 84% (8/31/12) | MACWIS Report: 64% PAD Report: 83% (2/28/13) | MACWIS Report: 29% PAD Report: 53% (8/31/13) | MACWIS Report: 39% PAD Report: 52% (8/31/13) | MACWIS Report: 74% PAD Report: 75% (8/31/13) | MACWIS Report: 36% PAD Report: 78% (8/31/13) |
| MSA requires that by 12 months following the date a Region has fully implemented, 95% of children who are 14-20 shall be provided with Independent Living services as set forth in their service plans. | 95% | MACWIS Report: 63% PAD Report: 83% (8/31/13) | MACWIS Report: 75% PAD Report: 87% (8/31/13) | | | | | |

MSA §§III.B.7.e.2. and III.B.7.f.2.
**7.  Transition to Independent Living**
   **e.  Beginning by the date as set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
      **2)  At least 80% of foster children in that region who are transitioning to independence shall have available an adequate living arrangement, a source of income, health care, independent living stipends, and education and training vouchers.  DFCS shall also assist such children in obtaining, prior to transitioning to independent living, the necessary documents and information identified in the COA standard PA-FC 13.06 for emancipating youth.  Those efforts shall be documented in the child's case record.**

---

[702]  The data that defendants submitted did not track whether the children to whom the requirement applied were provided an opportunity to participate in the creation of an independent living service plan and whether all of the services noted in the independent living services plan were provided as required by MSA §III.B.7.b.  Defendants have agreed to modify the guidance provided to the FCR reviewers in order to collect and report on data related to these elements of the requirement.

[703]  *See* App. A, Ex. 21A, chart prepared by the Office of the Court Monitor, Children Ages 14-20 Receiving Independent Living Services of Any Kind, By Practice Model Fully Implemented Date, By Region, 12-Month Periods Ending 7/31/12 Through 9/30/13 and App. A, Ex. 21B, corresponding table with underlying data; *see also* App. A, Ex. 22A, chart prepared by the Office of the Court Monitor, Children Ages 14-20 Receiving Independent Living Services As Set Forth In Service Plan, By Practice Model Fully Implemented Date and Region, Six-Month Periods Ending 7/31/12 Through 9/30/13 and App. A, Ex. 22B, corresponding table with underlying data.

     **f.**  <u>**Beginning by 12 months following the date set forth in**</u>
          <u>**Appendix "A" that a DFCS region has fully implemented the**</u>
          <u>**Practice Model**</u>**:**

       **2)**  **At least 90% of foster children in that region who are**
          **transitioning to independence shall have available an**
          **adequate living arrangement, a source of income, health**
          **care, independent living stipends, and education and**
          **training vouchers.  DFCS shall assist such children in**
          **obtaining, prior to transitioning to independent living, the**
          **necessary documents and information identified in the**
          **COA standard PA-FC 13.06 for emancipating youth.**
          **Those efforts shall be documented in the child's case**
          **record.**

    <u>**Status of Progress, MSA §§III.B.7.e.2. and III.B.7.f.2.:**</u>  Defendants produced data

responsive to this requirement pursuant to the June 24, 2013 Order.[704]  The data that defendants

provided did not measure performance with the full MSA requirement.[705]  Based on the data

submitted by defendants, the Monitor's findings regarding defendants' performance with respect

to the seven regions that fully implemented the Practice Model, two of which had fully

implemented for at least 12 months prior to September 30, 2013, are summarized in the table

below:[706]

---

[704]  June 24, 2013 Order §VI.E., Attachment One, and Attachment Two, Report 35.

[705]  The Monitor found that the data did not adequately track the requirements of MSA §III.B.7.c. related to the availability of independent living stipends and health care.  The parties have agreed that the FCR instrument will be revised to incorporate these portions of the requirement.

[706]  *See* App. A, Ex. 44A, chart prepared by the Office of the Court Monitor, Percentage of Foster Children Transitioning to Independence Who Have Available An Adequate Living Arrangement, a Source of Income, Health Care, Independent Living Stipends, and Education and Training Vouchers, by Practice Model Fully Implemented Date, by Region, Six Month Periods Ending 7/31/12 through 9/30/13; *see also* App. A, Ex. 44B, corresponding table with underlying data.

| MSA Requirement | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | |
|---|---|---|---|---|---|---|---|---|
| | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S |
| MSA requires by the date region fully implements, at least 80% of foster children in that region who are transitioning to independence shall have available an adequate living arrangement, a source of income, health care, independent living stipends, and education and training vouchers. | 80% | 67% (8/31/12) | 50% (8/31/12) | 91% (2/28/13) | 60% (8/31/13) | 50% (8/31/13) | 100% (8/31/13) | 100% (8/31/13) |
| MSA requires that by 12 months following the date that a Region fully implements, at least 90% of foster children in that region who are transitioning to independence shall have available an adequate living arrangement, a source of income, health care, independent living stipends, and education and training vouchers. | 90% | 44% (8/31/13) | 25% (8/31/13) | | | | | |

MSA §§III.B.8.d.1. and III.B.8.e.1.

8. **Case Closing and Aftercare**
   d. **Beginnings by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
      1) **At least 70% of foster children in that region who are reunified and who were in custody longer than 90 days shall receive a 90-day trial home visit period or have case record documentation reflecting the Youth Court's objection to such a trial home visit. During that trial home visit period, the child's caseworker or a Family Preservation caseworker shall meet with the child in the home at least two times per month, and DFCS shall provide or facilitate access to all services identified in the child's after-care plan, consistent with Modified Settlement Agreement requirements.**

   e. **Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
      1) **At least 90% of foster children in that region who are reunified and who were in custody longer than 90 days shall receive a 90-day trial home visit period or have case record documentation reflecting the Youth Court's objection to such a trial home visit. During that trial home visit period, the child's caseworker shall meet with the child in the home at least two times per month, and DFCS shall provide or facilitate access to all services identified in the child's after-care plan, consistent with Modified Settlement Agreement requirements.**

216

**Status of Progress, MSA §§III.B.8.d.1. and III.B.8.e.1.:** Defendants produced data responsive to this requirement pursuant to the June 24, 2013 Order.[707] The Monitor's findings regarding defendants' performance with respect to the seven regions that fully implemented the Practice Model, two of which had fully implemented for at least 12 months prior to September 30, 2013, are summarized in the table below:[708]

| MSA Requirement | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | |
|---|---|---|---|---|---|---|---|---|
| | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S |
| MSA requires that by date Region fully implements, 70% of children who are reunified and in custody longer than 90 days shall receive a 90-day THV; during the THV the child's caseworker or family preservation caseworker shall meet with the child in the home at least two times per month without parent or caretaker present, consistent with MSA requirements. | 70% | 46% (8/31/12) | 45% (8/31/12) | 0% (2/28/13) | 0% (8/31/13) | 33% (8/31/13) | 0% (8/31/13) | 43% (8/31/13) |
| MSA requires that by 12 months following the date a Region has fully implemented, 90% of children who are reunified and in custody longer than 90 days shall receive a 90-day THV; during the THV the child's caseworker or family preservation caseworker shall meet with the child in the home at least two times per month without parent or caretaker present, consistent with MSA requirements. | 90% | 57% (8/31/13) | 50% (8/31/13) | | | | | |

**MSA §§III.C.1.a.1. and III.C.1.b.1.**
1. **Reunification**
   a. **Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
      1) **At least 60% of foster children in that region who are discharged from custody and reunified with their parents or caretakers shall be reunified within 12 months of the latest removal from home.**

   b. **Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
      1) **At least 70% of foster children in that region who are discharged from custody and reunified with their parents or caretakers shall be reunified within 12 months of the latest removal from home.**

---

[707] June 24, 2013 Order §VI.E., Attachment One, and Attachment Two, Report 1. Defendants indicate that they are not able to track children's access to services identified in their aftercare plans. The parties have agreed that no modification will be made to MACWIS or the FCR instrument to address this matter.
[708] *See* App. A, Exs. 3A and 3B, *supra* note 45.

