**Ex. 17D**

# Subgrantee Signature Sheet

# And

# Budget Information

MISSISSIPPI
Form MDHS-SCS-1002
Revised 3-01-2005

**STATE OF MISSISSIPPI**
**MISSISSIPPI DEPARTMENT OF HUMAN SERVICES**
**SUBGRANT SIGNATURE SHEET**
**P.O. BOX 352**
**JACKSON, MISSISSIPPI 39205-0352**

<u>MDHS FUNDING DIVISION: Family and Children's Services</u>

| | |
|---|---|
| 1. SUBGRANTEE'S NAME, ADDRESS & PHONE # <br><br> Southern Christian Services for Children & Youth, Inc. <br><br> 860 East River Place, Suite 104 <br><br> Jackson, MS 39202 <br><br> SUBGRANTEE'S FISCAL YEAR END DATE: <br> September 30, 2013 <br><br> NAME/TITLE OF OFFICERS: (SUBGRANT ENTITY) <br> a. Susannah K. Cherney, Executive Director <br> b. Randolph F. Vessell, Chief Financial Officer <br> c. Barry Dixon, Program Director <br><br> CONTACT PERSON:    Susannah K. Cherney <br> PHONE NUMBER:    601-354-0983 | 2. EFFECTIVE DATE <br> 10/1/2012 <br><br> 3. SUBGRANT NUMBER <br> 323E431A <br><br> 4a. GRANT IDENTIFIER (funding source and year): <br> 2013 Chafee <br> b. CATALOG of FEDERAL DOMESTIC ASSISTANCE (CFDA)# <br> 93.674 <br> 5. BEGINNING AND ENDING DATE <br> 10/01/2012    to    09/30/2013 <br> 6. SUBGRANT PAYMENT METHOD <br><br> _____ CURRENT NEEDS/CASH ADVANCE <br><br> ___X___ COST REIMBURSEMENT <br><br> _____ OTHER <br><br> 7. PAGE 1 OF 3 |

| 8. THE FOLLOWING FUNDS ARE OBLIGATED: | | | |
|---|---|---|---|
| FEDERAL | 796,920.42 | ADMINISTRATION | 124,640.89 |
| STATE | | SERVICES | 871,509.64 |
| OTHER | 199,230.11 | OTHER | |
| TOTAL | 996,150.53 | TOTAL | 996,150.53 |

9. THE SUBGRANTEE AGREES TO ADMINISTER THIS SUBGRANT IN ACCORDANCE WITH ALL FEDERAL AND/OR STATE PROVISIONS
THAT ARE APPLICABLE TO SAID SUBGRANT. THE FOLLOWING DOCUMENTS ARE INCORPORATED HEREIN:

| | |
|---|---|
| a. SUBGRANT SIGNATURE SHEET | 3) STANDARD ASSURANCES POLICY |
| b. BUDGET SUMMARY | 4) DEBARMENT POLICY |
| c. COST SUMMARY SUPPORT SHEET | 5) DRUG FREE WORKPLACE POLICY |
| d. BUDGET NARRATIVE | 6) SUBGRANTEE MANUAL ACCEPTANCE |
| e. SUBGRANT AGREEMENT | f. VERIFICATION OF 25% FIDELITY BOND |
| 1) SCOPE OF SERVICES | g. COPY OF BOARD RESOLUTION (If Applicable) |
| 2) GENERAL TERMS AND PROVISIONS | h. COST ALLOCATION & INDIRECT COST RATES |

10. IDENTIFICATION OF OTHER FUNDING (List all other funds requested, anticipated or held over from prior years
dedicated to this or similar programs including Federal, State, Local or Private funds. If additional space is needed,
please attach typed pages).

| SOURCE | PURPOSE | CONTRACT # | PERIOD (dates) | AMOUNT |
|---|---|---|---|---|
| NA | | | | |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |

| 11. APPROVED FOR MDHS: | 12. APPROVED FOR SUBGRANTEE: |
|---|---|
| BY _signature_    DATE 9/17/12 <br> Richard A. Berry | BY _signature_    DATE 8/27/12 <br> Susannah K. Cherney |
| Executive Director <br> Title | Executive Director <br> Title |

# MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
## BUDGET SUMMARY

**PAGE 2 OF 3 PAGES**

**1. Applicant Agency:**    **Southern Christian Services for Children and Youth, Inc.**

| 2. Subgrant Number: | 3. Grant ID | 4. Beginning Date | 5. Ending Date |
|---|---|---|---|
| **323E431A** | 2013 Chafee | October 1, 2012 | September 30, 2013 |

**6. Submitted as Part of (Check one):**

a. Funding  
　　Request  ( X ) 

b. Modification  
　　No.( ) 

c. Modification  
　　Effective Date

**Funding Sources**

| 7. For MDHS Use Only | 8. Activity | Federal | State | Program Income | Other (Local-Private) | Total |
|---|---|---|---|---|---|---|
|  | Independent Living | 796,920.42 |  |  | 199,230.11 | 996,150.53 |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  | TOTAL | 796,920.42 |  |  | 199,230.11 | 996,150.53 |

# MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
## COST SUMMARY SUPPORT SHEET

**PAGE 3 OF 3 PAGES**

| | | | | | |
|---|---|---|---|---|---|
| **1. Applicant Agency:** | | Southern Christian Services for Children and Youth, Inc. | | | |
| **2. Subgrant Number:**<br><br>323E431A | **3. Grant ID**<br><br>2013 Chafee | | **4. Beginning Date**<br><br>October 1, 2012 | | **5. Ending Date**<br><br>September 30, 2013 |
| **6. Activity:** Independent Living | | | | | |

| 7. For MDHS Use Only | 8. Line Item | 9. Description of Item and/or Basis for Cost | 10. Budget | | |
|---|---|---|---|---|---|
| | | | **Federal** | **All Other** | **Total** |
| | SALARIES | See Attached Budget Narrative | 389,703.08 | 108,793.32 | 498,496.40 |
| | FRINGE BENEFITS | See Attached Budget Narrative | 87,848.24 | | 87,848.24 |
| | TRAVEL | See Attached Budget Narrative | 113,585.00 | | 113,585.00 |
| | CONTRACTUAL | See Attached Budget Narrative | 127,354.00 | 4,000.00 | 131,354.00 |
| | COMMODITIES | See Attached Budget Narrative | 28,276.00 | | 28,276.00 |
| | S., L. & G. | See Attached Budget Narrative | 6,500.00 | | 6,500.00 |
| | EQUIPMENT | See Attached Budget Narrative | 5,450.00 | | 5,450.00 |
| | INDIRECT COSTS | See Attached Budget Narrative | 38,204.10 | 86,436.79 | 124,640.89 |
| | | | | | |
| | | | | | |
| | **TOTAL** | | 796,920.42 | 199,230.11 | 996,150.53 |

# Agreement

# AGREEMENT BETWEEN
# MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
## AND
# SOUTHERN CHRISTIAN SERVICES FOR CHILDREN AND YOUTH, INC.

**THIS AGREEMENT** is made and entered into by and between the Division of Family and Children's Services, Mississippi Department of Human Services, hereinafter referred to as "MDHS," and Southern Christian Services for Children and Youth, Inc., hereinafter referred to as "Subgrantee."

In furtherance of the mutual interests and responsibilities of the parties hereto, this Agreement is entered into by and between the parties upon the following terms, provisions, and conditions, to-wit:

## SECTION I.  RESPONSIBILITY OF SUBGRANTEE

Subgrantee shall provide, perform and complete, in a satisfactory manner as determined by MDHS, the services and activities described in the "Scope of Services," attached hereto as Exhibit "A" and incorporated herein by reference and the "Modified Mississippi Settlement Agreement and Reform Plan," attached hereto as Exhibit "B".  Subgrantee shall establish and maintain effective controls and accountability over all funds, property and other assets covered by this Agreement.

## SECTION II.  TERM OF AGREEMENT

The term of this Agreement shall commence on October 1, 2012, or after all parties have signed, whichever is later, and end on September 30, 2013, with an option for up to four (4) one year renewals.  MDHS reserves the right to terminate any subgrant at any time, subject to current subgrant provisions, and avail itself to any and all remedies available to protect its interests.

## SECTION III.  PAYMENT AND BUDGET LIMITATIONS

A.      **SUBGRANT AMOUNT.**  The total amount of the subgrant to be provided by MDHS under this Agreement is Seven Hundred Ninety-Six Thousand Nine Hundred Twenty Dollars and Forty-Two Cents ($796,920.42).

B.      **METHOD OF PAYMENT.**  It is understood between the parties hereto that funds supporting this Agreement will be utilized and expended as provided for in the Budget Summary, Cost Summary Support Sheet(s), and Budget Narrative, collectively attached hereto as Exhibit "C" (herein referred to as the "Budget") and incorporated herein by reference under the same terms and conditions as set forth in said Budget.  MDHS shall process all reimbursement requests on a cost reimbursement basis in its normal course of business, and, if it is found in order, shall process payment thereon to be made within reasonable time to Subgrantee.

C.  **BUDGET REVISIONS.**  Any increase, decrease or change in the funding or budgeted line items under this Agreement shall be authorized only as provided by the Mississippi Department of Human Services' line item flexibility policy and/or as authorized by a modification to this Agreement.

D.  **MAXIMUM PAYMENT.**  Notwithstanding any other provision of this Agreement, the maximum payment by MDHS to Subgrantee shall not exceed the sum of Seven Hundred Ninety-Six Thousand Nine Hundred Twenty Dollars and Forty-Two Cents ($796,920.42) in consideration for all performances or services provided by Subgrantee, unless specifically modified as provided herein.

## SECTION IV.  RELATIONSHIP OF PARTIES

The relationship of the Subgrantee to MDHS is that of independent contractor. None of the provisions of this Agreement are intended to create nor shall they be construed to create an agency, partnership, joint venture or employee-employer relationship between MDHS and Subgrantee.

Any persons assigned by Subgrantee to perform the services hereunder shall be the employee of the Subgrantee. MDHS may, however, direct Subgrantee to replace any of its employees under this Agreement. The Subgrantee will replace the employee within five (5) calendar days after receipt of notice from MDHS.

## SECTION V.  COMPLAINT RESOLUTION

Subgrantee shall provide a complaint resolution procedure regarding decisions on eligibility for the program, applications that are not acted upon timely, and decisions otherwise affecting benefits and services for the program funded by this subgrant. The appeal or complaint procedures shall be carried out according to the Fair Hearing Procedure of the Mississippi Department of Human Services, a conciliation process, the Personal Responsibility and Work Opportunity Act of 1996, and/or such other Procedure as may be required by MDHS, whichever is appropriate to the complaint as directed by MDHS.

## SECTION VI.  CHANGES

MDHS reserves the right to change any portion of the work required under this Agreement or amend other terms, including the Scope of Services, necessary to meet federal or other operation requirements. Revision shall be made by written amendment to this Agreement duly signed by the authorized representative of each party hereto.

## SECTION VII.  SAFEGUARDING INFORMATION

A.  **CONFIDENTIALITY.**  Subgrantee shall treat all State data and information to which it has access under this Subgrant as confidential to the extent that confidential treatment of same is required under Federal and State law and shall not disclose same to a third party without specific written consent of the State. The provision herein shall survive termination of the subgrant for any reason and shall continue in full force and effect and shall be binding upon the Subgrantee

2

and its agents, employees, successors, assigns, subcontractors, or any party claiming an interest in the subgrant on behalf of, or under, the rights of the subgrant following any termination.

All records and information involving applicants or recipients of services under this subgrant shall be kept confidential. The use or disclosure of information concerning applicants and/or recipients shall be limited to purposes directly connected with the administration of the Chafee Foster Care Independence Program. Subgrantee shall take any and all steps necessary to insure the physical security of the records and information that it obtains under this Agreement, including but not limited to providing fire protection, protections against smoke and water damage, locked files, passwords, access logs or other methods to prevent loss or unauthorized access or retrieval of the records or information.

The safeguards for information to which both parties will adhere are contained in the MDHS Subgrantee/Contract Manual and any applicable Federal/State/Local Regulations. The restrictions herein shall survive the termination or completion of this Agreement and shall continue in full force and effect and shall be binding upon the Subgrantee and/or its officers, agents, employees, successors, assigns, subcontractors, or any party claiming an interest in the Agreement on behalf of or under the rights of the Subgrantee.

**B.**     **THIRD PARTY REQUESTS.**  In event that the Subgrantee receives notice that a third party requests divulgence of confidential or otherwise protected information and/or has served upon it a subpoena or other validly issued administrative or judicial process ordering divulgence of confidential or otherwise protected information, Subgrantee shall promptly inform MDHS and thereafter respond in conformity with such subpoena as required by applicable State and/or Federal law, rules and regulations.

**C.**     **LIABILITY.** Any liability resulting from the wrongful disclosure of confidential information on the part of the Subgrantee and/or its officers, agents, subcontractors, and/or representatives shall rest with the Subgrantee. Disclosure of any confidential information by the Subgrantee and/or its representatives or subcontractor without the express written approval of MDHS, shall result in the immediate termination of this Agreement. Nothing herein shall be construed to prevent MDHS from seeking any other remedy, in law or equity, available to it.

## SECTION VIII. TERMINATION OF AGREEMENT

**A.**     **TERMINATION FOR CONVENIENCE OF EITHER PARTY.**   This Agreement may be terminated by either party, in whole or in part, at any time, by giving written notice to the other party of such termination and specifying the effective date thereof, at least 30 days before the effective date of such termination. In the event of termination, Subgrantee shall be entitled to receive only reimbursement for allowable expenses incurred to the date of termination. In no event shall such expenses exceed the maximum amount payable under this Subgrant.

**B.**    **TERMINATION CLAIM.**    Within 30 days after receipt of a Notice of Termination, the Subgrantee shall submit to MDHS its termination claim, in the form prescribed by MDHS.

In the event of termination of this Subgrant as provided herein, Subgrantee shall be entitled to receive just and equitable compensation for services or performances actually and satisfactorily performed, prior to the effective date of termination, under this Agreement. Such compensation shall be based upon the payment provisions described in the Method of Payment section of the Subgrant Agreement, but, in no case, shall said compensation exceed the total amount of this Subgrant.

Subgrantee shall be liable to MDHS for damages sustained by MDHS by virtue of any breach of this Agreement by Subgrantee, and MDHS may withhold any payments to Subgrantee for the purpose of setoff until such time as the exact amount of damages due to MDHS from Subgrantee are determined. The rights and remedies of MDHS provided in this Section shall not be exclusive and are in addition to any other rights and remedies provided by law or in equity.

**C.**    **TERMINATION FOR DEFAULT.**    Unless the Subgrantee's default or breach of this subgrant is excused by MDHS, MDHS may by written notice of default to the Subgrantee terminate the whole or any part of this Agreement if the Subgrantee has failed to carry out its obligations hereunder and has not remedied or taken appropriate steps to remedy the default.

If, through any cause, Subgrantee shall fail to fulfill in a timely and proper manner, as determined by MDHS, its obligations under this Agreement, or if Subgrantee shall violate any of the covenants, agreements, or stipulations of this Subgrant, MDHS shall thereupon have the right to terminate the Subgrant by giving written notice to Subgrantee of such termination and specifying the effective date thereof at least five (5) days before the effective date of such termination. In the event of such termination, Subgrantee shall be entitled to receive just and equitable compensation for satisfactory work completed on documents, services or materials collected and/or prepared by Subgrantee in connection with this Agreement.

Notwithstanding the above, Subgrantee shall not be relieved of liability to MDHS for damages sustained by MDHS by virtue of any breach of this Agreement by Subgrantee, and MDHS may withhold any payments to Subgrantee for the purpose of set off until such time as the exact amount of damages due to MDHS from Subgrantee are determined.

The rights and remedies of MDHS provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law or under this Agreement.

If the Subgrantee fails to comply with any of the covenants, terms, or stipulations of this Agreement, whether stated in a Federal statute or regulation, an assurance,

4

in the State Plan or application, a notice of award, or elsewhere, MDHS may take any of the following actions:

   a. Issue a warning letter that further failure to comply with such covenant, term, or stipulation will result in a more serious sanction or action;
   b. Condition a future Subgrant;
   c. Direct the Subgrantee to stop the incurring of costs with Subgrant funds;
   d. Require that some or all of the Subgrant funds be remitted to MDHS;
   e. Reduce the level of funds the Subgrantee would otherwise be entitled to receive;
   f. Elect not to provide future Subgrant funds to the Subgrantee until appropriate actions are taken to ensure compliance;
   g. Wholly or partly suspend or terminate the current award of funds to the Subgrantee;
   h. Suspend reimbursements to Subgrantees who fail to meet deadlines on unresolved monitoring or audit findings, closeout packages, and/or fiscal and programmatic requirements; or
   i. Suspend payments upon notification that Subgrantee is bankrupt or receives tax lien of any type, regardless of the reason.

**D.**    <u>**TERMINATION BECAUSE OF CIRCUMSTANCES BEYOND THE CONTROL OF THE PARTIES.**</u> If either party is rendered unable, wholly or in part, by reason of strikes, accidents, acts of God, weather conditions or other acts beyond its control and without its faults or negligence, to comply with its obligations under this Agreement, then, such party shall have the option to cancel, upon the giving of written notice, this Agreement, in whole or part as the case may warrant.

**E.**    <u>**AVAILABILITY OF FUNDS.**</u> It is expressly understood and agreed that the obligation of MDHS to proceed under this Agreement is conditioned upon the availability of funds, appropriation of funds by the Mississippi State Legislature and the receipt of Federal and/or State funds. In the event that the funds anticipated for the fulfillment of the Agreement are at any time, not forth coming or are insufficient, either through the failure of the Federal government to provide funds or of the State of Mississippi to appropriate funds or the discontinuance or material alteration of the program under which funds were provided or if funds are not otherwise available to MDHS for the performance of this Agreement, MDHS, shall have the right to immediately terminate this Agreement, without damage, penalty, cost, or expense to MDHS of any kind whatsoever. The ultimate decision as to whether or not funds continue to be available for the performance of this Agreement lies solely with MDHS.

## SECTION IX. AGREEMENTS BY SUBGRANTEE

**A.** <u>**SUBCONTRACTS.**</u> It is understood and agreed that the Subgrantee may enter into agreements or subcontracts with eligible entities (hereinafter sometime

referred to as Subgrantee's Contractor/Subcontractor) for the provision of the services required under this Agreement. Any and all such agreements or subcontracts shall include all of the terms and conditions of this Agreement. Subgrantee agrees that it shall require all of its subcontractors to comply with all local, municipal and county health, safety and other ordinances and requirements and with all applicable Federal and State laws, statutes, and regulations, the same as apply to the Subgrantee herein. The agreements/subcontracts must include assurances that services will be provided to all eligible persons, regardless of potential participant's race, color, religious beliefs/practices, creed, age, national origin, sex, or mental or physical disability. The Subgrantee and its Contractors/Subcontractors cannot, on the basis of race, color, religious beliefs/practices, creed, age, national origin, sex, or mental or physical disability, treat one person differently from another in determining eligibility, benefits or services provided, if applicable.

The Subgrantee, however, shall be fully responsible for the performance of its Contractors/Subcontractors.

Copies of all subcontracts, agreements, and modifications thereto shall be forwarded to MDHS, Division of Family & Children's Services.

B.    **RELEASE OF LIABILITY.** Subgrantee agrees that in any agreement or subcontract for the provision of the services or activities covered by this Agreement, it shall require that the Subgrantee's contractor, subcontractor, representatives, or agents release and hold harmless MDHS from and against all claims, demands, liabilities, suits, damages, and costs of every kind and nature whatsoever, including court costs and attorney's fees, arising out of or caused by contractor or subcontractor and/or its officers, agents, or employees in the performance of such services or activities.

## SECTION X. REPORTING

A.    **MONTHLY REPORTS.** Subgrantee agrees to provide reports and/or information within ten (10) calendar days after the close of each month. Such reports shall be complete for the period concerned and shall contain information concerning clients served, catchment areas, administrative costs, if any, direct and indirect costs of any nature expended in the performance of this Subgrant, units of service, and other sufficient data to provide evidence of budget and programmatic compliance as required by this Subgrant. Subgrantee shall also provide to MDHS monthly financial supporting documentation of all expenditures pertaining to the Agreement.

B.    **TERMINATION REPORTS.** Subgrantee shall furnish MDHS a written termination report within ten (10) calendar days from the termination date unless additional time is granted by MDHS for the purpose of audits, examinations, or other reasons. The termination report shall include information as set forth in

6

Subsection A of this Section and any other data required by MDHS to furnish evidence of financial and programmatic compliance.

C.     **FINAL FISCAL REPORT.**  The Subgrantee agrees to provide a final fiscal reporting worksheet, along with closeout report, to MDHS within forty-five (45) days after the ending of this Subgrant.  These fiscal documents will be used for the purpose of reconciling this Subgrant to the actual expenditures for activities and services rendered, not to exceed the maximum liability as set forth in Section III D of this Agreement.  Any funds paid by MDHS to Subgrantee and not expended for activities or contracted services under this Agreement or funds expended in violation of this Subgrant shall be considered MDHS' funds and shall be returned to MDHS in full.  Where deemed appropriate by MDHS and accepted by the Subgrantee, a reduction may be allowed in future payments under future Agreements by a total amount equal to the amount disallowed or deferred or by other methods approved by MDHS.

## SECTION XI.  ALTERATION OR MODIFICATION OF SUBGRANT

All modification requests shall be submitted in accordance with established policies and procedures.  Any alteration, variation, modification, or waiver of any provisions of this Agreement shall become binding on both parties only when the agreement of the parties has been reduced to writing and duly executed.  Any line item transfer of funds shall be submitted to MDHS on a Subgrant modification form, along with a budget narrative and shall receive MDHS' prior approval before any such transfer may be affected.

## SECTION XII.  SEVERABILITY

If any term or provision of this Agreementt is prohibited by the laws of the State of Mississippi or is declared invalid or void by a court of competent jurisdiction, the remaining terms and provisions of this Agreement shall not be affected thereby, and each remaining term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

## SECTION XIII.  ASSIGNMENT

The rights, privileges, benefits, and obligations created by this Subgrant and by operation of law extend to and accrue and are obligatory upon the parties hereto, their personal or real representatives, and successors.

Subgrantee shall not assign or otherwise transfer the obligations incurred on its part pursuant to the terms of this Agreement without the prior written consent of MDHS.  Any attempted assignment or transfer of its obligation without such consent shall be wholly void.  MDHS does reserve, however, the exclusive right to direct the Subgrantee to assign and/or transfer this Subgrant when such course of action is mandated by the Federal grantor agency.  In the event that such a transfer or assignment is directed by MDHS, MDHS further reserves the right to ensure adequate and proper arrangement of

7

such transfer to assure continued, effective performance of the purposes for which the parties entered into this Agreement.

## SECTION XIV. RECORDS AND AUDITS

A.  **MAINTENANCE OF RECORDS.**  Subgrantee shall establish and maintain financial and programmatic records, supporting documents, statistical records and other records as may be necessary to reflect the performances of the provisions of this Agreement.

B.  **FISCAL REQUIREMENTS AND AUDIT.**  Subgrantee shall establish such fiscal control and fund accounting procedures, including internal auditing procedures, as may be necessary to assure the proper disbursal of and accounting for funds in accordance with this Agreement, the Single Audit Act Amendments of 1996 (31 U.S.C. Sections 7501-7507) and revised United States Office of Management and Budget (OMB) Circular A-133. The Subgrantee shall keep, maintain and present to MDHS, as required, necessary and proper vouchers, documentation and such other reports as may be required to support the expenditure of funds pursuant to this Agreement, and the Subgrantee shall keep and maintain bookkeeping and accounting records and procedures as the same may be established and approved by MDHS. The Subgrantee's records must be sufficient to allow MDHS to audit and monitor the Subgrantee's operation of its program and sufficient to permit the preparation of reports required by the Single Audit Act and the statues authorizing this subgrant. These records shall be set up in accordance with Generally Accepted Accounting Principles, MDHS' Fiscal Accountability Guidelines, and OMB Cost and Accounting Standards.

C.  **INDEPENDENT AUDIT.**  Audits shall be made by an independent auditor in accordance with the Single Audit Act Amendments of 1996, revised OMB Circular A-133, and generally accepted government standards covering financial audits.

The Subgrantee, by signature affixed herein, agrees that within forty-five (45) days of the expiration of this Agreement, an independent financial audit may be performed in order to comply with OMB Circular A-133.  No independent fiscal audit will be reimbursed in whole or in part by MDHS unless the Subgrantee is specifically required by MDHS to engage the services of an independent audit firm.  MDHS reserves the right to select the audit entity under this provision.

D.  **AUDIT FINDINGS.**  Subgrantee shall receive, reply to and resolve any State and/or Federal programmatic exceptions related to this Agreement and/or any of the Subgrantee's Contractors/Subcontractors.

## SECTION XV. DISPUTES

Any dispute concerning a question of fact under this Agreement which is not disposed of by agreement of the parties hereto shall be decided by the Director of the Division of

8

Family & Children's Services. This decision shall be reduced to writing and a copy thereof mailed or furnished to the Subgrantee and shall be final and conclusive, unless, within thirty (30) days from the date of the decision, Subgrantee mails or furnishes to the Executive Director of the Mississippi Department of Human Services a written request for review. Pending final decision of the Executive Director or his designee, the Subgrantee will proceed in accordance with the decision of the Director of the Division of Family & Children's Services.

In the review before the Executive Director, the Subgrantee shall be afforded an opportunity to be heard and to offer evidence in support of its position on the question and decision under review. The decision of the Executive Director or his designee shall be final and conclusive unless determined by a court of competent jurisdiction in Hinds County, State of Mississippi, to have been fraudulent, capricious, or so grossly erroneous as necessarily to imply bad faith or not supported by substantial evidence.

## SECTION XVI.  SUPPLANTING

Funds received under this Agreement shall be used only to supplement, not supplant, the amount of Federal and/or State, and Local funds otherwise expended for the support of Chafee Foster Care Independence services and related programs.

## SECTION XVII.  WAIVER

Failure of either party hereto to insist upon strict compliance with any of the terms, covenants, and conditions of this Subgrant shall not be deemed a waiver or relinquishment of any similar right or power hereunder at any subsequent time or of any other provision hereof nor shall it be construed to be a modification of the terms of this Agreement.

## SECTION XVIII.  RECORD RETENTION AND ACCESS TO RECORDS

It is specifically understood and agreed that the Subgrantee shall provide MDHS with readily accessible and full opportunity to conduct program and/or fiscal monitoring and auditing (including through on-site visits to the Subgrantee's premises) of the Subgrantee's performance under this Agreement. MDHS, any State agency authorized to audit MDHS, the Federal grantor agency, and the Comptroller General of the United States or any of their duly authorized representatives shall have the right of access to any books, documents, papers or other records of the Subgrantee that are pertinent to the services performed under this Agreement in order to make audit, examination, excerpts and/or transcripts. These records shall be retained for at least three (3) years; however, if any litigation or other legal action, by or on behalf of the State or Federal Government has begun that is not completed at the end of the three (3) year period, or if audit findings, litigation or other legal action has not been resolved at the end of the three (3) year period, the records shall be retained until resolution.

## SECTION XIX. PATENTS AND COPYRIGHTS AND RIGHTS IN DATA

A.  **PATENTS.**  This Agreement is not awarded for the purposes of experimental, developmental or research projects. Should the activities of Subgrantee and/or its Contractors/Subcontractors include experimental, developmental or research projects, this Agreement shall be promptly amended to include the standard patent right clauses required by 35 U.S.C. Section 202 as amended by Public Law 98-620 and 37 CFR Part 401, "Right to Inventions Made by Nonprofit Organizations and Small Business Firms Under Government Grants, Contracts and Cooperative Agreements," and any other provisions required by applicable State and/or Federal laws, rules, or regulations.

B.  **COPYRIGHTS AND RIGHTS IN DATA.**  MDHS reserves a royalty-free nonexclusive, and irrevocable license to reproduce, publish or otherwise use, and to authorize others to use:

> (1) The copyright in any work developed under this Agreement or under any other agreement or contract under this subgrant Agreement; and

> (2) Any rights of copyright to which the Subgrantee or any Subgrantee's Contractor/Subcontractor purchases ownership with subgrant support or funds provided under this Agreement.

> (3) MDHS grants Subgrantee the right to use such materials for educational and research purposes, provided MDHS is allowed to review such materials to ensure that confidential information of MDHS is not disclosed.

Subgrantee hereby assigns to MDHS all rights, title, and interest in any and all materials conceived or created by the Subgrantee, and/or its employees, agents, contractors, or subcontractors, either individually or jointly with others and which arise out of the performance of this Agreement, including any computer programs, systems, designs, source code, work papers, operating instructions, and all other information, documents, and work in whatever form. All work papers, cards, magnetic tapes, disk packs, or other storage media, temporary and/or permanent, containing programs and/or other information of any kind relating to this Agreement shall be available, upon request, to MDHS or its representative(s) for review, inspection, and if desired, reproduction. Such information and documents shall be delivered to MDHS on MDHS' request therefore. Subgrantee shall maintain all master programs and master data files in a completely secure manner. Such programs and files shall be identified by program and file name.

## SECTION XX. OWNERSHIP OF DOCUMENTS AND WORK PRODUCTS

All property purchased and all data, documents, notes, programs, books, databases (and all applications thereof), files, reports, studies, unfinished documents, and/or other material collected or prepared by Subgrantee in connection with this Subgrant shall be

owned by MDHS upon completion or termination of this Agreement. MDHS hereby reserves all rights to the data base and all applications thereof and to any and all information and/or material prepared in connection with this Agreement.

Except as otherwise provided by these General Terms and Provisions, the Subgrantee is prohibited from use or distribution of the above-described information and/or material without the express written approval of MDHS.

All printed mention, materials, deliverable products, publicity, and other documents and reports distributed by the Subgrantee as a result of this Agreement, regardless of its form, must give funding source credit to the Division of Family & Children's Services, Mississippi Department of Human Services. Division of Family & Children's Services must be provided a copy of the aforesaid documents and reports.

## SECTION XXI. CONFLICT OF INTEREST

Subgrantee shall ensure that there exists no direct or indirect conflict of interest in the performance of this subgrant and/or performance by any of the Subgrantee's Contractors/Subcontractors. Further, Subgrantee warrants that no part of any Federal or State money shall be paid directly or indirectly to an employee or official of MDHS as wages, compensation or gifts in exchange of acting as an officer, agent, employee, subcontractor, or consultant to the Subgrantee in connection with any work contemplated or pertaining to this subgrant or Agreement. Subgrantee shall strictly comply with all conflict of interest provisions or standards of conduct provisions contained in the MDHS Subgrantee/Contract Manual or any applicable State, Federal, or Local law, rule, or regulation.

## SECTION XXII. INDEMNIFICATION

Subgrantee agrees to indemnify , defend, save and hold harmless MDHS from and against all claims, demands, liabilities, suits, damages and costs of every kind and nature whatsoever, including court costs and attorneys' fees, arising out of or caused by the Subgrantee and/or its agents, employees, volunteers, contractors or subcontractors in the performance of this Agreement. The Subgrantee shall fully indemnify and repay MDHS any amounts provided hereunder that are found not to have been expended according to this Agreement or any amounts or costs that are disallowed by Federal grantor and/or by MDHS.

## SECTION XXIII. INSURANCE

Subgrantee represents that it will maintain workers' compensation insurance as required by law, which shall inure to the benefit of all Subgrantee's personnel performing services under this Agreement, employee fidelity bond insurance in an amount equal to twenty-five percent (25%) of funds awarded hereunder, and comprehensive general liability insurance. Subgrantee will furnish MDHS with a certificate of insurance providing the aforesaid coverage, prior to the commencement of performance under this Agreement. All insurance policies required under this Section shall be issued by an insurance company or companies licensed to do business in the State of Mississippi and shall be

acceptable to MDHS. The insurance required by this Section shall be maintained at all times during the course of this Agreement for the entire period thereof and MDHS must be given written notice by registered mail at least thirty (30) days in advance of any adverse modification or termination of any insurance.

## SECTION XXIV.  COMPLIANCE WITH LAWS, RULES AND REGULATIONS

Subgrantee shall comply with all applicable policies and procedures of MDHS and all applicable Federal, State, and/or Local laws, rules, regulations, directives, and guidelines that are now applicable or later made applicable to this Agreement. Particularly, but without limitation through inclusion, Subgrantee shall comply with the Chafee Foster Care Independence Program, and the Mississippi Department of Human Services' Subgrantee/Contract Manual **Revised March 2005, including all addenda**.

## SECTION XXV.  GOVERNING LAWS AND LEGAL REMEDIES

This Agreement shall be construed and governed in accordance with the laws of the State of Mississippi. Subgrantee expressly agrees that under no circumstances shall MDHS be obligated to pay an attorney's fee or cost of legal action to Subgrantee.

## SECTION XXVI.  CERTIFICATION OF COMPLIANCE AND ASSURANCES

This Agreement is also subject to the Standard Assurances, Certifications Regarding Lobbying, Debarment, Suspension and other Responsibility Matters; and Drug-Free Workplace Requirements; MDHS' Certification Regarding Unresolved Monitoring Findings, Unresolved Audit Findings; and Litigation Occurring Within the Last Three (3) Years; the Certification of Adequate Fidelity Bonding; and the Board Member's Notification of Liability, attached hereto.

## SECTION XXVII.  E-VERIFY

Subgrantee represents and warrants that it will ensure its compliance with the Mississippi Employment Protection Act (Senate Bill 2988 from the 2008 Regular Legislative Session) and will register and participate in the status verification system for all newly hired employees. The term "employee" as used herein means any person that is hired to perform work within the State of Mississippi. As used herein "status verification system" means the Illegal Immigration Reform and Immigration Responsibility Act of 1996 that is operated by the United States Department of Homeland Security, also known as the E-Verify Program, or any other successor electronic verification system replacing the E-Verify Program. Subgrantee agrees to maintain records of such compliance and, upon request of the State, to provide a copy of each such verification to the State. Subgrantee further represents and warrants that any person assigned to perform services hereunder meets the employment eligibility requirements of all immigration laws of the State of Mississippi. Subgrantee understands and agrees that any breach of these warranties may subject Subgrantee to the following: (a) termination of this Agreement and ineligibility for any State or public contract in Mississippi for up to three (3) years, with notice of such cancellation/termination being made public, or (b) the loss of any license permit, certification or other document granted to Subgrantee by an agency, department or

governmental entity for the right to do business in Mississippi for up to one (1) year, or (c) both. In the event of such termination/cancellation, Subgrantee would also be liable for any additional costs incurred by the State due to contract cancellation or loss of "license or permit".

## SECTION XXVIII. ENTIRE AGREEMENT

IN WITNESS WHEREOF, this Agreement has been made and interchangeably executed by the parties hereto in duplicate originals. This Contract constitutes the entire agreement of the parties with respect to the subject matter contained herein and supersedes and replaces any and all prior negotiations, understandings, and agreements, written or oral, between the parties relation thereto.

**MISSISSIPPI DEPARTMENT OF
HUMAN SERVICES**

By: _____

Title: _____

Date: _____9/17/12_____

Witness: _____

**SOUTHERN CHRISTIAN
SERVICES FOR CHILDREN
AND YOUTH, INC.**

By: _____

Title: _____Executive Director___

Date: _____8/27/12_____

Witness: _____

13

# EXHIBIT A
# Scope of Services

**SOUTHERN CHRISTIAN SERVICES FOR CHILDREN AND YOUTH, INC.
OCTOBER 1, 2012 – SEPTEMBER 30, 2013**

## DESCRIPTION OF SERVICES

1. ***NAME OF PROGRAM / SERVICE***
   The name of the program is **P.R.E.P.A.R.E.** *(Providing Resources, Education, and Preparation to Adolescents Reaching Emancipation)* Independent Living Services.

2. ***TARGET POPULATION***
   Southern Christian Services for Children and Youth, Inc. (SCSCY) will provide independent living services for fourteen (14) to twenty-one (21) year old foster youth in the custody of the Mississippi Department of Human Services (MDHS) and the Mississippi Band of Choctaw Indians, including youth from other states placed in Mississippi and in agreement with the state to do the same with Mississippi youth placed in their state.

   Utilizing data collected by MDHS and a computer based tracking system maintained by SCSCY, eligible youth will be identified and tracked. The identification of eligible youth will be determined from information in the Mississippi Automated Child Welfare Information System (MACWIS). MACWIS is maintained by MDHS and information identifying youth eligible for IL services will be submitted to program staff on a monthly basis. The information will be utilized to locate and administer the Ansell Casey Life Skills Assessment to each appropriate eligible youth for the Independent Living (IL) Program.

   Mississippi youth placed out of state that are in close proximity will also be provided services. Aftercare services will be provided to youth exiting foster care until age twenty-one (21) for those who age out of the system. SCSCY will be ready to accept, place and provide services for the Chafee Foster Care Independence Program (CFCIP) on October 1, 2012. This includes age appropriate youth currently involved in the IL Program.

   ***Targeted Number of Clients to be served***
   The target number of clients to be served will be approximately one thousand (1,000) dependent upon the number of foster teens in the custody of MDHS during the subgrant period and their availability for services.

3. ***PERSONNEL WHO WILL DELIVER SERVICE***
   The Independent Living Preparation Services will be provided by SCSCY utilizing a team of Independent Living Specialists under the direction of a Program Director who is supervised by the Executive Director of the Agency and who works closely with the State Independent Living Coordinator of the MDHS, as well as the MDHS S.A.I.L.S. *(Strategies for Achieving Independent Living Services)* Advisory Committee.

Independent Living Services provided to adolescent males and females age fourteen (14) to twenty-one (21) in the MDHS Division of Family & Children's Services (DFCS) Foster Care System will be strength-based and youth driven and will be for the purpose of assisting them in making a successful transition from foster care to independent living.

In order to deliver these services efficiently, staff members will be located strategically throughout the state. Independent Living Specialists will be located in the following areas: Jackson (2 specialists), Gulfport (1 specialist), Hattiesburg (1 specialist), Brookhaven (1 specialist), Indianola (1 specialist), Batesville (1 specialist), Tupelo (1 specialist), and Starkville (1 specialist). Specialists are to serve the thirteen (13) geographical DFCS regions. Senior Specialists will be located in Tupelo and Gulfport offices. During this grant period SCSCY will close the physical offices in Brookhaven, Indianola, Batesville, and Starkville. The specialists in those locations will work from home. In general, Specialists work forty (40) hours a week but their hours may be flexible due to the different program components.

The Program Director will work in the administrative office of SCSCY in Jackson, MS in close proximity to the MDHS State office.

P.R.E.P.A.R.E. will provide services to youth living in foster/resource homes, non-therapeutic group homes, emergency shelters, residential treatment centers, therapeutic group homes, relative placements, training schools and apartment placements. Training services will be provided in a variety of locations including MDHS county offices residential facilities, public facilities, retreat centers, and educational facilities. All training will be conducted within the State of Mississippi with the exception of services delivered to youth placed in a facility in the Mobile, Alabama area.

**4.    *DESCRIPTION OF PROGRAM ACTIVITIES AND TRAINING***
*Ansell-Casey Life Skills Assessment*
The Ansell-Casey Life Skills Assessment tool will be utilized to gather information about each youth to ensure that their individual skills training needs will be met. The Caregiver Assessment will be completed by the youth's MDHS Social Worker, resource parent or group home worker. All sections must be completed to determine the true level upon which the youth is performing. The assessments will be scored by the use of a computer via the Internet by the IL Specialists.

*Independent Living Plan*
An effective plan requires an accurate assessment of the youth's strengths and needs. Therefore, the Independent Living Specialists will complete the Ansell-Casey Independent Living Assessment on each youth entering the program. The IL Specialists will have knowledge of the needs of each youth in preparation for independent living, and sensitivity to how foster care placement affects growth and development. Once the IL Specialists establish the Independent Living Plan, he/she will discuss desired goals and objectives with the youth during and/or prior to Family Team Meeting. The IL Specialists will co-administer the ILP with the MDHS Social Workers to each

appropriate eligible youth in the IL Program.  The progress of the plan will be reviewed every ninety (90) days.

### Transitional Living Plan

The IL Specialists will assist the DFCS Social Worker with the development of a Transitional Living Plan (TLP) during and/or prior to Family Team Meetings for each eligible youth enrolled in the P.R.E.P.A.R.E. Program. The TLP will capture the goals that youth in care would like to achieve before being released from care. The TLP will also serve as a tool to help youth stay organized and focused while working to achieve their goals. All P.R.E.P.A.R.E. staff will continue an effective and engaged relationship and communicate regularly with the DFCS staff about each youth served in their independent living skills groups. The IL Specialists will co-administer the TLP with MDHS Social Worker to each appropriate eligible youth in the IL Program.  This plan will be updated every ninety (90) days for each youth based on assessment results and personal contacts.

### Family Team Meetings

IL Specialists will attend Family Team Meetings and/or provide updated progress reports along with a description of all programs and services that will help youth transition from foster care to independent living. Family Team Meetings will be held every ninety (90) days for each youth served. IL Specialists will be notified of the meetings by the County of Responsibility (COR) Social Workers.

IL Specialists will develop an Independent Living Plan (ILP) of Study and a Transitional Living Plan of Study (TLP) in conjunction with the youth's MDHS Social Workers during and/or prior to Family Team Meetings held every ninety (90) days for each participating youth based on assessment results and personal contacts. The TLP will be re-assessed in conjunction with MDHS Social Workers when a youth reaches his/her sixteenth (16) birthday and every ninety (90) days thereafter at Family Team Meetings.

### TRAINING
### Curriculum Description

The P.R.E.P.A.R.E. Program will provide a wide range of skill topics to the youth in the fourteen (14) to twenty-one (21) age range in MDHS custody.  The curriculum will be approved by MDHS/DFCS for participating youth based on assessments, personal contacts and ILP of Study and TLP of Study.  The curriculum will address hard and soft skills.  The curriculum guide covers ten (10) skills areas that include Community Resources, Communication Skills and Social Development, Employment, Money Management, Problem Solving and Decision Making, Housing, Daily Living, Self Care (Wellness) and Youth Law Issues, and Biology of Sex/Healthy Relationships.

Additional curriculum units have been developed and added to include soft skills such as team building; leadership; employment; decision-making skills; problem-solving skills; observation of forms of etiquette; interpersonal skills; neutralizing conflict with timing, instructions and polite concise language; and building lasting relationships with diverse personality types.  Some of these units may be taught at retreats.

## *ACTIVITIES*
### *Life Skills Training*
The Independent Living Specialists will conduct Life Skills training throughout the state. Up to two (2) Independent Living skills groups will be held in each county and/or group home setting per month, excluding the months of June and July for conference preparation and attendance.

Understanding that effective learning occurs in situations that engage the youth, the Independent Living Specialists will present the material using a variety of instructional methods. Specialist will make every effort to have the groups be interactive and relevant. Discussion, snacks, use of media, field trips, games, and other approaches will be utilized.

Topics will be based on youth's assessments, personal contact, Independent Living Plans, and Transitional Living Plans. Youth will be offered skills groups, with the potential of receiving up to three (3) skills group hours per month. All skills training will be conducted, coordinated, and supervised by the Independent Living Specialists. A pre-test will be given at the beginning of each module. Independent Living skills groups will be conducted by the Specialists in a classroom-type setting which offers experiential life skills training. Up to two (2) Independent Living skills groups will be held at SCSCY offices, MDHS county offices, therapeutic group homes, emergency shelters, regular group homes, schools or any public location that is convenient for the group to be held (library, civic center, etc.). Specialists will coordinate with MDHS Social Workers, group home staff, and foster parents to arrange transportation to and from the skills group sessions.

A module review and post-test will be given at the completion of each skills module to determine the increase in knowledge gained during participation in the skills groups. The degree of skills obtained by the youth will be assessed by the Specialists and documented in the Independent Living Plan. A report will be provided to youth's Social Workers, group home staff, and foster parent upon the completion of each skill component. Upon successful completion of six (6) skills group hours the youth will be eligible for a $20.00 stipend to be paid by MDHS. Skills hours credit for stipend purposes will be based on actual clock hours.

### *Life Skills Training Events (Retreats)*
Six (6) life skills training events or retreats will be held over the subgrant period. Each retreat will be open to a maximum of fifty (50) eligible foster care youth with a minimum of twenty-five (25) participants and will be held in different geographical areas of the state to provide an opportunity for participation by eligible youth in at least one (1) retreat during the subgrant period.

A variety of skills training will be offered, in addition to recreational and social

activities designed to improve interpersonal skills at the overnight retreats. Retreats will be based on selected themes, which center on both hard and soft life skills. Themes may include, but will not be limited to, "Parenting", "Personal and Home Safety", "Sexual Responsibility", "Healthy Relationships", "Making Good Choices", "Anger Management", "Money Management", "Teamwork and Creativity", "Life Strategies", "Cultural Diversity", "Law Related Education", "Self Discovery", and "Wildlife Survival Skills". While activities will focus on the theme of the retreat, other team building, socialization, and recreational activities will be included in each retreat.

IL Specialists will coordinate and assist MDHS Social Workers, group home staff and resource parents with transportation to and from retreats. Planning and coordination will include, but not be limited to, living accommodations, meals, agenda, itineraries, presenters, schedules and supervision of youth. It will be at the discretion of the MDHS Director of Independent Living as to whether a retreat has to be rescheduled when canceled due to weather conditions. Youth who attend retreats will receive a $20.00 stipend for attendance based on the youth following the rules established for the retreat.

A tentative list of all Life Skills Training Events (retreats) including the names and titles of the staff attending will be submitted to the Director of Independent Living Services within the first thirty (30) days of subgrant period.

### Annual Youth Conference

A Youth Leadership Conference will be held during the summer of 2013 for sixty-five (65) youth ages fifteen (15) to eighteen (18). Youth will be selected to attend the conference based on criteria set by the IL Director and S.A.I.L.S. Advisory Committee. This three (3) day conference will provide direct independent living skills training, as well as empowerment, leadership, positive youth development, and recreational activities. Planning and coordination for the event will be provided by P.R.E.P.A.R.E., MDHS staff and youth. Thirty (30) MDHS staff members will provide supervision and training of the youth, as needed. Appropriate universities and community colleges based in selected locations, will be considered as hosts for this event. The site will be approved by the S.A.I.L.S. and Teen Advisory Committees.

All SCSCY events and activities will provide inclusive environment for youth with special needs. When possible, special arrangements will be made to assist youth with physical handicaps and provide interpreters for youth with hearing and sight impairments.

A youth forum shall be included in the youth conference. This forum allows the youth leaders an opportunity to meet with other youth in small groups to secure their thoughts on areas of interest and concern in the foster care system. Youth leaders will be chosen from the Teen Advisory Board (TAB) and their comments and concerns will be summarized and presented to the youth group by their youth leaders. Additional activities planned include career workshops, special topic workshops, group activities that focus on independent living skills, and recreational activities. IL Specialists will coordinate conference activities and assist MDHS Social Workers in supervision of the

youth. The planning and coordination will include, but not be limited to, living accommodations, meals, agendas, itineraries, presenters, and schedules. Two (2) Registered Nurses will be contracted for the duration of the conference. IL Specialists will coordinate and assist MDHS Social Workers, group home staff and resource parents with transportation to and from youth conference. Youth who attend the Youth Leadership Conference will receive a $100.00 stipend for attendance based on the youth following the rules established for the Youth Leadership Conference. The Stipend will be issued by Southern Christian Services at the end of the conference.

Location and date of the conference including the names and titles of the staff to attend will be submitted to the Director of Independent Living Services within the first thirty (30) days of subgrant period.

### *Mentoring*

P.R.E.P.A.R.E. staff will partner with agencies such as Big Brothers Big Sisters for mentoring services to youth in the Independent Living Program. Staff will coordinate events and/or activities to introduce youth to suggested mentors. Staff will recruit, train and assist with identification of appropriate mentors for youth in IL statewide. Also, staff may partner with local community associations/agencies etc. A list will be provided with each youth who has been matched with mentors every ninety (90) days to the IL Director.

The P.R.E.P.A.R.E. program staff will develop and implement an individualized service model for youth ages seventeen (17) to twenty-one (21).

The ***Circles of Care Model*** will be utilized for this population of youth to offer an individualized approach using a wrap-around service method. The Independent Living Specialists will work with MDHS Social Workers in developing a ***Circle of Care Plan*** for each individual. The persons that may be involved could include: youth, social workers, IL specialists, parents/legal guardian/foster parent, group home staff, school personnel, community leaders, mentors, guardians ad litem and representatives of other community agencies. The purpose of this model will be to connect youth with important resources to increase the success rate of the transition out of the foster care system. This model will require that individuals involved with the youth meet to create a plan for necessary services to increase a better success rate for the youth. The plan will be discussed with youth to acquire their input to ensure that it is appropriate and effective to meet their needs.

The Care Plan will require that the Program Director to work closely with the MDHS Independent Living Director and utilize the MACWIS System to identify youth who are seventeen (17) to twenty-one (21) years of age in the system. The Program Director will maintain contact with the MDHS Social Workers on a monthly for updates on youth in custody that are not attending skills groups. The Care Plan model will address three models of care:

- **Care Plan 1** is designed for youth in the Independent Living Apartment

Placements. These youth are well advanced in achieving many of their goals but are in need of support services and connections to community resources.

- **Care Plan 2** is designed for youth who have attended groups and activities in the past but require a more individualized service to meet their goals of acquiring hard and soft skills. The Independent Living Specialists will meet with these youth to increase participation in completing the goals of their Independent Living Plan of Care and Transitional Living Plan of Care.

- **Care Plan 3** is designed for youth needing more intensive attention. These youth are in custody but have not participated in any skills groups, retreats, conferences etc., The care plan will include:

  o The review and update of the Independent Living Plan of Study Assessments and the Transitional Living Plan of Study by the Independent Living Specialists and the MDHS Social Workers. Thereafter, each plan will be updated at the Family Team meetings every ninety (90) days.
  o The Independent Living Specialists will assess the youth's needs, including but not limited to, community services, resources in the areas of basic needs, education, health care, financial, social and/or recreational.
  o The Independent Living Specialists will assist youth in coordinating resources when they are involved with multiple agencies and/or programs.
  o The Independent Living Specialists will provide individual services such as hard and soft skills training to the youth.
  o The Independent Living Specialists will work with youth on learning coping skills, supportive counseling, and crisis intervention tools.
  o The Independent Living Specialists will provide the youth with a packet of important documents that will include: a flyer with Southern Christian Services' telephone number to call about resources; information regarding the Medicaid program; information and assistance on Educational and Training Vouchers (ETV) Funds, information on colleges/universities, and information regarding military, vocational options and apprenticeships.
  o The Independent Living Specialists will provide each youth with information on our P.A.L.S. (Preparing Youth for Living Successfully) Transitional Living Program as an option, if they will be homeless after their release from custody.
  o The Independent Living Specialists will provide these services in SCSCY offices, community settings, homes of the youth (if legal guardian is present), group homes and apartments of youth participating in the independent living apartment placements.
  o The Independent Living Specialists will work individually with youth housed in the independent living apartment placement.
  o The frequency of contact will depend on the needs of the youth.

*Stipends/Educational and Training Vouchers (ETV)*
IL Specialists will assist in identifying eligible youth for stipends and ETV

funds. Stipends will be paid to youth for their accomplishments and participation. Eligible youth will be given information about stipends and ETV funds in skills groups, life skills training events (retreats), and the Youth Conference. An array of MDHS stipends will be available to youth upon successful completion of six (6) skills group hours the youth will be eligible for a $20.00 stipend to be paid by MDHS. Youth who attend a retreat will receive a $20.00 stipend for attendance based on the youth following the rules established for the retreat. Youth who attend Youth Leadership Conference will receive a $100.00 stipend for attendance based on the youth following the rules established for the Youth Conference. Youth who enroll in post-secondary educational and vocational programs may be eligible for ETV funds based on the criteria of the ETV program. The ETV Program makes vouchers of up to $5,000 per year available to eligible youth attending post-secondary education. IL Specialists will assist youth by working closely with MDHS Social Workers to insure that ETV funds are received. All youth will be encouraged to contact their MDHS Social Workers to take advantage of the funds designated for ETV and stipends. Stipends and ETV funds are requested by the youth's social worker based on the criteria in MDHS policy.

### Independent Living Placements

SCSCY will serve as a Child Placing Agency for any qualified youth who have reached the age of eighteen (18), or seventeen (17) with a high school diploma or GED, and are still in the custody of the State. SCSCY will recruit a minimum of fifteen (15) youth to be presented to the Strategies for Achieving Independent Living Services (S.A.I.L.S.) Advisory Committee to be considered for approved placement in the Independent Living Apartment Placement Program obtaining or exceeding a minimum goal of ten (10) youth approved per year. Independent Living Placement is defined as living in an apartment, house, or rooming house without on-site supervision. Standards and guidelines have been set up by MDHS and SCSCY that will be followed by all placement participations. The Independent Living Specialists will lend ongoing support (counseling) and training (life skills) to the independent living client. In addition, periodic supervision will be provided to the youth to include a minimum of one face-to-face visit every two (2) weeks at the youth's residence. The Independent Living Specialist will submit reports to the P.R.E.P.A.R.E. Program Director each month for review. Reports will also be submitted monthly to the S.A.I.L.S. Committee, MDHS Social Workers and State Independent Living Coordinator of MDHS.

The Specialists will work with MDHS Social Workers to identify any youth who could benefit from this service. Efforts will be made to place all appropriate youth in an Independent Living Placement arrangement. When a youth has been referred for placement, the Independent Living Specialists and the youth's MDHS social worker will work together to make a written recommendation to the State Independent Living Coordinator.

5.     **_COORDINATION WITH MDHS STAFF, RESOURCE PARENTS AND PROVIDERS_**
### Teen Advisory Board (TAB)

IL Specialists will assist the IL Coordinator with development and maintenance of the Teen Advisory Board (TAB) statewide. IL Specialists will be responsible for

nominating TAB members, co-facilitating TAB meetings, and coordinating meeting dates, times, places and transportation.

P.R.E.P.A.R.E. staff will coordinate with Lookin' to the Future and the Annual Resource Parent Training Conference planning committees, as well as, other venues to implement training events for resource parents and other caregivers for the purpose of educating them on how to facilitate continued Independent Living skills preparation to the foster youth in their care. P.R.E.P.A.R.E. staff will provide information and written documentation as proof of resource training participation. Specialists will participate in a minimum of three (3) Resource Parenting Training Events during the subgrant period.

***Community Awareness***
P.R.E.P.A.R.E. staff will be involved in local forums and use them to advocate for youth who are in MDHS custody and for those who have been released from custody. These arenas will be utilized to increase the awareness of the needs of youth in foster care, as well as the youth who have been released from foster care. Some areas of concern to be discussed for youth transitioning into independent living are housing, employment, education, and community resources. P.R.E.P.A.R.E. staff will promote and encourage volunteer mentors for the 2012-2013 subgrant period.

**6.**   ***REPORTING ACTIVITIES AND TRACKING***
***Monthly Reports***
An activity report and statistical report will be submitted by the 10th day of each month. The activity report will reflect unduplicated numbers of youth served and the nature of the service. The statistical report will be outlined by counties and regions and this report will include the number of eligible youth for independent living services, the number of skills groups offered, the number of youth actually participating, the percentages of participation and progress notes indicating hours of completion for each youth served. Additionally, the report will contain the same level of participation, numbers and dates of services provided to youth of the Mississippi Band of Choctaw Indians, Unaccompanied Refugee Minors and youth served in the individual service model.

***Client Reporting***
Youth records will include demographic information, assessments, lessons plans and record of skills group participation, contact with youth, overall independent living participation record, progress notes, stipend requests, and if applicable, IL apartment recommendations. Youth records will be kept confidential and will not be disclosed except for provisions outlined in section 43-21-261 of the Mississippi Code of 1972. An Order of Limited Disclosure must be issued by the court of competent jurisdiction for the youth before information is released.

All photographs of youth, including videos, books, as well as media presentations to include both television and newspaper articles will not be disclosed without an Order of Limited Disclosure under the confidentiality law; and written consent obtained from DFCS, the County of Responsibility, the youth, the birth parents, if available and the

Guardian Ad Litem.  To assure compliance with this requirement no photographs, videos or other media will be allowed at planned activities.

### Quarterly Reports

The Program Director will provide IL Director with baseline numbers of youth to be served by region and county within ninety (90) days of the subgrant period.  Every ninety (90) days thereafter an updated report of youth served and potential youth to be served shall be accompanied by the monthly statistical report.

### Tracking System

Utilizing data collected by MDHS and a computer based tracking system maintained by SCSCY, eligible youth will be identified and tracked.  The identification of eligible youth will be determined from information in the Mississippi Automated Child Welfare Information System (MACWIS).  This system is maintained by MDHS and submitted to program staff on a monthly basis.  The information will be utilized to locate and administer the Ansell Casey Life Skills Assessment to each appropriate eligible youth for the IL Program.  The tracking system will also be utilized to track youth serviced, as well as to enable staff to submit monthly and annual data to MDHS.  All reporting will be submitted to the Director of Independent Living Services.  SCSCY will provide reports as specified in the subgrant to include the following:

### National Youth in Transition Database (NYTD)

IL Specialists will assist the NYTD Coordinator with administering NYTD surveys to youth at age seventeen (17), nineteen (19) and twenty-one (21), tracking and contacting youth in the follow-up population, exhausting all resources to complete subsequent NYTD surveys, promote NYTD to youth, and advocate for NYTD survey participation.

7.   **PUBLIC AWARENESS**

Public Awareness efforts showcasing the P.R.E.P.A.R.E. Program will be accomplished in part through the distribution of agency brochures and an agency display at events, as well as the agency's periodic newsletters, which are distributed throughout the state.  MDHS logo and tag line shall be in any advertising print, brochure, flyers, etc., used to advertise services provided with MDHS funding. The Annual Report is also another productive and highly effective public awareness tool.  The following Public Awareness activities will be accomplished:

### Within the MDHS System

◆    Presentations will be made by SCSCY staff to MDHS staff including Regional Directors, supervisory staff members, county employees, and resource parents.
◆    A client handbook outlining all services will be disseminated to eligible foster care youth and their resource parents/care providers, as well as MDHS staff, and group home staff.
◆    A quarterly newsletter will be disseminated.

***Throughout the General Public***
- ♦    Services will be marketed through the SCSCY brochures, newsletters, and annual reports.
- ♦    Youth presentations will be made to public groups, such as the Lookin' to the Future Conference, the Bottom Line for Kids Annual dinner, and other events.
- ♦    Media coverage of the program components will be utilized.

***Information and Referral***

       On a statewide basis, program staff will provide information on specific community resources and make referrals for adolescents transitioning to independent living. Services available will be discussed with the youth and the COR Social Workers will be contacted when services are needed from MDHS.

8.    **_EVALUATION TOOLS AND METHODOLOGY_**

       SCSCY has a Continuous Quality Improvement Program that measures several areas to insure achievement of contractual goals, adequate training of staff, program quality, and fiscal integrity.

- **The fulfillment of contractual requirements is measured through a review of statistical and program reports prepared by IL Specialists and the Program Director. Indicators to be examined include the following program activities:**
  - ✓ Number of skills groups held
  - ✓ Number of youth served
  - ✓ Unduplicated youth served year to date
  - ✓ Number of individual contacts with each youth
  - ✓ Completed Ansell Casey Assessments
  - ✓ Completed Independent Living Plan of Study Assessments
  - ✓ Completed Transitional Living Plan of Study
  - ✓ Number of Circle of Care contacts and meetings held with youth, ages 17-21
  - ✓ Number of stipends requested
  - ✓ Number of retreats held and number of youth served
  - ✓ Number of youth served at the Youth Conference
  - ✓ Number of youth served in Independent Living Placement

- **Client Satisfaction is examined by:**
  - ✓ Youth Surveys mailed, returned, and compiled
    - ▪ Skills Group Surveys
    - ▪ Retreat Surveys
    - ▪ Annual Conference Surveys
    - ▪ Circle of Care Surveys
    - ▪ Independent Living Apartment Placement Program Surveys

- **Referral source, MDHS Staff satisfaction is examined by:**
  - ✓ Social Worker Surveys mailed, returned and evaluated
  - ✓ Periodic Consultation with the State Independent Living Director

✓ The number of surveys of the S.A.I.L.S. Committee, mailed, returned and compiled

- **Staff Performance Evaluation is measured by:**
  ✓ Periodic observations by the Program Director
  ✓ Bi-annual staff satisfaction surveys
  ✓ Annual Evaluations

- **Staff participation in ongoing training to enhance their skills to better serve the youth by participating in:**
  ✓ The Annual Staff Training Retreat
  ✓ The Lookin' to the Future Conference
  ✓ The National Resource Center for Youth Services at the University of Oklahoma College of Continuing Education conference
  ✓ Pertinent training related to independent living services.
  ✓ Webinars such as, Serving Lesbian, Bisexual, Gay, Transgender, Questioning (LBGTQ) Youth and Whatever it Takes: The Keys to Effective Aftercare
  ✓ Utilize the Runaway and Homeless Youth Training and Technical Assistance Center (RHYTTAC) for training and technical assistance.
  ✓ The Independent Living Specialists, care-givers, group home staff, foster parents and mentors involved with youth participating in the Independent Living Program will have access to the P.R.E.P.A.R.E. Resource Library, which includes teaching guides, videos, and other documents for approved curriculum.

- **Program Outcomes are reviewed using:**
  ✓ The evaluation of youth's knowledge of Life Skills through pre and post tests upon the completion of each module that is taught
  ✓ Quarterly Case File Reviews
  ✓ Each Independent Living Specialists will contact a minimum of five (5) youth, at least once in the subgrant period to follow up with progress after release from custody. The Benchmarks will include:
    - Safe Living Environment
    - Family Composition (for those that were reunited with family)
    - Pregnancy Postponement
    - Health Status
    - Employment Status
    - Budgeting Skills
    - Law/Legal Involvement
    - Substance Abuse

The Program evaluation will be presented to the Senior Management Team for review quarterly. Corrective actions are recommended and implemented by the Program Director and the Independent Living Specialists in consultation with the Independent Living Director.

9.    ***TIMELINE FOR DELIVERY OF SERVICE***

Services will be delivered from the first day of the subgrant. Skills training will begin on October 1, 2012, as scheduled and will continue through September 30, 2013. Retreats will be scheduled every other month beginning in October, excluding June, July and August. The youth conference will be held in June 2013. All other activities will commence on the first day of the subgrant and continue through the duration of the subgrant.

10.   ***OLIVIA Y. LAWSUIT***

SCSCY P.R.E.P.A.R.E. staff have read and discussed the Modified Mississippi Settlement Agreement and Reform Plan that resulted from the *Olivia Y.* Lawsuit. Staff understand their responsibility to assist MDHS where appropriate and that we must fulfill our subgrant requirements within compliance of the *Olivia Y.* Settlement Agreement and Reform Plan as it relates to the Independent Living Program.

# EXHIBIT B
# Modified Mississippi Settlement Agreement and Reform Plan

# EXHIBIT C
# Budget

**Southern Christian Services for Children and Youth**
**BUDGET PREPARED**
**October 1, 2012 - September 30, 2013**

| | Federal 80% | Match 20% | Total |
|---|---|---|---|
| **Salaries** | | | |
| Program Director ($2,004.77 x 26 pay periods) | $52,124.02 | | $52,124.02 |
| 1 Senior Specialist ($1,470.16 x 26 pay periods) | $38,224.16 | | $38,224.16 |
| 1 Senior Specialist ($1,247.40 x 26 pay periods) | $32,432.40 | | $32,432.40 |
| 1 Specialist ($1,226.19 x 26 pay periods) | $31,880.94 | | $31,880.94 |
| 1 Specialist ($1,180.57 x 26 pay periods) | $30,694.82 | | $30,694.82 |
| 3 Specialists ($1,140.36 x 26 pay periods x 3 specialists) | $88,948.08 | | $88,948.08 |
| 3 Specialist ($1,082.03 x 26 pay periods x 3 specialists) | $84,398.34 | | $84,398.34 |
| Part-time Prepare Administrative Assistant ($576.93 x 26 pay periods) | $15,000.18 | | $15,000.18 |
| Part-time Specialist ($615.39 x 26 pay periods) | $16,000.14 | | $16,000.14 |
| | $389,703.08 | $0.00 | $389,703.08 |
| **Salaries (Match & In-Kind)** | | | |
| Chief Financial Officer (12.5% of salary) $60,000 x .125 = $7,500 | $0.00 | $7,500.00 | $7,500.00 |
| Accountant (12.5% of salary) $31,050 x .125 = $3,881.25 | $0.00 | $3,881.25 | $3,881.25 |
| (In-Kind) Agency Board volunteer hours  779.29656 hrs x $125 = $97,412.07 | $0.00 | $97,412.07 | $97,412.07 |
| | $0.00 | $108,793.32 | $108,793.32 |
| | | | |
| **Total Salaries** | $389,703.08 | $108,793.32 | $498,496.40 |
| **Fringe** | | | |
| FICA (7.65 % x $389,703.08) | $29,812.29 | | $29,812.29 |
| Health Insurance (11.5 staff x $267.43 x 12) | $36,905.34 | | $36,905.34 |
| Life Insurance (11.5 staff x 2.4 x 12) | $331.20 | | $331.20 |
| Workers Comp Insurance (1.84 % x $389,703.08) | $7,170.54 | | $7,170.54 |
| Disability Insurance ( .48 % x $389,703.08) | $1,870.57 | | $1,870.57 |
| Pension Fund (11% x $90,348.18) | $9,938.30 | | $9,938.30 |
| Unemployment Insurance ( 13 staff x 2 % x $7,000) | $1,820.00 | | $1,820.00 |
| **Total Fringe** | $87,848.24 | $0.00 | $87,848.24 |
| | | | |
| **Total Personnel** | $477,551.32 | $108,793.32 | $586,344.64 |
| | | | |
| **Travel** | | | |
| Mileage (187,000 miles x $.555 per mile) | $103,785.00 | | $103,785.00 |
| (Mileage will be computed at the specified rate or at the state approved mileage rate in the event that it changes - not to exceed the total budget amount) | | | |
| Meals ($36 per day x 100 days) | $3,600.00 | | $3,600.00 |
| Air Fare for travel to out of state conferences (4 tickets x $500) | $2,000.00 | | $2,000.00 |
| Airport shuttle fees (4 x $50) | $200.00 | | $200.00 |
| Lodging (50 nights x $80 per night) | $4,000.00 | | $4,000.00 |
| **Total Travel** | $113,585.00 | $0.00 | $113,585.00 |
| | | | |
| **Contractual** | | | |
| Rent  for four locations (12 months x $2,900) | $34,800.00 | | $34,800.00 |
| Utilities and building/grounds maintenance for four locations (12 months x $600) | $7,200.00 | | $7,200.00 |
| Includes monthly electric, gas, water, janitorial fees, security monitoring fees, pest control fees, & building and grounds maintenance fees. | | | |
| Telephone & Internet ( 12 months x $1,200) | $14,400.00 | | $14,400.00 |
| Local, long distance, and internet service at four locations. | | | |
| Printing & Copier rental / usage ( 12 months x $1,000 ) | $12,000.00 | | $12,000.00 |
| Includes monthly copier rental, copier usage charges, and other printing charges. | | | |
| Postage (12 months x $400) | $4,800.00 | | $4,800.00 |
| Post office box rentals, postage machine leases,  and postage for 13 staff, including any newsletter mailings. | | | |
| Insurances (professional liability, officers/directors, property & equipment, etc.) (12 mths x $500) | $6,000.00 | | $6,000.00 |
| Computer Repair ( 12 months x $75) | $900.00 | | $900.00 |
| Staff Development (12 months x $500) | $6,000.00 | | $6,000.00 |
| Includes staff physicals, CPR/First Aid certifications, subscriptions to professional magazines, agency dues, conference registrations fees, staff recruitment and advertising, background checks, and training fees for specialized training. | | | |
| Weekend Life Skills Retreats | $12,750.00 | | $12,750.00 |
| 6 Weekend Retreats (3 retreats x $50 per camper x 50 campers = $7,500) + | | | |

(3 retreat x $35 per camper x 50 campers = $5,250) = $12,750. Includes the cost of food, lodging and meeting space.

| | | | |
|---|---|---|---|
| Youth Leadership Conference | $28,504.00 | | $28,504.00 |
| Lodging( 106 youth/staff x $20 x 2 nights ) = $4,240 | | | |
| Meals ( 106 youth/staff x $9 per meal x 6 meals) = $5,724 | | | |
| Meeting room rental; Facility Fees- $2,000 | | | |
| Nurses (Two RN's x $25 per hour x 48 hrs) = $2,400 | | | |
| Speakers (2 speakers x $5,000, 3 speakers x $1,000) = $13,000 | | | |
| Audio Visual rental - $500 | | | |
| Security (2 security guards x $20 per hr x 16 hrs) = $640 | | | |
| Payroll Processing  (12 months x $175 per month = $2,100) | $0.00 | $2,100.00 | $2,100.00 |
| Annual Audit, portion of fees charges to Grant (one time fee $1,900) | $0.00 | $1,900.00 | $1,900.00 |
| **Total Contractual** | **$127,354.00** | **$4,000.00** | **$131,354.00** |

**Commodities**

| | | | |
|---|---|---|---|
| General Office Supplies  (12 months x $950) Includes, but is not limited to such items as desk supplies, paper, pens, printer cartridges, binders, toiletries, and fax paper. Furnishings not to exceed $500. | $11,400.00 | | $11,400.00 |
| Skills Groups Supplies (12 months x $750) Includes instructor manuals, snacks, training supplies, presenter pads, paper, pencils, pens, and other items deemed necessary to provide services specified in the contract. | $9,000.00 | | $9,000.00 |
| Weekend Life Skills Retreats' Supplies (5 retreats x $500)  Includes snacks for retreats, supplies including items to conduct activities to include but not limited to: craft kits, games, outdoor game balls, name tags, and display materials. | $2,500.00 | | $2,500.00 |
| Youth Leadership Conference Supplies | $5,376.00 | | $5,376.00 |
| T-shirts - 120 x $12 = $1,440 | | | |
| Bags - 120 x $2 = $240 | | | |
| Snacks 106 x $2 x 3 snacks = $636 | | | |
| Leadership materials, such as books and brochures 65 x $30 = $1,950 | | | |
| Supplies  - $1,110 | | | |
| Includes, but is not limited to such items as the following: | | | |
| (Name tags - 100 x .50 each = $50, colored paper - 8 reams x $20 per ream = $160; laminating paper - 10 packs x $10 per pack = $100; copy paper - 5 cases x $20 per case = $100; folders- 100 folders x .50 each = $50, poster paper 50 pads x $1 each = $50; craft kits - 20 kits x $30 each = $600) | | | |
| **Total Commodities** | **$28,276.00** | **$0.00** | **$28,276.00** |

**Subsidies, Loans, Grants**

| | | | |
|---|---|---|---|
| Teen Conference stipends (65 x $100) = $6,500 | **$6,500.00** | **$0.00** | **$6,500.00** |
| Stipends given to youth for attending Teen Conference. | | | |

**Equipment**

| | | | |
|---|---|---|---|
| Computers, monitors, printers, telephones, digital camera, and projector. cpu's(5 x $500), monitors(5 x $150),printers(5 x $150), digital camera $250 projectors (2 x $600) | $5,450.00 | | |
| **Total Equipment** | **$5,450.00** | **$0.00** | **$5,450.00** |

| | | | |
|---|---|---|---|
| **Total Direct Costs** | **$758,716.32** | **$112,793.32** | **$871,509.64** |

**Indirect Costs**

| | | | |
|---|---|---|---|
| Federally approved Indirect Cost Rate (26.1% of Salaries and Fringes) | | | |
| 8.0 % to be charged to the grant ($477,551.32 x .08 = $38,204.10) | | | |
| 18.1 % to be used as Non-Federal Match ($477,551.32 x .181 = $86,436.79) | | | |
| **Total Indirect Costs** | **$38,204.10** | **$86,436.79** | **$124,640.89** |

| | | | |
|---|---|---|---|
| **Total Budget** | **$796,920.42** | **$199,230.11** | **$996,150.53** |

# Fidelity Bond

Jul. 25. 2012 10:40AM   Southern Christian   No. 4585   P. 2

SOUTH28   OP ID: CA

# ACORD® CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)** 03/07/12

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | | | |
|---|---|---|---|
| Wellington Associates, Inc.<br>7 River Bend Pl<br>Flowood, MS 39232<br>Bill Barham | 601-420-0174<br>601-420-1890 | **CONTACT NAME:** | |
| | | **PHONE (A/C, No, Ext):** | **FAX (A/C, No):** |
| | | **E-MAIL ADDRESS:** | |

| | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|
| | INSURER A : Brotherhood Mutual Insurance | |
| INSURED   Southern Christian Services<br>Donna Shaw<br>860 East River Place, Ste 104<br>Jackson, MS 39202 | INSURER B : | |
| | INSURER C : | |
| | INSURER D : | |
| | INSURER E : | |
| | INSURER F : | |

## COVERAGES   CERTIFICATE NUMBER:   REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | **GENERAL LIABILITY**<br>X COMMERCIAL GENERAL LIABILITY<br>CLAIMS-MADE X OCCUR<br>X Abuse $1,000,000<br>GEN'L AGGREGATE LIMIT APPLIES PER:<br>X POLICY □ PRO-JECT □ LOC | X | | 23MEA0314633 | 10/01/11 | 10/01/12 | EACH OCCURRENCE<br>DAMAGE TO RENTED PREMISES (Ea occurrence)<br>MED EXP (Any one person)<br>PERSONAL & ADV INJURY<br>GENERAL AGGREGATE<br>PRODUCTS - COMP/OP AGG<br>Emp Ben. | $ 1,000,000<br>$ 300,000<br>$ 5,000<br>$ 1,000,000<br>$ 3,000,000<br>$ 3,000,000<br>$ 1,000,000 |
| A | **AUTOMOBILE LIABILITY**<br>ANY AUTO<br>ALL OWNED AUTOS □ SCHEDULED AUTOS<br>X HIRED AUTOS X NON-OWNED AUTOS | | | 23MEA0314633 | 10/01/11 | 10/01/12 | COMBINED SINGLE LIMIT (Ea accident)<br>BODILY INJURY (Per person)<br>BODILY INJURY (Per accident)<br>PROPERTY DAMAGE (Per accident) | $ 1,000,000<br>$<br>$<br>$<br>$ |
| A | X **UMBRELLA LIAB** X OCCUR<br>**EXCESS LIAB** CLAIMS-MADE<br>DED X RETENTION$ 0 | | | 23MEA0314633 | 10/01/11 | 10/01/12 | EACH OCCURRENCE<br>AGGREGATE | $ 3,000,000<br>$ 3,000,000<br>$ |
| | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y/N<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? □ N/A<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | WC STATU-TORY LIMITS □ OTH-ER<br>E.L. EACH ACCIDENT<br>E.L. DISEASE - EA EMPLOYEE<br>E.L. DISEASE - POLICY LIMIT | $<br>$<br>$ |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (Attach ACORD 101, Additional Remarks Schedule, if more space is required)

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br>*William E. Barham* |

© 1988-2010 ACORD CORPORATION. All rights reserved.

ACORD 25 (2010/05)   The ACORD name and logo are registered marks of ACORD

# W-9

Form **W-9**
(Rev. October 2007)
Department of the Treasury
Internal Revenue Service

**Request for Taxpayer
Identification Number and Certification**

Give form to the
requester. Do not
send to the IRS.

Name (as shown on your income tax return)
Southern Christian Services for Children and Youth, Inc.

Business name, if different from above

Check appropriate box: ☐ Individual/Sole proprietor  ☒ Corporation  ☐ Partnership
☐ Limited liability company. Enter the tax classification (D=disregarded entity, C=corporation, P=partnership) ▶ ........
☐ Other (see instructions) ▶

☐ Exempt payee

Address (number, street, and apt. or suite no.)
860 East River Place, Suite 104

City, state, and ZIP code
Jackson, Mississippi 39202

Requester's name and address (optional)

List account number(s) here (optional)

**Part I    Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. The TIN provided must match the name given on Line 1 to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see How to get a TIN on page 3.

Note. If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Social security number

or

Employer identification number
64 : 0758344

**Part II    Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. citizen or other U.S. person (defined below).

Certification instructions. You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. See the instructions on page 4.

Sign
Here

Signature of
U.S. person ▶ *Susannah K. Cherry*

Date ▶ 8/15/12

**General Instructions**

Section references are to the Internal Revenue Code unless otherwise noted.

**Purpose of Form**

A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income.

Note. If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

Definition of a U.S. person. For federal tax purposes, you are considered a U.S. person if you are:

• An individual who is a U.S. citizen or U.S. resident alien,

• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States,

• An estate (other than a foreign estate), or

• A domestic trust (as defined in Regulations section 301.7701-7).

Special rules for partnerships. Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax on any foreign partners' share of income from such business. Further, in certain cases where a Form W-9 has not been received, a partnership is required to presume that a partner is a foreign person, and pay the withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid withholding on your share of partnership income.

The person who gives Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States is in the following cases:

• The U.S. owner of a disregarded entity and not the entity,

Cat. No. 10231X

Form **W-9** (Rev. 10-2007)

# E-Verify

  

E-VERIFY IS A SERVICE OF DHS

Company ID Number: 317276

## THE E-VERIFY PROGRAM FOR EMPLOYMENT VERIFICATION
## MEMORANDUM OF UNDERSTANDING

### ARTICLE I

### PURPOSE AND AUTHORITY

This Memorandum of Understanding (MOU) sets forth the points of agreement between the Department of Homeland Security (DHS) and **Southern Christian Services for Children and Youth, Inc.** (Employer) regarding the Employer's participation in the Employment Eligibility Verification Program (E-Verify). This MOU explains certain features of the E-Verify program and enumerates specific responsibilities of DHS, the Social Security Administration (SSA), and the Employer. E-Verify is a program that electronically confirms an employee's eligibility to work in the United States after completion of the Employment Eligibility Verification Form (Form I-9). For covered government contractors, E-Verify is used to verify the employment eligibility of all newly hired employees and all existing employees assigned to Federal contracts.

Authority for the E-Verify program is found in Title IV, Subtitle A, of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. 104-208, 110 Stat. 3009, as amended (8 U.S.C. § 1324a note). Authority for use of the E-Verify program by Federal contractors and subcontractors covered by the terms of Subpart 22.18, "Employment Eligibility Verification", of the Federal Acquisition Regulation (FAR) (hereinafter referred to in this MOU as a "Federal contractor") to verify the employment eligibility of certain employees working on Federal contracts is also found in Subpart 22.18 and in Executive Order 12989, as amended.

### ARTICLE II

### FUNCTIONS TO BE PERFORMED

**A.    RESPONSIBILITIES OF SSA**

1.    SSA agrees to provide the Employer with available information that allows the Employer to confirm the accuracy of Social Security Numbers provided by all employees verified under this MOU and the employment authorization of U.S. citizens.

2.    SSA agrees to provide to the Employer appropriate assistance with operational problems that may arise during the Employer's participation in the E-Verify program. SSA agrees to provide the Employer with names, titles, addresses, and telephone numbers of SSA representatives to be contacted during the E-Verify process.

3.    SSA agrees to safeguard the information provided by the Employer through the E-Verify program procedures, and to limit access to such information, as is appropriate by law, to individuals responsible for the verification of Social Security Numbers and for evaluation of the E-Verify program or such other persons or entities who may be authorized by SSA as governed by the Privacy Act (5 U.S.C. § 552a), the Social Security Act (42 U.S.C. 1306(a)), and SSA regulations (20 CFR Part 401).

# E-Verify



Company ID Number: 317276

4.    SSA agrees to provide a means of automated verification that is designed (in conjunction with DHS's automated system if necessary) to provide confirmation or tentative nonconfirmation of U.S. citizens' employment eligibility within 3 Federal Government work days of the initial inquiry.

5.    SSA agrees to provide a means of secondary verification (including updating SSA records as may be necessary) for employees who contest SSA tentative nonconfirmations that is designed to provide final confirmation or nonconfirmation of U.S. citizens' employment eligibility and accuracy of SSA records for both citizens and aliens within 10 Federal Government work days of the date of referral to SSA, unless SSA determines that more than 10 days may be necessary.  In such cases, SSA will provide additional verification instructions.

## B.    RESPONSIBILITIES OF DHS

1.    After SSA verifies the accuracy of SSA records for aliens through E-Verify, DHS agrees to provide the Employer access to selected data from DHS's database to enable the Employer to conduct, to the extent authorized by this MOU:

- Automated verification checks on alien employees by electronic means, and
- Photo verification checks (when available) on employees.

2.    DHS agrees to provide to the Employer appropriate assistance with operational problems that may arise during the Employer's participation in the E-Verify program.  DHS agrees to provide the Employer names, titles, addresses, and telephone numbers of DHS representatives to be contacted during the E-Verify process.

3.    DHS agrees to provide to the Employer a manual (the E-Verify User Manual) containing instructions on E-Verify policies, procedures and requirements for both SSA and DHS, including restrictions on the use of E-Verify.  DHS agrees to provide training materials on E-Verify.

4.    DHS agrees to provide to the Employer a notice, which indicates the Employer's participation in the E-Verify program.  DHS also agrees to provide to the Employer anti-discrimination notices issued by the Office of Special Counsel for Immigration-Related Unfair Employment Practices (OSC), Civil Rights Division, U.S. Department of Justice.

5.    DHS agrees to issue the Employer a user identification number and password that permits the Employer to verify information provided by alien employees with DHS's database.

6.    DHS agrees to safeguard the information provided to DHS by the Employer, and to limit access to such information to individuals responsible for the verification of alien employment eligibility and for evaluation of the E-Verify program, or to such other persons or entities as may be authorized by applicable law. Information will be used only to verify the accuracy of Social Security Numbers and employment eligibility, to enforce the Immigration and Nationality Act (INA) and Federal criminal laws, and to administer Federal contracting requirements.

7.    DHS agrees to provide a means of automated verification that is designed (in conjunction with SSA verification procedures) to provide confirmation or tentative

# E-Verify



E-VERIFY IS A SERVICE OF DHS

Company ID Number: 317276

nonconfirmation of employees' employment eligibility within 3 Federal Government work days of the initial inquiry.

8.    DHS agrees to provide a means of secondary verification (including updating DHS records as may be necessary) for employees who contest DHS tentative nonconfirmations and photo non-match tentative nonconfirmations that is designed to provide final confirmation or nonconfirmation of the employees' employment eligibility within 10 Federal Government work days of the date of referral to DHS, unless DHS determines that more than 10 days may be necessary. In such cases, DHS will provide additional verification instructions.

## C.    RESPONSIBILITIES OF THE EMPLOYER

1.    The Employer agrees to display the notices supplied by DHS in a prominent place that is clearly visible to prospective employees and all employees who are to be verified through the system.

2.    The Employer agrees to provide to the SSA and DHS the names, titles, addresses, and telephone numbers of the Employer representatives to be contacted regarding E-Verify.

3.    The Employer agrees to become familiar with and comply with the most recent version of the E-Verify User Manual.

4.    The Employer agrees that any Employer Representative who will perform employment verification queries will complete the E-Verify Tutorial before that individual initiates any queries.

    A.    The Employer agrees that all Employer representatives will take the refresher tutorials initiated by the E-Verify program as a condition of continued use of E-Verify, including any tutorials for Federal contractors if the Employer is a Federal contractor.

    B.    Failure to complete a refresher tutorial will prevent the Employer from continued use of the program.

5.    The Employer agrees to comply with current Form I-9 procedures, with two exceptions:

- If an employee presents a "List B" identity document, the Employer agrees to only accept "List B" documents that contain a photo. (List B documents identified in 8 C.F.R. § 274a.2(b)(1)(B)) can be presented during the Form I-9 process to establish identity.) If an employee objects to the photo requirement for religious reasons, the Employer should contact E-Verify at 888-464-4218.

- If an employee presents a DHS Form I-551 (Permanent Resident Card) or Form I-766 (Employment Authorization Document) to complete the Form I-9, the Employer agrees to make a photocopy of the document and to retain the photocopy with the employee's Form I-9.  The employer will use the photocopy to verify the photo and to assist DHS with its review of photo non-matches that are contested by employees.  Note that employees retain the right to present any List A, or List B and List C, documentation to complete the Form I-9.  DHS may in the future designate other documents that activate the photo screening tool.

# E-Verify

 

E-VERIFY IS A SERVICE OF DHS

Company ID Number: 317276

6.     The Employer understands that participation in E-Verify does not exempt the Employer from the responsibility to complete, retain, and make available for inspection Forms I-9 that relate to its employees, or from other requirements of applicable regulations or laws, including the obligation to comply with the antidiscrimination requirements of section 274B of the INA with respect to Form I-9 procedures, except for the following modified requirements applicable by reason of the Employer's participation in E-Verify: (1) identity documents must have photos, as described in paragraph 5 above; (2) a rebuttable presumption is established that the Employer has not violated section 274A(a)(1)(A) of the Immigration and Nationality Act (INA) with respect to the hiring of any individual if it obtains confirmation of the identity and employment eligibility of the individual in compliance with the terms and conditions of E-Verify; (3) the Employer must notify DHS if it continues to employ any employee after receiving a final nonconfirmation, and is subject to a civil money penalty between $550 and $1,100 for each failure to notify DHS of continued employment following a final nonconfirmation; (4) the Employer is subject to a rebuttable presumption that it has knowingly employed an unauthorized alien in violation of section 274A(a)(1)(A) if the Employer continues to employ an employee after receiving a final nonconfirmation; and (5) no person or entity participating in E-Verify is civilly or criminally liable under any law for any action taken in good faith based on information provided through the confirmation system. DHS reserves the right to conduct Form I-9 compliance inspections during the course of E-Verify, as well as to conduct any other enforcement activity authorized by law.

7.     The Employer agrees to initiate E-Verify verification procedures for new employees within 3 Employer business days after each employee has been hired (but after both sections 1 and 2 of the Form I-9 have been completed), and to complete as many (but only as many) steps of the E-Verify process as are necessary according to the E-Verify User Manual. The Employer is prohibited from initiating verification procedures before the employee has been hired and the Form I-9 completed. If the automated system to be queried is temporarily unavailable, the 3-day time period is extended until it is again operational in order to accommodate the Employer's attempting, in good faith, to make inquiries during the period of unavailability. In all cases, the Employer must use the SSA verification procedures first, and use DHS verification procedures and photo screening tool only after the SSA verification response has been given. Employers may initiate verification by notating the Form I-9 in circumstances where the employee has applied for a Social Security Number (SSN) from the SSA and is waiting to receive the SSN, provided that the Employer performs an E-Verify employment verification query using the employee's SSN as soon as the SSN becomes available.

8.     The Employer agrees not to use E-Verify procedures for pre-employment screening of job applicants, in support of any unlawful employment practice, or for any other use not authorized by this MOU.  Employers must use E-Verify for all new employees, unless an Employer is a Federal contractor that qualifies for the exceptions described in Article II.D.1.c. Except as provided in Article II.D, the Employer will not verify selectively and will not verify employees hired before the effective date of this MOU.  The Employer understands that if the Employer uses E-Verify procedures for any purpose other than as authorized by this MOU, the Employer may be subject to appropriate legal action and termination of its access to SSA and DHS information pursuant to this MOU.

9.     The Employer agrees to follow appropriate procedures (see Article III. below) regarding tentative nonconfirmations, including notifying employees of the finding, providing written referral instructions to employees, allowing employees to contest the finding, and not taking

# E-Verify



E-VERIFY IS A SERVICE OF DHS

Company ID Number: 317276

adverse action against employees if they choose to contest the finding. Further, when employees contest a tentative nonconfirmation based upon a photo non-match, the Employer is required to take affirmative steps (see Article III.B. below) to contact DHS with information necessary to resolve the challenge.

10.    The Employer agrees not to take any adverse action against an employee based upon the employee's perceived employment eligibility status while SSA or DHS is processing the verification request unless the Employer obtains knowledge (as defined in 8 C.F.R. § 274a.1(l)) that the employee is not work authorized. The Employer understands that an initial inability of the SSA or DHS automated verification system to verify work authorization, a tentative nonconfirmation, a case in continuance (indicating the need for additional time for the government to resolve a case), or the finding of a photo non-match, does not establish, and should not be interpreted as evidence, that the employee is not work authorized. In any of the cases listed above, the employee must be provided a full and fair opportunity to contest the finding, and if he or she does so, the employee may not be terminated or suffer any adverse employment consequences based upon the employee's perceived employment eligibility status (including denying, reducing, or extending work hours, delaying or preventing training, requiring an employee to work in poorer conditions, refusing to assign the employee to a Federal contract or other assignment, or otherwise subjecting an employee to any assumption that he or she is unauthorized to work) until and unless secondary verification by SSA or DHS has been completed and a final nonconfirmation has been issued. If the employee does not choose to contest a tentative nonconfirmation or a photo non-match or if a secondary verification is completed and a final nonconfirmation is issued, then the Employer can find the employee is not work authorized and terminate the employee's employment. Employers or employees with questions about a final nonconfirmation may call E-Verify at 1-888-464-4218 or OSC at 1-800-255-8155 or 1-800-237-2515 (TDD).

11.    The Employer agrees to comply with Title VII of the Civil Rights Act of 1964 and section 274B of the INA by not discriminating unlawfully against any individual in hiring, firing, or recruitment or referral practices because of his or her national origin or, in the case of a protected individual as defined in section 274B(a)(3) of the INA, because of his or her citizenship status. The Employer understands that such illegal practices can include selective verification or use of E-Verify except as provided in part D below, or discharging or refusing to hire employees because they appear or sound "foreign" or have received tentative nonconfirmations. The Employer further understands that any violation of the unfair immigration-related employment practices provisions in section 274B of the INA could subject the Employer to civil penalties, back pay awards, and other sanctions, and violations of Title VII could subject the Employer to back pay awards, compensatory and punitive damages. Violations of either section 274B of the INA or Title VII may also lead to the termination of its participation in E-Verify. If the Employer has any questions relating to the anti-discrimination provision, it should contact OSC at 1-800-255-8155 or 1-800-237-2515 (TDD).

12.    The Employer agrees to record the case verification number on the employee's Form I-9 or to print the screen containing the case verification number and attach it to the employee's Form I-9.

13.    The Employer agrees that it will use the information it receives from SSA or DHS pursuant to E-Verify and this MOU only to confirm the employment eligibility of employees as

# E-Verify 

E-VERIFY IS A SERVICE OF DHS

Company ID Number: 317276

authorized by this MOU. The Employer agrees that it will safeguard this information, and means of access to it (such as PINS and passwords) to ensure that it is not used for any other purpose and as necessary to protect its confidentiality, including ensuring that it is not disseminated to any person other than employees of the Employer who are authorized to perform the Employer's responsibilities under this MOU, except for such dissemination as may be authorized in advance by SSA or DHS for legitimate purposes.

14.     The Employer acknowledges that the information which it receives from SSA is governed by the Privacy Act (5 U.S.C. § 552a(i)(1) and (3)) and the Social Security Act (42 U.S.C. 1306(a)), and that any person who obtains this information under false pretenses or uses it for any purpose other than as provided for in this MOU may be subject to criminal penalties.

15.     The Employer agrees to cooperate with DHS and SSA in their compliance monitoring and evaluation of E-Verify, including by permitting DHS and SSA, upon reasonable notice, to review Forms I-9 and other employment records and to interview it and its employees regarding the Employer's use of E-Verify, and to respond in a timely and accurate manner to DHS requests for information relating to their participation in E-Verify.

## D.     RESPONSIBILITIES OF FEDERAL CONTRACTORS

1.     The Employer understands that if it is a Federal contractor subject to the employment verification terms in Subpart 22.18 of the FAR it must verify the employment eligibility of any "employee assigned to the contract" (as defined in FAR 22.1801) in addition to verifying the employment eligibility of all other employees required to be verified under the FAR. Once an employee has been verified through E-Verify by the Employer, the Employer may not reverify the employee through E-Verify.

a.     Federal contractors not enrolled at the time of contract award: An Employer that is not enrolled in E-Verify as a Federal contractor at the time of a contract award must enroll as a Federal contractor in the E-Verify program within 30 calendar days of contract award and, within 90 days of enrollment, begin to use E-Verify to initiate verification of employment eligibility of new hires of the Employer who are working in the United States, whether or not assigned to the contract. Once the Employer begins verifying new hires, such verification of new hires must be initiated within 3 business days after the date of hire. Once enrolled in E-Verify as a Federal contractor, the Employer must initiate verification of employees assigned to the contract within 90 calendar days after the date of enrollment or within 30 days of an employee's assignment to the contract, whichever date is later.

b.     Federal contractors already enrolled at the time of a contract award: Employers enrolled in E-Verify as a Federal contractor for 90 days or more at the time of a contract award must use E-Verify to initiate verification of employment eligibility for new hires of the Employer who are working in the United States, whether or not assigned to the contract, within 3 business days after the date of hire. If the Employer is enrolled in E-Verify as a Federal contractor for 90 calendar days or less at the time of contract award, the Employer must, within 90 days of enrollment, begin to use E-Verify to initiate verification of new hires of the contractor who are working in the United States, whether or not assigned to the contract. Such verification of new hires must be initiated within 3 business days after the date of hire. An Employer enrolled as a Federal contractor in E-Verify must initiate verification of each employee assigned to the

# E-Verify



E-VERIFY IS A SERVICE OF DHS

Company ID Number: 317276

contract within 90 calendar days after date of contract award or within 30 days after assignment to the contract, whichever is later.

     c.    Institutions of higher education, State, local and tribal governments and sureties: Federal contractors that are institutions of higher education (as defined at 20 U.S.C. 1001(a)), State or local governments, governments of Federally recognized Indian tribes, or sureties performing under a takeover agreement entered into with a Federal agency pursuant to a performance bond may choose to only verify new and existing employees assigned to the Federal contract. Such Federal contractors may, however, elect to verify all new hires, and/or all existing employees hired after November 6, 1986. The provisions of Article II.D, paragraphs 1.a and 1.b of this MOU providing timeframes for initiating employment verification of employees assigned to a contract apply to such institutions of higher education, State, local and tribal governments, and sureties.

     d.    Verification of all employees:   Upon enrollment, Employers who are Federal contractors may elect to verify employment eligibility of all existing employees working in the United States who were hired after November 6, 1986, instead of verifying only those employees assigned to a covered Federal contract. After enrollment, Employers must elect to do so only in the manner designated by DHS and initiate E-Verify verification of all existing employees within 180 days after the election.

     e.    Form I-9 procedures for Federal contractors:   The Employer may use a previously completed Form I-9 as the basis for initiating E-Verify verification of an employee assigned to a contract as long as that Form I-9 is complete (including the SSN), complies with Article II.C.5, the employee's work authorization has not expired, and the Employer has reviewed the information reflected in the Form I-9 either in person or in communications with the employee to ensure that the employee's stated basis in section 1 of the Form I-9 for work authorization has not changed (including, but not limited to, a lawful permanent resident alien having become a naturalized U.S. citizen). If the Employer is unable to determine that the Form I-9 complies with Article II.C.5, if the employee's basis for work authorization as attested in section 1 has expired or changed, or if the Form I-9 contains no SSN or is otherwise incomplete, the Employer shall complete a new I-9 consistent with Article II.C.5, or update the previous I-9 to provide the necessary information. If section 1 of the Form I-9 is otherwise valid and up-to-date and the form otherwise complies with Article II.C.5, but reflects documentation (such as a U.S. passport or Form I-551) that expired subsequent to completion of the Form I-9, the Employer shall not require the production of additional documentation, or use the photo screening tool described in Article II.C.5, subject to any additional or superseding instructions that may be provided on this subject in the E-Verify User Manual. Nothing in this section shall be construed to require a second verification using E-Verify of any assigned employee who has previously been verified as a newly hired employee under this MOU, or to authorize verification of any existing employee by any Employer that is not a Federal contractor.

2.    The Employer understands that if it is a Federal contractor, its compliance with this MOU is a performance requirement under the terms of the Federal contract or subcontract, and the Employer consents to the release of information relating to compliance with its verification responsibilities under this MOU to contracting officers or other officials authorized to review the Employer's compliance with Federal contracting requirements.

 

Company ID Number: 317276

## ARTICLE III

### REFERRAL OF INDIVIDUALS TO SSA AND DHS

**A.    REFERRAL TO SSA**

1.     If the Employer receives a tentative nonconfirmation issued by SSA, the Employer must print the tentative nonconfirmation notice as directed by the automated system and provide it to the employee so that the employee may determine whether he or she will contest the tentative nonconfirmation.

2.     The Employer will refer employees to SSA field offices only as directed by the automated system based on a tentative nonconfirmation, and only after the Employer records the case verification number, reviews the input to detect any transaction errors, and determines that the employee contests the tentative nonconfirmation. The Employer will transmit the Social Security Number to SSA for verification again if this review indicates a need to do so. The Employer will determine whether the employee contests the tentative nonconfirmation as soon as possible after the Employer receives it.

3.     If the employee contests an SSA tentative nonconfirmation, the Employer will provide the employee with a system-generated referral letter and instruct the employee to visit an SSA office within 8 Federal Government work days. SSA will electronically transmit the result of the referral to the Employer within 10 Federal Government work days of the referral unless it determines that more than 10 days is necessary. The Employer agrees to check the E-Verify system regularly for case updates.

4.     The Employer agrees not to ask the employee to obtain a printout from the Social Security Number database (the Numident) or other written verification of the Social Security Number from the SSA.

**B.    REFERRAL TO DHS**

1.     If the Employer receives a tentative nonconfirmation issued by DHS, the Employer must print the tentative nonconfirmation notice as directed by the automated system and provide it to the employee so that the employee may determine whether he or she will contest the tentative nonconfirmation.

2.     If the Employer finds a photo non-match for an employee who provides a document for which the automated system has transmitted a photo, the employer must print the photo non-match tentative nonconfirmation notice as directed by the automated system and provide it to the employee so that the employee may determine whether he or she will contest the finding.

3.     The Employer agrees to refer individuals to DHS only when the employee chooses to contest a tentative nonconfirmation received from DHS automated verification process or when the Employer issues a tentative nonconfirmation based upon a photo non-match. The Employer will determine whether the employee contests the tentative nonconfirmation as soon as possible

# E-Verify



E-VERIFY IS A SERVICE OF DHS

Company ID Number: 317276

after the Employer receives it.

4.      If the employee contests a tentative nonconfirmation issued by DHS, the Employer will provide the employee with a referral letter and instruct the employee to contact DHS through its toll-free hotline (as found on the referral letter) within 8 Federal Government work days.

5.      If the employee contests a tentative nonconfirmation based upon a photo non-match, the Employer will provide the employee with a referral letter to DHS. DHS will electronically transmit the result of the referral to the Employer within 10 Federal Government work days of the referral unless it determines that more than 10 days is necessary. The Employer agrees to check the E-Verify system regularly for case updates.

6.      The Employer agrees that if an employee contests a tentative nonconfirmation based upon a photo non-match, the Employer will send a copy of the employee's Form I-551 or Form I-766 to DHS for review by:

- Scanning and uploading the document, or
- Sending a photocopy of the document by an express mail account (furnished and paid for by DHS).

7.      The Employer understands that if it cannot determine whether there is a photo match/non-match, the Employer is required to forward the employee's documentation to DHS by scanning and uploading, or by sending the document as described in the preceding paragraph, and resolving the case as specified by the Immigration Services Verifier at DHS who will determine the photo match or non-match.

## ARTICLE IV

### SERVICE PROVISIONS

SSA and DHS will not charge the Employer for verification services performed under this MOU. The Employer is responsible for providing equipment needed to make inquiries. To access the E-Verify System, an Employer will need a personal computer with Internet access.

## ARTICLE V

### PARTIES

A.      This MOU is effective upon the signature of all parties, and shall continue in effect for as long as the SSA and DHS conduct the E-Verify program unless modified in writing by the mutual consent of all parties, or terminated by any party upon 30 days prior written notice to the others. Any and all system enhancements to the E-Verify program by DHS or SSA, including but not limited to the E-Verify checking against additional data sources and instituting new verification procedures, will be covered under this MOU and will not cause the need for a supplemental MOU that outlines these changes. DHS agrees to train employers on all changes made to E-Verify through the use of mandatory refresher tutorials and updates to the E-Verify User Manual. Even without changes to E-Verify, DHS reserves the right to require employers to take

# E-Verify

 

Company ID Number: 317276

mandatory refresher tutorials. An Employer that is a Federal contractor may terminate this MOU when the Federal contract that requires its participation in E-Verify is terminated or completed. In such a circumstance, the Federal contractor must provide written notice to DHS. If an Employer that is a Federal contractor fails to provide such notice, that Employer will remain a participant in the E-Verify program, will remain bound by the terms of this MOU that apply to non-Federal contractor participants, and will be required to use the E-Verify procedures to verify the employment eligibility of all newly hired employees.

B.     Notwithstanding Article V, part A of this MOU, DHS may terminate this MOU if deemed necessary because of the requirements of law or policy, or upon a determination by SSA or DHS that there has been a breach of system integrity or security by the Employer, or a failure on the part of the Employer to comply with established procedures or legal requirements. The Employer understands that if it is a Federal contractor, termination of this MOU by any party for any reason may negatively affect its performance of its contractual responsibilities.

C.     Some or all SSA and DHS responsibilities under this MOU may be performed by contractor(s), and SSA and DHS may adjust verification responsibilities between each other as they may determine necessary. By separate agreement with DHS, SSA has agreed to perform its responsibilities as described in this MOU.

D.     Nothing in this MOU is intended, or should be construed, to create any right or benefit, substantive or procedural, enforceable at law by any third party against the United States, its agencies, officers, or employees, or against the Employer, its agents, officers, or employees.

E.     Each party shall be solely responsible for defending any claim or action against it arising out of or related to E-Verify or this MOU, whether civil or criminal, and for any liability wherefrom, including (but not limited to) any dispute between the Employer and any other person or entity regarding the applicability of Section 403(d) of IIRIRA to any action taken or allegedly taken by the Employer.

F.     The Employer understands that the fact of its participation in E-Verify is not confidential information and may be disclosed as authorized or required by law and DHS or SSA policy, including but not limited to, Congressional oversight, E-Verify publicity and media inquiries, determinations of compliance with Federal contractual requirements, and responses to inquiries under the Freedom of Information Act (FOIA).

G.     The foregoing constitutes the full agreement on this subject between DHS and the Employer.

H.     The individuals whose signatures appear below represent that they are authorized to enter into this MOU on behalf of the Employer and DHS respectively.

  

Company ID Number: 317276

**To be accepted as a participant in E-Verify, you should only sign the Employer's Section of the signature page. If you have any questions, contact E-Verify at 888-464-4218.**

**Employer   Southern Christian Services for Children and Youth, Inc.**

<u>Donna Shaw</u>
Name (Please Type or Print)                                                    Title

<u>*Electronically Signed*</u>                                   <u>04/06/2010</u>
Signature                                                                        Date

**Department of Homeland Security – Verification Division**

<u>USCIS Verification Division</u>
Name (Please Type or Print)                                                    Title

<u>*Electronically Signed*</u>                                   <u>04/06/2010</u>
Signature                                                                        Date

  

E-VERIFY IS A SERVICE OF DHS

Company ID Number: 317276

## Information Required for the E-Verify Program

**Information relating to your Company:**

Company Name: Southern Christian Services for Children and Youth, Inc.

Company Facility Address: 860 East River Place

Suite 104

Jackson, MS 39202

Company Alternate
Address:

County or Parish: HINDS

Employer Identification
Number: 640758344

North American Industry
Classification Systems
Code: 623

Parent Company:

Number of Employees: 20 to 99

Number of Sites Verified
for: 5

**Are you verifying for more than 1 site? If yes, please provide the number of sites verified for in each State:**

- MISSISSIPPI                              5    site(s)

# E-Verify



Company ID Number: 317276

**Information relating to the Program Administrator(s) for your Company on policy questions or operational problems:**

| | | |
|---|---|---|
| Name: | | |
| Telephone Number: | Fax Number: | |
| E-mail Address: | | |

# Subgrantee Acceptance Manual

## MDHS Subgrantee Manual Acceptance Form

Subgrantee Manual Coordinator

Each subgrantee should designate a Mississippi Department of Human Services Subgrantee Manual coordinator who is familiar with the agency's operations. The coordinator's name, address, and telephone number should be sent directly to the Director, Office of Monitoring, Mississippi Department of Human Services, by the beginning of each contract period. The subgrantee should only notify the Director, Office of Monitoring, MDHS, in writing of any change in this assignment.

As duly authorized representative of the Southern Christian Services for Children and Youth, Inc._____, I certify that said organization will comply with the above provisions and that I have received as of this date, a copy of the Mississippi Department of Human Services Subgrantee Manual, *[including Addenda to the MDHS Subgrantee/Contract Mannual.]*

Signature

Date  9/12/12

Executive Director

Southern Christian Services for Children and Youth, Inc.

Title

Organization

# Notification
# Of
# Liability

# MISSISSIPPI DEPARTMENT OF HUMAN SERVICES

## BOARD MEMBER'S NOTIFICATION OF LIABILITY

## LIABILITY

MDHS assumes no liability for actions of the Subgrantee or its employees, agents or representatives under this Subgrant. Subgrantee agrees to indemnify, defend, save and hold harmless MDHS from and against all claims, demands, liabilities, suits, damages and costs of every kind and nature whatsoever, including court costs and attorney's fees, arising out of or caused by Subgrantee and/or its agents, employees, contractors, or subcontractors, in the performance of this Subgrant. The Subgrantee acting through its Board of Directors assumes liability in the event the Subgrantee misuses funds or fails to perform according to the provisions of the Subgrant. The Subgrantee shall notify each Board member, in writing, within 15 days of receiving the executed Subgrant of this requirement, and the Subgrantee shall sign a statement to this effect prior to receiving funds under this subgrant.

I acknowledge and agree to notify all members of the Board of Directors, if applicable, in writing of the assumption by Southern Christian Services and liability in the event that Southern Christian Services misuses funds of fails to perform according to the provisions of the Subgrant. Further, I will keep a copy of said notification letter as a permanent part of the Subgrant file.

Signature of Entity's Director _Susannah K. Cherney_

Name: _Susannah K. Cherney_

Organization: _Southern Christian Services for Children and Youth, Inc._

Date: _9/12/2_

Witness: _____

Date: _9/12/12_

# Standard Assurances

MDHS Subgrantee Manual                                    Section 4
Revised 3/01/2005                                         Page 1

## STANDARD ASSURANCES AND CERTIFICATIONS

### OVERVIEW

Each Subgrantee and any lower-tier subrecipient must assure that it will comply with the regulations, policies, guidelines, and requirements imposed by the Federal grantor agency and MDHS. The MDHS Subgrantee must also ensure that any lower-tier subgrants it issues through funds received from MDHS will require the lower-tier subrecipient to comply with these same regulations. The assurances listed in this section may not be applicable to a particular project or program, and there may be additional assurances required by certain Federal awarding agencies.

In addition, each subgrantee must certify in writing that it will comply with the following regulations:

- Lobbying
- Suspension and Debarment
- Drug-Free Workplace
- Unresolved Monitoring and Audit Findings
- Fidelity Bond Coverage

### STANDARD ASSURANCES

The Subgrantee assures that it:

1. has the legal authority to apply for and receive the subgrant; that a resolution, motion, or similar action has been duly adopted or passed as an official act of the subgrantee's governing body, authorizing the subgrant, including all understandings and assurances contained therein, and directing and authorizing the person identified as the official representative of the Subgrantee to act in connection with the subgrant and to provide such additional information as may be required.

2. will give MDHS, the State Auditor's Office, the Federal grantor agency, and the Comptroller General, or any of their authorized representatives, access to and the right to examine all records, books, papers, documents, or items related to the subgrant.

3. will establish and maintain both fiscal and program controls and accounting procedures in accordance with generally accepted accounting principles and Federal grantor agency and MDHS directives; and will keep and maintain such books and records for audit by MDHS, by the Federal grantor agency, by the State Auditor, or by their authorized representatives; and will maintain all such records, books, papers, documents, or items for a period of at least three (3) years from the date of submission of the final reporting worksheet, or, if any litigation, claim,

Case 3:04-cv-00251-HSO-ASH    Document 604-3    Filed 05/08/14    Page 62 of 588

### STANDARD ASSURANCES AND CERTIFICATIONS

audit, or action has begun before the expiration of the three-year period, will retain all such items until the completion of the action and resolution of all issues involved or until the end of the regular three-year period, whichever is later.

4.    will comply with the Single Audit Act Amendments of 1996.

5.    will establish safeguards to prohibit employees from using their positions for a purpose that constitutes, or presents the appearance of, personal or organizational conflict of interest, or personal gain.

6.    will comply with all Federal and State statutes relating to discrimination, including, but not limited to:

Title VI of the Civil Rights Act of 1964, prohibiting discrimination on the basis of race, color, or national origin;

Title VII of the Civil Rights Act of 1964, relating to non-discrimination in matters of recruitment, hiring, promotion, and other employment practices;

Title VIII of the Civil Rights Act of 1968, as amended, relating to non-discrimination in the sale, rental, or financing of housing;

Title IX of the Education Amendments of 1972, as amended, prohibiting discrimination on the basis of sex in federally assisted education programs and activities;

the Age Discrimination Act of 1975, prohibiting discrimination on the basis of age;

Section 504 of the Rehabilitation Act of 1973, prohibiting discrimination on the basis of handicaps;

Subtitle A, Title II of the Americans with Disabilities Act (ADA) (1990);

the Omnibus Reconciliation Act of 1981, prohibiting discrimination on the basis of race, color, religion, sex, national origin, age, and handicap;

the Drug Abuse Office and Treatment Act of 1972, as amended, relating to non-discrimination on the basis of drug abuse;

the Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment, and Rehabilitation Act of 1970, as amended, relating to non-discrimination on the basis of alcohol abuse or alcoholism; and,

Sections 523 and 527 of the Public Health Service Act of 1912, as amended, relating to confidentiality of alcohol and drug abuse patient records; and any other non-discrimination

MDHS Subgrantee Manual                                         Section 4
Revised 3/01/2005                                             Page 3

### STANDARD ASSURANCES AND CERTIFICATIONS

provisions in the specific statute(s) under which these monies will be granted or awarded and the requirements of any other non-discrimination statute(s) which may apply to this subgrant or award.

7.    will ensure that buildings and facilities owned, occupied, or financed by the United States government are accessible to and usable by physically handicapped persons in accordance with the Architectural Barriers Act of 1968.

8.    will comply with the requirements of the provisions of the Uniform Relocation Assistance and Real Property Acquisition Act of 1970, which provide for fair and equitable treatment of persons displaced or whose property is acquired as a result of Federal and federally assisted programs. These provisions apply to all interests in real property acquired for project purposes regardless of Federal participation in purchases.

9.    will comply with the provisions of the Hatch Act, as amended, which limit the political activities of employees whose principal employment activities are funded in whole or in part with Federal funds.

10.   will comply, as applicable, with the provisions of the Davis-Bacon Act, the Copeland Act, and the Contract Work Hours and Safety Standards Act, regarding labor standards for federally assisted construction subagreements.

11.   will conform with Executive Order (EO) 11246, entitled "Equal Employment Opportunity," as amended by EO 11375, and as supplemented in Department of Labor regulations (41 CFR Part 60) and will incorporate an equal opportunity clause in federally assisted construction contracts and subcontracts.

12.   will comply with the minimum wage and maximum hours provisions of the Federal Fair Labor Standards Act.

13.   will comply with the Intergovernmental Personnel Act of 1970 relating to prescribed standards for merit systems for programs funded under one of the 19 statutes or regulations specified in Appendix A of OPM's Standards for a Merit System of Personnel Administration.

14.   will comply, if applicable, with Section 102(a) of the Flood Disaster Protection Act of 1973, which requires recipients in a special flood hazard area to participate in the program and to purchase flood insurance if the total cost of insurable construction and acquisition is $10,000 or more.

15.   will comply with the Lead-Based Paint Poisoning Prevention Act, which prohibits the use of lead-based paint in construction or rehabilitation of residence structures.

16.   will assist the Federal grantor agency in assuring compliance with Section 106 of the National Historic Preservation Act of 1966, as amended; EO 11593; and the Archaeological and Historic Preservation Act of 1974.

## STANDARD ASSURANCES AND CERTIFICATIONS

17.    will comply with environmental standards which may be prescribed pursuant to the following: (a) institution of environmental quality control measures under the National Environmental Policy Act of 1969 and EO 11514; (b) notification of violating facilities pursuant to EO 11738; (c) protection of wetlands pursuant to EO 11990; (d) evaluation of flood hazards in flood plains in accordance with EO 11988; (e) assurance of project consistency with the approved State management program developed under the Coastal Zone Management Act of 1972; (f) conformity of Federal actions to State (Clean Air) Implementation Plans under Section 176 of the Clean Air Act of 1955, as amended; (g) protection of underground sources of drinking water under the Safe Drinking Water Act of 1974, as amended; (h) protection of endangered species under the Endangered Species Act of 1973, as amended; (I) Section 6002 of the Resource Conservation and Recovery Act; and (j) the Coastal Barriers Resources Act.

18.    will comply with the Wild and Scenic Rivers Act of 1968 related to protecting components or potential components of the national wild and scenic rivers system.

19.    will comply with Public Law (PL) 93-348 regarding the protection of human subjects involved in research, development and related activities supported by this subgrant.

20.    will comply with the Laboratory Animal Act of 1966 pertaining to the care, handling, and treatment of warm blooded animals held for research, teaching, or other activities supported by this subgrant.

21.    will comply with Federal regulations regarding criteria for cost sharing or matching contributions.

22.    will assure all funds received shall be used only to supplement services and activities that promote the purposes for which the grant is awarded, and not supplant, unless specifically authorized by the program regulations and the appropriate MDHS Division.

23.    will provide certification regarding lobbying to comply with Section 319, PL 101-121 (31 USC 1352).

24.    will provide the required certification regarding their exclusion status and that of their principals prior to the award in accordance with EOs 12549 and 12689 Debarment and Suspension.

25.    will provide certification to comply with the Drug-Free Workplace Act of 1988.

26.    will comply with all applicable requirements of all other Federal and State laws, Executive Orders, regulations, and policies governing the program(s) for which these monies are provided and with the terms and conditions of the Subgrant Agreement.

## STANDARD ASSURANCES AND CERTIFICATIONS

### REQUIRED CERTIFICATIONS

#### I. LOBBYING

As required by Section 1352, Title 31 of the U.S. Code, the Subgrantee certifies that:

A.    No Federal appropriated funds have been paid or will be paid, by or on behalf of the undersigned, to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making of any Federal grant, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal grant or cooperative agreement;

B.    If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress, in connection with this Federal grant or cooperative agreement, the undersigned shall complete and submit Standard Form - LLL, "Disclosure of Lobbying Activities," in accordance with its instructions;

C.    The undersigned shall require that the language of this certification be included in the award documents for all subawards at all tiers (including subgrants, contracts under grants and cooperative agreements, and subcontracts) and that all subrecipients shall certify and disclose accordingly.

#### II. SUSPENSION AND DEBARMENT
#### AND OTHER RESPONSIBILITY MATTERS (DIRECT RECIPIENT)

As required by Executive Order 12549 and 12689, Suspension and Debarment—

A.    The Subgrantee certifies that it and its principals: (a) Are not presently debarred, suspended, proposed for debarment, declared ineligible, sentenced to a denial of Federal benefits by a State or Federal court, or voluntarily excluded from covered transactions by a Federal department or agency;

(b) Have not within a three-year period preceding this subgrant been convicted of or had a civil judgment rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State, or local) transaction or contract under a public transaction; violation of Federal or State antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property;

(c) Are not presently indicted for or otherwise criminally or civilly charged by a governmental entity (Federal, State, or local) with commission of any of the offenses enumerated in paragraph (b) of this certification; and

(d) Have not within a three-year period preceding this subgrant had one or more public transactions (Federal, State, or local) terminated for cause or default; and

B.    Where the Subgrantee is unable to certify to any of the statements in this certification, he or she shall attach an explanation to this form.

## STANDARD ASSURANCES AND CERTIFICATIONS

### REQUIRED CERTIFICATIONS (Continued)

### III. DRUG-FREE WORKPLACE (SUBGRANTEES WHO ARE INDIVIDUALS)

As required by the Drug-Free Workplace Act of 1988–

A.    As a condition of the subgrant, I certify that I will not engage in the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance in conducting any activity with the subgrant; and

B.    If convicted of a criminal drug offence resulting from a violation occurring during the conduct of any subgrant activity, I will report the conviction, in writing, within 10 calendar days of the conviction to MDHS.

OR

### III. DRUG-FREE WORKPLACE (SUBGRANTEES OTHER THAN INDIVIDUALS)

As required by the Drug-Free Workplace Act of 1988 –

A.    The Subgrantee certifies that it will or will continue to provide a drug-free workplace by:

(a) Publishing a statement notifying employees that the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance is prohibited in the subgrantee's workplace and specifying the actions that will be taken against employees for violation of such prohibition;

(b) Establishing an on-going drug-free awareness program to inform employees about --

(1) The dangers of drug abuse in the workplace;
(2) The subgrantee's policy of maintaining a drug-free workplace;
(3) Any available drug counseling, rehabilitation, and employee assistance programs; and
(4) The penalties that may be imposed upon employees for drug abuse violations occurring in the workplace.

(c) Making it a requirement that each employee to be engaged in the performance of the subgrant be given a copy of the statement required by paragraph (a);

(d) Notifying the employee in the statement required by paragraph (a) that, as a condition of employment under the subgrant, the employee will –

(1) Abide by the terms of the statement; and

(2) Notify the employer in writing of his or her conviction for a violation of a criminal drug statute occurring in the workplace no later than five calendar days after such conviction;

(e) Notifying MDHS, in writing, within 10 calendar days after receiving notice under subparagraph (d)(2) from an employee or otherwise receiving actual notice of such conviction. Employers of convicted employees must provide notice, including position title to MDHS.  Notice shall include the identification number(s) of each affected grant;

## STANDARD ASSURANCES AND CERTIFICATIONS

### III.  DRUG FREE WORKPLACE (SUBGRANTEES OTHER THAN INDIVIDUALS) - Continued

(f) Taking one of the following actions, within 30 calendar days of receiving notice under subparagraph (d)(2), with respect to any employee who is so convicted –

> (1) Taking appropriate personnel action against such an employee, up to and including termination, consistent with the requirement of the Rehabilitation Act of 1973, as amended; or

> (2) Requiring such employee to participate satisfactorily in a drug abuse assistance or rehabilitation program approved for such purposed by a Federal, State, or local health, law enforcement, or other appropriate agency.

(g) Making a good faith effort to continue to maintain a drug-free workplace through implementation of paragraphs (a), (b), (c), (d), (e), and (f).

B. The Subgrantee may insert in the space provided below the site(s) for the performance of work done in connection with the specific subgrant. Check if there are workplaces on file that are not identified here:

Place of Performance (Street address, city, county, state, zip code)

860 East River Place, Suite 104, Jackson, Hinds, MS, 39202

### IV. UNRESOLVED MONITORING FINDINGS;
### UNRESOLVED AUDIT FINDINGS;
### AND LITIGATION OCCURRING WITHIN THE LAST THREE (3) YEARS

Identify any unresolved monitoring findings related to any programs that have been received by the Subgrantee during the last three (3) years and the status of each finding:
None

Identify any unresolved audit findings related to any programs received by the Subgrantee during the last three (3) years and the status of each finding:
None

Identify any litigation and/or administrative hearings that the Subgrantee, the Subgrantee's Senior Management, or Subgrantee's Directors have been involved in during the last three (3) years, including the outcome or disposition of the case:
None

## STANDARD ASSURANCES AND CERTIFICATIONS

REQUIRED CERTIFICATIONS (Continued)

### V. CERTIFICATION OF ADEQUATE FIDELITY BONDING

Identify any and all types of bond coverage currently in force. Include the types of bond coverage; the officers or owners and employees covered; the period covered by the bond; and the limits of coverage assigned to each officer, owner, or employee and the total limit of the bond as applicable.

Southern Christian Services for Children and Youth, Inc. is insured under a Fidelity Bond.

The Bond has a $1,000,000 limit and is effective 10/01/12 to 10/01/13. The Bond covers all

Employees, including all non-compensated officers.

For Subgrantees/Contractors that have been unable to obtain fidelity bond coverage, describe in detail the efforts made to obtain fidelity bond coverage and the reason coverage has not been obtained.

As the authorized representative of the subgrantee, I hereby certify that the subgrantee will comply with the above certifications in items I, II, and III; the information provided items III, IV and V is true and complete to the best of my knowledge, and that the coverage and amounts specified shall be maintained throughout the effective period of the subgrant.

SUBGRANTEE NAME AND ANY OTHER NAMES UNDER WHICH THE SUBGRANTEE HAS DONE BUSINESS:

Southern Christian Services for Children and Youth, Inc.

SUBGRANTEE ADDRESS AND ANY OTHER ADDRESSES THE SUBGRANTEE HAS USED:

860 East River Place, Suite 104, Jackson, MS 39202

TYPED NAME AND TITLE OF THE SUBGRANTEE'S AUTHORIZED REPRESENTATIVE
Susannah K. Cherney,  Executive Director

SIGNATURE OF SUBGRANTEE'S AUTHORIZED REPRESENTATIVE AND DATE:

Susannah K. Cherney                    9/12/12

# EPLS

Excluded Parties List System

**Search Results Excluded By**
**Firm, Entity, or Vessel : Southern Christian Services for Children & Youth**
**Classification : Firm**
**DUNS : 626069413**
**State : MISSISSIPPI**
**as of 12-Sep-2012 3:06 PM EDT**

---

**Your search returned no results.**

# Ex. 17E

# Subgrantee Signature Sheet

# And

# Budget Information

MISSISSIPPI
Form MDHS-SCS-1002
Revised 3-01-2005

**STATE OF MISSISSIPPI**
**MISSISSIPPI DEPARTMENT OF HUMAN SERVICES**
**SUBGRANT SIGNATURE SHEET**
**P.O. BOX 352**
**JACKSON, MISSISSIPPI 39205-0352**

MDHS FUNDING DIVISION: Family and Children's Services

| 1. SUBGRANTEE'S NAME, ADDRESS & PHONE # | 2. EFFECTIVE DATE<br>October 1, 2012 |
|---|---|
| Mississippi Children's Home Society<br>1900 N. West Street<br>Jackson, MS 39215 | 3. SUBGRANT NUMBER<br>233D331 |
| | 4a. GRANT IDENTIFIER (funding source and year):<br>G-1301-MSFPSS (2013 Promoting Safe & Stable Families)<br>b. CATALOG of FEDERAL DOMESTIC ASSISTANCE (CFDA)#<br>93.556 |
| SUBGRANTEE'S FISCAL YEAR END DATE:<br>December 31, 2012 | 5. BEGINNING AND ENDING DATE<br>10/01/2012    to    09/30/2013 |
| NAME/TITLE OF OFFICERS: (SUBGRANT ENTITY) | 6. SUBGRANT PAYMENT METHOD |
| a. Christopher M. Cherney, Chief Executive Officer | _____ CURRENT NEEDS/CASH ADVANCE |
| b. John Damon, Chief Operating Officer | __X__ COST REIMBURSEMENT |
| c. | _____ OTHER |
| CONTACT PERSON:    John Damon<br>PHONE NUMBER:    601-352-7784 | 7. PAGE 1 OF 5 |

8. THE FOLLOWING FUNDS ARE OBLIGATED:

| | | | |
|---|---|---|---|
| FEDERAL | 2,500,000.00 | ADMINISTRATION | 0.00 |
| STATE | | SERVICES | 2,500,000.00 |
| OTHER | 833,333.00 | OTHER | 833,333.00 |
| TOTAL | 3,333,333.00 | TOTAL | 3,333,333.00 |

9. THE SUBGRANTEE AGREES TO ADMINISTER THIS SUBGRANT IN ACCORDANCE WITH ALL FEDERAL AND/OR STATE PROVISIONS THAT ARE APPLICABLE TO SAID SUBGRANT. THE FOLLOWING DOCUMENTS ARE INCORPORATED HEREIN:

| | |
|---|---|
| a. SUBGRANT SIGNATURE SHEET | 3) STANDARD ASSURANCES POLICY |
| b. BUDGET SUMMARY | 4) DEBARMENT POLICY |
| c. COST SUMMARY SUPPORT SHEET | 5) DRUG FREE WORKPLACE POLICY |
| d. BUDGET NARRATIVE | 6) SUBGRANTEE MANUAL ACCEPTANCE |
| e. SUBGRANT AGREEMENT | f. VERIFICATION OF 25% FIDELITY BOND |
| 1) SCOPE OF SERVICES | g. COPY OF BOARD RESOLUTION (If Applicable) |
| 2) GENERAL TERMS AND PROVISIONS | h. COST ALLOCATION & INDIRECT COST RATES |

10. IDENTIFICATION OF OTHER FUNDING (List all other funds requested, anticipated or held over from prior years dedicated to this or similar programs including Federal, State, Local or Private funds. If additional space is needed, please attach typed pages).

| SOURCE | PURPOSE | CONTRACT # | PERIOD (dates) | AMOUNT |
|---|---|---|---|---|
| NA | | | | |
| | | | | |
| | | | | |

| 11. APPROVED FOR MDHS: | 12. APPROVED FOR SUBGRANTEE: |
|---|---|
| BY _[signature]_  DATE 9/5/12 | BY _[signature]_  DATE 8/17/12 |
| Richard A. Berry | Christopher M. Cherney |
| Executive Director | Chief Executive Officer |
| TITLE | TITLE |

# MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
## BUDGET SUMMARY

PAGE 2 OF 5 PAGES

| 1. Applicant Agency: | Mississippi Children's Home Society | | | |
|---|---|---|---|---|

| 2. Subgrant Number: | 3. Grant ID | 4. Beginning Date | 5. Ending Date |
|---|---|---|---|
| 233D331 | G-1301-MSFPSS | 10/1/2012 | 9/30/2013 |

6. Submitted as Part of (Check one):

| a. Funding | b. Modification | c. Modification |
|---|---|---|
| Request  ( X ) | No.(  ) | Effective Date |

**Funding Sources**

| 7. For MDHS Use Only | 8. Activity | Federal | State | Program Income | Other (Local-Private) | Total |
|---|---|---|---|---|---|---|
| | Preservation Services | $1,420,053.00 | | | $473,351.00 | $1,893,404.00 |
| | T/L Reunification | $678,702.00 | | | $226,234.00 | $904,936.00 |
| | Support Services | $401,245.00 | | | $133,748.00 | $534,993.00 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | TOTAL | $2,500,000.00 | | | $833,333.00 | $3,333,333.00 |

# MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
# COST SUMMARY SUPPORT SHEET

**PAGE 3 OF 5 PAGES**

| 1. Applicant Agency | Mississipppi Children's Home Society | | | |
|---|---|---|---|---|

| 2. Subgrant Number | 3. Grant ID | 4. Beginning Date | | 5. Ending Date |
|---|---|---|---|---|
| 233D331 | G-1301-MSFPSS | 10/1/2012 | | 9/30/2013 |

**6. Activity:  Family Preservation**

| 7. For MDHS Use Only | 8. Line Item | 9. Description of Item and/or Basis for Cost | 10. Budget | | |
|---|---|---|---|---|---|
| | | | Federal | All Other | Total |
| | SL&G | Refer to Budget Narrative | $1,420,053.00 | $473,351.00 | $1,893,404.00 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | **TOTAL** | $1,420,053.00 | $473,351.00 | $1,893,404.00 |

# MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
## COST SUMMARY SUPPORT SHEET

**PAGE 4 OF 5 PAGES**

| 1. Applicant Agency | Mississippi Children's Home Society | | |
|---|---|---|---|

| 2. Subgrant Number | 3. Grant ID | 4. Beginning Date | 5. Ending Date |
|---|---|---|---|
| 233D331 | G-1301-MSFPSS | 10/1/2012 | 9/30/2013 |

**6. Activity:  T/L Reunification**

| 7. For MDHS Use Only | 8. Line Item | 9. Description of Item and/or Basis for Cost | 10. Budget | | |
|---|---|---|---|---|---|
| | | | Federal | All Other | Total |
| | SL&G | Refer to Budget Narrative | $678,702.00 | $226,234.00 | $904,936.00 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | TOTAL | $678,702.00 | $226,234.00 | $904,936.00 |

# MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
## COST SUMMARY SUPPORT SHEET

**PAGE 5 OF 5 PAGES**

| 1. Applicant Agency | **Mississippi Children's Home Society** | | | |
|---|---|---|---|---|

| 2. Subgrant Number | 3. Grant ID | 4. Beginning Date | | 5. Ending Date |
|---|---|---|---|---|
| 233D331 | **G-1301-MSFPSS** | 10/1/2012 | | 9/30/2013 |

**6. Activity: Support Services**

| 7. For MDHS Use Only | 8. Line Item | 9. Description of Item and/or Basis for Cost | 10. Budget | | |
|---|---|---|---|---|---|
| | | | Federal | All Other | Total |
| | SL&G | Refer to Budget Narrative | $401,245.00 | $133,748.00 | $534,993.00 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | **TOTAL** | $401,245.00 | $133,748.00 | $534,993.00 |

# Agreement

# AGREEMENT BETWEEN
## MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
### AND
## MISSISSIPPI CHILDREN'S HOME SOCIETY

**THIS AGREEMENT** is made and entered into by and between the Division of Family and Children's Services, Mississippi Department of Human Services, hereinafter referred to as "MDHS," and Mississippi Children's Home Society, hereinafter referred to as "Subgrantee."

In furtherance of the mutual interests and responsibilities of the parties hereto, this Agreement is entered into by and between the parties upon the following terms, provisions, and conditions, to-wit:

## SECTION I.  RESPONSIBILITY OF SUBGRANTEE

Subgrantee shall provide, perform and complete, in a satisfactory manner as determined by MDHS, the services and activities described in the "Scope of Services," attached hereto as Exhibit "A" and the "Modified Mississippi Settlement Agreement and Reform Plan" attached hereto as Exhibit "C" incorporated herein by reference.  Subgrantee shall establish and maintain effective controls and accountability over all funds, property and other assets covered by this Agreement.

## SECTION II.  TERM OF AGREEMENT

The term of this Agreement shall commence on October 1, 2012, or after all parties have signed, whichever is later, and end on September 30, 2013.  MDHS shall have the option to renew the subgrant on an annual basis for up to three (3) years at the same terms and conditions.  Renewal of the subgrant agreement shall be at the sole discretion of MDHS.

## SECTION III.  PAYMENT AND BUDGET LIMITATIONS

**A.**    **SUBGRANT AMOUNT.**  The total amount of the subgrant to be provided by MDHS under this Agreement is Two Million Five Hundred Thousand Dollars and Zero Cents ($2,500,000.00).

**B.**    **METHOD OF PAYMENT.**  It is understood between the parties hereto that funds supporting this Agreement will be utilized and expended as provided for in the Budget Summary, Cost Summary Support Sheet(s), and Budget Narrative, collectively attached hereto as Exhibit "B," (herein referred to as the "Budget" and under the same terms and conditions as set forth in said Budget.) MDHS/DFCS shall process all reimbursement requests on a cost reimbursement basis in its normal course of business, and, if it is found in order, shall process payment thereon to be made within reasonable time to Subgrantee.

**C.**    **BUDGET REVISIONS.**  Any increase, decrease or change in the funding or budgeted line items under this Agreement shall be authorized only as provided by the Mississippi Department of Human Services' line item flexibility policy and/or as authorized by a modification to this Agreement according to Section XXIII hereof.

1

**MAXIMUM PAYMENT.** Notwithstanding any other provision of this Agreement, the maximum payment by MDHS to Subgrantee shall not exceed the sum of Two Million Five Hundred Thousand Dollars and Zero Cents ($2,500,000.00) as set forth in Section III.A. above, in consideration for all performances or services provided by Subgrantee, unless specifically modified as provided herein.

## SECTION IV.  RELATIONSHIP OF PARTIES

The relationship of the Subgrantee to MDHS is that of independent contractor. None of the provisions of this Agreement are intended to create nor shall they be construed to create an agency, partnership, joint venture or employee-employer relationship between MDHS and Subgrantee.

Any person assigned by Subgrantee to perform the services hereunder shall be the employee of the Subgrantee. MDHS may, however, direct Subgrantee to replace any of its employees under this Subgrant. The Subgrantee will replace the employee within five (5) calendar days after receipt of notice from MDHS.

## SECTION V.  COMPLAINT RESOLUTION

Subgrantee shall provide a complaint resolution procedure regarding decisions on eligibility for the program, applications that are not acted upon timely, and decisions otherwise affecting benefits and services for the program funded by this subgrant. The complaint procedure shall be carried out according to the Fair Hearing Procedure of the Mississippi Department of Human Services, a conciliation process, the Personal Responsibility and Work Opportunity Act of 1996, and/or such other procedure as may be required by MDHS, whichever is appropriate to the complaint as directed by MDHS.

## SECTION VI.  CHANGES

MDHS reserves the right to change any portion of the work required under this Agreement or amend other terms, including the Scope of Services, necessary to meet federal or other operation requirements. Revision shall be made by a written amendment to this Agreement duly signed by the authorized representative of each party hereto.

## SECTION VII.  SAFEGUARDING INFORMATION

**A.**    **CONFIDENTIALITY**. All records and information involving applicants or recipients of services under this subgrant shall be kept confidential. Subgrantee shall take any and all steps necessary to insure the physical security of the records and information that it obtains under this Agreement, including but not limited to providing fire protection, protection against smoke and water damage, locked files, passwords, access logs or other methods to prevent loss or unauthorized access or retrieval of the records or information.

**B.**    **THIRD PARTY REQUESTS.** Subgrantee shall treat all State data and information to which it has access under this Subgrant as confidential information to the extent that confidential treatment of same is required under federal and state law and shall not disclose same to a third party without specific written consent of the State. In the event that the Subgrantee receives notice that a third party requests divulgence of confidential or otherwise protected information and/or has served upon it a subpoena or other validly issued administrative or judicial process ordering divulgence of confidential or otherwise protected information, Subgrantee shall promptly inform MDHS and thereafter respond in conformity with such subpoena as required by applicable state and/or federal law, rules, and regulations. The provision herein shall survive

2

termination of the Subgrant for any reason and shall continue in full force and effect and shall be binding upon the Subgrantee and its agents, employees, successors, assigns, subcontractors, and any party claiming an interest in the Subgrant on behalf of, or under, the rights of the Subgrantee following any termination.

C. **LIABILITY**. Any liability resulting from the wrongful disclosure of confidential information on the part of the Subgrantee and/or its officers, agents, subcontractors, and/or representatives shall rest with the Subgrantee. Disclosure of any confidential information by the Subgrantee and/or its representatives or subcontractor without the express written approval of MDHS, shall result in the immediate termination of this Agreement. Nothing herein shall be construed to prevent MDHS from seeking any other remedy, in law or equity, available to it.

## SECTION VIII. TERMINATION OR SUSPENSION

A. **TERMINATION OR SUSPENSION**. If the Subgrantee materially fails to comply with any of the covenants, terms or stipulations of this Agreement, whether stated in a federal statute or regulation, an assurance, in the State plan or application, a notice of award, or elsewhere, MDHS may, upon giving written notice to Subgrantee, take one or more of the following actions, as appropriate in the circumstances:

(1) Temporarily withhold cash payments pending correction of the deficiency by Subgrantee or more severe enforcement action by MDHS;

(2) Disallow (that is, deny both use of funds and, if applicable, matching credit for) all or part of the cost of the activity or action not in compliance;

(3) Wholly or partly suspend or terminate the current award for the Subgrantee's program;

(4) Withhold further awards for the Subgrantee's program; or

(5) Take other remedies that may be legally available.

B. **TERMINATION FOR CONVENIENCE**. MDHS may terminate this Subgrant at any time by giving written notice to Subgrantee of such termination and specifying the effective date thereof, at least five (5) days before the effective date of such termination. Subgrantee shall be paid an amount which bears the same ratio to the total compensation as the services actually and satisfactorily performed bear to the total services of Subgrantee covered by the Subgrant, less payments of compensation previously made.

C. **TERMINATION FOR CAUSE.** If, through any cause, Subgrantee shall fail to fulfill in a timely and proper manner, as determined by MDHS, its obligations under this subgrant, or if Subgrantee shall violate any of the covenants, agreements, or stipulations of this subgrant, MDHS shall thereupon have the right to terminate the subgrant by giving written notice to Subgrantee of such termination and specifying the effective date thereof at least five (5) days before the effective date of such termination. In the event of such termination, Subgrantee shall be entitled to receive just and equitable compensation for satisfactory work completed on services or documents or materials collected and/or prepared by Subgrantee in connection with this subgrant. Such compensation shall be based upon the fees set forth in Paragraph 5, but, in no case, shall said compensation exceed the total subgrant price.

Notwithstanding the above, Subgrantee shall not be relieved of liability to MDHS for damages sustained by MDHS by virtue of any breach of this Subgrant by Subgrantee, and MDHS may withhold any payments to Subgrantee for the purpose of set off until such time as the exact damages due to MDHS from Subgrantee are determined.

**D.     PARTIAL TERMINATION.**  In the event of a partial termination, the Subgrantee shall incur no obligations other than those specifically identified in the subgrant or agreement governing the partial termination.

**E.     RIGHTS AND REMEDIES UPON TERMINATION OR SUSPENSION.**  In the event of termination or suspension as provided in this Section, Subgrantee shall be entitled to receive just and equitable compensation for un-reimbursed obligations or expenses that are reasonably and necessarily incurred in the satisfactory performance, as determined by MDHS, of this Agreement, that were incurred before the effective date of suspension or termination, and that are not in anticipation of termination or suspension. Costs of the Subgrantee resulting from obligations incurred by the Subgrantee during a suspension or after termination of this subgrant are not allowable under this Agreement.  MDHS shall not be liable for any further claims of the Subgrantee. In no case, however, shall said compensation or payment exceed the total amount of this subgrant.  Subgrantee shall be liable to MDHS for damages sustained by MDHS by virtue of any breach of this Agreement by Subgrantee, and MDHS may withhold any payments to Subgrantee for the purpose of set off until such time as the exact amount of damages due to MDHS from Subgrantee are determined.

In case of termination or suspension as provided hereunder, all property, finished or unfinished documents, data, studies, surveys, drawings, photographs, manuals and reports or other materials prepared by or for the Subgrantee under this Agreement shall, at the option of MDHS, become the property of MDHS and shall be disposed of according to MDHS' directives.

The rights and remedies of MDHS provided in this Section shall not be exclusive and are in addition to any other rights and remedies provided by law or in equity.

## SECTION IX.  AGREEMENTS BY SUBGRANTEE

**A.     SUBCONTRACTS.**  It is understood and agreed that the Subgrantee will be entering into agreements or subcontracts with eligible entities (hereinafter sometimes referred to as Subgrantee's Contractor/Subcontractor) for the provision of the services required under this Agreement. Any and all such agreements or subcontracts shall include all of the terms and conditions of this Agreement. The Subgrantee, however, shall be fully responsible for the performance of its Contractors/Subcontractors.

Copies of all subcontracts, agreements, and modifications thereto shall be forwarded to MDHS' Division of Family and Children's Services.

**B.     LIABILITY OF SUBCONTRACTORS.**  Subgrantee agrees that in any agreement or subcontract for the provision of the services covered by this Agreement, it shall require that the contractor or subcontractor release and hold harmless MDHS and the State of Mississippi from and against all claims, demands, liabilities, suits, damages and costs of every kind and nature whatsoever, including court costs and attorneys' fees, arising out of or caused by the contractor or subcontractor and/or its officers, agents, employees, and volunteers in the performance of such services.

4

## SECTION X.  RECORDS AND AUDITS

**A.**    **MAINTENANCE OF RECORDS.**  Subgrantee shall establish and maintain financial and programmatic records, supporting documents, statistical records and other records as may be necessary to reflect the performances of the provisions of this Agreement.

**B.**    **FISCAL REQUIREMENTS AND AUDIT.**  Subgrantee shall establish such fiscal control and fund accounting procedures, including internal auditing procedures, as may be necessary to assure the proper disbursal of and accounting for funds in accordance with this Agreement, the Single Audit Act Amendments of 1996 (31 U.S.C. Sections 7501 - 7507) and revised United States Office of Management and Budget (OMB) Circular A-133.  The Subgrantee shall keep, maintain and present to MDHS, as required, necessary and proper vouchers, documentation and such other reports as may be required to support the expenditure of funds pursuant to this Agreement, and the Subgrantee shall keep and maintain bookkeeping and accounting records and procedures as the same may be established and approved by MDHS.  The Subgrantee's records must be sufficient to allow MDHS to audit and monitor the Subgrantee's operation of its program and sufficient to permit the preparation of reports required by the Single Audit Act and the statutes authorizing this subgrant. These records shall be set up in accordance with Generally Accepted Accounting Principles, MDHS' Fiscal Accountability Guidelines, and OMB Cost and Accounting Standards.

**C.**    **INDEPENDENT AUDIT.**  Audits shall be made by an independent auditor in accordance with the Single Audit Act Amendments of 1996, revised OMB Circular A-133, and generally accepted government standards covering financial audits.

**D.**    **AUDIT FINDINGS.**  Subgrantee shall receive, reply to and resolve any state and/or federal programmatic exceptions related to this Agreement and/or any of the Subgrantee's Contractors/Subcontractors.  Should, during the process of monitoring the program, MDHS become aware of any monitoring findings, the grantee may be required to refund the amount of the questioned costs, following the procedures, outlined in the Subgrantee Manual, Section 9, Page 4, Corrective Action.

## SECTION XI.  RECORD RETENTION AND ACCESS TO RECORDS

It is specifically understood and agreed that the Subgrantee shall provide MDHS with full opportunity to conduct program and/or fiscal monitoring and auditing (including through on-site visits to the Subgrantee's premises) of the Subgrantee's performance under this Agreement.  MDHS, any State agency authorized to audit MDHS, the federal grantor agency, and the Comptroller General of the United States or any of their duly authorized representatives shall have the right of access to any books, documents, papers or other records of the Subgrantee that are pertinent to the services performed under this Agreement in order to make audit, examination, excerpts and/or transcripts.  These records shall be retained for at least three (3) years; however, if any litigation or other legal action, by or on behalf of the State or Federal Government has begun that is not completed at the end of the three (3) year period, or if audit finding, litigation or other legal action has not been resolved at the end of the three (3) year period, the records shall be retained until resolution.

## SECTION XII.  REPORTS

**A.**    **MONTHLY REPORTING.**  Subgrantee shall furnish MDHS with written monthly reports of costs incurred, which shall contain sufficient data to permit the tracing of funds to a level of expenditures adequate to establish that such funds have been used in compliance with this Agreement.  Such reports shall

be due ten (10) calendar days after the close of each month, shall be complete for the period covered and shall contain financial details pertinent to the subgrant.

Subgrantee shall review and discuss such reports with MDHS at such time and in such manner as may be deemed appropriate by MDHS.

**B.    TERMINATION REPORT.**  Subgrantee shall furnish MDHS a written termination report within ten (10) calendar days from the expiration or termination date of this Agreement, unless additional time is granted in writing by MDHS.  The report shall contain information and data sufficient to show that the Subgrantee has achieved compliance with applicable financial and programmatic requirements.

**C.    FINAL FISCAL REPORT.**  The Subgrantee agrees to provide a final fiscal report to MDHS within forty-five (45) calendar days after the ending of this Agreement. Any funds paid by MDHS to the Subgrantee and not expended for activities or services authorized under this Agreement or funds expended in violation of this Agreement shall be considered MDHS' funds and shall be returned by the Subgrantee to MDHS in full. Subgrantee must adhere to the procedures for closeout of subgrants set forth in Section 11 of the MDHS Subgrantee/Contract Manual.

**D.    TAX REPORTS.**  Subgrantee shall file timely federal and state tax reports as due and, if requested, shall furnish MDHS with a copy of such reports within ten (10) calendar days after the filing of the report(s) with the applicable state and/or federal taxing authority(ies).

## SECTION XIII.  PATENTS AND COPYRIGHTS AND RIGHTS DATA

**A.    PATENTS.**  This Agreement is not awarded for the purposes of experimental, developmental or research projects.  Should the activities of Subgrantee and/or its Contractors/Subcontractors include experimental, developmental or research projects, this Agreement shall be promptly amended to include the standard patent rights clauses required by 35 U.S.C. Section 202 as amended by Public Law 98-620 and 37 CFR Part 401, "Rights to Inventions Made by Nonprofit Organizations and Small Business Firms Under Government Grants, Contracts and Cooperative Agreements," and any other provisions required by applicable state and/or federal laws, rules, or regulations.

**B.    COPYRIGHTS AND RIGHTS IN DATA.**  MDHS reserves a royalty-free, nonexclusive, and irrevocable license to reproduce, publish or otherwise use, and to authorize others to use:

(1)    The copyright in any work developed under this Agreement or under any other agreement or contract under this subgrant Agreement; and

(2)    Any rights of copyright to which the Subgrantee or any Subgrantee's Contractor/Subcontractor purchases ownership with subgrant support or funds provided under this Agreement.

Subgrantee hereby assigns to MDHS all rights, title, and interest in any and all materials conceived or created by the Subgrantee, and/or its employees, agents, contractors, or subcontractors, either individually or jointly with others and which arise out of the performance of this Agreement, including any computer programs, systems, designs, source code, work papers, operating instructions, and all other information, documents, and work in whatever form.  All work papers, cards, magnetic tapes, disk packs, or other storage media, temporary and/or permanent, containing programs and/or other information of any kind relating to this Agreement shall be available, upon request, to MDHS or its representative(s) for review, inspection, and if desired, reproduction.  Such information and documents shall be delivered to MDHS on MDHS' request therefore.

Subgrantee shall maintain all master programs and master data files in a completely secure manner. Such programs and files shall be identified by program and file name.

## XIV.  OWNERSHIP OF DOCUMENTS AND WORK PRODUCTS

All documents, notes, programs, books, data bases (and all applications thereof), files, reports, studies, unfinished documents, and/or other material collected or prepared by the Subgrantee and/or any of its Contractors/Subcontractors in connection with this Agreement shall be owned by MDHS during the term of this Agreement and upon completion or termination of this Agreement. MDHS hereby reserves all rights to all systems, computer programs, data bases and all applications thereof and to any and all information and/or material prepared in connection with this Agreement. The Subgrantee is prohibited from use of the aforesaid information and/or material without the express prior written approval of MDHS.

## SECTION XV.  PROPERTY, EQUIPMENT AND SUPPLIES

Property, equipment and supplies purchased, in whole or in part, with funds provided by MDHS shall be accounted for and disposed of in accordance with MDHS' directives, policies and procedures. Subgrantee must adequately safeguard all such property and must assure that it is used solely for purposes authorized by this Agreement. Nothing herein, however, shall be construed to authorize the Subgrantee to purchase equipment with funds provided under this subgrant unless such is specifically allowed by Section III of this Agreement.

## SECTION XVI.  LIMITATION ON EXPENDITURE OF PROGRAM FUNDS

Expenses charged against funds granted herein shall not be incurred by the Subgrantee except during the period of this Agreement as set forth above and may only be incurred and paid only as necessary to the performance of the work and activities set forth in Exhibit A.   All expenses obligated for the approved program must be supported by approved signed contracts, bills, or other evidence of liability consistent with MDHS established procurement procedures.

Further, funds received under this Agreement and any contract or subcontract hereunder shall be used only to supplement, not supplant or duplicate, the amount of federal, state, and/or local funds otherwise expended for services provided by the Subgrantee or in the Subgrantee's service area.

## SECTION XVII.  CONFLICT OF INTEREST

Subgrantee shall ensure that there exists no direct or indirect conflict of interest in the performance of this subgrant and/or performance by any of the Subgrantee's Contractors/Subcontractors.   Subgrantee hereby warrants that no part of any federal or state money shall be paid directly or indirectly to an employee or official of MDHS as wages, compensation or gifts in exchange for acting as an officer, agent, employee, subcontractor, or consultant to the Subgrantee in connection with any work contemplated or pertaining to this subgrant or Agreement.   Subgrantee shall strictly comply with all conflict of interest provisions or standards of conduct provisions contained in the MDHS Subgrantee/Contract Manual or any applicable state, federal, or local law, rule, or regulation.

## SECTION XVIII.  INDEMNIFICATION

Subgrantee agrees to indemnify, defend, save and hold harmless MDHS and the State of Mississippi from and against all claims, demands, liabilities, suits, damages and costs of every kind and nature

7

whatsoever, including court costs and attorneys' fees, arising out of or caused by the Subgrantee and/or its agents, employees, volunteers, contractors or subcontractors in the performance of this Agreement. The Subgrantee shall fully indemnify and repay MDHS any amounts provided hereunder that are found not to have been expended according to this Agreement or any amounts or costs that are disallowed by the federal grantor agency and/or by MDHS.

## SECTION XIX. INSURANCE

Subgrantee represents that it will maintain workers' compensation insurance as required by law, which shall inure to the benefit of all Subgrantee's personnel performing services under this Agreement, employee fidelity bond insurance in an amount equal to twenty-five percent (25%) of the funds awarded hereunder, and comprehensive general liability insurance. Subgrantee will furnish MDHS with a certificate of insurance providing the aforesaid coverage, prior to the commencement of performance under this Agreement. All insurance policies required under this Section shall be issued by an insurance company or companies licensed to do business in the State of Mississippi and shall be acceptable to MDHS. The insurance required by this Section shall be maintained at all times during the course of this Agreement for the entire period hereof and MDHS must be given written notice by registered mail at least thirty (30) days in advance of any adverse modification or termination of any insurance.

If at any time the Subgrantee and/or its Contractors/Subcontractors lease, purchase or otherwise use an automobile, bus, van, or vehicle for the transportation of clients or program participants in carrying out the services required under this Agreement, the Subgrantee and its Contractors/Subcontractors must secure and maintain, at its/their own expense, the following insurance coverage in the amounts specified below:

- Owned vehicles - $30,000.00 combined single limit (bodily injury and property damage) together with medical coverage in the amount of $2,000.00 for owned vehicles.

- Hired vehicles - $25,000.00 combined single limit (bodily injury and property damage)

- Non-owned vehicles - $25,000.00 combined single limit (bodily injury and property damage

## SECTION XX. AVAILABILITY OF FUNDS

It is expressly understood and agreed that the obligation of MDHS to proceed under this Agreement is conditioned upon the appropriation of funds by the Mississippi State Legislature and the receipt of federal and/or state funds. If the funds anticipated for the fulfillment of this Agreement are, at any time, not forth coming or insufficient, either through the failure of the Federal Government to provide funds or of the State of Mississippi to appropriate funds or the discontinuance or material alteration of the program under which funds were provided or if funds are not otherwise available to MDHS for the payments or performance due under this Agreement, MDHS shall not be obligated to pay the amounts due under this Agreement; and all further obligations of MDHS under this Agreement will cease immediately, without penalty, cost or expense to MDHS of any kind whatsoever. In the event of such non-appropriation of funds or lack of funds, MDHS shall notify the Subgrantee, and this Agreement shall be null and void.

## SECTION XXI.  ASSIGNMENT

Subgrantee shall not assign or otherwise transfer the obligations incurred on its part pursuant to the terms of this Agreement without the prior written consent of MDHS.  Any attempted assignment or transfer of its obligation without such consent shall be wholly void.  MDHS does reserve, however, the exclusive right to direct the Subgrantee to assign and/or transfer this Agreement when such course of action is mandated by the federal grantor agency.  In the event that such a transfer or assignment is directed by MDHS, it, further, reserves the right to ensure adequate and proper arrangement of such transfer to assure the continued, effective performance of the purposes for which the parties entered into this Agreement.

## SECTION XXII.  COMPLIANCE WITH LAWS, RULES AND REGULATIONS

Subgrantee shall comply with all applicable policies and procedures of MDHS and all applicable federal, state, and/or local laws, rules, regulations, directives, and guidelines that are now applicable or later made applicable to this Agreement.  Particularly, but without limitation through inclusion, Subgrantee shall comply with 45 CFR Part 92 and the Mississippi Department of Human Services' Subgrantee/Contract Manual **Revised March 2005, including all addenda**.

## SECTION XXIII.  AMENDMENT OR MODIFICATION

Modifications, changes or amendments to this Agreement may be made upon mutual agreement of the parties hereto.  Except as otherwise specifically provided by MDHS' policy, any change, supplement, modification or amendment of any term, provision or condition of this Agreement must be in writing and signed by both parties hereto.  Any modifications to this grant must be requested in writing no earlier than thirty (30) days after the beginning date of the grant and no less than thirty (30) days prior to the expiration date of the grant.

## SECTION XXIV.  DISPUTES

Any dispute concerning a question of fact under this Agreement that is not disposed of by agreement of the parties hereto shall be decided by the Director of the Division of Family and Children's Services. This decision shall be reduced to writing and a copy thereof mailed or furnished to the Subgrantee and shall be final and conclusive, unless, within thirty (30) days from the date of the decision, the Subgrantee mails or furnishes to the Executive Director of the Mississippi Department of Human Services a written request for review.  Pending final decision of the Executive Director or his designee, the Subgrantee will proceed in accordance with the decision of the Director of the Division of Family and Children's Services.   In the review before the Executive Director, the Subgrantee shall be afforded an opportunity to be heard and to offer evidence in support of its position on the question and decision under review.  The decision of the Executive Director or designee shall be final and conclusive unless determined by a court of competent jurisdiction in Hinds County, State of Mississippi, to have been fraudulent, capricious or so grossly erroneous as necessarily to imply bad faith or not supported by substantial evidence.

## SECTION XXV.  WAIVER

Failure of either party hereto to insist upon strict compliance with any of the terms, covenants and conditions of this Agreement shall not be deemed a waiver or relinquishment of any similar right or power hereunder at any subsequent time or of any other provision hereof nor shall it be construed to be a modification of the terms of this Agreement.

9

## SECTION XXVI.  SEVERABILITY

If any term or provision of this Agreement is prohibited by the laws of the State of Mississippi or declared invalid or void by a court of competent jurisdiction, the remainder of this Agreement shall not be affected thereby and each term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

## SECTION XXVII.  GOVERNING LAWS AND LEGAL REMEDIES

This Agreement shall be construed and governed in accordance with the laws of the State of Mississippi.  Subgrantee expressly agrees that under no circumstances shall MDHS be obligated to pay an attorney's fee or the cost of legal action to Subgrantee.

## SECTION XXVIII.  NOTICE

Any notice required or permitted to be given under this Agreement shall be in writing, personally delivered or sent by certified mail, to the party to whom the notice should be given at the address set forth on the Mississippi Department of Human Services' (MDHS) Subgrant/Contract Signature Sheet or at such address as the party may provide in writing from time to time.

## SECTION XXIX.  CERTIFICATIONS OF COMPLIANCE AND ASSURANCES

This Agreement is also subject to the Standard Assurances, Certifications Regarding Lobbying, Debarment, Suspension and Other Responsibility Matters; and Drug-Free Workplace Requirements, MDHS' Certification Regarding Unresolved Monitoring Findings; Unresolved Audit Findings; and Litigation Occurring Within the Last Three (3) Years, and the Certification of Adequate Fidelity Bonding.

## SECTION XXX.  CAPTIONS

The captions and headings in this Agreement are for convenience only, and in no way define, limit or describe the scope or intent of any provision or article of this Agreement.

## SECTION XXXI.  E-VERIFY

Subgrantee represents and warrants that it will ensure compliance with the Mississippi Employment Protection Act (Senate Bill 2988 from the 2008 Regular Legislative Session) and will register and participate in the status verification system for all newly hired employees.  The term "employee" as used herein means any person that is hired to perform work within the State of Mississippi.  As used herein, "status verification system" means the Illegal Immigration Reform and Immigration Responsibility Act of 1996 that is operated by the United States Department of Homeland Security, also known as the E-Verify Program, or any other successor electronic verification system replacing the E-Verify Program.  Subgrantee agrees to maintain records of such compliance and, upon request of the State, to provide a copy of each such verification to the State. Subgrantee further represents and warrants that any person assigned to perform services hereunder meets the employment eligibility requirements of all immigration laws of the State of Mississippi. Subgrantee understands and agrees that any breach of these warranties may subject Subgrantee to the following: (a) termination of this Agreement and ineligibility for any state or public contract in Mississippi for up to three (3) years, with notice of such cancellation/termination being made public, or (b) the loss of any license, permit, certification or other document granted to Subgrantee by an agency, department or governmental entity for the right to do business in Mississippi for up to one (1) year, or (c)

10

both. In the event of such termination/cancellation, Subgrantee would also be liable for any additional costs incurred by the State due to contract cancellation or loss of "license or permit."

## SECTION XXXII.  ENTIRE AGREEMENT

IN WITNESS WHEREOF, this Agreement has been made and interchangeably executed by the parties hereto in duplicate originals.  This Contract constitutes the entire agreement of the parties with respect to the subject matter contained herein and supersedes and replaces any and all prior negotiations, understandings, and agreements, written or oral, between the parties relating thereto.

**MISSISSIPPI DEPARTMENT OF**
**HUMAN SERVICES**

By: _____

Title: _Deputy Executive Director_

Date: _9/5/12_

Witness: _____

**MISSISSIPPI CHILDREN'S**
**HOME SOCIETY**

By: _____

Title: _CEO_

Date: _8/17/12_

Witness: _____

11

# EXHIBIT A
# Scope of Services

**MISSISSIPPI CHILDREN'S HOME SOCIETY (MCHS)**
**COMPREHENSIVE FAMILY SUPPORT SERVICES PROGRAM (CFSSP)**
**OCTOBER 1, 2012 – SEPTEMBER 30, 2013**

**SCOPE OF SERVICES:**

1. Provide short-term (4 to 8 weeks) intensive in-home services to serve as an alternative to the unnecessary placement of children in out of home care (family preservation).  Provide intensive in-home services (12 to 16 weeks) that may include preparation, supervised visitation, transitional and reunification services to promote timely reunification for children who been removed from their homes (reunification).  Mississippi Children's Home Society (MCHS) will provide family support services to further strengthen and support the families served through both family preservation and reunification.

2. MCHS will provide sixteen (16) teams statewide available through MCHS regional and satellite offices to provide family preservation and reunification services.

3. Each team will have a caseload of no more than six (6) cases.  Based on these caseloads, these teams are available and may serve a total of sixty-four (64) to ninety-six (96) cases statewide on any given day.  The number of cases served by MCHS is dependent on the cases referred from Mississippi Department of Human Services (MDHS), Division of Family and Children's Services (DFCS) and assigned to MCHS.

4. Referral Criteria includes:

   a. All referrals must be submitted by MDHS/DFCS workers, approved by the MDHS CFSSP Program Coordinator, and assigned to the MCHS CFSSP Supervisors.

   b. The child or youth must be between the ages of birth to twenty-one (21) and served by MDHS/DFCS.

   c. The child/youth must be at risk of removal from the home setting for a placement in a standard or more restrictive foster care placement (family preservation).

   d. The child (ren) must have been recently removed from their home for a period not to exceed eight (8) months with the goal of timely reunification (reunification).

   e. Families must voluntarily agree to participate in the program.

5. Description of Services:

   a. Once the referral is accepted, MCHS will coordinate with the local MDHS staff and contact the family within twenty-four (24) hours.

   b. A Crisis and Safety Plan will be developed with the family and updated as needed and will include crisis intervention, crisis management and crisis debriefing. MCHS will present the Crisis and Safety Plan developed with the family to the MDHS caseworker to collaboratively integrate with the MDHS Safety Plan.

   c. Teams will be available to the families 24/7 for crisis intervention services once admitted into program.

   d. Intake assessment will be provided utilizing the North Carolina Family Assessment Scale (NCFAS) to determine family functioning and will be repeated at discharge to determine outcomes. The results of the assessments will be included in the Quarterly and Annual Reports.

e. Assessment tools will be available to the CFSSP therapist and will be completed with the family based on individualized needs.

f. Services will be provided by a team to include a Master's level therapist and a Bachelor's level case manager. The teams are supervised by a Master's level supervisor.

g. Family Team Meetings (FTM) will be held with the MDHS county staff, CFSSP staff, the family and additional family supports to collaborate with MDHS on the development and/or update of the Individualized Service Plan (ISP), building on the strengths and the individualized needs of the client and family.

h. MCHS will develop an ISP with the family as part of the CFSSP intake and initial assessment. The initial plan will be presented to MDHS county staff during Family Team Meetings to achieve a collaborative ISP. MDHS will be responsible for entering the documentation of the collaborative ISP in Mississippi Automated Child Welfare Information System (MACWIS).

i. Services provided must address the cause(s) for the child entering custody or reasons the child is at risk for an out of home placement. CFSSP services must be individualized and guided by the goals and activities of the ISP.

j. The services provided by the team include, but are not limited to:

   i. The therapist will provide therapeutic services based on assessed needs (e.g., assessments, brief or targeted therapy, trauma informed care, advocacy, behavior management and intervention, psycho-education, individualized parenting, skill building, etc.)

   ii. The case manager will provide case management services (e.g., referrals for basic needs including health and developmental services, access to formal and informal resources, linkages to community services and activities, transportation, life skills, etc.)

k. Flex funds will be available per family to assist with immediate and concrete needs when other funding sources are not available and to utilize non-traditional services as appropriate to the case.

l. Services will be family driven and youth guided. Services will be provided around the availability and schedule of the family and will primarily be provided in the home.

m. Families will have the opportunity to participate in evaluation of the program efficacy and consumer satisfaction through surveys and their input will be utilized to continuously improve services.

n. Bi-weekly conference calls will occur to review cases with CFSSP State Coordinator, MDHS County case workers, CFSSP therapist and case manager, and CFSSP Supervisors to determine progress toward the goals and objectives of the ISP and for on-going case planning to address continuing priorities and needs. At this time, decisions will be made by the CFSSP State Coordinator regarding continuing services, extensions or case closures (terminate services).

o. Extensions may be requested through the CFSSP State Coordinator at least fourteen (14) days prior to the planned discharge date if the extension would allow the family to reach additional goals or achieve positive outcomes prior to discharge.

6. Reporting:

    a. Weekly reporting will be provided to the MDHS county case worker by the MCHS assigned team. These weekly reports will be documented in a Communication Note and will include progress toward the ISP goals and objectives. The report will be part of the weekly upload into MACWIS in order for MDHS case workers to electronically view the report in the MDHS client's record.

    b. A Monthly Client List will be submitted to MDHS identifying the family cases served and case types to include Family Preservation or Reunification. In addition to case type, MCHS will also note cases that receive family support services. This will be submitted each month for the prior month of service in conjunction with the financial monthly reporting worksheet.

    c. MCHS will provide a Quarterly and Annual Report to DFCS and the CFSSP State Program Coordinator to include program data, progress toward outcomes, NCFAS report, training report, results of family and worker surveys, and documentation of successful cases.

7. Outcomes:

    a. Annually, at least eighty percent (80%) of the identified children classified as family preservation cases at the time of discharge, will have been safely maintained in the same home as the referral or with a family member/relative; therefore, preventing the child/children from entering the MDHS foster care system.

    b. Annually, at least eighty percent (80%) of the identified children classified as reunification cases, at the time of discharge, where the child was actually returned to the home (by the court or MDHS) during services, will have been safely maintained with family, preventing the child/children from re-entering MDHS foster care system.

    c. Annually, aggregate NCFAS scores for family preservation cases will reflect improvement (increase in scores from intake to discharge) in the five (5) areas of family functioning: Environmental, Parental Capabilities, Family Interactions, Family Safety, and Child Well-being. NCFAS results will be reported quarterly and annually.

    d. Annually, aggregate NCFAS scores for reunification cases will reflect improvement (increase in scores from intake to discharge) in the five (5) areas of family functioning listed above and include two (2) additional categories, Caregiver/Child Ambivalence and Readiness for Reunification. NCFAS results will be reported quarterly and annually.

    e. Annually, eighty percent (80%) of the families served will indicate satisfaction with family preservation or reunification services based on data collected by the Family Survey at the time of discharge.

# EXHIBIT B
# Budget

**MISSISSIPPI CHILDREN'S HOME SOCIETY**
**COMPREHENSIVE FAMILY SUPPORT SERVICES PROGRAM**
**BUDGET NARRATIVE FOR 10/1/2012 – 9/30/2013**

**Definitions of Child Welfare Activities Allowed Under Title IV-B Subpart 2 Promoting Safe and Stable Families (compiled from the Social Security Act and 45 Code of Federal Regulations)**

- Family Preservation Services means services for children and families designed to protect children from harm and help families (including foster, adoptive and extended families) at risk or in crisis, including:

  a. Service programs designed to help children, where safe and appropriate, return to families from which they have been removed; or be placed for adoption, with a legal guardian, or if adoption or legal guardianship is determined not to be safe and appropriate for a child, in some other planned, permanent living arrangement;

  b. Pre-placement preventive services programs, such as intensive family preservation programs, designed to help children at risk of foster care placement remain safely with their families, where possible;

  c. Service programs designed to provide follow-up care to families to whom a child has been returned after a foster care placement;

  d. Respite care of children to provide temporary relief for parents and other caregivers (including foster parents);

  e. Services designed to improve parenting skills (by reinforcing parents' confidence in their strengths, and helping them to identify where improvement is needed and to obtain assistance in improving those skills) with respect to matters such as child development, family budgeting, coping with stress, health, and nutrition;

  f. Infant safe haven programs to provide a way for a parent to safely relinquish a newborn infant at a safe haven designated pursuant to a State law; and

  g. Case management services designed to stabilize families in crisis such as transportation, assistance with housing and utility payments, and access to adequate health care.

- Family Support Services means community-based services to promote the safety and well being of children and families designed to increase the strength and stability of families (including adoptive, foster, and extended families), to increase parents' confidence and competence in their parenting abilities, to afford children a safe, stable and supportive family environment, to strengthen parental relationships and promote healthy marriages, and otherwise to enhance child development. Family support services may include:

  a. Services, including in-home visits, parent support groups, and other programs designed to improve parenting skills (by reinforcing parents' confidence in their strengths, and helping them to identify where improvement is needed and to obtain assistance in improving those skills) with respect to matters such as child development, family budgeting, coping with stress, health, and nutrition;

b. Respite care of children to provide temporary relief for parents and other caregivers;

c. Structured activities involving parents and children to strengthen the parent-child relationship;

d. Drop-in centers to afford families' opportunities for informal interaction with other families and with program staff;

e. Transportation, information and referral services to afford families access to other community services, including child care, health care, nutrition programs, adult education literacy programs, legal services, and counseling and mentoring services; and

f. Early developmental screening of children to assess the needs of such children, and assistance to families in securing specific services to meet these needs.

- Time Limited Family Reunification Services means the services and activities described below that are provided to a child that is removed from the child's home and placed in a foster family home or a child care institution and to the parents or primary caregiver of such a child, in order to facilitate the reunification of the child safely and appropriately within a timely fashion, but only during the 15 month period that begins on the date that the child, pursuant to section 475(5)(F), is considered to have entered foster care. The description of services and activities are as follows:

a. Individual, group and family counseling

b. Inpatient, residential, or outpatient substance abuse treatment services

c. Mental health services.

d. Assistance to address domestic violence.

e. Services designed to provide temporary child care and therapeutic services for families, including crisis nurseries.

f. Transportation to or from any of the services and activities described in this subparagraph.

The Division of Family and Children's Services (DFCS) has awarded MCHS $2,500,000.00 in federal funding for the CFSSP and MCHS will provide the 25% match requirement in the amount of $833,333.00, for a total of $3,333,333.00 to be utilized as follows:

| | |
|---|---|
| Family Preservation | $1,893,404.00 |
| Family Reunification | $904,936.00 |
| Support Services | $534,993.00 |
| Subgrant not to exceed: | $3,333,333.00 |

MCHS shall submit supporting documentation in conjunction with the monthly reporting worksheet to substantiate the families serviced during the reporting period. Additionally, MCHS shall provide in its monthly report, the name of the children receiving services, list of services provided to each child/family and the date cases were opened for each child/family receiving services during the reporting period.

Exhibit B, Budget                    2

# EXHIBIT C
# Modified Mississippi Settlement Agreement and Reform Plan

# Standard
# Assurances

## STANDARD ASSURANCES AND CERTIFICATIONS

### OVERVIEW

Each Subgrantee and any lower-tier subrecipient must assure that it will comply with the regulations, policies, guidelines, and requirements imposed by the Federal grantor agency and MDHS. The MDHS Subgrantee must also ensure that any lower-tier subgrants it issues through funds received from MDHS will require the lower-tier subrecipient to comply with these same regulations. The assurances listed in this section may not be applicable to a particular project or program, and there may be additional assurances required by certain Federal awarding agencies.

In addition, each subgrantee must certify in writing that it will comply with the following regulations:

- Lobbying
- Suspension and Debarment
- Drug-Free Workplace
- Unresolved Monitoring and Audit Findings
- Fidelity Bond Coverage

### STANDARD ASSURANCES

The Subgrantee assures that it:

1.  has the legal authority to apply for and receive the subgrant; that a resolution, motion, or similar action has been duly adopted or passed as an official act of the subgrantee's governing body, authorizing the subgrant, including all understandings and assurances contained therein, and directing and authorizing the person identified as the official representative of the Subgrantee to act in connection with the subgrant and to provide such additional information as may be required.

2.  will give MDHS, the State Auditor's Office, the Federal grantor agency, and the Comptroller General, or any of their authorized representatives, access to and the right to examine all records, books, papers, documents, or items related to the subgrant.

3.  will establish and maintain both fiscal and program controls and accounting procedures in accordance with generally accepted accounting principles and Federal grantor agency and MDHS directives; and will keep and maintain such books and records for audit by MDHS, by the Federal grantor agency, by the State Auditor, or by their authorized representatives; and will maintain all such records, books, papers, documents, or items for a period of at least three (3) years from the date of submission of the final reporting worksheet, or, if any litigation, claim,

## STANDARD ASSURANCES AND CERTIFICATIONS

audit, or action has begun before the expiration of the three-year period, will retain all such items until the completion of the action and resolution of all issues involved or until the end of the regular three-year period, whichever is later.

4.    will comply with the Single Audit Act Amendments of 1996.

5.    will establish safeguards to prohibit employees from using their positions for a purpose that constitutes, or presents the appearance of, personal or organizational conflict of interest, or personal gain.

6.    will comply with all Federal and State statutes relating to discrimination, including, but not limited to:

Title VI of the Civil Rights Act of 1964, prohibiting discrimination on the basis of race, color, or national origin;

Title VII of the Civil Rights Act of 1964, relating to non-discrimination in matters of recruitment, hiring, promotion, and other employment practices;

Title VIII of the Civil Rights Act of 1968, as amended, relating to non-discrimination in the sale, rental, or financing of housing;

Title IX of the Education Amendments of 1972, as amended, prohibiting discrimination on the basis of sex in federally assisted education programs and activities;

the Age Discrimination Act of 1975, prohibiting discrimination on the basis of age;

Section 504 of the Rehabilitation Act of 1973, prohibiting discrimination on the basis of handicaps;

Subtitle A, Title II of the Americans with Disabilities Act (ADA) (1990);

the Omnibus Reconciliation Act of 1981, prohibiting discrimination on the basis of race, color, religion, sex, national origin, age, and handicap;

the Drug Abuse Office and Treatment Act of 1972, as amended, relating to non-discrimination on the basis of drug abuse;

the Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment, and Rehabilitation Act of 1970, as amended, relating to non-discrimination on the basis of alcohol abuse or alcoholism; and,

Sections 523 and 527 of the Public Health Service Act of 1912, as amended, relating to confidentiality of alcohol and drug abuse patient records; and any other non-discrimination

## STANDARD ASSURANCES AND CERTIFICATIONS

provisions in the specific statute(s) under which these monies will be granted or awarded and the requirements of any other non-discrimination statute(s) which may apply to this subgrant or award.

7.   will ensure that buildings and facilities owned, occupied, or financed by the United States government are accessible to and usable by physically handicapped persons in accordance with the Architectural Barriers Act of 1968.

8.   will comply with the requirements of the provisions of the Uniform Relocation Assistance and Real Property Acquisition Act of 1970, which provide for fair and equitable treatment of persons displaced or whose property is acquired as a result of Federal and federally assisted programs. These provisions apply to all interests in real property acquired for project purposes regardless of Federal participation in purchases.

9.   will comply with the provisions of the Hatch Act, as amended, which limit the political activities of employees whose principal employment activities are funded in whole or in part with Federal funds.

10.   will comply, as applicable, with the provisions of the Davis-Bacon Act, the Copeland Act, and the Contract Work Hours and Safety Standards Act, regarding labor standards for federally assisted construction subagreements.

11.   will conform with Executive Order (EO) 11246, entitled "Equal Employment Opportunity," as amended by EO 11375, and as supplemented in Department of Labor regulations (41 CFR Part 60) and will incorporate an equal opportunity clause in federally assisted construction contracts and subcontracts.

12.   will comply with the minimum wage and maximum hours provisions of the Federal Fair Labor Standards Act.

13.   will comply with the Intergovernmental Personnel Act of 1970 relating to prescribed standards for merit systems for programs funded under one of the 19 statutes or regulations specified in Appendix A of OPM's Standards for a Merit System of Personnel Administration.

14.   will comply, if applicable, with Section 102(a) of the Flood Disaster Protection Act of 1973, which requires recipients in a special flood hazard area to participate in the program and to purchase flood insurance if the total cost of insurable construction and acquisition is $10,000 or more.

15.   will comply with the Lead-Based Paint Poisoning Prevention Act, which prohibits the use of lead-based paint in construction or rehabilitation of residence structures.

16.   will assist the Federal grantor agency in assuring compliance with Section 106 of the    National Historic Preservation Act of 1966, as amended; EO 11593; and the Archaeological and Historic Preservation Act of 1974.

## STANDARD ASSURANCES AND CERTIFICATIONS

17.    will comply with environmental standards which may be prescribed pursuant to the following: (a) institution of environmental quality control measures under the National Environmental Policy Act of 1969 and EO 11514; (b) notification of violating facilities pursuant to EO 11738; (c) protection of wetlands pursuant to EO 11990; (d) evaluation of flood hazards in flood plains in accordance with EO 11988; (e) assurance of project consistency with the approved State management program developed under the Coastal Zone Management Act of 1972; (f) conformity of Federal actions to State (Clean Air) Implementation Plans under Section 176 of the Clean Air Act of 1955, as amended; (g) protection of underground sources of drinking water under the Safe Drinking Water Act of 1974, as amended; (h) protection of endangered species under the Endangered Species Act of 1973, as amended; (I) Section 6002 of the Resource Conservation and Recovery Act; and (j) the Coastal Barriers Resources Act.

18.    will comply with the Wild and Scenic Rivers Act of 1968 related to protecting components or potential components of the national wild and scenic rivers system.

19.    will comply with Public Law (PL) 93-348 regarding the protection of human subjects involved in research, development and related activities supported by this subgrant.

20.    will comply with the Laboratory Animal Act of 1966 pertaining to the care, handling, and treatment of warm blooded animals held for research, teaching, or other activities supported by this subgrant.

21.    will comply with Federal regulations regarding criteria for cost sharing or matching contributions.

22.    will assure all funds received shall be used only to supplement services and activities that promote the purposes for which the grant is awarded, and not supplant, unless specifically authorized by the program regulations and the appropriate MDHS Division.

23.    will provide certification regarding lobbying to comply with Section 319, PL 101-121 (31 USC 1352).

24.    will provide the required certification regarding their exclusion status and that of their principals prior to the award in accordance with EOs 12549 and 12689 Debarment and Suspension.

25.    will provide certification to comply with the Drug-Free Workplace Act of 1988.

26.    will comply with all applicable requirements of all other Federal and State laws, Executive Orders, regulations, and policies governing the program(s) for which these monies are provided and with the terms and conditions of the Subgrant Agreement.

## STANDARD ASSURANCES AND CERTIFICATIONS

### REQUIRED CERTIFICATIONS

#### I. LOBBYING

As required by Section 1352, Title 31 of the U.S. Code, the Subgrantee certifies that:

A.    No Federal appropriated funds have been paid or will be paid, by or on behalf of the undersigned, to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making of any Federal grant, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal grant or cooperative agreement;

B.    If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress, in connection with this Federal grant or cooperative agreement, the undersigned shall complete and submit Standard Form - LLL, "Disclosure of Lobbying Activities," in accordance with its instructions;

C.    The undersigned shall require that the language of this certification be included in the award documents for all subawards at all tiers (including subgrants, contracts under grants and cooperative agreements, and subcontracts) and that all subrecipients shall certify and disclose accordingly.

#### II. SUSPENSION AND DEBARMENT
#### AND OTHER RESPONSIBILITY MATTERS (DIRECT RECIPIENT)

As required by Executive Order 12549 and 12689, Suspension and Debarment—

A.    The Subgrantee certifies that it and its principals: (a) Are not presently debarred, suspended, proposed for debarment, declared ineligible, sentenced to a denial of Federal benefits by a State or Federal court, or voluntarily excluded from covered transactions by a Federal department or agency;

(b) Have not within a three-year period preceding this subgrant been convicted of or had a civil judgment rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State, or local) transaction or contract under a public transaction; violation of Federal or State antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property;

(c) Are not presently indicted for or otherwise criminally or civilly charged by a governmental entity (Federal, State, or local) with commission of any of the offenses enumerated in paragraph (b) of this certification; and

(d) Have not within a three-year period preceding this subgrant had one or more public transactions (Federal, State, or local) terminated for cause or default; and

B.    Where the Subgrantee is unable to certify to any of the statements in this certification, he or she shall attach an explanation to this form.

## STANDARD ASSURANCES AND CERTIFICATIONS

### REQUIRED CERTIFICATIONS (Continued)

#### III. DRUG-FREE WORKPLACE (SUBGRANTEES WHO ARE INDIVIDUALS)

As required by the Drug-Free Workplace Act of 1988--

A.    As a condition of the subgrant, I certify that I will not engage in the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance in conducting any activity with the subgrant; and

B.    If convicted of a criminal drug offence resulting from a violation occurring during the conduct of any subgrant activity, I will report the conviction, in writing, within 10 calendar days of the conviction to MDHS.

OR

#### III. DRUG-FREE WORKPLACE (SUBGRANTEES OTHER THAN INDIVIDUALS)

As required by the Drug-Free Workplace Act of 1988 --

A.    The Subgrantee certifies that it will or will continue to provide a drug-free workplace by:

(a) Publishing a statement notifying employees that the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance is prohibited in the subgrantee's workplace and specifying the actions that will be taken against employees for violation of such prohibition;

(b) Establishing an on-going drug-free awareness program to inform employees about --

(1) The dangers of drug abuse in the workplace;
(2) The subgrantee's policy of maintaining a drug-free workplace;
(3) Any available drug counseling, rehabilitation, and employee assistance programs; and
(4) The penalties that may be imposed upon employees for drug abuse violations occurring in the workplace.

(c) Making it a requirement that each employee to be engaged in the performance of the subgrant be given a copy of the statement required by paragraph (a);

(d) Notifying the employee in the statement required by paragraph (a) that, as a condition of employment under the subgrant, the employee will --

(1) Abide by the terms of the statement; and
(2) Notify the employer in writing of his or her conviction for a violation of a criminal drug statute occurring in the workplace no later than five calendar days after such conviction;

(e) Notifying MDHS, in writing, within 10 calendar days after receiving notice under subparagraph (d)(2) from an employee or otherwise receiving actual notice of such conviction. Employers of convicted employees must provide notice, including position title to MDHS. Notice shall include the identification number(s) of each affected grant;

### STANDARD ASSURANCES AND CERTIFICATIONS

III. DRUG FREE WORKPLACE (SUBGRANTEES OTHER THAN INDIVIDUALS) - Continued

(f) Taking one of the following actions, within 30 calendar days of receiving notice under subparagraph (d)(2), with respect to any employee who is so convicted –

(1) Taking appropriate personnel action against such an employee, up to and including termination, consistent with the requirement of the Rehabilitation Act of 1973, as amended; or

(2) Requiring such employee to participate satisfactorily in a drug abuse assistance or rehabilitation program approved for such purposed by a Federal, State, or local health, law enforcement, or other appropriate agency.

(g) Making a good faith effort to continue to maintain a drug-free workplace through implementation of paragraphs (a), (b), (c), (d), (e), and (f).

B. The Subgrantee may insert in the space provided below the site(s) for the performance of work done in connection with the specific subgrant. Check if there are workplaces on file that are not identified here:

Place of Performance (Street address, city, county, state, zip code)

Mississippi Children's Home Society

1900 North West Street

Jackson, MS 39202    - Hinds County

---

### IV. UNRESOLVED MONITORING FINDINGS;
### UNRESOLVED AUDIT FINDINGS;
### AND LITIGATION OCCURRING WITHIN THE LAST THREE (3) YEARS

Identify any unresolved monitoring findings related to any programs that have been received by the Subgrantee during the last three (3) years and the status of each finding:

None

Identify any unresolved audit findings related to any programs received by the Subgrantee during the last three (3) years and the status of each finding:

None

Identify any litigation and/or administrative hearings that the Subgrantee, the Subgrantee's Senior Management, or Subgrantee's Directors have been involved in during the last three (3) years, including the outcome or disposition of the case:

None

## STANDARD ASSURANCES AND CERTIFICATIONS
### REQUIRED CERTIFICATIONS (Continued)

**V. CERTIFICATION OF ADEQUATE FIDELITY BONDING**

Identify any and all types of bond coverage currently in force. Include the types of bond coverage; the officers or owners and employees covered; the period covered by the bond; and the limits of coverage assigned to each officer, owner, or employee and the total limit of the bond as applicable.

See Attached

For Subgrantees/Contractors that have been unable to obtain fidelity bond coverage, describe in detail the efforts made to obtain fidelity bond coverage and the reason coverage has not been obtained.

As the authorized representative of the subgrantee, I hereby certify that the subgrantee will comply with the above certifications in items I, II, and III; the information provided items III, IV and V is true and complete to the best of my knowledge, and that the coverage and amounts specified shall be maintained throughout the effective period of the subgrant.

SUBGRANTEE NAME AND ANY OTHER NAMES UNDER WHICH THE SUBGRANTEE HAS DONE BUSINESS:

Mississippi Children's Home Society  -  Mississippi Children's Home Society and CAREES Center, Inc.  - Mississippi Children's Home Services

SUBGRANTEE ADDRESS AND ANY OTHER ADDRESSES THE SUBGRANTEE HAS USED:

1900 North West Street, Jackson MS 39202 - P. O. Box 1078, Jackson, MS 1801 North West Street, Jackson, MS 39202

TYPED NAME AND TITLE OF THE SUBGRANTEE'S AUTHORIZED REPRESENTATIVE

Christopher M. Cherney, Chief Executive Officer

SIGNATURE OF SUBGRANTEE'S AUTHORIZED REPRESENTATIVE AND DATE:

August 16, 2012

# Subgrantee Acceptance Manual

*Revised October 24, 2008*

## MDHS Subgrantee Manual Acceptance Form

Subgrantee Manual Coordinator

Each Subgrantee should designate a Mississippi Department of Human Services Subgrantee Manual coordinator who is familiar with the agency's operations. The coordinator's name, address, and telephone number should be sent directly to the Director, Office of Monitoring, Mississippi Department of Human Services, by the beginning of each contract period. The subgrantee should only notify the Director, Office of Monitoring, MDHS, in writing of any change in assignment.

As duly authorized representative of the __Mississippi Children's Home Society__ _____, I certify that said organization will comply with the above provisions and that I have received as of this date, a copy of the Mississippi Department of Human Services Subgrantee Manual, *[including Addenda to the MDHS Subgrantee/Contract Manual.]*

Signature _____

Date __August 16, 2012__

Title __Chief Executive Officer__

Organization __Christopher M. Cherney__

# Notification
# Of
# Liability

# MISSISSIPPI DEPARTMENT OF HUMAN SERVICES

## BOARD MEMBER'S NOTIFICATION OF LIABILITY

## LIABILITY

MDHS assumes no liability for actions of the Subgrantee or its employees, agents or representatives under this Subgrant. Subgrantee agrees to indemnify, defend, save and hold harmless MDHS from and against all claims, demands, liabilities, suits, damages and costs of every kind and nature whatsoever, including court costs and attorney's fees, arising out of or caused by Subgrantee and/or its agents, employees, contractors, or subcontractors, in the performance of this Subgrant. The Subgrantee acting through its Board of Directors assumes liability in the event the Subgrantee misuses funds or fails to perform according to the provisions of the Subgrant. The Subgrantee shall notify each Board member, in writing, within 15 days of receiving the executed Subgrant of this requirement, and the Subgrantee shall sign a statement to this effect prior to receiving funds under this subgrant.

I acknowledge and agree to notify all members of the Board of Directors, if applicable, in writing of the assumption by _Miss. Children's Home Society_ of liability in the event that _Mississippi Children's HOme Society_ misuses funds or fails to perform according to the provisions of the Subgrant. Further, I will keep a copy of said notification letter as a permanent part of the Subgrant file.

Signature of Entity's Director _[signature]_

Name: _Christopher M. Cherney_

Organization: _Mississippi Children's Home Society_

Date: _August 17, 2012_

Witness: _[signature]_

Date: _August 17, 2012_

1

# Fidelity Bond

| Client#: 19331 | | MSCHI |
|---|---|---|

**ACORD** ™

# CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
2/07/2012

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Miranda Wheeler, CISR | | |
|---|---|---|---|
| Ross & Yerger Insurance, Inc. P.O. Box 1139 Jackson, MS 39215 601 948-2900 | PHONE (A/C, No, Ext): 601 948-2900 | | FAX (A/C, No): 601 553-227 |
| | E-MAIL ADDRESS: mwheeler@rossandyerger.com | | |
| | PRODUCER CUSTOMER ID #: MSCHI | | |
| INSURED | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| Mississippi Children's Home Services Inc P. O. Box 1078 Jackson, MS 39215-1078 | INSURER A: Arch Insurance Company/Care Pro | | |
| | INSURER B: Travelers Cas. & Sur. Co. of Am. | | |
| | INSURER C: | | |
| | INSURER D: | | |
| | INSURER E: | | |
| | INSURER F: | | |

| COVERAGES | CERTIFICATE NUMBER: | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | GENERAL LIABILITY [X] COMMERCIAL GENERAL LIABILITY [X] CLAIMS-MADE [ ] OCCUR [X] Retro: 12/31/03 GEN'L AGGREGATE LIMIT APPLIES PER: [ ] POLICY [ ] PRO-JECT [X] LOC | | | NCPKG0016904 | 12/31/2011 | 12/31/2012 | EACH OCCURRENCE | $1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $100,000 |
| | | | | | | | MED EXP (Any one person) | $20,000 |
| | | | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | | | | | | | GENERAL AGGREGATE | $3,000,000 |
| | | | | | | | PRODUCTS - COMP/OP AGG | $3,000,000 |
| | | | | | | | $ | |
| A | AUTOMOBILE LIABILITY [X] ANY AUTO [ ] ALL OWNED AUTOS [ ] SCHEDULED AUTOS [X] HIRED AUTOS [X] NON-OWNED AUTOS | | | NCAUT0016904 | 12/31/2011 | 12/31/2012 | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | $ | |
| | | | | | | | $ | |
| A | [X] UMBRELLA LIAB [X] OCCUR [ ] EXCESS LIAB [ ] CLAIMS-MADE [ ] DEDUCTIBLE [X] RETENTION $ $10,000 | | | NCUMB0016904 | 12/31/2011 | 12/31/2012 | EACH OCCURRENCE | $1,000,000 |
| | | | | | | | AGGREGATE | $1,000,000 |
| | | | | | | | $ | |
| | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | Y/N N/A | | | | | [ ] WC STATU-TORY LIMITS [ ] OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| A B | Professional Liab Employee Theft | | | NCPKG0016904 105542230 | 12/31/2011 12/31/2010 | 12/31/2012 12/31/2013 | $1M/$3M; 12/31/03 Retro $1,000,000/$10,000 Ded. | |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (Attach ACORD 101, Additional Remarks Schedule, if more space is required)
General Liability, Professional Liability and Auto Liability policies contain Blanket Additional Insured Wording, per written Contract, Agreement or Permit, subject to policy terms, conditions and exclusions.
(See Attached Descriptions)

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Mississippi Department of Human Services 750 N. State Street Jackson, MS 39202 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE _Dudley D. Wooley_ |

©1988-2009 ACORD CORPORATION. All rights reserved.

ACORD 25 (2009/09)    1 of 2    The ACORD name and logo are registered marks of ACORD
#S269210/M265495

BLJ

## DESCRIPTIONS (Continued from Page 1)

General Liability policy also contains blanket waiver of subrogation, per written Contract, Agreement or Permit, subject to policy terms, conditions and exclusions.

Named Insureds:
Mississippi Children's Home Services, Inc.
Mississippi Children's Home Society
CARES Center, Inc.

**Ex. 17F**

# Subgrantee Signature Sheet

# And

# Budget Information

MISSISSIPPI
Form MDHS-SCS-1002
Revised 3-01-2005

### STATE OF MISSISSIPPI
### MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
### SUBGRANT SIGNATURE SHEET
P.O. BOX 352
JACKSON, MISSISSIPPI 39205-0352

**MDHS FUNDING DIVISION: Family and Children's Services**

| | |
|---|---|
| 1. SUBGRANTEE'S NAME, ADDRESS & PHONE #<br><br>Family Resource Center of Northeast Mississippi<br><br>425 Magazine Street<br><br>Tupelo, MS 38804<br><br>SUBGRANTEE'S FISCAL YEAR END DATE:<br>August 31, 2013 | 2. EFFECTIVE DATE<br>October 1, 2012<br><br>3. SUBGRANT NUMBER<br>503H121<br><br>4a. GRANT IDENTIFIER (funding source and year):<br>G1201MSCJA1 (2012 Children's Justice Act)<br>b. CATALOG of FEDERAL DOMESTIC ASSISTANCE (CFDA)#<br>93.643 |

NAME/TITLE OF OFFICERS: (SUBGRANT ENTITY)

| | |
|---|---|
| a. Christi Webb, Executive Director<br>b. _____<br>c. _____<br><br>CONTACT PERSON:   Chrisit Webb, Executive Director<br>PHONE NUMBER:      662-844-0013 | 5. BEGINNING AND ENDING DATE<br>10/01/2012      to      09/30/2013<br>6. SUBGRANT PAYMENT METHOD<br><br>_____ CURRENT NEEDS/CASH ADVANCE<br>___X___ COST REIMBURSEMENT<br>_____ OTHER<br><br>7. PAGE 1 OF 4 |

8. THE FOLLOWING FUNDS ARE OBLIGATED:

| | | | |
|---|---|---|---|
| FEDERAL | 186,000.00 | ADMINISTRATION | 19,673.96 |
| STATE | | SERVICES | 166,326.04 |
| OTHER | | OTHER | |
| TOTAL | 186,000.00 | TOTAL | 186,000.00 |

9. THE SUBGRANTEE AGREES TO ADMINISTER THIS SUBGRANT IN ACCORDANCE WITH ALL FEDERAL AND/OR STATE PROVISIONS THAT ARE APPLICABLE TO SAID SUBGRANT.  THE FOLLOWING DOCUMENTS ARE INCORPORATED HEREIN:

| | |
|---|---|
| a. SUBGRANT SIGNATURE SHEET | 3) STANDARD ASSURANCES POLICY |
| b. BUDGET SUMMARY | 4) DEBARMENT POLICY |
| c. COST SUMMARY SUPPORT SHEET | 5) DRUG FREE WORKPLACE POLICY |
| d. BUDGET NARRATIVE | 6) SUBGRANTEE MANUAL ACCEPTANCE |
| e. SUBGRANT AGREEMENT | f. VERIFICATION OF 25% FIDELITY BOND |
| 1) SCOPE OF SERVICES | g. COPY OF BOARD RESOLUTION (if Applicable) |
| 2) GENERAL TERMS AND PROVISIONS | h. COST ALLOCATION & INDIRECT COST RATES |

10. IDENTIFICATION OF OTHER FUNDING (List all other funds requested, anticipated or held over from prior years dedicated to this or similar programs including Federal, State, Local or Private funds.  If additional space is needed, please attach typed pages).

| SOURCE | PURPOSE | CONTRACT # | PERIOD (dates) | AMOUNT |
|---|---|---|---|---|
| NA | | | | |
| | | | | |
| | | | | |

| 11. APPROVED FOR MDHS: | 12. APPROVED FOR SUBGRANTEE: |
|---|---|
| BY _[signature]_ DATE 9/17/12<br>Richard A. Berry | BY _Christi Webb_ DATE 9-10-12<br>Christi Webb |
| Executive Director<br>TITLE | Executive Director<br>TITLE |

# MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
# BUDGET SUMMARY

**PAGE 2 OF 4 PAGES**

| | | | | |
|---|---|---|---|---|
| **1. Applicant Agency:** | **Family Resource Center of Northeast Mississippi** | | | |
| **2. Subgrant Number:** | **3. Grant ID** | **4. Beginning Date** | | **5. Ending Date** |
| **503H121** | **G1201MSCJA1** | **10/1/2012** | | **9/30/2013** |

**6. Submitted as Part of (Check one):**

| | | |
|---|---|---|
| **a. Funding** | **b. Modification** | **c. Modification** |
| **Request  ( X )** | **No.( )** | **Effective Date** |

**Funding Sources**

| 7.  For MDHS Use Only | 8. Activity | Federal | State | Program Income | Other (Local-Private) | Total |
|---|---|---|---|---|---|---|
| | Administration | $19,673.96 | | | | $19,673.96 |
| | Child Abuse & Neglect | $166,326.04 | | | | $166,326.04 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | TOTAL | $186,000.00 | | | | $186,000.00 |

# MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
# COST SUMMARY SUPPORT SHEET

**PAGE 3 OF 4 PAGES**

| 1. Applicant Agency: | | Family Resource Center of Northeast Mississippi | | | |
|---|---|---|---|---|---|

| 2. Subgrant Number: | | 3. Grant ID | 4. Beginning Date | | 5. Ending Date |
|---|---|---|---|---|---|
| 503H121 | | G1201MSCJA1 | 10/1/2012 | | 9/30/2013 |

**6. Activity:  Administration**

| 7. For MDHS Use Only | 8. Line Item | 9. Description of Item and/or Basis for Cost | 10. Budget | | |
|---|---|---|---|---|---|
| | | | Federal | All Other | Total |
| | Salaries | Refer to Budget Narrative | $16,950.00 | | $16,950.00 |
| | Fringe Benefits | Refer to Budget Narrative | $2,723.96 | | $2,723.96 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | **TOTAL** | $19,673.96 | | $19,673.96 |

# MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
# COST SUMMARY SUPPORT SHEET

**PAGE 4 OF 4 PAGES**

| 1. Applicant Agency: | | Family Resource Center of Northeast Mississippi | | | |
|---|---|---|---|---|---|

| 2. Subgrant Number: | | 3. Grant ID | 4. Beginning Date | | 5. Ending Date |
|---|---|---|---|---|---|
| 503H121 | | G1201MSCJA1 | 10/1/2012 | | 9/30/2013 |

**6. Activity:  Child Abuse & Neglect**

| 7. For MDHS Use Only | 8. Line Item | 9. Description of Item and/or Basis for Cost | 10. Budget | | |
|---|---|---|---|---|---|
| | | | Federal | All Other | Total |
| | Salaries | Refer to Budget Narrative | $133,080.00 | | $133,080.00 |
| | Fringe Benefits | Refer to Budget Narrative | $23,145.18 | | $23,145.18 |
| | Travel | Refer to Budget Narrative | $7,817.11 | | $7,817.11 |
| | Contractual | Refer to Budget Narrative | $1,784.00 | | $1,784.00 |
| | Commodities | Refer to Budget Narrative | $499.75 | | $499.75 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | **TOTAL** | $166,326.04 | | $166,326.04 |

# Agreement

# AGREEMENT BETWEEN
# MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
# AND
# FAMILY RESOURCE CENTER OF NORTHEAST MISSISSIPPI

**THIS AGREEMENT** is made and entered into by and between the Division of Family and Children's Services, Mississippi Department of Human Services, hereinafter referred to as "MDHS," and Family Resource Center of Northeast Mississippi, hereinafter referred to as "Subgrantee."

In furtherance of the mutual interests and responsibilities of the parties hereto, this Agreement is entered into by and between the parties upon the following terms, provisions, and conditions, to-wit:

## SECTION I.  RESPONSIBILITY OF SUBGRANTEE

Subgrantee shall provide, perform and complete, in a reasonable manner as determined by MDHS, the services and activities described in the "Scope of Services" attached hereto as Exhibit A and incorporated herein by reference and the "Modified Mississippi Settlement Agreement and Reform Plan" attached hereto as Exhibit B. Subgrantee shall establish and maintain effective controls and accountability over all funds, property and other assets covered by this Agreement.

## SECTION II.  TERM OF AGREEMENT

It is the intent of MDHS to enter into a subgrant for the period of October 1, 2012 through September 30, 2013, with an option for up to four (4) one year renewals.  MDHS reserves the right to terminate any subgrant at any time, subject to current subgrant provisions, and avail itself to any and all remedies available to protect its interests.

## SECTION III.  PAYMENT AND BUDGET LIMITATIONS

**SUBGRANT AMOUNT.**  The total amount of the subgrant to be provided by MDHS under this Agreement is One Hundred Eighty Six Thousand Dollars and Zero Cents ($186,000.00).

**METHOD OF PAYMENT.**  It is understood between the parties hereto that funds supporting this Agreement will be utilized and expended as provided for in the Budget Summary, Cost Summary Support Sheet(s), and Budget Narrative, attached hereto as Exhibit C (herein referred to as the "Budget") and incorporated herein by reference under the same terms and conditions as set forth in said Budget.

**BUDGET REVISIONS.**  Any increase, decrease or change in the funding or budgeted line items under this Agreement shall be authorized only as provided by the Mississippi Department of Human Services' line item flexibility policy and/or as authorized by a modification to this Agreement.

**MAXIMUM PAYMENT.** Notwithstanding any other provision of this Agreement, the maximum payment by MDHS to Subgrantee shall not exceed the sum of One Hundred Eighty Six Thousand Dollars and Zero Cents ($186,000.00) in consideration for all performances or services provided by Subgrantee, unless specifically modified as provided herein.

## SECTION IV. RELATIONSHIP OF PARTIES

The relationship of the Subgrantee to MDHS is that of independent contractor. None of the provisions of this Agreement are intended to create nor shall they be construed to create an agency, partnership, joint venture or employee-employer relationship between MDHS and Subgrantee.

Any persons assigned by Subgrantee to perform the services hereunder shall be the employee of the Subgrantee. MDHS may, however, direct Subgrantee to replace any of its employees under this subgrant. The Subgrantee will replace the employee within five (5) calendar days after receipt of notice from MDHS.

## SECTION V. COMPLAINT RESOLUTION

Subgrantee shall provide a complaint resolution procedure regarding decisions on eligibility for the program, applications that are not acted upon timely, and decisions otherwise affecting benefits and services for the program funded by this subgrant. The appeal or complaint procedures shall be carried out according to the Fair Hearing Procedure of the Mississippi Department of Human Services, a conciliation process, the Personal Responsibility and Work Opportunity Act of 1996, and/or such other Procedure as may be required by MDHS, whichever is appropriate to the complaint as directed by MDHS.

## SECTION VI. CHANGES

MDHS reserves the right to change any portion of the work required under this Agreement or amend other terms, including the Scope of Services, necessary to meet Federal or other operation requirements. Revision shall be made by written amendment to this Agreement duly signed by the authorized representative of each party hereto.

## SECTION VII. SAFEGUARDING INFORMATION

A.    **CONFIDENTIALITY.** Subgrantee shall treat all State data and information to which it has access under this subgrant as confidential to the extent that confidential treatment of same is required under Federal and State law and shall not disclose same to a third party without specific written consent of the State. In the event that Subgrantee receives notice that a third party requests divulgence of confidential or otherwise protected information, and has served upon it a subpoena or other validly issued administrative or judicial process ordering divulgence of confidential or otherwise protected information, Subgrantee shall promptly inform the State and thereafter respond in conformity with such subpoena as required by applicable State and/or Federal laws, rules and regulations. The provision herein shall survive termination of the subgrant for any reason and shall continue in full force and effect and shall be binding upon the Subgrantee and its agents,

2

employees, successors, assigns, subcontractors, or any party claiming an interest in the subgrant on behalf of, or under, the rights of the subgrant following any termination.

All records and information involving applicants or recipients of services under this subgrant shall be kept confidential. The use or disclosure of information concerning applicants and/or recipients shall be limited to purposes directly connected with the administration of the Children's Justice Act Program. Subgrantee shall take any and all steps necessary to insure the physical security of the records and information that it obtains under this Agreement, including but not limited to providing fire protection, protections against smoke and water damage, locked files, passwords, access logs or other methods to prevent loss or unauthorized access or retrieval of the records or information.

The safeguards for information to which both parties will adhere are contained in the MDHS Subgrantee/Contract Manual and any applicable Federal/State/Local regulations. The restrictions herein shall survive the termination or completion of this Agreement and shall continue in full force and effect and shall be binding upon the Subgrantee and/or its officers, agents, employees, successors, assigns, subcontractors, or any party claiming an interest in the Agreement on behalf of or under the rights of the Subgrantee.

**B.**     **THIRD PARTY REQUESTS.**  In event that the Subgrantee receives notice that a third party requests divulgence of confidential or otherwise protected information and/or has served upon it a subpoena or other validly issued administrative or judicial process ordering divulgence of confidential or otherwise protected information, Subgrantee shall promptly inform MDHS and thereafter respond in conformity with such subpoena as required by applicable State and/or Federal laws, rules and regulations.

**C.**     **LIABILITY.**   Any liability resulting from the wrongful disclosure of confidential information on the part of the Subgrantee and/or its officers, agents, subcontractors, and/or representatives shall rest with the Subgrantee. Disclosure of any confidential information by the Subgrantee and/or its representatives or subcontractor without the express written approval of MDHS, shall result in the immediate termination of this Agreement. Nothing herein shall be construed to prevent MDHS from seeking any other remedy, in law or equity, available to it.

## SECTION VIII. TERMINATION OF AGREEMENT

**A.**     **TERMINATION FOR CONVENIENCE OF EITHER PARTY**

This Agreement may be terminated by either party, in whole or in part, at any time, by giving written notice to the other party of such termination and specifying the effective date thereof, at least 30 days before the effective date of such termination. In the event of termination, Subgrantee shall be entitled to receive only reimbursement for allowable expenses incurred to the date of termination. In no event shall such expenses exceed the maximum amount payable under this subgrant.

**B.    TERMINATION CLAIM**

Within 30 days after receipt of a Notice of Termination, the Subgrantee shall submit to MDHS its termination claim, in the form prescribed by MDHS.

In the event of termination of this subgrant as provided herein, Subgrantee shall be entitled to receive just and equitable compensation for services or performances actually and satisfactorily performed, prior to the effective date of termination, under this subgrant. Such compensation shall be based upon the payment provisions described in Method of Payment Section of the subgrant but, in no case, shall said compensation exceed the total amount of this subgrant.

Subgrantee shall be liable to MDHS for damages sustained by MDHS by virtue of any breach of this subgrant by Subgrantee, and MDHS may withhold any payments to Subgrantee for the purpose of setoff until such time as the exact amount of damages due to MDHS from Subgrantee are determined. The rights and remedies of MDHS provided in this Section shall not be exclusive and are in addition to any other rights and remedies provided by law or in equity.

**C.    TERMINATION FOR DEFAULT**

Unless the Subgrantee's default or breach of this subgrant is excused by MDHS, MDHS may by written notice of default to the Subgrantee terminate the whole or any part of this Agreement if the Subgrantee has failed to carry out its obligations hereunder and has not remedied or taken appropriate steps to remedy the default.

If, through any cause, Subgrantee shall fail to fulfill in a timely and proper manner, as determined by MDHS, its obligations under this subgrant, or if Subgrantee shall violate any of the covenants, agreements, or stipulations of this subgrant, MDHS shall thereupon have the right to terminate the subgrant by giving written notice to Subgrantee of such termination and specifying the effective date thereof at least five (5) days before the effective date of such termination. In the event of such termination, Subgrantee shall be entitled to receive just and equitable compensation for satisfactory work completed on documents, services or materials collected and/or prepared by Subgrantee in connection with this subgrant.

Notwithstanding the above, Subgrantee shall not be relieved of liability to MDHS for damages sustained by MDHS by virtue of any breach of this subgrant by Subgrantee, and MDHS may withhold any payments to Subgrantee for the purpose of setoff until such time as the exact amount of damages due to MDHS from Subgrantee are determined.

The rights and remedies of MDHS provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law or under this subgrant.

If the Subgrantee fails to comply with any of the covenants, terms, or stipulations of this subgrant, whether stated in a Federal statute or regulation, an assurance, in the State Plan or application, a notice of award, or elsewhere, MDHS may take any of the following actions:

4

a. Issue a warning letter that further failure to comply with such covenant, term, or stipulation will result in a more serious sanction or action;
b. Condition a future subgrant;
c. Direct the Subgrantee to stop the incurring of costs with subgrant amounts;
d. Require that some or all of the subgrant amounts be remitted to MDHS;
e. Reduce the level of funds the Subgrantee would otherwise be entitled to receive;
f. Elect not to provide future subgrant funds to the Subgrantee until appropriate actions are taken to ensure compliance;
g. Wholly or partly suspend or terminate the current award of funds to the Subgrantee;
h. Suspend reimbursements to Subgrantees who fail to meet deadlines on unresolved monitoring or audit findings, closeout packages, and/or fiscal and programmatic requirements; or
i. Suspend payments upon notification that Subgrantee is bankrupt or receives tax lien of any type, regardless of the reason.

**D.    TERMINATION BECAUSE OF CIRCUMSTANCES BEYOND THE CONTROL OF THE PARTIES**

If either party is rendered unable, wholly or in part, by reason of strikes, accidents, acts of God, weather conditions or other acts beyond its control and without its faults or negligence, to comply with its obligations under this subgrant, then, such party shall have the option to cancel, upon the giving of written notice, this Agreement, in whole or part as the case may warrant.

**E.    AVAILABILITY OF FUNDS**

It is expressly understood and agreed that the obligation of MDHS to proceed under this Agreement is conditioned upon the availability of funds, appropriation of funds by the Mississippi State Legislature and the receipt of Federal and/or State funds. In the event that the funds anticipated for the fulfillment of the Agreement are at any time, not forth coming or are insufficient, either through the failure of the Federal government to provide funds or of the State of Mississippi to appropriate funds or the discontinuance or material alteration of the program under which funds were provided or if funds are not otherwise available to MDHS for the performance of this Agreement, MDHS, Division of Family & Children's Services, shall have the right to immediately terminate this Agreement, without damage, penalty, cost, or expense to MDHS of any kind whatsoever. The ultimate decision as to whether or not funds continue to be available for the performance of this Agreement lies solely with MDHS.

### SECTION IX.  AGREEMENTS BY SUBGRANTEE

**A.    SUBCONTRACTORS:** It is understood and agreed that the Subgrantee may enter into agreements or subcontracts with eligible entities (hereinafter sometime referred to as Subgrantee's Contractor/Subcontractor) for the provision of the services required under this Agreement.  Any and all such agreements or subcontracts shall include all of the

5

terms and conditions of this Agreement. Subgrantee agrees that it shall require all of its subcontractors to comply with all local, municipal and county health, safety and other ordinances and requirements and with all applicable Federal and State laws, statutes, and regulations, the same as apply to the Subgrantee herein. The agreements/subcontracts must include assurances that services will be provided to all eligible persons, regardless of potential participant's race, color, religious beliefs/practices, creed, age, national origin, sex, or mental or physical disability. The Subgrantee and its Contractors/Subcontractors cannot, on the basis of race, color, religious beliefs/practices, creed, age, national origin, sex, or mental or physical disability, treat one person differently from another in determining eligibility, benefits or services provided, if applicable.

The Subgrantee, however, shall be fully responsible for the performance of its Contractors/Subcontractors.

Copies of all subcontracts, agreements, and modifications thereto shall be forwarded to MDHS, Division of Family & Children's Services.

B.    **RELEASE OF LIABILITY:** Subgrantee agrees that in any agreement or subcontract for the provision of the services or activities covered by this subgrant, it shall require that the Subgrantee's contractor, subcontractor, representatives, or agents release and hold harmless MDHS and the State of Mississippi from and against all claims, demands, liabilities, suits, damages, and costs of every kind and nature whatsoever, including court costs and attorney's fees, arising out of or caused by contractor or subcontractor and/or its officers, agents, or employees in the performance of such services or activities.

## SECTION X. REPORTING

A.    **MONTHLY REPORTS.**  Subgrantee agrees to provide reports and/or information within ten (10) calendar days after the close of each month.  Such reports shall be complete for the period concerned and shall contain information concerning clients served, catchment areas, administrative costs, if any, direct and indirect costs of any nature expended in the performance of this subgrant, units of service, and other sufficient data to provide evidence of budget and programmatic compliance as required by this subgrant.  Subgrantee shall also provide to MDHS monthly financial supporting documentation of all expenditures pertaining to the subgrant.

B.    **TERMINATION REPORTS.**  Subgrantee shall furnish MDHS a written termination report within ten (10) calendar days from the termination date unless additional time is granted by MDHS for the purpose of audits, examinations, or other reasons.  The termination report shall include information as set forth in Subsection A of this Section and any other data required by MDHS to furnish evidence of financial and programmatic compliance.

C.    **FINAL FISCAL REPORT.**  The Subgrantee agrees to provide a final fiscal reporting worksheet, along with closeout report, to MDHS within forty-five (45) days after the ending of this subgrant.  Any funds paid by MDHS to Subgrantee and not expended for

activities or contracted services under this subgrant or funds expended in violation of this subgrant shall be considered MDHS' funds and shall be returned to MDHS in full. Subgrantees, who fail to meet the closeout deadline, as outlined in the MDHS Subgrantee/Contract Manual, may be disqualified from future funding consideration.

**D.**     **TAX REPORTS.** Subgrantee shall file timely federal and state tax reports as due and, if requested, shall furnish MDHS with a copy of such reports within ten (10) calendar days after the filing of the report(s) with the applicable state and/or federal taxing authority(ies).

## SECTION XI.  SEVERABILITY

If any term or provision of this subgrant is prohibited by the laws of the State of Mississippi or is declared invalid or void by a court of competent jurisdiction, the remaining terms and provisions of this subgrant shall not be affected thereby, and each remaining term and provision of this subgrant shall be valid and enforceable to the fullest extent permitted by law.

## SECTION XII.  ASSIGNMENT

**A.**     The rights, privileges, benefits, and obligations created by this subgrant and by operation of law extend to and accrue and are obligatory upon the parties hereto, their personal or real representatives, and successors.

**B.**     Subgrantee shall not assign or otherwise transfer the obligations incurred on its part pursuant to the terms of this subgrant without the prior written consent of MDHS.  Any attempted assignment or transfer of its obligation without such consent shall be wholly void.  MDHS does reserve, however, the exclusive right to direct the Subgrantee to assign and/or transfer this subgrant when such course of action is mandated by the Federal grantor agency.  In the event that such a transfer or assignment is directed by MDHS, MDHS further reserves the right to ensure adequate and proper arrangement of such transfer to assure continued, effective performance of the purposes for which the parties entered into this subgrant.

## SECTION XIII.  RECORDS AND AUDITS

**A.**     **MAINTENANCE OF RECORDS.**  Subgrantee shall establish and maintain financial and programmatic records, supporting documents, statistical records and other records as may be necessary to reflect the performances of the provisions of this Agreement.

**B.**     **FISCAL REQUIREMENTS AND AUDIT.**  Subgrantee shall establish such fiscal control and fund accounting procedures, including internal auditing procedures, as may be necessary to assure the proper disbursal of and accounting for funds in accordance with this Agreement, the Single Audit Act Amendments of 1996 (31 U.S.C. Sections 7501-7507) and revised United States Office of Management and Budget (OMB) Circular A-133. The Subgrantee shall keep, maintain and present to MDHS, as required, necessary and proper vouchers, documentation and such other reports as may be required to support the expenditure of funds pursuant to this Agreement, and the Subgrantee shall keep and maintain bookkeeping and accounting records and procedures

7

as the same may be established and approved by MDHS. The Subgrantee's records must be sufficient to allow MDHS to audit and monitor the Subgrantee's operation of its program and sufficient to permit the preparation of reports required by the Single Audit Act and the statues authorizing this subgrant. These records shall be set up in accordance with Generally Accepted Accounting Principles, MDHS' Fiscal Accountability Guidelines, and OMB Cost and Accounting Standards.

C.    **INDEPENDENT AUDIT.**   Audits shall be made by an independent auditor in accordance with the Single Audit Act Amendments of 1996, revised OMB Circular A-133, and generally accepted government standards covering financial audits.

The Subgrantee, by signature affixed herein, agrees that within forty-five (45) days of the expiration of this subgrant, an independent financial audit may be performed in order to comply with OMB Circular A-133. No independent fiscal audit will be reimbursed in whole or in part by MDHS unless the Subgrantee is specifically required by MDHS to engage the services of an independent audit firm. MDHS reserves the right to select the audit entity under this provision.

D.    **AUDIT FINDINGS.**   Subgrantee shall receive, reply to and resolve any State and/or Federal programmatic exceptions related to this Agreement and/or any of the Subgrantee's Contractors/Subcontractors.

## SECTION XIV.  DISPUTES

Any dispute concerning a question of fact under this subgrant which is not disposed of by agreement of the parties hereto shall be decided by the Director of the Division of Family & Children's Services. This decision shall be reduced to writing and a copy thereof mailed or furnished to the Subgrantee and shall be final and conclusive, unless, within thirty (30) days from the date of the decision, Subgrantee mails or furnishes to the Executive Director of the Mississippi Department of Human Services a written request for review. Pending final decision of the Executive Director or his designee, the Subgrantee will proceed in accordance with the decision of the Director of the Division of Family & Children's Services.

In the review before the Executive Director, the Subgrantee shall be afforded an opportunity to be heard and to offer evidence in support of its position on the question and decision under review. The decision of the Executive Director or his designee shall be final and conclusive unless determined by a court of competent jurisdiction in Hinds County, State of Mississippi, to have been fraudulent, capricious, or so grossly erroneous as necessarily to imply bad faith or not supported by substantial evidence.

## SECTION XV.  SUPPLANTING

Funds received under this subgrant shall be used only to supplement, not supplant, the amount of Federal and/or State, and Local funds otherwise expended for the support of Children's Justice Act Programs.

## SECTION XVI. WAIVER

Failure of either party hereto to insist upon strict compliance with any of the terms, covenants, and conditions of this subgrant shall not be deemed a waiver or relinquishment of any similar right or power hereunder at any subsequent time or of any other provision hereof nor shall it be construed to be a modification of the terms of this subgrant.

## SECTION XVII. RECORD RETENTION AND ACCESS TO RECORDS

It is specifically understood and agreed that the Subgrantee shall provide MDHS with readily accessible and full opportunity to conduct program and/or fiscal monitoring and auditing (including through on-site visits to the Subgrantee's premises) of the Subgrantee's performance under this Agreement. MDHS, any State agency authorized to audit MDHS, the Federal grantor agency, and the Comptroller General of the United States or any of their duly authorized representatives shall have the right of access to any books, documents, papers or other records of the Subgrantee that are pertinent to the services performed under this Agreement in order to make audit, examination, excerpts and/or transcripts. These records shall be retained for at least three (3) years; however, if any litigation or other legal action, by or on behalf of the State or Federal Government has begun that is not completed at the end of the three (3) year period, or if audit findings, litigation or other legal action has not been resolved at the end of the three (3) year period, the records shall be retained until resolution.

## SECTION XVIII. PATENTS AND COPYRIGHTS AND RIGHTS IN DATA

A.    **PATENTS.**    This Agreement is not awarded for the purposes of experimental, developmental or research projects. Should the activities of Subgrantee and/or its Contractors/Subcontractors include experimental, developmental or research projects, this Agreement shall be promptly amended to include the standard patent right clauses required by 35 U.S.C. Section 202 as amended by Public Law 98-620 and 37 CFR Part 401, "Right to Inventions Made by Nonprofit Organizations and Small Business Firms Under Government Grants, Contracts and Cooperative Agreements," and any other provisions required by applicable State and/or Federal laws, rules, or regulations.

B.    **COPYRIGHTS AND RIGHTS IN DATA.**    MDHS reserves a royalty-free nonexclusive, and irrevocable license to reproduce, publish or otherwise use, and to authorize others to use:

(1) The copyright in any work developed under this Agreement or under any other agreement or contract under this subgrant Agreement; and

(2) Any rights of copyright to which the Subgrantee or any Subgrantee's Contractor/Subcontractor purchases ownership with subgrant support or funds provided under this Agreement.

Subgrantee hereby assigns to MDHS all rights, title, and interest in any and all materials conceived or created by the Subgrantee, and/or its employees, agents, contractors, or subcontractors, either individually or jointly with others and which arise out of the performance of this Agreement, including any computer programs, systems, designs,

9

source code, work papers, operating instructions, and all other information, documents, and work in whatever form. All work papers, cards, magnetic tapes, disk packs, or other storage media, temporary and/or permanent, containing programs and/or other information of any kind relating to this Agreement shall be available, upon request, to MDHS or its representative(s) for review, inspection, and if desired, reproduction. Such information and documents shall be delivered to MDHS on MDHS' request therefore. Subgrantee shall maintain all master programs and master data files in a completely secure manner. Such programs and files shall be identified by program and file name.

## SECTION XIX.  OWNERSHIP OF DOCUMENTS AND WORK PRODUCTS

All property purchased and all data, documents, notes, programs, books, databases (and all applications thereof), files, reports, studies, unfinished documents, and/or other material collected or prepared by Subgrantee and/or any of its Contractors/Subcontractors in connection with this subgrant shall be owned by MDHS during the term of this subgrant and upon completion or termination of this subgrant.  MDHS hereby reserves all rights to the data base and all applications thereof and to any and all information and/or material prepared in connection with this subgrant.

Except as otherwise provided by these General Terms and Provisions, the Subgrantee is prohibited from use or distribution of the above-described information and/or material without the express written approval of MDHS.

All printed mention, materials, deliverable products, publicity, and other documents and reports distributed by the Subgrantee as a result of this subgrant, regardless of its form, must give funding source credit to the Division of Family & Children's Services, Mississippi Department of Human Services.  DFCS must be provided a copy of the aforesaid documents and reports.

## SECTION XX.  PROPERTY, EQUIPMENT AND SUPPLIES

Property, equipment and supplies purchased, in whole or in part, with funds provided by MDHS shall be accounted for and disposed of in accordance with MDHS' directives, policies and procedures.  Subgrantee must adequately safeguard all such property and must assure that it is used solely for purposes authorized by this Agreement.  Nothing herein, however, shall be construed to authorize the Subgrantee to purchase equipment with funds provided under this subgrant unless such is specifically allowed by Section III of this Agreement.

## SECTION XXI.  LIMITATION ON EXPENDITURE OF PROGRAM FUNDS

Expenses charged against funds granted herein shall not be incurred by the Subgrantee except during the period of this Agreement as set forth above and may only be incurred and paid only as necessary to the performance of the work and activities set forth in Exhibit A.   All expenses obligated for the approved program must be supported by approved signed contracts, bills, or other evidence of liability consistent with MDHS established procurement procedures.

## SECTION XXII.  CONFLICT OF INTEREST

Subgrantee shall ensure that there exists no direct or indirect conflict of interest in the performance of this subgrant and/or performance by any of the Subgrantee's Contractors/Subcontractors. Further, Subgrantee warrants that no part of any Federal or State money shall be paid directly or indirectly to an employee or official of MDHS as wages, compensation or gifts in exchange of acting as an officer, agent, employee, subcontractor, or consultant to the Subgrantee in connection with any work contemplated or pertaining to this subgrant or Agreement. Subgrantee shall strictly comply with all conflict of interest provisions or standards of conduct provisions contained in the MDHS Subgrantee/Contract Manual or any applicable State, Federal, or Local law, rule, or regulation.

## SECTION XXIII.  INDEMNIFICATION

Subgrantee agrees to indemnify, defend, save and hold harmless MDHS from and against all claims, demands, liabilities, suits, damages and costs of every kind and nature whatsoever, including court costs and attorneys' fees, arising out of or caused by the Subgrantee and/or its agents, employees, volunteers, contractors or subcontractors in the performance of this Agreement. The Subgrantee shall fully indemnify and repay MDHS any amounts provided hereunder that are found not to have been expended according to this Agreement or any amounts or costs that are disallowed by Federal grantor and/or by MDHS.

## SECTION XXIV.  INSURANCE

Subgrantee represents that it will maintain workers' compensation insurance as required by law, which shall inure to the benefit of all Subgrantee's personnel performing services under this Agreement, employee fidelity bond insurance in an amount equal to twenty-five percent (25%) of funds awarded hereunder, and comprehensive general liability insurance. Subgrantee will furnish to MDHS with a certificate of insurance providing the aforesaid coverage, prior to the commencement of performance under this Agreement. All insurance policies required under this Section shall be issued by an insurance company or companies licensed to do business in the State of Mississippi and shall be acceptable to MDHS. The insurance required by this Section shall be maintained at all times during the course of this Agreement for the entire period thereof and MDHS must be given written notice by registered mail at least thirty (30) days in advance if any adverse modification or termination of any insurance.

If at any time the Subgrantee and/or its Contractors/Subcontractors lease, purchase or otherwise use an automobile, bus, van, or vehicle for the transportation of clients or program participants in carrying out the services required under this Agreement, the Subgrantee and its Contractors/Subcontractors must secure and maintain, at its/their own expense, the following insurance coverage in the amounts specified below:

- Owned vehicles - $30,000.00 combined single limit (bodily injury and property damage) together with medical coverage in the amount of $2,000.00 for owned vehicles.

- Hired vehicles - $25,000.00 combined single limit (bodily injury and property damage)

- Non-owned vehicles - $25,000.00 combined single limit (bodily injury and property damage)

## SECTION XXV. COMPLIANCE WITH LAWS, RULES AND REGULATIONS

Subgrantee shall comply with all applicable policies and procedures of MDHS and all applicable Federal, State, and/or Local laws, rules, regulations, directives, and guidelines that are now applicable or later made applicable to this Agreement. Particularly, but without limitation through inclusion, Subgrantee shall comply with the Mississippi Department of Human Services' Subgrantee/Contract Manual **Revised March 2005, including all addenda.**

A.  **MISSISSIPPI DEPARTMENT OF HUMAN SERVICES SUBGRANTEE/ CONTRACT MANUAL.** The Subgrantee agrees to comply with, and require their subcontractors to comply with, all Mississippi Department of Human Services' policies and guidelines as set forth in the MDHS Subgrantee/Contract Manual.

B.  **SUBGRANT/CONTRACT SIGNATURE SHEET.** The Subgrantee agrees to comply with all the terms and conditions included in the Subgrant/Contract Signature Sheet attached hereto and incorporated herein.

## SECTION XXVI. GOVERNING LAWS AND LEGAL REMEDIES

This Agreement shall be construed and governed in accordance with the laws of the State of Mississippi. Subgrantee expressly agrees that under no circumstances shall MDHS be obligated to pay an attorney's fee or cost of legal action to Subgrantee.

## SECTION XXVII. AMENDMENT OR MODIFICATION

Modifications, changes or amendments to this Agreement may be made upon mutual agreement of the parties hereto. Except as otherwise specifically provided by MDHS' policy, any change, supplement, modification or amendment of any term, provision or condition of this Agreement must be in writing and signed by both parties hereto. Any modifications to this subgrant must be requested in writing no earlier than thirty (30) days after the beginning date of the subgrant and no less than thirty (30) days prior to the expiration date of the subgrant.

## SECTION XXVIII. NOTICE

Any notice required or permitted to be given under this Agreement shall be in writing, personally delivered or sent by certified mail, to the party to whom the notice should be given at the address set forth on the Mississippi Department of Human Services' (MDHS) Subgrant/Contract Signature Sheet or at such address as the party may provide in writing from time to time.

## SECTION XXIX. CERTIFICATION OF COMPLIANCE AND ASSURANCES

This Agreement is also subject to the Standard Assurances, Certifications Regarding Lobbying, Debarment, Suspension and other Responsibility Matters; and Drug-Free Workplace Requirements; MDHS' Certification Regarding Unresolved Monitoring Findings, Unresolved

Audit Findings; and Litigation Occurring Within the Last Three (3) Years; and the Certification of Adequate Fidelity Bonding, attached hereto.

### SECTION XXX.  CAPTIONS

The captions and headings in this Agreement are for convenience only, and in no way define, limit or describe the scope or intent of any provision or article of this Agreement.

### SECTION XXXI.  E-VERIFY CLAUSE

Subgrantee represents and warrants that it will ensure its compliance with the Mississippi Employment Protection Act (Senate Bill 2988 from the 2008 Regular Legislative Session) and will register and participate in the status verification system for all newly hired employees. The term "employee" as used herein means any person that is hired to perform work within the State of Mississippi. As used herein "status verification system" means the Illegal Immigration Reform and Immigration Responsibility Act of 1996 that is operated by the United States Department of Homeland Security, also known as the E-Verify Program, or any other successor electronic verification system replacing the E-Verify Program. Subgrantee agrees to maintain records of such compliance and, upon request of the State, to provide a copy of each such verification to the State. Subgrantee further represents and warrants that any person assigned to perform services hereunder meets the employment eligibility requirements of all immigration laws of the State of Mississippi. Subgrantee understands and agrees that any breach of these warranties may subject Subgrantee to the following: (a) termination of this Agreement and ineligibility for any State or public contract in Mississippi for up to three (3) years, with notice of such cancellation/termination being made public, or (b) the loss of any license permit, certification or other document granted to Subgrantee by an agency, department or governmental entity for the right to do business in Mississippi for up to one (1) year, or (c) both. In the event of such termination/cancellation, Subgrantee would also be liable for any additional costs incurred by the State due to contract cancellation or loss of "license or permit".

### SECTION XXXII.  ENTIRE AGREEMENT

IN WITNESS WHEREOF, this Agreement has been made and interchangeably executed by the parties hereto in duplicate originals.  This Contract constitutes the entire agreement of the parties with respect to the subject matter contained herein and superseded and replaces any and all prior negotiations, understandings, and agreements, written or oral, between the parties relating thereto.

| MISSISSIPPI DEPARTMENT OF HUMAN SERVICES | FAMILY RESOURCE CENTER OF NORTHEAST MISSISSIPPI |
|---|---|
| By: | By: Christi Webb |
| Title: Deputy Executive Director | Title: Executive Director |
| Date: 9/17/12 | Date: 9-10-12 |
| Witness: | Witness: |

13

# EXHIBIT A
# Scope of Services

**THE FAMILY RESOURCE CENTER**
**OF NORTHEAST MISSISSIPPI**
**October 1, 2012 – September 30, 2013**

**Scope of Services:**

The Family Resource Center of Northeast Mississippi (FRC) will continue a partnership with Mississippi Community Education Center (MCEC), the Children's Advocacy Center (CAC) in Greenwood, Leflore County, Mississippi by employing a Forensic Interview Specialist (FIS) at thirty-eight percent (38%) full time equivalency (FTE) from October 1, 2012 through September 30, 2013 to serve children in Leflore, Bolivar, Washington, Sunflower, Carroll, Holmes and Humphreys County. Two (2) FIS will be reemployed at the FRC in Tupelo to serve children in Lee, Alcorn, Prentiss, Tishomingo, Itawamba, Union, Pontotoc, Chickasaw, Clay, Monroe, Lowndes, Oktibbeha, Calhoun, Tippah, Benton and other counties as needed. *No child* will be denied an interview that has been referred by Mississippi Department of Human Services (MDHS) or Law Enforcement to an FRC site, regardless of the child's residence.

The FRC staff will provide training for Multi-Disciplinary Team (MDT) members on group facilitation techniques, purpose of MDT, and operation of MDTs according to SEC. 43-15-51. FRC staff along with the Children's Advocacy Centers of Mississippi (CACM) State Chapter will coordinate and facilitate training for FRC staff and MDT as well as other appropriate professionals (child protective services, law enforcement, medical personnel, and prosecutors) who assist in investigation and prosecution of felony child abuse cases by providing individual trainings, team trainings, and/or through invited conferences. FRC staff will administer evaluations bi-annually to MDT members to evaluate the MDT Facilitator and the MDT process. An evaluation and monitoring process will be utilized to ensure the quality of facilitation of MDT. The process will be approved by MDHS/Division of Family and Children's Services (DFCS).

The FRC in partnership with the CACM and MDHS/DFCS will coordinate the first annual Statewide MDT Networking Conference for Multidisciplinary Child Abuse Review Team Members, Children's Justice Act (CJA) Board Members MDHS/DFCS and partnering agency staff only if funding for such conference becomes available through funding sources other than MDHS.

Documentation of trainings and MDT attendance will be submitted to MDHS/DFCS Prevention/Protection Unit monthly by the fifth of the following month. A schedule of dates, times and locations of upcoming MDT meetings will be forwarded to MDHS/DFCS before the first of the month. The FRC staff will meet quarterly with the CJA Board and will report its progress and problems if there are any meeting goals and objectives set forth by the grant. Reports will be sent to MDHS/DFCS five (5) days prior to the meeting with scheduled dates, times and places of MDT meetings.

The FRC will be responsible for an annual programmatic and fiscal report to include information regarding the facts of the project, successes, failures, recommendations and any other additional information required by MDHS/DFCS no later than forty-five (45) days after the close of the grant.

The FRC will reemploy two (2) full time FIS for the Lee County, Tupelo site to serve suspected child victims from Lee, Alcorn, Prentiss, Tishomingo, Itawamba, Union, Pontotoc, Chickasaw, Clay, Monroe, Lowndes, Oktibbeha, Calhoun, Tippah and Benton (15 counties); one (1) full time MDT Coordinator (Tupelo, North MS) to coordinate MDT meetings in Lee, Itawamba, Pontotoc, Union, Tishomingo, Tippah, Desoto, Marshall, Benton, Alcorn, Prentiss, Panola, Lafayette, Tunica, Tate, Yalobusha, Calhoun, Chickasaw, Monroe, Lowndes, Noxubee, Oktibbeha, Clay, Webster, Choctaw, Montgomery, Grenada, Carroll, Leflore, Sunflower, Bolivar, Washington, Humphreys, Holmes, Attala, Winston, Coahoma, Copiah, Yazoo, Sharkey, Quitman, Tallahatchie, Issaquena (43 counties); and one (1) part-time MDT Facilitator (Central, Madison) to serve Madison, Rankin, Hinds, Simpson, Warren, Claiborne, Jefferson, Scott, Newton, Jasper, Smith, Lauderdale, Clarke, Kemper, Neshoba, Leake (16 counties). The MDT Facilitators will collectively serve fifty-nine (59) counties only if the counties have an order signed by the youth court judge permitting teams to discuss the cases and if there is not an established self facilitating team. The FRC staff is always available for any of these teams upon request.

The FRC will reemploy a part-time (38% FTE) FIS who will be located in Greenwood, Leflore County in the CAC. The FIS will do forensic interviews using the "Child First" (formerly Finding Words) interview protocol. A synopsis of the interview for MDT members will be completed within five (5) working days of the interview and the MDT member will be allowed to take a copy of the DVD with them.

The existing financial officer at the FRC will perform all financial duties. The Executive Director will supervise all aspects of children's advocacy services and the CAC Director will supervise the day to day operation of the CAC. The MDT Coordinator will provide training and supervision to MDT team members. The CACM Executive Director will participate in training and education sessions for each CAC (Greenwood and Tupelo). The Victim Intake Coordinator (VIC), located in the Tupelo Center will maintain and keep current the resource booklet, contact MDT members as needed in fifty-nine (59) counties with meeting reminders, scheduled interviews and will assist in the data entry into the tracking system and schedule interviews as needed.

## Goals and Objectives:

**Goal I**
To provide services needed in Mississippi to improve the investigative, administrative and judicial handling of child abuse cases.

**Objective 1**: Employ two (2) full time FIS (Tupelo Center) and one (1) part-time FIS (Greenwood, Leflore County) (1) full time MDT Coordinator (43 counties in North MS with an office in Tupelo Center), one (1) part-time MDT Facilitator (16 counties in Central MS with an office in Madison Center) and one (1) part-time VIC (located in the Tupelo Center and will serve all counties as needed). **All staff hired is based upon MDHS approval.**

**Performance Measure:** Filling these positions is essential to providing the best services to victims of abuse and their families in North and Central Mississippi. Documentation that persons have been hired to fill positions will be on file.

Exhibit A, Scope of Services            2

**Evaluation:** Three (3) full time positions and one (1) part-time will be employed/reemployed on October 1, 2012. They will start to provide services on or before that date. Forensic Interviewers will be evaluated through regional peer review and state peer review sessions conducted by the CACM Executive Director and staff. The CAC Director at the FRC will do individual evaluations of each FIS after observing actual interviews by each of the FIS. The FIS will also conduct self evaluations.

**Objective 2:** All intake referrals received from MDT members will be assessed by the VIC and/or other CAC staff to insure the safety of the child and determine what services are needed for that child/family. All intake assessments will be entered into the tracking system by a MDT Coordinator, a FIS or the VIC.

**Performance Measure:** Monthly statistical reports for grantors will include the number of assessments completed for each county during that month.

**Evaluation:** All intake calls will be placed on an intake referral sheet and entered into the intake log. A chart is made for every case that receives services. All cases will be entered into the database. Statistical reports will be submitted monthly. A bi-annual report will be submitted to the National Children's Alliance, an annual report to the CACM, and an oral report will be made to the CJA Advisory Board quarterly. The MDT Coordinator will evaluate the part-time MDT Facilitator and the Executive Director will evaluate the MDT Coordinator.

**Objective 3:** Coordinate and facilitate MDT meetings in fifty-nine (59) counties in Mississippi that have a court order signed by the Youth Court Judge and that does not self-facilitate and update case tracking table which includes new cases, cases to be closed, and cases awaiting prosecution, and maintain the data base for all cases.

**Performance Measure:** Progress and/or need for additional services will be updated on all open cases by MDT members and noted on the case tracking table.

**Evaluation:** The MDT Coordinator/Facilitator will coordinate and facilitate MDT meetings in counties in Mississippi. MDT Coordinator/Facilitator will continue to build teams in counties where teams are not meeting. Updated case-tracking tables will be maintained for each county. Sign-in sheets will be maintained for all MDT meetings. The MDT Coordinator will be evaluated by the Executive Director and the MDT Facilitator will be evaluated by the MDT Coordinator. The MDT Team Members will conduct evaluations on the MDT Coordinator/Facilitator twice a year.

**Objective 4:** Provide continuing education and training directly related to child abuse victims to MDT members/first responders and partnering agency staff. This will be done through individual trainings, team trainings, webinars, or in-service trainings at the MDT meetings.

**Performance Measure:** Evaluations will be completed by each attendee. FRC staff will calculate and summarize results of evaluations. Sign-in sheets will be maintained for all trainings and conferences.

Exhibit A, Scope of Services                3

**Evaluation:** Documentation of trainings and MDT attendance will be submitted on a monthly basis and reported to the MDHS. MDT Team Members who participate in the training will evaluate each training session.

**Objective 5:** Provide quality forensic interviews to victims of child abuse or neglect.

**Performance Measure:** Evaluations of each FIS will be conducted at Regional, State and in-house peer reviews. FIS will attend continued education hours to ensure techniques used are up to date and the most effective.

**Evaluation:** A personal conference will be conducted with each FIS by the Peer Review Facilitator to discuss weaknesses and needs of improvement. Documentation of continued education hours will be in the FIS file. If discrepancies arise necessary corrective measures will be implemented and said discrepancy will be re-evaluated. The FIS will be evaluated through regional peer review and state wide peer review. The CAC Director of the FRC will also evaluate each FIS.

The FRC's target area includes fifty-nine (59) counties in the state of Mississippi to be provided with MDT services and four hundred (400) individuals throughout the state with forensic interview services.

In an effort for community collaboration forensic interview space, audio visual equipment and observation areas will be provided by each of the three (3) sites for MDT members. These sites will be available upon request at no charge as a courtesy to MDHS/DFCS employees who are trained in *Child First* and have attended peer review. A written report of the findings will be submitted by the FIS to MDHS/DFCS within five (5) business days after the interview.

Children and families will be provided court preparation when necessary and will be assisted with Crime Victim Compensation Assistance and other services as needed.

**Evaluation Plan:**

Each goal and objective will be reviewed on a quarterly basis to ensure that they are being met. That review will then be forwarded to MDHS/DFCS for review and approval. Documentation regarding accomplishments concerning goals and objectives will be maintained on a monthly basis. Staff will complete self-evaluations and will also be evaluated annually by the executive director.

**59 Counties to be covered in Multi-Disciplinary Teams:**

Alcorn, Attala, Benton, Bolivar, Calhoun, Carroll, Chickasaw, Choctaw, Claiborne, Clarke, Clay, Coahoma, Copiah, Desoto, Grenada, Hinds, Holmes, Humphreys, Issaquena, Itawamba, Jasper, Jefferson, Kemper, Lafayette, Lauderdale, Leake, Lee, Leflore, Lowndes, Madison, Marshall, Monroe, Montgomery, Neshoba, Newton, Noxubee, Oktibbeha, Panola, Pontotoc, Prentiss, Quitman, Rankin, Scott, Sharkey, Simpson, Smith, Sunflower, Tallahatchie, Tate, Tippah, Tishomingo, Tunica, Union, Warren, Washington, Webster, Winston, Yalobusha, Yazoo

# EXHIBIT B
# Modified Mississippi Settlement Agreement and Reform Plan

# EXHIBIT C
# Budget

**THE FAMILY RESOURCE CENTER OF NORTHEAST MISSISSIPPI**
**OCTOBER 1, 2012 - SEPTEMBER 30, 2013**

**I. Administration Budget Activity**

**A. Salaries**

1. Executive Director - This position oversees the operation of the entire project.
2. Financial Officer - This position is responsible for all subgrantee financial monthly reports.

|  | Salary | Percentage | Total |
|---|---|---|---|
| Executive Director | $85,000.00 | 10% | $8,500.00 |
| Financial Officer | $65,000.00 | 13% | $8,450.00 |
|  |  | Total Administration Salary | $16,950.00 |

**B. Fringe Benefits**

1. FICA - 7.65% of gross salaries
2. Unemployment/Worker's Compensation Ins./Bonding/Liab.Ins. - $16,950 x 1% = $169.5
3. Retirement - 3% of gross salaries
4. Health Insurance - $432/mo. x 12 x 1 x 10%; $148/mo. x 12 x 1 x 13%

|  |  |  | Salaries | Compensation % | Total |
|---|---|---|---|---|---|
| FICA |  |  | $16,950.00 | 7.65% | $1,296.68 |
| Workman's Compensation |  |  | $16,950.00 | 1% | $169.50 |
| Retirement |  |  | $16,950.00 | 3% | $508.50 |
| Health Insurance | Month Rate | Months | No. Employees | Percentage | Total |
|  | $432.00 | 12 | 1 | 10% | $518.40 |
|  | $148.00 | 12 | 1 | 13% | $230.88 |
|  |  |  | Total Administration Fringe Benefits |  | $2,723.96 |
|  |  |  | Total for the Administration Budget Activity |  | $19,673.96 |

**II. The Family Resource Center of Northeast Mississippi "Program" Budget Activity**

**A. Salaries**

|  | No. Employees | Salary | Percentage | Total |  |
|---|---|---|---|---|---|
| 1. MDT Coordinator-North (43 counties) | 1 | $39,500.00 | 100% | $39,500.00 |  |
| 2. FI Specialist -part time (Greenwood) | 1 | $34,000.00 | 38% | $12,920.00 | no retirement/ins. |
| 3. Victim Intake Coordinator (Tupelo Site) | 1 | $33,000.00 | 10% | $3,300.00 |  |
| 4. MDT Facilitator-Central, Madison, (16 co.) | 1 | $31,200.00 | 30% | $9,360.00 | no retirement/ins. |
| 5. FI Specialist (North, Tupelo Center) | 1 | $34,000.00 | 100% | $34,000.00 |  |
| 6. FI Specialist (North, Tupelo Center) | 1 | $34,000.00 | 100% | $34,000.00 |  |
|  |  |  |  | Total Salaries | $133,080.00 |

**B. Fringe Benefits**

1. FICA - 7.65% of gross salaries
2. Unemployment/Workmen's Compensation/Bonding/Liab.Ins. - $133,080 x 1% = $1,330.80
3. Retirement - 3% of gross salaries
4. Health Insurance - $300/mo. x 12 mos. x 1 x 100%; $300/mo. x 12 mos. x 1 x 10%;
$245/mo. x 12 mos. x 1 x 100%; $117.48/mo. x 12 mos. x 1 x 100%;

|  |  |  | Salary | Compensation % | Total |
|---|---|---|---|---|---|
| FICA |  |  | $133,080.00 | 7.65% | $10,180.62 |
| Workmen's Comp |  |  | $133,080.00 | 1.00% | $1,330.80 |
| Retirement |  |  | $110,800.00 | 3.00% | $3,324.00 |
| Health | Month Rate | Months | No. Employees | Percentage | Total |
|  | $300.00 | 12 | 1 | 100% | $3,600.00 |
|  | $300.00 | 12 | 1 | 10% | $360.00 |
|  | $117.48 | 12 | 1 | 100% | $1,409.76 |
|  | $245.00 | 12 | 1 | 100% | $2,940.00 |
|  |  |  |  | Total Fringe Benefits | $23,145.18 |

**C. Travel**

Mileage- in state staff travel to MDT meetings, court, and other necessary places and peer reviews, est. @ 13,661 miles x $0.51 per mile (mileage will be computed at the state approved rate or a lower rate - not to exceed the budgeted amount).

Lodging-Travel to MDT meetings more than 75 miles away (one way) when multiple meetings are scheduled over a 2 or 3 day period. 10 nights @ approximately $85 per night = $850

|         | Miles   | Rate   | Total      |
|---------|---------|--------|------------|
| Mileage | 13,661  | $0.51  | $6,967.11  |
|         | Rate    | Nights | Total      |
| Lodging | $85.00  | 10     | $850.00    |
|         |         |        | **Total Travel** $7,817.11 |

**D. Contractual Services**

1. Repairs and General Maintenance of heat/air units, plumbing and all    equipment including computers, printers, etc. = $480
2. Liability Insurance – $6800 per year x 10% = $680
3. Printing - Printing includes all expenses for reproduction of documents or print copy, brochures, etc. = $360
4. Postage - Estimated @ $22 per month

|                          | Amount   | Total    |
|--------------------------|----------|----------|
| 1. Repairs & Maintenance | $480.00  | $480.00  |
| 2. Liability Insurance   | $680.00  | $680.00  |
| 3. Printing              | $360.00  | $360.00  |
| 4. Postage               | $264.00  | $264.00  |
|                          |          | **Total Contractual Services** $1,784.00 |

**E. Commodities**

1. General Office Supplies including DVDs, flip charts, consumable materials such as paper, towels, tissues, notebooks, pens, pencils, ink, toner, snacks, refreshments for events, cleaning supplies, consumable curriculum materials, training supplies    *$499.75*

|  |  |
|--|--|
| **Total Commodities** | $499.75 |
| **Total Program Support Budget Activity** | $166,326.04 |
| ***Total Dollars for The Family Resource Center Budget Activity*** | $186,000.00 |

# Standard Assurances

## STANDARD ASSURANCES AND CERTIFICATIONS

### OVERVIEW

Each Subgrantee and any lower-tier subrecipient must assure that it will comply with the regulations, policies, guidelines, and requirements imposed by the Federal grantor agency and MDHS. The MDHS Subgrantee must also ensure that any lower-tier subgrants it issues through funds received from MDHS will require the lower-tier subrecipient to comply with these same regulations. The assurances listed in this section may not be applicable to a particular project or program, and there may be additional assurances required by certain Federal awarding agencies.

In addition, each subgrantee must certify in writing that it will comply with the following regulations:

- Lobbying
- Suspension and Debarment
- Drug-Free Workplace
- Unresolved Monitoring and Audit Findings
- Fidelity Bond Coverage

### STANDARD ASSURANCES

The Subgrantee assures that it:

1. has the legal authority to apply for and receive the subgrant; that a resolution, motion, or similar action has been duly adopted or passed as an official act of the subgrantee's governing body, authorizing the subgrant, including all understandings and assurances contained therein, and directing and authorizing the person identified as the official representative of the Subgrantee to act in connection with the subgrant and to provide such additional information as may be required.

2. will give MDHS, the State Auditor's Office, the Federal grantor agency, and the Comptroller General, or any of their authorized representatives, access to and the right to examine all records, books, papers, documents, or items related to the subgrant.

3. will establish and maintain both fiscal and program controls and accounting procedures in accordance with generally accepted accounting principles and Federal grantor agency and MDHS directives; and will keep and maintain such books and records for audit by MDHS, by the Federal grantor agency, by the State Auditor, or by their authorized representatives; and will maintain all such records, books, papers, documents, or items for a period of at least three (3) years from the date of submission of the final reporting worksheet, or, if any litigation, claim,

## STANDARD ASSURANCES AND CERTIFICATIONS

audit, or action has begun before the expiration of the three-year period, will retain all such items until the completion of the action and resolution of all issues involved or until the end of the regular three-year period, whichever is later.

4.  will comply with the Single Audit Act Amendments of 1996.

5.  will establish safeguards to prohibit employees from using their positions for a purpose that constitutes, or presents the appearance of, personal or organizational conflict of interest, or personal gain.

6.  will comply with all Federal and State statutes relating to discrimination, including, but not limited to:

Title VI of the Civil Rights Act of 1964, prohibiting discrimination on the basis of race, color, or national origin;

Title VII of the Civil Rights Act of 1964, relating to non-discrimination in matters of recruitment, hiring, promotion, and other employment practices;

Title VIII of the Civil Rights Act of 1968, as amended, relating to non-discrimination in the sale, rental, or financing of housing;

Title IX of the Education Amendments of 1972, as amended, prohibiting discrimination on the basis of sex in federally assisted education programs and activities;

the Age Discrimination Act of 1975, prohibiting discrimination on the basis of age;

Section 504 of the Rehabilitation Act of 1973, prohibiting discrimination on the basis of handicaps;

Subtitle A, Title II of the Americans with Disabilities Act (ADA) (1990);

the Omnibus Reconciliation Act of 1981, prohibiting discrimination on the basis of race, color, religion, sex, national origin, age, and handicap;

the Drug Abuse Office and Treatment Act of 1972, as amended, relating to non-discrimination on the basis of drug abuse;

the Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment, and Rehabilitation Act of 1970, as amended, relating to non-discrimination on the basis of alcohol abuse or alcoholism; and,

Sections 523 and 527 of the Public Health Service Act of 1912, as amended, relating to confidentiality of alcohol and drug abuse patient records; and any other non-discrimination

## STANDARD ASSURANCES AND CERTIFICATIONS

provisions in the specific statute(s) under which these monies will be granted or awarded and the requirements of any other non-discrimination statute(s) which may apply to this subgrant or award.

7.    will ensure that buildings and facilities owned, occupied, or financed by the United States government are accessible to and usable by physically handicapped persons in accordance with the Architectural Barriers Act of 1968.

8.    will comply with the requirements of the provisions of the Uniform Relocation Assistance and Real Property Acquisition Act of 1970, which provide for fair and equitable treatment of persons displaced or whose property is acquired as a result of Federal and federally assisted programs. These provisions apply to all interests in real property acquired for project purposes regardless of Federal participation in purchases.

9.    will comply with the provisions of the Hatch Act, as amended, which limit the political activities of employees whose principal employment activities are funded in whole or in part with Federal funds.

10.    will comply, as applicable, with the provisions of the Davis-Bacon Act, the Copeland Act, and the Contract Work Hours and Safety Standards Act, regarding labor standards for federally assisted construction subagreements.

11.    will conform with Executive Order (EO) 11246, entitled "Equal Employment Opportunity," as amended by EO 11375, and as supplemented in Department of Labor regulations (41 CFR Part 60) and will incorporate an equal opportunity clause in federally assisted construction contracts and subcontracts.

12.    will comply with the minimum wage and maximum hours provisions of the Federal Fair Labor Standards Act.

13.    will comply with the Intergovernmental Personnel Act of 1970 relating to prescribed standards for merit systems for programs funded under one of the 19 statutes or regulations specified in Appendix A of OPM's Standards for a Merit System of Personnel Administration.

14.    will comply, if applicable, with Section 102(a) of the Flood Disaster Protection Act of 1973, which requires recipients in a special flood hazard area to participate in the program and to purchase flood insurance if the total cost of insurable construction and acquisition is $10,000 or more.

15.    will comply with the Lead-Based Paint Poisoning Prevention Act, which prohibits the use of lead-based paint in construction or rehabilitation of residence structures.

16.    will assist the Federal grantor agency in assuring compliance with Section 106 of the National Historic Preservation Act of 1966, as amended; EO 11593; and the Archaeological and Historic Preservation Act of 1974.

## STANDARD ASSURANCES AND CERTIFICATIONS

17.   will comply with environmental standards which may be prescribed pursuant to the following: (a) institution of environmental quality control measures under the National Environmental Policy Act of 1969 and EO 11514; (b) notification of violating facilities pursuant to EO 11738; (c) protection of wetlands pursuant to EO 11990; (d) evaluation of flood hazards in flood plains in accordance with EO 11988; (e) assurance of project consistency with the approved State management program developed under the Coastal Zone Management Act of 1972; (f) conformity of Federal actions to State (Clean Air) Implementation Plans under Section 176 of the Clean Air Act of 1955, as amended; (g) protection of underground sources of drinking water under the Safe Drinking Water Act of 1974, as amended; (h) protection of endangered species under the Endangered Species Act of 1973, as amended; (I) Section 6002 of the Resource Conservation and Recovery Act; and (j) the Coastal Barriers Resources Act.

18.   will comply with the Wild and Scenic Rivers Act of 1968 related to protecting components or potential components of the national wild and scenic rivers system.

19.   will comply with Public Law (PL) 93-348 regarding the protection of human subjects involved in research, development and related activities supported by this subgrant.

20.   will comply with the Laboratory Animal Act of 1966 pertaining to the care, handling, and treatment of warm blooded animals held for research, teaching, or other activities supported by this subgrant.

21.   will comply with Federal regulations regarding criteria for cost sharing or matching contributions.

22.   will assure all funds received shall be used only to supplement services and activities that promote the purposes for which the grant is awarded, and not supplant, unless specifically authorized by the program regulations and the appropriate MDHS Division.

23.   will provide certification regarding lobbying to comply with Section 319, PL 101-121 (31 USC 1352).

24.   will provide the required certification regarding their exclusion status and that of their principals prior to the award in accordance with EOs 12549 and 12689 Debarment and Suspension.

25.   will provide certification to comply with the Drug-Free Workplace Act of 1988.

26.   will comply with all applicable requirements of all other Federal and State laws, Executive Orders, regulations, and policies governing the program(s) for which these monies are provided and with the terms and conditions of the Subgrant Agreement.

## STANDARD ASSURANCES AND CERTIFICATIONS

### REQUIRED CERTIFICATIONS

#### I. LOBBYING

As required by Section 1352, Title 31 of the U.S. Code, the Subgrantee certifies that:

A.    No Federal appropriated funds have been paid or will be paid, by or on behalf of the undersigned, to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making of any Federal grant, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal grant or cooperative agreement;

B.    If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress, in connection with this Federal grant or cooperative agreement, the undersigned shall complete and submit Standard Form - LLL, "Disclosure of Lobbying Activities," in accordance with its instructions;

C.    The undersigned shall require that the language of this certification be included in the award documents for all subawards at all tiers (including subgrants, contracts under grants and cooperative agreements, and subcontracts) and that all subrecipients shall certify and disclose accordingly.

#### II. SUSPENSION AND DEBARMENT
#### AND OTHER RESPONSIBILITY MATTERS (DIRECT RECIPIENT)

As required by Executive Order 12549 and 12689, Suspension and Debarment—

A.    The Subgrantee certifies that it and its principals: (a) Are not presently debarred, suspended, proposed for debarment, declared ineligible, sentenced to a denial of Federal benefits by a State or Federal court, or voluntarily excluded from covered transactions by a Federal department or agency;

(b) Have not within a three-year period preceding this subgrant been convicted of or had a civil judgment rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State, or local) transaction or contract under a public transaction; violation of Federal or State antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property;

(c) Are not presently indicted for or otherwise criminally or civilly charged by a governmental entity (Federal, State, or local) with commission of any of the offenses enumerated in paragraph (b) of this certification; and

(d) Have not within a three-year period preceding this subgrant had one or more public transactions (Federal, State, or local) terminated for cause or default; and

B.    Where the Subgrantee is unable to certify to any of the statements in this certification, he or she shall attach an explanation to this form.

## STANDARD ASSURANCES AND CERTIFICATIONS

REQUIRED CERTIFICATIONS (Continued)

### III. DRUG-FREE WORKPLACE (SUBGRANTEES WHO ARE INDIVIDUALS)

As required by the Drug-Free Workplace Act of 1988—

A.    As a condition of the subgrant, I certify that I will not engage in the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance in conducting any activity with the subgrant; and

B.    If convicted of a criminal drug offence resulting from a violation occurring during the conduct of any subgrant activity, I will report the conviction, in writing, within 10 calendar days of the conviction to MDHS.

OR

### III. DRUG-FREE WORKPLACE (SUBGRANTEES OTHER THAN INDIVIDUALS)

As required by the Drug-Free Workplace Act of 1988 —

A.    The Subgrantee certifies that it will or will continue to provide a drug-free workplace by:

(a) Publishing a statement notifying employees that the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance is prohibited in the subgrantee's workplace and specifying the actions that will be taken against employees for violation of such prohibition;

(b) Establishing an on-going drug-free awareness program to inform employees about --

(1) The dangers of drug abuse in the workplace;
(2) The subgrantee's policy of maintaining a drug-free workplace;
(3) Any available drug counseling, rehabilitation, and employee assistance programs; and
(4) The penalties that may be imposed upon employees for drug abuse violations occurring in the workplace.

(c) Making it a requirement that each employee to be engaged in the performance of the subgrant be given a copy of the statement required by paragraph (a);

(d) Notifying the employee in the statement required by paragraph (a) that, as a condition of employment under the subgrant, the employee will –

(1) Abide by the terms of the statement; and
(2) Notify the employer in writing of his or her conviction for a violation of a criminal drug statute occurring in the workplace no later than five calendar days after such conviction;

(e) Notifying MDHS, in writing, within 10 calendar days after receiving notice under subparagraph (d)(2) from an employee or otherwise receiving actual notice of such conviction. Employers of convicted employees must provide notice, including position title to MDHS. Notice shall include the identification number(s) of each affected grant;

**STANDARD ASSURANCES AND CERTIFICATIONS**

III. DRUG FREE WORKPLACE (SUBGRANTEES OTHER THAN INDIVIDUALS) - Continued

(f) Taking one of the following actions, within 30 calendar days of receiving notice under subparagraph (d)(2), with respect to any employee who is so convicted –

(1) Taking appropriate personnel action against such an employee, up to and including termination, consistent with the requirement of the Rehabilitation Act of 1973, as amended; or

(2) Requiring such employee to participate satisfactorily in a drug abuse assistance or rehabilitation program approved for such purposed by a Federal, State, or local health, law enforcement, or other appropriate agency.

(g) Making a good faith effort to continue to maintain a drug-free workplace through implementation of paragraphs (a), (b), (c), (d), (e), and (f).

B. The Subgrantee may insert in the space provided below the site(s) for the performance of work done in connection with the specific subgrant. Check if there are workplaces on file that are not identified here:

Place of Performance (Street address, city, county, state, zip code)

*Family Resource Center of NE MS*
*425 Magazine St.*
*Tupelo, MS 38804*

IV. UNRESOLVED MONITORING FINDINGS;
UNRESOLVED AUDIT FINDINGS;
AND LITIGATION OCCURRING WITHIN THE LAST THREE (3) YEARS

Identify any unresolved monitoring findings related to any programs that have been received by the Subgrantee during the last three (3) years and the status of each finding:

*None*

Identify any unresolved audit findings related to any programs received by the Subgrantee during the last three (3) years and the status of each finding:

*None*

Identify any litigation and/or administrative hearings that the Subgrantee, the Subgrantee's Senior Management, or Subgrantee's Directors have been involved in during the last three (3) years, including the outcome or disposition of the case:

*None*

Page 8

## STANDARD ASSURANCES AND CERTIFICATIONS
### REQUIRED CERTIFICATIONS (Continued)

V. CERTIFICATION OF ADEQUATE FIDELITY BONDING

Identify any and all types of bond coverage currently in force. Include the types of bond coverage; the officers or owners and employees covered; the period covered by the bond; and the limits of coverage assigned to each officer, owner, or employee and the total limit of the bond as applicable.

*Travelers Casualty and Surety Co. of America*
*Fidelity Employee Theft   $312,500.00*

For Subgrantees/Contractors that have been unable to obtain fidelity bond coverage, describe in detail the efforts made to obtain fidelity bond coverage and the reason coverage has not been obtained.

*NA*

As the authorized representative of the subgrantee, I hereby certify that the subgrantee will comply with the above certifications in items I, II, and III; the information provided items III, IV and V is true and complete to the best of my knowledge, and that the coverage and amounts specified shall be maintained throughout the effective period of the subgrant.

SUBGRANTEE NAME AND ANY OTHER NAMES UNDER WHICH THE SUBGRANTEE HAS DONE BUSINESS:

*Lee County Families First / The Family Resource Center of Northeast Mississippi*

SUBGRANTEE ADDRESS AND ANY OTHER ADDRESSES THE SUBGRANTEE HAS USED:
*425 Magazine Street, Tupelo, MS 38804*

TYPED NAME AND TITLE OF THE SUBGRANTEE'S AUTHORIZED REPRESENTATIVE
*Christi Webb*

SIGNATURE OF SUBGRANTEE'S AUTHORIZED REPRESENTATIVE AND DATE:
*Christi Webb   9-10-12*

# Subgrantee Acceptance Manual

*Revised October 24, 2008*

## MDHS Subgrantee Manual Acceptance Form

Subgrantee Manual Coordinator

Each Subgrantee should designate a Mississippi Department of Human Services Subgrantee Manual coordinator who is familiar with the agency's operations. The coordinator's name, address, and telephone number should be sent directly to the Director, Office of Monitoring, Mississippi Department of Human Services, by the beginning of each contract period. The subgrantee should only notify the Director, Office of Monitoring, MDHS, in writing of any change in assignment.

Christi Welch          Family Resource Center, 425 Magazine
St. Tupelo, MS 38804     662-844-0013
As duly authorized representative of  Family Resource Center of
NEMS_____, I certify that said organization will comply with the above provisions and that I have received as of this date, a copy of the Mississippi Department of Human Services Subgrantee Manual, *[including Addenda to the MDHS Subgrantee/Contract Manual.]*

Christi Welch                      9-10-12
Signature                          Date

Executive Director                 Family Resource
Title                              Center of NEMS
                                   Organization

# Notification Of Liability

# MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
## BOARD MEMBER'S NOTIFICATION OF LIABILITY
### LIABILITY

MDHS assumes no liability for actions of the Subgrantee or its employees, agents or representatives under this Subgrant. Subgrantee agrees to indemnify, defend, save and hold harmless MDHS from and against all claims, demands, liabilities, suits, damages and costs of every kind and nature whatsoever, including court costs and attorney's fees, arising out of or caused by Subgrantee and/or its agents, employees, contractors, or subcontractors, in the performance of this Subgrant. The Subgrantee acting through its Board of Directors assumes liability in the event the Subgrantee misuses funds or fails to perform according to the provisions of the Subgrant. The Subgrantee shall notify each Board member, in writing, within 15 days of receiving the executed Subgrant of this requirement, and the Subgrantee shall sign a statement to this effect prior to receiving funds under this subgrant.

I acknowledge and agree to notify all members of the Board of Directors, if applicable, in writing of the assumption by _Family Resource Center of NE MS._ of liability in the event that _The Family Resource Center of NE MS_ misuses funds or fails to perform according to the provisions of the Subgrant. Further, I will keep a copy of said notification letter as a permanent part of the Subgrant file.

Signature of Entity's Director _Christi Webb_

Name: _Christi Webb_

Organization: _Family Resource Center of NE MS_

Date: _9-10-12_

Witness: _Debbie Underwood_

Date: _9-10-12_

1

# Fidelity Bond

THIS ENDORSEMENT CHANGES THE POLICY, PLEASE READ IT CAREFULLY.

## JOINT LOSS PAYABLE ENDORSEMENT

This endorsement modifies the following coverage:

**Crime**

It is agreed that:

1. This endorsement modifies all Insuring Agreements forming part of this **Crime Policy**, unless specified below as indicated below by the corresponding ☒ for the purposes of coverage:

   ☒   A. FIDELITY
   - ☒ Employee Theft    ☐ ERISA Fidelity    ☐ Employee Theft of Client Property

   ☐   B. FORGERY OR ALTERATION
   ☐   C. ON PREMISES
   ☐   D. IN TRANSIT
   ☐   E. MONEY ORDERS AND COUNTERFEIT MONEY
   ☐   F. COMPUTER CRIME
   - ☐ Computer Fraud    ☐ Computer Program and Electronic Data Restoration Expense

   ☐   G. FUNDS TRANSFER FRAUD
   ☐   H. PERSONAL ACCOUNTS PROTECTION
   ☐   I. CLAIM EXPENSE

2. The **Insured** agrees that any loss payable under the Insuring Agreement(s) indicated above and involving **Money or Other Property** in which the designated **Loss Payee** has an interest shall be paid jointly to the **Named Insured** and to the **Loss Payee** designated below:

   | Loss Payee Name | Loss Payee Address |
   |---|---|
   | **Mississippi Department of Human Services** | **750 N. State Street, Jackson, MS 39202** |

   and any such payment shall constitute payment to the **Insured**. The Company agrees to make all such payments to the **Named Insured** and to the **Loss Payee**, and the Company will not make any payment solely to the **Named Insured** unless the Company receives a request in writing from the Loss Payee to make such payment solely to the **Insured**.

3. The **Company's** liability under the Insuring Agreement(s) indicated above as extended by this endorsement are not cumulative.

4. No rights or benefits are bestowed on the Loss Payee other than payment of the loss as set forth herein.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: Travelers Casualty and Surety Company of America
Policy Number: 105493662

CRI-7019 Ed. 01-09 Printed in U.S.A.
©2009 The Travelers Companies, Inc. All Rights Reserved

Page 1 of 1

| THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY. |
| --- |

### POLICY CHANGES ENDORSEMENT

This endorsement modifies the following:

**Crime**

**It is agreed that:**

1. As of the Effective Date of this endorsement, the Declarations is amended, as indicated below by ☒:

☐ **ITEM 1:**

  ☐ NAMED INSURED:

  ☐ D/B/A:

  ☐ Principal Address:

☐ **ITEM 2:**

  POLICY PERIOD:

  Inception Date:                    Expiration Date:
  12:01 A.M. standard time both dates at the Principal Address stated in ITEM 1.

☒ **ITEM 5:** (but only for direct loss that the **Insured** sustains which is directly caused by a **Single Loss Discovered** on or after the Effective Date of this endorsement)

| CRIME | | |
| --- | --- | --- |
| | Single Loss Limit of Insurance | Single Loss Retention |
| ☒ Insuring Agreement A. Fidelity<br>1. Employee Theft<br>2. ERISA Fidelity<br>3. Employee Theft of Client Property | $312,500 | $1,000 |
| ☐ Insuring Agreement B. Forgery or Alteration | | |
| ☐ Insuring Agreement C. On Premises | | |
| ☐ Insuring Agreement D. | | |

Issuing Company: Travelers Casualty and Surety Company of America          Effective Date: July 01, 2012

Policy Number: 105493662

CRI-7112 Ed. 1-09 Printed in U.S.A.                                                     Page 1 of 3
©2009 The Travelers Companies, Inc. All Rights Reserved

| In Transit | | |
|---|---|---|
| ☐ Insuring Agreement E. Money Orders and Counterfeit Money | | |
| ☐ Insuring Agreement F. Computer Crime  1. Computer Fraud  2. Computer Program and Electronic Restoration Expense | | |
| ☐ Insuring Agreement G. Funds Transfer Fraud | | |
| ☐ Insuring Agreement H. Personal Accounts Protection  1. Personal Accounts Forgery or Alteration  2. Identity Fraud Expense Reimbursement | | |
| ☐ Insuring Agreement I. Claim Expense | | |

☐  Policy Aggregate Limit of Insurance:    ☐  Applicable    ☐  Not Applicable

If a Policy Aggregate Limit of Insurance is applicable, then the Policy Aggregate Limit of Insurance for each Policy Period for Insuring Agreements A through H, inclusive, is:   .

If a Policy Aggregate Limit of Insurance is not included, then this **Crime Policy** is not subject to a Policy Aggregate Limit of Insurance as set forth in Section V. CONDITIONS B. PROVISIONS AFFECTING LOSS ADJUSTMENT AND SETTLEMENT 1. Limit of Insurance a. Policy Aggregate Limit of Insurance.

☒  ITEM 6:

PREMIUM FOR THE POLICY PERIOD:

$1,366.00   Policy Premium

$567.00   Annual Installment Premium

☐  ITEM 7:

INSURED'S PREMISES COVERED: - All Premises of the Insured in the United States of America, its territories and possessions, Canada, or any other country throughout the world, except:

2. As of the Effective Date of this endorsement, this policy is amended as indicated below by ☒:

☒     Forms and endorsements added:
     **CRI-7019-0109.**

☐     Forms and endorsements deleted:


☐     Forms and endorsements amended:


---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

CRI-7112 Ed. 1-09 Printed in U.S.A.                                                                                   Page 3 of 3
©2009 The Travelers Companies, Inc. All Rights Reserved


**TRAVELERS**

*Wrap*✈ ®
for Non-Profit Organizations
*CRIME*
*DECLARATIONS*
POLICY NO: **105493662**

Travelers Casualty and Surety Company of America
Hartford, Connecticut
(A Stock Insurance Company, herein called the Company)

| ITEM 1 | **NAMED INSURED:**<br><br>THE FAMILY RESOURCE CENTER OF NE MS<br><br><br>D/B/A:<br><br><br><br><br>Principal Address:<br>**425 MAGAZINE STREET**<br>**TUPELO, MS 38801** |
|---|---|
| ITEM 2 | **POLICY PERIOD:**<br>Inception Date: **October 30, 2010**     Expiration Date: **October 30, 2013**<br>12:01 A.M. standard time both dates at the Principal Address stated in ITEM 1. |
| ITEM 3 | ALL NOTICES OF CLAIM OR LOSS MUST BE SENT TO THE COMPANY BY EMAIL, FACSIMILE, OR MAIL AS SET FORTH BELOW:<br><br>**Email:bfpclaims@travelers.com**<br>**FAX:(888) 460-6622**<br><br>Mail:Travelers Bond & Financial Products Claim<br>     385 Washington St. – Mail Code 9275-NB03F<br>     St Paul, MN  55102 |
| ITEM 4 | COVERAGE INCLUDED AS OF THE INCEPTION DATE IN ITEM 2:<br><br>Crime |

Page 1 of 4

CRI-2001 Ed. 01-09 Printed in U.S.A.
©2009 The Travelers Companies, Inc. All Rights Reserved

| ITEM 5 | CRIME | | |
|---|---|---|---|
| | Insuring Agreement | Single Loss Limit of Insurance | Single Loss Retention |
| | A. Fidelity | | |
| |   1. Employee Theft | $85,000 | $1,000 |
| |   2. ERISA Fidelity | Not Covered | |
| |   3. Employee Theft of Client Property | Not Covered | |
| | B. Forgery or Alteration | Not Covered | |
| | C. On Premises | Not Covered | |
| | D. In Transit | Not Covered | |
| | E. Money Orders and Counterfeit Money | Not Covered | |
| | F. Computer Crime | | |
| |   1. Computer Fraud | Not Covered | |
| |   2. Computer Program and Electronic Data Restoration Expense | Not Covered | |
| | G. Funds Transfer Fraud | Not Covered | |
| | H. Personal Accounts Protection | | |
| |   1. Personal Accounts Forgery or Alteration | Not Covered | |
| |   2. Identity Fraud Expense Reimbursement | Not Covered | |
| | I. Claim Expense | $5,000 | $0 |

CRI-2001 Ed. 01-09 Printed in U.S.A.
©2009 The Travelers Companies, Inc. All Rights Reserved

| ITEM 5.<br>(Cont'd) | If *"Not Covered"* is inserted above opposite any specified Insuring Agreement, or if no amount is included in the Limit of Insurance, such Insuring Agreement and any other reference thereto is deemed to be deleted from this **Crime Policy**.<br><br>**Policy Aggregate Limit of Insurance:**    ☐ Applicable    ☒ Not Applicable<br><br>If a Policy Aggregate Limit of Insurance is applicable, then the Policy Aggregate Limit of Insurance for each **Policy Period** for Insuring Agreements A through H, inclusive, is:    **Not Applicable**<br>If a Policy Aggregate Limit of Insurance is not included, then this **Crime Policy** is not subject to a Policy Aggregate Limit of Insurance as set forth in Section V. CONDITIONS B. PROVISIONS AFFECTING LOSS ADJUSTMENT AND SETTLEMENT 1. Limit of Insurance a. Policy Aggregate Limit of Insurance.<br><br>**Cancellation of Prior Insurance:**<br>By acceptance of this **Crime Policy**, the **Insured** gives the Company notice canceling prior policies or bonds issued by the Company that are designated by policy or bond numbers **105039468,**<br>such cancellation to be effective at the time this **Crime Policy** becomes effective.<br><br>**INSURED'S PREMISES COVERED:**<br><br>All Premises of the Insured in the United States of America, its territories and possessions, Canada, or any other country throughout the world, except:<br><br>**Not Applicable** |
|---|---|
| ITEM 6 | **PREMIUM FOR THE POLICY PERIOD:**<br><br>$1,098.00        Policy Premium<br><br>$366.00        Annual Installment Premium |
| ITEM 7 | **FORMS AND ENDORSEMENTS ATTACHED AT ISSUANCE:**<br>CRI-3001-0109; CRI-5025-0810 |

CRI-2001 Ed. 01-09 Printed in U.S.A.<br>©2009 The Travelers Companies, Inc. All Rights Reserved

THE DECLARATIONS, THE APPLICATION, THE CRIME TERMS AND CONDITIONS, ANY PURCHASED INSURING AGREEMENTS, AND ANY ENDORSEMENTS ATTACHED THERETO, CONSTITUTE THE ENTIRE AGREEMENT BETWEEN THE COMPANY AND THE NAMED INSURED.

_____

Countersigned By

IN WITNESS WHEREOF, the Company has caused this policy to be signed by its authorized officers.

Executive Vice President

Corporate Secretary

CRI-2001 Ed. 01-09 Printed in U.S.A.
©2009 The Travelers Companies, Inc. All Rights Reserved

**Ex. 17G**

# Subgrantee Signature Sheet

# And

# Budget Information

MISSISSIPPI
Form MDHS-SCS-1002
Revised 3-01-2005

STATE OF MISSISSIPPI
MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
SUBGRANT SIGNATURE SHEET
P.O. BOX 352
JACKSON, MISSISSIPPI 39205-0352

MDHS FUNDING DIVISION: Family and Children's Services

| | |
|---|---|
| 1. SUBGRANTEE'S NAME, ADDRESS & PHONE # | 2. EFFECTIVE DATE |
| | 10/1/2012 |
| Southern Christian Services for Children & Youth, inc. | 3. SUBGRANT NUMBER |
| 860 East River Place, Suite 104 | 323D321A |
| Jackson, MS 39202 | 4a. GRANT IDENTIFIER (funding source and year): |
| SUBGRANTEE'S FISCAL YEAR END DATE: September 30, 2013 | G-1201-MS-FPSS (2012 Promoting Safe & Stable Families) b. CATALOG of FEDERAL DOMESTIC ASSISTANCE (CFDA)# 93.556 |
| NAME/TITLE OF OFFICERS: (SUBGRANT ENTITY) | 5. BEGINNING AND ENDING DATE |
| a. Susannah K. Cherney, Executive Director | 10/01/2012     to     09/30/2013 |
| b. Randolph F. Vessell, Chief Financial Officer | 6. SUBGRANT PAYMENT METHOD |
| c. Patricia Digby, Program Director | _____ CURRENT NEEDS/CASH ADVANCE |
| CONTACT PERSON:   Susannah K. Cherney | X COST REIMBURSEMENT |
| PHONE NUMBER:   601-354-0983 | _____ OTHER |
| | 7. PAGE 1 OF 3 |

8. THE FOLLOWING FUNDS ARE OBLIGATED:

| | | | |
|---|---|---|---|
| FEDERAL | 674,993.41 | ADMINISTRATION | 81,817.38 |
| STATE | | SERVICES | 613,630.37 |
| OTHER | 224,997.80 | OTHER | 204,543.46 |
| TOTAL | 899,991.21 | TOTAL | 899,991.21 |

9. THE SUBGRANTEE AGREES TO ADMINISTER THIS SUBGRANT IN ACCORDANCE WITH ALL FEDERAL AND/OR STATE PROVISIONS THAT ARE APPLICABLE TO SAID SUBGRANT. THE FOLLOWING DOCUMENTS ARE INCORPORATED HEREIN:

a. SUBGRANT SIGNATURE SHEET
b. BUDGET SUMMARY
c. COST SUMMARY SUPPORT SHEET
d. BUDGET NARRATIVE
e. SUBGRANT AGREEMENT
   1) SCOPE OF SERVICES
   2) GENERAL TERMS AND PROVISIONS

3) STANDARD ASSURANCES POLICY
4) DEBARMENT POLICY
5) DRUG FREE WORKPLACE POLICY
6) SUBGRANTEE MANUAL ACCEPTANCE
f. VERIFICATION OF 25% FIDELITY BOND
g. COPY OF BOARD RESOLUTION (if Applicable)
h. COST ALLOCATION & INDIRECT COST RATES

10. IDENTIFICATION OF OTHER FUNDING (List all other funds requested, anticipated or held over from prior years dedicated to this or similar programs including Federal, State, Local or Private funds. If additional space is needed, please attach typed pages).

| SOURCE | PURPOSE | CONTRACT # | PERIOD (dates) | AMOUNT |
|---|---|---|---|---|
| NA | | | | |

| 11. APPROVED FOR MDHS: | 12. APPROVED FOR SUBGRANTEE: |
|---|---|
| BY _____ DATE 9/5/12 | BY _____ DATE 8/2/12 |
| Richard A. Berry | Susannah K. Cherney |
| Executive Director | Executive Director |
| Title | Title |

# MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
## BUDGET SUMMARY

**PAGE 2 OF 3 PAGES**

| | | | |
|---|---|---|---|
| 1. Applicant Agency: | **Southern Christian Services for Children and Youth, Inc.** | | |

| 2. Subgrant Number: | 3. Grant ID | 4. Beginning Date | 5. Ending Date |
|---|---|---|---|
| **323D321A** | **G-1201-MS-FPSS** | **10/1/2012** | **9/30/2013** |

**6. Submitted as Part of (Check one):**

| a. Funding | b. Modification | c. Modification |
|---|---|---|
| Request  ( X ) | No.(  ) | Effective Date |

**Funding Sources**

| 7.  For MDHS Use Only | 8. Activity | Federal | State | Program Income | Other (Local-Private) | Total |
|---|---|---|---|---|---|---|
| | Post Adoption Services | 674,993.41 | | | 224,997.80 | 899,991.21 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | TOTAL | 674,993.41 | | | 224,997.80 | 899,991.21 |

# MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
## COST SUMMARY SUPPORT SHEET

**PAGE 3 OF 3  PAGES**

**1. Applicant Agency:**    Southern Christian Services for Children and Youth, Inc.

| 2. Subgrant Number: | 3. Grant ID | 4. Beginning Date | 5. Ending Date |
|---|---|---|---|
| 323D321A | G-1201-MS-FPSS | 10/1/2012 | 9/30/2013 |

**6. Activity:  Post Adoption Services**

| 7. For MDHS Use Only | 8. Line Item | 9. Description of Item and/or Basis for Cost | 10. Budget | | |
|---|---|---|---|---|---|
| | | | Federal | All Other | Total |
| | Salaries | See Attached Budget Narrative | 303,177.29 | 78,523.13 | 381,700.42 |
| | Fringe Benefits | See Attached Budget Narrative | 69,617.41 | | 69,617.41 |
| | Travel | See Attached Budget Narrative | 63,285.00 | 3,000.00 | 66,285.00 |
| | Commodities | See Attached Budget Narrative | 27,360.00 | | 27,360.00 |
| | Contractual | See Attached Budget Narrative | 150,190.67 | 123,020.33 | 273,211.00 |
| | Indirect Costs | See Attached Budget Narrative | 61,363.04 | 20,454.34 | 81,817.38 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | **TOTAL** | | 674,993.41 | 224,997.80 | 899,991.21 |

# Agreement

## AGREEMENT BETWEEN
## MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
## AND
## SOUTHERN CHRISTIAN SERVICES FOR CHILDREN AND YOUTH, INC.
## PARTNERS IN PERMANENCY POST ADOPTION SERVICES

**THIS AGREEMENT** is made and entered into by and between the Division of Family and Children's Services, Mississippi Department of Human Services, hereinafter referred to as "MDHS," and Southern Christian Services for Children and Youth, Inc., hereinafter referred to as "Subgrantee."

In furtherance of the mutual interests and responsibilities of the parties hereto, this Agreement is entered into by and between the parties upon the following terms, provisions, and conditions, to-wit:

## SECTION I.  RESPONSIBILITY OF SUBGRANTEE

Subgrantee shall provide, perform and complete, in a satisfactory manner as determined by MDHS, the services and activities described in the "Scope of Services," attached hereto as Exhibit "A" and incorporated herein by reference and the "Settlement Agreement and Reform Plan, " attached hereto as Exhibit "C". Subgrantee shall establish and maintain effective controls and accountability over all funds, property and other assets covered by this Agreement.

## SECTION II.  TERM OF AGREEMENT

The term of this Agreement shall commence on October 1, 2012, or after all parties have signed, whichever is later, and end on September 30, 2013.  Should funds continue to be made available to MDHS through the Promoting Safe and Stable Families Grant (PSSF), or other grant award, MDHS shall have the option to renew the Subgrant Agreement on an annual basis for up to one (1) year at the same terms and conditions.  Renewal of the Subgrant Agreement shall be at the sole discretion of MDHS.

## SECTION III.  PAYMENT AND BUDGET LIMITATIONS

**A.**    **SUBGRANT AMOUNT**.  The total amount of the subgrant to be provided by MDHS under this Agreement is Six Hundred Seventy Four Thousand Nine Hundred Ninety Three Dollars and Forty-One Cents ($674,993.41).

**B.**    **METHOD OF PAYMENT**.  It is understood between the parties hereto that funds supporting this Agreement will be utilized and expended as provided for in the Budget Summary, Cost Summary Support Sheet(s), and Budget Narrative, collectively attached hereto as Exhibit "B," (herein referred to as the "Budget" and under the same terms and conditions as set forth in said Budget.) MDHS/DFCS shall process all reimbursement requests on a cost reimbursement basis in its normal course of business, and, if it is found in order, shall process payment thereon to be made within reasonable time to Subgrantee.

**C.**    **BUDGET REVISIONS.**  Any increase, decrease or change in the funding or budgeted line items under this Agreement shall be authorized only as provided by the Mississippi Department of Human Services' line item flexibility policy and/or as authorized by a modification to this Agreement according to Section XXIII hereof.

1

**D.    MAXIMUM PAYMENT.**  Notwithstanding any other provision of this Agreement, the maximum payment by MDHS to Subgrantee shall not exceed the sum of Six Hundred Seventy Four Thousand Nine Hundred Ninety Three Dollars and Forty One Cents ($674,993.41) as set forth in Section III.A. above, in consideration for all performances or services provided by Subgrantee, unless specifically modified as provided herein.

## SECTION IV.  RELATIONSHIP OF PARTIES

The relationship of the Subgrantee to MDHS is that of independent contractor.  None of the provisions of this Agreement are intended to create nor shall they be construed to create an agency, partnership, joint venture or employee-employer relationship between MDHS and Subgrantee.

Any person assigned by Subgrantee to perform the services hereunder shall be the employee of the Subgrantee.  MDHS may, however, direct Subgrantee to replace any of its employees under this Subgrant. The Subgrantee will replace the employee within five (5) calendar days after receipt of notice from MDHS.

## SECTION V.  COMPLAINT RESOLUTION

Subgrantee shall provide a complaint resolution procedure regarding decisions on eligibility for the program, applications that are not acted upon timely, and decisions otherwise affecting benefits and services for the program funded by this subgrant.  The complaint procedure shall be carried out according to the Fair Hearing Procedure of the Mississippi Department of Human Services, a conciliation process, the Personal Responsibility and Work Opportunity Act of 1996, and/or such other procedure as may be required by MDHS, whichever is appropriate to the complaint as directed by MDHS.

## SECTION VI.  CHANGES

MDHS reserves the right to change any portion of the work required under this Agreement or amend other terms, including the Scope of Services, necessary to meet federal or other operation requirements. Revision shall be made by a written amendment to this Agreement duly signed by the authorized representative of each party hereto.

## SECTION VII.  SAFEGUARDING INFORMATION

**A.    CONFIDENTIALITY.**  All records and information involving applicants or recipients of services under this subgrant shall be kept confidential.  Subgrantee shall take any and all steps necessary to insure the physical security of the records and information that it obtains under this Agreement, including but not limited to providing fire protection, protection against smoke and water damage, locked files, passwords, access logs or other methods to prevent loss or unauthorized access or retrieval of the records or information.

**B.    THIRD PARTY REQUESTS.**  Subgrantee shall treat all State data and information to which it has access under this Subgrant as confidential information to the extent that confidential treatment of same is required under federal and state law and shall not disclose same to a third party without specific written consent of the State.  In the event that the Subgrantee receives notice that a third party requests divulgence of confidential or otherwise protected information and/or has served upon it a subpoena or other validly issued administrative or judicial process ordering divulgence of confidential or otherwise protected information, Subgrantee shall promptly inform MDHS and thereafter respond in conformity with such subpoena as required by applicable state and/or federal law, rules, and regulations.  The provision herein shall survive termination of the Subgrant for any reason and shall continue in full force and effect and shall be binding

2

upon the Subgrantee and its agents, employees, successors, assigns, subcontractors, and any party claiming an interest in the Subgrant on behalf of, or under, the rights of the Subgrantee following any termination.

    **C.**    **LIABILITY**. Any liability resulting from the wrongful disclosure of confidential information on the part of the Subgrantee and/or its officers, agents, subcontractors, and/or representatives shall rest with the Subgrantee. Disclosure of any confidential information by the Subgrantee and/or its representatives or subcontractor without the express written approval of MDHS, shall result in the immediate termination of this Agreement. Nothing herein shall be construed to prevent MDHS from seeking any other remedy, in law or equity, available to it.

## SECTION VIII. TERMINATION OR SUSPENSION

    **A.**    **TERMINATION OR SUSPENSION**. If the Subgrantee materially fails to comply with any of the covenants, terms or stipulations of this Agreement, whether stated in a federal statute or regulation, an assurance, in the State plan or application, a notice of award, or elsewhere, MDHS may, upon giving written notice to Subgrantee, take one or more of the following actions, as appropriate in the circumstances:

    (1) Temporarily withhold cash payments pending correction of the deficiency by Subgrantee or more severe enforcement action by MDHS;

    (2) Disallow (that is, deny both use of funds and, if applicable, matching credit for) all or part of the cost of the activity or action not in compliance;

    (3) Wholly or partly suspend or terminate the current award for the Subgrantee's program;

    (4) Withhold further awards for the Subgrantee's program; or

    (5) Take other remedies that may be legally available.

    **B.**    **TERMINATION FOR CONVENIENCE.** MDHS may terminate this Subgrant at any time by giving written notice to Subgrantee of such termination and specifying the effective date thereof, at least five (5) days before the effective date of such termination. Subgrantee shall be paid an amount which bears the same ratio to the total compensation as the services actually and satisfactorily performed bear to the total services of Subgrantee covered by the Subgrant, less payments of compensation previously made.

    **C.**    **TERMINATION FOR CAUSE.** If, through any cause, Subgrantee shall fail to fulfill in a timely and proper manner, as determined by MDHS, its obligations under this Contract, or if Subgrantee shall violate any of the covenants, agreements, or stipulations of this Contract, MDHS shall thereupon have the right to terminate the Contract by giving written notice to Subgrantee of such termination and specifying the effective date thereof at least five (5) days before the effective date of such termination. In the event of such termination, Subgrantee shall be entitled to receive just and equitable compensation for satisfactory work completed on services or documents or materials collected and/or prepared by Subgrantee in connection with this Contract. Such compensation shall be based upon the fees set forth in Paragraph 5, but, in no case, shall said compensation exceed the total Contract price.

    Notwithstanding the above, Subgrantee shall not be relieved of liability to MDHS for damages sustained by MDHS by virtue of any breach of this Contract by Subgrantee, and MDHS may withhold any payments to Subgrantee for the purpose of set off until such time as the exact damages due to MDHS from Subgrantee are determined.

3

**D.**    **PARTIAL TERMINATION.** In the event of a partial termination, the Subgrantee shall incur no obligations other than those specifically identified in the agreement or contract governing the partial termination.

**E.**    **RIGHTS AND REMEDIES UPON TERMINATION OR SUSPENSION.** In the event of termination or suspension as provided in this Section, Subgrantee shall be entitled to receive just and equitable compensation for un-reimbursed obligations or expenses that are reasonably and necessarily incurred in the satisfactory performance, as determined by MDHS, of this Agreement, that were incurred before the effective date of suspension or termination, and that are not in anticipation of termination or suspension. Costs of the Subgrantee resulting from obligations incurred by the Subgrantee during a suspension or after termination of this subgrant are not allowable under this Agreement. MDHS shall not be liable for any further claims of the Subgrantee. In no case, however, shall said compensation or payment exceed the total amount of this subgrant. Subgrantee shall be liable to MDHS for damages sustained by MDHS by virtue of any breach of this Agreement by Subgrantee, and MDHS may withhold any payments to Subgrantee for the purpose of set off until such times as the exact amount of damages due to MDHS from Subgrantee are determined.

In case of termination or suspension as provided hereunder, all property, finished or unfinished documents, data, studies, surveys, drawings, photographs, manuals and reports or other materials prepared by or for the Subgrantee under this Agreement shall, at the option of MDHS, become the property of MDHS and shall be disposed of according to MDHS' directives.

The rights and remedies of MDHS provided in this Section shall not be exclusive and are in addition to any other rights and remedies provided by law or in equity.

## SECTION IX.  AGREEMENTS BY SUBGRANTEE

**A.**    **SUBCONTRACTS.** It is understood and agreed that the Subgrantee will be entering into agreements or subcontracts with eligible entities (hereinafter sometimes referred to as Subgrantee's Contractor/Subcontractor) for the provision of the services required under this Agreement. Any and all such agreements or subcontracts shall include all of the terms and conditions of this Agreement. The Subgrantee, however, shall be fully responsible for the performance of its Contractors/ Subcontractors.

Copies of all subcontracts, agreements, and modifications thereto shall be forwarded to MDHS' Division of Family and Children's Services.

**B.**    **LIABILITY OF SUBCONTRACTORS.** Subgrantee agrees that in any agreement or subcontract for the provision of the services covered by this Agreement, it shall require that the contractor or subcontractor release and hold harmless MDHS and the State of Mississippi from and against all claims, demands, liabilities, suits, damages and costs of every kind and nature whatsoever, including court costs and attorneys' fees, arising out of or caused by the contractor or subcontractor and/or its officers, agents, employees, and volunteers in the performance of such services.

## SECTION X.  RECORDS AND AUDITS

**A.**    **MAINTENANCE OF RECORDS.** Subgrantee shall establish and maintain financial and programmatic records, supporting documents, statistical records and other records as may be necessary to reflect the performances of the provisions of this Agreement.

4

**B.    FISCAL REQUIREMENTS AND AUDIT.** Subgrantee shall establish such fiscal control and fund accounting procedures, including internal auditing procedures, as may be necessary to assure the proper disbursal of and accounting for funds in accordance with this Agreement, the Single Audit Act Amendments of 1996 (31 U.S.C. Sections 7501 - 7507) and revised United States Office of Management and Budget (OMB) Circular A-133. The Subgrantee shall keep, maintain and present to MDHS, as required, necessary and proper vouchers, documentation and such other reports as may be required to support the expenditure of funds pursuant to this Agreement, and the Subgrantee shall keep and maintain bookkeeping and accounting records and procedures as the same may be established and approved by MDHS. The Subgrantee's records must be sufficient to allow MDHS to audit and monitor the Subgrantee's operation of its program and sufficient to permit the preparation of reports required by the Single Audit Act and the statutes authorizing this subgrant. These records shall be set up in accordance with Generally Accepted Accounting Principles, MDHS' Fiscal Accountability Guidelines, and OMB Cost and Accounting Standards.

**C.    INDEPENDENT AUDIT.** Audits shall be made by an independent auditor in accordance with the Single Audit Act Amendments of 1996, revised OMB Circular A-133, and generally accepted government standards covering financial audits.

**D.    AUDIT FINDINGS.** Subgrantee shall receive, reply to and resolve any state and/or federal programmatic exceptions related to this Agreement and/or any of the Subgrantee's Contractors/Subcontractors. Should, during the process of monitoring the program, MDHS become aware of any monitoring findings, the grantee may be required to refund the amount of the questioned costs, following the procedures, outlined in the Subgrantee Manual, Section 9, Page 4, Corrective Action.

## SECTION XI.  RECORD RETENTION AND ACCESS TO RECORDS

It is specifically understood and agreed that the Subgrantee shall provide MDHS with full opportunity to conduct program and/or fiscal monitoring and auditing (including through on-site visits to the Subgrantee's premises) of the Subgrantee's performance under this Agreement. MDHS, any State agency authorized to audit MDHS, the federal grantor agency, and the Comptroller General of the United States or any of their duly authorized representatives shall have the right of access to any books, documents, papers or other records of the Subgrantee that are pertinent to the services performed under this Agreement in order to make audit, examination, excerpts and/or transcripts. These records shall be retained for at least three (3) years; however, if any litigation or other legal action, by or on behalf of the State or Federal Government has begun that is not completed at the end of the three (3) year period, or if audit finding, litigation or other legal action has not been resolved at the end of the three (3) year period, the records shall be retained until resolution.

## SECTION XII.  REPORTS

**A.    MONTHLY REPORTING.** Subgrantee shall furnish MDHS with written monthly reports of costs incurred, which shall contain sufficient data to permit the tracing of funds to a level of expenditures adequate to establish that such funds have been used in compliance with this Agreement. Such reports shall be due ten (10) calendar days after the close of each month, shall be complete for the period covered and shall contain financial details pertinent to the subgrant.

Subgrantee shall review and discuss such reports with MDHS at such time and in such manner as may be deemed appropriate by MDHS.

**B.    TERMINATION REPORT.** Subgrantee shall furnish MDHS a written termination report within ten (10) calendar days from the expiration or termination date of this Agreement, unless additional

5

time is granted in writing by MDHS. The report shall contain information and data sufficient to show that the Subgrantee has achieved compliance with applicable financial and programmatic requirements.

    **C.**    **FINAL FISCAL REPORT.** The Subgrantee agrees to provide a final fiscal report to MDHS within forty-five (45) calendar days after the ending of this Agreement. Any funds paid by MDHS to the Subgrantee and not expended for activities or services authorized under this Agreement or funds expended in violation of this Agreement shall be considered MDHS' funds and shall be returned by the Subgrantee to MDHS in full. Subgrantee must adhere to the procedures for closeout of subgrants set forth in Section 11 of the MDHS Subgrantee/Contract Manual.

    **D.**    **TAX REPORTS.** Subgrantee shall file timely federal and state tax reports as due and, if requested, shall furnish MDHS with a copy of such reports within ten (10) calendar days after the filing of the report(s) with the applicable state and/or federal taxing authority(ies).

## SECTION XIII. PATENTS AND COPYRIGHTS AND RIGHTS DATA

    **A.**    **PATENTS.** This Agreement is not awarded for the purposes of experimental, developmental or research projects. Should the activities of Subgrantee and/or its Contractors/Subcontractors include experimental, developmental or research projects, this Agreement shall be promptly amended to include the standard patent rights clauses required by 35 U.S.C. Section 202 as amended by Public Law 98-620 and 37 CFR Part 401, "Rights to Inventions Made by Nonprofit Organizations and Small Business Firms Under Government Grants, Contracts and Cooperative Agreements," and any other provisions required by applicable state and/or federal laws, rules, or regulations.

    **B.**    **COPYRIGHTS AND RIGHTS IN DATA.** MDHS reserves a royalty-free, nonexclusive, and irrevocable license to reproduce, publish or otherwise use, and to authorize others to use:

    (1)    The copyright in any work developed under this Agreement or under any other agreement or contract under this subgrant Agreement; and

    (2)    Any rights of copyright to which the Subgrantee or any Subgrantee's Contractor/Subcontractor purchases ownership with subgrant support or funds provided under this Agreement.

Subgrantee hereby assigns to MDHS all rights, title, and interest in any and all materials conceived or created by the Subgrantee, and/or its employees, agents, contractors, or subcontractors, either individually or jointly with others and which arise out of the performance of this Agreement, including any computer programs, systems, designs, source code, work papers, operating instructions, and all other information, documents, and work in whatever form. All work papers, cards, magnetic tapes, disk packs, or other storage media, temporary and/or permanent, containing programs and/or other information of any kind relating to this Agreement shall be available, upon request, to MDHS or its representative(s) for review, inspection, and if desired, reproduction. Such information and documents shall be delivered to MDHS on MDHS' request therefore.

Subgrantee shall maintain all master programs and master data files in a completely secure manner. Such programs and files shall be identified by program and file name.

## XIV.   OWNERSHIP OF DOCUMENTS AND WORK PRODUCTS

All documents, notes, programs, books, data bases (and all applications thereof), files, reports, studies, unfinished documents, and/or other material collected or prepared by the Subgrantee and/or any of its Contractors/Subcontractors in connection with this Agreement shall be owned by MDHS during the term of this Agreement and upon completion or termination of this Agreement. MDHS hereby reserves all rights to all systems, computer programs, data bases and all applications thereof and to any and all information and/or material prepared in connection with this Agreement. The Subgrantee is prohibited from use of the aforesaid information and/or material without the express prior written approval of MDHS.

## SECTION XV.   PROPERTY, EQUIPMENT AND SUPPLIES

Property, equipment and supplies purchased, in whole or in part, with funds provided by MDHS shall be accounted for and disposed of in accordance with MDHS' directives, policies and procedures. Subgrantee must adequately safeguard all such property and must assure that it is used solely for purposes authorized by this Agreement.   Nothing herein, however, shall be construed to authorize the Subgrantee to purchase equipment with funds provided under this subgrant unless such is specifically allowed by Section III of this Agreement.

## SECTION XVI.   LIMITATION ON EXPENDITURE OF PROGRAM FUNDS

Expenses charged against funds granted herein shall not be incurred by the Subgrantee except during the period of this Agreement as set forth above and may only be incurred and paid only as necessary to the performance of the work and activities set forth in Exhibit A.    All expenses obligated for the approved program must be supported by approved signed contracts, bills, or other evidence of liability consistent with MDHS established procurement procedures.

Further, funds received under this Agreement and any contract or subcontract hereunder shall be used only to supplement, not supplant or duplicate, the amount of federal, state, and/or local funds otherwise expended for services provided by the Subgrantee or in the Subgrantee's service area.

## SECTION XVII.   CONFLICT OF INTEREST

Subgrantee shall ensure that there exists no direct or indirect conflict of interest in the performance of this subgrant and/or performance by any of the Subgrantee's Contractors/Subcontractors.  Subgrantee hereby warrants that no part of any federal or state money shall be paid directly or indirectly to an employee or official of MDHS as wages, compensation or gifts in exchange for acting as an officer, agent, employee, subcontractor, or consultant to the Subgrantee in connection with any work contemplated or pertaining to this subgrant or Agreement.  Subgrantee shall strictly comply with all conflict of interest provisions or standards of conduct provisions contained in the MDHS Subgrantee/Contract Manual or any applicable state, federal, or local law, rule, or regulation.

7

## SECTION XVIII.   INDEMNIFICATION

Subgrantee agrees to indemnify, defend, save and hold harmless MDHS and the State of Mississippi from and against all claims, demands, liabilities, suits, damages and costs of every kind and nature whatsoever, including court costs and attorneys' fees, arising out of or caused by the Subgrantee and/or its agents, employees, volunteers, contractors or subcontractors in the performance of this Agreement. The Subgrantee shall fully indemnify and repay MDHS any amounts provided hereunder that are found not to have been expended according to this Agreement or any amounts or costs that are disallowed by the federal grantor agency and/or by MDHS.

## SECTION XIX.  INSURANCE

Subgrantee represents that it will maintain workers' compensation insurance as required by law, which shall inure to the benefit of all Subgrantee's personnel performing services under this Agreement, employee fidelity bond insurance in an amount equal to twenty-five percent (25%) of the funds awarded hereunder, and comprehensive general liability insurance. Subgrantee will furnish MDHS with a certificate of insurance providing the aforesaid coverage, prior to the commencement of performance under this Agreement. All insurance policies required under this Section shall be issued by an insurance company or companies licensed to do business in the State of Mississippi and shall be acceptable to MDHS. The insurance required by this Section shall be maintained at all times during the course of this Agreement for the entire period hereof and MDHS must be given written notice by registered mail at least thirty (30) days in advance of any adverse modification or termination of any insurance.

If at any time the Subgrantee and/or its Contractors/Subcontractors lease, purchase or otherwise use an automobile, bus, van, or vehicle for the transportation of clients or program participants in carrying out the services required under this Agreement, the Subgrantee and its Contractors/Subcontractors must secure and maintain, at its/their own expense, the following insurance coverage in the amounts specified below:

- Owned vehicles - $30,000.00 combined single limit (bodily injury and property damage) together with medical coverage in the amount of $2,000.00 for owned vehicles.

- Hired vehicles - $25,000.00 combined single limit (bodily injury and property damage)

- Non-owned vehicles - $25,000.00 combined single limit (bodily injury and property damage)

## SECTION XX.  AVAILABILITY OF FUNDS

It is expressly understood and agreed that the obligation of MDHS to proceed under this Agreement is conditioned upon the appropriation of funds by the Mississippi State Legislature and the receipt of federal and/or state funds. If the funds anticipated for the fulfillment of this Agreement are, at any time, not forth coming or insufficient, either through the failure of the Federal Government to provide funds or of the State of Mississippi to appropriate funds or the discontinuance or material alteration of the program under which funds were provided or if funds are not otherwise available to MDHS for the payments or performance due under this Agreement, MDHS shall not be obligated to pay the amounts due under this Agreement; and all further obligations of MDHS under this Agreement will cease immediately, without penalty, cost or expense to MDHS of any kind whatsoever. In the event of such non-appropriation of funds or lack of funds, MDHS shall notify the Subgrantee, and this Agreement shall be null and void.

8

## SECTION XXI.  ASSIGNMENT

Subgrantee shall not assign or otherwise transfer the obligations incurred on its part pursuant to the terms of this Agreement without the prior written consent of MDHS.  Any attempted assignment or transfer of its obligation without such consent shall be wholly void.  MDHS does reserve, however, the exclusive right to direct the Subgrantee to assign and/or transfer this Agreement when such course of action is mandated by the federal grantor agency.  In the event that such a transfer or assignment is directed by MDHS, it, further, reserves the right to ensure adequate and proper arrangement of such transfer to assure the continued, effective performance of the purposes for which the parties entered into this Agreement.

## SECTION XXII.  COMPLIANCE WITH LAWS, RULES AND REGULATIONS

Subgrantee shall comply with all applicable policies and procedures of MDHS and all applicable federal, state, and/or local laws, rules, regulations, directives, and guidelines that are now applicable or later made applicable to this Agreement.  Particularly, but without limitation through inclusion, Subgrantee shall comply with 45 CFR Part 92, 45 CFR Part 260, and the Mississippi Department of Human Services' Subgrantee/Contract Manual.

## SECTION XXIII.  AMENDMENT OR MODIFICATION

Modifications, changes or amendments to this Agreement may be made upon mutual agreement of the parties hereto.  Except as otherwise specifically provided by MDHS' policy, any change, supplement, modification or amendment of any term, provision or condition of this Agreement must be in writing and signed by both parties hereto.  Any modifications to this grant must be requested in writing no earlier than thirty (30) days after the beginning date of the grant and no less than thirty (30) days prior to the expiration date of the grant.

## SECTION XXIV.  DISPUTES

Any dispute concerning a question of fact under this Agreement that is not disposed of by agreement of the parties hereto shall be decided by the Director of the Division of Family and Children's Services.  This decision shall be reduced to writing and a copy thereof mailed or furnished to the Subgrantee and shall be final and conclusive, unless, within thirty (30) days from the date of the decision, the Subgrantee mails or furnishes to the Executive Director of the Mississippi Department of Human Services a written request for review.  Pending final decision of the Executive Director or his designee, the Subgrantee will proceed in accordance with the decision of the Director of the Division of Family and Children's Services.  In the review before the Executive Director, the Subgrantee shall be afforded an opportunity to be heard and to offer evidence in support of its position on the question and decision under review.  The decision of the Executive Director or designee shall be final and conclusive unless determined by a court of competent jurisdiction in Hinds County, State of Mississippi, to have been fraudulent, capricious or so grossly erroneous as necessarily to imply bad faith or not supported by substantial evidence.

## SECTION XXV.  WAIVER

Failure of either party hereto to insist upon strict compliance with any of the terms, covenants and conditions of this Agreement shall not be deemed a waiver or relinquishment of any similar right or power hereunder at any subsequent time or of any other provision hereof nor shall it be construed to be a modification of the terms of this Agreement.

9

## SECTION XXVI.  SEVERABILITY

If any term or provision of this Agreement is prohibited by the laws of the State of Mississippi or declared invalid or void by a court of competent jurisdiction, the remainder of this Agreement shall not be affected thereby and each term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

## SECTION XXVII.  GOVERNING LAWS AND LEGAL REMEDIES

This Agreement shall be construed and governed in accordance with the laws of the State of Mississippi.  Subgrantee expressly agrees that under no circumstances shall MDHS be obligated to pay an attorney's fee or the cost of legal action to Subgrantee.

## SECTION XXVIII.  NOTICE

Any notice required or permitted to be given under this Agreement shall be in writing, personally delivered or sent by certified mail, to the party to whom the notice should be given at the address set forth on the Mississippi Department of Human Services' (MDHS) Subgrant/Contract Signature Sheet or at such address as the party may provide in writing from time to time.

## SECTION XXIX.  CERTIFICATIONS OF COMPLIANCE AND ASSURANCES

This Agreement is also subject to the Standard Assurances, Certifications Regarding Lobbying, Debarment, Suspension and Other Responsibility Matters; and Drug-Free Workplace Requirements, MDHS' Certification Regarding Unresolved Monitoring Findings; Unresolved Audit Findings; and Litigation Occurring Within the Last Three (3) Years, and the Certification of Adequate Fidelity Bonding.

## SECTION XXX.  CAPTIONS

The captions and headings in this Agreement are for convenience only, and in no way define, limit or describe the scope or intent of any provision or article of this Agreement.

## SECTION XXXI.  E-VERIFY

Independent Contractor represents and warrants that it will ensure compliance with the Mississippi Employment Protection Act (Senate Bill 2988 from the 2008 Regular Legislative Session) and will register and participate in the status verification system for all newly hired employees.  The term "employee" as used herein means any person that is hired to perform work within the State of Mississippi.  As used herein, "status verification system" means the Illegal Immigration Reform and Immigration Responsibility Act of 1996 that is operated by the United States Department of Homeland Security, also known as the E-Verify Program, or any other successor electronic verification system replacing the E-Verify Program.  Independent Contractor agrees to maintain records of such compliance and, upon request of the State, to provide a copy of each such verification to the State. Independent Contractor further represents and warrants that any person assigned to perform services hereunder meets the employment eligibility requirements of all immigration laws of the State of Mississippi. Independent Contractor understands and agrees that any breach of these warranties may subject Independent Contractor to the following: (a) termination of this Agreement and ineligibility for any state or public contract in Mississippi for up to three (3) years, with notice of such cancellation/termination being made public, or (b) the loss of any license permit, certification or other document granted to

10

Independent Contractor by an agency, department or governmental entity for the right to do business in Mississippi for up to one (1) year, or (c) both.  In the event of such termination/cancellation, Independent Contractor would also be liable for any additional costs incurred by the State due to contract cancellation or loss of "license or permit."

## SECTION XXXII.  ENTIRE AGREEMENT

IN WITNESS WHEREOF, this Agreement has been made and interchangeably executed by the parties hereto in duplicate originals.  This Contract constitutes the entire agreement of the parties with respect to the subject matter contained herein and supersedes and replaces any and all prior negotiations, understandings, and agreements, written or oral, between the parties relating thereto.

**MISSISSIPPI DEPARTMENT OF HUMAN SERVICES**

By: _____

Title: _Deputy Executive Director_

Date: _9/5/12_

Witness: _Leigh Wishing_

**SOUTHERN CHRISTIAN SERVICES FOR CHILDREN AND YOUTH, INC.**

By: _____

Title: _Executive Director_

Date: _8/2/12_

Witness: _____

11

# EXHIBIT A
# Scope of Services

**GOALS, OBJECTIVES, ACTIVITIES, TIMELINE, TARGET POPULATION, OUTCOMES:**
**October 1, 2012 – September 30, 2013**

**SOUTHERN CHRISTIAN SERVICES FOR CHILDREN AND YOUTH, INC.**
**FOSTER CARE PROGRAM**
**PARTNERS IN PERMANENCY**

| CRISIS MANAGEMENT SERVICES | | | | | | | |
|---|---|---|---|---|---|---|---|
| **NEEDS STATEMENT OF THE GOAL** | **GOAL** | **INPUTS** | **TARGET POPULATION** | **OBJECTIVES** | **TIMELINE** | **MEASURES** | **OUTCOMES** |
| a. Lack of awareness of available community resources when families feel threatened | Provide case management services by coordination of resources for families, such as counseling, family and group meetings, etc. | 1. Permanency/post adoption staff 2. Staff of community agencies with available resources | Thirty (30) resource families who are experiencing a crisis | Family's progress "tracked" through progress notes with the date & time of initial request, first contact, last contact and termination date | October 1, 2012 through Sept. 30, 2013 | Decreased stresses of parents measured through client satisfaction surveys and/or interviews after service rendered with 80% satisfaction rating | Parents will fully utilize the available resources to increase family commitment and maintain safety of child(ren) |
| b. Lack of available adoption competent therapists to work with families | Provide a pool of adoption competent therapists who will provide counseling to families in crisis | 1. Permanency/post adoption staff 2. Therapists 3. Staff Training | Fifteen (15) resource families will receive counseling from trained therapists | Update and train at least one therapist per MDHS region to offer adoption competent therapy | October 1, 2012 through Sept. 30, 2013 | Therapists will be trained and made available to families who have adopted children and who are experiencing crisis | Parents will fully utilize the trained therapists to assist with difficulties as a result of their child's loss and grief issues |
| c. Overwhelming family stress from prolonged crisis with child resulting in possible dissolution of the adoption | Provide to families short term non-threatening relief through respite services | 1. Trained respite providers 2. Permanency/post adoption staff 3. Respite Coordinator | Seventy-five (75) resource families who are experiencing stress | Daily and/or weekend respite in homes of trained respite families. | October 1, 2012 through Sept. 30, 2013 | Decreased stresses of parents measured through satisfaction surveys and/or personal interviews with 80% satisfaction rating Avoidance of disruption | Families exhibit increased stability and probability of abuse has decreased |

Exhibit A, Scope of Services

| CASE MANAGEMENT SERVICES | | | | | | | |
| NEEDS STATEMENT OF THE GOAL | GOAL | INPUTS | TARGET POPULATION | OBJECTIVES | TIMELINE | MEASURES | OUTCOMES |
|---|---|---|---|---|---|---|---|
| a. Poor utilization of community resources | Reduce fragmentation<br><br>Decrease duplication of services<br><br>Increase access to resources | 1. Permanency/post adoption staff<br>2. MAP Teams | Seventy-five (75) resource families who are experiencing difficulties and/or who are having difficulty accessing necessary resources | Monthly collaborative meetings with MAP teams to advocate on behalf of seventy-five (75) foster/adoptive children in families who are experiencing difficulties | October 1, 2012 through<br><br>Sept. 30, 2013 | Families in crisis receive effective community-based, wrap-around services provided through PIP and MAP team partners | Families exhibit increased stability and the well being of the children is enhanced |
| b. Lack of knowledge by families of available resources | Coordinate and link available resources to families and assist with family team meetings | 1. Permanency/post adoption staff<br>2. MDHS Staff<br>3. Community Resources | Fifty (50) resource families who are experiencing difficulties | Link families with agencies to assist with intervention services | October 1, 2012 through<br><br>Sept. 30, 2013 | Families receive requested services from available resources; effectiveness measured by client satisfaction survey | Families exhibit increased stability and commitment |

Exhibit A, Scope of Services

| TRAINING | | | | | | | |
|---|---|---|---|---|---|---|---|
| **NEEDS STATEMENT OF THE GOAL** | **GOAL** | **INPUTS** | **TARGET POPULATION** | **OBJECTIVES** | **TIMELINE** | **MEASURES** | **OUTCOMES** |
| a. Parenting skills are not sufficient to insure safety, permanency and well being of the child | Improve parenting skills in the area of discipline, communication, and relationships. Increase knowledge of human development | 1. Permanency/post adoption staff<br>2. Instructional training supplies<br>3. Professional lead trainers | Resource parents at four (4) in-service training events | Quarterly parent training classes<br>Support group Meetings | October 1, 2012 through Sept. 30, 2013 | Increased parenting skills<br><br>Client satisfaction surveys/training evaluations responses | Families learn new parenting techniques which enhance the permanency and well being of the children and stabilize the family unit |
| b. Parents lack innovative parenting skills and techniques for dealing with child/youth | Improve parenting skills through intensive training events | 1. Permanency/post adoption staff<br>2. Resource parents<br>3. Professional-lead workshops | Thirty (30) parents receiving scholarships to the Lookin to the Future Conference | Innovative parenting skills workshops and training events | October 1, 2012 through Sept. 30, 2013 | Increased knowledge and parenting skills measured by evaluations of each workshop | Families learn more information about adoption/ foster care issues and share with other resource parents |
| c. Parents lack skills to advocate for their child's needs and support | Improve parenting skills through weekend intensive training event (retreat) | 1. Permanency/post adoption staff<br>2. Adoption/foster care staff<br>3. Volunteers<br>4. MDHS staff<br>5. Instructional supplies<br>6. Workshops | Families attending intensive family training conference | One (1) weekend training event (retreat) | June 2013 | Increased skills, knowledge and support<br>Measured by retreat evaluations and by evidence of effective parent advocacy | Families gain skill, knowledge, and confidence necessary to advocate for child/family needs |

Exhibit A, Scope of Services

| SUPPORT | | | | | | | |
|---|---|---|---|---|---|---|---|
| **NEEDS STATEMENT OF THE GOAL** | **GOAL** | **INPUTS** | **TARGET POPULATION** | **OBJECTIVES** | **TIMELINE** | **MEASURES** | **OUTCOMES** |
| a. Families do not have adequate knowledge and support with the educational systems for children who have special needs. | Improve advocacy for families | 1. Permanency/post adoption staff<br>2. Resource parents<br>3. Local schools<br>4. Educational Resources | Resource parents of children with special needs in the education system | Resource parents will be trained to navigate the education system (particularly special needs) | October 1, 2012 through Sept. 30, 2013 | Increased knowledge and better educational services for child as determined through parent satisfaction survey | Families gain support and knowledge to access appropriate educational services for children with special needs |
| b. Families lack understanding of and knowledge of child and adolescent development and effects of trauma. | Equip families by bringing families and children together in family support groups with activities that are psycho-educational and strength-focused | 1. Permanency/post adoption staff<br>2. Resource parents<br>3. MDHS staff<br>4. Supplies<br>5. Resource parent mailing list | 75 families participating in support group activities | Support group meetings with families at least quarterly | October 1, 2012 through Sept. 30, 2013 | Increased level of support and knowledge measured by evaluation after each group session | Families gain support and increased stability of the family unit |
| c. Lack of support system and feelings of isolation by families | Provide opportunities for resource parents to network with other resource parents | 1. Volunteers<br>2. Permanency/post adoption staff<br>3. SCSCY staff<br>4. Resource parents | Twenty (20) resource parents and their children | Families will contact families who have similar situations and lifestyles when a crisis occurs | October 1, 2012 through Sept. 30, 2013 | Increased level of support felt by families as measured by satisfaction surveys | Families exhibit increased stability and permanency |

| PUBLIC AWARENESS | | | | | | | |
|---|---|---|---|---|---|---|---|
| **NEEDS STATEMENT OF THE GOAL** | **GOAL** | **INPUTS** | **TARGET POPULATION** | **OBJECTIVES** | **TIMELINE** | **MEASURES** | **OUTCOMES** |
| a. Lack of awareness by parents of training opportunities and other events; available resources; services; and crisis contact information | More aware and better informed parents of training and other events; available resources; services; and crisis contact information related to adoption and/or foster care | 1. Permanency/post adoption staff<br><br>2. Printed materials<br><br>3. Resource parents<br><br>4. SCSCY staff<br><br>5. Toll-free phone Numbers<br><br>6. Web-site<br><br>7. Multi-media library supplies<br><br>8. Provider Resource directory | 1. All resource parents on mailing list<br><br>2. MDHS licensure and resource staff | Quarterly newsletters distributed to resource parents and MDHS staff<br><br>Brochures distributed to all newly recruited and trained resource families<br><br>Increased awareness and usage of the toll-free number, website, lending library, and updated resource directory | October 1, 2012 through Sept. 30, 2013 | Families will become more aware and better informed of training and other events, available resources, services, and crisis contact information as measured by # of family calls, activity records, and # of website visits; Family utilization of the resource directory, lending library, and post adoption support services; and results of family satisfaction surveys | Children's well-being is enhanced and families exhibit improved stability and permanency through increased awareness and utilization of adoption and foster care resources and supports |

Exhibit A, Scope of Services

# EXHIBIT B
# Budget

**SOUTHERN CHRISTIAN SERVICES FOR CHILDREN AND YOUTH, INC.**
**PARTNERS IN PERMANENCY**
**OCTOBER 1, 2012 – SEPTEMBER 30, 2013**

**BUDGET NARRATIVE**

|  | TOTAL | DFCS<br>75% FEDERAL | SCSCY<br>25% MATCH |
|---|---|---|---|
| **Salaries** | | | |
| Program Director @ $923.08 x 26 pay periods x 1 staff | $ 24,000.08 | $ 24,000.08 | $ - |
| Sr. Permanency Specialist @ $1,824.23 x 26 pay periods x 1 staff | $ 47,429.98 | $ 47,429.98 | $ |
| 3 Permanency Specialists @ $1,373.08 x 26 pay periods x 3 staff | $ 107,100.24 | $ 107,100.24 | $ |
| 3 Permanency Specialists @ $1,294.62 x 26 pay periods x 3 staff | $ 100,980.36 | $ 100,980.36 | $ |
| Permanency Coordinator @ $538.46 x 26 pay periods x 1 staff | $ 13,999.96 | $ 13,999.96 | $ - |
| Respite Coordinator 1 staff @ $38,666.67 | $ 38,666.67 | $ 9,666.67 | $ 29,000.00 |
| Accountant @ $34,500 x 12.5% | $ 4,312.50 | $ - | $ 4,312.50 |
| Chief Financial Officer @ $57,165 x 12.5% | $ 7,145.63 | $ - | $ 7,145.63 |
| Adoption Secretary @ $30,500 x 33% | $ 10,065.00 | $ - | $ 10,065.00 |
| Wendy's Wonderful Kids Staff @ $40,000 x 70% | $ 28,000.00 | $ - | $ 28,000.00 |
| **Total Salaries:** | $ 381,700.42 | $ 303,177.29 | $ 78,523.13 |
| **Fringe Benefits** | | | |
| FICA @ 6.20% x $303,177.29 (Program staff) | $ 18,796.99 | $ 18,796.99 | $ - |
| Medicare @ 1.45% x $303,177.29 (Program staff) | $ 4,396.07 | $ 4,396.07 | $ - |
| Health Ins. @ $267.43/mo x 7 staff x 12 mos | $ 22,464.12 | $ 22,464.12 | $ - |
| $133.72/mo x 1 staff x 12 mos | $ 1,604.64 | $ 1,604.64 | $ - |
| $66.86/mo x 1 staff x 12 mos | $ 802.32 | $ 802.32 | $ - |
| Life Ins. @ $2.40/mo x 7 staff x 12 mos | $ 201.60 | $ 201.60 | $ - |
| $1.20/mo x 1 staff x 12 mos | $ 14.40 | $ 14.40 | $ - |
| $.60/mo x 1 staff x 12 mos | $ 7.20 | $ 7.20 | $ - |
| Workman's Comp @ .0184 x $303,177.29 (Program staff) | $ 5,578.46 | $ 5,578.46 | $ - |
| Disability @ .0048 x $303,177.29 (Program staff ) | $ 1,455.25 | $ 1,455.25 | $ - |
| Unemployment Comp. @ 8 staff x 2% x $7,000 | $ 1,120.00 | $ 1,120.00 | $ - |
| 1 staff x 2% x $3,500 | $ 70.00 | $ 70.00 | $ - |
| 1 staff x 2% x $1,750 | $ 35.00 | $ 35.00 | $ - |
| Pension Fund @ $434.78 x 1 staff x 12 mos | $ 5,217.36 | $ 5,217.36 | $ - |
| $327.25 x 2 staff x 12 mos | $ 7,854.00 | $ 7,854.00 | $ - |
| **Total Fringe Benefits:** | $ 69,617.41 | $ 69,617.41 | $ - |

*Exhibit B, Budget*                                   1

|  | TOTAL | DFCS 75% Federal | SCSCY 25% Match |
|---|---|---|---|

**Travel**

Mileage - 93,000 travel miles during the subgrant period. Staff and respite providers will be required to use their personal vehicles to be reimbursed at $.555 per mile. Resource parents will be reimbursed at $.555 per mile for travel to attend the MS Child Welfare/Lookin' to the Future Conference and out of state conference.

| Item | TOTAL | DFCS 75% Federal | SCSCY 25% Match |
|---|---|---|---|
| Mileage | $ 51,615.00 | $ 48,615.00 | $ 3,000.00 |

*(Mileage will be computed at the specified rate or at the state approved mileage rate in the event that it changes--not to exceed the total budgeted amount.)*

| Item | TOTAL | DFCS 75% Federal | SCSCY 25% Match |
|---|---|---|---|
| Lodging - lodging for the Division Director and Permanency Specialists (10 nights x 12 mos x $80 per night) = $9,600 | $ 9,600.00 | $ 9,600.00 | $ - |
| Meals @ $36/day x 10 days/mo x 12 mos = $4,320.00 | $ 4,320.00 | $ 4,320.00 | $ - |
| Conference Fees - Registration fees for PIP staff to attend the Lookin' to the Future Conference (10 staff x $75 = $750) | $ 750.00 | $ 750.00 | $ - |
| **Total Travel:** | **$ 66,285.00** | **$ 63,285.00** | **$ 3,000.00** |

**Commodities**

| Item | TOTAL | DFCS 75% Federal | SCSCY 25% Match |
|---|---|---|---|
| Program Supplies - includes but is not limited to instructional materials, videos, tapes, certificates, frames, door prizes, snacks for groups, and other items deemed necessary to provide the services specified in the contract. ($880 per mo x 12 mos) | $ 10,560.00 | $ 10,560.00 | $ - |
| Office Supplies - includes but is not limited to such items as desk supplies, paper, ink cartridges, and other items deemed necessary to provide services specified in the subgrant. Furnishings will not exceed $500. ($900.00 per mo x 12 mos) | $ 10,800.00 | $ 10,800.00 | $ - |
| Adoptive Parent Training - Snacks, t-shirts and training supplies to be used for training resource parents. Children's supplies for crafts, games and snacks. ($500 per mo x 12 mos) | $ 6,000.00 | $ 6,000.00 | $ - |
| **Total Commodities:** | **$ 27,360.00** | **$ 27,360.00** | **$ -** |

|  | TOTAL | DFCS 75% Federal | SCSCY 25% Match |
|---|---|---|---|
| **Contractual** | | | |
| Rent – South (Gulfport) $700 x 12 mos | $  8,400.00 | $  8,400.00 | $  - |
| South (Hattiesburg) $500 x 12 mos | $  6,000.00 | $  6,000.00 | $  - |
| Northwest (Batesville) $410 x 12 mos | $  4,920.00 | $  4,920.00 | $  - |
| Central (Jackson) $830 x 12 mos | $  9,960.00 | $  9,960.00 | $  - |
| Delta (Indianola) $600 x 12 mos | $  7,200.00 | $  7,200.00 | $  - |
| Tupelo Rent (In-Kind) $6,125 x 12 mos | $  73,500.00 | $  - | $  73,500.00 |
| Utilities – South (Hattiesburg) $200/mo. x 12 mos | $  2,400.00 | $  2,400.00 | $  - |
| Central (Jackson) $300/mo. x 12 mos | $  3,600.00 | $  3,600.00 | $  - |
| Tupelo (In-Kind) $1,250 x 12 mos | $  15,000.00 | $  - | $  15,000.00 |
| Telephone – Local and long distance and Internet $1,200/mo for six locations x 12 mos | $  14,400.00 | $  14,400.00 | $  - |
| 800 number – At least $60/mo x 12 mos | $  720.00 | $  720.00 | $  - |
| Postage – Includes all mailing of brochures, newsletters, and other items deemed necessary to provide services specified in this subgrant. At least $500 x 12 mos | $  6,000.00 | $  6,000.00 | $  - |
| Printing – Outside printing of brochures, newsletter lending library catalogue, resource directory and other items deemed necessary to provide the services specified in this subgrant. At least $800/mo x 12 mos | $  9,600.00 | $  9,600.00 | $  - |
| Resource Family recruitment dinner to be held at the Lookin' To the Future Conference (includes cost of Food & meeting space at convention center) 200 people x $15/person | $  3,000.00 | $  3,000.00 | $  - |
| Lodging for resource parents to attend the Lookin' to the Future Conference (25 adopt. Parents' rooms x $80/night x 2 nights) | $  4,000.00 | $  4,000.00 | $  - |
| Meals for resource parents to attend the Lookin' to the Future Conference (30 meals x $36/day x 3 days) | $  3,240.00 | $  3,240.00 | $  - |
| LTTF Conference Registration fees for thirty (30) resource parents to attend the Lookin' to the Future Conference (30 parents x $75) | $  2,250.00 | $  2,250.00 | $  - |
| Web-site Hosting - One time charge of $200 for contract period | $  200.00 | $  200.00 | $  - |
| Equipment rental (copier and postage meter) @ $400 per mo x 12 mos | $  4,800.00 | $  4,800.00 | $  - |
| Computer Repair @ $80 per mo x 12 mos | $  960.00 | $  960.00 | $  - |
| Prof liability, property, directors & etc (insurance) @ $325 per mo x 12 mos | $  3,900.00 | $  3,900.00 | $  - |
| Training for adoptive parents (retreat) – Two day Training for resource parents with approximately 300 people in attendance. The cost of meals and lodging as well as facility rental and speaker fees will be included in this cost. | $  27,000.00 | $  27,000.00 | $  - |
| Four meals @ $15 each x 300 people = $18,000 | | | |
| Lodging – 300 people x $20 x 1 nights = $6,000 | | | |
| Rental of facility/speaker fees = $3,000 | | | |

*Exhibit B, Budget*                                         3

|  | TOTAL | DFCS 75% Federal | SCSCY 25% Match |
|---|---|---|---|
| LTTF Conference Training Fees - portion of Lookin' to the Future Conference fees used to train resource parents. $10,000 one time Fee | $ 10,000.00 | $ - | $ 10,000.00 |
| Respite Care - Budgeted to help families in crisis in a resource home to have a temporary break from each other. 1 family per wknd x $100 per wknd x 350 wknds | $ 35,000.00 | $ 12,000.00 | $ 23,000.00 |
| Staff Training - staff training fees incurred so the specialist will be able to provide the training needed to respite providers and adoptive parents. ($110 per mo x 12 mos) | $ 1,320.00 | $ 1,320.00 | $ - |
| Staff Recruitment - background checks, recruitment (includes but not limited to the costs for employment ads, cost of physicals, and other items deemed necessary to provide services for this program. Cost of ads and background checks vary according to request.) $100 per mo x 12 mos | $ 1,200.00 | $ 1,200.00 | $ - |
| Payroll Processing @ $120 per mo x 12 mos | $ 1,440.00 | $ 1,440.00 | $ - |
| Building Maintenance (Janitorial, alarm & pest control) @ $73 per mo x 12 mos | $ 876.00 | $ 876.00 | $ - |
| Accounting Fees - One time fee during subgrant period allocated to PIP program. $1,725 | $ 1,725.00 | $ 204.67 | $ 1,520.33 |
| Licensure Expense - 6 prog spec @ $100 ea | $ 600.00 | $ 600.00 | $ - |
| Training for therapists conducted by an outside provider in specialized adoption | $ 10,000.00 | $ 10,000.00 | $ - |
| **Total Contractual:** | $ 273,211.00 | $ 150,190.67 | $ 123,020.33 |
| **Total Direct Costs:** | $ 818,173.83 | $ 613,630.37 | $ 204,543.46 |
| **Total Indirect Costs (10%):** | $ 81,817.38 | $ 61,363.04 | $ 20,454.34 |
| | $ 899,991.21 | $ 674,993.41 | $ 224,997.80 |

# EXHIBIT C
# Settlement Agreement and Reform Plan

(see MDHS website)

# Standard Assurances

## STANDARD ASSURANCES AND CERTIFICATIONS

### OVERVIEW

Each Subgrantee and any lower-tier subrecipient must assure that it will comply with the regulations, policies, guidelines, and requirements imposed by the Federal grantor agency and MDHS. The MDHS Subgrantee must also ensure that any lower-tier subgrants it issues through funds received from MDHS will require the lower-tier subrecipient to comply with these same regulations. The assurances listed in this section may not be applicable to a particular project or program, and there may be additional assurances required by certain Federal awarding agencies.

In addition, each subgrantee must certify in writing that it will comply with the following regulations:

- Lobbying
- Suspension and Debarment
- Drug-Free Workplace
- Unresolved Monitoring and Audit Findings
- Fidelity Bond Coverage

### STANDARD ASSURANCES

The Subgrantee assures that it:

1.  has the legal authority to apply for and receive the subgrant; that a resolution, motion, or similar action has been duly adopted or passed as an official act of the subgrantee's governing body, authorizing the subgrant, including all understandings and assurances contained therein, and directing and authorizing the person identified as the official representative of the Subgrantee to act in connection with the subgrant and to provide such additional information as may be required.

2.  will give MDHS, the State Auditor's Office, the Federal grantor agency, and the Comptroller General, or any of their authorized representatives, access to and the right to examine all records, books, papers, documents, or items related to the subgrant.

3.  will establish and maintain both fiscal and program controls and accounting procedures in accordance with generally accepted accounting principles and Federal grantor agency and MDHS directives; and will keep and maintain such books and records for audit by MDHS, by the Federal grantor agency, by the State Auditor, or by their authorized representatives; and will maintain all such records, books, papers, documents, or items for a period of at least three (3) years from the date of submission of the final reporting worksheet, or, if any litigation, claim,

## STANDARD ASSURANCES AND CERTIFICATIONS

audit, or action has begun before the expiration of the three-year period, will retain all such items until the completion of the action and resolution of all issues involved or until the end of the regular three-year period, whichever is later.

4.    will comply with the Single Audit Act Amendments of 1996.

5.    will establish safeguards to prohibit employees from using their positions for a purpose that constitutes, or presents the appearance of, personal or organizational conflict of interest, or personal gain.

6.    will comply with all Federal and State statutes relating to discrimination, including, but not limited to:

Title VI of the Civil Rights Act of 1964, prohibiting discrimination on the basis of race, color, or national origin;

Title VII of the Civil Rights Act of 1964, relating to non-discrimination in matters of recruitment, hiring, promotion, and other employment practices;

Title VIII of the Civil Rights Act of 1968, as amended, relating to non-discrimination in the sale, rental, or financing of housing;

Title IX of the Education Amendments of 1972, as amended, prohibiting discrimination on the basis of sex in federally assisted education programs and activities;

the Age Discrimination Act of 1975, prohibiting discrimination on the basis of age;

Section 504 of the Rehabilitation Act of 1973, prohibiting discrimination on the basis of handicaps;

Subtitle A, Title II of the Americans with Disabilities Act (ADA) (1990);

the Omnibus Reconciliation Act of 1981, prohibiting discrimination on the basis of race, color, religion, sex, national origin, age, and handicap;

the Drug Abuse Office and Treatment Act of 1972, as amended, relating to non-discrimination on the basis of drug abuse;

the Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment, and Rehabilitation Act of 1970, as amended, relating to non-discrimination on the basis of alcohol abuse or alcoholism; and,

Sections 523 and 527 of the Public Health Service Act of 1912, as amended, relating to confidentiality of alcohol and drug abuse patient records; and any other non-discrimination

## STANDARD ASSURANCES AND CERTIFICATIONS

provisions in the specific statute(s) under which these monies will be granted or awarded and the requirements of any other non-discrimination statute(s) which may apply to this subgrant or award.

7.  will ensure that buildings and facilities owned, occupied, or financed by the United States government are accessible to and usable by physically handicapped persons in accordance with the Architectural Barriers Act of 1968.

8.  will comply with the requirements of the provisions of the Uniform Relocation Assistance and Real Property Acquisition Act of 1970, which provide for fair and equitable treatment of persons displaced or whose property is acquired as a result of Federal and federally assisted programs. These provisions apply to all interests in real property acquired for project purposes regardless of Federal participation in purchases.

9.  will comply with the provisions of the Hatch Act, as amended, which limit the political activities of employees whose principal employment activities are funded in whole or in part with Federal funds.

10. will comply, as applicable, with the provisions of the Davis-Bacon Act, the Copeland Act, and the Contract Work Hours and Safety Standards Act, regarding labor standards for federally assisted construction subagreements.

11. will conform with Executive Order (EO) 11246, entitled "Equal Employment Opportunity," as amended by EO 11375, and as supplemented in Department of Labor regulations (41 CFR Part 60) and will incorporate an equal opportunity clause in federally assisted construction contracts and subcontracts.

12. will comply with the minimum wage and maximum hours provisions of the Federal Fair Labor Standards Act.

13. will comply with the Intergovernmental Personnel Act of 1970 relating to prescribed standards for merit systems for programs funded under one of the 19 statutes or regulations specified in Appendix A of OPM's Standards for a Merit System of Personnel Administration.

14. will comply, if applicable, with Section 102(a) of the Flood Disaster Protection Act of 1973, which requires recipients in a special flood hazard area to participate in the program and to purchase flood insurance if the total cost of insurable construction and acquisition is $10,000 or more.

15. will comply with the Lead-Based Paint Poisoning Prevention Act, which prohibits the use of lead-based paint in construction or rehabilitation of residence structures.

16. will assist the Federal grantor agency in assuring compliance with Section 106 of the National Historic Preservation Act of 1966, as amended; EO 11593; and the Archaeological and Historic Preservation Act of 1974.

## STANDARD ASSURANCES AND CERTIFICATIONS

17. will comply with environmental standards which may be prescribed pursuant to the following: (a) institution of environmental quality control measures under the National Environmental Policy Act of 1969 and EO 11514; (b) notification of violating facilities pursuant to EO 11738; (c) protection of wetlands pursuant to EO 11990; (d) evaluation of flood hazards in flood plains in accordance with EO 11988; (e) assurance of project consistency with the approved State management program developed under the Coastal Zone Management Act of 1972; (f) conformity of Federal actions to State (Clean Air) Implementation Plans under Section 176 of the Clean Air Act of 1955, as amended; (g) protection of underground sources of drinking water under the Safe Drinking Water Act of 1974, as amended; (h) protection of endangered species under the Endangered Species Act of 1973, as amended; (I) Section 6002 of the Resource Conservation and Recovery Act; and (j) the Coastal Barriers Resources Act.

18. will comply with the Wild and Scenic Rivers Act of 1968 related to protecting components or potential components of the national wild and scenic rivers system.

19. will comply with Public Law (PL) 93-348 regarding the protection of human subjects involved in research, development and related activities supported by this subgrant.

20. will comply with the Laboratory Animal Act of 1966 pertaining to the care, handling, and treatment of warm blooded animals held for research, teaching, or other activities supported by this subgrant.

21. will comply with Federal regulations regarding criteria for cost sharing or matching contributions.

22. will assure all funds received shall be used only to supplement services and activities that promote the purposes for which the grant is awarded, and not supplant, unless specifically authorized by the program regulations and the appropriate MDHS Division.

23. will provide certification regarding lobbying to comply with Section 319, PL 101-121 (31 USC 1352).

24. will provide the required certification regarding their exclusion status and that of their principals prior to the award in accordance with EOs 12549 and 12689 Debarment and Suspension.

25. will provide certification to comply with the Drug-Free Workplace Act of 1988.

26. will comply with all applicable requirements of all other Federal and State laws, Executive Orders, regulations, and policies governing the program(s) for which these monies are provided and with the terms and conditions of the Subgrant Agreement.

## STANDARD ASSURANCES AND CERTIFICATIONS

### REQUIRED CERTIFICATIONS

#### I. LOBBYING

As required by Section 1352, Title 31 of the U.S. Code, the Subgrantee certifies that:

A.    No Federal appropriated funds have been paid or will be paid, by or on behalf of the undersigned, to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making of any Federal grant, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal grant or cooperative agreement;

B.    If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress, in connection with this Federal grant or cooperative agreement, the undersigned shall complete and submit Standard Form - LLL, "Disclosure of Lobbying Activities," in accordance with its instructions;

C.    The undersigned shall require that the language of this certification be included in the award documents for all subawards at all tiers (including subgrants, contracts under grants and cooperative agreements, and subcontracts) and that all subrecipients shall certify and disclose accordingly.

#### II. SUSPENSION AND DEBARMENT
#### AND OTHER RESPONSIBILITY MATTERS (DIRECT RECIPIENT)

As required by Executive Order 12549 and 12689, Suspension and Debarment—

A.    The Subgrantee certifies that it and its principals: (a) Are not presently debarred, suspended, proposed for debarment, declared ineligible, sentenced to a denial of Federal benefits by a State or Federal court, or voluntarily excluded from covered transactions by a Federal department or agency;

(b) Have not within a three-year period preceding this subgrant been convicted of or had a civil judgment rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State, or local) transaction or contract under a public transaction; violation of Federal or State antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property;

(c) Are not presently indicted for or otherwise criminally or civilly charged by a governmental entity (Federal, State, or local) with commission of any of the offenses enumerated in paragraph (b) of this certification; and

(d) Have not within a three-year period preceding this subgrant had one or more public transactions (Federal, State, or local) terminated for cause or default; and

B.    Where the Subgrantee is unable to certify to any of the statements in this certification, he or she shall attach an explanation to this form.

## STANDARD ASSURANCES AND CERTIFICATIONS

REQUIRED CERTIFICATIONS (Continued)

### III. DRUG-FREE WORKPLACE (SUBGRANTEES WHO ARE INDIVIDUALS)

As required by the Drug-Free Workplace Act of 1988--

A.    As a condition of the subgrant, I certify that I will not engage in the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance in conducting any activity with the subgrant; and

B.    If convicted of a criminal drug offence resulting from a violation occurring during the conduct of any subgrant activity, I will report the conviction, in writing, within 10 calendar days of the conviction to MDHS.

OR

### III. DRUG-FREE WORKPLACE (SUBGRANTEES OTHER THAN INDIVIDUALS)

As required by the Drug-Free Workplace Act of 1988 --

A.    The Subgrantee certifies that it will or will continue to provide a drug-free workplace by:

(a) Publishing a statement notifying employees that the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance is prohibited in the subgrantee's workplace and specifying the actions that will be taken against employees for violation of such prohibition;

(b) Establishing an on-going drug-free awareness program to inform employees about --

    (1) The dangers of drug abuse in the workplace;
    (2) The subgrantee's policy of maintaining a drug-free workplace;
    (3) Any available drug counseling, rehabilitation, and employee assistance programs; and
    (4) The penalties that may be imposed upon employees for drug abuse violations occurring in the workplace.

(c) Making it a requirement that each employee to be engaged in the performance of the subgrant be given a copy of the statement required by paragraph (a);

(d) Notifying the employee in the statement required by paragraph (a) that, as a condition of employment under the subgrant, the employee will –

    (1) Abide by the terms of the statement; and
    (2) Notify the employer in writing of his or her conviction for a violation of a criminal drug statute occurring in the workplace no later than five calendar days after such conviction;

(e) Notifying MDHS, in writing, within 10 calendar days after receiving notice under subparagraph (d)(2) from an employee or otherwise receiving actual notice of such conviction. Employers of convicted employees must provide notice, including position title to MDHS. Notice shall include the identification number(s) of each affected grant;

## STANDARD ASSURANCES AND CERTIFICATIONS

III.  DRUG FREE WORKPLACE (SUBGRANTEES OTHER THAN INDIVIDUALS) - Continued

(f) Taking one of the following actions, within 30 calendar days of receiving notice under subparagraph (d)(2), with respect to any employee who is so convicted –

(1) Taking appropriate personnel action against such an employee, up to and including termination, consistent with the requirement of the Rehabilitation Act of 1973, as amended; or

(2) Requiring such employee to participate satisfactorily in a drug abuse assistance or rehabilitation program approved for such purposed by a Federal, State, or local health, law enforcement, or other appropriate agency.

(g) Making a good faith effort to continue to maintain a drug-free workplace through implementation of paragraphs (a), (b), (c), (d), (e), and (f).

B. The Subgrantee may insert in the space provided below the site(s) for the performance of work done in connection with the specific subgrant. Check if there are workplaces on file that are not identified here:

Place of Performance (Street address, city, county, state, zip code)

860 East River Place, Suite 104, Jackson, Hinds, MS, 39202

### IV. UNRESOLVED MONITORING FINDINGS; UNRESOLVED AUDIT FINDINGS; AND LITIGATION OCCURRING WITHIN THE LAST THREE (3) YEARS

Identify any unresolved monitoring findings related to any programs that have been received by the Subgrantee during the last three (3) years and the status of each finding:
None

Identify any unresolved audit findings related to any programs received by the Subgrantee during the last three (3) years and the status of each finding:
None

Identify any litigation and/or administrative hearings that the Subgrantee, the Subgrantee's Senior Management, or Subgrantee's Directors have been involved in during the last three (3) years, including the outcome or disposition of the case:
None

## STANDARD ASSURANCES AND CERTIFICATIONS

### REQUIRED CERTIFICATIONS (Continued)

**V. CERTIFICATION OF ADEQUATE FIDELITY BONDING**

Identify any and all types of bond coverage currently in force. Include the types of bond coverage; the officers or owners and employees covered; the period covered by the bond; and the limits of coverage assigned to each officer, owner, or employee and the total limit of the bond as applicable.

Southern Christian Services for Children and Youth, Inc. is insured under a Fidelity Bond.

The Bond has a $1,000,000 limit and is effective 10/01/12 to 10/01/13.  The Bond covers all

Employees, including all non-compensated officers.

For Subgrantees/Contractors that have been unable to obtain fidelity bond coverage, describe in detail the efforts made to obtain fidelity bond coverage and the reason coverage has not been obtained.

As the authorized representative of the subgrantee, I hereby certify that the subgrantee will comply with the above certifications in items I, II, and III; the information provided items III, IV and V is true and complete to the best of my knowledge, and that the coverage and amounts specified shall be maintained throughout the effective period of the subgrant.

SUBGRANTEE NAME AND ANY OTHER NAMES UNDER WHICH THE SUBGRANTEE HAS DONE BUSINESS:

Southern Christian Services for Children and Youth, Inc.

SUBGRANTEE ADDRESS AND ANY OTHER ADDRESSES THE SUBGRANTEE HAS USED:

860 East River Place, Suite 104, Jackson, MS 39202

TYPED NAME AND TITLE OF THE SUBGRANTEE'S AUTHORIZED REPRESENTATIVE
Susannah K. Cherney,  Executive Director

SIGNATURE OF SUBGRANTEE'S AUTHORIZED REPRESENTATIVE AND DATE:

Susannah K Cherney    8/2/12

# Subgrantee Acceptance Manual

## MDHS Subgrantee Manual Acceptance Form

Subgrantee Manual Coordinator

Each subgrantee should designate a Mississippi Department of Human Services Subgrantee Manual coordinator who is familiar with the agency's operations. The coordinator's name, address, and telephone number should be sent directly to the Director, Office of Monitoring, Mississippi Department of Human Services, by the beginning of each contract period. The subgrantee should only notify the Director, Office of Monitoring, MDHS, in writing of any change in this assignment.

As duly authorized representative of the Southern Christian Services for Childlren and Youth, Inc. , I certify that said organization will comply with the above provisions and that I have received as of this date, a copy of the Mississippi Department of Human Services Subgrantee Manual, *[including Addenda to the MDHS Subgrantee/Contract Mannual.]*

Signature

Date 5/2/10

Executive Director

Title

Southern Christian Services for Children and Youth, Inc.

Organization

# Notification
# Of
# Liability

**MISSISSIPPI DEPARTMENT OF HUMAN SERVICES**

**BOARD MEMBER'S NOTIFICATION OF LIABILITY**

**LIABILITY**

MDHS assumes no liability for actions of the Subgrantee or its employees, agents or representatives under this Subgrant. Subgrantee agrees to indemnify, defend, save and hold harmless MDHS from and against all claims, demands, liabilities, suits, damages and costs of every kind and nature whatsoever, including court costs and attorney's fees, arising out of or caused by Subgrantee and/or its agents, employees, contractors, or subcontractors, in the performance of this Subgrant. The Subgrantee acting through its Board of Directors assumes liability in the event the Subgrantee misuses funds or fails to perform according to the provisions of the Subgrant. The Subgrantee shall notify each Board member, in writing, within 15 days of receiving the executed Subgrant of this requirement, and the Subgrantee shall sign a statement to this effect prior to receiving funds under this subgrant.

I acknowledge and agree to notify all members of the Board of Directors, if applicable, in writing of the assumption by <u>Southern Christian Services</u> and liability in the event that <u>Southern Christian Services</u> misuses funds of fails to perform according to the provisions of the Subgrant. Further, I will keep a copy of said notification letter as a permanent part of the Subgrant file.

Signature of Entity's Director _Susannah K Cherney_

Name: _Susannah K. Cherney_

Organization: _Southern Christian Services for_

_Children and Youth, Inc._

Date: _8/12/12_

Witness: _William F Venn_

Date: _8/2/12_

# Fidelity Bond

Jul. 25. 2012 10:40AM    thern Christian                    No. 4363    P. 2

**ACORD**

SOUTH26    OP ID: CA

# CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
03/07/12

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER Wellington Associates, Inc. 7 River Bend Pl Flowood, MS 39232 Bill Barham | 601-420-0174 601-420-1890 | CONTACT NAME: | | |
|---|---|---|---|---|
| | | PHONE (A/C, No, Ext): | | FAX (A/C, No): |
| | | E-MAIL ADDRESS: | | |
| | | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | | INSURER A : Brotherhood Mutual Insurance | | |
| INSURED  Southern Christian Services Donna Shaw 860 East River Place, Ste 104 Jackson, MS 39202 | | INSURER B : | | |
| | | INSURER C : | | |
| | | INSURER D : | | |
| | | INSURER E : | | |
| | | INSURER F : | | |

## COVERAGES     CERTIFICATE NUMBER:                    REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | **GENERAL LIABILITY** X COMMERCIAL GENERAL LIABILITY CLAIMS-MADE X OCCUR X Abuse $1,000,000 | | | 23MEA0314633 | 10/01/11 | 10/01/12 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 300,000 |
| | | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | | | | | | GENERAL AGGREGATE | $ 3,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: X POLICY PRO-JECT LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 3,000,000 |
| | | | | | | | Emp Ben. | $ 1,000,000 |
| A | **AUTOMOBILE LIABILITY** ANY AUTO ALL OWNED AUTOS SCHEDULED AUTOS X HIRED AUTOS X NON-OWNED AUTOS | | | 23MEA0314633 | 10/01/11 | 10/01/12 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | **UMBRELLA LIAB** X OCCUR X EXCESS LIAB CLAIMS-MADE DED X RETENTION $ 0 | | | 23MEA0314633 | 10/01/11 | 10/01/12 | EACH OCCURRENCE | $ 3,000,000 |
| | | | | | | | AGGREGATE | $ 3,000,000 |
| | | | | | | | | $ |
| | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | Y/N N/A | | | | | WC STATU-TORY LIMITS OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (Attach ACORD 101, Additional Remarks Schedule, if more space is required)

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE *William E. Barham* |

© 1988-2010 ACORD CORPORATION. All rights reserved.

ACORD 25 (2010/05)        The ACORD name and logo are registered marks of ACORD

# Ex. 17H

MISSISSIPPI
Form MDHS-SCSS-1002
Revised 3-01-2005

**STATE OF MISSISSIPPI**
**MISSISSIPPI DEPARTMENT OF HUMAN SERVICES**
**SUBGRANT SIGNATURE SHEET**
**P. O. BOX 352**
**JACKSON, MISSISSIPPI 39205-0352**

RECEIVED
AUG 2 0 2012
DFCS ADMINISTRATION UNIT

MDHS FUNDING DIVISION:    FAMILY & CHILDREN'S SERVICES

| 1. SUBGRANTEE'S NAME, ADDRESS & PHONE # | 2. EFFECTIVE DATE: |
|---|---|
| Catholic Charities, Inc./Unaccompanied Refugee Minors | 10/1/2012 |
| 200 North Congress Street Ste. 100 | **3. SUBGRANT NUMBER:** |
| Jackson, MS  39201 | 128G131A |
| 601-355-8634 | **4a. GRANT IDENTIFIER (funding source and year):** |
| | G-13-AA-MS-4100 (2013 ORR-Cash and Medical) |
| **SUBGRANTEE'S FISCAL YEAR END DATE:** | **b. CATALOG OF FEDERAL DOMESTIC ASSISTANCE (CFDA) #:** |
| | 93.566 |
| June 30,2013 | **5. BEGINNING AND ENDING DATES:** |
| | 10/01/2012 to 9/30/2013 |
| **NAME/TITLE OF OFFICERS: (SUBGRANT ENTITY)** | **6. SUBGRANT PAYMENT METHOD:** |
| a. Most Rev. Joseph N. Latino, President | |
| b. Msgr. Elvin Sunds, Secretary | CURRENT NEEDS/CASH ADVANCE |
| c. Aad DeLange, Board Member | X    COST REIMBURSEMENT |
| | OTHER |
| CONTACT PERSON:    Debra West, URM Program Director | |
| PHONE NUMBER:    601-355-8634 | **7. PAGE 1 OF  3** |

**8. THE FOLLOWING FUNDS ARE OBLIGATED:**

| | | | | | |
|---|---|---|---|---|---|
| FEDERAL | $ | 1,446,643.51 | ADMINISTRATION | $ | 143,361.07 |
| STATE | $ | | SERVICES | $ | 1,303,282.44 |
| OTHER | $ | | OTHER | $ | |
| **TOTAL** | $ | 1,446,643.51 | **TOTAL** | $ | 1,446,643.51 |

**9. THE SUBGRANTEE AGREES TO ADMINISTER THIS SUBGRANT IN ACCORDANCE WITH ALL FEDERAL AND/OR STATE**
**PROVISIONS THAT ARE APPLICABLE TO SAID SUBGRANT.  THE FOLLOWING DOCUMENTS ARE INCORPORATED HEREIN:**

a. SUBGRANT SIGNATURE SHEET
b. BUDGET SUMMARY
c. COST SUMMARY SUPPORT SHEET
d. BUDGET NARRATIVE
e. SUBGRANT AGREEMENT
   1) SCOPE OF SERVICES
   2) GENERAL TERMS AND PROVISIONS

3) STANDARD ASSURANCES POLICY
4) DEBARMENT POLICY
5) DRUG FREE WORKPLACE POLICY
6) SUBGRANT MANUAL ACCEPTANCE
f. VERIFICATION OF 25% FIDELITY BOND
g. COPY OF BOARD RESOLUTION (if applicable)
h. COST ALLOCATION PLAN & INDIRECT COST RATES

**10. IDENTIFICATION OF OTHER FUNDING** (List all other funds requested, anticipated or held over from prior years
dedicated to this or similar programs including Federal, State, Local or Private funds.  If additional space is needed,
please attach typed pages).

| SOURCE | PURPOSE | CONTRACT # | AMOUNT |
|---|---|---|---|
| NA | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |

| 11. APPROVED FOR MDHS: | 12. APPROVED FOR SUBGRANTEE: |
|---|---|
| BY: _(signature)_    DATE: 9/5/12 | BY: _(signature)_    DATE: 8/16/12 |
| Richard A. Berry | Greg Patin |
| Executive Director | Executive Director |
| TITLE | TITLE |

MISSISSIPPI
Form MDHS-BS-1006
Effective 3-01-2005

**Mississippi Department of Human Services**
**BUDGET SUMMARY**

Page    2    of    3    Pages

| 1. Applicant Agency: |
|---|
| Catholic Charities, Inc./Unaccompanied Refugee Minors |

| 2. Subgrant Number: | 3. Grant ID | 4. Beginning | 5. Ending |
|---|---|---|---|
| 128G131A | G-13-AA-MS-4100 | October 1, 2012 | September 30, 2013 |

**6. Submitted as Part of (check one):**

a. Funding     b. Modification (  )     c. Modification (  )
Request  (X)      No.                     Effective Date

**FUNDING SOURCE**

| 7. FOR MDHS USE ONLY | 8. Budget Activity | Federal | State | Program Income | | Total |
|---|---|---|---|---|---|---|
| | Unaccompanied | $   1,446,643.51 | | | | $      1,446,643.51 |
| | Refugee Minors | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | TOTAL | $   1,446,643.51 | | | | $      1,446,643.51 |

Mississippi
Form MDHS-CSSS-1007
Effective 3-01-2005

**MISSISSIPPI DEPARTMENT OF HUMAN SERVICES**
**COST SUMMARY SUPPORT SHEET**

Page    3    of    3    Pages

| 1. Applicant Agency | | | | | |
|---|---|---|---|---|---|
| Catholic Charities, Inc./Unaccompanied Refugee Minors Program | | | | | |

| 2. Subgrant Number | 3. Grant ID | 4. Beginning | 5. Ending |
|---|---|---|---|
| 128G131A | G-13-AA-MS-4100 | October 1, 2012 | September 30, 2013 |

**6. Budget Activity**
Unaccompanied Refugee Minors

| 7. For MDHS Use Only | 8. Budget Category | 9. Description of Item and/or Basis for Cost | 10. Budget | | |
|---|---|---|---|---|---|
| | | | Federal | All Other | Total |
| | Salaries | See Attached Budget Narrative | $ 559,847.31 | | $ 559,847.31 |
| | Fringe | See Attached Budget Narrative | $ 179,924.47 | | $ 179,924.47 |
| | Travel | See Attached Budget Narrative | $ 35,696.10 | | $ 35,696.10 |
| | Contractual | See Attached Budget Narrative | $ 123,775.84 | | $ 123,775.84 |
| | Commodities | See Attached Budget Narrative | $ 15,238.72 | | $ 15,238.72 |
| | SL&G | See Attached Budget Narrative | $ 388,800.00 | | $ 388,800.00 |
| | Indirect Costs | See Attached Budget Narrative | $ 143,361.07 | | $ 143,361.07 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | Totals | | $ 1,446,643.51 | | $ 1,446,643.51 |

# Agreement

# AGREEMENT BETWEEN
## MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
### AND
## CATHOLIC CHARITIES, INC.

**THIS AGREEMENT** is made and entered into by and between the Division of Family and Children's Services, Mississippi Department of Human Services, hereinafter referred to as "MDHS," and Catholic Charities, Inc., hereinafter referred to as "Subgrantee."

In furtherance of the mutual interests and responsibilities of the parties hereto, this Agreement is entered into by and between the parties upon the following terms, provisions, and conditions, to-wit:

## SECTION I.  RESPONSIBILITY OF SUBGRANTEE

Subgrantee shall provide, perform and complete, in a satisfactory manner as determined by MDHS, the services and activities described in the "Scope of Services," attached hereto as Exhibit "A" and incorporated herein by reference and the "Modified Mississippi Settlement Agreement and Reform Plan," attached hereto as Exhibit "B".  Subgrantee shall establish and maintain effective controls and accountability over all funds, property and other assets covered by this Agreement.

## SECTION II.  TERM OF AGREEMENT

The term of this Agreement shall commence on October 1, 2012, or after all parties have signed, whichever is later, and end on September 30, 2013, with an option for up to four (4) one year renewals.  MDHS reserves the right to terminate any subgrant at any time, subject to current subgrant provisions, and avail itself to any and all remedies available to protect its interests.

## SECTION III.  PAYMENT AND BUDGET LIMITATIONS

A.      **SUBGRANT AMOUNT.** The total amount of the subgrant to be provided by MDHS under this Agreement is One Million Four Hundred Forty Six Thousand Six Hundred Forty Three Dollars and Fifty One Cents ($1,446,643.51).

B.      **METHOD OF PAYMENT.** It is understood between the parties hereto that funds supporting this Agreement will be utilized and expended as provided for in the Budget Summary Cost Summary Support Sheet(s), and Budget Narrative, collectively attached hereto as Exhibit "C" (herein referred to as the "Budget") and incorporated herein by reference under the same terms and conditions as set forth in said Budget.  MDHS shall process all reimbursement requests on a cost reimbursement basis in its normal course of business, and, if it is found in order, shall process payment thereon to be made within reasonable time to Subgrantee.

1

C.    **BUDGET REVISIONS.** Any increase, decrease or change in the funding or budgeted line items under this Agreement shall be authorized only as provided by the Mississippi Department of Human Services' line item flexibility policy and/or as authorized by a modification to this Agreement.

D.    **MAXIMUM PAYMENT.** Notwithstanding any other provision of this Agreement, the maximum payment by MDHS to Subgrantee shall not exceed the sum of One Million Four Hundred Forty Six Thousand Six Hundred Forty Three Dollars and Fifty One Cents ($1,446,643.51) in consideration for all performances or services provided by Subgrantee, unless specifically modified as provided herein.

## SECTION IV.  RELATIONSHIP OF PARTIES

The relationship of the Subgrantee to MDHS is that of independent contractor. None of the provisions of this Agreement are intended to create nor shall they be construed to create an agency, partnership, joint venture or employee-employer relationship between MDHS and Subgrantee.

Any persons assigned by Subgrantee to perform the services hereunder shall be the employee of the Subgrantee. MDHS may, however, direct Subgrantee to replace any of its employees under this Agreement. The Subgrantee will replace the employee within five (5) calendar days after receipt of notice from MDHS.

## SECTION V.  COMPLAINT RESOLUTION

Subgrantee shall provide a complaint resolution procedure regarding decisions on eligibility for the program, applications that are not acted upon timely, and decisions otherwise affecting benefits and services for the program funded by this subgrant. The appeal or complaint procedures shall be carried out according to the Fair Hearing Procedure of the Mississippi Department of Human Services, a conciliation process, the Personal Responsibility and Work Opportunity Act of 1996, and/or such other Procedure as may be required by MDHS, whichever is appropriate to the complaint as directed by MDHS.

## SECTION VI.  CHANGES

MDHS reserves the right to change any portion of the work required under this Agreement or amend other terms, including the Scope of Services, necessary to meet federal or other operation requirements. Revision shall be made by written amendment to this Agreement duly signed by the authorized representative of each party hereto.

## SECTION VII.  SAFEGUARDING INFORMATION

A.    **CONFIDENTIALITY.**  Subgrantee shall treat all State data and information to which it has access under this Subgrant as confidential to the extent that confidential treatment of same is required under Federal and State law and shall not disclose same to a third party without specific written consent of the State.

2

The provision herein shall survive termination of the subgrant for any reason and shall continue in full force and effect and shall be binding upon the Subgrantee and its agents, employees, successors, assigns, subcontractors, or any party claiming an interest in the subgrant on behalf of, or under, the rights of the subgrant following any termination.

All records and information involving applicants or recipients of services under this subgrant shall be kept confidential. The use or disclosure of information concerning applicants and/or recipients shall be limited to purposes directly connected with the administration of the Unaccompanied Refugee Minor Program. Subgrantee shall take any and all steps necessary to insure the physical security of the records and information that it obtains under this Agreement, including but not limited to, providing fire protection, protections against smoke and water damage, locked files, passwords, access logs or other methods to prevent loss or unauthorized access or retrieval of the records or information.

The safeguards for information to which both parties will adhere are contained in the MDHS Subgrantee/Contract Manual and any applicable Federal/State/Local regulations. The restrictions herein shall survive the termination or completion of this Agreement and shall continue in full force and effect and shall be binding upon the Subgrantee and/or its officers, agents, employees, successors, assigns, subcontractors, or any party claiming an interest in the Agreement on behalf of or under the rights of the Subgrantee.

B.     **THIRD PARTY REQUESTS.** In event that the Subgrantee receives notice that a third party requests divulgence of confidential or otherwise protected information and/or has served upon it a subpoena or other validly issued administrative or judicial process ordering divulgence of confidential or otherwise protected information, Subgrantee shall promptly inform MDHS and thereafter respond in conformity with such subpoena as required by applicable State and/or Federal law, rules and regulations.

C.     **LIABILITY.** Any liability resulting from the wrongful disclosure of confidential information on the part of the Subgrantee and/or its officers, agents, subcontractors, and/or representatives shall rest with the Subgrantee. Disclosure of any confidential information by the Subgrantee and/or its representatives or subcontractor without the express written approval of MDHS, shall result in the immediate termination of this Agreement. Nothing herein shall be construed to prevent MDHS from seeking any other remedy, in law or equity, available to it.

## SECTION VIII. TERMINATION OF AGREEMENT

A.     **TERMINATION FOR CONVENIENCE OF EITHER PARTY.** This Agreement may be terminated by either party, in whole or in part, at any time, by giving written notice to the other party of such termination and specifying the effective date thereof, at least 30 days before the effective date of such termination. In the event of termination, Subgrantee shall be entitled to receive only reimbursement for allowable expenses incurred to the date of termination. In

3

no event shall such expenses exceed the maximum amount payable under this Subgrant.

**B.**    **TERMINATION CLAIM.**    Within 30 days after receipt of a Notice of Termination, the Subgrantee shall submit to MDHS its termination claim, in the form prescribed by MDHS.

In the event of termination of this Subgrant as provided herein, Subgrantee shall be entitled to receive just and equitable compensation for services or performances actually and satisfactorily performed, prior to the effective date of termination, under this Agreement. Such compensation shall be based upon the payment provisions described in the Consideration and Method of Payment section of the Subgrant Agreement but, in no case, shall said compensation exceed the total amount of this Subgrant.

Subgrantee shall be liable to MDHS for damages sustained by MDHS by virtue of any breach of this Agreement by Subgrantee, and MDHS may withhold any payments to Subgrantee for the purpose of setoff until such time as the exact amount of damages due to MDHS from Subgrantee are determined. The rights and remedies of MDHS provided in this Section shall not be exclusive and are in addition to any other rights and remedies provided by law or in equity.

**C.**    **TERMINATION FOR DEFAULT.**    Unless the Subgrantee's default or breach of this subgrant is excused by MDHS, MDHS may by written notice of default to the Subgrantee terminate the whole or any part of this Agreement if the Subgrantee has failed to carry out its obligations hereunder and has not remedied or taken appropriate steps to remedy the default.

If, through any cause, Subgrantee shall fail to fulfill in a timely and proper manner, as determined by MDHS, its obligations under this Agreement, or if Subgrantee shall violate any of the covenants, agreements, or stipulations of this Subgrant, MDHS shall thereupon have the right to terminate the Subgrant by giving written notice to Subgrantee of such termination and specifying the effective date thereof at least five (5) days before the effective date of such termination. In the event of such termination, Subgrantee shall be entitled to receive just and equitable compensation for satisfactory work completed on documents, services or materials collected and/or prepared by Subgrantee in connection with this Agreement.

Notwithstanding the above, Subgrantee shall not be relieved of liability to MDHS for damages sustained by MDHS by virtue of any breach of this Agreement by Subgrantee, and MDHS may withhold any payments to Subgrantee for the purpose of set off until such time as the exact amount of damages due to MDHS from Subgrantee are determined.

The rights and remedies of MDHS provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law or under this Agreement.

If the Subgrantee fails to comply with any of the covenants, terms, or stipulations of this Agreement, whether stated in a Federal statute or regulation, an assurance, in the State Plan or application, a notice of award, or elsewhere, MDHS may take any of the following actions:

    a.  Issue a warning letter that further failure to comply with such covenant, term, or stipulation will result in a more serious sanction or action;

    b.  Condition a future Subgrant;

    c.  Direct the Subgrantee to stop the incurring of costs with Subgrant funds;

    d.  Require that some or all of the Subgrant funds be remitted to MDHS;

    e.  Reduce the level of funds the Subgrantee would otherwise be entitled to receive;

    f.  Elect not to provide future Subgrant funds to the Subgrantee until appropriate actions are taken to ensure compliance;

    g.  Wholly or partly suspend or terminate the current award of funds to the Subgrantee;

    h.  Suspend reimbursements to Subgrantees who fail to meet deadlines on unresolved monitoring or audit findings, closeout packages, and/or fiscal and programmatic requirements; or

    i.  Suspend payments upon notification that Subgrantee is bankrupt or receives tax lien of any type, regardless of the reason.

**D.**    **TERMINATION BECAUSE OF CIRCUMSTANCES BEYOND THE CONTROL OF THE PARTIES.** If either party is rendered unable, wholly or in part, by reason of strikes, accidents, acts of God, weather conditions or other acts beyond its control and without its faults or negligence, to comply with its obligations under this Agreement, then, such party shall have the option to cancel, upon the giving of written notice, this Agreement, in whole or part as the case may warrant.

**E.**    **AVAILABILITY OF FUNDS.** It is expressly understood and agreed that the obligation of MDHS to proceed under this Agreement is conditioned upon the availability of funds, appropriation of funds by the Mississippi State Legislature and the receipt of Federal and/or State funds. In the event that the funds anticipated for the fulfillment of the Agreement are at any time, not forth coming or are insufficient, either through the failure of the Federal government to provide funds or of the State of Mississippi to appropriate funds or the discontinuance or material alteration of the program under which funds were provided or if funds are not otherwise available to MDHS for the performance of this Agreement, MDHS, shall have the right to immediately terminate this Agreement, without damage, penalty, cost, or expense to MDHS of any kind whatsoever. The ultimate decision as to whether or not funds continue to be available for the performance of this Agreement lies solely with MDHS.

## SECTION IX. AGREEMENTS BY SUBGRANTEE

A.   **SUBCONTRACTS.** It is understood and agreed that the Subgrantee may enter into agreements or subcontracts with eligible entities (hereinafter sometime referred to as Subgrantee's Contractor/Subcontractor) for the provision of the services required under this Agreement.    Any and all such agreements or subcontracts shall include all of the terms and conditions of this Agreement. Subgrantee agrees that it shall require all of its subcontractors to comply with all local, municipal and county health, safety and other ordinances and requirements and with all applicable Federal and State laws, statutes, and regulations, the same as apply to the Subgrantee herein.   The agreements/subcontracts must include assurances that services will be provided to all eligible persons, regardless of potential participant's race, color, religious beliefs/practices, creed, age, national origin, sex, or mental or physical disability. The Subgrantee and its Contractors/Subcontractors cannot, on the basis of race, color, religious beliefs/practices, creed, age, national origin, sex, or mental or physical disability, treat one person differently from another in determining eligibility, benefits or services provided, if applicable.

The Subgrantee, however, shall be fully responsible for the performance of its Contractors/Subcontractors.

Copies of all subcontracts, agreements, and modifications thereto shall be forwarded to MDHS, Division of Family & Children's Services.

B.   **RELEASE OF LIABILITY.**   Subgrantee agrees that in any agreement or subcontract for the provision of the services or activities covered by this Agreement, it shall require that the Subgrantee's contractor, subcontractor, representatives, or agents release and hold harmless MDHS from and against all claims, demands, liabilities, suits, damages, and costs of every kind and nature whatsoever, including court costs and attorney's fees, arising out of or caused by contractor or subcontractor and/or its officers, agents, or employees in the performance of such services or activities.

## SECTION X. REPORTING

A.   **MONTHLY REPORTS.**    Subgrantee agrees to provide reports and/or information within ten (10) calendar days after the close of each month.   Such reports shall be complete for the period concerned and shall contain information concerning clients served, catchment areas, administrative costs, if any, direct and indirect costs of any nature expended in the performance of this Subgrant, units of service, and other sufficient data to provide evidence of budget and programmatic compliance as required by this Subgrant. Subgrantee shall also provide to MDHS monthly financial supporting documentation of all expenditures pertaining to the Agreement.

B.   **TERMINATION REPORTS.**   Subgrantee shall furnish MDHS a written termination report within ten (10) calendar days from the termination date unless

additional time is granted by MDHS for the purpose of audits, examinations, or other reasons. The termination report shall include information as set forth in Subsection A of this Section and any other data required by MDHS to furnish evidence of financial and programmatic compliance.

C.    **FINAL FISCAL REPORT.** The Subgrantee agrees to provide a final fiscal reporting worksheet, along with closeout report, to MDHS within forty-five (45) days after the ending of this Subgrant. These fiscal documents will be used for the purpose of reconciling this Subgrant to the actual expenditures for activities and services rendered, not to exceed the maximum liability as set forth in Section III D of this Agreement. Any funds paid by MDHS to Subgrantee and not expended for activities or contracted services under this Subgrant or funds expended in violation of this Agreement shall be considered MDHS' funds and shall be returned to MDHS in full. Where deemed appropriate by MDHS and accepted by the Subgrantee, a reduction may be allowed in future payments under future Agreements by a total amount equal to the amount disallowed or deferred or by other methods approved by MDHS.

## SECTION XI. ALTERATION OR MODIFICATION OF SUBGRANT

All modification requests shall be submitted in accordance with established policies and procedures. Any alteration, variation, modification, or waiver of any provisions of this Subgrant shall become binding on both parties only when the agreement of the parties has been reduced to writing and duly executed. Any line item transfer of funds shall be submitted to MDHS on a Subgrant modification form, along with a budget narrative and shall receive MDHS' prior approval before any such transfer may be affected.

## SECTION XII. SEVERABILITY

If any term or provision of this Agreement is prohibited by the laws of the State of Mississippi or is declared invalid or void by a court of competent jurisdiction, the remaining terms and provisions of this Agreement shall not be affected thereby, and each remaining term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

## SECTION XIII. ASSIGNMENT

The rights, privileges, benefits, and obligations created by this Subgrant and by operation of law extend to and accrue and are obligatory upon the parties hereto, their personal or real representatives, and successors.

Subgrantee shall not assign or otherwise transfer the obligations incurred on its part pursuant to the terms of this Agreement without the prior written consent of MDHS. Any attempted assignment or transfer of its obligation without such consent shall be wholly void. MDHS does reserve, however, the exclusive right to direct the Subgrantee to assign and/or transfer this Subgrant when such course of action is mandated by the

Federal grantor agency. In the event that such a transfer or assignment is directed by MDHS, MDHS further reserves the right to ensure adequate and proper arrangement of such transfer to assure continued, effective performance of the purposes for which the parties entered into this Agreement.

## SECTION XIV. RECORDS AND AUDITS

A.  **MAINTENANCE OF RECORDS.** Subgrantee shall establish and maintain financial and programmatic records, supporting documents, statistical records and other records as may be necessary to reflect the performances of the provisions of this Agreement.

B.  **FISCAL REQUIREMENTS AND AUDIT.** Subgrantee shall establish such fiscal control and fund accounting procedures, including internal auditing procedures, as may be necessary to assure the proper disbursal of and accounting for funds in accordance with this Agreement, the Single Audit Act Amendments of 1996 (31 U.S.C. Sections 7501-7507) and revised United States Office of Management and Budget (OMB) Circular A-133. The Subgrantee shall keep, maintain and present to MDHS, as required, necessary and proper vouchers, documentation and such other reports as may be required to support the expenditure of funds pursuant to this Agreement, and the Subgrantee shall keep and maintain bookkeeping and accounting records and procedures as the same may be established and approved by MDHS. The Subgrantee's records must be sufficient to allow MDHS to audit and monitor the Subgrantee's operation of its program and sufficient to permit the preparation of reports required by the Single Audit Act and the statues authorizing this subgrant. These records shall be set up in accordance with Generally Accepted Accounting Principles, MDHS' Fiscal Accountability Guidelines, and OMB Cost and Accounting Standards.

C.  **INDEPENDENT AUDIT.** Audits shall be made by an independent auditor in accordance with the Single Audit Act Amendments of 1996, revised OMB Circular A-133, and generally accepted government standards covering financial audits.

The Subgrantee, by signature affixed herein, agrees that within forty-five (45) days of the expiration of this Agreement, an independent financial audit may be performed in order to comply with OMB Circular A-133. No independent fiscal audit will be reimbursed in whole or in part by MDHS unless the Subgrantee is specifically required by MDHS to engage the services of an independent audit firm. MDHS reserves the right to select the audit entity under this provision.

D.  **AUDIT FINDINGS.** Subgrantee shall receive, reply to and resolve any State and/or Federal programmatic exceptions related to this Agreement and/or any of the Subgrantee's Contractors/Subcontractors.

## SECTION XV. DISPUTES

Any dispute concerning a question of fact under this Agreement which is not disposed of by agreement of the parties hereto shall be decided by the Director of the Division of Family & Children's Services. This decision shall be reduced to writing and a copy thereof mailed or furnished to the Subgrantee and shall be final and conclusive, unless, within thirty (30) days from the date of the decision, Subgrantee mails or furnishes to the Executive Director of the Mississippi Department of Human Services a written request for review. Pending final decision of the Executive Director or his designee, the Subgrantee will proceed in accordance with the decision of the Director of the Division of Family & Children's Services.

In the review before the Executive Director, the Subgrantee shall be afforded an opportunity to be heard and to offer evidence in support of its position on the question and decision under review. The decision of the Executive Director or his designee shall be final and conclusive unless determined by a court of competent jurisdiction in Hinds County, State of Mississippi, to have been fraudulent, capricious, or so grossly erroneous as necessarily to imply bad faith or not supported by substantial evidence.

## SECTION XVI. SUPPLANTING

Funds received under this Agreement shall be used only to supplement, not supplant, the amount of Federal and/or State, and Local funds otherwise expended for the support for URM services and related programs.

## SECTION XVII. WAIVER

Failure of either party hereto to insist upon strict compliance with any of the terms, covenants, and conditions of this Subgrant shall not be deemed a waiver or relinquishment of any similar right or power hereunder at any subsequent time or of any other provision hereof nor shall it be construed to be a modification of the terms of this Agreement.

## SECTION XVIII. RECORD RETENTION AND ACCESS TO RECORDS

It is specifically understood and agreed that the Subgrantee shall provide MDHS with readily accessible and full opportunity to conduct program and/or fiscal monitoring and auditing (including through on-site visits to the Subgrantee's premises) of the Subgrantee's performance under this Agreement. MDHS, any State agency authorized to audit MDHS, the Federal grantor agency, and the Comptroller General of the United States or any of their duly authorized representatives shall have the right of access to any books, documents, papers or other records of the Subgrantee that are pertinent to the services performed under this Agreement in order to make audit, examination, excerpts and/or transcripts. These records shall be retained for at least three (3) years; however, if any litigation or other legal action, by or on behalf of the State or Federal Government has begun that is not completed at the end of the three (3) year period, or if audit findings,

litigation or other legal action has not been resolved at the end of the three (3) year period, the records shall be retained until resolution.

### SECTION XIX. PATENTS AND COPYRIGHTS AND RIGHTS IN DATA

A. **PATENTS.** This Agreement is not awarded for the purposes of experimental, developmental or research projects. Should the activities of Subgrantee and/or its Contractors/Subcontractors include experimental, developmental or research projects, this Agreement shall be promptly amended to include the standard patent right clauses required by 35 U.S.C. Section 202 as amended by Public Law 98-620 and 37 CFR Part 401, "Right to Inventions Made by Nonprofit Organizations and Small Business Firms Under Government Grants, Contracts and Cooperative Agreements," and any other provisions required by applicable State and/or Federal laws, rules, or regulations.

B. **COPYRIGHTS AND RIGHTS IN DATA.** MDHS reserves a royalty-free nonexclusive, and irrevocable license to reproduce, publish or otherwise use, and to authorize others to use:

> (1) The copyright in any work developed under this Agreement or under any other agreement or contract under this subgrant Agreement; and

> (2) Any rights of copyright to which the Subgrantee or any Subgrantee's Contractor/Subcontractor purchases ownership with subgrant support or funds provided under this Agreement.

> (3) MDHS grants Subgrantee the right to use such materials for educational and research purposes, provided MDHS is allowed to review such materials to ensure that confidential information of MDHS is not disclosed.

Subgrantee hereby assigns to MDHS all rights, title, and interest in any and all materials conceived or created by the Subgrantee, and/or its employees, agents, contractors, or subcontractors, either individually or jointly with others and which arise out of the performance of this Agreement, including any computer programs, systems, designs, source code, work papers, operating instructions, and all other information, documents, and work in whatever form. All work papers, cards, magnetic tapes, disk packs, or other storage media, temporary and/or permanent, containing programs and/or other information of any kind relating to this Agreement shall be available, upon request, to MDHS or its representative(s) for review, inspection, and if desired, reproduction. Such information and documents shall be delivered to MDHS on MDHS' request therefore. Subgrantee shall maintain all master programs and master data files in a completely secure manner. Such programs and files shall be identified by program and file name.

### SECTION XX. OWNERSHIP OF DOCUMENTS AND WORK PRODUCTS

All property purchased and all data, documents, notes, programs, books, data bases (and all applications thereof), files, reports, studies, unfinished documents, and/or other

material collected or prepared by Subgrantee in connection with this Subgrant shall be owned by MDHS upon completion or termination of this Agreement. MDHS hereby reserves all rights to the data base and all applications thereof and to any and all information and/or material prepared in connection with this Agreement.

Except as otherwise provided by these General Terms and Provisions, the Subgrantee is prohibited from use or distribution of the above-described information and/or material without the express written approval of MDHS.

All printed mention, materials, deliverable products, publicity, and other documents and reports distributed by the Subgrantee as a result of this Agreement, regardless of its form, must give funding source credit to the Division of Family & Children's Services, Mississippi Department of Human Services. Division of Family and Children Services must be provided a copy of the aforesaid documents and reports.

## SECTION XXI. CONFLICT OF INTEREST

Subgrantee shall ensure that there exists no direct or indirect conflict of interest in the performance of this subgrant and/or performance by any of the Subgrantee's Contractors/Subcontractors. Further, Subgrantee warrants that no part of any Federal or State money shall be paid directly or indirectly to an employee or official of MDHS as wages, compensation or gifts in exchange of acting as an officer, agent, employee, subcontractor, or consultant to the Subgrantee in connection with any work contemplated or pertaining to this subgrant or Agreement. Subgrantee shall strictly comply with all conflict of interest provisions or standards of conduct provisions contained in the MDHS Subgrantee/Contract Manual or any applicable State, Federal, or Local law, rule, or regulation.

## SECTION XXII. INDEMNIFICATION

Subgrantee agrees to indemnify, defend, save and hold harmless MDHS from and against all claims, demands, liabilities, suits, damages and costs of every kind and nature whatsoever, including court costs and attorneys' fees, arising out of or caused by the Subgrantee and/or its agents, employees, volunteers, contractors or subcontractors in the performance of this Agreement. The Subgrantee shall fully indemnify and repay MDHS any amounts provided hereunder that are found not to have been expended according to this Agreement or any amounts or costs that are disallowed by Federal grantor and/or by MDHS.

## SECTION XXIII. INSURANCE

Subgrantee represents that it will maintain workers' compensation insurance as required by law, which shall inure to the benefit of all Subgrantee's personnel performing services under this Agreement, employee fidelity bond insurance in an amount equal to twenty-five percent (25%) of funds awarded hereunder, and comprehensive general liability insurance. Subgrantee will furnish to MDHS with a certificate of insurance providing the aforesaid coverage, prior to the commencement of performance under this Agreement. All insurance policies required under this Section shall be issued by an insurance

company or companies licensed to do business in the State of Mississippi and shall be acceptable to MDHS. The insurance required by this Section shall be maintained at all times during the course of this Agreement for the entire period thereof and MDHS must be given written notice by registered mail at least thirty (30) days in advance of any adverse modification or termination of any insurance.

### SECTION XXIV. COMPLIANCE WITH LAWS, RULES AND REGULATIONS

Subgrantee shall comply with all applicable policies and procedures of MDHS and all applicable Federal, State, and/or Local laws, rules, regulations, directives, and guidelines that are now applicable or later made applicable to this Agreement. Particularly, but without limitation through inclusion, Subgrantee shall comply with the Mississippi Department of Human Services' Subgrantee/Contract Manual **Revised March 2005, including all addenda.**

### SECTION XXV. GOVERNING LAWS AND LEGAL REMEDIES

This Agreement shall be construed and governed in accordance with the laws of the State of Mississippi. Subgrantee expressly agrees that under no circumstances shall MDHS be obligated to pay an attorney's fee or cost of legal action to Subgrantee.

### SECTION XXVI. CERTIFICATION OF COMPLIANCE AND ASSURANCES

This Agreement is also subject to the Standard Assurances, Certifications Regarding Lobbying, Debarment, Suspension and other Responsibility Matters; and Drug-Free Workplace Requirements; MDHS' Certification Regarding Unresolved Monitoring Findings, Unresolved Audit Findings; and Litigation Occurring Within the Last Three (3) Years; the Certification of Adequate Fidelity Bonding; and the Board Member's Notification of Liability, attached hereto.

### SECTION XXVII. E-VERIFY

Subgrantee represents and warrants that it will ensure its compliance with the Mississippi Employment Protection Act (Senate Bill 2988 from the 2008 Regular Legislative Session) and will register and participate in the status verification system for all newly hired employees. The term "employee" as used herein means any person that is hired to perform work within the State of Mississippi. As used herein "status verification system" means the Illegal Immigration Reform and Immigration Responsibility Act of 1996 that is operated by the United States Department of Homeland Security, also known as the E-Verify Program, or any other successor electronic verification system replacing the E-Verify Program. Subgrantee agrees to maintain records of such compliance and, upon request of the State, to provide a copy of each such verification to the State. Subgrantee further represents and warrants that any person assigned to perform services hereunder meets the employment eligibility requirements of all immigration laws of the State of Mississippi. Subgrantee understands and agrees that any breach of these warranties may subject Subgrantee to the following: (a) termination of this Agreement and ineligibility for any State or public contract in Mississippi for up to three (3) years, with notice of such cancellation/termination being made public, or (b) the loss of any license permit, certification or other document granted to Subgrantee by an agency, department or

governmental entity for the right to do business in Mississippi for up to one (1) year, or (c) both. In the event of such termination/cancellation, Subgrantee would also be liable for any additional costs incurred by the State due to contract cancellation or loss of "license or permit".

## SECTION XXVIII. ENTIRE AGREEMENT

IN WITNESS WHEREOF, this Agreement has been made and interchangeably executed by the parties hereto in duplicate originals. This Contract constitutes the entire agreement of the parties with respect to the subject matter contained herein and supersedes and replaces any and all prior negotiations, understandings, and agreements, written or oral, between the parties relation thereto.

**MISSISSIPPI DEPARTMENT OF HUMAN SERVICES**

By: _____

Title: _____

Date: _____

Witness: _____

**CATHOLIC CHARITIES, INC.**

By: _____

Title: _____

Date: _____

Witness: _____

# EXHIBIT A
# Scope of Services

**CATHOLIC CHARITIES, INC.**
**OCTOBER 1, 2012 – SEPTEMBER 30, 2013**
**SCOPE OF SERVICES**

**Name of Program/Service**
Unaccompanied Refugee Minors (URM) Program

**Description of Services**
Unaccompanied refugee minors will be placed in an individual therapeutic foster home environment, therapeutic group home or independent living setting where they can best develop appropriate skills to enter adulthood and achieve economic and social self sufficiency.

A.   Therapeutic Foster Homes are licensed according to standards set by the Mississippi Department of Human Services (MDHS) and Mississippi Department of Mental Health. Placement is determined by age, family history, and what is determined to be in the best interest of the youth.  Foster homes are located in the metropolitan and surrounding areas of Jackson, Mississippi.

B.   Therapeutic Group Homes provides an environment conducive to learning social and psychological skills.  These facilities offer specially trained staff in homes located in the community, where local schools can be attended.

C.   Independent living home placements will be determined by the youth's age, demonstrated responsibility, and readiness for increased independence.  The youth will live in rented apartments and participate in educational programs according to individual needs.  The regular based payment will be used to pay rent, utilities, and food if funds are available.

**Supportive Services**
The unaccompanied refugee minors are able to access other Catholic Charities services including comprehensive mental health services for children with Serious Emotional Disturbances (SED), Trauma Recovery for Youth, Hope Haven Home-based and Hope Haven Residential treatment facility. Staff receives approximately twenty-one (21) hours of in-service training regarding issues related to delivery of social services.

A.   Case Management will be provided by the case manager and include development and implementation of Individualized Service Plans.  The primary goal is to teach the youth how to become self-sufficient, productive law-abiding individuals.

B.   Medical/Dental/Psychological Support - Youth will receive medical and dental support from a variety of sources, which include county and private support systems that accept Medicaid.   Psychological evaluations will be conducted by the local mental health professionals. All recommended follow-up will be provided within the community by local professionals according to the individual needs of the youth.

C.  <u>Independent Living Skills</u> – Youth age fourteen and older, will be required to attend monthly independent living skills classes sponsored by the MDHS and facilitated by staff from Southern Christian Services. Independent living skills will be reinforced daily by foster parents, case managers, and other staff.

D.  <u>Socialization and Cultural Activities</u> will be provided to preserve the youth's cultural heritage. These activities will be spearheaded by the Cultural Specialist staff.

E.  <u>Intensive tutoring</u> designed to meet individual needs and will be provided to all of the youth in their respective school and in the URM office tutorial room.

F.  <u>Employment</u> - When appropriate, individual youth will receive assistance in securing employment. Transportation to-and-from jobs will be provided by foster parents and public transportation.

**Goals and Objectives**
**Goal #1:**    The unaccompanied refugee minors will receive appropriate culturally sensitive care and services that are consistent with the federal and state child welfare laws.

**Objectives:**
A.  Recruit and educate foster parents who are culturally sensitive to the youth.

1.  Develop and carry out a foster family and recruitment plan for all populations served by the program.
2.  License therapeutic foster care families according to standards set by the DMH, COA, MDHS, and Catholic Charities.
3.  Plan, schedule, and conduct at least five (5) in-service training sessions for foster parents, staff, and youth.

B.  Improve the quality of services provided to the youth by encouraging professional growth among the staff.

1.  Provide staff with in-service training that strengthens their job skills.
2.  Encourage staff participation in all in-service trainings provided by Catholic Charities, Inc.
3.  Provide staff with opportunities to participate in local community conferences and workshops that relate to their jobs.
4.  Conduct weekly staff meetings and individual supervision with special time allotted to discuss situations where assistance is needed in understanding appropriate responses and/or actions.
5.  Review Unaccompanied Refugee Minors Program policy and procedures and goals and objectives with staff annually.
6.  Encourage staff to work together as a team by providing team building opportunities.

**Goal #2:**    To provide opportunities for the unaccompanied refugee minors to develop independent living skills that will be beneficial to them as adults and help them achieve economic self-sufficiency.

**Objectives:**

A.    Seventy-five percent (75%) of youth will maintain passing grades in school or GED classes after tutorials have been conducted for six (6) months.

    1.    Assist each youth in developing appropriate individual short-term goals and a realistic education plan.
    2.    Provide in-service training on decision making and future planning for youth.
    3.    Provide each youth with the opportunity to participate in a minimum of five (5) hours of tutoring per week.

B.    Eighty-five percent (85%) of youth will possess the ability to comfortably converse in English within six (6) months of their admission into the program.

    1.    Provide opportunities for the youth to practice good social skills through activities and special training in conflict resolutions, anger control, daily communications, and appropriate expression of feelings.
    2.    Encourage youth to speak their native language in their bedrooms only and speak English only in the main sections of their homes and other public areas.
    3.    Encourage interactions/friendships with American youth.

C.    Of the four (4) youth emancipating from the program, 85% of the youth who have been in the program six (6) months or more will be discharged with independent living skills.

    1.    Provide instructions on how to prepare balanced meals and the advantages of good nutrition.
    2.    Provide instructions on personal health and hygiene practices.
    3.    Provide instructions on daily living skills.
    4.    Provide training on how to access public transportation.
    5.    Provide budgeting classes.
    6.    Encourage youth to open a savings account and obtain part-time work.
    7.    Offer small-group sex education classes with emphasis on abstinence.

**Goal #3:**    To provide opportunities for the unaccompanied refugee minors to maintain and value their ethnic culture while providing social acculturation skills into American culture.

**Objectives:**

A.    To provide the youth with opportunities to occasionally prepare ethnic food and teach others the recipes.

B.    To plan group gatherings for the youth so that they may speak and sing in their ethnic language, and have ethnic foods.

C.    To provide the youth with opportunities to practice their selected ethnic religion.

D.    To provide the youth with opportunities to share their ethnic culture with youth of different cultures, in their schools, churches, and community.

E.    To provide monthly contact with adult mentors from the youth's native homeland when available.  A cultural specialist will be made available to the youth twenty-four hours, seven (7) days a week, in case of an emergency.

**Description of Specific Activities to Be Conducted with Funds**

A.    Room and board will include meals, health and hygiene supplies, household supplies, and personal supplies to meet the needs of the youth.

B.    Clothing and monthly allowances will be provided according to MDHS allotments.

C.    Client transportation for medical appointments, school, therapy, and offsite consultation will be provided.

D.    Case management and therapy will be provided by case management staff to meet the needs of the youth.  Case managers will be assigned to all youth regardless of their placement.  A therapist through individual, family, and group sessions will assist the youth in working through post-traumatic stress issues, on a weekly and as needed basis.

E.    Recreational and special ethnic activities will be coordinated to help youth adapt to their new social, cultural environment and maintain their individual heritage. Recreational activities will be ongoing.

F.    Tutoring will be provided in a concentrated fashion to meet the individual educational needs of the youth. Assisting the youth with the English language and independent living skills is crucial.   English language learning supplies and school supplies will be purchased and ethnic translators will be provided as needed.

G.    Independent living skills will be taught and modeled by case managers, and therapeutic foster home families.

**Time Line for Delivery of Services**

Services will be provided October 1, 2012, through September 30, 2013.

**Targeted Population and Geographic Area to Be Served**

Because of Catholic Charities vast experience in providing services to unaccompanied refugee minors, our city was chosen as one of the few locations in the country to resettle these youth. We will continue to provide therapeutic foster home, group home or independent living placements for Haitians, Refugee, Special Immigrant Juvenile Status (SIJS), and Victims of Human trafficking youth when they are referred by the United States Conference of Catholic Bishops (USCCB) due to conditions in the youths' countries of origin.

**Targeted Number of Clients to Be Served**

There are currently twenty-five (25) unaccompanied refugee minors residing in therapeutic foster homes, therapeutic group homes, and independent living placements. The United States Conference of Catholic Bishops has asked Catholic Charities, Inc. to be staffed and ready to place additional youth immediately after referrals are made. The total number to be served October 1, 2012 – September 30, 2013 is thirty six (36).

**Plans for Involvement of Community Volunteers**

The possibilities for volunteerism are almost infinite with this group of youth and the agency is working hard to find and cultivate new volunteer recruitment. It is an ongoing challenge and source of gratification to have the local and state community become involved with this phenomenal group of young adults. Some of the organizations that are currently providing volunteers are as follows:

St. Peter's Catholic Church has provided financial support as well as religious and mentoring support to the youth. In addition, the church has held special services in prayer for peace in Sudan and candlelight vigil for earthquake victims in Haiti. They have also made their fellowship hall available for dinners, monthly foster parent trainings, and other meetings for the youth. Parishioners annually adopt the youth by providing Christmas gifts each year through their angel tree.

St. Andrew's Episcopal Church – Over one hundred parishioners, the vestry, and ministry of the church have become directly involved with the youth in many ways including educational assistance, tutoring, financial aid and counseling for college, mentoring, use of church facilities for special events, and summer camp activities.

Mississippi College, Jackson State University, and Belhaven University – Provide social work students who serve as interns for the program.

**Community Collaboration**

- Medical/Dental – Choices for Children, Quinn Healthcare Services, University of Mississippi Medical Center, Baptist Health Systems, Jackson Comprehensive Health Association, Robert Neely-DMD, and private practitioners who accept Medicaid and provide in-kind services are identified to provide required medical services.

- Psychological – University Hospital, Jackson Mental Health Center, McClain Grief Center, and private practitioners who accept Medicaid and provide in-kind services are utilized annually and as needed.

- Independent Living Skills – Southern Christian Services facilitates bi-monthly independent living skills groups for youth age fourteen (14) and older.

- Tutoring – Community volunteers have been and will continue to be used for tutoring. Weekly tutorials are conducted by highly qualified individuals who meet the required criteria of the organization.

- <u>Employment</u> – Opportunities have been and will continue to be provided by local community leaders and employers.

**Description of Outcomes**

The outcome measures utilized in the URM Program assess whether the program has been effective in meeting its goals. This includes the use of a consumer satisfaction/evaluation form, foster parent satisfaction/evaluation form, report cards, and review. The indicators and established thresholds chosen to monitor outcome for the period of October 1, 2012 – September 30, 2013 include:

- Seventy-five percent (75%) of youth will maintain passing grades in school or GED classes after participating in tutorials conducted for 6 months after arrival.

- Eighty-five percent (85%) of youth will possess the ability to comfortably converse in English within six (6) months of their admission into the program.

- Of the youth emancipating from the program, Eighty-five percent (85%) of the youth who have been in the program six (6) months or more will be discharged with independent living skills.

Quality assurance within the URM Program is monitored by the Performance Quality Indicator (PQI) Committee by establishing indicators and thresholds, tracking data, and reviewing results. The results are included in the Quarterly and Annual Reports. Indicators are reviewed and updated annually.

# EXHIBIT B
# Modified Mississippi Settlement Agreement and Reform Plan

# EXHIBIT C
# Budget

**CATHOLIC CHARITIES, INC.**
**UNACCOMPANIED REFUGEE MINORS PROGRAM**
**BUDGET NARRATIVE**
**OCTOBER 1, 2012 - SEPTEMBER 30, 2013**

**1. SALARIES:**

| | | |
|---|---|---|
| Program Director (full-time) | (100% of time x $4,479.2374 x 12 months) | $53,750.85 |
| Assistant Director (full-time) | (100% of time x $3,537.9301 x 12 months) | $42,455.16 |
| Administrative Assistant (full-time) | (100% of time x $2,751.3346 x 12 months) | $33,016.01 |
| Foster Care Specialist (full-time) | (100% of time x $3,032.0039 x 12 months) | $36,384.05 |
| Therapist (full-time) | (100% of time x $3,346.2432 x 12 months) | $40,154.92 |
| Therapist (full-time) | (100% of time x $3,023.8835 x 12 months) | $36,286.60 |
| Therapist (full-time) | (100% of time x $3,191.7733 x 12 months) | $38,301.28 |
| Therapist (part-time) | (100% of time x $1,671.1792 x 12 months) | $20,054.15 |
| Case Manager (full-time) | (100% of time x $2,758.7095 x 12 months) | $33,104.51 |
| Case Manager (full-time) | (100% of time x $2,612.3600 x 12 months) | $31,348.32 |
| Case Manager (full-time) | (100% of time x $2,675.3691 x 12 months) | $32,104.43 |
| Sudanese Cultural Specialist/ Case Manager (full-time) | (100% of time x $2,560.3730 x 12 months) | $30,724.48 |
| Burmese Cultural Specialist/ Case Manager (part-time) | (100% of time x $2,109.4563 x 12 months) | $25,313.48 |
| Hispanic Cultural Specialist/ Case Manager (full-time) | (100% of time x $2,620.7558 x 12 months) | $31,449.07 |
| Education Specialist (part-time) | (100% of time x $25.00/hr x 10 hours/week x 52 weeks) | $13,000.00 |
| Tutor (part time) | (100% of time x $20.00/hr x 10 hours/week x 52 weeks) | $10,400.00 |
| Tutor (part time) | (100% of time x $20.00/hr x 10 hours/week x 52 weeks) | $10,400.00 |
| Tutor (part time) | (100% of time x $20.00/hr x 10 hours/week x 52 weeks) | $10,400.00 |
| Tutor (part time) | (100% of time x $20.00/hr x 10 hours/week x 52 weeks) | $10,400.00 |
| Tutor (part time) | (100% of time x $20.00/hr x 10 hours/week x 52 weeks) | $10,400.00 |
| Tutor (part time) | (100% of time x $20.00/hr x 10 hours/week x 52 weeks) | $10,400.00 |
| Tutor (part time) | (100% of time x $20.00/hr x 10 hours/week x 52 weeks) | $10,400.00 |
| **Subtotal – Salaries** | | **$559,847.31** |

**2. FRINGE BENEFITS:**

| | | |
|---|---|---|
| FICA | ($559,847.31 x 7.65%) | $42,828.32 |
| Health Insurance | ($515.00/mth x 13 staff x 12 months) | $80,340.00 |
| Workers' Comp Insurance | ($559,847.31 x .871504%) | $4,879.09 |
| Unemployment Insurance | ($14,000 x .04 x 21 staff) | $11,760.00 |
| Long-Term Disability Insurance | ($559,847.31 - $13,000.00 Educ. Spec. - $62,400.00 Tutors - $20,054.15 Therapist x .006) | $2,786.36 |

Retirement: Catholic Charities pension plan is an insured non-contributor plan that covers lay employees who have attained the age of 21 and completed one year of service. Employees are vested after ten years of service and the normal retirement age is defined as the employee's 65th birthday, but the plan also provided for early retirement, disability and death benefits. Benefits are provided through an insurance contract and are based on years of service and average monthly earnings. Funding is accomplished through annual actuarially determined employer contribution by the plan's provider, Catholic Mass Mutual, based on the anticipated funding of employees' pension benefits spread over the period from their dates of employment to their dates of retirement.
*(Calculation is based on the billing for the employee by Catholic Mass Mutual, the plan's provider.)* Premiums for retirement paid annually for:

| | | |
|---|---|---|
| Program Director | $9,303.80 x 100% | *$9,303.80* |
| Assistant Director | $5,212.90 x 100% | *$5,212.90* |
| Administrative Assistant | $2,662.00 x 100% | *$2,662.00* |
| Foster Care Specialist | $3,272.50 x 100% | *$3,272.50* |
| Case Manager | $1,900.80 x 100% | *$1,900.80* |
| Case Manager | $2,253.90 x 100% | *$2,253.90* |
| Case Manager | $1,045.00 x 100% | *$1,045.00* |
| Therapist | $3,011.80 x 100% | *$3,011.80* |
| Therapist | $2,561.90 x 100% | *$2,561.90* |
| Therapist | $3,771.90 x 100% | *$3,771.90* |
| Cultural Specialist/Sudanese | $1,045.00 x 100% | *$1,045.00* |
| Cultural Specialist/Burmese | $1,289.20 x 100% | *$1,289.20* |

| | |
|---|---|
| **Total Retirement** | $37,330.70 |
| **Subtotal – Fringe Benefits** | **$179,924.47** |

## 3.  TRAVEL:

*In-State, Local Mileage*

Expenses incurred by staff for official duty related travel including case management, therapy, transporting youth to medical appointments, jobs, tutoring, school, and other service related activities for the program. Mileage calculated by current Federal Register reimbursement rate at .555 for privately-owned vehicles.  Rates will fluctuate based on the state approved mileage rate.

| | | |
|---|---|---|
| Case Managers & Foster Care Specialist Mileage, privately-owned vehicles. | 4 staff x 450 miles/mth x .$555 x 12 months | $11,988.00 |
| Therapists Mileage, privately-owned vehicles. | 4 staff x 225 miles/mth x .$555 x 12 months | $5,994.00 |
| Cultural Specialists Mileage, privately-owned vehicles. | 4 staff x 165 miles/mth x .$555 x 12 months | $4,395.60 |
| Program Director, Assistant Director, Administrative Assistant Mileage, privately-owned vehicles. | 3 staff x 75 miles/mth x .$555 x 12 months | $1,498.50 |
| | **Total** | **$23,876.10** |

*In-State Conference Travel -* MS NASW /Smart Institute Annual Conference, or any other conference  applicable to serving the youth of the URM program.  Two staff persons will be attending.

| | | |
|---|---|---|
| Registration | $500.00 x 2 staff | $1,000.00 |
| | **Conference total** | **$1,000.00** |

*Out-of-State Conference Travel -*  Conference and travel expenses of the URM Program Director and Assistant Director to attend a national conference sponsored by ORR, USCCB or any other conference related to refugee resettlement issues. Federal Register per diem rates used in claculation. Past conferences have been held in Washington, D.C. or Alexandria, VA.

*ORR Conference*

| | | |
|---|---|---|
| Roundtrip Airfare | $500.00 x 2 staff | $1,000.00 |
| Lodging | $255.00/night x 2 staff x 5 nights | $2,550.00 |
| Meals & Incidentals | $64.00/day x 2 staff x 6 days | $768.00 |
| Roundtrip Ground Transportation | $50.00 x 2 staff | $100.00 |
| | **Conference total** | **$4,418.00** |

*USCCB Conference*

| | | |
|---|---|---|
| Roundtrip Airfare | $500.00 x 2 staff | $1,000.00 |
| Lodging | $255.00/night x 2 staff x 5 nights | $2,550.00 |
| Meals & Incidentals | $64.00/day x 2 staff x 6 days | $768.00 |
| Roundtrip Ground Transportation | $50.00 x 2 staff | $100.00 |
| | **Conference total** | **$4,418.00** |

*Out-of-State Travel -* *includes family reunification when applicable and Department of Homeland Security (DHS) New Orleans, LA, Memphis, TN  meetings and court dates for permanent residency for youth (staff will transport & supervise).  Travel as mandated by the Immigration Court and/or attorney when permanent residency needs arise.*   $1,984.00

## Subtotal - Travel                                                    $35,696.10

## 4. CONTRACTUAL:

| | | |
|---|---|---|
| **Rent** – Program Office @ 200 North Congress Street Jackson, MS | ($4,728.35/mth x 9 months)+($4,910.23/mth x 3 months) | $57,285.84 |
| **Parking** - Staff parking @ 200 North Congress Street, Jackson, MS | (16 spaces x $40.00 per space x 12 months) | $7,680.00 |
| **Telephone Service** - Landline, local & long distance service and internet service; and cellular service for program director, assistant director, therapists, case managers, foster care specialist, cultural specialists on a 24/7 basis. | ($775.00/mth x 12 months) | $9,300.00 |

| | | |
|---|---|---|
| **Multi-Peril Insurance -** Premium paid annually. | ($175 x 1/year) | $175.00 |
| **Postage -** First class and overnight mailing. | ($50.00/mth x 12 months) | $600.00 |
| **Copying –** On site for programmatic and administration of the program. | ($725.00/mth x 12 months) | $8,700.00 |
| **Printing –** Brochures for foster parent recruitment and community awareness, business cards, forms, stationery and  envelopes. | ($175.00/mth x 12 months) | $2,100.00 |
| **Advertising –** Publication ads for foster parent recruitment, community awareness, and staff recruitment and recruitment supplies. | ($241.6667/mth x 12 months) | $2,900.00 |
| **File Storage & Retrieval -** Storage and retrieval of program records  and supplies stored securely offsite. | ($137.9167/mth x 12 months) | $1,655.00 |
| **Recreational & Special Ethnic Activities –** Includes athletic events, movies, circus, special local performances, state fair, park admission, museums, amusement parks, and any other approved recreational outing beneficial to the youth, along with concessions, and the emancipation of youth celebration.  Special ethnic activities will be held quarterly and annually. | ($35/mth x 36 yth x 12 months) | $15,120.00 |
| **Professional Fees- Computer/Network Technical Support -** Maintenance, troubleshooting, and technical support for computer, network, software, and printer needs of the program office. | ($261.6667/mth x 12 months) | $3,140.00 |
| **Professional Fees -** Medical, psychiatric, dental, residential treatment center, and hospitalization costs not covered by Medicaid, prescriptions, Medicaid co-payments; special educational services such as summer school and intensive tutoring for youth with special academic needs; GED classes; driver's ed classes; Immigration and Naturalization Services (INS) permanent residency applications/biometrics fees/employment authorizatins/fingerprinting; staff criminal background checks, fingerprinting, motor vehicle record driving checks; translation services; play/art/sand therapy for non-English speaking youth. | ($35.00/mth x 36 yth x 12 months) | $15,120.00 |
| **Subtotal – Contractual Services** | | **$123,775.84** |

**5. COMMODITIES:**

| | | |
|---|---|---:|
| **Building/Janitorial Supplies** — Light bulbs, paper towels, antibacterial soap, trash bags, cleaning/disinfecting supplies, cups, batteries for the program office. | ($178.56/mth x 12 months) | $2,142.72 |
| **Office & Computer Supplies** - General office supplies including paper, binders, pens/pencils/highlighters, labels, folders, envelopes, legal pads, post-it notes, staples, tape, clips, printer cartridges, software used for programmatic and daily administration of the program. | ($600.00/mth x 12 months) | $7,200.00 |
| **School Supplies** – Supplies for classroom instruction, tutoring aids, gym, athletics, band, tutoring, lab fees, ACT examinations, GED fees, text & reference books, book bags. | ($208.3333/mth x 12 months) | $2,500.00 |
| **Program Supplies** - Refreshments and supplies for monthly foster parent meetings/trainings for placement (pre, initial and ongoing) of foster children. | ($175.00/mth x 12 months) | $2,100.00 |
| **Health & Hygiene Supplies** - Personal health and hygiene products, first aid supplies, over-the-counter medications, for the youth as necessary. | ($3.00/mth x 36 yth x 12 months) | $1,296.00 |
| **Subtotal – Commodities** | | **$15,238.72** |

**6. SUBSIDIES, LOANS, GRANTS:**

| | | |
|---|---|---:|
| **Therapeutic board payment** - The therapeutic board rate is based on placement status and youth's age. Up to 36 youth are projected to be served during the subgrant period. | ($900.00/mth x 36 yth x 12 months) | $388,800.00 |
| **Subtotal – SL & G** | | **$388,800.00** |

| | | |
|---|---|---:|
| | **BUDGET SUBTOTAL** | **$1,303,282.44** |

**7. INDIRECT COSTS:**

| | | |
|---|---|---:|
| Indirect Costs - 11% of total grant awarded for administration of the program by Catholic Charities, Inc. HHS approved indirect cost rate. | ($1,303,282.44 x 11%) | $143,361.07 |

| | | |
|---|---|---:|
| | **TOTAL BUDGET** | **$1,446,643.51** |

# Standard Assurances

## STANDARD ASSURANCES AND CERTIFICATIONS

### OVERVIEW

Each Subgrantee and any lower-tier subrecipient must assure that it will comply with the regulations, policies, guidelines, and requirements imposed by the Federal grantor agency and MDHS. The MDHS Subgrantee must also ensure that any lower-tier subgrants it issues through funds received from MDHS will require the lower-tier subrecipient to comply with these same regulations. The assurances listed in this section may not be applicable to a particular project or program, and there may be additional assurances required by certain Federal awarding agencies.

In addition, each subgrantee must certify in writing that it will comply with the following regulations:

- Lobbying
- Suspension and Debarment
- Drug-Free Workplace
- Unresolved Monitoring and Audit Findings
- Fidelity Bond Coverage

### STANDARD ASSURANCES

The Subgrantee assures that it:

1. has the legal authority to apply for and receive the subgrant; that a resolution, motion, or similar action has been duly adopted or passed as an official act of the subgrantee's governing body, authorizing the subgrant, including all understandings and assurances contained therein, and directing and authorizing the person identified as the official representative of the Subgrantee to act in connection with the subgrant and to provide such additional information as may be required.

2. will give MDHS, the State Auditor's Office, the Federal grantor agency, and the Comptroller General, or any of their authorized representatives, access to and the right to examine all records, books, papers, documents, or items related to the subgrant.

3. will establish and maintain both fiscal and program controls and accounting procedures in accordance with generally accepted accounting principles and Federal grantor agency and MDHS directives; and will keep and maintain such books and records for audit by MDHS, by the Federal grantor agency, by the State Auditor, or by their authorized representatives; and will maintain all such records, books, papers, documents, or items for a period of at least three (3) years from the date of submission of the final reporting worksheet, or, if any litigation, claim,

## STANDARD ASSURANCES AND CERTIFICATIONS

audit, or action has begun before the expiration of the three-year period, will retain all such items until the completion of the action and resolution of all issues involved or until the end of the regular three-year period, whichever is later.

4.    will comply with the Single Audit Act Amendments of 1996.

5.    will establish safeguards to prohibit employees from using their positions for a purpose that constitutes, or presents the appearance of, personal or organizational conflict of interest, or personal gain.

6.    will comply with all Federal and State statutes relating to discrimination, including, but not limited to:

Title VI of the Civil Rights Act of 1964, prohibiting discrimination on the basis of race, color, or national origin;

Title VII of the Civil Rights Act of 1964, relating to non-discrimination in matters of recruitment, hiring, promotion, and other employment practices;

Title VIII of the Civil Rights Act of 1968, as amended, relating to non-discrimination in the sale, rental, or financing of housing;

Title IX of the Education Amendments of 1972, as amended, prohibiting discrimination on the basis of sex in federally assisted education programs and activities;

the Age Discrimination Act of 1975, prohibiting discrimination on the basis of age;

Section 504 of the Rehabilitation Act of 1973, prohibiting discrimination on the basis of handicaps;

Subtitle A, Title II of the Americans with Disabilities Act (ADA) (1990);

the Omnibus Reconciliation Act of 1981, prohibiting discrimination on the basis of race, color, religion, sex, national origin, age, and handicap;

the Drug Abuse Office and Treatment Act of 1972, as amended, relating to non-discrimination on the basis of drug abuse;

the Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment, and Rehabilitation Act of 1970, as amended, relating to non-discrimination on the basis of alcohol abuse or alcoholism; and,

Sections 523 and 527 of the Public Health Service Act of 1912, as amended, relating to confidentiality of alcohol and drug abuse patient records; and any other non-discrimination

## STANDARD ASSURANCES AND CERTIFICATIONS

provisions in the specific statute(s) under which these monies will be granted or awarded and the requirements of any other non-discrimination statute(s) which may apply to this subgrant or award.

7. will ensure that buildings and facilities owned, occupied, or financed by the United States government are accessible to and usable by physically handicapped persons in accordance with the Architectural Barriers Act of 1968.

8. will comply with the requirements of the provisions of the Uniform Relocation Assistance and Real Property Acquisition Act of 1970, which provide for fair and equitable treatment of persons displaced or whose property is acquired as a result of Federal and federally assisted programs. These provisions apply to all interests in real property acquired for project purposes regardless of Federal participation in purchases.

9. will comply with the provisions of the Hatch Act, as amended, which limit the political activities of employees whose principal employment activities are funded in whole or in part with Federal funds.

10. will comply, as applicable, with the provisions of the Davis-Bacon Act, the Copeland Act, and the Contract Work Hours and Safety Standards Act, regarding labor standards for federally assisted construction subagreements.

11. will conform with Executive Order (EO) 11246, entitled "Equal Employment Opportunity," as amended by EO 11375, and as supplemented in Department of Labor regulations (41 CFR Part 60) and will incorporate an equal opportunity clause in federally assisted construction contracts and subcontracts.

12. will comply with the minimum wage and maximum hours provisions of the Federal Fair Labor Standards Act.

13. will comply with the Intergovernmental Personnel Act of 1970 relating to prescribed standards for merit systems for programs funded under one of the 19 statutes or regulations specified in Appendix A of OPM's Standards for a Merit System of Personnel Administration.

14. will comply, if applicable, with Section 102(a) of the Flood Disaster Protection Act of 1973, which requires recipients in a special flood hazard area to participate in the program and to purchase flood insurance if the total cost of insurable construction and acquisition is $10,000 or more.

15. will comply with the Lead-Based Paint Poisoning Prevention Act, which prohibits the use of lead-based paint in construction or rehabilitation of residence structures.

16. will assist the Federal grantor agency in assuring compliance with Section 106 of the National Historic Preservation Act of 1966, as amended; EO 11593; and the Archaeological and Historic Preservation Act of 1974.

## STANDARD ASSURANCES AND CERTIFICATIONS

17.    will comply with environmental standards which may be prescribed pursuant to the following: (a) institution of environmental quality control measures under the National Environmental Policy Act of 1969 and EO 11514; (b) notification of violating facilities pursuant to EO 11738; (c) protection of wetlands pursuant to EO 11990; (d) evaluation of flood hazards in flood plains in accordance with EO 11988; (e) assurance of project consistency with the approved State management program developed under the Coastal Zone Management Act of 1972; (f) conformity of Federal actions to State (Clean Air) Implementation Plans under Section 176 of the Clean Air Act of 1955, as amended; (g) protection of underground sources of drinking water under the Safe Drinking Water Act of 1974, as amended; (h) protection of endangered species under the Endangered Species Act of 1973, as amended; (I) Section 6002 of the Resource Conservation and Recovery Act; and (j) the Coastal Barriers Resources Act.

18.    will comply with the Wild and Scenic Rivers Act of 1968 related to protecting components or potential components of the national wild and scenic rivers system.

19.    will comply with Public Law (PL) 93-348 regarding the protection of human subjects involved in research, development and related activities supported by this subgrant.

20.    will comply with the Laboratory Animal Act of 1966 pertaining to the care, handling, and treatment of warm blooded animals held for research, teaching, or other activities supported by this subgrant.

21.    will comply with Federal regulations regarding criteria for cost sharing or matching contributions.

22.    will assure all funds received shall be used only to supplement services and activities that promote the purposes for which the grant is awarded, and not supplant, unless specifically authorized by the program regulations and the appropriate MDHS Division.

23.    will provide certification regarding lobbying to comply with Section 319, PL 101-121 (31 USC 1352).

24.    will provide the required certification regarding their exclusion status and that of their principals prior to the award in accordance with EOs 12549 and 12689 Debarment and Suspension.

25.    will provide certification to comply with the Drug-Free Workplace Act of 1988.

26.    will comply with all applicable requirements of all other Federal and State laws, Executive Orders, regulations, and policies governing the program(s) for which these monies are provided and with the terms and conditions of the Subgrant Agreement.

## STANDARD ASSURANCES AND CERTIFICATIONS

### REQUIRED CERTIFICATIONS

#### I. LOBBYING

As required by Section 1352, Title 31 of the U.S. Code, the Subgrantee certifies that:

A.   No Federal appropriated funds have been paid or will be paid, by or on behalf of the undersigned, to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making of any Federal grant, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal grant or cooperative agreement;

B.   If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress, in connection with this Federal grant or cooperative agreement, the undersigned shall complete and submit Standard Form - LLL, "Disclosure of Lobbying Activities," in accordance with its instructions;

C.   The undersigned shall require that the language of this certification be included in the award documents for all subawards at all tiers (including subgrants, contracts under grants and cooperative agreements, and subcontracts) and that all subrecipients shall certify and disclose accordingly.

#### II. SUSPENSION AND DEBARMENT
#### AND OTHER RESPONSIBILITY MATTERS (DIRECT RECIPIENT)

As required by Executive Order 12549 and 12689, Suspension and Debarment—

A.   The Subgrantee certifies that it and its principals: (a) Are not presently debarred, suspended, proposed for debarment, declared ineligible, sentenced to a denial of Federal benefits by a State or Federal court, or voluntarily excluded from covered transactions by a Federal department or agency;

(b)  Have not within a three-year period preceding this subgrant been convicted of or had a civil judgment rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State, or local) transaction or contract under a public transaction; violation of Federal or State antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property;

(c)  Are not presently indicted for or otherwise criminally or civilly charged by a governmental entity (Federal, State, or local) with commission of any of the offenses enumerated in paragraph (b) of this certification; and

(d)  Have not within a three-year period preceding this subgrant had one or more public transactions (Federal, State, or local) terminated for cause or default; and

B.   Where the Subgrantee is unable to certify to any of the statements in this certification, he or she shall attach an explanation to this form.

## STANDARD ASSURANCES AND CERTIFICATIONS

### REQUIRED CERTIFICATIONS (Continued)

#### III. DRUG-FREE WORKPLACE (SUBGRANTEES WHO ARE INDIVIDUALS)

As required by the Drug-Free Workplace Act of 1988–

A.    As a condition of the subgrant, I certify that I will not engage in the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance in conducting any activity with the subgrant; and

B.    If convicted of a criminal drug offence resulting from a violation occurring during the conduct of any subgrant activity, I will report the conviction, in writing, within 10 calendar days of the conviction to MDHS.

OR

#### III. DRUG-FREE WORKPLACE (SUBGRANTEES OTHER THAN INDIVIDUALS)

As required by the Drug-Free Workplace Act of 1988 –

A.    The Subgrantee certifies that it will or will continue to provide a drug-free workplace by:

(a) Publishing a statement notifying employees that the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance is prohibited in the subgrantee's workplace and specifying the actions that will be taken against employees for violation of such prohibition;

(b) Establishing an on-going drug-free awareness program to inform employees about --

    (1) The dangers of drug abuse in the workplace;
    (2) The subgrantee's policy of maintaining a drug-free workplace;
    (3) Any available drug counseling, rehabilitation, and employee assistance
    programs; and
    (4) The penalties that may be imposed upon employees for drug abuse violations
    occurring in the workplace.

(c) Making it a requirement that each employee to be engaged in the performance of the subgrant be given a copy of the statement required by paragraph (a);

(d) Notifying the employee in the statement required by paragraph (a) that, as a condition of employment under the subgrant, the employee will –

    (1) Abide by the terms of the statement; and
    (2) Notify the employer in writing of his or her conviction for a violation of a criminal drug
    statute occurring in the workplace no later than five calendar days after such conviction;

(e) Notifying MDHS, in writing, within 10 calendar days after receiving notice under subparagraph (d)(2) from an employee or otherwise receiving actual notice of such conviction. Employers of convicted employees must provide notice, including position title to MDHS.  Notice shall include the identification number(s) of each affected grant;

## STANDARD ASSURANCES AND CERTIFICATIONS

III. DRUG FREE WORKPLACE (SUBGRANTEES OTHER THAN INDIVIDUALS) - Continued

(f) Taking one of the following actions, within 30 calendar days of receiving notice under subparagraph (d)(2), with respect to any employee who is so convicted –

(1) Taking appropriate personnel action against such an employee, up to and including termination, consistent with the requirement of the Rehabilitation Act of 1973, as amended; or

(2) Requiring such employee to participate satisfactorily in a drug abuse assistance or rehabilitation program approved for such purposed by a Federal, State, or local health, law enforcement, or other appropriate agency.

(g) Making a good faith effort to continue to maintain a drug-free workplace through implementation of paragraphs (a), (b), (c), (d), (e), and (f).

B. The Subgrantee may insert in the space provided below the site(s) for the performance of work done in connection with the specific subgrant. Check if there are workplaces on file that are not identified here:

Place of Performance (Street address, city, county, state, zip code)

_____

_____

_____

### IV. UNRESOLVED MONITORING FINDINGS;
### UNRESOLVED AUDIT FINDINGS;
### AND LITIGATION OCCURRING WITHIN THE LAST THREE (3) YEARS

Identify any unresolved monitoring findings related to any programs that have been received by the Subgrantee during the last three (3) years and the status of each finding:

_____

_____

Identify any unresolved audit findings related to any programs received by the Subgrantee during the last three (3) years and the status of each finding:

_____

_____

Identify any litigation and/or administrative hearings that the Subgrantee, the Subgrantee's Senior Management, or Subgrantee's Directors have been involved in during the last three (3) years, including the outcome or disposition of the case:

_____

_____

## STANDARD ASSURANCES AND CERTIFICATIONS
### REQUIRED CERTIFICATIONS (Continued)

**V. CERTIFICATION OF ADEQUATE FIDELITY BONDING**

Identify any and all types of bond coverage currently in force. Include the types of bond coverage; the officers or owners and employees covered; the period covered by the bond; and the limits of coverage assigned to each officer, owner, or employee and the total limit of the bond as applicable.

For Subgrantees/Contractors that have been unable to obtain fidelity bond coverage, describe in detail the efforts made to obtain fidelity bond coverage and the reason coverage has not been obtained.

As the authorized representative of the subgrantee, I hereby certify that the subgrantee will comply with the above certifications in items I, II, and III; the information provided items III, IV and V is true and complete to the best of my knowledge, and that the coverage and amounts specified shall be maintained throughout the effective period of the subgrant.

SUBGRANTEE NAME AND ANY OTHER NAMES UNDER WHICH THE SUBGRANTEE HAS DONE BUSINESS:

Catholic Charities, Inc.

SUBGRANTEE ADDRESS AND ANY OTHER ADDRESSES THE SUBGRANTEE HAS USED:
200 North Congress Street, Jackson, MS  39201

Suite 100

TYPED NAME AND TITLE OF THE SUBGRANTEE'S AUTHORIZED REPRESENTATIVE

Greg Patin - Executive Director

SIGNATURE OF SUBGRANTEE'S AUTHORIZED REPRESENTATIVE AND DATE:

# Subgrantee Acceptance Manual

*Revised October 24, 2008*

## MDHS Subgrantee Manual Acceptance Form

Subgrantee Manual Coordinator

Each Subgrantee should designate a Mississippi Department of Human Services Subgrantee Manual coordinator who is familiar with the agency's operations. The coordinator's name, address, and telephone number should be sent directly to the Director, Office of Monitoring, Mississippi Department of Human Services, by the beginning of each contract period. The subgrantee should only notify the Director, Office of Monitoring, MDHS, in writing of any change in assignment.

As duly authorized representative of the *Catholic Charities, Inc.*
_____, I certify that said organization will comply with the above provisions and that I have received as of this date, a copy of the Mississippi Department of Human Services Subgrantee Manual, *[including Addenda to the MDHS Subgrantee/Contract Manual.]*

_____          _8/16/12_
Signature                          Date

_Executive Director_               _Catholic Charities, Inc._
Title                              Organization

# Notification
# Of
# Liability

# MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
## BOARD MEMBER'S NOTIFICATION OF LIABILITY
## LIABILITY

MDHS assumes no liability for actions of the Subgrantee or its employees, agents or representatives under this Subgrant. Subgrantee agrees to indemnify, defend, save and hold harmless MDHS from and against all claims, demands, liabilities, suits, damages and costs of every kind and nature whatsoever, including court costs and attorney's fees, arising out of or caused by Subgrantee and/or its agents, employees, contractors, or subcontractors, in the performance of this Subgrant. The Subgrantee acting through its Board of Directors assumes liability in the event the Subgrantee misuses funds or fails to perform according to the provisions of the Subgrant. The Subgrantee shall notify each Board member, in writing, within 15 days of receiving the executed Subgrant of this requirement, and the Subgrantee shall sign a statement to this effect prior to receiving funds under this subgrant.

I acknowledge and agree to notify all members of the Board of Directors, if applicable, in writing of the assumption by _____Catholic Charities, Inc_____ of liability in the event that _____Catholic Charities, Inc_____ misuses funds or fails to perform according to the provisions of the Subgrant. Further, I will keep a copy of said notification letter as a permanent part of the Subgrant file.

Signature of Entity's Director _____

Name: _Gregory R. Patin_

Organization: _Catholic Charities, Inc._

Date: _8/16/12_

Witness: _Melissa McTega_

Date: _8/16/12_

1

# Fidelity Bond

RENEWAL

8575
Certificate Number

# The Catholic Mutual Relief Society of America
## DECLARATIONS

Catholic Diocese of Jackson, Inc. Most Rev. Joseph Latino,
Bishop of the Diocese of Jackson, and/or His Successors in Office
Certificate Holder:  Forever, Trustee for the Parishes of the Diocese of Jackson

| | | | |
|---|---|---|---|
| Address: | P. O. Box 2248 | Charges Due at Inception: | $1,515,223.00 |
| | Jackson, MS 39225 | Business of Certificate Holder | |
| | | Catholic Diocese | |

| | | | |
|---|---|---|---|
| Certificate Period From: | July 1, 2012 | To: | July 1, 2013 |
| | Noon Standard Time | | Noon Standard Time |

Coverage is provided in accordance with the following schedule of coverages. No coverage is provided for any part
of this certificate unless a limit of liability or the word "Included" is shown for such coverage section or part.

| Section I-Property | Limit of Coverage/Liability | Deductible |
|---|---|---|
| A. & B. Building and Personal Property*........................... | $ 391,475,000 | See PKS-166 |
| Supplementary Declarations - PKS-101A Garagekeepers' Coverage....................... | See PKS 144 & PKS-145 | See PKS-166 |
| Named Storm - See PKS-192(7-08)........................ | 20,000,000 Per Occurrence/ Annual Aggregate | See PKS-113-5 |
| *Coverage is limited per building/contents to the amount shown on the attached ledger page(s). | | |

| Section II-Liability Certificate Limit of Liability | $ 500,000 except as indicated below | |
|---|---|---|
| Limit(s) shown for the following is the maximum we will pay per occurrence/aggregate under the coverage part: | | |
| D. Bodily Injury, Property Damage, Personal Injury, Advertising Injury, Corporal Punishment........................... | 500,000 | |
| E. Fire Legal Liability........................................... | 500,000 | |
| F. Medical Payments to Others................................ | 5,000 | |
| G. Cemetery Errors & Omissions................................ | 500,000 | |
| H. Counseling Errors & Omissions................................ | 500,000 | |
| I. Sexual Misconduct - See PKS-113-7 for Retroactive Date Paragraph 2 Notice Date is 7-1-95 | 500,000 Annual Aggregate | $10,000 |
| Conditional Defense Coverage for Innocent Clergymen - Form PKS-182(7-08) Coverage Effective 7-1-99 - 1-1-2012 | 150,000 Annual Aggregate | $10,000 |
| Conditional Defense Coverage for Innocent Person - Form PKS-182(B)(1-12) Coverage Effective 1-1-2012 | 150,000 Annual Aggregate | $10,000 |
| J. Employee Benefits Errors & Omissions........................ | 500,000 | |
| K. Employment Practices Liability - Retroactive Date 7-1-97.. | 100,000 Annual Aggregate | 20% Certificate Holder Participation/ $25,000 maximum for any one loss |
| Optional: | | |
| Incidental Medical Malpractice.................................... | 500,000 | |
| Liquor Liability (Limited)........................................... | 500,000 | |
| Excess Auto Liability - Form PKS-104-2(7-08)...................... | 400,000 | |
| Excess Employers Liability - Form PKS-103-2(7-08)............. | 400,000 | |
| Limited Mold Coverage - Form PKS-190(7-08).......... | 250,000 | $10,000 |

| Section III-Crime Coverage Certificate Limit of Liability | $ 125,000 See PKS-113-8 | |
|---|---|---|
| Employee Dishonesty-Agreement I (Blanket)...................... | 125,000 | See PKS-166 |
| Theft-Agreement II-Money & Securities............................... | 125,000 | See PKS-166 |
| Depositors Forgery-Agreement III................................ | 125,000 | See PKS-166 |
| (Including Counterfeit Money) | | |

| 7-1-12 to 7-1-13 | | 8575 |
| Certificate Period | RENEWAL | Certificate Number |

| Section IV-Marine Forms<br>Specific Coverage | Limit of Coverage/Liability | Deductible |
|---|---|---|
| Builders Risk  Form PKS-102(1-08)............................................ | $ 10,000,000 | See PKS-166 |
| Builders Risk Earthquake............................... | 1,000,000 | $50,000 |
| | | |
| Musical Instruments PKS-111(7-08) | 5,000 | See PKS-166 |
| Property Floater  PKS-120(7-08) | 26,000 | See PKS-166 |
| Demolition Cost Coverage PKS-173(7-08) | See PKS-113-16 | See PKS-166 |

| Section V-Directors & Officers | | |
|---|---|---|
| Per Coverage Form        Retroactive<br>PKS-128(1-08)           Date        5-17-79 | 500,000 | |

| Section VI-Priests/Religious | | |
|---|---|---|
| Persons Covered     - Each Priest, Religious Brother, Sister &<br>                              Deacon on assignment at a covered location | | |
| Personal Property Coverage  PKS-106(7-08)...................... | 25,000 | $100 All Peril |
| Persons Covered     -  Each Priest on assignment at a<br>                               covered location | | |
| Personal Liability      PKS-107(7-08)................................... | 300,000 | |
| Personal Medical Payments - Per Person............................. | 500 | |

| Section VII-Excess Liability<br>Per Coverage Form(s) | | |
|---|---|---|
| See PKS-117(7-08) | | |
| A. (1) Each Occurrence, except Directors & Officers Liability.. | 10,000,000 | |
|     (2) Each Occurrence - Directors & Officers Liability......... | 10,000,000 | |
| B. Annual Aggregate (Per Location)............................. | 20,000,000 | |
| C. Retained Limit................................... | N/A | |

| Section VIII-Equipment Breakdown | | |
|---|---|---|
| Per Coverage Form  B&M2(1-11) | 100,000,000 Maximum | $500 |

| Section IX-E Commerce Protection | | |
|---|---|---|
| Per Coverage Form PKS-191(7-08)<br>   Retroactive Date: 7-1-02 | 250,000 Annual Aggregate | See PKS-166 |

| Section X-Long Term Care Professional<br>Liability, General Liability and<br>Directors & Officers | | |
|---|---|---|
| A. Each Occurrence  (Per Location)............................. | Nil | |
| B. Annual Aggregate (Per Location)............................. | Nil | |
| C. Medical Payments................................................... | Nil | |
| D. Retained Limit................................................... | Nil | |

PKS-101(7-08)

# Ex. 18A

# CONTRACT AGREEMENT
# SUNNYBROOK CHILDREN'S HOME

Revised 04/2013

## STATE OF MISSISSIPPI
## MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
## CONTRACT FOR PERSONAL OR PROFESSIONAL SERVICES

1. **Parties.** This Contract is made and entered into by and between the Division of Family and Children's Services, Mississippi Department of Human Services, hereinafter referred to as "MDHS," and Sunnybrook Children's Home, Inc., hereinafter referred to as "Independent Contractor."

2. **Purpose.** MDHS hereby engages the Independent Contractor and the Independent Contractor hereby agrees to render certain professional services described in Paragraph 3, "Scope of Services."

3. **Scope of Services.** The Independent Contractor shall perform and render the following services, attached hereto as "Exhibit A" and the *Modified Mississippi Settlement Agreement*, attached hereto as "Exhibit B".

4. **Period of Performance.** The period of performance of services under this Contract shall begin on July 1, 2013 and end on June 30, 2014. MDHS shall have the option to renew this Contract at one (1) year intervals for two (2) years at the same terms and conditions. These one (1) year options to this contract shall end on June 30, 2016.

5. **Consideration and Method of Payment.**

A. As consideration of all services and performances under this Contract, Independent Contractor shall be paid a fee not to exceed Five Hundred Twenty Four Thousand One Hundred Forty Dollars and Zero Cents ($524,140.00). It is expressly understood and agreed that in no event will the total compensation paid hereunder exceed the specified amount of Five Hundred Twenty Four Thousand One Hundred Forty Dollars and Zero Cents ($524,140.00). (Exhibit C)

B. The Independent Contractor will bill MDHS for its services on a monthly basis. Following the satisfactory completion, as determined by MDHS, of its monthly services, the State requires the Independent Contractor to submit invoices electronically throughout the term of the agreement. Invoices shall be submitted to MDHS using the processes and procedures identified by the State. The appropriate documentation shall be submitted on the last working day of the month, with the final invoice to be submitted within five (5) working days after the contract ending date.

Payments by state agencies using the Statewide Automated Accounting System (SAAS) shall be made and remittance information provided electronically as directed by the State. These payments shall be deposited into the bank account of the Independent Contractor's choice. The State may, at its sole discretion, require the Independent Contractor to submit invoices and supporting documentation electronically, at any time, during the term of this Agreement. Independent Contractor understands and agrees

that the State is exempt from the payment of taxes. All payments shall be in United States currency.

Independent Contractor agrees to accept all payments in United States currency via the State of Mississippi's electronic payment and remittance vehicle. MDHS agrees to make payment in accordance with Mississippi law on "Timely Payments for Purchases by Public Bodies," Mississippi Code Annotated 31-7-301, et. Seq., which generally provides for payment of undisputed amounts by MDHS within forty-five (45) days of receipt of invoice.

**6.    Relationship of Parties.**

A.    It is expressly understood and agreed that MDHS enters into this Contract with Independent Contractor on a purchase of service basis and not on an employer--employee relationship basis. Nothing contained herein shall be deemed or construed by MDHS, the Independent Contractor, or any third party as creating the relationship of principal and agent, partners, joint venturers, or any similar such relationship between MDHS and the Independent Contractor. Neither the method of computation of fees or other charges, nor any other provision contained herein, nor any acts of MDHS or the Independent Contractor hereunder, creates or shall be deemed to create a relationship other than the independent relationship of MDHS and the Independent Contractor.

B.    Independent Contractor represents that it has, or will secure, at its own expense, applicable personnel who shall be qualified to perform the duty required to be performed under this Contract.

C.    Any person assigned by Independent Contractor to perform the services hereunder shall be the employee of Independent Contractor, who shall have the sole right to hire and discharge its employee. MDHS may, however, direct Independent Contractor to replace any of its employees under this Contract. If Independent Contractor is notified within the first eight (8) hours of assignment that the person is unsatisfactory, Independent Contractor will not charge MDHS for those hours.

D.    It is further understood that the consideration expressed herein constitutes full and complete compensation for all services and performances hereunder, and that any sum due and payable to Independent Contractor shall be paid as a gross sum with no withholdings or deductions being made by MDHS for any purpose from said Contract sum.

E.    Independent Contractor shall pay when due all salaries and wages of its employees, and it accepts exclusive responsibility for the payment of Federal Income Tax, State Income Tax, Social Security, Unemployment Compensation and any other withholdings that may be required.

**7.    Termination for Cause.** If, through any cause, Independent Contractor fails to fulfill in a timely and proper manner, as determined by MDHS, its obligations under this Contract, or if Independent Contractor shall violate any of the covenants, agreements, or stipulations of this Contract, MDHS shall thereupon have the right to

2

terminate the Contract by giving written notice to Independent Contractor of such termination and specifying the effective date thereof at least five (5) days before the effective date of such termination. In the event of such termination, Independent Contractor shall be entitled to receive just and equitable compensation for satisfactory work completed on services or documents or materials collected and/or prepared by Independent Contractor in connection with this Contract. Such compensation shall be based upon the fees set forth in Paragraph 5, but, in no case, shall said compensation exceed the total Contract price.

Notwithstanding the above, Independent Contractor shall not be relieved of liability to MDHS for damages sustained by MDHS by virtue of any breach of this Contract by Independent Contractor, and MDHS may withhold any payments to Independent Contractor for the purpose of set off until such time as the exact damages due to MDHS from Independent Contractor are determined.

8.    **Termination for Convenience of MDHS.**    MDHS may terminate this Contract at any time by giving written notice to Independent Contractor of such termination and specifying the effective date thereof at least five (5) days before the effective date of such termination. Independent Contractor shall be paid an amount which bears the same ratio to the total compensation as the services actually and satisfactorily performed bear to the total services of Independent Contractor covered by the Contract, less payments of compensation previously made.

9.    **Ownership of Documents and Work Products.**    All data collected by Independent Contractor and all documents, notes, programs, data bases (and all applications thereof), files, reports, studies,  and/or other material collected and prepared by Independent Contractor in connection with this Contract shall be the property of MDHS upon completion of this Contract or upon termination of this Contract. MDHS hereby reserves all rights to the data base and all applications thereof and to any and all information and/or materials prepared under this Contract.

The Independent Contractor is prohibited from use of the above described information and/or materials without the express written approval of MDHS.

10.    **Record Retention and Access to Records.** Independent Contractor shall maintain, and make available to MDHS, any State agency authorized to audit MDHS, the federal grantor agency, the Comptroller General of the United States or any of their duly authorized representatives, financial records, supporting documents, statistical records, and all other records pertinent to the services performed under this Contract. These records shall be maintained for at least three (3) years; however, if any litigation or other legal action, by or on behalf of the state or federal government has begun that is not completed at the end of the three-year period, or if audit finding, litigation, or other legal action has not been resolved at the end of the three-year period, the records shall be retained until resolution.

11.    **Modification or Amendment.** Modifications, changes, or amendments to this Contract may be made upon mutual agreement of the parties hereto. However, any

change, supplement, modification, or amendment of any term, provision, or condition of this Contract must be in writing and signed by both parties hereto.

12.    **Assignments and Subcontracts.**    Independent Contractor shall not assign, sublet, or otherwise transfer the obligations incurred on its part pursuant to the terms of this Contract without the prior written consent of MDHS. Any attempted assignment or transfer of its obligation without such consent shall be wholly void.

13.    **Waiver.** Failure of either party hereto to insist upon strict compliance with any of the terms, covenants, and conditions hereof shall not be deemed a waiver or relinquishment of any similar right or power hereunder at any subsequent time or of any other provision hereof, nor shall it be construed to be a modification of the terms of this Contract.

14.    **Availability of Funds.**    It is expressly understood and agreed that the obligation of MDHS to proceed under this Contract is conditioned upon the availability of funds, the appropriation of funds by the Mississippi Legislature, and the receipt of state and/or federal funds. If, at any time, the funds anticipated for the fulfillment of this Contract are not forthcoming or are insufficient, either through the failure of the federal government to provide funds or of the State of Mississippi to appropriate funds or the discontinuance or material alteration of the program under which funds were provided, or if funds are not otherwise available to MDHS for the performance of this Contract, MDHS shall have the right, upon written notice to Independent Contractor, to immediately terminate this Contract without damage, penalty, cost, or expense to MDHS of any kind whatsoever. The effective date of termination shall be as specified in the notice of termination.

15.    **Price Adjustment.**

A.    **Price Adjustment Methods.**  The Contract price may be changed only by written agreement of the parties.  The value of any work covered by any claim for increase or decrease in the Contract Price shall be determined by one or more of the following methods:

    (1)    Unit prices, if any, previously approved by the parties and specified in this Contract; or

    (2)    MDHS may, at any time by written order, make changes in the specifications within the general scope of this Agreement.  If any such change causes an increase in the amount due under this Contract or in the time required for performance under this Agreement and if MDHS decides that the change justifies an adjustment to the Contract, an equitable adjustment in the Contract may be made by written modification of this Agreement.

4

No charge for any extra work or material will be allowed unless the same has been provided for by written amendment to this Contract signed by both parties.

**B.    Submission of Cost Pricing Data.** The Independent Contractor shall provide cost or pricing data for any price adjustments subject to the provisions of Section 3-403 (Cost or Pricing Data) of the Mississippi Personal Service Contract Procurement Regulations.

**16.    Indemnification.** MDHS shall, at no time, be legally responsible for any negligence or wrongdoing by the Independent Contractor and/or its employees, servants, agents, contractors, and/or subcontractors. Independent Contractor agrees to indemnify, defend, save and hold harmless MDHS from and against all claims, demands, liabilities, suits, damages, and costs of every kind and nature whatsoever, including court costs and attorney's fees, arising out of or caused by Independent Contractor and its employees, agents, contractors, and/or subcontractors in the performance of this Contract.

**17.    Insurance.** Independent Contractor represents that it will maintain workers' compensation insurance which shall inure to the benefit of all Independent Contractor's personnel performing services under this Contract, comprehensive general liability insurance, and employee fidelity bond insurance. Independent Contractor will furnish MDHS a certificate of insurance providing the aforesaid coverage, prior to the commencement of performance under this Agreement. (Exhibit D).

**18.    Applicable Law.** The contract shall be governed by and construed in accordance with the laws of the State of Mississippi, excluding its conflicts of laws provisions, and any litigation with respect thereto shall be brought in the courts of the state. The Independent Contractor shall comply with applicable federal, state and local laws and regulations.

**19.    Representation Regarding Contingent Fees.** The Independent Contractor represents that it has not retained a person to solicit or secure a State contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, except as disclosed in the Independent Contractor's bid, proposal, or herein.

**20.    Certification of Independent Price Determination.** The bidder certifies that the prices submitted in response to the solicitation have been arrived at independently and without, for the purpose of restricting competition, any consultation, communication, or agreement with any other bidder or competitor relating to those prices, the intention to submit a bid, or the methods or factors used to calculate the prices bid.

**21.    Representation Regarding Gratuities.** The Independent Contractor represents that neither it nor any officer, employee, agent, subcontractor or other representative of the Independent Contractor has violated, or is violating, and promises that it will not violate the prohibition against gratuities set forth in Section 6-204 (Gratuities) of the Mississippi Personal Service Contract Procurement Regulations.

22.    **Procurement Regulations.** The Contract shall be governed by the applicable provisions of the Personal Service Contract Review Board Regulations, a copy of which is available for inspection at 210 East Capitol Street, Suite 800, Jackson, Mississippi 39201, or downloadable at www.mspb.ms.gov.

23.    **Severability.** If any term or provision of this Contract is prohibited by the laws of the State of Mississippi or declared invalid or void by a court of competent jurisdiction, the remainder of this Contract shall not be affected thereby and each term and provision of this Contract shall be valid and enforceable to the fullest extent permitted by law.

24.    **Stop Work Order.**

A.    **Order to Stop Work.** The Director of Division of Family and Children's Services, may, by written order to the Independent Contractor at any time, and without notice to any surety, require the Independent Contractor to stop all or any part of the work called for by this Contract. This order shall be for a specified period not exceeding ninety (90) days after the order is delivered to the Independent Contractor, unless the parties agree to any further period. Any such order shall be identified specifically as a stop work order issued pursuant to this clause. Upon receipt of such an order, the Independent Contractor shall forthwith comply with its terms and take all steps to minimize the occurrence of costs allocable to the work covered by the order during the period of work stoppage. Before the stop work order expires, or within any further period to which the parties shall have agreed, the Director of Family and Children's Services shall either:

(1)    cancel the stop work order; or

(2)    terminate the work covered by such order as provided in the "Termination for Cause" clause or the "Termination for Convenience" clause of this Contract.

B.    **Cancellation or Expiration of the Order.** If a stop work order issued under this clause is canceled at any time during the period specified in the order, or if the period of the order or any extension thereof expires, the Independent Contractor shall have the right to resume work. An appropriate adjustment may be made in the delivery schedule or Independent Contractor's price, or both. If the stop work order results in an increase in the time required for, or in the Independent Contractor's cost properly allocable to, the performance of any part of this Contract and the Independent Contractor asserts a claim for such an adjustment within 30 days after the end of the period of work stoppage, an equitable adjustment in the Contract may be made by written modification of this Contract. If MDHS decides that the need justifies the requested adjustment, a modification will be made as provided by Section 12, Modification or Amendment, of this Contract.

C.    **Termination of Stopped Work.** If a stop work order is not canceled and the work covered by such order is terminated for cause or convenience, the

6

Independent Contractor may be paid the agreed upon price for any completed deliverable or service not previously tendered to MDHS, provided that MDHS accepts any such deliverable or service; or Independent Contractor may be paid an amount which bears the same ratio to the total compensation as the services actually and satisfactorily performed bear to the total services of Independent Contractor covered by the Contract, less payments of compensation previously made.

**D.    Adjustment of Price.** Any adjustment in Contract price made pursuant to this clause shall be determined in accordance with the Price Adjustment clause of this Contract.

**25.    Disputes.** Any dispute concerning a question of fact under this Contract which is not disposed of by agreement shall be decided by the Director of the Division of Family and Children's Services. This decision shall be reduced to writing and a copy thereof mailed or furnished to the Independent Contractor and shall be final and conclusive, unless within thirty (30) days from the date of the decision, Independent Contractor mails or furnishes to the Executive Director of MDHS a written request for review. Pending final decision of the Executive Director of a dispute hereunder, the Independent Contractor shall proceed in accordance with the decision of the Director of the Division of Family and Children's Services.

In a review before the Executive Director or designee, the Independent Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its position on the question and decision under review. The decision of the Executive Director on the review shall be final and conclusive unless determined by a court of competent jurisdiction in Hinds County, State of Mississippi, to have been fraudulent, capricious, so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence.

**26.    Compliance with Laws.** The Independent Contractor understands that the State is an equal opportunity employer and therefore maintains a policy which prohibits unlawful discrimination based on race, color, creed, sex, age, national origin, physical handicap, disability, genetic information, or any other consideration made unlawful by federal, State, or local laws. All such discrimination is unlawful and the Independent Contractor agrees during the term of the agreement that the Independent Contractor will strictly adhere to this policy in its employment practices and provision of services. The Independent Contractor shall comply with, and all activities under this agreement shall be subject to, all applicable federal, State of Mississippi, and local laws and regulations, as now existing and as may be amended or modified.

**27.    Confidentiality.** Independent Contractor shall treat all State data and information to which it has access under this Contract as confidential information to the extent that confidential treatment of same is required under federal and state law and shall not disclose same to a third party without specific written consent of the State. In the event that Independent Contractor receives notice that a third party requests divulgence of confidential or otherwise protected information and/or has served upon it a subpoena or other validly issued administrative or judicial process ordering divulgence of confidential or otherwise protected information, Independent Contractor shall

promptly inform the State and thereafter respond in conformity with such subpoena as required by applicable state and/or federal law, rules, and regulations. The provision herein shall survive termination of the Contract for any reason and shall continue in full force and effect and shall be binding upon the Independent Contractor and its agents, employees, successors, assigns, subcontractors, or any party claiming an interest in the Contract on behalf of, or under, the rights of the Independent Contractor following any termination.

28.    **E-Verify.**    Independent Contractor represents and warrants that it will ensure its compliance with the Mississippi Employment Protection Act, Mississippi Code Annotated 71-11-1 and 71-11-3, and will register and participate in the status verification system for all newly hired employees. The term "employee" as used herein means any person that is hired to perform work within the State of Mississippi. As used herein, "status verification system" means the Illegal Immigration Reform and Immigration Responsibility Act of 1996 that is operated by the United States Department of Homeland Security, also known as the E-Verify Program, or any other successor electronic verification system replacing the E-Verify Program. Independent Contractor agrees to maintain records of such compliance and, upon request of the State, to provide a copy of each such verification to the State. Independent Contractor further represents and warrants that any person assigned to perform services hereunder meets the employment eligibility requirements of all immigration laws of the State of Mississippi. Independent Contractor understands and agrees that any breach of these warranties may subject Independent Contractor to the following: (a) termination of this Agreement and ineligibility for any state or public contract in Mississippi for up to three (3) years, with notice of such cancellation/termination being made public, or (b) the loss of any license permit, certification or other document granted to Independent Contractor by an agency, department or governmental entity for the right to do business in Mississippi for up to one (1) year, or both. In the event of such termination/cancellation, Independent Contractor would also be liable for any additional costs incurred by the State due to contract cancellation or loss of "license or permit." (Exhibit E).

29.    **Special Terms and Conditions.** It is agreed and understood by each party to this Contract that there are no special terms and conditions.

30.    **Entire Agreement.**    It is understood and agreed that this Contract and the documents listed below constitute the entire understanding of the parties with respect to the subject matter contained herein and supersede and replace any and all prior negotiations, understandings and agreements, written or oral, between the parties relating thereto. The entire agreement made by and between the parties hereto shall consist of, and precedence is hereby established by the order of, the following documents incorporated herein:

1.    This Contract signed by the parties herein and any Exhibits attached hereto;

2.    The Request for Proposals dated March 4, 2013, Response to Proposals dated April 1, 2013, and the Written Clarifications or Answers provided by MDHS.

8

The documents are complementary, and what is required by one shall be binding as if required by all. A higher document shall supersede a lower order document to the extent necessary to resolve any conflict or inconsistency arising under the various provisions thereof; provided, however, that in no event an issue is addressed in one of the above-mentioned documents but is not addressed in another of such documents, no conflict or inconsistency shall be deemed to occur by reason thereof. The documents listed above are shown in descending order or priority, that is, the highest document begins with the first listed document ("1. This Contract signed by the parties herein and any Exhibits attached hereto") and the lowest document is listed last ("2. The Request for Proposals dated March 4, 2013, Response to Proposals dated April 1, 2013, and the Written Clarifications or Answers provided by MDHS").

**31.   Background Checks.** All child care facilities which are awarded funds, whether they are awarded funds directly or through contracts with entities who receive funds directly, shall ensure that all their personnel, whether owners, or employees or volunteer workers have first been subjects of criminal background checks. These persons shall not be allowed to operate a facility nor given even provisional employment until the results of said background checks are obtained. The background checks shall be requested by the child care facilities. The expense of these background checks shall not be borne by MDHS but instead by the child care facility which requests the background check.

If it is determined that there is a child care facility which is operated by, or has hired, or accepted as a volunteer, a person with a criminal background, MDHS reserves the right to terminate its Contract with said facility if its Contract was directly with said facility. If the MDHS Contract is with an intermediary facility which has passed the funds through to other facilities, MDHS reserves the right to demand that such intermediary facility terminate its Contract with the non-conforming facility, or the intermediary facility may face termination of its Contract with MDHS.

**32.   Non-Compete.** For the term of this contract and for a period of two (2) years thereafter, Sunnybrook Children's Home, Inc., hereby agrees not to directly or indirectly engage in competition in any way with MDHS or to associate with the state business or other business that may compete with MDHS. The term "competition" as used in the foregoing shall include, but not limited to, attempts to divert workers, clients, suppliers, or accounts from MDHS and/or attempt to induce employees of MDHS to terminate their employment. MDHS hereby agrees to enforce the provisions of the Non-Compete Agreement by any legal means. Such means shall include the right to enjoin by legal process for violating provisions hereof.

**33.   Conflict of Interest.** Independent Contractor shall ensure that there exists no direct or indirect conflict of interest in the performance of this contract and/or performance by any of the Independent Contractor's Contractors/Subcontractors. Independent Contractor hereby warrants that no part of any federal or state money shall be paid directly or indirectly to an employee or official of MDHS as wages, compensation or gifts exchange for acting as an officer, agent, employee, subcontractor, or consultant to the Independent Contractor in connection with any work

contemplated or pertaining to this Independent Contractor Agreement.   Independent Contractor shall strictly comply with all conflict of interest provisions or standards of conduct provisions contained in any applicable state, federal, or local law, rule, or regulation.

**34.**   **Transparency**.    This contract, including any accompanying exhibits, attachments, and appendices, is subject to the "Mississippi Public Records Act of 1983," codified as section 25-61-1 et seq., Mississippi Code Annotated and exceptions found in Section 79-23-1 of the Mississippi Code Annotated (1972, as amended).   In addition, this contract is subject to the provisions of the Mississippi Accountability and Transparency Act of 2008 (MATA), codified as Section 31-7-13 of the Mississippi Code Annotated (1972, as amended).   Unless exempted from disclosure due to a court-issued protective order, this contract is required to be posted to the Department of Finance and Administration's independent agency contract website for public access. Prior to posting the contract to the website, any information identified by the Contractor as trade secrets, or other proprietary information including confidential vendor information, or any other information which is required confidential by state or federal law or outside the applicable freedom of information statutes will be redacted.

**35.** **Notice.** Any notice required or permitted to be given under this Contract shall be in writing and sent by United States Certified Mail, Returned Receipt Requested to the party to whom the notice should be given at the address set forth below:

MDHS:                        Mr. Richard A. Berry, Executive Director
                             Mississippi Department of Human Services
                             P.O. Box 352
                             Jackson, Mississippi 39205

**SUNNYBROOK CHILDREN'S**
**HOME, INC.:**              Mr. Rob Salley, Executive Director
                             Sunnybrook Children's Home, Inc.
                             Post Office Box 4871
                             Jackson, Mississippi 39296

**IN WITNESS WHEREOF**, this Contract has been made and interchangeably executed by the parties hereto in duplicate originals.

Witness my signature this, the _26_ day of _June_ , 2013.

**MISSISSIPPI DEPARTMENT OF HUMAN SERVICES**

BY: _____
                              Signature
TITLE: _Deputy Executive Director_

WITNESSES:

_____

_____

Witness my signature this, the ____ day of _____, 2013.

**SUNNYBROOK CHILDREN'S HOME, INC.**

BY: _____
                              Signature
Printed Name: _Rob SALLEY_

TITLE: _EXE DIR_

WITNESSES:

_Shirley R. Wright_

_____

11

# SCOPE OF SERVICES
# SUNNYBROOK CHILDREN'S HOME

## SUNNYBROOK CHILDREN'S HOME
## JULY 1, 2013-JUNE 30, 2014
## GROUP HOME

Sunnybrook Children's Home is situated on a sixty (60) acre campus in Ridgeland, Mississippi that contains five (5) residential education homes that uses live-in houseparents as its direct care staff.  By limiting each home to the maximum of eight (8) residents, and one home serving as a relief home, thirty-two (32) children can be served in this manner. This campus also has the administrative offices.   By using live-in houseparents to provide daily direct care for children, we hope to provide the strongest response to the needs of the child.  As this is done on a centralized campus setting, the neighborhood environment can be maintained and structured around the youths' needs as well.  This also allows sibling groups to be placed in a setting where they can have daily contact when permitted by their needs.  This setting requires several layers of support to maintain appropriate facilities and social services to observe best practices in child care. This setting is also better positioned to meet the varied individual needs unique to each child with tutoring, counseling, social and church activities.  As a child responds to the different levels of programming, more opportunities become available to them that are appropriate for their further development in academic, athletic, financial, social, and spiritual venues.   Our overall goal is to prepare them to achieve their potential in either their own home or another home setting that most appropriately meets their needs.

**Programs/Services**

All Group Home Care requires a current license by the Mississippi Department of Human Services (MDHS). Group Home shall meet all requirements contained in LICENSING REQUIREMENTS FOR RESIDENTIAL CHILD CARING AGENCIES AND CHILD PLACING AGENCIES. Group Home shall have access to, shall follow practice guidelines and shall assist Division of Family and Children's Services (DFCS) in meeting requirements contained in MDHS/DFCS policies. The MDHS/DFCS policies are available online at http://www.mdhs.state.ms.us/fcs_policy.html.

### A. SERVICE DEFINITIONS

The Contractor shall be paid the regular foster care board rate according to the age of the child and in accordance with the MDHS/DFCS policy.

All services provided shall comply with all applicable federal and State of Mississippi laws, and regulations, as now existing and as may be amended or modified.

### Group Home

This Group Home shall provide services to children in MDHS custody ages ten (10) to twenty-one (21) years. Group homes may serve children younger than ten (10), upon written approval by the Regional Director, when they are siblings of a resident over age ten (10). Children under ten (10) shall be placed in group homes or other congregate care facilities no longer than forty-five (45) cumulative days.  The Group Home is licensed and certified to serve this age range.

The Group Home provides residential services to children and adolescents who are capable of functioning satisfactorily in a group care setting. The purpose of group home care is to provide an environment using professional and direct care staff as mentors and role models to help children to develop appropriate relationships with other children, peers and adults and to develop skills necessary for successful independence.

The Group Home provides specific services to help adolescents return to their families, transition to a less restrictive setting or to independent living. Services of other child-serving agencies are sometimes utilized to reach this goal. The Group Home shall prepare children to step down as soon as possible to family or Resource Family placements. The Group Home shall work in accordance with the DFCS Permanency Plan for the child. All discharges shall be planned and related to the Permanency Plan. Punitive discharges will not be allowed (discharges cannot be used as punishment for child's behavior). A viable family resource (parent, relative, foster, adopt, or mentor) shall be identified on each child's discharge plan. The family resource placements shall be approved by the child's DFCS Worker. No family member shall be recruited or allowed contact with the child without prior written permission from the DFCS County of Responsibility.

## B. **STAFFING**

The Facility shall show documentation of both direct care and professional staff on shifts around the clock, in accordance with the LICENSING REQUIREMENTS FOR RESIDENTIAL CHILD CARING AGENCIES AND CHILD PLACING AGENCIES which includes a full-time social worker (forty (40) hours per week).

## C. **SERVICE ACTIVITIES**

The Group Home shall comply with the following service activities. The delivery of services shall adequately address children's safety, permanency, emotional, social, health, and educational needs.

1. Services shall be provided in the least restrictive environment that is appropriate to the individual child's strengths and needs. An array of services needed to meet the child's individual needs shall be identified by the Group Home.

2. Services must reflect practice that is culturally responsive and designed to provide for the unique needs of each child. Group Home shall comply with the Multi-Ethnic Placement Act which prohibits the denying or delaying an individual or couple the opportunity to become a Resource Parent or delaying or denying placement of a child on the basis of race, color or natural origin of the prospective Resource Parent or child. These factors must be applied on an individualized basis and not by general rules.

3. The Facility shall work with the County of Responsibility to develop treatment plans, goals and services to address these goals. Behavior management plans will be

developed jointly for each child.

4. Services shall be provided twenty-four (24) hours per day seven (7) days per week, three hundred sixty-five (365) days per year.  Payment shall be made only for the actual nights a child spends in the Facility/Resource Home except in cases of leave for the purpose of enhancing the child's well-being and improving the probability of family reunification, adoption, or kinship care.  The per diem payment shall not interrupt under the following provisions:

   a. All leave shall have _prior_ written approval by the DFCS County of Responsibility.

   b. The child shall not be absent from the Facility for a consecutive twenty-four (24) hour period which constitutes a leave day.

   c. Leave does include Independent Living activities such as conferences, retreats, and special camps.

   d. Leave days shall be contingent upon the child returning to the Facility/Resource Home at the conclusion of each visit.

   e. All leave shall have _prior_ written approval by the DFCS County of Responsibility along with the approval from the child's court of jurisdiction when it is required.

   f. Documentation shall be provided to support the goal of enhancing the child's well-being and improving the probability of family reunification, adoption, or kinship care placements, duration of the leave, participants, and outcome(s) of the leave.  This documentation shall be prepared by the provider with a copy being placed in the resident's file and the original submitted to the DFCS County of Responsibility.

   g. Leave shall not include overnight stays in Acute Care Hospitals, Residential Treatment Centers, Detention Centers, or any other placements funded through other resources.

5. Siblings shall be placed together whenever possible, if referred to provider. Provider shall provide written justification if siblings are not placed together. A visitation plan must be included in the written justification when siblings are not placed together.

6. The delivery of services should be in close proximity to the child's County of Responsibility.

7. Medical/Dental/Mental Health Assessments shall be secured by the Group Home on every applicable child in custody of MDHS admitted to the Facility/Resource Home. Also, the Group Home shall maintain an immunization schedule meeting the health needs of the child and the requirements of the State Department of Health.

Medicaid Providers shall be obtained for all medical and dental services. Medications will be administered and monitored by assigned staff of facility or Resource Parent. Administration of psychotropic medications requires a written authorization from the County of Responsibility. A schedule of yearly medical exams and semi-annual dental exams will be maintained by the Facility/Resource Home. Initial medicals, dentals and mental health assessments shall be provided as required by DFCS policies. An initial medical exam is due seventy-two (72) hours from the time of initial custody and a comprehensive medical exam due within thirty (30) days of initial custody. Ongoing routine medicals shall be performed by the anniversary date of the child's comprehensive medical exam and dental exams six (6) months from the anniversary date of the child's initial dental exam. Mental health assessments are required on all children age four and above within thirty (30) calendar days of the date of custody, and ongoing assessments and identified mental health treatments shall be provided for all children requiring these therapeutic services.

8.  Appropriate educational services shall be provided by accredited schools. Educable Child Funds shall be pursued on each child through the Mississippi Department of Education (MDE) by the Group Home. The allowed costs for education should be billed through MDE for children eligible for these funds. The Group Home will assist in getting children ruled who are not currently eligible by completing the MDE Educable Child application (pink form). Education costs shall not be billed to DFCS. Developmental assessments will be secured for all children ages zero to three (0-3) and for children older than three when there is suspicion of any developmental delays. Educational services shall include, but not be limited to, based on the child's Individual Service Plan (ISP), tutoring, monitoring a child's educational progress and making contact with teachers and other educational personnel at least quarterly, attendance at Individual Education Plan (IEP) conferences, educational advocacy and ongoing communication with the County of Responsibility regarding the child's educational goals and progress. Assistance with GED and/or college or vocational preparation should be addressed in children's educational plans.

9.  The Group Home shall engage all youth ages fourteen – twenty (14-20) in Independent Living activities regardless of the placement. The Group Home shall arrange for Skills Groups to be conducted at the Facility or designated location and shall transport the teens to skill group activities sponsored by other sources or entities. In addition, the Group Home shall develop with each child and assigned DFCS staff, an individualized plan to prepare the teen for Independence.

10. A clothing inventory shall be completed by the Group Home and DFCS Worker at the time of admission and upon discharge. The Group Home and DFCS Worker must verify at admission and upon discharge the items the child is bringing to or taking from the Facility/Resource Home. Replacement clothing for children shall be provided as part of the per diem. The replacement clothing amount shall be equal to or greater than the amount designated by the DFCS Foster Board Breakdown according to the age of the child. Special clothing needs will be discussed with the assigned County of Responsibility Social Worker. In some situations, special items can be purchased with prior written approval from the Regional Director and with

the county reimbursement made directly to the clothing vendor.

11. Hygiene supplies and monthly allowance shall be provided through the per diem rate by the Group Home. The child's monthly allowance shall be equal to or greater than the amount designated by the DFCS Foster Board Breakdown according to the age of the child.

12. The Group Home shall coordinate with the County of Responsibility to meet the child's needs to maintain and strengthen permanent connections through: a) the visitation plan, b) an ongoing evaluation and identification of connections with the child, c) transportation for visits and special events, d) arranging for visits at the Facility or other approved site and e) counseling with the child regarding any grief and loss due to separation from important connections.

13. The Group Home shall provide all necessary transportation for the child, including but not limited to transportation to and from school, to and from work, off-site consultations, visits with parents/siblings/extended kin/connections, Adoption recruitment activities, therapy and/or medical treatment not provided by the Group Home, needed Independent Living activities and other appointments unless prior arrangement has been made with the child's DFCS Worker.

14. Any injury to a child shall be documented along with any subsequent treatment. The child's DFCS Worker shall be notified of minor or serious injuries and of the treatment required and/or received. Parental notification of serious injuries or treatment shall be made immediately by the child's DFCS Worker and prior to any visitation. Serious injuries and other serious incidents shall be reported verbally and followed up in writing to DFCS Congregate Care Director by the Group Home.

15. All photographs including videos, media presentations, and publications require an Order of Limited Disclosure from child's Youth Court Judge. In addition, written consent shall be obtained from the DFCS County of Responsibility, the child, the birth parents, if available, and the Guardian *ad litem*.

16. There must be a minimum of one face-to-face site visit monthly with the child in the Resource Home and a second monthly contact with the child at any appropriate location.

17. There must be at least one face-to-face contact with the Resource Parent monthly.

## D. SERVICES ASSURANCES/PROTOCOLS

1. The Group Home shall make its application form available and the application form shall be completed by the DFCS worker prior to admission to the Facility. The Group Home shall keep blank copies on file for emergency situations when the DFCS Staff has not completed one prior to placement of the child. In these instances, the DFCS Staff shall complete the form with as much information known, and forward the remaining documentation to the Facility as soon as possible. A copy of the application shall be filed in the child's case record. Any additional forms

needed by the contracted Facility shall be completed by the Facility staff.

2.  Any injury to a child shall be documented along with any subsequent treatment. The child's DFCS Worker shall be notified immediately of minor or serious injuries and of the treatment required and/or received. Parental notification of serious injuries or treatment shall be made immediately by the child's DFCS Worker and prior to any visitation.  Serious injuries and other serious incidents shall be reported verbally and followed up in writing to DFCS Director of Congregate Care by the Group Home.

3.  In the event that the child runs away, is placed in a detention center, or is hospitalized (acute or residential), or any other emergency facility, the Facility shall immediately notify verbally and in writing the DFCS Congregate Care Unit, DFCS Worker, and law enforcement, if applicable. Children shall not be discharged to detention facilities, holding facilities, or short-term hospitals. All discharges shall be planned in advance and in compliance with the child's Permanency Plan.  Punitive discharges shall not be allowed (discharges cannot be used as punishment for child's behavior). The Facility shall work with the agency to develop an appropriate discharge plan into the least restrictive environment. The Facility shall prepare the child for the move and participate in said move as requested by the County of Responsibility.

4.  A child cannot be sent to a detention center and then be discharged from the Facility/Resource Home unless there are charges and he/she is committed to a training school, incarcerated, or is a danger to self or others.  A child shall return to the Facility/Resource Home upon discharge from detention center unless one of these conditions is met. In such incidences, the Group Home shall assist DFCS and the court in getting the child admitted to the appropriate Facility.  If the Judge releases the child from the detention center prior to admission to the higher level of care, the Group Home shall maintain the child under close supervision until the transfer can be made.

5.  A child shall not be discharged due to negative behaviors, such as, but not limited to spitting, fighting without weapons, and cursing.  Reasons for all discharges shall be sent by the Facility in writing two (2) weeks prior to the discharge to the County of Responsibility. A placement disruption meeting must be scheduled and held prior to any unplanned discharge to ensure that appropriate services and supports have been implemented.

6.  The Group Home/Resource Parent cannot approach the Judge of jurisdiction regarding extending a child's stay at the Facility or discharge from a particular Facility. The DFCS County of Responsibility Worker and ASWS have the authority to approve placements and discharges.

7.  The appropriate law enforcement personnel shall be notified if a child leaves a Facility without permission (runaway).  The DFCS Worker shall be immediately notified that the child has left, and the County Social Worker shall file runaway charges or designate Facility personnel to file charges.  If a child causes injury to the Facility staff or another resident of the Facility/Resource Home, the Group Home

shall notify the DFCS Worker as well as the DFCS Congregate Care Unit and file charges with law enforcement so that the matter can be brought before the Judge of jurisdiction. Payments shall not be made for the night child is absent due to runaway status. Termination will be considered after child has not been located in seven (7) calendar days.

8. The Facility shall provide copies of progress reports/narrative contacts every other week (bi-weekly) to the child's DFCS Worker. In addition, Monthly Logs shall be submitted to child's DFCS worker by the tenth (10th) of every month which shall include direct (child and family) and indirect (school, employer, court, mental health, etc.) contacts.

9. Failure to comply with any of these provisions could be considered grounds for termination of the contract.

## E. <u>OUTCOME REPORTS</u>

The Facility shall submit Monthly Outcome Reports to the DFCS Congregate Care Unit by the tenth (10th) of every month. Unless otherwise indicated, please provide the following outcome measures for each month.

1. Safety

   a. Total number children served in the Facility/Resource Home(s) this reporting month
   b. Total number reports of maltreatment this reporting month
   c. Total Reports referred to DFCS centralized intake in less than (<) eight (8) hours
   d. Total reports referred to DFCS centralized intake in < twenty-four (24) hours
   e. Number of children removed from Facility/Resource Parent(s) due to report of maltreatment
   f. Number of reports requiring corrective action by the Facility/agency
   g. Number of corrective action reports submitted to DFCS < 30 days
   h. Number of runaway episodes
   i. Number of Serious Incidents

2. Discharges/Disruptions

   a. Number of children discharged to a final Permanency Plan outcome
   b. Percent of children discharged to a final Permanency Plan outcome
   c. Number of children which the Facility/Resource Parent(s) requested removal of the child
   d. Number of children which the Facility/Resource Parent(s) requested removal of the child in which a two (2) week notice was not given
   e. Number of these children for whom a placement disruption meeting was held prior to removal
   f. Number of children discharged due to unplanned circumstances
   g. Percent of total children discharged due to unplanned circumstances

*Exhibit A, Scope of Services*          7

  h. Number of children discharged to a lower level, less restrictive placement
  i. Percent of children discharged to a lower level, less restrictive placement
  j. Number of children discharged to a higher level, more restrictive placement
  k. Percent of children discharged to a higher level, more restrictive placement

3. Case Planning

  a. Number of Family Team Meetings/ISP Meetings/Adoption Status Meetings initiated by DFCS and attended by Facility social worker/Resource Parent(s) during the reporting month
  b. Number of Foster Care Review conferences attended by Facility social worker/Resource Parent(s) during the reporting month

4. Independent Living

  a. Number of children greater than (>) 14 years of age served during the reporting month
  b. Number of Independent Living Skills groups attended by these children during the reporting month
  c. Number of Independent Living Skills sessions conducted and documented by Facility professional staff/Resource Parent(s)

5. Child/Parent/Sibling Visitation – Connections

  a. Number of visits between children and their parents/other siblings in care held at the Facility or Resource Home
  b. Number of visits between children and their extended family/siblings not in care/other connections held at the Facility or Resource Home
  c. Number of visits between children/parents/siblings in care/connections in which the Facility staff or Resource Parent(s) provided primary supervision of visits
  d. Number of visits between children/parents/siblings in care/connections in which the Facility staff or Resource Parent(s) provided transportation to the visit site
  e. Number of other events (such as birthdays, school activities, medical/mental health appointments) for which the Facility provided transportation or assisted with arrangements that maintained or strengthened a child's relationship with significant connections
  f. Number of children served whose residence (home from which they were removed) is greater than fifty (50) miles from placement site
  g. Percent of children served whose residence (home from which they were removed) is greater than fifty (50) miles from placement site

6. Medical/Dental Needs

  a. Number of children served during the reporting month whose initial placement during the current custody episode was in this Facility/Resource Home

    b.   Number of these children who received an initial medical assessment within seventy-two (72) hours of custody

    c.   Number of these children who received a comprehensive medical exam within thirty (30) days of custody

    d.   Number of total children in care for whom an annual medical exam was due during the reporting month

    e.   Number of children due annual medical exams who received an annual medical exam

    f.   Number of children for whom a semi-annual dental exam was due during the reporting month

    g.   Number of children due a semi-annual dental exam who received a dental exam

    h.   Number of children who experienced an acute medical episode requiring emergency assessment/treatment or hospitalization

    i.   Number of children requiring psychotropic medication

    j.   Number of children requiring psychotropic medication who have a written plan of approval from the County of Responsibility for administration of psychotropic medication on file

    k.   Number of children ages zero to three (0-3) served during the month by the Facility or Resource Home(s)

    l.   Number of children ages zero to three (0-3) who have been referred to the First Steps Early Intervention Program

    m.   Number of children zero to three (0-3) who have been assessed by the First Steps Early Intervention Program

    n.   Number of children > three (3) years of age who have received a developmental assessment through the Department of Health, Department of Mental Health or private provider

    o.   Number of total children served during the reporting month whose recommended schedule of immunizations has been followed

7.      Mental Health

    a.   Number of children four (4) years and older placed in the Facility/Resource Home(s) during the past reporting month

    b.   Number of children four (4) years and older who have a mental health assessment on file

    c.   Number of children whose mental health assessment has determined the need for ongoing or follow up mental health services

    d.   Number of children who receive all mental health services recommended in this assessment

    e.   Number of children screened for Fetal Alcohol Spectrum Disorder

8.      Educational Needs

    a.   Number of school age children entering the Facility during the reporting month

    b.   Number of school age children who were enrolled in an accredited school within three (3) days (with the exception of school holidays and breaks)

    c.   Number of school age children who are able to remain in the same school they attended prior to placement in this Facility/Resource Home

    d.   Number of school age children whose initial placement was in this Facility/Resource Home

    e.   Number of school age children who received an educational assessment during the first thirty (30) days of placement

    f.   Number of children who meet the criteria of "exceptional child" as defined in § 37-23-3 of the Mississippi Code Annotated of 1972

    g.   Number of children who meet the criteria of "exceptional child" as defined in § 37-23-3 of the Mississippi Code Annotated of 1972 who have IEP

    h.   Number of children who meet the criteria of "exceptional child" as defined in § 37-23-3 of the Mississippi Code Annotated of 1972 who receive appropriate special education and related services as contained in the IEP

    i.   Number of IEP conferences attended by Facility social worker(s) and Resource Parents during the reporting month

Narrative Updates/Progress Reports

The Group Home will provide to the County of Responsibility bi-weekly narrative updates/progress reports on each child served. These updates/reports should address all issues of which DFCS Workers need to be aware. The Monthly Log of contacts will be submitted by the tenth (10th) of every month. Hard copies of any documents such as medical, mental health and educational records should be provided to the County of Responsibility immediately upon receipt by the Facility. The Facility should retain copies of all these documents in the child's file maintained by the Facility. The following documentation details should routinely be addressed in narrative updates and progress reports.

    a.   Documentation of assessment and certification of ongoing child safety-identification of risk, description of safety plans developed, description of staff management of safety plans, documentation of discussions with Facility staff or Resource Parents regarding risk, safety, and actions taken to address risk and safety factors identified

    b.   Documentation of periodic discussion with the child concerning his/her ISP and identification of barriers to achievement of permanency

    c.   Documentation of assessment of and provision for medical, dental, educational and mental health needs based on the child's ISP and requirements of DFCS policy

    d.   Documentation of assessment of and provision for a child's well being and permanency needs to include, but not limited to, the need for continuation of important connections and relationships, need for recreation and socialization, need for mentors and role models, need for development of vocational and family life skills

    e.   Documentation of child/parent-family-sibling visitation; description of how the Facility/Resource Parent(s) contributed to successful visitation as outlined in the

child visitation plan; description of any noted safety concerns during visitation

f.   Documentation clearly demonstrating that the child is actively involved in assessment of needs and case planning activities and discussions

g.   Documentation of the frequency and quality of visitation between a child and his/her parents/siblings/extended family/significant connections (where were visits conducted, length of visits, quality of transactions occurring during visits, child's reactions before and after visits)

h.   Documentation of specific Independent Living Services and description of Independent Living Skills activities

i.   Documentation of examples of educational advocacy for a child by the Facility or Resource Parent

j.   Documentation of services provided to Resource Parents by the Group Home to ensure that Resource Parents are given necessary support to successfully parent children in DFCS custody

The Division of Family and Children's Services (DFCS) Director of the DFCS Administration Unit, the Director of the DFCS Permanency Unit, the Director of the Continuous Quality Improvement Unit, and the Director of the DFCS Licensure Unit will ensure that the Independent Contractor meets the programmatic quality assurance and licensure requirement criteria**.** The Division of Program Integrity shall ensure the Independent Contractor further meets all aspects of the contract.

The tools utilized to evaluate these services will be the Licensure Standards and the programmatic reports submitted monthly to report the outcomes as outlined in Section E. Outcome Reports, beginning on page 7 of this Scope of Services.

The services will be evaluated by the Independent Contractor's submission of the required reports and by the Independent Contractor meeting the Licensure Standards.  Failure to meet the Licensure Standards will result in loss of payment.

Program Integrity shall perform a site visit as least once a year, more if requested by the Division of Family and Children's Services.  The Licensure Unit shall perform an onsite Annual Licensure Review for this Facility as the License is awarded for a one year period.  The Licensure Unit shall visit and perform annual facility reviews (at least one review) two (2) months prior to renewal of the License. If this facility is under a Corrective Action Plan (CAP) the Licensure Unit shall perform a site visit every month the facility is under the CAP. Also, a licensure investigation shall be conducted after all Abuse Neglect and Exploitation (ANE) investigations.  Therefore, the number of site visits performed by the Licensure Unit depends on the abovementioned circumstances, but at least one (1) site visit shall be performed by the Licensure Unit.

# Ex. 18B

# CONTRACT AGREEMENT
# PINE VALE CHILDREN'S HOME

**Revised 04/2013**

# STATE OF MISSISSIPPI
## MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
## CONTRACT FOR PERSONAL OR PROFESSIONAL SERVICES

1.    **Parties.**    This Contract is made and entered into by and between the Division of Family and Children's Services, Mississippi Department of Human Services, hereinafter referred to as "MDHS," and Pine Vale Children's Home, Inc., hereinafter referred to as "Independent Contractor."

2.    **Purpose.**    MDHS hereby engages the Independent Contractor and the Independent Contractor hereby agrees to render certain professional services described in Paragraph 3, "Scope of Services."

3.    **Scope of Services.**    The Independent Contractor shall perform and render the following services, attached hereto as "Exhibit A" and the *Modified Mississippi Settlement Agreement*, attached hereto as "Exhibit B".

4.    **Period of Performance.**  The period of performance of services under this Contract shall begin on July 1, 2013 and end on June 30, 2014.  MDHS shall have the option to renew this Contract at one (1) year intervals for two (2) years at the same terms and conditions.  These one (1) year options to this contract shall end on June 30, 2016.

5.    **Consideration and Method of Payment.**

A.    As consideration of all services and performances under this Contract, Independent Contractor shall be paid a fee not to exceed Three Hundred Seventy Seven Thousand Three Hundred Eighty-One Dollars and Zero Cents ($377,381.00).  It is expressly understood and agreed that in no event will the total compensation paid hereunder exceed the specified amount of Three Hundred Seventy Seven Thousand Three Hundred Eighty-One Dollars and Zero Cents ($377,381.00). (Exhibit C)

B. The Independent Contractor will bill MDHS for its services on a monthly basis. Following the satisfactory completion, as determined by MDHS, of its monthly services, the State requires the Independent Contractor to submit invoices electronically throughout the term of the agreement.  Invoices shall be submitted to MDHS using the processes and procedures identified by the State.  The appropriate documentation shall be submitted on the last working day of the month, with the final invoice to be submitted within five (5) working days after the contract ending date.

Payments by state agencies using the Statewide Automated Accounting System (SAAS) shall be made and remittance information provided electronically as directed by the State.  These payments shall be deposited into the bank account of the Independent Contractor's choice.  The State may, at its sole discretion, require the Independent Contractor to submit invoices and supporting documentation electronically, at any time, during the term of this Agreement.  Independent Contractor understands and agrees

that the State is exempt from the payment of taxes.  All payments shall be in United States currency.

Independent Contractor agrees to accept all payments in United States currency via the State of Mississippi's electronic payment and remittance vehicle. MDHS agrees to make payment in accordance with Mississippi law on "Timely Payments for Purchases by Public Bodies," Mississippi Code Annotated 31-7-301, et. Seq., which generally provides for payment of undisputed amounts by MDHS within forty-five (45) days of receipt of invoice.

6.     **Relationship of Parties.**

A.     It is expressly understood and agreed that MDHS enters into this Contract with Independent Contractor on a purchase of service basis and not on an employer--employee relationship basis. Nothing contained herein shall be deemed or construed by MDHS, the Independent Contractor, or any third party as creating the relationship of principal and agent, partners, joint venturers, or any similar such relationship between MDHS and the Independent Contractor.  Neither the method of computation of fees or other charges, nor any other provision contained herein, nor any acts of MDHS or the Independent Contractor hereunder, creates or shall be deemed to create a relationship other than the independent relationship of MDHS and the Independent Contractor.

B.     Independent Contractor represents that it has, or will secure, at its own expense, applicable personnel who shall be qualified to perform the duty required to be performed under this Contract.

C.     Any person assigned by Independent Contractor to perform the services hereunder shall be the employee of Independent Contractor, who shall have the sole right to hire and discharge its employee. MDHS may, however, direct Independent Contractor to replace any of its employees under this Contract. If Independent Contractor is notified within the first eight (8) hours of assignment that the person is unsatisfactory, Independent Contractor will not charge MDHS for those hours.

D.     It is further understood that the consideration expressed herein constitutes full and complete compensation for all services and performances hereunder, and that any sum due and payable to Independent Contractor shall be paid as a gross sum with no withholdings or deductions being made by MDHS for any purpose from said Contract sum.

E.     Independent Contractor shall pay when due all salaries and wages of its employees, and it accepts exclusive responsibility for the payment of Federal Income Tax, State Income Tax, Social Security, Unemployment Compensation and any other withholdings that may be required.

7.     **Termination for Cause.**  If, through any cause, Independent Contractor fails to fulfill in a timely and proper manner, as determined by MDHS, its obligations under this Contract, or if Independent Contractor shall violate any of the covenants, agreements, or stipulations of this Contract, MDHS shall thereupon have the right to

2

terminate the Contract by giving written notice to Independent Contractor of such termination and specifying the effective date thereof at least five (5) days before the effective date of such termination. In the event of such termination, Independent Contractor shall be entitled to receive just and equitable compensation for satisfactory work completed on services or documents or materials collected and/or prepared by Independent Contractor in connection with this Contract. Such compensation shall be based upon the fees set forth in Paragraph 5, but, in no case, shall said compensation exceed the total Contract price.

Notwithstanding the above, Independent Contractor shall not be relieved of liability to MDHS for damages sustained by MDHS by virtue of any breach of this Contract by Independent Contractor, and MDHS may withhold any payments to Independent Contractor for the purpose of set off until such time as the exact damages due to MDHS from Independent Contractor are determined.

8. **Termination for Convenience of MDHS.** MDHS may terminate this Contract at any time by giving written notice to Independent Contractor of such termination and specifying the effective date thereof at least five (5) days before the effective date of such termination. Independent Contractor shall be paid an amount which bears the same ratio to the total compensation as the services actually and satisfactorily performed bear to the total services of Independent Contractor covered by the Contract, less payments of compensation previously made.

9. **Ownership of Documents and Work Products.** All data collected by Independent Contractor and all documents, notes, programs, data bases (and all applications thereof), files, reports, studies, and/or other material collected and prepared by Independent Contractor in connection with this Contract shall be the property of MDHS upon completion of this Contract or upon termination of this Contract. MDHS hereby reserves all rights to the data base and all applications thereof and to any and all information and/or materials prepared under this Contract.

The Independent Contractor is prohibited from use of the above described information and/or materials without the express written approval of MDHS.

10. **Record Retention and Access to Records.** Independent Contractor shall maintain, and make available to MDHS, any State agency authorized to audit MDHS, the federal grantor agency, the Comptroller General of the United States or any of their duly authorized representatives, financial records, supporting documents, statistical records, and all other records pertinent to the services performed under this Contract. These records shall be maintained for at least three (3) years; however, if any litigation or other legal action, by or on behalf of the state or federal government has begun that is not completed at the end of the three-year period, or if audit finding, litigation, or other legal action has not been resolved at the end of the three-year period, the records shall be retained until resolution.

11. **Modification or Amendment.** Modifications, changes, or amendments to this Contract may be made upon mutual agreement of the parties hereto. However, any

change, supplement, modification, or amendment of any term, provision, or condition of this Contract must be in writing and signed by both parties hereto.

**12.    Assignments and Subcontracts.**    Independent Contractor shall not assign, sublet, or otherwise transfer the obligations incurred on its part pursuant to the terms of this Contract without the prior written consent of MDHS. Any attempted assignment or transfer of its obligation without such consent shall be wholly void.

**13.    Waiver.** Failure of either party hereto to insist upon strict compliance with any of the terms, covenants, and conditions hereof shall not be deemed a waiver or relinquishment of any similar right or power hereunder at any subsequent time or of any other provision hereof, nor shall it be construed to be a modification of the terms of this Contract.

**14.    Availability of Funds.**    It is expressly understood and agreed that the obligation of MDHS to proceed under this Contract is conditioned upon the availability of funds, the appropriation of funds by the Mississippi Legislature, and the receipt of state and/or federal funds. If, at any time, the funds anticipated for the fulfillment of this Contract are not forthcoming or are insufficient, either through the failure of the federal government to provide funds or of the State of Mississippi to appropriate funds or the discontinuance or material alteration of the program under which funds were provided, or if funds are not otherwise available to MDHS for the performance of this Contract, MDHS shall have the right, upon written notice to Independent Contractor, to immediately terminate this Contract without damage, penalty, cost, or expense to MDHS of any kind whatsoever. The effective date of termination shall be as specified in the notice of termination.

**15.    Price Adjustment.**

**A.    Price Adjustment Methods.**  The Contract price may be changed only by written agreement of the parties.  The value of any work covered by any claim for increase or decrease in the Contract Price shall be determined by one or more of the following methods:

> (1)    Unit prices, if any, previously approved by the parties and specified in this Contract; or

> (2)    MDHS may, at any time by written order, make changes in the specifications within the general scope of this Agreement.  If any such change causes an increase in the amount due under this Contract or in the time required for performance under this Agreement and if MDHS decides that the change justifies an adjustment to the Contract, an equitable adjustment in the Contract may be made by written modification of this Agreement.

4

No charge for any extra work or material will be allowed unless the same has been provided for by written amendment to this Contract signed by both parties.

**B.    Submission of Cost Pricing Data.** The Independent Contractor shall provide cost or pricing data for any price adjustments subject to the provisions of Section 3-403 (Cost or Pricing Data) of the Mississippi Personal Service Contract Procurement Regulations.

**16.    Indemnification.** MDHS shall, at no time, be legally responsible for any negligence or wrongdoing by the Independent Contractor and/or its employees, servants, agents, contractors, and/or subcontractors. Independent Contractor agrees to indemnify, defend, save and hold harmless MDHS from and against all claims, demands, liabilities, suits, damages, and costs of every kind and nature whatsoever, including court costs and attorney's fees, arising out of or caused by Independent Contractor and its employees, agents, contractors, and/or subcontractors in the performance of this Contract.

**17.    Insurance.**    Independent Contractor represents that it will maintain workers' compensation insurance which shall inure to the benefit of all Independent Contractor's personnel performing services under this Contract, comprehensive general liability insurance, and employee fidelity bond insurance.  Independent Contractor will furnish MDHS a certificate of insurance providing the aforesaid coverage, prior to the commencement of performance under this Agreement. (Exhibit D).

**18.    Applicable Law.**  The contract shall be governed by and construed in accordance with the laws of the State of Mississippi, excluding its conflicts of laws provisions, and any litigation with respect thereto shall be brought in the courts of the state. The Independent Contractor shall comply with applicable federal, state and local laws and regulations.

**19.    Representation Regarding Contingent Fees.**  The Independent Contractor represents that it has not retained a person to solicit or secure a State contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, except as disclosed in the Independent Contractor's bid, proposal, or herein.

**20.    Certification of Independent Price Determination.**  The bidder certifies that the prices submitted in response to the solicitation have been arrived at independently and without, for the purpose of restricting competition, any consultation, communication, or agreement with any other bidder or competitor relating to those prices, the intention to submit a bid, or the methods or factors used to calculate the prices bid.

**21.    Representation Regarding Gratuities.** The Independent Contractor represents that neither it nor any officer, employee, agent, subcontractor or other representative of the Independent Contractor has violated, or is violating, and promises that it will not violate the prohibition against gratuities set forth in Section 6-204 (Gratuities) of the Mississippi Personal Service Contract Procurement Regulations.

**22.    Procurement Regulations.** The Contract shall be governed by the applicable provisions of the Personal Service Contract Review Board Regulations, a copy of which is available for inspection at 210 East Capitol Street, Suite 800, Jackson, Mississippi 39201, or downloadable at www.mspb.ms.gov.

**23.    Severability.** If any term or provision of this Contract is prohibited by the laws of the State of Mississippi or declared invalid or void by a court of competent jurisdiction, the remainder of this Contract shall not be affected thereby and each term and provision of this Contract shall be valid and enforceable to the fullest extent permitted by law.

**24.    Stop Work Order.**

**A.    Order to Stop Work.** The Director of Division of Family and Children's Services, may, by written order to the Independent Contractor at any time, and without notice to any surety, require the Independent Contractor to stop all or any part of the work called for by this Contract. This order shall be for a specified period not exceeding ninety (90) days after the order is delivered to the Independent Contractor, unless the parties agree to any further period. Any such order shall be identified specifically as a stop work order issued pursuant to this clause. Upon receipt of such an order, the Independent Contractor shall forthwith comply with its terms and take all steps to minimize the occurrence of costs allocable to the work covered by the order during the period of work stoppage. Before the stop work order expires, or within any further period to which the parties shall have agreed, the Director of Family and Children's Services shall either:

(1)    cancel the stop work order; or

(2)    terminate the work covered by such order as provided in the "Termination for Cause" clause or the "Termination for Convenience" clause of this Contract.

**B.    Cancellation or Expiration of the Order.** If a stop work order issued under this clause is canceled at any time during the period specified in the order, or if the period of the order or any extension thereof expires, the Independent Contractor shall have the right to resume work. An appropriate adjustment may be made in the delivery schedule or Independent Contractor's price, or both. If the stop work order results in an increase in the time required for, or in the Independent Contractor's cost properly allocable to, the performance of any part of this Contract and the Independent Contractor asserts a claim for such an adjustment within 30 days after the end of the period of work stoppage, an equitable adjustment in the Contract may be made by written modification of this Contract. If MDHS decides that the need justifies the requested adjustment, a modification will be made as provided by Section 12, Modification or Amendment, of this Contract.

**C.    Termination of Stopped Work.** If a stop work order is not canceled and the work covered by such order is terminated for cause or convenience, the

6

Independent Contractor may be paid the agreed upon price for any completed deliverable or service not previously tendered to MDHS, provided that MDHS accepts any such deliverable or service; or Independent Contractor may be paid an amount which bears the same ratio to the total compensation as the services actually and satisfactorily performed bear to the total services of Independent Contractor covered by the Contract, less payments of compensation previously made.

D.    **Adjustment of Price.** Any adjustment in Contract price made pursuant to this clause shall be determined in accordance with the Price Adjustment clause of this Contract.

25.    **Disputes.** Any dispute concerning a question of fact under this Contract which is not disposed of by agreement shall be decided by the Director of the Division of Family and Children's Services. This decision shall be reduced to writing and a copy thereof mailed or furnished to the Independent Contractor and shall be final and conclusive, unless within thirty (30) days from the date of the decision, Independent Contractor mails or furnishes to the Executive Director of MDHS a written request for review. Pending final decision of the Executive Director of a dispute hereunder, the Independent Contractor shall proceed in accordance with the decision of the Director of the Division of Family and Children's Services.

In a review before the Executive Director or designee, the Independent Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its position on the question and decision under review. The decision of the Executive Director on the review shall be final and conclusive unless determined by a court of competent jurisdiction in Hinds County, State of Mississippi, to have been fraudulent, capricious, so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence.

26.    **Compliance with Laws.** The Independent Contractor understands that the State is an equal opportunity employer and therefore maintains a policy which prohibits unlawful discrimination based on race, color, creed, sex, age, national origin, physical handicap, disability, genetic information, or any other consideration made unlawful by federal, State, or local laws. All such discrimination is unlawful and the Independent Contractor agrees during the term of the agreement that the Independent Contractor will strictly adhere to this policy in its employment practices and provision of services. The Independent Contractor shall comply with, and all activities under this agreement shall be subject to, all applicable federal, State of Mississippi, and local laws and regulations, as now existing and as may be amended or modified.

27.    **Confidentiality.** Independent Contractor shall treat all State data and information to which it has access under this Contract as confidential information to the extent that confidential treatment of same is required under federal and state law and shall not disclose same to a third party without specific written consent of the State. In the event that Independent Contractor receives notice that a third party requests divulgence of confidential or otherwise protected information and/or has served upon it a subpoena or other validly issued administrative or judicial process ordering divulgence of confidential or otherwise protected information, Independent Contractor shall

7

promptly inform the State and thereafter respond in conformity with such subpoena as required by applicable state and/or federal law, rules, and regulations. The provision herein shall survive termination of the Contract for any reason and shall continue in full force and effect and shall be binding upon the Independent Contractor and its agents, employees, successors, assigns, subcontractors, or any party claiming an interest in the Contract on behalf of, or under, the rights of the Independent Contractor following any termination.

       **28.**   **E-Verify.**   Independent Contractor represents and warrants that it will ensure its compliance with the Mississippi Employment Protection Act, Mississippi Code Annotated 71-11-1 and 71-11-3, and will register and participate in the status verification system for all newly hired employees. The term "employee" as used herein means any person that is hired to perform work within the State of Mississippi. As used herein, "status verification system" means the Illegal Immigration Reform and Immigration Responsibility Act of 1996 that is operated by the United States Department of Homeland Security, also known as the E-Verify Program, or any other successor electronic verification system replacing the E-Verify Program. Independent Contractor agrees to maintain records of such compliance and, upon request of the State, to provide a copy of each such verification to the State. Independent Contractor further represents and warrants that any person assigned to perform services hereunder meets the employment eligibility requirements of all immigration laws of the State of Mississippi. Independent Contractor understands and agrees that any breach of these warranties may subject Independent Contractor to the following: (a) termination of this Agreement and ineligibility for any state or public contract in Mississippi for up to three (3) years, with notice of such cancellation/termination being made public, or (b) the loss of any license permit, certification or other document granted to Independent Contractor by an agency, department or governmental entity for the right to do business in Mississippi for up to one (1) year, or both. In the event of such termination/cancellation, Independent Contractor would also be liable for any additional costs incurred by the State due to contract cancellation or loss of "license or permit." (Exhibit E).

       **29.**   **Special Terms and Conditions.** It is agreed and understood by each party to this Contract that there are no special terms and conditions.

       **30.**   **Entire Agreement.** It is understood and agreed that this Contract and the documents listed below constitute the entire understanding of the parties with respect to the subject matter contained herein and supersede and replace any and all prior negotiations, understandings and agreements, written or oral, between the parties relating thereto. The entire agreement made by and between the parties hereto shall consist of, and precedence is hereby established by the order of, the following documents incorporated herein:

          1.   This Contract signed by the parties herein and any Exhibits attached hereto;

          2.   The Request for Proposals dated March 4, 2013, Response to Proposals dated April 1, 2013, and the Written Clarifications or Answers provided by MDHS.

The documents are complementary, and what is required by one shall be binding as if required by all. A higher document shall supersede a lower order document to the extent necessary to resolve any conflict or inconsistency arising under the various provisions thereof; provided, however, that in no event an issue is addressed in one of the above-mentioned documents but is not addressed in another of such documents, no conflict or inconsistency shall be deemed to occur by reason thereof. The documents listed above are shown in descending order or priority, that is, the highest document begins with the first listed document ("1. This Contract signed by the parties herein and any Exhibits attached hereto") and the lowest document is listed last ("2. The Request for Proposals dated March 4, 2013, Response to Proposals dated April 1, 2013, and the Written Clarifications or Answers provided by MDHS").

**31. Background Checks.** All child care facilities which are awarded funds, whether they are awarded funds directly or through contracts with entities who receive funds directly, shall ensure that all their personnel, whether owners, or employees or volunteer workers have first been subjects of criminal background checks. These persons shall not be allowed to operate a facility nor given even provisional employment until the results of said background checks are obtained. The background checks shall be requested by the child care facilities. The expense of these background checks shall not be borne by MDHS but instead by the child care facility which requests the background check.

If it is determined that there is a child care facility which is operated by, or has hired, or accepted as a volunteer, a person with a criminal background, MDHS reserves the right to terminate its Contract with said facility if its Contract was directly with said facility. If the MDHS Contract is with an intermediary facility which has passed the funds through to other facilities, MDHS reserves the right to demand that such intermediary facility terminate its Contract with the non-conforming facility, or the intermediary facility may face termination of its Contract with MDHS.

**32. Non-Compete.** For the term of this contract and for a period of two (2) years thereafter, Pine Vale Children's Home, Inc. hereby agrees not to directly or indirectly engage in competition in any way with MDHS or to associate with the state business or other business that may compete with MDHS. The term "competition" as used in the foregoing shall include, but not limited to, attempts to divert workers, clients, suppliers, or accounts from MDHS and/or attempt to induce employees of MDHS to terminate their employment. MDHS hereby agrees to enforce the provisions of the Non-Compete Agreement by any legal means. Such means shall include the right to enjoin by legal process for violating provisions hereof.

**33. Conflict of Interest.** Independent Contractor shall ensure that there exists no direct or indirect conflict of interest in the performance of this contract and/or performance by any of the Independent Contractor's Contractors/Subcontractors. Independent Contractor hereby warrants that no part of any federal or state money shall be paid directly or indirectly to an employee or official of MDHS as wages, compensation or gifts exchange for acting as an officer, agent, employee, subcontractor, or consultant to the Independent Contractor in connection with any work

9

contemplated or pertaining to this Independent Contractor Agreement. Independent Contractor shall strictly comply with all conflict of interest provisions or standards of conduct provisions contained in any applicable state, federal, or local law, rule, or regulation.

**34. Transparency.**    This contract, including any accompanying exhibits, attachments, and appendices, is subject to the "Mississippi Public Records Act of 1983," codified as section 25-61-1 et seq., Mississippi Code Annotated and exceptions found in Section 79-23-1 of the Mississippi Code Annotated (1972, as amended). In addition, this contract is subject to the provisions of the Mississippi Accountability and Transparency Act of 2008 (MATA), codified as Section 31-7-13 of the Mississippi Code Annotated (1972, as amended). Unless exempted from disclosure due to a court-issued protective order, this contract is required to be posted to the Department of Finance and Administration's independent agency contract website for public access. Prior to posting the contract to the website, any information identified by the Contractor as trade secrets, or other proprietary information including confidential vendor information, or any other information which is required confidential by state or federal law or outside the applicable freedom of information statutes will be redacted.

35.    **Notice.**  Any notice required or permitted to be given under this Contract shall be in writing and sent by United States Certified Mail, Returned Receipt Requested to the party to whom the notice should be given at the address set forth below:

**MDHS:**                     Mr. Richard A. Berry, Executive Director
                              Mississippi Department of Human Services
                              P.O. Box 352
                              Jackson, Mississippi 39205

**PINE VALE CHILDREN'S**
**HOME, INC.:**               Mr. Thomas Baragona, Executive Director
                              Pine Vale Children's Home, Inc.
                              1872 County Road 700
                              Corinth, Mississippi 38834

**IN WITNESS WHEREOF,** this Contract has been made and interchangeably executed by the parties hereto in duplicate originals.

Witness my signature this, the _25_ day of _JUNE_ , 2013.

### MISSISSIPPI DEPARTMENT OF HUMAN SERVICES

BY: _____
                    Signature

TITLE: _____

WITNESSES:

_____

_____

Witness my signature this, the _19th_ day of _June_ , 2013.

### PINE VALE CHILDREN'S HOME, INC.

BY: _____
                    Signature

Printed Name: __Thomas Baragona__

TITLE: __Executive Director__

WITNESSES:

_Angela Strickland_

_Juliana Shumaker_

11

# SCOPE OF SERVICES
# PINE VALE CHILDREN'S HOME

**PINE VALE CHILDREN'S HOME, INC.**
**GROUP HOME**
**SCOPE OF SERVICES**
**JULY 1, 2013 - JUNE 30, 2014**

Pine Vale Children's Home, Inc. is a 501c3 corporation located in Alcorn County, Mississippi. Pine Vale Children's Home, Inc. is under the direction of a Board of Directors who set policy and hire an Executive Director. The facility is located on fifty two (52) acres and consists of three (3) houses to care for children, an office/warehouse building, a Director's house, and a covered pavilion. There is also a swimming pool for the children's use during the summer months. Pine Vale Children's Home, Inc. is licensed by MDHS and inspected annually by the fire department and the Health Department. Pine Vale Children's Home, Inc. has been in operation since 1971. Pine Vale Children's Home, Inc. is currently licensed to house up to 36 children.

Each of our houses has a husband/wife team of house parents who live with the children in a home environment. Each house functions independently of the other houses. The house parents are responsible for the physical, emotional, and spiritual needs of the children in their care. They make sure the children have clean clothes, enough food, help with school work, doctor appointments, counseling, and many other tasks.

Pine Vale Children's Home, Inc. is a place that provides a home environment. Each family prepares its own meals and sits down to eat together. The members of each home function as a family, with each person fulfilling his own role. Education is an important priority at Pine Vale Children's Home, Inc. Our house parents are in constant contact with the school administration and teachers to insure our children receive the best education available.

Pine Vale Children's Home, Inc. is equipped to handle sibling groups. We have the capacity to care for these groups and keep them in the same placement. We currently have three sibling groups on our campus. We are willing to adjust our homes to accommodate these siblings and keep them together as much as possible.

**Programs/Services**

All Group Home Care requires a current license by the Mississippi Department of Human Services (MDHS). Group Home shall meet all requirements contained in LICENSING REQUIREMENTS FOR RESIDENTIAL CHILD CARING AGENCIES AND CHILD PLACING AGENCIES. Group Home shall have access to, shall follow practice guidelines and shall assist Division of Family and Children's Services (DFCS) in meeting requirements contained in MDHS/DFCS policies. The MDHS/DFCS policies are available online at http://www.mdhs.state.ms.us/fcs_policy.html.

**A. SERVICE DEFINITIONS**

The Contractor shall be paid the regular foster care board rate according to the age of the child and in accordance with the MDHS/DFCS policy.

All services provided shall comply with all applicable federal and State of Mississippi laws, and regulations, as now existing and as may be amended or modified.

**Group Home**

Pine Vale Children's Home, Inc. provides services to children up to 20 years of age. Children under 10 years of age must be part of a sibling group to be placed at Pine Vale Children's Home, Inc.  The Regional Director must approve placement of any child under 10 years of age. Children under 10 years of age are placed in a group home, like Pine Vale Children's Home, Inc., for no more than 45 days unless a written waiver is granted. The Group Home is licensed and certified to serve this age range.

The Group Home provides residential services to children and adolescents who are capable of functioning satisfactorily in a group care setting. The purpose of group home care is to provide an environment using professional and direct care staff as mentors and role models to help children to develop appropriate relationships with other children, peers and adults and to develop skills necessary for successful independence.

The Group Home provides specific services to help adolescents return to their families, transition to a less restrictive setting or to independent living.  Services of other child-serving agencies are sometimes utilized to reach this goal. The Group Home shall prepare children to step down as soon as possible to family or Resource Family placements. The Group Home shall work in accordance with the DFCS Permanency Plan for the child. All discharges shall be planned and related to the Permanency Plan. Punitive discharges will not be allowed (discharges cannot be used as punishment for child's behavior). A viable family resource (parent, relative, foster, adopt, or mentor) shall be identified on each child's discharge plan. The family resource placements shall be approved by the child's DFCS Worker. No family member shall be recruited or allowed contact with the child without prior written permission from the DFCS County of Responsibility.

## B. STAFFING

The Facility shall show documentation of both direct care and professional staff on shifts around the clock, in accordance with the LICENSING REQUIREMENTS FOR RESIDENTIAL CHILD CARING AGENCIES AND CHILD PLACING AGENCIES which includes a full-time social worker (40 hours per week).

## C. SERVICE ACTIVITIES

The Group Home shall comply with the following service activities. The delivery of services shall adequately address children's safety, permanency, emotional, social, health, and educational needs.

1.  Services shall be provided in the least restrictive environment that is appropriate to the individual child's strengths and needs. An array of services needed to meet the child's individual needs shall be identified by the Group Home.

2.  Services must reflect practice that is culturally responsive and designed to provide for the unique needs of each child. Group Home shall comply with the Multi-Ethnic Placement Act which prohibits the denying or delaying an individual or couple the opportunity to become a Resource Parent or delaying or denying placement of a child on the basis of race, color or natural origin of the prospective Resource Parent or child. These factors must be applied on an individualized basis and not by general rules.

3.    The Facility shall work with the County of Responsibility to develop treatment plans, goals and services to address these goals. Behavior management plans will be developed jointly for each child.

4.    Services shall be provided twenty-four (24) hours per day seven (7) days per week, three hundred sixty-five (365) days per year.  Payment shall be made only for the actual nights a child spends in the Facility/Resource Home except in cases of leave for the purpose of enhancing the child's well-being and improving the probability of family reunification, adoption, or kinship care.  The per diem payment shall not interrupt under the following provisions:

    a.    All leave shall have <u>prior</u> written approval by the DFCS County of Responsibility.

    b.    The child shall not be absent from the Facility for a consecutive twenty-four (24) hour period which constitutes a leave day.

    c.    Leave does include Independent Living activities such as conferences, retreats, and special camps.

    d.    Leave days shall be contingent upon the child returning to the Facility/Resource Home at the conclusion of each visit.

    e.    All leave shall have <u>prior</u> written approval by the DFCS County of Responsibility along with the approval from the child's court of jurisdiction when it is required.

    f.    Documentation shall be provided to support the goal of enhancing the child's well-being and improving the probability of family reunification, adoption, or kinship care placements, duration of the leave, participants, and outcome(s) of the leave. This documentation shall be prepared by the provider with a copy being placed in the resident's file and the original submitted to the DFCS County of Responsibility.

    g.    Leave shall not include overnight stays in Acute Care Hospitals, Residential Treatment Centers, Detention Centers, or any other placements funded through other resources.

5.    Siblings shall be placed together whenever possible, if referred to provider. Provider shall provide written justification if siblings are not placed together. A visitation plan must be included in the written justification when siblings are not placed together.

6.    The delivery of services should be in close proximity to the child's County of Responsibility.

7.    Medical/Dental/Mental Health Assessments shall be secured by the Group Home on every applicable child in custody of MDHS admitted to the Facility or Resource Home. Also, the Group Home shall maintain an immunization schedule meeting the health needs of the child and the requirements of the State Department of Health.  Medicaid Providers shall be obtained for all medical and dental services. Medications will be administered and monitored by assigned staff of facility or Resource Parent. Administration of psychotropic medications requires a written authorization from the County of Responsibility. A schedule of yearly medical exams and semi-annual dental

exams will be maintained by the Facility/Resource Home. Initial medicals, dentals and mental health assessments shall be provided as required by DFCS policies. An initial medical exam is due seventy-two (72) hours from the time of initial custody and a comprehensive medical exam due within thirty (30) days of initial custody. Ongoing routine medicals shall be performed by the anniversary date of the child's comprehensive medical exam and dental exams six (6) months from the anniversary date of the child's initial dental exam. Mental health assessments are required on all children age four and above within thirty (30) calendar days of the date of custody, and ongoing assessments and identified mental health treatments shall be provided for all children requiring these therapeutic services.

8.    Appropriate educational services shall be provided by accredited schools. Educable Child Funds shall be pursued on each child through the Mississippi Department of Education (MDE) by the Group Home. The allowed costs for education should be billed through MDE for children eligible for these funds. The Group Home will assist in getting children ruled who are not currently eligible by completing the MDE Educable Child application (pink form). Education costs shall not be billed to DFCS. Developmental assessments will be secured for all children ages zero to three (0-3) and for children older than three when there is suspicion of any developmental delays. Educational services shall include, but not be limited to, based on the child's Individual Service Plan (ISP), tutoring, monitoring a child's educational progress and making contact with teachers and other educational personnel at least quarterly, attendance at Individual Education Plan (IEP) conferences, educational advocacy and ongoing communication with the County of Responsibility regarding the child's educational goals and progress. Assistance with GED and/or college or vocational preparation should be addressed in children's educational plans.

9.    The Group Home shall engage all youth ages fourteen – twenty (14-20) in Independent Living activities regardless of the placement. The Group Home shall arrange for Skills Groups to be conducted at the Facility or designated location and shall transport the teens to skill group activities sponsored by other sources or entities. In addition, the Group Home shall develop with each child and assigned DFCS staff, an individualized plan to prepare the teen for Independence.

10.    A clothing inventory shall be completed by the Group Home and DFCS Worker at the time of admission and upon discharge. The Group Home and DFCS Worker must verify at admission and upon discharge the items the child is bringing to or taking from the Facility/Resource Home. Replacement clothing for children shall be provided as part of the per diem.  The replacement clothing amount shall be equal to or greater than the amount designated by the DFCS Foster Board Breakdown according to the age of the child.   Special clothing needs will be discussed with the assigned County of Responsibility Social Worker.  In some situations, special items can be purchased with prior written approval from the Regional Director and with the county reimbursement made directly to the clothing vendor.

11.    Hygiene supplies and monthly allowance shall be provided through the per diem rate by the Group Home. The child's monthly allowance shall be equal to or greater than the amount designated by the DFCS Foster Board Breakdown according to the age of the child.

12.    The Group Home shall coordinate with the County of Responsibility to meet the child's

needs to maintain and strengthen permanent connections through: a) the visitation plan, b) an ongoing evaluation and identification of connections with the child, c) transportation for visits and special events, d) arranging for visits at the Facility or other approved site and e) counseling with the child regarding any grief and loss due to separation from important connections.

13. The Group Home shall provide all necessary transportation for the child, including but not limited to transportation to and from school, to and from work, off-site consultations, visits with parents/siblings/extended kin/connections, Adoption recruitment activities, therapy and/or medical treatment not provided by the Group Home, needed Independent Living activities and other appointments unless prior arrangement has been made with the child's DFCS Worker.

14. Any injury to a child shall be documented along with any subsequent treatment. The child's DFCS Worker shall be notified of minor or serious injuries and of the treatment required and/or received. Parental notification of serious injuries or treatment shall be made immediately by the child's DFCS Worker and prior to any visitation. Serious injuries and other serious incidents shall be reported verbally and followed up in writing to DFCS Congregate Care Director by the Group Home.

15.  All photographs including videos, media presentations, and publications require an Order of Limited Disclosure from child's Youth Court Judge.  In addition, written consent shall be obtained from the DFCS County of Responsibility, the child, the birth parents, if available, and the Guardian *ad litem*.

16. There must be a minimum of one face-to-face site visit monthly with the child in the Resource Home and a second monthly contact with the child at any appropriate location.

17. There must be at least one face-to-face contact with the Resource Parent monthly.

## D. SERVICES ASSURANCES/PROTOCOLS

1. The Group Home shall make its application form available and the application form shall be completed by the DFCS worker prior to admission to the Facility. The Group Home shall keep blank copies on file for emergency situations when the DFCS Staff has not completed one prior to placement of the child.  In these instances, the DFCS Staff shall complete the form with as much information known, and forward the remaining documentation to the Facility as soon as possible. A copy of the application shall be filed in the child's case record. Any additional forms needed by the contracted Facility shall be completed by the Facility staff.

2. Any injury to a child shall be documented along with any subsequent treatment. The child's DFCS Worker shall be notified immediately of minor or serious injuries and of the treatment required and/or received. Parental notification of serious injuries or treatment shall be made immediately by the child's DFCS Worker and prior to any visitation.  Serious injuries and other serious incidents shall be reported verbally and followed up in writing to DFCS Director of Congregate Care by the Group Home.

3. In the event that the child runs away, is placed in a detention center, or is hospitalized (acute or residential), or any other emergency facility, the Facility shall immediately

notify verbally and in writing the DFCS Congregate Care Unit, DFCS Worker, and law enforcement, if applicable. Children shall not be discharged to detention facilities, holding facilities, or short-term hospitals. All discharges shall be planned in advance and in compliance with the child's Permanency Plan. Punitive discharges shall not be allowed (discharges cannot be used as punishment for child's behavior). The Facility shall work with the agency to develop an appropriate discharge plan into the least restrictive environment. The Facility shall prepare the child for the move and participate in said move as requested by the County of Responsibility.

4.    A child cannot be sent to a detention center and then be discharged from the Facility/Resource Home unless there are charges and he/she is committed to a training school, incarcerated, or is a danger to self or others. A child shall return to the Facility/Resource Home upon discharge from detention center unless one of these conditions is met. In such incidences, the Group Home shall assist DFCS and the court in getting the child admitted to the appropriate Facility. If the Judge releases the child from the detention center prior to admission to the higher level of care, the Group Home shall maintain the child under close supervision until the transfer can be made.

5.    A child shall not be discharged due to negative behaviors, such as, but not limited to spitting, fighting without weapons, and cursing. Reasons for all discharges shall be sent by the Facility in writing two (2) weeks prior to the discharge to the County of Responsibility. A placement disruption meeting must be scheduled and held prior to any unplanned discharge to ensure that appropriate services and supports have been implemented.

6.    The Group Home/Resource Parent cannot approach the Judge of jurisdiction regarding extending a child's stay at the Facility or discharge from a particular Facility. The DFCS County of Responsibility Worker and ASWS have the authority to approve placements and discharges.

7.    The appropriate law enforcement personnel shall be notified if a child leaves a Facility without permission (runaway). The DFCS Worker shall be immediately notified that the child has left, and the County Social Worker shall file runaway charges or designate Facility personnel to file charges. If a child causes injury to the Facility staff or another resident of the Facility/Resource Home, the Group Home shall notify the DFCS Worker as well as the DFCS Congregate Care Unit and file charges with law enforcement so that the matter can be brought before the Judge of jurisdiction. Payments shall not be made for the night child is absent due to runaway status. Termination will be considered after child has not been located in seven (7) calendar days.

8.    The Facility shall provide copies of progress reports/narrative contacts every other week (bi-weekly) to the child's DFCS Worker. In addition, Monthly Logs shall be submitted to child's DFCS worker by the tenth (10th) of every month which shall include direct (child and family) and indirect (school, employer, court, mental health, etc.) contacts.

9.    Failure to comply with any of these provisions could be considered grounds for termination of the contract.

## E.  OUTCOME REPORTS

The Facility shall submit Monthly Outcome Reports to the DFCS Congregate Care Unit by the tenth (10th) of every month. Unless otherwise indicated, please provide the following outcome measures for each month.

1.    Safety

    a.   Total number children served in the Facility/Resource Home(s) this reporting month
    b.   Total number reports of maltreatment this reporting month
    c.   Total Reports referred to DFCS centralized intake in less than (<) eight (8) hours
    d.   Total reports referred to DFCS centralized intake in < twenty-four (24) hours
    e.   Number of children removed from Facility/Resource Parent(s) due to report of maltreatment
    f.   Number of reports requiring corrective action by the Facility/agency
    g.   Number of corrective action reports submitted to DFCS < 30 days
    h.   Number of runaway episodes
    i.   Number of Serious Incidents

2.    Discharges/Disruptions

    a.   Number of children discharged to a final Permanency Plan outcome
    b.   Percent of children discharged to a final Permanency Plan outcome
    c.   Number of children which the Facility/Resource Parent(s) requested removal of the child
    d.   Number of children which the Facility/Resource Parent(s) requested removal of the child in which a two (2) week notice was not given
    e.   Number of these children for whom a placement disruption meeting was held prior to removal
    f.   Number of children discharged due to unplanned circumstances
    g.   Percent of total children discharged due to unplanned circumstances
    h.   Number of children discharged to a lower level, less restrictive placement
    i.   Percent of children discharged to a lower level, less restrictive placement
    j.   Number of children discharged to a higher level, more restrictive placement
    k.   Percent of children discharged to a higher level, more restrictive placement

3.    Case Planning

    a.   Number of Family Team Meetings/ISP Meetings/Adoption Status Meetings initiated by DFCS and attended by Facility social worker/Resource Parent(s) during the reporting month
    b.   Number of Foster Care Review conferences attended by Facility social worker/Resource Parent(s) during the reporting month

4.    Independent Living

    a.   Number of children greater than (>) 14 years of age served during the reporting month
    b.   Number of Independent Living Skills groups attended by these children during the reporting month
    c.   Number of Independent Living Skills sessions conducted and documented by Facility professional staff/Resource Parent(s)

*Exhibit A, Scope of Services*            7

5.    Child/Parent/Sibling Visitation – Connections

a.  Number of visits between children and their parents/other siblings in care held at the Facility or Resource Home
b.  Number of visits between children and their extended family/siblings not in care/other connections held at the Facility or Resource Home
c.  Number of visits between children/parents/siblings in care/connections in which the Facility staff or Resource Parent(s) provided primary supervision of visits
d.  Number of visits between children/parents/siblings in care/connections in which the Facility staff or Resource Parent(s) provided transportation to the visit site
e.  Number of other events (such as birthdays, school activities, medical/mental health appointments) for which the Facility provided transportation or assisted with arrangements that maintained or strengthened a child's relationship with significant connections
f.  Number of children served whose residence (home from which they were removed) is greater than fifty (50) miles from placement site
g.  Percent of children served whose residence (home from which they were removed) is greater than fifty (50) miles from placement site

6.    Medical/Dental Needs

a.  Number of children served during the reporting month whose initial placement during the current custody episode was in this Facility/Resource Home
b.  Number of these children who received an initial medical assessment within seventy-two (72) hours of custody
c.  Number of these children who received a comprehensive medical exam within thirty (30) days of custody
d.  Number of total children in care for whom an annual medical exam was due during the reporting month
e.  Number of children due annual medical exams who received an annual medical exam
f.  Number of children for whom a semi-annual dental exam was due during the reporting month
g.  Number of children due a semi-annual dental exam who received a dental exam
h.  Number of children who experienced an acute medical episode requiring emergency assessment/treatment or hospitalization
i.  Number of children requiring psychotropic medication
j.  Number of children requiring psychotropic medication who have a written plan of approval from the County of Responsibility for administration of psychotropic medication on file
k.  Number of children ages zero to three (0-3) served during the month by the Facility or Resource Home(s)
l.  Number of children ages zero to three (0-3) who have been referred to the First Steps Early Intervention Program
m.  Number of children zero to three (0-3) who have been assessed by the First Steps Early Intervention Program
n.  Number of children > three (3) years of age who have received a developmental assessment through the Department of Health, Department of Mental Health or private provider
o.  Number of total children served during the reporting month whose recommended schedule of immunizations has been followed

7.    Mental Health

    a.    Number of children four (4) years and older placed in the Facility/Resource Home(s) during the past reporting month

    b.    Number of children four (4) years and older who have a mental health assessment on file

    c.    Number of children whose mental health assessment has determined the need for ongoing or follow up mental health services

    d.    Number of children who receive all mental health services recommended in this assessment

    e.    Number of children screened for Fetal Alcohol Spectrum Disorder

8.    Educational Needs

    a.    Number of school age children entering the Facility during the reporting month

    b.    Number of school age children who were enrolled in an accredited school within three (3) days (with the exception of school holidays and breaks)

    c.    Number of school age children who are able to remain in the same school they attended prior to placement in this Facility/Resource Home

    d.    Number of school age children whose initial placement was in this Facility/Resource Home

    e.    Number of school age children who received an educational assessment during the first thirty (30) days of placement

    f.    Number of children who meet the criteria of "exceptional child" as defined in § 37-23-3 of the Mississippi Code Annotated of 1972

    g.    Number of children who meet the criteria of "exceptional child" as defined in § 37-23-3 of the Mississippi Code Annotated of 1972 who have IEP

    h.    Number of children who meet the criteria of "exceptional child" as defined in § 37-23-3 of the Mississippi Code Annotated of 1972 who receive appropriate special education and related services as contained in the IEP

    i.    Number of IEP conferences attended by Facility social worker(s) and Resource Parents during the reporting month

## Narrative Updates/Progress Reports

The Group Home will provide to the County of Responsibility bi-weekly narrative updates/progress reports on each child served. These updates/reports should address all issues of which DFCS Workers need to be aware. The Monthly Log of contacts will be submitted by the tenth (10th) of every month. Hard copies of any documents such as medical, mental health and educational records should be provided to the County of Responsibility immediately upon receipt by the Facility. The Facility should retain copies of all these documents in the child's file maintained by the Facility. The following documentation details should routinely be addressed in narrative updates and progress reports.

    a.    Documentation of assessment and certification of ongoing child safety- identification of risk, description of safety plans developed, description of staff management of safety plans, documentation of discussions with Facility staff or Resource Parents regarding risk, safety, and actions taken to address risk and safety factors identified

    b.    Documentation of periodic discussion with the child concerning his/her ISP and identification of barriers to achievement of permanency

    c.   Documentation of assessment of and provision for medical, dental, educational and mental health needs based on the child's ISP and requirements of DFCS policy

    d.   Documentation of assessment of and provision for a child's well being and permanency needs to include, but not limited to, the need for continuation of important connections and relationships, need for recreation and socialization, need for mentors and role models, need for development of vocational and family life skills

    e.   Documentation of child/parent-family-sibling visitation; description of how the Facility/Resource Parent(s) contributed to successful visitation as outlined in the child visitation plan; description of any noted safety concerns during visitation

    f.   Documentation clearly demonstrating that the child is actively involved in assessment of needs and case planning activities and discussions

    g.   Documentation of the frequency and quality of visitation between a child and his/her parents/siblings/extended family/significant connections (where were visits conducted, length of visits, quality of transactions occurring during visits, child's reactions before and after visits)

    h.   Documentation of specific Independent Living Services and description of Independent Living Skills activities

    i.   Documentation of examples of educational advocacy for a child by the Facility or Resource Parent

    j.   Documentation of services provided to Resource Parents by the Group Home to ensure that Resource Parents are given necessary support to successfully parent children in DFCS custody

The Division of Family and Children's Services (DFCS) Director of the DFCS Administration Unit, the Director of the DFCS Permanency Unit, the Director of the Continuous Quality Improvement Unit, and the Director of the DFCS Licensure Unit will ensure that the Independent Contractor meets the programmatic quality assurance and licensure requirement criteria. The Division of Program Integrity shall ensure the Independent Contractor further meets all aspects of the contract.

The tools utilized to evaluate these services will be the Licensure Standards and the programmatic reports submitted monthly to report the outcomes as outlined in Section E. Outcome Reports, beginning on page 7 of this Scope of Services.

The services will be evaluated by the Independent Contractor's submission of the required reports and by the Independent Contractor meeting the Licensure Standards. Failure to meet the Licensure Standards will result in loss of payment.

Program Integrity shall perform a site visit as least once a year, more if requested by the Division of Family and Children's Services. The Licensure Unit shall perform an onsite Annual Licensure Review for this Facility as the License is awarded for a one year period. The Licensure Unit shall visit and perform annual facility reviews (at least one review) two (2) months prior to renewal of the License. If this facility is under a Corrective Action Plan (CAP) the Licensure Unit shall perform

a site visit every month the facility is under the CAP.  Also, a licensure investigation shall be conducted after all Abuse Neglect and Exploitation (ANE) investigations.  Therefore, the number of site visits performed by the Licensure Unit depends on the abovementioned circumstances, but at least one (1) site visit shall be performed by the Licensure Unit.

# Ex. 18C

# CONTRACT AGREEMENT
# IMPACT MISSIONS, INC.

**Revised 04/2013**

# STATE OF MISSISSIPPI
## MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
## CONTRACT FOR PERSONAL OR PROFESSIONAL SERVICES

**1.     Parties.**     This Contract is made and entered into by and between the Division of Family and Children's Services, Mississippi Department of Human Services, hereinafter referred to as "MDHS," and Impact Missions, Inc., hereinafter referred to as "Independent Contractor."

**2.     Purpose.**     MDHS hereby engages the Independent Contractor and the Independent Contractor hereby agrees to render certain professional services described in Paragraph 3, "Scope of Services."

**3.     Scope of Services.**     The Independent Contractor shall perform and render the following services, attached hereto as "Exhibit A" and the *Modified Mississippi Settlement Agreement*, attached hereto as "Exhibit B".

**4.     Period of Performance.**  The period of performance of services under this Contract shall begin on July 1, 2013 and end on June 30, 2014.  MDHS shall have the option to renew this Contract at one (1) year intervals for two (2) years at the same terms and conditions.  These one (1) year options to this contract shall end on June 30, 2016.

**5.     Consideration and Method of Payment.**

A.   As consideration of all services and performances under this Contract, Independent Contractor shall be paid a fee not to exceed One Hundred Twenty Five Thousand Seven hundred Ninety-Four Dollars and Zero Cents ($125,794.00).  It is expressly understood and agreed that in no event will the total compensation paid hereunder exceed the specified amount of One Hundred Twenty Five Thousand Seven hundred Ninety-Four Dollars and Zero Cents ($125,794.00). (Exhibit C)

B.  The Independent Contractor will bill MDHS for its services on a monthly basis. Following the satisfactory completion, as determined by MDHS, of its monthly services, the State requires the Independent Contractor to submit invoices electronically throughout the term of the agreement.  Invoices shall be submitted to MDHS using the processes and procedures identified by the State.  The appropriate documentation shall be submitted on the last working day of the month, with the final invoice to be submitted within five (5) working days after the contract ending date.

Payments by state agencies using the Statewide Automated Accounting System (SAAS) shall be made and remittance information provided electronically as directed by the State.  These payments shall be deposited into the bank account of the Independent Contractor's choice.  The State may, at its sole discretion, require the Independent Contractor to submit invoices and supporting documentation electronically, at any time, during the term of this Agreement.  Independent Contractor understands and agrees

that the State is exempt from the payment of taxes. All payments shall be in United States currency.

Independent Contractor agrees to accept all payments in United States currency via the State of Mississippi's electronic payment and remittance vehicle. MDHS agrees to make payment in accordance with Mississippi law on "Timely Payments for Purchases by Public Bodies," Mississippi Code Annotated 31-7-301, et. Seq., which generally provides for payment of undisputed amounts by MDHS within forty-five (45) days of receipt of invoice.

6.    **Relationship of Parties.**

A.    It is expressly understood and agreed that MDHS enters into this Contract with Independent Contractor on a purchase of service basis and not on an employer--employee relationship basis. Nothing contained herein shall be deemed or construed by MDHS, the Independent Contractor, or any third party as creating the relationship of principal and agent, partners, joint venturers, or any similar such relationship between MDHS and the Independent Contractor. Neither the method of computation of fees or other charges, nor any other provision contained herein, nor any acts of MDHS or the Independent Contractor hereunder, creates or shall be deemed to create a relationship other than the independent relationship of MDHS and the Independent Contractor.

B.    Independent Contractor represents that it has, or will secure, at its own expense, applicable personnel who shall be qualified to perform the duty required to be performed under this Contract.

C.    Any person assigned by Independent Contractor to perform the services hereunder shall be the employee of Independent Contractor, who shall have the sole right to hire and discharge its employee. MDHS may, however, direct Independent Contractor to replace any of its employees under this Contract. If Independent Contractor is notified within the first eight (8) hours of assignment that the person is unsatisfactory, Independent Contractor will not charge MDHS for those hours.

D.    It is further understood that the consideration expressed herein constitutes full and complete compensation for all services and performances hereunder, and that any sum due and payable to Independent Contractor shall be paid as a gross sum with no withholdings or deductions being made by MDHS for any purpose from said Contract sum.

E.    Independent Contractor shall pay when due all salaries and wages of its employees, and it accepts exclusive responsibility for the payment of Federal Income Tax, State Income Tax, Social Security, Unemployment Compensation and any other withholdings that may be required.

7.    **Termination for Cause.** If, through any cause, Independent Contractor fails to fulfill in a timely and proper manner, as determined by MDHS, its obligations under this Contract, or if Independent Contractor shall violate any of the covenants, agreements, or stipulations of this Contract, MDHS shall thereupon have the right to

2

terminate the Contract by giving written notice to Independent Contractor of such termination and specifying the effective date thereof at least five (5) days before the effective date of such termination. In the event of such termination, Independent Contractor shall be entitled to receive just and equitable compensation for satisfactory work completed on services or documents or materials collected and/or prepared by Independent Contractor in connection with this Contract. Such compensation shall be based upon the fees set forth in Paragraph 5, but, in no case, shall said compensation exceed the total Contract price.

Notwithstanding the above, Independent Contractor shall not be relieved of liability to MDHS for damages sustained by MDHS by virtue of any breach of this Contract by Independent Contractor, and MDHS may withhold any payments to Independent Contractor for the purpose of set off until such time as the exact damages due to MDHS from Independent Contractor are determined.

8.    **Termination for Convenience of MDHS.**    MDHS may terminate this Contract at any time by giving written notice to Independent Contractor of such termination and specifying the effective date thereof at least five (5) days before the effective date of such termination. Independent Contractor shall be paid an amount which bears the same ratio to the total compensation as the services actually and satisfactorily performed bear to the total services of Independent Contractor covered by the Contract, less payments of compensation previously made.

9.    **Ownership of Documents and Work Products.**    All data collected by Independent Contractor and all documents, notes, programs, data bases (and all applications thereof), files, reports, studies,    and/or other material collected and prepared by Independent Contractor in connection with this Contract shall be the property of MDHS upon completion of this Contract or upon termination of this Contract. MDHS hereby reserves all rights to the data base and all applications thereof and to any and all information and/or materials prepared under this Contract.

The Independent Contractor is prohibited from use of the above described information and/or materials without the express written approval of MDHS.

10.    **Record Retention and Access to Records.** Independent Contractor shall maintain, and make available to MDHS, any State agency authorized to audit MDHS, the federal grantor agency, the Comptroller General of the United States or any of their duly authorized representatives, financial records, supporting documents, statistical records, and all other records pertinent to the services performed under this Contract. These records shall be maintained for at least three (3) years; however, if any litigation or other legal action, by or on behalf of the state or federal government has begun that is not completed at the end of the three-year period, or if audit finding, litigation, or other legal action has not been resolved at the end of the three-year period, the records shall be retained until resolution.

11.    **Modification or Amendment.**    Modifications, changes, or amendments to this Contract may be made upon mutual agreement of the parties hereto. However, any

3

change, supplement, modification, or amendment of any term, provision, or condition of this Contract must be in writing and signed by both parties hereto.

**12.    Assignments and Subcontracts.**    Independent Contractor shall not assign, sublet, or otherwise transfer the obligations incurred on its part pursuant to the terms of this Contract without the prior written consent of MDHS. Any attempted assignment or transfer of its obligation without such consent shall be wholly void.

**13.    Waiver.** Failure of either party hereto to insist upon strict compliance with any of the terms, covenants, and conditions hereof shall not be deemed a waiver or relinquishment of any similar right or power hereunder at any subsequent time or of any other provision hereof, nor shall it be construed to be a modification of the terms of this Contract.

**14.    Availability of Funds.**  It is expressly understood and agreed that the obligation of MDHS to proceed under this Contract is conditioned upon the availability of funds, the appropriation of funds by the Mississippi Legislature, and the receipt of state and/or federal funds. If, at any time, the funds anticipated for the fulfillment of this Contract are not forthcoming or are insufficient, either through the failure of the federal government to provide funds or of the State of Mississippi to appropriate funds or the discontinuance or material alteration of the program under which funds were provided, or if funds are not otherwise available to MDHS for the performance of this Contract, MDHS shall have the right, upon written notice to Independent Contractor, to immediately terminate this Contract without damage, penalty, cost, or expense to MDHS of any kind whatsoever. The effective date of termination shall be as specified in the notice of termination.

**15.    Price Adjustment.**

**A.    Price Adjustment Methods.**  The Contract price may be changed only by written agreement of the parties.  The value of any work covered by any claim for increase or decrease in the Contract Price shall be determined by one or more of the following methods:

> (1)    Unit prices, if any, previously approved by the parties and specified in this Contract; or

> (2)    MDHS may, at any time by written order, make changes in the specifications within the general scope of this Agreement.  If any such change causes an increase in the amount due under this Contract or in the time required for performance under this Agreement and if MDHS decides that the change justifies an adjustment to the Contract, an equitable adjustment in the Contract may be made by written modification of this Agreement.

4

No charge for any extra work or material will be allowed unless the same has been provided for by written amendment to this Contract signed by both parties.

**B.    Submission of Cost Pricing Data.** The Independent Contractor shall provide cost or pricing data for any price adjustments subject to the provisions of Section 3-403 (Cost or Pricing Data) of the Mississippi Personal Service Contract Procurement Regulations.

**16.    Indemnification.** MDHS shall, at no time, be legally responsible for any negligence or wrongdoing by the Independent Contractor and/or its employees, servants, agents, contractors, and/or subcontractors. Independent Contractor agrees to indemnify, defend, save and hold harmless MDHS from and against all claims, demands, liabilities, suits, damages, and costs of every kind and nature whatsoever, including court costs and attorney's fees, arising out of or caused by Independent Contractor and its employees, agents, contractors, and/or subcontractors in the performance of this Contract.

**17.    Insurance.** Independent Contractor represents that it will maintain workers' compensation insurance which shall inure to the benefit of all Independent Contractor's personnel performing services under this Contract, comprehensive general liability insurance, and employee fidelity bond insurance. Independent Contractor will furnish MDHS a certificate of insurance providing the aforesaid coverage, prior to the commencement of performance under this Agreement. (Exhibit D).

**18.    Applicable Law.** The contract shall be governed by and construed in accordance with the laws of the State of Mississippi, excluding its conflicts of laws provisions, and any litigation with respect thereto shall be brought in the courts of the state. The Independent Contractor shall comply with applicable federal, state and local laws and regulations.

**19.    Representation Regarding Contingent Fees.** The Independent Contractor represents that it has not retained a person to solicit or secure a State contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, except as disclosed in the Independent Contractor's bid, proposal, or herein.

**20.    Certification of Independent Price Determination.** The bidder certifies that the prices submitted in response to the solicitation have been arrived at independently and without, for the purpose of restricting competition, any consultation, communication, or agreement with any other bidder or competitor relating to those prices, the intention to submit a bid, or the methods or factors used to calculate the prices bid.

**21.    Representation Regarding Gratuities.** The Independent Contractor represents that neither it nor any officer, employee, agent, subcontractor or other representative of the Independent Contractor has violated, or is violating, and promises that it will not violate the prohibition against gratuities set forth in Section 6-204 (Gratuities) of the Mississippi Personal Service Contract Procurement Regulations.

22.    **Procurement Regulations**. The Contract shall be governed by the applicable provisions of the Personal Service Contract Review Board Regulations, a copy of which is available for inspection at 210 East Capitol Street, Suite 800, Jackson, Mississippi 39201, or downloadable at www.mspb.ms.gov.

23.    **Severability**.  If any term or provision of this Contract is prohibited by the laws of the State of Mississippi or declared invalid or void by a court of competent jurisdiction, the remainder of this Contract shall not be affected thereby and each term and provision of this Contract shall be valid and enforceable to the fullest extent permitted by law.

24.    **Stop Work Order**.

A.    **Order to Stop Work.** The Director of Division of Family and Children's Services, may, by written order to the Independent Contractor at any time, and without notice to any surety, require the Independent Contractor to stop all or any part of the work called for by this Contract. This order shall be for a specified period not exceeding ninety (90) days after the order is delivered to the Independent Contractor, unless the parties agree to any further period. Any such order shall be identified specifically as a stop work order issued pursuant to this clause. Upon receipt of such an order, the Independent Contractor shall forthwith comply with its terms and take all steps to minimize the occurrence of costs allocable to the work covered by the order during the period of work stoppage. Before the stop work order expires, or within any further period to which the parties shall have agreed, the Director of Family and Children's Services shall either:

(1)    cancel the stop work order; or

(2)    terminate the work covered by such order as provided in the "Termination for Cause" clause or the "Termination for Convenience" clause of this Contract.

B.    **Cancellation or Expiration of the Order.**  If a stop work order issued under this clause is canceled at any time during the period specified in the order, or if the period of the order or any extension thereof expires, the Independent Contractor shall have the right to resume work. An appropriate adjustment may be made in the delivery schedule or Independent Contractor's price, or both.  If the stop work order results in an increase in the time required for, or in the Independent Contractor's cost properly allocable to, the performance of any part of this Contract and the Independent Contractor asserts a claim for such an adjustment within 30 days after the end of the period of work stoppage, an equitable adjustment in the Contract may be made by written modification of this Contract.  If MDHS decides that the need justifies the requested adjustment, a modification will be made as provided by Section 12, Modification or Amendment, of this Contract.

C.    **Termination of Stopped Work.** If a stop work order is not canceled and the work covered by such order is terminated for cause or convenience, the

6

Independent Contractor may be paid the agreed upon price for any completed deliverable or service not previously tendered to MDHS, provided that MDHS accepts any such deliverable or service; or Independent Contractor may be paid an amount which bears the same ratio to the total compensation as the services actually and satisfactorily performed bear to the total services of Independent Contractor covered by the Contract, less payments of compensation previously made.

    **D.**    **Adjustment of Price.** Any adjustment in Contract price made pursuant to this clause shall be determined in accordance with the Price Adjustment clause of this Contract.

    **25.**    <u>Disputes</u>. Any dispute concerning a question of fact under this Contract which is not disposed of by agreement shall be decided by the Director of the Division of Family and Children's Services. This decision shall be reduced to writing and a copy thereof mailed or furnished to the Independent Contractor and shall be final and conclusive, unless within thirty (30) days from the date of the decision, Independent Contractor mails or furnishes to the Executive Director of MDHS a written request for review. Pending final decision of the Executive Director of a dispute hereunder, the Independent Contractor shall proceed in accordance with the decision of the Director of the Division of Family and Children's Services.

    In a review before the Executive Director or designee, the Independent Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its position on the question and decision under review. The decision of the Executive Director on the review shall be final and conclusive unless determined by a court of competent jurisdiction in Hinds County, State of Mississippi, to have been fraudulent, capricious, so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence.

    **26.**    <u>Compliance with Laws</u>. The Independent Contractor understands that the State is an equal opportunity employer and therefore maintains a policy which prohibits unlawful discrimination based on race, color, creed, sex, age, national origin, physical handicap, disability, genetic information, or any other consideration made unlawful by federal, State, or local laws. All such discrimination is unlawful and the Independent Contractor agrees during the term of the agreement that the Independent Contractor will strictly adhere to this policy in its employment practices and provision of services. The Independent Contractor shall comply with, and all activities under this agreement shall be subject to, all applicable federal, State of Mississippi, and local laws and regulations, as now existing and as may be amended or modified.

    **27.**    <u>Confidentiality</u>. Independent Contractor shall treat all State data and information to which it has access under this Contract as confidential information to the extent that confidential treatment of same is required under federal and state law and shall not disclose same to a third party without specific written consent of the State. In the event that Independent Contractor receives notice that a third party requests divulgence of confidential or otherwise protected information and/or has served upon it a subpoena or other validly issued administrative or judicial process ordering divulgence of confidential or otherwise protected information, Independent Contractor shall

7

promptly inform the State and thereafter respond in conformity with such subpoena as required by applicable state and/or federal law, rules, and regulations. The provision herein shall survive termination of the Contract for any reason and shall continue in full force and effect and shall be binding upon the Independent Contractor and its agents, employees, successors, assigns, subcontractors, or any party claiming an interest in the Contract on behalf of, or under, the rights of the Independent Contractor following any termination.

    **28.**   **E-Verify.**   Independent Contractor represents and warrants that it will ensure its compliance with the Mississippi Employment Protection Act, Mississippi Code Annotated 71-11-1 and 71-11-3, and will register and participate in the status verification system for all newly hired employees. The term "employee" as used herein means any person that is hired to perform work within the State of Mississippi. As used herein, "status verification system" means the Illegal Immigration Reform and Immigration Responsibility Act of 1996 that is operated by the United States Department of Homeland Security, also known as the E-Verify Program, or any other successor electronic verification system replacing the E-Verify Program. Independent Contractor agrees to maintain records of such compliance and, upon request of the State, to provide a copy of each such verification to the State. Independent Contractor further represents and warrants that any person assigned to perform services hereunder meets the employment eligibility requirements of all immigration laws of the State of Mississippi. Independent Contractor understands and agrees that any breach of these warranties may subject Independent Contractor to the following: (a) termination of this Agreement and ineligibility for any state or public contract in Mississippi for up to three (3) years, with notice of such cancellation/termination being made public, or (b) the loss of any license permit, certification or other document granted to Independent Contractor by an agency, department or governmental entity for the right to do business in Mississippi for up to one (1) year, or both. In the event of such termination/cancellation, Independent Contractor would also be liable for any additional costs incurred by the State due to contract cancellation or loss of "license or permit." (Exhibit E).

    **29.**   **Special Terms and Conditions.** It is agreed and understood by each party to this Contract that there are no special terms and conditions.

    **30.**   **Entire Agreement.**   It is understood and agreed that this Contract and the documents listed below constitute the entire understanding of the parties with respect to the subject matter contained herein and supersede and replace any and all prior negotiations, understandings and agreements, written or oral, between the parties relating thereto. The entire agreement made by and between the parties hereto shall consist of, and precedence is hereby established by the order of, the following documents incorporated herein:

        1.   This Contract signed by the parties herein and any Exhibits attached hereto;

        2.   The Request for Proposals dated March 4, 2013, Response to Proposals dated April 1, 2013, and the Written Clarifications or Answers provided by MDHS.

The documents are complementary, and what is required by one shall be binding as if required by all. A higher document shall supersede a lower order document to the extent necessary to resolve any conflict or inconsistency arising under the various provisions thereof; provided, however, that in no event an issue is addressed in one of the above-mentioned documents but is not addressed in another of such documents, no conflict or inconsistency shall be deemed to occur by reason thereof. The documents listed above are shown in descending order or priority, that is, the highest document begins with the first listed document ("1. This Contract signed by the parties herein and any Exhibits attached hereto") and the lowest document is listed last ("2. The Request for Proposals dated March 4, 2013, Response to Proposals dated April 1, 2013, and the Written Clarifications or Answers provided by MDHS").

**31.    Background Checks.**  All child care facilities which are awarded funds, whether they are awarded funds directly or through contracts with entities who receive funds directly, shall ensure that all their personnel, whether owners, or employees or volunteer workers have first been subjects of criminal background checks. These persons shall not be allowed to operate a facility nor given even provisional employment until the results of said background checks are obtained. The background checks shall be requested by the child care facilities. The expense of these background checks shall not be borne by MDHS but instead by the child care facility which requests the background check.

If it is determined that there is a child care facility which is operated by, or has hired, or accepted as a volunteer, a person with a criminal background, MDHS reserves the right to terminate its Contract with said facility if its Contract was directly with said facility. If the MDHS Contract is with an intermediary facility which has passed the funds through to other facilities, MDHS reserves the right to demand that such intermediary facility terminate its Contract with the non-conforming facility, or the intermediary facility may face termination of its Contract with MDHS.

**32.    Non-Compete.**  For the term of this contract and for a period of two (2) years thereafter, Impact Missions, Inc., hereby agrees not to directly or indirectly engage in competition in any way with MDHS or to associate with the state business or other business that may compete with MDHS. The term "competition" as used in the foregoing shall include, but not limited to, attempts to divert workers, clients, suppliers, or accounts from MDHS and/or attempt to induce employees of MDHS to terminate their employment. MDHS hereby agrees to enforce the provisions of the Non-Compete Agreement by any legal means. Such means shall include the right to enjoin by legal process for violating provisions hereof.

**33.    Conflict of Interest.**  Independent Contractor shall ensure that there exists no direct or indirect conflict of interest in the performance of this contract and/or performance by any of the Independent Contractor's Contractors/Subcontractors. Independent Contractor hereby warrants that no part of any federal or state money shall be paid directly or indirectly to an employee or official of MDHS as wages, compensation or gifts exchange for acting as an officer, agent, employee, subcontractor, or consultant to the Independent Contractor in connection with any work

contemplated or pertaining to this Independent Contractor Agreement. Independent Contractor shall strictly comply with all conflict of interest provisions or standards of conduct provisions contained in any applicable state, federal, or local law, rule, or regulation.

**34.   Transparency.**   This contract, including any accompanying exhibits, attachments, and appendices, is subject to the "Mississippi Public Records Act of 1983," codified as section 25-61-1 et seq., Mississippi Code Annotated and exceptions found in Section 79-23-1 of the Mississippi Code Annotated (1972, as amended). In addition, this contract is subject to the provisions of the Mississippi Accountability and Transparency Act of 2008 (MATA), codified as Section 31-7-13 of the Mississippi Code Annotated (1972, as amended). Unless exempted from disclosure due to a court-issued protective order, this contract is required to be posted to the Department of Finance and Administration's independent agency contract website for public access. Prior to posting the contract to the website, any information identified by the Contractor as trade secrets, or other proprietary information including confidential vendor information, or any other information which is required confidential by state or federal law or outside the applicable freedom of information statutes will be redacted.

35.  **Notice.**  Any notice required or permitted to be given under this Contract shall be in writing and sent by United States Certified Mail, Returned Receipt Requested to the party to whom the notice should be given at the address set forth below:

**MDHS:**    Mr. Richard A. Berry, Executive Director
Mississippi Department of Human Services
P.O. Box 352
Jackson, Mississippi 39205

**IMPACT MISSIONS, INC.:**    Mr. David Donaldson, Chief Executive Officer
Impact Missions, Inc.
5699 Getwell Road, Bldg H, Suite 1
Southaven, Mississippi 38672

**IN WITNESS WHEREOF**, this Contract has been made and interchangeably executed by the parties hereto in duplicate originals.

Witness my signature this, the 25th day of June, 2013.

**MISSISSIPPI DEPARTMENT OF HUMAN SERVICES**

BY: _____

TITLE: Deputy Executive Director

**WITNESSES:**

_____

_____

Witness my signature this, the 25th day of June, 2013.

**IMPACT MISSIONS, INC.**

BY: _____
                Signature

Printed Name: David R. Donaldson

TITLE: President / CEO

**WITNESSES:**

_____

Carmen N. Taylor, LMFT, MSHA

11

# SCOPE OF SERVICES
# IMPACT MISSIONS, INC.

Scope of Services

Impact Missions, Inc.

July 1, 2013 – June 30, 2014

Impact Missions, Inc. is currently licensed by the Mississippi Department of Human Services (MDHS).

A. Service  Definitions

Impact Missions, Inc. shall be paid the regular group home care board rate according to the age of the child and accordance with the MDHS/DCFS policy (attachment).

All services provided shall comply with all applicable federal and State of Mississippi laws, and regulations, as now existing and may be amended or modified.

1. Group Homes

Impact Missions, Inc. shall provide services to girls in MDHS custody ages ten (10) to twenty-one (21) years.  Impact Missions, Inc. may serve girls younger than ten (10), upon written approval by the Regional Director, when they are siblings of a resident over the age of 10.  Children under the age of ten (10) shall be placed in group homes or other congregate care facilities no longer than forty-five (45) cumulative days.  Impact Missions, Inc. understands that under RFP contract a license shall be issued to serve this age range.

Impact Missions, Inc. provides residential services to children and adolescents who are capable of functioning satisfactorily in a group care setting.  The purpose of Impact Missions Inc. is to provide a safe and structured environment and adult supervision.  Impact Missions, Inc. utilizes professional and direct care staff as mentors and role models to help girls to develop appropriate relationships with other girls, peers and adults and to develop skills necessary for successful independence.

Impact Missions, Inc. provides specific therapeutic, educational, and recreational activities to help girls make permanent connections to either return to their families, transition to a less restrictive setting or transition to independent living.   Impact Missions, Inc. partners with other child –serving agencies to meet the needs of the girls served.  Impact Missions, Inc. shall prepare girls to step down as soon as possible to family or Resource Family placements   Impact Missions, Inc. works in accordance with the DCFS Permanency Plan for the girls served.  All discharges shall be planned and related to the Permanency Plan.  Discharges are never punitive.  A

viable family resource shall be identifies on each girl's discharge plan. The family resource placements shall be approved by the girl's DCFS worker. No family member shall be recruited or allowed contact with the child without prior written permission form the DCFS County of Responsibility.

B. Staffing

Impact Missions, Inc. provides direct care and professional staff around the clock, in accordance with the Licensing requirements for Residential Child Care Agencies and Child Placing Agencies which includes a full-time social worker.

C. Service Activities

Impact Missions, Inc. complies with the following service activities. The delivery of the services adequately addresses children's safety, permanency, emotional, social, health and educational needs.

1. Services are provided in the least restrictive environment that is appropriate to the individual girl's strengths and needs. An array of services needed to meet the girl's needs is identified by Impact Missions, Inc.

2. Services reflect best practices that are culturally responsive and designed to provide for the unique needs of each girl served. Impact Missions, Inc. complies with the Multi-Ethnic Placement Act which prohibits the denying or delaying placement of a girl on the basis of race, color or natural origin of the girl. These factors are applied on an individualized basis and not by general rules.

3. Impact Missions, Inc. works with the County of Responsibility to develop treatment plans, goals and services to address these goals Behavior management plans are developed jointly for each child.

4. Impact Missions, Inc. provides services twenty-four (24) hours per day seven (7) days per week, three hundred sixty-five (365) days per year. Payment shall be made only for the actual nights a girl spends at Impact Missions, Inc. except in cases of leave for the purpose of enhancing the probability of family reunification, adoption or kinship care. The per diem payment shall not interrupt under the following provisions:

    a. All leave shall have prior written approval by the DCFS County of Responsibility.

    b. The child shall not be absent from the Impact Missions, Inc. for a consecutive twenty-four (24) hour period which constitutes a leave day.

    c. Leave days shall be limited to visits that emphasize enhancing family reunification, adoption, or kinship care placements. Leave does not include Independent Living activities such as conferences, retreats and special camps.

d.  The leave days shall not exceed a total of eighteen (18) days during a contract period; and shall be contingent upon the child returning to the Impact Missions, Inc. at the conclusion of each visit.

e.  All leave shall have prior written approval by the DCFS County of Responsibility along with approval from the child's court of jurisdiction when it is required.

f.  Documentation shall be provided to include the goals of enhancing family reunification, adoption, or kinship care placements, duration of the leave, participants and outcome(s) of the leave. This documentation shall be prepared by Impact Missions, Inc., with a copy being placed in the resident's file and the original submitted monthly to the DCFS County of Responsibility by the tenth (10th) working day of each month.

g.  Leave shall not include overnight stays in Acute Care Hospitals, Residential Treatment Centers, Detention Centers, or any other placements funded through other resources.

5. Siblings shall be placed together whenever possible, if referred to Impact Missions, Inc. Impact Missions, Inc. shall provide written justification if siblings are not placed together. A visitation plan will be included in the written verification.

6. The delivery of services must be in close proximity to the girl's County Of Responsibility.

7. Medical/Dental/Mental Health Assessment shall be secured by Impact Missions, Inc. on every applicable girl in custody of MDHS admitted to Impact Missions, Inc. Also, Impact Missions, Inc. shall maintain an immunization schedule meeting the health needs of the girl and the requirements of the State Department of Health. Medicaid providers shall be obtained for all medical and dental services. Medications will be administered and monitored by assigned staff of Impact Missions, Inc. signed authorization for the administration of psychotropic medications will be secured from the County of Responsibility prior to the administration of any psychotropic medications. A schedule of yearly medical exams and semi-annual dental exams will be maintained by Impact Missions, Inc. Initial medicals, dentals and mental health assessment shall be provided as required by DFCS policies. An initial medical exam is due seventy-two (72) hours from the time of initial custody. Ongoing routine medicals shall be performed by the anniversary date of the girl's comprehensive medical exam and dental exams six (6) months from the anniversary date of the child's initial dental exam. Mental health assessments are required on all children age four and above within thirty (30) calendar days of the date of custody, and ongoing assessments and identified mental health treatments shall be provided for all children requiring these therapeutic services.

*Exhibit A, Scope of Services*                    3

8. Appropriate educational services shall be provided by accredited schools. Educable Child Funds shall be pursued on each child through the Mississippi Department of Education (MDE) by Impact Missions, Inc. The allowed cost for education should be billed through MDE for the girl eligible for these funds. Impact Missions, Inc. will assist in getting girls ruled who are not currently eligible by completing the MDE Educable Child application (pink form). Education costs shall not be billed to DFCS. Developmental assessments will be secured for all girls ages zero to three (0-3) and for girls older than three when there is suspicion of any developmental delays. Educational services shall include, but not be limited to, based on the girl's Individual Service Plan (ISP), tutoring, monitoring a child's educational progress and making contact with teachers and other educational personnel at least quarterly, attendance at Individual Education Plan (IEP) conferences, educational advocacy and ongoing communication with the County of Responsibility regarding the girl's educational goals and progress. Assistance with GED and/or college or vocational preparation should be addressed in girl's educational plans.

9. Impact Missions, Inc. shall engage all youth ages fourteen-twenty (14-20) in Independent living activities regardless of the placement. Impact Missions, Inc. shall arrange for Skills groups to be conducted at the home or designated location and shall provide transportation top skill group activities sponsored by other sources or entities. In addition, Impact Missions, Inc. shall develop with each child and assigned DFCS staff, an Individualized plan to prepare the teen for Independence.

10. A clothing inventory shall be completed by Impact Missions, Inc. and DCS worker at the time of admission and upon discharge. Impact Missions, Inc. and the DFCS worker must verify at admission and upon discharge the items the child is bringing to or taking from the home. Replacement clothing for girls shall be provided at part of the per diem. The replacement clothing amount shall be equal to or greater than the amount designated by the DFCS Foster Board Breakdown according to the age of the girl. Special clothing needs will be discussed with the assigned County of Responsibility Social Worker. In some situations, special items can be purchased with prior written approval from the Regional Director and with the county reimbursement made directly to the clothing vendor.

11. Hygiene supplies and monthly allowance shall be provided through the per diem rate by Impact Missions, Inc. The girl's monthly allowance shall be equal to or greater than the amount designated by the DFCS Foster Board Breakdown according to the age of the child.

12. Impact Missions, Inc. shall coordinate with the County of Responsibility to meet the child's needs to maintain and strengthen permanent connections through; a) the visitation plan, b) an ongoing evaluation and identification of connections with the

child, c) transportation for visits and special events, d) arranging for visits at the Facility or other approved site and e) counseling with the girl regarding any grief and loss due to separation from important connections.

13. Impact Missions, Inc.,  Home For Girls shall provide all necessary transportation for the child, including but not limited to transportation to and from school, to and from work, off-site consultations, visits with parents/siblings/extended kin/connections, Adoption recruitment activities, therapy and/or medical treatment and not provided by Impact Missions, Inc. needed Independent Living activities and other appointments unless prior arrangement has been made with the girl's DFCS Worker.

14. Any injury to a girl shall be documented along with any subsequent treatment.  The child's DFCS Worker shall be notified of minor or serious injuries and of the treatment required and/or received.  Parental notification of serious injuries or treatment shall be made immediately by the girl's DFCS Worker and prior to and visitation.  Serious injuries and other serious incidents shall be reported verbally and followed up in writing to DFCS Congregate Care Director by the Impact Missions, Inc.

15. All photographs including videos, media presentations and publications require an Order of Limited Disclosure from the girl's Youth Court Judge.  In addition written consent shall be obtained from the DFCS County of Responsibility, the child, the natural parents, if available, and the Guardian ad litem.

16.  There must be a minimum of one face-to-face site visit monthly with the girl in the Resource Home and a second monthly contact with the girl at any appropriate location.

17. There must be at least one face-to-face contact with the Resource Parent monthly.

D.  <u>Services Assurance/Protocols</u>

1. Impact Mission, Inc. shall make its application form available and the application shall be completed by the DFCS worker prior to admission to the home.  Impact Missions, Inc. shall keep blank copies on file for emergency situations when the DFCS staff has not completed one prior to placement of the girl.  In these instances, the DFCS Staff shall complete the form with as much information known and forward all remaining documentation to the home as soon as possible,  A copy of the application shall be filed in the child's case record,  Any additional formed needed by the home shall be completed by Impact Missions, Inc. staff.

2. In the event that the girl runs away, is placed in a detention center, or is hospitalized (acute or residential), or any other emergency facility, Impact Missions, Inc. shall

notify verbally and in writing the DFCS Congregate Care Unit, DFCS worker and law enforcement if applicable. Girls shall not be discharged to detention facilities, holding facilities, or short-term hospitals. All discharges shall be planned in advance and in compliance with the girl's Permanency Plan. Punitive discharges shall not be allowed. Impact Missions, Inc. shall work with the agency to develop appropriate discharge plan into the least restrictive environment. Impact Missions, Inc. shall prepare the girl for the move and participate in said move as requested by the County of Responsibility.

## OUTCOME REPORTS

The Facility shall submit Monthly Outcome Reports to the DFCS Congregate Care Unit by the tenth (10th) of every month. Unless otherwise indicated, please provide the following outcome measures for each month.

1. **Safety**
   a. Total number children served in the Facility/Resource Home(s) this reporting month
   b. Total number reports of maltreatment this reporting month
   c. Total Reports referred to DFCS centralized intake in less than (<) eight (8) hours
   d. Total reports referred to DFCS centralized intake in < twenty-four (24) hours
   e. Number of children removed from Facility/Resource Parent(s) due to report of maltreatment
   f. Number of reports requiring corrective action by the Facility/agency
   g. Number of corrective action reports submitted to DFCS < 30 days
   h. Number of runaway episodes
   i. Number of Serious Incidents

2. **Discharges/Disruptions**
   a. Number of children discharged to a final Permanency Plan outcome
   b. Percent of children discharged to a final Permanency Plan outcome
   c. Number of children which the Facility/Resource Parent(s) requested removal of the child
   d. Number of children which the Facility/Resource Parent(s) requested removal of the child in which a two (2) week notice was not given
   e. Number of these children for whom a placement disruption meeting was held prior to removal
   f. Number of children discharged due to unplanned circumstances
   g. Percent of total children discharged due to unplanned circumstances
   h. Number of children discharged to a lower level, less restrictive placement
   i. Percent of children discharged to a lower level, less restrictive placement
   j. Number of children discharged to a higher level, more restrictive placement
   k. Percent of children discharged to a higher level, more restrictive placement

3.      **Case Planning**
   a.   Number of Family Team Meetings/ISP Meetings/Adoption Status Meetings initiated by DFCS and attended by Facility social worker/Resource Parent(s) during the reporting month
   b.   Number of Foster Care Review conferences attended by Facility social worker/Resource Parent(s) during the reporting month

4.      **Independent Living**
   a.   Number of children greater than (>) 14 years of age served during the reporting month
   b.   Number of Independent Living Skills groups attended by these children during the reporting month
   c.   Number of Independent Living Skills sessions conducted and documented by Facility professional staff/Resource Parent(s)

5.      **Child/Parent/Sibling Visitation – Connections**
   a.   Number of visits between children and their parents/other siblings in care held at the Facility or Resource Home
   b.   Number of visits between children and their extended family/siblings not in care/other connections held at the Facility or Resource Home
   c.   Number of visits between children/parents/siblings in care/connections in which the Facility staff or Resource Parent(s) provided primary supervision of visits
   d.   Number of visits between children/parents/siblings in care/connections in which the Facility staff or Resource Parent(s) provided transportation to the visit site
   e.   Number of other events (such as birthdays, school activities, medical/mental health appointments) for which the Facility provided transportation or assisted with arrangements that maintained or strengthened a child's relationship with significant connections
   f.   Number of children served whose residence (home from which they were removed) is greater than fifty (50) miles from placement site
   g.   Percent of children served whose residence (home from which they were removed) is greater than fifty (50) miles from placement site

6.      **Medical/Dental Needs**
   a.   Number of children served during the reporting month whose initial placement during the current custody episode was in this Facility/Resource Home
   b.   Number of these children who received an initial medical assessment within seventy-two (72) hours of custody
   c.   Number of these children who received a comprehensive medical exam within thirty (30) days of custody
   d.   Number of total children in care for whom an annual medical exam was due during the reporting month

e.  Number of children due annual medical exams who received an annual medical exam

f.  Number of children for whom a semi-annual dental exam was due during the reporting month

g.  Number of children due a semi-annual dental exam who received a dental exam

h.  Number of children who experienced an acute medical episode requiring emergency assessment/treatment or hospitalization

i.  Number of children requiring psychotropic medication

j.  Number of children requiring psychotropic medication who have a written plan of approval from the County of Responsibility for administration of psychotropic medication on file

k.  Number of children ages zero to three (0-3) served during the month by the Facility or Resource Home(s)

l.  Number of children ages zero to three (0-3) who have been referred to the First Steps Early Intervention Program

m.  Number of children zero to three (0-3) who have been assessed by the First Steps Early Intervention Program

n.  Number of children > three (3) years of age who have received a developmental assessment through the Department of Health, Department of Mental Health or private provider

o.  Number of total children served during the reporting month whose recommended schedule of immunizations has been followed


7.  **Mental Health**
    a.  Number of children four (4) years and older placed in the Facility/Resource Home(s) during the past reporting month

    b.  Number of children four (4) years and older who have a mental health assessment on file

    c.  Number of children whose mental health assessment has determined the need for ongoing or follow up mental health services

    d.  Number of children who receive all mental health services recommended in this assessment

    e.  Number of children screened for Fetal Alcohol Spectrum Disorder


8.  **Educational Needs**
    a.  Number of school age children entering the Facility during the reporting month

    b.  Number of school age children who were enrolled in an accredited school within three (3) days (with the exception of school holidays and breaks)

    c.  Number of school age children who are able to remain in the same school they attended prior to placement in this Facility/Resource Home

    d.  Number of school age children whose initial placement was in this Facility/Resource Home

    e.  Number of school age children who received an educational assessment

during the first thirty (30) days of placement

   f.   Number of children who meet the criteria of "exceptional child" as defined in § 37-23-3 of the Mississippi Code Annotated of 1972

   g.   Number of children who meet the criteria of "exceptional child" as defined in § 37-23-3 of the Mississippi Code Annotated of 1972 who have IEP

   h.   Number of children who meet the criteria of "exceptional child" as defined in § 37-23-3 of the Mississippi Code Annotated of 1972 who receive appropriate special education and related services as contained in the IEP

   i.   Number of IEP conferences attended by Facility social worker(s) and Resource Parents during the reporting month

## Narrative Updates/Progress Reports

The Contractor will provide to the County of Responsibility bi-weekly narrative updates/progress reports on each child served. These updates/reports should address all issues of which DFCS Workers need to be aware. The Monthly Log of contacts will be submitted by the tenth (10th) of every month. Hard copies of any documents such as medical, mental health and educational records should be provided to the County of Responsibility immediately upon receipt by the Facility. The Facility should retain copies of all these documents in the child's file maintained by the Facility. The following documentation details should routinely be addressed in narrative updates and progress reports.

   a.   Documentation of assessment and certification of ongoing child safety-identification of risk, description of safety plans developed, description of staff management of safety plans, documentation of discussions with Facility staff or Resource Parents regarding risk, safety, and actions taken to address risk and safety factors identified

   b.   Documentation of periodic discussion with the child concerning his/her ISP and identification of barriers to achievement of permanency

   c.   Documentation of assessment of and provision for medical, dental, educational and mental health needs based on the child's ISP and requirements of DFCS policy

   d.   Documentation of assessment of and provision for a child's well being and permanency needs to include, but not limited to, the need for continuation of important connections and relationships, need for recreation and socialization, need for mentors and role models, need for development of vocational and family life skills

e. Documentation of child/parent-family-sibling visitation; description of how the Facility/Resource Parent(s) contributed to successful visitation as outlined in the child visitation plan; description of any noted safety concerns during visitation

f. Documentation clearly demonstrating that the child is actively involved in assessment of needs and case planning activities and discussions

g. Documentation of the frequency and quality of visitation between a child and his/her parents/siblings/extended family/significant connections (where were visits conducted, length of visits, quality of transactions occurring during visits, child's reactions before and after visits)

h. Documentation of specific Independent Living Services and description of Independent Living Skills activities

i. Documentation of examples of educational advocacy for a child by the Facility or Resource Parent

j. Documentation of services provided to Resource Parents by the Contractor to ensure that Resource Parents are given necessary support to successfully parent children in DFCS custody

The Division of Family and Children's Services (DFCS) Director of the DFCS Administration Unit, the Director of the DFCS Permanency Unit, the Director of the Continuous Quality Improvement Unit, and the Director of the DFCS Licensure Unit will ensure that the Independent Contractor meets the programmatic quality assurance and licensure requirement criteria**.** The Division of Program Integrity shall ensure the Independent Contractor further meets all aspects of the contract.

The tools utilized to evaluate these services will be the Licensure Standards and the programmatic reports submitted monthly to report the outcomes as outlined in Section E. Outcome Reports, beginning on page 7 of this Scope of Services.

The services will be evaluated by the Independent Contractor's submission of the required reports and by the Independent Contractor meeting the Licensure Standards. Failure to meet the Licensure Standards will result in loss of payment.

Program Integrity shall perform a site visit as least once a year, more if requested by the Division of Family and Children's Services. The Licensure Unit shall perform an onsite Annual Licensure Review for this Facility as the License is awarded for a one year period. The Licensure Unit shall visit and perform annual facility reviews (at least one review) two (2) months prior to renewal of the License. If this facility is under a Corrective Action Plan

(CAP) the Licensure Unit shall perform a site visit every month the facility is under the CAP. Also, a licensure investigation shall be conducted after all Abuse Neglect and Exploitation (ANE) investigations.  Therefore, the number of site visits performed by the Licensure Unit depends on the abovementioned circumstances, but at least one (1) site visit shall be performed by the Licensure Unit.

# Ex. 18D

# CONTRACT AGREEMENT

# GARDNER SIMMONS HOME FOR GIRLS, INC

# Contract

Revised 04/2013

# STATE OF MISSISSIPPI
## MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
## CONTRACT FOR PERSONAL OR PROFESSIONAL SERVICES

**1.**    **Parties.**    This Contract is made and entered into by and between the Division of Family and Children's Services, Mississippi Department of Human Services, hereinafter referred to as "MDHS," and Gardner-Simmons Home for Girls, Inc., hereinafter referred to as "Independent Contractor."

**2.**    **Purpose.**    MDHS hereby engages the Independent Contractor and the Independent Contractor hereby agrees to render certain professional services described in Paragraph 3, "Scope of Services."

**3.**    **Scope of Services.**    The Independent Contractor shall perform and render the following services, attached hereto as "Exhibit A" and the *Modified Mississippi Settlement Agreement*, attached hereto as "Exhibit B".

**4.**    **Period of Performance.**    The period of performance of services under this Contract shall begin on July 1, 2013 and end on June 30, 2014. MDHS shall have the option to renew this Contract at one (1) year intervals for two (2) years at the same terms and conditions. These one (1) year options to this contract shall end on June 30, 2016.

**5.**    **Consideration and Method of Payment.**

A.    As consideration of all services and performances under this Contract, Independent Contractor shall be paid a fee not to exceed Three Hundred Twenty Six Thousand Eight Hundred Fifty Dollars and Twenty Cents ($326,850.20). It is expressly understood and agreed that in no event will the total compensation paid hereunder exceed the specified amount of Three Hundred Twenty Six Thousand Eight Hundred Fifty Dollars and Twenty Cents ($326,850.20). (Exhibit C)

B. The Independent Contractor will bill MDHS for its services on a monthly basis. Following the satisfactory completion, as determined by MDHS, of its monthly services, the State requires the Independent Contractor to submit invoices electronically throughout the term of the agreement. Invoices shall be submitted to MDHS using the processes and procedures identified by the State. The appropriate documentation shall be submitted on the last working day of the month, with the final invoice to be submitted within five (5) working days after the contract ending date.

Payments by state agencies using the Statewide Automated Accounting System (SAAS) shall be made and remittance information provided electronically as directed by the State. These payments shall be deposited into the bank account of the Independent Contractor's choice. The State may, at its sole discretion, require the Independent Contractor to submit invoices and supporting documentation electronically, at any time, during the term of this Agreement. Independent Contractor understands and agrees

that the State is exempt from the payment of taxes. All payments shall be in United States currency.

Independent Contractor agrees to accept all payments in United States currency via the State of Mississippi's electronic payment and remittance vehicle. MDHS agrees to make payment in accordance with Mississippi law on "Timely Payments for Purchases by Public Bodies," Mississippi Code Annotated 31-7-301, et. Seq., which generally provides for payment of undisputed amounts by MDHS within forty-five (45) days of receipt of invoice.

## 6.    Relationship of Parties.

A.    It is expressly understood and agreed that MDHS enters into this Contract with Independent Contractor on a purchase of service basis and not on an employer--employee relationship basis. Nothing contained herein shall be deemed or construed by MDHS, the Independent Contractor, or any third party as creating the relationship of principal and agent, partners, joint venturers, or any similar such relationship between MDHS and the Independent Contractor. Neither the method of computation of fees or other charges, nor any other provision contained herein, nor any acts of MDHS or the Independent Contractor hereunder, creates or shall be deemed to create a relationship other than the independent relationship of MDHS and the Independent Contractor.

B.    Independent Contractor represents that it has, or will secure, at its own expense, applicable personnel who shall be qualified to perform the duty required to be performed under this Contract.

C.    Any person assigned by Independent Contractor to perform the services hereunder shall be the employee of Independent Contractor, who shall have the sole right to hire and discharge its employee. MDHS may, however, direct Independent Contractor to replace any of its employees under this Contract. If Independent Contractor is notified within the first eight (8) hours of assignment that the person is unsatisfactory, Independent Contractor will not charge MDHS for those hours.

D.    It is further understood that the consideration expressed herein constitutes full and complete compensation for all services and performances hereunder, and that any sum due and payable to Independent Contractor shall be paid as a gross sum with no withholdings or deductions being made by MDHS for any purpose from said Contract sum.

E.    Independent Contractor shall pay when due all salaries and wages of its employees, and it accepts exclusive responsibility for the payment of Federal Income Tax, State Income Tax, Social Security, Unemployment Compensation and any other withholdings that may be required.

7.    **Termination for Cause.** If, through any cause, Independent Contractor fails to fulfill in a timely and proper manner, as determined by MDHS, its obligations under this Contract, or if Independent Contractor shall violate any of the covenants, agreements, or stipulations of this Contract, MDHS shall thereupon have the right to

2

terminate the Contract by giving written notice to Independent Contractor of such termination and specifying the effective date thereof at least five (5) days before the effective date of such termination. In the event of such termination, Independent Contractor shall be entitled to receive just and equitable compensation for satisfactory work completed on services or documents or materials collected and/or prepared by Independent Contractor in connection with this Contract. Such compensation shall be based upon the fees set forth in Paragraph 5, but, in no case, shall said compensation exceed the total Contract price.

Notwithstanding the above, Independent Contractor shall not be relieved of liability to MDHS for damages sustained by MDHS by virtue of any breach of this Contract by Independent Contractor, and MDHS may withhold any payments to Independent Contractor for the purpose of set off until such time as the exact damages due to MDHS from Independent Contractor are determined.

8.    **Termination for Convenience of MDHS.**   MDHS may terminate this Contract at any time by giving written notice to Independent Contractor of such termination and specifying the effective date thereof at least five (5) days before the effective date of such termination. Independent Contractor shall be paid an amount which bears the same ratio to the total compensation as the services actually and satisfactorily performed bear to the total services of Independent Contractor covered by the Contract, less payments of compensation previously made.

9.    **Ownership of Documents and Work Products.**   All data collected by Independent Contractor and all documents, notes, programs, data bases (and all applications thereof), files, reports, studies,   and/or other material collected and prepared by Independent Contractor in connection with this Contract shall be the property of MDHS upon completion of this Contract or upon termination of this Contract. MDHS hereby reserves all rights to the data base and all applications thereof and to any and all information and/or materials prepared under this Contract.

The Independent Contractor is prohibited from use of the above described information and/or materials without the express written approval of MDHS.

10.    **Record Retention and Access to Records.** Independent Contractor shall maintain, and make available to MDHS, any State agency authorized to audit MDHS, the federal grantor agency, the Comptroller General of the United States or any of their duly authorized representatives, financial records, supporting documents, statistical records, and all other records pertinent to the services performed under this Contract. These records shall be maintained for at least three (3) years; however, if any litigation or other legal action, by or on behalf of the state or federal government has begun that is not completed at the end of the three-year period, or if audit finding, litigation, or other legal action has not been resolved at the end of the three-year period, the records shall be retained until resolution.

11.    **Modification or Amendment.**  Modifications, changes, or amendments to this Contract may be made upon mutual agreement of the parties hereto. However, any

change, supplement, modification, or amendment of any term, provision, or condition of this Contract must be in writing and signed by both parties hereto.

**12.    Assignments and Subcontracts.**    Independent Contractor shall not assign, sublet, or otherwise transfer the obligations incurred on its part pursuant to the terms of this Contract without the prior written consent of MDHS. Any attempted assignment or transfer of its obligation without such consent shall be wholly void.

**13.    Waiver.** Failure of either party hereto to insist upon strict compliance with any of the terms, covenants, and conditions hereof shall not be deemed a waiver or relinquishment of any similar right or power hereunder at any subsequent time or of any other provision hereof, nor shall it be construed to be a modification of the terms of this Contract.

**14.    Availability of Funds.**    It is expressly understood and agreed that the obligation of MDHS to proceed under this Contract is conditioned upon the availability of funds, the appropriation of funds by the Mississippi Legislature, and the receipt of state and/or federal funds. If, at any time, the funds anticipated for the fulfillment of this Contract are not forthcoming or are insufficient, either through the failure of the federal government to provide funds or of the State of Mississippi to appropriate funds or the discontinuance or material alteration of the program under which funds were provided, or if funds are not otherwise available to MDHS for the performance of this Contract, MDHS shall have the right, upon written notice to Independent Contractor, to immediately terminate this Contract without damage, penalty, cost, or expense to MDHS of any kind whatsoever. The effective date of termination shall be as specified in the notice of termination.

**15.    Price Adjustment.**

**A.    Price Adjustment Methods.**  The Contract price may be changed only by written agreement of the parties.  The value of any work covered by any claim for increase or decrease in the Contract Price shall be determined by one or more of the following methods:

(1)    Unit prices, if any, previously approved by the parties and specified in this Contract; or

(2)    MDHS may, at any time by written order, make changes in the specifications within the general scope of this Agreement.  If any such change causes an increase in the amount due under this Contract or in the time required for performance under this Agreement and if MDHS decides that the change justifies an adjustment to the Contract, an equitable adjustment in the Contract may be made by written modification of this Agreement.

4

No charge for any extra work or material will be allowed unless the same has been provided for by written amendment to this Contract signed by both parties.

**B.    Submission of Cost Pricing Data.** The Independent Contractor shall provide cost or pricing data for any price adjustments subject to the provisions of Section 3-403 (Cost or Pricing Data) of the Mississippi Personal Service Contract Procurement Regulations.

**16.    Indemnification.** MDHS shall, at no time, be legally responsible for any negligence or wrongdoing by the Independent Contractor and/or its employees, servants, agents, contractors, and/or subcontractors. Independent Contractor agrees to indemnify, defend, save and hold harmless MDHS from and against all claims, demands, liabilities, suits, damages, and costs of every kind and nature whatsoever, including court costs and attorney's fees, arising out of or caused by Independent Contractor and its employees, agents, contractors, and/or subcontractors in the performance of this Contract.

**17.    Insurance.**   Independent Contractor represents that it will maintain workers' compensation insurance which shall inure to the benefit of all Independent Contractor's personnel performing services under this Contract, comprehensive general liability insurance, and employee fidelity bond insurance.  Independent Contractor will furnish MDHS a certificate of insurance providing the aforesaid coverage, prior to the commencement of performance under this Agreement. (Exhibit D).

**18.    Applicable Law.**  The contract shall be governed by and construed in accordance with the laws of the State of Mississippi, excluding its conflicts of laws provisions, and any litigation with respect thereto shall be brought in the courts of the state.  The Independent Contractor shall comply with applicable federal, state and local laws and regulations.

**19.    Representation Regarding Contingent Fees.** The Independent Contractor represents that it has not retained a person to solicit or secure a State contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, except as disclosed in the Independent Contractor's bid, proposal, or herein.

**20.    Certification of Independent Price Determination.**  The bidder certifies that the prices submitted in response to the solicitation have been arrived at independently and without, for the purpose of restricting competition, any consultation, communication, or agreement with any other bidder or competitor relating to those prices, the intention to submit a bid, or the methods or factors used to calculate the prices bid.

**21.    Representation Regarding Gratuities.** The Independent Contractor represents that neither it nor any officer, employee, agent, subcontractor or other representative of the Independent Contractor has violated, or is violating, and promises that it will not violate the prohibition against gratuities set forth in Section 6-204 (Gratuities) of the Mississippi Personal Service Contract Procurement Regulations.

5

22.    **Procurement Regulations.** The Contract shall be governed by the applicable provisions of the Personal Service Contract Review Board Regulations, a copy of which is available for inspection at 210 East Capitol Street, Suite 800, Jackson, Mississippi 39201, or downloadable at www.mspb.ms.gov.

23.    **Severability.**  If any term or provision of this Contract is prohibited by the laws of the State of Mississippi or declared invalid or void by a court of competent jurisdiction, the remainder of this Contract shall not be affected thereby and each term and provision of this Contract shall be valid and enforceable to the fullest extent permitted by law.

24.    **Stop Work Order.**

A.    **Order to Stop Work.** The Director of Division of Family and Children's Services, may, by written order to the Independent Contractor at any time, and without notice to any surety, require the Independent Contractor to stop all or any part of the work called for by this Contract. This order shall be for a specified period not exceeding ninety (90) days after the order is delivered to the Independent Contractor, unless the parties agree to any further period. Any such order shall be identified specifically as a stop work order issued pursuant to this clause. Upon receipt of such an order, the Independent Contractor shall forthwith comply with its terms and take all steps to minimize the occurrence of costs allocable to the work covered by the order during the period of work stoppage. Before the stop work order expires, or within any further period to which the parties shall have agreed, the Director of Family and Children's Services shall either:

(1)    cancel the stop work order; or

(2)    terminate the work covered by such order as provided in the "Termination for Cause" clause or the "Termination for Convenience" clause of this Contract.

B.    **Cancellation or Expiration of the Order.**  If a stop work order issued under this clause is canceled at any time during the period specified in the order, or if the period of the order or any extension thereof expires, the Independent Contractor shall have the right to resume work. An appropriate adjustment may be made in the delivery schedule or Independent Contractor's price, or both.  If the stop work order results in an increase in the time required for, or in the Independent Contractor's cost properly allocable to, the performance of any part of this Contract and the Independent Contractor asserts a claim for such an adjustment within 30 days after the end of the period of work stoppage, an equitable adjustment in the Contract may be made by written modification of this Contract.  If MDHS decides that the need justifies the requested adjustment, a modification will be made as provided by Section 12, Modification or Amendment, of this Contract.

C.    **Termination of Stopped Work.** If a stop work order is not canceled and the work covered by such order is terminated for cause or convenience, the

Independent Contractor may be paid the agreed upon price for any completed deliverable or service not previously tendered to MDHS, provided that MDHS accepts any such deliverable or service; or Independent Contractor may be paid an amount which bears the same ratio to the total compensation as the services actually and satisfactorily performed bear to the total services of Independent Contractor covered by the Contract, less payments of compensation previously made.

     **D.**    **Adjustment of Price.** Any adjustment in Contract price made pursuant to this clause shall be determined in accordance with the Price Adjustment clause of this Contract.

     **25.**    **Disputes.** Any dispute concerning a question of fact under this Contract which is not disposed of by agreement shall be decided by the Director of the Division of Family and Children's Services. This decision shall be reduced to writing and a copy thereof mailed or furnished to the Independent Contractor and shall be final and conclusive, unless within thirty (30) days from the date of the decision, Independent Contractor mails or furnishes to the Executive Director of MDHS a written request for review. Pending final decision of the Executive Director of a dispute hereunder, the Independent Contractor shall proceed in accordance with the decision of the Director of the Division of Family and Children's Services.

     In a review before the Executive Director or designee, the Independent Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its position on the question and decision under review. The decision of the Executive Director on the review shall be final and conclusive unless determined by a court of competent jurisdiction in Hinds County, State of Mississippi, to have been fraudulent, capricious, so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence.

     **26.**    **Compliance with Laws.** The Independent Contractor understands that the State is an equal opportunity employer and therefore maintains a policy which prohibits unlawful discrimination based on race, color, creed, sex, age, national origin, physical handicap, disability, genetic information, or any other consideration made unlawful by federal, State, or local laws. All such discrimination is unlawful and the Independent Contractor agrees during the term of the agreement that the Independent Contractor will strictly adhere to this policy in its employment practices and provision of services. The Independent Contractor shall comply with, and all activities under this agreement shall be subject to, all applicable federal, State of Mississippi, and local laws and regulations, as now existing and as may be amended or modified.

     **27.**    **Confidentiality.** Independent Contractor shall treat all State data and information to which it has access under this Contract as confidential information to the extent that confidential treatment of same is required under federal and state law and shall not disclose same to a third party without specific written consent of the State. In the event that Independent Contractor receives notice that a third party requests divulgence of confidential or otherwise protected information and/or has served upon it a subpoena or other validly issued administrative or judicial process ordering divulgence of confidential or otherwise protected information, Independent Contractor shall

promptly inform the State and thereafter respond in conformity with such subpoena as required by applicable state and/or federal law, rules, and regulations. The provision herein shall survive termination of the Contract for any reason and shall continue in full force and effect and shall be binding upon the Independent Contractor and its agents, employees, successors, assigns, subcontractors, or any party claiming an interest in the Contract on behalf of, or under, the rights of the Independent Contractor following any termination.

28.    **E-Verify.**    Independent Contractor represents and warrants that it will ensure its compliance with the Mississippi Employment Protection Act, Mississippi Code Annotated 71-11-1 and 71-11-3, and will register and participate in the status verification system for all newly hired employees. The term "employee" as used herein means any person that is hired to perform work within the State of Mississippi. As used herein, "status verification system" means the Illegal Immigration Reform and Immigration Responsibility Act of 1996 that is operated by the United States Department of Homeland Security, also known as the E-Verify Program, or any other successor electronic verification system replacing the E-Verify Program. Independent Contractor agrees to maintain records of such compliance and, upon request of the State, to provide a copy of each such verification to the State. Independent Contractor further represents and warrants that any person assigned to perform services hereunder meets the employment eligibility requirements of all immigration laws of the State of Mississippi. Independent Contractor understands and agrees that any breach of these warranties may subject Independent Contractor to the following: (a) termination of this Agreement and ineligibility for any state or public contract in Mississippi for up to three (3) years, with notice of such cancellation/termination being made public, or (b) the loss of any license permit, certification or other document granted to Independent Contractor by an agency, department or governmental entity for the right to do business in Mississippi for up to one (1) year, or both. In the event of such termination/cancellation, Independent Contractor would also be liable for any additional costs incurred by the State due to contract cancellation or loss of "license or permit." (Exhibit E).

29.    **Special Terms and Conditions.** It is agreed and understood by each party to this Contract that there are no special terms and conditions.

30.    **Entire Agreement.**    It is understood and agreed that this Contract and the documents listed below constitute the entire understanding of the parties with respect to the subject matter contained herein and supersede and replace any and all prior negotiations, understandings and agreements, written or oral, between the parties relating thereto. The entire agreement made by and between the parties hereto shall consist of, and precedence is hereby established by the order of, the following documents incorporated herein:

    1.   This Contract signed by the parties herein and any Exhibits attached hereto;

    2.   The Request for Proposals dated March 4, 2013, Response to Proposals dated April 1, 2013, and the Written Clarifications or Answers provided by MDHS.

The documents are complementary, and what is required by one shall be binding as if required by all. A higher document shall supersede a lower order document to the extent necessary to resolve any conflict or inconsistency arising under the various provisions thereof; provided, however, that in no event an issue is addressed in one of the above-mentioned documents but is not addressed in another of such documents, no conflict or inconsistency shall be deemed to occur by reason thereof. The documents listed above are shown in descending order or priority, that is, the highest document begins with the first listed document ("1. This Contract signed by the parties herein and any Exhibits attached hereto") and the lowest document is listed last ("2. The Request for Proposals dated March 4, 2013, Response to Proposals dated April 1, 2013, and the Written Clarifications or Answers provided by MDHS").

     **31.**    **Background Checks.** All child care facilities which are awarded funds, whether they are awarded funds directly or through contracts with entities who receive funds directly, shall ensure that all their personnel, whether owners, or employees or volunteer workers have first been subjects of criminal background checks. These persons shall not be allowed to operate a facility nor given even provisional employment until the results of said background checks are obtained. The background checks shall be requested by the child care facilities. The expense of these background checks shall not be borne by MDHS but instead by the child care facility which requests the background check.

     If it is determined that there is a child care facility which is operated by, or has hired, or accepted as a volunteer, a person with a criminal background, MDHS reserves the right to terminate its Contract with said facility if its Contract was directly with said facility. If the MDHS Contract is with an intermediary facility which has passed the funds through to other facilities, MDHS reserves the right to demand that such intermediary facility terminate its Contract with the non-conforming facility, or the intermediary facility may face termination of its Contract with MDHS.

     **32.**    **Non-Compete.** For the term of this contract and for a period of two (2) years thereafter, Gardner-Simmons Home for Girls, Inc., hereby agrees not to directly or indirectly engage in competition in any way with MDHS or to associate with the state business or other business that may compete with MDHS. The term "competition" as used in the foregoing shall include, but not limited to, attempts to divert workers, clients, suppliers, or accounts from MDHS and/or attempt to induce employees of MDHS to terminate their employment. MDHS hereby agrees to enforce the provisions of the Non-Compete Agreement by any legal means. Such means shall include the right to enjoin by legal process for violating provisions hereof.

     **33.**    **Conflict of Interest.** Independent Contractor shall ensure that there exists no direct or indirect conflict of interest in the performance of this contract and/or performance by any of the Independent Contractor's Contractors/Subcontractors. Independent Contractor hereby warrants that no part of any federal or state money shall be paid directly or indirectly to an employee or official of MDHS as wages, compensation or gifts exchange for acting as an officer, agent, employee, subcontractor, or consultant to the Independent Contractor in connection with any work

9

contemplated or pertaining to this Independent Contractor Agreement. Independent Contractor shall strictly comply with all conflict of interest provisions or standards of conduct provisions contained in any applicable state, federal, or local law, rule, or regulation.

      **34.**   **Transparency.**   This contract, including any accompanying exhibits, attachments, and appendices, is subject to the "Mississippi Public Records Act of 1983," codified as section 25-61-1 et seq., Mississippi Code Annotated and exceptions found in Section 79-23-1 of the Mississippi Code Annotated (1972, as amended). In addition, this contract is subject to the provisions of the Mississippi Accountability and Transparency Act of 2008 (MATA), codified as Section 31-7-13 of the Mississippi Code Annotated (1972, as amended). Unless exempted from disclosure due to a court-issued protective order, this contract is required to be posted to the Department of Finance and Administration's independent agency contract website for public access. Prior to posting the contract to the website, any information identified by the Contractor as trade secrets, or other proprietary information including confidential vendor information, or any other information which is required confidential by state or federal law or outside the applicable freedom of information statutes will be redacted.

35.    **Notice.**  Any notice required or permitted to be given under this Contract shall be in writing and sent by United States Certified Mail, Returned Receipt Requested to the party to whom the notice should be given at the address set forth below:

**MDHS:**                          Mr. Richard A. Berry, Executive Director
                                   Mississippi Department of Human Services
                                   P.O. Box 352
                                   Jackson, Mississippi 39205

**GARDNER-SIMMONS HOME**
**FOR GIRLS, INC.:**               Mr. Shane Robbins, Executive Director
                                   Gardner-Simmons Home for Girls, Inc.
                                   Post Office Box 935
                                   Tupelo, Mississippi 38802

**IN WITNESS WHEREOF**, this Contract has been made and interchangeably executed by the parties hereto in duplicate originals.

Witness my signature this, the ___25___ day of ___June___, 2013.

### MISSISSIPPI DEPARTMENT OF HUMAN SERVICES

BY: _____
                    Signature

TITLE: _____

WITNESSES:

_____

_____

Witness my signature this, the ___19___ day of ___June___, 2013.

### GARDNER-SIMMONS HOME FOR GIRLS, INC.

BY: _____
                    Signature

Printed Name: ___Shane Robbins___

TITLE: ___Executive Director___

WITNESSES:

_____

_____

11

# SCOPE OF SERVICES

# GARDNER SIMMONS HOME FOR GIRLS, INC

**GARDNER-SIMMONS HOME FOR GIRLS**
**SCOPE OF SERVICES**
**JULY 1, 2013 – JUNE 30, 2014**

## I.  MATERNITY HOME

In 1988, the Garner-Simmons Home for Girls 'stepped up' to meet the needs of abused, abandoned, or neglected girls in the community. In recent years, it has become evident that, due to changes in legal requirements involving the placement of adolescent children in group homes, that the need for the Girls Home as has existed for twenty-four (24) years is no longer present as it once was. In 2011, the board of directors began a serious study of existing needs within the community to target with its existing personnel and facilities.  In the summer of 2012, it was decided that the Gardner-Simmons Home for Girls, Inc., would once again rise to the occasion to address a prevalent need within its community - a home for girls who find themselves in crisis pregnancies and are in need of residential placement.

**The Gardner-Simmons Group Home will contract with the Mississippi Department of Human Services Department of Family and Children's Services to provide residential care in a home-like environment to girls ages 12-21 who are pregnant or have delivered their first child, that child is under 3 years of age and they are in need of a residential placement.** The program will seek to provide assistance to appropriate medical care through collaborative agreements within the community and provide on-site individual and group therapy through a state-licensed clinical social worker. Additional mentoring opportunities will also be provided through community and civic volunteers. Staff will continue to focus on providing an appropriate level of structure and activity to meet the emotional and behavioral needs of the residents.

## A.  Admission Criteria

The home will receive referrals from both MDHS for children in state custody as well as private referrals not in state custody. Potential female residents must be in their first pregnancy and ranging in age from twelve (12) to twenty-one (21) years of age. The home will accept residents who are planning to keep their baby or those who are planning to place their baby for adoption. The Gardner-Simmons Home for Girls is not a licensed adoption agency but will assist other agencies or personnel through the adoption process through providing ongoing emotional support to the resident and facilitating through the process, providing transportation to related appointments as necessary.

The Gardner-Simmons Home for Girls, Inc., does not discriminate on the basis of race, creed, or ethnicity. However, since the Gardner-Simmons Home for Girls is not equipped to meet the needs of certain girls and referrals may be deemed inappropriate for admission if they have one of the following needs:  severe mental retardation; chronic substance abuse; need for in-patient care or residential treatment; or a serious medical condition that makes it unsafe for the resident to live in a group home setting.

Applications will be received from social service agencies in the state of Mississippi. Inquiries for admission should be made by calling or faxing the Associate Director/Group Home Coordinator. A completed application form must be received prior to a resident's admission into the facility.

Once an application is received, the Gardner-Simmons Home Placement committee will meet on the application and, if necessary, schedule a pre-placement interview. It will be determined prior to the admission that the placement is appropriate for the referral in accordance with the established purpose and function of the Gardner Summons Group Home for Girls, Inc. Upon completion of this procedure, the Associate Director/Group Home Coordinator will notify the referring agency within 24 hours of the decision of the placement committee. A date and time will then be scheduled for admission into the group home.

Additional required information from the referring agency includes:

1. Social Summary
2. Psychological Evaluation
3. Medical history (including  a physical exam completed within last 30 days)
4.  Communicable Disease Statement
5. Dental Exam (within last 6 months)
6. School records (withdrawal form or last report card)
7. Immunization record
8. Copy of Birth Certificate
9. Copy of Social Security Card
10. Medicaid Card
11. Court Order
12. Copy of the DHS Case Plan/Permanency Plan (if in MDHS custody)
13. Signed Placement Agreement with signed Consent for Treatment Forms

## B.  Programming

The Maternity Home program will be staffed to meet or exceed the minimum requirements required by the MDHS Licensing standards for maternity group homes. The group home program is a residential home with its services provided twenty-four (24) hours a day, 365 days a year. The Associate Director/Group Home Coordinator will serve as the full-time social worker in the home, working a forty (40)-hour salaried position and has an office placed within the home for greater access from group home residents and direct care staff. The Associate Director/Group Home remains on-call twenty-four (24) hours a day for any emergencies that should arise at the home.

Each resident who is admitted into the program will go through a resident orientation to learn about the program structure, schedules, expectations, and behavioral program. The resident will learn about what they can expect from the group home staff as well as expectations group home staff will have for the resident. The resident will also be oriented to the B.R.I.C. (Building Responsibility, Independence, and Character) Program guidelines that allow the resident to earn increased privileges and independence within the home based on demonstrated responsible behavior and positive character. All guidelines are written in a positive "kid-friendly" language and presented in such a way that each resident understands.

All services are provided in a culturally responsible manner and designed to meet the unique needs of the child. The Gardner-Simmons Home for Girls, Inc. does not discriminate on the basis of race, creed, or ethnicity.

**C. Daily Living Policy and Procedures**

The Gardner Simmons Home for Girls provides an array of services to meet the daily living needs of the residents within its care. All services are provided in the least restrictive environment that is appropriate to the individual child's needs and strengths. This includes (but is not limited to):

- Case Plans - Each resident has a written case plan with stated goals and steps for the attainment of these goals. Goals will include goals related to the ISP as well as individual behavioral goals, educational goals, and goals toward independent living or relative placement. This plan is developed with the child's primary DFCS worker within thirty (30) days of placement in the girl's home program. It is signed by all parties and revised every six months or as needed.

- Health & Nutritional Services

  o Medical Care – The Girls Home Coordinator ensures that all program residents have access to routine medical care to address illnesses or routine medical needs. All medical intervention is communicated to the child's primary DFCS worker.

  o Collaborative service agreement* initiated with:

    Dr. Ronnie Young
    OBGYN Associates
    1793 Cliff Gookin Blvd.
    Tupelo, Mississippi

    *OBGYN Associates will agree to provide medical services through a collaborative agreement that utilizes Healthy Start, a comprehensive prenatal medical health service that provides 24-hour medical care by licensed nurse practitioners:

    Healthy Start
    602 Brunson Drive
    Tupelo, MS 38801

  o Nursing education & training will be provided on-site to the residents and staff through a contract agreement with an RN. The resident education will center on topics such as healthy eating, prenatal care, and physical care for their newborn. Training will also be provided to staff to address quality of care issues from a medical perspective.

  o Dental Care – The Girls Home Coordinator also has a planned program for the dental health of each resident that will be consistently followed. This includes, at minimum, a dental exam at least every six months.

  o Psycho-Social Program – Individual and group therapy will be provided in the home by a licensed clinical social worker to address psychosocial issues and resident functioning.

- Educational Services

    o All residents will work on an educational plan to include public school, a G.E.D. program, or a work-skills development program (e.g. cosmetology, computer programming, etc.) If the resident is a minor, this plan is approved by the parent/guardian or the child's primary DFCS worker.

    o The Home will arrange for specialized training and education as needed to include remedial education or vocational education with community agencies. This includes transportation to needed classes and appointments.

    o The home has a formed collaborative relationship with the Tupelo Public School district which provides tutors for the residents of the Girls Home for designated study times. Residents can also take advantage of the Tupelo High School educational program designed for pregnant teens.

- Spiritual Enrichment

    o The Girls Home provides opportunities for residents to participate in religiously affiliated programs and services. Residents are encouraged but not coerced into participation and alternative activities will be provided when necessary.

    o The Gardner Simmons Home for Girls is not affiliated with a particular religion or religious domination and residents are free to choose her religious affiliation as desired.

    o The Girls Home will provide spiritual enrichment opportunities to residents through volunteer groups who sign up to conduct meetings at the home as well as participation in outside church services.

- Independent living Activities

    o It is important for residents to have a successful transition from the home back to the community so this will be a focus from day one of admission. All residents in MDHS custody ages fourteen (14) and older will engage in Independent Living activities including skills groups either conducted at the agency or at a designated location. Each resident's case plan will address goals and objectives toward independent living.

- Additional Policies

    o Resident's Rights – Residents are informed of their rights upon admission and sign a form that they are aware of their rights as a resident of the group home. Group home staff take every effort to ensure that resident rights are respected at all times.

o Grievance Procedures – A resident can present a grievance at any time she is not satisfied with a situation at the group home and can be done so without fear of disciplinary action or retaliation. All meetings on grievances will be held in private.  Each grievance is investigated by the Girls Home Coordinator and the findings reported to the Executive Director and the child's parents or MDHS Social worker as necessary. A copy of the findings will be placed in the resident's file.

o Hygiene supplies and monthly allowance are provided through the per diem rate by the Contractor. Allowances are provided for all children per MDHS Licensing guidelines.

o Transportation – All transportation needs for residents of the home are provided by the Gardner Simmons group home through licensed and insured drivers.

o Appropriate records are kept on site and in a resident's case file to include all documentation as required by MDHS Licensing standards. This includes (but is not limited to) medication logs, clothing inventory, report of serious incidents (which are forwarded to the resident's DFCS worker), and the bi-weekly summary reports. Bi-weekly summary reports are forwarded to the child's DFCS worker and a copy kept in the resident's case file. These reports include a documented review of the resident's:

- Documented Safety Issues for the resident
- Work on the resident's ISP
- Documentation of the resident's involvement in identifying needs and case planning
- Current Placement Issues/Behavioral Report
- Medical/Dental Needs Addressed
- Psychological/Emotional Needs & How Addressed
- Emotional/Developmental Needs & How Addressed
- Family Visitation During the Month
- Additional Related Information as Necessary
- Documentation of participation in Independent Living Skills activities including those programs provided through the state by local community organizations

o Monthly Agency Outcome Reports – The facility shall submit a Monthly Outcome Report to the DFCS Congregate Care Unit by the 10th day of each working day of each month. This report will include the following as indicated in the RFP Exhibit B document:

- Safety
- Discharges/Disruptions
- Case Planning
- Independent Living Activities
- Child/Parent/Sibling Visitation – Connections

- Medical/Dental Needs Addressed
- Mental Health Needs Addressed
- Educational Needs Addressed

**D. Delivery**

An employee of the Gardner-Simmons Home for Girls will accompany each resident throughout the time of delivery to assist in communication of needs to medical personnel. If applicable, the parents/guardians or MDHS social worker will be notified immediately upon the time a resident begins having contractions with regular updates given as contractions increase in frequency/intensity. Administrative staff will be notified as well and steps will be taken to ensure proper coverage is obtained for the resident's delivery as well as for other residents within the home.

**E. Discharge**

Discharge planning for each resident begins from the day of admission. The group home coordinator works closely with the child's parents or primary DFCS worker to develop a case plan that addresses the permanency plan and allows the resident to work on goals and objectives toward their long-term living arrangement. Ideally, all discharges will be planned out over time and will involve the resident's parent or primary DFCS worker throughout the process.

Discharges will never be used as a form of punitive intervention, nor will residents be threatened in that regard. Discharges will be conducted in conjunction with the child's parent or primary DFCS worker and any unplanned discharges will include only those made due to a documented safety risk on the part of a resident or other residents placed within the home. At that time, the group home will work with the parent or child's DFCS worker to develop an appropriate discharge plan into an appropriate placement level. The group home will then prepare the child for the move and participate in transitional as reasonably expected. All discharge criteria and procedures will be implemented to align with MDHS licensing standards for non-therapeutic residential group homes.

**F. Post-Delivery**

An employee of the Gardner-Simmons Home for Girls will be available for the resident while hospitalized after delivery. Assistance will be provided to the resident in caring for the child, however, the emphasis will be on the resident learning the necessary skills to care for their child with the Gardner-Simmons staff coaching the resident on the skills to provide the appropriate level of parental care.

A resident who chooses to keep her newborn child can remain at the home for a period of up to six (6) months post delivery. This is to assist the resident in developing the necessary skills to provide long-term care for her child and address any post-partum emotional needs. During this time, a crib will be brought into the resident's room for her child. The mother will not be allowed to have the child in her own bed as a precautionary measure. Rocking chairs and quiet areas will be provided in the home to ensure an appropriate environment for a young mother and her newborn. The mother will be monitored closely to ensure that she is providing appropriate care to

her child and she will receive the needed coaching from staff to ensure success. Emphasis will be placed on the resident learning the skills necessary to be a successful mother. The resident will remain responsible for the child's care up until discharge with staff coaching the resident as needed. A report will be made to the parent, guardian, or DHS social worker at discharge to notify them of the resident's ability to successfully and independently care for the health and welfare of their new baby.

Although the resident can remain at the home with her child for up to six months, discharge planning began upon her initial admission and steps will have already been underway to transition the resident to long-term residency as soon as possible as long as it is in the best interests of the resident.

Residents who choose adoption for their newborn child and return to the home without their child can remain in the home for up to three (3) months to deal with any physical or emotional post-partum needs as well as address any emotional issues in counseling related to placing their child for adoption.

## II.  FOSTER CARE/RESOURCE HOMES

The Gardner-Simmons Group Home will contract with the Mississippi Department of Human Services Department of Family and Children's Services to continue to provide resource homes to the local MDHS Department of Family and Children's Services offices by recruiting, licensing, training, and helping to develop a support system for private foster families to provide, care, and nurture boys and girls, ages 0-18 years who have been removed from their home.

### A.  Intake and Admissions

The primary focus of this Agency's Foster Home Program is on children from Northeast Mississippi. The age and gender of children placed is dependent upon the specific license of foster parents in our program.  We seek to have a broad range of placement possibilities available.

The intake process includes the following steps:

1. To refer a child for foster home placement, the MDHS DFCS worker shall complete an application for admission with our Agency.  This application calls for an attachment of a number of documents regarding the potential foster child.

2. Gardner-Simmons Foster Home Case Manager will dialogue with appropriate personnel from the DFCS worker and other appropriate individuals in an effort to determine whether the child's need for placement services can be met by this Agency.

3. When appropriate and possible, the Foster Home Case Manager shall interview the potential foster child prior to placement.

4. After careful study and assessment of the child's background and needs, as well as review of placement options available in our program, the Foster Home Case Manager will assess whether a successful placement is likely.

Factors to consider in the determination of whether the child can be accepted for placement include, but are not limited to the following:

1. Availability- The Foster Home Program Case Manager will review the homes in our program to determine if a family exists, whose license accommodates a child of the gender, age, and race of the potential foster child.

2. Compatibility – An assessment will be made, based on the lifestyle, composition, temperament, etc. of available foster homes as to the likelihood that a placement can be facilitated in which child and family are compatible.

3. The medical and psychological condition of children who exhibit extreme behavior problems or symptoms of severe mental health disturbances would not be considered appropriate placements. Likewise, children with severe physical handicaps or conditions whose medical needs are such that continual nursing care is required would not be appropriate referrals for this foster home program.

   After careful consideration of all factors, the Foster Home Program Case Manager will determine if a placement can be made which will offer the child maximum benefit and one in which his physical, emotional, medical and social needs can be met to the fullest extent possible. The DFCS worker will be notified as soon as possible whether the application for admission can be approved.

   Authority for the final decision regarding placement rests with the Executive Director of Gardner-Simmons Home for Girls, Inc.

**B.  Case Plan**

If the decision is made to accept the child for foster home placement, the process will be the Gardner-Simmons Foster Home Program Case Manager, DFCS worker, appropriate family members, and when appropriate, the child will meet to determine a case plan. A semi-annual review of this plan shall occur involving these same parties. Additionally, monthly conferences regarding each case shall occur between the Foster Home Program Case Manager and the Executive director of Gardner-Simmons. The case plan shall address all items specified in the Licensing Standards of the Department of Human Services and shall be developed within 30 days of placement.

**C.  Program Services**

In order to facilitate successful placements within resource homes, the implementation of support services will be provided for each foster child through collaborative efforts by this agency along with the foster child's DFCS worker. These services include, but are not limited to the following:

a. Medical Examination – Every child shall be given a medical examination prior to or within 30 days of placement. A medical report will be completed by the examining physician and retained in the child's case file.

b. Medical Services- All medical needs, including vision and dental, shall be addressed. The Gardner-Simmons Foster Home Program Case Manager will provide a location and a

referral service when needed to ensure the foster family is able to help the child avail him or herself of needed health care services.

c.  Psychological Services – Every foster child shall be administered a psychological evaluation should the need be apparent following the initial evaluation, this service shall be made available to the child.

d.  Support Services- Basic to the goal of quality foster family home care is the provision of support services including counseling, transportation, and referral services for foster children.  The Agency's intention is not to offer direct service to the child's biological parents (with the exception of assisting, when called for, in arranging visitation between child and parents).  However, the Agency would be willing to work with the biological parents through the Custody Holder in such cases that would be beneficial to the foster child.

e.  Counseling Service – Through regular, on-going contact between the Foster Home Program Case Manager, foster parents, and foster child, problems with the placement should become apparent and the Case Manager should be prepared to offer counseling to assist the family in working through whatever difficulty exists.  Should problems or needs arise which are outside the Foster Home Program Case Manager's realm of expertise, referral to an appropriate resource should be made.

f.  Referral Service – In order to be effective in provision of referral service, the Foster Home Program Case Manager should be able to help foster parent and/or child avail themselves of these resources.

g.  Transportation – The responsibility of arranging transportation for the foster child belongs to the foster family.  There may be times, however, when the Foster Home Program Case Manager will need to provide assistance with transporting a child in order for him to receive services from various community resources.

h.  Advocacy – In interacting on behalf of the foster child with various community resources such as schools, physicians, therapists, etc., the Foster Home Program Case Manager will act as an advocate for the child and will seek to have his best interest served.

i.  Special Needs – There may be occasions when special purchases need to be made for the foster child.  This will be particularly true at Christmas time, the beginning of the school year, and other special events.  The foster parents will obtain prior approval before making extra purchases of this type if seeking reimbursement.

j.  Case Management – The Foster Home Program Case Manager is responsible for maintaining complete and current case files for each child in foster care.

k.  Visiting Home – The Agency recognizes that parents function more effectively if respite time is allowed from the constant demands of parenting.  This is true of parenting biological children as well as foster children.  With this in mind, the Agency would like, when possible, to make available to foster parents a Visiting Home to function as host to the foster child on an occasional basis.  As with the children at the group home, a specific visiting home would be arranged for each child for whom the service is desired. The use of a visiting home must receive prior written approval from the child's primary DFCS worker before being utilized.

**D.  Discharge/Termination Services**

The decision to terminate foster care placement may originate with the Legal Custody Holder, Gardner-Simmons Home for Girls, Inc., or the foster parents. Discharges will never be used as a form of punitive intervention, nor will residents be threatened in that regard. When this occurs, the Foster Home Program Case Manager will make every effort to identify and alternative foster

home if one is available. The Foster Home Program Case Manager will work closely with the child's primary DFCS to help identify an alternative placement and assist with needed transitions.

Aftercare – Contact either by phone or in person shall be made with a representative of the agency holding custody after a child is removed from foster care. This follow-up will continue for a reasonable length of time in order to determine the progress and welfare of the child.

### E. Foster Home Licensing

a. Foster Home Application

The first step in the foster home application process is the initial meeting between the prospective foster parents and the Gardner-Simmons Foster Home Program Staff. The Agency's intention during this initial meeting is to gain as much information and understanding as possible of the applicant's family make-up, lifestyle, and suitability for the Foster Care Program. The Foster Home Case Manager should be able to give the applicants some insights about whether foster care is something they wish to pursue and if so, the number, ages, and gender of foster children that would best compliment their family.

If the prospective applicants wish to follow through with the application process, they should complete the application and return it to the Agency.

b. Foster Home Study

The foster home study is initiated by completion of the Foster Home Application by the applicants. The following steps must also be completed before an application can be accepted or rejected:

1. Home Inspection
2. Reference/Background Checks
3. Medical Examination
4. Water Supply Test and Sewage Disposal System
5. Marriage Verification
6. Income Verification
7. Investigate & Confirm Child Care/Educational facilities

### F. Foster Home Training

Upon approval and licensure, the next step in the process for foster parents is orientation and training. The purpose for training is to ensure that foster parents have a clear understanding of their roles and relationships with the Agency and with the child, and are familiar with Agency policies and procedures, including: confidentiality, discipline, abuse and neglect, as well as to provide them with information they need to be effective parents. Initially, the foster parents will be educated through a training program that is approved by the Mississippi State Department of Human Services. Participation in this training is mandatory for all foster parents.

Further training will be offered according to the individual child's needs as well as annual training for all active families.  Topics to be addressed may include sexual abuse, resolving conflicts, the impact of foster care on biological children, and stress management.

## III.    OUTCOME REPORTS

The Facility shall submit Monthly Outcome Reports to the DFCS Congregate Care Unit by the tenth (10th) of every month. Unless otherwise indicated, please provide the following outcome measures for each month.

1.    Safety
   a.   Total number children served in the Facility/Resource Home(s) this reporting month
   b.   Total number reports of maltreatment this reporting month
   c.   Total Reports referred to DFCS centralized intake in less than (<) eight (8) hours
   d.   Total reports referred to DFCS centralized intake in < twenty-four (24) hours
   e.   Number of children removed from Facility/Resource Parent(s) due to report of maltreatment
   f.   Number of reports requiring corrective action by the Facility/agency
   g.   Number of corrective action reports submitted to DFCS < 30 days
   h.   Number of runaway episodes
   i.   Number of Serious Incidents

2.    Discharges/Disruptions
   a.   Number of children discharged to a final Permanency Plan outcome
   b.   Percent of children discharged to a final Permanency Plan outcome
   c.   Number of children which the Facility/Resource Parent(s) requested removal of the child
   d.   Number of children which the Facility/Resource Parent(s) requested removal of the child in which a two (2) week notice was not given
   e.   Number of these children for whom a placement disruption meeting was held prior to removal
   f.   Number of children discharged due to unplanned circumstances
   g.   Percent of total children discharged due to unplanned circumstances
   h.   Number of children discharged to a lower level, less restrictive placement
   i.   Percent of children discharged to a lower level, less restrictive placement
   j.   Number of children discharged to a higher level, more restrictive placement
   k.   Percent of children discharged to a higher level, more restrictive placement

3.    Case Planning
   a.   Number of Family Team Meetings/ISP Meetings/Adoption Status Meetings initiated by DFCS and attended by Facility social worker/Resource Parent(s) during the reporting month
   b.   Number of Foster Care Review conferences attended by Facility social worker/Resource Parent(s) during the reporting month

4.    Independent Living
   a.   Number of children greater than (>) 14 years of age served during the reporting month
   b.   Number of Independent Living Skills groups attended by these children during the reporting month

c.   Number of Independent Living Skills sessions conducted and documented by Facility professional staff/Resource Parent(s)

5.   Child/Parent/Sibling Visitation – Connections
a.   Number of visits between children and their parents/other siblings in care held at the Facility or Resource Home
b.   Number of visits between children and their extended family/siblings not in care/other connections held at the Facility or Resource Home
c.   Number of visits between children/parents/siblings in care/connections in which the Facility staff or Resource Parent(s) provided primary supervision of visits
d.   Number of visits between children/parents/siblings in care/connections in which the Facility staff or Resource Parent(s) provided transportation to the visit site
e.   Number of other events (such as birthdays, school activities, medical/mental health appointments) for which the Facility provided transportation or assisted with arrangements that maintained or strengthened a child's relationship with significant connections
f.   Number of children served whose residence (home from which they were removed) is greater than fifty (50) miles from placement site
g.   Percent of children served whose residence (home from which they were removed) is greater than fifty (50) miles from placement site

6.   Medical/Dental Needs
a.   Number of children served during the reporting month whose initial placement during the current custody episode was in this Facility/Resource Home
b.   Number of these children who received an initial medical assessment within seventy-two (72) hours of custody
c.   Number of these children who received a comprehensive medical exam within thirty (30) days of custody
d.   Number of total children in care for whom an annual medical exam was due during the reporting month
e.   Number of children due annual medical exams who received an annual medical exam
f.   Number of children for whom a semi-annual dental exam was due during the reporting month
g.   Number of children due a semi-annual dental exam who received a dental exam
h.   Number of children who experienced an acute medical episode requiring emergency assessment/treatment or hospitalization
i.   Number of children requiring psychotropic medication
j.   Number of children requiring psychotropic medication who have a written plan of approval from the County of Responsibility for administration of psychotropic medication on file
k.   Number of children ages zero to three (0-3) served during the month by the Facility or Resource Home(s)
l.   Number of children ages zero to three (0-3) who have been referred to the First Steps Early Intervention Program
m.   Number of children zero to three (0-3) who have been assessed by the First Steps Early Intervention Program
n.   Number of children > three (3) years of age who have received a developmental assessment through the Department of Health, Department of Mental Health or private provider
o.   Number of total children served during the reporting month whose recommended schedule of immunizations has been followed

7.  Mental Health
    a.  Number of children four (4) years and older placed in the Facility/Resource Home(s) during the past reporting month
    b.  Number of children four (4) years and older who have a mental health assessment on file
    c.  Number of children whose mental health assessment has determined the need for ongoing or follow up mental health services
    d.  Number of children who receive all mental health services recommended in this assessment
    e.  Number of children screened for Fetal Alcohol Spectrum Disorder

8.  Educational Needs
    a.  Number of school age children entering the Facility during the reporting month
    b.  Number of school age children who were enrolled in an accredited school within three (3) days (with the exception of school holidays and breaks)
    c.  Number of school age children who are able to remain in the same school they attended prior to placement in this Facility/Resource Home
    d.  Number of school age children whose initial placement was in this Facility/Resource Home
    e.  Number of school age children who received an educational assessment during the first thirty (30) days of placement
    f.  Number of children who meet the criteria of "exceptional child" as defined in § 37-23-3 of the Mississippi Code Annotated of 1972
    g.  Number of children who meet the criteria of "exceptional child" as defined in § 37-23-3 of the Mississippi Code Annotated of 1972 who have IEP
    h.  Number of children who meet the criteria of "exceptional child" as defined in § 37-23-3 of the Mississippi Code Annotated of 1972 who receive appropriate special education and related services as contained in the IEP
    i.  Number of IEP conferences attended by Facility social worker(s) and Resource Parents during the reporting month

<u>Narrative Updates/Progress Reports</u>

The Contractor will provide to the County of Responsibility bi-weekly narrative updates/progress reports on each child served. These updates/reports should address all issues of which DFCS Workers need to be aware. The Monthly Log of contacts will be submitted by the tenth (10th) of every month. Hard copies of any documents such as medical, mental health and educational records should be provided to the County of Responsibility immediately upon receipt by the Facility. The Facility should retain copies of all these documents in the child's file maintained by the Facility. The following documentation details should routinely be addressed in narrative updates and progress reports.

    a.  Documentation of assessment and certification of ongoing child safety- identification of risk, description of safety plans developed, description of staff management of safety plans, documentation of discussions with Facility staff or Resource Parents regarding risk, safety, and actions taken to address risk and safety factors identified
    b.  Documentation of periodic discussion with the child concerning his/her ISP and identification of barriers to achievement of permanency
    c.  Documentation of assessment of and provision for medical, dental, educational and mental health needs based on the child's ISP and requirements of DFCS policy

d.  Documentation of assessment of and provision for a child's well being and permanency needs to include, but not limited to, the need for continuation of important connections and relationships, need for recreation and socialization, need for mentors and role models, need for development of vocational and family life skills

e.  Documentation of child/parent-family-sibling visitation; description of how the Facility/Resource Parent(s) contributed to successful visitation as outlined in the child visitation plan; description of any noted safety concerns during visitation

f.  Documentation clearly demonstrating that the child is actively involved in assessment of needs and case planning activities and discussions

g.  Documentation of the frequency and quality of visitation between a child and his/her parents/siblings/extended family/significant connections (where were visits conducted, length of visits, quality of transactions occurring during visits, child's reactions before and after visits)

h.  Documentation of specific Independent Living Services and description of Independent Living Skills activities

i.  Documentation of examples of educational advocacy for a child by the Facility or Resource Parent

j.  Documentation of services provided to Resource Parents by the Contractor to ensure that Resource Parents are given necessary support to successfully parent children in DFCS custody

The Division of Family and Children's Services (DFCS) Director of the DFCS Administration Unit, the Director of the DFCS Permanency Unit, the Director of the Continuous Quality Improvement Unit, and the Director of the DFCS Licensure Unit will ensure that the Independent Contractor meets the programmatic quality assurance and licensure requirement criteria. The Division of Program Integrity shall ensure the Independent Contractor further meets all aspects of the contract.

The tools utilized to evaluate these services will be the Licensure Standards and the programmatic reports submitted monthly to report the outcomes as outlined in Section E. Outcome Reports, beginning on page 11 of this Scope of Services.

The services will be evaluated by the Independent Contractor's submission of the required reports and by the Independent Contractor meeting the Licensure Standards. Failure to meet the Licensure Standards will result in loss of payment.

Program Integrity shall perform a site visit as least once a year, more if requested by the Division of Family and Children's Services. The Licensure Unit shall perform an onsite Annual Licensure Review for this Facility as the License is awarded for a one year period. The Licensure Unit shall visit and perform annual facility reviews (at least one review) two (2) months prior to renewal of the License. If this facility is under a Corrective Action Plan (CAP) the Licensure Unit shall perform a site visit every month the facility is under the CAP. Also, a licensure investigation shall be conducted after all Abuse Neglect and Exploitation (ANE) investigations. Therefore, the number of site visits performed by the Licensure Unit depends on the abovementioned circumstances, but at least one (1) site visit shall be performed by the Licensure Unit.

# Ex. 18E

# CONTRACT AGREEMENT
# BEREAN CHILDREN'S HOME, INC.

**Revised 04/2013**

# STATE OF MISSISSIPPI
## MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
## CONTRACT FOR PERSONAL OR PROFESSIONAL SERVICES

     **1.**    **Parties.**    This Contract is made and entered into by and between the Division of Family and Children's Services, Mississippi Department of Human Services, hereinafter referred to as "MDHS," and Berean Children's Home, Inc., hereinafter referred to as "Independent Contractor."

     **2.**    **Purpose.**    MDHS hereby engages the Independent Contractor and the Independent Contractor hereby agrees to render certain professional services described in Paragraph 3, "Scope of Services."

     **3.**    **Scope of Services.**    The Independent Contractor shall perform and render the following services, attached hereto as "Exhibit A" and the *Modified Mississippi Settlement Agreement*, attached hereto as "Exhibit B".

     **4.**    **Period of Performance.**  The period of performance of services under this Contract shall begin on July 1, 2013 and end on June 30, 2014.  MDHS shall have the option to renew this Contract at one (1) year intervals for two (2) years at the same terms and conditions.  These one (1) year options to this contract shall end on June 30, 2016.

     **5.**    **Consideration and Method of Payment.**

     A.  As consideration of all services and performances under this Contract, Independent Contractor shall be paid a fee not to exceed One Hundred Sixty-Seven Thousand Seven Hundred Twenty-Five Dollars and Zero Cents ($167,725.00).  It is expressly understood and agreed that in no event will the total compensation paid hereunder exceed the specified amount of One Hundred Sixty-Seven Thousand Seven Hundred Twenty-Five Dollars and Zero Cents ($167,725.00).  (Exhibit C)

     B.  The Independent Contractor will bill MDHS for its services on a monthly basis. Following the satisfactory completion, as determined by MDHS, of its monthly services, the State requires the Independent Contractor to submit invoices electronically throughout the term of the agreement.  Invoices shall be submitted to MDHS using the processes and procedures identified by the State.  The appropriate documentation shall be submitted on the last working day of the month, with the final invoice to be submitted within five (5) working days after the contract ending date.

     Payments by state agencies using the Statewide Automated Accounting System (SAAS) shall be made and remittance information provided electronically as directed by the State.  These payments shall be deposited into the bank account of the Independent Contractor's choice.  The State may, at its sole discretion, require the Independent Contractor to submit invoices and supporting documentation electronically, at any time, during the term of this Agreement.  Independent Contractor understands and agrees

that the State is exempt from the payment of taxes. All payments shall be in United States currency.

Independent Contractor agrees to accept all payments in United States currency via the State of Mississippi's electronic payment and remittance vehicle. MDHS agrees to make payment in accordance with Mississippi law on "Timely Payments for Purchases by Public Bodies," Mississippi Code Annotated 31-7-301, et. Seq., which generally provides for payment of undisputed amounts by MDHS within forty-five (45) days of receipt of invoice.

6.    **Relationship of Parties.**

A.    It is expressly understood and agreed that MDHS enters into this Contract with Independent Contractor on a purchase of service basis and not on an employer-- employee relationship basis. Nothing contained herein shall be deemed or construed by MDHS, the Independent Contractor, or any third party as creating the relationship of principal and agent, partners, joint venturers, or any similar such relationship between MDHS and the Independent Contractor. Neither the method of computation of fees or other charges, nor any other provision contained herein, nor any acts of MDHS or the Independent Contractor hereunder, creates or shall be deemed to create a relationship other than the independent relationship of MDHS and the Independent Contractor.

B.    Independent Contractor represents that it has, or will secure, at its own expense, applicable personnel who shall be qualified to perform the duty required to be performed under this Contract.

C.    Any person assigned by Independent Contractor to perform the services hereunder shall be the employee of Independent Contractor, who shall have the sole right to hire and discharge its employee. MDHS may, however, direct Independent Contractor to replace any of its employees under this Contract. If Independent Contractor is notified within the first eight (8) hours of assignment that the person is unsatisfactory, Independent Contractor will not charge MDHS for those hours.

D.    It is further understood that the consideration expressed herein constitutes full and complete compensation for all services and performances hereunder, and that any sum due and payable to Independent Contractor shall be paid as a gross sum with no withholdings or deductions being made by MDHS for any purpose from said Contract sum.

E.    Independent Contractor shall pay when due all salaries and wages of its employees, and it accepts exclusive responsibility for the payment of Federal Income Tax, State Income Tax, Social Security, Unemployment Compensation and any other withholdings that may be required.

7.    **Termination for Cause.**  If, through any cause, Independent Contractor fails to fulfill in a timely and proper manner, as determined by MDHS, its obligations under this Contract, or if Independent Contractor shall violate any of the covenants, agreements, or stipulations of this Contract, MDHS shall thereupon have the right to

2

terminate the Contract by giving written notice to Independent Contractor of such termination and specifying the effective date thereof at least five (5) days before the effective date of such termination. In the event of such termination, Independent Contractor shall be entitled to receive just and equitable compensation for satisfactory work completed on services or documents or materials collected and/or prepared by Independent Contractor in connection with this Contract. Such compensation shall be based upon the fees set forth in Paragraph 5, but, in no case, shall said compensation exceed the total Contract price.

Notwithstanding the above, Independent Contractor shall not be relieved of liability to MDHS for damages sustained by MDHS by virtue of any breach of this Contract by Independent Contractor, and MDHS may withhold any payments to Independent Contractor for the purpose of set off until such time as the exact damages due to MDHS from Independent Contractor are determined.

8.    **Termination for Convenience of MDHS.**   MDHS may terminate this Contract at any time by giving written notice to Independent Contractor of such termination and specifying the effective date thereof at least five (5) days before the effective date of such termination. Independent Contractor shall be paid an amount which bears the same ratio to the total compensation as the services actually and satisfactorily performed bear to the total services of Independent Contractor covered by the Contract, less payments of compensation previously made.

9.    **Ownership of Documents and Work Products.**   All data collected by Independent Contractor and all documents, notes, programs, data bases (and all applications thereof), files, reports, studies,  and/or other material collected and prepared by Independent Contractor in connection with this Contract shall be the property of MDHS upon completion of this Contract or upon termination of this Contract. MDHS hereby reserves all rights to the data base and all applications thereof and to any and all information and/or materials prepared under this Contract.

The Independent Contractor is prohibited from use of the above described information and/or materials without the express written approval of MDHS.

10.    **Record Retention and Access to Records.** Independent Contractor shall maintain, and make available to MDHS, any State agency authorized to audit MDHS, the federal grantor agency, the Comptroller General of the United States or any of their duly authorized representatives, financial records, supporting documents, statistical records, and all other records pertinent to the services performed under this Contract. These records shall be maintained for at least three (3) years; however, if any litigation or other legal action, by or on behalf of the state or federal government has begun that is not completed at the end of the three-year period, or if audit finding, litigation, or other legal action has not been resolved at the end of the three-year period, the records shall be retained until resolution.

11.    **Modification or Amendment.**  Modifications, changes, or amendments to this Contract may be made upon mutual agreement of the parties hereto. However, any

3

change, supplement, modification, or amendment of any term, provision, or condition of this Contract must be in writing and signed by both parties hereto.

**12.    Assignments and Subcontracts.**    Independent Contractor shall not assign, sublet, or otherwise transfer the obligations incurred on its part pursuant to the terms of this Contract without the prior written consent of MDHS. Any attempted assignment or transfer of its obligation without such consent shall be wholly void.

**13.    Waiver.** Failure of either party hereto to insist upon strict compliance with any of the terms, covenants, and conditions hereof shall not be deemed a waiver or relinquishment of any similar right or power hereunder at any subsequent time or of any other provision hereof, nor shall it be construed to be a modification of the terms of this Contract.

**14.    Availability of Funds.**  It is expressly understood and agreed that the obligation of MDHS to proceed under this Contract is conditioned upon the availability of funds, the appropriation of funds by the Mississippi Legislature, and the receipt of state and/or federal funds. If, at any time, the funds anticipated for the fulfillment of this Contract are not forthcoming or are insufficient, either through the failure of the federal government to provide funds or of the State of Mississippi to appropriate funds or the discontinuance or material alteration of the program under which funds were provided, or if funds are not otherwise available to MDHS for the performance of this Contract, MDHS shall have the right, upon written notice to Independent Contractor, to immediately terminate this Contract without damage, penalty, cost, or expense to MDHS of any kind whatsoever. The effective date of termination shall be as specified in the notice of termination.

**15.    Price Adjustment.**

**A.    Price Adjustment Methods.  The** Contract price may be changed only by written agreement of the parties.  The value of any work covered by any claim for increase or decrease in the Contract Price shall be determined by one or more of the following methods:

      (1)    Unit prices, if any, previously approved by the parties and specified in this Contract; or

      (2)    MDHS may, at any time by written order, make changes in the specifications within the general scope of this Agreement.  If any such change causes an increase in the amount due under this Contract or in the time required for performance under this Agreement and if MDHS decides that the change justifies an adjustment to the Contract, an equitable adjustment in the Contract may be made by written modification of this Agreement.

No charge for any extra work or material will be allowed unless the same has been provided for by written amendment to this Contract signed by both parties.

**B.    Submission of Cost Pricing Data.** The Independent Contractor shall provide cost or pricing data for any price adjustments subject to the provisions of Section 3-403 (Cost or Pricing Data) of the Mississippi Personal Service Contract Procurement Regulations.

**16.    Indemnification.** MDHS shall, at no time, be legally responsible for any negligence or wrongdoing by the Independent Contractor and/or its employees, servants, agents, contractors, and/or subcontractors. Independent Contractor agrees to indemnify, defend, save and hold harmless MDHS from and against all claims, demands, liabilities, suits, damages, and costs of every kind and nature whatsoever, including court costs and attorney's fees, arising out of or caused by Independent Contractor and its employees, agents, contractors, and/or subcontractors in the performance of this Contract.

**17.    Insurance.** Independent Contractor represents that it will maintain workers' compensation insurance which shall inure to the benefit of all Independent Contractor's personnel performing services under this Contract, comprehensive general liability insurance, and employee fidelity bond insurance. Independent Contractor will furnish MDHS a certificate of insurance providing the aforesaid coverage, prior to the commencement of performance under this Agreement. (Exhibit D).

**18.    Applicable Law.** The contract shall be governed by and construed in accordance with the laws of the State of Mississippi, excluding its conflicts of laws provisions, and any litigation with respect thereto shall be brought in the courts of the state. The Independent Contractor shall comply with applicable federal, state and local laws and regulations.

**19.    Representation Regarding Contingent Fees.** The Independent Contractor represents that it has not retained a person to solicit or secure a State contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, except as disclosed in the Independent Contractor's bid, proposal, or herein.

**20.    Certification of Independent Price Determination.** The bidder certifies that the prices submitted in response to the solicitation have been arrived at independently and without, for the purpose of restricting competition, any consultation, communication, or agreement with any other bidder or competitor relating to those prices, the intention to submit a bid, or the methods or factors used to calculate the prices bid.

**21.    Representation Regarding Gratuities.** The Independent Contractor represents that neither it nor any officer, employee, agent, subcontractor or other representative of the Independent Contractor has violated, or is violating, and promises that it will not violate the prohibition against gratuities set forth in Section 6-204 (Gratuities) of the Mississippi Personal Service Contract Procurement Regulations.

**22.    Procurement Regulations.** The Contract shall be governed by the applicable provisions of the Personal Service Contract Review Board Regulations, a copy of which is available for inspection at 210 East Capitol Street, Suite 800, Jackson, Mississippi 39201, or downloadable at www.mspb.ms.gov.

**23.    Severability.** If any term or provision of this Contract is prohibited by the laws of the State of Mississippi or declared invalid or void by a court of competent jurisdiction, the remainder of this Contract shall not be affected thereby and each term and provision of this Contract shall be valid and enforceable to the fullest extent permitted by law.

**24.    Stop Work Order.**

**A.    Order to Stop Work.** The Director of Division of Family and Children's Services, may, by written order to the Independent Contractor at any time, and without notice to any surety, require the Independent Contractor to stop all or any part of the work called for by this Contract. This order shall be for a specified period not exceeding ninety (90) days after the order is delivered to the Independent Contractor, unless the parties agree to any further period. Any such order shall be identified specifically as a stop work order issued pursuant to this clause. Upon receipt of such an order, the Independent Contractor shall forthwith comply with its terms and take all steps to minimize the occurrence of costs allocable to the work covered by the order during the period of work stoppage. Before the stop work order expires, or within any further period to which the parties shall have agreed, the Director of Family and Children's Services shall either:

(1)    cancel the stop work order; or

(2)    terminate the work covered by such order as provided in the "Termination for Cause" clause or the "Termination for Convenience" clause of this Contract.

**B.    Cancellation or Expiration of the Order.** If a stop work order issued under this clause is canceled at any time during the period specified in the order, or if the period of the order or any extension thereof expires, the Independent Contractor shall have the right to resume work. An appropriate adjustment may be made in the delivery schedule or Independent Contractor's price, or both. If the stop work order results in an increase in the time required for, or in the Independent Contractor's cost properly allocable to, the performance of any part of this Contract and the Independent Contractor asserts a claim for such an adjustment within 30 days after the end of the period of work stoppage, an equitable adjustment in the Contract may be made by written modification of this Contract. If MDHS decides that the need justifies the requested adjustment, a modification will be made as provided by Section 12, Modification or Amendment, of this Contract.

**C.    Termination of Stopped Work.** If a stop work order is not canceled and the work covered by such order is terminated for cause or convenience, the

Independent Contractor may be paid the agreed upon price for any completed deliverable or service not previously tendered to MDHS, provided that MDHS accepts any such deliverable or service; or Independent Contractor may be paid an amount which bears the same ratio to the total compensation as the services actually and satisfactorily performed bear to the total services of Independent Contractor covered by the Contract, less payments of compensation previously made.

**D.    Adjustment of Price.** Any adjustment in Contract price made pursuant to this clause shall be determined in accordance with the Price Adjustment clause of this Contract.

**25.    Disputes.** Any dispute concerning a question of fact under this Contract which is not disposed of by agreement shall be decided by the Director of the Division of Family and Children's Services. This decision shall be reduced to writing and a copy thereof mailed or furnished to the Independent Contractor and shall be final and conclusive, unless within thirty (30) days from the date of the decision, Independent Contractor mails or furnishes to the Executive Director of MDHS a written request for review. Pending final decision of the Executive Director of a dispute hereunder, the Independent Contractor shall proceed in accordance with the decision of the Director of the Division of Family and Children's Services.

In a review before the Executive Director or designee, the Independent Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its position on the question and decision under review. The decision of the Executive Director on the review shall be final and conclusive unless determined by a court of competent jurisdiction in Hinds County, State of Mississippi, to have been fraudulent, capricious, so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence.

**26.    Compliance with Laws.** The Independent Contractor understands that the State is an equal opportunity employer and therefore maintains a policy which prohibits unlawful discrimination based on race, color, creed, sex, age, national origin, physical handicap, disability, genetic information, or any other consideration made unlawful by federal, State, or local laws. All such discrimination is unlawful and the Independent Contractor agrees during the term of the agreement that the Independent Contractor will strictly adhere to this policy in its employment practices and provision of services. The Independent Contractor shall comply with, and all activities under this agreement shall be subject to, all applicable federal, State of Mississippi, and local laws and regulations, as now existing and as may be amended or modified.

**27.    Confidentiality.** Independent Contractor shall treat all State data and information to which it has access under this Contract as confidential information to the extent that confidential treatment of same is required under federal and state law and shall not disclose same to a third party without specific written consent of the State. In the event that Independent Contractor receives notice that a third party requests divulgence of confidential or otherwise protected information and/or has served upon it a subpoena or other validly issued administrative or judicial process ordering divulgence of confidential or otherwise protected information, Independent Contractor shall

promptly inform the State and thereafter respond in conformity with such subpoena as required by applicable state and/or federal law, rules, and regulations. The provision herein shall survive termination of the Contract for any reason and shall continue in full force and effect and shall be binding upon the Independent Contractor and its agents, employees, successors, assigns, subcontractors, or any party claiming an interest in the Contract on behalf of, or under, the rights of the Independent Contractor following any termination.

**28.     E-Verify.**     Independent Contractor represents and warrants that it will ensure its compliance with the Mississippi Employment Protection Act, Mississippi Code Annotated 71-11-1 and 71-11-3, and will register and participate in the status verification system for all newly hired employees. The term "employee" as used herein means any person that is hired to perform work within the State of Mississippi. As used herein, "status verification system" means the Illegal Immigration Reform and Immigration Responsibility Act of 1996 that is operated by the United States Department of Homeland Security, also known as the E-Verify Program, or any other successor electronic verification system replacing the E-Verify Program. Independent Contractor agrees to maintain records of such compliance and, upon request of the State, to provide a copy of each such verification to the State. Independent Contractor further represents and warrants that any person assigned to perform services hereunder meets the employment eligibility requirements of all immigration laws of the State of Mississippi. Independent Contractor understands and agrees that any breach of these warranties may subject Independent Contractor to the following: (a) termination of this Agreement and ineligibility for any state or public contract in Mississippi for up to three (3) years, with notice of such cancellation/termination being made public, or (b) the loss of any license permit, certification or other document granted to Independent Contractor by an agency, department or governmental entity for the right to do business in Mississippi for up to one (1) year, or both. In the event of such termination/cancellation, Independent Contractor would also be liable for any additional costs incurred by the State due to contract cancellation or loss of "license or permit." (Exhibit E).

**29.     Special Terms and Conditions.** It is agreed and understood by each party to this Contract that there are no special terms and conditions.

**30.     Entire Agreement.**     It is understood and agreed that this Contract and the documents listed below constitute the entire understanding of the parties with respect to the subject matter contained herein and supersede and replace any and all prior negotiations, understandings and agreements, written or oral, between the parties relating thereto. The entire agreement made by and between the parties hereto shall consist of, and precedence is hereby established by the order of, the following documents incorporated herein:

1.   This Contract signed by the parties herein and any Exhibits attached hereto;

2.   The Request for Proposals dated March 4, 2013, Response to Proposals dated April 1, 2013, and the Written Clarifications or Answers provided by MDHS.

The documents are complementary, and what is required by one shall be binding as if required by all. A higher document shall supersede a lower order document to the extent necessary to resolve any conflict or inconsistency arising under the various provisions thereof; provided, however, that in no event an issue is addressed in one of the above-mentioned documents but is not addressed in another of such documents, no conflict or inconsistency shall be deemed to occur by reason thereof. The documents listed above are shown in descending order or priority, that is, the highest document begins with the first listed document ("1. This Contract signed by the parties herein and any Exhibits attached hereto") and the lowest document is listed last ("2. The Request for Proposals dated March 4, 2013, Response to Proposals dated April 1, 2013, and the Written Clarifications or Answers provided by MDHS").

**31.    Background Checks.** All child care facilities which are awarded funds, whether they are awarded funds directly or through contracts with entities who receive funds directly, shall ensure that all their personnel, whether owners, or employees or volunteer workers have first been subjects of criminal background checks. These persons shall not be allowed to operate a facility nor given even provisional employment until the results of said background checks are obtained. The background checks shall be requested by the child care facilities. The expense of these background checks shall not be borne by MDHS but instead by the child care facility which requests the background check.

If it is determined that there is a child care facility which is operated by, or has hired, or accepted as a volunteer, a person with a criminal background, MDHS reserves the right to terminate its Contract with said facility if its Contract was directly with said facility. If the MDHS Contract is with an intermediary facility which has passed the funds through to other facilities, MDHS reserves the right to demand that such intermediary facility terminate its Contract with the non-conforming facility, or the intermediary facility may face termination of its Contract with MDHS.

**32.    Non-Compete.** For the term of this contract and for a period of two (2) years thereafter, Berean Children's Home, Inc., hereby agrees not to directly or indirectly engage in competition in any way with MDHS or to associate with the state business or other business that may compete with MDHS. The term "competition" as used in the foregoing shall include, but not limited to, attempts to divert workers, clients, suppliers, or accounts from MDHS and/or attempt to induce employees of MDHS to terminate their employment. MDHS hereby agrees to enforce the provisions of the Non-Compete Agreement by any legal means. Such means shall include the right to enjoin by legal process for violating provisions hereof.

**33.    Conflict of Interest.** Independent Contractor shall ensure that there exists no direct or indirect conflict of interest in the performance of this contract and/or performance by any of the Independent Contractor's Contractors/Subcontractors. Independent Contractor hereby warrants that no part of any federal or state money shall be paid directly or indirectly to an employee or official of MDHS as wages, compensation or gifts exchange for acting as an officer, agent, employee, subcontractor, or consultant to the Independent Contractor in connection with any work

contemplated or pertaining to this Independent Contractor Agreement. Independent Contractor shall strictly comply with all conflict of interest provisions or standards of conduct provisions contained in any applicable state, federal, or local law, rule, or regulation.

      **34.**   **Transparency.**   This contract, including any accompanying exhibits, attachments, and appendices, is subject to the "Mississippi Public Records Act of 1983," codified as section 25-61-1 et seq., Mississippi Code Annotated and exceptions found in Section 79-23-1 of the Mississippi Code Annotated (1972, as amended). In addition, this contract is subject to the provisions of the Mississippi Accountability and Transparency Act of 2008 (MATA), codified as Section 31-7-13 of the Mississippi Code Annotated (1972, as amended). Unless exempted from disclosure due to a court-issued protective order, this contract is required to be posted to the Department of Finance and Administration's independent agency contract website for public access. Prior to posting the contract to the website, any information identified by the Contractor as trade secrets, or other proprietary information including confidential vendor information, or any other information which is required confidential by state or federal law or outside the applicable freedom of information statutes will be redacted.

35.    <u>Notice</u>.  Any notice required or permitted to be given under this Contract shall be in writing and sent by United States Certified Mail, Returned Receipt Requested to the party to whom the notice should be given at the address set forth below:

**MDHS:**

Mr. Richard A. Berry, Executive Director
Mississippi Department of Human Services
P.O. Box 352
Jackson, Mississippi 39205

**BEREAN CHILDREN'S: HOME**

Mr. Wendell Davis, President
Berean Children's Home
P. O. Box 1009
Brookhaven, Mississippi 39602

**IN WITNESS WHEREOF,** this Contract has been made and interchangeably executed by the parties hereto in duplicate originals.

Witness my signature this, the 26 day of June_____, 2013.

**MISSISSIPPI DEPARTMENT OF HUMAN SERVICES**

BY: _____
                    Signature
TITLE: Deputy Executive Director_____

**WITNESSES:**

_____

_____

Witness my signature this, the 19th day of June_____, 2013.

**BEREAN CHILDREN'S HOME, INC.**

BY: _____
                    Signature
Printed Name: Wendell Davis_____

TITLE: President_____

**WITNESSES:**

Camiece Redd_____

Christina Smith_____

11

# SCOPE OF SERVICES
# BEREAN CHILDREN'S HOME, INC.

**BEREAN CHILDREN'S HOME, INC.**
**JULY 1, 2013-JUNE 30, 2014**
**GROUP HOME**

The Berean Children's Home, Inc. is a residential child care facility located at 1180 Berea Trail SE, Bogue Chitto, MS 39629. The Home is a registered 501 (c)(3) nonprofit organization under the United States Internal Revenue code and is incorporated in the state of Mississippi exclusively for charitable, religious, and educational purposes under the Mississippi Non-Profit Corporation Law.

The mission has always been to provide less fortunate children with a loving, caring home with proper guidance and encouragement to challenge each resident to achieve excellence and mature spiritually, intellectually, emotionally, socially, and physically.

The Group Home shall provide residential services to children and adolescents who are capable of functioning satisfactorily in a group care setting. The purpose of group home care is to provide an environment using professional and direct care staff as mentors and role models to help children to develop appropriate relationships with other children, peers, and adults and to develop skills necessary for successful independence.

**Programs/Services**

All Group Home Care requires a current license by the Mississippi Department of Human Services (MDHS). Group Home shall meet all requirements contained in LICENSING REQUIREMENTS FOR RESIDENTIAL CHILD CARING AGENCIES AND CHILD PLACING AGENCIES. Group Home shall have access to, shall follow practice guidelines and shall assist Division of Family and Children's Services (DFCS) in meeting requirements contained in MDHS/DFCS policies. The MDHS/DFCS policies are available online at http://www.mdhs.state.ms.us/fcs_policy.html.

A. **SERVICE DEFINITIONS**

The Contractor shall be paid the regular foster care board rate according to the age of the child and in accordance with the MDHS/DFCS policy.

All services provided shall comply with all applicable federal and State of Mississippi laws, and regulations, as now existing and as may be amended or modified.

**Group Home**

This Group Home shall provide services to children in MDHS custody ages ten (10) to twenty-one (21) years. Group homes may serve children younger than ten (10), upon written approval by the Regional Director, when they are siblings of a resident over age ten (10). Children under ten (10) shall be placed in group homes or other congregate care facilities no longer than forty-five (45) cumulative days. The Group Home is licensed and certified to serve this age range.

The Group Home provides residential services to children and adolescents who are capable of functioning satisfactorily in a group care setting. The purpose of group home care is to provide an environment using professional and direct care staff as mentors and role models to help children to develop appropriate relationships with other children, peers and adults and to develop skills necessary for successful independence.

The Group Home provides specific services to help adolescents return to their families, transition to a less restrictive setting or to independent living. Services of other child-serving agencies are sometimes utilized to reach this goal. The Group Home shall prepare children to step down as soon as possible to family or Resource Family placements. The Group Home shall work in accordance with the DFCS Permanency Plan for the child. All discharges shall be planned and related to the Permanency Plan. Punitive discharges will not be allowed (discharges cannot be used as punishment for child's behavior). A viable family resource (parent, relative, foster, adopt, or mentor) shall be identified on each child's discharge plan. The family resource placements shall be approved by the child's DFCS Worker. No family member shall be recruited or allowed contact with the child without prior written permission from the DFCS County of Responsibility.

## B. STAFFING

The Facility shall show documentation of both direct care and professional staff on shifts around the clock, in accordance with the LICENSING REQUIREMENTS FOR RESIDENTIAL CHILD CARING AGENCIES AND CHILD PLACING AGENCIES which includes a full-time social worker (forty (40) hours per week).

## C. SERVICE ACTIVITIES

The Group Home shall comply with the following service activities. The delivery of services shall adequately address children's safety, permanency, emotional, social, health, and educational needs.

1. Services shall be provided in the least restrictive environment that is appropriate to the individual child's strengths and needs. An array of services needed to meet the child's individual needs shall be identified by the Group Home.

2. Services must reflect practice that is culturally responsive and designed to provide for the unique needs of each child. Group Home shall comply with the Multi-Ethnic Placement Act which prohibits the denying or delaying an individual or couple the opportunity to become a Resource Parent or delaying or denying placement of a child on the basis of race, color or natural origin of the prospective Resource Parent or child. These factors must be applied on an individualized basis and not by general rules.

3. The Facility shall work with the County of Responsibility to develop treatment plans, goals and services to address these goals. Behavior management plans will be developed jointly for each child.

4. Services shall be provided twenty-four (24) hours per day seven (7) days per week, three hundred sixty-five (365) days per year.  Payment shall be made only for the actual nights a child spends in the Facility/Resource Home except in cases of leave for the purpose of enhancing the child's well-being and improving the probability of family reunification, adoption, or kinship care.  The per diem payment shall not interrupt under the following provisions:

   a. All leave shall have <u>prior</u> written approval by the DFCS County of Responsibility.

   b. The child shall not be absent from the Facility for a consecutive twenty-four (24) hour period which constitutes a leave day.

   c. Leave does include Independent Living activities such as conferences, retreats, and special camps.

   d. Leave days shall be contingent upon the child returning to the Facility/Resource Home at the conclusion of each visit.

   e. All leave shall have <u>prior</u> written approval by the DFCS County of Responsibility along with the approval from the child's court of jurisdiction when it is required.

   f. Documentation shall be provided to support the goal of enhancing the child's well-being and improving the probability of family reunification, adoption, or kinship care placements, duration of the leave, participants, and outcome(s) of the leave.  This documentation shall be prepared by the provider with a copy being placed in the resident's file and the original submitted to the DFCS County of Responsibility.

   g. Leave shall not include overnight stays in Acute Care Hospitals, Residential Treatment Centers, Detention Centers, or any other placements funded through other resources.

5. Siblings shall be placed together whenever possible, if referred to provider. Provider shall provide written justification if siblings are not placed together. A visitation plan must be included in the written justification when siblings are not placed together.

6. The delivery of services should be in close proximity to the child's County of Responsibility.

7. Medical/Dental/Mental Health Assessments shall be secured by the Group Home on every applicable child in custody of MDHS admitted to the Facility/Resource Home. Also, the Group Home shall maintain an immunization schedule meeting the health needs of the child and the requirements of the State Department of Health. Medicaid Providers shall be obtained for all medical and dental services.

Medications will be administered and monitored by assigned staff of facility or Resource Parent. Administration of psychotropic medications requires a written authorization from the County of Responsibility. A schedule of yearly medical exams and semi-annual dental exams will be maintained by the Facility/Resource Home. Initial medicals, dentals and mental health assessments shall be provided as required by DFCS policies. An initial medical exam is due seventy-two (72) hours from the time of initial custody and a comprehensive medical exam due within thirty (30) days of initial custody. Ongoing routine medicals shall be performed by the anniversary date of the child's comprehensive medical exam and dental exams six (6) months from the anniversary date of the child's initial dental exam. Mental health assessments are required on all children age four and above within thirty (30) calendar days of the date of custody, and ongoing assessments and identified mental health treatments shall be provided for all children requiring these therapeutic services.

8.  Appropriate educational services shall be provided by accredited schools. Educable Child Funds shall be pursued on each child through the Mississippi Department of Education (MDE) by the Group Home. The allowed costs for education should be billed through MDE for children eligible for these funds. The Group Home will assist in getting children ruled who are not currently eligible by completing the MDE Educable Child application (pink form). Education costs shall not be billed to DFCS. Developmental assessments will be secured for all children ages zero to three (0-3) and for children older than three when there is suspicion of any developmental delays. Educational services shall include, but not be limited to, based on the child's Individual Service Plan (ISP), tutoring, monitoring a child's educational progress and making contact with teachers and other educational personnel at least quarterly, attendance at Individual Education Plan (IEP) conferences, educational advocacy and ongoing communication with the County of Responsibility regarding the child's educational goals and progress. Assistance with GED and/or college or vocational preparation should be addressed in children's educational plans.

9.  The Group Home shall engage all youth ages fourteen – twenty (14-20) in Independent Living activities regardless of the placement. The Group Home shall arrange for Skills Groups to be conducted at the Facility or designated location and shall transport the teens to skill group activities sponsored by other sources or entities. In addition, the Group Home shall develop with each child and assigned DFCS staff, an individualized plan to prepare the teen for Independence.

10. A clothing inventory shall be completed by the Group Home and DFCS Worker at the time of admission and upon discharge. The Group Home and DFCS Worker must verify at admission and upon discharge the items the child is bringing to or taking from the Facility/Resource Home. Replacement clothing for children shall be provided as part of the per diem. The replacement clothing amount shall be equal to or greater than the amount designated by the DFCS Foster Board Breakdown according to the age of the child. Special clothing needs will be discussed with the assigned County of Responsibility Social Worker. In some situations, special items can be purchased with prior written approval from the Regional Director and with the county reimbursement made directly to the clothing vendor.

11. Hygiene supplies and monthly allowance shall be provided through the per diem rate by the Group Home. The child's monthly allowance shall be equal to or greater than the amount designated by the DFCS Foster Board Breakdown according to the age of the child.

12. The Group Home shall coordinate with the County of Responsibility to meet the child's needs to maintain and strengthen permanent connections through: a) the visitation plan, b) an ongoing evaluation and identification of connections with the child, c) transportation for visits and special events, d) arranging for visits at the Facility or other approved site and e) counseling with the child regarding any grief and loss due to separation from important connections.

13. The Group Home shall provide all necessary transportation for the child, including but not limited to transportation to and from school, to and from work, off-site consultations, visits with parents/siblings/extended kin/connections, Adoption recruitment activities, therapy and/or medical treatment not provided by the Group Home, needed Independent Living activities and other appointments unless prior arrangement has been made with the child's DFCS Worker.

14. Any injury to a child shall be documented along with any subsequent treatment. The child's DFCS Worker shall be notified of minor or serious injuries and of the treatment required and/or received. Parental notification of serious injuries or treatment shall be made immediately by the child's DFCS Worker and prior to any visitation. Serious injuries and other serious incidents shall be reported verbally and followed up in writing to DFCS Congregate Care Director by the Group Home.

15. All photographs including videos, media presentations, and publications require an Order of Limited Disclosure from child's Youth Court Judge. In addition, written consent shall be obtained from the DFCS County of Responsibility, the child, the birth parents, if available, and the Guardian *ad litem*.

16. There must be a minimum of one face-to-face site visit monthly with the child in the Resource Home and a second monthly contact with the child at any appropriate location.

17. There must be at least one face-to-face contact with the Resource Parent monthly.

**D. <u>SERVICES ASSURANCES/PROTOCOLS</u>**

1. The Group Home shall make its application form available and the application form shall be completed by the DFCS worker prior to admission to the Facility. The Group Home shall keep blank copies on file for emergency situations when the DFCS Staff has not completed one prior to placement of the child. In these instances, the DFCS Staff shall complete the form with as much information known, and forward the remaining documentation to the Facility as soon as possible. A copy of the application shall be filed in the child's case record. Any additional forms needed by the contracted Facility shall be completed by the Facility staff.

2.  Any injury to a child shall be documented along with any subsequent treatment. The child's DFCS Worker shall be notified immediately of minor or serious injuries and of the treatment required and/or received. Parental notification of serious injuries or treatment shall be made immediately by the child's DFCS Worker and prior to any visitation.  Serious injuries and other serious incidents shall be reported verbally and followed up in writing to DFCS Director of Congregate Care by the Group Home.

3.  In the event that the child runs away, is placed in a detention center, or is hospitalized (acute or residential), or any other emergency facility, the Facility shall immediately notify verbally and in writing the DFCS Congregate Care Unit, DFCS Worker, and law enforcement, if applicable. Children shall not be discharged to detention facilities, holding facilities, or short-term hospitals. All discharges shall be planned in advance and in compliance with the child's Permanency Plan.  Punitive discharges shall not be allowed (discharges cannot be used as punishment for child's behavior). The Facility shall work with the agency to develop an appropriate discharge plan into the least restrictive environment. The Facility shall prepare the child for the move and participate in said move as requested by the County of Responsibility.

4.  A child cannot be sent to a detention center and then be discharged from the Facility/Resource Home unless there are charges and he/she is committed to a training school, incarcerated, or is a danger to self or others.  A child shall return to the Facility/Resource Home upon discharge from detention center unless one of these conditions is met. In such incidences, the Group Home shall assist DFCS and the court in getting the child admitted to the appropriate Facility.  If the Judge releases the child from the detention center prior to admission to the higher level of care, the Group Home shall maintain the child under close supervision until the transfer can be made.

5.  A child shall not be discharged due to negative behaviors, such as, but not limited to spitting, fighting without weapons, and cursing.  Reasons for all discharges shall be sent by the Facility in writing two (2) weeks prior to the discharge to the County of Responsibility. A placement disruption meeting must be scheduled and held prior to any unplanned discharge to ensure that appropriate services and supports have been implemented.

6.  The Group Home/Resource Parent cannot approach the Judge of jurisdiction regarding extending a child's stay at the Facility or discharge from a particular Facility. The DFCS County of Responsibility Worker and ASWS have the authority to approve placements and discharges.

7.  The appropriate law enforcement personnel shall be notified if a child leaves a Facility without permission (runaway).  The DFCS Worker shall be immediately notified that the child has left, and the County Social Worker shall file runaway charges or designate Facility personnel to file charges.  If a child causes injury to the Facility staff or another resident of the Facility/Resource Home, the Group Home shall notify the DFCS Worker as well as the DFCS Congregate Care Unit and file

charges with law enforcement so that the matter can be brought before the Judge of jurisdiction. Payments shall not be made for the night child is absent due to runaway status. Termination will be considered after child has not been located in seven (7) calendar days.

8. The Facility shall provide copies of progress reports/narrative contacts every other week (bi-weekly) to the child's DFCS Worker. In addition, Monthly Logs shall be submitted to child's DFCS worker by the tenth (10th) of every month which shall include direct (child and family) and indirect (school, employer, court, mental health, etc.) contacts.

9. Failure to comply with any of these provisions could be considered grounds for termination of the contract.

## E. **OUTCOME REPORTS**

The Facility shall submit Monthly Outcome Reports to the DFCS Congregate Care Unit by the tenth (10th) of every month. Unless otherwise indicated, please provide the following outcome measures for each month.

1.   Safety

   a.   Total number children served in the Facility/Resource Home(s) this reporting month
   b.   Total number reports of maltreatment this reporting month
   c.   Total Reports referred to DFCS centralized intake in less than (<) eight (8) hours
   d.   Total reports referred to DFCS centralized intake in < twenty-four (24) hours
   e.   Number of children removed from Facility/Resource Parent(s) due to report of maltreatment
   f.   Number of reports requiring corrective action by the Facility/agency
   g.   Number of corrective action reports submitted to DFCS < 30 days
   h.   Number of runaway episodes
   i.   Number of Serious Incidents

2.   Discharges/Disruptions

   a.   Number of children discharged to a final Permanency Plan outcome
   b.   Percent of children discharged to a final Permanency Plan outcome
   c.   Number of children which the Facility/Resource Parent(s) requested removal of the child
   d.   Number of children which the Facility/Resource Parent(s) requested removal of the child in which a two (2) week notice was not given
   e.   Number of these children for whom a placement disruption meeting was held prior to removal
   f.   Number of children discharged due to unplanned circumstances
   g.   Percent of total children discharged due to unplanned circumstances
   h.   Number of children discharged to a lower level, less restrictive placement

      i.  Percent of children discharged to a lower level, less restrictive placement
      j.  Number of children discharged to a higher level, more restrictive placement
      k.  Percent of children discharged to a higher level, more restrictive placement

3.    Case Planning

      a.  Number of Family Team Meetings/ISP Meetings/Adoption Status Meetings initiated by DFCS and attended by Facility social worker/Resource Parent(s) during the reporting month
      b.  Number of Foster Care Review conferences attended by Facility social worker/Resource Parent(s) during the reporting month

4.    Independent Living

      a.  Number of children greater than (>) 14 years of age served during the reporting month
      b.  Number of Independent Living Skills groups attended by these children during the reporting month
      c.  Number of Independent Living Skills sessions conducted and documented by Facility professional staff/Resource Parent(s)

5.    Child/Parent/Sibling Visitation – Connections

      a.  Number of visits between children and their parents/other siblings in care held at the Facility or Resource Home
      b.  Number of visits between children and their extended family/siblings not in care/other connections held at the Facility or Resource Home
      c.  Number of visits between children/parents/siblings in care/connections in which the Facility staff or Resource Parent(s) provided primary supervision of visits
      d.  Number of visits between children/parents/siblings in care/connections in which the Facility staff or Resource Parent(s) provided transportation to the visit site
      e.  Number of other events (such as birthdays, school activities, medical/mental health appointments) for which the Facility provided transportation or assisted with arrangements that maintained or strengthened a child's relationship with significant connections
      f.  Number of children served whose residence (home from which they were removed) is greater than fifty (50) miles from placement site
      g.  Percent of children served whose residence (home from which they were removed) is greater than fifty (50) miles from placement site

6.    Medical/Dental Needs

      a.  Number of children served during the reporting month whose initial placement during the current custody episode was in this Facility/Resource Home
      b.  Number of these children who received an initial medical assessment within

seventy-two (72) hours of custody

c.  Number of these children who received a comprehensive medical exam within thirty (30) days of custody

d.  Number of total children in care for whom an annual medical exam was due during the reporting month

e.  Number of children due annual medical exams who received an annual medical exam

f.  Number of children for whom a semi-annual dental exam was due during the reporting month

g.  Number of children due a semi-annual dental exam who received a dental exam

h.  Number of children who experienced an acute medical episode requiring emergency assessment/treatment or hospitalization

i.  Number of children requiring psychotropic medication

j.  Number of children requiring psychotropic medication who have a written plan of approval from the County of Responsibility for administration of psychotropic medication on file

k.  Number of children ages zero to three (0-3) served during the month by the Facility or Resource Home(s)

l.  Number of children ages zero to three (0-3) who have been referred to the First Steps Early Intervention Program

m.  Number of children zero to three (0-3) who have been assessed by the First Steps Early Intervention Program

n.  Number of children > three (3) years of age who have received a developmental assessment through the Department of Health, Department of Mental Health or private provider

o.  Number of total children served during the reporting month whose recommended schedule of immunizations has been followed

7.  Mental Health

a.  Number of children four (4) years and older placed in the Facility/Resource Home(s) during the past reporting month

b.  Number of children four (4) years and older who have a mental health assessment on file

c.  Number of children whose mental health assessment has determined the need for ongoing or follow up mental health services

d.  Number of children who receive all mental health services recommended in this assessment

e.  Number of children screened for Fetal Alcohol Spectrum Disorder

8.  Educational Needs

a.  Number of school age children entering the Facility during the reporting month

b.  Number of school age children who were enrolled in an accredited school within three (3) days (with the exception of school holidays and breaks)

c.  Number of school age children who are able to remain in the same school they

attended prior to placement in this Facility/Resource Home

    d.  Number of school age children whose initial placement was in this Facility/Resource Home

    e.  Number of school age children who received an educational assessment during the first thirty (30) days of placement

    f.  Number of children who meet the criteria of "exceptional child" as defined in § 37-23-3 of the Mississippi Code Annotated of 1972

    g.  Number of children who meet the criteria of "exceptional child" as defined in § 37-23-3 of the Mississippi Code Annotated of 1972 who have IEP

    h.  Number of children who meet the criteria of "exceptional child" as defined in § 37-23-3 of the Mississippi Code Annotated of 1972 who receive appropriate special education and related services as contained in the IEP

    i.  Number of IEP conferences attended by Facility social worker(s) and Resource Parents during the reporting month

<u>Narrative Updates/Progress Reports</u>

The Group Home will provide to the County of Responsibility bi-weekly narrative updates/progress reports on each child served. These updates/reports should address all issues of which DFCS Workers need to be aware. The Monthly Log of contacts will be submitted by the tenth (10th) of every month. Hard copies of any documents such as medical, mental health and educational records should be provided to the County of Responsibility immediately upon receipt by the Facility. The Facility should retain copies of all these documents in the child's file maintained by the Facility. The following documentation details should routinely be addressed in narrative updates and progress reports.

    a.  Documentation of assessment and certification of ongoing child safety-identification of risk, description of safety plans developed, description of staff management of safety plans, documentation of discussions with Facility staff or Resource Parents regarding risk, safety, and actions taken to address risk and safety factors identified

    b.  Documentation of periodic discussion with the child concerning his/her ISP and identification of barriers to achievement of permanency

    c.  Documentation of assessment of and provision for medical, dental, educational and mental health needs based on the child's ISP and requirements of DFCS policy

    d.  Documentation of assessment of and provision for a child's well being and permanency needs to include, but not limited to, the need for continuation of important connections and relationships, need for recreation and socialization, need for mentors and role models, need for development of vocational and family life skills

    e.  Documentation of child/parent-family-sibling visitation; description of how the Facility/Resource Parent(s) contributed to successful visitation as outlined in the child visitation plan; description of any noted safety concerns during visitation

f.  Documentation clearly demonstrating that the child is actively involved in assessment of needs and case planning activities and discussions

g.  Documentation of the frequency and quality of visitation between a child and his/her parents/siblings/extended family/significant connections (where were visits conducted, length of visits, quality of transactions occurring during visits, child's reactions before and after visits)

h.  Documentation of specific Independent Living Services and description of Independent Living Skills activities

i.  Documentation of examples of educational advocacy for a child by the Facility or Resource Parent

j.  Documentation of services provided to Resource Parents by the Group Home to ensure that Resource Parents are given necessary support to successfully parent children in DFCS custody

The Division of Family and Children's Services (DFCS) Director of the DFCS Administration Unit, the Director of the DFCS Permanency Unit, the Director of the Continuous Quality Improvement Unit, and the Director of the DFCS Licensure Unit will ensure that the Independent Contractor meets the programmatic quality assurance and licensure requirement criteria. The Division of Program Integrity shall ensure the Independent Contractor further meets all aspects of the contract.

The tools utilized to evaluate these services will be the Licensure Standards and the programmatic reports submitted monthly to report the outcomes as outlined in Section E. Outcome Reports, beginning on page 7 of this Scope of Services.

The services will be evaluated by the Independent Contractor's submission of the required reports and by the Independent Contractor meeting the Licensure Standards. Failure to meet the Licensure Standards will result in loss of payment.

Program Integrity shall perform a site visit as least once a year, more if requested by the Division of Family and Children's Services. The Licensure Unit shall perform an onsite Annual Licensure Review for this Facility as the License is awarded for a one year period. The Licensure Unit shall visit and perform annual facility reviews (at least one review) two (2) months prior to renewal of the License. If this facility is under a Corrective Action Plan (CAP) the Licensure Unit shall perform a site visit every month the facility is under the CAP. Also, a licensure investigation shall be conducted after all Abuse Neglect and Exploitation (ANE) investigations. Therefore, the number of site visits performed by the Licensure Unit depends on the abovementioned circumstances, but at least one (1) site visit shall be performed by the Licensure Unit.

# Ex. 18F

# CONTRACT AGREEMENT

# CHRISTIANS IN ACTION, INC.

Revised 04/2013

# STATE OF MISSISSIPPI
## MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
### CONTRACT FOR PERSONAL OR PROFESSIONAL SERVICES

**1.    Parties.**    This Contract is made and entered into by and between the Division of Family and Children's Services, Mississippi Department of Human Services, hereinafter referred to as "MDHS," and Christians in Action, Inc., hereinafter referred to as "Independent Contractor."

**2.    Purpose.**    MDHS hereby engages the Independent Contractor and the Independent Contractor hereby agrees to render certain professional services described in Paragraph 3, "Scope of Services."

**3.    Scope of Services.**    The Independent Contractor shall perform and render the following services, attached hereto as "Exhibit A" and the *Modified Mississippi Settlement Agreement*, attached hereto as "Exhibit B".

**4.    Period of Performance.**  The period of performance of services under this Contract shall begin on July 1, 2013 and end on June 30, 2014.  MDHS shall have the option to renew this Contract at one (1) year intervals for two (2) years at the same terms and conditions.  These one (1) year options to this contract shall end on June 30, 2016.

**5.    Consideration and Method of Payment.**

A.   As consideration of all services and performances under this Contract, Independent Contractor shall be paid a fee not to exceed Six Hundred Thirty Three Thousand Eighty Five Dollars and Twenty Cents ($633,085.20).  It is expressly understood and agreed that in no event will the total compensation paid hereunder exceed the specified amount of Six Hundred Thirty Three Thousand Eighty Five Dollars and Twenty Cents ($633,085.20). (Exhibit C)

B. The Independent Contractor will bill MDHS for its services on a monthly basis. Following the satisfactory completion, as determined by MDHS, of its daily services, the State requires the Independent Contractor to submit invoices electronically throughout the term of the agreement.  Invoices shall be submitted to MDHS using the processes and procedures identified by the State.   The appropriate documentation shall be submitted on the last working day of the month, with the final invoice to be submitted within five (5) working days after the contract ending date.

Payments by state agencies using the Statewide Automated Accounting System (SAAS) shall be made and remittance information provided electronically as directed by the State.  These payments shall be deposited into the bank account of the Independent Contractor's choice.   The State may, at its sole discretion, require the Independent Contractor to submit invoices and supporting documentation electronically, at any time, during the term of this Agreement.  Independent Contractor understands and agrees

that the State is exempt from the payment of taxes. All payments shall be in United States currency.

Independent Contractor agrees to accept all payments in United States currency via the State of Mississippi's electronic payment and remittance vehicle. MDHS agrees to make payment in accordance with Mississippi law on "Timely Payments for Purchases by Public Bodies," Mississippi Code Annotated 31-7-301, et. Seq., which generally provides for payment of undisputed amounts by MDHS within forty-five (45) days of receipt of invoice.

## 6. **Relationship of Parties**.

A.     It is expressly understood and agreed that MDHS enters into this Contract with Independent Contractor on a purchase of service basis and not on an employer-employee relationship basis. Nothing contained herein shall be deemed or construed by MDHS, the Independent Contractor, or any third party as creating the relationship of principal and agent, partners, joint venturers, or any similar such relationship between MDHS and the Independent Contractor. Neither the method of computation of fees or other charges, nor any other provision contained herein, nor any acts of MDHS or the Independent Contractor hereunder, creates or shall be deemed to create a relationship other than the independent relationship of MDHS and the Independent Contractor.

B.     Independent Contractor represents that it has, or will secure, at its own expense, applicable personnel who shall be qualified to perform the duty required to be performed under this Contract.

C.     Any person assigned by Independent Contractor to perform the services hereunder shall be the employee of Independent Contractor, who shall have the sole right to hire and discharge its employee. MDHS may, however, direct Independent Contractor to replace any of its employees under this Contract. If Independent Contractor is notified within the first eight (8) hours of assignment that the person is unsatisfactory, Independent Contractor will not charge MDHS for those hours.

D.     It is further understood that the consideration expressed herein constitutes full and complete compensation for all services and performances hereunder, and that any sum due and payable to Independent Contractor shall be paid as a gross sum with no withholdings or deductions being made by MDHS for any purpose from said Contract sum.

E.     Independent Contractor shall pay when due all salaries and wages of its employees, and it accepts exclusive responsibility for the payment of Federal Income Tax, State Income Tax, Social Security, Unemployment Compensation and any other withholdings that may be required.

## 7. **Termination for Cause.**  If, through any cause, Independent Contractor fails to fulfill in a timely and proper manner, as determined by MDHS, its obligations under this Contract, or if Independent Contractor shall violate any of the covenants, agreements, or stipulations of this Contract, MDHS shall thereupon have the right to

2

terminate the Contract by giving written notice to Independent Contractor of such termination and specifying the effective date thereof at least five (5) days before the effective date of such termination. In the event of such termination, Independent Contractor shall be entitled to receive just and equitable compensation for satisfactory work completed on services or documents or materials collected and/or prepared by Independent Contractor in connection with this Contract. Such compensation shall be based upon the fees set forth in Paragraph 5, but, in no case, shall said compensation exceed the total Contract price.

Notwithstanding the above, Independent Contractor shall not be relieved of liability to MDHS for damages sustained by MDHS by virtue of any breach of this Contract by Independent Contractor, and MDHS may withhold any payments to Independent Contractor for the purpose of set off until such time as the exact damages due to MDHS from Independent Contractor are determined.

8.  **Termination for Convenience of MDHS.**  MDHS may terminate this Contract at any time by giving written notice to Independent Contractor of such termination and specifying the effective date thereof at least five (5) days before the effective date of such termination. Independent Contractor shall be paid an amount which bears the same ratio to the total compensation as the services actually and satisfactorily performed bear to the total services of Independent Contractor covered by the Contract, less payments of compensation previously made.

9.  **Ownership of Documents and Work Products.**  All data collected by Independent Contractor and all documents, notes, programs, data bases (and all applications thereof), files, reports, studies,  and/or other material collected and prepared by Independent Contractor in connection with this Contract shall be the property of MDHS upon completion of this Contract or upon termination of this Contract. MDHS hereby reserves all rights to the data base and all applications thereof and to any and all information and/or materials prepared under this Contract.

The Independent Contractor is prohibited from use of the above described information and/or materials without the express written approval of MDHS.

10.  **Conflict of Interest.**  Independent Contractor shall ensure that there exists no direct or indirect conflict of interest in the performance of this contract and/or performance by any of the Independent Contractor's Contractors/Subcontractors. Independent Contractor hereby warrants that no part of any federal or state money shall be paid directly or indirectly to an employee or official of MDHS as wages, compensation or gifts exchange for acting as an officer, agent, employee, subcontractor, or consultant to the Independent Contractor in connection with any work contemplated or pertaining to this Independent Contractor Agreement.  Independent Contractor shall strictly comply with all conflict of interest provisions or standards of conduct provisions contained in any applicable state, federal, or local law, rule, or regulation.

11.  **Record Retention and Access to Records.** Independent Contractor shall maintain, and make available to MDHS, any State agency authorized to audit MDHS,

3

the federal grantor agency, the Comptroller General of the United States or any of their duly authorized representatives, financial records, supporting documents, statistical records, and all other records pertinent to the services performed under this Contract. These records shall be maintained for at least three (3) years; however, if any litigation or other legal action, by or on behalf of the state or federal government has begun that is not completed at the end of the three-year period, or if audit finding, litigation, or other legal action has not been resolved at the end of the three-year period, the records shall be retained until resolution.

**12.** **Modification or Amendment.** Modifications, changes, or amendments to this Contract may be made upon mutual agreement of the parties hereto. However, any change, supplement, modification, or amendment of any term, provision, or condition of this Contract must be in writing and signed by both parties hereto.

**13.** **Assignments and Subcontracts.** Independent Contractor shall not assign, sublet, or otherwise transfer the obligations incurred on its part pursuant to the terms of this Contract without the prior written consent of MDHS. Any attempted assignment or transfer of its obligation without such consent shall be wholly void.

**14.** **Waiver.** Failure of either party hereto to insist upon strict compliance with any of the terms, covenants, and conditions hereof shall not be deemed a waiver or relinquishment of any similar right or power hereunder at any subsequent time or of any other provision hereof, nor shall it be construed to be a modification of the terms of this Contract.

**15.** **Availability of Funds.** It is expressly understood and agreed that the obligation of MDHS to proceed under this Contract is conditioned upon the availability of funds, the appropriation of funds by the Mississippi Legislature, and the receipt of state and/or federal funds. If, at any time, the funds anticipated for the fulfillment of this Contract are not forthcoming or are insufficient, either through the failure of the federal government to provide funds or of the State of Mississippi to appropriate funds or the discontinuance or material alteration of the program under which funds were provided, or if funds are not otherwise available to MDHS for the performance of this Contract, MDHS shall have the right, upon written notice to Independent Contractor, to immediately terminate this Contract without damage, penalty, cost, or expense to MDHS of any kind whatsoever. The effective date of termination shall be as specified in the notice of termination.

**16.** **Price Adjustment.**

**A.** **Price Adjustment Methods.** The Contract price may be changed only by written agreement of the parties. The value of any work covered by any claim for increase or decrease in the Contract Price shall be determined by one or more of the following methods:

      (1)    Unit prices, if any, previously approved by the parties and specified in this Contract; or

4

(2)   MDHS may, at any time by written order, make changes in the specifications within the general scope of this Agreement.  If any such change causes an increase in the amount due under this Contract or in the time required for performance under this Agreement and if MDHS decides that the change justifies an adjustment to the Contract, an equitable adjustment in the Contract may be made by written modification of this Agreement.

No charge for any extra work or material will be allowed unless the same has been provided for by written amendment to this Contract signed by both parties.

**B.**    **Submission of Cost Pricing Data.** The Independent Contractor shall provide cost or pricing data for any price adjustments subject to the provisions of Section 3-403 (Cost or Pricing Data) of the Mississippi Personal Service Contract Procurement Regulations.

**17.**    **Indemnification.** MDHS shall, at no time, be legally responsible for any negligence or wrongdoing by the Independent Contractor and/or its employees, servants, agents, contractors, and/or subcontractors. Independent Contractor agrees to indemnify, defend, save and hold harmless MDHS from and against all claims, demands, liabilities, suits, damages, and costs of every kind and nature whatsoever, including court costs and attorney's fees, arising out of or caused by Independent Contractor and its employees, agents, contractors, and/or subcontractors in the performance of this Contract.

**18.**    **Insurance.**    Independent Contractor represents that it will maintain workers' compensation insurance which shall inure to the benefit of all Independent Contractor's personnel performing services under this Contract, comprehensive general liability insurance, and employee fidelity bond insurance.  Independent Contractor will furnish MDHS a certificate of insurance providing the aforesaid coverage, prior to the commencement of performance under this Agreement. (Exhibit D).

**19.**    **Applicable Law.**   The contract shall be governed by and construed in accordance with the laws of the State of Mississippi, excluding its conflicts of laws provisions, and any litigation with respect thereto shall be brought in the courts of the state.  The Independent Contractor shall comply with applicable federal, state and local laws and regulations.

**20.**    **Representation Regarding Contingent Fees.**  The Independent Contractor represents that it has not retained a person to solicit or secure a State contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, except as disclosed in the Independent Contractor's bid, proposal, or herein.

**21.**    **Certification of Independent Price Determination.**  The bidder certifies that the prices submitted in response to the solicitation have been arrived at

5

independently and without, for the purpose of restricting competition, any consultation, communication, or agreement with any other bidder or competitor relating to those prices, the intention to submit a bid, or the methods or factors used to calculate the prices bid.

22.    **Representation Regarding Gratuities.** The Independent Contractor represents that neither it nor any officer, employee, agent, subcontractor or other representative of the Independent Contractor has violated, or is violating, and promises that it will not violate the prohibition against gratuities set forth in Section 6-204 (Gratuities) of the Mississippi Personal Service Contract Procurement Regulations.

23.    **Procurement Regulations.** The Contract shall be governed by the applicable provisions of the Personal Service Contract Review Board Regulations, a copy of which is available for inspection at 210 East Capitol Street, Suite 800, Jackson, Mississippi 39201, or downloadable at www.mspb.ms.gov.

24.    **Severability.** If any term or provision of this Contract is prohibited by the laws of the State of Mississippi or declared invalid or void by a court of competent jurisdiction, the remainder of this Contract shall not be affected thereby and each term and provision of this Contract shall be valid and enforceable to the fullest extent permitted by law.

25.    **Stop Work Order.**

A.    **Order to Stop Work.** The Director of Division of Family and Children's Services, may, by written order to the Independent Contractor at any time, and without notice to any surety, require the Independent Contractor to stop all or any part of the work called for by this Contract. This order shall be for a specified period not exceeding 90 days after the order is delivered to the Independent Contractor, unless the parties agree to any further period. Any such order shall be identified specifically as a stop work order issued pursuant to this clause. Upon receipt of such an order, the Independent Contractor shall forthwith comply with its terms and take all steps to minimize the occurrence of costs allocable to the work covered by the order during the period of work stoppage. Before the stop work order expires, or within any further period to which the parties shall have agreed, the Director of Family and Children's Services shall either:

(1)    cancel the stop work order; or

(2)    terminate the work covered by such order as provided in the "Termination for Cause" clause or the "Termination for Convenience" clause of this Contract.

B.    **Cancellation or Expiration of the Order.** If a stop work order issued under this clause is canceled at any time during the period specified in the order, or if the period of the order or any extension thereof expires, the Independent Contractor shall have the right to resume work. An appropriate adjustment may be made in the delivery schedule or Independent Contractor's price, or both. If the stop work order results in an increase in the time required for, or in the Independent Contractor's cost

6

properly allocable to, the performance of any part of this Contract and the Independent Contractor asserts a claim for such an adjustment within 30 days after the end of the period of work stoppage, an equitable adjustment in the Contract may be made by written modification of this Contract. If MDHS decides that the need justifies the requested adjustment, a modification will be made as provided by Section 12, Modification or Amendment, of this Contract.

**C.    Termination of Stopped Work.** If a stop work order is not canceled and the work covered by such order is terminated for cause or convenience, the Independent Contractor may be paid the agreed upon price for any completed deliverable or service not previously tendered to MDHS, provided that MDHS accepts any such deliverable or service; or Independent Contractor may be paid an amount which bears the same ratio to the total compensation as the services actually and satisfactorily performed bear to the total services of Independent Contractor covered by the Contract, less payments of compensation previously made.

**D.    Adjustment of Price.** Any adjustment in Contract price made pursuant to this clause shall be determined in accordance with the Price Adjustment clause of this Contract.

**26.    Disputes.** Any dispute concerning a question of fact under this Contract which is not disposed of by agreement shall be decided by the Director of the Division of Family and Children's Services. This decision shall be reduced to writing and a copy thereof mailed or furnished to the Independent Contractor and shall be final and conclusive, unless within thirty (30) days from the date of the decision, Independent Contractor mails or furnishes to the Executive Director of MDHS a written request for review. Pending final decision of the Executive Director of a dispute hereunder, the Independent Contractor shall proceed in accordance with the decision of the Director of the Division of Family and Children's Services.

In a review before the Executive Director or designee, the Independent Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its position on the question and decision under review. The decision of the Executive Director on the review shall be final and conclusive unless determined by a court of competent jurisdiction in Hinds County, State of Mississippi, to have been fraudulent, capricious, so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence.

**27.    Compliance with Laws.** The Independent Contractor understands that the State is an equal opportunity employer and therefore maintains a policy which prohibits unlawful discrimination based on race, color, creed, sex, age, national origin, physical handicap, disability, genetic information, or any other consideration made unlawful by federal, State, or local laws. All such discrimination is unlawful and the Independent Contractor agrees during the term of the agreement that the Independent Contractor will strictly adhere to this policy in its employment practices and provision of services. The Independent Contractor shall comply with, and all activities under this agreement shall be subject to, all applicable federal, State of Mississippi, and local laws and regulations, as now existing and as may be amended or modified.

28.    **Confidentiality.**  Independent Contractor shall treat all State data and information to which it has access under this Contract as confidential information to the extent that confidential treatment of same is required under federal and state law and shall not disclose same to a third party without specific written consent of the State.  In the event that Independent Contractor receives notice that a third party requests divulgence of confidential or otherwise protected information and/or has served upon it a subpoena or other validly issued administrative or judicial process ordering divulgence of confidential or otherwise protected information, Independent Contractor shall promptly inform the State and thereafter respond in conformity with such subpoena as required by applicable state and/or federal law, rules, and regulations.  The provision herein shall survive termination of the Contract for any reason and shall continue in full force and effect and shall be binding upon the Independent Contractor and its agents, employees, successors, assigns, subcontractors, or any party claiming an interest in the Contract on behalf of, or under, the rights of the Independent Contractor following any termination.

29.    **E-Verify.**    Independent Contractor represents and warrants that it will ensure its compliance with the Mississippi Employment Protection Act, Mississippi Code Annotated 71-11-1 and 71-11-3, and will register and participate in the status verification system for all newly hired employees.  The term "employee" as used herein means any person that is hired to perform work within the State of Mississippi.  As used herein, "status verification system" means the Illegal Immigration Reform and Immigration Responsibility Act of 1996 that is operated by the United States Department of Homeland Security, also known as the E-Verify Program, or any other successor electronic verification system replacing the E-Verify Program.  Independent Contractor agrees to maintain records of such compliance and, upon request of the State, to provide a copy of each such verification to the State. Independent Contractor further represents and warrants that any person assigned to perform services hereunder meets the employment eligibility requirements of all immigration laws of the State of Mississippi.  Independent Contractor understands and agrees that any breach of these warranties may subject Independent Contractor to the following: (a) termination of this Agreement and ineligibility for any state or public contract in Mississippi for up to three (3) years, with notice of such cancellation/termination being made public, or (b) the loss of any license permit, certification or other document granted to Independent Contractor by an agency, department or governmental entity for the right to do business in Mississippi for up to one (1) year, or both.  In the event of such termination/cancellation, Independent Contractor would also be liable for any additional costs incurred by the State due to contract cancellation or loss of "license or permit." (Exhibit E).

30.    **Special Terms and Conditions.** It is agreed and understood by each party to this Contract that there are no special terms and conditions.

31.    **Entire Agreement.**   It is understood and agreed that this Contract and the documents listed below constitute the entire understanding of the parties with respect to the subject matter contained herein and supersede and replace any and all prior negotiations, understandings and agreements, written or oral, between the parties relating thereto.  The entire agreement made by and between the parties hereto shall

8

consist of, and precedence is hereby established by the order of, the following documents incorporated herein:

1. This Contract signed by the parties herein and any Exhibits attached hereto;

2. The Request for Proposals dated February 11, 2013; Response to Proposals dated March 8, 2013.

The documents are complementary, and what is required by one shall be binding as if required by all. A higher document shall supersede a lower order document to the extent necessary to resolve any conflict or inconsistency arising under the various provisions thereof; provided, however, that in no event an issue is addressed in one of the above-mentioned documents but is not addressed in another of such documents, no conflict or inconsistency shall be deemed to occur by reason thereof. The documents listed above are shown in descending order or priority, that is, the highest document begins with the first listed document ("1. This Contract signed by the parties herein and any Exhibits attached hereto") and the lowest document is listed last ("2. The Request for Proposals dated February 11, 2013 and Response to Proposals dated March 8, 2013").

32. **Background Checks.** All child care facilities which are awarded funds, whether they are awarded funds directly or through contracts with entities who receive funds directly, shall ensure that all their personnel, whether owners, or employees or volunteer workers have first been subjects of criminal background checks. These persons shall not be allowed to operate a facility nor given even provisional employment until the results of said background checks are obtained. The background checks shall be requested by the child care facilities. The expense of these background checks shall not be borne by MDHS but instead by the child care facility which requests the background check.

If it is determined that there is a child care facility which is operated by, or has hired, or accepted as a volunteer, a person with a criminal background, MDHS reserves the right to terminate its Contract with said facility if its Contract was directly with said facility. If the MDHS Contract is with an intermediary facility which has passed the funds through to other facilities, MDHS reserves the right to demand that such intermediary facility terminate its Contract with the non-conforming facility, or the intermediary facility may face termination of its Contract with MDHS.

33. **Non-Compete.** For the term of this contract and for a period of two (2) years thereafter, Christians in Action, Inc., hereby agrees not to directly or indirectly engage in competition in any way with MDHS or to associate with the state business or other business that may compete with MDHS. The term "competition" as used in the foregoing shall include, but not limited to, attempts to divert workers, clients, suppliers, or accounts from MDHS and/or attempt to induce employees of MDHS to terminate their employment. MDHS hereby agrees to enforce the provisions of the Non-Compete Agreement by any legal means. Such means shall include the right to enjoin by legal process for violating provisions hereof.

9

**34.    Transparency.**    This contract, including any accompanying exhibits, attachments, and appendices, is subject to the "Mississippi Public Records Act of 1983," codified as section 25-61-1 et seq., Mississippi Code Annotated and exceptions found in Section 79-23-1 of the Mississippi Code Annotated (1972, as amended).  In addition, this contract is subject to the provisions of the Mississippi Accountability and Transparency Act of 2008 (MATA), codified as Section 31-7-13 of the Mississippi Code Annotated (1972, as amended).    Unless exempted from disclosure due to a court-issued protective order, this contract is required to be posted to the Department of Finance and Administration's independent agency contract website for public access. Prior to posting the contract to the website, any information identified by the Contractor as trade secrets, or other proprietary information including confidential vendor information, or any other information which is required confidential by state or federal law or outside the applicable freedom of information statutes will be redacted.

**35.    Notice.**  Any notice required or permitted to be given under this Contract shall be in writing and sent by United States Certified Mail, Returned Receipt Requested to the party to whom the notice should be given at the address set forth below:

**MDHS:**                         Mr. Richard A. Berry, Executive Director
                                  Mississippi Department of Human Services
                                  P.O. Box 352
                                  Jackson, Mississippi 39205

**CHRISTIANS IN**
**ACTION, INC.:**                 Ms. Janice Wilder, Executive Director
                                  Christians in Action, Inc.
                                  Post Office Box 7676
                                  Jackson, Mississippi 39284

**IN WITNESS WHEREOF,** this Contract has been made and interchangeably executed by the parties hereto in duplicate originals.

Witness my signature this, the _25_ day of _June_ _____, 2013.

**MISSISSIPPI DEPARTMENT OF HUMAN SERVICES**

BY: _____
                         **Signature**
TITLE: _Deputy Executive Director_

**WITNESSES:**

_____

_____

Witness my signature this, the _20th_ day of _June_ _____, 2013.

**CHRISTIANS IN ACTION, INC.**

BY: _____
                         **Signature**
Printed Name: _Janice Wilder_

TITLE: _Executive Director_

**WITNESSES:**

_____

_____

11

# SCOPE OF SERVICES
# CHRISTIANS IN ACTION, INC.

**CHRISTIANS IN ACTION, INC.**
**EMERGENCY SHELTER/DIAGNOSTIC/ EVALUATION FACILITY**
**SCOPE OF SERVICES**
**JULY 1, 2013 – JUNE 30, 2014**

The Emergency Shelter is licensed to care for twelve (12) children who may remain for a forty-five (45) day period, pending court proceedings and foster care placement, or return home. It is a resource to be used when a short-term placement is needed, and is available twenty-four (24) hours a day, year round. Located in Hinds County, among those with the highest number of substantiated reports, it enables children to be placed near their homes, to have access to their families for visits, and prevents out of county placements. It allows children to remain with their siblings and keeps them in close proximity to their MDHS social worker. Our most recent statistics show that over seventy percent (70%) of children served by our agency are part of a sibling group.

Preserving this sibling bond is imperative to children who are already suffering from the psychological impact of separation from their parents.

The following are some of our goals, which are achieved by providing the following service plan.

- <u>Goal</u>  To assist the Mississippi Department of Human Services in Family Preservation and to prevent further abuse, neglect, exploitation, or abandonment of children

- <u>Goal</u> That children placed in shelter care have their physical, emotional and educational needs met

- <u>Goal</u>  To insure that the psychological needs of children are met, both immediate and long term

All supervision, food, recreation and personal supplies are provided by the agency. Transportation to schools, doctor's visits, and recreational outings is provided. Comprehensive medical, dental, psychological assessments, and counseling are provided through Medicaid. Clothing is provided for immediate, basic needs and the agency provides school uniforms for children in our care. Supplemental clothing is also provided by the county of responsibility and by community volunteers.

Consistency in education is maintained by allowing children from Hinds County to remain in their current school setting, where they can remain with friends, teachers and mentors, with no disruption in their current educational process. Tutoring is provided by staff and volunteers. Every effort is made to insure that children feel they are a part of the community and involved in activities separate from shelter life. The shelter coordinates school activities for each child and encourages outside activities. Teens who are not in school are encouraged to acquire their GED and arrangements are made with a program at Jackson State University for study help for this purpose.

With the increasing number of Hispanic children placed in our agency who may not speak English, an interpreter from Jackson State University is utilized to facilitate communication.

Independent Living Skills training is provided for youth, ages fourteen (14) and up, to include money management, social and study skills, anger management and building self-esteem.

Christians in Action, Inc. has assembled a network of health and service providers which enables the agency to access wrap around services for children in shelter care. A medical provider works with our agency in providing screenings in the time frame required, and often sees large sibling groups in one visit. The staff social worker serves as the agency network coordinator and collaborates with all service providers to insure that the needs of our children are met.

Diagnostic and Evaluation assessments are provided for all eligible children between the age of five and seventeen, so that a long-term plan of care can be developed to insure appropriate placement. This is achieved through the services of a Licensed, Clinical Psychologist. In addition, we provide office space for a Licensed, Clinical Social Worker who comes to the shelter three times a week for counseling sessions, using Cognitive Behavioral Therapy and a Multimodal Behavior Therapy approach. An initial medical/dental/vision screening is performed in accordance with licensure requirements. These services are provided through Medicaid. Brentwood Behavioral Center may be utilized as a resource for immediate needs as determined by Christians in Action, Inc. and the county of responsibility.

The agency provides respite care to foster parents who are experiencing burn-out, if space is available in the shelter, and Christians in Action, Inc. can insure adequate supervision of additional children. Referrals must come from the MDHS county social worker. This service is delivered free of charge to the foster parent and to the Mississippi Department of Human Services. Respite care can prevent disruption of the foster home placement and prevent multiple placements.

Time Line for Delivery of Services-

Children are placed in the Emergency Child Shelter for a period not to exceed forty-five (45) days. The facility social worker shall notify the county of responsibility of the discharge date. If the county of responsibility cannot find placement within forty-five (45) days, a request may be made to the Division Director. Approval must be received before an extension can be granted.

If a child has been in the shelter for more than three days, the facility will assist MDHS in assessing the individual needs of the child, and provide a plan of the services to be provided and other resources needed. Any child, who has not had a medical within thirty (30) days of entering shelter care, will receive a medical examination, to include an EPSDT and dental screening, within seven working days of entering the facility. A psychological assessment will be provided for children, at age appropriate levels, who have remained in care for twenty-one (21) days. Copies of all plans will be maintained at the shelter and provided to the placing agency in a timely manner. The facility will be open for placement, twenty-four (24) hours a day, year round, including holidays.

Targeted population and geographic area to be served-

The target population is any child, birth through seventeen, who has been abused or neglected, abandoned, (or at risk of), is eligible for the service. All clients must be in custody of the Mississippi Department of Human Services. The shelter is located in Region III-S, however,

any child in Mississippi may be served by the program, space permitting, and upon request of the MDHS.

- Target number of clients to be served

An average number of one hundred fifty (150) children are served each year, and have been provided an average of 3,700 units of service over a three (3) year period.

- Plans for involvement of community volunteers
  Christians in Action, Inc. actively engages members of the community to provide activities relative to holidays, to furnish gifts, clothing and special needs for our children in shelter care. Community resources are utilized for funding projects for the shelter which enables the agency to purchase new equipment and improve the facility.

- Description of how collaboration will be implemented with DFCS County, Regional and State Office Staff.  The facility shall provide the County of Responsibility progress reports as requested in the RFP. The facility will work with MDHS staff in developing an appropriate placement plan according to the child's behavior, strengths, problems, and needs. Conduct disorders, sexually reactive and aggressive behavior shall be immediately reported to MDHS so these can be addressed prior to permanent placement. Law enforcement shall be immediately notified if a child leaves the facility without permission. Staff will then contact the Executive Director, who may enlist the assistance of other key personnel. The county of responsibility will be notified, and a Serious Incident Report filed with MDHS within 72 hours.  Children leaving the facility without permission can return with approval of the Mississippi Department of Human Services provided charges have not been filed for injury or destruction of property.

Minor injury requiring a doctor will be documented and the MDHS staff notified.  All injuries are recorded in child's file.  If a child receives a major injury, emergency treatment will be sought immediately, and the MDHS family protection staff notified.

Christians in Action, Inc. accepts all general terms and conditions of the Request for Proposal except as noted below:

- Christians in Action, Inc. can provide basic clothing needs, school uniforms, and emergency clothing, and will depend upon the county of responsibility to furnish clothing needs beyond this.

- Christians in Action, Inc. provides transportation to area schools, medical visits, and for recreation.  We are willing to provide transportation for visits on a limited basis when staff and vehicles are available, on a case by case basis and within a limited service area, but cannot leave the shelter without adequate coverage.  The current per diem rate does not provide an adequate amount to hire additional staff to supervise family visits or pay for excess travel.

- Our agency is licensed to provide services to children, birth through seventeen years of age only.

- Christians in Action, Inc. is unable to bear the cost of medical treatment not paid by Medicaid.  All services for psychological assessments, therapeutic counseling,

medical and dental care and prescriptions must be paid by Medicaid or by the Mississippi Department of Human Services.

- Emergency Shelters are exempted from the No Decline/No Dismissal policy as outlined in the MDHS Licensure Standards. In all cases, Christians in Action, Inc. will defer to the Standards.

## OUTCOME REPORTS

The Facility will submit Monthly Outcome Reports to the DFCS Congregate Care Unit by the tenth (10th) working day of each month. Unless otherwise indicated, please provide the following outcome measures for each month.

1. Safety

    a.  Number of children served in the emergency shelter
    b.  Number of reports of maltreatment
    c.  Number of reports referred to DFCS centralized intake in < eight (8) hours
    d.  Number of reports referred to DFCS centralized intake in < twenty-four (24) hours
    e.  Number of children removed from Facility due to report of maltreatment
    f.  Number of reports requiring corrective action by the Facility/agency
    g.  Number of corrective action reports submitted to DFCS < thirty (30) days
    h.  Number of runaway episodes
    i.  Number of Serious Incidents

2. Discharges/Disruptions

    a.  Number of children discharged to a final Permanency Plan outcome
    b.  Percent of children discharged to a final Permanency Plan outcome
    c.  Number of children which the Facility requested removal of the child
    d.  Number of children for whom the Facility requested removal and a placement disruption meeting was held prior to removal
    e.  Number of children for whom the Facility requested removal and a two (2) week notice was not given
    f.  Number of children discharged due to unplanned circumstances
    g.  Percent of total children discharged due to unplanned circumstances
    h.  Number of children discharged to a lower level, less restrictive placement
    i.  Percent of children discharged to a lower level, less restrictive placement
    j.  Number of children discharged to a higher level, more restrictive placement
    k.  Percent of children discharged to a higher level, more restrictive placement

3. Case Planning

    a.  Number of Family Team Meetings/ISP Meetings/Adoption Status Meetings initiated by DFCS and attended by Facility social worker during the reporting month

    b.  Number of Foster Care Review conferences attended by Facility social worker during the reporting month

4. Independent Living

    a.  Number of children> fourteen (14) years of age served during the reporting month
    b.  Number of Independent Living Skills groups attended by these children during the reporting month

c. Number of Independent Living Skills sessions conducted and documented by Facility professional staff

5. Child/Parent/Sibling Visitation -Connections

a. Number of visits between children and their parents/other siblings in care held at the Facility or approved location other than DFCS office

b. Number of visits between children and their extended family/siblings not in care/other connections held at the Facility or approved location other than DFCS office

c. Number of visits between children/parents/siblings in care/connections in which the Facility staff provided primary supervision of visits

d. Number of visits between children/parents/siblings in care/connections in which the Facility staff provided transportation to the visit site

e. Number of other events (such as birthdays, school activities, medical/mental health appointments) for which the Facility provided transportation or assisted with arrangements that maintained or strengthened a child's relationship with significant connections

f. Number of children served whose residence (home from which they were removed) is greater than fifty (50) miles from placement site

g. Percent of children served whose residence (home from which they were removed) is greater than fifty (50) miles from placement site

6. Medical/Dental Needs

a. Number of children served during the reporting month whose initial placement during the current custody episode was in this Facility

b. Number of these children who received an initial medical assessment within seventy-two (72) hours of custody

c. Number of these children who received a comprehensive medical exam within thirty (30) days of custody

d. Number of total children in care for whom an annual medical exam was due during the reporting month

e. Number of children due annual medical exams who received an annual medical exam

f. Number of children for whom a semi-annual dental exam was due during the reporting month

g. Number of children due a semi-annual dental exam who received a dental exam

h. Number of children who experienced an acute medical episode requiring emergency assessment, treatment or hospitalization

i. Number of children requiring psychotropic medication

j. Number of children requiring psychotropic medication who have a written plan of approval from the County of Responsibility for administration of psychotropic medication on file

k. Number of children ages zero to three (0-3) served during the month by the Facility or Resource Home(s)

l. Number of children ages zero to three (0-3) who have been referred to the First

m. Number of children ages zero to three (0-3) who have been assessed by the First Steps Early Intervention Program

n. Number of children> three (3) years of age who have received a developmental assessment through the Department of Health, Department of Mental Health or private provider

o. Number of total children served during the reporting month whose recommended schedule of immunizations has been followed

7.    Mental Health

    a.    Number of children four (4) years and older placed in the Facility during the past reporting month

    b.    Number of children four (4) years and older who have a current mental health assessment on file

    c.    Number of children whose mental health assessment has determined the need for ongoing or follow up mental health services

    d.    Number of children who receive all mental health services recommended in this assessment

    e.    Number of children screened for Fetal Alcohol Spectrum Disorder

8.    Educational Needs

    a.    Number of school age children entering the Facility during the reporting month

    b.    Number of school age children who were enrolled in an accredited school within three (3) days (with the exception of school holidays and breaks)

    c.    Number of school age children who are able to remain in the same school they attended prior to placement in this Facility

    d.    Number of school age children whose initial placement was in this Facility

    e.    Number of school age children who received an educational assessment during the first thirty (30) days of placement

    f.    Number of children who meet the criteria of "exceptional child" as defined in §37¬23-3 of the Mississippi Code

    g.    Number of children who meet the criteria of "exceptional child" as defined in §37¬23-3 of the Mississippi Code have an IEP

    h.    Number of children who meet the criteria of "exceptional child" as defined in §37¬23-3 of the Mississippi Code who receive appropriate special education and related services as contained in the IEP

    i.    Number of IEP conferences attended by Facility social worker(s) during the reporting month

<u>Narrative Updates/Progress Reports</u>

The Facility will provide to the County of Responsibility bi-weekly narrative updates/progress reports on each child served. These updates/reports should address all issues of which DFCS Workers need to be aware. The Monthly Log of contacts will be submitted by the tenth (10th) working day each month. Hard copies of any documents such as medical, mental health and educational records should be provided to the County of Responsibility immediately upon receipt by the Facility. The Facility should retain copies of all these documents in the child's file maintained by the Facility. The following documentation details should routinely be addressed in narrative updates and progress reports.

    a.    Documentation of assessment and clarification of ongoing child safety identification of risk, description of safety plans developed,

    b.    Documentation of periodic discussion with the child concerning his/her ISP and identification of barriers to achievement and permanency.

    c.    Documentation of assessment of and provision for medical, dental, educational and mental health needs based on the child's ISP and requirements of MDHS/DFCS policy; documentation of educational advocacy.

    d.    Documentation of assessment of and provision for a child's well-being and permanency needs to include, but not limited to, the need for continuation of important connections

and relationships, need for recreation and socialization, need for mentors and role models, need for development of vocational and family life skills.

e.    Documentation of child/parent-family-sibling visitation; description of how the Facility contributed to successful visitation as outlined in the child visitation plan; description of any noted safety concerns during visitation

f.    Documentation clearly demonstrating that the child, when age appropriate, is actively involved in assessment of needs and case planning activities and discussions

g.    Documentation of the frequency and quality of visitation between a child and his/her parents/siblings/extended family/significant connections (where were visits conducted, length of visits, quality of transactions occurring during visits, child's reactions before and after visits)

h.    Documentation of specific Independent Living Services and description of Independent Living Skills activities

i.    Documentation of examples of educational advocacy for a child by the Facility or Resource Parent

The Division of Family and Children's Services (DFCS) Director of the DFCS Administration Unit, the Director of the DFCS Permanency Unit, the Director of the Continuous Quality Improvement Unit, and the Director of the DFCS Licensure Unit will ensure that the Independent Contractor meets the programmatic quality assurance and licensure requirement criteria**.** The Division of Program Integrity shall ensure the Independent Contractor further meets all aspects of the contract.

The tools utilized to evaluate these services will be the Licensure Standards and the programmatic reports submitted monthly to report the outcomes as outlined in Outcome Reports, beginning on page 4 of this Scope of Services.

The services will be evaluated by the Independent Contractor's submission of the required reports and by the Independent Contractor meeting the Licensure Standards.  Failure to meet the Licensure Standards will result in loss of payment.

Program Integrity shall perform a site visit as least once a year, more if requested by the Division of Family and Children's Services.  The Licensure Unit shall perform an onsite Annual Licensure Review for this Facility as the License is awarded for a one year period.  The Licensure Unit shall visit and perform annual facility reviews (at least one review) two (2) months prior to renewal of the License.  If this facility is under a Corrective Action Plan (CAP) the Licensure Unit shall perform a site visit every month the facility is under the CAP.  Also, a licensure investigation shall be conducted after all Abuse Neglect and Exploitation (ANE) investigations.  Therefore, the number of site visits performed by the Licensure Unit depends on the abovementioned circumstances, but at least one (1) site visit shall be performed by the Licensure Unit.

# Ex. 18G

# CONTRACT AGREEMENT
# SALLY KATE WINTERS FAMILY SERVICES

Revised 04/2013

# STATE OF MISSISSIPPI
## MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
## CONTRACT FOR PERSONAL OR PROFESSIONAL SERVICES

**1.    Parties.**    This Contract is made and entered into by and between the Division of Family and Children's Services, Mississippi Department of Human Services, hereinafter referred to as "MDHS," and Sally Kate Winters Family Services, hereinafter referred to as "Independent Contractor."

**2.    Purpose.**    MDHS hereby engages the Independent Contractor and the Independent Contractor hereby agrees to render certain professional services described in Paragraph 3, "Scope of Services."

**3.    Scope of Services.**    The Independent Contractor shall perform and render the following services, attached hereto as "Exhibit A" and the *Modified Mississippi Settlement Agreement,* attached hereto as "Exhibit B".

**4.    Period of Performance.**  The period of performance of services under this Contract shall begin on July 1, 2013 and end on June 30, 2014.  MDHS shall have the option to renew this Contract at one (1) year intervals for two (2) years at the same terms and conditions.  These one (1) year options to this contract shall end on June 30, 2016.

**5.    Consideration and Method of Payment.**

A.    As consideration of all services and performances under this Contract, Independent Contractor shall be paid a fee not to exceed Six Hundred Thirty Three Thousand Eighty Five Dollars and Twenty Cents ($633,085.20).  It is expressly understood and agreed that in no event will the total compensation paid hereunder exceed the specified amount of Six Hundred Thirty Three Thousand Eighty Five Dollars and Twenty Cents ($633,085.20). (Exhibit C)

B.  The Independent Contractor will bill MDHS for its services on a monthly basis. Following the satisfactory completion, as determined by MDHS, of its monthly services, the State requires the Independent Contractor to submit invoices electronically throughout the term of the agreement.  Invoices shall be submitted to MDHS using the processes and procedures identified by the State.  The appropriate documentation shall be submitted on the last working day of the month, with the final invoice to be submitted within five (5) working days after the contract ending date.

Payments by state agencies using the Statewide Automated Accounting System (SAAS) shall be made and remittance information provided electronically as directed by the State.  These payments shall be deposited into the bank account of the Independent Contractor's choice.  The State may, at its sole discretion, require the Independent Contractor to submit invoices and supporting documentation electronically, at any time, during the term of this Agreement.  Independent Contractor understands and agrees

that the State is exempt from the payment of taxes. All payments shall be in United States currency.

Independent Contractor agrees to accept all payments in United States currency via the State of Mississippi's electronic payment and remittance vehicle. MDHS agrees to make payment in accordance with Mississippi law on "Timely Payments for Purchases by Public Bodies," Mississippi Code Annotated 31-7-301, et. Seq., which generally provides for payment of undisputed amounts by MDHS within forty-five (45) days of receipt of invoice.

6.    **Relationship of Parties.**

A.    It is expressly understood and agreed that MDHS enters into this Contract with Independent Contractor on a purchase of service basis and not on an employer--employee relationship basis. Nothing contained herein shall be deemed or construed by MDHS, the Independent Contractor, or any third party as creating the relationship of principal and agent, partners, joint venturers, or any similar such relationship between MDHS and the Independent Contractor. Neither the method of computation of fees or other charges, nor any other provision contained herein, nor any acts of MDHS or the Independent Contractor hereunder, creates or shall be deemed to create a relationship other than the independent relationship of MDHS and the Independent Contractor.

B.    Independent Contractor represents that it has, or will secure, at its own expense, applicable personnel who shall be qualified to perform the duty required to be performed under this Contract.

C.    Any person assigned by Independent Contractor to perform the services hereunder shall be the employee of Independent Contractor, who shall have the sole right to hire and discharge its employee. MDHS may, however, direct Independent Contractor to replace any of its employees under this Contract. If Independent Contractor is notified within the first eight (8) hours of assignment that the person is unsatisfactory, Independent Contractor will not charge MDHS for those hours.

D.    It is further understood that the consideration expressed herein constitutes full and complete compensation for all services and performances hereunder, and that any sum due and payable to Independent Contractor shall be paid as a gross sum with no withholdings or deductions being made by MDHS for any purpose from said Contract sum.

E.    Independent Contractor shall pay when due all salaries and wages of its employees, and it accepts exclusive responsibility for the payment of Federal Income Tax, State Income Tax, Social Security, Unemployment Compensation and any other withholdings that may be required.

7.    **Termination for Cause.**  If, through any cause, Independent Contractor fails to fulfill in a timely and proper manner, as determined by MDHS, its obligations under this Contract, or if Independent Contractor shall violate any of the covenants, agreements, or stipulations of this Contract, MDHS shall thereupon have the right to

2

terminate the Contract by giving written notice to Independent Contractor of such termination and specifying the effective date thereof at least five (5) days before the effective date of such termination. In the event of such termination, Independent Contractor shall be entitled to receive just and equitable compensation for satisfactory work completed on services or documents or materials collected and/or prepared by Independent Contractor in connection with this Contract. Such compensation shall be based upon the fees set forth in Paragraph 5, but, in no case, shall said compensation exceed the total Contract price.

Notwithstanding the above, Independent Contractor shall not be relieved of liability to MDHS for damages sustained by MDHS by virtue of any breach of this Contract by Independent Contractor, and MDHS may withhold any payments to Independent Contractor for the purpose of set off until such time as the exact damages due to MDHS from Independent Contractor are determined.

8. **Termination for Convenience of MDHS.** MDHS may terminate this Contract at any time by giving written notice to Independent Contractor of such termination and specifying the effective date thereof at least five (5) days before the effective date of such termination. Independent Contractor shall be paid an amount which bears the same ratio to the total compensation as the services actually and satisfactorily performed bear to the total services of Independent Contractor covered by the Contract, less payments of compensation previously made.

9. **Ownership of Documents and Work Products.** All data collected by Independent Contractor and all documents, notes, programs, data bases (and all applications thereof), files, reports, studies, and/or other material collected and prepared by Independent Contractor in connection with this Contract shall be the property of MDHS upon completion of this Contract or upon termination of this Contract. MDHS hereby reserves all rights to the data base and all applications thereof and to any and all information and/or materials prepared under this Contract.

The Independent Contractor is prohibited from use of the above described information and/or materials without the express written approval of MDHS.

10. **Conflict of Interest.** Independent Contractor shall ensure that there exists no direct or indirect conflict of interest in the performance of this contract and/or performance by any of the Independent Contractor's Contractors/Subcontractors. Independent Contractor hereby warrants that no part of any federal or state money shall be paid directly or indirectly to an employee or official of MDHS as wages, compensation or gifts exchange for acting as an officer, agent, employee, subcontractor, or consultant to the Independent Contractor in connection with any work contemplated or pertaining to this Independent Contractor Agreement. Independent Contractor shall strictly comply with all conflict of interest provisions or standards of conduct provisions contained in any applicable state, federal, or local law, rule, or regulation.

11. **Record Retention and Access to Records.** Independent Contractor shall maintain, and make available to MDHS, any State agency authorized to audit MDHS,

3

the federal grantor agency, the Comptroller General of the United States or any of their duly authorized representatives, financial records, supporting documents, statistical records, and all other records pertinent to the services performed under this Contract. These records shall be maintained for at least three (3) years; however, if any litigation or other legal action, by or on behalf of the state or federal government has begun that is not completed at the end of the three-year period, or if audit finding, litigation, or other legal action has not been resolved at the end of the three-year period, the records shall be retained until resolution.

**12.    Modification or Amendment.**  Modifications, changes, or amendments to this Contract may be made upon mutual agreement of the parties hereto. However, any change, supplement, modification, or amendment of any term, provision, or condition of this Contract must be in writing and signed by both parties hereto.

**13.    Assignments and Subcontracts.**    Independent Contractor shall not assign, sublet, or otherwise transfer the obligations incurred on its part pursuant to the terms of this Contract without the prior written consent of MDHS. Any attempted assignment or transfer of its obligation without such consent shall be wholly void.

**14.    Waiver.** Failure of either party hereto to insist upon strict compliance with any of the terms, covenants, and conditions hereof shall not be deemed a waiver or relinquishment of any similar right or power hereunder at any subsequent time or of any other provision hereof, nor shall it be construed to be a modification of the terms of this Contract.

**15.    Availability of Funds.**  It is expressly understood and agreed that the obligation of MDHS to proceed under this Contract is conditioned upon the availability of funds, the appropriation of funds by the Mississippi Legislature, and the receipt of state and/or federal funds. If, at any time, the funds anticipated for the fulfillment of this Contract are not forthcoming or are insufficient, either through the failure of the federal government to provide funds or of the State of Mississippi to appropriate funds or the discontinuance or material alteration of the program under which funds were provided, or if funds are not otherwise available to MDHS for the performance of this Contract, MDHS shall have the right, upon written notice to Independent Contractor, to immediately terminate this Contract without damage, penalty, cost, or expense to MDHS of any kind whatsoever. The effective date of termination shall be as specified in the notice of termination.

**16.    Price Adjustment.**

**A.    Price Adjustment Methods.**  The Contract price may be changed only by written agreement of the parties.  The value of any work covered by any claim for increase or decrease in the Contract Price shall be determined by one or more of the following methods:

(1)    Unit prices, if any, previously approved by the parties and specified in this Contract; or

4

(2)    MDHS may, at any time by written order, make changes in the specifications within the general scope of this Agreement. If any such change causes an increase in the amount due under this Contract or in the time required for performance under this Agreement and if MDHS decides that the change justifies an adjustment to the Contract, an equitable adjustment in the Contract may be made by written modification of this Agreement.

No charge for any extra work or material will be allowed unless the same has been provided for by written amendment to this Contract signed by both parties.

**B.    Submission of Cost Pricing Data.** The Independent Contractor shall provide cost or pricing data for any price adjustments subject to the provisions of Section 3-403 (Cost or Pricing Data) of the Mississippi Personal Service Contract Procurement Regulations.

**17.    Indemnification.** MDHS shall, at no time, be legally responsible for any negligence or wrongdoing by the Independent Contractor and/or its employees, servants, agents, contractors, and/or subcontractors. Independent Contractor agrees to indemnify, defend, save and hold harmless MDHS from and against all claims, demands, liabilities, suits, damages, and costs of every kind and nature whatsoever, including court costs and attorney's fees, arising out of or caused by Independent Contractor and its employees, agents, contractors, and/or subcontractors in the performance of this Contract.

**18.    Insurance.** Independent Contractor represents that it will maintain workers' compensation insurance which shall inure to the benefit of all Independent Contractor's personnel performing services under this Contract, comprehensive general liability insurance, and employee fidelity bond insurance. Independent Contractor will furnish MDHS a certificate of insurance providing the aforesaid coverage, prior to the commencement of performance under this Agreement. (Exhibit D).

**19.    Applicable Law.** The contract shall be governed by and construed in accordance with the laws of the State of Mississippi, excluding its conflicts of laws provisions, and any litigation with respect thereto shall be brought in the courts of the state. The Independent Contractor shall comply with applicable federal, state and local laws and regulations.

**20.    Representation Regarding Contingent Fees.** The Independent Contractor represents that it has not retained a person to solicit or secure a State contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, except as disclosed in the Independent Contractor's bid, proposal, or herein.

**21.    Certification of Independent Price Determination.** The bidder certifies that the prices submitted in response to the solicitation have been arrived at

5

independently and without, for the purpose of restricting competition, any consultation, communication, or agreement with any other bidder or competitor relating to those prices, the intention to submit a bid, or the methods or factors used to calculate the prices bid.

**22.    Representation Regarding Gratuities.** The Independent Contractor represents that neither it nor any officer, employee, agent, subcontractor or other representative of the Independent Contractor has violated, or is violating, and promises that it will not violate the prohibition against gratuities set forth in Section 6-204 (Gratuities) of the Mississippi Personal Service Contract Procurement Regulations.

**23.    Procurement Regulations.** The Contract shall be governed by the applicable provisions of the Personal Service Contract Review Board Regulations, a copy of which is available for inspection at 210 East Capitol Street, Suite 800, Jackson, Mississippi 39201, or downloadable at www.mspb.ms.gov.

**24.    Severability.**  If any term or provision of this Contract is prohibited by the laws of the State of Mississippi or declared invalid or void by a court of competent jurisdiction, the remainder of this Contract shall not be affected thereby and each term and provision of this Contract shall be valid and enforceable to the fullest extent permitted by law.

**25.    Stop Work Order.**

**A.    Order to Stop Work.** The Director of Division of Family and Children's Services, may, by written order to the Independent Contractor at any time, and without notice to any surety, require the Independent Contractor to stop all or any part of the work called for by this Contract. This order shall be for a specified period not exceeding 90 days after the order is delivered to the Independent Contractor, unless the parties agree to any further period. Any such order shall be identified specifically as a stop work order issued pursuant to this clause. Upon receipt of such an order, the Independent Contractor shall forthwith comply with its terms and take all steps to minimize the occurrence of costs allocable to the work covered by the order during the period of work stoppage. Before the stop work order expires, or within any further period to which the parties shall have agreed, the Director of Family and Children's Services shall either:

    (1)    cancel the stop work order; or

    (2)    terminate the work covered by such order as provided in the "Termination for Cause" clause or the "Termination for Convenience" clause of this Contract.

**B.    Cancellation or Expiration of the Order.**  If a stop work order issued under this clause is canceled at any time during the period specified in the order, or if the period of the order or any extension thereof expires, the Independent Contractor shall have the right to resume work. An appropriate adjustment may be made in the delivery schedule or Independent Contractor's price, or both.  If the stop work order results in an increase in the time required for, or in the Independent Contractor's cost

properly allocable to, the performance of any part of this Contract and the Independent Contractor asserts a claim for such an adjustment within 30 days after the end of the period of work stoppage, an equitable adjustment in the Contract may be made by written modification of this Contract.  If MDHS decides that the need justifies the requested adjustment, a modification will be made as provided by Section 12, Modification or Amendment, of this Contract.

    **C.    Termination of Stopped Work.** If a stop work order is not canceled and the work covered by such order is terminated for cause or convenience, the Independent Contractor may be paid the agreed upon price for any completed deliverable or service not previously tendered to MDHS,  provided that MDHS accepts any such deliverable or service;  or  Independent Contractor may be paid an amount which bears the same ratio to the total compensation as the services actually and satisfactorily performed bear to the total services of Independent Contractor covered by the Contract, less payments of compensation previously made.

    **D.    Adjustment of Price.** Any adjustment in Contract price made pursuant to this clause shall be determined in accordance with the Price Adjustment clause of this Contract.

    **26.    Disputes.** Any dispute concerning a question of fact under this Contract which is not disposed of by agreement shall be decided by the Director of the Division of Family and Children's Services.  This decision shall be reduced to writing and a copy thereof mailed or furnished to the Independent Contractor and shall be final and conclusive, unless within thirty (30) days from the date of the decision, Independent Contractor mails or furnishes to the Executive Director of MDHS a written request for review. Pending final decision of the Executive Director of a dispute hereunder, the Independent Contractor shall proceed in accordance with the decision of the Director of the Division of Family and Children's Services.

    In a review before the Executive Director or designee, the Independent Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its position on the question and decision under review. The decision of the Executive Director on the review shall be final and conclusive unless determined by a court of competent jurisdiction in Hinds County, State of Mississippi, to have been fraudulent, capricious, so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence.

    **27.    Compliance with Laws.** The Independent Contractor understands that the State is an equal opportunity employer and therefore maintains a policy which prohibits unlawful discrimination based on race, color, creed, sex, age, national origin, physical handicap, disability, genetic information, or any other consideration made unlawful by federal, State, or local laws.  All such discrimination is unlawful and the Independent Contractor agrees during the term of the agreement that the Independent Contractor will strictly adhere to this policy in its employment practices and provision of services. The Independent Contractor shall comply with, and all activities under this agreement shall be subject to, all applicable federal, State of Mississippi, and local laws and regulations, as now existing and as may be amended or modified.

28.    **Confidentiality.**  Independent Contractor shall treat all State data and information to which it has access under this Contract as confidential information to the extent that confidential treatment of same is required under federal and state law and shall not disclose same to a third party without specific written consent of the State.  In the event that Independent Contractor receives notice that a third party requests divulgence of confidential or otherwise protected information and/or has served upon it a subpoena or other validly issued administrative or judicial process ordering divulgence of confidential or otherwise protected information, Independent Contractor shall promptly inform the State and thereafter respond in conformity with such subpoena as required by applicable state and/or federal law, rules, and regulations.  The provision herein shall survive termination of the Contract for any reason and shall continue in full force and effect and shall be binding upon the Independent Contractor and its agents, employees, successors, assigns, subcontractors, or any party claiming an interest in the Contract on behalf of, or under, the rights of the Independent Contractor following any termination.

29.    **E-Verify.**  Independent Contractor represents and warrants that it will ensure its compliance with the Mississippi Employment Protection Act, Mississippi Code Annotated 71-11-1 and 71-11-3, and will register and participate in the status verification system for all newly hired employees.  The term "employee" as used herein means any person that is hired to perform work within the State of Mississippi.  As used herein, "status verification system" means the Illegal Immigration Reform and Immigration Responsibility Act of 1996 that is operated by the United States Department of Homeland Security, also known as the E-Verify Program, or any other successor electronic verification system replacing the E-Verify Program.  Independent Contractor agrees to maintain records of such compliance and, upon request of the State, to provide a copy of each such verification to the State.  Independent Contractor further represents and warrants that any person assigned to perform services hereunder meets the employment eligibility requirements of all immigration laws of the State of Mississippi.  Independent Contractor understands and agrees that any breach of these warranties may subject Independent Contractor to the following: (a) termination of this Agreement and ineligibility for any state or public contract in Mississippi for up to three (3) years, with notice of such cancellation/termination being made public, or (b) the loss of any license permit, certification or other document granted to Independent Contractor by an agency, department or governmental entity for the right to do business in Mississippi for up to one (1) year, or both.  In the event of such termination/cancellation, Independent Contractor would also be liable for any additional costs incurred by the State due to contract cancellation or loss of "license or permit." (Exhibit E).

30.    **Special Terms and Conditions.** It is agreed and understood by each party to this Contract that there are no special terms and conditions.

31.    **Entire Agreement.**  It is understood and agreed that this Contract and the documents listed below constitute the entire understanding of the parties with respect to the subject matter contained herein and supersede and replace any and all prior negotiations, understandings and agreements, written or oral, between the parties relating thereto.  The entire agreement made by and between the parties hereto shall

8

consist of, and precedence is hereby established by the order of, the following documents incorporated herein:

1. This Contract signed by the parties herein and any Exhibits attached hereto;

2. The Request for Proposals dated February 11, 2013 and Response to Proposals dated March 8, 2013.

The documents are complementary, and what is required by one shall be binding as if required by all. A higher document shall supersede a lower order document to the extent necessary to resolve any conflict or inconsistency arising under the various provisions thereof; provided, however, that in no event an issue is addressed in one of the above-mentioned documents but is not addressed in another of such documents, no conflict or inconsistency shall be deemed to occur by reason thereof. The documents listed above are shown in descending order or priority, that is, the highest document begins with the first listed document ("1. This Contract signed by the parties herein and any Exhibits attached hereto") and the lowest document is listed last ("2. The Request for Proposals dated February 11, 2013 and Response to Proposals dated March 8, 2013").

**32.    Background Checks.**  All child care facilities which are awarded funds, whether they are awarded funds directly or through contracts with entities who receive funds directly, shall ensure that all their personnel, whether owners, or employees or volunteer workers have first been subjects of criminal background checks. These persons shall not be allowed to operate a facility nor given even provisional employment until the results of said background checks are obtained. The background checks shall be requested by the child care facilities. The expense of these background checks shall not be borne by MDHS but instead by the child care facility which requests the background check.

If it is determined that there is a child care facility which is operated by, or has hired, or accepted as a volunteer, a person with a criminal background, MDHS reserves the right to terminate its Contract with said facility if its Contract was directly with said facility. If the MDHS Contract is with an intermediary facility which has passed the funds through to other facilities, MDHS reserves the right to demand that such intermediary facility terminate its Contract with the non-conforming facility, or the intermediary facility may face termination of its Contract with MDHS.

**33.    Non-Compete.**  For the term of this contract and for a period of two (2) years thereafter, Sally Kate Winters Family Services, hereby agrees not to directly or indirectly engage in competition in any way with MDHS or to associate with the state business or other business that may compete with MDHS. The term "competition" as used in the foregoing shall include, but not limited to, attempts to divert workers, clients, suppliers, or accounts from MDHS and/or attempt to induce employees of MDHS to terminate their employment. MDHS hereby agrees to enforce the provisions of the Non-Compete Agreement by any legal means. Such means shall include the right to enjoin by legal process for violating provisions hereof.

9

34.    <u>Transparency</u>.    This contract, including any accompanying exhibits, attachments, and appendices, is subject to the "Mississippi Public Records Act of 1983," codified as section 25-61-1 et seq., Mississippi Code Annotated and exceptions found in Section 79-23-1 of the Mississippi Code Annotated (1972, as amended).   In addition, this contract is subject to the provisions of the Mississippi Accountability and Transparency Act of 2008 (MATA), codified as Section 31-7-13 of the Mississippi Code Annotated (1972, as amended).   Unless exempted from disclosure due to a court-issued protective order, this contract is required to be posted to the Department of Finance and Administration's independent agency contract website for public access. Prior to posting the contract to the website, any information identified by the Contractor as trade secrets, or other proprietary information including confidential vendor information, or any other information which is required confidential by state or federal law or outside the applicable freedom of information statutes will be redacted.

10

35.   **Notice.**  Any notice required or permitted to be given under this Contract shall be in writing and sent by United States Certified Mail, Returned Receipt Requested to the party to whom the notice should be given at the address set forth below:

**MDHS:**
Mr. Richard A. Berry, Executive Director
Mississippi Department of Human Services
P.O. Box 352
Jackson, Mississippi 39205

**SALLY KATE WINTERS FAMILY SERVICES:**
Ms. Sheila G. Brand, Executive Director
Sally Kate Winters Family Services
317 North Division Street
West Point, Mississippi 39773

**IN WITNESS WHEREOF,** this Contract has been made and interchangeably executed by the parties hereto in duplicate originals.

Witness my signature this, the ___25___ day of ___June___, 2013.

**MISSISSIPPI DEPARTMENT OF HUMAN SERVICES**

BY: _____
Signature

TITLE: _____

**WITNESSES:**

_____

_____

Witness my signature this, the __19th__ day of ___June___, 2013.

**SALLY KATE WINTERS FAMILY SERVICES**

BY: _____
Signature

Printed Name: ___Sheila G. Brand___

TITLE: ___Executive Director___

**WITNESSES:**

_____

___Georgia Sams, LCSW___

11

# SCOPE OF SERVICES

# SALLY KATE WINTERS FAMILY SERVICES

**SALLY KATE WINTERS FAMILY SERVICES**
**SCOPE OF SERVICES**
**JULY 1, 2013 – JUNE 30, 2014**

*Sally Kate Winters Family Services (*SKWFS)*,* located in West Point, Mississippi, is a private, non-profit organization committed to offering social services and family support services that empower children and families to experience an improved quality of life. Licensed as a *Residential and Emergency Shelter Care Facility* with the Mississippi Department of Human Services (MDHS), SKWFS provides emergency shelter services for children, age birth to seventeen, who have experienced a family crisis, abuse, neglect, or be in danger of exploitation. Shelter services are offered to assist with the emergency situations that require the need for a temporary, secure environment. The twelve-bed facility is open for intake twenty-four hours a day, 365 days a year to address the referrals made by the MDHS, Youth Courts, Law Enforcement Officials and Runaway/Homeless Youth. Eight beds are available for children referred by MDHS, primarily offered for children and families representing Clay County and the twelve surrounding counties (including both Region 1S and Region 4N) with placement available for referrals from other parts of the state as needed.

Shelter services are available on a twenty-four (24) hour basis, seven days per week, 365 days a year to address the emergency needs of children in crisis. An array of services are offered utilizing direct services, a strong referral system, and various service linkages to meet the overwhelming needs of the children utilizing shelter services. Crisis intervention services are identified to address the physical, emotional, and personal needs on an individual basis securing additional services as appropriate.

SKWFS implements services and supports based on the Positive Youth Development (PYD) model. Within short-term programs, this approach improves the overall quality of services, creating a meaningful experience that will attract, engage, and retain youth. PYD identifies the nurturing of several focus areas that empower youth to attain desirable outcomes, minimizing negative, risky behaviors. SKWFS staff is trained on the PYD model and are exposed to the model in action across all programs administered by the agency. SKWFS staff have identified several components of the PYD model that create a framework for the services provided ensuring that they seek to achieve one or more of the following PYD objectives:

1. Promotes bonding
2. Fosters resilience
3. Promotes competence
   (social, emotional, cognitive, behavioral, moral)
4. Fosters self-determination

5. Fosters spirituality
6. Fosters self-efficacy
7. Fosters clear and positive identity
8. Fosters belief in future

(aspe.hhs.gov/hsp/positiveyouthdev99)

SKWFS staff initially focuses on promoting bonding and fostering resilience. Successful services depend on the youth's ability to develop a positive relationship with a healthy adult allowing true communication and awareness of crisis. This is addressed through various opportunities of offering a sense of safety and belonging for the youth, an acceptance of them

within the program and a neutral, non-threatening environment.  SKWFS staff will emphasize strategies for adapting to change and stressful events in healthy, flexible ways.

SKWFS establishes a client file upon initial placement in the emergency shelter program. The County of Responsibility completes the MDHS Residential Application as part of the intake packet, providing data relating to family dynamics, reason for placement, school history, medications, and immediate needs of the child.  The emergency shelter program administrative staff develops a crisis intervention plan for the child based on this data.  The plan outlines the projected services to be provided during shelter placement.  Direct-care staff maintains daily charting records to identify activities, behaviors, and attitudes of the children.  This information along with counseling updates, a record of outside services, and reunification/placement recommendations are compiled in weekly summaries that are submitted to the appropriate representative of the County of Responsibility.  A discharge summary outlining all services provided and long-term recommendations are provided upon the child's removal from the shelter program.

**Goals and Objectives:**

GOAL:  SKWFS will provide emergency shelter services for children and youth promoting safety, well-being, and permanency for each child.

OBJECTIVE #1:  Increase the overall safety of seventy (70) children, ages birth thru seventeen, who are placed in the emergency shelter program.

•      SKWFS provides twenty-four hour supervision for children placed in the emergency shelter services addressing the basic needs of food, shelter, and safety.  Emergency shelter services are available twenty-four hours a day, 365 days a year to provide services for children in need of a temporary placement.  Emergency shelter services are provided for a maximum forty-five (45) day placement as indicated by the MDHS.  Shelter services includes 24-hour supervision of children with two, direct-care staff scheduled on a twelve-hour shift rotation representing a staff-to-residents ration of 1:6.  Children are provided with three nutritional meals each day plus a morning, afternoon, and evening snack.  Direct-care staff provide positive interaction with the children, preparing meals, assisting with bath-time, disbursing medications, and completing household duties such as cleaning, sanitation, and laundry.  All personal hygiene supplies, school supplies, and supplemental clothing is provided by the agency.  One administrative staff member is on-call as the emergency contact to address any situations that require immediate attention involving the children and on-duty staff. The staffing schedules, staff responsibilities, and identified protocols allow SKWFS to provide overall safety for each child placed in the emergency shelter program.

 OBJECTIVE #2:  Assure the improved well-being of seventy-five percent (75%) of the children placed in the shelter program by addressing their physical, psychological, emotional, and educational needs.

•      *Sally Kate Winters Family Services* will address the overall well-being of the children through the establishment of a crisis intervention plan for each child.  The crisis intervention plan

will address the physical, psychological, emotional, and educational needs of the child.  Specific services include:  initial physical exam within 72 hours if child is new to DHS custody; comprehensive medical, dental, vision, and psychological evaluations and/or psycho-social assessment within thirty days of placement; on-site crisis counseling to include individual and group sessions;  school enrollment;  independent living skills;  and education/personal development.  SKWFS will contract with four clinics under the umbrella of North Mississippi Medical Center (West Point Children's Clinic, Family Medical Clinic, Internal Medicine Associates, and the Women's Group) to conduct initial physicals, comprehensive medicals, and follow-up appointments.  North Mississippi Medical Center – West Point will be the hospital used for any emergencies, x-rays, and/or blood work required.  Magnolia Family Dentistry will conduct dental services for the children.  Vision screenings, eye glasses, and follow-up appointments will be made with Dr. Staci Moore, Optometrist with the Eye Clinic of West Point.  Psychological evaluations will be scheduled and completed by psychologist, Dr. John Jolly.  These services will be provided for children placed in the shelter program who fall within the Medicaid eligibility guidelines, with all fees/expenses billed to Medicaid.  If these services have already been provided prior to emergency shelter placement, copies of the service records will be requested from the County of Responsibility and included in the client file.  Developmental assessments are secured for children ages zero to three and older children when there is suspicion of any developmental delays or as requested by the County of Responsibility.  Additionally, older children exhibiting developmental delays will be evaluated to ensure appropriate services are acquired.  Crisis counseling will be provided by the Counseling Coordinator, licensed clinical social worker employed with SKWFS.  Counseling will include individual sessions, group sessions, and the completion of a psycho-social assessment, as necessary.  Educational support is provided through school enrollment, teacher conferences, IEP meetings as necessary, and assistance with services outside the traditional educational system: GED preparation/testing, college exploration, and/or vocational training.  Children will be enrolled in the West Point Public School System to attend classes or the GED program as indicated on the educational history and paperwork for each child.  Daily after-school tutoring will be conducted with each child through a tutoring program offered by the school district and volunteers.  The tutoring program will include completion of homework, computer skills, educational computer programs, GED study curriculums, and educational games.  SKWFS staff will request a copy of the independent living skills plan for each age-appropriate child from the County of Responsibility and Independent Living Specialist to include with client file.  All age appropriate children will attend the bi-weekly independent living classes held at the Clay County DHS office.  Shelter staff will provide support and activities that promote the success of the plan including the facilitation of the "Let's Talk" Runaway & Homeless Youth life skills curriculum implementing grocery shopping, planning menus, budgeting exercises, etc.  Children will be encouraged to attend conferences and retreats that are available during their shelter placement through coordinated efforts with the County of Responsibility.   SKWFS will provide numerous opportunities for art activities, craft projects, and recreational outings for the children throughout the shelter placement.  Daily art activities and craft projects are scheduled during the after-school program.  Children are encouraged to have daily exercise through planned outdoor activities and leisurely activities utilizing the walking track, basketball court, and bicycles available onsite at the facility.  Weekly recreational outings are planned to include movies, bowling, skating, swimming, shopping, and eating at restaurants.  Emotional support is offered by both the administrative staff and the direct-care staff through scheduled and impromptu meetings, as well

as the availability of awake, trained staff twenty-four hours a day. SKWFS provides transportation for services such as school attendance, local independent living sessions, recreational opportunities, and community referrals services determined and scheduled by administrative staff. SKWFS provides personal hygiene supplies, school supplies, and art/craft supplies needed by the children during their shelter placement. Weekly progress reports are mailed to the County of Responsibility informing them of the services provided, behaviors of the child, strengths of the child, and staff recommendations for services and placement.

OBJECTIVE #3:  Increase the plans of permanency for fifty percent (50%) of the children referred to the program by networking with MDHS and making recommendations for long-term placement.

•      Within seven days of emergency shelter placement, SKWFS staff discusses in detail the reunification plans and/or adoption plans with the County of Responsibility. According to DHS approval, appropriate supervised visits and non-supervised visits are planned along with telephone contacts and written correspondence. Counseling sessions are conducted with the child to assist with processing their emotions regarding separation, reunification with family, and/or adoption. Supervised visits (when staff is available) may be coordinated with SKWFS staff to be held on-site at the shelter facility. All supervised visits administered by SKWFS include the completion of an interaction checklist that is completed and forwarded to the County of Responsibility. SKWFS networks with the MDHS and Youth Court regarding court proceedings and long-term plans for the children. Counseling and court preparation is provided whenever necessary. SKWFS administrative staff attends court hearings when requested by Youth Court and/or County of Responsibility. Reunification plans are reviewed by shelter staff when provided by County of Responsibility with support provided for planned activities. Reunification recommendations are included with weekly summaries submitted to MDHS.

SKWFS has numerous protocols in place to address the overall safety of all children placed in the shelter program. Motion detectors and security cameras allow for monitoring of staff and clients at all times within the non-living areas of the shelter facility. Daily charting and hourly bed checks completed by direct-care staff ensures communication and review with the administrative staff and County of Responsibility.

Should an incident occur during shelter placement including major or minor injuries, SKWFS staff secures the appropriate medical treatment for the child. Major injuries and/or incidents require immediately notifying the administrative staff, proceeding with informing the DHS County of Responsibility worker and/or county supervisor through the emergency contact numbers given at the time of placement. In addition, staff completes an incident form outlining the injury, circumstances, and actions taken. All incident forms are included as part of the client file for review. A detailed description of any major incident is included as part of the weekly summary. Any suspicions of child abuse and neglect by staff or residents, is reported to the Child Abuse Hotline, the County of Responsibility, and the MDHS Licensure Unit. Children who leave the facility without permission are placed on runaway status. The West Point Police Department and on-call administrative staff are immediately contacted. The police department is provided with a picture of the child and details of their exit from the facility. The administrative staff makes immediate contact with the County of Responsibility worker and/or supervisor.

SKWFS operates a detailed emergency preparedness and management plan addressing severe weather, natural disaster, and small-scale disasters based on the Ready for Anything Model.  Each policy identifies the procedures, critical supplies/resources, contacts, and recovery process.  An emergency preparedness plan manual is distributed to all staff and is available to on-duty staff throughout locations in shelter facility, offices, and client transportation vehicle.  Emergency response telephone numbers are posted by each telephone throughout the facility and within the manual.  Emergency supplies are stored in the identified facility safe room to ensure the availability of necessary items for the clients.  A generator system has been installed to operate the shelter facility should a power-outage be experienced.  Monthly fire and tornado drills are conducted with on-duty staff and clients.  The Emergency Preparedness process offers staff and clients a clear guide for handling disaster situations that might affect the delivery of services ensuring overall safety of clients.

SKWFS maintains an active policy regarding confidentiality of client information, agency procedures, and personnel/volunteer records.  Client records are maintained with double lock protection to ensure confidentiality and limited access of client information.  All SKWFS staff sign confidentiality agreements as part of employee orientation and received ongoing training on the confidentiality policy.

The program works with local organizations to recruit volunteers to assist with program activities.  SKWFS is an approved volunteer placement site and accepts field placement students from the Social Work Department at Mississippi State University, Delta State University, and the University of Mississippi.

## OUTCOME REPORTS

The Facility will submit Monthly Outcome Reports to the DFCS Congregate Care Unit by the tenth (10th) working day of each month. Unless otherwise indicated, please provide the following outcome measures for each month.

1.   Safety

      a.   Number of children served in the emergency shelter
      b.   Number of reports of maltreatment
      c.   Number of reports referred to DFCS centralized intake in < eight (8) hours
      d.   Number of reports referred to DFCS centralized intake in < twenty-four (24) hours
      e.   Number of children removed from Facility due to report of maltreatment
      f.   Number of reports requiring corrective action by the Facility/agency
      g.   Number of corrective action reports submitted to DFCS < thirty (30) days
      h.   Number of runaway episodes
      i.   Number of Serious Incidents

2.   Discharges/Disruptions

      a.   Number of children discharged to a final Permanency Plan outcome
      b.   Percent of children discharged to a final Permanency Plan outcome
      c.   Number of children which the Facility requested removal of the child
      d.   Number of children for whom the Facility requested removal and a placement disruption meeting was held prior to removal

e.       Number of children for whom the Facility requested removal and a two (2) week notice was not given

f.       Number of children discharged due to unplanned circumstances

g.      Percent of total children discharged due to unplanned circumstances

h.      Number of children discharged to a lower level, less restrictive placement

i.       Percent of children discharged to a lower level, less restrictive placement

j.       Number of children discharged to a higher level, more restrictive placement

k.      Percent of children discharged to a higher level, more restrictive placement

3.      Case Planning

     a.       Number of Family Team Meetings/ISP Meetings/Adoption Status Meetings initiated by DFCS and attended by Facility social worker during the reporting month

     b.       Number of Foster Care Review conferences attended by Facility social worker during the reporting month

4.      Independent Living

     a.       Number of children> fourteen (14) years of age served during the reporting month

     b.       Number of Independent Living Skills groups attended by these children during the reporting month

     c.       Number of Independent Living Skills sessions conducted and documented by Facility professional staff

5.      Child/Parent/Sibling Visitation -Connections

     a.       Number of visits between children and their parents/other siblings in care held at the Facility or approved location other than DFCS office

     b.       Number of visits between children and their extended family/siblings not in care/other connections held at the Facility or approved location other than DFCS office

     c.       Number of visits between children/parents/siblings in care/connections in which the Facility staff provided primary supervision of visits

     d.       Number of visits between children/parents/siblings in care/connections in which the Facility staff provided transportation to the visit site

     e.       Number of other events (such as birthdays, school activities, medical/mental health appointments) for which the Facility provided transportation or assisted with arrangements that maintained or strengthened a child's relationship with significant connections

     f.       Number of children served whose residence (home from which they were removed) is greater than fifty (50) miles from placement site

     g.       Percent of children served whose residence (home from which they were removed) is greater than fifty (50) miles from placement site

6.      Medical/Dental Needs

     a.       Number of children served during the reporting month whose initial placement during the current custody episode was in this Facility

     b.       Number of these children who received an initial medical assessment within seventy-two (72) hours of custody

c.      Number of these children who received a comprehensive medical exam within thirty (30) days of custody

d.      Number of total children in care for whom an annual medical exam was due during the reporting month

e.      Number of children due annual medical exams who received an annual medical exam

f.      Number of children for whom a semi-annual dental exam was due during the reporting month

g.      Number of children due a semi-annual dental exam who received a dental exam

h.      Number of children who experienced an acute medical episode requiring emergency assessment, treatment or hospitalization

i.      Number of children requiring psychotropic medication

j.      Number of children requiring psychotropic medication who have a written plan of approval from the County of Responsibility for administration of psychotropic medication on file

k.      Number of children ages zero to three (0-3) served during the month by the Facility or Resource Home(s)

l.      Number of children ages zero to three (0-3) who have been referred to the First

m.      Number of children ages zero to three (0-3) who have been assessed by the First Steps Early Intervention Program

n.      Number of children> three (3) years of age who have received a developmental assessment through the Department of Health, Department of Mental Health or private provider

o.      Number of total children served during the reporting month whose recommended schedule of immunizations has been followed

7.    Mental Health

a.      Number of children four (4) years and older placed in the Facility during the past reporting month

b.      Number of children four (4) years and older who have a current mental health assessment on file

c.      Number of children whose mental health assessment has determined the need for ongoing or follow up mental health services

d.      Number of children who receive all mental health services recommended in this assessment

e.      Number of children screened for Fetal Alcohol Spectrum Disorder

8.    Educational Needs

a.      Number of school age children entering the Facility during the reporting month

b.      Number of school age children who were enrolled in an accredited school within three (3) days (with the exception of school holidays and breaks)

c.      Number of school age children who are able to remain in the same school they attended prior to placement in this Facility

d.      Number of school age children whose initial placement was in this Facility

e.      Number of school age children who received an educational assessment during the first thirty (30) days of placement

f.      Number of children who meet the criteria of "exceptional child" as defined in §37¬23-3 of the Mississippi Code

g.      Number of children who meet the criteria of "exceptional child" as defined in §37¬23-3 of the Mississippi Code have an IEP

      h.      Number of children who meet the criteria of "exceptional child" as defined in §37¬23-3 of the Mississippi Code who receive appropriate special education and related services as contained in the IEP

      i.       Number of IEP conferences attended by Facility social worker(s) during the reporting month

<u>Narrative Updates/Progress Reports</u>

The Facility will provide to the County of Responsibility bi-weekly narrative updates/progress reports on each child served. These updates/reports should address all issues of which DFCS Workers need to be aware. The Monthly Log of contacts will be submitted by the tenth (10th) working day each month. Hard copies of any documents such as medical, mental health and educational records should be provided to the County of Responsibility immediately upon receipt by the Facility. The Facility should retain copies of all these documents in the child's file maintained by the Facility. The following documentation details should routinely be addressed in narrative updates and progress reports.

      a.      Documentation of assessment and clarification of ongoing child safety identification of risk, description of safety plans developed,

      b.       Documentation of periodic discussion with the child concerning his/her ISP and identification of barriers to achievement and permanency.

      c.      Documentation of assessment of and provision for medical, dental, educational and mental health needs based on the child's ISP and requirements of MDHS/DFCS policy; documentation of educational advocacy.

      d.      Documentation of assessment of and provision for a child's well-being and permanency needs to include, but not limited to, the need for continuation of important connections and relationships, need for recreation and socialization, need for mentors and role models, need for development of vocational and family life skills.

      e.      Documentation of child/parent-family-sibling visitation; description of how the Facility contributed to successful visitation as outlined in the child visitation plan; description of any noted safety concerns during visitation

      f.       Documentation clearly demonstrating that the child, when age appropriate, is actively involved in assessment of needs and case planning activities and discussions

      g.      Documentation of the frequency and quality of visitation between a child and his/her parents/siblings/extended family/significant connections (where were visits conducted, length of visits, quality of transactions occurring during visits, child's reactions before and after visits)

      h.      Documentation of specific Independent Living Services and description of Independent Living Skills activities

      i.       Documentation of examples of educational advocacy for a child by the Facility or Resource Parent

The Division of Family and Children's Services (DFCS) Director of the DFCS Administration Unit, the Director of the DFCS Permanency Unit, the Director of the Continuous Quality Improvement Unit, and

the Director of the DFCS Licensure Unit will ensure that the Independent Contractor meets the programmatic quality assurance and licensure requirement criteria. The Division of Program Integrity shall ensure the Independent Contractor further meets all aspects of the contract.

The tools utilized to evaluate these services will be the Licensure Standards and the programmatic reports submitted monthly to report the outcomes as outlined in Outcome Reports, beginning on page 4 of this Scope of Services.

The services will be evaluated by the Independent Contractor's submission of the required reports and by the Independent Contractor meeting the Licensure Standards.  Failure to meet the Licensure Standards will result in loss of payment.

Program Integrity shall perform a site visit as least once a year, more if requested by the Division of Family and Children's Services.  The Licensure Unit shall perform an onsite Annual Licensure Review for this Facility as the License is awarded for a one year period.  The Licensure Unit shall visit and perform annual facility reviews (at least one review) two (2) months prior to renewal of the License. If this facility is under a Corrective Action Plan (CAP) the Licensure Unit shall perform a site visit every month the facility is under the CAP.  Also, a licensure investigation shall be conducted after all Abuse Neglect and Exploitation (ANE) investigations.  Therefore, the number of site visits performed by the Licensure Unit depends on the abovementioned circumstances, but at least one (1) site visit shall be performed by the Licensure Unit.

# Ex. 18H

# CONTRACT AGREEMENT

# MISSISSIPPI CHILDREN'S HOME SOCIETY

Revised 04/2013

# STATE OF MISSISSIPPI
## MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
## CONTRACT FOR PERSONAL OR PROFESSIONAL SERVICES

**1.    Parties.**    This Contract is made and entered into by and between the Division of Family and Children's Services, Mississippi Department of Human Services, hereinafter referred to as "MDHS," and Mississippi Children's Home Society, hereinafter referred to as "Independent Contractor."

**2.    Purpose.**    MDHS hereby engages the Independent Contractor and the Independent Contractor hereby agrees to render certain professional services described in Paragraph 3, "Scope of Services."

**3.    Scope of Services.**    The Independent Contractor shall perform and render the following services, attached hereto as "Exhibit A" and the *Modified Mississippi Settlement Agreement*, attached hereto as "Exhibit B".

**4.    Period of Performance.**  The period of performance of services under this Contract shall begin on July 1, 2013 and end on June 30, 2014.  MDHS shall have the option to renew this Contract at one (1) year intervals for two (2) years at the same terms and conditions.  These one (1) year options to this contract shall end on June 30, 2016.

**5.    Consideration and Method of Payment.**

A.  As consideration of all services and performances under this Contract, Independent Contractor shall be paid a fee not to exceed One Million Two Hundred Sixty Six Thousand One Hundred Seventy Dollars and Forty Cents ($1,266,170.40).  It is expressly understood and agreed that in no event will the total compensation paid hereunder exceed the specified amount of One Million Two Hundred Sixty Six Thousand One Hundred Seventy Dollars and Forty Cents ($1,266,170.40). (Exhibit C)

B.  The Independent Contractor will bill MDHS for its services on a monthly basis. Following the satisfactory completion, as determined by MDHS, of its monthly services, the State requires the Independent Contractor to submit invoices electronically throughout the term of the agreement.  Invoices shall be submitted to MDHS using the processes and procedures identified by the State.  The appropriate documentation shall be submitted on the last working day of the month, with the final invoice to be submitted within five (5) working days after the contract ending date.

Payments by state agencies using the Statewide Automated Accounting System (SAAS) shall be made and remittance information provided electronically as directed by the State.  These payments shall be deposited into the bank account of the Independent Contractor's choice.  The State may, at its sole discretion, require the Independent Contractor to submit invoices and supporting documentation electronically, at any time, during the term of this Agreement.   Independent Contractor understands and agrees

that the State is exempt from the payment of taxes. All payments shall be in United States currency.

Independent Contractor agrees to accept all payments in United States currency via the State of Mississippi's electronic payment and remittance vehicle. MDHS agrees to make payment in accordance with Mississippi law on "Timely Payments for Purchases by Public Bodies," Mississippi Code Annotated 31-7-301, et. Seq., which generally provides for payment of undisputed amounts by MDHS within forty-five (45) days of receipt of invoice.

6.    **Relationship of Parties.**

A.    It is expressly understood and agreed that MDHS enters into this Contract with Independent Contractor on a purchase of service basis and not on an employer-- employee relationship basis. Nothing contained herein shall be deemed or construed by MDHS, the Independent Contractor, or any third party as creating the relationship of principal and agent, partners, joint venturers, or any similar such relationship between MDHS and the Independent Contractor. Neither the method of computation of fees or other charges, nor any other provision contained herein, nor any acts of MDHS or the Independent Contractor hereunder, creates or shall be deemed to create a relationship other than the independent relationship of MDHS and the Independent Contractor.

B.    Independent Contractor represents that it has, or will secure, at its own expense, applicable personnel who shall be qualified to perform the duty required to be performed under this Contract.

C.    Any person assigned by Independent Contractor to perform the services hereunder shall be the employee of Independent Contractor, who shall have the sole right to hire and discharge its employee. MDHS may, however, direct Independent Contractor to replace any of its employees under this Contract. If Independent Contractor is notified within the first eight (8) hours of assignment that the person is unsatisfactory, Independent Contractor will not charge MDHS for those hours.

D.    It is further understood that the consideration expressed herein constitutes full and complete compensation for all services and performances hereunder, and that any sum due and payable to Independent Contractor shall be paid as a gross sum with no withholdings or deductions being made by MDHS for any purpose from said Contract sum.

E.    Independent Contractor shall pay when due all salaries and wages of its employees, and it accepts exclusive responsibility for the payment of Federal Income Tax, State Income Tax, Social Security, Unemployment Compensation and any other withholdings that may be required.

7.    **Termination for Cause.**  If, through any cause, Independent Contractor fails to fulfill in a timely and proper manner, as determined by MDHS, its obligations under this Contract, or if Independent Contractor shall violate any of the covenants, agreements, or stipulations of this Contract, MDHS shall thereupon have the right to

2

terminate the Contract by giving written notice to Independent Contractor of such termination and specifying the effective date thereof at least five (5) days before the effective date of such termination. In the event of such termination, Independent Contractor shall be entitled to receive just and equitable compensation for satisfactory work completed on services or documents or materials collected and/or prepared by Independent Contractor in connection with this Contract. Such compensation shall be based upon the fees set forth in Paragraph 5, but, in no case, shall said compensation exceed the total Contract price.

Notwithstanding the above, Independent Contractor shall not be relieved of liability to MDHS for damages sustained by MDHS by virtue of any breach of this Contract by Independent Contractor, and MDHS may withhold any payments to Independent Contractor for the purpose of set off until such time as the exact damages due to MDHS from Independent Contractor are determined.

**8.     Termination for Convenience of MDHS.**     MDHS may terminate this Contract at any time by giving written notice to Independent Contractor of such termination and specifying the effective date thereof at least five (5) days before the effective date of such termination. Independent Contractor shall be paid an amount which bears the same ratio to the total compensation as the services actually and satisfactorily performed bear to the total services of Independent Contractor covered by the Contract, less payments of compensation previously made.

**9.     Ownership of Documents and Work Products.**     All data collected by Independent Contractor and all documents, notes, programs, data bases (and all applications thereof), files, reports, studies,  and/or other material collected and prepared by Independent Contractor in connection with this Contract shall be the property of MDHS upon completion of this Contract or upon termination of this Contract. MDHS hereby reserves all rights to the data base and all applications thereof and to any and all information and/or materials prepared under this Contract.

The Independent Contractor is prohibited from use of the above described information and/or materials without the express written approval of MDHS.

**10.     Conflict of Interest.**  Independent Contractor shall ensure that there exists no direct or indirect conflict of interest in the performance of this contract and/or performance by any of the Independent Contractor's Contractors/Subcontractors. Independent Contractor hereby warrants that no part of any federal or state money shall be paid directly or indirectly to an employee or official of MDHS as wages, compensation or gifts exchange for acting as an officer, agent, employee, subcontractor, or consultant to the Independent Contractor in connection with any work contemplated or pertaining to this Independent Contractor Agreement.  Independent Contractor shall strictly comply with all conflict of interest provisions or standards of conduct provisions contained in any applicable state, federal, or local law, rule, or regulation.

**11.     Record Retention and Access to Records.** Independent Contractor shall maintain, and make available to MDHS, any State agency authorized to audit MDHS,

3

the federal grantor agency, the Comptroller General of the United States or any of their duly authorized representatives, financial records, supporting documents, statistical records, and all other records pertinent to the services performed under this Contract. These records shall be maintained for at least three (3) years; however, if any litigation or other legal action, by or on behalf of the state or federal government has begun that is not completed at the end of the three-year period, or if audit finding, litigation, or other legal action has not been resolved at the end of the three-year period, the records shall be retained until resolution.

**12.    Modification or Amendment.**  Modifications, changes, or amendments to this Contract may be made upon mutual agreement of the parties hereto. However, any change, supplement, modification, or amendment of any term, provision, or condition of this Contract must be in writing and signed by both parties hereto.

**13.    Assignments and Subcontracts.**    Independent Contractor shall not assign, sublet, or otherwise transfer the obligations incurred on its part pursuant to the terms of this Contract without the prior written consent of MDHS. Any attempted assignment or transfer of its obligation without such consent shall be wholly void.

**14.    Waiver.** Failure of either party hereto to insist upon strict compliance with any of the terms, covenants, and conditions hereof shall not be deemed a waiver or relinquishment of any similar right or power hereunder at any subsequent time or of any other provision hereof, nor shall it be construed to be a modification of the terms of this Contract.

**15.    Availability of Funds.**  It is expressly understood and agreed that the obligation of MDHS to proceed under this Contract is conditioned upon the availability of funds, the appropriation of funds by the Mississippi Legislature, and the receipt of state and/or federal funds. If, at any time, the funds anticipated for the fulfillment of this Contract are not forthcoming or are insufficient, either through the failure of the federal government to provide funds or of the State of Mississippi to appropriate funds or the discontinuance or material alteration of the program under which funds were provided, or if funds are not otherwise available to MDHS for the performance of this Contract, MDHS shall have the right, upon written notice to Independent Contractor, to immediately terminate this Contract without damage, penalty, cost, or expense to MDHS of any kind whatsoever. The effective date of termination shall be as specified in the notice of termination.

**16.    Price Adjustment.**

**A.    Price Adjustment Methods.**  The Contract price may be changed only by written agreement of the parties.  The value of any work covered by any claim for increase or decrease in the Contract Price shall be determined by one or more of the following methods:

(1)    Unit prices, if any, previously approved by the parties and specified in this Contract; or

4

    (2)    MDHS may, at any time by written order, make changes in the specifications within the general scope of this Agreement. If any such change causes an increase in the amount due under this Contract or in the time required for performance under this Agreement and if MDHS decides that the change justifies an adjustment to the Contract, an equitable adjustment in the Contract may be made by written modification of this Agreement.

No charge for any extra work or material will be allowed unless the same has been provided for by written amendment to this Contract signed by both parties.

    **B.**    **Submission of Cost Pricing Data.** The Independent Contractor shall provide cost or pricing data for any price adjustments subject to the provisions of Section 3-403 (Cost or Pricing Data) of the Mississippi Personal Service Contract Procurement Regulations.

    **17.**    **Indemnification.** MDHS shall, at no time, be legally responsible for any negligence or wrongdoing by the Independent Contractor and/or its employees, servants, agents, contractors, and/or subcontractors. Independent Contractor agrees to indemnify, defend, save and hold harmless MDHS from and against all claims, demands, liabilities, suits, damages, and costs of every kind and nature whatsoever, including court costs and attorney's fees, arising out of or caused by Independent Contractor and its employees, agents, contractors, and/or subcontractors in the performance of this Contract.

    **18.**    **Insurance.**  Independent Contractor represents that it will maintain workers' compensation insurance which shall inure to the benefit of all Independent Contractor's personnel performing services under this Contract, comprehensive general liability insurance, and employee fidelity bond insurance. Independent Contractor will furnish MDHS a certificate of insurance providing the aforesaid coverage, prior to the commencement of performance under this Agreement. (Exhibit D).

    **19.**    **Applicable Law.**  The contract shall be governed by and construed in accordance with the laws of the State of Mississippi, excluding its conflicts of laws provisions, and any litigation with respect thereto shall be brought in the courts of the state. The Independent Contractor shall comply with applicable federal, state and local laws and regulations.

    **20.**    **Representation Regarding Contingent Fees.**  The Independent Contractor represents that it has not retained a person to solicit or secure a State contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, except as disclosed in the Independent Contractor's bid, proposal, or herein.

    **21.**    **Certification of Independent Price Determination.**  The bidder certifies that the prices submitted in response to the solicitation have been arrived at

independently and without, for the purpose of restricting competition, any consultation, communication, or agreement with any other bidder or competitor relating to those prices, the intention to submit a bid, or the methods or factors used to calculate the prices bid.

22.    **Representation Regarding Gratuities.** The Independent Contractor represents that neither it nor any officer, employee, agent, subcontractor or other representative of the Independent Contractor has violated, or is violating, and promises that it will not violate the prohibition against gratuities set forth in Section 6-204 (Gratuities) of the Mississippi Personal Service Contract Procurement Regulations.

23.    **Procurement Regulations.** The Contract shall be governed by the applicable provisions of the Personal Service Contract Review Board Regulations, a copy of which is available for inspection at 210 East Capitol Street, Suite 800, Jackson, Mississippi 39201, or downloadable at www.mspb.ms.gov.

24.    **Severability.** If any term or provision of this Contract is prohibited by the laws of the State of Mississippi or declared invalid or void by a court of competent jurisdiction, the remainder of this Contract shall not be affected thereby and each term and provision of this Contract shall be valid and enforceable to the fullest extent permitted by law.

25.    **Stop Work Order.**

A.    **Order to Stop Work.** The Director of Division of Family and Children's Services, may, by written order to the Independent Contractor at any time, and without notice to any surety, require the Independent Contractor to stop all or any part of the work called for by this Contract. This order shall be for a specified period not exceeding 90 days after the order is delivered to the Independent Contractor, unless the parties agree to any further period. Any such order shall be identified specifically as a stop work order issued pursuant to this clause. Upon receipt of such an order, the Independent Contractor shall forthwith comply with its terms and take all steps to minimize the occurrence of costs allocable to the work covered by the order during the period of work stoppage. Before the stop work order expires, or within any further period to which the parties shall have agreed, the Director of Family and Children's Services shall either:

    (1)    cancel the stop work order; or

    (2)    terminate the work covered by such order as provided in the "Termination for Cause" clause or the "Termination for Convenience" clause of this Contract.

B.    **Cancellation or Expiration of the Order.** If a stop work order issued under this clause is canceled at any time during the period specified in the order, or if the period of the order or any extension thereof expires, the Independent Contractor shall have the right to resume work. An appropriate adjustment may be made in the delivery schedule or Independent Contractor's price, or both. If the stop work order results in an increase in the time required for, or in the Independent Contractor's cost

6

properly allocable to, the performance of any part of this Contract and the Independent Contractor asserts a claim for such an adjustment within 30 days after the end of the period of work stoppage, an equitable adjustment in the Contract may be made by written modification of this Contract. If MDHS decides that the need justifies the requested adjustment, a modification will be made as provided by Section 12, Modification or Amendment, of this Contract.

      **C.**    **Termination of Stopped Work.** If a stop work order is not canceled and the work covered by such order is terminated for cause or convenience, the Independent Contractor may be paid upon agreed upon price for any completed deliverable or service not previously tendered to MDHS, provided that MDHS accepts any such deliverable or service; or Independent Contractor may be paid an amount which bears the same ratio to the total compensation as the services actually and satisfactorily performed bear to the total services of Independent Contractor covered by the Contract, less payments of compensation previously made.

      **D.**    **Adjustment of Price.** Any adjustment in Contract price made pursuant to this clause shall be determined in accordance with the Price Adjustment clause of this Contract.

      **26.**    **Disputes.** Any dispute concerning a question of fact under this Contract which is not disposed of by agreement shall be decided by the Director of the Division of Family and Children's Services. This decision shall be reduced to writing and a copy thereof mailed or furnished to the Independent Contractor and shall be final and conclusive, unless within thirty (30) days from the date of the decision, Independent Contractor mails or furnishes to the Executive Director of MDHS a written request for review. Pending final decision of the Executive Director of a dispute hereunder, the Independent Contractor shall proceed in accordance with the decision of the Director of the Division of Family and Children's Services.

      In a review before the Executive Director or designee, the Independent Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its position on the question and decision under review. The decision of the Executive Director on the review shall be final and conclusive unless determined by a court of competent jurisdiction in Hinds County, State of Mississippi, to have been fraudulent, capricious, so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence.

      **27.**    **Compliance with Laws.** The Independent Contractor understands that the State is an equal opportunity employer and therefore maintains a policy which prohibits unlawful discrimination based on race, color, creed, sex, age, national origin, physical handicap, disability, genetic information, or any other consideration made unlawful by federal, State, or local laws. All such discrimination is unlawful and the Independent Contractor agrees during the term of the agreement that the Independent Contractor will strictly adhere to this policy in its employment practices and provision of services. The Independent Contractor shall comply with, and all activities under this agreement shall be subject to, all applicable federal, State of Mississippi, and local laws and regulations, as now existing and as may be amended or modified.

28.    **Confidentiality.**    Independent Contractor shall treat all State data and information to which it has access under this Contract as confidential information to the extent that confidential treatment of same is required under federal and state law and shall not disclose same to a third party without specific written consent of the State. In the event that Independent Contractor receives notice that a third party requests divulgence of confidential or otherwise protected information and/or has served upon it a subpoena or other validly issued administrative or judicial process ordering divulgence of confidential or otherwise protected information, Independent Contractor shall promptly inform the State and thereafter respond in conformity with such subpoena as required by applicable state and/or federal law, rules, and regulations. The provision herein shall survive termination of the Contract for any reason and shall continue in full force and effect and shall be binding upon the Independent Contractor and its agents, employees, successors, assigns, subcontractors, or any party claiming an interest in the Contract on behalf of, or under, the rights of the Independent Contractor following any termination.

29.    **E-Verify.**    Independent Contractor represents and warrants that it will ensure its compliance with the Mississippi Employment Protection Act, Mississippi Code Annotated 71-11-1 and 71-11-3, and will register and participate in the status verification system for all newly hired employees. The term "employee" as used herein means any person that is hired to perform work within the State of Mississippi. As used herein, "status verification system" means the Illegal Immigration Reform and Immigration Responsibility Act of 1996 that is operated by the United States Department of Homeland Security, also known as the E-Verify Program, or any other successor electronic verification system replacing the E-Verify Program. Independent Contractor agrees to maintain records of such compliance and, upon request of the State, to provide a copy of each such verification to the State. Independent Contractor further represents and warrants that any person assigned to perform services hereunder meets the employment eligibility requirements of all immigration laws of the State of Mississippi. Independent Contractor understands and agrees that any breach of these warranties may subject Independent Contractor to the following: (a) termination of this Agreement and ineligibility for any state or public contract in Mississippi for up to three (3) years, with notice of such cancellation/termination being made public, or (b) the loss of any license permit, certification or other document granted to Independent Contractor by an agency, department or governmental entity for the right to do business in Mississippi for up to one (1) year, or both. In the event of such termination/cancellation, Independent Contractor would also be liable for any additional costs incurred by the State due to contract cancellation or loss of "license or permit." (Exhibit E).

30.    **Special Terms and Conditions.** It is agreed and understood by each party to this Contract that there are no special terms and conditions.

31.    **Entire Agreement.**    It is understood and agreed that this Contract and the documents listed below constitute the entire understanding of the parties with respect to the subject matter contained herein and supersede and replace any and all prior negotiations, understandings and agreements, written or oral, between the parties relating thereto. The entire agreement made by and between the parties hereto shall

8

consist of, and precedence is hereby established by the order of, the following documents incorporated herein:

1.   This Contract signed by the parties herein and any Exhibits attached hereto;

2.   The Request for Proposals dated February 11, 2013 and Response to Proposals dated March 8, 2013.

The documents are complementary, and what is required by one shall be binding as if required by all. A higher document shall supersede a lower order document to the extent necessary to resolve any conflict or inconsistency arising under the various provisions thereof; provided, however, that in no event an issue is addressed in one of the above-mentioned documents but is not addressed in another of such documents, no conflict or inconsistency shall be deemed to occur by reason thereof. The documents listed above are shown in descending order or priority, that is, the highest document begins with the first listed document ("1. This Contract signed by the parties herein and any Exhibits attached hereto") and the lowest document is listed last ("2. The Request for Proposals dated February 11, 2013 and Response to Proposals dated March 8, 2013").

**32.    Background Checks.**  All child care facilities which are awarded funds, whether they are awarded funds directly or through contracts with entities who receive funds directly, shall ensure that all their personnel, whether owners, or employees or volunteer workers have first been subjects of criminal background checks. These persons shall not be allowed to operate a facility nor given even provisional employment until the results of said background checks are obtained. The background checks shall be requested by the child care facilities. The expense of these background checks shall not be borne by MDHS but instead by the child care facility which requests the background check.

If it is determined that there is a child care facility which is operated by, or has hired, or accepted as a volunteer, a person with a criminal background, MDHS reserves the right to terminate its Contract with said facility if its Contract was directly with said facility. If the MDHS Contract is with an intermediary facility which has passed the funds through to other facilities, MDHS reserves the right to demand that such intermediary facility terminate its Contract with the non-conforming facility, or the intermediary facility may face termination of its Contract with MDHS.

**33.    Non-Compete.**  For the term of this contract and for a period of two (2) years thereafter, Mississippi Children's Home Society, hereby agrees not to directly or indirectly engage in competition in any way with MDHS or to associate with the state business or other business that may compete with MDHS. The term "competition" as used in the foregoing shall include, but not limited to, attempts to divert workers, clients, suppliers, or accounts from MDHS and/or attempt to induce employees of MDHS to terminate their employment. MDHS hereby agrees to enforce the provisions of the Non-Compete Agreement by any legal means. Such means shall include the right to enjoin by legal process for violating provisions hereof.

**34.    Transparency.**    This contract, including any accompanying exhibits, attachments, and appendices, is subject to the "Mississippi Public Records Act of 1983," codified as section 25-61-1 et seq., Mississippi Code Annotated and exceptions found in Section 79-23-1 of the Mississippi Code Annotated (1972, as amended).  In addition, this contract is subject to the provisions of the Mississippi Accountability and Transparency Act of 2008 (MATA), codified as Section 31-7-13 of the Mississippi Code Annotated (1972, as amended).  Unless exempted from disclosure due to a court-issued protective order, this contract is required to be posted to the Department of Finance and Administration's independent agency contract website for public access. Prior to posting the contract to the website, any information identified by the Contractor as trade secrets, or other proprietary information including confidential vendor information, or any other information which is required confidential by state or federal law or outside the applicable freedom of information statutes will be redacted.

35.    <u>Notice.</u>  Any notice required or permitted to be given under this Contract shall be in writing and sent by United States Certified Mail, Returned Receipt Requested to the party to whom the notice should be given at the address set forth below:

**MDHS:**                                    Mr. Richard A. Berry, Executive Director
                                             Mississippi Department of Human Services
                                             P.O. Box 352
                                             Jackson, Mississippi 39205

**MISSISSIPPI CHILDREN'S
HOME SOCIETY:**                              Dr. John D. Damon, Chief Executive Officer
                                             Mississippi Children's Home Society
                                             P.O. Box 1078
                                             Jackson, Mississippi 39215

**IN WITNESS WHEREOF**, this Contract has been made and interchangeably executed by the parties hereto in duplicate originals.

Witness my signature this, the _26_ day of _JUNE_____, 2013.

**MISSISSIPPI DEPARTMENT OF HUMAN SERVICES**

BY: _____
                        Signature
TITLE: _____

**WITNESSES:**



Witness my signature this, the _21st_ day of _June_____, 2013.

**MISSISSIPPI CHILDREN'S HOME SOCIETY**

BY: _____
                        Signature
Printed Name: _____

TITLE: _____CEO_____

**WITNESSES:**

MCHS LEGAL

11

# SCOPE OF SERVICES
# MISSISSIPPI CHILDREN'S HOME SOCIETY

# Mississippi Children's Homes Society (MCHS)

### July 1, 2013 – June 30, 2014
### Scope of Services

Mississippi Children's Home Society (MCHS) operates two (2) Diagnostic and Evaluation Emergency Shelters: Warren County Children's Shelter (WCCS) and South Mississippi Children's Center (SMCC). Both shelters are licensed by MDHS. WCCS has been licensed since 1991 and SMCC has been licensed since 1993 and both remain in good standing. Both shelters also participated in the on-site review and have been accredited through the Joint Commission since September 2009. While the shelters function independently of each other, they are more similar than different as they provide the same services and meet the same standards and requirements. The main difference between the shelters is the geographical area and population they serve with SMCC serving up to twelve (12) children, ages nine (9) through seventeen (17) years, male and female, and WCCS serving up to twelve (12) children, infants through seventeen (17) years, male and female. SMCC is located in Hattiesburg, serving Forrest County and the surrounding southern counties of the state, while WCCS is located in Vicksburg, serving Warren County and the surrounding central counties of the state.

## SERVICES

### Shelter Admissions:

All children will be admitted 24 hours a day, seven days a week, and 365 days a year including holidays. Children shall not be denied admission to the Shelters due to race, creed, or disability. The Shelters shall guarantee that children will be accepted at any hour of the day or night, including weekends and holidays, in accordance with the approved/licensed capacity and census. The admission process is designed to provide support to the child while orienting the child or youth to the Shelter. Paperwork is gathered at admission to insure the Shelter's ability to provide medical attention and provide for all other immediate needs. The MDHS Residential Application is kept at the Shelter and is utilized at admission.

Admission requirements including age and number of children to be served is established through MDHS licensure. As previously mentioned, WCCS is currently licensed for twelve (12) children, birth through seventeen (17) years, both male and female. SMCC is currently licensed for twelve (12) children, ages nine (9) through seventeen (17) years, both male and female. Children younger than ten (10) may be served in order for siblings to remain together or if there is documentation that the child's needs cannot be met in a relative's home or resource home and written approval has been given by the appropriate DFCS Regional Director.

As part of admissions, the Shelter makes Residential Services applications and all required forms readily available to MDHS case workers including copies available for emergency situations when the DCFS staff has not completed one prior to placement of the child. In emergency situations, the DFCS staff completes the form with as much information as is known, and forwards the remaining documentation

to the Shelters as soon as possible. In an emergency situation, no child shall be denied admission by the Shelter because the DFCS staff cannot provide an application form prior to placement.

At admission, our first priority is the safety and well-being of the child. We provide a nurturing home like environment that provides a safe haven for children and youth. We address their basic needs including safety, shelter, food, clothing, hygiene, and health/medical and any other immediate needs. At admission, we begin relationship building and initiate individualized assessments with the child and or youth.

### Diagnostic and Evaluation Services

The emergency Shelter is a short-term interim placement resource. The brief time in the shelter (forty-five (45) day maximum) gives the DFCS staff time to further evaluate the child's situation and the shelter staff time to provide and collect assessments and evaluations to provide a more complete picture of the child or youth and their individualized needs to assist DFCS with the most appropriate placement possible.

Diagnostic and Evaluation Services include health and physical examinations (in sexual abuse cases, STD cultures will be part of the medical examination), psychological evaluations, dental examinations, vision screening, educational services, and other services as required by MDHS Licensing Standards and as deemed necessary through additional assessment.

### Medical/Dental

Based on MDHS requirements, an initial medical exam is due within 72 hours of custody and a comprehensive exam within 30 days of custody. MDHS requires a schedule of yearly medical exams. The Shelters require a copy of the most recent history and physical at the time of admission or immediately following. Based on the dates of the history and physical provided, the Shelter staff will schedule needed medical evaluations to maintain compliance with these regulations. MDHS requires semi-annual dental exams and based on the dental records provided and dates of the last exam, the Shelter staff will schedule needed dental exams to maintain compliance with these regulations.

The Shelters maintain immunization records and schedule, meeting the health needs of the child and the requirements of the State Department of Health. Developmental assessments are secured for all children 0 to 3 and for children over 3 when there is suspicion of developmental delays. Medicaid Providers will be utilized for all medical and dental services for children and youth who are Medicaid eligible and or on Medicaid. All diagnostic and evaluation services provided by service providers in the community require insurance reimbursement or direct payment at the time services are rendered. Children must have a valid, active Medicaid number or some alternate form of insurance at the time of service. If a child does not have Medicaid or other health insurance coverage at the time of service, the child's County of Responsibility must make payment arrangements with the service provider. This same consideration must be made for prescription medications. The Shelters will be responsible for any over the counter medications children may need during their stay.

SMCC has agreements with the Richton Clinic for medical care; Forrest General Hospital for emergency care and hospital services and Dr. Terry Lambert for dental care. SMCC has agreements with the

Vicksburg Clinic for medical care; River Region Medical Center for emergency and hospital services and Dr. Jimmy Vessel for dental care.

## Mental Health

Ongoing assessments and identified mental health treatment shall be provided for all children for whom mental health needs have been identified. Each child receives a psychological evaluation within 20-30 days of admission that evaluates the youth in emotional, psychological, educational, and behavioral areas. The psychological evaluation also makes a placement recommendation that reflects any therapeutic needs the child may have.  The Shelter Counselor works in conjunction with the Program Director, Case Manager, and Psychologist to report to the DFCS worker all recommendations regarding future placement and treatment of the children receiving diagnostic and evaluation services.

Children and youth, who are admitted to the Shelter with psychotropic medications, will be required to have a written authorization from the County of Responsibility. Psychotropic medications will not be administered without signed consent from the legal guardian. The Shelters utilize staff supervised self administration and medication monitoring procedures in compliance with the Joint Commission on Accreditation standards for all residents on medications. The Shelters have adopted, through agency and program policies and procedures, the proper supervision of medication through assisted self-administration.  All staff whose duties require supervision of youth receives training and education during orientation.  The importance of clearly defined directions for and accurate documentation of all prescribed medication are stressed.   Equally important is the need to monitor the children and immediately report to the attending physician any adverse reaction or possible side effects that may be even remotely attributable to the prescribed medication.  Accurate and timely notations and records are kept on each child related to the monitoring of their medications.  Medication is kept behind double locks.  Follow-up physician's appointments scheduled after discharge are coordinated with the MDHS. All evaluations and recommendations will be given to the DFCS worker to assist in the best possible placement.

## Education

The Shelters ensure that all residents attend and receive appropriate educational services by accredited schools. Each child is staffed with the school system to insure that they are placed in an appropriate educational setting. It is necessary for the County of Responsibility to withdraw the child from their most recent school to allow the Shelter to enroll residents in the local school placement.  Children who have been home schooled are tested by the local school district while in the Shelter to determine appropriate educational placement and needs. If the child or youth has been suspended indefinitely by the Department of Education, the Shelter provides tutors and other educational services and supports on site.

Youth, who are eligible and or actively pursuing GED, the Shelter enrolls in local GED classes. If a youth is preparing for college, the Shelter will assist the youth with college applications, applications for financial assistance, application for campus housing (dormitory), and any other related needs. The Shelter will assist eligible youth with vocational preparation by referring to vocational programs such as Youth Challenge, Job Corps, or Transitional Living and Learning Center (TLC).

## Clinical Services

In order to continuously improve the quality of assessments and interventions for children, while placed with the shelters, both shelters are implementing Client Directed Outcome Informed (CDOI) practices. CDOI is an evidence-based model of practice that MCHS is implementing agency wide as standard practice. This model is based on the work of Dr. Barry Duncan, author of *The Heart and Soul of Change* and *On Becoming a Better Therapist.* Dr. Duncan is providing technical assistance, consultation and training related to CDOI which proactively partners with consumers to improve the value of the care they receive and is the only system that by design includes clients in all aspects of outcome management.

This approach is client directed and youth driven. The purpose is to ensure the child or youth directs the services, understands the purpose of the counseling, and is involved in their own care. The Counselor solicits systemic feedback from the child or youth, engaging them in a collaborative monitoring of outcomes, heightening hope for improvement, and maximizing changes for a strong alliance which is a core feature for therapeutic change. The client based outcome feedback is about client privilege and benefit and helping Counselors get better at what they do!  Given that most Counselors improve their outcomes with feedback; a positive non competitive approach goes a long way to dismiss Counselor's fears. This practice engages the client in the evaluation process utilizing an Outcome Rating Scale (ORS) to assess where the client is individually (personal well being), interpersonally (family, close relationships), socially (work, school, friendships), and overall (general sense of well-being); and, at the end of each session the client completes a Session Rating Scale (SRS) that provides immediate feedback allowing the therapist to collaborate more effectively with clients. This process allows for the collection of measurable data that can be used to evaluate effectiveness of services provided and to improve outcomes for the children, youth and families served.

The child welfare system has become increasing aware of the impact of trauma on children and youth in the foster care system. MCHS has taken steps to implement evidenced based clinical practices that are trauma informed. Trauma Informed Care (TIC) is incorporated into all facets of the shelters' scope of services.   Children and youth admitted to the shelters are screened for trauma at admission and throughout their stay as appropriate. MDHS children being admitted to the shelters in an emergency situation have been removed from their own homes due to possible abuse and or neglect. The removal of children from their own home and separation from their family can create trauma for children and youth. MCHS has provided training for all shelter staff to increase their understanding and awareness of the impact these events have on the children they serve and how to successfully work with traumatized children to better understand their behaviors and to improve their treatment outcomes. MCHS is committed to on-going training for agency and shelter staff related to TIC.

Trauma Focused Cognitive Behavioral Therapy (TF CBT) is an evidenced based model of practice that is nationally recognized in working with traumatized children, youth and their families. The shelter staff has been provided training that presented an overview of the TF CBT and how to work with the practice.  The shelter counselors have been engaged in more targeted training on TF CBT for therapist.   The shelter counselors are currently engaged in a certification process for TF CBT.  As part of the certification process, the shelter counselors participate in monthly case supervision with the TF CBT consultant. The

TF CBT assessment tools include Post Traumatic Stress Disorder Index for DSM IV (child and adolescent versions), Trauma History Checklist and Interview, and the Trauma History Questionnaire for Child. The results of these assessments provide information that helps staff in developing appropriate therapeutic interventions.

The very nature of emergency shelters means that many children or youth arrive at the shelters in a crisis situation. Best practice from Joint Commission and other regulatory bodies, recognize the need for and require suicide risk assessments as part of screening at admission and throughout placement as needed. Both shelters provide this screening at the time of referral with the guardian, at admission with the child or youth, and ongoing for the duration of the shelter stay, to determine the degree of risk for suicide and also to ensure an appropriate level of care and placement. If the result of the initial screening indicates suicidal or homicidal ideation, then the child or youth would require an acute assessment for possible hospitalization prior to admission to the Shelter.

Initial and on-going assessments available through the shelters based on the child or youth's individual needs may include: suicide risk, anger management, comprehensive screening inventory, activity, psychosocial, trauma history checklist, trauma interview screen, measures of change (Outcome Rating Scale and Session Rating Scale), Life Domain, Child Behavioral Checklist (CBCL), Beck Youth Inventories for Depression, Anxiety, Anger, Disruptive Behavior and Self-Concept.

Each child receives a strengths-based psychosocial assessment within 7 days of admission to    the Shelter.  The Shelters Counselor and Case Manager gather information from the child and DFCS Worker pertaining to the child's previous placement and history of placements, the child's attitude, past and present relationships with peers and family, educational information, physical and mental health history, history and information regarding family, history of abuse, and information regarding the child's permanency plan. The Shelters staff convenes a clinical staffing for each child at least once a week.  A staffing note reflecting the child's progress, diagnosis, behavior, strengths and needs is written for each child.

### Counseling

As part of Shelters case planning and assessment process, short-term treatment goals are established to help the child cope with separation and emergency placement, control anxiety, and fear, modify destructive and disruptive behavior and correct cognitive distortions.  Short-term treatment goals are also directed at helping the child prepare for the return home or to another appropriate placement. Crisis counseling is available to youth 24 hours per day.  The Shelters employ a full time Counselor, a full time Case manager and have access to community mental health providers including a local Psychologist.

The child's individual treatment plan also reflects social skill goals and is part of a continuum of care which includes the daily documentation and reinforcement of social skills by the staff and the weekly groups the youth attend that also reinforce social skills.

### Family Counseling

Family counseling is provided to those families in which a runaway situation has occurred, and MDHS has not deemed the family dangerous to the child.  Family counseling can be provided to families and foster families of children in DHS custody in appropriate situations with the approval of DHS and when counseling is identified as being in the best interest of the child.

### Psycho-educational and Psychotherapeutic Groups

Counselors, Case Managers, and others provide educational presentations and materials to the shelter residents regarding prevention of abuse, drugs, alcohol, and teen pregnancy.  Hygiene, STDs, peer pressure, and other subjects important to young people are discussed in an open forum. Psychotherapeutic groups are held to aid the youth in managing anger, problem solving and social development.

### Recreation

Volunteers and staff provide recreational activities at the shelter and in the community.  Age appropriate activities for children are readily accessible.  Both Shelters provide safe green space with a variety of sports and play equipment.  Residents attend recreational activity outside of the shelter at least twice a week.  During the summer months, additional recreational programs are planned during the week.  Appropriate resources, where children can participate in a variety of activities, are utilized. The youth regularly attend the public library, zoo, park, movies, arts and crafts displays, spectator sports, and YMCA activities.

In addition, the SMCC outdoor adventure program, the "Cooperative Challenge Program," uses the Center's low elements ropes course to prepare youth to experience high adventure activities away from the Center once a month.  The activities consist of hiking, canoeing, rappelling, and a high ropes course. Participants are selected after successful completion of low ropes activities at the Center.

### Spiritual

One of the fundamental principles of a free society is that the individual has the right to follow their own conscience in matters of worship.  The Shelters work with local churches and community groups to develop fellowship and worship opportunities. Children are not coerced to pursue or reject a specific religious affiliation.  The children have the opportunity to attend the church of their choice in the community.

### Independent Living Skills Development

The Shelters coordinate with the MDHS Independent Living Specialist to ensure residents between the ages of 14 and 20 participate in Independent Living activities, skills groups and events. The Shelters staff teaches housekeeping skills through completion of assigned daily chores and upkeep of their own personal space.  Social skills are taught on a daily basis to aid youth in their interactions with the community.

### Clothing and Monthly Allowance

Clothing is inventoried at admission and updated as clothing is purchased or donated. The Child or youth, MDHS worker and Children's Youth Advisor (CYA), admitting the youth sign the inventory sheets.

At discharge, the clothes are re-inventoried, and the youth, CYA, and MDHS worker signs in acceptance. The Shelters and DFCS staff must verify at admission and upon discharge items the child is bringing to or taking from the Shelter.

While at the Shelters, the child's personal monthly allowance shall be, equal to or greater than, the amount designated by the DFCS Foster Board Payment Schedule according to the age of the child. Special clothing needs will be discussed with the assigned County of Responsibility worker. In some situations, special items may be purchased with prior written approval from the Regional Director and with the county reimbursement made directly to the clothing vendor. The Shelters provide hygiene supplies through the MDHS per diem rate.

## Plans

The Shelters will work with the County of Responsibility to develop treatment plans, permanency plans, and placement plans, including goals and services to address these plans. The Shelters will work the MDHS County of Responsibility to jointly develop behavioral management plans as needed for each child.  MCHS plans to provide training for the Shelters Counselor and Case Managers utilizing Dr. Kim Ray, a recognized expert in behavioral management. The focus of the consultation and training with Dr. Ray will focus on how to develop and implement appropriate and positive behavioral management plans. Dr. Ray is a MCHS staff member with the Educational Division.

The Shelters will coordinate with the County of Responsibility to meet the child's needs to maintain and strengthen permanent connections through: a) the visitation plan; b) an ongoing evaluation and identification of connections with the child, c) transportation for visits and special events, d) arranging for visits at approved sites and e) counseling with the child regarding any grief and loss due to separation from important connections.

## Visitation

The DFCS worker and the Shelters Counselors discuss visitation during admission.  The DFCS worker and the Shelters Counselors will sign a visitation schedule that specifies who, how often and where.  The shelter provides transportation to visits in the community. At a neutral location staff members will supervise the visits between clients and their families and will provide a written report of visits to MDHS every two weeks. The DFCS worker is expected to provide transportation for visits outside of the county.

## Transportation

The Shelter will provide all necessary transportation for the child, including but not limited to transportation to and from school, off-site consultations, visits with parents/siblings/extended kin/connections, adoption recruitment activities, therapy and or medical treatment not provided by the Shelter, needed Independent Living activities, to and from work, and other appointments unless prior arrangement has been made with the child's DFCS Worker.

The Shelters have access to passenger vans.  The agency vans contain all of the required safety equipment including seatbelts, fire extinguishers, and first aid kits.  All employees are screened based on their driving records and history before hire. As part of new hire and annual orientation, employees who transport children or youth are required to complete defensive driving training courses and pass the

related exams. All employees are licensed drivers with excellent driving histories, and are covered under the MCHS agency insurance policy.

### Confidentiality

It is the intent of the Shelters to guard the confidentiality of information regarding children, youth, parents, legal guardians, and the families of origins. Information obtained in the admission process or while in the program is strictly confidential. Specific guidelines regarding confidentiality have been established and are made available to the children, youth, and the parents and to any interested parties. The Shelters takes special care in outlining the specific rights of children, youth, guardians and families of origin.

The Shelters do not allow any photographs, videos, media presentations, or publications involving any MDHS child unless an Order of Limited Disclosure has been obtained from the child's Youth Court Judge. In addition, written consent is required from the DFCS County of Responsibility, the child, the natural parents, if available, and the Guardian ad litem.

### Grievance Procedure

At times a child may feel that he/she has a legitimate grievance or complaint concerning the care received or an aspect of the shelter's program. A notice of client's rights for resident, parents and legal guardians is posted as a means of allowing clients to voice their disagreements and problems in constructive and socially acceptable ways. It demonstrates that the program operates fairly and eliminates the frustrations associated with restrictions, which seem arbitrary. The grievance procedure is explained to each youth at admission, and the youth signs the written explanation in the process.

### Safety and Incident Reporting

MCHS takes seriously the safety of all children and youth while in their care and services. The agency has a stringent reporting system, agency wide, to ensure timely notification and appropriate actions for all incidences whether serious or non serious. Any injury to a child is documented utilizing the agency incident reporting forms and includes relevant information related to any treatment and or follow up actions necessary to address the injury or resolve the incident. As part of the internal reporting, the incident reports are routed through management to ensure accurate and timely reporting to the appropriate regulatory and licensing agencies.

For the Shelters, the child's DFCS Worker is notified of serious and non-serious injuries and of the treatment required and or received. Serious injuries and other serious incidents are reported verbally and followed up in writing by the Shelter to the DFCS Congregate Care Director.

### Discharge Planning

A conscious and concentrated effort has been made by the staff to view children's placement in the facility as a means toward an end. With this in mind, discharge planning begins upon intake. The facility staff works toward ensuring that the benefits derived by the children from emergency care are not negated or reversed through lack of sufficient support during the transition.

A discharge summary complete with a list of services is provided within 7 days of discharge. Aftercare recommendations and appointments are given to the DFCS worker upon discharge of the child. Follow-ups are conducted at one month and 6 month intervals demonstrating continuing care; and it also provides the facility with information that can be helpful in evaluating overall effectiveness of the program.

Youth are not discharged because of minor rule infractions.  However, at times youth may refuse to follow rules that are essential to keeping order in the facility.  Rules such as a child leaving the Shelters repeatedly, refusing to stay out of the opposite sex's area and threats to others could result in a request to have the youth removed.  Law Enforcement and MDHS staff will be notified of any child who leaves the facility without permission.  The child shall be returned to the facility once located.

Because these Shelters are co-educational, it is important that the Shelter staff is able to supervise the residents at all times.  Youth refusing to stay in assigned areas cannot be properly supervised and may need a more structured level of care. Youth are discharged to a psychiatric facility or detention if they are found to be a danger to self or others.  If appropriate, the youth are re-admitted to the Shelter after stabilization. All DFCS workers receive a discharge notice two weeks before the youth's 45th day to remind the worker of the approaching 45-day limit.  If additional time is needed, the MDHS worker may request an extension.

### Outreach Services

WCCS and SMCC sponsors Project Safe Place, a nationally organized early intervention, prevention and outreach program designed to assist youth and families in crisis situations.  The Shelters work with multiple Safe Place sites from businesses to Fire Stations.  Any youth in crisis may enter a location bearing the Safe Place sign and request help.  Employees of a Safe Place site will provide the youth with a secure place to wait while the Shelters are contacted.  The Shelters then dispatch a trained volunteer to the Safe Place site to offer assistance and provide transportation to the Shelter if necessary.  Outreach efforts include presentations throughout the communities including schools, civic clubs, churches, etc. in an attempt to be sure that youth and adults know about the program. The Shelter employees also provide information to the public regarding child abuse and neglect. Employees provide educational seminars during the regional and state conferences at no charge.

### Required Reports

The shelters will provide the County of Responsibility with a written child's narrative documentation/progress report every other week (bi-weekly) which shall include information regarding the child's behavior, progress, strengths, problems, needs and discharge plans.  Monthly logs will be submitted to the child's DFCS worker by the tenth (10) working day each month and will include direct (child and family) and indirect (school, employer, court, mental health, etc) contacts.

### OUTCOME REPORTS

The Facility will submit Monthly Outcome Reports to the DFCS Congregate Care Unit by the tenth (10th) working day of each month. Unless otherwise indicated, please provide the following outcome measures for each month.

1.      Safety

      a.      Number of children served in the emergency shelter
      b.      Number of reports of maltreatment
      c.      Number of reports referred to DFCS centralized intake in < eight (8) hours
      d.      Number of reports referred to DFCS centralized intake in < twenty-four (24) hours
      e.      Number of children removed from Facility due to report of maltreatment
      f.      Number of reports requiring corrective action by the Facility/agency
      g.      Number of corrective action reports submitted to DFCS < thirty (30) days
      h.      Number of runaway episodes
      i.      Number of Serious Incidents

2.      Discharges/Disruptions

      a.      Number of children discharged to a final Permanency Plan outcome
      b.      Percent of children discharged to a final Permanency Plan outcome
      c.      Number of children which the Facility requested removal of the child
      d.      Number of children for whom the Facility requested removal and a placement disruption meeting was held prior to removal
      e.      Number of children for whom the Facility requested removal and a two (2) week notice was not given
      f.      Number of children discharged due to unplanned circumstances
      g.      Percent of total children discharged due to unplanned circumstances
      h.      Number of children discharged to a lower level, less restrictive placement
      i.      Percent of children discharged to a lower level, less restrictive placement
      j.      Number of children discharged to a higher level, more restrictive placement
      k.      Percent of children discharged to a higher level, more restrictive placement

3.      Case Planning

      a.      Number of Family Team Meetings/ISP Meetings/Adoption Status Meetings initiated by DFCS and attended by Facility social worker during the reporting month
      b.      Number of Foster Care Review conferences attended by Facility social worker during the reporting month

4.      Independent Living

      a.      Number of children> fourteen (14) years of age served during the reporting month
      b.      Number of Independent Living Skills groups attended by these children during the reporting month
      c.      Number of Independent Living Skills sessions conducted and documented by Facility professional staff

5.      Child/Parent/Sibling Visitation -Connections

      a.      Number of visits between children and their parents/other siblings in care held at the Facility or approved location other than DFCS office

b.       Number of visits between children and their extended family/siblings not in care/other connections held at the Facility or approved location other than DFCS office

c.       Number of visits between children/parents/siblings in care/connections in which the Facility staff provided primary supervision of visits

d.       Number of visits between children/parents/siblings in care/connections in which the Facility staff provided transportation to the visit site

e.       Number of other events (such as birthdays, school activities, medical/mental health appointments) for which the Facility provided transportation or assisted with arrangements that maintained or strengthened a child's relationship with significant connections

f.       Number of children served whose residence (home from which they were removed) is greater than fifty (50) miles from placement site

g.       Percent of children served whose residence (home from which they were removed) is greater than fifty (50) miles from placement site

6.      Medical/Dental Needs

a.       Number of children served during the reporting month whose initial placement during the current custody episode was in this Facility

b.       Number of these children who received an initial medical assessment within seventy-two (72) hours of custody

c.       Number of these children who received a comprehensive medical exam within thirty (30) days of custody

d.       Number of total children in care for whom an annual medical exam was due during the reporting month

e.       Number of children due annual medical exams who received an annual medical exam

f.       Number of children for whom a semi-annual dental exam was due during the reporting month

g.       Number of children due a semi-annual dental exam who received a dental exam

h.       Number of children who experienced an acute medical episode requiring emergency assessment, treatment or hospitalization

i.       Number of children requiring psychotropic medication

j.       Number of children requiring psychotropic medication who have a written plan of approval from the County of Responsibility for administration of psychotropic medication on file

k.       Number of children ages zero to three (0-3) served during the month by the Facility or Resource Home(s)

l.       Number of children ages zero to three (0-3) who have been referred to the First Steps Early Intervention Program

m.      Number of children ages zero to three (0-3) who have been assessed by the First Steps Early Intervention Program

n.      Number of children> three (3) years of age who have received a developmental assessment through the Department of Health, Department of Mental Health or private provider

o.       Number of total children served during the reporting month whose recommended schedule of immunizations has been followed

7.      Mental Health

  a.      Number of children four (4) years and older placed in the Facility during the past reporting month
  b.      Number of children four (4) years and older who have a current mental health assessment on file
  c.      Number of children whose mental health assessment has determined the need for ongoing or follow up mental health services
  d.      Number of children who receive all mental health services recommended in this assessment
  e.      Number of children screened for Fetal Alcohol Spectrum Disorder

8.      Educational Needs

  a.      Number of school age children entering the Facility during the reporting month
  b.      Number of school age children who were enrolled in an accredited school within three (3) days (with the exception of school holidays and breaks)
  c.      Number of school age children who are able to remain in the same school they attended prior to placement in this Facility
  d.      Number of school age children whose initial placement was in this Facility
  e.      Number of school age children who received an educational assessment during the first thirty (30) days of placement
  f.      Number of children who meet the criteria of "exceptional child" as defined in §37¬23-3 of the Mississippi Code
  g.      Number of children who meet the criteria of "exceptional child" as defined in §37¬23-3 of the Mississippi Code have an IEP
  h.      Number of children who meet the criteria of "exceptional child" as defined in §37¬23-3 of the Mississippi Code who receive appropriate special education and related services as contained in the IEP
  i.      Number of IEP conferences attended by Facility social worker(s) during the reporting month

Narrative Updates/Progress Reports

The Facility will provide to the County of Responsibility bi-weekly narrative updates/progress reports on each child served. These updates/reports should address all issues of which DFCS Workers need to be aware. The Monthly Log of contacts will be submitted by the tenth (10th) working day each month. Hard copies of any documents such as medical, mental health and educational records should be provided to the County of Responsibility immediately upon receipt by the Facility. The Facility should retain copies of all these documents in the child's file maintained by the Facility. The following documentation details should routinely be addressed in narrative updates and progress reports.

  a.      Documentation of assessment and clarification of ongoing child safety identification of risk, description of safety plans developed,

  b.      Documentation of periodic discussion with the child concerning his/her ISP and identification of barriers to achievement and permanency.

c.    Documentation of assessment of and provision for medical, dental, educational and mental health needs based on the child's ISP and requirements of MDHS/DFCS policy; documentation of educational advocacy.

d.    Documentation of assessment of and provision for a child's well-being and permanency needs to include, but not limited to, the need for continuation of important connections and relationships, need for recreation and socialization, need for mentors and role models, need for development of vocational and family life skills.

e.    Documentation of child/parent-family-sibling visitation; description of how the Facility contributed to successful visitation as outlined in the child visitation plan; description of any noted safety concerns during visitation

f.    Documentation clearly demonstrating that the child, when age appropriate, is actively involved in assessment of needs and case planning activities and discussions

g.    Documentation of the frequency and quality of visitation between a child and his/her parents/siblings/extended family/significant connections (where were visits conducted, length of visits, quality of transactions occurring during visits, child's reactions before and after visits)

h.    Documentation of specific Independent Living Services and description of Independent Living Skills activities

i.    Documentation of examples of educational advocacy for a child by the Facility or Resource Parent

Program Integrity **shall** perform a site visit as least once a year, more if requested by the Division of Family and Children's Services.  The Licensure Unit **shall** perform an onsite Annual Licensure Review for this Facility as the License is awarded for a one year period.  The Licensure Unit **shall** visit and perform annual facility reviews (at least one review) two (2) months prior to renewal of the License. **If** this facility is under a Corrective Action Plan (CAP) the Licensure Unit **shall** perform a site visit every month the facility is under the CAP.  Also, a licensure investigation **shall be** conducted after all Abuse Neglect and Exploitation (ANE) investigations.  Therefore, the number of site visits performed by the Licensure Unit depends on the abovementioned circumstances, but at least one (1) site visit **shall be performed** by the Licensure Unit.

**Ex. 18I**

# CONTRACT AGREEMENT

# HOPE VILLAGES, INC.

Revised 04/2013

# STATE OF MISSISSIPPI
## MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
## CONTRACT FOR PERSONAL OR PROFESSIONAL SERVICES

**1.    Parties.**    This Contract is made and entered into by and between the Division of Family and Children's Services, Mississippi Department of Human Services, hereinafter referred to as "MDHS," and Hope Village for Children, Inc., hereinafter referred to as "Independent Contractor."

**2.    Purpose.**    MDHS hereby engages the Independent Contractor and the Independent Contractor hereby agrees to render certain professional services described in Paragraph 3, "Scope of Services."

**3.    Scope of Services.**    The Independent Contractor shall perform and render the following services, attached hereto as "Exhibit A" and the *Modified Mississippi Settlement Agreement*, attached hereto as "Exhibit B".

**4.    Period of Performance.**  The period of performance of services under this Contract shall begin on July 1, 2013 and end on June 30, 2014.  MDHS shall have the option to renew this Contract at one (1) year intervals for two (2) years at the same terms and conditions.  These one (1) year options to this contract shall end on June 30, 2016.

**5.    Consideration and Method of Payment.**

A.   As consideration of all services and performances under this Contract, Independent Contractor shall be paid a fee not to exceed Six Hundred Thirty Three Thousand Eighty Five Dollars and Twenty Cents ($633,085.20).   It is expressly understood and agreed that in no event will the total compensation paid hereunder exceed the specified amount of Six Hundred Thirty Three Thousand Eighty Five Dollars and Twenty Cents ($633,085.20). (Exhibit C)

B.  The Independent Contractor will bill MDHS for its services on a monthly basis. Following the satisfactory completion, as determined by MDHS, of its daily services, the State requires the Independent Contractor to submit invoices electronically throughout the term of the agreement.  Invoices shall be submitted to MDHS using the processes and procedures identified by the State.   The appropriate documentation shall be submitted on the last working day of the month, with the final invoice to be submitted within five (5) working days after the contract ending date.

Payments by state agencies using the Statewide Automated Accounting System (SAAS) shall be made and remittance information provided electronically as directed by the State.  These payments shall be deposited into the bank account of the Independent Contractor's choice.  The State may, at its sole discretion, require the Independent Contractor to submit invoices and supporting documentation electronically, at any time, during the term of this Agreement.  Independent Contractor understands and agrees

that the State is exempt from the payment of taxes. All payments shall be in United States currency.

Independent Contractor agrees to accept all payments in United States currency via the State of Mississippi's electronic payment and remittance vehicle. MDHS agrees to make payment in accordance with Mississippi law on "Timely Payments for Purchases by Public Bodies," Mississippi Code Annotated 31-7-301, et. Seq., which generally provides for payment of undisputed amounts by MDHS within forty-five (45) days of receipt of invoice.

6.    **Relationship of Parties.**

A.    It is expressly understood and agreed that MDHS enters into this Contract with Independent Contractor on a purchase of service basis and not on an employer--employee relationship basis. Nothing contained herein shall be deemed or construed by MDHS, the Independent Contractor, or any third party as creating the relationship of principal and agent, partners, joint venturers, or any similar such relationship between MDHS and the Independent Contractor. Neither the method of computation of fees or other charges, nor any other provision contained herein, nor any acts of MDHS or the Independent Contractor hereunder, creates or shall be deemed to create a relationship other than the independent relationship of MDHS and the Independent Contractor.

B.    Independent Contractor represents that it has, or will secure, at its own expense, applicable personnel who shall be qualified to perform the duty required to be performed under this Contract.

C.    Any person assigned by Independent Contractor to perform the services hereunder shall be the employee of Independent Contractor, who shall have the sole right to hire and discharge its employee. MDHS may, however, direct Independent Contractor to replace any of its employees under this Contract. If Independent Contractor is notified within the first eight (8) hours of assignment that the person is unsatisfactory, Independent Contractor will not charge MDHS for those hours.

D.    It is further understood that the consideration expressed herein constitutes full and complete compensation for all services and performances hereunder, and that any sum due and payable to Independent Contractor shall be paid as a gross sum with no withholdings or deductions being made by MDHS for any purpose from said Contract sum.

E.    Independent Contractor shall pay when due all salaries and wages of its employees, and it accepts exclusive responsibility for the payment of Federal Income Tax, State Income Tax, Social Security, Unemployment Compensation and any other withholdings that may be required.

7.    **Termination for Cause.** If, through any cause, Independent Contractor fails to fulfill in a timely and proper manner, as determined by MDHS, its obligations under this Contract, or if Independent Contractor shall violate any of the covenants, agreements, or stipulations of this Contract, MDHS shall thereupon have the right to

2

terminate the Contract by giving written notice to Independent Contractor of such termination and specifying the effective date thereof at least five (5) days before the effective date of such termination. In the event of such termination, Independent Contractor shall be entitled to receive just and equitable compensation for satisfactory work completed on services or documents or materials collected and/or prepared by Independent Contractor in connection with this Contract. Such compensation shall be based upon the fees set forth in Paragraph 5, but, in no case, shall said compensation exceed the total Contract price.

Notwithstanding the above, Independent Contractor shall not be relieved of liability to MDHS for damages sustained by MDHS by virtue of any breach of this Contract by Independent Contractor, and MDHS may withhold any payments to Independent Contractor for the purpose of set off until such time as the exact damages due to MDHS from Independent Contractor are determined.

8.    **Termination for Convenience of MDHS.**  MDHS may terminate this Contract at any time by giving written notice to Independent Contractor of such termination and specifying the effective date thereof at least five (5) days before the effective date of such termination. Independent Contractor shall be paid an amount which bears the same ratio to the total compensation as the services actually and satisfactorily performed bear to the total services of Independent Contractor covered by the Contract, less payments of compensation previously made.

9.    **Ownership of Documents and Work Products.**  All data collected by Independent Contractor and all documents, notes, programs, data bases (and all applications thereof), files, reports, studies,  and/or other material collected and prepared by Independent Contractor in connection with this Contract shall be the property of MDHS upon completion of this Contract or upon termination of this Contract. MDHS hereby reserves all rights to the data base and all applications thereof and to any and all information and/or materials prepared under this Contract.

The Independent Contractor is prohibited from use of the above described information and/or materials without the express written approval of MDHS.

10.    **Conflict of Interest.**  Independent Contractor shall ensure that there exists no direct or indirect conflict of interest in the performance of this contract and/or performance by any of the Independent Contractor's Contractors/Subcontractors. Independent Contractor hereby warrants that no part of any federal or state money shall be paid directly or indirectly to an employee or official of MDHS as wages, compensation or gifts exchange for acting as an officer, agent, employee, subcontractor, or consultant to the Independent Contractor in connection with any work contemplated or pertaining to this Independent Contractor Agreement.  Independent Contractor shall strictly comply with all conflict of interest provisions or standards of conduct provisions contained in any applicable state, federal, or local law, rule, or regulation.

11.    **Record Retention and Access to Records.** Independent Contractor shall maintain, and make available to MDHS, any State agency authorized to audit MDHS,

the federal grantor agency, the Comptroller General of the United States or any of their duly authorized representatives, financial records, supporting documents, statistical records, and all other records pertinent to the services performed under this Contract. These records shall be maintained for at least three (3) years; however, if any litigation or other legal action, by or on behalf of the state or federal government has begun that is not completed at the end of the three-year period, or if audit finding, litigation, or other legal action has not been resolved at the end of the three-year period, the records shall be retained until resolution.

12.    **Modification or Amendment.**  Modifications, changes, or amendments to this Contract may be made upon mutual agreement of the parties hereto. However, any change, supplement, modification, or amendment of any term, provision, or condition of this Contract must be in writing and signed by both parties hereto.

13.    **Assignments and Subcontracts.**    Independent Contractor shall not assign, sublet, or otherwise transfer the obligations incurred on its part pursuant to the terms of this Contract without the prior written consent of MDHS. Any attempted assignment or transfer of its obligation without such consent shall be wholly void.

14.    **Waiver.** Failure of either party hereto to insist upon strict compliance with any of the terms, covenants, and conditions hereof shall not be deemed a waiver or relinquishment of any similar right or power hereunder at any subsequent time or of any other provision hereof, nor shall it be construed to be a modification of the terms of this Contract.

15.    **Availability of Funds.**  It is expressly understood and agreed that the obligation of MDHS to proceed under this Contract is conditioned upon the availability of funds, the appropriation of funds by the Mississippi Legislature, and the receipt of state and/or federal funds. If, at any time, the funds anticipated for the fulfillment of this Contract are not forthcoming or are insufficient, either through the failure of the federal government to provide funds or of the State of Mississippi to appropriate funds or the discontinuance or material alteration of the program under which funds were provided, or if funds are not otherwise available to MDHS for the performance of this Contract, MDHS shall have the right, upon written notice to Independent Contractor, to immediately terminate this Contract without damage, penalty, cost, or expense to MDHS of any kind whatsoever. The effective date of termination shall be as specified in the notice of termination.

16.    **Price Adjustment.**

A.    **Price Adjustment Methods.**  The Contract price may be changed only by written agreement of the parties.  The value of any work covered by any claim for increase or decrease in the Contract Price shall be determined by one or more of the following methods:

(1)    Unit prices, if any, previously approved by the parties and specified in this Contract; or

(2) MDHS may, at any time by written order, make changes in the specifications within the general scope of this Agreement. If any such change causes an increase in the amount due under this Contract or in the time required for performance under this Agreement and if MDHS decides that the change justifies an adjustment to the Contract, an equitable adjustment in the Contract may be made by written modification of this Agreement.

No charge for any extra work or material will be allowed unless the same has been provided for by written amendment to this Contract signed by both parties.

**B.    Submission of Cost Pricing Data.** The Independent Contractor shall provide cost or pricing data for any price adjustments subject to the provisions of Section 3-403 (Cost or Pricing Data) of the Mississippi Personal Service Contract Procurement Regulations.

**17.    Indemnification.** MDHS shall, at no time, be legally responsible for any negligence or wrongdoing by the Independent Contractor and/or its employees, servants, agents, contractors, and/or subcontractors. Independent Contractor agrees to indemnify, defend, save and hold harmless MDHS from and against all claims, demands, liabilities, suits, damages, and costs of every kind and nature whatsoever, including court costs and attorney's fees, arising out of or caused by Independent Contractor and its employees, agents, contractors, and/or subcontractors in the performance of this Contract.

**18.    Insurance.** Independent Contractor represents that it will maintain workers' compensation insurance which shall inure to the benefit of all Independent Contractor's personnel performing services under this Contract, comprehensive general liability insurance, and employee fidelity bond insurance. Independent Contractor will furnish MDHS a certificate of insurance providing the aforesaid coverage, prior to the commencement of performance under this Agreement. (Exhibit D).

**19.    Applicable Law.** The contract shall be governed by and construed in accordance with the laws of the State of Mississippi, excluding its conflicts of laws provisions, and any litigation with respect thereto shall be brought in the courts of the state. The Independent Contractor shall comply with applicable federal, state and local laws and regulations.

**20.    Representation Regarding Contingent Fees.** The Independent Contractor represents that it has not retained a person to solicit or secure a State contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, except as disclosed in the Independent Contractor's bid, proposal, or herein.

**21.    Certification of Independent Price Determination.** The bidder certifies that the prices submitted in response to the solicitation have been arrived at

independently and without, for the purpose of restricting competition, any consultation, communication, or agreement with any other bidder or competitor relating to those prices, the intention to submit a bid, or the methods or factors used to calculate the prices bid.

22. **Representation Regarding Gratuities.** The Independent Contractor represents that neither it nor any officer, employee, agent, subcontractor or other representative of the Independent Contractor has violated, or is violating, and promises that it will not violate the prohibition against gratuities set forth in Section 6-204 (Gratuities) of the Mississippi Personal Service Contract Procurement Regulations.

23. **Procurement Regulations.** The Contract shall be governed by the applicable provisions of the Personal Service Contract Review Board Regulations, a copy of which is available for inspection at 210 East Capitol Street, Suite 800, Jackson, Mississippi 39201, or downloadable at www.mspb.ms.gov.

24. **Severability.** If any term or provision of this Contract is prohibited by the laws of the State of Mississippi or declared invalid or void by a court of competent jurisdiction, the remainder of this Contract shall not be affected thereby and each term and provision of this Contract shall be valid and enforceable to the fullest extent permitted by law.

25. **Stop Work Order.**

A. **Order to Stop Work.** The Director of Division of Family and Children's Services, may, by written order to the Independent Contractor at any time, and without notice to any surety, require the Independent Contractor to stop all or any part of the work called for by this Contract. This order shall be for a specified period not exceeding 90 days after the order is delivered to the Independent Contractor, unless the parties agree to any further period. Any such order shall be identified specifically as a stop work order issued pursuant to this clause. Upon receipt of such an order, the Independent Contractor shall forthwith comply with its terms and take all steps to minimize the occurrence of costs allocable to the work covered by the order during the period of work stoppage. Before the stop work order expires, or within any further period to which the parties shall have agreed, the Director of Family and Children's Services shall either:

(1) cancel the stop work order; or

(2) terminate the work covered by such order as provided in the "Termination for Cause" clause or the "Termination for Convenience" clause of this Contract.

B. **Cancellation or Expiration of the Order.** If a stop work order issued under this clause is canceled at any time during the period specified in the order, or if the period of the order or any extension thereof expires, the Independent Contractor shall have the right to resume work. An appropriate adjustment may be made in the delivery schedule or Independent Contractor's price, or both. If the stop work order results in an increase in the time required for, or in the Independent Contractor's cost

properly allocable to, the performance of any part of this Contract and the Independent Contractor asserts a claim for such an adjustment within 30 days after the end of the period of work stoppage, an equitable adjustment in the Contract may be made by written modification of this Contract. If MDHS decides that the need justifies the requested adjustment, a modification will be made as provided by Section 12, Modification or Amendment, of this Contract.

   **C.    Termination of Stopped Work.** If a stop work order is not canceled and the work covered by such order is terminated for cause or convenience, the Independent Contractor may be paid the agreed upon price for any completed deliverable or service not previously tendered to MDHS, provided that MDHS accepts any such deliverable or service; or Independent Contractor may be paid an amount which bears the same ratio to the total compensation as the services actually and satisfactorily performed bear to the total services of Independent Contractor covered by the Contract, less payments of compensation previously made.

   **D.    Adjustment of Price.** Any adjustment in Contract price made pursuant to this clause shall be determined in accordance with the Price Adjustment clause of this Contract.

   **26.    Disputes.** Any dispute concerning a question of fact under this Contract which is not disposed of by agreement shall be decided by the Director of the Division of Family and Children's Services. This decision shall be reduced to writing and a copy thereof mailed or furnished to the Independent Contractor and shall be final and conclusive, unless within thirty (30) days from the date of the decision, Independent Contractor mails or furnishes to the Executive Director of MDHS a written request for review. Pending final decision of the Executive Director of a dispute hereunder, the Independent Contractor shall proceed in accordance with the decision of the Director of the Division of Family and Children's Services.

   In a review before the Executive Director or designee, the Independent Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its position on the question and decision under review. The decision of the Executive Director on the review shall be final and conclusive unless determined by a court of competent jurisdiction in Hinds County, State of Mississippi, to have been fraudulent, capricious, so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence.

   **27.    Compliance with Laws.** The Independent Contractor understands that the State is an equal opportunity employer and therefore maintains a policy which prohibits unlawful discrimination based on race, color, creed, sex, age, national origin, physical handicap, disability, genetic information, or any other consideration made unlawful by federal, State, or local laws. All such discrimination is unlawful and the Independent Contractor agrees during the term of the agreement that the Independent Contractor will strictly adhere to this policy in its employment practices and provision of services. The Independent Contractor shall comply with, and all activities under this agreement shall be subject to, all applicable federal, State of Mississippi, and local laws and regulations, as now existing and as may be amended or modified.

7

**28.    Confidentiality.**  Independent Contractor shall treat all State data and information to which it has access under this Contract as confidential information to the extent that confidential treatment of same is required under federal and state law and shall not disclose same to a third party without specific written consent of the State.  In the event that Independent Contractor receives notice that a third party requests divulgence of confidential or otherwise protected information and/or has served upon it a subpoena or other validly issued administrative or judicial process ordering divulgence of confidential or otherwise protected information, Independent Contractor shall promptly inform the State and thereafter respond in conformity with such subpoena as required by applicable state and/or federal law, rules, and regulations.  The provision herein shall survive termination of the Contract for any reason and shall continue in full force and effect and shall be binding upon the Independent Contractor and its agents, employees, successors, assigns, subcontractors, or any party claiming an interest in the Contract on behalf of, or under, the rights of the Independent Contractor following any termination.

**29.    E-Verify.**   Independent Contractor represents and warrants that it will ensure its compliance with the Mississippi Employment Protection Act, Mississippi Code Annotated 71-11-1 and 71-11-3, and will register and participate in the status verification system for all newly hired employees.  The term "employee" as used herein means any person that is hired to perform work within the State of Mississippi.  As used herein, "status verification system" means the Illegal Immigration Reform and Immigration Responsibility Act of 1996 that is operated by the United States Department of Homeland Security, also known as the E-Verify Program, or any other successor electronic verification system replacing the E-Verify Program.  Independent Contractor agrees to maintain records of such compliance and, upon request of the State, to provide a copy of each such verification to the State.  Independent Contractor further represents and warrants that any person assigned to perform services hereunder meets the employment eligibility requirements of all immigration laws of the State of Mississippi.  Independent Contractor understands and agrees that any breach of these warranties may subject Independent Contractor to the following: (a) termination of this Agreement and ineligibility for any state or public contract in Mississippi for up to three (3) years, with notice of such cancellation/termination being made public, or (b) the loss of any license permit, certification or other document granted to Independent Contractor by an agency, department or governmental entity for the right to do business in Mississippi for up to one (1) year, or both.  In the event of such termination/cancellation, Independent Contractor would also be liable for any additional costs incurred by the State due to contract cancellation or loss of "license or permit." (Exhibit E).

**30.    Special Terms and Conditions.**  It is agreed and understood by each party to this Contract that there are no special terms and conditions.

**31.    Entire Agreement.**   It is understood and agreed that this Contract and the documents listed below constitute the entire understanding of the parties with respect to the subject matter contained herein and supersede and replace any and all prior negotiations, understandings and agreements, written or oral, between the parties relating thereto.  The entire agreement made by and between the parties hereto shall

consist of, and precedence is hereby established by the order of, the following documents incorporated herein:

1.  This Contract signed by the parties herein and any Exhibits attached hereto;

2.  The Request for Proposals dated February 11, 2013 and Response to Proposals dated March 8, 2013.

The documents are complementary, and what is required by one shall be binding as if required by all. A higher document shall supersede a lower order document to the extent necessary to resolve any conflict or inconsistency arising under the various provisions thereof; provided, however, that in no event an issue is addressed in one of the above-mentioned documents but is not addressed in another of such documents, no conflict or inconsistency shall be deemed to occur by reason thereof. The documents listed above are shown in descending order or priority, that is, the highest document begins with the first listed document ("1. This Contract signed by the parties herein and any Exhibits attached hereto") and the lowest document is listed last ("2. The Request for Proposals dated February 11, 2013 and Response to Proposals dated March 8, 2013").

**32.    Background Checks.**  All child care facilities which are awarded funds, whether they are awarded funds directly or through contracts with entities who receive funds directly, shall ensure that all their personnel, whether owners, or employees or volunteer workers have first been subjects of criminal background checks. These persons shall not be allowed to operate a facility nor given even provisional employment until the results of said background checks are obtained. The background checks shall be requested by the child care facilities. The expense of these background checks shall not be borne by MDHS but instead by the child care facility which requests the background check.

If it is determined that there is a child care facility which is operated by, or has hired, or accepted as a volunteer, a person with a criminal background, MDHS reserves the right to terminate its Contract with said facility if its Contract was directly with said facility. If the MDHS Contract is with an intermediary facility which has passed the funds through to other facilities, MDHS reserves the right to demand that such intermediary facility terminate its Contract with the non-conforming facility, or the intermediary facility may face termination of its Contract with MDHS.

**33.    Non-Compete.**  For the term of this contract and for a period of two (2) years thereafter, Hope Village for Children, Inc., hereby agrees not to directly or indirectly engage in competition in any way with MDHS or to associate with the state business or other business that may compete with MDHS. The term "competition" as used in the foregoing shall include, but not limited to, attempts to divert workers, clients, suppliers, or accounts from MDHS and/or attempt to induce employees of MDHS to terminate their employment. MDHS hereby agrees to enforce the provisions of the Non-Compete Agreement by any legal means. Such means shall include the right to enjoin by legal process for violating provisions hereof.

34.    <u>Transparency</u>.    This contract, including any accompanying exhibits, attachments, and appendices, is subject to the "Mississippi Public Records Act of 1983," codified as section 25-61-1 et seq., Mississippi Code Annotated and exceptions found in Section 79-23-1 of the Mississippi Code Annotated (1972, as amended).  In addition, this contract is subject to the provisions of the Mississippi Accountability and Transparency Act of 2008 (MATA), codified as Section 31-7-13 of the Mississippi Code Annotated (1972, as amended).  Unless exempted from disclosure due to a court-issued protective order, this contract is required to be posted to the Department of Finance and Administration's independent agency contract website for public access. Prior to posting the contract to the website, any information identified by the Contractor as trade secrets, or other proprietary information including confidential vendor information, or any other information which is required confidential by state or federal law or outside the applicable freedom of information statutes will be redacted.

**35.**  **Notice.**  Any notice required or permitted to be given under this Contract shall be in writing and sent by United States Certified Mail, Returned Receipt Requested to the party to whom the notice should be given at the address set forth below:

**MDHS:**  Mr. Richard A. Berry, Executive Director
Mississippi Department of Human Services
P.O. Box 352
Jackson, Mississippi 39205

**HOPE VILLAGE FOR CHILDREN, INC.:**  Ms. Tina Aycock, Executive Director
Hope Village for Children, Inc.
2433 23rd Avenue
Meridian, Mississippi 39302

**IN WITNESS WHEREOF**, this Contract has been made and interchangeably executed by the parties hereto in duplicate originals.

Witness my signature this, the ___25___ day of ___June___, 2013.

**MISSISSIPPI DEPARTMENT OF HUMAN SERVICES**

BY: _____
Signature

TITLE: _____

**WITNESSES:**

_____
_____

Witness my signature this, the ___20___ day of ___June___, 2013.

**HOPE VILLAGE FOR CHILDREN, INC.**

BY: _____
Signature

Printed Name: ___Tina Aycock___

TITLE: ___Exec. Director___

**WITNESSES:**

_____
_____

11

# SCOPE OF SERVICES
# HOPE VILLAGES, INC.

**HOPE VILLAGE FOR CHILDREN, INC**
**SCOPE OF SERVICES**
**JULY 1, 2013 – JUNE 30, 2014**

Hope Village for Children, Inc. Shelter/Diagnostic/Evaluation Facility is designed to provide short-term temporary residential care to meet the basic needs and to further evaluate the situation of Mississippi's foster children. We embrace the philosophy that this facility and its services are to be utilized only in the absence of other appropriate alternatives. This program recognizes the need to maintain family ties and will encourage family interaction as appropriate and feasible.

While in our care, we will address the physical, mental, emotional, educational and social needs of the children we serve.  An array of services to meet each child's individual needs will be provided.  Objectives will include:

1) We will meet the physical needs of the youth in our care.
   a) If this is the initial placement of the youth, a medical exam which will include a dental exam will be given within 72 hours of admittance to our program.
   b) All youth who have not received a recent physical exam will be seen by a medical doctor within 7 days of admittance to our program.
   c) Children between the ages of zero and 3 will have a developmental assessment when there is suspicion of developmental delays.
   d) Additional appointments for speech, hearing, vision, drug screens, sexually transmitted infection testing and TB testing will be scheduled when necessary.
   e) Youth have access to on-campus exercise equipment and participate in an exercise program during months that school is out of session.
   f) Nutritional meals and snacks approved by a dietician are served daily.
      All medical findings will be reported to the social worker along with a copy of all reports.

2) We will address the emotional and mental health issues facing the youth in our care.
   a) A psychological exam will be administered within 21 days of admittance to our program unless a current exam is available.
   b) Individual therapy is provided, when appropriate, by Weems Mental Health on a weekly basis.
   c) Group therapy, for age appropriate residents, is provided weekly by the professional staff at Hope Village for Children, Inc.
   d) A social worker is on duty 40 hours each week with qualified staff available 24 hours per day to address crisis situations.
   e) Sibling groups will be maintained together if at all possible in order to reduce the trauma of separation for youth already dealing with difficult situations.
   f) Hope Village for Children, Inc. will coordinate with the County of Responsibility to meet the child's needs to maintain and strengthen permanent connections as outlined in the Request for Proposal.

3) Residents will improve their interpersonal skills during their time at Hope Village for Children, Inc.

    a) Hope Village for Children, Inc. has a level system in place that is used to modify behavior.  As a youth improves his/her skills, privileges are given.

    b) Residents have the opportunity to participate in Game Night held twice monthly and attended by all Hope Village for Children, Inc. residents.

    c) Residents attend after school functions, church, community cultural events, movies and participate in holiday celebrations held on our campus.

4) Educational deficits will be identified and addressed for all school age residents.

    a) A plan is developed to address each child's individual educational challenges.  If possible, children are placed in the local public school system.  Case Managers meet with school counselors to address issues unique to children in the foster care system.

    b) If a child's age and circumstance make acquiring a GED the most appropriate educational opportunity, the child is enrolled in classes to prepare for that exam.

    c) Children with an IEP and whose behavior does not allow for success in the public school setting are referred to Crossroads school located at The Crossings Residential Treatment Facility.

    d) Tutors are provided for all residents at Hope Village for Children, Inc. 4 days per week, 52 weeks per year.  Each child has a tutor assigned to him/her so that a relationship can be developed and special needs can be addressed.

5) The Personal and Safety needs of each child will be addressed.

    a) Each child will be provided with all necessary hygiene products and will be instructed on their proper use.

    b) Each resident will have his/her own clean, well fitting, attractive, seasonal clothing that are appropriate to age, gender, individual needs and comparable to community standards. The resident will be involved in the selection care, and maintenance of clothing as appropriate to age and ability. A clothing inventory will be verified at admission and upon discharge.

    c) In order to ensure the safety of each resident, Hope Village for Children, Inc. requires 2 well-trained staff be on duty at all times.  When the diversity or numbers of residents make supervision difficult, a third staff will be available.  No member of the Hope Village for Children, Inc. staff sleeps while on duty.

    d)  An alarm system is in place to alert staff if a resident leaves without permission or if someone enters without permission.  Cameras have also been installed in all community areas to monitor interactions between staff, residents and peers.

6) All residents over the age of 14 will be exposed to independent living instruction.

    a) Hope Village for Children, Inc. will offer work tasks to provide a constructive experience for residents.  Residents will not be used as a substitute for staff members.

    b) Hope Village for Children, Inc. will assign jobs and household chores appropriate to the age and ability of the residents and in a manner so as not to conflict with schooling, recreation, extracurricular activities, visits with families and friends or any other activities associated with meeting the goals of their permanency plan.

c) Independent Living Skills Groups are provided twice monthly on our campus and are mandatory for all residents 14 years and older.
d) Transportation will be provided or arranged with the DFCS worker so that residents may attend skills group activities sponsored by other sources or entities.
e) Money management classes are offered weekly to all residents at Hope Village for Children, Inc. who are 14 years and older.
f) If a resident arrives at Hope Village for Children, Inc. and is employed locally, we will make sure he/she has transportation and the necessary tools to maintain that job.

## OUTCOME REPORTS

The Facility will submit Monthly Outcome Reports to the DFCS Congregate Care Unit by the tenth (10th) working day of each month. Unless otherwise indicated, please provide the following outcome measures for each month.

1.    Safety

   a.    Number of children served in the emergency shelter
   b.    Number of reports of maltreatment
   c.    Number of reports referred to DFCS centralized intake in < eight (8) hours
   d.    Number of reports referred to DFCS centralized intake in < twenty-four (24) hours
   e.    Number of children removed from Facility due to report of maltreatment
   f.    Number of reports requiring corrective action by the Facility/agency
   g.    Number of corrective action reports submitted to DFCS < thirty (30) days
   h.    Number of runaway episodes
   i.    Number of Serious Incidents

2.    Discharges/Disruptions

   a.    Number of children discharged to a final Permanency Plan outcome
   b.    Percent of children discharged to a final Permanency Plan outcome
   c.    Number of children which the Facility requested removal of the child
   d.    Number of children for whom the Facility requested removal and a placement disruption meeting was held prior to removal
   e.    Number of children for whom the Facility requested removal and a two (2) week notice was not given
   f.    Number of children discharged due to unplanned circumstances
   g.    Percent of total children discharged due to unplanned circumstances
   h.    Number of children discharged to a lower level, less restrictive placement
   i.    Percent of children discharged to a lower level, less restrictive placement
   j.    Number of children discharged to a higher level, more restrictive placement
   k.    Percent of children discharged to a higher level, more restrictive placement

3.  Case Planning

    a.  Number of Family Team Meetings/ISP Meetings/Adoption Status Meetings initiated by DFCS and attended by Facility social worker during the reporting month

    b.  Number of Foster Care Review conferences attended by Facility social worker during the reporting month

4.  Independent Living

    a.  Number of children> fourteen (14) years of age served during the reporting month

    b.  Number of Independent Living Skills groups attended by these children during the reporting month

    c.  Number of Independent Living Skills sessions conducted and documented by Facility professional staff

5.  Child/Parent/Sibling Visitation -Connections

    a.  Number of visits between children and their parents/other siblings in care held at the Facility or approved location other than DFCS office

    b.  Number of visits between children and their extended family/siblings not in care/other connections held at the Facility or approved location other than DFCS office

    c.  Number of visits between children/parents/siblings in care/connections in which the Facility staff provided primary supervision of visits

    d.  Number of visits between children/parents/siblings in care/connections in which the Facility staff provided transportation to the visit site

    e.  Number of other events (such as birthdays, school activities, medical/mental health appointments) for which the Facility provided transportation or assisted with arrangements that maintained or strengthened a child's relationship with significant connections

    f.  Number of children served whose residence (home from which they were removed) is greater than fifty (50) miles from placement site

    g.  Percent of children served whose residence (home from which they were removed) is greater than fifty (50) miles from placement site

6.  Medical/Dental Needs

    a.  Number of children served during the reporting month whose initial placement during the current custody episode was in this Facility

    b.  Number of these children who received an initial medical assessment within seventy-two (72) hours of custody

    c.  Number of these children who received a comprehensive medical exam within thirty (30) days of custody

d.     Number of total children in care for whom an annual medical exam was due during the reporting month

e.     Number of children due annual medical exams who received an annual medical exam

f.     Number of children for whom a semi-annual dental exam was due during the reporting month

g.     Number of children due a semi-annual dental exam who received a dental exam

h.     Number of children who experienced an acute medical episode requiring emergency assessment, treatment or hospitalization

i.     Number of children requiring psychotropic medication

j.     Number of children requiring psychotropic medication who have a written plan of approval from the County of Responsibility for administration of psychotropic medication on file

k.     Number of children ages zero to three (0-3) served during the month by the Facility or Resource Home(s)

l.     Number of children ages zero to three (0-3) who have been referred to the First Steps Early Intervention Program

m.     Number of children ages zero to three (0-3) who have been assessed by the First Steps Early Intervention Program

n.     Number of children> three (3) years of age who have received a developmental assessment through the Department of Health, Department of Mental Health or private provider

o.     Number of total children served during the reporting month whose recommended schedule of immunizations has been followed

7.    Mental Health

a.     Number of children four (4) years and older placed in the Facility during the past reporting month

b.     Number of children four (4) years and older who have a current mental health assessment on file

c.     Number of children whose mental health assessment has determined the need for ongoing or follow up mental health services

d.     Number of children who receive all mental health services recommended in this assessment

e.     Number of children screened for Fetal Alcohol Spectrum Disorder

8.    Educational Needs

a.     Number of school age children entering the Facility during the reporting month

b.     Number of school age children who were enrolled in an accredited school within three (3) days (with the exception of school holidays and breaks)

c.     Number of school age children who are able to remain in the same school they attended prior to placement in this Facility

d.     Number of school age children whose initial placement was in this Facility

e.   Number of school age children who received an educational assessment during the first thirty (30) days of placement

f.   Number of children who meet the criteria of "exceptional child" as defined in §37¬23-3 of the Mississippi Code

g.   Number of children who meet the criteria of "exceptional child" as defined in §37¬23-3 of the Mississippi Code have an IEP

h.   Number of children who meet the criteria of "exceptional child" as defined in §37¬23-3 of the Mississippi Code who receive appropriate special education and related services as contained in the IEP

i.   Number of IEP conferences attended by Facility social worker(s) during the reporting month

Narrative Updates/Progress Reports

The Facility will provide to the County of Responsibility bi-weekly narrative updates/progress reports on each child served. These updates/reports should address all issues of which DFCS Workers need to be aware. The Monthly Log of contacts will be submitted by the tenth (10th) working day each month. Hard copies of any documents such as medical, mental health and educational records should be provided to the County of Responsibility immediately upon receipt by the Facility. The Facility should retain copies of all these documents in the child's file maintained by the Facility. The following documentation details should routinely be addressed in narrative updates and progress reports.

a.   Documentation of assessment and clarification of ongoing child safety identification of risk, description of safety plans developed,

b.    Documentation of periodic discussion with the child concerning his/her ISP and identification of barriers to achievement and permanency.

c.   Documentation of assessment of and provision for medical, dental, educational and mental health needs based on the child's ISP and requirements of MDHS/DFCS policy; documentation of educational advocacy.

d.   Documentation of assessment of and provision for a child's well-being and permanency needs to include, but not limited to, the need for continuation of important connections and relationships, need for recreation and socialization, need for mentors and role models, need for development of vocational and family life skills.

e.   Documentation of child/parent-family-sibling visitation; description of how the Facility contributed to successful visitation as outlined in the child visitation plan; description of any noted safety concerns during visitation

f.   Documentation clearly demonstrating that the child, when age appropriate, is actively involved in assessment of needs and case planning activities and discussions

g.  Documentation of the frequency and quality of visitation between a child and his/her parents/siblings/extended family/significant connections (where were visits conducted, length of visits, quality of transactions occurring during visits, child's reactions before and after visits)

h.  Documentation of specific Independent Living Services and description of Independent Living Skills activities

i.  Documentation of examples of educational advocacy for a child by the Facility or Resource Parent

The Division of Family and Children's Services (DFCS) Director of the DFCS Administration Unit, the Director of the DFCS Permanency Unit, the Director of the Continuous Quality Improvement Unit, and the Director of the DFCS Licensure Unit will ensure that the Independent Contractor meets the programmatic quality assurance and licensure requirement criteria**. The Division of Program Integrity shall ensure the Independent Contractor further meets all aspects of the contract.

The tools utilized to evaluate these services will be the Licensure Standards and the programmatic reports submitted monthly to report the outcomes as outlined in Outcome Reports, beginning on page 3 of this Scope of Services.

The services will be evaluated by the Independent Contractor's submission of the required reports and by the Independent Contractor meeting the Licensure Standards. Failure to meet the Licensure Standards will result in loss of payment.

Program Integrity shall perform a site visit as least once a year, more if requested by the Division of Family and Children's Services. The Licensure Unit shall perform an onsite Annual Licensure Review for this Facility as the License is awarded for a one year period. The Licensure Unit shall visit and perform annual facility reviews (at least one review) two (2) months prior to renewal of the License. If this facility is under a Corrective Action Plan (CAP) the Licensure Unit shall perform a site visit every month the facility is under the CAP. Also, a licensure investigation shall be conducted after all Abuse Neglect and Exploitation (ANE) investigations. Therefore, the number of site visits performed by the Licensure Unit depends on the abovementioned circumstances, but at least one (1) site visit shall be performed by the Licensure Unit.

**Ex. 18J**

# CONTRACT AGREEMENT
# FAITH HAVEN, INC.

Revised 04/2013

# STATE OF MISSISSIPPI
## MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
## CONTRACT FOR PERSONAL OR PROFESSIONAL SERVICES

     **1.**    **Parties.**    This Contract is made and entered into by and between the Division of Family and Children's Services, Mississippi Department of Human Services, hereinafter referred to as "MDHS," and Faith Haven, Inc., hereinafter referred to as "Independent Contractor."

     **2.**    **Purpose.**    MDHS hereby engages the Independent Contractor and the Independent Contractor hereby agrees to render certain professional services described in Paragraph 3, "Scope of Services."

     **3.**    **Scope of Services.**    The Independent Contractor shall perform and render the following services, attached hereto as "Exhibit A" and the *Modified Mississippi Settlement Agreement*, attached hereto as "Exhibit B".

     **4.**    **Period of Performance.** The period of performance of services under this Contract shall begin on July 1, 2013 and end on June 30, 2014. MDHS shall have the option to renew this Contract at one (1) year intervals for two (2) years at the same terms and conditions. These one (1) year options to this contract shall end on June 30, 2016.

     **5.**    **Consideration and Method of Payment.**

     A.    As consideration of all services and performances under this Contract, Independent Contractor shall be paid a fee not to exceed Six Hundred Thirty Three Thousand Eighty Five Dollars and Twenty Cents ($633,085.20). It is expressly understood and agreed that in no event will the total compensation paid hereunder exceed the specified amount of Six Hundred Thirty Three Thousand Eighty Five Dollars and Twenty Cents ($633,085.20). (Exhibit C)

     B. The Independent Contractor will bill MDHS for its services on a monthly basis. Following the satisfactory completion, as determined by MDHS, of its daily services, the State requires the Independent Contractor to submit invoices electronically throughout the term of the agreement. Invoices shall be submitted to MDHS using the processes and procedures identified by the State. The appropriate documentation shall be submitted on the last working day of the month, with the final invoice to be submitted within five (5) working days after the contract ending date.

     Payments by state agencies using the Statewide Automated Accounting System (SAAS) shall be made and remittance information provided electronically as directed by the State. These payments shall be deposited into the bank account of the Independent Contractor's choice. The State may, at its sole discretion, require the Independent Contractor to submit invoices and supporting documentation electronically, at any time, during the term of this Agreement. Independent Contractor understands and agrees

that the State is exempt from the payment of taxes. All payments shall be in United States currency.

Independent Contractor agrees to accept all payments in United States currency via the State of Mississippi's electronic payment and remittance vehicle. MDHS agrees to make payment in accordance with Mississippi law on "Timely Payments for Purchases by Public Bodies," Mississippi Code Annotated 31-7-301, et. Seq., which generally provides for payment of undisputed amounts by MDHS within forty-five (45) days of receipt of invoice.

**6.     Relationship of Parties.**

A.     It is expressly understood and agreed that MDHS enters into this Contract with Independent Contractor on a purchase of service basis and not on an employer--employee relationship basis. Nothing contained herein shall be deemed or construed by MDHS, the Independent Contractor, or any third party as creating the relationship of principal and agent, partners, joint venturers, or any similar such relationship between MDHS and the Independent Contractor. Neither the method of computation of fees or other charges, nor any other provision contained herein, nor any acts of MDHS or the Independent Contractor hereunder, creates or shall be deemed to create a relationship other than the independent relationship of MDHS and the Independent Contractor.

B.     Independent Contractor represents that it has, or will secure, at its own expense, applicable personnel who shall be qualified to perform the duty required to be performed under this Contract.

C.     Any person assigned by Independent Contractor to perform the services hereunder shall be the employee of Independent Contractor, who shall have the sole right to hire and discharge its employee. MDHS may, however, direct Independent Contractor to replace any of its employees under this Contract. If Independent Contractor is notified within the first eight (8) hours of assignment that the person is unsatisfactory, Independent Contractor will not charge MDHS for those hours.

D.     It is further understood that the consideration expressed herein constitutes full and complete compensation for all services and performances hereunder, and that any sum due and payable to Independent Contractor shall be paid as a gross sum with no withholdings or deductions being made by MDHS for any purpose from said Contract sum.

E.     Independent Contractor shall pay when due all salaries and wages of its employees, and it accepts exclusive responsibility for the payment of Federal Income Tax, State Income Tax, Social Security, Unemployment Compensation and any other withholdings that may be required.

**7.     Termination for Cause.** If, through any cause, Independent Contractor fails to fulfill in a timely and proper manner, as determined by MDHS, its obligations under this Contract, or if Independent Contractor shall violate any of the covenants, agreements, or stipulations of this Contract, MDHS shall thereupon have the right to

2

terminate the Contract by giving written notice to Independent Contractor of such termination and specifying the effective date thereof at least five (5) days before the effective date of such termination. In the event of such termination, Independent Contractor shall be entitled to receive just and equitable compensation for satisfactory work completed on services or documents or materials collected and/or prepared by Independent Contractor in connection with this Contract. Such compensation shall be based upon the fees set forth in Paragraph 5, but, in no case, shall said compensation exceed the total Contract price.

Notwithstanding the above, Independent Contractor shall not be relieved of liability to MDHS for damages sustained by MDHS by virtue of any breach of this Contract by Independent Contractor, and MDHS may withhold any payments to Independent Contractor for the purpose of set off until such time as the exact damages due to MDHS from Independent Contractor are determined.

**8.    Termination for Convenience of MDHS.**    MDHS may terminate this Contract at any time by giving written notice to Independent Contractor of such termination and specifying the effective date thereof at least five (5) days before the effective date of such termination. Independent Contractor shall be paid an amount which bears the same ratio to the total compensation as the services actually and satisfactorily performed bear to the total services of Independent Contractor covered by the Contract, less payments of compensation previously made.

**9.    Ownership of Documents and Work Products.**    All data collected by Independent Contractor and all documents, notes, programs, data bases (and all applications thereof), files, reports, studies,  and/or other material collected and prepared by Independent Contractor in connection with this Contract shall be the property of MDHS upon completion of this Contract or upon termination of this Contract. MDHS hereby reserves all rights to the data base and all applications thereof and to any and all information and/or materials prepared under this Contract.

The Independent Contractor is prohibited from use of the above described information and/or materials without the express written approval of MDHS.

**10.    Conflict of Interest.**  Independent Contractor shall ensure that there exists no direct or indirect conflict of interest in the performance of this contract and/or performance by any of the Independent Contractor's Contractors/Subcontractors. Independent Contractor hereby warrants that no part of any federal or state money shall be paid directly or indirectly to an employee or official of MDHS as wages, compensation or gifts exchange for acting as an officer, agent, employee, subcontractor, or consultant to the Independent Contractor in connection with any work contemplated or pertaining to this Independent Contractor Agreement.  Independent Contractor shall strictly comply with all conflict of interest provisions or standards of conduct provisions contained in any applicable state, federal, or local law, rule, or regulation.

**11.    Record Retention and Access to Records.** Independent Contractor shall maintain, and make available to MDHS, any State agency authorized to audit MDHS,

the federal grantor agency, the Comptroller General of the United States or any of their duly authorized representatives, financial records, supporting documents, statistical records, and all other records pertinent to the services performed under this Contract. These records shall be maintained for at least three (3) years; however, if any litigation or other legal action, by or on behalf of the state or federal government has begun that is not completed at the end of the three-year period, or if audit finding, litigation, or other legal action has not been resolved at the end of the three-year period, the records shall be retained until resolution.

**12. Modification or Amendment.** Modifications, changes, or amendments to this Contract may be made upon mutual agreement of the parties hereto. However, any change, supplement, modification, or amendment of any term, provision, or condition of this Contract must be in writing and signed by both parties hereto.

**13. Assignments and Subcontracts.** Independent Contractor shall not assign, sublet, or otherwise transfer the obligations incurred on its part pursuant to the terms of this Contract without the prior written consent of MDHS. Any attempted assignment or transfer of its obligation without such consent shall be wholly void.

**14. Waiver.** Failure of either party hereto to insist upon strict compliance with any of the terms, covenants, and conditions hereof shall not be deemed a waiver or relinquishment of any similar right or power hereunder at any subsequent time or of any other provision hereof, nor shall it be construed to be a modification of the terms of this Contract.

**15. Availability of Funds.** It is expressly understood and agreed that the obligation of MDHS to proceed under this Contract is conditioned upon the availability of funds, the appropriation of funds by the Mississippi Legislature, and the receipt of state and/or federal funds. If, at any time, the funds anticipated for the fulfillment of this Contract are not forthcoming or are insufficient, either through the failure of the federal government to provide funds or of the State of Mississippi to appropriate funds or the discontinuance or material alteration of the program under which funds were provided, or if funds are not otherwise available to MDHS for the performance of this Contract, MDHS shall have the right, upon written notice to Independent Contractor, to immediately terminate this Contract without damage, penalty, cost, or expense to MDHS of any kind whatsoever. The effective date of termination shall be as specified in the notice of termination.

**16. Price Adjustment.**

**A. Price Adjustment Methods.** The Contract price may be changed only by written agreement of the parties. The value of any work covered by any claim for increase or decrease in the Contract Price shall be determined by one or more of the following methods:

(1) Unit prices, if any, previously approved by the parties and specified in this Contract; or

4

(2)  MDHS may, at any time by written order, make changes in the specifications within the general scope of this Agreement.  If any such change causes an increase in the amount due under this Contract or in the time required for performance under this Agreement and if MDHS decides that the change justifies an adjustment to the Contract, an equitable adjustment in the Contract may be made by written modification of this Agreement.

No charge for any extra work or material will be allowed unless the same has been provided for by written amendment to this Contract signed by both parties.

**B.    Submission of Cost Pricing Data.** The Independent Contractor shall provide cost or pricing data for any price adjustments subject to the provisions of Section 3-403 (Cost or Pricing Data) of the Mississippi Personal Service Contract Procurement Regulations.

**17.    Indemnification.** MDHS shall, at no time, be legally responsible for any negligence or wrongdoing by the Independent Contractor and/or its employees, servants, agents, contractors, and/or subcontractors. Independent Contractor agrees to indemnify, defend, save and hold harmless MDHS from and against all claims, demands, liabilities, suits, damages, and costs of every kind and nature whatsoever, including court costs and attorney's fees, arising out of or caused by Independent Contractor and its employees, agents, contractors, and/or subcontractors in the performance of this Contract.

**18.    Insurance.**    Independent Contractor represents that it will maintain workers' compensation insurance which shall inure to the benefit of all Independent Contractor's personnel performing services under this Contract, comprehensive general liability insurance, and employee fidelity bond insurance.  Independent Contractor will furnish MDHS a certificate of insurance providing the aforesaid coverage, prior to the commencement of performance under this Agreement. (Exhibit D).

**19.    Applicable Law.**  The contract shall be governed by and construed in accordance with the laws of the State of Mississippi, excluding its conflicts of laws provisions, and any litigation with respect thereto shall be brought in the courts of the state.  The Independent Contractor shall comply with applicable federal, state and local laws and regulations.

**20.    Representation Regarding  Contingent Fees.**  The Independent Contractor represents that it has not retained a person to solicit or secure a State contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, except as disclosed in the Independent Contractor's bid, proposal, or herein.

**21.    Certification of Independent Price Determination.**  The bidder certifies that the prices submitted in response to the solicitation have been arrived at

5

independently and without, for the purpose of restricting competition, any consultation, communication, or agreement with any other bidder or competitor relating to those prices, the intention to submit a bid, or the methods or factors used to calculate the prices bid.

22. **Representation Regarding Gratuities.** The Independent Contractor represents that neither it nor any officer, employee, agent, subcontractor or other representative of the Independent Contractor has violated, or is violating, and promises that it will not violate the prohibition against gratuities set forth in Section 6-204 (Gratuities) of the Mississippi Personal Service Contract Procurement Regulations.

23. **Procurement Regulations.** The Contract shall be governed by the applicable provisions of the Personal Service Contract Review Board Regulations, a copy of which is available for inspection at 210 East Capitol Street, Suite 800, Jackson, Mississippi 39201, or downloadable at www.mspb.ms.gov.

24. **Severability.** If any term or provision of this Contract is prohibited by the laws of the State of Mississippi or declared invalid or void by a court of competent jurisdiction, the remainder of this Contract shall not be affected thereby and each term and provision of this Contract shall be valid and enforceable to the fullest extent permitted by law.

25. **Stop Work Order.**

A. **Order to Stop Work.** The Director of Division of Family and Children's Services, may, by written order to the Independent Contractor at any time, and without notice to any surety, require the Independent Contractor to stop all or any part of the work called for by this Contract. This order shall be for a specified period not exceeding 90 days after the order is delivered to the Independent Contractor, unless the parties agree to any further period. Any such order shall be identified specifically as a stop work order issued pursuant to this clause. Upon receipt of such an order, the Independent Contractor shall forthwith comply with its terms and take all steps to minimize the occurrence of costs allocable to the work covered by the order during the period of work stoppage. Before the stop work order expires, or within any further period to which the parties shall have agreed, the Director of Family and Children's Services shall either:

    (1)    cancel the stop work order; or

    (2)    terminate the work covered by such order as provided in the "Termination for Cause" clause or the "Termination for Convenience" clause of this Contract.

B. **Cancellation or Expiration of the Order.** If a stop work order issued under this clause is canceled at any time during the period specified in the order, or if the period of the order or any extension thereof expires, the Independent Contractor shall have the right to resume work. An appropriate adjustment may be made in the delivery schedule or Independent Contractor's price, or both. If the stop work order results in an increase in the time required for, or in the Independent Contractor's cost

properly allocable to, the performance of any part of this Contract and the Independent Contractor asserts a claim for such an adjustment within 30 days after the end of the period of work stoppage, an equitable adjustment in the Contract may be made by written modification of this Contract. If MDHS decides that the need justifies the requested adjustment, a modification will be made as provided by Section 12, Modification or Amendment, of this Contract.

      **C.**     **Termination of Stopped Work.** If a stop work order is not canceled and the work covered by such order is terminated for cause or convenience, the Independent Contractor may be paid the agreed upon price for any completed deliverable or service not previously tendered to MDHS, provided that MDHS accepts any such deliverable or service; or Independent Contractor may be paid an amount which bears the same ratio to the total compensation as the services actually and satisfactorily performed bear to the total services of Independent Contractor covered by the Contract, less payments of compensation previously made.

      **D.**     **Adjustment of Price.** Any adjustment in Contract price made pursuant to this clause shall be determined in accordance with the Price Adjustment clause of this Contract.

      **26.**     **Disputes.** Any dispute concerning a question of fact under this Contract which is not disposed of by agreement shall be decided by the Director of the Division of Family and Children's Services. This decision shall be reduced to writing and a copy thereof mailed or furnished to the Independent Contractor and shall be final and conclusive, unless within thirty (30) days from the date of the decision, Independent Contractor mails or furnishes to the Executive Director of MDHS a written request for review. Pending final decision of the Executive Director of a dispute hereunder, the Independent Contractor shall proceed in accordance with the decision of the Director of the Division of Family and Children's Services.

      In a review before the Executive Director or designee, the Independent Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its position on the question and decision under review. The decision of the Executive Director on the review shall be final and conclusive unless determined by a court of competent jurisdiction in Hinds County, State of Mississippi, to have been fraudulent, capricious, so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence.

      **27.**     **Compliance with Laws.** The Independent Contractor understands that the State is an equal opportunity employer and therefore maintains a policy which prohibits unlawful discrimination based on race, color, creed, sex, age, national origin, physical handicap, disability, genetic information, or any other consideration made unlawful by federal, State, or local laws. All such discrimination is unlawful and the Independent Contractor agrees during the term of the agreement that the Independent Contractor will strictly adhere to this policy in its employment practices and provision of services. The Independent Contractor shall comply with, and all activities under this agreement shall be subject to, all applicable federal, State of Mississippi, and local laws and regulations, as now existing and as may be amended or modified.

28.  **Confidentiality.**  Independent Contractor shall treat all State data and information to which it has access under this Contract as confidential information to the extent that confidential treatment of same is required under federal and state law and shall not disclose same to a third party without specific written consent of the State. In the event that Independent Contractor receives notice that a third party requests divulgence of confidential or otherwise protected information and/or has served upon it a subpoena or other validly issued administrative or judicial process ordering divulgence of confidential or otherwise protected information, Independent Contractor shall promptly inform the State and thereafter respond in conformity with such subpoena as required by applicable state and/or federal law, rules, and regulations. The provision herein shall survive termination of the Contract for any reason and shall continue in full force and effect and shall be binding upon the Independent Contractor and its agents, employees, successors, assigns, subcontractors, or any party claiming an interest in the Contract on behalf of, or under, the rights of the Independent Contractor following any termination.

29.  **E-Verify.**  Independent Contractor represents and warrants that it will ensure its compliance with the Mississippi Employment Protection Act, Mississippi Code Annotated 71-11-1 and 71-11-3, and will register and participate in the status verification system for all newly hired employees. The term "employee" as used herein means any person that is hired to perform work within the State of Mississippi. As used herein, "status verification system" means the Illegal Immigration Reform and Immigration Responsibility Act of 1996 that is operated by the United States Department of Homeland Security, also known as the E-Verify Program, or any other successor electronic verification system replacing the E-Verify Program. Independent Contractor agrees to maintain records of such compliance and, upon request of the State, to provide a copy of each such verification to the State. Independent Contractor further represents and warrants that any person assigned to perform services hereunder meets the employment eligibility requirements of all immigration laws of the State of Mississippi. Independent Contractor understands and agrees that any breach of these warranties may subject Independent Contractor to the following: (a) termination of this Agreement and ineligibility for any state or public contract in Mississippi for up to three (3) years, with notice of such cancellation/termination being made public, or (b) the loss of any license permit, certification or other document granted to Independent Contractor by an agency, department or governmental entity for the right to do business in Mississippi for up to one (1) year, or both. In the event of such termination/cancellation, Independent Contractor would also be liable for any additional costs incurred by the State due to contract cancellation or loss of "license or permit." (Exhibit E).

30.  **Special Terms and Conditions.** It is agreed and understood by each party to this Contract that there are no special terms and conditions.

31.  **Entire Agreement.**  It is understood and agreed that this Contract and the documents listed below constitute the entire understanding of the parties with respect to the subject matter contained herein and supersede and replace any and all prior negotiations, understandings and agreements, written or oral, between the parties relating thereto. The entire agreement made by and between the parties hereto shall

consist of, and precedence is hereby established by the order of, the following documents incorporated herein:

1.  This Contract signed by the parties herein and any Exhibits attached hereto;

2.  The Request for Proposals dated February 11, 2013 and Response to Proposals dated March 8, 2013.

The documents are complementary, and what is required by one shall be binding as if required by all. A higher document shall supersede a lower order document to the extent necessary to resolve any conflict or inconsistency arising under the various provisions thereof; provided, however, that in no event an issue is addressed in one of the above-mentioned documents but is not addressed in another of such documents, no conflict or inconsistency shall be deemed to occur by reason thereof. The documents listed above are shown in descending order or priority, that is, the highest document begins with the first listed document ("1. This Contract signed by the parties herein and any Exhibits attached hereto") and the lowest document is listed last ("2. The Request for Proposals dated February 11, 2013 and Response to Proposals dated March 8, 2013").

32.  **Background Checks**. All child care facilities which are awarded funds, whether they are awarded funds directly or through contracts with entities who receive funds directly, shall ensure that all their personnel, whether owners, or employees or volunteer workers have first been subjects of criminal background checks. These persons shall not be allowed to operate a facility nor given even provisional employment until the results of said background checks are obtained. The background checks shall be requested by the child care facilities. The expense of these background checks shall not be borne by MDHS but instead by the child care facility which requests the background check.

If it is determined that there is a child care facility which is operated by, or has hired, or accepted as a volunteer, a person with a criminal background, MDHS reserves the right to terminate its Contract with said facility if its Contract was directly with said facility. If the MDHS Contract is with an intermediary facility which has passed the funds through to other facilities, MDHS reserves the right to demand that such intermediary facility terminate its Contract with the non-conforming facility, or the intermediary facility may face termination of its Contract with MDHS.

33.  **Non-Compete**. For the term of this contract and for a period of two (2) years thereafter, Faith Haven, Inc., hereby agrees not to directly or indirectly engage in competition in any way with MDHS or to associate with the state business or other business that may compete with MDHS. The term "competition" as used in the foregoing shall include, but not limited to, attempts to divert workers, clients, suppliers, or accounts from MDHS and/or attempt to induce employees of MDHS to terminate their employment. MDHS hereby agrees to enforce the provisions of the Non-Compete Agreement by any legal means. Such means shall include the right to enjoin by legal process for violating provisions hereof.

9

**34.** **Transparency**.    This contract, including any accompanying exhibits, attachments, and appendices, is subject to the "Mississippi Public Records Act of 1983," codified as section 25-61-1 et seq., Mississippi Code Annotated and exceptions found in Section 79-23-1 of the Mississippi Code Annotated (1972, as amended).  In addition, this contract is subject to the provisions of the Mississippi Accountability and Transparency Act of 2008 (MATA), codified as Section 31-7-13 of the Mississippi Code Annotated (1972, as amended).  Unless exempted from disclosure due to a court-issued protective order, this contract is required to be posted to the Department of Finance and Administration's independent agency contract website for public access. Prior to posting the contract to the website, any information identified by the Contractor as trade secrets, or other proprietary information including confidential vendor information, or any other information which is required confidential by state or federal law or outside the applicable freedom of information statutes will be redacted.

35.   **Notice.**  Any notice required or permitted to be given under this Contract shall be in writing and sent by United States Certified Mail, Returned Receipt Requested to the party to whom the notice should be given at the address set forth below:

**MDHS:**                Mr. Richard A. Berry, Executive Director
                         Mississippi Department of Human Services
                         P.O. Box 352
                         Jackson, Mississippi 39205


**FAITH HAVEN, INC.:**   Ms. Kathryn McKee, Executive Director
                         Faith Haven, Inc.
                         Post Office Box 835
                         Tupelo, Mississippi 38802

**IN WITNESS WHEREOF,** this Contract has been made and interchangeably executed by the parties hereto in duplicate originals.

Witness my signature this, the _____ day of _____, 2013.

**MISSISSIPPI DEPARTMENT OF HUMAN SERVICES**

BY: _____
                          Signature
TITLE: _____

**WITNESSES:**

_____

_____

Witness my signature this, the 20th day of _____, 2013.

**FAITH HAVEN, INC.**

BY: _____
                          Signature
Printed Name: _____KATHRYN McKEE_____

TITLE: _____Executive Director_____

**WITNESSES:**

_____

_____

11

# SCOPE OF SERVICES

# FAITH HAVEN, INC.

**FAITH HAVEN, INC**
**SCOPE OF SERVICES**
**JULY 1, 2013 – JUNE 30, 2014**

Faith Haven, Inc. will provide the services for a temporary emergency residential child care facility for children ages ten (10) through eighteen (18) years of age. These children will be in custody of the Mississippi Department of Human Services. Faith Haven, Inc. will also accept sibling groups or children younger than ten (10) if DFCS needs these emergency placements. Faith Haven, Inc. will accept children/youth approved by the Division of Family and Children's Services (DFCS) County of Responsibility. The facility will be available seven (7) days per week on a twenty-four (24) hour basis, three hundred sixty-five (365) days per year. Comprehensive medical, dental and psychological assessments shall be provided.

Faith Haven, Inc. will remain licensed as a residential child care facility by DFCS and shall assist DFCS in meeting requirements contained in MDHS/DFCS policies.

Faith Haven, Inc. will be open for admissions at any hour. The application form will be made available if the DFCS staff wishes to complete the information known at the time. No child will be denied admission because an application form has not been provided.

Faith Haven, Inc. will not deny admission to the facility due to race, creed or disability.

Faith Haven, Inc. will accept the per diem rate per child per day. No additional charges will be billed by the facility to the county or state office.

Faith Haven, Inc. will provide staff coverage that meets or exceeds the licensing requirements. Faith Haven, Inc. remains dedicated to providing the best quality care to the children in the facility. The facility will provide an Executive Director who will be responsible in ensuring that these services will be provided.

Faith Haven, Inc. will provide the County of Responsibility a written child's progress report every other week. Services will be provided with staff supervision while allowing each resident the opportunity to have time alone in his/her room. Faith Haven, Inc. reflects practice that is culturally responsible and designed for the needs of each child.

Faith Haven, Inc. will work with the County of Responsibility to develop treatment plans, permanency and placement plans, goals & services to address these plans. Behavior management plans will be developed with the DFCS social worker.

Educational services will be provided by Tupelo Public Schools. The school system will also provide teachers to provide tutoring at Faith Haven, Inc. four days per week. Faith Haven, Inc. staff will transport to and from school. The Faith Haven, Inc. Social Worker will enroll and withdraw residents from school. Faith Haven, Inc. will remain dedicated to the educational needs of residents. Developmental assessments will be done for children ages zero to three (0-3) and older children if developmental delays are

suspicioned.   Educational services will include school registration, tutoring, making contact with school officials, attending individual education plan (IEP) conferences and working with the county social worker regarding the child's educational goals and progress.  Faith Haven, Inc. staff will continue to assist with GED and other educational opportunities.

Faith Haven, Inc. will transport all youth ages 14 – 19 to Independent Living Skills Groups.  Faith Haven, Inc. Staff will also engage residents in age appropriate life skill activities.  Residents may learn to be responsible for their rooms, laundry and personal hygiene.  They may also learn to prepare meals and accept responsibility for chores.

Faith Haven, Inc. will complete a clothing inventory at admission and discharge.  Faith Haven, Inc. will continue to purchase clothing for children prior to the receipt of the DHS clothing voucher.   Replacement clothing will be provided by the DFCS County of Responsibility as needed.

Faith Haven, Inc. will purchase hygiene supplies and provide allowances through the DHS per diem rate.  The allowance will be equal to or greater than the amount designated by the DFCS Foster Board Breakdown according to the age of the child.

Faith Haven, Inc. will coordinate services with the County of Responsibility social worker to meet the child's needs to maintain and strengthen permanent connections through:

    (a) the visitation plan
    (b) ongoing evaluation and identification of connections with the child
    (c) transportation for visits and special events
    (d) arranging for visits at the facility or other approved site and counseling the children regarding grief and loss due to separation from important connections.

Faith Haven, Inc. Staff feel that maintaining connections is very important to children.  The facility has engaged in the above named services for several years.  In coordination with the MDHS workers, Faith Haven, Inc. allows telephone contact quite frequently with approved contact/contacts.

Faith Haven, Inc. will provide all necessary transportation for the child within the county and will work with the Child's DFCS Worker regarding travel outside the county.

Faith Haven, Inc. will secure treatment for an injury to a child or any illness requiring medical attention.   The child's DFCS worker will be notified immediately.   Serious injuries and other serious incidents will be reported verbally and in writing to the DFCS Congregate Care Director.  Faith Haven, Inc. understands and will abide by the approval for extensions.

Faith Haven, Inc. Staff work diligently with a resident to avoid a detention center. If a child is sent to a detention center, the facility will take him/her back unless there are charges and he/she is committed to a training school, incarcerated, or is a danger to self or others.

The appropriate law enforcement personnel will be notified if a child leaves the facility without permission. The DFCS Social Worker will be notified immediately.

Faith Haven, Inc. will provide copies of progress reports/narratives to the child's DFCS worker. Monthly logs shall be submitted to the worker by the tenth (10th) of every month.

Faith Haven, Inc. remains dedicated to providing these services listed above in addition to providing a home-like environment with nurturing staff members. Faith Haven, Inc. wants to ensure each child acceptance and good quality care during the temporary placement in our facility.

## OUTCOME REPORTS

The Facility will submit Monthly Outcome Reports to the DFCS Congregate Care Unit by the tenth (10th) working day of each month. Unless otherwise indicated, please provide the following outcome measures for each month.

1.    Safety

      a.    Number of children served in the emergency shelter
      b.    Number of reports of maltreatment
      c.    Number of reports referred to DFCS centralized intake in < eight (8) hours
      d.    Number of reports referred to DFCS centralized intake in < twenty-four (24) hours
      e.    Number of children removed from Facility due to report of maltreatment
      f.    Number of reports requiring corrective action by the Facility/agency
      g.    Number of corrective action reports submitted to DFCS < thirty (30) days
      h.    Number of runaway episodes
      i.    Number of Serious Incidents

2.    Discharges/Disruptions

      a.    Number of children discharged to a final Permanency Plan outcome
      b.    Percent of children discharged to a final Permanency Plan outcome
      c.    Number of children which the Facility requested removal of the child
      d.    Number of children for whom the Facility requested removal and a placement disruption meeting was held prior to removal
      e.    Number of children for whom the Facility requested removal and a two (2) week notice was not given

    f.     Number of children discharged due to unplanned circumstances
    g.    Percent of total children discharged due to unplanned circumstances
    h.    Number of children discharged to a lower level, less restrictive placement
    i.     Percent of children discharged to a lower level, less restrictive placement
    j.    Number of children discharged to a higher level, more restrictive placement
    k.    Percent of children discharged to a higher level, more restrictive placement

3.    Case Planning

    a.    Number of Family Team Meetings/ISP Meetings/Adoption Status Meetings initiated by DFCS and attended by Facility social worker during the reporting month
    b.    Number of Foster Care Review conferences attended by Facility social worker during the reporting month

4.    Independent Living

    a.    Number of children> fourteen (14) years of age served during the reporting month
    b.    Number of Independent Living Skills groups attended by these children during the reporting month
    c.    Number of Independent Living Skills sessions conducted and documented by Facility professional staff

5.    Child/Parent/Sibling Visitation -Connections

    a.    Number of visits between children and their parents/other siblings in care held at the Facility or approved location other than DFCS office
    b.    Number of visits between children and their extended family/siblings not in care/other connections held at the Facility or approved location other than DFCS office
    c.    Number of visits between children/parents/siblings in care/connections in which the Facility staff provided primary supervision of visits
    d.    Number of visits between children/parents/siblings in care/connections in which the Facility staff provided transportation to the visit site
    e.    Number of other events (such as birthdays, school activities, medical/mental health appointments) for which the Facility provided transportation or assisted with arrangements that maintained or strengthened a child's relationship with significant connections
    f.    Number of children served whose residence (home from which they were removed) is greater than fifty (50) miles from placement site
    g.    Percent of children served whose residence (home from which they were removed) is greater than fifty (50) miles from placement site

6.      Medical/Dental Needs

      a.      Number of children served during the reporting month whose initial placement during the current custody episode was in this Facility

      b.      Number of these children who received an initial medical assessment within seventy-two (72) hours of custody

      c.      Number of these children who received a comprehensive medical exam within thirty (30) days of custody

      d.      Number of total children in care for whom an annual medical exam was due during the reporting month

      e.      Number of children due annual medical exams who received an annual medical exam

      f.      Number of children for whom a semi-annual dental exam was due during the reporting month

      g.      Number of children due a semi-annual dental exam who received a dental exam

      h.      Number of children who experienced an acute medical episode requiring emergency assessment, treatment or hospitalization

      i.      Number of children requiring psychotropic medication

      j.      Number of children requiring psychotropic medication who have a written plan of approval from the County of Responsibility for administration of psychotropic medication on file

      k.      Number of children ages zero to three (0-3) served during the month by the Facility or Resource Home(s)

      l.      Number of children ages zero to three (0-3) who have been referred to the First Steps Early Intervention Program

      m.      Number of children ages zero to three (0-3) who have been assessed by the First Steps Early Intervention Program

      n.      Number of children> three (3) years of age who have received a developmental assessment through the Department of Health, Department of Mental Health or private provider

      o.      Number of total children served during the reporting month whose recommended schedule of immunizations has been followed

7.      Mental Health

      a.      Number of children four (4) years and older placed in the Facility during the past reporting month

      b.      Number of children four (4) years and older who have a current mental health assessment on file

      c.      Number of children whose mental health assessment has determined the need for ongoing or follow up mental health services

      d.      Number of children who receive all mental health services recommended in this assessment

      e.      Number of children screened for Fetal Alcohol Spectrum Disorder

8.    Educational Needs

    a.    Number of school age children entering the Facility during the reporting month

    b.    Number of school age children who were enrolled in an accredited school within three (3) days (with the exception of school holidays and breaks)

    c.    Number of school age children who are able to remain in the same school they attended prior to placement in this Facility

    d.    Number of school age children whose initial placement was in this Facility

    e.    Number of school age children who received an educational assessment during the first thirty (30) days of placement

    f.    Number of children who meet the criteria of "exceptional child" as defined in §37¬23-3 of the Mississippi Code

    g.    Number of children who meet the criteria of "exceptional child" as defined in §37¬23-3 of the Mississippi Code have an IEP

    h.    Number of children who meet the criteria of "exceptional child" as defined in §37¬23-3 of the Mississippi Code who receive appropriate special education and related services as contained in the IEP

    i.    Number of IEP conferences attended by Facility social worker(s) during the reporting month

<u>Narrative Updates/Progress Reports</u>

The Facility will provide to the County of Responsibility bi-weekly narrative updates/progress reports on each child served. These updates/reports should address all issues of which DFCS Workers need to be aware. The Monthly Log of contacts will be submitted by the tenth (10th) working day each month. Hard copies of any documents such as medical, mental health and educational records should be provided to the County of Responsibility immediately upon receipt by the Facility. The Facility should retain copies of all these documents in the child's file maintained by the Facility. The following documentation details should routinely be addressed in narrative updates and progress reports.

    a.    Documentation of assessment and clarification of ongoing child safety identification of risk, description of safety plans developed,

    b.    Documentation of periodic discussion with the child concerning his/her ISP and identification of barriers to achievement and permanency.

    c.    Documentation of assessment of and provision for medical, dental, educational and mental health needs based on the child's ISP and requirements of MDHS/DFCS policy; documentation of educational advocacy.

    d.    Documentation of assessment of and provision for a child's well-being and permanency needs to include, but not limited to, the need for continuation of important connections and relationships, need for

*Exhibit A, Scope of Services*                    6

recreation and socialization, need for mentors and role models, need for development of vocational and family life skills.

e.    Documentation of child/parent-family-sibling visitation; description of how the Facility contributed to successful visitation as outlined in the child visitation plan; description of any noted safety concerns during visitation

f.    Documentation clearly demonstrating that the child, when age appropriate, is actively involved in assessment of needs and case planning activities and discussions

g.    Documentation of the frequency and quality of visitation between a child and his/her parents/siblings/extended family/significant connections (where were visits conducted, length of visits, quality of transactions occurring during visits, child's reactions before and after visits)

h.    Documentation of specific Independent Living Services and description of Independent Living Skills activities

i.    Documentation of examples of educational advocacy for a child by the Facility or Resource Parent

The Division of Family and Children's Services (DFCS) Director of the DFCS Administration Unit, the Director of the DFCS Permanency Unit, the Director of the Continuous Quality Improvement Unit, and the Director of the DFCS Licensure Unit will ensure that the Independent Contractor meets the programmatic quality assurance and licensure requirement criteria**.** The Division of Program Integrity shall ensure the Independent Contractor further meets all aspects of the contract.

The tools utilized to evaluate these services will be the Licensure Standards and the programmatic reports submitted monthly to report the outcomes as outlined in Outcome Reports, beginning on page 3 of this Scope of Services.

The services will be evaluated by the Independent Contractor's submission of the required reports and by the Independent Contractor meeting the Licensure Standards. Failure to meet the Licensure Standards will result in loss of payment.

Program Integrity shall perform a site visit as least once a year, more if requested by the Division of Family and Children's Services.  The Licensure Unit shall perform an onsite Annual Licensure Review for this Facility as the License is awarded for a one year period.  The Licensure Unit shall visit and perform annual facility reviews (at least one review) two (2) months prior to renewal of the License. If this facility is under a Corrective Action Plan (CAP) the Licensure Unit shall perform a site visit every month the facility is under the CAP.  Also, a licensure investigation shall be conducted after all Abuse Neglect and Exploitation (ANE) investigations.  Therefore, the number of site

visits performed by the Licensure Unit depends on the abovementioned circumstances, but at least one (1) site visit shall be performed by the Licensure Unit.

**Ex. 19A**

# PERFORMANCE BASED CONTRACTING

**Olivia Y Modified Settlement Agreement (MSA)  Implementing performance based contracting (II.A.2.d.1)**

*Defendants shall implement and maintain a performance based contracting system to evaluate annually contract agency compliance with the terms of the Modified Settlement Agreement.  Defendants shall take reasonable steps to ensure contract agency remediation of any identified deficiencies.  2) By the end of Implementation Period Three: (a) All therapeutic resource parents who have one or more foster children residing in the home shall be visited in the home at least once per month by their private agency caseworker.  These visits shall be in addition to the monthly home visit conducted by DFCS (Appendix I).  Beginning in Implementation Period Three, all contracts executed between Defendants and private agencies that provide services to foster children shall require that the private caseworker (1) share all relevant and legally disclosable information concerning the foster child; (2) evaluate the foster child's safety, need, and well-being; and (3) monitor service delivery and the achievement of service goals.  DFCS shall require that such visits occur, that they are documented in the child's case record, and that remedial action is taken if such visits are not taking place.  (b) Beginning in Implementation Period Three, all contracts executed between Defendants and private agencies that provide protective, preventive, foster care, or adoption case work services shall require the contract agencies to abide by all related terms of the Modified Settlement Agreement, including, but not limited to, provisions regarding training curricula, minimum training hours, and caseload standards, with the exception that contract agency caseworkers shall not be required to undertake the hours of pre-service training required of DFCS caseworkers that pertain to MACWIS instruction and DFCS-specific workplace procedures.*

*I.A.4. Contract Agency Requirements-Defendants shall work with Casey Family Programs, or another consultant approved by the Monitor, for technical assistance with developing a plan with specific action steps and timeframes for a performance based contracting system with the capacity to monitor and enforce contract performance.  That plan shall be complete by the end of Implementation Period 3.*

*Part One: Performance Based Contracting Plan*

<u>Mississippi DHS organized a Performance Based Contracting Unit.</u>

███████, Bureau Director II, Administration, hired two financial coordinators, ███████ and ███████, and a Bureau Director I, ███████ as the contract/subgrant team. An experience Project Officer IV, ███████, is also part of this team. ███████ had been handling subgrants, personal service contracts, and developed the current Requests for Proposals and Contracts with the assistance of the Attorney General's Office and Human Resources liaison, ███████, with the Mississippi State Personnel Board. ███████ was also added to the team. The team meets monthly for advanced professional development regarding contract practices, facilitated by ███████, Attorney, and ███████, Attorney.

<u>Mississippi DHS issued a Request for Proposals and subsequently issued contract awards to pilot Performance Based Contracting.</u>

Two Requests for Proposals (RFP) were issued August 20, 2012:

  (a) Resource Homes/Group Homes (RHGH2012A) and

  (b) Emergency Shelters/Diagnostic/Evaluation Facility (ESDEF2012A),

These contracts include the *Olivia Y.* language requirements regarding service providers meeting the same requirements of the Modified Settlement Agreement (II.A.2.d.1),(2)(b)) with the exception of the hours of pre-service training required of DFCS caseworkers that pertain to MACWIS instruction and DFCS-specific workplace procedures. The Modified Settlement Agreement is an attachment to the RFPs. Letters of Intent were received by the September 10, 2012 deadline. Proposals were received by the September 21, 2012, deadline and evaluated September 27, 2012. Recommendations were made for awarding of contracts to the State Personnel Board by the December 2012 meeting.

Eight (8) proposals were submitted as a result of the Resource Home/Group Home RFP. Six (6) contracts were awarded. Six (6) proposals were submitted as a result of the Emergency Shelter RFP. All six (6) were issued award letters for contracts.

<u>The MDHS Division of Program Integrity developed a plan for monitoring performance based contracts.</u>

The Office of Monitoring performs fiscal monitoring using the subgrantee/contractor's general ledger and the most current cost reporting work sheet filed with the MDHS Office of Budgets and Accounting. Monitors sample a selection (20) of non-payroll items that are checked for proper cost allocation. These items are checked and verified by invoices, cancelled checks and

proper authorization in the subgrantee/contractor's line item budget narrative. Two pay periods for five employees are also verified using the same method. All items of equipment purchased for use are also verified by the same method.

The Office of Monitoring also performs programmatic monitoring on these same subgrantee/contractor contracts. Specific programmatic monitoring tools are created for each individual contract based on the contract's Scope of Services and the requirements of DFCS Licensure Standards, along with specific requirements mandated by the Modified Settlement Agreement. Each programmatic review tool includes the areas of, but is not limited to, Internal Control, Licensure Standards, Scope of Services, Personnel and Expected Outcomes. This programmatic monitoring is much more detailed than the fiscal monitoring, because performance based contracts place greater emphasis on the programmatic scopes. After monitoring is completed, reports are issued and followed up with communication between the MDHS DFCS and the contractor until satisfactory results are obtained.

███████████, Director, Program Integrity; and ███████, Program Integrity; developed the following:

  *Revised instruments to guide DFCS monitoring team for conducting contract agency reviews that cover the items listed in MSA (i.e. behavior management, foster home placements, evaluation of foster child's safety, permanency and well-being, contract agency visits with foster child, training hours, and caseload standards).

  *Developed instructions for the instruments (i.e. what information can be gathered through data system, most recent permanency plans or assessments, EPSDT, what is gathered during the on-site visit, where the data should be entered, where there is some room for subjectivity).

  *Developed a protocol for contract monitoring (i.e. quarterly site visits, annual site visits, follow up reports, follow up conversations, what happens when corrective action is needed, what to do when there are serious concerns affecting child safety).

  *Provided training for the DFCS monitoring team about how to use the instruments.

  *Requested TA from CSF.

*MDHS developed a plan for processing, reviewing and approving invoices for services provided.*

In June, 2012, ████████ met with ████████, CQI; ████████, ████████, Deputy Executive Director, and ████████ regarding a pilot for Performance Based Contracting by January, 2013.

A meeting was held on September 10, 2012, regarding how payments to facilities on contract would be paid through Budgets and Accounting rather than through the MACWIS system, as done in the past. The change was necessary to help alleviate over and under payments to the facilities. Implementation of this change would be effective January 1, 2013.

The process is that placement providers will submit an invoice to the Contract Unit. Providers' invoices are due by the 10th of each month, along with the facilities admission/exit sign-in/out sheet signed by the worker placing the child. (This sheet is for verification of accuracy and tracking purposes). The information on the invoice would be verified/confirmed by the Regional Directors as well as confirmation/verification by the Contract Unit regarding accuracy of information on the invoice including: Name, DOB, SS#, date child was placed, date child left, per diem board rates, funding type, funding source codes, and total payment to the facility.

After verification/confirmation from RD's, Contract Unit, MACWIS, and MIS, the Director of Administration will sign, and an email is sent to the provider to submit their total in the MDHS electronic payment system known as Paymode. Copies of the completed invoice are sent to Management Information Systems (MIS) for confirmation of placement. Another copy is sent to Budgets and Financial Planning for discrepancies found within the facility invoice after verification/confirmation process. The timeline for issuing the payment once the invoice is received in state office if no errors are found is forty-five (45) days.

Note: Emergency Shelters receive a fifty-five dollars ($55) per diem rate through June 30, 2013, and the regular group homes will receive the regular board rate based on the age of the child. The Agency shall increase the rate for Emergency Shelters in an amount not to exceed One Hundred Forty-Four Dollars and Fifty-Four Cents ($144.54) per child per day, which becomes effective July 1, 2013. No additional charges shall be billed by the facility to the county or State Office without written permission from the DFCS Congregate Care Director.

Part Two: *Performance Based Contracting Timeline-Progression of Implementation*

<u>MDHS requested and received technical assistance from Casey Family Programs to help develop a plan with specific actions steps and timeframes for implementation of a performance based contracting system.</u>

In June, 2012, ▮▮▮▮▮ met with ▮▮▮▮▮▮ , Casey Family Programs, to request technical assistance with Performance Based Contracting. ▮▮▮▮▮ and ▮▮▮▮▮ , Deputy Director, Family and Children Services, discussed with the Child Welfare League of America (CWLA) about providing and scheduling the training.

Technical Assistance – 2012-2013

In July, 2012, Casey Family Programs (CFP) and American Public Human Services Association, (APHSA) agreed to provide technical assistance to the Mississippi Department of Human Services (MDHS), Division of Family and Children's Services (DFCS) in developing a plan with specific action steps and timeframes for a performance based contracting system with the capacity to monitor and enforce contract performance. The plan must be completed by the end of the Implementation Period Three as required by the *Olivia Y* Modified Settlement Agreement (MSA). Several conference calls were held during the months of July, August and September to plan the next steps and action plans for implementing Performance Based Contracting (PBC).

On July 30, 2012, a conference call was held with ▮▮▮▮▮ , Administration Unit; ▮▮▮▮ ▮▮▮▮ , Contracts; ▮▮▮▮▮ , CFP; and ▮▮▮▮▮ , APHSA. A draft matrix was developed and a two-day session planned for the month of October.

On August 6, 2012, a conference call was held with CFP to discuss providing technical assistance to our unit regarding scope and nature of work, and general thoughts regarding PBC in MS. The call included ▮▮▮▮▮ , Administration Unit; ▮▮▮▮▮ , Contract Unit; ▮▮▮▮▮ , CFP; and ▮▮▮▮▮ , APSHA.

A conference call occurred on October 2, 2012, to discuss the agenda for the two day conference scheduled for October 10-11, 2012. The conference call included the following people: ▮▮▮▮▮ , Director of Administration; ▮▮▮▮▮ , Director of PBC; ▮▮▮▮▮ , APSHA; ▮▮▮▮▮ Executive Leadership Advisor/CFP. The scope of work for the October 10-11, 2012 session was discussed.

MDHS/DFCS continued to work with CFP and APHSA to set several meeting dates with various units of MDHS to provide direction as well as strengths and gaps analysis regarding the implementation of PBC.

*MDHS has regularly engaged representative stakeholders to develop the Mississippi Performance Based Contracting Plan.*

**October 10-11, 2012 Convening of Stakeholders**

The two (2) day session was set for October 10-11, 2012. Representatives from various units attended. (Appendix A)

During this session, the following steps were accomplished: identified desired future state, strengths, gaps, root causes, general remedies, and next steps with timeframes and persons responsible. Also achieved during this session was the hiring of contract staff, obtaining technical assistance from Casey Family Programs and APHSA, piloting PBC through six emergency shelter contracts, setting up a stakeholder conference for February, 2013, as well as confirming another session within DFCS to be scheduled for November, 28-29, 2012. The monitoring unit was added for the November meeting. (Appendix B).

*November 27, 2012 Convening of Stakeholders Regarding Licensure Standards*

On November 27, 2012, ████████████, Director of Congregate Care, held a meeting for all Residential Child Caring and Child Placing Agencies licensed by DFCS. The meeting provided an overview of MSA, prepared by a DFCS staff attorney, as well as a discussion of the implementation of PBC in MS. Service Providers and MDHS staff attended (*Appendix C*).

*November 28-29, 2012 Technical Assistance from APHSA*

The two (2) day session was set for November 28-29, 2012. Multiple DFCS units and MDHS representatives attended (Appendix D).

The matrix was updated as to desired future state, strengths, gaps, root causes, general remedies, and next steps with updated/corrected timeframes and persons responsible. Representatives from the monitoring unit were included in this session. They included: ████████ ████ and ████████████. The PBC implementation plan was further developed, as well as identifying requirements regarding PBC under the *Olivia Y* Modified Settlement Agreement. Dates were set, groups were re-aligned and anticipated completion dates were scheduled and changed/added to complete the specific tasks generated by various units during the sessions held in October and November.

*December 5, 2012 Meeting with Executive Leadership*

On December 5, 2012, a PBC Commitment Meeting was held. The purpose of this meeting was to secure the support and commitment from executive management to the PBC effort. Those attending were ████████, Administration Unit/Contracts, ████████, Contract Administrator; ████████, CFP; ████████, Personnel Officer IV; ████████ Executive Director, MDHS; and ████████, Deputy Executive Director, MDHS.

*January 30, 2013 Contract Process Meeting*

On January 30, 2013, a mandatory contract process meeting was held to review the changing process of contracts within the agency. Those presenting information were ████████, Human Resources; ████████, Budgets & Accounting; ████████, Budgets & Accounting; ████ ████████, Program Integrity, ████████, Attorney General's Office; ████████ Deputy Administrator for Administration and Acting Director of MIS; ████████, MIS; and ████ ████████, Contract Administrator.

*February 12, 2013 Convening of Stakeholders*

For the next several months, CFP, APHSA, and MDHS/DFCS continued phone call and email discussions to hold a one day conference which would include two separate tracks. One track being the development of the 5-Year CFSR Plan for the agency, and the second track would include the discussion of the implementation of PBC. Participants of the conference would include stakeholders, judges, legislators and MDHS/DFCS staff.

An email was sent On October 24, 2012, to ████████ Program Manager, Administrative Office of Courts, asking him to assist with the February 12, 2013 conference. ████ suggested Judge ████████ of Indiana, as a possible keynote speaker at the CFSP/PBC conference on February 12, 2013. Judge ████████ would address the Child and Family Services Plan (Track One) of the conference. ████████ of Center for Support of Families and ████████ of Casey Family Programs agreed to contact speakers for the PBC (Track Two). The following speakers/panelists were secured for the February 12, 2013 conference: ████████, Senior Researcher, ████████; ████████, Center for Support of Families; ████████, MSW, ACSW, CEO Lawrence Hall Youth Services; ████████, Senior Director, Strategic Consulting Casey Family Program. American Public Human Services Association was retained by Casey Family Programs to provide technical assistance rather than CWLA, as previously discussed, for developing the PBC Plan.

A Save the Date email was sent out November 7, 2012, to stakeholders, judges, legislators and MDHS/DFCS staff to RSVP for the February 12, 2013 conference.

On January 11, 2013, a formal invitation was sent with a request to RSVP for the February 12, 2013 conference. Along with the e-invite, a website link called "Survey Monkey" was attached. This questionnaire's purpose was to identify questions/issues that would be discussed during the Track Two part of the February 12, 2013 conference. (Appendix E).

_February 12, 2013 Convening of Stakeholders (continued)_

On February 12, 2013, the CFSR/PBC Conference was held, which identified Mississippi's approach to implementation of PBC, as well as development of a 5-Year Plan for CFSR. A total of 125 people were in attendance, consisting of DFCS staff, judges, and stakeholders. The meeting attendees were divided into two groups. Track One: Child & Family Services Plan and Track Two: Performance Based Contracting. The two groups met separately to discuss topics pertinent to each track. MDHS Deputy Executive Director, ███████ welcomed the group and provided opening remarks regarding goals and activities pertaining to DFCS' child welfare system. He stressed that the primary goals for this conference was to ensure children's safety and effective timeliness in moving children to permanency.

The Child and Family Services Plan (CFSP) focused on the following: Mobilizing Services, Safety and Risk, Involvement of Child and Family, Identifying Strengths and Weaknesses, Timeliness in Implementation. The keynote speaker was Judge ███████, Director of the Department of Child Services for the State of Indiana.

_TRACK ONE_

The Child and Family Services Plan (Track One) divided into break-out discussion groups as follows: Judicial, Tribal, Resource Development, Regional Group Homes, Congregate Care, Adoption, Prevention, Emergency Shelters, Protection, Foster Care, and Independent Living. Copies of the beginning draft of the 5-year plan were distributed outlining the goals. Each group identified their specific goals and answered a set of questions provided by the facilitator, ███████, an Organizational Effectiveness Consultant with APHSA. After each group presented their answers, a common ground approach was reached which addressed the 5-year plan strategies.

_TRACK TWO_

The PBC (Track Two) began with facilitator ███████ holding an open-ended discussion under the topic of "Understanding PBC." The discussion focused on the PBC process, outcome measures, timelines, and timeliness of permanency. ███████, Center for the Support of

Families, discussed implementation of PBC in Tennessee. She discussed what they had done prior to PBC, and spoke to the impact of the development of PBC regarding payments, funding, contract monitoring, incentives, and the changes it brought about to the child of Tennessee. Speaker █████████ Senior Researcher from the University of Chicago, continued the discussion with how data was utilized from their SACWIS system, Baseline Targets, and the focus on data as well as the Continuous Quality Improvement (CQI) process.

█████████, Casey Family, and █████████, CEO of Lawrence Hall Youth Services in Illinois, spoke about the strengths of PBC, as well as the changes which were evident after PBC had been implemented in Illinois. Technical versus adaptive change was discussed. A question and answer session followed. The providers were emailed the various presentations given by the speakers.

### *February 20, 2013 Meeting to Identify Monitoring Division for PBC*

On February 20, 2013, a meeting was held with various DHS units attending. The subject of the meeting was the monitoring of PBC. Program Integrity (PI) agreed to implement a monitoring plan and hire three (3) staff to perform tasks. Program Integrity submitted a working draft of the monitoring tool that would be used to monitor the Division of Family and Children's Services Contracts. The program management tool was a working draft based on Scopes of Services from a Group Home. The working drafts will be updated as needed. Discussions were held regarding the requirements of the Modified Settlement Agreement (MSA), requirements at the beginning of the implementation period, Child Safety, Physical and Mental Health, Therapeutic Services, Family Assessments, Case Recordings, and the Permanency Plan. Various units and representatives attended (Appendix F).

Subsequently, three (3) staff were hired and trained to monitor PBC's as of March, 2013.

### *February 28, 2013 Meeting of PBC Team to Report and Update Matrix*

On February 28, 2013, a meeting was held with various units attending. The objective of the meeting was to update the PBC matrix. Various units and representatives attended (Appendix G).

The discussion centered around updating the PBC matrix, completion of the PBC conference held February 12, 2013, and an update on the monitoring plan. Feedback from an updated matrix was completed and sent out to all units for review. The standard procedure for processing and issuing monitoring reports was discussed, with a hand-out of the timeline of the following: Notification of Monitoring Review to Subgrantee, Preparation of Draft Initial Report, Monitoring Director Review of Draft Initial Report, Funding Division Director Comments, Report Mailed to Subgrantee, First Response Due from Subgrantee, Status Report to Reply to

Subgrantee's Response; Second Response Due from Subgrantee; Final Decision Letter to Subgrantee; Referral to Attorney General's Office. Also discussed was the Office of Monitoring Checklist, as well as the Standard Assurance Test.

### *March 1, 2013 Training by the Personal Services Contract Review Board*

On March 1, 2013, the Personal Services Contract Review Board (PSCRB) representatives from the State Personnel Board provided contract training to staff at MDHS. Representatives provided detailed information in the areas of preparing Request for Proposals, procedures and guidelines for selecting reviewers, and the evaluations and scoring processes. Various units and representatives attended (Appendix H).

### *March 21, 2013 Meeting of MDHS Units and MIS Regarding Invoice Procedures*

On March 21, 2013, a meeting was held with staff from MACWIS, MIS, Administration and Finance, and the Contract Unit. The subject of the meeting was the completion/update of invoices by Emergency Shelters and Group Homes. Concerns were outlined and procedures were implemented regarding the invoice process. The Contract Unit will continue confirmation of children, as well as send discrepancies to the Administration & Finance Unit for resolution. Regional Directors (RD) will receive a copy of the invoices and the information on the invoices will be verified, along with the confirmation of placement via tickler confirmation in MACWIS from field workers. Those attending were as follows: ██████████, DFCS Administration; ██████████, Eligibility Unit; ██████████ CQI; ██████████, Budgets & Accounting; ██████████, MACWIS Consultant; ██████████, MIS; ██████████ DFCS Admin. & Finance; ██████████, DFCS Contracts.

### *March 22, 2013 Meeting of Program Integrity and CFS Consultant Regarding Monitoring Plan*

On March 22, 2013, ██████████, Director of Program Integrity; ██████████ Program Integrity; and ██████████, Center for Support of Families held a telephone conference and reviewed PI's monitoring tools for Performance Based Contracts. It was suggested to possibly scale down and/or revise the questions that would require a more clinical analysis. As a result of the conversation, the tools were revised to establish a more tangible analysis and measurement of the contract agency. On March 26, 2013, there was another discussion and it was decided that a conference call would be scheduled with ██████████ from Tennessee after obtaining a copy of the monitoring tools used by Tennessee. The call was scheduled for April 2, 2013. The conference call was made on this date, with ██████████ from Tennessee added to the call. ██████████ explained Tennessee's process for monitoring PBC, offering many tips and best practices.

Tennessee was able to contract with Vanderbilt for training on how to build their monitoring tools and measure the clinical type outcomes required by the Tennessee lawsuit.

*April 4, 2013 Meeting Regarding Invoice Procedures*

On April 4, 2013, a follow-up meeting was held regarding the Invoices submitted by Emergency Shelters and Group Homes. Discrepancies which impact the payments being made to the facilities were discussed and a plan implemented. Once discrepancies are resolved by the Finance Unit, the Contract Unit will be notified of those changes and the Contract Unit will validate the placements in MACWIS after receiving confirmation from the RD's and forward the necessary information to MIS designee.

*April 22, 2013 Planning Meeting for Convening of Therapeutic Providers Prior to RFP for January 1, 2014 Start Date*

On April 22, 2013, the Contract Unit began discussions with Casey Family Programs to plan a Casey-sponsored convening of Stakeholders who are interested in providing therapeutic services when the RFP is issued. Dr. ███████████, Deputy Administrator of Family and Children's Services, was asked to address the group of stakeholders regarding the services required by the Modified Settlement Agreement (MSA) for therapeutic homes. ███████████ Director of Permanency, was asked to address the group of stakeholders regarding the monitoring of performance from a programmatic standpoint, as well speak about the licensure requirements for a facility. ███████████ was asked to address the monitoring plan and processes. The Therapeutic Group Stakeholder Conference will be held on June 27, 2013. The Contract Unit is in the planning stages of this conference.

On May 29, 2013, a Save the Date invitation was sent to stakeholders to attend the convening on June 27, 2013.

*Next Steps*

An RFP will be advertised during the summer for Therapeutic Group Homes. Proposals will be accepted and evaluated. Contracts will be awarded and sent to SPB for approval. The contracts will be effective January 1, 2014.

Two additional contract staff have been requested. One will handle invoices and confirmation processes, and the second hired will prepare therapeutic group homes' RFPs and contracts.

In 2014, a stakeholder meeting will be held involving a question and answer session, as well as training in PBC.

**Appendix A**

*October 10-11, 2013 Convening of Stakeholders*

| Name | Title | Agency/Division/Other |
|------|-------|-----------------------|
| ▇▇▇▇ | Director | MACWIS |
| ▇▇▇▇ | Personnel Officer V | Human Resources |
| ▇▇▇▇ | Division Director II | Professional Development |
| ▇▇▇▇ | Special Assistant | Attorney General's Office |
| ▇▇▇▇ | Bureau Director II | Prevention/Protection |
| ▇▇▇▇ | Division Director II | Prevention/Protection |
| ▇▇▇▇ | Division Director II | Administration |
| ▇▇▇▇ | Bureau Director II | Administration |
| ▇▇▇▇ | Bureau Director I | Performance Based Contracting |
| ▇▇▇▇ | Project Officer IV | Contracts |
| ▇▇▇▇ | Financial Coordinator | Contracts |
| ▇▇▇▇ | Financial Coordinator | Contracts |
| ▇▇▇▇ | Projects Officer IV/Special | Administration |
| ▇▇▇▇ | Bureau Director I | Budgets & Accounting |
| ▇▇▇▇ | Division Director II | Budgets and Accounting |
| ▇▇▇▇ | Division Director II | Congregate Care and Placement |
| ▇▇▇▇ | Division Director II | Independent Living |
| ▇▇▇▇ | Director | Family and Children's Services |

**Appendix B: Action Plan:**

| | General Remedies | | Specific Tasks | Responsible Group | Anticipated Completion Date | Status / Notes (completed, in-progress, not started) |
|---|---|---|---|---|---|---|
| 1. | Convene the MS DHS PBC team regularly to manage PBC planning and implementation | A. | Convene to review work team progress and plan Feb, 2013 convening | ██████ PBC Team | Jan 9, 2013 @ 9-11:30am | The Core Group noted in the PBC plan (██████ ████, ██████, ████) will ensure forward momentum between convenings of the full PBC team. |
| | | B. | Convene to debrief Feb, 2013 convening and review work team progress and overall PBC plan | | TBD Feb-July | |
| 2. | Complete assessment of the current state versus our desired future state | C. | Identify the quality of the information and report sharing between Licensing and Program/Field units and the extent to which that shared information is used | ████, ████, ████, ████, ████ | November 28, 2012 | COMPLETED |
| | | D. | Investigate what other divisions in MS DHS are doing re. Performance Based Contracting | ████ | November 14, 2012 | COMPLETED |
| | | E. | Complete assessment of data capacity | PBC Team | November 28, 2012 | COMPLETED |
| 3. | Ensure effective communication between DHS and contractors/potential contractors | | Provide to the Performance Based Contracting Team language re: policy/regulations regarding communication with potential vendors | ████, ████, ████ | November 14, 2012 | COMPLETED |

**MID-TERM AND LONGER-TERM REMEDIES**

| | General Remedies | Specific Tasks | Responsible Group | Anticipated Completion Date | Status / Notes (completed, in-progress, not started) |
|---|---|---|---|---|---|
| 4. | Pilot PBC in Emergency Shelters and Group Homes/Resource Homes program areas | A. Issue RFPs and select contractors | ██████, █████ | | COMPLETED |
| | | B. Identify and put in place initial monitoring process, staffing, etc. for pilot contracts utilizing existing staff | █████ ████ PBC team  ████████████ | | February 1, 2013 |
| 5. | Draw on technical assistance from Casey Family Programs and APHSA to complete a comprehensive plan for rolling out PBC with strong likelihood of success and sustainability | A. Contact Virginia Pryor, Casey Family Programs, regarding TA to develop PBC Plan | █████, ████ | | COMPLETED |
| | | B. Work with American Public Human Services Association (APHSA) to set date for TA to develop PBC Plan | ██████ █████ | | COMPLETED |
| | | C. Hold two-day planning conference facilitated by APHSA in October 2012 | █████ ████, PBC Team | | COMPLETED |
| | | D. Hold two-day planning conference facilitated by APHSA in November 2012 | █████, █████ PBC Team | | COMPLETED |
| | | E. Develop CFP/APHSA work plan for 2013 | █████ █████  █████ █████ | December 20, 2012 | |

| | General Remedies | | Specific Tasks | Responsible Group | Anticipated Completion Date | Status / Notes (completed, in-progress, not started) |
|---|---|---|---|---|---|---|
| 6. | Identify a general approach to PBC in Mississippi, grounded in a solid understanding of practices in other states | A. | Research other states that have PBC | ▮▮, ▮▮ (▮▮), ▮▮ | October 8, 2012 | COMPLETED |
| | | B. | Gather examples of three types of approaches for PBC. | ▮▮ (▮▮), ▮▮ | October 8, 2012 | COMPLETED |
| | | C. | Recommend to the PBC team the general approach to PBC that is the right fit for Mississippi | ▮▮, ▮▮ ▮▮, ▮▮), ▮▮, ▮▮ ▮▮ | February 1, 2013 | COMPLETED |
| | | D. | Conduct second round research with other PBC states and localities and provide an updated summary to the PBC team | ▮▮, ▮▮ (▮▮), ▮▮ | February 1, 2013 | Research re. how they establish partnership relationships with vendors, which achieve the best outcomes, and their lessons learned |
| 7. | Identify clear timelines for internal contracting systems, with longer timelines than have been used historically | Identify a standard contracting timeline | | ▮▮, ▮▮ ▮▮ | | COMPLETED |
| 8. | Educate executive leadership and Bureau Directors about State Personnel Board contracting rules and secure their commitment to work within these rules. | A. | Run the draft PBC plan by executive leaders | ▮▮ ▮▮ ▮▮, ▮▮ | February 1, 2013 | COMPLETED 12/5/2012 |
| | | B. | Run an updated draft by Bureau Directors whose bureaus manage contracts | | | |

| | General Remedies | | Specific Tasks | Responsible Group | Anticipated Completion Date | Status / Notes (completed, in-progress, not started) |
|---|---|---|---|---|---|---|
| 9. | Ensure all major stakeholders are in the loop and generally bought in | A. | Discuss with Program Integrity their role and posture toward performance based contracting | ▄▄, ▄▄▄, with input from ▄▄ and ▄▄▄ | October 31, 2012 | COMPLETED |
| | | B. | Plan Feb 12, 2013 stakeholder convening | ▄▄, ▄▄▄, ▄▄▄, ▄▄▄, APHSA, ▄▄▄▄ staff + ▄▄▄ & ▄▄▄▄ | | COMPLETED |
| | | C. | Identify areas for input from staff and providers versus areas the state needs in order to make decisions. | ▄▄, ▄▄, ▄▄▄ ▄▄▄▄ ▄▄ ▄▄▄ | May 31, 2013 | |
| | | D. | Explore options for periodic stakeholder meetings | | Ongoing. | June 27, 2013 stakeholder meeting for therapeutic group homes and therapeutic homes |

| | General Remedies | Specific Tasks | Responsible Group | Anticipated Completion Date | Status / Notes (completed, in-progress, not started) |
|---|---|---|---|---|---|
| 8 co nt. | Ensure all major stakeholders are in the loop and generally bought in – *Implement Feb 12, 2013 convening* | E. Overall planning and execution of convening | ▮▮, ▮▮, ▮▮, ▮▮, APHSA, staff + ▮▮ & ▮▮ | February 12, 2013 | COMPLETED |
| | | F. Identify Date and Location for stakeholder convening | | October 31, 2012 | COMPLETED |
| | | G. Send "save the dates" for the February, 2013 convening | ▮▮, ▮▮ | October 31, 2012 | COMPLETED |
| | | H. Reach out to legislators for participation in the February, 2013 convening | ▮▮ | November 14, 2012 | COMPLETED |
| | | I. Work with AOC and Mississippi Judicial College (MJC) regarding Save the Date Notices to Judges/Referees | ▮▮ | | COMPLETED |
| | | J. Identify keynote speakers for two tracks (CFSR and PBC), Administrative Office of Courts (AOC) providing speaker for Child and Family Services Plan (CFSP) and Casey Family Programs providing speaker for PBC | ▮▮ | January 2013 | COMPLETED |
| | | K. Schedule speakers | ▮▮ | January 2013 | COMPLETE |
| | | L. Plan and manage all meeting logistics | ▮▮ | | COMPLETED |
| | | M. Develop and produce meeting materials/packets | ▮▮ | | COMPLETED |

| | General Remedies | Specific Tasks | Responsible Group | Anticipated Completion Date | Status / Notes (completed, in-progress, not started) |
|---|---|---|---|---|---|
| 10. | Complete writing and communicating standards for corrective action plans to be used across the board. | A. Draft guidelines for corrective action to be used across the board, <br><br> a. starting from licensing's current approach <br> b. Including expectations for workers to develop contingency plans <br><br> B. Get feedback from: <br> a. ▓▓▓▓ / Settlement Team <br> b. County program staff <br> c. Providers currently on CAP <br><br> C. Finalize and start using guidelines | ▓▓▓ ▓▓▓ <br> ▓▓▓ ▓▓ | February 1, 2013 | Completed |
| 11. | Get contract documentation in MACWIS | A. Identify what needs to be documented in MACWIS, for what kinds of contracts, and starting when <br><br> B. Identify where in MACWIS documentation needs to be entered, who does it, and what role/security they need in MACWIS <br><br> C. Communicate expectations to staff required to enter documentation and provide licensing more staff to handle the increased administrative burden | ▓▓▓ ▓▓▓, <br> ▓▓▓ ▓▓▓, <br> ▓▓▓ | February 1, 2013 | COMPLETED |

| | General Remedies | Specific Tasks | Responsible Group | Anticipated Completion Date | Status / Notes (completed, in-progress, not started) |
|---|---|---|---|---|---|
| 12. | Strengthen communication between Licensing and Program staff | A. Identify expectations and process for inter-unit communication | ██, ██, ██, ██, ██ | February 1, 2013 | Ongoing |
| | | B. Get input from PBC team and others as needed | | February 1, 2013 | Ongoing |
| | | C. Update and begin implementing the process | | | Ongoing |
| | | D. Monitor implementation for progress, impact, and lessons learned | | | Ongoing |
| 13. | Define the skills and/or knowledge needed to serve as a reviewer of written proposals | E. Identify State Personnel Board requirements for reviewers and what additionally DHS needs to identify | ██, ██, ██, ██, ██ | | Note: <br> • To avoid conflicts of interest <br> • To build on SPB requirements <br> • To review proposals consistently and fairly <br> • To include multiple levels of screening (pre-screening before full panel reviews) <br> • To include feedback for applicants |
| | | F. Develop requirements and process for proposal reviews and training / support / oversight for reviewers | | February 1, 2013 | |
| | | G. Develop and implement an orientation/ training for reviewers, potentially using the training from 8 years ago as a starting point | | | |

| | General Remedies | Specific Tasks | Responsible Group | Anticipated Completion Date | Status / Notes (completed, in-progress, not started) |
|---|---|---|---|---|---|
| 14. | Develop and start using a consistent RFP template | A. Review 12 contracts going into effect Jan/Feb 2013<br><br>██, ██, ██<br>██ ██,<br>██ ██,<br>APHSA | ██, ██, ██ ██ ██, ██ ██, APHSA | | Including guidelines for:<br>• Budgets & budget narratives (embedding performance based budgeting principles)<br>• G.A.A.P<br>• Services to be provided<br>• Outcomes to be achieved (outcomes from MSA with % benchmarks identified) |
| | | B. Provide 10 program managers and 5 admin. staff overview of State Personnel Board requirements for RFPs | ██ ██ | February 11, 2013 | |
| | | C. Provide training in performance-based budgeting/financial management to program and admin staff | ██ | February 11, 2013 | |
| | | D. Draft RFP template, having DHS staff tasked with writing RFPs. Work together as a group to develop RFPs, building skills and experience in a supportive environment. | Core Group | Ongoing | |
| | | E. Draft RFPs for next group of contracts, including fixing errors in the current RFP standard language and – once it's finalized – using the new PBC RFP template | PBC Unit, AG, HR | Ongoing | |
| | | F. Identify what technical assistance providers will need, and how they can get it | Core Group | Ongoing | |
| | | G. Identify and communicate third party capacity building resources available to help potential bidders for DFCS contracts (e.g., through PDDs, regional implementation teams) | Core Group | Ongoing | |

| | General Remedies | Specific Tasks | Responsible Group | Anticipated Completion Date | Status / Notes (completed, in-progress, not started) |
|---|---|---|---|---|---|
| 15. | **Communicate RFPs in state in accordance with state personnel board rules and regulations as well as out of state to diversify the pool of respondents.** | | Contract Unit | Ongoing | |
| 16. | Conduct power and resistance analysis surrounding the rollout of performance based contracting and identify strategies to maximize the agency's power to resist undue outside influence on its internal contracting processes. | | PBC Team, APHSA Facilitator | After the February, 2013 convening | Completed |
| 17. | Develop and implement a system for transferring knowledge from outgoing to incoming DHS workers. This system may include written information (e.g., manuals) and cross-training/peer-to-peer coaching. | | ██████, ██████, ██████ | TBD | Using a more structured approach to contracting (e.g., that uses consistent templates for contracts and includes in written contracts more information regarding expected performance) will already help address root causes in this area. |
| 18. | Develop PBC documentation/ reporting tools and process, starting from tools already developed | A. Staff currently using reporting/monitoring tools and processes (e.g., ██████, ██████) send them to ██████  B. Draft consistent PBC reporting tool to be submitted by contractors monthly | ██████, ██████, ██████, ██████ | July 1, 2013 | NOTE: The ideal would be to gather documentation increasingly via the internet, but data capacity gaps at DHS and providers makes this infeasible at least over the next couple of years |

| | General Remedies | Specific Tasks | Responsible Group | Anticipated Completion Date | Status / Notes (completed, in-progress, not started) |
|---|---|---|---|---|---|
| 19. | Establish clear expectations and processes set for communication between these units. | TBD | Licensing and Program PBC members | TBD | |
| 20. | Establish a dedicated PBC monitoring team with the skills and capacity to work around MACWIS limitations and monitor contractor performance by facility. | A.  Develop a monitoring plan | ██████ ██ ██████ ██, ████████ APHSA ████████ | In process | Program Integrity |
| | | B.  Get input/feedback from ████ (Foster Care Review), ████ (CQI), ████ (CQI) | | | |
| | | C.  Update plan and get input/feedback from the state implementation team | | Ongoing | |
| | | D.  Update plan and get input/feedback from Grace the Court Monitor | | Ongoing | |
| 21. | Identify rationalized provider rates as required by Olivia Y | | | Completed | New rates effective July 1, 2013 |

**Appendix C**

_November 27, 2012 Convening of Stakeholders Regarding Licensure Standards_

| Name | Title | Agency/Division/Other |
|------|-------|----------------------|
| ▮ | Director | Congregate Care |
| ▮ | Bureau Director II | Administration Unit/Contracts |
| ▮ | Program Manager | Residential Licensure |
| ▮ | | Joshua Group Home |
| ▮ | | Joshua Group Home |
| ▮ | | Pine Vale Children's Home |
| ▮ | | Pine Vale Children's Home |
| ▮ | | Berean Children's Home |
| ▮ | | Joshua Group Home |
| ▮ | | Savior of Life Group Home |
| ▮ | | Savior of Life Group Home |
| ▮ | | Baptist Children's Village |
| ▮ | | Sunnybrook |
| ▮ | | Hope Village |
| ▮ | | Impact Missions |
| ▮ | | MS Children's Home Society |
| ▮ | | Sally Kate Winters |
| ▮ | | Lifeline |
| ▮ | | Apelah |
| ▮ | | Christians in Action |

**Appendix C-Continued**



Youth Villages

Faith Haven

Methodist Children's Home

Millcreek

200 Million Flowers

Catholic Charities

Southern Foundation

Christians in Action

Treasure House

**Appendix D**

*November 28-29, 2013 Technical Assistance from APHSA*

| Name | Title | Agency/Division/Other |
|------|-------|----------------------|
| ███████████ | Director | MACWIS |
| ███████ | Personnel Officer V | Human Resources |
| █████████ | Division Director II | Professional Development |
| ████████ | Special Assistant | Attorney General's Office |
| ████████ | Bureau Director II | Prevention/Protection |
| ██████ | Division Director II | Prevention/Protection |
| ████████ | Division Director II | Administration |
| ███████ | Bureau Director II | Administration |
| ████████ | Bureau Director I | Performance Based Contracting |
| ████████ | Project Officer IV | Contracts |
| █████████ | Financial Coordinator | Contracts |
| █████████ | Financial Coordinator | Contracts |
| ████████ | Projects Officer IV/Special | Administration |
| █████████ | Bureau Director I | Budgets & Accounting |
| ████████ | Division Director II | Budgets and Accounting |
| █████████ | Division Director II | Congregate Care and Placement |
| █████████ | Division Director II | Independent Living |
| ███████ | Director | Family and Children's Services |
| ████████ | Director | Program Integrity |
| ████████ | Director | Program Integrity |

**Appendix E**

## Providers Questionnaire

**1. In what ways is our current contracting or purchase of service process working well for your agency?**

|  | ResponseCount |
|---|---|
|  | 11 |
| AnsweredQuestion | 11 |
| SkippedQuestion | 2 |

**2. In what ways is our current contracting or purchase of service process not working well for your agency?**

|  | ResponseCount |
|---|---|
|  | 9 |
| AnsweredQuestion | 9 |
| SkippedQuestion | 4 |

**3. Does your agency have the ability to send and receive email?**

|  | ResponseCount |
|---|---|
|  | 11 |
| AnsweredQuestion | 11 |
| SkippedQuestion | 2 |

**4. Does your agency have the ability to use electronic accounting procedures?**

|  | ResponseCount |
|---|---|
|  | 11 |
| AnsweredQuestion | 11 |
| SkippedQuestion | 2 |

**5. How does your agency monitor your own agency's performance?**

|  | ResponseCount |
|---|---|
|  | 10 |
| AnsweredQuestion | 10 |
| SkippedQuestion | 3 |

**6. Who is responsible for monitoring your own agency's performance?**

|  | ResponseCount |
|---|---|
|  | 9 |
| AnsweredQuestion | 9 |
| SkippedQuestion | 4 |

**7. What are your performance outcomes?**

|  | ResponseCount |
|---|---|
|  | 6 |
| AnsweredQuestion | 6 |
| SkippedQuestion | 7 |

**8. How are the data gathered and tracked?**

|  | ResponseCount |
|---|---|
|  | 7 |
| AnsweredQuestion | 7 |
| SkippedQuestion | 6 |

**Appendix –E-1**

Result Summary for Survey:Providers Questionnaire                    Page 2 of 2

9. Who is responsible for reporting these outcomes?

|  | ResponseCount |
|---|---|
|  | 7 |
| AnsweredQuestion | 7 |
| SkippedQuestion | 6 |

10. How are children and families doing on these performance outcomes?

|  | ResponseCount |
|---|---|
|  | 7 |
| AnsweredQuestion | 7 |
| SkippedQuestion | 6 |

11. How do you use the information you gather on performance within your agency?

|  | ResponseCount |
|---|---|
|  | 7 |
| AnsweredQuestion | 7 |
| SkippedQuestion | 6 |

12. What, in your opinion, are the barriers that have the greatest potential to affect the success of Performance Based Contracting?

|  | ResponseCount |
|---|---|
|  | 6 |
| AnsweredQuestion | 6 |
| SkippedQuestion | 7 |

13. What supports are needed to help ensure the success of Performance Based Contracting?

|  | ResponseCount |
|---|---|
|  | 6 |
| AnsweredQuestion | 6 |
| SkippedQuestion | 7 |

14. What kind of feedback do you currently receive on your agency's performance from MDHS? Who provides the feedback and how is it provided?

|  | ResponseCount |
|---|---|
|  | 5 |
| AnsweredQuestion | 5 |
| SkippedQuestion | 8 |

15. How would you like to engage in communication with MDHS?

|  | ResponseCount |
|---|---|
|  | 5 |
| AnsweredQuestion | 5 |
| SkippedQuestion | 8 |

16. So that we can provide you with what you need to better service our children, please use the box below for additional comments or questions.

|  | ResponseCount |
|---|---|
|  | 2 |
| AnsweredQuestion | 2 |
| SkippedQuestion | 11 |

**Appendix F- February 20, 2013 Meeting to Identify Monitoring Division for PBC**

| Name | Title | Agency/Division/Other |
|------|-------|----------------------|
| ▓▓▓▓▓ | Bureau Director II | Administration |
| ▓▓▓▓▓ | Bureau Director I | Performance Based Contracting |
| ▓▓▓▓▓ | Project Officer IV | Contracts |
| ▓▓▓▓▓ | Financial Coordinator | Contracts |
| ▓▓▓▓▓ | Projects Officer IV/Special | Administration |
| ▓▓▓▓▓ | Division Director II | Budgets and Accounting |
| ▓▓▓▓▓ | Staff Officer | Executive Director's Office |
| ▓▓▓▓▓ | Bureau Director I | Administration and Finance |
| ▓▓▓▓▓ | Consultant | MACWIS |
| ▓▓▓▓▓ | Financial Coordinator | Contracts |
| ▓▓▓▓▓ | Director | Program Integrity |
| ▓▓▓▓▓ | Consultant | Center for Support of Families. |

**Appendix G-February 28, 2013 Meeting of PBC Team to Report and Update Matrix**

| Name | Title | Agency/Division/Other |
|---|---|---|
| ████ | Bureau Director II | Administration |
| ████ | Bureau Director I | Performance Based Contracting |
| ████ | Project Officer IV | Contracts |
| ████ | Financial Coordinator | Contracts |
| ████ | Projects Officer IV/Special | Administration |
| ████ | Division Director II | Budgets and Accounting |
| ████ | Staff Officer | Executive Director's Office |
| ████ | Bureau Director I | Administration and Finance |
| ████ | Consultant | MACWIS |
| ████ | Financial Coordinator | Contracts |
| ████ | Director | Program Integrity |
| ████ (phone) | Consultant | Center for Support of Families |
| ████ | Bureau Director II | Resource Development |

**Appendix H-March 1, 2013 Training by State Personal Services Contract Review Board**

| Name | Title | Agency/Division/Other |
|------|-------|----------------------|
| ██████████ | Director | Aging and Adult Services |
| ██████ | Director | Div. of Early Childhood Care & Dev. |
| ███████ | Director | Div. of Social Services Block Grant |
| ███████ | Director | Family and Children's Services |
| ██████ | Director | Division of Program Integrity |
| █████████ | Director | Division of Youth Services |
| ███████ | Director | Div. of Family Foundation & Support |
| ██████ | Director | Division of Community Services |
| ██████ | Director | Division of Field Operations |
| ██████ | Director | Division of Budgets & Accounting |
| ██████ | Director | Administration Unit |
| ████████ | Director | Contract Unit |
| ███████ | Sp. Projects IV | Administration Unit |
| ████████ | Financial Coordinator | Contract Unit |
| ███████ | Financial Coordinator | Contract Unit |
| ████████ | Program Specialist IV | Administration Unit |

**Ex. 19B**

**Grace M. Lopes**

| | |
|---|---|
| **From:** | Grace M. Lopes [gmlopes@oymonitor.org] |
| **Sent:** | Thursday, January 16, 2014 3:22 PM |
| **To:** | 'Debbie Brewer' |
| **Subject:** | RE: PBC deliverables |

Debbie:

I hope you had a good holiday season.  I'm writing to follow up on the document related to performance based contracting that you sent to me in December (see below).  I would appreciate it if you could send me the following documents identified in Appendix B of the document:

No. 2     The assessment of the current state v/s desired state
No. 4     All documents related to the PBC pilot for emergency shelters and group homes and resource homes, including complete RFPs and completed contracts
No. 5    The completed comprehensive plan for rolling out PBC with strong likelihood of success and sustainability
No. 6     All documents related to the general approach in Mississippi
No. 7     The timelines for internal contracting systems
No. 10   The standards for corrective action
No. 11    List of all contract documentation in MACWIS
No. 13   List of skills/knowledge for reviewers
No. 14    The RFP template
No. 16    The power and resistance analysis and related strategies
No. 17    A description of the system for transferring knowledge
No. 18    All PBC documentation/reporting tools and process
No. 20    The PBC monitoring plan
No. 21     The rationale for the provider rates

Thank you. - Grace


*Grace M. Lopes*
*Monitor, Olivia Y.*
*1220 19th Street, N.W.*
*Suite 500*
*Washington, D.C.  20036*
*202.232.8311*

*This email and any attachments may contain confidential and privileged information.  If you are not the intended recipient, please notify the sender immediately, destroy this email, and destroy any copies.  Any dissemination or use of this information by a person other than the intended recipient is unauthorized and may be illegal.*

**From:** Debbie Brewer [mailto:Debbie.Brewer@mdhs.ms.gov]
**Sent:** Tuesday, December 10, 2013 5:16 PM
**To:** gmlopes@oymonitor.org
**Subject:** PBC deliverables

Please view the attached.  If you have further questions, please do not hesitate to call or email me.

Thank you,


*Debbie Brewer*
*Bureau Director I*
*Division of Family and Children's Services*

*Mississippi Department of Human Services*
*(601) 359-4323*

-----Forwarded by Debbie Brewer/DFCS/MDHS on 12/10/2013 04:14PM -----

To: "Debbie" <debbie.brewer@mdhs.ms.gov>
From: FCS@mdhs.ms.gov
Date: 12/10/2013 11:21AM
Subject: Message from "RNP00267348D9E5"
*(See attached file: 201312101123.pdf)*


This E-mail was sent from "RNP00267348D9E5" (Aficio MP 5002).

Scan Date: 12.10.2013 11:23:21 (-0600)
Queries to: FCS@mdhs.ms.gov

=

**Ex. 20**

## MDHS DIVISION OF FAMILY AND CHILDREN'S SERVICES
## Safety, Permanency, and Well-Being
### CONTINUOUS QUALITY IMPROVEMENT
### REVIEW INSTRUMENT

| Home | Instructions | Protocol | Logout |

*Welcome I*                                                              **Case Number:**

**Face Sheet**    Onsite Review Instrument - Face Sheet

Item1

Item2                                          *Case Name*

Item3        Name of county:        Region:      First name:    MI    Last name:    Case Number (9 digits):

Item4

Item5(A)     *Period Under
             Review:*             To Date:       Reviewer:                  Date case reviewed
Item5(B)     From Date:                                                     (MM/DD/YYYY):

Item5(C)

Item6

Item7        **Target    Child(ren)'s                                          Date(s) of birth    Gender:**
             **Child:    name(s):**       Race:          Ethnicity:          (MM/DD/YYYY)
Item8        [ ]                                                                                  [Add]

Item9        |

Item10       Type of Case
             Reviewed :

Item11       ○ Foster Care Case   ○ In-home Services Case

Item12       Was this case opened for reasons other than child abuse and neglect?

Item13       ○ Yes    ○ No

Item14

Item15       Date of most recent case opening for all cases
             (MM/DD/YYYY) :

Item16

Item17       Date of the child's most recent entry into foster care
             (MM/DD/YYYY) :
Item18

Item19       |                              ○ Not Applicable

Item20       Date of discharge from foster care for the most recent foster care episode
             (MM/DD/YYYY) :
Item21
                                           ○ Not Applicable    ○ Not Yet discharged
Item22       Date of case closure (for all cases)
             (MM/DD/YYYY) :
Item23
Item24                                      ○ Case not closed by time of review

             Primary reason for agency involvement

             Additional reasons for agency involvement :

             ☐ Abandonment           ☐ Alcohol Abuse-Child          ☐ Alcohol Abuse-Parent

☐ Caretaker Inability to Cope    ☐ Child's behavior problem         ☐ Child Disability
☐ Court Directed                 ☐ Death of Parent(s)               ☐ Drug Abuse-Child
☐ Drug Abuse-Parent              ☐ Domestic violence in child's home ☐ Inadequate Family Support
☐ Emotional abuse                ☐ Exploitation                     ☐ Inadequate Food Supply
☐ Physical abuse                 ☐ Inadequate Housing               ☐ Inadequate Income
☐ Inadequate Parenting Skills    ☐ Incarceration of Parent          ☐ Lack of Child Care
☐ Neglect                        ☐ Relinquishment                   ☐ Sexual abuse
☐ Runaway                        ☐ School Dropout                   ☐ Truancy
☐ Unemployment                   ☐ Other

**Persons interviewed by the reviewers (list below) :**

| Name/Relationship to Case: | Date of Interview: | Type of Interview: | | |
|---|---|---|---|---|
| | | ○ In-Person  ○ Phone | Add |

Next

*@2012 Mississippi Department of Human Services | 1-800-345-6347 | 750 North State Street | Jackson, MS 39202*



Please elaborate on any
findings:

Previous    Next

©2012 Mississippi Department of Human Services / 1-800-315-6347 / 750 North State Street / Jackson, MS 39202

## MDHS DIVISION OF FAMILY AND CHILDREN'S SERVICES
# Safety, Permanency, and Well-Being
## CONTINUOUS QUALITY IMPROVEMENT
### REVIEW INSTRUMENT

| Home | Instructions | Protocol | Logout |
|------|--------------|----------|--------|

**Welcome !**                                                                 **Case Number:**

Face Sheet    Onsite Review Instrument - Assuring Safety and Managing Risk

Item1
Item2

*Item 2: Repeat maltreatment*

| | | | |
|--|--|--|--|
| Item3 | | | |
| Item4 | 7. | Was there at least one evidenced maltreatment report involving any child in the family during the period under review? | ○Yes ○No |
| Item5(A) | | | |
| Item5(B) | 8. | If Yes to #7, within a 6-month period before or after any maltreatment report identified, was there at least one additional evidenced maltreatment report involving any child in the family? | ○Yes ○No ○NA |
| Item5(C) | | | |
| Item6 | | | |
| Item7 | 9. | If Yes to #8, did the report(s) identified above involve the same or similar circumstances? | ○Yes ○No ○NA |
| Item8 | | | |
| Item9 | 10. | If Yes to #8, did any of the reports involve maltreatment of the child by the foster parents, members of the foster parents' family, other children in the foster home or facility, or facility staff members? | ○Yes ○No ○NA |
| Item10 | | | |
| Item11 | | | |
| Item12 | | | |
| Item13 | 11. | If there was maltreatment recurrence, document the circumstances related to maltreatment incidents including information related to the perpetrators, and indicate why the reviewers determined that the two incidents did or did not involve the same circumstances. Also indicate the dates of all maltrreatment reports occuring within the 6-month period: | |
| Item14 | | | |
| Item15 | | | |
| Item16 | | | |
| Item17 | | | |
| Item18 | | | |
| Item19 | | | |
| Item20 | | | |
| Item21 | | | |
| Item22 | 12. | Describe the circumstances related to any evidenced reports of maltreatment (if relevant) involving the foster parents, members of the foster parents' family, other children in the foster home or facility, or facility staff members: | |
| Item23 | | | |
| Item24 | | | |

13. For cases where repeat maltreatment did occur, identify interventions and actions, or absense of interventions and actions, taken by the caseworker and ASWS to try and prevent maltreatment of the child(ren):

| Rate Item 2 | |

Please elaborate on any findings:

Previous    Next

©2012 Mississippi Department of Human Services / 1-800-345-6347 / 750 North State Street / Jackson, MS 39202

## MDHS DIVISION OF FAMILY AND CHILDREN'S SERVICES
## Safety, Permanency, and Well-Being
### CONTINUOUS QUALITY IMPROVEMENT
### REVIEW INSTRUMENT

| Home | Instructions | Protocol | Logout | |
|------|-------------|----------|--------|--|

**Welcome I**                                                    *Case Number:*

| | |
|--|--|
| Face Sheet | Onsite Review Instrument - Assuring Safety and Managing Risk |
| Item1 | |
| Item2 | *Item 3: Services to Family to Protect Child(ren) in the Home and Prevent Removal or Re-Entry into Foster Care* |
| **Item3** | |
| Item4 | 14. For the period under review, did the agency make concerted efforts to provide or arrange for appropriate services for the family to protect children and prevent their entry into foster care or re-entry into foster care after a reunification?  ○Yes ○No ○NA |
| Item5(A) | |
| Item5(B) | |
| Item5(C) | Please elaborate your answer for #14. |
| Item6 | |
| Item7 | |
| Item8 | |
| Item9 | |
| Item10 | |
| Item11 | |
| Item12 | |
| Item13 | 15. If, during the period under review, any child was removed from the home without providing or arranging for services, was this action necessary to ensure the child's safety?  ○Yes ○No ○NA |
| Item14 | |
| Item15 | |
| Item16 | Please elaborate your answer for #15. |
| Item17 | |
| Item18 | |
| Item19 | |
| Item20 | |
| Item21 | |
| Item22 | |
| Item23 | |
| Item24 | |
| | 16. Please identify the circumstances that indicate a safety risk to the child and the services that were needed by the family to address safety issues and describe how those services were or were not provided by the agency during the period under review: |



17. Please note the reason for removing the child from the home during the period under review without providing services (if relevant and reason is available) and provide the reviewers' reasons for determining whether the reason was appropriate or inappropriate:

Rate Item 3

Please elaborate on any findings:

Previous    Next

©2012 Mississippi Department of Human Services | 1-800-345-6347 | 750 North State Street | Jackson, MS 39202

**MDHS DIVISION OF FAMILY AND CHILDREN'S SERVICES**

# Safety, Permanency, and Well-Being

## CONTINUOUS QUALITY IMPROVEMENT
## REVIEW INSTRUMENT

| Home | Instructions | Protocol | Logout | |
|------|--------------|----------|--------|--|
| *Welcome !* | | | | *Case Number:* |

| | |
|---|---|
| Face Sheet | Onsite Review Instrument - Assuring Safety and Managing Risk |

**Item 4: Risk assessment and safety management**

| | | | |
|---|---|---|---|
| | 18. | If the case was opened during the period under review, did the agency conduct an initial assessment of the risk to the target child in foster care and/or any child(ren) in the family remaining in the home? | ○Yes ○No ○NA |
| | 19. | During the period under review, did the agency conduct ongoing assessments of the risk to the target child in foster care and/or any child(ren) in the family remaining in the home? | ○Yes ○No ○NA |
| | 20. | If the case was opened during the period under review for either foster care or in-home services, did the agency: (1) conduct an initial assessment of the safety of the target child in foster care and/or any child(ren) remaining in the home, and (2) develop a safety plan with the family for addressing identified safety issues? | ○Yes ○No ○NA |
| | 21. | During the period under review, did the agency: (1) conduct ongoing safety assessments of the target child in foster care and/or any child(ren) remaining in the home, and (2) continually monitor and update the safety plan, including encouraging family engagement in services designed to promote achievement of the goals of the safety plan? | ○Yes ○No ○NA |
| | 22. | During the period under review, were there safety concerns pertaining to the target child in foster care or any child(ren) in the family remaining in the home that were not adequately or appropriately addressed by the agency? | ○Yes ○No ○NA |
| | 23. | During the period under review, was there a safety concern related to the target child in foster care during visitation by parents or other family members that could be attributed to not providing sufficient monitoring of visitation, permitting unsupervised visitation when it was not appropriate, or court-ordered visitation against agency recommendations? | ○Yes ○No ○NA |
| | 24. | During the period under review, was there a concern for the target child's safety related to the foster parents, members of the foster parents' family, other children in the foster home or facility, or facility staff members that was not adequately or appropriately addressed by the agency? (Foster parents include pre-adoptive parents and nonlicensed relatives providing care to a child in State custody.) | ○Yes ○No ○NA |
| | 25. | During the period under review, if the target child was discharged from foster care to be reunited with parents or relatives or returned home on a trial home visit, did the agency conduct a thorough safety assessment? | ○Yes ○No ○NA |
| | 26. | Describe the circumstances of the case that indicate risk concerns related to the child(ren): | |

The left sidebar contains: Item1, Item2, Item3, **Item4**, Item5(A), Item5(B), Item5(C), Item6, Item7, Item8, Item9, Item10, Item11, Item12, Item13, Item14, Item15, Item16, Item17, Item18, Item19, Item20, Item21, Item22, Item23, Item24

27. Describe the circumstances of the case that indicate safety concerns related to the child(ren):

28. Describe the characteristics of the risk assessment(s) and safety assessment(s) (was one conducted, how was it conducted, when it was conducted, how comprehensive was it, what did it include or not include), including their timing:

29. If applicable, describe the nature of the safety concerns related to the child(ren) during visitation, including a description of the visitation (for example, was it unsupervised, and if so, was this appropriate?):

30. If applicable, describe the nature of the safety concerns related to the child(ren) from foster care providers and MDHS's activities with regard to addressing safety.

31. Identify the activities undertaken to monitor participation in safety-related services (or the absence of activities to monitor service participation):

32. Was there a report evidenced that the foster care provider(s) maltreated the child during the period under review? If Yes, describe the circumstances of that report, whether the agency might have prevented the maltreatment, and the agency's response:

Rate Item 4

Please elaborate on any findings:

©2012 Mississippi Department of Human Services | 1-800-345-6347 | 750 North State Street | Jackson, MS 39209

Previous    Next



MDHS DIVISION OF FAMILY AND CHILDREN'S SERVICES

## Safety, Permanency, and Well-Being

### CONTINUOUS QUALITY IMPROVEMENT
### REVIEW INSTRUMENT

| Home | Instructions | Protocol | Logout |

**Welcome !**                                                          **Case Number:**

**Face Sheet**   Onsite Review Instrument - Assessing Strengths and Needs

Item1

Item2         *Item 5 (Section A): Needs and Services of Child, Parents, and Foster Parents*

Item3

Item4         33. During the period under review, did the agency conduct (1) a formal or informal initial
              comprehensive assessment of the child(ren)'s strengths and needs (if the case was
**Item5(A)**       opened during the period under review), or (2) an ongoing assessment to provide      ○ Yes ○ No
              updated information regarding the child(ren)'s needs for case planning purposes (if
Item5(B)          the case was opened before the period under review)? *Reviewers are to answer
              this question with regard to an assessment of strengths and needs other than those
Item5(C)          related to the child's educational, physical health, and mental/behavioral health
              (including substance abuse)*

Item6

Item7         34. If Yes and the case was opened during PUR, was the initial children's strengths      ○ Yes ○ No ○ NA
              and needs assessment conducted within the first 30 days?

Item8

Item9         35. During the period under review, were all needed services provided to meet the        ○ Yes ○ No ○ NA
              child's identified needs?
Item10

Item11        Please elaborate your answer for Question 35.

Item12

Item13

Item14

Item15

Item16

Item17

Item18

Item19

Item20        36. Were all services provided to children in a timely manner?                           ○ Yes ○ No ○ NA

Item21

Item22        37. Was the child interviewed prior to the completion of the strengths and needs         ○ Yes ○ No ○ NA
              assessment?
Item23

Item24        38. Is there clear evidence, other than signatures, of child involvement and input in    ○ Yes ○ No ○ NA
              the strengths and needs assessment?

              39. Document the method that the agency used to assess the child's needs:



40. Document the services provided to the child(ren):

41. Document the services that were needed but not provided:

Rate Item 5A

Please elaborate on any findings:

Previous    Next

©2012 Mississippi Department of Human Services  |  1-800-345-6347  |  750 North State Street  |  Jackson, MS 39202

## MDHS DIVISION OF FAMILY AND CHILDREN'S SERVICES
## Safety, Permanency, and Well-Being
### CONTINUOUS QUALITY IMPROVEMENT
### REVIEW INSTRUMENT

| Home | Instructions | Protocol | Logout | |
|------|--------------|----------|--------|--|

**Welcome !**                                                    **Case Number:**

| Face Sheet | Onsite Review Instrument - Assessing Strengths and Needs | |
|---|---|---|
| Item1 | | |
| Item2 | **Item 5 (Section B): Needs and Services of Child, Parents, and Foster Parents** | |
| Item3 | | |
| Item4 | 42. During the period under review, did the agency conduct (1) a formal or informal initial comprehensive assessment of the mother's strengths and needs (if the case was opened during the period under review) or (2) an ongoing assessment to provide updated information regarding the mother's needs for case planning purposes (if the case was opened before the period under review)? | ○Yes ○No ○NA |
| Item5(A) | | |
| **Item5(B)** | | |
| Item5(C) | 43. If Yes and the case was opened during PUR, was the initial strengths and needs assessment of the mother conducted within the first 30 days? | ○Yes ○No ○NA |
| Item6 | | |
| Item7 | 44. Were all services provided to mother in a timely manner? | ○Yes ○No ○NA |
| Item8 | | |
| Item9 | 45. Was mother interviewed prior to the completion of the strengths and needs assessment? | ○Yes ○No ○NA |
| Item10 | | |
| Item11 | | |
| Item12 | 46. Is there clear evidence, other than signatures, of mother involvement and input in the strengths and needs assessment? | ○Yes ○No ○NA |
| Item13 | | |
| Item14 | 47. During the period under review, did the agency provide all needed services to the mother to meet identified and assessed needs (with respect to services the mother needs in order to provide appropriate care and supervision to ensure the safety and well-being of her children)? | ○Yes ○No ○NA |
| Item15 | | |
| Item16 | | |
| Item17 | | |
| Item18 | 48. During the period under review, did the agency conduct (1) a formal or informal initial comprehensive assessment of the father's strengths and needs (if the case was opened during the period under review) or (2) an ongoing assessment to provide updated information regarding the father's needs for case planning purposes (if the case was opened before the period under review)? | ○Yes ○No ○NA |
| Item19 | | |
| Item20 | | |
| Item21 | 49. If Yes and the case was opened during PUR, was the initial strengths and needs assessment of the father conducted within the first 30 days? | ○Yes ○No ○NA |
| Item22 | | |
| Item23 | 50. During the period under review, did the agency provide all needed services to the father to address identified and assessed needs (with respect to services the father needs in order to provide appropriate care and supervision to ensure the safety and well-being of his children)? | ○Yes ○No ○NA |
| Item24 | | |
| | 51. Were all services provided to father in a timely manner? | ○Yes ○No ○NA |
| | 52. | ○Yes ○No ○NA |

CQI - Continuous Quality Improvement

| | Was father interviewed prior to the completion of the strengths and needs assessment? | |
|---|---|---|
| 53. | Is there clear evidence, other than signatures, of father's involvement and input in the strengths and needs assessment? | ○Yes ○No ○NA |
| 54. | Please indicate any reason why a needs assessment did not need to be completed on either the mother or father: | |
| | | |
| 55. | Document the services that were provided to the mother: | |
| | | |
| 56. | Document the services that the mother needed, based on an assessment, but that were not provided: | |
| | | |
| 57. | Document the services provided to the father: | |
| | | |



58. Document the services that the father needed, based on an assessment, but that were not provided:

Rate Item 6B

Please elaborate on any findings:

Previous    Next

©2012 Mississippi Department of Human Services | 1-800-345-6347 | 750 North State Street | Jackson, MS 39202



MDHS DIVISION OF FAMILY AND CHILDREN'S SERVICES

# Safety, Permanency, and Well-Being

## CONTINUOUS QUALITY IMPROVEMENT
## REVIEW INSTRUMENT

| Home | Instructions | Protocol | Logout | |
|------|-------------|----------|--------|---|

**Welcome !**                                                                **Case Number:**

**Face Sheet** — Onsite Review Instrument - Assessing Strengths and Needs

| | |
|---|---|
| Item1 | |
| Item2 | *Item 5 (Section C): Needs and Services of Child, Parents, and Foster Parents* |
| Item3 | |
| Item4 | **59.** During the period under review, did the agency conduct an assessment of the needs of the foster or pre-adoptive parents on an ongoing basis (with respect to services they need in order to provide appropriate care and supervision to ensure the safety and well-being of the children in their care)? ○Yes ○No ○NA |
| Item5(A) | |
| Item5(B) | **60.** During the period under review, were the foster or pre-adoptive parents provided with all needed services to address identified needs that pertained to their capacity to provide appropriate care and supervision and ensure the safety and well-being of the children in their care? ○Yes ○No ○NA |
| **Item5(C)** | |
| Item6 | |
| Item7 | **61.** Were all services provided to the foster/pre-adoptive family in a timely manner? ○Yes ○No ○NA |
| Item8 | |
| Item9 | |
| Item10 | **62.** Document the services provided to the foster parent(s): |
| Item11 | |
| Item12 | |
| Item13 | |
| Item14 | |
| Item15 | |
| Item16 | |
| Item17 | |
| Item18 | **63.** Document the services that the foster parent(s) needed, based on an assessment, but that were not provided: |
| Item19 | |
| Item20 | |
| Item21 | |
| Item22 | |
| Item23 | |
| Item24 | |

[ Rate Item 5C ]



Please elaborate on any findings:

Rate Item 5

Please elaborate on any findings:

Previous    Next



MDHS DIVISION OF FAMILY AND CHILDREN'S SERVICES
**Safety, Permanency, and Well-Being**
CONTINUOUS QUALITY IMPROVEMENT
REVIEW INSTRUMENT

| Home | Instructions | Protocol | Logout | |
|------|-------------|----------|--------|--|

**Welcome !**                                                **Case Number:**

Face Sheet     Onsite Review Instrument - Assessing Strengths and Needs

Item1

Item2           *Item 6: Educational Needs of the Child*

Item3
Item4      64.  During the period under review, did the agency make concerted efforts to assess and address the child(ren)'s educational needs?                          ○ Yes ○ No ○ NA
Item5(A)        *If the target child is not of legal school age (6 years old but less than 17 on September 1 of the calendar year) then only answer N/A for this question.*

Item5(B)
Item5(C)   65.  If case opened during PUR, were the child's educational needs assessed within 30 days of entry into foster care?                                           ○ Yes ○ No ○ NA
Item6           *If the target child is not of legal school age (6 years old but less than 17 on September 1 of the calendar year) then only answer N/A for this question.*

Item7
Item8      66.  If case opened during PUR and if the child is 3 years of age or younger, did (s)he receive a developmental assessment within 30 days of foster care entry?      ○ Yes ○ No ○ NA

Item9

Item10     67.  Document the process used for educational assessment, if relevant:
Item11

Item12

Item13

Item14

Item15

Item16

Item17

Item18

Item19     68.  Document in the chart below the services provided or not provided to address the child's educational needs. Services would include advocacy on the part of foster parents as well as the caseworker; ensuring that the child received special education classes; making provisions for the child to receive tutoring or educational mentoring; or arranging for the child to be enrolled in early intervention preschool classes, such as Head Start:
Item20
Item21

Item22        **Educational Needs**      **Services Provided**      **Services Needed but not provided**
Item23                                                                                                   Add  Del
Item24

           69.  If there are services that were not or are not being provided, document agency efforts, or lack of agency efforts, to provide those services:



| 70. | Was the child enrolled in an accredited school within 3 days of custody or placement change? | ○Yes ○No ○NA |
| --- | --- | --- |

Rate Item 6

Please elaborate on any findings:

Previous   Next

©2012 Mississippi Department of Human Services | 1-800-345-6347 | 750 North State Street | Jackson, MS 39202

MDHS DIVISION OF FAMILY AND CHILDREN'S SERVICES
**Safety, Permanency, and Well-Being**
CONTINUOUS QUALITY IMPROVEMENT
REVIEW INSTRUMENT

| Home | Instructions | Protocol | Logout | |
|------|-------------|----------|--------|--|

*Welcome !*                                                                     **Case Number:**

Face Sheet | Onsite Review Instrument - Involving Children and Families in Case Planning and Decision Making

| | | |
|--|--|--|
| Item1 | *Item 7: Child and family involvement in case planning* | |
| Item2 | | |
| Item3 | 71. During the period under review, did the agency make concerted efforts to actively involve the child in the case planning process? | ○Yes ○No ○NA |
| Item4 | | |
| Item5(A) | | |
| Item5(B) | 72. During the period under review, did the agency make concerted efforts to actively involve the mother in the case planning process? | ○Yes ○No ○NA |
| Item5(C) | | |
| Item6 | | |
| **Item7** | 73. During the period under review, did the agency make concerted efforts to actively involve the father in the case planning process? | ○Yes ○No ○NA |
| Item8 | | |
| Item9 | | |
| Item10 | 74. Document the ways in which each party listed below was or was not involved in case planning (for example, identifying needs and services, establishing goals, evaluating progress, etc.) If the involvement of the child, mother, or father is determined by the reviewers to be Not Applicable, document the reasons for this determination (including any evidence of efforts to locate absent parents). | |
| Item11 | | |
| Item12 | | |
| Item13 | | |
| Item14 | Child: | |
| Item15 | | |
| Item16 | | |
| Item17 | | |
| Item18 | | |
| Item19 | | |
| Item20 | | |
| Item21 | Mother: | |
| Item22 | | |
| Item23 | | |
| Item24 | | |

Father:

CQI - Continuous Quality Improvement

| 75. | Is there evidence that the family was informed of and prepared to actively participate in case events, including the FTMs, case plan development, and court events? | ○ Yes ○ No ○ NA |
|---|---|---|
| | Please explain your answer: | |
| | | |
| 76. | Is there evidence that child(ren) and or parent(s) were involved in choosing services included on their case plan? | ○ Yes ○ No ○ NA |

Is there evidence of family involvement and input in the development of the case plan?

| 77. | *Mother* | ○ Yes ○ No ○ NA |
|---|---|---|
| 78. | *Father* | ○ Yes ○ No ○ NA |
| 79. | *Age-appropriate child/youth* | ○ Yes ○ No ○ NA |
| 80. | Were all the service plans signed by the parents or guardians? | ○ Yes ○ No ○ NA |
| 81. | Were all the service plans signed by the child/ren ages 6 and up? | ○ Yes ○ No ○ NA |
| 82. | Did the families attend the County Conferences? | ○ Yes ○ No ○ NA |

Rate Item 7

CQI - Continuous Quality Improvement



Please elaborate on any findings:

Previous     Next

©2012 Mississippi Department of Human Services / 1-800-345-6347 / 750 North State Street / Jackson, MS 39202

**MDHS DIVISION OF FAMILY AND CHILDREN'S SERVICES**
**Safety, Permanency, and Well-Being**
CONTINUOUS QUALITY IMPROVEMENT
REVIEW INSTRUMENT

| Home | Instructions | Protocol | Logout | |
|---|---|---|---|---|
| Welcome ! | | | | **Case Number:** |

| Face Sheet | Onsite Review Instrument - Involving Children and Families in Case Planning and Decision Making |
|---|---|

**Item 8: Caseworker visits with child**

| | | |
|---|---|---|
| 83. | During the period under review, was the frequency of the visits between the caseworker and the child(ren) sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals? | ○Yes ○No |

84. During the period under review, what was the most typical pattern of visitation between the caseworker and the child(ren) in the case? (Select the box that describes the usual pattern of visitation.)

○ More than once a week          ○ Once a week
○ Less than once a week, but at least twice a month  ○ Less than twice a month, but at least once a month
○ Less than once a month          ○ Never

| | | |
|---|---|---|
| 85. | Did the caseworker visits occur atleast 2 times per month for *foster care/placement cases* , with at least one visit occuring in the home, or at least 1 time per month for *In-home cases?* | ○Yes ○No |

| | | |
|---|---|---|
| 86. | During the period under review, was the quality of the visits between the caseworker and the child(ren) sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals (for example, did the visits between the caseworker and the child(ren) focus on issues pertinent to case planning, service delivery, and goal achievement)? | ○Yes ○No |

87. Please document barriers to more frequent visiting (if relevant) or explain why less frequent visitation was still appropriate, or not:

88. Document the aspects of the caseworker visits with the child that contributed to high quality visits (if relevant) or why caseworker visits were not of high quality (if relevant), as related to the response in question 86:



Rate Item 8

Please elaborate on any findings:

[ Previous ] [ Next ]

©2012 Mississippi Department of Human Services | 1-800-345-6347 | 750 North State Street | Jackson, MS 39202

CQI - Continuous Quality Improvement

# MDHS DIVISION OF FAMILY AND CHILDREN'S SERVICES
## Safety, Permanency, and Well-Being
### CONTINUOUS QUALITY IMPROVEMENT
### REVIEW INSTRUMENT

| Home | Instructions | Protocol | Logout | |
|------|-------------|----------|--------|---|
| Welcome ! | | | | **Case Number:** |

| | |
|---|---|
| Face Sheet | Onsite Review Instrument - Involving Children and Families in Case Planning and Decision Making |

**Item 9: Caseworker visits with parents**

| | | | |
|---|---|---|---|
| Item1 | | | |
| Item2 | | | |
| Item3 | 89. | During the period under review, was the frequency of the visits between the caseworker and the mother sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals? | ○Yes ○No ○NA |
| Item4 | | | |
| Item5(A) | | | |
| Item5(B) | 90. | During the period under review, what was the most typical pattern of visitation between the caseworker and the mother of the child(ren)? | |
| Item5(C) | | | |
| Item6 | | ○ More than once a week          ○ Once a week | |
| Item7 | | ○ Less than once a week, but at least twice a month  ○ Less than twice a month, but at least once a month | |
| Item8 | | ○ Less than once a month          ○ Not Applicable | |
| **Item9** | | ○ Never | |
| Item10 | 91. | During the period under review, was the frequency of the visits between the caseworker and the father sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals? | ○Yes ○No ○NA |
| Item11 | | | |
| Item12 | | | |
| Item13 | 92. | During the period under review, what was the most typical pattern of visitation between the caseworker and the father of the child(ren): | |
| Item14 | | | |
| Item15 | | | |
| Item16 | | ○ More than once a week          ○ Once a week | |
| Item17 | | ○ Less than once a week, but at least twice a month  ○ Less than twice a month, but at least once a month | |
| Item18 | | ○ Less than once a month          ○ Not Applicable | |
| Item19 | | ○ Never | |
| Item20 | 93. | During the period under review, was the quality of the visits between the caseworker and the mother sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals? | ○Yes ○No ○NA |
| Item21 | | | |
| Item22 | | | |
| Item23 | 94. | During the period under review, was the quality of the visits between the caseworker and the father sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals? | ○Yes ○No ○NA |
| Item24 | | | |
| | 95. | Please describe barriers to more frequent visiting with the mother (if relevant) and father (if relevant), and discuss (if relevant) why reviewer felt less frequent visitation was appropriate: | |

| 96. | Describe the general quality of the caseworker visits with the mother and the father, and the issues that were or were not addressed during caseworker visits (If relevant): |
| --- | --- |

| 97. | If regular visitation is not occuring due to mother not being involved or found, are there documented diligent efforts to locate mother? | ○Yes ○No ○NA |
| --- | --- | --- |
| 98. | If regular visitation is not occuring due to father not being involved or found, are there documented diligent efforts to locate father? | ○Yes ○No ○NA |

Rate Item 9

Please elaborate on any findings:

Previous   Next

@2012 Mississippi Department of Human Services | 1-800-345-6347 | 750 North State Street | Jackson, MS 39208

## MDHS DIVISION OF FAMILY AND CHILDREN'S SERVICES
## Safety, Permanency, and Well-Being
### CONTINUOUS QUALITY IMPROVEMENT
### REVIEW INSTRUMENT

| Home | Instructions | Protocol | Logout |
| --- | --- | --- | --- |

**Welcome !**                                                                  *Case Number:*

| Face Sheet | Onsite Review Instrument - Individualizing Case Planning |

| Item1 | |
| Item2 | ***Item 10: Permanency plan for child*** |

| Item3 | 99. | What is (are) the child's current permanency plan(s) (or if the case was closed during the period under review, what was the permanency plan before the case was closed)? |
| Item4 | | |

| Item5(A) | | Plan 1 |
| Item5(B) | | |
| Item5(C) | | Plan 2 |

| Item6 | |
| Item7 | 100. | Is (are) the child's permanency goal(s) specified in the case file? | ○Yes ○No ○NA |
| Item8 | |

| Item9 | 101. | If child entered care during the PUR, was a permanency goal developed within the childs first 30 days in care? | ○Yes ○No ○NA |
| Item10 | |

| Item11 | |
| Item12 | 102. | Were all permanency goals in effect during the period under review established in a timely manner? | ○Yes ○No ○NA |
| Item13 | |

| Item14 | | Permanency Goal | Date Established | Time in Foster Care Before Goal | Date Goal Changed | Reason for Goal Change |
| Item15 | | | | | | Add Del |
| Item16 | | | | | | |

| Item17 | |
| Item18 | 103. | Were all permanency goals in effect during the period under review appropriate to the child's needs for permanency and to the circumstances of the case? | ○Yes ○No ○NA |
| Item19 | |

| Item20 | 104. | Please document the reasons the reviewers determined that the goals were not timely and/or appropriate (if relevant): |
| Item21 | |
| Item22 | |
| Item23 | |
| Item24 | |

○Yes ○No ○NA

105. Has the child been in foster care at least 15 of the last 22 months?

*"Only Yes or No are valid responses for this question".*

| | | |
|---|---|---|
| 106. | If 'No' to question 105, does the child meet Adoption and Safe Families Act (ASFA) criteria for termination of parental rights (TPR)? | ○Yes ○No ○NA |
| 107. | If 'Yes' to question 105, did the agency file a TPR petition before the period under review or in a timely manner during the period under review? | ○Yes ○No ○NA |
| 108. | If no TPR petition has been filed, and the child has been in state's custody for 15 of the most recent 22 months, is an "exception" or compelling reason for not filing for TPR documented in the case file? <br><br> *"Only Yes or No are valid responses for this question".* | ○Yes ○No ○NA |
| 109. | If an exception has not been documented, do circumstances exist that would constitute a legal exception? | ○Yes ○No ○NA |
| 110. | If the child has a goal of reunification, does the case record documentation reflecting active concurrent permanency planning ? | ○Yes ○No ○NA |
| 111. | If the child was discharged during PUR, was an aftercare plan developed prior to discharge? | ○Yes ○No ○NA |

Rate Item 10

Please elaborate on any findings:

[ Previous ]  [ Next ]

**MDHS DIVISION OF FAMILY AND CHILDREN'S SERVICES**
# Safety, Permanency, and Well-Being
**CONTINUOUS QUALITY IMPROVEMENT**
**REVIEW INSTRUMENT**

| Home | Instructions | Protocol | Logout | |
|---|---|---|---|---|
| *Welcome !* | | | | **Case Number:** |

| | |
|---|---|
| Face Sheet | Onsite Review Instrument - Individualizing Case Planning |
| Item1 | |
| Item2 | *Item 11: Case Planning* |
| Item3 | |
| Item4 | 112. How many FTMs have occurred during the PUR?  *(number only) (If NA enter 0)* |
| Item5(A) | |
| Item5(B) | 113. How many FTMs have been attended by both the birth and resource parents during the PUR?  *(number only) (If NA enter 0)* |
| Item5(C) | |
| Item6 | 114. Was a FTM used in the initial development of the case plan if the initial plan was developed during the PUR, and was the FTM used to update the case plans quarterly?  ○Yes ○No ○NA |
| Item7 | |
| Item8 | 115. Were there family team meetings within 30 calendar days of any placement or other significant change in the child's or family's circumstances?  ○Yes ○No ○NA |
| Item9 | |
| Item10 | 116. Were there documented discussions of concurrent planning with the birth parents?  ○Yes ○No ○NA |
| Item11 | |
| Item12 | Rate Item 11 |
| Item13 | |
| Item14 | Please elaborate on any findings: |
| Item15 | |
| Item16 | |
| Item17 | |
| Item18 | |
| Item19 | |
| Item20 | |
| Item21 | |
| Item22 | |
| Item23 | |
| Item24 | Previous   Next |

©2012 Mississippi Department of Human Services | 1-800-345-6347 | 750 North State Street | Jackson, MS 39202



MDHS DIVISION OF FAMILY AND CHILDREN'S SERVICES
**Safety, Permanency, and Well-Being**
CONTINUOUS QUALITY IMPROVEMENT
REVIEW INSTRUMENT

| Home | Instructions | Protocol | Logout | |
|------|--------------|----------|--------|--|
| **Welcome !** | | | | **Case Number:** |

Face Sheet | Onsite Review Instrument - Mobilizing Services Timely

Item1
Item2

**Item 12: Foster Care Re-Entries**

Item3
Item4

117. Did any of the child's foster care entries during the period under review occur within 12 months of the child's discharge from a prior foster care episode? ○Yes ○No ○NA

Item5(A)
Item5(B)

118. If the answer is Yes, was there evidence that concerted efforts were made to prevent re-entry? ○Yes ○No ○NA

Item5(C)
Item6

119. Date of child's first entry into foster care during the period under review:

Item7
Item8

Item9

120. Was this entry within 12 months of a previous discharge: ○Yes ○No ○NA

Item10
Item11

121. Date of discharge, if any, within 12 months of this entry:

Item12
Item13

Document the circumstances related to the re-entry within 12 months:

Item14
Item15
Item16
Item17
Item18
Item19
Item20
Item21

122. If there are any additional entries into foster care after a discharge during the period under review, provide the above information for each of these entries:

Item22
Item23
Item24

[ Rate Item 12 ]



Please elaborate on any findings:

[ Previous ]  [ Next ]

*©2012 Mississippi Department of Human Services | 1-800-345-6347 | 750 North State Street | Jackson, MS 39202*

**MDHS DIVISION OF FAMILY AND CHILDREN'S SERVICES**
# Safety, Permanency, and Well-Being
## CONTINUOUS QUALITY IMPROVEMENT
### REVIEW INSTRUMENT

| Home | Instructions | Protocol | Logout | |
|------|-------------|----------|--------|--|

*Welcome !*                                                                 **Case Number:**

| | |
|--|--|
| Face Sheet | Onsite Review Instrument - Mobilizing Services Timely |
| Item1 | |
| Item2 | *Item 13: Reunification, Guardianship or Permanent Placement with Relatives* |
| Item3 | |
| Item4 | 123. Does the child have (or, if discharged during the period under review and reunited, did they have) a goal of reunification, guardianship, or permanent placement with relatives?    ○Yes ○No ○NA |
| Item5(A) | |
| Item5(B) | 124. What is/was the child's most recent permanent goal and or concurrent goal? |
| Item5(C) | |
| Item6 | Permanent Goal: |
| Item7 | |
| Item8 | Concurrent Goal: |
| Item9 | |
| Item10 | |
| Item11 | 125. Are the agency and court making (or did they make) concerted efforts to achieve the goal (or these goals, if there are concurrent goals) in a timely manner during the PUR?    ○Yes ○No ○NA |
| Item12 | |
| Item13 | |
| Item14 | |
| Item15 | 126. Date of the child's most recent entry into foster care: |
| Item16 | |
| Item17 | 127. Time in care (in months) at the time of the onsite review:    *(number only)* |
| Item18 | |
| Item19 | |
| Item20 | 128. Date of discharge from foster care: |
| Item21 | |
| Item22 | 129. Document efforts made to achieve plan, including the appropriateness and effectiveness of the efforts as well as barriers to achieving the plan (for example, agency, court, or other factors that prevented or are preventing timely achievement of the plan): |
| Item23 | |
| Item24 | |



130. Please document any contributing factors in the case in which the goal of Reunification or Custody with Relatives was not achieved or is not likely to be achieved within 12 months. If the permanency goal was achieved within 12 months, what were the contributing factors?

131. For children with a plan of Reunification, have parental service plans identified those services DFCS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care?    ○Yes ○No ○NA

Did DFCS make those services identified available either through direct or referral service?

132.      Mother?    ○Yes ○No ○NA

133.      Father?    ○Yes ○No ○NA

134. If the child was discharged during PUR and was reunified, was there a 90 day trial home visit?    ○Yes ○No ○NA

Rate Item 13

Please elaborate on any findings:

CQI - Continuous Quality Improvement

Previous    Next



**MDHS DIVISION OF FAMILY AND CHILDREN'S SERVICES**
# Safety, Permanency, and Well-Being
## CONTINUOUS QUALITY IMPROVEMENT
### REVIEW INSTRUMENT

| Home | Instructions | Protocol | Logout | |
|------|-------------|----------|--------|--|

*Welcome !*                                                    **Case Number:**

Face Sheet    Onsite Review Instrument - Mobilizing Services Timely

*Item 14: Stability of Foster Care Placement*

135. How long has the child been in the current placement setting?
*(months)*
*(number only)*

136. How many placement settings did the child experience during the period under review? (If the child has had no placement settings, enter 0 under "months" and explain in the ratings section)
*(number only)*

Placement Date        Placement Type        Reason for Change in Placement
[Add] [Del]

137. If there was more than 1 placement, were all placement changes during the **period under review** planned by the agency in an effort to achieve the child's case plan goals **or** made in an effort to meet the needs of the child?
○ Yes  ○ No  ○ NA

138. Is the child's current placement setting (or most recent placement if the child is no longer in foster care) stable?
○ Yes  ○ No  ○ NA

139. If applicable, indicate why the placement changes were or were not planned in an effort to achieve the child's case goals or to meet the needs of the child:

140. If applicable, provide your reasons for determining that the child's current placement (or most recent placement if the child is no longer in foster care) is **or** is not stable:

Left sidebar items: Item1, Item2, Item3, Item4, Item5(A), Item5(B), Item5(C), Item6, Item7, Item8, Item9, Item10, Item11, Item12, Item13, **Item14**, Item15, Item16, Item17, Item18, Item19, Item20, Item21, Item22, Item23, Item24

CQI - Continuous Quality Improvement



141. If the child has been assessed with special needs, Is s(he) placed in a placement that can meet their therapeutic, educational and medical needs?    ○Yes ○No ○NA

142. Was the child placed in the least restrictive setting that meets his/her individual needs ?
*(If this is a Foster care case, then you have to select either Yes or No)*    ○Yes ○No ○NA

Rate Item 14

Please elaborate on any findings:

Previous  Next

©2012 Mississippi Department of Human Services | 1-800-345-6347 | 750 North State Street | Jackson, MS 39202

CQI - Continuous Quality Improvement

Page 1 of 2

## MDHS DIVISION OF FAMILY AND CHILDREN'S SERVICES
# Safety, Permanency, and Well-Being
## CONTINUOUS QUALITY IMPROVEMENT
## REVIEW INSTRUMENT

| Home | Instructions | Protocol | Logout | |
|------|-------------|----------|--------|--|

**Welcome !**                                                    **Case Number:**

| Face Sheet | | Onsite Review Instrument - Mobilizing Services Timely | | |
|---|---|---|---|---|
| Item1 | | | | |
| Item2 | | **Item 15: Adoption** | | |
| Item3 | 143. | Does the child have (or, if discharged during the period under review and adopted, did they have) a permanent plan of Adoption? | ○Yes ○No ○NA | |
| Item4 | | | | |
| Item5(A) | 144. | Are the agency and court making (or did the agency and court make) concerted efforts to achieve the goal of Adoption in a timely manner? | ○Yes ○No ○NA | |
| Item5(B) | | | | |
| Item5(C) | | | | |
| Item6 | 145. | Date of the child's most recent entry into foster care (this should be the same date on the Face Sheet): | | |
| Item7 | | | | |
| Item8 | 146. | Time in care (in months) at the time of the onsite review (this is the number of months that the child was in foster care from the date of the most recent entry into foster care to the beginning of the onsite review week or from the date of the most recent entry into foster care to the time of adoption finalization or discharge from foster care): | *(number only)* | |
| Item9 | | | | |
| Item10 | | | | |
| Item11 | 147. | Date of adoption finalization (if relevant) (this is the date that the court legally established the adoption and transferred care and placement responsibility or supervision from the State to the adoptive parent(s); this should be the same date on the Face Sheet): | | |
| Item12 | | | | |
| Item13 | | | | |
| Item14 | | | | |
| Item15 | 148. | Please document efforts made to achieve the child's goal of Adoption, including the appropriateness and effectiveness of the efforts, and barriers to achieving the goal of adoption (for example, agency- or court-related factors that prevented or are preventing achievement of the goal in a timely manner): | | |
| Item16 | | | | |
| Item17 | | | | |
| Item18 | | | | |
| Item19 | | | | |
| Item20 | | | | |
| Item21 | | | | |
| Item22 | | | | |
| Item23 | | | | |
| Item24 | 149. | Please document special circumstances in the case which are contributing to the child either likely to achieve the goal of Adoption within 24 months or not: | | |

| | | |
|---|---|---|
| 150. | Does the child have an assigned adoption specialist and an adoption plan that identifies the child-specific activities that DFCS will undertake to achieve adoption, and receiving regular adoption status meetings consistent with plan requirements, and was that adoption specialist assigned within 10 days of the adoption goal change? | ○ Yes ○ No ○ NA |
| 151. | Is there evidence that the resource family has been informed of available subsidies, including post-adoptive subsidies? | ○ Yes ○ No ○ NA |
| 152. | If the child has been in care longer than 12 months, is there evidence that the resource parents have been engaged on discussions regarding adoption? | ○ Yes ○ No ○ NA |

Rate Item 15

Please elaborate on any findings:

[ Previous ]  [ Next ]

©2012 Mississippi Department of Human Services | 1-800-315-6347 | 750 North State Street | Jackson, MS 39202

CQI - Continuous Quality Improvement                                    Page 1 of 2

## MDHS DIVISION OF FAMILY AND CHILDREN'S SERVICES
# Safety, Permanency, and Well-Being
## CONTINUOUS QUALITY IMPROVEMENT
## REVIEW INSTRUMENT

| Home | Instructions | Protocol | Logout | |
|------|-------------|----------|--------|--|

| Welcome ! | | | Case Number: |
|-----------|--|--|--------------|

| Face Sheet | Onsite Review Instrument - Mobilizing Services Timely |
|------------|------------------------------------------------------|

**Item 16: Other planned permanent living arrangement**

| Item# | No. | Question | Response |
|-------|-----|----------|----------|
| Item1, Item2 | | | |
| Item3, Item4 | 153. | Does the child have (or, if discharged during the period under review to another planned permanent living arrangement, did they have) a goal of "other planned permanent living arrangement"? | ○ Yes ○ No ○ NA |
| Item5(A), Item5(B), Item5(C) | 154. | What is the child's Other Planned Permanent Living Arrangement goal (check the goal that most closely reflects the one in the case file)? | |
| Item6, Item7 | | ○ Living Independently/Emancipation   ○ Long-term foster care   ○ Other   ○ NA | |
| Item8, Item9, Item10, Item11 | 155. | For children aged 14-20 in the PUR, were concerted efforts made to provide the child with services to adequately prepare the child for independent living when the child leaves foster care, as set forth in a service plan? | ○ Yes ○ No ○ NA |
| Item12, Item13, Item14 | 156. | Were concerted efforts made to achieve the goal of Other Planned Permanent Living Arrangement in a timely manner by placing the child in a living arrangement that is "permanent", that is, the child will remain in the living arrangement until discharge from foster care? | ○ Yes ○ No ○ NA |
| Item15, Item16, Item17 | 157. | Date of the child's most recent entry into foster care: | |
| Item18, Item19, Item20, Item21 | 158. | Time in care (in months) at the time of the onsite review: | *months (If NA enter 0)* |
| Item22, Item23, Item24 | 159. | Date of documentation regarding "permanency" of the child's living arrangements | |
| | 160. | Date of discharge from foster care | |
| | 161. | If the child is not in a living arrangement that can be considered permanent, were concerted efforts made during the period under review to achieve this type of living arrangement for the child? | ○ Yes ○ No ○ NA |

| 162. | Please document the efforts made to achieve the child's goal, including the appropriateness and effectiveness of the efforts, and barriers to achieving the goal: |
|---|---|
| | |

| 163. | Document the services provided, or not provided, to adequately prepare the child for independent living: |
|---|---|
| | |

| 164. | If the child is over 14 and involved with ILS, how long has s(he) consistently been attending ILS classes? | months (If NA enter 0) |
|---|---|---|

Rate Item 16

Please elaborate on any findings:

Previous    Next

@2012 Mississippi Department of Human Services | 1-800-345-6347 | 750 North State Street | Jackson, MS 39202

**MDHS DIVISION OF FAMILY AND CHILDREN'S SERVICES**
**Safety, Permanency, and Well-Being**
**CONTINUOUS QUALITY IMPROVEMENT**
**REVIEW INSTRUMENT**

| Home | Instructions | Protocol | Logout | |
|------|-------------|----------|--------|--|
| Welcome ! | | | | Case Number: |

| | |
|--|--|
| Face Sheet | Onsite Review Instrument - Mobilizing Services Timely |

| | | |
|--|--|--|
| Item1 | | |
| Item2 | *Item 17: Physical Health of the Child* | |
| Item3 | 165. | In the last 12 months period, has the agency assessed the child's physical health care needs? | ○Yes ○No ○NA |
| Item4 | | |
| Item5(A) | | |
| Item5(B) | 166. | If the child came into care during the PUR, did the child receive an initial screening within 72 hours? | ○Yes ○No ○NA |
| Item5(C) | | |
| Item6 | 167. | If the child came into care during the PUR, did the child receive a comprehensive health screening within 30 days of foster care entry? | ○Yes ○No ○NA |
| Item7 | | |
| Item8 | 168. | During the period under review, did the agency assess the child's dental health care needs? | ○Yes ○No ○NA |
| Item9 | | |
| Item10 | 169. | During the PUR, did the child, if over 3, receive an initial dental examination within 90 days of entry into care or within 90 days of his/her 3rd birthday if occurring during stay in foster care? | ○Yes ○No ○NA |
| Item11 | | |
| Item12 | 170. | During the period under review, did the agency ensure that appropriate services were provided to the child to address all identified physical health needs on a timely basis? | ○Yes ○No ○NA |
| Item13 | | |
| Item14 | 171. | During the period under review, did the agency ensure that appropriate services were provided to the child to address all identified dental health needs on a timely basis? | ○Yes ○No ○NA |
| Item15 | | |
| Item16 | | |
| **Item17** | 172. | Did the child receive periodic, age-appropriate physical and dental health examinations to ensure ongoing assessment of needs? If not, document the reasons why the agency did not conduct this ongoing assessment: | |
| Item18 | | |
| Item19 | | |
| Item20 | | |
| Item21 | | |
| Item22 | | |
| Item23 | | |
| Item24 | | |
| | 173. | Based on the assessment of needs, if there are services that were not provided, document why the services were not provided (for example, lack of agency efforts to secure services, lack of service availability in the community, lack of transportation for foster parents to take child to appointments, etc.): | |

CQI - Continuous Quality Improvement



Rate Item 17

Please elaborate on any findings:

Previous    Next

©2012 Mississippi Department of Human Services | 1-800-345-6347 | 750 North State Street | Jackson, MS 39202

## MDHS DIVISION OF FAMILY AND CHILDREN'S SERVICES
## Safety, Permanency, and Well-Being
### CONTINUOUS QUALITY IMPROVEMENT
### REVIEW INSTRUMENT

| Home | Instructions | Protocol | Logout | |
|---|---|---|---|---|
| Welcome ! | | | | Case Number: |

| | |
|---|---|
| Face Sheet | Onsite Review Instrument - Mobilizing Services Timely |
| Item1 | |
| Item2 | **Item 18: Mental/Behavioral Health of the Child** |
| Item3 | 174. During the PUR, did the child, age 4 and older, receive an initial mental health screening within 30 days of entry into care and/or within 30 days of the 4th birthday if occurring during stay in foster care?  ○Yes ○No ○NA |
| Item4 | |
| Item5(A) | 175. Did the agency conduct an assessment of the child(ren)'s mental/behavioral health needs on an ongoing basis or as follow-up based on indications to inform case planning decisions?  ○Yes ○No ○NA |
| Item5(B) | |
| Item5(C) | 176. During the period under review, did the agency provide appropriate services to address the child(ren)'s mental/behavioral health needs on a timely basis?  ○Yes ○No ○NA |
| Item6 | |
| Item7 | 177. Note whether or not there is evidence of a mental/behavioral health (including substance abuse) assessment. For example, (1) what type of needs assessment was conducted, and (2) what kind of information was in the case file or missing from the case file that is relevant to an assessment of mental/behavioral health needs? Indicate if a formal assessment was conducted, and, if so, note the diagnosis: |
| Item8 | |
| Item9 | |
| Item10 | |
| Item11 | |
| Item12 | |
| Item13 | |
| Item14 | |
| Item15 | |
| Item16 | |
| Item17 | 178. If there are services that were not or are not being provided based on the assessment of needs, describe why the services were not provided (for example, lack of agency efforts to secure services, lack of service availability in the community, no transportation for foster parents to take child to appointments, parent's unwillingness to engage child in services, etc.). If the services were not available due to lack of availability, or reviewer notices other services not available in the community, please describe in detail: |
| Item18 | |
| Item19 | |
| Item20 | |
| Item21 | |
| Item22 | |
| Item23 | |
| Item24 | |

Rate Item 18

Please elaborate on any findings:

CQI - Continuous Quality Improvement



Previous    Next

©2012 Mississippi Department of Human Services | 1-800-345-6347 | 750 North State Street | Jackson, MS 39202

## MDHS DIVISION OF FAMILY AND CHILDREN'S SERVICES
## Safety, Permanency, and Well-Being
### CONTINUOUS QUALITY IMPROVEMENT
### REVIEW INSTRUMENT

| Home | Instructions | Protocol | Logout | |
|------|-------------|----------|--------|--|
| Welcome ! | | | | Case Number: |

| Face Sheet | | Onsite Review Instrument - Preserving and Maintaining Connections | |
|-----------|---|---|---|
| Item1 | | | |
| Item2 | | **Item 19: Proximity of Foster Care Placement** | |
| Item3 | | Was the child placed in the same county as (s)he was removed? | |
| Item4 | 179. | *(Only note N/A if the child was placed outside of the county and it was documented to be in the child's best interest. This must be explained by reviewer in the item rating section).* | ○Yes ○No ○NA |
| Item5(A) | | | |
| Item5(B) | 180. | Is the child's current or most recent placement close enough to his or her parents or other potential permanent caregiver to facilitate frequent face-to-face contact between the child and the parents while the child is (or was) in foster care? | ○Yes ○No ○NA |
| Item5(C) | | | |
| Item6 | 181. | If No, was the reason for the location of the child's current or most recent placement based on the child's needs and intended to ensure that the child's case plan goals are achieved? | ○Yes ○No ○NA |
| Item7 | | | |
| Item8 | | Describe the relationship between the child's current or most recent placement and the location of the | |
| Item9 | 182. | parents or of a family member with whom the child is likely to be reunified (for example, the child will be reunified with a grandmother): | |
| Item10 | | | |
| Item11 | | | |
| Item12 | | | |
| Item13 | | | |
| Item14 | | | |
| Item15 | | | |
| Item16 | | | |
| Item17 | | | |
| Item18 | 183. | If the reviewers determine that the child's placement is not sufficiently close to the parent(s) to facilitate frequent contact, document the reasons for this determination (and identify any reasons provided by the agency): | |
| **Item19** | | | |
| Item20 | | | |
| Item21 | | | |
| Item22 | | | |
| Item23 | | | |
| Item24 | | | |
| | 184. | Did the child remain in the same school (s)he attended prior to foster care placement? | ○Yes ○No ○NA |
| | 185. | If no, was this appropriate based on case circumstances? | ○Yes ○No ○NA |



If No, please explain why:

Rate Item 19

Please elaborate on any findings:

Previous    Next

©2012 Mississippi Department of Human Services | 1-800-345-6347 | 750 North State Street | Jackson, MS 39202



MDHS DIVISION OF FAMILY AND CHILDREN'S SERVICES
**Safety, Permanency, and Well-Being**
CONTINUOUS QUALITY IMPROVEMENT
REVIEW INSTRUMENT

| Home | Instructions | Protocol | Logout | |
|------|--------------|----------|--------|---|

**Welcome !**                                                                 *Case Number:*

Face Sheet | Onsite Review Instrument - Preserving and Maintaining Connections

**Item 20: Placement with Siblings**

| 186. | During the period under review, was the child placed with all siblings who also were in foster care? | ○Yes ○No ○NA |
|------|------|------|
| 187. | If No, was there a valid reason for the child's separation from the siblings (for example, the separation was necessary to meet the needs of one of the siblings, to address safety concerns for one or more of the siblings, or to accommodate a large sibling group)? | ○Yes ○No ○NA |
| 188. | Reason for Separation (if applicable)-please list sibling's name, placement setting, and the reason for separation: | |

Left navigation: Item1, Item2, Item3, Item4, Item5(A), Item5(B), Item5(C), Item6, Item7, Item8, Item9, Item10, Item11, Item12, Item13, Item14, Item15, Item16, Item17, Item18, Item19, **Item20**, Item21, Item22, Item23, Item24

[ Rate Item 20 ]

Please elaborate on any findings:

[ Previous ] [ Next ]

*@2012 Mississippi Department of Human Services | 1-800-345-6347 | 750 North State Street | Jackson, MS 39202*

## MDHS DIVISION OF FAMILY AND CHILDREN'S SERVICES
## Safety, Permanency, and Well-Being
### CONTINUOUS QUALITY IMPROVEMENT
### REVIEW INSTRUMENT

| Home | Instructions | Protocol | Logout | |
|---|---|---|---|---|
| Welcome ! | | | | Case Number: |

Face Sheet — Onsite Review Instrument - Preserving and Maintaining Connections

Item1
Item2

**Item 21: Visiting with parents and siblings in foster care**

Item3
Item4

189. If the child entered care during the PUR, was an initial visitation plan developed in the first 30 days of the child's placement?    ○Yes ○No ○NA

Item5(A)
Item5(B)
Item5(C)

190. During the period under review, was the visitation plan updated/reviewed as circumstances in the case warranted? (answer N/A if circumstances in the case DID NOT warrant the visitation plan being updated/reviewed)    ○Yes ○No ○NA

Item6
Item7

191. Does the visitation plan include all visitation (parents, siblings, connections, etc)?    ○Yes ○No ○NA

Item8
Item9

192. During the period under review, were concerted efforts made to ensure that visitation (or other forms of contact if visitation was not possible) between the child and his or her mother was of sufficient frequency to maintain or promote the continuity of the relationship?    ○Yes ○No ○NA

Item10
Item11

193. Check the box next to the statement that best describes the usual frequency of visits between the mother and the child:

Item12
Item13
Item14
Item15

○More than once a week                    ○Once a week
○Less than once a week, but at least twice a month  ○Less than twice a month, but at least once a month
○Less than once a month                   ○Never
○NA

Item16
Item17

Specify:

Item18
Item19
Item20
**Item21**
Item22
Item23
Item24

194. During the period under review, were concerted efforts made to ensure that visitation (or other forms of contact if visitation was not possible) between the child and his or her father was of sufficient frequency to maintain or promote the continuity of the relationship?    ○Yes ○No ○NA

195. Check the box next to the statement that best describes the usual frequency of visits between the father and the child:

○More than once a week                    ○Once a week

CQI - Continuous Quality Improvement

○ Less than once a week, but at least twice a month  ○ Less than twice a month, but at least once a month
○ Less than once a month                             ○ Never
○ NA

Specify:

| 196. | During the period under review, were concerted efforts made to ensure that the quality of visitation between the child and the mother was sufficient to maintain or promote the continuity of the relationship? | ○ Yes ○ No ○ NA |
|---|---|---|
| 197. | During the period under review, were concerted efforts made to ensure that the quality of visitation between the child and the father was sufficient to maintain or promote the continuity of the relationship? | ○ Yes ○ No ○ NA |
| 198. | During the period under review, were concerted efforts made to ensure that visitation (or other forms of contact if visitation was not possible) between the child and his or her sibling(s) in foster care was of sufficient frequency to maintain or promote the continuity of the relationship? | ○ Yes ○ No ○ NA |

199. Check the box next to the statement that best describes the usual frequency of visits between the target child and his/her siblings in foster care:

○ More than once a week                               ○ Once a week
○ Less than once a week, but at least twice a month  ○ Less than twice a month, but at least once a month
○ Less than once a month                             ○ Never
○ NA

Specify:

| 200. | During the period under review, were concerted efforts made to ensure that the quality of visitation between the child and his or her sibling(s) in foster care was sufficient to promote the continuity of their relationships? | ○ Yes ○ No ○ NA |
|---|---|---|

201. For each applicable relationship (Mother, Father, Sibling(s)), document concerted effrts or lack of efforts to promote frequent visitation. Also document any reasoning why a relationship is not applicable:



202. If the child entered care during the PUR did the child have a visit with his/her parents within 24 hours of placement, or at a minimum a phone call with relatives within first 24 hours?

○ Yes ○ No ○ NA

Rate Item 21

Please elaborate on any findings:

Previous    Next

@2012 Mississippi Department of Human Services / 1-800-345-6347 / 750 North State Street / Jackson, MS 39202

CQI - Continuous Quality Improvement



MDHS DIVISION OF FAMILY AND CHILDREN'S SERVICES

**Safety, Permanency, and Well-Being**

CONTINUOUS QUALITY IMPROVEMENT
REVIEW INSTRUMENT

| Home | Instructions | Protocol | Logout |
|---|---|---|---|

**Welcome !**                                                                                    **Case Number:**

Face Sheet

Onsite Review Instrument - Preserving and Maintaining Connections

Item1

Item2

**Item 22: Preserving Connections**

Item3

203. During the period under review, were concerted efforts made to maintain the child's important connections (for example, neighborhood, community, faith, language, extended family members including siblings who are not in foster care, school, tribe, and/or friends)?   ○Yes ○No ○NA

Item4

Item5(A)

Item5(B)

204. Was a sufficient inquiry conducted with the parent, child, custodian, or other interested party to determine whether the child may be a member of, or eligible for membership in, an Indian tribe?   ○Yes ○No ○NA

Item5(C)

Item6

Item7

205. If the child may be a member of, or eligible for membership in, an Indian tribe, during the period under review, was the tribe provided timely notification of its right to intervene in any State court proceedings seeking an involuntary foster care placement or termination of parental rights (TPR)?   ○Yes ○No ○NA

Item8

Item9

Item10

206. If the child is a member of, or eligible for membership in, an Indian tribe, was the child placed in foster care in accordance with the Indian Child Welfare Act (ICWA) placement preferences or were concerted efforts made to place the child in accordance with ICWA placement preferences?   ○Yes ○No ○NA

Item11

Item12

Item13

Item14

207. Document agency efforts or lack of efforts to help children maintain important connections when these are not being maintained through the placement itself:

Item15

Item16

Item17

Item18

Item19

Item20

Item21

**Item22**

Item23

Rate Item 22

Item24

Please elaborate on any findings:



*©2012 Mississippi Department of Human Services | 1-800-345-6347 | 750 North State Street | Jackson, MS 39202*

## MDHS DIVISION OF FAMILY AND CHILDREN'S SERVICES
# Safety, Permanency, and Well-Being
### CONTINUOUS QUALITY IMPROVEMENT
### REVIEW INSTRUMENT

| Home | Instructions | Protocol | Logout |
| --- | --- | --- | --- |

| Welcome ! | Case Number: |
| --- | --- |

**Face Sheet**

Item1
Item2
Item3
Item4
Item5(A)
Item5(B)
Item5(C)
Item6
Item7
Item8
Item9
Item10
Item11
Item12
Item13
Item14
Item15
Item16
Item17
Item18
Item19
Item20
Item21
Item22
**Item23**
Item24

Onsite Review Instrument - Preserving and Maintaining Connections

*Item 23: Relationship of Child in Care with Parents*

208. Did a meeting occur between the birth parents and resource parents within the first month of placement (if placement occurred during the PUR)?    ○Yes ○No ○NA

209. Is there evidence in the case record of shared parenting responsibilities between the birth and resource parents?    ○Yes ○No ○NA

210. If not explained in the "reason for rating" section, document efforts or lack of efforts to support or maintain a positive mother-child, and or father-child relationship. (The focus should be on activities such as the ones listed in the instructions, rather than on visitation). Foster parent activities may be considered equivalent to "agency" activities in responding to this question:

Rate Item 23

Please elaborate on any findings:

Previous   Next

# MDHS DIVISION OF FAMILY AND CHILDREN'S SERVICES
## Safety, Permanency, and Well-Being
### CONTINUOUS QUALITY IMPROVEMENT
### REVIEW INSTRUMENT

| Home | Instructions | Protocol | Logout |

*Welcome !*                                               **Case Number:**

**Face Sheet**

Onsite Review Instrument - Preserving and Maintaining Connections

Item1
Item2

***Item 24: Relative placement***

Item3
Item4

211. During the period under review, was the child's current or most recent placement with a relative?   ○Yes ○No ○NA

Item5(A)
Item5(B)

212. If Yes, is (or was) this placement stable and appropriate to the child's needs?   ○Yes ○No ○NA

Item5(C)
Item6
Item7

213. If No to question 211, did the agency, during the period under review, make concerted efforts to identify, locate, and evaluate maternal relatives as potential placements for the child, with the result that maternal relatives were ruled out as, or were unwilling to be, placement resources?   ○Yes ○No ○NA

Item8
Item9
Item10

214. If No to question 211, did the agency, during the period under review, make concerted efforts to identify, locate, and evaluate paternal relatives as potential placements for the child, with the result that paternal relatives were ruled out as, or were unwilling to be, placement resources?   ○Yes ○No ○NA

Item11
Item12
Item13
Item14
Item15
Item16
Item17
Item18
Item19

215. Document agency efforts or lack of efforts to locate and evaluate maternal relatives (including reasons why relatives were not considered as placement resources, if relevant) if appropriate, during the period under review:

Item20
Item21
Item22
Item23
**Item24**

216. Document agency efforts or lack of efforts to locate and evaluate paternal relatives (including reasons why relatives were not considered as placement resources, if relevant) if appropriate, during the period under review:

CQI - Continuous Quality Improvement



©2012 Mississippi Department of Human Services / 1-800-345-6347 / 750 North State Street / Jackson, MS 39202