**Ex. 21**

# MISSISSIPPI DIVISION OF FAMILY AND CHILDREN'S SERVICES



# CONTINUOUS QUALITY IMPROVEMENT PLAN

## July 2012

DHS
296037

# *Table of Contents*

Introduction--------------------------------------------------------------------------------------------1

**Section I:  Purpose, Vision and Function of CQI**-----------------------------------------------2

    Purpose of the CQI Process and Plan--------------------------------------------------------2

    DFCS' Vision for CQI------------------------------------------------------------------------3

    Functions and Structure of CQI--------------------------------------------------------------6

**Section II: Current Status and Plans for CQI Functions**-------------------------------------21

    Building a Case Review Process--------------------------------------------------------------21

    Building Data Reporting Capacity------------------------------------------------------------24

    Building CQI Monitoring and Reporting Capacity------------------------------------------27

    Ensuring a Trained, Qualified CQI Workforce---------------------------------------------30

    Supporting Local CQI Processes-------------------------------------------------------------32

**Section III:  Appendices**--------------------------------------------------------------------------36

    Appendix A:  EMU Case Review Instrument-----------------------------------------------37

    Appendix B:  EMU Sampling Process-------------------------------------------------------59

    Appendix C:  Map of Data Indicators to EMU Reviews------------------------------------60

    Appendix D:  Data Report Validation Process---------------------------------------------61

    Appendix E: MACWIS Reports Produced during Bridge Plan------------------------------62

    Appendix F:  Data Report Re-validation Schedule-----------------------------------------65

    Appendix G:  Data Reports Scheduled for Development in 2012--------------------------68

    Appendix H:  Foster Care Review Instrument----------------------------------------------73

    Appendix I:  EMU Reference Guide --------------------------------------------------------83

DHS
296038

# *Introduction*

The development and implementation of a Continuous Quality Improvement ("CQI") process within the Mississippi Department of Human Services ("MDHS"), Division of Family and Children's Services ("DFCS") is required by both the *Olivia Y v. Barbour* Modified Settlement Agreement (the "Settlement Agreement") and the Council on Accreditation ("COA"). As part of the efforts of MDHS/DFCS to improve its processes to better serve its clients, effectively implement the Settlement Agreement and attain accreditation by COA, DFCS (a/k/a "the Division") has designed and begun implementation of CQI activities as an integral component to its ongoing efforts to ensure the quality of services delivered to the children and families that the Division serves, and to focus service delivery and management on improving the outcomes of the Division's services and programs.

DFCS recognizes the need for a detailed plan to guide the full implementation of CQI. An initial CQI plan was created during 2009, a period in which DFCS was undergoing organizational restructuring to meet the requirements of the original 2008 Settlement Agreement. The Division created the Continuous Quality Improvement Unit ("CQI Unit"), previously known as the Performance Improvement Unit, but it did not have a Division Director. Out of necessity, the goals and activities of the 2009 plan were broad and the CQI Unit's function was limited to monitoring the placement cases through the Foster Care Review ("FCR") process that had been in place for a number of years. In addition, the Unit's workgroup had monthly meetings for the purpose of meeting the Settlement Agreement and COA requirements.

This 2012 CQI Plan (the "Plan") reflects a more detailed plan for CQI, based on the collaborative work of the CQI Unit, DFCS management, and the Center for the Support of Families ("CSF"), a consulting company approved by the Court Monitor to collaborate with DFCS on this work. It also reflects lessons learned in the initial implementation of CQI, lessons that will guide the full implementation of the CQI process.

This Plan outlines the Division's purpose for implementing CQI activities and the values embraced by the Division in promoting positive outcomes for children and families. The CQI process is designed to align with the principles of family centered practice embodied in DFCS' Family Centered Practice Model, and to reinforce those principles on an ongoing basis. The phased implementation schedule of CQI activities is designed to follow, support, and inform the phased implementation of the Practice Model throughout the state.

This CQI Plan consolidates all previous DFCS statewide CQI plans, provides updates on CQI development and activities to date, and cites planned activities and developments for the year. It is the Division 's intent to update this plan annually, providing a summary of accomplishments to date and a description of work planned for the next year.

## Section I
## Purpose, Vision, and Function of CQI

## *Purpose of the CQI Process and Plan*

The CQI process is the primary means of promoting quality of service delivery to children and families, accountability within DFCS, and fidelity to the Child Welfare Practice Model.  The full implementation of the process is ongoing and this Plan serves the following purposes:

- To provide a "road map" to full implementation of the CQI process by describing the vision of the process, its desired structure, and its goals and objectives;

- To provide a means of articulating specific steps and activities planned for a given year that are directed toward full implementation; and

- To provide a means of annual reporting to MDHS/DFCS and other pertinent stakeholders on progress made in implementing the CQI process.

The primary purposes for engaging in CQI activities are to: (a) promote positive outcomes for the children and families served by the Division by reinforcing the principles of the newly adopted Child Welfare Practice Model; (b) ensure a consistently high quality of service delivery to children and families; and (c) provide for accountability to the goals, standards, and policies of the Division.

To achieve these goals, it is essential for DFCS to: (1) institute structured processes that examine, evaluate, and act on quality-related issues within the Division and (2) involve a broad array of DFCS staff, families, and stakeholders in these processes.  To achieve these goals, the CQI Unit:

- Assigns responsibility for coordination/implementation of CQI activities, and provision of technical assistance in using the CQI process;

- Directs the scope of CQI activities;

- Establishes how DFCS periodically reviews essential management and service delivery processes consistent with the Division's priorities and goals;

- Determines how stakeholders will participate in the CQI process;

- Outlines methods and timeframes for monitoring and reporting activities;

- Provides structured feedback to DFCS staff at all levels regarding performance and outcomes;

- Periodically assesses the utility of the CQI program, including any barriers and supports for implementation; and

2

DHS
296040

- Provides the structure and accountability needed for making performance improvements based on information provided through CQI.

In implementing a continuous quality improvement process, it is important to distinguish between the terms *quality assurance* and *quality improvement*. It is the intent of this CQI process to provide for both quality assurance and quality improvement.

*Quality assurance* refers to those processes that measure the conformity of child welfare practice with the goals, mission, and values of MDHS/DFCS, and compliance with the standards that guide the work of DFCS with children and families. These activities may include case record reviews, program evaluation, input from families and stakeholders, and use of well-defined performance indicators.

*Quality improvement* refers to actions that lead to incremental improvements in the provision of services or in the services provided to consumers. These actions are usually conceptualized and implemented by staff and stakeholders, based on information gained through review activities. Providing constructive feedback to staff will help assure that the quality improvement process actually leads to improved practice and outcomes.

## *DFCS' Vision for CQI*

The vision for a fully implemented CQI process in Mississippi is based on the Division's commitment to children and families, as outlined in DFCS' mission and values.

**DFCS Mission Statement and Values**

Our mission is to lead Mississippi in protecting children and youth from abuse, neglect and exploitation by providing services to promote safe and stable families.

DFCS has identified six values that will be honored in working with clients, community partners and each other, as follows:

- *Competence.* We have technical skills and knowledge; we work with common sense; we make informed decisions; and we follow through to achieve successful outcomes.

- *Integrity.* We are honest in our interactions; we are accountable for our actions; and we do the right thing.

- *Responsibility.* We do what we say we are going to do; we take initiative.

- *Respect.* We treat others with kindness, compassion, dignity, and honor differences of our clients and each other.

- *Personal Courage.* We are loyal to the Mission of MDHS/DFCS; we advocate for our clients; we lead by example, even when doing so carries risk.

3

- *Collaboration.* We make decisions for the common good; we share resources based on need; we work together effectively in teams; and work with a collective knowledge of all programs and services.

As the Division moves to implement the provisions of the Settlement Agreement, the COA standards, and federally-required practices within the Child and Family Services Reviews (CFSR), these practices and values, which are incorporated into the Practice Model, will guide the Division's work with children and families throughout the state. They will provide a framework that allows for integration of policy, practice, and monitoring activities in ways that promote consistency in work, and help ensure that all children and families have the opportunity for the highest quality of interventions regardless of which county in the state serves them.

**Vision and Design of CQI**

The vision for CQI is that it will be thoroughly integrated into ongoing work and serve primarily as a means of reinforcing the practices that are currently being implemented in the state. CQI is a means of keeping DFCS' mission and vision in clear focus for staff in the field and of sustaining the improvements that are achieved in practice and outcomes over time.  In order for it to serve that function, the CQI Unit must actually monitor for the practices that are put into place and provide sufficient feedback to staff to inform practice, decision making, and resource allocation.

The CQI process is designed to align with the Practice Model, and thereby supports its implementation and sustainability.  The Practice Model includes the major requirements of the Settlement Agreement, recognizes best practices in child welfare, and is based on the Mission Statement and Values outlined above.  It includes six broad categories of activities in working with children and families as follows:

- Mobilizing Appropriate Services Timely
- Safety Assurance and Risk Management
- Involving Families and Children in Case Planning and Decision Making
- Strengths and Needs Assessments of Children and Families
- Preserving Connections and Relationships
- Individualized and Timely Case Planning

Similarly, the CQI process reviews and reports on practices and outcomes in each of these 6 practice areas, in addition to reporting on 6 systemic supports/areas (discussed in detail on page 16), that address the Division's capacity to support the Practice Model.

The CQI process includes the following characteristics:

- *CQI reinforces positive practice at the case level.*  By making a clear connection between practice and monitoring, DFCS has a much stronger opportunity to improve practice and outcomes.  Monitoring should also be conducted in ways that provide constructive case-specific feedback to staff, in addition to providing higher level analysis of information, in order to help staff understand the relationship between their practice and the outcomes for children and families.  Monitoring should serve a supportive, helpful function to staff

4

rather than being a compliance-based exercise that does not directly benefit workers in the field in their daily work.

- *CQI provides analysis of findings at a high enough level to inform the ongoing development and maintenance of the Practice Model.* In addition to case-level feedback, the aggregated findings of CQI at county, regional, and state levels will provide information for use by the Division's leadership in determining whether goals are being attained, what factors are supporting or inhibiting goal attainment, and whether changes to the Model or systemic factors need to be implemented to stay on course.

- *CQI evaluates the capacity of the system to support quality casework practice.* In addition to monitoring practice and outcomes, the CQI process also monitors the effectiveness of systemic factors, such as training, policy, resources, and caseloads to support practice that is consistent with the Practice Model. It will provide information to the DFCS administration that will be useful in decision making, resource allocation, and technical assistance initiatives.

- *CQI is an inclusive process.* In order to be effective and thoroughly integrated into the Division's operations, CQI will reach all levels of DFCS staff and include stakeholders outside of the Division as well. Both the state and regional Practice Model implementation teams will have responsibility for receiving and reviewing CQI information, and for providing a measure of oversight for the implementation of required program improvement plans resulting from the CQI reviews.

- *CQI coordinates with other oversight and review processes and improvement efforts.* The CQI system encompasses the FCR process, the Evaluation and Monitoring process ("EMU"), and data reporting from the Mississippi Automated Child Welfare Information System ("MACWIS"), and is coordinated with the CFSRs and the review activities of the Court Monitor.

- *CQI focuses on identifying strengths and needs of practice and supports making needed improvements.* The strengths and needs of the Division's practice and systemic supports will be identified in CQI reviews. Where indicated, program improvement plans will be developed and implemented regionally that address areas identified as needing improvement. The regions will be responsible for implementing needed improvements, with oversight responsibility provided by the local Practice Model implementation teams and regional CQI teams in addition to State Office administrative oversight.

- *CQI integrates into the ongoing work of staff in county offices, rather than being regarded as a special or periodic effort.* Although the State CQI Unit will only have the capacity to conduct formal reviews of each region and county office at periodic intervals, there will be processes in place between these periodic reviews that ensure monitoring on a more frequent basis.

- *CQI focuses on accountability and improvement.* The ultimate objective of CQI is to improve practice and outcomes. The information from CQI activities will identify both the strengths and areas needing improvement within county practice and systemic factors.

5

This information will also guide the development of program improvement plans which will include specific steps needed for meaningful improvement. The analysis of information collected through CQI will help identify associations among practice, systemic factors, and outcomes that can be used statewide and locally to develop effective improvement strategies. Further, as the systemic reforms evolve over time, the CQI information will be used to make any needed adjustments in the State's approach to implementing the Practice Model.

## *Functions and Structure of CQI*

The structure of the CQI process within DFCS includes several components. A visual representation of the structure of the CQI process is provided below:



The State Implementation Team ("SIT") is the governing group for the implementation of the provisions of the Settlement Agreement and the Practice Model. The SIT is chaired by the MDHS Executive Director and also includes the Deputy Executive Director, the Deputy Director for Family and Children's Services, the Division of Family Children's Services Director, the Field Operations Director, and the CQI Director. The SIT also includes several sub-teams that meet regularly and report directly to the SIT. Among those, the CQI Sub-Team provides guidance and direction to the CQI process and the State Office CQI Unit. Currently, the State CQI Sub-Team meets at least quarterly. The State CQI Sub-Team provides feedback and guidance to the SIT and DFCS on CQI activities, updates, and the development and growth of the CQI process. The team is chaired by the CQI Director and consists of the FCR Director, EMU Director, MACWIS Director, a Regional Director ("RD"), Area Social Work Supervisors ("ASWS"), a CSF representative, and other consultants.

Each region has a Regional Implementation Team ("RIT") to guide implementation of the Practice Model as the region begins the planning phase. The RIT also includes several sub-teams, including a Regional CQI Sub-Team. The functions of the Regional CQI Sub-Teams are to: review data generated by MACWIS or other sources on a regular basis; review the results of CQI case reviews (which includes evaluation and monitoring reviews as well as foster care reviews); identify trends that warrant attention in the implementation process in the region; make recommendations pertaining to the quality of work/services or the region's capacity to support the Practice Model; participate in the development and monitoring of regional program improvement plans; and monitor the regions' progress in addressing the sub-team's recommendations. The Regional CQI Sub-Teams report directly to the RIT and are linked with the State CQI Sub-Team through the involvement of the regional EMU and FCR liaisons on the regional teams, and they may elevate issues or raise questions to the State CQI Sub-Team at any point. A template for the meeting agendas of the Regional CQI Sub-Teams follows on the next page.

The State CQI Unit has the responsibility for carrying out CQI activities at the state and regional levels, and includes CQI liaisons and reviewers who work within the regions to review and report on cases and conduct other CQI activities. The Regional Evaluation and Monitoring Liaisons and reviewers are expected to interact with the Regional CQI Sub-Teams by providing assistance with case reviews and the results of case reviews, along with data pertaining to regional, county, and state performance on identified indicators.

As CQI issues emerge within regions, this structure provides a vehicle for elevating issues through the RIT to the SIT for attention, feedback, or consultation. Similarly, the SIT, through this structure, has a means of providing feedback through the teams and sub-teams to the field.

DHS
296045

**Suggested Agenda for Regional CQI Sub-Team Meetings**

The purposes of the Regional CQI Sub-Teams are to: regularly review the data and other information pertaining to region's progress in meeting MSA progress goals/benchmarks; identify areas needing improvement in performance or outcomes; recommend ongoing review activities; and report to the Regional Implementation Team on the status of the region's progress.

- **Review progress measures in MSA, Year III Plan, and Regional Implementation Plan (RIP)**
  - At least monthly, review the CQI sub-team report(s) that should include regional data/case review findings, including FCR results, CQI reviews, targeted reviews, MACWIS reports, etc., on progress measures in the MSA/Yr 3 Plan/RIP
  - Hear de-briefings of EMU case reviews conducted during the month

- **Consult with RD, regional FCR and EMU liaisons on areas of high and low performance**
  - Determine areas where progress is reaching agreed upon goals and likelihood of continuing progress toward ultimate goals
  - Determine areas at risk of not reaching agreed upon goals and identify barriers to reaching benchmarks/goals
  - Assist in developing recommendations/strategies for addressing failure to achieve goals and sustaining progress

- **Update regional tracking matrix with regard to data indicators/progress measures for reporting to Regional Implementation Team**
  - Color code matrix items on track (green), at risk (yellow), and overdue/at serious risk (red)
  - Provide comments on matrix to explain codes/status of indicators
  - Provide additional information as needed that should be presented to the RIT
  - Provide recommendations to RIT for addressing areas of low performance and sustaining areas of sufficient/high performance

- **Address any issues regarding the regional CQI process**
  - Ensure that regional CQI processes are operating/moving forward as required/needed
  - Provide information for the RIT/RD on concerns regarding the CQI process
  - Identify recommendations for elevating any CQI concerns to the State Implementation Team or State CQI Sub-Team

- **Approve regional CQI report to RIT/Review feedback from prior report(s)**
  - Approve quarterly (or more frequently if needed) reports to the RIT
  - Address/respond to issues/questions raised by RIT based on prior reports or other sources

**State Office CQI Unit**

The primary entity responsible for administering CQI functions statewide is the State Office CQI Unit, which includes the following:

- Evaluation and Monitoring Unit (EMU);
- Foster Care Review Unit (FCRU);
- MACWIS Unit;
- COA coordination activities;
- Court improvement activities.

The State Office CQI Unit specifically carries out the following responsibilities:

- Develops and updates the instruments and tools needed to carry out CQI responsibilities, such as case review tools, procedures manual, and sampling criteria;
- Conducts regional and county specific CQI case reviews (including Evaluation and Monitoring and Foster Care Review) within the Division;
- Provides training and orientation to state and local stakeholders on the CQI process;
- Assists RDs in reviewing and approving county program improvement plans resulting from the Evaluation and Monitoring baseline and/or annual follow-up case reviews, and in determining if the goals and progress measures identified in the plans have been achieved;
- Ensures that other oversight and monitoring functions within DFCS are coordinated and aligned; and,
- Conducts special studies as needed or requested to evaluate specific areas.

The staffing plan for the State Office CQI Unit includes, at a minimum, a director, a data analyst, a report writer, and staff of the EMU, FCRU, and MACWIS units, in addition to staff that conduct special safety reviews and reviews of investigations of maltreatment while in foster care, coordinate COA activities and court improvement activities. The organizational chart that follows shows the current and projected staffing of the CQI process within the State CQI Unit. This chart is not intended to display all offices and functions within the CQI Unit.

# Organizational Chart for the CQI Process*

*Red print indicates currently un-filled positions. The MACWIS Organization Chart is shown below.

DHS
296048



The functions of the CQI positions noted above are integrated within the CQI Unit as follows:

**Evaluation and Monitoring Unit (EMU)**

During SFY 2011, the EMU developed and adopted a mission and vision statement in addition to identifying the EMU's values:

> *Being guided by the strengths perspective and the principles of family centered practice, the mission of the Evaluation and Monitoring Unit is to provide clear, fair, and unbiased feedback on casework and service delivery within the Division of Family and Children's Services.*
>
> *The vision of this endeavor is to strengthen practice by supporting a framework, or model of practice, which unifies and coordinates service delivery so that clients receive the best services that this agency can provide to increase safety, permanency, and wellbeing for all parties whom we serve.*
>
> *The values that drive this mission are personal courage, objectivity, a non-punitive evaluation model, integrity, respect, collaboration, and personal accountability.*

The EMU's major functions involve monitoring through case reviews and organized feedback on multiple levels. The EMU specifically carries out the following responsibilities:

DHS
296049

11

- Conducts random-sample baseline and annual follow-up case reviews on a regional basis using the Evaluation and Monitoring Unit Case Review Instrument ("EMU Case Review Instrument");
- Conducts ongoing monthly random sample case reviews at the county level using the EMU Case Review Instrument;
- Provides case-level feedback to county staff on cases reviewed, provides feedback to supervisors and administrators on county-wide performance, and to State-level staff and stakeholders on county, regional, and statewide performance;
- Reviews data reports reflecting state, regional, and county performance on various child welfare indicators;
- Analyzes the findings of reviews, including qualitative and quantitative analyses, and compiles results into periodic reports that identify the strengths and areas needing improvement identified in the reviews;
- Hires Evaluation and Monitoring Liaisons for each region and staffs regional CQI teams in each region implementing the Practice Model

Specific duties and performance standards, along with a Performance Appraisal Review Report (PAR), for EMU Liaisons has been developed. The following has been established as the essential foundation knowledge needed and primary tasks of EMU Liaisons:

- Effectively present information regarding the Practice Model and the CQI process;
- Working knowledge of data indicators utilized in CQI process;
- Working knowledge of the EMU Case Review Instrument and ability to perform quality assurance checks on the completed instruments;
- Working knowledge of stakeholder surveys used to gather information regarding systemic factors;
- Effectively support the regions in preparing for baseline EMU reviews and annual follow-up reviews;
- Effectively co-facilitate the regional CQI Sub-Team meetings with FCR staff;
- Support regions in the development of their program improvement efforts to respond to findings of the EMU reviews; and
- Conduct ongoing monthly case reviews within assigned region and provide verbal and written feedback to the caseworker, supervisor, and RD.

In addition, a procedures manual has been developed to clearly define EMU procedures, roles, and responsibilities and to provide guidance on topics such as case reviews, case sampling procedures, feedback processes, development of reports, use of findings to develop program improvement plans, and logistical issues in CQI (*see* Appendix "I"). This document will be updated on an ongoing basis as the Unit continually evolves.

*Case Reviews*

The EMU will conduct an initial review of each region near the beginning of the region's initial implementation phase of the Practice Model. A follow-up review will be conducted approximately twelve months later, within the two-month period following the region's

completion of the initial implementation phase.  From that point forward, an annual EMU review will be conducted in each region.

The EMU reviews combine qualitative information, obtained through periodic case reviews and stakeholder surveys, with quantitative information obtained through MACWIS data reports.  Regular EMU case reviews are conducted on a sample of families receiving in-home and foster care services. The reviews include information obtained from documented case files, but also from interviews with parents, children, foster caretakers, service providers, and caseworkers involved in each case. The comprehensive EMU Case Review Instrument utilized for case reviews includes components of the Practice Model, COA standards, elements of the Settlement Agreement, and additional indicators related to federal and state requirements (*see* Appendix "A").  The results of the case review provide a description of how well each of the 6 Practice Model components functions within the individual case.  In addition to the information needed to evaluate conformity with the Practice Model and the Settlement Agreement, the review of individual cases also includes indicators of performance in relation to federal or state requirements not specifically identified in the Practice Model or Settlement Agreement.

Although most of the requirements of the Settlement Agreement pertain specifically to foster care services, the Practice Model is intended to guide casework practice in both in-home and foster care cases.  In order to promote application of the Practice Model across all cases, the cases monitored are selected randomly.  The State Office CQI Unit has developed detailed sampling guidance that includes case selection criteria and the number of cases to be reviewed by type in each region.  Twenty-four (24) total cases are reviewed by twelve (12) pairs of reviewers (totaling 24 reviewers) at each on-site regional case review.  A well-defined process for obtaining and eliminating cases to establish the sample of fourteen (14) foster care and ten (10 in-home cases has been developed (*see* Appendix "B").

Where families and children are served through purchased services, the quality of those services, the fit of the services to identified needs, and the accountability and responsiveness of service providers is part of the case review process.

In preparation for the on-site case reviews, the EMU Liaisons work with the region to establish an appropriate case sample, schedule case member interviews and ensure that logistics are well planned.  Additionally, the EMU Liaisons seek the input of various stakeholders from the region through the use of surveys.  The stakeholders may complete surveys electronically, over the phone, or on paper.  The information provided by stakeholders through surveys is used to gather information and feedback regarding systemic factors.

The on-site review begins with a training session for all reviewers that explains the overall case review process, the EMU Case Review Instrument, interview guide, and schedule.  Two full days are then spent by each team of reviewers assessing two cases using the EMU Case Review Instrument by utilizing the paper case file, electronic case record, as well as interviews with key case members. During the review process a designated team leader is available to answer questions and assist review teams as needed.  Quality assurance of the EMU Case Review Instrument is conducted by two EMU members after each instrument is submitted.  The on-site review is concluded with an exit conference where the preliminary findings and results of the

13

review are presented. Regional staff, implementation team members, as well as stakeholders, are invited to attend the exit conferences.

_Review of Systemic Factors_

In addition to evaluating case practice, EMU reviews also evaluate systemic performance in terms of the capacity of the child welfare "system" to support interventions with children and families that are consistent with the Practice Model and to help them achieve positive outcomes. While the EMU reviews are conducted at the regional level for an entire region, issues may emerge that are county-specific in nature that the RD and others must address, and all strengths and needs may not be region-wide in scope. Among the systemic factors to be monitored are:

- _Training of staff and providers._ EMU evaluates the extent to which pre-service and ongoing training are being provided and are providing the skills needed for staff and providers to carry out their roles and responsibilities.

- _Service array._ EMU routinely evaluates the extent, accessibility, flexibility, and responsiveness of the State and local service array to address the individualized needs of children and families, and identifies gaps in the service array.

- _Placement resources._ EMU evaluates the array, accessibility, and responsiveness of the foster care placement options within the counties to meet the individualized placement needs of children in foster care, and identifies gaps in those services.

- _Caseloads._ EMU monitors the conformity of county departments to caseload standards and supervisory ratios through the worker gap analysis.

- _Oversight and monitoring._ EMU evaluates the effectiveness of supervision and administration in monitoring and reinforcing practice that is consistent with the Practice Model and in providing the necessary systemic supports. It will also monitor the functioning and effectiveness of regional and county CQI processes in place.

- _Court processes._ EMU reviews the effectiveness of court-related procedures, such as holding timely and meaningful reviews and hearings, notifying appropriate parties of proceedings, and filing for timely TPR.

- _Data Quality and Usage._ EMU monitors the accuracy and thoroughness of MACWIS data at the county level and evaluates the outcomes of practice.

In each regional onsite review, EMU Liaisons survey the appropriate stakeholders who have first-hand knowledge of these systemic areas, and review supporting documentation. For example, in evaluating the _service array_ systemic factor, EMU surveys service providers, caseworkers, supervisors, and consumers to determine the extent to which needed services are in place, are readily accessible to children and families, and can be tailored to meet their individualized needs. Information derived from case reviews on the provision of services will be used to supplement information from the stakeholder surveys.

14

DHS
296052

An integral part of each EMU review is the evaluation of regional performance based on MACWIS data reports of key indicators. The State Office CQI Unit has developed a map of data indicators related to each of the 6 Practice Model components included in the EMU reviews and the systemic factors that are reviewed (*see* Appendix "C"). In 2010, MACWIS began developing the data reports, and the development of needed reports is continuing. A report validation process used by CSF and MACWIS staff helps to ensure the accuracy of the reports (*see* Appendix "D"). Reports are validated prior to being used in the EMU reviews and again at six-month intervals.

*Feedback and Follow Up*

Following each baseline and annual on-site EMU review, a formal report is provided to the RD within sixty (60) days. The report provides both qualitative data from the case reviews and stakeholder surveys as well as quantitative data obtained from data indicator reports. The RD then has sixty (60) days to update the regional implementation plan and submit it to the EMU Director and the Director of Field Operations.

*Regional CQI Processes*

DFCS has adopted a process of ongoing reviews in each region which are facilitated by the EMU Liaisons.

The EMU Liaison facilitates monthly EMU reviews within the region in collaboration with one other Regional CQI Sub-Team member. Two cases (one foster care and one in-home) are randomly selected and reviewed using the comprehensive EMU Case Review Instrument and protocol from the state/regional EMU reviews. A different county's cases are reviewed each month, on a rotating basis, in alphabetical order by county within the region. Direct and prompt feedback is provided to caseworkers and supervisors whose cases are selected for review. After the review, a debriefing is immediately held between the review team and the assigned caseworker, ASWS, and RD or Regional ASWS, if available. The emphasis is placed on using the team and process to support staff in decision-making and offering constructive feedback on interventions, so as to help staff view the process as positive and helpful in improving practice. Teams may also conduct follow-up reviews or request status reports on how their recommendations have been addressed in the cases reviewed.

Data-to-Action meetings were established as means for the State Office CQI Unit to collaborate with regions soon after the finalized regional CQI report is received following an EMU baseline and/or annual follow-up review. The sessions are attended by the RD, key regional staff which would include but is not limited to the ASWSs, the Regional Practice Coach, and Adoption Supervisors. E&M Director, FCR Director, EMU Liaison, the Foster Care Reviewer, and RIT representatives, as well as the RD from the next region scheduled for implementation of the Practice Model (for learning purposes), are in attendance at these meetings. These meetings aid in the interpretation of the case review results and data indicators, and identify strengths and areas of needed improvement in order to inform practice and support program improvement plan efforts within the regions. Data from the EMU review, quarterly FCR data, and Data Dashboard

15

information (described below) drive the discussion in which strategies for improvement efforts are brought forth. The effort is designed to ensure that CQI results are effectively integrated into the ongoing regional implementation plans so that the regions operate on an informed basis in implementing the Practice Model and requirements of the Settlement Agreement.

**Foster Care Review Unit (FCRU)**

According to Mississippi Youth Court law, MISS. CODE. § 43-15-11, all children in the custody of DFCS must have a foster care case review, including a County Conference, within every 6-month period of custody.

The purpose of these reviews is to expedite the goal of moving children out of foster care and into homes intended to be permanent. Such permanency may be achieved by reunifying foster children with their parents, placing them with relatives, or by placing them with adoptive families. The County Conference includes items for discussion which detail what the Division staff and what the child's parents must do to achieve the permanency plan for each individual child in custody. A court report is submitted for each Foster Care Review (FCR) that provides mandated information necessary for the court to enter a finding regarding the degree of compliance by the Division and parents with the service plan and regarding the safety, health and best interest of the child.

> *Please Note:* The FCR Procedures Manual does not reflect the current process. The manual is scheduled for an update in SFY 2013 to reflect current and planned changes for the FCR process.

As part of this process, the Foster Care Reviewers submit Division feedback through foster care review reports to the county, regional and state offices. Issues of concern that affect the immediate safety of the child are reported to the FCR Program Division Director who then provides a written report of the issues to the Office of Field Operations for follow up. The reported concerns and follow up action are then tracked and reported through FCR for continuous quality assurance and accountability.

Foster Care Reviewers are assigned a territory based on custody caseloads and they are responsible for ensuring that every child in foster care receives a Foster Care Review and County Conference every 5 months. Reviewers set County Conferences which include invitations to parents, the child(ren) in care, grandparents, resource parents, guardians ad litem, and all case assigned DFCS caseworkers to participate in the conference and provide information regarding the permanent plan for the child. The information provided at those meetings contributes to the overall mandated findings made by the Foster Care Reviewer which are reported to the court.

The instrument utilized by the Foster Case Reviewers in each child's foster care case review is called the Periodic Administrative Determination ("PAD"). The PAD is designed to assess issues related to safety, permanency, and wellbeing of children in foster care. The reports resulting from these case reviews provide qualitative feedback for any needed corrective action. The reports are provided for each child's individual case within 15 days of the County Conference. Aggregated quantitative data generated from the PAD is also used to reveal trends that are

16

significant to the quality of casework. Statistical results from this data point to obvious strengths as well as areas that may need improvement. This provides statistical information (integrated with EMU data and MACWIS data indicators) for the comprehensive CQI baseline and annual follow-up reports that are provided to the regions and to senior management. This information is also utilized for quarterly statistical feedback at the Regional CQI Sub-Team meetings. Case specific information is provided to the county of responsibility for informing the case decision-making process, follow-up on any identified issues of concern pertaining to the safety, permanency, and well-being of the child and any corrective action that is needed.

The "Youth Court Hearing and Review Summaries" are completed within 10 days of the County Conference for each child reviewed. The Foster Care Reviewer documents the information discussed during the County Conference into this report. The report is then forwarded to the county worker and ASWS for completion and forwarding to the youth court. The form is designed to contain all federally-required language and all federally-required information that must be submitted to the court every 6 months for a court finding.

The Foster Care Reviewers also assist the EMU staff to conduct and facilitate regional CQI meetings in every region where the Practice Model is being implemented. Foster Care Reviewers participate in discussion regarding casework trends observed through the review process. Reviewers also participate in baseline and follow up reviews conducted through evaluation and monitoring in each region. The FCRU provides staff for periodic reviews with state and federal partners and assists DFCS with disaster planning efforts as needed. The data collected through the foster care review process is utilized to track and identify needed court improvements and to engage court partners through the related CQI court improvement program.  Additionally, the FCR Director is currently serving on the Court Improvement Program work group.

Finally, evaluating consumer satisfaction on their experience with the Division and providers is one of the COA standards for a CQI process. Currently, the FCR process includes a consumer satisfaction survey.  A similar satisfaction survey will be developed for families receiving in-home services and administered as part of the state and local CQI process. Together, information from both sources will be compiled and described in annual CQI reports. Both surveys would include satisfaction with the Division's responsiveness to the child's and family's needs and also the responsiveness of any relevant service providers. Although consumer satisfaction is not always an indicator of the Division's effectiveness, it is an important source of information in identifying the strengths and needs of casework practice and service provision.

**Mississippi Automated Child Welfare Information System (MACWIS) Unit**

It is imperative that the CQI system have access to aggregate data to monitor and evaluate indicators and outcomes. The Mississippi Automated Child Welfare Information System (MACWIS) currently provides this quantitative data.  While the MACWIS Unit provides broad data and reporting needs for MDHS/DFCS, many of its functions and reports are directly related to the CQI Office functions and needs.  Staff of the MACWIS Unit works with MDHS technical staff and contractors to develop needed data reports that support CQI efforts. In collaboration with CSF, MACWIS staff also provides initial validation and periodic re-validation of the data

17

reports used by CQI.  (*See* Appendix "D" for a copy of the validation process).  MACWIS staff also assists in training other CQI staff on the use of data reports.

MACWIS Reports User Guides have been developed and are now available through the DFCS Connection website, the Division's intranet website.  The guides outline requirements for each MACWIS report and include screen shots from where in the system the data on the reports populates.  These guides were designed to be used by field staff, supervisors, and RDs to reduce data entry errors and support case level supervision and monitoring.

The MACWIS Unit also maintains the Data Dashboard, which was implemented in December 2010, as a means for all DFCS employees to view, on the Connection website, quarterly regional and statewide findings to key data indicators tied to the Practice Model.  The validated MACWIS reports produced during the 2010 *Olivia Y* Bridge Plan Period ("Bridge Plan Period") are presented in graph format and provide a vehicle for regions to examine their performance on these indicators and to see statewide performance quarterly.

MACWIS staff and CQI staff also work with the Mississippi Administrative Office of Courts for data file exchanges between MACWIS and the Mississippi Youth Court Information Delivery System ("MYCIDS"), which house information on children who fall under the jurisdiction of the Youth Court. In May 2011, 81 counties in Mississippi were in some stage of implementing MYCIDS, including comprehensive use, training, receiving equipment or were just getting started.  In February 2012, read-only access to the MYCIDS application was made available on the DFCS server.  Once staff completes the MYCIDS webinar training, they will be given MYCIDS log in user ids and passwords for accessing MYCIDS for such activities as accessing court orders and permanency hearing information.

**Safety Review Unit (SRU)**

**_Maltreatment In-Care Reviews (MIC)_**

The MIC reviews, together with the licensure reviews that are required under the Settlement Agreement  that will be conducted at the regional level, will replace the special safety reviews that were previously conducted. A safety review unit (SRU) will be developed to house the MIC reviews. The SRU's major functions involve monitoring through case reviews and organized feedback on multiple levels.  The SRU specifically carries out the following responsibilities:

- Conducts reviews on in-care maltreatment investigations of children in foster care, as identified by data from MACWIS monthly reports;
- Provides safety and casework-related findings to county staff on cases reviewed, provides feedback to supervisors and administrators on county-wide performance, and to state-level staff and stakeholders on county, regional, and statewide performance;
- Reviews data reports reflecting state, regional, and county performance on various child welfare indicators;
- Analyzes the findings of reviews, including qualitative and quantitative analyses, and compiles results into periodic reports that identify the strengths and areas needing improvement identified in the reviews;

18

- Monitors case-specific improvement efforts resulting from the reviews.

The MIC Review process is a CQI component which addresses the maltreatment of children in foster care who reside in resource homes or group care facilities. The results of these reviews are used to guide further improvements to assure the safety, permanency, and well-being of children while in DFCS custody. These reviews may result in recommendations by the State Office CQI Unit to the appropriate RD for corrective action to be taken by DFCS staff and/or by resource home/group facility staff.

Findings of the reviews are entered into an MIC Review instrument, which addresses strengths, areas needing improvement, and recommendations of corrective actions for the facility/resource home and/or DFCS staff. The MIC Review reports are submitted to the EMU Director and to the DFCS Director and Field Operations Director. The information is then distributed to RDs for implementing and monitoring corrective actions. Notifications of actions taken by DFCS or facility staff are forwarded to the MIC Reviewers who track actions and forward the information to the EMU Director, the DFCS Director, the Director of Field Operations and the Director of Licensure, if the home is licensed by an agency other than DFCS, or is a congregate care facility. The Director of Field Operations is responsible for follow-up actions to be conducted by DFCS staff. The Director of Licensure is responsible for corrective actions to be conducted by resource home or facility staff as appropriate.

In addition, any situation of imminent risk noted by MIC Reviewers will be reported to local DFCS staff, if it is a matter which requires a faster response than normal procedure described above.

MIC Reviews will be completed on investigations completed each month, within 30 days of the completion of the investigation. DFCS staff and facility staff must initiate corrective actions involving the safety of the child within 5 days of the notification from the EMU of the need for corrective actions. If the corrective actions related to safety have not been initiated within this time period, the EMU shall notify the ASWS, RD, and Director of Field Operations With regard to remedial actions regarding case practice issues, the EMU shall notify the ASWS, RD, and Director of Field Operations when such remedial actions have not been initiated within 20 working days of identification of the need for such actions or timely completed.

## _Complaints_

The CQI Complaints staff will be located in the SRU and is responsible for processing personnel, protection and placement complaints for the Division. Processing complaints involves daily phone/public contact with family members, concerned citizens, and public officials. Once a complaint is received, the case is researched in MACWIS. The investigations and case records are reviewed and the complaint form is submitted to the RD. The RD is allowed three (3) business days to review the complaint and have the county staff respond to the CQI Complaints staff. The RD, or his/her designee, then contacts the complainant to address the concerns. Once this contact is made, the CQI Complaints staff follows up with the complainant to ensure that his/her concerns have been addressed and resolved.

DHS
296057

The CQI Complaints staff also handles complaints/inquiries from state officials regarding their constituents. Once these requests are received, the case is reviewed in MACWIS. A summary is written and provided to the MDHS Executive Director's office. In most instances, the complainant will receive a written response from the Director.

Additionally, the CQI Complaints staff receives referrals from the intake staff. Each complainant is contacted and their problems are either resolved or referred to the appropriate RD for assistance.

In 2013 DFCS will explore moving the Complaints process from the oversight of the EMU due to the Complaints staff providing a service and not conducting duties that evaluate or monitor programs.

**Supervisory Administrative Review (SAR)**

There is currently a Supervisory Administrative Review (SAR) process which supervisors use to review their workers' cases. However, the process is used differently by the different supervisors and, additionally, the Division's ability to draw information in the aggregate from the SAR in MACWIS is seriously limited.

The process and requirements for supervisors using the SAR protocol and for collecting data from the SARs need strengthening. Rather than modifying MACWIS to capture reports from the SARs pending the development of a new information system, interim measures for tracking case documentation will be developed using current review processes (e.g., FCR, EMU). These processes will be developed and implemented by the end of Implementation Period 3.

20

## Section II
## Current Status and Plans for CQI Functions

The primary goals and plans for further developing the CQI process are grouped into the following categories:

- Building a case review process;

- Building data reporting capacity;

- Building CQI monitoring and reporting capacity.

- Ensuring a trained, qualified CQI workforce; and

- Supporting local CQI processes.

The sections below provide information on the current status and capacity within each of these categories, along with a schedule of activities planned for each area in 2012. For ongoing annual updates to this CQI Plan, State Office CQI Unit will provide current information on the status and capacity within each area and will report on progress in carrying out the activities identified, as well as making any needed revisions to the activities planned for the next year.

## *Building a Case Review Process*

### Current Status and Capacity

#### *EMU Case Reviews*

As of November 2011, the EMU has conducted baseline EMU reviews in 8 of the state's 13 child welfare regions. In June 2010, the first EMU baseline reviews were successfully completed in Regions I-South and II-West as part of the planned roll-out of the state's Practice Model. 24 cases (10 in-home and 14 foster care) were reviewed in each region to provide insight into the Division's current practice within each component of the Practice Model. These reviews included direct service staff from within each region and the neighboring regions as well as State Office staff and staff from the Court Monitor approved consultant, CSF. The process included a review of the electronic case record, paper case record, and interviews with the case members (parents, children, resource parents, caseworkers). Stakeholders from the courts, service providers, caseworkers and supervisors, resource parents, and members of the RIT were surveyed with regard to systemic issues that affect practice and service delivery.

The EMU also conducted baseline EMU reviews in Region V-West in December 2010, Region IV-North in January 2011, Region I-North in May 2011, Region 4-South in July 2011, Region 3-South in August 2011, and Region VII-East in November 2011. An annual follow-up review was conducted in Region 1-South and Region 2-West in June 2011 and in Region 5-West in December 2011. As of this writing, aside from Region 7-East baseline review in November and

the 5-West follow-up review in December, final reports have been completed for all of these regions and distributed to the appropriate RDs and senior management staff.

The EMU has developed a schedule for conducting baseline reviews and follow-up reviews in the remaining regions in conjunction with the rollout of the Practice Model. All regions are scheduled to have a baseline review by the end of SFY 2013. Annual follow up reviews will take place on an ongoing basis.

An automated version of the EMU Case Review Instrument has been developed and user acceptance testing was completed during April 2011. The automated instrument was used for a select number of cases during the Region I-North baseline review in May 2011 and was used to complete all case reviews during the Region I-South annual follow up review in June 2011. The automated instrument will be fully integrated in all future reviews.

*FCR Case Reviews*

The Foster Care Review Unit has utilized the Periodic Administrative Determination (PAD) as the case review instrument since 2005. Every child in foster care 5 months or longer is reviewed with this instrument every 5 months. A comprehensive review of the MACWIS case record as well as the paper case file is completed with each review. Additionally, a County Conference is conducted in which the social worker, the ASWS, the parents, the resource parents, the foster child, the guardian ad litem, grandparents, and any other relevant case members are engaged to provide information related to the child's permanent and concurrent plan.

The Attorney General's Office submits a report of children who have been referred for termination of parental rights. The Permanency Unit submits a report of the children needing an adoptive placement. These reports provide evidence to support the case review findings.

The resulting report from these reviews is forwarded to the county of responsibility and the RD, within 15 days of the review, for their follow-up. Part B of the Youth Court Hearing and Review Summary is completed by the Reviewer in MACWIS to document the comments made during the County Conference and to assist in making findings on the mandated determinations of compliance with case planning, conduciveness/ appropriateness/ restrictiveness of the child's placement, progress toward alleviating the causes that led to custody, and continuing need for custody, as well as appropriateness of the child's permanency plan.

The FCRU, in collaboration with the MACWIS and MIS Units, is in the process of automating the PAD in MACWIS. This automation will allow the findings from the review to be stored directly in the electronic case file and will enhance the counties' and regions' ability to follow up on case review findings.

**Plans for 2012 and Beyond**

During 2012, the State Office CQI Unit will focus on completing EMU baseline reviews in regions that are beginning the rollout of the Practice Model and on conducting follow-up EMU

22

reviews in the regions that are completing the initial implementation year. The chart below identifies those regions and the schedule for the EMU reviews in 2012.

In addition, the Settlement Agreement Year 3 Implementation Plan requires that by the end of Year 3, DFCS develop the training, and processes required for staff to be able to:

1) review in-care maltreatment investigations to identify case practice deficiencies;

Note: This review process is to be fully implemented by the end of Y3.

2) identify necessary remedial actions necessary to ensure the safety of the child who is the subject of the investigation as well any other child in the home or placement;

3) identify any corrective action that is necessary to address deficiencies in case practice demonstrated by the investigation;

4) monitor initiation and completion of the remedial actions regarding individual child safety and notify the ASWS, RD, and Director of Field Operations when such remedial actions have not been initiated within 5 days of identification or timely completed; and,

5) monitor initiation and completion of the remedial actions regarding case practice and notify the ASWS, RD, and Director of Field Operations when such remedial actions have not been are initiated within 20 days of identification or timely completed.

The State Office CQI Unit has identified the following goals and activities for the coming year:

| Activity | Person or Unit Responsible | Date Due |
|---|---|---|
| Prepare for and conduct baseline EMU reviews in the following regions:<br><br>• II-East<br>• III-North<br>• V-East<br>• VI<br>• VII-West | EMU | Feb. 1, 2013<br>Aug. 1, 2012<br>May 1, 2012<br>Dec. 1, 2012<br>Nov. 1, 2012 |

DHS
296061

| Activity | Person or Unit Responsible | Date Due |
|---|---|---|
| Prepare for and conduct follow-up EMU reviews in the following regions:<br>• IV-North<br>• I-North<br>• I-South<br>• II-West<br>• IV-South<br>• III-South<br>• V-West<br>• VII-East | EMU | Jan. 1, 2012<br>June 1, 2012<br>July 1, 2012<br>July 1, 2012<br>Sept. 1, 2012<br>Oct. 1, 2012<br>Mar. 1, 2013<br>April 1, 2013<br>June 1, 2013 |
| Develop process for completing reviews of investigations of reports of maltreatment of children in foster care, as follows:<br>• Determine process, sampling, schedule<br>• Develop review instrument<br>• Develop reporting, follow-up, and monitoring procedures<br>• Develop training for staff | Office of CQI | EOP3 (July 5, 2013) |
| Train CQI staff in conducting reviews of investigations of reports of maltreatment of children in foster care. | Office of CQI | EOP3 (July 5, 2013) |
| Fully implement the process of reviewing investigations of reports of maltreatment of children in foster care. | Office of CQI | EOP3 (July 5, 2013) |
| Develop automated FCR PAD in MACWIS. | MACWIS/MIS | Feb. 2012 |
| Complete User Acceptance Testing on automated FCR PAD | FCRU | Mar.2012 |
| Training of FCR staff on using the PAD | FCRU | Mar. 2012 |

## *Building Data Reporting Capacity*

### Current Status and Capacity

Building data reporting capacity to support the CQI processes and monitor the progress of DFCS in meeting its goals and objectives has been challenging. The structure of MACWIS requires detailed and time consuming programming for all new reports, and many previously existing

24

reports did not captured data in precisely the way that the indicators are defined in the Settlement Agreement.

At the same time that DFCS and MIS are developing new reports for CQI processes and making other system enhancements, MDHS, following state and federal guidance, contracted with Walter R. McDonald and Associates to perform an "alternatives analysis" for the current version of MACWIS. This analysis is required by the federal Administration for Children and Families ("ACF") prior to a state implementing a new or significantly upgraded system. The project began in April 2011 and will conclude in May 2012. At the conclusion of this alternatives analysis, major areas in need of upgrade or replacement will be identified along with possible solution options and an estimated cost of each option.

Despite these challenges, much progress has been made in producing needed reports. For example, during the Bridge Plan Period DFCS and MIS developed a number of new reports to assist in monitoring the Settlement Agreement and to support CQI processes. Those reports are listed in Appendix "E". DFCS has used the data in these reports in evaluating statewide and regional performance in the EMU reviews and in reporting progress to the Court Monitor.

Currently, DFCS is using only those reports that have undergone the validation process adopted by DFCS. In addition, the MACWIS Unit has continued to re-validate these reports on a 6-month schedule in order to review for ongoing accuracy and to update the report specifications and parameters, as needed. The schedule for re-validating existing reports is included in Appendix "F". CSF staff and other consultants performed the initial report validation activities with the exception of "User Acceptance Testing" which is performed by MACWIS staff. DFCS is moving gradually toward assuming ongoing responsibility for data report validation with the continued assistance of CSF staff.

Some of the reports used in the CQI process are, of necessity at this point, prepared through a combination of MACWIS data and manual compilation. These are the reports related to worker training before assuming caseload responsibilities and those related to caseworker and supervisor workloads.

In December 2010, a Data Dashboard was developed and posted for all DFCS employees on the Connections website. This website is designed by MACWIS staff to make DFCS information available for wide-spread distribution. The validated MACWIS reports produced during the Bridge Plan Period form the basis of the Data Dashboard. Data are presented in graph format for ease of observation and understanding and include definitions of terms specific to each report. The Data Dashboard data is updated quarterly. Validated report results are added as they are developed and validated.

**Plans for SFY 2012 and Beyond**

Among the most substantial CQI plans for 2012 is the development and validation of a new set of data indicators that DFCS will use to support CQI activities and to report on progress in implementing the Settlement Agreement. Appendix "G" provides a schedule of the reports to be developed during 2012.

The current report validation process has been conducted jointly by CSF and MACWIS staff, with the initial steps toward transferring that responsibility to MACWIS having begun with CSF conducting training of MACWIS staff and providing the procedures for the validation process. In 2012, CSF will develop more detailed procedures for MACWIS staff to use in validating the reports on an ongoing basis and will provide additional training to MACWIS staff in the validation process.

While the EMU Case Review Instrument has been automated, the reporting capacity to aggregate the findings is not yet fully developed but will be developed during 2012.

The MACWIS and FCR Units will also work on automating the PAD during 2012, in order to capture data in a way that can be reported accurately, and on training staff and implementing the new automated instrument.

The chart below provides the planned data reporting CQI activities to be achieved during 2012.

| Activity | Person or Unit Responsible | Date Due |
|---|---|---|
| Produce and validate new data reports identified in Appendix "G". | MACWIS | See attached schedule in Appendix "G" |
| Re-validate data reports developed during Bridge Plan Period in accordance with the attached schedule | MACWIS | See Appendix "F" |
| Provide detailed report validation procedures for MACWIS staff to follow in validating reports. | CSF | June 2012 |
| Update data dashboard quarterly, including new validated reports as they are developed in accordance with the attached schedule at Appendix "G" | MACWIS | Oct. 31, 2011 (for Sept. data)<br><br>Jan. 31, 2012 (for Dec. data)<br><br>Apr. 30, 2012 (for Mar. data)<br><br>Aug. 31, 2012 (for July data) |
| Generate automated reports from the EMU Case Review Instrument | EMU/MACWIS/ MIS | Sept. 30, 2012 |
| Develop data reporting capacity from the PAD | FCR/MACWIS/ MIS | Nov. 30, 2012 |
| Train FCR staff on the use of the automated PAD | FCR/MACWIS | Mar. 2012 |
| Begin producing reports based on the aggregated PAD data | MACWIS/MIS | Dec. 31, 2012 |

DHS
296064

## *Building CQI Monitoring and Reporting Capacity*

**Current Status and Capacity**

In addition to building data reporting capacity through the development of data reports from the MACWIS, the State Office CQI Unit has recognized the need to capture and report data in an automated way from the EMU and FCR case reviews. During the current year, work began on automating the EMU Case Review Instrument and the automated instrument has been used in some reviews to date. During 2012, DFCS will enhance the automated functions of the instrument to permit aggregate reporting of data from the EMU reviews. DFCS has also identified the need to capture a large number of essential data indicators from the ongoing case reviews of children in foster care conducted by the FCRU. In order to capture the FCR data accurately and efficiently, the FCRU began revising the PAD during the current year and the staff of MACWIS and MIS began the automation process. A copy of the PAD is included in Appendix "H". When fully automated, the PAD will provide the capacity to produce data reports from the FCR reviews on an ongoing basis. A number of FCR indicators have been identified for reporting on the progress of implementing the Settlement Agreement. When the automation of the PAD is complete and the reporting capacity in place, the FCR indicators will add to the array of indicators reported routinely through MACWIS and the EMU reviews.

In pursuing COA accreditation, DFCS is also developing a process for statewide reporting on CQI data and outcomes that goes beyond individual EMU or FCR reviews. The statewide reporting process, at this point, is envisioned as an annual report that will capture the year's information from MACWIS reports, EMU and FCR reviews. In the current year, in collaboration with CSF, a template for the first annual CQI report was developed and will be used in preparing the first annual report in 2012.

**Plans for SFY 2012 and Beyond**

Primary activities in 2012 related to this goal concern the further automation and reporting of EMU and FCR case review information, issuing the first annual CQI report, and developing additional monitoring capacity with the State Office CQI Unit.

During 2012, the State Office CQI Unit will develop the process for the review of incidents, accidents, and grievances. DFCS will develop a clear definition of the incidents and accidents that fall within the monitoring and reporting responsibility of CQI. For example, fatalities, near-fatalities, and serious injuries to children under the Division's care and responsibility will be included in this definition. Similar incidents regarding children for whom DFCS has an open service case or a recently closed case will also be included in the definition. All grievances received by DFCS from consumers and stakeholders will be included in the definition.

During 2012, the State Office CQI Unit will develop and implement procedures for reviewing investigations of maltreatment reports involving children in custody and will require additional CQI staff to complete the reviews and manage the accountability process in the regions.

During 2012, updates to the methods and tools used for FCR data collection will be completed in order to reflect the changes in practice and policy and to provide a reliable source of aggregate statewide and regional information on identified indicators. Quality assurance methods within FCR will be further refined and identified, a plan for internal staff training will be developed and implemented, and an accountability process will be put into place to notify staff of serious issues emerging from FCR reviews and for monitoring the Division's response to the issues. Plans have also been developed to ensure all FCR and EMU staff has Practice Model training by October 2011.

Through the development of reliable tracking methods, the FCRU will begin to provide data to different program areas specific to the services provided. Information related to permanency issues, court related concerns and safety issues will be shared with the specific programs and state level implementation teams that will address and monitor the trends. The FCR Director will maintain, monitor and track the data and the action taken from individual groups and units for overall CQI feedback and to assist with the development of statewide policy and procedures.

Specific activities for 2012 related to this goal are as follows:

| Activity | Person or Unit Responsible | Date Due |
|---|---|---|
| Complete enhancement of the automated EMU Case Review Instrument to include data reporting | EMU/MACWIS/MIS | Sept. 30, 2012 |
| Begin producing aggregate reports from the EMU reviews based on the automated data | EMU/MACWIS/MIS | Sept. 30, 2012 |
| Complete MACWIS revisions to permit data reporting capacity on the automated PAD, including developing an electronic data base with efficient and reliable reporting capability | MACWIS/MIS | Dec. 31, 2012 |
| Train FCR staff on use of automated PAD; | FCRU | Mar. 2012 |
| Begin producing aggregate reports based on PAD data | CQI | Dec. 31, 2012 |
| Develop and define a written protocol for corrective action of monthly county issues identified in the | FCRU | June 2012 |
| Continue to assess capability to have FCR findings entered into MYCIDS | Office of CQI | Assess Mar. 1 – Aug. 30, 2012 |
| Issue first statewide Annual CQI Report | EMU | 45 days after approval of MSA (Aug. 5, 2012) |

28

| Activity | Person or Unit Responsible | Date Due |
|---|---|---|
| Develop procedures for conducting CQI reviews of investigations of maltreatment reports involving children in custody, including:<br><br>a schedule of rolling out the reviews;<br><br>staffing the review process;<br><br>the tools needed for the reviews; and<br><br>follow-up and accountability processes where concerns are identified with regard to the child's safety or in investigatory or casework activities. | Office of CQI | Nov. 1, 2012 |
| Determine the number of staff needed, hire and train the additional CQI staff to implement the reviews of investigations. | Office of CQI | EOP3 (July 5, 2013) |
| Initiate the reviews of investigations. | Office of CQI | EOP3 (July 5, 2013) |
| State CQI Sub-team reports quarterly to State Implementation Team | Office of CQI | Beginning Aug. 2012 |
| Issue EMU review reports as follows: | | |
| • II-East (baseline) | EMU | Apr. 2, 2013 |
| • III-North (baseline) | EMU | Oct. 1, 2012 |
| • V-East (baseline) | EMU | Oct. 4, 2012 |
| • VI (baseline) | EMU | Jan. 30, 2013 |
| • VII-West (baseline) | EMU | Dec. 31, 2012 |
| • I-North (follow-up) | EMU | Oct. 4, 2012 |
| • I-South (follow-up) | EMU | Aug. 30, 2012 |
| • II-West (follow-up) | EMU | Aug. 30, 2012 |
| • IV-South (follow-up) | EMU | Oct. 31, 2012 |
| • III-South (follow-up) | EMU | Nov. 30, 2012 |

29

| Activity | Person or Unit Responsible | Date Due |
|---|---|---|
| • V-West (follow-up) | EMU | Apr. 30, 2013 |
| • V-East (follow-up) | EMU | May 31, 2013 |
| • VII-East (follow-up) | EMU | July 31, 2013 |

## Ensuring a trained, qualified CQI workforce

**Current Status and Capacity**

In terms of staffing the State Office CQI Unit, the current status is described in the CQI organizational chart above. More specifically the status is as follows:

- The EMU has grown during the past year from a single Unit Director to having 5 regional EMU Liaisons serving in Regions I-N (hired September 2011), I-S, II-W, IV-N, and IV-S (hired April 2011). The unit is actively recruiting liaisons in Regions III-S, V-W and VII-E. Two Program Administrator Senior positions were hired and assigned to the EMU on March 1, 2012.

- The FCRU is currently made up of a Division Director, a Program Manager, a Program Administrator, and 1 vacant Secretary Principal position (anticipated start date May 1, 2012). The program currently has 13 Foster Care Reviewers with 1 Reviewer vacancy.

- The MACWIS Unit has 16 staff members and 1 contract staff who assist in the development, testing, and validation of data reports to support CQI processes, and CSF continues to support MACWIS staff in these functions. Further, 4 new positions have been allocated to the MACWIS Unit to focus on the initial and recurring validation of data reports issued by MACWIS to support CQI functions, and to assist in the development and testing of new reports.

There is a need for a data analyst/report writer in the CQI Unit in order to provide the growing need for data and reporting within CQI sub-units. This will be particularly true as the capacity of the FCR and EMU units to gather automated data from their reviews increases. There is also a need for a staff person devoted to assisting in preparing reports and analysis of CQI reviews due to the time and complexity involved in analyzing information from multiple sources and providing the information to staff in ways that support program improvement efforts.

In terms of training, CQI overview training for all DFCS personnel was completed in all regions during SFY 2011. This training oriented staff with the CQI process as well as the components of the state's Practice Model. Further training was developed and provided in the following areas:

- A training process for EMU staff was developed in association with CSF and continues to be a work in progress. EMU staff is trained in the case review process, the QA of case reviews, debriefing of cases with county and regional staff, and completing of case review summary reports.

- In collaboration with MACWIS and CSF staff, data training was presented to all FCR and EMU staff during April 2011. The training provided an overview of the MACWIS data indicators and reports used in the State Office CQI Unit, the Settlement Agreement standards, and the Division's recent performance in meeting those standards, user guide information on how each data report is compiled within MACWIS, and how staff should utilize this information for the purpose of improvement efforts.

**Plans for SFY 2012 and Beyond**

Activities related to this goal in 2012 will focus on completing the staffing plan for the EMU and adding the additional capacity needed in MACWIS and the State Office CQI Unit as a whole, and ensuring that all CQI staff has the initial set of skills and information needed to carry out CQI activities. Also the Year 3 Implementation Plan requires that DFCS conduct training for all RDs and staff above the classification of Bureau Director II in the use of data in management activities. DFCS will also address this requirement in 2012.

Specific activities planned for 2012 are as follows:

| Activity | Person or Unit Responsible | Date Due |
|---|---|---|
| Hire the following EMU staff: | EMU Director | |
| EMU liaison for Region III-South | | Dec. 1, 2012* |
| EMU liaison for Region V-East | | Dec. 1, 2012* |
| EMU liaison for Region III-North | | Dec. 1, 2012* |
| EMU liaison for Region II-East | | Dec. 1, 2012* |
| EMU liaison for Region VI | | Dec. 1, 2012* |
| EMU liaison for Region VII-East | | Dec. 1, 2012* |
| EMU liaison for Region VII-West | | Dec. 1, 2012* |
| | | Dec. 1, 2012* |
| CQI Data Analyst/Report Writer | CQI Director | Sept. 30, 2012 |
| CQI Assistant Analyst | | Sept. 30, 2012 |
| Hire the additional MACWIS staff to be allocated to data report validation | MACWIS Director | July 31, 2012 |

31

| Activity | Person or Unit Responsible | Date Due |
|---|---|---|
| Hire a Program Administrator Sr. for the EMU | CQI Director | 30 days after approval of MSA (Aug. 5, 2012) |
| Provide training to new MACWIS staff on data report validation procedures | CSF/MACWIS | Aug. 2012 |
| Develop CQI training content for new hires to be used at the time of orientation to the agency | Office of CQI/Training Unit | Sept. 30, 2012 |
| Conduct second round of data training for all EMU and FCR staff | CSF/Office of CQI | July 1, 2012 |
| Make referral to the National Child Welfare Resource Center on Data and Technology to provide training to DFCS supervisors, administrators, and RDs on the use of data in management. | Office of CQI | Jan. 2012 |
| Provide training to DFCS supervisors, administrators, and RDs on the use of data in management. | Office of CQI | Aug. 5, 2012 |
| Hire all CQI staff required by plan | Office of CQI | EOP3 (July 5, 2013) |

\* 3 of these EMU liaisons will be hired by 45 days following approval of the MSA (or by August 20, 2012). The regions they serve will be dependent upon where qualified staff can be located.

## *Supporting Local CQI Processes*

**Current Status and Capacity**

As part of the SIT structure, Regional CQI Sub-Teams have been formed in Regions I-South, II-W, IV-N, IV-S, and I-N.  These teams report to the RITs. EMU and FCR liaisons assist in facilitating the regional teams. Plans are underway to form teams in Regions V-W, III-S, VII-E, V-E and III-N. Regional EMU Liaisons and FCR Reviewers will help to facilitate these teams as they are convened. During 2012, a more formal format will be developed so that CQI Sub-Team meetings are held more consistently at prescribed dates and times in order to allow for better planning and presentation.

In an effort to integrate CQI activities into the ongoing work within counties and regions and avoid EMU case reviews occurring during baseline and follow-up CQI reviews, EMU staff is currently reviewing 2 cases monthly using the EMU Case Review Instrument in the regions in which there are Regional EMU Liaisons.  The cases are selected randomly and the Regional EMU Liaison reviews the case in collaboration with another member of the Regional CQI Sub-

Team (in Regions I-South and II-West). The Regional EMU Liaison then provides verbal feedback to workers and supervisors on the cases reviewed in the form of a debriefing. A summary of findings report results from the case review which is discussed during the debriefing. The report contains a summary of the strengths and areas needing improvement that were found during the course of the case review and interviews with case participants. The reports also contain comments and suggestions by the review team as well as space for the county of responsibility to address what its plan is for improving upon areas of the case that did not rate as strength. This document is signed by the case review team, the caseworker, the supervisor, and the RD.

During 2011, the State Office CQI Unit took a significant step toward helping managers and staff at the county/regional levels to use CQI findings and data in developing and carrying out plans to implement the Practice Model and the requirements of the Settlement Agreement through the initiation of the Data-to-Action meetings described earlier. During 2011, CQI staff conducted Data-to-Action meetings in Regions 1-South and 2-West. In 2012 following the baseline reviews conducted. So far in 2012 Data-to-Action meetings have occurred following the baseline reviews in Regions 4-North, 4-South, 3-South, 7-East, and 1-North. Plans are underway to conduct Data-to-Action meetings in 5-East and 5-West.

In the regions where the Data-to-Action meetings occurred, the regions used the information to either construct their original Practice Model implementation plans or to modify existing plans.

**Plans for SFY 2012 and Beyond**

During 2012, EMU staff will convene Regional CQI Sub-Teams in Regions V-W, III-S, VII-E, V-E and III-N. As the Regional EMU Liaisons are hired for those regions, they will also begin the monthly case review and debriefing process. EMU staff will also engage the Regional CQI Sub-Teams more specifically in the case review and debriefing process and plans to develop an agenda template for Regional CQI Sub-Team meetings that will include debriefing cases reviewed monthly with the entire team instead of only with the relevant social worker and supervisor.

Training will also be provided to the Regional CQI Sub-Teams for the completion of case reviews and other CQI related activities that may fall under their responsibility.

The Year 3 Implementation Plan calls for meeting and reporting processes within the SIT structure and for the Regional CQI Sub-Teams to meet at least monthly and to report at least quarterly. There is a need to assist the Regional CQI Sub-Teams to develop the reporting process and capacity which is not currently in place.

Also, with the sub-teams being relatively new entities in the regions, support will be provided to RDs and Regional EMU Liaisons on how best to use the sub-teams to carry out essential CQI functions within the regions. In collaboration with CSF, DFCS will convene State Office managers, RDs, Regional ASWSs, CQI Liaisons, and Practice Model Coaches in early 2012 as part of the Practice Model rollout process. A portion of the meeting will focus on the use of teams at various levels within the SIT structure.

33

In helping ensure that children in custody, who are placed in therapeutic foster homes licensed by agencies other than DFCS, are actually in placements that are equipped to meet their needs and provide safe and appropriate care for them, the FCRU will implement a reporting process based on its review of those children by the end of Implementation Period 3. A set of questions in the revised FCR instrument that address the ability of the foster care provider to meet the children's needs will be used to provide information to the county/region. If concerns are identified regarding the care of the children reviewed, the FCR reviewer will advise the RD who will then be responsible for follow-up and implementing corrective actions as needed. The FCRU will track the implementation of corrective actions.

Finally, as a means of ensuring that CQI findings and data are actually used to craft plans for implementing the Practice Model and requirements of the Settlement Agreement, the State Office CQI Unit will conduct Data-to-Action meetings in the regions in which reports are issued following baseline and follow-up EMU reviews in 2012.

| Activity | Person or Unit Responsible | Date Due |
|---|---|---|
| Establish Regional CQI Sub-Teams in the following regions: | | |
| • I-North | EMU | 30 days after MSA approval (Aug. 5, 2012) |
| • I-South | EMU | 30 days after MSA approval (Aug. 5, 2012) |
| • II-West | EMU | 30 days after MSA approval (Aug. 5, 2012) |
| • III-South | EMU | 30 days after MSA approval (Aug. 5, 2012) |
| • IV-North | EMU | 30 days after MSA approval (Aug. 5, 2012) |
| • IV-South | EMU | 30 days after MSA approval (Aug. 5, 2012) |
| • V-East | EMU | 30 days after MSA approval (Aug. 5, 2012) |
| • V-West | EMU | 30 days after MSA approval (Aug. 5, 2012) |

DHS
296072

| Activity | Person or Unit Responsible | Date Due |
|---|---|---|
| • III-North | EMU | Oct. 1, 2012 |
| • VII-East | EMU | Oct. 1, 2012 |
| Develop reporting process for Regional CQI Sub-Teams | EMU | June 1, 2012 |
| Implement reporting process for Regional CQI Sub-Teams | EMU | Aug. 1, 2012 |
| Convene RDs, Regional ASWSs, CQI liaisons, and Practice Model Coaches and provide guidance on using teams to carry out CQI functions | CSF | Feb. 2012 |
| Develop and implement content in the FCR instrument for reviewing whether permanency plans contain all of the required elements | FCR/MACWIS | EPOP3 (July 5, 2013) |
| Convene Data-to-Action meetings in the following regions:<br><br>Region 1-North<br><br>Region 4-South<br><br>Region 3-South<br><br>Region 7-East<br><br>Region 4-North | Office of CQI | <br><br>Oct. 2011<br>Dec. 2011<br>Mar. 2012<br>Apr. 2012<br><br>July 2012 |

## Section III: Appendices

**Appendix A:** EMU Case Review Instrument

**Appendix B:** EMU Sampling Process

**Appendix C:** Map of Data Indicators to EMU Reviews

**Appendix D:** Data Report Validation Process

**Appendix E:** MACWIS Reports Produced during Bridge Plan

**Appendix F:** Data Report Re-validation Schedule

**Appendix G:** Data Reports scheduled for development in 2012

**Appendix H:** Periodic Administrative Determination ("PAD")

**Appendix I:** EMU Procedures Manual

## Appendix A:  EMU Case Review Instrument

### Evaluation and Monitoring
#### ONSITE REVIEW INSTRUMENT
##### Face Sheet

| Name of county and region: | | Case name: | Period under review: |
|---|---|---|---|
| Reviewer(s): | | Date case reviewed: | |

| Target Child (Check only for Foster Care Cases) | Child(ren)'s name(s): | Race and/or Ethnicity: | Date(s) of birth (MM/DD/YY): | Gender: |
|---|---|---|---|---|
| ☐ | | | | |
| ☐ | | | | |
| ☐ | | | | |
| ☐ | | | | |
| ☐ | | | | |
| ☐ | | | | |

Type of case reviewed:
☐ Foster Care Case      ☐ In-home Services Case

Was this case opened for reasons other than child abuse and neglect? (i.e. CHINS)          Yes ☐   No ☐

Date of most recent case opening for all cases (MM/DD/YY): _____

Date of the child's most recent entry into foster care (MM/DD/YY):  _____      Not Applicable ☐

Date of discharge from foster care for the most recent foster care episode (MM/DD/YY): _____
     Not Applicable ☐       Not Yet Discharged ☐

Date of case closure (for all cases) (MM/DD/YY): _____

     Case not closed by time of review ☐

Reason the agency is working with the family (initial and evolving): (Check all that apply BUT place an asterisk '*' next to the PRIMARY reason):

| | | | |
|---|---|---|---|
| ☐ Abandonment | ☐ Alcohol Abuse-Child | ☐ Alcohol Abuse-Parent | ☐ Caretaker Inability to Cope |
| ☐ Child's behavior problem | | ☐ Child Disability | ☐ Court Directed |
| ☐ Death of Parent(s) | ☐ Drug Abuse-Child | ☐ Drug Abuse-Parent | ☐ Domestic violence in child's home |
| ☐ Emotional abuse | ☐ Exploitation | ☐ Inadequate Family Support | ☐ Inadequate Food Supply |
| ☐ Physical abuse | ☐ Inadequate Housing | ☐ Medical Neglect | ☐ Relinquishment |
| ☐ Incarceration of Parent | ☐ Lack of Child Care | ☐ Neglect (Does not include medical neglect) | |
| ☐ Sexual abuse | ☐ Runaway | ☐ School Dropout | ☐ Truancy |
| ☐ Unemployment | ☐ Inadequate Income | ☐ Other (specify): | |

| Persons Interviewed by the Reviewers (list below) | | | |
|---|---|---|---|
| Date of Interview | Name of Case Participant | Relationship in Case | Type of Interview |
| | | | ☐ In-Person   ☐ Phone |
| | | | ☐ In-Person   ☐ Phone |
| | | | ☐ In-Person   ☐ Phone |
| | | | ☐ In-Person   ☐ Phone |
| | | | ☐ In-Person   ☐ Phone |

EMU Review Instrument.revised 01132012Cover Sheet

DHS
296075

**ITEM 1: Timeliness of Initiating Investigations of Reports of Child Maltreatment**

| | | Number |
|---|---|---|
| 1 | How many reports of suspected abuse or neglect have been received on any child(ren) in the family (including those that were screened out by the agency) during the life of the case? | |
| 2 | How many accepted reports alleging abuse or neglect were received on any child(ren) in the family during the **period under review** (i.e., they were not screened out)? | |

| | ReportDate | First Name of Child | Allegation | Priority Level (if Applicable) | Date Assigned for an Investigation | Date Investigation Initiated | Date of Face-to-Face Contact With Child | Relationship of Alleged Perpetrator to Child | Disposition |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

| | | Number |
|---|---|---|
| 3 | In how many of the reports listed above was the investigation NOT initiated in accordance with the MDHS timeframes and requirements for a report of that priority? | |
| 4 | In how many of the reports listed above was face-to-face contact with the child(ren) who is the subject of the report NOT made in accordance with the State's timeframes and requirements for a report of that priority? | |

| | | | | |
|---|---|---|---|---|
| 5 | For all reports identified above, were the reasons for the delays due to circumstances beyond the control of the agency? | Yes | No | NA |
| 6 | Identify any reasons why a response was not initiated within established timeframes or face to face contact was not made (if applicable and reason is available): | | | |
| Rating | Section 1 is rated:_____. Please elaborate on any findings: | | | |

**ITEM 2: Repeat Maltreatment**

| | | | | |
|---|---|---|---|---|
| 7 | Was there at least one evidenced maltreatment report involving any child in the family during the period under review? | Yes | No | NA |
| 8 | If Yes to #7, within a 6-month period before or after any maltreatment report identified was there at least one additional evidenced maltreatment report involving any child in the family? | Yes | No | NA |
| 9 | If Yes to #8, did the report(s) identified above involve the same or similar circumstances? | Yes | No | NA |
| 10 | If Yes to #8, did any of the reports involve maltreatment of the child by the foster parents, members of the foster parents' family, other children in the foster home or facility, or facility staff members? | Yes | No | NA |
| 11 | If there was maltreatment recurrence, document the circumstances related to maltreatment incidents including information related to the perpetrators, and indicate why the reviewers determined that the two incidents did or did not involve the same circumstances. Also indicate the dates of all maltreatment reports occuring within the 6-month period: | | | |
| 12 | Describe the circumstances related to any evidenced reports of maltreatment (if relevant) involving the foster parents, members of the foster parents' family, other children in the foster home or facility, or facility staff members: | | | |
| 13 | For cases where repeat maltreatment did occur, identify interventions and actions, or absence of interventions and actions, taken by the caseworker and ASWS to try and prevent maltreatment of the child(ren): | | | |
| Rating | Section 2 is rated:_____. Please elaborate on any findings: | | | |

**ITEM 3: Services to Family to Protect Child(ren) in the Home and Prevent Removal or Re-Entry into Foster Care**

| | | | | |
|---|---|---|---|---|
| 14 | For the period under review, did the agency make concerted efforts to provide or arrange for appropriate services for the family to protect children and prevent their entry into foster care or re-entry into foster care after a reunification? | Yes | No | NA |
| 15 | If, during the period under review, any child was removed from the home without providing or arranging for services, was this action necessary to ensure the child's safety? | Yes | No | NA |

EMU Review Instrument.revised 01132012Assuring Safety

38

DHS
296076

| 16 | Please identify the circumstances that indicate a safety risk to the child and the services that were needed by the family to address safety issues and describe how those services were or were not provided by the agency during the period under review: |
|---|---|
| 17 | Please note the reason for removing the child from the home during the period under review without providing services (if relevant and reason is available) and provide the reviewers' reasons for determining whether the reason was appropriate or inappropriate: |
| Rating | Section 3 is rated:_____. Please elaborate on any findings: |

## ITEM 4: Risk Assessment and Safety Management

| | | | | |
|---|---|---|---|---|
| 18 | If the case was opened during the period under review, did the agency conduct an initial assessment of the risk to the target child in foster care and/or any child(ren) in the family remaining in the home? | Yes | No | NA |
| 19 | During the period under review, did the agency conduct ongoing assessments of the risk to the target child in foster care and/or any child(ren) in the family remaining in the home? | Yes | No | NA |
| 20 | If the case was opened during the period under review for either foster care or in-home services, did the agency: (1) conduct an initial assessment of the safety of the target child in foster care and/or any child(ren) remaining in the home, and (2) develop a safety plan with the family for addressing identified safety issues? | Yes | No | NA |
| 21 | During the period under review, did the agency: (1) conduct ongoing safety assessments of the target child in foster care and/or any child(ren) remaining in the home, and (2) continually monitor and update the safety plan, including encouraging family engagement in services designed to promote achievement of the goals of the safety plan? | Yes | No | NA |
| 22 | During the period under review, were there safety concerns pertaining to the target child in foster care or any child(ren) in the family remaining in the home that were not adequately or appropriately addressed by the agency? | Yes | No | NA |
| 23 | During the period under review, was there a safety concern related to the target child in foster care during visitation by parents or other family members that could be attributed to not providing sufficient monitoring of visitation, permitting unsupervised visitation when it was not appropriate, or court-ordered visitation against agency recommendations? | Yes | No | NA |
| 24 | During the period under review, was there a concern for the target child's safety related to the foster parents, members of the foster parents' family, other children in the foster home or facility, or facility staff members that was not adequately or appropriately addressed by the agency? (Foster parents include pre-adoptive parents | Yes | No | NA |
| 25 | During the period under review, if the target child was discharged from foster care to be reunited with parents or relatives or returned home on a trial home visit, did the agency conduct a thorough safety assessment? | Yes | No | NA |

39

| 26 | Describe the circumstances of the case that indicate risk concerns related to the child(ren): |
| 27 | Describe the circumstances of the case that indicate safety concerns related to the child(ren): |
| 28 | Describe the characteristics of the risk assessment(s) and safety assessment(s) (was one conducted, how was it conducted, when it was conducted, how comprehensive was it, what did it include or not include), including their timing: |
| 29 | If applicable, describe the nature of the safety concerns related to the child(ren) during visitation, including a description of the visitation (for example, was it unsupervised, and if so, was this appropriate?): |
| 30 | If applicable, describe the nature of the safety concerns related to the child(ren) from foster care providers and MDHS's activities with regard to addressing safety. |
| 31 | Identify the activities undertaken to monitor participation in safety-related services (or the absence of activities to monitor service participation): |
| 32 | Was there a report evidenced that the foster care provider(s) maltreated the child during the period under review? If Yes, describe the circumstances of that report, whether the agency might have prevented the maltreatment, and the agency's response: |
| Ratng | Section 4 is rated:_____. Please elaborate on any findings: |

*Assessing Strengths and Needs*

| ITEM 5. Needs and Services of Child, Parents, and Foster Parents | | | | | |
|---|---|---|---|---|---|
| | 33 | During the period under review, did the agency conduct (1) a formal or informal initial comprehensive assessment of the child(ren)'s strengths and needs (if the case was opened during the period under review), or (2) an ongoing assessment to provide updated information regarding the **child(ren)'s** needs for case planning purposes (if the case was opened before the period under review)? | Yes | No | NA |
| | 34 | If Yes to #33, **and** the case was opened during PUR, was the initial children's strengths and needs assessment conducted within the first 30 days? | Yes | No | NA |
| | 35 | During the period under review, were all needed services provided to meet the child's identified needs? | Yes | No | NA |
| | 36 | Were all services provided to children in a timely manner? | Yes | No | NA |
| | 37 | Was the child interviewed prior to the completion of the strengths and needs assessment? | Yes | No | NA |
| | 38 | Is there clear evidence, other than signatures, of child involvement and input in the strengths and needs assessment? | Yes | No | NA |
| | 39 | Document the method that the agency used to assess the child's needs: | | | |
| | 40 | Document the services provided to the child(ren): | | | |
| | 41 | Document the services that were needed but not provided: | | | |
| | 42 | During the period under review, did the agency conduct (1) a formal or informal initial comprehensive assessment of the mother's strengths and needs (if the case was opened during the period under review) or (2) an ongoing assessment to provide updated information regarding the **mother's** needs for case planning purposes (if the case was opened before the period under review)? | Yes | No | NA |
| | 43 | If Yes to #42, **and** the case was opened during PUR, was the initial strengths and needs assessment of the mother conducted within the first 30 days? | Yes | No | NA |
| | 44 | Were all services provided to mother in a timely manner? | Yes | No | NA |
| | 45 | Was mother interviewed prior to the completion of the strengths and needs assessment? | Yes | No | NA |
| | 46 | Is there clear evidence, other than signatures, of mother involvement and input in the strengths and needs assessment? | Yes | No | NA |
| Section B (#42-58) | 47 | During the period under review, did the agency provide all needed services to the mother to meet identified and assessed needs (with respect to services the mother needs in order to provide appropriate care and supervision to ensure the safety and well-being of her children)? | Yes | No | NA |
| | 48 | During the period under review, did the agency conduct (1) a formal or informal initial comprehensive assessment of the **father's** strengths and needs (if the case was opened during the period under review) or (2) an ongoing assessment to provide updated information regarding the father's needs for case planning purposes (if the case was opened before the period under review)? | Yes | No | NA |
| | 49 | If Yes to #48, and the case was opened during PUR, was the initial strengths and needs assessment of the father conducted within the first 30 days? | Yes | No | NA |
| | 50 | During the period under review, did the agency provide all needed services to the father to address identified and assessed needs (with respect to services the father needs in order to provide appropriate care and supervision to ensure the safety and well-being of his children)? | Yes | No | NA |

EMU Review Instrument.revised 01132012Strengths and Needs

| | | | | | |
|---|---|---|---|---|---|
| | 51 | Were all services provided to father in a timely manner? | Yes | No | NA |
| | 52 | Was father interviewed prior to the completion of the strengths and needs assessment? | Yes | No | NA |
| | 53 | Is there clear evidence, other than signatures, of father's involvement and input in the strengths and needs assessment? | Yes | No | NA |
| Section B (Continued) | 54 | Please indicate any reason why a needs assessment did not need to be completed on either the mother or father: | | | |
| | 55 | Document the services that were provided to the mother: | | | |
| | 56 | Document the services that the mother needed, based on an assessment, but that were not provided: | | | |
| | 57 | Document the services provided to the father: | | | |
| | 58 | Document the services that the father needed, based on an assessment, but that were not provided: | | | |

| | | | | | |
|---|---|---|---|---|---|
| | 59 | During the period under review, did the agency conduct an assessment of the needs of the **foster or pre-adoptive parents** on an ongoing basis (with respect to services they need in order to provide appropriate care and supervision to ensure the safety and well-being of the children in their care)? | Yes | No | NA |
| | 60 | During the period under review, were the foster or pre-adoptive parents provided with all needed services to address identified needs that pertained to their capacity to provide appropriate care and supervision and ensure the safety and well-being of the children in their care? | Yes | No | NA |
| Section C (#59-63) | 61 | Were all services provided to the foster/pre-adoptive family in a timely manner? | Yes | No | NA |
| | 62 | Document the services provided to the foster parent(s): | | | |
| | 63 | Document the services that the foster parent(s) needed, based on an assessment, but that were not provided: | | | |
| Rating | | Section 5 (overall) is rated:_____. Please elaborate on any findings: | | | |

EMU Review Instrument.revised 01132012Strengths and Needs

DHS
296080

## ITEM 6.  Educational Needs of the Child

| | | | | |
|---|---|---|---|---|
| 64 | During the period under review, did the agency make concerted efforts to assess and address the child(ren)'s educational needs? | Yes | No | NA |
| 65 | If case **opened** during PUR, were the child's educational needs assessed within 30 days of entry into foster care? | Yes | No | NA |
| 66 | If case **opened** during PUR, and the child is **3 years of age or younger**, did (s)he receive a developmental assessment within 30 days of foster care entry? | Yes | No | NA |
| 67 | If not explained in the "reason for rating" section, document the process used for educational assessment, if relevant: | | | |
| 68 | Document in the chart below the services provided or not provided to address the child's educational needs. Services would include advocacy on the part of foster parents as well as the caseworker; ensuring that the child received special education classes; making provisions for the child to receive tutoring or educational mentoring; or arranging for the child to be enrolled in early intervention preschool classes, such as Head Start: | | | |

| Educational Needs | Services Provided | Services Needed but Not Provided |
|---|---|---|
| | | |
| | | |
| | | |

| | | | | |
|---|---|---|---|---|
| 69 | If there are services that were not or are not being provided, document agency efforts, or lack of agency efforts, to provide those services: | | | |
| 70 | Was the child enrolled in an accredited school within 3 days of custody or placement change? | Yes | No | NA |
| Rating | Section 6 is rated:_____. Please elaborate on any findings: | | | |

*Involving Children and Families in Case Planning and Decision Making*

| ITEM 7. Child and Family Involvement in Case Planning | | | | |
|---|---|---|---|---|
| | During the period under review, did the agency make concerted efforts to actively involve the **child** in the case planning process? | Yes | No | NA |
| 72 | During the period under review, did the agency make concerted efforts to actively involve the **mother** in the case planning process? | Yes | No | NA |
| 73 | During the period under review, did the agency make concerted efforts to actively involve the **father** in the case planning process? | Yes | No | NA |
| 74 | Document the ways in which each party listed below was or was not involved in case planning (for example, identifying needs and services, establishing goals, evaluating progress, etc.) If the involvement of the child, mother, or father is determined by the reviewers to be Not Applicable, document the reasons for this determination (including any evidence of efforts to locate absent parents). | | | |
| | Child: | | | |
| | Mother: | | | |
| | Father: | | | |
| 75 | Is there evidence that the family was informed of and prepared to actively participate in case events, including the FTMs, case plan development, and court events? | Yes | No | NA |
| | Please explain your answer to #75: | | | |
| 76 | Is there evidence that child(ren) and/or parent(s) were involved in choosing services included on their case plan? | Yes | No | NA |
| 77 | Is there evidence of family involvement and input in the development of the case plan? | | | |
| | Mother | Yes | No | NA |
| 78 | Father | Yes | No | NA |
| 79 | Age-appropriate child/youth | Yes | No | NA |
| 80 | Were the service plans signed by the parents or guardians? | Yes | No | NA |
| 81 | Were the service plans signed by the child(ren), aged 6 and up? *(Does not apply to Prevention cases but does apply to appropriate Foster Care and Protection cases. Elaborate in the 'Rating' section below.)* | Yes | No | NA |
| 82 | Did the families attend the County Conferences during the period under review? *("Families" is the mother/father/primary caretaker/legal guardians, grandparents)* | Yes | No | NA |
| Rating | Section 7 is rated:_____. Please elaborate on any findings: | | | |

EMU Review Instrument.revised 01132012Involving

*Involving Children and Families in Case Planning and Decision Making*

| ITEM 8. Caseworker Visits with Child | | | | |
|---|---|---|---|---|
| 83 | During the period under review, was the frequency of the visits between the caseworker and the child(ren) sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals? | Yes | No | |
| 84 | During the period under review, what was the most typical pattern of visitation between the caseworker and the child(ren) in the case? (Select the box that describes the usual pattern of visitation.) | ☐ More than once a week<br>☐ Once a week<br>☐ Less than once a week, but at least twice a month<br>☐ Less than twice a month, but at least once a month<br>☐ Less than once a month<br>☐ Never | | |
| 85 | Did the caseworker visits occur at least 2 times per month for *foster care/placement cases*, with at least one visit occurring in the home, or at least 2 times per month for *in-home cases*? | Yes | No | NA |
| 86 | During the period under review, was the quality of the visits between the caseworker and the child(ren) sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals *(for example, did the visits between the caseworker and the child(ren) focus on issues pertinent to case planning, service delivery, and goal achievement)*? | Yes | No | |
| 87 | Please document barriers to more frequent visiting *(if relevant)* or explain why less frequent visitation was still appropriate, or not: | | | |
| 88 | Document examples of the caseworker visits with the child that contributed to high quality visits *(if relevant)* or why caseworker visits were not of high quality *(if relevant)*, as related to the response in question #86: | | | |
| Rating | Section 8 is rated:_____. Please elaborate on any findings: | | | |

| ITEM 9. Caseworker Visits with Parents | | | | |
|---|---|---|---|---|
| 89 | During the period under review, was the frequency of the visits between the caseworker and the <u>mother</u> sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals? | Yes | No | NA |
| 90 | During the period under review, what was the most typical pattern of visitation between the caseworker and the mother of the child(ren)? | ☐ More than once a week<br>☐ Once a week<br>☐ Less than once a week, but at least twice a month<br>☐ Less than twice a month, but at least once a month<br>☐ Less than once a month<br>☐ Not Applicable<br>☐ Never | | |
| 91 | During the period under review, was the frequency of the visits between the caseworker and the <u>father</u> sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals? | Yes | No | NA |

EMU Review Instrument.revised 01132012Involving

| 92 | During the period under review, what was the most typical pattern of visitation between the caseworker and the father of the child(ren): | ☐ More than once a week |
| | | ☐ Once a week |
| | | ☐ Less than once a week, but at least twice a month |
| | | ☐ Less than twice a month, but at least once a month |
| | | ☐ Less than once a month |
| | | ☐ Not Applicable |
| | | ☐ Never |

| 93 | During the period under review, was the quality of the visits between the caseworker and the **mother** sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals? | Yes | No | NA |
|---|---|---|---|---|
| 94 | During the period under review, was the quality of the visits between the caseworker and the **father** sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals? | Yes | No | NA |

| 95 | Please describe barriers to more frequent visiting with the mother (if relevant) and father (if relevant), and discuss (if relevant) why reviewer felt less frequent visitation was appropriate: |
|---|---|

| 96 | Describe the general quality of the caseworker visits with the mother and the father, and the issues that were or were not addressed during caseworker visits (if relevant): |
|---|---|

| 97 | If regular visitation is not occuring due to **mother** not being involved or found, are there documented diligent efforts to locate mother? | Yes | No | NA |
|---|---|---|---|---|
| 98 | If regular visitation is not occuring due to **father** not being involved or found, are there documented diligent efforts to locate father? | Yes | No | NA |

| Rating | Section 9 is rated:_____. Please elaborate on any findings: |
|---|---|

EMU Review Instrument.revised 01132012Involving

DHS
296084

*Individualizing Case Planning*

## ITEM 10. Permanency goal for child *(Does not apply to In-Home Cases)*

| | | Permanent | | Concurrent | |
|---|---|---|---|---|---|
| 99 | What is (are) the child's current permanency goal(s) (or if the case was closed during the period under review, what was the permanency goal before the case was closed)? | | | | |
| 100 | Is (are) the child's permanency goal(s) specified in the case file? *(Check 'N/A' for Prevention or Protection cases only)* | Yes | No | NA | |
| 101 | If the child **entered care during the PUR**, was a permanency plan developed within the childs first 30 days in care? | Yes | No | NA | |
| 102 | Were all of the permanency goals that were in effect during the period under review established in a timely manner? | Yes | No | N/A | |

| | Permanency Goal | Date Established | Time in Foster Care Before Goal | Date Goal Changed | Reason for Goal Change |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 103 | Were all permanency goals in effect during the period under review appropriate to the child's needs for permanency and to the circumstances of the case? | Yes | No | NA | |
| 104 | Please document the reasons the reviewers determined that the goals were not timely and/or appropriate (if relevant): | | | | |
| 105 | Has the child been in foster care at least 15 of the last 22 months? | Yes | No | | |
| 106 | If no to #105, does the child meet Adoption and Safe Families Act (ASFA) criteria for termination of parental rights (TPR)? | Yes | No | NA | |
| 107 | If yes to #105, did the agency file a TPR petition before the period under review or in a timely manner during the period under review? | Yes | No | NA | |
| 108 | If no TPR petition has been filed, and the child has been in state's custody for 15 of the most recent 22 months, is an "exception" or compelling reason for not filing for TPR documented in the case file? | Yes | No | NA | |
| 109 | If an exception has not been documented, do circumstances exist that would constitute a legal exception? | Yes | No | NA | |
| 110 | If the child has a goal of reunification, does the case record documentation reflecting active concurrent permanency planning? | Yes | No | NA | |
| 111 | If the child was discharged during PUR, was an aftercare plan developed prior to discharge? | Yes | No | NA | |
| Rating | Section 10 is rated:_____. Please elaborate on any findings: | | | | |

## ITEM 11. Case Planning

| | | | | |
|---|---|---|---|---|
| 112 | How many Family Team Meetings (FTM) have occurred during the PUR? | | | |
| 113 | How many FTMs have been attended by **both** the birth and resource parents during the PUR? | | | |
| 114 | Was a FTM used in the initial development of the case plan if the initial plan was developed during the PUR, **and/or** was the FTM used to update the case plans quarterly? | Yes | No | NA |
| 115 | Were there family team meetings within 30 calendar days of any placement or other significant change in the child's or family's circumstances? | Yes | No | NA |
| 116 | Were there documented discussions of concurrent planning with the birth parents? | Yes | No | NA |
| Rating | Section 11 is rated:_____. Please elaborate on any findings: | | | |

## ITEM 12. Foster Care Re-Entries *(Does not apply to In-Home Cases)*

| | | | | |
|---|---|---|---|---|
| 117 | Did any of the child's foster care entries <u>during the period under review</u> occur within 12 months of the child's discharge from a prior foster care episode? (Refer to instructions. If the child entered before the period under review, and did not discharge and re-enter, then this would all be N/A.) | Yes | No | NA |
| 118 | If the answer to #117 is 'Yes', was there evidence that concerted efforts were made to prevent re-entry? | Yes | No | NA |
| 119 | Date of child's first entry into foster care <u>during the period under review</u>: _____ | | | |
| 120 | Was this entry within 12 months of a previous discharge: | Yes | No | NA |
| 121 | Date of diacharge, if any, within 12 months of this entry:_____                Document the circumstances related to the re-entry within 12 months: | | | |
| 122 | If there are any additional entries into foster care after a discharge during the period under review, provide the above information for each of these entries: | | | |
| Rating | Section 12 is rated:_____. Please elaborate on any findings: | | | |

**EMU Review Instrument.revised 01132012Individualizing**

DHS
296086

48

*Mobilizing Services Timely*

| | **Item 13: Reunification, Guardianship, or Permanent Placement with Relatives** | | | | | |
|---|---|---|---|---|---|---|
| 123 | Does the child have (or, if discharged during the period under review and reunited, did they have) a goal | | | Yes | No | NA |
| 124 | What is/was the child's most recent permanency goal? | Reunification | Guardianship | Perm. Placement with Relatives | | |
| 125 | Are the agency and court making (or did they make) concerted efforts to achieve the goal (or these goals, if there are concurrent goals) in a timely manner during the PUR? | | | Yes | No | NA |
| 126 | Date of the child's most recent entry into foster care: | | | | | |
| 127 | Time in care (in months) at the time of the onsite review: | | | | | |
| 128 | Date of discharge from foster care: | | | | | |
| 129 | Document efforts made to achieve goal, including the appropriateness and effectiveness of the efforts, and, barriers to achieving the goal (for example, agency, court, or other factors that prevented or are preventing timely achievement of the goal): | | | | | |
| 130 | Please document any contributing factors to the case in both the circumstance of the goal of reunification, permanent placement with relatives, or guardianship was not achieved or is not likely to be achieved within 12 months, or if the permanency goal was achieved within 12 months: | | | | | |
| 131 | For children with a goal of reunification, have parental service plans identified those services DFCS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care? | | | Yes | No | NA |
| | **Did DCFS make those services identified available either through direct or referral service?** | | | | | |
| 132 | | | Mother? | Yes | No | NA |
| 133 | | | Father? | Yes | No | NA |
| 134 | If the child was discharged during PUR and was reunified, was there a 90 day trial home placement? | | | Yes | No | NA |
| Rating | Section 13 is rated:_____. Please elaborate on any findings: | | | | | |

| ITEM 14. Stability of Foster Care Placement *(Does not apply to In-Home Cases)* | | | | |
|---|---|---|---|---|
| 135 | How long has the child been in the current placement setting? | | | ____Months |
| 136 | How many placement settings did the child experience during the **period under review**? | | | **Number** |

| | Placement Date | Placement Type | Reason for Change in Placement |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| 137 | If there was more than 1 placement, were all placement changes during the **period under review** planned by the agency in an effort to achieve the child's case plan goals **or** made in an effort to meet the needs of the child? | Yes | No | NA |
|---|---|---|---|---|
| 138 | Is the child's current placement setting (or most recent placement if the child is no longer in foster care) stable? | Yes | No | |
| 139 | If applicable, indicate why the placement changes were or were not planned in an effort to achieve the child's case goals or to meet the needs of the child: | | | |
| 140 | If applicable, provide your reasons for determining that the child's current placement (or most recent placement if the child is no longer in foster care) is or is not stable: | | | |
| 141 | If the child has been assessed with special needs, is s(he) placed in a placement that can meet their therapeutic, educational and medical needs? | Yes | No | NA |
| 142 | Was the child placed in the least restrictive setting that meets his/her individual needs ? | Yes | No | NA |
| Rating | Section 14 is rated:_____. Please elaborate on any findings: | | | |

EMU Review Instrument.revised 01132012Mobilizing

## ITEM 15. Adoption *(Does not apply to In-Home Cases)*

| | | | | |
|---|---|---|---|---|
| 143 | Does the child have (or, if discharged during the period under review and adopted, did they have) a permanent plan of Adoption? | Yes | No | NA |
| 144 | Are the agency and court making (or did the agency and court make) concerted efforts to achieve the plan of Adoption in a timely manner? | Yes | No | |
| 145 | Date of the child's most recent entry into foster care (this should be the same date on the Face Sheet): | | | |
| 146 | Time in care (in months) at the time of the onsite review (this is the number of months that the child was in foster care from the date of the most recent entry into foster care to the beginning of the onsite review week or from the date of the most recent entry into foster care to the time of adoption finalization or discharge from foster care): | | | |
| 147 | Date of adoption finalization (if relevant) *(this is the date that the court legally established the adoption and transferred care and placement responsibilty or supervision from the State to the adoptive parent(s); this should be the same date on the Face Sheet; if the adoption has not been finalized, enter Not Applicable (NA))*: | | | |
| 148 | Please document efforts made to achieve the child's goal of adoption, including the appropriateness and effectiveness of the efforts, and barriers to achieving the goal of adoption (for example, agency- or court-related factors that prevented or are preventing achievement of the goal in a timely manner): | | | |
| 149 | Please document special circumstances in the case which are contributing to the child either likely to achieve the goal of adoption within 24 months or not: | | | |
| 150 | Does the child have an assigned adoption specialist and an adoption plan that identifies the child-specific activities that DFCS will undertake to achieve adoption, and receiving regular adoption status meetings consistent with plan requirements, and was that adoption specialist assigned within 10 days of the adoption goal change? *(Does not apply to children with Adoption as a CONCURRENT plan.)* | Yes | No | NA |
| 151 | Is there evidence that the resource family has been informed of available subsidies, including post-adoptive subsidies? | Yes | No | NA |
| 152 | If the child has been in care longer than 12 months, is there evidence that the resource parents have been engaged on discussions regarding adoption? | Yes | No | NA |
| Rating | Section 15 is rated:_____. Please elaborate on any findings: | | | |

EMU Review Instrument.revised 01132012Mobilizing

DHS
296089

51

**ITEM 16. Other planned permanent living arrangement** *(Does not apply to In-Home Cases)*

| 153 | Does the child have a goal of "other planned permanent living arrangement"? (See below in #154) | | Yes | No | NA |
|---|---|---|---|---|---|
| 154 | What is the child's other planned permanent living arrangement goal (check the goal that most closely reflects the one in the case file)? | ☐ Living Independently / Emancipation | | | |
| | | ☐ Long-term foster care | | | |
| | | ☐ Long-term foster care with kin | | | |
| | | ☐ Placement in a long-term care facility until transition to an adult care facility. | | | |
| | | ☐ Other (specify): | | | |
| 155 | For children aged <u>14-20</u> in the PUR, were concerted efforts made to provide the child with services to adequately prepare the child for independent living when the child leaves foster care, as set forth/included in the service plan? | | Yes | No | NA |
| 156 | Were concerted efforts made to achieve the goal of other planned permanent living arrangement in a timely manner by placing the child in a living arrangement that is "permanent," that is, the child will remain in the living arrangement until discharge from foster care? | | Yes | No | NA |
| 157 | Date of the child's most recent entry into foster care: | | | | |
| 158 | Time in care (in months) at the time of the onsite review: | | | | |
| 159 | Date of documentation regarding "permanency" of the child's living arrangements | | | | |
| 160 | Date of discharge from foster care | | | | |
| 161 | If the child is not in a living arrangement that can be considered permanent, were concerted efforts made during the period under review to achieve this type of living arrangement for the child? | | Yes | No | NA |
| 162 | Please document the efforts made to achieve the child's goal, including the appropriateness and effectiveness of the efforts, and barriers to achieving the goal: | | | | |
| 163 | Document the services provided, or not provided, to adequately prepare the child for independent living: | | | | |
| 164 | If the child is over 14 and involved with Independent Living Services (ILS), how long has s(he) consistently been attending ILS classes? | | | | |
| | Please explain your answer: | | | | |
| Rating | Section 16 is rated:_____. Please elaborate on any findings: | | | | |

## ITEM 17. Physical Health of the Child

| | | | | |
|---|---|---|---|---|
| 165 | In the last 12 month period, has the agency assessed the child's physical health care needs? | Yes | No | NA |
| 166 | If the child came into care during the PUR, did the child receive an initial screening within 72 hours? | Yes | No | NA |
| 167 | If the child came into care during the PUR, did the child receive a comprehensive health screening within 30 days of foster care entry? | Yes | No | NA |
| 168 | During the **period under review**, did the agency assess the child's dental health care needs? *(If age appropriate / 3 years of age or older)* | Yes | No | NA |
| 169 | During the PUR, did the child, if over 3, receive an initial dental examination within 90 days of entry into care or within 90 days of his/her 3rd birthday if occurring during stay in foster care? | Yes | No | NA |
| 170 | During the **period under review**, did the agency ensure that appropriate services were provided to the child to address all **identified physical health needs** on a timely basis? | Yes | No | NA |
| 171 | During the **period under review**, did the agency ensure that appropriate services were provided to the child to address all **identified dental health needs** within required timeframes? | Yes | No | NA |
| 172 | Did the child receive periodic, age-appropriate physical **and** dental health examinations to ensure ongoing assessment of needs? If not, document the reasons why the agency did not conduct this ongoing assessment: | | | |
| 173 | Based on the assessment of needs, if there are services that were not provided, document why the services were not provided (for example, lack of agency efforts to secure services, lack of service availability in the community, lack of transportation for foster parents to take child to appointments, etc.): | | | |
| Rating | Section 17 is rated:_____. Please elaborate on any findings: | | | |

EMU Review Instrument.revised 01132012Mobilizing

DHS
296091

53

## ITEM 18. Mental/Behavioral Health of the Child

| | | | | |
|---|---|---|---|---|
| 174 | During the PUR, did the child, age 4 and older, receive an initial mental health screening within 30 days of entry into care and/or within 30 days of the 4th birthday if occurring during stay in foster care? | Yes | No | NA |
| 175 | Did the agency conduct an assessment of the child(ren)'s mental/behavioral health needs on an ongoing basis or as follow-up based on indications to inform case planning decisions? | Yes | No | NA |
| 176 | During the period under review, did the agency provide appropriate services to address the child(ren)'s mental/behavioral health needs on a timely basis? | Yes | No | NA |
| 177 | Note whether or not there is evidence of a mental/behavioral health (including substance abuse) assessment. For example, (1) what type of needs assessment was conducted, and (2) what kind of information was in the case file or missing from the case file that is relevant to an assessment of mental/behavioral health needs? Indicate if a formal assessment was conducted, and, if so, note the diagnosis: | | | |
| 178 | If there are services that were not or are not being provided based on the assessment of needs, describe why the services were not provided (for example, lack of agency efforts to secure services, lack of service availability in the community, no transportation for foster parents to take child to appointments, parent's unwillingness to engage child in services, etc.). If the services were not available due to lack of availability, or reviewer notices other services not available in the community, please describe in detail: | | | |
| Rating | Section 18 is rated:_____. Please elaborate on any findings: | | | |

*Preserving and Maintaining Connections*

## ITEM 19. Proximity of Foster Care Placement *(Does not apply to In-Home Cases)*

| | | | | |
|---|---|---|---|---|
| | Was the child placed in the same county as (s)he was removed? | Yes | No | NA |
| 180 | Is the child's current or most recent placement close enough to his or her parents or other potential permanent caregiver to facilitate frequent face-to-face contact between the child and the parents while the child is (or was) in foster care? | Yes | No | NA |
| 181 | If No to #180, was the reason for the location of the child's current or most recent placement based on the child's needs and intended to ensure that the child's case plan goals are achieved? | Yes | No | NA |
| 182 | Describe the relationship between the child's current or most recent placement and the location of the parents or of a family member with whom the child is likely to be reunified (for example, the child will be reunified with a grandmother): | | | |
| 183 | If the reviewers determine that the child's placement is not sufficiently close to the parent(s) to facilitate frequent contact, document the reasons for this determination (and identify any reasons provided by the agency): | | | |
| 184 | Did the child remain in the same school (s)he attended prior to foster care placement? | Yes | No | NA |
| 185 | If no to #184, was this appropriate based on case circumstances? | Yes | No | NA |
| | If No to #184, please explain why: | | | |
| Rating | Section 19 is rated:_____. Please elaborate on any findings: | | | |

## ITEM 20. Placement with Siblings *(Does not apply to In-Home Cases)*

| | | | | |
|---|---|---|---|---|
| 186 | During the period under review, was the child placed with all siblings who also were in foster care? | Yes | No | NA |
| 187 | If No to #186, was there a valid reason for the child's separation from the siblings (for example, the separation was necessary to meet the needs of one of the siblings, to address safety concerns for one or more of the siblings, or to accommodate a large sibling group)? | Yes | No | NA |
| 188 | Reason for Separation of siblings (if applicable): | | | |
| Rating | Section 20 is rated:_____. Please elaborate on any findings: | | | |

**ITEM 21. Visiting with parents and siblings in foster care** *(Does not apply to In-Home Cases)*

| | | | | | |
|---|---|---|---|---|---|
| 189 | If the child entered care during the PUR, was an initial visitation plan developed in the first 30 days of the child's placement? | Yes | No | NA | |
| 190 | During the period under review, was the visitation plan updated as circumstances in the case warranted? (answer N/A if circumstances in the case DID NOT warrant the visitation plan being updated) | Yes | No | NA | |
| 191 | Does the visitation plan include all visitation (parents, siblings, connections, etc)? | Yes | No | NA | |
| 192 | During the period under review, were concerted efforts made to ensure that visitation (or other forms of contact if visitation was not possible) between the child and his or her <u>mother</u> was of sufficient frequency to maintain or promote the continuity of the relationship? | Yes | No | NA | |

| 193 | Check the box next to the statement that best describes the usual frequency of visits between the mother and the child: | ☐ More than once a week |
|---|---|---|
| | | ☐ Once a week |
| | | ☐ Less than once a week, but at least twice a month |
| | | ☐ Less than twice a month, but at least once a month |
| | | ☐ Less than once a month |
| | | ☐ Never |

| | | | | |
|---|---|---|---|---|
| 194 | During the period under review, were concerted efforts made to ensure that visitation (or other forms of contact if visitation was not possible) between the child and his or her <u>father</u> was of sufficient frequency to maintain or promote the continuity of the relationship? | Yes | No | NA |

| 195 | Check the box next to the statement that best describes the usual frequency of visits between the father and the child: | ☐ More than once a week |
|---|---|---|
| | | ☐ Once a week |
| | | ☐ Less than once a week, but at least twice a month |
| | | ☐ Less than twice a month, but at least once a month |
| | | ☐ Less than once a month |
| | | ☐ Never |

| | | | | |
|---|---|---|---|---|
| 196 | During the period under review, were concerted efforts made to ensure that the quality of visitation between the child and the <u>mother</u> was sufficient to maintain or promote the continuity of the relationship? | Yes | No | NA |
| 197 | During the period under review, were concerted efforts made to ensure that the quality of visitation between the child and the <u>father</u> was sufficient to maintain or promote the continuity of the relationship? | Yes | No | NA |
| 198 | During the period under review, were concerted efforts made to ensure that visitation (or other forms of contact if visitation was not possible) between the child and the <u>sibling(s)</u> was of sufficient frequency to maintain or promote the continuity of the relationship? | Yes | No | NA |

| 199 | Check the box next to the statement that best describes the usual frequency of visits between the siblings and the child: | ☐ More than once a week |
|---|---|---|
| | | ☐ Once a week |
| | | ☐ Less than once a week, but at least twice a month |
| | | ☐ Less than twice a month, but at least once a month |
| | | ☐ Less than once a month |
| | | ☐ Never |

EMU Review Instrument.revised 01132012Preserving

| 200 | During the period under review, were concerted efforts made to ensure that the quality of visitation between the child and his or her sibling(s) was sufficient to promote the continuity of their relationships? | Yes | No | NA |
|---|---|---|---|---|
| 201 | For each applicable relationship (Mother, Father, Sibling(s)), document concerted effrts or lack of efforts to promote frequent visitation. Also document any reasoning why a relationship is not applicable: | | | |
| 202 | If the child entered care during the PUR did the child have a visit with his/her parents within 24 hours of placement, or at a minimum a phone call with relatives within first 24 hours? | Yes | No | NA |
| Rating | Section 21 is rated:_____. Please elaborate on any findings: | | | |

### ITEM 22. Preserving Connections · *(Does not apply to In-Home Cases)*

| 203 | During the period under review, were concerted efforts made to maintain the child's important connections *(for example, neighborhood, community, faith, language, extended family members including siblings who are not in foster care, school, tribe, and/or friends)* ? | Yes | No | NA |
|---|---|---|---|---|
| 204 | Was a sufficient inquiry conducted with the parent, child, custodian, or other interested party to determine whether the child may be a member of, or eligible for membership in, an Indian tribe? | Yes | No | NA |
| 205 | If the child may be a member of, or eligible for membership in, an Indian tribe, during the period under review, was the tribe provided timely notification of its right to intervene in any State court proceedings seeking an involuntary foster care placement or termination of parental rights (TPR)? | Yes | No | NA |
| 206 | If the child is a member of, or eligible for membership in, an Indian tribe, was the child placed in foster care in accordance with the Indian Child Welfare Act (ICWA) placement preferences or were concerted efforts made to place the child in accordance with ICWA placement preferences? | Yes | No | NA |
| 207 | Document agency efforts or lack of efforts to help children maintain important connections when these are not being maintained through the placement itself: | | | |
| Rating | Section 22 is rated:_____. Please elaborate on any findings: | | | |

EMU Review Instrument.revised 01132012Preserving

DHS
296095

## ITEM 23. Relationship of Child in Care with Parents  *(Does not apply to In-Home Cases)*

| 208 | Did a meeting occur between the birth parents and resource parents within the first month of placement (if placement occurred during the PUR)? | Yes | No | NA |
|---|---|---|---|---|
| 209 | Is there evidence in the case record of shared parenting responsibilities between the birth and resource parents? | Yes | No | NA |
| 210 | If "No" to #209, explained in the "reason for rating" section, document efforts or lack of efforts to support or maintain a positive mother-child, and-or father-child relationship. *(The focus should be on activities such as the ones listed in the instructions, rather than on visitation)*. Foster parent activities may be considered equivalent to "agency" activities in responding to this question. | | | |
| | Please provide a basis for your response: | | | |
| Rating | Section 23 is rated:_____. Please elaborate on any findings: | | | |

## ITEM 24. Relative placement  (Does not apply to In-Home Cases)

| 211 | During the period under review, was the child's current or most recent placement with a relative? | Yes | No | |
|---|---|---|---|---|
| 212 | If Yes to #211, is (or was) this placement stable and appropriate to the child's needs? | Yes | No | NA |
| 213 | If No to #211, did the agency, during the period under review, make concerted efforts to identify, locate, and evaluate maternal relatives as potential placements for the child, with the result that maternal relatives were ruled out as, or were unwilling to be, placement resources? | Yes | No | NA |
| 214 | If No to #211, did the agency, during the period under review, make concerted efforts to identify, locate, and evaluate paternal relatives as potential placements for the child, with the result that paternal relatives were ruled out as, or were unwilling to be, placement resources? | Yes | No | NA |
| 215 | Document agency efforts or lack of efforts to locate and evaluate maternal relatives *(including reasons why relatives were not considered as placement resources, if relevant)* if appropriate, during the period under review: | | | |
| 216 | Document agency efforts or lack of efforts to locate and evaluate paternal relatives *(including reasons why relatives were not considered as placement resources, if relevant)* if appropriate, during the period under review: | | | |
| Rating | Section 24 is rated:_____. Please elaborate on any findings: | | | |

Appendix B:  EMU Sampling Process

## METHODOLOGY FOR OBTAINING BASELINE OR FOLLOW-UP SAMPLING OF CQI CASES

- Request Sample of Foster Care and In-Home cases from MIS through DFCS/MACWIS for specific time period with the criteria of cases having to be open for at least 60 days during the period under review

- Open Random.org and enter the number of children listed on the Foster Care universe of cases. Generate randomizer (Number — Sequence). Take the first 28 numbers on the generator and identify which child's name correlates with each number (in order) and this will be your foster care sampling. Verify that 1) none of these children are scheduled for a foster care review for the month (identified by report name MWCPCRMD — Pending Conference Review Report) and 2) that none of the identified children (or their siblings) have already been reviewed through a baseline, follow-up or monthly review.

- Complete the same process for In-Home to obtain 20 numbers generated by Random.org. Run the random generator again to obtain 20 cases for the In-Home sample of cases.

## METHODOLOGY FOR OBTAINING MONTHLY SAMPLING OF CQI CASES

- Pull the below reports for county under review for current month
  1. MWCURCUS — Foster Care
  2. MWBPREVD — In Home
  3. MWBPROTD — In Home

- Open Random.org and enter the number of children listed on the MWCURCUS report. Generate randomizer (Number — Sequence). Take the first three numbers on the generator and identify which child's name correlates with each number (in order) and this will be your foster care sampling. Verify that 1) none of these children are scheduled for a foster care review for the month (identified by report name MWCPCRMD — Pending Conference Review Report) and 2) that none of the identified children (or their siblings) have already been reviewed through a baseline, follow-up or monthly review.

- Protection and Prevention will each have three numbers generated by Random.org. Count all cases combined for the county. Run the random generator again to obtain 3 cases from the combined report.

## Appendix C:  Map of Data Indicators to EMU Reviews

(*Region Name* ) **Data Indicators**
**CQI Review Report**
Month/Year

### Practice Model Components

| Mobilizing Appropriate Services Timely | | | | | | |
|---|---|---|---|---|---|---|
| **Data Indicators Associated with Mobilizing Appropriate Services Timely** | **Year III Goal/ Compliance Measure** | **Region (Month/Year)** | **State (Month/Year)** | County Name | County Name | County Name |
| Placement Stability - Number of children in custody 12 months or less that have had 2 or fewer placement moves<br>Data Source: MWZPLMSS<br>*As of (Date) | 60% | | | | | |
| Placement Stability - Number of moves for all children regardless of time in custody<br>Data Source: MWBRD07S & MWBRD07T<br>*As of (Date) | | | | | | |
| Children in custody, ages 14 - 20, are provided with independent living services per their service plan **<br>Data Source: MWBRD16S<br>**Month/Year through Month/Year | 90% | | | | | |
| Children discharged from custody and reunified with parents/caretakers in the last year are reunified within 12 months of latest removal from home<br>Data Source: MWBRD05S & MWBRL05C<br>**Month/Year through Month/Year | 60% | | | | | |
| Children discharged in the last year upon finalization of an adoption have had the adoption finalized within 24 months of the latest removal from home<br>Data Source: MWBRD10D & MWBRD10S<br>**Month/Year through Month/Year | 25% | | | | | |
| Foster Care Re-entries | | *Not yet available* | | | | |
| Children in custody have received periodic medical examinations and all necessary follow-up services and treatment | At least 75% of children in custody | *Not yet available* | | | | |
| Children in custody have received a dental examination every 6 months and all medically necessary dental services | At least 60% of children age 3 and over in custody | *Not yet available* | | | | |
| Children in custody have received a mental health assessment by a qualified professional within 90 calendar days of placement or their 4th birthday, respectively, and all recommended mental health services pursuant to his/her assessment | At least 50% of children age 4 and over in custody | *Not yet available* | | | | |
| Children in custody have received a developmental assessment, by a qualified professional, and all needed developmental services. | At least 30% of relevant children in custody | *Not yet available* | | | | |

DHS
296098

60

## Appendix D:   MACWIS Data Reports Validation Process

**STEP 1:** The process for MACWIS reports validation begins with the validation coordinator: 1) conducting user acceptance testing for newly developed reports; 2) documenting the high level business rules and data point locations for each report; 3) pulling report samples (minimum of 5% – 10%); and 4) assigning reports (or parts of reports) to reviewers for data validation.

**STEP 2:** Each data validation team member takes his/her assigned report (or report section) and while using the high level business rules/data point locations document as a guide, works each sample record to determine in MACWIS if the data in the system matches the report data based on the data point location within MACWIS. Each team member documents their findings within a standardized error reports document.

**STEP 3:** The validation coordinator compiles team member validation results for QA review, and then assigns the report or report sections to QA team members for secondary validation of results (approx. 5% of reviewed cases are reviewed for QA).

**STEP 4:** The validation coordinator reviews all results, researches issues found, documents errors for further review by MIS. When possible, errors are communicated from the validation coordinator to the social workers for data correction. In the event of error trends, there will be involvement from the Field Staff Operations Director in communicating information to the field.

Reports developed during Bridge Plan Period and all newly developed reports are scheduled for re-validation every 6 months. The re-validation process works the same as above with the exception of the validation coordinator beginning with #3 of STEP 1 – pulling report samples – since the other tasks would have already been completed during the initial round of validation.


DHS
296099

61

## Appendix E: MACWIS Reports Produced during Bridge Plan Period

| Monthly Scheduled Run Date | Job | Program | Reports and Import Ready Text Files |
|---|---|---|---|
| 5th | MW3JWKLP | MWASAW8B | (2) MWASAWE1 - Workload Bad Data Rejected Aging Workers |
| | | | (3) MWASAWE2 - Workload Bad Data Worker with Missing Unit |
| | | | (4) MWASAWE3 - Workload Bad Data Rejected Terminated Worker |
| | | | (5) MWASAWE4 - Workload Bad Data Court Ordered Relative Appl |
| | | MWASAW9B | MWASAW9D - Super Worker Workload Summary by Service |
| | | | MWASA9S1 - Super Worker Workload Worker Summary |
| | | | MWASA9S2 - Super Worker Workload Regional Summary |
| | | MWASAW4B | MWASAW4D - County Social Service Workload Summary |
| | | | MWASA4S1 - Region and State Social Service Workload Summary |
| | | MWAFYF1B | MWAFYF1D - SSBG Programmatic Reporting Worksheet |
| | | MWASAW5B | MWASAW5S - County, Region and State Summary Totals |
| | | | MWASA5D1 - Worker Total Minutes Detail Report |
| | | | MWASA5D2 - ASWS Detail Report |
| 5th | MW3JWKRP | MWZPWKRB | MWZPWKRB - Worker Count by Type and County with a Caseload |
| 5th | MW3JWC5P | MWZWCR5B | MWZWCA5D - Annual Worker/Child Face to Face Visit Contact Report |
| | | | MWZWCA5S - Annual Worker/Child Face to Face Visit Contact Summary |
| | | | MWZWC5D2 - Monthly Worker/Child Face to Face Visit Contact Report |
| | | | MWZWC5S2 - Monthly Worker/Child Face to Face Visit Contact Summary |
| | | | MWZWCR5X_Children_In_Custody_Detail |
| | | | MWZWCR5X_Children_In_Custody_Summary |
| 5th | MW3JCURP | MWCURCUS | MWCURCD1 - Listing of Children Currently in Custody |
| | | | MWCURCD2 - Listing of Children Currently in Custody - Hinds and Warren Counties |
| | | | MWCURCS1 - Listing of Children Currently in Custody - Summary |
| | | | MWCURCUX_List_of_Children_Currently_in_Custody |
| | | | MWCURCX2_List_of_Children_Currently_in_Custody - Hinds and Warren Counties |
| 5th | MW3JL31P | MWLS311B | MWLS311D - Children Who have Re-Entered Foster Care Within 1 Year of Reunification |
| | | | MWLS311S - Children Who have Re-Entered Foster Care Within 1 Year of Reunification - Summary |
| | | | MWLS311E - Children Who have Re-Entered Foster Care Within 1 Year of Reunification - Exceptions |
| | | | MWLS311DX_Children_Re-Entered_w_in_Yr_Reunify |
| | | | MWLS311SX_Children_Re-Entered_w_in_Yr_Reunify_Smry |
| | | | |
| 10th | MW3JIVOP | MWZ1271B | MW1271WS - Custody Children in Open ANE Invest Worker Summary |
| | | | MW1271RS - Custody Children in Open ANE Invest Region Summary |
| | | | MW1271SS - Custody Children in Open ANE Invest State Summary |
| | | | MWZ1271D - Custody Children in Open ANE Investigations Detail |
| | | | MWZ1271E - Investigations with Narrative Errors |
| | | | MWZ1271X - Custody Children in Open ANE Investigation Text File |
| 10th | MW3JIV2P | MWZ1272B | MWZ1272W - All Children In Open ANE Investigations Level 2 or 3 - Worker Summary |
| | | | MWZ1272R - All Children In Open ANE Investigations Level 2 or 3 - Regional Summary |
| | | | MWZ1272S - All Children In Open ANE Investigations Level 2 or 3 - Statewide Summary |
| | | | MWZ1272E - Investigations With Narrative Errors |
| | | | MWZ1272D - All Children In Open ANE Investigations Level 2 or 3 - Intake Detail |
| | | | MWZ1272C - All Children In Open ANE Investigations - Combined Levels Summary |

Last Updated 10/11/2011

DHS
296100

62

| Monthly Scheduled Run Date | Job | Program | Reports and Import Ready Text Files |
|---|---|---|---|
| | | | MWZ1272X - All Children in Open ANE Investigation by Lvl Text File |
| 10th | MW3JWPCP | MWZWCR3B | MWZWCR3D - Worker / Birth and Adopted Parent Face to Face Contacts |
| | | | MWZWCR3S - Worker / Birth and Adopted Parent Face to Face Contacts State Summary |
| 10th | MW3J508P | MWBRD06B | MWBRD06D - Children with Alleged Maltreatment While In Custody Report |
| | | | MWBRD06S - Children with Alleged Maltreatment While In Custody ReporT Summary |
| | | | MWBRD6E1 - Alleged Maltreatment while in Custody - Exception Report |
| | | | MWBRD6E2 - ANE Intakes without a Maltreatment -- Exception Report |
| 10th | MW3JPL5P | MWZPLM5B | MWZPLM5D - Custody 12 months or less with 1 or 2 Placement Settings |
| | | | MWZPLM5S - Custody 12 months or less with 1 or 2 Placement Settings Summary |
| 10th | MW3J527P | MWBRD07R | MWBRD07D - Number of Placements for Children in Active Custody |
| | | | MWBRD07S - Number of Placements for Children in Active Custody Summary |
| | | | MWBRD07T - Number of Placements for Children in Active Custody State Summary |
| | | | |
| 15th | MW3J525P | MWBRD05B | |
| | | MWBRD05R | MWBRD05D - Number Children Leaving State Custody And Their Outcome Detail Report |
| | | | MWBRD05C - Number Children Leaving State Custody And Their Outcome |
| | | | MWBRD05S - Number of Children Leaving State Custody and their Outcome |
| | | | MWBRD05T - Number Children Leaving Custody - Transferred to another Agency |
| | | | MWBRD05E - Number of Children Leaving State Custody and their Outcome not processed correctly |
| 15th | MW3J510P | MWBRD10B | MWBRD10D - Length of Time Between Court Custody and Adoption Finalization |
| | | | MWBRD10S - Length of Time Between Court Custody and Adoption Finalization - Summary |
| | | | MWBRD10E - Length of Time Between Court Custody and Adoption Finalization - Exception Report |
| 15th | MW3JTACP | MWZTACRB | MWZTACRD - Timely Administrative (County Conference) Reviews Detail |
| | | | MWZTACRS - Timely Administrative (County Conference) Reviews Summary |
| 15th | MW3JTPHP | MWZTPHRB | MWZTPHRD - Children in Custody for 12+ Months with a Timely Permanency Hearing |
| | | | MWZTPHRS - Children in Custody for 12+ Months with a Timely Permanency Hearing Summary |
| 15th | MW3J516P | MWBRD16B | MWBRD16D - Children in Custody, Ages 14-20 and Their IL Services and Skills Provided |
| | | | MWBRD16S - Children in Custody, Ages 14-20 and Their IL Services and Skills Provided - Summary |
| 15th | MW4J516P | | Quarterly version of above job, runs the months of October, January, April, and July |
| 15th | MW3J530P | MWBPREV1 | MWBPREVD - Families and Children in Active Prevention COR and R&S Cases |
| | | | MWBPREVS - Families and Children in Active Prevention COR and R&S Cases Summary |
| 15th | MW3J531P | MWBPROT1 | MWBPROTD - Families and Children in Active Protection COR and R&S Services |
| | | | MWBPROTS - Families and Children in Active Protection COR and R&S Services Summary |
| 15th | MW9JAH8P | MWZAH08B | MWZAH08D - Active Custody Children Diagnosed with Medical Disability |
| 15th | MW3JPLBP | MWZPLMBB | MWZPLMBD - Therapeutic Care and Placement Setting Resource Contacts |
| | | | MWZPLMFS - Therapeutic Care and Placement Setting Resource Contacts Summary Totals by Facility Name |
| | | | MWZPLMBS - Therapeutic Care and Placement Setting Resource Contacts Summary |
| | | | MWZPLMDR - Therapeutic Care and Placement Setting - Discharge Report |
| | | | MWZPLMBE - Therapeutic Care and Placement Setting - Exception Report |
| | | | MWZPLMD2 - Therapeutic Care and Placement Setting Resource Contacts (Foster Care Only) |
| | | | MWZPLMS2 - Therapeutic Care and Placement Setting Resource Contacts Summary (Foster Care Only) |
| 15th | MW3JPLCP | MWZPLMCB | MWZPLMCD - Non-Therapeutic Care and Placement Setting Resource Contacts |
| | | | MWZPLMCF - Non-Therapeutic Care and Placement Setting Summary Totals by Facility Name |

Last Updated 10/11/2011

DHS
296101

63

| Monthly Scheduled Run Date | Job | Program | Reports and Import Ready Text Files |
|---|---|---|---|
| | | | MWZPLMCS - Non-Therapeutic Care and Placement Setting Contacts Resource Summary |
| | | | MWZPLMCR - Non-Therapeutic Care and Placement Setting - Discharge Report |
| | | | MWZPLMCE - Non-Therapeutic Care and Placement Setting - Exception Report |
| 15th | MW3JRSLP | MWZRESLB | MWZRESLD - Number of Licensed Foster Family Homes |
| | | | MWZRESLS - Number of Licensed Foster Family Homes Summary Report |
| 15th | MW3JRSPP | MWZRESPB | MWZRESPD - Number of Pending  Foster Family Homes |
| | | | MWZRESPS - Number of Pending  Foster Family Homes Summary Report |
| | | | MWZRSPDX_Number_of_Pending_Foster_Family_Homes |
| | | | MWZRSPSX_Number_of_Pending_Foster_Family_Homes_Smry |
| 15th | MW3JPLTP | MWZ0510B | MWZ0510D - Number of Children in Foster Care by Placement Type |
| | | | MWZ0510S - Number of Children in Foster Care by Placement Type Summary |
| | | | |
| 20th | MW3JL50P | MWLS50DB | MWLS50DD - Children over 45 days in Emergency Shelter or Temporary Facility |
| | | | MWLS50DS - Children over 45 days in Emergency Shelter or Temporary Facility Summary |
| 20th | MW3JL51P | MWLS51DB | MWLS51DD - Children in Custody with 2 or More Emergency or Temporary Placements |
| | | | MWLS51DS - Children in Custody with 2 or More Emergency or Temporary Placements Summary |
| 20th | MW3JL52P | MWLS52HB | MWLS52HD - Children in Foster Care Less than 10 Years of Age Placed in Congregate Care |
| | | | MWLS52HS - Children in Foster Care Less than 10 Years of Age Placed in Congregate Care Summary |
| 20th | MW3JL53P | MWLS53HB | MWLS53HD - Sib Groups in Congregate care over 45 days with one or more sibling under 10 |
| | | | MWLS53HS - Sib Groups in Congregate care over 45 days with one or more sibling under 10 Summary |
| 20th | MW3JL54P | MWLS54AB | MWLS54AD - Children in initial 90 days of trail home visit with their caseworker contacts |
| | | | MWLS54AS - Children in initial 90 days of trail home visit with their caseworker contacts Summary |
| 20th | MW3JL55P | MWLS55AB | MWLS55AD - Children Remaining in Placement Following Maltreatment and Their Caseworker Contacts |
| | | | MWLS55AS - Children Remaining in Placement Following Maltreatment & Their Caseworker Contacts Summary |
| 20th | MW3JL32P | MWLS312B | MWLS312D - Children w Perm Plan within 30 days |
| | | | MWLS312S - Children w Perm Plan within 30 days Summary |
| | | | MWLS312DX_D&CDATE_Children_w_Perm_Plan_within_30_days |
| | | | MWLS312SX_D&CDATE_Children_w_Perm_Plan_within_30_days_Smry |

Last Updated  10/11/2011

*DHS*
*296102*

64

## Appendix F: Data Report Re-validation Schedule

| | MACWIS REPORTS RE-VALIDATION SCHEDULE 2011-2013 | | | | | |
|---|---|---|---|---|---|---|
| | **MACWIS Report Number** | **MACWIS Data Indicator** | **2011 Re-validation Dates** | **Status** | **2012 Re-validation Dates** | **Status** |
| Bridge Plan (Ph I) | MWZWC5 - Caseworker Face-to-Face Visits with Child (2X a Month In Home) | At least 70% of all children in custody shall have 2x a month in person. | 01/31/2011 06/30/2011 11/30/2011 | Complete Complete Complete | 04/30/2012 11/30/2012 | Complete |
| Bridge Plan (Ph I) | MWZWCR3 - Caseworker Face-to-Face Visits with Parents of Children with Goal of Reunification (1X a Month In Home) | At least 60% of all parents of children with a goal of reunification will have at least 1 visit a month in the home of each parent (if applicable). | 01/31/2011 06/30/2011 11/30/2011 | Complete Complete Complete | 04/30/2012 11/30/2012 | Complete |
| Bridge Plan (Ph I) | MWZ1272 - Investigation Timeliness For All Children | At least 90% of all investigations are initiated timely (72 hrs for Level 2, 24 hrs for Level 3) and completed timely (within 30 days). | 01/31/2011 06/30/2011 11/30/2011 | Complete Complete Complete | 04/30/2012 11/30/2012 | Complete |
| Bridge Plan (Ph I) | MWZ1271 - Investigation Timeliness for Children in Custody | At least 90% of all investigations for children currently in custody are initiated within 24 hours and completed within 30 days. | 01/31/2011 06/30/2011 11/30/2011 | Complete Complete Complete | 04/30/2012 11/30/2012 | Complete |
| Bridge Plan (Ph I) | MWBRD06 - Children with Alleged Maltreatment While in Custody | Less than 1% of all children in custody will be found (evidenced) to have been maltreated while in custody. | 01/31/2011 06/30/2011 11/30/2011 | Complete Complete Complete | 04/30/2012 11/30/2012 | Complete |
| Bridge Plan (Ph I) | MWBRD07 - Number of Placements for Children in Active Custody | children in care less than 12 months from the time of latest removal from home shall have had two or fewer placements. | 01/31/2011 06/30/2011 11/30/2012 | Complete Complete Complete | 04/30/2012 11/30/2012 | Complete |
| Bridge Plan (Ph I) | MWZPLM5 - Placement Stability (Children in Care < 12 Months with 1-2 Placements and All Children in Care by Number of Placements) | At least 70% of all children who have been in custody 12 months or less will have had no more than 2 placements | 01/31/2011 06/30/2011 11/30/2011 | Complete Complete Complete | 04/30/2012 11/30/2012 | Complete |
| Bridge Plan (Ph I) | MWZ014D1 - Termination of Parental Rights Petitions Filed | At least 80% of children who have been in care 15 of the last 22 months who have no exception filed will have had a TPR filed. | 01/31/2011 06/30/2011 11/30/2011 | Complete Complete Complete | 04/30/2012 11/30/2012 | Complete |
| Bridge Plan (Ph I) | MWZ014D2 - Exception Noted-Children in Care 15 of 22 Months | At least 80% of children who have been in care 15 of the last 22 months will have an exception filed | 01/31/2011 06/30/2011 11/30/2011 | Complete Complete Complete | 04/30/2012 11/30/2012 | Complete |
| Bridge Plan (Ph II) | MWZAH06 - Special Needs of Children in Foster Care | The agency is aware of all children in custody diagnosed with special needs and what those needs are. | 01/31/2011 08/31/2011 | Complete Complete | 01/31/2012 | Complete |
| Bridge Plan (Ph II) | MWZTACR - Children Who Have Been in Custody at Least 6 Months Have Had a Timely Court Review | At least 80% of children who have been in custody at least 6 months have had a timely court review (county conference). | 01/31/2011 08/31/2011 | Complete Complete | 01/31/2012 08/31/2012 | Complete |
| Bridge Plan (Ph II) | MWZTPHR - Children in Custody at Least 12 Months Have Had a Timely Annual Court Review | At least 75% of children in custody at least 12 months have had a timely annual permanency hearing. | 01/31/2011 08/31/2011 | Complete Complete | 01/31/2012 08/31/2012 | Complete |

MACWIS
Practice Model Project Plan

7/26/2012

| | MACWIS Report Number | MACWIS Data Indicator | 2011 Re-validation Dates | Status | 2012 Re-validation Dates | Status |
|---|---|---|---|---|---|---|
| Bridge Plan (Ph II) | MWBRD05 - Children Discharged From Custody and Reunified with Parents/Caretakers in the Last Year are Reunified Within 12 Months of Latest Removal From Home | At least 60% of children discharged from custody and reunified with parents/caretakers were reunified within 12 months of the latest removal | 01/31/2011 08/31/2011 | Complete Complete | 01/31/2012 08/31/2012 | Complete |
| Bridge Plan (Ph II) | MWBRD10 - Children Discharged in the Last Year Upon the Finalization of an Adoption Have Had the Adoption Finalized Within 24 Months of the Latest Removal From Home | At least 25% of children who have had an adoption finalization were adopted within 24 months of the latest removal from the home. | 01/31/2011 08/31/2011 | Complete Complete | 01/31/2012 08/31/2012 | Complete |
| Bridge Plan (Ph II) | MWZ0510- Number of Children in Foster Care by Placement Type | The agency will be aware of all children in foster care by their placement type. | 01/31/2011 08/31/2011 | Complete Complete | 01/31/2012 08/31/2012 | Complete |
| Bridge Plan (Ph II) | MWZPROT - Number of Children in Protection Cases | The agency will be aware of all children currently involved in protection cases. | 01/31/2011 08/31/2011 | Complete Complete | 01/31/2012 08/31/2012 | Complete |
| Bridge Plan (Ph II) | MWZPREV - Number of Families in Prevention Cases | The agency will be aware of all families currently involved in prevention cases. | 01/31/2011 08/31/2011 | Complete Complete | 01/31/2012 08/31/2012 | Complete |
| Bridge Plan (Ph II) | MWZRESL - Number of Licensed Foster Family Homes | The agency will be aware of all licensed foster family homes currently available and in use | 01/31/2011 08/31/2011 | Complete Complete | 01/31/2012 08/31/2012 | Complete |
| Bridge Plan (Ph II) | MWZRESP - Number of Pending Foster Family Homes | The agency will be aware of all pending foster family homes and where they are in that process. | 01/31/2011 08/31/2011 | Complete Complete | 01/31/2012 08/31/2012 | Complete |
| Bridge Plan (Ph II) | MWZPLMC - Non-Therapeutic Home Contacts | Foster parents, with at least 1 foster child residing in their home during the Period, have had a DCFS worker visit the home twice a month (therapeutic foster homes) or monthly (non-therapeutic foster homes), per Plan, and documented in the children's case records | 01/31/2011 08/31/2011 | Complete Complete | 01/31/2012 08/31/2012 | Complete |
| Bridge Plan (Ph II) | MWZPLMB - Therapeutic Home Contacts | Foster parents, with at least 1 foster child residing in their home during the Period, have had a DCFS worker visit the home twice a month (therapeutic foster homes) or monthly (non-therapeutic foster homes), per Plan, and documented in the children's case records | 01/31/2011 08/31/2011 | Complete Complete | 01/31/2012 08/31/2012 | Complete |
| Bridge Plan (Ph III) | MWBRD16 - Independent Living Services | Children in custody, ages 14-20 during Period 2, are provided with Independent Living services, per their service plan | 02/28/2011 09/30/2011 | Complete Complete | 02/28/2012 09/30/2012 | Complete |
| Bridge Plan (Ph III) | MWLS50D - Children in Emergency Shelter > 45 Days | No foster child remains in an emergency or temporary facility more than 45 days unless approval exception signed by Division Director | 02/28/2011 09/30/2011 | Complete Complete | 02/28/2012 09/30/2012 | Complete |
| Bridge Plan (Ph III) | MWLS51D - Children in More Than 1 Emergency Placement | No child is placed in more than 1 emergency or temporary facility within 1 episode of foster care, unless an immediate placement is necessary to protect the safety of the child or others and is certified, in writing, by the Regional Director | 02/28/2011 09/30/2011 | Complete Complete | 02/28/2012 09/30/2012 | Complete |

66

MACWIS
Practice Model Project Plan

7/26/2012

| | MACWIS Report Number | MACWIS Data Indicator | 2011 Re-validation Dates | Status | 2012 Re-validation Dates | Status |
|---|---|---|---|---|---|---|
| Bridge Plan (Ph III) | MWLS52D - Children Under Age 10 In Emergency Placement | No child under 10 years of age is placed in any kind of congregate care setting unless child has exceptional needs that cannot be met in a relative or foster family home or child is a member of a sibling group, and the Regional Director has granted express written approval for the congregate care placement. | 02/28/2011 09/30/2011 | Complete Complete | 02/28/2012 09/30/2012 | Complete |
| Bridge Plan (Ph III) | MWLS53D - Sibling Groups in Congregate Care | Sibling groups, with one or more of siblings under 10, are not placed in congregate care settings for more than 45 days | 02/28/2011 09/30/2011 | Complete Complete | 02/28/2012 09/30/2012 | Complete |
| Bridge Plan (Ph III) | MWLS54A - Children in Initial 90 Days of Trial Home Visit with Caseworker | During the trial home visit period, child's caseworker or a Family Preservation caseworker meets with the child in the home at least twice per month | 02/28/2011 09/30/2011 | Complete Complete | 02/28/2012 09/30/2012 | Complete |
| Bridge Plan (Ph III) | MWLS55A - Children Remaining in Placement Following Maltreatment and Their Caseworker Contacts | All foster children remaining in placement following a maltreatment investigation are visited by caseworker twice per month for 3 months after investigation conclusion | 02/28/2011 09/30/2011 | Complete Complete | 02/28/2012 09/30/2012 | Complete |
| MSA Rpt | MWLS311 - Children ReEntered care w_in 1 Yr Reunification | children who were reunified with their parents and reentered care within one year of reunification | NA | | 4/30/2012 10/31/2012 | Complete |
| MSA Rpt | MWLS312 - Children who have a perm plan developed within 30 days | children who have had an permanent plan in an ISP approved within 30 days of custody | NA | | 4/30/2012 10/31/2012 | Complete |
| MSA Rpt | MWLS314 Proximity of Initial Placement for all Children Entering Custody | location of the initial placement of all children entering custody. | NA | | 12/31/2012 06/31/2013 | |
| MSA Rpt | MWLS315 Children who received a comprehensive health assessment within 30 days of custody | children who have had an initial health screening within 72 hours of custody and children who have had a comprehensive assessment within 30 days of custody | NA | | 12/31/2012 06/31/2013 | |
| MSA Rpt | MWLS316D-Sibling Groups Who Entered Care Who Are Placed Together | Siblings who enter placement at/near the same time are placed together(with exceptions) | N/A | | 01/31/2013 07/31/2013 | |
| MSA Rpt | MWZ017D1-Children Who Have Been In Custody for 17 Of The Most Recent 22 Months | Children reaching the point at which they have spent 17 of previous 22 months in foster care during the period shall have TPR petition filed or exception documented by the last day of the 17th month. | NA | | 01/31/2013 07/31/2013 | |
| MSA Rpt | MWLS318D- Child Contact With Parents And Siblings While In Custody | Children in custody are provided with contacts with their parents/siblings not in same placement within 24 hours of placement (exceptions may apply). | NA | | 01/31/2013 07/31/2013 | |
| MSA Rpt | MWLS319D-Custody Children In Unlicensed Placements | Children are not placed in a foster care setting that has not been licensed or approved as meeting DFCS licensure standards unless placed pursuant to relative licensing process. | NA | | 01/31/2013 07/31/2013 | |

## Appendix G:  Data Reports Scheduled for Development in 2012

Case 3:04-cv-00251-TSL-FKB   Document 571   Filed 07/06/12   Page 69 of 81

APPENDIX "C"
Modified Mississippi Settlement Agreement and Reform Plan

Proposed Data Reports Schedule - Period 3 Implementation Plan[1]

| Data Report | MACWIS Report Number, Manual Report, or FCR | Current or Projected Availability |
|---|---|---|
| Number of Children in Foster Care by Placement Type. | MWZ0510 | Currently Available |
| Number of Licensed Foster Family Homes. | MWZRESL | Currently Available |
| During trial home visit period, child's caseworker or a Family Preservation caseworker meets with child in the home at least twice a month. *(MSA III.B.8.b)* | MWLS54A | Currently Available |
| Investigations of reports of maltreatment of children in DFCS custody must be initiated within 24 hours. *(MSA II.B.1.e.2)* | MWZ1271 | Currently Available |
| Investigations of reports of maltreatment of children in DFCS custody must be completed within 30 calendar days, including supervisory approval.  *(MSA II.B.1.e.2)* | MWZ1271 | Currently Available |
| Children remaining in the same out-of-home placement following an investigation into a report of maltreatment are visited by a DFCS caseworker twice a month for 3 months.  *(MSA II.B.1.e.3)* | MWLS55SA | Currently Available |
| No child shall remain in an emergency/temp facility for more than 45 calendar days (exceptions may apply). *(MSA II.B.2.k)* | MWLS50D | Currently Available |
| No child under 10 will be placed in a congregate care setting unless the child has exceptional needs that can't be met in a relative or foster family home (other conditions may apply.) *(MSA II.B.2.m)* | MWLS52HS | Currently Available |
| Sibling groups, in which there is at least one sibling under age 10, will not be placed in congregate care settings for more than 45 days.  *(MSA II.B.2.m)* | MWWLS53HS | Currently Available |
| No child will be placed in more than 1 emergency/temp facility within 1 episode of foster care (exceptions may apply). *(MSA II.B.2.o)* | MWLS51D/S | Currently Available |
| For children with goal of reunification, the assigned DFCS caseworker will meet with the child's bio parents at least once a month to assess service delivery and achievement. *(MSA II.B.5.b) (MSA III.B.3.d.2)* | MWZWCR3 | Currently Available |
| A DFCS caseworker will visit the home of non-therapeutic resource parents, who have at least 1 foster child residing in the home, at least once a month *(MSA II.B.5.c)* | MWZPLMC | Currently Available |

[1] Appendix "C" will be updated, as needed, for each year's Implementation Plan.

1

APPENDIX "C"
Modified Mississippi Settlement Agreement and Reform Plan

| Data Report | MACWIS Report Number, Manual Report, or FCR | Current or Projected Availability |
|---|---|---|
| A DFCS caseworker will visit the home of therapeutic resource parents, who have at least 1 foster child residing in the home, at least once a month *(MSA II.B.5.c.)* | MWZPLMB | Currently Available |
| Children in care fewer than 12 months from time of latest removal from home shall have had 2 or fewer placements. *(MSA II.C.1)* | MWZPLM5S | Currently Available |
| The rate of abuse/maltreatment in care in the last year *(MSA II.C.2)* | MWBRD06 | Currently Available |
| A child's permanency plan will be reviewed in a court or administrative case review at least every 6 months. *(MSA III.B.3.c.1)* | MWZTACR | Currently Available |
| DFCS will take reasonable steps to ensure a court review is held for children in custody within 12 months of initial placement and annually thereafter. *(MSA III.B.3.c.2)* | MWZTPHR | Currently Available |
| Children who've spent more than 17 of the previous 22 months in foster care without a TPR petition filed or exception documented shall have a petition filed or exception noted. *(MSA III.B.3.e.1)* | MWZ2014D1 and MWZ2014D2 | Currently Available |
| Children in custody, ages 14-20, shall be provided with independent living services as set forth in their service plans. *(MSA III.B.7.b)* | MWBRD16 | Currently Available |
| Children discharged and reunified in the last year shall have been reunified within 12 months of latest removal. *(MSA III.C.1)* | MBWRD05 | Currently Available |
| Number of Pending Foster Family Homes. | MWZRESPD | Currently Available |
| Child's permanency plan will be developed within 30 calendar days of initial placement and documented in the child's case record. *(MSA III.B.3.a.1-2)* | MWLS312D | Currently Available |
| Assigned DFCS caseworker (COR or COS) will meet with child in person and, where age appropriate, alone at least twice a month to assess child's safety and wellbeing. At least 1 visit during the month will take place in the child's placement. *(MSA II.B.5.a)* | MWZWC5D | Currently Available |
| New caseworkers/supervisors complete their training requirements before assuming their responsibilities. *(MSA II.A.2.c.2-3)²* | Manual Report | 90 days after start of IP3 |
| Caseworkers shall carry a caseload that doesn't exceed Plan requirements. *(MSA II. A.2.a.1)* | Manual Report | 120 days after start of IP3 |
| Caseworkers do not carry a caseload exceeding 2x the caseload requirements. *(MSA II.A.2.a.1)* | Manual Report | 120 days after start of IP3 |

¹ Quarterly Report

2

DHS
296107

69

APPENDIX "C"
Modified Mississippi Settlement Agreement and Reform Plan

| Data Report | MACWIS Report Number, Manual Report, or FCR | Current or Projected Availability |
|---|---|---|
| Supervisors, responsible for supervising caseworkers, shall be responsible for supervising no more than 5 caseworkers. *(MSA II.A.2.a.6)* | Manual Report | 120 days after start of IP3 |
| Children discharged in last year on finalization of adoption shall have had the adoption finalized within 24 mo. of latest removal from home. *(MSA III.C.2)* | MWBRD10 | Currently Available |
| Children shall be placed within their own county or within 50 miles of the home from which they were removed (with exceptions). *(MSA II.B.2.g)* | MWLS314 | 06/15/12 |
| Children entering foster care shall receive a health screening evaluation from a qualified medical practitioner within 72 hours of placement. *(MSA II.B.3.a)* | MWLS315 | 06/15/12 |
| Within 30 calendar days of placement in foster care, children shall receive a comprehensive health assessment. *(MSA II.B.3.b)* | MWLS315 | 06/15/12 |
| Children reaching the point at which they have spent 17 of previous 22 months in foster care during the period shall have TPR petition filed or exception documented by the last day of the 17th month *(MSA III.B.3.e.1)* | MACWIS Report Number TBD | 07/11/12 |
| Siblings who enter placement at/near the same time are placed together (with exceptions). *(MSA II.B.2.h)* | MWLS316 | 07/15/12 |
| Children in custody are provided with contacts with their parents/siblings not in same placement within 24 hours of placement (exceptions may apply). *(MSA III.B.5.b)* | MACWIS Report Number TBD | 07/15/12 |
| Children are not placed in a foster care setting that has not been licensed or approved as meeting DFCS licensure standards unless placed pursuant to relative licensing process. *(MSA II.B.2.a)* | MWZ0151 | 7/31/12 |
| Children with special needs shall be matched with placement resources that can meet their therapeutic and medical needs. *(MSA II.B.2.e)* | FCR | 12/31/12 |
| Children are placed in the least restrictive setting that meets his/her individual needs as determined by a review of all intake, screening, assessment and prior placement information on the child available at the time of placement. *(MSA II.B.2.f)* | FCR | 12/31/12 |
| No later than time of placement, DFCS will provide resource parents/facility staff with foster child's current available medical, dental, educational and psychological information (including certain specific info). *(MSA II.B.2.i)* | FCR | 12/31/12 |

3

APPENDIX "C"
Modified Mississippi Settlement Agreement and Reform Plan

| Data Report | MACWIS Report Number, Manual Report, or FCR | Current or Projected Availability |
|---|---|---|
| DFCS will take all reasonable steps to avoid disruption of appropriate placements and ensure placement stability; if worker has knowledge of disruption possibility, s/he must convene FTM immediately. *(MSA II.B.2.j)* | FCR | 12/31/12 |
| Children shall have a family assessment¹ completed within 30 calendar days of the child's entrance into custody which is documented in the child's case record. *(MSA III.B.1.a)* | FCR | 12/31/12 |
| Foster children will receive recommended mental health services pursuant to his/her assessment. *(MSA II.B.3.f)* | FCR | 12/31/12 |
| Foster children shall be provided with needed follow-up developmental services. *(MSA II.B.3.g)* | FCR | 12/31/12 |
| DFCS caseworkers will screen children for general/special educational needs within 30 calendar days of his/her entry into foster care. *(MSA III.B.6.a)* | FCR | 12/31/12 |
| DFCS shall take reasonable steps to ensure that school-age foster children are registered for and attending accredited schools within 3 business days of initial placement or other placement changes (including shelters or other temp placements unless delayed by Youth Court). *(MSA III.B.6.b)* | FCR | 12/31/12 |
| Children requiring thera. and/or rehab. foster care services (because of diagnosis of significant medical, developmental, emotional or behavioral problems) have been provided a treatment plan and services in accordance with the plan. *(MSA II.B.4.a)* | FCR | 12/31/12 |
| In cases where the whereabouts of one/both parents is unknown, DFCS will immediately institute a diligent search for the parents which shall be documented in the child's case record. *(MSA III.B.1.b)* | FCR | 12/31/12 |
| Within 30 days of a child's entrance into foster care, the caseworker will convene a team meeting with specified parties to develop service plans. *(MSA III.B.2.a)* | FCR | 12/31/12 |
| Service plans shall be reviewed and updated quarterly at a team meeting and within 30 days of a placement change. *(MSA III.B.2.b)* | FCR | 12/31/12 |
| Appropriate permanency goals include: no goal of permanent foster care; durable legal custody only after other goals are ruled out; and conditions for APPLA. *(MSA III.B.3.a.3-5)* | FCR | 12/31/12 |

¹ This assessment will become the Comprehensive Family Assessment as regions fully implement the Practice Model.

4

APPENDIX "C"
Modified Mississippi Settlement Agreement and Reform Plan

| Data Report | MACWIS Report Number, Manual Report, or FCR | Current or Projected Availability |
|---|---|---|
| For children with goals of reunification, DFCS will engage in concurrent planning within the 1st 6 months of custody *(MSA III.B.3.b.1)* | FCR | 12/31/12 |
| Youth in custody transitioning to independence shall have available: an adequate living arrangement; a source of income; health care; IL stipends; education/training vouchers. *(MSA III.B.7.c)* | FCR | 12/31/12 |
| Children in custody will receive periodic medical exams and all medically necessary follow-up services/treatment throughout the time they are in State custody. *(MSA II.B.3.d)* | FCR | 12/31/12 |
| Children, 4 years and older, shall be provided a mental health assessment by a qualified professional within 30 calendar days of foster care placement. *(MSA II.B.3.f)* | FCR | 12/31/12 |
| Children, birth-3 years, will be provided a developmental assessment by a qualified professional and each child older than age 3 shall be provided with a developmental assessment if factors indicate such an assessment is warranted. *(MSA II.B.3.g)* | FCR | 12/31/12 |
| Children, age 3 and older, shall be provided a dental exam within 90 calendar days of foster care placement and every 6 months thereafter. *(MSA II.B.3.e)* | FCR | 12/31/12 |
| Children reaching age 3 in care shall be provided a dental exam within 90 days of his/her 3rd birthday and every 6 months thereafter. *(MSA II.B.3.e)* | FCR | 12/31/12 |
| Supervisors shall receive a minimum of 24 hours annual on-going, in-service training. *(MSA II.A.2.c.4)* | Manual Report | 12/31/12 |

5

DHS
296110

# Appendix H:  Foster Care Review Instrument

## PERIODIC ADMINISTRATIVE DETERMINATION
### *On Children in State's Custody*

FCR PAD revised 1-31-12
Page 1 of 9

| County of Responsibility | | Foster Care Reviewer's Name | |
|---|---|---|---|
| Assigned Caseworker's Name | | Area Social Work Supervisor's Name | |
| Date of Conference | | Date Report  Forwarded to A.S.W.S., Regional Director, and Reviewer's Supervisor | |

| Child's Name | Birth Date | Custody Date | ISP Date | Enter Child's Permanent Plan / Concurrent Plan *(example: Reunification with Parent / Custody to a Relative)* | Perm. Plan's Expected Date of Achievement |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| Date of Most Recent Parental or Primary Caretaker ISP/Case Plan: *(Document ISP date for additional father or primary caretaker. Delete "Mother", "Father", and /or "Primary Caretaker" and enter their actual names.* | Mother | Termination of Parental Rights Date (if Applicable) *(Blank space may be used to document TPR date for any additional fathers. Delete "Mother", "Father", and /or "Primary Caretaker" and enter their  actual names.* | Mother |
| | Father (1) | | Father (1) |
| | Father (2) | | Father (2) |
| | Father (3) | | Father (3) |
| | Father or Primary Caretaker | | |

*Instructions for instrument: please enter the number of children each answer applies to. If the instrument has multiple children (sibling groups), the reviewer will indicate how many children are yes, how many are no, etc. Reviewer will document in comments child specific information to assist the county to identify the child. For those questions that have more answers than yes/no/na, reviewer will use * or # symbol then the number of children  inside the NA column*

| # | Yes | No | N/A | PREVIOUS PAD Q's:<br><br>The following questions apply to the previous PAD for the child (ren) and the compliance by the county regarding necessary case staffing and corrective actions. |
|---|---|---|---|---|
| | | | | i. Did the reviewer find evidence of a case staffing between the ASWS and worker(s) as a follow up to the PAD? [Yes / No / * (NA)] |
| | | | | ii. Did the reviewer find evidence of corrective action taken by the assigned staff / ASWS to address areas of concern / deficiencies? [Yes / No / * (NA)] |
| | | | | iii. Did reviewer find evidence supporting timely corrective action? [Yes / No / * (NA)] |
| | | | | Reviewers shall specify below any issues related to a "No" answer or areas viewed as a strength |
| | | | | |
| 1 | | | | Was a discrepancy noted between demographic information in MACWIS and the paper file / information obtained in county conference? [Yes / No] |
| 2 | | | | Did the reviewer find evidence that the child was invited to the County Conference or PAR (Periodic Administrative Review)? [Yes / No] |
| 3 | | | | Did the child participate in or attend the County Conference or PAR? [Yes / No / NA] |
| 4 | | | | If the child was unavailable to be physically present at the County Conference or PAR, did the primary COR make attempts to ensure they could participate by other means (phone, letter, email)? [Yes / No / * (NA)] |

FOR PAD revised 1-31-12
Page 2 of 9

| # | | | | |
|---|---|---|---|---|
| 5 | | | | Did the assigned COR worker attend / participate in the County Conference or PAR? [Yes / No] |
| 6 | | | | Did the assigned COR ASWS attend / participate in the County Conference or PAR? [Yes / No] |
| 7 | | | | Was agency staff prepared for County Conference or PAR? [Yes / No] |
| 8 | | | | Is this the first (initial) review of the case? [Yes / No] |

Reviewers shall specify below any issues related to a "No" answer or areas viewed as a strength

| # | Yes | No | N/A | |
|---|---|---|---|---|
| 9 | | | | Was there evidence that the child was registered for/attending an accredited school within 3 business days of initial placement? [Yes / No / * (NA - not age appropriate/school not in session at placement)] |
| 10 | | | | Was a FTM held to develop the child's ISP within 30 days of entry into foster care? [Yes / No] |
| 11 | | | | If the ISP was developed within 30 days of custody, did it include a permanency goal, timeframes and activities to achieve/ support permanency? [Yes / No / * (ISP NOT developed within 30 days of custody) / # (ISP not developed in MACWIS, but evidence suggests verbal acknowledgement of these things with the family within 30 days)] |
| 12 | | | | Was screening (CFA or other DFCS assessment) completed to address general and special educational needs of the child within 30 calendar days of entry into foster care? [Yes / No] |
| 13 | | | | Was a screening provided to address mental health/emotional/therapeutic needs of the child within 30 calendar days of entry into foster care? [Yes / No] |
| 14 | | | | Was a health screening provided to address medical needs of the child within 30 calendar days of entry into foster care? [Yes / No] |
| 14a | | | | If the child is over age three, was a dental examination provided within 90 calendar days of placement? [Yes / No / * (NA - child younger than three)] |

Reviewers shall specify below any issues related to a "No" answer or areas viewed as a strength

DHS
296112

74

FCR PAD revised 1-31-12
Page 3 of 9

| # | Yes | No | N/A | PLACEMENT Q's: |
|---|---|---|---|---|
| 15 | | | | Has the child experienced a placement move (including initial placement) within the review period? [Yes / No (If No select NA for questions 16-18) / * (NA - child on home trial placement)] |
| 16 | | | | Was there evidence that the child was registered for/attending an accredited school within 3 business days after any placement change? [Yes / No / * (NA - not age appropriate, or summer session) / # (NA - no placement change)] |
| 17 | | | | Did Reviewer locate a signed copy of the foster care information form in the case record for each placement change? [Yes / No / * (NA - child on home trial placement / # (NA - no placement change)] |
| 18 | | | | Was the ISP updated within 30 days of the placement change? [Yes / No / * (MACWIS ISP review not entered timely, but evidence exists that all appropriate parties were involved in a FTM is discuss placement changes and changes in needs of child within 30 days of the placement change) / # (NA - no placement change)] |
| 19 | | | | If the child is on runaway status or child's whereabouts are otherwise unknown, were efforts to locate the child in collaboration with law enforcement, public agencies and other community organizations documented monthly during the review period? [Yes / No / * (NA - child not on runaway/whereabouts known)] |
| 20 | | | | Was documentation found in the case file indicating that the child was seen monthly (in any setting) by an agency representative? [Yes / No] |
| 21 | | | | Was documentation found in the file indicating that the child was seen monthly by an agency representative in the child's placement setting? [Yes / No] |
| 22 | | | | Was documentation found in the case file that an agency representative had monthly contact with the caregiver/placement provider of the child? [Yes / No] |
| 23 | | | | During the review period, did the reviewer note any safety concerns that may require further assessment by the agency? [Yes / No] |
| 24 | | | | Does the current placement appear to be conducive to the safety of the children? [Yes / No / * (Unable to determine due to lack of documentation and/or participation in the PAD)] |
| 25 | | | | The child's placement setting appears to be free from the risk of an unplanned disruption, or a move not directly related to the achievement of the child's permanency goal, in the foreseeable future [Yes / No] |
| 26 | | | | . If no to question above, did reviewer find evidence that the agency is taking all reasonable steps to avoid the disruption and ensure placement stability? [Yes / No / * (NA)] |
| 27 | | | | If plans are being made to move the child into a new placement, is there evidence of efforts to foster a relationship between the child/family and prospective resource parent/relative? [Yes / No / * (NA - no plans to move child)] |
| 28 | | | | Child is placed with all siblings in state custody unless there is clear evidence through documentation and/testimony that the separation is necessary to meet the needs of the child/ren? [Yes / No / * (NA - no sibs in custody)] |
| 29 | | | | Is the child visiting with separated siblings? [Yes / No / * (NA - no siblings, or no siblings separated)] |
| 30 | | | | Is the current/upcoming placement the least restrictive placement with regard to the needs of the child? [Yes / No / * (NA - lack of supporting documentation/information)] |

FOR PAD revised 1-31-12
Page 4 of 9

| # | Yes | No | N/A | |
|---|-----|----|----|---|
| | | | | |
| | | | | Reviewers shall specify below any issues related to any "No" answers or areas viewed as a strength |
| | | | | |
| **#** | **Yes** | **No** | **N/A** | **ICPC DEVELOPMENTAL SELECTION:** |
| 31 | | | | Is the child placed out of state? [Yes / No] |
| 35 | | | | Does the child have a developmental diagnosis? [Yes / No] |
| | | | | |
| 32 | | | | Is there evidence that the agency is receiving ICPC services from the other state in which the child is placed? [Yes / No / * (Court ordered, receiving state has not accepted ICPC jurisdiction) / # (ICPC services requested, but no documentation from other state)] |
| 33 | | | | Is there evidence that the ICPC assigned worker received notification asking them to participate in the County Conference? [Yes / No / * (NA - other state hasn't accepted jurisdiction)] |
| 34 | | | | Did reviewer find evidence of MS DFCS staff making monthly assessments or attempts to make monthly assessment of the child placed out of state? [Yes / No] |
| 34a | | | | Was a report of maltreatment investigated during the PAR? [Yes / No / NA] |
| 34b | | | | Did the reviewer find evidence of twice monthly visits to the child? [Yes / No / NA] |
| | | | | Reviewers shall specify below any issues related to a "No" answer or areas viewed as a strength |
| | | | | |
| 36 | | | | Did the child receive a treatment plan regarding the diagnosis? [Yes / No / * (Treatment plan not in file, but documentation of plan in narratives)] |
| 37 | | | | Did the child receive services pursuant to the treatment plan? [Yes / No / * (Treatment plan not in file, but follow up services documented)] |
| 38 | | | | Did the child receive follow up developmental/medical services? [Yes / No] |
| 39 | | | | Is the current placement provider meeting the medical needs of the child? [Yes / No / * (Provider is willing and capable, however, services are lacking)] |
| 39a | | | | Has the child received a developmental assessment by a qualified professional as specified in DFCS policy Section D, pg. 75? [Yes / No / * (NA - child over age three and assessment not warranted)] |
| | | | | Reviewers shall specify below any issues related to a "No" answer or areas viewed as a strength |
| | | | | |

FCR PAD revised 1-31-12
Page 5 of 9

| | Yes | No | N/A | MENTAL HEALTH |
|---|---|---|---|---|
| 40 | | | | Does the child have a therapeutic/ emotional/ behavioral (mental health) diagnosis? [Yes / No] |
| 44 | | | | Does the child have a general or special educational diagnosis? [Yes / No] |
| | | | | |

| | Yes | No | N/A | |
|---|---|---|---|---|
| 41 | | | | If yes, did the child receive a treatment plan? [Yes / No / * (Treatment plan not in file, but documentation of plan in narratives)] |
| 42 | | | | Did the child receive recommended mental health services pursuant to his/her mental health assessment/ treatment plan? [Yes / No / * (Treatment plan not in file, but evidence of follow up)] |
| 43 | | | | Is the current placement provider meeting the therapeutic needs of the child? [Yes / No / * (Provider is willing and capable, however, services are lacking)] |
| | | | | Reviewers shall specify below any issues related to a "No" answer or areas viewed as a strength |
| | | | | |

| | Yes | No | N/A | EDUCATIONAL |
|---|---|---|---|---|
| 45 | | | | Did the child receive a treatment plan/IEP? [Yes / No / * (Treatment plan not in file, but documentation of plan in narratives)] |
| 46 | | | | Did the child receive recommended/follow up services pursuant to the general/special educational needs assessment/recommendations? [Yes / No / * (Treatment plan not in file, but evidence of follow up)] |
| | | | | Reviewers shall specify below any issues related to a "No" answer or areas viewed as a strength |
| | | | | |

| | Yes | No | N/A | WELL-BEING |
|---|---|---|---|---|
| 47 | | | | Is the current placement provider meeting the needs of the child? [Yes / No / * (Provider is willing and capable, however, services are lacking)] |
| 48 | | | | Were needs identified for the child as a result of the CFA or other (outside or informal) assessments? [Yes / No] |
| 49 | | | | If needs were identified, were services provided or referrals made for the child to receive needed services? [Yes / No / * (NA - no needs identified)] |
| 50 | | | | Is the current/upcoming placement the most appropriate with regard to the needs of the child? [Yes / No / * (Lack of supporting documentation/information)] |
| 50 A | | | | If the child reached the age of three during the PUR, was there evidence that the child received a dental examination within 90 days of their third birthday? [Yes / No / * (NA)] |
| 50 B | | | | If older than three, has the child received regular (at least every six months) dental examinations? [Yes / No / * (NA - child younger than three)] |
| 50 C | | | | Did the child receive any necessary follow up dental services? [Yes / No / * (NA - follow-up services not needed)] |

FCR PAD revised 1-31-12
Page 6 of 9

| | Yes | No | N/A | CASE PLANNING |
|---|---|---|---|---|
| 51 | | | | Were the ISP's that were due in the review period updated quarterly? [Yes / No / * (Not updated timely, however, ISP was reviewed and updated prior to PAD) / # (Updated timely, however, updates are needed for accuracy)] |
| 52 | | | | Was the most recent ISP updated as a result of a FTM? [Yes / No] |
| 53 | | | | Did reviewer find evidence that efforts have been made to identify and locate maternal and paternal relatives/ any interested relative for placement? [Yes / No / * (NA - child placed with relatives/temporary home trial placement) / # (NA - TPR / Child free for adoption)] |
| 54 | | | | Did reviewer find evidence of efforts to actively work towards a concurrent plan? [Yes / No / * (NA - Current plan for child is attainable) / # (NA - TPR / Child free for adoption)] |
| 55 | | | | Has there been agency compliance with the child's individual service plan? [Yes / No / * (Other - specify)] |

Reviewers shall specify below any issues related to a "No" answer or areas viewed as a strength

| | Yes | No | N/A | TPR/ADOPTION |
|---|---|---|---|---|
| 56 | | | | Has TPR occurred/is the child free for adoption? [Yes / No] |
| 62 | | | | Does the child have a permanent plan of adoption? [Yes / No] |
| | | | | **TPR** |
| 57 | | | | Has the child been in custody 15/22 months? [Yes / No] |
| 58 | | | | Did reviewer find evidence that exceptions exist to not refer the case for TPR? [Yes / No] |
| 59 | | | | Has the court ordered the case to be referred for TPR? [Yes / No] |
| 60 | | | | Has the TPR packet been submitted? [Yes / No] |
| 61 | | | | Was the TPR packet due or overdue at the last review of the case? [Yes / No] |

| # | Yes | No | N/A | ADOPTION |
|---|---|---|---|---|
| 63 | | | | Does the child have an assigned adoption specialist? [Yes / No] |
| 64 | | | | Adoption COR/COS attended/Participated in PAR? [Yes / No / * (NA - no Adoption COR/COS)] |

DHS
296116

78

FCR PAD revised 1-31-12
Page 7 of 9

| # | Yes | No | N/A | |
|---|-----|----|----|---|
| 65 | | | | Did the reviewer find supporting evidence that the child has an adoption plan? [Yes / No] |
| 66 | | | | Does it appear that active efforts are being made to achieve a finalized adoption for the child (including locating/recruiting a committed placement for the child?) [Yes / No] |
| 67 | | | | Has the child been freed for adoption longer than six months without an identified, committed adoptive placement? [Yes / No] |
| 68 | | | | Did reviewer find evidence that a request has been made for an external adoption consultant? [Yes / No / * (NA - external Adoption Consultants not available to DFCS during PUR)] |
| | | | | Reviewers shall specify below any issues related to a "No" answer or areas viewed as a strength |
| | | | | |

| # | Yes | No | N/A | INDEPENDENT LIVING |
|---|-----|----|----|---|
| 69 | | | | Is the child eligible for Independent Living services? [Yes / No] |
| 70 | | | | Is there evidence the child is receiving Independent Living services? [Yes / No] |
| 71 | | | | Do the services provided appear to adequately prepare the child for living independently once they are discharged from state's custody? [Yes / No] |
| 72 | | | | Is the child transitioning to living independently? [Yes / No (If no select NA - Child not transitioning to independence for questions 73-76)] |
| 73 | | | | If the child is transitioning to living independently, is there evidence that the child has a plan with available services to provide an adequate living arrangement? [Yes / No (explain) / * (NA - child not transitioning to independence)] |
| 74 | | | | If the child is transitioning to living independently, is there evidence that the child has a plan with available services to provide a source of income? [Yes / No (explain) / * (NA - child not transitioning to independence)] |
| 75 | | | | If the child is transitioning to living independently, is there evidence that the child has a plan with available services to provide health care after custody or information to obtain health care? [Yes / No / * (NA - child not transitioning to independence)] |
| 76 | | | | If the child is transitioning to living independently, is there evidence that the child has a plan with available services regarding independent living stipends information, educational and training vouchers or information on obtaining these after custody? [Yes / No / * (NA - child not transitioning to independence)] |
| | | | | Reviewers shall specify below any issues related to a "No" answer or areas viewed as a strength |
| | | | | |

| | Yes | No | N/A | LEGAL HISTORY / PERMANENCY |
|---|-----|----|----|---|
| 77 | | | | Did the child have a timely court review or hearing? [Yes / No] |
| 78 | | | | Is there evidence the county received court orders in a timely manner? [Yes / No / * (other - specify)] |
| 79 | | | | Is there is a 'no contact court order' prohibiting visitation between the child and their parent(s)? [Yes / No (If no, answer NA for question 80)] |
| 80 | | | | If a no contact court order prohibiting visitation/contact exists, is there evidence that contact between the child(ren) and the parent(s) would be detrimental to the safety and/or the well-being of the child(ren)? [Yes / No / * (NA - 'no contact' order not in place) / # (other – specify)] |
| 81 | | | | Is there a continuing need for custody of the child? [Yes / No] |
| 82 | | | | Is the permanent plan for the child appropriate based on case information and policy guidelines? [Yes / No] |

DHS
296117

FCR PAD revised 1-31-12
Page 8 of 9

| 82a | | | | Was there evidence that the previous Youth Court Hearing and Review Summary was forwarded to the court of jurisdiction by COR? [Yes / No / * (NA)] |
|---|---|---|---|---|
| | | | | Reviewers shall specify below any issues related to a "No" answer or areas viewed as a strength |
| | | | | |

## PARENT INFORMATION

| | Yes | No | N/A | |
|---|---|---|---|---|
| 83 | | | | Is the parent deceased or has TPR occurred on this parent? [Yes / No] |
| 84 | | | | Are the whereabouts of the parent unknown despite diligent efforts to locate them? [Yes (If Yes select NA - whereabouts unknown for questions 85-98) / No / * (NA - diligent efforts not documented monthly)] |
| 85 | | | | Evidence in case file that Rights and Responsibilities were signed or that parent was asked to sign/provided with form? [Yes / No / * (NA - whereabouts unknown)] |
| 86 | | | | Is the parent incarcerated? [Yes / No (select NA - parent not incarcerated for question 87) / * (NA - whereabouts unknown)] |
| 87 | | | | If parent was incarcerated/out of state/otherwise unavailable to be physically present at the PAD county conference, did the county make attempts to ensure they could participate by other means (phone, letter, email)? [Yes / No / * (NA - parent not incarcerated) / # (NA - whereabouts unknown)] |
| 88 | | | | Was the parent invited to PAR? [Yes / No / * (NA - whereabouts unknown)] |
| 89 | | | | Did the parent attend/participate in PAR? [Yes / No / * (NA - whereabouts unknown)] |
| 90 | | | | Is the permanent or concurrent plan reunification? [Yes / No (If No, answer NA - Plan not Reunification for questions 91-98) / * (No, but parent is involved in case planning activities) / # (NA - whereabouts unknown)] |
| 91 | | | | Did Reviewer find evidence that the adult ISP identifies services necessary to address conditions that led to custody? [Yes / No / * (NA-whereabouts unknown) / # (NA-Plan not Reunification)] |
| 92 | | | | Did Reviewer find evidence that the parents have had the opportunity to/were encouraged to participate in the child's care (attend school events, IEP meetings, extra curricular activities, doctor visits, etc)in an effort to promote the relationship and move the case toward permanency? [Yes / No / * (NA - whereabouts unknown) / # (NA - plan not Reunification)] |
| 93 | | | | For those cases in which the parent is not actively participating, despite available services, did reviewer find evidence of efforts by the agency to engage the parents to identify/address/develop alternate solutions to barriers? [Yes / No / * (NA - whereabouts unknown) / # (NA - plan not Reunification)] |
| 94 | | | | Did Reviewer find evidence that services were made available to the parent effectively addressing conditions that led to custody? [Yes / No / * (Supporting evidence lacking) / # (NA - whereabouts unknown) / @ (NA - plan not Reunification)] |
| 95 | | | | Has there been agency compliance with the parental individual service plan? [Yes / No / * (NA - whereabouts unknown) / # (NA - plan not Reunification)] |
| 96 | | | | Is there evidence that the parent is regularly attending visits and other activities offered/encouraged by the county/placement provider? [Yes / No / * (Lack of evidence that county has offered this service monthly to parent) / # (NA - whereabouts unknown) / @ (NA - plan not Reunification)] |
| 97 | | | | Is there evidence that the parent is actively participating in/making diligent efforts to complete the service agreement? [Yes / No / * (NA - whereabouts unknown) / # (NA - plan not Reunification)] |
| 98 | | | | Has parental progress been made toward alleviating or mitigating the causes which necessitated the placement of the child(ren) in state's custody? [Yes / No / * (NA - whereabouts unknown) / # (NA - plan not Reunification)] |
| | | | | Reviewers shall specify below any issues related to a "No" answer or areas viewed as a strength |
| | | | | |

DHS
296118

80

FCR PAD revised 1-31-12
Page 9 of 9

| | Yes | No | N/A | RESOURCE PLACEMENT |
|---|---|---|---|---|
| 99 | | | | Is the child placed at home on trial placement? [Yes / No] |
| 100 | | | | Was the resource caregiver invited to PAR? [Yes / No] |
| 101 | | | | Did the resource caregiver attend/Participate in PAR? [Yes / No] |
| 102 | | | | If the resource caregiver was unavailable to be physically present at the PAR County Conference, did the county make attempts to ensure they could participate by other means (phone, letter, email)? [Yes / No / * (NA - caregiver attended)] |
| 103 | | | | Did reviewer find evidence of monthly contact with resource caregiver that included discussion of service delivery, issues related to the ongoing needs of the child, planning for future permanency? [Yes / No] |
| 104 | | | | Did reviewer find evidence of monthly assessment of the needs of the resource caregiver by the COR or COS? [Yes / No] |
| 105 | | | | Were services/referrals provided to assist or meet the needs of the resource caregiver? [Yes / No] |

REVIEWER RECOMMENDATIONS:

**Appendix I:   EMU Reference Guide**

DHS
296120

# EVALUATION AND MONITORING

# REFERENCE GUIDE

DHS
296121

# **Contents**

- Opening Summary
  - o Practice Model Components
  - o Systemic Factors

- Division of Evaluation and Monitoring Mission and Vision Statement

- On-Site Case Review Process

- Evaluation and Monitoring On-Site Case Review Coordination and Procedures

- Case Review Sample and Case Elimination Process
  - o Case Review and Interview Schedule

- Methodology for Obtaining Baseline or Follow-Up Sampling of CQI Cases

- Methodology for Obtaining Monthly Sampling of CQI Cases

- Mississippi On-Site Case Review Guidance
  - o On-Site Case Review Tools
    - ▪ EMU Review Instrument
    - ▪ Scoring Guide
    - ▪ Review Instrument Instructions
    - ▪ EMU Onsite Review Instrument - MACWIS Documentation Guide
    - ▪ Questions Guide
    - ▪ Conducting QA on CQI Case Review Instrument

- On-Site Case Review Reporting
  - o MACWIS Data Indicators
  - o Stakeholder Surveys
  - o Practice Model Components

- Data-to-Action Meetings

DHS
296122

84

**EMU Mission Statement**

In connection with the *Olivia Y* Settlement Agreement, Council of Accreditation (COA), federal standards and to support the implementation of the Mississippi Child Welfare Practice Model, the Mississippi Department of Human Service's Division of Family and Children's Services (DFCS) (a/k/a "the Division") has embarked on developing a Continuous Quality Improvement (CQI) System which includes the Division of Evaluation and Monitoring (EMU), the Foster Care Review Program (FCR), and the Mississippi Automated Child Welfare Information System (MACWIS). The CQI System utilizes both quantitative and qualitative information to determine how counties, regions and the state are assuring the safety, permanency and well-being of children and families served by the State. This will be accomplished by monitoring key child welfare indicators associated with the components and systemic factors associated with the Practice Model.

The CQI system is organized around the six components and seven systemic factors of the Practice Model and includes elements of the Child and Family Services Review (CFSR), COA standards, and components of the *Olivia Y* settlement agreement. In order to monitor county, regional and state performance, the CQI system is centered around quantitative data indicators which will establish how counties and the region are doing in comparison to standards that have been set or in comparison to statewide performance. The qualitative information gathered is intended to provide context and a deeper insight to better understand counties and regions performance on the data indicators.

The State's six components of the Practice Model are as follows:

<u>**Mobilizing Appropriate Services Timely**</u>

Appropriate and timely services refer to a process whereby services are designed and delivered pursuant to a careful assessment of children's and parents' needs. The assessment should identify both the strengths of the children and parents with regard to the issues requiring interventions, and their needs with regard to ensuring safety, permanency, and well-being. Needs should not be confused with services. In order to provide appropriate and timely services to children and parents, there is a need to think beyond what is available in the service array in order to avoid offering a standard menu of services that may or may not match the unique needs of some parents and children. The concept of appropriate services emphasizes that services should be comprehensive, incorporating a broad array of services and supports that are individualized to meet the specific needs of the children and families. These services and supports should be provided in the least restrictive setting that is appropriate for the child and accessible to all jurisdictions within the State.

The following practice principles are linked to this component:
- Services are designed and delivered pursuant to a careful assessment of the children's and parents' needs;
- Services and supports are individualized to meet the unique needs of the children and parents;
- Services are based on needs, not on availability;

85

- Services are delivered when they are needed and in locations that are accessible to the children and parents who need them; and
- Children and families are treated as partners to assure joint decision making about the services that they need.

## Assuring Safety and Managing Risk

Safety and risk-related interventions are designed to help children remain safely at home whenever possible and appropriate. Assuring child safety begins with the first report to MDHS that someone believes a child is being maltreated and continues through initiating investigations of maltreatment; initial safety and risk assessment; ongoing safety and risk assessment; developing a case plan; assuring safety during placement; reunification; and case closure. Safety and risk interventions are applicable for all children within a home, not only for a child for whom a report of maltreatment has been received.

The following practice principles are linked to this component:
- Safety and risk assessment practice guide casework activities with regard to safety, permanency and well-being;
- Safety and risk assessments are used to address case plans and service delivery;
- Safety and risk assessment occurs throughout the life of the case;
- Family-centered practice principles apply to safety and risk interventions; and
- Safety and risk are addressed within the cultural background of the children and families being served.

## Involving Children and Families in Case Planning and Decision Making

This component includes active involvement of age-appropriate children, families, and youth in identifying their unique strengths, needs, and service requests, and in developing plans that address their needs, establish and attain their goals, and support safe and appropriate relationships within families while children are in foster care. It includes all relevant family members, whether in the e household or not, preparing them for and supporting their participation in meetings, reviews, and other processes that affect them. It also includes using information from safety and risk assessments and comprehensive strengths and needs assessments to determine negotiable and non-negotiable aspects of case planning, casework activity, and levels of family involvement.

The following practice principles are linked to this component:
- Parents, age-appropriate children, and youth are actively involved in developing or modifying all plans that pertain to them;
- Parents who do not reside in the home of the children are involved in developing and modifying plans that pertain to their children whenever it is safe and appropriate to do so;
- When safe and appropriate, parents are involved in the care of their children in foster care and in their children's activities; and
- Safety of children is not compromised through involving children and parents in case planning and decision making.

## Assessing Strengths and Needs

Comprehensive family assessment (CFA) is the ongoing and continuous process of gathering, organizing, and analyzing information for the purpose of informed decision-making and service planning concerning the safety, permanency, and well-being of children, youth, and families. Beyond an assessment of risks, safety and the circumstances leading to agency involvement, the CFA includes a broader focus of the strengths and needs of all individual family members along with underlying conditions affecting the family. Collaboration with key professionals throughout the process is critical.

The following practice principles are linked to this component:
- All families have unique strengths and needs;
- Families are participants in identifying their strengths and needs and in requesting services;
- Assessment includes strengths and needs regarding safety, permanency and well-being;
- Assessment addresses underlying conditions in addition to presenting issues;
- All relevant family members' strengths and needs should be assessed;
- Assessment information is used to guide case planning and decision making;
- Families are best understood in the context of their culture;
- Early identification of concerns that can lead to emotional and behavioral disturbance are
- prioritized in assessments; and
- Assessments should be multidisciplinary.

## Preserving and Maintaining Connections

When children enter foster care, they often become separated from the people and places that are the most familiar and comforting to them. This component of the practice model emphasizes the normalizing of connections and relationships for children in foster care to the extent that it is safe and appropriate to do so. The focus is on keeping children safe and stable within placement settings that permit them to retain important relationships with family members, retain normalized sibling relationships and friendships, and maintain important traditions and connections that define them culturally, and continue being a part of the social institutions that nurture them, such as school, religion, and so forth.

The following practice principles are linked to this component:
- Foster care should support the family instead of substitute for the parents whenever possible and appropriate;
- Healthy child/parent relationships should be supported and maintained throughout a foster care episode if safe and appropriate to do so;
- Children in foster care have important connections and relationships that help to define them as individuals and members of a family, community, and culture;
- Caseworkers should work to normalize the connections and relationships for children in foster care to the extent that it is safe and appropriate to do so;
- Children should be allowed to retain important relationships with extended family, siblings, and other friendships as deemed safe and appropriate; and

87

- Agencies should ensure that important traditions, identity with social institutions, and cultural connections are maintained.

## Individualizing Case Planning

An individualized case plan will start with information gathered from the comprehensive family assessment and should continue to be informed by the assessment throughout the life of the case. The development of the case plan, the review of the case plan and the overall planning process must involve all relevant family members, including parents who may not reside in the home, and age-appropriate children and youth. Individualized case plans must be developed *with* the family not *for* the family; occur early in the casework process; address the underlying issues that contribute to the presenting needs; include the safety plan; be written clearly in simple, straight forward language; demonstrate the family's culture and level of functioning; be flexible enough to change as the family's needs and progress toward achieving the identified goals change; include independent living goals and specific plans and tasks for age appropriate youth; and be reviewed and updated regularly *with* the family.

The following practice principles are linked to this component:
- Timely decisions about goals and activities are made in collaboration with children, youth, and parents;
- The case plan is a guide for the agency's and service providers' work with children and families, and not simply a requirement to be met;
- The family's progress is monitored regularly in order to make timely decisions with regard to changing or continuing goals and services, or to take other actions to assure the safety, permanency and well-being of children; and
- Information from all available sources should be used to ensure that a placement is the most appropriate for the child in order to assure timely permanency.

**Systemic factors:**   In evaluating systemic performance, the CQI system should gauge the capacity of the child welfare "system" to support interventions with children and families that are consistent with the practice model and to help them achieve positive outcomes.   Among the systemic factors that should be monitored are:

- ***Training of staff and providers***. CQI should conduct evaluations of the extent to which pre-service and ongoing training are being provided and are providing the skills needed for staff and providers to carry out their roles and responsibilities.

- ***Service array***.   CQI should evaluate the extent, accessibility, flexibility, and responsiveness of the State and local service array to address the individualized needs of children and families on a routine basis, and should identify gaps in the service array.

- ***Placement resources***.  CQI should evaluate the array, accessibility, and responsiveness of the foster care placement options within the counties to meet the individualized placement needs of children in foster care, and identify gaps.

- *Caseloads*.   CQI should monitor the conformity of county departments to caseload standards and supervisory ratios.

- *Oversight and monitoring*.   CQI should evaluate the effectiveness of supervision and administration in monitoring and reinforcing practice that is consistent with the practice model and in providing the necessary systemic supports.  It should also monitor for the functioning and effectiveness of local CQI processes in place.

- *Court processes.*   CQI should review the effectiveness of court-related procedures, such as holding timely and meaningful reviews and hearings, notifying appropriate parties of proceedings, filing for TPR timely, and so forth.

- *Data Quality and Usage*.   CQI should monitor the accuracy and thoroughness of MACWIS data at the county level, particularly given the Department's reliance on MACWIS data to determine if critical benchmarks of progress have been made, and to evaluate the outcomes of practice.

As DFCS identifies its strengths and needs through the CQI process, goals and activities of improvement efforts should be aligned with the goals and activities of other major initiatives. In involving the courts in these efforts, and in complying with federal requirements, the goals and activities resulting from CQI should also be coordinated with Mississippi's Court Improvement Program plan.

As DFCS moves forward, the CQI process should serve as the vehicle for keeping the core practices, values, and principles in front of staff at all levels. If implemented properly and supported, it will become the Divison's main source of sustaining the progress that it makes over time.

## MISSION STATEMENT

Division of Evaluation and Monitoring

➢ Being guided by the strengths perspective and the principle of family centered practice, the mission of the Division of Evaluation and Monitoring is to provide clear, fair, and unbiased feedback on the case work and service delivery within the Department of Human Services.

➢ The vision of this endeavor is to strengthen practice by supporting a framework, or Model of Practice, which unifies and coordinates services delivery so that clients receive the best services that this agency can provide to increase safety, permanency, and well-being for all parties whom we serve.

➢ The values that drive this mission are personal courage, objectivity, a non-punitive evaluation model, integrity, respect, collaboration, and personal accountability.

DHS
296128

90

## ON-SITE CASE REVIEW PROCESS

The following section contains documents and process used to coordinate and conduct on-site case reviews in the regions annually as well as monthly. The documents in this section are as follows:

- Evaluation and Monitoring Case Review Coordination and Procedures

- Case Review Sample and Elimination Process
  - Case Review and Interview Schedule

- Methodology for Obtaining Baseline or Follow-Up Sampling of CQI Cases

- Methodology for Obtaining Monthly Sampling of CQI Cases

- Mississippi CQI Baseline Reviews Guidance

- On-Site Case Review Tools
  - Evaluation and Monitoring On-Site Review Instrument
  - Scoring Guide for the Evaluation and Monitoring Review Instrument
  - Evaluation and Monitoring Review Instrument Instructions
  - Evaluation and Monitoring On-Site Review MACWIS Documentation Guide
  - On-Site Case Review Interview Questions Guide
  - Guide for Conducting Quality Assurance on CQI Case Review Instruments

## Evaluation and Monitoring
## On-Site Case Review Coordination and Procedures

o **3 Months Prior to review:**
  o Contact region and set a date and location for the review;

  o Via the MACWIS Unit, request a Universe of Cases (UOC) from MIS for foster care and in-home case types;

    ▪ Include in the UOC request, the period under review.   For example, if the review is held in May 2012, the review period in the UOC request should be from May 2011 to the date MIS runs the UOC report.

o **2 Months Prior to review:**
  o In collaboration with the region, locate a hotel for the review team members to stay;

  o Contact Reservations Coordinator and request that the hotel be contacted for a block of rooms. Assure that the hotel will direct bill and give a state government rate;

  o If the county office where the review will be held does not have a conference room large enough to accommodate the overview training and/or exit conference, assure that the Reservations Coordinator asks if the hotel has a meeting room large enough to conduct the overview training. A room large enough to hold 30 people is sufficient.

    ▪ The hotel's breakfast area is not a sufficient space to conduct these events.

  o If the hotel does not have such accommodations, the region's EMU Field Liaison shall contact the Regional Director or his/her designee to locate an offsite facility for the overview training and exit conference.  Examples of such facilities would include but are not limited to:

    ▪ Public library
    ▪ Community college/university
    ▪ Church family life center
    ▪ Other state agency conference rooms (i.e. Mental Health, Health Department)

  o Begin assembling the review team of 24 people and at least 4 alternates.  Team should be made up of:

    ▪ CQI staff (EMU/FCR),
    ▪ staff from the region being reviewed,
    ▪ staff from other regions (preferably in close proximity to region being reviewed), and
    ▪ any available State Office staff;

- Identify 2-3 QA reviewers and a team lead. Preferably, these will be EMU management, the region's EMU Field Liaison, or FCR management.

- If necessary, contact MIS (via MACWIS Director) to ask for the status of the UOC.

o **Six Weeks Prior to review:**
  - If available, QA the UOC to assure that they fall into the criteria of having been open at least 60 days during the period under review and compile a sample of 14 foster care cases and 10 in-home cases. Have an over-sample of 14 foster care cases and 10 in-home cases to pull from during the case elimination process;

    - **Cases should have been open at least 60 days during the review period**.

    - Check the sample against the Foster Care Review schedules for the region and month to assure that none of the foster care cases are already scheduled for a county conference. This can be done by checking the Conferences Pending report for the counties within the region.

  - Once the case review sample is completed, send it to the region being reviewed;

  - Contact the region to set a date(s) to discuss case elimination as soon as possible.

  - The EMU Liaison for the region being reviewed shall begin compiling a list of stakeholders for surveys.

    - Stakeholders include foster parents, judges, service providers, implementation team.

    - The information gathered needs to include email address, phone numbers, and mailing address.

    - If an email address is not available, the Regional EMU Liaison will need to contact these individuals by phone or in person to go over the survey with them. Any hard copy surveys will need to be sent to the State Office Evaluation and Monitoring Unit.

o **1 Month Prior to review:**
  - The EMU supervisor for the region and the assigned Field Liaison will be in a constant contact with the regional staff with regard to progress on the case review sample and making any needed adjustments/revisions to the sample listing;

  - The Regional EMU Liaison will be in constant contact with the regional staff to assist with setting up interviews with case members;

  - A finalized review team listing should be in place by this time complete with alternates;

- o The Regional EMU Field Liaison will go to the site of the review and check the office for data ports and other items that may be needed such as conference room space and parking.

- o Assure that final hotel reservations are made for the review team.

- o **2 weeks prior to the review:**
  - o The case sample should be finalized by this time with interviews scheduled.

  - o The EMU supervisor, Field Liaison, and regional staff will begin making final case assignments to the review teams.

    - ▪ There will be twelve (12) reviews teams made up of two people each.

    - ▪ Assure that two (2) of the review teams are assigned two (2) foster care cases. It is best if these two teams are made up of more experienced case reviewers (an EMU reviewer and a FCR/EMU reviewer and an experienced ASWS);

  - o Make any needed adjustments to the hotel reservations.

- o **1 week prior to the review:**
  - o If needed, finalize the case review and interview schedule. Assure no caseworkers or supervisors on the review team is assigned to review any of their own cases or cases from their own county;

  - o Develop the Power Point for the Overview Training and copy to a flash drive;

  - o Assure that the regional point person (RD, Regional ASWS, other) has put a procedure in place to have the paper files delivered to the review site by the time of the review.

  - o Assure that all review forms and copies of the Overview Training Power Point (print in "handouts" format) are put together.

- o **The day before the overview training:**
  - o The designated auto-tool administrator will assure that case assignments are made in the data base for the review team members and that QA Reviewers are assigned to each case review team.

  - o Appropriate EMU Management (Director, Program Administrator Sr.) assure that lap tops, power cords, surge protectors, extension cords, wireless router, projector and connectors are packed.

  - o Assure that legal pads, sticky notes, and pencils are packed.

94

DHS
296132

o Go to the review site and set up the wireless router and lap-top computers.

o Test the signal from the wireless router to each lap-top to assure connectivity.

o **The day of the overview training:**
    o Set up the projector and lap-top for the overview training;

    o Assure that there is a screen or an adequate space on the wall to project the Power Point;

    o Using the overview training Power Point from the flash drive, present the training;

    o Before dismissing the training, assure that everyone is clear on the topics covered, when to be at the review site, and where the hotel is located, etc.;

    o Pack up the projector, lap-top, cords and surge protectors, and assure that you have the flash drive.

    o Assure that the review team members know to click the "Next" button at the bottom of each page of the auto-tool. This will save the information entered on the page and allow the review team to move to the next item. Clicking the item number on the left hand side of the screen will not save the information that has been entered on the page.

        ▪ This needs to be done when making corrections pointed out by QA.

    o Assure review team members know to not only click the "Finish" button at the end of the instrument, but also click the "Submit to QA" button.

o **On-site review (Day 1 and Day 2)**
    o Arrive at the office early to assure the work space is set up and everything is working properly;

    o During the morning you will probably have to spend time assisting the case reviewers with logging on to the lap top computers and signing in to the auto-tool;

        ▪ Most will try to access MACWIS through the internet Explorer icon on their lap top's desk top. They should first log in to MACWIS through the portal, access the DFCS Connection site (data dashboards);

        ▪ On the left hand side of the DFCS Connection, select the CQI link;

        ▪ Scroll down to Evaluation and Monitoring and select the EMU Automated Review Instrument;

- ▪ Log in with mw# and password, click on View Cases, go to the case number being reviewed and click on Select at the end of the line.

o Answer any questions regarding case review or the instrument that people may have;

o Print and fill out the QA checklist;

o When performing QA of cases, be sure to not only notate on the auto tool the issues that need to be corrected (if any) but also let the review team know you have sent their case back to them for corrections. In the "QA Comments" section of the Face Sheet, list the items that the review team will need to address. This will save time for the review team in knowing what items need to be corrected without having to navigate through the entire instrument.

o As cases are finished and QA completed, print the review (once the auto tool reporting is in place you will not have to do this any longer), and tally the strengths and areas needing improvement from each case onto the case review tally sheet.

o Once the case is completed, QA has been performed, the case has been printed and tallied…mark at the top of the printed case review "QA", "FC" (for foster care if it's a foster care case), "IH" (for in-home if it is an in-home case), and the initials of the person who QA'd the case;

o Update the QA checklist to show that the QA and tallying of the case is complete.

o During the afternoon debriefings, keep the discussion as strengths based as possible. Areas needing improvement need to be discussed but not in a punitive or negative manner.

o **At the end of Day 2,**
  - o During the day 2 debriefing, find out which members of the case review team will be in attendance at the exit conference the following day. Stress to those individuals that they will be encouraged to make comments during the exit conference but they need to remain strengths based and non-punitive/non-judgmental in their comments. There is nothing wrong with pointing out areas needing improvement but they should do so in a professional manner;

  - o Make arrangements with the county clerical staff to shred the notes from the review. You may have to do the shredding yourself;

  - o Put together the Exit Conference power point using the tally of strengths and areas needing improvement. Keep this document on a flash drive.

  - o Print the notes version of the Power Point to use during your presentation. You may have to do this the day of the exit conference from the county office.

o If there are printed case reviews, be sure to pack them (separating the in-home cases from the foster care cases) and take them to the state office to the Evaluation and Monitoring office for tallying and reporting.

o **The Day of the Exit Conference:**
  o 90 minutes prior to the exit conference, meet with the RD and Regional ASWS to go over the preliminary findings of the case review. This will allow them to go into the conference informed of the findings and experiencing no surprises;

  o Set up the projector, screen, and lap-top for the presentation;

  o Have the exit conference participants introduce themselves. Afterwards, be sure to make a special acknowledgement of any community partners who are in attendance;

  o Present the material for the exit conference. The exit conference will include the Regional Director and staff (ASWSs, Practice Coach, Adoption/FC staff) as well as community partners;

  o Give the members of the review team who are present the opportunity to make comments as to what they observed (remaining strengths based and non-punitive) during the course of their case review with regard to each of the practice model components discussed.

  o At the end of the exit conference, be sure to acknowledge everyone who assisted in coordinating the review.

  o Pack up all gear (lap top, projector, extension cords, flash drive, etc.) and return it to the Evaluation and Monitoring office at the State Office in Jackson. Assure that you have the printed case reviews and take them to the State Office Evaluation and Monitoring office.

  o Email a copy of the case review results spreadsheet and the exit conference Power Point to the Regional Director and Regional ASWS. "CC" the Evaluation and Monitoring Director and the Data Analyst.

# CASE REVIEW SAMPLE AND CASE ELIMINATION PROCESS

## Foster Care and In-Home Case Samples

A randomly selected sample of foster care and in-home cases will be generated based on the universe of cases and provided to the regional office.

- For each regional review there will be **14 foster care and 10 in-home cases scheduled for review**.

- The Regional CQI Liaison will meet with the regional staff to explain the case review sample, the case elimination process, and the scheduling process.

- Since the county case worker has already established a working relationship with the clients, the worker will call and set up appointments for parents, resource parents (including relatives), the child (ren), therapist, any person of great importance to the case (ex. grandparent, aunt, uncle, etc.) and a time for the case worker (COR and COS, if applicable).
    - Interviews should be set up for the **afternoon** of **the first day of the review** for the **foster care cases** and the **afternoon** of the **second day of the review** for the **in-home cases**.
    - Interviews 30 minutes to 1 hour apart.
    - These interviews should be in person but can be conducted by phone if needed.
    - A phone number, date, and time for the telephone interview should be obtained.
    - Interviews can be before lunch but are not preferred.

- The region should start scheduling foster care and in-home cases for review from the beginning of the respective lists and work each list sequentially until the requisite numbers of cases are scheduled for review.

- Preliminary arrangements should be made for two alternate cases for each case type in the event that a case has to be eliminated at the time of the on-site review.

## Elimination of Cases from the Sample

The region should consult with the Division of Evaluation and Monitoring on a case-by-case basis in regards to any reasons for eliminating cases from the sample. The region should provide to the Division of Evaluation and Monitoring a document listing the reasons for any cases that are eliminated from the sample. The region may eliminate cases for the following reasons **only**:

- Cases in which the key individuals are unavailable or unwilling during the onsite review for interviews, even by telephone. The key individuals in a case are:
    - the child (if school age),
    - the parents,
    - the foster parents,
    - County of Responsibility worker and County of Service worker.

DHS
296136

98

- Cases in which the target child has been in a trial placement with the parent(s)/primary caretaker(s) for more than 90 days and the Agency continues to retain custody.

- There may be cases, however, that should not be eliminated even though key individuals are unavailable. Before eliminating these cases, the region should determine whether sufficient information and perspectives can be obtained from the available parties. If the region determines the case should be eliminated, it should consult with the Division of Evaluation and Monitoring.

- Cases involving out-of-county or out-of-state family members or services are considered on a case-by-case basis, depending on availability of key individuals.

- If a case was open for 60 consecutive days in the region under review and the case was then transferred out of the region, the case should still be considered for review and the reviewers will review only for the time period when the case was open in the region. If a case was transferred between counties within the region under review during the sampling period and the case was open for 60 consecutive days in the region under review, the case should be considered for review and the reviewers will review for the time period the case was open within the region. However, if a case was not open in the region for 60 consecutive days during the sampling period under review then the case should be eliminated.

- A foster care case or an in-home services case open for <u>fewer</u> than 60 consecutive days during the past year should be eliminated.

- An in-home services case in which any child in the family was in foster care <u>during the past year</u> should be eliminated.

- A case reported to MACWIS in error or no children are receiving services in the case should be eliminated.

- Situations in which case selection would result in over-representation of child welfare agency staff, such as when more than two cases in one region are from the caseload of a single caseworker, should be eliminated.

# Case Review and Interview Schedule

| Review Team | | | CASE #1 | | | | | |
|---|---|---|---|---|---|---|---|---|
| Region | | | | | | | | |
| Review Site | | | | | | | | |

| Target Child/Case Name | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| County of Responsibility | | | | | | | | |
| Foster Care or In-Home Case | | | | | | | | |

| Date/Time of Case Participant Interview | | Name of Person(s) Interviewed | Role in Case (Mother, Father, Child, Resource Parent, Caseworker, etc) | Interview in Person? | If In Person, was interview in Office or Home? | If Home, what is address and town? | Interview by Phone? | If by Phone, what is phone number? |
|---|---|---|---|---|---|---|---|---|
| Date (mm/dd/yy) | Time | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| Review Team | | | CASE #2 | | | | | |
|---|---|---|---|---|---|---|---|---|
| Region | | | | | | | | |
| Review Site | | | | | | | | |

| Target Child/Case Name | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| County of Responsibility | | | | | | | | |
| Foster Care or In-Home Case | | | | | | | | |

| Date/Time of Case Participant Interview | | Name of Person(s) Interviewed | Role in Case (Mother, Father, Child, Resource Parent, Caseworker, etc) | Interview in Person? | If In Person, was interview in Office or Home? | If Home, what is address and town? | Interview by Phone? | If by Phone, What is phone number? |
|---|---|---|---|---|---|---|---|---|
| Time | Time | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

DHS
296138

100

## METHODOLOGY FOR OBTAINING BASELINE OR FOLLOW-UP SAMPLING OF CQI CASES

- Request sample of foster care and in-home cases from MIS through DFCS/MACWIS for specific time period with the criteria of cases having to be open for at least 60 days during the period under review

- Open Random.org and enter the number of children listed on the foster care universe of cases. Generate randomizer (Number - Sequence). Take the first 28 numbers on the generator and identify which child's name correlates with each number (in order) and this will be your foster care sampling. Verify that

    1) none of these children are scheduled for a foster care review for the month (identified by report name MWCPCRMD — Pending Conference Review Report) and

    2) none of the identified children (or their siblings) have already been reviewed through a baseline, follow-up or monthly review.

- Complete the same process for in-home to obtain 20 numbers generated by Random.org. Run the random generator again to obtain 20 cases for the in-Home sample of cases.



DHS
296139

101

# Mississippi On-Site Case Review Guidance

Specifications for the universe of foster care and in-home cases (MACWIS Team will provide these lists)

## FOSTER CARE SAMPLE

The list needs to be of cases open **at least 60 days during the past year as of the date of the pull** and should include the following information:
- County name
- ASWS (County of Responsibility)
- Worker name (County of Responsibility)
- Case Head Name
- Child's name
- Person ID
- Custody Date
- Permanent plan

## IN-HOME SAMPLE

The list needs to be of cases open at least 60 days during the past year as of the date of the pull and should include the following information:
- Region
- County Name
- ASWS name
- Caseworker's name
- Client ID#
- Case Name
- Type of Service
- Number of Associated Household Children
- Date case was opened

## Foster Care and In-Home Case Samples
A randomly selected sample of foster care and in-home cases will be generated based on the universe of cases and provided to the regional office.

- For each regional review there will be 14 foster care and 10 in-home cases scheduled for review.

- The region should start scheduling foster care and in-home cases for review from the beginning of the respective lists and work each list sequentially until the requisite numbers of cases are scheduled for review.

- Preliminary arrangements should be made for two alternate cases for each case type.

## Elimination of Cases from the Sample

The region should consult with the Evaluation and Monitoring Unit on a case-by-case basis in regards to any reasons for eliminating cases from the sample. The region should provide to the Evaluation and Monitoring Unit a document listing the reasons for any cases that are eliminated from the sample. The region may eliminate cases for the following reasons **only**:

- Cases in which the key individuals are unavailable or unwilling during the onsite review for interviews, even by telephone. The key individuals in a case are:
  - the child (if school age),
  - the parents,
  - the foster parents,
  - County of Responsibility worker and County of Service worker.

- Cases in which the target child has been in a trial placement with the parent(s)/primary caretaker(s) for more than 90 days and the Agency continues to retain custody.

- There may be cases, however, that should not be eliminated even though key individuals are unavailable. Before eliminating these cases, the region should determine whether sufficient information and perspectives can be obtained from the available parties. If the region determines the case should be eliminated, it should consult with the Evaluation and Monitoring Unit.

- Cases involving out-of-county or out-of-state family members or services are considered on a case-by-case basis, depending on availability of key individuals.

- If a case was open for 60 consecutive days in the region under review and the case was then transferred out of the region, the case should still be considered for review and the reviewers will only review for the time period when the case was open in the region. If a case was transferred between counties within the region under review during the sampling period and the case was open for 60 consecutive days within the region under review then the case should be considered for review and the reviewers will review for the time period the case was open within the region. However, if a case was not open for 60 consecutive days during the sampling period in the region under review, the case should be eliminated.

- A foster care case or an in-home services case open for fewer than 60 consecutive days during the past year should be eliminated.

- An in-home services case in which any child in the family was in foster care during the past year should be eliminated.

- A case reported to MACWIS in error or no children receiving services in the case should be eliminated.

- Situations in which case selection would result in over-representation of child welfare agency staff, such as when more than two cases in one region are from the caseload of a single caseworker, should be eliminated.

**Timeline for the Three Days of the Review**

Day One
| | |
|---|---|
| 1:00–5:00 | Review Opening / Orientation Meeting / Training on Evaluation and Monitoring On-Site Review Instrument |

Day Two
| | |
|---|---|
| 8:00–12:00 | Review Pair's First Case |
| 12:00–1:00 | Lunch on your own |
| 1:00–5:00 | Completion of Review Pair's Second Case |
| 5:00–5:30 | Debriefing |

Day Three
| | |
|---|---|
| 8:00– 12:00 | Review Pair's Second Case |
| 12:00–1:00 | Lunch on your own |
| 1:00–5:00 | Completion of Review Pair's Second Case |
| 5:00–5:30 | Debriefing |

Day Four
| | |
|---|---|
| 9:00–12:00 | Final Review Team Debriefing and Exit Conference with Regional Staff and Stakeholders |

**Case-Related Interviews**

Interviews for each case should be scheduled between 3:00 pm and 5:00 pm on the first day of the case review and remaining interviews scheduled between 8:00 am and 10:00 am the following day.

- County of Responsibility Worker and County of Service Worker

  o Please try to schedule these individuals for an interview first so that key information can be gathered before the other interviews.

- The child (school age)

- The child's parent(s)  (Do not interview parents whose rights have been terminated)

- The child's foster parent(s), pre-adoptive parent(s), or other caregiver(s), such as a relative caregiver

For more information on interviews, see the "Scheduling Case Reviews" section below.

<u>**Scheduling Case Reviews**</u>

- There will be 12 pairs of reviewers and each pair of reviewers should be assigned at least one foster care case.

    o  Two pairs of reviewers will review two foster care cases.

    o  The remaining 10 pairs of reviewers will review one foster care case and one in-home services case.

- The two cases to be reviewed by each pair of reviewers should be scheduled in a manner so the review pair can focus on reviewing their first case record beginning at 8:00 AM on Day Two of the review and have a chance to get familiar with the case prior to the first interview.

    o  Every effort should be made to schedule interviews for the first case late in the day of Day Two or early in the day of Day Three.

- The review pair should be able to start reviewing their second case record beginning at 8:00AM on Day Three of the review and have a chance to get familiar with the case prior to the first interview for the second case.

    o  Every effort should be made to schedule interviews for the second case late in the day of Day Three.

- The review pairs must be completed with their case instruments by 5:00PM on Day Three.

- The region should schedule each interview for an hour or less.  The County of Responsibility and County of Service workers can be combined for one interview.  If the County of Responsibility and/or County of Service are unable to be scheduled, the ASWS should be scheduled for an interview.

    o  Due to concerns about travel time it may be preferable for interviews to occur in the location where the review pairs are working or by telephone.

    o  If possible, due to location accessibility, interviews with children, parents, and foster parents may be conducted in the home or foster home.


<u>**Roles of Team Members**</u>

<u>Team Leaders</u>
- Provide guidance for review

- Conduct QA and Approve all instruments

<u>QA Reviewers</u>
- Conduct quality assurance of case review instruments submitted by the review teams.

<u>Review Teams and Pairs</u>
- Teams should be made up of:

  o Regional Directors from regions outside the area being reviewed,

  o Area Social Work Supervisors within the region being reviewed,

  o Resource staff within the region being reviewed,

  o EMU and FCR staff,

  o Various State Office staff,

- 2 people per case review team

- Each team will review 2 cases

- Review MACWIS case record

- Review physical case file

- Interview case participants

- Thoroughly complete review instrument

- Submit instrument to QA reviewer and Team Leads

- Actively participate in Full Team debriefing

# EMU Review Instrument

## Evaluation and Monitoring
### ONSITE REVIEW INSTRUMENT
#### Face Sheet

| Name of county and region: | | Case name: | Period under review: |
|---|---|---|---|
| Reviewer(s): | | | Date case reviewed: |

| Target Child (Check only for Foster Care Cases) | Child(ren)'s name(s): | Race and/or Ethnicity: | Date(s) of birth (MM/DD/YY): | Gender: |
|---|---|---|---|---|
| ☐ | | | | |
| ☐ | | | | |
| ☐ | | | | |
| ☐ | | | | |
| ☐ | | | | |
| ☐ | | | | |

Type of case reviewed:
☐ Foster Care Case    ☐ In-home Services Case

Was this case opened for reasons other than child abuse and neglect? (i.e. CHINS)    Yes ☐ No ☐

Date of most recent case opening for all cases (MM/DD/YY): _____

Date of the child's most recent entry into foster care (MM/DD/YY): _____    Not Applicable ☐

Date of discharge from foster care for the most recent foster care episode (MM/DD/YY): _____
Not Applicable ☐    Not Yet Discharged ☐

Date of case closure (for all cases) (MM/DD/YY): _____

Case not closed by time of review ☐

Reason the agency is working with the family (initial and evolving): (Check all that apply BUT place an asterisk '*' next to the PRIMARY reason)

| ☐ Abandonment | ☐ Alcohol Abuse-Child | ☐ Alcohol Abuse-Parent | ☐ Caretaker Inability to Cope |
|---|---|---|---|
| ☐ Child's behavior problem | | ☐ Child Disability | ☐ Court Directed |
| ☐ Death of Parent(s) | ☐ Drug Abuse-Child | ☐ Drug Abuse-Parent | ☐ Domestic violence in child's home |
| ☐ Emotional abuse | ☐ Exploitation | ☐ Inadequate Family Support | ☐ Inadequate Food Supply |
| ☐ Physical abuse | ☐ Inadequate Housing | ☐ Medical Neglect | ☐ Relinquishment |
| ☐ Incarceration of Parent | ☐ Lack of Child Care | ☐ Neglect (Does not include medical neglect) | |
| ☐ Sexual abuse | ☐ Runaway | ☐ School Dropout | ☐ Truancy |
| ☐ Unemployment | ☐ Inadequate Income | ☐ Other (specify): | |

*Persons interviewed by the Reviewers (list below)*

| Date of Interview | Name of Case Participant | Relationship to Case | Type of Interview |
|---|---|---|---|
| | | | ☐ In-Person  ☐ Phone |
| | | | ☐ In-Person  ☐ Phone |
| | | | ☐ In-Person  ☐ Phone |
| | | | ☐ In-Person  ☐ Phone |
| | | | ☐ In-Person  ☐ Phone |

EMU Review Instrument.revised 01132012Cover Sheet

107

## ITEM 1: Timeliness of Initiating Investigations of Reports of Child Maltreatment

| | | | | | | | | | Number |
|---|---|---|---|---|---|---|---|---|---|
| 1 | How many reports of suspected abuse or neglect have been received on any child(ren) in the family (including those that were screened out by the agency) **during the life of the case?** | | | | | | | | |
| 2 | How many accepted reports alleging abuse or neglect were received on any child(ren) in the family during the **period under review** (i.e., they were not screened out)? | | | | | | | | |

| | ReportDate | First Name of Child | Allegation | Priority Level (if Applicable) | Date Assigned for an Investigation | Date Investigation Initiated | Date of Face-to-Face Contact With Child | Relationship of Alleged Perpetrator to Child | Disposition |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

| | | Number |
|---|---|---|
| 3 | In how many of the reports listed above was the investigation NOT initiated in accordance with the MDHS timeframes and requirements for a report of that priority? | |
| 4 | In how many of the reports listed above was face-to-face contact with the child(ren) who is the subject of the report NOT made in accordance with the State's timeframes and requirements for a report of that priority? | |

| 5 | For all reports identified above, were the reasons for the delays due to circumstances beyond the control of the agency? | Yes | No | NA |
|---|---|---|---|---|
| 6 | Identify any reasons why a response was not initiated within established timeframes or face to face contact was not made (if applicable and reason is available): | | | |
| Rating | Section 1 is rated:_____. Please elaborate on any findings: | | | |

## ITEM 2: Repeat Maltreatment

| 7 | Was there at least one evidenced maltreatment report involving any child in the family during the period under review? | Yes | No | NA |
|---|---|---|---|---|
| 8 | If Yes to #7, within a 6-month period before or after any maltreatment report identified was there at least one additional evidenced maltreatment report involving any child in the family? | Yes | No | NA |
| 9 | If Yes to #8, did the report(s) identified above involve the same or similar circumstances? | Yes | No | NA |
| 10 | If Yes to #8, did any of the reports involve maltreatment of the child by the foster parents, members of the foster parents' family, other children in the foster home or facility, or facility staff members? | Yes | No | NA |
| 11 | If there was maltreatment recurrence, document the circumstances related to maltreatment incidents including information related to the perpetrators, and indicate why the reviewers determined that the two incidents did or did not involve the same circumstances. Also indicate the dates of all maltreatment reports occuring within the 6-month period: | | | |
| 12 | Describe the circumstances related to any evidenced reports of maltreatment (if relevant) involving the foster parents, members of the foster parents' family, other children in the foster home or facility, or facility staff members: | | | |
| 13 | For cases where repeat maltreatment did occur, identify interventions and actions, or absense of interventions and actions, taken by the caseworker and ASWS to try and prevent maltreatment of the child(ren): | | | |
| Rating | Section 2 is rated:_____. Please elaborate on any findings: | | | |



## ITEM 3: Services to Family to Protect Child(ren) in the Home and Prevent Removal or Re-Entry into Foster Care

| 14 | For the period under review, did the agency make concerted efforts to provide or arrange for appropriate services for the family to protect children and prevent their entry into foster care or re-entry into foster care after a reunification? | Yes | No | NA |
|---|---|---|---|---|
| 15 | If, during the period under review, any child was removed from the home without providing or arranging for services, was this action necessary to ensure the child's safety? | Yes | No | NA |

| | | | | | |
|---|---|---|---|---|---|
| 16 | Please identify the circumstances that indicate a safety risk to the child and the services that were needed by the family to address safety issues and describe how those services were or were not provided by the agency during the period under review: | | | | |
| 17 | Please note the reason for removing the child from the home during the period under review without providing services (if relevant and reason is available) and provide the reviewers' reasons for determining whether the reason was appropriate or inappropriate: | | | | |
| Rating | Section 3 is rated:_____. Please elaborate on any findings: | | | | |

## ITEM 4: Risk Assessment and Safety Management

| | | | | |
|---|---|---|---|---|
| 18 | If the case was opened during the period under review, did the agency conduct an initial assessment of the risk to the target child in foster care and/or any child(ren) in the family remaining in the home? | Yes | No | NA |
| 19 | During the period under review, did the agency conduct ongoing assessments of the risk to the target child in foster care and/or any child(ren) in the family remaining in the home? | Yes | No | NA |
| 20 | If the case was opened during the period under review for either foster care or in-home services, did the agency: (1) conduct an initial assessment of the safety of the target child in foster care and/or any child(ren) remaining in the home, and (2) develop a safety plan with the family for addressing identified safety issues? | Yes | No | NA |
| 21 | During the period under review, did the agency: (1) conduct ongoing safety assessments of the target child in foster care and/or any child(ren) remaining in the home, and (2) continually monitor and update the safety plan, including encouraging family engagement in services designed to promote achievement of the goals of the safety plan? | Yes | No | NA |
| 22 | During the period under review, were there safety concerns pertaining to the target child in foster care or any child(ren) in the family remaining in the home that were not adequately or appropriately addressed by the agency? | Yes | No | NA |
| 23 | During the period under review, was there a safety concern related to the target child in foster care during visitation by parents or other family members that could be attributed to not providing sufficient monitoring of visitation, permitting unsupervised visitation when it was not appropriate, or court-ordered visitation against agency recommendations? | Yes | No | NA |
| 24 | During the period under review, was there a concern for the target child's safety related to the foster parents, members of the foster parents' family, other children in the foster home or facility, or facility staff members that was not adequately or appropriately addressed by the agency? (Foster parents include pre-adoptive parents | Yes | No | NA |
| 25 | During the period under review, if the target child was discharged from foster care to be reunited with parents or relatives or returned home on a trial home visit, did the agency conduct a thorough safety assessment? | Yes | No | NA |

| | |
|---|---|
| 26 | Describe the circumstances of the case that indicate risk concerns related to the child(ren): |
| 27 | Describe the circumstances of the case that indicate safety concerns related to the child(ren): |
| 28 | Describe the characteristics of the risk assessment(s) and safety assessment(s) (was one conducted, how was it conducted, when it was conducted, how comprehensive was it, what did it include or not include), including their timing: |
| 29 | If applicable, describe the nature of the safety concerns related to the child(ren) during visitation, including a description of the visitation (for example, was it unsupervised, and if so, was this appropriate?): |
| 30 | If applicable, describe the nature of the safety concerns related to the child(ren) from foster care providers and MDHS's activities with regard to addressing safety. |
| 31 | Identify the activities undertaken to monitor participation in safety-related services (or the absence of activities to monitor service participation): |
| 32 | Was there a report evidenced that the foster care provider(s) maltreated the child during the period under review? If Yes, describe the circumstances of that report, whether the agency might have prevented the maltreatment, and the agency's response: |
| Rating | Section 4 is rated:_____. Please elaborate on any findings: |

*Assessing Strengths and Needs*

| ITEM 5. Needs and Services of Child, Parents, and Foster Parents | | | | | |
|---|---|---|---|---|---|
| | 33 | During the period under review, did the agency conduct (1) a formal or informal initial comprehensive assessment of the child(ren)'s strengths and needs (if the case was opened during the period under review), or (2) an ongoing assessment to provide updated information regarding the **child(ren)'s** needs for case planning purposes (if the case was opened before the period under review)? | Yes | No | NA |
| | 34 | If Yes to #33, and the case was opened during PUR, was the initial children's strengths and needs assessment conducted within the first 30 days? | Yes | No | NA |
| | 35 | During the period under review, were all needed services provided to meet the child's identified needs? | Yes | No | NA |
| | 36 | Were all services provided to children in a timely manner? | Yes | No | NA |
| | 37 | Was the child interviewed prior to the completion of the strengths and needs assessment? | Yes | No | NA |
| | 38 | Is there clear evidence, other than signatures, of child involvement and input in the strengths and needs assessment? | Yes | No | NA |
| | 39 | Document the method that the agency used to assess the child's needs: | | | |
| | 40 | Document the services provided to the child(ren): | | | |
| | 41 | Document the services that were needed but not provided: | | | |
| | 42 | During the period under review, did the agency conduct (1) a formal or informal initial comprehensive assessment of the mother's strengths and needs (if the case was opened during the period under review) or (2) an ongoing assessment to provide updated information regarding the **mother's** needs for case planning purposes (if the case was opened before the period under review)? | Yes | No | NA |
| | 43 | If Yes to #42, and the case was opened during PUR, was the initial strengths and needs assessment of the mother conducted within the first 30 days? | Yes | No | NA |
| | 44 | Were all services provided to mother in a timely manner? | Yes | No | NA |
| | 45 | Was mother interviewed prior to the completion of the strengths and needs assessment? | Yes | No | NA |
| | 46 | Is there clear evidence, other than signatures, of mother involvement and input in the strengths and needs assessment? | Yes | No | NA |
| Section B (#42-58) | 47 | During the period under review, did the agency provide all needed services to the mother to meet identified and assessed needs (with respect to services the mother needs in order to provide appropriate care and supervision to ensure the safety and well-being of her children)? | Yes | No | NA |
| | 48 | During the period under review, did the agency conduct (1) a formal or informal initial comprehensive assessment of the **father's** strengths and needs (if the case was opened during the period under review) or (2) an ongoing assessment to provide updated information regarding the father's needs for case planning purposes (if the case was opened before the period under review)? | Yes | No | NA |
| | 49 | If Yes to #48, and the case was opened during PUR, was the initial strengths and needs assessment of the father conducted within the first 30 days? | Yes | No | NA |
| | 50 | During the period under review, did the agency provide all needed services to the father to address identified and assessed needs (with respect to services the father needs in order to provide appropriate care and supervision to ensure the safety and well-being of his children)? | Yes | No | NA |

EMU Review Instrument.revised 01132012Strengths and Needs

DHS
296149

| | | | | | |
|---|---|---|---|---|---|
| Section B (Continued) | 51 | Were all services provided to father in a timely manner? | Yes | No | NA |
| | 52 | Was father interviewed prior to the completion of the strengths and needs assessment? | Yes | No | NA |
| | 53 | Is there clear evidence, other than signatures, of father's involvement and input in the strengths and needs assessment? | Yes | No | NA |
| | 54 | Please indicate any reason why a needs assessment did not need to be completed on either the mother or father: | | | |
| | 55 | Document the services that were provided to the mother: | | | |
| | 56 | Document the services that the mother needed, based on an assessment, but that were not provided: | | | |
| | 57 | Document the services provided to the father: | | | |
| | 58 | Document the services that the father needed, based on an assessment, but that were not provided: | | | |
| Section C (#59-63) | 59 | During the period under review, did the agency conduct an assessment of the needs of the **foster or pre-adoptive parents** on an ongoing basis (with respect to services they need in order to provide appropriate care and supervision to ensure the safety and well-being of the children in their care)? | Yes | No | NA |
| | 60 | During the period under review, were the foster or pre-adoptive parents provided with all needed services to address identified needs that pertained to their capacity to provide appropriate care and supervision and ensure the safety and well-being of the children in their care? | Yes | No | NA |
| | 61 | Were all services provided to the foster/pre-adoptive family in a timely manner? | Yes | No | NA |
| | 62 | Document the services provided to the foster parent(s): | | | |
| | 63 | Document the services that the foster parent(s) needed, based on an assessment, but that were not provided: | | | |
| Rating | | Section 5 (overall) is rated:_____. Please elaborate on any findings: | | | |

EMU Review Instrument.revised 01132012Strengths and Needs

112

## ITEM 6.  Educational Needs of the Child

| 64 | During the period under review, did the agency make concerted efforts to assess and address the child(ren)'s educational needs? | Yes | No | NA |
|----|---|---|---|---|
| 65 | If case **opened** during PUR, were the child's educational needs assessed within 30 days of entry into foster care? | Yes | No | NA |
| 66 | If case **opened** during PUR, and the child is **3 years of age or younger**, did (s)he receive a developmental assessment within 30 days of foster care entry? | Yes | No | NA |
| 67 | If not explained in the "reason for rating" section, document the process used for educational assessment, if relevant: | | | |
| 68 | Document in the chart below the services provided or not provided to address the child's educational needs. Services would include advocacy on the part of foster parents as well as the caseworker; ensuring that the child received special education classes; making provisions for the child to receive tutoring or educational mentoring; or arranging for the child to be enrolled in early intervention preschool classes, such as Head Start: | | | |

| | Educational Needs | Services Provided | Services Needed but Not Provided |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

| 69 | If there are services that were not or are not being provided, document agency efforts, or lack of agency efforts, to provide those services: | | | |
|----|---|---|---|---|
| 70 | Was the child enrolled in an accredited school within 3 days of custody or placement change? | Yes | No | NA |
| Rating | Section 6 is rated:_____. Please elaborate on any findings: | | | |

DHS
296151

*Involving Children and Families in Case Planning and Decision Making*

| ITEM 7. Child and Family Involvement in Case Planning | | | | |
|---|---|---|---|---|
| | During the period under review, did the agency make concerted efforts to actively involve the **child** in the case planning process? | Yes | No | NA |
| 72 | During the period under review, did the agency make concerted efforts to actively involve the **mother** in the case planning process? | Yes | No | NA |
| 73 | During the period under review, did the agency make concerted efforts to actively involve the **father** in the case planning process? | Yes | No | NA |
| 74 | Document the ways in which each party listed below was or was not involved in case planning (for example, identifying needs and services, establishing goals, evaluating progress, etc.) If the involvement of the child, mother, or father is determined by the reviewers to be Not Applicable, document the reasons for this determination (including any evidence of efforts to locate absent parents). | | | |
| | Child: | | | |
| | Mother: | | | |
| | Father: | | | |
| 75 | Is there evidence that the family was informed of and prepared to actively participate in case events, including the FTMs, case plan development, and court events? | Yes | No | NA |
| | Please explain your answer to #75: | | | |
| 76 | Is there evidence that child(ren) and/or parent(s) were involved in choosing services included on their case plan? | Yes | No | NA |
| 77 | Is there evidence of family involvement and input in the development of the case plan? | | | |
| | Mother | Yes | No | NA |
| 78 | Father | Yes | No | NA |
| 79 | Age-appropriate child/youth | Yes | No | NA |
| 80 | Were the service plans signed by the parents or guardians? | Yes | No | NA |
| 81 | Were the service plans signed by the child(ren), aged 6 and up? *(Does not apply to Prevention cases but does apply to appropriate Foster Care and Protection cases. Elaborate in the 'Rating' section below.)* | Yes | No | NA |
| 82 | Did the families attend the County Conferences during the period under review? *("Families" is the mother/father/primary caretaker/legal guardians, grandparents)* | Yes | No | NA |
| Rating | Section 7 is rated:_____. Please elaborate on any findings: | | | |

*Involving Children and Families in Case Planning and Decision Making*

| ITEM 8. Caseworker Visits with Child | | | | |
|---|---|---|---|---|
| 83 | During the period under review, was the frequency of the visits between the caseworker and the child(ren) sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals? | Yes | No | |
| 84 | During the period under review, what was the most typical pattern of visitation between the caseworker and the child(ren) in the case? (Select the box that describes the usual pattern of visitation.) | ☐ More than once a week<br>☐ Once a week<br>☐ Less than once a week, but at least twice a month<br>☐ Less than twice a month, but at least once a month<br>☐ Less than once a month<br>☐ Never | | |
| 85 | Did the caseworker visits occur at least 2 times per month for *foster care/placement cases*, with at least one visit occurring in the home, or at least 2 times per month for *in-home cases*? | Yes | No | NA |
| 86 | During the period under review, was the quality of the visits between the caseworker and the child(ren) sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals *(for example, did the visits between the caseworker and the child(ren) focus on issues pertinent to case planning, service delivery, and goal achievement)*? | Yes | No | |
| 87 | Please document barriers to more frequent visiting *(if relevant)* or explain why less frequent visitation was still appropriate, or not: | | | |
| 88 | Document examples of the caseworker visits with the child that contributed to high quality visits *(if relevant)* or why caseworker visits were not of high quality *(if relevant)*, as related to the response in question #86: | | | |
| Rating | Section 8 is rated:_____. Please elaborate on any findings: | | | |

| ITEM 9. Caseworker Visits with Parents | | | | |
|---|---|---|---|---|
| 89 | During the period under review, was the frequency of the visits between the caseworker and the **mother** sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals? | Yes | No | NA |
| 90 | During the period under review, what was the most typical pattern of visitation between the caseworker and the mother of the child(ren)? | ☐ More than once a week<br>☐ Once a week<br>☐ Less than once a week, but at least twice a month<br>☐ Less than twice a month, but at least once a month<br>☐ Less than once a month<br>☐ Not Applicable<br>☐ Never | | |
| 91 | During the period under review, was the frequency of the visits between the caseworker and the **father** sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals? | Yes | No | NA |

EMU Review Instrument.revised 01132012Involving

| | | | | | |
|---|---|---|---|---|---|
| 92 | During the period under review, what was the most typical pattern of visitation between the caseworker and the father of the child(ren): | ☐ More than once a week | | | |
| | | ☐ Once a week | | | |
| | | ☐ Less than once a week, but at least twice a month | | | |
| | | ☐ Less than twice a month, but at least once a month | | | |
| | | ☐ Less than once a month | | | |
| | | ☐ Not Applicable | | | |
| | | ☐ Never | | | |
| 93 | During the period under review, was the quality of the visits between the caseworker and the **mother** sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals? | Yes | No | NA | |
| 94 | During the period under review, was the quality of the visits between the caseworker and the **father** sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals? | Yes | No | NA | |
| 95 | Please describe barriers to more frequent visiting with the mother (if relevant) and father (if relevant), and discuss (if relevant) why reviewer felt less frequent visitation was appropriate: | | | | |
| 96 | Describe the general quality of the caseworker visits with the mother and the father, and the issues that were or were not addressed during caseworker visits (if relevant): | | | | |
| 97 | If regular visitation is not occuring due to **mother** not being involved or found, are there documented diligent efforts to locate mother? | Yes | No | NA | |
| 98 | If regular visitation is not occuring due to **father** not being involved or found, are there documented diligent efforts to locate father? | Yes | No | NA | |
| Rating | Section 9 is rated:_____. Please elaborate on any findings: | | | | |

EMU Review Instrument.revised 01132012Involving

*Individualizing Case Planning*

| ITEM 10. Permanency goal for child *(Does not apply to In-Home Cases)* | | | | | | |
|---|---|---|---|---|---|---|

| | | Permanent | | | Concurrent | |
|---|---|---|---|---|---|---|
| 99 | What is (are) the child's current permanency goal(s) (or if the case was closed during the period under review, what was the permanency goal before the case was closed)? | | | | | |
| 100 | Is (are) the child's permanency goal(s) specified in the case file? *(Check 'N/A' for Prevention or Protection cases only)* | Yes | No | NA | | |
| 101 | If the child entered care during the PUR, was a permanency plan developed within the childs first 30 days in care? | Yes | No | NA | | |
| 102 | Were all of the permanency goals that were in effect during the period under review established in a timely manner? | Yes | No | N/A | | |

| Permanency Goal | Date Established | Time in Foster Care Before Goal | Date Goal Changed | | Reason for Goal Change | |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

| 103 | Were all permanency goals in effect during the period under review appropriate to the child's needs for permanency and to the circumstances of the case? | Yes | No | NA |
|---|---|---|---|---|
| 104 | Please document the reasons the reviewers determined that the goals were not timely and/or appropriate (if relevant): | | | |
| 105 | Has the child been in foster care at least 15 of the last 22 months? | Yes | No | |
| 106 | If no to #105, does the child meet Adoption and Safe Families Act (ASFA) criteria for termination of parental rights (TPR)? | Yes | No | NA |
| 107 | If yes to #105, did the agency file a TPR petition before the period under review or in a timely manner during the period under review? | Yes | No | NA |
| 108 | If no TPR petition has been filed, and the child has been in state's custody for 15 of the most recent 22 months, is an "exception" or compelling reason for not filing for TPR documented in the case file? | Yes | No | NA |
| 109 | If an exception has not been documented, do circumstances exist that would constitute a legal exception? | Yes | No | NA |
| 110 | If the child has a goal of reunification, does the case record documentation reflecting active concurrent permanency planning ? | Yes | No | NA |
| 111 | If the child was discharged during PUR, was an aftercare plan developed prior to discharge? | Yes | No | NA |
| Rating | Section 10 is rated:_____. Please elaborate on any findings: | | | |

## ITEM 11. Case Planning

| | | | | |
|---|---|---|---|---|
| 112 | How many Family Team Meetings (FTM) have occurred during the PUR? | | | |
| 113 | How many FTMs have been attended by **both the birth and resource parents** during the PUR? | | | |
| 114 | Was a FTM used in the initial development of the case plan if the initial plan was developed during the PUR, **and/or** was the FTM used to update the case plans quarterly? | Yes | No | NA |
| 115 | Were there family team meetings within 30 calendar days of any placement or other significant change in the child's or family's circumstances? | Yes | No | NA |
| 116 | Were there documented discussions of concurrent planning with the **birth parents**? | Yes | No | NA |
| Rating | Section 11 is rated:_____. Please elaborate on any findings: | | | |

## ITEM 12. Foster Care Re-Entries *(Does not apply to In-Home Cases)*

| | | | | |
|---|---|---|---|---|
| 117 | Did any of the child's foster care entries <u>during the period under review</u> occur within 12 months of the child's discharge from a prior foster care episode? (Refer to instructions. If the child entered before the period under review, and did not discharge and re-enter, then this would all be N/A.) | Yes | No | NA |
| 118 | If the answer to #117 is 'Yes', was there evidence that concerted efforts were made to prevent re-entry? | Yes | No | NA |
| 119 | Date of child's first entry into foster care <u>during the period under review</u>: _____ | | | |
| 120 | Was this entry within 12 months of a previous discharge: | Yes | No | NA |
| 121 | Date of diacharge, if any, within 12 months of this entry:_____   Document the circumstances related to the re-entry within 12 months: | | | |
| 122 | If there are any additional entries into foster care after a discharge during the period under review, provide the above information for each of these entries: | | | |
| Rating | Section 12 is rated:_____. Please elaborate on any findings: | | | |

*Mobilizing Services Timely*

| Item 13: Reunification, Guardianship, or Permanent Placement with Relatives | | | | | | |
|---|---|---|---|---|---|---|
| 123 | Does the child have (or, if discharged during the period under review and reunited, did they have) a goal | | | | Yes | No | NA |
| 124 | What is/was the child's most recent permanency goal? | Reunification | | Guardianship | Perm. Placement with Relatives | | |
| 125 | Are the agency and court making (or did they make) concerted efforts to achieve the goal (or these goals, if there are concurrent goals) in a timely manner during the PUR? | | | | Yes | No | NA |
| 126 | Date of the child's most recent entry into foster care: | | | | | | |
| 127 | Time in care (in months) at the time of the onsite review: | | | | | | |
| 128 | Date of discharge from foster care: | | | | | | |
| 129 | Document efforts made to achieve goal, including the appropriateness and effectiveness of the efforts, and, barriers to achieving the goal (for example, agency, court, or other factors that prevented or are preventing timely achievement of the goal): | | | | | | |
| 130 | Please document any contributing factors to the case in both the circumstance of the goal of reunification, permanent placement with relatives, or guardianship was not achieved or is not likely to be achieved within 12 months, or if the permanency goal was achieved within 12 months: | | | | | | |
| 131 | For children with a goal of reunification, have parental service plans identified those services DFCS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care? | | | | Yes | No | NA |
| | **Did DCFS make those services identified available either through direct or referral service?** | | | | | | |
| 132 | | | | Mother? | Yes | No | NA |
| 133 | | | | Father? | Yes | No | NA |
| 134 | If the child was discharged during PUR and was reunified, was there a 90 day trial home placement? | | | | Yes | No | NA |
| Rating | Section 13 is rated:_____. Please elaborate on any findings: | | | | | | |

EMU Review Instrument.revised 01132012Mobilizing

## ITEM 14. Stability of Foster Care Placement *(Does not apply to In-Home Cases)*

| | | |
|---|---|---|
| 135 | How long has the child been in the current placement setting? | ____Months |
| 136 | How many placement settings did the child experience during the period under review? | Number |

| | Placement Date | Placement Type | Reason for Change in Placement |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| | | Yes | No | NA |
|---|---|---|---|---|
| 137 | If there was more than 1 placement, were all placement changes during the period under review planned by the agency in an effort to achieve the child's case plan goals <u>or</u> made in an effort to meet the needs of the child? | Yes | No | NA |
| 138 | Is the child's current placement setting (or most recent placement if the child is no longer in foster care) stable? | Yes | No | |
| 139 | If applicable, indicate why the placement changes were or were not planned in an effort to achieve the child's case goals or to meet the needs of the child: | | | |
| 140 | If applicable, provide your reasons for determining that the child's current placement (or most recent placement if the child is no longer in foster care) is or is not stable: | | | |
| 141 | If the child has been assessed with special needs, is s(he) placed in a placement that can meet their therapeutic, educational and medical needs? | Yes | No | NA |
| 142 | Was the child placed in the least restrictive setting that meets his/her individual needs? | Yes | No | NA |
| Rating | Section 14 is rated:_____. Please elaborate on any findings: | | | |

EMU Review Instrument.revised 01132012Mobilizing

| ITEM 15. Adoption *(Does not apply to In-Home Cases)* | | | | |
|---|---|---|---|---|
| 143 | Does the child have (or, if discharged during the period under review and adopted, did they have) a permanent plan of Adoption? | Yes | No | NA |
| 144 | Are the agency and court making (or did the agency and court make) concerted efforts to achieve the plan of Adoption in a timely manner? | Yes | No | |
| 145 | Date of the child's most recent entry into foster care (this should be the same date on the Face Sheet): | | | |
| 146 | Time in care (in months) at the time of the onsite review (this is the number of months that the child was in foster care from the date of the most recent entry into foster care to the beginning of the onsite review week or from the date of the most recent entry into foster care to the time of adoption finalization or discharge from foster care): | | | |
| 147 | Date of adoption finalization (if relevant) *(this is the date that the court legally established the adoption and transferred care and placement responsibility or supervision from the State to the adoptive parent(s); this should be the same date on the Face Sheet; if the adoption has not been finalized, enter Not Applicable (NA)):* | | | |
| 148 | Please document efforts made to achieve the child's goal of adoption, including the appropriateness and effectiveness of the efforts, and barriers to achieving the goal of adoption (for example, agency- or court-related factors that prevented or are preventing achievement of the goal in a timely manner): | | | |
| 149 | Please document special circumstances in the case which are contributing to the child either likely to achieve the goal of adoption within 24 months or not: | | | |
| 150 | Does the child have an assigned adoption specialist and an adoption plan that identifies the child-specific activities that DFCS will undertake to achieve adoption, and receiving regular adoption status meetings consistent with plan requirements, and was that adoption specialist assigned within 10 days of the adoption goal change? *(Does not apply to children with Adoption as a CONCURRENT plan.)* | Yes | No | NA |
| 151 | Is there evidence that the resource family has been informed of available subsidies, including post-adoptive subsidies? | Yes | No | NA |
| 152 | If the child has been in care longer than 12 months, is there evidence that the resource parents have been engaged on discussions regarding adoption? | Yes | No | NA |
| Rating | Section 15 is rated:_____. Please elaborate on any findings: | | | |

## ITEM 16. Other planned permanent living arrangement *(Does not apply to In-Home Cases)*

| 153 | Does the child have a goal of "other planned permanent living arrangement"? (See below in #154) | | Yes | No | NA |
|---|---|---|---|---|---|
| 154 | What is the child's other planned permanent living arrangement goal (check the goal that most closely reflects the one in the case file)? | ☐ Living Independently / Emancipation | | | |
| | | ☐ Long-term foster care | | | |
| | | ☐ Long-term foster care with kin | | | |
| | | ☐ Placement in a long-term care facility until transition to an adult care facility. | | | |
| | | ☐ Other (specify): | | | |
| 155 | For children aged <u>14-20</u> in the PUR, were concerted efforts made to provide the child with services to adequately prepare the child for independent living when the child leaves foster care, as set forth/included in the service plan? | | Yes | No | NA |
| 156 | Were concerted efforts made to achieve the goal of other planned permanent living arrangement in a timely manner by placing the child in a living arrangement that is "permanent," that is, the child will remain in the living arrangement until discharge from foster care? | | Yes | No | NA |
| 157 | Date of the child's most recent entry into foster care: | | | | |
| 158 | Time in care (in months) at the time of the onsite review: | | | | |
| 159 | Date of documentation regarding "permanency" of the child's living arrangements | | | | |
| 160 | Date of discharge from foster care | | | | |
| 161 | If the child is not in a living arrangement that can be considered permanent, were concerted efforts made during the period under review to achieve this type of living arrangement for the child? | | Yes | No | NA |
| 162 | Please document the efforts made to achieve the child's goal, including the appropriateness and effectiveness of the efforts, and barriers to achieving the goal: | | | | |
| 163 | Document the services provided, or not provided, to adequately prepare the child for independent living: | | | | |
| 164 | If the child is over 14 and involved with Independent Living Services (ILS), how long has s(he) consistently been attending ILS classes? | | | | |
| | Please explain your answer: | | | | |
| Rating | Section 16 is rated:_____. Please elaborate on any findings: | | | | |

## ITEM 17. Physical Health of the Child

| | | | | |
|---|---|---|---|---|
| 165 | In the last 12 month period, has the agency assessed the child's **physical health** care needs? | Yes | No | NA |
| 166 | If the child came into care during the **PUR**, did the child receive an initial screening within 72 hours? | Yes | No | NA |
| 167 | If the child came into care during the **PUR**, did the child receive a comprehensive health screening within 30 days of foster care entry? | Yes | No | NA |
| 168 | During the **period under review**, did the agency assess the child's **dental health** care needs? *(If age appropriate / 3 years of age or older)* | Yes | No | NA |
| 169 | During the **PUR**, did the child, if over 3, receive an initial dental examination within 90 days of entry into care or within 90 days of his/her 3rd birthday if occurring during stay in foster care? | Yes | No | NA |
| 170 | During the **period under review**, did the agency ensure that appropriate services were provided to the child to address all **identified physical health** needs on a timely basis? | Yes | No | NA |
| 171 | During the **period under review**, did the agency ensure that appropriate services were provided to the child to address all **identified dental health** needs within required timeframes? | Yes | No | NA |
| 172 | Did the child receive periodic, age-appropriate physical **and** dental health examinations to ensure ongoing assessment of needs? If not, document the reasons why the agency did not conduct this ongoing assessment: | | | |
| 173 | Based on the assessment of needs, if there are services that were not provided, document why the services were not provided (for example, lack of agency efforts to secure services, lack of service availability in the community, lack of transportation for foster parents to take child to appointments, etc.): | | | |
| Rating | Section 17 is rated:_____. Please elaborate on any findings: | | | |

EMU Review Instrument.revised 01132012Mobilizing

| ITEM 18. Mental/Behavioral Health of the Child | | | | |
|---|---|---|---|---|
| 174 | During the **PUR**, did the child, age 4 and older, receive an initial mental health screening within 30 days of entry into care and/or within 30 days of the 4th birthday if occurring during stay in foster care? | Yes | No | NA |
| 175 | Did the agency conduct an assessment of the child(ren)'s mental/behavioral health needs on an ongoing basis or as follow-up based on indications to inform case planning decisions? | Yes | No | NA |
| 176 | During the **period under review**, did the agency provide appropriate services to address the child(ren)'s mental/behavioral health needs on a timely basis? | Yes | No | NA |
| 177 | Note whether or not there is evidence of a mental/behavioral health (including substance abuse) assessment. For example, (1) what type of needs assessment was conducted, and (2) what kind of information was in the case file or missing from the case file that is relevant to an assessment of mental/behavioral health needs? Indicate if a formal assessment was conducted, and, if so, note the diagnosis: | | | |
| 178 | If there are services that were not or are not being provided based on the assessment of needs, describe why the services were not provided (for example, lack of agency efforts to secure services, lack of service availability in the community, no transportation for foster parents to take child to appointments, parent's unwillingness to engage child in services, etc.). If the services were not available due to lack of availability, or reviewer notices other services not available in the community, please describe in detail: | | | |
| Rating | Section 18 is rated:_____. Please elaborate on any findings: | | | |

*Preserving and Maintaining Connections*

| ITEM 19. Proximity of Foster Care Placement *(Does not apply to In-Home Cases)* | | | | |
|---|---|---|---|---|
| | Was the child placed in the same county as (s)he was removed? | Yes | No | NA |
| 180 | Is the child's current or most recent placement close enough to his or her parents or other potential permanent caregiver to facilitate frequent face-to-face contact between the child and the parents while the child is (or was) in foster care? | Yes | No | NA |
| 181 | If No to #180, was the reason for the location of the child's current or most recent placement based on the child's needs and intended to ensure that the child's case plan goals are achieved? | Yes | No | NA |
| 182 | Describe the relationship between the child's current or most recent placement and the location of the parents or of a family member with whom the child is likely to be reunified (for example, the child will be reunified with a grandmother): | | | |
| 183 | If the reviewers determine that the child's placement is not sufficiently close to the parent(s) to facilitate frequent contact, document the reasons for this determination (and identify any reasons provided by the agency): | | | |
| 184 | Did the child remain in the same school (s)he attended prior to foster care placement? | Yes | No | NA |
| 185 | If no to #184, was this appropriate based on case circumstances? | Yes | No | NA |
| | If No to #184, please explain why: | | | |
| Rating | Section 19 is rated:_____. Please elaborate on any findings: | | | |

| ITEM 20. Placement with Siblings *(Does not apply to In-Home Cases* | | | | |
|---|---|---|---|---|
| 186 | During the period under review, was the child placed with all siblings who also were in foster care? | Yes | No | NA |
| 187 | If No to #186, was there a valid reason for the child's separation from the siblings (for example, the separation was necessary to meet the needs of one of the siblings, to address safety concerns for one or more of the siblings, or to accommodate a large sibling group)? | Yes | No | NA |
| 188 | Reason for Separation of siblings (if applicable): | | | |
| Rating | Section 20 is rated:_____. Please elaborate on any findings: | | | |

DHS
296163

## ITEM 21. Visiting with parents and siblings in foster care *(Does not apply to In-Home Cases)*

| 189 | If the child entered care during the PUR, was an initial visitation plan developed in the first 30 days of the child's placement? | Yes | No | NA |
|---|---|---|---|---|
| 190 | During the period under review, was the visitation plan updated as circumstances in the case warranted? (answer N/A if circumstances in the case DID NOT warrant the visitation plan being updated) | Yes | No | NA |
| 191 | Does the visitation plan include all visitation (parents, siblings, connections, etc)? | Yes | No | NA |
| 192 | During the period under review, were concerted efforts made to ensure that visitation (or other forms of contact if visitation was not possible) between the child and his or her **mother** was of sufficient frequency to maintain or promote the continuity of the relationship? | Yes | No | NA |
| 193 | Check the box next to the statement that best describes the usual frequency of visits between the mother and the child: | ☐ More than once a week<br>☐ Once a week<br>☐ Less than once a week, but at least twice a month<br>☐ Less than twice a month, but at least once a month<br>☐ Less than once a month<br>☐ Never | | |
| 194 | During the period under review, were concerted efforts made to ensure that visitation (or other forms of contact if visitation was not possible) between the child and his or her **father** was of sufficient frequency to maintain or promote the continuity of the relationship? | Yes | No | NA |
| 195 | Check the box next to the statement that best describes the usual frequency of visits between the father and the child: | ☐ More than once a week<br>☐ Once a week<br>☐ Less than once a week, but at least twice a month<br>☐ Less than twice a month, but at least once a month<br>☐ Less than once a month<br>☐ Never | | |
| 196 | During the period under review, were concerted efforts made to ensure that the quality of visitation between the child and the **mother** was sufficient to maintain or promote the continuity of the relationship? | Yes | No | NA |
| 197 | During the period under review, were concerted efforts made to ensure that the quality of visitation between the child and the **father** was sufficient to maintain or promote the continuity of the relationship? | Yes | No | NA |
| 198 | During the period under review, were concerted efforts made to ensure that visitation (or other forms of contact if visitation was not possible) between the child and his or her **sibling(s)** was of sufficient frequency to maintain or promote the continuity of the relationship? | Yes | No | NA |
| 199 | Check the box next to the statement that best describes the usual frequency of visits between the siblings and the child: | ☐ More than once a week<br>☐ Once a week<br>☐ Less than once a week, but at least twice a month<br>☐ Less than twice a month, but at least once a month<br>☐ Less than once a month<br>☐ Never | | |

| 200 | During the period under review, were concerted efforts made to ensure that the quality of visitation between the child and his or her sibling(s) was sufficient to promote the continuity of their relationships? | Yes | No | NA |
|---|---|---|---|---|
| 201 | For each applicable relationship (Mother, Father, Sibling(s)), document concerted efforts or lack of efforts to promote frequent visitation. Also document any reasoning why a relationship is not applicable: | | | |
| 202 | If the child entered care during the PUR did the child have a visit with his/her parents within 24 hours of placement, or at a minimum a phone call with relatives within first 24 hours? | Yes | No | NA |
| Rating | Section 21 is rated:_____. Please elaborate on any findings: | | | |

## ITEM 22. Preserving Connections  (Does not apply to In-Home Cases)

| 203 | During the period under review, were concerted efforts made to maintain the child's important connections (for example, neighborhood, community, faith, language, extended family members including siblings who are not in foster care, school, tribe, and/or friends) ? | Yes | No | NA |
|---|---|---|---|---|
| 204 | Was a sufficient inquiry conducted with the parent, child, custodian, or other interested party to determine whether the child may be a member of, or eligible for membership in, an Indian tribe? | Yes | No | NA |
| 205 | If the child may be a member of, or eligible for membership in, an Indian tribe, during the period under review, was the tribe provided timely notification of its right to intervene in any State court proceedings seeking an involuntary foster care placement or termination of parental rights (TPR)? | Yes | No | NA |
| 206 | If the child is a member of, or eligible for membership in, an Indian tribe, was the child placed in foster care in accordance with the Indian Child Welfare Act (ICWA) placement preferences or were concerted efforts made to place the child in accordance with ICWA placement preferences? | Yes | No | NA |
| 207 | Document agency efforts or lack of efforts to help children maintain important connections when these are not being maintained through the placement itself: | | | |
| Rating | Section 22 is rated:_____. Please elaborate on any findings: | | | |

DHS
296165

## Scoring for the Evaluation and Monitoring Review Instrument

| Component | Item Number/ Section | Scoring | Details |
|---|---|---|---|
| Assuring Safety and Managing Risk | 1 | Same as CFSR | Strength<br><br>♦ If questions 3 and 4 are 0<br><br>♦ If questions 3 and 4 are >0 but question 5 is a 'Yes'<br><br>Needs Improvement<br><br>♦ If questions 3 and 4 are >0 but question 5 is a 'No'<br><br>Not Applicable<br><br>♦ If the answer to 2 is 0 |
| | 2 | Same as CFSR | Strength<br><br>♦ If questions 7 is 'Yes' (and question 8 is 'No')<br><br>♦ If questions 9 and 10 are 'No' or 'NA'<br><br>♦ If question 8 is 'Yes' and both 9 and 10 are 'No' (or 'N/A')<br><br>Needs Improvement<br><br>♦ If at least one question 8,9 or 10 are a 'Yes'<br><br>Not Applicable<br><br>♦ If the answer to 7 is No |
| | 3 | Same as CFSR | Strength<br><br>♦ If question 14 is 'Yes' and 15 is 'NA'<br><br>♦ If question 14 is 'No and 15 is 'Yes'<br><br>Needs Improvement<br><br>♦ If question 14 is 'No' and 15 is 'No' or 'NA'<br><br>Not Applicable<br><br>♦ If questions 14 and 15 are 'NA' |
| | 4 | Same as CFSR | Strength<br><br>♦ If questions 18, 19, 20, 21 and 25 are 'Yes' or 'NA' and questions 22, 23 and 24 are 'No' or 'NA'<br><br>Needs Improvement<br><br>♦ If questions 18, 19, 20, 21 or 25 are 'No'<br><br>♦ If questions 22, 23 or 24 are 'Yes' |

128

| Component | Item Number/ Section | Scoring | Details |
|---|---|---|---|
| Assessing Strengths and Needs | 5 | CFSR and PM merge | Section A-Strength<br><br>♦ If questions 33, 34, 35, 36, 37 and 38 are all 'Yes'<br><br>♦ If questions 33, 37 and 38 are 'Yes' and 34, 35 and/or 36 is 'NA'<br><br>♦ If questions 33, 34, 35, 36 is "Yes" and questions 37 and 38 is "N/A"<br><br>♦ If questions 33, 35, 36 is "Yes" and questions 34, 37, and 38 is "N/A"<br><br>♦ If questions 33, 35, 36, and 37 are "Yes" and questions 34 and 38 are "N/A".<br><br>♦ If question 34 is "N/A" but all other questions are answered "Yes"<br><br>Section A-Needs Improvement<br><br>♦ If any of questions 33, 34, 35, 36, 37 or 38 are 'No'<br><br>♦ If questions 33, 34, 35, and 36 is "Yes" and questions 37 and 38 is "No"<br><br>Section B-Strength<br><br>♦ If questions 42, 43, 44, 45, 46, 47, 48, 49 and 50 are 'Yes'<br><br>♦ If at least one of questions 42, 43, 44, 45, 46, 47, 48, 49, 50, 52 or 53 is 'Yes' and the rest are 'NA'<br><br>♦ If question 43 and/or 49 are "N/A" but all other questions are Yes<br><br>Section B-Needs Improvement<br><br>♦ If any of questions 42, 43, 44, 45, 46, 47, 48, 49, 50, 52 or 53   are 'No'<br><br>Section C-Strength<br><br>♦ If questions 59, 60 and 61 are 'Yes'<br><br>♦ If question 59 is 'Yes' and 60 and 61 are 'NA'<br><br>Section C-Needs Improvement<br><br>♦ If either questions 59, 60 or 61 are 'No'<br><br>Overall 5-Strength<br><br>♦ If Sections A-C are 'Strengths' or 'NA'<br><br>Overall 5-Needs Improvement<br><br>If any Section A-C is rated as 'Needs Improvement' |

129

| Component | Item Number/ Section | Scoring | Details |
|---|---|---|---|
| | 6 | CFSR and PM merge | Strength<br><br>♦ If question 64 is "YES" and question 65 is "YES" and question 66 is "YES" and question 70 is "Yes"<br><br>♦ If questions 64 is "YES" or "N/A" and 65 is 'Yes' or "N/A" and 66 is "YES" or "N/A" and question 70 is "Yes" or "NA"<br><br>Needs Improvement<br><br>♦ If any of questions 64, 65, 66 and 70 are 'No'<br><br>Not Applicable<br><br>♦ If questions 64 and 65 and 66 and 70 are <u>all</u> 'N/A' |
| Involving Children and Families in Case Planning and Decision Making | 7 | CFSR and PM merge | Strength<br><br>♦ If questions 71, 72, 73, 75, 76, 79, 80, 81, and 82 are 'Yes' and 77 and 78 are 'Yes' or 'NA'<br><br>♦ If questions 71, 72, 73, 75, 76, and 80 are 'Yes' and questions 79, 81, and 82 are 'NA'.<br><br>Needs Improvement<br><br>♦ If questions 71, 72, 73, 75, 76, 77, 78, 79, 80, 81 or 82 are 'No'<br><br>Not Applicable<br><br>♦ If all questions 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, and 82 are "N/A" |
| | 8 | CFSR and PM merge | Strength<br><br>♦ If questions 83, 85 and 86 are 'Yes' or 'NA'<br><br>Needs Improvement<br><br>♦ If questions 83, 85 or 86 are 'No' |
| | 9 | CFSR and PM merge | Strength<br><br>♦ If questions 89, 91, 93, 94, 97 and 98 are 'Yes' or 'NA'<br><br>♦ If questions 91 and 94 are 'No', but 98 is 'Yes'<br><br>Needs Improvement<br><br>♦ If questions 89, 91, 93, 94, 97 or 98 are 'No'<br><br>Not Applicable<br><br>♦ If questions 89, 90, 91, 92, 93, 94, 97, and 98 are "N/A" |

| Component | Item Number/ Section | Scoring | Details |
|---|---|---|---|
| Individualizing Case Planning | 10 | CFSR and PM merge | Strength<br><br>♦ If Question 100 is "Yes" and Question 101 is "Yes" or "N/A" and Question 102 is "Yes" and Question 103 is "Yes" and Question 105 is "Yes" and Question 106 will default to "N/A" and Question 107 is "Yes" or "N/A" and Question 108 is "Yes" or "N/A" and Question 109 is "No" or "N/A" and Question 110 is "Yes" or "N/A" and Question 111 is "Yes" or "N/A"<br><br>♦ If question 100 is "Yes" and Question 101 is "Yes" or "N/A" and Question 102 is "Yes" and Question 103 is "Yes" and Question 105 is "No" and Question 106 is "Yes" or "No" and Question 107 will disable and default to "N/A" and Question 108 is "Yes" or "N/A" and Question 109 is "No" and Question 110 is "Yes" or "N/A" and Question 111 is "Yes" or "N/A"<br><br>♦ If question 100 is "Yes" and Question 101 is "Yes" or "N/A"; Question 102 is "Yes"; Question 103 is "Yes"; Question 105 is "Yes"; Question 106 will disable and default to N/A; Question 107 is "No"; Question 108 is "Yes"; Question 109 is "NA"; Question 110 is "Yes" or "N/A" and Question 111 is "Yes or N/A".<br><br>Needs Improvement<br><br>♦ If question 100 or question 101 or question 102 or question 103 is "NO"<br><br>♦ If question 100 and question 101 and question 102 and question 103 is "YES" and question 105 is "YES" and question 107 is "NO" and question 108 is "NO" and question 109 is "YES" or "NO" and question 110 is "YES" or "NO" or "N/A" and question 111 is "YES" or "NO" or "N/A"<br><br>♦ If question 100 and question 101 and question 102 and question 103 is "YES" and question 105 is "NO" and if question 106 is "YES" question 107 is "NA" and question 108 is "No" and question 109 is "YES" or "No" or "N/A" and question 110 is "YES" or "NO" or "N/A" and question 111 is "YES" or "NO" or "N/A"<br><br>Item 10 will rate a "Not Applicable"<br><br>♦ If the target child is in an 'In-Home' case |
| | 11 | All PM questions | Strength<br><br>♦ If questions 114 and 115 are 'Yes'<br><br>Needs Improvement<br><br>♦ If questions 114 or 115 are 'No' |

| Component | Item Number/ Section | Scoring | Details |
|---|---|---|---|
| Mobilizing Services Timely | 12 | Same as CFSR | **Strength**<br><br>♦ If question 117 is 'No'<br><br>♦ If question 117 and 118 are 'Yes'<br><br>**Needs Improvement**<br><br>♦ If question 117 is 'Yes'<br><br>♦ If question 118 is 'No'<br><br>**Not Applicable**<br><br>♦ If the child was in an 'In-home' case<br><br>♦ If questions 117, 118 and 120 are "N/A" |
| | 13 | CFSR and PM merge | **Strength**<br><br>♦ If question 125 is 'Yes', and 131, 132, 133 and 134 are 'Yes' or 'NA'<br><br>**Needs Improvement**<br><br>♦ If any of questions 125, 131, 132, 133 or 134 are 'No'<br><br>**Not Applicable**<br><br>♦ If the child was in an 'In-home' case<br><br>♦ If question 123 is "No" or "N/A" |
| | 14 | CFSR and PM merge | **Strength**<br><br>♦ If question 136 is '1', 137 is 'NA' and 138 is 'Yes'<br><br>♦ If question 136 is >'1', 137 and 138 are 'Yes'<br><br>♦ If questions 137 and 138 and 142 and 143 are all "Yes"<br><br>**Needs Improvement**<br><br>♦ If question 136 is '1', and 138 is 'No'<br><br>♦ If question 136 is >'1', 137 or 138 are 'No'<br><br>**Not Applicable**<br><br>♦ If the child was in an 'In-Home' case<br><br>♦ If any question 137 or 138 or 142 or 143 are "No |

132

| Component | Item Number/ Section | Scoring | Details |
|---|---|---|---|
| | 15 | CFSR and PM merge | **Strength**<br><br>♦ If question 144 is 'Yes', and 150, 151 and 152 are 'Yes' or 'NA'<br><br>**Needs Improvement**<br><br>♦ If questions 144, 150, 151, 152 are 'No'<br><br>**Not Applicable**<br><br>♦ If the case is an In-Home case<br><br>♦ If question 143 is "No" or "N/A" and questions 150, 151, and 152 is "No" or "N/A", the rating for item 15 will be "N/A" |
| | 16 | Same as CFSR | **Strength**<br><br>♦ If questions 155, 156 and 161 are 'Yes' or 'NA'<br><br>♦ If question 155 is 'Yes' or 'NA', 156 is 'No', and 161 is 'Yes'<br><br>**Needs Improvement**<br><br>♦ If question 155 is 'No'<br><br>♦ If questions 156 is 'No' or 'NA' and 161 are 'No'<br><br>**Not Applicable**<br><br>♦ If it is an 'In-home' case<br><br>♦ If question 153 is "No" or "N/A" and question 155 is "N/A" item 16 will rate as Not Applicable |
| | 17 | CFSR and PM merge | **Strength**<br><br>♦ If questions 165, 166, 167, 168, 169, 170 and 171 are 'Yes'<br><br>♦ If questions 166 and 167 are 'Yes' and at least one of 165, 168, 169, 170 and 171 are a 'Yes' and the rest are 'NA'<br><br>♦ Item 17 will rate as a Strength if question 165 is "Yes" and question 166 is "N/A" and question 167 is "N/A" and question 168 is "Yes" or N/A and question 169 is "Yes or "N/A" and question 170 is "Yes" and question 171 is "Yes".<br><br>**Needs Improvement**<br><br>♦ If any of questions 165, 166, 167, 168, 169, 170 and 171 are 'No'<br><br>**Not Applicable**<br><br>♦ Item 17 will rate as Not Applicable if questions 165 and 168 are answered "N/A" |

| Component | Item Number/ Section | Scoring | Details |
|---|---|---|---|
| | 18 | CFSR and PM merge | Strength<br><br>♦ If all questions 174, 175, and 176 are "Yes"<br><br>♦ If question 175 is "Yes", and 174 and 176 are "Yes or N/A"<br><br>Needs Improvement<br><br>♦ If any of questions 174, 175 or 176 are 'No'<br><br>Not Applicable<br><br>♦ Item 18 will rate as Not Applicable if questions 174, 175 and 176 are all answered "N/A" |
| Preserving and Maintaining Connections | 19 | CFSR and PM merge | Strength<br><br>♦ If 179 and 180 are 'No', but 181 is 'Yes'<br><br>♦ If 179 is 'No' but 180 is 'Yes'<br><br>♦ If 179 is 'No', but 181 is 'Yes'<br><br>♦ If question 180 is 'Yes' and 181 is 'NA' and both 179 or 184 are 'Yes'<br><br>♦ If question 180 is 'No' and 181 is 'Yes' and both 179 or 184 is 'Yes'<br><br>♦ If question 180 is 'No' and 181 is 'Yes', both 179 is 'Yes', and 184 is a 'No' but 185 is a 'Yes'<br><br>♦ Item 19 will rate as a Strength if questions 179 and 180 are "No" but question 181 is "Yes"<br><br>♦ Item 19 will rate as a Strength if question 179 is 'N/A' and 180 is "No" and 181 is "Yes" and 184 is "No" and 185 is "Yes"<br><br>♦ Item 19 will rate as a Strength if question 179 is "Yes" and question 180 is "Yes" and question 181 is "N/A" and question 184 is "No" or "N/A" and question 185 is "Yes"<br><br>Needs Improvement<br><br>♦ If questions 179, 180 and 181 are 'No'<br><br>♦ Item 19 will rate as Needs Improvement if question 179 is "Yes" and question 180 is "Yes" and question 181 is "N/A" and question 184 is "No" or "N/A" and question 185 is "No"<br><br>Not Applicable<br><br>♦ Item 19 will rate as Not Applicable if questions 179-181 and 184-185 are all "N/A"<br><br>♦ If the case is an In-Home case |

134

DHS
296172

| Component | Item Number/ Section | Scoring | Details |
|---|---|---|---|
| | 20 | Same as CFSR | **Strength**<br><br>♦ If question 186 is 'Yes'<br><br>♦ If question 186 is a 'No and 187 is a 'Yes'<br><br>**Needs Improvement**<br><br>♦ If questions 186 and 187 are 'No'<br><br>**Not Applicable**<br><br>♦ If the case is an In-Home case,<br><br>♦ Item 20 will rate as Not Applicable if question 186 is "N/A" |
| | 21 | CFSR and PM merge | **Strength**<br><br>♦ If questions 189, 190, 191, 192, 194, 196, 197, 198, 200 and 202 are 'Yes' or 'NA'<br><br>**Needs Improvement**<br><br>♦ If any of questions 189, 190, 191, 192, 194, 196, 197, 198, 200 or 202 are 'No'<br><br>**Not Applicable**<br><br>♦ If the case is an In-Home case<br><br>♦ Item 21 will rate as Not Applicable if questions 189-192 and 194-198 and 200 and 202 are 'N/A" |
| | 22 | Same as CFSR | **Strength**<br><br>♦ If question 203 and 204 are 'Yes' and 205 and 206 are 'Yes' or 'NA'<br><br>**Needs Improvement**<br><br>♦ If question 203 and 204 are a 'Yes' but 205 or 206 are 'No'<br><br>♦ If question 203 and 204 are a 'No'<br><br>♦ If question 203 OR 204 are a 'No'<br><br>**Not Applicable**<br><br>♦ If the case is an In-Home case |

| Component | Item Number/ Section | Scoring | Details |
|---|---|---|---|
| | 23 | CFSR and PM merge | <u>Strength</u><br><br>♦ If questions 208 and 209 are 'Yes' or 'NA'<br><br>♦ If questions 208 and 209 are a 'Yes' or 'NA', AND AT LEAST ONE IS A 'YES'<br><br>♦ Item 23 will rate as a Strength if question 208 or 209 are "Yes" or "N/A" and at least one is a "Yes"<br><br><u>Needs Improvement</u><br><br>♦ If any of questions 208 and 209 are 'No'<br><br>♦ Item 23 will rate as Needs Improvement if questions 208 or 209 is "No"<br><br><u>Not Applicable</u><br><br>♦ If the case is an In-Home case<br><br>♦ Item 23 will rate as Not Applicable if questions 208 and 209 are "N/A" |
| | 24 | Same as CFSR | <u>Strength</u><br><br>♦ If questions 211 and 212 are 'Yes'<br><br>♦ If questions 211 or 212 are 'No', but 213 and 214 are 'Yes' or 'NA' (but at least one of 213 and 214 need to be 'Yes')<br><br><u>Needs Improvement</u><br><br>♦ If questions 211 or 212 are 'No' and 213 or 214 are 'No'<br><br>♦ Item 24 will rate as Needs Improvement if question 211 is 'Yes' and question 212 is "No"<br><br><u>Not Applicable</u><br><br>♦ If the case is an In-Home case<br><br>♦ Item 24 will rate as Not Applicable if question 211 is "No" and questions 213 and 214 are both "N/A" |

*Change made on 6/7/12 was from 107 being N/A or No to 107 being Yes or N/A*

*Change made on 6/8/12 - Question 101 is "Yes" or "N/A"*

# EMU Review Instrument Instructions

| Assuring Safety and Managing Risks | |
|---|---|
| **Item 1** | |
| 1 | The information collected in Question 1 is intended to provide background information on the family. It is not to be used to determine the rating |
| | The life of the case begins with the first recorded maltreatment report received by the Agency on any child in the family, even if the report was screened out. |
| | For foster care cases, reviewers should record the total number of reports of child maltreatment for all children in the family, not just the child in foster care. |
| 2 | Complete the following table for all accepted reports received during the period under review |
| | The date the investigation was initiated is the date the Agency made the first attempt to contact the family. |
| | The date assigned for an investigation is the date the report is assigned to a specific worker to conduct the investigation |
| | In the last column, report the disposition of the case (evidenced/not evidenced) |
| | If Question 2 is "0", the rating for the entire item is "Not Applicable (N/A)" |
| 3, 4, 5 | If the answers to both Questions 3 and 4 are "0", the answer to Question 5 should be "NA" |
| | Level 2 reports must be initiated within 72 hours and Level 3 reports initiated within 24 hours |
| | Delays in services provided by organizations or agencies under contract with the Agency would not be considered to be beyond the control of the Agency. However, where services are provided by another public state or local agency, such as law enforcement, the actions of these agencies may be beyond the control of the Agency. |
| 6 | Complete only if this question is applicable. Be specific in the answer, including the source of the information. |
| **Item 2** | |
| 7 | Definition:  "Evidenced" refers to an investigation in which the report of maltreatment, suspected maltreatment or risk of maltreatment was supported or founded according to state law or policy. |
| | Use the information provided in the table for item 1 to answer Question 7. The key information is provided in the columns pertaining to (1) the report date and (2) the disposition. |
| | If the answer to Question 7 is "No", the case should be rated "NA" for this item. Provide your reason in the documentation section. |
| 8 | Reviewers should answer "No" to Question 8 if the only additional maltreatment reports occurring within 6 months of one another referred to the same maltreatment incident identified in Question 7. |
| | * Reviewers should be aware that sometimes when children come into contact with a child welfare agency they disclose maltreatment incidents that occurred prior to the maltreatment incident that brought them into contact with the agency. The Agency then may investigate these earlier incidents. If the case under review involves this type of maltreatment report and the report was evidenced, please follow the instructions below:<br><br>• If the maltreatment report refers to an incident that occurred *within* 6 months before another maltreatment report received during the period under review, and the report is evidenced, then the answer to Question 8 should be "Yes".<br><br>• If the maltreatment report refers to an incident that occurred *more than* 6 months before another maltreatment report received during the period under review, then the answers to Question 8 should be "No", even if the report is evidenced. |

| | |
|---|---|
| 9,10 | If the answer to Question 8 is "No", the reviewers should answer "NA" to Questions 9 and 10. |
| | Reviewers should answer "No" to Question 9 if the answer to Question 8 is "Yes", but there is no relationship between the circumstances involved in the two events. In determining the similarity of the circumstances, reviewers should consider the perpetrator of the maltreatment and other individuals involved in the incident. |
| | Reviewers should answer "No" to Question 10 if the answer to Question 8 is "Yes", but none of the evidenced maltreatment reports involved maltreatment of the child by the foster parents, members of the foster parents' family, other children in the foster home or facility, or facility staff members. |
| 11 | Be specific in your answer, noting sources of information. |
| 12 | Answer only if the child is in foster care. Be specific in your answer, noting sources of information. |
| 13 | Be sure to note whether the interventions included services, referrals, or were directly provided by the worker as opposed to a contractor. Please note the extent to which the ASWS was involved/consulted in the interventions implemented |
| **Item 3** | |
| 14 | Definitions: <br><br> "Appropriate Services," for purposes of Item 3, are those provided to, or arranged for, the family with the explicit goal of ensuring the child's safety (such as homemaking services, family preservation services, anger management classes, or substance abuse treatment services, etc.) and that meet the specific needs or circumstances of the family. For example, if a parent's substance abuse is associated with the neglect that brought the case to the attention of the Agency, then substance abuse treatment would be an appropriate service. If, in this situation, all that is offered is parenting education, that service by itself would not be appropriate to address the safety issues. Example 2: if there was domestic violence in the family and no effort was made to offer or provide domestic violence prevention services to the family, the services would not be considered appropriate to ensure the child's safety. If a child needs mental health services, education-related services, or services to address behavioral problems, in most cases these would not be considered relevant to the child's safety if the child remained in the home. Efforts of the Agency to meet these service needs are assessed in other items. <br><br> "Appropriate services" also would include services provided to, or arranged for, a noncustodial parent, but only if the parent has contact with the child and there are safety concerns associated with that contact. It would not include services to assist the noncustodial parent in becoming a permanent caregiver. <br><br> "Concerted efforts," for purposes of Item 3, refers to the following activities: conducting a safety assessment to identify the services that are necessary to ensure the child's safety in the home, working to engage families in services, and facilitating a family's access to those services. |
| | In answering Question 14, focus only on whether the Agency made concerted efforts to provide appropriate and relevant services to the family to address the safety issues in the family so the child could remain in the home or would not re-enter foster care. Concerns about monitoring service participation and safety planning and assessment of progress made will be captured elsewhere. |
| | If the Agency removed the child from the home without making concerted efforts to provide services, the answer to Question 14 should be "No", even if the Agency determined that it was necessary to remove the child for safety reasons. This issue will be addressed in Question 15. |
| 15 | If the answer to Question 14 is "Yes", but, after making efforts to provide services, the child(ren) were removed from the home during the period under review due to safety concerns, the answer to Question 15 should be "NA" |
| | If the child was not removed from the home during the period under review, the answer to Question 15 should "NA". |

| | |
|---|---|
| 15 cont. | Reviewers should focus on whether the circumstances of the case suggest that services would not have been able to ensure the child's safety if the child remained in the home. If the information indicates that it was necessary to remove the child to ensure the child's safety, the answer to Question 15 should be "Yes". If the information indicates that services should have been provided to prevent removal (e.g., homemaking or family preservation services) but the child was removed without providing those services, this question should be answered "No". |
| | If services should have been offered to protect the child, but were not because those services were not available in the community, the answer to Question 15 should be "No". |
| 16 | Be specific in your answer |
| 17 | Be specific in your answer |

**Item 4**

| | |
|---|---|
| 18, 19 | Definitions:<br><br>"Risk" is the likelihood that a child will be maltreated in the future<br><br>"Target child" is a child in a foster care case who is the subject of the case. |
| | Questions 18 and 19 should be answered for the target child in foster care or receiving in-home services and any other children in the family remaining in the home. |
| | Question 18 should be answered "NA" if the case was opened before the period under review. |
| | * Reviewers should note that in some cases, the issue of ongoing risk assessments may not be relevant because the case was opened near the end of the period under review and was not closed during the period under review . (E.g., if the case was opened shortly before the end of the period under review and during the initial assessment the Agency determined that there were no risk concerns, then it may be reasonable to conclude that the Agency would not have conducted a second risk assessment during the period under review). In such case, reviewers should determine whether the Agency conducted ongoing risk assessments and, if not, whether it should have given the timeframe of the case. If reviewers believe that ongoing risk assessments were not necessary, Question 19 may be answered "NA" |
| | In responding to Question 19, reviewers should determine whether ongoing risk assessments (formal or informal) were conducted during the period under review. If the Agency conducted a risk assessment at the onset of the case, but did not assess for risk on an ongoing basis (e.g., when there were new allegations of abuse or neglect, changing family conditions, changes to visitation, upon reunification, or at case closure, etc.) then the answer to Question19 should be "No" unless the reviewers have sufficient information, based on their review of the case, to determine that during the period under review there were no apparent risk concerns for the child in foster care or any child(ren) in the family who remained in the home. |
| | If a case was closed during the period under review, reviewers should determine whether the Agency conducted a risk assessment before closing the case. If not, the answer to Question 19 should be "No", unless the reviewers have sufficient information, based on their review of the case, to determine that such an assessment was not necessary because during the period under review there were no apparent risk concerns for the child in foster care or any child(ren) in the family remaining in the home. |
| 20, 21 | Definitions:<br><br>"Safety Assessment" refers to the determination of whether a child is in a safe environment. A safe environment is one in which there are no threats that pose a danger or, if there are threats, there is a responsible adult in a caregiving role who demonstrates sufficient capacity to protect the child.<br><br>"Safety Plan" refers to a plan that describes strategies developed by the Agency and family to ensure that the child(ren) is safe. Safety plans should address safety threats and how those will be managed/ addressed by the caregiver, caregiver capacity to implement the plan and report safety issues to the Agency, and family involvement in implementation of the plan. Safety plans may be separate from or integrated into the case plan. |

| | |
|---|---|
| 20, 21 cont. | Questions 20 and 21 should be answered for the target child in foster care or receiving in-home services and any other child(ren) in the family remaining in the home |
| | Question 20 should be answered "NA" if the case was opened before the period under review. |
| | Question 21 should be answered "NA" if the reviewers determine that during the period under review there were no apparent safety concerns for the target child in foster care and/or any child(ren) in the family remaining in the home. |
| | * Reviewers should note that in some cases, the issue of ongoing safety assessments may not be relevant because the case was opened near the end of the period under review and was not closed during the period under review. (E.g., if the case was opened shortly before the end of the period under review and during the initial assessment the Agency determined that there were no safety concerns, then it may be reasonable to conclude that the Agency would not have conducted a second safety assessment during the period under review). In this case, reviewers should determine whether the Agency conducted ongoing safety assessments and, if not, whether the assessments should have been conducted given the timeframe of the case. If reviewers believe that ongoing safety assessments were not necessary, Question 21 may be answered "NA" |
| | In responding to Questions 20 and 21, reviewers should determine whether the Agency conducted initial and ongoing safety assessments (formal or informal) during the period under review. |
| | If the Agency did not assess the child(ren)'s safety on an ongoing basis (e.g., when there were new allegations of abuse or neglect, changing family conditions, changes to visitation, upon reunification, or at case closure, etc.) then the answer to Question 21 should be "No" unless the reviewer determines that during the period under review there were no apparent safety concerns for any child(ren) in the family remaining in the home. |
| | If the case was closed during the period under review, reviewers should determine whether a safety assessment was conducted before closing the case. If not, the answer to Question 21 should be "No", unless the reviewer has sufficient information, based on review of the case, to determine that such an assessment was not necessary because during the period under review there were no apparent safety concerns for any child(ren) in the family remaining in the home. |
| 22 | In answering Question 22, reviewers should consider whether any of the following occurred while the case was open for services (select all that are appropriate and provide further information in the documentation section):<br><br>There were maltreatment allegations on the family that were reported to the Agency but were inappropriately screened out (based on reviewers' judgments).<br><br>There were maltreatment allegations on the family but they were never formally reported or formally investigated.<br><br>There were extensive delays in accepting an allegation for investigation or assessment.<br><br>There were maltreatment allegations that were not substantiated despite evidence that would support a substantiation.<br><br>The case was closed prematurely (based on reviewers' judgments and because of either an agency or court decision). |
| | Question 22 should be answered "NA" if the reviewer determines that during the period under review there were no apparent safety concerns for the target child in foster care and/or any child(ren) in the family remaining in the home. |
| 23 | The answer to Question 23 should be "NA" if this is not a foster care case. |
| | If the child does not have visits with the parents or with other family members (e.g., parental rights have been terminated and the parents are no longer involved in the child's life, or parents are incarcerated and there are no visits with family members), the answer to Question 23 should be "NA". |

| 23 cont. | Reviewers should determine whether the visitation arrangements with parents or other family members, with regard to supervised or unsupervised visits or home visits, were appropriate given the circumstances of the case. |
| | If a reviewer determines that unsupervised visitation is permitted, but that this type of visitation presents safety concerns for the child, then the answer to Question 23 should be "Yes". |
| | Reviewers should assess whether any safety concerns existed during the child's visitation with parents. For example, were there allegations of child maltreatment during visitation or was the child in an unsafe situation during visitation (e.g., because the custodial parent's significant other, who was known to be a drug user, was present in the home or because previously identified risk factors had not been mitigated through effective treatment)? |
| 24 | The answer to Question 24 should be "NA" if this is not a foster care case |
| | The answer to Question 24 should be "Yes" if reviewers determine that, during the period under review, the child was in at least one foster care placement in which he or she was unsafe and appropriate action was not taken (such as providing closer monitoring of the placement, placing fewer children in the home, providing services to address potential problems or existing problems, finding a more appropriate placement, etc.). The following are examples: <br><br> There was a substantiated allegation of maltreatment of the child by a foster parent (including a relative foster parent) or facility staff member that could have been prevented if the Agency had taken appropriate actions. <br><br> There was a critical incident report or other major issue relevant to noncompliance by foster parents or facility staff that could potentially make the child unsafe, and the Agency could have prevented it or did not provide an adequate response after it occurred. <br><br> The child's placement during the period under review presented other risks to the child that are not being addressed, even though no allegation was made and no critical incident reports were filed. |
| | The reviewers discover that there are safety concerns related to the child in the foster home that the Agency is unaware of because of inadequate monitoring. |
| 25 | The answer to Question 25 should be "NA" if, during the period under review, the child was not discharged from foster care to reunification with parents or relatives or was not returned home on a trial visit at any time. |
| | The answer to Question 25 should be "Yes" if the child was reunified with parents or relatives on a permanent or trial basis, and a thorough safety assessment was conducted before reunification. |
| | If a thorough safety assessment was not conducted before reunification or a trial home visit, the answer to Question 25 should be "No". |
| 26 | Be specific in your answer, noting sources of information. |
| 27 | Be specific in your answer, noting sources of information. |
| 28 | Be specific in your answer, noting sources of information. |
| 29 | Be specific in your answer, noting sources of information. |
| 30 | Be specific in your answer, noting sources of information. |
| 31 | Be specific in your answer, noting sources of information. |
| 32 | Be specific in your answer, noting sources of information. |

## Assessing Strengths and Needs

| Item 5 | |
|---|---|
| | Assessment of strengths and needs may take different forms. For example, strengths and needs may be assessed through a formal evaluation conducted by another agency or by a contracted provider or through a more informal case planning process involving intensive interviews with the child, family, service providers, etc. |
| 33 | Reviewers should answer Question 33 based on a determination of whether the Agency made concerted efforts to achieve an in-depth understanding of the strengths and needs of the child and family, regardless of whether the strengths and needs were assessed in a formal or informal manner. Consequently, the evaluation of the assessment should focus on its adequacy in addition to whether one was conducted or not. |
| | Reviewers should consider whether there were safety concerns pertaining to the child(ren), other than those identified in the section that could be reasonably expected to escalate to an immediate safety issue without intervention. |
| | In answering this question, reviewers should consider whether the Agency conducted an adequate assessment of the child's strengths and needs with regard to appropriate placement. |
| | Reviewers should answer this question with regard to an assessment of strengths and needs other than those related to the child's education, physical health, and mental/behavioral health (including substance abuse). The assessment of the child's strengths and needs related to these issues is addressed in later items. |
| | If the case is a foster care case, reviewers should determine only whether the Agency assessed the strengths and needs of the target child in the case, even if there are other children in the family in foster care or in the home. |
| | If the case is a foster care case, and the child is an adolescent, reviewers should determine whether the child's strengths and needs for independent living services are being assessed on an ongoing basis as part of the child's independent living plan. However, if the child is an adolescent and has a permanency plan goal of Another Planned Permanent Living Arrangement (APPLA), the reviewer should not to focus on independent living services assessments because it is reviewed elsewhere. |
| 34 | Reviewers should note if the assessment occurred within 30 calendar days of the agency receiving care and placement responsibility for the child, if this occurred within the period under review. |
| 35 | If the answer to Question 33 is "Yes" but the result of the assessment was that no service needs were identified other than those related to education, physical health, and mental/behavioral health (including substance abuse), and therefore no services were provided other than services to address those needs, the answer to Question 35 should be "NA". (These assessments will be addressed in later items) |
| | Reviewers should focus on the Agency's provision of services during the period under review. If services were provided before the period under review, and an assessment conducted during the period under review indicated no further service needs, the answer to Question 35 should be "NA". |
| | Reviewers should answer this question with regard to provision of services other than those related to education, physical health, or mental/behavioral health (including substance abuse). The assessment of service provision related to these issues is addressed in later items. |
| | Reviewers should determine whether the services provided matched identified needs. For example, were the services provided simply because those were the services available or were they provided because the assessment revealed a particular need for a particular type of service? |
| | If the case is an in-home services case, reviewers should consider whether the Agency met the service needs of all children in the family, even if only one child was the subject of the maltreatment report. |
| | If the case is a foster care case, reviewers are to determine only whether the Agency met the service needs of the target child in the case, even if there are other children in the family in foster care or in the home. |

142

| | |
|---|---|
| | If the case is a foster care case, and the child is an adolescent but does not have a permanency plan of APPLA, reviewers should determine whether the Agency met the service needs relevant to independent living. |
| | * Examples of services that are assessed under this item include child care services that are not required for the child's safety, mentoring programs not related to the child's education, recreational services, teen parenting education, preparation for adoption and other permanency goals, services that address family relationships that are not mental health in nature (e.g., services to assist children in reestablishing or maintaining family ties), and services to assist the child that are recommended by a therapist or other provider but are not mental-health related (such as enrollment in an activity to assist with social skills or to boost self-esteem), etc. |
| 36 | **Definition:** <br><br> "Timely Manner" is being consistent with the family member's need for services and not being subject to delays in receiving services. Referrals are to be made promptly and not be subject to delays unless time frames for referring are specified in the case planning process |
| 37 | The child should be interviewed by the person completing the assessment |
| 38 | In addition to considering the child being interviewed, reviewers should look for evidence that the age-appropriate child was asked specific questions about their strengths and needs, through both reviewer interview's and caseworker notes. |
| 39 | Be specific in your answer, noting sources of information. |
| 40 | Be specific in your answer, noting sources of information. |
| 41 | Be specific in your answer, noting sources of information. |
| 42, 48 | Questions 42 or 48 should be answered "NA" if <br><br> (1) the parent's parental rights were terminated before the period under review, <br><br> (2) the parent's whereabouts was not known during the entire period under review despite Agency efforts to locate her or him, or <br><br> (3) the parent was deceased during the entire period under review. |
| | Reviewers should determine whether the Agency has made concerted efforts to ensure that case planning is based on an in-depth understanding of the strengths and needs of the child and parent, regardless of whether the strengths and needs were assessed in a formal or informal manner. (Assessment of needs may take different forms. E.g., strengths and needs may be assessed through a formal psychosocial evaluation conducted by another agency or by a contracted provider or through a more informal case planning process involving intensive interviews with the child, family, service providers, etc.) |
| | Assessment of parents' strengths and needs refers to a determination of what parents need to provide appropriate care and supervision to ensure the safety and well-being of their children. |
| | Assessment of parents' needs may include mental and physical health strengths and needs, as later items do not address these concerns for the parents. |
| | If the case was opened during the period under review, reviewers should focus on whether the Agency conducted an initial comprehensive assessment as a basis for developing a case plan, and whether ongoing assessment was conducted as appropriate. |
| | If the case was opened before the period under review, reviewers should focus on whether the Agency conducted periodic comprehensive strengths and needs assessments (as appropriate) during the period under review to update information relevant to ongoing case planning. |
| | If the child is in an adoptive home (the adoption has been finalized), reviewers should consider the adoptive parents as the parents. |
| 43 | Policy dictates the assessment be conducted within the first 30 calendar days from when the Agency receives care and placement responsibility for the child. Use "NA" if case opened before period under review. |

143

| 44 | See #36 above for definition of "timely manner" |
|---|---|
| 45 | The caseworker completing the assessment should interview the mother, and seek her input and opinions |
| 46 | The mother should be intricately involved in the completion of the strengths and needs assessment, beyond the signing of the document. |
| 47, 50 | Follow the instructions for Questions 42 and 48. |
| | If an assessment was conducted but no service needs were identified, this question can be answered "NA" |
| | Appropriate services are those that enhance the parents' ability to provide care and supervision to their children and ensure the children's safety and well-being. For example, substance abuse treatment, parenting skills classes, safety-related services not included in Item 4. |
| 49 | Policy dictates the assessment be conducted within the first 30 calendar days from when the Agency receives care and placement responsibility for the child. |
| 51 | Definition:<br><br>"Timely Manner" is being consistent with the family member's need for services and not being subject to delays in receiving services. Referrals are to be made promptly and not be subject to delays unless time frames for referring are specified in the case planning process |
| 52 | The caseworker completing the assessment should interview the father, and seek his input and opinions |
| 53 | The father should be intricately involved in the completion of the strengths and needs assessment, beyond the signing of the document. |
| 54 | Acceptable reasons include termination of parental rights, death, whereabouts unknown despite Agency efforts to locate, or parent's involvement with child was determined to be contrary to the child's safety or best interests (e.g., the parents are considered abusive parents whose contacts with the child continue to pose unmanageable risks). Someone being a non-custodial parent is not in itself a reason to forego completing an assessment on a mother or father. |
| 55 | Be specific in your answer |
| 56 | Be specific in your answer |
| 57 | Be specific in your answer |
| 58 | Be specific in your answer |
| 59, 60 | Definitions:<br><br>"Foster Parents" are related or non-related caregivers given responsibility for care of a child by the Agency while the child is under the care, placement responsibility, and supervision of the Agency. This term includes pre-adoptive parents if the adoption has not been finalized. |
| | Reviewers should select "NA" for both Questions 59 and 60 if the case is not a foster care case or if, during the entire period under review, the child was in out-of-home care in a residential facility or similar placement, but does not have foster parents. |
| | The answer to Question 60 should be "NA" if strengths and needs were assessed but none were identified. |
| | Reviewers should determine whether an assessment was conducted to identify what the foster parents needed to enhance their capacity to provide appropriate care and supervision to the children in their home, including needs for respite care, assistance with transportation needs, counseling to address the child's behavior problems, etc. |
| | Reviewers should determine whether assessment of foster parent strengths and needs is done on an ongoing basis. If there is no evidence in the case file that the Agency assessed the needs of the foster parents at any time during the period under review, and the foster parents (if available for interview) indicate that they have not been assessed, the answer to Question 59 should be "No". |
| 61 | See #36 above for definition of "timely manner" |

DHS
296182

| 62 | Be specific in your answer |
|---|---|
| 63 | Be specific in your answer |
| **Item 6** | |
| 64 | If the case is a foster care case, Question 64 should be answered only for the child in foster care, even if the child was reunified during the period under review and there are other children in the home. |
| | If the case is an in-home services case, Question 64 should be answered for all children in the home for whom educational issues are relevant to the reason for the Agency's involvement with the family, and/or it is reasonable to expect that the Agency would address educational issues given the circumstances of the case. |
| | Question 64 should be answered "Yes" if there was evidence of an educational assessment in the case file, such as the following:<br>    ♦  An educational assessment was included in the comprehensive needs assessment.<br>    ♦  A separate educational assessment was conducted by the school (and made available to the Agency) or by the Agency.<br>    ♦  The Agency conducted an informal (and documented) educational assessment. |
| | Question 64 should be answered "Yes" if the reviewer determines through interviews with key individuals that the Agency assessed the child's educational needs, even if the case file did not include the documentation identified above. |
| 65 | Policy dictates the assessment be conducted within the first 30 calendar days from when the child enters care and placement responsibility of the Agency. |
| 66 | Complete only if applicable. Policy dictates the assessment be conducted within the first 30 calendar days from when the child enters care and placement responsibility of the Agency. |
| 67 | Be specific to note any specific tools used, and who conducted the assessment |
| 68 | Be specific in your answer |
| 69 | Be specific in your answer |
| 70 | Policy dictates that the child should be enrolled in an accredited school within 3 calendar days from when the child enters care and placement responsibility of the Agency. |

**Involving Children and Families in Case Planning and Decision Making**

| Item 7 | |
|---|---|
| | **Definition:**<br><br>"Actively Involved" means the Agency consulted with the child (as developmentally appropriate) regarding the child's goals and services, explained the plan and terms used in the plan in language that the child can understand, and included the child in periodic case planning meetings, particularly if any changes are being considered in the plan. |
| 71 | Reviewers should select "NA" if the child is not old enough to participate in case planning or is incapacitated. Although the capacity to participate actively in case planning will need to be decided on a case-by-case basis, as a guideline, most children who are elementary school-aged or older may be expected to participate to some extent. |
| | If the case is a foster care case, this section applies to the target child only. If the case is an in-home services case, this section applies to all children in the family who are/were receiving agency services or are/were residing within the family. |
| | If the case is a foster care case, reviewers should answer "No" to this question if there is no case plan in the case file. |
| | If the case is an in-home services case, reviewers should answer "No" to this question if there is no case plan in the case file. |
| | Reviewers should not assume that a child's knowledge about his or her case plan is an indicator of active involvement. |
| | If the initial case plan was developed before the period under review, reviewers should focus on the child's involvement during the period under review in the ongoing case planning process, particularly with regard to evaluating progress and making changes in the type and level of services needed. |
| 72, 73 | **Definitions:**<br><br>"Actively Involved" means the Agency consulted with the child (as developmentally appropriate) regarding the child's goals and services, explained the plan and terms used in the plan in language that the child can understand, and included the child in periodic case planning meetings, particularly if any changes are being considered in the plan.<br><br>"Parents" (with regard to in-home cases) means the child's primary caregivers with whom the child lives, or as a noncustodial parent who is involved or wishes to be involved in the child's life.<br><br>"Mother" or "Father" (with regard to foster care cases) includes:<br>1) child's biological parents<br>2) child's primary caregivers (other than biological parents) from whom the child was removed<br>3) child's adoptive parents, if adoption has been finalized. |
| | Reviewers should select "NA" if the parents' involvement was determined to be contrary to the child's safety or best interests (for example, the parents are considered abusive parents whose contacts with the child continue to pose unmanageable risks). Documentation must be in the case file. |
| | Reviewers should select "NA" if the parents' whereabouts were not known, and there is documentation in the case file regarding the Agency's concerted efforts to locate her or him. |
| | If the initial case plan was developed before the period under review, reviewers should focus on the parents' involvement during the period under review in the ongoing case planning process, particularly with regard to evaluating progress and making changes in the plan. |
| | Reviewers should select "No" if the Agency did not make concerted efforts to locate a parent whose whereabouts were unknown. |

| 74 | Be specific in your answer |
|---|---|
| 75 | Families should be informed of case planning events as soon in advance of meetings as they are scheduled to help ensure participation, and their availability should be considered in the scheduling of events. Caseworkers should meet with families in person or on phone and discuss the purpose of the upcoming events, what will occur, and how the families should participate. Be specific in your explanation. |
| 76 | Please note the source of the evidence (case notes, interviews, etc). Children and families should be specifically asked what they need. |
| 77 | Family involvement goes beyond simply signing the plan. Family members should be engaged, their input solicited and used in the plan development. Objections to services and assessments should also be noted. "NA" should only be used if TPR occurred prior to period under review. |
| 78 | Family involvement goes beyond simply signing the plan. Family members should be engaged, their input solicited and used in the plan development. Objections to services and assessments should also be noted. "NA" should only be used if TPR occurred prior to period under review. |
| 79 | Family involvement goes beyond simply signing the plan. Family members should be engaged, their input solicited and used in the plan development. Objections to services and assessments should also be noted. |
| 80 | Service plans must be signed by parents or guardians. |
| 81 | Service plans must be signed by children aged 6 and older. |
| 82 | Families must always be invited to County Conferences, and their attendance is encouraged. |
| **Item 8** | |
| 83, 84 | Definition:<br><br>"Visit" is a face-to-face contact between the caseworker and the child. |
| | If the case is an in-home services case, Question 83 should be answered for all children in the family who are living in the home and/or receiving services through the Agency. |
| | If the case is a foster care case, Question 83 should be answered only for the target child in the case. |
| | Reviewers should consider only the pattern of visits during the period under review and not over the life of the case. |
| | Reviewers should focus on the visitation frequency of the Agency caseworker responsible for the case. |
| | Reviewers should determine the most typical pattern of visiting during the period under review because the actual frequency may vary in specific time periods. |
| | Reviewers should base their determination on the frequency necessary to ensure the child's safety, permanency, and well-being, and not on policy requirements regarding caseworker contacts or visits with the child. For example, if the reviewer determines that given the circumstances of the case (e.g., there are safety concerns), the caseworker should visit more frequently, then the answer to Question 83 should be "No", and the reason for this answer should be provided in the documentation section. |
| | If the typical pattern of visits is less than twice a month, the answer to Question 83 should be "No" unless the reviewer determines that there is a substantial justification for a "Yes" answer. In this situation the justification should be included in the documentation section. |
| | If the child is in a placement in another state, the reviewer should determine whether a caseworker from the jurisdiction in which the child is placed, or a caseworker from the jurisdiction from which the child was placed, visits with the child in the placement on a schedule that is consistent with the child's needs and no less frequently than once per year, as required by federal law. |

147

| | |
|---|---|
| 85 | Per policy, "NA" for in-home cases, as requirement is 1x per month; however if 2 visits do occur in an in-home case, mark "Yes" |
| 86 | Reviewers should consider both the length of the visit (e.g., was it of sufficient duration to address key issues with the child, or was it just a brief visit) and the location of the visit (e.g., was it in a place conducive to open and honest conversation, such as a private home, or was it in a more formal or public environment, such as a restaurant or court house). |
| | Reviewers should consider whether the caseworker saw the child alone or whether the parent or foster parent was usually present during the caseworker's visits with the child. If the child was older than an infant and the caseworker did not see the child alone for at least part of each visit, then the answer to Question 86 should be "No". |
| | Reviewers also should consider the topics that were discussed during the visits, if that information is available in the case file or through interviews. For the answer to Question 86 to be "Yes", there must be some evidence that the caseworker and the child addressed issues pertaining to the child's needs, services, and case goals during the visits. |
| 87 | Be specific in your answer |
| 88 | Be specific in your answer |
| **Item 9** | |
| 89, 90, 91, 92 | Definitions:<br><br>"Visit" is a face-to-face contact between the caseworker and the parent.<br><br>"Parents" (with regard to in-home cases) means the child's primary caregivers with whom the child lives, or as a noncustodial parent who is involved or wishes to be involved in the child's life.<br><br>"Mother" or "Father" (with regard to foster care cases) includes:<br>  1) child's biological parents<br>  2) child's primary caregivers (other than biological parents) from whom the child was removed<br>  3) child's adoptive parents, if adoption has been finalized. |
| | Reviewers should select "NA" if:<br>    (1) Agency contact with the mother or father was determined to be contrary to a child's safety or best interests (and this is documented in the case file);<br><br>    (2) the location of the parent was unknown during the entire period under review, despite documented concerted Agency efforts to locate her or him;<br><br>    (3) the parents' parental rights were terminated before the period under review and she or he is not involved in the child's life; or<br><br>    (4) during the entire period under review, the parent was not involved in the child's life or in case planning in any way despite Agency efforts to involve her or him. |
| | If the answer to Questions 89 or 91 is "NA", the answer to Questions 90 or 92 for that parent also should be "NA" |
| | Reviewers should consider only the pattern of visits during the period under review and not over the life of the case. |
| | Reviewers should determine the most typical pattern of visiting during the period under review because the actual frequency may vary in specific time periods. |
| | Reviewers should select "Never" for Questions 90 and 92 if the Agency reported that the whereabouts of the mother or father was unknown, but there was no evidence that the Agency made concerted efforts to locate either the mother or the father. |

148

DHS
296186

| | |
|---|---|
| | Reviewers should consider the frequency of visits that is necessary to effectively address: (1) the child's safety, permanency, and well-being, and (2) achievement of case goals. Reviewers should not answer the question based on the caseworker visit requirements that are established by policy. |
| | The answers to Questions 89 and 91 should be "No" if the typical pattern of contact is less than once a month, unless the reviewer has a substantial justification for answering either question as "Yes". (Please provide this justification in the documentation section.) |
| 93, 94 | Reviewers should consider both the length of the visit (was it of sufficient duration to address key issues with the mother/father, or was it just a brief visit) and the location of the visit (was it in a place conducive to open and honest conversation, such as a private home, or was it in a formal or public environment that might be uncomfortable for the parent, such as a court house or restaurant). |
| | Reviewers should consider whether the visits between the caseworker or other responsible party and the father/mother focused on issues pertinent to case planning, service delivery, and goal achievement. |
| | If the answer to Question 89 or 91 is "NA", then the answer to the corresponding question (same parent) 93 or 94 should be "NA". |
| 95 | Be specific in your answer |
| 96 | Be specific in your answer |
| 97 | Caseworkers should make an initial effort, and routine/continual efforts to locate the parent, following up on leads that may surface as the case continues. |
| 98 | Caseworkers should make an initial effort, and routine/continual efforts to locate the parent, following up on leads that may surface as the case continues. |

**Individualized Case Planning**

| Item 10 | |
|---|---|
| 99 | Permanency goals are the following: adoption, guardianship, reunification with parents, reunification with relatives, and other planned permanent living arrangements. A goal of Another Planned Permanent Living Arrangement (APPLA) often will not be specified in the case file using that term. This goal refers to a situation in which the state maintains care and custody responsibilities for the child, but places the child in a setting in which the child is expected to remain until adulthood, such as with foster parents who have made a commitment to care for the child permanently, with relatives who have made the same commitment, or with a residential care facility (e.g., for children with developmental disabilities who require residential care). If this is an in-home case, this Item should be "NA" |
| | The permanency goal or goals identified in Question 99 determine the additional items to be completed for sections Reunification, Adoption, or Other Permanent Plan in Mobilizing Services Timely. If two concurrent permanency goals have been established and are identified in the case plan, identify both goals and complete the corresponding sections in Mobilizing Services Timely (Reunification, Adoption, or Other Permanent Plan) for each of the goals. Do not report concurrent goals in Question 99 unless both are identified in the case file. |
| 100 | Permanency goals should be established in the case file. If the permanency goal is not specified anywhere in the case file, such as in the case plan or in a court order, then the answer to Question 100 should be "No", and this section should be rated as an "Area Needing Improvement". |
| | If no permanency goal is specified in the case file, reviewers should ask the caseworker to identify the permanency goal toward which the Agency is working for the child. This goal should be entered for Question 99, and should be used to determine which additional item is completed for the case. Reviewers should ask the caseworker to explain why the child's permanency goal is not specified in the case file and include that information in the documentation section. |
| 101 | Policy dictates that the permanency plan be developed within the first 30 calendar days from when the agency receives care and placement responsibility for the child. |
| 102 | Reviewers should answer this question based on their professional judgment regarding the timeliness of establishing the goal, particularly with regard to changing a goal, and provide the rationale for their decision in the documentation section. For children who recently entered care, reviewers should expect the first permanency goal to be established no later than 30 days from the date of the child's entry into foster care consistent with policy. For children whose goal was changed from reunification to adoption, reviewers should consider the guidelines established by the Federal Adoption and Safe Families Act (ASFA) regarding seeking termination of parental rights, which might impact the timeliness of changing a goal from reunification to adoption. |
| | Reviewers should answer this question for all permanency goals in effect during the period under review. If there are concurrent goals, the answer should apply to both goals. For example, if there are concurrent goals of reunification and adoption, and you believe that the reunification goal was established in a timely manner, but the adoption goal was not, the answer to Question 102 should be "No" |
| | Complete the table below for each of the goals in place during the period under review. Begin with the child's first permanency goal in place during the period under review, and end with the current or latest permanency goal or goals identified in Question 99. |
| 103 | Reviewers should answer this question based on their professional judgment regarding the appropriateness of the permanency goal and provide the rationale for their decision in the documentation section. |
| | Reviewers should consider the factors that the Agency considered in deciding on the permanency goal and whether all of the relevant factors were evaluated. |
| | If one of the goals is other planned permanent living arrangement and the reviewer determines that the goal was established without a thorough consideration of other permanency goals, then the answer to Question 103 should be "No". |
| 104 | Be specific in your answer |
| 105 | In answering Question 105, reviewers should begin the "count" with the date of the judicial finding of child abuse and neglect (usually the adjudicatory hearing) or 60 days after the child's removal from the home and placement in a substitute care setting, whichever is earlier. |

DHS
296188

150

| | |
|---|---|
| 106 | **Definitions:**<br><br>ASFA requires an agency to see TPR under the following circumstances:<br><br>The child has been in care for at least 15 of the most recent 22 months or a court of competent jurisdiction has determined that:<br><br>♦ the child is an abandoned child or<br>♦ the child's parents have been convicted of one of the felonies designated in § 475(5)(E) of the *Social Security Act*, including: (1) committed murder of another child of the parent; (2) committed voluntary manslaughter of another child of the parent; (3) aided or abetted, attempted, conspired, or solicited to commit such a murder or such a voluntary manslaughter; or (4) committed a felony assault that resulted in serious bodily injury to the child or another child of the parent. |
| | If the answer to Question 105 is "Yes", the answer to Question 106 should be "NA" |
| | Question 106 must be answered if the answer to Question 105 is "No". |
| | If any of the conditions noted above apply to the case under review, Question 106 should be answered "Yes". |
| 107 | If the answers to both Questions 105 and 106 are "No", the answer to Question 107 should be "NA" |
| | Reviewers should review the case file for evidence of petitioning for TPR. If there is no evidence of this in the file, then reviewers should ask the caseworker for documentation regarding petitioning for TPR. If there is no evidence in the file or other documentation, Question 107 should be answered "No". |
| 108 | **Definitions:**<br><br>Exceptions to the TPR requirement include the following: (1) at the option of the state, the child is being cared for by a relative; (2) the Agency has documented in the case plan a compelling reason for determining that a TPR would not be in the best interest of the child; or (3) the state has not provided to the family the services that the state deemed necessary for the safe return of the child to the child's home if reasonable efforts of the type described in §471(a)(15)(B)(ii) of the *Social Security Act* are required to be made with respect to the child. |
| | If the answer to Question 107 is "Yes" or "NA" then Question 108 should be answered "NA" |
| | Question 108 can be answered "Yes" only if the "exception" or compelling reason for not seeking TPR is noted somewhere in the case file or if there is a court order that acknowledges the exception. If, during an interview, the caseworker provides a reason for not seeking TPR, but cannot provide any documentation, Question 108 should be answered "No". However, the caseworker's verbal description of the reason for not seeking TPR should be noted in the documentation section. |
| 109 | Acceptable circumstances are: child is placed with a relative, compelling reasons, or the state has not provided mandated services. |
| 110 | In addition to just being labeled in the case plan, case notes, and progress reports should reflect efforts in concurrent planning. |
| **Item 11** | |
| 112 | Note the number in the box provided. Participants in the FTM need to include more than just the caseworker and the parent unless they are the only relevant participants for the meetings. |
| 113 | Ideally, both parents and resource parents (where appropriate) attend FTMs in addition to other supports. |
| 114 | FTMs are an excellent forum for developing the case plan. Answer only if applicable. |
| 115 | FTMs are an excellent forum to be used when any major event occurs in the child's life, like placement moves or a traumatic event. Only answer if applicable. |
| 116 | Concurrent planning should be discussed with the birth parents at the initial case plan development, when their input is being solicited. Parents must be aware of the agencies plans for concurrent planning, in the event that reunification does not occur. |

151

**Mobilizing Appropriate Services Timely**

| Item 12 | | |
|---|---|---|
| 117 | Definitions: | |
| | "Entry into foster care" refers to a child's removal from his or her normal place of residence and placement in a substitute care setting under the care and placement responsibility of the state or local title IV-E/IV-B agency. Children are considered to have entered foster care if the child has been in substitute care for 24 hours or more. Question and Item is "NA" if child is an in-home case. | |
| | "Episode of foster care" refers to the timeframe between a child's entry into foster care and the child's discharge from foster care (both dates shown on the face sheet). | |
| | "Discharge" refers to the point when the child is no longer in foster care under the care and responsibility or supervision of the Agency. If the Agency retains supervision of a child and the child returns home on a trial basis for an unspecified period of time, the child should be considered discharged from foster care after a 6-month period of time, unless a longer period of time has been specified in a court order. | |
| | Reviewers should answer this question based only on formal entries into and exits from foster care as defined above. Reviewers should not consider physical reunification as a discharge from foster care unless there also is a transfer of care and placement responsibility. | |
| 118 | If the answer to Question 117 is "No", the answer to Question 118 should be "NA" | |
| | Reviewers should examine the reasons why a child had multiple entries into foster care and what efforts were made to prevent the re-entry. | |
| 119 | Enter date noted on the face sheet. | |
| 120 | Information should be available in the case file in MACWIS | |
| 121 | Be specific in your answer | |
| 122 | Be specific in your answer | |
| Item 13 | | |
| 123, 124 | A goal of reunification is defined as a plan for the child to be discharged from foster care to his or her parents or primary caretaker. | |
| | A goal of guardianship is defined as a plan for the child to be discharged from foster care to a legally established custody arrangement with an individual that is intended to be permanent. | |
| | A goal of permanent placement with relatives is defined as a plan for the child to be discharged from foster care to the permanent care of a relative other than the one from whose home he or she was removed. | |
| | Answer if it is a permanent or concurrent goal. If there are concurrent goals identify both goals. | |
| 125, 126, 127, 128 | **Definitions:** | |
| | "Entry into foster care" refers to a child's removal from his or her normal place of residence and placement in a substitute care setting under the care and placement responsibility of the state or local title IV-E/IV-B agency. Children are considered to have entered foster care if the child has been in substitute care for 24 hours or more. | |
| | "Discharge from foster care" is defined as the point when the child is no longer in foster care under the care and placement responsibility or supervision of the Agency. If a child returns home on a trial home visit and the Agency retains responsibility or supervision of the child, the child is not considered discharged from foster care unless the trial home visit is longer than 6 months, and there was no court order extending the trial home visit beyond 6 months. | |

DHS
296190

| | |
|---|---|
| 125, 126, 127, 128 cont. | In determining a response to Question 125 reviewers should consider the time the child has been in foster care as well as Agency and court efforts. As a general rule, if the child has been in foster care for more than 12 months and the goal has not yet been achieved, the answer to Question 125 should be "No", unless there are particular circumstances that justify the delay.  If the reviewer determines that there is a justification for the child remaining in foster care for longer than 12 months before achieving the permanency goal, the justification should be included in the documentation section for this item. For example:<br>♦  The permanency goal of reunification has been in place for longer than 12 months but there is a concurrent goal of adoption and the Agency and court also are working toward the goal of adoption<br>♦  The permanency goal of reunification has been in place for longer than 12 months but the child was physically returned to the parents during or before the 12th month and remained at home on a trial home visit beyond the 12th month.  If the reviewer determines the length of time the child spent in out-of-home care and on the trial home visit was reasonable given the child and family circumstances, the item may be rated as a strength even though the child was not discharged from foster care until after the 12th month |
| 129 | Be specific in your answer |
| 130 | Be specific in your answer |
| 131 | Service plans should be specific in services needed to address concerns. |
| 132 | Services can either be provided by the caseworker directly or through another agency. |
| 133 | Services can either be provided by the caseworker directly or through another agency. |
| 134 | Children who are to be reunified should have a 90 day trial home visit which is monitored closely by the caseworker to ensure the appropriateness of the goal and to close the case. |
| **Item 14** | |
| 135 | Note timeframe to the closest month. Do not round up. |
| 136 | Definitions:<br><br> "Placement setting" refers to a physical setting in which a child resides while in foster care under the care and placement of the Agency. A new placement setting would result, for example, when a child moves from one foster family home to another or to a group home or institution. Placement settings may include shelter care, treatment facilities, and juvenile justice placements. If, however, a foster family with whom a child is placed moves and the child moves with them, this does not constitute a change in placement.<br><br>"Entry into foster care" refers to a child's removal from his or her normal place of residence and placement in a substitute care  setting under the care and placement responsibility of the state or local title IV-E/IV-B agency. Children are considered to have entered foster care if the child has been in substitute care for 24 hours or more<br><br>"Current episode of foster care" refers to a child's current stay in foster care based on the most recent removal of the child from his or her normal place of residence, resulting in his or her placement in a foster care setting and ending upon the child's discharge from foster care. |
| | If there were multiple episodes of foster care during the period under review, add up the placement settings within each episode. If there is a re-entry into foster care and the child is placed in a different placement setting at the time of re-entry, then it would count as a new placement setting. If the child returns to the placement setting that he or she was in before the return home, then it would not count as a new placement setting. |
| | Reviewers should not consider the following as placement settings: (1) a trial home visit; (2) a runaway episode; (3) temporary absences from the child's ongoing foster care placement, including visitation with a sibling, relative, or other caretaker (e.g., pre-placement visits with a subsequent foster care provider or pre-adoptive parents); (4) hospitalization for medical treatment, acute psychiatric episodes, or diagnosis; (5) respite care; and (6) day or summer camps. |

153

| | |
|---|---|
| | Complete the table below. Begin with the child's placement setting at the onset of the period under review, or if the child entered foster care during the period under review, begin with the first placement setting at entry into foster care. If there was only one placement setting, complete only the first two columns of the first row. |
| 137 | **Definitions:** <br><br> "Placement Changes" that reflect Agency efforts to achieve case goals include:  moves from a foster home to an adoptive home;  moves from a more restrictive to a less restrictive placement;  moves from non-relative foster care to relative foster care;   moves that bring the child closer to family or community, etc. <br><br> Placement changes that *do not* reflect Agency efforts to achieve case goals include:  moves due to unexpected and undesired placement disruptions;  moves due to placing the child in an inappropriate placement (one based on availability rather than on appropriateness);  moves to more restrictive placements when this is not essential to achieving a child's permanency goal;  temporary placements while awaiting a more appropriate placement;  and practices of routinely placing children in a particular placement type, such as shelter care, upon initial entry into foster care regardless of individual needs |
| | If the response to Question 136 is "1", then the response to Question 137 should be "NA".  If the single placement is not stable, that information will be collected in Question 138. |
| | If ALL placement changes during the period under review reflect planned Agency efforts to achieve the child's case goals or meet the needs of the child, the answer to Question 137 should be "Yes". |
| | If any single placement change that occurred during the period under review was for a reason other than Agency efforts to achieve case goals or to meet the child's needs, the answer to Question 137 should be "No". |
| | Placement changes that occur as a result of unexpected circumstances that are out of the control of the Agency (such as the death of a foster parent or foster parents moving to another state) can be considered similar to those that reflect Agency efforts to achieve case goals for purposes of Question 137. |
| 138 | If any of the following apply to the child's current placement, the answer to Question 138 should be "No" (select all that apply).  If none of the following applies, the answer to Question 138 should be "Yes": <br><br> • The child's current placement is in a temporary shelter or other temporary setting. <br><br> • There is information indicating that the child's current substitute care provider may not be able to continue to care for the child. <br><br> • There are problems in the current placement that threaten the stability of the placement but that the agency is not addressing. <br><br> • The child has run away from this placement more than once in the past, or is in runaway status at the time of the review. <br><br> • Other (describe): |
| 139 | Be specific in your answer |
| 140 | Be specific in your answer |
| 141 | Child will be noted as special needs as classified in MACWIS. |
| 142 | Children should be placed in minimally restrictive, familial settings, based on their needs. |

| Item 15 | |
|---|---|
| 143, 144, 145, 146, 147 | **Definition:**<br><br>"Entry into foster care" refers to a child's removal from his or her normal place of residence and placement in a substitute care setting under the care and placement responsibility of the state or local title IV-E/IV-B agency. Children are considered to have entered foster care if the child has been in substitute care for 24 hours or more.<br><br>"Discharge from foster care" is defined as the point when the child is no longer in foster care under the care and placement responsibility or supervision of the Agency. If a child returns home on a trial home visit and the Agency retains responsibility or supervision of the child, the child is not considered discharged from foster care unless the trial home visit is longer than 6 months, and has not been extended by a court order. |
| | Question 143 is "Yes" if adoption is either a permanent or concurrent goal |
| | In determining a response to Question 144, reviewers should consider the following:<br>• The length of time a child has been in foster care<br>• The Agency-related efforts to achieve adoption in a timely manner (e.g., establishing a goal of adoption concurrent with the goal of reunification at the onset of the case, placing the child in a foster/adoptive home as the first placement, completing paperwork in a timely manner, conducting a concerted search for an absent parent early in the case, etc.).<br>• The court-related efforts (e.g., holding termination of parental rights hearings in a timely manner, not permitting continuances, etc) |
| | The determination of timeliness should be based on the date of the child's most recent entry into foster care, not the date that the goal of adoption was established |
| | If the adoption was not achieved within 24 months of the date of the most recent entry into foster care, or it does not appear that the adoption will be achieved within that timeframe, the answer to Question 144 should be "No", unless the reviewer finds that there are particular circumstances that warrant the delay. These circumstances must be beyond the control of the Agency or the courts. For example, there is evidence the Agency has made concerted efforts to find an adoptive home for a child with special needs, but the appropriate family has not yet been found, or a pre-adoptive placement disrupted despite concerted efforts on the part of the agency to support it. |
| | If the adoption occurs within 24 months, but the reviewer determines that it could have been achieved earlier if the Agency and court had made more concerted efforts, the answer to Question 144 should be "No", but the reviewer must specifically document the Agency-related delays in the documentation section |
| 148 | Be specific in your answer |
| 149 | Be specific in your answer |
| 150 | The adoption specialist is different than the caseworker, however, the adoption plan is part of the case plan. |
| 151, 152 | If the child is in a loving and stable placement and the goal is likely to change to adoption, the child's current resource parents should be encouraged to consider adoption when appropriate, based on the specific needs of the child and the relationship between the child and resource parents. |
| **Item 16** | |
| 153, 154 | If the permanent or concurrent goal is not APPLA, but the child is in foster care and is 14 or older in the period under review, please complete accordingly. Item is "NA" if an in-home case, or neither of these conditions apply. |

| | |
|---|---|
| 153, 154 cont | A goal of "Another Planned Permanent Living Arrangement" often is not specified in the case file using that term. This goal refers to a situation in which the Agency maintains care and custody responsibilities for and supervision of the child, and places the child in a setting in which the child is expected to remain until adulthood, such as with foster parents who have made a commitment to care for the child permanently, with relative foster caregivers who have made the same commitment, or with a long-term care facility (e.g., for those children with developmental disabilities who require long-term residential care services.). |
| | If the case plan permanency goal is to establish legal guardianship with a relative or non-relative caregiver and for the child to be discharged from foster care to the care of that relative, then this item is not appropriate and Reunification should be completed instead. |
| 155 | Question 155 should be answered "NA" if the child did not reach his/ her 16th birthday at any time during the period under review, and the child does not have a goal of emancipation or independence. |
| | In making this determination, reviewers should consider the following: |
| | • Did the Agency assess for independent living skills? |
| | • Is there an independent living plan in the file? (This is required for all youth age 16 and older.) |
| | • Is the child receiving an age-appropriate range of independent living services (e.g., post-high school planning, life skills classes, employment training, financial planning skills training)? |
| | • Is the child receiving transitional living services? |
| | • Does the child have an independent living caseworker? |
| | Reviewers should complete this item for all children 16 and older who have a goal of APPLA and for all children who have a goal of emancipation/independence regardless of age. Information regarding independent living services for children who have other types of goals will be captured under "Service Needs". |
| 156, 157, 158, 159, 160 | Question 156 is relevant for all cases that are applicable for an assessment of this section, including those in which the child's stated goal is emancipation/independence. Regardless of the specifics of the goal, reviewers must establish that there were Agency efforts to ensure that a child who does not have a goal of adoption, reunification, or guardianship has long-term stability until he or she reaches adulthood. |
| 161 | If the child is in a permanent living arrangement or was in a permanent living arrangement before being discharged from foster care, the answer to Question 161 should be "NA" |
| | In answering Question161, reviewers should consider the child's current living arrangement and whether formal steps were completed to make this arrangement permanent. E.g., if the child is in a shelter or living with foster parents without a formal permanent foster care agreement, the answer to Question 161 would be "No". A formal agreement would include a signed agreement, a court order, or other method the state uses to formalize the agreement. |
| | Reviewers should consider the efforts or actions taken during the period under review to achieve a planned permanency arrangement other than adoption, guardianship, or reunification with family. This might include asking foster parents or relatives to agree to and sign a long-term care commitment, etc. |
| | If the child is no longer in foster care, the answer to Question 161 should be based on the child's last placement before leaving foster care. |
| 162 | Be specific in your answer |
| 163 | Be specific in your answer |
| 164 | Note timeframe to the closest month. Do not round up. |

156

DHS
296194

| Item 17 | |
|---|---|
| | Questions in Item 17 should be completed if the case is a foster care case or if it is an in-home case but there are identified needs/concerns in the area. otherwise, Item 17 questions will be "NA" |
| 165, 168 | If the child is too young for a dental exam (under 3), Question 168 should be answered "NA" |
| | Reviewers should determine if there is evidence that, during the period under review, the Agency arranged for assessment of the child's health care needs, including dental care needs, both initially (if the child entered foster care during the period under review), or on an ongoing basis through periodic health and dental screening services conducted during the period under review. |
| | The evidence to consider would include, but is not limited to: |
| | • Conducting an initial health care screening, such as EPSDT (Early Periodic Screening, Diagnosis, and Treatment) or other comprehensive medical examination upon entry into foster care (if the child entered foster care during the period under review). |
| | • Ensuring that, during the period under review, the child received ongoing periodic preventive physical and dental health screenings to identify and avoid potential problems. (Preventive health care refers to initial and periodic age-appropriate dental or physical health examinations.) |
| | Including an assessment of physical and dental health needs in the initial comprehensive needs assessment (if the child entered foster care during the period under review), or in ongoing needs assessments conducted to guide case planning. |
| 166 | Policy states children should receive an initial health screening within 24 hours of entering care. |
| 167 | Policy states children should receive a comprehensive health screening within 30 calendar days of entering care. |
| 169 | Per policy mandates. |
| 170, 171 | If the answers to Questions 165 and/or 168 are "Yes" and no needs for services or treatment were identified, the corresponding Questions 170 and/or 171 should be answered "NA". If Question 170 is "NA" because of the child's age, then Question 171 should also be "NA". |
| | Reviewers should answer these questions based on a determination of the child(ren)'s physical health needs and the services provided or not provided to address those needs during the period under review. This would include immunizations, treatment services, and dental services, including orthodontics. |
| | For foster care cases only, reviewers should determine if, during the period under review, there was evidence that the following case-management criteria required by federal statute were met (select each one that was met): |
| | ♦ To the extent available and accessible, the child's health records are up to date and included in the case file [Social Security Act §475(1)(C)]. |
| | ♦ The case plan addresses the issue of health and dental care needs [Social Security Act §475(1)(C)]. |
| | ♦ To the extent available and accessible, foster parents or caregivers of a child placed in a facility are provided with the child's health records [Social Security Act §475(5)(D)]. |
| | Health records include the names and addresses of the child's health care providers, a record of the child's immunizations, the child's known medical problems, the child's medications, and any other relevant health information. |
| | Reviewers should answer "No" to Questions 170 or 171 if they determine that the case management activities were not met had or has a negative impact on the Agency's ability to meet the child's health and dental care needs. E.g., foster parents were unable to effectively address health care needs because they had never seen the child's health records, or the child's health care needs were not being met because there were no health records in the case file and the worker was unaware of the child's health care needs. |

| 172 | * Be specific in your answer |
|---|---|
| 173 | * Be specific in your answer |
| **Item 18** | |
| | Questions in Item 18 should be completed if the case is a foster care case or if it is an in-home case but there are identified needs/concerns in the area. otherwise, Item 18 questions will be "NA" |
| 174 | Policy states children should receive an initial mental health screening within 30 days of entering care, if over the age of 4. |
| 175 | Definition:<br><br>"Behavioral health needs" includes needs related to behavioral problems that are not always specified as mental health needs, including substance abuse. |
| | This question should be answered for all cases determined to be applicable for an assessment of this item, based on the above criteria |
| | Reviewers should determine whether, during the period under review, the Agency conducted a formal or informal mental/behavioral health assessment on the child either at entry into foster care (if the child entered foster care during the period under review), or on an ongoing basis to provide updated information for case planning decisions with regard to mental/behavioral health issues. |
| | If the case is an in-home services case, Question 175 should be answered for all children in the home for whom mental/behavioral health needs are relevant to the reason for the Agency's involvement with the family. |
| 176 | If Question 175 is answered "Yes", but no mental/behavioral health service needs were identified, the answer to Question 176 should be "NA"<br><br>Reviewers should consider the mental/behavioral health needs that existed during the period under review and the services that the Agency provided to address those needs, including outpatient treatment, inpatient mental health treatment, treatment for substance abuse disorders, individual therapy, group therapy, family therapy, etc. |
| 177 | Be specific in your answer |
| 178 | Be specific in your answer |

## Preserving and Maintaining Connections

| Item 19 | |
|---|---|
| 179 | It is best practice to place a child in the same community from which they were removed unless the child can be placed with a relative. Only note "NA" if the child was placed outside of the county and it was documented to be in the child's best interest. This must be explained by reviewer in the item rating section |
| 180 | Reviewers should determine if the child's placement is (or was) in one of the following (select the appropriate placement):<br>• Same community<br>• Different community, but same county<br>• Different county, but same state<br>• Different state |
| | If placement is in the same community as the parents, the answer to Question 180 should be "Yes". |
| | If placement is not in the same community, reviewers should consider if the placement is sufficiently close to allow frequent contact between the child and the parents. E.g., if placement is in another state, but is still very near where the parents live, the answer to Question 180 would be "Yes". In contrast, if placement is in the same state or county, but is actually quite a distance from the parents, the answer to Question 180 would be "No". |
| | As a general rule, reviewers should consider a travel distance of less than 1 hour as close enough for face-to-face contact. However, this is just a general guideline. Reviewers should consider all relevant circumstances in determining whether the location of the child's placement allows parents to visit the child on a frequent basis. |
| | If the child's parents live separately, reviewers should determine which parent is most involved in case planning and is most likely to be reunified with the child. The answer to Question 180 would then be based on the location of that parent's residence. |
| 181 | Reviewers should check "NA" if the answer to Question 180 is "Yes". |
| | Reviewers should determine if the placement decision was made in order to achieve the child's case goals or to meet the child's needs for specialized services (e.g., to place with a relative, to place in a potential adoptive home, to provide a highly specialized treatment setting, etc.). |
| | Question 181 should be answered "No" if the only reason for not placing the child in close proximity to the parents was a lack of existing placement resources in the community, unless the resource is such a highly specialized treatment facility that most communities would not be expected to maintain one (e.g., a residential treatment program for sexual offenders). |
| 182 | Be specific in your answer |
| 183 | Be specific in your answer |
| 184 | It is best practice to try and have the child remain in the same school upon placement, unless information from an assessment suggests a reason to move the child. |
| 185 | In some case circumstances it is appropriate for child to be removed from same school, like if an assessment deems appropriate, or if there are safety concerns |
| Item 20 | |
| 186 | **Definitions:**<br><br>"Siblings" are children who have one or more parents in common either biologically, through adoption, or through the marriage of their parents, and with whom the child lived before his or her foster care placement, or with whom the child would be expected to live if the child were not in foster care. |
| | In answering Question 186, reviewers should consider only the location of each of the siblings, not the reason for their location |

159

| | |
|---|---|
| | If the answer to Question 186 is "Yes", the answer to Question 187 should be "NA" |
| 187 | Reviewers should consider the circumstances of the placement of siblings, focusing on whether separation was necessary to meet the child's needs. E.g., were siblings separated temporarily because one sibling needed a specialized treatment or to be in a treatment foster home, or because one sibling was abusive to the other, or because siblings with different fathers were placed with paternal relatives? |
| | If the separation of siblings is attributed by the agency to a lack of foster homes willing to take sibling groups, Question 187 should be answered "No", unless the reviewer believes that the size of the sibling group (i.e., five or more children) made finding a single placement difficult and concerted efforts were made to place the children in close proximity to each other. |
| | If siblings were separated for a valid reason, reviewers should consider the entire period under review and determine if that valid reason still exists and if the need for separation still exists. For example, the siblings were separated because one sibling needed temporary treatment services. However, during the period under review, the sibling's treatment services ended. In this situation, reviewers should determine whether concerted efforts were made to reunite the siblings after the treatment service was completed. If the need for separation no longer exists and no efforts have been made to reunite the siblings, then the answer to Question187 should be "No". |
| 188 | Be specific in your answer |
| **Item 21** | |
| 189, 190 | A formal visitation plan is a critical best practice to ensure children and their families are afforded regular and convenient visitation, if deemed appropriate. Policy states this plan should be developed within 30 calendar days of placement, and updated every 90 days thereafter, and should be signed by all pertinent parties. |
| 191 | The visitation plan should be specific, and reflect all important people in the child's life. |
| 192, 193, 194, 195 | Reviewers should answer "NA" if: (1) contact between the child and the mother/father was not in the child's best interest and this was documented in the case file or court order; (2) the whereabouts of the mother/father was not known during the entire period under review, despite documented concerted efforts to locate her/him; (3) the mother's/father's parental rights were terminated before the period under review and s/he is not involved in the child's life; or (4) the mother/father was deceased during the entire period under review. |
| | Reviewers should determine whether the frequency of visitation during the period under review was sufficient to maintain the continuity of the relationship between the child and the parent, depending on the circumstances of the case. E.g., frequency may need to be greater for infants and young children than for some older children. Frequency also may need to be greater if reunification is imminent. |
| | If, during the period under review, frequent visitation with a parent was not possible (e.g., due to incarceration or the parent being in another state), reviewers should determine whether there are documented concerted efforts to promote other forms of contact between the child and the parent, such as telephone calls or letters in addition to facilitating visits when possible and appropriate. |
| | Reviewers should address the question of appropriate frequency based on the circumstances of the child and the family, rather than on policy. |
| 196, 197 | Response to Questions 196-197 are the same as for Questions 192 and 194 except that reviewers should determine if concerted efforts were made to ensure that the quality of parent-child visitation was sufficient to maintain the continuity of the relationship. E.g., did visits take place in a comfortable atmosphere and were they of an appropriate length? Did visitation allow for sufficient interaction between parent and child? If siblings were involved, did visits allow parents to interact with each child individually? If appropriate, were unsupervised visits and visits in the parent's home in preparation for reunification allowed? |

160

| | |
|---|---|
| 198, 199 | Reviewers should answer "NA" if the child has no siblings in foster care or if contact with all siblings who are in foster care is not considered to be in the best interests of the child (for example, one sibling is a physical threat to the other sibling or has a history of physical or sexual abuse of the other sibling). |
| | Reviewers should consider whether the frequency of visits during the period under review was sufficient to maintain the continuity of the sibling relationships. |
| 200 | Same as for 198, except reviewers should determine if concerted efforts were made to ensure that the quality of sibling visitation was sufficient to maintain the continuity of the relationship. For example, were visits long enough to permit quality interaction? Did sibling contacts only occur in the context of parent visitations? Did visits occur in a comfortable atmosphere? |
| 201 | Be specific in your answer |
| 202 | Per policy mandate |
| **Item 22** | |
| 203 | Reviewers must determine what the important connections are for the child (e.g., a young child is more likely to have an important connection with extended family than with school, and it is important for Native American children to maintain tribal connections) and then determine whether concerted efforts were made to maintain those connections. |
| | Reviewers should not rate this question based on connections to parents or siblings who are in foster care. Information about sustaining those connections is captured in other questions. However, the question may be rated based on connections with siblings who are not in foster care and other extended family members (who were not the child's primary caregivers before entry into foster care), such as grandparents, uncles, aunts, cousins, etc. |
| 204 | If there is no evidence found in the case file or through interviews that the child is a member of, or eligible for membership in, an Indian tribe, the answer to Question 204 is "NA" |
| | If there is no information in the case file that indicates the child is a member of, or eligible for membership in, an Indian tribe, but the reviewers learn through interviews that the child has Native American heritage and no apparent efforts were made to determine this, the answer to Question 204 is "No". |
| | If the child entered foster care during the period under review, reviewers should determine whether timely and appropriate action was taken to determine whether the child is a member of, or eligible for membership in, an Indian tribe. This may include exploring this with the parents and/or other persons with a relationship to the child, contacting tribes, and contacting the Bureau of Indian Affairs. |
| | If the child entered foster care before the period under review, the answer to Question 204 can be "Yes" if by the beginning of the period under review an informed determination was made about the child's membership, or eligibility for membership, in an Indian tribe and all appropriate steps were taken to determine whether the child is Native American. |
| 205 | If the child is not a member of, or eligible for membership in, an Indian tribe, the answer to Question 205 is "NA". |
| | If the child entered care during the period under review or had a TPR hearing during the period under review, reviewers should determine if timely notice was provided to the tribe. Timely notice is notice that was received no later than 10 days before the proceeding. If timely notice was not provided, the answer to Question 205 is "No". |
| | If the child entered care before the period under review and did not have a TPR hearing during the period under review, the answer to Question 205 is "Yes", if, by the beginning of the period under review, all appropriate steps were taken to notify the tribe. |

161

DHS
296199

| | |
|---|---|
| | If the child is not Native American, the answer to Question 206 is "NA" |
| 206 | Reviewers should determine whether, during the period under review, the child was placed (1) with a member of the child's extended family, (2) in a foster home licensed, approved, or specified by the Native American child's tribe, (3) in another Native American foster home placement, or (4) in an institution approved by a tribe or operated by a Native American organization. Placement preference is in this order unless another order is specified by tribal resolution. |
| | If the child's placement was not made in accordance with ICWA placement preferences, reviewers should determine if, during the period under review, there were documented concerted efforts to meet the ICWA placement preferences. |
| 207 | Be specific in your answer |
| **Item 23** | |
| 208 | It is important for birth and resource parents to have a good working relationship in order to best serve the child. |
| 209 | Even if a child is placed out of the home, it is important that the birth parent maintain some role in parenting, along with the resource parents, if it is determined safe to do so. |
| 210 | Be specific in your answer |
| **Item 24** | |
| 211, 212 | If the answer to Question 211 is "No", the answer to Question 212 should be "NA" |
| | If the answer to Question 212 is "Yes", reviewers may rate the section as a Strength, and answer "NA" to the remaining questions for the item. |
| | If the answer to Question 212 is "No", reviewers should answer the remaining questions for this item. |
| 213, 214 | The answers to Questions 213 and 214 should be "NA" if the answers to both Questions 211 and 212 are "Yes". |
| | If a child entered foster care during the period under review, reviewers must determine if the Agency followed the requirements of the Title IV-E provision that requires states to consider giving preference to placing the child with relatives, and determine whether the Agency considered such a placement and how (for example, identifying, seeking out, and evaluating the child's relatives). |
| | If a child entered foster care before the period under review and the answer to either Questions 211 or 212 is "No", reviewers must determine whether, during the period under review, the Agency made concerted efforts to search for and assess relatives as placement resources, if appropriate. If reviewers determine that, during the period under review, the Agency did not consider relatives as placement resources in cases in which consideration was appropriate, the answer to Question 213 should be "No". |
| 215 | Be specific in your answer |
| 216 | Be specific in your answer |

# EMU ONSITE REVIEW INSTRUMENT
# MACWIS DOCUMENTATION GUIDE

| FACE SHEET | |
|---|---|
| Child(ren's) names: | Case History and Participant Screen |
| Race and ethnicity, DOB's, Gender | Demographics |
| Type of case | Defined by CQI Review List and verified through Individual Service Plan Direct Services Tab |
| Was case opened for reasons other than child abuse and neglect? | Case Planning/Reasons for Service Information can also be found in the first FTM narrative or the last intake prior to the case opening (ex – CHINS intake or recommendations for service in an investigation) |
| Date of most recent case opening for all cases | Case History Screen |
| Date of child's most recent entry into foster care | Court History Screen |
| Date of child's most recent discharge from foster care | Court History Screen |
| Date of discharge from foster care for the most recent episode | Court History Screen |
| Date of case closure (for all cases) | Case History Screen |
| Reason for Agency involvement | Case Planning/Reasons for Services Information can also be found in the first FTM narrative or the last intake prior to the case opening (ex – CHINS intake or recommendations for service in an investigation) |

| Component #1:  ASSURING SAFETY AND MANAGING RISK | |
|---|---|
| **Section 1. TIMELINESS OF INITIATING INVESTIGATIONS OF REPORTS OF CHILD MALTREATMENT** | |
| 1 | How many reports of suspected abuse or neglect have been received on any child(ren) in the family (including those that were screened out by the Agency) during the life of the case? | Intake/Investigation Screen |
| 2 | How many accepted reports alleging abuse or neglect were received on any child(ren) in the family during the period under review (i.e., they were not screened out)? | Intake/Investigation Screen |
| 3 | In how many of the reports listed above was face-to-face contact with the child(ren) who is the subject of the report NOT made in accordance with the state's timeframes and requirements for a report of that priority? | Intake/Investigation Screen and Investigation Narrative |
| 4 | In how many of the reports listed above was face-to-face contact with the child(ren) who is the subject of the report NOT made in accordance with the state's timeframes and requirements for a report of that priority? | Intake/Investigation Screen and Investigation Narrative |
| 5 | For all reports identified above, were the reasons for the delays due to circumstances beyond the control of the Agency? | Investigation Narrative and Worker Assignment "Special Instructions" |
| 6 | Identify any reasons why a response was not initiated within established timeframes or face to face contact was not made (if applicable and reason is available): | Investigation Narrative and Worker Assignment "Special Instructions" |

| | Section 2. REPEAT MALTREATMENT | |
|---|---|---|
| 7 | Was there at least one evidenced maltreatment report involving any child in the family during the period under review? | Intake/Investigation Screen and Supervisor's Approval of Findings |
| 8 | If Yes, within a 6-month period before or after any maltreatment report identified, was there at least one additional evidenced maltreatment report involving any child in the family? | Intake/Investigation Screen and Supervisor's Approval of Findings |
| 9 | If Yes, did the report(s) identified above involve the same or similar circumstances? | Intake/Investigation Screen and Supervisor's Approval of Findings Worker Findings – Basis for Findings and Safety Assessment |
| 10 | If Yes, did any of the reports involve maltreatment of the child by the foster parents, members of the foster parents' family, other children in the foster home or facility, or facility staff members? | Intake/Investigation Screen Worker Findings – Basis for Findings and Safety Assessment |
| 11 | If there was maltreatment recurrence, document the circumstances related to maltreatment incidents including information related to the perpetrators, and indicate why the reviewers determined that the two incidents did or did not involve the same circumstances. Also indicate the dates of all maltreatment reports occurring within the 6-month period: | Intake/Investigation Screen and Investigation Narrative |
| 12 | Describe the circumstances related to any evidenced reports of maltreatment (if relevant) involving the foster parents, members of the foster parents' family, other children in the foster home or facility, or facility staff members: | Investigation Narrative Safety Assessment and Worker Findings – Basis for Findings |
| 13 | For cases where repeat maltreatment did occur, identify interventions and actions, or absence of interventions and actions, taken by the caseworker and ASWS to try and prevent maltreatment of the child(ren): | Investigation Recommendation for Services Safety Plan |
| | **Section 3. SERVICES TO FAMILY TO PROTECT CHILD(REN) IN THE HOME AND PREVENT REMOVAL OR RE-ENTRY INTO FOSTER CARE** | |
| 14 | For the PUR,, did the Agency make concerted efforts to provide or arrange for appropriate services for the family to protect children and prevent their entry into foster care or re-entry into foster care after a reunification? | Case Narratives and Tasks & Goals |
| 15 | If, during the PUR,, any child was removed from the home without providing or arranging for services, was this action necessary to ensure the child's safety? | Case Narratives and Tasks & Goals Case Planning - Reason for Service/Removal Reason |
| 16 | Please identify the circumstances that indicate a safety risk to the child and the services that were needed by the family to address safety issues and describe how those services were or were not provided by the Agency during the PUR,: | Case Narratives and Risk Assessment and Safety Assessment |
| 17 | Please note the reason for removing the child from the home during the PUR,without providing services (if relevant and reason is available) and provide the reviewers' reasons for determining whether the reason was appropriate or inappropriate | Case Narratives and Risk Assessment and Safety Assessment Case Planning – Reason for Service/Removal Reason |

| Section 4. RISK ASSESSMENT AND SAFETY MANAGEMENT | | |
|---|---|---|
| 18 | If the case was opened during the PUR, did the Agency conduct an initial assessment of the risk to the target child in foster care and/or any child(ren) in the family remaining in the home? | Risk Assessment and Safety Assessment |
| 19 | During the PUR, did the Agency conduct ongoing assessments of the risk to the target child in foster care and/or any child(ren) in the family remaining in the home? | Risk Assessment and Safety Assessment |
| 20 | If the case was opened during the PUR for either foster care or in-home services, did the Agency: (1) conduct an initial assessment of the safety of the target child in foster care and/or any child(ren) remaining in the home, and (2) develop a safety plan with the family for addressing identified safety issues? | Risk Assessment and Safety Assessment (2) Safety Plan, Case Narratives (FTM, client contact) |
| 21 | During the PUR, did the Agency: (1) conduct ongoing safety assessments of the target child in foster care and/or any child(ren) remaining in the home, and (2) continually monitor and update the safety plan, including encouraging family engagement in services designed to promote achievement of the goals of the safety plan? | Risk Assessment and Safety Assessment Case Narratives and Tasks and Goals |
| 22 | During the PUR, were there safety concerns pertaining to the target child in foster care or any child(ren) in the family remaining in the home that were not adequately or appropriately addressed by the Agency? | Risk Assessment and Safety Assessment Case Narratives |
| 23 | During the PUR, was there a safety concern related to the target child in foster care during visitation by parents or other family members that could be attributed to not providing sufficient monitoring of visitation, permitting unsupervised visitation when it was not appropriate, or court-ordered visitation against Agency recommendations? | Risk Assessment and Safety Assessment and Visitation Plan |
| 24 | During the PUR, was there a concern for the target child's safety related to the foster parents, members of the foster parents' family, other children in the foster home or facility, or facility staff members that was not adequately or appropriately addressed by the Agency? (Foster parents include pre-adoptive parents and non-licensed relatives providing care to a child in state custody.) | Case Narratives and Risk Assessment and Safety Assessment |
| 25 | During the PUR, if the target child was discharged from foster care to be reunited with parents or relatives or returned home on a trial home visit, did the Agency conduct a thorough safety assessment? | Case Narratives and Risk Assessment and Safety Assessment |
| 27 | Describe the circumstances of the case that indicate safety concerns related to the child(ren): | Case Narratives and Risk Assessment and Safety Assessment |
| 28 | Describe the characteristics of the risk assessment(s) and safety assessment(s) (was one conducted, how was it conducted, when it was conducted, how comprehensive was it, what did it include or not include), including their timing: | Case Narratives and Risk Assessment and Safety Assessment |
| 29 | If applicable, describe the nature of the safety concerns related to the child(ren) during visitation, including a description of the visitation (was it unsupervised, and if so, was this appropriate?): | Case Narratives and Safety Assessment and Visitation Plan |

165

| 30 | If applicable, describe the nature of the safety concerns related to the child(ren) from foster care providers and MDHS' activities with regard to addressing safety. | Case Narratives and Safety Assessment and Visitation Plan and Resource Parent Case Narratives |
|---|---|---|
| 31 | Identify the activities undertaken to monitor participation in safety-related services (or the absence of activities to monitor service participation): | Case Narratives and Safety Assessment and Visitation Plan and Tasks and Goals |
| 32 | Was there a report evidenced that the foster care provider(s) maltreated the child during the PUR? If Yes, describe the circumstances of that report, whether the Agency might have prevented the maltreatment, and the Agency's response: | Intake/Investigation Screen and Investigation Narrative and Resource Parent Case Narratives and ANE History |

### Component #2:  ASSESSING STRENGTHS AND NEEDS

**Section 5.  Needs and Services of Child, Parents, and Foster Parents**

| 33 | During the PUR, did the Agency conduct (1) a formal or informal initial comprehensive assessment of the child(ren)'s strengths and needs (if the case was opened during the period under review), or (2) an ongoing assessment to provide updated information regarding the child(ren)'s needs for case planning purposes (if the case was opened before the period under review)? | Risk Assessment |
|---|---|---|
| 34 | If Yes and the case was opened during PUR, was the initial children's strengths and needs assessment conducted within the first 30 days? | Risk Assessment |
| 35 | During the PUR, were all needed services provided to meet the child's identified needs? | Case Narratives and Case Planning and Tasks & Goals Services, Medical |
| 36 | Were all services provided to children in a timely manner? | Case Narratives and Case Planning and Tasks & Goals Services, Medical |
| 37 | Was the child interviewed prior to the completion of the strengths and needs assessment? | Case Narratives |
| 38 | Is there clear evidence, other than signatures, of child involvement and input in the strengths and needs assessment? | Case Narratives |
| 39 | Document the method that the Agency used to assess the child's needs: | Risk Assessment Case Narratives |
| 40 | Document the services provided to the child(ren): | Case Narratives and Case Planning and Tasks & Goals Services, Medical, IL/TL Plan |
| 41 | Document the services that were needed but not provided: | Case Narratives and Case Planning and Tasks & Goals Services, Medical, IL/TL Plan |

| | | |
|---|---|---|
| 42 | During the PUR, did the Agency conduct (1) a formal or informal initial comprehensive assessment of the mother's strengths and needs (if the case was opened during the period under review) or (2) an ongoing assessment to provide updated information regarding the mother's needs for case planning purposes (if the case was opened before the PUR)? | Case Narratives and Risk Assessment and Safety Assessment and Case Planning and Tasks & Goals |
| 43 | If Yes and the case was opened during PUR, was the initial strengths and needs assessment of the mother conducted within the first 30 days? | Risk Assessment and Safety Assessment |
| 44 | Were all services provided to mother in a timely manner? | Case Narratives and Case Planning and Tasks & Goals |
| 45 | Was mother interviewed prior to the completion of the strengths and needs assessment? | Case Narratives |
| 46 | Is there clear evidence, other than signatures, of mother involvement and input in the strengths and needs assessment? | Case Narratives |
| 47 | During the PUR, did the Agency provide all needed services to the mother to meet identified and assessed needs (with respect to services the mother needs in order to provide appropriate care and supervision to ensure the safety and well-being of her children)? | Case Narratives and Risk Assessment and Safety Assessment and Case Planning and Tasks & Goals Services |
| 48 | During the PUR, did the Agency conduct (1) a formal or informal initial comprehensive assessment of the father's strengths and needs (if the case was opened during the period under review) or (2) an ongoing assessment to provide updated information regarding the father's needs for case planning purposes (if the case was opened before the period under review)? | Case Narratives and Risk Assessment and Safety Assessment and Case Planning and Tasks & Goals |
| 49 | If Yes and the case was opened during PUR, was the initial strengths and needs assessment of the father conducted within the first 30 days? | Case Narratives and Risk Assessment and Safety Assessment and Case Planning and Tasks & Goals |
| 50 | During the PUR, did the Agency provide all needed services to the father to address identified and assessed needs (with respect to services the father needs in order to provide appropriate care and supervision to ensure the safety and well-being of his children)? | Case Narratives and Risk Assessment and Safety Assessment and Case Planning and Tasks & Goals Services |
| 51 | Were all services provided to father in a timely manner? | Case Narratives and Case Planning and Tasks & Goals |
| 52 | Was father interviewed prior to the completion of the strengths and needs assessment? | Case Narratives |
| 53 | Is there clear evidence, other than signatures, of father's involvement and input in the strengths and needs assessment? | Case Narratives |
| 54 | Please indicate any reason why a needs assessment did not need to be completed on either the mother or father: | Case Narratives and Intake/Investigation Court/Detail/Court Order Special Conditions |
| 55 | Document the services that were provided to the mother: | Case Narratives and Case Planning and Tasks & Goals and Services |

167

| 56 | Document the services that the mother needed, based on an assessment, but that were not provided: | Case Narratives and Case Planning and Tasks & Goals |
|---|---|---|
| 57 | Document the services provided to the father: | Case Narratives and Case Planning and Tasks and Goals Services |
| 58 | Document the services that the father needed, based on an assessment, but that were not provided: | Case Narratives and Case Planning and Tasks and Goals |
| 59 | During the PUR, did the Agency conduct an assessment of the needs of the foster or pre-adoptive parents on an ongoing basis (with respect to services they need in order to provide appropriate care and supervision to ensure the safety and well-being of the children in their care)? | Case Narrative and Resource Home/Evaluation/Re-Evaluation/ANE History Resource Home/RSP/Narratives |
| 60 | During the PUR, were the foster or pre-adoptive parents provided with all needed services to address identified needs that pertained to their capacity to provide appropriate care and supervision and ensure the safety and well-being of the children in their care? | Case Narrative and Resource Home/Evaluation/Re-Evaluation/ANE History Resource Home/RSP/Narratives |
| 61 | Were all services provided to the foster/pre-adoptive family in a timely manner? | Case Narrative and Resource Home/Evaluation/Re-Evaluation/ANE History Resource Home/RSP/Narratives |
| 62 | Document the services provided to the foster parent(s): | Resource Home/Evaluation/Re-Evaluation/ANE History Resource Home/RSP/Narratives |
| 63 | Document the services that the foster parent(s) needed, based on an assessment, but that were not provided: | Case Narrative and Resource Home/Evaluation/Re-Evaluation/ANE History Resource Home/RSP/Narratives |

## Section 6. EDUCATIONAL NEEDS OF THE CHILD

| 64 | During the PUR, did the Agency make concerted efforts to assess and address the child(ren)'s educational needs? | Case Narratives and Demographics/Child Educational Record and Case Planning./Initial/Review/ Educational Issues |
|---|---|---|
| 65 | Were the child's educational needs assessed within 30 days of entry into foster care? | Case Narratives and Demographics/Child Educational Record and Case Planning./Initial/Review/ Educational Issues |
| 66 | If the child is 3 years of age or younger, did (s)he receive a developmental assessment within 30 days of foster care entry? | Case Narratives and Demographics/Child Educational Record and Case Planning/ISP Medical/Health Record |
| 67 | If not explained in the "reason for rating" section, document the process used for educational assessment, if relevant: | To be documented by Reviewer |

| | | |
|---|---|---|
| 68 | Document in the chart below the services provided or not provided to address the child's educational needs. Services would include advocacy on the part of foster parents as well as the caseworker; ensuring that the child received special education classes; making provisions for the child to receive tutoring or educational mentoring; or arranging for the child to be enrolled in early intervention preschool classes, such as Head Start: | Case Narratives and Demographics/Child Educational Record and Case Planning./Initial/Review/ Educational Issues |
| 69 | If there are services that were not or are not being provided, document agency efforts, or lack of Agency efforts, to provide those services: | Case Narratives and Demographics/Child Educational Record and Case Planning./Initial/Review/ Educational Issues |
| 70 | Was the child enrolled in an accredited school within 3 days of custody or placement change? | Case Narratives and Demographics/Child Educational Record and Case Planning./Initial/Review/ Educational Issues |

## Component #3: INVOLVING CHILDREN & FAMILIES IN CASE PLANNING AND DECISION MAKING

### Section 7. CHILD AND FAMILY INVOLVEMENT IN CASE PLANNING

| | | |
|---|---|---|
| 71 | During the PUR, did the Agency make concerted efforts to actively involve the child in the case planning process? | Case Narratives |
| 72 | During the PUR, did the Agency make concerted efforts to actively involve the mother in the case planning process? | Case Narratives |
| 73 | During PUR, did the Agency make concerted efforts to actively involve the father in the case planning process? | Case Narratives |
| 74 | Document ways in which each party listed below was or was not involved in case planning (e.g., identifying needs and services, establishing goals, evaluating progress, etc.) If the involvement of the child, mother, or father is determined by the reviewers to be Not Applicable, document the reasons for this determination (including any evidence of efforts to locate absent parents). | To be documented by Reviewer Case Narratives (FTM, client contact, foster child contact, parent/caretaker contact) |
| 75 | Is there evidence that the family was informed of and prepared to actively participate in case events, including the FTMs, case plan development, and court events? | Case Narratives and County Conference Letter Verification Court Invitation Letter Verification (paper file) |
| 76 | Is there evidence that child(ren) and or parent(s) were involved in choosing services included on their case plan? | Case Narratives and County Conference |
| 77 | Mother | Case Narratives and County Conference |
| 78 | Father | Case Narratives and County Conference |
| 79 | Age appropriate child/youth | Case Narratives and County Conference |
| 80 | Were the service plans signed by the parents or guardians? | Case Planning/History and County Conference |
| 81 | Were the service plans signed by the children, aged 6 and up? | Case Planning/History and County Conference |
| 82 | Did the families attend the county conferences? | Case Narratives and County Conference |

169

| | **Section 8. CASEWORKER VISITS WITH CHILD** | |
|---|---|---|
| 83 | During the PUR, was the frequency of the visits between the caseworker and the child(ren) sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals? | Case Narratives |
| 84 | During the PUR, what was the most typical pattern of visitation between the caseworker delete or other responsible party and the child(ren) in the case | Case Narratives |
| 85 | Did the caseworker visits occur 2 times a month, with at least one in the home? | Case Narratives |
| 86 | During the PUR, was the quality of the visits between the case worker and the child(ren) sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals (e.g., did the visits between the caseworker and the child(ren) focus on issues pertinent to case planning, service delivery, and goal achievement)? | Case Narratives |
| 87 | Please document barriers to more frequent visiting (if relevant) or explain why less frequent visitation was still appropriate, or not: | Case Narratives |
| 88 | Document the aspects of the caseworker visits with the child that contributed to high quality visits (if relevant) or why caseworker visits were not of high quality (if relevant), as related to the response in question 86: | To be documented by Reviewer |
| | **Section 9. CASEWORKER VISITS WITH PARENTS** | |
| 89 | During the PUR, was the frequency of the visits between the caseworker and the mother sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals? | Case Narratives |
| 90 | During the PUR, what was the most typical pattern of visitation between the caseworker and the mother of the child(ren)? | Case Narratives |
| 91 | During the PUR, was the frequency of the visits between the caseworker and the father sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals? | Case Narratives |
| 92 | During the PUR, what was the most typical pattern of visitation between the caseworker and the father of the child(ren): | Case Narratives |
| 93 | During the PUR, was the quality of the visits between the caseworker and the mother sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals? | Case Narratives |
| 94 | During the PUR, was the quality of the visits between the caseworker and the father sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals? | Case Narratives |
| 95 | Please describe barriers to more frequent visiting with the mother (if relevant) and father (if relevant), and discuss (if relevant) why reviewer felt less frequent visitation was appropriate: | Case Narratives and Court/Details and To be documented by Reviewer |
| 96 | Describe the general quality of the caseworker visits with the mother and the father, and the issues that were or were not addressed during caseworker visits (if relevant): | Case Narratives |

| 97 | If regular visitation is not occurring due to mother not being involved or found, are there documented diligent efforts to locate mother? | Case Narratives and Court/Details |
|---|---|---|
| 98 | If regular visitation is not occurring due to father not being involved or found, are there documented diligent efforts to locate father? | Case Narratives and Court/Details and To be documented by Reviewer |

## Component #4: INDIVIDUALIZING CASE PLANNING

### Section 10. PERMANENCY GOAL FOR CHILD

| 99 | What is (are) the child's current permanency goal(s) (or if the case was closed during the PUR, what was the permanency goal before the case was closed)? | Case Planning/ISP |
|---|---|---|
| 100 | Is (are) the child's permanency goal(s) specified in the case file? | Case Planning/ISP |
| 101 | Was a permanency plan developed within the child's first 30 days in care? | Case Planning/ISP |
| 102 | Were all permanency goals in effect during the PUR established in a timely manner? | Case Planning/ISP |
| 103 | Were all permanency goals in effect during the PUR appropriate to the child's needs for permanency and to the circumstances of the case? | Case Narratives and Case Planning/ISP Court/Detail/Court Order Special Conditions |
| 104 | Please document the reasons the reviewers determined that the goals were not timely and/or appropriate (if relevant): | To be document by reviewer |
| 105 | Has the child been in foster care at least 15 of the last 22 months? | Court Custody Record |
| 106 | If not, does the child meet Adoption and Safe Families Act (ASFA) criteria for termination of parental rights (TPR)? | Case Planning/ Initial/Review/Compelling Reasons and Adoption Discussion and County Conference Part C |
| 107 | If yes, did the Agency file a TPR petition before the period under review or in a timely manner during the period under review? | Court/TPR Request and Court Detail |
| 108 | If no TPR petition has been filed, is an "exception" or compelling reason for not filing for TPR documented in the case file? | Case Planning/ Initial/Review/Compelling Reasons and Adoption Discussion and County Conference Part C |
| 109 | If an exception has not been documented, do circumstances exist that would constitute a legal exception? | Case Narrative and County Conference Part C Court/Detail/Court Order Special Conditions |
| 110 | If the child has a goal of reunification, does the case record documentation reflect active concurrent permanency planning? | Case Narrative and County Conference Review |
| 111 | If the child was discharged during PUR, was an aftercare plan developed prior to discharge? | Case Narrative and Independent Living Plan |

### Section 11. CASE PLANNING

| 112 | How many FTMs have occurred during the PUR? | Case Narrative |
|---|---|---|
| 113 | How many FTMs have been attended by both the birth and resource parents during the PUR? | Case Narrative |
| 114 | Was a FTM used in the initial development of the case plan if the initial plan was developed during the PUR, and was the FTM used to update the case plans quarterly? | Case Narrative |

171

| 115 | Were there family team meetings within 30 calendar days of any placement or other significant change in the child's or family's circumstances? | Case Narrative |
| 116 | Were there documented discussions of concurrent planning with the birth parents? | Case Narrative |

## Component #5: MOBILIZING SERVICES TIMELY

### Section 12. FOSTER CARE RE-ENTRIES

| 117 | Did any of the child's foster care entries during the PUR occur within 12 months of the child's discharge from a prior foster care episode? | Court Custody Record |
| 118 | If the answer is Yes, was there evidence that concerted efforts were made to prevent re-entry? | Case Narratives and Risk Assessment and Safety Assessment and Case Planning and Tasks & Goals |
| 119 | Date of child's first entry into foster care during the period under review: | Court Custody Record |
| 120 | Was this entry within 12 months of a previous discharge: | Court Custody Record |
| 121 | Date of discharge, if any, within 12 months of this entry:_____ Document the circumstances related to the re-entry within 12 months: | Court Custody Record and To be document by Reviewer |
| 122 | If there are any additional entries into foster care after a discharge during the PUR, provide the above information for each of these entries: | Court Custody Record |

### Section 13. REUNIFICATION, GUARDIANSHIP OR PERMANENT PLACEMENT WITH RELATIVES

| 123 | Does the child have a goal of reunification, guardianship, or permanent placement with relatives? | Case Planning/ISP/Individual Service Plan Tab |
| 124 | What is/was the child's most recent permanency goal? | Case Planning/Individual Service Plan Tab |
| 125 | Are the Agency and court making (or did they make) concerted efforts to achieve the goal (or these goals, if there are concurrent goals) in a timely manner during the PUR? | Case Narratives and Case Planning/ISP Court/Detail/Court Order Special Conditions |
| 126 | Date of the child's most recent entry into foster care: | Court Custody Record |
| 127 | Time in care (in months) at the time of the onsite review: | Court Custody Record |
| 128 | Date of discharge from foster care: | Court Custody Record |
| 129 | Document efforts made to achieve goal, including the appropriateness and effectiveness of the efforts, and, barriers to achieving the goal (for example, agency, court, or other factors that prevented or are preventing timely achievement of the goal): | Case Narratives and Case Planning/ISP |
| 130 | Please document any contributing factors to the case in both the circumstance of the goal of reunification or permanent placement with relatives was not achieved or is not likely to be achieved within 12 months, or if the permanency goal was achieved within 12 months: | Case Narratives and Case Planning/ISP/Initial/Review/Barriers to Permanent Plan |
| 131 | For children with a goal of reunification, have parental service plans identified those services DFCS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care? | Case Narratives and Case Planning and Tasks & Goals |
| | Did DCFS make those services identified available either through direct or referral service? | Case Narratives and Case Planning and Tasks & Goals |

| 132 | Mother? | Case Narratives and Case Planning and Tasks & Goals |
|---|---|---|
| 133 | Father? | Case Narratives and Case Planning and Tasks & Goals |
| 134 | If the child was discharged during PUR and was reunified, was there a 90 day trial home visit? | Case Narratives and Placement Screen |

**Section 14. STABILITY OF FOSTER CARE PLACEMENT**

| 135 | How long has the child been in the current placement setting? | Placement Screen/Request Tab |
|---|---|---|
| 136 | How many placement settings did the child experience during the PUR? | Placement Screen/History Tab |
| 137 | If there was more than 1 placement, were all placement changes during the PUR planned by the Agency in an effort to achieve the child's case goals or to meet the needs of the child? | Case Narratives and Placement Screen/ Request Tab |
| 138 | Is the child's current placement setting (or most recent placement if the child is no longer in foster care) stable? | Case Narratives and Placement Screen/ Request Tab and Resource Parent Narratives |
| 139 | If applicable, indicate why the placement changes were or were not planned in an effort to achieve the child's case goals or to meet the needs of the child: | Case Narratives and Placement Screen/Request and Resource Parent Narratives |
| 140 | If applicable, provide your reasons for determining that the child's current placement (or most recent placement if the child is no longer in foster care) is or is not stable: | To be document by Reviewer |
| 141 | If the child has been assessed with special needs, is s(he) placed in a placement that can meet their therapeutic, educational and medical needs? | Case Narratives and Placement Screen/ Request and Resource Parent Narratives |
| 142 | Was the child placed in the least restrictive setting that meets his/her individual needs? | Case Narratives and Placement Screen/ Request and Resource Parent Narratives |

**Section 15. ADOPTION**

| 143 | Does the child have a goal of adoption? | Case Planning/Individual Service Plan Tab |
|---|---|---|
| 144 | Are the Agency and court making (or did the agency and court make) concerted efforts to achieve the goal of adoption in a timely manner? | Case Planning/ Initial/Review/Compelling Reasons and Adoption Discussion and County Conference Review Court/Detail/TPR Petition Filed Court/TPR Request Case Narratives |
| 145 | Date of the child's most recent entry into foster care (this should be the same date on the Face Sheet): | Court Custody Record |
| 146 | Time in care (in months) at the time of the onsite review (this is the number of months that the child was in foster care from the date of the most recent entry into foster care to the beginning of the onsite review week or from the date of the most recent entry into foster care to the time of adoption finalization or discharge from foster care): | Court Custody Record |
| 147 | Date of adoption finalization (if relevant) (this is the date that the court legally established the adoption and transferred care and placement responsibility or supervision from the state to the adoptive parent(s); this should be the same date; if the adoption has not been finalized, enter Not Applicable (NA): | Case Narrative and Case Planning/ISP Initial/Review/Compelling Reasons and Adoption Discussion and Court Detail Record |

| 148 | Please document efforts made to achieve the child's goal of adoption, including the appropriateness and effectiveness of the efforts, and barriers to achieving the goal of adoption (for example, agency- or court-related factors that prevented or are preventing achievement of the goal in a timely manner): | Case Narrative and Case Planning/ISP Initial/Review/Compelling Reasons and Adoption Discussion and Barriers to Permanent Plan and Court Detail Record |
|---|---|---|
| 149 | Please document special circumstances in the case which are contributing to the child either likely to achieve the goal of adoption within 24 months or not: | Case Narrative and Case Planning/ISP Initial/Review/Compelling Reasons and Adoption Discussion and Barriers to Permanent Plan and Court Detail Record |
| 150 | Does the child have an assigned adoption specialist and an adoption plan that identifies the child-specific activities that DFCS will undertake to achieve adoption, and receiving regular adoption status meetings consistent with plan requirements, and was that adoption specialist assigned within 10 days of the adoption goal change? | Case Assign/Transfer and Case Narratives and Case Planning/Direct Services |
| 151 | Is there evidence that the resource family has been informed of available subsidies, including post-adoptive subsidies? | Case Narratives and Placement Screen/Requests and Resource Parent Narratives |
| 152 | If the child has been in care longer than 12 months, is there evidence that the resource parents have been engaged on discussions regarding adoption? | Case Narratives and Placement Screen/Requests and Resource Parent Narratives |

**Section 16. OTHER PLANNED PERMANENT LIVING ARRANGEMENT**

| 153 | Does the child have a goal of other planned permanent living arrangement? | Case Planning/ISP/Direct Services/Permanent Plan |
|---|---|---|
| 154 | What is the child's other planned permanent living arrangement goal (check the goal that most closely reflects the one in the case file)? | Case Planning/ISP/Direct Services/Concurrent Plan |
| 155 | For children aged 14-20 in the PUR, were concerted efforts made to provide the child with services to adequately prepare the child for independent living when the child leaves foster care, as set forth in a service plan? | Case Narrative and Case Planning./Initial/Review and Independent Living Plan |
| 156 | Were concerted efforts made to achieve the goal of other planned permanent living arrangement in a timely manner by placing the child in a living arrangement that is "permanent," that is, the child will remain in the living arrangement until discharge from foster care? | Case Narrative and Case Planning./Initial/Review and Independent Living Plan Placement Screen/Requests and Adjustment |
| 157 | Date of the child's most recent entry into foster care: | Court Custody Record |
| 158 | Time in care (in months) at the time of the onsite review: | Court Custody Record |
| 159 | Date of documentation regarding "permanency" of the child's living arrangements | Case Planning/Direct Services/Permanent Plan Placement Screen/Requests and Adjustment County Conference Case Narratives SAR/Placement/#4 |
| 160 | Date of discharge from foster care: | Court Custody Record |
| 161 | If the child is not in a living arrangement that can be considered permanent, were concerted efforts made during the period under review to achieve this type of living arrangement for the child? | Case Narrative and Case Planning./Initial/Review and Independent Living Plan Placement/History/Rejection History |

| 162 | Please document the efforts made to achieve the child's goal, including the appropriateness and effectiveness of the efforts, and barriers to achieving the goal: | Case Narrative and Case Planning./Initial/Review and Independent Living Plan |
|---|---|---|
| 163 | Document the services provided, or not provided, to adequately prepare the child for independent living: | Case Narrative and Case Planning./Initial/Review and Independent Living Plan |
| 164 | If the child is over 14 and involved with ILS, how long has s(he) consistently been attending ILS classes? | Case Narrative and Case Planning./Initial/Review and Independent Living Plan |

**Section 17.  PHYSICAL HEALTH OF THE CHILD**

| 165 | In the last 12 months period, has the Agency assessed the child's physical health care needs? | Case Narratives and Demographics/Medical Info and Medical/Health Record |
|---|---|---|
| 166 | If the child came into care during the PUR, did the child receive an initial screening within 24 hours? | Case Narratives and Demographics/Medical Info and Medical/Health Record and County Conference Review |
| 167 | If the child came into care during the PUR, did the child receive a comprehensive health screening within 30 days of foster care entry? | Case Narratives and Demographics/Medical Info and Medical/Health Record and County Conference Review |
| 168 | During the PUR, did the Agency assess the child's dental health care needs? | Case Narratives and Demographics/Medical Info and Medical/Health Record and County Conference Review |
| 169 | Did the child, if over 3, receive an initial dental examination within 90 days of entry into care or within 90 days of his/her 3rd birthday if occurring during stay in foster care? | Case Narratives and Demographics/Medical Info and Medical/Health Record and County Conference Review |
| 170 | During PUR, did the Agency ensure that appropriate services were provided to the child to address all identified physical health needs within required timeframes? | Case Narratives and Demographics/Medical Info and Medical/Health Record and County Conference Review |
| 171 | During the PUR, did the Agency ensure that appropriate services were provided to the child to address all identified dental health needs within required timeframes? | Case Narratives and Demographics/Medical Info and Medical/Health Record and County Conference Review |
| 172 | Did the child receive periodic, age-appropriate physical and dental health examinations to ensure ongoing assessment of needs? If not, document the reasons why the Agency did not conduct this ongoing assessment: | Case Narratives and Demographics/Medical Info and Medical/Health Record and County Conference Review Case Planning/Initial/Review/ Medical Issues |
| 173 | Based on the assessment of needs, if there are services that were not provided, document why the services were not provided (for example, lack of Agency efforts to secure services, lack of service availability in the community, lack of transportation for foster parents to take child to appointments, etc.): | Case Narratives and Demographics/Medical Info and Medical/Health Record and County Conference Review Case Planning/Initial/Review/Medical Issues |

| | **Section 18. MENTAL/BEHAVIORAL HEALTH OF THE CHILD** | |
|---|---|---|
| 174 | Did the child, age 4 and older, receive an initial mental health screening within 30 days of entry into care and/or within 30 days of the 4th birthday if occurring during stay in foster care? | Case Narratives and Demographics/Medical Info and Medical/Health Record and County Conference Review |
| 175 | Did the Agency conduct an assessment of the child(ren)'s mental/behavioral health needs on an ongoing basis or as follow-up based on indications to inform case planning decisions? | Case Narratives and Demographics/Medical Info and Medical/Health Record and County Conference Review Risk Assessment Case Planning/Initial/Review/Mental Health Assessment and Emotional Behavioral Issues |
| 176 | During the PUR, did the Agency provide appropriate services to address the child(ren)'s mental/behavioral health needs within required timeframes? | Case Narratives and Demographics/Medical Info and Medical/Health Record and County Conference Review Case Planning/Initial/Review/Mental Health Assessment and Emotional Behavioral Issues |
| 177 | Note whether or not there is evidence of a mental/behavioral health (including substance abuse) assessment. For example, (1) what type of needs assessment was conducted, and (2) what kind of information was in the case file or missing from the case file that is relevant to an assessment of mental/behavioral health needs? Indicate if a formal assessment was conducted, and, if so, note the diagnosis: | Case Narratives and Demographics/Medical Info and Medical/Health Record and County Conference Review Risk Assessment Case Planning/Initial/Review/Mental Health Assessment and Emotional Behavioral Issues |
| 178 | If there are services that were not or are not being provided based on the assessment of needs, describe why the services were not provided (for example, lack of Agency efforts to secure services, lack of service availability in the community, no transportation for foster parents to take child to appointments, parent's unwillingness to engage child in services, etc.). If the services were not available due to lack of availability, or reviewer notices other services not available in the community, please describe in detail: | Case Narratives and Demographics/Medical Info and Medical/Health Record and County Conference Review Case Planning/Initial/Review/Mental Health Assessment and Emotional Behavioral Issues |

## Component #6: PRESERVING & MAINTAINING CONNECTIONS

**Section 19. PROXIMITY OF FOSTER CARE PLACEMENT**

| | | |
|---|---|---|
| 179 | Was the child placed in the same county as (s)he was removed? | Placement Screen/Director Approval/Proximity button |
| 180 | Is the child's current or most recent placement close enough to his or her parents or other potential permanent caregiver to facilitate frequent face-to-face contact between the child and the parents while the child is (or was) in foster care? | Placement Screen/Director Approval/Proximity button |
| 181 | If No, was the reason for the location of the child's current or most recent placement based on the child's needs and intended to ensure that the child's case plan goals are achieved? | Case Narrative and Placement Screen/Director Approval/Proximity button |
| 182 | Describe the relationship between the child's current or most recent placement and the location of the parents or of a family member with whom the child is likely to be reunified (for example, the child will be reunified with a grandmother): | Case Narrative and Placement Screen/Director Approval/Proximity button |

176

| 183 | If the reviewers determine that the child's placement is not sufficiently close to the parent(s) to facilitate frequent contact, document the reasons for this determination (and identify any reasons provided by the Agency): | Case Narrative and Placement Screen/Director Approval/Proximity button |
|---|---|---|
| 184 | Did the child remain in the same school (s)he attended prior to foster care placement? | Case Narrative and Placement screen/Proximity button/ Discussion/Request and Education Record Case Planning/Initial/Review/Educational Issues |
| 185 | If No, please explain why: | Case Narrative and Placement screen/Proximity button/ Discussion |

**Section 20. PLACEMENT WITH SIBLINGS**

| 186 | During the period under review, was the child placed with all siblings who also were in foster care? | Case Narrative and Placement Screen/Director Approval/Placed with Siblings button |
|---|---|---|
| 187 | If No, was there a valid reason for the child's separation from the siblings (for example, the separation was necessary to meet the needs of one of the siblings, to address safety concerns for one or more of the siblings, or to accommodate a large sibling group)? | Case Narrative and Placement Screen/Director Approval/Placed with Siblings button |
| 188 | Reason for Separation (if applicable)-please list sibling's name, placement setting, and the reason for separation: | Case Narrative and Placement Screen/Director Approval/Placed with Siblings button |

**Section 21. VISITING WITH PARENTS AND SIBLINGS IN FOSTER CARE**

| 189 | Was an initial visitation plan developed in the first 30 days of the child's placement? | Case Narrative and Visitation Plan |
|---|---|---|
| 190 | Was a visitation plan updated every 90 days during the PUR? | Visitation Plan |
| 191 | Does the visitation plan include all visitations (parents, siblings, connections, etc)? | Case Narrative and Visitation Plan |
| 192 | During the PUR, were concerted efforts made to ensure that visitation (or other forms of contact if visitation was not possible) between the child and the mother was of sufficient frequency to maintain or promote the continuity of the relationship? | Case Narrative and Visitation Plan |
| 193 | Check the box next to the statement that best describes the usual frequency of visits between the mother and the child: | Case Narrative and Visitation Plan |
| 194 | During the PUR, were concerted efforts made to ensure that visitation (or other forms of contact if visitation was not possible) between the child and the father was of sufficient frequency to maintain or promote the continuity of the relationship? | Case Narrative and Visitation Plan |
| 195 | Check the box next to the statement that best describes the usual frequency of visits between the father and the child: | Case Narrative and Visitation Plan |
| 196 | During the PUR, were concerted efforts made to ensure that the quality of visitation between the child and the mother was sufficient to maintain or promote the continuity of the relationship? | Case Narrative and Visitation Plan |

DHS
296215

| | | |
|---|---|---|
| 197 | During the PUR, were concerted efforts made to ensure that the quality of visitation between the child and the father was sufficient to maintain or promote the continuity of the relationship? | Case Narrative and Visitation Plan |
| 198 | During the PUR, were concerted efforts made to ensure that visitation (or other forms of contact if visitation was not possible) between the child and his/her sibling(s) was of sufficient frequency to maintain or promote the continuity of the relationship? | Case Narrative and Visitation Plan |
| 199 | Check the box next to the statement that best describes the usual frequency of visits between the siblings and the child: | Case Narrative and Visitation Plan |
| 200 | During the PUR, were concerted efforts made to ensure that the quality of visitation between the child and his/her sibling(s) was sufficient to promote the continuity of their relationships? | Case Narrative and Visitation Plan |
| 201 | For each applicable relationship (mother, father, sibling(s)), document concerted efforts or lack of efforts to promote frequent visitation. Also document any reasoning why a relationship is not applicable: | Case Narrative and Visitation Plan and Court Detail Record (Possible No Contact Order) |
| 202 | Did the child have a visit with his/her parents within 24 hours of placement, or at a minimum a phone call with relatives within first 24 hours? | Investigative and/or Case Narrative |
| **Section 22. PRESERVING CONNECTIONS** | | |
| 203 | During the PUR, were concerted efforts made to maintain the child's important connections (for example, neighborhood, community, faith, language, extended family members including siblings who are not in foster care, school, tribe, and/or friends)? | Case Narrative and Placement Screen/Director Approval/Proximity button |
| 204 | Was a sufficient inquiry conducted with the parent, child, custodian, or other interested party to determine whether the child may be a member of, or eligible for membership in, an Indian tribe? | Investigative and/or Case Narrative/ICWA Contact Narrative Type |
| 205 | If the child may be a member of, or eligible for membership in, an Indian tribe, during the PUR, was the tribe provided timely notification of its right to intervene in any State court proceedings seeking an involuntary foster care placement or termination of parental rights (TPR)? | Case Narrative and Investigative and/or Case Narrative/ICWA Contact Narrative Type |
| 206 | If the child is a member of, or eligible for membership in, an Indian tribe, was the child placed in foster care in accordance with the Indian Child Welfare Act (ICWA) placement preferences or were concerted efforts made to place the child in accordance with ICWA placement preferences? | Case Narrative and Court Custody Record |
| 207 | Document Agency efforts or lack of efforts to help children maintain important connections when these are not being maintained through the placement itself: | Case Narrative and Placement Screen/Director Approval/Proximity button Visitation Plan |
| **Section 23. RELATIONSHIP OF CHILD IN CARE WITH PARENTS** | | |
| 208 | Did a meeting occur between the birth parents and resource parents within the first month of placement (if placement occurred during the PUR)? | Case Narrative and County Conference |
| 209 | Is there evidence in the case record of shared parenting responsibilities between the birth and resource parents? | Case Narrative and County Conference |

178

| 210 | If not explained in the "reason for rating" section, document efforts or lack of efforts to support or maintain a positive mother-child, and or father-child relationship. (The focus should be on activities such as the ones listed in the instructions, rather than on visitation). Foster parent activities may be considered equivalent to "agency" activities in responding to this question: | Case Narrative and County Conference |
|---|---|---|
| **Section 24. RELATIVE PLACEMENT** | | |
| 211 | During the PUR, was the child's current or most recent placement with a relative? | Placement/History/Request |
| 212 | If Yes, is (or was) this placement stable and appropriate to the child's needs? | Case Narratives and Placement Screen/Requests/Adjustment |
| 213 | If No, did the Agency, during the period under review, make concerted efforts to identify, locate, and evaluate maternal relatives as potential placements for the child, with the result that maternal relatives were ruled out as, or were unwilling to be, placement resources? | Case Narratives and Placement Screen/ Requests and Resource Home Studies ICPC Requests and Summary |
| 214 | If No, did the Agency, during the period under review, make concerted efforts to identify, locate, and evaluate paternal relatives as potential placements for the child, with the result that paternal relatives were ruled out as, or were unwilling to be, placement resources? | Case Narratives and Placement Screen/ Requests and Resource Home Studies ICPC Requests and Summary |
| 215 | Document Agency efforts or lack of efforts to locate and evaluate maternal relatives (including reasons why relatives were not considered as placement resources, if relevant) if appropriate, during the PUR: | Case Narratives and Placement Screen/ Requests and Resource Home Studies ICPC Requests and Summary |
| 216 | Document Agency efforts or lack of efforts to locate and evaluate paternal relatives (including reasons why relatives were not considered as placement resources, if relevant) if appropriate, during the PUR: | Case Narratives and Placement Screen/ Requests and Resource Home Studies ICPC Requests and Summary |

DHS
296217

179

## MACWIS MAIN MENUS AND MENU FUNCTIONS

**INTAKE**

| REPORT | LOG | INVESTIGATION | SPECIAL INVISTIGATION LOG | PERSON SEARCH | RESOURCE INQUIRY | MASS TRANSFER | HOME STUDY |
|---|---|---|---|---|---|---|---|
| SERVICE | REASSIGNMENT | SCREENING | | | | | |

**DEMOGRAPHICS**

| DEMOGRAPHICS | MEDICAL CONDITIONS |
|---|---|

**CASE**

| EMER. PLACEMENT | ICPC | CHILD AW ADOPTION | INDEPEND ENT LIV PLAN | NARRA-TIVE | ASSIGN/ TRANSFER | RELATION-SHIPS | ASSESS-MENT | EPSDT/ THIRD PARTY |
|---|---|---|---|---|---|---|---|---|
| CASE PLANING | SERVICES | TASKS GOALS | PLACEMENT | VISITATION | MEDICAL | CHILD EVALUATION | INT/INV SEARCH | RISK ASSESSMENT |

**COURT**

| LEGAL HISTORY | COUNTY CONFERENCE | CHILD SUPPORT REFERRAL | COURT ORDER REQUEST | HEARING REQUEST | MEDICAL ORDER REQUEST | NO CONTACT REQUEST | COVER LETTER | TPR HISTORY | TPR REQUEST |
|---|---|---|---|---|---|---|---|---|---|

**ELIGIBILITY**

| ELIGIBILITY | CHILD SUPPORT HISTORY | ADOPTION LOG | ADOPTION ELIGIBILITY | ADOPTION CONTRACT | ADOPTION CONVERSION | ICAMA/ NonMDHS |
|---|---|---|---|---|---|---|
| NEEDS STANDARD TABLE | | | | | | |

**FINANCE**

| GENERAL FINANCE | ACCOUNT MAINTENANCE | CO LEDGER | CO TRIAL BALANCE | CO BANK RECONCILIATION | CO. PURCHASE ORDER | CO DEPOSITS | CO CHECKS |
|---|---|---|---|---|---|---|---|
| COUNTY CHECKS TO STATE OFFICE | ALLOTMENTS | ST CHECKS | ST PAYMENTS | BALANCE AVAILABLE | ST ACCT RECEIVABLE | FINANCE CODE TABLE | |

**RESOURCES**

| DIRECTORY | LOG | NON-LICENSED RESOURCE | MDHS LICENSE FACILITY | NON-MDHS LIC FACILITY | DETAILS | RSP. | FH ADDENDUM | RATE MAINTENANCE |
|---|---|---|---|---|---|---|---|---|
| ADOPTION CHANGE | WAIVER REQUEST | FH REEVALUATION | ADP ADDENDUM | REASSIGNMENT | CLOSE RESOURCE | LIC CHANGE REQUEST | | |

**PERSONNEL**

| EMPLOYEE LIST | TRAINING | POSITION MAINT | POSITION ASSIGN | EMPLOYEE DETAIL | ASSIGN COUNTY INFO | POSITION HISTORY | POST AND FILL |
|---|---|---|---|---|---|---|---|

**REPORTS**

| COURT STATS | STAFFING REPORT | LENGTH OF EMPLOYMENT | TERMINATION REASONS | TRAINING SESSION | EMPLOYEE REPORT |
|---|---|---|---|---|---|

**SYSTEM ADMIN**

| USER SECURITY | PROXY MAINT. | COUNTY ASSIGN | TICKLER TYPE | CODE TABLE | ERROR MESSAGE | PROFILE MAINT. | NEEDS STANDARD TABLE | STATE LEVEL DESIGNATION | WORKLOAD SELECTION | SAR | COMFIRMED PREP |
|---|---|---|---|---|---|---|---|---|---|---|---|

DHS
296218

180

## Questions Guide

### Caseworkers

- How effective is the Agency in providing services, when appropriate, to prevent removing children from their homes?
- How effective is the Agency in reducing risk of harm to children, both in foster care and in home? (identifying concerns, decision making, etc.)
- How effective is the Agency in preventing multiple entries of children in care?
- How effective is the Agency in minimizing placement changes for children in foster care?
- How effective is the Agency in helping children achieve their permanency goals in a timely manner?

### Parents

- Has the Agency made efforts to place foster children close to their parents or in their own communities?
- Is the Agency effective in keeping siblings together in foster care?
- How effective is the Agency in facilitating child-parent visits while in foster care?
- How effective is the Agency in identifying and soliciting relatives for placement?
- Does the Agency help in to maintain the parent-child relationship while a child is in foster care? Through visits? Other opportunities?
- Has the Agency been effective in assessing and providing services to meet the needs of children and parents?
- To what extent were the parents and children in the case planning process? Developing/updating the ISP?
- How effective is the Agency in conducting face to face visits with parents as often as needed?

### Children

- Has the Agency helped keep children with their siblings while in foster care? Visits?
- How effective is the Agency in facilitating child-parent visits while in foster care?
- How effective is the Agency in preserving important connections? School? Church? Friends?
- Have services been helpful? IL? Counseling?

### Foster Parents

- How effective is the Agency of notifying foster parents of review hearings?
- How effective is the Agency at providing foster parents with background information on children that will be in their care?
- How effective is the Agency's array of services to meet the needs of children? Services to support foster parents?
- How effectively does the state tailor services to meet unique needs of children?

## Conducting Quality Assurance on CQI Case Review Instruments

*General*
- Make sure that every item has a rating; it is the correct rating based on the scoring guide, and that there is at least a brief explanation as to why the rating is what it is labeled that is detailed enough.
- Make sure that items 10, 12, 13, 14, 15, 16, 19, 20, 21, 22, 23, 24, are rated NA for in-home cases.
- Make sure all applicable 'please explain' questions are filled out, are appropriately detailed, and make sense in the context of the question as well as the rest of the case.
- Look for agreement among questions
   - For example, if in Item 5 it says children received all necessary services, there shouldn't be services listed in the question about what services weren't provided
- Look for agreement among items
   - For example, if Item 10 indicates that the permanency goal is Adoption and it wasn't established timely this may impact item 15
   - For example, if Item 2 is ANI (services not provided to prevent removal) then this may impact Item 4 (safety and risk concerns being assessed/addressed)
- Make sure no identifying names are used throughout the document, with the exception of the cover page, and Q188
- Make sure that the explanations provided relate to the circumstances of the case and the rating decision (ie no 'Based on the scoring sheet this is an ANI, but it really is a Strength)
- If it is an in-home case, and the Item is NA, then none of the questions under that item should be filled out yes or no, only NA

*Specific*
- If foster care case, then target child identified on cover page.  For in-home cases, there is no target child, and all children in the home should be considered when answering the instrument.
- The cover page has an asterisk next to the primary reason for involvement
- The cover page detail who was interviewed, what their relationship is in the case, and the methodology in which they were interviewed
- Make sure the answer in Q2 is consistent for the chart below it (ie only reports during the PUR)
- If items 6, 17, and/or 18 are filled for in-home cases, make sure that the issue/concern is detailed (and that it is a reason for involvement for an issue that arose in the case).

**On-Site Case Review Reporting**

The Comprehensive CQI Report discusses the results of the Continuous Quality Improvement (CQI) data gathered by the Division of Evaluation and Monitoring in partnership with field staff from various regions and state office staff and serves to measure and monitor improvement in the months and years to come. The sources for the information used in this report are as follows:

- **Data Indicators**: The MACWIS data indicators track and report information related to the state's Practice Model Components, Systemic Factors, and the requirements of the *Olivia Y* Settlement Agreement *(see data table footnotes in appendix for the time period covered for these data indicators)*. Existing data reports were augmented and new reports were developed and validated in order to capture key indicators of child welfare practice across the Practice Model components, and systemic factors. In obtaining the results for the counties', regions', and state's respective levels of performance, the most recent summary reports, which have been validated for accuracy, were utilized. These data indicators will serve as the cornerstone for measuring strengths and areas needing improvement in counties and regions and will be used to establish baselines. The information from the case reviews, desk audits, and stakeholder surveys will be used to support the information from the data indicators.

- **On-site case record reviews and case member interviews**: To support the results of the data indicators from MACWIS, regions also conducted a qualitative case review to provide deeper context to the data results. After requesting and receiving a universe of cases for the Region being reviewed, a random sample of 14 foster care and 10 in-home services cases from the counties within the Region is obtained. Twelve teams, made up of two people each, conducted the case reviews, and were supported by one team leader and two quality assurance reviewers. The information considered in the onsite review is concentrated to a 12 month period (period under review) and comes from the electronic case management system (MACWIS), paper files, and interviews with the various case members who included the parents, the children, and the caseworkers.

- Stakeholder involvement is critical to the success of the Practice Model. In particular, service providers, as well as the courts, resource parents, the Regional Implementation Team, and caseworkers and supervisors need to be fully engaged in the child welfare process. Stakeholders in the Regions are provided with surveys to determine how they believe the agency is performing with regard to the following systemic factors:
  - o  Training of Staff and Providers,
  - o  Service Array, Placement Resources,
  - o   Caseloads, Oversight and Monitoring,
  - o  Court Processes, and
  - o  Data Quality and Usage.

- **Foster Care Review Data:**  The Foster Care Review Program conducts periodic administrative reviews on the cases of each child who has been in foster care six months or longer. During the course of the case review, data is collected to provide the

DHS
296221

caseworker, supervisor, and Regional Director with the status of each case as to the child's permanency, safety, and well-being

The State CQI Unit, through Evaluation and Monitoring, will have **60 working days** to complete and provide the CQI Baseline/Follow-Up Review Final Report to the appropriate Regional office.  Following the CQI Baseline Reviews, the Regions will address areas for corrective action as identified in the final reports by determining if the issues are already addressed in their Practice Model Implementation Plan or if they need to revise their implementation plan to address the issues. The report will include the following:

- Background information

- Methodology and Sources

- Results from the on-site review and the available data indicators on the Practice Model components and Systemic Factor components;

- Next Steps

- Appendix which includes a copy of the Regional Data Indicators and a Summary of Areas for Improvement Efforts

**MACWIS Data Indicators**

An integral part of each CQI review conducted by Evaluation and Monitoring (EMU) is the evaluation of regional performance based on MACWIS data reports of key indicators. The State CQI Office has developed a map of data indicators to each of the six Practice Model components included in the EMU reviews and the systemic factors that are reviewed.

There is also a report validation process that CSF and MACWIS staff use to ensure the accuracy of the reports developed and generated. Reports are validated prior to being used in the EMU reviews and again at approximate six-month intervals.



DHS
296223

**(Region Name) Data Indicators**
**CQI Review Report**
**Month/Year**

## Practice Model Components

| Mobilizing Appropriate Services Timely | | | | | | |
|---|---|---|---|---|---|---|
| **Data Indicators Associated with Mobilizing Appropriate Services Timely** | **Year III Goal/ Compliance Measure** | **Region (Month/Year)** | **State (Month/Year)** | **County Name** | **County Name** | **County Name** |
| Placement Stability - Number of children in custody 12 months or less that have had 2 or fewer placement moves<br>Data Source: MWZPLM5S<br>*As of (Date) | 70% | | | | | |
| Placement Stability - Number of moves for all children regardless of time in custody<br>Data Source: MWBRD07S & MWBRD07T<br>*As of (Date) | | | | | | |
| Children in custody, ages 14 - 20, are provided with independent living services per their service plan **<br>Data Source: MWBRD16S<br>**Month/Year through Month/Year | 90% | | | | | |
| Children discharged from custody and reunified with parents/caretakers in the last year are reunified within 12 months of latest removal from home<br>Data Source: MWBRD05S & MWBRD05C<br>**Month/Year through Month/Year | 60% | | | | | |
| Children discharged in the last year upon finalization of an adoption have had the adoption finalized within 24 months of the latest removal from home<br>Data Source: MWBRD10D & MWBRD10S<br>**Month/Year through Month/Year | 25% | | | | | |
| Foster Care Re-entries | | *Not yet available* | | | | |
| Children in custody have received periodic medical examinations and all necessary follow-up services and treatment | At least 40% of children in custody | *Not yet available* | | | | |

| | | |
|---|---|---|
| Children in custody have received a dental examination every 6 months and all medically necessary dental services | At least 40% of children age 3 and over in custody | *Not yet available* |
| Children in custody have received a mental health assessment by a qualified professional within 90 calendar days of placement or their 4th birthday, respectively, and all recommended mental health services pursuant to his/her assessment | At least 40% of children age 4 and over in custody | *Not yet available* |
| Children in custody have received a developmental assessment, by a qualified professional, and all needed developmental services. | At least 40% of relevant children in custody | *Not yet available* |

(Region Name) Data Indicators
CQI Review Report
Month/Year

# Practice Model Components

| Assuring Safety and Risk Management | | | | | | |
|---|---|---|---|---|---|---|

| Data Indicators Associated with Assuring Safety and Managing Risk | Year III Goal/ Compliance Measure | Region (Month/Year) | State (Month/Year) | County Name | County Name | County Name |
|---|---|---|---|---|---|---|
| Placement Stability - Number of children in custody 12 months or less that have had 2 or fewer placement moves<br>Data Source: MWZPLM5S<br>*As of (Date) | 100% | | | | | |
| Placement Stability - Number of moves for all children regardless of time in custody<br>Data Source: MWBRD07S & MWBRD07T<br>*As of (Date) | 100% | | | | | |
| Children in custody, ages 14 - 20, are provided with independent living services per their service plan **<br>Data Source: MWBRD16S<br>**Month/Year through Month/Year | <0.57% | | | | | |
| Children discharged from custody and reunified with parents/caretakers in the last year are reunified within 12 months of latest removal from home<br>Data Source: MWBRD05S & MWBRD05C<br>**Month/Year through Month/Year | | *Not Currently Available* | | | | |
| Children discharged in the last year upon finalization of an adoption have had the adoption finalized within 24 months of the latest removal from home<br>Data Source: MWBRD10D & MWBRD10S<br>**Month/Year through Month/Year | 100% | | | | | |
| Foster parents with at least one foster child residing in their home shall have a DFCS worker visit the home twice a month (therapeutic FH) or monthly (non-therapeutic FH)<br>Data Source: MWZPLMCS & MWZPLMS2<br>** (Date Range) | 80% | | | | | |

188

DHS
296226

**(Region Name) Data Indicators**
**CQI Review Report**
**Month/Year**

## Practice Model Components

| Involving Children and Families | | | | | | |
|---|---|---|---|---|---|---|
| **Data Indicators Associated with Involving Children and Families in Case Planning and Decision Making** | **Year III Goal/ Compliance Measure** | **Region (Month/Year)** | **State (Month/Year)** | **County Name** | **County Name** | **County Name** |
| Placement Stability - Number of children in custody 12 months or less that have had 2 or fewer placement moves<br>Data Source: MWZPLM5S<br>*As of (Date) | At least 70% | | | | | |
| Placement Stability - Number of moves for all children regardless of time in custody<br>Data Source: MWBRD07S & MWBRD07T<br>*As of (Date) | At least 80% | | | | | |
| Children in custody, ages 14 - 20, are provided with independent living services per their service plan **<br>Data Source: MWBRD16S<br>**Month/Year through Month/Year | | *Not Currently Available* | | | | |
| Children discharged from custody and reunified with parents/caretakers in the last year are reunified within 12 months of latest removal from home<br>Data Source: MWBRD05S & MWBRD05C<br>**Month/Year through Month/Year | | | | | | |
| Children discharged in the last year upon finalization of an adoption have had the adoption finalized within 24 months of the latest removal from home<br>Data Source: MWBRD10D & MWBRD10S<br>**Month/Year through Month/Year | | | | | | |

189

**(Region Name) Data Indicators**
**CQI Review Report**
Month/Year

## Practice Model Components

| Individual Case Planning | | | | | | |
|---|---|---|---|---|---|---|
| **Data Indicators Associated with Individualizing Case Planning** | **Year III Goal/ Compliance Measure** | **Region (Month/Year)** | **State (Month/Year)** | **County Name** | **County Name** | **County Name** |
| Placement Stability - Number of children in custody 12 months or less that have had 2 or fewer placement moves<br>Data Source: MWZPLM5S<br>*As of (Date) | 80% | | *Not Currently Available* | | | |
| Placement Stability - Number of moves for all children regardless of time in custody<br>Data Source: MWBRD07S & MWBRD07T<br>*As of (Date) | 80% | | *Not Currently Available* | | | |
| Children in custody, ages 14 - 20, are provided with independent living services per their service plan **<br>Data Source: MWBRD16S<br>**Month/Year through Month/Year | 90% | | *Not Currently Available* | | | |
| Children discharged from custody and reunified with parents/caretakers in the last year are reunified within 12 months of latest removal from home<br>Data Source: MWBRD05S & MWBRD05C<br>**Month/Year through Month/Year | 90% | | *Not Currently Available* | | | |
| Children discharged in the last year upon finalization of an adoption have had the adoption finalized within 24 months of the latest removal from home<br>Data Source: MWBRD10D & MWBRD10S<br>**Month/Year through Month/Year | At least 90% | | *Not Currently Available* | | | |

**(Region Name) Data Indicators**
**CQI Review Report**
**Month/Year**

# Systemic Factors

| Training of Staff and Providers | | | | | | |
|---|---|---|---|---|---|---|

| Data Indicators Associated with Training of Staff and Providers | Year III Goal/ Compliance Measure | Region (Month/Year) | State (Month/Year) | County Name | County Name | County Name |
|---|---|---|---|---|---|---|
| Placement Stability - Number of children in custody 12 months or less that have had 2 or fewer placement moves<br>Data Source: MWZPLM5S<br>*As of (Date) | 100% | | *Not Currently Available* | | | |
| Placement Stability - Number of moves for all children regardless of time in custody<br>Data Source: MWBRD07S & MWBRD07T<br>*As of (Date) | | | *Not Currently Available* | | | |
| Children in custody, ages 14 - 20, are provided with independent living services per their service plan **<br>Data Source: MWBRD16S<br>**Month/Year through Month/Year | | | *Not Currently Available* | | | |
| Children discharged from custody and reunified with parents/caretakers in the last year are reunified within 12 months of latest removal from home<br>Data Source: MWBRD05S & MWBRD05C<br>**Month/Year through Month/Year | | | *Not Currently Available* | | | |
| Children discharged in the last year upon finalization of an adoption have had the adoption finalized within 24 months of the latest removal from home<br>Data Source: MWBRD10D & MWBRD10S<br>**Month/Year through Month/Year | | | | | | |

*DHS*
*296229*

191

**CQI Review Report**

Month/Year

# Systemic Factors

| Service Array | | | | | | |
|---|---|---|---|---|---|---|
| **Data Indicators Associated with Service Array** | **Year III Goal/ Compliance Measure** | **Region (Month/Year)** | **State (Month/Year)** | **County Name** | **County Name** | **County Name** |
| Placement Stability - Number of children in custody 12 months or less that have had 2 or fewer placement moves<br>Data Source: MWZPLM5S<br>*As of (Date) | | | | | | |
| Placement Stability - Number of moves for all children regardless of time in custody<br>Data Source: MWBRD07S & MWBRD07T<br>*As of (Date) | | | | | | |
| Children in custody, ages 14 - 20, are provided with independent living services per their service plan **<br>Data Source: MWBRD16S<br>**Month/Year through Month/Year | | | | | | |
| Children discharged from custody and reunified with parents/caretakers in the last year are reunified within 12 months of latest removal from home<br>Data Source: MWBRD05S & MWBRD05C<br>**Month/Year through Month/Year | | | | | | |
| Children discharged in the last year upon finalization of an adoption have had the adoption finalized within 24 months of the latest removal from home<br>Data Source: MWBRD10D & MWBRD10S<br>**Month/Year through Month/Year | | | | | | |

**(Region Name) Data Indicators**
**CQI Review Report**
**Month/Year**

# Systemic Factors

| Placement Resources | | | | | | |
|---|---|---|---|---|---|---|

| Data Indicators Associated with Placement Resources | Year III Goal/ Compliance Measure | Region (Month/Year) | State (Month/Year) | County Name | County Name | County Name |
|---|---|---|---|---|---|---|
| Placement Stability - Number of children in custody 12 months or less that have had 2 or fewer placement moves<br>Data Source: MWZPLM5S<br>*As of (Date) | | | | | | |
| Placement Stability - Number of moves for all children regardless of time in custody<br>Data Source: MWBRD07S & MWBRD07T<br>*As of (Date) | | | | | | |
| Children in custody, ages 14 - 20, are provided with independent living services per their service plan **<br>Data Source: MWBRD16S<br>**Month/Year through Month/Year | | | | | | |
| Children discharged from custody and reunified with parents/caretakers in the last year are reunified within 12 months of latest removal from home<br>Data Source: MWBRD05S & MWBRD05C<br>**Month/Year through Month/Year | 100% | | | | | |
| Children discharged in the last year upon finalization of an adoption have had the adoption finalized within 24 months of the latest removal from home<br>Data Source: MWBRD10D & MWBRD10S<br>**Month/Year through Month/Year | 100% | | | | | |

**(Region Name) Data Indicators**
**CQI Review Report**
**Month/Year**

## Systemic Factors

| Caseloads | | | | | | |
|---|---|---|---|---|---|---|
| **Data Indicators Associated with Caseloads** | **Year III Goal/ Compliance Measure** | **Region (Month/Year)** | **State (Month/Year)** | **County Name** | **County Name** | **County Name** |
| Placement Stability - Number of children in custody 12 months or less that had had 2 or fewer placement moves<br>Data Source: MWZPLM5S<br>*As of (Date) | At least 75% | | | | | |
| Placement Stability - Number of moves for all children regardless of time in custody<br>Data Source: MWBRD07S & MWBRD07T<br>*As of (Date) | No more than 10% | | | | | |
| Children in custody, ages 14 - 20, are provided with independent living services per their service plan **<br>Data Source: MWBRD16S<br>**Month/Year through Month/Year | 100% | | | | | |
| Children discharged from custody and reunified with parents/caretakers in the last year are reunified within 12 months of latest removal from home<br>Data Source: MWBRD05S & MWBRD05C<br>**Month/Year through Month/Year | | | | | | |
| Children discharged in the last year upon finalization of an adoption have had the adoption finalized within 24 months of the latest removal from home<br>Data Source: MWBRD10D & MWBRD10S<br>**Month/Year through Month/Year | | | | | | |

**(Region Name) Data Indicators**
**CQI Review Report**
Month/Year

## Systemic Factors

| Oversight and Monitoring | | | | | | |
|---|---|---|---|---|---|---|

| Data Indicators Associated with Oversight and Monitoring | Year III Goal/ Compliance Measure | Region (Month/Year) | State (Month/Year) | County Name | County Name | County Name |
|---|---|---|---|---|---|---|
| Placement Stability - Number of children in custody 12 months or less that have had 2 or fewer placement moves<br>Data Source: MWZPLM5S<br>*As of (Date) | No more than 10% | | | | | |
| Placement Stability - Number of moves for all children regardless of time in custody<br>Data Source: MWBRD07S & MWBRD07T<br>*As of (Date) | | *Not Currently Available* | | | | |
| Children in custody, ages 14 - 20, are provided with independent living services per their service plan **<br>Data Source: MWBRD16S<br>**Month/Year through Month/Year | | *Not Currently Available* | | | | |
| Children discharged from custody and reunified with parents/caretakers in the last year are reunified within 12 months of latest removal from home<br>Data Source: MWBRD05S & MWBRD05C<br>**Month/Year through Month/Year | | | | | | |
| Children discharged in the last year upon finalization of an adoption have had the adoption finalized within 24 months of the latest removal from home<br>Data Source: MWBRD10D & MWBRD10S<br>**Month/Year through Month/Year | | | | | | |

DHS
296233

**(Region Name) Data Indicators**
**CQI Review Report**
**Month/Year**

## Systemic Factors

| Court Process | | | | | | |
|---|---|---|---|---|---|---|

| Data Indicators Associated with Court Processes | Year III Goal/ Compliance Measure | Region (Month/Year) | State (Month/Year) | County Name | County Name | County Name |
|---|---|---|---|---|---|---|
| Children who have been in custody at least 6 months have had a timely county conference<br>Data Source: MWZTACRS<br>* (Date Range) | 90% | | | | | |
| Children in custody at least 12 months have had a timely annual court review             Data Source: MWZTPHRS         *<br>(Date Range) | 90% | | | | | |
| Children in custody reaching the point at which they have spent 15 of the previous 22 months in foster care with no ASFA exception noted will have a petition for TPR filed on their behalf<br>Data Source: MWZ014S1<br>* (Date Range) | 80% | | | | | |
| Children in custody who have spent more than 15 of the previous 22 months in FC without a TPR petition filed will have an exception noted or a TPR filed §             Data Source: MWZ014S1 & MWZ014S2<br>* (Date Range) | 80% | | | | | |

**(Region Name) Data Indicators**
**CQI Review Report**
**Month/Year**

## Systemic Factors

| Data Quality and Usage | | | | | | |
|---|---|---|---|---|---|---|
| **Data Indicators Associated with Data Quality & Usage** | **Year III Goal/ Compliance Measure** | **Region (Month/Year)** | **State (Month/Year)** | County Name | County Name | County Name |
| *Currently, no proposed indicators* | | | | | | |

## Stakeholder Surveys

Stakeholder involvement is critical to the success of the Practice Model. In particular, service providers, as well as the courts, resource parents, the Regional Implementation Team, and caseworkers and supervisors need to be fully engaged in the child welfare process. Stakeholders in the regions are provided with surveys to determine how they believe the agency is performing with regard to the following systemic factors:

- Training of Staff and Providers,
- Service Array, Placement Resources,
- Caseloads, Oversight and Monitoring,
- Court Processes, and
- Data Quality and Usage.

Stakeholders are surveyed through email addresses provided by the Area Social Work Supervisors (ASWS) in each county in the appropriate Region. The stakeholders are identified by the ASWS and forwarded to the Regional Director who then compiles a condensed list of stakeholders and then forwards, along with their email addresses to the Evaluation and Monitoring Unit. Using an online survey tool, the Evaluation and Monitoring Unit sends the link to the appropriate survey to the applicable stakeholder electronically via email.

DHS
296236

198

## CQI Stakeholder Survey / Judges

### 1. What Region are you in?

Please enter the Region for which you are completing this survey, not the Region in which you live/work. If you are uncertain as to which Region that you are completing this survey, please refer to the email message.

**\* 1. For which Family and Children's Services Region are you completing this survey?**

○ 1-N          ○ 3-S          ○ 6

○ 1-S          ○ 4-N          ○ 7-E

○ 2-E          ○ 4-S          ○ 7-W

○ 2-W          ○ 5-E

○ 3-N          ○ 5-W

Page 1

DHS
296237

199

## CQI Stakeholder Survey / Judges

### 2. Service Array

\* 1. Describe and evaluate the quality and effectiveness of services to meet children's health, dental and mental health needs who are served by DFCS.

\* 2. How effective is DFCS in the county/region at providing or contracting for an adequate array of services to promote timely reunification of children in foster care with their families?

○ Never                    ○ Frequently              ○ No Information

○ Rarely                   ○ Almost Always

○ Somewhat                 ○ N/A

\* 3. Identify strengths and barriers or gaps in services.

\* 4. How effective is the county/region at providing or contracting for an adequate array of services to promote timely adoptions?

○ Never                    ○ Frequently              ○ No Information

○ Rarely                   ○ Almost Always

○ Somewhat                 ○ N/A

Page 2

DHS
296238

200

**CQI Stakeholder Survey / Judges**

✱ 5. Identify strengths and barriers or gaps in services.

✱ 6. How effectively does the county/region individualize, or tailor, services to meet the unique needs of children and families?

○ Never          ○ Frequently          ○ No Information

○ Rarely         ○ Almost Always

○ Somewhat       ○ N/A

Page 3

DHS
296239

201

**CQI Stakeholder Survey / Judges**

3. Placement Resources

\* 1. Explain how initial shelters, assessment centers, or other temporary placements are used, the expected frequency and timeframes for their use, and whether these expectations generally are met. If temporary placements are not used, explain how they are avoided.



Page 4

## CQI Stakeholder Survey / Judges

### 4. Oversight and Monitoring

\* 1. How effective is DFCS in providing information about the performance of their agency through data reports or other means?

- ○ Never
- ○ Rarely
- ○ Somewhat
- ○ Frequently
- ○ Almost Always
- ○ N/A
- ○ No Information

\* 2. Identify strengths and barriers to the process listed above.

Page 5

DHS
296241

203

## CQI Stakeholder Survey / Judges

### 5. Court Processes

**\* 1. How effective is the Foster Care Review/County Conference process in helping to ensure that children have the appropriate goals and achieve goals timely?**

○ Never                    ○ Frequently                    ○ No Information

○ Rarely                    ○ Almost Always

○ Somewhat                  ○ N/A

**\* 2. How effective is the county/region in ensuring that each child in foster care has a permanency hearing in a qualified court no later than 12 months from the date the child entered foster care and no less frequently than every 12 months thereafter?**

○ Never                    ○ Frequently                    ○ No Information

○ Rarely                    ○ Almost Always

○ Somewhat                  ○ N/A

**\* 3. How effective is the county/region in filing for termination of parental rights (TPR) when a child is in foster care 15 of 22 months unless there is a compelling reason not to file, in accordance with the provisions of the Adoption and Safe Families Act (ASFA)?**

○ Never                    ○ Frequently                    ○ No Information

○ Rarely                    ○ Almost Always

○ Somewhat                  ○ N/A

**\* 4. How effective is the county/region in ensuring that foster parents, pre-adoptive parents, and relative caregivers of children in foster care receive notice of reviews or hearings held with respect to the children in their care, and have an opportunity to be heard?**

○ Never                    ○ Frequently                    ○ No Information

○ Rarely                    ○ Almost Always

○ Somewhat                  ○ N/A

Page 6

DHS
296242

204

## CQI Stakeholder Survey / Implementation Team

### 1. What Region are you in?

Please enter the Region for which you are completing this survey, not the Region in which you live/work. If you are uncertain as to which Region that you are completing this survey, please refer to the email message.

**\* 1. For which Family and Children's Services Region are you completing this survey?**

○ 1-N          ○ 3-S          ○ 6

○ 1-S          ○ 4-N          ○ 7-E

○ 2-E          ○ 4-S          ○ 7-W

○ 2-W          ○ 5-E

○ 3-N          ○ 5-W

Page 1

DHS
296243

205

## CQI Stakeholder Survey / Implementation Team

### 2. Service Array

**\* 1. How effective and timely are the preventive and protection services provided by DFCS to children in their own homes?**

- ◯ Never
- ◯ Rarely
- ◯ Somewhat
- ◯ Frequently
- ◯ Almost Always
- ◯ N/A
- ◯ No Information

**\* 2. How effective is DFCS in the county/region at providing or contracting for an adequate array of services to provide timely permanency of children in foster care?**

- ◯ Never
- ◯ Rarely
- ◯ Somewhat
- ◯ Frequently
- ◯ Almost Always
- ◯ N/A
- ◯ No Information

**3. Identify strengths and barriers or gaps in services.**

**\* 4. How effective is the county/region at providing or contracting for an adequate array of services to promote timely adoptions?**

- ◯ Never
- ◯ Rarely
- ◯ Somewhat
- ◯ Frequently
- ◯ Almost Always
- ◯ N/A
- ◯ No Information

**\* 5. Identify strengths and barriers or gaps in services.**

Page 2

DHS
296244

206

## CQI Stakeholder Survey / Implementation Team

\* 6. How effective is the county/region at providing or contracting for an adequate array of services to youth in foster care to prepare them for independent living and to make the transition from foster care to adulthood?

◯ Never          ◯ Frequently          ◯ No Information

◯ Rarely          ◯ Almost Always

◯ Somewhat          ◯ N/A

\* 7. Identify strengths and barriers or gaps in services.

Page 3

DHS
296245

207

## CQI Stakeholder Survey / Implementation Team

### 3. Placement Resources

\* 1. Explain how initial shelters, assessment centers, or other temporary placements are used, the expected frequency and timeframes for their use, and whether these expectations generally are met. If temporary placements are not used, explain how they are avoided.

\* 2. Does the county's current pool of resource families reflect the ethnic and racial diversity of children in need of foster care and adoptive placement, and meet most of the foster care placement needs of the children it serves?

- ○ Never
- ○ Rarely
- ○ Somewhat
- ○ Frequently
- ○ Almost Always
- ○ N/A
- ○ No Information

3. Identify strengths and barriers or unmet recruitment needs.

Page 4

DHS
296246

208

## CQI Stakeholder Survey / Implementation Team

### 4. Oversight and Monitoring

* 1. How effective is DFCS at providing information about the performance of their agency through data reports or other means?

○ Never                    ○ Frequently                ○ No Information

○ Rarely                   ○ Almost Always

○ Somewhat                 ○ N/A

* 2. Identify strengths an barriers to the process.

DHS
296247

209

## CQI Stakeholder Survey / Resource Parents

### 1. What Region are you in?

Please enter the Region for which you are completing this survey, not the Region in which you live/work. If you are uncertain as to which Region that you are completing this survey, please refer to the email message.

\* **1. For which Family and Children's Services Region are you completing this survey?**

○ 1-N          ○ 3-S          ○ 6

○ 1-S          ○ 4-N          ○ 7-E

○ 2-E          ○ 4-S          ○ 7-W

○ 2-W          ○ 5-E

○ 3-N          ○ 5-W

DHS
296248

210

## CQI Stakeholder Survey / Resource Parents

### 2. Training of Staff and Providers

\* 1. How effective is DFCS in providing adequate training for current (or those interested in being) foster parents, including relative caregivers, and adoptive parents that addresses the skills and knowledge needed to carry out their duties?

○ Never          ○ Frequently          ○ No Information
○ Rarely         ○ Almost Always
○ Somewhat       ○ N/A

\* 2. Does DFCS provide frequent training to license new foster homes?

○ Never          ○ Frequently          ○ No Information
○ Rarely         ○ Almost Always
○ Somewhat       ○ N/A

DHS
296249

211

## CQI Stakeholder Survey / Resource Parents

### 3. Service Array

**\* 1. How effective is DFCS in the county/region at providing or contracting for an adequate range of services to promote timely permanency (reunification, licensed relative placement, adoption, living independently) of children in foster care?**

- ○ Never
- ○ Rarely
- ○ Somewhat
- ○ Frequently
- ○ Almost Always
- ○ N/A
- ○ No Information

**\* 2. Identify strengths and barriers or gaps in services in reference to the above question.**

[ text box ]

**\* 3. How effective is DFCS in the county/region at providing or contracting for an adequate range of services to support resource parents?**

- ○ Never
- ○ Rarely
- ○ Somewhat
- ○ Frequently
- ○ Almost Always
- ○ N/A
- ○ No Information

**\* 4. Identify strengths and barriers or gaps in services.**

[ text box ]

**\* 5. How effective is DFCS in the county/region at providing or contracting for an adequate range of services to youth in foster care to prepare them for independent living and to make the transition from foster care to adulthood?**

- ○ Never
- ○ Rarely
- ○ Somewhat
- ○ Frequently
- ○ Almost Always
- ○ N/A
- ○ No Information

Page 3

DHS
296250

212

## CQI Stakeholder Survey / Resource Parents

\* 6. Identify strengths and barriers or gaps in services regarding the above question.

Page 4

DHS
296251

213

# CQI Stakeholder Survey / Resource Parents

## 4. Placement Resources

**\* 1. DFCS' rules (policy) places limits on the number of children that can be placed in a foster home: three that can be placed in a foster home, 5 children (biological, foster and adoptive) that can reside in a licensed foster home, foster homes caring for 5 children cannot have more than 2 children in the home less than 2 years of age, therapeutic foster care homes can have no more than a total of 4 children in the home and no more than 2 can have therapeutic needs. In your opinion, is DFCS abiding by these rules?**

○ Never      ○ Frequently      ○ No Information
○ Rarely      ○ Almost Always
○ Somewhat    ○ N/A

**\* 2. How effective is the county in conducting criminal background checks on people interested in being foster and adoptive parents before licensing or approving them to care for children?**

○ Never      ○ Frequently      ○ No Information
○ Rarely      ○ Almost Always
○ Somewhat    ○ N/A

**\* 3. How effective is the county/region in recruiting foster and adoptive homes needed to care for the children in the county/region in foster care, and in keeping these homes?**

○ Never      ○ Frequently      ○ No Information
○ Rarely      ○ Almost Always
○ Somewhat    ○ N/A

Page 5

DHS
296252

214

# CQI Stakeholder Survey / Service Providers

## 1. What Region are you in?

Please enter the Region for which you are completing this survey, not the Region in which you live/work. If you are uncertain as to which Region that you are completing this survey, please refer to the email message.

**1. For which Family and Children's Services Region are you completing this survey?**

- ○ 1-N
- ○ 1-S
- ○ 2-E
- ○ 2-W
- ○ 3-N
- ○ 3-S
- ○ 4-N
- ○ 4-S
- ○ 5-E
- ○ 5-W
- ○ 6
- ○ 7-E
- ○ 7-W

DHS
296253

215

## CQI Stakeholder Survey / Service Providers

### 2. Training of Staff and Providers

\* 1. How effective is DFCS in providing and ensuring completion of adequate training for current or prospective foster parents, including relative caregivers, adoptive parents and staff of State licensed or approved facilities, that addresses the skills and knowledge needed to carry out their duties?

- ○ Never
- ○ Rarely
- ○ Somewhat
- ○ Frequently
- ○ Almost Always
- ○ N/A
- ○ No Information

\* 2. Does DFCS provide frequent training to license new foster homes?

- ○ Never
- ○ Rarely
- ○ Somewhat
- ○ Frequently
- ○ Almost Always
- ○ N/A
- ○ No Information

Page 2

DHS
296254

216

## CQI Stakeholder Survey / Service Providers

### 3. Service Array

\* 1. How effective and timely are preventive and protective services provided to DFCS children in their own homes?

- ◯ Never
- ◯ Rarely
- ◯ Somewhat
- ◯ Frequently
- ◯ Almost Always
- ◯ N/A
- ◯ No Information

\* 2. Describe and evaluate the quality and effectiveness of services to meet children's health, dental and mental health needs who are served by DFCS.

[text box]

\* 3. How accessible are needed medical services?

- ◯ Never
- ◯ Rarely
- ◯ Somewhat
- ◯ Frequently
- ◯ Almost Always
- ◯ N/A
- ◯ No Information

\* 4. How accessible are needed dental services?

- ◯ Never
- ◯ Rarely
- ◯ Somewhat
- ◯ Frequently
- ◯ Almost Always
- ◯ N/A
- ◯ No Information

\* 5. How accessible are needed mental health services?

- ◯ Never
- ◯ Rarely
- ◯ Somewhat
- ◯ Frequently
- ◯ Almost Always
- ◯ N/A
- ◯ No Information

Page 3

DHS
296255

217

## CQI Stakeholder Survey / Service Providers

\* 6. How effective is DFCS in the county/region at providing or contracting for an adequate array of services to promote timely reunification of children in foster care with their families?

○ Never                    ○ Frequently                    ○ No Information

○ Rarely                   ○ Almost Always

○ Somewhat                 ○ N/A

\* 7. Identify strengths and barriers or gaps in services.

\* 8. How effectively does the county/region individualize, or tailor, services to meet the unique needs of children and families?

○ Never                    ○ Frequently                    ○ No Information

○ Rarely                   ○ Almost Always

○ Somewhat                 ○ N/A

Page 4

DHS
296256

218

## CQI Stakeholder Survey / Service Providers

### 4. Oversight and Monitoring

\* 1. How effective is DFCS in providing information about performance of their agency through data reports or other means?

○ Never

○ Rarely

○ Somewhat

○ Frequently

○ Almost Always

○ N/A

○ No Information

\* 2. Identify strengths and barriers to the process referred to above.

Page 5

DHS
296257

219

## CQI Stakeholder Survey / Caseworkers and Supervisors

### 1. What Region are you in?

Please enter the Region for which you are completing this survey, not the Region in which you live/work. If you are uncertain as to which Region that you are completing this survey, please refer to the email message.

**\* 1. For which Family and Children's Services Region are you completing this survey?**

○ 1-N          ○ 3-S          ○ 6

○ 1-S          ○ 4-N          ○ 7-E

○ 2-E          ○ 4-S          ○ 7-W

○ 2-W          ○ 5-E

○ 3-N          ○ 5-W

DHS
296258

220

## CQI Stakeholder Survey / Caseworkers and Supervisors

### 2. Training of Staff and Providers

\* 1. How effective is DFCS in providing and ensuring completion of adequate initial training for all new caseworkers/supervisors who provide child welfare services?

- ○ Never
- ○ Rarely
- ○ Somewhat
- ○ Frequently
- ○ Almost Always
- ○ N/A

\* 2. How effective is DFCS in providing and ensuring completion of adequate ongoing training for staff that addresses the skills and knowledge base needed to carry out their duties?

- ○ Never
- ○ Rarely
- ○ Somewhat
- ○ Frequently
- ○ Almost Always
- ○ N/A

\* 3. How effective is DFCS in providing and ensuring completion of adequate training for current or prospective resource parents, including relative caregivers, adoptive parents, and staff of State licensed and approved facilities, that address the skills and knowledge needed to carry out their duties?

- ○ Never
- ○ Rarely
- ○ Somewhat
- ○ Frequently
- ○ Almost Always
- ○ N/A

Page 2

DHS
296259

221

## CQI Stakeholder Survey / Caseworkers and Supervisors

### 3. Service Array

* 1. Evaluate the effectiveness and timeliness of preventive and protective services provided by DFCS to children in their own homes.

○ Not Effective or Timely       ○ Somewhat Effective or Timely       ○ Almost Always Effective or Timely

○ Rarely Effective or Timely       ○ Frequently Effective or Timely       ○ N/A

* 2. Describe and evaluate the quality and effectiveness of services to meet children's health, dental, and mental health needs who are served by DFCS.

* 3. How effective is DFCS in the county/region at providing or contracting for an adequate array of services to promote timely permanency of children in foster care?

○ Not Effective       ○ Somewhat       ○ Almost Always

○ Rarely       ○ Frequently       ○ N/A

* 4. Identify strengths and barriers or gaps in services.

* 5. How effectively does the county/region individualize, or tailor, services to meet the unique needs of children and families?

○ Not Effective       ○ Somewhat       ○ Almost Always

○ Rarely       ○ Frequently       ○ N/A

Page 3

DHS
296260

222

## CQI Stakeholder Survey / Caseworkers and Supervisors

### 4. Placement Resources

*1. Explain how initial shelters, assessment centers, or other temporary placements are used, the expected frequency and time frames for their use, and whether these expectations generally are met. If temporary placements are not used, explain how they are avoided.

*2. How effective is the county/region in expediting the licensing of relative resource parents, and giving them priority over resource parents in closer proximity?

○ Never            ○ Somewhat          ○ Almost Always
○ Rarely           ○ Frequently        ○ N/A

*3. How effectively has the county/region implemented a process for ensuring the diligent recruitment of potential resource families that reflect the ethnic and racial diversity of children needing resource homes?

○ Never            ○ Somewhat          ○ Almost Always
○ Rarely           ○ Frequently        ○ N/A

DHS
296261

223

**CQI Stakeholder Survey / Caseworkers and Supervisors**

5. Caseloads

*1. Do the caseworkers have caseloads within prescribed limits?

○ Never              ○ Somewhat            ○ Almost Always

○ Rarely             ○ Frequently          ○ N/A

*2. Describe any caseloads over the established limits - for example, are caseloads twice or three times the caseload requirements

Page 5

DHS
296262

224

## CQI Stakeholder Survey / Caseworkers and Supervisors

### 6. Oversight and Monitoring

**\*1.** Does the worker and supervisor review cases quarterly through supervisory or peer team review to assess the appropriateness of safety and permanency plans?

- ○ Never
- ○ Rarely
- ○ Somewhat
- ○ Frequently
- ○ Almost Always
- ○ N/A

**\*2.** Evaluate the ability of the quality assurance system (CQI, FCR, SAR) to assess effectively the quality of practice and outcomes, identify strengths and areas needing improvement measures.

- ○ Never
- ○ Rarely
- ○ Somewhat
- ○ Frequently
- ○ Almost Always
- ○ N/A

**\*3.** Identify strengths and barriers to the processes listed in #2 above

**\*4.** Evaluate the involvement of service providers, parents, youth, resource parents, group caregivers, relatives, tribes, court personnel, and/or other stakeholders in the quality assurance process.

- ○ Never
- ○ Rarely
- ○ Somewhat
- ○ Frequently
- ○ Almost Always
- ○ N/A

**\*5.** Identify strengths and barriers to the process identified in #4 above.

DHS
296263

225

## CQI Stakeholder Survey / Caseworkers and Supervisors

### 7. Court Processes

* 1. Evaluate the effectiveness of the 6 month reviews in promoting timely achievement of permanency for all children in foster care.

○ Never          ○ Somewhat          ○ Almost Always

○ Rarely         ○ Frequently         ○ N/A

* 2. Identify strengths and barriers to the effectiveness in the above question.

* 3. Identify strengths and barriers to the process described above.

* 4. How effective is the county/region in filing for termination of parental rights (TPR) when a child is in foster care for 15 of 22 months unless there is a compelling reason not to file in accordance with the provisions of the Adoption and Safe Families Act (ASFA)?

○ Never          ○ Somewhat          ○ Almost Always

○ Rarely         ○ Frequently         ○ N/A

Page 7

DHS
296264

226

**CQI Stakeholder Survey / Caseworkers and Supervisors**

\* 5. Describe the notification process, and identify strengths and barriers to notification for the following reviews. If applicable, identify differences between 6 month periodic reviews conducted by administrative bodies (FCR/County Conferences), 6 month reviews conducted by the court, and 12 month permanency hearings.

# CQI Stakeholder Survey / Caseworkers and Supervisors

## 8. Data Quality and Usage

\* 1. Evaluate whether data reports are useful and current, and are provided to staff, supervisors, managers, and administrators in a timely manner.

- ○ Never
- ○ Rarely
- ○ Somewhat
- ○ Frequently
- ○ Almost Always
- ○ N/A

\* 2. Identify strengths and barriers to the process above.

\* 3. Does the county/region have knowledge of any children under it's care for whom information on their whereabouts is not in the information system (MACWIS)? How is this addressed?

DHS
296266

228

**Data to Action Meetings**

Within 30 working days of the finalization and submission of the baseline or annual follow-up comprehensive CQI report to the region, a Data-to-Action meeting is held with the Regional Director, Regional ASWS, Area Social Work Supervisors, and other key staff such as the Practice Coach, Adoption Supervisors, and Regional Family Protection Specialist Advanced. The purpose of this meeting is to discuss the results of the report in order to help guide the region in using the data in their implementation and improvement efforts and to inform their practice.

Data from the MACWIS data indicators/data dashboards, on-site case review results conducted by the Division of Evaluation and Monitoring, and the case reviews conducted during the review period by the Division of Foster Care Review are presented in a format that shows a comparison among the data sources that helps inform the region as to where their strengths and areas needing improvement are in relation to the practice model components and systemic factors. These data sometimes point clearly to overall strengths and areas needing improvement. However, when there is a contrast  in the data it could be an indication of (for example) issues such as timely and/or accurate data entry in MACWIS.

**Ex. 22**

## Grace M. Lopes

**From:** Robert Hamrick [Robert.Hamrick@mdhs.ms.gov]
**Sent:** Tuesday, November 05, 2013 4:51 PM
**To:** Grace M. Lopes
**Cc:** Cindy Greer; mcaras@sparb.org
**Subject:** Fw: CQI Regional Reports.
**Attachments:** cqi 1-north corrective action open and closed  report.pdf; cqi 1-south corrective action open and closed  report.pdf; cqi 2-east corrective action open and closed  report.pdf; cqi 2-west corrective action open and closed  report.pdf; cqi 3-north corrective action open and closed report.pdf; cqi 3-south corrective action open and closed  report.pdf; cqi 4-north corrective action open and closed  report.pdf; cqi 4-south corrective action open and closed  report.pdf; cqi 5 -east corrective action open and closed  report.pdf; cqi 5 -west corrective action open and closed  report.pdf; cqi 6 - corrective action open and closed  report.pdf; cqi 7 east - corrective action open and closed  report.pdf; cqi 7 west - corrective action open and closed report.pdf

Grace,

As you requested in our meeting today, I am sending you the most recent CQI Corrective Action Open and Closed Heat Ticket weekly report.

####################################################################################
*Thank you for your attention to this matter. The "Read/Receipt" I get will serve as an acknowledgment that you have read and understand this matter unless you notify me otherwise.*
####################################################################################
Robert A. Hamrick, Director/Division of Evaluation & Monitoring
Mississippi Division of Family & Children Services
Office of Continuous Quality Improvement
P.O. Box 352
750 North State Street / Room 633
Jackson, Ms  39205-0352
601-383-6559 (state cell)*
601-359-4018 (state office)
601-635-4014 (fax)
robert.hamrick@mdhs.ms.gov
*Primary number*
Child Abuse and Neglect Hotline 1-800-222-8000
Child Abuse/Neglect Website: https://www.msabusehotline.mdhs.ms.gov/
Adoption Information 1-800-821-9157
Foster Care Information 1-800-345-6347
####################################################################################
**Confidentiality Statement:** *The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential, proprietary, and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from all computers.*

**Please consider the environment before printing this e-mail**

-----Forwarded by Robert Hamrick/DFCS/MDHS on 11/05/2013 03:47PM -----

To: Robert Hamrick/DFCS/MDHS@MDHS
From: Donald Oliver/DFCS/MDHS
Date: 11/04/2013 01:18PM
Cc: Cindy Greer/DFCS/MDHS@MDHS, Tracy Aynes/DFCS/MDHS@MDHS

1

Subject: CQI Regional Reports.
*(See attached file: cqi 1-north corrective action open and closed report.pdf)*
*(See attached file: cqi 1-south corrective action open and closed report.pdf)*
*(See attached file: cqi 2-east corrective action open and closed report.pdf)*
*(See attached file: cqi 2-west corrective action open and closed report.pdf)*
*(See attached file: cqi 3-north corrective action open and closed report.pdf)*
*(See attached file: cqi 3-south corrective action open and closed report.pdf)*
*(See attached file: cqi 4-north corrective action open and closed report.pdf)*
*(See attached file: cqi 4-south corrective action open and closed report.pdf)*
*(See attached file: cqi 5 -east corrective action open and closed report.pdf)*
*(See attached file: cqi 5 -west corrective action open and closed report.pdf)*
*(See attached file: cqi 6 - corrective action open and closed report.pdf)*
*(See attached file: cqi 7 east - corrective action open and closed report.pdf)*
*(See attached file: cqi 7 west - corrective action open and closed report.pdf)*


   Hi Rob,
        Attached are the  reports for CQI that we previously had been separating by call type.  These
new ones below combine the CQI call types, but now each division will have its own report.   They are
sorted by county and call type category. Call with any questions.  thx !

Don Oliver
Business Analyst 1
MACWIS-State Office
Division of Family and Children's Services
Office:601-359-4620
Fax: 601-576-5026 or 877-244-2706
Email, donald.oliver@mdhs.ms.gov

Child Abuse and Neglect Hotline: 800-222-8000


Confidentiality Statement: The information transmitted is intended only for the person or entity to which
it is addressed and may contain confidential, proprietary, and/or privileged material. Any review,
retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by
persons or entities other than the intended recipient is prohibited. If you received this in error, please
contact the sender and delete the material from all computers.

 =

# Ex. 23A



NEOGOV

| | |
|---|---|
| **Job Title:** | DHS-Family Protection Spec, Adv |
| **Closing Date/Time:** | Wed 04/18/12 11 59 PM Central Time |
| **Salary:** | $32,700 43 / Year |
| **Job Type:** | Full-Time |
| **Location:** | 25 - HINDS, Mississippi |
| **Shift Schedule:** | Day Shift Only |
| **Travel Schedule:** | None |
| **Time Limited Position:** | No |
| **Agency Information:** | This position is located in the Evaluation & Monitoring Unit within the Department of Family and Children's Services Office of Continuous Quality Improvement. Applicants may apply online or mail State of Mississippi applications to MDHS/DFCS P.O. Box 325, Jackson, MS 39205. The paper application is located under the "How to Apply" link |

**Job Openings**
Agency Only Opportunities
State Employee Opportunities
Job Interest Cards

**MSPB Applicant Care Center**
Quick Help-Username/Password
FAQs

**MSPB General Information**
Events
Job Descriptions

Print Job Information | Apply

**Characteristics of Work**    **Benefits**    **Supplemental Questions**

This is professional level social work encompassing services designed to strengthen, rehabilitate and



This is professional level social work encompassing services designed to strengthen, rehabilitate and preserve families and provide protection and care for children and/or vulnerable adults in need of supplementary or substitute care, or provide full-time intake services. Incumbents evaluate the social needs of adults and children, develop a plan directed toward the solution of individual and family problems, and provide protective and placement services for homeless, dependent, or neglected children. Work includes developing and utilizing all agency and community resources which will carry out the above objectives. Work is performed under the supervision of an administrative superior, and close supervision is received in the form of review of case work plans, recorded narratives, and frequent case work conferences. Incumbents remain on-call on a 24-hour basis and may be expected to intervene and/or assist law enforcement in volatile situations involving removing at-risk children/vulnerable adults from abusive parents or guardians.

**Examples of Work:**

Examples of work performed in this classification include, but are not limited to, the following:

Interviews clients in reference to adult/child abuse referrals made by the general public.

Conducts routine and special investigations.

Supervises foster children/homes

Makes referrals to other community/agency resources for clients as necessary.

Provides counseling services to children and parents/caregivers.

Provides client transportation as needed.

May recruit, inspect, and grant licensure to potential residences to be used as foster homes; performs group



Performs related or similar duties as required or assigned.

**Minimum Qualifications:**

These minimum qualifications have been agreed upon by Subject Matter Experts (SMEs) in this job class and are based upon a job analysis and the essential functions. However, if a candidate believes he/she is qualified for the job although he/she does not have the minimum qualifications set forth below, he/she may request special consideration through substitution of related education and experience, demonstrating the ability to perform the essential functions of the position. Any request to substitute related education or experience for minimum qualifications must be addressed to the State Personnel Board in writing, identifying the related education and experience which demonstrates the candidate's ability to perform all essential functions of the position.

EXPERIENCE/EDUCATIONAL REQUIREMENTS:

Experience:
Four (4) years of directly related experience.

AND

Must be licensed to practice Bachelor¿½s Level social work (LSW or above) in the State of Mississippi.

Documentation Required.

Applicant must attach a copy of his/her current wallet-size social Worker License. Incumbent must possess a valid driver¿½s license and proof of insurance which will be verified by the hiring agency.

**Ex. 23B**

# M E M O R A N D U M
## MISSISSIPPI DEPARTMENT OF HUMAN SERVICES

### April 11, 2012

In-House Promotional Opportunities 12-42

TO:       Office Directors
             Bureau Directors
             Division Directors                        **CORRECTION**
             Branch Directors
             Regional Directors
             County Directors
             Area Social Work Supervisors
             Youth Services Community Services Administrator
             Youth Services Regional Supervisors
             Oakley Youth Development Center Administrator
             Child Support Senior Attorneys
             County Child Support Supervisors
             County Economic Assistance Supervisors

FROM:     Daren T. Vandevender, Director
             Division of Human Resources

RE:        DHS In-House Promotional Opportunities

Please advise all staff that the position(s) listed below are vacant and are promotional/demotional/transfer opportunities. Positions must be on recruitment for **ANYONE** to apply. Applications must have the position number (or job number), a 16 or 17 digit number with 2 dashes located under the "print job information" link (example: **Position #4556-0662-20110803**), and the supplemental questions answered. Applicants can print the job information, along with the answered supplemental questions, and submit it with the application. Eligible employees must submit an electronic application to the State Personnel Board by **April 18, 2012.** Applications submitted to the Division of Human Resources will be forwarded to the State Personnel Board for evaluation; however, it is encouraged that all applications be submitted electronically. **"You can view SPB website at www.mspb.ms.gov for full job description."** Applications submitted without the job number and /or the supplemental questions will be considered invalid.

| POSITION | LOCATION | MONTHLY SALARY |
|---|---|---|
| Secretary Principal Evaluated | Family & Children's Services Jones | $1,660.41 |
| DHS-Family Protection Specialist, Advanced Evaluated (3 Positions) | Family & Children's Services Hinds | $2,725.04 |

These positions are for the Evaluation and Monitoring Unit within the DFCS Office of Continuous Quality Improvement. The candidate selected does not have to be housed in the county that is advertised but must be housed within Region III-S, Region VII-E and Region V-W.

**"THE MISSISSIPPI DEPARTMENT OF HUMAN SERVICES IS AN EQUAL OPPORTUNITY EMPLOYER"**

**In-House Promotional Opportunities 12-42**
**April 11, 2012**
**Page 2**

| | | |
|---|---|---|
| DHS-Program Administrator, Sr. | Family & Children's Services | $3,404.06 |
| Evaluated | State Office | |

**Must have a Masters Degree in a Human Service related field and a Bachelors Degree in Education.**

| | | |
|---|---|---|
| Youth Services Counselor, Regional Supervisor | Youth Services | $3,407.57 |
| Evaluated | Madison | |

**Must have a Masters Degree in one of the Behavioral Sciences.**

| | | |
|---|---|---|
| Systems Manager II | Management Information Systems | $4,960.34 |
| Evaluated | State Office | |

| | | |
|---|---|---|
| Systems Manager II | Management Information Systems | $4,960.34 |
| Evaluated | State Office | |

| | | |
|---|---|---|
| DHS-Child Support Enforcement Officer | Child Support Enforcement | $2,006.36 |
| Evaluated | Pike | |

**Must have a minimum of two (2) years of experience in interviewing or customer service.**

**"THE MISSISSIPPI DEPARTMENT OF HUMAN SERVICES IS AN EQUAL OPPORTUNITY EMPLOYER"**

**Ex. 24**

# MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
## *Division of Family and Children's Services*
### Continuous Quality Improvement (CQI)
### Annual CQI Report[1]

## *Introduction*

Mississippi's Division of Family and Children's Services (DFCS) has made great strides in the development of a Continuous Quality Improvement (CQI) system which includes the Evaluation and Monitoring Unit (EMU), the FCR Unit (FCR), and the Mississippi Automated Child Welfare Information System (MACWIS). The DFCS CQI System supports the *Olivia Y* Settlement Agreement, Council of Accreditation (COA) standards, federal standards, and the implementation of the Mississippi Child Welfare Practice Model. The CQI system utilizes both quantitative and qualitative information to determine how counties, regions and the state are assuring the safety, permanency and well-being of children and families served by the state. This will be accomplished by monitoring key child welfare indicators associated with the components and systemic factors of the Practice Model which is being implemented simultaneously with the CQI processes. The CQI system is organized around the six components and seven systemic factors of the Practice Model and includes elements of the Child and Family Services Review (CFSR), COA standards, and components of the *Olivia Y* Settlement Agreement. In order to monitor county, regional and state performance, the CQI system is centered around quantitative data indicators which will establish how counties and the region are doing in comparison to standards that have been set or in comparison to statewide performance. The qualitative information gathered is intended to provide context and a deeper insight to better understand counties' and regions' performance on the child welfare data indicators.

The EMU conducts an initial baseline review in each of the DFCS regions as they begin implementing the Practice Model. The information from these reviews, including aggregate data reports, the findings of a sample of qualitative case reviews, and the responses from an electronic survey of key stakeholders, provides a starting point for measuring progress as the region continues implementing the Practice Model. After the initial 12-month implementation period has ended, the EMU conducts a second, follow-up, review to determine whether the region has begun to make progress and to gather information that will inform the region's efforts and technical assistance activities in the second 12-month implementation period.

---

[1] This report covers the time period June 1, 2010-June 30, 2011

DHS
296674

Of note, the *Olivia Y* Settlement Agreement and the Year 3 Implementation Plan associated with it have been in re-negotiation status for the past year. At the time of this CQI report, the *Olivia Y* requirement incorporated in the report are those included in the most recent but currently non-finalized version of the Modified Settlement Agreement. It is important to note that certain indicators in the Modified Settlement Agreement, will be measured on a regional basis until all regions in the state have completed implementation of the Practice Model, while other indicators will be measured on a statewide basis throughout the implementation process. Under the Modified Settlement Agreement, for regional measures, regions will become accountable for meeting those particular *Olivia Y* requirements at the point when they complete Practice Model implementation going forward. Two regions in the state (Regions I-South and II-West) completed Practice Model implementation as of the end date of the CQI report (June 30, 2011) and no other regions had completed Practice Model implementation. Since the performance of these two regions will begin to be measured for conformity with *Olivia Y* requirements from June 30 forward, the data presented in this report should not be taken as an indication that the regions are either in conformity or non-conformity with *Olivia Y* requirements. The comparison of performance to applicable standards is for descriptive purposes only.

We should also note that this is the first Annual CQI Report and it covers a time frame for which many of the needed measures for requirements in the *Olivia Y* Settlement Agreement and the Practice Model had not yet been developed. Therefore, the CQI Office is limited in its ability to report on both statewide and implementing regions' performance with regard to some indicators. Additional MACWIS reports and reports from automated FCR data are in development and will be available for reporting in subsequent Annual CQI Reports.

During the June 2010 through June 2011 time period, the CQI Office engaged in these initiatives:

o  The EMU conducted baseline and annual follow-up reviews in Regions 1-South and 2-West. Baseline reviews were conducted in Regions 5-West, 4-North, and 1-North. A comprehensive CQI report was produced for each review using validated MACWIS data indicators, on-site case review results, FCR data, and stakeholder survey data.

o  The EMU, in collaboration with MACWIS and MDHS Management Information Systems (MIS), developed and began testing an automated case review instrument for use in the baseline and follow-up reviews in the regions.

o  EMU Liaisons were hired in Regions 1-South, 2-West, 4-South, and 4-North. These are Family Protection Specialist Advanced positions which require 4 years of social work experience and a license to practice social work in Mississippi.

o  During State Fiscal Year 2011 (July 1, 2010 to June 30, 2011), the FCR Unit reviewed the cases of 3,358 children in foster care cases statewide at least twice, which resulted in 97.99% of the children in state's custody having a timely periodic administrative determination and county conference held on their case.

2

○ The FCR Unit, in collaboration with MACWIS and MIS, began planning and development of an automated foster care review instrument with user acceptance testing and implementation scheduled for early 2012.

○ EMU, FCR and MACWIS staff conducted training sessions for EMU and FCR staff to educate staff on how to use data indicators/reports regarding the Practice Model and *Olivia Y* Settlement Agreement in their daily work.

## Data Sources and Methodology

Table 1 below reflects the sources of information presented and analyzed in this year-end report. The report is organized by the six Practice Model components and the six systemic factors associated with the Practice Model.

**Table 1**
**Number of Data Indicators Assessed, by Practice Model Components and Systemic Factors**

| Practice Model Components | | | | |
|---|---|---|---|---|
| Area Of Practice | Data Reports | Case Review | Survey | FCR | Total # of Indicators |
| Mobilizing Services Timely | 3 | 6 | 0 | 8 | 17 |
| Assuring Safety and Managing Risk | 5 | 4 | 0 | 5 | 14 |
| Involving Children and Families | 2 | 3 | 0 | 9 | 14 |
| Individualized Case Planning | 0 | 3 | 3 | 6 | 12 |
| Assessing Strengths and Needs | 0 | 2 | 0 | 3 | 5 |
| Preserving & Maintaining | 0 | 6 | 1 | 7 | 14 |
| **Systemic Factors** | | | | |
| Systemic Component | Data Reports | Case Review | Survey | FCR | Total # of Indicators |
| Training of Staff and Providers | 0 | 0 | 3 | 0 | 3 |
| Service Array | 0 | 0 | 5 | 0 | 5 |
| Placement Resources | 2 | 0 | 3 | 1 | 6 |
| Caseloads | 3 | 0 | 1 | 0 | 4 |
| Oversight and Monitoring | 1 | 0 | 5 | 2 | 8 |
| Court Processes | 4 | 0 | 4 | 2 | 10 |
| Data Quality and Usage | 0 | 0 | 5 | 0 | 5 |
| **TOTAL** | **20** | **24** | **30** | **43** | **117** |

3

DHS
296676

*Data Indicators*

The MACWIS data indicators track and report information related to the state's Practice Model components, systemic factors, and the requirements of the *Olivia Y* Settlement Agreement *(see data table footnotes in Appendix A for the time period covered for these data indicators)*. These data indicators serve as the cornerstone for measuring strengths and areas needing improvement in counties and regions statewide. These indicators are used to establish baselines and measure improvements in performance. The information from the case reviews, desk audits, and stakeholder surveys will be used to support the information from the data indicators.

Approximately 28 MACWIS reports were developed specifically to capture key indicators of child welfare practice across the Practice Model components as well as systemic factors. The broad spectrum of requirements for each of these reports was submitted to MIS for development after many Joint Application Development (JAD) sessions involving MACWIS, MIS and the Center for the Support of Families (CSF) which provides technical assistance to DFCS. In obtaining county, regional and state results for respective levels of performance, the most recent summary reports were utilized and transformed into bar charts for reporting performance percentages statewide and by region.

Reports developed for use in data indicator tracking were validated prior to release into the production environment. Each of these reports is scheduled on a six-month revalidation schedule. The following steps give a high level overview of the validation process:

> **STEP 1:** The process for MACWIS reports validation begins with the validation coordinator: 1) conducting user acceptance testing for newly developed reports; 2) documenting the high level business rules and data point locations for each report; 3) pulling report samples (minimum of 5 – 10%); and 4) assigning reports (or parts of reports) to reviewers for data validation.

> **STEP 2:** Each data validation team member takes their assigned report (or report section) and while using the high level business rules/data point locations document as a guide, works each sample record to determine in MACWIS if the data in the system match the report data based on the data point location within MACWIS. Each team member documents their findings within a standardized error reports document.

> **STEP 3:** The validation coordinator compiles team member validation results for quality assurance (QA) review, and then assigns the report or report sections to QA team members for secondary validation of results (approx 5% of reviewed cases are reviewed for QA).

> **STEP 4:** The validation coordinator reviews all results, researches issues found, documents errors for further review by MIS. When possible, errors are communicated from the validation coordinator to the social workers for data correction. In the event of error trends, there will be involvement from the Field Operations Director in communicating information to the field.

DHS
296677

*EMU Case Reviews*

To support the results of the data indicators from MACWIS, regional qualitative case reviews were conducted to provide deeper context to the data results. After requesting and receiving a universe of cases from each of the implementing regions, a random sample of 14 foster care ████████████ ████████ cases from each of the 5 implementing regions was obtained. Twelve teams made up of two people conducted the case reviews in each region, and were supported by one team leader and two quality assurance reviewers. The case review data in this report covers the period from June 2010 through June 2011. In addition, regional EMU liaisons conduct 2 monthly case reviews per region to provide additional data to the regions to target areas of improvement.

During the period of June 2010 through June 2011, CQI EMU staff conducted 5 baseline reviews (5 regions) and 2 follow up reviews (2 regions). Each case review included 14 foster care cases ████████ ████████████████. This resulted in a total of 168 cases being reviewed during the June 2010 to June 2011 reporting period. 36 monthly case reviews (foster care cases ███████████████████) were also conducted in the implementing regions during this time period except in regions where there were baseline or follow-up reviews taking place. Overall, 204 total cases were reviewed in the implementing regions during the June 2010 to June 2011 reporting period.

The case review process involves a half day of training for reviewers on the details of the review as well as how to use the web-based review instrument. The actual review time allotted is 2 days including client/staff interviews.  Two reviewers, utilizing MACWIS and the EMU automated web-based instrument, conduct a detailed review of the case based on the instrument questions. Once the case review and interviews are complete and all information is gathered and entered into the instrument, the reviewer submits the review data and EMU assigned QA staff review the case review data for validity/accuracy. Any issues found within the review data are sent back to the reviewer via the automated instrument for correction and explanation. After all corrections/explanations are finalized, the reviewer submits the final version of the case review and the review is considered complete.

*Stakeholder Surveys*

Stakeholder involvement is critical to the success of the Practice Model. In particular, service providers, as well as the courts, resource parents, the Regional Implementation Team (RIT), and caseworkers and supervisors need to be fully engaged in the child welfare process. Between June 1, 2010 and June 30, 2011, stakeholders in the implementing regions were provided with surveys to determine how they believe the Agency is performing with regard to the following systemic factors: Training of Staff and Providers; Service Array; Placement Resources; Caseloads; Oversight and Monitoring; Court Processes; and Data Quality and Usage. Stakeholders were surveyed through email addresses provided by the Area Social Work Supervisors (ASWS) in each county.

The stakeholders were identified by the ASWS and forwarded to the Regional Director (RD) who then compiled a condensed list of stakeholders who were solicited for participation.

5

*Foster Care Review (FCR)*

The FCR Unit conducts periodic administrative reviews on the cases of each child who has been in foster care five months or longer. During the course of the case review, data are collected to provide the caseworker, supervisor, and RD with the status of each case as to the child's permanency, safety, and well-being.

Necessary changes in the FCR instrument prior to January 2011 resulted in having data available on the current FCR indicators in this report from January 2011 through June 2011. From the period of January 1, 2011 through June 30, 2011, the FCR Unit reviewed 3,363 foster care cases statewide. While aggregate data are currently compiled manually, the automation of the FCR instrument will result in automated report extractions allowing for even more reliable data for reporting on *Olivia Y* Modified Settlement Agreement requirements for FCR.

FCR data appear below in this report broken down by percentages relevant to each child welfare data indicator.

# *Findings: Practice Model Components*

## Mobilizing Appropriate Services Timely

"Appropriate and Timely Services" refers to a process whereby services are designed and delivered pursuant to a careful assessment of children's and parents' needs. The assessment should identify both the strengths of the children and parents with regard to the issues requiring interventions, and their needs with regard to ensuring safety, permanency, and well-being. "Needs" should not be confused with "services". In order to provide appropriate and timely services to children and parents, there is a need to think beyond what is available in the service array  to avoid offering a standard menu of services that may or may not match the unique needs of some parents and children. The concept of appropriate services emphasizes that services should be comprehensive, incorporating a broad array of services and supports that are individualized to meet the specific needs of the children and families.  These services and supports should be provided in the least restrictive setting appropriate for the child and accessible to all jurisdictions within the state.

The following practice principles are linked to this component:

- Services are designed and delivered pursuant to a careful assessment of the children's and parents' needs;
- Services and supports are individualized to meet the unique needs of the children and parents;
- Services are based on needs, not on availability;
- Services are delivered when they are needed and in locations that are accessible to the children and parents who need them; and
- Children and families are treated as partners to assure joint decision making about the services that they need.

DHS
296679

### *Statewide Performance*

Statewide performance is reported through the following sources: aggregate data MACWIS reports; findings from the Foster Care Reviews; and findings from the Evaluation and Monitoring Reviews.

Using MACWIS reports, the state is using 4 aggregate data indicators for this Practice Model component. The data are extracted from MACWIS and represent statewide performance.

- Placement Stability - Number of children in custody 12 months or less who have had 2 or fewer placement moves / Data Source: MWZPLM5S - As of June 2011;

- Children in custody, ages 14 - 20, are provided with independent living services per their service plan / Data Source: MWBRD16S - July 1, 2010 thru June 30, 2011;

- Children discharged from custody and reunified with parents/caretakers in the last year are reunified within 12 months of latest removal from home / Data Source: MWBRD05S & MWBRD05C - July 1, 2010 thru June 30, 2011;

- Children discharged in the last year upon finalization of an adoption have had the adoption finalized within 24 months of the latest removal from home / Data Source: MWBRD10D & MWBRD10S - July 1, 2010 thru June 30, 2011.

Chart 1 below shows the statewide percentages for the 4 currently available data reports used to measure Mobilizing Appropriate Services Timely and compares the state's performance from June 2010 to the performance in June 2011.

**Chart 1**
**Statewide Percentage Meeting Mobilizing Appropriate Services Timely Indicators**



DHS
296680

- The statewide *Olivia Y* Year 3 requirement for **Placement Stability** is 60%. The data indicator measures the number of children in custody 12 months or less who have had two (2) or fewer placement moves. The Agency met the standard at 71.59% in June 2010 and at 72.31% in June 2011.

- The *Olivia Y Modified* Settlement Agreement requires that the indicator, **Children ages 14-20 with Independent Living Services Provided,** be measured on a regional basis following a region's implementation of the Practice Model. Ultimately, all regions and the state as a whole must attain a 95% requirement. The statewide requirement for this standard has not yet been met.

- The *Olivia Y Modified* Settlement Agreement requires that the indicator for Year 3 for children discharged from **custody and reunified with parents/caretakers in the last year are reunified within 12 months of the latest removal from the home** be measured on a regional basis following a region's implementation of the Practice Model. Ultimately, all regions and the state as a whole must attain a 76.2% standard. The statewide requirement for this standard has not yet been met.

- The *Olivia Y Modified* Settlement Agreement requires that the indicator for **children discharged in the last year upon finalization of an adoption have had their adoption finalized within 24 months of the latest removal from the home** be measured on a regional basis following region's implementation of the Practice Model. Ultimately, all regions and the state as a whole must attain a 32% requirement. The statewide requirement for this standard has not yet been met.

In addition to the aggregate data from MACWIS reports, FCR data collected during the January 2011 through June 2011 review period reflect the 3,363 foster care cases reviewed statewide. FCR data are by case, not by child, and there could be multiple children in a case. During the course of the FCR case review process, issues of concern may arise for which the reviewer reports. These are issues that can have an effect on the child's safety, permanency, and well-being while in foster care. "Issues of Concern" can include issues like a lack of face-to-face contact with foster children, medical/educational/dental/mental health documentation lacking in the case record, safety/appropriateness of the child's placement, child and parental involvement in the case planning process, timeliness of the TPR/Adoption process, etc. Table 2 below shows the data indicators for Mobilizing Appropriate Services Timely reported by the FCR Unit during the January 2011 through June 2011 reporting period; the total number of foster care cases reviewed; the total number cited for each indicator with issues of concern and reported to the appropriate county of responsibility and/or region and/or Field Operations for corrective action; and the percentage cited/reported for each indicator.

8

**Table 2**
**FCR Statewide Findings, Year in Total, for Mobilizing Appropriate Services Timely**

| Indicator (January 2011 through June 2011) | Statewide 3363 Total Cases Reviewed |
|---|---|
| Children's case plans that do not include up to date medical/dental/mental health and other vital information | 2213 cases w/ this Issue 65.80% |
| Children with identified medical/dental/mental health needs for which services do not appear to be provided | 48 cases w/ this issue |
| Children with a plan of Adoption but no TPR referral has been submitted or there are other barriers | 184 cases w/this issue |
| Age appropriate children with no documentation of being provided Independent Living/Transitional Living services | 226 cases w/this issue |
| Children with potential placement disruption issues | 105 cases w/this issue 3.12% |
| Placement appropriateness issues | 46 cases w/this issue 1.37% |
| Placement restrictiveness issues | 78 cases w/this issue 2.32% |
| Issues surrounding children's personal, holiday, and special allowances | 671 cases w/this issue 19.95% |

The FCR Unit notes that a primary issue having an effect on Mobilizing Appropriate Services timely is that of children's Individual Service Plans (ISPs) lacking vital, up-to-date information regarding their placement, medical, dental, education, and mental health information.  this documentation populates onto the child's ISP from various areas of MACWIS and if current information is not entered into the appropriate fields, MACWIS will not capture that information for inclusion in the ISP.

*Regions' Performance*

The charts below show a comparison among the implementing regions on the 4 current data indicators that are used to measure performance and improvements with regard to Mobilizing Appropriate Services timely and compare the regions' June 2010 performance to the June 2011 performance. The

9

DHS
296682

charts also include the state's overall performance on each of the indicators for June 2010 and June 2011.

**Chart 2**
**Placement Stability: Children in care <12 mos with 1 or 2 Placements**



In Chart 2 above, according to the Placement Stability data indicator (Children in care less than 12 months with 1 or 2 placements), all five of the regions involved in Practice Model implementation during the time frame covered by the report met the Year 3 statewide requirement of 60% in both June 2010 and July 2010. Region I-South showed the highest level of performance on this indicator and improved performance between 2010 and 2011, while the remaining 4 regions decreased their performance between 2010 and 2011, according to the MACWIS reports.

**Chart 3**
**Children ages 14-20 receiving Independent Living Services**

10



In Chart 3 above, the Independent Living data indicator (Children 14-20 receiving Independent Living Services) shows that all regions except 5-W decreased their performance. This was due in part to changing the data report to show only those youth who received Independent Living services during the year covered by the report as opposed to showing youth who had received IL services at any time during their foster care episode as in the 2010 data. While ultimately all regions and the state will need to achieve 95% on this indicator, the *Olivia Y* requirement that these regions are striving to achieve initially, beginning at the point in which they complete the Practice Model implementation, is 90%. The time period covered by this CQI report ends on June 2011, which is when Regions I-South and II-West will *begin* to ensure that 90% of applicable youth in foster care receive independent living services. Therefore, this report cannot determine the regions' conformity with the requirement. The other regions in the chart were not yet at that point as of June 2011.

**Chart 4**
**Children Reunified within 12 months of Latest Removal from the Home**



11

In Chart 4 above, the number of children who are discharged from custody and reunified with parents/caretakers in the last year that are reunified within 12 months of latest removal from home is shown in the chart above. The ultimate statewide requirement that all regions must achieve for this indicator is 76.2%. However, regions are initially striving to achieve a 60% requirement which begins to be measured at the time that the region has completed the Practice Model implementation. As with the placement stability indicator, Regions I-South and II-West will begin to be measured on this indicator as of the end of the period covered by this CQI report, and we therefore cannot report on the regions' conformity with the requirement. For the time period covered, the data show Regions 1-North and 5-West exceeding the Year 3 requirement of 60% on this measure. Region 5-West shows an almost 10% increase in its performance between June 2010 and June 2011. However, the other regions dropped in their performance. This data indicator is from the MACWIS report MWBRD06 and shows children's outcomes for a year's period. The reporting period utilized for this report covers the period of July 1, 2009 through June 30, 2010 and July 1, 2010 through June 30, 2011.

- For the July 1, 2009 through June 30, 2010 reporting period, Region 1-North had 121 children reported with an outcome of reunification. 78 of those children (64.46%) were reunified within 12 months of entering state's custody. For the July 1, 2010 through June 30, 2011 reporting period, the region had 146 children reported as having an outcome of reunification with 91 (62.33%) being reunified within 12 months of entering state's custody.

- For the July 1, 2009 through June 30, 2010 reporting period, Region 1-South had 121 children reported with an outcome of reunification. 67 (55.37%) were reunified within 12 months of entering state's custody. For the July 1, 2010 through June 30, 2011 reporting period, the region had 142 children reported as having an outcome of reunification with 69 (48.59%) being reunified within 12 months of entering state's custody. In both years, the region had a similar number of children reunified within 12 months of entering state's custody but the total number of children reunified during the July 2010 through June 2011 period was larger by 21 children.

- For the July 1, 2009 through June 30, 2010 reporting period, Region 2-West had 20 children reported with an outcome of reunification. 17 of those children (88%) were reunified within 12 months of entering state's custody. For the July 1, 2010 through June 30, 2011 reporting period, Region 2-West had 25 children reported as having an outcome of reunification with 11 (44%) being reunified within 12 months of entering state's custody.

- For the July 1, 2009 through June 30, 2010 reporting period, Region 4-North had 87 children reported with an outcome of reunification. 70 of those children (80.46%) were reunified within 12 months of entering state's custody. For the July 1, 2010 through June 30, 2011 reporting period, the Region had 63 children reported as having an outcome of reunification with 37 (58.73%) being reunified within 12 months of entering state's custody.

DHS
296685

- For the July 1, 2009 through June 30, 2010 reporting period, Region 5-West had 50 children reported with an outcome of reunification. 34 of those children (68%) were reunified within 12 months of entering state's custody. For the July 1, 2010 through June 30, 2011 reporting period, Region 5-West had 61 children reported as having an outcome of reunification with 48 (78.69%) being reunified within 12 months of entering state's custody.

**Chart 5**
**Children Adopted within 24 Months of Latest Removal from the Home**



Chart 5 above shows the implementing regions' performance on children adopted within 24 months of the latest removal from the home. The ultimate requirement that regions and the state must achieve for this indicator is 32%. However, regions are initially striving to achieve 25%, beginning with the year in which they complete Practice Model implementation. Regions I-South and II-West will *begin* to be accountable for achieving this requirement at the end of June 2011 and we, therefore, cannot report on the regions' conformity with this requirement. The data in the chart above reflect current performance as of the end of June 2011. All of the implementing regions with the exception of Region 2-West and 5-West met and exceeded the 25% requirement. The MACWIS report MWBRD10S is a regional summary report that shows the length of time between custody and adoption finalization. The data report shows that Region 2-West had 7 children adopted during the July 1, 2010 through July 2011 reporting period. The average number of years to adoption finalization for those children was 5.11 years. Region 5-West had 20 children adopted during the July 1, 2010 through June 30, 2011 reporting period. The average number of years to adoption finalization was 2.74 years.

Data from the EMU baseline, follow-up, and monthly reviews in the implementing regions also provide information related to Mobilizing Appropriate Services Timely. The case reviews include i▬▬▬▬▬ ▬▬▬▬ foster care cases. The total number of cases reviewed for the period was 204. This includes:

13

- A baseline review in Region 1-South in June 2010 of 24 cases, a follow-up review in June 2011 of 24 cases, and 8 monthly reviews during the reporting period;

- A baseline review in Region 2-West in June 2010 of 24 cases, a follow-up review in June 2011 of 24 cases, and 8 monthly reviews during the reporting period;

- A baseline review in Region 5-West in December 2010 of 24 cases and 10 monthly reviews during the reporting period;

- A baseline review in Region 4-North in January 2011 of 24 cases and 10 monthly reviews during the reporting period;

- A baseline review in Region 1-North in May 2011 of 24 cases.

There are 6 items in the EMU review instrument that address this component of the Practice Model and that the results are listed in Table 3 below.

**Table 3**
**Number/Percent of EMU Case Review Cases for Mobilizing Services Timely Items\*\***

| MOBILIZING SERVICES TIMELY | | | | | | |
|---|---|---|---|---|---|---|
| Case Review Item | Item 13: Reunification, Guardianship, or Permanent Placement with Relatives | Item 14: Stability of Foster Care Placement | Item 15: Adoption | Item 16: Other Planned Permanent Living Arrangement | Item 17: Physical Health of Child | Item 18: Mental Health of Child |
| Total Strength | 33 | 97 | 13 | 29 | 98 | 77 |
| % | 40.2% | 84.3% | 28.9% | 74.4% | 64.1% | 60.2% |
| Total ANI | 49 | 18 | 32 | 10 | 55 | 51 |
| % | 59.8% | 15.7% | 71.1% | 25.6% | 35.9% | 39.8% |
| Total Applicable | 82 | 115 | 45 | 39 | 153 | 128 |

\*\*Please note that these numbers include both the baseline/follow-up reviews and the monthly case reviews (as applicable) for all implementing regions to date.

- For Review Instrument Item 13, 40.2% of the foster care cases that were subject of the June 2010 through June 2011 on-site case reviews rated Strength.

  o Of the 47 applicable children with a permanent plan of Reunification, Guardianship, or Permanent Placement with Relatives who were subject of the June 2010 through June

14

DHS
296687

2011 on-site case reviews, it appears concerted efforts were being made by the Agency and the courts to achieve a goal of Reunification, Guardianship, or Permanent Placement with Relatives in a timely manner in 73.47% of those cases.

o    Of the 36 children with a goal of reunification, parental service plans identified those services DFCS deems necessary to address behaviors or conditions resulting in the child's placement in foster care in 77.78% of the cases reviewed.

o    DFCS made the identified services available either through direct or referral service to the mother in 72.97%% of the applicable cases and to the father in 30% of the applicable cases.

o    Of the 10 children in the case review samples who were discharged during the period under review and reunified, there was evidence that a 90 day trial home placement occurred in 80% of those cases.

o    It appears that a lack of making identified services available through direct provision or referral to the father in only 30% of the cases is the factor that led to this item rating 40.2% Strength.

• For Review Instrument Item 14, 84.3% of the foster care cases reviewed during the June 2010 through June 2011 reporting period rated Strength for Placement Stability.

o    Of the 35 children in the on-site case review samples who had a placement change during the period under review, 29 (82.86%) of the children experienced moves that were planned by the Agency in an effort to achieve the their case plan goals or to meet the needs of the child.

o    66 of the 69 (95.65%) applicable children were found to have placements that were stable, i.e., free from the threat of disruption.

o    23 children in the on-site case review samples during the reporting period were found to have special needs. 22 (96%) were in placements that could meet those special needs.

o    65 of the 68 children in the sample were found to be in placements that were the least restrictive to meet their individual needs.

• For Review Instrument Item 15, 28.9% of the applicable cases that were subject of the on-site case reviews during the reporting period rated Strength for Adoption.

o    Of the 28 children in the case review sample with a plan of Adoption, concerted efforts are/were being made by the Agency and the courts in 11 (37.93%) of the applicable cases to achieve the plan of adoption in a timely manner.

o    Of the applicable cases reviewed, 16 children had an adoption specialist assigned and an adoption plan that identifies the child-specific activities DFCS will undertake to achieve adoption.

15

DHS
296688

- o  There is evidence in 19 of the applicable cases that resource parents had been informed of available subsidies, including post-adoptive services.

- o  For the 22 children in the review with a plan of adoption who have been in care longer than 12 months, there is evidence in 20 of the applicable cases that the resource parents have been engaged in discussions regarding adoption.

- For Review Instrument Item 16, 74.4% of the applicable cases subject to the on-site case reviews during the reporting period rated Strength for Another Planned Living Arrangement which also addresses the provision of Independent Living services.

  - o  20 children were identified in the review sample who were age appropriate for independent living services. 16 (80%) were found to be provided with services to adequately prepare them to live independently when they leave foster care.

- For Review Instrument Item 17, 64.1% of the foster care ████████ cases rated a Strength for assessing physical and dental health needs and providing applicable services (Note there are no *Olivia Y* requirements for in-home service cases).

  - o  During the reporting period, the Agency assessed the physical health care needs of 88.10% of the children who were subject of the on-site case reviews.

  - o  Of the children who came into Agency custody during the period under review, 55.56% received an initial screening within 72 hours and 88.89% received a comprehensive health screening within 30 days of foster care entry. (The current statewide *Olivia Y* Year 3 requirement is 50% for the 72-hr screening and 50% for the 30-day evaluation. Statewide reports had not yet been developed to measure these indicators as of the end of the period covered by this CQI report.)

  - o  There were 68 children in the on-site case review who were age appropriate for dental services. Of the 26 foster children who entered care during the period under review, 19 (73.08%) of those children had their dental health care needs assessed within 90 days of entry into custody or within 90 days of their 3rd birthday. (The current statewide *Olivia Y* Year 3 requirement is 60%. Statewide reports had not yet been developed to measure this indicator as of the end of the period covered by this CQI report.)

  - o  Of the 75 children with identified physical health needs, 84% were provided with appropriate services in a timely manner to address those needs. Of the 46 children with identified dental health needs, 75.41% were provided with appropriate services in a timely manner to address those needs. (The current *Olivia Y* Year 3 requirement is 75% for medical services and 60% for dental services. Statewide reports had not yet been developed to measure this indicator as of the end of the period covered by this CQI report.)

16

- For Review Instrument Item 18, 60.2% of the applicable ███████ foster care cases rated Strength for assessing mental health needs and providing applicable services. (Note that there are no *Olivia Y* requirements for in-home service cases)

  o During the period under review, age appropriate foster children who were the subjects of the on-site case reviews received an initial mental health screening within 30 days of entry into foster care and/or within 30 days of their 4th birthday in 66.67% of the 6 applicable cases. (The current *Olivia Y* Year 3 requirement is 50%. Statewide reports were not yet developed to measure this indicator as of the end of the period covered by this CQI report.)

  o The Agency conducted an assessment of the children's mental/behavioral health needs on an on-going basis or as a follow-up based on indications to inform case planning decisions in 82.35% of the applicable cases and (during the review period) provided appropriate services to address the children's mental/behavioral health needs in a timely manner in 77.08% of those cases. (The current *Olivia Y* Year 3 requirement is 70%. Statewide reports are not yet developed to measure this indicator.)

In addition to the MACWIS, FCR, and EMU information related to Mobilizing Appropriate Services Timely, additional information is presented below relating to this component. There are either no current *Olivia Y* requirements for the following indicators that are addressed in the CQI process or the requirements that do exist pertain to statewide and/or regional performance that cannot be measured through the EMU case reviews alone because the reviews do not include a statistically representative number of cases. However the following information from the on-site case reviews provides some insight into in these areas that will be useful in understanding the state's performance:

**Table 4**
**Placement Stability - Number of moves for all children regardless of time in custody**

There is currently no established *Olivia Y* requirement for this item (*Placement Stability – Number of Moves for all Children regardless of Time in Custody*). However, there are data to reflect how the state is performing with regard to the number of moves children are experiencing, as follows:

DHS
296690

| Data Indicators Associated with Mobilizing Appropriate Services Timely | Year 3 Standard/-Compliance Measure | State June 2010 | State                   June 2011 |
|---|---|---|---|
| Placement Stability - Number of moves for all children regardless of time in custody<br>Data Source: MWBRD07S & MWBRD07T | | 1-2 moves: 2,009 children 58%<br><br>3-5 Moves: 904 children 26.1%<br><br>6> moves: 549 children 15.9% | 1 - 2 moves: 1,959 children 55.9%<br><br>3 - 5 moves: 957 children 27.3%<br><br>6> moves: 590 children 16.8% |

**Table 5**
**FCR Regional Findings, Year in Total, for Mobilizing Services Timely**

| Indicator<br><br>January 2011-June 2011 | I-N<br><br>202 Total Cases Reviewed | I-S<br><br>195 Total Cases Reviewed | II-W<br><br>83 Total Cases Reviewed | IV-N<br><br>102 Total Cases Reviewed | V-W<br><br>97 Total Cases Reviewed |
|---|---|---|---|---|---|
| Children's case plans that do not include up to date medical/dental/mental health and other vital information | 181 cases w/ this Issue<br><br>89.60% | 124 cases w/this issue<br><br>63.59% | 31 cases w/this issue<br><br>37.35% | 48 cases w/this issue<br><br>47.06% | 27 cases w/this issue<br><br>27.84% |
| Children with identified medical/dental/mental health needs for which services do not appear to be provided | 7 cases w/this issue | 1 cases w/ this issue | 0 cases w/this issue | 2 cases w/this issue | 2 cases w/this issue |

18

| Indicator<br><br>January 2011-June 2011 | I-N<br><br>202 Total Cases Reviewed | I-S<br><br>195 Total Cases Reviewed | II-W<br><br>83 Total Cases Reviewed | IV-N<br><br>102 Total Cases Reviewed | V-W<br><br>97 Total Cases Reviewed |
|---|---|---|---|---|---|
| Children with a plan of Adoption but no TPR referral has been submitted or there are other barriers | 9 cases w/this issue | 7 cases w/this issue | 3 cases w/this issue | 3 cases w/this issue | 14 cases w/this issue |
| Age appropriate children with no documentation of being provided Independent Living/Transitional Living services | 17 cases w/this issue | 14 cases w/this issue | 1 cases w/this issue | 2 cases w/this issue | 8 cases w/this issue |
| Children with potential placement disruption issues | 8 cases w/this issue<br><br>3.96% | 7 cases w/this issue<br><br>3.59% | 4 cases w/this issue<br><br>4.82% | 0 cases w/this issue | 2 cases w/this issue<br><br>2.06% |
| Placement appropriateness issues | 5 cases w/this issue<br><br>2.48% | 2 cases w/this issue<br><br>1.03% | 1 cases w/this issue<br><br>1.02% | 0 cases w/this issue | 3 cases w/this issue<br><br>3.09% |
| Placement restrictiveness issues | 6 cases w/this issue<br><br>2.97% | 3 cases w/this issue<br><br>1.54% | 2 cases w/this issue<br><br>2.41% | 0 cases w/this issue | 6 cases w/this issue<br><br>6.19% |
| Issues surrounding children's personal, holiday, and special allowances | 92 cases w/this issue<br><br>45.54% | 16 cases w/this issue<br><br>18.21% | 0 cases w/this issue | 35 cases w/this issue<br><br>34.31% | 4 cases w/this issue<br><br>4.12% |

19

DHS
296692

In Table 5 above, as with the statewide FCR results, the primary issue of concern cited most frequently and reported to the counties of responsibility are children's ISPs that are missing up-to-date vital information such their placement, medical/dental/educational/mental health and other required components of the ISP. This can have an effect in assessing the effectiveness of services to children with regard to their safety, permanency, and well-being. Many of these issues can be tied to supervisory oversight and regular case staffing between the caseworker and the supervisor to take corrective action and developing/implementing a plan to alleviate these issues.

*Strengths in Mobilizing Appropriate Services Timely*

- The number of children in state's custody 12 months or less with 2 or fewer placement moves is a strength. Data indicators, on-site EMU case reviews and FCR data all show that Placement Stability is a strength statewide, as well as in the implementing regions, although 4 of the 5 regions showed decreased performance in this area over the reporting year

- The number of children discharged from custody and reunified with parents/caretakers in the last year and who were reunified within 12 months of latest removal from home is a strength. Data indicators show this is a strength statewide in that it exceeded the first regional benchmark of 60% on this measure (which regions will be accountable for after they complete Practice Model implementation). Additionally, two of the implementing regions have already exceeded the 60% goal in June 2010 and in June 2011 although these are not the time frames against which they will ultimately be measured for conformity with *Olivia Y.*

*Areas Needing Improvement in Mobilizing Appropriate Services Timely*

- Improvements are needed in providing age appropriate children with Independent Living services. With the exception of one region (a region that implemented the Practice Model late in the reporting period), the implementing regions' performance on this item (though in need of continued improvement) outweighed the overall state performance. As mentioned previously, this was due in part to changing the data report from which these data are drawn to show only those youth who received IL services during the year covered by the report. youth who had received IL services at any time during their foster care episode as in the 2010 data.

- As a whole, the State did not meet the first regional benchmark of 25% for children discharged in the last year upon finalization of an adoption having had the adoption finalized within 24 months of the latest removal from home.  This is an area needing improvement based on the data indicators from the June 30, 2011 period. However, 3 of the 5 implementing regions met or exceeded the first regional benchmark, although they are not yet at the point of being accountable for meeting that measure, based on their scheduled for implementing the practice model.

20

DHS
296693

- On-site case review data and FCR data seem to show a need for improvement in assessing children's physical and mental health needs and providing services in a timely manner to meet those identified needs.

- On-site case review data shows that 59.8% of the applicable cases subject to the on-site case reviews rated an Area Needing Improvement for Item 13 (Reunification, Guardianship, or Permanent Placement with Relatives based primarily on services not being provided to fathers). Of the 36 children with a goal of reunification, parental service plans identified those services DFCS deems necessary to address behaviors or conditions resulting in the child's placement in foster care in 77.78% of the cases reviewed. DFCS made those identified services available either through direct or referral service to the mother in 72.97% of the applicable cases and to the father in 30% of the applicable cases. A lack of engaging fathers in casework could have an effect on a number of items in the Practice Model and is an issue that needs to continuously be stressed to staff in the field.

## Assuring Safety and Managing Risk

Safety and risk-related interventions are designed to help children remain safely at home whenever possible and appropriate. Assuring child safety begins with the first report to MDHS that someone believes a child is being maltreated and continues through initiating investigations of maltreatment; initial safety and risk assessment; ongoing safety and risk assessment; developing a case plan; assuring safety during placement; reunification; and case closure. Safety and risk interventions are applicable for all children within a home, not only for a child for whom a report of maltreatment has been received.

The following practice principles are linked to this component:

- Safety and risk assessment practice guide casework activities with regard to safety, permanency, and well-being;

- Safety and risk assessments are used to address case plans and service delivery;

- Safety and risk assessment occurs throughout the life of a case;

- Family-centered practice principles apply to safety and risk interventions; and

- Safety and risk are addressed within the cultural background of the children and families being served.

### *Statewide Performance*

Data are presented below from MACWIS reports and the findings of the FCR and EMU reviews related to assuring safety and managing risk.

21

DHS
296694

There are 5 aggregate data indicators for this Practice Model component extracted from MACWIS and representing statewide performance. The currently available data indicators are being used to measure performance with regard to Assuring Safety and Managing Risk:

- All investigations into reports of maltreatment, including corporal punishment, of children in DFCS custody must be initiated within 24 hours of the report and completed within 30 calendar days, including supervisory approval / Data Source: MWZ1271R & MWZ127S - June 1, 2011 through June 30, 2011;

- Investigation timeliness for all children (timely initiated based from worker assignment) / Data Source: MWZ1272S & MWZ1272R - June 1, 2011 through June 30, 2011;

- Rate of Abuse / Neglect / Maltreatment in Care / Data Source: MWBRD06S - July 1, 2010 through June 30, 2011 *(NOTE: This number is duplicative as it counts the number of evidenced findings rather than the children that were maltreated in care.)*;

- Any foster child who remains in the same out of home placement following an investigation into a report that he/she was maltreated, or subject to corporal punishment, in that placement shall be visited by a DFCS caseworker twice a month for three months after the conclusion of the investigation / Data Source: MWLS55AS & MWLS55AD - June 1, 2011 through June 30, 2011;

- Foster parents with at least one foster child residing in their home shall have a DFCS worker visit the home twice a month (therapeutic FH) or monthly (non-therapeutic FH) / Data Source: MWZPLMCS & MWZPLMS2 - June 1, 2011 through June 30, 2011.

DHS
296695

**Chart 6**
**Statewide Percentage Meeting Assuring Safety and Managing Risk**



The chart above shows the statewide performance on the 5 aggregate data indicators for this component.  The applicable *Olivia Y* requirements for these indicators are as follows:

- Investigation timeliness for children in custody:  Presumed requirement is 100%

- Investigation timeliness for all children:  There are no *Olivia Y* requirements for this indicator

- Rate of abuse/neglect of children in foster care: Statewide less than 1.00% by the end of Implementation Year 3

- Caseworker visits with children remaining in the placement following a maltreatment report investigation: Presumed requirement is 100%

- Caseworker visits with foster parents (non-therapeutic and therapeutic): Statewide 40% by the end of Implementation Year 3 and 80% for regions beginning with the completion of Practice Model implementation.

DHS
296696

Statewide performance, based on MACWIS data, indicates that the state met the 40% requirement for caseworker visits with non-therapeutic foster parents as of June 2011.  The state has not yet met the other requirements noted in this chart.

In addition to the MACWIS data above, FCR data collected during the January 2011 through June 2011 review period shows that 3,363 foster care cases were reviewed statewide.  Table 6 below shows the data indicators for Assuring Safety and Managing Risk reported by the FCR Unit during the January 2011 through June 2011 reporting period; the total number of foster care cases reviewed; the total number cited for each indicator with issues of concern and reported to the appropriate county of responsibility and/or region and/or Director of Field Operations for corrective action; and the percentage cited/reported for each indicator.

**Table 6**
**Statewide Number and Percent of Foster Care Review Cases for Assuring Safety and Managing Risk**

| Indicator (January 2011 through June 2011) | Total Cited w/Issues | % |
|---|---|---|
| Issues due to a lack of efforts to locate missing children. | 17 | |
| Issues due to children out of state with no outgoing ICPC. | 14 | |
| Issues related to children placed out of state but there is no documentation of regular supervisory reports from the placement site. | 28 | |
| Issues related to children who are placed out of state: there is no ICPC case with the placement state and there is a lack of at least quarterly face to face contacts with the children by the Mississippi caseworker. | 34 | |
| Placement safety issues. | 344 | 10.23% |

Of the cases reviewed by the FCR Unit between January 2011 and June 2011, 10.23% (344) were cited and reported to the county of responsibility due to issues surrounding the safety of the child's placement.[2] A number of these were in response to the mandated determination of if the child's placement is conducive to their safety. This issue was cited a number of times due to a lack of face-to-face contact between the caseworker and the child in the placement setting.  The majority of these placement safety issues appear to have been cited in regions that have not yet implemented the Practice Model.

---

[2] FCR data were unavailable for reporting on the time period from June 2010 through December 2010.

DHS 296697

## *Implementing Regions' Performance*

The charts below depict the performance of the 5 regions implementing the Practice Model during the period covered by this CQI report.

Chart 7 below shows that in June 2011, 3 of the implementing regions (Regions I-South, II-West, and V-West) met the 100% Year 3 requirement for Investigation Timeliness for Children in Custody and improved their performance from June 2010.

**Chart 7**
**Investigation Timeliness for Children in Custody**



Chart 8 below shows that none of the implementing regions were at 100% for Investigation Timeliness for all Children, although there is no *Olivia Y* requirement for this indicator. However, Region 1-South and Region 2-West improved their performance in June 2011 from their performance in June 2010. Region 4-North and Region 5-West remained somewhat steady in their performance, and Region I-North showed a decline in performance.

25

DHS
296698

**Chart 8**
**Investigation Timeliness for All Children**



Chart 9 below shows that of the 5 implementing regions, only Region 1-South met the Year 3 Implementation Period requirement of less than 1.00%.  The other 4 implementing regions had an increase in their rate or remained steady in their performance.  It should be noted here that the population of children included in this indicator is very small and, therefore, one investigation can make a dramatic change in overall performance, percentage-wise.

**Chart 9**
**Rate of Abuse/Neglect/Maltreatment in Care**



DHS
296699

In Chart 10 below, the Year 3 requirement for this measure is 100%. Region 4-North met the requirement in June 2010 and in June 2011. Region 2-West met the requirement in June 2010 but its performance dropped to 60% in June 2011. The remaining implementing regions, as shown in the chart above, did not meet the 100% requirement in June 2010 or June 2011. Similar to the indicator above, these percentages represent very small numbers and the events in one case can make a large percentage of difference in reporting results.

**Chart 10**
**Caseworker visits with foster child who remains in same out of home placement following an investigation**



In Chart 11 below, the regional requirement for implementing regions, beginning when they complete their Practice Model implementation and going forward is 80%. For the time period covered by this report, none of the regions were yet subject to meeting this requirement. However, performance in implementing regions indicates that while none of the implementing regions met this requirement for the June 2010 or 2011 periods, Regions 5-West, 1-South, and II-West (the first regions to complete implementation of the Practice Model) are the closest to meeting the requirement in June 2011 at 72.2%, 70.3%, and 68.3% respectively. It should be noted that all but one of the implementing regions' performance is higher than the overall state performance of 43%.

DHS
296700

27

**Chart 11**
**Caseworker Visits with Foster Parents**



In Chart 12 below, the regional requirement for implementing regions, beginning when they complete Practice Model implementation and going forward is 80%. For the time period covered by this report, none of the regions were yet subject to meeting this requirement. However, performance in implementing regions indicates that Regions 5-West and I-South were close to meeting the requirement in June 2011 at 71.4% and 72.7% respectively.

**Chart 12**
**Caseworker Visits with Therapeutic Foster Parents**



The EMU reviews also address the Practice Model component, Assuring Safety and Managing Risk. Table 7 below shows the summary of Strengths and Areas Needing Improvement for this component that resulted from the on-site case reviews conducted from June 2010 through June 2011. It should be noted that, as reviewed by EMU, none of these 4 indicators address *Olivia Y* requirements. Each of the 4 indicators, however, addresses a federal CFSR requirement, and the federal requirement for

28

determining whether all of the items are rated as Strength or Area needing improvement is 85%[3].

- For Review Instrument Item 1, timeliness of initiating investigations of reports of child maltreatment, 82.8% of the applicable cases in the reporting period's sample population rated a Strength while 17.2% rated an Area Needing Improvement.  This item applies to all children who were the subject of a report of maltreatment, not only children in custody;

- For Review Instrument Item 2, repeat maltreatment, 88.7% of the applicable cases in the sample reviewed during the reporting period rated a Strength while 11.3% rated an Area Needing Improvement;

- For Review Instrument Item 3, services to family to protect child(ren) in the home and prevent removal or re-entry into foster care, 85.0% of the applicable cases in the sample rated a Strength while 15.0% rated an Area Needing Improvement;

- For Review Instrument Item 4, risk assessment and safety management, 71.4% of the applicable cases in the sample population rated Strength while 28.6% rated an area needing improvement.

**Table 7**
**Number and Percent of CQI Case Review Cases for Assuring Safety and Managing Risk\***

| ASSURING SAFETY AND MANAGING RISK | | | |
|---|---|---|---|
| | Item 1: Timeliness of initiating investigations of reports of child maltreatment | Item 2: Repeat Maltreatment | Item 3:  Services to Family to Protect Child(ren) in the Home and Prevent Removal or Re-Entry into Foster Care | Item 4: Risk Assessment and Safety Management |
| Total Strength | 72 | 47 | 113 | 145 |
| % | 82.8% | 88.7% | 85.0% | 71.4% |
| Total ANI | 15 | 6 | 20 | 58 |
| % | 17.2% | 11.3% | 15.0% | 28.6% |
| Total Applicable | 87 | 53 | 133 | 203 |

\*Please note that these numbers include both the baseline/follow-up reviews and the monthly case reviews (as applicable) for all implementing regions to date

---

[3] Although we are reporting whether or not the EMU results conform to applicable CSFR standards as an objective means of comparing the state's performance to some national standard, this is not an indication that the state is or is not achieving the goals associated with its Program Improvement Plan (PIP) that results from the CFSR. The federal government uses EMU review results, in part, to determine the state's conformity with the PIP but may not use the same time periods or the specific regional reviews reported in this CQI report. Also, for the PIP, the federal government may negotiate a percentage of improvement that a state must achieve within the PIP that is less than the CFSR standards for Strength ratings reported in this CQI report (85%).

DHS
296702

**Table 8**
**Foster Care Review Cases Cited in Implementing Regions for Items Affecting Assuring Safety and Managing Risk**

| Indicator<br><br>January 2011-June 2011 | I-N<br><br>202 Total Cases Reviewed | I-S<br><br>195 Total Cases Reviewed | II-W<br><br>83 Total Cases Reviewed | IV-N<br><br>102 Total Cases Reviewed | V-W<br><br>97 Total Cases Reviewed |
|---|---|---|---|---|---|
| Issues due to a lack of efforts to locate missing children. | 1 Case Cited | 1 Case Cited | 0 Cases Cited | 0 Cases Cited | 1 Case Cited |
| Issues due to children out of state with no outgoing ICPC. | 6 Cases Cited | 1 Case Cited | 0 Cases Cited | 0 Cases Cited | 1 Case Cited |
| Issues related to children placed out of state but there is no documentation of regular supervisory reports from the placement site. | 2 Cases Cited | 2 Cases Cited | 0 Cases Cited | 1 Case Cited | 3 Cases Cited |
| Issues related to children who are placed out of state: there is no ICPC case with the placement state and there is a lack of at least quarterly face to face contacts with the children by the Mississippi caseworker. | 3 Cases Cited | 2 Cases Cited | 0 Cases Cited | 1 Case Cited | 0 Cases Cited |
| Placement safety issues. | 4 Cases Cited<br><br>1.98% | 4 Cases Cited<br><br>2.05% | 15 Cases Cited<br><br>18.07% | 5 Cases Cited<br><br>4.90% | 4 Cases Cited<br><br>4.12% |

## *Strengths in Assuring Safety and Managing Risk*

- Review Instrument Item 2, repeat maltreatment, met the federal CFSR requirement of 85%, with 88.7% of the implementing regions' applicable cases in the sample reviewed during the reporting period rated a Strength;

DHS
296703

- Review Instrument Item 3, services to family to protect child(ren) in the home and prevent removal or re-entry into foster care, met the federal CFSR requirement of 85.0% , with 85% of the applicable cases from the implementing regions in the sample rated a Strength;

- Caseworker visits with non-therapeutic foster parents is a strength for the state as a whole, with statewide performance at 43% in June 2011, compared to the *Olivia Y* requirement of 40%.

### *Areas Needing Improvement in Assuring Safety and Managing Risk*

- Review Instrument Item 1, timeliness of initiating investigations of reports of child maltreatment, did not meet the federal CFSR standard of 85%, with 82.8% of the applicable cases reviewed in the implementing regions by EMU in the reporting period's sample population rated a Strength.  Further, the statewide performance on this indicator did not reach 85%;

- Review Instrument Item 4, risk assessment and safety management, did not meet the federal CFSR standard of 85%, with 71.4% of the applicable cases in the sample population from the implementing regions rated Strength;

- Regional performance on attaining the standard of 80% on caseworker visits with foster parents with at least one foster child residing in their home should be strengthened.

- With regard to the data indicators associated with Assuring Safety and Managing Risk, the State did not meet the following standards tied to those measures:

  o All investigations into reports of maltreatment, including corporal punishment, of children in DFCS custody must be initiated within 24 hours of the report and completed within 30 calendar days, including supervisory approval (*OY* Year 3 requirement is 100%);
  o 344 cases were cited by the FCR Program with possible child safety issues in their placements. The majority of these were cited due to a lack of face-to-face contact with children in their placement settings.
  o Investigation timeliness for all children (timely initiated based from worker assignment) (No *Olivia Y* requirement, but the federal CFSR standard for a strength rating is 85%);
  o Rate of Abuse / Neglect / Maltreatment in Care (*OY* Year 3 requirement is <0.57%);
  o Any foster child who remains in the same out of home placement following an investigation into a report that he/she was maltreated, or subject to corporal punishment, in that placement shall be visited by a DFCS caseworker twice a month for three months after the conclusion of the investigation  (*OY* Year 3 requirement is 100%);

31

   o  Therapeutic foster parents with at least one foster child residing in their home shall have a DFCS worker visit the home twice a month (*OY* Year 3 requirement is 40%). The state's performance in June 2011 it was 20.1%.

## Involving Children and Families in Case Planning

This component includes: (1) active involvement of age-appropriate children, families, and youth in identifying their unique strengths, needs, and service requests, and in developing plans that address their needs, establish and attain their goals, and support safe and appropriate relationships within families while children are in foster care; (2) all relevant family members, whether in the household or not, in preparing them for and supporting their participation in meetings, reviews, and other processes that affect them; and (3) using information from safety and risk assessments and comprehensive strengths and needs assessments to determine negotiable and non-negotiable aspects of case planning, casework activity, and levels of family involvement.

The following practice principles are linked to this component:

- Parents, age-appropriate children, and youth are actively involved in developing or modifying all plans that pertain to them;

- Parents who do not reside in the home of the children are involved in developing and modifying plans that pertain to their children whenever it is safe and appropriate to do so;

- When safe and appropriate, parents are involved in the care of their children in foster care and in their children's activities; and

- Safety of children is not compromised through involving children and parents in case planning and decision making.

### *Statewide Performance*

The state uses 2 aggregate data indicators from MACWIS to evaluate this Practice Model component. The data represent statewide performance. The currently available data indicators that are being used to measure performance with regard to Involving Children and Families in Case Planning:

- Children in custody shall receive documented twice-monthly, in-person visits by the assigned DFCS caseworker / Data Source: MWZWC5S2 - June 1, 2011 thru June 30, 2011;

- Children with a goal of reunification shall have their assigned DFCS caseworker meet monthly with the child's biological parents / Data Source: MWZWCR3S - June 1, 2011 thru June 30, 2011.

DHS
296705

Chart 13 below shows the state's performance on caseworker visits with children in custody and caseworker visits with parents of children in custody with a permanency goal of reunification. These reports are the only statewide indicators on this topic and measure onlyfrequency, not content of discussion during visits.

- Caseworker Face-to-Face Visits with Child:

    o This data indicator measures children in custody who have received documented twice-monthly, in-person visits by the assigned DFCS caseworker for the June 1, 2010 through June 30, 2011;

    o The statewide *Olivia Y* Year 3 requirement for this indicator is at least 60% of the children in foster care will receive the required twice monthly visits for each of the 12 months in the implementation period. Implementing regions must begin to achieve this indicator at 70% after they have completed Practice Model implementation. Currently, the statewide data report measures visits for one month and not for the entire 12-month period, so we cannot say definitively the state is meeting this requirement. The latest monthly report for the period covered by this review, reflecting visits in June 2011, showed the state's performance at 58.1%.

- Caseworker Face-to-Face Visits with Parents

    o This indicator measures children with a goal of reunification who have had their assigned DFCS caseworker meet monthly with the child's biological parents during the June 1, 2010 through June 30, 2011 period.

    o The *Olivia Y* Year 3 requirement for this data indicator is that at least 40% of the children's parents will be visited monthly for each month of the implementation period (a 12-month period of time). Implementing regions must begin to achieve this indicator at 80% after they have completed Practice Model implementation. Currently, the statewide data report measures visits for one month and not for the entire 12-month period, so we cannot say definitively whether the state is meeting this requirement. The latest monthly report for the period covered by this review, reflecting visits in June 2011, showed 22.33%;

DHS
296706

**Chart 13**

**Statewide Percentage Caseworker Visits with Children in Custody and Parents of Children in Custody with a goal of Reunification**



In addition to the aggregate MACWIS data on this component of the Practice Model, Table 9 below shows the FCR Unit data gathered on caseworker/child face-to-face contact issues cited and reported to the county of responsibility during the January 2011 through December 2011 review cycle:

**Table 9**

**FCR Statewide Findings, Year-to-Date, Involving Children and Families in Case Planning**

| Indicator (January 2011 through June 2011) | Total Cited w/Issues | % |
|---|---|---|
| Issues due to a lack of caseworker/child contacts. | 316 | 9.40% |
| Issues due to a lack of quality contacts between caseworker/child. | 79 | 2.35% |
| Issues due to a lack of caseworker/child contacts in placement setting. | 592 | 17.60% |
| Issues related to county conference notification. | 1255 | 37.32% |
| Children participation in case planning activities. | 108 | |
| Parent/Primary Caretaker participation in case planning issues. | 738 | 21.94% |
| Parent/Primary Caretaker/Caseworker contact issues. | 1397 | 41.54% |
| Quality of parent/caretaker/caseworker contact issues. | 673 | 20.01% |
| Issues due to lack of efforts to locate absent parents. | 483 | |
| Cases Reviewed January 2011 through June 2011 | 3363 | |

Frequent, quality caseworker contacts with foster children and parents can have a profound effect on the case planning and decision making process as well as on a number of other Practice Model components. Early, quality engagement of children and parents is crucial in establishing as well as assuring the safety and well-being of children in foster care. Continued, frequent visitation between

34

caseworkers, children in care, and parents is vital to assure case plan goals are being achieved, timely service delivery is in place to meet identified needs, children are safe in their placements, and assessment of permanency goals. Below is a synopsis of the issues noted by the FCR Unit with regard to Involving Children and Families in Case planning and Decision Making:

- There were 316 of the 3,363 cases cited by the FCR Unit between January 2011 and June 2011 due to issues related to caseworker contacts with foster children. These issues were reported to the county of responsibility to address with corrective action. 2.35% of the cases reviewed were cited due to issues surrounding the quality of the visits between caseworkers and foster children. 17.60% of the cases reviewed were cited and reported to the county of responsibility for corrective action due to issues surrounding caseworker/foster child visits in the child's placement setting.

- 37.32% of the 3,363 cases reviewed between January 2011 and June 2011 by the FCR Unit were cited and reported to the county of responsibility due to County Conference notification issues.

- 108 foster care cases reviewed by the FCR Unit between January 2011 and June 2011 were cited due to issues related to age appropriate children not participating in case planning activities.

- 21.94% of the cases reviewed by the FCR Unit were cited with issues due to parental/primary caretaker participation in the case planning process.

- 41.54% of the cases reviewed by the FCR Unit were cited with issues surrounding caseworker contacts with parents/primary caretakers. 20.01% were cited due to issues surrounding the quality of the parent/primary caretaker contacts with the caseworker.

- 483 of the cases reviewed were cited and reported to the county of responsibility due to issues related to efforts to locate absent parents.

### *Implementing Regions' Performance*

The charts below depict the performance of the 5 regions implementing the Practice Model during the period covered by this CQI report.

Chart 14 below depicts the performance of the implementing regions on monthly caseworker visits with children. When these regions complete the Practice Model implementation, they must begin to meet the *Olivia* Y requirement of 70%. Three of the implementing regions (1-South, 2-West, and 5-West) met this requirement in June 2010 and June 2011. However, as noted earlier, this performance is currently being reported monthly and the *Olivia* Y requirement is for an entire 12-month period. Region 4-North met the requirement in June 2010 but missed meeting the requirement in June 2011 by a few

DHS
296708

percentage points. As stated previously, the report from which this data is aggregated only show the frequency of these visits and does not measure if the visits addressed items pertaining to permanency, safety, well-being, needs, and goal attainment.

**Chart 14**
**Caseworker Face to Face Visits with Child**



Chart 15 below depicts the performance of the implementing regions with regard to caseworker visits with parents of children with a goal of reunification. When these regions complete the Practice Model implementation, they must begin to meet the *Olivia* Y requirement of 80%. Three of the implementing regions (1-South, 2-West, and 5-West) met this requirement in June 2010 and June 2011. However, as noted earlier, this performance is currently being reported monthly and the *Olivia* Y requirement is for an entire 12-month period. None of the implementing regions met the requirement in June 2010 or in June 2011. As stated previously, the report from which this data is aggregated only show the frequency of these visits and does not measure if the visits addressed items pertaining to permanency, safety, and well-being of the child and promote goal achievement.

DHS
296709

**Chart 15**
**Caseworker Face to Face Visits with Parents**



The EMU reviews also address the indicators regarding involving children and families in case planning and decision making. Table 10 shows regional performance on the 3 items covered in the EMU reviews for this component.

**Table 10**
**Number and Percent of CQI Case Review Cases for Involving Children and Families***

| INVOLVING CHILDREN AND FAMILIES IN CASE PLANNING AND DECISION MAKING | | | |
|---|---|---|---|
| Case Review item | Item 7:<br>Child and Family Involvement<br>in Case Planning | Item 8:<br>Caseworker Visits<br>with Child | Item 9:<br>Caseworker Visits<br>with Parents |
| Total Strength | 35 | 123 | 38 |
| % | 17.7% | 60.9% | 20.1% |
| Total ANI | 163 | 79 | 151 |
| % | 82.3% | 39.1% | 79.9% |
| Total Applicable | 198 | 202 | 189 |

*Please note that these numbers include both the baseline/follow-up reviews and the monthly case reviews (as applicable) for all implementing regions to date

- For Review Instrument Item 7, child and family involvement in case planning, there is not a specific *Olivia Y* requirement as EMU measures it, although requirements related to involvement are included throughout the Modified Settlement Agreement. Also, EMU reviews this item for both foster care ██████████ cases, and the Modified Settlement Agreement applies only to

DHS
296710

foster care cases. The federal CFSR standard for this indicator is 85% for ███████ foster care cases.

o  Child and family involvement in case planning was rated Strength in 21.4% of the foster care cases reviewed ██████████████████████ reviewed during the June 2010 through June 2011 on-site case reviews in the implementing regions. Since this item applies to foster care ██████████████ cases, the overall, combined rating for item is 17.7%. It appears this item rated overall as an Area Needing Improvement due to a lack of involvement by and with fathers in the case planning process.

o  The Agency made concerted efforts to actively involve the *child* in the case planning process in 67.39% of the applicable foster care cases ███████████████████████

o  The Agency made concerted efforts to actively involve the *mother* in the case planning process in 65.00% of the applicable foster care cases ███████████████████████ ████

o  The Agency made concerted efforts to actively involve the *father* in the case planning process in 30.19% of the applicable foster care cases ███████████████████████ ████

o  There was evidence in 60.00% of foster care cases ████████████████ that the family was informed and prepared to actively participate in case events, including family team meetings, case plan development, and court events.

o  There was evidence in 55.88% of the foster care cases ██████████████████ that children and parents were involved in choosing the services included on their case plans.

o  51.61% of foster care cases ████████████████ reviewed contained case plans with signatures by the parents while 43.18% of foster care cases █████████████ ████████████████████████ contained case plans with the signature of children ages 6 and up.

o  60.32% of the families subject to the case review sample in the implementing regions were in attendance at the County Conferences (Periodic Administrative Review) during the period under review.

•  For Review Instrument Item 8, caseworker visits with child, the *Olivia Y* statewide  Year 3 requirement is 60% and the requirement for implementing regions is that they must begin to

DHS
296711

achieve 70% when they complete Practice Model implementation. Information on this indicator is as follows:



████This item measures caseworker visits with the child (foster care ████████████████). 60.9% of the cases reviewed was rated Strength for this item. The implementing regions' foster care performance on this item was rated Strength in 73.7% of the cases████ ████████████████████████████████████████ ████████████████████████

o   89.86% of the foster care cases in the review sample ████████████████████ ████ had visits with their assigned caseworker that were of a frequency sufficient to address issues pertaining to safety, permanency, and well-being and promote achievement of case plan goals.

o   81.43% of the foster children in the review sample had visits occurring with their assigned caseworker at least twice a month with one visit occurring in the home ████████████ ████████████████████████████████████.

o   74.29% of the caseworker/child contacts in the foster care cases ████████████ ████████████████████████ were found to be of a quality sufficient to address safety, permanency, and well-being of the child and promote achievement of the case plan goals.

• For Review Instrument Item 9, caseworker visits with parents, the *Olivia Y* statewide requirement for Year 3 is 40%, and the requirement for implementing regions is that they must begin to achieve 80% when they complete Practice Model implementation. Information on this indicator is as follows:

████Item 9 of the on-site case review evaluates caseworker visits with parents. 26.5% of the applicable foster care cases rated as a Strength ████████████████████████████ ████████████████████████████████████████████ ████████████████████████

o   During the on-site case reviews in the implementing regions, 45.76% of the applicable foster care cases ████████████████████ had contacts between the caseworker and the *mother* that were of a frequency sufficient enough to address issues pertaining to safety, permanency, and well-being of the child and promote achievement of case goals. 43.10% of the foster care cases ████████████████████ contained documentation of visits that were of a sufficient quality to address issues of safety, permanency, and well-being and promote achievement of case goals;

39

DHS
296712

o  22.00% of the applicable foster care cases ███████████████ reviewed in the implementing regions had contacts between the caseworker and the *father* that were of a frequency sufficient enough to address issues pertaining to safety, permanency, and well-being of the child and promote achievement of case goals. 24.49% of the applicable foster care cases reviewed ████████████████ reviewed in the implementing regions had documentation of caseworker visits with the father that were of a sufficient quality to address issues of safety, permanency, and well-being and promote achievement of case goals;

o  During the on-site case reviews in the implementing regions, of the applicable foster care case where regular caseworker/mother visitation was not occurring due to the mother not being involved or found, diligent efforts were made in 22.2% of the cases to locate her by the agency. Diligent efforts were made in 23.3% of the applicable cases reviewed in the implementing regions where the fathers were not involved or found. ███████████████ ████████████████████████████████████████████

The FCR regional review findings with regard to this component of the Practice Model are identified below:

**Table 11**
**FCR Regional Findings, Year to Date, Involving Children and Families in Case Planning**

| Indicator | Statewide | I-N | I-S | II-W | IV-N | V-W |
|---|---|---|---|---|---|---|
| Issues due to a lack of caseworker/child contacts. | 9.40% | 13.86% | 4.10% | 2.41% | 5.88% | 5.15% |
| Issues due to a lack of quality contacts between caseworker/child. | 2.35% | 1.98% | 1.54% | 1.20% | 5.88% | 3.09% |
| Issues due to a lack of caseworker/child contacts in placement setting. | 17.60% | 33.17% | 13.85% | 2.41% | 8.82% | 3.09% |
| Issues related to county conference notification. | 37.32% | 45.05% | 43.59% | 18.07% | 23.53% | 3.09% |
| Children participation in case planning activities. | 108 cases cited | 18 cases cited | 8 cases cited | 0 cases cited | 5 cases cited | 0 cases cited |
| Parent/Primary Caretaker participation in case planning issues. | 21.94% | 27.23% | 31.79% | 10.84% | 32.35% | 8.25% |
| Parent/Primary Caretaker/Caseworker contact issues. | 41.54% | 51.49% | 50.26% | 24.10% | 62.75% | 40.21% |

DHS
296713

| Indicator | Statewide | I-N | I-S | II-W | IV-N | V-W |
|-----------|-----------|-----|-----|------|------|-----|
| Quality of parent/caretaker/caseworker contact issues. | 20.01% | 26.73% | 21.03% | 10.84% | 31.37% | 5.15% |
| Issues due to lack of efforts to locate absent parents. | 483 cases cited | 36 cases cited | 23 cases cited | 3 cases cited | 21 cases cited | 11 cases cited |
| Total Cases Reviewed January 2011-June 2011 | 3363 | 202 | 195 | 83 | 102 | 90 |

## *Strengths in Involving Children and Families in Decision Making*

- Caseworker visits with children in the implementing regions is a Strength with 3 regions performing (on a monthly basis) at *Olivia Y* requirement levels. The state is also close to achieving the statewide requirement. There were also higher EMU ratings for quality of visits in implementing regions that have had the Practice Model in place for the majority of the reporting period.[4]

## *Areas Needing Improvement in Involving Children and Families in Decision Making*

- Caseworker contacts with parents is an Area Needing Improvement based on the data reports as well as the on-site case review data from Evaluation and Monitoring as well as Foster Care Review. EMU case review data indicates that a lack of contacts by caseworkers with fathers resulted in this item rating Needs Improvement in the implementing regions. However, caseworker contacts with mothers also need improvement. Strategies to improve the rate of monthly meetings between the caseworker and the parents of children with a permanent plan of reunification should be a topic of focus for continued improvement efforts. This will assure better engagement of parents in the case planning process, the assessment process, and result in more timely permanency for children.

- Although there are no current MACWIS data indicators available to measure this item on a larger scale, Child and Family Involvement in Case Planning rates as an Area Needing Improvement in the implementing regions where EMU on-site case reviews have been held. Over 20% of the cases reviewed by FCR between January 2011 and June 2011 show that parental involvement in the case planning process is an area where focus is needed for improvement efforts. Efforts to improve the involvement of parents (especially fathers) and children in the case planning and decision making process will also result in more timely

---

[4] Note that the federal CFSR standard for this indicator is 85% for a strength rating, and the state's performance relative to federal standards is not a strength.

41

permanency for children in the region who are in care ████████████████████
█████████████████

# Individualized Case Planning

An individualized case plan will start with information gathered from the comprehensive family assessment and should continue to be informed by the assessment throughout the life of the case. The development of the case plan, the review of the case plan and the overall planning process must involve all relevant family members, including parents who may not reside in the home, and age-appropriate children and youth. Individualized case plans must be developed *with* the family not *for* the family; occur early in the casework process; address the underlying issues that contribute to the presenting needs; include the safety plan; be written clearly in simple, straightforward language; demonstrate the family's culture and level of functioning; be flexible enough to change as the family's needs and progress toward achieving the identified goals change; include independent living goals and specific plans and tasks for age appropriate youth; and be reviewed and updated regularly with the family.

The following practice principles are linked to this component:

- Timely decisions about goals and activities are made in collaboration with children, youth, and parents;

- The case plan is a guide for the Agency's and service providers' work with children and families, and not simply a requirement to be met;

- The family's progress is monitored regularly in order to make timely decisions with regard to changing or continuing goals and services, or to take other actions to assure the safety, permanency and well-being of children; and

- Information from all available sources should be used to ensure that a placement is the most appropriate for the child in order to assure timely permanency.

## *Statewide Performance*

We are using two statewide aggregate data indicators currently to assess this Practice Model component, foster care re-entries (not addressed in the *Olivia Y* Settlement Agreement but is addressed in the federal CFSR), and children in foster care for 15 of the most recent 22 months who have had a petition filed for termination of parental rights or an exception noted in the case record (addressed in both *Olivia* Y and the CFSR).

- Foster care re-entries:  the July 2, 2010 through June 30, 2011 report of children who have re-entered foster care within one year of reunification shows that 107 children re-entered foster

DHS
296715

care during the reporting period which is 5.81% of the 1,842 applicable children. Although there is not an *Olivia Y* requirement for this indicator, nor a specific federal CFSR standard, there is a national performance median associated with the CFSR that is reported to the states. That median is 15%,[5] and a lower score is preferable, indicating fewer children re-entering foster care. Based on statewide data, the Agency is performing well with regard to foster care re-entries.[6]

- Children with TPR petitions filed or exceptions noted: MWZ014S1/2 shows children in state's custody 15 of the most recent 22 months with a petition for TPR filed or who have an exception noted. The June 30, 2011 statewide data shows that of the 1,669 children in custody for 15 of the most recent 22 months, 1,033 had a petition for TPR filed or (if not) they had an exception noted in their case record. The *Olivia Y* requirement for this indicator is a regional requirement, rather than a statewide requirement at present. Implementing regions must begin to achieve 80% on this indicator at the point when they complete Practice Model implementation, and when all regions are fully implemented the state must achieve 80%. The Agency's performance on this indicator for the time period covered by this CQI report was 63.52%.

Table 12 below provides FCR review data on this component of the Practice Model.

**Table 12**
**FCR Statewide Findings, Year to Date, Individualized Case Planning**

| Indicator (January 2011 through June 2011) | Total Cases Cited w/Issues | % |
|---|---|---|
| Agency compliance with the child's individual service plan. | 2768 | 82.31% |
| 15/22 month issues. | 299 | |
| Living Independently/LTFC with no efforts to try other plans first. | 5 | |
| Issues due to appropriateness of permanent plan. | 234 | 6.96% |
| Parent/Primary Caretaker ISP content/timeliness issues. | 1338 | 39.79% |
| Agency compliance with the parental ISP. | 1606 | 47.75% |
| Continuing need for child(ren) to remain in custody? | 90 | 2.68% |
| **Cases Reviewed** | **3363** | |

In order to promote the permanency and well-being of the child in care, it is essential that the child have a case plan tailored to meet his/her needs for permanency and address the individual, identified needs and the services provided to meet those needs. It is also essential that parents and/or primary caretakers have individualized case plans that meet their need for services to address the behaviors and conditions that led to their children being placed in state's custody. The

---

[5] Mississippi Child and Family Services Data Profile: March 15, 2012
[6] Note that the federal standard is based on petitions filed or exceptions noted at 17 of 22 months, and the state report is being changed subsequent to the end date of this report to reflect conformity with the federal measure.

DHS
296716

case plans for children and their parents (if applicable) should be reviewed frequently and updated as case circumstances change to allow for the timely permanency of children in care.

- 82.31% of the cases cited by the FCR Unit during the January 2011 through June 2011 reporting period were cited due to issues surrounding Agency compliance with the child's individual service plan. This was cited primarily due to timeliness issues or due to vital information related to the child's placement, educational status, or physical/mental health information not being current or missing;

- 39.79% of the cases were cited statewide by the FCR Unit due to issues related to the content of the parental/primary caretaker case plans or timeliness issues. This also resulted in 47.75% of the adult case plans not being in compliance;

- F C R data between January 2011 and June 2011 show that 234 (6.96%) of the 3,363 foster care cases reviewed during that period of time were cited due to concerns about the appropriateness of the child's permanency plan; and

- 299 of the cases reviewed from January 2011 through June 2011 by the FCR Unit were cited and reported to the county of responsibility due to issues surrounding the 15 of 22 month issue. Either they were not referred for TPR in a timely manner, not referred for TPR at all, or had no compelling reasons documented in the case file for not pursuing TPR.


*Implementing Regions' Performance*

The charts below depict the performance of the implementing regions on individualizing case plans for children and families during the period of time covered by this CQI report.

Table 13 below provides data from the July 1, 2010 through June 30, 2011 reporting period of children who have re-entered foster care within one year of reunification (MWLS311S). The implementing regions' data for the reporting period shows foster care re-entries were most prevalent in Regions 2-West and 4-North. Region 2-West had 53 applicable children during the reporting period, 5 (9.43%) who re-entered foster care within 12 months of a previous discharge from foster care to reunification. Region 4-North had 127 applicable children for the reporting period, including 13 (10.24%) who re-entered foster care within 12 months of a previous discharge from foster care to reunification.

DHS 296717

**Table 13**
**Children who have re-entered foster care within 1 year of Reunification**

| Region | Children in Care during Report Period | Children re-entering care within 12 months | % |
|--------|--------------------------------------|--------------------------------------------|------|
| 1-North | 167 | 4 | 2.40% |
| 1-South | 128 | 5 | 3.91% |
| 2-West | 53 | 5 | 9.43% |
| 4-North | 127 | 13 | 10.24% |
| 5-West | 96 | 2 | 2.08% |
| State | 1,842 | 107 | 5.81% |

Chart 16 below shows the implementing regions' performance as of June 30, 2011 with regard for TPR petitions filed on behalf of children in state's custody 15 of the most recent 22 months or those who have an exception noted in their case. (The current *Olivia Y* Year 3 requirement for implementing regions is 80% for filing for TPR or documenting an exception at 15 of 22 months.) Region 5-West met the Year 3 requirement at 82.43% for the reporting period while Regions 1-North and 1-South were within 10 percentage points of meeting the requirement.

**Chart 16**
**TPR Petitions Filed or Exceptions Noted**



The EMU reviews also address three items related to individualized case planning. Table 14 below depicts the implementing regions' performance on those three indicators.

DHS
296718

**Table 14**
**Number and Percent of CQI Case Review Cases for Individualized Case Planning\***

| INDIVIDUALIZING CASE PLANNING | | | |
|---|---|---|---|
| Case Review Item | Item 10: Permanency Goal for Child ▇ | Item 11: Case Planning | Item 12: Foster Care Re-Entries ▇ |
| Total Strength | 54 | 55 | 48 |
| % | 47.0% | 28.4% | 100.0% |
| Total ANI | 61 | 139 | 0 |
| % | 53.0% | 71.6% | 0.0% |
| Total Applicable | 115 | 194 | 48 |

\*Please note that these numbers include both the baseline/follow-up reviews and the monthly case reviews (as applicable) for all implementing regions to date

- For Review Instrument Item 10, permanency goal for the child, 47% of the foster cases reviewed by EMU in the implementing regions during the June 2010 through June 2011 reporting period were rated as a Strength.

  o The permanency goal(s) for the child were specified in the case file in 100% of the foster care cases reviewed. The permanency plan was developed within the child's first 30 days in care in 83.33% of the cases where the child entered care during the period under review. Permanency goals that were in effect during the period under review were established in a timely manner for children in 74.29% of the applicable cases reviewed. (The current *Olivia Y* Year 3 requirement for implementing regions is 90% for establishing the permanency plan within 30 days. Statewide reports are not yet developed to measure this indicator.)

  o The permanency goals were appropriate to the child's needs for permanency and to the circumstances of the cases in 91.3% of the foster cases reviewed in the implementing regions during the June 2010 through June 2011 reporting period.

  o 39 (56.52%) of the subject children had been in care for 15 of the most recent 22 months. 11 (30.56%) of those children had their cases referred for termination of parental rights (TPR) in a timely manner. Of those whose case was not referred for TPR, there was an "exception" or compelling reasons for not filing for TPR documented in the

46

child's case file in 21 of the applicable cases. Of the 29 children who were not in state's custody for 15 of the most recent 22 months, 2 met Adoption and Safe Families Act (ASFA) criteria for TPR. (The current *Olivia Y* Year 3 requirement for implementing regions is 80% for filing for TPR or documenting an exception at 15 of 22 months.)

- o 85.71% of the cases reviewed with a goal of reunification contain documentation that reflects active concurrent permanency planning.

- o Of the 18 foster children in the case reviews discharged from care during the period under review, 12 (66.7%) had an aftercare plan developed prior to discharge.

- For Review Instrument Item 11, case planning, the on-site EMU case reviews showed that 32.7% of the foster care cases reviewed rated as a Strength ███████████████████ rated as a Strength, for a combined Strength percentage of 28.4%.

  - o Results from the on-site case reviews in the implementing regions during the June 2010 through June 2011 reporting period show that a Family Team Meeting was used in the initial development of the case plan (if the initial plan was developed during the period under review) and/or was used to update case plans quarterly in 44.26% of the foster care cases reviewed ███████████████████. (The current *Olivia Y* Year 3 requirement for implementing regions is 80%. Statewide reports are not yet developed to measure this indicator.)

  - o The case reviews show that there were Family Team Meetings within 30 calendar days of any placement or other significant change in 43.33% of foster care cases ████ ████████.

  - o There was documentation of discussions of concurrent planning with birth parents in 33% of the applicable foster care cases reviewed.

  - o For Review Instrument Item 12, foster care re-entries, the EMU reviews showed that 100% of the 48 applicable foster care cases during the reporting period rated as a Strength. This item measures whether any of the child's foster care entries during the period under review occurred within 12 months of the child's discharge from a previous foster care episode and, if so, were there concerted efforts made to prevent re-entry.

The FCR data relevant for this component of the Practice Model are as follows:

Table 15 below shows that the largest number of issues reported in the implementing regions were those regarding case plan compliance, content, and timeliness issues.  Issues reported with regard to children in custody 15 of the most recent 22 months appears to be predominant in Region 1-North.

**Table 15**
**FCR Regional Findings, Year to Date, Individualized Case Planning**

| Indicator | Statewide | I-N | I-S | II-W | IV-N | V-W |
|---|---|---|---|---|---|---|
| Agency compliance with the child's individual service plan. | 82.31% | 98.02% | 88.21% | 66.27% | 89.22% | 55.67% |
| 15/22 month issues. | 299 cases cited | 45 cases cited | 9 cases cited | 7 cases cited | 5 cases cited | 4 cases cited |
| Living Independently/LTFC with no efforts to try other plans first. | 5 cases cited | 0 cases cited | 0 cases cited | 0 cases cited | 0 cases cited | 0 cases cited |
| Issues due to appropriateness of permanent plan. | 6.96% | 14.85% | 2.56% | 7.23% | 2.94% | 7.22% |
| Parent/Primary Caretaker ISP content/timeliness issues. | 39.79% | 52.48% | 51.79% | 16.87% | 59.80% | 38.14% |
| Agency compliance with the parental ISP. | 47.75% | 69.31% | 66.15% | 34.94% | 61.76% | 40.21% |
| Continuing need for child(ren) to remain in custody? | 2.68% | 0.00% | 0.51% | 0.00% | 0.00% | 5.15% |
| Total Cases Reviewed | 3363 | 202 | 195 | 83 | 102 | 97 |

*Strengths in Individualized Case Planning*

- Foster care re-entries is a Strength.  The July 1, 2010 through June 30, 2011 report of children who have re-entered foster care within one year of reunification shows that 107 children re-entered foster care during the reporting period which is 5.81% of the 1,842 applicable children, compared to a national CFSR median of 15%. 100% of the cases reviewed in the on-site reviews in the implementing regions rated Strength for foster care re-entries. Of the children in the reviews that re-entered foster care during the period under review within 12 months of a discharge from a prior foster care episode, all had evidence that concerted efforts were made to prevent the re-entry.

DHS
296721

*Areas Needing Improvement in Individualized Case Planning*

- Timely filing of petitions to terminate parental rights or documented an approved exception is an Area Needing Improvement as the statewide data indicates the Agency has yet to achieve the *Olivia Y* requirement.

- Case planning is an Area Needing Improvement. On-site case review data from the implementing regions reflects that there is a need for improvement in utilizing family team meetings to their fullest potential as a planned event with all appropriate case members in attendance in order to develop and update parental and child case plans. 28.4% of the applicable foster care ███████████ reviewed in the implementing regions rated Strength for case planning.

- Establishing a timely permanency goal for children in foster care is a Strength. 47% of the applicable cases reviewed in the implementing regions were rated as a Strength for permanency goal for child. On-site case review data shows that timeliness of submitting TPR referrals on behalf of children in custody 15 of 22 months for whom there are no compelling reasons for not doing so contributed to this item rating an Area Needing Improvement.

## Assessing Strengths and Needs

Comprehensive Family Assessment (CFA) is the ongoing and continuous process of gathering, organizing, and analyzing information for the purpose of informed decision-making and service planning concerning the safety, permanency, and well-being of children, youth, and families. Beyond an assessment of risks, safety and the circumstances leading to Agency involvement, the CFA includes a broader focus of the strengths and needs of all individual family members along with underlying conditions affecting the family. Collaboration with key professionals throughout the process is critical.

The following practice principles are linked to this component:

- All families have unique strengths and needs;

- Families are participants in identifying their strengths and needs and in requesting services;

- Assessment includes strengths and needs regarding safety, permanency, and well-being;

- Assessment addresses underlying conditions in addition to presenting issues;

- All relevant family members' strengths and needs should be assessed;

- Assessment information is used to guide case planning and decision making;

DHS
296722

- Families are best understood in the context of their culture;

- Early identification of concerns that can lead to emotional and behavioral disturbance are prioritized in assessments; and

- Assessments should be multidisciplinary.

## Statewide Performance

During the period covered by this CQI report, there were no MACWIS data indicators available for this component of the Practice Model. Information from the FCR reviews is the only information that can be used to assess the performance in the area of assessing strengths and needs for the period covered by this CQI report.

Table 16 below provides the FCR review data related to this component.

**Table 16**
**FCR Statewide Findings, Year to Date, Assessing Strength and Needs**

| Indicator (January 2011 through June 2011) | Total Cited w/Issues | % |
|---|---|---|
| Parent/Primary Caretaker identified needs issues. | 249 | 7.40% |
| Resource Parent identified needs issues. | 30 | 0.89% |
| Parent/ Primary Caretaker progress. | 973 | 28.93% |
| Total Cases Reviewed | 3363 | |

Assessment of needs and the provision of appropriate services to meet those identified needs are important in assuring the safety, permanency, and well-being of children in foster care. Timely assessments (initial and on-going) can identify needed services for children in care as well as for their parents who are making efforts to reunify with them. The lack of these assessments and the provision of needed services to meet identified needs can have an effect on parental progress to alleviate or mitigate the causes necessitating placement of their children in foster care. During the January 2011 through June 2011 case review cycle, the FCR Unit reviewed 3,363 foster care cases statewide. Below is a synopsis of the issues noted and reported to the appropriate county of responsibility with regard to Assessing Strength and Needs:

- o During the January 2011 through June 2011 review cycle, the FCR Unit cited and reported to the county of responsibility 249 cases due to issues related to service provision to meet the identified needs of the parents/caretakers.

DHS
296723

- o 30 cases were cited and reported to the county of responsibility due to issues related to service provision to meet the identified needs of the resource parents.

- o In 973 cases (28.93%), it was determined that parental progress had not been sufficiently made in order to achieve the permanent plan for children.

## *Implementing Regions' Performance*

The following tables present information on the implementing regions' performance with regard to Assessing Strengths and Needs. Table 17 below identifies the 2 items included in the EMU reviews that address this component of the Practice Model.

**Table 17**
**Number and Percent of EMU Case Review Cases for Assessing Strengths and Needs***

| ASSESSING STRENGTHS AND NEEDS | | |
|---|---|---|
| Case Review Item | Item 5:<br>Needs/Services of Child/Parents/Foster Parents | Item 6:<br>Child's Educational Needs |
| Total Strength | 38 | 104 |
| % | 18.7% | 73.8% |
| Total ANI | 165 | 37 |
| % | 81.3% | 26.2% |
| Total Applicable | 203 | 141 |

*Please note that these numbers include both the baseline/follow-up reviews and the monthly case reviews (as applicable) for all implementing regions to date

- • For Review Instrument Item 5, needs and services of the child, parents, and foster parents, there is not a combination *Olivia Y* requirement that addresses the several areas of case practice addressed in this EMU review item, except as noted below. The item covers the extent to which the needs of the child, parents, and foster parents are assessed and appropriate services provided to each party based on identified needs. These practices are referenced throughout the Settlement Agreement. The federal CFSR standard for rating this item as a Strength is 85%.

  - o The results from the June 2010 through June 2011 on-site case reviews in the implementing regions show that 24.3% of the foster care cases ▓▓▓▓▓▓ ▓▓▓▓▓▓ rated a Strength for needs and services of the child, parents, and foster parents. Since this applies to both case types, this resulted in a combined Strength percentage of 18.7%, which is far less than 85% CFSR standard.

51

DHS
296724

o  The on-site case review results conducted by the EMU show that the needs of the *child* were assessed (formally or informally) initially and on-going in all 94.29% of the foster care cases ███████████████████. For cases opened during the period under review, these assessments occurred within the first 30 days of the case being opened in 84.29% of the applicable foster care cases a███████████████████ ████ The *Olivia Y* Year 3 statewide requirement for conducting a comprehensive assessment of the child's needs within 30 days of entering foster care is 50%. During the period under review, all needed services were provided to meet the child's identified needs in 80.60% of the applicable foster care cases ██████████████ ██████████████████. All services were provided to the children in a timely manner in 71.64% of the applicable foster care cases ██████████████ ██████████. The child was interviewed prior to the completion of the strengths and need assessment in 85.42% of the foster care cases ██████████████████. The child's involvement in the strengths and needs assessment (other than signatures) was apparent in 78.72% of the foster care cases ██████████████████.

o  The on-site case review results from the implementing regions show that the needs of the *mother* were assessed (formally or informally) initially and on-going in 76.67% of the foster care cases ███████████████████. For cases opened during the period under review, these assessments with the mother occurred within the first 30 days of the case being opened in 84.62% of the applicable foster care cases ██████ ████████████████. Services were provided to the mother in a timely manner in 61.40% of the applicable foster care cases ████████████████ ████ The mother was interviewed prior to the completion of the strengths and need assessment in 71.93% of the foster care cases ██████████████████. The mother's involvement in the strengths and needs assessment (other than signatures) was apparent in 60.34% of the foster care cases █████████████████. During the review period, the Agency in the implementing regions provided all needed services to the mother to meet identified and assessed needs in 62.07% of the foster care cases ████████████████.

o  As a result of June 2010 through June 2011 on-site follow-up case reviews conducted by the EMU in the implementing regions, the needs of the *father* were assessed (formally or informally) initially and on-going in 39.62% of the foster care cases ████████ ████████████████. For cases opened during the period under review, these assessments with the father occurred within the first 30 days of the case being opened in 41.67% of the applicable foster care cases ██████████████████. Services were provided to the father in a timely manner in 28.26% of the foster care cases ███████ █████████████████ The father was interviewed prior to the completion of the strengths and needs assessment in 34.69% of the foster care cases ██████████████ ██████████████ The father's involvement in the strengths and needs assessment (other

52

than signatures) was apparent in 22.45% of the applicable foster care . During the review period, the Agency in the implementing regions provided all needed services to the father to meet identified and assessed needs in 29.17% of the applicable foster care cases ███████████ ██████████

- o The case review results show that the needs of the *foster/pre-adoptive family* were assessed (formally or informally) initially and on-going in 81.97% of the applicable foster care cases. During the period under review, the foster parents or pre-adoptive parents were provided with all needed services to meet their identified needs that pertained to their capacity to provide appropriate care and supervision and ensure the safety and well-being of the children in their care in 77.05% of the applicable cases. Services were provided to the foster/pre-adoptive family in a timely manner in 79.03% of the cases.

- • Review Instrument Item 6, educational needs of the child, addresses the assessment of educational needs and the provision of needed educational services for children in foster care. The EMU reviews cover both foster care cases ████████████ for this item. The *Olivia Y* requirements for this area require the caseworker to review the child's educational records and document their educational needs within 30 calendar days of the child's entry into foster care, which is somewhat different from the way EMU reviews for educational needs (appropriate data reports will be developed later). The *Olivia Y* requirement for implementing regions is 80%, which must begin to be met when the region completes its Practice Model implementation. The CFSR standard for rating this item as a strength is 85%.

  - o The results from the on-site case reviews show that 75.7% of the applicable foster care cases ████████████████████ rated as a Strength for Assessing Educational Needs of the Child (this item includes both assessments and provision of services). ██████████████████████ ██████████████

  - o During the June 2010 through June 2011 on-site case reviews in the implementing regions, 90.91% of the applicable foster care cases ███████████████ ████████ during the period under review, show the Agency in those regions made concerted efforts to assess and address the child's educational needs.

  - o For foster care cases opened during the period under review, the child's educational needs were assessed within 30 days of entry into foster care in 84.62% the applicable cases

  - o A developmental assessment was done for children 3 years of age or younger within 30 days of entry into foster care in 5 of the 8 applicable case in the review sample. The

DHS
296726

statewide *Olivia Y* Year 3 requirement for attaining developmental assessments on children age 3 years and older is 30%. Given the few cases in the EMU reviews applicable for this item, we cannot determine if this is a Strength or an Area Needing Improvement.

o   91.67% of the applicable children in the on-site case review sample were enrolled in an accredited school within 3 days of placement. The applicable *Olivia Y* requirement for this indicator is an implementing region requirement and is 80%.

The FCR findings pertaining to Assessing Strengths and Needs are shown below.

As shown in Table 18 below, FCR data show that issues cited with regard to the Agency meeting the identified needs of parents and/or primary caretakers was most prevalent in Regions 1-South, 2-West, and 4-North. This could be linked to the level of progress made by parents/caretakers toward alleviating or mitigating the causes which necessitated entry into foster care.

**Table 18**
**FCR Regional Findings, Year to Date, Assessing Strengths and Needs**

| Indicator | Statewide | I-N | I-S | II-W | IV-N | V-W |
|---|---|---|---|---|---|---|
| Parent/Primary Caretaker identified needs issues. | 7.40% | 5.94% | 14.87% | 14.87% | 14.71% | 3.09% |
| Resource Parent identified needs issues. | 0.89% | 0.00% | 0.51% | 0.51% | 0.00% | 1.03% |
| Parent/ Primary Caretaker progress. | 28.93% | 51.49% | 50.26% | 50.26% | 62.75% | 40.21% |
| Total Cases Reviewed | 3363 | 202 | 195 | 83 | 102 | 97 |

## *Strengths in Assessing Strengths and Needs*

*   Based on the on-site case review data, it appears the implementing regions are proficient at assessing the strengths and needs of children, rating at 84.20%.

*   The EMU reviews found that assessing for the educational needs of children in foster care was a Strength, surpassing the *Olivia Y* requirement for implementing regions.

*   The EMU reviews found a Strength rating for providing educational services, at 90% compared to a CFSR standard of 85% for a Strength rating.

DHS
296727

- Enrolling children in school within 3 days of placement is a Strength in implementing regions, with the EMU reviews finding that the implementing regions surpassed the 80% *Olivia Y* requirement for implementing regions.

### Areas Needing Improvement in Assessing Strengths and Needs

- The on-site case review data from the implementing regions reflects that the combination of assessing educational needs and providing the needed services to the same children is rated less than is required by the *Olivia Y* requirement for implementing regions and by the CFSR for a strengths rating. While individually the assessments and provision of educational services are rated as Strengths, when combined with each other ███████████████████, the ratings result in an Area Needing Improvement.

- Overall, assessing and addressing the needs of parents/foster parent and providing services to children/parents/foster parents is an Area Needing Improvement, as this item did not meet federal CFSR standards. On-site case review results indicate that there is a need to improve the assessment of strengths and needs for fathers. It does seem that not all fathers are being engaged in the assessment process in foster care ████████ cases which contributed to this item as an Area Needing Improvement overall for the implementing regions. The needs of the father were assessed (formally or informally) initially and on-going in 39.62% of the foster care cases ██████████████████████.

## Preserving and Maintaining Connections

When children enter foster care, they often become separated from the people and places that are the most familiar and comforting to them. This component of the practice model emphasizes normalizing connections and relationships for children in foster care to the extent that it is safe and appropriate to do so. The focus is on keeping children safe and stable within placement settings that permit them to retain important relationships with family members, retain normal sibling relationships and friendships, and maintain important traditions and connections that define them culturally, and continue being a part of the social institutions that nurture them, such as school, religion, and so forth.

The following practice principles are linked to this component:

- Foster care should support the family instead of substitute for the parents whenever possible and appropriate;

- Healthy child/parent relationships should be supported and maintained throughout a foster care episode if safe and appropriate to do so;

- Children in foster care have important connections and relationships that help to define them as individuals and members of a family, community, and culture;

- Caseworkers should work to normalize the connections and relationships for children in foster care to the extent that it is safe and appropriate to do so;

- Children should be allowed to retain important relationships with extended family, siblings, and other friendships as deemed safe and appropriate; and

- Agencies should ensure that important traditions, identity with social institutions, and cultural connections are maintained.

## Statewide Performance

For the time frame covered by this CQI report, there were no MACWIS indicators that have data and/or standards available for the period covered by this report for which to assess strengths or needed areas of improvement. Statewide data reports are being developed and will be available for future CQI annual reports.  Table 19 below provides information from the FCR reviews regarding concerns identified in the reviews related to this component.

**Table 19**
**FCR Statewide Findings, Year to Date, Preserving and Maintaining Connections**

| Indicator (January 2011 through June 2011) | Total Cases Cited w/Issues | % |
|---|---|---|
| Parent/child visitation issues | 896 | |
| Proximity of placement issues | 31 | 0.92% |
| Sibling placement issues. | 75 | |
| Sibling visitation issues. | 168 | |
| ICWA issues (not documented/documented but with only one parent, etc.) | 542 | |
| Efforts to locate relatives not documented. | 175 | 5.20% |
| Primary connections issues. | 64 | 1.90% |
| Total Cases Reviewed | 3363 | |

Children in foster care adjust better and experience fewer placement moves when they are kept closer to home and to the people they know and trust for support. This, in turn, results in more timely permanency outcomes for children. The following items related to Preserving and Maintaining Connections were noted and reported to the appropriate county of responsibility by the FCR Unit during the January 2011 through June 2011 review cycle:

DHS
296729

- 896 of the 3,363 cases reviewed statewide by the FCR Unit were cited and reported to the county of responsibility due to issues surrounding parent/child visitation;

- 0.92% of the foster care cases were cited with issues surrounding the proximity of the child's placement and whether or not the placement was necessary to meet the needs of the child;

- 75 of the cases reviewed were noted with issues related to sibling placement issues and whether the need for the separation was necessary to meet the needs of the separated siblings;

- 542 of the cases reviewed were cited due to ICWA issues. In many of the cases cited, the ICWA policy was carried out with only one parent;

- 168 of the cases reviewed by the FCR Unit between January 2011 and June 2011 were cited and reported to the county of responsibility due to issues surrounding sibling visitation;

- 5.2% of the cases reviewed were cited and reported to the county of responsibility by the FCR Unit due to issues surrounding Agency efforts to locate relatives for possible placement of foster children; and

- 1.92% of the cases were cited due to primary connections not being preserved for children in foster care.

## *Implementing Regions' Performance*

There were no MACWIS data indicators for the time period covered by this CQI report associated with Preserving and Maintaining Connections.

The EMU reviews address Preserving and Maintaining Connections by reviewing six indicators, which are described in Table 20 below.

DHS
296730

**Table 20**
**Number and Percent of CQI Case Review Cases for Preserving and Maintaining Connections***

| PRESERVING CONNECTIONS | | | | | | |
|---|---|---|---|---|---|---|
| Case Review Item | Item 19: Proximity of Foster Care Placement | Item 20: Placement with Siblings | Item 21: Visiting with Parents and with Siblings in Foster Care | Item 22: Preserving Connections | Item 23: Relationship of Child in Care with Parents | Item 24: Relative Placement |
| Total Strength | 96 | 63 | 12 | 78 | 34 | 67 |
| % | 85.7% | 94.0% | 11.2% | 67.2% | 34.3% | 60.9% |
| Total ANI | 16 | 4 | 95 | 38 | 65 | 43 |
| % | 14.3% | 6.0% | 88.8% | 32.8% | 65.7% | 39.1% |
| Total Applicable | 112 | 67 | 107 | 116 | 99 | 110 |

*Please note that these numbers include both the baseline/follow-up reviews and the monthly case reviews (as applicable) for all implementing regions to date

The EMU case reviews conducted in Region 5-West in December 2011 reflect the following with regard to the Practice Model component of Preserving and Maintaining Connections:

- For Review Instrument Item 19, proximity of foster care placement, the EMU reviews address whether children in foster care are placed within 50 miles of the home from which they were removed. The statewide *Olivia Y* Year 3 requirement for this indicator is 85%, and the requirement for implementing regions is 80%.

  o 85.7% of the applicable foster care cases reviewed in the implementing regions during the June 2010 through June 2011 reporting period rated as a Strength for Proximity of Foster Care Placement;

  o On-site case review results from the implementing regions found 41 foster children from the implementing regions to be in placements outside of the county from which they were removed. In 78.79% of those cases, the placement was close enough to the applicable children's parents or other potential caregiver to facilitate face-to-face contacts between the child and the parents while the child is in foster care. Of the children not in close proximity to facilitate contact with their parents or other potential caregiver, the reason for the placement in 66.67% of the cases was based on the child's needs and intended to ensure that the child's case plan goals are achieved;

58

DHS
296731

o    21 children were not attending the same school as when they first came into DFCS custody. However, it was found in 90% of those cases that this was appropriate based on case circumstances.

• For Review Instrument Item 20, placement with siblings, the EMU reviews determine if children were placed with siblings in foster care and, if not, whether there were justifiable circumstances to separate them. The statewide *Olivia Y* Year 3 requirement and the implementing regions' requirement for this indicator is 80%.

o    94% of the applicable foster care cases reviewed in the implementing regions rated as a Strength for placement with siblings;

o    Of the applicable foster children reviewed for this item, 72.73% of the children with siblings in care were placed with all of his/her siblings. Of the children who were not placed with all of their siblings in foster care, there was a valid reason in 91.67% of the cases for the separation of the siblings such as it was necessary to meet the individual needs of the child or there were safety concerns.

• For Review Instrument Item 21, visiting with parents and siblings in foster care, the EMU reviews determine whether or not children in foster care have regular visits with their parents and siblings who are in foster care but from whom they are separated in different placements. The *Olivia Y* requirements for this indicator have multiple components and the EMU reviews may not capture every component of the requirement (data reports under development will capture the requirements in future reviews). The federal CFSR measure for rating this indicator a Strength is 85%.

o    11.2% of the applicable foster care cases reviewed in the implementing regions were rated Strength for Visiting with Parents and Siblings in Foster Care.;

o    Of the applicable foster care cases (children who entered DFCS custody during the period under review) 66.67% contained a visitation plan that was developed within the first 30 days of the child entering custody. 48.33% addressed all visitations (parents, siblings, connections, etc.), and 16.36% of the applicable cases had a visitation plan updated as circumstances in the case warranted;

o    69.64% of applicable foster care cases had concerted efforts made during the period under review to ensure frequency of visitation (or other forms of contact if visitation was not possible) between the child and his/her mother. In 67.35% of these cases, the quality of the mother/child visitation was sufficient in order to maintain or promote a continuity of the relationship.

DHS
296732

o 52.08% of the applicable foster care cases had concerted efforts made to ensure frequency of visitation (or other forms of contact if visitation was not possible) between the child and his/her father. During the period under review, concerted efforts were made in 47.83% of the applicable cases to ensure that the quality of the visitation (or other forms of contact if visitation was not possible) was of a sufficient frequency to maintain or promote a continuity of the relationship.

o 63.64% of the foster care cases showed concerted efforts had been made to ensure visitation (or other forms of contact if visitation was not possible) between the child and his/her siblings. During the period under review, concerted efforts were made to ensure that the quality of the visitation (or other forms of contact if visitation was not possible) was of a sufficient frequency to maintain or promote a continuity of the relationship in 78.95% of these cases reviewed in the implementing regions.

o For children in the implementing regions entering care during the period under review, 54.17% of the applicable foster children had a visit with his/her parents within 24 hours of placement or, at a minimum, a phone call with relatives within the first 24 hours.

- For Review Instrument Item 22, preserving connections, the EMU reviews for the extent to which important ties and connections are supported and maintained for children in foster care, in addition to visits with parents and siblings. This item specifically evaluates maintaining the tribal ties for Native American children placed in foster care. The federal CFSR standard for rating this item a strength is 85%.

o Of the foster care cases reviewed in the implementing regions between June 2010 and June 2011, 67.2% rated a Strength for Preserving Connections;

o 71.67% of the foster care cases reviewed had concerted efforts made to maintain the child's important connections;

o 75% of the foster care cases reviewed had a sufficient inquiry conducted with the parent, child, custodian, or other interested party to determine whether the child may be a member of or is eligible for membership in a Native American (Indian) tribe. It appears there were 19 cases reviewed in the implementing regions where a child was identified who may have been a member of a tribe (or eligible for membership). In 11 of those cases, the appropriate tribe was notified of its rights to intervene in any state court proceedings seeking an involuntary foster care placement or termination of parental rights. 5 children were found to be members of, or eligible for membership in, an American Indian tribe. In none of those cases does it appear that the child was placed in foster care in accordance with the Indian Child Welfare Act (ICWA) placement preferences

DHS
296733

or concerted efforts were made to place the child in accordance with ICWA placement preferences.

- Review Instrument Item 23, relationship of child in care with parents, evaluates the efforts made to support the parent/child relationship while the child is in foster care. The federal CFSR standard for rating this item a Strength is 85%.

    o This item rated as a Strength in 34.3% of the applicable foster care cases reviewed in the implementing regions during the June 2010 through June 2011 reporting period;

    o In 30.43% of the applicable foster care cases reviewed, there was sufficient documentation/evidence that a meeting occurred between the birth parents and the resource parents within the first month of placement (if the placement occurred during the period under review);

    o Of the applicable foster care cases reviewed in the implementing regions, there was evidence of shared parenting responsibilities between the birth and resource parents in 40.74% of the applicable cases.

- Review Instrument Item 24, relative placement, evaluates whether appropriate relatives of a child were identified and evaluated as possible placement resources and whether, if appropriate, the child is placed with available relatives. The federal CFSR standard for rating this item a Strength is 85%.

    o As a result of the on-site reviews in the implementing regions, this item rated as a Strength in 60.9% of the applicable foster care cases reviewed;

    o During the period under review, 23 foster children in the case review samples in the implementing regions were placed with relatives. Of those, all placements were found to be stable;

    o Of the foster children who were not placed with relatives, concerted efforts to identify, locate, and evaluate maternal relatives for possible placement in 44.12% of the applicable foster care cases reviewed and efforts were made for paternal relatives in 47.35% of the applicable foster care cases reviewed.

The FCR addresses this component of the Practice Model through the review of several items. Table 21 below provides a description of the most frequently cited concerns in the implementing regions based on FCR findings.

DHS
296734

**Table 21**
**Concerns Cited in FCR Regional Findings, Year to Date, Preserving and Maintaining Connections**

| Indicator | Statewide | I-N | I-S | II-W | IV-N | V-W |
|---|---|---|---|---|---|---|
| Parent/child visitation issues | 26.64% | 44.06% | 41.54% | 37.35% | 34.31% | 31.96% |
| Proximity of placement issues | 0.92% | 1.98% | 2.05% | 1.20% | 0.00% | 2.06% |
| Sibling placement issues. | 75 cases cited | 3 cases cited | 2 cases cited | 4 cases cited | 0 cases cited | 6 cases cited |
| Sibling visitation issues. | 168 cases cited | 7 cases cited | 11 cases cited | 7 cases cited | 1 cases cited | 7 cases cited |
| ICWA issues (not documented/documented but with only one parent,etc.) | 16.12% | 21.29% | 30.26% | 7.23% | 14.71% | 4.21% |
| Efforts to locate relatives not documented. | 5.20% | 4.95% | 5.64% | 0.00% | 7.84% | 3.09% |
| Primary connections issues. | 26.64% | 2.48% | 3.59% | 0.00% | 3.92% | 1.03% |
| Total Cases Reviewed | 3363 | 202 | 195 | 83 | 102 | 97 |

## Strengths in Preserving and Maintaining Connections

- Placement proximity for children in foster care is a Strength, based on EMU review findings in the implementing regions. The reviews indicate that the regions, on the whole, surpassed the statewide *Olivia Y* Year 3 requirement of 85% and the requirement for implementing regions of 80%.

- Placement of children in foster care with their siblings, or only separating them under acceptable circumstances, was also a Strength based on EMU reviews of implementing regions. This indicator also surpassed the statewide *Olivia Y* Year 3 requirement and the requirement for implementing regions of 80%.

## Areas Needing Improvement in Preserving and Maintaining Connections

- Children's visits with parents and separated siblings while in foster care is an Area Needing Improvement. The EMU reviews in implementing regions indicate that the regions did not achieve the federal CFSR standard of 85%. The primary reason for rating visits with parents and

DHS
296735

siblings in foster care as an Area Needing Improvement is the lack of engaging fathers in visitation planning. Updating of visitation plans as case circumstances warrant is another area that is in need of improvement with regard to this indicator.

- Maintaining the relationship of the child in care with parents was also rated an Area Needing Improvement due to there being no evidence that meetings between birth parents and resource parents are occurring within the first month of placement (for placements occurring during the period under review). Shared parenting is also an area that needs attention for improvement efforts. A number of parents are not participating in their children's school functions, doctor's appointments, and other day-to-day activities when it is safe and appropriate to do so.

- Preserving connections is an Area Needing Improvement as it did not meet the federal CFSR standard for a Strength rating of 85%. Of the children in the case reviews conducted during the reporting period in the implementing regions, none of the children identified as a member of or eligible for membership in, an American Indian tribe were placed in accordance with the Indian Child Welfare Act (ICWA) placement preferences or had concerted efforts made to place them in accordance with ICWA placement preferences.

- Placement of children in foster care with relatives is also an Area Needing Improvement for not meeting the federal CFSR standard of 85%.

DHS
296736

## *Findings: Systemic Factors*

In addition to monitoring and reporting on the six components of the Mississippi Practice Model, the CQI Office monitors and reports on several systemic factors that affect the ability of MDHS to help families and children achieve timely and appropriate outcomes. The systemic factors are:

- Training of staff and providers

- Services array

- Placement resources

- Caseloads

- Oversight and monitoring

- Court processes

- Data quality and usage

Not all of these systemic factors has specific standards associated with them, although some do have applicable *Olivia Y* requirements. Further, for the time period covered by this CQI report MDHS had not yet developed all of the measures needed to report on each systemic factor. For each factor, the CQI Office has conducted stakeholder surveys which are included below.

## Training of Staff and Providers

The *Olivia Y* Settlement Agreement requirements for training of staff and providers are as follows:

- 100% of all new caseworkers/supervisors complete their training requirements before assuming their responsibilities;

  o Between June 2010 and June 2011, the Agency's Professional Development Unit reports 152 caseworkers received pre-service training from CWPD (Child Welfare Professional Development).

- Caseworkers receive a minimum of 40 hours of annual ongoing, in-service training, and;

- Supervisors receive a minimum of 24 hours of annual ongoing, in-service training.

  o Between June 2010 and June 2011, the Agency's Professional Development Unit reports 41 supervisors received in-service training.

DHS
296737

There are currently no MACWIS data indicators and/or standards yet established for these items.

The information from the stakeholder surveys can be used to evaluate perceptions the Agency's performance with regard to this systemic factor based on responses from stakeholders who responded to the surveys across the implementing regions with either a baseline or follow-up CQI review conducted. These perceptions cannot be used to evaluate MDHS' conformity with applicable standards. Table 22 below provides a synopsis of the internal and external stakeholder responses to questions pertaining to training of staff and providers.

**Table 22**
**Stakeholder Survey Statewide Responses, Year to Date, Training of Staff and Providers**

| Survey | Indicator | Total |
|---|---|---|
| Caseworker Staff (411 responses) | How effective is DFCS in providing and ensuring completion of adequate initial training for all new caseworkers/supervisors who provide child welfare services? | 73.3% Almost Always/Frequently<br>25% Somewhat/Rarely<br>0.5% Never<br>1.2% N/A |
| | How effective is DFCS in providing and ensuring completion of adequate ongoing training for staff that addresses the skills and knowledge base needed to carry out their duties? | 66.4% Almost Always/ Frequently<br>32.1% Somewhat/Rarely<br>0.3% Never<br>1.2%N/A |
| | How effective is DFCS in providing adequate training to current or prospective resource parents, including relative caregivers, adoptive parents, and staff of state licensed and approved facilities, that addresses the skills and knowledge needed to carry out their duties? | 67.4% Almost Always/Frequently<br>27.0% Somewhat/Rarely<br>0.2% Never<br>5.4% N/A |
| Court Staff | None measured | NA |
| Provider Agencies (136 responses) | How effective is DFCS in providing and ensuring completion of adequate training for current or prospective foster parents, including relative caregivers, adoptive parents and staff of state licensed or approved facilities, that addresses the skills and knowledge needed to carry out their duties? | 37.3% Almost Always/Frequently<br>13.5% Somewhat/Rarely<br>0.8% Never<br>48.4% No Information or N/A |
| | Does DFCS provide frequent training to license new foster homes? | 30.2% Almost Always/Frequently<br>7.9% Somewhat/Rarely<br>61.9% No Information or N/A |
| Foster Parents (78 responses) | How effective is DFCS in providing adequate training for current (or those interested in being) foster parents, including relative caregivers, and adoptive parents that addresses the skills and knowledge needed to carry out their duties? | 78.2% Almost Always/Frequently<br>15.4% Somewhat/Rarely<br>1.3% Never<br>5.1% No Information or N/A |
| | Does DFCS provide frequent training to license new foster homes? | 76.9% Almost Always/Frequently<br>14.1% Somewhat/Rarely<br>9.0% Never/No Information/NA |

Foster parents provided the highest ratings with regard to the effectiveness and frequency of providing training to foster parents. The majority of the internal stakeholders (caseworker and supervisors) believe that the training they receive is adequate in order for them to perform their job duties. External stakeholders (service providers) gave the lowest ratings with regard to the initial and on-gong training they get in order to provide services to foster children and families that they serve.

DHS
296738

The responses to the stakeholder surveys indicate the lowest ratings in general were from the service providers surveyed. This could be an indication that more efforts need to be made to include the Agency's service providers in planning and development of training that is targeted toward them so that it is sufficient in helping them care for and meet the needs of the children and families we ask them to serve.

## Services Array

The service array systemic factor addresses the extent to which there is an adequate array of services in the field to address the needs of children and families served by MDHS. *Olivia Y* requirements in this area refer to services provided to meet specific needs, such as medical and mental health needs. Those requirements are identified below. Given the lack of available objective data to evaluate this systemic factor for the time period covered by this CQI report, we cannot identify specific Strengths and Areas Needing Improvement with confidence.

*Statewide Performance*



*Implementing Regions' Performance*

DHS
296739



In addition to the data indicators available, the EMU reviews include stakeholder surveys that provide perceptions of the respondents to the surveys of how they view the service array. For information purposes only, we are providing the results of those responses in Table 23 below, but they cannot be used to interpret MDHS' conformity with applicable standards related to the service array.

**Table 23**
**Stakeholder Survey Statewide Responses, Year to Date, Service Array**

DHS
296740

| Survey | Indicator | Total |
|---|---|---|
| Caseworker Staff (364 responses) | How effective is DFCS in the county/region at providing or contracting for an adequate array of services to promote timely permanency of children in foster care? | 59.3% Almost Always/Frequently<br>35.7% Somewhat/Rarely<br>1.9% Not Effective<br>3.1% NA |
| | ████████████████████<br>████████████████<br>████ | ███████████ |
| | How effectively does the county/region individualize, or tailor, services to meet the unique needs of children and families? | 63.7% Almost Always/Frequently<br>34.3% Somewhat/Rarely<br>0.6% Not Effective<br>1.4% N/A |
| Court Staff (26 responses) | How effective is DFCS in the county/region at providing or contracting for an adequate array of services to promote timely reunification of children in foster care with their families? | 62.5% Almost Always/Frequently<br>33.3% Somewhat/Rarely<br>4.2% No Information or N/A |
| | How effective is the county/region at providing or contracting for an adequate array of services to promote timely adoptions? | 62.5% Almost Always/Frequently<br>20.8% Somewhat/Rarely<br>16.7% No Information or N/A |
| Provider Agencies (97 responses) | ██████████████████<br>██████████████ | ███████████ |
| | How accessible are needed medical services? | 54.3% Almost Always/Frequently<br>19.6% Somewhat/Rarely<br>26.1% No Information or N/A |
| | How accessible are needed dental services? | 72.8% Almost Always/Frequently Accessible<br>12% Somewhat/Rarely Accessible<br>15.2% No Information or N/A |
| | How accessible are needed mental health services? | 64.1% Almost Always/Frequently Accessible<br>17.4% Somewhat/Rarely Accessible<br>18.5% No Information or N/A |

68

DHS 296741

| Survey | Indicator | Total |
|---|---|---|
|  | How effective is DFCS in the county/region at providing or contracting for an adequate array of services to promote timely reunification of children in foster care with their families? | 58.7% Almost Always/Frequently Accessible<br>25% Somewhat/Rarely Accessible<br>16.3% No Information or N/A |
| Foster Parents (64 responses) | How effective is DFCS in the county/region at providing or contracting for an adequate range of services to promote timely permanency (reunification, licensed relative placement, adoption, living independently) of children in foster care? | 48.9% Almost Always/Frequently<br>22.8% Somewhat/Rarely<br>28.3% No Information or N/A |
|  | How effective is DFCS in the county/region at providing or contracting for an adequate range of services to support resource parents? | 53.3% Almost Always/Frequently<br>28.3% Somewhat/Rarely<br>1% Not Effective<br>17.4% N/A |
|  | How effective is DFCS in the county/region at providing or contracting for an adequate range of services to youth in foster care to prepare them for independent living and to make the transition from foster care to adulthood? | 61% Almost Always/Frequently<br>25% Somewhat/Rarely<br>14% No Information or NA |

## Placement Resources

The service array systemic factor addresses the extent to which there is an adequate array of services in the field to address the needs of children and families served by MDHS. *Olivia Y* requirements in this area refer to services provided to meet specific needs, such as medical and mental health needs. Those requirements are identified below. Given the lack of available objective data to evaluate this systemic factor for the time period covered by this CQI report, we cannot identify specific Strengths and Areas Needing Improvement with confidence.

### *Statewide and Implementing Regions' Performance*

The state is using 5 aggregate data indicators for this systemic component. The data are extracted from MACWIS and represent statewide performance. The currently available data indicators are being used to measure performance with regard to placement resources:

- No child shall be placed in more than one emergency or temporary facility within one episode of foster care, unless an immediate placement move is necessary to protect the safety of the child or others as certified in writing by the RD / Data Source: MWLS51DS - June 1, 2011 thru June 30, 2011;

- No child under 10 years of age shall be placed in a congregate care setting unless the child has exceptional needs that cannot be met in a relative or foster family home or the child is a

DHS
296742

member of a sibling group, and the RD has granted express written approval for the placement / Data Source: MWLS52HS - June 1, 2011 thru June 30, 2011; and

- Sibling groups, with one or more of siblings under 10, are not placed in congregate care settings for more than 45 days / Data Source: MWLS53HS - June 1, 2011 thru June 30, 2011.

- Number of Licensed/Pending Foster Family Homes / Data Source: MWZRESLS & MWZRESPS - Licensed Homes: June 1, 2011 thru June 30, 2011  / Pending Homes: As of July 15, 2011 (Note: this is a descriptive indicator only and not tied to specific requirements); and

- Number of Children in Foster Care by Placement Type (family based v. non-family based) / Data Source: MWZ0510S - June 1, 2011 thru June 30, 2011      *(NOTE: Family Based Placements=Adoptive Home, Child Specific, CO Non Licensed Non-Relative, CO Non Licensed Relative Foster Home, *Expedited Pending Relative Resource Home (added May 2011), Foster Home, Foster/Adopt Home, Group Home, Own Home, Relative Foster Home, Respite Foster Care, Teenage Parent Foster Home and Therapeutic Group and Foster Homes.  Also, this is a descriptive indicator only and not tied to specific requirements.);*

**Chart 20**
**No child in more than 1 emergency placement in 1 episode without Regional Directors Approval**



The statewide *Olivia Y* Year 3 requirement is that no more than 180 children statewide shall be placed in more than one emergency or temporary facility within one episode of foster care unless an immediate placement move is necessary to protect the safety of the child or others as certified in writing by the RI D. The June 2011 data (MWLS51DS) shows that the state does not meet the requirement of no more than 180 children.

DHS
296743

**Chart 21**
**No child under 10 placed in congregate care unless exceptional needs noted and Approved by Regional Director**



The statewide *Olivia* Y Year 3 requirement is that no more than 40 children statewide under 10 years of age shall be placed in a congregate care setting unless the child has exceptional needs that cannot be met in a relative or foster family home or the child is a member of a sibling group, and the RD has granted express written approval for the placement. The June 2011 data report (MWLS52HS) reflects that the state did not meet the requirement of no more than 40 children.

**Chart 22**
**Sibling groups, with one or more of siblings under 10, are not placed in congregate care settings for more than 45 days**



DHS
296744

The presumed (because it is not stated specifically in the Settlement Agreement) statewide *Olivia Y* Year 3 requirement is that 100% of sibling groups with one or more siblings under the age of 10 shall not be placed in congregate care settings for more than 45 days. Statewide data show that, as of June 2011, 7 seven children statewide failed to meet this requirement and that one child in Region I-North failed to meet the requirement. The other four implementing regions did not have children who failed to meet this requirement in either June 2010 or June 2011.

The following 3 charts, Chart 23, Chart 24, and Chart 25, provide descriptive information only and are not tied to specific measures. They provide some indication of the number of children needing placement statewide and within implementing regions and the numbers of licensed homes available to serve them, along with the numbers of potential homes pending licensure.

**Chart 23**
**Number of Licensed Homes**



DHS
296745

**Chart 24**
**Number of Pending Homes**



**Chart 25**
**Number of children in Foster Care by Placement Type**
**(Family based v. Non-Family based)**



The responses to the EMU review stakeholder surveys in implementing regions with regard to this systemic factor are provided in Table 24 below.

73

**Table 24**
**Stakeholder Survey Statewide Responses, Year to Date, Placement Resources**

| Survey | Indicator | Total |
|---|---|---|
| Caseworker Staff (354 responses) | How effective is the county/region in expediting the licensing of relative resource parents, and giving them priority over resource parents in closer proximity? | 60.1% Almost Always/ Frequently<br>31.9% Somewhat/Rarely<br>0.6% Never<br>7.4% No Information/NA |
| | How effectively has the county/region implemented a process for ensuring the diligent recruitment of potential resource families that reflect the ethnic and racial diversity of children needing resource homes? | 50.9% Almost Always/Frequently<br><br>43.9% Somewhat/Rarely<br><br>0.6% Never<br>4.6% N/A |
| Court Staff | None Reported as all were qualitative responses | NA |
| Provider Agencies | None Measured | NA |
| Foster Parents (64 responses) | DFCS' rules (policy) places limits on the number of children that can be placed in a foster home: 3 who can be placed in a foster home, 5 children (biological, foster and adoptive) who can reside in a licensed foster home, foster homes caring for 5 children cannot have more than 2 children in the home less than 2 years of age, therapeutic foster care homes can have no more than a total of 4 children in the home and no more than 2 can have therapeutic needs. In your opinion, is DFCS abiding by these rules? | 73.4% Almost Always/Frequently<br>6.3% Somewhat/Rarely<br>20.3% No Information or N/A |
| | How effective is the county in conducting criminal background checks on people interested in being foster and adoptive parents before licensing or approving them to care for children? | 89.1% Almost Always/Frequently<br>3.1% Somewhat/Rarely<br>7.8% No Information or N/A |
| | How effective is the county/region in recruiting foster and adoptive homes needed to care for the children in the county/region in foster care, and in keeping these homes? | 54.7% Almost Always/Frequently<br>25% Somewhat/Rarely<br>3.1% Never<br>17.2% No Information or N/A |

# Caseloads

## *Statewide Performance*

The state is using 3 aggregate data indicators for this systemic component. The data are extracted from MACWIS and represent statewide performance. The *Olivia* Y  Year 3 statewide requirements with regard to caseloads are as follows:

DHS
296747

- At least 75% of caseworkers carry a caseload that does not exceed Plan caseload requirements (over 6,960 minutes) / Data Source: MWASA9S1 - June 1, 2011 thru June 30, 2011 *(Includes Direct Service Workers and Resource Workers)*

- No more than 10% of caseworkers shall carry a caseload exceeding twice the caseload requirements (over 13,920 minutes) / Data Source: MWASA9S1 - June 1, 2011 thru June 30, 2011;

- No caseworkers carry a caseload exceeding three times the caseload requirements (over 20,880 minutes) / Data Source: MWASA9S1 - June 1, 2011 thru June 30, 2011.

**Chart 26**
**State Performance on Data Indicators Regarding Caseloads**



- Caseworkers with Over 6,960 Minutes:
  - o The Year 3 requirement for this measure is that at least 75% of caseworkers carry a caseload that does not exceed caseload requirements (over 6,900 minutes). The data indicator from the reporting period reveals that the Agency did not meet this requirement.

- Caseworkers with Over 13,920 Minutes:
  - o The Year 3 requirement for this measure is "No More Than 10%". The Agency does not meet this requirement in that as of June 2011 13.1% of the caseworkers has a caseload over 13,920 minutes.

- Caseworkers with Over 20,880 Minutes:

DHS
296748

o The Year 3 requirement for this measure is that no caseworkers carry a caseload exceeding three times the caseload requirements (over 20,880 minutes). Data from the reporting period shows that the Agency is not meeting this requirement. June 2011 data shows 6.4% of the Agency's caseworkers carry caseloads exceeding 20,880 minutes.

## *Implementing Regions' Performance*

Similar data from the 5 implementing regions are presented in the charts below:

**Chart 27**
**At least 75% of Caseworkers carry a Caseload that does not exceed 6,960 minutes**



The *Olivia Y* Year 3 statewide requirement for this measure is that at least 75% of caseworkers carry a caseload that does not exceed 6,960 minutes. As of June 2011, none of the implementing regions met the Year 3 requirement.

**Chart 28**
**No more than 10% of Caseworkers carry a Caseload that exceeds 13,920 minutes**



76

DHS
296749

As of June 2011, Regions 1-South, 2-West, 4-North, and 5-West met the *Olivia Y* Year 3 statewide requirement for this measure in that there were no workers in these regions carrying caseloads that exceeded 13,920 minutes.

**Chart 29**
**No Caseworkers carry a Caseload that exceeds 20,880 minutes**



As of June 2011, it appears that of the implementing regions, Region 5-West was the only region that met the *Olivia Y* Year 3 statewide requirement for this measure in that there were no caseworkers in the region who carried a caseload that exceeded 20,880 minutes.

With regard to the survey of stakeholders in the EMU reviews conducted in the implementing regions, Table 25 below provide a synopsis of the responses. Only internal stakeholders were surveyed for this systemic factor. Despite the positive performance of the implementing regions on the caseload data presented above, the survey responses did not indicate favorable perceptions in this area with over half of the respondents indicating that caseload limits are somewhat or rarely met.

DHS
296750

**Table 25**
**Stakeholder Survey Statewide Responses, Year to Date, Caseload**

| Survey | Indicator | Total |
|---|---|---|
| Caseworker Staff (351 responses) | Do the caseworkers have caseloads within prescribed limits? | 31.3% Almost Always/Frequently<br>55.5% Somewhat/Rarely<br>8.6% Never<br>4.6% N/A |
| Court Staff | None Measured | N/A |
| Provider Agencies | None Measured | N/A |
| Foster Parents | None Measured | N/A |

# Oversight and Monitoring

This systemic factor addresses supervision in counties and the functioning of continuous quality improvement processes within the region. For reporting purposes, we are focusing on supervision in this CQI report.

## *Statewide and Implementing Regions' Performance*

The Agency is using one aggregate data indicator for this systemic factor. The data are extracted from MACWIS and represent statewide performance. The currently available data indicators are being used to measure performance with regard to Oversight and Monitoring:

- Supervisors, who supervise caseworkers, are responsible for supervising no more than 5 caseworkers / Data Source: MWASA5D2 - June 1, 2011 thru June 30, 2011

DHS
296751

**Chart 30**
**Supervisors who supervise more than 5 Caseworkers (State)**



Supervisors who Supervise more than 5 Caseworkers

The *Olivia* Y Year 3 statewide requirement is that no more than 10% of supervisors, who supervise caseworkers, are responsible for supervising no more than 5 caseworkers. As shown in Chart 30 above, as of June 2011 the Agency does not meet this requirement in that there were 19 supervisors (15.70%) who supervised more than 5 caseworkers statewide.

**Chart 31**
**Supervisors who supervise More Than 5 Caseworkers**



Of the 5 implementing regions, Chart 31 above shows that as of June 2011, Regions 1-South and 5-West met the supervisory requirement for this indicator.

Table 26 below provides a synopsis of the internal and external stakeholder responses from the EMU reviews in the implementing regions during the reporting period with regard to Oversight and Monitoring.

**Table 26**
**Stakeholder Survey Statewide Responses, Year to Date, Oversight and Monitoring**

| Survey | Indicator | Total |
|--------|-----------|-------|
| Caseworker Staff (334 responses) | Does the worker and supervisor review cases quarterly through supervisory or peer team review to assess the appropriateness of safety and permanency plans? | 78% Almost Always/Frequently<br>17.2% Somewhat/Rarely<br>0.9% Never<br>3.9% N/A |
| | Evaluate the ability of the quality assurance system which includes Evaluation and Monitoring or CQI, Foster Care Review, and the Supervisory Administrative Reviews (CQI, FCR,SAR) to assess effectively the quality of practice and outcomes, identify strengths and areas needing improvement measures. | 66.8% Almost Always/Frequently<br>26% Somewhat/Rarely<br>0.9% Never<br>6.3% N/A |
| | Evaluate the involvement of service providers, parents, youth, resource parents, group caregivers, relatives, tribes, court personnel, and/or other stakeholders in the quality assurance process. | 55.3% Almost Always/Frequently<br>37.8% Somewhat/Rarely<br>.03% Never<br>6.6% N/A |
| Court Staff (24 responses) | How effective is DFCS in providing information about the performance of their agency through data reports or other means? | 27.3% Almost Always/Frequently<br>27.3% Somewhat/Rarely<br>18.1% Never<br>27.3 No Information or N/A |
| Provider Agencies (96 responses) | How effective is DFCS in providing information about performance of their agency through data reports or other means? | 33% Almost Always/Frequently<br>18.7% Somewhat/Rarely<br>8.8% Never<br>39.5% No information or N/A |
| Foster Parents (64 responses) | How effective is DFCS in providing information about the performance of their agency through data reports or other means? | 37.5% Almost Always/Frequently<br>20.3% Somewhat/Rarely<br>11% Never<br>31.2% No information or N/A |

Table 27 below provides information on concerns identified through the FCR reviews related to Supervisory Administrative Reviews of their workers' cases.

**Table 27**
**FCR Statewide Findings, Year to Date, Oversight and Monitoring**

| January 2011 through June 2011 | TOTAL | % |
|--------------------------------|-------|---|
| Issues cited related to Supervisory Administrative Reviews. | 624 | 18.55% |
| Total Cases Reviewed | 3363 | |

DHS
296753

The FCR Unit reviewed 3,363 cases between January 2011 and June 2011. 624 (18.55%) were cited due to there being no evidence that the supervisory administrative review of the case had been printed and signed indicating that a case staffing took place as a result of the review.

Table 28 below gives a comparison among the implementing regions between January 2011 and June 2011 with regard to issues pertaining to the use of the Supervisory Administrative Review as an Oversight and Monitoring tool.

**Table 28**
**FCR Statewide and Implementing Regions, Oversight and Monitoring**

| Indicator | Statewide | 1-N | I-S | II-W | IV-N | V-W |
|---|---|---|---|---|---|---|
| Issues cited related to Supervisory Administrative Reviews. | 18.55% | 15.35% | 20.51% | 2.41% | 4.90% | 3.09% |

# Court Processes

## *Statewide and Implementing Regions' Performance*

The Agency is using 3 aggregate data indicators for this systemic component. The data are extracted from MACWIS and represent statewide performance. The currently available data indicators are being used to measure performance with regard to Court Processes:

- Children who have been in custody at least 6 months have had a timely county conference / Data Source: MWZTACRS - July 1, 2010 thru June 30, 2011;

- Children in custody at least 12 months have had a timely annual court review / Data Source: MWZTPHRS - July 1, 2010 thru June 30, 2011;

- Children in custody who have spent more than 15 of the previous 22 months in foster care without a TPR petition filed will have an exception noted or a TPR filed  / Data Source: MWZ014S1 & MWZ014S2 - As of June 4, 2011.

**Chart 32**
**Statewide Performance on Data Indicators regarding Court Processes**



As shown in Chart 32 above, the Agency's performance on the indicators for Court Process is as follows:

- *Children who have been in custody at least 6 months have had a timely county conference*. The *Olivia Y* requirement for this indicator is 90% and is a regional requirement, which implementing regions must begin to meet when they have completed Practice Model implementation. The Agency, as a whole, met this requirement in June 2010 at 94.5% and in June 2011 at 98%, based on holding the reviews timely, although we do not currently have reportable information about who was invited to attend the reviews, which is also addressed in the *Olivia Y* requirement.

- *Children in custody at least 12 months have had a timely annual court review*. The *Olivia Y* requirement for this indicator is also 90% and is a regional requirement, which implementing regions must begin to meet when they have completed Practice Model implementation. The Agency, as a whole did not meet this requirement in June 2010 or in June 2011 because of the timeliness of the reviews.

- *Children in Custody 15 of the most recent 22 months will have their case referred for TPR or have an exception filed*. The *Olivia Y* requirement for this indicator is 80% and is a regional requirement, which implementing regions must begin to meet when they have completed Practice Model implementation. The Agency as a whole did not meet this requirement in June 2010 or in June 2011 based on data for all children who have been in custody for at least 15 of 22 months, although we do not currently have reportable data on children reaching the 15 of 22 months mark during the period, which is addressed in the Settlement Agreement.

Performance for the implementing regions is described in the following charts. As shown in Chart 33 below, the requirement for holding timely six-month reviews of children in foster care (90%) was met in all implementing regions in June 2011. The requirement was not met in Region 2-West in June 2010 but was met in June 2011.

82

DHS
296755

**Chart 33**
**Timely County Conferences**



As shown in Chart 34 below, none of the implementing regions met the 90% requirement for holding timely permanency hearings in June 2011. Region 2-West met the requirement in June 2010.

**Chart 34**
**Timely Annual Court Permanency Reviews**



DHS
296756

As shown in Chart 35 below, Regions I-South and V-West met the 80% requirement for filing TPR petitions or documenting exceptions for children in foster care for 15 of the most recent 22 months.

**Chart 35**
**Children in Custody 15 of 22 Months have Either an Exception Noted or TPR Filed**



Table 29 below provides a synopsis of the internal and external stakeholder results below from the EMU reviews conducted in the implementing regions during the reporting period of June 2010 through June 2011 related to Court Processes.

**Table 29**
**Stakeholder Survey Statewide Findings, Year to Date, Court Processes**

| Survey | Indicator | Total |
|---|---|---|
| Caseworker Staff (321 responses) | Evaluate the effectiveness of the 6 month reviews in promoting timely achievement of permanency for all children in foster care. | 73.6% Almost Always/Frequently<br>17.6% Somewhat/Rarely<br>0.6% Never<br>8.2% N/A |
| | How effective is the county/region in filing for termination of parental rights (TPR) when a child is in foster care for 15 of 22 months unless there is a compelling reason not to file in accordance with the provisions of the Adoption and Safe Families Act (ASFA)? | 65.1% Almost Always/Frequently<br>27.7% Somewhat/Rarely<br>0.3% Never<br>6.9% N/A |
| Court Staff | How effective is the Foster Care Review/County Conference process in helping to ensure that children have the appropriate goals and achieve goals timely? | 48% Almost Always/Frequently<br>33% Somewhat/Rarely<br>19% Never/No information/NA |
| | How effective is the county/region in ensuring that each child in foster care has a permanency hearing in | 90% Almost Always/Frequently<br>5% Somewhat/Rarely<br>5% Never/No information/NA |

DHS
296757

| Survey | Indicator | Total |
|---|---|---|
| | a qualified court no later than 12 months from the date the child entered foster care and no less frequently than every 12 months thereafter? | |
| | How effective is the county/region in filing for termination of parental rights (TPR) when a child is in foster care 15 of 22 months unless there is a compelling reason not to file, in accordance with the provisions of the Adoption and Safe Families Act (ASFA)? | 71% Almost Always/Frequently<br>19% Somewhat/Rarely<br>10% No information |
| | How effective is the county/region in ensuring that foster parents, pre-adoptive parents, and relative caregivers of children in foster care receive notice of reviews or hearings held with respect to the children in their care, and have an opportunity to be heard | 85.7% Almost Always/Frequently<br>9.5% Somewhat/Rarely<br>4.8% No information |
| Provider Agencies | How effective is the county/region in filing for termination of parental rights (TPR) when a child is in foster care 15 of 22 months unless there is a compelling reason not to file, in accordance with the provisions of the Adoption and Safe Families Act (ASFA)? | 22% Almost Always/Frequently<br>27.5% Somewhat/Rarely<br>2.2% Never<br>48.3%No information or N/A |
| Foster Parents | How effective is the Foster Care Review/County Conference process in helping to ensure that children have the appropriate goals and achieve goals timely? | 56.5% Almost Always/Frequently<br>24.2% Somewhat/Rarely<br>1.6% Never<br>17.7% No information or N/A |
| | How effective are the 12 month court hearings for children in foster care in addressing timely permanency? | 51.6% Almost Always/Frequently<br>22.6% Somewhat/Rarely<br>3.2% Never<br>22.6% No information or N/A |
| | How effective is the county in making sure that foster parents, pre-adoptive parents, and relative caregivers of children in foster care receive notice of reviews or hearings held with respect to the children in their care, and have an opportunity to be heard? | 67.7% Almost Always/Frequently<br>22.6% Somewhat/Rarely<br>9.7% No information or N/A |

## Data Quality and Usage

### *Statewide and Implementing Regions' Performance*

There are currently no MACWIS data indicators associated with Data Quality and Usage. The survey information in Table 30 below provides responses from stakeholders surveyed as part of the EMU reviews conducted in the implementing regions for the time period covered by this CQI report.

DHS
296758

**Table 30**
**Stakeholder Survey Statewide Findings, Year to Date, Data Quality and Usage**

| Survey | Indicator | Total |
|---|---|---|
| Caseworker Staff (316 responses) | Evaluate whether data reports are useful and current, and are provided to staff, supervisors, managers, and administrators in a timely manner. | 59.1% Almost Always/Frequently 32% Somewhat/Rarely 0.6% Never 8.3% N/A |
| Court Staff | None Measured | N/A |
| Provider Agencies | None Measured | N/A |
| Foster Parents | None Measured | N/A |

## *Conclusion*

Continuous quality improvement is an ongoing process by which an agency makes decisions and evaluates its progress. Creating a comprehensive and complete CQI system takes time and effort with many stages of evolution and development.  This year has proven to be a time of growth for the DFCS CQI Unit. MACWIS, FCR and EMU staff continue to work together toward the common goal of building the CQI Unit and moving to the next level with quality improvement for DFCS. The use of data within the Agency continues to grow with staff better understanding how data is used to measure progress and areas needing improvement. The CQI Unit is committed to providing data via MACWIS reporting and EMU/FCR reviews reporting to aide each region statewide in meeting the *Olivia Y* Settlement Agreement data indicator requirements. The safety, permanency and well-being of children in the State of Mississippi is the primary driving force for the CQI Unit in supporting practice, programs and policies.

A number of statewide and regional data reports from MACWIS are currently in development and will be available in subsequent Annual CQI Reports for describing the state's and regions' performance in the areas covered by the Annual CQI Report.

DHS
296759

**Ex. 25A**

# Region 3-South
## Continuous Quality Improvement
## Baseline Report
## August 2011



**Compiled from MACWIS Data Indicator Reports, Evaluation and Monitoring On-Site Case Review Findings, Foster Care Review Program Data, and Stakeholder Survey Results**

Submitted by:
**Mississippi Family and Children's Services**
**Division of Evaluation and Monitoring**
**Office of Continuous Quality Improvement**

DHS
291111

## **Table of Contents**

Background ..................................................................................................1

Methodology and Sources .......................................................................1

Mobilizing Appropriate Services Timely .............................................3

Assuring Safety and Managing Risk ...................................................7

Involving Children and Families in Case Planning and Decision Making .................11

Assessing Strengths and Needs ...........................................................14

Preserving and Maintaining Connections ..........................................16

Individualizing Case Planning .............................................................19

Training of Staff and Providers ...........................................................21

Service Array.............................................................................................23

Placement Resources ..............................................................................24

Caseloads ...................................................................................................26

Oversight and Monitoring .....................................................................28

Court Processes ........................................................................................30

Data Quality and Usage .........................................................................33

Next Steps...................................................................................................34

Appendix

- o  Region 3-South August 2011 Data Indicators
- o  Region 3-South FCR Data
- o  Summary of Areas for Improvement Efforts

DHS
291112

# Region 3-South
# Baseline CQI Review Report

## Background

In connection with the *Olivia Y* Settlement Agreement, Council of Accreditation (COA), Federal standards and to support the implementation of the Mississippi Child Welfare Practice Model, Mississippi's Division of Family and Children's Services (DFCS) has embarked on developing a Continuous Quality Improvement (CQI) System which includes the Division of Evaluation and Monitoring, the Foster Care Review Program (FCR), and the Mississippi Automated Child Welfare Information System (MACWIS). The CQI System utilizes both quantitative and qualitative information to determine how counties, regions and the state are assuring the safety, permanency and well-being of children and families served by the State. This will be accomplished by monitoring key child welfare indicators associated with the components and systemic factors associated with the Practice Model. Therefore, the CQI system is organized around the six components and seven systemic factors of the Practice Model and includes elements of the Child and Family Services Review (CFSR), Council on Accreditation (COA) standards, and components of the *Olivia Y* settlement agreement. In order to monitor county, regional and state performance, the CQI system is centered around quantitative data indicators which will establish how counties and the region are doing in comparison to standards that have been set or in comparison to statewide performance. The qualitative information gathered is intended to provide context and a deeper insight to better understand counties and regions performance on the data indicators.

## Methodology and Sources

This report discusses the results of the Continuous Quality Improvement (CQI) data gathered for Region 3-South in Mississippi, and will serve as a baseline to measure and monitor improvement in the months and years to come. The sources for the information used in this report are as follows:

- **Data Indicators**: The MACWIS data indicators track and report information related to the state's Practice Model Components, Systemic Factors, and the requirements of the *Olivia Y* Settlement Agreement *(see data table footnotes in appendix for the time period covered for these data indicators)*. Existing data reports were augmented and new reports were developed and validated in order to capture key indicators of child welfare practice across the Practice Model components as well as systemic factors. In obtaining the results for the counties', regions', and state's respective levels of performance, the most recent summary reports, which have been validated for accuracy, were utilized. These data indicators will serve as the cornerstone for measuring strengths and areas needing improvement in counties and regions and will be used to establish baselines. The information from the case reviews, desk audits, and stakeholder surveys will be used to support the information from the data indicators.

- **On-site case record reviews and case member interviews**: To support the results of the data indicators from MACWIS, regions also conducted a qualitative case review to provide deeper context to the data results. After requesting and receiving a universe of cases from Region 3-South, a random sample of 14 foster care ██████████████ cases from both[1] of Region 3-South's 2 counties was obtained. Twelve teams made up of two people conducted the case reviews, and were supported by one team leader and two quality assurance reviewers. The information considered in the onsite review which occurred in August, 2011, focused on a 12 month period ending August 25, 2011 and came from the electronic case management system (MACWIS), paper files, and interviews with the various case members who included the parents, the children, and the caseworkers. The table below further illustrates the demographics from the sample of cases:

---

[1] Counties which had cases included in the review sample were: Hinds and Warren Counties

DHS
291113

| Case Characteristics | Foster Care | |
|---|---|---|
| **Total Number of Cases** | **14** | |
| **Date case was opened** | | |
| • Opened prior to the period under review (PUR) | 12 (85.7%) | |
| • Opened during the period under review (PUR) | 2 (14.3%) | |
| **Child entered foster care during the PUR** | 2 (14.3%) | |
| **Child's age at start of PUR** | | |
| • Younger than 10 | 5 (35.7%) | |
| • At least 10 but younger than 13 | 1 (7.1%) | |
| • At least 13 but younger than 16 | 6 (42.9%) | |
| • 16 and older | 2 (14.3%) | |
| **Race/Ethnicity** | | |
| • Black Non-Hispanic | 13 (92.9%) | |
| • Hispanic (of any race) | 0 | |
| • White Non-Hispanic | 1 (7.1%) | |
| • Unable to Determine | 0 | |
| **Primary reason for opening case** | | |
| • Physical Abuse | 3 (21.4%) | |
| • Neglect (not including medical neglect) | 2 (14.3%) | |
| • Domestic violence in child's home | 0 | |
| • Drug abuse by parent | 1 (7.1%) | |
| • Sexual Abuse | 2 (14.3%) | |
| • Other | 6 (42.9%) | |

- **Foster Care Review Data:** The Foster Care Review Program conducts periodic administrative reviews and county conferences on the cases of each child who has been in foster care six months or longer. During the course of the case review, data is collected to provide the caseworker, supervisor, and Regional Director with the status of each case as to the child's permanency, safety, and well-being. Issues of concern cited by the Foster Care Reviewer during the course of the case review are documented and reported to the county of responsibility supervisor and caseworker for their information and any needed corrective action. Beginning in January 2011 and ending in July 2011, the Foster Care Review Program reviewed 283 foster care cases in Region 3-South.

- **Stakeholder Surveys:** Stakeholder involvement is critical to the success of the Practice Model. In particular, service providers, as well as the courts, resource parents, the Regional Implementation Team, caseworkers, and supervisors need to be fully engaged in the child welfare process. In August, 2011, 206 stakeholders in Region 3-South were provided with surveys to determine how they believe the agency is performing with regard to the following systemic factors: Training of Staff and Providers, Service Array, Placement Resources, Caseloads, Oversight and Monitoring, Court Processes, and Data Quality and Usage. Stakeholders were surveyed through email addresses provided by the Area Social Work Supervisors (ASWS) in each county. The stakeholders were identified by the ASWS and forwarded to the Regional Director who then compiled a condensed list of stakeholders who were solicited for participation. 48 of the 206 possible surveys solicited were completed which resulted in an overall return rate of 23.3%. In some areas, a definitive number of solicited responses are not known, so for those areas, the percentages are based on the numbers of identified potential recipients based on documentation provided to the Evaluation and Monitoring Unit. Below is a summary of the return rate on each category of stakeholders surveyed:
  - **10% of Service Providers** – 4 out of 40 service providers solicited responded to the surveys in Region 3-South.
  - **53% of Caseworkers and Area Social Work Supervisors** (ASWS) – 27 out of 51 direct service workers, homemakers, clerks, resource and adoption workers, Regional Directors and ASWS' completed the surveys in Region 3-South.
  - **9.75% of Resource Parents** – 8 resource parents out of 82 identified resource parents completed the surveys in Region 3-South.

- 25.8% of Implementation Team – 8 out of 31 identified potential members of the Implementation Team completed the surveys in Region 3-South.
- 50% of Judges– 1 out of 2 Youth Court Judges, completed the surveys in Region 3-South.

# Section One
# Practice Model Components

## Mobilizing Appropriate Services Timely

Appropriate and timely services refer to a process whereby services are designed and delivered pursuant to a careful assessment of children's and parents' needs. The assessment should identify both the strengths of the children and parents with regard to the issues requiring interventions, and their needs with regard to ensuring safety, permanency, and well-being. Needs should not be confused with services. In order to provide appropriate and timely services to children and parents, there is a need to think beyond what is available in the service array so as to avoid offering a standard menu of services that may or may not match the unique needs of some parents and children. The concept of appropriate services emphasizes that services should be comprehensive, incorporating a broad array of services and supports that are individualized to meet the specific needs of the children and families. These services and supports should be provided in the least restrictive setting appropriate for the child and accessible to all jurisdictions within the State.

The following practice principles are linked to this component:

- Services are designed and delivered pursuant to a careful assessment of the children's and parents' needs;
- Services and supports are individualized to meet the unique needs of the children and parents;
- Services are based on needs, not on availability;
- Services are delivered when they are needed and in locations that are accessible to the children and parents who need them; and
- Children and families are treated as partners to assure joint decision making about the services that they need.

The results below detail the findings of Region 3-South's current success in Mobilizing Appropriate Services Timely.

### Number of Indicators Assessed: Mobilizing Appropriate Services Timely

| Type | Number | Percent |
|---|---|---|
| Indicators Exceeding Goals | 2 | 50% |
| Indicators Not Exceeding Goals | 2 | 50% |
| Total Indicators Currently Measurable | 4 | 100% |
| Other Indicators (not tied to Goals) | 6 | -- |
| TOTAL | 10 | -- |

There are 10 indicators associated with Mobilizing Appropriate Services Timely. There are 4 indicators at this time for which there is data to establish a baseline and to measure strengths and areas of needed improvement. 2 of the 4 (50%) indicators for which there is data meet or exceed the established goals indicating strengths in practice. 2 (50%) of the data indicators do not meet or exceed the established goals and indicates an area of needed improvement.

DHS
291115

*Strengths in Practice*

| Data Indicators Associated with Mobilizing Appropriate Services Timely | Year III Goal/ Compliance Measure | Region August 2011 | State August 2011 |
|---|---|---|---|
| Placement Stability - Number of children in custody 12 months or less that have had 2 or fewer placement moves<br>Data Source: MWZPLM5S<br>*As of August 31, 2011 | 70% | 224 of 311 children; 72% | 1,724 of 2,375 children 72.6% |

- The Year III goal for this measure is that 70% of children in custody 12 months or less have had 2 or fewer placement moves. Region 3-South meets this goal at 72% which is consistent with the overall state performance for the baseline period.
- During the August 2011 on-site case review, 97.1% of the foster care cases reviewed were rated a Strength for Placement Stability.
- Of the 9 cases reviewed during the on-site case review where there was more than one placement change during the period under review, 7 (78%) appear to have been planned by the agency in an effort to achieve the child's case plan goals or made in an effort to meet the needs of the child;
- All placements settings were found to be stable at the time of the on-site case review;
- 8 children were found to be assessed with special needs. 7 of those 8 children are in placements that can meet their therapeutic, educational, and medical needs;
- All placement settings were found to be least restrictive to meet the child's individual needs.
- Foster Care Review Program data from January 2011 thru July 2011 shows that of the 283 foster care cases reviewed, 4 cases were cited and reported to the regional/county staff due to issues related to children in non-licensed/non-court ordered placements; 11 cases were cited and reported due to potential placement disruption issues; 4 cases were cited and reported due to issues surrounding the appropriateness of the child's placement; and 7 cases were cited and reported to regional/county staff due to issues related to the restrictiveness of the child's placement.

| Data Indicators Associated with Mobilizing Appropriate Services Timely | Year III Goal/ Compliance Measure | Region August 2011 | State August 2011 |
|---|---|---|---|
| Children discharged from custody and reunified with parents/caretakers in the last year are reunified within 12 months of latest removal from home<br>Data Source: MWBRD05S & MWBRD05C<br>**September 1, 2010 August 31, 2011 | 60% | 78 of 107 children 72.9% | 898 of 1,344 children 66.8% |

- The Year III goal for this measure is that 60% of children discharged from custody and reunified with parents/caretakers in the last year are reunified within 12 months of the latest removal from the home. Region 3-South exceeds this goal at 72.9% which surpasses the overall state performance of 66.8% for the baseline period.
- 15.4% of the cases that were subject of the August 2011 on-site case review rated a Strength for Reunification/Guardianship/Permanent Placement with Relatives. Of the 13 applicable children who were subject of the August 2011 on-site case review, it appears concerted efforts are/were being made by the

agency and the courts to achieve a goal of Reunification, Guardianship, or Permanent Placement with Relatives in a timely manner in 8 (62%) of those cases. Of the 10 children with a goal of Reunification, parental service plans identified those services DFCS deems necessary to address behaviors or conditions resulting in the child's placement in foster care in 80% of the cases reviewed. DFCS made those services that were identified available either through direct or referral service to the mother in 70% of the applicable cases and to the father in 11% of the applicable cases. There were 2 children discharged during the period under review and reunified. In both cases, there was no evidence that a 90 day trial home placement occurred.

## *Areas Needing Improvement*

| Data Indicators Associated with Mobilizing Appropriate Services Timely | Year III Goal/ Compliance Measure | Region August 2011 | State August 2011 |
|---|---|---|---|
| Children in custody, ages 14 - 20, are provided with independent living services per their service plan ** Data Source: MWBRD16S **September 1, 2010 August 31, 2011 | 90% | 98 of 219 children 44.8% | 663 of 1,382 children 47.9% |

- The Year III goal for this measure is that 90% of children in custody, ages 14-20, are provided with Independent Living services per their service plan. Region 3-South does not meet this goal at 44.8% which is slightly below the overall state performance for the baseline period (September 1, 2010 thru August 31, 2011).
- 75% of the cases subject to the August 2011 on-site case review rated a Strength for Other Planned Living Arrangement. During the course of the review, there were 4 children identified in the review sample who were age appropriate for independent living services. 75% were found to be provided with services to adequately prepare them to live independently when they leave foster care.
- Of the 283 foster care cases reviewed by the Foster Care Review Program from January 2011 thru July 2011 in Region 3-South, 39 were cited with issues related to age appropriate children not receiving independent living services.

| Data Indicators Associated with Mobilizing Appropriate Services Timely | Year III Goal/ Compliance Measure | Region August 2011 | State August 2011 |
|---|---|---|---|
| Children discharged in the last year upon finalization of an adoption have had the adoption finalized within 24 months of the latest removal from home Data Source: MWBRD10D & MWBRD10S **September 1, 2010 August 31, 2011 | 25% | 2 of 14 children 14.3% | 76 of 296 children 25.7% |

- The Year III goal for this measure is that 25% of children discharged in the last year upon finalization of an adoption have had their adoption finalized within 24 months of the latest removal from the home. From September 1, 2010 thru August 31, 2011 there were 14 children in Region 3-South who were adopted. 2 (14.3%) met the criteria of the goal by being adopted within 24 months of the latest removal from the home. This does not meet the Year III goal.
- None of the applicable cases that were subject of the August 2011 on-site case review rated a Strength for Adoption. Of the children in the case review sample with a plan of Adoption, it appears concerted efforts are not/were not being made by the agency and the courts in any of the cases to achieve the plan of

DHS
291117

Adoption in a timely manner. Of the applicable cases reviewed, 1 child had had an adoption specialist assigned and an adoption plan that identifies the child-specific activities that DFCS will undertake to achieve adoption. There is evidence in 0 of the applicable cases that shows the resource parents have been informed of available subsidies, including post-adoptive services. For children in the review who have been in care longer than 12 months, there is evidence in 1 of the applicable cases that that the resource parents have been engaged in discussions regarding adoption.

- 24 of the 283 cases reviewed in Region 3-South by the Foster Care Review Program during the January 2011 thru July 2011 review cycle show that there were issues cited and reported to regional/county staff due to children having a plan of Adoption but there was no evidence/documentation that a referral had been made for termination of parental rights or that other barriers to timely adoption were notated.

## *Other Key Indicators*

- There are currently no MACWIS data indicators available for the items addressed below. However the Region may want to use the following information from the on-site case reviews as indicators of practice in these areas:

| Data Indicators Associated with Mobilizing Appropriate Services Timely | Year III Goal/ Compliance Measure | Region August 2011 | State August 2011 |
|---|---|---|---|
| Placement Stability - Number of moves for all children regardless of time in custody<br>Data Source: MWBRD07S & MWBRD07T<br>*As of August 31, 2011 | | 1 - 2 moves: 192 of 419 children 45.8%<br>3 - 5 moves: 131 of 419 children 31.3%<br>6> moves: 96 of 419 children 22.9% | 1 - 2 moves: 1,922 of 3,534 children 54.4%<br>3 - 5 moves: 1,010 of 3,534 children 28.6%<br>6> moves: 602 of 3,534 children 17% |

- There is currently no established goal for this item (*Placement Stability – Number of Moves for all Children regardless of Time in Custody*). However, there is data to reflect how the Region is performing with regard to the number of moves children are experiencing.
- **Foster Care Re-entries:**
  - 83.3% of the 6 applicable foster care cases during the August 2011 on-site case review rated a Strength for this item.
- **Physical Health of the Child:**
  - 35.7% of the 14 foster care cases rated a Strength for this item. ██████████████ ████████████████████ In the last 12 month period, the agency assessed the physical health care needs of 13 of the 14 (93%) foster children who were subject of the August 2011 on-site case review. Of the 5 children who came into agency custody during the period under review, none received an initial screening within 72 hours and 1 received a comprehensive health screening within 30 days of foster care entry. There were 13 children in the on-site case review who were age appropriate for dental services. 69% of those children had their dental health care needs assessed during the period under review. Of the children with identified physical health needs, 54% were provided with appropriate services in a timely manner to address those needs. 42% of the children with identified dental health needs were provided with appropriate services in a timely manner to address those needs.
- **Mental/Behavioral Health of the Child:**
  - 66.7% of the 12 applicable foster care cases rated a Strength for this item. ████████████ ████████████████████ During the period under review, age appropriate foster

DHS
291118

children who were the subjects of the August 2011 on-site case review received an initial mental health screening within 30 days of entry into foster care and/or within 30 days of their 4th birthday in 50% of the applicable cases. The agency conducted an assessment of the children's mental/behavioral health needs on an on-going basis or as a follow-up based on indications to inform case planning decisions in 83% of the applicable cases and (during the review period) provided appropriate services to address the children's mental/behavioral health needs in a timely manner in 83% of those cases.

- Foster Care Review data collected during the January 2011 thru July 2011 review period shows that of the 283 foster care cases reviewed, 200 (71%) were cited and reported to the county of responsibility due to issues related to vital ISP information missing such as medical, dental, mental health (in addition to placement information and other required ISP components). 3 cases were cited due to issues related to children with identified medical, educational, or mental health needs not having those needs addressed in an appropriate or timely manner.

### *Areas for Improvement Efforts to better address Mobilizing Appropriate Services Timely*

- On-site case review and Foster Care Review data shows that (overall) age appropriate children are being provided with Independent Living services by the Region. However, Region 3-South's data indicators show that children in custody, ages 14 - 20, being provided with independent living services per their service plan is an area of needed improvement. It is suggested that the Region review their data entry in MACWIS and refer to the Report Guides on the "DFCS Connection" website to determine if this is a practice issue or (as with other areas of the state) a data entry issue.
- Children discharged in the last year upon finalization of an adoption having had the adoption finalized within 24 months of the latest removal from home shows to be an area needing improvement based on the data indicators from the September 1, 2010 thru August 31, 2011 baseline period. Strategies to improve the timeliness of adoptions within the prescribed time periods should be developed by the Region's Implementation Team and its applicable sub-groups.
- On-site case review data and Foster Care Review Program data seems to show a need for improvement in assessing children's physical and mental health needs and providing services in a timely manner to meet those identified needs.

## Assuring Safety and Managing Risk

Safety and risk-related interventions are designed to help children remain safely at home whenever possible and appropriate. Assuring child safety begins with the first report to MDHS that someone believes a child is being maltreated and continues through initiating investigations of maltreatment; initial safety and risk assessment; ongoing safety and risk assessment; developing a case plan; assuring safety during placement; reunification; and case closure. Safety and risk interventions are applicable for all children within a home, not only for a child for whom a report of maltreatment has been received.

The following practice principles are linked to this component:
- Safety and risk assessment practice guide casework activities with regard to safety, permanency, and well-being;
- Safety and risk assessments are used to address case plans and service delivery;
- Safety and risk assessment occurs throughout the life of a case;
- Family-centered practice principles apply to safety and risk interventions; and
- Safety and risk are addressed within the cultural background of the children and families being served.

DHS
291119

The results below detail the findings of Region 3-South's current success in Assuring Safety and Managing Risk.

**Number of Indicators Assessed: Assuring Safety and Managing Risk**

| Type | Number | Percent |
|---|---|---|
| Indicators Exceeding Goals | 0 | -- |
| Indicators Not Exceeding Goals | 5 | 100% |
| Total Indicators Currently Measurable | 5 | 100% |
| Other Indicators (not tied to Goals) | 1 | -- |
| **TOTAL** | **6** | -- |

There are 6 data indicators associated with Assuring Safety and Managing Risk. Of the 6 indicators, only 5 currently have Goals and/or data to measure against best practice Goals. Of the 5 Goals that currently have data available for which to establish a baseline and to measure strengths and areas of needed improvement, 0 of the 5 indicators for which there is data meet or exceed Goals indicating strengths in practice. 5 (100%) data indicators do not meet or exceed Goals and indicates an area of needed improvement.

*Strengths in Practice*

- There are no MACWIS data indicators that rate as a Strength for the Region in Assuring Safety and Managing Risk.

*Areas Needing Improvement*

| Data Indicators Associated with Assuring Safety and Managing Risk | Year III Goal/ Compliance Measure | Region August 2011 | State August 2011 |
|---|---|---|---|
| All investigations into reports of maltreatment, including corporal punishment, of children in DFCS custody must be initiated within 24 hours of the report and completed within 30 calendar days, including supervisory approval. Data Source: MWZ1271R & MWZ1271S * August 1, 2011 thru August 30, 2011 | 100% | Total Investigations 15 Timely Initiated: 12 investigations 80% Timely Completed: 1 investigation 16.7% | Total Investigations 89 Timely Initiated: 73 investigations 82% Timely Completed: 14 investigations 35.9% |

- The Year III goal for this measure is 100% of all investigations into reports of maltreatment, including corporal punishment, of **children in DFCS custody** must be initiated within 24 hours of the report and completed within 30 calendar days, including supervisory approval. Region 3-South does not meet this goal at 80% initiated timely and 16.7% completed timely.

| Data Indicators Associated with Assuring Safety and Managing Risk | Year III Goal/ Compliance Measure | Region August 2011 | State August 2011 |
|---|---|---|---|
| Investigation timeliness for all children Data Source: MWZ1272S & MWZ1272R * August 1, 2011 thru August 30, 2011 | 100% | Timely Initiated ▇ L3= 85 70.8% investigations Timely Completed: ▇ L3= 11 19.6% investigations | Timely Initiated ▇ L3= 911 76.6% investigations Timely Completed: ▇ L3= 326 46.9% investigations |

- The Year III goal for this measure is 100%. The Region does not meet this goal in that ▇▇▇ 70.8% of the Level 3 investigations were initiated in a timely manner. ▇▇▇ 19.6% of the Level 3 investigations were completed in a timely manner (which includes supervisory approval).

| Data Indicators Associated with Assuring Safety and Managing Risk | Year III Goal/ Compliance Measure | Region August 2011 | State August 2011 |
|---|---|---|---|
| Rate of Abuse / Neglect / Maltreatment in Care Data Source: MWBRD06S § September 1, 2010 thru August 31, 2011 **NOTE:** This number is duplicative as it counts the number of evidenced findings rather than the children that were maltreated in care. | <0.57% | 0.83% of 721 children in custody | 1.43% of 6,071 children in custody |

- The Year III goal for this measure is less than 0.57%. Of the 721 children in custody during the reporting period of August 1, 2010 through July 31, 2011, there was a rate of 0.83% for Region 3-South. It should be noted that this number is duplicative as it counts the number of evidenced findings rather than the children that were maltreated in care.

DHS
291121

| Data Indicators Associated with Assuring Safety and Managing Risk | Year III Goal/ Compliance Measure | Region August 2011 | State August 2011 |
|---|---|---|---|
| Any foster child who remains in the same out of home placement following an investigation into a report that he/she was maltreated, or subject to corporal punishment, in that placement shall be visited by a DFCS caseworker twice a month for three months after the conclusion of the investigation Data Source: MWLS55AS & MWLS55AD * August 1, 2011 thru August 30, 2011 | 100% | 0 of 5 children 0% | 26 of 59 children 44.1% |

- This data indicator measures any foster child who remains in the same out of home placement following an investigation into a report that he/she was maltreated, or subject to corporal punishment, in that placement shall be visited by a DFCS caseworker twice a month for three months after the conclusion of the investigation. The Year III goal for this measure is 100%. The Region does not meet the prescribed goal in that there were 5 children who met the criteria for the measure but none actually had the necessary visits made as outlined in the indicator.

| Data Indicators Associated with Assuring Safety and Managing Risk | Year III Goal/ Compliance Measure | Region August 2011 | State August 2011 |
|---|---|---|---|
| Foster parents with at least one foster child residing in their home shall have a DFCS worker visit the home twice a month (therapeutic FH) or monthly (non-therapeutic FH) Data Source: MWZPLMCS & MWZPLMS2 * August 1, 2011 thru August 30, 2011 | 80% | Foster Homes: 43 of 224 children 19.2% Thera Foster Homes: 2 of 83 children 2.4% | Foster Homes: 956 of 2,479 children 38.6% Thera Foster Homes: 32 of 245 children 13.1% |

- This indicator measures whether foster parents with at least one foster child residing in their home have had a DFCS worker visit the home twice a month (therapeutic FH) or monthly (non-therapeutic FH);
- The Year III goal for this measure is 80%. The Region does not meet this goal at 19.2% for foster homes and 2.4% for therapeutic foster homes.

### Other Key Indicators

- There are currently no MACWIS data indicators available for the items addressed below. However the Region may want to use the following information from the August 2011 on-site case reviews as indicators of practice in these areas:
  - Timeliness of initiating investigations of reports of child maltreatment (Item 1) / 50% of the placement cases reviewed rated a Strength ███████████████████████ ████;
  - Repeat Maltreatment (Item 2) / 100% of the placement cases ████████████ reviewed rated a Strength;

- Services to Family to Protect Child(ren) in the Home and Prevent Removal or Re-Entry into Foster Care (Item 3) / 100% Strength for placement cases ▮▮▮▮▮▮▮▮ reviewed;
- Risk Assessment and Safety Management (Item 4) / 57.1% Strength for placement cases ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*Areas for Improvement Efforts to better address Assuring Safety and Managing Risk*

o   Although a number of items rated a Strength during the on-site case review, the baseline data indicators show a need for improvement in the area of Assuring Safety and Managing Risk. Due to the conflict in the on-site review information and the MACWIS data indicators, there could be a need for more timely entry of investigative data in MACWIS by staff in Region 3-South. A review of this issue by the Region's Implementation Team and/or the Region's CQI Team may result in strategies that will lead to improvements in the timeliness of investigations initiated and completed.
o   Efforts to better address caseworker visits with children who remain in the same out of home placement following an investigation into a report that he/she was maltreated, or subject to corporal punishment, in that placement should be developed in order to assure safety and manage risk.
o   Efforts to better address caseworker visits with foster parents with at least one foster child residing in their home should be developed by the Region in order to manage risk and assure safety of the children placed in those homes.

# Involving Children and Families in Case Planning and Decision Making

This component includes active involvement of age-appropriate children, families, and youth in identifying their unique strengths, needs, and service requests, and in developing plans that address their needs, establish and attain their goals, and support safe and appropriate relationships within families while children are in foster care. It includes all relevant family members, whether in the household or not, preparing them for and supporting their participation in meetings, reviews, and other processes that affect them. It also includes using information from safety and risk assessments and comprehensive strengths and needs assessments to determine negotiable and non-negotiable aspects of case planning, casework activity, and levels of family involvement.

The following practice principles are linked to this component:
- Parents, age-appropriate children, and youth are actively involved in developing or modifying all plans that pertain to them;
- Parents who do not reside in the home of the children are involved in developing and modifying plans that pertain to their children whenever it is safe and appropriate to do so;
- When safe and appropriate, parents are involved in the care of their children in foster care and in their children's activities; and
- Safety of children is not compromised through involving children and parents in case planning and decision making.

The results below detail the findings of Region 3-South's current success in Involving Children and Families in Case Planning and Decision Making.

**Number of Indicators Assessed: Involving Children and Families in Case Planning and Decision Making.**

| Type | Number | Percent |
|---|---|---|
| Indicators Exceeding Goals | 0 | -- |
| Indicators Not Exceeding Goals | 2 | 100% |
| Total Indicators Currently Measurable | 2 | 100% |
| Other Indicators (not tied to Goals) | 1 | -- |
| **TOTAL** | **3** | **--** |

There are 3 data indicators associated with Involving Children and Families in Case Planning and Decision Making. Of the 3 indicators, there are currently only 2 for which there is an established goal and available regional and state data to measure against best practice. 0 of the 2 indicators for which there is data meet or exceed the established goals indicating strengths in practice. 2 (100%) data indicator does not meet or exceed established goals and indicates an area of needed improvement.

## Strengths in Practice

- There are no MACWIS data indicators that rate as a Strength for the Region in Assuring Safety and Managing Risk.

## Areas Needing Improvement

| Data Indicators Associated with Involving Children and Families in Case Planning and Decision Making | Year III Goal/ Compliance Measure | Region August 2011 | State August 2011 |
|---|---|---|---|
| Children in custody shall receive documented twice-monthly, in-person visits by the assigned DFCS caseworker<br>Data Source: MWZWC5S2<br>* August 1, 2011 thru August 31, 2011 | At least 70% | 160 of 450 children in custody 35.6% | 1989 of 3,651 children in custody 54.5% |

- The Year III Goal for this measure is at least 70% of children in custody shall receive documented, twice-monthly, in-person visits by the assigned DFCS caseworker. Region 3-South does not meet this goal at 35.6%;
- 71.4% of the foster care cases ▓▓▓▓▓▓▓▓▓▓▓ reviewed during the August 2011 on-site case review rated a Strength for caseworker visits with the child;
- 100% of the foster care cases ▓▓▓▓▓▓▓▓▓▓▓▓ reviewed in the August 2011 on-site review had caseworker contacts with children that were of a frequency sufficient to address issues pertaining to safety, permanency, and well-being of the child and promote the achievement of case goals;
- 78% of the caseworker contacts in foster care cases ▓▓▓▓▓▓▓▓▓ ▓▓▓ subject to the August 2011 on-site case review were of a quality sufficient to address issues pertaining to safety, permanency, and well-being of the child and promote achievement of case goals.
- Of the 283 foster care cases reviewed by the Foster Care Review Program in Region 3-South during the January 2011 thru July 2011 review period, the follow issues pertaining to caseworker visits with children were cited and reported to the county of responsibility:
    - 23 foster care cases were cited where there were no consistent contacts made each month between the caseworker and child;
    - 11 foster care cases were cited due to issues surrounding the quality of the caseworker/child contacts made;
    - 101 (36%) foster care cases were cited due to a lack of caseworker visits with the child in their placement setting.

DHS
291124

| Data Indicators Associated with Involving Children and Families in Case Planning and Decision Making | Year III Goal/ Compliance Measure | Region August 2011 | State August 2011 |
|---|---|---|---|
| Children with a goal of reunification shall have their assigned DFCS caseworker meet monthly with the child's biological parents Data Source: MWZWCR3S * August 1, 2011 thru August 31, 2011 | At least 80% | 8 of 253 children with plan of reunification 3.2% | 460 of 2,059 children with plan of reunification 22.3% |

- The Year III goal for this measure is that at least 80% of children with a goal of Reunification shall have their assigned DFCS caseworker meet monthly with the child's biological parents. Region 3-South does not meet this goal at 3.2%.
- 16.7% of the foster care cases ███████████████ reviewed during the August 2011 on-site case review rated a Strength for Caseworker Visits with Parents;
- 33% of the foster care ████████████ cases reviewed during the August 2011 on-site case review had caseworker visits with the mother that were of a frequency sufficient to address issues pertaining to safety permanency and well-being while 10% of the foster care cases ████████████ had caseworker visits with the father that were of such a frequency.;
- 42% of the foster care cases reviewed ████████████ reviewed had caseworker visits with the mother that were of a quality sufficient to address issues pertaining to safety, permanency, and well-being while none of the foster care ████████ cases reviewed had caseworker contacts with fathers that were of a quality sufficient to address issues pertaining to safety, permanency, and well-being;
- None of the foster care cases had documented diligent efforts made to locate the mother or the father if contacts were not made with the parents due to their whereabouts being unknown. ████████████████████████████████████████████████████
- Foster Care Review Program data shows that during the January 2011 thru July 2011 review period, there were 136 foster care cases cited and reported to the county of responsibility where there was a lack of caseworker visits with the parents/primary caretakers. 127 cases were cited and reported to the county of responsibility due to issues surrounding the quality of contacts with parents/primary caretakers. 69 cases were cited and reported to the county of responsibility due to a lack of efforts made to locate parents whose whereabouts are unknown.

## Other Key Indicators

There are currently no MACWIS data indicators available for the items addressed below. However the Region may want to use the following information from the on-site case reviews as indicators of practice in these areas:

- 100% of the foster care cases ████████████████ rated an Area Needing Improvement for Involving Children and Parents in Case Planning and Decision Making.
- The agency made concerted efforts to actively involve the **child** in the case planning process in 79% of the applicable foster care cases ████████████████. 10 of the 283 foster care cases reviewed by the Foster Care Review program between January 2011 and July 2011 were cited due to issues related to age appropriate children not participating in case planning activities.
- The agency made concerted efforts to actively involve the **mother** in the case planning process in 67% of the applicable foster care cases ████████████████. The agency made concerted efforts to actively involve the **father** in the case planning process in none of the applicable foster care cases ████████████████. 119 of the 283 cases reviewed by the Foster Care

DHS
291125

Review program between January 2011 and July 2011 were cited due to parental/primary caretaker involvement in case planning activities.

- There was evidence in 38% of foster care cases ███████████████ that the family was informed and prepared to actively participate in case events, including family team meetings, case plan development, and court events.
- There was evidence in 43% of the foster care cases ███████████████ that children and parents were involved in choosing the services included on their case plans.
- 23% of foster care cases ███████████████ reviewed contained case plans with signatures by the parents while 40% of foster care cases ███████████████ contained case plan with the signature of children ages 6 and up.
- 64% of the families subject to the case review sample were in attendance at the County Conferences (Periodic Administrative Review) during the period under review. 158 of the 283 (56%) cases reviewed between January 2011 and July 2011 by the Foster Care Review Program were cited due to County Conference notification issues.

*Areas for Improvement Efforts to better address Involving Children and Families in Case Planning and Decision Making*

- A plan to improve the frequency and quality of visits taking place between caseworkers and children should be developed and implemented by the Region to improve performance for involving children in case planning and decision making.
- A plan should be developed by the Region to assure more frequent and more quality visits take place between caseworkers and parents of children who have a permanent plan of Reunification. This will result in more timely permanency for children in care and can also have a positive effect on the Region's performance of other practice model components in ████ placement ████████ cases. ████Efforts to improve the involvement of parents (especially fathers) and children in the case planning process will also result in more timely permanency for children in the Region who are in care ████████ ███████████████████████████████
- Improving notification for the county conference process and encouraging attendance will also assist in improving the Region's performance in involving children and families in case planning and decision making.

## Assessing Strengths and Needs

Comprehensive family assessment (CFA) is the ongoing and continuous process of gathering, organizing, and analyzing information for the purpose of informed decision-making and service planning concerning the safety, permanency, and well-being of children, youth, and families. Beyond an assessment of risks, safety and the circumstances leading to agency involvement, the CFA includes a broader focus of the strengths and needs of all individual family members along with underlying conditions affecting the family. Collaboration with key professionals throughout the process is critical.

The following practice principles are linked to this component:
- All families have unique strengths and needs;
- Families are participants in identifying their strengths and needs and in requesting services;
- Assessment includes strengths and needs regarding safety, permanency, and well-being;
- Assessment addresses underlying conditions in addition to presenting issues;
- All relevant family members' strengths and needs should be assessed;
- Assessment information is used to guide case planning and decision making;
- Families are best understood in the context of their culture;
- Early identification of concerns that can lead to emotional and behavioral disturbances are prioritized in assessments; and
- Assessments should be multidisciplinary.

The results below detail the findings of Region 3-South's current success in Assessing Strengths and Needs.

**Number of Indicators Assessed: Assessing Strengths and Needs.**

| Type | Number | Percent |
|---|---|---|
| Indicators Exceeding Goals | -- | -- |
| Indicators Not Exceeding Goals | -- | -- |
| Total Indicators Currently Measurable | -- | -- |
| Other Indicators (not tied to Goals) | 5 | 100% |
| **TOTAL** | **5** | **100%** |

There are 5 data indicators associated with Assessing Strengths and Needs. However, there is currently no regional or state data indicator information available at this time. Information from the desk audits and on-site case reviews show mixed strengths and areas of needed improvement.

### Strengths in Practice

There are currently no MACWIS data indicators available for the items within this component. Please see "Other Key Indicators" for on-site case review data that may be used to assess the Region's performance in the area of Assessing Strengths and Needs.

### Areas Needing Improvement

There are currently no MACWIS data indicators available for the items within this component. Please see "Other Key Indicators" for on-site case review data that may be used to assess the Region's performance in the area of Assessing Strengths and Needs.

### Other Key Indicators

- There are currently no MACWIS data indicators available for the items addressed below. However the Region may want to use the following information from the on-site case reviews as indicators of practice in these areas:

- **Educational Needs of the Child:**
  - The results from the August 2011 on-site case review show that 61.5% of foster care cases ▮▮▮ rated as a Strength for Assessing Educational Needs of the Child (On-Site Case Review Item 6).
  - In 92% of the applicable foster care cases ▮▮▮▮▮▮▮▮▮▮ during the period under review, the agency made concerted efforts to assess and address the child's educational needs.
  - 90% of the applicable children in the case review sample were enrolled in an accredited school within 3 days of custody or placement.
- **Needs and Services of the Child, Parents, and Foster Parents:**
  - The results from the August 2011 on-site case review show that 14.3% of the foster care cases rated a Strength ▮▮▮▮▮▮▮▮ for Needs and Services of the Child, Parents, and Foster Parents (On-Site Case Review Item 5).
  - The case review results show that the needs of the child were assessed (formally or informally) initially and on-going in 79% of the foster care cases ▮▮▮▮▮▮▮▮▮. For cases opened during the period under review, these assessments occurred within the first 30 days of the case being opened in 75% of the applicable foster care ▮▮▮▮▮ cases. Services were provided to the children in a timely manner in 90% of the foster care cases ▮▮▮▮▮▮. The child was interviewed prior to the completion of the strengths and need assessment in 85% of the foster care cases ▮▮▮▮▮▮▮ cases. The child's involvement in the strengths and needs assessment (other than signatures) was apparent in 69% of the foster care cases ▮▮▮▮▮▮.

DHS
291127

- ○ The case review results show that the needs of the mother were assessed (formally or informally) initially and on-going in 70% of the applicable foster care cases ███████████████████████████████████ ███████████████████████████████████████████████████████████████ Services were provided to the mother in a timely manner in 70% of the foster care cases ███████████████ . The mother was interviewed prior to the completion of the strengths and need assessment in 64% of the foster care cases ███████████ . The mother's involvement in the strengths and needs assessment (other than signatures) was apparent in 55% of the foster care ████████████████ cases.

- ○ The case review results show that the needs of the father were assessed (formally or informally) initially and on-going in 18% of the foster care cases ████████████ . For cases opened during the period under review, these assessments with the father occurred within the first 30 days of the case being opened in none of the applicable foster care ████████████ . Services were provided to the father in a timely manner in 10% of the foster care cases ████████████ . The father was interviewed prior to the completion of the strengths and needs assessment in none of the foster care cases ████████ . The father's involvement in the strengths and needs assessment (other than signatures) was apparent in none of the foster care cases ████████ .

- ○ The case review results show that the needs of the foster/pre-adoptive family were assessed (formally or informally) initially and on-going in 88% of the foster care cases. Services were provided to the foster/pre-adoptive family in a timely manner in 88% of the cases. During the review period, the agency in Region 3-South provided all needed services to the foster/pre-adoptive family to meet identified and assessed needs in 86% of the cases.

- ○ Foster Care Review Program data from the January 2011 thru July 2011 review cycle shows that of the 283 foster care cases reviewed, 2 cases were cited and reported to the county of responsibility due to issues surrounding services being provided to parents/primary caretakers to meet identified needs. 8 cases were cited during the review cycle related to services being provided to meet the identified needs of the resource parents.

### *Areas for Improvement Efforts to better address Assessing Strengths and Needs*

- • There is currently no baseline data indicator information for which to measure compliance with regard to Assessing Strengths and Needs. However, on-site case review results indicate that the Region may need to develop and implement a plan to improve the assessment of strengths and needs. It appears assessments are taking place with child and, to a slightly lesser extent, with mothers and resource parents. It does seem that fathers are not being fully engaged in the assessment process since fathers were indeed engaged in some of the foster care cases ████████████ .

## Preserving and Maintaining Connections

When children enter foster care, they often become separated from the people and places that are the most familiar and comforting to them. This component of the practice model emphasizes the normalizing of connections and relationships for children in foster care to the extent that it is safe and appropriate to do so. The focus is on keeping children safe and stable within placement settings that permit them to retain important relationships with family members, retain normalized sibling relationships and friendships, and maintain important traditions and connections that define them culturally, and continue being a part of the social institutions that nurture them, such as school, religion, and so forth.

The following practice principles are linked to this component:
- • Foster care should support the family instead of substitute for the parents whenever possible and appropriate;
- • Healthy child/parent relationships should be supported and maintained throughout a foster care episode if safe and appropriate to do so;

- Children in foster care have important connections and relationships that help to define them as individuals and members of a family, community, and culture;
- Caseworkers should work to normalize the connections and relationships for children in foster care to the extent that it is safe and appropriate to do so;
- Children should be allowed to retain important relationships with extended family, siblings, and other friendships as deemed safe and appropriate; and
- Agencies should ensure that important traditions, identity with social institutions, and cultural connections are maintained.

**Number of Indicators Assessed: Preserving and Maintaining Connections**

| Type | Number | Percent |
|---|---|---|
| Indicators Exceeding Goals | -- | -- |
| Indicators Not Exceeding Goals | -- | -- |
| Total Indicators Currently Measurable | 0 | -- |
| Other Indicators (not tied to Goals) | 4 | 100% |
| **TOTAL** | **4** | **100%** |

There are 4 indicators associated with the component of Preserving and Maintaining Connections. Currently there are no indicators that have data and/or goals available for which to assess strengths or needed areas of improvement. Information from the on-site case reviews may be used by the region as indicators as to where practice may lie within the region with regard to Preserving and Maintaining Connections and to develop any actions that may be necessary to improve that practice.

*Strengths in Practice*

There are currently no data indicators available from which to evaluate strengths. Refer to the *"Other Key Indicators"* segment for strengths observed during the course of the on-site case review held in July 2011 in Region 4-South.

*Areas of Needed Improvement*

There are currently no data indicators available from which to evaluate areas of needed improvement. Refer to the *"Other Key Indicators"* segment for areas of needed improvement observed during the course of the on-site case review held in July 2011 in Region 4-South.

*Other Key Indicators*

There are no data indicators available at this time from which to evaluate strengths and areas of needed improvement in order to set a baseline and establish a plan for corrective action. However, the information below from the on-site case reviews may be used by the Region to evaluate its current practice and to proceed with plans for corrective action.

The on-site case reviews conducted in Region 3-South in August 2011 reflect the following with regard to the Practice Model component of Preserving and Maintaining Connections:

- **Proximity of Foster Care Placement (On-Site Case Review Item 19):**
    - 92.9% of the 14 applicable foster care cases reviewed rated as a Strength;
    - Case review results found 6 foster children to be in placements outside of the county from which they were removed.
    - 3 children's placements were found to not be in close enough proximity to their parents to facilitate frequent face-to-face contacts with them. However, it was found that the proximity of the placement was necessary to meet the individual needs and case plan goals of the children.

DHS
291129

- ○ 10 children in the sample were not attending the same school as when they first came into DFCS custody. However, it was found in all 10 cases that this was appropriate based on case circumstances.
- ○ Foster Care Review Program data shows that no foster care cases were cited in Region 3-South during the January 2011 thru July 2011 case review cycle due to proximity of placement issues.
- **Placement with Siblings (On-Site Case Review Item 20):**
  - ○ 100% of the 9 applicable foster care cases reviewed in August 2011 rated as a Strength;
  - ○ Of the 9 applicable foster children reviewed for this item, 7 children (78%) were placed with all of his/her siblings that are in foster care. Of the 2 children who were not placed with all of their siblings in foster care, there was a valid reason in both cases (100%) for the separation of the siblings such as it was necessary to meet the individual needs of the child or there were safety concerns.
  - ○ None of the 283 foster care cases reviewed by the Foster Care Review Program during the January 2011 thru July 2011 review cycle were cited due to sibling placement issues.
- **Visiting with Parents and Siblings in Foster Care (On-Site Case Review Item 21)**
  - ○ 84.6% of the foster care cases reviewed during the August 2011 on-site case review were rated an Area Needing Improvement;
  - ○ None of the 4 applicable foster care cases (children who entered DFCS custody during the period under review) contained a visitation plan that was developed within the first 30 days of the child entering custody with 5 of 11 applicable cases having a visitation plan updated every 90 days during the period under review, and 6 of the plans addressed all visitations (parents, siblings, connections, etc.);
  - ○ 55% of applicable foster care cases had concerted efforts made during the period under review to ensure frequency of visitation (or other forms of contact if visitation was not possible) between the child and his/her mother. In 70% of the applicable cases, the quality of the mother/child visitation was sufficient in order to maintain or promote a continuity of the relationship.
  - ○ 10% of the applicable foster care cases had concerted efforts made to ensure frequency of visitation (or other forms of contact if visitation was not possible) between the child and his/her father. During the period under review, concerted efforts were made in 11% of the cases to ensure that the quality of the visitation (or other forms of contact if visitation was not possible) was of a sufficient frequency to maintain or promote a continuity of the relationship.
  - ○ 18% of the 283 cases reviewed by the Foster Care Review Program between January 2011 and July 2011 were cited due to issues surrounding parent/child visitation.
  - ○ 88% of the foster care cases showed concerted efforts had been made to ensure visitation (or other forms of contact if visitation was not possible) between the child and his/her siblings. During the period under review, concerted efforts were made to ensure that the quality of the visitation (or other forms of contact if visitation was not possible) was of a sufficient quality to maintain or promote a continuity of the relationship in all of these cases.
  - ○ 20 of the 283 foster care cases reviewed by the Foster Care Review Program between January 2011 and July 2011 were cited and reported to the county of responsibility due to issues surrounding sibling visitation.
  - ○ During the period under review, 0 of the 4 applicable foster children had a visit with his/her parents within 24 hours of placement or, at a minimum, a phone call with relatives within the first 24 hours.
- **Preserving Connections (On-Site Review Item 22):**
  - ○ Of the 14 foster care cases reviewed in August 2011, 64.3% rated a Strength for Preserving Connections.
  - ○ 86% of the foster care cases reviewed had concerted efforts made to maintain the child's important connections.
  - ○ 10 of the 14 foster care cases reviewed had a sufficient inquiry conducted with the parent, child, custodian, or other interested party to determine whether the child may be a member of or is eligible for membership in a Native American (Indian) tribe. It appears there were no cases reviewed where a child was identified who may have been a member of a tribe (or eligible for membership).
- **Relationship of Child in Care with Parents (On-Site Review Item 23):**

- o This item rated as a Strength in 25% of the applicable foster care cases reviewed;
- o Of the 2 applicable foster care cases reviewed, neither had sufficient documentation/evidence that a meeting occurred between the birth parents and the resource parents within the first month of placement (*if the placement occurred during the period under review*);
- o Of the applicable foster care cases reviewed in August 2011, there was evidence of shared parenting responsibilities between the birth and resource parents in 25% of the cases.
- **Relative Placement (On-Site Review Item 24):**
  - o This item rated as a Strength in 53.8% of the applicable foster care cases reviewed;
  - o During the period under review, 5 foster children in the case review were placed with relatives. Of those 5, all were found to be stable.
  - o Of the foster children who were not placed with relatives, concerted efforts to identify, locate, and evaluate maternal relatives were made in half of the applicable cases in the sample and in none of the applicable cases with regard to paternal relatives.
  - o Foster Care Review Program data shows that 22 foster care cases were cited and reported to the county of responsibility concerning issues surrounding efforts made to locate relatives for placement.

### *Areas for Improvement Efforts to better address Preserving and Maintaining Connections*

- There is currently no baseline data indicator information for which to measure compliance. However, on-site case review results seem to indicate that the Region may need to develop and implement a plan to improve performance in the area of Preserving and Maintaining Connections for children in foster care with regard to visitation with parents and siblings. 84.6% of the applicable cases in the August 2011 on-site review rated an Area Needing Improvement. 18% of the foster care cases reviewed by the Foster Care Review Program during the January 2011 thru July 2011 review cycle were cited and reported to the county of responsibility for any needed corrective action due to parent/child visitation issues. It appears this need for improvement may primarily be due to a need for more concerted efforts to be made on the part of the agency to address inconsistent visitation between children and their fathers as well as an issue of quality visitation taking place. More focus on improving the quality of the documentation of these visits may prove to be beneficial.
- 25% of the cases in the on-site case review rated a Strength for Relationship of Child in Care with Parents. Efforts should be made to assure that meetings occur between birth parents and resource parents within the first month of placement and that efforts are made to implement shared parenting when it is appropriate and safe to do so.
- Relative Placement rated a Strength in 53.8% of the cases reviewed. The primary factor in this item not rating higher appears to be concerted efforts need to be made by the Region to identify, locate, and evaluate maternal and paternal relatives for placement.

## Individualizing Case Planning

An individualized case plan will start with information gathered from the comprehensive family assessment and should continue to be informed by the assessment throughout the life of the case. The development of the case plan, the review of the case plan and the overall planning process must involve all relevant family members, including parents who may not reside in the home, and age-appropriate children and youth. Individualized case plans must be developed *with* the family not *for* the family; occur early in the casework process; address the underlying issues that contribute to the presenting needs; include the safety plan; be written clearly in simple, straightforward language; demonstrate the family's culture and level of functioning; be flexible enough to change as the family's needs and progress toward achieving the identified goal changes; include independent living goals and specific plans and tasks for age appropriate youth; and be reviewed and updated regularly *with* the family.

The following practice principles are linked to this component:
- Timely decisions about goals and activities are made in collaboration with children, youth, and parents;
- The case plan is a guide for the agency's and service providers' work with children and families, and not simply a requirement to be met;

DHS
291131

- The family's progress is monitored regularly in order to make timely decisions with regard to changing or continuing goals and services, or to take other actions to assure the safety, permanency and well-being of children; and
- Information from all available sources should be used to ensure any placement is the most appropriate for the child in order to assure timely permanency.

**Number of Indicators Assessed: Individualized Case Planning**

| Type | Number | Percent |
|---|---|---|
| Indicators Exceeding Goals | -- | -- |
| Indicators Not Exceeding Goals | -- | -- |
| Total Indicators Currently Measurable | 0 | -- |
| Other Indicators (not tied to Goals) | 5 | 100% |
| **TOTAL** | **5** | **100%** |

There are 5 data indicators associated with Individualizing Case Planning. Currently there are no indicators that have data and/or goals available for which to assess strengths or needed areas of improvement. Information from the on-site case reviews may be used by the region as indicators as to where practice may lie within the region with regard to Individualizing Case Planning and to develop any actions that may be necessary to improve that practice.

***Strengths in Practice***

There are currently no MACWIS data indicators available for the items within this component. Please see "Other Key Indicators" for on-site case review data that may be used to assess the Region's performance in the area of Assessing Strengths and Needs.

***Areas Needing Improvement***

There are currently no MACWIS data indicators available for the items within this component. Please see "Other Key Indicators" for on-site case review data that may be used to assess the Region's performance in the area of Assessing Strengths and Needs.

***Other Key Indicators***

Due to there being no current data indicators available to establish a baseline or develop an improvement plan, the following information from the on-site case reviews could be utilized by the Region to evaluate as to where practice may lie regarding the applicable indicators.

- 14.3% of the foster cases reviewed rated as a Strength for **Permanency Goal for the Child (On-Site Case Review Item 10)**.
  - The permanency goal(s) for the child were specified in the case file in 13 of 14 of the foster care cases reviewed. The permanency plan was developed within the child's first 30 days in care for children who entered custody during the period under review in 2 of the 3 applicable cases reviewed.
  - Permanency goals that were in effect during the period under review were established in a timely manner in 57% of the foster care cases reviewed in the sample.
  - The permanency goals were appropriate to the child's needs for permanency and to the circumstances of the cases in 79% of the foster cases reviewed.
  - 8 of the 14 subject children had been in care for 15 of the most recent 22 months. Of those in custody 15 of 22 months, 1 had been referred for TPR in a timely manner. Of those who were not referred for TPR, 2 had documented compelling reasons for not pursuing TPR;
  - 70% of the cases reviewed with a goal of Reunification, contain documentation that reflects active concurrent permanency planning.

- o  3 children were discharged during the period under review. Of those, 2 children had an aftercare plan developed prior to discharge.
- o  46 cases were cited and reported to the county of responsibility by the Foster Care Review Program during the January 2011 thru July 2011 review cycle due to issues surrounding the appropriateness of permanent plans for foster children.
- o  64 cases were cited and reported to the county of responsibility by the Foster Care Review Program during the January 2011 thru July 2011 review cycle due to issues surrounding children in custody 15 of the most recent 22 months who had not been referred for termination of parental rights or had sufficient compelling reasons documented for not being referred for TPR.
- o  100% of the foster care cases reviewed rated as an Area Needing Improvement ███████ ████ rated as an Area Needing Improvement for **Case Planning (On-Site Case Review Item 11)**.
  - o  Results from the on-site case review show that a Family Team Meeting was used in the initial development of the case plan (if the initial plan was developed during the period under review) **and/or** was used to update case plans quarterly in none of the Placement cases reviewed ████████ ██████████ reviewed. The August 2011 review showed that there were Family Team Meetings within 30 calendar days of any placement or other significant change in 18% of Placement cases ███████████████.
  - o  There was documentation of discussions of concurrent planning with birth parents in 42% of the Placement cases reviewed.
- o  **Foster Care Re-Entries (On-Site Case Review Item 12)** rated as a Strength in 83.3% of the applicable Placement cases reviewed.
  - o  Of the 5 children who did re-enter foster care during the period under review, none of the re-entries occurred within 12 months of the child's discharge from a prior foster care episode.

### *Areas for Improvement Efforts to better address Individualizing Case Planning*

- o  On-site case review data reflects that the Region needs improvement in the area of establishing permanency goals for children in a timely manner and making efforts for establishing permanency for children who have been in state's custody for 15 of the most recent 22 months by referring the case for TPR in a timely manner or documenting an exception (compelling reasons) for not doing so.
- o  On site case review data reflects that the Region needs continued improvement efforts in the area of case planning; specifically utilizing family team meetings to their fullest potential as a planned event with all appropriate case members in attendance in order to develop and update parental and child case plans.

# <u>Section Two</u><br><u>Systemic Factors</u>

## Training of Staff and Providers

**Number of Indicators Assessed: Training of Staff and Providers**

| Type | Number | Percent |
|---|---|---|
| Indicators Exceeding Goals | -- | -- |
| Indicators Not Exceeding Goals | -- | -- |
| Total Indicators Currently Measurable | 0 | -- |
| Other Indicators (not tied to Goals) | 4 | 100% |
| **TOTAL** | **4** | **100%** |

There are 4 data indicators associated with Training of Staff and Providers. However, there is currently no MACWIS data indicators and/or goals yet established for these 4 items. The information from the stakeholder surveys could be used to partially evaluate where the agency may currently be with regarding to Training of Staff and Providers.

DHS
291133

*Strengths in Practice*

There are currently no data indicators available for which to evaluate strengths. Refer to the *"Other Key Indicators"* segment for strengths observed as a result of the Stakeholder Surveys received from Region 3-South.

### Areas of Needed Improvement

There are currently no data indicators available for which to evaluate areas of needed improvement. Refer to the *"Other Key Indicators"* segment for areas of needed improvement observed as a result of the Stakeholder Surveys received from Region 3-South.

### Other Key Indicators

- o  Internal stakeholders were asked how effective DFCS is in providing and ensuring completion of adequate initial training for all new caseworkers/supervisors who provide child welfare services. The baseline data indicator goal for this item is 100%. Although there is no available data indicator information for this item at this time, 48.1% of those responding to the survey believe the agency is frequently or almost always providing adequate initial training for all new caseworkers and supervisors while 37.1% believe the agency is rarely or somewhat providing adequate initial training for new caseworkers and supervisors, an additional 3.7% feel that the agency never provides or ensures completion of said training, and 11.1% stated that the question did not apply to them or simply did not reply to the question.
- o  When asked how effective DFCS is in providing and ensuring completion of adequate, ongoing training for staff that addresses the skills and knowledge base needed to carry out their duties, 40.7% of the internal stakeholders responding believe the agency is frequently or almost always providing adequate ongoing training to its caseworkers and supervisors while 37.1% believe the agency is somewhat or rarely providing adequate ongoing training to its caseworkers and supervisors, an additional 11.1% feel that the agency never provides ongoing training, and 11.1% stated that the question did not apply to them or simply did not reply to the question.
- o  Relevant stakeholders were asked how effective DHS is in providing adequate training to placement providers that addresses the skills and knowledge needed to carry out their duties for current and prospective foster parents, relative caregivers, adoptive parents, and staff of state licensed or approved facilities. Results from the surveys show relevant stakeholders varied in their responses. 44% of Internal Stakeholders state they believe the agency frequently or almost always provides adequate training, while 30% believe the agency only somewhat or rarely provides adequate training. An additional 7% believe that the agency never provides adequate training, and 19% stated that the question did not apply to them or simply did not reply to the question. Of the external respondents, 58.4% believe that they frequently or almost always receive adequate training, 8.3% believe resource parents and agencies somewhat or rarely receive adequate training needed to carry out their duties, and 33.3% stated that they had no information; the question did not apply to them, or simply did not provide a response.
- o  When asked if DHS provides frequent training to license new foster homes, 50% of the external stakeholders who responded believe the agency frequently or almost always provides frequent training to new foster homes, while another 16.7% believe the agency somewhat or rarely provides such training, and 33.3% stated that the question did not apply to them, had no information, or simply did not reply to the question.

### Areas for Improvement Efforts to better address Training of Staff and Providers

- o  Although there is no regional or state data indicator information available to establish a baseline and to determine strengths and areas needing improvement with regard to this systemic factor, stakeholder survey information could be used by the Region to evaluate the effectiveness of DFCS' performance with regard to these items.
- o  Based on the results of the relevant stakeholder surveys which (overall) were positive, DFCS should continue to focus its efforts on providing and ensuring completion of adequate initial training (for new

caseworker and supervisors who provide child welfare services) and on-going training for all caseworkers and supervisors who provide child welfare services.
- Based on the results of the relevant stakeholder surveys which (overall) were positive, DFCS should continue to focus its efforts on providing adequate training to placement providers (current and prospective foster parents, relative caregivers, adoptive parents, and staff of state licensed or approved facilities) that addresses the skills and knowledge needed to carry out their duties.
- It is concerning that in the internal stakeholder's surveys (staff), there were responses that indicate that there are times when initial or ongoing training is never done. This should be addressed by supervision in a manner that points out the agency's provision of training, in-service, staffing, etc.

# Service Array

**Number of Indicators Assessed: Service Array**

| Type | Number | Percent |
|---|---|---|
| Indicators Exceeding Goals | -- | -- |
| Indicators Not Exceeding Goals | -- | -- |
| Total Indicators Currently Measurable | 0 | -- |
| Other Indicators (not tied to Goals) | 1 | 100% |
| **TOTAL** | **1** | **100%** |

There is 1 data indicator associated with Service Array. Although there is no established goal, there is regional and state MACWIS data for these items as well as stakeholder survey information. ███████

## *Strengths in Practice*

There are currently no data indicators available for which to evaluate strengths. Refer to the *"Other Key Indicators"* segment for strengths observed as a result of the Stakeholder Surveys received from Region 3-South.

## *Areas of Needed Improvement*

There are currently no data indicators available for which to evaluate areas of needed improvement. Refer to the *"Other Key Indicators"* segment for areas of needed improvement observed as a result of the Stakeholder Surveys received from Region 3-South.

## *Other Key Indicators*



- Internal stakeholders were asked about the accessibility of medical, dental, and mental health services. 50% state medical services are frequently or almost always accessible, while 0% state medical services are somewhat or rarely accessible, and 50% stated that they had no information on this subject, the question did not apply to them, or they simply did not provide a response. 25% state dental services are frequently or almost always accessible, and 75% stated that they had no information on this subject, the question did not apply to them, or they simply did not provide a response. 25% stated mental health

DHS
291135

services are almost always accessible, and 75% stated that they had no information on this subject, the question did not apply to them, or they simply did not provide a response. Respondent comments were by and large positive, and did not indicate any barriers to receiving the needed medical, dental, or mental health care services.

o   When relevant stakeholders were asked how effective DFCS is in the county/region at providing or contracting for an adequate array of services to promote timely permanency of children in foster care, 32.6% report the agency is frequently or almost always effective in providing or contracting services towards permanency, 25.6% report the agency is somewhat or rarely effective in providing or contracting services towards permanency, 2.3% report the agency is not at all effective in providing or contracting for services towards permanency, and 39.5% stated that this question was not applicable to them, that they had no information, or simply did not provide a response.

o   When external stakeholders were asked about how effective the agency is in providing or contracting for an adequate array of services to promote timely reunification of children in foster care with their families 20% of respondents stated that the agency frequently provides an adequate array of services, 20% stated that the agency somewhat provides for an adequate array of services, and 60% stated that they had no information, answered N/A, or did not provide an answer to the question.

o   Relevant internal and external stakeholders were asked to address how effective the county/region is at providing or contracting for an adequate array of services to promote timely adoptions. 11.1% stated the agency frequently or almost always effectively provided or contracted for adoption services while 33.3% responded that the agency somewhat effectively provides or contracts for adoption services, and the remaining 55.6% responded that they had no information or skipped this question.

o   When asked how effectively the county/region individualizes or tailors services to meet the unique needs of the children and families, 31.25% of the judges/court personnel, service providers and caseworkers/supervisors responded that the agency frequently or is almost always effective in individualizing or tailoring services for children and families while 34.375% responded that the agency somewhat or rarely is effective in individualizing services. 3.125% of respondents stated that the agency does not tailor services to meet individual needs, and the remaining 31.25% responded that they had no information or did not answer the question at all.

### *Areas for Improvement Efforts to better address Service Array*

- It is concerning that a large percentage of internal and external stakeholders believe that a number of these items on Service Array does not apply to them or that they did not have sufficient information on the topic to be able to rate the item in the survey. The agency may need to evaluate its approach on educating these relevant stakeholders on the importance of the provision of these services.
- Based on the survey results it appears that of the stakeholders who actually responded, fewer believe that the agency is effective in individualizing services than those who do not, and a great percentage of those respondents either felt they did not have adequate information to rate the item or answer the question at all. The region may want to consider educating stakeholders as part of their implementation plan.

## Placement Resources

### Number of Indicators Assessed: Placement Resources

| Type | Number | Percent |
|------|--------|---------|
| Measurable Indicators Exceeding Goals | | 0% |
| Measurable Indicators Not Exceeding Goals | 2 | 100% |
| Total Indicators Currently Measurable | 2 | 40% |
| Other Indicators (not tied to Goals) | 3 | 60% |
| **TOTAL** | **5** | **100%** |

There are 5 indicators associated with Placement Resources. 2 of the indicators have goals associated with them by which to measure strengths and areas of needed improvement. Three have regional and state data but no goal by which to assess performance.

*Strengths in Practice*

There were no identified strengths found at the time of the 3-South baseline review as it relates to placement resources. There are two measurable data indicators related to placement resources, and both indicators have a year three goal of 100% compliance. For these data indicators, the region was at 89.5% and 70.37% respectively at the time of the on-site case review.

*Areas Needing Improvement*

| Data Indicators Associated with Placement Resources | Year III Goal/ Compliance Measure | Region | State |
|---|---|---|---|
| No child under 10 years of age shall be placed in a congregate care setting unless the child has exceptional needs that cannot be met in a relative or foster family home or the child is a member of a sibling group, and the RD has granted express written approval for the placement ** Data Source: MWLS52HS  ** August 1, 2011 thru August 31, 2011 | 100% | 17 of 19 children 89.5% RD Approval | 256 of 358 children 71.51% RD Approval |

- The Year III goal for this item is 100% and requires that no child under the age of 10 years shall be placed in a congregate care setting unless the child has exceptional needs that cannot be met in a relatives or foster family home or the child is a member of a sibling group, and the Regional Director has granted express written approval for the placement. The August 2011 data indicator shows that the region does not meet the year three standard for this indicator.

| Data Indicators Associated with Placement Resources | Year III Goal/ Compliance Measure | Region | State |
|---|---|---|---|
| No child shall be placed in more than one emergency or temporary facility within one episode of foster care, unless an immediate placement move is necessary to protect the safety of the child or others as certified in writing by the RD ** Data Source: MWLS51DS  ** August 1, 2011 thru August 31, 2011 | 100% | 57 of 81 child 70.37% RD Approval | 252 children 69.8% RD Approval |

- The Year III goal for this item is 100% in that no child shall be placed in more than one emergency or temporary facility within one episode of foster care unless an immediate placement move is necessary to protect the safety of the child or others as certified in writing by the Regional Director. Region 3-South does not meet the year three standard as indicated above.

*Other Key Indicators*

o There is no established goal for *"Number of Children in Foster Care by Placement Type"*. However, the regional data indicator reveals that 87.1% of children in custody in Region 3-South are placed in family based placements as opposed to non-family based placements. Even though there is no set goal at this time, this particular item could certainly be viewed as being a strength for the region.
o Internal stakeholders were asked how effective the county/region has been in implementing a process for ensuring the diligent recruitment of potential resource families that reflect the ethnic and racial diversity of children needing resource homes. 33% stated the agency has frequently or almost always implemented

a process for recruiting ethnically diverse foster homes, 30% stated the agency has somewhat or rarely implemented a process for recruiting ethnically diverse foster homes, 4% stated the agency has never implemented a process for recruiting ethnically diverse foster homes, and 33% responded that they had no information or skipped this question.

o   Relevant stakeholders were asked if the resource families in the Region reflect the ethnic and racial diversity of the children in need of foster care and adoptive placements, and meet most of the foster care placement needs of the children it services. 37.5% state the resource homes in the Region somewhat or rarely reflect the ethnic/racial diversity of the children in need of foster care or adoptive placements, and the remaining 62.5% responded that they had no information or skipped this question.

o   Of those relevant stakeholders who answered how effective the county/region is in expediting the licensing of relative resource parents, and giving them priority over resource parents in closer proximity, 37% stated the agency frequently or almost always effectively expedited the licensing of relative resource homes. 30% stated the agency rarely or somewhat effectively expedited the licensing of relative resource homes, 7% stated that the county/region is never effective in expediting the licensing of relative resource parents, and 26% reported N/A on this item or skipped it altogether.

o   Relevant External Stakeholders were asked if, in their opinion, DFCS is abiding by the policy that limits the number of children that may be placed in a foster home. 37.5% responded that they agency almost always or frequently abides by that policy while 62.5% of survey participants did not provide an answer to this question.

o   Relevant Internal Stakeholders were asked how effective the Region is in conducting criminal background checks on people interested in being foster and adoptive parents before licensing or approving them to care for children. 50% responded the agency almost always is effective in doing so, while 50% of survey participants did not provide an answer to this question or indicated that they had no information.

o   Relevant Internal Stakeholders were asked how effective the Region is in recruiting foster and adoptive homes needed to care for the children in the county/region in foster care and in keeping these homes. 25% responded that the agency is somewhat effective in recruiting and retaining homes while the remaining 75% responded that they had no information on this item or did not answer the item.

*Areas for Improvement Efforts to better address Placement Resources*

•   The agency does not meet the Year III goal for placing children in more than one emergency or temporary facility within one episode of foster care (unless an immediate placement move is necessary to protect the safety of the child or others as certified in writing by the Regional Director). Efforts to improve this measure should be addressed.

•   Relevant stakeholder information seems to indicate the Region may need to make improvement efforts in the area of recruiting foster and adoptive homes that reflect the ethnic and racial diversity of the children in the Region in need of such placements as well as expediting the licensing of relative resource parents and giving them priority over resource parents in closer proximity.

## Caseloads

**Number of Indicators Assessed: Involving Children and Families in Caseloads.**

| Type | Number | Percent |
|---|---|---|
| Indicators Exceeding Goals | 0 | 0% |
| Indicators Not Exceeding Goals | 3 | 100% |
| Other Indicators (not tied to Goals) | -- | -- |
| **TOTAL** | **3** | **100%** |

There are 3 data indicators tied to Caseloads. None of these indicators meet the current year's target goal.

*Strengths in Practice*

There were no identified strengths in practice as it relates to caseloads. There are currently three measurable data indicators. Region 3-South does not meet any of the standards for year three compliance.

## Areas Needing Improvement

| Data Indicators Associated with Caseloads | Year III Goal/ Compliance Measure | Region | State |
|---|---|---|---|
| No caseworkers carry a caseload exceeding three times the caseload requirements (over 20,880 minutes)* Data Source: MWASA9S1  * July 1, 2011 thru July 31, 2011 *(Includes Direct Service Workers and Resource Workers)* | 100% | 2 workers 95.9% | 36 workers 94.4% |

- The Year III goal for this measure is that no caseworkers carry a caseload exceeding three times the caseload requirements (over 20,880 minutes). Data from the baseline month shows that Region 3-South is not meeting this goal in that two workers carry caseloads over 20,880 minutes.

| Data Indicators Associated with Caseloads | Year III Goal/ Compliance Measure | Region | State |
|---|---|---|---|
| No more than 10% of caseworkers shall carry a caseload exceeding twice the caseload requirements (over 13,920 minutes)* Data Source: MWASA9S1 * July 1, 2011 thru July 31, 2011 *(Includes Direct Service Workers and Resource Workers)* | No more than 10% | 9 workers 18.4% | 81 workers 12.7% |

- The Year III goal for this measure is that no more than 10% of caseworkers shall carry a caseload exceeding twice the caseload requirements (over 13,290 minutes). Data from the baseline month reveals that Region 3-South does not meet this goal in that 18.4% of workers in the region carry caseloads which exceed 13,920 minutes.

| Data Indicators Associated with Caseloads | Year III Goal/ Compliance Measure | Region | State |
|---|---|---|---|
| At least 75% of caseworkers carry a caseload that does not exceed Plan caseload requirements (over 6,960 minutes)* Data Source: MWASA9S1 * July 1, 2011 thru July 31, 2011 *(Includes Direct Service Workers and Resource Workers)* | At least 75% | 25 workers 49% | 311 workers 51.4% |

DHS
291139

- The Year III goal for this measure is that at least 75% of caseworkers carry a caseload that does not exceed caseload requirements (over 6,900 minutes). The most data indicators from the baseline month reveal that the Region does not meet this goal. Only 49% of the region's workers carry caseloads that do not exceed caseload requirements of 6,960 minutes.

## Other Key Indicators

o Internal stakeholders were asked to complete the Caseloads portion of the stakeholder survey. When asked if caseworkers have caseloads within the prescribed measures, 14.8% stated they frequently or almost always have caseloads within the prescribed limits, 40.7% stated they somewhat or rarely have caseloads within the prescribed limits, 18.5% stated they never or rarely have caseloads within the prescribed limits, and 26% responded N/A (clerical positions, etc.), or did not provide an answer to the question.

o Internal stakeholders were asked to describe any caseloads over the established limits – for example, are caseloads twice or three times the caseload requirements? 14 respondents commented on this survey item. Of those that answered, none believe caseloads are within the requirements of the plan while 100% believe caseloads are over the limit. It was stated that some caseworkers have caseloads that are overwhelming and expressed that due to a lack of workers, unfair assignment of cases, and high caseloads due to employee turn over.

### Areas for Improvement Efforts to better address Caseloads

- The data indicators from the baseline month reveal that there are some caseworkers within the Region who have caseloads that are twice and three times the plan requirements. This could be due to the turnover in some areas of the Region or, as it is has been found in other areas of the state, due to Resource Workers having caseloads that are higher. Comments from the survey results seem to show that many of the supervisors are working diligently to keep caseloads within the prescribed requirements. However, other comments show that caseloads are high and need to be addressed.

# Oversight and Monitoring

**Number of Indicators Assessed: Involving Children and Families in Oversight and Monitoring.**

| Type | Number | Percent |
|---|---|---|
| Indicators Exceeding Goals | 1 | 100% |
| Indicators Not Exceeding Goals | -- | -- |
| Total Indicators Currently Measurable | 1 | 100% |
| Other Indicators (not tied to Goals) | 2 | -- |
| **TOTAL** | **3** | **--** |

There are 3 data indicators for the Oversight and Monitoring systemic factor. Only 1 of the 3 indicators currently has a goal identified with which to measure against performance. Region 3-South does meet the acceptable goal on that one data indicator.

## Strengths in Practice

- The year three compliance measure for oversight and monitoring which is measurable states that no supervisor, who supervises caseworkers, should be responsible for the supervision of more than five caseworkers. Region 3-South meets this measure at 100% as there are no supervisors in the region who supervise more than five caseworkers.

| Data Indicators Associated with Oversight and Monitoring | Year III Goal/ Compliance Measure | Region | State |
|---|---|---|---|
| Supervisors, who supervise caseworkers, are responsible for supervising no more than 5 caseworkers*<br>Data Source: MWASA5D2<br><br>*August 1, 2011 thru August 31, 2011 | No more than 10% | 0 ASWS 0% | 11 ASWS 9.24% |

This measure requires that supervisors, who supervise caseworkers, are responsible for supervising no more than 5 caseworkers. The Region does meet the goal of "No more than 10%" in that data from the baseline month show that none of the supervisors in the Region are responsible for supervising more than 5 caseworkers.

### Areas Needing Improvement

There are no data indicators that reflect an Area Needing Improvement in this area for Region 3-South. Stakeholder survey information in the "Other Key Indicators" section may be referred to in order to evaluate any areas of needed improvement.

### Other Key Indictors

- Internal stakeholders were asked to evaluate the ability of the quality assurance system (Evaluation and Monitoring, Foster Care Review, Supervisory Administrative Review) to assess effectively the quality of practice and outcomes, identify strengths and areas needing improvement measures. 18.5% stated the QA system frequently or almost always effectively assesses the quality of practice and outcomes. 14.8% stated the QA system somewhat effectively assesses the quality of practice and outcomes, while 3.7% stated that the QA system never effectively assesses the quality of practice and outcomes, and 63% indicate that this does not apply to them or did not provide an answer.
- Reported ways the system is beneficial is that processes such as Foster Care Review, Evaluation and Monitoring, and Supervisory Administrative Review are that the hiring of practice model coaches will provide caseworkers with individualized attention in areas of needed improvement in order to get them to the next level. It was also stated that these practices show workers and supervisors ways to improve in certain areas of their duties.
- Internal stakeholders surveyed were asked to evaluate the involvement of service providers, parents, youth, resource parents, group caregivers, relatives, tribes, court personnel, and/or stakeholders in the quality assurance process. 22% stated stakeholders are frequently or almost always involved, 26% stated stakeholders are somewhat or rarely involved, 8% stated that stakeholders are never involved, and 44% stated this did not apply to them.
- External stakeholders were asked how effective is DFCS in providing information about the performance of their agency through data reports and other means, 4.8% stated the agency frequently or almost always provides information about performance, 9.5% stated the agency somewhat or rarely provides information about performance, and 85.7% of respondents stated that they had no information, that the question did not apply to them, or simply chose not to answer the question.
- When asked if the supervisor and the worker review cases quarterly through supervisory or peer review to assess the appropriateness of safety and permanency plans, 41% stated they frequently or almost always reviewed their cases with peers or a supervisor, 18% stated they somewhat or rarely reviewed their cases with peers or a supervisor and 41% indicated that they had no information, that the question did not apply to them, or simply did not provide an answer.

DHS
291141

*Areas for Improvement Efforts to better address Oversight and Monitoring*

- Efforts to improve the inclusion of stakeholders in the Quality Improvement process and to share data on the agency's performance with them should be implemented to strengthen this particular systemic factor.
- For this component, there are a very high percentage of respondents who state that they have no information or that the process does not apply to them. The region may consider addressing this. One respondent indicated that while there is documentation that case staffings are occurring, they are not being done in collaboration between the workers and supervisors, and that they often involve the supervisor simply e-mailing the worker with his or her concerns rather than discussing it with the worker. One respondent stated that there was "no quality assurance system that I am aware of."

# Court Processes

**Number of Indicators Assessed: Court Processes.**

| Type | Number | Percent |
|---|---|---|
| Indicators Exceeding Goals | 1 | 25% |
| Indicators Not Exceeding Goals | 3 | 75% |
| Other Indicators (not tied to Goals) | -- | -- |
| **TOTAL** | **4** | **100%** |

There are 4 data indicators associated with the Court Processes systemic factor. All 4 of the data indicators have goals established to measure performance and establish a baseline. 1 data indictor for Region 3-South meets or exceeds the established goals while 3 do not.

*Strengths in Practice*

| Data Indicators Associated with Court Processes | Year III Goal/ Compliance Measure | Region | State |
|---|---|---|---|
| Children who have been in custody at least 6 months had a timely county conference**<br>Data Source: MWZTACRS<br><br>**September 1, 2010 thru August 31, 2011 | 90% | 369 children 94.4% | 3,377 children 97.4% |

- The Region exceeds the Year III Goal of 90% in that 94.4% of the children in custody at least six months have had a timely county conference.

*Areas Needing Improvement*

| Data Indicators Associated with Court Processes | Year III Goal/ Compliance Measure | Region | State |
|---|---|---|---|
| Children in custody at least 12 months have had a timely annual court review**<br>Data Source: MWZTPHRS<br><br>**September 1, 2010 thru August 31, 2011 | 90% | 111 children 33% | 1,961 children 63.5% |

- The Year III Goal for this item is that 90% of children in custody at least 12 months have had a timely annual court review. The Region does not meet this measure in that 33% of the children have had such hearings in a timely manner.

| Data Indicators Associated with Court Processes | Year III Goal/ Compliance Measure | Region | State |
|---|---|---|---|
| Children in custody reaching the point at which they have spent 15 of the previous 22 months in foster care with no ASFA exception noted will have a petition for TPR filed on their behalf §<br>Data Source: MWZ014S1<br><br>§ As of August 5, 2011 | 80% | 10 of 111 children 9% | 382 of 1,028 children 37.2% |

- The Year III goal for this measure is 80% of children in custody reaching the point at which they have spent 15 of the most recent 22 months in foster care with no Adoption Safe Families Act (ASFA) exception noted will have a petition for termination of parental rights (TPR) filed on their behalf. The Region does not meet this goal in that 9% of children with in custody 15 of the most recent 22 months with no ASFA exception noted have had a TPR petition filed on their behalf.

| Data Indicators Associated with Court Processes | Year III Goal/ Compliance Measure | Region | State |
|---|---|---|---|
| Children in custody who have spent more than 15 of the previous 22 months in FC without a TPR petition filed will have an exception noted or a TPR filed §<br>Data Source: MWZ014S1 & MWZ014S2<br><br>§ As of August 5, 2011 | 80% | 134 of 235 children 57% | 1,105 of 1,751 children 63.1% |

DHS
291143

- The Year III goal for this data indicator is 80% of children in custody who have spent more than 15 of the most recent 22 months in foster care without a TPR petition filed will have an excepted noted or a TPR filed. Region 3-South does not meet this goal at 57%.

## Other Key Indictors

o When asked how effective is the Foster Care Review/County Conference process in helping ensure that children have the appropriate goals and achieve goals timely, 22% of the external stakeholders stated the FCR process is somewhat effective while 78% stated they have no information on the FCR process, that the process does not apply to them, or did not provide an answer.

o Internal stakeholders were asked to evaluate the effectiveness of the 6 month reviews in promoting timely achievement of permanency for all children in foster care. 14.8% stated the 6 month reviews were frequently or almost always effective in promoting timely permanency, 18.5% stated the 6 month reviews were somewhat or rarely effective in promoting timely permanency, 3.7% stated that the 6 month reviews are never effective in promoting timely permanency, and 63% of respondents answered N/A, "No Information", or did not provide an answer to the question.

o External stakeholders were asked how effective the county/region is at making sure that foster parents, pre-adoptive parents and relative caregivers receive notice of reviews and hearings, and have an opportunity to be heard. 11% stated the agency almost always was effective in making sure resource parents receive notice. 22% stated the agency was somewhat effective in making sure the resource parents receive notice, and 67% stated that they had no information, that the question did not apply to them, or did not respond to the question.

o When relevant stakeholders were asked how effective the county/region is in filing for termination of parental rights when a child is in foster care for 15 of the most recent 22 months and there is no compelling reason not to file, 15.6% stated the agency frequently or almost always is effective in filing for TPR; 18.8% stated the agency is somewhat or rarely effective in filing for TPR and 65.6% answered "No Information", "N/A", or did not provide an answer.

o Relevant external stakeholders were asked how effective the 12 month court hearings are for children in foster care in addressing timely permanency. 25% responded that the 12 month hearings are somewhat effective in addressing timely permanency; 75% responded "N/A" or "No Information" or did not provide an answer to the question.

o Relevant external stakeholders were asked how effective is the county/region is in ensuring that each child in foster care had a permanency hearing in a qualified court no later than 12 months from the date the child entered foster care and no less frequently than every 12 months thereafter. For this particular question, there was not a single response. It should be noted that there are only two judges in the region, and that only one of the judges completed a survey, but chose not to answer this particular question.

## Areas for Improvement Efforts to better address Court Processes

- The Region does not meet the Year III goal of 90% for children having timely permanency hearings. It is concerning that 75% of the relevant external stakeholders who responded to the survey responded that they had no information on this topic. The Region should develop a strategy to ensure that permanency hearings are held in a timely manner to improve performance and promote timely permanency for children in care. The Region may also want to consider raising awareness among relevant external stakeholders on the importance of holding these hearings in a timely manner.

- The Region does not meet the Year III goal of 80% for children in custody 15 of the most recent 22 months having a petition for termination of parental rights filed on their behalf or have an ASFA exception noted in their case plan. Relevant stakeholder survey responses seem to reflect a need for improvement in these areas as well. Strategies such as internal permanency reviews, complimented by 6 month Foster Care Review reviews and reports, could assist in improved performance in these areas.

- It is concerning that some of the responses from internal stakeholders (staff members) seem to indicate that these individuals do not feel that the foster care review process or the court processes apply to them in their day to day work. Efforts to increase awareness about the urgency of permanency and review hearings should be implemented and reinforced across the region.

## Data Quality and Usage

### Number of Indicators Assessed: Data Quality and Usage

| Type | Number | Percent |
|------|--------|---------|
| Indicators Exceeding Goals | -- | -- |
| Indicators Not Exceeding Goals | -- | -- |
| Other Indicators (not tied to Goals) | -- | -- |
| TOTAL | 0 | -- |

There are currently no proposed data indicators for Data Quality and Usage. The source for the evaluation of this systemic component and Region 3-South's performance is from the relevant stakeholder survey information.

### *Strengths in Data Quality and Usage*

o   Currently, there are no proposed indicators for Data Quality and Usage.

### *Areas of Needed Improvement*

o   Currently, there are no proposed indicators for Data Quality and Usage.

### *Other Key Indicators*

o   Internal stakeholders were asked to evaluate whether data reports are useful and current, and are provided to staff, supervisors, and administrators in a timely manner. 7% stated the data reports are frequently or almost always useful, current, and provided to staff in a timely manner; 15% stated the data reports are somewhat or rarely useful, current and provided to staff in a timely manner, and the remaining 78% responded with "N/A", "No Information", or did not answer the question.

o   Comments of those surveyed are mixed as it comes to data reports.  Some of the positive feedback received is that the data reports are very useful and current, and that they keep everyone informed.  There was also a comment made that the data reports are interesting, but that the staff has little time to read them.

### *Areas for Improvement Efforts to better address Data Quality and Usage*

•   It is recommended that administrative staff within the Region (including Foster Care Review and Evaluation and Monitoring staff) continue to stress the importance of utilizing data to measure performance and make improvements as well as the importance of accurate and timely data entry in order to give as accurate a picture as possible of the work that is being conducted in the region.

DHS
291145

## Next Steps

After the Region has received and reviewed this report, CQI staff from Evaluation and Monitoring and Foster Care Review will meet with the Regional Director and staff from within the Region (Area Social Work Supervisors, Practice Coaches, and other key staff) to conduct a "Data-to-Action" meeting to review not only the results of this report but also utilize Foster Care Review information and Data Dashboard information in order to inform practice in the region and guide the Regional Implementation Plan process. Monthly Evaluation and Monitoring case reviews will take place during the coming year which will mimic the on-site case review process. The results of those reviews will be shared with the Regional CQI Team in quarterly meetings. In 12 to 14 months, the Division of Evaluation and Monitoring will conduct another follow-up review to measure progress on performance on areas of the Practice Model components and Systemic Factors.

# Region 3-South
## Summary of Areas of Needed Improvement

*Areas for Improvement Efforts to better address Mobilizing Appropriate Services Timely*

- On-site case review and Foster Care Review data shows that (overall) age appropriate children are being provided with Independent Living services by the Region. However, Region 3-South's data indicators show that children in custody, ages 14 - 20, being provided with independent living services per their service plan is an area of needed improvement. It is suggested that the Region review their data entry in MACWIS and refer to the Report Guides on the "DFCS Connection" website to determine if this is a practice issue or (as with other areas of the state) a data entry issue.
- Children discharged in the last year upon finalization of an adoption having had the adoption finalized within 24 months of the latest removal from home shows to be an area needing improvement based on the data indicators from the September 1, 2010 thru August 31, 2011 baseline period. Strategies to improve the timeliness of adoptions within the prescribed time periods should be developed by the Region's Implementation Team and its applicable sub-groups.
- On-site case review data and Foster Care Review Program data seems to show a need for improvement in assessing children's physical and mental health needs and providing services in a timely manner to meet those identified needs.

*Areas for Improvement Efforts to better address Assuring Safety and Managing Risk*

- Although a number of items rated a Strength during the on-site case review, the baseline data indicators show a need for improvement in the area of Assuring Safety and Managing Risk. Due to the conflict in the on-site review information and the MACWIS data indicators, there could be a need for more timely entry of investigative data in MACWIS by staff in Region 3-South. A review of this issue by the Region's Implementation Team and/or the Region's CQI Team may result in strategies that will lead to improvements in the timeliness of investigations initiated and completed.
- Efforts to better address caseworker visits with children who remain in the same out of home placement following an investigation into a report that he/she was maltreated, or subject to corporal punishment, in that placement should be developed in order to assure safety and manage risk.
- Efforts to better address caseworker visits with foster parents with at least one foster child residing in their home should be developed by the Region in order to manage risk and assure safety of the children placed in those homes.

*Areas for Improvement Efforts to better address Involving Children and Families in Case Planning and Decision Making*

- A plan to improve the frequency and quality of visits taking place between caseworkers and children should be developed and implemented by the Region to improve performance for involving children in case planning and decision making.
- A plan should be developed by the Region to assure more frequent and more quality visits take place between caseworkers and parents of children who have a permanent plan of Reunification. This will result in more timely permanency for children in care and can

also have a positive effect on the Region's performance of other practice model components in ▉ placement ▉▉▉ cases.

- Efforts to improve the involvement of parents (especially fathers) and children in the case planning process will also result in more timely permanency for children in the Region who are in care ▉▉▉▉▉.
- Improving notification for the county conference process and encouraging attendance will also assist in improving the Region's performance in involving children and families in case planning and decision making.

### *Areas for Improvement Efforts to better address Assessing Strengths and Needs*

- There is currently no baseline data indicator information for which to measure compliance with regard to Assessing Strengths and Needs. However, on-site case review results indicate that the Region may need to develop and implement a plan to improve the assessment of strengths and needs. It appears assessments are taking place with child and, to a slightly lesser extent, with mothers and resource parents. It does seem that fathers are not being fully engaged in the assessment process since fathers were indeed engaged in some of the foster care cases ▉▉▉▉▉▉ in-.

### *Areas for Improvement Efforts to better address Preserving and Maintaining Connections*

- There is currently no baseline data indicator information for which to measure compliance. However, on-site case review results seem to indicate that the Region may need to develop and implement a plan to improve performance in the area of Preserving and Maintaining Connections for children in foster care with regard to visitation with parents and siblings. 84.6% of the applicable cases in the August 2011 on-site review rated an Area Needing Improvement. 18% of the foster care cases reviewed by the Foster Care Review Program during the January 2011 thru July 2011 review cycle were cited and reported to the county of responsibility for any needed corrective action due to parent/child visitation issues. It appears this need for improvement may primarily be due to a need for more concerted efforts to be made on the part of the agency to address inconsistent visitation between children and their fathers as well as an issue of quality visitation taking place. More focus on improving the quality of the documentation of these visits may prove to be beneficial.
- 25% of the cases in the on-site case review rated a Strength for Relationship of Child in Care with Parents. Efforts should be made to assure that meetings occur between birth parents and resource parents within the first month of placement and that efforts are made to implement shared parenting when it is appropriate and safe to do so.
- Relative Placement rated a Strength in 53.8% of the cases reviewed. The primary factor in this item not rating higher appears to be concerted efforts need to be made by the Region to identify, locate, and evaluate maternal and paternal relatives for placement.

### *Areas for Improvement Efforts to better address Individualizing Case Planning*

- On-site case review data reflects that the Region needs improvement in the area of establishing permanency goals for children in a timely manner and making efforts for establishing permanency for children who have been in state's custody for 15 of the most

recent 22 months by referring the case for TPR in a timely manner or documenting an exception (compelling reasons) for not doing so.

o  On site case review data reflects that the Region needs continued improvement efforts in the area of case planning; specifically utilizing family team meetings to their fullest potential as a planned event with all appropriate case members in attendance in order to develop and update parental and child case plans.

### Areas for Improvement Efforts to better address Training of Staff and Providers

o  Although there is no regional or state data indicator information available to establish a baseline and to determine strengths and areas needing improvement with regard to this systemic factor, stakeholder survey information could be used by the Region to evaluate the effectiveness of DFCS' performance with regard to these items.

o  Based on the results of the relevant stakeholder surveys which (overall) were positive, DFCS should continue to focus its efforts on providing and ensuring completion of adequate initial training (for new caseworker and supervisors who provide child welfare services) and on-going training for all caseworkers and supervisors who provide child welfare services.

o  Based on the results of the relevant stakeholder surveys which (overall) were positive, DFCS should continue to focus its efforts on providing adequate training to placement providers (current and prospective foster parents, relative caregivers, adoptive parents, and staff of state licensed or approved facilities) that addresses the skills and knowledge needed to carry out their duties.

o  It is concerning that in the internal stakeholder's surveys (staff), there were responses that indicate that there are times when initial or ongoing training is never done. This should be addressed by supervision in a manner that points out the agency's provision of training, in-service, staffing, etc.

### Areas for Improvement Efforts to better address Service Array

•  It is concerning that a large percentage of internal and external stakeholders believe that a number of these items on Service Array does not apply to them or that they did not have sufficient information on the topic to be able to rate the item in the survey. The agency may need to evaluate its approach on educating these relevant stakeholders on the importance of the provision of these services.

•  Based on the survey results it appears that of the stakeholders who actually responded, fewer believe that the agency is effective in individualizing services than those who do not, and a great percentage of those respondents either felt they did not have adequate information to rate the item or answer the question at all. The region may want to consider educating stakeholders as part of their implementation plan.

### Areas for Improvement Efforts to better address Placement Resources

•  The agency does not meet the Year III goal for placing children in more than one emergency or temporary facility within one episode of foster care (unless an immediate placement move is necessary to protect the safety of the child or others as certified in writing by the Regional Director). Efforts to improve this measure should be addressed.

•  Relevant stakeholder information seems to indicate the Region may need to make improvement efforts in the area of recruiting foster and adoptive homes that reflect the ethnic and racial diversity of the children in the Region in need of such placements as

well as expediting the licensing of relative resource parents and giving them priority over resource parents in closer proximity.

### Areas for Improvement Efforts to better address Caseloads

- The data indicators from the baseline month reveal that there are some caseworkers within the Region who have caseloads that are twice and three times the plan requirements. This could be due to the turnover in some areas of the Region or, as it is has been found in other areas of the state, due to Resource Workers having caseloads that are higher. Comments from the survey results seem to show that many of the supervisors are working diligently to keep caseloads within the prescribed requirements. However, other comments show that caseloads are high and need to be addressed.

### Areas for Improvement Efforts to better address Oversight and Monitoring

- Efforts to improve the inclusion of stakeholders in the Quality Improvement process and to share data on the agency's performance with them should be implemented to strengthen this particular systemic factor.
- For this component, there are a very high percentage of respondents who state that they have no information or that the process does not apply to them. The region may consider addressing this. One respondent indicated that while there is documentation that case staffings are occurring, they are not being done in collaboration between the workers and supervisors, and that they often involve the supervisor simply e-mailing the worker with his or her concerns rather than discussing it with the worker. One respondent stated that there was "no quality assurance system that I am aware of."

### Areas for Improvement Efforts to better address Court Processes

- The Region does not meet the Year III goal of 90% for children having timely permanency hearings. It is concerning that 75% of the relevant external stakeholders who responded to the survey responded that they had no information on this topic. The Region should develop a strategy to ensure that permanency hearings are held in a timely manner to improve performance and promote timely permanency for children in care. The Region may also want to consider raising awareness among relevant external stakeholders on the importance of holding these hearings in a timely manner.
- The Region does not meet the Year III goal of 80% for children in custody 15 of the most recent 22 months having a petition for termination of parental rights filed on their behalf or have an ASFA exception noted in their case plan. Relevant stakeholder survey responses seem to reflect a need for improvement in these areas as well. Strategies such as internal permanency reviews, complimented by 6 month Foster Care Review reviews and reports, could assist in improved performance in these areas.
- It is concerning that some of the responses from internal stakeholders (staff members) seem to indicate that these individuals do not feel that the foster care review process or the court processes apply to them in their day to day work. Efforts to increase awareness about the urgency of permanency and review hearings should be implemented and reinforced across the region.

***Areas for Improvement Efforts to better address Data Quality and Usage***

- It is recommended that administrative staff within the Region (including Foster Care Review and Evaluation and Monitoring staff) continue to stress the importance of utilizing data to measure performance and make improvements as well as the importance of accurate and timely data entry in order to give as accurate a picture as possible of the work that is being conducted in the region.

# APPENDIX

- **Region 3-South Data Indicator Tables**
  - **Region 3-South January 2011 – July Foster Care Review Issues Data**
- **3-South August 2011 Summary of Areas of Needing Improvement**

DHS
291152

| County: | | |
|---|---|---|
| Region: | 3 South | |
| Reviewer: | | |

| Month: | J | F | M | A | M | J | J | TOTAL |
|---|---|---|---|---|---|---|---|---|
| #1 Issues due to a lack of caseworker/child contacts. | 2 | 3 | 4 | 2 | 6 | 3 | 3 | 23 |
| #2 Issues due to a lack of quality contacts between caseworker/child. | 3 | 1 | | | 4 | 2 | 1 | 11 |
| #3 Issues due to a lack of caseworker/child contacts in placement setting. | 11 | 18 | 8 | 17 | 20 | 16 | 11 | 101 |
| #4 Issues due to a lack of efforts to locate missing children. | | 1 | 1 | | | | 1 | 3 |
| #5 Issues due to children out of state with no outgoing ICPC. | | | | | | | | 0 |
| #6 Issues related to children placed out of state but there is no | | | | | | | | 0 |
| documentation of regular supervisory reports from the placement site. | | | | | | | | 0 |
| #7 Issues related to children who are placed out of state: there is no ICPC | | | | | | | | |
| case with the placement state and there is a lack of at least quarterly face | | | | | | | | |
| to face contacts with the children by the Mississippi caseworker. | | | | | | | | 0 |
| #8 Issues related to county conference notification. | 20 | 24 | 15 | 18 | 23 | 30 | 28 | 158 |
| #9 Issues due to lack of county conference attendance by agency staff. | 1 | | | | | 1 | | 2 |
| #10 Child ISP content/timeliness issues (overdue for review ISP; missing | | | | | | | | |
| Medical/dental/education/mental health/IL/placement info issues/etc. | 26 | 25 | 17 | 27 | 36 | 35 | 34 | 200 |
| #11 Medical/educational/mental health identified needs issues. | 1 | | | | | 1 | | 3 |
| #12 Children participation in case planning activities. | 1 | | 1 | 1 | 6 | 1 | | 10 |
| #13 Agency compliance with the child's individual service plan. | 24 | 20 | 17 | 30 | 36 | 38 | 37 | 202 |
| #14 15/22 month issues. | 11 | 8 | 3 | 6 | 17 | 7 | 12 | 64 |
| #15 Plan of Adoption with no TPR referral or other barriers. | 2 | 2 | 1 | 9 | 5 | 2 | 3 | 24 |
| #16 Living Independently/LTFC with no efforts to try other plans first. | | 1 | | | | | | 1 |
| #17 No IL/Transitional Living services provided to age appropriate child. | 5 | 2 | 2 | 8 | 10 | 7 | 5 | 39 |
| #18 Issues due to appropriateness of permanent plan. | 10 | 6 | 4 | 6 | 5 | 9 | 6 | 46 |
| #19 Parent/Primary Caretaker ISP content/timeliness issues. | 15 | 8 | 13 | 14 | 19 | 29 | 19 | 117 |
| #20 Parent/Primary Caretaker participation in case planning issues. | 13 | 9 | 14 | 13 | 20 | 29 | 21 | 119 |
| #21 Parent/Primary Caretaker identified needs issues. | | | 1 | | 1 | | | 2 |
| #22 Resource Parent identified needs issues. | 2 | 1 | | | 4 | 1 | | 8 |
| #23 Parent/Primary Caretaker/Caseworker contact issues. | 20 | 10 | 15 | 14 | 25 | 30 | 22 | 136 |
| #24 Quality of parent/caretaker/caseworker contact issues. | 15 | 10 | 15 | 14 | 25 | 29 | 19 | 127 |
| #25 Issues due to lack of efforts to locate absent parents. | 8 | 6 | 8 | 8 | 10 | 14 | 15 | 69 |
| #26 Agency compliance with the parental ISP. | 12 | 11 | 14 | 13 | 24 | 30 | 20 | 124 |
| #27 Parent/ Primary Caretaker progress. | 16 | 3 | 10 | 8 | 14 | 23 | 13 | 87 |
| #28 Continuing need for child(ren) to remain in custody? | 1 | 2 | 1 | | | | | 4 |
| #29 Parent/child visitation issues | 9 | 1 | 7 | 5 | 10 | 15 | 5 | 52 |
| #30 Children in non-licensed/non court ordered placement issues | | | 1 | 1 | 2 | | | 4 |
| #31 Proximity of placement issues | | | | | | | | 0 |
| #32 Placement disruption issues | 1 | 2 | 2 | 1 | 3 | | 2 | 11 |
| #33 Placement safety. | 24 | 20 | 9 | 11 | 36 | 33 | 30 | 163 |
| #34 Placement appropriateness. | | | 1 | | 3 | | | 4 |
| #35 Placement least restrictive. | | | 1 | | 2 | | | 7 |
| #36 Sibling placement issues. | | | | | | | | 0 |
| #37 Sibling visitation issues. | 2 | 6 | 2 | 4 | 3 | 1 | 2 | 20 |
| #38 ICWA issues (not documented/documented but with only one parent, | | | | | | 13 | | |
| etc.) | 5 | 3 | 3 | 4 | 8 | 4 | 7 | 34 |
| #39 Efforts to locate relatives not documented. | 3 | 3 | | 5 | 4 | | 7 | 22 |
| #40 Primary connections issues. | | | 1 | | | | | 1 |
| #41 Printed/signed SAR. | 8 | 7 | 5 | 9 | 12 | 16 | 17 | 74 |
| #42 County Conference report to court issues. | 10 | 11 | 8 | 5 | 12 | 19 | 12 | 77 |
| #43 Previous PAD not filed in case record issues. | 2 | 2 | 6 | 5 | 3 | 2 | 8 | 137 |
| #44 Permanency hearing issues (overdue or not Scheduled at all. | 17 | 13 | 9 | 12 | 19 | 21 | 18 | 109 |
| #45 Notification to court hearing issues. | 29 | 38 | 17 | | 1 | 2 | | 87 |
| #46 Allowances issues. | 3 | 3 | 5 | 6 | 12 | 5 | 9 | 43 |
| Cases Reviewed | 39 | 39 | 38 | 32 | 44 | 45 | 46 | 283 |
| Case with Issues | 39 | 39 | 38 | 32 | 43 | 44 | 45 | 280 |

DHS
291153

DHS
291154

**3-South Data Indicators**
**Baseline CQI Review Report**
August 2011

## Practice Model Components

| Mobilizing Appropriate Services Timely | | | | | |
|---|---|---|---|---|---|
| **Data Indicators Associated with Mobilizing Appropriate Services Timely** | **Year III Goal/ Compliance Measure** | **Region August 2011** | **State August 2011** | **Hinds** | **Warren** |
| Placement Stability - Number of children in custody 12 months or less that have had 2 or fewer placement moves<br>Data Source: MWZPLM5S<br>*As of August 31, 2011 | 70% | 224 of 311 children; 72% | 1,724 of 2,375 children 72.6% | 186 of 263 children; 70.7% | 38 of 48 children; 79.2% |
| Placement Stability - Number of moves for all children regardless of time in custody<br>Data Source: MWBRD07S & MWBRD07T<br>*As of August 31, 2011 | | 1 - 2 moves: 192 of 419 children 45.8%<br>3 - 5 moves: 131 of 419 children 31.3%<br>6> moves: 96 of 419 children 22.9% | 1 - 2 moves: 1,922 of 3,534 children 54.4%<br>3 - 5 moves: 1,010 of 3,534 children 28.6%<br>6> moves: 602 of 3,534 children 17% | 1 - 2 moves: 174 of 373 children 46.6%<br>3 - 5 moves: 114 of 373 children 30.6%<br>6> moves: 85 of 373 children 22.8% | 1 - 2 moves: 18 of 46 children 39.1%<br>3 - 5 moves: 17 of 373 children 37%<br>6> moves: 11 of 46 children 23.9% |
| Children in custody, ages 14 - 20, are provided with independent living services per their service plan **<br>Data Source: MWBRD16S<br>**September 1, 2010 August 31, 2011 | 90% | 98 of 219 children 44.8% | 663 of 1,382 children 47.9% | 80 of 186 children 43% | 18 of 33 children 54.6% |
| Children discharged from custody and reunified with parents/caretakers in the last year are reunified within 12 months of latest removal from home<br>Data Source: MWBRD05S & MWBRD05C<br>**September 1, 2010 August 31, 2011 | 60% | 78 of 107 children 72.9% | 898 of 1,344 children 66.8% | 54 of 77 children 70.1% | 24 of 30 children 80% |

DHS
291155

**3-South Data Indicators**
**Baseline CQI Review Report**
August 2011

## Practice Model Components

| Mobilizing Appropriate Services Timely | | | | | |
|---|---|---|---|---|---|
| Data Indicators Associated with Mobilizing Appropriate Services Timely | Year III Goal/ Compliance Measure | Region August 2011 | State August 2011 | Hinds | Warren |
| Children discharged in the last year upon finalization of an adoption have had the adoption finalized within 24 months of the latest removal from home Data Source: MWBRD10D & MWBRD10S **September 1, 2010 August 31, 2011 | 25% | 2 of 14 children 14.3% | 76 of 296 children 25.7% | 1 of 8 children 12.5% | 1 of 6 children 16.7% |
| Foster Care Re-entries | | | | | |
| Children in custody have received periodic medical examinations and all necessary follow-up services and treatment | At least 40% of children in custody | | | | |
| Children in custody have received a dental examination every 6 months and all medically necessary dental services | At least 40% of children age 3 and over in custody | | | | |
| Children in custody have received a mental health assessment by a qualified professional within 90 calendar days of placement or their 4th birthday, respectively, and all recommended mental health services pursuant to his/her assessment | At least 40% of children age 4 and over in custody | | | | |
| Children in custody have received a developmental assessment, by a qualified professional, and all needed developmental services. | At least 40% of relevant children in custody | | | | |

**3-South Data Indicators**
**Baseline CQI Review Report**
**August 2011**

# Practice Model Components

| Assuring Safety and Risk Management | | | | | |
|---|---|---|---|---|---|
| **Data Indicators Associated with Assuring Safety and Managing Risk** | **Year III Goal/ Compliance Measure** | **Region August 2011** | **State August 2011** | **Hinds** | **Warren** |
| All investigations into reports of maltreatment, including corporal punishment, of children in DFCS custody must be initiated within 24 hours of the report and completed within 30 calendar days, including supervisory approval Data Source: MWZ1271R & MWZ1271S * August 1, 2011 thru August 30, 2011 | 100% | Total Investigations 15 Timely Initiated: 12 investigations 80% Timely Completed: 1 investigation 16.7% | Total Investigations 89 Timely Initiated: 73 investigations 82% Timely Completed: 14 investigations 35.9% | Total Investigations 13 Timely Initiated: 10 investigations 76.9% Timely Completed: 0 investigations 0% | Total Investigations 2 Timely Initiated: 2 investigations 100% Timely Completed: 1 investigation 50% |
| Investigation timeliness for all children Data Source: MWZ1272S & MWZ1272R * August 1, 2011 thru August 30, 2011 | 100% | Timely Initiated **REDACTED** L3= 85 70.8% investigations Timely Completed: **REDACTED** L3= 11 19.6% investigations | Timely Initiated **REDACTED** L3= 911 76.6% investigations Timely Completed: **REDACTED** L3= 326 46.9% investigations | Timely Initiated **REDACTED** L3= 77 69.4% investigations Timely Completed: **REDACTED** L3= 10 19.2% investigations | Timely Initiated **REDACTED** L3= 8 88.9% investigations Timely Completed: **REDACTED** L3= 1 25% investigations |

**3-South Data Indicators**
**Baseline CQI Review Report**
**August 2011**

# Practice Model Components

| | | | | | |
|---|---|---|---|---|---|
| **Assuring Safety and Risk Management** | | | | | |
| **Data Indicators Associated with Assuring Safety and Managing Risk** | **Year III Goal/ Compliance Measure** | **Region August 2011** | **State August 2011** | **Hinds** | **Warren** |
| Rate of Abuse / Neglect / Maltreatment in Care Data Source: MWBRD06S § September 1, 2010 thru August 31, 2011 **NOTE:** This number is duplicative as it counts the number of evidenced findings rather than the children that were maltreated in care. | <0.57% | 0.83% of 721 children in custody | 1.43% of 6,071 children in custody | .81% of 611 children in custody | .90% of 110 children in custody |
| Recurrence of Maltreatment | | *Not Currently Available* | | | |
| Any foster child who remains in the same out of home placement following an investigation into a report that he/she was maltreated, or subject to corporal punishment, in that placement shall be visited by a DFCS caseworker twice a month for three months after the conclusion of the investigation Data Source: MWLS55AS & MWLS55AD * August 1, 2011 thru August 30, 2011 | 100% | 0 of 5 children 0% | 26 of 59 children 44.1% | 0 of 5 children 0% | N/A |

DHS
291157

**3-South Data Indicators**
**Baseline CQI Review Report**
**August 2011**

# Practice Model Components

| Assuring Safety and Risk Management | | | | | |
|---|---|---|---|---|---|
| **Data Indicators Associated with Assuring Safety and Managing Risk** | **Year III Goal/ Compliance Measure** | **Region August 2011** | **State August 2011** | **Hinds** | **Warren** |
| Foster parents with at least one foster child residing in their home shall have a DFCS worker visit the home twice a month (therapeutic FH) or monthly (non-therapeutic FH) Data Source: MWZPLMCS & MWZPLMS2 * August 1, 2011 thru August 30, 2011 | 80% | Foster Homes: 43 of 224 children 19.2% Thera Foster Homes: 2 of 83 children 2.4% | Foster Homes: 956 of 2,479 children 38.6% Thera Foster Homes: 32 of 245 children 13.1% | Foster Homes: 34 of 203 children 16.7% Thera Foster Homes: 2 of 71 children 2.8% | Foster Homes: 9 of 21 children 42.9% Thera Foster Homes: 0 of 12 children 0% |

DHS
291159

### 3-South Data Indicators
### Baseline CQI Review Report
#### August 2011

## Practice Model Components

| Involving Children and Families | | | | | |
|---|---|---|---|---|---|
| **Data Indicators Associated with Involving Children and Families in Case Planning and Decision Making** | **Year III Goal/ Compliance Measure** | **Region August 2011** | **State August 2011** | **Hinds** | **Warren** |
| Children in custody shall receive documented twice-monthly, in-person visits by the assigned DFCS caseworker Data Source: MWZWC5S2 * August 1, 2011 thru August 31, 2011 | At least 70% | 160 of 450 children in custody 35.6% | 1989 of 3,651 children in custody 54.5% | 122 of 402 children in custody 30.6% | 38 of 48 children in custody 79.2% |
| Children with a goal of reunification shall have their assigned DFCS caseworker meet monthly with the child's biological parents Data Source: MWZWCR3S * August 1, 2011 thru August 31, 2011 | At least 80% | 8 of 253 children with plan of reunification 3.2% | 460 of 2,059 children with plan of reunification 22.3% | 5 of 234 children with plan of reunification 2.1% | 3 of 19 children with plan of reunification 15.8% |
| (Have had and ITM 1) with child and caseworker within the first 72 hours of placement/move; 2) with child's parent and caseworker within first 2 weeks of initial placement; and 3) with Foster Care provider and caseworker within first 2 weeks of placement | | *Not Currently Available* | | | |

**3-South Data Indicators**
**Baseline CQI Review Report**
**August 2011**

## Practice Model Components

| Assessing Strengths and Needs | | | | | |
|---|---|---|---|---|---|
| **Data Indicators Associated with Assessing Strengths and Needs** | **Year III Goal/ Compliance Measure** | **Region August 2011** | **State August 2011** | **Hinds** | **Warren** |
| Receives a comprehensive strength and needs assessment – Desk audit tracking in implementing counties | | *Not Currently Available* | | | |
| (Have received a comprehensive health assessment within 30 days of entering care) | 80% | *Not Currently Available* | | | |
| (Have gone through screening and assessment within 30 days of entering custody) | | *Not Currently Available* | | | |
| (Are screened for general and special education needs within 30 calendar days of their entry into foster care) | 80% | *Not Currently Available* | | | |
| (Have their currently available medical, dental, educational, and psychological information provided to their foster parents or facility staff no later than at the time of any new placement during the PUR) | 80% | *Not Currently Available* | | | |

**3-South Data Indicators**
**Baseline CQI Review Report**
**August 2011**

## Practice Model Components

| Preserving and Maintaining Connections | | | | | |
|---|---|---|---|---|---|
| **Data Indicators Associated with Preserving and Maintaining Connections** | **Year III Goal/ Compliance Measure** | **Region August 2011** | **State August 2011** | **Hinds** | **Warren** |
| (Children Placed In-County and Out-of-County) | | *Not Currently Available* | | | |
| (Sibling Groups Placed Together or Apart) | | *Not Currently Available* | | | |
| (At least 40% of placement cases in which whereabouts of one or both parents is unknown, DFCS shall have immediately instituted a diligent search for the parents/documented in case record) | | *Not Currently Available* | | | |
| (Have been provided contacts with parents and siblings not in same placement ) | At least 90% of children in custody | *Not Currently Available* | | | |

DHS
291161

**3-South Data Indicators**
**Baseline CQI Review Report**
**August 2011**

## Practice Model Components

| Individual Case Planning | | | | | |
|---|---|---|---|---|---|
| **Data Indicators Associated with Individualizing Case Planning** | **Year III Goal/ Compliance Measure** | **Region August 2011** | **State August 2011** | **Hinds** | **Warren** |
| (Have had a team meeting with service plans developed for child and parents within 30 calendar days of entry into foster care – Desk Audit in implementing counties) | 80% | *Not Currently Available* | | | |
| (Have had a team meeting during which their service plan has been updated quarterly and within 30 calendar days of any placement / significant change – Desk Audit in implementing counties) | 80% | *Not Currently Available* | | | |
| (Have a permanent plan within 30 days of entry into care ) | 90% | *Not Currently Available* | | | |
| (Have a permanent plan consistent with Plan requirements) | 90% | *Not Currently Available* | | | |
| (At least 90% of children in custody with the goal of reunification shall have case record documentation reflecting active concurrent permanency planning)  FCR? | At least 90% | *Not Currently Available* | | | |

DHS
291162

**3-South Data Indicators**
**Baseline CQI Review Report**
**August 2011**

DHS
291163

## Systemic Factors

| Training of Staff and Providers | | | | | |
|---|---|---|---|---|---|

| Data Indicators Associated with Training of Staff and Providers | Year III Goal/ Compliance Measure | Region August 2011 | State August 2011 | Hinds | Warren |
|---|---|---|---|---|---|
| All new caseworkers/supervisors complete their training requirements before assuming their responsibilities | 100% | *Not Currently Available* | | | |
| (Caseworkers receive minimum of 40 hours of annual ongoing, in-service training) | | *Not Currently Available* | | | |
| (Supervisors receive a minimum of 24 hours of annual ongoing, in-service training) | | *Not Currently Available* | | | |
| (Develop indicators regarding Foster/Adoptive Parent Training) | | *Not Currently Available* | | | |

**3-South Data Indicators**
**Baseline CQI Review Report**
August 2011

## Systemic Factors

| Service Array | | | | | |
|---|---|---|---|---|---|
| Data Indicators Associated with Service Array | Year III Goal/ Compliance Measure | Region August 2011 | State August 2011 | Hinds | Warren |
| | | | | | |

DHS
291164

**3-South Data Indicators**
**Baseline CQI Review Report**
August 2011

## Systemic Factors

| Placement Resources | | | | | |
|---|---|---|---|---|---|

| Data Indicators Associated with Placement Resources | Year III Goal/ Compliance Measure | Region August 2011 | State August 2011 | Hinds | Warren |
|---|---|---|---|---|---|
| Number of Licensed/Pending Foster Family Homes                Data Source: MWZRESLS & MWZRESPS *Licensed Homes: August 1, 2011 thru August 31, 2011 *Pending Homes: As of August 15, 2011 | | 127 Licensed 25 Pending | 2,512 Licensed 247 Pending | 113 Licensed 25 Pending | 14 Licensed 0 Pending |
| Number of Children in Foster Care by Placement Type (family based v. non-family based)                Data Source: MWZ0510S  **NOTE**:Family Based Placements=Adoptive Home, Child Specific, CO Non Licensed Non-Relative, CO Non Licensed Relative Foster Home, *Expedited Pending Relative Resource Home (added May 2011), Foster Home, Foster/Adopt Home, Group Home, Own Home, Relative Foster Home, Respite Foster Care, Teenage Parent Foster Home and Therapeutic Group and Foster Homes * August 1, 2011 thru August 31, 2011 | | 370 of 425 children 87.1% | 3,244 of 3,652 children 88.8% | 333 of 378 children 88.1% | 37 of 47 children 78.7% |
| Sibling groups, with one or more of siblings under 10, are not placed in congregate care settings for more than 45 days Data Source: MWLS53HS * August 1, 2011 thru August 31, 2011 | | 1 of 4 sibling groups 25% RD Approval | 2 of 8 sibling groups 25% RD Approval | 1 of 4 sibling groups 25% RD Approval | N/A |

DHS
291165

**3-South Data Indicators**
**Baseline CQI Review Report**
August 2011

## Systemic Factors

| Placement Resources | | | | | |
|---|---|---|---|---|---|
| **Data Indicators Associated with Placement Resources** | **Year III Goal/ Compliance Measure** | **Region August 2011** | **State August 2011** | **Hinds** | **Warren** |
| No child shall be placed in more than one emergency or temporary facility within one episode of foster care, unless an immediate placement move is necessary to protect the safety of the child or others as certified in writing by the RD<br>Data Source: MWLS51DS<br>*August 1, 2011 thru August 31, 2011 | 100% | 57 of 81 child 70.37% RD Approval | 256 of 358 children 71.51% RD Approval | 50 of 73 child 68.49% RD Approval | 7 of 8 child 87.5% RD Approval |
| No child under 10 years of age shall be placed in a congregate care setting unless the child has exceptional needs that cannot be met in a relative or foster family home or the child is a member of a sibling group, and the RD has granted express written approval for the placement<br>Data Source: MWLS52HS<br>*August 1, 2011 thru August 31, 2011 | 100% | 17 of 19 children 89.5% RD Approval | 69 of 74 children 93.2% RD Approval | 17 of 19 children 89.5% RD Approval | N/A |

DHS
291166

DHS
291167

**3-South Data Indicators**
**Baseline CQI Review Report**
**August 2011**

# Systemic Factors

| Caseloads | | | | | |
|---|---|---|---|---|---|
| **Data Indicators Associated with Caseloads** | **Year III Goal/ Compliance Measure** | **Region August 2011** | **State August 2011** | **Hinds** | **Warren** |
| At least 75% of caseworkers carry a caseload that does not exceed Plan caseload requirements (over 6,960 minutes) Data Source: MWASA9S1 *August 1, 2011 thru August 31, 2011 (Includes Direct Service Workers and Resource Workers) | At least 75% | 25 workers 49% | 311 workers 51.4% | 24 workers 40% | 1 worker 88.9% |
| No more than 10% of caseworkers shall carry a caseload exceeding twice the caseload requirements (over 13,920 minutes) Data Source: MWASA9S1 *August 1, 2011 thru August 31, 2011 (Includes Direct Service Workers and Resource Workers) | No more than 10% | 9 workers 18.4% | 81 workers 12.7% | 9 workers 22.5% | 0 workers 0% |
| No caseworkers carry a caseload exceeding three times the caseload requirements (over 20,880 minutes) Data Source: MWASA9S1 *August 1, 2011 thru August 31, 2011 (Includes Direct Service Workers and Resource Workers) | 100% | 2 workers 95.9% | 36 workers 94.4% | 2 workers 95% | 0 workers 100% |

**3-South Data Indicators**
**Baseline CQI Review Report**
**August 2011**

## Systemic Factors

| | | | | | |
|---|---|---|---|---|---|
| **Oversight and Monitoring** | | | | | |
| **Data Indicators Associated with Oversight and Monitoring** | **Year III Goal/ Compliance Measure** | **Region August 2011** | **State August 2011** | **Hinds** | **Warren** |
| Supervisors, who supervise caseworkers, are responsible for supervising no more than 5 caseworkers<br>Data Source: MWASA5D2<br>\*August 1, 2011 thru August 31, 2011 | No more than 10% | 0<br>ASWS's    0% | 11<br>ASWS<br>9.24% | 0<br>ASWS's<br>0% | 0<br>ASWS's<br>0% |
| (DFCS held special permanency reviews for each child in custody who had, as of 1/4/08, been in foster care more than 15/22 previous months & for whom DFCS hadn't filed a TPR petition or documented an ASFA exception) | *Not Currently Available* | | | | |
| (Develop indicator regarding number of SARs completed by supervisors) | *Not Currently Available* | | | | |

DHS
291168

DHS
291169

## 3-South Data Indicators
## Baseline CQI Review Report
### August 2011

## Systemic Factors

| Court Process | | | | | |
|---|---|---|---|---|---|
| **Data Indicators Associated with Court Processes** | **Year III Goal/ Compliance Measure** | **Region August 2011** | **State August 2011** | **Hinds** | **Warren** |
| Children who have been in custody at least 6 months have had a timely county conference<br>Data Source: MWZTACRS<br>*September 1, 2010 thru August 31, 2011 | 90% | 369 of 391 children<br>94.4% | 3,377 of 3,466 children<br>97.4% | 325 of 346 children<br>93.9% | 44 of 45 children<br>97.8% |
| Children in custody at least 12 months have had a timely annual court review<br>Data Source: MWZTPHRS<br>*September 1, 2010 thru August 31, 2011 | 90% | 111 of 336 children<br>33% | 1,961 of 3,089 children<br>63.5% | 82 of 293 children<br>28% | 29 of 43 children<br>67.4% |
| Children in custody reaching the point at which they have spent 15 of the previous 22 months in foster care with no ASFA exception noted will have a petition for TPR filed on their behalf<br>Data Source: MWZ014S1<br>§ As of August 5, 2011 | 80% | 10 of 111 children<br>9% | 382 of 1,028 children<br>37.2% | 7 of 93 children<br>7.5% | 3 of 18 children<br>16.7% |
| Children in custody who have spent more than 15 of the previous 22 months in FC without a TPR petition filed will have an exception noted or a TPR filed §<br>Data Source: MWZ014S1 & MWZ014S2<br>§ As of August 5, 2011 | 80% | 134 of 235 children<br>57% | 1,105 of 1,751 children<br>63.1% | 123 of 209 children<br>58.9% | 11 of 26 children<br>42.3% |

**3-South Data Indicators**
**Baseline CQI Review Report**
August 2011

## Systemic Factors

| Data Quality and Usage | | | | | |
|---|---|---|---|---|---|
| **Data Indicators Associated with Data Quality & Usage** | **Year III Goal/ Compliance Measure** | **Region August 2011** | **State August 2011** | Hinds | Warren |
| Currently, no proposed indicators | | | | | |

DHS
291170

**Ex. 25B**

# Region 3-South
## Continuous Quality Improvement
## Annual Follow-Up Report
## September 2012



**Compiled from MACWIS Data Indicator Reports, On-Site
Case Review Findings, and Stakeholder Survey Results**

Submitted December 10, 2012 by the Mississippi Family and Children's Services
**Division of Evaluation and Monitoring
Office of Continuous Quality Improvement**

DHS
312557

## Table of Contents

Background ....................................................................................................1

Methodology and Sources ...........................................................................1

Mobilizing Appropriate Services Timely .....................................................3

Assuring Safety and Managing Risk .............................................................7

Involving Children and Families in Case Planning and Decision Making ..................10

Assessing Strengths and Needs ...................................................................13

Preserving and Maintaining Connections .....................................................16

Individualizing Case Planning ......................................................................19

Training of Staff and Providers ....................................................................22

Service Array................................................................................................23

Placement Resources ....................................................................................25

Caseloads .....................................................................................................28

Oversight and Monitoring ............................................................................30

Court Processes ...........................................................................................32

Data Quality and Usage ...............................................................................35

Next Steps.....................................................................................................36

**Appendix**

- o   Region 3-South September 2012 Follow-Up Data Indicators
- o   Summary of Areas for Improvement Efforts

# Region 3-South
# Annual Follow-Up CQI Review Report

## Background

In connection with the *Olivia Y* Settlement Agreement, Council of Accreditation (COA), Federal standards and to support the implementation of the Mississippi Child Welfare Practice Model, Mississippi's Division of Family and Children's Services (DFCS) has embarked on developing a Continuous Quality Improvement (CQI) System which includes the Division of Evaluation and Monitoring, the Foster Care Review Program (FCR), and the Mississippi Automated Child Welfare Information System (MACWIS). The CQI System utilizes both quantitative and qualitative information to determine how counties, regions and the state are assuring the safety, permanency and well-being of children and families served by the State. This will be accomplished by monitoring key child welfare indicators associated with the components and systemic factors associated with the Practice Model. The CQI system is organized around the six components and seven systemic factors of the Practice Model and includes elements of the Child and Family Services Review (CFSR), Council on Accreditation (COA) standards, and components of the *Olivia Y* settlement agreement. In order to monitor county, regional and state performance, the CQI system is centered around quantitative data indicators which will establish how counties and the region are doing in comparison to standards that have been set or in comparison to statewide performance. The qualitative information gathered is intended to provide context and a deeper insight to better understand counties and regions performance on the data indicators.

## Methodology and Sources

This report discusses the results of the Continuous Quality Improvement (CQI) data gathered for Region 3-South in Mississippi, and will be used to measure and monitor improvement in the months and years to come. The sources for the information used in this report are as follows:

- **Data Indicators**: The MACWIS data indicators track and report information related to the state's Practice Model Components, Systemic Factors, and the requirements of the *Olivia Y* Modified Settlement Agreement *(see data table footnotes in appendix for the time period covered for these data indicators)*. Existing data reports were augmented and new reports were developed and validated in order to capture key indicators of child welfare practice across the Practice Model components as well as systemic factors. In obtaining the results for the counties', regions', and state's respective levels of performance, the most recent summary reports, which have been validated for accuracy, were utilized. These data indicators will serve as the cornerstone for measuring strengths and areas needing improvement in counties and regions and will be used to establish baselines. The information from the case reviews, desk audits, and stakeholder surveys will be used to support the information from the data indicators.

- **On-site case record reviews and case member interviews**: To support the results of the data indicators from MACWIS, regions also conducted a qualitative case review to provide deeper context to the data results. After requesting and receiving a universe of cases from Region 3-South, a random sample was obtained that consisted of 14 foster care ███████████████ cases from both[1] of Region 3-South's counties. Twelve teams made up of two people conducted the case reviews, and were supported by one team leader and two quality assurance reviewers. The information considered in the onsite review which occurred in September, 2012, focused on a 12 month period ending September 20, 2012, and came from the electronic case management system (MACWIS), paper files, and interviews with the ,various case members who included the parents, the children, and the caseworkers. The table below further illustrates the demographics from the sample of cases:

---

[1] Counties which had cases included in the review sample were: Hinds and Warren Counties

DHS
312559

| Case Characteristics | Foster Care | | |
|---|---|---|---|
| **Total Number of Cases** | **14** | | |
| **Date case was opened** | | | |
| • Opened prior to the period under review (PUR) | 8 (57%) | | |
| • Opened during the period under review (PUR) | 6 (43%) | | |
| **Child entered foster care during the PUR** | 7 (50%) | | |
| **Child's age at start of PUR** | | | |
| • Younger than 10 | 4 (29%) | | |
| • At least 10 but younger than 13 | 3 (21%) | | |
| • At least 13 but younger than 16 | 4 (29%) | | |
| • 16 and older | 3 (21%) | | |
| **Race/Ethnicity** | | | |
| • Black Non-Hispanic | 12 (86%) | | |
| • Hispanic (of any race) | 1 (7%) | | |
| • White Non-Hispanic | 2 (14%) | | |
| • Unable to Determine | 0 | | |
| **Primary reason for opening case** | | | |
| • Physical Abuse | 4 (29%) | | |
| • Neglect (not including medical neglect) | 4 (29%) | | |
| • Domestic violence in child's home | 0 | | |
| • Drug abuse by parent | 1 (7%) | | |
| • Sexual Abuse | 1 (7%) | | |
| • Other | 5 (36%) | | |

- **Stakeholder Surveys:** Stakeholder involvement is critical to the success of the Practice Model. In particular, service providers, as well as the courts, resource parents, the Regional Implementation Team, caseworkers, and supervisors need to be fully engaged in the child welfare process. In October and November, 2012, 115 stakeholders in Region 3-South were provided with surveys to determine how they believe the agency is performing with regard to the following systemic factors: Training of Staff and Providers, Service Array, Placement Resources, Caseloads, Oversight and Monitoring, Court Processes, and Data Quality and Usage. Stakeholders were surveyed through email addresses provided by the Area Social Work Supervisors (ASWS) in each county. The stakeholders were identified by the ASWS and forwarded to the Regional Director who then compiled a condensed list of stakeholders who were solicited for participation. 31 of the 115 possible surveys solicited were completed which resulted in an overall return rate of 26.96%. In some areas, a definitive number of solicited responses are not known, so for those areas, the percentages are based on the numbers of identified potential recipients based on documentation provided to the Evaluation and Monitoring Unit. Below is a summary of the return rate on each category of stakeholders surveyed:
  - **27.3% of Service Providers** – 6 out of 22 service providers solicited responded to the surveys in Region 3-South.
  - **27.5% of Caseworkers and Area Social Work Supervisors** (ASWS) – 14 out of 51 direct service workers, homemakers, clerks, resource and adoption workers, Regional Directors and ASWS completed the surveys in Region 3-South.
  - **100% of Resource Parents** – 5 resource parents out of 5 solicited resource parents completed the surveys in Region 3-South
  - **14.3% of Implementation Team** – 5 out of 35 identified potential members of the Implementation Team completed the surveys in Region 3-South.
  - **50% of Judges**– 1 out of 2 Youth Court Judges, completed the surveys in Region 3-South.

DHS
312560

# Section One
# Practice Model Components

## Mobilizing Appropriate Services Timely

Appropriate and timely services refer to a process whereby services are designed and delivered pursuant to a careful assessment of children's and parents' needs. The assessment should identify both the strengths of the children and parents with regard to the issues requiring interventions, and their needs with regard to ensuring safety, permanency, and well-being. Needs should not be confused with services. In order to provide appropriate and timely services to children and parents, there is a need to think beyond what is available in the service array so as to avoid offering a standard menu of services that may or may not match the unique needs of some parents and children. The concept of appropriate services emphasizes that services should be comprehensive, incorporating a broad array of services and supports that are individualized to meet the specific needs of the children and families. These services and supports should be provided in the least restrictive setting appropriate for the child and accessible to all jurisdictions within the State.

The following practice principles are linked to this component:
- Services are designed and delivered pursuant to a careful assessment of the children's and parents' needs;
- Services and supports are individualized to meet the unique needs of the children and parents;
- Services are based on needs, not on availability;
- Services are delivered when they are needed and in locations that are accessible to the children and parents who need them; and
- Children and families are treated as partners to assure joint decision making about the services that they need.

The results below detail the findings of Region 3-South's current success in Mobilizing Appropriate Services Timely.

### Number of Indicators Assessed: Mobilizing Appropriate Services Timely

| Type | Number | Percent |
|------|--------|---------|
| Indicators Exceeding Goals | 1 | 25% |
| Indicators Not Exceeding Goals | 3 | 75% |
| Total Indicators Currently Measurable | 4 | 100% |
| Other Indicators (not tied to Goals) | 6 | -- |
| TOTAL | 10 | -- |

There are 10 indicators associated with Mobilizing Appropriate Services Timely. There are 4 indicators at this time for which there is data to establish a baseline and to measure strengths and areas of needed improvement. 1 (25%) of the 4 indicators for which there is data meet or exceed the established goals indicating strengths in practice. 3 (75%) of the data indicators do not meet or exceed the established goals and indicates an area of needed improvement.

### *Strengths in Practice*

| Data Indicators Associated with Mobilizing Appropriate Services Timely | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 |
|---|---|---|---|---|---|
| Placement Stability - Number of children in custody 12 months or less that have had 2 or fewer placement moves<br>Data Source: MWZPLM5S<br>*As of September 30, 2012 | 70% | 224 of 311 children; 72% | 289 of 207 children; 71.63% | 1,724 of 2,375 children 72.6% | 1,726 of 2448 children 70.51% |

DHS
312561

- The Year III goal for this measure is that 70% of children in custody 12 months or less have had 2 or fewer placement moves. Region 3-South meets this goal at 71.63% which is consistent with the overall state performance for the reporting period.
- During the September 2012 on-site case review, 92.9% of the foster care cases reviewed were rated a Strength for Placement Stability.
- Of the 7 cases reviewed during the on-site case review where there was more than one placement change during the period under review, 6 (85.7%) appear to have been planned by the agency in an effort to achieve the child's case plan goals or made in an effort to meet the needs of the child;
- All placements settings were found to be stable at the time of the on-site case review;
- 8 children were found to be assessed with special needs. 7 of those 8children are in placements that can meet their therapeutic, educational, and medical needs;
- All placement settings were found to be least restrictive to meet the child's individual needs.

## Areas Needing Improvement

| Data Indicators Associated with Mobilizing Appropriate Services Timely | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 |
|---|---|---|---|---|---|
| Children in custody, ages 14 - 20, are provided with independent living services per their service plan ** Data Source: MWBRD16S **October 1, 2011 through September 30, 2012 | 90% | 98 of 219 children 44.8% | 66 of 216 children 30.56% | 663 of 1,382 children 47.9% | 565 of 1,339 children 42.20% |

- The Year III goal for this measure is that 90% of children in custody, ages 14-20, are provided with Independent Living services per their service plan. Region 3-South does not meet this goal at 30.56% which is below the region's performance for the baseline period of 44.8%.
- 71.4% of the 7 applicable cases subject to the September 2012 on-site case review rated a Strength for Other Planned Living Arrangement. During the course of the review, there were 7 children identified in the review sample who were age appropriate for independent living services. 71.4% were found to be provided with services to adequately prepare them to live independently when they leave foster care.

| Data Indicators Associated with Mobilizing Appropriate Services Timely | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 |
|---|---|---|---|---|---|
| Children discharged from custody and reunified with parents/caretakers in the last year are reunified within 12 months of latest removal from home Data Source: MWBRD05S & MWBRD05C **October 1, 2011 through September 30, 2012 | 60% | 78 of 107 children 72.9% | 59 of 116 children 50.86 | 898 of 1,344 children 66.8% | 817 of 1,338 children 61.06% |

- The Year III goal for this measure is that 60% of children discharged from custody and reunified with parents/caretakers in the last year are reunified within 12 months of the latest removal from the home. Region 3-South does not meet this goal at 50.89% %. This is a decrease in the region's performance of 72.9% for the baseline period of August 2011.

DHS
312562

- 33.3% of the cases that were subject of the September 2012 on-site case review rated a Strength for Reunification/Guardianship/Permanent Placement with Relatives. Of the 6 applicable children who were subject of the September 2012 on-site case review, it appears concerted efforts are/were being made by the agency and the courts to achieve a goal of Reunification, Guardianship, or Permanent Placement with Relatives in a timely manner in 2 (33.3%) of those cases. Of the 5 children with a goal of Reunification, parental service plans identified those services DFCS deems necessary to address behaviors or conditions resulting in the child's placement in foster care in 80% of the cases reviewed. DFCS made those services that were identified available either through direct or referral service to the mother in 60% of the applicable cases and to the father in 20% of the applicable cases. There was one child discharged during the period under review and reunified. In this case, there was no evidence that a 90 day trial home placement occurred.

| Data Indicators Associated with Mobilizing Appropriate Services Timely | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 |
|---|---|---|---|---|---|
| Children discharged in the last year upon finalization of an adoption have had the adoption finalized within 24 months of the latest removal from home<br>Data Source: MWBRD10D & MWBRD10S<br>**October 1, 2011 through September 30, 2012 | 25% | 2 of 14 children 14.3% | 2 of 16 children 12.50% | 76 of 296 children 25.7% | 91 of 400 children 22.52% |

- The Year III goal for this measure is that 25% of children discharged in the last year upon finalization of an adoption have had their adoption finalized within 24 months of the latest removal from the home. From October 1, 2011 thru September 30, 2012 there were 16 children in Region 3-South who were adopted. 2 (12.5%) met the criteria of the goal by being adopted within 24 months of the latest removal from the home. This does not meet the Year III goal.
- 33.3% of the applicable cases that were subjects of the September 2012 on-site case review rated a Strength for Adoption. Of the children in the case review sample with a plan of Adoption, it appears concerted efforts are not/were not being made by the agency and the courts in 40% of the applicable cases to achieve the plan of Adoption in a timely manner. Of the 4 applicable cases reviewed, 1 child had an adoption specialist assigned and an adoption plan that identifies the child-specific activities that DFCS will undertake to achieve adoption. There is evidence in all of the applicable cases that shows the resource parents have been informed of available subsidies, including post-adoptive services. For children in the review who have been in care longer than 12 months, there is evidence in all of the applicable cases that that the resource parents have been engaged in discussions regarding adoption.

### Other Key Indicators
- There are currently no MACWIS data indicators available for the items addressed below. However the Region may want to use the following information from the on-site case reviews as indicators of practice in these areas:

DHS
312563

| Data Indicators Associated with Mobilizing Appropriate Services Timely | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 |
|---|---|---|---|---|---|
| Placement Stability - Number of moves for all children regardless of time in custody<br>Data Source: MWBRD07S & MWBRD07T<br>*As of September 30, 2012 | - | 1 - 2 moves: 192 of 433 children 45.8%<br>3 - 5 moves: 131 of 419 children 31.3%<br>6> moves: 96 of 419 children 22.9% | 1 - 2 moves: 220 of 419 children 50.81%<br>3 - 5 moves: 123 of 433 children 28.41%<br>6> moves: 90 of 433 children 20.79% | 1 - 2 moves: 1,922 of 3,534 children 54.4%<br>3 - 5 moves: 1,010 of 3,534 children 28.6%<br>6> moves: 602 of 3,534 children 17% | 1 - 2 moves: 1,967 of 3,519 children 55.90%<br>3 - 5 moves: 1006 of 3,519 children 28.59%<br>6> moves: 546 of 3,519 children 15.52% |

- There is currently no established goal for this item (*Placement Stability – Number of Moves for all Children regardless of Time in Custody*). However, there is data to reflect how the Region is performing with regard to the number of moves children are experiencing.
- **Foster Care Re-entries:**

| Data Indicators Associated with Mobilizing Appropriate Services Timely | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 |
|---|---|---|---|---|---|
| Children re-entering foster care within 1 year of reunification.<br>Data Source: MWLS311S<br>**October 1, 2011 through September 30, 2012 | – | n/a | 15 of 237 children 6.33% | n/a | 110 of 1885 children 5.84% |

- The table above reflects that during the October 1, 2011 through September 30, 2012 reporting period, 15 of 237 (6.33%) re-entered state's custody within 1 year of being reunified with a parent or caretaker (there is currently no established goal for this particular item). 6 of the 7 (85.7%) applicable foster care cases during the September 2012 on-site case review rated a Strength for this item.
- **Physical Health of the Child:**
  - 42.9% of the 14 foster care cases rated a Strength for this item. ████████████ ██████████████████ In the last 12 month period, the agency assessed the physical health care needs of 12 of the 14 (85.7%) foster children who were subject to the September 2012 on-site case review. Of the 7 children who came into agency custody during the period under review, 2 received an initial screening within 72 hours and 2 received a comprehensive health screening within 30 days of foster care entry. There were 12 children in the on-site case review who were age appropriate for dental services. 66.7% of those children had their dental health care needs assessed during the period under review. Of the children with identified physical health needs, 71.4% were provided with appropriate services in a timely manner to address those needs. 50% of the children with identified dental health needs were provided with appropriate services in a timely manner to address those needs.
- **Mental/Behavioral Health of the Child:**
  - 36.4% of the 11 applicable foster care cases rated a Strength for this item. ████████████████ ████████████████████████████████ During the period under review,

DHS
312564

age appropriate foster children who were the subjects of the September 2012 on-site case review received an initial mental health screening within 30 days of entry into foster care and/or within 30 days of their 4th birthday in none of the applicable cases. The agency conducted an assessment of the children's mental/behavioral health needs on an on-going basis or as a follow-up based on indications to inform case planning decisions in 45.5% of the applicable cases and (during the review period) provided appropriate services to address the children's mental/behavioral health needs in a timely manner in 45.5% of those cases.

### *Areas for Improvement Efforts to better address Mobilizing Appropriate Services Timely*

- On-site case review and Foster Care Review data shows that (overall) age appropriate children are being provided with Independent Living services by the Region. However, Region 3-South's data indicators show that children in custody, ages 14 - 20, being provided with independent living services per their service plan is an area of needed improvement.
- Children discharged to a plan of Reunification within 12 months of entering state's custody is an area needing improvement based on the region's September 2012 data indicators.
- Children discharged in the last year upon finalization of an adoption having had the adoption finalized within 24 months of the latest removal from home shows to be an area needing improvement based on the data indicators from the October 1, 2011 thru September 30, 2012 baseline period.
- September 2012 on-site case review data shows a need for improvement in assessing children's physical and mental health needs and providing services in a timely manner to meet those identified needs.

## Assuring Safety and Managing Risk

Safety and risk-related interventions are designed to help children remain safely at home whenever possible and appropriate. Assuring child safety begins with the first report to MDHS that someone believes a child is being maltreated and continues through initiating investigations of maltreatment; initial safety and risk assessment; ongoing safety and risk assessment; developing a case plan; assuring safety during placement; reunification; and case closure. Safety and risk interventions are applicable for all children within a home, not only for a child for whom a report of maltreatment has been received.

The following practice principles are linked to this component:
- Safety and risk assessment practice guide casework activities with regard to safety, permanency, and well-being;
- Safety and risk assessments are used to address case plans and service delivery;
- Safety and risk assessment occurs throughout the life of a case;
- Family-centered practice principles apply to safety and risk interventions; and
- Safety and risk are addressed within the cultural background of the children and families being served.

The results below detail the findings of Region 3-South's current success in Assuring Safety and Managing Risk.

### Number of Indicators Assessed: Assuring Safety and Managing Risk

| Type | Number | Percent |
|---|---|---|
| Indicators Exceeding Goals | 0 | -- |
| Indicators Not Exceeding Goals | 5 | 100% |
| Total Indicators Currently Measurable | 5 | 100% |
| Other Indicators (not tied to Goals) | 1 | -- |
| **TOTAL** | **6** | **--** |

There are 6 data indicators associated with Assuring Safety and Managing Risk. Of the 6 indicators, only 5 currently have Goals and/or data to measure against best practice Goals. Of the 5 Goals that currently have data available for which to establish a baseline and to measure strengths and areas of needed improvement, 0 of the 5 indicators for which there is data meet or exceed Goals indicating strengths in practice. 5 (100%) data indicators do not meet or exceed Goals and indicates an area of needed improvement.

DHS
312565

*Strengths in Practice*
- There are no MACWIS data indicators that rate as a Strength for the Region in Assuring Safety and Managing Risk.

*Areas Needing Improvement*

| Data Indicators Associated with Assuring Safety and Managing Risk | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 |
|---|---|---|---|---|---|
| All investigations into reports of maltreatment, including corporal punishment, of children in DFCS custody must be initiated within 24 hours of the report and completed within 30 calendar days, including supervisory approval Data Source: MWZ1271R & MWZ1271S * September 1, 2012 thru September 30, 2012 | 100% | Total Investigations 15 Timely Initiated: 12 investigations 80% Timely Completed: 1 investigation 16.7% | Total Investigations 7 Timely Initiated: 6 investigations 85.7% Timely Completed: 1 investigation 33.3% | Total Investigations 89 Timely Initiated: 73 investigations 82% Timely Completed: 14 investigations 35.9% | Total Investigations 53 Timely Initiated: 40 investigations 75.5% Timely Completed: 19 investigations 73.1% |

- The Year III goal for this measure is 100% of all investigations into reports of maltreatment, including corporal punishment, of **children in DFCS custody** must be initiated within 24 hours of the report and completed within 30 calendar days, including supervisory approval. Region 3-South does not meet this goal at 85.7 initiated timely and 33.3% completed timely.
- Timeliness of initiating investigations of reports of child maltreatment (Item 1): 75% of the 8 applicable foster care cases reviewed at the September 2012 on-site case review rated a Strength. ██████████

| Data Indicators Associated with Assuring Safety and Managing Risk | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 |
|---|---|---|---|---|---|
| Investigation timeliness for all children Data Source: MWZ1272S & MWZ1272R * September 1, 2012 thru September 30, 2012 | 100% | Timely Initiated ██████ L3= 85 70.8% investigations Timely Completed: ██████ L3= 11 19.6% investigations | Timely Initiated ██████ L3= 52 61.2% investigations Timely Completed: ██████ L3= 24 40.% investigations | Timely Initiated ██████ L3= 911 76.6% investigations Timely Completed: ██████ L3= 326 46.9% investigations | Timely Initiated ██████ L3= 592 67.4% investigations Timely Completed: ██████ L3= 468 70.3% investigations |

- The Year III goal for this measure is 100%. The Region does not meet this goal in that ██████ ██████ 61.2% of the Level 3 investigations were initiated in a timely manner. ██████ ██████ 40% of the Level 3 investigations were completed in a timely manner (which includes supervisory approval). The completion of these investigations is an improvement over the August 2011 baseline performance of ██████████ 19.6% for Level 3 reports.

DHS
312566

- Timeliness of initiating investigations of reports of child maltreatment (Item 1): As mentioned in the section above, 75% of the 8 applicable foster care cases reviewed at the September 2012 on-site case review rated a Strength. ███████████████████

| Data Indicators Associated with Assuring Safety and Managing Risk | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 |
|---|---|---|---|---|---|
| Rate of Abuse / Neglect / Maltreatment in Care Data Source: MWBRD06S § October 1, 2011 thru September 30, 2012 | <0.57% | 0.83% of 721 children in custody | 1.47% of 745 children in custody | 1.43% of 6,071 children in custody | 1.65% of 6,149 children in custody |

- The Year III goal for this measure is less than 0.57%. Of the 745 children in custody during the reporting period of October 1, 2011 through September 30, 2012, there was a rate of 1.47% for Region 3-South. This is an increase in the August 2011 baseline performance of 0.83%.

| Data Indicators Associated with Assuring Safety and Managing Risk | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 |
|---|---|---|---|---|---|
| Any foster child who remains in the same out of home placement following an investigation into a report that he/she was maltreated, or subject to corporal punishment, in that placement shall be visited by a DFCS caseworker twice a month for three months after the conclusion of the investigation Data Source: MWLS55AS & MWLS55AD * Sept 1, 2012 through September 30, 2012 | 100% | 0 of 5 children 0% | 1 of 7 children 14.29% | 26 of 59 children 44.1% | 26 of 50 children 52.0% |

- This data indicator measures any foster child who remains in the same out of home placement following an investigation into a report that he/she was maltreated, or subject to corporal punishment, in that placement shall be visited by a DFCS caseworker twice a month for three months after the conclusion of the investigation. The Year III goal for this measure is 100%. The region does not meet the prescribed goal in that there were 7 children who met the criteria for the measure but 1 actually (14.29%) had the necessary visits made as outlined in the indicator.

DHS
312567

| Data Indicators Associated with Assuring Safety and Managing Risk | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 |
|---|---|---|---|---|---|
| Foster parents with at least one foster child residing in their home shall have a DFCS worker visit the home twice a month (therapeutic FH) or monthly (non-therapeutic FH) Data Source: MWZPLMCS & MWZPLMS2 * September 1, 2012 thru September 30, 2012 | 80% | Foster Homes: 43 of 224 children 19.2% Thera Foster Homes: 2 of 83 children 2.4% | Foster Homes: 60 of 231 children 25.97% Thera Foster Homes: 16 of 90 children 17.77% | Foster Homes: 956 of 2,479 children 38.6% Thera Foster Homes: 32 of 245 children 13.1% | Foster Homes: 1294 of 2349 children 55.08% Thera Foster Homes: 89 of 234 children 38.03% |

- This indicator measures whether foster parents with at least one foster child residing in their home have had a DFCS worker visit the home twice a month (therapeutic FH) or monthly (non-therapeutic FH);
- The Year III goal for this measure is 80%. The Region does not meet this goal at 25.97% for foster homes and 17.77% for therapeutic foster homes. However, this is an improvement over the August 2011 baseline performance of 19.2% (foster homes) and 2.4% (therapeutic foster homes).

*Other Key Indicators*

- There are currently no MACWIS data indicators available for the items addressed below. However the Region may want to use the following information from the September 2012 on-site case reviews as indicators of practice in these areas:
  - Repeat Maltreatment (Item 2) / 100% of the placement cases rated a Strength. ▮▮▮▮▮▮▮
  - Services to Family to Protect Child(ren) in the Home and Prevent Removal or Re-Entry into Foster Care (Item 3) / 75% Strength for placement cases ▮▮▮▮▮▮▮▮ reviewed;
  - Risk Assessment and Safety Management (Item 4) / 57.1% Strength for placement cases ▮▮▮ ▮▮▮▮▮▮▮

*Areas for Improvement Efforts to better address Assuring Safety and Managing Risk*

- o Although a number of items rated a Strength during the on-site case review, the baseline data indicators show a need for improvement in the area of Assuring Safety and Managing Risk for initiating and completing investigations (all as well as children in care) in a timely manner.
- o Efforts to better address caseworker visits with children who remain in the same out of home placement following an investigation into a report that he/she was maltreated, or subject to corporal punishment, in that placement should be developed in order to assure safety and manage risk.
- o Efforts to better address caseworker visits with foster parents with at least one foster child residing in their home should be developed by the Region in order to manage risk and assure safety of the children placed in those homes.

# Involving Children and Families in Case Planning and Decision Making

This component includes active involvement of age-appropriate children, families, and youth in identifying their unique strengths, needs, and service requests, and in developing plans that address their needs, establish and attain their goals, and support safe and appropriate relationships within families while children are in foster care. It includes all relevant family members, whether in the household or not, preparing them for and supporting their participation in meetings, reviews, and other processes that affect them. It also includes using information from safety and risk assessments and comprehensive strengths and needs assessments to determine negotiable and non-negotiable aspects of case planning, casework activity, and levels of family involvement.

DHS
312568

The following practice principles are linked to this component:

- Parents, age-appropriate children, and youth are actively involved in developing or modifying all plans that pertain to them;
- Parents who do not reside in the home of the children are involved in developing and modifying plans that pertain to their children whenever it is safe and appropriate to do so;
- When safe and appropriate, parents are involved in the care of their children in foster care and in their children's activities; and
- Safety of children is not compromised through involving children and parents in case planning and decision making.

The results below detail the findings of Region 3-South's current success in Involving Children and Families in Case Planning and Decision Making.

**Number of Indicators Assessed: Involving Children and Families in Case Planning and Decision Making.**

| Type | Number | Percent |
|---|---|---|
| Indicators Exceeding Goals | 0 | -- |
| Indicators Not Exceeding Goals | 2 | 100% |
| Total Indicators Currently Measurable | 2 | 100% |
| Other Indicators (not tied to Goals) | 1 | -- |
| **TOTAL** | **3** | **--** |

There are 3 data indicators associated with Involving Children and Families in Case Planning and Decision Making. Of the 3 indicators, there are currently only 2 for which there is an established goal and available regional and state data to measure against best practice. 0 of the 2 indicators for which there is data meet or exceed the established goals indicating strengths in practice. 2 (100%) data indicator does not meet or exceed established goals and indicates an area of needed improvement.

*Strengths in Practice*

- There are no MACWIS data indicators that rate as a Strength for the Region in Assuring Safety and Managing Risk.

*Areas Needing Improvement*

| Data Indicators Associated with Involving Children and Families in Case Planning and Decision Making | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 |
|---|---|---|---|---|---|
| Children in custody shall receive documented twice-monthly, in-person visits by the assigned DFCS caseworker<br>Data Source: MWZWC5S2<br>* September 1, 2012 thru September 30, 2012 | At least 70% | 160 of 450 children in custody 35.6% | 315 of 503 children in custody 62.62% | 1989 of 3,651 children in custody 54.5% | 2733 of 3970 children in custody 68.84% |

- The Year III Goal for this measure is at least 70% of children in custody shall receive documented, twice-monthly, in-person visits by the assigned DFCS caseworker. Region 3-South does not meet this goal at 62.62%. However, this is a significant improvement from the August 2011 baseline performance of 35.6%.
- 42.9% of the foster care cases ████████████████████ reviewed during the September 2012 on-site case review rated a Strength for caseworker visits with the child;

DHS
312569

- 57.1% of the foster care cases ███████████████ reviewed in the September 2012 on-site review had caseworker contacts with children that were of a frequency sufficient to address issues pertaining to safety, permanency, and well-being of the child and promote the achievement of case goals;
- 71.4% of the caseworker contacts in foster care cases ████████████████████████████ ████ subject to the September 2012 on-site case review were of a quality sufficient to address issues pertaining to safety, permanency, and well-being of the child and promote achievement of case goals.

| Data Indicators Associated with Involving Children and Families in Case Planning and Decision Making | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 |
|---|---|---|---|---|---|
| Children with a goal of reunification shall have their assigned DFCS caseworker meet monthly with the child's biological parents Data Source: MWZWCR3S * September 1, 2012 thru September 30, 2012 | At least 80% | 8 of 253 children with plan of reunification 3.2% | 18 of 252 children with plan of reunification 7.14% | 460 of 2,059 children with plan of reunification 22.3% | 535 of 2170 children with plan of reunification 24.65% |

- The Year III goal for this measure is that at least 80% of children with a goal of Reunification shall have their assigned DFCS caseworker meet monthly with the child's biological parents. Region 3-South does not meet this goal at 7.14%.
- None of the 11 applicable foster care cases ███████████████ reviewed during the September 2012 on-site case review rated a Strength for Caseworker Visits with Parents;
- None of the foster care as well ██████████████████ reviewed during the September 2012 on-site case review had caseworker visits with the mother that were of a frequency sufficient to address issues pertaining to safety permanency and well-being and none of the foster care cases ████████████████
- 11.1% of the foster care cases reviewed ██████████████████████ reviewed had caseworker visits with the mother that were of a quality sufficient to address issues pertaining to safety, permanency, and well-being while none of the foster care ██████████████████████ reviewed had caseworker contacts with fathers that were of a quality sufficient to address issues pertaining to safety, permanency, and well-being;
- None of the foster care cases had documented diligent efforts made to locate the mother and one of the foster care cases had documented diligent efforts made to locate the father if contacts were not made with the parents due to their whereabouts being unknown. ████████████████████████████████ ████████████████████████████████████████████████████████████████████████;

## Other Key Indicators

There are currently no MACWIS data indicators available for the items addressed below. However the region may want to use the following information from the on-site case reviews as indicators of practice in these areas:

- 100% of the foster care cases ██████████████████████ rated an Area Needing Improvement for Involving Children and Parents in Case Planning and Decision Making.
- The agency made concerted efforts to actively involve the **child** in the case planning process in 46.2% of the applicable foster care cases ██████████████████.
- The agency made concerted efforts to actively involve the **mother** in the case planning process in 22.2% of the applicable foster care cases ██████████████████████. The agency made concerted efforts to actively involve the **father** in the case planning process in 20% of the applicable foster care cases ██████████████████.

DHS 312570

- There was evidence in 30.8% of foster care cases ███████████████ that the family was informed and prepared to actively participate in case events, including family team meetings, case plan development, and court events.
- There was evidence in 38.5% of the foster care cases ███████████████ that children and parents were involved in choosing the services included on their case plans.
- 25% of foster care cases ███████████████ reviewed contained case plans with signatures by the parents while 33.3% of foster care cases ███████████████
- contained case plan with the signature of children ages 6 and up.

***Areas for Improvement Efforts to better address Involving Children and Families in Case Planning and Decision Making***

- A plan to improve the frequency and quality of visits taking place between caseworkers and children should be developed and implemented by the Region to improve performance for involving children in case planning and decision making. It should be noted that the MACWIS data indicators show a significant increase in the caseworker/child contacts since the time of the August 2011 baseline review. The quality of these narratives appears to be an area of needed improvement based on the on-site case review results.
- A plan should be developed by the Region to assure more frequent and more quality visits take place between caseworkers and parents of children who have a permanent plan of Reunification. This will result in more timely permanency for children in care and can also have a positive effect on the Region's performance of other practice model components in both placement and in-home cases.
- Efforts to improve the involvement of parents (especially fathers) and children in the case planning process will also result in more timely permanency for children in the Region who are in care ███████████ ████████████████████████████████████

# Assessing Strengths and Needs

Comprehensive family assessment (CFA) is the ongoing and continuous process of gathering, organizing, and analyzing information for the purpose of informed decision-making and service planning concerning the safety, permanency, and well-being of children, youth, and families. Beyond an assessment of risks, safety and the circumstances leading to agency involvement, the CFA includes a broader focus of the strengths and needs of all individual family members along with underlying conditions affecting the family. Collaboration with key professionals throughout the process is critical.

The following practice principles are linked to this component:
- All families have unique strengths and needs;
- Families are participants in identifying their strengths and needs and in requesting services;
- Assessment includes strengths and needs regarding safety, permanency, and well-being;
- Assessment addresses underlying conditions in addition to presenting issues;
- All relevant family members' strengths and needs should be assessed;
- Assessment information is used to guide case planning and decision making;
- Families are best understood in the context of their culture;
- Early identification of concerns that can lead to emotional and behavioral disturbances are prioritized in assessments; and
- Assessments should be multidisciplinary.

The results below detail the findings of Region 3-South's current success in Assessing Strengths and Needs.

**Number of Indicators Assessed: Assessing Strengths and Needs.**

| Type | Number | Percent |
|---|---|---|
| Indicators Exceeding Goals | 0 | -- |
| Indicators Not Exceeding Goals | 1 | 100% |
| Total Indicators Currently Measurable | 1 | -- |
| Other Indicators (not tied to Goals) | 3 | -- |
| **TOTAL** | **4** | **100%** |

There are 4 data indicators associated with Assessing Strengths and Needs. Of the 4 indicators, there is currently 1 for which there is an established goal and available regional and state data to measure against best practice. The 1 (100%) data indicator does not meet or exceed established goals and indicates an area of needed improvement.

*Strengths in Practice*

There are currently no MACWIS data indicators available for the items within this component. Please see "Other Key Indicators" for on-site case review data that may be used to assess the Region's performance in the area of Assessing Strengths and Needs.

*Areas Needing Improvement*

| Data Indicators Associated with Assessing Strengths and Needs | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 |
|---|---|---|---|---|---|
| Have received a comprehensive health assessment within 30 days of entering care. Data Source: MWLS315S October 1, 2011 through September 30, 2012 | 50% | n/a | 25 of 290 children 9.77% | n/a | 604 of 2473 children 25.79% |

- o The Year III goal for this measure is 50% of children in foster care will have a comprehensive health assessment within 30 days of entering care. Region 3-South does not meet this goal at 9.77% for the reporting period of October 1, 2011 through September 30, 2012.
- o Of the 7 children who came into agency custody during the period under review, 2 received a comprehensive health screening within 30 days of foster care entry.

*Other Key Indicators*

- There are currently no MACWIS data indicators available for the items addressed below. However the Region may want to use the following information from the on-site case reviews as indicators of practice in these areas:

- **Educational Needs of the Child:**
  - o The results from the September 2012 on-site case review show that 46.2% of foster care cases ███████████████████ rated as a Strength for Assessing Educational Needs of the Child (On-Site Case Review Item 6).
  - o In 66.7% of the applicable foster care cases ████████████████████ during the period under review, the agency made concerted efforts to assess and address the child's educational needs.

DHS
312572

- 77.8% of the 9 applicable children in the case review sample were enrolled in an accredited school within 3 days of custody or placement.
- In the 6 applicable cases opened during the Period Under Review, the child's educational needs were assessed within 30 days of entry into foster care in 2 of the cases.
- In the 2 applicable cases opened during the Period Under Review, and the child was 3 years of age or younger, both 100%) of them received a developmental assessment within 30 days of entry into foster care.

- **Needs and Services of the Child, Parents, and Foster Parents:**
  - The results from the September 2012 on-site case review show that 7.1% of the foster care cases rated a Strength ███████████████████████ for Needs and Services of the Child, Parents, and Foster Parents (On-Site Case Review Item 5).
  - The case review results show that the needs of the child were assessed (formally or informally) initially and on-going in 64.3% of the foster care cases ██████████████████ For cases opened during the period under review, these assessments occurred within the first 30 days of the case being opened in 75% of the applicable foster care cases ████████████████ ████████████ Services were provided to the children in a timely manner in 69.2% of the foster care cases ████████████████. The child was interviewed prior to the completion of the strengths and need assessment in 63.6% of the foster care cases ██████████████ ████ The child's involvement in the strengths and needs assessment (other than signatures) was apparent in 33.3% of the foster care cases ██████████████.
  - The case review results show that the needs of the mother were assessed (formally or informally) initially and on-going in 44.4% of the applicable foster care cases ████████████ ████████████ For cases opened during the period under review, these assessments with the mother occurred within the first 30 days of the case being opened in 50% of the applicable foster care cases. ████████████████████████████ Services were provided to the mother in a timely manner in none of the foster care cases ████████████████████ The mother was interviewed prior to the completion of the strengths and need assessment in 33.3% of the foster care cases ████████████████. The mother's involvement in the strengths and needs assessment (other than signatures) was apparent in none of the foster care cases ████████████.
  - During the review period, the agency in Region 3-South provided all needed services to the mother to meet identified and assessed needs in 11.1% of the foster care cases ████████████
  - The case review results show that the needs of the father were assessed (formally or informally) initially and on-going in 10% of the foster care cases ██████████████. There were no applicable foster care ████████████ for cases opened during the period under review, these assessments with the father occurred within the first 30 days of the case being opened. Services were provided to the father in a timely manner in 11.1% of the foster care cases ████ ████████████ The father was interviewed prior to the completion of the strengths and needs assessment in 22.2% of the foster care cases ████████████ ████ The father's involvement in the strengths and needs assessment (other than signatures) was apparent in 11.1 of the foster care cases ████████████.
  - During the review period, the agency in Region 3-South provided all needed services to the father to meet identified and assessed needs in 11.1% of the foster care cases ████████ ████

The case review results show that the needs of the foster/pre-adoptive family were assessed (formally or informally) initially and on-going in 77.8% of the foster care cases. Services were provided to the foster/pre-adoptive family in a timely manner in 87.5% of the cases. During the review period, the agency in Region 3-South provided all needed services to the foster/pre-adoptive family to meet identified and assessed needs in 87.5% of the cases.

*Areas for Improvement Efforts to better address Assessing Strengths and Needs*

DHS
312573

- A child receiving a comprehensive health assessment within 30 days of entering custody is an area needing improvement for the region. The Year III goal is 50%. As of the October 1, 2011 through September 30, 2012 reporting period, the region does not meet the 50% goal at 9.77%.
- On-site case review results indicate that the Region may need to develop and implement a plan to improve the assessment of strengths and needs. It appears assessments are taking place with the child and with foster/pre-adoptive parents more than with mothers and fathers. The percentage for foster/pre-adoptive parents is significantly higher than those of the mothers and fathers.

## Preserving and Maintaining Connections

When children enter foster care, they often become separated from the people and places that are the most familiar and comforting to them. This component of the practice model emphasizes the normalizing of connections and relationships for children in foster care to the extent that it is safe and appropriate to do so. The focus is on keeping children safe and stable within placement settings that permit them to retain important relationships with family members, retain normalized sibling relationships and friendships, and maintain important traditions and connections that define them culturally, and continue being a part of the social institutions that nurture them, such as school, religion, and so forth.

The following practice principles are linked to this component:
- Foster care should support the family instead of substitute for the parents whenever possible and appropriate;
- Healthy child/parent relationships should be supported and maintained throughout a foster care episode if safe and appropriate to do so;
- Children in foster care have important connections and relationships that help to define them as individuals and members of a family, community, and culture;
- Caseworkers should work to normalize the connections and relationships for children in foster care to the extent that it is safe and appropriate to do so;
- Children should be allowed to retain important relationships with extended family, siblings, and other friendships as deemed safe and appropriate; and
- Agencies should ensure that important traditions, identity with social institutions, and cultural connections are maintained.

### Number of Indicators Assessed: Preserving and Maintaining Connections

| Type | Number | Percent |
|---|---|---|
| Indicators Exceeding Goals | -- | -- |
| Indicators Not Exceeding Goals | -- | -- |
| Total Indicators Currently Measurable | 0 | -- |
| Other Indicators (not tied to Goals) | 4 | 100% |
| **TOTAL** | **4** | **100%** |

There are 4 indicators associated with the component of Preserving and Maintaining Connections. Currently there are 2 indicators that have data and/or goals available for which to assess strengths or needed areas of improvement. Of the 2 indicators, 1 has an established goal and available regional and state data to measure against best practice. The 1 (100%) data indicator does not meet or exceed established goals and indicates an area of needed improvement.

### Strengths in Practice

There are currently no data indicators available from which to evaluate strengths. Refer to the *"Other Key Indicators"* segment for Strengths observed during the course of the on-site case review held in September 2012 in Region 3-South.

### Areas of Needed Improvement

DHS
312574

| Data Indicators Associated with Preserving and Maintaining Connections | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 |
|---|---|---|---|---|---|
| Contacts with parents and separated siblings. Source: MWLS318D, MWLS318S August 1, 2012 through August 31, 2012 | At least 90% of children in custody | *N/A* | 4 of 262 children in custody 1.53% | *N/A* | 141 of 2362 children in custody 5.97% |

o   This report was developed to document compliance with the *Olivia Y* MSA settlement agreement p.40.III.B.5.a which states: *"For all children entering foster case, a visitation plan for the child and his/her family shall be developed as part of the service plan. This visitation plan shall be developed and regularly updated in collaboration with parents, resource parents, and the child. If parental visitation is appropriate based on the above factors, this visitation plan shall include a minimum of two visits per month with the parents (unless a court order in the child's case limits such visits). For all children, regardless of permanency goal, this visitation plan shall include at least one visit per month with any siblings not in the same placement (unless a court order in the child's case limits such visits")*;

o   The Year III goal for this indicator is that at least 90% of children in custody will have monthly contact with their parents and/or separated siblings. The region does not meet the 90% goal at 1.53%.

- **Visiting with Parents and Siblings in Foster Care (On-Site Case Review Item 21)**
  - o   7.7% of the foster care cases reviewed during the September 2012 on-site case review were rated an Area Needing Improvement;
  - o   1 of the 6 applicable foster care cases (children who entered DFCS custody during the period under review) contained a visitation plan that was developed within the first 30 days of the child entering custody with 4 of 12 applicable cases having a visitation plan updated as circumstances warranted during the period under review, and 2 of the plans addressed all visitations (parents, siblings, connections, etc.);
  - o   37.5% of applicable foster care cases had concerted efforts made during the period under review to ensure frequency of visitation (or other forms of contact if visitation was not possible) between the child and his/her **mother** was of sufficient frequency to maintain or promote the continuity of the relationship. In 33.3% of the applicable cases, the quality of the mother/child visitation was sufficient in order to maintain or promote a continuity of the relationship.
  - o   33.3% of the applicable foster care cases had concerted efforts made to ensure frequency of visitation (or other forms of contact if visitation was not possible) between the child and his/her **father** was of sufficient frequency to maintain or promote the continuity of the relationship. During the period under review, concerted efforts were made in 33.3% of the cases to ensure that the quality of the visitation (or other forms of contact if visitation was not possible) was of a sufficient frequency to maintain or promote a continuity of the relationship.
  - o   62.5% of the foster care cases showed concerted efforts had been made to ensure visitation (or other forms of contact if visitation was not possible) between the child and his/her **siblings** was of sufficient frequency to maintain or promote the continuity of the relationship. During the period under review, concerted efforts were made to ensure that the quality of the visitation (or other forms of contact if visitation was not possible) was of a sufficient quality to maintain or promote a continuity of the relationship in 62.5% of these cases.
  - o   During the period under review, 1 of the 4 applicable foster children had a visit with his/her parents within 24 hours of placement or, at a minimum, a phone call with relatives within the first 24 hours.

*Other Key Indicators*

There are no data indicators available at this time from which to evaluate strengths and areas of needed improvement in order to set a baseline and establish a plan for corrective action. However, the information below

from the on-site case reviews may be used by the Region to evaluate its current practice and to proceed with plans for corrective action.

The on-site case reviews conducted in Region 3-South in September 2012 reflect the following with regard to the Practice Model component of Preserving and Maintaining Connections:

| Data Indicators Associated with Preserving and Maintaining Connections | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 |
|---|---|---|---|---|---|
| Proximity of initial placement (placed out of county but within 50 miles) Data Source: MWLS314S September 1, 2011 through August 31, 2012 | | *N/A* | 56 of 279 children in custody 20.1 % | *N/A* | 470 of 2391 children in custody 19.7 % |
| Proximity of initial placement (placed out of county beyond 50 miles) Data Source: MWLS314S September 1, 2011 through August 31, 2012 | | *N/A* | 21 of 279 children in custody 7.5 % | *N/A* | 240 of 2391 children in custody 10.0 % |
| Proximity of initial placement (placed in county but within 50 miles) Data Source: MWLS314S September 1, 2011 through August 31, 2012 | | *N/A* | 193 of 279 children in custody 69.2 % | *N/A* | 1619 of 2391 children in custody 67.7 % |
| Proximity of initial placement (placed in county but beyond 50 miles) Data Source: MWLS314S September 1, 2011 through August 31, 2012 | | *N/A* | 9 of 279 children in custody 3.2% | *N/A* | 62 of 2391 children in custody 2.6 % |

- The MACWIS data indicators above show the proximity of the child's initial placement and whether it is within the county (within or beyond 50 miles) or outside of the county (within or beyond 50 miles). This data shows that 69.2% of the children in Region 3-South have an initial placement that is within the county from which they were removed and that placement is within 50 miles of their original home. Another 20% had an initial placement outside of the county but within 50 miles of their original home. This could be seen as a Strength for the region.
- **Proximity of Foster Care Placement (On-Site Case Review Item 19):**
  o  92.3% of the 14 applicable foster care cases reviewed rated as a Strength;
  o  Case review results found 4 foster children to be in placements outside of the county from which they were removed.
  o  3 children's placements were found to not be in close enough proximity to their parents to facilitate frequent face-to-face contacts with them. However, it was found that the proximity of the placement was necessary to meet the individual needs and case plan goals of the children.
  o  5 children in the sample were not attending the same school as when they first came into DFCS custody. However, it was found in 4 cases that this was appropriate based on case circumstances.
- **Placement with Siblings (On-Site Case Review Item 20):**
  o  100% of the 7 applicable foster care cases reviewed in September 2012 rated as a Strength;
  o  Of the 7 applicable foster children reviewed for this item, 5 children (71.4%) were placed with all of his/her siblings that are in foster care. Of the 2 children who were not placed with all of their siblings in foster care, there was a valid reason in both cases (100%) for the separation of the siblings such as it was necessary to meet the individual needs of the child or there were safety concerns.
- **Preserving Connections (On-Site Review Item 22):**

DHS
312576

- o Of the 14 foster care cases reviewed in September 2012, 57.1% rated a Strength for Preserving Connections.
- o 84.6% of the foster care cases reviewed had concerted efforts made to maintain the child's important connections.
- o 9 of the 13 applicable foster care cases reviewed had a sufficient inquiry conducted with the parent, child, custodian, or other interested party to determine whether the child may be a member of or is eligible for membership in a Native American (Indian) tribe. There were 2 cases reviewed where a child was identified who may have been a member of a tribe (or eligible for membership) and the tribe was not provided timely notification of its right to intervene in any State court proceedings seeking an involuntary foster care placement or termination of parental rights (TPR). The 2 applicable cases were not placed in foster care in accordance with the Indian Child Welfare Act (ICWA) placement preferences and there were no concerted efforts made to place the child in accordance with ICWA placement preferences.

- **Relationship of Child in Care with Parents (On-Site Review Item 23):**
  - o This item rated as a Strength in 25% of the applicable foster care cases reviewed;
  - o Of the 6 applicable foster care cases reviewed, 3 (50%) had sufficient documentation/evidence that a meeting occurred between the birth parents and the resource parents within the first month of placement (*if the placement occurred during the period under review*);
  - o Of the applicable foster care cases reviewed in September 2012, there was evidence of shared parenting responsibilities between the birth and resource parents in 14.3% of the cases.

- **Relative Placement (On-Site Review Item 24):**
  - o This item rated as a Strength in 66.7% of the applicable foster care cases reviewed;
  - o During the period under review, 6 foster children in the case review were placed with relatives. Of those 6, all were found to be stable.
  - o Of the foster children who were not placed with relatives, concerted efforts to identify, locate, and evaluate maternal relatives were made in 2 of the applicable cases in the sample and in 1 of the applicable cases with regard to paternal relatives.

*Areas for Improvement Efforts to better address Preserving and Maintaining Connections*

- The MACWIS data indicators from the annual follow-up review reporting period shows a need for improvement in the area of children having visits with their parents (if appropriate) and their siblings in care for whom they are separated. On-site case review results seem to indicate that the region may need to develop and implement a plan to improve performance in the area of Preserving and Maintaining Connections for children in foster care with regard to visitation with parents and siblings. 42.9% of the applicable cases in the September 2012 follow up on-site review rated an Area Needing Improvement.
- 25% of the cases in the on-site case review rated a Strength for Relationship of Child in Care with Parents. Efforts should be made to assure that meetings occur between birth parents and resource parents within the first month of placement and that efforts are made to implement shared parenting when it is appropriate and safe to do so.
- Relative Placement rated a Strength in 66.7% of the cases reviewed. The primary factor in this item not rating higher appears to be concerted efforts need to be made by the Region to identify, locate, and evaluate maternal and paternal relatives for placement.

## Individualizing Case Planning

An individualized case plan will start with information gathered from the comprehensive family assessment and should continue to be informed by the assessment throughout the life of the case. The development of the case plan, the review of the case plan and the overall planning process must involve all relevant family members, including parents who may not reside in the home, and age-appropriate children and youth. Individualized case plans must be developed *with* the family not *for* the family; occur early in the casework process; address the underlying issues that contribute to the presenting needs; include the safety plan; be written clearly in simple,

DHS
312577

straightforward language; demonstrate the family's culture and level of functioning; be flexible enough to change as the family's needs and progress toward achieving the identified goal changes; include independent living goals and specific plans and tasks for age appropriate youth; and be reviewed and updated regularly *with* the family.

The following practice principles are linked to this component:
- Timely decisions about goals and activities are made in collaboration with children, youth, and parents;
- The case plan is a guide for the agency's and service providers' work with children and families, and not simply a requirement to be met;
- The family's progress is monitored regularly in order to make timely decisions with regard to changing or continuing goals and services, or to take other actions to assure the safety, permanency and well-being of children; and
- Information from all available sources should be used to ensure any placement is the most appropriate for the child in order to assure timely permanency.

**Number of Indicators Assessed: Individualized Case Planning**

| Type | Number | Percent |
|---|---|---|
| Indicators Exceeding Goals | -- | -- |
| Indicators Not Exceeding Goals | 1 | 100% |
| Total Indicators Currently Measurable | 1 | -- |
| Other Indicators (not tied to Goals) | 5 | 100% |
| **TOTAL** | **5** | **100%** |

There are 5 data indicators associated with Individualizing Case Planning. There is currently 1 indicator that has data and/or goals available for which to assess strengths or needed areas of improvement. The 1 indicator for which there is data available shows an area of needed improvement.

*Strengths in Practice*

There are currently no MACWIS data indicators available for the items within this component. Please see "Other Key Indicators" for on-site case review data that may be used to assess the Region's performance in the area of Assessing Strengths and Needs.

*Areas Needing Improvement*

| Data Indicators Associated with Individualizing Case Planning | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 |
|---|---|---|---|---|---|
| Working with service providers, foster parents, the child, and the family, DFCS shall develop and document in the child's case record a permanency plan within 30 calendar days of the child's initial placement that specifies the permanency goal, a timeframe for achieving permanency, and activities that support permanency. Data Source: MWLS312S/D October 1, 2011 through September 30, 2012 | 90% | n/a | 65 of 278 children 23.38% | n/a | 846 of 2399 children 35.26% |

- The Year III goal for the measure above it that 90% of children shall have a permanency plan developed and documented in their case record within 30 calendar days of the child's initial placement that specifies

a permanency goal, a timeframe for achieving permanency, and activities that support permanency. The region does not meet the 90% goal at 23.38%.

- 35.7% of the foster cases reviewed rated as a Strength for **Permanency Goal for the Child (On-Site Case Review Item 10)**.
  - o The permanency goal(s) for the child were specified in the case file in 13 of 14 of the foster care cases reviewed. The permanency plan was developed within the child's first 30 days in care for children who entered custody during the period under review in 2 of the 7 applicable cases reviewed.
  - o Permanency goals that were in effect during the period under review were established in a timely manner in 64.3% of the foster care cases reviewed in the sample.
  - o The permanency goals were appropriate to the child's needs for permanency and to the circumstances of the cases in 78.8% of the foster cases reviewed.
  - o 7 of the 14 subject children had been in care for 15 of the most recent 22 months. Of those in custody 15 of 22 months, 2 had been referred for TPR in a timely manner. Of those who were not referred for TPR, 2 had documented compelling reasons for not pursuing TPR;
  - o 83.3% of the cases reviewed with a goal of Reunification, contain documentation that reflects active concurrent permanency planning.
  - o 4 children were discharged during the period under review. Of those, 1 child had an aftercare plan developed prior to discharge.
  - o Foster Care Review data shows that during the June 2012 through September 2012 time period, there were 7 cases reported in Region 3-South where children who had a plan of Adoption have not had a referral for termination of parental rights made on their behalf.

### Other Key Indicators

Due to there being no current data indicators available to establish a baseline or develop an improvement plan, the following information from the on-site case reviews could be utilized by the region to evaluate as to where practice may lie regarding the applicable indicators.

- o 14.3% of the foster care cases reviewed rated a Strength ████████████████ for **Case Planning (On-Site Case Review Item 11)**.
  - o Results from the on-site case review show that a Family Team Meeting was used in the initial development of the case plan (if the initial plan was developed during the period under review) **and/or** was used to update case plans quarterly in 2 of the Placement cases reviewed ████████ ████████. The September 2012 review showed that there were Family Team Meetings within 30 calendar days of any placement or other significant change in 23.1% of Placement cases ████████████████.
  - o There was documentation of discussions of concurrent planning with birth parents in 33.3% of the Placement cases reviewed.
- o **Foster Care Re-Entries (On-Site Case Review Item 12)** rated as a Strength in 85.7% of the 7 applicable Placement cases reviewed.
  - o Of the 7 children who did re-enter foster care during the period under review, 1 of the re-entries occurred within 12 months of the child's discharge from a prior foster care episode.

### Areas for Improvement Efforts to better address Individualizing Case Planning

- On-site case review data and MACWIS data indicators show that the region needs improvement in the area of establishing permanency goals for children in a timely manner and making efforts for establishing permanency for children who have been in state's custody for 15 of the most recent 22 months by referring the case for TPR in a timely manner or documenting an exception (compelling reasons) for not doing so.
- On site case review data reflects that the region needs continued improvement efforts in the area of case planning; specifically utilizing family team meetings to their fullest potential as a planned event with all appropriate case members in attendance in order to develop and update parental and child case plans.

# Section Two
# Systemic Factors

## Training of Staff and Providers

**Number of Indicators Assessed: Training of Staff and Providers**

| Type | Number | Percent |
|---|---|---|
| Indicators Exceeding Goals | -- | -- |
| Indicators Not Exceeding Goals | -- | -- |
| Total Indicators Currently Measurable | 0 | -- |
| Other Indicators (not tied to Goals) | 4 | 100% |
| **TOTAL** | **4** | **100%** |

There are 4 data indicators associated with Training of Staff and Providers. However, there is currently no MACWIS data indicators and/or goals yet established for these 4 items. The information from the stakeholder surveys could be used to partially evaluate where the agency may currently be with regarding to Training of Staff and Providers.

### *Strengths in Practice*

There are currently no data indicators available for which to evaluate strengths. Refer to the *"Other Key Indicators"* segment for strengths observed as a result of the Stakeholder Surveys received from Region 3-South.

### *Areas of Needed Improvement*

There are currently no data indicators available for which to evaluate areas of needed improvement. Refer to the *"Other Key Indicators"* segment for areas of needed improvement observed as a result of the Stakeholder Surveys received from Region 3-South.

### *Other Key Indicators*

o   Internal stakeholders were asked how effective DFCS is in providing and ensuring completion of adequate initial training for all new caseworkers/supervisors who provide child welfare services. The baseline data indicator goal for this item is 100%. Although there is no available data indicator information for this item at this time, 71.4% of those responding to the survey believe the agency is frequently or almost always providing adequate initial training for all new caseworkers and supervisors while 28.6% believe the agency is somewhat providing adequate initial training for new caseworkers and supervisors.

o   When asked how effective DFCS is in providing and ensuring completion of adequate, ongoing training for staff that addresses the skills and knowledge base needed to carry out their duties, 28.6% of the internal stakeholders responding believe the agency is frequently providing adequate ongoing training to its caseworkers and supervisors while 71.4% believe the agency is somewhat or rarely providing adequate ongoing training to its caseworkers and supervisors.

o   Relevant stakeholders were asked how effective DHS is in providing adequate training to placement providers that addresses the skills and knowledge needed to carry out their duties for current and prospective foster parents, relative caregivers, adoptive parents, and staff of state licensed or approved facilities. Results from the surveys show relevant stakeholders varied in their responses. 64.3% of Internal Stakeholders stated they believe the agency frequently provides adequate training, while 28.6% believe the agency only somewhat provides adequate training, and an additional 7.1% of respondents stated that the question did no t apply to them.  Of the external respondents, 63.6% believe that they frequently or almost always receive adequate training, and 36.4% stated that they had no information.  When taken

together, 64% of respondents stated that the agency frequently or almost always provides adequate training, 16% believe that the agency somewhat provides adequate training, and the remaining 16% stated that they had no information on this matter, and 4% stated that the question did not apply to them.

o When asked if DHS provides frequent training to license new foster homes, 63.6% of the external stakeholders who responded believe the agency almost always or frequently provides frequent training to new foster homes, while another 36.4% had no information regarding the question.

### *Areas for Improvement Efforts to better address Training of Staff and Providers*

- Although there is no regional or state data indicator information available to establish a baseline and to determine strengths and areas needing improvement with regard to this systemic factor, stakeholder survey information could be used by the Region to evaluate the effectiveness of DFCS' performance with regard to these items.
- Based on the results of the relevant stakeholder surveys which (overall) were positive, DFCS should continue to focus its efforts on providing and ensuring completion of adequate initial training (for new caseworker and supervisors who provide child welfare services) and on-going training for all caseworkers and supervisors who provide child welfare services.
- Based on the results of the relevant stakeholder surveys which (overall) were positive, DFCS should continue to focus its efforts on providing adequate training to placement providers (current and prospective foster parents, relative caregivers, adoptive parents, and staff of state licensed or approved facilities) that addresses the skills and knowledge needed to carry out their duties.
- Based on the results of the relevant stakeholder surveys which (overall) were positive, DFCS should continue to provide frequent training to license new foster homes.

## Service Array

**Number of Indicators Assessed: Service Array**

| Type | Number | Percent |
|---|---|---|
| Indicators Exceeding Goals | -- | -- |
| Indicators Not Exceeding Goals | -- | -- |
| Total Indicators Currently Measurable | 0 | -- |
| Other Indicators (not tied to Goals) | 1 | 100% |
| **TOTAL** | **1** | **100%** |

There is 1 data indicator associated with Service Array. Although there is no established goal, there is regional and state MACWIS data for these items as well as stakeholder survey information.

### *Strengths in Practice*

There are currently no data indicators available for which to evaluate strengths. Refer to the *"Other Key Indicators"* segment for strengths observed as a result of the Stakeholder Surveys received from Region 3-South.

### *Areas of Needed Improvement*

There are currently no data indicators available for which to evaluate areas of needed improvement. Refer to the *"Other Key Indicators"* segment for areas of needed improvement observed as a result of the Stakeholder Surveys received from Region 3-South.

### *Other Key Indicators*

DHS
312581

| Data Indicators Associated with Service Array | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 |
|---|---|---|---|---|---|
| ██████████ | █ | ███ | ███ | ███ | ███ |



- o  Relevant stakeholders were asked to rate the effectiveness of DFCS in the county/region at providing or contracting for an adequate range of services to support resource parents. 100% of respondents stated that the agency almost always or frequently provides for such services.

- o  Internal stakeholders were asked about the accessibility of medical, dental, and mental health services. 33% state medical services are almost always accessible, while 33% state medical services are somewhat accessible, and 34% did not provide a response. 33% state dental services are almost always accessible, 17% state that dental services are rarely accessible, 17% stated that they had no information on this subject, and 33% did not provide a response. 17% stated mental health services are almost always accessible, another 50% state that mental health services are somewhat available, and 33% did not provide a response. Respondent comments were of a mixed variety, with one respondent citing a lack of follow up in these areas, especially with relatives who are providing placement services.
- o  When relevant stakeholders were asked how effective DFCS is in the county/region at providing or contracting for an adequate array of services to promote timely permanency of children in foster care, 58.33% report the agency is almost always or frequently effective in providing or contracting services towards permanency, 37.50%report the agency is somewhat effective in providing or contracting services towards permanency, and 4.17% stated that this question did not apply to them.
- o  When external stakeholders were asked about how effective the agency is in providing or contracting for an adequate array of services to promote timely reunification of children in foster care with their families, 28.6% of respondents stated that the agency rarely or never provides an adequate array of services, 42.8% stated that they had no information and 28.6% did not provide an answer to the question.
- o  Relevant internal and external stakeholders were asked to address how effective the county/region is at providing or contracting for an adequate array of services to promote timely adoptions. 33.3% of respondents stated that the agency somewhat provides or contracts for adequate services to promote timely adoptions, 33.3% stated that the agency somewhat provides or contracts for adequate services to promote timely adoptions, 16.7% of respondents stated the agency rarely provides or contracts for adequate services to promote timely adoptions, and 16.7% stated that they had no information on this matter.
- o  When asked how effectively the county/region individualizes or tailors services to meet the unique needs of the children and families, 33% of the judges/court personnel, service providers and caseworkers/supervisors responded that the agency frequently or is almost always effective in individualizing or tailoring services for children and families while 43% responded that the agency somewhat or rarely is effective in individualizing services. 14% of respondents stated that they had no information, and 10% did not answer the question at all.

o   Relevant stakeholders were asked how effective is the county/region at providing or contracting for an adequate array of services to youth in foster care to prepare them for independent living and to make the transition from foster care to adulthood. 30% of respondents stated that the agency almost always or frequently provides or contracts for an adequate range of services to youth in care to prepare them to live independently and transition from foster care to adulthood, 30% feel that the agency somewhat provides for such services, 20% believe that the question does not apply to them as a respondent, and the remaining 20% stated that they had no information on this subject.

### *Areas for Improvement Efforts to better address Service Array*

- A large percentage of the questions regarding service array were not answered due to the fact that there was a small number of actual respondents. The region may want to institute a plan for engaging all stakeholders in the quality improvement process, including their participation in stakeholder surveys.
- Based on the survey results it appears that of the stakeholders who actually responded, more of them believe that the agency is effective in individualizing services than those who do not.

## Placement Resources

### Number of Indicators Assessed: Placement Resources

| Type | Number | Percent |
|---|---|---|
| Measurable Indicators Exceeding Goals | | 0% |
| Measurable Indicators Not Exceeding Goals | 2 | 100% |
| Total Indicators Currently Measurable | 2 | 100% |
| Other Indicators (not tied to Goals) | 4 | -- |
| **TOTAL** | **6** | **100%** |

There are 6 indicators associated with Placement Resources. 2 of the indicators have goals associated with them by which to measure strengths and areas of needed improvement. 4 indicators have regional and state data but no goal by which to assess performance.

### *Strengths in Practice*

There were no identified strengths found at the time of the 3-South baseline review as it relates to placement resources.

### *Areas Needing Improvement*

| Data Indicators Associated with Placement Resources | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 |
|---|---|---|---|---|---|
| No child under 10 years of age shall be placed in a congregate care setting unless the child has exceptional needs that cannot be met in a relative or foster family home or the child is a member of a sibling group, and the RD has granted express written approval for the placement Data Source: MWLS52HS *September 1, 2012 through September 30, 2012 | 100% | 17 of 19 children 89.5% RD Approval | 11 of 13 children 84.62% RD Approval | 69 of 74 children 93.2% RD Approval | 55 of 58 children 94.83% RD Approval |

DHS
312583

- The Year III goal for this item is 100% and requires that no child under the age of 10 years shall be placed in a congregate care setting unless the child has exceptional needs that cannot be met in a relatives or foster family home or the child is a member of a sibling group, and the Regional Director has granted express written approval for the placement. The September 2012 data indicator shows that the region does not meet the year three standard for this indicator.

| Data Indicators Associated with Placement Resources | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 |
|---|---|---|---|---|---|
| No child shall be placed in more than one emergency or temporary facility within one episode of foster care, unless an immediate placement move is necessary to protect the safety of the child or others as certified in writing by the RD  Data Source: MWLS51DS  *September 1, 2012 through September 30, 2012 | 100% | 57 of 81 child 70.37% RD Approval | 58 of 74 child 78.38% RD Approval | 256 of 358 children 71.51% RD Approval | 246 of 310 children 79.35% RD Approval |

- The Year III goal for this item is 100% in that no child shall be placed in more than one emergency or temporary facility within one episode of foster care unless an immediate placement move is necessary to protect the safety of the child or others as certified in writing by the Regional Director. Region 3-South does not meet the year three standard at 78.38% as indicated above. However, this is a slight improvement from the August 2011 baseline performance of 70.37%.

## Other Key Indicators

| Data Indicators Associated with Placement Resources | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 |
|---|---|---|---|---|---|
| Number of Children in Foster Care by Placement Type (family based v. non-family based)  Data Source: MWZ0510S  NOTE: Family Based Placements=Adoptive Home, Child Specific, CO Non Licensed Non-Relative, CO Non Licensed Relative Foster Home, *Expedited Pending Relative Resource Home (added May 2011), Foster Home, Foster/Adopt Home, Group Home, Own Home, Relative Foster Home, Respite Foster Care, Teenage Parent Foster Home and Therapeutic Group and Foster Homes  * September 1, 2012 through September 30, 2012 | | 370 of 425 children 87.1% | 328 of 441 children 74.38% | 3,244 of 3,652 children 88.8% | 2974 of 3,601 children 88.8% |

- There is no established goal for *"Number of Children in Foster Care by Placement Type"*. However, the regional data indicator reveals that 74.38% of children in custody in Region 3-South are placed in family

DHS
312584

based placements as opposed to non-family based placements. This is a drop from the baseline performance of 87.1% in August 2011.

| Data Indicators Associated with Placement Resources | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 |
|---|---|---|---|---|---|
| Number of Licensed/Pending Foster Family Homes Data Source: MWZRESLS & MWZRESPS *Licensed Homes: September 1, 2012 through September 30, 2012 **Pending Homes: As of September 15, 2012 | | 127 Licensed 25 Pending | 127 Licensed 75 Pending | 2,512 Licensed 247 Pending | 2,512 Licensed 244 Pending |

o   The table above shows the number of licensed foster family homes in Region 3-South as well as the number of those with a pending license. Since the time of the August 2011 baseline, the number of licensed homes has remained the same for the region but the number of those with pending licenses has increased from 25 to 75.

| Data Indicators Associated with Placement Resources | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 |
|---|---|---|---|---|---|
| Sibling groups, with one or more of siblings under 10, are not placed in congregate care settings for more than 45 days Data Source: MWLS53HS * * September 1, 2012 thru September 30, 2012 | | 1 of 4 sibling groups 25% RD Approval | 2 of 4 sibling groups 50% RD Approval | 2 of 8 sibling groups 25% RD Approval | 3 of 12 sibling groups 25.0% RD Approval |

o   The table above shows the number of sibling groups with one or more sibling under the age of 10 who are placed in congregate care settings for more than 45 days.

o   Internal stakeholders were asked how effective the county/region has been in implementing a process for ensuring the diligent recruitment of potential resource families that reflect the ethnic and racial diversity of children needing resource homes. 36% stated the agency has frequently or almost always implemented a process for recruiting ethnically diverse foster homes, 36% stated the agency has somewhat or rarely implemented a process for recruiting ethnically diverse foster homes, 7% stated the agency has never implemented a process for recruiting ethnically diverse foster homes, 7% stated that the question did not apply to them, and 14% skipped this question.

o   Relevant stakeholders were asked if the resource families in the Region reflect the ethnic and racial diversity of the children in need of foster care and adoptive placements, and meet most of the foster care placement needs of the children it services. 20% of those respondents stated that the pool of resource families frequently reflects the racial and ethnic diversity of the children in need of foster care and adoptive placements, 60% stated that the pool of resource families somewhat or rarely reflects the racial and ethnic diversity of the children in need of foster care and adoptive placements, and the remaining 20% of respondents did not provide an answer to this question.

o   Of those relevant stakeholders who answered how effective the county/region is in expediting the licensing of relative resource parents, and giving them priority over resource parents in closer proximity, 50% stated the agency frequently or almost always effectively expedited the licensing of relative resource

DHS
312585

homes. 36% stated the agency rarely or somewhat effectively expedited the licensing of relative resource homes, and 14% of respondents skipped it altogether.

o   Relevant External Stakeholders were asked if, in their opinion, DFCS is abiding by the policy that limits the number of children that may be placed in a foster home. 80% responded that they agency almost always or frequently abides by that policy while 20% of survey participants stated that they had no information on this subject.

o   Relevant Internal Stakeholders were asked how effective the Region is in conducting criminal background checks on people interested in being foster and adoptive parents before licensing or approving them to care for children. 100% of respondents stated that the agency almost always or frequently is effective in doing so.

o   Relevant Internal Stakeholders were asked how effective the Region is in recruiting foster and adoptive homes needed to care for the children in the county/region in foster care and in keeping these homes. 80% responded that the agency almost always or frequently effective in recruiting and retaining homes while the remaining 20% responded that they had no information on this item.

### *Areas for Improvement Efforts to better address Placement Resources*

- The agency does not meet the Year III goal for placing children in more than one emergency or temporary facility within one episode of foster care (unless an immediate placement move is necessary to protect the safety of the child or others as certified in writing by the Regional Director). Efforts to improve this measure should be implemented.

- Relevant stakeholder information seems to indicate the Region may need to make improvement efforts in the area of recruiting foster and adoptive homes that reflect the ethnic and racial diversity of the children in the Region in need of such placements.

## Caseloads

**Number of Indicators Assessed: Involving Children and Families in Caseloads.**

| Type | Number | Percent |
|---|---|---|
| Indicators Exceeding Goals | 0 | 0% |
| Indicators Not Exceeding Goals | 3 | 100% |
| Other Indicators (not tied to Goals) | -- | -- |
| **TOTAL** | **3** | **100%** |

There are 3 data indicators tied to Caseloads. None of these indicators meet the current year's target goal.

### *Strengths in Practice*

There were no identified strengths in practice as it relates to caseloads. There are currently three measurable data indicators. Region 3-South does not meet any of the standards for year three compliance.

*Areas Needing Improvement*

| Data Indicators Associated with Caseloads | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 |
|---|---|---|---|---|---|
| No caseworkers carry a caseload exceeding three times the caseload requirements (over 20,880 minutes) Data Source: MWASA9S1 *September 1, 2012 thru September 30, 2012 (Includes Direct Service Workers and Resource Workers) | 100% | 2 workers 95.9% | 4 workers 94.0% | 36 workers 94.4% | 29 workers 96.04% |

- The Year III goal for this measure is that no caseworkers carry a caseload exceeding three times the caseload requirements (over 20,880 minutes). Data from the baseline month shows that Region 3-South is not meeting this goal in that 4 workers carry caseloads over 20,880 minutes.

| Data Indicators Associated with Caseloads | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 |
|---|---|---|---|---|---|
| No more than 10% of caseworkers shall carry a caseload exceeding twice the caseload requirements (over 13,920 minutes) Data Source: MWASA9S1 *September 1, 2012 thru September 30, 2012 (Includes Direct Service Workers and Resource Workers) | No more than 10% | 9 workers 18.4% | 17 workers 26% | 81 workers 12.7% | 85 workers 11.6% |

- The Year III goal for this measure is that no more than 10% of caseworkers shall carry a caseload exceeding twice the caseload requirements (over 13,290 minutes). Data from the baseline month reveals that Region 3-South does not meet this goal in that 26% of workers in the region carry caseloads which exceed 13,920 minutes.

| Data Indicators Associated with Caseloads | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 |
|---|---|---|---|---|---|
| At least 75% of caseworkers carry a caseload that does not exceed Plan caseload requirements (over 6,960 minutes) Data Source: MWASA9S1 *September 1, 2012 thru September 30, 2012 (Includes Direct Service Workers and Resource Workers) | At least 75% | 25 workers 49% | 33 workers 50% | 311 workers 51.4% | 329 workers 45.% |

DHS
312587

- The Year III goal for this measure is that at least 75% of caseworkers carry a caseload that does not exceed caseload requirements (over 6,900 minutes). The data indicators from the reporting month reveal that the region does not meet this goal. 50% of the region's workers carry caseloads that do not exceed caseload requirements of 6,960 minutes.

### Other Key Indicators

o Internal stakeholders were asked to complete the Caseloads portion of the stakeholder survey. When asked if caseworkers have caseloads within the prescribed measures, 7.1% stated they frequently have caseloads within the prescribed limits, 64.3% stated they somewhat or rarely have caseloads within the prescribed limits, 14.3% stated they never have caseloads within the prescribed limits, and 14.3% did not provide an answer to the question.

o Internal stakeholders were asked to describe any caseloads over the established limits – for example, are caseloads twice or three times the caseload requirements? 12 respondents commented on this survey item. Of those that answered, only one respondent believes caseloads are within the requirements of the plan while 11 believe caseloads are over the limit. It was stated that some caseworkers have caseloads that are overwhelming and expressed that due to a lack of workers, unfair assignment of cases, and high caseloads due to employee turnover.

### Areas for Improvement Efforts to better address Caseloads

- The data indicators from the baseline month reveal that there are some caseworkers within the region who have caseloads that are twice and three times the plan requirements. This could be due to the turnover in some areas of the region or, as it is has been found in other areas of the state, due to Resource Workers having caseloads that are higher. Comments from the survey results seem to show that some workers feel that when staff turnover occurs, or while awaiting new workers to be trained, the workers are unfairly given high caseloads.

## Oversight and Monitoring

**Number of Indicators Assessed: Involving Children and Families in Oversight and Monitoring.**

| Type | Number | Percent |
|---|---|---|
| Indicators Exceeding Goals | 1 | 100% |
| Indicators Not Exceeding Goals | -- | -- |
| Total Indicators Currently Measurable | 1 | 100% |
| Other Indicators (not tied to Goals) | 2 | -- |
| **TOTAL** | **3** | **--** |

There are 3 data indicators for the Oversight and Monitoring systemic factor. Only 1 of the 3 indicators currently has a goal identified with which to measure against performance. Region 3-South does meet the acceptable goal on that one data indicator.

*Strengths in Practice*

| Data Indicators Associated with Oversight and Monitoring | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 |
|---|---|---|---|---|---|
| Supervisors, who supervise caseworkers, are responsible for supervising no more than 5 caseworkers<br>Data Source: MWASA5D2<br>*September 1, 2012 – September 30, 2012 | No more than 10% | 0 ASWSs 0% | 1 ASWSs 10% | 11 ASWS 9.24% | 18 ASWS 10.4% |

- o   This measure requires that supervisors, who supervise caseworkers, are responsible for supervising no more than 5 caseworkers. The region meets the goal of "No more than 10%" in that data from the baseline month show that none of the supervisors in the Region are responsible for supervising more than 5 caseworkers.

*Areas Needing Improvement*
There are no data indicators that reflect an Area Needing Improvement in this area for Region 3-South. Stakeholder survey information in the "Other Key Indicators" section may be referred to in order to evaluate any areas of needed improvement.

*Other Key Indictors*

- o   Internal stakeholders were asked to evaluate the ability of the quality assurance system (Evaluation and Monitoring, Foster Care Review, Supervisory Administrative Review) to assess effectively the quality of practice and outcomes, identify strengths and areas needing improvement measures. 57.14% stated the QA system frequently or almost always effectively assesses the quality of practice and outcomes. 21.43% stated the QA system somewhat effectively assesses the quality of practice and outcomes, while 7.14% stated that this does not apply to them and 14.3% did not provide an answer.
- o   Reported ways the system is beneficial is that processes such as Foster Care Review, Evaluation and Monitoring, and Supervisory Administrative Review are an effective data tracking system, and that the reviews are systematic and based on policy.
- o   Internal stakeholders surveyed were asked to evaluate the involvement of service providers, parents, youth, resource parents, group caregivers, relatives, tribes, court personnel, and/or stakeholders in the quality assurance process. 64.3% stated stakeholders are frequently or almost always involved, 21.4% stated stakeholders are somewhat involved, and 14.3…..% did not provide a response.
- o   External stakeholders were asked how effective is DFCS in providing information about the performance of their agency through data reports and other means, 47% stated the agency frequently or almost always provides information about performance, 12% stated the agency somewhat provides information about performance, 6% stated that the agency never provides information about performance.  Additionally, 17% stated that they had no information on the subject, and 18% chose not to answer the question.
- o   When asked if the supervisor and the worker review cases quarterly through supervisory or peer review to assess the appropriateness of safety and permanency plans, 50% stated they frequently or almost always reviewed their cases with peers or a supervisor, 36% stated they somewhat or rarely reviewed their cases with peers or a supervisor and 14% did not provide an answer.

*Areas for Improvement Efforts to better address Oversight and Monitoring*

- •   Efforts to improve the inclusion of stakeholders in the Quality Improvement process and to share data on the agency's performance with them should be implemented to strengthen this particular systemic factor.

## Court Processes

**Number of Indicators Assessed: Court Processes.**

| Type | Number | Percent |
|---|---|---|
| Indicators Exceeding Goals | 1 | 25% |
| Indicators Not Exceeding Goals | 3 | 75% |
| Other Indicators (not tied to Goals) | -- | -- |
| **TOTAL** | **5** | **100%** |

There are 5 data indicators associated with the Court Processes systemic factor. All 5 of the data indicators have goals established to measure performance and establish a baseline. 1 data indictor for Region 3-South meets or exceeds the established goals while 4 do not.

### *Strengths in Practice*

| Data Indicators Associated with Court Processes | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 |
|---|---|---|---|---|---|
| Children who have been in custody at least 6 months have had a timely county conference Data Source: MWZTACRS *October 1, 2011 thru September 30, 2012 | 90% | 369 of 391 children 94.4% | 391 of 428 children 91.36% | 3,377 of 3,466 children 97.4% | 3,422 of 3,628 children 94.32% |

- The Region exceeds the Year III Goal of 90% in that 91.36% of the children in custody at least six months have had a timely county conference.

### *Areas Needing Improvement*

| Data Indicators Associated with Court Processes | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 |
|---|---|---|---|---|---|
| Children in custody at least 12 months have had a timely annual court review Data Source: MWZTPHRS **October 1, 2011 - September 30, 2012 | 90% | 111 of 336 children 33% | 116 of 399 children 29.07% | 1,961 of 3,089 children 63.5% | 1,886 of 3,179 children 59.33% |

- The Year III Goal for this item is that 90% of children in custody at least 12 months have had a timely annual court review. The Region does not meet this measure in that 29.07% of the children have had such hearings in a timely manner. This is a slight decrease from the 33% performance at the time of the August 2011 baseline.

DHS
312589

| Data Indicators Associated with Court Processes | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 |
|---|---|---|---|---|---|
| Children in custody reaching the point at which they have spent 15 of the previous 22 months in foster care with no ASFA exception noted will have a petition for TPR filed on their behalf<br>Data Source: MWZ014S1<br>§ As of September 5, 2012 | 80% | 10 of 111 children 9% | 13 of 93 children 13.97% | 382 of 1,028 children 37.2% | 423 of 1,005 children 42.08% |

- The Year III goal for this measure is 80% of children in custody reaching the point at which they have spent 15 of the most recent 22 months in foster care with no Adoption Safe Families Act (ASFA) exception noted will have a petition for termination of parental rights (TPR) filed on their behalf. The region does not meet this goal in that 13.97% of children with in custody 15 of the most recent 22 months with no ASFA exception noted have had a TPR petition filed on their behalf. This is a slight improvement over the Augsut 2011 baseline performance but there continues to be a need for dramatic improvement in this area.

| Data Indicators Associated with Court Processes | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 |
|---|---|---|---|---|---|
| Children in custody who have spent more than 15 of the previous 22 months in FC without a TPR petition filed will have an exception noted or a TPR filed §<br>Data Source: MWZ014S1 & MWZ014S2<br>§ As of September 5, 2012 | 80% | 134 of 235 children 57% | 131 of 211 children 62.09% | 1,105 of 1,751 children 63.1% | 1,082 of 1,664 children 65.02% |

- The Year III goal for this data indicator is 80% of children in custody who have spent more than 15 of the most recent 22 months in foster care without a TPR petition filed will have an excepted noted or a TPR filed. Region 3-South does not meet this goal at 62.09%. This is a slight improvement over the August 2011 baseline performance of 57%.

DHS
312590

| Data Indicators Associated with Court Processes | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 |
|---|---|---|---|---|---|
| A termination of parental rights petition shall be filed on behalf of children who have spent 17 of the previous 22 months in foster care by the last day of a child's seventeenth month in care, unless an available exception under ASFA has been documented in the child's case record. Data Source: MWZ017S1 *September 1, 2012 through September 30, 2012 | 80% | n/a | 139 of 234 children 59.40% | n/a | 849 of 1476 children 57.52% |

- This measure requires that 80% of children who have spent 17 of the previous 22 months in foster care shall have a petition for TPR filed on their behalf by the last day of the child's 17th month in care unless an available exception under ASFA has been documented in the child's case record. The region does not meet the 80% goal in that 59.40% of the children who meet the reporting criteria have had a TPR referral made on their behalf or have an ASFA exception noted in their case record.

*Other Key Indictors*
- When asked how effective is the Foster Care Review/County Conference process in helping ensure that children have the appropriate goals and achieve goals timely, 66% of the external stakeholders stated the FCR process is almost always or frequently effective, while 17% state that the FCR process is somewhat effective and 17% stated they have no information on the FCR process.
- Internal stakeholders were asked to evaluate the effectiveness of the 6 month reviews in promoting timely achievement of permanency for all children in foster care. 35.7% stated the 6 month reviews were frequently or almost always effective in promoting timely permanency, 28.6% stated the 6 month reviews were somewhat effective in promoting timely permanency, 7.1% stated that the 6 month reviews are never effective in promoting timely permanency, and 14.3% of respondents answered N/A. 14.3% of respondents did not provide an answer to the question.
- External stakeholders were asked how effective the county/region is at making sure that foster parents, pre-adoptive parents and relative caregivers receive notice of reviews and hearings, and have an opportunity to be heard. 66% stated the agency almost always or frequently was effective in making sure resource parents receive notice. 17% stated the agency was somewhat effective in making sure the resource parents receive notice, and 17% stated that they had no information.
- When relevant stakeholders were asked how effective the county/region is in filing for termination of parental rights when a child is in foster care for 15 of the most recent 22 months and there is no compelling reason not to file, 33% stated the agency frequently or almost always is effective in filing for TPR; 24% stated the agency is somewhat or rarely effective in filing for TPR and 9.5% answered "No Information". Another 9.5% answered "N/A", and 24% did not provide an answer.
- Relevant external stakeholders were asked how effective the 12 month court hearings are for children in foster care in addressing timely permanency. 80%% responded that the 12 month hearings are almost always or frequently effective in addressing timely permanency, and 20% stated that they had no information on this subject.
- Relevant external stakeholders were asked how effective is the county/region is in ensuring that each child in foster care had a permanency hearing in a qualified court no later than 12 months from the date the child entered foster care and no less frequently than every 12 months thereafter. For this particular question, there was only a single response. That respondent stated that the county/region is somewhat effective in ensuring that each child in foster care had a permanency hearing in a qualified court no later than 12 months from the date the child entered foster care and no less frequently than every 12 months

DHS
312591

thereafter. It should be noted that there are only two judges in the region, and that only one of the judges completed a survey.

### *Areas for Improvement Efforts to better address Court Processes*

- The region does not meet the Year III goal of 90% for children having timely permanency hearings. The Region should develop a strategy to ensure that permanency hearings are held in a timely manner to improve performance and promote timely permanency for children in care. The Region may also want to consider raising awareness among relevant external stakeholders on the importance of holding these hearings in a timely manner.
- The region does not meet the Year III goal of 80% for children in custody 15 of the most recent 22 months having a petition for termination of parental rights filed on their behalf or have an ASFA exception noted in their case plan. Relevant stakeholder survey responses seem to reflect a need for improvement in these areas as well. Strategies such as internal permanency reviews, complimented by 6 month Foster Care Review reviews and reports, could assist in improved performance in these areas.
- The region does not meet the Year III goal of 80% for a termination of parental rights petition to be filed on behalf of children who have spent 17 of the previous 22 months in foster care by the last day of a child's seventeenth month in care, unless an available exception under ASFA has been documented in the child's case record.

## Data Quality and Usage

### Number of Indicators Assessed: Data Quality and Usage

| Type | Number | Percent |
|------|--------|---------|
| Indicators Exceeding Goals | -- | -- |
| Indicators Not Exceeding Goals | -- | -- |
| Other Indicators (not tied to Goals) | -- | -- |
| TOTAL | 0 | -- |

There are currently no proposed data indicators for Data Quality and Usage. The source for the evaluation of this systemic component and Region 3-South's performance is from the relevant stakeholder survey information.

### *Strengths in Data Quality and Usage*

o Currently, there are no proposed indicators for Data Quality and Usage.

### *Areas of Needed Improvement*

o Currently, there are no proposed indicators for Data Quality and Usage.

### *Other Key Indicators*

o Internal stakeholders were asked to evaluate whether data reports are useful and current, and are provided to staff, supervisors, and administrators in a timely manner. 42.86% stated the data reports are frequently or almost always useful, current, and provided to staff in a timely manner; 35.71% stated the data reports are somewhat or rarely useful, current and provided to staff in a timely manner, 7.14% responded with "N/A", and the remaining 14.29% did not answer the question.

o Comments of those surveyed are mixed as it comes to data reports. Some of the positive feedback received is that the data reports provide a month to month assessment of progress, and another stated that the reports are helpful in identifying how well expectations are being met. One respondent stated that they did not have time to read the reports and that it was disheartening to have to work many hours just to

stay current, only to be told that they were not doing enough.  That respondent challenged anyone to try it for one week.

*Areas for Improvement Efforts to better address Data Quality and Usage*

- It is recommended that administrative staff within the Region (including Foster Care Review and Evaluation and Monitoring staff) continue to stress the importance of utilizing data to measure performance and make improvements as well as the importance of accurate and timely data entry in order to give as accurate a picture as possible of the work that is being conducted in the region.  Efforts to improve employee morale may also be beneficial to the region, based on survey responses.

## <u>Next Steps</u>

Within 30 working days after the Region has received and reviewed this report, CQI staff will meet with the Regional Director and staff from within the region (Area Social Work Supervisors, Practice Coaches, and other key staff) to conduct a "Data-to-Action" meeting to review the results of this report in order to inform practice in the region and guide the Regional Implementation Plan process. Monthly Evaluation and Monitoring case reviews will continue to take place during the coming year which will mimic the on-site case review process. The Foster Care Review Program will also continue to conduct case reviews of children who have been in state's custody for at least 5 months. The results of the case reviews along with MACWIS data will be shared with the Regional CQI Team in quarterly meetings to develop recommendations for improvement strategies for the region that will be reported to the Implementation Team. In 12 to 14 months, the Division of Evaluation and Monitoring will conduct another follow-up review to measure progress on performance on areas of the Practice Model components and Systemic Factors.

DHS
312593

# APPENDIX

- 3-South Data Indicator Tables
- 3-South Summary of Areas Needing Improvement

DHS
312594

3-South Data Indicators
Annual CQI Report
September.2012

## Practice Model Components

| Mobilizing Appropriate Services Timely | | | | | | | |
|---|---|---|---|---|---|---|---|
| Data Indicators Associated with Mobilizing Appropriate Services Timely | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 | Hinds | Warren |
| Placement Stability - Number of children in custody 12 months or less that have had 2 or fewer placement moves Data Source: MWZPLM5S *As of September 30, 2012 | 70% | 224 of 311 children; 72% | 289 of 207 children; 71.63% | 1,724 of 2,375 children 72.6% | 1,726 of 2448 children 70.51% | 238 of 163 children; 68.49% | 51 of 44 children; 86.27% |
| Placement Stability - Number of moves for all children regardless of time in custody Data Source: MWBRD07S & MWBRD07T *As of September 30, 2012 | | 1 - 2 moves: 192 of 433 children 45.8% 3 - 5 moves: 131 of 419 children 31.3% 6> moves: 96 of 419 children 22.9% | 1 - 2 moves: 220 of 419 children 50.81% 3 - 5 moves: 123 of 433 children 28.41% 6> moves: 90 of 433 children 20.79% | 1 - 2 moves: 1,922 of 3,534 children 54.4% 3 - 5 moves: 1,010 of 3,534 children 28.6% 6> moves: 602 of 3,534 children 17% | 1 - 2 moves: 1,967 of 3,519 children 55.90% 3 - 5 moves: 1006 of 3,519 children 28.59% 6> moves: 546 of 3,519 children 15.52% | 1 - 2 moves: 1,96 of 390 children 50.26% 3 - 5 moves: 116 of 390 children 29.74% 6> moves: 78 of 390 children 20.% | 1 - 2 moves: 24 of 43 children 55.81% 3 - 5 moves: 7 of 43 children 16.28% 6> moves: 12 of 43 children 27.91% |
| Children in custody, ages 14 - 20, are provided with independent living services per their service plan ** Data Source: MWBRD16S **October 1, 2011 through September 30, 2012 | 90% | 98 of 219 children 44.8% | 66 of 216 children 30.56 | 663 of 1,382 children 47.9% | 565 of 1,339 children 42.20% | 60 of 196 children 30.61 | 6 of 20 children 30.% |
| Children discharged from custody and reunified with parents/caretakers in the last year are reunified within 12 months of latest removal from home Data Source: MWBRD05S & MWBRD05C **October 1, 2011 through September 30, 2012 | 60% | 78 of 107 children 72.9% | 59 of 116 children 50.86 | 898 of 1,344 children 66.8% | 817 of 1,338 children 61.06% | 51 of 106 children 48.11% | 8 of 10 children 80.% |

DHS 312595

3-South Data Indicators
Annual CQI Report
September.2012

## Practice Model Components

| Mobilizing Appropriate Services Timely | | | | | | | |
|---|---|---|---|---|---|---|---|
| Data Indicators Associated with Mobilizing Appropriate Services Timely | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 | Hinds | Warren |
| Children discharged in the last year upon finalization of an adoption have had the adoption finalized within 24 months of the latest removal from home Data Source: MWBRD10D & MWBRD10S **October 1, 2011 through September 30, 2012 | 25% | 2 of 14 children 14.3% | 2 of 16 children 12.50% | 76 of 296 children 25.7% | 91 of 400 children 22.52% | 1 of 6 children 16.6% | 1 of 10 children 10.% |
| Children re-entering foster care within 1 year of reunification. Data Source: MWLS311S **October 1, 2011 through September 30, 2012 | | n/a | 15 of 237 children 6.33% | n/a | 110 of 1885 children 5.84% | 15 of 194 children 7.73% | 0 of 43 children 0 % |

DHS 312596

## 3-South Data Indicators
## Annual CQI Report
September.2012

## Practice Model Components

| Assuring Safety and Risk Management | | | | | | | |
|---|---|---|---|---|---|---|---|
| Data Indicators Associated with Assuring Safety and Managing Risk | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 | Hinds | Warren |
| All investigations into reports of maltreatment, including corporal punishment, of children in DFCS custody must be initiated within 24 hours of the report and completed within 30 calendar days, including supervisory approval Data Source: MWZ1271R & MWZ1271S * September 1, 2012 thru September 30, 2012 | 100% | Total Investigations 15 Timely Initiated: 12 investigations 80% Timely Completed: 1 investigation 16.7% | Total Investigations 7 Timely Initiated: 6 investigations 85.7% Timely Completed: 1 investigation 33.3% | Total Investigations 89 Timely Initiated: 73 investigations 82% Timely Completed: 14 investigations 35.9% | Total Investigations 53 Timely Initiated: 40 investigations 75.5% Timely Completed: 19 investigations 73.1% | Total Investigations 7 Timely Initiated: 6 investigations 85.7% Timely Completed: 1 investigations 33.1% | Total Investigations 0 Timely Initiated: 0 investigations 0 % Timely Completed: 0 investigations 0% |
| Investigation timeliness for all children Data Source: MWZ1272S & MWZ1272R * September 1, 2012 thru September 30, 2012 | 100% | Timely Initiated **REDACTED** L3= 85 70.8% investigations Timely Completed: **REDACTED** L3= 11 19.6% investigations | Timely Initiated **REDACTED** L3= 52 61.2% investigations Timely Completed: **REDACTED** L3= 24 40.% investigations | Timely Initiated **REDACTED** L3= 911 76.6% investigations Timely Completed: **REDACTED** L3= 326 46.9% investigations | Timely Initiated **REDACTED** L3= 592 67.4% investigations Timely Completed: **REDACTED** L3= 468 70.3% investigations | Timely Initiated **REDACTED** L3= 40 58.8% investigations Timely Completed: **REDACTED** L3= 18 34.6% investigations | Timely Initiated **REDACTED** L3= 12 70.6% investigations Timely Completed: **REDACTED** L3= 6 75.% investigations |

DHS 312597

3-South Data Indicators
Annual CQI Report
September.2012

DHS
312598

## Practice Model Components

| Assuring Safety and Risk Management | | | | | | | |
|---|---|---|---|---|---|---|---|
| Data Indicators Associated with Assuring Safety and Managing Risk | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 | Hinds | Warren |
| Rate of Abuse / Neglect / Maltreatment in Care<br>Data Source: MWBRD06S<br>§ October 1, 2011 thru September 30, 2012 | <0.57% | 0.83% of 721 children in custody | 1.47% of 745 children in custody | 1.43% of 6,071 children in custody | 1.65% of 6,149 children in custody | 1.54% of 649 children in custody | 1.04% of 96 children in custody |
| Recurrence of Maltreatment | *Not Currently Available* | | | | | | |
| Any foster child who remains in the same out of home placement following an investigation into a report that he/she was maltreated, or subject to corporal punishment, in that placement shall be visited by a DFCS caseworker twice a month for three months after the conclusion of the investigation<br>Data Source: MWLS55AS & MWLS55AD<br>* Sept 1, 2012 throu September 30, 2012 | 100% | 0 of 5 children 0% | 1 of 7 children 14.29% | 26 of 59 children 44.1% | 26 of 50 children 52.0% | 1 of 7 children 14..29 | 0 of 0 children 0.% |

DHS
312599

## 3-South Data Indicators
## Annual CQI Report
### September.2012

## Practice Model Components

| Assuring Safety and Risk Management | | | | | | | |
|---|---|---|---|---|---|---|---|
| Data Indicators Associated with Assuring Safety and Managing Risk | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 | Hinds | Warren |
| Foster parents with at least one foster child residing in their home shall have a DFCS worker visit the home twice a month (therapeutic FH) or monthly (non-therapeutic FH) Data Source: MWZPLMCS & MWZPLMS2 * September 1, 2012 thru September 30, 2012 | 80% | Foster Homes: 43 of 224 children 19.2% Thera Foster Homes: 2 of 83 children 2.4% | Foster Homes: 60 of 231 children 25.97% Thera Foster Homes: 16 of 90 children 17.77% | Foster Homes: 956 of 2,479 children 38.6% Thera Foster Homes: 32 of 245 children 13.1% | Foster Homes: 1294 of 2349 children 55.08% Thera Foster Homes: 89 of 234 children 38.03% | Foster Homes: 39 of 203 children 19.21% Thera Foster Homes: 14 of 86 children 16.27% | Foster Homes: 21 of 28 children 75.0% Thera Foster Homes: 2 of 4 children 50.0% |

3-South Data Indicators
Annual CQI Report
September.2012

## Practice Model Components

**Involving Children and Families**

| Data Indicators Associated with Involving Children and Families in Case Planning and Decision Making | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 | Hinds | Warren |
|---|---|---|---|---|---|---|---|
| Children in custody shall receive documented twice-monthly, in-person visits by the assigned DFCS caseworker Data Source: MWZWC5S2 * September 1, 2012 thru September 30, 2012 | At least 70% | 160 of 450 children in custody 35.6% | 315 of 503 children in custody 62.62% | 1989 of 3,651 children in custody 54.5% | 2733 of 3970 children in custody 68.84% | 276 of 449 children in custody 61.47% | 39 of 54 children in custody 72.22% |
| Children with a goal of reunification shall have their assigned DFCS caseworker meet monthly with the child's biological parents Data Source: MWZWCR3S * September 1, 2012 thru September 30, 2012 | At least 80% | 8 of 253 children with plan of reunification 3.2% | 18 of 252 children with plan of reunification 7.14% | 460 of 2,059 children with plan of reunification 22.3% | 535 of 2170 children with plan of reunification 24.65% | 11 of 228 children with plan of reunification 4.82% | 7 of 24 children with plan of reunification 29.17% |

3-South Data Indicators
Annual CQI Report
September.2012

DHS
312601

## Practice Model Components

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Data Indicators Associated with Assessing Strengths and Needs** | **Year III Goal/ Compliance Measure** | **Region August 2011** | **Region September 2012** | **State August 2011** | **State September 2012** | **Hinds** | **Warren** | |
| Have received a comprehensive health assessment within 30 days of entering care. Data Source: MWLS315S October 1, 2011 through September 30, 2012 | 50% | n/a | 25 of 290 children 9.77% | n/a | 604 of 2473 children 25.79% | 20 of 242 children 8.97% | 5 of 48 children 15.15% | |
| (Have gone through screening and assessment within 30 days of entering custody) | | *Not Currently Available* | | | | | | |
| (Are screened for general and special education needs within 30 calendar days of their entry into foster care) | 80% | *Not Currently Available* | | | | | | |
| (Have their currently available medical, dental, educational, and psychological information provided to their foster parents or facility staff no later than at the time of any new placement during the PUR) | 80% | *Not Currently Available* | | | | | | |

**3-South Data Indicators**
**Annual CQI Report**
September.2012

## Practice Model Components

| Preserving and Maintaining Connections | | | | | | | |
|---|---|---|---|---|---|---|---|
| Data Indicators Associated with Preserving and Maintaining Connections | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 | Hinds | Warren |
| (Sibling Groups Placed Together or Apart) | | *Not Currently Available* | | | | | |
| (At least 40% of placement cases in which whereabouts of one or both parents is unknown, DFCS shall have immediately instituted a diligent search for the parents/documented in case record) | | *Not Currently Available* | | | | | |
| Contacts with parents and separated siblings.<br>Source: MWLS318D, MWLS318S<br>August 1, 2012 through August 31, 2012 | At least 90% of children in custody | *N/A* | 4 of 262 children in custody<br>1.53% | *N/A* | 141 of 2362 children in custody<br>5.97% | 4 of 226 children in custody<br>1.77% | 0 of 36 children in custody<br>0% |
| Proximity of initial placement   (placed out of county but within 50 miles)        Data Source: MWLS314S<br>September 1, 2011 through August 31, 2012 | | *N/A* | 56  of 279 children in custody<br>20.1 % | *N/A* | 470 of 2391 children in custody<br>19.7 % | 27 of 228 children in custody<br>11.18% | 29 of 51 children in custody<br>56.9% |
| Proximity of initial placement   (placed out of county beyond 50 miles)        Data Source: MWLS314S<br>September 1, 2011 through August 31, 2012 | | *N/A* | 21  of 279 children in custody<br>7.5 % | *N/A* | 240 of 2391 children in custody<br>10.0 % | 15 of 228 children in custody<br>5.3% | 6 of 51 children in custody<br>11.8% |
| Proximity of initial placement   (placed in county but within 50 miles)        Data Source: MWLS314S<br>September 1, 2011 through August 31, 2012 | | *N/A* | 193 of 279 children in custody<br>69.2 % | *N/A* | 1619 of 2391 children in custody<br>67.7 % | 177 of 228 children in custody<br>77.6% | 16 of 51 children in custody<br>31.4% |
| Proximity of initial placement   (placed in county but beyond 50 miles)        Data Source: MWLS314S<br>September 1, 2011 through August 31, 2012 | | *N/A* | 9  of 279 children in custody<br>3.2% | *N/A* | 62 of 2391 children in custody<br>2.6 % | 9 of 228 children in custody<br>4.8% | 0 of 51 children in custody<br>0% |

DHS
312602

DHS
312603

**3-South Data Indicators**
**Annual CQI Report**
September.2012

## Practice Model Components

| Individual Case Planning | | | | | | | | |
|---|---|---|---|---|---|---|---|---|

| Data Indicators Associated with Individualizing Case Planning | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 | Hinds | Warren |
|---|---|---|---|---|---|---|---|
| Working with service providers, foster parents, the child, and the family, DFCS shall develop and document in the child's case record a permanency plan within 30 calendar days of the child's initial placement that specifies the permanency goal, a timeframe for achieving permanency, and activities that support permanency.          Data Source: MWLS312S/D October 1, 2011 through September 30, 2012 | 90% | n/a | 65 of 278 children 23.38% | n/a | 846 of 2399 children 35.26% | 41 of 246 children 16.67% | 24 of 32 children 75.0% |

3-South Data Indicators
Annual CQI Report
September.2012

## Systemic Factors

| Training of Staff and Providers | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Data Indicators Associated with Training of Staff and Providers** | **Year III Goal/ Compliance Measure** | **Region August 2011** | **Region September 2012** | **State August 2011** | **State September 2012** | **Hinds** | **Warren** | |
| All new caseworkers/supervisors complete their training requirements before assuming their responsibilities | 100% | *Not Currently Available* | | | | | | |
| (Caseworkers receive minimum of 40 hours of annual ongoing, in-service training) | | *Not Currently Available* | | | | | | |
| (Supervisors receive a minimum of 24 hours of annual ongoing, in-service training) | | *Not Currently Available* | | | | | | |
| (Develop indicators regarding Foster/Adoptive Parent Training) | | *Not Currently Available* | | | | | | |

DHS
312604

**3-South Data Indicators**
**Annual CQI Report**
September.2012

## Systemic Factors

| Service Array | | | | | | | |
|---|---|---|---|---|---|---|---|

| Data Indicators Associated with Service Array | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 | Hinds | Warren |
|---|---|---|---|---|---|---|---|
| | | REDACTED | | | | | |

DHS
312605

DHS
312606

**3-South Data Indicators**
**Annual CQI Report**
September.2012

## Systemic Factors

| Placement Resources | | | | | | | |
|---|---|---|---|---|---|---|---|
| Data Indicators Associated with Placement Resources | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 | Hinds | Warren |
| Number of Licensed/Pending Foster Family Homes          Data Source: MWZRESLS & MWZRESPS *Licensed Homes: September 1, 2012 through September 30, 2012 **Pending Homes: As of September 15, 2012 | | 127 Licensed 25 Pending | 127 Licensed 75 Pending | 2,512 Licensed 247 Pending | 2,512 Licensed 244 Pending | 113 Licensed 58 Pending | 14 Licensed 17 Pending |
| Number of Children in Foster Care by Placement Type (family based v. non-family based)          Data Source: MWZ0510S  NOTE:Family Based Placements=Adoptive Home, Child Specific, CO Non Licensed Non-Relative, CO Non Licensed Relative Foster Home, *Expedited Pending Relative Resource Home (added May 2011), Foster Home, Foster/Adopt Home, Group Home, Own Home, Relative Foster Home, Respite Foster Care, Teenage Parent Foster Home and Therapeutic Group and Foster Homes * September 1, 2012 through September 30, 2012 | | 370 of 425 children 87.1% | 328 of 441 children 74.38% | 3,244 of 3,652 children 88.8% | 2974 of 3,601 children 88.8% | 296 of 397 children 74.56% | 32 of 44 children 72.73% |
| Sibling groups, with one or more of siblings under 10, are not placed in congregate care settings for more than 45 days Data Source: MWLS53HS * August 1, 2011 thru August 31, 2011 | | 1 of 4 sibling groups 25% RD Approval | 2 of 4 sibling groups 50% RD Approval | 2 of 8 sibling groups 25% RD Approval | 3 of 12 sibling groups 25.0% RD Approval | 1 of 3 sibling groups 33.3% RD Approval | 1 of 1 sibling groups 100.% RD Approval |

**3-South Data Indicators**
**Annual CQI Report**
September.2012

## Systemic Factors

| Placement Resources | | | | | | | |
|---|---|---|---|---|---|---|---|
| Data Indicators Associated with Placement Resources | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 | Hinds | Warren |
| No child shall be placed in more than one emergency or temporary facility within one episode of foster care, unless an immediate placement move is necessary to protect the safety of the child or others as certified in writing by the RD. Data Source: MWLS51DS *September 1, 2012 through September 30, 2012 | 100% | 57 of 81 child 70.37% RD Approval | 58 of 74 child 78.38% RD Approval | 256 of 358 children 71.51% RD Approval | 246 of 310 children 79.35% RD Approval | 49 of 64 child 76.56% RD Approval | 9 of 10 child 90.0% RD Approval |
| No child under 10 years of age shall be placed in a congregate care setting unless the child has exceptional needs that cannot be met in a relative or foster family home or the child is a member of a sibling group, and the RD has granted express written approval for the placement. Data Source: MWLS52HS *September 1, 2012 through September 30, 2012 | 100% | 17 of 19 children 89.5% RD Approval | 11 of 13 children 84.62% RD Approval | 69 of 74 children 93.2% RD Approval | 55 of 58 children 94.83% RD Approval | 4 of 6 children 66.7% RD Approval | 7 of 7 children 100.% RD Approval |
| Children placed in unlicensed placements. Source: MWLS319D, MWLS319S September 1, 2012 through September 30, 2012 | | n/a | 41 of 501 children 8.18% | n/a | 41 of 501 children 8.18% | 519 of 3980 children 8.0% | 5 of 51 children 9.80% |

DHS 312607

**3-South Data Indicators**
**Annual CQI Report**
September.2012

## Systemic Factors

| Caseloads | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Data Indicators Associated with Caseloads** | **Year III Goal/ Compliance Measure** | **Region August 2011** | **Region September 2012** | **State August 2011** | **State September 2012** | **Hinds** | **Warren** |
| At least 75% of caseworkers carry a caseload that does not exceed Plan caseload requirements (over 6,960 minutes) Data Source: MWASA9S1 ** September 1, 2012 thru September 30, 2012 (Includes Direct Service Workers and Resource Workers) | At least 75% | 25 workers 49% | 33 workers 50% | 311 workers 51.4% | 329 workers 45.% | 28 workers 49.1% | 5 worker 55.5% |
| No more than 10% of caseworkers shall carry a caseload exceeding twice the caseload requirements (over 13,920 minutes) Data Source: MWASA9S1 * September 1, 2012 thru September 30, 2012 (Includes Direct Service Workers and Resource Workers) | No more than 10% | 9 workers 18.4% | 17 workers 26.% | 81 workers 12.7% | 85 workers 11.6% | 16 workers 28.0% | 1 workers 11% |
| No caseworkers carry a caseload exceeding three times the caseload requirements (over 20,880 minutes) Data Source: MWASA9S1 * September 1, 2012 thru September 30, 2012 (Includes Direct Service Workers and Resource Workers) | 100% | 2 workers 95.9% | 4 workers 94.0% | 36 workers 94.4% | 29 workers 96.04% | 4 workers 93.0% | 0 workers 100% |

DHS
312608

3-South Data Indicators
Annual CQI Report
September.2012

## Systemic Factors

| Oversight and Monitoring | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Data Indicators Associated with Oversight and Monitoring** | **Year III Goal/ Compliance Measure** | **Region August 2011** | **Region September 2012** | **State August 2011** | **State September 2012** | **Hinds** | **Warren** |
| Supervisors, who supervise caseworkers, are responsible for supervising no more than 5 caseworkers<br>Data Source: MWASA5D2<br>* September 1, 2012 thru September 30, 2012 | No more than 10% | 0 ASWS's    0% | 1 ASWS's 10% | 11 ASWS 9.24% | 18 ASWS 10.4% | 1 ASWS's 14.2% | 0 ASWS's 0% |
| (DFCS held special permanency reviews for each child in custody who had, as of 1/4/08, been in foster care more than 15/22 previous months & for whom DFCS hadn't filed a TPR petition or documented an ASFA exception) | *Not Currently Available* | | | | | | |
| (Develop indicator regarding number of SARs completed by supervisors) | *Not Currently Available* | | | | | | |

DHS
312609

**3-South Data Indicators**
**Annual CQI Report**
September.2012

## Systemic Factors

| Court Process | | | | | | | |
|---|---|---|---|---|---|---|---|
| Data Indicators Associated with Court Processes | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 | Hinds | Warren |
| Children who have been in custody at least 6 months have had a timely county conference Data Source: MWZTACRS *October 1, 2011 - September 30, 2012 | 90% | 369 of 391 children 94.4% | 391 of 428 children 91.36% | 3,377 of 3,466 children 97.4% | 3,422 of 3,628 children 94.32% | 353 of 390 children 90.51% | 38 of 38 children 100.0% |
| Children in custody at least 12 months have had a timely annual court review Data Source: MWZTPHRS *October 1, 2011 - September 30, 2012 | 90% | 111 of 336 children 33% | 116 of 399 children 29.07% | 1,961 of 3,089 children 63.5% | 1,886 of 3,179 children 59.33% | 91 of 360 children 25.28% | 25 of 38 children 64.10% |
| Children in custody reaching the point at which they have spent 15 of the previous 22 months in foster care with no ASFA exception noted will have a petition for TPR filed on their behalf Data Source: MWZ014S1 § As of September 5, 2012 | 80% | 10 of 111 children 9% | 13 of 93 children 13.97% | 382 of 1,028 children 37.2% | 423 of 1,005 children 42.08% | 3 of 75 children 4.0% | 10 of 18 children 55.55% |
| Children in custody who have spent more than 15 of the previous 22 months in FC without a TPR petition filed will have an exception noted or a TPR filed § Data Source: MWZ014S1 & MWZ014S2 § As of September 5, 2012 | 80% | 134 of 235 children 57% | 131 of 211 children 62.09% | 1,105 of 1,751 children 63.1% | 1,082 of 1,664 children 65.02% | 117 of 189 children 61.90% | 14 of 22 children 63.64% |
| A termination of parental rights petition shall be filed on behalf of children who have spent 17 of the previous 22 months in foster care by the last day of a child's seventeenth month in care, unless an available exception under ASFA has been documented in the child's case record. Data Source: MWZ017S1 *September 1, 2012 through September 30, 2012 | 80% | n/a | 139 of 234 children 59.40% | n/a | 849 of 1476 children 57.52% | 126 of 213 children 59.15% | 13 of 21 children 61.90% |

DHS
312610

DHS
312611

**3-South Data Indicators**
**Annual CQI Report**
September.2012

## Systemic Factors

| Data Quality and Usage |
|---|

| Data Indicators Associated with Data Quality & Usage | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | State August 2011 | State September 2012 | Hinds | Warren |
|---|---|---|---|---|---|---|---|
| Currently, no proposed indicators | | | | | | | |

# Region 3-South
# Annual Follow-Up CQI Report
# Summary of Areas Needing Improvement

*Areas for Improvement Efforts to better address Mobilizing Appropriate Services Timely*

- On-site case review and Foster Care Review data shows that (overall) age appropriate children are being provided with Independent Living services by the Region. However, Region 3-South's data indicators show that children in custody, ages 14 - 20, being provided with independent living services per their service plan is an area of needed improvement.
- Children discharged to a plan of Reunification within 12 months of entering state's custody is an area needing improvement based on the region's September 2012 data indicators.
- Children discharged in the last year upon finalization of an adoption having had the adoption finalized within 24 months of the latest removal from home shows to be an area needing improvement based on the data indicators from the October 1, 2011 thru September 30, 2012 baseline period.
- September 2012 on-site case review data shows a need for improvement in assessing children's physical and mental health needs and providing services in a timely manner to meet those identified needs.

*Areas for Improvement Efforts to better address Assuring Safety and Managing Risk*

- Although a number of items rated a Strength during the on-site case review, the baseline data indicators show a need for improvement in the area of Assuring Safety and Managing Risk for initiating and completing investigations (all as well as children in care) in a timely manner.
- Efforts to better address caseworker visits with children who remain in the same out of home placement following an investigation into a report that he/she was maltreated, or subject to corporal punishment, in that placement should be developed in order to assure safety and manage risk.
- Efforts to better address caseworker visits with foster parents with at least one foster child residing in their home should be developed by the Region in order to manage risk and assure safety of the children placed in those homes.

*Areas for Improvement Efforts to better address Involving Children and Families in Case Planning and Decision Making*

- A plan to improve the frequency and quality of visits taking place between caseworkers and children should be developed and implemented by the Region to improve performance for involving children in case planning and decision making. It should be noted that the MACWIS data indicators show a significant increase in the caseworker/child contacts since the time of the August 2011 baseline review. The quality

of these narratives appears to be an area of needed improvement based on the on-site case review results.

- A plan should be developed by the Region to assure more frequent and more quality visits take place between caseworkers and parents of children who have a permanent plan of Reunification. This will result in more timely permanency for children in care and can also have a positive effect on the Region's performance of other practice model components in both placement and in-home cases.
- Efforts to improve the involvement of parents (especially fathers) and children in the case planning process will also result in more timely permanency for children in the Region who are in care and prevent foster care entries for children in the in-home cases.

### *Areas for Improvement Efforts to better address Assessing Strengths and Needs*

- A child receiving a comprehensive health assessment within 30 days of entering custody is an area needing improvement for the region. The Year III goal is 50%. As of the October 1, 2011 through September 30, 2012 reporting period, the region does not meet the 50% goal at 9.77%.
- On-site case review results indicate that the Region may need to develop and implement a plan to improve the assessment of strengths and needs. It appears assessments are taking place with the child and with foster/pre-adoptive parents more than with mothers and fathers. The percentage for foster/pre-adoptive parents is significantly higher than those of the mothers and fathers.

### *Areas for Improvement Efforts to better address Preserving and Maintaining Connections*

- The MACWIS data indicators from the annual follow-up review reporting period shows a need for improvement in the area of children having visits with their parents (if appropriate) and their siblings in care for whom they are separated. On-site case review results seem to indicate that the region may need to develop and implement a plan to improve performance in the area of Preserving and Maintaining Connections for children in foster care with regard to visitation with parents and siblings. 42.9% of the applicable cases in the September 2012 follow up on-site review rated an Area Needing Improvement.
- 25% of the cases in the on-site case review rated a Strength for Relationship of Child in Care with Parents. Efforts should be made to assure that meetings occur between birth parents and resource parents within the first month of placement and that efforts are made to implement shared parenting when it is appropriate and safe to do so.
- Relative Placement rated a Strength in 66.7% of the cases reviewed. The primary factor in this item not rating higher appears to be concerted efforts need to be made by the Region to identify, locate, and evaluate maternal and paternal relatives for placement.

### *Areas for Improvement Efforts to better address Individualizing Case Planning*

- On-site case review data and MACWIS data indicators show that the region needs improvement in the area of establishing permanency goals for children in a timely manner and making efforts for establishing permanency for children who have been in state's custody for 15 of the most recent 22 months by referring the case for TPR in a timely manner or documenting an exception (compelling reasons) for not doing so.

- On site case review data reflects that the region needs continued improvement efforts in the area of case planning; specifically utilizing family team meetings to their fullest potential as a planned event with all appropriate case members in attendance in order to develop and update parental and child case plans.

### Areas for Improvement Efforts to better address Training of Staff and Providers

- Although there is no regional or state data indicator information available to establish a baseline and to determine strengths and areas needing improvement with regard to this systemic factor, stakeholder survey information could be used by the Region to evaluate the effectiveness of DFCS' performance with regard to these items.
- Based on the results of the relevant stakeholder surveys which (overall) were positive, DFCS should continue to focus its efforts on providing and ensuring completion of adequate initial training (for new caseworker and supervisors who provide child welfare services) and on-going training for all caseworkers and supervisors who provide child welfare services.
- Based on the results of the relevant stakeholder surveys which (overall) were positive, DFCS should continue to focus its efforts on providing adequate training to placement providers (current and prospective foster parents, relative caregivers, adoptive parents, and staff of state licensed or approved facilities) that addresses the skills and knowledge needed to carry out their duties.
- Based on the results of the relevant stakeholder surveys which (overall) were positive, DFCS should continue to provide frequent training to license new foster homes.

### Areas for Improvement Efforts to better address Service Array

- A large percentage of the questions regarding service array were not answered due to the fact that there was a small number of actual respondents. The region may want to institute a plan for engaging all stakeholders in the quality improvement process, including their participation in stakeholder surveys.
- Based on the survey results it appears that of the stakeholders who actually responded, more of them believe that the agency is effective in individualizing services than those who do not.

### Areas for Improvement Efforts to better address Placement Resources

- The agency does not meet the Year III goal for placing children in more than one emergency or temporary facility within one episode of foster care (unless an immediate placement move is necessary to protect the safety of the child or others as certified in writing by the Regional Director). Efforts to improve this measure should be implemented.
- Relevant stakeholder information seems to indicate the Region may need to make improvement efforts in the area of recruiting foster and adoptive homes that reflect the ethnic and racial diversity of the children in the Region in need of such placements.

### Areas for Improvement Efforts to better address Caseloads

- The data indicators from the baseline month reveal that there are some caseworkers within the region who have caseloads that are twice and three times the plan

requirements. This could be due to the turnover in some areas of the region or, as it is has been found in other areas of the state, due to Resource Workers having caseloads that are higher. Comments from the survey results seem to show that some workers feel that when staff turnover occurs, or while awaiting new workers to be trained, the workers are unfairly given high caseloads.

### Areas for Improvement Efforts to better address Oversight and Monitoring

- Efforts to improve the inclusion of stakeholders in the Quality Improvement process and to share data on the agency's performance with them should be implemented to strengthen this particular systemic factor.

### Areas for Improvement Efforts to better address Court Processes

- The region does not meet the Year III goal of 90% for children having timely permanency hearings. The Region should develop a strategy to ensure that permanency hearings are held in a timely manner to improve performance and promote timely permanency for children in care. The Region may also want to consider raising awareness among relevant external stakeholders on the importance of holding these hearings in a timely manner.
- The region does not meet the Year III goal of 80% for children in custody 15 of the most recent 22 months having a petition for termination of parental rights filed on their behalf or have an ASFA exception noted in their case plan. Relevant stakeholder survey responses seem to reflect a need for improvement in these areas as well. Strategies such as internal permanency reviews, complimented by 6 month Foster Care Review reviews and reports, could assist in improved performance in these areas.
- The region does not meet the Year III goal of 80% for a termination of parental rights petition to be filed on behalf of children who have spent 17 of the previous 22 months in foster care by the last day of a child's seventeenth month in care, unless an available exception under ASFA has been documented in the child's case record.

### Areas for Improvement Efforts to better address Data Quality and Usage

- It is recommended that administrative staff within the Region (including Foster Care Review and Evaluation and Monitoring staff) continue to stress the importance of utilizing data to measure performance and make improvements as well as the importance of accurate and timely data entry in order to give as accurate a picture as possible of the work that is being conducted in the region. Efforts to improve employee morale may also be beneficial to the region, based on survey responses.

**Ex. 25C**

# Region 3-South
## Continuous Quality Improvement
## Annual Report
## October 2013



**Compiled from MACWIS Data Indicator Reports, Evaluation
and Monitoring On-Site Case Review Findings, and
Stakeholder Survey Results**

Submitted by:
**Mississippi Family and Children's Services
Division of Evaluation and Monitoring
Office of Continuous Quality Improvement**

DHS
362164

## Table of Contents

Background ........................................................................................1

Methodology and Sources .................................................................1

Mobilizing Appropriate Services Timely .........................................3

Assuring Safety and Managing Risk .................................................8

Involving Children and Families in Case Planning and Decision Making .................13

Assessing Strengths and Needs ........................................................16

Preserving and Maintaining Connections ........................................19

Individualizing Case Planning .........................................................24

Training of Staff and Providers .......................................................27

Service Array....................................................................................28

Placement Resources .......................................................................30

Caseloads .........................................................................................34

Oversight and Monitoring ...............................................................36

Court Processes ...............................................................................37

Data Quality and Usage ..................................................................40

Next Steps........................................................................................42

**Appendix**

- o   Region 3-South September 2013 Follow-Up Data Indicators
- o   Summary of Areas for Improvement Efforts

DHS
362165

# Region 3-South
# Annual Follow-Up CQI Review Report
## Background

In connection with the *Olivia Y* Modified Settlement Agreement, Council of Accreditation (COA), Federal standards and to support the implementation of the Mississippi Child Welfare Practice Model, Mississippi's Division of Family and Children's Services (DFCS) has embarked on developing a Continuous Quality Improvement (CQI) System which includes the Division of Evaluation and Monitoring, the Foster Care Review Program (FCR), and the Mississippi Automated Child Welfare Information System (MACWIS). The CQI System utilizes both quantitative and qualitative information to determine how counties, regions and the state are assuring the safety, permanency and well-being of children and families served by the State. This will be accomplished by monitoring key child welfare indicators associated with the components and systemic factors associated with the Practice Model. The CQI system is organized around the six components and seven systemic factors of the Practice Model and includes elements of the Child and Family Services Review (CFSR), Council on Accreditation (COA) standards, and components of the *Olivia Y* settlement agreement. In order to monitor county, regional and state performance, the CQI system is centered around quantitative data indicators which will establish how counties and the region are doing in comparison to standards that have been set or in comparison to statewide performance. The qualitative information gathered is intended to provide context and a deeper insight to better understand counties and regions performance on the data indicators.

## Methodology and Sources

This report discusses the results of the Continuous Quality Improvement (CQI) data gathered for Region 3-South in Mississippi, and will be used to measure and monitor improvement in the months and years to come. The sources for the information used in this report are as follows:

- **Data Indicators**: The MACWIS data indicators track and report information related to the state's Practice Model Components, Systemic Factors, and the requirements of the *Olivia Y* Modified Settlement Agreement *(see data table footnotes in appendix for the time period covered for these data indicators)*. Existing data reports were augmented and new reports were developed and validated in order to capture key indicators of child welfare practice across the Practice Model components as well as systemic factors. In obtaining the results for the counties', regions', and state's respective levels of performance, the most recent summary reports, which have been validated for accuracy, were utilized. These data indicators will serve as the cornerstone for measuring strengths and areas needing improvement in counties and regions and will be used to establish baselines. The information from the case reviews, desk audits, and stakeholder surveys will be used to support the information from the data indicators.

- **On-site case record reviews and case member interviews**: To support the results of the data indicators from MACWIS, regions also conducted a qualitative case review to provide deeper context to the data results. After requesting and receiving a universe of cases from Region 3-South, a random sample was obtained that consisted of 14 foster care and 10 in-home services cases from both[1] of Region 3-South's counties. Twelve teams made up of two people conducted the case reviews, and were supported by one team leader and two quality assurance reviewers. The information considered in the onsite review which occurred in September, 2012, focused on a 12 month period ending September 20, 2012, and came from the electronic case management system (MACWIS), paper files, and interviews with the ,various case members who included the parents, the children, and the caseworkers. The table below further illustrates the demographics from the sample of cases:

---

[1] Counties which had cases included in the review sample were: Hinds and Warren Counties

DHS
362166

| CASE CHARACTERISTICS | Foster Care | % (Foster Care) | In-Home | % (In-Home) |
|---|---|---|---|---|
| **TOTAL NUMBER OF CASES >>** | **14** | | **10** | |
| | | | | |
| **CASE OPENING** | | | | |
| Cases opened prior to the period under review | 12 | 86% | ▌ | ▐ |
| Cases opened during the period under review | 2 | 14% | ▌ | ▐ |
| Child entered foster care during the period under review | 2 | 14% | ▌ | ▐ |
| | | | | |
| **CHILD'S AGE AT START OF PERIOD UNDER REVIEW** | | | | |
| Children in case review sample under age 10 | 7 | 50% | ▌ | ▌ |
| Children in case review sample at least 10 but younger than 13 | 1 | 7% | ▌ | ▌ |
| Children in case review sample at least 13 but younger than 16 | 2 | 14% | ▌ | ▌ |
| Children in case review sample age 16 and older | 4 | 29% | ▌ | ▌ |
| | | | ▌ | ▌ |
| **CHILD'S RACE/ETHNICITY** | | | ▌ | |
| Black/Non-Hispanic | 12 | 86% | ▌ | ▌ |
| Hispanic (of any race) | | 0% | ▌ | ▌ |
| White Non-Hispanic | 2 | 14% | ▌ | ▌ |
| Unable to Determine | | 0% | ▌ | ▌ |
| | | | ▌ | ▌ |
| **PRIMARY REASON FOR OPENING CASE** | | | ▌ | ▌ |
| Physical Abuse | 2 | 14% | ▌ | ▐ |
| Neglect (not including medical neglect) | 6 | 43% | ▌ | ▐ |
| Domestic violence in child's home | 0 | 0% | ▌ | ▐ |
| Drug abuse by parent | 1 | 7% | ▌ | ▐ |
| Sexual abuse | 3 | 21% | ▌ | ▐ |
| Other | 2 | 14% | ▌ | ▐ |

- **Stakeholder Surveys:** Stakeholder involvement is critical to the success of the Practice Model. The Implementation Team, caseworkers, and supervisors need to be fully engaged in the child welfare process. In October, 2013, 232 stakeholders in Region 3-South were provided with surveys to determine how they believe the agency is performing with regard to the following systemic factors: Training of Staff and Providers, Service Array, Placement Resources, Caseloads, Oversight and Monitoring, Court Processes, and Data Quality and Usage. Stakeholders were surveyed through email addresses provided by the Area Social Work Supervisors (ASWS) in each county. The stakeholders were identified by the ASWS and forwarded to the Regional Director who then compiled a condensed list of stakeholders who were solicited for participation. 56 of the 232 possible surveys solicited were completed which resulted in an overall return rate of 24.14%. Below is a summary of the return rate on each category of stakeholders surveyed:
  - **4.8% of Service Providers** – 1 out of 21 service providers solicited responded to the surveys in Region 3-South.

- o **24.4% of Caseworkers and Area Social Work Supervisors** (ASWS) – 20 out of 82 direct service workers, homemakers, clerks, resource and adoption workers, Regional Directors and ASWS completed the surveys in Region 3-South.
- o **22.2% of Resource Parents** – 20 resource parents out of 90 solicited resource parents completed the surveys in Region 3-South
- o **48.4% of Implementation Team** – 15 out of 31 identified potential members of the Implementation Team completed the surveys in Region 3-South.
- o **0% of Judges and court personnel**– 0 out of 8 Youth Court Judges, guardians ad litem, and court personnel completed the surveys in Region 3-South.

# Section One
# Practice Model Components

## <u>Mobilizing Appropriate Services Timely</u>

Appropriate and timely services refer to a process whereby services are designed and delivered pursuant to a careful assessment of children's and parents' needs. The assessment should identify both the strengths of the children and parents with regard to the issues requiring interventions, and their needs with regard to ensuring safety, permanency, and well-being. Needs should not be confused with services. In order to provide appropriate and timely services to children and parents, there is a need to think beyond what is available in the service array so as to avoid offering a standard menu of services that may or may not match the unique needs of some parents and children. The concept of appropriate services emphasizes that services should be comprehensive, incorporating a broad array of services and supports that are individualized to meet the specific needs of the children and families. These services and supports should be provided in the least restrictive setting appropriate for the child and accessible to all jurisdictions within the State.

The following practice principles are linked to this component:
- Services are designed and delivered pursuant to a careful assessment of the children's and parents' needs;
- Services and supports are individualized to meet the unique needs of the children and parents;
- Services are based on needs, not on availability;
- Services are delivered when they are needed and in locations that are accessible to the children and parents who need them; and
- Children and families are treated as partners to assure joint decision making about the services that they need.

The results below detail the findings of Region 3-South's current success in Mobilizing Appropriate Services Timely.

### Number of Indicators Assessed: Mobilizing Appropriate Services Timely

| Type | Number | Percent |
|---|---|---|
| Indicators Exceeding Goals | 0 | 0% |
| Indicators Not Exceeding Goals | 4 | 100% |
| Total Indicators Currently Measurable | 4 | 100% |
| Other Indicators (not tied to Goals) | 6 | -- |
| **TOTAL** | **10** | -- |

There are 10 indicators associated with Mobilizing Appropriate Services Timely. There are 4 indicators at this time for which there is data to establish a baseline and to measure strengths and areas of needed improvement. 4 (100%) of the data indicators do not meet or exceed the established goals and indicates an area of needed improvement.

DHS 362168

Below is a summary of the strengths and areas needing improvement in relation to the practice model component of Mobilizing Appropriate Services Timely. All items area applicable to foster care cases with Items 17 and 18 being applicable to foster care and any in-home cases where physical health needs and/or mental health needs were the reason for the case being opened or became a factor after the case opened.

| MOBILIZING SERVICES TIMELY | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Item 12: Foster Care Re-Entries | Item 13: Reunification, Guardianship, or Permanent Placement with Relatives | Item 14: Stability of Foster Care Placement | Item 15: Adoption | Item 16: Other Planned Permanent Living Arrangement | Item 17: Physical Health of Child | Item 18: Mental Health of Child |
| **Total Strength** | 7 | 1 | 11 | 0 | 2 | 8 | 4 |
| **%** | 100.0% | 14.3% | 78.6% | 0.0% | 50.0% | 47.1% | 44.4% |
| **Total ANI** | 0 | 6 | 3 | 6 | 2 | 9 | 5 |
| **%** | 0.0% | 85.7% | 21.4% | 100.0% | 50.0% | 52.9% | 55.6% |
| **Total Applicable** | 7 | 7 | 14 | 6 | 4 | 17 | 9 |

## Strengths in Practice

There are no strengths identified through the MACWIS data indicator reports for Region 4-South during the reporting period (October 2013).

## Areas Needing Improvement

| Data Indicators Associated with Mobilizing Appropriate Services Timely | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 |
|---|---|---|---|---|---|
| Placement Stability - Number of children in custody 12 months or less who have had 2 or fewer placement moves<br>Data Source: MWZPLM5S<br>*As of October 31, 2013 | Year III 60%<br>Year IV 75% | 224 of 311 children; 72% | 289 of 207 children; 71.63% | 241 of 360 children 66.94% | 1900 of 2795 children 67.98% |

- The Year IV goal for this measure is that 75% of children in custody 12 months or less have had 2 or fewer placement moves. Region 3-South does not meet this goal at 66.94% for the reporting period.
- During the October 2013 on-site case review, 78.6% of the foster care cases reviewed were rated a Strength for Placement Stability.
- Of the 5 cases reviewed during the on-site case review where there was more than one placement change during the period under review, 4 (80%) appear to have been planned by the agency in an effort to achieve the child's case plan goals or made in an effort to meet the needs of the child;
- 12 of the 14 (85.71%) applicable cases rated that placements settings were found to be stable at the time of the on-site case review;

- 3 children were found to be assessed with special needs. All of those children were found to be in placements that can meet their therapeutic, educational, and medical needs;
- All placement settings were found to be least restrictive to meet the child's individual needs.

| Data Indicators Associated with Mobilizing Appropriate Services Timely | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 |
|---|---|---|---|---|---|
| Children in custody, ages 14 - 20, are provided with independent living services per their service plan ** Data Source: MWBRD16S *November 1, 2012 through October 31, 2013 | Year III 90% Year IV 95% | 98 of 219 children 44.8% | 66 of 216 children 30.56 | 62 of 240 children 25.83% | 576 of 1382 children 41.68% |

- The Year IV goal for this measure is that 95% of children in custody, ages 14-20, are provided with Independent Living services per their service plan. Region 3-South does not meet this goal at 25.83% which is below the region's performance for the baseline period of 44.8% and the 2012 follow-up performance of 30.56%.
- 50% of the 4 applicable cases subject to the October 2013 on-site case review rated a Strength for Other Planned Living Arrangement.
- During the course of the review, there were 4 children identified in the review sample who were age appropriate for independent living services. 50% were found to be provided with services to adequately prepare them to live independently when they leave foster care.

| Data Indicators Associated with Mobilizing Appropriate Services Timely | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 |
|---|---|---|---|---|---|
| Children discharged from custody and reunified with parents/caretakers in the last year are reunified within 12 months of latest removal from home Data Source: MWBRD05S & MWBRD05C **November 1, 2012 through October 31, 2013 | Year III 60% Year IV 70% | 78 of 107 children 72.9% | 59 of 116 children 50.86% | 40 of 80 children 56.34% | 512 of 997 children 51.35% |

- The Year IV goal for this measure is that 70% of children discharged from custody and reunified with parents/caretakers in the last year are reunified within 12 months of the latest removal from the home. Region 3-South does not meet this goal at 56.34%. This is a decrease in the region's performance of 72.9% for the baseline period of August 2011 but an increase from the September 2012 performance of 50.86%.
- 14.3% of the applicable cases that were subject of the October 2013 on-site case review rated a Strength for Reunification/Guardianship/Permanent Placement with Relatives.
- Of the 7 applicable children who were subject of the October 2013 on-site case review, it appears concerted efforts are/were being made by the agency and the courts to achieve a goal of Reunification, Guardianship, or Permanent Placement with Relatives in a timely manner in 5 (71.43%) of those cases. Of the 5 children with a goal of Reunification, parental service plans identified those services DFCS deems necessary to address behaviors or conditions resulting in the child's placement in foster care in 60% of the cases reviewed. DFCS made those services that were identified available either through direct

DHS
362170

or referral service to the mother in 80% of the applicable cases and to the father in 20% of the applicable cases. There was one child discharged during the period under review and reunified. In this case, there was no evidence that a 90 day trial home placement occurred.

| Data Indicators Associated with Mobilizing Appropriate Services Timely | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 |
|---|---|---|---|---|---|
| Children discharged in the last year upon finalization of an adoption have had the adoption finalized within 24 months of the latest removal from home Data Source: MWBRD10D & MWBRD10S *November 1, 2012 through October 31, 2013 | Year III 25% Year IV 30% | 2 of 14 children 14.3% | 2 of 16 children 12.50% | 1 of 9 children 11.11% | 0 of 27 children 00.00% |

- The Year IV goal for this measure is that 30% of children discharged in the last year upon finalization of an adoption have had their adoption finalized within 24 months of the latest removal from the home. From November 1, 2012 through October 31, 2013 there were 9 children in Region 3-South who were adopted. 1 (11.11%) met the criteria of the goal by being adopted within 24 months of the latest removal from the home. This does not meet the Year IV goal.
- 0% of the applicable cases that were subjects of the October 2013 on-site case review rated a Strength for Adoption.
- Of the children in the case review sample with a plan of Adoption, it appears concerted efforts are not/were not being made by the agency and the courts in 33.33% of the applicable cases to achieve the plan of Adoption in a timely manner. Of the 7 applicable cases reviewed, 2 children had an adoption specialist assigned and an adoption plan that identifies the child-specific activities that DFCS will undertake to achieve adoption. There is evidence in 1 of the 5 (16.67%) of the applicable cases that shows the resource parents have been informed of available subsidies, including post-adoptive services. For children in the review who have been in care longer than 12 months, there is evidence in 4 of the 6 applicable cases (66.67%) that that the resource parents have been engaged in discussions regarding adoption.

## Other Key Indicators

- There are currently no MACWIS data indicators available for the items addressed below. However the region may want to use the following information from the on-site case reviews as indicators of practice in these areas:

| Data Indicators Associated with Mobilizing Appropriate Services Timely | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 |
|---|---|---|---|---|---|
| Placement Stability - Number of moves for all children regardless of time in custody Data Source: MWBRD07S & MWBRD07T *As of October 31, 2013 | — | 1 - 2 moves: 192 of 433 children 45.8% 3 - 5 moves: 131 of 419 children 31.3% 6> moves: 96 of 419 children 22.9% | 1 - 2 moves: 220 of 419 children 50.81% 3 - 5 moves: 123 of 433 children 28.41% 6> moves: 90 of 433 children 20.79% | 1-2 moves: 172 children - 87.76%; 3-5 moves - 20 children - 10.20%; >6 children - 4 children - 2.04% | 1-2 moves: 1771 children - 94.10%; 3-5 moves: 101 children - 5.37%; >6 moves: 11 children - .58% |

DHS
362171

- There is currently no established goal for this item (*Placement Stability – Number of Moves for all Children regardless of Time in Custody*). However, there is data to reflect how the region is performing with regard to the number of moves children are experiencing.
- **Foster Care Re-entries:**

| Data Indicators Associated with Mobilizing Appropriate Services Timely | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 |
|---|---|---|---|---|---|
| Children re-entering foster care within 1 year of reunification. Data Source: MWLS311S *November 1, 2012 through October 31, 2013 | – | n/a | 15 of 237 children 6.33% | 18 of 245 children 7.35% | 106 of 1812 children 5.85% |

- ○ The table above reflects that during the November 1, 2012 through October 31, 2013 reporting period, 18 of 245 (7.35%) re-entered state's custody within 1 year of being reunified with a parent or caretaker (there is currently no established goal for this particular item).
- ○ 7 of the 7 (100%) applicable foster care cases during the October 2013 on-site case review rated a Strength for this item.
- **Physical Health of the Child:**
  - ○ 47.1% of the 14 foster care cases rated a Strength for this item. ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ In the last 12 month period, the agency assessed the physical health care needs of 12 of the 14 (85.7%) foster children who were subject to the October 2013 on-site case review. Of the 2 children who came into agency custody during the period under review, 1 received an initial screening within 72 hours and 1 received a comprehensive health screening within 30 days of foster care entry. There were 11 children in the on-site case review who were age appropriate for dental services. 45.45% of those children had their dental health care needs assessed during the period under review. Of the children with identified physical health needs, 84.62% were provided with appropriate services in a timely manner to address those needs. 563.64% of the children with identified dental health needs were provided with appropriate services in a timely manner to address those needs.
- **Mental/Behavioral Health of the Child:**
  - ○ 44.4% of the 11 applicable foster care cases rated a Strength for this item. ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ During the period under review, age appropriate foster children who were the subjects of the October 2013 on-site case review 1 of 2 at 50% received an initial mental health screening within 30 days of entry into foster care and/or within 30 days of their 4th birthday in none of the applicable cases. The agency conducted an assessment of the children's mental/behavioral health needs on an on-going basis or as a follow-up based on indications to inform case planning decisions in 50% of the applicable cases and (during the review period) provided appropriate services to address the children's mental/behavioral health needs in a timely manner in 50% of those cases.

*Areas for Improvement Efforts to better address Mobilizing Appropriate Services Timely*

- On-site case review data shows that age appropriate children are being provided with Independent Living services by the region. However, Region 3-South's data indicators show that children in custody, ages 14 - 20, being provided with independent living services per their service plan is an area of needed improvement.
- Children discharged to a plan of Reunification within 12 months of entering state's custody is an area needing improvement based on the region's October 2013 data indicators.

- Children discharged in the last year upon finalization of an adoption having had the adoption finalized within 24 months of the latest removal from home shows to be an area needing improvement based on the data indicators from the November 1, 2012 through October 31, 2013 reporting period.
- October 2013 on-site case review data shows a need for improvement in assessing children's physical and mental health needs and providing services in a timely manner to meet those identified needs.

## Assuring Safety and Managing Risk

Safety and risk-related interventions are designed to help children remain safely at home whenever possible and appropriate. Assuring child safety begins with the first report to MDHS that someone believes a child is being maltreated and continues through initiating investigations of maltreatment; initial safety and risk assessment; ongoing safety and risk assessment; developing a case plan; assuring safety during placement; reunification; and case closure. Safety and risk interventions are applicable for all children within a home, not only for a child for whom a report of maltreatment has been received.

The following practice principles are linked to this component:
- Safety and risk assessment practice guide casework activities with regard to safety, permanency, and well-being;
- Safety and risk assessments are used to address case plans and service delivery;
- Safety and risk assessment occurs throughout the life of a case;
- Family-centered practice principles apply to safety and risk interventions; and
- Safety and risk are addressed within the cultural background of the children and families being served.

The results below detail the findings of Region 3-South's current success in Assuring Safety and Managing Risk.

**Number of Indicators Assessed: Assuring Safety and Managing Risk**

| Type | Number | Percent |
|------|--------|---------|
| Indicators Exceeding Goals | 0 | -- |
| Indicators Not Exceeding Goals | 5 | 100% |
| Total Indicators Currently Measurable | 5 | 100% |
| Other Indicators (not tied to Goals) | 1 | -- |
| **TOTAL** | **6** | **--** |

There are 6 data indicators associated with Assuring Safety and Managing Risk. Of the 6 indicators, only 5 currently have Goals and/or data to measure against best practice Goals. Of the 5 Goals that currently have data available for which to establish a baseline and to measure strengths and areas of needed improvement, 0 of the 5 indicators for which there is data meet or exceed Goals indicating strengths in practice. 5 (100%) data indicators do not meet or exceed Goals and indicates an area of needed improvement.

Below is a summary of the strengths and areas needing improvement in relation to the practice model component of Assuring Safety and Managing Risk. All items area applicable to foster care cases as well as in-home cases.

DHS
362173

| | Item 1: Timeliness of initiating investigations of reports of child maltreatment | Item 2: Repeat Maltreatment | Item 3: Services to Family to Protect Child(ren) in the Home and Prevent Removal or Re-Entry into Foster Care | Item 4: Risk Assessment and Safety Management |
|---|---|---|---|---|
| **Total Strength** | 5 | 5 | 12 | 12 |
| **%** | 71.4% | 100.0% | 70.6% | 52.2% |
| **Total ANI** | 2 | 0 | 5 | 11 |
| **%** | 28.6% | 0.0% | 29.4% | 47.8% |
| **Total Applicable** | 7 | 5 | 17 | 23 |

*ASSURING SAFETY AND MANAGING RISK*

## Strengths in Practice

- There are no MACWIS data indicators that rate as a Strength for the Region in Assuring Safety and Managing Risk.

## Areas Needing Improvement

| Data Indicators Associated with Assuring Safety and Managing Risk | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 |
|---|---|---|---|---|---|
| All investigations into reports of maltreatment, including corporal punishment, of children in DFCS custody must be initiated within 24 hours of the report and completed within 30 calendar days, including supervisory approval Data Source: MWZ1271R & MWZ1271S *October 1, 2013 through October 31, 2013 | 100% | Total Investigations 15 Timely Initiated: 12 investigations 80% Timely Completed: 1 investigation 16.7% | Total Investigations 7 Timely Initiated: 6 investigations 85.7% Timely Completed: 1 investigation 33.3% | 6 of 9 investigations initiated timely - 66.67%; 4 of 6 investigations completed timely - 66.67% | 70 of 85 investigations initiated timely - 82.35%; 25 of 46 investigations completed timely - 54.35% |

- The goal for this measure is 100% of all investigations into reports of maltreatment, including corporal punishment, of **children in DFCS custody** must be initiated within 24 hours of the report and completed within 30 calendar days, including supervisory approval. Region 3-South does not meet this goal at 66.67% initiated timely and 54.35% completed timely.

DHS 362174

- Timeliness of initiating investigations of reports of child maltreatment (Item 1): 75% of the 4 applicable foster care cases reviewed at the time of the October 2013 on-site case review rated a Strength. ███████
███████████████████████████████████████████████

| Data Indicators Associated with Assuring Safety and Managing Risk | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 |
|---|---|---|---|---|---|
| Investigation timeliness for all children Data Source: MWZ1272S & MWZ1272R **October 1, 2013 through October 31, 2013 | 100% | Timely Initiated ████ L3= 85 70.8% investigations Timely Completed: ████ L3= 11 19.6% investigations | Timely Initiated ████ L3= 52 61.2% investigations Timely Completed: ████ L3= 24 40.% investigations | ██████ **Level 3:** 108 of 132 investigations initiated in 24 hours - 81.82%; 51 of 87 investigations completed within 30 days - 58.62% | ██████ **Level 3:** 997 of 1187 investigations initiated in 24 hours - 83.99%; 745 of 934 investigations completed within 30 days - 79.76% |

- The for this measure is 100%. The region does not meet this goal in that ████████████ ████████████ 81.82% of the Level 3 investigations were initiated in a timely manner. ████████████ 58.620% of the Level 3 investigations were completed in a timely manner (which includes supervisory approval). The completion of these investigations continues to be an improvement over the August 2011 baseline performance and the September 2012 follow-up performance.

| Data Indicators Associated with Assuring Safety and Managing Risk | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 |
|---|---|---|---|---|---|
| Rate of Abuse / Neglect / Maltreatment in Care Data Source: MWBRD06S **November 1, 2012 through October 31, 2013 | Year III - 1.00% Year IV - Less than 0.50% | 0.83% of 721 children in custody | 1.47% of 745 children in custody | 3 of 563 children .53% | 74 of 4475 children 1.65% |

- The Year IV goal for this measure is less than 0.50%. Of the 563 children in custody during the reporting period of November 1, 2012 through October 31, 2013 there was a rate of .53% for Region 3-South. This is very close to meeting the Year IV goal and it is a dramatic decrease from the September 2012 performance of 1.47%.

DHS
362175

| Data Indicators Associated with Assuring Safety and Managing Risk | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 |
|---|---|---|---|---|---|
| Any foster child who remains in the same out of home placement following an investigation into a report that he/she was maltreated, or subject to corporal punishment, in that placement shall be visited by a DFCS caseworker twice a month for three months after the conclusion of the investigation Data Source: MWLS55AS & MWLS55AD *October 1, 2013 through October 31, 2013 | 100% | 0 of 5 children 0% | 1 of 7 children 14.29% | 8 of 11 children 72.73% | 55 of 89 children 61.80% |

- This data indicator measures any foster child who remains in the same out of home placement following an investigation into a report that he/she was maltreated, or subject to corporal punishment, in that placement shall be visited by a DFCS caseworker twice a month for three months after the conclusion of the investigation. The goal for this measure is 100%. The region does not meet the prescribed goal in that there were 11 children who met the criteria for the measure but 8 actually (72.73%) had the necessary visits made as outlined in the indicator. This is a dramatic improvement over the baseline performance as well as the 2012 follow-up performance.

| Data Indicators Associated with Assuring Safety and Managing Risk | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 |
|---|---|---|---|---|---|
| Foster parents with at least one foster child residing in their home shall have a DFCS worker visit the home monthly (therapeutic FH) or monthly (non-therapeutic FH) Data Source: MWZPLMCS & MWZPLMS2 *October 1, 2013 through October 31, 2013 | Year III 40% Year IV 60% | Foster Homes: 43 of 224 children 19.2% Thera Foster Homes: 2 of 83 children 2.4% | Foster Homes: 60 of 231 children 25.97% Thera Foster Homes: 16 of 90 children 17.77% | Non-Therapeutic: 126 of 245 children - 51.42% Therapeutic: 30 of 94 children - 31.91% | Therapeutic: 95 of 230 children - 41.30%    Non-Therapeutic: 1442 of 2383 children - 60.51% |

- This indicator measures whether foster parents with at least one foster child residing in their home have had a DFCS worker visit the home twice a month (therapeutic FH) or monthly (non-therapeutic FH);
- The goal for this measure is 60%. The region does not meet this goal at 51.42% for foster homes and 31.91% for therapeutic foster homes. However, this is an improvement over the August 2011 baseline performance and the 2012 follow-up performance.

DHS
362176

| Data Indicators Associated with Assuring Safety and Managing Risk | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 |
|---|---|---|---|---|---|
| At least 70% of children in custody who are reunified during the period shall receive a 90 day trial home visit period or have case record documentation reflecting the Youth Court's objection to such a trial home visit. During that trial home visit period, the child's caseworker or a Family Preservation caseworker shall meet with the child in the home at least two times per month, and DFCS shall provide or facilitate access to all services identified in the child's after-care plan, consistent with plan requirements. Data Source: MWLS54AS *October 1, 2013 through October 31, 2013 | 70% | Not Available | Not Available | 5 of 8 children 62.50% | 100 of 177 children 56.50% |

- The goal for this measure is that at least 70% of children in custody who are reunified during the period shall receive a 90 day trial home visits period or have record documentation reflecting the Youth Court's objection to such a trial home visit. During that trial home visit period, the child's caseworker or a Family Preservation caseworker shall meet with the child in the home at least two times per month, and DFCS shall provide or facilitate access to all services identified in the child's after-care plan, consistent with plan requirements. Region 3-South does not meet this goal in that 5 of 8 children (62.50%) in trial home placements during the reporting period did not have visits by their caseworker that met such criteria. The region's performance exceeds the overall state performance on this measure.

## Other Key Indicators

- There are currently no MACWIS data indicators available for the items addressed below. However the region may want to use the following information from the September 2012 on-site case reviews as indicators of practice in these areas:
  - Repeat Maltreatment (Item 2) / 100% of the placement cases rated a Strength.
  - Services to Family to Protect Child(ren) in the Home and Prevent Removal or Re-Entry into Foster Care (Item 3) / 85.7% Strength for placement cases ███████ reviewed;
  - Risk Assessment and Safety Management (Item 4) / 69.2% Strength for placement cases ███████ ███████████ sample population.

## Areas for Improvement Efforts to better address Assuring Safety and Managing Risk

- o Although a number of items rated a Strength during the on-site case review, the baseline data indicators show a need for improvement in the area of Assuring Safety and Managing Risk for initiating and completing investigations (all as well as children in care) in a timely manner.
- o Efforts to better address caseworker visits with children who remain in the same out of home placement following an investigation into a report that he/she was maltreated, or subject to corporal punishment, in that placement should be developed in order to assure safety and manage risk.

DHS
362177

o  Efforts to better address caseworker visits with foster parents with at least one foster child residing in their home should be developed by the region in order to manage risk and assure safety of the children placed in those homes.
o  It should be noted that a number of these items show improvement since the time of the August 2011 baseline.

## Involving Children and Families in Case Planning and Decision Making

This component includes active involvement of age-appropriate children, families, and youth in identifying their unique strengths, needs, and service requests, and in developing plans that address their needs, establish and attain their goals, and support safe and appropriate relationships within families while children are in foster care. It includes all relevant family members, whether in the household or not, preparing them for and supporting their participation in meetings, reviews, and other processes that affect them. It also includes using information from safety and risk assessments and comprehensive strengths and needs assessments to determine negotiable and non-negotiable aspects of case planning, casework activity, and levels of family involvement.

The following practice principles are linked to this component:
- Parents, age-appropriate children, and youth are actively involved in developing or modifying all plans that pertain to them;
- Parents who do not reside in the home of the children are involved in developing and modifying plans that pertain to their children whenever it is safe and appropriate to do so;
- When safe and appropriate, parents are involved in the care of their children in foster care and in their children's activities; and
- Safety of children is not compromised through involving children and parents in case planning and decision making.

The results below detail the findings of Region 3-South's current success in Involving Children and Families in Case Planning and Decision Making.

**Number of Indicators Assessed: Involving Children and Families in Case Planning and Decision Making.**

| Type | Number | Percent |
|---|---|---|
| Indicators Exceeding Goals | 0 | -- |
| Indicators Not Exceeding Goals | 2 | 100% |
| Total Indicators Currently Measurable | 2 | 100% |
| Other Indicators (not tied to Goals) | 1 | -- |
| **TOTAL** | **3** | **--** |

There are 3 data indicators associated with Involving Children and Families in Case Planning and Decision Making. Of the 3 indicators, there are currently only 2 for which there is an established goal and available regional and state data to measure against best practice. 0 of the 2 indicators for which there is data meet or exceed the established goals indicating strengths in practice. 2 (100%) data indicator does not meet or exceed established goals and indicates an area of needed improvement.

Below is a summary of the strengths and areas needing improvement in relation to the practice model component of Involving Children and Families in Case Planning and Decision Making. All items area applicable to foster care cases ████████████████.

| INVOLVING CHILDREN AND FAMILIES IN CASE PLANNING AND DECISION MAKING | | | |
|---|---|---|---|
| | Item 7: Child and Family Involvement in Case Planning | Item 8: Caseworker Visits with Child | Item 9: Caseworker Visits with Parents |
| Total Strength | 0 | 11 | 0 |
| % | 0.0% | 45.8% | 0.0% |
| Total ANI | 24 | 13 | 22 |
| % | 100.0% | 54.2% | 100.0% |
| Total Applicable | 24 | 24 | 22 |

## Strengths in Practice

- There are no MACWIS data indicators that rate as a Strength for the region for Involving Children and Families in Case Planning and Decision Making practice model component.

## Areas Needing Improvement

| Data Indicators Associated with Involving Children and Families in Case Planning and Decision Making | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 |
|---|---|---|---|---|---|
| Children in custody shall receive documented twice-monthly, in-person visits by the assigned DFCS caseworker Data Source: MWZWC5S2 **October 1, 2013 through October 31, 2013 | Year III 60% Year IV 80% | 160 of 450 children in custody 35.6% | 315 of 503 children in custody 62.62% | 363 of 531 children 68.36% | 3269 of 4291 children 76.18% |

- The Year IV Goal for this measure is at least 80% of children in custody shall receive documented, twice-monthly, in-person visits by the assigned DFCS caseworker. Region 3-South does not meet this goal at 68.36%. However, this is a significant improvement from the August 2011 baseline performance of 35.6% and a slight improvement from the September 2013 follow-up performance.
- 45.8% of the 24 cases in the October 2013 on-site review rated a Strength for Caseworker Visits with Children. 78.6% of the foster care cases ███████████ reviewed during the October 2013 on-site case review rated a Strength for caseworker visits with the child;
- 92.86% of the foster care cases ████████████████████ reviewed in the October 2013 on-site review had caseworker contacts with children that were of a frequency sufficient to address issues pertaining to safety, permanency, and well-being of the child and promote the achievement of case goals;
- 78.57% of the caseworker contacts in foster care cases ██████████████████████ ████████ subject to the October 2013 on-site case review were of a quality sufficient to address issues pertaining to safety, permanency, and well-being of the child and promote achievement of case goals.

DHS
362179

| Data Indicators Associated with Involving Children and Families in Case Planning and Decision Making | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 |
|---|---|---|---|---|---|
| Children with a goal of reunification shall have their assigned DFCS caseworker meet monthly with the child's biological parents Data Source: MWZWCR3S **October 1, 2013 through October 31, 2013 | Year III 40% Year IV 60% | 8 of 253 children with plan of reunification 3.2% | 18 of 252 children with plan of reunification 7.14% | 18 of 165 children 10.91% | 75 of 1311 children 5.72% |

- The Year IV goal for this measure is that at least 60% of children with a goal of Reunification shall have their assigned DFCS caseworker meet monthly with the child's biological parents. Region 3-South does not meet this goal at 10.91%.
- None of the applicable foster care cases ▊▊▊▊▊▊▊▊ reviewed during the October 2013 on-site case review rated a Strength for Caseworker Visits with Parents;
- 41.67% of the foster care ▊▊▊▊▊▊▊▊ cases reviewed during the October 2013 on-site case review had caseworker visits with the mother that were of a frequency sufficient to address issues pertaining to safety permanency and well-being and none of the foster care cases ▊▊▊▊▊▊▊▊ had caseworker visits with the father that were of such a frequency.;
- 33.3% of the foster care cases reviewed ▊▊▊▊▊▊▊▊ had caseworker visits with the mother that were of a quality sufficient to address issues pertaining to safety, permanency, and well-being while none of the foster care ▊▊▊▊▊▊▊▊ cases reviewed had caseworker contacts with fathers that were of a quality sufficient to address issues pertaining to safety, permanency, and well-being;
- None of the foster care cases had documented diligent efforts made to locate the mother and one of the foster care cases had documented diligent efforts made to locate the father if contacts were not made with the parents due to their whereabouts being unknown. ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊

## *Other Key Indicators*

There are currently no MACWIS data indicators available for the items addressed below. However the region may want to use the following information from the on-site case reviews as indicators of practice in these areas:

- 100% of the foster care cases ▊▊▊▊▊▊▊▊▊▊ rated an Area Needing Improvement for Involving Children and Parents in Case Planning and Decision Making.
- The agency made concerted efforts to actively involve the **child** in the case planning process in 40% of the applicable foster care cases ▊▊▊▊▊▊▊▊▊.
- The agency made concerted efforts to actively involve the **mother** in the case planning process in 25% of the applicable foster care cases ▊▊▊▊▊▊▊▊▊. The agency made concerted efforts to actively involve the **father** in the case planning process in 0% of the applicable foster care cases ▊▊▊▊▊▊▊▊.
- There was evidence in 28.57% of foster care cases ▊▊▊▊▊▊▊▊▊ that the family was informed and prepared to actively participate in case events, including family team meetings, case plan development, and court events.
- There was evidence in 21.43% of the foster care cases ▊▊▊▊▊▊▊▊▊ that children and parents were involved in choosing the services included on their case plans.

- 8.33% of foster care cases ██████████████ reviewed contained case plans with signatures by the parents while 20% of foster care cases ████████████████ contained case plan with the signature of children ages 6 and up.

***Areas for Improvement Efforts to better address Involving Children and Families in Case Planning and Decision Making***

- A plan to improve the frequency and quality of visits taking place between caseworkers and children should be developed and implemented by the region to improve performance for involving children in case planning and decision making. It should be noted that the MACWIS data indicators show a significant increase in the caseworker/child contacts since the time of the August 2011 baseline review. The quality of these narratives appears to be an area of needed improvement based on the on-site case review results.
- A plan should be developed by the region to assure more frequent and more quality visits take place between caseworkers and parents of children who have a permanent plan of Reunification. This will result in more timely permanency for children in care and can also have a positive effect on the region's performance of other practice model components in both placement and in-home cases. Efforts to improve the involvement of parents (especially fathers) and children in the case planning process will also result in more timely permanency for children in the region who are in care and prevent foster care entries for children in the in-home cases.
- 

# Assessing Strengths and Needs

Comprehensive family assessment (CFA) is the ongoing and continuous process of gathering, organizing, and analyzing information for the purpose of informed decision-making and service planning concerning the safety, permanency, and well-being of children, youth, and families. Beyond an assessment of risks, safety and the circumstances leading to agency involvement, the CFA includes a broader focus of the strengths and needs of all individual family members along with underlying conditions affecting the family. Collaboration with key professionals throughout the process is critical.

The following practice principles are linked to this component:
- All families have unique strengths and needs;
- Families are participants in identifying their strengths and needs and in requesting services;
- Assessment includes strengths and needs regarding safety, permanency, and well-being;
- Assessment addresses underlying conditions in addition to presenting issues;
- All relevant family members' strengths and needs should be assessed;
- Assessment information is used to guide case planning and decision making;
- Families are best understood in the context of their culture;
- Early identification of concerns that can lead to emotional and behavioral disturbances are prioritized in assessments; and
- Assessments should be multidisciplinary.

The results below detail the findings of Region 3-South's current success in Assessing Strengths and Needs.

DHS
362181

**Number of Indicators Assessed: Assessing Strengths and Needs.**

| Type | Number | Percent |
|---|---|---|
| Indicators Exceeding Goals | 0 | -- |
| Indicators Not Exceeding Goals | 1 | 100% |
| Total Indicators Currently Measurable | 1 | -- |
| Other Indicators (not tied to Goals) | 3 | -- |
| **TOTAL** | **4** | **100%** |

There are 4 data indicators associated with Assessing Strengths and Needs. Of the 4 indicators, there is currently 1 for which there is an established goal and available regional and state data to measure against best practice. The 1 (100%) data indicator does not meet or exceed established goals and indicates an area of needed improvement.

Below is a summary of the strengths and areas needing improvement in relation to the practice model component of Assessing Strengths and Needs. All items area applicable to foster care cases and to in-home cases where educational issues were the reason for the case opening or became a factor after the case opened.

| ASSESSING STRENGTHS AND NEEDS | | |
|---|---|---|
| | **Item 5: Needs and Services of Child, Parents, and Foster Parents** | **Item 6: Educational Needs of the Child** |
| **Total Strength** | 2 | 7 |
| **%** | 8.3% | 63.6% |
| **Total ANI** | 22 | 4 |
| **%** | 91.7% | 36.4% |
| **Total Applicable** | 24 | 11 |

*Strengths in Practice*

There are currently no MACWIS data indicators available for the items within this component. Please see "Other Key Indicators" for on-site case review data that may be used to assess the region's performance in the area of Assessing Strengths and Needs.

DHS
362182

*Areas Needing Improvement*

| Data Indicators Associated with Assessing Strengths and Needs | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 |
|---|---|---|---|---|---|
| Have received a comprehensive health assessment within 30 days of entering care. Data Source: MWLS315S *November 1, 2012 through October 31, 2013 | Year III 50% Year IV 70% | Not Available | 25 of 290 children 9.77% | 47 of 257 children 18.29% | 614 of 2469 children 24.87% |

- o The Year IV goal for this measure is 70% of children in foster care will have a comprehensive health assessment within 30 days of entering care. Region 3-South does not meet this goal at 18.29% for the reporting period of November 1, 2012 through October 31, 2013.
- o Of the 2 applicable children in the October 2013 case review sample who came into agency custody during the period under review, 1 received a comprehensive health screening within 30 days of foster care entry.

*Other Key Indicators*

- • There are currently no MACWIS data indicators available for the items addressed below. However, the region may want to use the following information from the on-site case reviews as indicators of practice in these areas:

- • **Educational Needs of the Child:**
    - o The results from the October 2013 on-site case review show that 63.6% of foster care cases ▮▮ ▮▮▮▮▮▮ rated as a Strength for Assessing Educational Needs of the Child (On-Site Case Review Item 6).
    - o In 70% of the applicable foster care cases the agency made concerted efforts to assess and address the child's educational needs.
    - o 88.33% of the 6 applicable children in the case review sample were enrolled in an accredited school within 3 days of custody or placement.
    - o In the 2 applicable cases opened during the period under review, the child's educational needs were assessed within 30 days of entry into foster care in 2 (100%) of the cases.
    - o In the 2 applicable cases opened during the period under review, and the child was 3 years of age or younger, neither of them received a developmental assessment within 30 days of entry into foster care.

- • **Needs and Services of the Child, Parents, and Foster Parents:**
    - o The results from the October 2013 on-site case review show that 7.1% of the foster care cases rated a Strength ▮▮▮▮▮▮▮▮ rated a Strength for Needs and Services of the Child, Parents, and Foster Parents (On-Site Case Review Item 5).
    - o The case review results show that the needs of the child were assessed (formally or informally) initially and on-going in 78.57% of the foster care cases ▮▮▮▮▮▮▮. For cases opened during the period under review, these assessments occurred within the first 30 days of the case being opened in 33.33% of the applicable foster care cases a ▮▮▮▮▮▮▮ ▮▮▮▮▮▮. Services were provided to the children in a timely manner in 92.86% of the foster care cases ▮▮▮▮▮▮▮. The child was interviewed prior to the completion of the strengths and need assessment in 50% of the foster care cases ▮▮▮▮▮▮▮▮



DHS
362183

███. The child's involvement in the strengths and needs assessment (other than signatures) was apparent in 33.3% of the foster care cases ████████████████████████████.

o   The case review results show that the needs of the mother were assessed (formally or informally) initially and on-going in 50% of the applicable foster care cases ████████████████████████ ███████████. For cases opened during the period under review, these assessments with the mother occurred within the first 30 days of the case being opened in 50% of the applicable foster care cases ████████████████████████████████. Services were provided to the mother in a timely manner in 33.3% of the foster care cases ████████████████████████████. The mother was interviewed prior to the completion of the strengths and need assessment in 41.67% of the foster care cases ████████████████████. The mother's involvement in the strengths and needs assessment (other than signatures) was apparent in 33.3% of the foster care cases ███ ██████████.

o   During the review period, the agency in Region 3-South provided all needed services to the mother to meet identified and assessed needs in 45.45% of the foster care cases ████████ ██████████.

o   The case review results show that the needs of the father were assessed (formally or informally) initially and on-going in 8.33% of the foster care cases ████████████████████. There was no applicable foster care cases ███████████ ████████████████████████████████████████ ████████████████████████. Services were provided to the father in a timely manner in 0% of the foster care cases ████████████████████████████. The father was interviewed prior to the completion of the strengths and needs assessment in 16.67% of the foster care cases ████████████████████. The father's involvement in the strengths and needs assessment (other than signatures) was apparent in none of the foster care cases ███ ███████████████████.

o   During the review period, the agency in Region 3-South provided all needed services to the father to meet identified and assessed needs in none of the foster care cases ████████████████████ ███.

The case review results show that the needs of the foster/pre-adoptive family were assessed (formally or informally) initially and on-going in 66.67% of the foster care cases. Services were provided to the foster/pre-adoptive family in a timely manner in 66.67% of the cases. During the review period, the agency in Region 3-South provided all needed services to the foster/pre-adoptive family to meet identified and assessed needs in 66.67% of the cases.

*Areas for Improvement Efforts to better address Assessing Strengths and Needs*

- A child receiving a comprehensive health assessment within 30 days of entering custody is an area needing improvement for the region. The Year IV goal is 70%. As of the November 1, 2012 through October 31, 2013 reporting period, the region does not meet the 70% goal at 18.29%. The region does show an improvement over the 2012 performance of 9.77%.
- On-site case review results indicate that the region may need to develop and implement a plan to improve the assessment of strengths and needs. It appears assessments are taking place with the child and with foster/pre-adoptive parents more than with mothers and fathers. The percentage for foster/pre-adoptive parents is significantly higher than those of the mothers and fathers.

# Preserving and Maintaining Connections

When children enter foster care, they often become separated from the people and places that are the most familiar and comforting to them. This component of the practice model emphasizes the normalizing of connections and relationships for children in foster care to the extent that it is safe and appropriate to do so. The focus is on keeping children safe and stable within placement settings that permit them to retain important

relationships with family members, retain normalized sibling relationships and friendships, and maintain important traditions and connections that define them culturally, and continue being a part of the social institutions that nurture them, such as school, religion, and so forth.

The following practice principles are linked to this component:
- Foster care should support the family instead of substitute for the parents whenever possible and appropriate;
- Healthy child/parent relationships should be supported and maintained throughout a foster care episode if safe and appropriate to do so;
- Children in foster care have important connections and relationships that help to define them as individuals and members of a family, community, and culture;
- Caseworkers should work to normalize the connections and relationships for children in foster care to the extent that it is safe and appropriate to do so;
- Children should be allowed to retain important relationships with extended family, siblings, and other friendships as deemed safe and appropriate; and
- Agencies should ensure that important traditions, identity with social institutions, and cultural connections are maintained.

**Number of Indicators Assessed: Preserving and Maintaining Connections**

| Type | Number | Percent |
|---|---|---|
| Indicators Exceeding Goals | 1 | 50% |
| Indicators Not Exceeding Goals | 1 | 50% |
| Total Indicators Currently Measurable | 0 | -- |
| Other Indicators (not tied to Goals) | 4 | 100% |
| **TOTAL** | **4** | **100%** |

There are 4 indicators associated with the component of Preserving and Maintaining Connections. Currently there are 2 indicators that have data and/or goals available for which to assess strengths or needed areas of improvement. Both indicators have an established goal and available regional and state data to measure against best practice. 1 (50%) data indicator does not meet or exceed established goals and indicates an area of needed improvement. 1 (50%) data indicator does meet or exceed goals and indicates a strength in practice.

Below is a summary of the strengths and areas needing improvement in relation to the practice model component of Preserving and Maintaining Connections. All items area applicable to foster care cases.

| PRESERVING CONNECTIONS | | | | | | |
|---|---|---|---|---|---|---|
| | Item 19: Proximity of Foster Care Placement | Item 20: Placement with Siblings | Item 21: Visiting with Parents and with Siblings in Foster Care | Item 22: Preserving Connections | Item 23: Relationship of Child in Care with Parents | Item 24: Relative Placement |
| Total Strength | 12 | 9 | 3 | 11 | 1 | 6 |
| % | 85.7% | 90.0% | 21.4% | 78.6% | 8.3% | 46.2% |
| Total ANI | 2 | 1 | 11 | 3 | 11 | 7 |
| % | 14.3% | 10.0% | 78.6% | 21.4% | 91.7% | 53.8% |
| Total Applicable | 14 | 10 | 14 | 14 | 12 | 13 |

DHS
362185

*Strengths in Practice*

- The Year IV goal is that 90% of children who entered DFCS custody shall be placed within his/her own county or within 50 miles of the home from which he/she was removed unless one of the exceptions provided in the Modified Settlement Agreement is documented as applying. The region's performance is a combination of the two measures below.

| Data Indicators Associated with Preserving and Maintaining Connections | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 |
|---|---|---|---|---|---|
| Proximity of initial placement (placed out of county but within 50 miles) Data Source: MWLS314S **November 1, 2012 through October 31, 2013 | Year III: 85% Year IV: 90% | *Not Available* | 56 of 279 children in custody 20.1 % | 55 of 352 children 15.63% | 532 of 2649 children 20.08% |
| Proximity of initial placement (placed in county but within 50 miles) Data Source: MWLS314S **November 1, 2012 through October 31, 2013 | | *Not Available* | 193 of 279 children in custody 69.2 % | 274 of 352 children 77.84% | 1837 of 2649 children 69.35% |

- The table above reflects the proximity of initial placement of children in Region 3-South for the reporting period of November 1, 2012 through October 31, 2013. The data reflects that the majority of children's initial placements are placed in the county of their original home and within 50 miles. In Region 3-South, there were 352 children in the reporting population for the reporting period. 55 of those children were placed **outside of their home county but within 50 miles**. 274 were placed **in their home county and within 50 miles**. This results in 329 of 352 children in Region 3-South during the reporting period who were placed in his/her own county or within 50 miles of the home from which they were removed. Combining the two indicators regarding children placed in county but within 50 miles and children placed out of county but within 50 miles, the region's performance is 93% (329 within proximity/352 in total reporting population = 93%). The region meets the Year IV 90% requirement for the measure.

- **Proximity of Foster Care Placement (On-Site Case Review Item 19):**
  - o 85.7% of the 14 applicable foster care cases reviewed rated as a Strength;
  - o Case review results found 3 foster children to be in placements outside of the county from which they were removed.
  - o 2 children's placements were found to not be in close enough proximity to their parents to facilitate frequent face-to-face contacts with them. However, it was found that the proximity of the placement was necessary to meet the individual needs and case plan goals of the children.
  - o 4 children in the sample were not attending the same school as when they first came into DFCS custody. However, it was found in 4 cases that this was appropriate based on case circumstances.

DHS
362186

*Areas of Needed Improvement*

| Data Indicators Associated with Preserving and Maintaining Connections | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 |
|---|---|---|---|---|---|
| Contacts with parents and separated siblings. Source: MWLS318D, MWLS318S **October 1, 2013 through October 31, 2013 | Year III: 80% Year IV: 90% | *Not Available* | 4 of 262 children in custody 1.53% | 23 of 289 children 7.96% | 197 of 2695 children 7.31% |

o   This report was developed to document compliance with the *Olivia Y MSA* settlement agreement p.40.III.B.5.a which states: *"For all children entering foster case, a visitation plan for the child and his/her family shall be developed as part of the service plan. This visitation plan shall be developed and regularly updated in collaboration with parents, resource parents, and the child. If parental visitation is appropriate based on the above factors, this visitation plan shall include a minimum of two visits per month with the parents (unless a court order in the child's case limits such visits). For all children, regardless of permanency goal, this visitation plan shall include at least one visit per month with any siblings not in the same placement (unless a court order in the child's case limits such visits";*

o   The Year IV goal for this indicator is that at least 90% of children in custody will have monthly contact with their parents and/or separated siblings. The region does not meet the 90% goal at 7.69%.

• **Visiting with Parents and Siblings in Foster Care (On-Site Case Review Item 21)**
  o   21.4% of the foster care cases reviewed during the October 2013 on-site case review were rated a Strength on this item;
  o   Neither of the 2 applicable foster care cases (children who entered DFCS custody during the period under review) contained a visitation plan that was developed within the first 30 days of the child entering custody with 1 of 10 applicable cases having a visitation plan updated as circumstances warranted during the period under review, and 2 of the plans addressed all visitations (parents, siblings, connections, etc.);
  o   27.27% of applicable foster care cases had concerted efforts made during the period under review to ensure frequency of visitation (or other forms of contact if visitation was not possible) between the child and his/her **mother** was of sufficient frequency to maintain or promote the continuity of the relationship.  In 45.45% of the applicable cases, the quality of the mother/child visitation was sufficient in order to maintain or promote a continuity of the relationship.
  o   0% of the 10 applicable foster care cases had concerted efforts made to ensure frequency of visitation (or other forms of contact if visitation was not possible) between the child and his/her **father** was of sufficient frequency to maintain or promote the continuity of the relationship. During the period under review, concerted efforts were made in 0% of the 10 cases to ensure that the quality of the visitation (or other forms of contact if visitation was not possible) was of a sufficient frequency to maintain or promote a continuity of the relationship.
  o   71.43% of the foster care cases showed concerted efforts had been made to ensure visitation (or other forms of contact if visitation was not possible) between the child and his/her **siblings** was of sufficient frequency to maintain or promote the continuity of the relationship.  During the period under review, concerted efforts were made to ensure that the quality of the visitation (or other forms of contact if visitation was not possible) was of a sufficient quality to maintain or promote a continuity of the relationship in 71.43% of these cases.
  o   During the period under review, neither of the 2 applicable foster children had a visit with his/her parents within 24 hours of placement or, at a minimum, a phone call with relatives within the first 24 hours.

DHS
362187

*Other Key Indicators*

There are no data indicators available at this time from which to evaluate strengths and areas of needed improvement in order to set a baseline and establish a plan for corrective action. However, the information below from the on-site case reviews may be used by the Region to evaluate its current practice and to proceed with plans for corrective action.

The on-site case reviews conducted in Region 3-South in October 2013 reflect the following with regard to the Practice Model component of Preserving and Maintaining Connections:

- **Placement with Siblings (On-Site Case Review Item 20):**
  - 90% of the 10 applicable foster care cases reviewed in October 2013 rated as a Strength;
  - Of the 10 applicable foster children reviewed for this item, 7 children (70%) were placed with all of his/her siblings that are in foster care. Of the 2 children who were not placed with all of their siblings in foster care, there was a valid reason in 2 cases (66.67%) for the separation of the siblings such as it was necessary to meet the individual needs of the child or there were safety concerns.
- **Preserving Connections (On-Site Review Item 22):**
  - Of the 14 foster care cases reviewed in October 2013, 78.6% rated a Strength for Preserving Connections.
  - 78.57% of the foster care cases reviewed had concerted efforts made to maintain the child's important connections.
  - 13 of the 14 applicable foster care cases reviewed had a sufficient inquiry conducted with the parent, child, custodian, or other interested party to determine whether the child may be a member of or is eligible for membership in a Native American (Indian) tribe. None of the cases reviewed reflected where a child was identified who may have been a member of a tribe (or eligible for membership) and the tribe was not provided timely notification of its right to intervene in any State court proceedings seeking an involuntary foster care placement or termination of parental rights (TPR).
- **Relationship of Child in Care with Parents (On-Site Review Item 23):**
  - This item rated as a Strength in 8.3% of the applicable foster care cases reviewed;
  - Of the 4 applicable foster care cases reviewed, no cases had sufficient documentation/evidence that a meeting occurred between the birth parents and the resource parents within the first month of placement (*if the placement occurred during the period under review*);
  - Of the applicable foster care cases reviewed in October 2013, there was evidence of shared parenting responsibilities between the birth and resource parents in 8.33% of the cases.
- **Relative Placement (On-Site Review Item 24):**
  - This item rated as a Strength in 46.2% of the applicable foster care cases reviewed;
  - During the period under review, 5 foster children in the case review were placed with relatives. Of those 5, all but one child was found to be in a stable placement.
  - Of the foster children who were not placed with relatives, concerted efforts to identify, locate, and evaluate maternal relatives were made in 1 of the 7 applicable cases in the sample and in 1 of the 7 applicable cases with regard to paternal relatives.

*Areas for Improvement Efforts to better address Preserving and Maintaining Connections*

- The MACWIS data indicators from the annual follow-up review reporting period shows a need for improvement in the area of children having visits with their parents (if appropriate) and their siblings in care for whom they are separated. On-site case review results seem to indicate that the region may need to develop and implement a plan to improve performance in the area of Preserving and Maintaining Connections for children in foster care with regard to visitation with parents and siblings.

DHS
362188

- 8.3% of the cases in the on-site case review rated a Strength for Relationship of Child in Care with Parents. Efforts should be made to assure that meetings occur between birth parents and resource parents within the first month of placement and that efforts are made to implement shared parenting when it is appropriate and safe to do so.

## Individualizing Case Planning

An individualized case plan will start with information gathered from the comprehensive family assessment and should continue to be informed by the assessment throughout the life of the case. The development of the case plan, the review of the case plan and the overall planning process must involve all relevant family members, including parents who may not reside in the home, and age-appropriate children and youth. Individualized case plans must be developed *with* the family not *for* the family; occur early in the casework process; address the underlying issues that contribute to the presenting needs; include the safety plan; be written clearly in simple, straightforward language; demonstrate the family's culture and level of functioning; be flexible enough to change as the family's needs and progress toward achieving the identified goal changes; include independent living goals and specific plans and tasks for age appropriate youth; and be reviewed and updated regularly *with* the family.

The following practice principles are linked to this component:
- Timely decisions about goals and activities are made in collaboration with children, youth, and parents;
- The case plan is a guide for the agency's and service providers' work with children and families, and not simply a requirement to be met;
- The family's progress is monitored regularly in order to make timely decisions with regard to changing or continuing goals and services, or to take other actions to assure the safety, permanency and well-being of children; and
- Information from all available sources should be used to ensure any placement is the most appropriate for the child in order to assure timely permanency.

**Number of Indicators Assessed: Individualized Case Planning**

| Type | Number | Percent |
|------|--------|---------|
| Indicators Exceeding Goals | -- | -- |
| Indicators Not Exceeding Goals | 1 | 100% |
| Total Indicators Currently Measurable | 1 | -- |
| Other Indicators (not tied to Goals) | 5 | 100% |
| **TOTAL** | **5** | **100%** |

There are 5 data indicators associated with Individualizing Case Planning. There is currently 1 indicator that has data and/or goals available for which to assess strengths or needed areas of improvement. The 1 indicator for which there is data available shows an area of needed improvement.

Below is a summary of the strengths and areas needing improvement in relation to the practice model component of Individualizing Case Planning. All items area applicable to foster care cases.

DHS
362189

| INDIVIDUALIZING CASE PLANNING | | |
|---|---|---|
| | Item 10: Permanency Goal for Child | Item 11: Case Planning |
| Total Strength | 4 | 1 |
| % | 28.6% | 5.9% |
| Total ANI | 10 | 16 |
| % | 71.4% | 94.1% |
| Total Applicable | 14 | 17 |

## Strengths in Practice

There are currently no MACWIS data indicators available for the items within this component. Please see "Other Key Indicators" for on-site case review data that may be used to assess the Region's performance in the area of Assessing Strengths and Needs.

## Areas Needing Improvement

| Data Indicators Associated with Individualizing Case Planning | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 |
|---|---|---|---|---|---|
| Working with service providers, foster parents, the child, and the family, DFCS shall develop and document in the child's case record a permanency plan within 30 calendar days of the child's initial placement that specifies the permanency goal, a timeframe for achieving permanency, and activities that support permanency. Data Source: MWLS312S/D **November 1, 2012 through October 31, 2013 | Year III 90% Year IV 95% | Not Available | 65 of 278 children 23.38% | 12 of 252 children 4.76% | 113 of 2433 children 4.64% |

- The Year IV goal for the measure above it that 95% of children shall have a permanency plan developed and documented in their case record within 30 calendar days of the child's initial placement that specifies a permanency goal, a timeframe for achieving permanency, and activities that support permanency. The region does not meet the 95% goal at 4.76%.
- 28.6% of the foster cases reviewed rated as a Strength for **Permanency Goal for the Child (On-Site Case Review Item 10)**.
  - The permanency goal(s) for the child were specified in the case file in all 14 of the foster care cases reviewed. The permanency plan was developed within the child's first 30 days in care for children who entered custody during the period under review in 0 of the 3 applicable cases reviewed.
  - Permanency goals that were in effect during the period under review were established in a timely manner in 38.46% of the foster care cases reviewed in the sample.

DHS
362190

- o The permanency goals were appropriate to the child's needs for permanency and to the circumstances of the cases in 92.86% of the foster cases reviewed.
- o 9 of the 14 subject children had been in care for 15 of the most recent 22 months. Of those in custody 15 of 22 months, 4 had been referred for TPR in a timely manner. Of those who were not referred for TPR, 3 had documented compelling reasons for not pursuing TPR;
- o 33.33% of the cases reviewed with a goal of Reunification, contain documentation that reflects active concurrent permanency planning.
- o 2 children were discharged during the period under review. Of those, 1 child had an aftercare plan developed prior to discharge.

## *Other Key Indicators*

Due to there being no current data indicators available to establish a baseline or develop an improvement plan, the following information from the on-site case reviews could be utilized by the region to evaluate as to where practice may lie regarding the applicable indicators.

- o 0% of the 14 foster care cases reviewed rated a Strength ███████████████████ **Case Planning (On-Site Case Review Item 11)**.
  - o Results from the on-site case review show that a Family Team Meeting was used in the initial development of the case plan (if the initial plan was developed during the period under review) **and/or** was used to update case plans quarterly in 0 of the 12 of the Placement cases reviewed ███████████████████. The October 2013 review showed that there were Family Team Meetings within 30 calendar days of any placement or other significant change in 9.09% of Placement cases ███████████████.
  - o There was documentation of discussions of concurrent planning with birth parents in 33.3% of the Placement cases reviewed.

## *Areas for Improvement Efforts to better address Individualizing Case Planning*

- On-site case review data and MACWIS data indicators show that the region needs improvement in the area of establishing permanency goals for children in a timely manner and making efforts for establishing permanency for children who have been in state's custody for 15 of the most recent 22 months by referring the case for TPR in a timely manner or documenting an exception (compelling reasons) for not doing so.
- On site case review data reflects that the region needs continued improvement efforts in the area of case planning; specifically utilizing family team meetings to their fullest potential as a planned event with all appropriate case members in attendance in order to develop and update parental and child case plans.

# Section Two
# Systemic Factors

## Training of Staff and Providers

**Number of Indicators Assessed: Training of Staff and Providers**

| Type | Number | Percent |
|---|---|---|
| Indicators Exceeding Goals | -- | -- |
| Indicators Not Exceeding Goals | -- | -- |
| Total Indicators Currently Measurable | 0 | -- |
| Other Indicators (not tied to Goals) | 4 | 100% |
| **TOTAL** | **4** | **100%** |

There are 4 data indicators associated with Training of Staff and Providers. However, there is currently no MACWIS data indicators and/or goals yet established for these 4 items. The information from the stakeholder surveys could be used to partially evaluate where the agency may currently be with regarding to Training of Staff and Providers.

### *Strengths in Practice*

There are currently no data indicators available for which to evaluate strengths. Refer to the *"Other Key Indicators"* segment for strengths observed as a result of the Stakeholder Surveys received from Region 3-South.

### *Areas of Needed Improvement*

There are currently no data indicators available for which to evaluate areas of needed improvement. Refer to the *"Other Key Indicators"* segment for areas of needed improvement observed as a result of the Stakeholder Surveys received from Region 3-South.

### *Other Key Indicators*

o  Internal stakeholders were asked how effective DFCS is in providing and ensuring completion of adequate initial training for all new caseworkers/supervisors who provide child welfare services. The baseline data indicator goal for this item is 100%. Although there is no available data indicator information for this item at this time, 45% of those responding to the survey believe the agency is almost always or frequently providing adequate initial training for all new caseworkers and supervisors while 50% believe the agency is somewhat or rarely providing adequate initial training for new caseworkers and supervisors. The remaining 5% did not provide a response.

o  When asked how effective DFCS is in providing and ensuring completion of adequate, ongoing training for staff that addresses the skills and knowledge base needed to carry out their duties, 35% of the internal stakeholders responding believe the agency is almost always or frequently providing adequate ongoing training to its caseworkers and supervisors while 55% believe the agency is somewhat or rarely providing adequate ongoing training to its caseworkers and supervisors. Another 5% stated that the question was not applicable to them and the remaining 5% did not provide a response.

o  Relevant stakeholders were asked how effective DHS is in providing adequate training to placement providers that addresses the skills and knowledge needed to carry out their duties for current and prospective foster parents, relative caregivers, adoptive parents, and staff of state licensed or approved facilities. Results from the surveys show relevant stakeholders varied in their responses. 40% of Internal Stakeholders stated they believe the agency almost always or frequently provides adequate training, while

DHS
362192

another 40% believe the agency only somewhat or rarely provides adequate training, and an additional 15% of respondents stated that the question did no t apply to them.    The remaining 5% of internal stakeholders did not provide a response.

o   Of the external respondents, 71.4% believe that they almost always or frequently receive adequate training, while 23.8% stated that they somewhat or rarely receive adequate training,  and 4.8% stated that they had no information.

o   When taken together, 56.1% of respondents feel that the agency almost always or frequently provides adequate training, while 31.7% believe that the agency somewhat or rarely provides adequate training, and 9.8% stated that the question did not apply to them,  The remaining 2.4% did not provide a response .

o   When asked if DHS provides frequent training to license new foster homes, 61.8% of the external stakeholders who responded believe the agency almost always or frequently provides frequent training to new foster homes, while 28.6% stated that the agency somewhat or rarely provides frequent training. 4.8% stated that the agency never provides training, and the remaining 4.8% stated that they had no information.

### *Areas for Improvement Efforts to better address Training of Staff and Providers*

- Although there is no regional or state data indicator information available to establish a baseline and to determine strengths and areas needing improvement with regard to this systemic factor, stakeholder survey information could be used by the Region to evaluate the effectiveness of DFCS' performance with regard to these items.
- Based on the results of the relevant stakeholder surveys which (overall) were positive, DFCS should continue to focus its efforts on providing and ensuring completion of adequate initial training (for new caseworker and supervisors who provide child welfare services) and on-going training for all caseworkers and supervisors who provide child welfare services.
- Based on the results of the relevant stakeholder surveys which (overall) were positive, DFCS should continue to focus its efforts on providing adequate training to placement providers (current and prospective foster parents, relative caregivers, adoptive parents, and staff of state licensed or approved facilities) that addresses the skills and knowledge needed to carry out their duties.
- Based on the results of the relevant stakeholder surveys which (overall) were positive, DFCS should continue to provide frequent training to license new foster homes.

## Service Array

### Number of Indicators Assessed: Service Array

| Type | Number | Percent |
|---|---|---|
| Indicators Exceeding Goals | -- | -- |
| Indicators Not Exceeding Goals | -- | -- |
| Total Indicators Currently Measurable | 0 | -- |
| Other Indicators (not tied to Goals) | 1 | 100% |
| **TOTAL** | **1** | **100%** |

There is 1 data indicator associated with Service Array. Although there is no established goal, there is regional and state MACWIS data for these items as well as stakeholder survey information.

### *Strengths in Practice*

There are currently no data indicators available for which to evaluate strengths. Refer to the *"Other Key Indicators"* segment for strengths observed as a result of the Stakeholder Surveys received from Region 3-South.

*Areas of Needed Improvement*

There are currently no data indicators available for which to evaluate areas of needed improvement. Refer to the *"Other Key Indicators"* segment for areas of needed improvement observed as a result of the Stakeholder Surveys received from Region 3-South.

*Other Key Indicators*



| Data Indicators Associated with Service Array | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 |
|---|---|---|---|---|---|
| ███████ | ▮ | ██ ██ | ██ ██ | ██ ██ | ██ ▄ |

- o ████████████████████████████████████████████████████.
- o Relevant stakeholders were asked to rate the effectiveness of DFCS in the county/region at providing or contracting for an adequate range of services to support resource parents. 40% of respondents stated that the agency almost always or frequently provides for such services, while 55% stated that the agency somewhat or rarely provides for such services, and 5% stated that the question was not applicable to them.
- o ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.
  
  Of the relevant External Stakeholders responding, 31.25% believe the agency almost always or frequently provides effective and timely services, while 37.5% believe the agency somewhat or rarely provides effective and timely services. 12.5% of respondents stated that they had no information on this matter, and 18.75% of external respondents did not provide an answer.
- o Relevant stakeholders were asked about the accessibility of medical, dental, and mental health services. There was only one respondent to provide a response to this question, and in the case of Medical, Dental, and Mental Health services, these services were identified as almost always available and accessible. Internal Stakeholders were asked to describe the accessibility of these services and responses were mixed. Some respondents indicated that children receive appropriate and timely services, while others did not provide a response but rather listed all of the responsibilities which prevent workers from accessing these services timely.
- o When relevant stakeholders were asked how effective DFCS is in the county/region at providing or contracting for an adequate array of services to promote timely permanency of children in foster care, 25.5% report the agency is almost always or frequently effective in providing or contracting services towards permanency, 32.7% report the agency is somewhat or rarely effective in providing or contracting services towards permanency, and 3.6% stated that the agency is never effective in providing or contracting services towards permanency. Additionally, 7.3% stated that this question did not apply to them, another 7.3% stated that they had no information, and the remaining 23.6% did not provide a response.
- o External stakeholders were asked about how effective the agency is in providing or contracting for an adequate array of services to promote timely reunification of children in foster care with their families.

This question is asked of judges and court personnel and service providers. There was only one response collected for this question and it was that the respondent had no information.

o  Relevant internal and external stakeholders were asked to address how effective the county/region is at providing or contracting for an adequate array of services to promote timely adoptions. in Of those responding, 13.3% stated that the agency is almost always or frequently effective in providing such services, another 13.3% stated that the agency is somewhat or rarely effective in providing such services, 13.4% stated that the question did not apply to them and 40% stated that they had no information. The remaining 20% did not provide a response.

o  When asked how effectively the county/region individualizes or tailors services to meet the unique needs of the children and families, 9.5% of the judges/court personnel, service providers and caseworkers/supervisors responded that the agency almost always or frequently is effective in individualizing or tailoring services for children and families while 33.3% responded that the agency somewhat or rarely is effective in individualizing services. 4.8% stated that the agency is never effective in individualizing services, and 4.8% stated that the question did not apply to them, The remaining 47.6% did not provide a response.

o  Relevant stakeholders were asked how effective the county/region is at providing or contracting for an adequate array of services to youth in foster care to prepare them for independent living and to make the transition from foster care to adulthood. 22.86% of respondents stated that the agency almost always or frequently provides or contracts for an adequate range of services to youth in care to prepare them to live independently and transition from foster care to adulthood, 20% feel that the agency somewhat or rarely provides for such services, 5.71% stated that the agency never provides for such services. Additionally, 28.57% stated that they had no information, another 14.29% stated that the question was not applicable to them, and the remaining 8.57% did not provide a response.

*Areas for Improvement Efforts to better address Service Array*

- A large percentage of the questions regarding service array were not answered or did not have a sufficient number of responses to measure due to the fact that there was a small number of actual respondents. For instance, there was not a single response form any judge or court personnel solicited. The region may want to institute a plan for engaging all stakeholders in the quality improvement process, including their participation in stakeholder surveys, Regional Implementation Teams, and the Regional CQI Sub Team.

- Based on the survey results it appears that of the stakeholders who actually responded, more of them believe that the agency is not effective in individualizing services. Efforts to individualize and tailor services should be made or efforts to educate stakeholders on how this is done should be implemented.

## Placement Resources

### Number of Indicators Assessed: Placement Resources

| Type | Number | Percent |
|---|---|---|
| Measurable Indicators Exceeding Goals | | 0% |
| Measurable Indicators Not Exceeding Goals | 2 | 100% |
| Total Indicators Currently Measurable | 2 | 100% |
| Other Indicators (not tied to Goals) | 4 | -- |
| **TOTAL** | **6** | **100%** |

There are 6 indicators associated with Placement Resources. 2 of the indicators have goals associated with them by which to measure strengths and areas of needed improvement. 4 indicators have regional and state data but no goal by which to assess performance.

*Strengths in Practice*

The MACWIS data indicators do not show any strengths as it relates to placement resources in Region 3-South.

*Areas Needing Improvement*

| Data Indicators Associated with Placement Resources | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 |
|---|---|---|---|---|---|
| No child under 10 years of age shall be placed in a congregate care setting unless the child has exceptional needs that cannot be met in a relative or foster family home or the child is a member of a sibling group, and the RD has granted express written approval for the placement<br><br>Data Source: MWLS52HS<br>**October 1, 2013 through October 31, 2013 | 100% | 17 of 19 children 89.5% RD Approval | 11 of 13 children 84.62% RD Approval | 11 of 13 children 84.62% RD Approval | 89 of 95 children 93.68% RD Approval |

- The goal for this item is 100% and requires that no child under the age of 10 years shall be placed in a congregate care setting unless the child has exceptional needs that cannot be met in a relatives or foster family home or the child is a member of a sibling group, and the Regional Director has granted express written approval for the placement. The October 2013 data indicator shows that the region does not meet the year three standard for this indicator. 13 children met the criteria for the measure. 11 (84.62%) of those 13 children had written RD (Regional Director) approval for their placement.

| Data Indicators Associated with Placement Resources | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 |
|---|---|---|---|---|---|
| No child shall be placed in more than one emergency or temporary facility within one episode of foster care, unless an immediate placement move is necessary to protect the safety of the child or others as certified in writing by the RD<br><br>Data Source: MWLS51DS<br>**October 1, 2013 through October 31, 2013 | 100% | 57 of 81 child 70.37% RD Approval | 58 of 74 child 78.38% RD Approval | 54 of 68 children 79.41% RD Approval | 229 of 270 children 84.81% RD Approval |

- The goal for this item is 100% in that no child shall be placed in more than one emergency or temporary facility within one episode of foster care unless an immediate placement move is necessary to protect the safety of the child or others as certified in writing by the Regional Director. Region 3-South does not meet the year three standard at 79.41% as indicated above. However, this is a slight improvement from the August 2011 baseline performance of 70.37% and the September 2012 annual follow-up performance of 78.38%.

*Other Key Indicators*

| Data Indicators Associated with Placement Resources | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 |
|---|---|---|---|---|---|
| Number of Children in Foster Care by Placement Type (family based v. non-family based) Data Indicator: MWZ0510S *October 1, 2013 through October 31, 2013 | — | 370 of 425 children 87.1% | 328 of 441 children 74.38% | 418 of 483 children 86.54% | 3406 of 3827 children 89.00% |

- There is no established goal for *"Number of Children in Foster Care by Placement Type"*. However, the regional data indicator reveals that 86.54% of children in custody in Region 3-South are placed in family based placements as opposed to non-family based placements.

| Data Indicators Associated with Placement Resources | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 |
|---|---|---|---|---|---|
| Number of Licensed/Pending Foster Family Homes Data Source: MWZRESLS & MWZRESPS *Licensed Homes: October 1, 2013 through October 31, 2013 *Pending Homes: November 15, 2013 | — | 127 Licensed 25 Pending | 127 Licensed 75 Pending | 137 Licensed Foster Homes; 81 Pending Foster Homes | 2607 Licensed Foster Homes; 982 Pending Foster Homes |

o The table above shows the number of licensed foster family homes in Region 3-South as well as the number of those with a pending license. As of the reporting period, there are 137 licensed foster homes in the region with 81 pending licensure approval.

| Data Indicators Associated with Placement Resources | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 |
|---|---|---|---|---|---|
| Sibling groups, with one or more of siblings under 10, are not placed in congregate care settings for more than 45 days Data Source: MWLS53HS *October 1, 2013 through ) October 31, 2013 | — | 1 of 4 sibling groups 25% RD Approval | 2 of 4 sibling groups 50% RD Approval | 1 of 3 sibling groups 33.33% | 0 of 17 sibling groups 35.29% |

o The table above shows the number of sibling groups with one or more sibling under the age of 10 who are placed in congregate care settings for more than 45 days.

DHS
362197

| Data Indicators Associated with Placement Resources | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 |
|---|---|---|---|---|---|
| Children placed in unlicensed placements. Data Source: MWLS319S **October 1, 2013 through October 31, 2013 | – | Not Available | 41 of 501 children 8.18% | 34 of 531 children 6.40% | 539 of 4319 children 12.48% |

- The table above reflects the number of children in Region 3-South that are placed in unlicensed placements. For the reporting period of October 1, 2013 through October 31, 2013, there were 34 children in the region who are (or were) in licensed placement.
- Internal stakeholders were asked how effective the county/region has been in implementing a process for ensuring the diligent recruitment of potential resource families that reflect the ethnic and racial diversity of children needing resource homes. Of those responding, 5% stated the agency has  frequently implemented a process for recruiting ethnically diverse foster homes, 20% stated the agency has somewhat or rarely implemented a process for recruiting ethnically diverse foster homes, 10% stated the agency has never implemented a process for recruiting ethnically diverse foster homes, 10% stated that the question did not apply to them, and 55% skipped this question.
- Relevant stakeholders were asked if the resource families in the Region reflect the ethnic and racial diversity of the children in need of foster care and adoptive placements, and meet most of the foster care placement needs of the children it services. 27% of those respondents stated that the pool of resource families almost always or frequently reflects the racial and ethnic diversity of the children in need of foster care and adoptive placements, 20% stated that the pool of resource families somewhat or rarely reflects the racial and ethnic diversity of the children in need of foster care and adoptive placements, and 13% stated that the question was not applicable to them.  Additionally, 20% stated that they had no information and the remaining 20% did not provide a response.
- Of those relevant stakeholders who answered how effective the county/region is in expediting the licensing of relative resource parents, and giving them priority over resource parents in closer proximity, 15% stated the agency almost always or frequently effectively expedited the licensing of relative resource homes. 20% stated the agency rarely or somewhat effectively expedited the licensing of relative resource homes, and 5% stated that the agency never is effectively expediting the licensing of relative resource homes.  Another 5% stated that the question was not applicable to them and the remaining 55% of respondents skipped it altogether.
- Relevant External Stakeholders were asked if, in their opinion, DFCS is abiding by the policy that limits the number of children that may be placed in a foster home. 65% responded that they agency almost always or frequently abides by that policy while 10% stated that the agency somewhat or rarely abides by this policy,  15% stated that the question did not apply to them, and the remaining 10% of survey participants stated that they had no information on this subject.
- Relevant Internal Stakeholders were asked how effective the Region is in conducting criminal background checks on people interested in being foster and adoptive parents before licensing or approving them to care for children. 95% of respondents stated that the agency almost always or frequently is effective in doing so while 5% indicated that they had no information.
- Relevant Internal Stakeholders were asked how effective the Region is in recruiting foster and adoptive homes needed to care for the children in the county/region in foster care and in keeping these homes. 50% responded that the agency almost always or frequently is effective in recruiting and retaining homes while 35% stated that the agency somewhat or rarely is effective in recruiting and retaining these homes, and the remaining 15% responded that they had no information on this item.

DHS
362198

*Areas for Improvement Efforts to better address Placement Resources*

- The agency does not meet the goal for placing children in more than one emergency or temporary facility within one episode of foster care (unless an immediate placement move is necessary to protect the safety of the child or others as certified in writing by the Regional Director). Efforts to improve this measure should be implemented.
- The region does not meet the goal for placing children under the age of 10 in a congregate case setting unless the child has exceptional needs that cannot be met in a relative's home or a foster home (or the child is a member of a sibling group).
- Relevant stakeholder information seems to indicate the region may need to make improvement efforts in the area of expediting the licensing of relatives to provide resource care and in giving them priority over resource parents in closer proximity.
- Relevant stakeholder information seems to indicate that the region may need to make more concerted efforts in recruiting foster and adoptive resource homes that reflect the ethnic and racial diversity of the children in the Region in need of such placements.

# Caseloads

**Number of Indicators Assessed: Involving Children and Families in Caseloads.**

| Type | Number | Percent |
|---|---|---|
| Indicators Exceeding Goals | 2 | 67% |
| Indicators Not Exceeding Goals | 1 | 33% |
| Other Indicators (not tied to Goals) | -- | -- |
| **TOTAL** | **3** | **100%** |

There are 3 data indicators tied to Caseloads. Two of these indicators meet the current year's target goal.

*Strengths in Practice*

| Data Indicators Associated with Caseloads | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 |
|---|---|---|---|---|---|
| No more than 10% of caseworkers shall carry a caseload exceeding twice the caseload requirements (over 13,920 minutes) * For period ending October 31, 2013 (Includes Direct Service Workers and Resource Workers) | No more than 10% | 9 workers 18.4% | 17 workers 26% | 2 of 67 workers 2.99% | 17 of 751 workers 2.00% |

- The goal for this measure is that no more than 10% of caseworkers shall carry a caseload exceeding twice the caseload requirements (over 13,290 minutes). Data from the reporting month reveals that Region 3-South meets this goal in that only 2.99% of workers in the region carry caseloads which exceed 13,920 minutes.

DHS
362199

| Data Indicators Associated with Caseloads | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 |
|---|---|---|---|---|---|
| No caseworkers carry a caseload exceeding three times the caseload requirements (over 20,880 minutes) Data Source: MWASA9S1 * For period ending October 31, 2013 (Includes Direct Service Workers and Resource Workers) | 100% | 2 workers 95.9% | 4 workers 94.0% | 0 of 67 workers 00.00% | 1 of 751 workers .13% |

- The goal for this measure is that no caseworkers carry a caseload exceeding three times the caseload requirements (over 20,880 minutes). Data from the reporting month shows that Region 3-South is meeting this goal in that there are no caseworkers who carry caseloads over 20,880 minutes.

## Areas Needing Improvement

| Data Indicators Associated with Caseloads | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 |
|---|---|---|---|---|---|
| At least 75% of caseworkers carry a caseload that does not exceed Plan caseload requirements (over 6,960 minutes) Data Source: MWASA9S1 * For period ending October 31, 2013 (Includes Direct Service Workers and Resource Workers) | At least 75% | 25 workers 49% | 33 workers 50% | 31 of 67 workers 46.27% | 244 of 751 workers 32.49% |

- The Year III goal for this measure is that at least 75% of caseworkers carry a caseload that does not exceed caseload requirements (over 6,900 minutes). The data indicator from the reporting month reveals that the region does not meet this goal. 46.27% of the region's workers carry caseloads that do not exceed caseload requirements of 6,960 minutes.

## Other Key Indicators

o Internal stakeholders were asked to complete the Caseloads portion of the stakeholder survey. When asked if caseworkers have caseloads within the prescribed measures, 5% stated they frequently have caseloads within the prescribed limits, 15% stated they somewhat or rarely have caseloads within the prescribed limits, 10% stated they never have caseloads within the prescribed limits, and 10% stated that the question did not apply to them. The remaining 60% of respondents did not provide a response.

o Internal stakeholders were asked to describe any caseloads over the established limits – for example, are caseloads twice or three times the caseload requirements? 8 respondents commented on this survey item. Of those that answered, two respondents stated that the question did not apply, while the remaining six indicated that caseloads are over caseload limits. Most of the responses indicated that caseload distribution is not fair and is done based on favoritism.

## Areas for Improvement Efforts to better address Caseloads

- The region has improved in the area of caseloads since the time of the 2011 baseline and the 2012 annual review. However, the data indicators from the reporting month reveal that there are some caseworkers within

DHS
362200

the region who have caseloads that still exceed 6,960 minutes. This could be due to the turnover in some areas of the region or, as it is has been found in other areas of the state, due to Resource Workers having caseloads that are higher. Comments from the survey results seem to show that some workers feel that when staff turnover occurs, or while awaiting new workers to be trained, the workers are unfairly given high caseloads.  It also seems that workers feel that caseloads are not assigned fairly.

## Oversight and Monitoring

**Number of Indicators Assessed: Involving Children and Families in Oversight and Monitoring.**

| Type | Number | Percent |
|---|---|---|
| Indicators Exceeding Goals | 1 | 100% |
| Indicators Not Exceeding Goals | -- | -- |
| Total Indicators Currently Measurable | 1 | 100% |
| Other Indicators (not tied to Goals) | 2 | -- |
| TOTAL | 3 | -- |

There are 3 data indicators for the Oversight and Monitoring systemic factor. Only 1 of the 3 indicators currently has a goal identified with which to measure against performance. Region 3-South does meet the acceptable goal on that one data indicator.

### *Strengths in Practice*

| Data Indicators Associated with Oversight and Monitoring | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 |
|---|---|---|---|---|---|
| Supervisors, who supervise caseworkers, are responsible for supervising no more than 5 caseworkers<br>Data Source: MWASA5D2<br>*October 1, 2013 through October 31, 2013 | No more than 10% | 0 ASWSs 0% | 1 ASWSs 10% | 9 ASWSs 0 w/ > 5 workers 00.00% | 128 ASWSs 0 w/ > 5 workers 00.00% |

- o  This measure requires that supervisors, who supervise caseworkers, are responsible for supervising no more than 5 caseworkers. The region meets the goal of "No more than 10%" in that data from the baseline month show that none of the 9 supervisors in the region are responsible for supervising more than 5 caseworkers.

### *Areas Needing Improvement*

There are no data indicators that reflect an Area Needing Improvement in this area for Region 3-South. Stakeholder survey information in the "Other Key Indicators" section may be referred to in order to evaluate any areas of needed improvement.

### *Other Key Indictors*

- o  Internal stakeholders were asked to evaluate the ability of the quality assurance system (Evaluation and Monitoring, Foster Care Review, Supervisory Administrative Review) to assess effectively the quality of practice and outcomes, identify strengths and areas needing improvement measures. 10% stated the QA system almost always or frequently effectively assesses the quality of practice and outcomes, 25% stated

the QA system somewhat or rarely effectively assesses the quality of practice and outcomes, while 5% stated that this does not apply to them and 60% did not provide an answer.

o  Reported ways the system is beneficial is that processes such as Foster Care Review, Evaluation and Monitoring, and Supervisory Administrative Review are being done to staff cases and help to plan casework.  Most of the responses did not provide any report of the benefit of the Quality Improvement System.

o  Internal stakeholders surveyed were asked to evaluate the involvement of service providers, parents, youth, resource parents, group caregivers, relatives, tribes, court personnel, and/or stakeholders in the quality assurance process. 10% stated stakeholders are  frequently involved, 20% stated stakeholders are somewhat or rarely involved, 5% indicated that stakeholders are never involved, and 5% stated that the question was not applicable to them.  The remaining 60% did not provide a response.

o  External stakeholders were asked how effective DFCS is in providing information about the performance of their agency through data reports and other means, 27.8% stated the agency almost always or frequently provides information about performance, 19.4% stated the agency somewhat or rarely provides information about performance, 11.1% stated that the agency never provides information about performance.  Additionally, 30.6% stated that they had no information on the subject, 2.8% stated that the question did not apply to them,  and 8.3% chose not to answer the question.

o  When asked if the supervisor and the worker review cases quarterly through supervisory or peer review to assess the appropriateness of safety and permanency plans, 10% stated they almost always or frequently reviewed their cases with peers or a supervisor, 20% stated they somewhat reviewed their cases with peers or a supervisor and 10% stated that the question did not apply to them.  The remaining 60% did not provide an answer.

### Areas for Improvement Efforts to better address Oversight and Monitoring

• Survey responses were limited as it relates to internal stakeholders' perception of the quality improvement unit.  Efforts to include more staff in the quality improvement process should be made.

• Survey responses indicate that more efforts need to be made to ensure that supervisors and caseworkers review their cases at least quarterly to address case plans.

## Court Processes

### Number of Indicators Assessed: Court Processes.

| Type | Number | Percent |
|------|--------|---------|
| Indicators Exceeding Goals | 0 | 0% |
| Indicators Not Exceeding Goals | 5 | 100% |
| Other Indicators (not tied to Goals) | -- | -- |
| **TOTAL** | **5** | **100%** |

There are 5 data indicators associated with the Court Processes systemic factor. All 5 of the data indicators have goals established to measure performance and establish a baseline. All 5 data indictors for Region 3-South do not meet or exceed the established goals.

### Strengths in Practice

o  There are no MACWIS data indicators from the reporting period that show a strength in court processes for the region.

### Areas Needing Improvement

DHS
362202

| Data Indicators Associated with Court Processes | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 |
|---|---|---|---|---|---|
| Children who have been in custody at least 6 months have had a timely county conference Data Source: MWZTACRS *November 1, 2012 through October 31, 2013 | Year III 90% Year IV 95% | 369 of 391 children 94.4% | 391 of 428 children 91.36% | 405 of 437 children 92.68% | 3404 of 3571 children 95.32% |

The region does not meet the Year IV Goal of 95% in that 92.68% of the children in custody at least six months have had a timely county conference.

| Data Indicators Associated with Court Processes | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 |
|---|---|---|---|---|---|
| Children in custody at least 12 months have had a timely annual court review Data Source: MWZTPHRS *November 1, 2012 through October 31, 2013 | Year III 90% Year IV 95% | 111 of 336 children 33% | 116 of 399 children 29.07% | 117 of 403 children 29.03% | 1804 of 3158 children 57.12% |

- The Year IV goal for this item is that 95% of children in custody at least 12 months have had a timely annual court review. The region does not meet this measure in that 29.03% of the children have had such hearings in a timely manner. This appears to be the trend for Region 3-South over the last three years.

| Data Indicators Associated with Court Processes | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 |
|---|---|---|---|---|---|
| Children in custody reaching the point at which they have spent 15 of the previous 22 months in foster care with no ASFA exception noted will have a petition for TPR filed on their behalf Data Source: MWZ014S1 *As of November 5, 2013 | Year III 80% Year IV 90% | 10 of 111 children 9% | 13 of 93 children 13.97% | 23 of 87 children 26.43% | 528 of 1020 children 51.76% |

- The Year IV goal for this measure is 90% of children in custody reaching the point at which they have spent 15 of the most recent 22 months in foster care with no Adoption Safe Families Act (ASFA) exception noted will have a petition for termination of parental rights (TPR) filed on their behalf. The region does not meet this goal in that 26.43% of children with in custody 15 of the most recent 22 months with no ASFA exception noted have had a TPR petition filed on their behalf.

DHS
362203

| Data Indicators Associated with Court Processes | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 |
|---|---|---|---|---|---|
| Children in custody who have spent more than 15 of the previous 22 months in FC without a TPR petition filed will have an exception noted or a TPR filed § Data Source: MWZ014S1 & MWZ014S2 *As of November 5, 2013 | Year III 80% Year IV 90% | 134 of 235 children 57% | 131 of 211 children 62.09% | 146 of 210 children 69.52% | 1171 of 1663 children 70.41% |

- The Year IV goal for this data indicator is 90% of children in custody who have spent more than 15 of the most recent 22 months in foster care without a TPR petition filed will have an exception noted or a TPR filed. Region 3-South does not meet this goal at 69.52%.

| Data Indicators Associated with Court Processes | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 |
|---|---|---|---|---|---|
| A termination of parental rights petition shall be filed on behalf of children who have spent 17 of the previous 22 months in foster care by the last day of a child's seventeenth month in care, unless an available exception under ASFA has been documented in the child's case record. Data Source: MWZ017S1 **through October 31, 2013 | Year III 80% Year IV 90% | Not Available | 139 of 234 children 59.40% | 166 of 271 children 61.25% | 970 of 1615 children 60.06% |

- This measure requires that 90% of children who have spent 17 of the previous 22 months in foster care shall have a petition for TPR filed on their behalf by the last day of the child's 17th month in care unless an available exception under ASFA has been documented in the child's case record. The region does not meet the 90% goal in that 61.25% of the children who meet the reporting criteria have had a TPR referral made on their behalf or have an ASFA exception noted in their case record.

*Other Key Indictors*

o  When asked how effective the Foster Care Review/County Conference process is in helping ensure that children have the appropriate goals and achieve goals timely, 40% of the external stakeholders stated the FCR process is almost always or frequently effective, while 35% state that the FCR process is somewhat effective and 5% stated that the FCR process is not at all effective. The remaining 20% did not provide a response.

o  Internal stakeholders were asked to evaluate the effectiveness of the 6 month reviews in promoting timely achievement of permanency for all children in foster care. 15% stated that the 6 month reviews were frequently effective in promoting timely permanency, 15% stated the 6 month reviews were somewhat or rarely effective in promoting timely permanency, and 10% of respondents answered N/A. The remaining 60% of respondents did not provide an answer to the question.

o  External stakeholders were asked how effective the county/region is at making sure that foster parents, pre-adoptive parents and relative caregivers receive notice of reviews and hearings, and have an opportunity to be heard. 60% stated the agency almost always or frequently was effective in making sure resource parents receive notice. 15% stated the agency was rarely effective in making sure the resource

parents receive notice, and 5% stated that the question did not apply to them.   The remaining 20% stated that they had no information.

o   When relevant stakeholders were asked how effective the county/region is in filing for termination of parental rights when a child is in foster care for 15 of the most recent 22 months and there is no compelling reason not to file, 9.5% stated the agency  frequently is effective in filing for TPR; 23.8% stated the agency is somewhat or rarely effective in filing for TPR and 4.8% answered "No Information". Another 4.8% answered "N/A", and 57.1%% did not provide an answer.

o   Relevant external stakeholders were asked how effective the 12 month court hearings are for children in foster care in addressing timely permanency. 30% responded that the 12 month hearings are almost always or frequently effective in addressing timely permanency, 15% stated that the 12 month court hearings are somewhat or rarely effective in addressing timely permanency, 10% stated that the 12 month court hearings are never effective in addressing timely permanency.  Additionally, 10% stated that the question was not applicable to the, and the remaining 35% stated that they had no information.

o   Relevant external stakeholders were asked how effective the county/region is in ensuring that each child in foster care had a permanency hearing in a qualified court no later than 12 months from the date the child entered foster care and no less frequently than every 12 months thereafter. For this particular question, there was not a single response. It should be noted that there were only eight judges and court personnel in the region to whom this question was asked, and that none of those solicited responded to the survey.

*Areas for Improvement Efforts to better address Court Processes*

•   The region does not meet the Year IV goal of 95% for children in custody at least 6 months having a timely county conference.

•   The region does not meet the Year IV goal of 95% for children having timely permanency hearings. The region should develop a strategy to ensure that permanency hearings are held in a timely manner to improve performance and promote timely permanency for children in care. The region may also want to consider raising awareness among relevant external stakeholders on the importance of holding these hearings in a timely manner.

•   The region does not meet the Year III goal of 90% for children in custody 15 of the most recent 22 months having a petition for termination of parental rights filed on their behalf or have an ASFA exception noted in their case plan. Relevant stakeholder survey responses seem to reflect a need for improvement in these areas as well. Strategies such as internal permanency reviews, complimented by 6 month Foster Care Review reviews and reports, could assist in improved performance in these areas.

•   The region does not meet the Year IV goal of 90% for a termination of parental rights petition to be filed on behalf of children who have spent 17 of the previous 22 months in foster care by the last day of a child's seventeenth month in care, unless an available exception under ASFA has been documented  in the child's case record.

•   It is concerning that for the area of court processes there was not a single survey respondent.  Efforts to engage court personnel in case activities should be made.

# Data Quality and Usage

## Number of Indicators Assessed: Data Quality and Usage

| Type | Number | Percent |
|------|--------|---------|
| Indicators Exceeding Goals | -- | -- |
| Indicators Not Exceeding Goals | -- | -- |
| Other Indicators (not tied to Goals) | -- | -- |
| **TOTAL** | **0** | -- |

There are currently no proposed data indicators for Data Quality and Usage. The source for the evaluation of this systemic component and Region 3-South's performance is from the relevant stakeholder survey information.

### Strengths in Data Quality and Usage

o   Currently, there are no proposed indicators for Data Quality and Usage.

### Areas of Needed Improvement

o   Currently, there are no proposed indicators for Data Quality and Usage.

### Other Key Indicators

o   Internal stakeholders were asked to evaluate whether data reports are useful and current, and are provided to staff, supervisors, and administrators in a timely manner. 10%   stated the data reports are almost always or frequently useful, current, and provided to staff in a timely manner; 15% stated the data reports are somewhat or rarely useful, current and provided to staff in a timely manner, 5% stated that the data reports are never useful, current and provided to staff in a timely manner.  Additionally 10% responded with "N/A", and the remaining 60% did not answer the question.

o   Comments of those surveyed were minimal as it comes to data reports.  One respondent simply stated that Hinds County can see the strengths and the weaknesses.  Most others simply entered NA, and the remaining respondent gave a negative response to the data reports.

### Areas for Improvement Efforts to better address Data Quality and Usage

•   It is recommended that administrative staff within the Region (including Foster Care Review and Evaluation and Monitoring staff) continue to stress the importance of utilizing data to measure performance and make improvements as well as the importance of accurate and timely data entry in order to give as accurate a picture as possible of the work that is being conducted in the region.  Efforts to improve employee morale may also be beneficial to the region, based on survey responses.

DHS
362206

# <u>Next Steps</u>

## Data-to-Action Meeting

Within 30 working days after the region has received and reviewed this report, CQI staff will meet with the Regional Director and staff from within the region (Area Social Work Supervisors, Practice Coaches, other key staff,) to conduct a "Data-to-Action" meeting to review the results of this report in order to inform practice in the region and guide the Regional Implementation Plan process. As a means of ensuring that Continuous Quality Improvement (CQI) findings and data are actually used to craft plans for implementing the Practice Model and to meet the requirements of the Settlement Agreement, the State Office CQI Unit will conduct Data-to-Action meetings in the regions in which reports are issued following baseline and follow-up Evaluation and Monitoring reviews. Data-to-Action meetings were established as a means for the State Office CQI Unit to collaborate with regions shortly after the finalized regional CQI report is received following an Evaluation and Monitoring baseline and/or annual follow-up review. The Evaluation and Monitoring Liaison, the Foster Care Reviewer, Regional Implementation Team representatives, and key external stakeholders are also in attendance. These meetings aid in the interpretation of the case review results and data indicators, along with information obtained through stakeholder surveys and Foster Care Review

## Regional CQI Sub-Team

As part of the Implementation Team structure, Regional CQI Sub-Teams are to be formed in the regions composed of staff members with different duties. For example, the Sub-Team may be composed of ASWS, frontline workers, Practice Coaches, regional staff, resource workers or other staff members as well as any external stakeholders designated by the Department of Human Services. These teams report to the Regional Implementation Teams. Regional Evaluation and Monitoring Liaisons and Foster Care Reviewers help to facilitate these teams as they are convened.

The purposes of the Regional CQI Sub-Teams are to regularly review the data and other information pertaining to region's progress in meeting progress goals/benchmarks; identify areas needing improvement in performance or outcomes; recommend ongoing review activities; and report to the Regional Implementation Team (RIT) on the status of the region's progress. The regional CQI Sub-Teams may conduct needs and strengths assessments for individual counties in the region to analyze what is working well for particular counties in order to share with other RIT members. By analyzing the practice behind what the data reflects, the information could promote overall growth for the region. Where areas in need of improvement are identified, current practices could be analyzed to identify any barriers or systemic issues that could be hindering improvement towards meeting Agency policy and standards.

Items addressed during the Regional CQI Sub-Team are part of a strategic process to identify areas in need of improvement by using the social work process: engagement, data collection, assessment, intervention strategies, monitor / evaluate, then termination. The CQI Sub-Team has the ability to change focus on areas as the individual needs of the region may change. Each CQI Sub-Team member has assigned agreed upon tasks to complete by the next scheduled meeting. The team may identify and implement any improvement strategies that are needed by the region.

The activities and assessments of the CQI Sub-Team can be shared in the RIT meetings that also include external stakeholders. By identifying and sharing needs and strengths, the outside providers have a better understanding of how their services can better benefit the clients of DFCS. If systemic issues arise with a stakeholder, the issue can directly be addressed to elevate any barriers or advocacy can begin to promote better working relationships with providers. DFCS practice model encourages involvement of outside providers in case planning. Communication

DHS
362207

can be enhanced so that more effective and efficient services can be provided by DFCS staff as well as stakeholders so that more comprehensive services can be provided to clients.

## Monthly Case Reviews

Monthly Evaluation and Monitoring case reviews will take place during the coming year which will mimic the on-site case review process. The Foster Care Review Program will also continue to conduct case reviews and county conferences on children who have been in state's custody for at least 5 months. The results of the EMU case reviews, Foster Care Review Periodic Administrative Determination (P.A.D.) along with information from monthly MACWIS data reports will be shared with the Regional CQI Sub-Team in periodic meetings to develop recommendations for improvement strategies for the region that will be reported to the Regional Implementation Team.

## Next On-Site Case Review

In 12 to 14 months, the Division of Evaluation and Monitoring will conduct another follow-up review to measure progress on performance on areas of the Practice Model components and Systemic Factors.

DHS
362208

# APPENDIX

- **3-South Data Indicator Tables**
- **3-South Summary of Areas Needing Improvement**

DHS
362209

**Region III South**

**CQI Review Report**

October. 2013

## Practice Model Components

| Mobilizing Appropriate Services Timely | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Data Indicators Associated with Mobilizing Appropriate Services Timely** | **Goal/ Compliance Measure** | **Region August 2011** | **Region September 2012** | **Region October 2013** | **State October 2013** | **Hinds** | **Warren** |
| Placement Stability - Number of children in custody 12 months or less that have had 2 or fewer placement moves Data Source: MWZPLM5S *As of October 31, 2013 | Year III 60% Year IV 75% | 224 of 311 children; 72% | 289 of 207 children; 71.63% | 241 of 360 children 66.94% | 1900 of 2795 children 67.98% | 211 of 320 children 65.94% | 30 of 40 children 75.00% |
| Placement Stability - Number of moves for all children regardless of time in custody Data Source: MWBRD07S & MWBRD07T *As of October 31, 2013 | — | 1 - 2 moves: 192 of 433 children 45.8% 3 - 5 moves: 131 of 419 children 31.3% 6> moves: 96 of 419 children 22.9% | 1 - 2 moves: 220 of 419 children 50.81% 3 - 5 moves: 123 of 433 children 28.41% 6> moves: 90 of 433 children 20.79% | 1-2 moves: 172 children - 87.76%; 3-5 moves - 20 children - 10.20%; >6 moves - 4 children - 2.04% | 1-2 moves: 1771 children - 94.10%; 3-5 moves: 101 children - 5.37%; >6 moves 11 children - .58% | 1-2 moves: 154 children - 87.00%; 3-5 moves: 19 children - 10.73%; >6 moves: 3 children - 1.69% | 1-2 moves: 18 children - 94.74%; 3-5 moves: 1 child - 5.26%; >6 moves: 0 children - 00.00% |
| Children in custody, ages 14 - 20, are provided with independent living services per their service plan ** Data Source: MWBRD16S *November 1, 2012 through October 31, 2013 | Year III 90% Year IV 95% | 98 of 219 children 44.8% | 66 of 216 children 30.56 | 62 of 240 children 25.83% | 576 of 1382 children 41.68% | 54 of 219 children 24.66% | 8 of 21 children 38.10% |
| Children discharged from custody and reunified with parents/caretakers in the last year are reunified within 12 months of latest removal from home Data Source: MWBRD05S & MWBRD05C **November 1, 2012 through October 31, 2013 | Year III 60% Year IV 70% | 78 of 107 children  72.9% | 59 of 116 children 50.86% | 40 of 80 children 56.34% | 512 of 997 children 51.35% | 32 of 61 children 52.46% | 8 of 10 children 80.00% |

**Region III South**

**CQI Review Report**

October. 2013

## Practice Model Components

| Mobilizing Appropriate Services Timely | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Data Indicators Associated with Mobilizing Appropriate Services Timely** | **Goal/ Compliance Measure** | **Region August 2011** | **Region September 2012** | **Region October 2013** | **State October 2013** | **Hinds** | **Warren** |
| Children discharged in the last year upon finalization of an adoption have had the adoption finalized within 24 months of the latest removal from home. Data Source: MWBRD10D & MWBRD10S *November 1, 2012 through October 31, 2013 | Year III 25% Year IV 30% | 2 of 14 children 14.3% | 2 of 16 children 12.50% | 1 of 9 children 11.11% | 0 of 27 children 00.00% | 1 of 5 children 20.00% | 0 of 4 children 00.00% |
| Children in custody have received periodic medical examinations and all necessary follow-up services and treatment | At least 40% of children in custody | | | *Not yet available* | | | |
| Children in custody have received a dental examination every 6 months and all medically necessary dental services | At least 40% of children age 3 and over in custody | | | *Not yet available* | | | |
| Children in custody have received a mental health assessment by a qualified professional within 90 calendar days of placement or their 4th birthday, respectively, and all recommended mental health services pursuant to his/her assessment | At least 40% of children age 4 and over in custody | | | *Not yet available* | | | |
| Children in custody have received a developmental assessment, by a qualified professional, and all needed developmental services. | At least 40% of relevant children in custody | | | *Not yet available* | | | |

DHS
362211

**Region III South**

**CQI Review Report**

October. 2013

## Practice Model Components

| Mobilizing Appropriate Services Timely | | | | | | | |
|---|---|---|---|---|---|---|---|

| Data Indicators Associated with Mobilizing Appropriate Services Timely | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 | Hinds | Warren |
|---|---|---|---|---|---|---|---|
| Children re-entering foster care within 1 year of reunification. Data Source: MWLS311S *November 1, 2012 through October 31, 2013 | – | n/a | 15 of 237 children 6.33% | 18 of 245 children 7.35% | 106 of 1812 children 5.85% | 18 of 204 children 8.82% | 0 of 41 children 00.00% |

DHS
362212

.

**Region III South**

'QI Review Repoɪ

October.2013

## Practice Model Components

| Assuring Safety and Risk Management | | | | | | | |
|---|---|---|---|---|---|---|---|
| Data Indicators Associated with Assuring Safety and Managing Risk | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 | Hinds | Warren |
| All investigations into reports of maltreatment, including corporal punishment, of children in DFCS custody must be initiated within 24 hours of the report and completed within 30 calendar days, including supervisory approval Data Source: MWZ1271R & MWZ1271S *October 1, 2013 through October 31, 2013 | 100% | Total Investigations 15 Timely Initiated: 12 investigations 80% Timely Completed: 1 investigation 16.7% | Total Investigations 7 Timely Initiated: 6 investigations 85.7% Timely Completed: 1 investigation 33.3% | 6 of 9 investigations initiated timely - 66.67%; 4 of 6 investigations completed timely - 66.67% | 70 of 85 investigations initiated timely - 82.35%; 25 of 46 investigations completed timely - 54.35% | 6 of 9 investigations initiated timely - 66.67%; 4 of 6 investigations completed timely - 66.67% | N/A |
| Investigation timeliness for all children Data Source: MWZ1272S & MWZ1272R **October 1, 2013 through October 31, 2013 | 100% | Timely Initiated REDACTED L3= 85 70.8% investigations Timely Completed: L3= 11 19.6% investigations | Timely Initiated L3= 52 61.2% investigations Timely Completed: L3= 24 40.% investigations | REDACTED **Level 3:** 108 of 132 investigations initiated in 24 hours - 81.82%; 51 of 87 investigations completed within 30 days - 58.62% | **Level 3:** 997 of 1187 investigations initiated in 24 hours 83.99%; 745 of 934 investigations completed within 30 days - 79.76% | REDACTED **Level 3: 94 of 114** investigations initiated in 24 hours 82.46%; 46 of 77 investigations completed within 30 days - 59.74% | **Level 3:** 14 of 18 investigations initiated in 24 hours - 77.78%; 5 of 10 investigations completed within 30 days - 50.00% |
| Rate of Abuse / Neglect / Maltreatment in Care Data Source: MWBRD06S **November 1, 2012 through October 31, 2013 | Year III - 1.00% Year IV - Less than .5% | 0.83% of 721 children in custody | 1.47% of 745 children in custody | 3 of 563 children .53% | 74 of 4475 children 1.65% | 2 of 509 children .39% | 1 of 54 children 1.85% |

DHS
362213

**Region III South**

'QI Review Repor

October.2013

## Practice Model Components

| Assuring Safety and Risk Management | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Data Indicators Associated with Assuring Safety and Managing Risk** | **Goal/ Compliance Measure** | **Region August 2011** | **Region September 2012** | **Region October 2013** | **State October 2013** | **Hinds** | **Warren** |
| Recurrence of Maltreatment | | | | *Not Currently Available* | | | |
| Any foster child who remains in the same out of home placement following an investigation into a report that he/she was maltreated, or subject to corporal punishment, in that placement shall be visited by a DFCS caseworker twice a month for three months after the conclusion of the investigation Data Source: MWLS55AS & MWLS55AD *October 1, 2013 through October 31, 2013 | 100% | 0 of 5 children 0% | 1 of 7 children 14.29% | 8 of 11 children 72.73% | 55 of 89 children 61.80% | 4 of 7 children 57.14% | 4 of 4 children 100.00% |
| Foster parents with at least one foster child residing in their home shall have a DFCS worker visit the home monthly (therapeutic FH) or monthly (non-therapeutic FH) Data Source: MWZPLMCS & MWZPLMS2 *October 1, 2013 through October 31, 2013 | Year III 40% Year IV 60% | Foster Homes: 43 of 224 children 19.2% Thera Foster Homes: 2 of 83 children 2.4% | Foster Homes: 60 of 231 children 25.97% Thera Foster Homes: 16 of 90 children 17.77% | Therapeutic: 30 of 94 children - 31.91% Non-Therapeutic: 126 of 245 children - 51.42% | Therapeutic: 95 of 230 children - 41.30% Non-Therapeutic: 1442 of 2383 children - 60.51% | Therapeutic: 30 of 87 children - 34.48% Non-Therapeutic: 110 of 213 children 51.64% | Therapeutic: 0 of 7 children - 00.00% Non-Therapeutic: 16 of 32 children - 50.00% |

DHS
362214

**Region III South**

:QI Review Repoi

October.2013

## Practice Model Components

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Assuring Safety and Risk Management | | | | | | | |
| **Data Indicators Associated with Assuring Safety and Managing Risk** | **Goal/ Compliance Measure** | **Region August 2011** | **Region September 2012** | **Region October 2013** | **State October 2013** | **Hinds** | **Warren** |
| At least 70% of children in custody who are reunified during the period shall receive a 90 day trial home visit period or have case record documentation reflecting the Youth Court's objection to such a trial home visit. During that trial home visit period, the child's caseworker or a Family Preservation caseworker shall meet with the child in the home at least two times per month, and DFCS shall provide or facilitate access to all services identified in the child's after-care plan, consistent with plan requirements.<br>Data Source: MWLS54AS<br>*October 1, 2013 through October 31, 2013 | Year III 70% | Not Available | Not Available | 5 of 8 children 62.50% | 100 of 177 children 56.50% | 5 of 6 children 83.33% | 0 of 2 children 00.00% |

DHS
362215

Region III South
## CQI Review Report
October.2013

## Practice Model Components

| Involving Children and Families | | | | | | | |
|---|---|---|---|---|---|---|---|

| Data Indicators Associated with Involving Children and Families in Case Planning and Decision Making | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 | Hinds | Warren |
|---|---|---|---|---|---|---|---|
| Children in custody shall receive documented twice-monthly, in-person visits by the assigned DFCS caseworker Data Source: MWZWC5S2 **October 1, 2013 through October 31, 2013 | Year III 60% Year IV 80% | 160 of 450 children in custody 35.6% | 315 of 503 children in custody 62.62% | 363 of 531 children 68.36% | 3269 of 4291 children 76.18% | 330 of 469 children 70.36% | 33 of 62 children 53.23% |
| Children with a goal of reunification shall have their assigned DFCS caseworker meet monthly with the child's biological parents Data Source: MWZWCR3S **October 1, 2013 through October 31, 2013 | Year III 40% Year IV 60% | 8 of 253 children with plan of reunification 3.2% | 18 of 252 children with plan of reunification 7.14% | 18 of 165 children 10.91% | 75 of 1311 children 5.72% | 17 of 146 children 11.64% | 1 of 19 children 5.26% |

DHS
362216

**Region III South**
**CQI Review Report**
October.2013

## Practice Model Components

| | Assessing Strengths and Needs | | | | | | |
|---|---|---|---|---|---|---|---|

| Data Indicators Associated with Assessing Strengths and Needs | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 | Hinds | Warren |
|---|---|---|---|---|---|---|---|
| Receives a comprehensive strength and needs assessment | | | | *Not Currently Available* | | | |
| Have received a comprehensive health assessment within 30 days of entering care. Data Source: MWLS315S *November 1, 2012 through October 31, 2013 | Year III 50% Year IV 70% | Not Available | 25 of 290 children 9.77% | 47 of 257 children 18.29% | 614 of 2469 children 24.87% | 32 of 226 children 14.16% | 15 of 31 children 48.39% |

DHS
362217

Region III South
**CQI Review Report**
October.2013

# Practice Model Components

| | Preserving and Maintaining Connections | | | | | | |
|---|---|---|---|---|---|---|---|

| Data Indicators Associated with Preserving and Maintaining Connections | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 | Hinds | Warren |
|---|---|---|---|---|---|---|---|
| Contacts with parents and separated siblings. Source: MWLS318D, MWLS318S **October 1, 2013 through October 31, 2013 | Year III: 80% Year IV: 90% | *Not Available* | 4 of 262 children in custody 1.53% | 23 of 289 children 7.96% | 197 of 2695 children 7.31% | 21 of 242 children 8.68% | 2 of 47 children 4.26% |
| Proximity of initial placement (placed out of county but within 50 miles) Data Source: MWLS314S **November 1, 2012 through October 31, 2013 | Year III: 85% Year IV: 90% | *Not Available* | 56 of 279 children in custody 20.1% | 55 of 352 children 15.63% | 532 of 2649 children 20.08% | 48 of 313 children 15.34% | 7 of 39 children 17.95% |
| Proximity of initial placement (placed in county but within 50 miles) Data Source: MWLS314S **November 1, 2012 through October 31, 2013 | | *Not Available* | 193 of 279 children in custody 69.2% | 274 of 352 children 77.84% | 1837 of 2649 children 69.35% | 246 of 313 children 78.59% | 28 of 39 children 71.79% |

DHS
362218

Region III South
CQI Review Report
October.2013

## Practice Model Components

| Individual Case Planning | | | | | | | | |

| Data Indicators Associated with Individualizing Case Planning | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 | Hinds | Warren | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Working with service providers, foster parents, the child, and the family, DFCS shall develop and document in the child's case record a permanency plan within 30 calendar days of the child's initial placement that specifies the permanency goal, a timeframe for achieving permanency, and activities that support permanency.          Data Source: MWLS312S/D **November 1, 2012 through October 31, 2013 | Year III 90% Year IV 95% | Not Available | 65 of 278 children 23.38% | 12 of 252 children 4.76% | 113 of 2433 children 4.64% | 8 of 221 children 3.62% | 4 of 31 children 12.90% | | | | |

DHS
362219

**Region III South**
**CQI Review Report**
October.2013

## Systemic Factors

| Training of Staff and Providers | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|

| Data Indicators Associated with Training of Staff and Providers | Year III Goal/ Compliance Measure | Region October 2013 | State October 2013 | Hinds | Warren | | | | |
|---|---|---|---|---|---|---|---|---|---|
| All new caseworkers/supervisors complete their training requirements before assuming their responsibilities | 100% | | | *Not Currently Available* | | | | | |
| (Caseworkers receive minimum of 40 hours of annual ongoing, in-service training) | | | | *Not Currently Available* | | | | | |
| (Supervisors receive a minimum of 24 hours of annual ongoing, in-service training) | | | | *Not Currently Available* | | | | | |
| (Develop indicators regarding Foster/Adoptive Parent Training) | | | | *Not Currently Available* | | | | | |

DHS
362220

**Region III South**
**CQI Review Report**
October.2013

## Systemic Factors

| Service Array | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|

| Data Indicators Associated with Service Array | Year III Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 | Hinds | Warren | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | REDACTED | | | | | | | |

DHS
362221

Region III South
CQI Review Report
October.2013

## Systemic Factors

| Placement Resources | | | | | | | |
|---|---|---|---|---|---|---|---|

| Data Indicators Associated with Placement Resources | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 | Hinds | Warren |
|---|---|---|---|---|---|---|---|
| Number of Licensed/Pending Foster Family Homes    Data Source: MWZRESLS & MWZRESPS *Licensed Homes: *October 1, 2013 through October 31, 2013 *Pending Homes: *November 15, 2013 | — | 127 Licensed 25 Pending | 127 Licensed 75 Pending | 137 Licensed Foster Homes; 81 Pending Foster Homes | 2607 Licensed Foster Homes; 982 Pending Foster Homes | 110 Licensed Foster Homes; 59 Pending Foster Homes | 27 Licensed Foster Homes; 22 Pending Foster Homes |
| Number of Children in Foster Care by Placement Type (family based v. non-family based)    Data Source: MWZ0510S   NOTE:Family Based Placements=Adoptive Home, Child Specific, CO Non Licensed Non-Relative, CO Non Licensed Relative Foster Home, *Expedited Pending Relative Resource Home (added May 2011), Foster Home, Foster/Adopt Home, Group Home, Own Home, Relative Foster Home, Respite Foster Care, Teenage Parent Foster Home and Therapeutic Group and Foster Homes *October 1, 2013 through October 31, 2013 | — | 370 of 425 children 87.1% | 328 of 441 children 74.38% | 418 of 483 children 86.54% | 3406 of 3827 children 89.00% | 372 of 424 children 87.74% | 46 of 59 children 77.97% |
| Sibling groups, with one or more of siblings under 10, are not placed in congregate care settings for more than 45 days Data Source: MWLS53HS *October 1, 2013 through )ctober 31, 2013 | — | 1 of 4 sibling groups 25% RD Approval | 2 of 4 sibling groups 50% RD Approval | 1 of 3 sibling groups 33.33% | 0 of 17 sibling groups 35.29% | 1 of 2 sibling groups - 50.00% | 0 of 1 sibling groups 00.00% |
| No child shall be placed in more than one emergency or temporary facility within one episode of foster care, unless an immediate placement move is necessary to protect the safety of the child or others as certified in writing by the RD Data Source: MWLS51DS **October 1, 2013 through October 31, 2013 | 100% | 57 of 81 child 70.37% RD Approval | 58 of 74 child 78.38% RD Approval | 54 of 68 children 79.41% | 229 of 270 children  84.81% | 45 of 58 children 77.59% | 9 of 10 children 90.00% |

DHS
362222

**Region III South**
**CQI Review Report**
October.2013

## Systemic Factors

| Placement Resources | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Data Indicators Associated with Placement Resources** | **Goal/ Compliance Measure** | **Region August 2011** | **Region September 2012** | **Region October 2013** | **State October 2013** | **Hinds** | **Warren** |
| No child under 10 years of age shall be placed in a congregate care setting unless the child has exceptional needs that cannot he met in a relative or foster family home or the child is a member of a sibling group, and the RD has granted express written approval for the placement Data Source: MWLS52HS **October 1, 2013 through October 31, 2013 | 100% | 17 of 19 children 89.5%    RD Approval | 11 of 13 children 84.62% RD Approval | 11 of 13 children 84.62% | 89 of 95 children 93.68% | 7 of 7 children 100.00% | 4 of 6 children 66.67% |
| Children placed in unlicensed placements. Data Source: MWLS319S **October 1, 2013 through October 31, 2013 | — | Not Available | 41 of 501 children 8.18% | 34 of 531 children 6.40% | 539 of 4319 children 12.48% | 27 of 468 children 5.77% | 7 of 63 children 11.11% |

DHS
362223

Region III South
CQI Review Report
October.2013

# Systemic Factors

| Caseloads | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Data Indicators Associated with Caseloads** | **Goal/ Compliance Measure** | **Region August 2011** | **Region September 2012** | **Region October 2013** | **State October 2013** | **Hinds** | **Warren** |
| At least 75% of caseworkers carry a caseload that does not exceed Plan caseload requirements (over 6,960 minutes) Data Source: MWASA9S1 * For period ending October 31, 2013 (Includes Direct Service Workers and Resource Workers) | At least 75% | 25 workers 49% | 33 workers 50% | 31 of 67 workers 46.27% | 244 of 751 workers 32.49% | 27 of 58 workers 46.55% | 4 of 9 worker 44.44% |
| No more than 10% of caseworkers shall carry a caseload exceeding twice the caseload requirements (over 13,920 minutes) * For period ending October 31, 2013 (Includes Direct Service Workers and Resource Workers) | No more than 10% | 9 workers 18.4% | 17 workers 26.% | 2 of 67 workers 2.99% | 17 of 751 workers 2.00% | 2 of 58 workers 3.45% | 0 of 9 workers 00.00% |
| No caseworkers carry a caseload exceeding three times the caseload requirements (over 20,880 minutes) Data Source: MWASA9S1 For period ending October 31, 2013 (Includes Direct Service Workers and Resource Workers) | * 100% | 2 workers 95.9% | 4 workers 94.0% | 0 of 67 workers 00.00% | 1 of 751 workers .13% | 0 of 58 workers 00.00% | 0 of 9 workers 00.00% |

DHS
362224

**Region III South**
**CQI Review Report**
October.2013

## Systemic Factors

| | Oversight and Monitoring | | | | | | |
|---|---|---|---|---|---|---|---|

| Data Indicators Associated with Oversight and Monitoring | Goal/ Compliance Measure | Region August 2011 | Region September 2012 | Region October 2013 | State October 2013 | Hinds | Warren |
|---|---|---|---|---|---|---|---|
| Supervisors, who supervise caseworkers, are responsible for supervising no more than 5 caseworkers<br>Data Source: MWASA5D2<br>*October 1, 2013 through October 31, 2013 | No more than 10% | 0       ASWS's<br>0% | 1       ASWS's<br>10% | 9 ASWS's<br>0 w/ > 5 workers<br>00.00% | 128 ASWS's<br>0 w/ > 5 workers<br>00.00% | 7 ASWS's<br>0 w/ > 5 workers<br>00.00% | 2 ASWS's<br>0 w/ > 5 workers<br>00.00% |

DHS
362225

**Region III South**
**CQI Review Report**
October.2013

## Systemic Factors

| Court Process | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Data Indicators Associated with Court Processes** | **Goal/ Compliance Measure** | **Region August 2011** | **Region September 2012** | **Region October 2013** | **State October 2013** | **Hinds** | **Warren** |
| Children who have been in custody at least 6 months have had a timely county conference Data Source: MWZTACRS *November 1, 2012 through October 31, 2013 | Year III 90% Year IV 95% | 369 of 391 children 94.4% | 391 of 428 children 91.36% | 405 of 437 children 92.68% | 3404 of 3571 children 95.32% | 362 of 392 children 92.35% | 43 of 45 children 95.56% |
| Children in custody at least 12 months have had a timely annual court review Data Source: MWZTPHRS *November 1, 2012 through October 31, 2013 | Year III 90% Year IV 95% | 111 of 336 children 33% | 116 of 399 children 29.07% | 117 of 403 children 29.03% | 1804 of 3158 children 57.12% | 88 of 364 children 24.18% | 29 of 39 children 74.36% |
| Children in custody reaching the point at which they have spent 15 of the previous 22 months in foster care with no ASFA exception noted will have a petition for TPR filed on their behalf Data Source: MWZ014S1 *As of November 5, 2013 | Year III 80% Year IV 90% | 10 of 111 children 9% | 13 of 93 children 13.97% | 23 of 87 children 26.43% | 528 of 1020 children 51.76% | 14 of 70 children 20.00% | 9 of 17 children 52.94% |
| Children in custody who have spent more than 15 of the previous 22 months in FC without a TPR petition filed will have an exception noted or a TPR filed § Data Source: MWZ014S1 & MWZ014S2 *As of November 5, 2013 | Year III 80% Year IV 90% | 134 of 235 children 57% | 131 of 211 children 62.09% | 146 of 210 children 69.52% | 1171 of 1663 children 70.41% | 132 of 188 children 70.21% | 14 of 22 children 63.64% |
| A termination of parental rights petition shall be filed on behalf of children who have spent 17 of the previous 22 months in foster care by the last day of a child's seventeenth month in care, unless an available exception under ASFA has been documented in the child's case record. Data Source: MWZ017S1 **through October 31, 2013 | Year III 80% Year IV 90% | Not Available | 139 of 234 children 59.40% | 166 of 271 children 61.25% | 970 of 1615 children 60.06% | 158 of 248 children 63.70% | 8 of 23 children 34.78% |

**Region III South**
**CQI  Review Report**
October.2013

## Systemic Factors

| Data Quality and Usage | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Data Indicators Associated with Data Quality & Usage** | **Goal/ Compliance Measure** | **Region August 2011** | **Region September 2012** | **Region October 2013** | **State   October 2013** | **Hinds** | **Warren** | | | | |
| *Currently, no proposed indicators* | | | | | | | | | | | |

DHS
362227

# Region 3-South
# 2013 Annual Follow-Up CQI Report
# Summary of Areas Needing Improvement

*Areas for Improvement Efforts to better address Mobilizing Appropriate Services Timely*

- On-site case review data shows that  age appropriate children are being provided with Independent Living services by the region. However, Region 3-South's data indicators show that children in custody, ages 14 - 20, being provided with independent living services per their service plan is an area of needed improvement.
- Children discharged to a plan of Reunification within 12 months of entering state's custody is an area needing improvement based on the region's October 2013 data indicators.
- Children discharged in the last year upon finalization of an adoption having had the adoption finalized within 24 months of the latest removal from home shows to be an area needing improvement based on the data indicators from the November 1, 2012 through October 31, 2013 reporting period.
- October 2013 on-site case review data shows a need for improvement in assessing children's physical and mental health needs and providing services in a timely manner to meet those identified needs.

*Areas for Improvement Efforts to better address Assuring Safety and Managing Risk*

- Although a number of items rated a Strength during the on-site case review, the baseline data indicators show a need for improvement in the area of Assuring Safety and Managing Risk for initiating and completing investigations (all as well as children in care) in a timely manner.
- Efforts to better address caseworker visits with children who remain in the same out of home placement following an investigation into a report that he/she was maltreated, or subject to corporal punishment, in that placement should be developed in order to assure safety and manage risk.
- Efforts to better address caseworker visits with foster parents with at least one foster child residing in their home should be developed by the region in order to manage risk and assure safety of the children placed in those homes.
- It should be noted that a number of these items show improvement since the time of the August 2011 baseline.

*Areas for Improvement Efforts to better address Involving Children and Families in Case Planning and Decision Making*

- A plan to improve the frequency and quality of visits taking place between caseworkers and children should be developed and implemented by the region to improve performance for involving children in case planning and decision making. It should be noted that the MACWIS data indicators show a significant increase in the

caseworker/child contacts since the time of the August 2011 baseline review. The quality of these narratives appears to be an area of needed improvement based on the on-site case review results.

- A plan should be developed by the region to assure more frequent and more quality visits take place between caseworkers and parents of children who have a permanent plan of Reunification. This will result in more timely permanency for children in care and can also have a positive effect on the region's performance of other practice model components in both placement and in-home cases. Efforts to improve the involvement of parents (especially fathers) and children in the case planning process will also result in more timely permanency for children in the region who are in care and prevent foster care entries for children in the in-home cases.

# REDACTED

*Areas for Improvement Efforts to better address Assessing Strengths and Needs*

- A child receiving a comprehensive health assessment within 30 days of entering custody is an area needing improvement for the region. The Year IV goal is 70%. As of the November 1, 2012 through October 31, 2013 reporting period, the region does not meet the 70% goal at 18.29%. The region does show an improvement over the 2012 performance of 9.77%.
- On-site case review results indicate that the region may need to develop and implement a plan to improve the assessment of strengths and needs. It appears assessments are taking place with the child and with foster/pre-adoptive parents more than with mothers and fathers. The percentage for foster/pre-adoptive parents is significantly higher than those of the mothers and fathers.

*Areas for Improvement Efforts to better address Preserving and Maintaining Connections*

- The MACWIS data indicators from the annual follow-up review reporting period shows a need for improvement in the area of children having visits with their parents (if appropriate) and their siblings in care for whom they are separated. On-site case review results seem to indicate that the region may need to develop and implement a plan to improve performance in the area of Preserving and Maintaining Connections for children in foster care with regard to visitation with parents and siblings.
- 8.3% of the cases in the on-site case review rated a Strength for Relationship of Child in Care with Parents. Efforts should be made to assure that meetings occur between birth parents and resource parents within the first month of placement and that efforts are made to implement shared parenting when it is appropriate and safe to do so.

*Areas for Improvement Efforts to better address Individualizing Case Planning*

- On-site case review data and MACWIS data indicators show that the region needs improvement in the area of establishing permanency goals for children in a timely manner and making efforts for establishing permanency for children who have been in

state's custody for 15 of the most recent 22 months by referring the case for TPR in a timely manner or documenting an exception (compelling reasons) for not doing so.

- On site case review data reflects that the region needs continued improvement efforts in the area of case planning; specifically utilizing family team meetings to their fullest potential as a planned event with all appropriate case members in attendance in order to develop and update parental and child case plans.

### Areas for Improvement Efforts to better address Training of Staff and Providers

- Although there is no regional or state data indicator information available to establish a baseline and to determine strengths and areas needing improvement with regard to this systemic factor, stakeholder survey information could be used by the Region to evaluate the effectiveness of DFCS' performance with regard to these items.
- Based on the results of the relevant stakeholder surveys which (overall) were positive, DFCS should continue to focus its efforts on providing and ensuring completion of adequate initial training (for new caseworker and supervisors who provide child welfare services) and on-going training for all caseworkers and supervisors who provide child welfare services.
- Based on the results of the relevant stakeholder surveys which (overall) were positive, DFCS should continue to focus its efforts on providing adequate training to placement providers (current and prospective foster parents, relative caregivers, adoptive parents, and staff of state licensed or approved facilities) that addresses the skills and knowledge needed to carry out their duties.
- Based on the results of the relevant stakeholder surveys which (overall) were positive, DFCS should continue to provide frequent training to license new foster homes.

### Areas for Improvement Efforts to better address Service Array

- A large percentage of the questions regarding service array were not answered or did not have a sufficient number of responses to measure due to the fact that there was a small number of actual respondents. For instance, there was not a single response form any judge or court personnel solicited. The region may want to institute a plan for engaging all stakeholders in the quality improvement process, including their participation in stakeholder surveys, Regional Implementation Teams, and the Regional CQI Sub Team.

- Based on the survey results it appears that of the stakeholders who actually responded, more of them believe that the agency is not effective in individualizing services. Efforts to individualize and tailor services should be made or efforts to educate stakeholders on how this is done should be implemented.

### Areas for Improvement Efforts to better address Placement Resources

- The agency does not meet the goal for placing children in more than one emergency or temporary facility within one episode of foster care (unless an immediate placement move is necessary to protect the safety of the child or others as certified in writing by the Regional Director). Efforts to improve this measure should be implemented.
- The region does not meet the goal for placing children under the age of 10 in a congregate case setting unless the child has exceptional needs that cannot be met in a relative's home or a foster home (or the child is a member of a sibling group).

- Relevant stakeholder information seems to indicate the region may need to make improvement efforts in the area of expediting the licensing of relatives to provide resource care and in giving them priority over resource parents in closer proximity.
- Relevant stakeholder information seems to indicate that the region may need to make more concerted efforts in recruiting foster and adoptive resource homes that reflect the ethnic and racial diversity of the children in the Region in need of such placements.

### Areas for Improvement Efforts to better address Caseloads

- The region has improved in the area of caseloads since the time of the 2011 baseline and the 2012 annual review. However, the data indicators from the reporting month reveal that there are some caseworkers within the region who have caseloads that still exceed 6,960 minutes. This could be due to the turnover in some areas of the region or, as it is has been found in other areas of the state, due to Resource Workers having caseloads that are higher. Comments from the survey results seem to show that some workers feel that when staff turnover occurs, or while awaiting new workers to be trained, the workers are unfairly given high caseloads. It also seems that workers feel that caseloads are not assigned fairly.

### Areas for Improvement Efforts to better address Oversight and Monitoring

- Survey responses were limited as it relates to internal stakeholders' perception of the quality improvement unit. Efforts to include more staff in the quality improvement process should be made.
- Survey responses indicate that more efforts need to be made to ensure that supervisors and caseworkers review their cases at least quarterly to address case plans.

### Areas for Improvement Efforts to better address Court Processes

- The region does not meet the Year IV goal of 95% for children in custody at least 6 months having a timely county conference.
- The region does not meet the Year IV goal of 95% for children having timely permanency hearings. The region should develop a strategy to ensure that permanency hearings are held in a timely manner to improve performance and promote timely permanency for children in care. The region may also want to consider raising awareness among relevant external stakeholders on the importance of holding these hearings in a timely manner.
- The region does not meet the Year III goal of 90% for children in custody 15 of the most recent 22 months having a petition for termination of parental rights filed on their behalf or have an ASFA exception noted in their case plan. Relevant stakeholder survey responses seem to reflect a need for improvement in these areas as well. Strategies such as internal permanency reviews, complimented by 6 month Foster Care Review reviews and reports, could assist in improved performance in these areas.
- The region does not meet the Year IV goal of 90% for a termination of parental rights petition to be filed on behalf of children who have spent 17 of the previous 22 months in foster care by the last day of a child's seventeenth month in care, unless an available exception under ASFA has been documented in the child's case record.
- It is concerning that for the area of court processes there was not a single survey respondent. Efforts to engage court personnel in case activities should be made.

### Areas for Improvement Efforts to better address Data Quality and Usage

DHS
362231

- It is recommended that administrative staff within the Region (including Foster Care Review and Evaluation and Monitoring staff) continue to stress the importance of utilizing data to measure performance and make improvements as well as the importance of accurate and timely data entry in order to give as accurate a picture as possible of the work that is being conducted in the region. Efforts to improve employee morale may also be beneficial to the region, based on survey responses.

DHS
362232

# Ex. 26A

FCR Corrective Action Spreadsheet

NA = No Response Located

| Case Reviewer's Name | Child(ren)'s Name(s) | Issue Noted | Summary of Specific Issue Noted | Region | County of Responsibility | Date Issues Addressed with County/Region Staff | Caseworker's Name | Regional Director's Name | Date Reported to DD II/FCR Email | Date Reported to Field Operations | Corrective Action Taken by the County | Date Corrective Action Sent by ASWS to the Regional Director | Date Received by Field Operations | Date Field Operations Reports Corrective Action to CQI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | No COS Worker/Lack of Contact | Placed at Millcreek on 3/23/12. No Cos worker assigned. No documentation showing agency has gone to Millcreek to check well-being. | 7W | Hancock | | 8/3/2012 | | 8/2/2012 | 8/3/2012 | Email from RD to worker: Immediate contact needs to be made this week. Email me when complete. | NA | NA | NA |
| | | Permanency Concern | There was a permanency concern noted due to the recent actions of the current adoptive home, Mr. and Ms. ███████, stating that they have changed their mind and wish for ██████ to be moved from their home after several months of telling her that they were going to adopt her and has not let her know their new plan. The local agency is exhausting all efforts to maintain the placement, if appropriate. | 15 | W. Chickasaw | NA | | | 8/2/2012 | 8/2/2012 | NA | NA | | 8/2/2012 | NA |
| | | No documented efforts to locate runaway | Agency has not documented efforts to locate; dental, psychological, and medical reports have not been updated in MACWIS; ISP has not been updated in over a year. | 7W | Hancock | 8/6/2012 | | | 8/6/2012 | 8/6/2012 | NA | NA | NA | NA |
| | | Child Not In Custody | Father not allowing face-to-face contact due to fear of child coming into custody | 15 | Union | NA | | | 8/7/2012 | NA | | NA | NA | NA |
| | | Face-to-face contact | No documented face-to-face contact since 4-3-12 | 7W | Harrison | 8/8/2012 | | | 8/7/2012 | 8/8/2012 | | NA | NA | NA |
| | | possible safety concern | ███████ is a Harrison County foster child who had a PAR on 08-10-12.  From review of the case file, ██████ has a 14 year old sister, ███████, who is in the legal custody of their mother, ███████. ██████ stated the mother has convinced ██████ to return to her home, and she fears ██████'s mother is allowing her to not attend school by using home schooling as an excuse without any actual home schooling, she fears the mother is allowing ██████'s boyfriend to share ██████'s bed with her, and she fears substance abuse by ██████'s step-father.  There doesn't appear to be documentation this information has been forwarded to Lamar County DFCS. | 6 | Lamar | N/A | N/A | | 8/10/2012 | 8/10/2012 | | NA | NA | NA |
| | | Face-to-face contact/no medical records | No documented contact made with ██████ in March, April, June, and July 2012. No documented contact with ██████ and ██████ in March, June, and July 2012. ███████ has been diagnosed with Autism.  There were no medical records found in his case file supporting his therapy. | 7W | Hancock | 8/27/2012 | | | 8/27/2012 | 8/27/2012 | 8/27/12 Regional Director Responded | NA | NA | NA |
| | | Permanency Concern | The SW stated after the FCR that Harden House staff has defended the home stating that this is one of their better homes, which may have influenced the investigating SW. The reason the child remained in the home was because the grandmother's home in FL had been approved and the Agency had planned on moving the child there within a short amount of time, but when ██████ changed her mind and did not want to go to the grandmothers at the last minute in court, the GAL and Judge stated that she did not have to go if she did not want to. Chancery court for TPR is scheduled for Sept. 25. FCR and COR share the same concerns. The COR wants the child to be given the opportunity to bond with the grandmother, but can not if the court does not agree to let her go. | 15 | Lafayette | 8/28/2012 | NA | | 8/28/2012 | 8/28/2012 | Investigation/MIC completed by Region 1N. Field Ops responded 8/29/12 Permanency Director responded 8/29/12 | 8/28/2012 | 8/2/2012 | NA |
| | | Well-Being Concern | ██████ baby's father was brought out at ██████ and his approximate age is 24. ██████ would have been 17 at the time of conception and the father would be over 24 mths in age difference. There has not been a separate report entered at this time, as we do not know the relationship status between ██████ and ██████ | 4N | Lowndes | NA | | NA | 9/11/2012 | | NA | NA | NA | NA |

August 2012 - February 11 2013

Date Printed : 2/13/2013

FCR Corrective Action Spreadsheet

NA = No Response Located

| Case Reviewer's Name | Child(ren)'s Name(s) | Issue Noted | Summary of Specific Issue Noted | Region | County of Responsibility | Date Issues Addressed with County/Region Staff | Caseworker's Name | Regional Director's Name | Date Reported to DD II/FCR Email | Date Reported to Field Operations | Corrective Action Taken by the County | Date Corrective Action Sent by ASWS to the Regional Director | Date Received by Field Operations | Date Field Operations Reports Corrective Action to CQI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Face-to-face contact | no documented contact made with ▮ in April, July, and August 2012. ▮ has not had an updated/documented medical exam since December 2010. Her last dental exam was in April 2011. | 7W | Hancock | 9/12/2012 | | | 9/12/2012 | 9/12/2012 | Email from RD: Supervisors, please review this case. This child needs permanency. Worker needs to make a visit right away. | NA | NA | NA |
| | | Face-to-face contact/documentation | No documented contact made with the children in March, July, and August 2012. No documented safety, well-being, and needs to of the children, as well as the needs to of the foster parents. The children's medical record has not been updated since 2010. There is still no documented dental exam. The ISPs for the children have not been updated since June 2011 | 7W | Hancock | 9/12/2012 | | | 9/12/2012 | 9/12/2012 | 9/12/12 Email from RD to worker: ▮, please stress concerns to ▮ and have her make an immediate visit and address safety and well-being. | NA | NA | NA |
| | | Face-to-face contact | no documented contact made with ▮ in April, May, and August 2012. There did not appear to be a documented medical and developmental assessment on | 7W | Hancock | 9/12/2012 | | | 9/12/2012 | 9/12/2012 | 9/13/12 Email from RD ▮ have worker aggressively work on ensuring needs of the child are met. Have her ensure all assessments are completed and documented. | NA | NA | NA |
| | | Well-Being Comment | However, through documentation and county conference discussion, I determined that ▮ has special needs (mental and physical) that will need to be addressed after he is discharged from agency custody. These issues will continually need to be addressed due to Axis I and Axis II diagnoses of Major Depressive Disorder NOS and Mood Disorder along with a history of cutting himself, homicidal thoughts, and drug cravings | 15 | Lee | NA | | | 9/13/2012 | NA | Not an immediate safety concern | NA | NA | |
| | | emotional well-being | ▮ has not been seen by this agency since 12-29-11 and ▮ has not been seen by this agency since 01-28-12. There are several Adoption Status Meetings documented where information has been requested by the COR, but it does not appear that follow up has been made. Permanency appears to be a great issue in this as these children are approaching two years in custody. | 7W | Hancock | 9/14/2012 | | | 9/14/2012 | 9/14/2012 | NA | NA | NA | |
| | | Face-to-face contact | 6/2/11 and 11/28/12 There doesn't appear to be documented face-to-face contact with child since 3-5-12. | 7W | Harrison | 9/17/2012 | | | 9/17/2012 | 9/17/2012 | 9/17/12   RD Response | NA | NA | |
| | | emotional well-being | Documentation in the case file from Licensed Clinical Social Worker ▮ reflects that behavioral issues appear after ▮ visits his mother. A psychological assessment from Dr. ▮ reflects the recommendation that ▮ not be returned to his mother and strong consideration be given to the resource parents concerning adoption. The social worker ▮ and resource parents said that they would not like for ▮ to be admitted to acute care at this time. They are concerned that the relationship between ▮ and the resource parents will be strained if he is admitted to acute care. While acute care may strain the relationship between ▮ and the resource parents, current counseling services and medications do not appear to be completely resolving the issues addressed above. The visitation plan between ▮ and his mother should be addressed in the youth court as soon as possible. Acute care and/or long term care for ▮ should be explored due to the seriousness and frequency of ▮ outbursts and the potential safety risk he poses to himself and the resource parents. | 15 | Monroe | 9/20/2012 | | | 9/20/2012 | 9/20/2012 | Email from RD: I have been working with mother. I will email county attorney and GAC today to express increasing problems with child and let them know we will hold off with visits until after court and we get some clarity on what court orders. | NA | NA | NA |

August 2012 - February 11 2013

Date Printed : 2/13/2013

FCR Corrective Action Spreadsheet

NA = No Response Located

| Case Reviewer's Name | Child(ren)'s Name(s) | Issue Noted | Summary of Specific Issue Noted | Region | County of Responsibility | Date Issues Addressed with County/Region Staff | Caseworker's Name | Regional Director's Name | Date Reported to DD II/FCR Email | Date Reported to Field Operations | Corrective Action Taken by the County | Date Corrective Action Sent by ASWS to the Regional Director | Date Received by Field Operations | Date Field Operations Reports Corrective Action to CQI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Face-to-face contact | There doesn't appear to be documented face-to-face contact with ████ and ████ since 04-24-12. | 7W | Harrison | 9/24/2012 | | | 9/21/2012 | 9/24/2012 | Email from RD: Plase ensure ████ handles this situation. I need her to make contact this week. | NA | NA | NA |
| | | Face-to-face/placement | has not been seen face-to-face by the agency since August 30th, 2012. Documentation and county conference discussion reflects that the agency has attempted to visit Ms. ████ and ████ in the placement setting during the month of September, 2012 were no avail. ASWS ████ and Social Worker ████ said that the agency did not recommend the trial home placement and that GAS ████ went against the agency's recommendation placing her back into the home with Ms. ████. | 15 | Union | 9/26/2012 | | | 9/26/2012 | 9/26/2012 | | | | |
| | | Face-to-face contact | There doesn't appear to be documented face-to-face contact with ████ since 04-20-12 | 7W | Harrison | 9/27/2012 | | | 9/27/2012 | 9/27/2012 | Email from RD: ████, ensure ████ makes a visit at once. Please remind her child has to be seen twice a month and one has to be a visit in the home. | NA | NA | NA |
| | | Face-to-face contact | There doesn't appear to be documented face-to-face contact with ████ since 08-08-12, or with ████ in her placement setting, since 08-08-12. | 7W | Harrison | | | | 10/3/2012 | NA | NA | NA | NA | NA |
| | | Face-to-face contact | There doesn't appear to be documented face-to-face contact with ████ since 05-03-12, or with ████ in his placement setting since 05-03-12 | 7W | Harrison | | | | 10/3/2012 | NA | NA | NA | NA | NA |
| | | Face-to-face contact | There doesn't appear to be documented face-to-face contact with ████ and ████ since 07-24-12. | 7W | Harrison | | | | 10/3/2012 | NA | NA | NA | NA | NA |
| | | Face-to-face contact | There doesn't appear to be documented face-to-face contact with ████ in his placement setting since 07-31-12. | 7W | Harrison | | | | 10/3/2012 | NA | NA | NA | NA | NA |
| | | Face-to-face contact | There doesn't appear to be documented face-to-face contact with ████ and ████ since 05-16-12, or with ████ in her placement setting since 11-19-11 (which was noted in the previous PAR), or with ████ and ████ in their placement setting since 12-26-11 | 7W | Harrison | | | | 10/3/2012 | NA | NA | NA | NA | NA |
| | | Face-to-face contact | There doesn't appear to be documented face-to-face contact with ████ since 05-15-12 | 7W | Harrison | | | | 10/3/2012 | NA | NA | NA | NA | NA |
| | | Face-to-face contact | There doesn't appear to be documented face-to-face contact with ████ since 07-18-12, or with ████ in her placement setting, since 07-18-12. | 7W | Harrison | | | | 10/3/2012 | NA | NA | NA | NA | NA |
| | | Face-to-face contact/documentation | Safety and well-being of ████ cannot be determined due to the lack of face-to-face contact | 7W | Harrison | | | | 10/4/2012 | NA | NA | NA | NA | NA |
| | | Face-to-face contact/documentation | There doesn't appear to be documented face-to-face contact with ████ and ████ since 05-25-12. Their safety and well-being cannot be determined due to the lack of documentation. | 7W | Harrison | 10/4/2012 | | | 10/4/2012 | 10/4/2012 | Email from RD: Plase make visit ASAP. Remind worker that it is mandatory that all children be seen twice a month and one has to be in the home setting. Visit needs to be make by close of business 10-8-12. | NA | NA | NA |

August 2012 - February 11 2013

FCR Corrective Action Spreadsheet

NA = No Response Located

| Case Reviewer's Name | Child(ren)'s Name(s) | Issue Noted | Summary of Specific Issue Noted | Region | County of Responsibility | Date Issues Addressed with County/Region Staff | Caseworker's Name | Regional Director's Name | Date Reported to DD II/FCR Email | Date Reported to Field Operations | Corrective Action Taken by the County | Date Corrective Action Sent by ASWS to the Regional Director | Date Received by Field Operations | Date Field Operations Reports Corrective Action to CQI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | children have been in custody five months and have not received a comprehensive medical exam or a comprehensive dental exam as of October 5th, 2012. The case has been transferred to ██████ who is now the county of responsibility social worker. Documentation reflects that ██████ is the county of service worker in Forrest County. It has been identified through documentation and county conference discussion that ██████ has stated he is having trouble hearing. Ms. ██████ said that ██████ may need glasses. The social worker ██████ said that the children's medicaid benefits are inactive and that the responsibility of the children getting medicaid relies on the relative resource parent. The social worker said that the relative resource parent has been "too busy" to sign the children up for medicaid. It was suggested that the social worker and mother may want to assist the relative resource parent in obtaining medicaid benefits for the children as soon as possible and for the children to have medical and dental exams as soon as possible. | 7W | Harrison | 10/5/2012 | ██████ | ██████ | 10/5/2012 | NA | NA | NA | NA | NA |
| | | Medical/Dental/Psychological/Placement Appropriateness | Documentation in MACWIS and the paper case file does not reflect that ██████ is receiving mental health treatment,counseling, dental exams, or other services. Documentation in MACWIS and the paper case file does not reflect that ██████ is receiving dental exams or medical exams. the appropriateness of ██████'s placement cannot fully be determined through documentation and county conference discussion. | 7W | Harrison | | ██████ | ██████ | 10/8/2012 | NA | 10/8/12 RD Response | NA | NA | NA |
| | | Documentation/Safety Concern | The social worker, ██████, was not able to identify if any kind of forensic exam has been completed on ██████. Documentation in MACWIS and the case file does not reflect that any recent medical assessments have been completed | 7W | Harrison | | ██████ | ██████ | 10/8/2012 | NA | 10/8/12 RD Response | NA | NA | NA |
| | | Face-to-face contact | There doesn't appear to be documented face-to-face contact with ██████ since 05-19-12.  As pointed out in the previous PAD, there doesn't appear to be documented face-to-face contact with ██████ in his placement setting since 01-03-12 , or with ██████ in her placement setting, since 02-29-12. | 7W | Harrison | 10/10/2012 | ██████ | ██████ | 10/10/2012 | 10/10/2012 | Email from RD: I am scheduling an appointment to have a discussion with supervisors regarding lack of face-to-face contacts. | 10/10/2012 | 10/10/2012 | 10/10/2012 |
| | | Face-to-face contact | there doesn't appear to be documented face-to-face contact with ██████ in her placement setting since 10-10-11 | 7W | Harrison | 10/10/2012 | ██████ | ██████ | 10/10/2012 | 10/10/2012 | Email from RD: ██, please get with the worker and make plans to have children seen. | 10/10/2012 | 10/10/2012 | 10/10/2012 |
| | | Face-to-face contact | There doesn't appear to be documented face-to-face contact with ██████ and ██████ since 06-01-12 | 7W | Harrison | 10/10/2012 | ██████ | ██████ | 10/10/2012 | 10/10/2012 | Email from RD: ██, please get with the worker and make plans to have children seen. | 10/10/2012 | 10/10/2012 | 10/10/2012 |
| | | Face-to-face contact/no services | Agency has not documented any contact with ██████ since she came into DHS custody in May 2012. Agency has not seen this child in her placement setting.  Agency has not addressed her overall safety, needs, and well-being.  The only documented contact made with ██████ is in June 2012 when he was brought to the police station to speak with a detective.  Agency has not documented any contact with the children's caregivers.  There was only one documented contact each with the parents for this review period. | 7W | Hancock | 10/22/2012 | ██████ | ██████ | 10/22/2012 | 10/22/2012 | Email from RD: ██ make sure ██ gets out to see children on her caseload. Let her know she is required to see the children twice a month and one has to be in the home setting. I am continuously receiving emails regarding her lack of compliance in seeing children as required. | NA | NA | NA |

August 2012 - February 11 2013

FCR Corrective Action Spreadsheet

NA = No Response Located

| Case Reviewer's Name | Child(ren)'s Name(s) | Issue Noted | Summary of Specific Issue Noted | Region | County of Responsibility | Date Issues Addressed with County/Region Staff | Caseworker's Name | Regional Director's Name | Date Reported to DD II/FCR Email | Date Reported to Field Operations | Corrective Action Taken by the County | Date Corrective Action Sent by ASWS to the Regional Director | Date Received by Field Operations | Date Field Operations Reports Corrective Action to CQI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Lack of documentation/cont act/assessment | The children are residing in Harrison County with their paternal grandmother, ███. She is a licensed foster parent for the children. There is no COS worker established with Harrison County. There has been no attempted contact made with the parents. It was noted that the mother was released from jail on July 29, 2012. Additionally, there is no documented medical, dental, or mental health assessments completed. The children's eligibility has not been completed. There has been no monthly assessment regarding the safety, needs, and well-being of these children. It was noted in three contacts made with the paternal grandmother were she identified needs for the children. Although the letters to the county conference were printed on 9-19-12, no participants were selected for the review. | 7W | Hancock | 10/29/2012 | | | 10/29/2012 | 10/29/2012 | Email from ███. All of these things are being addressed. I thought that all of them had been done in this case. | NA | NA | NA |
| | | Lack of Contact/No Assessment/Perman ency | Noted 2 times in 2012 | 7W | Hancock | 10/29/2012 | | | 10/29/2012 | 10/29/2012 | NA | NA | NA | NA |
| | | Documentation/Ass essment | There was no documentation made with the children in May, July, August, and September 2012. Agency has not documented case planning efforts with the parents where their service agreements are discussed. It does not appear that the parents or paternal grandparents, who reportedly have unsupervised visitation every other weekend, were invited to the county conference. The children have not had a documented medical, developmental assessment (███), mental health assessment (███), or dental exam ███ since entering custody. | 7W | Hancock | 10/29/2012 | | | 10/29/2012 | 10/29/2012 | NA | NA | NA | NA |
| | | Lack of Contact/No Assessment | no documented contact made with these children in June, August, and October 2012. In looking at the children's ISPs, a COS worker has not been assigned by the COS ASWS. It does not appear that monthly assessment is occurring in this case to ensure all needs of the children and the foster parents are being met. Due to the allegations in this case, sexual abuse and sibling sexual misconduct in the past, on-going assessment is needed in this case. | 7W | Hancock | 10/31/2012 | | | 10/31/2012 | 10/31/2012 | NA | NA | NA | NA |
| | | Lack of in-home contact with child/no assessment | Case opened in June 2012 and there has not been a documented contact made with ███ in his placement setting. The contact that took place in home was not child's actual placement setting. COS has not been requested for ███. No documented contact made in August and October 2012. Medical record has not been documented, no developmental assessment, and no visitation plan. Child and father were not confirmed in the investigation and therefore do not show that there was an investigation completed. When this Reviewer checked the Investigation for the ICWA contact, there were only two narratives. It appears that it is possible that this case was submitted prematurely. No services, such as a birthday allowance or initial clothing allowance, has been provided for ███. The invitations to the county conference were not printed by the assigned worker. | 7W | Hancock | 11/6/2012 | | | 11/6/2012 | 11/6/2012 | NA | NA | NA | NA |

August 2012 - February 11 2013

FCR Corrective Action Spreadsheet

NA = No Response Located

| Case Reviewer's Name | Child(ren)'s Name(s) | Issue Noted | Summary of Specific Issue Noted | Region | County of Responsibility | Date Issues Addressed with County/Region Staff | Caseworker's Name | Regional Director's Name | Date Reported to DD II/FCR Email | Date Reported to Field Operations | Corrective Action Taken by the County | Date Corrective Action Sent by ASWS to the Regional Director | Date Received by Field Operations | Date Field Operations Reports Corrective Action to CQI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Lack of contact in placement setting/no assessment | Initial ISP for ▓ not submitted and no ISP for ▓. No services have been provided for the children, such as an initial clothing allowance. No documented medical, dental, mental health assessment for the children. Eligibility not completed and submitted. Placement record has not been entered in MACWIS. Unable to determine from case narratives if the children are placed in county or elsewhere with their grandmother. There appears to be some speech issues regarding ▓. Agency needs to document what services have been provided for this child. When the grandmother comes to pick the children up from the parent's home following visitation, she has the police escort her. Both parents deny ever threatening the grandmother to warrant her having a police escort. The family Preservation staff stated that the grandmother feels threatened over something that happened a year ago. Safety issues were noted by Family Preservation. Worker is having contact with the children during supervised visitation at the parent's home, contact with the children has not been made at the grandmother's home. Contact is needed in actual placement setting. | 7W | Hancock | 11/6/2012 | | | 11/6/2012 | 11/6/2012 | NA | NA | NA | NA |
| | | Lack of contact/assessment/ case management | Case opened June 2012. None of the children or parents have ISPs. Father to ▓ and the father to ▓ have not been attached to this case. After reading the narratives, I was still not sure where children are placed. There was one narrative stating that ▓ was with her paternal grandfather and then another contact where the children were seen at their maternal aunt's home. Her address was noted and she resides in Hancock County. No services, such as a clothing allowance, has been requested for the children. No documented dental or medical exams. There is no visitation plan and the children's placement record has not been added. The children's address has not been entered. There was no documented contact made with ▓ in June, July, August, and October 2012. There was no documented contact made with ▓ and ▓ in July, August, and October. There is no documentation with the children's placement provider and no on-going contact with the parents. It appears that the last contact with the mother and father to ▓ was in July 2012. If contact was made, it has not yet been entered into MACWIS. | 7W | Hancock | 11/6/2012 | | | 11/6/2012 | 11/6/2012 | NA | NA | NA | NA |
| | | Lack of contact/no ongoing assessment | ▓, who is 5 months old, is placed in Harrison County (▓) in a licensed foster home and has been in this placement since 7/24/12. A COS worker has not been assigned to the ISP for ▓. There are no permanency/concurrent plan. It appears that the initial ISP was approved by the previous ASWS even though it appears that the ISP was incomplete at the time. ▓ mother is very developmentally delayed. It does not appear that this agency has referred this child for a developmental assessment to ensure that he is developmentally on track. There is no documented medical exam and no documented visitation plan. It does not appear that this agency has engaged the mother and father in case planning efforts. There was no documented contact with the child in July, August, and September 2012 and he was not seen in his placement setting in October 2012. There has only been one documented contact with the foster parent for this review period. | 7W | Hancock | 11/6/2012 | | | 11/6/2012 | 11/6/2012 | Email from RD: ▓, can you please make sure case is reassigned ASAP. | NA | NA | NA |
| | | Well-being Concern | No twice monthly visits with the minor in placement setting in June and July. Appears worker did not focus on the issues related to the minor safety and well being during her monthly contacts. | 7E | Jackson | NA | | | 11/7/2012 | 11/15/2012 | RD Read Receipt 11/15/12 | NA | NA | NA |

August 2012 - February 11 2013

Date Printed : 2/13/2013

FCR Corrective Action Spreadsheet

NA = No Response Located

| Case Reviewer's Name | Child(ren)'s Name(s) | Issue Noted | Summary of Specific Issue Noted | Region | County of Responsibility | Date Issues Addressed with County/Region Staff | Caseworker's Name | Regional Director's Name | Date Reported to DD II/FCR Email | Date Reported to Field Operations | Corrective Action Taken by the County | Date Corrective Action Sent by ASWS to the Regional Director | Date Received by Field Operations | Date Field Operations Reports Corrective Action to CQI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Lack of contact/no on-going assessment | No documented contact made for this review period. This includes face-to-face and phone contact. Last documented narrative was on July 31, 2012 for a case staffing. ███ is placed in Hancock County with her maternal grandmother, ███. ███ has been in this placement since March 2011. It is noted that Ms.███ is not licensed as a foster parent. ███'s medical records have not been updated since 2011. This is the second safety concern documented in this case. If contact with ███ and her grandmother was made for this review period, it has not yet been documented. | 7W | Hancock | 11/15/2012 | | | 11/15/2012 | 11/15/2012 | NA | NA | NA | NA |
| | | Lack of contact/no on-going assessment | No documented contact. Both children are placed together with ███ in Hancock County. No documented contact made with the parents and the children's caregiver for this review period. Medical, dental, and mental health assessment have not been documented. Case has been open since March 2011. ███ has been diagnosed with Cerebral Palsy, ███, and his father ███, have not had a Review ISP since their initial Review in 2011. A report of maltreatment was made on 11-13-12 regarding the father driving under the influence of alcohol with his children in his vehicle. As of yesterday, this investigation has not been assigned. Contact has not yet been entered into MACWIS. | 7W | Hancock | 11/15/2012 | | | 11/15/2012 | 11/15/2012 | Email from RD:███ see below. This requires immediate attention. Please complete discrepancies by Nov 26 and email me when complete. | NA | NA | NA |
| | | lack of in home contact/no on-going assessment | No documented face-to-face contact made with ███ in June, August, and September 2012. Contact with ███ was made by phone when she was at the Salvation Army in July 2012. Difficult to ascertain why she was at the Salvation Army and for how long. Contact with ███ was not made in her placement setting in July and October 2012. No documented face-to-face contact made with ███ in June, September, and October 2012. She was not seen in her placement setting in July and August 2012. It appears that both girls are placed home with their father, ███. Twice monthly contact is needed with the children. Initial ISPs in this case for all parties have not been submitted. No documented medical or dental exam. Their mental health assessments have not been updated since their last stay in custody. Placement record for ███ has not been updated to reflect her current placement. Difficult to tell what efforts were being made on the part of both parents. It would appear that documented assessment with this family is needed to clarify permanency efforts in this case. | 7W | Hancock | 11/15/2012 | | | 11/15/2012 | 11/15/2012 | Email from RD: ███ I am aware that today is ███'s last day with the agency. Can you please assign this case to a new worker as soon as possible. Make sure worker is aware of discrepancies and start to work on them. | NA | NA | NA |
| | | No documented efforts to locate runaway | When the child was told that she would not be placed with a relative, she ran away from her placement. Placement tab indicates that the child has been on runaway status since 11/07/2011. Since the first of November, 2011, there have been 9 narratives entered on this child, and most of the say something to the extent of "███ remains on runaway status. A petition has been filed at the youth court." Some do not say that much. My concern is that there are no real diligent efforts to locate this child. At the previous conference, held 6/25/2012, ASWS███ indicated that because of the child being 18, the agency would be requesting to be relieved of responsibility on this child, but so far, we have not been. | 3S | Hinds | 11/20/2012 | | | 11/20/2012 | 11/20/2012 | NA | NA | NA | NA |
| | | lack of follow up/lack of documentation | Lack of appropriate follow up os an incident that occurred 9-25-11 during which the child disclosed concerns regarding an altercation with a caregiver. There are also noted concerns here about the child not receiving IL funds and an indication that this issue is regional and therefore may need follow up on a larger level. | 3S | Hinds | 11/21/2012 | | | 11/20/2012 | 11/21/2012 | 11/27/12 Email from RD: 3S was experiencing difficulty in receiving the IL info but the issue was resolved. A listing of children enrolled in IL classes will be sent monthly. | NA | NA | NA |

August 2012 - February 11 2013

Date Printed : 2/13/2013

FCR Corrective Action Spreadsheet

NA = No Response Located

| Case Reviewer's Name | Child(ren)'s Name(s) | Issue Noted | Summary of Specific Issue Noted | Region | County of Responsibility | Date Issues Addressed with County/Region Staff | Caseworker's Name | Regional Director's Name | Date Reported to DD II/FCR Email | Date Reported to Field Operations | Corrective Action Taken by the County | Date Corrective Action Sent by ASWS to the Regional Director | Date Received by Field Operations | Date Field Operations Reports Corrective Action to CQI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | lack of face-to-face co | There doesn't appear to be any documented face-to-face contact with ███ in her placement setting whatsoever since she entered agency custody on 06-01-12. | 7W | Harrison | 11/21/2012 | | | 11/21/2012 | 11/21/2012 | NA | NA | NA | NA |
| | | No follow up/ Not supposed to be in custody | It was discussed that ███ was never supposed to be in custody and that his worker would end-date his custody record. Checked in MACWIS and ███ is still showing in active custody. The last documented narrative in this case was on 7-30-12. | 7W | Hancock | 10/23/2012 | | | 12/7/2012 | NA | County worker saw child in December | NA | NA | NA |
| | | lack of face-to-face contact/no permanency efforts | ███, age 9, has been placed at Youth Villages in Memphis, TN since 11-18-11. During this time, there has not been an assigned COS Worker for ███. Due to no COS, contact with ███ has not been made for this period of review. A phone contact was made with ███ on 7/12/12. ███ is scheduled to discharge from Youth Villages soon, but there does not appear to be documented permanency efforts for this child. The TPR in this case was dismissed in November 2012, and the plan has been changed to reunification; however, there is no documented efforts to work with a parent or relative for permanency. His father surrendered his parental rights on 9/12/11. It is noted that the presenting allegations in this case make placement for ███ a unique one. An ICPC was approved in this case; however, it does not appear that this placement can be used. Permanency is a huge concern in this case. This child has been at a facility placement for the majority of his custody. The child's mother, ███████, has not been attached to the case. ███ needs an updated medical and dental exam as his last documented exams were in 2011. Invitations to the county conference were not printed for this review. | 7W | Hancock | 12/10/2012 | | | 12/10/2012 | 12/10/2012 | NA | NA | NA | NA |
| | | lack of contact/no case management | Please note the COR worker is noted as unknown due to cases being assigned to other workers. The most recent assigned worker to this case recently left the agency. There is no initial ISP for the father, ███, and the initial ISPs for ███, and ███ have not been approved at this time. There is no documented medical, dental, and mental health assessments/developmental assessments for the children, and it was noted in a recent narrative that ███, age 3, has issues with his speech and is receiving therapy. It is noted that there was no documented contact consistently made with the family until October 2012. While it appears that the children have been transported to and from this agency by the Social Worker aides, only two visits have actually been documented, the rest were transportation narratives. Permanency is a concern in this case due to the case being opened on 7/28/12 and little involvement with the family as noted by case narratives. | 7W | Hancock | 12/10/2012 | Unknown | | 12/10/2012 | 12/10/2012 | NA | NA | NA | NA |

August 2012 - February 11 2013

Date Printed : 2/13/2013

FCR Corrective Action Spreadsheet

NA = No Response Located

| Case Reviewer's Name | Child(ren)'s Name(s) | Issue Noted | Summary of Specific Issue Noted | Region | County of Responsibility | Date Issues Addressed with County/Region Staff | Caseworker's Name | Regional Director's Name | Date Reported to DD II/FCR Email | Date Reported to Field Operations | Corrective Action Taken by the County | Date Corrective Action Sent by ASWS to the Regional Director | Date Received by Field Operations | Date Field Operations Reports Corrective Action to CQI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | sibling visitation | There doesn't appear to be documented face-to-face contact with ___ in his placement setting since 08-20-12. ___ is placed in the licensed therapeutic resource home of Mr. ___ in Jackson County. Another concern is ___ and ___ have not had any sibling visitation since ___ was placed at Millcreek of Magee on 07-27-12. A MACWIS narrative dated 12-02-12 states ___ has requested a visit with his brother. | 7W | Harrison | 12/12/2012 | | | 12/12/2012 | 12/12/2012 NA | | NA | NA | NA |
| | | Well Being Concern/case documentation | Reviewer found that there has been lack of contact with the child in the placement setting. ___ was placed with paternal relative, ___, until 11-07-12. No visits are documented with the child in the placement setting during the months of July, September, and October 2012. Some contacts are coded as home visits, however, were held at the parent's home and not at the resource home. In talking with the caseworker, she stated home visits were attempted in July. The caseworker related the resource parent was not very cooperative with visits and the permanent plan for the child. The caseworker stated this issue was shared with the resource worker July 2012. The child started a trial placement with the mother on 11-07-12. A home visit was made on 11-28-12; however, visits should be twice a month with the child during a trial placement. It is also noted that medicals, dentals, (current) immunizations, and a visitation plan have not been documented in MACWIS or the case file. | 1N | Alcorn | 12/13/2012 | | | 12/13/2012 | 12/13/2012 NA | | NA | NA | NA |
| | | Lack of case management/cont act | ___ and ___ are placed with their maternal grandmother, ___ in Harrison County (D'Iberville, MS). No documented contact made with ___ in July and September 2012 and none with ___ in July, September, and November 2012. Contact was not made in the placement setting in August 2012 and November 2012. Placement in MACWIS has not yet been approved. No County of Service has been requested in this case. Eligibility has not been completed. Initial ISPs on the children and their mother has not yet been approved. Children's ISPs in MACWIS are incomplete, which includes, medical, dental, mental health assessment, immunization record, visitation plan, and education record. Agency needs to document children's address in their demographic record. It is noted that the current worker, ___, was assigned this case on 12-11-12. | 7W | Hancock | 12/13/2012 | | | 12/13/2012 | 12/13/2012 NA | | NA | NA | NA |
| | | Lack of face-to-face contact | Documentation does not reflect face-to-face contact with ___ during the month of August 2012, September 2012, October 2012, and November 2012. Documentation supports that ___ was placed in Louisiana without ICPC approval. Documentation does not support that ___ is a licensed placement at this time; however, he is placed with his grandparents in LaPlace, Louisiana. Documentation does not support that the placement is currently licensed or that the ICPC has been approved. | 7W | Hancock | 12/18/2012 | (Acting) | | 12/18/2012 | 12/18/2012 | Email from RD: We are diligently working on concerns in Hancock County. We had a massive exit of workers, therefore newly assigned worker and out of county workers are assigned the cases. | NA | NA | NA |

August 2012 - February 11 2013

FCR Corrective Action Spreadsheet

NA = No Response Located

| Case Reviewer's Name | Child(ren)'s Name(s) | Issue Noted | Summary of Specific Issue Noted | Region | County of Responsibility | Date Issues Addressed with County/Region Staff | Caseworker's Name | Regional Director's Name | Date Reported to DD II/FCR Email | Date Reported to Field Operations | Corrective Action Taken by the County | Date Corrective Action Sent by ASWS to the Regional Director | Date Received by Field Operations | Date Field Operations Reports Corrective Action to CQI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ▓▓▓ | ▓▓▓ | Lack of information on ANE investigation and lack of face-to-face contact | Documentation does not reflect face-to-face contact with ▓▓ during the month of October 2012 and November 2012. Documentation and county conference discussion reflects that ▓▓ is currently placed with her maternal grandmother ▓▓▓▓▓▓. Documentation in MACWIS reflects that a level three custody report was received on 9-18-2012 concerning alleged physical neglect of ▓▓▓▓▓ involving illegal drug use in the grandmother's home. This is the second report received on the grandmother's home during the review period. The first report was received on 7-05-2012 and involved allegations of someone not living in the household pouring hot sauce in ▓▓'s mouth. The report on 7-05-2012 was not evidenced by social worker ▓▓. The second investigation does not have any contact narratives with the alleged victim ▓▓▓ or alleged perpetrators ▓▓▓, and ▓▓▓ ▓▓ or any other narratives. The social worker was not in attendance at the county conference. It is unclear through documentation as to whether or not this report has been assessed. Safety and well-being of ▓▓ cannot be assessed by the Reviewer due to the lack of face-to-face contact and incomplete investigation in MACWIS. Also, the grandmother is in the process | 7W | Hancock | 12/18/2012 ▓▓▓ | ▓▓▓ | | 12/18/2012 | 12/18/2012 | Email from RD: We are diligently working on concerns in Hancock County. We had a massive exit of workers, therefore newly assigned worker and out of county workers are assigned the cases. | NA | NA | NA |
| ▓▓▓ | ▓▓▓ | Lack of face-to-face contact/Lack of assessment concerning visitation/needs | Documentation in MACWIS does not reflect monthly face-to-face contact with ▓▓ in any setting during the months of July 2012, August 2012, September 2012, October 2012, and November 2012. Documentation does not reflect face-to-face contact with ▓▓ and ▓▓ during the months September 2012, October 2012, and November 2012. Youth Court order dated 10-03-2012 states children are allowed to visit their father ▓▓▓ unsupervised on the weekends. Documentation in MACWIS does not reflect that an assessment of the father's physical home environment has been completed. The children were removed due to the father's anger and alleged physical abuse. There are concerns with previous domestic violence in the home. The Youth Court has relinquished the agency from working with Ms. ▓▓▓, the children's mother, toward reunification efforts. While documentation supports that Mr. ▓▓ has completed anger management and wants to be reunified with the children, their safety and his appropriateness of parenting can be completely assessed at this time due to the lack of documentation and face-to-face contact. Hancock County Youth Court ordered that Mr. ▓▓ and the children attend counseling and family therapy and provide proof of attendance to the court. The Youth Court has Mr. ▓▓ to attend a Domestic Violence Intervention Program at the Center for Prevention of Non-Violence and provide proof to the court. There's no documentation to confirm or deny Mr. ▓▓'s enrollment in these services. The social worker was not available for | 7W | Hancock | 12/18/2012 ▓▓▓ | ▓▓▓ | | 12/18/2012 | 12/18/2012 | Email from RD: We are diligently working on concerns in Hancock County. We had a massive exit of workers, therefore newly assigned worker and out of county workers are assigned the cases. | NA | NA | NA |

August 2012 - February 11 2013

FCR Corrective Action Spreadsheet

NA = No Response Located

| Case Reviewer's Name | Child(ren)'s Name(s) | Issue Noted | Summary of Specific Issue Noted | Region | County of Responsibility | Date Issues Addressed with County/Region Staff | Caseworker's Name | Regional Director's Name | Date Reported to DD II/FCR Email | Date Reported to Field Operations | Corrective Action Taken by the County | Date Corrective Action Sent by ASWS to the Regional Director | Date Received by Field Operations | Date Field Operations Reports Corrective Action to CQI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| �▓▓▓ | | Lack of documentation | This issue involves a lack of documentation concerning services of ▓ as well as a lack of timely permanency and case planning with ▓'s adoptive parent ▓▓▓. The social worker was not available during the county conference. Documentation in MACWIS does not reflect a monthly assessment of ▓▓'s placement in the treatment facilities to assess her well-being and if her needs have been met. | 7W | Hancock | 12/26/2012 | ▓▓▓ | | 12/26/2012 | 12/26/2012 | NA | NA | NA | NA |
| ▓▓▓ | ▓▓▓ | Lack of Documentation | ▓▓▓ is placed in the foster home ▓▓▓ in Harrison County. There is no COS worker requested for this case. The only in-home contact made with ▓ in his placement setting appears to be in November 2012. A report of maltreatment was reported in this case on 7/24/12; however it was unsubstantiated. This report was prior to his placement with his current foster parents. ▓ was placed with the ▓ family on 8/1/12. I did not see any documentation in case narratives where these bruises were documented by the worker on the case at that time. | 1N | Desoto | 1/7/2013 | ▓▓▓ | | 1/4/2013 | 1/7/2013 | NA | NA | NA | NA |
| ▓▓▓ | NA | Undistributed checks, belongings, etc... | During special assignment in Hancock County, many foster child items were noted to be sitting around in the cubicles untouched for some time. Checks, gifts and letters were located that had not been given to children. Recommendations were made to the RD and ASWS have the items organized, identify who they belong to and have the items delivered to the children. | 7W | Hancock | 1/7/2013 NA | ▓▓▓ | | 1/7/2013 | 1/7/2013 | NA | NA | NA | NA |
| ▓▓▓ | | Lack of face-to-face contact | This child has not had a documented contact since 8/9/12. The worker was not present at the County Conference and I could not address this issue with them. | 7W | Hancock | 1/11/2013 | ▓▓▓ | | 1/10/2013 | 1/11/2013 | NA | NA | NA | NA |
| ▓▓▓ | | No documented medical follow-up | This concern is being sent just on ▓▓ due to it being documented that the child informed his COS worker, ▓▓▓, that he fell on a glass table in the garage and hurt his shoulder. He was taken to Urigcare. There is no documented follow up by this agency regarding this injury or documentation regarding the severity of the injury, i.e. cuts, bruising, dislocated shoulder, etc. ▓▓ stated that he did not break his arm, but thought he sprained his arm. He told the COS worker that if he does not feel better by the weekend, he was going back to Urigcare. there was no follow up documentation regarding this injury. There is no medical documentation in the case regard. This reviewer wants to ensure that any needed medical attention was followed through by this agency and/or the grandmother. It is noted that the grandmother is not yet licensed as a foster parent for her grandchildren, but is working on that process according to the COR worker, ▓▓▓, LSW. | 7W | Hancock | 1/11/2013 | ▓▓▓ | | 1/11/2013 NA | | NA | NA | NA | NA |
| ▓▓▓ | | Lack of face-to-face contact | There doesn't appear to be documented face-to-face contact with ▓▓ and ▓ since 10-26-12, and as noted in the previous PAD, there doesn't appear to be documented face-to-face contact with ▓ and ▓ in their placement setting since 02-27-12. According to Ms. ▓▓ FPS, she has made an appointment to visit them in their relative resource home in Forrest County tomorrow, 01-12-13 | 7W | Harrison (COS Forrest) | 1/11/2013 | ▓▓▓ | | 1/11/2013 | 1/11/2013 | Ms. ▓ went to Forrest county and saw children in home setting. She is not sure why COS worker is not entering narratives. COS worker and supervisor have been told to enter narratives. | 1/14/2013 | NA | NA |

August 2012 - February 11 2013

Date Printed : 2/13/2013

FCR Corrective Action Spreadsheet

NA = No Response Located

| Case Reviewer's Name | Child(ren)'s Name(s) | Issue Noted | Summary of Specific Issue Noted | Region | County of Responsibility | Date Issues Addressed with County/Region Staff | Caseworker's Name | Regional Director's Name | Date Reported to DD II/FCR Email | Date Reported to Field Operations | Corrective Action Taken by the County | Date Corrective Action Sent by ASWS to the Regional Director | Date Received by Field Operations | Date Field Operations Reports Corrective Action to CQI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Child with bruises/Lack of documentation/Lack of face-to-face contact | During the county conference on the case for ███ on 12-28-12, the child's mother, ███ showed this Reviewer and the assigned worker three pictures of her son taken during her supervised visits. The first one was dated 10/10/12 and time stamped 10:45 a.m. The pictured showed ant bites on the child's right hand, which the mother stated went up his arm. The second picture was dated 11/7/12 and time stamped 10:04 a.m. The picture showed a bruise on the lower left side of ███ cheek. The third picture was dated 11/7/12 and time stamped 10:24 a.m. The picture showed a bruise, which was reddish in color, under ███ eye that extended onto his cheek. Ms. ███ stated during the conference that she was told that it was because there were older children in the foster home with ███, but was never given any other detailed explanation of what happened. She also stated that the Youth Court Judge was aware of the bruises and would look into the matter, but she has not heard anything further on the matter. | 7W | Hancock | 1/11/2013 | | | 1/11/2013 | 1/11/2013 | NA | NA | NA | NA |
| | | permanency and well-being concern | During the January 3, 2013 county conference, the caseworker (Ms. ███) stated she went to the prison where Ms. ███ is incarcerated and tried to secure a voluntary surrender from her but she was unable to do so because she did not have a notary public with her. ███ has requested visitation/phone calls with his cousins, ███ and ███ with whom he was once in foster care and has a close bond. There is no documentation that he has had any contact with them during this review period. ███ is currently in a therapeutic foster home in Hinds County but it is unclear if he is receiving any mental health services to help him deal with the trauma he suffered. | 3N | Scott | 1/11/2013 | | | 1/11/2013 | 1/11/2013 | NA | NA | NA | NA |
| | | Lack of contact in placement setting/no assessment | children were not seen in their placement setting in August, September, November, and December 2012. Agency has not documented the children's safety and well-being in their placement setting. If contact has been made, it has not been documented into MACWIS. | 7W | Hancock | 1/15/2013 | | | 1/15/2013 | 1/15/2013 | NA | NA | NA | NA |

August 2012 - February 11 2013

Date Printed : 2/13/2013

FCR Corrective Action Spreadsheet

NA = No Response Located

| Case Reviewer's Name | Child(ren)'s Name(s) | Issue Noted | Summary of Specific Issue Noted | Region | County of Responsibility | Date Issues Addressed with County/Region Staff | Caseworker's Name | Regional Director's Name | Date Reported to DD II/FCR Email | Date Reported to Field Operations | Corrective Action Taken by the County | Date Corrective Action Sent by ASWS to the Regional Director | Date Received by Field Operations | Date Field Operations Reports Corrective Action to CQI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ▉ | ▉ | Permanency Concern | The agency was ordered by the court in November 2011 to refer this case for termination of parental rights to free ▉ adoption. To date, there is no documentation/evidence that this has been done. This was an issue cited at the time of the last review held in August 2012. The case record does reveal that ▉ had been adopted previously and the agency is being required by the court in Rankin County to provide information on this prior adoption. The foster home in which she is currently residing ▉ wishes to adopt her. It is suggested that the state's Attorney General's office be contacted for assistance with this. The ASWS stated in the county conference that the previous adoption may have taken place in Louisiana and that ▉ was born in prison in Louisiana. She stated the family is from the New Orleans area. DHS has been unable to locate any documentation on this prior adoption. Another possibility comes to mind on this is that sometimes we have children in custody whose parents claimed to have adopted them from their mother who (for example) was in prison but after you dig deeper, you find that it wasn't a legal adoption. They are just taking care of the child until the mother gets out of prison. I'm wondering if something of that nature could be going on here | 3N | Rankin | 1/21/2013 | ▉ | ▉ | 1/21/2013 | 1/21/2013 | NA | NA | 1/28/12 requested follow up from RD ▉ | NA |
| ▉ | ▉ | Lack of face-to-face contact/Lack of documentation | child has had no contact since the case was opened. The case opened on 8/23/12 and has three narratives, one is court events, the second is a transfer summary, and last is an attempted contact with the child. No ISP/FSPs are completed on any family members and no other documentation is entered in MACWIS. The worker was not present for the County Conference. | 7W | Harrison | 1/25/2013 | ▉ | ▉ | 1/24/2013 | 1/24/2013 | Worker was informed by school on 11-30-12 that child was withdrawn from school and Castlen Elementary in Grand Bay, AL had requested his records. Worker was informed by Harrison Co. Youth court to perform diligent search. Letters were sent to Castlen elementary on 12-17-12 & 1-14-13. Worker was also informed child did not attend that school or any known schools in Alabama. Child is still in DHS physical custody but placed in mother's physical custody on 9-25-12. Worker sent a PSA to Mobile Co. AL on 2-5-13. Was informed that child did not show in any AL database or attend public school in Mobile Co. Spoke with ▉ elementary to verify name of school that requested records and it was Castlen Elementary in AL. | NA | 1/30/2013 | NA |

August 2012 - February 11 2013

Date Printed : 2/13/2013

FCR Corrective Action Spreadsheet

NA = No Response Located

| Case Reviewer's Name | Child(ren)'s Name(s) | Issue Noted | Summary of Specific Issue Noted | Region | County of Responsibility | Date Issues Addressed with County/Region Staff | Caseworker's Name | Regional Director's Name | Date Reported to DD II/FCR Email | Date Reported to Field Operations | Corrective Action Taken by the County | Date Corrective Action Sent by ASWS to the Regional Director | Date Received by Field Operations | Date Field Operations Reports Corrective Action to CQI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Well-being Concern | It was discussed after the county conference that the agency needs to contact the judge as soon as possible regarding ▓▓▓ testing positive for crystal meth and admitting to the agency that she flushed her system out. ASWS ▓▓▓ states that the agency received a report on January 23, 2013 on ▓▓▓ regarding no lights or food in the home. ASWS ▓▓▓ states that she and FPS ▓▓▓ will make a visit to the home today regarding those allegations. It is strongly suggested that the agency monitors this home very closely. It is strongly suggested that the agency contacts the judge as soon as possible regarding ▓▓▓ testing positive for crystal meth and admitting to the agency that she flushed her system out. It is strongly suggested that the agency reassess if ▓▓▓ is capable of providing a safe environment for all of her children. | 6 Lamar | | | | | 1/25/2013 | 1/25/2013 | RD and ASWS respond on same day. Follow up was occurring. | 1/25/2013 | 1/25/2013 | NA |
| | | Face-to-face contact | Doesn't appear to be documented face-to-face contact with child in placement setting since 9-6-12. Child is placed in the court ordered non-licensed relative placement of her maternal grandparents. | 7W | Harrison | | | | 1/25/2013 | 1/24/2013 | | | 1/25/2013 | NA |
| | | Face-to-face contact | Doesn't appear to be documented face-to-face contact with child since 9-11-12 | 7W | Harrison | | | | 1/26/2013 | 1/24/2013 | | | 1/25/2013 | NA |
| | | Face-to-face contact | Doesn't appear to be documented face-to-face contact with children in their placement setting. They are place in the court ordered non-licensed relative placement of their maternal grandmother. | 7W | Harrison | | | | 1/27/2013 | 1/24/2013 | | | 1/25/2013 | NA |
| | | Face-to-face contact | There doesn't appear to be documented face-to-face contact with ▓▓▓ since 11-12-12. | 7W | Harrison | 1/28/2013 | | | 1/28/2013 | 1/28/2013 | Email from FCR Division Director II to RD and Field Ops regarding custody issues | | 1/28/2013 | NA |
| | | Face-to-face contact | There doesn't appear to be documented face-to-face contact with ▓▓▓ & ▓▓▓ and ▓▓▓ since 11-19-12. | 7W | Harrison | | | | 1/28/2013 | 1/28/2013 | | | 1/28/2013 | NA |
| | | Detention facility concern | ▓▓▓ had three bottles of insulin was missing from detention center. Sent to ▓▓▓ to forward. | 1N | Desoto | | | | 1/28/2013 | | | | | NA |
| | | Face-to-face contact | There doesn't appear to be documented face-to-face contact with ▓▓▓ and ▓▓▓ since 09-12-12; with ▓▓▓ since 09-14-12. | 7W | Harrison | | | | 1/28/2013 | 1/28/2013 | | | 1/28/2013 | NA |
| | | Face-to-face contact | There doesn't appear to be documented face-to-face contact with ▓▓▓ since 05-24-12. Following the previous PAR held on 09-21-12, it was noted there had not been any face-to-face contact with ▓▓▓ in April, June, July, and August. | 7W | Harrison | | | | 1/28/2013 | 1/28/2013 | | | 1/28/2013 | NA |
| | | Face-to-face contact | Doesn't appear to be documented face-to-face contact with child since 11-7-12. | 7W | Harrison | | | | 1/28/2013 | 1/24/2013 | | | 1/25/2013 | NA |
| | | Face-to-face contact | There doesn't appear to be documented face-to-face contact with ▓▓▓ and ▓▓▓ in their placement setting since 11-27-12. They are placed in the court ordered, non-licensed home of their maternal grandmother, Ms. ▓▓▓ in Harrison County. | 7W | Harrison | 1/29/2013 | | | 1/29/2013 | 1/29/2013 | From RD to COR Worker: ▓▓▓, please address with worker. Remind the worker that all children have to bee seen twice a month with one being in the home setting. | NA | 1/30/2013 | NA |

August 2012 - February 11 2013

Date Printed : 2/13/2013

FCR Corrective Action Spreadsheet

NA = No Response Located

| Case Reviewer's Name | Child(ren)'s Name(s) | Issue Noted | Summary of Specific Issue Noted | Region | County of Responsibility | Date Issues Addressed with County/Region Staff | Caseworker's Name | Regional Director's Name | Date Reported to DD II/FCR Email | Date Reported to Field Operations | Corrective Action Taken by the County | Date Corrective Action Sent by ASWS to the Regional Director | Date Received by Field Operations | Date Field Operations Reports Corrective Action to CQI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Well-being Concern | 17 year old is attempting to leave group home. He is currently in detention. No identified permanent connections. Group doesn't appear to be relaying information to the county. County doesn't appear to be documenting everything they may be doing. There was no documentation indicating the county has engaged the group home staff in discussions about planning for ▇▇. Follow up needs to occur to determined who is caring for the children until an adoptive placement can be found ▇▇ that situation and determine if this is a possible resource for the child. | 3S | Hinds | | NA | | 1/29/2013 | 1/29/2013 | RD Read Receipt 1/29/13 | NA | NA | NA |
| | | Lack of permanency efforts | Does not appear to be efforts made by this agency to locate and secure a pre-adoptive placement for these children. The foster parents have made it known from the beginning that they were not interested in adopting the children, but were dedicated to caring for the children until an adoptive placement can be found ▇▇ is placed at Millcreek in Magee, MS for his third time. This was very concerning due to the first two times placed at this time treatment center did not work for him. The foster parents have stated in a previous conference that ▇▇ came back from Millcreek worse off then when he left for this 1st placement there. | 7W | Hancock | 1/31/2013 | | | 1/31/2013 | 1/31/2013 | From Area SWS: From We are prepared with the CCA and can present the children at the next adoption placement committee meeting on February 28, 2013. We already have a family in Harden House that want these children, we have worked with Harden House and the worker Ms. ▇▇ and have had this as the plan. We were waiting until closer to the TPR hearing because it has been postponed in the past. ▇▇ will present the family so we can officially match them and begin visits. Their TPR hearing is in March. | 2/11/2013 | NA | NA |
| | | Face-to-face contact | In preparing for the county conference on 01-23-13, Reviewer found that there has been lack of contact with these three children in their placement setting. The children were in placed with foster parent ▇▇ in Desoto County. Ms ▇▇ moved to Gulfport, MS with the children in July 2012. A contact was not documented with the three children in their placement setting during the months of August, September, and October 2012. A face-to-face contact was not documented during the month of October 2012 with the three children. Contacts have not been documented on a monthly basis with the resource parent, Ms ▇▇ to assess the children and resource parents needs. It is noted that since that time the county of service worker in Harrison County, ▇▇, has been maintaining face-to-face contacts with the children twice a month which includes in the home. The adoption worker visited with the children and the foster parent in the placement on 12-08-12 | 7W | Harrison | 2/3/2013 | | | 1/31/2013 | 2/3/2013 | Reviewer submitted this to the FCR email due to lack of consistent documented contacts and the length of time this occurred (3 months with no face to face). It appears much improvement has been made on this . | NA | 2/3/2013 | NA |
| | | Face-to-face contact | During the course of the County Conference on these children, it was discovered that ▇▇ has only been seen one time since the last county conference, and ▇▇ has not been seen at all ▇▇ has COS in Pearl River County and has been seen appropriately. According to ▇▇ ▇▇ may be with her father in Slidell, LA, but she still is in custody and contacts are not happening. | 7W | Hancock | 2/6/2013 | | | 2/6/2013 | 2/6/2013 | NA | NA | NA | NA |

August 2012 - February 11 2013

FCR Corrective Action Spreadsheet

NA = No Response Located

| Case Reviewer's Name | Child(ren)'s Name(s) | Issue Noted | Summary of Specific Issue Noted | Region | County of Responsibility | Date Issues Addressed with County/Region Staff | Caseworker's Name | Regional Director's Name | Date Reported to DD II/FCR Email | Date Reported to Field Operations | Corrective Action Taken by the County | Date Corrective Action Sent by ASWS to the Regional Director | Date Received by Field Operations | Date Field Operations Reports Corrective Action to CQI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Suspected abuse not reported | According to the case narrative dated 2-6-2013 as entered by Social Worker Aide, ▓▓▓▓ at 10:39 a.m.: "Received call from Ms. ▓▓▓▓ 601-347-1201 with concerns about the kids. She visited with the family and got into it with them because they have been hitting on the kids. ▓▓▓ had a busted mouth. She felt compelled to report. Ms. ▓▓▓ said she called the Hot Line with a report." Upon checking to see if any follow up reports were made, none were entered. There was no follow up documentation in the case narratives regarding this incident. This reviewer has entered a report of maltreatment on this case. The report confirmation number is 9942. It is noted that there have not been any other reports of maltreatment while the children have been with their grandmother. This contact was made by ▓▓▓▓ following a family visit. This was the first visit the family had in over a year. | 7W | Hancock | 2/11/2013 | | | 2/11/2013 | 2/11/2013 | NA | NA | NA | NA |

**Ex. 26B**

| Case Reviewer's Name | Child(ren)'s Name(s) | Issue Noted | Summary of Specific Issue Noted | Region | County of Responsibility | Date Issues Addressed with County/Region Staff | Caseworker's Name | Regional Director's Name | Date Reported to REDACTED DD II/FCR Email | Date Reported to Field Operations | Corrective Action Taken by the County | Date Corrective Action Sent by ASWS to the Regional Director | Date Received by Field Operations | Date Field Operations Reports Corrective Action to CQI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | Well Being Concern/case documentation | Reviewer found that there has been lack of contact with the child in the placement setting. REDACTED was placed with paternal relative, REDACTED, until 11-07-12. No visits are documented with the child in the placement setting during the months of July, September, and October 2012. Some contacts are coded as home visits, however, were held at the parent's home and not at the resource home. In talking with the caseworker, she stated home visits were attempted in July. The caseworker related the resource parent was not very cooperative with visits and the permanent plan for the child. The caseworker stated this issue was shared with the resource worker July 2012. The child started a trial placement with the mother on 11-07-12. A home visit was made on 11-28-12; however, visits should be twice a month with the child during a trial placement. It is also noted that medicals, dentals, (current) immunizations, and a visitation plan have not been documented in MACWIS or the case file. | 1N | Alcorn | 12/13/2012 | REDACTED | REDACTED | 12/13/2012 | 12/13/2012 | NA | NA | NA | NA |
| REDACTED | REDACTED | Lack of Documentation | REDACTED is placed in the foster home REDACTED in Harrison County. There is no COS worker requested for this case. The only in-home contact made with REDACTED in his placement setting appears to be in November 2012. A report of maltreatment was reported in this case on 7/24/12; however it was unsubstantiated. This report was prior to his placement with his current foster parents. REDACTED was placed with the REDACTED family on 8/1/12. I did not see any documentation in case narratives where these bruises were documented by the worker on the case at that time. | 1N | Desoto | 1/7/2013 | REDACTED | REDACTED | 1/4/2013 | 1/7/2013 | NA | NA | NA | NA |
| REDACTED | REDACTED | Detention facility concern | REDACTED had three bottles of insulin was missing from detention center. Sent to REDACTED to forward. | 1N | Desoto | | REDACTED | | 1/28/2013 | | | | | NA |
| REDACTED | REDACTED | Safety Concern | Agency recently investigated foster home. Neglect by foster parents was unsubstantiated; however, several recommendations were made regarding proper supervision of the foster child by the REDACTED. **Refer to email for further details.** | 1N | Desoto | 3/29/2013 | REDACTED | REDACTED | 3/29/2013 | 3/29/2013 | NA | NA | NA | NA |

| Case Reviewer's Name | Child(ren)'s Name(s) | Issue Noted | Summary of Specific Issue Noted | Region | County of Responsibility | Date Issues Addressed with County/Region Staff | Caseworker's Name | Regional Director's Name | Date Reported to REDACTED DD II/FCR Email | Date Reported to Field Operations | Corrective Action Taken by the County | Date Corrective Action Sent by ASWS to the Regional Director | Date Received by Field Operations | Date Field Operations Reports Corrective Action to CQI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | Permanency Concern | The SW stated after the FCR that Harden House staff has defended the home stating that this is one of their better homes, which may have influenced the investigating SW. The reason the child remained in the home was because the grandmother's home in FL had been approved and the Agency had planned on moving the child there within a short amount of time, but when REDACTED changed her mind and did not want to go to the grandmothers at the last minute at court, the GAL and Judge stated that she did not have to go if she did not want to. Chancery court for TPR is scheduled for Sept. 25. FCR and COR share the same concerns. The COR wants the child to be given the opportunity to bond with the grandmother, but can not if the court does not agree to let her go. | 1S | Lafayette | 8/28/2012 NA | REDACTED | | 8/28/2012 | 8/28/2012 | Investigation/MIC completed by Region 1N. Field Ops responded 8/29/12 Permanency Director responded 8/29/12 | 8/28/2012 | 8/2/2012 NA | |
| REDACTED | REDACTED | Permanency Concern | The parents have been requesting unsupervised visits with the child for several months. The visits have been supervised by the agency or the relative resource parents. Reviewer noted the following barriers that could contribute to delayed reunification for the child and parents: There was no ICPC request for a home study in January when the case was reviewed. There was little evidence of extended efforts made by the agency to assess or explore extended relative support, community or other systems that could support successful reunification of the child with the parents. The parents have limited transportation and this will affect their ability to maintain connections with the child: further case management may be needed to explore referrals that can provide the parents with transportation and other communication needs | 1S | Lafayette | 2/28/2013 REDACTED | REDACTED | | 2/28/2013 | 2/28/2013 | 3-1-13 Issues addressed by social worker to RD via email. Refer to email. | 3/1/2013 NA | | NA |
| REDACTED | REDACTED | Maltreatment in Care/Resource home concerns | REDACTED disclosed that her foster father has been making sexual advances towards her. It appears an ongoing investigation is occurring, so this will make the second maltreatment in care report on this resource family in 7 months. REDACTED has been moved from the home, but, two other children reside in this home whom the resource parents recently adopted. | 1S | Lafayette | 3/1/2013 REDACTED | REDACTED | | 3/1/2013 | 3/1/2013 | 3-1-13 Social worker responded by email to RD. Some of the issues addressed. Refer to email. | 3/1/2013 NA | | NA |
| REDACTED | REDACTED | Well-Being Comment | However, through documentation and county conference discussion, I determined that REDACTED has special needs (mental and physical) that will need to be addressed after he is discharged from agency custody. These issues will continually need to be addressed due to Axis I and Axis II diagnoses of Major Depressive Disorder NOS and Mood Disorder along with a history of cutting himself, homicidal thoughts, and drug cravings | 1S | Lee | NA | REDACTED | REDACTED | 9/13/2012 NA | | Not an immediate safety concern | NA | NA | |
| REDACTED | REDACTED | emotional well-being | Documentation in the case file from Licensed Clinical Social Worker REDACTED reflects that behavioral issues appear after REDACTED visits his mother. A psychological assessment from Dr. REDACTED reflects the recommendation that REDACTED not be returned to his mother and strong consideration be given to the resource parents concerning adoption. The social worker REDACTED, REDACTED, and resource parents said that they would not like for REDACTED to be admitted to acute care at this time. They are concerned that the relationship between REDACTED and the resource parents will be strained if he is admitted to acute care. While acute care may strain the relationship between REDACTED and the resource parents, current counseling services and medications do not appear to be completely resolving the issues addressed above. The visitation plan between REDACTED and his mother should be addressed in the youth court as soon as possible. Acute care and/or long term care for REDACTED should be explored due to the seriousness and frequency of REDACTED outbursts and the potential safety risk it poses to himself and the resource parents. | 1S | Monroe | 9/20/2012 REDACTED | REDACTED | | 9/20/2012 | 9/20/2012 | Email from RD: I have been working with mother. I will email county attorney and GAC today to express increasing problems with child and let them know we will hold off with visits until after court and we get some clarity on what court orders. | NA | NA | |
| REDACTED | REDACTED | Well-being concern | lack of documentation in the closing summary which doesn't reflect whether or not services have been put into place upon his return to Louisiana, whether or not the grandmother's home is appropriate, and the fact that he was released from custody and put on a bus. The narrative does not state where the bus was going or who would be meeting him at the drop off bus station. | 1S | Monroe | 3/1/2013 REDACTED | REDACTED | | 3/1/2013 | 3/1/2013 NA | | NA | NA | NA |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | Child Not In Custody | Father not allowing face-to-face contact due to fear of child coming into custody | 1S | Union | NA | REDACTED | REDACTED | 8/7/2012 | NA | | NA | NA | NA NA |
| REDACTED | REDACTED | Face-to-face/placement | has not been seen face-to-face by the agency since August 30th, 2012. Documentation and county conference discussion reflects that the agency has attempted to visit REDACTED and REDACTED in the placement setting during the month of September, 2012 with no avail.ASWS REDACTED and Social Worker REDACTED said that the agency did not recommend the trial home placement and that GAL REDACTED went against the agency's recommendation placing her back into the home with REDACTED. | 1S | Union | | 9/26/2012 REDACTED | REDACTED | 9/26/2012 | 9/26/2012 | 9/27/12 RD sent follow up | | | |
| REDACTED | REDACTED | Permanency Concern | There was a permanency concern noted due to the recent actions of the current adoptive home, REDACTED, stating that they have changed their mind and wish for REDACTED to be moved from their home after several months of telling her that they were going to adopt her and has not let her know their new plan. The local agency is exhausting all efforts to maintain the placement, if appropriate. | 1S | W. Chickisaw | NA | REDACTED | REDACTED | 8/2/2012 | 8/2/2012 | NA | | NA | 8/2/2012 NA |

| Case Reviewer's Name | Child(ren)'s Name(s) | Issue Noted | Summary of Specific Issue Noted | Region | County of Responsibility | Date Issues Addressed with County/Region Staff | Caseworker's Name | Regional Director's Name | Date Reported to REDACTED DD II/FCR Email | Date Reported to Field Operations | Corrective Action Taken by the County | Date Corrective Action Sent by ASWS to the Regional Director | Date Received by Field Operations | Date Field Operations Reports Corrective Action to CQI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | Safety concern | Upon reviewing the case, the reviewer noted that a report dated 4/26/2013 had been made by the COR worker, REDACTED. REDACTED is currently on trail home placement with his mother, REDACTED, and the placement is going well, however, REDACTED disclosed to his mother that when he was at Millcreek, he was raped by a staff member. As of 6/21/2013, this investigation is not complete and REDACTED still hasn't received a forensic interview. The worker, REDACTED documented that she has made several attempts to schedule the forensic interview, however, she has not received a response related to an appointment date thus far | 2E | Grenada | 6/24/2013 | REDACTED | REDACTED | 6/24/2013 | 6/24/2013 | Email from RD to worker on 6-24-13: I asked for this to be handled last week; I just checked and nothing is in the system. Please have REDACTED or another worker go speak with REDACTED and find out what happened. There is no need to wait on a forensic interview with a child who is 14 years old and can articulate what happened to him. The other children at Millcreek are being placed in an extremely high risk situation when Simpson County does not know who the perpetrator is. REDACTED has this information. I'd like for this to be taken care of today. | NA | NA | NA |
| REDACTED | REDACTED | lack of contact/ case planning | No COS ASWS or worker assigned to the case. Forwarding for RD REDACTED to review and address as needed. The COS worker in Stone County is not documenting visits in the placement setting with the children nor the resource parent. Upon reviewing the case, the reviewer did not note any MAY 2013 contact with the children, resource parent, nor the parents by the COS worker. | 2E | Panola | 6/10/2013 | REDACTED | REDACTED | 6/10/2013 | 6/10/2013 | Email from RD on 6-10-13 : I am requesting help from the other RD in getting all this resolved. | NA | NA | NA |

| Case Reviewer's Name | Child(ren)'s Name(s) | Issue Noted | Summary of Specific Issue Noted | Region | County of Responsibility | Date Issues Addressed with County/Region Staff | Caseworker's Name | Regional Director's Name | Date Reported to REDACTED DD II/FCR Email | Date Reported to Field Operations | Corrective Action Taken by the County | Date Corrective Action Sent by ASWS to the Regional Director | Date Received by Field Operations | Date Field Operations Reports Corrective Action to CQI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | Permanency Concern | The agency was ordered by the court in November 2011 to refer this case for termination of parental rights to free REDACTED adoption. To date, there is no documentation/evidence that this has been done. This was an issue cited at the time of the last review held in August 2012. The case record does reveal that REDACTED had been adopted previously and the agency is being required by the court in Rankin County to provide information on this prior adoption. The foster home in which she is currently residing (REDACTED) wishes to adopt her. It is suggested that the state's Attorney General's office be contacted for assistance with this. The ASWS stated in the county conference that the previous adoption may have taken place in Louisiana and that REDACTED was born in prison in Louisiana. She stated the family is from the New Orleans area. DHS has been unable to locate any documentation on this prior adoption. Another possibility comes to mind on this is that sometimes we have children in custody whose parents claimed to have adopted them from their mother who (for example) was in prison but after you dig deeper, you find that it wasn't a legal adoption. They were just taking care of the child until the mother gets out of prison. I'm wondering if something of that nature could be going on here since no one can produce any documentation from this previous adoption. | 3N | Rankin | 1/21/2013 | REDACTED | REDACTED | 1/21/2013 | 1/21/2013 | NA | NA | 1/28/12 REDACTED requested follow up from RD | NA |
| REDACTED | REDACTED | Medical, dental, vision, permanency follow up | **DD II QA of case. Refer to email for more info.** FCR could not locate court orders in the case file. There was a permanency hearing dated September 11, 2011. (Cited on the previous PAD) There were FCR letter printed from MACWIS but they were not printed or mailed 10 days prior to this county conference. There has not been an updated medical since October 27, 2010 , a dental since November 11, 2010 and a vision since November 02, 2010. This information needs to be completed and updated as soon as possible. (This was cited on the previous PAD.)FCR did not locate a current IEP for REDACTED in the case file. This information needs to be obtained and placed in his case record. | 3N | Rankin | 2/14/2013 | REDACTED | REDACTED | 2/14/2013 | 2/14/2013 | NA | NA | NA | NA |
| REDACTED | REDACTED | permanency and well-being concern | During the January 3, 2013 county conference, the caseworker (REDACTED) stated she went to the prison where REDACTED is incarcerated and tried to secure a voluntary surrender from her but she was unable to do so because she did not have a notary public with her. REDACTED has requested visitation/phone calls with his cousins, REDACTED and REDACTED with whom he was once in foster care and has a close bond. There is no documentation that he has had any contact with them during this review period. REDACTED is currently in a therapeutic foster home in Hinds County but it is unclear if he is receiving any mental health services to help him deal with the trauma he suffered. | 3N | Scott | 1/11/2013 | REDACTED | REDACTED | 1/11/2013 | 1/11/2013 | NA | NA | NA | NA |
| REDACTED | REDACTED | safety/well-being concern | REDACTED has been placed back with her mother since 2/21/13. The stepfather is living in the home. Protective capacities were not well documented in the case. Protective actions regarding the step brother are not documented in the case. REDACTED has recanted her sexual abuse statements recently, however, within the case file, the stepfather wrote a statement admitting to touching REDACTED in inappropriate ways (2011). The mother stated (in her written statement) that she walked in on her husband and witnessed him touching her daughter on the breast. In the report from the forensic interview that was completed in 2011, it is also documented REDACTED statements about the abuse (stepfather and step brother). | 3N | Scott | 3/5/2013 | REDACTED | REDACTED | 3/5/2013 | 3/5/2013 | NA | NA | NA | NA |

| REDACTED | REDACTED | Case Files for FCR | 10am review on Thursday, the worker never brought me the case file. I had REDACTED go ask for her it and I could hear her through the walls asking her, but the worker, REDACTED, never brought it to me. So I will be answering the PAD based on what I gathered in MACWIS and during the review. Also with REDACTED, she needs some encouragement on entering where her narratives took place. There were a lot of what I call "transportation" narratives without a lot of meat to it and some face-to-face narratives were vague on where the contact took place | 3N | Scott | 4/19/2013 | REDACTED | 4/19/2013 | 4/22/2013 NA | | NA | 4/22/2013 NA |

| Case Reviewer's Name | Child(ren)'s Name(s) | Issue Noted | Summary of Specific Issue Noted | Region | County of Responsibility | Date Issues Addressed with County/Region Staff | Caseworker's Name | Regional Director's Name | Date Reported to REDACTED DD II/FCR Email | Date Reported to Field Operations | Corrective Action Taken by the County | Date Corrective Action Sent by ASWS to the Regional Director | Date Received by Field Operations | Date Field Operations Reports Corrective Action to CQI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | Child in custody since 1988 | 29 year old in custody, active custody lines, placement at Millcreek, narratives for several years indicating the county is well aware and seeking a conservator. Forwarded to REDACTED. | 3S | Hinds | 3/23/2013 NA | REDACTED | REDACTED | 3/22/2013 NA | | Sent to appropriate DFCS staff. Completed follow up has occurred. | NA | NA | NA |
| REDACTED | REDACTED | Documentation concern | forwarding several narratives copied and pasted from the Mays review I completed in Hinds County today, 6-25-13. These narratives were entered by REDACTED, County of Service Social Worker in Simpson County. After review of the case, and county conference discussion, it appears that the COS is visiting REDACTED twice a month. There are subtle differences in a few of the sentences, but the narratives appear to be in the same format, and not detail specific as to what steps were taken to address REDACTED needs. | 3S | Hinds | 6/26/2013 REDACTED | REDACTED | REDACTED | 6/25/2013 | 6/26/2013 NA | | NA | NA | NA |
| REDACTED | REDACTED | Lack of effort to locate missing child | Reviewer did not find anything in the hard case file showing that the agency has made efforts to locate the child such as a Serious Incident Report, Law Enforcement Report, or Court ordering pick, etc.. Also the child had no documented medical since 2011. | 3S | Hinds | 2/26/2013 REDACTED | REDACTED | REDACTED | 2/26/2013 | 2/26/2013 NA | | NA | NA | NA |
| REDACTED | REDACTED | lack of follow up/lack of documentation | Lack of appropriate follow up os an incident that occurred 9-25-11 during which the child disclosed concerns regarding an altercation with a caregiver. There are also noted concerns here about the child not receiving IL funds and an indication that this issue is regional and therefore may need follow up on a larger level. | 3S | Hinds | 11/21/2012 REDACTED | REDACTED | REDACTED | 11/20/2012 | 11/21/2012 | 11/27/12 Email from RD: 3S was experiencing difficulty in receiving the IL info but the issue was resolved. A listing of children enrolled in IL classes will be sent monthly. | NA | NA | NA |
| REDACTED | REDACTED | No diligent effort to locate runaway | Discussion from SW REDACTED reflects that she has not followed up/completed diligent searches on REDACTED status on a weekly basis, but that her supervisor, REDACTED, has instructed her to do so. Documentation supports a case staffing concerning ASWS REDACTED has not been seen face-to-face in almost a month. It is unknown if REDACTED is appropriately being taken care of, or if her prenatal care needs are being met. | 3S | Hinds | 6/26/2013 REDACTED | REDACTED | REDACTED | 6/26/2013 | 6/26/2013 | Notification to RD of runaway child. Need to continue follow up to locate. RD acknowledged email. | | 6/26/2013 NA | |
| REDACTED | REDACTED | No documented efforts to locate runaway | When the child was told that she would not be placed with a relative, she ran away from her placement.  Placement tab indicates that the child has been on runaway status since 11/07/2011. Since the first of November, 2011, there have been 9 narratives entered on this child, and most of the say something to the extent of "REDACTED remains on runaway status.  A petition has been filed at the youth court."  Some do not say that much. My concern is that there are no real diligent efforts to locate this child.  At the previous conference, held 6/25/2012, ASWS REDACTED indicated that because of the child being 18, the agency would be requesting to be relieved of responsibility on this child, but so far, we have not been. | 3S | Hinds | 11/20/2012 REDACTED | REDACTED | REDACTED | 11/20/2012 | 11/20/2012 NA | | NA | NA | NA |
| REDACTED | REDACTED | Overdue TPR and AFCARS due to no endate/No documentation | During the review, I saw that the worker had not documented anything on the case. I tried to find the ASWS for the case, but I was unable to locate her. I do not know if the child is still in custody or not; however, if the child is in custody there is no documentation on what services has been provided for the child and her family. | 3S | Hinds | 5/8/2013 REDACTED | REDACTED | REDACTED | 5/8/2013 | 5/8/2013 | County is aware. AFCARS issue because of no end-date. Refer to email snet from RD REDACTED on 6-5-13 | NA | NA | NA |
| REDACTED | REDACTED | Permanency | This is the third Periodic Administrative Determination where the TPR Packet is overdue.  It appears that the worker, the supervisor, and the Regional Director worked on and approved a TPR packet.  The packet was then sent to the adoption unit for review and submission to the state office, but it never got forwarded to the state office.  State Office denied the TPR request based on the fact that a TPR packet was never received at the state office.  This is the third PAD where TPR has been overdue.  Corrective action is needed to move this TPR forward.  This child does not have an assigned adoption specialist, but does have an adoption COS line on services stating that the COR Caseworker and Supervisor are the adoption staff assigned. | 3S | Hinds | 4/2/2013 REDACTED | REDACTED | REDACTED | 4/2/2013 | 4/2/2013 | Email from REDACTED: According to my spreadsheet I never received a TPR packet on this child from Hinds Co. If the packet was send to the Adoption Unit for and documents were in he packet, then I would review it and forwarded it to the AG's Office for processing. | NA | NA | NA |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | permanency concern and need to follow up on mental health of child | FCR discovered during the County Conference that the Permanent Plan is Adoption and the Current Plan is Custody with a Relative. The Supervisor, ASWS REDACTED, informed FCR REDACTED that the TPR packet has been submitted to State Office, however, FCR REDACTED did not see where the TPR Request had been documented/submitted in MACWIS and there was no information in the case file indicating a TPR packet has been created or submitted. It appears that the agency requested a Permanency Hearing on 6/22/2010, 7/27/2011 and 11/16/2011, however, a Permanency Hearing has not been documented since 9/30/2010. There were two safety concerns that were documented in MACWIS that raised concern for FCR REDACTED. The first concern was REDACTED (oldest child- 13) telling child that he was going to school because the male child was accused of picking on REDACTED about REDACTED cell phone that he received for Christmas. It was stated that the child told REDACTED the cell phone was fake. The second concern was that REDACTED told a child (female) on the school bus that he was going to rape her. | 3S | Hinds | 2/12/2013 REDACTED | REDACTED | 2/12/2013 | 2/12/2013 NA | NA | NA | NA |
| REDACTED | REDACTED | Permanency/ Well-Being Concern | Adoption was court ordered as plan on 1-21-10; 15 of 22 mths would have been October of 2009. The Court then documented in 7-26-12 order that the agency must TPR. TPR packet has still not been submitted by the county. There are no documented contacts with the caregiver by the Adoption COS REDACTED to discuss the plan of adoption with the maternal great grandmother. There was one narrative that the COR asked REDACTED about adoption on 12-6-12, " Worker asked REDACTED if she was going to adopt the girls and she stated that she wants the agency to proceed with the TPR process and she will decide after the ruling." The last documented contact with REDACTED was on 12-20-12 in the RSP narratives from the Resource worker where it was noted that her toilet was not working, which was also documented in the previous contact on 8-16-12 . There has been no documented services to address this issue. | 3S | Hinds | 6/24/2013 REDACTED | REDACTED | 6/24/2013 | 6/24/2013 NA | NA | NA | NA |
| REDACTED | REDACTED | well being/permanency concern | Documentation does not support that the child's medical needs are being met at this time. The last documented medical at the time of review was 12-20-11. It was documented that REDACTED has gastric ulcers, however, there is no documentation of follow up services. The last documented dental exam was 7-23-12. The FSP was not updated during this review period, the last ISP was updated 9-21-12. The tabs on the Service Plan were not completed. There was no evidence of FTMs in the PUR with the foster parents or Catholic Charities for up dates on case planning or meeting the needs of REDACTED | 3S | Hinds | 6/26/2013 REDACTED | REDACTED | 6/26/2013 | 6/26/2013 RD acknowledged email. | NA | NA | NA |
| REDACTED | REDACTED | Well-being Concern | 17 year old is attempting to leave group home. He is currently in detention. No identified permanent connections. Group doesn't appear to be relaying information to the county. County doesn't appear to be documenting everything they may be doing. There was no documentation indicating the county has engaged the group home staff in discussions about planning for REDACTED. Follow up needs to occur to determined who the teacher is that has taken an interest in REDACTED and assess the appropriateness of that situation and determine if this is a possible resource for the child. | 3S | Hinds | REDACTED | REDACTED | 1/29/2013 | 1/29/2013 RD Read Receipt 1/29/13 | NA | NA | NA |
| REDACTED | REDACTED | No diligent effort to locate runaway | on runaway status where he has been since October 2011. The worker's only documentation of efforts to locate this child is a monthly narrative stating that she has called the sheriff's office and they have no information. The child's last ISP (no FSP entered) was dated 6/13/2011. There have been no documented efforts to contact any family or any other agencies (power companies, telephone providers, etc.) Based on these facts, submission for corrective action is being made | 3S | Hinds | 7/9/2013 REDACTED | REDACTED | 7/9/2013 | 7/9/2013 | Email from RD on 7-10-13: I will take a look at this case. It should be noted, however, that the responsible ASWS was REDACTED.  REDACTED was assigned to this worker in JUne of 2013. | NA | NA | NA |

| 2 | Child(ren)'s Name(s) | Issue Noted | Summary of Specific Issue Noted | Region | County of Responsibility | Date Issues Addressed with County/Region Staff | Caseworker's Name | Regional Director's Name | Date Reported to REDACTED DD II/FCR Email | Date Reported to Field Operations | Corrective Action Taken by the County | Date Corrective Action Sent by AWSS to the Regional Director | Date Received by Field Operations | Date Field Operations Reports Corrective Action to CQI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | Well-Being Concern Lack of permanency efforts | REDACTED baby's father was brought out as REDACTED and his approximate age is 24. REDACTED would have been 17 at the time of conception and the father would be over 24 mths in age difference. There has not been a separate report entered at this time, as we do not know the relationship status between REDACTED and REDACTED.<br><br>**Not an immediate safety or well being concern.  See email for further information.** | 4N | Lowndes | NA | NA | NA | 9/11/2012 NA | NA | | NA | NA | NA |
| REDACTED | REDACTED | | | 4N | Lowndes | 4/8/2013 REDACTED | REDACTED | 4/8/2013 | 4/8/2013 NA | | | NA | NA | NA |
| REDACTED | REDACTED | Possible safety concern | Discussion reflects that REDACTED is court ordered not to be in the home, Youth Court order reflects that REDACTED is not to have "any" contact with REDACTED and REDACTED. Discussion from SW REDACTED reflects that GAL REDACTED wanted the visits to stop; however, Judge REDACTED requested that REDACTED attend four counseling sessions with REDACTED, REDACTED therapist from Youth Villages. Discussion reflects that REDACTED attended those sessions. Discussion from Social Worker REDACTED and ASWS REDACTED reflects that REDACTED is a registered sex offender. Discussion reflects that REDACTED was convicted in May 2000 of statutory rape against a minor female not related to him. Discussion reflects that REDACTED met a female in a bar, and charges were pressed against him for inappropriate sexual contact. REDACTED denied that he committed a crime. REDACTED said he was placed on five years probation  related to that conviction. After being registered as a sex offender, REDACTED moved into a home near a daycare center, and will be facing a court hearing concerning criminal charges related to that issuor visit unsupervised with the children at this time.  REDACTED is the father of REDACTED, and the mother's significant other. REDACTED, REDACTED and REDACTED father, is deceased. The most recent Lowndes County Youth Court order reflects that REDACTED is not to have "any" contact with REDACTED and REDACTED. Discussion from SW REDACTED reflects that GAL REDACTED wanted the visits to stop; however, Judge REDACTED requested that REDACTED attend four counseling sessions with REDACTED, REDACTED therapist from Youth Villages. Discussion reflects that REDACTED attended those sessions. Discussion from Social Worker REDACTED and ASWS REDACTED reflects that REDACTED is a registered sex offender. Discussion reflects that REDACTED was convicted in May 2000 of statutory rape against a minor female not related to him. Discussion reflects that REDACTED met a female in a bar, and charges were pressed against him for inappropriate sexual contact. REDACTED denied that he committed a crime. REDACTED said he was placed on five years probation  related to that conviction. After be facing a court hearing concerning criminal charges related to that issue. REDACTED said that the court hearing keeps being postponed, and may be held in August 2013. | 4N | Lowndes | 6/19/2013 REDACTED | REDACTED | 6/19/2013 | 6/19/2013 NA | | | NA | NA | NA |
| REDACTED | REDACTED | Possible physical abuse at previos Diamond Grove Stay/possible prior abuse by father | Before REDACTED admission to Millcreek, she was placed at Diamond Grove for treatment. An alleged treatment of physical abuse was documented to have occurred at Diamond Groove in January 2013.  Documentation in MACWIS or paper file does not reflect information concerning medical follow up. Refer to email for more information. | 4N | Neshoba | 3/18/2013 REDACTED | REDACTED | 3/18/2013 | 3/18/2013 | | | | | |
| REDACTED | REDACTED | Case needing state office support | **Please note this is not a case requiring corrective action, but rather, assistance and support to locate resources that can provide this child with some legal permanency** | 4N | Winston | 3/22/2013 REDACTED | REDACTED | 3/22/2013 | 3/22/2013 NA | | | NA | 3/25/2013 NA | |

| Case Reviewer's Name | Child(ren)'s Name(s) | Issue Noted | Summary of Specific Issue Noted | Region | County of Responsibility | Date Issues Addressed with County/Region Staff | Caseworker's Name | Regional Director's Name | Date Reported to REDACTED DD II/FCR Email | Date Reported to Field Operations | Corrective Action Taken by the County | Date Corrective Action Sent by ASWS to the Regional Director | Date Received by Field Operations | Date Field Operations Reports Corrective Action to CQI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | Allegation of ANE identified during county conference | This is a concern noted by the child's mom during county conference. There does not appear to be an immediate risk of harm to the child. The socal worker said she will follow-up with the child and resource parent concerning the allegation. This is being noted for the FCR record. | 4S | Lauderdale | 5/30/2013 | REDACTED | REDACTED | 5/29/2013 | 5/30/2013 | NA | NA | NA | NA |

| Case Reviewer's Name | Child(ren)'s Name(s) | Issue Noted | Summary of Specific Issue Noted | Region | County of Responsibility | Date Issues Addressed with County/Region Staff | Caseworker's Name | Regional Director's Name | Date Reported to REDACTED DD II/FCR Email | Date Reported to Field Operations | Corrective Action Taken by the County | Date Corrective Action Sent by ASWS to the Regional Director | Date Received by Field Operations | Date Field Operations Reports Corrective Action to CQI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | Safety Concern **Report made to Central Intake by reviewer** | On 02-13-15 at the county conference, REDACTED, maternal grandmother of REDACTED, REDACTED, and REDACTED reported that she had witnessed the children's paternal grandmother, REDACTED, (also relative foster parent) put soap in REDACTED mouth the day after Christmas for him biting REDACTED, another sibling. She also said but did not know if it was true that the grandfather (relative foster parent) has been shaking the kids. Supposedly, another relative told her about that, but she did not know if it was true. | 5E | Simpson | Report made to Central Intake by reviewer | REDACTED | REDACTED | 2/14/2013 | Report made to Central Intake by reviewer | Report made to Central Intake by reviewer | Report made to Central Intake by reviewer | Report made to Central Intake by reviewer | Report made to Central Intake by reviewer |
| REDACTED | REDACTED | Effort to locate runaway | . I am sending this through for corrective action not because I found that there were no efforts to locate this child, but due to the need to increase efforts to locate him and possibly the need to utilize the assistance of other counties to help locate this teen | 5E | Copiah | 7/18/2013 | REDACTED | REDACTED | 7/18/2013 | 7/18/2013 | NA | NA | NA | NA |

| Case Reviewer's Name | Child(ren)'s Name(s) | Issue Noted | Summary of Specific Issue Noted | Region | County of Responsibility | Date Issues Addressed with County/Region Staff | Caseworker's Name | Regional Director's Name | Date Reported to REDACTED DD II/FCR Email | Date Reported to Field Operations | Corrective Action Taken by the County | Date Corrective Action Sent by ASWS to the Regional Director | Date Received by Field Operations | Date Field Operations Reports Corrective Action to CQI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | possible safety concern | REDACTED is a Harrison County foster child who had a PAR on 08-10-12. From review of the case file, REDACTED has a 14 year old sister, REDACTED, who is in the legal custody of their mother, REDACTED.REDACTED stated the mother has convinced REDACTED to return to her home, and she fears REDACTED mother is allowing her to not attend school by using home schooling as an excuse without any actual home schooling, she fears the mother is allowing REDACTED boyfriend to share REDACTED bed with her, and she fears substance abuse by REDACTED step-father. There doesn't appear to be documentation this information has been forwarded to Lamar County DFCS. | 6 | Lamar | N/A | N/A | REDACTED | 8/10/2012 | 8/10/2012 | NA | | NA | NA | NA |
| REDACTED | REDACTED | Well-being Concern | It was discussed after the county conference that the agency needs to contact the judge as soon as possible regarding REDACTED testing positive for crystal meth and admitting to the agency that she flushed her system out. ASWS REDACTED states that the agency received a report on January 23, 2013 on REDACTED regarding no lights or food in the home. ASWS REDACTED states that she and FPS REDACTED will make a visit to the home today regarding those allegations. It is strongly suggested that the agency monitors this home very closely. It is strongly suggested that the agency contacts the judge as soon as possible regarding REDACTED testing positive for crystal meth and admitting to the agency that she flushed her system out. It is strongly suggested that the agency reassess if REDACTED is capable of providing a safe environment for all of her children. | 6 | Lamar | | | REDACTED | REDACTED | 1/25/2013 | 1/25/2013 | RD and ASWS respond on same day. Follow up was occurring. | 1/25/2013 | 1/25/2013 | NA |

| Case Reviewer's Name | Child(ren)'s Name(s) | Issue Noted | Summary of Specific Issue Noted | Region | County of Responsibility | Date Issues Addressed with County/Region Staff | Caseworker's Name | Regional Director's Name | Date Reported to REDACTED DD II/FCR Email | Date Reported to Field Operations | Corrective Action Taken by the County | Date Corrective Action Sent by ASWS to the Regional Director | Date Received by Field Operations | Date Field Operations Reports Corrective Action to CQI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | Well-being Concern | No twice monthly visits with the minor in placement setting in June and July. Appears worker did not focus on the issues related to the minor safety and well being during her monthly contacts. | 7E | Jackson | NA | REDACTED | REDACTED | 11/7/2012 | 11/15/2012 | RD Read Receipt 11/15/12 | NA | NA | NA |

| Case Reviewer's Name | Child(ren)'s Name(s) | Issue Noted | Summary of Specific Issue Noted | Region | County of Responsibility | Date Issues Addressed with County/Region Staff | Caseworker's Name | Regional Director's Name | Date Reported to REDACTED DD II/FCR Email | Date Reported to Field Operations | Corrective Action Taken by the County | Date Corrective Action Sent by ASWS to the Regional Director | Date Received by Field Operations | Date Field Operations Reports Corrective Action to CQI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | No COS Worker/Lack of Contact No documented efforts to locate runaway | Placed at Millcreek on 3/23/12. No Cos worker assigned. No documentation showing agency has gone to Millcreek to check well-being. | 7W | Hancock | 8/3/2012 REDACTED | REDACTED | 8/2/2012 | 8/3/2012 | Email from RD to worker: Immediate contact needs to be made this week. Email me when complete. | NA | NA | NA |
| REDACTED | REDACTED | Face-to-face contact/no medical records | Agency has not documented efforts to locate; dental, psychological, and medical reports have not been updated in MACWIS; ISP has not been updated in over a year. No documented contact made with REDACTED in March, April, June, and July 2012. | 7W | Hancock | 8/6/2012 REDACTED | REDACTED | 8/6/2012 | 8/6/2012 | NA | NA | NA | NA |
| REDACTED | REDACTED | Face-to-face contact | No documented contact made with REDACTED and REDACTED in March, June, and July 2012. REDACTED has been diagnosed with Autism. There were no medical records found in his case file supporting his therapy. no documented contact made with REDACTED in April, July, and August 2012. REDACTED has not had an updated/documented medical exam since December 2010. Her last dental exam was in April 2011. | 7W | Hancock | 8/27/2012 REDACTED | REDACTED | 8/27/2012 | 8/27/2012 | 8/27/12 Regional Director Responded | NA | NA | NA |
| REDACTED | REDACTED | Face-to-face contact/documentation | No documented contact made with the children in March, July, and August 2012. No documented safety, well-being, and needs to of the children, as well as the needs to of the foster parents. The children's medical record has not been updated since 2010. There is still no documented dental exam. The ISPs for the children have not been updated since June 2011 | 7W | Hancock | 9/12/2012 REDACTED | REDACTED | 9/12/2012 | 9/12/2012 | Email from RD: Supervisors, please review this case. This child needs permanency. Worker needs to make a visit right away. REDACTED, please stress concerns to REDACTED and have her make an immediate visit and address safety and well-being. | NA | NA | NA |
| REDACTED | REDACTED | Face-to-face contact emotional well-being | no documented contact made with REDACTED in April, May, and August 2012. There did not appear to be a documented medical and developmental assessment on REDACTED | 7W | Hancock | 9/12/2012 REDACTED | REDACTED | 9/12/2012 | 9/12/2012 | 9/13/12 Email from RD: REDACTED, have worker aggressively work on ensuring needs of the child are met. Have her ensure all assessments are completed and documented. | NA | NA | NA |
| REDACTED | REDACTED | Face-to-face contact | Not an immediate safety concern | 7W | Hancock | 9/14/2012 REDACTED | REDACTED | 9/14/2012 | 9/14/2012 | NA | NA | NA | NA |
| REDACTED | REDACTED | Face-to-face contact | REDACTED has not been seen by this agency since 12-29-11 and REDACTED has not been seen by this agency since 01-28-12. There are several Adoption Status Meetings documented where information has been requested by the COR, but it does not appear that follow up has been made. Permanency appears to be a great issue in this as these children are approaching two years in custody. | 7W | Hancock | 9/17/2012 REDACTED | REDACTED | 9/17/2012 | 9/17/2012 | 9/17/12  RD Response | NA | NA | NA |
| REDACTED | REDACTED | Face-to-face contact/no services | Agency has not documented any contact with REDACTED since she came into DMS custody in May 2012.  Agency has not seen this child in her placement setting. Agency has not addressed her overall safety, needs, and well-being. The only documented contact made with REDACTED is in June 2012 when he was brought the police station to speak with a detective.  Agency has not documented any contact with the children's caregivers.  There was only one documented contact each with the parents for this review period. | 7W | Hancock | 10/22/2012 REDACTED | REDACTED | 10/22/2012 | 10/22/2012 | Email from RD: REDACTED, make sure REDACTED gets out to see children on her caseload. Let her know she is required to see the children twice a month and one has to be in the home setting. I am continuously receiving emails regarding her lack of compliance in seeing  children as required. | NA | NA | NA |
| REDACTED | REDACTED | Lack of documentation/cont act/assessment | The children are residing in Harrison County with their paternal grandmother, REDACTED.  She is a licensed foster parent for the children.  There is no COS worker established with Harrison County.  There has been no attempted contact made with the parents.  It was noted that the mother was released from jail on July 29, 2012. Additionally, there is no documented medical, dental, or mental health assessments completed.  The children's eligibility has not been completed.  There has been no monthly assessment regarding the safety, needs, and well-being of these children.  It was noted in three contacts made with the paternal grandmother were she identified needs for the children.  Although the letters to the county conference were printed on 9-19-12, no participants were selected for the review. | 7W | Hancock | 10/29/2012 REDACTED | REDACTED | 10/29/2012 | 10/29/2012 | Email from REDACTED: All of these things are being addressed. I thought that all of them had been done in this case. | NA | NA | NA |
| REDACTED | REDACTED | Lack of Contact/No Assessment/Permanency | Noted 2 times in 2012 | 7W | Hancock | 10/29/2012 REDACTED | REDACTED | 10/29/2012 | 10/29/2012 | NA | NA | NA | NA |
| REDACTED | REDACTED | Documentation/Assessment | There was no documentation made with the children in May, July, August, and September 2012. Agency has not documented case planning efforts with the parents where their service agreements are discussed.  It does not appear that the parents or paternal grandparents, who reportedly have unsupervised visitation every other weekend, were invited to the county conference. The children have not had a documented medical, developmental assessment (REDACTED), mental health assessment (REDACTED), or dental exam (REDACTED) since entering custody. | 7W | Hancock | 10/29/2012 REDACTED | REDACTED | 10/29/2012 | 10/29/2012 | NA | NA | NA | NA |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | Lack of Contact/No Assessment | no documented contact made with these children in June, August, and October 2012.  In looking at the children's ISPs, a COS worker has not been assigned by the COS ASWS. It does not appear that monthly assessment is occurring in this case to ensure all needs of the children and the foster parents are being met.  Due to the allegations in this case, sexual abuse and sibling sexual misconduct in the past, on-going assessment is needed in this case. | 7W | Hancock | 10/31/2012 REDACTED | REDACTED | 10/31/2012 | 10/31/2012 NA | | NA | NA | NA |
| REDACTED | REDACTED | Lack of in-home contact with child/no assessment | Case opened in June 2012 and there has not been a documented contact made with REDACTED in his placement setting.  The contact that took place in home was not child's actual placement setting.  COS has not been requested for REDACTED.  No documented contact made in August and October 2012. Medical record has not been documented,  no developmental assessment, and no visitation plan.  Child and father were not confirmed in the investigation and therefore do not show that there was an investigation completed.  When this Reviewer checked the investigation for the ICWA contact, there were only two narratives.  It appears that it is possible that this case was submitted prematurely.  No services, such as a birthday allowance or initial clothing allowance, has been provided for REDACTED.  The invitations to the county conference were not printed by the assigned worker. Initial ISP for REDACTED not submitted and no ISP for REDACTED.  No services have been provided for the children, such as an initial clothing allowance.  No documented medical, dental, mental health assessment for the children.  Eligibility  not completed and submitted.  Placement record has not been entered in MACWIS.  Unable to determine from case narratives if the children are placed in county or elsewhere with their grandmother.  There appears to be some speech issues regarding REDACTED.  Agency needs to document what services have been provided for this child. When the grandmother comes to pick the children up from the parent's home following visitation, she has the police escort her.  Both parents deny ever threatening the grandmother to warrant her having a police escort.  The family Preservation staff stated that the grandmother feels threatened over something that happened a year ago.  Safety issues were noted by Family Preservation.  Worker is having contact with the children during supervised visitation at the parent's home, contact with the children has not been made at the grandmother's home.  Contact is needed in  actual placement setting. | 7W | Hancock | 11/6/2012 REDACTED | REDACTED | 11/6/2012 | 11/6/2012 NA | | NA | NA | NA |
| REDACTED | REDACTED | Lack of contact in placement setting/no assessment | Case opened June 2012.  None of the children or parents have ISPs. Father to REDACTED  and the father to REDACTED  have not been attached to this case.  After reading the narratives, I was still not  sure where children are placed.  There was one narrative stating that REDACTED was with her paternal grandfather and then another contact where the children were seen at their maternal aunt's home.  Her address was noted and she resides in Hancock County. No services, such as a clothing allowance, has been requested for the children.  No documented dental or medical exams.  There is no visitation plan and the children's placement record has not been added. The children's address has not been entered. | 7W | Hancock | 11/6/2012 REDACTED | REDACTED | 11/6/2012 | 11/6/2012 NA | | NA | NA | NA |
| REDACTED | REDACTED | Lack of contact/assessment /case management | There was no documented contact made with REDACTED in June, July, August, and October 2012.  There was no documented contact made with REDACTED and REDACTED in July, August, and October.  There is no documentation with the children's placement provider and no on-going contact with the parents.  It appears that the last contact with the mother and father to REDACTED were in July 2012.  If contact with REDACTED and the children has not been made, it has not yet been entered into MACWIS. | 7W | Hancock | 11/6/2012 REDACTED | REDACTED | 11/6/2012 | 11/6/2012 NA | | NA | NA | NA |
| REDACTED | REDACTED | Lack of contact/no ongoing assessment | licensed foster home and has been in this placement since 7/24/12.  A COS worker has not been assigned to the ISP for REDACTED.  There are no permanency/concurrent plan.  It appears that the Initial ISP was approved by the previous ASWS even though it appears that the ISP was incomplete at the time. REDACTED mother is very developmentally delayed.  It does not appear that this agency has referred this child for a developmental assessment to ensure that he is developmentally on track.  There is no documented medical exam and no documented visitation plan.  It does not appear that this agency has engaged the mother and father in case planning efforts.  There was no documented contact with the child in July, August, and September 2012 and he was not seen in his placement setting in October 2012. There has only been one documented contact with the foster parent for this review period. | 7W | Hancock | 11/6/2012 REDACTED | REDACTED | 11/6/2012 | Email from RD: REDACTED, can you please 11/6/2012 make sure case is reassigned ASAP. | | NA | NA | NA |
| REDACTED | REDACTED | Lack of contact/no on-going assessment | No documented contact made for this review period.  This includes face-to-face and phone contact. Last documented narrative  was on July 31, 2012 for a case staffing. REDACTED is placed in Hancock County with her maternal grandmother, REDACTED.  REDACTED has been in this placement since March 2011.  It is noted that REDACTED is not licensed as a foster parent. REDACTED medical records have not been updated since 2011. This is the second safety concern documented in this case.  If contact with REDACTED and her grandmother was made for this review period, it has not yet been documented. | 7W | Hancock | 11/15/2012 REDACTED | REDACTED | 11/15/2012 | 11/15/2012 NA | | NA | NA | NA |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | Lack of contact/no on-going assessment | No documented contact. Both children are placed together with REDACTED in Hancock County. No documented contact made with the parents and the children's caregiver for this review period. Medical, dental, and mental health assessment have not been documented. Case has been open since March 2011. REDACTED has been diagnosed with Cerebral Palsy. REDACTED, and his father, REDACTED, have not had a Review ISP since their Initial Review in 2011. A report of maltreatment was made on 11-13-12 regarding the father driving under the influence of alcohol with his children in his vehicle. As of yesterday, this investigation has not been assigned. Contact has not yet been entered into MACWIS. | 7W | Hancock | 11/15/2012 REDACTED | REDACTED | 11/15/2012 | 11/15/2012 | Email from RD: REDACTED, see below. This requires immediate attention. Please complete discrepancies by Nov 26 and email me when complete. | NA | NA | NA |
| REDACTED | REDACTED | lack of in home contact/no on-going assessment | No documented face-to-face contact made with REDACTED in June, August, and September 2012. Contact with REDACTED was made by phone when she was at the Salvation Army in July 2012. Difficult to ascertain why she was at the Salvation Army and for how long. Contact with REDACTED was not made in her placement setting in July and October 2012. No documented face-to-face contact made with REDACTED in June, September, and October 2012. She was not seen in her placement setting in July and August 2012. It appears that both girls are placed home with their father, REDACTED. Twice monthly contact is needed with the children. Initial ISPs in this case for all parties have not been submitted. No documented medical or dental exam. Their mental health assessments have not been updated since their last stay in custody. Placement record for REDACTED has not been updated to reflect her current placement. Difficult to tell what efforts were being made on the part of both parents. It would appear that documented assessment with this family is needed to clarify permanency efforts in this case. | 7W | Hancock | 11/15/2012 REDACTED | REDACTED | 11/15/2012 | 11/15/2012 | Email from RD: REDACTED, I am aware that today is REDACTED last day with the agency. Can you please assign this case to a new worker as soon as possible. Make sure worker is aware of discrepancies and start to work on them. | NA | NA | NA |
| REDACTED | REDACTED | No follow up/ Not supposed to be in custody | It was discussed that REDACTED was never supposed to be in custody and that his worker would end-date his custody record. Checked in MACWIS and REDACTED is still showing in active custody. The last documented narrative in this case was on 7-30-12. | 7W | Hancock | 10/23/2012 REDACTED | REDACTED | 12/7/2012 NA | | County worker saw child in December | NA | NA | NA |
| REDACTED | REDACTED | lack of face-to-face contact/no permanency efforts | REDACTED, age 9, has been placed at Youth Villages in Memphis, TN since 11-18-11. During this time, there has not been an assigned COS Worker for REDACTED. Due to no COS, contact with REDACTED has not been made for this period of review. A phone contact was made with REDACTED on 7/12/12. REDACTED is scheduled to discharge from Youth Villages soon, but there does not appear to be documented permanency efforts for this child. The TPR in this case was dismissed in November 2012, and the plan has been changed to reunification; however, there is no documented efforts to work with a parent or relative for permanency. His father surrendered his parental rights on 9/12/11. It is noted that the presenting allegations in this case make placement for REDACTED a unique one. An ICPC was approved in this case; however, it does not appear that this placement can be used. Permanency is a huge concern in this case. This child has been a facility placement for the majority of his custody. The child's mother, REDACTED, has not been attached to the case. REDACTED needs an updated medical and dental exam as his last documented exams were in 2011. Invitations to the county conference were not printed for this review. | 7W | Hancock | 12/10/2012 REDACTED | REDACTED | 12/10/2012 | 12/10/2012 NA | | NA | NA | NA |
| REDACTED | REDACTED | lack of contact/no case management | Please note the COR worker is noted as unknown due to cases being assigned to other workers. The most recent assigned worker to this case recently left the agency. There is no Initial ISP for the father, REDACTED, and the Initial ISPs for REDACTED and REDACTED have not been approved at this time. There is no documented medical, dental, and mental health assessments/developmental assessments for the children, and it was noted in a recent narrative that REDACTED, age 3, has issues with his speech and is receiving therapy. It is noted that there was no documented contact consistently made with the family until October 2012. While it appears that the children have been transported to and from this agency by the Social Worker aides, only two visits have actually been documented, the rest are transportation narratives. Permanency is a concern in this case due to the case being opened on 7/28/12 and little involvement with the family as noted by case narratives. | 7W | Hancock | 12/10/2012 REDACTED | REDACTED | 12/10/2012 | 12/10/2012 NA | | NA | NA | NA |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | Lack of case management/cont act | REDACTED and REDACTED are placed with their maternal grandmother, REDACTED, in Harrison County (D'Iberville, MS). No documented contact made with REDACTED in July and September 2012 and none with REDACTED in July, September, and November 2012. Contact was not made in the placement setting in August 2012 and November 2012. Placement in MACWIS has not yet been approved. No County of Service has been requested in this case. Eligibility has not been completed. Initial ISPs on the children and their mother has not yet been approved. Children's ISPs in MACWIS are incomplete, which includes, medical, dental, mental health assessment, immunization record, visitation plan, and education record. Agency needs to document children's address in their demographic record. It is noted that the current worker, REDACTED, was assigned this case on 12-11-12. | 7W | Hancock | 12/13/2012 | REDACTED | REDACTED | 12/13/2012 | 12/13/2012 | NA | NA | NA | NA |
| REDACTED | REDACTED | Lack of face-to-face contact | Documentation does not reflect face-to-face contact with REDACTED during the month of August 2012, September 2012, October 2012, and November 2012. Documentation supports that REDACTED was placed in Louisiana without ICPC approval. Documentation does not support that REDACTEDis in a licensed placement at this time; however, he is placed with his grandparents in LaPlace, Louisiana. Documentation does not support that the placement is currently licensed or that the ICPC has been approved. | 7W | Hancock | 12/18/2012 | REDACTED | REDACTED | 12/18/2012 | 12/18/2012 | Email from RD: We are diligently working on concerns in Hancock County. We had a massive exit of workers, therefore newly assigned worker and out of county workers are assigned the cases. | NA | NA | NA |
| REDACTED | REDACTED | Lack of information on ANE investigation and lack of face-to-face contact | Documentation does not reflect face-to-face contact with REDACTED during the month of October 2012 and November 2012. Documentation and county conference discussion reflects that REDACTED is currently placed with her maternal grandmother REDACTED. Documentation in MACWIS reflects that a level three custody report was received on 9-18-2012 concerning alleged physical neglect of REDACTED involving illegal drug use in the grandmother's home. This is the second report received on the grandmother's home during the review period. The first report was received on 7-05-2012 and involved allegations of someone not living in the household pouring hot sauce in REDACTED mouth. The report on 7-05-2012 was not evidenced by social worker REDACTED. The second investigation does not have any contact narratives with the alleged victim REDACTED or alleged perpetrators REDACTED and REDACTED or any other narratives. The social worker was not in attendance at the county conference. It is unclear through documentation as to whether or not this report has been assessed. Safety and well-being of REDACTED cannot be assessed by the Reviewer due to the lack of face-to-face contact and incomplete investigation in MACWIS. Also, the grandmother is in the process of becoming a licensed relative placement but as of the conference date her home has not been licensed. | 7W | Hancock | 12/18/2012 | REDACTED | REDACTED | 12/18/2012 | 12/18/2012 | Email from RD: We are diligently working on concerns in Hancock County. We had a massive exit of workers, therefore newly assigned worker and out of county workers are assigned the cases. | NA | NA | NA |
| REDACTED | REDACTED | Lack of face-to-face contact/Lack of assessment concerning visitation/needs | Documentation in MACWIS does not reflect monthly face-to-face contact with REDACTED in any setting during the months of July 2012, August 2012, September 2012, October 2012, and November 2012.Documentation does not reflect face-to-face contact with REDACTED and REDACTED during the months September 2012, October 2012, and November 2012. Youth Court order dated 10-03-2012 states children are allowed to visit their father REDACTED unsupervised on the weekends. Documentation in MACWIS does not reflect that an assessment of the father's physical home environment has been completed. The children were removed due to the father's anger and alleged physical abuse. There are concerns with previous domestic violence in the home. The Youth Court has relinquished the agency from working with REDACTED, the children's mother, toward reunification efforts. While documentation supports that REDACTED has completed anger management and wants to be reunified with the children, their safety and his appropriateness of parenting cannot be completely assessed at this time due to the lack of documentation and face-to-face contact. Hancock County Youth Court ordered that REDACTED and the children attend counseling and family therapy and provide proof of attendance to the court. The Youth Court has REDACTED to attend a Domestic Violence Intervention Program at the Center for Prevention of Non-Violence and provide proof to the court. There's no documentation to confirm or deny REDACTED enrollment in these services. The social worker was not available for the county conference. | 7W | Hancock | 12/18/2012 | REDACTED | REDACTED | 12/18/2012 | 12/18/2012 | Email from RD: We are diligently working on concerns in Hancock County. We had a massive exit of workers, therefore newly assigned worker and out of county workers are assigned the cases. | NA | NA | NA |
| REDACTED | REDACTED | Lack of documentation | This issue involves a lack of documentation concerning services of REDACTED as well as a lack of timely permanency and case planning with REDACTED adoptive parent REDACTED .The social worker was not available during the county conference. Documentation in MACWIS does not reflect a monthly assessment of REDACTED placement in the treatment facilities to assess her well-being and if her needs can best be met. | 7W | Hancock | 12/26/2012 | REDACTED | REDACTED | 12/26/2012 | 12/26/2012 | NA | NA | NA | NA |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | Undistributed checks, belongings, etc... | During special assignment in Hancock County, many foster child items were noted to be sitting around in the cubicles untouched for some time. Checks, gifts and letters were located that had not been given to children. Recommendations were made to the RD and ASWS have the items organized, identify who they belong to and have the items delivered to the children. | 7W | Hancock | 1/7/2013 REDACTED | REDACTED | 1/7/2013 | 1/7/2013 NA | | NA | NA | NA |
| REDACTED | REDACTED | Lack of face-to-face contact | This child has not had a documented contact since 8/9/12. The worker was not present at the County Conference and I could not address this issue with them. | 7W | Hancock | 1/11/2013 REDACTED | REDACTED | 1/10/2013 | 1/11/2013 NA | | NA | NA | NA |
| REDACTED | REDACTED | No documented medical follow-up | This concern is being sent just on REDACTED due to it being documented that the child informed his COS worker, REDACTED, that he fell on a glass table in the garage and hurt his shoulder. He was taken to Urigcare. There is no documented follow up by this agency regarding this injury or documentation regarding the severity of the injury, i.e. cuts, bruising, dislocated shoulder, etc. REDACTED stated that he did not break his arm, but thought he sprained his arm. He told the COS worker that if he does not feel better by the weekend, he was going back to Urigcare. there was no follow up documentation regarding this injury. There is no medical documentation in the case regard. This reviewer wants to ensure that any needed medical attention was followed through by this agency and/or the grandmother. It is noted that the grandmother is not yet licensed as a foster parent for her grandchildren, but is working on that process according to the COR worker, REDACTED, LSW. | 7W | Hancock | 1/11/2013 REDACTED | REDACTED | 1/11/2013 NA | NA | | NA | NA | NA |
| REDACTED | REDACTED | Child with bruises/Lack of documentation/Lack of face-to-face contact | During the county conference on the case for REDACTED on 12-28-12, the child's mother, REDACTED, showed this Reviewer and the assigned worker three pictures of her son taken during her supervised visits. The first one was dated 10/10/12 and time stamped 10:45 a.m. The pictured showed ant bites on the child's right hand, which the mother stated went up his arm. The second picture was dated 11/7/12 and time stamped 10:04 a.m. The picture showed a bruise on the lower left side of REDACTED cheek. The third picture was dated 11/7/12 and time stamped 10:24 a.m. The picture showed a bruise, which was reddish in color, under REDACTED eye that extended onto his cheek. REDACTED stated during the conference that she was told that it was because there were older children in the foster home with REDACTED, but was never given any other detailed explanation of what happened. She also stated that the Youth Court Judge was aware of the bruises and would look into the matter, but she has not heard anything further on the matter. | 7W | Hancock | 1/11/2013 REDACTED | REDACTED | 1/11/2013 | 1/11/2013 NA | | NA | NA | NA |
| REDACTED | REDACTED | Lack of contact in placement setting/no assessment | children were not seen in their placement setting in August, September, November, and December 2012. Agency has not documented the children's safety and well-being in their placement setting. If contact has been made, it has not been documented into MACWIS. | 7W | Hancock | 1/15/2013 REDACTED | REDACTED | 1/15/2013 | 1/15/2013 NA | | NA | NA | NA |
| REDACTED | REDACTED | Lack of permanency efforts | Does not appear to be efforts made by this agency to locate and secure a pre-adoptive placement for these children. The foster parents have made it known from the beginning that they were not interested in adopting the children, but were dedicated to caring for the children until an adoptive placement can be found. REDACTED is placed at Millcreek in Magee, MS for his third time. This was very concerning due to the first two times placed at this time treatment center did not work for him. The foster parents have stated in a previous conference that REDACTED came back from Millcreek worse off then when he left for this 1st placement there. | 7W | Hancock | 1/31/2013 REDACTED | REDACTED | 1/31/2013 | 1/31/2013 TPR hearing is in March. | From Area SWS: From We are prepared with the CCA and can present the children at the next adoption placement committee meeting on February 28, 2013. We already have a family in Harden House that want these children, we have worked with Harden House and the worker REDACTED and have had this as the plan. We were waiting until closer to the TPR hearing because it has been postponed in the past. REDACTED will present the family so we can officially match them and begin visits. Their | 2/11/2013 NA | NA |
| REDACTED | REDACTED | Face-to-face contact | During the course of the County Conference on these children, it was discovered that REDACTED has only been seen one time since the last county conference, and REDACTED has not been seen at all. REDACTED has COS on Pearl River County and has been seen appropriately. According to REDACTED, REDACTED may be with her father in Slidell, LA, but she still is in custody and contacts are not happening. | 7W | Hancock | 2/6/2013 REDACTED | REDACTED | 2/6/2013 | 2/6/2013 NA | | NA | NA | NA |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | No documented medical follow up | documented that the child informed his COS worker, REDACTED, that he fell on a glass table in the garage and hurt his shoulder. He was taken to Urigcare. There is no documented follow up by this agency regarding this injury or documentation regarding the severity of the injury, i.e. cuts, bruising, dislocated shoulder, etc. REDACTED stated that he did not break his arm, but thought he sprained his arm. He told the COS worker that if he does not feel better by the weekend, he was going back to Urigcare. In reading the following case narratives, there was no follow up documentation regarding this injury. There is no medical documentation in the case regard. | 7W | Hancock | 2/11/2013 REDACTED | REDACTED | 2/11/2013 | 2/11/2013 | 2-12-13 Email from RD to ASWS: REDACTED, please handle ASAP! Please make sure the injury is documented in great detail. | | | |
| REDACTED | REDACTED | Suspected abuse not reported | REDACTED, age 6, is placed with his paternal grandmother, REDACTED. He is residing in Bay St. Louis, MS (Hancock County) and has been placed with his grandmother since entering agency custody on June 22, 2011. Also in the home is REDACTED 4-year-old sister, REDACTED. According to the case narrative dated 2-6-2013 as entered by Social Worker Aide, REDACTED, at 10:39 a.m.: "Received call from [REDACTED] [REDACTED] with concerns about the kids. She visited with the family and got into it with them because they have been hitting on the kids. [REDACTED] had a busted mouth. She felt compelled to report. [REDACTED] said she called the Hot Line with a report."Upon checking to see if any follow up reports were made, none were entered. There was no follow up documentation in the case narratives regarding this incident. This reviewer has entered a report of maltreatment on this case. The report confirmation number is 9942. It is noted that there have not been any other reports of maltreatment while the children have been with their grandmother. This contact was made by REDACTED following a family visit. This was the first visit the family had in over a year. | 7W | Hancock | 2/11/2013 REDACTED | REDACTED | 2/11/2013 | 2/11/2013 | 2-12-13 Email from RD to ASWS: REDACTED, it is vitally that this report be made and all concerns and allegations be addressed. This is a terrible situation if the allegations are true. This requires immediate attention. Please follow up on this today. We can not place children in homes where they will be abused or neglected. Thanks for your immediate attention to this matter. Please email me with results. | NA | NA | NA |
| REDACTED | REDACTED | Child does not show active custody in MACWIS | child does not show active custody in MACWIS. I am not certain what is up, because he did make it to the MACWIS Report for pending conferences, but when  you search this child, it does not appear that he has ever been entered in MACWIS as a foster child. | 7W | Hancock | REDACTED | REDACTED | 2/12/2013 | | | | | |
| REDACTED | REDACTED | lack of ICPC reports/no agency contact | REDACTED, age 17, is placed with her paternal aunt and uncle in Alabama. The ICPC was approved for this case on 9/11/12. REDACTED has resided with her aunt and uncle in Alabama since April 2012. In this time, this agency has not been to the residence to check on the status of REDACTED and assess her needs. Although the ICPC was approved, there does not appear that any documentation from the receiving State has been sent to this office. The last documented contact with REDACTED was in November 2012 for the TPR hearing in Harrison County. Also, REDACTED has been free for adoption since November 2012. There is no assigned Adoption COS worker. The county agency needs to request an Adoption ICPC and work towards finalizing this case. | 7W | Hancock | 2/28/2013 REDACTED | REDACTED | 2/28/2013 | | 3-1-13 Email from RD to ASWS: REDACTED, please address and handle ASAP. | | | |
| REDACTED | REDACTED | lack of face-to-face contact after MIC report | REDACTED, age 8, is placed in a licensed foster home in Harrison County. She has been in this placement with REDACTED since 5/22/12. There does not appear to be an assigned COS worker for her. The only documented contact made with REDACTED for this review period was in October and November 2012. A report of maltreatment was made on her foster home on 11/30/12, and while this report was unsubstantiated, this agency has not made twice monthly contact with REDACTED in her placement setting. | 7W | Hancock | 3/1/2013 REDACTED | REDACTED | 3/1/2013 | 3/1/2013 NA | | | NA | NA |
| REDACTED | REDACTED | Inappropriate transportation by a foster parent | A narrative dated 11-01-12 documents that the foster parent, REDACTED, transported the child, who is 10-years-old, on a motorcycle to his visit with his mother. The foster parent lived in Saucier, MS and the visit took place in Bay St. Louis, MS. Normally that is about a 35-min drive if you take the highway and interstate. In the narrative, the child's grandmother was upset by this. There is another narrative dated 11/6/12 where the previous COR worker addressed this with the foster parent. There is also a narrative dated 11/14/12 in this case record where there is a conversation between the child's mother and the foster parent regarding him being on the bike. The mother was concerned because there was no backrest on the bike, but that it was okay for him to ride around town. | 7W | Hancock | 3/1/2013 REDACTED | REDACTED | 3/1/2013 | 3/1/2013 NA | | | NA | NA |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | No SIR filed on child runaway | REDACTED, age 14, was noted as a runaway on 9-16-12. She was found in Marion County on 9-20-12. When her assigned worker spoke with her at Marion County DHS on 9-20-12, REDACTED disclosed that she was forced to have sex with several men during this time. According to the case narrative, REDACTED could not provide the worker with names of the men. Upon review of the case file and case narratives, there is no documented Serious Incident Report and it does not appear that a police report was filed. REDACTED had two more runaways noted on 9/21/12 until 9/24/12 and again on 9/25/12 until 9/29/12. She is now placed at Specialized Treatment Facility in Harrison | 7W | Hancock | 3/1/2013 REDACTED | REDACTED | 3/1/2013 | 3/1/2013 NA | | | |
| REDACTED | REDACTED | lack of face-to-face contact | REDACTED, age 4, is placed with his maternal great aunt in Bay St. Louis, MS--Hancock County. For this period of review, agency did not document contact with the child in September, October, and November 2012. Agency is not documenting monthly contact with the caregiver to ensure all needs and services are being met for the child. It was also noted that this agency has not documented any medical, dental, or mental health assessments for this child since entering custody in September 2012. Child also has an IEP that needs to be documented and agency will need ensure services are being provided. | 7W | Hancock | 3/4/2013 REDACTED | REDACTED | 3/4/2013 | 3/4/2013 3-4-13 Email from RD: Please make sure the child is seen and the visit is documented. Please see the report below. Have worker get this completed by Friday. If it is a matter of documenting the efforts, worker should get done sooner. | NA | NA | NA |
| REDACTED | REDACTED | lack of documented medical follow up | Agency needs to request an Adoption COS worker as the parents surrendered their rights on 1/10/13. Agency has not documented the children's medical, dental, and mental health since they entered custody in March 2012. There is no documented visitation plan or education records. The Eligibility Redetermination on REDACTED and REDACTED was pending at the time of this review. Additionally, the Initial Eligibility on REDACTED was not approved at the time of this review. The children's grandmother needs to become licensed as a foster parent. The children have been placed with their grandmother since custody. | 7W | Hancock | 3/4/2013 REDACTED | REDACTED | 3/4/2013 | 3/4/2013 NA | | NA | NA | NA |
| REDACTED | REDACTED | lack of face-to-face contact | There is no COS worker assigned to this case and the initial ISP was never completed for REDACTED and has not been completed at this time. There is no supporting documentation noted where contact was made with REDACTED from November 2012 to February 2013. The assigned worker was knowledgeable about this case during the county conference, which leads me to believe that documentation has not been entered regarding contact. It was also noted that there were no documented contacts made with the child's caregiver for this period of review. | 7W | Hancock | 3/6/2013 REDACTED | REDACTED | 3/6/2013 | 3/6/2013 NA | | NA | NA | NA |
| REDACTED | REDACTED | lack of contact | last documented contact made with REDACTED, age 12, was on February 28, 2012. There is no supporting documenting showing where this child has been seen by a DFCS worker in over a year. REDACTED is placed in Hancock County with her maternal grandmother, REDACTED. There was no supporting documentation where this agency had contact with the grandmother in this period. Agency has not assessed the child's safety, needs, well-being during this period. | 7W | Hancock | 4/3/2013 REDACTED | REDACTED | 4/3/2013 | 4/3/2013 NA | | NA | NA | NA |
| REDACTED | REDACTED | Safety and well being/Lack of face-to-face | Lack of face-to-face contact, possible previous broken collar bone while in the trial home placement, lack of documentation to assess safety and well-being | 7W | Hancock | 4/5/2013 REDACTED | REDACTED | 4/5/2013 | 4/5/2013 NA | | NA | NA | NA |
| REDACTED | REDACTED | Safety concerns in children's placement | This Reviewer was approached by resource supervisor, REDACTED, regarding safety issues regarding the children's placement. In the case narrative in the MACWIS record on this case dated 3/26/13, she noted that she "observed several safety issues during this inspection. The home has roach infestation, mold around the floor board, leaking ceiling with mold and standing water under the trailer. The children play area has a number of safety items in the midst of their space. There is a toilet, shower, motorized go cart, trampoline with no net, broken bikes and other items. Worker encouraged [REDACTED] to repair the pipes, roof and ceiling. [REDACTED] stated that she feels that her home does not meet the agency standards and will hire an attorney for Durable Legal Custody." | 7W | Hancock | 4/9/2013 REDACTED | REDACTED | 4/9/2013 | 4/9/2013 NA | | NA | NA | NA |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | Financial Issues | REDACTED would like to replace her stolen laptop and get back into college.  She asked me about her money with DHS.  From what I can tell, she has $200 in her acct from Child Support and $12,439.64 in Child's Own Funds-Other.  We need to assist REDACTED in every effort to get her ready to leave custody.  I am not sure what exactly she owes with school, but if she has ETV money from Independent Living, we need see if there are any loans that need to be paid, issues with Regions Bank resolved, possible transportation of her own, and that she is self-sufficient.  Please note that REDACTED was receiving survivor benefits from her late father. | 7W | Hancock | 4/16/2013 REDACTED | REDACTED | 4/16/2013 NA | NA | NA | NA | NA |
| REDACTED | REDACTED | Lack of face-to-face | There doesn't appear to be documented face-to-face contact with REDACTED in his placement setting since 1-24-13. | 7W | Hancock | 4/16/2013 REDACTED | REDACTED | 4/16/2013 | 4/16/2013 NA | NA | NA | NA |
| REDACTED | REDACTED | Case Files for FCR | Email from reviewer REDACTED to ASWS: REDACTED, I wanted to let you know that the only case file I was given today for FCR was the 9am review that REDACTED sat in for REDACTED. I had 5 reviews and was only given 1 file. 2nd email from reviewer REDACTED sent to RD on 5-2-13 for same issue. * | 7W | Hancock | 4/30/2013 REDACTED | REDACTED | 4/25/2013 NA | RD responded by sending an email to all her staff about the importance of attending FCR. | NA | NA | NA |
| REDACTED | REDACTED | Children not being entered into custody | I had four cases that were overdue for conferences in April due to children not being entered timely. Three children were identified as not being entered into custody since February 2013, and there are 6 cases that had to be added to the May 2013 conference schedule due to custody not being entered timely.<br><br>In order to ensure that Hancock County is having timely reviews, please respond a.s.a.p to notify me of any of these cases. | 7W | Hancock | 5/1/2013 REDACTED | REDACTED | 5/1/2013 | 5/1/2013 NA | NA | NA | NA |
| REDACTED | REDACTED | Child's Medications | I was informed by the foster mother for REDACTED that he has 28 days left on his medications for his ADHD.  He is on Focalin and Intuniv.  I was told that the Guardian ad Litem for REDACTED was able to arrange an emergency supply of medications for him in Diamondhead, MS.  GAL, REDACTED,contacted me following the conference and I was informed that this was a one-time thing.  You will need to make arrangements for REDACTED to see a psychiatrist to get this medication filled.  It was noted that REDACTED was off his medications for 5-weeks and his grades in school severely dropped.  The foster parent informed me that it is still possible for REDACTED to pass to the 4th grade and that the school was aware of the situations and is trying to work with him.  If I may suggest Memorial Outpatient Clinic in Gulfport, MS as a possibility for medications and on-going counseling.  the foster mother stated that REDACTED has not been in mental health counseling since he was placed in her home in December 2012 | 7W | Hancock | 5/2/2013 REDACTED | REDACTED | 5/2/2013 | 5/2/2013 NA | NA | NA | NA |
| REDACTED | REDACTED | Safety Concern/Lack of Contact | This case was review in MACWIS on 4/3/13 for the county conference held on 4/25/13.  During the MACWIS review, it was noted that the has been no documented contact with the children in this case since the case was opened.  If contact occurred, it was not documented in the narratives.  All three children are placed together with their maternal uncle and his wife in Hancock County.  There was no documented medical, dental, or mental health assessment located in MACWIS.  The children's placement record has not been entered and it is noted that the children stayed with a foster parent until they were placed with their aunt and uncle.  there is no documented IEP on REDACTED, who is autistic, and on REDACTED.  It does not appear that REDACTED is attending IL Classes | 7W | Hancock | 5/2/2013 REDACTED | REDACTED | 5/2/2013 | 5/2/2013 | REDACTED contacted Central Intake Hotline. Email from RD to worker on 5-3-13: REDACTED, immediate contact needs to be made with this family.  We must see the children Twice a month. One of the visits must be made in the home setting.  If you have made visits they should be documented in MACWIS. If you have not made a visit, please do so and email when done. REDACTED | NA | NA | NA |

| | | Category | Description | | County | | | | | Email/Notes | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | Failure to appear/prepare for conference | On April 30, 2013, I had a county conference at 2pm with REDACTED. He no-showed for that conference and I was not given a case file for that review. I noted that the invitations to the county conference for that review were not printed and mailed. On May 2, 2013, I had two conferences with him at 9am and 10am. Myself, REDACTED, and REDACTED tried to contact him to see where he was. the phone went straight to voicemail. The invitations to these two conferences were not printed and mailed. I was able to make phone contact with the foster parents on these two cases due to locating them in the case narratives. I tried looking for the files on these two cases and county find them. REDACTED was told yesterday, May 1, 2013 that he had conferences on this day. He did not inform me that he would not be present and he did not make arrangements for another worker to cover for him. | 7W | Hancock | 5/3/2013 REDACTED | REDACTED | 5/2/2013 NA | | Email from RD to worker: REDACTED, can you tell me why you did not attend your conferences or mail out you letters. Please provide me an explanation in writing. As I have said, these conferences are very important and I want the conferences handled as you would handle court. I will await your response. REDACTED | NA | NA | NA |
| REDACTED | REDACTED | lack of contact/no case planning documented | The FPS/CFA has not been completed and there is no documented permanent plan in this case. It appears that there are many good things happening in this case; however, it is not being documented. The mother is working on a preliminary service agreement with the Youth Court and looks to be in compliance. Agency needs to document the children's medical, dental, mental health assessments, immunization record, visitation plan, Independent Living plan, and education record. Agency also needs to document the children's current living address | 7W | Hancock | 5/6/2013 REDACTED | REDACTED | 5/6/2013 | 5/6/2013 NA | | NA | NA | NA |
| REDACTED | REDACTED | lack of contact in the placement setting | Upon review of the case narratives for the county conference held on 4/25/13, agency has not documented contact with the children in their placement setting for this period of review. There was no documented contact made with the children in November, March, and in April, only contact with REDACTED was made at his school. There was no contact made with REDACTED in December 2012. | 7W | Hancock | 5/7/2013 REDACTED | REDACTED | 5/7/2013 | 5/7/2013 NA | | NA | NA | NA |
| REDACTED | REDACTED | lack of contact | REDACTED is currently placed with his maternal aunt, REDACTED in what appears to be Stone County. Reviewer did not see the foster care information form in the case file regarding his placement. The only contact made with REDACTED for this period of review was in February and March 2013. There is no COS worker assigned to this case | 7W | Hancock | 5/7/2013 REDACTED | REDACTED | 5/7/2013 | 5/7/2013 | | | NA | NA | NA |
| REDACTED | REDACTED | Lack of contact/on-going assessment | There was no medical, dental, mental health assessment, CFA or SAR at the last review of the case and none of these items have received follow up at this review. The lack of diligent efforts to locate the father and to effectively assess maternal and paternal relatives as sources of support was also noted at last review and this has not occurred during this PUR. The medical screen is completely blank and there were no medicals located in the case file that provided evidence of follow up. The county provided very good documentation and follow up from December-February, however, this has diminished. The worker obtained the IEP, made contact with the school counselor and had a lot of follow up with the mother during those months. There is no follow up documentation regarding Independent Living services. The paper file was in good order. Need to follow up with filing loose papers. The most recent court order needs to be printed for the file. | 7W | Hancock | 5/17/2013 REDACTED | REDACTED | 5/17/2013 | 5/20/2013 | Email from RD to worker on 5-20-13: REDACTED, please see below. Please schedule time for us to staff this case with REDACTED ASAP! The email below list the concerns needing to be addressed. | NA | NA | NA |
| REDACTED | REDACTED | Lack of Contact and permanency planning | There is no established permanent plan in MACWIS for the children. Agency has not documented updated dental, medical, mental health assessments, and developmental assessments on the children as deemed age appropriate. due to their not being a custody record, the children's placement record has not been documented and their eligibility has not been documented. According to the Youth Court orders, the children entered DHS custody on 12-29-2012. There is no FSP/CFA or case plan for the parents. Agency has not documented diligent efforts to engage the father of the two older children. A Family Team Meeting has not been held in this case | 7W | Hancock | 6/12/2013 REDACTED | REDACTED | 6/12/2013 | 6/12/2013 NA | | NA | NA | NA |
| REDACTED | REDACTED | Failure to appear/prepare for conference | A conference was held for REDACTED and REDACTED on 6/6/13, neither the assigned worker, REDACTED or ASWS REDACTED, appeared for the conference on the said date. The conference was scheduled for 2:00 p. m. and efforts were made to contact the worker and ASWS, by telephone to remind them of the conference. REDACTED, resource parent for REDACTED, REDACTED and REDACTED, resource parents for REDACTED, REDACTED and her attorney were present. The attorney for REDACTED became angry and argumentative when advised that the assigned worker, REDACTED was not present. | 7W | Hancock | 6/14/2013 REDACTED | REDACTED | 6/14/2013 | 6/14/2013 NA | | NA | NA | NA |
| REDACTED | REDACTED | Face-to-face contact | There appears to be only one documented face-to-face contact with REDACTED on 3-13-13; there doesn't appear to be any documented contact with REDACTED placement provider. There doesn't appear to be documented face-to-face contact with REDACTED since 1-17-13, with REDACTED from 12-18-12 to 5-01-13, or with their court ordered non-licensed relative | 7W | Hancock | 6/26/2013 REDACTED | REDACTED | 6/26/2013 | 6/26/2013 NA | | NA | NA | NA |
| REDACTED | REDACTED | Face-to-face contact | placement, REDACTED, since 1-17-13. | 7W | Hancock | 7/1/2013 REDACTED | REDACTED | 7/1/2013 | 7/1/2013 NA | | NA | NA | NA |
| REDACTED | REDACTED | Face-to-face contact | No documented face-to-face contact since 4-3-12 | 7W | Harrison | 8/8/2012 REDACTED | REDACTED | 8/7/2012 | 8/8/2012 NA | | NA | NA | NA |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | Face-to-face contact | 6/2/11 and 11/28/12 There doesn't appear to be documented face-to-face contact with child since 3-5-12. | 7W | Harrison | 9/17/2012 REDACTED | REDACTED | 9/17/2012 | 9/17/2012 | 9/18/12 Email from RD: REDACTED, make sure child is seen by close of business on. | NA | NA | NA |
| REDACTED | REDACTED | Face-to-face contact | There doesn't appear to be documented face to face contact with REDACTED and REDACTED since 04-24-12. | 7W | Harrison | 9/24/2012 REDACTED | REDACTED | 9/21/2012 | 9/24/2012 | Email from RD: Plase ensure REDACTED handles this situation. I need her to make contact this week. | NA | NA | NA |
| REDACTED | REDACTED | Face-to-face contact | There doesn't appear to be documented face-to-face contact with REDACTED since 04-20-12 | 7W | Harrison | 9/27/2012 REDACTED | REDACTED | 9/27/2012 | 9/27/2012 | Email from RD: REDACTED, ensure REDACTED makes a visit at once. Please remind her child has to be seen twice a month and one has to be a visit in the home. | NA | NA | NA |
| REDACTED | REDACTED | Face-to-face contact | There doesn't appear to be documented face-to-face contact with REDACTED since 08-08-12, or with REDACTED in her placement setting, since 08-08-12. | 7W | Harrison | REDACTED | REDACTED | 10/3/2012 | NA | NA | NA | NA | NA |
| REDACTED | REDACTED | Face-to-face contact | There doesn't appear to be documented face-to-face contact with REDACTED since 05-03-12, or with REDACTED in his placement setting since 05-03-12 | 7W | Harrison | REDACTED | REDACTED | 10/3/2012 | NA | NA | NA | NA | NA |
| REDACTED | REDACTED | Face-to-face contact | There doesn't appear to be documented face-to-face contact with REDACTED and REDACTED since 07-24-12. | 7W | Harrison | REDACTED | REDACTED | 10/3/2012 | NA | NA | NA | NA | NA |
| REDACTED | REDACTED | Face-to-face contact | There doesn't appear to be documented face-to-face contact with REDACTED and REDACTED since 07-27-12. | 7W | Harrison | REDACTED | REDACTED | 10/3/2012 | NA | NA | NA | NA | NA |
| REDACTED | REDACTED | Face-to-face contact | There doesn't appear to be documented face-to-face contact with REDACTED in his placement setting since 07-31-12. | 7W | Harrison | REDACTED | REDACTED | 10/3/2012 | NA | NA | NA | NA | NA |
| REDACTED | REDACTED | Face-to-face contact | There doesn't appear to be documented face-to-face contact with REDACTED, REDACTED, and REDACTED since 05-16-12, or with REDACTED in her placement setting since 11-19-11 (which was noted in the previous PAR), or with REDACTED and REDACTED in their placement setting since 12-26-11 | 7W | Harrison | REDACTED | REDACTED | 10/3/2012 | NA | NA | NA | NA | NA |
| REDACTED | REDACTED | Face-to-face contact | There doesn't appear to be documented face-to-face contact with REDACTED since 05-15-12 | 7W | Harrison | REDACTED | REDACTED | 10/3/2012 | NA | NA | NA | NA | NA |
| REDACTED | REDACTED | Face-to-face contact | There doesn't appear to be documented face-to-face contact with REDACTED since 07-18-12, or with REDACTED in her placement setting, since 07-18-12. | 7W | Harrison | REDACTED | REDACTED | 10/3/2012 | NA | NA | NA | NA | NA |
| REDACTED | REDACTED | Face-to-face contact/documentation | Safety and well-being of REDACTED cannot be determined due to the lack of face-to-face contact | 7W | Harrison | REDACTED | REDACTED | 10/4/2012 | NA | NA | NA | NA | NA |
| REDACTED | REDACTED | Face-to-face contact/documentation | There doesn't appear to be documented face-to-face contact with REDACTED and REDACTED since 05-25-12. Their safety and well-being cannot be determined due to the lack of documentation. | 7W | Harrison | 10/4/2012 REDACTED | REDACTED | 10/4/2012 | 10/4/2012 | Email from RD: Plae make visit ASAP. Remind worker that it is mandatory that all children be seen twice a month and one has to be in the home setting. Visit needs to be make by close of business 10-8-12. | NA | NA | NA |
| REDACTED | REDACTED | | children have been in custody five months and have not received a comprehensive medical exam or a comprehensive dental exam as of October 5th, 2012. The case has been transferred to REDACTED who is now the county of responsibility social worker. Documentation reflects that REDACTED is the county of service worker in Forrest County. It has been identified through documentation and county conference discussion that REDACTED has stated he is having trouble hearing. REDACTED said that REDACTED may need glasses. The social worker REDACTED said that the children's Medicaid benefits are inactive and that the responsibility of the children getting Medicaid relies on the relative resource parent. The social worker said that the relative resource parent has been "too busy" to sign the children up for Medicaid. It was suggested that the social worker and mother may want to assist the relative resource parent in obtaining medicaid benefits for the children as soon as possible and for the children to have medical and dental exams as soon as possible. | 7W | Harrison | 10/5/2012 REDACTED | REDACTED | 10/5/2012 | NA | NA | NA | NA | NA |
| REDACTED | REDACTED | Medical/Dental/Psychological/Placement Appropriateness | Documentation in MACWIS and the paper case file does not reflect that REDACTED is receiving mental health treatment, counseling, dental exams, or other services. Documentation in MACWIS and the paper case file does not reflect that REDACTED is receiving dental exams or medical exams. the appropriateness of REDACTED placement cannot fully be determined through documentation and county conference discussion. | 7W | Harrison | REDACTED | REDACTED | 10/8/2012 | NA | 10/8/12 RD Response | NA | NA | NA |
| REDACTED | REDACTED | Documentation/Safety Concern | The social worker, REDACTED, was not able to identify if any kind of forensic exam has been completed on REDACTED. Documentation in MACWIS and the case file does not reflect that any recent medical assessments have been completed | 7W | Harrison | REDACTED | REDACTED | 10/8/2012 | NA | 10/8/12 RD Response | NA | NA | NA |
| REDACTED | REDACTED | Face-to-face contact | There doesn't appear to be documented face-to-face contact with REDACTED since 05-19-12. As pointed out in the previous PAD, there doesn't appear to be documented face-to-face contact with REDACTED in his placement setting since 01-03-12 , or with REDACTED in her placement setting, since 02-29-12. | 7W | Harrison | 10/10/2012 REDACTED | REDACTED | 10/10/2012 | 10/10/2012 | Email from RD: I am scheduling an appointment to have a discussion with supervisors regarding lack of face-to-face contacts. | 10/10/2012 | 10/10/2012 | 10/10/2012 |
| REDACTED | REDACTED | Face-to-face contact | there doesn't appear to be documented face-to-face contact with REDACTED in her placement setting since 10-10-11 | 7W | Harrison | 10/10/2012 REDACTED | REDACTED | 10/10/2012 | 10/10/2012 | Email from RD: REDACTED, please get with the worker and make plans to have children seen. | 10/10/2012 | 10/10/2012 | 10/10/2012 |
| REDACTED | REDACTED | Face-to-face contact | There doesn't appear to be documented face-to-face contact with REDACTED and REDACTED since 08-01-12 | 7W | Harrison | 10/10/2012 REDACTED | REDACTED | 10/10/2012 | 10/10/2012 | Email from RD: REDACTED, please get with the worker and make plans to have children seen. | 10/10/2012 | 10/10/2012 | 10/10/2012 |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | lack of face-to-face cc | There doesn't appear to be any documented face-to-face contact with REDACTED in her placement setting whatsoever since she entered agency custody on 06-01-12. | 7W | Harrison | 11/21/2012 REDACTED | REDACTED | 11/21/2012 | 11/21/2012 NA | | | NA | NA | NA |
| REDACTED | REDACTED | sibling visitation | There doesn't appear to be documented face-to-face contact with REDACTED in his placement since 08-20-12. REDACTED is placed in the licensed therapeutic resource home of REDACTED in Jackson County. Another concern is REDACTED and REDACTED have not had any sibling visitation since REDACTED was placed at Millcreek of Magee on 07-27-12. A MACWIS narrative dated 12-02-12 states REDACTED has requested a visit with his brother. | 7W | Harrison | 12/12/2012 REDACTED | REDACTED | 12/12/2012 | 12/12/2012 NA | | | NA | NA | NA |
| REDACTED | REDACTED | Lack of face-to-face contact/Lack of documentation | child has had no contact since the case was opened. The case opened on 8/23/12 and has three narratives, one is court events, the second is a transfer summary, and last is an attempted contact with the child. No ISP/FSPs are completed on any family members and no other documentation is entered in MACWIS. The worker was not present for the County Conference. Doesn't appear to be documented face-to-face contact with child in placement setting since 9-6-12. Child is placed in the court ordered non-licensed relative | 7W | Harrison | 1/25/2013 REDACTED | REDACTED | 1/24/2013 | 1/24/2013 Castlen Elementary in AL. | Worker was informed by school on 11-30-12 that child was withdrawn from school and Castlen Elementary in Grand Bay, AL had requested his records. Worker was informed by Harrison Co. Youth court to perform diligent search. Letters were sent to Castlen elementary on 12-17-12 & 1-14-13. Worker was informed child did not attend that school or any known schools in Alabama. Child is still in DHS legal custody but placed in mother's physical custody on 9-25-12. Worker sent a PSA to Mobile Co. AL on 2-5-13. Was informed that child did not show in any AL database or attend public school in Mobile Co. Spoke wit REDACTED elementary to verify name of school that requested records and it was | NA | 1/30/2013 NA | |
| REDACTED | REDACTED | Face-to-face contact | placement of her maternal grandparents. | 7W | Harrison | REDACTED | REDACTED | 1/25/2013 | 1/24/2013 | | | | 1/25/2013 | |
| REDACTED | REDACTED | Face-to-face contact | Doesn't appear to be documented face-to-face contact with child since 9-11-12. Doesn't appear to be documented face-to-face contact with children in their placement setting. They are place in the court ordered non-licensed relative | 7W | Harrison | REDACTED | REDACTED | 1/26/2013 | 1/24/2013 | | | | 1/25/2013 | |
| REDACTED | REDACTED | Face-to-face contact | placement of their maternal grandmother. | 7W | Harrison | REDACTED | REDACTED | 1/27/2013 | 1/24/2013 | | | | 1/25/2013 | |
| REDACTED | REDACTED | Face-to-face contact | There doesn't appear to be documented face-to-face contact with REDACTED & REDACTED and REDACTED since 11-19-12. | 7W | Harrison | REDACTED | REDACTED | 1/28/2013 | 1/28/2013 | | | | 1/28/2013 NA | |
| REDACTED | REDACTED | Face-to-face contact | There doesn't appear to be documented face-to-face contact with REDACTED, and REDACTED since 09-14-12; with REDACTED since 05-24-12. Following the previous PAR held on 09-21-12, it was noted there had not been any documented face-to-face contact with REDACTED in April, June, July, and August. | 7W | Harrison | REDACTED | REDACTED | 1/28/2013 | 1/28/2013 | | | | 1/28/2013 NA | |
| REDACTED | REDACTED | Face-to-face contact | There doesn't appear to be documented face-to-face contact with REDACTED since 11-12-12. Email from FCR REDACTED: REDACTED has shown up on the corrective action spreadsheet three times. The reviewer has repeatedly noted lack of consistent contact with this child. I am forwarding the first incident which was reported 6/2/11 by FCR. REDACTED was reported again 11/17/11, 09/17/12 and 1/28/13. | 7W | Harrison | 1/28/2013 REDACTED | REDACTED | 1/28/2013 | 1/28/2013 and Field Ops regarding custody issues | Email from FCR Division Director II to RD | | 1/28/2013 NA | |
| REDACTED | REDACTED | Face-to-face contact | Doesn't appear to be documented face-to-face contact with child since 11-7-12. | 7W | Harrison | REDACTED | REDACTED | 1/28/2013 | 1/24/2013 | | | | 1/25/2013 | |
| REDACTED | REDACTED | Face-to-face contact | There doesn't appear to be documented face-to-face contact with REDACTED and REDACTED in their placement setting since 11-27-12. They are placed in the court ordered, non-licensed home of their maternal grandmother, REDACTED, in Harrison County. | 7W | Harrison | 1/29/2013 REDACTED | REDACTED | 1/29/2013 | 1/29/2013 month with one being in the home setting. | From RD to COR Worker: REDACTED, please address with worker. Remind the worker that all children have to be seen twice a | NA | 1/30/2013 NA | |
| REDACTED | REDACTED | Face-to-face contact | In preparing for the county conference on 01-23-13, Reviewer found that there has been lack of contact with these three children in their placement setting. The children were in placed with foster parent, REDACTED in Desoto County. REDACTED moved to Gulfport, MS with the children in July 2012. A contact was not documented with the three children in their placement setting during the months of August, September, and October 2012. A face-to-face contact was not documented during the month of October 2012 with the three children. Contacts have not been documented on a monthly basis with the resource parent, REDACTED to assess the children and resource parents needs. It is noted that since that time the county of service worker in Harrison County, REDACTED, has been maintaining face-to-face contacts with the children twice a month which includes in the home. The adoption worker visited with the children and the foster parent in the placement on 12-08-12 | 7W | Harrison | 2/3/2013 | REDACTED | 1/31/2013 | 2/3/2013 on this . | Reviewer submitted this to the FCR email due to lack of consistent documented contacts and the length of time this child did not have (face to face). It appears much improvement has been made | NA | 2/3/2013 NA | |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | Case has been reported for corrective action 3 times. | 2-12-13 Email from REDACTED to RD and FO: REDACTED has shown up on the corrective action spreadsheet three times. The reviewer has repeatedly noted lack of consistent contact with this child. I am forwarding the first incident which was reported 6/2/11 by FCR. REDACTED was reported again 11/17/11, 09/17/12 and 1/28/13. | 7W | Harrison | 2/12/2013 REDACTED | REDACTED | 2/12/2013 | 2/12/2013 | 2-12-13 Email from RD to ASWS, FO, reviewer: REDACTED, please research this for me. Let's find out what is going on. Let the worker and supervisor know that this is unacceptable. I need a corrective action plan. I do not understand why this child is not being seen. Please include everyone on the email with the response. | | | |
| REDACTED | REDACTED | Lack of face-to-face | There doesn't appear to be documented face-to-face contact with REDACTED since 11-19-12, with REDACTED & REDACTED since 11-16-12, or with REDACTED, REDACTED, & REDACTED in their placement setting since 04-16-12. | 7W | Harrison | 2/12/2013 REDACTED | REDACTED | 2/12/2013 | 2/12/2013 | Email from RD 2-13-12 REDACTED, please respond asap. I am noticing REDACTED is not seeing her children the way she should. Please talk with her and advise her of how important it is for her to see the children twice a month. One of the visits need to be made in the home setting. REDACTED need to see the children by Friday. I am requesting the visit be documented in Macwis by close of business on Friday. thanks REDACTED | NA | NA | NA |
| REDACTED | REDACTED | Lack of face-to-face | There doesn't appear to be documented face-to-face contact with REDACTED since 12-16-12 | 7W | Harrison | 2/12/2013 REDACTED | REDACTED | 2/12/2013 | 2/12/2013 | Email from RD 2-13-12 REDACTED, please respond asap. I am noticing REDACTED is not seeing her children the way she should. Please talk with her and advise her of how important it is for her to see the children twice a month. One of the visits need to be made in the home setting. REDACTED need to see the children by Friday. I am requesting the visit be documented in Macwis by close of business on Friday. thanks REDACTED | NA | NA | NA |
| REDACTED | REDACTED | Lack of face-to-face | There doesn't appear to be documented face-to-face contact with REDACTED and REDACTED since 12-08-12. | 7W | Harrison | 2/12/2013 REDACTED | REDACTED | 2/12/2013 | 2/12/2013 | Email from RD 2-13-12 REDACTED, please respond asap. I am noticing REDACTED is not seeing her children the way she should. Please talk with her and advise her of how important it is for her to see the children twice a month. One of the visits need to be made in the home setting. REDACTED need to see the children by Friday. I am requesting the visit be documented in Macwis by close of business on Friday. thanks REDACTED | NA | NA | NA |
| REDACTED | REDACTED | Lack of face-to-face | There doesn't appear to be documented face-to-face contact with REDACTED and REDACTED since 12-17-12. | 7W | Harrison | 2/12/2013 REDACTED | REDACTED | 2/12/2013 | 2/12/2013 | Email from RD 2-13-12 REDACTED, please respond asap. I am noticing REDACTED is not seeing her children the way she should. Please talk with her and advise her of how important it is for her to see the children twice a month. One of the visits need to be made in the home setting. REDACTED need to see the children by Friday. I am requesting the visit be documented in Macwis by close of business on Friday. thanks REDACTED | NA | NA | NA |
| REDACTED | REDACTED | Lack of face-to-face | There doesn't appear to be documented face-to-face contact with REDACTED in his placement setting since 07-31-12. | 7W | Harrison | 2/21/2013 REDACTED | REDACTED | 2/21/2013 | 2/21/2013 | | | | |
| REDACTED | REDACTED | Lack of face-to-face | There doesn't appear to be documented face-to-face contact with REDACTED in his placement setting since 10-22-12. | 7W | Harrison | 2/21/2013 REDACTED | REDACTED | 2/21/2013 | 2/21/2013 | | | | |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | Lack of face-to-face | There doesn't appear to be documented face-to-face contact with REDACTED in her placement setting since 12-12-12. | 7W | Harrison | 2/21/2013 REDACTED | REDACTED | 2/21/2013 | 2/21/2013 | | | | |
| REDACTED | REDACTED | Lack of face-to-face | There doesn't appear to be documented face-to-face contact with REDACTED, REDACTED, & REDACTED since 12-22-12, or with REDACTED since 12-16-12, or with REDACTED in her placement setting since 11-21-12, or with REDACTED since 12-21-12. | 7W | Harrison | 2/21/2013 REDACTED | REDACTED | 2/21/2013 | 2/21/2013 | | | | |
| REDACTED | REDACTED | Lack of face-to-face | There doesn't appear to be documented face-to-face contact with REDACTED in her placement setting since 7-6-12. | 7W | Harrison | 3/1/2013 REDACTED | REDACTED | 2/28/2013 | 3/1/2013 | | | | |
| REDACTED | REDACTED | Lack of face-to-face | There doesn't appear to be documented face-to-face contact with REDACTED in his placement setting since 10-8-12. | 7W | Harrison | 3/1/2013 REDACTED | REDACTED | 2/28/2013 | 3/1/2013 | | | | |
| REDACTED | REDACTED | Lack of face-to-face | There doesn't appear to be documented face-to-face contact with REDACTED and REDACTED in their placement setting since 10-29-12. | 7W | Harrison | 3/1/2013 REDACTED | REDACTED | 2/28/2013 | 3/1/2013 | | | | |
| REDACTED | REDACTED | Lack of face-to-face | There doesn't appear to be documented face-to-face contact with REDACTED in her placement setting since 10-30-12. | 7W | Harrison | 3/1/2013 REDACTED | REDACTED | 2/28/2013 | 3/1/2013 | | | | |
| REDACTED | REDACTED | lack of face-to-face | REDACTED moved to Lompoc, CA with her court ordered non-licensed relative placement, REDACTED, and there doesn't appear to be documented face-to-face contact with REDACTED since 07-25-12. MACWIS shows the outgoing ICPC request was submitted to the state office on 01-11-13. | 7W | Harrison | 3/8/2013 REDACTED | REDACTED | 3/8/2013 | 3/8/2013 | 3-8-13 Email from RD to Supervisors: Supervisors, please develop an action plan to get the children seen. Please have the workers document their efforts ASAP. Email me your response. | NA | NA | NA |
| REDACTED | REDACTED | lack of face-to-face | A MACWIS narrative dated 07-12-12 states an error was noticed where REDACTED should have had an active custody record, but her custody record was not entered until 11-01-12. There doesn't appear to be documented face-to-face contact with REDACTED since 04-27-12. | 7W | Harrison | 3/8/2013 REDACTED | REDACTED | 3/8/2013 | 3/8/2013 | 3-8-13 Email from RD to Supervisors: Supervisors, please develop an action plan to get the children seen. Please have the workers document their efforts ASAP. Email me your response. | NA | NA | NA |
| REDACTED | REDACTED | lack of face-to-face | There doesn't appear to be documented face-to-face contact with REDACTED since 12-17-12 or with REDACTED in his placement setting since 05-07-12. | 7W | Harrison | 3/9/2013 REDACTED | REDACTED | 3/8/2013 | 3/8/2013 | 3-8-13 Email from RD to Supervisors: Supervisors, please develop an action plan to get the children seen. Please have the workers document their efforts ASAP. Email me your response. | NA | NA | NA |
| REDACTED | REDACTED | lack of face-to-face | There doesn't appear to be documented face-to-face contact with REDACTED, REDACTED, and REDACTED since 12-20-12. | 7W | Harrison | 3/9/2013 REDACTED | REDACTED | 3/8/2013 | 3/8/2013 | 3-8-13 Email from RD to Supervisors: Supervisors, please develop an action plan to get the children seen. Please have the workers document their efforts ASAP. Email me your response. | NA | NA | NA |
| REDACTED | REDACTED | lack of face-to-face | There doesn't appear to be documented face-to-face contact with REDACTED since 11-16-12; with REDACTED in his placement setting since 11-16-12; with REDACTED in her placement setting since 11-07-12. | 7W | Harrison | 3/9/2013 REDACTED | REDACTED | 3/8/2013 | 3/8/2013 | 3-8-13 Email from RD to Supervisors: Supervisors, please develop an action plan to get the children seen. Please have the workers document their efforts ASAP. Email me your response. | NA | NA | NA |
| REDACTED | REDACTED | lack of face-to-face | There doesn't appear to be documented face-to-face contact, REDACTED, REDACTED, or REDACTED since 12-14-12 | 7W | Harrison | 3/15/2013 REDACTED | REDACTED | 3/15/2013 | 3/15/2013 | 3-18-13 Email from RD to ASWS: REDACTED, please make a plan for the children to be seen ASAP. Please provide a response as to why the children have not been seen. | NA | NA | NA |
| REDACTED | REDACTED | lack of face-to-face | There doesn't appear to be documented face-to-face contact with REDACTED since 12-27-12 or with Tristen since 1-16-13. | 7W | Harrison | 3/15/2013 REDACTED | REDACTED | 3/15/2013 | 3/15/2013 | 3-18-13 Email from RD to ASWS: REDACTED, please make a plan for the children to be seen ASAP. Please provide a response as to why the children have not been seen. | NA | NA | NA |
| REDACTED | REDACTED | lack of face-to-face | There doesn't appear to be documented face-to-face contact with REDACTED since 12-17-12. | 7W | Harrison | 3/15/2013 REDACTED | REDACTED | 3/15/2013 | 3/15/2013 | 3-18-13 Email from RD to ASWS: REDACTED, please make a plan for the children to be seen ASAP. Please provide a response as to why the children have not been seen. | NA | NA | NA |
| REDACTED | REDACTED | lack of face-to-face | There doesn't appear to be any documented contact with REDACTED and REDACTED in their placement setting. | 7W | Harrison | 3/15/2013 REDACTED | REDACTED | 3/15/2013 | 3/15/2013 | 3-18-13 Email from RD to ASWS: REDACTED, please make a plan for the children to be seen ASAP. Please provide a response as to why the children have not been seen. | NA | NA | NA |
| REDACTED | REDACTED | lack of face-to-face | As noted on in the previous PAR, there doesn't appear to be documented face-to-face contact with REDACTED in her placement setting since 10-11-11. | 7W | Harrison | 3/15/2013 REDACTED | REDACTED | 3/15/2013 | 3/15/2013 | 3-18-13 Email from RD to ASWS: REDACTED, please make a plan for the children to be seen ASAP. Please provide a response as to why the children have not been seen. | NA | NA | NA |

| | | Category | Description | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | Permanency Concern | From REDACTED: During QA, I found that child is placed in Millcreek and his plan is LTFC. He has needs that will continue into adulthood and needs legal permanency. What is being done to identify a legal custodian? From FCR REDACTED: At permancy hearing on 12-3-12, agency recommended a permanent plan of LTFC which was the order of the court. There doesn't appear to be any documentation of efforts by agency to establish legal permanancy for child. (Refer to email). | 7W | Harrison | 3/19/2013 REDACTED | REDACTED | 3/19/2013 | 3/19/2013 | **Date reported to REDACTED DDII /FCR** **Email only used for filtering purposes.** NA | NA | NA |
| REDACTED | REDACTED | Child in no one's legal custody until chancery court issues a ruling | Reviewer was informed by REDACTED, FPW II, that she contacted the GAL to clarify whether REDACTED remained in agency custody since the 02-19-13 court order states the agency was relieved of supervision while this cause is deferred to chancery court for a custody determination, and she was told REDACTED is "in no one's legal custody until chancery court issues a ruling." REDACTED stated REDACTED, GAL, stated this is similar to when a parent places custody of a child with a relative until legal documentation is established, and she stated she was advised the agency may close this case. | 7W | Harrison | REDACTED | REDACTED | 3/20/2013 | 3/21/2013 RD discussion with judge. | NA | NA | NA |
| REDACTED | REDACTED | Lack of face-to-face/Documented Follow up | Agency received a referral of neglect in regard to REDACTED in the maternal grandmother's home, and although it is assigned to REDACTED, there doesn't appear to be supporting documentation it has been initiated; there doesn't appear to be documented face-to-face contact with REDACTED, REDACTED, REDACTED and REDACTED since 1-29-13. | 7W | Harrison | 3/29/2013 REDACTED | REDACTED | 3/29/2013 | 3/29/2013 NA | NA | NA | NA |
| REDACTED | REDACTED | lack of face-to-face | There doesn't appear to be documented face-to-face contact with REDACTED since 12-20-12, with REDACTED in her placement setting since 12-20-12, or with REDACTED since 1-11-13. | 7W | Harrison | 3/29/2013 REDACTED | REDACTED | 3/29/2013 | 3/29/2013 NA | NA | NA | NA |
| REDACTED | REDACTED | lack of face-to-face | There doesn't appear to be documented face-to-face contact with REDACTED and REDACTED in their placement setting since 1-24-13. | 7W | Harrison | 3/29/2013 REDACTED | REDACTED | 3/29/2013 | 3/29/2013 NA | NA | NA | NA |
| REDACTED | REDACTED | lack of documentation | Documentation does not reflect that the children are being visited face-to-face on a monthly basis and they have not been visited face-to-face since January 17th, 2013. Monthly documentation does not support that the children's needs are being assessed and if they are being met. | 7W | Harrison | 4/1/2013 REDACTED | REDACTED | 4/1/2013 | 4/1/2013 NA | NA | NA | NA |
| REDACTED | REDACTED | lack of documentation | The social worker identified concerns for the children's safety and well-being and reflected concerns that REDACTED was defensive and could not provide sufficient support and care to meeting the basic needs of the children. County conference review reflects that REDACTED could not account how REDACTED received two fractures. County conference review reflects that REDACTED is being investigated by the Gulfport Police Department for child abuse concerning this incident. Documentation does not reflect that the children are being visited face-to-face on a monthly basis and REDACTED has not been visited face-to-face since December 2012. Monthly documentation does not support that the children's needs are being assessed and if they are being met. These needs include appropriate placement, medicals for REDACTED and REDACTED, dentals for REDACTED and REDACTED, and educational for REDACTED. | 7W | Harrison | 4/1/2013 REDACTED | REDACTED | 4/1/2013 | 4/1/2013 NA | NA | NA | NA |
| REDACTED | REDACTED | Behavioral Issues Concern | County conference review supports that REDACTED has exhibited sexual behaviors toward male peers and was removed from a foster home in June 2011 due to making advances toward a male peer in the home. She was admitted to CARES for follow-up concerning her behavioral issues... **Refer to email for more info and several other concerns.** | 7W | Harrison | 4/2/2013 REDACTED | REDACTED | 4/2/2013 | 4/2/2013 NA | NA | NA | NA |
| REDACTED | REDACTED | Lack of face-to-face | There doesn't appear to be documented face-to-face contact with REDACTED since 11-9-12. | 7W | Harrison | 4/16/2013 REDACTED | REDACTED | 4/16/2013 | 4/16/2013 NA | NA | NA | NA |
| REDACTED | REDACTED | face-to-face contact | There doesn't appear to be any documented face-to-face contact with REDACTED in his placement setting whatsoever. | 7W | Harrison | 4/30/2013 REDACTED | REDACTED | 4/30/2013 | 4/30/2013 NA | NA | NA | NA |
| REDACTED | REDACTED | Lack of face-to-face | Doesn't appear to be documented face-to-face contact with the mother since 1-2-13 or an assessment of the children's living arrangement since 1-24-13. | 7W | Harrison | 5/1/2013 REDACTED | REDACTED | 5/1/2013 | 5/1/2013 NA | NA | NA | NA |
| REDACTED | REDACTED | Face-to-face contact | There doesn't appear to be documented face-to-face contact with REDACTED since 3-06-13, or in his placement setting, since 11-30-12. | 7W | Harrison | 5/13/2013 REDACTED | REDACTED | 5/13/2013 | Email from RD to worker on 5-13-13: you need to make an immediate visit. Please do by friday, May 17th. Email me when the visits made. Please make sure you visit per policy and because we need to know our 5/13/2013 children are safe and doing well. | NA | NA | NA |

| | | Concern Type | Description | Unit | County | | | | Notes | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | Face-to-face contact | There doesn't appear to be documented face-to-face contact with REDACTED and REDACTED from 11-19-12 to 3-07-13, with REDACTED from 10-25-12 to 2-13-13, or within their placement setting (or an assessment of the needs of their relative resource parent) since 10-15-12. | 7W | Harrison | 5/16/2013 REDACTED | REDACTED | 5/16/2013 | 5/16/2013 Email from RD to worker on 5-17-13: please make sure REDACTED makes contact. We need to ensure the safety of the children we service. We also need to make sure we are visiting with parents and resource parents. Have REDACTED make a visit by next wednesday. Email me when complete. | NA | NA | NA |
| REDACTED | REDACTED | Face-to-face contact | There doesn't appear to be documented face-to-face contact with REDACTED from 1-03-13 to 3-26-13 or since then, or assessments of the needs of her court ordered non-licensed relative placement, REDACTED, since 1-08-13. There doesn't appear to be documented face-to-face contact with REDACTED until 3-26-13 or since then and there doesn't appear to be any documented contact with his court ordered non-licensed relative placement, REDACTED. | 7W | Harrison | 5/17/2013 REDACTED | REDACTED | 5/17/2013 | 5/17/2013 Email from worker on 5-20-13: REDACTED, please resolve this issue asap. Have REDACTED make a visit and address the concerns below. Email me when she has completed the visit. | NA | NA | NA |
| REDACTED | REDACTED | Face-to-face contact | Concern: REDACTED was placed in his parents' own home on 1-3-13 and there doesn't appear to be documented face-to-face contact with him, or an assessment of his mother's needs and the physical home environment since 1-24-13, or an assessment of the needs of the father, since 10-31-12. | 7W | Harrison | 5/17/2013 REDACTED | REDACTED | 5/17/2013 | 5/17/2013 Email from worker on 5-20-13: REDACTED, please see the concerns below. Please address with the worker and have her make a visit ASAP with all involved. She will need to make the contact this week. Please email me when is this is complete | NA | NA | NA |
| REDACTED | REDACTED | Face-to-face contact | There doesn't appear to be documented face-to-face contact with REDACTED from 1-17-13 to 3-22-13 or since then. | 7W | Harrison | 5/17/2013 REDACTED | REDACTED | 5/17/2013 | 5/17/2013 NA | NA | NA | NA |
| REDACTED | REDACTED | Face-to-face contact | | 7W | Harrison | 5/31/2013 REDACTED | REDACTED | 5/30/2013 | 5/30/2013 NA | NA | NA | NA |
| REDACTED | REDACTED | Lack of contact/no on-going assessment | REDACTED and REDACTED are placed in their mother's own home. There doesn't appear to be documented face-to-face contact with REDACTED, or an assessment of the mother's needs since 12-22-12; with REDACTED from 12-22-12 to 5-10-13. | 7W | Harrison | 5/31/2013 REDACTED | REDACTED | 5/31/2013 | 5/31/2013 Narratives were entered for 5/10/13, 5/29/13 and 5/31/13. Appears assigned worker was on medical leave during March and April. Refer to email received on 6-3-13 for more info. | | 6/3/2013 NA | NA |
| REDACTED | REDACTED | Lack of contact/no on-going assessment | There doesn't appear to be documented face-to-face contact with REDACTED and REDACTED from 12-6-12 to 2-5-13 or from 2-15-13 to 4-12-13. There doesn appear to be documented face-to-face contact with REDACTED and REDACTED in their placement setting, or an assessment of the needs of their relative resouce parents, from 11-30-12 to 2-5-13 or since 2-15-13. | 7W | Harrison | 5/31/2013 REDACTED | REDACTED | 5/31/2013 | 5/31/2013 Narratives were entered for 4-13-13, 5-14-13 and 5-31-13. Appears assigned worker was on medical leave during March and April. Refer to email received on 6-3-13 for more info. | | 6/3/2013 NA | NA |
| REDACTED | REDACTED | Lack of contact/no on-going assessment | There doesn't appear to be documented face-to-face contact with REDACTED since 8-20-12. REDACTED is placed in the adoptive placement of REDACTED in Rankin County and there doesn't appear to be any documented assesments of REDACTED needs whatsoever. | 7W | Harrison | 6/5/2013 REDACTED | REDACTED | 6/5/2013 | 6/5/2013 NA | NA | NA | NA |
| REDACTED | REDACTED | Lack of contact/no on-going assessment | There doesn't appear to be documented face-to-face contact with REDACTED since 3-8-13. He is placed in the licensed resource home in his maternal great-grandmother, REDACTED, and there doesn't appear to be a documented assessment of her needs since 2-7-13. | 7W | Harrison | 6/5/2013 REDACTED | REDACTED | 6/5/2013 | 6/5/2013 NA | NA | NA | NA |
| REDACTED | REDACTED | Face-to-face contact | There doesn't appear to be documented face-to-face contact with REDACTED from 1-30-13 to 4-17-13, or in her placement setting, since 1-02-13. | 7W | Harrison | 6/10/2013 REDACTED | REDACTED | 6/10/2013 | 6/10/2013 NA | NA | NA | NA |
| REDACTED | REDACTED | Face-to-face contact | There doesn't appear to be documented face-to-face contact with REDACTED and REDACTED since 2-14-13. According to REDACTED, FPW, she has maintained contact but she has not maintained timely documentation. | 7W | Harrison | 6/14/2013 REDACTED | REDACTED | 6/14/2013 | 6/14/2013 NA | NA | NA | NA |
| REDACTED | REDACTED | Face-to-face contact | There doesn't appear to be documented face-to-face contact with REDACTED since 2-12-13. According to REDACTED, FPW, she has maintained at least twice monthly contact, but she has not maintained timely documentation. | 7W | Harrison | 6/14/2013 REDACTED | REDACTED | 6/14/2013 | 6/14/2013 NA | NA | NA | NA |
| REDACTED | REDACTED | Lack of contact/no on-going assessment | There doesn't appear to be documented face-to-face contact with REDACTED from 11-07-12 to 3-06-13 or since then. REDACTED is placed in her mother's own home and there doesn't appear to be a documented assessment of her mother's needs since 1-16-13. | 7W | Harrison | 6/18/2013 REDACTED | REDACTED | 6/18/2013 | 6/18/2013 NA | NA | NA | NA |
| REDACTED | REDACTED | Face-to-face contact | There doesn't appear to be documented face-to-face contact with REDACTED since 3-21-13, or in his placement setting, since 2-18-13. | 7W | Harrison | 6/19/2013 REDACTED | REDACTED | 6/19/2013 | 6/19/2013 NA | NA | NA | NA |
| REDACTED | REDACTED | Safety Concern/Failure to appear/prepare for conference | The assigned caseworker and ASWS were both unavailable for the county conference. During the conference, REDACTED court ordered non-licensed relative placement, REDACTED, stated she needs a crib since "REDACTED sleeps with her". Reviewer explained it is unsafe for an 8 month old infant to be sleeping with an adult. REDACTED stated the agency was aware she did not have a crib when REDACTED was placed in her home and someone from the agency brought her a toddler size bed, which she also feels is unsafe. The siblings' paternal grandmother stated she has a "play pin" she would trade her for the toddler size bed. | 7W | Harrison | 7/2/2013 REDACTED | REDACTED | 7/2/2013 | 7/2/2013 NA | NA | NA | NA |
| REDACTED | REDACTED | Lack of face-to-face contact | There doesn't appear to be documented face-to-face contact with REDACTED and REDACTED since 10-26-12, and as noted in the previous PAD, there doesn't appear to be documented face-to-face contact with REDACTED and REDACTED in their placement setting since 02-27-12. According to REDACTED, FPS, she has made an appointment to visit them in their relative resource home in Forrest County tomorrow, 01-12-13 | 7W | Harrison (COS Forrest) | 1/11/2013 REDACTED | REDACTED | 1/11/2013 | 1/11/2013 REDACTED went to Forrest county and saw children in home setting. She is not sure why COS worker is not entering narratives. COS worker and supervisor have been told to enter narratives. | 1/14/2013 NA | NA | |
| REDACTED | REDACTED | Face-to-face contact | There doesn't appear to be documented face-to-face contact with REDACTED, REDACTED, and REDACTED since 2-28-13. | 7W | Harrison | 7/11/2013 REDACTED | REDACTED | 7/11/2013 | 7/11/2013 Email from FO to worker on 7-12-13: REDACTED, Please see below and provide a response. No contact documented since February - REDACTED unit. | NA | 7/12/2013 | 7/12/2013 |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | Face-to-face contact | According to the caseworker, she has maintained twice monthly face-to-face contact with REDACTED, REDACTED , and REDACTED.There doesn't appear to be documented face-to-face contact with REDACTED and REDACTED since 3-01-13, or with REDACTED, since 3-15-13. | 7W | Harrison | 7/12/2013 REDACTED | REDACTED | 7/12/2013 | 7/12/2013 | Email from FO to worker on 7-12-13: REDACTED - Please see FCR concern below and provide a response back. If the visits were done, they need to be documented. If not done, please have REDACTED make sure we make a visit and document today. There is no evidence that children have been seen since March. | NA | 7/12/2013 | 7/12/2013 |
| REDACTED | REDACTED | Face-to-face contact | As noted in the previous PAD on 2-27-13, there doesn't appear to be documented face-to-face contact with REDACTED, or her resource parent, since 06-30-12 and there doesn't appear to be any documented face-to-face contact whatsoever with REDACTED in her placement setting. It should be noted REDACTED resource parent, REDACTED, lives in Pensacola, FL and the outgoing ICPC request was approved on 01-03-13. There doesn't appear to be any supervisory reports received from Florida and filed in the case file. | 7W | Harrison | 7/16/2013 REDACTED | REDACTED | 7/16/2013 | 7/16/2013 NA | | NA | NA | NA |
| REDACTED | REDACTED | Face-to-face contact | There doesn't appear to be documented face-to-face contact with REDACTED from 4-24-13 to 6-18-13, or in his placement setting and with his mother, since 11-12-12. | 7W | Harrison | 7/16/2013 REDACTED | REDACTED | 7/16/2013 | 7/16/2013 | Email from worker on 7-18-13: I have been visiting with REDACTED at his child care placement. The child has been seen in this setting because  REDACTED works at the child care facility in which the child attends and when I schedule visits to see the child, she's always at work and REDACTED is there too. There has been occasions where I have scheduled visits with REDACTED in-home and REDACTED would have to work late on her job so I would REDACTED in the child care setting. I scheduled a in-home visit with REDACTED to visit REDACTED on 5/17/13 but I was unable to follow through with the visit due to me being out off due to bereavement. I have an in-home visit with REDACTED scheduled on 7/23/13 at 3:30p.m. | 7/18/2013 | 7/17/2013 | 7/18/2013 |
| REDACTED | REDACTED | Face-to-face contact | There doesn't appear to be documented face-to-face contact with REDACTED, or her non-licensed relative placement, REDACTED, from 1-31-13 to 5-29-13 or since then. | 7W | Harrison | 7/17/2013 REDACTED | REDACTED | 7/17/2013 | 7/17/2013 | Email from REDACTED on 7-24-13: The following has now been documented in case narratives. See email in FCR email. | NA | NA | NA |
| REDACTED | REDACTED | lack of contact in placement setting/No COS worker assigned | FSP has not been completed and a request made with Harrison County DHS to provide a COS worker for the child and her foster parents. In reading the case narratives, the assigned worker has been visiting with REDACTED and her foster parents, but outside the agency, such as a bookstore in Gulfport, MS. It is noted that REDACTED was not seen in her placement setting in January, February, April, June, and July 2013. There was no documented contact made in December 2012 and in March 2013. The only contact made in the foster home placement was in May 2013. Agency has not assessed for the child's overall safety, needs, and well-being in her foster home setting. Agency has documented monthly contact with the foster parents and there are no documented diligent efforts to locate the mother and make contact with the father, who is incarcerated. | 7W | Hancock | 7/22/2013 REDACTED | REDACTED | 7/22/2013 | 7/22/2013 NA | | NA | NA | NA |
| REDACTED | REDACTED | Lack of contact with pregnant teen/No COS worker assigned | Upon review of the MACWIS record, agency has not documented contact with REDACTED, who is pregnant, in March, April, June, and July 2013. She was not seen in her placement setting in May 2013. There is no COS worker assigned to this case, as REDACTED is placed at Two of Us therapeutic group home in Jackson, MS. Refer to email sent to FCR account on 7-22-13. | 7W | Hancock | 7/22/2013 REDACTED | REDACTED | 7/22/2013 | 7/22/2013 NA | | NA | NA | NA |
| REDACTED | REDACTED | Face-to-face contact | According to the case narratives, there was no documented contact made with REDACTED in February, March, and June 2013 and no in-home contact made with REDACTED in April 2013. It appears that REDACTED does reside in Hancock County. Agency only documented contact with the caregivers in April and July 2013. It does not appear that monthly assessment of the child/caregivers needs were assessed by the agency. Agency has not documented the child's medical and dental exams or mental health assessment. There is no education documentation found in the case narratives or in demographics. | 7W | Hancock | 7/22/2013 REDACTED | REDACTED | 7/22/2013 | 7/22/2013 NA | | NA | NA | NA |

**Ex. 27A**

Mississippi, DFCS Policy                                    Section D
Revised 7-22-13

## FOSTER CARE

APPLA will either involve a permanent adult caregiver of the child or at least adult parent figures playing permanent and important roles in the child's life. The decision and development of an APPLA should include the following:

- Parent(s)
- Placement provider
- Youth
- DFCS COR/COS Worker
- Guardian Ad Liten
- COR ASWS

## D. Reviews

### 1. Supervisory Administrative Review

The DFCS Supervisory Administrative Review (SAR) is an administrative review that meets the requirements of MISS. CODE ANN. § 43-15-13(3), which require that all open cases have a supervisory review.

The SAR is completed in MACWIS at the following intervals by the COR Supervisor:

1. Initially, the SAR is required within ninety (90) calendar days after opening a placement case,

2. A SAR shall be completed at the fifteen out of twenty-two month interval, and

3. Every 12 months following the 15 month SAR.

The SAR consists of a review of the electronic and paper files as well as an individual conference with the assigned COR Worker. This review shall be printed, signed and filed in the paper case record.

### 2. Special Permanency Reviews

A special permanency review shall be held for all children who have been in custody for 15 of the most recent 22 months without an ASFA exception or for whom a TPR petition has not been filed.

- The special permanency review shall be held by the 15th of each month.

**Ex. 27B**

**MACWIS TECHNICAL ASSISTANCE BULLETIN**
**July 22, 2013        Issue # 16**

**ATTENTION – ALL MACWIS USERS**

<u>**EFFECTIVE July 8, 2013**</u>

**You will notice changes within the MACWIS system regarding:**

- **Supervisor Administrative Review (SAR)**

**Please refer to the following detailed instructions for understanding all system changes. After you have reviewed the instructions, if you have any questions or experience any system problems please contact the MACWIS Helpdesk at 1-877-244-2528.**

_____

**USER INSTRUCTIONS**

The question '**Based on your review, is the child's case record current, complete and documented by the assigned caseworker?**' has been added to the Supervisory Administrative Review (SAR) instrument in MACWIS in order to satisfy the following statement in the Modified Settlement Agreement.

> *Defendants shall revise the Supervisory Administrative Review process to require a review of whether DFCS child welfare case records are current, complete, made by the appropriate caseworker, and signed and dated by supervisors.*

There are also some questions on the current SAR that have been re-worded due to other changes that have been made in MACWIS.

The policy has changed so that the supervisor will complete a SAR every 12 months after the 15 month SAR is done as long as the child remains in custody.

## OVERVIEW OF THE CHANGES:

The question "**Based on your review, is the child's case record current, complete and documented by the assigned caseworker?"** was added to the Follow Up tab of the SAR.  The Supervisor will click Yes or No depending on the answer.



The following modifications were made to the ISP tab:



If the SAR was completed before the FSP was implemented, the tab will show ISP. If the SAR was completed after the implementation of the FSP, the tab will show FSP.

There is no field in the FSP to indicate whether or not the FSP was signed so the supervisor will have to complete this question.

The choice of N/A has been added to questions 5 and 6. (an example of when NA might apply: if the child is an infant)

The following changes were made to the Health tab:

Before



After



Since the SARA is no longer functional, question 4 has been removed from the tab. Mental Health Assessment has been added to question 3.

The other question numbers were changed to stay in sequence.

The following changes were made to the Plans tab:

Before



After

The Permanent and Concurrent plans will now pull from the FSP.

The choice of N/A has been added to questions 4 and 5, to be used if Adoption is not the permanent plan.

The following changes were made to the Contacts/Visitation tab:

Before



After

Question 2 was changed to say 'Are visits being documented in MACWIS?'

Since the policy has changed to do an annual SAR on chldren in custody, another SAR type has been added called 'Annual SAR'.  The supervisor will receive a tickler 335 days after the 15th Month SAR is completed for the supervisor to complete the Annual SAR.

The tickler will escalate to the Regional Director if the SAR has not been completed within 30 days of the generation of the tickler.

The tickler will continue to generate for the Annual SAR as long as the child is in custody (every 335 days).

The 'Subsequent SAR' has been changed to the 'Review SAR'.

The Initial SAR will be the only choice in the drop down box when the Initial SAR is due.

The 15th Month SAR and the Review SAR will be available after the Initial SAR has been completed.  The Review SAR can be done at any time deemed necessary once it is available in the picklist.

Once the 15th Month SAR has been completed, the Review SAR and the Annual SAR will be the choices in the picklist.

# Ex. 28

# Financial Assessment
## Findings and Recommendations

**May 2011**

**Mississippi Department of Human Services
Division of Family and Children's Services**

Produced by Hornby Zeller Associates, Inc.
Under Contract to
Center for the Support of Families, Inc.

## CONTENTS

OVERVIEW                                                          1

PERSONAL SERVICES                                                 3

SUBSIDIES, LOANS AND GRANTS                                      10

    SERVICE SUBGRANTS                                        10

    MAINTENANCE                                              13

PROFESSIONAL EDUCATION AND TRAINING                             17

APPENDIX A – RECOMMENDED CHANGES TO THE COST ALLOCATION PLAN     35

APPENDIX B – TITLE IV-E TRAINING WORKSHEET                       36

**Contact:**
Helaine Hornby, M.A.:  (207) 773-9529
Dennis Zeller, Ph.D.:   (518) 273-1614
Hornby Zeller Associates, Inc.
48 Fourth Street
Troy, NY 12180

## OVERVIEW

For state fiscal year (SFY) 2009, the Mississippi Department of Human Services (MDHS) spent over $92 million on programs and services provided by the Division of Family and Children's Services (DFCS). The Fiscal Year 2011 Budget Request shows that in SFY 2009 $39.5 million was incurred for Personal Services, including staff time and travel; nearly $14 million for Contractual Services; $1.3 million for Commodities; and $37.4 million for Subsidies, Loans and Grants, including payments for children in foster care. Mississippi received close to $52.1 million in federal support with the balance largely paid through state general funds. State general funds in the amount of $10.4 million and $20 million were incurred for Personal Services and Subsidies, Loans and Grants, respectively, the largest two categories of agency expenditures. The table below provides a budget overview.

| SFY 2009 Expenditures | | | |
|---|---|---|---|
| | Spent | Federal Reimbursement | State |
| **Personal** | $ 39.5 million | $ 29.1 million | $10.4 million |
| **Contractual** | $14.0 million | $7.6 million | $6.3 million |
| **Commodities and Capital Outlay** | $1.3 million | $0.8 million | $0.5 million |
| **Subsidies, Loans and Grants** | $37.4 million | $ 17.4 million | $20.0 million |

At the start of SFY 2010 Mississippi officials forecast, correctly, that the costs for its child welfare program would increase. According to the quarterly Title IV-E Foster Care and Adoption Assistance Financial Reports for federal fiscal years 2009 and 2010, expenditures for the state's foster care program increased by 28 percent. However, the federal share of the increased expenditures failed to keep pace, showing only a 25 percent rise.

Nevertheless, there was progress in SFY 2010 in the state's ability to use awarded federal funds. In previous years federal grant awards for the state's child welfare program were often not completely spent, leaving carry over funds to the next year. At the close of SFY 2010, it appears that most – if not all – federal grant award monies for federal fiscal year 2010, as well as those outstanding from previous years, had been spent. Nevertheless, DFCS expended $16.7 million in state general funds for services theoretically eligible for reimbursement through its Child Welfare or Title IV-B, Part 1 grant. The expenditures were paid with state funds because DFCS exceeded its Part 1 cap by that amount.

Hornby Zeller Associates, Inc. (HZA) was contracted by the Center for the Support of Families, Inc. (CSF) to conduct a financial assessment of MDHS to determine the

degree to which additional federal funding is available to support DFCS programs. Several areas of opportunity have been identified, with those involving the Personal Services and Subsidies, Loans and Grants line items of the Division's budget having the greatest impact. The following portions of this paper outline the potential opportunities for DFCS in these two areas, first describing the current practice followed by a brief description of issues and concerns and then recommendations about how to enhance the state's access to federal funding.

Before presenting the findings of this assessment, one assumption needs to be articulated. Many states, including Mississippi, exhibit a preference for federal funds which have few restrictions and low or no match requirements. The problem is that all such federal funding sources are capped. The uncapped federal funding sources, principally Title IV-E and Title XIX (Medicaid), have many rules governing their use and the clientele eligible to receive them. When states set up processes which favor utilization of the simpler, capped funds, they can find they are not making maximum use of the uncapped sources and, in fact, end up spending state general revenue for activities which could legitimately be reimbursed by either a capped or uncapped funding stream. This leads to the broad assumption underlying this assessment.

> After a funding source is fully expended, there is no difference between a federal dollar from that source and a dollar of state general revenue.

Consequently the focus of the assessment is shifting costs from both the capped federal sources and state general revenue to Title IV-E and Title XIX.

## PERSONAL SERVICES

HZA identified the following areas which should be addressed to improve federal claiming in the expenditure category of Personal Services: the use of PINs, the Cost Allocation Plan and the Random Moment Survey. While we also delved into Targeted Case Management as an option, for the reasons described below HZA does not recommend it as a source to be pursued at present.

### Current Practice

- **PINS:**  Personal services in the amount of $39.5 million in 2009 includes the cost of caseworkers and supervisors. MDHS assigns a Personal Identification Number (PIN) to each employee. The PIN is assigned to the county and unit where the position was initially created and based on that, the PIN is assigned to a cost pool; however, as vacancies occur and positions are filled, PINS are often used in locations other than where they are assigned.

- **Cost Allocation Plan**:  The federally-approved Cost Allocation Plan establishes "cost pools." All the costs associated with the activities defining each pool are grouped and then allocated according to the Plan's specifications. Some of these pools such as P170, Division of Family and Children's Services, are allocated generically over multiple state and federal funding sources. Others, such as P173 Foster Care Services/Licensing State Office or P176 Adoption Training are split between Title IV-E and Child Welfare Services (Part 1 of Title IV-B) using the penetration rate to determine the proportion of costs going to each funding source. The proportion going to Title IV-E is reimbursed at either 50 percent or 75 percent, depending on whether the activity is administrative or training. The cost pool to which a worker is assigned is dependent on his or her PIN, not necessarily on where he or she is currently working.

- **Random Moment Survey including Foster Care Candidates**:  As prescribed by its federally approved Cost Allocation Plan, MDHS employs the Social Worker Random Moment Survey (SWRMS) to measure the proportion of personnel and other indirect costs which may be charged to the various federal funding sources available to support child welfare. The SWRMS "strikes" are categorized into one of 16 activity codes. Each code is defined by a series of activities social workers perform on behalf of specified case types such as protective services or foster care. That is, the definitions of the activity codes include both the activity and the case type in a single code.

  Current procedures call for responses to be completed by supervisors within 15 minutes of the randomly selected moment. An exception to the short time frame is granted when the worker is in the field.

- **Targeted Case Management:** In 1998, Mississippi amended its Title XIX State Plan to include in its targeted case management (TCM) population, children in the custody of or under the supervision of the DFCS. Several years later, the Centers for Medicare & Medicaid Services (CMS) took a hard-line approach to the comprehensive use of targeted case management, limiting the activities for which TCM could be used. In response, Mississippi not only curtailed its use of TCM for foster children; it eliminated it.

### Issues and Concerns

- **PINS:** The system of tying a PIN directly to a cost pool means that the agency has to reassign each and every PIN to a new cost pool when the position is moved from its original position. An example is someone moving from being a social work supervisor to becoming a foster care reviewer. The process of re-assigning the PIN is sufficiently labor intensive that it often does not occur in a timely way or, sometimes, at all, affecting the accuracy of the cost pool and hindering proper claiming if a person is performing a function that could be direct charged.

- **Cost Allocation Plan:** The Cost Allocation Plan has not been updated to reflect new units such as Continuous Quality Improvement or Resource Development. This means that PINS must either be assigned to very broad categories, such as P170 (Division of Family and Children Services) or be assigned in some ad hoc fashion because the plan does not include the right categories. This can result in a loss of federal funds, particularly when the unit is wholly or largely devoted to foster care and adoption work, like the Resource Development Unit, but the PINs are assigned to a generic cost pool.

- **Random Moment Survey including Foster Care Candidates:** Activity Code 14, Other Program-related Activities, appears to be utilized as a "miscellaneous" category where SWRMS strikes are assigned when the reporting supervisor cannot fit the activity anywhere else. This is exacerbated by the fact that there are errors regarding this code in both the cost allocation plan and in the definition of the activity. The Cost Allocation Coding Matrix for the SWRMS indicates that the quarterly strikes for Activity Code 14 should be disbursed among 11 funding sources, including Title IV-E Foster Care Administration. In reality all of the time reported against this code is charged to the Social Services Block Grant (SSBG). In addition, DHS central fiscal staff intend Activity Code 14 to include only non-foster care activities, but the actual definition encompasses activities that clearly relate to foster children, specifically, "[m]aking referrals for treatment and counseling services that relate to the provisions necessary to a child, his or her family, or to a child's foster care provider, to ameliorate or remedy personal problems, behavioral problems or problems with home conditions." While the SWRMS participant is given the opportunity to identify the case within the remarks section of the tool and thus to identify whether the activity was

performed on behalf of a child in foster care, re-classifying cases based on those remarks would be so labor-intensive that it is unlikely to occur on a regular basis.

Strikes for Activity Code 9, Case Planning & Management Activity for Foster Care (Independent Living), have also been charged to SSBG. If DFCS were not maximizing its use of Chaffee funds, a percentage of qualifying costs would be most appropriately charged to the independent living program. Because the Federal Grant Expenditures report for the quarter ending June 30, 2010 indicates that DFCS does expend its Chafee funds fully, these costs should be treated as normal foster care costs and reimbursed under Title IV-E, to the extent that the children are eligible. For the quarter ending September 30, 2010, nearly 22 percent of the children age 16, 17 or 18 were IV-E eligible. Three percent of all strikes for the quarter ending September 2010 were attributed to this activity. While not significant, it does present some opportunity for DFCS to improve federal funding of its foster care programs.

While the MDHS Title IV-E State Plan references "candidates" for foster care, and the SWRMS does so as well, Activity Code 6, Pre-placement Activities for Candidates of Foster Care, the category is underutilized (67 strikes out of 2658 valid cases for September 2010), presumably because staff do not know what it means. If caseworkers are engaged in Case Planning and Management for in-home or protective services cases, the time they spend for these eligible activities is reimbursable under Title IV-E if the family has a case plan which says the child will be placed unless placement prevention services are successful[1]. No eligibility determinations need to be made, so long as the state uses the Title IV-E penetration rate in calculating its claim.

---

[1] A child who is at serious risk of removal from home as evidenced by the agency either pursuing his/her removal or making reasonable efforts to prevent removal is considered a Candidate. The basis is found in Statute, Departmental Policy and Departmental Appeals Board (DAB) Decisions:

**Statute**
- Section 471(a)(15)(B)(i): provides a frame of reference for determining at which point a child becomes a candidate for foster care by requiring a state to make reasonable efforts to prevent a child's removal.
- Agency's involvement must be for the specific purpose of either removing the child from the home or satisfying the reasonable efforts requirement with regard to preventing removal

**Departmental Policy**
3 acceptable methods for documenting a child's candidacy:
- A defined case plan which clearly indicates that active preventative services, foster care is the planned arrangement for the child.
- An eligibility determination form which has been completed to establish the child's eligibility under Title IV-E
  - Should include evidence that the child is in serious risk of removal from home.
  - Evidence of AFDC eligibility in and of itself is insufficient to establish candidacy.
- Evidence of court proceedings in relation to the removal of the child from the home, in the form of a petition to the court, a court order or transcript of court proceedings.

**DAB Decisions**
- Decision No 1428 offers the following guidance for identifying the point at which a child can be a candidate:
  - The state has initiated efforts to actually remove the child from his/her home or has made the decision that the child should be placed in foster care unless preventative services are effective.
  - A report of child abuse or neglect is insufficient for establishing a child's candidacy.
- A child who is at serious risk of removal from his/her home because the state is either pursuing that removal or attempting to prevent it.

---

- **Targeted Case Management:** The approach Mississippi took in response to CMS' stance on TCM was more restrictive than that adopted by some other states. HZA, therefore, examined the potential for shifting some of the case management costs for children in foster care to that source. After discussions with representatives of both DHS and the Division of Medicaid, HZA decided not to include any recommendations regarding TCM in its report. At the federal level the program is subject to too much flux, and almost any method of claiming TCM dollars could threaten the State with disallowances, simply moving today's fiscal problems into the future.

### Revenue Enhancement Actions

*Prospective Opportunities*

In its interim report, HZA made three recommendations to MDHS related to increasing its federal reimbursement for Personal Services costs. These included the following.

1) MDHS needs to update its Cost Allocation Plan to include units not currently accounted for.

2) MDHS should map its cost pools to units and create a mechanism for changing the association of a PIN to a unit whenever the position moves either geographically or functionally.

3) THE SWRMS should be revised to have supervisors (or workers) report the activity in which the worker is engaged, along with the case number, and the type of case should be determined in an automated fashion with the data in MACWIS.

The first two of these recommendations are connected and MDHS' response reflects that connection. The recommendations envision a cost allocation plan which is focused on organizational units (defined in various ways, depending on their functions). The intent of the recommendations was to make the cost pool assignment of each staff person automatic as soon as the person was assigned to a unit.

MDHS' response to these first two recommendations was that the structure of the business processes for human resources and budgeting and accounting make it impractical to connect units to cost pools, but that the same effect could be obtained by ensuring that PINS are appropriately assigned. To help ensure that this occurs in the future, the agency is transferring responsibility for making the cost pool assignments of individual PINs away from Human Resources and to the Administrative/Finance unit of DFCS, which has an institutional interest in maximizing revenues.

One advantage to the MDHS approach is that new units can be created without changing the cost allocation plan. For instance, although the Foster Care Review unit is not cited anywhere in the cost allocation plan, the agency reports that the PINs in the unit are appropriately assigned to P173, Foster Care. If cost pools were tied to units rather than individual people, the cost allocation plan would have to be changed each time there was a significant change in the organization. Under the current system, the PINs could be assigned without a change in the cost allocation plan.

While MDHS' approach does have that advantage, HZA continues to believe that it will ultimately cost the agency some federal revenue. This is because the approach requires two kinds of activities to keep the cost allocation accurate. The first is the proper re-assignment of PINs whenever someone changes jobs. This obviously occurs far more frequently than do organizational changes, and while the re-assignment of responsibility will probably ensure greater accuracy, there is no guarantee that workload or other factors will not get in the way and that the backlog in PIN reassignments which was present at the start of HZA's efforts will not recur.

Second, with the agency's approach there has to be a deliberate examination of the functions of any new units to determine where to assign the PINs in the new unit. The issue with this is manifest in that it had not yet been done for the Continuous Quality Improvement Unit. Whether there is a loss of federal revenue because of that can only be known empirically, by close examination not only of what the unit does but also of how much it does for different kinds of cases. Thus, even if the cost allocation plan need not be changed for each new unit, the same level of thought has to be devoted to federal reimbursement when a new unit is created.

Ultimately, though, this is a question which has to be answered empirically. It is possible for the DHS approach to work, and actual practice in the future will show whether it does or not.

HZA's intent with the third recommendation was to help DFCS avoid having the staff reporting on the SWRMS select a miscellaneous category, like "Other Program-related Activities" except in the most unusual or clearly non-reimbursable situations. Right now, this category accounts for *one out of every six SWRMS hits*, almost certainly more than it should.

The agency's first response to the recommendation is that it will train its workers and supervisors better on what each of the codes mean. While that may provide some improvement, and we encourage that in the interim, it is likely to be both small and short-lived. The problem is not the knowledge or skill of the staff; it is the range of choices the SWRMS allows. When all activities but one are defined by both what the worker is doing and what kind of case is involved, that one remaining activity will always be over-reported. It will be chosen any time the worker or supervisor cannot find another category where *both* criteria are met. Sometimes that will occur because the criteria have been drawn too tightly; sometimes it will occur because the worker or supervisor will err in deciding what kind of case is in question.

One of the impacts of the over-utilization of the miscellaneous category can be seen in the under-reporting of activities for foster care candidates, activities for which personnel costs can be claimed as administration under Title IV-E. Given the current system in which staff must correctly identify both the type of case and the activity in order to charge time to candidates, only 2.5 percent of the SWRMS hits are for that category. Since candidates (in-home cases with case plans) represent over 40 percent of all open cases[2], either in-home cases receive virtually no casework attention compared to out-of-home cases or the time spent on in-home cases is being classified in some other way. HZA estimates conservatively that candidates should draw more than twice the amount they now do through the SWRMS. At present most of that money seems to be charged to Code 14 and SSBG.

While there may be many approaches to minimizing these kinds of reporting errors, errors which will nearly always cost the state money, the most direct is to define the activity codes solely as activities and have the worker report the case number so that a pre-designed computer program can determine what kind of case is at issue. The worker or supervisor is much less likely to be confused about the activity than about the case type.

HZA offered MDHS, as part of the current contract and without additional cost, a Random Moment Survey system which would be structured in the appropriate way, but the agency's information technology requirements prevented it from accepting that offer. MDHS has just released a Request for Proposals for a new RMS system which involves the other agency divisions, as well, with proposals due in June. Although the RFP does not require the structure of the system to separate identification of the activity from identification of the type of case, it is strongly recommended that the final system employ this approach.

*Retroactive Opportunities*

While MDHS will be able to enhance its federal revenues for personal services in the future, it does not currently have any meaningful retroactive opportunities for these costs. In relation to the over-utilization of Activity Code 14, Other Program-related Activities, there might be some minor retroactive claims which could be made, if someone were to examine the explanations supervisors wrote into the "remarks" section of the SWRMS reporting form and were able to reclassify some of the hits as being foster care related, but it is doubtful that the effort would be worth the benefit.

With the recent efforts to map all of the PINs to appropriate cost pools, the agency could have potentially generated some retroactive claims, if the start dates for the reassignments had been made back to the dates when the staff involved moved to their new positions. As HZA understands it, however, that was not done. Without more knowledge of how many PINs were involved and to what new cost pools they were

---

[2] The definition provided in Activity Code 6 says, "A child is considered a candidate for foster care if a full case plan has been completed, and services are being provided to prevent out-of-home placement." The 40 percent estimate is derived from MACWIS and includes all in-home cases with a case plan.

assigned, HZA is unable to determine how much, if anything, could have been generated by attaching the appropriate date to the re-assignment.  At this point, that could only be determined by changing the assignment dates, and the outcome is too uncertain to guarantee a significant result.

## SUBSIDIES, LOANS AND GRANTS

The Subsidies, Loans and Grants budget item for DFCS includes various types of expenditures: service subgrants; professional education and training costs; and maintenance payments. This chapter relates to the service subgrants and maintenance payments, while professional education and training is addressed in the following chapter.

**Service Subgrants**

*Current Practice*

- DFCS makes wide use of subgrants to access and pay for needed services. Subgrants do not require approval outside the Division. The State's rules require, however, that subgrants be funded by only a single federal funding source, even if the activities could conceivably qualify for multiple sources.

- As of October 1, 2010, DFCS had subgrants with six providers (excluding some who for a variety of reasons cannot be impacted by increased federal funding) totaling nearly $6 million in awards. The funding sources for the subgrants include Promoting Safe and Stable Families (PSSF which is Part 2 of Title IV-B) grant monies and state general funds. Title IV-E is not used to fund any of the subgrants even though the scope of services sometimes encompasses allowable Title IV-E activities.

*Issues and Concerns*

- At least three of the subgrants currently funded with PSSF block grant monies and used for purposes other than training are used to fund activities which are eligible for Title IV-E funding at the 50 percent match rate for administrative activities. This is a concern because PSSF (as well as several other federal sources) is over spent, making MDHS fall back on state funds. If some of the expenditures funded by capped federal funds can be shifted to the uncapped Title IV-E, the former can be used for other activities currently funded by state general revenues.

*Revenue Enhancement Actions*

*Prospective Opportunities*

In its interim report, HZA suggested that up to $900,000 per year could be generated from three subgrants aimed at providing family preservation services, reunification services and adoption services. The table on the following page shows the maximum

amount the State could generate in additional Title IV-E funding, given the current proportion of clients eligible for Title IV-E and the structure of those programs. That is, the estimate assumes that the full costs of the subgrants are attributable to eligible activities.[3] The IV-E penetration rates as of September 2010 (36.95 percent for foster care and 62.07 percent for adoption), along with the 50 percent reimbursement rate for administrative activities, determine the amount of federal reimbursement.

| Service Subgrants with Title IV-E Potential | | | | |
|---|---|---|---|---|
| Subgrantee | Current Funding Source | Subgrant Value | Activity Description | Title IV-E Funding Potential |
| Mississippi Children's Home | PSSF | $1,774,068 | Family preservation services | $327,759 |
| | | $1,559,265 | Reunification services | $288,074 |
| Southern Christian Services | PSSF | $938,650 | Adoption-related services | $291,310 |
| Total | | $4,271,983 | | $907,143 |

MDHS requested assistance in re-structuring these subgrants to achieve the enhanced revenue. Because subgrants may only utilize one funding stream, maximizing federal reimbursement will require that each subgrant be divided into at least two, and possibly three, if some of the activities are clinical and therefore not Title IV-E reimbursable. One or two of the subgrants will come from the existing funding source, PSSF, and the other will be funded from Title IV-E. The activities carried out under one subgrant will be clinical only, regardless of who is served; the activities for each of the others would be identical, the only difference being that the population for one would be Title IV-E eligible children and for the other non-Title IV-E eligible children. It should not be necessary, however, to release multiple requests for proposals. A single RFP should be able to specify that the award will be divided into multiple subgrants.

The major question, then, is how to divide the amounts of the existing subgrants into two or three. First, the provider should separate discrete clinical services and their costs. The methodology for distinguishing clinical services could involve ongoing time recording of some kind or, if appropriate, segregation of the costs of therapist staff from the costs of other staff. This latter method could be done in the contract and specified as part of the rate justification and structure. With the remainder, assuming that the services are funded on a unit cost basis, if DFCS underestimates the percentage of Title IV-E clients served by the provider, the additional IV-E eligible clients will continue to be reimbursed with PSSF funds, not with Title IV-E funds. Conversely, if the agency overestimates the percentage of Title IV-E clients, the non-Title IV-E clients served under the subgrant intended for Title IV-E will be supported through state general revenue.

Given that the State already overspends PSSF and that many of these so-called PSSF expenditures are actually funded through state general revenues, the preferable

[3] If some are truly clinical in nature, they should be excluded from the calculation.

strategy is to err on the side of overestimating the Title IV-E clientele. If the provider serves a smaller proportion of Title IV-E clients than anticipated, the non-eligible clients would have been paid for through state general revenue in any event, either because they are not eligible for Title IV-E or because the state does not have enough PSSF funding to cover all of them.

This does not mean that the State should claim more Title IV-E funds than are justified. If there are fewer Title IV-E eligible children than anticipated, i.e., if some of the children paid for under the subgrant intended for Title IV-E children are not IV-E eligible, the federal claim should be for a proportion of the costs of the IV-E subgrant equal to the proportion of IV-E eligible children. Unless a serious mistake has been made in the estimation, this figure should still be close to 100 percent. The remaining percentage must be paid by state general revenues.

As noted, the above method assumes that the services are reimbursed on some kind of unit cost basis. If, on the other hand, the subgrants are reimbursed on a program budget basis, there should be very few instances in which non-IV-E eligible children were found under the IV-E subgrant. Program budgets call for the provider to be reimbursed a set amount, so long as the provider serves some minimum number of clients or delivers some minimum number of units of service. The methods for estimating the sizes of the subgrants should be the same, but with only a floor on the number of clients in each subgrant rather than proportions equal to 100 percent, there should be fewer instances in which the standards are not met.

*Retroactive Opportunities*

The potential for retroactive claiming for the subgrants presents a curious situation. From the federal perspective there is nothing that would fundamentally prohibit retroactive claiming for the costs of the services provided under these subgrants. On the state level, however, it would appear to be a violation of the rules governing subgrants to take part of the costs and re-assign them to Title IV-E while the remainder stayed under PSSF. If state officials nevertheless wish to pursue such a strategy, they are much better placed than external consultants to determine what will be allowed and under what conditions.

From the federal perspective, the two things that would be needed for retroactive claiming would be a mechanism for distinguishing between Title IV-E eligible children and non-Title IV-E eligible children, and a means of ensuring that only eligible activities were claimed. The first of these should be relatively easy. Children receiving reunification and adoption services should be identifiable and their IV-E status at the time of service delivery should be calculable from MACWIS data. That may be possible as well with family preservation cases, but it is more likely that the state would simply apply the penetration rate, because these cases are reimbursable under the same rules as foster care candidate cases.

Whether the second requirement can be met depends on the activities the providers undertake and the means they have of separating the costs of those activities. If all of the activities under one or more of the subgrants are reimbursable, there is no issue at all. Everything can be claimed for the Title IV-E eligible cases. If only some of the activities are reimbursable and others are not, there must exist some *contemporary* means of separating the costs of the reimbursable activities from the costs of the non-reimbursable activities. In this case, the term "contemporary" means that those costs are divided by facts applicable at the same time the services were delivered. Most notably, it is not permissible to conduct a time study now and apply the results to some past period of time. So, if one or more of these subgrants involved both reimbursable and non-reimbursable activities, and the providers did not conduct time studies and did not limit the non-reimbursable activities to specific staff whose costs could be isolated, there is no way to make a retroactive claim for these costs.

**Maintenance Payments**

*Current Practice*

- Between September 2009 and September 2010, the foster care penetration rate for DFCS hovered between 37 and 39 percent. During the same period the adoption penetration rate stayed consistently around 62 percent.

- While MDHS is taking steps to increase its penetration rates, including working with local courts to ensure court orders have the language required for each child's eligibility, the single most frequent reason for children's ineligibility for Title IV-E appears to be income, and that appears even to affect nearly half of the cases without the proper court language.

- Between November 1, 2009 and October 31, 2010, Mississippi incurred nearly $5 million in expenditures for support services. DFCS uses federal block grant awards to fund most of its support services. Several of the support services satisfy the definition of maintenance payments, including clothing, personal needs, school supplies and transportation.

*Issues and Concerns*

- DFCS's very low penetration rate limits its ability to maximize federal funds, because it limits the impact of virtually every effort to obtain additional funding. At the same time, the agency should be aware from its own data that some of its efforts to increase the rate will have limited impact because some of the major reasons for ineligibility are largely unchangeable circumstances beyond the control of the agency.

- The Children's Rights consent decree stipulated that Mississippi's relative (kinship) placement providers be licensed to serve as foster care providers. At

the end of federal fiscal year 2008, 17.9 percent of the children in out-of-home care were in a relative placement setting. DFCS makes room and board payments to licensed providers only; as relative placement settings become licensed, maintenance payments will increase.

- An annualized MACWIS generated report dated November 5, 2010, supported by examples of monthly payment vouchers to counties, showed a number of support services qualifying as maintenance as being currently funded through TANF. Between November 2009 and October 2010, over $2.5 million was incurred by DFCS for these services. Many of these support services represent maintenance costs fundable at the FMAP rate if the child is Title IV-E eligible. Others represent medical costs which should have been paid for through Medicaid.

### Revenue Enhancement Actions

#### Prospective Opportunities

For maintenance payments there are only two ways in which MDHS will be able to increase its federal reimbursement on a prospective basis. The first and more important, if also the more difficult, is to raise the penetration rate. Assuming that MACWIS data are correct and that the reasons for ineligibility recorded there are not simply the result of worker errors, a substantial number of the reasons children are not eligible for Title IV-E represent factors over which neither the agency nor the court has control, so efforts to improve the rate are likely to be slower than desired. On the other hand, the review of Title IV-E eligibility determinations undertaken by CSF will presumably give the agency some insight into common errors which get made and which could be corrected and have a measurable impact on the penetration rate.

The second method for prospective enhancements of federal reimbursement has to do with support services. It appears that support services are by and large funded through very flexible, non-matched but capped federal funding sources. These funds are easy to use because there are few rules governing them and because they require no match. The principal sources of this type are TANF and SSBG.

Unfortunately, both are seriously over-spent and, as noted at the outset of this paper, there is no difference between a federal dollar and a dollar of state general revenue, when the source of the federal dollar has already been fully expended. If half of the $2.5 million in support service expenditures would represent eligible costs and one-third of that half would be spent on Title IV-E eligible children, the State would increase its federal revenue by about $300,000 each year from this source alone. As will be seen below, that probably underestimates the real potential, especially when Medicaid funds are included in the calculations. Consequently, DFCS should stop using TANF and SSBG funding for support services if the child is Title IV-E (or Title XIX) eligible and instead charge the service as a Title IV-E maintenance (or a Title XIX) cost.

*Retroactive Opportunities*

HZA obtained data from MDHS in order to calculate the potential for retroactive claiming of support services costs. The first attempt involved MACWIS data. HZA determined the eligibility of the child at the time of the service and then identified eligible services for eligible children. MDHS then asked that the analysis be repeated using fiscal system categories and data. The results were very similar, and it is the fiscal system data which are shown here.

The following table shows the expenditures eligible for retroactive claiming for calendar years 2009 and 2010.

| | Eligible Support Services Expenditures for Title IV-E Eligible Children | | |
|---|---|---|---|
| | IV-E | Medicaid | Transportation |
| 2009 Q1 | $93,343.70 | | $739.02 |
| 2009 Q2 | $107,970.20 | | $1,243.54 |
| 2009 Q3 | $213,865.48 | | $2,109.72 |
| 2009 Q4 | $201,421.11 | | $1,364.00 |
| 2010 Q1 | $123,204.55 | $34,990.26 | $525.00 |
| 2010 Q2 | $135,530.03 | $72,406.91 | $2,648.25 |
| 2010 Q3 | $170,205.00 | $28,897.28 | $2,121.01 |
| 2010 Q4 | $136,781.49 | $44,368.10 | $1,391.80 |
| | | | |
| Total | $1,182,321.56 | $180,662.55 | $12,142.34 |

Examining only the Title IV-E reimbursable column, MDHS can receive nearly $900,000 in federal funds by submitting claims for the past two years for these $1.2 million in support services which were paid out of TANF or SSBG or, in reality, state general revenue. If that is a typical result from year to year, for the future the agency should be getting about $450,000 each year more than it now receives.

In fact, the agency has submitted a claim for the first quarter of this two-year period based on this review. That claim included not only the costs of the support services shown here, but also regular room and board costs identified as reimbursable through CSF's review. Additional claims will be filed in time to avoid missing the two-year limit on retroactive claims.

Retroactive claiming is also available for Medicaid expenditures, although the process is more complex and the time limit is effectively different. DHS does not itself make the

Medicaid claims; the providers do. The costs shown in the table above reflect situations where MDHS paid the medical bills for foster children before they were determined eligible for Medicaid, so the providers have already been paid. For retroactive claiming to occur, MDHS needs to ask the providers to make the claims assuming they are themselves Medicaid-eligible, and then, when they get paid, to refund the money to MDHS. Obviously, this is likely to be more difficult, the more time that has passed since the provider rendered the service.

To make matters a bit more difficult, the initial Medicaid claim can only be made within 12 months of the expenditure. So, while in theory two years is the allotted time for retroactive claims, if the provider has not made an initial claim within one year of the expenditure, the agency does not have the opportunity to capture the funds. This is why the table shows only a single year's worth of retroactive expenditures as available for Medicaid.

Although the Medicaid procedure is more cumbersome than the one for Title IV-E, one should also note that substantial sums are potentially available, especially in the future. *The Medicaid expenditures shown in the table relate only to children eligible for Title IV-E. Nearly all children in foster care should, however, be eligible for Medicaid, so this figure could almost be equal to that for Title IV-E.* Even more important than making the retroactive claims which are available now, MDHS needs to develop an ongoing mechanism for making retroactive claims for Medicaid expenditures. Unlike the Title IV-E support services expenditures, the sums paid out for medical services cannot initially be charged to Medicaid because the children have not yet been determined eligible. All of these charges will, therefore, represent retroactive claims, and MDHS simply needs to instruct its workers and supervisors on how to ensure that these claims are made on an ongoing basis.

While it is not possible for HZA to determine how the transportation costs should be reimbursed, it seems certain that some type of federal funds should be available to cover them. If the transportation involves medical care, Medicaid should probably be the funding source. If it involves transportation to services or visits to the foster child's parents or siblings, it should be Title IV-E maintenance. If it involves other transportation for a foster child, it should be Title IV-E administration. Whatever the source, not a large amount of money is involved, but neither is there any reason to forego the federal reimbursement.

## PROFESSIONAL EDUCATION AND TRAINING

Professional education and training encompasses a broad array of topics, from preparing new workers to assume a child welfare caseload to training foster and adoptive parents to perform their roles. This chapter addresses each training topic.

### Current Practice

- **Career preparation and development**: DFCS provides funds for current employees to obtain graduate degrees in Social Work through its MSW Cohort Partnership. The Partnership is implemented through subgrants with three universities.

- **Pre-service and in-service training:** DFCS uses both internal and external staff to develop and provide pre-service and in-service training to child welfare staff. Pre-service training consists of four weeks of classroom instruction with six weeks of on-the-job training. Training Program staff and Regional Training Coordinators are used to carry out the pre-service training program. Caseworkers are required to complete 40 hours of in-service training annually which are delivered through trainers hired by DFCS.

- **Supervisory training:** New supervisors must complete a five-day pre-service training. Four of the days are provided by general state resources, with one day devoted solely to DFCS policies and practices. Supervisors are required to complete 24 hours of in-service training annually.

- **Training support:** DFCS subgrants to the University of Southern Mississippi for the development, coordination and facilitation of supervisory learning labs which supervisors use to satisfy their in-service training requirement. Other activities provided by the University's Training Academy, qualifying as administrative for Title IV-E purposes, include consultation and technical support.

- **In-house Training Costs and Resource family training**: The Child and Family Service Plan makes abundant references to the expansion of training staff although their presence is not reflective in the training claims. In addition, foster and adoptive parent trainings are partially conducted through contracts with external providers and partially by resource workers in the field. Resource development workers who are responsible for recruiting placement resources are responsible for conducting the trainings of the prospective families.

### Issues and Concerns

- The Mississippi FY 2010 – 2014 Child and Family Service Plan (Five Year Strategic Plan) submitted June 2009 does not include all the categories of

training and types of educational activities for which DFCS would be entitled to claim reimbursement.

- DFCS funds it MSW Cohort Partnership entirely with state general revenue. However, federal regulation 45 CFR 1356 states that grants to an institution or a person attending an institution for a bachelor's or master's degree, who is employed or about to be employed by an agency responsible for administering a foster care program, are reimbursable with Title IV-E funds at the federal match rate of 75 percent.

- Stipends paid to MSW students who achieve a grade point average of B or higher are also reimbursed through state general funds, although they, too, are eligible for Title IV-E funding at the higher match rate for training.

- Claims for Title IV-E funding for federal fiscal year 2010 did not include any expenditures for training.  While a small amount of expenditures was estimated for future quarters in the first quarter of the fiscal year, totaling no more than $43,368, none were claimed. In fact, Mississippi has not filed a claim for federal reimbursement for training since the third quarter of federal fiscal year 2009. During the first three quarters, total expenditures of $320,227, yielding $240,171 in federal funds, was posted. During the fourth quarter, a negative adjustment was made in the claim for federal training reimbursement. Assuming that this was the result of a federal finding of some kind, DFCS should know what it has to do to claim reimbursement for training, even beyond what is suggested above.

## *Discussion of Each Area*

The format of this section departs somewhat from the rest of the report due to the numbers and kinds of training and educational topics addressed. Each type of training is discussed in turn, reflecting both the current practices and the steps that need to be taken to enhance revenue in each area.

### Career Preparation and Development

DFCS makes subgrants to three universities for current employees to obtain a graduate degree in Social Work. The MSW Cohort Partnership program is funded in full with state general revenue. Federal regulation 45 CFSR 1356 states that grants to an educational institution or a person attending an institution for a bachelor's or master's degree, who is employed or about to be employed by an agency responsible for administering a foster care program, are reimbursable with Title IV-E funds at the federal match rate of 75 percent. DFCS also pays stipends to MSW students who achieve a grade point average of B or higher. The stipends are also currently reimbursed through state general funds but are eligible for federal reimbursement.

*University Subgrants*

HZA conducted a review of the course descriptions for the three sub-granted universities to identify the percentage of courses which qualify for Title IV-E reimbursement at the match rate of 75 percent. While a review of the entire course curriculum would provide a clearer indication of a course's eligibility for reimbursement at the higher training rate, examination of just the descriptions suggested that at least three-quarters of each university's MSW program satisfies the IV-E training requirements. The table below lists the courses for each university's MSW program and indicates whether the course satisfies the federal requirements or not.

| MSW Cohort Partnership | | |
|---|---|---|
| **Reimbursable** | **Course** | **Credit Hours** |
| **Contractor: Jackson State – MSW Program** | | |
| Yes | SW 580.  Social Work Practice Skills Lab | 1 |
| Yes | SW 581.  Social Work Practice I | 3 |
| Yes | SW 582.  Social Work Practice II | 3 |
| Yes | SW 583.  Integrated Social Work Practice (Advanced Standing) | 3 |
| Yes | SW 584.  Intervention with Children and Youth | 3 |
| Yes | SW 586.  Family Intervention | 3 |
| Yes | SW 588.  Seminar in Advanced Direct Practice | 3 |
| Yes | SW 571.  Social Welfare Policy and Services I | 3 |
| Yes | SW 572.  Social Welfare Policy and Services II | 3 |
| Yes | SW 560.  Human Behavior and the Social Work Environment: HBSE I | 3 |
| Yes | SW 561.  Human Diversity: HBSE II | 3 |
| Yes | SW 562.  Psychopathology | 3 |
| Yes | SW 555.  Research Methods | 3 |
| Yes | SW 556.  Advanced Research Methods | 3 |
| Yes | SW 595.  Field Instruction | 3 |
| No | SW 594.  Field Instruction II | 6 |
| No | SW 593.  Field Instruction (Advanced Standing) | 3 |
| Yes | SW 510.  Ethics and Social Work Practice | 2 |
| Yes | SW 596.  Independent Study | 2–3 |
| Yes | SW 515.  Child Abuse and Neglect: Protective Services (Elective) | 3 |
| Yes | SW 520.  Forensic Social Work (Elective) | 3 |
| No | SW 521.  Crisis Intervention (Elective) | 3 |
| Yes | SW 535.  Family Violence: Strategies for Intervention (Elective) | 3 |
| Yes | SW 545.  Administration in Social Welfare (Elective) | 3 |
| Yes | SW 546.  Adult Development: Young Adulthood, Middle Years and Aging (Elective) | 3 |
| No | SW 547.  Clinical Intervention with the Elderly (Elective) | 3 |
| No | SW 548.  Public Policy Issues in Aging (Elective) | 3 |
| No | SW 549.  Independent Study: Special Topics in Aging (Elective) | 3 |
| No | SW 550.  Introduction to Social Gerontology (Elective) | 3 |
| Yes | SW 557.  Applied Research Methods (Elective) | 3 |

| Reimbursable | Course | Credit Hours |
|---|---|---|
|  | **MSW Cohort Partnership** | |
| Yes | SW 573.  Social Welfare Policy Affecting Children, Youth and Families (Elective) | 3 |
| Yes | SW 587.  Advanced Social Work Practice with Groups (Elective) | 3 |
| Yes | SW 589.  Urban Poverty: Intervention Approaches (Elective) | 3 |
|  | **Contractor:  University of Mississippi – MSW Program** | |
| Yes | SW 601.  Human Behavior in the Social Environment. | 3 |
| Yes | SW 602.  Social Work Practice with Individuals | 3 |
| Yes | SW 603.  Social Work Research Methods | 3 |
| Yes | SW 604.  Social Welfare Policies and Programs | 3 |
| Yes | SW 615.  Practice with Families and Groups | 3 |
| Yes | SW 620.  Practice with Organizations and Communities | 3 |
| Yes | SW 621.  Field Instruction I | 3 |
| Yes | SW 622.  Field Instruction II | 3 |
| No | SW 623.  Field Instruction III | 3 |
| No | SW 624.  Field Instruction IV | 3 |
| Yes | SW 630.  Theories and Methods of Family Intervention | 3 |
| No | SW 640.  Advanced Practice with Groups | 3 |
| No | SW 650.  Clinical Assessment and Diagnosis | 3 |
| Yes | SW 660.  Clinical Supervision | 3 |
| Yes | SW 680.  Evaluation Research | 3 |
| Yes | SW 681.  Forensic Social Work with Children | 3 |
| No | SW 682.  Clinical Practice in Child Welfare | 3 |
| No | SW 683.  Theories of Psychotherapy | 3 |
| No | SW 686.  Traumatic Stress and Crisis Intervention | 3 |
| Yes | SW 687.  Substance Abuse and Addiction | 3 |
|  | **Contractor:  University of Southern Mississippi** | |
| Yes | 601.  Human Behavior and Social Environment | 3 |
| Yes | 602.  Human Behavior and Social Environment II | 3 |
| Yes | 605.  Social Work Policy | 3 |
| Yes | 608.  Social Work Generalist Practice I | 3 |
| Yes | 609.  Social Work Generalist Practice II | 3 |
| Yes | 610.  Theoretical Bases for Social Work Practice | 3 |
| Yes | 617.  Social Work Research | 3 |
| Yes | 634.  Social Work Practice in a Diverse Society | 3 |
| Yes | 641.  Field Education I | 3 |
| Yes | 642.  Field Education II | 3 |
| Yes | 635.  Social Service Management and Supervision (Advanced Practice) | 3 |
| No | 653.  Mental Health Assessment (Advanced Practice) | 3 |
| No | 658.  Advanced Interventive Methods (Advanced Practice) | 3 |
| Yes | 666.  Community Development and Social Planning (Advanced Practice) | 3 |
| Yes | 673.  Field Education III (Advanced Practice) | 3-6 |
| Yes | 674.  Social Work Practice with Families (Advanced Practice) | 3 |
| Yes | 696.  Social Work Practice with Groups (Advanced Practice) | 3 |
| No | 578.  Specialized Studies in Developmental Disabilities (Advanced Practice) | 1-6 |

| Reimbursable | Course | Credit Hours |
|---|---|---|
| **MSW Cohort Partnership** | | |
| No | 675.  Social Work Practice with Persons in Middle and Late Life (Advanced Practice) | 3 |
| No | 677.  Social Work Practice with Children and Adolescents (Advanced Practice) | 3 |
| Yes | 688.  Medical Aspects of Developmental Disabilities (Advanced Practice) | 3 |
| Yes | 692.  Special Problems (Advanced Practice) | 3 |
| Yes | 695.  Social Work Practice in Jamaica (Advanced Practice) | 4 |
| Yes | 698.  Families of the Developmentally Disabled (Advanced Practice) | 3 |
| **Contractor:  Mississippi Valley State University – MSW Program** | | |
| Yes | SW 500.  Social Work Practice I | Unknown |
| Yes | SW 501.  Social Work Practice II | Unknown |
| Yes | SW 510.  Social Work Policy and Services I | Unknown |
| Yes | SW 511.  Social Work Policy and Services II | Unknown |
| Yes | SW 520.  Human Behavior and the Social Environment I | Unknown |
| Yes | SW 521.  Human Behavior and the Social Environment II | Unknown |
| Yes | SW 530.  Statistics for Social Work | Unknown |
| Yes | SW 531.  Methods of Social Work Practice | Unknown |
| Yes | SW 540.  Diversity: Micro, Mezzo and Macro Approaches | Unknown |
| Yes | SW 580.  Field Practice Seminar I | Unknown |
| Yes | SW 581.  Field Internship I | Unknown |
| Yes | SW 600.  Social Work Practice with Children | Unknown |
| No | SW 601.  Social Work Practice with the Aging | Unknown |
| Yes | SW 610.  Family and Child Welfare Policy | Unknown |
| Yes | SW 611.  Social Welfare and Health Policy | Unknown |
| Yes | SW 615.  Advanced Social Work with Children and Families: Indirect Practice | Unknown |
| Yes | SW 620.  Rural Social Work | Unknown |
| Yes | SW 630.  Mental Health: Assessment and Intervention | Unknown |
| No | SW 631.  Psychosocial and Mental Health Aspects of Aging | Unknown |
| Yes | SW 650.  Needs Assessment and Program Evaluation | Unknown |
| Yes | SW 680.  Field Practice Seminar II | Unknown |
| No | SW 681.  Field Internship II | Unknown |

Applying the subgrant value for state fiscal year 2010 to the count of eligible courses, and then multiplying by the 75 percent rate for grants to educational institutions, the potential increase for federal reimbursement is $207,580.

| University Partnership Awards, 2010 | | | |
|---|---|---|---|
| University | Subgrant Value | Percent of IV-E Related Courses | Title IV-E Funding Potential |
| Jackson State University | $104,757 | 79% | $62,069 |
| University of Mississippi | $116,437 | 65% | $56,763 |
| University of Southern Mississippi | $149,786 | 79% | $88,748 |
| Mississippi Valley State University[4] | Unknown | 86% | Unavailable |
| Totals | $370,980 | | $207,580 |

*Student Stipends*

DFCS staff are reimbursed for their expenses to pursue a Master's in Social Work if they achieve a grade point average of at least a B. During state fiscal year 2010, which includes the summer and fall programs for 2009 and the spring program for 2010, $226,569 was reimbursed to participants for their participation. Staff were reimbursed for tuition, books, parking and miscellaneous fees. At the 75 percent match rate, these expenditures represent a funding opportunity of $62,788 in federal revenues for Mississippi, after applying the IV-E penetration rate for fourth quarter of federal fiscal year 2010.

*Action Steps: Career Preparation and Development*

Steps similar to those described below for new staff training must be taken to capture Title IV-E reimbursement at the training rate for career development activities.

1)      Update the Child and Family Service Plan

There are four potential ways to involve the universities in degree-granting career preparation and development, one of which is included now. These are represented in the following table:

---

[4] DFCS did not give a subgrant to Mississippi Valley State University in state fiscal year 2010; however, the training unit provided a copy of the MSW courses for review.

| State-University Partnership Degree-Granting Potential and Current Usage | | |
|---|---|---|
| | **Career Preparation:** **Workers *Not* Currently Employed** | **Career Development:** **Workers *Are* Currently Employed** |
| **BSW** | Could add new partnerships to bolster job candidates | Could add new partnerships to serve existing staff |
| **MSW** | Could expand MSW Cohort Partnership to include MSW students who would commit to work with CFSD | **YES**: MSW Cohort Partnership |

In revising the CFSP, DFCS should determine which others it may want to include, even if the plan will not be implemented all at once. In a recent meeting convened by DFCS with its university partners it became clear that there was interest on both sides in all these options, with at least one university voicing strong interest in providing the BSW component. Other states, including Georgia, employ career preparation strategies not only to increase the volume of its workforce, but also to insure it has caseworkers of high quality at all levels. Similar to the MSW program, students must agree to work for the agency for a set number of years in order to receive reimbursement. Other caveats, such as maintaining a B average or better, may also be put into effect.

The following provides suggested language for the state's CFSP, including the possibility of expanding the degree program to BSW applicants.

### Social Worker Degree Programs

#### MSW IV-E Partnership

DFCS makes subgrants to multiple universities across Mississippi to provide the necessary coursework for currently employed caseworkers and supervisors to earn their Master's in Social Work. University partners will support the mission and values of the Mississippi Department of Human Services/Division of Family and Children's Services as reflected in its New Practice Model. University partners will design and implements MSW cohorts specifically for the non-traditional, child welfare employed MSW students. Students will complete their field practicum within DFCS under the supervision of a qualified supervisor other than the student's own supervisor and engage in a new learning experience.

MSW program participants who achieve a grade point average of B or higher are paid a stipend by DFCS for their coursework. DFCS reimburses successful participants for their tuition, fees and books. Participants agree to maintain employment at DFCS for a prescribed number of years upon completing their degrees.

DFCS intends to expand this program to entering MSW students who wish to pursue a career in child welfare but who are not yet employed by DFCS. Similar to the career development program, MSW program participants who achieve a grade point average of B or higher are paid a stipend by DFCS for their coursework. DFCS reimburses successful participants for their tuition, fees and books. These students will do their field placements at DFCS and will commit to serving at the agency for three years after graduation.

*BSW IV-E Partnership*

DFCS intends to recruit individuals as DFCS worker candidates by offering to reimburse their costs of tuition, fees and books if enrolled in a Bachelor's of Social Work program. Similar to that done for MSW candidates, DFCS will reimburse individuals who achieve a grade point average of B or higher, and who agree to work for DFCS for at least three years following graduation. The funding will be offered to current DFCS staff who wish to advance in their positions as well as to prospective DFCS staff or caseworkers who wish to pursue a BSW degree. A Training Academy, currently hosted through the University of Southern Mississippi, not only provides instruction to BSW and MSW candidates, it also recruits individuals as DFCS workers. That effort will continue as well.

The methodology for funding the Title IV-E Partnerships will be to determine what proportion of the overall costs of the BSW and MSW programs are Title IV-E eligible by virtue of the content of the coursework and what percent of the student population is eligible calculated by the number enrolled in the Partnership over the total number enrolled in the program and then multiplying by 75 percent to reflect the allowable rate of reimbursement under Grants to Educational Institutions.

2)     Develop IV-E Funded University Subgrants

DFCS subgrants with a number of entities to provide various activities or services. While subgrants offer an easier vehicle for the Division to access external sources, they are limited in that only one funding source may be used to obtain financial support, even though multiple funding streams might qualify. DFCS should modify its Request for Proposal language so that the resulting subgrants can be divided, based on the funding source. The course description or curriculum may be used as the method of allocation with the value of the courses which qualify for Title IV-E reimbursement written as one subgrant, thus enabling DFCS to capture reimbursement at the higher training match rate. A second subgrant would be written each state fiscal year for the remainder which would be funded through other sources, such as PSSF. One subgrant will then be written as being funded with IV-E funds and the other with state general funds. This process would be repeated for each university subgrant, regardless if

it were for students pursuing an MSW or BSW degree. Alternatively, DFCS could build a way into its subgrant budgets to fairly allocate Title IV-E and non Title IV-E costs, with the universities themselves contributing a significant portion of the non Title IV-E costs; these may be offset in part by state general revenue.

It should be noted that MDHS has already released its RFP for the cohort partnerships and it has done so following the guidance in this report. In addition, the agency met with representatives of the universities likely to apply and distributed a model budget to help them structure their proposals in a way which will maximize the federal reimbursement.

3)     Assign Stipends to the Foster Care Training Cost Pool

As current (and/or prospective) staff submit vouchers for reimbursement for the successful completion of MSW or BSW coursework, the vouchers should be assigned to the foster care training cost pool, P174. Direct application of stipend payments as a training cost will allow expenditures to be reimbursed as a Title IV-E training expenditure.

4)     Make a Retroactive Claim for the MSW Cohort Program and Student Stipends

The current Child and Family Services Plan does make reference to the MSW partnership as follows:

> Collaborative efforts continue to center around engaging the Universities in coordinated activities for DFCS staff that are returning to school and are required to complete a student internship.

> Request continued funding for and encourage worker enrollment in tuition assistance plan. In FFY 2009, the Agency requested additional funds from the state legislature to pay tuition for DFCS workers to attend graduate school in Social Work in exchange for a work commitment after award of degree. Several workers have enrolled in this program. Tuition was reimbursed for those who applied for the program and qualified. Participants who earn an MSW commit to work for the agency for two years post-MSW. This work force investment effort targets increased professional staff resources and encourages retention of experienced staff.

While the Plan could be made more specific with the suggestions above, there is sufficient information to make a claim for the MSW Cohort subgrants and the student stipends. As suggested above, this would equal at least $207,580 for the University Partnership Awards and $62,788 for tuition and stipends for 2010.

**Pre-service Training for New Caseworkers and Supervisors**

The DFCS Training Unit has developed comprehensive training programs for new caseworkers and supervisors. The pre-service training for new caseworkers consists of four weeks of classroom instruction combined with six weeks of on-the-job training while the pre-service training for new supervisors follows one week of classroom instruction with 24 weeks of on-the-job training.

Federal regulations 45 CFR 1356.60(b)(3) and 235.61(a) provide that the employee costs of salary, fringe benefits, travel or per diem during the training period may be allocated at the 75 percent match. Opportunities exist for Mississippi to capture increased federal financial support to support its in-house training program, especially that which is provided to prepare new caseworkers.

*New Caseworkers*

A review was conducted of the classroom training curriculum for new caseworkers to determine the extent to which costs associated with the Child Welfare Professional Workshop training participants are eligible for reimbursement at the 75 percent match rate. Each module or training topic was reviewed to determine if it addressed administrative activities covered under the Title IV-E program.

The Children's Bureau Child Welfare Policy Manual clarifies that training topics must be closely related to the activities necessary for the administration of the foster care program, as specified in 45 CFR 1356.60(c)(2):

- Referral to services,
- Preparation for and participation in judicial determinations,
- Placement of the child,
- Development of the case plan,
- Case reviews,
- Case management and supervision,
- Recruitment and licensing of foster homes and institutions, and
- Rate-setting.

Additional examples offered as part of the Child Welfare Policy Manual include:

- Grievance procedures,
- Negotiation and review of adoption assistance agreements,
- Post-placement management of subsidy payments,
- Home studies, and
- Proportionate share of the development and use of adoption exchanges.

With the exception of one course, which is directly related to activities carried out in the investigation of a resource home, all modules for new caseworkers were determined to

satisfy the criteria for Title IV-E reimbursement, i.e., they covered an allowable training topic.

The curriculum is not designed to distinguish between foster care and child welfare populations. Instead, as permitted by the Children's Bureau, it recognizes that training needs to account for the "total child." This comprehensive approach allows state training programs to cover the full range of activities, including those needed to meet Title IV-E maintenance and service requirements, without having to develop dual trainings – one for foster care and another for protection. The following offers a couple of examples taken from the Child Welfare Policy Manual, 8.1H.8:

- Social work practice, such as family centered practice and social work methods including interviewing and assessment.
- Cultural competency related to children and families.
- Child abuse and neglect issues, such as the impact of child abuse and neglect on a child, and general overviews of the issues involved in child abuse and neglect investigations, if the training is not related to how to conduct an investigation of child abuse and neglect.

The table below lists each of the training topics and the ability to satisfy Title IV-E claiming requirements.

| New Caseworker Training | | |
|---|---|---|
| Reimbursable | Topic | Length |
| Module 1. Permanency and Family Connections, Quality Visits | | |
| Yes | Worker – Child Visits | 1 day |
| Yes | Supervision | ½ day |
| Yes | Worker – Parent Visits | 1 day |
| Yes | Train the Trainer | Unknown |
| Module 2. Adoption Competency | | |
| Yes | Child/Youth Assessment and Preparation | 2 days |
| Yes | Decision Making and Placement Selection in Adoption | ½ day |
| Yes | Family Assessment and Preparation | 1 ½ days |
| Yes | Train the Trainer | Unknown |
| Module 3. Advanced Skills | | |
| Yes | Assessment in Child Welfare Setting | 2 days |
| Yes | Case Planning in Child Welfare Setting | 2 days |
| Yes | Client Engagement | 2 days |
| Module 4. Court Training | | |
| Yes | Professional Development for Court Procedure | Unknown |
| Yes | ICPC/IV-E Funding Eligibility/Uniform Rules of Youth Court Practice | Unknown |
| Yes | Disproportionality and Six Steps to Find a Family: A Practice Guide to Family Search and Engagement | Unknown |

| New Caseworker Training | | |
|---|---|---|
| **Reimbursable** | **Topic** | **Length** |
| **Other Modules** | | |
| Yes | Child and Family Services Reviews | Unknown |
| Yes | Clerical | Unknown |
| Yes | MACWIS | Unknown |
| Yes | Resource Family Finance | Unknown |
| Yes | Cultural Competency | ½ day |
| No | Resource Home Maltreatment Investigations | Unknown |

The on-the-job training component of the new caseworker training program also offers an opportunity for DFCS to access federal funding to support its program. As described in the Children's Bureau Child Welfare Policy Manual (8.1H.14), salary, fringe benefits, travel or diem may be reimbursable at the 75 percent rate if caseworkers are carrying a partial caseload, i.e., the caseload must be significantly lower than seasoned caseworkers. Additionally, it is expected that the day-to-day supervision of the staff in training will also be greater than the standard.

Mississippi's Child and Family Service Plan (page 50) states that "all new caseworkers receive the new Child Welfare Professional Development Workshop prior to the assignment of a workload…" Therefore, the three weeks of on-the-job training caseworkers receive prior to the classroom instruction would be eligible for reimbursement at the higher match rate in addition to the four weeks of classroom training. It is highly unlikely that a new caseworker would be given a caseload the size of a seasoned worker to manage when first starting; if that is the case the remaining three weeks would be eligible for 75 percent reimbursement as well, assuming that supervisors closely monitor and coach the caseworkers during this time, another requisite for enhanced federal reimbursement. This makes ten weeks in all.

States are also able to claim the costs for day-to-day staff supervision at the 75 percent match rate if the supervisor is providing training as part of the formalized training program, as long as the supervision is allocable to the foster care program. For example, the salary, fringe benefits and travel or per diem expenses of the supervisor who is providing day-to-day supervision at an increased level for a new permanency caseworker would be eligible for reimbursement. Here again, the activities and costs of the increased supervision carried out by the new caseworkers' supervisors would need to be incorporated within the Child and Family Services Plan (Title IV-B Plan).

Although in recent years MDHS has conducted its pre-service training in-house, it is now preparing to contract that out to the universities. In fact, it appears that this Financial Assessment has opened the door to closer relations between the agency and the university and the agency is taking full advantage of that opportunity. A major advantage of delivering training under contract is that universities are often able to assume some or all of the federal match required to draw Title IV-E funds. DFCS sponsored a meeting between the universities, DFCS and HZA to discuss methods for

developing budgets which would conform to federal requirements while expanding the education and training program.

*New Supervisors*

In conjunction with other social services programs, Mississippi requires new supervisors to participate in a five-day classroom training program. With much of the current program not being specific to DFCS, reimbursement at the 75 percent match rate is not permissible. However, as described in the Children's Bureau Child Welfare Policy Manual, a large portion of it is eligible for reimbursement at the administrative rate of 50 percent. Federal regulation 45 CFR 1356.60(c) specifies that states are eligible for reimbursement for activities carried out for the proper and efficient administration of the Title IV-E state plan.

Of the five days of classroom instruction which new supervisors are required to complete, four of the days satisfy the requirement for reimbursement at the Title IV-E rate of administrative reimbursement, i.e., 50 percent.

| New Supervisor Training | | |
|---|---|---|
| Reimbursable | Topic | Length |
| **Basic Supervisory Course for New Supervisors** | | |
| Yes | Day One – Accountability, Self-management, Communication, Results Oriented | 1 day |
| Yes | Day Two – Communication | 1 day |
| No | Day Three – Guide to State Government | 1 day |
| Yes | Day Four – Competency-based Management, Communication, Coaching | 1 day |
| Yes | Day Five – Delegation, Decision-making | 1 day |

New supervisors are also required to participate in a 24-week on-the-job training program. A structured set of course work is to be completed through a series of supervisory learning labs. A portion of the cost of the learning labs at the University of Southern Mississippi's Training Academy could be allocated to Title IV-E administration while the supervisors' time in pursuing the labs should be captured through the SWRMS.

*Action Steps:  Pre-service Training for New Caseworkers and Supervisors*

To maximize federal reimbursement for new staff training, two steps must be taken – update the Child and Family Service Plan and assign new caseworkers to the training cost pool for the term of their training. Each is described below.

1)    Update the Child and Family Service Plan

The Child and Family Service Plan must describe the state's training program and costs which are to be funded with Title IV-E monies. The current CFSP provides a description of the new caseworker training or Child Welfare Professional Development Workshop and the components of the new supervisor training. It should specify that new caseworkers will have a reduced caseload for the entire six weeks of non-classroom training; that the work experience component of the training is an integral component of the plan; that staff will receive more intensive supervision during the on-the-job training period; and that the trainees' performance is closely monitored and assessed. The following provides suggested language for the state's CFSP:

> *Pre-Service Training for New Caseworkers*
>
> DFCS provides ten weeks of training for new caseworkers. The program includes a mix of classroom training and on-the-job training. The on-the-job, work experience component of the training is integral to the entire program. It lasts for six of the ten weeks, with the time generally split between the classroom phase. During the on-the-job training, caseworkers either shadow other workers or carry a significantly lower caseload than seasoned workers. In addition, they receive far greater day-to-day supervision and feedback than is the standard. Supervisors closely monitor and coach the caseworkers during this time as part of their structured new worker training program and provide feedback on their performance.
>
> DFCS may provide this training using in-house training staff or through university partnership awards in which the universities help to defray the Title IV-E matching requirements.

2)    Assign New Caseworkers to Foster Care Training Cost Pool

For the first ten weeks of employment, new caseworkers should be assigned to the Foster Care Training cost pool (P174), allowing the costs for salary, fringe benefits and travel or per diem to be allocated for reimbursement at the 75 percent match rate.

Care needs to be given in identifying the unit to which the new caseworker is assigned when charging the administrative costs when engaged in the on-the-job component. New caseworkers assigned to investigative units, for example, would not be eligible for reimbursement at the 75 percent rate when participating in the field work component because their activities are unrelated to the Title IV-E program. Clearly caseworkers assigned to work with foster care cases would be

eligible, as well as those assigned to work with in-home placement prevention cases.,

It is important to note that the portion of time in which new caseworkers are engaged in the Resource Home Maltreatment Investigation training module is not reimbursable for IV-E reimbursement. The proportion of time that course represents needs to be taken into account when submitting a claim for Title IV-E reimbursement. For example, if the investigation module was a one day course out of four weeks of training total, the administrative and travel costs for new caseworkers for the time they are involved in formal instruction would be multiplied by 95 percent (19 days/20 days), with the 75 percent match rate applied to the result.

3)    Make a Retroactive Title IV-E Claim for New Worker Casework Salaries

DFCS should go back eight quarters to determine how many people received New Worker Casework training. It is clear that seven weeks of the ten-week program are eligible for reimbursement including staff salaries, and if enhanced supervision was provided for the other three weeks and the caseload was less than a normal worker, then the entire ten weeks can be claimed. It will be necessary to assure that the salaries of the staff are removed from the cost pools distributed by the SWRMS for the weeks they are claimed herein. Those costs should then be placed into a cost pool which is distributed by the penetration rate.

4)    Make a Retroactive Title IV-E Claim for Supervisory Training

DFCS should go back eight quarters to determine how many people received New Supervisor Training. As indicated above, of the five days of classroom instruction which new supervisors are required to complete, four of the days satisfy the requirement for reimbursement at the Title IV-E rate of administrative reimbursement, i.e., 50 percent. It will be necessary to assure that the salaries of the supervisors are removed from the cost pools distributed by the SWRMS for the weeks they are claimed herein. Those costs should then be placed into a cost pool which is distributed by the penetration rate.

**Training Support – Training Academy**

For state fiscal year 2010, DFCS entered into a subgrant with the University of Southern Mississippi for the Training Academy. The total for the subgrant, funded through the PSSF block grant, was $1,216,150.  As noted earlier, portions of the subgrant to the University represent Title IV-E eligible training; other portions represent administrative activities. The scope of services eligible for IV-E reimbursement at the 50 percent match rate includes consultation and technical support, professional development and training services, supervisory learning labs, social worker recruitment, support for DFCS

workers pursuing the MSW degree, and research and evaluation. The CFSP outlines the services the university provides in regard to training as well as the continuation of Supervisory Learning Labs. It mentions some administrative support services such as the training needs assessment but not the full range of administrative support it provides to DFCS.

Section 471(a)(7) of the Social Security Act addresses the need for states to conduct quality assurance reviews of its Title IV-E program. Child Welfare Policy clarifies that IV-E funding for such reviews is available at the administrative match rate. For administrative or quality assurance services provided through the Training Academy on behalf of Mississippi's Title IV-E program, including data collection and reporting, federal funding is available as an administrative expense.

*Action Steps:  Training Support*

Here again, amendments to the state's CFSP should be made as well as to the DFCS' subgrant with the university.

1)    Update the Child and Family Service Plan

The current CFSP is fairly clear as to the training support the university's Training Academy provides to DFCS, especially in terms of the Supervisory Learning Labs and training of new and seasoned supervisors. It does not, however, address the consultation and technical support or the research and evaluation services it provides. Language needs to be included within the CFSP which describes the Quality Assurance support the Training Academy provides to DFCS. Proposed language is provided below; the language is generic in the event that other universities are included in the future to perform these functions.

DFCS contracts with the universities for technical assistance and research and evaluation to guide practice and policy. The efforts of the university which are carried out by the Training Academy are designed to support the State's commitment to continuous quality improvement as well as improved safety, permanency and well-being outcomes for children and families served.

2)    Modify Subgrant Awards

Referring to the subgrant for state fiscal year 2010, it is unclear what portion is for training and what portion is for administrative-related activities. The contract budgets should separate administrative from training activities so each can be charged at the appropriate allowable rate. In addition, activities which are strictly non Title IV-E eligible should be put in a separate subgrant and charged to PSSF or another relevant source.

**In-house Training Costs and Resource Family Training**

*Training Costs*

Based on the state's cost allocation plan, it appears many of the agency's training costs are placed into pools that should be matched at the 75 percent training rate. According to Mississippi's 2010 – 2014 Child and Family Services Plan, DFCS' Training Program is made up of one Training Director, five Training Coordinators, one program specialist, one curriculum writer, one educational liaison and one clerk typist. The program was to be expanded to include additional Training Coordinators to cover the expansion to the newly formed 13 regions. To the extent Training Program staff are involved in the development or delivery of training to support the Title IV-E program, personnel expenditures and other related costs should be charged to Foster Care Training cost pool, P174.

*Resource Family Training*

Resource Development staff who are charged with the responsibility of recruiting foster and adoptive parents and providing training to prospective resource families can be charged at the enhanced 75 percent Title IV-E rate. External providers are contracted to conduct a portion of the foster and adoptive parent trainings and the rule applies to them as well. In addition the expenses of foster and adoptive parents to attend the training such as travel reimbursement and child care can be included. It is unclear the extent to which any of these costs are being claimed on a consistent basis. A review of the training activities (e.g., training development, training delivery, equipment, materials, travel or per diem) and related costs needs to be undertaken to determine if additional federal revenues are available to support placement resource training.

*Action Steps:  In-house Training Costs and Resource Family Training*

1)      Make sure that the PINs of full-time trainers are assigned to the proper cost pools.

2)      Make sure that all expenditures associated with training including meeting rooms, staff travel, and related expenses are charged to Title IV-E training when the subject of the training is relevant.

3)       Make sure that staff and contractors hired to recruit and train foster and adoptive families are assigned to the correct cost pools and that their costs are direct charged where appropriate.  Include expenses of foster and adoptive parents in the direct charges.

4)      Consider adopting a practice similar to that used in Georgia of completing a worksheet for audit purposes on each training program to help justify the Title IV-E reimbursement (see Appendix B).

5)    Make a Retroactive Claim for the Internal Training Unit

The Child and Family Services Plan makes extensive references to the expansion of the internal training unit. Even if no contract for training is adequate to justify a retroactive claim, the cost allocation process for staff within the agency should have captured some training activities. The absence of a claim for any Title IV-E training says that the agency did not do any relevant training for more than a year, and that presumably is not true. Given the lack of claiming for training during state fiscal year 2010 and the amount of claims made in state fiscal year 2009, it should be assumed that a minimum of $300,000 (approximately one-third more than the amount claimed during the first three quarters of 2009) is available for federal reimbursement. A closer review of the costs for staff responsible for developing training curricula – including an assessment of the training modules which were developed or enhanced and delivered – needs to be undertaken, including expenditures for office space, equipment and travel or per diem and a claim made accordingly.

**APPENDIX A.    RECOMMENDED CHANGES TO THE COST ALLOCATION PLAN**

The following represent changes to Mississippi's cost allocation plan which conform to the recommendations made above, particularly those related to training and targeted case management. They do not include correction of the straightforward mistakes in the existing cost allocation plan, such as the matrix which shows Code 14 costs distributed among 11 different funding sources. Nor do they include the more fundamental changes which HZA believes are needed in the SWRMS. Until the agency receives proposals for and agrees to a new SWRMS, it is not possible to write the definitions of the activities or to describe the impacts changes in the activity definitions may have on a variety of cost pools.

Section 4 – Administrative Cost Pools, Page 4-17 [Training]
Name of Cost Pool: Foster Care Training, Cost Pool Code: P174

- The Description of Cost Pool should be revised, as follows. The *italicized language* signifies language which should be added.

  o The function of this cost pool is to capture the costs of *preparing and providing* training (as long as the subject matter of the training is an allowable cost for the trainers and materials used) to foster care employees and parents (*including approved and prospective foster families*), *as well as those preparing for employment with the Division of Family and Children Services* (only travel and per diem of the foster parents being trained). The costs are at the 75% FFP rate. The costs allocated from this cost pool to Title IV-E Foster Care are eligible for IV-E Training at 75% FFP.

Section 4 – Administrative Cost Pools, Page 4-18 [Training]
Name of the Cost Pool: Adoption Training, Cost Pool Code: P176

- The Description of Cost Pool should be revised, as follows. The *italicized language* signifies language which should be added.

  o The function of this cost pool is to capture the cost of *preparing and providing* training (as long as the subject matter of the training is an allowable cost for the trainers and materials used) to adoption employees and *current and prospective adoptive* parents (only travel and per diem of the adoption parents being trained). The costs are at the 75% FFP rate. The costs allocated from this cost pool to Title IV-E Adoption are eligible for IV-E Adoption Training at 75% FFP.

## APPENDIX B.    TITLE IV-E TRAINING WORKSHEET

**MISSISSIPPI CHECKLIST FOR ADDRESSING TRAINING ACTIVITIES/EVENTS UNDER THE TITLE IV-B PLAN**

This checklist should be completed for each program delivered during the reporting period.

*Provide a one paragraph brief syllabus of the training activity*

Name of Course:

Description:

*Indicate which, if any, of the specifically allowable Title IV-E administrative functions this training activity addresses.*

| | | | |
|---|---|---|---|
| | IV-E Eligibility Determination or Redetermination | | Placement of Child |
| | Rate Setting | | Development and Maintenance of Case Plan |
| | Hearings and Appeals | | Case Management |
| | Referral to Services | | Recruitment/Licensing of Foster/Adoptive Homes and Institutions |
| | Preparation for and Participation in Judicial Determinations | | Data Collection and Reporting (including MACWIS) |

| *Indicate setting/venue for the training activity* | | *Indicate proposed provider of training activity* | | |
|---|---|---|---|---|
| | | | | Specify |
| | MSW Career Preparation (Student has agreed to work for agency upon graduation) | | In-house agency training staff | |
| | New Caseworker (Person hired but not carrying full caseload) | | | |
| | Ongoing Caseworker (Continuing in-service training) | | Public university ----------------------------------> | |
| | MSW Cohort/Partnership (MSW coursework for employed staff) | | Private university -------------------------------> | |
| | New Supervisor (Preparation for supervisory functions) | | Contracted trainer ------------------------------> | |
| | All Supervisors (Level II Advanced Skill Level) | | Other --------------------------------------------> | |
| | Training Unit Workshop | | | |
| | Financial and Clerical (MACWIS, Information Systems) | | | |
| | Olivia Y Settlement Agreement Education | | | |

| *Indicate duration category of the training activity* | | *Specify approximate number of days or hours of training activity* | |
|---|---|---|---|
| | Short Term (Less than eight consecutive work weeks) | | Days |
| | Long Term (Eight or more consecutive work weeks) | | Hours per day |
| | | | Credit hours |

*Indicate the audience to receive training*

| | | | |
|---|---|---|---|
| | Staff of State/local agency administering the State Plan | | Adoptive parents |
| | Volunteers of State/local agency administering State Plan | | Child caring agency staff |
| | Persons preparing for employment with State/local agency | | Child placement agency staff |
| | Foster parents | | Other State agency staff (JJ, MH, DD, etc.) [Specify] |
| | | | Other community staff (medical, legal, police) |

| *Costing method* | | *Estimated total cost* | | |
|---|---|---|---|---|
| | Unit cost per trainee (Tuition/books/supplies per trainee) or | Unit cost | No. Trainees | Total Cost |
| | Cost per class/training function | Estim. no. of trainees in class | | Total Cost |
| | Other (specify) | Estim. no. of sessions per year | 25 | Total Cost |

*For MDHS Use Only: Cost allocation methodology*

Describe basis for allocating costs among benefiting programs & funding sources (including application of eligibility rates, where applicable)

*For MDHS Use Only: Indicate all applicable funding sources*

| | | | |
|---|---|---|---|
| | IV-B-1 (CWS) | | CAPTA |
| | IV-B-2 (PSSF) | | IV-E Independent Living Program |
| | IV-E Foster Care | | State only (mark only if other than non-Fed match) |
| | IV-E Adoption | | Other, Specify    LIHEAP, CSBG, Food Stamp, Refugee, |
| | TANF | | Other, Specify    Family Violence, Rape Prevention |
| | SSBG | | Other, Specify    SSBG, XIX, CCDF, Children Justice |

**Ex. 29**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

OLIVIA Y., et al.                                                    PLAINTIFFS

v.                                              CIVIL ACTION NO. 3:04CV251LN

PHIL BRYANT, as Governor of the State of Mississippi, et al.        DEFENDANTS

---

**AGREEMENT REGARDING THE ENHANCEMENT OF FEDERAL FUNDING**

---

The Mississippi Department of Human Services and its Division of Family and Children's Services ("DFCS") will work to achieve enhanced federal funding in accordance with recommendations by Hornby Zeller Associates ("HZA") and the Center for the Support of Families ("CSF").[1]

DFCS shall implement the following recommendations by the end of Period 3:

1.    **Career Preparation and Development Training Program.**  Title IV-E funding shall be sought for eligible expenditures of the "career preparation and development training program" through the Masters of Social Work and Bachelors of Social Work cohort partnerships with the University of Mississippi, University of Southern Mississippi and Jackson State University.  DFCS shall:

    a.    Update the Child and Family Service Plan ("CFSP") to describe the Masters of Social Work and Bachelors of Social Work partnerships with the universities.  The method of funding shall be included in the CFSP update.

    b.    Utilize the Reimbursement Calculator created by HZA to facilitate retroactive claims for reimbursement of expenditures eligible for federal Title IV-E funding.

        i.    Utilize the Reimbursement Calculator created by HZA to analyze and maximize allowable IV-E reimbursement of MSW or BSW coursework reimbursed by DFCS to its current and prospective staff.

        ii.    Utilize the Reimbursement Calculator created by HZA to facilitate quarterly

---

[1]Pursuant to Section II.6 of the Modified Settlement Agreement and Reform Plan, the Parties agreed to negotiate those recommendations of HZA and CSF that will be implemented by Defendants and to file that agreement with the Court by July 14, 2012.

1

filing for federal reimbursement on a retroactive basis for the Title IV-E eligible expenditures.

2.  **Pre-service Training Program for New Caseworkers and Supervisors.** Title IV-E funding shall be sought for eligible expenses of the "pre-service training program for new caseworkers and supervisors" through the sub-grant with the Child Welfare Training Academy at the University of Mississippi. DFCS shall:

    a.  Update the CFSP to describe the state's training program and costs which are to be funded with Title IV-E monies.

    b.  Update the CFSP to specify that: new caseworkers will not carry a caseload until all pre-service training has been completed; the work experience component of the training is an integral component of the plan; staff will receive more intensive supervision during the on-the-job training period; and the trainees' performance is closely monitored and assessed.

    c.  Assign new caseworkers to the training cost pool for the first eight weeks so that the appropriate portion of the costs will be eligible for Title IV-E reimbursement.

3.  **Supervisory Learning Labs and Administrative Technical Assistance.** All eligible expenses of the Supervisory Learning Labs and Administrative Technical Assistance established by sub-grant with the University of Southern Mississippi shall be allocated to the administrative cost pool, which will be eligible for Title IV-E reimbursement.

4.  **In-House Training.** Title IV-E funding shall be sought for eligible in-house training costs. DFCS shall:

    a.  Develop and implement a process for ensuring that the PINS of full-time trainers are assigned to the proper cost pools.

    b.  Develop and implement a process for ensuring that all expenditures associated with training (including meeting rooms, staff travel, and related expenses) are charged to Title IV-E training when the subject of the training is relevant.

    c.  Ensure that all costs for trainers (excluding office space) are allocated to the training pool, which will be eligible for Title IV-E reimbursement.

5.  **Supportive Services Expenditures.** Title IV-E funding shall be sought for eligible supportive services expenditures. DFCS shall :

    a.  Where allowable, use the Support Services Calculator created by HZA to discontinue the use of TANF and SSBG funding for support services for Title IV-E (or Title XIX) eligible children, and begin charging those services as a Title IV-E (or Title

2

XIX) maintenance or cost.

    b.    Institute a process for the quarterly filing of retroactive Title IV-E eligible expenditure claims.

**6.    Random Moment Sampling Process.**  Restructure the random moment sampling (RMS) process to require workers and supervisors to define activity codes separately from case types. This shall be implemented by collaboration between HZA, MDHS, and Interactive Voice Associates, MDHS' implementation partner for its new RMS system.  DFCS shall:

    a.    Define a set of activities, case- and non-case specific, to be used for the new RMS.

    b.    Using DFCS' current definitions and case practices, as well as those of agencies of other states, develop a set of activities and their definitions.

    c.    Identify case types.

    d.    Prepare a matrix that maps activities to case types.

    e.    Amend the cost allocation plan to reference the new RMS system in sufficient detail to obtain federal approval.

SO ORDERED AND ADJUDGED, this the 12th of July, 2012.

        /s/Tom S. Lee
        DISTRICT JUDGE

**AGREED:**

**FOR PLAINTIFFS:**

/s/ Miriam Ingber
Marcia Robinson Lowry (MBN 43991 *pro hac vice*)
Miriam Ingber (MBN 46823 *pro hac vice*)
Jessica Polansky (MBN 45356 *pro hac vice*)
Sarah Russo (MBN 46802 *pro hac vice*)
CHILDREN'S RIGHTS
330 Seventh Avenue, 4th Floor
New York, NY 10001
Telephone: (212) 683-2210

Wayne Drinkwater (MBN 6193)

3

BRADLEY ARANT BOULT CUMMINGS LLP
188 East Capitol Street, Suite 400
Jackson, MS 39201
(601) 948-8000

John Lang (pro hac vice MBN 43987)
Attorney at Law
60 East 42nd Street
Suite 4600
New York, NY 10165
Tel. 212.300.0646

Christina D. Carbone (pro hac vice MBN 43986)
John Piskora (pro hac vice MBN 44474)
LOEB & LOEB LLP
345 Park Ave.
New York, NY 10154


**FOR DEFENDANTS:**

/s/ Dewitt L. "Rusty" Fortenberry, Jr.
Dewitt L. ("Rusty") Fortenberry Jr., Esq. (MBN 5435)
Kenya Key Rachal, Esq. (MBN 99227)
Ashley Tullos Young, Esq. (MBN 101839)
BAKER, DONELSON, BEARMAN, CALDWELL, & BERKOWITZ, PC
428 I-55 North
Meadowbrook Office Park
Jackson, MS 39211
(601) 351-2400

Harold E. Pizzetta, III, Esq. (MBN 99867)
Assistant Attorney General
General Civil Division
Carroll Gartin Justice
Building 430 High Street
Jackson, MS 39201

# Ex. 30A

**STATE OF MISSISSIPPI**
**Department of Human Services**
**Division of Family and Children's Services**



**Mississippi FY 2011**
**FFY October 1, 2010 to September 30, 2011**
**Annual Progress and Services Report**
**Submitted June 30, 2012**
**http://www.mdhs.state.ms.us/links.html**

Progress toward Meeting Goals
- 11 Four week Pre-Service training sessions were held during the reporting period with 175 newly hired direct service workers completing the training;
- 4 Forty hour Pre-Service training sessions were held for new supervisors with 61 supervisors completing the training;
- 5 Two day clerical training sessions were held during the reporting period with 20 newly hired clerical staff completing the training as well as 29 supervisory and field staff
- Issued an RFP to the colleges and universities in the state with CSWE accredited programs to create a new 270 hour pre-service training as well as new Clinical Supervisory Training.
- On-Going training sessions held:
  - 21 Adoption Competency Trainings were conducted from October 2010 – January 2011
  - 16 additional training sessions on Maltreatment Investigations in Out of Home Placements conducted
  - 29 Secondary Traumatic Stress training classes were held across the state to educate staff on the effects of STS
- Workshops and Conferences:
  - Court Improvement Initiative
    - In October and November of 2010, training was delivered to direct service staff in each region on Advanced Professional Development of Court Proceedings, ICPC, IV-E eligibility and the new Uniform Youth Court Rules.

- More than 100 DFCS staff are enrolled in graduate level social work programs in 4 Universities across the state.

- Funds were again allocated by the state legislature to pay tuition for DFCS staff to pursue an advanced degree in social work in exchange for a work commitment after award of degree.
  - Tuition was reimbursed for 61 DFCS employees under the Professional Enhancement Scholarship Program.
  - This work force investment effort targets increased professional staff resources and encourages retention of experienced staff.

- 5 Learning Labs in each region for direct service supervisors and regional directors were delivered through a contract with the University of Southern Mississippi Social Work Training Academy

The request for expansion of Training Unit Staff was partially realized.  The requests for additional PINS for Training Coordinators and Program Specialist were approved.  The Unit added a Bureau Director and a Division Director II.   The Training Specialists and MACWIS technician were not pursued further at this time.

69

**Ex. 30B**

# STATE OF MISSISSIPPI
## Department of Human Services
## Division of Family and Children's Services



**Mississippi FY 2012**
**FFY October 1, 2011 to September 30, 2012**
**Annual Progress and Services Report**
**Submitted June 26, 2013**
http://www.mdhs.state.ms.us/links.html

**CFSP/APSR Coordinator**



# V. PROGRAM SUPPORT

## A. Professional Development and Training Unit

The mission of the Professional Development Unit is to provide quality training to enhance the knowledge, skills and abilities of DFCS personnel and to prepare them to assume their responsibilities.

### Child and Family Services Plan Update

This section updates the DFCS CFSP 2010-2014 with plans to promote professional education and development through the expansion of MSW program by working with universities throughout Mississippi. It then describes efforts to enhance the training of new caseworkers and supervisors and to grow its in-house training capacity.

### Professional Education and Development

MSW Program for Currently Employed Staff

DFCS has awarded contracts to Jackson State University, University of Mississippi and University of Southern Mississippi to provide necessary coursework for caseworkers and supervisors currently employed with DFCS to earn their Master's in Social Work (MSW). University partners support the mission and values of DFCS as reflected in the Child Welfare Practice Model that is being implemented throughout various regions of the State. Each university has assembled cohorts for DFCS employees and classes are scheduled in conjunction with their work hours to include the agency's compressed work schedule. The MSW cohorts have been designed and implemented specifically for the non-traditional, child welfare employed MSW students.

Students are required to complete 60 hours of coursework to earn their degree. Students, including some who are not in the cohort, who achieve a grade point average of "B" or higher generally receive reimbursement for their tuition, fees and books. Students will complete their field placements within DFCS and will commit to serving at the agency for up to three years after graduation. Those students who fail to complete up to three years with the agency after graduation may be required to repay reimbursements by the agency for tuition, fees and books.

### Expansion and Enhancement of Staff Training

Pre-service Training for New Caseworkers

DFCS has partnered with the University of Mississippi to develop and deliver a pre-service training curriculum for new caseworkers. The 9 - week pre-service training includes the principles of the new Child Welfare Practice Model.

New caseworker training includes an on-the-job training component. Its modules cover topics consistent with the Title IVE program. The curriculum is not designed to distinguish between foster care and child welfare populations. Instead, as permitted by the Children's Bureau, it

49

Reporting Period: October 1, 2011-September 30, 2012
Submitted: June 30, 2013
MS Annual Progress and Services Report