**Status of Progress, MSA §§III.C.1.a.1. and III.C.1.b.1.:**  Defendants produced data responsive to this requirement pursuant to the June 24, 2013 Order.[709]  The Monitor's findings regarding defendants' performance with respect to the seven regions that fully implemented the Practice Model, two of which had fully implemented for at least 12 months prior to September 30, 2013, are summarized in the table below:[710]

| MSA Requirement | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | |
|---|---|---|---|---|---|---|---|---|
| | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S |
| MSA requires that by date Region fully implements, 60% of children who are discharged from custody and reunified with parents or caretakers shall be reunified within 12 months from the latest removal from home. | 60% | 56% (8/31/12) | 43% (8/31/12) | 59% (2/28/13) | 73% (8/31/13) | 69% (8/31/13) | 50% (8/31/13) | 62% (8/31/13) |
| MSA requires that by 12 months following the date a Region has fully implemented, 70% of children who are discharged from custody and reunified with parents or caretakers shall be reunified within 12 months from the latest removal from home. | 70% | 55% (8/31/13) | 44% (8/31/13) | | | | | |

MSA §§III.C.2.a.1. and III.C.2.b.1.
2. **Time to Adoption Finalization**
  a. **Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
    1) **At least 25% of foster children in that region who are discharged upon finalization of an adoption shall have had the adoption finalized within 24 months of the latest removal from home.**

  b. **Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
    1) **At least 30% of foster children in that region who are discharged upon finalization of an adoption shall have had the adoption finalized within 24 months of the latest removal from home.**

**Status of Progress, MSA §§III.C.2.a.1. and III.C.2.b.1.:**  Defendants produced data responsive to this requirement pursuant to the June 24, 2013 Order.[711]  The Monitor's findings

---

[709]  June 24, 2013 Order §VI.E., Attachment One, and Attachment Two, Report 14.
[710]  *See* App. A, Ex. 19A, chart prepared by the Office of the Court Monitor, Children Reunified With Parent or Caretaker In Under 12 Months From Latest Removal, By Practice Model Fully Implemented Date, By Region, 12-Month Periods Ending 7/31/12 through 9/30/13; *see also* App. A, Ex. 19B, corresponding table with underlying data.
[711]  June 24, 2013 Order §VI.E., Attachment One, and Attachment Two, Report 15.

regarding defendants' performance with respect to the seven regions that fully implemented the Practice Model, two of which had fully implemented for at least 12 months prior to September 30, 2013, are summarized in the table below:[712]

| MSA Requirement | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | |
|---|---|---|---|---|---|---|---|---|
| | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S |
| MSA requires that by date Region fully implemented, 25% of children who were discharged upon finalization of an adoption shall have the adoption finalized within 24 months from the latest removal from home. | 25% | 42% (8/31/12) | 15% (8/31/12) | 50% (2/28/13) | 0% (8/31/13) | 17% (8/31/13) | 0% (8/31/13) | 8% (8/31/13) |
| MSA requires that by 12 months following the date a Region has fully implemented, 30% of children who were discharged upon finalization of an adoption shall have the adoption finalized within 24 months from the latest removal from home. | 30% | 29% (8/31/13) | 9% (8/31/13) | | | | | |

## IV. <u>CONCLUSION</u>

As this report explains, during Period 3 defendants were unable to produce validated data related to their performance relative to MSA requirements.  This is a recurrent theme and a long-standing problem in this case, impeding both defendants' reform efforts as well as plaintiffs' and the Monitor's ability to assess defendants' performance.  Consequently, a remedial process triggered by the February 21, 2013 status hearing was implemented and, for the first time in the history of this case, defendants have been able to produce data responsive to many key MSA requirements.  While this remedial process has been resource intensive and challenging for the defendants, the management information reports that have been developed are already valuable to the reform effort.

In fact, the performance levels reflected in the data reports that defendants have produced confirm that defendants continue to struggle to meet many MSA requirements.  For example, in

---

[712] *See* App. A, Ex. 20A, chart prepared by the Office of the Court Monitor, Length of Time Between Court Custody and Finalization of Adoption, By Practice Model Fully Implemented Date, By Region, 12-Month Periods Ending 7/31/12 through 9/30/13; *see also* App. A, Ex. 20B, corresponding table with underlying data.

Period 3 defendants met 10 of 23 statewide performance requirements for which the Monitor could make a finding, and among the seven DFCS regions that had fully implemented the Practice Model, the region that met or exceeded the most requirements at the time of full implementation did so for seven of the 16 requirements for which the Monitor could make a finding for that region. These performance levels underscore the need for defendants to act with far greater urgency to marshal the resources and build the necessary capacity to meet the requirements of the MSA.

At the same time, the data also provide a more nuanced understanding of defendants' performance than was previously discernible. The performance reports suggest that in general, the Practice Model is having a broad, if slower than anticipated, impact on performance in those DFCS regions where the model was implemented earliest. The data reports illuminate substantial regional differences in performance and draw attention to the relative strengths and serious deficiencies in service delivery across the state. These data reports confirm that performance levels in certain regions are profoundly troubling, requiring concentrated and sustained remedial efforts. Specifically, Regions III-S and VII-W, in which significant numbers of children in custody are served, require immediate attention. Pursuant to Period 4 requirements, defendants have developed improvement plans for these regions which the Monitor expects to report on following the conclusion of Period 4.

The detailed, manipulable performance reports that the defendants have produced provide information that should be critical to DFCS managers at every level as they craft, monitor, and refine strategies to meet MSA requirements. But in order to realize the potential of these new data reports, defendants must continue to build management systems and invest in the human capital to support high quality and consistent service delivery at the regional level.

220

There is evidence that the building process is underway.  During Period 3 there was notable progress hiring caseworkers, particularly in some DFCS regions that have had substantial difficulties recruiting and retaining qualified staff.  In addition, extensive revisions to DFCS policies and procedures were completed in order to make them consistent with MSA requirements and build part of the foundation necessary to promote staff accountability.  New accounting systems and related processes were developed to increase federal revenue streams, which in turn have helped to subsidize effective efforts to strengthen the pre-service and in-service training programs for DFCS caseworkers and supervisors.

But much critical work remains to be done.  For example, it is still not possible to assess whether defendants' seemingly hard-earned gains in caseworker staffing levels have translated into improvements in caseworker caseloads because, despite serial efforts, defendants have been unable to produce complete and validated reports on caseworker caseloads, a *sine qua non* for defendants' capacity to diagnose the causes of many performance problems.  Concurrently, caseworkers will be less likely to stay on the job unless defendants can staunch the relatively long-standing flow of supervisory staff out of the agency.  Without a sufficient number of supervisors, caseworkers will lack the essential guidance and support they need to do what is unquestionably critical, but often exceptionally challenging work.

Moreover, while a comprehensive and promising CQI plan was developed and is being implemented, the related accountability systems are weak at best and do not ensure timely corrective action on a consistent basis.  A performance-based contracting plan, intended to help fuel improvements in the array and quality of placements and services available to children in DFCS custody, has not yet been developed.  In addition, while there has been notable progress upgrading the network and software infrastructure in order to address long-standing limitations in

DFCS staff access to MACWIS, further progress is needed on a far more condensed timetable to ensure that all staff have reasonable access to MACWIS, the primary repository for most case records, on a consistent basis.

To advance and accelerate progress toward meeting MSA requirements, defendants must have a clear strategy and a commitment to allocate the needed resources. The performance data reflected in this report suggest that different DFCS regions confront different service delivery challenges. It stands to reason that different regions may therefore require different resources. At this juncture, over half of the 13 regions in the state have fully implemented the Practice Model and by September of this year, 10 of the 13 regions will have fully implemented the model. Yet, to varying degrees, every region continues to struggle to deliver services consistently relative to the range of MSA requirements. Thus, there is a need not only to improve aggregate statewide performance, but there is also a need to achieve greater consistency in service delivery among the 13 regions.

Achieving this end will require skilled managers working across the state who are equipped by MDHS/DFCS management with the appropriate resources. Perhaps most importantly, this includes sufficient numbers of qualified and well trained caseworkers and supervisors. But it also includes resources such as timely management information in order to help managers understand how they are performing with respect to performance goals. Once regional managers are provided with the appropriate tools, defendants can more fairly and effectively rely on the performance management and CQI processes they have developed to hold managers accountable for producing results.

As the parties negotiate the Period 5 IP, they must consider the totality of evidence regarding defendants' implementation of the Practice Model. There must be a specific and

credible strategy to enhance management systems and to allocate appropriate resources at the regional level in order to deliver services that satisfy MSA requirements. The safety and well being of the children in defendants' custody depend on this.

The Monitor looks forward to addressing these matters with the Court and the parties at the May 22, 2014 status hearing.

Respectfully submitted,

_____ / s / _____

Grace M. Lopes (MBN 45693 *pro hac vice*)
Court Monitor
1220 19th Street, N.W.
Suite 500
Washington, D.C. 20036
(202) 232-8311
gmlopes@oymonitor.org

## CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2014, the Court Monitor's Report to the Court Regarding Implementation Period 3 and the June 24, 2013 Order, was transmitted electronically to the following counsel of record in this matter:

Dewitt L. ("Rusty") Fortenberry Jr.
Kenya Key Rachal
Ashley Tullos Young
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
428 I-55 North
Meadowbrook Office Park
Jackson, Mississippi 39211

Harold E. Pizzetta, III
Assistant Attorney General
General Civil Division
Carroll Gartin Justice Building
430 High Street
Jackson, MS 39201

W. Wayne Drinkwater, Jr.
BRADLEY ARANT ROSE & WHITE LLP
188 East Capital Street, Suite 450
Jackson, Mississippi  39201

Marcia Robinson Lowry
Julia Davis
Kathryn A. Wood
CHILDREN'S RIGHTS
330 Seventh Avenue
New York, New York  10001

John Lang
John Piskora
LOEB & LOEB LLP
345 Park Ave.
New York, New York  10154

                              _____/ s /_____
                                        Grace M. Lopes

**Index to Exhibits**

Appendix A

App. A, Ex. 1        June 24, 2013 Order, Attachment Two

App. A, Ex. 2A      Status of Data Reports Required By June 24, 2013 Order

App. A, Ex. 2B      Guide to Reading Performance Charts

App. A, Ex. 3A      Chart prepared by the Office of the Court Monitor, During Trial Home Visit Period, Number of Children Who Met With Their Caseworker or Family Preservation Caseworker in the Home Twice in a One-Month Period or At Least Once Monthly if 15 Days or Less for 90 Days, By Practice Model Fully Implemented Date, By Region

App. A, Ex. 3B      Table with underlying data: During Trial Home Visit Period, Number of Children Who Met With Their Caseworker or Family Preservation Caseworker in the Home Twice in a One-Month Period or At Least Once Monthly if 15 Days or Less for 90 Days, By Practice Model Fully Implemented Date, By Region

App. A, Ex. 4A      Chart prepared by the Office of the Court Monitor, Total Number of Maltreatment Investigations Open One or More Days During Period, By Region and Month

App. A, Ex. 4B      Table with underlying data: Total Number of Maltreatment Investigations Open One or More Days During Period, By Region and Month

App. A, Ex. 5A      Chart prepared by the Office of the Court Monitor, Maltreatment Investigations Initiated Within 24 Hours and Completed With Supervisory Approval Within 30 Days, by Month Investigation Initiated

App. A, Ex. 5B      Table with underlying data: Maltreatment Investigations Initiated Within 24 Hours and Completed With Supervisory Approval Within 30 Days, by Month Investigation Initiated

App. A, Ex. 6A      Chart prepared by the Office of the Court Monitor, Children in Custody Remaining in the Same Placement Following Maltreatment Investigation Who Met Face-to-Face With Worker Twice in a One-Month Period or At Least Once if 15 Days or Less For Three Months Following Completed Maltreatment Investigation, By Region

App. A, Ex. 6B      Table with underlying data: Children in Custody Remaining in the Same Placement Following Maltreatment Investigation Who Met Face-to-Face With Worker Twice in a One-Month Period or At Least Once if 15 Days

or Less For Three Months Following Completed Maltreatment Investigation, By Region

App. A, Ex. 7A     Chart prepared by the Office of the Court Monitor, Children With a Goal of Reunification Whose Assigned Caseworker Met Monthly With the Parent(s) With Whom the Child Was to be Reunified, by Region

App. A, Ex. 7B     Table with underlying data: Children With a Goal of Reunification Whose Assigned Caseworker Met Monthly With the Parent(s) With Whom the Child Was to be Reunified, by Region

App. A, Ex. 8A     Chart prepared by the Office of the Court Monitor, Non-Therapeutic Placement Setting Contacts, By Region

App. A, Ex. 8B     Table with underlying data: Non-Therapeutic Placement Setting Contacts, By Region

App. A, Ex. 9A     Chart prepared by the Office of the Court Monitor, Content of Non-Therapeutic Placement Setting Contacts, By Region

App. A, Ex. 9B     Table with underlying data: Content of Non-Therapeutic Placement Setting Contacts, By Region

App. A, Ex. 10A     Chart prepared by the Office of the Court Monitor, Therapeutic Placement Setting Contacts, By Region

App. A, Ex. 10B     Table with underlying data: Therapeutic Placement Setting Contacts, By Region

App. A, Ex. 11A     Chart prepared by the Office of the Court Monitor, Content of Therapeutic Placement Setting Contacts, By Region

App. A, Ex. 11B     Table with underlying data: Content of Therapeutic Placement Setting Contacts, By Region

App. A, Ex. 12A     Chart prepared by the Office of the Court Monitor, Rate of Maltreatment in Care, by Region

App. A, Ex. 12B     Table with underlying data: Rate of Maltreatment in Care, by Region

App. A, Ex. 13A     Chart prepared by the Office of the Court Monitor, Twice Monthly In-Person Visits With Child by Assigned Caseworkers, by Region

App. A, Ex. 13B     Table with underlying data: Twice Monthly In-Person Visits With Child by Assigned Caseworkers, by Region

App. A, Ex. 14A    Chart prepared by the Office of the Court Monitor, Number of Supervisors Supervising One to Five and Six or More Caseworker, by Region

App. A, Ex. 14B    Table with underlying data: Number of Supervisors Supervising One to Five and Six or More Caseworker, by Region

App. A, Ex. 15A    Chart prepared by the Office of the Court Monitor, Caseworkers With Dedicated Caseloads Exceeding MSA Requirements, by Region

App. A, Ex. 15B    Table with underlying data: Caseworkers With Dedicated Caseloads Exceeding MSA Requirements, by Region

App. A, Ex. 16A    Chart prepared by the Office of the Court Monitor, Number of Individuals Who Started Caseworker Pre-Service Training, by Quarter and Training Completion Status

App. A, Ex. 16B    Table with underlying data: Number of Individuals Who Started Caseworker Pre-Service Training, by Quarter and Training Completion Status

App. A, Ex. 17A    Chart prepared by the Office of the Court Monitor, Number of Individuals Who Started Pre-Service Caseworker Supervisory Training, by Quarter and Training Completion Status

App. A, Ex. 17B    Table with underlying data: Number of Individuals Who Started Pre-Service Caseworker Supervisory Training, by Quarter and Training Completion Status

App. A, Ex. 18A    Chart prepared by the Office of the Court Monitor, Number of Children in Custody Fewer Than 12 Months From Latest Removal From Home, by Number of Placements

App. A, Ex. 18B    Table with underlying data: Number of Children in Custody Fewer Than 12 Months From Latest Removal From Home, by Number of Placements

App. A, Ex. 19A    Chart prepared by the Office of the Court Monitor, Children Reunified With Parent or Caretaker In Under 12 Months From Latest Removal, By Practice Model Fully Implemented Date, By Region

App. A, Ex. 19B    Table with underlying data: Children Reunified With Parent or Caretaker In Under 12 Months From Latest Removal, By Practice Model Fully Implemented Date, By Region

App. A, Ex. 20A    Chart prepared by the Office of the Court Monitor, Length of Time Between Court Custody and Finalization of Adoption, By Practice Model Fully Implemented Date, By Region

App. A, Ex. 20B    Table with underlying data: Length of Time Between Court Custody and Finalization of Adoption, By Practice Model Fully Implemented Date, By Region

App. A, Ex. 21A    Chart prepared by the Office of the Court Monitor, Children Ages 14-20 Receiving Independent Living Services of Any Kind, By Practice Model Fully Implemented Date, By Region

App. A, Ex. 21B    Table with underlying data: Children Ages 14-20 Receiving Independent Living Services of Any Kind, By Practice Model Fully Implemented Date, By Region

App. A, Ex. 22A    Chart prepared by the Office of the Court Monitor, Children Ages 14-20 Receiving Independent Living Services As Set Forth In Service Plan, By Practice Model Fully Implemented Date and Region

App. A, Ex. 22B    Table with underlying data: Children Ages 14-20 Receiving Independent Living Services As Set Forth In Service Plan, By Practice Model Fully Implemented Date and Region

App. A, Ex. 23A    Chart prepared by the Office of the Court Monitor, Children With a Permanency Plan By Their 30th Day of Custody, By Practice Model Fully Implemented Date, By Region

App. A, Ex. 23B    Table with underlying data: Children With a Permanency Plan By Their 30th Day of Custody, By Practice Model Fully Implemented Date, By Region

App. A, Ex. 24A    Chart prepared by the Office of the Court Monitor, Children Who Had a Permanency Plan Developed Within 30 Days of Initial Placement Specifying Permanency Goal, A Timeframe, and Activities to Support the Goal of Permanency, by Practice Model Fully Implemented Date, by Region

App. A, Ex. 24B    Table with underlying data: Children Who Had a Permanency Plan Developed Within 30 Days of Initial Placement Specifying Permanency Goal, A Timeframe, and Activities to Support the Goal of Permanency, by Practice Model Fully Implemented Date, by Region

App. A, Ex. 25A    Chart prepared by the Office of the Court Monitor, Licensure Status of Relative and Non-Relative Foster Family Homes, By Region

App. A, Ex. 25B    Table with underlying data: Licensure Status of Relative and Non-Relative Foster Family Homes, By Region

App. A, Ex. 26A   Chart prepared by the Office of the Court Monitor, Number of Relative and Non-Relative Resource Family Homes Pending Licensure With A Home Study Created, By Region

App. A, Ex. 26B   Table with underlying data: Number of Relative and Non-Relative Resource Family Homes Pending Licensure With A Home Study Created, By Region

App. A, Ex. 27A   Chart prepared by the Office of the Court Monitor, Children in Foster Care By Placement Type, By Region

App. A, Ex. 27B   Table with underlying data: Children in Foster Care By Placement Type, By Region

App. A, Ex. 28A   Chart prepared by the Office of the Court Monitor, Children Placed in Unlicensed Foster Care Settings That Do Not Meet DFCS Licensure Standards and Children Placed in Expedited Pending Relative Resource Homes For More Than 90 Days

App. A, Ex. 28B   Table with underlying data: Children Placed in Unlicensed Foster Care Settings That Do Not Meet DFCS Licensure Standards and Children Placed in Expedited Pending Relative Resource Homes For More Than 90 Days

App. A, Ex. 29A   Chart prepared by the Office of the Court Monitor, Children Placed or Remaining In a Foster Care Setting Meeting DFCS Licensure Standards Consistent with MSA Requirements, Unless Ordered by the Youth Court Over DFCS Objections

App. A, Ex. 29B   Table with underlying data: Children Placed or Remaining In a Foster Care Setting Meeting DFCS Licensure Standards Consistent with MSA Requirements, Unless Ordered by the Youth Court Over DFCS Objections

App. A, Ex. 30A   Chart prepared by the Office of the Court Monitor, Children Entering Custody Who Received an Initial Health Screening Within 72 Hours of Entering Custody

App. A, Ex. 30B   Table with underlying data: Children Entering Custody Who Received an Initial Health Screening Within 72 Hours of Entering Custody

App. A, Ex. 31A   Chart prepared by the Office of the Court Monitor, Children in Custody 30+ Days Who Received a Comprehensive Health Assessment Within 30 Days of Entering Custody

App. A, Ex. 31B   Table with underlying data: Children in Custody 30+ Days Who Received a Comprehensive Health Assessment Within 30 Days of Entering Custody

App. A, Ex. 32A    Chart prepared by the Office of the Court Monitor, Children in Custody for Six Months or More With an Administrative Review Every Six Months, by Practice Model Fully Implemented Date, by Region

App. A, Ex. 32B    Table with underlying data: Children in Custody for Six Months or More With an Administrative Review Every Six Months, by Practice Model Fully Implemented Date, by Region

App. A, Ex. 33A    Chart prepared by the Office of the Court Monitor, Children in Custody for 12 Months or More With a Timely Permanency Hearing, by Practice Model Fully Implemented Date, by Region

App. A, Ex. 33B    Table with underlying data: Children in Custody for 12 Months or More With a Timely Permanency Hearing, by Practice Model Fully Implemented Date, by Region

App. A, Ex. 34A    Chart prepared by the Office of the Court Monitor, Children in Custody at Least 17 of the Previous 22 Months For Whom a TPR Petition Was Filed or an Available ASFA Exception Has Been Documented by the Last Day of the Child's Seventeenth Month in Care, by Practice Model Fully Implemented Date and Region

App. A, Ex. 34B    Table with underlying data: Children in Custody at Least 17 of the Previous 22 Months For Whom a TPR Petition Was Filed or an Available ASFA Exception Has Been Documented by the Last Day of the Child's Seventeenth Month in Care, by Practice Model Fully Implemented Date and Region

App. A, Ex. 35A    Chart prepared by the Office of the Court Monitor, Children in Custody at Least 17 of the Previous 22 Months Without a TPR Petition Filed or an Available ASFA Exception by the Last Day of the Child's Seventeenth Month in Care For Whom a TPR Petition Was Filed or an Available ASFA Exception Was Subsequently Documented, by Practice Model Fully Implemented Date and Region

App. A, Ex. 35B    Table with underlying data: Children in Custody at Least 17 of the Previous 22 Months Without a TPR Petition Filed or an Available ASFA Exception by the Last Day of the Child's Seventeenth Month in Care For Whom a TPR Petition Was Filed or an Available ASFA Exception Was Subsequently Documented, by Practice Model Fully Implemented Date and Region

App. A, Ex. 36A    Chart prepared by the Office of the Court Monitor, Child Contacts With Parents/Siblings Within 24 Hours of Custody, By Practice Model Fully Implemented Date, By Region

App. A, Ex. 36B     Table with underlying data: Child Contacts With Parents/Siblings Within 24 Hours of Custody, By Practice Model Fully Implemented Date, By Region

App. A, Ex. 37A     Chart prepared by the Office of the Court Monitor, Sibling Groups Who Entered Custody At Or Around the Same Time Placed Together, By Region

App. A, Ex. 37B     Table with underlying data: Sibling Groups Who Entered Custody At Or Around the Same Time Placed Together, By Region

App. A, Ex. 38A     Chart prepared by the Office of the Court Monitor, Children in Emergency Shelter or Temporary Facility for Over 45 Days With and Without Approval, By Region

App. A, Ex. 38B     Table with underlying data: Children in Emergency Shelter or Temporary Facility for Over 45 Days With and Without Approval, By Region

App. A, Ex. 39A     Chart prepared by the Office of the Court Monitor, Children Under Age 10 Housed in a Congregate Care Setting With and Without Exception and Regional Director Approval, By Region

App. A, Ex. 39B     Table with underlying data: Children Under Age 10 Housed in a Congregate Care Setting With and Without Exception and Regional Director Approval, By Region

App. A, Ex. 40A     Chart prepared by the Office of the Court Monitor, Number of Sibling Groups With At Least One Sibling Under Age 10 Placed in Congregate Care Housing For More Than 45 Days

App. A, Ex. 40B     Table with underlying data: Number of Sibling Groups With At Least One Sibling Under Age 10 Placed in Congregate Care Housing For More Than 45 Days

App. A, Ex. 41A     Chart prepared by the Office of the Court Monitor, Percentage of Children Who Entered DFCS Custody Who Were Placed Within Their Own County or Within 50 Miles of the Home From Which He/She Was Removed Consistent With MSA Requirements, by Region

App. A, Ex. 41B     Table with underlying data: Percentage of Children Who Entered DFCS Custody Who Were Placed Within Their Own County or Within 50 Miles of the Home From Which He/She Was Removed Consistent With MSA Requirements, by Region

App. A, Ex. 42A     Chart prepared by the Office of the Court Monitor, Children Who Had Family Team Meeting and Service Plan Reviewed and Updated Quarterly,

Including Within 30 Days of Placement Change, by Practice Model Fully Implemented Date, by Region

App. A, Ex. 42B    Table with underlying data: Children Who Had Family Team Meeting and Service Plan Reviewed and Updated Quarterly, Including Within 30 Days of Placement Change, by Practice Model Fully Implemented Date, by Region

App. A, Ex. 43A    Chart prepared by the Office of the Court Monitor, Children With a Goal of Reunification Who Have Documentation Reflecting Active Concurrent Permanency Planning, by Practice Model Fully Implemented Date, by Region

App. A, Ex. 43B    Table with underlying data: Children With a Goal of Reunification Who Have Documentation Reflecting Active Concurrent Permanency Planning, by Practice Model Fully Implemented Date, by Region

App. A, Ex. 44A    Chart prepared by the Office of the Court Monitor, Percentage of Foster Children Transitioning to Independence Who Have Available An Adequate Living Arrangement, a Source of Income, Health Care, Independent Living Stipends, and Education and Training Vouchers, by Practice Model Fully Implemented Date, by Region

App. A, Ex. 44B    Table with underlying data: Percentage of Foster Children Transitioning to Independence Who Have Available An Adequate Living Arrangement, a Source of Income, Health Care, Independent Living Stipends, and Education and Training Vouchers, by Practice Model Fully Implemented Date, by Region

App. A, Ex. 45A    Chart prepared by the Office of the Court Monitor, Appropriateness of Permanency Goal for Children with Permanency Goals of DLC Guardianship, APPLA, Living Independently, Long Term Foster Care or Permanent Foster Care, by Practice Model Fully Implemented Date, by Region

App. A, Ex. 45B    Table with underlying data: Appropriateness of Permanency Goal for Children with Permanency Goals of DLC Guardianship, APPLA, Living Independently, Long Term Foster Care or Permanent Foster Care, by Practice Model Fully Implemented Date, by Region

App. A, Ex. 46A    Chart prepared by the Office of the Court Monitor, Children With a Diagnosis of Developmental and/or Emotional/Behavioral/Mental Health Problems That Were Provided With a Treatment Plan and Services Tied to the Plan, by Region

App. A, Ex. 46B   Table with underlying data: Children With a Diagnosis of Developmental and/or Emotional/Behavioral/Mental Health Problems That Were Provided With a Treatment Plan and Services Tied to the Plan, by Region

App. A, Ex. 47A   Chart prepared by the Office of the Court Monitor, Children Ages 0-3 Receiving a Timely Developmental Assessment and Necessary Follow-Up Services, by Region

App. A, Ex. 47B   Table with underlying data: Children Ages 0-3 Receiving a Timely Developmental Assessment and Necessary Follow-Up Services, by Region

App. A, Ex. 48A   Chart prepared by the Office of the Court Monitor, Percentage of Children Four Years Old or Older Entering Custody During the Period Who Received A Mental Health Assessment Within 30 Days of Placement, by Region

App. A, Ex. 48B   Table with underlying data: Percentage of Children Four Years Old or Older Entering Custody During the Period Who Received A Mental Health Assessment Within 30 Days of Placement, by Region

App. A, Ex. 49A   Chart prepared by the Office of the Court Monitor, Children Age 3 and Older Who Entered Custody and Received a Dental Examination Within 90 Days, by Region

App. A, Ex. 49B   Table with underlying data: Children Age 3 and Older Who Entered Custody and Received a Dental Examination Within 90 Days, by Region

App. A, Ex. 50A   Chart prepared by the Office of the Court Monitor, Children Ages Three and Older at the Start of the Period Under Review Who Were Provided a Dental Exam Every Six Months, by Region

App. A, Ex. 50B   Table with underlying data: Children Ages Three and Older at the Start of the Period Under Review Who Were Provided a Dental Exam Every Six Months, by Region

App. A, Ex. 51A   Chart prepared by the Office of the Court Monitor, Percentage of Children Turning Three Years Old During the Period Under Review Who Received a Dental Examination Within 90 Calendar Days of Their Third Birthday, by Region

App. A, Ex. 51B   Table with underlying data: Percentage of Children Turning Three Years Old During the Period Under Review Who Received a Dental Examination Within 90 Calendar Days of Their Third Birthday, by Region

App. A, Ex. 52A    Chart prepared by the Office of the Court Monitor, Children Receiving Periodic Medical Examinations and All Medically Necessary Follow-Up Services and Treatment, by Region

App. A, Ex. 52B    Table with underlying data: Children Receiving Periodic Medical Examinations and All Medically Necessary Follow-Up Services and Treatment, by Region

App. A, Ex. 53A    Chart prepared by the Office of the Court Monitor, Percentage of Children With a Comprehensive Family Assessment Completed Within 30 Days of Being Taken Into Custody Consistent With MSA Requirements, by Practice Model Fully Implemented Date, by Region

App. A, Ex. 53B    Table with underlying data: Percentage of Children With a Comprehensive Family Assessment Completed Within 30 Days of Being Taken Into Custody Consistent With MSA Requirements, by Practice Model Fully Implemented Date, by Region

App. A, Ex. 54A    Chart prepared by the Office of the Court Monitor, Children Who Had Their Educational Record Reviewed Timely for General and Special Education Needs, by Practice Model Fully Implemented Date, by Region

App. A, Ex. 54B    Table with underlying data: Children Who Had Their Educational Record Reviewed Timely for General and Special Education Needs, by Practice Model Fully Implemented Date, by Region

App. A, Ex. 55A    Chart prepared by the Office of the Court Monitor, Children With Special Needs Matched to a Placement That Can Meet Their Therapeutic and Medical Needs, by Region

App. A, Ex. 55B    Table with underlying data: Children With Special Needs Matched to a Placement That Can Meet Their Therapeutic and Medical Needs, by Region

App. A, Ex. 56A    Chart prepared by the Office of the Court Monitor, Children Placed in Least Restrictive Setting That Meets Their Individual Needs, by Region

App. A, Ex. 56B    Table with underlying data: Children Placed in Least Restrictive Setting That Meets Their Individual Needs, by Region

App. A, Ex. 57A    Chart prepared by the Office of the Court Monitor, Percentage of Children Who Enter Custody Or Change Placements Who Are Registered For And Attending School Within Three Days of Entering Custody or The Placement Change, by Practice Model Fully Implemented Date, by Region

App. A, Ex. 57B    Table with underlying data: Percentage of Children Who Enter Custody Or Change Placements Who Are Registered For And Attending School Within Three Days of Entering Custody or The Placement Change, by Practice Model Fully Implemented Date, by Region

App. A, Ex. 58A    Chart prepared by the Office of the Court Monitor, Percentage of Children Whose Placement Was at Risk of Disruption at the Time of PAD Completion for Whom DFCS Took All Reasonable Steps to Avoid the Disruption and Ensure Placement Stability, by Region

App. A, Ex. 58B    Table with underlying data: Percentage of Children Whose Placement Was at Risk of Disruption at the Time of PAD Completion for Whom DFCS Took All Reasonable Steps to Avoid the Disruption and Ensure Placement Stability, by Region

App. A, Ex. 59A    Chart prepared by the Office of the Court Monitor, Children for Whom Their Resource Parents or Facility Staff Were Provided the Foster Care Information Form Within 15 Days of Placement, by Region

App. A, Ex. 59B    Table with underlying data: Children for Whom Their Resource Parents or Facility Staff Were Provided the Foster Care Information Form Within 15 Days of Placement, by Region

App. A, Ex. 60    Chart prepared by the Office of the Court Monitor, Relative Regional Performance With Respect to 26 Statewide Performance Reports, by Practice Model Fully Implemented Date, as of June 30, 2013

App. A, Ex. 61    Chart prepared by the Office of the Court Monitor, Relative Regional Performance With Respect to 26 Statewide Performance Reports, by Practice Model Fully Implemented Date, as of September 30, 2013

Appendix B

Ex. 1    Monthly Status Report – Practice Model Implementation, September 2012, redacted excerpt

Ex. 2A    February 14, 2013 e-mail to Grace M. Lopes from Ginger Gibson with attached work plans for diligent recruitment, policy, training, caseload staffing, legal and judicial, resource development, and finance sub-teams, redacted

Ex. 2B    February 23, 2013 e-mail to Grace M. Lopes from Ginger Gibson with attached work plan for CQI sub-team, redacted

Ex. 2C    July 8, 2013 e-mail to Mia Caras from Ginger Gibson with attached work plan for MACWIS sub-team

Ex. 3                    Mississippi, Division of Family and Children's Services ("DFCS") Policy,
                         Section D, Foster Care, Revised 7-22-13, §VII.B.4.c. and d.

Ex. 4A                   December 3, 2012 correspondence to Miriam Ingber from Kenya Key
                         Rachal

Ex. 4B                   January 2, 2013 correspondence to Miriam Ingber from Kenya Key
                         Rachal

Ex. 4C                   February 1, 2013 correspondence to Miriam Ingber from Kenya Key
                         Rachal

Ex. 5A                   September 4, 2013 e-mail to Grace M. Lopes from Kenya Rachal

Ex. 5B                   October 2, 2013 correspondence to Miriam Ingber from Kenya Key
                         Rachal

Ex. 5C                   September 3, 2013 correspondence to Miriam Ingber from Ashley C.
                         Tullos

Ex. 5D                   November 1, 2013 correspondence to Miriam Ingber from Kenya Key
                         Rachal

Ex. 5E                   December 2, 2013 correspondence to Julia Davis from Kenya Key Rachal

Ex. 5F                   December 6, 2013 correspondence to Julia Davis from Kenya Key Rachal

Ex. 5G                   December 20, 2013 correspondence to Julia Davis from Kenya Key
                         Rachal

Ex. 5H                   Chart prepared by the Office of the Court Monitor, Caseworkers with
                         Mixed Caseloads Meeting MSA Requirements, by Region, One-Day
                         Snapshot 11/1/13

Ex. 5I                   January 24, 2014 correspondence to Grace Lopes from Kenya Key Rachal
                         with supplemental information to correct caseworker mixed caseload data
                         reports and explanation of ASWS appearance on mixed caseload report,
                         redacted

Ex. 5J                   Division of Family and Children's Services, Continuous Quality
                         Improvement (CQI) Sub Team Quarterly Report (July 2012 – October
                         2012), redacted excerpt

Ex. 5K                   Continuous Quality Improvement Sub Team Meetings, Meeting Minutes,
                         October 2, 2012, redacted

| | |
|---|---|
| Ex. 5L | Division of Family and Children's Services, Continuous Quality Improvement (CQI) Sub Team Quarterly Report (February 21, 2013 through June 30, 2013), redacted excerpt |
| Ex. 5M | February 3, 2014 correspondence to Julia Davis from Kenya Key Rachal |
| Ex. 5N | February 7, 2014 e-mail to Kenya Rachal from Grace M. Lopes |
| Ex. 5O | February 25, 2014 e-mail to Grace M. Lopes and Julia Davis from Kenya Rachal with annotated February 24, 2014 e-mail to Kenya Rachal and Julia Davis from Grace M. Lopes, redacted |
| Ex. 6A | September 18, 2013 correspondence to Miriam Ingber from Kenya Key Rachal |
| Ex. 6B | January 16, 2014 correspondence to Rebecca Tedesco from Mark A. Smith, redacted, with attached excerpt from *The Court Monitor's Status Report to the Court Regarding Progress During Period Three* |
| Ex. 6C | February 26, 2014 correspondence to Mark Smith from Rebecca Tedesco, redacted |
| Ex. 7 | DHS-Area Social Work Supervisor Position Description for Hancock County, January 10, 2014 |
| Ex. 8A | Mississippi Department of Human Services, Division of Family and Children Services (MDHS/DFCS), Workforce Development Plan, Phase I, Harrison, Hancock, Jackson, & Hinds Counties, redacted |
| Ex. 8B | October 1, 2012 e-mail to Mark Smith from Grace M. Lopes, redacted |
| Ex. 8C | Mississippi Department of Human Services, Division of Family and Children Services (MDHS/DFCS), Workforce Development Plan, April 2013, redacted |
| Ex. 8D | August 14, 2013 e-mail to Kenya Rachal and Miriam Ingber from Grace M. Lopes |
| Ex. 8E | October 9, 2013 e-mail to Kenya Rachal and Miriam Ingber from Grace M. Lopes |
| Ex. 8F | October 15, 2013 e-mail to Kenya Rachal and Miriam Ingber from Grace M. Lopes |
| Ex. 8G | Mississippi Department of Human Services, Division of Family and Children Services (DFCS) Workforce Development Plan, April 2013, Revised November 2013, redacted |

Ex. 8H            November 18, 2013 e-mail to Kenya Rachal and Julia Davis from Grace
                  M. Lopes

Ex. 9A            Social Work Aide, Position Description, Revised, June 2006

Ex. 9B            DHS-Case Aide Job Description, February 26, 2014

Ex. 10            Strategies for Promoting Implementation of the *Olivia Y.* Standards in the
                  Mississippi Youth Courts, with attached correspondence to the Honorable
                  Elise Epperson Deana, the Honorable Sanford R. Steckler, the Honorable
                  Sharon Sigalas, the Honorable Margaret Alfonso, and the Honorable
                  William Skinner from Mary Fuller, redacted

Ex. 11            September 28, 2012 e-mail to Mark Smith from Grace M. Lopes

Ex. 12            State of Mississippi, Department of Human Services, Division of Family
                  and Children's Services, Youth Court Strategies Plan, redacted

Ex. 13            Description of DFCS In-Service Training Program

Ex. 14            In-Service Training Schedule, June 2013 - June 2014, redacted

Ex. 15A           October 3, 2013 correspondence to Miriam Ingber from Kenya Key
                  Rachal, redacted

Ex. 15B           November 1, 2013 correspondence to Miriam Ingber from Kenya Key
                  Rachal

Ex. 16            DFCS Tracking Spreadsheets for In-Service Training, redacted

Ex. 17A           November 20, 2012 e-mail to Wendy Benoit from Mia Caras and
                  November 20, 2012 e-mail to Mia Caras from Wendy Benoit

Ex. 17B           Agreement between the Mississippi Department of Human Services and
                  Catholic Charities, Inc., redacted

Ex. 17C           Agreement between the Mississippi Department of Human Services and
                  Starkville School District

Ex. 17D           Agreement between the Mississippi Department of Human Services and
                  Southern Christian Services for Children and Youth, Inc., redacted

Ex. 17E           Agreement between the Mississippi Department of Human Services and
                  Mississippi Children's Home Society

Ex. 17F          Agreement between the Mississippi Department of Human Services and Family Resource Center of Northeast Mississippi

Ex. 17G          Agreement between the Mississippi Department of Human Services and Southern Christian Services for Children and Youth, Inc.

Ex. 17H          Agreement between the Mississippi Department of Human Services and Catholic Charities, Inc.

Ex. 18A          State of Mississippi, Mississippi Department of Human Services, Contract for Personal or Professional Services between the Division of Family and Children's Services, Mississippi Department of Human Services and Sunnybrook Children's Home, Inc., July 1, 2013 - June 30, 2014

Ex. 18B          State of Mississippi, Mississippi Department of Human Services, Contract for Personal or Professional Services between the Division of Family and Children's Services, Mississippi Department of Human Services and Pine Vale Children's Home, July 1, 2013 - June 30, 2014

Ex. 18C          State of Mississippi, Mississippi Department of Human Services, Contract for Personal or Professional Services between the Division of Family and Children's Services, Mississippi Department of Human Services and Impact Missions, Inc., July 1, 2013 - June 30, 2014

Ex. 18D          State of Mississippi, Mississippi Department of Human Services, Contract for Personal or Professional Services between the Division of Family and Children's Services, Mississippi Department of Human Services and Gardner-Simmons Home for Girls, Inc., July 1, 2013 - June 30, 2014

Ex. 18E          State of Mississippi, Mississippi Department of Human Services, Contract for Personal or Professional Services between the Division of Family and Children's Services, Mississippi Department of Human Services and Berean Children's Home, Inc., July 1, 2013 - June 30, 2014

Ex. 18F          State of Mississippi, Mississippi Department of Human Services, Contract for Personal or Professional Services between the Division of Family and Children's Services, Mississippi Department of Human Services and Christians in Action, Inc., July 1, 2013 - June 30, 2014

Ex. 18G          State of Mississippi, Mississippi Department of Human Services, Contract for Personal or Professional Services between the Division of Family and Children's Services, Mississippi Department of Human Services and Sally Kate Winters Family Services, July 1, 2013 - June 30, 2014

Ex. 18H          State of Mississippi, Mississippi Department of Human Services, Contract for Personal or Professional Services between the Division of Family and

Children's Services, Mississippi Department of Human Services and
Mississippi Children's Home Society, July 1, 2013 - June 30, 2014

Ex. 18I          State of Mississippi, Mississippi Department of Human Services, Contract
                 for Personal or Professional Services between the Division of Family and
                 Children's Services, Mississippi Department of Human Services and
                 Hope Village for Children, Inc., July 1, 2013 - June 30, 2014

Ex. 18J          State of Mississippi, Mississippi Department of Human Services, Contract
                 for Personal or Professional Services between the Division of Family and
                 Children's Services, Mississippi Department of Human Services and
                 Faith Haven, Inc., July 1, 2013 - June 30, 2014

Ex. 19A          Performance Based Contracting, May 31, 2013, PBC Plan, redacted

Ex. 19B          January 16, 2014 e-mail to Debbie Brewer from Grace M. Lopes and
                 December 10, 2013 e-mail to Grace M. Lopes from Debbie Brewer

Ex. 20           MDHS Division of Family and Children's Services, Safety, Permanency,
                 and Well-Being, Continuous Quality Improvement Review Instrument

Ex. 21           Mississippi Division of Family and Children's Services, Continuous
                 Quality Improvement Plan, July 2012, redacted

Ex. 22           November 5, 2013 e-mail to Grace M. Lopes from Robert Hamrick

Ex. 23A          Vacancy Announcement, Mississippi State Personnel Board, DHS-
                 Family Protection Spec[ialist], Adv[anced]

Ex. 23B          Memorandum, Mississippi Department of Human Services, April 11,
                 2012, In-House Promotional Opportunities

Ex. 24           Mississippi Department of Human Services, Division of Family and
                 Children's Services, Continuous Quality Improvement (CQI) Annual CQI
                 Report, redacted

Ex. 25A          Region 3-South, Continuous Quality Improvement Baseline Report,
                 August 2011, redacted

Ex. 25B          Region 3-South, Continuous Quality Improvement Annual Follow-Up
                 Report, September 2012, redacted

Ex. 25C          Region 3-South, Continuous Quality Improvement Annual Report,
                 October 2013, redacted

Ex. 26A          Foster Care Review ("FCR") Corrective Action Spreadsheet (submitted on
                 February 13, 2013), redacted

Ex. 26B          FCR Corrective Action Spreadsheet (submitted on July 29, 2013) , redacted

Ex. 27A          Mississippi, DFCS Policy, Section D, Foster Care, Revised 7-22-13, §VII.D.1.

Ex. 27B          MACWIS Technical Assistance Bulletin, July 22, 2013, Issue #16, redacted

Ex. 28           Financial Assessment Findings and Recommendations, May 2011, Mississippi Department of Human Services Division of Family and Children's Services, Hornby Zeller Associates, Inc.

Ex. 29           Agreement Regarding the Enhancement of Federal Funding, July 12, 2012 [Dkt. No. 573]

Ex. 30A          State of Mississippi, Department of Human Services, Division of Family and Children's Services, Mississippi FY 2011 Annual Progress and Services Report, submitted June 30, 2012, excerpt

Ex. 30B          State of Mississippi, Department of Human Services, Division of Family and Children's Services, Mississippi FY 2012 Annual Progress and Services Report, submitted June 26, 2013, redacted excerpt

Ex. 31A          July 8, 2013 correspondence to Miriam Ingber from Kenya Key Rachal with attached documents: Report on Impact of Hornby Zeller Associates' (HZA) Recommendations, Agreement Regarding the Enhancement of Federal Funding, Responses to Requirements of the Modified Settlement Agreement (MSA) and Implementation Plan for Period 3 (Y3IP), Status Report on Implementation of Agreement Regarding the Enhancement of Federal Funding Filed with the Court on July 12, 2012, and State Fund Appropriations by Year, redacted

Ex. 31B          Spreadsheet, submitted on January 8, 2014 by MDHS/DFCS division of budget and financial planning: current and retroactive claims for federal reimbursement and revenue received for calendar years 2009-2013

Ex. 32           State of Mississippi, Department of Human Services, Division of Family and Children's Services, Mississippi FY 2012 Annual Progress and Services Report, submitted June 26, 2013, redacted excerpt

Ex. 33           State of Mississippi, Department of Human Services Cost Allocation Plan, Effective July 2, 2012, excerpt, Appendix C: Random Moment Sampling

Ex. 34           February 13, 2013 correspondence to Earl D. Walker, Director, Division of Budgets and Accounting, Mississippi Department of Human Services,

from Arif Karim, Director, Division of Cost Allocation, United States Department of Health and Human Services

Ex. 35A          March 27, 2013 correspondence to Richard A. Berry from Joseph J. Bock, redacted

Ex. 35B          U.S. Department of Health and Human Services, Administration for Children and Families, Mississippi Title IV-E Foster Care Program Administrative Cost Review Pilot Final Report, On-Site Review May 7-11, 2012, excerpt

Ex. 36           November 2, 2012 correspondence to Miriam Ingber from Ashley Christin Tullos

Ex. 37           June 20, 2013 correspondence to Miriam Ingber from Ashley Christin Tullos

Ex. 38A          Periodic Administrative Determination ("PAD") Q11, excerpted from the automated version of the PAD, July 25, 2012

Ex. 38B          FCR Periodic Administrative Determination Reference Guide, excerpt

Ex. 39           Mississippi, DFCS Policy, Section D, Foster Care, Revised 7-22-13, §VII.D.4.d.-e.

Ex. 40           May 28, 2013 e-mail to Miriam Ingber and Grace M. Lopes from Gwen Long with attached Termination of Parental Rights Remediation Plan, May 2013, redacted

Ex. 41A          Mississippi, DFCS Policy, Section D, Foster Care, Revised 7-22-13, §VII.D.5.

Ex. 41B          Mississippi, DFCS Policy, Section D, Foster Care, Revised 5-29-13, §VII.D.5.d.

Ex. 42           December 6, 2013 e-mail to Kenya Key Rachal from Grace M. Lopes with attached December 6, 2013 e-mail to Grace M. Lopes from Mark Jordan

Ex. 43A          October 9, 2013 correspondence to Onetta S. Whitley, Deputy Attorney General, from M. Earl Scales, Assistant Attorney General, redacted

Ex. 43B          Tracking Form Maintained by DFCS Termination of Parental Rights ("TPR") Coordinator, redacted

Ex. 43C          Unresolved FCR Overdue TPR Packets, June 2012-February 2014, redacted

Ex. 43D   TPR Tracking System Maintained by DFCS TPR Coordinator, Updated as of March 25, 2014, redacted

Ex. 44A   MDHS Division of Family & Children's Services, Mississippi PATH (Parents as Tender Healers), A Curriculum for Foster, Adoptive and Kinship Care Parents (Resource Families), redacted excerpt

Ex. 44B   Mississippi, DFCS Policy, Section D, Foster Care, Revised 7-22-13, §VII.C.5.b.

Ex. 44C   Mississippi, DFCS Policy, Section G, Adoption Services, Revised 5-3-12, §V.A.

Ex. 44D   Resource Family Procedures Manual, redacted excerpts

Ex. 45A   Job Content Questionnaire, Adoption Specialist, MDHS/DFCS

Ex. 45B   Mississippi State Personnel Board, Performance Appraisal Review Report, SPB Form 800-3, Revised April 2012, Adoption Specialist

Ex. 45C   Initial Planning Meeting (Adoption Status Meeting), DFCS Form 7/10/12

Ex. 45D   Mississippi, DFCS Policy, Section G, Adoption Services, Revised 5-13-12, §IV.2.C.

Ex. 45E   Resource Family Procedures Manual, excerpt, Adoptive Placements and Legal Risk Adoptive Placements; Legal Risk Adoptive Placement Agreement, redacted

Ex. 46   State of Mississippi, Department of Human Services, Division of Family and Children's Services, Section B: Intake/Assessment Policy, revised 7-22-13

Ex. 47   May 4, 2012 e-mail to Kenya Rachal from Grace M. Lopes with attached May 4, 2012 e-mail to Grace M. Lopes from Mia Caras, redacted

Ex. 48   June 4, 2013 correspondence to Grace M. Lopes from Kenya Key Rachal

Ex. 49   DFCS Licensure Investigations Protocol, redacted

Ex. 50A   November 5, 2013 e-mail to Grace M. Lopes from Gwen Long with attached Child Fatality Review, revision submitted November 5, 2013, redacted

Ex. 50B   Child Fatality Review, submitted July 8, 2013, redacted

Ex. 50C          September 26, 2013 e-mail to Kenya Rachal and Miriam Ingber from Grace M. Lopes, redacted

Ex. 50D          November 18, 2013 e-mail to Kenya Rachal and Julia Davis from Grace M. Lopes

Ex. 51A          DFCS CQI Maltreatment in Care Review Process, redacted

Ex. 51B          Safety Review Unit, Maltreatment in Care Review Instrument, Revised 02-21-2014

Ex. 51C          January 20, 2014 e-mail to Grace M. Lopes and Mia Caras from Robert Hamrick

Ex. 52           Mississippi, DFCS Policy, Section D, Foster Care, Revised 7-22-13, §V.G.1.d.

Ex. 53           February 25, 2014 e-mail to Kenya Rachal from Mark Jordan with attached redacted specification for MACWIS Report SLS51D

Ex. 54           Mississippi, DFCS Policy, Section D, Foster Care, Revised 7-22-13, §V.B.

Ex. 55A          Mississippi, DFCS Policy, Section D, Foster Care, Revised 7-22-13, §VII.A.1.

Ex. 55B          Mississippi, DFCS Policy, Section D, Foster Care, Revised 7-22-13, Appendix F, Sample Foster Child Information Form

Ex. 56           Mississippi Department of Human Services, Division of Family and Children's Services, Permanency Planning and Placement Unit/Congregate Care, Changes to the Therapeutic Placement Process (without attachments)

Ex. 57           Mississippi Department of Human Services, Division of Family and Children Services, Resource Development Unit, Physical, Dental, and Mental Health Services Plan

Ex. 58A          Mississippi Department of Human Services, Division of Family and Children Services, Educational Plan

Ex. 58B          Special Education Advocacy, Children in Foster Care, redacted

Ex. 59A          Mississippi Department of Human Services, Resource Guide for Living Independently in Mississippi, Revised 2012

Ex. 59B  Texas Foster Youth Justice Project, A Guide for Those "Aging Out" of Foster Care in Texas, Second Edition, excerpt

Ex. 59C  Resource Guide Implementation (without attachments)

Ex. 60A  Appendix "D" Modified Mississippi Settlement Agreement and Reform Plan, Mississippi Diligent Recruitment of Families for Children, Implementation Plan – Phase II, Version A

Ex. 60B  May 30, 2013 correspondence to Bernard Morgan and Taffy B. Compain from Richard A. Berry, redacted

Ex. 60C  Program and Budget Narrative, excerpt from May 30, 2013 grant renewal application for HHS-2011-ACF-CONT-ACYF-CB-CO, Diligent Recruitment of Families for Children in the Foster Care System in the State of Mississippi; Grant No. 90CO1052

Ex. 60D  Department of Health and Human Services Administration for Children and Families, Notice of Award, September 18, 2013

Ex. 61A  Mississippi PATH, Parents as Tender Healers, Resource Applicant Handbook, Revised, February 2012 (cover page and table of contents) , redacted

Ex. 61B  Summary of updates to the PATH Handbook, distributed February 2012, redacted

Ex. 62A  January 10, 2014 e-mail from Grace M. Lopes to Kenya Rachal and Julia Davis, without attachments

Ex. 62B  Abuse/Neglect/Maltreatment in Care, DHS 356905-356910

Ex. 62C  January 17, 2014 e-mail to Grace M. Lopes and Julia Davis from Kenya Rachal

Ex. 62D  February 6, 2014 e-mail to Grace M. Lopes from Kenya Rachal

Ex. 62E  February 28, 2014 e-mail to Grace M. Lopes and Julia Davis from Kenya Rachal, redacted