# Ex. 31A



4268 I-55 NORTH
MEADOWBROOK OFFICE PARK
JACKSON, MISSISSIPPI 39211
PHONE: 601.351.2400
FAX: 601.351.2424

www.bakerdonelson.com

KENYA KEY RACHAL., ESQ.
Direct Dial: (601) 351-8940
Direct Fax: (601) 974-8940
E-Mail Address: krachal@bakerdonelson.com

July 8, 2013

**VIA ELECTRONIC and US MAIL**

Miriam Ingber
Children's Rights Inc.
330 Seventh Avenue, 4th Floor
New York, NY 10001

RE: *Olivia Y., et al. v. Haley Barbour, et al*; In the United States District Court for the Southern District of Mississippi, Jackson Division; Cause No. 3:04CV251LN

Dear Miriam:

In accordance Year 3 Implementation Plan provisions, Defendants are producing the following via DVD which we have put in the US Mail:

*Y3IP - II.F.2.*
*...shall have developed a written plan for increasing the array of services available to foster children*
Service Array Plan DHS 344534-344554

*Y3IP - I.A.2.c.4*
*... shall develop and begin implementing written strategies for promoting implementation of the Olivia Y. standards in the Mississippi Youth Courts*
Youth Court Strategies Plan DHS 345455-345507

*Y3IP - I.F.1*
*Defendants shall issue a written report on the impact of HAZ's recommendations...*
HZA Recommendations Report DHS 345508-345559

Y3IP - II.C.1
*...shall conduct an assessment of the FM fatality....a written assessment shall be provided...*
Child Fatality Review DHS 345560-345608

Please note that DFCS records are subject to the Confidentiality Order of August 5, 2004.

Sincerely,

Kenya

Kenya Key Rachal

cc: Grace Lopes
Mark Smith
Enclosures

# Mississippi Department of Human Services
## Division of Family and Children's Services

## Finance Sub-Team Report for Period 3

I. Report on Impact of Hornby Zeller Associates' (HZA) Recommendations

II. Agreement Regarding the Enhancement of Federal Funding

III. Responses to Requirements of the Modified Settlement Agreement (MSA) and Implementation Plan for Period 3 (Y3IP)

   a. Requirements pursuant to MSA

   b. Requirements pursuant to Y3IP

IV. Status Report on Implementation of Agreement Regarding the Enhancement of Federal Funding Filed with the Court on July 12, 2012

V. State Fund Appropriations by Year

**Report on Impact of Hornby Zeller Associates' (HZA) Recommendations on Mississippi Department of Human Services' (MDHS) and its Division of Family and Children's Services' (DFCS) Ability to Increase Federal Funding**

One of the impediments to Mississippi Department of Human Services-Division of Family and Children's Services (DFCS) being able to institute best practices in Mississippi's child welfare programs is the lack of adequate financial resources, i.e., monetary funding available to it. In order to implement and maintain corrective actions that have been agreed to by DFCS management and other interested parties, extraordinary increases in funding will be required. In looking for ways to acquire this enormous funding increase, it is not reasonable to expect that DFCS will be able to rely solely on increased state appropriations. Given the recent depressed national economy, access to additional state funding has been severely limited due to lower tax collections. This is in addition to competing priorities, as always, in the state Legislature and Office of the Governor.

Identifying additional federal funding opportunities provides the only other significant method of enhancing revenue for Mississippi's child welfare programs administered by DFCS. Certain existing federal grants utilized by DFCS are capped, i.e., they are limited to a fixed allotment each grant year. DFCS is currently fully expending these capped grants and expects to do so for the foreseeable future. Therefore, it is not reasonable to expect that these grants will provide any enhanced revenue. Accordingly, Hornby Zeller Associates' (HZA) focus on revenue enhancement was to find opportunities for DFCS to shift costs from both existing capped federal grants and state general funds to uncapped federal grants, specifically Title IV-E.

Based on the findings of its prior assessment of DFCS' efforts to maximize federal funding, HZA made recommendations to DFCS on ways to increase the use of Title IV-E funding. DFCS has implemented these recommendations to the extent practical, described as follows, with the indicated results.

Career Preparation and Development Program

DFCS has used 100% state general funds for sub-grant arrangements with certain state universities for cohort partnerships that enabled employees to obtain Master of Social Work (MSW) degrees. However, these state expenditures are eligible for Title IV-E reimbursement at the administrative or training federal financial participation rate (FFP), as the case may be, depending on the nature of the instruction. DFCS also has a policy of reimbursing certain employees for their tuition, fees, and books if they are pursuing a MSW degree and meet certain other criteria. This tuition reimbursement, which was being paid from state general funds, is also eligible for Title IV-E reimbursement. HAZ recommended that DFCS seek IV-E funding for these programs and DFCS has implemented this recommendation.

A retroactive claim for refund was filed for the period January 2009 through March 2011(9 quarters) in the total amount of $407,789, of which $186,989 represented the federal portion, which resulted in additional revenue. On the federal report for quarter ended March 2013, DFCS filed a claim covering the period April 2011 through July 2012 (6 quarters) for $71,715, of which $49,800 was the federal portion, which has resulted in additional revenue. If the aforementioned claim for the period ended July 2012 can be considered typical, then DFCS can expect the

1

DHS 345509

**Report on Impact of Hornby Zeller Associates' (HZA) Recommendations on Mississippi Department of Human Services' (MDHS) and its Division of Family and Children's Services' (DFCS) Ability to Increase Federal Funding**

implementation of these new procedures to generate $8,300 per quarter in additional federal revenue.

Pre-service Training Program for New Caseworkers and Supervisors

Whereas in the past training costs for new caseworkers and supervisors were being claimed at the 50% FFP administrative rate for that portion of the costs apportioned to Title IV-E via the statistics from the social worker random moment sample, there is an opportunity for funding at both the 75% and 50% FFP rate for specifically identified pre-service training pursuant to HZA' recommendations.

New procedures have been implemented by DFCS whereby certain costs for both new caseworkers and supervisors are assigned to a distinct cost pool (P151) in the cost allocation system which allows this cost to be claimed as Title IV-E at the 75% or 50% FFP rate. These new procedures have also been implemented for the staff of the Professional Development unit. The presumption is that these costs would have been claimed previously at the 50% FFP but after implementation of the HZA recommendations, they are being claimed at the 75% FFP which results in an additional 25% of the training cost being reimbursed by Title IV-E.

The following table presents the impact of the change in procedures:

| Quarter Ended | Foster Care IV-E Training Costs | Adoption IV-E Training Costs | Total IV-E Training Costs | Additional IV-E Claim |
|---|---|---|---|---|
| 03/31/2012 | $59,085 | $0 | $59,085 | $14,771 |
| 06/30/2012 | $120,219 | $0 | $120,219 | $30,055 |
| 09/30/2012 | $135,977 | $96,294 | $232,271 | $58,068 |
| 12/31/2012 | $125,985 | $122,688 | $248,673 | $62,168 |
| 03/31/2013 | $131,515 | $123,022 | $254,537 | $63,634 |

Supervisory Learning Labs and Administrative Technical Assistance

DFCS has a sub-grant with the University of Southern Mississippi (USM) that covers the Supervisory Learning Labs and Administrative Technical Assistance. The sub-grant was previously funded by the Promoting Safe and Stable Families (PSSF) grant and is currently funded with money recovered by refund claims related to the HZA external financial assessment recommendations. The current sub-grant is in the amount of $572,320.

HZA determined that certain expenditures funded by this sub-grant were eligible for reimbursement under Title IV-E. DFCS explored the possibility of Title IV-E claims and discovered it was not administratively practical to accurately track the Title IV-E expenditures in sufficient detail needed to support federal claiming and reporting. Neither USM or the consultants providing the administrative technical assistance services had the facility to maintain and provide the necessary expenditure detail. This sub-grant arrangement will be discontinued effective July 1, 2013. As of April 2013, there have been $331,668 in expenditures on this sub-grant and presumably by June 30, 2013, it will be fully expended. Going forward, most of the services performed under this sub-grant will be provided either in-house or by way of other contractual arrangements. The Supervisory Learning Labs will be discontinued and the

2

DHS
345510

**Report on Impact of Hornby Zeller Associates' (HZA) Recommendations on Mississippi Department of Human Services' (MDHS) and its Division of Family and Children's Services' (DFCS) Ability to Increase Federal Funding**

assistance in managing the Modified Settlement Agreement (MSA) will be absorbed by existing in-house attorneys at no incremental costs.

DFCS estimates that approximately 27% of the cost of the current sub-grant will continue to be incurred to pay for a contract with a COA coordinator and approximately 24% of the sub-grant will continue to be incurred for consultants to do MACWIS Data/Workload Validation. This 51% of the costs, or approximately $291,883, when paid will be charged to accounting codes such that Title IV-E will be appropriately charged its allocable share of the costs. The COA coordinator's expenses of approximately $154,526 (27% x $572,320) will be coded to a Reporting Category (P170 DFCS) which currently allocates approximately 48% of its costs to Title IV-E. The MACWIS Data/Workload Validation costs of approximately $137,357 ($572,320 x 24%) will be coded to a Reporting Category (P177, Operational Cost [Non-Compliant SACWIS System]) that currently allocates approximately 32% of its costs to Title IV-E. Therefore, DFCS will now be able to access the Title IV-E grant to help fund costs that in the past were paid with PSSF or "one time" funds that can now be used elsewhere. The projected annual impact would be ($154,526 x 48% x 50% FFP) or $37,086 for the COA coordinator and ($137,357 x 32% x 50% FFP) or $21,977 for the MACWIS Data/Workload Validation support.

In-House Training

Per HZA's assessment of DFCS' federal reporting, it appeared that all training costs were not being claimed as training and thus DFCS was missing an opportunity to be reimbursed by the Title IV-E grant at the 75% FFP rate for in-house training costs. Consequently, per HZA's recommendations, procedures have been implemented to insure that the Professional Development Unit's expenditures are charged to the proper cost pool, namely Pool P151, Training Social Services. This will allow for DFCS' cost allocation system to distribute the costs of the unit to all programs for which the unit provides training, including foster care and adoption training. The impact of the change for Pool P151 is incorporated and reflected, but not separately stated, in the table in the previous section on Pre-service Training Program for New Caseworkers and Supervisors.

Similar procedures have been implemented for costs incurred that are exclusively for either foster care or adoption training. Those costs are coded to appropriate cost pools, namely P174, Foster Care Training, and P176, Adoption Training. This will allow DFCS' cost allocation system to charge the Title IV-E grant with its allocable share of the training costs. DFCS has always used cost pools P174 and P176 in the manner recommended by HZA so there would be no incremental revenue. There have been only a few opportunities where training costs could be exclusively identified as either foster care or adoption. Typically training costs incurred are common to all activities engaged in by child welfare workers and, therefore, more appropriately charged to cost pool P151.

Supportive Services

Supportive services expenditures made in the field offices, such as those incurred for unmet personal needs and initial clothing, are being paid for with funds from the Temporary Assistance

3

DHS
345511

**Report on Impact of Hornby Zeller Associates' (HZA) Recommendations on Mississippi Department of Human Services' (MDHS) and its Division of Family and Children's Services' (DFCS) Ability to Increase Federal Funding**

for Needy Families (TANF) grant and the Social Services Block Grant (SSBG). These grants support several MDHS divisions and programs besides DFCS and they are capped and being fully expended each year. The DFCS supportive services expenditures fit the definition of foster care maintenance payments and are thus eligible for reimbursement under the Title IV-E grant. Procedures have been implemented to capture these expenses and file claims on a retrospective basis each quarter. The goal of DFCS is to be able to provide county clerks with the facility and training to code these expenditures to the appropriate funding source at the time of entry into the child welfare database which would eliminate the need for retroactive claiming.

The following table shows supportive services claims made pursuant to the HZA recommendations; the federal portion of the claim is the additional revenue:

| Quarter Claim Filed | Period Covered | # of Quarters Covered | Total Amount of Claim | Federal Portion of Claim |
|---|---|---|---|---|
| 03/31/2011 | Q/E 03/31/2009 thru Q/E 12/31/2010 | 8 | $1,182,321 | $975,297 |
| 03/31/2012 | Q/E 12/31/2011 | 1 | $159,656 | $118,433 |
| 06/30/2012 | Q/E 03/31/2011 thru Q/E 06/30/2012 | 5 | $646,720 | $490,716 |
| 09/30/2012 | Q/E 09/30/2012 | 1 | $107,989 | $80,106 |
| 12/31/2012 | Q/E 12/31/2012 | 1 | $47,225 | $34,677 |
| 03/31/2013 | Q/E 03/31/2013 | 1 | $54,064 | $39,699 |

Random Moment Sampling (RMS) Process

HZA concluded that the DFCS random moment sampling process for social workers, which is a primary underlying component of DFCS' cost allocation plan, was not structured to allow social workers to accurately report the activities they were engaged in at the time of the sample. The questions posed in the random moment sampling process, which are used to evaluate the activity being performed by a social worker, required the social worker to select a response that indicated the activity being performed in addition to the case type. HZA believed this kind of combination question was too complex and unnecessarily confusing and could require information the social worker did not have access to at the random moment. The result could be inaccurate responses or a worker selecting generic responses such as "Other" because the worker was not able to select an appropriate activity and case type combination from the available list of selections.

HZA recommended redefining activity selections so that social workers would only need to respond for the activity they were involved in. If the activity reported on was case specific, the sampled worker would also be required to provide the related case number. That case number then would be traced to the child welfare database where the case type could be confirmed. DFCS has implemented these recommendations.

The Title IV-E costs claiming most affected by the RMS are those charged to Reporting Category P300, County Social Workers. Prior to the implementation of HZA's recommendations, on average, 21.09% of costs in this category were charged to Title IV-E. After the implementation of HZA's recommendations, which occurred in quarter ending June 30, 2012 through quarter ending March 31, 2013, an average of 28.79% of the costs in this cost pool have been charged to Title IV-E. This is a 7.70% increase in Title IV-E claiming. Prior to the implementing the HZA recommendations, total average costs for this cost pool were

4

DHS
345512

**Report on Impact of Hornby Zeller Associates' (HZA) Recommendations on Mississippi Department of Human Services' (MDHS) and its Division of Family and Children's Services' (DFCS) Ability to Increase Federal Funding**

approximately $8,267,000 per quarter (example based on December 31, 2010-March 31, 2012 quarters). An enhanced 7.70% Title IV-E claiming would have resulted in $318,280 ($8,267,000 x 7.70% x 50% FFP) per quarter in additional federal revenue.

Conclusion

The implementation of most of HZA's recommendations has involved a significant learning curve by DFCS that has not been completed in all cases. For example, the new RMS involves an almost 100% business process change to an activity that was difficult to administer, even under the prior system where social workers and their supervisors had years of experience.

In order to implement the RMS recommendations, DFCS needed a more efficient sampling and data collection tool. Fortunately DFCS had been proactive and were already in the process of implementing a new RMS tool when HZA came onboard. The difficult part is that DFCS had to train workers on not only a new tool (paper-based to electronic) and also HZA's new process changes, i.e. new activity codes, etc. The new RMS was implemented on April 1, 2012, and DFCS is continuing to refine and perfect the process and the tool each quarter.

DFCS believes the new RMS is more accurate and provides better results; however additional time is needed to be certain. The new RMS is based on sound principles and in compliance with federal rules, but it has not been subjected to the scrutiny of a federal review or audit.

5

DHS
345513

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

OLIVIA Y., et al. PLAINTIFFS

v. CIVIL ACTION NO. 3:04CV251LN

PHIL BRYANT, as Governor of the State of Mississippi, et al. DEFENDANTS

---

**AGREEMENT REGARDING THE ENHANCEMENT OF FEDERAL FUNDING**

---

The Mississippi Department of Human Services and its Division of Family and Children's Services ("DFCS") will work to achieve enhanced federal funding in accordance with recommendations by Hornby Zeller Associates ("HZA") and the Center for the Support of Families ("CSF").[1]

DFCS shall implement the following recommendations by the end of Period 3:

1. **Career Preparation and Development Training Program.** Title IV-E funding shall be sought for eligible expenditures of the "career preparation and development training program" through the Masters of Social Work and Bachelors of Social Work cohort partnerships with the University of Mississippi, University of Southern Mississippi and Jackson State University. DFCS shall:

   a. Update the Child and Family Service Plan ("CFSP") to describe the Masters of Social Work and Bachelors of Social Work partnerships with the universities. The method of funding shall be included in the CFSP update.

   b. Utilize the Reimbursement Calculator created by HZA to facilitate retroactive claims for reimbursement of expenditures eligible for federal Title IV-E funding.

      i. Utilize the Reimbursement Calculator created by HZA to analyze and maximize allowable IV-E reimbursement of MSW or BSW coursework reimbursed by DFCS to its current and prospective staff.

      ii. Utilize the Reimbursement Calculator created by HZA to facilitate quarterly

[1]Pursuant to Section II.6 of the Modified Settlement Agreement and Reform Plan, the Parties agreed to negotiate those recommendations of HZA and CSF that will be implemented by Defendants and to file that agreement with the Court by July 14, 2012.

DHS
345514

filing for federal reimbursement on a retroactive basis for the Title IV-E eligible expenditures.

2. **Pre-service Training Program for New Caseworkers and Supervisors.** Title IV-E funding shall be sought for eligible expenses of the "pre-service training program for new caseworkers and supervisors" through the sub-grant with the Child Welfare Training Academy at the University of Mississippi. DFCS shall:

   a. Update the CFSP to describe the state's training program and costs which are to be funded with Title IV-E monies.

   b. Update the CFSP to specify that: new caseworkers will not carry a caseload until all pre-service training has been completed; the work experience component of the training is an integral component of the plan; staff will receive more intensive supervision during the on-the-job training period; and the trainees' performance is closely monitored and assessed.

   c. Assign new caseworkers to the training cost pool for the first eight weeks so that the appropriate portion of the costs will be eligible for Title IV-E reimbursement.

3. **Supervisory Learning Labs and Administrative Technical Assistance.** All eligible expenses of the Supervisory Learning Labs and Administrative Technical Assistance established by sub-grant with the University of Southern Mississippi shall be allocated to the administrative cost pool, which will be eligible for Title IV-E reimbursement.

4. **In-House Training.** Title IV-E funding shall be sought for eligible in-house training costs. DFCS shall:

   a. Develop and implement a process for ensuring that the PINS of full-time trainers are assigned to the proper cost pools.

   b. Develop and implement a process for ensuring that all expenditures associated with training (including meeting rooms, staff travel, and related expenses) are charged to Title IV-E training when the subject of the training is relevant.

   c. Ensure that all costs for trainers (excluding office space) are allocated to the training pool, which will be eligible for Title IV-E reimbursement.

5. **Supportive Services Expenditures.** Title IV-E funding shall be sought for eligible supportive services expenditures. DFCS shall :

   a. Where allowable, use the Support Services Calculator created by HZA to discontinue the use of TANF and SSBG funding for support services for Title IV-E (or Title XIX) eligible children, and begin charging those services as a Title IV-E (or Title

DHS
345515

XIX) maintenance or cost.

b. Institute a process for the quarterly filing of retroactive Title IV-E eligible expenditure claims.

6. **Random Moment Sampling Process.** Restructure the random moment sampling (RMS) process to require workers and supervisors to define activity codes separately from case types. This shall be implemented by collaboration between HZA, MDHS, and Interactive Voice Associates, MDHS' implementation partner for its new RMS system. DFCS shall:

a. Define a set of activities, case- and non-case specific, to be used for the new RMS.

b. Using DFCS' current definitions and case practices, as well as those of agencies of other states, develop a set of activities and their definitions.

c. Identify case types.

d. Prepare a matrix that maps activities to case types.

e. Amend the cost allocation plan to reference the new RMS system in sufficient detail to obtain federal approval.

SO ORDERED AND ADJUDGED, this the 12th of July, 2012.

/s/Tom S. Lee
DISTRICT JUDGE

**AGREED:**

**FOR PLAINTIFFS:**

/s/ Miriam Ingber
Marcia Robinson Lowry (MBN 43991 *pro hac vice*)
Miriam Ingber (MBN 46823 *pro hac vice*)
Jessica Polansky (MBN 45356 *pro hac vice*)
Sarah Russo (MBN 46802 *pro hac vice*)
CHILDREN'S RIGHTS
330 Seventh Avenue, 4th Floor
New York, NY 10001
Telephone: (212) 683-2210

Wayne Drinkwater (MBN 6193)

BRADLEY ARANT BOULT CUMMINGS LLP
188 East Capitol Street, Suite 400
Jackson, MS 39201
(601) 948-8000

John Lang (pro hac vice MBN 43987)
Attorney at Law
60 East 42nd Street
Suite 4600
New York, NY 10165
Tel. 212.300.0646

Christina D. Carbone (pro hac vice MBN 43986)
John Piskora (pro hac vice MBN 44474)
LOEB & LOEB LLP
345 Park Ave.
New York, NY 10154

**FOR DEFENDANTS:**

/s/ Dewitt L. "Rusty" Fortenberry, Jr.
Dewitt L. ("Rusty") Fortenberry Jr., Esq. (MBN 5435)
Kenya Key Rachal, Esq. (MBN 99227)
Ashley Tullos Young, Esq. (MBN 101839)
BAKER, DONELSON, BEARMAN, CALDWELL, & BERKOWITZ, PC
428 I-55 North
Meadowbrook Office Park
Jackson, MS 39211
(601) 351-2400

Harold E. Pizzetta, III, Esq. (MBN 99867)
Assistant Attorney General
General Civil Division
Carroll Gartin Justice
Building 430 High Street
Jackson, MS 39201

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

OLIVIA Y., et al. PLAINTIFFS

v. CIVIL ACTION NO. 3:04CV251LN

PHIL BRYANT, as Governor of the State of Mississippi, et al. DEFENDANTS

---

**AGREEMENT REGARDING THE ENHANCEMENT OF FEDERAL FUNDING**

---

The Mississippi Department of Human Services and its Division of Family and Children's Services ("DFCS") will work to achieve enhanced federal funding in accordance with recommendations by Hornby Zeller Associates ("HZA") and the Center for the Support of Families ("CSF").[1]

DFCS shall implement the following recommendations by the end of Period 3:

1. **Career Preparation and Development Training Program.** Title IV-E funding shall be sought for eligible expenditures of the "career preparation and development training program" through the Masters of Social Work and Bachelors of Social Work cohort partnerships with the University of Mississippi, University of Southern Mississippi and Jackson State University. DFCS shall:

   a. Update the Child and Family Service Plan ("CFSP") to describe the Masters of Social Work and Bachelors of Social Work partnerships with the universities. The method of funding shall be included in the CFSP update.

   b. Utilize the Reimbursement Calculator created by HZA to facilitate retroactive claims for reimbursement of expenditures eligible for federal Title IV-E funding.

      i. Utilize the Reimbursement Calculator created by HZA to analyze and maximize allowable IV-E reimbursement of MSW or BSW coursework reimbursed by DFCS to its current and prospective staff.

      ii. Utilize the Reimbursement Calculator created by HZA to facilitate quarterly

---

[1]Pursuant to Section II.6 of the Modified Settlement Agreement and Reform Plan, the Parties agreed to negotiate those recommendations of HZA and CSF that will be implemented by Defendants and to file that agreement with the Court by July 14, 2012.

filing for federal reimbursement on a retroactive basis for the Title IV-E eligible expenditures.

2. **Pre-service Training Program for New Caseworkers and Supervisors.** Title IV-E funding shall be sought for eligible expenses of the "pre-service training program for new caseworkers and supervisors" through the sub-grant with the Child Welfare Training Academy at the University of Mississippi. DFCS shall:

    a.     Update the CFSP to describe the state's training program and costs which are to be funded with Title IV-E monies.

    b.     Update the CFSP to specify that: new caseworkers will not carry a caseload until all pre-service training has been completed; the work experience component of the training is an integral component of the plan; staff will receive more intensive supervision during the on-the-job training period; and the trainees' performance is closely monitored and assessed.

    c.     Assign new caseworkers to the training cost pool for the first eight weeks so that the appropriate portion of the costs will be eligible for Title IV-E reimbursement.

3. **Supervisory Learning Labs and Administrative Technical Assistance.** All eligible expenses of the Supervisory Learning Labs and Administrative Technical Assistance established by sub-grant with the University of Southern Mississippi shall be allocated to the administrative cost pool, which will be eligible for Title IV-E reimbursement.

4. **In-House Training.** Title IV-E funding shall be sought for eligible in-house training costs. DFCS shall:

    a.     Develop and implement a process for ensuring that the PINS of full-time trainers are assigned to the proper cost pools.

    b.     Develop and implement a process for ensuring that all expenditures associated with training (including meeting rooms, staff travel, and related expenses) are charged to Title IV-E training when the subject of the training is relevant.

    c.     Ensure that all costs for trainers (excluding office space) are allocated to the training pool, which will be eligible for Title IV-E reimbursement.

5. **Supportive Services Expenditures.** Title IV-E funding shall be sought for eligible supportive services expenditures. DFCS shall :

    a.     Where allowable, use the Support Services Calculator created by HZA to discontinue the use of TANF and SSBG funding for support services for Title IV-E (or Title XIX) eligible children, and begin charging those services as a Title IV-E (or Title

DHS
345519

XIX) maintenance or cost.

b. Institute a process for the quarterly filing of retroactive Title IV-E eligible expenditure claims.

**6. Random Moment Sampling Process.** Restructure the random moment sampling (RMS) process to require workers and supervisors to define activity codes separately from case types. This shall be implemented by collaboration between HZA, MDHS, and Interactive Voice Associates, MDHS' implementation partner for its new RMS system. DFCS shall:

a. Define a set of activities, case- and non-case specific, to be used for the new RMS.

b. Using DFCS' current definitions and case practices, as well as those of agencies of other states, develop a set of activities and their definitions.

c. Identify case types.

d. Prepare a matrix that maps activities to case types.

e. Amend the cost allocation plan to reference the new RMS system in sufficient detail to obtain federal approval.

SO ORDERED AND ADJUDGED, this the 12th of July, 2012.

/s/Tom S. Lee
DISTRICT JUDGE

**AGREED:**

**FOR PLAINTIFFS:**

/s/ Miriam Ingber

Marcia Robinson Lowry (MBN 43991 *pro hac vice*)
Miriam Ingber (MBN 46823 *pro hac vice*)
Jessica Polansky (MBN 45356 *pro hac vice*)
Sarah Russo (MBN 46802 *pro hac vice*)
CHILDREN'S RIGHTS
330 Seventh Avenue, 4th Floor
New York, NY 10001
Telephone: (212) 683-2210

Wayne Drinkwater (MBN 6193)

DHS
345520

BRADLEY ARANT BOULT CUMMINGS LLP
188 East Capitol Street, Suite 400
Jackson, MS 39201
(601) 948-8000

John Lang (pro hac vice MBN 43987)
Attorney at Law
60 East 42nd Street
Suite 4600
New York, NY 10165
Tel. 212.300.0646

Christina D. Carbone (pro hac vice MBN 43986)
John Piskora (pro hac vice MBN 44474)
LOEB & LOEB LLP
345 Park Ave.
New York, NY 10154

**FOR DEFENDANTS:**

/s/ Dewitt L. "Rusty" Fortenberry, Jr.
Dewitt L. ("Rusty") Fortenberry Jr., Esq. (MBN 5435)
Kenya Key Rachal, Esq. (MBN 99227)
Ashley Tullos Young, Esq. (MBN 101839)
BAKER, DONELSON, BEARMAN, CALDWELL, & BERKOWITZ, PC
428 I-55 North
Meadowbrook Office Park
Jackson, MS 39211
(601) 351-2400

Harold E. Pizzetta, III, Esq. (MBN 99867)
Assistant Attorney General
General Civil Division
Carroll Gartin Justice
Building 430 High Street
Jackson, MS 39201

Mississippi Department of Human Services
Division of Family and Children's Services

**Responses to Requirements of the MSA and Y3IP**

Requirements pursuant to MSA: II.A.6.b.1 and MSA: II.A.6.b.2

6. **Financial Management**
   b. *By the end of Implementation Period Three:*
      1) *Defendants shall have implemented and shall maintain implementation of the recommendations negotiated and agreed to by the Parties, and filed with the Court by July 14, 2012.*

RESPONSE: Details on the progress of implementation of recommendations are included on the attached document entitled "Status Report on Implementation of Agreement Regarding the Enhancement of Federal Funding".

2) *Funds realized as a result of revenue maximization activities shall not supplant appropriated state funds but shall be used in furtherance of the reforms and outcome measures provided for herein and to improve child welfare services.*

RESPONSE: No state funds appropriated by the Mississippi legislature for DFCS have been supplanted by monies claimed as a result of this revenue maximization effort. For State Fiscal Year 2010 and thereafter, the DFCS is the only division in the MDHS which has received an increase in state appropriation. Please refer to the attached schedule entitled "State Funds Appropriation by Year". In cases where the revenue maximization effort has resulted in refunds, those monies have been segregated for use by DFCS. A schedule is attached entitled "Retroactive Claims for IV-E Funding" which lists the refunds.

Requirements pursuant to IP3: I.F.1 and IP3: I.F.2.

F. **Financial Management**
   1. *By the end of Implementation Period 3, Defendants shall have implemented and shall maintain implementation of those recommendations made by Hornby Zeller Associates ("HZA") and the Center for Support of Families negotiated and agreed to by the Parties, and filed with the Court by July 14, 2012. The recommendations negotiated and agreed to by the Parties and filed with the Court shall become an enforceable part of this Period 3 Implementation Plan.*

RESPONSE: Details on the progress of implementation of recommendations are included on the attached document entitled "Status Report on Implementation of Agreement Regarding the Enhancement of Federal Funding".

a. *Defendants shall issue a written report on the impact of HZA's recommendations on Defendants' ability to increase federal funding and any barriers to implementation. Defendants shall share the report with the Monitor and Plaintiffs.*

RESPONSE: Please refer to the attached document entitled "Report on Impact of HZA's Recommendations on MDHS/DFCS' Ability to Increase Federal Funding".

**Status Report on**

**Implementation of *Agreement Regarding the Enhancement of Federal Funding***

**Filed With The Court on July 12, 2012**

*'he Mississippi Department of Human Services ("MDHS") and its Division of Family and Children's Services ("DFCS") will work to achieve enhanced federal funding in accordance with ecommendations by Hornby Zeller Associates ("HZA") and the Center for the Support of Families ("CSF").*

*)FCS shall implement the following recommendations by the end of Period 3:*

| | | | Recommendations | Status of Implementation Activities |
|---|---|---|---|---|
| .) | **Career Preparation and Development Training Program** | | | |
| | *Title IV-E funding shall be sought for eligible expenditures of the "career preparation and development training program" through the Masters of Social Work and Bachelors of Social Work cohort partnerships with the University of Mississippi, University of Southern Mississippi and Jackson State University. DFCS shall:* | | | |
| | a. | *Update the Child and Family Service Plan ("CFSP") to describe the Masters of Social Work and Bachelors of Social Work partnerships with the universities. The method of funding shall be included in the CFSP update.* | | The CFSP was updated in 2012 through the Annual Progress Services Report (APSR). DFCS is in the process of updating the CFSP for the June 30, 2013 submission to the Children's Bureau. The 2011 APSR, which was submitted June 30, 2012, is posted on the MDHS website under "Family and Children's Services". dFCS management decided that it was not feasible to pursue partnerships with the universities relative to the Bachelor of Social Work program and instead would concentrate its resources on the Master of Social Work program. |
| | b. | *Utilize the Reimbursement Calculator created by HZA to facilitate retroactive claims for reimbursement of expenditures eligible for federal Title IV-E funding.* | | |
| | | i. | *Utilize the Reimbursement Calculator created by HZA to analyze and maximize allowable IV-E reimbursement of MSW or BSW coursework reimbursed by DFCS to its current and prospective staff.* | Hornby Zeller has provided the Reimbursement Calculator (Microsoft Access tool) and DFCS developed the methodology to gather the input needed to compute claims using the Reimbursement Calculator. The Reimbursement Calculator was used to calculate a claim for the January - March 2013 quarter and will be used going forward. DFCS management decided that it was not feasible to pursue partnerships with the universities relative to the BSW program and instead would concentrate its resources on the MSW program. DFCS management also decided it would not concentrate its resources on existing staff as opposed to those prospective staff who were only considering the possibility working for DFCS. |
| | | ii. | *Utilize the Reimbursement Calculator created by HZA to facilitate quarterly filing for federal reimbursement on a retroactive basis for the Title IV-E eligible expenditures.* | Hornby Zeller has provided the Reimbursement Calculator and DFCS developed the methodology to gather the input needed to compute claims using the Reimbursement Calculator. The Reimbursement Calculator was used to calculate a claim for the January - March 2013 quarter and will be used going forward. |

DHS 345523

**Status Report on**
**Implementation of *Agreement Regarding the Enhancement of Federal Funding***
**Filed With The Court on July 12, 2012**

*'he Mississippi Department of Human Services ("MDHS") and its Division of Family and Children's Services ("DFCS") will work to achieve enhanced federal funding in accordance with ecommendations by Hornby Zeller Associates ("HZA") and the Center for the Support of Families ("CSF").*

*)FCS shall implement the following recommendations by the end of Period 3:*

| | | Recommendations | Status of Implementation Activities |
|---|---|---|---|
| **2)** | | **Pre-service Training Program for New Caseworkers and Supervisors** | |
| | | *Title IV-E funding shall be sought for eligible expenses of the "pre-service training program for new caseworkers and supervisors" through the sub-grant with the Child Welfare Training Academy at the University of Mississippi. DFCS shall:* | |
| | a. | *Update the CFSP to describe the state's training program and costs which are to be funded with Title IV-E monies.* | The CFSP was updated in 2012 through the APSR. DFCS is in the process of updating the CFSP for the June 30, 2013 submission to the Children's Bureau. The 2011 APSR, which was submitted 06/30/2012, is posted on the MDHS website under" Family and Children's Services". |
| | b. | *Update the CFSP to specify that: new caseworkers will not carry a caseload until all pre-service training has been completed; the work experience component of the training is an integral component of the plan; staff will receive more intensive supervision during the on-the-job training period; and the trainees' performance is closely monitored and assessed.* | The CFSP was updated in 2012 through the APSR. DFCS is in the process of updating the CFSP for the June 30, 2013 submission to the Children's Bureau. The 2011 APSR, which was submitted 06/30/2012, is posted on the MDHS website under "Family and Children's Services". |
| | c. | *Assign new caseworkers to the training cost pool for the first eight weeks so that the appropriate portion of the costs will be eligible for Title IV-E reimbursement.* | New procedures have been implemented so that new caseworkers "grant override", i.e. specifically charge their expenditures, such as salaries and fringes, to a training cost pool P151 which allows the cost allocation system to charge the appropriate amount to the IV-E grant for training at the enhanced(75%) claiming rate . Travel expenditures for the same trainees are being charged to cost pool P151. Both the Professional Development Unit and pre-service trainees are charging to cost pool (P151); however, each has been assigned a different organization code to differentiate between the two (PDU 2428/trainees 2420). |

DHS
345524

**Status Report on**

**Implementation of *Agreement Regarding the Enhancement of Federal Funding***

**Filed With The Court on July 12, 2012**

*'he Mississippi Department of Human Services ("MDHS") and its Division of Family and Children's Services ("DFCS") will work to achieve enhanced federal funding in accordance with ecommendations by Hornby Zeller Associates ("HZA") and the Center for the Support of Families ("CSF").*

*)FCS shall implement the following recommendations by the end of Period 3:*

| | | Recommendations | Status of Implementation Activities |
|---|---|---|---|
| ;) | | **Supervisory Learning Labs and Administrative Technical Assistance** | |
| | | *All eligible expenses of the Supervisory Learning Labs and Administrative Technical Assistance established by sub-grant with the University of Southern Mississippi shall be allocated to the administrative cost pool, which will be eligible for Title IV-E reimbursement.* | The current sub-grant agreement for this activity with the university did not allow for practical application of Title IV-E claiming as recommended by HZA due to the administrative burden of tracking Title IV-E activities being engaged in by participants. However, DFCS was able to fund this sub-grant with monies recouped through other efforts of the external financial assessment. This initiative will be discontinued effective July 1, 2013, after which any activities performed previously will be handled by other resources, primarily in-house. |
| I) | | **In-House Training** | |
| | | *Title IV-E funding shall be sought for eligible in-house training costs. DFCS shall:* | |
| | a. | *Develop and implement a process for ensuring that the PINS of full-time trainers are assigned to the proper cost pools.* | The new procedures are in place where DFCS Professional Development Unit's expenses are direct-charged to a training cost pool (P151) which is cost-allocated to training for all child welfare programs including an allocation to IV-E. |
| | b. | *Develop and implement a process for ensuring that all expenditures associated with training (including meeting rooms, staff travel, and related expenses) are charged to Title IV-E training when the subject of the training is relevant.* | Procedures are in place so training costs that are exclusively IV-E Foster Care and IV-E Adoption training are charged to the training cost pools (P174/P176) directly. Opportunities to utilize this type of claiming have been limited as there have been few instances in which the training can be designated as exclusively for "foster care" or exclusively for "adoption". |
| | c. | *Insure that all costs for trainers (excluding office space) are allocated to the training pool, which will be eligible for Title IV-E reimbursement.* | The new procedures are in place where DFCS Professional Development Unit's expenses are direct-charged to a training cost pool (P151) which is cost-allocated to training for all child welfare programs, including an allocation to IV-E. |

DHS
345525

**Status Report on**

**Implementation of *Agreement Regarding the Enhancement of Federal Funding***

**Filed With The Court on July 12, 2012**

*'he Mississippi Department of Human Services ("MDHS") and its Division of Family and Children's Services ("DFCS") will work to achieve enhanced federal funding in accordance with ecommendations by Hornby Zeller Associates ("HZA") and the Center for the Support of Families ("CSF").*

*)FCS shall implement the following recommendations by the end of Period 3:*

| | | Recommendations | Status of Implementation Activities |
|---|---|---|---|
| ;) | **Supportive Services Expenditures** | | |
| | | *Title IV-E funding shall be sought for eligible supportive services expenditures. DFCS shall:* | |
| | *a.* | *Where allowable, use the Supportive Services Calculator created by HZA to discontinue the use of TANF and SSBG funding for support services for Title IV-E (or Title XIX) eligible children, and begin charging those services as a Title IV-E (or Title XIX) maintenance cost.* | DFCS has not implemented this process yet. This process involves being able to determine whether certain costs relate to Title IV-E eligible children prior to the expenditure being made. This will require proper training on the MACWIS module to enable clerks to access the IV-E eligibility status of children prior to coding. |
| | *b.* | *Institute a process for the filing of retrospective Title IV-E eligible expenditure claims.* | DFCS is using the Supportive Services Calculator to file claims on the Federal Report each quarter. |

DHS
345526

**Status Report on**

**Implementation of *Agreement Regarding the Enhancement of Federal Funding***

**Filed With The Court on July 12, 2012**

*'he Mississippi Department of Human Services ("MDHS") and its Division of Family and Children's Services ("DFCS") will work to achieve enhanced federal funding in accordance with ecommendations by Hornby Zeller Associates ("HZA") and the Center for the Support of Families ("CSF").*

*)FCS shall implement the following recommendations by the end of Period 3:*

| | | **Recommendations** | **Status of Implementation Activities** |
|---|---|---|---|
| i) | **Random Moment Sampling Process** | | |
| | *Restructure the random moment sampling (RMS) process to require workers and supervisors to define activity codes separately from case types. This shall be implemented by collaboration between HZA, MDHS, and Interactive Voice Associates, MDHS' implementation partner for its new RMS system. DFCS shall:* | | DFCS went live with the new RMS on 4/1/2012. While the data is not sufficient to establish a definite trend, the indication is that the new RMS process will result in increased IV-E claiming. |
| | a. | *Define a set of activities, case and non-case specific, to be used for the new RMS.* | This change in the Random Moment Sampling process has been completed and has been incorporated in the revised Cost Allocation Plan dated April 1, 2012. |
| | b. | *Using DFCS' current definitions and case practices, as well as those of agencies of other states, develop a set of activities and their definitions.* | This change in the Random Moment Sampling process has been completed and has been incorporated in the revised Cost Allocation Plan dated April 1, 2012. |
| | c. | *Identify case types.* | This change in the Random Moment Sampling process has been completed and has been incorporated in the revised Cost Allocation Plan dated April 1, 2012. |
| | d. | *Prepare a matrix that maps activities to case types.* | This change in the Random Moment Sampling process has been completed and has been incorporated in the revised Cost Allocation Plan dated April 1, 2012. |
| | e. | *Amend the cost allocation plan to reference the new RMS system in sufficient detail to obtain federal approval.* | This change in the Random Moment Sampling process has been completed and a revised Cost Allocation Plan (CAP) was filed with the federal agencies with an effective date of 4/1/2012. The revised CAP was approved with the stipulation that once the Administration For Children and Families (ACF) issued their final report from the pilot Administrative Cost Review (ACR) conducted in May 2012, DFCS would likely need to update the CAP. ACF issued their final report March 27, 2013. DFCSs currently revising the CAP to include the necessary recommendations. |

DHS
345527

# Summary of
## Prior Quarter Adjustments
## IV-E Claims on Federal Financial Reports

**DFCS**

| Quarter Claim Filed | Quarter Claim Occurred | Total Claim | Federal Share | | Type of Claim |
|---|---|---|---|---|---|
| July-Sept 2009 | | 369,893 | 298,701 | (786,254) | Eligibility/Training |
| Oct-Dec 2009 | | 109,781 | 90,758 | | Eligibility |
| Jan-Mar 2010 | | 153,235 | [illegible] | | Eligibility |
| April-Jun 2010 | | 145,438 | [illegible] | | Eligibility |
| July-Sept 2010 | | 18,155 | [illegible] | | Eligibility |
| Oct-Dec 2010 | | 71,222 | 58,751 | | Eligibility |
| Jan-Mar 2011 | | 36,045 | 29,734 | | Eligibility |
| Apr-Jun 2011 | | 91,054 | [illegible] | | Eligibility |
| Jan-Mar 2012 | | | [illegible] | | Review Disallowance |
| Jan-Mar 2012 | Oct-Dec 2011 | 172,596 | 127,507 | | |
| | | 12,940 | | 9,074 | Eligibility |
| | | 159,656 | | 118,433 | Supportive Services |
| Apr-Jun 2012 | Jan-Mar 2011 ——Apr-Jun 2012 | 646,720 | [illegible] | | Supportive Services |
| July-Sept 2012 | July-Sept 2012 | 107,989 | [illegible] | | Supportive Services |
| Oct-Dec 2012 | Oct-Dec 2012 | 47,225 | [illegible] | | Supportive Services |
| Jan-Mar 2013 | | 1,195,474 | 625,067 | | |
| | Apr-June 2012 | 1,069,685 | | 535,568 | CAP/RMS adj-Adm |
| | Jan-Mar 2013 | 54,064 | | 39,699 | Supportive Services |
| | Apr-Jun 2011-—Jul-Sept 2012 | 58,633 | | 43,977 | Cohort/Pre Srv-Adm |
| | Apr-Jun 2011-—Jul-Sept 2012 | 13,082 | | 5,823 | Cohort/Pre Srv-Trng |
| | | 4,532,897 | [redacted] | | |

**HZA**

| Total Claim | Period Covered | Federal Share | Type of Claim |
|---|---|---|---|
| 1,182,321 | Mar 2009-Dec 2010 | 975,297 | Supportive Services |
| 407,789 | | [illegible] | Training/Tuition & Subgrants |
| 1,590,110 | | [redacted] | |

**CFS**

| Total Claim | Federal Share | Type of Claim |
|---|---|---|
| 432,575 | [redacted] | Eligibility |
| 432,575 | [redacted] | 0 |

6/12/2013

Prepared by: [redacted]

# COST POOL P151, TRAINING - SOCIAL SERVICES

Training Claimed on Federal Financial Reports

| | FOSTER CARE | | | ADOPTION | | |
|---|---|---|---|---|---|---|
| | Total Claim | Adjustment from Training to ADM | Revised Claim | Total Claim | Adjustment from Training to ADM | Revised Claim |
| 3/31/2012 | 59,085 | | | 0 | | |
| 6/30/2012 | 120,219 | | | 0 | | |
| 9/30/2012 | 135,977 | | | 96,294 | | |
| *12/31/2012 | 332,210 | (206,225) | 125,985 | 323,515 | (200,828) | 122,688 |
| *3/31/2013 | 391,751 | (260,236) | 131,515 | 367,785 | (244,763) | 123,022 |

Prepared by: [redacted]

**Agency Funding**
**MDHS**

| | 2007 | | 2008 | | 2009 | | 2010 | | 2011 | | 2012 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Requested | Appropriated | Requested | Appropriated | Requested | Appropriated | Requested | Appropriated | Requested | Appropriated | Requested | Appropriated |
| General Funds | 89,548,677 | 93,530,087 | 121,136,483 | 95,994,907 | 124,983,568 | 118,790,233 | 149,231,447 | 128,568,248 | 130,496,417 | 119,569,982 | 131,679,580 | 126,000,000 |
| Special Funds | 679,224,847 | 681,721,677 | 691,728,120 | 665,320,211 | 684,675,949 | 692,905,503 | 731,406,612 | 723,328,968 | 728,142,419 | 730,854,020 | 754,269,981 | 742,175,756 |
| Total | 768,773,524 | 775,251,764 | 812,864,603 | 761,315,118 | 809,659,517 | 811,695,736 | 880,638,059 | 851,897,216 | 858,638,836 | 850,424,002 | 885,949,561 | 868,175,756 |
| General Funds cuts | | | | | | (2,990,780) | | (12,182,616) | | | | |
| Additional Appropriations: | | | | | | | | | | | | |
| SB 2495 - General Funds | | | | 10,000,000 | | | | | | | | |
| SB 2495 -Budget Contingency Fund | | | | | | | | 2,500,000 | | | | |
| SB 3085 - Budget Contingency Fund | | | | | | | | | | 3,000,000 | | |

| | 2007 Requested | 2007 Appropriated | 2008 Requested | 2008 Appropriated | 2009 Requested | 2009 Appropriated | 2010 Requested | 2010 Appropriated | 2011 Requested | 2011 Appropriated | 2012 Requested | 2012 Appropriated |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EA | | 34,224,525 | | 36,496,269 | 39,996,269 | 32,113,344 | 42,374,573 | 26,056,129 | 39,446,444 | 33,886,000 | 33,886,000 | 33,886,000 |
| CSE | | 4,849,239 | | 5,709,046 | 6,848,613 | 5,428,692 | 5,965,599 | 5,385,762 | 5,918,731 | 5,919,000 | 5,919,000 | 5,919,000 |
| FCS | | 20,126,387 | | 26,793,449 | 34,700,508 | 37,301,243 | 54,015,287 | 47,538,443 | 48,960,510 | 46,957,982 | 58,033,531 | 53,338,000 |
| SS | | 5,564,308 | | 5,726,835 | 4,054,984 | 5,543,734 | 4,004,513 | 5,547,053 | 3,836,909 | 5,678,000 | 5,955,443 | 6,678,000 |
| OCY/DECCD | | 7,665,498 | | 6,840,498 | 9,168,812 | 9,398,473 | 15,462,779 | 8,044,430 | 8,840,498 | 8,840,000 | 8,840,000 | 7,340,000 |
| AAS | | 1,300,412 | | 1,305,712 | 4,833,031 | 1,240,574 | 5,535,303 | 1,188,411 | 1,606,016 | 987,000 | 987,000 | 987,000 |
| YS | | 19,799,718 | | 23,123,098 | 25,381,351 | 24,773,393 | 21,873,393 | 22,625,404 | 21,887,309 | 17,302,000 | 18,058,606 | 17,852,000 |
| CSE | - | - | - | - | - | - | - | - | - | - | - | - |
| SSBG | - | - | - | - | - | - | - | - | - | - | - | - |
| | - | 93,530,087 | - | 105,994,907 | 124,983,568 | 115,799,453 | 149,231,447 | 116,385,632 | 130,496,417 | 119,569,982 | 131,679,580 | 126,000,000 |

**State Fund Appropriations by Year**
**Mississippi Department of Human Services**

| | SFY 2009 | SFY 2010 | SFY 2011 | SFY 2012 | SFY 2013 |
|---|---|---|---|---|---|
| Division of Economic Assistance | 32,113,344 | 26,056,129 | 33,886,000 | 33,886,000 | 33,886,000 |
| Division of Child Support Enforcement | 5,428,692 | 5,385,762 | 5,919,000 | 5,919,000 | 5,919,000 |
| Division of Family and Children's Services | 37,301,243 | 47,538,443 | 46,957,982 | 53,338,000 | 57,159,140 |
| Division of Support Services | 5,543,734 | 5,547,053 | 5,678,000 | 6,678,000 | 6,678,000 |
| Division of Early Childhood Care and Development | 9,398,473 | 8,044,430 | 8,840,000 | 7,340,000 | 7,340,000 |
| Division of Aging and Adult Services | 1,240,574 | 1,188,411 | 987,000 | 987,000 | 987,000 |
| Division of Youth Services | 24,773,393 | 22,625,404 | 17,302,000 | 17,852,000 | 17,852,000 |
| Division of Community Services | - | - | - | - | - |
| Social Services Block Grant | - | - | - | - | - |
| Total for MDHS Agency | 115,799,453 | 116,385,632 | 119,569,982 | 126,000,000 | 129,821,140 |

| | | | | | |
|---|---|---|---|---|---|
| Division of Family and Children's Services | 37,301,243 | 47,538,443 | 46,957,982 | 53,338,000 | 57,159,140 |
| All Other MDHS Divisions | 78,498,210 | 68,847,189 | 72,612,000 | 72,662,000 | 72,662,000 |
| DFCS % of Total | 47.52% | 69.05% | 64.67% | 73.41% | 78.66% |

DHS
345531

**General Fund and Budget Contingency Fund Appropriation History**
**Mississippi Department of Human Services**

| | | General Fund Appropriation | | | | Budget Contingency Fund Appropriation |
|---|---|---|---|---|---|---|
| | **Requested** | **Regular** | **Cuts** | **Additional** | **Total** | |
| 2012 | **131,679,580** | 126,000,000 | - | - | **126,000,000** | |
| 2011 | **130,496,417** | 119,569,982 | - | - | **119,569,982** | **3,000,000** |
| 2010 | **149,231,447** | 128,568,248 | (12,182,616) | | **116,385,632** | **2,500,000** |
| 2009 | **124,983,568** | 118,790,233 | (2,990,780) | | **115,799,453** | |
| 2008 | **121,136,483** | 95,994,907 | - | 10,000,000 | **105,994,907** | |
| 2007 | **89,548,677** | 93,530,087 | - | - | **93,530,087** | |

**State General Fund Appropriations**
**Mississippi Department of Human Services**

| | SFY 2009 | | SFY 2010 | | SFY 2011 | | SFY 2012 | | SFY 2013 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Requested | Appropriated | Requested | Appropriated | Requested | Appropriated | Requested | Appropriated | Requested | Appropriated |
| Division of Economic Assistance | 39,996,269 | 32,113,344 | 42,374,573 | 26,056,129 | 39,446,444 | 33,886,000 | 33,886,000 | 33,886,000 | 34,330,261 | 33,886,000 |
| Division of Child Support Enforcement | 6,848,613 | 5,428,692 | 5,965,599 | 5,385,762 | 5,918,731 | 5,919,000 | 5,919,000 | 5,919,000 | 8,519,000 | 5,919,000 |
| Division of Family and Children's Services | 34,700,508 | 37,301,243 | 54,015,287 | 47,538,443 | 48,960,510 | 46,957,982 | 58,033,531 | 53,338,000 | 70,002,374 | 57,159,140 |
| Division of Support Services | 4,054,984 | 5,543,734 | 4,004,513 | 5,547,053 | 3,836,909 | 5,678,000 | 5,955,443 | 6,678,000 | 7,177,945 | 6,678,000 |
| Division of Early Childhood Care and Development | 9,168,812 | 9,398,473 | 15,462,779 | 8,044,430 | 8,840,498 | 8,840,000 | 8,840,000 | 7,340,000 | 7,340,000 | 7,340,000 |
| Division of Aging and Adult Services | 4,833,031 | 1,240,574 | 5,535,303 | 1,188,411 | 1,606,016 | 987,000 | 987,000 | 987,000 | 1,044,692 | 987,000 |
| Division of Youth Services | 25,381,351 | 24,773,393 | 21,873,393 | 22,625,404 | 21,887,309 | 17,302,000 | 18,058,606 | 17,852,000 | 19,052,000 | 17,852,000 |
| Division of Community Services | - | - | - | - | - | - | - | - | - | - |
| Social Services Block Grant | - | - | - | - | - | - | - | - | - | - |
| | 124,983,568 | 115,799,453 | 149,231,447 | 116,385,632 | 130,496,417 | 119,569,982 | 131,679,580 | 126,000,000 | 147,466,272 | 129,821,140 |
| | | | | | | | | | | |
| Division of Family and Children's Services | 34,700,508 | 37,301,243 | 54,015,287 | 47,538,443 | 48,960,510 | 46,957,982 | 58,033,531 | 53,338,000 | 70,002,374 | 57,159,140 |
| All Other MDHS Divisions | 90,283,060 | 78,498,210 | 95,216,160 | 68,847,189 | 81,535,907 | 72,612,000 | 73,646,049 | 72,662,000 | 77,463,898 | 72,662,000 |
| DFCS % of Total | 38.44% | 47.52% | 56.73% | 69.05% | 60.05% | 64.67% | 78.80% | 73.41% | 90.37% | 78.66% |

**RMS IV-E Analysis for P170 and P177**

| | | From P170 | | From P171 | | From P173 | | From P175 | | From P177 | | From P360 | | From P361 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Run Date | Q/E | TO: | | TO: | | TO: | | TO: | | TO: | | TO: | | TO: | |
| 05/06/13 | 03/31/13 | D312 | 58,433.93 | D153 | 12,948.21 | D153 | 428,075.55 | D153 | 181,081.82 | D153 | 28,988.57 | D153 | 132.37 | D153 | 7,604.71 |
| | | E133 | 130,841.16 | E133 | 5,169.03 | E133 | 295,996.92 | | | E133 | 11,572.51 | | | E133 | 3,677.31 |
| | | P171 | 85,110.26 | E133 | 15,916.58 | | | | | E133 | 35,634.17 | | | E133 | 3,677.31 |
| | | P173 | 724,072.47 | E133 | 255.89 | | | | | E133 | 572.90 | | | | |
| | | P175 | 453,498.00 | E323 | 51.17 | | | E323 | 272,416.18 | E323 | 114.58 | E323 | 199.14 | E323 | 3,439.82 |
| | | P177 | 190,545.43 | P360 | 102.35 | | | | | P360 | 229.16 | | | | |
| | | | - | P361 | 5,680.84 | | | | | P361 | 12,718.31 | | | | |
| | | | - | P364 | 51.18 | | | | | P364 | 114.58 | | | | |
| | | | - | P366 | 5,936.72 | | | | | P366 | 13,291.20 | | | | |
| | | | - | V513 | 6,448.52 | | | | | V513 | 14,437.00 | | | | |
| | | | | W123 | 18,987.30 | | | | | W123 | 42,508.93 | | | | |
| | | | | W613 | 13,562.46 | | | | | W613 | 30,363.52 | | | | |
| | | | - | | | | | | | | | | | | |
| | | | 1,642,501.25 | | 85,110.27 | | 724,072.47 | | 453,498.00 | | 190,545.43 | | 331.51 | | 18,399.14 |

| From P364 | | From P366 | | Total IV-E | | |
|---|---|---|---|---|---|---|
| TO: | | TO: | | | | % of P170 |
| D153 | 98.00 | D153 | 11,367.65 | | | |
| E133 | 67.76 | E133 | 7,860.27 | E133 | 455,184.96 | |
| | | | | E133 | 55,228.06 | |
| | | | | E133 | 828.79 | |
| | | | | E323 | 276,220.88 | |
| | 165.76 | | 19,227.93 | | 787,462.70 | 47.94% |

DHS
345535

| Run Date | Q/E | From P177 TO: | | From P360 TO: | | From P361 TO: | | From P364 TO: | | From P366 TO: | | Total IV-E | | % of P177 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 05/06/13 | 03/31/13 | D153 | 152,777.93 | **D153** | 482.24 | **D153** | 27,704.35 | **D153** | 357.00 | **D153** | 41,412.91 | | | |
| | | E133 | 60,990.40 | | | **E133** | 13,396.61 | **E133** | 246.85 | **E133** | 28,635.36 | E133 | 103,269.22 | |
| | | E133 | 187,802.12 | | | **E133** | 13,396.61 | | | | | E133 | 201,198.73 | |
| | | E133 | 3,019.31 | | | | | | | | | E133 | 3,019.31 | |
| | | E323 | 603.85 | **E323** | 725.47 | **E323** | 12,531.44 | | | | | E323 | 13,860.76 | |
| | | P360 | 1,207.71 | | | | | | | | | | | |
| | | P361 | 67,029.02 | | | | | | | | | | | |
| | | P364 | 603.85 | | | | | | | | | | | |
| | | P366 | 70,048.27 | | | | | | | | | | | |
| | | V513 | 76,087.03 | | | | | | | | | | | |
| | | W123 | 224,034.03 | | | | | | | | | | | |
| | | W613 | 160,024.69 | | | | | | | | | | | |
| | | | 1,004,228.21 | | **1,207.71** | | **67,029.02** | | 603.85 | | 70,048.27 | | 321,348.03 | 32.00% |

**Analysis of IV-E Cost Allocation**
**Cost Pool P300**
**Social Worker Random Moment Sample Basis of Allocation**

| Run Date | Q/E | Quarter | SFY | Social Worker Cost Pool P300 | IV-E Cost Allocation of P300 | | | | | | | | | Total IV-E | IV-E% of P300 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | E130 | E131 | E132 | E162 | E320 | E321 | E322 | E133 | E323 | | | |
| 05/06/13 | 03/31/13 | 3 | 2013 | 10,464,352 | | | | | | | | 3,204,109 | 144,434 | 3,348,542 | 31.99951724% | |
| 01/21/13 | 12/31/12 | 2 | 2013 | 9,843,452 | | | | | | | | 2,825,188 | 177,234 | 3,002,423 | 30.50172622% | |
| 10/26/12 | 09/30/12 | 1 | 2013 | 7,978,129 | | | 1,985,776 | 32,448 | | | 113,088 | | | 2,131,311 | 26.71442555% | |
| 09/18/12 | 06/30/12 | Lapse | 2012 | 2,747,695 | | | 703,245 | | | | 7,675 | | | 710,920 | 25.87331082% | |
| 07/18/12 | 06/30/12 | 4 | 2012 | 8,872,942 | | | 2,270,946 | | | | 24,785 | | | 2,295,730 | 25.87338447% | |
| | | | | **39,906,570** | | | | | | | | | | **11,488,926** | **28.78956094%** | *Post HZA Implementation* |
| 04/13/12 | 03/31/12 | 3 | 2012 | 8,585,156 | | | 1,858,293 | | | | 94,616 | | | 1,952,909 | 22.74750238% | |
| 01/13/12 | 12/31/11 | 2 | 2012 | 8,159,485 | | | 1,660,502 | | | | 46,361 | | | 1,706,862 | 20.91875361% | |
| 10/14/11 | 09/30/11 | 1 | 2012 | 6,769,595 | | 1,315,200 | | | | 48,330 | | | | 1,363,530 | 20.14196932% | |
| 09/08/11 | 06/30/11 | Lapse | 2011 | 1,741,477 | | 356,706 | | | | 11,028 | | | | 367,734 | 21.11622672% | |
| 07/15/11 | 06/30/11 | 4 | 2011 | 8,055,770 | | 1,650,065 | | | | 51,013 | | | | 1,701,078 | 21.11626353% | |
| 04/15/11 | 03/31/11 | 3 | 2011 | 8,150,983 | | 1,583,485 | | | | 62,221 | | | | 1,645,706 | 20.19027921% | |
| 01/14/11 | 12/31/10 | 2 | 2011 | 8,138,483 | | 1,642,638 | | | | 45,193 | | | | 1,687,830 | 20.73888329% | |
| 10/15/10 | 09/30/10 | 1 | 2011 | 6,903,145 | 1,418,170 | | | | 46,688 | | | | | 1,464,858 | 21.22015964% | |
| 09/15/10 | 06/30/10 | Lapse | 2010 | 1,733,763 | 365,688 | | | | 25,103 | | | | | 390,791 | 22.54005081% | |
| | | | | 58,237,857 | | | | | | | | | | **12,281,299** | **21.08817107%** | *Pre-HZA Implementation* |

For analysis purposes, the average quarterly costs in pool P300 prior to the HZA Implementation used only QE 12/31/10-QE 03/31/12 above to eliminate the possible disparate impact of the 06/30/10 Lpase Period being included without the regular QE 06/30/10 being included

DHS
345537

| Run Date | Q/E | From P300 TO: | | From P339 TO: | | From P360 TO: | | From P361 TO: | | From P362 TO: | | From P363 TO: | | From P364 TO: | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 05/06/13 | 03/31/13 | D153 | 1,591,991.10 | | | D153 | 5,025.11 | D153 | 288,687.64 | | | | | D153 | 3,720.13 |
| | | E133 | 635,537.89 | | | | | E133 | 139,596.76 | | | | | E133 | 2,572.30 |
| | | E133 | 1,956,953.47 | | | | | E133 | 139,596.76 | | | | | | |
| | | E133 | 31,462.23 | | | | | | | | | | | | |
| | | E323 | 6,292.43 | | | E323 | 7,559.85 | E323 | 130,581.27 | | | | | | |
| | | P360 | 12,584.96 | | | | | | | | | | | | |
| | | P361 | 698,462.43 | | | | | | | | | | | | |
| | | P364 | 6,292.43 | | | | | | | | | | | | |
| | | P366 | 729,924.76 | | | | | | | | | | | | |
| | | V513 | 792,849.32 | | | | | | | | | | | | |
| | | W123 | 2,334,500.72 | | | | | | | | | | | | |
| | | W613 | 1,667,500.47 | | | | | | | | | | | | |
| | | | 10,464,352.21 | | | | **12,584.96** | | **698,462.43** | | | | | | **6,292.43** |
| 01/21/13 | 12/31/12 | D153 | 2,805,678.42 | | | **D153** | 7,064.95 | **D153** | 340,448.52 | | | | | **D153** | 10,590.95 |
| | | E133 | 2,322,347.26 | | | | | **E133** | 158,989.00 | | | | | **E133** | 7,091.89 |
| | | E133 | 41,260.02 | | | | | | | | | | | | |
| | | E323 | 11,788.53 | | | **E323** | 10,617.89 | **E323** | 154,827.87 | | | | | | |
| | | P360 | 17,682.84 | | | | | | | | | | | | |
| | | P361 | 654,265.39 | | | | | | | | | | | | |
| | | P364 | 17,682.84 | | | | | | | | | | | | |
| | | P366 | 736,785.30 | | | | | | | | | | | | |
| | | V513 | 789,833.83 | | | | | | | | | | | | |
| | | W123 | 2,104,258.85 | | | | | | | | | | | | |
| | | W613 | 341,868.36 | | | | | | | | | | | | |
| | | | 9,843,451.64 | | | | **17,682.84** | | **654,265.39** | | | | | | 17,682.84 |
| 10/26/12 | 09/30/12 | D112 | 4,507,067.54 | | | D112 | 5,247.28 | D112 | 124,830.12 | | | D112 | 49,454.87 | D112 | 13,366.81 |
| | | E132 | 1,722,248.77 | | | | | | | | | | | E132 | 8,770.02 |
| | | E132 | 44,273.74 | | | | | | | | | | | | |
| | | E162 | | | | | | | | | | E162 | 32,448.13 | | |
| | | E322 | 26,564.21 | | | E322 | 8,034.86 | | | | | | | | |
| | | P360 | 13,282.14 | | | | | | | | | | | | |
| | | P361 | 336,480.50 | | | | | | | | | | | | |
| | | P362 | | | | | | | | | | | | | |
| | | P363 | | | | | | P363 | 81,902.99 | | | | | | |

DHS
345538

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | P364 | 22,136.83 | | | | | | | | | | |
| | | P365 | | | | | | | | | | | |
| | | P366 | 531,284.93 | | | | | | | | | | |
| | | P367 | | | | | P367 | 129,747.39 | | | | | |
| | | P394 | | | | | | | | | | | |
| | | P395 | | | | | | | | | | | |
| | | P396 | | | | | | | | | | | |
| | | V512 | 774,790.67 | | | | | | | | | | |
| | | | 7,978,129.33 | | | 13,282.14 | | 336,480.50 | | | 81,902.99 | | 22,136.83 |
| | | | | | | | | | | | | | |
| 09/18/12 | 06/30/12 | D311 | 8,595.49 | D311 | 614.57 | | | | | | | | |
| | | D112 | | | | | | | D112 | 906,055.74 | | D112 | 10,364.81 |
| | | E132 | | | | | | | E132 | 596,724.25 | | E132 | 6,826.20 |
| | | E322 | 7,162.91 | E322 | 512.18 | | | | | | | | |
| | | P339 | 183,370.66 | P392 | 107,461.48 | | | | | | | | |
| | | P362 | 1,502,779.99 | P394 | 1,229.23 | | | | | | | | |
| | | P364 | 17,191.01 | P395 | 2,151.18 | | | | | | | | |
| | | P365 | 30,084.28 | P396 | 4,302.42 | | | | | | | | |
| | | P366 | 60,168.47 | V512 | 3,073.15 | | | | | | | | |
| | | V512 | 42,977.47 | W122 | 41,693.72 | | | | | | | | |
| | | W122 | 583,061.44 | W612 | 22,332.73 | | | | | | | | |
| | | W612 | 312,303.25 | | | | | | | | | | |
| | | | 2,747,694.97 | | 183,370.66 | | | | | 1,502,779.99 | | | 17,191.01 |
| | | | | | | | | | | | | | |
| 07/18/12 | 06/30/12 | D311 | 27,756.87 | D311 | 1,984.73 | | | | | | | | |
| | | D112 | | | | | | | D112 | 2,925,863.23 | | D112 | 33,470.37 |
| | | E132 | | | | | | | E132 | 1,926,960.70 | | E132 | 22,043.37 |
| | | E322 | 23,130.67 | E322 | 1,653.92 | | | | | | | | |
| | | P339 | 592,146.24 | P392 | 347,017.75 | | | | | | | | |
| | | P362 | 4,852,823.93 | P394 | 3,969.60 | | | | | | | | |
| | | P364 | 55,513.74 | P395 | 6,946.83 | | | | | | | | |
| | | P365 | 97,149.04 | P396 | 13,893.78 | | | | | | | | |
| | | P366 | 194,297.99 | V512 | 9,924.09 | | | | | | | | |
| | | V512 | 138,784.23 | W122 | 134,638.69 | | | | | | | | |
| | | W122 | 1,882,840.17 | W612 | 72,116.85 | | | | | | | | |
| | | W612 | 1,008,499.23 | | | | | | | | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | 8,872,942.11 | 592,146.24 | | 4,852,823.93 | | 55,513.74 |
| 04/13/12 | 03/31/12 | D311 | 94,615.98 | | | | | |
| | | D311 | 49,797.90 | | | | | |
| | | D112 | | | D112 | 1,657,370.02 | D112 | 174,460.31 |
| | | E132 | | | E132 | 1,086,493.69 | E132 | 114,367.43 |
| | | E322 | 94,615.98 | | | | | |
| | | P362 | 2,743,863.71 | | | | | |
| | | P364 | 288,827.74 | | | | | |
| | | P365 | 373,484.17 | | | | | |
| | | P366 | 717,089.59 | | | | | |
| | | V512 | 602,554.43 | | | | | |
| | | W122 | 1,792,724.07 | | | | | |
| | | W612 | 1,827,582.55 | | | | | |
| | | | 8,585,156.12 | | | 2,743,863.71 | | 288,827.74 |
| 01/13/12 | 12/31/11 | D311 | 83,449.27 | | | | | |
| | | D311 | 32,452.35 | | | | | |
| | | D112 | | | D112 | 1,641,127.75 | D112 | 154,980.39 |
| | | E132 | | | E132 | 1,108,062.23 | E132 | 104,639.57 |
| | | E322 | 46,360.75 | | | | | |
| | | P362 | 2,749,189.98 | | | | | |
| | | P364 | 259,619.96 | | | | | |
| | | P365 | 208,623.19 | | | | | |
| | | P366 | 593,417.05 | | | | | |
| | | V512 | 607,325.29 | | | | | |
| | | W122 | 1,877,608.71 | | | | | |
| | | W612 | 1,701,438.00 | | | | | |
| | | | 8,159,484.55 | | | 2,749,189.98 | | 259,619.96 |
| 10/14/11 | 09/30/11 | D310 | 58,685.94 | | | | | |
| | | D310 | 31,069.11 | | | | | |
| | | D111 | | | D111 | 1,289,423.07 | D111 | 74,629.25 |
| | | E131 | | | E131 | 857,791.58 | E131 | 49,646.83 |
| | | E321 | 48,329.55 | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | P362 | 2,147,214.65 | | | | |
| | | P364 | 124,276.08 | | | | |
| | | P365 | 189,866.21 | | | | |
| | | P366 | 545,433.98 | | | | |
| | | V511 | 573,050.86 | | | | |
| | | W121 | 1,432,627.12 | | | | |
| | | W611 | 1,619,041.25 | | | | |
| | | | 6,769,594.75 | | 2,147,214.65 | | 124,276.08 |
| 09/08/11 | 06/30/11 | D310 | 22,055.66 | | | | |
| | | D310 | 6,432.92 | | | | |
| | | D111 | | D111 | 330,732.00 | D111 | 27,009.99 |
| | | E131 | | E131 | 220,659.16 | E131 | 18,020.30 |
| | | E321 | 11,027.81 | | | | |
| | | P362 | 551,391.16 | | | | |
| | | P364 | 45,030.29 | | | | |
| | | P365 | 55,139.13 | | | | |
| | | P366 | 157,146.49 | | | | |
| | | V511 | 135,090.82 | | | | |
| | | W121 | 349,214.38 | | | | |
| | | W611 | 408,948.47 | | | | |
| | | | 1,741,477.13 | | 551,391.16 | | 45,030.29 |
| 07/15/11 | 06/30/11 | D310 | 102,025.59 | | | | |
| | | D310 | 29,757.40 | | | | |
| | | D111 | | D111 | 1,529,906.90 | D111 | 124,942.59 |
| | | E131 | | E131 | 1,020,732.59 | E131 | 83,359.65 |
| | | E321 | 51,012.77 | | | | |
| | | P362 | 2,550,639.49 | | | | |
| | | P364 | 208,302.24 | | | | |
| | | P365 | 255,063.94 | | | | |
| | | P366 | 726,932.28 | | | | |
| | | V511 | 624,906.66 | | | | |
| | | W121 | 1,615,404.97 | | | | |
| | | W611 | 1,891,724.30 | | | | |
| | | | 8,055,769.64 | | 2,550,639.49 | | 208,302.24 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 04/15/11 | 03/31/11 | D310 | 93,331.85 | | | | |
| | | D310 | 17,777.42 | | | | |
| | | D111 | | D111 | 1,509,833.36 | D111 | 116,142.12 |
| | | E131 | | E131 | 974,572.11 | E131 | 74,966.01 |
| | | E321 | 62,221.25 | | | | |
| | | P362 | 2,484,405.47 | | | | |
| | | P364 | 191,108.13 | | | | |
| | | P365 | 204,441.24 | | | | |
| | | P366 | 839,986.83 | | | | |
| | | V511 | 493,325.62 | | | | |
| | | W121 | 2,035,523.59 | | | | |
| | | W611 | 1,728,861.74 | | | | |
| | | | 8,150,983.14 | | 2,484,405.47 | | 191,108.13 |
| 01/14/11 | 12/31/10 | D310 | 112,982.17 | | | | |
| | | D310 | 26,362.52 | | | | |
| | | D111 | | D111 | 1,686,684.10 | D111 | 139,396.29 |
| | | E131 | | E131 | 1,047,484.55 | E131 | 86,568.04 |
| | | E321 | 45,192.84 | | | | |
| | | P362 | 2,734,168.65 | | | | |
| | | P364 | 225,964.33 | | | | |
| | | P365 | 256,092.92 | | | | |
| | | P366 | 659,062.70 | | | | |
| | | V511 | 455,694.79 | | | | |
| | | W121 | 1,913,164.77 | | | | |
| | | W611 | 1,709,796.88 | | | | |
| | | | 8,138,482.57 | | 2,734,168.65 | | 225,964.33 |
| 10/15/10 | 09/30/10 | D310 | 90,041.02 | | | | |
| | | D310 | 20,009.15 | | | | |
| | | D110 | | D110 | 1,360,461.46 | D110 | 140,883.89 |
| | | E130 | | E130 | 797,188.33 | E130 | 82,551.23 |
| | | E320 | 46,687.98 | | | | |
| | | P362 | 2,157,649.79 | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | P364 | 223,435.12 | | | | |
| | | P365 | 250,113.93 | | | | |
| | | P366 | 780,355.57 | | | | |
| | | V510 | 353,494.40 | | | | |
| | | W120 | 1,594,059.62 | | | | |
| | | W610 | 1,387,298.77 | | | | |
| | | | 6,903,145.35 | | 2,157,649.79 | | 223,435.12 |
| 09/15/10 | 06/30/10 | D310 | 28,449.78 | | | | |
| | | D310 | 14,224.95 | | | | |
| | | D110 | | D110 | 353,796.63 | D110 | 29,000.98 |
| | | E130 | | E130 | 207,668.26 | E130 | 17,020.75 |
| | | E320 | 25,102.74 | | | | |
| | | P362 | 561,464.89 | | | | |
| | | P364 | 46,021.73 | | | | |
| | | P365 | 88,696.39 | | | | |
| | | P366 | 141,412.16 | | | | |
| | | V510 | 131,371.05 | | | | |
| | | W120 | 399,133.77 | | | | |
| | | W610 | 297,885.97 | | | | |
| | | | 1,733,763.43 | | 561,464.89 | | 46,021.73 |

| From P365 TO: | From P366 TO: | | From P367 TO: | | From P392 TO: | From P394 TO: | From P395 TO: | From P396 TO: | TOTAL IV-E | |
|---|---|---|---|---|---|---|---|---|---|---|
| | D153 | 431,535.53 | | | | | | | | |
| | E133 | 298,389.23 | | | | | | | E133 | 1,076,096.18 |
| | | | | | | | | | E133 | 2,096,550.23 |
| | | | | | | | | | E133 | 31,462.23 |
| | | | | | | | | | E323 | 144,433.55 |
| | | **729,924.76** | | | | | | | | **3,348,542.18** |
| | **D153** | 441,285.09 | | | | | | | | |
| | **E133** | 295,500.21 | | | | | | | E133 | 2,783,928.36 |
| | | | | | | | | | E133 | 41,260.02 |
| | | | | | | | | | E323 | 177,234.29 |
| | | 736,785.30 | | | | | | | | 3,002,422.67 |
| | D112 | 320,801.91 | D112 | 51,258.71 | | | | | | |
| | E132 | 210,483.02 | | | | | | | E132 | 1,941,501.81 |
| | | | | | | | | | E132 | 44,273.74 |
| | | | | | | | | | E162 | 32,448.13 |
| | | | E322 | 78,488.67 | | | | | E322 | 113,087.74 |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 531,284.93 | 129,747.39 | | | | | | | | | | 2,131,311.41 |
| D112 | | D112 | 36,276.78 | | D112 | 64,792.59 | D112 | 741.53 | D112 | 1,297.51 | D112 | 2,594.55 | | |
| E132 | 30,084.28 | E132 | 23,891.69 | | E132 | 42,668.89 | E132 | 487.70 | E132 | 853.67 | E132 | 1,707.87 | E132 | 703,244.57 |
| | | | | | | | | | | | | | E322 | 7,675.09 |
| | | | | | | 107,461.48 | | 1,229.23 | | 2,151.18 | | 4,302.42 | | 710,919.65 |
| | 30,084.28 | | 60,168.47 | | | | | | | | | | | |
| D112 | | D112 | 117,146.13 | | D112 | 209,226.05 | D112 | 2,394.10 | D112 | 4,189.29 | D112 | 8,377.65 | | |
| E132 | 97,149.04 | E132 | 77,151.86 | | E132 | 137,791.70 | E132 | 1,575.50 | E132 | 2,757.55 | E132 | 5,516.13 | E132 | 2,270,945.84 |
| | | | | | | | | | | | | | E322 | 24,784.59 |
| | | | | | | 347,017.75 | | 3,969.60 | | 6,946.83 | | 13,893.78 | | 2,295,730.43 |

DHS
345545

| | | | | | |
|---|---|---|---|---|---|
| | 97,149.04 | | 194,297.99 | | |
| | | D112 | 433,142.27 | | |
| E132 | 373,484.17 | E132 | 283,947.32 | E132 | 1,858,292.61 |
| | | | | E322 | 94,615.98 |
| | 373,484.17 | | 717,089.59 | | 1,952,908.59 |
| | | D112 | 354,240.32 | | |
| E132 | 208,623.19 | E132 | 239,176.73 | E132 | 1,660,501.72 |
| | | | | E322 | 46,360.75 |
| | 208,623.19 | | 593,417.05 | | 1,706,862.47 |
| D111 | | D111 | 327,538.46 | | |
| E131 | 189,866.21 | E131 | 217,895.52 | E131 | 1,315,200.15 |
| | | | | E321 | 48,329.55 |

DHS
345546

| | | | | | |
|---|---|---|---|---|---|
| | 189,866.21 | | 545,433.98 | | 1,363,529.70 |
| D111 | | D111 | 94,258.63 | | |
| E131 | 55,139.13 | E131 | 62,887.86 | E131 | 356,706.45 |
| | | | | E321 | 11,027.81 |
| | 55,139.13 | | 157,146.49 | | 367,734.26 |
| D111 | | D111 | 436,023.68 | | |
| E131 | 255,063.94 | E131 | 290,908.60 | E131 | 1,650,064.78 |
| | | | | E321 | 51,012.77 |
| | 255,063.94 | | 726,932.28 | | 1,701,077.55 |

| | | | | | |
|---|---|---|---|---|---|
| | | D111 | 510,481.18 | | |
| E131 | 204,441.24 | E131 | 329,505.65 | E131 | 1,583,485.00 |
| | | | | E321 | 62,221.25 |
| | 204,441.24 | | 839,986.83 | | 1,645,706.25 |
| | | D111 | 406,570.64 | | |
| E131 | 256,092.92 | E131 | 252,492.06 | E131 | 1,642,637.56 |
| | | | | E321 | 45,192.84 |
| | 256,092.92 | | 659,062.70 | | 1,687,830.40 |
| | | D110 | 492,038.57 | | |
| E130 | 250,113.93 | E130 | 288,317.00 | E130 | 1,418,170.48 |
| | | | | E320 | 46,687.98 |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | 1,464,858.46 |
| | 250,113.93 | | 780,355.57 | | |
| | | D110 | 89,109.14 | | |
| E130 | 88,696.39 | E130 | 52,303.02 | E130 | 365,688.42 |
| | | | | E320 | 25,102.74 |
| | 88,696.39 | | 141,412.16 | | 390,791.16 |

DHS
345549

| | | From P300 | | From P339 | From P360 | | From P361 | | From P362 | From P363 | | From P364 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Run Date** | **Q/E** | TO: | | TO: | TO: | | TO: | | TO: | TO: | | TO: | |
| **05/06/13** | **03/31/13** | D153 | 1,591,991.10 | | **D153** | **5,025.11** | **D153** | **288,687.64** | | | | **D153** | **3,720.13** |
| | | E133 | 635,537.89 | | **E323** | **7,559.85** | **E133** | **139,596.76** | | | | **E133** | **2,572.30** |
| | | E133 | 1,956,953.47 | | | | **E133** | **139,596.76** | | | | | |
| | | E133 | 31,462.23 | | | | **E323** | **130,581.27** | | | | | |
| | | E323 | 6,292.43 | | | | | | | | | | |
| | | P360 | 12,584.96 | | | | | | | | | | |
| | | P361 | 698,462.43 | | | | | | | | | | |
| | | P364 | 6,292.43 | | | | | | | | | | |
| | | P366 | 729,924.76 | | | | | | | | | | |
| | | V513 | 792,849.32 | | | | | | | | | | |
| | | W123 | 2,334,500.72 | | | | | | | | | | |
| | | W613 | 1,667,500.47 | | | | | | | | | | |
| | | | 10,464,352.21 | | | **12,584.96** | | **698,462.43** | | | | | **6,292.43** |
| 01/21/13 | 12/31/12 | D153 | 2,805,678.42 | | **D153** | 7,064.95 | **D153** | 340,448.52 | | | | **D153** | 10,590.95 |
| | | E133 | 2,322,347.26 | | **E323** | 10,617.89 | **E133** | 158,989.00 | | | | **E133** | 7,091.89 |
| | | E133 | 41,260.02 | | | | **E323** | 154,827.87 | | | | | |
| | | E323 | 11,788.53 | | | | | | | | | | |
| | | P360 | 17,682.84 | | | | | | | | | | |
| | | P361 | 654,265.39 | | | | | | | | | | |
| | | P364 | 17,682.84 | | | | | | | | | | |
| | | P366 | 736,785.30 | | | | | | | | | | |
| | | V513 | 789,833.83 | | | | | | | | | | |
| | | W123 | 2,104,258.85 | | | | | | | | | | |
| | | W613 | 341,868.36 | | | | | | | | | | |
| | | | 9,843,451.64 | | | **17,682.84** | | **654,265.39** | | | | | 17,682.84 |
| 10/26/12 | 09/30/12 | D112 | 4,507,067.54 | | D112 | 5,247.28 | D112 | 124,830.12 | | D112 | 49,454.87 | D112 | 13,366.81 |
| | | E132 | 1,722,248.77 | | E322 | 8,034.86 | P363 | 81,902.99 | | E162 | 32,448.13 | E132 | 8,770.02 |
| | | E132 | 44,273.74 | | | | P367 | 129,747.39 | | | | | |
| | | E322 | 26,564.21 | | | | | | | | | | |
| | | P360 | 13,282.14 | | | | | | | | | | |
| | | P361 | 336,480.50 | | | | | | | | | | |
| | | P364 | 22,136.83 | | | | | | | | | | |
| | | P366 | 531,284.93 | | | | | | | | | | |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | V512 | 774,790.67 | | | | | | | | | |
| | | | 7,978,129.33 | | | 13,282.14 | 336,480.50 | | | 81,902.99 | | 22,136.83 |
| 09/18/12 | 06/30/12 | D311 | 8,595.49 | D311 | 614.57 | | | D112 | 906,055.74 | | D112 | 10,364.81 |
| | | E322 | 7,162.91 | E322 | 512.18 | | | E132 | 596,724.25 | | E132 | 6,826.20 |
| | | P339 | 183,370.66 | P392 | 107,461.48 | | | | | | | |
| | | P362 | 1,502,779.99 | P394 | 1,229.23 | | | | | | | |
| | | P364 | 17,191.01 | P395 | 2,151.18 | | | | | | | |
| | | P365 | 30,084.28 | P396 | 4,302.42 | | | | | | | |
| | | P366 | 60,168.47 | V512 | 3,073.15 | | | | | | | |
| | | V512 | 42,977.47 | W122 | 41,693.72 | | | | | | | |
| | | W122 | 583,061.44 | W612 | 22,332.73 | | | | | | | |
| | | W612 | 312,303.25 | | | | | | | | | |
| | | | 2,747,694.97 | | 183,370.66 | | | | 1,502,779.99 | | | 17,191.01 |
| 07/18/12 | 06/30/12 | D311 | 27,756.87 | D311 | 1,984.73 | | | D112 | 2,925,863.23 | | D112 | 33,470.37 |
| | | E322 | 23,130.67 | E322 | 1,653.92 | | | E132 | 1,926,960.70 | | E132 | 22,043.37 |
| | | P339 | 592,146.24 | P392 | 347,017.75 | | | | | | | |
| | | P362 | 4,852,823.93 | P394 | 3,969.60 | | | | | | | |
| | | P364 | 55,513.74 | P395 | 6,946.83 | | | | | | | |
| | | P365 | 97,149.04 | P396 | 13,893.78 | | | | | | | |
| | | P366 | 194,297.99 | V512 | 9,924.09 | | | | | | | |
| | | V512 | 138,784.23 | W122 | 134,638.69 | | | | | | | |
| | | W122 | 1,882,840.17 | W612 | 72,116.85 | | | | | | | |
| | | W612 | 1,008,499.23 | | | | | | | | | |
| | | | 8,872,942.11 | | 592,146.24 | | | | 4,852,823.93 | | | 55,513.74 |
| 10/14/11 | 09/30/11 | D310 | 58,685.94 | | | | | D111 | 1,289,423.07 | | D111 | 74,629.25 |
| | | D310 | 31,069.11 | | | | | E131 | 857,791.58 | | E131 | 49,646.83 |
| | | E321 | 48,329.55 | | | | | | | | | |
| | | P362 | 2,147,214.65 | | | | | | | | | |
| | | P364 | 124,276.08 | | | | | | | | | |
| | | P365 | 189,866.21 | | | | | | | | | |
| | | P366 | 545,433.98 | | | | | | | | | |
| | | V511 | 573,050.86 | | | | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | W121 | 1,432,627.12 | | | | |
| | | W611 | 1,619,041.25 | | | | |
| | | | 6,769,594.75 | | 2,147,214.65 | | 124,276.08 |
| 09/08/11 | 06/30/11 | D310 | 22,055.66 | D111 | 330,732.00 | D111 | 27,009.99 |
| | | D310 | 6,432.92 | E131 | 220,659.16 | E131 | 18,020.30 |
| | | E321 | 11,027.81 | | | | |
| | | P362 | 551,391.16 | | | | |
| | | P364 | 45,030.29 | | | | |
| | | P365 | 55,139.13 | | | | |
| | | P366 | 157,146.49 | | | | |
| | | V511 | 135,090.82 | | | | |
| | | W121 | 349,214.38 | | | | |
| | | W611 | 408,948.47 | | | | |
| | | | 1,741,477.13 | | 551,391.16 | | 45,030.29 |
| 07/15/11 | 06/30/11 | D310 | 102,025.59 | D111 | 1,529,906.90 | D111 | 124,942.59 |
| | | D310 | 29,757.40 | E131 | 1,020,732.59 | E131 | 83,359.65 |
| | | E321 | 51,012.77 | | | | |
| | | P362 | 2,550,639.49 | | | | |
| | | P364 | 208,302.24 | | | | |
| | | P365 | 255,063.94 | | | | |
| | | P366 | 726,932.28 | | | | |
| | | V511 | 624,906.66 | | | | |
| | | W121 | 1,615,404.97 | | | | |
| | | W611 | 1,891,724.30 | | | | |
| | | | 8,055,769.64 | | 2,550,639.49 | | 208,302.24 |
| 01/13/12 | 12/31/11 | D311 | 83,449.27 | D112 | 1,641,127.75 | D112 | 154,980.39 |
| | | D311 | 32,452.35 | E132 | 1,108,062.23 | E132 | 104,639.57 |
| | | E322 | 46,360.75 | | | | |
| | | P362 | 2,749,189.98 | | | | |
| | | P364 | 259,619.96 | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | P365 | 208,623.19 | | | | |
| | | P366 | 593,417.05 | | | | |
| | | V512 | 607,325.29 | | | | |
| | | W122 | 1,877,608.71 | | | | |
| | | W612 | 1,701,438.00 | | | | |
| | | | 8,159,484.55 | | 2,749,189.98 | | 259,619.96 |
| 04/15/11 | 03/31/11 | D310 | 93,331.85 | D111 | 1,509,833.36 | D111 | 116,142.12 |
| | | D310 | 17,777.42 | E131 | 974,572.11 | E131 | 74,966.01 |
| | | E321 | 62,221.25 | | | | |
| | | P362 | 2,484,405.47 | | | | |
| | | P364 | 191,108.13 | | | | |
| | | P365 | 204,441.24 | | | | |
| | | P366 | 839,986.83 | | | | |
| | | V511 | 493,325.62 | | | | |
| | | W121 | 2,035,523.59 | | | | |
| | | W611 | 1,728,861.74 | | | | |
| | | | 8,150,983.14 | | 2,484,405.47 | | 191,108.13 |
| 04/13/12 | 03/31/12 | D311 | 94,615.98 | D112 | 1,657,370.02 | D112 | 174,460.31 |
| | | D311 | 49,797.90 | E132 | 1,086,493.69 | E132 | 114,367.43 |
| | | E322 | 94,615.98 | | | | |
| | | P362 | 2,743,863.71 | | | | |
| | | P364 | 288,827.74 | | | | |
| | | P365 | 373,484.17 | | | | |
| | | P366 | 717,089.59 | | | | |
| | | V512 | 602,554.43 | | | | |
| | | W122 | 1,792,724.07 | | | | |
| | | W612 | 1,827,582.55 | | | | |
| | | | 8,585,156.12 | | 2,743,863.71 | | 288,827.74 |
| 01/14/11 | 12/31/10 | D310 | 112,982.17 | D111 | 1,686,684.10 | D111 | 139,396.29 |
| | | D310 | 26,362.52 | E131 | 1,047,484.55 | E131 | 86,568.04 |
| | | E321 | 45,192.84 | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | P362 | 2,734,168.65 | | | | |
| | | P364 | 225,964.33 | | | | |
| | | P365 | 256,092.92 | | | | |
| | | P366 | 659,062.70 | | | | |
| | | V511 | 455,694.79 | | | | |
| | | W121 | 1,913,164.77 | | | | |
| | | W611 | 1,709,796.88 | | | | |
| | | | 8,138,482.57 | | 2,734,168.65 | | 225,964.33 |
| 10/15/10 | 09/30/10 | D310 | 90,041.02 | D110 | 1,360,461.46 | D110 | 140,883.89 |
| | | D310 | 20,009.15 | E130 | 797,188.33 | E130 | 82,551.23 |
| | | E320 | 46,687.98 | | | | |
| | | P362 | 2,157,649.79 | | | | |
| | | P364 | 223,435.12 | | | | |
| | | P365 | 250,113.93 | | | | |
| | | P366 | 780,355.57 | | | | |
| | | V510 | 353,494.40 | | | | |
| | | W120 | 1,594,059.62 | | | | |
| | | W610 | 1,387,298.77 | | | | |
| | | | 6,903,145.35 | | 2,157,649.79 | | 223,435.12 |
| 09/15/10 | 06/30/10 | D310 | 28,449.78 | D110 | 353,796.63 | D110 | 29,000.98 |
| | | D310 | 14,224.95 | E130 | 207,668.26 | E130 | 17,020.75 |
| | | E320 | 25,102.74 | | | | |
| | | P362 | 561,464.89 | | | | |
| | | P364 | 46,021.73 | | | | |
| | | P365 | 88,696.39 | | | | |
| | | P366 | 141,412.16 | | | | |
| | | V510 | 131,371.05 | | | | |
| | | W120 | 399,133.77 | | | | |
| | | W610 | 297,885.97 | | | | |
| | | | 1,733,763.43 | | 561,464.89 | | 46,021.73 |

| From P365 TO: | From P366 TO: | | From P367 TO: | | From P392 TO: | From P394 TO: | From P395 TO: | From P396 TO: |
|---|---|---|---|---|---|---|---|---|
| | **D153** | **431,535.53** | | | | | | |
| | **E133** | **298,389.23** | | | | | | |
| | | **729,924.76** | | | | | | |
| | **D153** | 441,285.09 | | | | | | |
| | **E133** | 295,500.21 | | | | | | |
| | | 736,785.30 | | | | | | |
| | D112 | 320,801.91 | D112 | 51,258.71 | | | | |
| | E132 | 210,483.02 | E322 | 78,488.67 | | | | |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 531,284.93 | 129,747.39 | | | | | | | | | |
| D112 | | D112 | 36,276.78 | | D112 | 64,792.59 | D112 | 741.53 | D112 | 1,297.51 | D112 | 2,594.55 |
| E132 | 30,084.28 | E132 | 23,891.69 | | E132 | 42,668.89 | E132 | 487.70 | E132 | 853.67 | E132 | 1,707.87 |
| | | | | | | 107,461.48 | | 1,229.23 | | 2,151.18 | | 4,302.42 |
| | 30,084.28 | | 60,168.47 | | | | | | | | | |
| D112 | | D112 | 117,146.13 | | D112 | 209,226.05 | D112 | 2,394.10 | D112 | 4,189.29 | D112 | 8,377.65 |
| E132 | 97,149.04 | E132 | 77,151.86 | | E132 | 137,791.70 | E132 | 1,575.50 | E132 | 2,757.55 | E132 | 5,516.13 |
| | | | | | | 347,017.75 | | 3,969.60 | | 6,946.83 | | 13,893.78 |
| | 97,149.04 | | 194,297.99 | | | | | | | | | |
| D111 | | D111 | 327,538.46 | | | | | | | | | |
| E131 | 189,866.21 | E131 | 217,895.52 | | | | | | | | | |

| | | | |
|---|---|---|---|
| | 189,866.21 | | 545,433.98 |
| D111 | | D111 | 94,258.63 |
| E131 | 55,139.13 | E131 | 62,887.86 |
| | 55,139.13 | | 157,146.49 |
| D111 | | D111 | 436,023.68 |
| E131 | 255,063.94 | E131 | 290,908.60 |
| | 255,063.94 | | 726,932.28 |
| | | D112 | 354,240.32 |
| E132 | 208,623.19 | E132 | 239,176.73 |

| | | | |
|---|---|---|---|
| | 208,623.19 | | 593,417.05 |
| | | D111 | 510,481.18 |
| E131 | 204,441.24 | E131 | 329,505.65 |
| | 204,441.24 | | 839,986.83 |
| | | D112 | 433,142.27 |
| E132 | 373,484.17 | E132 | 283,947.32 |
| | 373,484.17 | | 717,089.59 |
| | | D111 | 406,570.64 |
| E131 | 256,092.92 | E131 | 252,492.06 |

| | | | |
|---|---|---|---|
| | 256,092.92 | | 659,062.70 |
| | | D110 | 492,038.57 |
| E130 | 250,113.93 | E130 | 288,317.00 |
| | 250,113.93 | | 780,355.57 |
| | | D110 | 89,109.14 |
| E130 | 88,696.39 | E130 | 52,303.02 |
| | 88,696.39 | | 141,412.16 |

# Ex. 31B

**Title IV-E Revenue By Year Revenue Received Regardless of Whether Retroactive Payment**

| | 2009 | 2010 | 2011 | 2012 | 2013 to date |
|---|---|---|---|---|---|
| **Career preparation and development training program** | $ 16,568.00 | $ 125,319.00 | $ 45,102.00 | $ 31,667.00 | $ 10,581.92 |
| | | | $ 17,362.00 | | $ 300.08 |
| **TOTAL:** | | | **$ 62,464.00** | | **$ 10,882.00** |
| **University Contract/Subgrant Expenses for Pre-service training for new caseworkers and supervisors** | | | $ - | $ 52,880.78 | $ 55,907.00 |
| **Pre-service training for new caseworker/supervisor salaries & travel expenses, and expenses incurred by the in-house Professional Development Unit** | | | $ 59,368.00 | $ 608,696.22 | $ 694,279.00 |
| **TOTAL:** | | | **$ 59,368.00** | **$ 661,577.00** | **$ 750,186.00** |
| **Administrative technical assistance contracts (Supervisory learning labs have been discontinued)** | | | | | $ 13,714.24 |
| **Supportive services** | $ 508,633.00 | $ 466,663.00 | $ 453,743.00 | $ 270,189.00 | $ 158,616.00 |

HZA Retro MSW Cohort Claim filed during Calendar Year 2011 (CY2009 $16,568.00 + CY2010 $125,319.00 + CY2011 $45,102.00 = $186,989.00)
DHS Retro MSW Cohort Claim filed during Calendar Year 2013 (CY2011 $17,362.00 + CY2012 $31,667.00 + CY2013 $10,581.92 = $59,610.92)
DHS Retro Tuition Reimbursement Claim filed during Calendar Year 2013 (CY2013 $300.08)

DHS Retro University Pre-Service Claims filed during Calendar Year 2013 (CY2011 $0 + CY2012 $52,880.78 + CY2013 $55,907 = $108,787.78)
DHS Current Training Claims allocated to P151 (CY2011 $59,368.00 + CY2012 $608,696.22 + CY2013 $694,279.00 = $1,362,343.22)

DHS Current Administrative Contracts (COA Coordinator/MACWIS Workload) Claims allocated to P170 during Calendar Year 2013 (CY2013 $13,714.24)

HZA Retro Support Services Claim filed during Calendar Year 2011 (CY2009 $508,633.00 + CY2010 $466,663.00 = $975,296)
DHS Retro Support Services Claims filed during Calendar Year 2012 (CY2011 $453,743 + CY2012 $270,189.00 + CY2013 $158,616.00 = $882,548.00)

**Ex. 32**

**STATE OF MISSISSIPPI**
**Department of Human Services**
**Division of Family and Children's Services**

**Mississippi FY 2012**
**FFY October 1, 2011 to September 30, 2012**
**Annual Progress and Services Report**
**Submitted June 26, 2013**
**http://www.mdhs.state.ms.us/links.html**

**CFSP/APSR Coordinator**



## V. PROGRAM SUPPORT

### A. Professional Development and Training Unit

The mission of the Professional Development Unit is to provide quality training to enhance the knowledge, skills and abilities of DFCS personnel and to prepare them to assume their responsibilities.

#### Child and Family Services Plan Update

This section updates the DFCS CFSP 2010-2014 with plans to promote professional education and development through the expansion of MSW program by working with universities throughout Mississippi. It then describes efforts to enhance the training of new caseworkers and supervisors and to grow its in-house training capacity.

#### Professional Education and Development

MSW Program for Currently Employed Staff

DFCS has awarded contracts to Jackson State University, University of Mississippi and University of Southern Mississippi to provide necessary coursework for caseworkers and supervisors currently employed with DFCS to earn their Master's in Social Work (MSW). University partners support the mission and values of DFCS as reflected in the Child Welfare Practice Model that is being implemented throughout various regions of the State. Each university has assembled cohorts for DFCS employees and classes are scheduled in conjunction with their work hours to include the agency's compressed work schedule. The MSW cohorts have been designed and implemented specifically for the non-traditional, child welfare employed MSW students.

Students are required to complete 60 hours of coursework to earn their degree. Students, including some who are not in the cohort, who achieve a grade point average of "B" or higher generally receive reimbursement for their tuition, fees and books. Students will complete their field placements within DFCS and will commit to serving at the agency for up to three years after graduation. Those students who fail to complete up to three years with the agency after graduation may be required to repay reimbursements by the agency for tuition, fees and books.

#### Expansion and Enhancement of Staff Training

Pre-service Training for New Caseworkers

DFCS has partnered with the University of Mississippi to develop and deliver a pre-service training curriculum for new caseworkers. The 9 - week pre-service training includes the principles of the new Child Welfare Practice Model.

New caseworker training includes an on-the-job training component. Its modules cover topics consistent with the Title IVE program. The curriculum is not designed to distinguish between foster care and child welfare populations. Instead, as permitted by the Children's Bureau, it

recognizes that training needs to account for the "total child." This comprehensive approach allows the training program to cover the full range of activities, including those needed to meet Title IV-E maintenance and service requirements, without having to develop dual trainings – one for foster care and another for protection. The following offers a couple of examples taken from the Child Welfare Policy Manual, 8.1H.8, consistent with Mississippi's program:

- Social work practice, such as family centered practice and social work methods including interviewing and assessment.
- Cultural competency related to children and families.
- Child abuse and neglect issues, such as the impact of child abuse and neglect on a child.

New caseworkers will carry no caseload during non-classroom training. New caseworkers will receive rigorous feedback on the work experience component of the training; further, the staff will receive more intensive supervision during the on-the-job training period; and the trainees' performance will be closely monitored and assessed.

Technical Assistance and Support Services

DFCS contracts with various partners for technical assistance and research and evaluation to guide practice and policy. These efforts are designed to support the State's commitment to continuous quality improvement as well as improved safety, permanency and well-being outcomes for children and families served. Support is given in areas like the Child and Family Services Review, effective supervision and policy development.

Training for New Supervisors

DFCS has awarded a contract to the University of Mississippi to develop and deliver a training curriculum for new supervisors. The contract will provide training for new and seasoned supervisors throughout Mississippi. The university will be required to develop and deliver a curriculum for Supervisory Training; DFCS training coordinators will partner with university trainers on an ongoing basis to assure that the principles taught in the classroom are implemented in practice. A train-the-trainer curriculum will be used to help transfer knowledge and skills to DFCS staff.

Intensive Supervisory Training

DFCS is developing and implementing Intensive Supervisory Support activities that will build the capacity of county supervisors to manage the work, lead change efforts in their counties and help their staff to perform consistently at high levels of quality work with children and families. The supervisory training is focused on improving the quality or supervision with the goal of improving upon the quality of work done in the field. The supervisors will be presented with data regarding their counties that will speak to quality visits with children. Individual professional development plans will be developed with supervisors regarding underlying conditions, barriers, and needs that result in unsuccessful visits. Coaches will determine the skills that can be built by training and targeted specific coaching that will improve direct practice, including quality visits. Supervision is the link that needs to be enhanced that will lead to quality visits.

DFCS continues to explore initiatives that will capitalize on training and tools which strategically improve the quality and quantity of face-to-face visits with children and their families; as well as, focusing on the recruitment and retention of caseworkers.

**Professional Development Unit**

In-house Training Capacity

DFCS is enhancing its in-house Professional Development Unit used for staff training. This unit is being expanded to provide training coordinators to support the 13 regions within the Division for the development and delivery of training. Efforts will be made to ensure that training expenses, including personnel expenditures and other related costs, are charged to the appropriate funding streams.

Goals

- Enhance the quality of training provided to DFCS staff
  - Child Welfare Professional Development four week pre-service training sessions offered throughout the year in multiple regions;
  - Forty hour Pre-Service Training offered for newly hired/promoted front line supervisors;
  - On-going training sessions offered throughout the year for workers and supervisors; and
  - Child Welfare Professional Development pre-service training curriculum updated as new policy is issued.
- Expand Training Unit Staff to support regionally based training plan
  - Request PINs for 13 new Training Coordinators;
  - Request PINs for 13 Training Specialists;
  - Addition of computer programmer to develop eLearning curriculum;
  - Addition of MACWIS technician; and
  - Addition of Program Specialist for clerical/book keeping training.
- Continue training initiatives and collaborative efforts
  - Administrative Office of Courts;
  - Partner with Universities in coordinated activities for DFCS staff returning to school to pursue advanced social work degrees;
  - University of Mississippi Medical Center Children's Justice Center; and
  - Continued funding to encourage staff enrollment in the Tuition Assistance program.

Progress toward Meeting Goals

The agency entered a partnership with the University of Mississippi for the development and delivery of Pre-Service Training for frontline staff;

- 3 Child Welfare Professional Development training classes were delivered during the reporting period and 4 newly revised Pre-Service Trainings for frontline staff were

delivered during his year. A total of 60 workers completed CWPD before the revision and a total of 156 new hires completed the Pre-Service training. This gives a total number of 216 staff who have been through the 270 hour training;

- In conjunction with the partnership with the University of Mississippi there was also a Clinical Supervisory Training created which is a 40 hour training that is required for newly hired or promoted supervisory staff. This training was launched in February and 51 participants completed the training during the reporting period;
- 5 Two day clerical training sessions were held during the reporting period with 20 newly hired clerical staff completing the training as well as 29 supervisory and field staff
- Entered a contract with the University of Mississippi to develop and deliver the 270 hour Pre-Service training for front line staff and the 40 hour Clinical Supervisory Training for supervisory staff. This partnership began in October of 2011 and training began in February 2012.
- Workshops and Conferences:
    - Court Improvement Initiative
        - In October and November of 2010, training was delivered to direct service staff in each region on Advanced Professional Development of Court Proceedings, ICPC, IV-E eligibility and the new Uniform Youth Court Rules.
        - Beginning November 2012, training on Advanced Professional Development of Court Proceedings, ICPC, IV-E eligibility and the new Uniform Youth Court Rules is being offered quarterly for all new staff.
- More than 100 DFCS staff is enrolled in graduate level social work programs in 4 Universities across the state.
- Funds were again allocated by the state legislature to pay tuition for DFCS staff to pursue an advanced degree in social work in exchange for a work commitment after award of degree.
    - Tuition was reimbursed for 65 DFCS employees under the Professional Enhancement Scholarship Program.
    - This work force investment effort targets increased professional staff resources and encourages retention of experienced staff.
- 3 Learning Labs in each region for direct service supervisors and regional directors were delivered through a contract with the University of Southern Mississippi Social Work Training Academy

The request for expansion of Training Unit Staff was partially realized. 9 Training Coordinators are working across the state to help with on-the-job training and begin the development of on-going training for staff statewide. The Unit added a Bureau Director and a Division Director II.

A train-the- trainer was conducted with all of the training coordinators as well as a survey to determine training needs across the state. The agency trainers were paired together to research and develop training topics that will be delivered across the state. These trainings will be delivered in the upcoming year.

Casey Family Programs is working with the agency in implementing their program of Permanency Roundtables and will deliver Permanency Values Training and Permanency Skills Training to stakeholders and staff participating in the Permanency Roundtables. In addition to the formal training, staff of Casey Family Programs will be acting as coaches to DFCS staff in the actual Permanency Roundtable meetings.

In cooperation with the Mississippi Band of Choctaws Model Court, the Forrest County Model Court and the Court Improvement Project, the DFCS Court Improvement Workgroup developed and sponsored an Indian Child Welfare Act Conference for DFCS staff and court personnel. Assistance for the conference was provided by the National Resource Center on Legal and Judicial Issues, The National Resource Center for Tribes and The National Council for Juvenile and Family Court Judges.

Future Plans for Training Program
Advanced Professional Social Work Education for staff will continue to be encouraged through the agency's Professional Enhancement Scholarship Program and through the MSW cohort agreements with universities in the state.

The development of on-going training will become a reality in the coming year. A statewide training calendar will be developed and various topics will be delivered by the Professional Development Unit across the state.

## Workforce Information

Workforce Development Plan
The Division of Family & Children's Services, through generous support from Casey Family Programs, obtained the services and support of the American Public Human Services Association (APHSA) to develop a Workforce Development Plan to positively affect recruitment and retention of agency staff throughout Mississippi. The intention of the Workforce Development Plan is to address current and potential agency gaps (through data analysis, staff surveys, interviews, and focus groups) and strategize remedies to improve recruitment efforts, as well as to increase staff capacity, efficacy, and retention throughout the Division of Family & Children's Services with the long-term goal of ultimately improving outcomes for Mississippi children and families.

The Workforce Development Plan was designed to accompany and support the implementation of the *Olivia Y.* Modified Settlement Agreement (MSA) and Mississippi Practice Model, and includes financial projections and staffing progress information. In addition to information regarding statewide improvement efforts, a section of the plan focuses on workforce issues in the counties of Hinds, Harrison, Hancock, and Jackson counties, identified in the MSA as "Carve Out Counties". These counties have historically had difficulty in recruiting and retaining quality staff for reasons that believed to be county/region specific. In collaboration with APHSA, periodic workgroups were held to review assessment findings and develop strategies to address

# Ex. 33

# STATE OF MISSISSIPPI

# DEPARTMENT OF HUMAN SERVICES

# COST ALLOCATION PLAN

EFFECTIVE JULY 1, 2012

# Appendix C:
# Random Moment Sampling

# RANDOM MOMENT SAMPLING OVERVIEW

Federal grantor agencies require that non-federal grantees such as the Mississippi Department of Human Services (Agency) maintain accounting systems that enable them to insure that their costs are charged to federal programs and grants in a fair and equitable manner. Direct costs, i.e. those specifically identifiable to a particular federal program, are charged directly to the benefiting federal programs, using program-specific codes, as described in Section 3:, Plan Methodology, of this manual. Indirect Costs, i.e. those benefiting and which are common to more than one federal program, are allocated to those programs using various allocation bases as described in Section 6:, Cost Allocation Bases, of this manual.

Random Moment Sampling (RMS) is the method selected by the Agency for determining the cost allocation bases for certain federal programs. The RMS process is a work time study whereby a sample of workers is surveyed to determine which program activities they are engaged in at randomly selected moments. From this sample data it is inferred that all similar workers are engaged in similar activities that benefit the same programs. Total indirect costs of these workers are then allocated to the benefiting programs based on the ratio of valid and eligible responses for a particular activity to the total valid and eligible responses for all activities. Valid responses are those that have been conducted timely and accurately. Eligible responses are those that are reimbursable by a federal grant. Also, the validity of the sample is confirmed by insuring that the Agency receives responses that meet a certain threshold of the entire sample.

The Agency conducts three (3) Random Moment Samples as follows:

- Social Worker Random Moment Sampling in the Division of Family and Children's Services for various Child Welfare programs.
- Eligibility Worker Random Moment Sampling in the Division of Economic Assistance for the Temporary Assistance For Needy Families Program (TANF) and the Supplemental Nutrition Assistance Program (SNAP).
- County Clerical Worker Random Moment Sampling for various program activities support in county offices.

The Agency uses a web-based data gathering tool, RMSPlus, distributed by Interactive Voice Associates, as the mechanism for collecting the statistics, i.e. for conducting the time studies. The previously mentioned workers are subject to the sampling process during each quarter and they are notified by email that they have been selected to be part of the sample and will be required to complete the survey. The workers then access the time study tool, RMSPlus, through a link in the email and the workers complete the surveys online by answering a series of questions designed to capture pertinent information relative to the activities the workers are performing at the random moments indicated.

# RANDOM MOMENT SAMPLING OVERVIEW

The Agency chose RMS for time tracking of these workers as the Agency believes that, given the large population of workers involved and the diverse nature of the activities they perform, this method of time study provides the most complete, accurate, and timely data for cost allocation as required by the respective federal agencies. The worker time studies are not used by the Agency for any purpose other than for cost allocations for federal programs and grants. For example, the time studies are not used for any personnel or labor relations purpose.

On the following pages are the following documents which present the pertinent details of proposed revisions to the Agency's Cost Allocation Plan relative to RMS:

- Instructions For Responding To The Social Services Random Moment Sampling – This document details the Social Worker Random Moment Sampling, including how the data derived therefrom is applied to the cost allocation process.
- Instructions For Responding To The Eligibility Worker Random Moment Sampling – This document details the Eligibility Workers (EW) Random Moment Sampling, including how the data derived therefrom is applied to the cost allocation process.
- Instructions For Responding To The County Clerical Worker Random Moment Sampling – This document details the County Clerical Worker Random Moment Sampling, including how the data derived therefrom is applied to the cost allocation process.

# MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
# DIVISION OF FAMILY AND CHILDREN SERVICES

## INSTRUCTIONS FOR RESPONDING TO THE SOCIAL SERVICES RANDOM MOMENT SAMPLING

### GENERAL INSTRUCTIONS

You have been selected at random to participate in the Social Services Random Moment Sampling (RMS). The RMS is used to identify the activity in which you are engaged at a randomly chosen moment and, to the extent you were working on a case, the program for which the case activity is being performed.

A federal requirement mandates all Social Services RMS responses be received within 48 hours of the RMS sampled moment. A follow-up email will be sent to you within 24 hours of the RMS moment if a response was not received. If a response is not received within 48 hours of the sampled moment, the RMS moment will default to 'no response.' Staff is urged to check their email periodically throughout the work day and before leaving for the weekend, whether in the field or office, to prevent the occurrence of a 'no response.'

Please respond to each of the items as they appear on your screen.

### CASE IDENTIFICATION

*Identify the type of activity in which you were engaged at the time selected.*

1 Case Specific Activity
2 Program Related but Non-case Specific Activity
3 Other Administrative Activity

*If working on a specific case, enter the case number or child ID of the family or client. In the absence of a case number or child ID, record the investigation ID.*

### ACTIVITY CODES

*From the appropriate list (Case Specific Activity or Non-case Specific Activity), select the activity code which best represents the activity in which you were engaged at the time selected.*

## Case Specific Activities

10 *Intake and Investigation*
Includes receiving calls of suspected maltreatment or requests for services; collecting referral information; conducting preliminary reviews of documentation; referring cases to the appropriate unit; conducting past history searches and interviews with victims, non-victims, alleged perpetrators, non-offenders, collaterals and reporters; and collecting documentation.

12*[1] *Title IV-E Eligibility*
Includes collecting and verifying information required for an eligibility determination, completing forms, determining and documenting eligibility, and preparing decision notices. Also includes completing these activities for the redetermination of Title IV-E eligibility. Use code 12 when activities are being performed in conjunction with Medicaid eligibility.

13* *Risk and Safety Assessments*
Includes assessing risks and safety of the child and/or family, informally as well as formally (i.e., completion of designated forms to determine the level of risk and safety).

14* *Placement*
Includes identifying potential placement settings, preparing and submitting documentation to the potential placement source, contacting placement agencies or families/facilities and conducting pre-placement visits, as well as transporting the client. Use this code for placing a child into an initial or subsequent setting.

15* *Preparation/Participation in Judicial Hearings/Reviews*
Includes conducting file reviews, developing court reports and studies, meeting with county attorneys, traveling to court, appearing at hearings, providing testimony as well as waiting for the hearings to begin, if no other activity is being done while waiting.

16* *Case Planning and Documentation*
Includes identifying the service needs of the client, gathering input from the client and provider, preparing and reviewing the case plan and preparing narratives about client-related activities, service provision and progress. Use this code regardless of the client's participation in case planning.

---

[1] Activities denoted with an asterisk (*) represent either Title IV-E foster care eligible activities (including candidates) or Title IV-E adoption activities, depending on the client's eligibility. Depending on the client and the activity, some costs may also be charged to Independent Living. The asterisks are added here as information for DHS administration. They should not be included in the instructions given to workers and supervisors.

18* *Service Coordination and Referral*
Includes identifying service providers, arranging and coordinating treatment of children and their families, as well as supervising and monitoring the provision of services to ensure they are delivered according to the approved plan of care. Includes completing applications and gathering information to determine eligibility for a service program (other than Title IV-E or Medicaid) as well as negotiating service agreements with respect to arranging client-specific services or service contracts. Also includes arranging transportation to enable clients to travel to service providers.

19 *Counseling, Treatment and Other Direct Services*
Includes the direct provision of treatment services such as counseling, homemaker, or structured treatment of psychological problems.

20* *Administrative Reviews and Fair Hearings and Appeals*
Includes preparing for and participating in administrative reviews, e.g., Quality Assurance reviews, reviewing case files for hearings and appeals, preparing testimony, appearing in hearings and completing appropriate forms.

21**[2] *Targeted Adoptive Parent Recruitment*
Includes engaging in child-specific recruitment, meeting with prospective adoptive families, conducting home studies and other licensure activities, whenever these activities are conducted on behalf of a specific waiting child.

22* *Supervised Visitation*
Includes all activities associated with supervising a child's visit with his/her parents, siblings and or other relatives.

23 *Medicaid Eligibility*
Includes providing assistance to families when enrolling children in the Medicaid program. Includes gathering documentation, completing applications and assisting with the eligibility process. Use code 12 when activities are performed in conjunction with Title IV-E eligibility determinations.

**Program Related but Not Case Specific Activities**

41* *Conduct and Participate in Meetings*
Includes preparing, conducting or participating in unit or staff meetings.

42* *Community Resource Development*
Includes activities related to expanding the base of prospective service providers and other community-based resources. This includes speaking to community

[2] Activities noted with a double asterisk (**) represent Title IV-E adoption activities. The asterisks are added here as information for DHS administration. They should not be included in the instructions given to workers and supervisors.

groups. Use codes 43 through 48 for activities related to the recruitment and licensing of adoptive and foster families when not case-specific.

43* *Recruitment–Foster Care*
Includes participating in local forums or public service programs to inform the public of need, composing brochures or flyers, distributing materials or other promotional activities directly related to recruitment of foster homes and facilities.

44** *Recruitment–Adoption*
Includes participating in local forums or public service programs to inform the public of need, composing brochures or flyers, distributing materials or other promotional activities directly related to recruitment of adoptive homes.

45* *Recruitment–Foster Care and Adoption*
Includes participating in local forums or public service programs to inform the public of need, composing brochures or flyers, distributing materials or other promotional activities directly related to recruitment of both adoptive and foster homes.

46* *Foster Care Parent Certification*
Includes meeting with prospective foster families, conducting home studies and other licensure activities as well as renewals, and providing interim monitoring.

47** *Adoptive Parent Certification*
Includes meeting with prospective adoptive families, conducting home studies and other licensure activities as well as renewals, and providing interim monitoring.

48** *Foster Care/Adoptive Parent Certification*
Includes meeting with prospective families interested in dual certification, conducting home studies and other licensure activities as well as renewals, and providing interim monitoring.

49***[3] *Staff Training Development*
Includes developing training materials as well as conducting research for training content and methods.

50*** *Staff Training Delivery and Participation*
Includes preparing for training delivery (e.g., arranging locations) as well as the actual delivery and participation in training. Includes travel to and from the training site.

[3] Activities noted with a triple asterisk (***) represent training activities. The asterisks are added here as information for DHS administration. They should not be included in the instructions given to workers and supervisors.

**Other Administrative Activities**

51 *Supervisory Conference/Meeting*
Includes meeting with a supervisor to discuss non-case specific issues.

52 *General Administrative Functions*
Includes all other non-case related activities.

91 *Lunch, Breaks, Personal Business*
Includes paid lunch, breaks and time engaged in personal business activities.

92 *Leave*
Use when leave has been approved (e.g., annual leave, sick leave).

93 *Not Scheduled to Work*
Includes unpaid time off as well as sampled moments prior to or after scheduled work time.

## APPLICATION OF RMS DATA

Random moments which were completed in a timely manner will be placed into one of seven groupings, dependent on the activity the respondent noted. Activities that may be reimbursed by Title IV-E if conducted for eligible cases will be placed into either the *Case Specific–Eligible Activity* pool, the *Program Related–Foster Care Eligible Activity* or the *Program Related--Adoption Eligible Activity* pool. Training activities will be placed into the *Program Related–Training Activity* pool.

Case Specific–Eligible Activity
Case Specific–Non-eligible Activity
Program Related–Foster Care Eligible Activity
Program Related–Adoption Eligible Activity
Program Related–Training Activity
Other Administrative Activity
Non-work Related Activity

The case or child number listed for each of the responses which fall within the *Case Specific–Eligible Activity* group will be matched to the data in MACWIS to determine eligibility for Title IV-E as of the month of the RMS moment. Responses within this group will be apportioned into one of four groups: *Case Specific–Foster Care Claimable Activity, Case Specific–Foster Care Candidate Activity, Case Specific–Adoption Claimable Activity* or *Case Specific–Non-claimable Activity.*

RMS moments which fall within the *Non-work Related Activity* group, i.e., 91–Lunch, Breaks, Personal Business; 92–Leave and 93–Not Scheduled to Work, will be excluded from the calculation of claimable activities.

A series of administrative activity rates will be calculated for each pool in which an activity is classified. The costs resulting from application of the administrative activity rate will either be directly applied to the IV-E administrative match rate of 50 percent or applied to the IV-E penetration rate prior to application of the administrative or training match rate.

Lastly, the proportion of moments with a case specific activity code of 10–Intake and Investigation, 19–Counseling, Treatment and Other Direct Services and 23–Medicaid Eligibility are defined as non-claimable activities which will be charged to *IV-E Ineligible Administrative Activity.*

The following illustrates the application of the pools in the calculation of claimable activities.

### Participation Rate

| | |
|---|---|
| (1) | Total Social Services Random Moments Identified |
| (2) | Total Surveys Completed in a Timely Manner |
| (2/1) | Response Rate |

### Summary of Responses

| | |
|---|---|
| (3) | Case Specific–Eligible Activity |
| (4) | Case Specific–Non-eligible Activity |
| (5) | Program Related–Foster Care Eligible Activity |
| (6) | Program Related–Adoption Eligible Activity |
| (7) | Program Related–Training Activity |
| (8) | Other Administrative Activity |
| (9) | Non-work Related Activity |

### Detailed Response Pools

Based on the activity code and matching to MACWIS for claimable case specific activities to identify the IV-E eligibility status of the client or case, activities will be assigned to a detailed response pool.

| | |
|---|---|
| (3a) | Case Specific–Foster Care Claimable Activity |
| (3b) | Case Specific–Foster Care Candidate Activity |
| (3c) | Case Specific–Adoption Claimable Activity |
| (3d) | Case Specific–Non-claimable Activity |
| (5) | Program Related–Foster Care Eligible Activity |
| (6) | Program Related–Adoption Eligible Activity |
| (7) | Program Related–Training Activity |
| (8) | Other Administrative Activity |

### Administrative Activity Rates

The detailed response pool or combination of detailed response pools will be divided by the number of eligible moments. The total number of eligible moments (N) is calculated as (2) minus (9) or Total Surveys Completed in a Timely Manner less Non-work Related Activities.

*Foster Care Administrative Activity Rate*

| | |
|---|---|
| (3a) | Case Specific–Foster Care Claimable Activity |
| (N) | Total Number of Eligible Moments |
| (3a)/ (N) | Foster Care Administrative Activity Rate |

*Adoption Administrative Activity Rate*

| | |
|---|---|
| (3c) | Case Specific–Adoption Claimable Activity |
| (N) | Total Number of Eligible Moments |
| (3c)/ (N) | Adoption Administrative Activity Rate |

Administrative costs will be multiplied by the respective foster care and adoption administrative activity rates. The IV-E administrative match rate of 50 percent will then be applied to the total resulting from adding the two administrative amounts together.

*Candidate Administrative Activity Rate*

| | |
|---|---|
| (3b) | Case Specific–Foster Care Candidate Activity |
| (N) | Total Number of Eligible Moments |
| (3b)/ (N) | Candidate Administrative Activity Rate |

*Program Related–Foster Care Administrative Activity Rate*

| | |
|---|---|
| (5) | Program Related–Foster Care Eligible Activity |
| (N) | Total Number of Eligible Moments |
| (5)/ (N) | Program Related–Foster Care Administrative Activity Rate |

Administrative costs will be multiplied by the *Candidate* administrative activity rate and again by the *Program Related–Foster Care* administrative activity rate. Before applying the IV-E administrative match rate of 50 percent, the IV-E penetration rate for children in foster care for the quarter, i.e., Bases Code 11-38, must first be applied.

*Program Related–Adoption Administrative Activity Rate*

| | |
|---|---|
| (6) | Program Related–Adoption Eligible Activity |
| (N) | Total Number of Eligible Moments |
| (6)/ (N) | Program Related–Adoption Administrative Activity Rate |

After multiplying the administrative costs by the *Program Related–Adoption* administrative activity rate, the resulting amount will be multiplied by the IV-E penetration rate of children receiving assistance, i.e., Bases Code 11-39. The resulting amount will then be multiplied by the administrative match rate of 50 percent.

*Program Related–Training Administrative Activity Rate*

| | |
|---|---|
| (7) | Program Related–Training Activity |
| (N) | Total Number of Eligible Moments |
| (7)/ (N) | Program Related–Training Administrative Activity Rate |

Once the administrative costs have been multiplied by the *Program Related–Training* administrative activity rate, costs should be apportioned into the appropriate training pools in the same manner as university contracts are apportioned, i.e., through workload reports.

*IV-E Ineligible Administrative Activity Rate*

Activities assigned to the remaining detailed response pools, specifically *Case Specific–Non-claimable Activity* (3d) and *Other Administrative Activity* (8) will be summed to identify the *IV-E Ineligible Activity* pool, which will be referred to here as (B) and includes costs which are allocated to Family Preservation (PSSF), Social Services Block Grant, TANF and State funds.

| | |
|---|---|
| (3d + 8) | IV-E Ineligible Activity (B) |
| (N) | Total Number of Eligible Moments |
| (B)/ (N) | IV-E Ineligible Administrative Activity Rate |

The resulting administrative activity rate will be multiplied to the administrative cost pool to identify costs not eligible for IV-E reimbursement.


## Funding Stream

Costs resulting from application of the administrative activity rates detailed above may be allocated across a number of funding streams, dependent on eligibility for a given program, amount to be reimbursed, e.g., portion IV-E reimbursable vs. state match, and amount available to support the activity, e.g., amount remaining from the Social Services Block Grant. The matrix which follows identifies the funding streams which will be used to allocate the costs.

| Administrative Activity Rate | IV-E Foster Care | IV-E Adoption | IL | Child Welfare Services | Family Preservation | Social Services Block Grant | TANF | State Funds |
|---|---|---|---|---|---|---|---|---|
| Foster Care | ✓ | | ✓ | ✓ | | | ✓ | ✓ |
| Adoption | | ✓ | | ✓ | | | ✓ | ✓ |
| Candidate | ✓ | | | ✓ | | ✓ | ✓ | ✓ |
| Program Related – Foster Care | ✓ | | | ✓ | | | | ✓ |
| Program Related – Adoption | | ✓ | | ✓ | | | | ✓ |
| Program Related – Training | ✓ | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ |
| IV-E Ineligible Costs | | | | ✓ | ✓ | ✓ | ✓ | ✓ |

**Ex. 34**

 DEPARTMENT OF HEALTH & HUMAN SERVICES

Program Support Center
Financial Management Service
Division of Cost Allocation
Central States Field Office

1301 Young Street
Room 732
Dallas, TX 75202
(214) 767-3261
(214) 767-3264 FAX

February 13, 2013

**Amendment Number: MS DHS 2012-1**

Mr. Earl D. Walker, Director
Division of Budgets and Accounting
Mississippi Department of Human Services
P.O. Box 352
750 N. State Street
Jackson, Mississippi 39205

Dear Mr. Walker:

This is to advise you of the approval of Amendment 2012-1 to the Mississippi Department of Human Services Cost Allocation Plan, which was submitted on July 19, 2012. The effective date of the Plan is April 1, 2012. This letter supersedes our letter dated November 2, 2012 that had an effective date of July 1, 2012.

This Plan is approved with the understanding that DHS will submit an updated Cost Allocation Plan upon its receipt of the final report of Administration for Children and Families (ACF) Title IV-E administrative cost review (ACR) Pilot, which was conducted in May 2012 with draft findings issued on July 20, 2012.

In accordance with 45 CFR Part 95 Subpart E, this Approval is continuous until the allocation methods shown in the plan become outdated as a result of organizational changes within your department, legislative or regulatory changes, or a new plan is submitted by you. The regulations require that as a condition of receipt of Federal Financial Participation in administration services (excluding assistance and medical vendor payments and purchased services) and training for any quarterly period, the State's claim for expenditures must be in accordance with the Cost Allocation Plan on file and approved by the Director, Division of Cost Allocation, for that period. Amendments to your plan would be required for any changes indicated above. The sole responsibility for submitting proposed revisions rests with the State.

Approval of the Plan Amendment cited above is predicated upon the following conditions (1) that no costs other than those incurred pursuant to the approved State plan are included in claims to Department of Health and Human Services or other Federal Agencies and that such costs are legal obligations, (2) that the same costs that have been treated as indirect costs have not been claimed as direct costs, and (3) that similar types of costs have been accorded consistent treatment.

Mr. Earl D. Walker
Mississippi Department of Human Services
Amendment 2012-1
February 13, 2013

This approval presumes the existence of an accounting system with internal controls adequate to protect the interests of both the State and Federal Governments. This approval relates to the accounting treatment accorded the costs of your programs only, and nothing contained herein should be construed to approve activities not otherwise authorized by approved program plans, Federal legislation or regulations.

The operation of the Cost Allocation Plan approved by this document may from time to time be reviewed by authorized Federal staff, including the Division of Cost Allocation, operating divisions, DHHS Office of Inspector General for Audit Services, the Department of Agriculture, the Department of Labor, and the General Accounting Office. The disclosure of inequities during such reviews may necessitate changes to the plan.

If you have any questions, please contact June Talbert at (301)492-4871.

Sincerely,

Arif Karim
Director
Division of Cost Allocation

cc:    Juan Gordon, ACF
       Jackie Glaze, CMS
       Francisco Lebron, USDA

# Ex. 35A



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

ADMINISTRATION FOR CHILDREN AND FAMILIES
**Administration on Children, Youth and Families**
1250 Maryland Avenue, S.W.
Washington, D.C. 20024

MAR 27 2013

Richard A. Berry
Executive Director
Mississippi Department of Human Services
750 North State Street
Jackson, Mississippi 39202

Dear Mr. Berry:

During the week of May 7 – 11, 2012, a Review Team consisting of Administration for Children and Families' (ACF) staff from the Children's Bureau (CB) and the Office of Grants Management (OGM) and two State agency staff performed the on-site stage of an Administrative Cost Review (ACR) Pilot of Mississippi's title IV-E Foster Care program. This activity was preceded by extensive pre-site review information gathering and followed by a post-site review data analysis period. During the post-site visit stage, Federal staff assembled and shared with State agency officials a summary of draft findings. The on-site stage was primarily conducted at the Mississippi Department of Human Services (MDHS) central offices in Jackson. Visits were also made to the Division of Family and Children Services (DFCS) Adams, Hinds and Lauderdale County Offices. The primary purpose of the ACR Pilot was to test various CB protocols and data collection instruments currently under development. These items, still in draft form, were developed in response to the Office of Management and Budget's mandate that the ACF identify a "national error rate" for the title IV-E Foster Care program, and subsequently an action plan to reduce that error rate including the proportion associated with administrative costs.

We would like again to express our appreciation for Mississippi's volunteering to participate in the ACR Pilot process and thank you and your staff for the significant efforts that were made to prepare for and participate in this review. In particular, we thank Ms. [redacted] and the DFCS staff that assisted her for exceptional efforts in planning, coordinating and preparing requested documentation submissions for the ACR Pilot. These parties as well as other officials and staff of the Department's Division of Budgets and Accounting and others in MDHS also exhibited great knowledge and extraordinary patience in answering our review questions. [redacted] and [redacted] of your staff provided invaluable assistance by participating as review team members in the completion of the foster care candidate case review component of the ACR Pilot. The pilot review was a valuable learning experience for our review team and we hope that the feedback being provided to your agency proves valuable to your financial and program staff.

The enclosed final report of the ACR Pilot includes a summary of State processes, review activities, findings and recommendations to enhance the operation of the approved public assistance cost allocation plan (PACAP) and other financial practices that impact the claiming of Federal financial participation (FFP) under the title IV-E Foster Care program. Please note that the Appendices to the final report are being provided in electronic form only. Since the review was by design of limited scope, the findings and recommendations provided within the report may, or may not, be representative of those which would have resulted from a more broad-based review. Nevertheless, we hope that you find them to be of value.

In general, we found that among the items tested for the claiming period under review (PUR) from April 1, 2011 through September 30, 2011, Mississippi's processes for accumulating and allocating costs that are claimed as title IV-E Foster Care administration are well documented and, with several noted exceptions, in conformance with the requirements of the approved PACAP and applicable Federal regulations and policies. Unfortunately, a few of the exceptions have a notable impact on the allocation of costs for the PUR. Examples include a failure to fully follow the approved MDHS PACAP with respect to the allocation of costs through the established matrix for the social worker random moment sampling (SWRMS), claiming of some costs outside of the cost pools identified in the approved PACAP and significant deficiencies in the documentation of candidates for foster care served by the DFCS. Therefore, the final report identifies several significant areas where enhancements to the PACAP or State agency procedures delineated elsewhere are required to improve the operation of the claiming system and prevent claiming of unallowable costs. Overall, the review identified areas where the cost impact of amended cost allocation procedures would result in both increases and decreases in title IV-E Foster Care claims.

Although no disallowance action will be taken as part of this review, it is important that your staff work with assigned CB Program Specialists and OGM Financial Operations Specialists in the ACF Atlanta Regional Office (RO IV), to address recommended claiming adjustments and corrective actions associated with the PACAP or other cited processes. The final report specifically cites a need for the State to review and amend several of the methodologies utilized to allocate costs and includes recommended effective dates for these amendments, where appropriate. It should be noted that several recommendations specify that corrective action is to be effective for periods beginning no later than January 1, 2013.

We are aware and very much appreciate that your Department has already initiated a number of actions in response to the draft findings from this review. See Appendix I of the enclosed final report for information on these actions. While we do not expect all such changes to be in place immediately, the State should work with ACF RO IV officials to assure that prospective title IV-E claims properly reflect the findings in this report. Required amendments to the State's PACAP must be submitted for Federal approval by the HHS Division of Cost Allocation.

Please contact [redacted], Senior Child Welfare Program Specialist, of the Children's Bureau Division of Program Implementation at [redacted] extension [redacted] if you have any questions about this review process or the recommendations contained in the final report.

Sincerely,

Joseph J. Bock
Acting Associate Commissioner
Children's Bureau

Enclosure

cc: Mark Smith, Deputy Executive Director, MDHS
Mike Gallarno, Director of Family and Children Services, MDHS, DFCS
Takesha Darby, Director of Finance, MDHS, DFCS
Ruth Walker, Child Welfare Regional Program Manager; CB, RO IV
Juan Gordon, Grants Management Officer; ACF, OGM, RO IV
Gail Collins, Director, CB, Division of Program Implementation, Washington, DC
Robert Noonan, Acting Deputy Assistant Secretary for Administration, Office of Administration, Washington, DC
Arif Karim, Director, HHS Division of Cost Allocation, Central States Field Office
Terry Hill, Branch Chief, National Specialist—Determination/Litigation Support and PACAPs, HHS Division of Cost Allocation, Central States Office

# Ex. 35B



DEPARTMENT OF HEALTH & HUMAN SERVICES • USA
U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
ADMINISTRATION FOR
CHILDREN & FAMILIES
Administration on Children, Youth and Families
Children's Bureau

# MISSISSIPPI

# TITLE IV-E FOSTER CARE PROGRAM

# ADMINISTRATIVE COST REVIEW PILOT

# FINAL REPORT

**On-Site Review: May 7 - 11, 2012**

Children's
Bureau



We also found that the procedures used to draw and administer the SWRMS sample were either not delineated in the approved PACAP or were insufficient to clearly identify the established policy. For example, no information is provided on the size, composition or statistical validity of the sample and potentially confusing information is provided with respect to when a sample taker should classify an observation as "invalid". On the latter point, the SWRMS instructions indicate that if the social worker is working offsite, the sample taker should page the worker and that the worker should respond within fifteen minutes to report the activity that was performed at the strike moment. A caveat is given that if the worker is engaged in activity that prevents an immediate response, he or she should contact the sample taker as soon as possible. It is not clear whether the fifteen minute response time is meant to apply to all worker observations or just those that involve a worker who is offsite? It is also unclear whether there is a maximum length of time after the strike moment for a worker to respond. We found from interviews with county sample takers and social workers that some sample takers routinely leave the SWRMS form in the worker's in-box and do not measure when the worker response is recorded or that other sample takers immediately classify the response as invalid when a worker is not available.

State agency officials indicated that the only quality control process used in administering the SWRMS is monitoring to assure that completed SWRMSOF-499 forms are received in the MDHS central office for all selected observations each quarter. No specific effort is made at the central office level to review the forms to assure that all required entries are made, to test a sample of observations to determine accuracy and the availability of supporting documentation or to track activity reporting trends.

It is our understanding that the existing process was replaced with a new e-mail based SWRMS beginning on April 1, 2012. We did not review or assess the results of that process since it is outside of the PUR and it was not included in a pending PACAP amendment at the time of our review. We note, however, that in accordance with Federal regulations at 45 CFR 95.509(a), a PACAP amendment is needed delineating the new SWRMS process since it differs from the cost allocation method described in the currently approved PACAP.

## 2. SWRMS Activity Code Definitions

The Mississippi SWRMS used during the PUR provides for a series of sixteen (16) activity codes. Several of these codes identified allowable title IV-E administrative activities such as foster care case management and court work while other codes separately identified unallowable title IV-E administrative activities related to investigation. However, some activity code definitions do not include all possible activities a worker could be performing and some definitions included both title IV-E allowable and unallowable activities in the same code.

General Comments:

- Lack of Distinction Between Case Type and Activity - The SWRMS definitions combined the type of case and the activity performed into a single RMS code rather than using a two step process to separately identify the type of case (e.g. in-home non-candidate, in-home candidate, foster care, or adoption) and the type of work performed. As a result some work did not fit within the available definitions. For example, when a worker was performing court work on an in-home case, the only

**Ex. 36**



MEADOWBROOK OFFICE PARK
4268 I-55 NORTH
JACKSON, MISSISSIPPI 39211

PHONE: 601.351.2400
FAX: 601.351.2424

www.bakerdonelson.com

ASHLEY CHRISTIN TULLOS
**Direct Dial**: 601.351.8949
**Direct Fax**: 601.974.8949
**E-Mail Address**: atullos@bakerdonelson.com

November 2, 2012

**VIA ELECTRONIC & UNITED STATES MAIL**

Miriam Ingber
Children's Rights Incorporated
330 Seventh Avenue, 4th Floor
New York, NY 10001

RE: Olivia Y., et al. v. Phil Bryant, et al; In the United States District Court for the Southern District of Mississippi, Jackson Division; Cause No. 3:04CV251LN Mississippi Rate Setting Final Report, Dated September 25, 2009

Dear Miriam:

Thank you for your phone call on Friday, October 26, 2012, to discuss Defendants' October 25, 2012 letter regarding the therapeutic group home per diem rate structure as contemplated by sections II.A.7.d. and II.A.7.e.1 of the Modified Mississippi Settlement Agreement and Reform Plan ("MSA"). Based on our discussion, it appears that the parties are very close to reaching a final agreement and I am writing this letter to memorialize Defendants' proposal.

Defendants' proposal is as follows:

A) Per Diem Rates for Therapeutic Group Homes

1) Beginning on July 1, 2013, therapeutic group homes caring for children in DHS custody will receive a foster care maintenance payment per diem of $95.11; and
2) Pending and upon approval of the Centers of Medicare and Medicaid Services ("CMS"), therapeutic group homes meeting Mississippi Division of Medicaid requirements will be eligible for a Treatment Foster Care per diem rate of $131.00 from the Mississippi Division of Medicaid for the provision of

JM ATY 1142802 v1
2902819-000001 11/02/2012

therapeutic services to children in DHS custody being cared for at the therapeutic group homes.

B) Determination of Appropriate Foster Care Maintenance Payment Per Diem Upon Implementation of DFCS' Performance Based Contracting System

Pursuant to section II.A.2.d.1 of the MSA, Defendants are required to implement and maintain a performance-based contracting system by the end of Implementation Period 6. Toward this end, Period 3 Implementation Plan section I.A.4 requires Defendants to develop a plan that contains specific action steps and timeframes for a performance-based contracting system. Accordingly, Defendants have started the development of this plan that is to be finalized by July 2013.

The performance-based contracting system to be implemented by Defendants will contractually obligate therapeutic group homes to gather, maintain, and produce cost reporting and accounting data on the costs associated with the provision of care and oversight to children in DHS custody, including the costs associated with the administration and operation of the therapeutic group homes. Once this data is produced by the therapeutic group homes, DFCS will process and analyze the data to determine an appropriate per diem foster care maintenance payment that will cover the cost of the items enumerated in 42 U.S.C. §675(4)(A).

Defendants intend to have therapeutic group homes on contracts that include the cost reporting and accounting data obligation by January 2014. Once these contracts are in place and following the production of 12 months of costs reporting and accounting data[1] by the therapeutic group homes, which should occur in January 2015, Defendants will process and analyze the data in order to determine a new foster care maintenance per diem rate for therapeutic group homes. Defendants will determine this new rate by July 2015. Upon determination of the new rate, Defendants will provide Plaintiffs with an explanation of how the new rate was determined along with the relevant data. This information and data shall not be shared with third parties and shall be treated as confidential for Plaintiffs' use only in the *Olivia Y. v. Bryant* lawsuit.

[1] A minimum of 12 months of data collection is necessary as there are many relevant operation and administration expenses, such as county property taxes, federal and state taxes, insurance premiums, etc., that occur at various points throughout a 12-month period that must be captured in order to determine an adequate foster care maintenance per diem rate in accordance with 42 U.S.C. §675(4)(A).

Please confirm whether this proposal meets your approval.

Very truly yours,

BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC

Ashley Tullos/KKR

Ashley Christin Tullos

ATY/fdb

cc: Ms. Grace Lopes
Mr. Jack Wilson
Mr. Rickey Berry
Mr. Mark Smith
Mr. Jerry Milner

**Ex. 37**

BAKER DONELSON
BEARMAN, CALDWELL & BERKOWITZ, PC

MEADOWBROOK OFFICE PARK
4268 I-55 NORTH
JACKSON, MISSISSIPPI 39211

PHONE: 601.351.2400
FAX: 601.351.2424

www.bakerdonelson.com

ASHLEY CHRISTIN TULLOS
**Direct Dial**: 601.351.8949
**Direct Fax**: 601.974.8949
**E-Mail Address**: atullos@bakerdonelson.com

June 20, 2013

Miriam Ingber
Children's Rights Incorporated
330 Seventh Avenue, 4th Floor
New York, NY 10001

RE: Olivia Y., et al. v. Phil Bryant, et al; In the United States District Court for the Southern District of Mississippi, Jackson Division; Cause No. 3:04CV251LN

Dear Miriam:

This letter is in response to your June 11, 2013 letter regarding foster care rates. Pursuant to the parties' agreement set forth in Defendants' November 2, 2012 letter, therapeutic group homes are entitled to the following:

Per Diem Rates for Therapeutic Group Homes

1) Beginning on July 1, 2013, therapeutic group homes caring for children in DHS custody will receive a foster care maintenance payment per diem of $95.11; and
2) Pending and upon approval of the Centers of Medicare and Medicaid Services ("CMS"), therapeutic group homes meeting Mississippi Division of Medicaid requirements will be eligible for a Treatment Foster Care per diem rate of $131.00 from the Mississippi Division of Medicaid for the provision of therapeutic services to children in DHS custody being cared for at the therapeutic group homes.

*See* November 2, 2012 Letter from A. Tullos to M. Ingber.

Currently, therapeutic group homes are receiving a daily foster care maintenance payment per diem of $72.00, which will increase to $95.11 as of July 1, 2013. In addition, therapeutic group homes that a) are certified by the Mississippi Department of Mental Health and b) meet all requirements of the Mississippi State Medicaid Plan, Part 206, Rule 1.11 are eligible to receive a daily "intensive outpatient services" rate of approximately $122.00 from the Division

of Medicaid (DOM) for the provision of therapeutic services to children in DHS custody being cared for at the therapeutic group home.

Pursuant to the parties' agreement, therapeutic group homes meeting DOM requirements will become eligible for a treatment foster care per diem rate of $131.00 from DOM "pending and upon approval of the Centers of Medicare and Medicaid Services ("CMS")." In July 2012, DOM submitted a State Plan Amendment ("SPA") to CMS that included provisions regarding the all-inclusive per diem rate of $131.00 for treatment foster care. In October 2012, CMS sent a "Request for Additional Information" ("RAI") regarding the treatment foster care provisions. Following receipt of the RAI, DOM and CMS exchanged multiple sets of questions and answers and CMS agreed to provide guidance and technical assistance to DOM regarding revisions that were needed to the treatment foster care provisions.

When it became apparent that additional time would be needed to draft and agree on alternative language for the treatment foster care provisions, CMS requested that DOM pull the treatment foster care provisions as written from the SPA so that the remaining provisions in the SPA—which were unrelated and for which there was no need for additional information or negotiation—could be approved by CMS and become effective. In December 2012, DOM followed CMS' request and removed the treatment foster care provisions from the SPA with the understanding that the treatment foster care provisions would be re-submitted after DOM received the promised guidance and technical assistance from CMS. DHS was aware that the treatment foster care provisions were being pulled from the SPA with the understanding that the treatment foster care provisions and rate would be re-submitted as soon as possible after DOM received additional guidance and technical assistance from CMS. CMS approved the SPA that did not include the treatment foster care provisions on January 8, 2013.

Since that time, DOM has continued to work with DHS and Mississippi Department of Mental Health to draft alternative language for the treatment foster care provisions but is still awaiting the promised technical assistance and guidance from CMS. DOM has advised that once it receives this technical assistance from CMS, the revised provisions will be re-submitted to CMS in a new SPA. DOM has told DHS that it remains committed to finalizing and implementing the treatment foster care provisions and the all-inclusive per diem rate of $131.00 and is optimistic that the revisions will be re-submitted to CMS in Fall 2013. Until then, therapeutic group homes will remain eligible for the daily "intensive outpatient services" rate of approximately $122.00 from DOM discussed above for the provision of therapeutic services to children in DHS custody being cared for at the home.

Finally, in response to your request for a complete and up-to-date schedule of payment rates for all out-of-home placements, I am including the following Resource Board Payment Rate Schedule that will be effective as of July 1, 2013:

**Resource Board Payment Rate Schedule (effective July 1, 2013)**

| Age/Status | Board | Clothing | Allowance | Payment | Daily Per Diem |
|---|---|---|---|---|---|
| 0-8 | $ 574.90 | $ 80.00 | $ 30.00 | $ 684.90 | $ 22.83 |
| 9-15 | $ 658.40 | $ 80.00 | $ 50.00 | $ 788.40 | $ 26.28 |
| 16-21 | $ 721.60 | $ 80.00 | $ 60.00 | $ 861.60 | $ 28.72 |
| Special Needs I | $ 792.70 | $ 80.00 | $ 30.00 | $ 902.70 | $ 30.09 |
| Special Needs II | $ 854.50 | $ 80.00 | $ 30.00 | $ 964.50 | $ 32.15 |
| Foster Teen Parent | $ 1,296.50 | $ 160.00 | $ 90.00 | $ 1,546.50 | $ 51.55 |
| Emergency Shelters | $ 4,336.20 | $ - | $ - | $ 4,336.20 | $ 144.54 |
| Therapeutic Resource/ Group Homes | $ 2,743.30 | $ 80.00 | $ 30.00 | $ 2,853.30 | $ 95.11 |
| Related Therapeutic Placement | $ 1,240.00 | $ 80.00 | $ 30.00 | $ 1,350.00 | $ 45.00 |

Very truly yours,

BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC

Ashley Christin Tullos

cc: Grace Lopes

# Ex. 38A

INITIAL SELECTION:

Q8. Is this the first (initial) review of the case? [Yes / No]

INITIAL Q's:

Q9. Was there evidence that the child was registered fo•/attending an accredited school within 3 business days of initial placement? [Yes / No / * (NA - not age appropriate/school not in session at placement)]

Q10. Was a FTM held to develop the child 's ISP within 30 days of entry into foster care? [Yes / No]

Q11. If the ISP was developed within 30 days of custody, did it include a p errnanency goal, timeframes and activities to achieve/ support permanency? [Yes / No / * (ISP NOT developed within 30 days of custody) //I (ISP not developed in MACWIS, but evidence suggests verbal acknowledgement of these things with the family within 30 days)]

Q12. Was screening (CFA or other DFCS assessment) completed to address general and special educ ational needs of the child within 30 ea lendar days of entry into foster care? [Yes / No]

Q13. Was a screening provided to address mental healthiemotional/therape utie needs of the child within 30 calen dar days of entry into foster care? [Yes / No]

Q14. Was a health scr eening provided to address medical needs of the child within 30 calendar days of entry into foster care? [Yes / No]

Q14A. If the child is over age three, was a dental examination provided within 90 calendar days of placement? [Yes / No / * (NA - child younger than three)]

# Ex. 38B

# FCR Periodic.Administrative.Determination. REFERENCE GUIDE

| | | | |
|---|---|---|---|
| Q10. Was a FTM held to develop the child's FSP / ISP within 30 days of entry into foster care? [Yes / No] | Reviewer will answer **YES** when a FTM was held in the first 30 calendar days of custody regardless of how the FTM is labeled in MACWIS. Reviewer answers **YES** if the **content** of the FTM included engagement/discussion with the available family members about plans regarding custody and tasks needed to accomplish those plans. A FTM is a planned meeting where key case members are engaged in planning for permanency and well-being of a child. All FTMs must be documented in MACWIS and shall include, at a minimum, worker and supervisor, child, child's family if appropriate, and foster family. If there is any reason one of the above mentioned parties' is unable to attend their absence must be justified in MACWIS. (Note: include other attendees as appropriate); discuss progress, options, timelines, and permanency at all FTMs.<br><br>Example: In the investigation, the Reviewer finds a narrative not labeled as a FTM, however, the mother, the paternal GM and the relative placement were all present (the father's whereabouts were unknown at the time) and the worker documented a discussion of the reasons the child was removed, the plans to return custody and engaged members to identify tasks needed to work toward that plan, this would be considered a FTM and the question can be answered **YES**. | MSA III.B.2.a<br><br>MS DFCS Policy revised 7-15-11 Sec. D. pg. 61<br><br>- inviting all of these people is best practice, but the presence of everyone listed is not necessary for a yes answer<br><br>Please reference the FTM Practice Guidance (finalized 09/29/11) | 2/19/13 |
| Q11. If the FSP / ISP was developed within 30 days of custody, did it include a permanency goal, timeframes and activities to achieve/ support permanency? [Yes / No / * (FSP / ISP NOT developed within 30 days of custody) / # (FSP / ISP not developed in MACWIS, but evidence suggests verbal acknowledgement of these things with the family within 30 days)] This answer needs to be removed from the instrument. Reviewers should not use # for an answer. The intent of # is answered in #10. | IF #10 is **YES**, Reviewer answers this question **YES** if the ISP documented in MACWIS included: permanency goal, timeframes and activities to achieve/ support permanency. Reviewer should **answer NO when #10 was YES but the ISP/FSP *did not* include the permanency goal, timeframes and activities to achieve/ support permanency** *Developed* for the purposes of this question means the worker entered a permanency goal, timeframes and activities (tasks and goals) to achieve permanency. *Developed by the worker is not the same as approved in MACWIS by the ASWS.* While not worded in the question as it qas in Q10, the FSP for the parent is also required to developed in an FTM. If the reviewer found that a FTM occurred with available participants (whereabouts known, available parents/caregivers) and the plan regarding custody was discussed/ identified and this was then identified in the FSP/ISP in MACWIS within 30 days of custody in the child and parental ISP, this answer **is YES**. This answer requires the reviewer to use professional judgment to determine who was available in those first 30 days to develop these plans with. The reviewer must determine if the parental ISP had identified tasks and goals/timeframes as it relates to this child for this answer to be **YES. Answer * if #10 was NO** or FSP/ISP was developed after 30 days**.** While # is an option on the PAD, this was added in error and is not allowed to be used in any circumstance. It will be removed from the PAD when MIS time permits.<br><br>Location(s): Case file and MACWIS narratives and case planning tab | MSA III.B.2.a MSA III.B.2.a: Within 30 calendar days of a child's entrance into foster care, the DFCS caseworker shall convene a family team meeting and develop a service plan that addresses the strengths, needs and services required for both the child and the parents as explored during that family team meeting.<br>MS DFCS Policy revised 7-15-11 Sec. D. pg. 64<br>. | 2/1/13 |

= MSA Related Question

# Ex. 39

adjudicatory hearing is not held within the ninety (90) calendar days, the petition shall be dismissed with prejudice."

### c) Disposition Hearing

MISS. CODE ANN. § 43-21-601(1), states that "If the child has been adjudicated a delinquent child, a child in need of supervision, a neglected child or an abused child the youth court shall immediately set a time and place for a disposition hearing which shall be separate, distinct and subsequent to the adjudicatory hearing. The disposition hearing, however, may be held immediately following the adjudicatory hearing unless a continuance is necessary to allow the parties to prepare for their participation in the proceedings." The judge makes a determination at this hearing whether the child will be returned to the parent(s), legal guardian, or relative or remains in the custody of DFCS.

### d) Permanency Plan, Updating and Review

A child's permanency plan shall be reviewed in a court or administrative case review at least every six months. Foster care reviews shall satisfy this administrative case review requirement. DFCS will take reasonable steps, including written notice, to ensure the participation of the child, parents, caregivers, and relevant professionals in court or administrative reviews.

DFCS will take reasonable steps to ensure that a court review, which may be called a review, dispositional, or permanency hearing, is held for each child in foster care custody within 12 months of initial placement, and annually thereafter.

DFCS shall review all documented exceptions under the federal Adoption and Safe Families Act (ASFA) for children who have spent more than 17 of the previous 22 months in foster care during the child's foster care review.

### e) Permanency Hearing

A Permanency Hearing is an official meeting, inside a court or administrative body, for the purpose of determining a child's permanency plan and/or reviewing the sufficiency of the one previously decided upon. Specifically U.S.C. 675 §475(5)(c) defines the purpose as *"...{to} determine the permanency plan for the child...". The purpose of permanency hearings, in general, is to compel a resolution of the case so the child does not remain indefinitely "in the system."*

MISS. CODE ANN. § 43-15-13(5), as amended, and 42 D.S.C.675§ 475(5) (C), provide the following with regard to who holds permanency hearings—"*the youth court or its designee(s)*

*and/or the personnel within the Department of Human Services (MS Code) and "in a family or juvenile court or another court(including a tribal court) of competent jurisdiction, or by an administrative body appointed or approved by the court " (§475(5)(c)*

42 U.S.C. 675, § 475(5)(B) states "*the status of each child is reviewed periodically but no less frequently than once every six months by either a court or by an administrative review*." These reviews may be labeled by the reviewing as a "Six Month Review Hearing", a "Dispositional Hearing" or a "Permanency Hearing", but note - there is a difference between a Permanency Hearing and any other review of the case.

42 U.S.C. 671 § 471provides that the court or administrative body must make a findings of whether or not reasonable efforts have been made to finalize a permanent plan, and MISS. CODE ANN. § 43-15-13(8), maintains that DFCS' "*first priority shall be to make reasonable efforts to reunify the family when temporary placement of the child occurs or shall request a finding from the court that reasonable efforts are not appropriate or have been unsuccessful*." A determination shall also be made as whether such placement continues to be appropriate and in the best interest of the child.

DFCS shall provide the youth court with jurisdiction over the child, a detailed up-to-date report on the current status of the child's placement, visitation, permanent plan progress, and service needs.

### (1) Purpose of Hearing

"Permanency Hearing" is defined in 42 U.S.C. 675, § 475(5)(C) as being a "*…hearing to be held, in a family or juvenile court or another court (including a tribal court) of competent jurisdiction, or by an administrative body appointed or approved by the court, no later than 12 months after the date the child is considered to have entered foster care (as determined under subparagraph (F)) (and not less frequently than every 12 months thereafter during the continuation of foster care), which hearing shall determine the permanency plan for the child…*"

After the initial permanency hearing, subsequent permanency hearings must be held no less frequently than every 12 months during the child's continuation in foster care.

### (2) Timeline

MISS. CODE ANN. § 43-21-603(7) requires that: "*Once the reasonable efforts [to maintain the child in his/her own home] requirement is bypassed, the court shall have a permanency hearing under Section 43-21-613 within thirty (30) days of the finding.*"

MISS. CODE ANN. § 43-21-613(3)(a) requires that: "…*For children who have been adjudicated abused or neglected, the youth court shall conduct a permanency hearing within twelve months after the earlier of (i) an adjudication that the child has been abused or neglected; or (ii) the date of the child's removal from the allegedly abusive or neglected custodian/ parent…*"

And MISS. CODE ANN. § 43-21-613(3)(a)(ii) further requires: "…*that the youth court shall continue to conduct permanency hearings for a child who has been adjudicated abused or neglected at least annually thereafter for as long as the child remains in the custody*…"

A written court order shall result from the review hearing. It must show that a determination was made about the future status of the child, including, but not limited to, whether the child shall:

1. Be returned to the parent(s),
2. Shall be continued in foster care for a specified period of time, or
3. Be placed for adoption.

The Worker must request the Permanency Hearing in MACWIS sixty (60) calendar days prior to the hearing due date.

### (3) Who Should Be Invited

DFCS is directed to invite parents and/or legal guardians, foster, adoptive or relative-care parents, and grandparents to the review hearings, and any proceedings held with respect to the child in foster care pursuant MISS. CODE ANN. § 43-21-603(5) (e). However others who may have "relevant testimony" may be invited:

- Child
- Parent(s)-birth, legal, putative, primary caretaker, adoptive or Resource Parents
- Relatives with legal custody or other custodial adults
- Extended family members
- Assigned Worker and supervisor
- County Prosecuting Attorney
- Attorney for the child and/or GAL
- Court Appointed Special Advocate (CASA)
- Law enforcement officers

- Service providers
- Other witnesses

### (4) Worker's Responsibilities for Hearings and Notification of Hearings

**(Some courts require this to be handled differently. It is advisable to check with your court for any local rules that are applicable)**

- Notification Types include the following:
- Telephone Call
- Letter
- Summons and/or Subpoena
- Face-to-face notification

Documentation should be provided to the court by the Worker regarding who provided notice and what type of notification was used.

## 5. Termination of Parental Rights

Termination of parental rights (TPR) ends the legal parent-child relationship. TPRs may be effectuated via voluntary relinquishment of rights by the parent(s) or by a judicial finding by the court after parental due process.

After their child(ren) have been placed into DFCS custody, parents have a six-month period of time to work with the COR and complete an adult FSP for the benefit of the child. If the FSP is not satisfactorily completed within six months and if there are no compelling reasons to extend the FSP, DFCS may initiate a referral for TPR. (see MISS. CODE ANN. § 43-15-13(3-4)).

According to MISS. CODE ANN. § 43-15-13(4), DFCS may initiate TPR as follows:

If the conditions in the parents' FSP has not been satisfactorily met,

- *For children under the age of three (3) years, termination of parental rights shall be initiated within six (6) months, unless the department has documented compelling and extraordinary circumstances, and placement in a permanent relative's home, adoptive home or foster/adoptive home within two (2) months; and*

# Ex. 40

**Grace M. Lopes**

**From:** Long, Gwen [glong@bakerdonelson.com]
**Sent:** Tuesday, May 28, 2013 3:14 PM
**To:** mingber@ChildrensRights.Org; gmlopes@oymonitor.org
**Cc:** Mia Caras (mcaras@sparb.org); Rachal, Kenya
**Subject:** 319 and TPR Remediation Production
**Attachments:** mwls319001.pdf; TPR Remediation Plan001.pdf

Ladies:

Attached, please find:

| | |
|---|---|
| MWLS319 | DHS 331123-331229 |
| TPR Remediation Plan | DHS 332095-332130 |

Gwen

**Gwen N. Long**
Paralegal
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
Meadowbrook Office Park
4268 I-55 North
Jackson, MS 39211
Direct: 601.351.8962
Fax: 601.974.8962
E-Mail: glong@bakerdonelson.com
www.bakerdonelson.com

Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C. represents clients across the U.S. and abroad from offices in Alabama, Florida, Georgia, Louisiana, Mississippi, Tennessee, Texas, Washington, D.C.

Please consider the environment before printing this e-mail
**Baker Donelson**: One of FORTUNE magazine's "100 Best Companies to Work For"

---

Under requirements imposed by the IRS, we inform you that, if any advice concerning one or more U.S. federal tax issues is contained in this communication (including in any attachments and, if this communication is by email, then in any part of the same series of emails), such advice was not intended or written by the sender or by Baker, Donelson, Bearman, Caldwell & Berkowitz, PC to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or tax-related matter addressed herein.

This electronic mail transmission may constitute an attorney-client communication that is privileged at law. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this electronic mail transmission in error, please delete it from your system without copying it, and notify the sender by reply e-mail, so that our address record can be corrected.

# TERMINATION OF PARENTAL RIGHTS REMEDIATION PLAN
**May 2013**

## INTRODUCTION

In 2009, the Center for the Support of Families (CSF) and consultants for the Mississippi Department of Human Services Division of Family and Children's Services (hereinafter "DFCS") from the University of Southern Mississippi conducted a series of assessments required by the *Olivia Y* Settlement Agreement. One of the assessments was a Termination of Parental Rights (TPR) Assessment for the purpose of identifying those children who had been in custody more than 15 of the previous 22 months and for whom DFCS had neither filed a TPR petition nor documented an exception under the federal Adoption and Safe Families Act (ASFA). As a result of the Assessment, the final report included the following recommendations:

- That DFCS issue guidance to county departments regarding the new TPR "petition date" fields in MACWIS and provide directions regarding entering dates in the system. The guidance should include information pertaining to petitions filed by county departments in county court as well as petitions filed by the Attorney General's (AG) office and should advise staff to enter dates and other information in the required uniform fields on a timely basis;

- That for the next several months, DFCS continue validating the MACWIS reports through random case reviews in order to strengthen the accuracy of the reports;

- That DFCS develop a protocol with the AG's office that ensures regular communications with county departments on the dates TPR petitions are filed so the information can be entered into MACWIS promptly by the county worker;

- That DFCS review and strengthen its policy regarding the TPR process as needed, and clarify policy with county departments, for example, in the area of identifying and documenting appropriate exceptions to filing a TPR petition at each county conference;

- That the CQI process and enhancements to supervision address the timeliness and appropriateness of TPR practice and procedures, e.g., that decisions are made timely and accurately, that referrals are made timely, that exceptions are appropriate to the child's/family's circumstances, and that all information is recorded accurately in MACWIS;

- That, when the FCR reviews an individual child's case each six months at the time of county conferences, the FCR reviewers compare the information pertaining to TPR identified in the review with the information recorded in MACWIS, both in the case plan and the court history fields, and note the conformity or lack of conformity in its feedback/reports to the county (the report noted that this may already be occurring);

- That the TPR reports developed by MACWIS be actively used in evaluating county performance, and be distributed monthly to Regional Directors and ASWSs, as a means

of monitoring their accuracy and consistency and in promoting accountability for complete information. It also recommended that, for children identified in the reports in care for at least 15 of the most recent 22 months without either a petition filed date or an exception documented, the ASWS provide a written report to the RD explaining the circumstances of the case and the reasoning behind neither a filing a petition nor documenting an exception;

- That a supervisory protocol be developed to use the TPR reports in the supervision of caseworkers to ensure that exceptions are appropriate, documented correctly and routinely evaluated, and that TPR petitions are filed timely based on federal requirements. Supervisors should be required to validate the accuracy of the TPR information in the MACWIS reports on a monthly basis in order to ensure accurate information on children in care 15 of 22 months going forward; and

- That DFCS strengthen training on TPR proceedings and decision making as a means of ensuring that practice in this area is appropriate. Training should address the issue of children who object to adoption by helping build the skills of staff to discuss adoption appropriately with children in foster care, identifying strategies to address the concerns expressed by children/youth, and ensuring that permanency goals are re-evaluated and re-considered over time.

Subsequently, the Settlement Agreement was modified and in the Modified Settlement Agreement (MSA) and Period 3 Implementation Plan (IP3) at Section II. B. 4. a & b, the requirement is as follows:

*a. Within six (6) months of the start of Implementation Period 3, Defendants, in conjunction with a qualified independent consultant, shall develop a remedial plan with related action steps and time frames necessary to address the deficiencies found by the TPR Assessment in case practice and documentation related to the timely filing of termination of parental rights on behalf of children who have spent 17 of the previous 22 months in foster care, and for whom an available exception under the Adoption and Safe Families Act ("ASFA") has not been documented. The issues that the remedial plan shall address include:*

1) *accurately identifying children for whom the ASFA TPR requirements apply;*
2) *adequate training for caseworkers regarding the circumstances that qualify as exceptions to filing TPRs pursuant to ASFA; and*
3) *appropriately documenting exceptions*

*b. Defendants shall have begun implementing the TPR remedial plan by the end of Implementation Period 3.*

Based on the requirements in the MSA and IP3, this TPR Remedial Plan will address each of the recommendations of the TPR Assessment and the requirements noted above. The sections that follow correspond to each of the recommendations listed above.

**Recommendation: Provide Guidance on Entering TPR Petition Dates into MACWIS**

This recommendation was for DFCS to issue guidance and direction to the county caseworkers regarding the TPR petition date fields in MACWIS. The Legal/Judicial Sub-Team, which is made up of representatives from the adoption unit, the AGs office and the field, decided it would be more consistent to manage this task at the State Office level than to rely on data entry at the county level.

The information that DFCS uses to track progress on TPR actions is filed in a report sent to the TPR Coordinator by the AG's office on a monthly basis. Prior to the TPR Assessment, the report did not include the date the petition was filed. Since the time of the TPR Assessment, the monthly AG's report on TPR referrals was revised to add two columns: one for the date the petition was filed and the other for the judge's name who will hear the case. The TPR Coordinator at the State Office currently receives this report each month and enters all the new petition filed dates into the MACWIS system for all counties except Forrest County (unlike other counties in Mississippi, TPR cases in Forrest County are heard by the Youth Court Judge in County Court. The Forrest County staff is responsible for entering the TPR petition filed dates into MACWIS for each Forrest County Court TPR in a timely manner. (MACWIS Report MWZ014D1 reflects those petition dates). This information is captured on monthly reports generated by MACWIS (MWZ01451 AND MWZ0452). The AG's monthly TPR Report is posted on the DFCS Connection site which is available to all DFCS staff. A sample of this report is in Appendix A.

No further action is needed in order to comply with this recommendation.

**Recommendation: Validate MACWIS TPR Reports**

Beginning with the *Olivia Y* Bridge Plan period in 2010, as new MACWIS reports have been developed, they have been validated/revalidated by MACWIS staff. Secondary review assistance is provided by university contractual staff along with CSF contractual staff. CSF has also developed a validation process in order to ensure consistency in validating and re-validating reports.

After a new MACWIS report is implemented, validated reports are scheduled for revalidation every 6 months and continue to be revalidated on a rotating 6-month schedule performed by the MACWIS unit. There are currently 3 reports used to validate the TPR status for children in custody: MWZ014D1, MWZ014D2, and MWZ017. MWZ014D1 and MWZ014D2 report children in custody 15 out of the most recent 22 months. MWZ014D1 reports children with no documented exceptions to the TPR filing requirements and MWZ014D2 reports with documented exceptions. MWZ017 was created as a result of the new MSA requirement to report children in custody 17 of the most 22 months, and was validated and implemented July 2012. This report lists children with and without an ASFA exception.

In July 2012, four new staff members were hired in the MACWIS unit and assigned responsibility to validate and revalidate MACWIS reports based on established validation protocols resulting from the *Olivia Y* Bridge Plan. In August 2012, these new staff began validation and revalidation of reports. Staff consists of one program administrator and three program managers trained to conduct validation/revalidation of reports by university contractual staff in the MACWIS unit. Guidance and assistance continue to be provided by university contractual staff and CSF contractual staff.

As part of the effort to thoroughly familiarize all DFCS staff with the requirements, measures, and documentation processes associated with the MSA, DFCS and CSF are conducting regional meetings to cover these topics with front line staff, supervisors, and regional staff. Part of the expected outcome of these meetings is that staff will improve the documentation of their work and increase the accuracy of the reports used to describe their work.

MACWIS QA staff works with MIS staff in requesting a "snapshot" of the production database on a particular date prior to the beginning of each revalidation cycle. The validation process overview is as follows:

**STEP 1:** MACWIS reports validation begins with the validation coordinator:

1) conducting user acceptance testing for newly developed reports,
2) documenting the high level business rules and data point locations for each report,
3) pulling report samples (minimum of 5–10%),
4) assigning reports (or parts of reports) to reviewers for data validation.

**STEP 2:** Each data validation team member, using the high level business rules/data point locations document as a guide, works each sample record to determine in MACWIS if the data in the system matches the report data, based on the data point location within MACWIS. Each team member documents his/her findings within a standardized error reports document.

**STEP 3:** The validation coordinator compiles the validation results for QA review and assigns the report, or sections, to QA team members for secondary validation of results (approximately 5% of reviewed cases are reviewed for QA).

**STEP 4:** The validation coordinator reviews all results, researches issues found, documents errors for further review by MIS and documents those findings by using a tracking mechanism called HEAT. Currently, the validation team forwards data entry errors to the CQI Business Analyst, MACWIS Director and CQI Director. Efforts to determine the best recourse for disbursement of those findings to field staff for data corrections and casework improvements are underway and indicated in the next steps section.

| Action Needed | Action Steps | Person(s) Responsible | Anticipated Completion Date |
|---|---|---|---|
| A formalized plan to distribute the findings to the field and to track the corrections | CQI Sub-Team to develop and implement the plan | CQI Sub-Team | June 30, 2013 |
| Provide for increased accuracy and consistency in the report validation process | CSF will provide additional training for the validation staff. In addition, as DFCS develops its capacity to extract data from the MACWIS system and produce reports from another server, CSF will provide the initial validation of the newly re-created reports and will work closely with DFCS report validation staff to increase their ability to provide validation activities on an on-going basis. | CSF staff and [redacted] | The initial/additional training of the DFCS validation staff was provided by CSF as of February 28, 2013. The ongoing revalidation of reports by CSF referenced in the "Action Steps" column will be initiated following the production of the first batch of reports, approximately July 2013, and will be on-going through November 15, 2013. |

**Recommendation: Develop Protocol with Attorney General's Office Regarding Dates Petitions Filed**

Several steps have been taken to ensure regular communication between the AG's office and county staff regarding petitions filed:

1) The assigned AG attorney submits a draft petition to terminate parental right to the county of responsibility (COR) worker and ASWS to review for accuracy prior to filing;
2) Each month the AG's Office submits a report to the DFCS TPR Coordinator which includes the date the AG's office received the TPR packet, the date the petition was filed, the judge who will hear the petition, and the status of the case. A sample of this report is in Appendix A. With that information on the report,
3) The TPR Coordinator enters the petition filed dates for each case into MACWIS.
4) The AG's report is posted monthly on the DFCS Connection site where county staff can check for the status of the cases.

No further action is needed in order to comply with this recommendation.

**Recommendation: Strengthen Policy on TPR Process**

Current policy on the TPR process is detailed as far as the actual referral for TPR, the mechanics of the forms, documents and procedure or making a referral. It is not as detailed about ASFA

Exceptions to filing a TPR. There is no detailed discussion of the criteria for making a compelling reason determination. In addition to listing the criteria, policy should outline the evidence the caseworker will need to consider and provide in support of the exception. Equally important as the clarity on the criteria for making a compelling reason determination is the process that is used by the caseworker to make and document a decision as well as the process for ongoing review of that decision by the Agency and the court.

| Action Needed | Action Steps | Person Responsible | Anticipated Completion Date |
|---|---|---|---|
| Strengthen policy related to TPR and ASFA Exceptions | Policy will be revised to include details about ASFA TPR requirements , exceptions to filing TPR, documenting exceptions and approval of the exception | [redacted], Chair of the Policy Sub-Team | July 31, 2013 |

**Recommendation: CQI Process and Enhancements to Supervision Addresses TPR Requirements**

**Recommendation: Use the TPR MACWIS Reports to Evaluate County Performance**

The CQI Unit addresses TPR requirements through two review processes within CQI, the Evaluation and Monitoring Unit (EMU) reviews and the Foster Care Review (FCR) process. The FCR process is addressed in the next recommendation separately since it was a separate recommendation in the TPR assessment.

The EMU provides information on termination of parental rights through the results of each region's annual on-site case review, monthly case review results, MACWIS data indicators, and stakeholder survey results. Item 10 on the "Evaluation and Monitoring On-Site Review Instrument" addresses the permanency goal for the child and includes items that pertain to ASFA criteria for referring cases for termination of parental rights or documenting exceptions when a child has been in state's custody for 15 of the most recent 22 months. Item 15 on the review instrument addresses adoption and prompts the reviewer to make a determination if the Agency and the courts are making concerted efforts to achieve the plan of adoption in a timely manner.

Included in each region's comprehensive EMU review report are the MACWIS data indicators surrounding the Court Processes systemic factor that address the ASFA regulations and how the region and each county within the region are performing with regard to children in custody reaching the point at which they have spent 15 of the previous 22 months in foster care with no ASFA exception noted having a petition for TPR filed on their behalf. The data indicators also measure if an exception has been noted for those children which have been in state's custody for 15 of the most recent 22 months with no petition for TPR filed on their behalf.

The Agency has recently started reporting on whether a termination of parental rights petition has been filed on behalf of children who have spent 17 of the previous 22 months in foster care by the last day of a child's seventeenth month in care, unless an available exception under ASFA has been documented in the child's case record. The 17 of 22 month *reporting* criterion was

adopted in collaboration with the *Olivia Y* parties to comport with federal processes for *reporting* this same information, although the actual federal requirement remains applicable for children in care for 15 of 22 months.

As part of the stakeholder survey process conducted in each region by the EMU, internal and external stakeholders are asked how effective the county/region is in filing for termination of parental rights when a child is in foster care for 15 of the most recent 22 months.

If identified as an area of needed improvement, the issue of submitting termination of parental rights referrals in a timely and accurate manner are addressed through the Regional CQI Sub-Teams utilizing MACWIS data indicators, case review results, and FCR data made available on the DFCS Connection site that identifies and tracks the TPR process on a child specific basis until the packet is successfully submitted to State Office.

As a means of ensuring that CQI findings and data are actually used to craft plans for implementing the Practice Model and to meet the requirements of the MSA, the CQI Unit conducts Data-to-Action meetings in the regions in which reports are issued following baseline and follow-up Evaluation and Monitoring reviews.

Data-to-Action meetings were established as a means for the CQI Unit to collaborate with regions shortly after the finalized regional CQI report is received following an EMU baseline and/or annual follow-up review. The sessions are attended by the RD, key regional staff which would include but the ASWSs, the Regional Practice Coach, Adoption Supervisors and others. The EMU Liaison, the foster care reviewer, Regional Implementation Team representatives, and key external stakeholders are also in attendance. These meetings aid in the interpretation of the case review results and data indicators, along with information obtained through stakeholder surveys and FCR data, and identify strengths and areas of needed improvement in order to inform practice and support program improvement plan efforts within the region. Data from the EMU review, FCR data, and Data Dashboard information drive the discussion in which strategies for improvement efforts are brought forth. The effort is designed to generate analytic strategies to ensure that CQI results are effectively integrated into the ongoing regional implementation plans so that the regions operate on an informed basis in implementing the Practice Model. The Data-to-Action meetings are designed to assist the region in understanding their data and interpreting it as a "road map" to improvement. Included in these Data-to-Action meetings are data surrounding timeliness of adoptions, children in custody 15 of the most recent 22 months with a TPR referral made or an exception noted, and children in custody 17 of the most recent 22 months with a TPR referral made or an exception noted.

If, during the course of a Regional CQI Sub-Team meeting, the issue of timeliness of termination of parental rights is identified as an area needing improvement for the region, the team will develop strategies for monitoring improvement. These strategies could include monthly monitoring of MACWIS data reports, utilization of FCR data, and targeted case reviews in order to get a clearer picture as to what the barriers are in the TPR process for the region and what areas of the region the issue seems to be most prominent. Based on the results of this monitoring, the Regional CQI Sub-Team can then identify whether it is a practice issue or a systemic issue and develop more specific strategies to address the matter and work toward improvement in

performance. With continued monitoring, the region will then know if the strategies and corrective actions implemented resulted in positive change.

The SFY 2012 CQI Plan calls for a written protocol to be developed and defined for corrective action of timely monthly county issues identified in the FCR process. In addition to the FCR process, the CQI Unit also will address issues that arise during the course of monthly, baseline, and annual follow-up EMU on-site case reviews, as well as during the course of the Maltreatment In Care (MIC) reviews when the MIC reviews are implemented. Finally, if relevant concerns are identified in the course of validating MACWIS reports, they will also be addressed by the CQI Unit. This protocol provides for a consolidated process to address areas requiring immediate attention identified in all of these review activities.

Although these procedures and time frames in the IP3 apply specifically to safety-related deficiencies noted in the MIC reviews and to monitoring remedial actions pertaining to the child's safety, the Office of CQI will use the same procedures for similar issues identified in other review activities in order to ensure consistency in approach across all review activities. The CQI process, through the EMU and FCR reviews, monitors for strengths and needs in case practice related to child permanency (which includes timeliness of referrals for termination of parental rights) and well-being as well as safety. That is the primary purpose of the review processes and in every case reviewed, CQI reviewers will identify both strengths and needs in practice and outcomes that will require some level of attention by the county department. In general, the case-specific concerns identified through the FCR and EMU reviews are described in verbal and written reports back to the county department and circulated to the DFCS administration. The FCR process has traditionally identified concerns in practice that are shared with staff in the county department following reviews. There are other processes in place that require county departments to address these routine concerns through corrective actions, which will remain in place.

Copies of the following documents are in Appendix B:

- Item 10 of the EMU On-Site Review Instrument which addresses the permanency goal for the child;
- A copy of sections from a regional CQI report to show how Item 10 from the review instrument is addressed in the Individualizing Case Planning section;
- A copy of sections from a regional CQI report to show how these items are addressed in the Court Processes section through the MACWIS data indicators and the stakeholder surveys; and
- Minutes from a recent Regional CQI Sub-Team meeting that address adoption.

| Action Needed | Action Steps | Person Responsible | Anticipated Completion Date |
|---|---|---|---|
| Protocol for corrective action of monthly county issues in the FCR process, CQI reviews, MIC reviews and validation of MACWIS reports | Development of protocol for corrective action | CQI Sub Team [redacted] | June 30, 2013 |
| Implementation of Corrective Action Protocol | Provide instructions and training, if needed, for field staff about the corrective action protocol | CQI Sub Team [redacted] | June 30, 2013 |

**Recommendation: FCR Reviews Address Documentation of TPR Requirements**

The FCR Unit reviews the MACWIS and paper file cases of all children who have been in foster care for at least 6 months on an every-6-month schedule, and conducts family group conferences to gather verbal information for case assessment. The children in custody 15/22 months or longer are included in these reviews. The review, held at 6-month intervals, provides feedback at the county level on each child as it relates to the appropriateness of the plan, what efforts are being made to achieve the plan, the timeliness and quality of the services provided, etc. The feedback from the review is captured in two MACWIS documents that are a part of the child's MACWIS case file. The Periodic Administrative Determination (PAD) and the Youth Court Hearing and Review Summary are the MACWIS tools used by FCR staff to document the findings of the review process. Those findings can relate to areas requiring further administrative assessment if the review identifies documentation discrepancies, lack of documentation, lack of provided services, etc., and includes citing casework needs related to TPR such as overdue TPR packets, failure to document court procedures in MACWIS, discrepancies in names/spellings on court orders, birth certificates, etc. The recommendations that result from the FCR are forwarded to the ASWS who is, then, expected to follow up with any needed corrective action. The ASWS is also required to ensure that the assigned worker completes the comments sections of the Youth Court Hearing and Review Summary adequately so that exceptions for filing/not filing for TPR are documented for the court. The ASWS is responsible for ensuring that the appropriate exceptions are documented in the Youth Court Hearing and Review Summary tabs and that the tool is printed and filed with the youth court.

The FCR team began collecting and tracking the names of children with overdue TPR packets in August 2011. Each child identified with an overdue TPR packet is tracked until the packet is successfully submitted to State Office. A report is updated monthly and is uploaded to the DFCS Connection site. RDs have been charged with the responsibility of ensuing communication to field staff about the availability of this tracking system and report. The following documents are in Appendix C:

- Screen print of the DFCS connection page;
- Youth Court Hearing and Review Summary;
- Screen prints of selected pages of the PAD;
- Summary tab on the PAD

No further action is needed to comply with this recommendation.

**Recommendation: Supervisory Protocol on Monitoring TPR Requirements**

Identifying children for whom the ASFA TPR requirements apply has been facilitated by the availability of MACWIS reports MWZ041D1, MWZ041D2, MWZ01451, and MWZ01452, which are updated monthly on the DFCS Connection site. These reports are tools available to all DFCS staff and can be used by workers, supervisors, RDs, and State Office personnel in measuring workers', counties' and regions' performance in the area of seeking permanency for these children in a timely manner.

Additionally, the AG, the Permanency Unit and FCR produce monthly reports. The AG's report indicates the legal status of all TPR referrals accepted by that office. The Permanency Unit reports each referral being held and not referred to the AG because of missing documentation. The missing documentation is specified. The FCR report lists cases that are past due for a TPR referral. These reports assist the supervisory staff to monitor, provide consultation, and ensure the timely and appropriate referrals for TPR.

DFCS Administrative Policy outlines the administrative and programmatic duties of the county ASWSs. Among other things included is one about applying data reports to improve client outcomes and another one is a requirement to hold weekly individual conferences with each staff member under their supervision.

With the implementation of the Practice Model, staff in the region receives extensive training on Family Centered Practice and assuring safety, permanency and well-being for all children. The Practice Model also provides opportunities to focus on data reports and what they mean in relation to practice. In addition to the training all staff receives, there are also coaches for the workers and coaches for supervisors. The supervisory coaches work with supervisors in the region to improve their supervisory skills of casework practice.

Newly hired or promoted supervisors receive 40 hours of pre-service clinical supervisory training prior to assuming supervisory responsibilities. Included in the training are the various methods supervisors have available to assess the performance of workers, including timeliness of TPR referrals. A new training curriculum was recently implemented for experienced supervisors entitled, "Level 2 – Clinical Supervisory Training". After a supervisor has a year of experience, they receive this advanced level of training to enhance their supervisory skills. This training is delivered in three 2-day sessions. Transfer-of-learning and coaching activities follow each session to reinforce the material presented in each classroom session. The focus of the training is on supporting the MSA through the successful implementation of the Practice Model. Permanency for children is an important piece of this, and timeliness of achieving permanency is a focal point.

**Recommendation: Strengthen Training on TPR Processes**

DFCS has strengthened training on the TPR proceedings with the Competent Permanency Planning Curriculum and the Adoption Competency Curriculum. Both of these curricula address the issue of children who object to adoption and present a model for assessing and preparing children/youth for adoption. This model includes using life books and other tools as staff continues to re-visit the permanency goals with the youth in care. The training includes information about children for whom ASFA TPR exceptions may apply. A copy of the Adoption Competency Agenda and objectives are in Appendix D. The Adoption Competency Curriculum has been delivered to trainees statewide and refresher courses are being offered continually. Competent Permanency Planning training is provided following the practice model training in each region. A separate training focusing on life books is being developed by the University of Mississippi Social Work Training Academy. This training will be offered as ongoing training for all staff and will be delivered by the UM trainers.

In addition to the training conducted by the Professional Development Unit and the Permanency Unit, the Legal/Judicial Sub-Team has developed training on the TPR process which is delivered by an attorney and the TPR Coordinator when requested by the regions. This training focuses on the documentation needed to refer a case for TPR, the processes to gather the documentation and the procedures for routing a completed TPR packet to the State Office.

**Summary of the Plan**

Each of the recommendations from the 2009 Termination of Parental Rights Assessment has been addressed and measures put in place to implement them. Policies and procedures have been revised to incorporate the recommendations into the regular work of direct service staff as well as State Office staff. Giant steps have been taken to improve the communication between the AG's office and the DFCS office on TPR cases. Two different reports with information about cases on referral are posted monthly on the DFCS Connection site from the AG's office and from the TPR coordinator. Another report is posted by the FCR Unit on children whose cases are past due for a referral for TPR. MACWIS reports are reviewed by several different entities to ensure accuracy and to evaluate county and worker performance. Staff and supervisors have access to all these reports through the DFCS Connection site.

Workers are trained, from the beginning of their employment, that permanency for children is the goal and should be accomplished as quickly as possible. There is still need for training on the specific casework techniques needed to discuss permanency with children/youth and help them explore the options available to them and what each option might mean for them in the long term. Workers also continue to need help and support from supervisors in addressing specific case situations.

# Appendix A

STATE OF MISSISSIPPI

OFFICE OF THE ATTORNEY GENERAL

JIM HOOD
ATTORNEY GENERAL

HUMAN SERVICES
DIVISION

November 21, 2012

Onetta S. Whitley
Deputy Attorney General
550 High Street, Suite 1200
Jackson, Mississippi 39201

Dear Ms. Whitley:

Enclosed, please find updated TPR Spreadsheets that list all of the children that are in our office as of November 21, 2012. In October, there were a total of 307 children pending TPR. As of today's date, there is a total of 326 children pending TPR. Below is a chart detailing each pending category from 0-3 months through 6 months or older.

| CATEGORIES | Cases 0-3 Months Old | Cases 3-6 Months Old | Cases 6 Months or Older | TOTAL |
|---|---|---|---|---|
| Court Dates | 64 | 42 | 103 | 209 |
| Petitions Being Drafted | 54 | 0 | 0 | 54 |
| Reviewed By [redacted] or Social Workers | 6 | 2 | 1 | 9 |
| Mailed To Clerk's Office | 15 | 2 | 0 | 17 |
| Pending Activity | 7 | 8 | 22 | 37 |
| TOTAL JUDGMENTS 01/04/12-Present 310 | | TOTAL CHILDREN PENDING TPR 326 | | |

Denotes 1st Setting

Sincerely,

Earl Scales/swm

M. Earl Scales
Assistant Attorney General

MES/swm

cc: Rickey Berry, Executive Director, MDHS
Mark Smith, Deputy Administrator, F&CS
Mike Gallarno, Division Director MDHS

750 N. STATE STREET - POST OFFICE BOX 220 - JACKSON, MISSISSIPPI 39205
TELEPHONE (601) 359-4239 - FACSIMILE (601) 359-4240

DHS
332106

| | CASE NAME & CHILD/CHILDREN NAME(S) 0-3 MONTHS | DATE RECEIVED | DATE FILED | ATTORNEY | COUNTY | JUDGE | STATUS |
|---|---|---|---|---|---|---|---|
| 1 | | 9/21/2012 | 10/1/2012 | | Alcorn | | 01/09/13 Court Date, 1st Setting |
| 2 | | 8/17/2012 | 10/25/2012 | | Harrison | | 01/10/13 Court Date, 1st Setting |
| 3 | | 8/17/2012 | 10/25/2012 | | Harrison | | 01/10/13 Court Date, 1st Setting |
| 4 | | 8/17/2012 | 10/25/2012 | | Harrison | | 01/10/13 Court Date, 1st Setting |
| 5 | | 8/24/2012 | 10/3/2012 | | Humphreys | | 01/15/13 Court Date, 1st Setting |
| 6 | | 8/10/2012 | 10/2/2012 | | Holmes | | 01/17/13 Court Date, 1st Setting |
| 7 | | 8/10/2012 | 10/2/2012 | | Holmes | | 01/17/13 Court Date, 1st Setting |
| 8 | | 8/10/2012 | 9/10/2012 | | Washington | | 01/17/13 Court Date, 1st Setting |
| 9 | | 8/10/2012 | 9/10/2012 | | Washington | | 01/17/13 Court Date, 1st Setting |
| 10 | | 9/13/2012 | 10/25/2012 | | Adams | | 01/23/13 Court Date, 1st Setting |
| 11 | | 9/13/2012 | 10/25/2012 | | Adams | | 01/23/13 Court Date, 1st Setting |
| 12 | | 9/13/2012 | 10/25/2012 | | Adams | | 01/23/13 Court Date, 1st Setting |
| 13 | | 9/26/2012 | 10/22/2012 | | Clay | | 01/25/13 Court Date, 1st Setting |
| 14 | | 9/26/2012 | 10/22/2012 | | Clay | | 01/25/13 Court Date, 1st Setting |
| 15 | | 9/26/2012 | 10/22/2012 | | Clay | | 01/25/13 Court Date, 1st Setting |
| 16 | | 9/13/2012 | 9/27/2012 | | Oktibbeha | | 01/29/13 Court Date, 1st Setting |
| 17 | | 9/13/2012 | 9/27/2012 | | Oktibbeha | | 01/29/13 Court Date, 1st Setting |
| 18 | | 9/13/2012 | 10/25/2012 | | Harrison | | 01/31/13 Court Date, 1st Setting |
| 19 | | 9/21/2012 | 10/25/2012 | | Harrison | | 01/31/13 Court Date, 1st Setting |
| 20 | | 9/26/2012 | 10/22/2012 | | Hancock | | 02/01/13 Court Date, 1st Setting |
| 21 | | 9/26/2012 | 10/22/2012 | | Hancock | | 02/01/13 Court Date, 1st Setting |
| 22 | | 9/26/2012 | 10/22/2012 | | Hancock | | 02/01/13 Court Date, 1st Setting |
| 23 | | 9/26/2012 | 10/22/2012 | | Hancock | | 02/01/13 Court Date, 1st Setting |
| 24 | | 9/21/2012 | 10/1/2012 | | DeSoto | | 02/06/13 Court Date, 1st Setting |
| 25 | | 9/21/2012 | 10/1/2012 | | DeSoto | | 02/06/13 Court Date, 1st Setting |

## Appendix B

### *Individualizing Case Planning*

| ITEM 10. Permanency goal for child *(Does not apply to In-Home Cases)* | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | Permanent | | Concurrent |
| 99 | What is (are) the child's current permanency goal(s) (or if the case was closed during the period under review, what was the permanency goal before the case was closed)? | | | | | | |
| 100 | Is (are) the child's permanency goal(s) specified in the case file? *(Check 'N/A' for Prevention or Protection cases only)* | | | | Yes | No | NA |
| 101 | If the child entered care during the PUR, was a permanency plan developed within the childs first 30 days in care? | | | | Yes | No | NA |
| 102 | Were all of the permanency goals that were in effect during the period under review established in a timely manner? | | | | Yes | No | N/A |
| | Permanency Goal | Date Established | Time in Foster Care Before Goal | Date Goal Changed | Reason for Goal Change | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| 103 | Were all permanency goals in effect during the period under review appropriate to the child's needs for permanency and to the circumstances of the case? | | | | Yes | No | NA |
| 104 | Please document the reasons the reviewers determined that the goals were not timely and/or appropriate (if relevant): | | | | | | |
| 105 | Has the child been in foster care at least 15 of the last 22 months? | | | | Yes | No | |
| 106 | If no to #105, does the child meet Adoption and Safe Families Act (ASFA) criteria for termination of parental rights (TPR)? | | | | Yes | No | NA |
| 107 | If yes to #105, did the agency file a TPR petition before the period under review or in a timely manner during the period under review? | | | | Yes | No | NA |
| 108 | If no TPR petition has been filed, and the child has been in state's custody for 15 of the most recent 22 months, is an "exception" or compelling reason for not filing for TPR documented in the case file? | | | | Yes | No | NA |
| 109 | If an exception has not been documented, do circumstances exist that would constitute a legal exception? | | | | Yes | No | NA |
| 110 | If the child has a goal of reunification, does the case record documentation reflecting active concurrent permanency planning ? | | | | Yes | No | NA |
| 111 | If the child was discharged during PUR, was an aftercare plan developed prior to discharge? | | | | Yes | No | NA |
| Rating | Section 10 is rated:________________. Please elaborate on any findings: | | | | | | |

EMU Review Instrument.revised 01132012.xlsIndividualizing

DHS 332108

*Areas Needing Improvement*

| Data Indicators Associated with Individualizing Case Planning | Year III Goal/ Compliance Measure | Region (July 2012) | State (July 2012) |
|---|---|---|---|
| Working with service providers, foster parents, the child, and the family, DFCS shall develop and document in the child's case record a permanency plan within 30 calendar days of the child's initial placement that specifies the permanency goal, a timeframe for achieving permanency, and activities that support permanency.<br>Data Source: MWLS312S/D<br>*August 1, 2011-July 31, 2012 | 90% | 44<br>27.16% | 810<br>34.13% |

- The data indicator in the table above states, *"Working with service providers, foster parents, the child, and the family, DFCS shall develop and document in the child's case record a permanency plan within 30 calendar days of the child's initial placement that specifies the permanency goal, a timeframe for achieving permanency, and activities that support permanency"*.
- The goal for this measure is 90%. Region 3-North does not meet this goal at 27.16%.
- 21.4% of the foster cases reviewed rated as Strength for <u>Permanency Goal for the Child (On-Site Case Review Item 10)</u>.
    - o The permanency goal(s) for the child were specified in the case file in 12 of the 14 foster care cases reviewed. The permanency plan was developed within the child's first 30 days in care for children who entered custody during the period under review in 1 of the 2 applicable cases reviewed.
    - o Permanency goals that were in effect during the period under review were established in a timely manner in 69.2% of the applicable foster care cases reviewed in the sample.
    - o The permanency goals were appropriate to the child's needs for permanency and to the circumstances of the cases in 85.7% of the foster cases reviewed.
    - o 6 of the 14 subject children had been in care for 15 of the most recent 22 months. Of those 6 in custody 15 of 22 months, none had been referred for TPR in a timely manner. Of those who were not referred for TPR, 3 had documented compelling reasons for not pursuing TPR
    - o Of the 10 cases reviewed with a goal of Reunification, 5 contained documentation that reflects active concurrent permanency planning.
    - o 5 children in the case review sample were discharged during the period under review. Of those 5, 2 children had an aftercare plan developed prior to discharge.
    - o 10 cases were cited and reported to the county of responsibility by the Foster Care Review Program during the February 2011 through January 2012 review cycle due to issues surrounding the appropriateness of permanent plans for foster children.
    - o 33 cases were cited and reported to the county of responsibility by the Foster Care Review Program due to issues surrounding children in custody 15 of the most recent 22 months who had not been referred for termination of parental rights or had sufficient compelling reasons documented for not being referred for TPR.

| Data Indicators Associated with Court Processes | Year III Goal/ Compliance Measure | Region | State |
|---|---|---|---|
| Children in custody who have spent more than 15 of the previous 22 months in FC without a TPR petition filed will have an exception noted or a TPR filed §<br>Data Source: MWZ014S1 & MWZ014S2<br>§ As of July 5, 2012 | 80% | 69 children 57.02% | 1,040 children 62.3% |

The Year III goal for this data indicator is 80% of children in custody who have spent more than 15 of the most recent 22 months in foster care without a TPR petition filed will have an exception noted or a TPR filed. Region 3-North does not meet this goal at 57.02%.

*Other Key Indictors*

- Judges and resource parents were asked how effective the Foster Care Review/County Conference process is in helping ensure that children have the appropriate goals and achieve goals timely. Of those who responded, 50% feel that the process is almost always or frequently effective, 22% feel that it is somewhat or rarely effective, 6% do not feel that it is at all effective, and 6% responded with NA. 16% chose not to respond to this particular question.
- Internal stakeholders were asked to evaluate the effectiveness of the 6 month reviews in promoting timely achievement of permanency for all children in foster care. 45.7% stated the 6 month reviews were almost always or frequently effective in promoting timely permanency, 30.4% stated the 6 month reviews were somewhat effective in promoting timely permanency, and 2.2% of respondents answered N/A. 21.7% of respondents did not provide an answer to the question.
- External stakeholders were asked how effective the county/region is at making sure that foster parents, pre-adoptive parents and relative caregivers receive notice of reviews and hearings, and have an opportunity to be heard. 83.2% stated the agency almost always or frequently is effective in making sure resource parents receive notice and were allowed to be heard, 5.6% stated that the agency is somewhat or rarely effective in making sure of this, 5.6% stated that the agency is not at all effective in making sure that resource parents receive notice of hearings and are allowed to be heard, and the remaining 5.6% stated that they had no information.
- When relevant stakeholders were asked how effective the county/region is in filing for termination of parental rights when a child is in foster care for 15 of the most recent 22 months and there is no compelling reason not to file, 33% stated the agency frequently or almost always is effective in filing for TPR; 35% stated the agency is somewhat or rarely effective in filing for TPR, 8% stated that the question did not apply to them, and 4% answered "No Information". 20% of those responding did not provide an answer.
- Relevant external stakeholders were asked how effective the 12 month court hearings are for children in foster care in addressing timely permanency. 44% of those respondents stated that the 12 month hearings are almost always or frequently effective, 17% stated that the hearings are somewhat or rarely effective, 6% stated that they are not at all effective, and the remaining 11% responded N/A and the remaining 22% stated that they had no information on this.
- Relevant external stakeholders were asked how effective the county/region is in ensuring that each child in foster care had a permanency hearing in a qualified court no later than 12 months from the date the child entered foster care and no less frequently than every 12 months thereafter. For this particular question, there were no respondents. This question is asked only on the Judges and court personnel survey.

DHS 332110

| Data Indicators Associated with Court Processes | Year III Goal/ Compliance Measure | Region (July 2012) | State (July 2012) |
|---|---|---|---|
| Children who have been in custody at least 6 months have had a timely county conference Data Source: MWZTACRS **August 1, 2011-July 31, 2012 | 90% | 242 children 95.65% | 3,405 children 95.89% |

*Areas Needing Improvement*

| Data Indicators Associated with Court Processes | Year III Goal/ Compliance Measure | Region (July 2012) | State (July 2012) |
|---|---|---|---|
| Children in custody at least 12 months have had a timely annual court review Data Source: MWZTPHRS ** August 1, 2011-July 31, 2012 | 90% | 73 children 34.11% | 1928 children 59.88% |

- The Year III Goal for this item is that 90% of children in custody at least 12 months have had a timely annual court review. The Region does not meet this measure in that 34.11% of the children for whom this measure applies have had such hearings in a timely manner.

| Data Indicators Associated with Court Processes | Year III Goal/ Compliance Measure | Region (July 2012) | State (July 2012) |
|---|---|---|---|
| Children in custody reaching the point at which they have spent 15 of the previous 22 months in foster care with no ASFA exception noted will have a petition for TPR filed on their behalf Data Source: MWZ014S1 ** As of July 5, 2012 | 80% | 3 children 5.45% | 389 children 38.21% |

- The Year III goal for this measure is 80% of children in custody reaching the point at which they have spent 15 of the most recent 22 months in foster care with no Adoption Safe Families Act (ASFA) exception noted will have a petition for termination of parental rights (TPR) filed on their behalf. The region does not meet this goal in that 5.45% of children with in custody 15 of the most recent 22 months with no ASFA exception noted have had a TPR petition filed on their behalf. This was also noted as an Area Needing Improvement in the Practice Model section of this report.

DHS 332112

REGION 3-NORTH
CQI Review Report
July, 2012

## Systemic Factors

Court Process

| Data Indicators/Goal for Court Process | Year III Goal Compliance Years | Region [illegible] 2012 | State [illegible] 2012 | [illegible] County | [illegible] County | [illegible] County | [illegible] County | [illegible] County | [illegible] County | [illegible] County | [illegible] County | [illegible] County |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Children who have been in custody at least 6 months have had a timely county conference<br>Data Source: MWZTACRS<br>** August 1, 2011-July 31, 2012 | 90% | 242 children 95.65% | 3,405 children 95.89% | 3 children 100% | 6 children 100% | N/A | 3 children 100% | 46 children 95.83% | 70 children 90.91% | 60 children 100% | 3 children 100% | 51 children 96.23% |
| Children in custody at least 12 months have had a timely annual court review<br>Data Source: MWZTPHRS<br>** August 1, 2011-July 31, 2012 | 90% | 73 children 34.11% | 1928 children 59.88% | 0 children 0% | 6 children 50% | N/A | 0 children 0% | 28 children 73.68% | 3 children 6.12% | 2 children 3.77% | 3 children 100% | 31 children 58.36% |
| Children in custody reaching the point at which they have spent 15 of the previous 22 months in foster care with no ASFA exception noted will have a petition for TPR filed on their behalf<br>Data Source: MWZ014S1<br>** As of July 5, 2012 | 80% | 3 children 5.45% | 389 children 38.21% | 0 children 0% | 1 children 20% | N/A | 0 children 0% | 0 children 0% | 2 children 15.38% | 0 children 0% | N/A | 0 children 0% |
| Children in custody who have spent more than 15 of the previous 22 months in FC without a TPR petition filed will have an exception noted or a TPR filed**<br>Data Source: MWZ014S1 & MWZ014S2<br>** As of July 5, 2012 | 80% | 69 children 57.02% | 1,040 children 62.3% | 0 children 0% | 2 children 33.33% | N/A | 0 children 0% | 8 children 50% | 13 children 54.17% | 22 children 73.33% | 1 children 100% | 23 children 57.50% |

# Quarterly CQI Team Meeting
## Region 4-North
## November 1, 2012

## Minutes

1. Welcome by [redacted]

2. Strategies for Improvement from the July 19, 2012 meeting: where do we stand at this point?

   - Discussed Independent Living – sign in sheets and information being shared. Reported by EML that Region 4 – North has had an independent Living Training in which a state office Independent worker came down and did the training. Region should see an improvement in the numbers
   - FTM's – EML also reported that Region 4 – North has had a FTM training done recently by the Practice Coach. Region should see an improvement. Need to stress to ASWS that FTM's need to held to update ISP's.

3. Key concerns as identified by the Data-to-Action Meeting of 7/19/2012 and the most recent Data Dashboard:
   - Rate of Maltreatment in Care—Currently (or at last dashboard), Year III Standard is <.57%. Region was at 2.71 %. or nearly 5X the acceptable rate.
     - Target review needs to be done to see if the staff is evidencing reports of policy violations as abuse and neglect due to the increase in the rate of maltreatment in care for this region. Also, the report needs to look at to see if one child or the entire sibling group is being counted in a maltreatment report.
   - Children Reunified within 12 months of entering care. Standard for Year III is 60%. Region now is at 46.94%.
     - Reasons giving during the meeting for our numbers include, but are not limited to: court continuation and TPR packets done timely. Areas also affecting reunification found through case reviews are the lack of FTM's being held to update ISP's. Lack of documented contact with parents appears to be an issue found through case reviews. Region should see improvement due to recent FTM trainings, and Permanency Competency Trainings.

- Adoption Finalization. Children reaching a finalized adoption within 24 months of entering care. Year III Standard is 25%. Region is at 10%.

  - (rolling report) According to staff in the meeting, court continuation seems to be a big issue, but children are being adopted.

- Visiting with parents (emphasis on absent parents, or primarily, fathers). Year IV Standard is that 40% will have monthly, face to face contact with the worker. Region is at 32.73%.

  - Numbers reflecting the fact that we have several parents who reside out of state and the staff is unable to visit monthly. According to Clay County ASWS, she has 13 kids whose parents live out of state. This situation is out of the agency's control due to where they are located. ASWS stated that her workers do make regular phone calls to those parents that reside out of state.

4. Improvement Strategies: What can we do right now to improve in these areas (if not all four, then we can discuss a few).

   - EML needs to communicate with the RD about these concerns and the strategies that we have. The staff needs to improve on the visitation of the parents that are feasible and local in order to improve practice as well as these numbers and help with the ones that located out of state. This issue also needs to be brought to the State Implementation level to be addressed concerning the parents who live out of state.

   - Also, it has been suggested that the Regional ASWS possibly spot check to see if ASWS's are holding and documented staffing with their workers.

   - Also, it has been suggested that the ASWS look at the quality as well as to see if the visits are occurring with parents where the goal is reunification.

   - EML to look at case reviews that have been done since January and focus on the visitation part only. EML to do targeted case reviews and look at specific information. If not enough cases have been done since January review, EML to do a random sample of maybe a certain county or certain workers to focus on a certain item.

- Target review needed to look at specific kids and see what the maltreatment was and what is being documented. Also, we need to pull the report guide for this report to see exactly what it is counting.

- The report needs to be pulled and looked at individual children to see what the time frame is in regards to adoption finalization. Also, need to make sure the worker is documenting efforts and lack of efforts that is being made by the court and the agency. It was noted that the Adoption ASWS, had the MS School of Law come down and discuss the process.

5. Next Steps: Next meeting has been scheduled for 1-17-2013 from 10-12 at Clay County office. EML to print reports off of the P-drive for these areas. It appears that by having these reports in hand that the staffs are able to look and see the areas and the children. This will provide for better discussion as well as coming up with appropriate strategies.

6. Dismiss

## Appendix C

DHS
332116

**TPR/Adoption Tab**

TPR Q's:

Q56. Has TPR occurred/is the child free for adoption? [Yes / No / * (NA)]

Q57. Has the child been in custody 15/22 months? [Yes / No / * (NA)]

Q58. Did reviewer find evidence that exceptions exist to not refer the case for TPR? [Yes / No / * (NA)]

Q59. Has the court ordered the case to be referred for TPR? [Yes / No / * (NA)]

Q60. Has the TPR packet been submitted? [Yes / No / * (NA)]

Q61. Was the TPR packet due or overdue at the last review of the case? [Yes / No / * (NA)]

ADOPTION Q's:

Q62. Does the child have a permanent plan of adoption? [Yes / No / * (NA)]

Q63. Does the child have an assigned adoption specialist? [Yes / No / * (NA)]

Q64. Adoption COR/COS attended/Participated in PAR? [Yes / No / * (NA - no Adoption COR/COS)]

Q65. Did the reviewer find supporting evidence that the child has an adoption plan? [Yes / No / * (NA)]

Q66. Does it appear that active efforts are being made to achieve a finalized adoption for the child (including locating/recruiting a committed placement for the child?) [Yes / No / * (NA)]

Q67. Has the child been freed for adoption longer than six months without an identified, committed adoptive placement? [Yes / No / * (NA)]

Q68. Did reviewer find evidence that a request has been made for an external adoption consultant? [Yes / No / * (NA - external Adoption Consultants not available to DFCS during PUR)]



Comments 1 and 2 are completed by the FCR reviewer to include comments from the family group conference and any recommendations as a result of the review of the case and conference.

Recommendation Tabs 1, 2 and 3 are completed by the county worker / assigned COR worker and the Agency Assessment Tab is also completed as a Court Report or Summary.

When all screens are printed, the child ISP is included which includes a history of all services provided to the child, including court hearings, etc.

This is printed and submitted to the Youth Court file *every 6 months* that the child remains in custody. The court should enter a finding as a result.



MACWIS - County Conference
File Edit Ticklers Search Spell Check Web Help
New Update Save Delete Confirm Tickler Workload Pad To Do Spell Chk Calculator Scr Help Help
Intake
Report
Log
Investigation
Person Search
Mass Transfer
All Reviews
Invitation Letter
Conf Comments 1
Conf Comments 2
Rec / Reasons 1
Rec / Reasons 2
Rec / Reasons 3
Agency Assessment
Please check any of the following factors that may apply for each child
Abandonment or desertion of the child
No contact by parent with child, under 3 for 6 months, or 3+ for 1 year
Parent responsible for a series of abusive incidents involving children
Parent failed to maintain visitation
Parent did not comply with the case plan
Parent's behavior unchanged
Animosity by child toward parent
Court has determined reunification is not in child's best interest
Save
Reviewer
Social Worker
ASWS
More Info
Lock Review
Print Conference
Close
Demographics
Case
Court
Eligibility
Finance
Resource
Personnel
Reports
System Admin
MWCFCRVB
Name:
ID:
11/27/2012 9:47 AM
Start
DFCS Connec...
TPR
TPR Remediat...
Document1 - ...
MACWIS - C...
Quick Launch

DHS
332119



MACWIS - County Conference

File Edit Ticklers Search Spell Check Web Help

New Update Save Delete Confirm Tickler Workload Pad To Do Spell Chk Calculator Scr Help Help

Intake | Report | Log | Investigation | Person Search | Mass Transfer

All Reviews | Invitation Letter | Conf Comments 1 | Conf Comments 2 | Rec / Reasons 1 | Rec / Reasons 2 | Rec / Reasons 3 | Agency Assessment

Agency recommendation, check all that apply

| | |
|---|---|
| Agency recommends a finding of Aggravated Circumstances | |
| Agency recommends the Termination of Parental Rights | |

For those children for whom TPR is not recommended, check all that apply

| | |
|---|---|
| Child is being cared for by a relative | |
| Not in the best interest of the child | |
| Needed services not provided | |
| Child 14+ and objects to adoption | |
| Parents maintain regular visits | |

Save

Reviewer | Social Worker | ASWS

More Info | Lock Review | Print Conference | Close

Demographics | Case | Court | Eligibility | Finance | Resource | Personnel | Reports | System Admin

MWCFCRVB | Name : | ID : | 11/27/2012 | 8:47 AM

Start | DFCS Connec... | TPR | TPR Remediat... | Document1 - ... | MACWIS - C... | Quick Launch

DHS 332120



Screenshot #1:  New FCR PAD icon is located under the County Conference  icon.  Each time a reviewer sets a conference for a child, the names of the children the conference was set for will pull into the PAD.

DHS
332121



MACWIS - Periodic Administrative Determination
File Edit Ticklers Search Spell Check Web Help
New Update Save Delete Confirm Tickler Workload Pad To Do Spell Chk Calculator Scr Help Help
0-21 at Tombigbee State Park 264 Cabin Drive Tupelo, MS. Youth age 17 to 20 should attend.**** >>>>>>>>>>>>>>
Intake Demographics Case Court
Well Being / Care Planning TPR / Adoption Indep Living / Legal Hist + Permanency Parent Information Resource Placement Comments / Recommendations
PAD Previous Pad / General Initial Placement ICPC / Developmental Mental / Educational
PAD's
Reviewer Start Date Completed Date
02/10/2012 02/10/2012
Legal History County Conference PAD Child Support Referral Court Order Request Hearing Request Medical Order Request
Children in Custody
Name DOB SSN Cust Start Date Cust End Date Address
Comments
Update
COR Worker COR ASWS COS Worker Adop Worker Close
Eligibility Finance Resource Personnel Reports System Admin
MWCPADTB Client: DOB:
2/10/2012 10:54 AM
Start Citrix Access Platform - ... MACWIS - Periodic Ad... Windows 2000 Desktop f...
10:54 AM

Screen shot #2: 1st tab of PAD

28

DHS
332122



Screenshot #3: Double click on line at top with reviewer's name. The "start date" is the date the reviewer set the county conference. The "completed date" will generate once the reviewer has submitted the PAD to the county ASWS.



Screen shot #4: The questions reviewers are answering are in the bottom section. You can scroll down to see them. The reviewer answers the questions with an "X" in the appropriate field. If there are multiple children in a case, each child will be displayed and the questions are answered for each child.

Comments are entered by the reviewer in a different screen. The comments box in the lower right hand side is clicked and takes the reviewer to the next screen to enter the comments.



Screenshot #5: Some questions require that the reviewer enter comments to explain the answer. These comment boxes look like this. This section will contain the qualitative information entered by the reviewer.

DHS
332125



The last tab on the PAD: The reviewer completes each tab of the PAD and enters any recommendations in this section. The PAD will be locked and sent to the county ASWS. The county ASWS will receive a tickler stating that a case staffing is needed to finalize the PAD.

**Appendix D**

ADOPTION
COMPETENCY
CURRICULUM

## CHILD/YOUTH ASSESSMENT AND PREPARATION

- Policies and Processes in Child/Youth Assessment and Preparation
- Transitioning from Foster Care to Adoption
- Older Child Adoption
- Adoption of Sibling Groups

National Child Welfare
Resource Center for Adoption
ACC - Child/Youth Assessment & Preparation

Spaulding for Children
JAN. 2008

33

DHS
332127

## Agenda

Review of Objectives, Competencies and Content

**Segment I: Policies and Processes in Child/Youth Assessment and Preparation**

Definitions

The Framework, Processes and Tools for Quality Assessments and Preparation

Child Assessment and Preparation: A Framework and Process for High Quality Assessment

Preparation Process

Child/Youth Assessment and Preparation: Tools and Techniques

DVD: *Getting to Know You*

Large Group Discussion: Tools and Techniques

**Segment II: Transitioning from Foster Care to Adoption**

Review of Content

Large Group Discussion: Focusing on the Perceptions of Children/Youth

Team Activity: Harris Family Profile

Ways to Help Build Attachments during Transition from Foster Care to Adoption

Large Group Discussion: Helping Children/Youth Understand their History

Working Towards Redefining Relationships

Team Activity: Helping Children/Youth Transition from Foster Care to Adoption

**Segment III: Older Child Adoptions**

Review of Content

Definition of Older Child/Youth

Individual Activity: Personal and Professional Values

Large Group Discussion: Personal and Professional Values

DVD: *Isaiah's Story: Part I*

Large Group Discussion: Isaiah - Part 1

Five Major Issues a Youth Needs to Address in the Process of Moving Successfully into a Family

What Does It Really Mean when an Youth says, "No, I Don't want to be Adopted"

What You Can Do Instead of Accepting "No"

DVD: *Isaiah - Part 2*

Addressing Issues Involved in Adoption of Older Children/Youth

Identifying Barriers: Child Welfare Practitioner Issues

Dynamics of Older Children/Youth Transitioning to Adoptive Placements

Attachment and Relationships

Working Strategies and Solutions

**Segment IV: Adoption of Sibling Groups (approximately 3 hours)**

Review of Content

Large Group Discussion: Harris Family Case Profile

Large Group Discussion: Sibling Relationships

Placement of Siblings: State Policies and Procedures

Team Activity: Advantages of Placing Siblings Together, Disadvantages of Placing Siblings Together

Promising Practices in Sibling Placement

**Segment IV: Recording and Assessing Information in the Child Study and Assessment**

Review of Content

Large Group Discussion:

## Child Assessment and Preparation

*Objectives:*
- *Examine the current needs of the adoption field and the participants within it.*
- *Build knowledge and skills in conducting an adoption process based on empowering children/youth and prospective adoptive parents.*
- *Build knowledge and skills in writing a child/youth assessment and preparation.*
- *Identify ways in which adoption impacts growth and development.*
- *Understand the unique needs of adopted children/youth.*
- *Heighten participant awareness of the need for preparation of children/youth who are being adopted by their current foster parents or relatives.*
- *Help clarify, from the child/youth's perspective, the differences between being a child/youth in foster care and being a child/youth who has been adopted.*
- *Practice reframing "problem" behaviors as "survival" behaviors.*

*Competencies: Participants will be able to:*
- *Complete a comprehensive child/youth assessment.*
- *Utilize an assessment and preparation process to make placement decisions, develop service plans, and prepare a child/youth for any change in placement or relationship with the current foster family or relatives.*
- *Utilize a variety of tools and techniques to engage, assess and prepare children/youth for better placement.*
- *Collaborate with others more effectively in the assessment and preparation process.*
- *Assist a child/youth in understanding the role the practitioner plays in the assessment and preparation process.*
- *Assist children/youth to gain a better understanding of what has happened and what will be happening, and engage children/youth in the planning for their present and future life experiences.*
- *Prepare children/youth to transition from being in foster care to being adopted in the same household.*
- *Engage the children/youth actively in preparing to be adopted by their current foster parents or other parents.*

### Content Outline

This module contains the following segments:

- Policies and Processes in Child/Youth Assessment and Preparation
- Transitioning Children/Youth from Foster Care to Adoption
- Older Child Adoption
- Adoption of Sibling Groups
- Recording and Assessing Information in the Child Profile and Assessment.

# Ex. 41A

- Service providers
- Other witnesses

### (4) Worker's Responsibilities for Hearings and Notification of Hearings

**(Some courts require this to be handled differently. It is advisable to check with your court for any local rules that are applicable)**

- Notification Types include the following:
- Telephone Call
- Letter
- Summons and/or Subpoena
- Face-to-face notification

Documentation should be provided to the court by the Worker regarding who provided notice and what type of notification was used.

## 5. Termination of Parental Rights

Termination of parental rights (TPR) ends the legal parent-child relationship. TPRs may be effectuated via voluntary relinquishment of rights by the parent(s) or by a judicial finding by the court after parental due process.

After their child(ren) have been placed into DFCS custody, parents have a six-month period of time to work with the COR and complete an adult FSP for the benefit of the child. If the FSP is not satisfactorily completed within six months and if there are no compelling reasons to extend the FSP, DFCS may initiate a referral for TPR. (see MISS. CODE ANN. § 43-15-13(3-4)).

According to MISS. CODE ANN. § 43-15-13(4), DFCS may initiate TPR as follows:

If the conditions in the parents' FSP has not been satisfactorily met,

- *For children under the age of three (3) years, termination of parental rights shall be initiated within six (6) months, unless the department has documented compelling and extraordinary circumstances, and placement in a permanent relative's home, adoptive home or foster/adoptive home within two (2) months; and*

# FOSTER CARE

- *For children who have been abandoned under the provisions of Section 97-5-1, termination of parental rights shall be initiated within thirty (30) calendar days in an adoptive home shall be initiated without necessity for placement in a foster home.*

But, in any case, per MISS. CODE ANN. § 43-15-13(3), DFCS shall initiate TPR proceedings: *"For any child who has been in foster care for fifteen (15) of the last twenty-two (22) months regardless of whether the foster care was continuous for all of those twenty-two (22) months… The time period starts to run from the date the court makes a finding of abuse and/or neglect or sixty (60) calendar days from when the child was removed from his/her home, whichever is earlier".*

The Worker shall inform parents of the following facts:

1. The rights and relationships of the birth parents (as well as all other biological relatives) will be legally and completely severed from the child. The parents and extended family will no longer have legal right to talk to, visit or have contact with the child(ren) when parental rights are surrendered.
2. When adopted the child will legally become a part of a new family.
3. A voluntary release of the child signed by the birth parents is generally irrevocable.

Parents must be informed of the process DFCS follows to terminate their parental rights. They must also be informed of their rights to an attorney and be offered a referral to supportive counseling.

If parents voluntarily surrender their rights, they must be asked if they understand the consequences of the surrender. DFCS may accept a voluntary surrender, regardless of the parent's age (MISS. CODE ANN. § 93-15-103 (2)), unless that parent is *non compis mentis* and/or committed to a psychiatric hospital for the mentally ill or mentally retarded.

### a) Legal Basis

MISS. CODE ANN. § 93-15-103 through 93-15-111 provides the procedures and grounds for the TPR.

MISS. CODE ANN. §§ 43-15-13(3) and (4) provides additional circumstances under which TPR may be initiated.

MISS. CODE ANN. § 43-21-121 provides for the appointment of a Guardian Ad Litem (GAL) to protect the interest(s) of the child.

MISS. CODE ANN. § 43-21-121(2) states that "the Guardian Ad Litem shall be appointed by the court when custody is ordered or at the first judicial hearing regarding the case, whichever occurs first".

### b) Grounds

The grounds for TPR are based on one or more of the following eight factors which may be found at MISS. CODE ANN. § 93-15-103(3). The following grounds may apply singularly or in combination in any given case:

1. A parent has deserted without means of identification or abandoned a child as defined in MISS. CODE ANN. § 97-5-1;
2. A parent has made no contact with a child under the age of three (3) for six (6) months or a child three (3) years of age or older for a period of one (1) year;
3. A parent has been responsible for a series of abusive incidents concerning one or more children;
4. When the child has been in the care and custody of a licensed child caring agency or the Department of Human Services for at least one (1) year, that agency or the department has made diligent efforts to develop and implement a plan for return of the child to its parents, and:

   a. The parent has failed to exercise reasonable available visitation with the child; or

   b. The parent, having agreed to a plan to effect placement of the child with the parent, fails to implement the plan so that the child caring agency is unable to return the child to said parent;
5. The parent exhibits ongoing behavior which would make it impossible to return the child to the parent's care and custody:

   a. Because the parent has a diagnosable condition unlikely to change within a reasonable time such as alcohol or drug addiction, severe mental deficiencies or mental illness, or extreme physical incapacitation, which condition makes the parent unable to assume minimally, acceptable care of the child; or

   b. Because the parent fails to eliminate behavior, identified by the child caring agency or the court, which prevents placement of said child with the parent in spite of diligent efforts of the child caring agency to assist the parent;
6. When there is an extreme and deep-seated antipathy by the child toward the parent or when there is some other substantial erosion of the relationship between the parent and child which was caused at least in part by the parent's failure to visit or communicate, or prolonged imprisonment; or

7. When a parent has been **convicted** of any of the following offenses against any child:
    a. **Rape** of a child (per § 97-3-65).
    b. **Sexual Battery** of a child (per § 97-3-95(c)).
    c. **Touching** a child for lustful purposes (per § 97-5-23).
    d. **Exploitation** of a child (per § 97-5-31).
    e. **Felonious Abuse or Battery** of a child (per § 97-5-39(2)), or
    f. **Carnal Knowledge** of step or adopted child or a child of a cohabitating partner (per § 97-5-41).
    g. **Murder**, voluntary manslaughter, aided or abetted, attempted, conspired or solicited to commit such murder or voluntary manslaughter, or a felony assault that results in the serious bodily injury of the surviving child or another child of such parent; or
8. The child has been **adjudicated** to have been abused or neglected and custody has been transferred from the child's parent(s) for placement pursuant to MISS. CODE ANN. § 43-15-13, and a court of competent jurisdiction has determined that reunification shall not be in the child's best interest.

## c) When to Initiate

DFCS is required to file a petition or join an existing petition to terminate parental rights and concurrently identify, recruit, process, and approve a qualified adoptive family:

1. When a child has been in custody for six (6) months and the parents or primary caretakers are not completing the FSP, and no compelling reasons to extend the six month time frame for completion of the goals and conditions of the FSP are present. (MISS. CODE ANN. § 43-15-13(4))
2. When a child (of any age) has been in foster care **15 of the most recent 22 months**, regardless of whether the foster care was continuous during those 22 months. A cumulative method of calculation should be used when a child has had multiple exits and entries into foster care during the 22 month period. Trial home visits and runaway episodes should not be used in calculating the 15 months in foster care. (MISS. CODE ANN. § 43-15-13(3)).
3. When a court has determined a child to be an abandoned infant, TPR shall be initiated within thirty (30) calendar days. (MISS. CODE ANN. § 43-15-201)
4. When a parent has been convicted of the following offenses against any child, pursuant to: (i) rape, (ii) sexual battery, (iii) touching for lustful purposes, (iv) exploitation, (v)

felonious abuse or battery, (vi) carnal knowledge of a step or adopted child or a child of a cohabitating partner, (vii) murder of a child of such parent, voluntary manslaughter of another child of such parent, aided or abetted, attempted, conspired or solicited to commit such murder or voluntary manslaughter, or a felony assault that results in the serious bodily injury of the surviving child or another child of such parent, or (viii) a court of competent jurisdiction has determined that reunification shall not be in the child's best interest. ( MISS. CODE ANN. § 93-15-103).

5. When the court of jurisdiction orders DFCS to proceed with TPR. (MISS. CODE ANN. § 93-15-103(3)).

## d) Exceptions and Compelling Reasons not to File TPR

DFCS may choose not to file for TPR if any of the following apply and a court order is obtained:

1. The child is being cared for by a relative.
    a) Pursuant to 93-15-103(4), "legal custody and guardianship by persons other than the parent as well as other permanent alternatives which end the supervision by the Department of Human Services should be considered as alternatives to the termination of parental rights, and these alternatives should be selected when, in the best interest of the child, parental contacts are desirable and it is possible to secure such placement without termination of parental rights."
2. DFCS has documented compelling and extraordinary reason(s) why TPR would NOT be in the best interest of the child.
3. DFCS has not provided such services as it deems necessary for the safe reunification of the family (provided reasonable efforts are required to be made at all), or services were not available or accessible. (see 42 U.S.C. 671 § 471)

Compelling and extraordinary reasons may include but are not limited to the following:

a) As a result of a current assessment, DFCS has determined that a family setting will not meet the child's needs because of the child's severe emotional, behavioral or psychiatric needs. The case plan shall demonstrate that services have been put in place to address the problems that prevent the child from functioning in a family setting.

b) The child has a permanent disability which can be managed only with intensive assistance in a specialized setting (such as a residential group care setting, therapeutic foster home, or medical foster home) and

    1. The child's birth parent or other family member continues to be meaningfully involved in planning for the child, or

c) The parent(s) have made substantial progress in eliminating the problems causing the child's continued placement in foster care and there is a strong likelihood that the child will be able to return home safely with the next six (6) months.

All exceptions for compelling reasons must be approved by the assigned ASWS and the RD, and shall be documented clearly in the case record. Children who have been in care 15 of the last 22 months must have an exception noted or a TPR petition filed no later than the 17th month in care.

## e) Worker Responsibilities

The COR Worker shall have the following responsibilities in obtaining TPR:

1. Make diligent searches to locate the parents; (see "f. Diligent Search" below)
2. Discuss with the Supervisor the documented evidence and circumstances of the case and the grounds for TPR, and obtain the Supervisor's approval to pursue TPR;
3. Initiate, through face-to-face contact, a discussion with the parents on voluntary surrender of parental rights, explaining thoroughly what TPR means for them and the child;
4. Inform the parents of DFCS's decision to pursue TPR, citing the grounds, documented evidence, and circumstances of the case. This includes the informing parent(s) that even if they are visiting with the child(ren) and are in the process of complying with an FSP for the return of the child(ren),DFCS is pursuing TPR and intends to obtain a TPR judgment;
5. Discuss the plan of adoption with the child, gaining the child's input/reaction to the decision to file a petition to TPR, and explain what the process means for the child. This discussion shall be held by the COR and if applicable by the COS;
6. Document the Adoption Discussion with the child in the Child's FSP under the "Initial/Review" tab in MACWIS.
7. Submit a TPR referral through MACWIS and a TPR packet to the Supervisor who will submit it to the RD.
    - The RD will send both an electronic and paper request to the Permanency Unit at the State Office.
    - The RD will approve the TPR request in MACWIS when the TPR packet is sent to the Permanency Unit.
    - The Permanency Unit will notify the Attorney General's (AG) office that a TPR packet has been sent.
8. Review the TPR petition for accuracy.

9. Sign the affidavit on diligent searches and return, within seven (7) calendar days to the AG's office.
10. Be knowledgeable of the case being referred for TPR and be prepared to testify in the TPR proceeding. In addition the COS may be called to testify on the case.
11. After the hearing the Worker will document results of the hearing in the child's case in MACWIS.
12. File a copy of the Judgment in the child's paper case and forward the document to the Permanency Unit.

When a child's primary permanency goal is established as adoption, DFCS shall submit a TPR packet to the State Office within 30 calendar days. Within 30 calendar days of receipt of the TPR packet by the State Office, the State Office shall:

- review the packet,
- remedy any deficiencies, and
- submit a TPR referral to the Office of the Attorney General.

Within 30 calendar days of such referral, the Office of the Attorney General shall either file the petition for TPR or document to DFCS a legal deficiency preventing timely filing. Within 10 working days of receiving documentation of a legal deficiency, the assigned DFCS Worker shall document to the Office of the Attorney General the steps to be taken to address the deficiency. The DFCS Worker and that Worker's direct supervisor shall meet in person every 30 calendar days thereafter to document progress being made to address the legal deficiency until a TPR referral has been accepted as legally sufficient by the Office of the Attorney General, who shall file the petition for TPR within 30 calendar days.

### f) Diligent Searches

MISS. CODE ANN. § 43-15-13(3), states DFCS "shall make all possible contact with the child's natural parent(s) and any interested relative for the first two (2) months following the child's entry into the foster care system." Possible sources for diligent searches include, but are not limited to:

1. Sending correspondence to all previous addresses;
2. Calling all previous telephone numbers posted in the case file;
3. Sending letters to General Delivery in a town or city where the Worker believes the parent to be residing but has no specific address;
4. Contacting motor vehicle registration;

5. Requesting a record check from local law enforcement;
6. Writing the State Department of Labor (local Employment Office), if Worker has a social security number;
7. Contacting prisons and/or state hospitals;
8. Contacting all known relatives, friends and previous employers;
9. Checking the telephone directory, county, and city directories;
10. Contacting utility and telephone companies;
11. Accessing the State and Federal Parent Locator Service through the Child Support Enforcement Office;
12. Accessing the Location Services through contact with the local post office;
13. Making a historical check through MACWIS; and
14. Utilizing Internet services.

The Worker should document all efforts to locate the **biological father** whose identity is unknown or whose identity is known but whose address is unknown.

### g) TPR Packet Checklist

When submitting a TPR packet to the Permanency Unit, these items must include:

1. Birth certificate of child(ren) which includes the parent's names;
2. Attested copies of all court orders concerning the child(ren);
3. Any of Form MDHS-459 series, if applicable;
4. Psychological Evaluation of child(ren), if applicable;
5. All medical or psychological reports on parents, if available, including necessary medical releases;
6. Any summaries or court reports prepared on child(ren) or his/her family;
7. Copies of written parental FSPs, if applicable;
8. A recent color photograph of child(ren);
9. State Department of Health Form 913 (original), **with birth records attached**;
10. If a Form 459 is signed, State Department of Health Forms 914 and 915 (originals) must be included;
11. Additional items (ex. DNA test results, Social Security Cards);

12. AG's Office memorandum.

**A copy of the completed/signed TPR Checklist shall be filed in the case file.**

To prevent delays in processing the information, the county should submit a **complete referral** including all of the items listed above.

Upon receipt, a Permanency Unit Worker will:

- Date stamp and log the information,
- Make the appropriate number of copies,
- Set up a case record,
- Review the information, and
- Prepare a "Data Sheet" for the Director's Advisory Committee on Permanency Planning (DACOPP) members, if applicable.

### h) Health Department Form 913

The COR Worker will obtain information for the Health Department form MSDH-913 and other case documentation. This information is used to:

1. Assess the child's physical and personality characteristics, current development, and special needs;
2. Determine whether the child's basic needs can best be met in an adoptive placement;
3. Help in the selection of a family for the child;
4. Provide information to prospective adoptive parents to assist in making a decision about the adoption of the child;
5. Provide information about the child and birth parents at the appropriate time;
6. Satisfy the child's need to know about the birth parents at the appropriate time.

## 6. Types of Referrals

### a) Court Ordered

A referral may be made in cases where a court has mandated the county office to file a petition or take the necessary action needed to terminate parental rights. This request should be acted on

within thirty (30) calendar days. These cases are not reviewed by DACOPP because the court order takes precedence over any DACOPP decision. DACOPP is made aware of these referrals, however, by the Permanency unit.

Some judges order the county office to bypass the state office and submit court ordered TPR referrals directly to the AG's Office. This is acceptable because the county office must comply with the court order. At the same time, the COR must submit a complete TPR referral to the Permanency unit at the State Office to prevent delays in processing.

### b) Voluntary Surrender of Parental Rights

This type of referral occurs when all legal, biological and putative parents have signed the form **MDHS-SS-459 "Voluntary Surrender of Parental Rights".** Voluntary Surrender of Parental Rights is permanent and irrevocable except for showings of fraud and/or financial gain, duress or undue influence.

With the Voluntary Surrender, the parent(s) must also sign State Department of Health Form 914 or 915(originals), depending on whether or not the parent wants information about them given to the child when the child reaches adulthood.

If only one parent releases his/her parental rights, the TPR referral will be reviewed by DACOPP to determine if sufficient grounds exist to terminate the parental rights of the other parent.

If both parents have signed the MDHS-SS-459 "Voluntary Surrender of Parental Rights" in the presence of a notary public, the referral will not be reviewed by DACOPP but the Permanency Unit will obtain a legal clearance.

If the parents were not married and there is no court order establishing paternity in the man claiming to be the father or in the man the mother claims to be the father, a TPR hearing must be held for an "Unknown Putative Father" before any legal clearances may be obtained.

The Voluntary Surrender should not be offered to parents who are *non compis mentis* and/or committed to a psychiatric or state hospital.

A parent may sign one or more of the following MDHS forms:

1. MDHS-SS-459 Surrender Parental Rights and Consent to Adoption
   This form may not be executed by the birth parents until 72 hours after the birth of a child.

   **Each parent must sign at least six originals** of this form in the presence of the Worker and a notary public. The originals are distributed as follows:

- Originals #1-2 each parent,
- Original #3 filed in the case record
- Original #4-7 four originals are forwarded to the Permanency Unit along with a complete TPR referral.

Note: Original 459's for each child of each parent must be included in the TPR packet.

2. MDHS-SS-459A Mother's Statement Naming the Father of Child

   This form is signed by the unmarried or married mother whose abandoned husband is not the biological father of the child.

   There must be **six originals** of this form signed in the presence of the Worker and a notary public. The originals are distributed as follows:

   - Original #1 mother,
   - Original #2 filed in the case record
   - Original #3-6 four originals are forwarded to the Permanency Unit along with a complete TPR referral.

   If the named father has not established any rights, the Worker shall give him information about how he can file to establish paternity.

3. MDHS-SS-459B Mother's Statement about Unknown Father of Child

   This form is signed when the Mother cannot identify the biological father. **Six originals** must be signed in the presence of the Worker and notary public. The originals are distributed as follows:

   - Original #1 mother,
   - Original #2 filed in the case record
   - Original #3-6 four originals are forwarded to the Permanency Unit along with a complete TPR referral.

4. The TPR packet must be forwarded to the Permanency Unit even though both parents have signed the MDHS-SS-459 "Voluntary Surrender of Parental Rights" in the presence of a Notary Public, in order for the Permanency Unit to obtain a legal clearance.

### c) Regular Referrals

This type of referral is not court ordered nor have the parents surrendered their rights.

The referral is prepared by the COR after all reasonable and diligent efforts to reunite the child with his/her family or place the child with relatives have failed.

The COR will document efforts to locate parents, if appropriate and identified legal grounds on which to terminate parental rights.

If these actions have taken place, the COR will prepare and submit a TPR referral with all required items to the Permanency unit. The referral will be reviewed by DACOPP to determine if sufficient grounds exist to terminate the parental rights.

### d) Special Referrals

These referrals are considered to be "special" because three circumstances apply:

a. A child is in custody and;
b. Both parents are deceased and;
c. Relatives are not available as placement resources.

This is a special kind of rare situation because both parents are deceased and there are no rights to terminate.

Along with regular TPR referral paperwork, the COR must submit the death certificates of the parents.

In addition, if circumstances dictate, a TPR referral may also be made to TPR an Unknown Putative Father.

### e) Rights of the Parents in the TPR Process

Prior to the entry of a Judgment Terminating Parental Rights the parent has a right to:

1. Receive notice of a hearing on a petition for TPR;
2. Appear and contest the petition;

3. Sign and execute a written voluntary release to relinquish parental rights to DFCS, regardless of the parent's age;
4. Continue visits with child until TPR is finalized or until court has restricted or discontinued visits due to other factors;
5. Obtain legal counsel prior to the date for which the TPR hearing is set.

### f) Evaluation of TPR Referrals

Evaluation of a TPR referral is conducted by the Permanency Unit TPR Coordinator. Referrals that are not court ordered are reviewed by the (DACOPP). If DACOPP requires additional information, a request will be submitted to the COR. When the review is completed, DACOPP will forward the review sheet and letter to the RD and COR.

The Permanency Unit will adhere to the following TPR procedures:

1. All TPR referrals are submitted from the COR to the Permanency Unit Director at the State Office;
2. The TPR referral will be given to the TPR Coordinator who will determine the need for a DACOPP referral before proceeding;
3. The Permanency Unit Director and TPR Coordinator will review the material in the referral packet for current and correct information before submitting it to the AG's office;
4. A copy of the TPR packet along with a receipt will be hand delivered to the AG's Office by the Permanency Unit;
5. The AG's Office will sign the receipt stating that the TPR package was received from the Permanency Unit;
6. Additional information may be requested by the AG from the COR Worker, Placement Director or DFCS Director;
7. The Permanency Unit Director will provide-the RD with a copy of any information requested by and sent to the AG's Office;
8. The Permanency Unit Director will log all out-going and in-coming mail concerning the TPR;
9. When information comes from the AG's Office it will be logged and sent to the RD to be disbursed to the correct supervisor;
10. Once the AG's Office drafts an affidavit for the COR Worker to review and correct as needed, the Affidavit will be amended and sent to the Permanency unit Director, who will log then mail it to the RD;

11. The corrected Affidavit will be hand-delivered to the AG's Office by the Permanency unit;
12. The Permanency unit Director will review the Petition and sign it as Next of Friend and send a copy to the RD and Director of Field Operation for the log and case file;
13. The AG will schedule a court date in Chancery Court;
14. The AG's Office will provide a quarterly docket to the Permanency unit;
15. The AG's Office will provide the Permanency unit Director a copy of the TPR Judgment which the Permanency unit Director will send to the RD, and TPR Coordinator. This Judgment is also logged.

### g) Attorney General's Office

A Special Assistant Attorney General will draft the petition and send it to the COR Worker and supervisor to review and to make any corrections or additions needed. The Worker should carefully review the petition for accuracy, making sure all the appropriate grounds are included, before routing it to the Placement Director for signature.

During the TPR process, the COR must notify the AG's Office of any changes in the case or with the family. Any questions or concerns must be discussed with the Special Assistant Attorney General handling the case or assigned to the region.

If the petition is correct it should be forwarded immediately to the Placement Director for signature. Within fourteen (14) working days of the COR's receipt of the petition, it must be signed by the RD and returned to the AG's office.

The attorney handling the case will notify the county of the date of the hearing and will help prepare staff for the court appearance. The petition may be presented to the court for adjudication at any time after the expiration of thirty (30) calendar days after process has been received by the respondent(s).

## VIII. Fiscal Aspects of Foster Care

### A. Board Payment

The "board payment" for foster children is determined by DFCS dependent upon the appropriation of the Mississippi Legislature. The board rate is based on the age, Supplemental Security Income (SSI) status, or non-SSI disability status, or special needs of the child. The total

# Ex. 41B

15-13, and a court of competent jurisdiction has determined that reunification shall not be in the child's best interest.

### c) When to Initiate

DFCS is required to file a petition or join an existing petition to terminate parental rights and concurrently identify, recruit, process, and approve a qualified adoptive family:

1. When a child has been in custody for six (6) months and the parents or primary caretakers are not completing the FSP, and no compelling reasons to extend the six month time frame for completion of the goals and conditions of the FSP are present. (MISS. CODE ANN. § 43-15-13(4))
2. When a child (of any age) has been in foster care **15 of the most recent 22 months**, regardless of whether the foster care was continuous during those 22 months. A cumulative method of calculation should be used when a child has had multiple exits and entries into foster care during the 22 month period. Trial home visits and runaway episodes should not be used in calculating the 15 months in foster care. (MISS. CODE ANN. § 43-15-13(3)).
3. When a court has determined a child to be an abandoned infant, TPR shall be initiated within thirty (30) calendar days. (MISS. CODE ANN. § 43-15-201)
4. When a parent has been convicted of the following offenses against any child, pursuant to: (i) rape, (ii) sexual battery, (iii) touching for lustful purposes, (iv) exploitation, (v) felonious abuse or battery, (vi) carnal knowledge of a step or adopted child or a child of a cohabitating partner, (vii) murder of a child of such parent, voluntary manslaughter of another child of such parent, aided or abetted, attempted, conspired or solicited to commit such murder or voluntary manslaughter, or a felony assault that results in the serious bodily injury of the surviving child or another child of such parent, or (viii) a court of competent jurisdiction has determined that reunification shall not be in the child's best interest. ( MISS. CODE ANN. § 93-15-103).
5. When the court of jurisdiction orders DFCS to proceed with TPR. (MISS. CODE ANN. § 93-15-103(3)).

### d) Exceptions and Compelling Reasons not to File TPR

DFCS may choose not to file for TPR if any of the following apply and a court order is obtained:

1. The child is being cared for by a relative.

a) Pursuant to 93-15-103(4), "legal custody and guardianship by persons other than the parent as well as other permanent alternatives which end the supervision by the Department of Human Services should be considered as alternatives to the termination of parental rights, and these alternatives should be selected when, in the best interest of the child, parental contacts are desirable and it is possible to secure such placement without termination of parental rights."

2. DFCS has documented compelling and extraordinary reason(s) why TPR would NOT be in the best interest of the child.
3. DFCS has not provided such services as it deems necessary for the safe reunification of the family (provided reasonable efforts are required to be made at all), or services were not available or accessible. (see 42 U.S.C. 671 § 471)
4. Parents make regular and meaningful visits/contacts with the child, maintain a relationship with the child, and TPR is not in the child's best interest.

## e) Worker Responsibilities

The COR Worker shall have the following responsibilities in obtaining TPR:

1. Make diligent searches to locate the parents; (see "f. Diligent Search" below)
2. Discuss with the Supervisor the documented evidence and circumstances of the case and the grounds for TPR, and obtain the Supervisor's approval to pursue TPR;
3. Initiate, through face-to-face contact, a discussion with the parents on voluntary surrender of parental rights, explaining thoroughly what TPR means for them and the child;
4. Inform the parents of DFCS's decision to pursue TPR, citing the grounds, documented evidence, and circumstances of the case. This includes the informing parent(s) that even if they are visiting with the child(ren) and are in the process of complying with an FSP for the return of the child(ren),DFCS is pursuing TPR and intends to obtain a TPR judgment;
5. Discuss the plan of adoption with the child, gaining the child's input/reaction to the decision to file a petition to TPR, and explain what the process means for the child. This discussion shall be held by the COR and if applicable by the COS;
6. Document the Adoption Discussion with the child in the Child's FSP under the "Initial/Review" tab in MACWIS.
7. Submit a TPR referral through MACWIS and a TPR packet to the Supervisor who will submit it to the RD.

# Ex. 42

**Grace M. Lopes**

**From:** Grace M. Lopes [gmlopes@oymonitor.org]
**Sent:** Friday, December 06, 2013 1:49 PM
**To:** 'Rachal, Kenya Key'
**Cc:** 'jdavis@ChildrensRights.Org'; 'Mark Jordan'; 'Mia Caras'
**Subject:** Problem with SZ0171 - Children in Custody at Least 17 of the Previous 22 Months For Whom a TPR Petition Was Filed or an Available ASFA Exception

Kenya: Please see Mark Jordan's e-mail, below, reporting on a problem with the PDF report for SZ1070. Although we were able to analyze the data, I am bringing this matter to your attention so you can alert your clients. If you have any questions, please contact Mark or Mia directly. Thank you. - Grace

*Grace M. Lopes*
*Monitor, Olivia Y.*
*1220 19th Street, N.W.*
*Suite 500*
*Washington, D.C. 20036*
*202.232.8311*

*This email and any attachments may contain confidential and privileged information. If you are not the intended recipient, please notify the sender immediately, destroy this email, and destroy any copies. Any dissemination or use of this information by a person other than the intended recipient is unauthorized and may be illegal.*

---

**From:** Mark Jordan [mailto:mjordan@sparb.org]
**Sent:** Friday, December 06, 2013 1:22 PM
**To:** 'Grace M. Lopes'
**Cc:** 'Mia Caras'; mjordan@sparb.org
**Subject:** Problem with SZ0171 - Children in Custody at Least 17 of the Previous 22 Months For Whom a TPR Petition Was Filed or an Available ASFA Exception

We have identified what appears to be a problem with the PDF of SZ0170.

This report is intended to reflect the following:

1) The number and percentage of children for whom a TPR petition was filed or an exception was noted prior to the end of the child's 17th month in custody (for those children in custody 17 of the prior 22 months); and
2) For those children for whom a TPR was filed or an exception was not noted prior to the end of the 17th month in custody, whether a TPR was filed or an exception was noted subsequently.

My understanding of the specification is that the report is intended to divide the cohort of youth in the report population into mutually exclusive, collectively exhaustive groups. In other words, every child in the cohort should appear in certain subtotals and every child should appear in not more than one of the subtotals. More specifically, the report should indicate among the cohort of youth being reported on how many children (and what percentage) had a TPR filed or an exception noted consistent with MSA requirements and how many children did not have a TPR filed or an ASFA exception noted consistent with MSA requirements.

As it is currently designed, the report does not divide children into mutually exclusive groups. For example, in the PDF report for the period 6/1/13 – 6/30/13 in Region II-E, the report reflects the following:

| | |
|---|---|
| Total number of children in custody 17 of 22 months: | 37 |
| # and % of Children of whom a TPR petition filed/exceptions noted after 17 of 22 months: | 23 |
| # and % of Children of whom a TPR petition filed/exceptions noted within 17 of 22 months: | 34 |

A footer in the report notes that "Children may have both TPR filed and exception noted so summary numbers may not be unique."  It appears that the unit of analysis in the PDF report is not the child, but rather the TPR or exception noted for each child, which explains why the subtotals sum to more than the total number of children.

For our analysis, we used individual children as the unit of analysis.  Because we did not identify any concerns with the underlying data, we analyzed the data consistent with the MSA.  The numbers in our chart will therefore differ from the numbers reflected in the PDF of this report.

If you should have any questions about this, please let me know.

Thanks.


Mark Jordan
Office of the Special Arbiter
1220 19th St, NW, Suite 500
Washington, DC, 20036
(202) 232-8311 (ph)
(202) 232-2052 (fax)

**Ex. 43A**

STATE OF MISSISSIPPI

OFFICE OF THE ATTORNEY GENERAL

JIM HOOD
ATTORNEY GENERAL

HUMAN SERVICES
DIVISION

October 9, 2013

Onetta S. Whitley
Deputy Attorney General
550 High Street, Suite 1200
Jackson, Mississippi 39201

Dear Ms. Whitley:

Enclosed, please find updated TPR Spreadsheets that list all of the children that are in our office as of October 9, 2013. In September, there were a total of 369 children pending TPR. As of today's date, there is a total of 349 children pending TPR. Below is a chart detailing each pending category from 0-3 months through 6 months or older.

| CATEGORIES | Cases 0-3 Months Old | Cases 3-6 Months Old | Cases 6 Months or Older | TOTAL |
|---|---|---|---|---|
| Court Dates | 45 | 91 | 111 | 247 |
| Petitions Being Drafted | 34 | 0 | 0 | 34 |
| Reviewed By [redacted] or Social Workers | 6 | 0 | 0 | 6 |
| Mailed To Clerk's Office | 7 | 3 | 0 | 10 |
| Pending Activity | 7 | 5 | 40 | 52 |
| TOTAL JUDGMENTS 12/13/12-Present 304 | | TOTAL CHILDREN PENDING TPR 349 | | |

Denotes 1st Setting

Sincerely,

M. Earl Scales
Assistant Attorney General

MES/swm

cc: Richard A. Berry, Executive Director, MDHS
Mark Smith, Deputy Administrator, F&CS
Mike Gallarno, Division Director MDHS

750 N. STATE STREET - POST OFFICE BOX 220 - JACKSON, MISSISSIPPI 39205
TELEPHONE (601) 359-4239 - FACSIMILE (601) 359-4240

# Ex. 43B

## TPR Tracking System at State Office

| Last name | First name | DOB | County | Social worker | Date Rec'd in SO | 1st Request | 2 nd Request | Final Notice | Date sent to AG's Office | Comments | Date returned to county |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Neshoba | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | Neshoba | | 3/13/2014 | 3/25/2014 | | | | Need a Permanency order stating the Plan | |
| | | | Neshoba | | 3/13/2014 | 3/25/2014 | | | | Need a Permanency order stating the Plan | |
| | | | Neshoba | | 3/13/2014 | 3/25/2014 | | | | Need a Permanency order stating the Plan | |
| | | | Neshoba | | 3/13/2014 | 3/25/2014 | | | | Need a Permanency order stating the Plan | |
| | | | | | | | | | | | |
| | | | Neshoba | | 3/6/2014 | 3/25/2014 | | | | Need an Adjudicatory & Permanency Order | |
| | | | | | | | | | | | |
| | | | Sunflower | | 3/10/2014 | 3/25/2014 | | | | Need an Adjudictatory & Permanency Order with name as same Birth Certificate. | |

# Ex. 43C

Unresolved
FCR Overdue TPR Packets

| Child's Name | County of Responsibility | Region | Number of Days Currently Overdue | Resolved Yes/No | Heat Ticket # |
|---|---|---|---|---|---|
| [redacted] | Pearl River | 6 | 270 | No | #113950 |
| [redacted] | Pearl River | 6 | 214 | No | #113950 |
| [redacted] | Pearl River | 6 | 214 | No | #113950 |
| [redacted] | Stone | 6 | 144 | No | #113951 |
| [redacted] | Stone | 6 | 144 | No | #113951 |
| [redacted] | Stone | 6 | 144 | No | #113951 |
| [redacted] | Tate | 2W | 227 | No | #00115042 |
| [redacted] | Yalobusha | 2W | 227 | No | #00115043 |
| [redacted] | Yalobusha | 2W | 227 | No | #00115043 |
| [redacted] | Rankin | 3N | 374 | No | #114239 |
| [redacted] | Rankin | 3N | 374 | No | #114239 |
| [redacted] | Rankin | 3N | 374 | No | #114239 |
| [redacted] | Rankin | 3N | 285 | No | #114003 |
| [redacted] | Rankin | 3N | 285 | No | #114003 |
| [redacted] | Rankin | 3N | 279 | No | #00115143 |
| [redacted] | Rankin | 3N | 279 | No | #00115143 |
| [redacted] | Rankin | 3N | 20 | No | #116306 |
| [redacted] | Rankin | 3N | 21 | No | #116305 |
| [redacted] | Rankin | 3N | 453 | No | #114237 |
| [redacted] | Rankin | 3N | 335 | No | #114003 |
| [redacted] | Rankin | 3N | 431 | No | #00111658 |
| [redacted] | Rankin | 3N | 320 | No | #114003 |
| [redacted] | Yazoo | 3N | 496 | No | #116265 |

Data reflects cases reviewed June 2012 - February 2014

Date Printed: 3/4/2014

Unresolved
FCR Overdue TPR Packets

| Child's Name | County of Responsibility | Region | Number of Days Currently Overdue | Resolved Yes/No | Heat Ticket # |
|---|---|---|---|---|---|
| [redacted] | Yazoo | 3N | 496 | No | #116265 |
| [redacted] | Yazoo | 3N | 496 | No | #116265 |
| [redacted] | Yazoo | 3N | 423 | No | #114001 |
| [redacted] | Yazoo | 3N | 592 | No | #114001 |
| [redacted] | Yazoo | 3N | 592 | No | #114001 |
| [redacted] | Yazoo | 3N | 1638 | No | #114001 |
| [redacted] | Yazoo | 3N | 1055 | No | #114001 |
| [redacted] | Hinds | 3S | 1139 | No | #00115139 |
| [redacted] | Hinds | 3S | 178 | No | #00115340 |
| [redacted] | Hinds | 3S | 383 | No | #114012 |
| [redacted] | Hinds | 3S | 383 | No | #114012 |
| [redacted] | Hinds | 3S | 1473 | No | #114012 |
| [redacted] | Hinds | 3S | 1473 | No | #114012 |
| [redacted] | Hinds | 3S | 784 | No | #114012 |
| [redacted] | Hinds | 3S | | No | #00114963 |
| [redacted] | Hinds | 3S | 381 | No | #114012 |
| [redacted] | Hinds | 3S | 381 | No | #114012 |
| [redacted] | Hinds | 3S | 381 | No | #114012 |
| [redacted] | Hinds | 3S | 381 | No | #114012 |
| [redacted] | Hinds | 3S | 381 | No | #114012 |
| [redacted] | Hinds | 3S | 598 | No | #114012 |
| [redacted] | Hinds | 3S | 598 | No | #114012 |

Data reflects cases reviewed June 2012 - February 2014

Date Printed: 3/4/2014

Unresolved
FCR Overdue TPR Packets

| Child's Name | County of Responsibility | Region | Number of Days Currently Overdue | Resolved Yes/No | Heat Ticket # |
|---|---|---|---|---|---|
| [redacted] | Hinds | 3S | 598 | No | #114012 |
| [redacted] | Hinds | 3S | 276 | No | #114014 |
| [redacted] | Hinds | 3S | 229 | No | #114014 |
| [redacted] | Hinds | 3S | 229 | No | #114014 |
| [redacted] | Hinds | 3S | 598 | No | #114012 |
| [redacted] | Hinds | 3S | 121 | No | #00115040 |
| [redacted] | Lowndes | 4N | 591 | No | #00113981 |
| [redacted] | Harrison | 7W | 1139 | No | #111472 |
| [redacted] | Harrison | 7W | 97 | No | #00115047 |
| [redacted] | Harrison | 7W | 97 | No | #00115047 |
| [redacted] | Harrison | 7W | 97 | No | #00115047 |
| [redacted] | Harrison | 7W | 97 | No | #00115047 |
| [redacted] | Harrison | 7W | 633 | No | #113971 |
| [redacted] | Harrison | 7W | 228 | No | #00115336 |
| [redacted] | Harrison | 7W | 228 | No | #00115336 |
| [redacted] | Harrison | 7W | 480 | No | #113971 |
| [redacted] | Harrison | 7W | 299 | No | #00115045 |
| [redacted] | Harrison | 7W | 299 | No | #00115045 |
| [redacted] | Harrison | 7W | 633 | No | #113971 |
| [redacted] | Harrison | 7W | 633 | No | #113971 |
| [redacted] | Harrison | 7W | 178 | No | #00115140 |
| [redacted] | Harrison | 7W | 451 | No | #113971 |
| [redacted] | Harrison | 7W | 417 | No | #113971 |
| [redacted] | Harrison | 7W | 227 | No | #00115049 |
| [redacted] | Harrison | 7W | 695 | No | #00115049 |

Data reflects cases reviewed June 2012 - February 2014

Date Printed: 3/4/2014

Unresolved
FCR Overdue TPR Packets

| Child's Name | County of Responsibility | Region | Number of Days Currently Overdue | Resolved Yes/No | Heat Ticket # |
|---|---|---|---|---|---|
| [redacted] | Harrison | 7W | 1139 | No | #111472 |
| [redacted] | Harrison | 7W | 445 | No | #113971 |
| [redacted] | Harrison | 7W | 451 | No | #113971 |
| [redacted] | Harrison | 7W | 445 | No | #113971 |
| [redacted] | Harrison | 7W | 383 | No | #113971 |
| [redacted] | Harrison | 7W | 495 | No | #113977 |
| [redacted] | Harrison | 7W | 172 | No | #00115048 |
| [redacted] | Harrison | 7W | 668 | No | #113977 |
| [redacted] | Harrison | 7W | 668 | No | #113977 |
| [redacted] | Harrison | 7W | 668 | No | #113977 |
| [redacted] | Harrison | 7W | 110 | No | #00115044 |
| [redacted] | Harrison | 7W | 110 | No | #00115044 |
| [redacted] | Harrison | 7W | 347 | No | #00111703 |
| [redacted] | Harrison | 7W | 347 | No | #00111703 |
| [redacted] | Harrison | 7W | 297 | No | #113971 |
| [redacted] | Harrison | 7W | 235 | No | #113977 |
| [redacted] | Harrison | 7W | 417 | No | #113977 |
| [redacted] | Harrison | 7W | 417 | No | #113977 |

Data reflects cases reviewed June 2012 - February 2014

Date Printed: 3/4/2014

# Ex. 43D

Track 3/01/2014

## TPR Tracking System at State Office

| Last Name | First Name | R/S | DOB | Date of Custody | County of Responsibility | Social Worker | Date to A.G. | Date Petition Filed | A.G. List 0-3 | A.G. List 3-6 | A.G. List 6+ | Date TPR Judgement Rec'd | Date of Legal Clearance | 459 Signed Date | Comments | Stamped |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | **BF** | REDACTED | **8/1/2013** | **Hinds** | REDACTED | **2/21/2014** | | X | | | | | | | |
| REDACTED | REDACTED | **WF** | REDACTED | **11/12/2008** | **Scott** | REDACTED | **2/26/2014** | | X | | | | | | | |
| REDACTED | REDACTED | **WM** | REDACTED | **5/7/2012** | **Harrison** | REDACTED | **3/14/2014** | | X | | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 10/22/2012 | Hancock | REDACTED | 1/30/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 10/22/2012 | Hancock | REDACTED | 1/30/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 10/22/2012 | Hancock | REDACTED | 1/30/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 2/11/2013 | Harrison | REDACTED | 1/10/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 9/27/2012 | Harrison | REDACTED | 3/14/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 12/6/2009 | Lincoln | REDACTED | 2/26/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 8/1/2012 | Harrison | REDACTED | 3/14/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 10/23/2009 | Lincoln | REDACTED | 2/26/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 6/22/2011 | Harrison | REDACTED | 1/3/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 6/22/2011 | Harrison | REDACTED | 1/3/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 8/29/2013 | Union | REDACTED | 1/16/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 8/29/2013 | Union | REDACTED | 1/16/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 11/2/2012 | Tishomingo | REDACTED | 2/7/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 6/19/2012 | Harrison | REDACTED | 3/14/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 2/4/2013 | Itawamba | REDACTED | 3/7/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 3/3/2010 | Scott | REDACTED | 2/26/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 5/5/2010 | Scott | REDACTED | 2/7/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 5/23/2012 | Jackson | REDACTED | 3/14/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 8/20/2013 | Desoto | REDACTED | 3/7/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 8/20/2013 | Desoto | REDACTED | 3/7/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 1/31/2006 | Yazoo | REDACTED | 2/26/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 1/31/2006 | Yazoo | REDACTED | 2/26/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 1/31/2006 | Yazoo | REDACTED | 2/26/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 1/31/2006 | Yazoo | REDACTED | 2/26/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 1/31/2006 | Yazoo | REDACTED | 2/26/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 1/31/2006 | Yazoo | REDACTED | 2/26/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 1/31/2006 | Yazoo | REDACTED | 2/26/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 5/22/2012 | P. River | REDACTED | 2/21/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 6/22/2011 | Harrison | REDACTED | 1/3/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 6/22/2011 | Harrison | REDACTED | 1/3/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 5/9/2013 | Pontotoc | REDACTED | 1/16/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 1/24/2013 | Oktibbeha | REDACTED | 2/7/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 5/9/2012 | Itawamba | REDACTED | 3/14/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 8/20/2013 | Desoto | REDACTED | 3/7/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 8/28/2013 | Washington | REDACTED | 2/10/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 8/28/2013 | Washington | REDACTED | 2/10/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 8/10/2012 | Tate | REDACTED | 2/12/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 8/1/2012 | Harrison | REDACTED | 3/14/2014 | | X | | | | | | | |
| REDACTED | REDACTED | HM | REDACTED | 1/23/2013 | Harrison | REDACTED | 1/10/2014 | | X | | | | | | | |
| REDACTED | REDACTED | HM | REDACTED | 1/23/2013 | Harrison | REDACTED | 1/10/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 6/22/2011 | Harrison | REDACTED | 1/3/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 5/7/2012 | Harrison | REDACTED | 3/14/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 9/2/2011 | Harrison | REDACTED | 1/16/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 5/7/2012 | Harrison | REDACTED | 3/14/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 12/21/2011 | Harrison | REDACTED | 1/28/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 12/21/2011 | Harrison | REDACTED | 1/28/2014 | | X | | | | | | | |
| REDACTED | REDACTED | NA | REDACTED | 12/15/2011 | Harrison | REDACTED | 1/16/2014 | | X | | | | | | | |
| REDACTED | REDACTED | NA | REDACTED | 12/15/2011 | Harrison | REDACTED | 1/16/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 6/21/2012 | Hancock | REDACTED | 1/10/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 3/21/2013 | Kemper | REDACTED | 2/21/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 12/21/2011 | Harrison | REDACTED | 1/28/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 6/6/2013 | E. Chickasaw | REDACTED | 2/10/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 8/30/2011 | Hinds | REDACTED | 2/7/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 8/30/2011 | Hinds | REDACTED | 2/7/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 8/30/2011 | Hinds | REDACTED | 2/7/2014 | | X | | | | | | | |

**TPR Tracking System at State Office**

| Last Name | First Name | R/S | DOB | Date of Custody | County of Responsibility | Social Worker | Date to A.G. | Date Petition Filed | A.G. List 0-3 | A.G. List 3-6 | A.G. List 6+ | Date TPR Judgement Rec'd | Date of Legal Clearance | 459 Signed Date | Comments | Stamped |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | BM | REDACTED | 3/15/2011 | Jackson | REDACTED | 2/7/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 8/30/2011 | Hinds | REDACTED | 2/7/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 8/30/2011 | Hinds | REDACTED | 2/7/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 12/28/2011 | Harrison | REDACTED | 1/3/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 1/3/2014 | Harrison | REDACTED | 1/3/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 1/9/2012 | Harrison | REDACTED | 1/28/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 9/23/2011 | Hancock | REDACTED | 1/16/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 8/27/2010 | P. River | REDACTED | 3/14/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BrF | REDACTED | 1/16/2013 | W. Bolivar | REDACTED | 2/21/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BrF | REDACTED | 1/16/2013 | W. Bolivar | REDACTED | 2/21/2014 | | X | | | | | | | |
| REDACTED | REDACTED | HM | REDACTED | 1/23/2013 | Harrison | REDACTED | 1/10/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 2/15/2013 | Alcorn | REDACTED | 2/21/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 2/15/2013 | Alcorn | REDACTED | 2/21/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 2/15/2013 | Alcorn | REDACTED | 2/21/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 2/15/2013 | Alcorn | REDACTED | 2/21/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 2/15/2013 | Alcorn | REDACTED | 2/21/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BrF | REDACTED | 1/23/2013 | Harrison | REDACTED | 1/10/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 9/30/2013 | Union | REDACTED | 1/16/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 9/30/2013 | Union | REDACTED | 1/16/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 3/6/2012 | Washington | REDACTED | 2/10/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 3/15/2011 | Jackson | REDACTED | 2/7/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 1/9/2012 | Harrison | REDACTED | 1/28/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 10/30/2012 | Washington | REDACTED | 2/10/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 7/21/2006 | Yazoo | REDACTED | 2/26/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 6/15/2011 | Scott | REDACTED | 2/26/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 3/26/2010 | Jackson | REDACTED | 3/7/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 5/11/2011 | P. River | REDACTED | 3/14/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 5/11/2011 | P. River | REDACTED | 3/14/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 2/16/2012 | Harrison | REDACTED | 2/7/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 8/14/2012 | Washington | REDACTED | 2/10/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 12/7/2011 | Harrison | REDACTED | 3/7/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 11/27/2012 | Harrison | REDACTED | 1/28/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 11/27/2012 | Harrison | REDACTED | 1/28/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 11/27/2012 | Harrison | REDACTED | 1/28/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 11/27/2012 | Harrison | REDACTED | 1/28/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 11/27/2012 | Harrison | REDACTED | 1/28/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 6/13/2012 | Jackson | REDACTED | 1/16/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 7/26/2012 | Harrison | REDACTED | 1/3/2014 | | X | | | 2/24/2014 | 3/7/2014 | 459/459 | both parents surrendered | |
| REDACTED | REDACTED | BF | REDACTED | 8/9/2012 | Yolobusha | REDACTED | 2/7/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BrM | REDACTED | 2/5/2013 | Yolobusha | REDACTED | 2/12/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 3/3/2010 | Scott | REDACTED | 2/14/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 2/15/2013 | Alcorn | REDACTED | 2/21/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 8/28/2013 | Desoto | REDACTED | 1/30/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 12/10/2012 | Harrison | REDACTED | 3/14/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 12/5/2012 | Jackson | REDACTED | 3/14/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 12/5/2012 | Jackson | REDACTED | 3/14/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 12/9/2012 | Monroe | REDACTED | 2/7/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 12/9/2012 | Monroe | REDACTED | 2/7/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 12/9/2012 | Monroe | REDACTED | 2/7/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 12/9/2012 | Monroe | REDACTED | 2/7/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 12/9/2012 | Monroe | REDACTED | 2/7/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 6/14/2012 | Harrison | REDACTED | 1/21/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 6/14/2012 | Harrison | REDACTED | 1/21/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 1/17/2013 | Hinds | REDACTED | 3/14/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 9/19/2011 | Lincoln | REDACTED | 2/26/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 12/22/2009 | Lincoln | REDACTED | 2/26/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 10/6/2011 | Harrison | REDACTED | 2/26/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 10/6/2011 | Harrison | REDACTED | 2/26/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BrF | REDACTED | 2/5/2013 | Yolobusha | REDACTED | 2/12/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 8/18/2011 | Hancock | REDACTED | 1/10/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 8/18/2011 | Hancock | REDACTED | 1/10/2014 | | X | | | | | | | |

TPR Tracking System at State Office

| Last Name | First Name | R/S | DOB | Date of Custody | County of Responsibility | Social Worker | Date to A.G. | Date Petition Filed | A.G. List 0-3 | A.G. List 3-6 | A.G. List 6+ | Date TPR Judgement Rec'd | Date of Legal Clearance | 459 Signed Date | Comments | Stamped |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | WM | REDACTED | 8/18/2011 | Hancock | REDACTED | 1/10/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 12/19/2012 | Hancock | REDACTED | 2/7/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 12/19/2012 | Hancock | REDACTED | 2/7/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 6/4/2013 | Monroe | REDACTED | 1/28/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 2/14/2012 | Lauderdale | REDACTED | 3/14/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 8/28/2013 | Desoto | REDACTED | 1/30/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 8/28/2013 | Desoto | REDACTED | 1/30/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 5/11/2011 | P. River | REDACTED | 3/14/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 1/24/2012 | Harrison | REDACTED | 3/7/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BrM | REDACTED | 11/20/2012 | Harrison | REDACTED | 3/14/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 12/27/2011 | Hinds | REDACTED | 2/7/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 4/8/2012 | Marshall | REDACTED | 1/10/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 1/19/2013 | Harrison | REDACTED | 1/16/2014 | | X | | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 10/30/2012 | Washington | REDACTED | 2/10/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 1/19/2013 | Harrison | REDACTED | 1/16/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 1/19/2013 | Harrison | REDACTED | 1/16/2014 | | X | | | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 9/1/2013 | Hinds | REDACTED | 2/12/2014 | | X | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 3/12/2012 | Washington | REDACTED | 10/7/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 7/14/2012 | Hancock | REDACTED | 10/7/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 7/14/2012 | Hancock | REDACTED | 10/7/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 9/8/2011 | Hinds | REDACTED | 11/1/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 9/8/2011 | Hinds | REDACTED | 11/1/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BrF | REDACTED | 10/11/2013 | Neshoba | REDACTED | 12/18/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 11/16/2011 | Calhoun | REDACTED | 10/7/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 3/12/2012 | Lamar | REDACTED | 12/18/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 3/30/2012 | Webster | REDACTED | 10/24/2013 | | | X | | **3/20/2014** | | | | **3/24/2014** |
| REDACTED | REDACTED | WF | REDACTED | 9/4/2012 | Itawamba | REDACTED | 10/18/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 9/4/2012 | Itawamba | REDACTED | 10/18/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 9/4/2012 | Itawamba | REDACTED | 10/18/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 3/24/2011 | Sunflower | REDACTED | 12/6/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 3/24/2011 | Sunflower | REDACTED | 12/6/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 3/24/2011 | Sunflower | REDACTED | 12/6/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BrM | REDACTED | 5/16/2013 | Harrison | REDACTED | 11/15/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 10/20/2011 | Stone | REDACTED | 12/18/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 10/20/2011 | Stone | REDACTED | 12/18/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 10/20/2011 | Stone | REDACTED | 12/18/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 10/20/2011 | Stone | REDACTED | 12/18/2013 | | | X | | | | | | |
| REDACTED | REDACTED | HM | REDACTED | 8/1/2012 | Jackson | REDACTED | 11/15/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 12/29/2011 | P. River | REDACTED | 10/18/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 1/17/2013 | Coahoma | REDACTED | 11/22/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 1/17/2013 | Coahoma | REDACTED | 11/22/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 12/29/2012 | Prentiss | REDACTED | 10/11/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 6/5/2012 | Tishomingo | REDACTED | 11/22/2013 | | | X | | **3/17/2014** | | | | 3/21/2014 |
| REDACTED | REDACTED | WF | REDACTED | 8/7/2012 | Lauderdale | REDACTED | 11/22/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 1/30/2013 | Hancock | REDACTED | 11/15/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 12/29/2011 | P. River | REDACTED | 10/18/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 1/26/2012 | Jackson | REDACTED | 10/11/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 1/26/2012 | Jackson | REDACTED | 10/11/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 11/30/2012 | Itawamba | REDACTED | 12/6/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 7/23/2012 | P. River | REDACTED | 10/11/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 4/16/2011 | Jackson | REDACTED | 11/15/2013 | | | X | | | | 459/459 | **both parents surrende** | |
| REDACTED | REDACTED | BM | REDACTED | 4/16/2011 | Jackson | REDACTED | 11/15/2013 | | | X | | | | 459/459 | **both parents surrende** | |
| REDACTED | REDACTED | WF | REDACTED | 4/11/2013 | Calhoun | REDACTED | 11/22/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 4/3/2012 | Jackson | REDACTED | 11/22/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 1/26/2012 | Jackson | REDACTED | 10/11/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 4/3/2012 | Jackson | REDACTED | 11/22/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 4/3/2012 | Jackson | REDACTED | 11/22/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 3/12/2012 | Washington | REDACTED | 10/7/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 8/15/2012 | Harrison | REDACTED | 12/18/2013 | | | X | | | | | | |

| Last Name | First Name | R/S | DOB | Date of Custody | County of Responsibility | Social Worker | Date to A.G. | Date Petition Filed | A.G. List 0-3 | A.G. List 3-6 | A.G. List 6+ | Date TPR Judgement Rec'd | Date of Legal Clearance | 459 Signed Date | Comments | Stamped |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | WM | REDACTED | 7/3/2013 | Lamar | REDACTED | 12/18/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 8/7/2012 | Lauderdale | REDACTED | 11/22/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 7/14/2012 | Hancock | REDACTED | 10/7/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 4/12/2012 | Lamar | REDACTED | 12/18/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 5/8/2013 | Lauderdale | REDACTED | 11/1/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 5/8/2013 | Lauderdale | REDACTED | 11/1/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 5/8/2013 | Lauderdale | REDACTED | 11/1/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 5/8/2013 | Lauderdale | REDACTED | 11/1/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 7/7/2012 | Hancock | REDACTED | 10/11/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 5/8/2013 | Lauderdale | REDACTED | 11/1/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 11/14/2012 | Pontotoc | REDACTED | 12/6/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 4/23/2012 | Prentiss | REDACTED | 12/6/2013 | | | X | | | 3/1814 | | | | 3/24/2014 |
| REDACTED | REDACTED | BF | REDACTED | 9/27/2011 | Washington | REDACTED | 10/24/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 12/7/2011 | Jackson | REDACTED | 10/24/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 11/16/2011 | Calhoun | REDACTED | 10/7/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 10/20/2012 | Lowndes | REDACTED | 11/22/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 12/29/2011 | Smith | REDACTED | 11/1/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 10/23/2007 | Rankin | REDACTED | 11/1/2013 | | | X | | | 3/18/2014 | | | | 3/24/2014 |
| REDACTED | REDACTED | HF | REDACTED | 8/1/2012 | Jackson | REDACTED | 11/15/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 3/25/2012 | Hancock | REDACTED | 11/22/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 3/25/2012 | Hancock | REDACTED | 11/22/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 6/15/2012 | Adams | REDACTED | 11/15/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 5/18/2012 | Panola | REDACTED | 12/6/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 5/18/2012 | Panola | REDACTED | 12/6/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 10/23/2013 | Union | REDACTED | 10/24/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 2/28/2012 | Stone | REDACTED | 12/6/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 10/24/2013 | Union | REDACTED | 10/24/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 12/21/2012 | Monroe | REDACTED | 10/7/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 4/16/2001 | Jackson | REDACTED | 11/15/2013 | | | X | | | | | 459/459 | both parents surrendered | |
| REDACTED | REDACTED | WF | REDACTED | 6/27/2012 | Monroe | REDACTED | 10/7/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 11/8/2011 | Alcorn | REDACTED | 12/21/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 10/23/2013 | Union | REDACTED | 10/24/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 1023/13 | Union | REDACTED | 10/24/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 3/22/2012 | Tippah | REDACTED | 10/24/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 12/29/2011 | P. River | REDACTED | 10/18/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 3/29/2012 | Hinds | REDACTED | 11/15/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 10/24/2012 | Union | REDACTED | 11/1/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 4/11/2013 | Jackson | REDACTED | 10/11/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 4/16/2011 | Jackson | REDACTED | 11/15/2013 | | | X | | | | | 459/DC | mother surrendered/DC | |
| REDACTED | REDACTED | BF | REDACTED | 12/7/2011 | Jackson | REDACTED | 10/24/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 9/12/2012 | Jefferson Davis | REDACTED | 11/15/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 4/3/2012 | Jackson | REDACTED | 11/22/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 2/4/2013 | Harrison | REDACTED | 11/27/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 11/27/2012 | Jackson | REDACTED | 10/18/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 10/23/2013 | Union | REDACTED | 10/24/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 3/25/2012 | Copiah | REDACTED | 10/11/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 3/25/2012 | Copiah | REDACTED | 10/11/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 8/5/2013 | Lauderdale | REDACTED | 11/1/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 1/14/2012 | Desoto | REDACTED | 11/15/2013 | | | X | | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 2/4/2013 | Harrison | REDACTED | 11/27/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 4/8/2011 | Stone | REDACTED | 10/11/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 4/8/2011 | Stone | REDACTED | 10/11/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 4/8/2011 | Stone | REDACTED | 10/11/2013 | | | X | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 4/8/2011 | Stone | REDACTED | 10/11/2013 | | | X | | | | | | |
| | | | | | | | | | | | | | | | | |
| REDACTED | REDACTED | HM | REDACTED | 5/4/2012 | Alcorn | REDACTED | 10/4/2012 | | | | X | 8/6/2013 | 8/27/2013 | | | |
| REDACTED | REDACTED | BF | REDACTED | 12/28/2011 | Harrison | REDACTED | 10/9/2012 | | | | X | 6/27/2013 | 3/7/2014 | | | |
| REDACTED | REDACTED | WM | REDACTED | 1/26/2012 | Lee | REDACTED | 12/12/2012 | 3/20/2013 | | | X | 10/18/2013 | 3/7/2014 | | | |
| REDACTED | REDACTED | BM | REDACTED | 6/20/2008 | Yazoo | REDACTED | 5/11/2012 | 6/11/2012 | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 6/20/2008 | Yazoo | REDACTED | 5/11/2012 | | | | X | | | | | |

TPR Tracking System at State Office

| Last Name | First Name | R/S | DOB | Date of Custody | County of Responsibility | Social Worker | Date to A.G. | Date Petition Filed | A.G. List 0-3 | A.G. List 3-6 | A.G. List 6+ | Date TPR Judgement Rec'd | Date of Legal Clearance | 459 Signed Date | Comments | Stamped |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | BF | REDACTED | 4/1/2011 | Marion | REDACTED | 8/28/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 6/20/2008 | Yazoo | REDACTED | 5/11/2012 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 5/18/2011 | Calhoun | REDACTED | 10/12/2012 | | | | X | 10/11/2013 | 11/5/2013 | | | |
| REDACTED | REDACTED | WM | REDACTED | 5/18/2011 | Calhoun | REDACTED | 10/12/2012 | | | | X | 10/11/2013 | 11/5/2013 | | | |
| REDACTED | REDACTED | WF | REDACTED | 5/18/2011 | Calhoun | REDACTED | 10/12/2012 | | | | X | 10/11/2013 | 11/5/2013 | | | |
| REDACTED | REDACTED | BM | REDACTED | 10/10/2012 | Wilkinson | REDACTED | 5/31/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 5/8/2012 | Clay | REDACTED | 5/22/2013 | | | | X | 1/8/2014 | 2/7/2014 | | | |
| REDACTED | REDACTED | BM | REDACTED | 5/8/2012 | Clay | REDACTED | 5/22/2013 | | | | X | 1/8/2014 | 2/7/2014 | | | |
| REDACTED | REDACTED | WF | REDACTED | 3/7/2012 | Lincoln | REDACTED | 1/4/2013 | | | | X | | | 459/father | | |
| REDACTED | REDACTED | BrF | REDACTED | 6/12/2011 | Lee | REDACTED | 7/6/2012 | | | | X | 11/20/2013 | 12/13/2013 | | | |
| REDACTED | REDACTED | BM | REDACTED | 5/10/2011 | Pontotoc | REDACTED | 8/10/2012 | | | | X | 10/12/2013 | | | | |
| REDACTED | REDACTED | BF | REDACTED | 3/29/2011 | Harrison | REDACTED | 8/2/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 3/29/2011 | Harrison | REDACTED | 8/2/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 4/13/2010 | Desoto | REDACTED | 9/21/2012 | | | | X | 3/26/2013 | | | | |
| REDACTED | REDACTED | WM | REDACTED | 12/23/2011 | Jackson | REDACTED | 3/8/2013 | | | | X | 11/7/2013 | 3/7/2014 | | | |
| REDACTED | REDACTED | WM | REDACTED | 12/23/2011 | Jackson | REDACTED | 3/8/2013 | | | | X | 11/7/2013 | 3/7/2014 | | | |
| REDACTED | REDACTED | BF | REDACTED | 5/5/2011 | Coahoma | REDACTED | 6/28/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 5/1/2009 | P. River | REDACTED | 11/21/2012 | | | | X | 1/13/2014 | | | | |
| REDACTED | REDACTED | BM | REDACTED | 1/28/2012 | Jackson | REDACTED | 3/1/2013 | 4/9/2013 | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 1/28/2012 | Jackson | REDACTED | 3/1/2013 | 4/9/2013 | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 4/23/2012 | Desoto | REDACTED | 10/12/2012 | | | | X | 3/26/2013 | 4/8/2013 | 459/ m | | |
| REDACTED | REDACTED | WF | REDACTED | 6/1/2011 | Itawamba | REDACTED | 1/15/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 4/2/2012 | Itawamba | REDACTED | 1/15/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 11/28/2011 | Jackson | REDACTED | 9/6/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 5/21/2013 | Calhoun | REDACTED | 9/20/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 5/21/2013 | Calhoun | REDACTED | 9/20/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 5/21/2013 | Calhoun | REDACTED | 9/20/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 2/4/2011 | Harrison | REDACTED | 6/7/2013 | | | | X | 11/15/2013 | | dismissed | | |
| REDACTED | REDACTED | W/M | REDACTED | 8/29/2009 | Jackson | REDACTED | 3/10/2011 | | | | X | | | | | |
| REDACTED | REDACTED | WHF | REDACTED | 8/7/2012 | Jones | REDACTED | 7/3/2013 | | | | X | 2/14/2014 | 3/7/2014 | | | |
| REDACTED | REDACTED | BM | REDACTED | 5/5/2011 | Coahoma | REDACTED | 6/28/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 4/27/2010 | Tishomingo | REDACTED | 4/6/2012 | | | | X | 2/15/2013 | 2/25/2013 | | | |
| REDACTED | REDACTED | WF | REDACTED | 10/13/2011 | Lafayette | REDACTED | 8/17/2012 | 3/14/2013 | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 10/13/2011 | Lafayette | REDACTED | 8/17/2012 | 3/14/2013 | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 6/21/2003 | J. Davis | REDACTED | 10/30/2012 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 6/21/2003 | J. Davis | REDACTED | 10/30/2012 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 6/21/2010 | J. Davis | REDACTED | 10/30/2012 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 6/21/2010 | J. Davis | REDACTED | 10/30/2012 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 6/21/2010 | J. Davis | REDACTED | 10/30/2012 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 5/23/2012 | Hancock | REDACTED | 7/24/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 3/14/2012 | Desoto | REDACTED | 2/7/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 3/27/2012 | Desoto | REDACTED | 2/7/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 4/3/2013 | Calhoun | REDACTED | 9/20/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 2/2/2012 | Lee | REDACTED | 12/12/2012 | 3/20/2013 | | | X | 9/11/2013 | 10/18/2013 | 459/mothe | | |
| REDACTED | REDACTED | WM | REDACTED | 4/3/2013 | Calhoun | REDACTED | 9/20/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 3/22/2011 | Pontotoc | REDACTED | 5/11/2012 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 1/6/2013 | Pike | REDACTED | 4/12/2013 | 5/9/2013 | | | X | 9/4/2013 | 9/30/2013 | | | |
| REDACTED | REDACTED | WF | REDACTED | 9/27/2012 | Neshoba | REDACTED | 12/7/2012 | | | | X | 2/6/2014 | | | | |
| REDACTED | REDACTED | WF | REDACTED | 5/10/2012 | Hancock | REDACTED | 5/23/2013 | | | | X | 1/17/2014 | 3/7/2014 | 459/f | | |
| REDACTED | REDACTED | BM | REDACTED | 6/7/2011 | Pontotoc | REDACTED | 9/13/2012 | | | | X | 5/10/2013 | | 459 | | |
| REDACTED | REDACTED | BM | REDACTED | 6/7/2011 | Pontotoc | REDACTED | 9/13/2012 | | | | X | 5/10/2013 | | 459 | | |
| REDACTED | REDACTED | WM | REDACTED | 6/22/2011 | Hancock | REDACTED | 10/26/2012 | | | | X | 1/15/2014 | | | | |
| REDACTED | REDACTED | BF | REDACTED | 2/29/13 | Kemper | REDACTED | 6/7/2013 | | | | X | 2/3/2014 | 2/7/2014 | | | |
| REDACTED | REDACTED | BF | REDACTED | 2/29/13 | Kemper | REDACTED | 6/7/2013 | | | | X | 2/3/2014 | 7-Feb | | | |
| REDACTED | REDACTED | BF | REDACTED | 2/29/13 | Kemper | REDACTED | 6/7/2013 | | | | X | 2/3/2014 | 2/7/2014 | | | |
| REDACTED | REDACTED | BF | REDACTED | 6/15/2011 | Warren | REDACTED | 7/12/2013 | | | | X | 2/10/2014 | 3/7/2014 | | | |
| REDACTED | REDACTED | BM | REDACTED | 6/21/2012 | Marion | REDACTED | 8/23/2013 | | | | X | 1/23/2014 | 2/6/2014 | | | |
| REDACTED | REDACTED | BM | REDACTED | 1/20/2012 | Lincoln | REDACTED | 8/23/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 12/27/2011 | Desoto | REDACTED | 4/5/2013 | 4/26/2013 | | | X | 9/24/2013 | 10/28/2013 | | | |
| REDACTED | REDACTED | WF | REDACTED | 2/20/2012 | Hancock | REDACTED | 6/7/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 3/4/2011 | Prentiss | REDACTED | 3/14/2012 | | | | X | | | 459/459 | | |

TPR Tracking System at State Office

| Last Name | First Name | R/S | DOB | Date of Custody | County of Responsibility | Social Worker | Date to A.G. | Date Petition Filed | A.G. List 0-3 | A.G. List 3-6 | A.G. List 6+ | Date TPR Judgement Rec'd | Date of Legal Clearance | 459 Signed Date | Comments | Stamped |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | WM | REDACTED | 8/21/2012 | Desoto | REDACTED | 6/28/2013 | | | | X | 12/19/2013 | | | | |
| REDACTED | REDACTED | WF | REDACTED | 4/19/2012 | Jackson | REDACTED | 8/28/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 2/20/2012 | Hancock | REDACTED | 6/7/2013 | | | | X | 1/31/2014 | 2/6/2014 | 459/mother | | |
| REDACTED | REDACTED | WF | REDACTED | 8/21/2012 | Desoto | REDACTED | 6/28/2013 | | | | X | 12/19/2013 | | | | |
| REDACTED | REDACTED | WM | REDACTED | 4/6/2011 | Desoto | REDACTED | 7/6/2012 | | | | X | 3/5/2013 | 4/2/2013 | | | |
| REDACTED | REDACTED | WM | REDACTED | 6/12/2011 | Desoto | REDACTED | 7/6/2012 | | | | X | 11/20/2013 | 12/12/2013 | | | |
| REDACTED | REDACTED | WF | REDACTED | 9/11/2011 | Jackson | REDACTED | 3/29/2012 | | | | X | 11/4/2013 | | | | |
| REDACTED | REDACTED | BF | REDACTED | 9/17/2009 | Hinds | REDACTED | 3/21/2013 | 5/7/2013 | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 11/24/2010 | Jeff. Davis | REDACTED | 4/4/2012 | 5/16/2012 | | | X | 11/5/2013 | 11/18/2013 | | | |
| REDACTED | REDACTED | BM | REDACTED | 9/17/2009 | Hinds | REDACTED | 3/21/2013 | 5/7/2013 | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 9/17/2009 | Hinds | REDACTED | 3/21/2013 | 5/7/2013 | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 10/13/2011 | Lafayette | REDACTED | 1/15/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 1/11/2012 | Tishomingo | REDACTED | 10/26/2012 | | | | X | 4/12/2013 | 4/24/2013 | | | |
| REDACTED | REDACTED | BF | REDACTED | 5/17/2011 | Jackson | REDACTED | 6/7/2012 | | | | X | 3/6/2013 | 3/12/2013 | 459/459 | 3 parents surrendered | |
| REDACTED | REDACTED | BM | REDACTED | 9/16/2003 | Alcorn | REDACTED | 7/12/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 9/22/2011 | Yalobusha | REDACTED | 8/16/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 3/7/2012 | Lee | REDACTED | 8/23/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 4/24/2012 | Wilkinson | REDACTED | 8/2/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 2/11/2013 | Tippah | REDACTED | 9/6/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 7/6/2011 | Itawamba | REDACTED | 4/13/2012 | 6/28/2012 | | | X | 3/28/2013 | 4/11/2013 | 459/m | | |
| REDACTED | REDACTED | WM | REDACTED | 7/6/2011 | Itawamba | REDACTED | 4/13/2012 | 6/28/2012 | | | X | 3/28/2013 | 4/11/2013 | 459/m | | |
| REDACTED | REDACTED | WF | REDACTED | 7/6/2011 | Itawamba | REDACTED | 4/13/2012 | | | | | 3/28/2013 | 4/11/2013 | 459/m | | |
| REDACTED | REDACTED | WM | REDACTED | 11/9/2009 | Copiah | REDACTED | 12/20/2012 | | | | X | 1/14/2014 | 2/6/2014 | | | |
| REDACTED | REDACTED | Wf | REDACTED | 10/13/2010 | Jackson | REDACTED | 10/30/2012 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 10/13/2010 | Jackson | REDACTED | 10/30/2012 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 10/7/2011 | Clay | REDACTED | 1/4/2013 | | | | X | 6/11/2013 | | | | |
| REDACTED | REDACTED | WF | REDACTED | 2/16/2011 | Union | REDACTED | 7/20/2012 | | | | X | 8/27/2013 | 11/6/2013 | 459/father | | |
| REDACTED | REDACTED | WF | REDACTED | 2/16/2011 | Union | REDACTED | 7/20/2012 | | | | X | 8/27/2013 | 11/6/2013 | | | |
| REDACTED | REDACTED | WF | REDACTED | 4/2/2011 | Harrison | REDACTED | 9/13/2012 | | | | X | | | 10/25/2012 | mother surrendered | |
| REDACTED | REDACTED | WM | REDACTED | 7/24/2009 | Harrison | REDACTED | 7/6/2012 | | | | X | | 1/8/2013 | | | |
| REDACTED | REDACTED | | REDACTED | 8/10/2009 | JEFF. DAVIS | REDACTED | 11/10/2011 | | | | X | 1/8/2013 | | | | |
| REDACTED | REDACTED | BF | REDACTED | 1/24/2011 | Noxubee | REDACTED | 4/6/2012 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 7/6/2011 | Marshall | REDACTED | 4/6/2012 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 12/7/2011 | Hinds | REDACTED | 9/20/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 5/25/2011 | Harrison | REDACTED | 2/15/2013 | 4/9/2013 | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 5/25/2011 | Harrison | REDACTED | 2/15/2013 | 4/9/2013 | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 8/22/2011 | Harrison | REDACTED | 7/20/2012 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 7/25/2011 | Marion | REDACTED | 8/17/2012 | | | | X | 2/25/2013 | 3/13/2013 | | | |
| REDACTED | REDACTED | BM | REDACTED | 11/4/2010 | Desoto | REDACTED | 11/30/2012 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 9/25/2012 | Hancock | REDACTED | 5/31/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 2/8/2011 | Warren | REDACTED | 6/28/2013 | | | | X | 2/10/2013 | 3/7/2014 | | | |
| REDACTED | REDACTED | WF | REDACTED | 9/15/2009 | Clay | REDACTED | 10/8/2010 | 6/27/2012 | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 9/30/2011 | Union | REDACTED | 2/1/2013 | 3/25/2013 | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 11/4/2010 | Lafayette | REDACTED | 6/7/2012 | 7/11/2012 | | | X | 2/12/2013 | 3/14/2014 | | | |
| REDACTED | REDACTED | WM | REDACTED | 11/4/2010 | Lafayette | REDACTED | 6/7/2012 | | | | X | 2/12/2013 | 2/25/2013 | | | |
| REDACTED | REDACTED | WM | REDACTED | 8/26/2011 | Tippah | REDACTED | 12/20/2012 | 4/26/2013 | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 5/4/2011 | Marion | REDACTED | 10/26/2012 | | | | X | 3/4/2013 | 3/13/2013 | | | |
| REDACTED | REDACTED | WH | REDACTED | 4/18/2012 | Hancoc | REDACTED | 6/7/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 8/26/2011 | Tippah | REDACTED | 12/20/2012 | 4/26/2013 | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 3/16/2011 | Washingotn | REDACTED | 12/7/2012 | | | | X | 9/30/2013 | 10/15/2013 | | | |
| REDACTED | REDACTED | BM | REDACTED | 2/22/2012 | Adams | REDACTED | 9/13/2012 | | | | X | 1/23/2013 | 2/6/2013 | | | |
| REDACTED | REDACTED | BM | REDACTED | 2/22/2012 | Adams | REDACTED | 9/13/2012 | | | | X | 1/23/2013 | 2/6/2013 | | | |
| REDACTED | REDACTED | WF | REDACTED | 4/6/2011 | Tishomingo | REDACTED | 4/6/2012 | 4/4/2012 | | | X | 2/15/2013 | 2/25/2013 | | | |
| REDACTED | REDACTED | BM | REDACTED | 4/19/2012 | Covington | REDACTED | 2/17/2012 | | | | X | 1/8/2013 | 2/12/2013 | | | |
| REDACTED | REDACTED | WM | REDACTED | 8/9/2011 | Monroe | REDACTED | 2/15/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 3/29/2011 | J. Davis | REDACTED | 3/9/2012 | 5/21/2012 | | | X | 1/8/2013 | | | father was not tpr | |
| REDACTED | REDACTED | WM | REDACTED | 9/9/2011 | Winston | REDACTED | 4/19/2013 | 5/1/2013 | | | X | 1/24/2014 | 3/7/2014 | | | |
| REDACTED | REDACTED | BM | REDACTED | 3/9/2010 | Smith | REDACTED | 10/9/2012 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 6/3/2011 | Harrison | REDACTED | 5/23/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 6/3/2011 | Harrison | REDACTED | 5/23/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 1/12/2012 | Jackson | REDACTED | 2/1/2013 | | | | X | 3/6/2014 | | | | |

TPR Tracking System at State Office

| Last Name | First Name | R/S | DOB | Date of Custody | County of Responsibility | Social Worker | Date to A.G. | Date Petition Filed | A.G. List 0-3 | A.G. List 3-6 | A.G. List 6+ | Date TPR Judgement Rec'd | Date of Legal Clearance | 459 Signed Date | Comments | Stamped |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | BM | REDACTED | 8/12/2010 | Lafayette | REDACTED | 4/11/2012 | | | | X | 3/13/2013 | **3/21/2013** | | | |
| REDACTED | REDACTED | BF | REDACTED | 8/12/2010 | Lafayette | REDACTED | 4/11/2012 | **6/26/2012** | | | X | 3/13/2013 | **3/21/2013** | | | |
| REDACTED | REDACTED | BM | REDACTED | 6/25/2010 | Marshall | REDACTED | 6/15/2012 | | | | X | 7/17/2013 | | | | |
| REDACTED | REDACTED | WF | REDACTED | 4/27/2012 | | REDACTED | 12/7/2012 | | | | X | **10/14/2013** | **2/6/2014** | **459/m** | | |
| REDACTED | REDACTED | W/F | REDACTED | 12/20/2010 | Hancock | REDACTED | 8/20/2011 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 1/24/2011 | Noxubee | REDACTED | 4/6/2012 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 6/7/2011 | Harrison | REDACTED | 3/14/2013 | **4/1/2013** | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 6/7/2011 | Harrison | REDACTED | 3/14/2013 | **4/1/2013** | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 6/7/2011 | Harrison | REDACTED | 3/14/2013 | **4/1/2013** | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 12/7/2012 | Adams | REDACTED | 9/13/2013 | | | | X | **12/11/2013** | | | | |
| REDACTED | REDACTED | BM | REDACTED | 7/28/2011 | Tate | REDACTED | 2/1/2013 | | | | X | **7/19/2013** | | | | |
| REDACTED | REDACTED | BF | REDACTED | 2/9/2012 | Adams | REDACTED | 9/13/2012 | | | | X | **4/8/2013** | **4/10/2013** | | | |
| REDACTED | REDACTED | WM | REDACTED | 2/2/2012 | Lee | REDACTED | 12/12/2012 | **3/20/2013** | | | X | **9/11/2013** | **10/18/2013** | **459/m** | **father trp date 4/17/03** | |
| REDACTED | REDACTED | BF | REDACTED | 12/17/2011 | Lauderdale | REDACTED | 12/12/2012 | | | | X | **7/18/2013** | | | | |
| REDACTED | REDACTED | WF | REDACTED | 3/4/2005 | Jackson | REDACTED | 3/29/2012 | | | | X | 3/5/2013 | | | | |
| REDACTED | REDACTED | WM | REDACTED | 3/17/2011 | Adams | REDACTED | 11/30/2012 | | | | X | **8/19/2013** | **9/10/2013** | | | |
| REDACTED | REDACTED | WM | REDACTED | 3/17/2011 | Adams | REDACTED | 11/30/2012 | | | | X | **8/19/2013** | **9/10/2013** | | | |
| REDACTED | REDACTED | WF | REDACTED | 3/17/2012 | Adams | REDACTED | 11/30/2012 | | | | X | **8/19/2013** | **9/10/2013** | | | |
| REDACTED | REDACTED | WF | REDACTED | 2/11/2013 | Adams | REDACTED | 5/23/2013 | | | | X | **10/8/2013** | **10/28/2013** | | | |
| REDACTED | REDACTED | WF | REDACTED | 10/12/2011 | Adams | REDACTED | 7/20/2012 | | | | X | 1/7/2013 | **1/16/2013** | | | |
| REDACTED | REDACTED | BM | REDACTED | 2/8/2013 | Monroe | REDACTED | 8/16/2013 | | | | X | | | | | 459 |
| REDACTED | REDACTED | B/M | REDACTED | 4/26/2011 | Wilkinson | REDACTED | 7/21/2011 | | | | X | 2/4/2013 | | 459/father | | |
| REDACTED | REDACTED | B/F | REDACTED | 4/26/2011 | Wilkinson | REDACTED | 7/21/2011 | | | | X | 2/4/2013 | | 459/father | | |
| REDACTED | REDACTED | BF | REDACTED | 4/11/2012 | Monroe | REDACTED | 1/25/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 9/13/2009 | P. River | REDACTED | 7/25/2012 | | | | X | | | | | |
| REDACTED | REDACTED | W/F | REDACTED | 3/31/2011 | JACKSON | REDACTED | 8/12/2011 | | | | X | 7/25/2013 | **12/4/2013** | | | |
| REDACTED | REDACTED | BM | REDACTED | 3/1/2012 | Adams | REDACTED | 3/21/2013 | **4/5/2013** | | | X | **7/8/2013** | | | | |
| REDACTED | REDACTED | WM | REDACTED | 4/12/2011 | Union | REDACTED | 10/4/2012 | | | | X | | | **5/2/2013** | **mother surrendered** | |
| REDACTED | REDACTED | WM | REDACTED | 4/16/2011 | Union | REDACTED | 10/4/2012 | | | | X | | | **5/2/2013** | **mother surrendered** | |
| REDACTED | REDACTED | WF | REDACTED | 6/21/2011 | Hancock | REDACTED | 10/26/2012 | | | | X | **1/15/2014** | | | | |
| REDACTED | REDACTED | WM | REDACTED | 10/16/2012 | Pontotoc | REDACTED | 5/31/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 5/5/2012 | Alcorn | REDACTED | 7/12/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 7/6/2011 | Lee | REDACTED | 4/13/2012 | **7/2/2012** | | | X | 1/2/2013 | **1/16/2013** | | | |
| REDACTED | REDACTED | WF | REDACTED | 7/6/2011 | Lee | REDACTED | 4/13/2012 | **7/2/2012** | | | X | 1/2/2013 | **1/16/2013** | | | |
| REDACTED | REDACTED | WF | REDACTED | 7/6/2011 | Lee | REDACTED | 4/13/2012 | **7/2/2012** | | | X | 1/2/2013 | **1/16/2013** | | | |
| REDACTED | REDACTED | WF | REDACTED | 7/6/2011 | Lee | REDACTED | 4/13/2011 | | | | X | 1/2/2013 | **1/16/2013** | | | |
| REDACTED | REDACTED | BF | REDACTED | 9/28/2011 | Copiah | REDACTED | 8/30/2012 | | | | X | | | | | |
| REDACTED | REDACTED | BrM | REDACTED | 5/2/2012 | Itawamba | REDACTED | 7/12/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 8/23/2011 | J. Davis | REDACTED | 12/7/2012 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 2/27/2012 | Harrison | REDACTED | 5/3/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 3/18/2009 | Prentiss | REDACTED | 10/4/2012 | | | | X | 9/4/2013 | **9/10/2013** | | | |
| REDACTED | REDACTED | WF | REDACTED | 2/16/2012 | Desoto | REDACTED | 9/13/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 3/31/2011 | Jackson | REDACTED | 11/23/2011 | | | | X | 7/25/2013 | **12/5/2013** | | | |
| REDACTED | REDACTED | W/F | REDACTED | 3/31/2011 | Jackson | REDACTED | 8/12/2011 | | | | X | 7/25/2013 | **12/5/2013** | | | |
| REDACTED | REDACTED | WF | REDACTED | 8/11/2012 | Jackson | REDACTED | 11/23/2011 | | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 8/11/2009 | Jackson | REDACTED | 11/23/2011 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 12/3/2009 | P. River | REDACTED | 10/26/2012 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 5/27/2008 | Washingotn | REDACTED | 12/7/2012 | | | | X | 7/25/2013 | **9/23/2013** | | | |
| REDACTED | REDACTED | WF | REDACTED | 5/27/2012 | Washingotn | REDACTED | 12/7/2012 | | | | X | 7/25/2013 | **9/23/2013** | | | |
| REDACTED | REDACTED | BF | REDACTED | 5/9/2011 | Tate | REDACTED | 5/8/2013 | | | | X | **10/16/2013** | **12/30/2013** | | | |
| REDACTED | REDACTED | WM | REDACTED | 1/27/2009 | Copiah | REDACTED | 12/20/2012 | | | | X | 7/31/2013 | **9/23/2013** | 459/459 | | |
| REDACTED | REDACTED | WF | REDACTED | 9/25/2012 | Hancock | REDACTED | 5/31/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 12/2/2010 | COPIAH | REDACTED | 11/16/2011 | | | | X | 1/9/2013 | **8/26/2013** | | | |
| REDACTED | REDACTED | WM | REDACTED | 12/2/2010 | COPIAH | REDACTED | 11/16/2011 | | | | X | 1/9/2013 | **8/26/2013** | | | |
| REDACTED | REDACTED | WF | REDACTED | 12/2/2010 | COPIAH | REDACTED | 11/16/2011 | | | | X | 1/9/2013 | **8/26/2013** | | | |
| REDACTED | REDACTED | WM | REDACTED | 8/26/2011 | Pontotoc | REDACTED | 2/1/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 4/9/2012 | Pontotoc | REDACTED | 2/1/2013 | | | | X | 7/3/2013 | **10/7/2013** | 459/459 | | |
| REDACTED | REDACTED | BM | REDACTED | 6/7/2011 | Pontotoc | REDACTED | 9/13/2012 | **5/9/2013** | | | X | 5/10/2013 | | 459/459 | | |
| REDACTED | REDACTED | WF | REDACTED | 4/27/2011 | Hancock | REDACTED | 3/1/2012 | | | | X | 1/30/2013 | | | **mother is deceased** | |
| REDACTED | REDACTED | BF | REDACTED | 10/29/2008 | E. Bolivar | REDACTED | 4/24/2013 | | | | X | | | | | |
| REDACTED | REDACTED | W/M | REDACTED | 6/14/2010 | Union | REDACTED | 9/23/2011 | **6/11/2012** | | | X | 4/2/2013 | **4/11/2013** | | | |

TPR Tracking System at State Office

| Last Name | First Name | R/S | DOB | Date of Custody | County of Responsibility | Social Worker | Date to A.G. | Date Petition Filed | A.G. List 0-3 | A.G. List 3-6 | A.G. List 6+ | Date TPR Judgement Rec'd | Date of Legal Clearance | 459 Signed Date | Comments | Stamped |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | WF | REDACTED | 12/13/2011 | Warren | REDACTED | 4/19/2013 | **4/25/2013** | | | X | 8/12/2013 | **8/20/2013** | | | |
| REDACTED | REDACTED | WM | REDACTED | 5/15/2012 | Jones | REDACTED | 6/28/2013 | | | | X | 2/13/2014 | **3/7/2014** | | | |
| REDACTED | REDACTED | WM | REDACTED | 8/2/2012 | Hancock | REDACTED | 5/23/2013 | | | | X | 1/31/2014 | **2/6/2014** | 459/459 | | |
| REDACTED | REDACTED | WM | REDACTED | 5/15/2012 | Jones | REDACTED | 6/28/2013 | | | | X | 2/13/2014 | **3/7/2014** | | | |
| REDACTED | REDACTED | WF | REDACTED | 5/12/2012 | Jones | REDACTED | 6/28/2013 | | | | X | 2/13/2014 | **3/7/2014** | | | |
| REDACTED | REDACTED | BM | REDACTED | 9/23/2010 | Lafayette | REDACTED | 4/4/2012 | | | | X | 3/18/2013 | **4/11/2013** | | | |
| REDACTED | REDACTED | WF | REDACTED | 2/2/2012 | Monroe | REDACTED | 3/8/2013 | **3/27/2013** | | | X | 7/18/2013 | **8/22/2013** | | | |
| REDACTED | REDACTED | WF | REDACTED | 2/2/2012 | Monroe | REDACTED | 3/8/2013 | **3/27/2013** | | | X | 7/18/2013 | **8/22/2013** | | | |
| REDACTED | REDACTED | BF | REDACTED | 9/28/2011 | Copiah | REDACTED | 8/30/2012 | | | | X | | | | | |
| REDACTED | REDACTED | B/M | REDACTED | 2/25/2011 | Walthall | REDACTED | 9/23/2011 | | | | X | | | | | |
| REDACTED | REDACTED | B/F | REDACTED | 2/25/2011 | Walthall | REDACTED | 9/23/2011 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 5/2/2012 | Coahoma | REDACTED | 6/21/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 5/2/2012 | Coahoma | REDACTED | 6/21/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 12/3/2009 | P. River | REDACTED | 10/26/2012 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 10/4/2011 | Union | REDACTED | 10/30/2012 | **3/13/2013** | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 5/1/2009 | P. River | REDACTED | 11/12/2012 | | | | X | 2/13/2014 | | | | |
| REDACTED | REDACTED | BF | REDACTED | 2/1/2012 | Tippah | REDACTED | 7/13/2012 | | | | X | 7/29/2013 | | | | |
| REDACTED | REDACTED | WF | REDACTED | 5/1/2012 | Jackson | REDACTED | 12/7/2012 | | | | X | 5/1/2013 | | 459/459 | **Both parents surrendered** | |
| REDACTED | REDACTED | WF | REDACTED | 5/1/2012 | Jackson | REDACTED | 12/7/2012 | | | | X | 5/1/2013 | | 459/459 | **Both parents surrendered** | |
| REDACTED | REDACTED | WM | REDACTED | 12/12/2012 | Hancock | REDACTED | 9/13/2013 | | | | X | | | | | |
| REDACTED | REDACTED | OM | REDACTED | 1/12/2012 | Harrison | REDACTED | 2/1/2013 | | | | X | 2/26/2014 | | | | 3/24/2014 |
| REDACTED | REDACTED | BM | REDACTED | 5/22/2012 | Lauderdale | REDACTED | 7/3/2013 | | | | X | 11/19/2013 | | | | |
| REDACTED | REDACTED | WF | REDACTED | 3/3/2010 | Jackson | REDACTED | 11/3/2011 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 8/17/2011 | Washington | REDACTED | 3/29/2013 | **5/9/2013** | | | X | 8/23/2013 | **8/27/2013** | | | |
| REDACTED | REDACTED | WF | REDACTED | 7/28/2011 | Alcorn | REDACTED | 10/4/2012 | | | | X | 4/29/2013 | | | | |
| REDACTED | REDACTED | BF | REDACTED | 9/30/2012 | Clay | REDACTED | 11/1/3012 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 5/3/2010 | Lowndes | REDACTED | 8/1/3012 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 5/3/2010 | Lowndes | REDACTED | 8/30/2012 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 5/3/2010 | Lowndes | REDACTED | 8/1/3012 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 9/20/2010 | Clay | REDACTED | 11/30/2012 | | | | X | 4/11/2013 | | | **father is not tpr'ed** | |
| REDACTED | REDACTED | BM | REDACTED | 9/20/2010 | Clay | REDACTED | 11/30/2012 | | | | X | 4/11/2013 | | | **father is not tpr'ed** | |
| REDACTED | REDACTED | WF | REDACTED | 3/3/2010 | Jackson | REDACTED | 11/3/2011 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 9/20/2012 | Clay | REDACTED | 11/30/2012 | | | | X | 4/11/2013 | | | **father is not tpr'ed** | |
| REDACTED | REDACTED | BF | REDACTED | 9/20/2010 | Clay | REDACTED | 11/30/2012 | | | | X | 4/11/2013 | | | | |
| REDACTED | REDACTED | WF | REDACTED | 7/17/2012 | Alcorn | REDACTED | 12/20/2012 | | | | X | 8/16/2013 | **9/10/2013** | 5/1/2013 | **459/father surrenderd** | |
| REDACTED | REDACTED | BM | REDACTED | 3/20/2011 | Oktibbeha | REDACTED | 3/14/2013 | **3/19/2013** | | | X | 6/27/2013 | | | | |
| REDACTED | REDACTED | BF | REDACTED | 12/31/2008 | Oktibbeha | REDACTED | 5/13/2011 | 7/2/2012 | | | X | 3/25/2013 | 4/2/2013 | | | |
| REDACTED | REDACTED | WM | REDACTED | 10/18/2011 | Itawamba | REDACTED | 2/15/2013 | **3/25/2013** | | | X | 1/21/2014 | | | | |
| REDACTED | REDACTED | WM | REDACTED | 5/15/2010 | Itawamba | REDACTED | 4/13/2012 | | | | X | 2/5/2013 | **2/11/2013** | | | |
| REDACTED | REDACTED | WF | REDACTED | 5/15/2010 | Itawamba | REDACTED | 4/13/2012 | | | | X | 2/5/2013 | **2/11/2013** | | | |
| REDACTED | REDACTED | BF | REDACTED | 9/12/2011 | Coahoma | REDACTED | 6/21/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 8/9/2011 | Itawamba | REDACTED | 4/13/2012 | | | | X | | | 459 father | | |
| REDACTED | REDACTED | WF | REDACTED | 8/9/2011 | Itawamba | REDACTED | 4/13/2012 | **8/2/2012** | | | X | | | | | |
| REDACTED | REDACTED | OM | REDACTED | 8/3/2012 | Alcorn | REDACTED | 9/21/2012 | | | | X | 1/9/2013 | **1/16/2013** | | | |
| REDACTED | REDACTED | WM | REDACTED | 6/26/2012 | Hancock | REDACTED | 6/7/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 6/15/2011 | Warren | REDACTED | 7/12/2013 | | | | X | 2/10/2014 | **3/7/2014** | | | |
| REDACTED | REDACTED | WM | REDACTED | 3/30/2012 | Calhoun | REDACTED | 11/21/2012 | | | | X | 3/28/2013 | **4/5/2013** | | | |
| REDACTED | REDACTED | WM | REDACTED | 3/30/2012 | Calhoun | REDACTED | 11/21/2012 | | | | X | 3/28/2013 | **4/5/2013** | | | |
| REDACTED | REDACTED | WM | REDACTED | 3/30/2012 | Calhoun | REDACTED | 11/21/2012 | | | | X | 3/28/2013 | **4/5/2013** | | | |
| REDACTED | REDACTED | WM | REDACTED | 3/30/2012 | Calhoun | REDACTED | 11/21/2012 | | | | X | 3/28/2013 | **4/5/2013** | | | |
| REDACTED | REDACTED | BM | REDACTED | 4/17/2012 | Jackson | REDACTED | 4/12/2013 | **5/7/2013** | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 3/14/2011 | Jackson | REDACTED | 7/20/2012 | | | | X | 4/9/2013 | **4/17/2013** | | | |
| REDACTED | REDACTED | WM | REDACTED | 9/11/2011 | Jackson | REDACTED | 3/29/2012 | | | | X | 11/4/2013 | 1/29/2001 | | | |
| REDACTED | REDACTED | BM | REDACTED | 7/21/2012 | Lauderdale | REDACTED | 10/19/2012 | | | | X | 2/7/2013 | | | | |
| REDACTED | REDACTED | WM | REDACTED | 2/6/2012 | Lowndes | REDACTED | 1/25/2013 | | | | X | | | 459/459 | | |
| REDACTED | REDACTED | BF | REDACTED | 7/21/2011 | Lauderdale | REDACTED | 10/19/2012 | | | | X | 2/7/2013 | | | | |
| REDACTED | REDACTED | BM | REDACTED | 7/21/2011 | Lauderdale | REDACTED | 10/19/2012 | | | | X | 2/7/2013 | | | | |
| REDACTED | REDACTED | WF | REDACTED | 2/27/2011 | Harrison | REDACTED | 5/3/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 2/14/2011 | Neshobo | REDACTED | 3/14/2013 | **3/19/2013** | | | X | 8/1/2013 | **9/30/2013** | 459 father | | |
| REDACTED | REDACTED | WF | REDACTED | 1/30/2011 | Harrison | REDACTED | 7/6/2012 | | | | X | 8/5/2013 | **8/27/2013** | 459 mother | | |
| REDACTED | REDACTED | WM | REDACTED | 8/18/2010 | W. Chickasaw | REDACTED | 10/28/2011 | | | | X | 5/14/2013 | | | | |

**TPR Tracking System at State Office**

| Last Name | First Name | R/S | DOB | Date of Custody | County of Responsibility | Social Worker | Date to A.G. | Date Petition Filed | A.G. List 0-3 | A.G. List 3-6 | A.G. List 6+ | Date TPR Judgement Rec'd | Date of Legal Clearance | 459 Signed Date | Comments | Stamped |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | BR/M | REDACTED | 8/12/2012 | Lauderdale | REDACTED | 8/2/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 11/3/2012 | Lafayette | REDACTED | 8/28/2013 | | | | X | 1/15/2014 | **2/10/2014** | 459/459 | | |
| REDACTED | REDACTED | WM | REDACTED | 2/28/2012 | Alcorn | REDACTED | 4/12/2013 | | | | X | 2/7/2014 | **3/7/2014** | | | |
| REDACTED | REDACTED | WF | REDACTED | 2/28/2012 | Alcorn | REDACTED | 4/12/2013 | | | | X | 2/7/2014 | **3/7/2014** | | | |
| REDACTED | REDACTED | WM | REDACTED | 2/28/2012 | Alcorn | REDACTED | 4/12/2013 | | | | X | 2/7/2014 | **3/7/2014** | | | |
| REDACTED | REDACTED | WF | REDACTED | 9/23/2011 | Hancock | REDACTED | 11/9/2012 | | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | | Jackson | REDACTED | 3/10/2011 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 10/7/2011 | Harrison | REDACTED | 10/12/2012 | | | | X | 8/15/2013 | **459/f** | | | |
| REDACTED | REDACTED | BF | REDACTED | 1/22/2008 | Holmes | REDACTED | 8/10/2012 | | | | X | 6/6/2013 | | | | |
| REDACTED | REDACTED | BF | REDACTED | 1/22/2008 | Holmes | REDACTED | 8/10/2012 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 2/29/2012 | Adams | REDACTED | 5/31/2013 | | | | X | 12/11/2013 | **2/3/2014** | | | |
| REDACTED | REDACTED | WF | REDACTED | 2/29/2012 | Adams | REDACTED | 5/31/2013 | | | | X | 12/11/2013 | **2/3/2014** | | | |
| REDACTED | REDACTED | BM | REDACTED | 2/4/2012 | Harrison | REDACTED | 6/7/2013 | | | | X | 11/15/2013 | | dismissed | | |
| REDACTED | REDACTED | WM | REDACTED | 12/8/2010 | Alcorn | REDACTED | 10/4/2012 | | | | X | 4/29/2013 | | | | |
| REDACTED | REDACTED | WF | REDACTED | 8/24/2011 | Harrison | REDACTED | 10/26/2012 | | | | X | 8/15/2013 | **9/11/2013** | | | |
| REDACTED | REDACTED | BM | REDACTED | 2/4/2011 | Harrison | REDACTED | 6/7/2013 | | | | X | 11/15/2013 | | dismissed | | |
| REDACTED | REDACTED | BM | REDACTED | 12/1/2011 | Tunica | REDACTED | 7/12/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 9/11/2011 | Hancock | REDACTED | 11/30/2012 | | | | X | 8/21/2013 | **9/10/2013** | | | |
| REDACTED | REDACTED | WM | REDACTED | 9/11/2011 | Hancock | REDACTED | 11/30/2012 | | | | X | 8/21/2013 | **9/10/2013** | | | |
| REDACTED | REDACTED | BF | REDACTED | 1/22/2008 | Holmes | REDACTED | 8/10/2012 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 11/5/2012 | Pontotoc | REDACTED | 7/3/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 11/5/2012 | Pontotoc | REDACTED | 7/3/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 11/5/2012 | Pontotoc | REDACTED | 7/3/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 9/15/2009 | P. River | REDACTED | 7/25/2012 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 3/7/2012 | Lee | REDACTED | 8/23/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 3/13/2008 | Lowndes | REDACTED | 3/21/2013 | **4/26/2013** | | | X | 3/6/2014 | | | | |
| REDACTED | REDACTED | WF | REDACTED | 9/15/2009 | P. River | REDACTED | 7/25/2012 | | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 3/24/2011 | Neshobo | REDACTED | 8/24/2012 | | | | X | 10/9/2013 | **10/28/2013** | | | |
| REDACTED | REDACTED | WF | REDACTED | 3/24/2011 | Neshobo | REDACTED | 8/24/2012 | | | | X | 10/9/2013 | **10/28/2013** | | | |
| REDACTED | REDACTED | W/F | REDACTED | 4/6/2011 | Tishomingo | REDACTED | 4/6/2012 | | | | X | 2/15/2013 | 2/25/2013 | | | |
| REDACTED | REDACTED | WM | REDACTED | 4/6/2011 | Desoto | REDACTED | 7/6/2012 | | | | X | 3/5/2013 | **4/2/2013** | | | |
| REDACTED | REDACTED | B/M | REDACTED | 6/5/2008 | Lowndes | REDACTED | 4/22/2011 | | | | X | | | | | |
| REDACTED | REDACTED | B/F | REDACTED | 4/30/2008 | Lowndes | REDACTED | 4/22/2011 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 5/15/2012 | Hancock | REDACTED | 6/7/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 8/13/2011 | Tippah | REDACTED | 10/19/2012 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 10/27/2010 | Lowndes | REDACTED | 4/5/2013 | **4/26/2013** | | | X | 10/31/2013 | **11/7/2013** | | | |
| REDACTED | REDACTED | B/F | REDACTED | 8/7/2006 | Lowndes | REDACTED | 4/14/2011 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 4/17/2012 | Jackson | REDACTED | 4/12/2013 | **5/7/2013** | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 6/2/2012 | Cohoma | REDACTED | 6/28/2013 | | | | X | 1/28/2014 | **3/7/2014** | | | |
| REDACTED | REDACTED | BM | REDACTED | 6/2/2012 | Coahoma | REDACTED | 6/28/2013 | | | | X | 1/28/2014 | **3/7/2014** | | | |
| REDACTED | REDACTED | WF | REDACTED | 8/12/2012 | Lauderdale | REDACTED | 8/2/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 12/13/2010 | Harrison | REDACTED | 10/9/2012 | | | | X | 6/27/2013 | **8/22/2013** | | | |
| REDACTED | REDACTED | WM | REDACTED | 12/13/2010 | Harrison | REDACTED | 10/9/2012 | | | | X | 6/27/2013 | **8/22/2013** | | | |
| REDACTED | REDACTED | WM | REDACTED | 12/13/2010 | Harrison | REDACTED | 10/9/2012 | | | | X | 6/27/2013 | **8/22/2013** | | | |
| REDACTED | REDACTED | WM | REDACTED | 3/10/2013 | Harrison | REDACTED | 1/3/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 11/2/2010 | Hinds | REDACTED | 2/1/2013 | **4/4/2013** | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 11/20/2010 | Hinds | REDACTED | 2/1/2013 | **4/4/2013** | | | X | | | 8/6/2012 | **Both parents signed 459** | |
| REDACTED | REDACTED | BF | REDACTED | 11/20/2010 | Hinds | REDACTED | 2/1/2013 | **4/4/2013** | | | X | | | 8/6/2012 | | |
| REDACTED | REDACTED | BM | REDACTED | 5/8/2012 | Harrison | REDACTED | 5/22/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 1/23/2010 | Harrison | REDACTED | 2/10/2012 | 4/17/2012 | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 1/26/2011 | Grenada | REDACTED | 2/28/2012 | | | | X | 1/31/2013 | 2/6/2013 | | | |
| REDACTED | REDACTED | BF | REDACTED | 1/26/2011 | Grenada | REDACTED | 2/28/2012 | | | | X | 1/31/2013 | 2/6/2013 | | | |
| REDACTED | REDACTED | BM | REDACTED | 4/14/2011 | Clay | REDACTED | 5/23/2013 | | | | X | 1/8/2014 | **2/7/2014** | | | |
| REDACTED | REDACTED | WF | REDACTED | 7/6/2011 | Itawamba | REDACTED | 4/13/2012 | 7/16/2012 | | | X | 3/28/2013 | 4/11/2013 | | | |
| REDACTED | REDACTED | BF | REDACTED | 9/17/2009 | Hinds | REDACTED | 3/21/2013 | **5/7/2013** | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 4/14/2011 | Clay | REDACTED | 5/22/2013 | | | | X | 1/8/2014 | **2/7/2014** | | | |
| REDACTED | REDACTED | BF | REDACTED | 4/14/2011 | Clay | REDACTED | 5/22/2013 | | | | X | 1/8/2014 | **2/7/2014** | | | |
| REDACTED | REDACTED | BF | REDACTED | 9/13/2012 | Marshall | REDACTED | 2/7/2013 | | | | X | 8/21/2013 | **9/10/2013** | | | |
| REDACTED | REDACTED | BF | REDACTED | 7/22/2010 | Oktibbeha | REDACTED | 9/13/2012 | | | | X | 1/30/2013 | **2/11/2013** | 1/16/2013 | **Both parents surrendered** | |
| REDACTED | REDACTED | BF | REDACTED | 7/22/2010 | Oktibbeha | REDACTED | 9/13/2012 | | | | X | 1/30/2013 | **2/11/2013** | 1/16/2013 | **Both parents surrendered** | |
| REDACTED | REDACTED | BF | REDACTED | 12/15/2010 | Wayne | REDACTED | 12/12/2012 | | | | X | 4/23/2013 | **5/6/2013** | | | |

**TPR Tracking System at State Office**

| Last Name | First Name | R/S | DOB | Date of Custody | County of Responsibility | Social Worker | Date to A.G. | Date Petition Filed | A.G. List 0-3 | A.G. List 3-6 | A.G. List 6+ | Date TPR Judgement Rec'd | Date of Legal Clearance | 459 Signed Date | Comments | Stamped |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | BF | REDACTED | 12/15/2010 | Wayne | REDACTED | 12/12/2012 | | | | X | 4/23/2013 | **5/6/2013** | | | |
| REDACTED | REDACTED | BM | REDACTED | 1/6/2010 | Hinds | REDACTED | 1/10/2013 | | | | X | 9/11/2013 | **9/23/2013** | | | |
| REDACTED | REDACTED | BM | REDACTED | 12/15/2010 | Wayne | REDACTED | 12/12/2012 | | | | X | 4/23/2013 | **5/6/2013** | | | |
| REDACTED | REDACTED | BM | REDACTED | 1/6/2010 | Hinds | REDACTED | 1/10/2013 | | | | X | 9/11/2013 | **9/23/2013** | | | |
| REDACTED | REDACTED | WM | REDACTED | 4/14/2011 | Franklin | REDACTED | 2/22/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 1/6/2010 | Hinds | REDACTED | 1/10/2013 | | | | X | 9/11/2013 | **9/23/2013** | | | |
| REDACTED | REDACTED | WF | REDACTED | 5/1/2009 | P. River | REDACTED | 11/21/2012 | | | | X | 8/12/2013 | **8/27/2013** | 459/father | | |
| REDACTED | REDACTED | WM | REDACTED | 2/20/2012 | Harrison | REDACTED | 3/1/2013 | | | | X | 9/27/2013 | **11/15/2013** | | | |
| REDACTED | REDACTED | BM | REDACTED | 9/20/2012 | Clay | REDACTED | 11/30/2012 | | | | X | 4/11/2013 | **4/24/2013** | | | |
| REDACTED | REDACTED | BM | REDACTED | 9/20/2012 | Clay | REDACTED | 11/30/2012 | | | | X | 4/11/2013 | **4/24/2013** | | | |
| REDACTED | REDACTED | BM | REDACTED | 9/20/2012 | Clay | REDACTED | 11/30/2012 | | | | X | 4/11/2013 | **4/24/2013** | | | |
| REDACTED | REDACTED | BF | REDACTED | 5/11/2011 | Pontotoc | REDACTED | 8/10/2012 | | | | X | 10/12/2013 | | | | |
| REDACTED | REDACTED | BM | REDACTED | 5/11/2011 | Pontotoc | REDACTED | 8/10/2012 | | | | X | 10/12/2013 | | | | |
| REDACTED | REDACTED | WF | REDACTED | 6/18/2012 | Tishomingo | REDACTED | 4/19/2013 | | | | X | 2/24/2014 | **3/7/2014** | | | |
| REDACTED | REDACTED | WF | REDACTED | 6/18/2012 | Tishomingo | REDACTED | 4/19/2013 | | | | X | 2/24/2014 | **3/7/2014** | | | |
| REDACTED | REDACTED | WF | REDACTED | 9/12/2011 | Hancock | REDACTED | 9/26/2012 | | | | X | 4/1/2013 | | | | |
| REDACTED | REDACTED | WM | REDACTED | 9/11/2012 | Hancock | REDACTED | 9/26/2012 | | | | X | 4/1/2013 | | | | |
| REDACTED | REDACTED | WM | REDACTED | 3/4/2011 | Jackson | REDACTED | 3/29/2012 | 5/21/2012 | | | X | 3/5/2013 | | | | |
| REDACTED | REDACTED | BrM | REDACTED | 7/21/2011 | Jackson | REDACTED | 2/15/2013 | **4/11/2013** | | | X | 12/2/2013 | **3/7/2014** | DC/mother | | |
| REDACTED | REDACTED | BrM | REDACTED | 7/21/2011 | Jackson | REDACTED | 2/15/2013 | **4/11/2013** | | | X | 12/2/2013 | **3/7/2014** | DC/mother | | |
| REDACTED | REDACTED | BF | REDACTED | 8/23/2011 | J. Davis | REDACTED | 12/7/2012 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 7/7/2011 | Hinds | REDACTED | 3/29/2013 | **5/9/2013** | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 7/7/2011 | Hinds | REDACTED | 3/29/2013 | **5/9/2013** | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 8/26/2011 | Jackson | REDACTED | 5/22/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 8/26/2011 | Jackson | REDACTED | 5/22/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 8/26/2011 | Jackson | REDACTED | 5/22/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 9/13/2012 | Desoto | REDACTED | 7/3/2013 | | | | X | 12/19/2013 | | | | |
| REDACTED | REDACTED | WM | REDACTED | 9/13/2012 | Desoto | REDACTED | 7/3/2013 | | | | X | 12/19/2013 | | | | |
| REDACTED | REDACTED | BF | REDACTED | 5/16/2013 | Hinds | REDACTED | 9/20/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 9/11/2012 | Calhoun | REDACTED | 9/26/2012 | | | | X | 7/15/2013 | | | | |
| REDACTED | REDACTED | BF | REDACTED | 9/12/2011 | Calhoun | REDACTED | 9/26/2012 | | | | X | 7/15/2013 | | | | |
| REDACTED | REDACTED | B/M | REDACTED | 6/20/2008 | Lowndes | REDACTED | 9/2/2011 | 5/16/2012 | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 2/24/2010 | Harrison | REDACTED | 1/2/2012 | 4/25/2012 | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 10/21/2010 | Panola | REDACTED | 12/12/2012 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 7/27/2011 | Monroe | REDACTED | 4/5/2013 | **4/26/2013** | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 7/27/2011 | Monroe | REDACTED | 4/5/2013 | **4/26/2013** | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 7/27/2011 | Monroe | REDACTED | 4/5/2013 | **4/26/2013** | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 7/27/111 | Monroe | REDACTED | 4/5/2013 | **4/26/2013** | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 1/18/2012 | Stone | REDACTED | 8/28/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 8/25/2010 | Hinds | REDACTED | 3/14/2013 | **4/25/2013** | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 8/25/2010 | Hinds | REDACTED | 3/14/2013 | **4/25/2013** | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 8/25/2010 | Hinds | REDACTED | 3/14/2013 | **4/25/2013** | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 4/15/2011 | Union | REDACTED | 9/6/2013 | | | | X | | **459mother** | | | |
| REDACTED | REDACTED | WM | REDACTED | 2/16/2010 | Lincoln | REDACTED | 4/14/2011 | | | | X | 5/11/2012 | **8/29/2013** | | | |
| REDACTED | REDACTED | WF | REDACTED | 9/24/2011 | Desoto | REDACTED | 3/14/2012 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 5/4/2011 | Lauderdale | REDACTED | 12/12/2012 | | | | X | 7/18/2013 | | | | |
| REDACTED | REDACTED | BF | REDACTED | 6/6/2011 | Marion | REDACTED | 3/29/2012 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 12/19/2011 | Harrison | REDACTED | 5/3/2013 | | | | X | 10/14/2013 | **11/5/2013** | 459/father | | |
| REDACTED | REDACTED | WM | REDACTED | 5/8/2012 | Harrison | REDACTED | 5/3/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 5/8/2012 | Harrison | REDACTED | 5/3/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 4/15/2011 | Jackson | REDACTED | 9/6/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 6/6/2011 | Marion | REDACTED | 3/29/2012 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 9/26/2009 | Stone | REDACTED | 9/20/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 9/26/2009 | Stone | REDACTED | 9/20/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 12/14/2000 | Yazoo | REDACTED | 5/11/2012 | | | | X | | | | | |
| REDACTED | REDACTED | BrM | REDACTED | 12/13/2011 | Lafayette | REDACTED | 8/17/2012 | | | | X | 8/21/2013 | 8/27/2013 | | | |
| REDACTED | REDACTED | WF | REDACTED | 8/8/2012 | E. Bolivar | REDACTED | 9/13/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 8/8/2012 | E. Bolivar | REDACTED | 9/13/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 10/4/2011 | W. Bolivar | REDACTED | 10/26/2012 | | | | X | 5/20/2013 | | | | |
| REDACTED | REDACTED | BM | REDACTED | 12/14/2000 | Yazoo | REDACTED | 5/11/2012 | 6/12/2011 | | | X | | | | | |

TPR Tracking System at State Office

| Last Name | First Name | R/S | DOB | Date of Custody | County of Responsibility | Social Worker | Date to A.G. | Date Petition Filed | A.G. List 0-3 | A.G. List 3-6 | A.G. List 6+ | Date TPR Judgement Rec'd | Date of Legal Clearance | 459 Signed Date | Comments | Stamped |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | WM | REDACTED | 8/4/2011 | Harrison | REDACTED | 3/7/2013 | **3/20/2013** | | | X | 6/14/2013 | | | **Both parents surrendered** | |
| REDACTED | REDACTED | WF | REDACTED | 9/24/2012 | Hancock | REDACTED | 9/13/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 5/8/2012 | Jackson | REDACTED | 6/14/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 5/8/2012 | Harrison | REDACTED | 5/22/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WH/M | REDACTED | 7/2/2010 | Pontotoc | REDACTED | 8/31/2012 | | | | X | | | | | |
| REDACTED | REDACTED | WH/F | REDACTED | 7/2/2010 | Pontotoc | REDACTED | 8/31/2012 | | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 12/11/2011 | Stone | REDACTED | 2/7/2013 | | | | X | 9/26/2013 | **11/15/2013** | | | |
| REDACTED | REDACTED | WM | REDACTED | 8/26/2011 | Tippah | REDACTED | 12/20/2012 | 4/26/2013 | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 10/13/2011 | Lafayette | REDACTED | 1/15/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 10/13/2011 | Lafayette | REDACTED | 1/15/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 10/21/2010 | Tippah | REDACTED | 12/3/2011 | 4/17/2012 | | | X | 7/15/2013 | 9/11/2013 | | | |
| REDACTED | REDACTED | BF | REDACTED | 8/30/2011 | Washington | REDACTED | 8/10/2012 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 8/30/2011 | Washington | REDACTED | 8/10/2012 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 9/16/2010 | Winston | REDACTED | 2/13/2012 | | | | X | 4/23/2013 | | | | |
| REDACTED | REDACTED | BM | REDACTED | 11/5/2009 | Winston | REDACTED | 2/13/2012 | | | | X | 4/26/2013 | | | | |
| REDACTED | REDACTED | BM | REDACTED | 9/16/2010 | Winston | REDACTED | 2/13/2012 | | | | X | 4/26/2013 | | | | |
| REDACTED | REDACTED | BF | REDACTED | 5/10/2011 | Itawamba | REDACTED | 8/17/2012 | | | | X | Apr-13 | | 2/25/2013 | both parents surrendered | |
| REDACTED | REDACTED | BM | REDACTED | 11/2/2010 | Hinds | REDACTED | 2/1/2013 | 4/4/2013 | | | X | | | 8/6/2012 | | |
| REDACTED | REDACTED | BM | REDACTED | 11/2/2010 | Hinds | REDACTED | 2/1/2013 | 4/4/2013 | | | X | | | 8/6/2012 | | |
| REDACTED | REDACTED | BM | REDACTED | 11/2/2010 | Hinds | REDACTED | 2/1/2013 | 4/4/2013 | | | X | | | 8/6/2012 | | |
| REDACTED | REDACTED | WF | REDACTED | 6/22/2011 | Jackson | REDACTED | 10/19/2012 | | | | X | 5/18/2013 | | | Mother surrendered | |
| REDACTED | REDACTED | BF | REDACTED | 5/9/2011 | Tate | REDACTED | 5/8/2013 | | | | X | 10/16/2013 | **12/27/2013** | | | |
| REDACTED | REDACTED | WF | REDACTED | 3/22/2012 | Hancock | REDACTED | 1/15/2013 | | | | X | 8/16/2013 | | 459/mother | DC, father | |
| REDACTED | REDACTED | BM | REDACTED | 5/8/2012 | Harrison | REDACTED | 5/22/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 3/22/2012 | Hancock | REDACTED | 1/15/2013 | | | | X | 8/16/2013 | | 459/ mother | DC, father | |
| REDACTED | REDACTED | BF | REDACTED | 5/8/2012 | Harrison | REDACTED | 5/22/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 3/6/2011 | Jackson | REDACTED | 7/20/2012 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 3/23/2012 | E. Chickasaw | REDACTED | 3/25/2013 | 4/3/2013 | | | X | 6/27/2013 | | | | |
| REDACTED | REDACTED | WM | REDACTED | 3/8/2012 | Hancock | REDACTED | 6/7/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 3/12/2012 | Hancock | REDACTED | 6/7/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 12/22/2011 | Union | REDACTED | 1/25/2013 | 3/13/2013 | | | X | 11/20/2013 | 3/7/2014 | | | |
| REDACTED | REDACTED | WF | REDACTED | 8/24/2010 | Hinds | REDACTED | 7/13/2012 | 6/6/2012 | | | X | 2/22/2013 | | | | |
| REDACTED | REDACTED | BF | REDACTED | 12/22/2011 | Union | REDACTED | 1/25/2013 | 3/13/2013 | | | X | 11/20/2013 | 3/7/2014 | | | |
| REDACTED | REDACTED | BM | REDACTED | 6/16/2010 | Washington | REDACTED | 5/3/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 6/16/2010 | Washington | REDACTED | 5/3/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 6/16/2010 | Washington | REDACTED | 5/3/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 6/16/2010 | Washington | REDACTED | 5/3/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 10/24/2011 | Alcorn | REDACTED | 3/21/2013 | | | | X | 11/4/2013 | 11/15/2013 | | | |
| REDACTED | REDACTED | WF | REDACTED | 10/24/2011 | Alcorn | REDACTED | 3/21/2013 | | | | X | 11/4/2013 | 11/15/2013 | | | |
| REDACTED | REDACTED | WM | REDACTED | 10/24/2011 | Alcorn | REDACTED | 3/21/2013 | | | | X | 11/4/2013 | 11/15/2013 | | | |
| REDACTED | REDACTED | B/M | REDACTED | 10/23/2006 | Jackson | REDACTED | 1/29/2010 | | | | X | | | | | |
| REDACTED | REDACTED | BrM | REDACTED | 4/8/2011 | Harrison | REDACTED | 8/17/2012 | | | | X | 1/11/2013 | 1/24/2013 | | | |
| REDACTED | REDACTED | BM | REDACTED | 3/11/2011 | Alcorn | REDACTED | 3/8/2013 | 4/26/2013 | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 3/11/2011 | Alcorn | REDACTED | 3/8/2013 | 4/26/2013 | | | X | | | | | |
| REDACTED | REDACTED | BrM | REDACTED | 4/4/2012 | Hinds | REDACTED | 8/23/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 7/19/2012 | Pnototoc | REDACTED | 4/19/2013 | 5/8/2013 | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 4/15/2011 | MONROE | REDACTED | 1/20/2012 | | | | X | 1/24/2013 | 2/6/2013 | | | |
| REDACTED | REDACTED | WM | REDACTED | 10/8/2009 | Monroe | REDACTED | 3/14/2013 | | | | X | | | 12/23/2013 | | |
| REDACTED | REDACTED | BF | REDACTED | 9/10/2010 | Jackson | REDACTED | 9/21/2012 | | | | X | 7/24/2013 | | | | |
| REDACTED | REDACTED | BM | REDACTED | 9/22/2011 | Union | REDACTED | 2/15/2013 | 5/8/2013 | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 11/13/2012 | Union | REDACTED | 8/2/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 7/21/2012 | Lauderdale | REDACTED | 10/19/2012 | | | | X | 2/7/2013 | | | | |
| REDACTED | REDACTED | BF | REDACTED | 7/21/2012 | Lauderdale | REDACTED | 10/19/2012 | | | | X | 2/7/2013 | | | | |
| REDACTED | REDACTED | WF | REDACTED | 12/17/2009 | Jackson | REDACTED | 8/10/2012 | | | | X | 6/24/2013 | | | | |
| REDACTED | REDACTED | WF | REDACTED | 2/7/2012 | Lee | REDACTED | 2/15/2013 | 3/20/2013 | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 9/29/2011 | Calhoun | REDACTED | 6/1/2012 | | | | X | 1/24/2013 | 1/29/2013 | | | |
| REDACTED | REDACTED | BM | REDACTED | 2/11/2011 | Washington | REDACTED | 3/9/2012 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 1/12/2010 | HARRISON | REDACTED | 11/23/2011 | 6/18/2012 | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 2/11/2013 | Lafayette | REDACTED | 5/23/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 9/27/2012 | Desoto | REDACTED | 2/7/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 9/9/2009 | Marshall | REDACTED | 4/6/2012 | | | | X | | | | | |

TPR Tracking System at State Office

| Last Name | First Name | R/S | DOB | Date of Custody | County of Responsibility | Social Worker | Date to A.G. | Date Petition Filed | A.G. List 0-3 | A.G. List 3-6 | A.G. List 6+ | Date TPR Judgement Rec'd | Date of Legal Clearance | 459 Signed Date | Comments | Stamped |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | WM | REDACTED | 6/28/2012 | Panola | REDACTED | 5/23/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 6/1/2812 | Panola | REDACTED | 5/23/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 6/2/2011 | Union | REDACTED | 10/4/2012 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 6/2/2011 | Union | REDACTED | 10/4/2012 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 3/26/2010 | Jackson | REDACTED | 10/30/2012 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 8/12/2010 | Hinds | REDACTED | 8/24/2012 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 8/12/2010 | Hinds | REDACTED | 8/24/2012 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 8/12/2010 | Hinds | REDACTED | 8/24/2012 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 7/29/2010 | Marshall | REDACTED | 12/16/2011 | 3/23/2012 | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 4/21/2011 | Union | REDACTED | 9/21/2012 | | | | X | 6/18/2013 | | | | |
| REDACTED | REDACTED | BM | REDACTED | 4/21/2011 | Union | REDACTED | 9/21/2012 | | | | X | 6/18/2013 | | | | |
| REDACTED | REDACTED | BM | REDACTED | 11/4/2010 | Desoto | REDACTED | 11/30/2012 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 9/9/2009 | Marshall | REDACTED | 4/6/2012 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 1/11/2011 | Oktibbeha | REDACTED | 1/25/2013 | | | | X | 5/7/2013 | | | | |
| REDACTED | REDACTED | WM | REDACTED | 10/12/2012 | Hancock | REDACTED | 2/7/2013 | | | | X | 2/28/2014 | | 459/459 | | |
| REDACTED | REDACTED | WM | REDACTED | 10/10/2013 | Hancock | REDACTED | 2/7/2013 | | | | X | 2/28/2014 | | 459/459 | | |
| REDACTED | REDACTED | BM | REDACTED | 12/13/2011 | Lafayette | REDACTED | 8/17/2012 | | | | X | 1/14/2014 | | | | |
| REDACTED | REDACTED | BM | REDACTED | 12/13/2011 | Lafayette | REDACTED | 8/17/2012 | | | | X | 1/14/2014 | | | | |
| REDACTED | REDACTED | WF | REDACTED | 2/16/2010 | Lincoln | REDACTED | 9/9/2011 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 5/8/2012 | Harrison | REDACTED | 5/22/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WHF | REDACTED | 2/23/2011 | Jackson | REDACTED | 7/3/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WHM | REDACTED | 2/23/2011 | Jackson | REDACTED | 7/3/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WHM | REDACTED | 2/23/2011 | Jackson | REDACTED | 7/3/2013 | | | | X | | | | | |
| REDACTED | REDACTED | HF | REDACTED | 8/23/2013 | Jones | REDACTED | 7/24/2013 | | | | X | 2/14/2014 | | | | |
| REDACTED | REDACTED | HM | REDACTED | 8/23/2013 | Jones | REDACTED | 7/24/2013 | | | | X | 2/14/2014 | | | | |
| REDACTED | REDACTED | BF | REDACTED | 4/22/2011 | Harrison | REDACTED | 4/2/2012 | 4/25/2013 | | | X | 9/24/2013 | 11/15/2013 | | | |
| REDACTED | REDACTED | BrF | REDACTED | 12/19/2011 | Hinds | REDACTED | 11/9/2012 | | | | X | 10/21/2013 | 11/5/2013 | | | |
| REDACTED | REDACTED | BrM | REDACTED | 10/1/2012 | Jefferson Davis | REDACTED | 9/6/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 4/22/2010 | Hancock | REDACTED | 1/6/2012 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 4/13/2010 | Desoto | REDACTED | 9/21/2012 | | | | X | 3/26/2013 | 4/1/2013 | | | |
| REDACTED | REDACTED | WF | REDACTED | 7/23/2012 | Tishomingo | REDACTED | 7/3/2013 | | | | X | 11/18/2013 | 12/12/2013 | | | |
| REDACTED | REDACTED | WF | REDACTED | 4/13/2010 | Desoto | REDACTED | 9/21/2012 | | | | X | 3/26/2013 | 4/1/2013 | | | |
| REDACTED | REDACTED | WM | REDACTED | 11/13/2008 | Jackson | REDACTED | 2/1/2013 | | | | X | 3/7/2013 | 4/1/2013 | 459/459 | | |
| REDACTED | REDACTED | BM | REDACTED | 6/10/2010 | J. Davis | REDACTED | 3/1/2012 | 6/18/2012 | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 9/16/2010 | Winston | REDACTED | 2/13/2012 | | | | X | 4/26/2013 | | | | |
| REDACTED | REDACTED | BM | REDACTED | 9/16/2010 | Winston | REDACTED | 2/13/2012 | 5/9/2012 | | | X | 4/26/2013 | | | | |
| REDACTED | REDACTED | B/F | REDACTED | 2/2/2010 | CHOCTAW | REDACTED | 10/10/2011 | | | | X | | | | | |
| REDACTED | REDACTED | HF | REDACTED | 10/23/2012 | Harrison | REDACTED | 8/2/2013 | | | | X | | | | | |
| REDACTED | REDACTED | HF | REDACTED | 10/23/2012 | Harrison | REDACTED | 8/2/2013 | | | | X | | | | | |
| REDACTED | REDACTED | HM | REDACTED | 10/23/2012 | Harrison | REDACTED | 8/2/2013 | | | | X | | | | | |
| REDACTED | REDACTED | Hm | REDACTED | 10/23/2012 | Harrison | REDACTED | 8/2/2013 | | | | X | | | | | |
| REDACTED | REDACTED | HF | REDACTED | 10/23/2012 | Harrison | REDACTED | 8/2/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 8/10/2009 | JEFF. DAVIS | REDACTED | 11/10/2011 | | | | X | | 1/8/2013 | | | |
| REDACTED | REDACTED | WF | REDACTED | 11/14/2012 | Webster | REDACTED | 9/6/2013 | | | | X | 2/5/2014 | 3/7/2014 | | | |
| REDACTED | REDACTED | WF | REDACTED | 3/1/2012 | Pontotoc | REDACTED | 2/15/2013 | 3/25/2013 | | | X | 9/6/2013 | | 459/mother | | |
| REDACTED | REDACTED | WM | REDACTED | 3/1/2012 | Pontotoc | REDACTED | 2/15/2013 | 3/25/2013 | | | X | 9/6/2013 | | 459/mother | | |
| REDACTED | REDACTED | BrM | REDACTED | 7/21/2011 | Jackson | REDACTED | 2/15/2013 | 4/11/2013 | | | X | 12/2/2013 | 3/7/2014 | dc/mother | | |
| REDACTED | REDACTED | WM | REDACTED | 9/13/2012 | Desoto | REDACTED | 7/3/2013 | | | | X | 12/19/2013 | | | | |
| REDACTED | REDACTED | BM | REDACTED | 12/10/2010 | Oktibbeha | REDACTED | 11/21/2012 | | | | X | 4/11/2013 | | 459/mother | | |
| REDACTED | REDACTED | WM | REDACTED | 3/15/2011 | Lincoln | REDACTED | 12/20/2012 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 3/15/2011 | Lincoln | REDACTED | 12/20/2012 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 5/26/2010 | Monroe | REDACTED | 2/1/2013 | 3/13/2013 | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 12/15/2011 | Tippah | REDACTED | 3/8/2013 | 4/26/2013 | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 12/15/2011 | Tippah | REDACTED | 3/8/2013 | 4/26/2013 | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 12/15/2011 | Tippah | REDACTED | 3/8/2013 | 4/26/2013 | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 3/9/1996 | Hancock | REDACTED | 7/24/2001 | | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 3/9/1996 | Hancock | REDACTED | 7/24/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 10/31/2011 | Lauderdale | REDACTED | 6/28/2013 | | | | X | | | 4/3/1901 | | |
| REDACTED | REDACTED | BF | REDACTED | 10/31/2011 | Lauderdale | REDACTED | 6/28/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BrM | REDACTED | 2/22/2011 | Lauderdale | REDACTED | 7/3/2013 | | | | X | 11/19/2013 | 1/24/2014 | 459mother | | |
| REDACTED | REDACTED | BF | REDACTED | 6/2/2012 | Cohoma | REDACTED | 6/28/2013 | | | | X | 1/28/2014 | 3/7/2014 | | | |

TPR Tracking System at State Office

| Last Name | First Name | R/S | DOB | Date of Custody | County of Responsibility | Social Worker | Date to A.G. | Date Petition Filed | A.G. List 0-3 | A.G. List 3-6 | A.G. List 6+ | Date TPR Judgement Rec'd | Date of Legal Clearance | 459 Signed Date | Comments | Stamped |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | WM | REDACTED | 1/6/2011 | Harrison | REDACTED | 5/31/2013 | | | | X | 2/26/2014 | | 459/459 | Both parents surrendered | |
| REDACTED | REDACTED | BrF | REDACTED | 4/8/2011 | Harrison | REDACTED | 8/17/2012 | | | | X | 1/11/2013 | 1/24/2013 | | | |
| REDACTED | REDACTED | BrM | REDACTED | 4/8/2008 | Harrison | REDACTED | 8/17/2012 | | | | X | 1/11/2013 | 1/24/2013 | | | |
| REDACTED | REDACTED | BF | REDACTED | 8/5/2011 | Hinds | REDACTED | 6/21/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 2/6/2012 | lowndes | REDACTED | 1/25/2013 | | | | X | 10/31/2013 | | 459/459 | | |
| REDACTED | REDACTED | WF | REDACTED | 8/18/2011 | Hancock | REDACTED | 10/19/2012 | | | | X | 9/4/2013 | 10/28/2013 | 459/459 | | |
| REDACTED | REDACTED | WM | REDACTED | 3/1/2011 | Hancock | REDACTED | 10/19/2012 | | | | X | 12/12/2013 | | | | |
| REDACTED | REDACTED | WM | REDACTED | 3/1/2011 | Hancock | REDACTED | 10/19/2012 | | | | X | 12/12/2013 | | | | |
| REDACTED | REDACTED | BF | REDACTED | 5/3/2012 | Washingotn | REDACTED | 12/7/2012 | | | | X | 4/9/2013 | 4/16/2013 | | | |
| REDACTED | REDACTED | WF | REDACTED | 3/1/2011 | Hancock | REDACTED | 10/19/2012 | | | | X | 12/12/2013 | | | | |
| REDACTED | REDACTED | BF | REDACTED | 2/13/2012 | Warren | REDACTED | 8/28/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 1/7/2012 | Lee | REDACTED | 4/12/2013 | 4/26/2013 | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 6/28/2010 | Okitbbeha | REDACTED | 8/16/2013 | | | | X | 12/10/2013 | | | | |
| REDACTED | REDACTED | BM | REDACTED | 6/28/2010 | Okitbbeha | REDACTED | 8/16/2013 | | | | X | 12/10/2013 | | | | |
| REDACTED | REDACTED | WF | REDACTED | 1/7/2012 | Lee | REDACTED | 4/12/2013 | 4/26/2013 | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 6/10/2011 | Alcorn | REDACTED | 2/21/2013 | | | | X | 6/25/2013 | | | | |
| REDACTED | REDACTED | WM | REDACTED | 2/21/2013 | Alcorn | REDACTED | 2/21/2013 | | | | X | 6/25/2013 | | | | |
| REDACTED | REDACTED | WM | REDACTED | 6/10/2011 | Alcorn | REDACTED | 2/21/2013 | | | | X | 6/25/2013 | | | | |
| REDACTED | REDACTED | BM | REDACTED | 4/4/2010 | Humphreys | REDACTED | 8/24/2012 | | | | X | 3/7/2013 | 3/12/2013 | | | |
| REDACTED | REDACTED | BF | REDACTED | 3/16/2011 | Washingotn | REDACTED | 12/7/2012 | | | | X | 9/30/2013 | 10/15/2013 | | | |
| REDACTED | REDACTED | B/F | REDACTED | 12/20/2010 | Hinds | REDACTED | 8/19/2011 | 3/26/2012 | | | X | 6/21/2013 | | | | |
| REDACTED | REDACTED | B/F | REDACTED | 10/20/2010 | Hinds | REDACTED | 8/19/2011 | | | | X | 6/21/2013 | | | | |
| REDACTED | REDACTED | W/F | REDACTED | 9/21/2009 | Harrison | REDACTED | 7/30/2010 | | | | X | 6/21/2013 | | | | |
| REDACTED | REDACTED | BF | REDACTED | 5/22/2012 | Lauderdale | REDACTED | 7/3/2013 | | | | X | 11/19/2013 | | | | |
| REDACTED | REDACTED | BM | REDACTED | 5/22/2012 | Lauderdale | REDACTED | 7/3/2013 | | | | X | 11/19/2013 | | | | |
| REDACTED | REDACTED | B/F | REDACTED | 12/20/2010 | Hinds | REDACTED | 8/19/2011 | | | | X | | | | | |
| REDACTED | REDACTED | W/F | REDACTED | 9/21/2009 | Harrison | REDACTED | 7/30/2010 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 6/26/2012 | Monroe | REDACTED | 2/21/2013 | 3/27/2013 | | | X | 11/5/2013 | | | | |
| REDACTED | REDACTED | BM | REDACTED | 5/21/2012 | Union | REDACTED | 10/7/2011 | | | | X | 1/29/2014 | | | | |
| REDACTED | REDACTED | B/F | REDACTED | 5/21/2009 | Union | REDACTED | 10/7/2011 | | | | X | 1/29/2014 | | | | |
| REDACTED | REDACTED | WF | REDACTED | 4/3/2013 | Calhoun | REDACTED | 9/20/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 9/15/2011 | Union | REDACTED | 10/30/2012 | 3/13/2013 | | | X | | | | | |
| REDACTED | REDACTED | HF | REDACTED | 2/10/2012 | W.Chickasaw | REDACTED | 9/26/2012 | | | | X | 4/30/2013 | | | | |
| REDACTED | REDACTED | HF | REDACTED | 2/10/2012 | W.Chickasaw | REDACTED | 9/26/2012 | | | | X | 4/30/2013 | | | | |
| REDACTED | REDACTED | HF | REDACTED | 2/10/2012 | W. Chickasaw | REDACTED | 9/26/2012 | | | | X | 4/30/2013 | | | | |
| REDACTED | REDACTED | HF | REDACTED | 2/12/2012 | W. Chickasaw | REDACTED | 9/26/2012 | | | | X | 4/30/2013 | | | | |
| REDACTED | REDACTED | HF | REDACTED | 2/10/2012 | W. Chickasaw | REDACTED | 9/26/2012 | | | | X | 4/30/2013 | | | | |
| REDACTED | REDACTED | WF | REDACTED | 1/18/2008 | Jackson | REDACTED | 3/9/2012 | 5/9/2012 | | | X | 4/3/2013 | 4/10/2013 | | | |
| REDACTED | REDACTED | WM | REDACTED | 1/18/2008 | Jackson | REDACTED | 3/9/2012 | 5/9/2012 | | | X | 4/3/2013 | 4/10/2013 | | | |
| REDACTED | REDACTED | WF | REDACTED | 8/8/2012 | E. Bolivar | REDACTED | 9/13/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 8/8/2012 | E. Bolivar | REDACTED | 9/13/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 8/8/2012 | E. Bolivar | REDACTED | 9/13/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 4/24/2012 | Wilkinson | REDACTED | 8/2/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 4/24/2012 | Wilkinson | REDACTED | 8/2/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 4/24/2012 | Wilkinson | REDACTED | 8/2/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 10/27/2011 | Marion | REDACTED | 3/14/2013 | 4/9/2013 | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 12/19/2011 | Harrison | REDACTED | 5/3/2013 | | | | X | 2/10/2014 | | | | |
| REDACTED | REDACTED | WM | REDACTED | 12/19/2011 | Harrison | REDACTED | 5/3/2013 | | | | X | 2/10/2014 | | | | |
| REDACTED | REDACTED | WF | REDACTED | 12/18/2012 | Hancock | REDACTED | 8/2/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 5/22/2012 | Lauderdale | REDACTED | 7/3/2013 | | | | X | 11/19/2013 | | | | |
| REDACTED | REDACTED | WM | REDACTED | 2/29/2012 | Stone | REDACTED | 10/12/2012 | | | | X | 2/14/2013 | | 4/3/1901 | | **3/24/2014** |
| REDACTED | REDACTED | BrF | REDACTED | 12/23/2011 | P. River | REDACTED | 5/3/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 8/23/2012 | Harrison | REDACTED | 8/2/2013 | | | | X | | | | | |
| REDACTED | REDACTED | W/M | REDACTED | 3/31/2010 | Tishomingo | REDACTED | 5/13/2011 | | | | X | 1/10/2012 | | | | |
| REDACTED | REDACTED | W/F | REDACTED | 3/31/2010 | Tishomingo | REDACTED | 5/13/2011 | | | | X | 1/10/2012 | | | | |
| REDACTED | REDACTED | W/F | REDACTED | 3/31/2010 | Tishomingo | REDACTED | 5/13/2011 | | | | X | 1/10/2012 | | | | |
| REDACTED | REDACTED | WF | REDACTED | 3/31/2010 | Tishomingo | REDACTED | 5/13/2011 | | | | X | 1/10/2012 | | | | |
| REDACTED | REDACTED | WF | REDACTED | 5/2/2011 | Hancock | REDACTED | 1/25/2012 | | | | X | 5/29/2013 | | | | |
| REDACTED | REDACTED | WM | REDACTED | 5/2/2011 | Hancock | REDACTED | 1/25/2012 | | | | X | 5/29/2013 | | | | |
| REDACTED | REDACTED | WM | REDACTED | 5/2/2011 | Hancock | REDACTED | 1/25/2012 | | | | X | 5/29/2013 | | | | |
| REDACTED | REDACTED | BF | REDACTED | 9/1/2009 | Lafayette | REDACTED | 2/28/2012 | | | | X | 9/17/2013 | | child with father | | |

TPR Tracking System at State Office

| Last Name | First Name | R/S | DOB | Date of Custody | County of Responsibility | Social Worker | Date to A.G. | Date Petition Filed | A.G. List 0-3 | A.G. List 3-6 | A.G. List 6+ | Date TPR Judgement Rec'd | Date of Legal Clearance | 459 Signed Date | Comments | Stamped |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | WF | REDACTED | 9/9/2011 | Winston | REDACTED | 4/19/2013 | 5/1/2013 | | | X | 1/24/2014 | 3/7/2014 | | | |
| REDACTED | REDACTED | BM | REDACTED | 6/16/2011 | Harrison | REDACTED | 5/11/2012 | 5/16/2012 | | | X | 11/16/2012 | 12/12/2012 | | | |
| REDACTED | REDACTED | BF | REDACTED | 10/22/2010 | Noxubee | REDACTED | 4/25/2012 | | | | X | 9/3/2012 | 10/11/2012 | | | |
| REDACTED | REDACTED | BM | REDACTED | 8/22/2011 | Harrison | REDACTED | 7/20/2012 | 5/16/2012 | | | X | 12/12/2012 | 11/12/2013 | | | |
| REDACTED | REDACTED | BF | REDACTED | 2/1/2012 | Washington | REDACTED | 7/12/2013 | | | | X | 1/30/2014 | 3/7/2014 | 459/f | | |
| REDACTED | REDACTED | BM | REDACTED | 2/1/2012 | Washington | REDACTED | 7/12/2013 | | | | X | 1/30/2014 | 3/7/2014 | 459/f | | |
| REDACTED | REDACTED | BF | REDACTED | 6/3/2011 | Harrison | REDACTED | 5/23/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 6/3/2011 | Harrison | REDACTED | 5/23/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 9/26/2009 | Stone | REDACTED | 9/20/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 5/15/2012 | Hancock | REDACTED | 6/7/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 5/15/2012 | Hancock | REDACTED | 6/7/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 4/3/2013 | Winston | REDACTED | 6/14/2013 | | | | X | 10/2/2013 | 10/28/2013 | | | |
| REDACTED | REDACTED | WF | REDACTED | 10/7/2011 | Stone | REDACTED | 10/12/2012 | | | | X | 2/13/2013 | | 459/459 | | **3/24/2014** |
| REDACTED | REDACTED | BF | REDACTED | 8/7/2010 | Hinds | REDACTED | 8/17/2012 | | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 4/26/2011 | Harrison | REDACTED | 5/11/2012 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 5/4/2011 | Marion | REDACTED | 10/26/2012 | | | | X | 3/4/2013 | 3/12/2013 | | | |
| REDACTED | REDACTED | BF | REDACTED | 7/7/2009 | Tunica | REDACTED | 7/6/2012 | 7/16/2012 | | | X | | 8/26/2013 | | | |
| REDACTED | REDACTED | BF | REDACTED | 4/3/2013 | Winston | REDACTED | 6/14/2013 | | | | X | 10/2/2013 | 10/28/2013 | | | |
| REDACTED | REDACTED | BM | REDACTED | 5/4/2011 | Marion | REDACTED | 10/26/2012 | | | | X | 3/4/2013 | 3/12/2013 | | | |
| REDACTED | REDACTED | WF | REDACTED | 10/8/2010 | Marion | REDACTED | 1/10/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 4/11/2012 | Monroe | REDACTED | 1/25/2013 | | | | X | | | | | |
| REDACTED | REDACTED | B/M | REDACTED | 7/29/2010 | Tallahatchie | REDACTED | 12/21/2011 | | | | X | 4/18/2012 | 5/7/2012 | | | |
| REDACTED | REDACTED | BR/M | REDACTED | 4/29/2011 | Hancock | REDACTED | 8/26/2011 | | | | X | 3/29/2012 | 4/17/2012 | | | |
| REDACTED | REDACTED | B/F | REDACTED | 1/29/2010 | Grenada | REDACTED | 10/28/2010 | | | | X | 2/25/2012 | | | | |
| REDACTED | REDACTED | WF | REDACTED | 8/22/2011 | Harrison | REDACTED | 3/1/2013 | 4/9/2013 | | | X | 9/24/2013 | 10/21/2013 | | | |
| REDACTED | REDACTED | WF | REDACTED | 9/21/2010 | P. River | REDACTED | 11/21/2012 | | | | X | 5/20/2013 | | | | |
| REDACTED | REDACTED | BM | REDACTED | 3/29/2011 | A. Elmore | REDACTED | 8/2/2013 | | | | X | | | | | |
| REDACTED | REDACTED | HM | REDACTED | 4/8/2011 | Alcorn | REDACTED | 10/4/2012 | | | | X | 8/6/2013 | 8/27/2013 | | | |
| REDACTED | REDACTED | BrF | REDACTED | 5/19/2011 | Tishomingo | REDACTED | 10/12/2012 | 3/13/2013 | | | X | 8/5/2013 | 8/21/2013 | | | |
| REDACTED | REDACTED | WF | REDACTED | 8/13/2009 | Pearl River | REDACTED | 7/3/2013 | | | | X | 11/14/2013 | 12/5/2013 | | | |
| REDACTED | REDACTED | BF | REDACTED | 7/19/2011 | Jackson | REDACTED | 8/30/2012 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 7/19/2011 | Jackson | REDACTED | 8/30/2012 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 7/19/2011 | Jackson | REDACTED | 8/30/2012 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 12/8/2010 | Alcorn | REDACTED | 10/4/2012 | | | | X | 7/24/2013 | | | | |
| REDACTED | REDACTED | WM | REDACTED | 7/28/2011 | Alcorn | REDACTED | 10/4/2012 | | | | X | 7/24/2013 | | | | |
| REDACTED | REDACTED | WM | REDACTED | 7/28/2011 | Alcorn | REDACTED | 10/4/2012 | | | | X | 7/24/2013 | | | | |
| REDACTED | REDACTED | WF | REDACTED | 9/1/2012 | Desoto | REDACTED | 8/22/2013 | | | | X | 12/18/2013 | | | | |
| REDACTED | REDACTED | BM | REDACTED | 9/21/2011 | Washington | REDACTED | 8/2/2013 | | | | X | 1/30/2014 | 3/7/2014 | | | |
| REDACTED | REDACTED | B/M | REDACTED | 12/22/2008 | Hinds | REDACTED | 6/23/2011 | 3/26/2013 | | | X | 11/13/2013 | 12/5/2013 | | | |
| REDACTED | REDACTED | B/M | REDACTED | 12/22/2008 | Hinds | REDACTED | 6/23/2011 | 3/26/2013 | | | X | 11/13/2013 | 12/5/2013 | | | |
| REDACTED | REDACTED | B/F | REDACTED | 12/22/2008 | Hinds | REDACTED | 6/23/2011 | 3/26/2013 | | | X | 11/13/2013 | 12/5/2013 | | | |
| REDACTED | REDACTED | B/M | REDACTED | 12/22/2008 | Hinds | REDACTED | 6/23/2011 | 3/26/2012 | | | X | 11/13/2013 | 12/5/2013 | | | |
| REDACTED | REDACTED | WM | REDACTED | 8/17/2010 | Harrison | REDACTED | 5/27/2011 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 10/21/2010 | Tippah | REDACTED | 12/2/2011 | | | | X | 7/15/2013 | 9/11/2013 | | | |
| REDACTED | REDACTED | BM | REDACTED | 10/21/2010 | Tippah | REDACTED | 12/2/2011 | | | | X | 7/15/2013 | 9/11/2013 | | | |
| REDACTED | REDACTED | WF | REDACTED | 4/2/2012 | Pearl River | REDACTED | 7/12/2013 | | | | X | 12/9/2013 | 2/6/2014 | | | |
| REDACTED | REDACTED | BF | REDACTED | 12/20/2010 | Hinds | REDACTED | 8/19/2011 | | | | X | 6/21/2013 | | | | |
| REDACTED | REDACTED | WF | REDACTED | 1/26/2012 | Harrison | REDACTED | 3/29/2013 | 4/9/2013 | | | X | 8/8/2013 | 8/22/2013 | | | |
| REDACTED | REDACTED | BF | REDACTED | 11/2/2010 | Hinds | REDACTED | 2/1/2013 | 4/4/2013 | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 8/11/2011 | Jackson | REDACTED | 6/21/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 8/11/2011 | Jackson | REDACTED | 6/21/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 9/15/2011 | Pontotoc | REDACTED | 10/19/2012 | | | | X | | | | | |
| REDACTED | REDACTED | B/M | REDACTED | 8/8/2010 | Harrison | REDACTED | 3/17/2011 | 6/18/2012 | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 5/2/2011 | Amite | REDACTED | 5/8/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 5/2/2011 | Amite | REDACTED | 5/8/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 8/8/2012 | Hancock | REDACTED | 2/15/2013 | | | | X | 9/12/2013 | 10/28/2013 | 459/459 | | |
| REDACTED | REDACTED | WF | REDACTED | 9/11/2012 | Hancock | REDACTED | 9/26/2012 | | | | X | 4/1/2013 | 4/10/2013 | | | |
| REDACTED | REDACTED | WF | REDACTED | 9/12/2011 | Hancock | REDACTED | 9/26/2012 | | | | X | 4/1/2013 | 4/10/2013 | | | |
| REDACTED | REDACTED | WF | REDACTED | 9/30/2013 | Calhoun | REDACTED | 9/20/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 12/3/2009 | P. River | REDACTED | 10/26/2012 | | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 8/24/2011 | Harrison | REDACTED | 7/13/2012 | | | | X | 1/9/2013 | 1/16/2013 | | | |

TPR Tracking System at State Office

| Last Name | First Name | R/S | DOB | Date of Custody | County of Responsibility | Social Worker | Date to A.G. | Date Petition Filed | A.G. List 0-3 | A.G. List 3-6 | A.G. List 6+ | Date TPR Judgement Rec'd | Date of Legal Clearance | 459 Signed Date | Comments | Stamped |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | WM | REDACTED | 3/20/2012 | Desoto | REDACTED | 1/25/2013 | | | | X | 6/12/2013 | | 459/DC | mother 459/father decease | |
| REDACTED | REDACTED | BF | REDACTED | 12/15/2011 | Tippah | REDACTED | 3/8/2013 | 4/26/2013 | | | X | | | | | |
| REDACTED | REDACTED | HF | REDACTED | 1/24/2012 | Harrison | REDACTED | 3/1/2013 | | | | X | | | | | |
| REDACTED | REDACTED | HF | REDACTED | 1/24/2012 | Harrison | REDACTED | 3/1/2013 | | | | X | | | | | |
| REDACTED | REDACTED | HF | REDACTED | 4/19/2012 | Harrison | REDACTED | 3/1/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 4/27/2012 | Tishomingo | REDACTED | 4/6/2012 | | | | X | 2/15/2013 | 2/25/2013 | | | |
| REDACTED | REDACTED | WF | REDACTED | 4/27/2010 | Tishomingo | REDACTED | 4/6/2012 | | | | X | 2/15/2013 | 2/25/2013 | | | |
| REDACTED | REDACTED | BM | REDACTED | 11/4/2010 | Desoto | REDACTED | 10/30/2012 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 11/4/2010 | Desoto | REDACTED | 10/30/2012 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 11/15/2012 | Monroe | REDACTED | 7/12/2013 | | | | X | 12/5/2013 | 2/10/2014 | | | |
| REDACTED | REDACTED | WM | REDACTED | 2/22/2012 | Hancock | REDACTED | 1/10/2013 | | | | X | 5/24/2013 | 10/28/2013 | | | |
| REDACTED | REDACTED | WF | REDACTED | 9/9/2011 | Winston | REDACTED | 4/19/2013 | 5/2/2013 | | | X | | | | | |
| REDACTED | REDACTED | BrF | REDACTED | 6/13/2012 | Pike | REDACTED | 5/22/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 9/26/2009 | Stone | REDACTED | 9/20/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 10/10/2012 | Pontotoc | REDACTED | 8/2/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 10/31/2011 | Lauderdale | REDACTED | 6/28/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 5/10/2011 | Pontotoc | REDACTED | 8/10/2012 | | | | X | 11/12/2013 | | | | |
| REDACTED | REDACTED | WM | REDACTED | 2/17/2012 | Pontotoc | REDACTED | 5/8/2013 | | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 2/17/2012 | Pontotoc | REDACTED | 5/8/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 9/10/2008 | Copiah | REDACTED | 10/28/2011 | | | | X | 3/15/2013 | 8/22/2013 | | | |
| REDACTED | REDACTED | WF | REDACTED | 2/17/2012 | Pontotoc | REDACTED | 5/8/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 9/10/2008 | Copiah | REDACTED | 10/28/2011 | 6/27/2012 | | | X | 3/15/2013 | 8/22/2013 | | | |
| REDACTED | REDACTED | WF | REDACTED | 3/12/2010 | Jackson | REDACTED | 10/21/2011 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 9/1/2012 | Desoto | REDACTED | 8/23/2013 | | | | X | 12/19/2013 | | | | |
| REDACTED | REDACTED | Wf | REDACTED | 3/7/2012 | Lee | REDACTED | 10/19/2012 | | | | X | | | | | |
| REDACTED | REDACTED | BR/F | REDACTED | 12/8/2010 | Llincoln | REDACTED | 7/5/2011 | | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 5/10/2010 | Okitbbeha | REDACTED | 6/21/2013 | | | | X | 10/22/2013 | 11/6/2013 | | | |
| REDACTED | REDACTED | WF | REDACTED | 6/17/2011 | Lauderdale | REDACTED | 2/15/2013 | | | | X | 6/4/2013 | 8/12/2013 | | | |
| REDACTED | REDACTED | WF | REDACTED | 3/17/2011 | Adams | REDACTED | 10/30/2012 | | | | X | 8/19/2013 | 9/10/2013 | | | |
| REDACTED | REDACTED | WF | REDACTED | 8/30/2011 | Prentiss | REDACTED | 1/4/2013 | | | | X | 9/17/2013 | 9/30/2013 | | | |
| REDACTED | REDACTED | WF | REDACTED | 2/24/2011 | Lee | REDACTED | 8/10/2012 | | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 2/24/2011 | Lee | REDACTED | 8/10/2012 | | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 3/29/2010 | Lee | REDACTED | 7/25/2012 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 6/18/2012 | Tishomingo | REDACTED | 4/19/2013 | | | | X | 2/24/2014 | 3/7/2014 | | | |
| REDACTED | REDACTED | WM | REDACTED | 9/2/2011 | E. Bolivar | REDACTED | 12/7/2012 | | | | X | 5/20/2013 | | | | |
| REDACTED | REDACTED | BM | REDACTED | 9/9/2011 | Pontotoc | REDACTED | 1/25/2013 | | | | X | 1/21/2014 | | | | |
| REDACTED | REDACTED | WF | REDACTED | 9/11/2011 | Hancock | REDACTED | 10/30/2012 | | | | X | 8/21/2013 | 9/10/2013 | | | |
| REDACTED | REDACTED | BF | REDACTED | 5/16/2007 | LEE | REDACTED | 1/20/2012 | | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 9/8/2009 | Hancock | REDACTED | 1/10/2013 | | | | X | 1/31/2014 | 2/6/2014 | 459/father | 459 | |
| REDACTED | REDACTED | BM | REDACTED | 10/15/2008 | Jackson | REDACTED | 10/28/2011 | | | | X | 3/6/2013 | 3/12/2013 | | 2nd submission to AG's | |
| REDACTED | REDACTED | BM | REDACTED | 8/31/2011 | Tippah | REDACTED | 10/19/2012 | | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 7/7/2011 | Hancock | REDACTED | 1/10/2013 | | | | X | 1/31/2014 | 10/17/2013 | 459 father | | |
| REDACTED | REDACTED | WM | REDACTED | 9/8/2002 | Hancock | REDACTED | 1/10/2013 | | | | X | 1/31/2014 | 2/6/2014 | 459/father | working with father | |
| REDACTED | REDACTED | BF | REDACTED | 8/1/2008 | Hinds | REDACTED | 4/19/2013 | | | | X | 12/9/2013 | | 459/father | | |
| REDACTED | REDACTED | BM | REDACTED | 2/7/2012 | Lauderdale | REDACTED | 6/28/2013 | | | | X | 11/19/2013 | 11/6/2013 | | | |
| REDACTED | REDACTED | BM | REDACTED | 6/26/2012 | Monroe | REDACTED | 2/21/2013 | 3/27/2013 | | | X | 11/5/2013 | | | | |
| REDACTED | REDACTED | BM | REDACTED | 4/11/2012 | Monroe | REDACTED | 1/25/2013 | 3/27/2013 | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 11/2/2010 | Harrison | REDACTED | 2/1/2013 | | | | X | 12/5/2013 | 459/m | | | |
| REDACTED | REDACTED | BM | REDACTED | 6/26/2012 | Monroe | REDACTED | 2/21/2013 | 3/27/2013 | | | X | 11/5/2013 | | | | |
| REDACTED | REDACTED | WM | REDACTED | 9/11/2011 | Hancock | REDACTED | 11/30/2012 | | | | X | 8/21/2013 | 9/10/2013 | | | |
| REDACTED | REDACTED | WM | REDACTED | 9/11/2011 | Hancock | REDACTED | 11/30/2012 | | | | X | 8/21/2013 | 9/10/2013 | | | |
| REDACTED | REDACTED | WF | REDACTED | 8/24/2011 | Harrison | REDACTED | 10/26/2012 | | | | X | 8/15/2013 | 9/10/2013 | | | |
| REDACTED | REDACTED | WM | REDACTED | 6/3/2011 | Jackson | REDACTED | 7/6/2012 | 6/28/2012 | | | X | 8/2/2013 | 8/22/2013 | | | |
| REDACTED | REDACTED | WF | REDACTED | 12/12/2012 | Hancock | REDACTED | 9/13/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 8/12/2010 | Lafayette | REDACTED | 5/11/2012 | | | | X | 3/13/2013 | 3/21/2013 | | | |
| REDACTED | REDACTED | WM | REDACTED | 4/26/2011 | Pontotoc | REDACTED | 10/12/2012 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 9/13/2011 | Harrison | REDACTED | 5/31/2013 | | | | X | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 10/11/2012 | Lafayette | REDACTED | 11/15/2012 | | | | X | | | | | |
| REDACTED | REDACTED | WM | REDACTED | 8/18/2011 | Hancock | REDACTED | 10/19/2012 | | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 2/14/2012 | Neshoba | REDACTED | 8/2/2013 | | | | X | 3/6/2014 | | | | 3/13/2014 |
| REDACTED | REDACTED | WF | REDACTED | 8/1/2008 | Copiah | REDACTED | 2/21/2013 | | | | X | | | | | |

TPR Tracking System at State Office

| Last Name | First Name | R/S | DOB | Date of Custody | County of Responsibility | Social Worker | Date to A.G. | Date Petition Filed | A.G. List 0-3 | A.G. List 3-6 | A.G. List 6+ | Date TPR Judgement Rec'd | Date of Legal Clearance | 459 Signed Date | Comments | Stamped |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | WM | REDACTED | 9/28/2011 | Hancock | REDACTED | 7/6/2012 | | | | X | 1/31/2013 | 2/11/2013 | | | |
| REDACTED | REDACTED | BM | REDACTED | 8/21/2012 | Hinds | REDACTED | 10/19/2012 | | | | X | 12/5/2013 | 12/12/2013 | | | |
| REDACTED | REDACTED | BF | REDACTED | 8/12/2012 | Hinds | REDACTED | 10/19/2012 | | | | X | 12/5/2013 | 12/12/2013 | | | |
| REDACTED | REDACTED | BF | REDACTED | 8/12/2012 | Hinds | REDACTED | 10/19/2012 | | | | X | 12/5/2013 | 12/12/2013 | | | |
| REDACTED | REDACTED | WM | REDACTED | 5/26/2010 | Monroe | REDACTED | 2/1/2013 | 3/13/2013 | | | X | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 3/7/2012 | Lincoln | REDACTED | 1/4/2013 | | | | X | | | 459/father | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| SURRENDERS | | | | | | | | | | | | | | | | |
| REDACTED | REDACTED | WF | | | Hancock | REDACTED | NA | NA | | | | | 10/3/2012 | 459/DC | adoptive parent surrenderd | |
| REDACTED | REDACTED | BM | REDACTED | 11/28/2011 | Jackson | REDACTED | NA | NA | | | | | 11/27/2012 | 459/ | mother surrendered,father | has childre |
| REDACTED | REDACTED | BF | REDACTED | 11/28/2011 | Jackson | REDACTED | NA | NA | | | | | 11/27/2012 | 459 | Mother surrenderd, father has | has childre |
| REDACTED | REDACTED | BF | REDACTED | 5/14/2012 | Lee | REDACTED | NA | NA | | | | 5/24/2012 | 6/27/2012 | 459 | adoptive parent surrenderd | |
| REDACTED | REDACTED | WM | REDACTED | 3/20/2012 | E. Chickasaw | REDACTED | NA | NA | | | | 3/13/2012 | | 459/459 | Both parents surrendered | |
| REDACTED | REDACTED | WM | REDACTED | 7/24/2012 | Marshall | REDACTED | NA | NA | | | | 1/3/2013 | | 459/459 | Both parents surrendered | |
| REDACTED | REDACTED | WF | REDACTED | 5/17/2011 | Jackson | REDACTED | NA | NA | | | | 12/29/2012 | 4/24/2013 | | Both parents surrendered | |
| REDACTED | REDACTED | WF | REDACTED | 9/13/2011 | Hancock | REDACTED | NA | NA | | | | 1/31/2012 | 11/28/2012 | 459/459 | Both parents surrendered | |
| REDACTED | REDACTED | WM | REDACTED | 9/13/2011 | Hancock | REDACTED | NA | NA | | | | 1/31/2012 | 11/28/2012 | 459/459 | Both parents surrendered | |
| REDACTED | REDACTED | AP | REDACTED | 10/5/2011 | Harrison | REDACTED | NA | NA | | | | 10/5/2011 | 11/30/2012 | DC/DC | Both parents deceased | |
| REDACTED | REDACTED | AP | REDACTED | 10/5/2011 | Harrison | REDACTED | NA | NA | | | | 10/5/2011 | 11/30/2012 | DC/DC | Both parents deceased | |
| REDACTED | REDACTED | AP | REDACTED | 10/5/2011 | Harrison | REDACTED | NA | NA | | | | 10/5/2011 | 11/30/2012 | DC/DC | Both parents deceased | |
| REDACTED | REDACTED | AP | REDACTED | 10/5/2011 | Harrison | REDACTED | NA | NA | | | | 10/5/2011 | 1/23/2013 | DC/DC | Both Parents deceased | |
| REDACTED | REDACTED | Wf | REDACTED | 11/19/2009 | P. River | REDACTED | NA | NA | | | | 6/6/2011 | 10/16/2012 | 459/459 | Both parents surrendered | |
| REDACTED | REDACTED | WF | REDACTED | 1/24/2012 | Hancock | REDACTED | NA | NA | | | | 10/26/2012 | 12/17/2012 | 459/459 | | |
| REDACTED | REDACTED | BM | REDACTED | 5/22/2010 | Forrest | REDACTED | NA | NA | | | | 1/30/2012 | | 459/459 | Judge REDACTED TPR | |
| REDACTED | REDACTED | BF | REDACTED | 12/5/2011 | Lincoln | REDACTED | NA | NA | | | | 2/14/2012 | 3/21/2012 | 459/459 | | |
| REDACTED | REDACTED | WF | REDACTED | 5/10/2012 | Harrison | REDACTED | NA | NA | | | | 4/30/2012 | 2/3/2014 | 459/459 | Both parents surrendered | |
| REDACTED | REDACTED | WF | REDACTED | 5/20/2012 | Lincoln | REDACTED | NA | NA | | | | 12/5/2013 | 3/7/2014 | 459/459 | Both parents surrendered | |
| REDACTED | REDACTED | WF | REDACTED | 3/8/2012 | Hancock | REDACTED | NA | NA | | | | 1/10/2013 | | 459/459 | Both parents surrendered | |
| REDACTED | REDACTED | Wf | REDACTED | 3/8/2013 | Hancock | REDACTED | NA | NA | | | | 1/10/2013 | | 459/459 | Both parents surrendered | |
| REDACTED | REDACTED | BM | REDACTED | 11/3/2011 | Harrison | REDACTED | NA | NA | | | | 2/8/2012 | 5/31/2012 | 459/459 | Both parents surrendered | |
| REDACTED | REDACTED | WM | REDACTED | 5/30/2013 | Adams | REDACTED | NA | NA | | | | 3/5/2013 | | DC/459 | Mother deceased, father s | |
| REDACTED | REDACTED | WM | REDACTED | 5/30/2013 | Adams | REDACTED | NA | NA | | | | 3/5/2013 | | DC/459 | Mother deceased, father s | |
| REDACTED | REDACTED | WF | REDACTED | | Desoto | REDACTED | NA | NA | | | | 1/18/2012 | 3/21/2012 | 459/459 | | |
| REDACTED | REDACTED | WF | REDACTED | | Desoto | REDACTED | NA | NA | | | | 1/8/2012 | 3/21/2012 | 1/18/2012 | | |
| REDACTED | REDACTED | WF | REDACTED | | Desoto | REDACTED | NA | NA | | | | 1/18/2012 | 3/21/2012 | 1/18/2012 | | |
| REDACTED | REDACTED | BM | REDACTED | 3/29/2012 | Desoto | REDACTED | NA | NA | | | | 9/11/2012 | 12/5/2013 | | Adoptive parent deceased | |
| REDACTED | REDACTED | WM | REDACTED | 6/5/2012 | Tishomingo | REDACTED | NA | NA | | | | 1/29/2013 | 4/22/2013 | 459/459 | Both parents surrendered | **Legal fath** |
| REDACTED | REDACTED | WF | REDACTED | 11/5/2012 | Pontotoc | REDACTED | NA | NA | | | | 5/8/2013 | | 459/459 | Both parents surrendered | |
| REDACTED | REDACTED | WM | REDACTED | 10/7/2011 | Prentiss | REDACTED | NA | NA | | | | 11/7/2011 | 3/21/2012 | 11/7/2011 | | |
| REDACTED | REDACTED | WM | REDACTED | 10/7/2011 | Prentiss | REDACTED | NA | NA | | | | 11/7/2011 | 3/21/2012 | 11/7/2011 | | |
| REDACTED | REDACTED | WF | REDACTED | 9/9/2011 | Stone | REDACTED | NA | NA | | | | 2/1/2012 | 7/25/2012 | 459/459 | Both parents surrendered | |
| REDACTED | REDACTED | WM | REDACTED | 11/30/2011 | Jackson | REDACTED | NA | NA | | | | 12/3/2012 | 4/17/2013 | 459/459 | Both oarents surrendered | |
| REDACTED | REDACTED | WF | REDACTED | 12/1/2810 | Hancock | REDACTED | NA | NA | | | | 7/10/2012 | 8/17/2012 | 459/459 | Both parents surrendered | |
| REDACTED | REDACTED | WF | REDACTED | 12/1/2010 | Hancock | REDACTED | NA | NA | | | | 7/10/2012 | 8/17/2012 | 459/459 | Both parents surrendered | |
| REDACTED | REDACTED | WF | REDACTED | 6/16/2009 | P. River | REDACTED | NA | NA | | | | 5/2/2012 | 11/28/2012 | 459/459 | Both parents surrendered | |
| REDACTED | REDACTED | BM | REDACTED | 7/18/2011 | Lauderdale | REDACTED | NA | NA | | | | 10/29/2003 | 11/5/2013 | DC/DC | Both parents are deceased | |
| REDACTED | REDACTED | WF | | | | | NA | NA | | | | | 3/26/2012 | | | |
| REDACTED | REDACTED | WM | REDACTED | | Stone | | NA | NA | | | | 5/13/2013 | 10/28/2013 | 459/459 | | |
| REDACTED | REDACTED | WF | REDACTED | 10/20/2011 | Stone | REDACTED | NA | NA | | | | 8/2/2012 | 9/30/2013 | 459/459 | Both parent are deceased | |
| REDACTED | REDACTED | BrF | REDACTED | 9/6/2011 | Harrison | REDACTED | NA | NA | | | | 12/13/2011 | 5/31/2012 | 4/3/1901 | father 459, mom deceased | |
| REDACTED | REDACTED | WF | REDACTED | 2/15/2011 | E. Chickasaw | REDACTED | NA | NA | | | | 3/29/2012 | 5/15/2012 | 459/459 | | |
| REDACTED | REDACTED | WM | REDACTED | 2/15/2011 | E. Chickasaw | REDACTED | NA | NA | | | | 3/29/2012 | 5/15/2012 | 459/459 | | |
| REDACTED | REDACTED | BF | REDACTED | 10/19/2013 | Alcorn | REDACTED | NA | NA | | | | 5/2/2013 | | 459/459 | Both parents surrendered | |
| REDACTED | REDACTED | BF | REDACTED | 4/5/2012 | Attala | REDACTED | NA | NA | | | | 11/5/2012 | 3/7/2014 | 459/459 | adoptive parents | |
| REDACTED | REDACTED | BM | REDACTED | 4/5/2012 | Attala | REDACTED | NA | NA | | | | 11/5/2012 | 3/7/2014 | 459/459 | Adoptive parents | |
| REDACTED | REDACTED | BF | REDACTED | 4/5/2012 | Attala | REDACTED | NA | NA | | | | 11/5/2012 | 3/7/2014 | 459/459 | Adoptive parents | |
| REDACTED | REDACTED | WF | REDACTED | 2/14/2012 | Harrison | REDACTED | NA | NA | | | | 4/27/2012 | 6/18/2012 | surrendered | Private Adoption | |

TPR Tracking System at State Office

| Last Name | First Name | R/S | DOB | Date of Custody | County of Responsibility | Social Worker | Date to A.G. | Date Petition Filed | A.G. List 0-3 | A.G. List 3-6 | A.G. List 6+ | Date TPR Judgement Rec'd | Date of Legal Clearance | 459 Signed Date | Comments | Stamped |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | REDACTED | WM | REDACTED | 8/12/2003 | Forrest | | NA | NA | | | | 5/12/2012 | | 459/459 | | |
| REDACTED | REDACTED | WF | REDACTED | 7/13/2012 | P. River | REDACTED | NA | NA | | | | 4/24/2013 | 10/7/2013 | 459/459 | both parent surrendered | |
| REDACTED | REDACTED | WM | REDACTED | 7/13/2012 | P. River | REDACTED | NA | NA | | | | 4/24/2013 | 10/7/2013 | 459/459 | both parent surrendered | |
| REDACTED | REDACTED | WM | REDACTED | 10/12/2012 | Prentiss | REDACTED | NA | NA | | | | 1/24/2014 | | 459/459 | both parent surrendered | |
| REDACTED | REDACTED | WF | | 2/16/2012 | Lincoln | REDACTED | NA | NA | | | | 5/3/2012 | 5/31/2012 | | | |
| REDACTED | REDACTED | BF | REDACTED | 12/20/2010 | Lincoln | REDACTED | NA | NA | | | | 5/10/2012 | | | Both parents surrendered | |
| REDACTED | REDACTED | WF | REDACTED | 6/8/2012 | Stone | REDACTED | NA | NA | | | | 11/7/2012 | 3/7/2014 | 459 | Mother surrendered, father has | **custody** |
| REDACTED | REDACTED | WF | REDACTED | 6/8/2012 | Stone | REDACTED | NA | NA | | | | 11/7/2012 | 3/7/2014 | 459 | Mother surrendered, father has | **custody** |
| REDACTED | REDACTED | WM | REDACTED | 6/8/2012 | Stone | REDACTED | NA | NA | | | | 11/7/2012 | 3/7/2014 | 459 | Mother surrendered, father has | **custody** |
| REDACTED | REDACTED | WM | REDACTED | 3/8/2012 | Hancock | REDACTED | NA | NA | | | | 1/10/2013 | | 459/459 | Both parents surrendered | |
| REDACTED | REDACTED | WF | REDACTED | 5/16/2012 | Harrison | REDACTED | NA | NA | | | | 1/9/2014 | 3/7/2014 | 459/459 | Both parents surrendered | |
| REDACTED | REDACTED | BM | REDACTED | 5/28/2010 | Amite | REDACTED | NA | NA | | | | 1/4/2011 | 7/25/2012 | DC/DC | Both parents deceased | |
| REDACTED | REDACTED | BF | REDACTED | 1/5/2011 | Lowndes | REDACTED | NA | NA | | | | 4/26/2013 | 3/7/2014 | 459/459 | Adoptive Parents | |
| REDACTED | REDACTED | WF | REDACTED | 10/22/2008 | P. River | REDACTED | NA | NA | | | | 8/10/2011 | 10/16/2012 | 459/459 | Both parents surrendered | |
| REDACTED | REDACTED | wm | REDACTED | 10/22/2008 | P. River | REDACTED | NA | NA | | | | 8/10/2012 | 10/16/2012 | 459/459 | Both parents surrendered | |
| REDACTED | REDACTED | BM | REDACTED | 2/9/2009 | Harrison | REDACTED | NA | NA | | | | 10/7/2012 | 12/5/2013 | Dc/DC | Both parents deceased | |
| REDACTED | REDACTED | WM | REDACTED | 10/1/2011 | Harrison | REDACTED | NA | NA | | | | 9/27/2013 | 1/29/2014 | 459/459 | Both parents surrendered | |
| REDACTED | REDACTED | WF | REDACTED | 3/8/2012 | Desoto | REDACTED | NA | NA | | | | 5/14/2012 | 8/29/2013 | 459/459 | Both Adoptive p. surrender | |
| REDACTED | REDACTED | BM | REDACTED | 12/20/2010 | R. Smith | REDACTED | NA | NA | | | | 5/10/2012 | 8/21/2013 | | Both parents surrendered | |
| REDACTED | REDACTED | WF | REDACTED | 5/2/2012 | Monroe | REDACTED | NA | NA | | | | 2/1/2013 | 2/12/2013 | 459/459 | Both parents surrendered | |
| REDACTED | REDACTED | WF | REDACTED | 11/19/2009 | Stone | REDACTED | NA | NA | | | | 6/15/2012 | 11/1/2012 | 459/DC | father 459, mom deceased | |
| REDACTED | REDACTED | WF | REDACTED | 3/24/2011 | Walthall | REDACTED | NA | NA | | | | 7/5/2012 | | | | |
| REDACTED | REDACTED | WF | REDACTED | 3/24/2011 | Walthall | REDACTED | NA | NA | | | | 7/5/2012 | | | | |
| REDACTED | REDACTED | WF | REDACTED | 2/13/2013 | Union | REDACTED | NA | NA | | | | 10/17/2013 | 11/5/2013 | 459/459 | Both parents surrendered | |
| REDACTED | REDACTED | WF | REDACTED | 2/2/2012 | Harrison | REDACTED | NA | NA | | | | 2/19/2003 | | 459/459 | Both parents surrendered | |
| REDACTED | REDACTED | WM | REDACTED | 11/19/2009 | Stone | REDACTED | NA | NA | | | | 3/31/2012 | | DC/DC | Both parents deceased | |
| REDACTED | REDACTED | BrF | REDACTED | 6/14/2012 | Harrison | REDACTED | NA | NA | | | | 2/20/2013 | 9/18/2013 | 12/14/3157 | Both parents deceased | |
| REDACTED | REDACTED | BrM | REDACTED | 6/14/2012 | Harrison | REDACTED | NA | NA | | | | 2/20/2013 | 9/18/2013 | 459/459 | Both parents surrendered | |
| REDACTED | REDACTED | WM | | | Simpson | | NA | NA | | | | | 9/19/2012 | | | |
| REDACTED | REDACTED | WF | REDACTED | 2/14/2011 | Pontotoc | REDACTED | NA | NA | | | | 1/27/2012 | 6/5/2012 | 459/459 | Both parents surrendered | |
| REDACTED | REDACTED | WF | REDACTED | 2/14/2011 | Pontotoc | REDACTED | NA | NA | | | | 1/27/2012 | 6/5/2012 | 459/459 | Both parents surrendered | |
| REDACTED | REDACTED | WF | REDACTED | 12/1/2010 | Desoto | REDACTED | NA | NA | | | | 3/7/2012 | 7/3/2012 | 459/dc | Mother surrendered, father deceased | |
| REDACTED | REDACTED | BM | REDACTED | 11/2/2010 | Harrison | REDACTED | NA | NA | | | | 6/19/2012 | | 459/459 | Both parents surrendered | |
| REDACTED | REDACTED | BM | REDACTED | 11/2/2010 | Harrison | REDACTED | NA | NA | | | | 6/19/2012 | | 459/459 | Both parents surrendered | |
| REDACTED | REDACTED | WM | REDACTED | 7/19/2011 | Desoto | REDACTED | NA | NA | | | | 6/26/2012 | | 459/459 | Both parents surrendered | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| FORREST COUNTY | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| REDACTED | REDACTED | BF | REDACTED | 7/9/2011 | Forrest | | NA | NA | | | | 4/25/2013 | | | | |
| REDACTED | REDACTED | WM | REDACTED | 1/11/2012 | Forrest | REDACTED | NA | NA | | | | 3/1/2013 | 3/12/2013 | | | |
| REDACTED | REDACTED | WF | REDACTED | 12/6/2011 | Forrest | | NA | NA | | | | 7/3/2012 | 7/10/2012 | | | |
| REDACTED | REDACTED | wf | REDACTED | 8/11/2010 | Forrest | | Na | NA | | | | 8/22/2012 | | | | |
| REDACTED | REDACTED | WM | REDACTED | 7/27/2010 | Forrest | REDACTED | NA | **NA** | | | | 2/13/2014 | **3/7/2014** | | | |
| REDACTED | REDACTED | WF | REDACTED | 7/27/2010 | Forrest | REDACTED | NA | NA | | | | 2/13/2014 | 3/7/2014 | | | |
| REDACTED | REDACTED | WF | REDACTED | | Forrest | REDACTED | NA | NA | | | | | 459/M | | | |
| REDACTED | REDACTED | WM | REDACTED | | Forrest | REDACTED | NA | NA | | | | | 459/m | | | |
| REDACTED | REDACTED | BrM | REDACTED | | Forrest | REDACTED | NA | NA | | | | | 459/459 | | | |
| REDACTED | REDACTED | BF | REDACTED | | Forrest | REDACTED | NA | NA | | | | | | | | |
| REDACTED | REDACTED | WF | REDACTED | 7/27/2010 | Forrest | REDACTED | NA | NA | | | | 2/14/2014 | 3/7/2014 | | | |
| REDACTED | REDACTED | WF | REDACTED | 6/26/2011 | Forrest | REDACTED | NA | NA | | | | 8/19/2013 | 8/28/2013 | | | |
| REDACTED | REDACTED | WM | REDACTED | 6/27/2011 | Forrest | REDACTED | NA | NA | | | | 8/19/2013 | 8/28/2013 | | | |
| REDACTED | REDACTED | BM | REDACTED | 11/25/2011 | Forrest | REDACTED | NA | NA | | | | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 11/25/2011 | Forrest | REDACTED | NA | NA | | | | | | | | |
| REDACTED | REDACTED | BM | REDACTED | 10/3/2012 | Forrest | REDACTED | NA | NA | | | | 12/10/2013 | | | | |

# Ex. 44A

# MDHS

# Division of Family & Children's Services

## Mississippi PATH

## (Parents as Tender Healers)

### A Curriculum for Foster, Adoptive and Kinship Care Parents

### (Resource Families)

**Certain passages in each Session as well as several articles are copied, with permission from Training and Resource Center – Spaulding for Children**

Revision (February 2012) Contributors: [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], and [redacted].

Original Contributors: [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], (National Resource center), and the Adoption and Licensure Specialist for the Division of Family and Children's Services.

Funding through the Adoption and Licensure Unit and Diligent Recruitment and Retention Grant

# Session V
# Permanent Connections

**Welcome Resource Parent!**

**Session V – Objectives:**

- Understand the reason for maintaining permanent connections.
- Understand how to identify and maintain permanent connections.
- Understand the process for finalizing an adoption.
- Understand the support services of an adoptive family including: Adoption Assistance, Post-Adoptive Services such as PIP Services, and Support Groups.

## Activity: Eco-maps

The presenter will demonstrate how easy it is to complete an eco-map and explain why they are important. You may be asked to refer back to Brandon's story from Session I, page 25, and see if you can complete his eco-map.

________________________________________

________________________________________

________________________________________

________________________________________

## Finalization of MDHS Adoption Flow Chart:

1. Family along with Adoption worker completes the following:
   - Adoption Assistance Forms (3 signed originals- for state office)
   - Signed Background Information (2 signed originals-one for family, one for file)
   - Adoption Addendum - Summary of placement
   - Opt Out Form (Determination of Attorney)
   - Social Security document – as needed
   - Corporal Punishment Acknowledgement
   - Statement 11-5-91, if there was publication on TPR for the parents

2. After all above paperwork is completed, Adoption worker turns in paperwork to the Resource ASWS.

3. Resource ASWS then sends approval letter to family.

4. Family will then take approval letter to their Attorney

5. The Family's Attorney will send notification [as attorney for the adoption] letter to Adoption Unit - State Office.

6. Attorney will give the family a medical statement to be filled out by the child's physician stating that the child is a "well child" [or other diagnosis].

7. Adoption Unit - State Office, will then send the Family's Attorney the "Attorney Letter" with the "Legal Consent" for each child being adopted.

8. Once the "Attorney Letter" is received by the Family's Attorney and the petition is submitted, the court date can be set.

**Note:** *The Family's Attorney is responsible for filing for the new birth certificates and sending those to the family once they are received by the attorney. This fee is included in the Non-Reoccurring Adoption Expenses. MS only pays up to $600 for attorney fees, court costs and filing of the birth certificate, per child.*

*The family will need to gain a new Social Security Card with the name change. Social Security will need two forms of identification including the adoption court order and new birth certificate.*

## Adoption Subsidy Eligibility Criteria

The Resource Family Program Staff is responsible for compiling the information needed to determine a child's eligibility for Adoption Subsidy. The following criteria should be considered to determine a child's eligibility to receive an Adoption Subsidy:

1. The court that holds jurisdiction determined that it was in the best interest to remove the child from the parents and the child cannot return to their home. This ***must*** be stated in the initial custody court order.
2. The child must be determined by the agency to be a child with ***one or more*** special needs as follows:
    - Physical disability
    - Mental (IQ 70 or less), emotional, and/or developmental (25% delay) disability.
    - Age (must be six (6) years old or older).
    - Membership in a sibling group of two (2) or more children being placed together, even if adoptions are finalized at different times.
    - Medical conditions
    - Factors in a child's medical history or background, or the medical history or background of the child's biological family, which places the child ***at risk*** of acquiring a medical condition, a physical, mental or developmental disability or an emotional disorder. This includes unknown parent, abandoned children and safe babies. Current information is required to document the above conditions.
    - Receiving SSI benefits.
    - Receiving adoption assistance in a previous adoption by parents who died or who dissolved the adoption.
    - Meets the requirements of PL 104-193 of the Personal Responsibility and Work Opportunities Reconciliation Act (PRWOA) in any case in which a child is an alien.
3. Significant emotional ties with Resource Parent(s), if child is being adopted by his or her Resource Family.
4. The state made reasonable, but unsuccessful efforts, to place the child without an Adoption Subsidy.

ADOPTION
SUBSIDY
WWW.NACAC.ORG
Federal
Law & Policy

# Mississippi State Subsidy Profile

*Updated July 2010*

## State Subsidy Contact Person

Department of Human Services
Family and Children Services
750 North State Street
Jackson, MS 39202
(in state);
(out of state)
Fax:

or

Phone:
E-mail:

## NACAC Subsidy Representative (parent/volunteer)

Family Matters of Jackson
2062 Suzanna Drive
Raymond, MS 39154
Home:
E-mail:

---

## What Is Adoption Subsidy?

Parents who are thinking about or are in the process of adopting a child with special needs from foster care should know about adoption assistance (also known as adoption subsidy). Federal (Title IV-E) and state (often called non-IV-E) adoption assistance programs are designed to help parents meet their adopted children's varied, and often costly, needs. Children can qualify for federal adoption assistance or state assistance, depending on the child's history. Adoption subsidy policies and practices are, for the most part, dependent on the state in which the child was in foster care before the adoption.

Below is information related to definitions of special needs, benefits available, and procedures in Mississippi. Answers to select questions were made available by the Association of Administrators of the Interstate Compact on Adoption and Medical Assistance (AAICAMA) through the Child Welfare Information Gateway (www.childwelfare.gov).

Profiles for other states' subsidy programs are available. If you have additional questions, please contact NACAC at 651-644-3036, 800-470-6665, or adoption.assistance@nacac.org. If you have state-specific questions, please call your State Subsidy Contact Person or the NACAC Subsidy Representative (listed above) for more information.

For more information on Title IV-E eligibility, view our fact sheet Eligibility and Benefits for Federal Adoption Assistance.

**Adoption resources on the web:**
http://www.mdhs.state.ms.us/fcs_howadopt.html

**Mississippi's state-specific medical assistance:**
http://www.medicaid.ms.gov/

**Mississippi's adoption assistance:**
http://www.mdhs.state.ms.us/fcs_adoptall.html
then scroll down to Adoption Assistance

**Mississippi Code, Adoption Supplemental Benefit Law, 93-17-51 through 93-17-69**
http://michie.lexisnexis.com/mississippi/lpext.dll?f=templates&fn=main-h.htm&cp
then click on the Section titled Adoption Supplement Benefit Law

## Who is Eligible for Adoption Assistance or Subsidy?

### 1. How does Mississippi define special needs to determine eligibility?

A child with special needs is defined as a child that has at least one of the following circumstances that may be a barrier to adoption without financial assistance:

a. Six years of age or older
b. Member of a sibling group of two or more children placed together for adoption
c. Physical disability
d. Mental disability (IQ of 70 or less)
e. Developmental disability
f. Emotional disturbance
g. Medical condition(s)
h. History of abuse that puts a child at risk of having special needs

### 2. Does the state-only funded adoption assistance program differ in any way from the Title IV-E program?

To be eligible for state-funded adoption assistance a child must meet the special needs definition in question 1 above. There are no differences in eligibility criteria or monetary benefits. However, if a state-funded child is approved for deferred adoption assistance (see question 8), the child does not receive Medicaid. Title IV-E eligible children with deferred adoption assistance do receive Medicaid.

**3. Are children adopted from private agencies in Mississippi eligible for adoption assistance?**

Only if they are eligible for federal (Title IV-E) adoption assistance. Very few private agency children qualify because such children do not meet the requirement for a judicial removal of the child from the home.

## What Supports and Services Are Available?

### Monthly Payments

**4. What is the maximum basic monthly adoption assistance maintenance payment in Mississippi?**

| Age | Rate |
|---|---|
| 0-3 | $325 |
| 4-5 | $335 |
| 6-9 | $355 |
| 10-12 | $375 |
| 13-15 | $390 |
| 16-21 | $400 |
| SSI Rate | $500 |

**5. Does Mississippi provide specialized rates (based on the extraordinary needs of the child or the additional parenting skill needed to raise the child)?**

Specialized rates are determined based on the rate established for the child in foster care based on the child's individual needs. Decisions are made on a case-by-case basis. Generally, children must have multiple medical needs to qualify for specialized rates. The following children may be eligible for specialized rates:

1. Children who have exceptional physical, mental, or emotional, or behavioral needs
2. Children with extreme illness or disabilities requiring nursing care (excluding children in residential treatment facilities)
3. Emotionally disturbed children requiring therapeutic care
4. Medically fragile children

The maximum monthly specialized rates are $700 for exceptional therapeutic needs, and up to $900 for exceptional medical needs.

**6. When do adoption assistance payments begin?**

Adoption assistance payments begin at adoption placement. In the case of adoption by foster parents, payments begin at adoption finalization.

**7. When a child turns 18, which benefits, if any, continue?**

Assistance payments terminate when a child reaches age 18. However, the state may choose to extend assistance until children turn 21 if they have a mental or physical disability that warrants continuation.

**8. Does Mississippi offer deferred adoption assistance agreements (agreements where initial monthly maintenance amount is $0 for children at risk of developing special needs later)?**

Yes.

## Medical Care

**9. What Medicaid services are available in Mississippi?**

- Child health—all children and youth under age 21 who are on Medicaid are eligible for Early and Periodic Screening, Diagnostic and Treatment Services (EPSDT)
- Christian Science sanatoria
- Dental—dental exam and cleaning every 6 months, emergency dental extractions, and if necessary, treatment for an acute dental condition; (fillings, crowns, bridges, and dentures are not covered)
- Vision—exams and one pair of eyeglasses per year
- Family planning
- Home health—50 home health visits each fiscal year when ordered by a physician.
- Inpatient hospital care—up to 30 days of hospital care each fiscal year (July 1 - June 30); unlimited hospital days will be allowed for children with certain diagnoses or in certain facilities
- Laboratory
- Nursing home care
- Outpatient hospital care—6 emergency room visits each fiscal year
- Pharmacy services—5 prescriptions per month if the drugs are on Medicaid's approved list of medicine
- Physician Services—12 visits each fiscal year at doctor's office, rural health clinic, or hospital emergency room
- Rural health clinic—visits to a rural health clinic are included in the 12 visit limit to a physician
- Transportation

For more information, call the central state Medicaid office at 601-359-6050.

**10. What medical benefits are available for state-funded children? (Children who have federally funded/Title IV-E adoption assistance are automatically eligible for Medicaid benefits.)**

Children adopted with adoption assistance (state or federal) receive a Medicaid card. However, state-funded children who have deferred adoption assistance do not receive Medicaid. All children have access to identical medical coverage.

**11. What mental health services are available?**

Public mental health services for children in Mississippi are administered by the Office of the Governor, Division of Medicaid (DOM) and may include the following: inpatient and outpatient hospital, physician services, prescription drugs, psychiatric residential treatment, and inpatient psychiatric care. For more information, visit http://www.medicaid.ms.gov/ or call the Medicaid central office at 601-359-6050.

## Other Benefits

**12. In Mississippi, what nonrecurring adoption expenses directly related to the finalization of an adoption may be reimbursed?**

Families may receive reimbursement, of up to $1,000 per child, of the one-time expenses incurred in adoption, including attorney fees, court costs, criminal records clearance, the adoption home study performed by a licensed child-placing agency, costs of amending a birth certificate, required medical and psychological evaluations, transportation costs for placement and pre-placement, and the reasonable costs of lodging and food necessary for the child and adoptive parents to complete the adoption process.

Families adopting children with special needs through licensed child-placing agencies or independent adoptions may be eligible for reimbursement of nonreoccurring expenses. To be eligible, an adoption assistance agreement must be signed by DHS prior to finalization. Means tests are not permitted, and children need not be IV-E eligible.

**13. Is child care available? If yes, who is eligible and how do families access child care?**

Child care is currently not available.

**14. Is respite care available? If yes, who is eligible and how do families access respite care?**

All adopted children are eligible for respite care, which can be accessed by contacting Partners in Permanency (601-354-0983 or 800-748-3005).

**15. Is residential treatment available? If yes, who is eligible and how do families access residential treatment services?**

The Adoption Assistance Program does not include a provision for the payment of residential treatment. DHS will help families who adopted through DHS to explore funding resources for residential care.

Families who need residential treatment services must apply through the Medicaid program. They should:

1. call the central state Medicaid office (601-359-6050) and ask for the contact information for the regional Medicaid office;
2. call the regional office and request for residential treatment; set up an appointment, and determine the appropriate steps to take; and

3. bring documentation to the regional office appointment stating the doctor's recommendation for the child to receive residential treatment.

**16. What other post-adoption services are available in Mississippi and how do families find out more about them?**

Post-adoption services in Mississippi are administered by MDHS Family and Children's Services Resource Family Units, which are located in each region. Contact the local Department of Family and Children's Services office to access services or contact the regional office. A list of the regional offices is also available at http://www.mdhs.state.ms.us/fcs_rd.html or by calling 601-359-4999.
Partners in Permanency (PIP), a program administered through a private adoption agency, also provides post-adoption services to all adopted children in Mississippi. PIP can be contacted at 1-800-748-3005. Services may include the following:

1. Information and referral
2. Educational materials
3. Support groups
4. Therapeutic intervention (limited)
5. Counseling
6. Retreats
7. Respite care

Please note that not all services may be available in all cases. The families' adoption assistance worker or post-adoption services contact will have more information about process, eligibility, availability, and duration of services.

**17. If the assistance listed above in questions 13 to 16 are for specific services, must these services be explicitly identified in the adoption assistance agreement?**

n/a

## What Should Families Know About Applying for Subsidy?

**18. Who initiates the adoption assistance agreement?**

The adoption assistance agreement is initiated by the adoption specialist in the area where the adopting family resides.

**19. Who makes the final determination on an adoption assistance agreement?**

The state office administrator (or a designee) makes final determination.

**20. How do families request adoption assistance after finalization of an adoption?**

Families must submit a written request with any supporting documentation to:

[redacted]
Department of Human Services
Family and Children Services
750 North State Street
Jackson, MS 39202
[redacted] (in state); [redacted] (out of state)
[redacted]
Fax: [redacted]

## How Can a Family Adjust an Adoption Assistance Agreement?

**21. Can adoptive parents ask to change an adoption assistance agreement?**

Adoptive parents may request a change in the adoption assistance agreement at any time. Parents must submit a written request to the DHS administrator (see contact information in question 20 above) along with current documentation of the child's special needs. The administrator approves or disapproves any changes in agreements.

**22. What steps does a family go through to appeal an adoption assistance decision in Mississippi?**

Requests for a fair hearing in Mississippi can be made whenever there is a disagreement regarding an agency action affecting adoption assistance.

Adoptive parents must file a written grievance requesting a fair hearing with DHS within 10 working days of the date of the contested agency decision. Fair hearings are held within 60 calendar days of the receipt of the written request, and notices of the proposed hearing shall be sent to all involved parties at least 30 calendar days before the fair hearing.

## What Else do Families Need to Know?

**23. How is the adoption assistance program operated and funded in Mississippi?**

The program is state supervised/state administered. This means that both policy and eligibility decisions are made by staff at the state office.

In Mississippi, the federal contribution for Title IV-E-eligible children is 75.84 percent (the Federal Financial Participation or FFP rate). The remaining cost of the program is state funded.

**24. Does Mississippi operate a subsidized guardianship program?**

No.

**25. Does Mississippi offer a tuition waiver program?**

No, but Mississippi does have an Education and Training Voucher (ETV) program. The ETV program provides financial assistance to meet the cost of attendance in eligible post-secondary educational and vocational training programs for all youth who aged out of custody or who were adopted from foster care after their 16th birthday. (Youth who are adopted into Mississippi after their 16th birthday from another state may qualify to receive ETV funds from the state that had legal custody of the youth.)

For more information, contact [redacted] at [redacted] or [redacted]

**26. Does Mississippi offer a state adoption tax credit?**

Mississippi established a tax credit of up to $2,500 per year for qualified adoption expenses. Qualified applicants can apply for the credit the year the adoption is finalized. Please visit to www.dor.ms.gov for further information.

**27. Does Mississippi have any program to support an adoptee whose adoptive parents die until the child is adopted again?**

Mississippi will assist in the re-adoption of the child by providing the courts with a home study and covering non-recurring adoption expenses.

**28. What else differentiates Mississippi's adoption assistance program from others around the country?**

n/a

**North American Council on Adoptable Children (NACAC)**
970 Raymond Avenue, Suite 106
St. Paul, MN 55114
phone: 651-644-3036
fax: 651-644-9848
e-mail: info@nacac.org
Feedback

# Ex. 44B

7. Update the FSP and request Adoption COS.

### b) Adoption Specialist's Responsibilities in Achieving Adoption

Within 3 calendar days of receipt of notice of a child's primary permanent plan becoming "adoption", the Regional Resource Supervisor will assign an Adoption Specialist to begin the process of locating an appropriate adoptive placement for the child.

Within fifteen (15) calendar days of the permanent plan becoming "adoption", the Adoption Specialist will convene an Adoption Planning Meeting with the COR Worker, the COS Worker, (if different), the Adoption Specialist assigned to the child and the appropriate ASWSs. Other staff may be invited. The purpose of this meeting is to develop separate service plans for the child, the birth family and the adoptive family. Each plan includes:

- Goals,
- Desired outcomes,
- Services to be performed and by whom, and
- The time frames in which the tasks will be completed.

Issues which might be addressed in the service plans include, but are not limited to:

- A comprehensive child assessment,
- The role of birth family in the child's future,
- Life book preparation,
- Completion of any medical or dental treatments for the child,
- Determination that the child has an adequate supply of clothing,
- TPR, either voluntarily or through court action,
- Compilation of documents needed for legal action, and
- Discussion with Resource Family regarding their interest in adopting the child.

Assure the goals of the service plans are met within the specified time frames.

Convene Adoption Status Meetings with the DFCS Worker, and the worker's supervisor in the following frequencies: weekly for infants from birth to twelve (12) months; monthly for all other children awaiting adoptive placement. The purpose of these meetings is:

- Review the progress of the Adoption Plan,
- Identify barriers, and
- Develop strategies to overcome the barriers in order to achieve the goal of adoption.

The Adoption Status Meeting shall be documented in the child's case record in MACWIS within 5 working days by the Adoption Specialist.

As a part of the adoption plan, the Adoption Specialist will complete an Assessment and Preparation process with the child. During this process, the Adoption Specialist will discuss with the resource family and the child the possibility of adoption by the current Resource Family. The Resource Family will be informed of the possibility of Adoption Assistance if it appears the child may be eligible.

If the current Resource Family will not or cannot adopt the child, the Resource Unit will proceed to identify an adoptive family for the child and will make every effort to place the child in a permanent adoptive home within ninety (90) calendar days of the primary plan becoming adoption. These efforts will be entered in to the narrative section of MACWIS. If the child is not legally free for adoption, she/he will be placed with an adoptive family who is willing to accept a Legal Risk Placement.

Once a placement has been identified, obtain approval of the proposed placement from COR supervisor prior to beginning pre-placement activities.

Coordinate with COR/COS, the pre-placement visits and activities between the child and the pre-adoptive family.

Coordinate the actual placement with the family, which will begin with the sharing of information about the child with the family and information about the family with the child. If appropriate, the family will be given an opportunity to consult with their own attorney about the risks involved and if the child is not legally free for adoption.

A series of pre-placement visits will be coordinated, and when both the child and family are comfortable with proceeding with the placement, the family will sign either the Adoption Placement Agreement or the Legal Risk Placement Form.

Provide written notification of the placement to the COR and COS, if appropriate.

Supervise the adoptive placement and communicate with the COR via regular supervisory reports of the placement.

### c) Documentation of Efforts to Adopt

For every child whose permanency goal is adoption, the Resource Specialist will document in child's narratives monthly, the steps taken to find an adoptive family or permanent home. The documentation must include child specific recruitment efforts such as Adoption Resource Exchange, internet, newspaper, adoption picnic, media and/or other efforts.

Publication of a child's picture in recruitment efforts may not occur until the child is legally free for adoption- not just when the plan is adoption.

### d) Achievement Criteria- Adoption

The goal of adoption is considered achieved when the child is placed with an adoptive family and the adoption has been finalized. The COR Worker will document in MACWIS the dates in the legal history detail tab.

### e) Another Permanent Plan Living Arrangement (APPLA)

The ASFA created Another Planned Permanent Living Arrangement (APPLA) as the least preferred permanency option for children. APPLA is not intended to be a catch all for whatever plan is needed, but is a "living arrangement that is truly planned and permanent in nature."

"Planned" means the arrangement is intended, designed, considered, premeditated, or deliberate.

"Permanent" means endearing, permanent, or stable.

"Living arrangement" includes not only the physical placement of the child, but also the quality of care, supervision, and nurturing the child will receive. While living arrangements might not be a specific residence or facility it does imply certain stabilizing features.

If DFCS concludes, after considering reunification, adoption, durable legal custody, and permanent placement with a relative, that these permanency plans are inappropriate or unavailable for a child, DFCS may assign a permanency goal of Another Permanent Planned Living Arrangement (APPLA) for the child.  In such circumstances:

1. the child must be at least 16 years old and
2. DFCS must document to the youth court a compelling reason why this permanency goal is in the best interest of the child and more appropriate than reunification, adoption, durable legal custody, or permanent placement with a relative.

# Ex. 44C

| | | |
|---|---|---|
| **[10/01/15-09/30/16]** | | |
| **2017**<br>**[10/01/16-09/30/17]** | **2 and older** | **Prior to October 1, 2015** |
| **2018**<br>**[10/01/17-09/30/18]** | **All children** | |

4. The child is a child of a minor parent who is in foster care and received IV-E foster care payments that covered both the minor parent and the child, and the child meets the definition of a child with special needs.
5. The child previously was eligible for IV-E Adoption Assistance and meets the definition of a child with special needs. In the situation of a child who was adopted and received IV-E adoption assistance, but the adoption dissolved or the adoptive parents died, the child continues to be eligible for IV-E adoption assistance in a subsequent adoption. The only determination that must be made is whether the child is a child with special needs. Because IV-E adoption assistance eligibility does not have to be re-established for subsequent adoptions, the manner of a child's removal from the adoptive home, including whether the child is voluntarily relinquished to an individual or a private agency, is irrelevant.

Each child in DFCS custody who is legally freed for adoption must have his/her case reviewed for determination of eligibility for IV-E Adoption Assistance. If eligible, this information will be shared with DFCS staff and with interested prospective adoptive parent(s).

## A. Establishing Child's Eligibility for IV-E Adoption Assistance

The Adoption Specialist is responsible for compiling the information needed to determine a child's eligibility for IV-E Adoption Assistance. The child must be determined eligible for Adoption Assistance by the Adoption Assistance Supervisor and approved by the Director of the Adoption Unit as requiring Adoption Assistance to assure adoption. Each of the following conditions must be met and documented in the child's case record which is maintained in the State Office Adoption Unit:

1. The child must be legally free for adoption.

# Ex. 44D

# RESOURCE FAMILY PROCEDURES MANUAL

# CHILD'S FILE CHECKLIST

**Child's Name:** ________________________________ **Date of Birth:** ________________
**Date Freed:** **(Mother)** ____________________ **(Father)** ____________________
**Adoption Specialist:** ____________________ **COR:** ____________________
*(Submit to ASWS within 30 days of notice that a child is Freed for Adoption.)* **Submitted to ASWS:** ____________________
**date**

**Documents for Certification of Adoption Assistance:**
*The Adoption Specialist submits these documents to the Adoption ASWS. These are forwarded to State Office to determine the child's eligibility for Adoption Assistance. These are filed at the top of the Child's File packet. (Check all that apply)*

____ Birth Certificate (document age and sibling group membership)

____ Early Intervention Evaluation (Current within a year for children from birth to three years old)

____ Developmental Assessment (Current within a year documenting areas of delay; Must have if child is over three years old, but too young for a psychological.)

____ Psychological evaluation, dated within a year AND a statement regarding the follow-thru of the recommendations (Must have evaluation if child is over three years old.)

____ Current therapy notes or monthly report which addresses a child's diagnosis from an evaluation which is over a year old (attach the evaluation)

____ Individualized Educational Plan (IEP) or other special needs documentation (if applicable)

____ Psychological evaluation of a PARENT which documents a diagnosis which could be a 'Risk Factor' for the child (if applicable)

____ Medical statement or a page of medical records with diagnosis documented (must have child's name or parents' name on medical document)

____ SSI Award letter (if applicable)

____ MS Department of Health Form 913, and if available, 914 or 915

____ Birth Records: Discharge summary or documentation from records stating the diagnosis of child or mother; or mother's admitted drug usage; or other determined 'risk factor' (not all in entirety)

____ TPR Court Order and/or MDHS Surrender Form 459

**Screens to Complete in MACWIS:**

____ Child Evaluation Update tab in MACWIS (Mark "Public"))

____ TPR History including Legally Freed Date completed on all parents in MACWIS

____ Adoption Eligibility Recommendation documented in a narrative AND emailed to ASWS

Adoption Specialist Recommends Child's Eligibility as: ____ IV-E ____ IV-B
__Deferred __Special Needs I (must receive SN I board rate)
__Regular Board Rate at $ __________ __Special Needs II (SSI)
__Therapeutic or Medically Fragile Board Rate at $__________

____________________________
Adoption ASWS Approval

# Adoption Assistance Process

Step 1. The Adoption Specialist is added to a case when Adoption is added as a potential permanent plan for the child. The Adoption Specialist will begin at that time to compile the Child's File information to prepare for certification of Adoption Assistance.

Step 2. Adoption Specialist makes his/her recommendation on the Child's File Checklist and submits documentation to Resource ASWS for processing (preferably within 10 days but no later than 30 days of accomplishing TPR.

Step 3. Resource ASWS reviews Child's File and either enters or concurs with the Adoption Specialist's recommendation in MACWIS – Adoption Eligibility Screen, "Adoption Worker Determination." The narrative shall include the following:

A. Child's name and DOB.
B. Child's exact special needs (use policy language)
C. Documentation in Child's file to verify special needs (i.e. – see child's birth certificate in file to verify age; see psychological Evaluation in file to verify diagnosis of ADHD; see birth records to verify drug exposure at birth, etc.)
ALL DOCUMENTATION OF CURRENT DIAGNOSES MUST BE WITHIN THE YEAR OF THE CERTIFICATION.
D. This child is IV-E or IV-B eligible for the subsidy based on _______? (initial eligibility in foster care, SSI recipient, expanded IV-E for age or 60 months in foster care or sibling of such being adopted together)
E. A (<u>what rate</u>?) basic rate, special needs I, special needs II therapeutic rate, or medical fragile rate is recommended in the amount of $___ per month. Or Approval for deferred is recommended with Medicaid Only.

Step 4. Resource ASWS will submit entire Child's File to State Office (Margaret. Shelton and Edna.McLendon) by scan and email or fax within 5 days of Receipt of complete packet. Fax # 601-359-4360. (Larger packets may be Mailed to Adoption Unit, P.O. Box 352, Jackson, MS 39205.)

Step 5. An Administrative Review will be completed in State Office within 5 Days of receipt and entered In MACWIS – Adoption Eligibility – Administrative Approval will show the maximum amount of child's eligibility and a final decision of all recommended actions will be completed by the designated Adoption staff in State Office. Any additional information needed in order to complete this determination will be requested by email to the Resource ASWS and cc to Adoption Specialist and Regional Director.

Step 6. The Application for Adoption Subsidy is presented to the Adoptive Family and The Adoption Subsidy is negotiated. All parties sign the Adoption Assistance Application. **This application is submitted to State Office for final approval.** This application can be submitted prior to OR with the Family File, along with the Adoption Assistance Agreement. However, the Adoption Assistance Application MUST be approved prior the finalization of the adoption in order for the Adoption Assistance Agreement to be valid.

**Mississippi**
**Form DFCS 433**

# Application for Adoption Subsidy

## I. Child's Information:

CHILD'S BIRTH NAME ____________________________________________
LAST FIRST MIDDLE

CHILD'S ADOPTIVE NAME (if previously adopted)

______________________________________________________________
LAST FIRST MIDDLE

CHILD'S SOCIAL SECURITY NUMBER ________________________

DATE OF BIRTH ___________ SEX _______ RACE/ETHNIC GROUP __________

CURRENT ADDRESS:

______________________________________________________________

______________________________________________________________

## II. Legal Status of Child:

Father: ___Relinquished ___Court Terminated Date ______________
Mother: ___Relinquished ___ Court Terminated Date ______________
Child legally free for adoption: ___________________ (date)
Section 11-5-91 applies _____ Does not apply

Custody of child with authority to consent to adoption: _________________________
Name of Agency

## III. **Current Foster Care Rate** (based on child's age/special needs) $ ____________

Steps taken to place child for adoption without a subsidy unless the child's record documents that the best interest of the child would not be served by such efforts and therefore are not applicable:

____ Child has significant emotional ties to foster parent. (This is ONLY intended to document why an exhaustive search was not conducted to find an adoptive family that is willing to adopt without a subsidy.)

Child listed with MS Adoption Exchange Registry _____________________.
Date

Child taped for Wednesday's Child: _____________________.
Date

Child presented at Statewide Placement Committee: _____________________.
Date

Child featured on AdoptUSkids website: _____________________.
Date

**Mississippi**
**Form DFCS 433**

Eligibility for Assistance: Title IV-E / Foster Care: _______ SSI: _______
Title IV-B / Foster Care: _______ (State Subsidy only)

**IV. GENERAL DIAGNOSTIC STATEMENT:** (Child Assessment – to include a summary of child's history, description of barriers to adoption, justification for proposed subsidy, prognosis of adoption without subsidy and a chronological list of child's placements for foster care and / or adoption.) Attach on a separate sheet.

As with any child placed for adoption, information may become known, issues and problems may arise in the future that are unknown to anyone at this time and could not be reasonably anticipated by the placing agency.

**V. REASONS SUBSIDY IS NEEDED:**
____ Child is one with special needs. (Check all barriers which are present and/or which existed at the time of placement for adoption and represent basis for subsidy.)

___ Physical Disability*
___ Mental Disability*
___ Emotional Disturbance*
___ Developmental Disability**

Other Barriers:
___ Age (over 6)
___ Sibling group membership
___ Other (Specify)
________________________________

Risk Factors:
___ Child's Medical History*
___ Birth Parents' Background*

*****Requires a current statement (within a year of certification) signed by a physician, psychiatrist, psychologist or therapist, which describes the condition(s) and includes diagnosis, treatment, and prognosis, to be attached to this form.***

*****If the child is developmentally delayed resulting in educational delays or has a significant learning processing difficulty, a statement from the school or from a licensed medical / mental health professional needs to be attached. A copy of a current IEP can substitute for the school's written statement.***

Child meets criteria for: (Check one)
___ Deferred
___ Special Needs I $ ______
___ Therapeutic rate of $ _______
___ Basic rate of $ ______
___ Special Needs II $ ______
___ Medically Fragile rate of $ ______

______________________________ __________ ______________________________
ADOPTION SPECIALIST DATE RESOURCE ADOPTION ASWS

___ Maximum Subsidy approved $ __________ per month ___ No Subsidy approved

Reason(s) ____________________________________________________________

______________________________ ______________
Adoption Unit Director or Designee Date

Mississippi
Form DFCS 433

## VI. FAMILY RESOURCES AVAILABLE TO MEET THE CHILD'S SPECIAL NEEDS: (To be completed by the adoptive family with the agency worker.)

**This section is only to evaluate family and community resources available to meet the special needs of the child in order to determine what additional services the child will need. This is not a means test as the child's subsidy will be based solely on the special needs of the child.**

What is your family's gross monthly income? (Do not include foster or subsidy payment.):__________________

Number of persons supported by that income: ____ Total number of persons in the home: _____

List additional financial sources and amounts available to members of the household (i.e. foster care, child support)

______________________________________________________________________

Does anyone in your family have unusual costs, such as medical or educational expenses? If yes, please explain:

______________________________________________________________________

______________________________________________________________________

What financial resources, other than your income, are available to meet this child's needs? (Indicate amount by appropriate category.):

$ _______SSD (disability of parent) include a copy of letter from SSA
$ _______ SSA (survivors / death of birth parent) include a copy of the letter from SSA
$ _______ SSI (child's disability) include a copy of the letter from SSA
$ _______ Child Support (being received by adoptive family)
$ _______ other
(specify) ____________________________________________________________

Will this child become eligible for additional benefits based on adoption by you? Indicate kind of benefits and amount:

______________________________________________________________________

In thinking about the needs of this child and the resources (financial, extended family, community services, etc.) available to you your family, what will be REQUIRED in addition to those resources to continue support of this child in your household? (Attach additional page if necessary.)

______________________________________________________________________

______________________________________________________________________

**Mississippi**
**Form DFCS 433**

What current services are needed/being provided that will need to continue post finalization? (Day care services, dental services, therapeutic foster care services etc.)

___

___

___

Will the child named in this application be added to your medical insurance policy? __yes __no
If yes, please complete the following:

Name of Insurance Company______________________________

Address (street, city, state, zip)______________________________

Name of Policy Holder______________________SS Number:______________

Group/Plan#______________________Policy ID #______________

## VII. NEGOTIATION OF PROPOSED SUBSIDY: (Using Section V of this form as the maximum subsidy available, please indicate below the subsidy necessary in order to meet the needs of this child.)

Please circle the letter if this service is necessary and enter amounts where indicated.

A. Non-recurring Adoption Expenses
The Department agrees to pay for expenses that are reasonable and necessary for the adoption to occur, subject to a maximum of $600. The expenses must:

1) Directly relate to the legal adoption; and,
2) Not be in violation of state or federal law; and
3) Not have been reimbursed from other sources of funds

Expenses covered are:

1) Attorney Fees
2) Court Cost
3) Revised Birth Certificate
4) Other ______________________

B. MAINTENANCE: (Select the Adoption Subsidy for which the child is eligible as shown in Section V and enter amount requested)

(Subsidy amount must not exceed the foster care board rate)

___ Eligible for Title IV-E Federal Adoption Assistance
 ___ (1) Medicaid Only (check if appropriate)

___ (2) Deferred* (No Medicaid at the time of Adoption)
___ (3) Long Term (monthly cash payment) $ ___________
___ (4) No Subsidy Needed

*Deferred means, no adoption assistance payment is provided at the time of the adoption; however, due to the above documented risk factors in the child's medical history or background, or the medical history or background of the child's biological family; the child is at risk to acquire a medical condition, a physical, mental, developmental or emotional disorder. Current documentation will need to be submitted to the agency if this child develops special needs related to these risk factors.

C. MEDICAL CARE:

Medical and dental services will be provided through the Medicaid Program (Title XIX of the Social Security Act).

D. SOCIAL SERVICES:

Social Services will be provided through the Social Services Block Grant Program Title XX.

The Adoption Assistance payment, Title XIX Medical Services and Title XX Social Services are available regardless of the state of residence. Families moving out-of-state will be provided with a contract in the new state using the Interstate Compact on Adoption and Medical Assistance Program. Title XIX Medical Services and Title XX Social Services vary from state to state and are available to the child in accordance with the procedures of the state in which the child resides.

Interstate Compact on Adoption Medical Assistance (ICAMA)

If your family moves out-of-state after the finalization of the adoption, your family must contact the adoption unit to access medical assistance services in the new state. The adoption unit should be contacted 60 days prior to moving out-of-state.

E. OTHER:

If you receive SSI payments for this child, it is the adoptive parent(s)' responsibility to inform the Social Security Administration if the child is also receiving adoption assistance payments.

**Mississippi**
**Form DFCS 433**

## APPLICATION STATEMENT

### IMPORTANT – READ THE FOLLOWING CAREFULLY BEFORE YOU SIGN

HAVING BEEN INFORMED TO OUR SATISFACTION OF THE PARENTAL HISTORY AND BACKGROUND FACTS IN CONNECTION WITH THE ABOVE-NAMED CHILD, WE DECLARE OUR DESIRE TO HAVE SAID CHILD PLACED IN OUR HOME FOR THE PURPOSE OF LEGAL ADOPTION.

WE HEREBY APPLY FOR AN ADOPTION SUBSIDY, AS PROVIDED FOR IN THE RULES AND REGULATIONS OF THE MISSISSIPPI DEPARTMENT OF HUMAN SERVICES.

IN COMPLETING AND SIGNING THIS APPLICATION, I CERTIFY THAT THE INFORMATION SUPPLIED HEREIN IS TRUE, ACCURATE AND COMPLETE TO THE BEST OF MY KNOWLEDGE. IN ADDITION, I AM AWARE THAT IF I MAKE A WILLFULLY FALSE STATEMENT OR REPRESENTATION, OR USE OTHER FRAUDULENT METHODS TO OBTAIN ASSISTANCE TO WHICH I AM NOT ENTITLED TO OR GREATER THAN THAT TO WHICH I AM ENTITLED, I CAN BE FOUND GUILTY OF A FELONY OR MISDEMEANOR UNDER APPROPRIATE STATE OF FEDERAL LAW; AND,

I AM AWARE THAT I HAVE THE RIGHT TO A FAIR HEARING AND / OR STATE APPEAL IN THE EVENT OF A DENIAL, REDUCTION, OR TERMINATION OF MY ASSISTANCE, AND IN OTHER MATTERS FOR WHICH SUCH APPEAL RIGHTS EXIST AND TO RETAIN LEGAL COUNSEL AT MY EXPENSE IN CONNECTION WITH SUCH HEARINGS.

ADOPTIVE PARENT DATE ADOPTIVE PARENT DATE

RIGHT OF APPEAL AND FAIR HEARING

If you believe the agency has been unfair or has made a mistake concerning your eligibility, you have the right to appeal. This means you will be given a hearing by the agency's administration at which time you will be given an opportunity to present your case for a review by persons not responsible for the original decision to be sure the agency's action was a proper one.

**Mississippi**
**Form DFCS 431**

CASE NAME ____________________

CASE NUMBER ____________________

# ADOPTION ASSISTANCE AGREEMENT

This agreement is being made and entered into between the Mississippi Department of Human Services, (hereinafter "MDHS/DFCS"), and

______________________________________________
Adoptive Parent(s) Full Name(s)

______________________________________________
Address Telephone

It is agreed and understood that the MDHS/DFCS will provide:

☐ IV-E Federal Adoption Assistance ☐ IV-B State Adoption Assistance

to assist in the provision of proper care for my / our child, ____________________,
Child's Birth Name

born ____________ This child is certified for Adoption Assistance based on the following current
Date of Birth

Special Needs: ☐ Age ☐ Sibling Group Membership

☐ Medical Diagnosis of: ______________________________________________

☐ Psychological: ______________________________________________

☐ Mental Disability: ______________________________________________

☐ Developmental Disability: ______________________________________________

☐ Other: ______________________________________________

**Mississippi**
**Form DFCS 431**

**PROVISIONS OF AGREEMENT**

## I. Assistance

A. Non-recurring adoption expenses (list specific items and cost of each) Maximum $600.00

__X__ Court Cost __X__ Attorney Fees __X__ Revised Birth Certificate

☐ Other (This is marked when there are other fees. Example: additional GAL fees.)

B. Monthly Cash Payment: ☐ YES $ __________ (Amount) ☐ NO

The amount of this monthly cash payment (Adoption Assistance) is based on the needs of the child and the circumstances of the adoptive parent(s) and has been determined by mutual agreement between the adoptive parent(s) and MDHS/DFCS. The amount of the payment does not exceed the foster care maintenance payment of the child if he/she were in a Resource Family home in the State of Mississippi. Adjustments in cash assistance payments may be made with the concurrence of the adoptive parent(s) based upon changes in the needs of the child, changes in the circumstances of the adoptive family, or changes in the maximum allowable Adoption Assistance payment. Documentation of changes in the child's needs or family's circumstances may be required.

Please check one of the following. You may not select both C and D.

☐ C. Adoption Assistance payment will begin at the time of placement. An Adoption Assistance Agreement is in place for the Adoptive Placement of a certified special needs child placed with adoptive parent(s).

☐ D. Adoption Assistance payment will begin at finalization of adoption. An Adoption Assistance Agreement is in place for an Adoptive Placement of a certified special needs child placed with adoptive parent(s).

E. Schedule of Payments Increase by Age
The Adoption Specialist should initial in this section that the terms of the increase in subsidy have been explained to the adoptive parent(s); the adoptive parent(s) should initial that he/she concurs with the increase in Adoption Assistance payments.

Adoptive Parent(s) __________ ; __________ Adoption Specialist __________

## II. Deferred Agreement

Because the child is at risk of developing special needs due to known background documentation, the child is eligible for Deferred Adoption Assistance and a Deferred Assistance Agreement is in place, prior to finalization. The child who is Child Welfare System (CWS) eligible is currently ineligible for Medicaid but receives Non-Recurring Adoption Assistance because the child does not currently exhibit diagnosable difficulties. Children with IV-E eligibility receive Non-Recurring Adoption Assistance and Medicaid even if child does not currently exhibit diagnosable difficulties.

Child's "At Risk" Factor ____________________
Documentation ____________________

## III. Medical Care

An Agreement will not be processed if this section is not completed by the adoptive parent(s) and the adoption specialist. The parent(s) and the adoption worker should initial either A or B.

☐ A. IV-E - Children who are eligible for Title IV-E Adoption Assistance are automatically eligible for Title XIX Medicaid and Title XX Services in their state of residence under the Consolidated Omnibus Budget Act (COBRA), P.L. 99-272, effective October 1, 1996. Mississippi is a member of the Interstate Compact on Adoption and Medicaid Assistance.

**Mississippi**
**Form DFCS 431**

☐ B. IV-B - Medicaid benefits as provided under Title XIX of the Social Security Act (Medicaid) will be available to the child in accordance with the procedures of the state in which the child resides.

MDHS/DFCS shall provide this financial assistance regardless of the child's state of residence as long as the child was adopted through DHS in the State of Mississippi.

**IV. Notification of Change**

A. The adoptive parent(s) will immediately notify MDHS/DFCS, in writing, if they are no longer legally responsible for the support of the child or are no longer supporting the child.

B. MDHS/DFCS will notify the adoptive parent(s) in writing of across-the-board changes in Adoption Assistance payments. Adjustments may be made, if requested in writing by the adoptive parent(s).

C. MDHS/DFCS may renegotiate an Adoption Assistance Agreement if the adoptive parent(s) request an increase in payments due to a change in their circumstances and a higher foster care rate would have been paid on behalf of the child if the child had still been in foster care, depending on availability of funds.

D. Adoption Assistance payments made on behalf of a child cannot exceed the amount the child would have received if the child had been in a Resource Family home.

E. Parents will notify MDHS/DFCS of changes of address in writing.

**V. Annual Review/Medicaid Form**

A. The Annual Review/Medicaid Form is reviewed annually by the adoptive parent(s) and MDHS/DFCS.

B. MDHS/DFCS shall notify the adoptive parent(s), in writing, 45 days before the renewal and shall supply the adoptive parent(s) with the appropriate forms.

**VI. Termination**

Termination will occur in any of the following circumstances:

A. Upon the conclusion of the terms of the Agreement.
B. Upon the adoptive parent(s)' request.
C. Adoption subsidy payments will terminate when the child reaches the age of 18. Adoption subsidy may be provided as a State option until the child is 21 years of age if the child has a mental or physical handicap that warrants continuation. Section 93-17-67 of the Mississippi Code provides subsidy to a child up to age 21 if the DFCS State Office Administrator determines that the treatment or rehabilitation for which payment is being paid is in the best interest of the child.
D. The child becomes emancipated as a minor.
E. The child enters the military
F. The child marries.
G. Upon the child's death.
H. It is determined that the adoptive parents are no longer financially supporting the child.
I. Legal custody is granted to someone other than the adoptive parents.
J. Parental Rights have been terminated or surrendered.

MDHS/DFCS may require the repayment of any and all Adoption Assistance payments which the adoptive parents received erroneously.

**Mississippi**
**Form DFCS 431**

**VII. Appeal**

Adoptive parent(s) may appeal MDHS/DFCS's decision to reduce, change or terminate Adoption Assistance in accordance with rules and procedures of the Administrative Grievance Hearing and Appeal process. Information may be requested from MDHS/DFCS. Mail request to: **Mississippi Department of Human Services, Division of Family and Children's Services, Adoption Unit, Post Office Box 352, Jackson, Mississippi, 39205-0352.**

This agreement will expire on the child's 18th birthday: ______________________
(Specify date of 18th birthday)

Effective date for Titles XIX and XX: ______________________

Effective date of Adoption Assistance Payment: ______________________

______________________ Adoptive Mother's Signature ______ Date ______________________ Adoptive Father's Signature ______ Date

______________________ Authorized MDHS/DFCS Representative's Signature ______________ Title ______ Date

Adoption Assistance Agreement approved by Adoption Area Social Work Supervisor on: ______________ Date

______________________________________
Signature of Adoption Area Social Work Supervisor

Signed copy of the Adoption Assistance Agreement given / sent to adoptive parent(s): ______________ Date

# Basic Special Needs

Special needs as determined by MDHS include one or more of the following:

1. Physical disability
2. Mental disability (I.Q. of 70 or less)
3. Developmental Disability
4. Emotional Disturbance
5. Medical Conditions

Documentation of special needs must be within a year from the date of the application for subsidy or subsidy re-negotiation. Documentation may include:

Medical records, psychological evaluation with diagnosis, notes or letter from therapist indicating a diagnosis for which the child is currently being treated, Individualized Educational Plan (IEP) from the school, developmental assessment, language, occupational, or physical therapy evaluation indicating need for intervention, etc.

**BREAKDOWN FOR BASIC ADOPTION ASSISTANCE RATES:**
(Maximum amount per month)

| | |
|---|---|
| 0-3 | $325.00 |
| 4-5 | $335.00 |
| 6-9 | $355.00 |
| 10-12 | $375.00 |
| 13-15 | $390.00 |
| 16+ | $400.00 |

# SPECIAL NEEDS I AND SPECIAL NEEDS II

**SPECIAL NEEDS I** – RATE = $440

Criteria: Child has a medical diagnosis or an Axis I Mental Health Diagnosis but does not qualify for SSI. Child is receiving a Special Needs I Foster Board Rate.

(Requesting a Special Needs I Foster Board Rate may also assist in the child being able to receive a Therapeutic Rate if the child meets those criteria since the Adoption Assistance payment cannot exceed the amount of the Foster Board payment.)

**SPECIAL NEEDS II** – RATE = $500

Criteria: Child is an SSI recipient and a copy of the SSI Award letter is in the Child's File.

(Note: There is a major difference in SSI and SSA. SSI is based solely on the child's own special needs. SSA benefits are based on the parent's death or disabilities.)

# Criteria for Therapeutic and Medically Fragile Rates for Adoption Assistance

1)      **Therapeutic Rate**                    $700 per month

The following standards are guidelines for a child to be certified for the therapeutic rate of adoption assistance:

The adoptee has multiple diagnoses (either mental health or medical conditions or a combination) for which he/she continues to receive therapeutic intervention.

OR

The adoptee has a single diagnosis which is causing significant impairment in multiple settings (home, school, peers, etc).

**Documentation needed to verify therapeutic need:**

Current Psychological Evaluation (within a year of the date of certification)
or
Past psychological evaluation with current notes from therapist or physician of ongoing intervention / treatment
or
Current Developmental Assessment and recommendation for ongoing speech/ occupational/ physical therapy.
Or
Current Individualized Educational Plan (IEP) which shows disabilities and current intervention.

2)      **Medically Fragile Rate**              $900 per month

The following standards are guidelines for a child to be certified for the Medically Fragile rate of adoption assistance:

The adoptee has a medical condition or multiple medical diagnoses which

   a) Are life threatening in nature      or
   b) Require specialized medical care in the home      or
   c) Will require corrective major surgery / recurrent surgeries
            or
   d) The prognosis for full recovery is negligible and the child is not expected to ever live independently.

**Documentation needed to verify Medical Fragile Need:**

Current medical records (within a year of certification) which give diagnosis, instructions for care, prognosis, recommended corrective surgeries, etc.


Note:
Adoption Subsidy rates cannot exceed the rate the child is receiving in foster care or would receive if he/she re-entered foster care at this time. Based on the child's documented need, the subsidy rate may be increased up to the amount of the child's current foster board rate.

# Ex. 45A

## JOB CONTENT QUESTIONNAIRE

| **1.** | **Position Data** | | | | | | |
|---|---|---|---|---|---|---|---|
| **a.** | **Position Number (PIN)** | | **Check one:** | X | **Filled** | | **Vacant** |
| **b.** | **Job Class** | Adoption Speicalist | | | | | |
| **c.** | **Agency** | MDHS/DFCS -- 0662 | | | | | |
| | **County** | | | | | | |
| **d.** | **Work Site(s)** ***[Check.]*** | | **Office** | | **Field** | | |
| | | | **Other *[Specify.]*** | | | | |

**e. Job Summary** ***[Short statement of the job's basic purpose; why the job exists.]***

The Adoption Specialist will work with children whose permanent plan is adoption and the families who will/have adopt(ed) them by preparing and assessing the children and families and providing supportive services needed to maintain the child in a permanent home.

**2. What education, special training, experience, or licenses are required for satisfactory job performance?**

Must be licensed to practice Bachelor's level social work (LSW or above) in the State of Mississippi and have 4 years of directly related experience. The preferred candidate will be licensed to practice Master's Level Social Work (LMSW).

Microsoft Office Suite, MACWIS, computer, fax machine, telephone, and general office equipment

**4. What are the working conditions? List such items as noise, heat, outside work, exposure to bad weather.**

Travel, exposed to bad weather. Potentially the focus of disgruntled clients or an angry public.

**5. Do you directly supervise other employees? If so, give the number supervised, their job titles, and the number they each supervise.**

No

**6. Are there any special characteristics, physical requirements, etc., a person must possess in order to perform your duties satisfactorily?**

Must be able to relate to children/youth of all ages and complete comprehensive assessments of children and families.

**Certification of Incumbent: I certify that I have read the instructions and that the entries are my own and to the best of my knowledge are accurate and complete.**

| **Signature** | **Date** |
|---|---|
| | |

**Duty Statement #1**

Prepares and Assesses children for adoption by completing a Comprehensive Child Assessment (CCA) on each child.

**Tasks**

1. Initiate the CCA within 30 days of assignment of Adoption COS
2. Update CCA showing new information and child's progress with preparation monthly.
3. Utilize 3-5-7 Model for preparing children for adoption
4. Develop or enhance child's Life Book.

| % of Time Devoted to this Duty | How frequently is this duty performed? *[Check one.]* | | Consequence of Error (1-5) |
|---|---|---|---|
| | X | Regularly | |
| 45 | | Periodically | 5 |
| | | Infrequently | |

| Were you required to be able to perform this duty upon entry into the position? | Adoption Competency Training to be provided initially |
|---|---|

**Knowledges**

Knowledge of child development, Effects of childhood trauma, grief and loss models, and attachment cycle.

**Skills**

Listening skills and assessment skills; good writing skills

**Abilities**

To relate to children/youth of all ages and backgrounds; to be flexible in schedule and approaches to working with traumatized children.

**Duty Statement #2**

Foster permanent connections with the child's birth family and adoptive family.

**Tasks**

1. Engage birth family, significant others, and adoptive family in the development of a life book.
2. Facilitate ongoing relationships with birth family, mediating the most appropriate ongoing contact between child and birth family minding the comfort level of the adoptive family.
3. Mine case files to discover appropriate persons with whom to foster connections.

| % of Time Devoted to this Duty | How frequently is this duty performed? *[Check on.]* | | Consequence of Error (1-5) |
|---|---|---|---|
| | X | Regularly | |
| 15 | | Periodically | 4 |
| | | Infrequently | |

| **Were you required to be able to perform this duty upon entry into the position?** | Adoption Competency Training to be provided |
|---|---|

**Knowledges**

Value of permanent connections and case mining

**Skills**

Mediation skills and good communication skills; relationship building skills

**Abilities**

To facilitate family team meetings,

| **Duty Statement #3** | | | |
|---|---|---|---|
| Recruit, prepare, and assess potential resource families to adopt foster children. | | | |
| **Tasks** | | | |
| 1. Complete assessments on current placement families, giving them all necessary information to make their decision about adoption.<br>2. Complete Adoption Assistance certification and contracts with adoption family.<br>3. Participate in general, targeted, and child-specific recruitment activities, including community involvement and community presentations.<br>4. Conduct pre-service trainings and home studies for potential adoptive families. | | | |
| **% of Time Devoted to this Duty** | **How frequently is this duty performed?** ***[Check one.]*** | | **Consequence of Error (1-5)** |
| | X | **Regularly** | |
| 20 | | **Periodically** | 4 |
| | | **Infrequently** | |
| **Were you required to be able to perform this duty upon entry into the position?** | | | Training will be provided |
| **Knowledges** | | | |
| Knowledge of agency policy, guidelines and procedures regarding licensing of resource families and adoption assistance | | | |
| **Skills** | | | |
| Presentation skills and assessment skills; good writing skills | | | |
| **Abilities** | | | |
| Maintain a flexible schedule which will include working evenings and weekends; | | | |

**Duty Statement #4**

Fully document all progress toward the finalization of adoptions.

**Tasks**

1. Document monthly Adoption Status Meetings (ASM) using a standard format.
2. Present children at placement committees and document each presentation.
3. Enter narratives within 5 days following contact with children and family members.

| % of Time Devoted to this Duty | How frequently is this duty performed? *[Check one.]* | | Consequence of Error (1-5) |
|---|---|---|---|
| | | **Regularly** | |
| 10 | X | **Periodically** | 3 |
| | | **Infrequently** | |

| **Were you required to be able to perform this duty upon entry into the position?** | Yes |
|---|---|

**Knowledges**

Knowledge of policy and guidelines for ASM; Knowledge of MACWIS to access narratives

**Skills**

Ability to verbally communicate and organize documentation; good writing skills

**Abilities**

To be clear and concise in both oral and written communication.

| **Duty Statement #5** | | | |
|---|---|---|---|
| Provide retention services and post-adoptive services as needed. | | | |
| **Tasks** | | | |
| 1. Document monthly contacts and complete re-evaluation and license changes for all assigned licensed resource homes.<br>2. Keep families informed of support group meetings, in-service training, and facilitate adoptive placement.<br>3. Provide crisis intervention, information and referrals, mediation services, search services, facilitate out-of-home placements, re-negotiation of adoption subsidies, and re-adoption as needed. | | | |
| **% of Time Devoted to this Duty** | **How frequently is this duty performed? *[Check one.]*** | | **Consequence of Error (1-5)** |
| | X | **Regularly** | |
| 10 | | **Periodically** | 4 |
| | | **Infrequently** | |
| **Were you required to be able to perform this duty upon entry into the position?** | | | Training to be provided |
| **Knowledges** | | | |
| Knowledge of licensing standards and post-adoption services | | | |
| **Skills** | | | |
| Skills in linking families to all supportive services; assessment skills; crisis intervention skills; good writing skills | | | |
| **Abilities** | | | |
| Ability to multi-task; work flexible hours | | | |

**TO BE COMPLETED BY THE IMMEDIATE SUPERVISOR**

**This section should be completed by the employee's immediate supervisor after reviewing the entries made by the incumbent. Should you find incomplete entries or inaccuracies in the employee's description of his or her job, resolve these discrepancies before the employee completes the final draft of this form. The immediate supervisor's section has been designed as a recap and overview of the employee's description of the job. It should be completed in either your own handwriting or typed and it must be signed and dated.**

**1. Briefly describe the functions performed by the unit in which the employee works.**

Assesses and Prepares children and families for maintaining a permanent legal relationship through adoption.

**2. What do you consider the most important responsibilities of this position?**

Assessing and Preparing children for adoption.

**3. What types of formal education, specialized training, related work experience, certification, licensure, or registration, and other special requirements should be required at entry for this job?**

Must be licensed to practice Bachelor's level social work (LSW or above) in the State of Mississippi and have 4 years of directly related experience. The preferred candidate will be licensed to practice Master's Level Social Work (LMSW).

**4. How many months would it take a new employee in this position to perform at the level that a fully experienced individual performs?**

6-12 months

**5. Indicate the statement which most nearly describes the difficulty and general complexity of the work performed in this position.**

| | |
|---|---|
| | **The work is routine or highly repetitive and simple in nature with little or no choice of action.** |
| | **The work is routine or repetitive and follows clearly prescribed standard practice involving straightforward application of readily understood rules and procedures. The employees may make minor decisions, usually of relatively little importance, which affect efficiency of the operation rather than accuracy, correctness, or quality of work.** |
| | **The work is generally routine or standardized but involves a choice of action within limits defined by standard practices and instructions. It also requires applying established rules and procedures and making decisions that may affect quality, accuracy, or utility of results.** |
| | **The work is generally semi-routine or diversified and requires judgment in applying broader aspects of established practices and procedures to problems and situations not falling clearly within the limitations of accepted standards and precedents. The employee works toward assigned objectives, sometimes adopting or modifying methods and standards to meet changing conditions.** |
| X | **The work is governed generally by broad instructions, objectives, and policies, usually involving frequently changing conditions and problems. It requires considerable judgment to apply factual background and fundamental principles in developing problem-solving approaches and techniques.** |
| | **The work requires analysis of broad problems, the planning of interrelated activities, and sometimes the coordination of efforts of more than one major department or division. The employee works out programs and approaches to major problems using recognized general principles.** |
| | **The work involves responsibility for consideration and analysis of major problems for the organization. It requires development of data and recommendations influencing decisions on long-term policies relating to major functions where no precedent has been established.** |
| **6.Class of your position** | Family Protection Specialist, Advanced |

**Certification of Immediate Supervisor: I certify that I have reviewed the entries made by the employee on this form and agree that they are accurate and complete; I also certify that the entries in this section are my own and**

**to the best of my knowledge are accurate and complete.**

| **Signature** | **Date** |
|---|---|
| | |

**The following area may be used by the agency as a place for documentation of the essential functions for this position. Factors to consider in determining if a function is essential include, but are not limited to: whether the position exists to perform that function; the number of employees available to perform that job function or among whom the performance of that function can be distributed; and the degree of expertise or skill required to perform the function. Marginal functions are considered to be those which are not essential.**

| **Duty Statements** | | **Essential** | | **Marginal** |
|---|---|---|---|---|
| **1** | Prepares and Assesses children for adoption by completing a Comprehensive Child Assessment (CCA) on each child. | X | 45 | |
| **2** | Foster permanent connections with the child's birth family and adoptive family. | X | 15 | |
| **3** | Recruit, prepare, and assess potential resource families to adopt foster children. | X | 20 | |
| **4** | Fully document all progress toward the finalization of adoptions. | X | 10 | |
| **5** | Provide retention services and post-adoptive services as needed. | X | 10 | |
| **6** | Total % of Time Devoted to Above Duties | | 100 | |

| **Signature** | **Date** |
|---|---|
| | |

# Ex. 45B

**SPB Form 800-3**
**Revised: April 2012**

**MS STATE PERSONNEL BOARD**
**PERFORMANCE APPRAISAL REVIEW REPORT**

**Name:____________________ Title: Adoption Specialist___ Agcy: 0662_ PIN:____________**
**Employee's Signature:______________________________________ Date:_____________________**

| **Section 2.** **Duties/Performance Standards** | **WT** | **Section 5. Accomplishments/Areas To Improve** | Weight X Rating = Points |
|---|---|---|---|
| **1. The Adoption Specialist will Prepare and Assess Children for Adoption as they complete a Comprehensive Child Assessment (CCA) of each child assigned to them as Adoption COS.**<br>o Within 30 days of assignment, the Adoption Specialist will have begun the CCA showing the information readily available and notating the gaps of any information that will be needed.<br>o The CCA will be updated monthly and presented at each ASM to show the additional information and child's response to the preparation work. | 2 | | 2 X __ = ___ |
| **2. The Adoption Specialist will foster permanent connections with the child's birth family and adoptive family.**<br>o Engage all family in the development of Life Book<br>o Facilitate ongoing relationships with birth family, siblings, and significant others. | 2 | | 2 X __ = ___ |

| | | | | |
|---|---|---|---|---|
| **3. The Adoption Specialist will assess the current placement resource as a potential adoptive family and recruit, prepare and assess potential adoptive families as needed.**<br>o Complete placement family's assessment, informing family of the child's potential eligibility for Adoption Assistance prior to TPR or within 10 days of TPR.<br>o Complete Adoption Assistance certification and contract within 60 days of TPR and submit family file to State Office for preparation for finalization.<br>o Participate in general, targeted, and child-specific recruitment activities on an ongoing basis, including community involvement and community presentations.<br>o Conduct pre-service trainings and home studies for potential adoptive families as assigned. | 2 | | | 2 X __ = ___ |
| **4. The Adoption Specialist will fully document all progress toward the finalization of the adoption.**<br>o Monthly Adoption Status Meetings will be documented within 5 days using standard format.<br>o The presentation of children at regional, multi-regional and statewide placement committee meetings will be documented.<br>o Narratives will be entered within 5 days of face-to-face contact with children and / or adoptive / birth family.<br>o Provide updates/participate in FTM's (as appropriate), FCR, Court Hearings, CQI Reviews, etc. for all assigned children. | **2** | | | 2 X __ = ___ |

| | | | |
|---|---|---|---|
| **5. The Adoption Specialist will provide retention services and post-adoptive services as needed.**<br>o Document monthly contacts, complete re-evaluations, license changes, etc. for all assigned licensed resource (Adoptive) homes.<br>o Keep families informed of support group meetings, in-service training, and facilitate adoptive placements with these licensed families.<br>o The Adoption Specialist will provide crisis intervention, information and referrals, mediation, search services, facilitate out-of- home placements, re-negotiation of subsidies, and re-adoption as needed. | 2 | | 2 X __ = ___ |
| **5. Complies with administrative directives.**<br>o Signs in and out with each arrival to and departure from the office.<br>o Responds to the need for after-hours or emergency work and performs accordingly.<br>o Assumes other duties as assigned.<br>o Completes monthly reports in accordance with established time.<br>o Completes and submits monthly work plan by the 5th of the month.<br>o Maintains Social Work License. | 2 | | 2 X __ = ___ |
| **7. Maintains a current Office Property & Equipment Log, Form MDHS-PROP-114E** visibly posted in office or work area, and ensures that all assigned property is accounted for. | 1 | | 1 X __ = ___ |

| | | | |
|---|---|---|---|
| **8. Works cooperatively with County Director and supervisors from all divisions before and after the opening and staffing of local shelters**.<br>o Assumes shelter duty and/or helps with regular MDHS duties in the emergency aftermath in affected or surrounding county.<br>o Is knowledgeable of DFCS's Disaster Plan and of implements the plan in the event of a disaster. | **1** | | 1 X __ = ___ |

**_______14_______TOTAL WEIGHT** **______________TOTAL POINTS**

**Total Points - Total Weight = SUMMARY RATING**

__________ ÷ **_____14_____ =** ____________________

# Ex. 45C

DFCS Form
7/10/12

*COR Worker to complete pages 1-2 of this form prior to Initial ASM*

## Initial Planning Meeting (Adoption Status Meeting)

Child's Name ______________________ Date of meeting ______________________
Child's DOB ______________________ County of ______________________

### Current Plan and Placement

Permanent Plan: ______________ Date Changed: __________ Court-Ordered: ☐ yes ☐ no
Concurrent Plan: ______________ Date Changed: __________
Current Placement/ Address:

If out-of-state, is placement licensed and ICPC Approved? ☐ yes ☐ no
If no, explain:

### Relative Placement Options

Have all known maternal relatives been contacted and evaluated as potential placement resources? ☐ yes ☐ no
Explain results of search:

Have all known paternal relatives been contacted and evaluated as potential placement resources? ☐ yes ☐ no
Explain results of search:

Is there a need to re-evaluate any possible relatives? ☐ yes ☐ no
Explain:

### Termination of Parental Rights

Has the TPR packet been submitted to State Office? ☐ yes ☐ no
If no, what are the barriers?

Has a TPR Hearing date been set? ☐ yes ☐ no Date

Has the mother signed the voluntary surrender of parental rights? ☐ yes ☐ no Date

Has the father signed the voluntary surrender of parental rights? ☐ yes ☐ no Date

### Siblings Discussion

Does the child have siblings? ☐ yes ☐ no
If yes, please list name and ages of siblings:

Are siblings currently placed together? ☐ yes ☐no

Will all siblings be adopted together? ☐ yes ☐ no
If no, explain including current and post-adoptive visitation plans:

DFCS Form
7/10/12

## Child's Adoption Discussion

Is the child free for adoption? ☐ yes ☐ no Date

Has the plan of adoption been discussed with the child? ☐ yes ☐ no
If no, explain:

How does the child feel about the plan of adoption?

## Resource Family's Adoption Discussion

Has the plan of adoption been discussed with the current resource parents? ☐ yes ☐ no
If no, explain:

Are the resource parents committed to adopting the child? ☐ yes ☐ no
If yes, is this plan agreed on by the COR Worker and Adoption Specialist? ☐ yes ☐ no
If no, explain:

Has a potential adoptive family been identified? ☐ yes ☐ no
If yes, name of family:
If no, discuss the child preparation and recruitment plan:

## Birth Family's Adoption Discussion

Has the plan of adoption and termination of parental rights been discussed with the biological mother? ☐ yes ☐ no
If no, explain:

Has the plan of adoption and termination of parental rights been discussed with the biological father? ☐ yes ☐ no
If no, explain:

Is it in the best interest of the child to continue contact with the birth family? ☐ yes ☐ no
Explain how this will be addressed:

How will permanent connections with the birth family be maintained?

Have the resource parents and birth family met? ☐ yes ☐ no
Describe the relationship:

*Page 3 of this form shall be updated monthly at each ASM.*

DFCS Form
7/10/12

# Monthly Strategies to Achieve Permanency

(copy and paste into child's case narrative)

NARRATIVE: (Complete the narrative by typing into the format below. Add additional goals (or omit) as needed. Copy and paste all information below into the MACWIS Adoption Status Meeting narrative for the date the meeting is held)

The Initial Plan to Achieve Permanency has been reviewed for progress, to identify barriers and to develop strategies that overcome these barriers in order to achieve permanency.

CHILD'S NAME:

PERSONS ATTENDING:

GOAL # 1:
ACTION STEPS:
BARRIERS:
STRATEGIES FOR OVERCOMING BARRIERS:
TIME FRAME
PERSON(S) ASSIGNED:

GOAL # 2:
ACTION STEPS:
BARRIERS:
STRATEGIES FOR OVERCOMING BARRIERS:
TIME FRAME:
PERSON(S) ASSIGNED:

GOAL # 3:
ACTION STEPS:
BARRIERS:
STRATEGIES FOR OVERCOMING BARRIERS:
TIME FRAME:
PERSON(S) ASSIGNED:

Suggested Goals: Complete Comprehensive Child Assessment, Complete Child's File for Adoption Assistance Certification, Complete Adoption Addendum, Locate, engage, and assess family members who are potential permanency resources; Locate, engage, and assess non-family members who are potential permanency resources; Engage youth in permanency planning; Engage family members and critical supportive adults in permanency planning; Free Child for adoption, Advocate for legal actions that will expedite permanency; Improve child well-being to increase probability of permanency; Strengthen child's connections to his/her siblings and other family members; Present child at placement committee in region, multi-regional, statewide, Engage child in recruitment efforts of Wednesday's Child, AdoptUSKids website, newspaper, etc.

Action Steps may include: Do a diligent search; FTM to solicit names and contact information of other family members; Talk to youth regarding people he/she is close to (or have been close to in the past); Mine case file; FTM to discuss permanency planning; Request change of youth's permanency plan in court; Submit TPR packet; FTM to discuss parents signing surrenders; Meet with GAL to discuss permanency for child/youth; Obtain psych and medical evaluations to clarify needs and document underlying conditions; Advocate for child's/youth's educational needs; Set up ongoing visits with siblings and/or other birth family; Invite family members to ballgames, school functions, Discuss recruitment efforts with youth, etc.

DFCS Form
7/10/12

# Instructions for Adoption Status Meeting Form

**PURPOSE**:

The purpose of the Adoption Status Meeting (ASM) Form is to capture and facilitate the progress being made toward the permanent goal of adoption each month (or week for children 12 months of age and younger.)

**TIMEFRAMES:**

At the time an ISP is updated to include Adoption as part of any child's permanent plan (either primary or concurrent), a COS Adoption line of direct service should be added. An Adoption Specialist should immediately be assigned to work with the COR Worker, Child, and Family.

The COR Worker needs to complete the ASM Form Pages 1 and 2 within 10 working days of adding Adoption to the child's permanent plan. The initial ASM shall be convened within 15 calendar days of the permanency goal being updated to include adoption.

At the initial ASM, the first 2 pages of the ASM Form will give a clear picture of the status of the case. It may be helpful for all ASM participants to get a copy of these two pages at the beginning of the meeting.

**DOCUMENTATION**:

Each ASM will need a scribe who will type onto page 3 during the meeting. Goals that need to be met in order to move the child toward adoption will be set each month. (Suggested goals are listed at the bottom of page 3.) Action steps needed in order to reach the goal will be documented along with barriers to completion, strategies for overcoming barriers, time frames, and person(s) assigned specific tasks.

Within 5 working days following each ASM, the page 3 ASM Narrative should be copied and pasted as an Adoption Status Meeting narrative in the child's case. Contact method should reflect if the meeting was held face-to-face or by phone (conference call).

**EXAMPLE:**

GOAL: # 1: Free child for adoption
ACTION STEPS: Submit TPR Packet
BARRIERS: Child's name on birth certificate does not match name on court orders.
STRATEGIES FOR OVERCOMING BARRIERS: Written request to judge to amend court order with correct names.
TIME FRAME: Letter to be submitted to court within 5 days of meeting.
PERSON(S) ASSIGNED: COR ASWS (name)

# Ex. 45D

- If the child is not matched at Multi-regional Placement Committee Meeting, the child will be presented at Statewide Placement Committee Meeting.

## b) Selection of Homes for Children through the Placement Committee

Multi-Ethnic Placement Act (MEPA) of 1994 (P.L. 103-382) and amended in 1996 (P.L. 104-188), prohibits those agencies receiving Title IV-E foster care funds from denying or delaying an individual or couple the opportunity to be an adoptive or Resource Parent or delaying or denying placement of a child on the basis of race, color or national origin of the prospective Resource Parent or child. These factors must be applied on an individualized basis, not by general rule "in the best interest of the child.

## c) The Placement Process

Placement of a child for adoption is a legal and social process. The child must be legally free for adoption as certified by the AG's Office prior to DFCS entering into an adoptive placement agreement with the new adoptive family. Legal risk adoptive placements may be made prior to the child being legally freed for adoption with **legal risk adoptive placement agreements** in place.

Many factors must be considered in the selection of the prospective home for a child. The Placement Committee uses its professional judgment in matching families to our awaiting children that best meet the needs of the children.

Among the child-related factors often considered are the child's:

- current functioning and behaviors
- medical, educational and developmental needs of the child
- history and past experience
- cultural and racial identity needs
- interest and talents
- attachment to current caretakers

Among the factors that agencies consider in assessing a prospective family's suitability to care for a particular child is the ability to:

## ADOPTION SERVICES

- form relationships and to bond with the specific child
- help the child integrate into the family
- accept the child's background and help the child cope with his/her past
- accept the behavior and personality of the specific child
- validate the child's cultural, racial and ethnic background
- meet the child's particular educational, developmental or psychological needs

Once a family has been selected for a particular child, the Adoption Specialist for the child, along with the Adoption Specialist for the family, will make a presentation of the child to the potential adoptive family. The presentation should be done in a face-to-face interview with the adoptive parents. The presentation will include all the information available on the child, particularly information on any special needs, as well as photographs, and video if available. Full disclosure of the child's problems and background, as well as the financial aspects of adoption, must be discussed with all adoptive parents.

The prospective adoptive parent(s) shall have the opportunity to decide whether they consider the child appropriate for them. After being presented all known information about the child, the family should be clearly informed that they are not obligated to accept placement of the particular child and refusal to accept a particular child does not prohibit their being considered for another child at a later time. Regardless of the family's decision, the Adoption ASWS and State Office Adoption Unit should be notified immediately in order that planning may proceed or be changed.

If the placement of the particular child is declined, it is important that the Adoption Specialist evaluate whether the family is refusing placement of the particular child, or manifesting their conflicts about parenthood or adoption. If the family decides to proceed with the placement, the Adoption Specialist will present the family to the child (if age appropriate) using a picture book prepared by the family.

The Adoption Specialist and county staff will formulate a specific placement plan at an adoption status meeting. This plan will outline dates, times, and locations of pre-placement visits and placement along with who will be responsible for transporting the child for each visit. This plan will be confirmed in writing to the child's COR Worker and the Adoption ASWS and the family's Adoption Specialist with copies to the appropriate COR ASWS and RD(s). The Adoption Specialist will share the information with the potential adoptive family and the child's current placement family or staff at placement facility.

## ADOPTION SERVICES

The removal of the child from the current Resource Home or placement facility should be planned very carefully. The primary concern should be to prepare the child for separation from his/her Resource Family or staff so that his/her adjustment in the new living situation will be no more difficult than it has to be. To do so, it is important to be supportive of the Resource Family and considerate of their feelings so they will be able to help the child separate from them.

Resource Parents or staff at a placement facility will be encouraged to prepare information for the adoptive parents regarding the child's schedule, habits, likes, and dislikes and other information which will help the child separate from them and transition into a new home.

On the day of placement, the COR/COS Worker is responsible for making sure that all of the child's belongings go with the child. The Adoption Specialist will be responsible for obtaining all necessary documents to give to the new adoptive parents in order to enroll the child in school or day care. These documents will include the school withdrawal forms, immunization records, copy of birth certificate and social security card, and a copy of Medicaid card.

The adoptive parents will be instructed by the Adoption Specialist to write at least one letter or email to the Resource Parents about the adjustment of the child in the new home. Continuing contacts between Resource Parents and the adoptive parents are encouraged.

At the time of placement, the adoptive family will be given the following information on the child.

- written background information and a Comprehensive Child Assessment,
- names and addresses of physicians,
- non-identifying information on the birth parents,
- names, date of birth and address of all siblings,
- placement and case history of the child, and
- current functioning of the child with emphasis on medical, psychological and emotional issues.

On the date of the placement the Adoption Placement Agreement shall be completed. The child will be removed from the foster home status and placed in an adoptive home status. The COR will be notified to enter a placement change and show the child in the new home as an adoptive placement which will end the foster board payment, keep the child/children's Medicaid open. The case on the child remains open in the COR until the finalization of the adoption.

# Ex. 45E

# RESOURCE FAMILY PROCEDURES MANUAL

# ADOPTIVE PLACEMENTS AND LEGAL RISK ADOPTIVE PLACEMENTS

**What makes it an adoptive placement?**

1. **The child must be free for adoption and a legal clearance completed** (Legal clearance is done by the State Office following the 30 day waiting period after a TPR Decree or after a complete (shorter version) TPR packet is submitted with all Form 459's necessary to free the child for adoption.)

2. **The child's Adoption Assistance certification must be completed.** (Within 30 days of receiving TPR, the child's file should be submitted to state office and the certification must have administrative approval through the State Office Adoption Unit.)

3. **A Comprehensive Child Assessment** (formerly called child evaluation) **must be completed prior to placement and signed by the adoptive parent(s) on or before the date of placement.** (This is much more than just the written background summary and should include information regarding the child's medical, developmental, sexual, academic, and emotional functioning as well as a description of birth family involvement and child's readiness for adoption)

4. **The child was matched with the family through an Adoption Status Meeting or Placement Committee Meeting and then fully presented to the family for the purpose of adoption (with the assessment mentioned above).** (Preferably, the child has visited in the adoptive home and there is a written pre-placement visitation plan.)

5. **The Resource Home Study has been loaded into the Resource Directory by the Resource Worker.** (If the family is licensed through a private agency, the child's Adoption Specialist should enter basic information for the agency's home study into MACWIS and show the home approved with adoption services [domestic]. All adoptive placements must have a resource home study in MACWIS with the type of service - Adoptive Home [Domestic] in order to attach the Adoption Assistance Contract for the child to the adoptive family.)

6. **The Adoptive Parent(s) must sign an Adoptive Placement Agreement (3 originals - 1 for the family, 1 for local file, 1 for the State Office) for each child as well as Adoption Assistance Agreements (2 originals) ON THE DAY OF PLACEMENT.**

**The following documents should be submitted to the State Office Adoption Unit within 3 days of placement:**

1. **Adoptive Placement Agreements**
2. **Adoption Assistance Agreements (2 originals for each child)**
3. **Written pre-placement visitation plan (if available)**
4. **Signed copy of Comprehensive Child Assessment**
5. **Signed copy of background narrative (can be combined into Assessment)**
6. **Printed copy of approved home study from MACWIS**

**Adoptive placements should be well-planned placements coordinated between the child's Adoption Specialist, COR Worker, and the family's Social Worker, whether they are licensed by MDHS or by a private agency. Emergency moves of children from one placement to another should not be considered Adoptive Placements unless all of the above steps have been completed.**

****Please note:** Some agencies that are represented at Placement Committees will **only** accept placement of children who qualify for Therapeutic Foster Care. Adoptive Placements (NOR Legal Risk Adoptive Placements) can be made with families licensed by those agencies unless the child qualifies for Therapeutic Foster Care. Make sure the agency is fully aware of whether or not a child qualifies for TFC. When a child qualifies for therapeutic foster care and is being placed by a TFC agency, the placement is shown as a therapeutic foster care placement with the therapeutic foster board rate of $72 per day ($45 per day for siblings) even though the child was matched with the family at Placement Committee. Adoption Assistance will not be set up until the child's adoption specialist completes an Adoption Addendum, enters the TFC family home study in MACWIS, and the family finalizes the adoption.

**When all of these steps have been completed and the above documentation submitted to the State Office Adoption Unit, the placement should be shown as follows:**

# LEGAL RISK ADOPTIVE PLACEMENTS

## What's a legal risk adoptive placement?

Legal risk adoptive placements are placements of children whose permanent plan is adoption into a resource home who plans to adopt that child when the child is legally freed for adoption. Even if the child is freed for adoption, it is a LEGAL RISK ADOPTIVE PLACEMENT if steps 1-6 of the ADOPTIVE PLACEMENTS have not been completed PRIOR to the placement of the child into the resource home.

**When do we make legal risk adoptive placements?**

Legal risk adoptive placements are made when TPR is eminent – a court date is set and reunification services have been terminated (parents are no longer visiting, incarcerated for an extended period of time, deceased, etc. )

**AND**

The child is not in a permanent placement with his/her siblings.

**AND**

The child(ren) are matched with a potential adoptive family at an Adoption Status Meeting or Placement Committee Meeting.

**How do we distinguish the placement as a legal risk adoptive placement?**

The family should sign with notarization 3 originals of a "Legal Risk Adoptive Placement Agreement" (see attachment) to show that this placement is intended to be the child's permanent home.

When placing a child into a legal risk adoptive placement **with an MDHS licensed resource home**, make sure the home is licensed for both foster and adoptive home [domestic] services. Show the child placed into the home as a foster home placement. Enter a narrative on the date of placement that states the child is placed here as a legal risk adoptive placement and also on the **placement screen** under Social Worker Comments. **The family will receive a regular board payment until the adoption finalizes.**

**What if the child qualifies for therapeutic foster care and is placed into a TFC Family?**

If the child being placed qualifies for therapeutic services and is being **placed in a therapeutic foster home through one of the private agency** providers, the family will sign with notarization 3 originals of the "Legal Risk Adoptive Placement Agreement." The placement should be shown as any other placement into TFC and

the placing agency will receive the therapeutic rate of $72 per day ($45 per day for siblings). A narrative should be entered as noted above in the child's case and on the placement screen under Social Worker Comments. Prior to the finalization of adoption, the TFC home must be entered into MACWIS by the Adoption Specialist who completes the Adoption Addendum. Adoption Assistance certification must be completed and adoption assistance will begin after finalization.

****Please note: Some agencies that are represented at Placement Committees will ONLY accept placement of children who are qualified for Therapeutic Foster Care. Legal risk adoptive placements NOR Adoptive Placements can be made into those agency's homes unless the child qualifies for Therapeutic Foster Care.**

If the child is being placed into a **resource home licensed by a private agency** as a legal risk adoptive placement (Steps 1-6 of ADOPTIVE PLACEMENTS have NOT been completed) and **the child is not qualified for therapeutic foster care services,** the placement shall be shown in MACWIS as depicted on screen-shot 2:

Note: You may need to contact [redacted] in the State Office Placement Unit to make sure the private agency subordinate resource has been entered and can be selected for placement. Check the Resource Directory and see if the home is entered as a subordinate resource as shown below:

MISSISSIPPI
Form DHS-SS-4406 A
05-01-12

**STATE OF MISSISSIPPI**
**Phil Bryant, Governor**
**DEPARTMENT OF HUMAN SERVICES**
**Richard A. Berry**
**Executive Director**

MISSISSIPPI DEPARTMENT OF HUMAN SERVICES

# LEGAL RISK ADOPTIVE PLACEMENT AGREEMENT

I/We, the undersigned accept ______________________________, born ______________ for the purpose of adoption. I/We understand that this is a placement with a legal risk. It is my/our understanding that the permanent plan for the above named child is adoption; however, he/she is not yet legally free for adoption. I/We understand that parental rights have not yet been terminated through the court. I/We further understand that verbal permission must be obtained through MDHS/DFCS and the court of jurisdiction in order for the above named child to leave the State of Mississippi overnight. I/We are aware of the legal risk in this placement and are willing to accept this placement.

________________________________ ______________
Adoptive Mother Date

________________________________ ______________
Adoptive Father Date

________________________________ ______________
Witnessed By Date

*(Seal)*

Subscribed and sworn to before me this ___ day of ________, 20___.
My commission expires on _________________.

________________________________

# Ex. 46

STATE OF MISSISSIPPI
DEPARTMENT OF HUMAN SERVICES
DIVISION OF FAMILY AND CHILDREN'S SERVICES

# Section B: Intake/Assessment Policy

# INTAKE & ASSESSMENT

I. DFCS OVERVIEW ..... 5
A. Introduction and Scope of Services ..... 5
B. Goals ..... 5
C. Legal Basis for Authority ..... 6
1. State Laws ..... 6
2. Federal Laws ..... 7
a) Child Abuse Prevention and Treatment Act (CAPTA) ..... 7
b) The Adoption and Safe Families Act of 1997 (ASFA) ..... 8
c) Indian Child Welfare Act of 1978 (ICWA) ..... 9
3. Exceptions & Limitations ..... 9
II. DFCS PROCEDURES FOR SERVICE ACTIVITY ..... 9
A. Family Centered Practice Principles ..... 9
B. Definitions ..... 10
C. Intake ..... 12
1. Who May Make a Report ..... 12
a) Mandated Reporters ..... 12
b) Immunity from Liability ..... 13
c) Anonymous Reporters ..... 13
2. Types of Reports ..... 14
a) Abuse, Neglect and Exploitation or ANE ..... 14
b) Information and Referrals ..... 14
c) Case Management ..... 14
d) CHINS/Voluntary Placement/ Safe Baby/Unaccompanied Refugee Minors ..... 14
e) Resource Inquiries ..... 15
3. Maltreatment Definitions ..... 16
4. Intake Procedures ..... 17
a) Centralized Intake Procedures ..... 17
b) ANE Intakes That Require Special Handling ..... 19
*1. Reports of Maltreatment in Foster Care* ..... 19
*2. Resource Reports* ..... 20
*3. Special Investigations* ..... 20
c) Additional Reports Entered As ANE ..... 20
*1. Reports on Native American Children* ..... 20
*2. Unaccompanied Refugee Minor* ..... 21
*3. Reports of Safe Babies* ..... 21
*4. Child Death* ..... 21
*5. County Intake Procedures* ..... 21
D. Screening ..... 22
1. Screening Process ..... 22
2. Screening Reports and Assigning Response ..... 23

## INTAKE & ASSESSMENT

a) Screening Out of Home Reports ........ 24
b) Duplicate Reports........ 25
c) Child on Child Reports ........ 25
d) Additional Reports on An Open Investigation ........ 25
e) Reports Involving More Than One County ........ 26
f) Reports Involving Foster Children........ 26
g) Screening Special Investigations ........ 26
E. Investigations and Assessments........ 26
1. Investigation Reports ........ 26
2. MDHS Request for Law Enforcement to Accompany ........ 27
3. Initiation of Investigation/Assessment........ 27
a) Interview with Reporter ........ 29
b) Interview with Child Victim ........ 30
c) Interviewing in the School Setting:........ 30
d) Interview with Parent/Guardian/Custodian/Caretaker/AllegedPerpetrator ........ 30
e) Examination and Photographs of the Victim ........ 31
f) Drug Screenings........32
g) Medical/Mental Health Examination........ 33
4. Safety and Risk Assessment ........ 33
a) Safety Assessment ........ 33
b) Safety Plan ........ 34
c) Removals........ 36
d) Risk Assessment ........ 38
5. Decision Making and Evidence ........ 38
a) Substantiation Criteria ........ 40
b) Supervisory Responsibilities in the Investigations, Reviews, etc......... 44
c) Investigation Staffing with ASWS........44
1. Initial Staffing ........44
2. On-going Staffing ........44
d) Investigation Reports & Notifications to Youth Court, District Attorney and law Enforcement when applicable. ........ 45
e) Appeals Procedure ........ 46
f) False Reports........ 47
F. DFCS Investigations/Assessments Requiring Special Handling........ 47
1. Introduction........ 47
a) Legal Base........ 47
b) Policy ........ 48
c) Purpose........ 48
d) Procedures........ 49
2. Resource Reports ........ 49
a) Resource Homes ........ 49

b) Licensed facilities ... 52
c) Special Investigations ... 54
3. Expanded Investigations in Extraordinary Circumstances ... 55
a) Investigations/Assessments Involving Native American Children ... 55
b) Medical Neglect of Handicapped Infants ... 56
c) Death of a Child ... 57
d) Out of Home ... 60
e) Investigations of Meth Labs ... 60
f) Reports Involving More Than One County ... 61
g) Abused Child from Another State ... 62
h) Mississippi Child Abused in Another State ... 63
i) Family Moves Out of State ... 63
j) Protective Services Alert ... 63
k) Requests from Another State ... 64
III. FAMILY CENTERED PRACTICE ... 64
A. Family Team Meeting ... 64
1. FTM Philosophy and Practice ... 64
2. FTM Requirements ... 65
B. Mobilizing Services ... 65
C. Disposition of Cases ... 66
1. Cases in which the Family's Whereabouts Become Unknown before Completion of an Investigation ... 66
IV. APPENDICES ... 67
Appendix A: Procedure for Service Activity ... 68
Appendix B: Behavioral Indicators of Abuse ... 71

# INTAKE & ASSESSMENT

## I. DFCS Overview

*The Mississippi Department of Human Services will hereinafter be known as "MDHS" and its Division of Family and Children's Services hereinafter will be known as "DFCS".*

### A. Introduction and Scope of Services

The basic task of child welfare practice is the protection of children from harm. This task includes protection of children not only from harm occurring to a child as a result of abuse or neglect by the child's caretaker but also protection from harm caused by the separation of a child from their family. This approach requires that the family be considered as the client, and that the Worker's goal is to help the family solve problems so children can safely remain in their homes.

DFCS is responsible for evaluating the allegations of abuse or neglect in which the alleged perpetrator is identified as:

- a parent;
- a relative;
- a guardian or custodian; or
- any person responsible for the child's care or support. This shall include, but is not limited to step parents, foster parents, non-licensed baby sitters, and staff of residential care facilities and group homes that are licensed by MDHS.

(MISS. CODE ANN. § 43-21-353). (*See* also MISS. CODE ANN. § 43-21-105)

### B. Goals

The primary goals of DFCS are to:

- Ensure the safety, permanency and well-being of children who have been abused, neglected, and/or exploited.
- Enable families to recognize behaviors that harm or threaten the well-being of their children.
- Offer services to parents/persons responsible for the care and support of children to promote change in their parenting behaviors to permit independent care of children.
- Enable children to remain in their own homes; and if they are unable to remain in their home, make reasonable efforts to place them in the least restrictive setting which meets their needs such as with relatives or in other settings to meet their emotional and physical needs.

## C. Legal Basis for Authority

### 1. State Laws

MISS. CODE ANN. § 43-15-3, entitled the "Powers and Duties of Department of Human Services…," authorizes, empowers, and directs DFCS to

> …fully cooperate with the United States Children's Bureau and Secretary of Labor in establishing and strengthening child welfare services for the protection and care of the homeless, dependent and neglected child and children in danger of becoming delinquent. [MDHS/DFCS] is further authorized, empowered and directed to cooperate with the United States Children's Bureau and Secretary of Labor in developing plans for said child welfare services and extending any other cooperation necessary under Section 521 of Public Law No. 271-74th Congress of the United States.

MISS. CODE ANN. § 43-21-353 outlines the duty of individuals having reasonable cause to suspect that a child is a neglected or abused child to notify MDHS immediately and MDHS will notify the Youth Court Intake Unit. (*See Investigation Reports & Notifications to Youth Court, District Attorney and law Enforcement when applicable* for more detail on § 43-21-353)

The Mississippi Youth Court Law, MISS. CODE ANN. § 43-21-101 et seq. outlines the definitions for abuse and neglect; child abuse and neglect intake procedure; reporting requirements for child abuse and neglect; immunity for reporting; confidentiality provisions for children's case records; the jurisdiction of the Youth Court; the conditions under which a child may be taken into protective custody; and the authority and responsibilities of the court, DFCS, and law enforcement officials in protecting children.

The Youth Court Law mandates DFCS to conduct investigations and provide services when reports of suspected abuse and/or neglect are made. (MISS. CODE ANN. § 43-21-353)

The Youth Court Law also permits DFCS to take a child into custody without a court order for no longer than 24 hours when there is probable cause to believe:

- the child is in immediate danger of personal harm, or
- the parent, guardian, or custodian is not available to provide care and supervision to the child, or
- no reasonable alternative to custody can be found.

(MISS. CODE ANN. § 43-21-303(1)(b) and (4))

MISS. CODE ANN. § 97-5-1 et seq. outlines the offenses affecting children and further identifies which offenses constitute misdemeanors or felonies and the penalties for the commission of crimes against children.

MISS. CODE ANN. § 43-21-259 requires all records involving children and the contents thereof, including the identity of the reporter, to be kept confidential except as provided in § 43-21-261.

MISS. CODE ANN. § 43-21-354 requires a statewide incoming telephone service to be maintained by DFCS on a twenty-four-hour, seven-days-a-week basis for the purpose of reporting abuse or neglect of a child pursuant to § 43-21-353.

## 2. Federal Laws

### a) Child Abuse Prevention and Treatment Act (CAPTA)

CAPTA originally enacted in 1974 as P.L. 93-247 has been amended several times, most recently amended and reauthorized on December 20, 2010, as Child Abuse Prevention and Treatment Act, as amended by Public Law 111-320. Key components of P.L. 111-320 are as follows:

- An assurance in the form of a certification by the Governor that the State has in effect and is enforcing a State law, or has in effect and is operating a Statewide program that includes provisions and procedures for:
    - reporting of child abuse and neglect, including a State law for mandatory reporting on child abuse and neglect by certain individuals required to report such instances (section 106(b)(2)(B)(i));
    - addressing the needs of infants born with and identified as being affected by a Fetal Alcohol Spectrum Disorder (including appropriate referrals to child protection service systems and for other appropriate services) (section 106(b)(2)(B)(ii));
    - including differential response in triage procedures for the appropriate referral of a child not at risk of imminent harm to a community organization or voluntary preventive service (section 106(b)(2)(B)(v));
    - training in early childhood, child, and adolescent development for guardians ad litem appointed to victims of child abuse or neglect in cases which result in a judicial proceeding (section 106(b)(2)(B)(xiii));
    - assuring that the State does not require reunification of a child with a parent who has been found by a court to have committed sexual abuse against a child of the parent or who the court has required to be registered in a sex offender registry under the Adam

Walsh Child Protection and Safety Act of 2006 (42 U.S.C. 16913(a)) (section 106(b)(2)(B)(xvi)(V) and (VI));

- requiring criminal background checks that meet the requirements of section 471(a)(20) of the Social Security Act (42 U.S.C. 671(a)(20)) for prospective foster and adoptive parents and other adult relatives and non-relatives residing in the household (section 106(b)(2)(B)(xxii)); and
- technology systems that support the child protective service system and track reports of child abuse and neglect from intake through final disposition (section 106(b)(2)(B)(xxiii)).

- A description of policies and procedures:
  - encouraging the appropriate involvement of families in decision-making pertaining to children who experienced child abuse or neglect (section 106(b)(2)(D)(iv));
  - promoting and enhancing collaboration among child protective services, domestic violence, substance abuse, and other agencies in investigations, interventions and service delivery to children and families affected by child abuse or neglect (including children exposed to domestic violence) (section 106(b)(2)(D)(v)); and
  - regarding the use of differential response, as applicable (section 106(b)(2)(D)(vi)).

- An assurance that the State, to the maximum extent practicable, has coordinated its CAPTA State plan with its title IV-B State plan (section 106(b)(2)(A)).

- An assurance that programs and training funded under title I of CAPTA address the needs of unaccompanied homeless youth as defined in the McKinney-Vento Homeless Assistance Act (i.e., a youth not living in the physical custody of his/her parent or guardian who lacks a fixed, regular, and adequate nighttime residence, including youth awaiting foster care placement) and meet the requirements of McKinney-Vento Homeless Assistance Act (section 106(b)(2)(F)).

## b) The Adoption and Safe Families Act of 1997 (ASFA)

ASFA of 1997 (P.L. 105-89) focuses on the safety, permanency and well-being of children in foster care and establishes the framework for the current child welfare system. Significant parts of this law relating to safety establish that:

- Child health and child safety are identified as the paramount concerns for DFCS decision-making, including making reasonable efforts to prevent placement.
- Safety must be addressed in safety plans or integrated into case plans and services must address conditions related to safety.

- Case reviews must consider child safety in placement and potential dates upon which a child can return home safely.
- Responsible agencies must conduct concurrent planning that involves working toward reunification and simultaneously working on other permanency options based on permanency and safety considerations to accelerate the permanent placement of children in care.

### c) Indian Child Welfare Act of 1978 (ICWA)

ICWA (P.L. 95-608) establishes exclusive jurisdiction over Indian child custody proceedings.

An Indian tribe shall have jurisdiction **exclusive** as to any State over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation of such tribe, except where such jurisdiction is otherwise vested in the State by existing federal law. Where an Indian child is a ward of a tribal court, the Indian tribe shall retain exclusive jurisdiction, notwithstanding the residence or domicile of the child.

### 3. Exceptions & Limitations

A DFCS Worker may not enter a home without permission of the occupant, except by court order.

## II. DFCS Procedures for Service Activity

### A. Family Centered Practice Principles

The purpose of child welfare services and child protective services in a Family-Centered Practice culture or service environment is to enable children to safely grow up in their own families. The primary and essential component of a Family-Centered Practice approach is the engagement of and the development of a relationship with the family through an active and ongoing commitment to and execution of a practice approach which recognizes the value and dignity of the family, consistently and genuinely displaying respect and consideration for all family members, encouraging and allowing families to make their own decisions and solve their own problems. The major practice techniques causing effective engagement and resulting in meaningful relationships are family team meetings and individualized service planning through a family case planning process. The object is to solve family problems so children can grow up safe and sound at home.

The technology of the Mississippi Division of Family and Children's Services (DFCS) is Family-Centered Practice. The values, philosophy, and principles must drive actions and

decisions across the entire spectrum of practice from Intake to Permanency. Relationships must be built with families from initial engagement through case closure – relationships built on faith, honesty, justice, and trust. Each individual, each parent, each child, and every family is different and unique. Family differences must be recognized, acknowledged, appreciated, and respected. Judgment must be suspended. Relationships must be formed, built, nurtured, and maintained. Strengths must be identified and emphasized.

Family-Centered Practice identifies family strengths, support systems, and community services that will assist families in acquiring the resources, taking action, making decisions, and developing the skills they need to safely take care of their children and reduce the risk of future maltreatment. Strength-based assessment is an assessment protocol that looks at families' capabilities, strengths, and resources throughout the life of the case, supporting the development of strategies built on competencies, assets, and resources. Reports of child abuse or neglect or other intakes received by DFCS are subjected to a strength-based, structured intake process which allows for the concerns of the reporter to be heard, documented, and screened by intake workers. An effective intake process enhances both the quality and consistency of the information collected and emphasizes the strengths of the family about whom the report is being made. The initial relationship developed within a DFCS case is the relationship developed with the reporter. Reporters should feel valued, supported, and understood as the information provided by reporters regarding the circumstances being reported about the family significantly affects DFCS response.

## B. Definitions

**Safe**

*A child is safe when there are no immediate threats of serious harm due to the caregivers' actions or inactions, or the protective capacities of the family are able to mitigate these threats.*

**Unsafe**

*A child is unsafe when the caregivers' actions or inactions present immediate threats of serious harm to a vulnerable child and the family's protective capacities are diminished.*

**Risk**

*A child is at risk when there is a likelihood that maltreatment will occur in the future.*

## INTAKE & ASSESSMENT

**Safety vs. Risk**

*Risk and safety are not interchangeable terms. Safety applies to the need for action based on an immediate threat. Risk refers to the likelihood of future maltreatment even when the immediate safety threats are not present, and is seen on a continuum from low to high. Assuring child safety begins with the report of maltreatment and continues through the investigation, initial safety and risk assessment; ongoing safety and risk assessment; developing a case plan; assuring safety during placement; reunification and case closure. Safety and risk interventions are applicable for all children whether they are in out of home placements or in their own home.*

**Harm**

- *Harm is the effect of child abuse or neglect. DFCS must address children at all levels of harm resulting from identified or alleged maltreatment.*
- *Harm is the consequence of enacting the threat.*
- *When a child is physically abused, it is the abuse or injury that is the harm.*
- *Harm may be physical, psychological or mental, or emotional.*
- *The extent of damage to a child who has been harmed depends on the nature of the harm, the severity of the injury, the dynamics and characteristics of the family, and the vulnerability and sensitivity of the child.*
- *The harm to the child of abuse or neglect by parents or caretakers must be weighed against the harm to the child and family of DFCS' intervention strategy, particularly removal of the child from the home.*

**Threat**

*The threat is the caregiver's underlying condition or contributing factor and insufficient protective capacities that led to serious harm or threatened serious harm. To assess the safety threat, the seriousness of the harm must be assessed.*

**Protective Capacities**

*Individual or family strengths, or resources that reduce, control and/or prevent threats of serious harm from arising or having an unsafe impact on a child are strengths that are specifically relevant to child safety. Protective capacities must be accessible and actionable and fall under the following categories:*

- *Personal*
- *Behavioral*

- *Cognitive*
- *Emotional characteristics and/or Resources*

*Protective capacities must be accessible and actionable.*

**Maltreatment**

*An act, or failure to act or pattern of behavior that results in death, physical, medical, sexual, emotional harm or mental injury or presents imminent threat of harm to a child.*

**Imminent Danger**

*Clearly observable behavior or a situation that is actively occurring, is about to occur, or is likely to occur in the present time and cause serious harm.*

**Emerging Danger**

*A safety consideration that arises when the underlying conditions and contributing factors associated with a danger-related risk element in the family are escalating and/or protective capacities are diminishing.*

## C. Intake

### 1. Who May Make a Report

Per MISS. CODE ANN. § 43-21-353, any person who has reason to suspect the abuse and/or neglect of a child must make a report by telephone to Mississippi Centralized Intake ("MCI"), DFCS' 24 hour statewide Child Abuse Hotline for the reporting of abuse and/or neglect at 1-800-222-8000, or electronically at www.msabusehotline.mdhs.ms.gov.

When a reporter comes to the county office to make a report, he/she shall be educated on the report process and allowed to use a DFCS phone to call MCI. If the reporter does not choose to make a report from the office phone, the county staff shall make the report to MCI immediately.

### a) Mandated Reporters

**Professional Mandated Reporters** are those required by law to report suspicion of abuse or neglect. Professional Mandated Reporters include, but are not limited to, any attorney, physician, dentist, intern, resident, nurse, psychologist, social Worker, family protection Worker, family protection specialist, child caregiver, minister, law enforcement officer, public or private

school employee or any other professional, who becomes aware of information leading them to believe abuse or neglect to a child has occurred.

Professional Mandated Reporters are required to provide written reports of suspected child abuse and neglect. These written reports should be forwarded to DFCS as soon as possible after the oral report is made. Professional Mandated Reporters are encouraged to report suspected abuse and neglect electronically because it will eliminate the need to send a separate, written report. Refer to MISS. CODE ANN. § 43-21-257 which requires that any records involving children, including valid and invalid complaints, be kept confidential and not be disclosed except as provided by MISS. CODE ANN. § 43-21-261.

**As child welfare professionals, all DFCS employees are mandated to report any suspicion of child abuse or neglect.** Maltreatment, including the use of corporal punishment by a Resource Parent (relative or not) on foster children, is strictly forbidden by the MDHS, DFCS' policy. (*See* Section F, DFCS Resource Policy).

If any DFCS staff has suspicion that a child in DFCS custody is being maltreated in any way, or that corporal punishment is being used within any placement type, the DFCS staff member, as a mandated reporter, will formally report to MCI any suspicions of maltreatment, including corporal punishment.

### b) Immunity from Liability

Any attorney, physician, dentist, intern, resident, nurse, psychologist, social Worker, family protection Worker, family protection specialist, child caregiver, minister, law enforcement officer, school attendance officer, public school district employee, nonpublic school employee, licensed professional counselor or any other person participating in the making of a required report pursuant to MISS. CODE ANN. § 43-21-355, participating in the judicial proceeding resulting there from, shall be presumed to be acting in good faith. Any person or institution reporting in good faith shall be immune from any liability, civil or criminal, that might otherwise be incurred or imposed.

### c) Anonymous Reporters

DFCS does not require a reporter to identify him/herself as a condition for reporting suspected child abuse, neglect or exploitation. The MCI intake Worker should encourage anonymous reporters to leave contact information. This will allow the Worker responsible for responding to the report to contact the reporter for any information which would be helpful in assessing the report and working with the family.

Reporters may be reluctant to share their identities due to fear of personal repercussions or other factors. Anonymous reporting does not permit an opportunity for future contact by DFCS; therefore, it is crucial that the intake Worker gather as much information as possible before the intake call is terminated.

## 2. Types of Reports

### a) Abuse, Neglect and Exploitation or ANE

The ANE intake type is used to report suspicion of child maltreatment through MCI. Reports are subject to DFCS screening procedure and, if statutory criteria are met, require official DFCS response.

### b) Information and Referrals

The Information and Referral intake type (I&R) is used for assisting the public by sharing information or referring them to any needed services not provided by DFCS. These referrals are entered into MACWIS by county staff and MCI.

### c) Case Management

The Case Management intake type is used to provide concrete services when a need is identified or a request is received. Concrete services are provided when possible and appropriate.

### d) CHINS/Voluntary Placement/ Safe Baby/Unaccompanied Refugee Minors/Prevention Services

This intake type is used in the following circumstances:

**(1) CHINS:** A "Child in Need of Supervision" (CHINS) is a child who has reached his/her seventh birthday and is in need of treatment or rehabilitation because the child:

- Is habitually disobedient of reasonable and lawful commands of his/her parents, guardian or custodian and is ungovernable; or
- While being required to attend school, willfully and habitually violates the rules thereof or willfully and habitually fails to attend school;
- Runs away from home without good cause; or
- Has committed a delinquent act or acts;

- Is placed in DFCS custody by a Youth Court judge and there are no allegations of abuse or neglect.

(MISS. CODE ANN. § 43-21-105 (k))

**(2) Voluntary Placement:** An agreement between parents and custodians and DFCS where children are placed in DFCS custody for up to 180 days by signing the Voluntary Placement Agreement.

**(3) Safe Baby:** A child who is younger than 72 hours old and is surrendered by a parent to a licensed hospital which operates as an emergency department or an adoption agency duly licensed by DFCS (MISS. CODE ANN. §§ 43-15-201 thru 209).

**(4) Unaccompanied Refugee Minors (URM):** URMs are minors brought to the United States without their parents or who come as a result of human trafficking or exploitation. This intake type should be used only by staff in Hinds County designated to handle URM intakes.

**(5) Prevention Services:** Services provided to families when issues of safety and risk exist though there is no report of abuse or neglect being made which meets the criteria for screening in for investigation.

## e) Resource Inquiries

This intake type is used when individuals request information regarding licensure as Resource Parents. For cases involving Resource Inquiries the following information should be obtained:

**(1) For Foster/Adopt Resource Inquiries:**

- Age, gender, and race of child the applicant resource family is interested in fostering or adopting.
- Income of applicant
- Availability of space in the home for additional children
- Whether the applicant is interested in fostering, adopting or fostering-to-adopt
- Marital status of the applicant
- Previous parenting experience
- Whether the applicant is working with a private provider to license the applicant's home

**(2) For Relative Inquiries:**

- County of responsibility
- County of responsibility Worker
- Name and age of foster child
- Relation to the child
- Date the child was placed in the home, if applicable
- Reason the child was taken into custody

## 3. Maltreatment Definitions

Types of Maltreatment include:

**Emotional Abuse/Neglect**

*Any acts and/or threatening statements made and/or allowed, or failure on a periodic or continuing basis, regardless of cause, to provide adequate nurture to meet the child's needs which results in a substantial impairment of intellectual, psychological or emotional well-being and functioning of the child. It describes emotional abuse, mental injury, and other types of maltreatment. Refer to MISS. CODE ANN. § (43-21-105).*

**Medical Neglect**

One whose parent, guardian or custodian or any person responsible for his care or support, neglects or refuses, when able so to do, to provide for him proper and necessary care or support, or education as required by law, or medical, surgical, or other care necessary for his well-being; however, a parent who withholds medical treatment from any child who in good faith is under treatment by spiritual means alone through prayer in accordance with the tenets and practices of a recognized church or religious denomination by a duly accredited practitioner thereof shall not, for that reason alone, be considered to be neglectful under any provision of this chapter. *(MISS. CODE ANN. § 43-21-105)*

**Physical Abuse**

"Abused child" means a child whose parent, guardian or custodian or any person responsible for his care or support, whether legally obligated to do so or not, has caused or allowed to be caused upon the child sexual abuse, sexual exploitation, emotional abuse, mental injury, non-accidental physical injury or other maltreatment. However, physical discipline, including spanking,

performed on a child by a parent, guardian or custodian in a reasonable manner shall not be deemed abuse under this section.
*(MISS. CODE ANN. § 43-21-105).*

**Physical Neglect**

One whose parent, guardian or custodian or any person responsible for his care or support, neglects or refuses, when able so to do, to provide for him proper and necessary care or support, or education as required by law, or medical, surgical, or other care necessary for his well-being; however, a parent who withholds medical treatment from any child who in good faith is under treatment by spiritual means alone through prayer in accordance with the tenets and practices of a recognized church or religious denomination by a duly accredited practitioner thereof shall not, for that reason alone, be considered to be neglectful under any provision of this chapter
*(MISS. CODE ANN. § 43-21-105).*

**Sexual Abuse and Exploitation**

"Sexual abuse" means obscene or pornographic photographing, filming or depiction of children for commercial purposes, or the rape, molestation, incest, prostitution or other such forms of sexual exploitation of children under circumstances which indicate that the child's health or welfare is harmed or threatened.
*(MISS. CODE ANN. § 43-21-105).*

## 4. Intake Procedures

## a) Centralized Intake Procedures

Mississippi Centralized Intake accepts the following intake types:

- ANE;
- I&R;
- Case Management,
- CHINS/Safe Baby/Unaccompanied Refugee Minors/Voluntary Placement/Prevention Services;
- Resource Inquiries.

**All intakes must be documented in MACWIS upon receipt.**
The MCI staff shall be responsible for gathering as much information as possible from the reporter of the abuse or neglect allegations, including, but not limited to:

## INTAKE & ASSESSMENT

- how to locate the family;
- whether or not the alleged abuse and/or neglect is caused by the person caring for the child;
- access of alleged perpetrator to the alleged victim;
- nature of the abuse and/or neglect (severity, duration, type of maltreatment, etc.);
- if the report falls under the statutes of our state law as abuse and/or neglect;
- history on family/household;
- history/ability of caregiver;
- history of ANE;
- potential safety risks for Worker;
- prior criminal history of household members, if known;
- information on the victim (mental & physical capabilities/limits; age; school, etc.);
- general dynamics of the family, if known (traditions, culture differences, strengths and weaknesses;
- if the family being reported has any tribal affiliation.

MCI staff shall also inform reporters of DFCS' responsibilities including:

- protection of reporter's identity;
- screening and investigation process and any on-going communication with the reporter;
- confidentiality/disclosure of records; and
- determining whether the victim is a Native American and/or resides on Native American tribal lands.

Intake duties of the MCI staff after taking a report include but are not limited to:

- entering the "Report Date" as the date the reporter received the report in the county or the date a child was placed in DFCS custody;
- search for prior MDHS involvement (METTS, MSSIS, MAVERICS and MACWIS); including but not limited to reports of abuse and neglect;
- diligent search to identify the absent parent (METTS, MSSIS, MAVERICS and MACWIS);
- forward complaints to DFCS Complaints Unit;

- contact the language line for assistance when working with reporters having language barriers; and
- notify the appropriate county office or on-call Worker immediately when a request for immediate assistance is made by law enforcement, judges, or hospitals.

## b) ANE Intakes That Require Special Handling

### *1. Reports of Maltreatment in Foster Care*

All reports of maltreatment, including corporal punishment, involving children in custody must be reported through MCI and entered as ANE and must be initiated within 24 hours of initial intake "report date and time" and completed within 30 calendar days including supervisory approval.

If information gathered from the reporter or a diligent search of MACWIS identifies the alleged victim as a child in custody, the intake Worker will:

1) Confirm the identity of the child.
2) Confirm all household members that are identified at intake and who have prior history in MACWIS.
3) Assign the intake to the county where the resource home/facility is located.

After it is determined the alleged victim is a child in custody, the report should be entered into MACWIS using the following guidelines:

1) If a report of maltreatment, including use of corporal punishment by a Resource Parent is received, the report should be entered as a Resource Report and assigned to the county where the resource home is located.
2) If the maltreatment occurred outside of the Resource/Facility setting, the report should be entered as an ANE with the appropriate alleged perpetrator identified and assigned to the county where the child currently resides.
3) If the maltreatment occurred in the child's own home, the report should be entered as ANE and the alleged perpetrator identified and assigned to the county where the child currently resides.

***2. Resource Report Option***

The "Resource Report" option in MACWIS should be selected only in the following instances:

- If a report of maltreatment, including corporal punishment, by a Resource Parent is received on a child in custody.
- If a report is received on a child in custody in which alleged maltreatment occurred in the Resource Home.
- If a report is received on a child in custody in which alleged maltreatment is a result of the Resource Family's actions or inactions.
- If a report of maltreatment is received involving a child in custody placed in a licensed or non-licensed facility.

***3. Special Investigations***

The "Special Investigation" option in MACWIS should be used only in the following instances:

a. Reports in which a DFCS staff person, at intake, meets one of the following criteria:

- named as alleged perpetrator
- named as alleged victim
- reported as being otherwise involved with the alleged maltreatment

b. Reports in which the alleged perpetrator or his/her immediate family member is in a position of authority, including, but not limited to: government officials, community leaders, local DFCS and/or department heads.

## c) Additional Reports Entered As ANE

***1. Reports on Native American Children***

The Mississippi Band of Choctaw Indians or any other Indian Tribe to which the child belongs has the right to accept or deny jurisdiction of the said child and to help with placement resources.

The Federal *Indian Child Welfare Act (ICWA)* was passed in 1978 and grants Indian tribes exclusive jurisdiction in child welfare cases involving Native American children. Because of this Act's existence, DFCS has no jurisdiction to investigate allegations of abuse or neglect

occurring on Native American tribal lands. However, DFCS has and will continue to receive reports of abuse/neglect regarding Native American children whether they live on or off tribal lands. Should MCI receive such a report, a determination shall be made as to whether:

- The child is a member of a Native American Tribe and falls under the purview of ICWA;
- The child resides on designated tribal lands where an Indian tribe has jurisdiction.

The Mississippi Band of Choctaw Indians has tribal land in Neshoba, Attala, Jones, Kemper, Leake, Newton, Scott, and Winston counties.

If a child is identified at Intake as a member of the Choctaw tribe or another Indian tribe and lives on tribal land, the MCI Worker will screen the report to the county where the child resides. The COR Intake Supervisor, who will notify the Mississippi Band of Choctaw Indians or any other tribal court and provide them with the allegations and all identifying information. If they do not wish to retain jurisdiction and request the county to investigate the allegations, the county will follow normal investigative procedures. The contact information for the Mississippi Band of Choctaw Indians is located on the MACWIS Web. (refer to Section D, ICWA)

### *2. Unaccompanied Refugee Minor*

All ANE reports involving an Unaccompanied Refugee Minor (URM) should follow the same intake procedure for reports of maltreatment in foster care.

### *3. Reports of Safe Babies*

Safe Babies should be reported through MCI. If the report comes directly to the county office, the Worker is responsible for making the report through the MCI system. The report shall be assigned through MCI to the county where the child is surrendered.

### *4. Child Death*

If a report is received alleging that a child has died as a result of abuse or neglect, the intake Worker shall indicate this by selecting “Yes” to the related question on the Allegations/Living Arrangement Tab in MACWIS.

### *5. County Intake Procedures*

All reports of abuse/neglect including an emergency or after hours report from law enforcement, court, hospital, etc. received in the county offices or by an on-call Worker must be sent to MCI prior to responding to the report or immediately thereafter.

Each county office accepts the following intake types: I&R; Case Management, CHINS/Safe Baby/Unaccompanied Refugee Minors/Voluntary Placement; and Resource Inquiries/Prevention Services.

## D. Screening

### 1. Screening Report and Assigning Response

For a report, MCI staff will determine the following criteria:

- If the family can be located.
  - If the reporter identified the county in which the family lives, adequate information exists to locate the family for screening purposes.
- If the alleged perpetrator is a parent, guardian, relative, someone in a caretaking role, foster care provider, other legal caretaker, or if the parent/guardian permits abuse or neglect to occur or fails to protect the child from maltreatment, or if the alleged perpetrator has access to the child due to the relationship with the parent or caretaker.
- If the report alleges maltreatment of the child that meets statutory and DFCS criteria of maltreatment.
- If the child has been harmed or is in imminent risk of being harmed.

After gathering as much information as possible, MCI staff will use the MACWIS screening tool and, according to selections made, the report is screened in or out by the MCI staff. This task must be completed immediately upon receipt of report but shall be screened to the county within 90 minutes.

All reports of positive drug screens for mother and/or infant shall be screened in by MCI.

MCI staff will use the statutory criteria to make the screening decision.

**Level One-** A report that does not meet the statutory criteria in MISS. CODE ANN. §§ 43-21-353; 97-5-39 is **screened out** for DFCS and may receive a referral for information or a referral for services. (*See* Appendix A for additional information on reports that are screened out)

**Level Two-** A report which meets the statutory criteria in MISS. CODE ANN. §§ 43-21-353; 97-5-39, but is not considered felony child abuse, or the alleged victim is not a foster child, is **screened in** and assigned to a Worker who must initiate the investigation within 72 hours of initial intake “report date and time”.

# INTAKE & ASSESSMENT

**Level Three-** A report that is considered a felony as defined by MISS. CODE ANN. §§ 43-21-353; 97-5-39 or involves a foster child is **screened in** and assigned for investigation. The assigned Worker has 24 hours from the initial intake "report date and time" to initiate the investigation.
***If the Intake Supervisor receives an intake and screening from MCI that indicates a child is in imminent danger, the Intake Supervisor will assign a Worker for immediate response.***

## 2. County Screening Process

The Intake Supervisor/designee has two (2) hours from receipt of report for assignment.

All Level III reports of maltreatment of children, including children in DFCS custody must be initiated within 24 hours of the initial intake "report date and time" and completed within 30 calendar days including supervisory approval.

All reports of positive drug screens for mother and/or infant that have been screened in by MCI, shall be assigned by the Intake ASWS to a worker for investigation/assessment.

A copy of all screened in reports of abuse/neglect shall be sent to the county youth court and felony reports shall be sent to the county youth court/prosecutor/DA.

If the Intake Supervisor/designee in the county responsible for investigating the report determines that the screened-in report does not meet criteria for investigation and the report does not meet the standards required by MISS. CODE ANN. §§ 43-21-353; 97-5-39 for investigation, the Intake Supervisor/designee changes the screening decision, documents the reason for screening the report out in the justification/rationale box, citing the Miss. Code and notifies the Regional Director (RD) that the request for reconsideration has been submitted via MACWIS for review and approval. The RD shall reconsider the Intake Supervisor's determination that the report does not meet criteria for investigation. If the RD concurs with the Intake Supervisor's decision to screen out the report, then the RD shall notify by email with the Reconsideration Form attached (*See* DFCS Connection Website under *"Forms"*), to the Director of Field Operations and the Bureau Director of Prevention and Protection. All reconsiderations should be tracked and maintained by the RD. If the RD disagrees with the supervisor's recommendation to screen the report out, the original decision made by MCI stands.

When the Intake Supervisor/designee determines the report meets standards as required by MISS. CODE ANN. §§ 43-21-353; 97-5-39 for investigation but the report was screened out by MCI staff, the supervisor/designee changes the screening decision, documents the reason for changing the screening decision in the justification/rationale box citing the Miss. Code, and notifies the RD by telephone that the request has been submitted for review and approval. The

## INTAKE & ASSESSMENT

Intake Supervisor then submits the screening request via MACWIS to the RD for final approval. If the RD agrees with the decision to screen in, the report will go back to the Intake Supervisor via MACWIS for assignment. The RD shall notify by email with the Reconsideration Form attached, to the Director of Field Operations and the Bureau Director of Prevention and Protection. All reconsiderations should be tracked and maintained by the RD. If the RD disagrees with the Intake Supervisor’s recommendation to screen the report in, the original decision made by MCI stands.

### a) Screening Out of Home Reports

When DFCS receives a report that a child has been abused by a person responsible for the care and/or support of the child, a determination must be made that the abuse was not committed or contributed to by a parent, legal guardian, primary caretaker, or relative.

If this is the case, the report must be handled as an “Out of Home” report.

“Out of Home” is defined by MISS. CODE ANN. § 43-21-105(x) as: temporary supervision or care of children by: staff of licensed day care centers, staff of public, private and state schools, staff of juvenile detention facilities, staff of unlicensed residential care facilities and group homes, or staff of individuals representing churches, civic or social organizations.

According to MISS. CODE ANN. § 43-21-353(8), If a report is made directly to DFCS that a child has been abused or neglected in an out-of-home setting, a referral shall be made immediately to the law enforcement agency in whose jurisdiction the abuse occurred and the department shall notify the district attorney's office within forty-eight (48) hours of such report.

DFCS shall investigate the out-of-home setting report of abuse or neglect to determine whether the child who is the subject of the report, or other children in the same environment, comes within the jurisdiction of the youth court and shall report to the youth court the department's findings and recommendation as to whether the child who is the subject of the report or other children in the same environment require the protection of the youth court.

The law enforcement agency shall investigate the reported abuse immediately and shall file a preliminary report with the district attorney's office within forty-eight (48) hours and shall make additional reports as new information or evidence becomes available. If the out-of-home setting is a licensed facility, an additional referral shall be made by DFCS to the licensing agency. The licensing agency shall investigate the report and shall provide DFCS, the law enforcement agency and the district attorney's office with their written findings from such investigation as well as that licensing agency's recommendations and actions taken.

## INTAKE & ASSESSMENT

Upon receiving the out-of-home intake the MCI Intake Worker must notify the local licensing entity by phone, facsimile or electronic mail.

When an out-of-home report is screened out, the county Intake ASWS will notify by phone, facsimile or electronic mail the following:

- Law enforcement
- District Attorney's office in the appropriate jurisdiction
- Youth Court

### b) Duplicate Reports

In order to classify a report as a "duplicate report" and to screen it out for investigation, it must be determined if the new information includes:

1) Same alleged perpetrator(s);
2) Same victim(s)
3) Same types of child maltreatment(s); and
4) Same incident

If the prior investigation has been completed, the COR Supervisor must always make sure the prior report was thoroughly investigated. Information on the same report will be entered into MACWIS and screened out.

### c) Child on Child Reports

In order for a child to be considered a perpetrator, he/she must meet the following condition:

- They are in a caretaker role.

The MCI staff must assess the possibility of parental neglect having contributed to one child harming another.

### d) Additional Reports on An Open Investigation

If there is an open investigation and an additional report is made, but it is not a duplicate report, the additional allegation should be added to the open investigation on the post allegation tab and the additional report should be screened out.

## INTAKE & ASSESSMENT

### e) Reports Involving More Than One County

MCI may receive a report of child ANE when the incident occurred in one county and the child lives in another county. The report should be screened to the county of residence of the child and the COR Worker is responsible for notifying law enforcement in the county where the incident occurred.

### f) Reports Involving Foster Children

If MCI receives a report that meets the statute and DFCS criteria for maltreatment or is a report of corporal punishment and the identified victim is a foster child, the report must be screened in as a level three. The report and the screening are sent to the RD where the Resource Home is located. If the alleged maltreatment occurred outside of the resource/facility setting and the resource parent/household members were not involved the report should be entered as ANE and screened to the COR.

### g) Screening Special Investigations

If the report is determined during intake to be a Special Investigation, it is screened according to normal screening procedures and sent to the RD for final decisions and assignment.

## E. Investigations and Assessments

### 1. Investigation Reports

MISS. CODE ANN. § 43-21-353. Duty to inform state agencies and officials; duty to inform individual about whom report has been made of specific allegations.

*Any attorney, physician, dentist, intern, resident, nurse, psychologist, social worker, family protection worker, family protection specialist, child caregiver, minister, law enforcement officer, public or private school employee or any other person having reasonable cause to suspect that a child is a neglected child or an abused child, shall cause an oral report to be made immediately by telephone or otherwise and followed as soon thereafter as possible by a report in writing to the Department of Human Services, and immediately a referral shall be made by the Department of Human Services to the youth court intake unit, which unit shall promptly comply with Section 43-21-357…Where appropriate, the Department of Human Services shall additionally make a referral to the Youth Court Prosecutor. *in counties which do not have a County Youth Court Prosecutor, the District Attorney should be notified.*

*Upon receiving a report that a child has been sexually abused, or burned, tortured, mutilated or otherwise physically abused in such a manner as to cause serious bodily harm, or upon receiving any report of abuse that would be a felony under state or federal law, the Department of Human Services shall immediately notify the law enforcement agency in whose jurisdiction the abuse occurred and shall notify the appropriate prosecutor within forty-eight (48) hours, and the Department of Human Services shall have the duty to provide the law enforcement agency all the names and facts known at the time of the report; this duty shall be of a continuing nature. The law enforcement agency and the Department of Human Services shall investigate the reported abuse immediately and shall file a preliminary report with the appropriate prosecutor's office within twenty-four (24) hours and shall make additional reports as new or additional information or evidence becomes available. The Department of Human Services shall advise the clerk of the youth court and the youth court prosecutor of all cases of abuse reported to the department within seventy-two (72) hours and shall update such report as information becomes available.*

## 2. MDHS Request for Law Enforcement to Accompany

The MISS. CODE ANN. § 43-21-353 (6), specifies:
*In any investigation of a report made under this chapter of abuse or neglect of a child as defined in § 43-21-105(m), the Department of Human Services may request the appropriate law enforcement officer with jurisdiction to accompany the Department Representative on its investigation, and in such cases the law enforcement officer shall comply with such requests.*

## 3. Initiation of Investigation/Assessment

When the Intake Supervisor receives an intake and screening from MCI that indicates a child is in imminent danger, the Intake Supervisor shall assign a Worker for immediate response.

“Imminent danger” is defined as clearly observable behavior, or a situation that is actively occurring, is about to occur, or is likely to occur in the present time and would cause serious harm.

Prior to initiating the investigation, the Worker should conduct an additional thorough review of any prior DFCS involvement with the family. The Worker may need to look at old paper case files as well as a MACWIS records check.

Information regarding any prior reports shall immediately be made available to the Worker to whom the case has been assigned for investigation.

An investigation is considered “initiated” when face to face contact or attempted face to face contact is made with the alleged victim(s) and should occur within the timeframes required by

the level of the report. The Worker may be unable to see a child for the following reasons: the child disappeared, the family fled, incorrect/nonexistent address, the child is not at the location, or the parent/caretaker refused to allow Worker to interview or observe the child. This must be documented in MACWIS as part of the investigation.

Criteria for attempted contact for the initiation of an investigation are considered met when two or more locations have been checked including the child's identified home and one of the following: the neighbor, school, and daycare. Concerted efforts will continue daily to locate the child or children. At the initial unsuccessful home visit the Worker may leave a note or write a letter requesting that the Worker be contacted. The note or letter should not indicate the purpose of the visit.

Workers shall resolve the issue of Indian heritage as soon as possible after contact is made with the family, either through a report of abuse/neglect or a referral for services. The Worker shall ask the family the following questions to gain knowledge in deciding what is in the best interest of the child and document the discussion in the narrative section of MACWIS:

1. Is parent or child of Native American heritage?
2. Is parent eligible for tribal membership?
3. Is parent registered with Native American tribe?
4. Is child eligible for tribal membership?
5. Has child been registered with Native American tribe?
6. Does the family live on tribal land?

If a child is identified at Intake as a member of the Choctaw tribe or another Indian tribe and lives on tribal land, the MCI Worker will screen the report to the county where the child resides. The COR Intake Supervisor, will notify the Mississippi Band of Choctaw Indians or any other tribal court and provide them with the allegations and all identifying information. If they do not wish to retain jurisdiction and request the county to investigate the allegations, the county will follow normal investigative procedures. The contact information for the Mississippi Band of Choctaw Indians is located at http://www.neshoba.org/community/ms-band-choctaw-indians.php**)**

Following contact with the alleged victim(s), other people to be interviewed include the following:

- The Reporter, if possible
- Parent/Guardian/Caretaker
- Siblings who reside in the home

- All other children and other household members
- A collateral contact
    - At least one collateral contact shall be made on all investigations. May include, but not limited to the following: service agencies, doctors, nurses, teachers, law enforcement, neighbors, relatives (not including household members), and others who may have information concerning the health and welfare of the child. If a relative is used as a collateral you must also have a second collateral who is a non-relative.
- Alleged perpetrator unless otherwise instructed by law enforcement

All Interviews with the individuals shall be held in private and additionally, the Worker must make a visit to the home and a physical home environment narrative entered in MACWIS.

Attempted face to face contact with the child, parent/guardian, custodian, or caretaker and efforts to locate the child does not end the investigation. If the Worker cannot make face to face contact or locate the family, the Supervisor shall be notified immediately on case status. Law enforcement will be requested to assist in locating the child and family.

## a) Interview with Reporter

If contact information is provided on the reporter, the Worker assigned the investigation will contact the reporter as the first step in the investigation. If the reporter cannot be contacted, the Worker should proceed with the investigation and attempt to contact the reporter at a later time. The inability to contact the reporter should not delay proceeding with the investigation.

The purposes of contacting the reporter are:

- to get additional information in regard to the abuse or neglect being reported,
- to inform the reporter of the role and purpose of the DFCS in its response to the report, and
- to give the reporter the opportunity to assist the DFCS in helping the family solve its problems so the child can remain safely at home or to assist the agency and family in developing plans to assure the safety of the child if the child cannot remain safely at home.

Contact with the reporter is an opportunity for the DFCS to engage the reporter and to educate the community in regard to Family Centered Practice and to elicit the support of the reporter and community in effectively addressing the problem of child abuse and neglect as it relates to the specific family and to the community at large.

### b) Interview with Child Victim

The Worker will notify the parent/ guardian or custodian or caretaker before interviewing the child, unless notification would endanger the child or impede the investigation.
All child(ren) should be interviewed privately with documentation addressing time and location.

If not notified prior to interviewing child(ren), the parent/caretaker should be notified immediately following the interview, unless this would endanger the child(ren).

### c) Interviewing in the School Setting

Child(ren) may be interviewed without the parent's consent if the notification would endanger the child or impede the investigation.

If the principal or other school official insists on being present, advise school official(s) that they may be subpoenaed to court to testify and have him/her sign a Confidentiality Statement. The Confidentiality Statement is filed in the case record. (*See* DFCS Connection Website under *"Forms"*)

### d) Interview with Parent/Guardian/Custodian/Caretaker or Alleged Perpetrator:

- The Worker will interview the parent/ guardian or custodian or caretaker and/or the alleged perpetrator face to face separately and privately with documentation in MACWIS with details of the meetings as well as time and location of each meeting.
- In circumstances where the alleged perpetrator has been charged or arrested for a child abuse crime, the Worker only needs to interview the alleged perpetrator if information is needed to determine the safety of the child(ren) or risk of harm. If the alleged perpetrator is not interviewed, the record should document the reasons. A copy of the interview with the perpetrator by law enforcement should be obtained for DFCS records.
- If the parent/guardian or custodian or caretaker or alleged perpetrator has not been charged or arrested, and law enforcement, district attorney, or other appropriate official, requests the Worker not to interview the person; the Worker will advise the Area Social Worker Supervisor (ASWS) and the Youth Court Judge of jurisdiction of the request.
- During the interview with the parent/caretaker the Client's Rights and Responsibilities and Grievance procedures will be provided and discussed. The

parent/ caretaker will sign the Clients Rights and Responsibilities form, (*See* DFCS Connection Website under *"Forms"*). A copy will be provided to the parent/caretaker and a copy will be filed in the case record.

- ICWA will be addressed and documented in MACWIS. Information for the TANF form will be gathered. The TANF form will be completed by the Worker and submitted to the Administration Unit prior to the end of the month that the report was received.
- The Safety Checklist will be completed on all children and a copy provided to the parent/caretaker.

## e) Examination and Photographs of the Victim

### *1. Examination of the Victim (child)*

- All victims of physical abuse should be thoroughly examined for evidence of abuse (bruises, bites, burns, welts, etc.). When possible, a Worker of the same sex as the child will examine the child. The procedure should be explained in a non-threatening, comforting way.
- Victims of neglect should be thoroughly examined if the investigation indicates reasons to suspect physical abuse; or if there are observable signs of neglect (malnutrition, untreated accidental injuries, infestations, bug bites).
- A parent/caretaker or another adult witness must be present when child is examined.
- Worker should request that the parent/caretaker or the child, if old enough, remove the child's clothes. Worker should be sensitive to the child's feelings of undressing in front of a stranger.
- If there is reason for an examination of the genital area of any child or breasts of female children over age 6, arrangements should be made for examination by a medical professional.
- If a child or parent refuses to cooperate, seek court intervention.
- If there is reason to suspect physical abuse of other children, examine them.

### *2. Photographs of the Victim (child)*

- The investigating Worker may take photographs of child, child's home, or location where the child was residing when abused/neglected to document any physical evidence of abuse/neglect. If parents do not cooperate, seek youth court or law enforcement intervention.

- A parent, another DFCS Worker, or another professional must always be present as a second party when photographs are taken of a child.
- Identifying information (name of the victim or other appropriate identifying information, date photograph was taken, time, and location) should be written on back of photograph or attached to it. The person's name who took photograph should be included also.
- Each photograph shall have a visible body landmark to distinguish the identity of the child, actual location, and extent of the area of injury. More than one photograph of the injury may be required to show landmark and still obtain a clear close-up of abuse.
- Photographs are filed in the case record.

***3. Use of DVD or Video Tapes***

- When interviewing individuals, the Worker may record the information. Verbal permission must be obtained for children from the parent or guardian.
- The DVD/Video Tape should be labeled with the following information:
  - (a) Name of interviewee
  - (b) Date, time and location of interview
  - (c) Name of interviewer
- The DVD/Tape becomes a part of the confidential case record and should be closely protected.

## f) Drug Screenings

DFCS Workers may request a drug screen any time there is suspicion of drug or alcohol use.

DFCS Workers shall not administer drug tests of any type to clients.

DFCS Workers shall facilitate drug testing of clients when ordered by the Court by:

- Sending client(s) to a certified drug testing facility when client can pay for test and has transportation;
- Transporting client to a drug testing facility, if necessary, as well as DFCS paying the fee;
- Arranging for drug testing company Worker to come to the Court; or
- Requesting Court personnel perform drug test.

## g) Medical/Mental Health Examination

- Medical examinations of children should occur when there are specific allegations indicating injury which can be corroborated and verified by an examination; and the initial phases of the investigation reveal information indicating that a medical examination is necessary and warranted in order to determine whether or not there is evidence to substantiate any harm or maltreatment.
- Medical examinations may be needed to confirm or rule out abuse/neglect and/or to prevent removal.

The Worker will assist parent/caretaker to arrange for the examination. The parent's own physical/mental health professional, etc., may be used. If the parent/caretaker is unwilling to pay for the examination, Medicaid or other DFCS resources are utilized.

If a situation arises and a parent/caretaker refuses to cooperate, the Worker will consult with his/her Supervisor and court intervention may be sought. When a court orders a medical/mental health examination the Worker will take the child for the examination, even though DFCS may not have custody. In this situation the court order should specify the authority of DFCS to take the child for examination.

## 4. Safety and Risk Assessment

## a) Safety Assessment

The Safety Assessment is completed in all situations when the report has been assigned a Level Two or Level Three investigation. This assessment is completed in MACWIS within seven (7) calendar days of the report being assigned. The Safety Assessment addresses the following areas: (*See* DFCS Connection Website under *"Forms"*)

- Physical harm or injury
- Neglect of basic needs
- Family strengths and needs
- Prior history of abuse/neglect/exploitation/domestic violence
- Protective capacity of parent/caregiver.

Reasonable efforts will be made to maintain children in their own home or with family and support services should be made available to the family. However, if adverse safety and risk factors are identified during the investigative phase, the Worker should hold a Family Team

Meeting to determine if there are family members or extended family who can assist the parent/caretaker in making an appropriate safety plan that is in the child/(children)'s best interest.

Family Team Meetings are an integral part of Family Centered Practice which allows families to identify a support system to address issues that caused a disruption in the family. This allows the family to be a part of finding their own solutions and engaging others in building relationships built on empathy, genuineness and trust. All families are unique and different and all have strengths that should be identified and acknowledged through the interaction of this group process.

### b) Safety Plan

Safety planning is a part of DFCS making reasonable efforts to maintain children with family.

The technical components of Family-Centered Practice – engagement, relationship-building, and problem-solving – are put into action immediately by the Worker with the family during the initial phases of investigation/assessment in order to develop and implement a plan for the family in which the child is safe from harm. This process, including the utilization of Family Team Meetings, is safety planning. Safety planning constitutes a process in which the family and the Worker can develop jointly a plan for the child and family in which identified issues or factors of safety and risk are recognized, acknowledged, and analyzed in light of the strengths and protective capacities of the family for the purpose of assuring the safety of the child and the preservation of the family.

Although safety and risk of harm are the key considerations in the development of a plan, issues of permanency and well-being are also brought to the table from the very beginning. The development of a trusting and honest relationship with the family is of the essence in effective safety planning. The DFCS Practice Model definition of safety assurance and risk management assumes that children should live in a safe and permanent home with their own families whenever possible, and that agency interventions should assist families to care for and nurture their children. Practice, service provision, and intervention from the initial contact with the family must be focused on this end. Safety plans should be short term and developed only when a decision of "unsafe" has been determined and workers, with supervisory approval, assess that without the plan, the child(ren) cannot remain safely in the home. Success is dependent on the relationship developed with the family by the Worker and the agency. A safety plan is short term and should be in place to prevent removal and allow a child(ren) to remain with family.

In order to justify a recommendation for removal of a child, Workers must be able to report to the court the following: (*See* DFCS Connection Website under *"Forms"*)

- Removal is in the best interest of the child; or

- Continuation in the home would be contrary to the welfare of the child; AND
- Reasonable efforts were made to prevent removal;
- Due to an emergency situation, no reasonable efforts were made to prevent
- removal; or
- Reasonable efforts were determined not required by the court

The Worker must be mindful that even though removal is at times necessary, removing a child from his or her parents also constitutes taking a child's parents away from the child, creates a situation of impermanency for the child, and traumatizes the child and family permanently. For such action to be put forth as being in the best interests of and contrary to the welfare of the child, extensive justification is required not only in regard to the safety and risk issues involved but also in regard to the efforts attempted to prevent removal.

In circumstances where safety issues are identified, a Safety Plan will be developed with the family and will be implemented immediately.

The Safety Plan incorporates all safety interventions designed to maintain children safely within their own families whenever possible and is developed by the Worker with family input and with supervisory approval.

The Worker will fully explain to the parent/caretaker their responsibility for carrying out the specific component of the plan assigned to them.

The Safety Plan will be documented in MACWIS, printed and signed by the parent/caretaker, and a copy given to parent/caretaker and filed in the case folder.

The Safety Plan will be monitored by the Worker throughout the life of the investigation. If there is a continued need for a Safety Plan at the close of the investigation the plan will be reevaluated and a case must be opened.

The following shall be identified and documented on the Safety Plan:

- Identification of specific serious harm or the threat of serious harm as identified in the Safety Assessment.
- What actions have or will be taken to protect each child in relation to the current safety concern?
- If the plan will involve (a) In home services or (b) Alternative caregiver.
- If an alternate caregiver is identified, a background check shall be completed on all household members over the age of 14.

- o If alternative caregiver, has a background check been completed on all household members over the age of 14?
- Who is responsible for implementing the plan?
- How will the plan be monitored and evaluated and by whom?
- What time frames have been imposed by this plan?
- Under what conditions will termination of the Safety Plan occur?

The Safety Plan will be signed by the Worker, parent/caregiver, supervisor and copy given to parent/caregiver and original placed in case file.

In cases where no safety issues are identified, the report requires a Risk Assessment prior to the completion of the investigation. The results of the Risk Assessment and the report findings will be used to determine if a case should be opened for services.

### c) Removals

***An ASWS with an advanced degree in social work or related field must be involved in the decision making process before approval is given to remove a child from their home and placement into foster care.***

***Authorization from the Youth Court Judge must be obtained for all removals and placements of a child into foster care.***

***Under no circumstances, even emergencies, shall foster children be taken to the home of a DFCS employee.***

When DFCS is ordered by the court to remove a child from their home without an investigation/ assessment of the maltreatment allegations, the worker must document the following information in MACWIS:

- Name of contact person from the court;
- Time and date request is received;
- By what means, i.e. court order, fax, email or telephone; and
- Date of court order (if issued).

# INTAKE & ASSESSMENT

In cases where the child is not safe and a Safety Plan cannot be developed to mitigate safety concerns a removal of the child from the parent or caregiver's custody by order of the Youth Court may be necessary to ensure child safety.

In investigations where the worker has observed/documented abuse or neglect and the child has been placed in a protective environment, the worker must document and substantiate the initial findings. If a worker at any time suggests, discusses, or recommends the removal of a child from their home, the worker must contact the ASWS and Youth Court Judge for approval.

Removal of a child from the home creates a state of impermanency for the child even though such removal may be justified due to issues of safety. Reasonable efforts requirements demand that the Worker and DFCS work diligently and concertedly with the family first of all to prevent removal of the child or children if possible, and if not possible, to provide services and solve problems to get the child back home as soon as safety can be reasonably assured. The Worker, while working diligently and concertedly with the family to remedy the impermanence created by the removal of the child, must develop and initiate active efforts toward the achievement of an alternative plan just in case the child cannot be returned home.

A finding of substantiated abuse or neglect does not, in and of itself, constitute grounds for removal. Decisions of removal are based on issues of safety, risk, protective capacities of parent/caregiver and the ability or inability to implement plans assuring the safety of children remaining in the home or with family.

The Worker shall devote as much time as necessary in helping the child and his parents understand the reason for removal and what to expect from the placement of their child in DFCS custody. The Worker shall help the parents assume as much responsibility as possible for preparing the child for placement. Whenever possible, parents should be the first to discuss placement with the child. If the child feels the parents concur in this plan for him/her, placement will be easier for him to understand and accept. Not only does the child need preparation for the placement, but the Worker may need to assist the parents in working through their conflict about placement, as well as their feelings about separation from the child.

Prior to removing a child from their home, the Worker shall identify information such as the child's daily routine, preferred foods and activities, needed therapeutic or medical care, allergies, cultural practices, and educational information. The child should be given the opportunity to collect things from his/her home that are meaningful to him/her; such as a favorite toy or a picture album.

The Worker shall explain to the child:

1. Why he/she is in care;

2. The Worker's role in the process;
3. Placements for other siblings (if siblings have separate placements); and
4. Feelings of separation and loss.

## d) Risk Assessment

The Risk Assessment shall be addressed simultaneously with the Safety Assessment but must be completed in MACWIS within 25 calendar days of initial intake "report date and time" and submitted with the completed investigation via MACWIS to the supervisor for approval, who has 5 calendar days to approve the findings. During this assessment, the Worker should be assessing the well-being of the child and the risk factors for abuse and neglect.

The following shall be identified and documented during the Risk Assessment: (*See* DFCS Connection Website under *"Forms"*)

- What is the exact nature of the abuse and/or neglect? Describe the parent/caretaker's initial response. Describe the maltreatment found and describe any injuries.
- If abuse and/or neglect is found, how long has it been going on and what is the impact on the child?
- How do the parents/caretakers and the children view their current situation? Describe the caregiver's ability to provide basic needs?
- Describe the parents/caretaker's level of functioning. Are the parents/caretakers capable of addressing issues related to the maltreatment?
- Describe any mental/physical health concerns of household members. Do any concerns pose danger to the child?
- Describe how each child's functioning ability as it relates to such things as age, communication skills, school performance, physical and behavioral health and fear of harm.
- Describe family's support system. What kinship resources are available to family?
- Identify and describe caregiver and family strengths, and protective capacities.
- Describe family and caregiver–child relationships. Include things such as parenting style, parenting knowledge and skill, and discipline techniques.

## 5. Decision Making and Evidence

When the Worker completes an investigation, a determination is made to support the disposition of the report. This determination is made based upon:

1) Substantiation criteria
2) MDHS-SS-442-B, Safety Checklist for Children (*See* DFCS Connection Website under *"Forms"*)
3) Safety/Risk Assessment
4) Information gathered and entered in MACWIS
5) Direct observation/Medical or Psychological information

The investigating Worker must complete a Safety Assessment and must submit it to his/her supervisor within 7 calendar days of report assignment. If the determination is made that a child is unsafe, the Worker will develop a Safety Plan or take protective custody. Report findings are:

a. Substantiated
b. Unsubstantiated.

In the final analysis, the Worker will base conclusions on the totality of the evidence, not on "gut feelings" or "professional intuition." In some cases where medical evidence is strong, where there is photographic evidence or an admission by the perpetrator, or credible victim's statement, the Worker will have supporting documentation. In other cases where the medical evidence is inconclusive and the perpetrator denies the abuse, the Worker will examine the constellation of all factors in reaching the decision. In these cases, something might be lacking from the child's statement, or the witnesses may be in conflict and may be biased. The investigative finding of substantiated or unsubstantiated must reflect a careful weighing of all the facts.

To evaluate whether the information supports or refutes the allegations and to what degree, the Worker must understand some basic concepts about evidence.

- The usefulness of information depends on the validity of its source.
- If the evaluation of the validity of information affects the decisions one makes or recommends, it should also affect the way one documents the case.
- Information gathered or evaluated has the potential to become key evidence in court hearings.

The following section provides a guide to evidence substantiation criteria that should assist the Worker in determining the findings of an investigation.

## INTAKE & ASSESSMENT

### a) Substantiation Criteria

The Worker shall document in MACWIS, the supporting information to confirm the findings of substantiated/un-substantiated.

Proof of one or more of the following factors, may constitute "substantial and material evidence." The exception is behavioral indicators or circumstantial evidence. Both are used only to further corroborate other forms of evidence.

#### *1. Medical and or Psychological Information*

This may take the form of medical documentation that a child was abused (i.e., evidence of sexual penetration of a young child or spiral fractures of long bones) or evidence which verifies the child sustained severe injuries which are medically inconsistent with the caregivers' explanation.

In sexual abuse, this includes:

- Genital, anal, or oral bruises or bleeding;
- Swollen or red cervix, vulva or perineum;
- Abnormal dilation of the urethra, vagina, or rectal openings;
- Semen on genitals, around mouth or clothing;
- Venereal (sexually transmitted) diseases;
- Pregnancy

This factor might also include psychological information which reveals a predisposition to abusive behavior on the part of the alleged perpetrator or otherwise corroborates evidence related to abuse.

An admission by the perpetrator (including a caregiver who acknowledges she or he knowingly failed to protect the child).

#### *2. Statement of Credible Witness*

The investigator must be careful to evaluate fully, the credibility and potential bias of any witnesses to the act. The investigator must also consider the credibility of any witnesses which serve to refute the allegations or otherwise diminish the strength of other evidence (i.e., reliable witness who states the alleged offender was elsewhere at the time of the alleged abuse). Parent or

relatives, for example, who are involved in a custody dispute, could not be considered fully reliable witnesses either in support of or in disagreement with the allegations.

***3. The Child Victim's Statement***

For allegations of sexual abuse:

The child states the abuse occurred and identifies the perpetrator(s). The following elements are typical of sexually abusive situations, and should be considered in assessing the weight to be given to the child's statement in cases where sexual abuse is alleged:

**History**

a. Multiple Incidents over Time

   *Did the child indicate more than one incident occurred? This situation is most common where the alleged perpetrator is a relative, friend, or caregiver of the victim.*

b. Progression of Sexual Activity

   *Did the sexual activity progress from less severe forms to more serious? Does the child describe transitional activities which appear acceptable at first, but become sexual (i.e., sleeping with parent, tickling or wrestling leading to fondling)? This is most common where the abuse occurs in the context of a long-standing relationship.*

**Details**

a. Explicit Knowledge of Sexual Activity

   *Did child give explicit details of the sexual experience? Were these details beyond the knowledge typical of a child this age?*

b. Richness of Detail

   *When age and developmentally appropriate, could the child give the location of the incident and a time, even though specific dates were not given? Did she or he tell anyone else, if so, whom? Could she or he give any details of the environment? Such details by a preschool age child are not expected. As a child's developmental age increases, more detail may be expected.*

   *Research indicates that very young children can accurately recall traumatic events in detail; however, they may not be able to recall details of the environment.*

## INTAKE & ASSESSMENT

c. Consistency

*If the child was interviewed more than once, were the responses consistent from one interview to the next? Were any parts of the child's story corroborated by others or by physical evidence?*

**Secrecy**

Does the child indicate that she or he was instructed to keep the abuse secret? Did it occur in a private setting?

**Coercion**

What are elements of coercion or persuasion? How did the perpetrator get the child to engage in the activity? What does the child think will happen now that they have told the story? Are they afraid of anything? (Note: These questions must be phrased in age appropriate language that is not leading).

Each of the above criteria must be evaluated separately in order to determine the status of the case. These elements are typical of many child sexual abuse cases. Yet the absence of information in some areas does not necessarily mean that the case is unsubstantiated.

If information is missing in any one category, further exploration regarding, the reason for the absence is needed.

Perhaps the right questions to elicit the information were not asked or the child was too uncomfortable to respond.

It may be possible that a particular element is not pertinent to the case in question. For example, a child who alleges fondling by a school bus driver may not report multiple incidents or progression. This aspect in and of itself does not unsubstantiate the case. Look beyond this individual element to determine the role of other indicators in the abuse. While carefully evaluating the presence of each individual indicator, it should be remembered that it is the constellation of symptoms which is the heart of the evaluation process.

In most cases, there will be little doubt as to the accuracy of the child's statement based on the presence of these elements. In rare cases of false allegations by children, the statements of those children will depart significantly from the criteria.

The child's statement should be weighed against any medical evidence and/or the physiological indicators. Does their explanation corroborate the medical findings or the physiological

indicators as to how the injury was sustained? Whom do they say hurt them? Did anyone else know it was going on? How did they try to help? Has this type of injury ever happened before?

***4. Indicators and Circumstances of Abuse or Neglect (****See* Appendix B***)***

1. **Physiological indicators or signs of abuse,** including, but not limited to: cuts, bruises, burns, or broken bones.
   This criteria includes physiological findings recorded on videotape or with a camera which strongly substantiate severe abuse.

2. **Physical evidence** gathered by law enforcement or observed by Worker which tends to substantiate the allegations, including, but not limited to, the following:

   - Presence of child pornography or erotica such as child-oriented books, magazines, articles;
   - Video equipment, cameras, photos, negatives, slides, movies, video cassettes, drawings of children;
   - Personal letters and other correspondence from pedophile;
   - Diaries indicating sexual abuse occurred;
   - Sexual aids (as described by child);
   - Sexual "souvenirs" (e. g., panties or other similar items);
   - Lists of other victims, other offenders;
   - Weapons (as described by child);
   - Bed, clothing, sheets, etc. which contain body fluids, pubic hairs, and other physical evidence;
   - Torn, stained, bloody underclothing;
   - Conditions apparent in the home:
     - Bare electrical wires
     - Frayed cords
     - Gas leaks
     - No railing on stairs
     - Unprotected or broken window accessible to small children
     - Medicines, cleaning compounds hot liquids within the child's reach
     - Holes in wall or floors
     - Overrun with vermin

- Urine-soaked mattress
- Human or animal feces on floors
- Toilets used but not in working order
- Garbage left to rot inside the house
- Heating inoperable in cold weather

This evidence should be sought and seized by law enforcement investigators under a search warrant or consent to search or documented by Worker with pictures or written description.

3. **Behavioral Indicators**. Child abuse often leads to behavioral manifestations in the child victim. The existence of some or all of the behavioral patterns in the chart located in Section B, Appendix B may be indicative of child abuse in a given case, and corroborate other evidence of abuse. It is particularly important to observe the parent-child interaction.

NOTE: Most of these behavioral indicators located in Appendix B can have numerous explanations besides child abuse. Their value is when they are linked to the abuse allegations, such as a change in school grades about the time the child alleges the abuse began or regressive behavior in anticipation of a visit with a father the child says abused her or him. A case cannot be considered substantiated based on behavioral indicators alone.

4. **Circumstantial evidence** linking the alleged perpetrator(s) to the abusive act(s) (e. g., the child was in care of the alleged perpetrator(s) at the time the abuse occurred and no other reasonable explanation of the cause of the abuse exists in the record). Circumstantial evidence may include other professional reports, such as school records, past police records, day care records, homemaker reports, etc.

## b) Supervisory Responsibilities in the Investigations, Reviews, etc.

Report information will be entered in MACWIS on appropriate screens as information is received. The Worker has 25 calendar days from initial intake “report date and time” to complete the investigation and submit to the Supervisor who has 5 days for approval.

## c) Investigation Staffing with ASWS

1. Initial Staffing (the date of assignment)
2. On-going Staffing within 5 calendar days of assignment and anytime thereafter.

- Close the case with no further action;
- Close and refer the case to community providers; or
- Open the case for ongoing protection/prevention services

Once reviewed and approved the ASWS shall submit the completed investigation with the Youth Court Tracking form to the Youth Court with recommendations.

## d) Investigation Reports & Notifications to Youth Court, District Attorney and law Enforcement when applicable.

### *1. Investigation Reports*

The Worker investigating the report is responsible for completing a finding on all investigations in MACWIS and submitting to his/her supervisor for approval. The Worker will also print the Youth Court Tracking form and forward to his/her supervisor. All completed investigations are made a part of the child's file in the MACWIS system and can be printed upon request.

### *2. Report to the District Attorney (DA), Law Enforcement (LE)and County Prosecutor*

When a felony investigation is completed, the investigating Worker shall submit the completed report in MACWIS to the supervisor for approval. These approved reports along with the concluding DA and/or LE reports shall be mailed or hand-delivered to the DA, LE, or County Prosecutor (when applicable) by the supervisor. Information submitted to the DA and LE or County Prosecutor shall be included in the court report/summary.

### *3. Report to Youth Court*

All assigned investigations of child abuse and neglect are completed by the Worker and forwarded to the ASWS for approval who forwards the reports to the Youth Court along with the Youth Court Tracking form.

1. MISS. CODE ANN. § 43-21-357 *After receiving a report, the youth court intake unit shall promptly make a preliminary inquiry to determine whether the interest of the child, other children in the same environment or the public requires the youth court to take further action. As part of the preliminary inquiry, the youth court intake unit may request or the youth court may order the Department of Human Services, the Department of Youth Services, any successor agency or any other qualified public employee to make an investigation or report concerning the child and any other children in the same environment, and present the findings thereof to the youth court intake unit. If the youth court intake unit receives a neglect or abuse report, the youth court intake unit shall*

*immediately forward the complaint to the Department of Human Services to promptly make an investigation or report concerning the child and any other children in the same environment and promptly present the findings thereof to the youth court intake unit. If it appears from the preliminary inquiry that the child or other children in the same environment are within the jurisdiction of the court, the youth court intake unit shall recommend to the youth court:*

*(a) That the youth court take no action;*

*(b) That an informal adjustment be made;*

*(c) The Department of Human Services, Division of Family and Children Services, monitor the child, family and other children in the same environment;*

*(d) That the child is warned or counseled informally; or*

*(e) That a petition be filed.*

*(2) The youth court shall then, without a hearing:*

*(a) Order that no action be taken;*

*(b) Order that an informal adjustment be made;*

*(c) Order that the Department of Human Services, Division of Family and Children Services, monitor the child, family and other children in the same environment;*

*(d) Order that the child is warned or counseled informally; or*

*(e) Order that a petition be filed.*

*(3) If the preliminary inquiry discloses that a child needs emergency medical treatment, the judge may order the necessary treatment.*

### *4. Notifications*

The investigation is not officially closed until the ASWS approves the investigation in MACWIS. Once the ASWS approves the investigation the ASWS will notify the family in writing of the findings (*See* DFCS Connection Website under *"Forms"*).

The Worker shall provide more information to the professional reporter regarding the investigation, without a court order if the reporter has a continuing professional relationship with the child and a need for such information in order to protect or treat the child.

## e) Appeals Procedure

The MDHS/DFCS provides individuals who disagree with DFCS findings or decisions covered under this policy, a right to appeal the decision.

The Child Abuse Prevention and Treatment Act (CAPTA) Amendments of 1996, (P.L. 104.235)(as codified at 42 U.S.C. Section 5106a) requires States to have provisions, procedures, and mechanisms in effect by which individuals who disagree with an official finding of child abuse or neglect can appeal such a finding. This requirement applies to the perpetrator of child abuse or neglect and applies to States receiving funds under a CAPTA state plan.

This requirement is to assure that individuals, who have been found by the State to have committed child abuse or neglect, are afforded due process. It also requires that individuals be given written notification of their right to appeal, and the method by which they may appeal, at the time they are notified of the official finding of child abuse or neglect; and that the office or individual hearing such appeals cannot be involved in any other state of the case, and that such officer or individual has the authority to overturn a previous finding of abuse or neglect. (Section A, DFCS Policy, Appeals Process).

### f) False Reports

An intentional false report is a report in which it is concluded that not only is there no evidence under state law or policy that a child was maltreated or at risk of maltreatment, but the reporter knew the allegation was false. The Worker should request that the reporter verify that the allegations were false. According to MISS. CODE ANN. § 43-21-353(7), *"anyone who willfully violates any provision of this section [with false reporting], shall be, upon being found guilty, punished by a fine not to exceed five thousand dollars ($5,000.00), or by imprisonment in jail not to exceed one (1) year or both.*

## F. DFCS Investigations/Assessments Requiring Special Handling

### 1. Introduction

### a) Legal Base

MISS. CODE ANN. § *43-21-105 (v)* – "Any person responsible for care or support" means the person who is providing for the child at a given time. This term shall include, but is not limited to, stepparents, foster parents, relatives, non-licensed babysitters or other similar persons responsible for a child and staff of residential care facilities and group homes that are licensed by the MDHS.

MISS. CODE ANN. § *43-21-105(x)* – "Out-of-home" setting means the temporary supervision or care of children by the staff of licensed day care centers, the staff of public, private and state schools, the staff of juvenile detention facilities, the staff of unlicensed residential care facilities

and group homes and the staff of, or individuals representing, churches, civic or social organizations.

MISS. CODE ANN. § *43-21-353-(8)* - If a report is made directly to the Department of Human Services that a child has been abused or neglected in an out-of-home setting, a referral shall be made immediately to the law enforcement agency in whose jurisdiction the abuse occurred and the department shall notify the district attorney's office within forty-eight (48) hours of such report. The Department of Human Services shall investigate the out-of-home setting report of abuse or neglect to determine whether the child who is the subject of the report, or other children in the same environment, comes within the jurisdiction of the youth court and shall report to the youth court the department's findings and recommendation as to whether the child who is the subject of the report or other children in the same environment require the protection of the youth court. The law enforcement agency shall investigate the reported abuse immediately and shall file a preliminary report with the district attorney's office within forty-eight (48) hours and shall make additional reports as new information or evidence becomes available. If the out-of-home setting is a licensed facility, an additional referral shall be made by the Department of Human Services to the licensing agency. The licensing agency shall investigate the report and shall provide the Department of Human Services, the law enforcement agency and the district attorney's office with their written findings from such investigation as well as that licensing agency's recommendations and actions taken.

*Child Abuse Amendments of 1984, (P.L. 98-457)* requires states to have in place, with State Protection Systems, procedures to respond to the reporting of medical neglect, including instances of withholding medically indicated treatment from disabled infants with life-threatening conditions.

## b) Policy

DFCS shall conduct an investigation/assessment of all maltreatment reports that are screened as a level II or III. All level III allegations of maltreatment including corporal punishment of a child in DFCS custody shall be initiated within 24 hours of the initial intake "report date and time" and investigation completed within 30 calendar days including supervisory approval. All level II allegations of maltreatment shall be initiated within 72 hours of initial intake "report date and time" and investigation completed within 30 calendar days including supervisory approval.

## c) Purpose

DFCS is mandated by MISS. CODE ANN. § 43-21-357(1) to investigate all reports of possible abuse or neglect of children by their parents or caretakers. The caretaker may be someone who is entrusted with the care of the child, such as a foster parent, non-licensed child care providers/babysitters, scout leaders, tutor, clergy, or residential care facility staff. DFCS will

respond within mandated time frames and investigate allegations of child abuse and neglect in these complex cases and address the child's risk, safety, and well-being while addressing the trauma of placement moves during the investigative/assessment process.

### d) Procedures

The standard investigative/assessment protocol applies to all DFCS investigations but there are additional requirements that apply to special handling DFCS investigations/assessments. Those reports that are considered to be special handling DFCS investigations/assessments are: reports on resource homes, licensed facilities and DFCS employees. Medical neglect of a handicapped infant, death of a child, and other settings are considered "Expanded Investigations in Extraordinary Circumstances".

Reports on other settings such as unlicensed child care providers/babysitters, the staff / individuals representing churches, civic or social organizations are entered as DFCS regular intakes. In addition to the standard investigative/assessment protocol there are additional steps outlined under the Out-of Home section of this policy.

## 2. Resource Reports

### a) Resource Homes

DFCS shall initiate all allegations of maltreatment, including corporal punishment involving a child in DFCS custody within 24 hours of initial intake "report date and time" and the investigation completed within 30 calendar days, including supervisory approval. Upon learning of or observing such maltreatment the DFCS employee must immediately notify his/her supervisor. The DFCS employee will then make the report to the MCI either by phone or electronically.

All allegations of maltreatment in a licensed Resource Home received by the MCI shall be entered as a report for the county where the Resource Home is located.

Once MCI enters and screens the intake report it will go to the RD of the region where the Resource Home is located for assignment. In addition to the standard investigative/assessment protocol, the following procedures must be followed.

The COR Worker for a child in DFCS custody, regardless of the location of the resource home/ facility and regardless of which county has responsibility for conducting the investigation, must accept immediate and full responsibility for the safety, permanency and well-being of that child, including assessing the placement in terms of the incident reported and investigated and making

immediate contact with the child. The placement of the child must be evaluated by the COR in terms of safety, permanency and well-being regardless of the outcome of the investigation.

"A report of corporal punishment of a foster child which does not meet the criteria for screening delineated in "Screening Reports and Assigning Response" in this section- that is, a report indicating that a foster child has been subjected to corporal punishment but there is no report of injury, indication that the child is not safe, nor information suggesting that the child is in danger of harm – will be screened in as an ANE report requiring a level 3 investigation strictly due to the requirement that the prohibition of corporal punishment in Resource/Facility Settings requires the report of such corporal punishment be investigated as potential child abuse. If the investigation determines that corporal punishment did occur but there is no injury to the child and the punishment administered in a reasonable manner, child abuse shall not be substantiated. The investigation will indicate the occurrence of a policy violation and referred to the appropriate Licensure Specialist for corrective action."

1. The RD/designee shall notify by phone and/or email the COR and COS if applicable, and the Resource ASWS of the allegations. The COR ASWS for all other children residing in the home should be notified as well.

2. The RD/designee shall assign the investigation to a Worker who has been trained in conducting maltreatment investigations in Resource/Facility Settings and will notify his/her ASWS before the assignment is made. The Worker shall not have been involved in the licensure of the Resource Home and shall have no ongoing connection to the foster care case.

3. The assigned Resource Specialist shall accompany the assigned Worker to the home to assess possible policy and/or licensure violations.

4. The RD, ASWS, COR and COS if applicable must make a determination if the identified victim and other children should remain in the home until the investigation/assessment is completed. The investigation and decisions should be based on a full and systematic evaluation of the factors that may place a child in DFCS custody at risk.

5. The Permanency Unit will log all reports on DFCS homes and monitor completion of the investigation/assessment and the final report.

6. The RD will monitor the timeliness of initiating and completing investigations of reports of maltreatment in foster care on a monthly basis.

7. Within 24 hours of the allegations being made the child's COR Worker shall verbally notify parents or caretaker from whom the child was removed and the Guardian *ad litem* of

the allegations involving the child. This notification must be documented in the child(ren)'s case record and the investigation/assessment report.

8. All alleged victim(s) must be seen and interviewed within 24 hours of initial intake "report date and time" to assess risk, safety, and well-being.

9. No additional children may be placed in the home pending the completion of the investigation/assessment.

10. The assigned Investigative Worker shall:
    a. Interview:
        1. Alleged victim(s); privately
        2. All DFCS children in the home; privately
        3. DFCS Worker(s) of the alleged victim
        4. Resource Specialist
        5. Former DFCS Staff, as appropriate
        6. Children formerly in the home, as appropriate
        7. Other professionals and collateral contact persons associated with the children in the home
        8. Other household members, if applicable
        9. Alleged perpetrators.
    b. Review Cases of:
        1. Alleged victim(s)
        2. Other child(ren) in the home
        3. Resource Home
    c. Staff report of initial findings within 3 days with the RD in the region where the home is located and advise the RD as additional information is obtained.
    d. Provide written notice to the District Attorney within 48 hours of finding evidence that a child has been abused.
    e. Complete the Safety and Risk Assessment for resource reports within DFCS timeframes. (*See* DFCS Connection Website under *"Forms"*)
    f. Give a verbal report to the RD at the conclusion of the investigation/assessment
    g. Submit the completed report to the RD in the region where the home is located within 25 calendar days from initial intake "report date and time". The RD has 5 calendar days to approve the investigation.

11. After the initial safety assessment is completed, the Resource Specialist and the assigned Worker shall discuss with the Resource Supervisor the corrective actions needed. This emergency corrective action plan, if needed, is then verbally submitted to RD.

12. The RD will notify the Permanency Unit Director/Director of Field Operations/Division Director/Bureau Director of Prevention/Protection via electronic mail regarding the completed investigative findings, recommendations, and corrective actions. The completed investigation is available for viewing in the MACWIS system.

13. Once the final report, recommendations, and corrective action plans are approved, the Resource Specialist, Resource ASWS and COR Worker will convene a FTM with the resource family and COS Worker, if applicable, to notify them of the findings and recommendations.

14. When a maltreatment investigation involves a resource home, DFCS shall file a copy of the approved final investigation report, and any recommendations and/or corrective actions DFCS has deemed necessary, in the case record of the foster child, the file of the foster/adoptive parents with a copy of the letter of notification to the foster or adoptive parents, and in the DFCS State Office. DFCS shall also provide those records to the Youth Court Judge with jurisdiction over the child, the Guardian *ad litem* and to the Monitor.

### b) Licensed facilities

Upon receipt of a report of child maltreatment in a DFCS licensed group home, emergency shelter, child placing agency resource home, DFCS shall undertake a licensure investigation, that is in addition to, and independent of, any child protective investigation, that shall include an on-site inspection of the facility or home to determine the contract provider's compliance with DFCS licensure standards. If the provider is found to be in violation of licensure standards, it shall have 30 calendar days to submit a Corrective Action Plan (CAP) with timeframes to rectify the violation and comply with the approved CAP and timeframes. If the provider does not comply with the licensure standards based on the approved CAP and timeframes, DFCS shall revoke the license.

If a report involves felony child abuse, law enforcement must be notified immediately.

The RD of the region in which the facility is located will assign a Worker who has been trained in conducting maltreatment investigations in out-of-home placements and has no ongoing connection to the foster care case.

## INTAKE & ASSESSMENT

Upon arriving at the facility, the Worker will confer with the director or staff member in charge to inform them of the report. The regular investigation protocol shall be followed with these additions:

- Parents/guardians/custodians of children identified as victims will be informed after child is interviewed and immediately if medical treatment is needed;
- Referral of above child(ren) to physician or other professionals as appropriate to assist in the investigation;
- Interviews with other appropriate personnel;
- Interview with any other DFCS foster child(ren) currently in the facility or who has left the facility, who may have information regarding the incident;
- Interview with alleged perpetrator if law enforcement is not involved or if law enforcement has indicated you may do so;
- View of physical premises where incident is alleged to have occurred;
- Review of documents or records related to the incident; If access to records is denied contact Youth Court in that jurisdiction for assistance; and
- Review of facility policy and procedures and obtain a copy of the facility's policy/procedures regarding behavior management, if report involves physical abuse as a result of behavior management technique.

If immediate protection is needed, Youth Court and the licensing agency should be contacted and protective measures taken.

When a maltreatment investigation involves an agency group home, emergency shelter, private child placing agency resource home, or other facility licensed by DFCS, a copy of the final investigative report shall be filed in the following:

- child's case record,
- DFCS State Office licensing file, and
- sent to the licensed provider facility.

DFCS shall also provide the report to the following:

- Youth Court Judge with jurisdiction over the child and
- the Monitor.

The completed investigation is available for viewing and printing via the MACWIS system.

# INTAKE & ASSESSMENT

Any foster child who remains in the same out-of-home placement following an investigation into a report that he/she was maltreated, or subject to corporal punishment in that placement shall be visited by the DFCS Worker twice a month for 3 months after the conclusion of the investigation to assure the child's continued safety and well-being.

Within 30 days of the completion of any investigation of maltreatment of a child in custody, DFCS shall review the maltreatment investigation. This review shall include:

1. identification of any case practice deficiencies;
2. identification of any remedial actions necessary to ensure the safety of the child who is the subject of the investigation as well as any other child in the home or placement as well as the timeframe in which such remedial action must take place; and
3. identification of any corrective action that is necessary to address deficiencies in case practice demonstrated by the investigation as well as the timeframe in which such remedial action must take place.

DFCS will monitor the initiation and completion of the remedial actions regarding individual child safety and case practice. DFCS shall notify the Area Social Work Supervisor (ASWS), Regional Director, and Director of Field Operations when such remedial actions have not been initiated within five days of identification or timely completed.

## c) Special Investigations

Any abuse/neglect report received by Intake that names a DFCS employee as a possible perpetrator, or victim or indicates a DFCS employee is somehow involved with this report (i.e. related, past or present relationship that is more than casual) requires a special investigation/assessment.

Once the intake is entered into MACWIS the RD in the region where the employee resides will receive a notification tickler of the intake. The RD shall assign a Worker from outside the county/region to conduct the investigation and make the assignment in MACWIS. The RD shall notify the Director of Field Operations immediately upon receipt of the Intake regarding the report and shall keep the Director informed of the progress. The assigned Worker shall initiate the investigation/ assessment and document in MACWIS within 24 hours of initial intake "report date and time". The assigned Worker shall staff the investigation/ assessment with the RD throughout the investigative/assessment process.

Other than the above differences, the assigned Worker should follow the standard investigative time frames. The RD shall notify the Director of Field Operations upon completion of the investigation, which is available for viewing in the MACWIS System.

### 3. Expanded Investigations In Extraordinary Circumstances

### a) Native American Children

The Mississippi Band of Choctaw Indians or any other Indian Tribe to which the child belongs has the right to accept or deny jurisdiction of the said child and to help with placement resources.

The Federal *Indian Child Welfare Act (ICWA)* was passed in 1978 and grants Indian tribes exclusive jurisdiction in child welfare cases involving Native American children. Because of this Act's existence, DFCS has no jurisdiction to investigate allegations of abuse or neglect occurring on Native American tribal lands. However, DFCS has and will continue to receive reports of abuse/neglect regarding Native American children whether they live on or off tribal lands. Should MCI receive such a report, a determination shall be made as to whether:

- The child is a member of a Native American Tribe and falls under the purview of ICWA;
- The child resides on designated tribal lands where an Indian tribe has jurisdiction.

The Mississippi Band of Choctaw Indians has tribal land in Neshoba, Attala, Jones, Kemper, Leake, Newton, Scott, and Winston counties.

If a child is identified at Intake as a member of the Choctaw tribe or another Indian tribe and lives on tribal land, the MCI Worker will screen the report to the county where the child resides. The COR Intake Supervisor will in turn notify the Mississippi Band of Choctaw Indians or any other tribal court and provide them with the allegations and all identifying information. If they do not wish to retain jurisdiction and request the county to investigate the allegations, the county will follow normal investigative procedures. The contact information for the Mississippi Band of Choctaw Indians is located on the MACWIS Web.

Workers must resolve the issue of Indian heritage as soon as possible after contact is made with the family, either through a report of abuse/neglect or a referral for services. The Worker shall ask the family the following questions to gain knowledge in deciding what is in the best interest of the child and document the discussion in the narrative section of MACWIS:

1. Is parent or child of Native American heritage?
2. Is parent eligible for tribal membership?
3. Is parent registered with Native American tribe?
4. Is child eligible for tribal membership?
5. Has child been registered with Native American tribe?

6. Does the family live on tribal land?

(refer to Section D, ICWA)

## b) Medical Neglect of Handicapped Infants

Federal regulations (*Child Abuse Amendments of 1984, P.L. 98-457*) requires DFCS to respond to reports of medical neglect, including instances of withholding of medically indicated treatment (including appropriate nutrition, hydration, and medication) from disabled infants less than one year of age with life threatening conditions.

DFCS will investigate all allegations of medical neglect of a handicapped infant. Once a report of medical neglect of a handicapped infant is received by MCI it will be screened in for the county where the child/family resides.

1) ASWS shall
   a. Assign the report for investigation immediately.
   b. Notify immediately designated contact person at the health care facility/hospital if applicable and the facility's Social Services Department, if applicable.
   c. If the child is in a health care facility/hospital the Worker shall conduct interviews with the following:

      1. Designated contact person
      2. Family
      3. Others involved with the infant
      4. Infant Care Review Committee (ICRC) if one is established at the health care facility.
      5. The assigned Worker shall complete the following:

   d. Obtain an independent assessment from a medical consultant, if there is a determined need.
   e. Review infant's medical records, if necessary with the assistance of designated contact person. If the parents or facility do not cooperate, contact the Youth Court Judge or designee for a court order.
   f. Request an independent medical examination of the infant, if necessary, to assure an appropriate resolution of the report. If the parents or facility do not cooperate, contact the Youth Court Judge or designee for a court order.

2) If the findings of the investigation indicate that the infant is medically neglected, the ASWS must:
   a. Contact the Youth Court Judge to request an order to:
      1. Require parents to seek appropriate medical care, or
      2. Place custody with DFCS to obtain appropriate medical care.
   b. Document request to Youth Court Judge in the narrative section in the MACWIS System.
   c. Assign case to a Worker.

3) At the conclusion of the investigation, the ASWS must:
   a. Notify the RD of the findings that are available for viewing via the MACWIS system which includes the following:
      1. Names of:
         - Child
         - Parents
         - Alleged perpetrator
         - Designated contact person
         - Attending physician
      2. Circumstances surrounding allegations of medical neglect.
      3. Identities of persons interviewed.
      4. Investigation/assessment information
      5. Case disposition
      6. Action taken, if valid report
   b. Share the report with the Worker assigned to the case.
   c. Send letter to the facility administrator regarding disposition.

## c) Death of a Child

When MCI receives a report of the death of a child, DFCS will investigate these reports when the death of a child is caused by or is suspected of being caused by abuse or neglect. In addition to the standard investigative/assessment protocol the following procedures must be followed:

1. Notifications

   a. The ASWS immediately notifies the RD by phone and completes the SIR and submits electronically to the RD for approval

## INTAKE & ASSESSMENT

b. District Attorney

c. Law Enforcement

d. Coroner, if not already informed

e. The RD reviews and approves the SIR and submits electronically to the Division Director/Director of Field Operations/Bureau Director of Protection Unit and the Director of Permanency Unit, who then forwards the SIR to the *Olivia Y* Monitor.

2. DFCS staff who learn of the death of a child where there is suspicion of abuse or neglect, shall immediately notify MCI and provide the following additional information if known, to their immediate supervisor.

   a. The child is in DFCS custody;
   b. The child or family has an open or closed DFCS case;
   c. A DFCS investigation is pending at the time of the child's death;
   d. Prior reports concerning the child or family were screened out for DFCS investigation;
   e. Other children remain in the home and safety and protection issues must be addressed; or
   f. It is not known if other children reside in the home and require protection.

3. Assignment

   a. If there is an active/closed case or open investigation on the alleged victim or immediate household/family member the RD will thoroughly review the case records and arrange for the investigation to be handled by a Worker from outside the Region.
   b. If it was unknown initially that there was past involvement with the child/family and the report was already assigned, then the ASWS must notify his/her RD who shall instruct the ASWS to re-assign the report to a specific Worker from outside the Region.

4. Investigation/Assessment

   a. The assigned Worker shall meet with law enforcement and others as appropriate to outline roles, responsibilities and procedures for sharing information. It is very important to coordinate the investigation/assessment with law enforcement to avoid duplication and negating valuable evidence.

b. Death of a child under the age of two (2) years where death results from an unknown cause or where the circumstances surrounding the death indicate that sudden infant death syndrome may be the cause of death. (MISS. CODE ANN. § 41-61-59(2)(j))

- Autopsy is performed by State Medical Examiner's Office or one of its designated pathologists.

c. The assigned Worker should request a verbal report and the final autopsy report from the coroner in order to aid in investigation/assessment.

- The assigned Worker reports the initial findings within 24 hours to his/her ASWS who then notifies the RD regarding whether it is an active/closed case, and shall advise as additional information is obtained.
    a. The investigation will then be transferred electronically by his/her ASWS to the newly assigned Worker.
    b. The initial Worker will relay all pertinent information to the newly assigned Worker.
- The assigned Worker submits a written report to the District Attorney within 48 hours of finding evidence of abuse or neglect, § 43-21-353(8).
- The completed report shall be submitted electronically within 25 calendar days to his/her ASWS.
- When a child died as a result of abuse/neglect the COR sets up a case record with the following:
    1. Referral Information
    2. Autopsy Report
    3. Completed report of investigation/assessment and findings.

**Public Disclosure**
According to the U.S. Department of Human Services' Child Welfare Policy Manual, disclosure of information related to child fatalities or near fatalities is mandatory.

A "near fatality" is defined under section 106 (b)(4)(A) as "an act that, as certified by a physician, places the child in serious or critical condition." For example, if hospital records reflect that the child's condition is "serious" or "critical," this would be considered a "near fatality" under CAPTA. In situations of non-DFCS involvement in which there is alleged abuse or neglect that results in a "near fatality", an SIR is required. Refer to "Death of a Child" for the steps in completing an investigation on a "near fatality".

MISS. CODE ANN. § 43-21-257 states the general rule: "any record involving children…shall be kept confidential and shall not be disclosed except as provided in § 43-21-261."

The exception in § 43-21-261 (18) specifies that:

> *In every case where there is any indication or suggestion of either abuse or neglect and a child's physical condition is medically labeled as medically "serious" or "critical" or a child dies, the confidentiality provisions of this section shall not apply. In cases of child deaths, the following information may be released by the MDHS: (a) child's name; (b) address or location;(c) verification from the Department of Human Services of case status (no case or involvement, case exists, open or active case, case closed); (d) if a case exists, the type of report or case (physical abuse, neglect, etc.), date of intake(s) and investigation(s), and case disposition (substantiated or unsubstantiated). Notwithstanding the aforesaid, the confidentiality provisions of this section shall continue if there is a pending or planned investigation by any local, state or federal governmental agency or institution.*

The information specified above should be provided immediately by the county ASWS to the Deputy Director of DFCS. The Deputy Director has the authority to release this information.

## d) Out of Home

DFCS does not investigate reports in Out-of-Home settings unless otherwise ordered to do so by the Youth Court. DFCS may assist in these investigations if requested by law enforcement, etc. (refer to MISS. CODE ANN. § 43-21-105(x))

## e) Investigations of Meth Labs

**Definitions:**

**Active "meth lab"**
*A setting wherein crystal methamphetamine is being manufactured.*

**Inactive "meth lab"**
*A setting where crystal methamphetamine has ever been manufactured but without a decontamination process being completed by the Mississippi Bureau of Narcotics (MBN), MBN affiliate, MBN designee or MBN approved source.*

### *1. Protocol for Social Workers*

- No DFCS Worker shall knowingly enter an active or inactive "meth lab" for any reason.
- All reports of children currently residing in "meth labs" active or inactive should be "screened in" for investigation. The appropriate local law enforcement entity and the

regional MBN office must be contacted and requested to assist the investigating Worker on each "meth lab" investigation. If local law enforcement is unable or unwilling to assist, the administrative chain of command should be followed in seeking advice as to how the matter should be handled (i.e., Worker-ASWS-RD). During a "meth lab" investigation, the investigating Worker should remain outside, at least 100 feet from the "meth lab", while law enforcement officers remove the child/children from the lab unless instructed otherwise by law enforcement.

- The Worker shall request copies of any photographs taken by law enforcement at the scene and follow-up to ensure that this information is received and placed in the DFCS's files.
- The child/children must be decontaminated by law enforcement or medical staff either at the scene or at a medical facility. The Worker should not place the child/children into her/his vehicle without the decontamination process having been conducted.
- If the victim(s) is/are taken to a medical facility, the Worker shall make a request to receive the results of any examinations and/or tests performed on the child/children, and follow-up to ensure that this information is received and placed in the DFCS's files.
- If decontamination occurs on the scene, the Worker should advocate that the procedure be performed in such a way that does not further traumatize the child.
- If it is determined that a child is residing in a setting wherein an active or inactive "meth lab" exists a Family Team Meeting would be held and a Safety Plan developed.
- Recommendations for vulnerable adults should be reported using the same MCI number 1-800-222-8000 or www.msabusehotline.mdhs.ms.gov.

**2. *Reasons to Consider the Removal of Children***

Child(ren) may be removed for the following reasons:

a. If child(ren) is in imminent danger that cannot be resolved by a Safety Plan or by providing services.

b. If it is determined that a child is residing in a setting wherein an active "meth lab" exists, this shall be viewed as a situation in which the victim cannot remain safely in the home.

## f) Reports Involving More Than One County

When a report is screened to the child’s county of residence and the incident happened in another county the responsibility of the Intake County is as follows:
(*See* section on Resource Investigations for children in custody)

***1. Responsibilities of county of residence:***

- Accept report;
- Initiate legal action, as needed for child’s protection;
- Coordinate ongoing legal/court intervention;
- Coordinate investigation with county where incident occurred;
- Arrange treatment services for child and family as appropriate in county of residence;
- Notify law enforcement if needed;
- Complete investigation in MACWIS.
- Contact alleged perpetrator’s county of residence to coordinate interviews
- Coordinate interviews on a child who may be visiting in another county.

***2. Responsibilities of county where incident occurred:***

If a child is receiving services at a hospital or medical facility in a county other than his/her county of residence, and a report is received, the county Worker where the child is located at the time of the report shall assist in any way, including initiating the contact with the child and assessing the safety of the child(ren). The Worker (where the child is located at the time of the report) shall conduct the following interviews:

- Interview alleged perpetrator;
- Interview alleged victim or any other children who may still be in the county where incident occurred.
- Interview reporter unless he or she has chosen to remain anonymous.
- Assist with coordination of services if needed.

All information gathered shall be entered in the MACWIS system in the investigative report.

## g) Abused Child from Another State

When the child, who is the subject of an allegation of abuse, is a resident of another state and the abuse occurred in that state, and the child is currently located in Miss. the MCI Worker receiving the report will:

- Complete the Information and Referral (I&R) and notify the MCI Supervisor, MDHS/DFCS Protection Unit Director and e-mail and/or fax the information to the other state.

- If services are needed, the ASWS in the county where the child is currently located will coordinate services with the child's state of residence.

## h) Mississippi Child Abused in Another State

When the child who is the subject of an allegation of abuse is a resident in Mississippi and has been allegedly abused in another state, the MCI Worker shall:

- Complete the requested data on the MACWIS Intake Screens and forward the information to COR Intake Supervisor. (The contact information for the state in which the alleged abuse occurred will be listed within the location information of the MACWIS Intake.)
- Make an oral report to the Child Protective Service Unit in the state where the abuse allegedly occurred.
- Request the other state's assistance in completing the investigation.

## i) Family Moves out of State

If a family moves out of state during an investigation of a child abuse/neglect and the family's new address can be obtained, a letter to the Child Protective Service Division in the other state must be written informing them of the report and must be sent to the Office of Protective Services, Division of Family and Children's, for the other state.

If the report indicated that there may be imminent danger of harm or threatened harm to the child, a protective service referral must be made immediately by telephone to the other state and confirmed in writing through the other state's DFCS as soon as possible after making the oral report.

## j) Protective Services Alert

Protective Service alerts are used when the family and/or victim's exact whereabouts is unknown **and** the Worker is of the opinion that further harm may come to the child victim(s) unless protective services are provided.

In the case of a child fatality, when the family has moved to another county or state while the case is under investigation, **and siblings** to the deceased child have moved with the parents, a child protective alert needs to be sent by the assigned Worker and/or supervisor to the appropriate state and/or county office.

Protective Service Alerts received in the State Office from other states will be forwarded from the Protection Unit via electronic mail to each county office.

If a county needs to send a Protective Service Alert to another county or all counties within Mississippi, the county office will forward the alert to the Protection Unit to be disseminated via electronic mail to the other counties.

If a county office needs to send a Protective Service Alert to a Family and Children's Services' office in another state, the county office will forward the alert to the Protection Unit to be forwarded to the other state via electronic mail.

#### k) Requests from Another State

A county office may receive a request from another state for completion of a child abuse/neglect investigation when the incident occurred in that state with a child and the alleged perpetrator resides in Mississippi. An assigned Worker from the county office shall interview the alleged perpetrator for the other state.

## III. Family Centered Practice

### A. Family Team Meeting (FTM)

A Family Team Meeting (FTM) is a planned, structured, facilitated decision making process to which members of the family both formal/informal, are invited along with required DFCS staff and any other support system identified by the family and DFCS. The key to a successful FTM is the engaging and bringing together of those individuals, both formal and informal, who are a part of the family's support system. FTMs allow for the gathering of information critical to the assessment process, to the development of the case plan, monitoring of the case plan and involvement of the family and other pertinent individuals in key decision making.

#### 1. FTM Philosophy and Practice

At all times a FTM should be a family led, youth guided and agency supported process. The primary focus must always be the safety and well being of the children and youth. As a philosophy, it reflects the belief that families can solve their own problems most of the time if they are provided the opportunity and support. No one knows a family's strengths, needs and challenges better than the family. The family team decision making approach is also a practice in that it describes the basic method by and through which DFCS seeks to serve children/youth and families. A child welfare supervisor's participation in a FTM is an opportunity to assess the

Worker's use of Family Centered Practice principles. The Family Centered Practice Principal encompasses the following components:

- A clear but open-ended purpose;
- An opportunity for the family to be involved in decision-making and planning;
- Options for the family to consider and decisions for the family to make;
- The family's involvement in the development of specific safety or permanency plans and in the development of services and supports;
- Engagement;
- Relationship building;
- Problem solving; and
- The outcome of the meeting will be reflected in the development of a case plan with tasks and goals.

## 2. FTM Requirements

A FTM is required during:

- An investigation if removal is necessary for the safety of the child.
- This meeting should occur prior to the removal when possible, or within 24 hours of removal unless the Worker is unable, after diligent efforts documented in the case record, to identify, locate, and engage the family.
- An investigation when safety and risk factors are identified and a safety plan is needed.
- An investigation when evidence of abuse or neglect is found or if there are safety and risk factors present to warrant opening a case.

On all cases, an Initial FTM shall be completed within thirty (30) calendar days from the opening of the case. The case is considered open when the ASWS makes the decision in MACWIS for continuing services. The ASWS should make a decision within five (5) calendar days of the Worker's recommendation for continuing services.

## B. Mobilizing Services

In providing services to the family or child, DFCS, in collaboration with the family members, and based on assessment information, should recommend services that are determined to be the most beneficial and least intrusive to the family while maintaining the child's safety. This recommendation should include consideration of the ability of family members to access services

as needed, provision of needed services in the home and/or community in which the family members live, and providers that can best meet the family members' needs.

Services shall be mobilized at any point in an investigation when services are needed to maintain a child's safety or reduce risks for abuse and neglect. The decision to mobilize services should be based on the safety and risk assessment and parental protective factors. Cases with active safety concerns requiring a safety plan or protective custody must be opened for services. Services with no active safety concerns but assessed to have a moderate or high level of risk may be opened for services. In those situations, the Worker should:

- Make decisions with the family regarding the identification of services needed, appropriate providers, and locations of services;
- Make prompt referrals to service providers; and
- Follow up to help ensure prompt service initiation.

If the case is opened for services, the Worker should use the Comprehensive Family Assessment (CFA) and FTM to identify services that need to continue or to be initiated based on the goals, assessment, and case plan. If the case is not opened for service, but the Worker and family determine that services would benefit the family, the Worker shall assist the family with referrals to community based resources.

## C. Disposition of Cases

### 1. Cases in which the Family's Whereabouts Become Unknown before Completion of an Investigation

Some families with whom DFCS is working will move without notification. If a family moves without leaving a forwarding address, and the investigation is incomplete and the Safety and Risk Assessments have not been completed which would alleviate harm or imminent danger, the Worker should immediately make every effort to locate them via neighbors, family, schools, law enforcement, courts, mental health facilities, etc. and if located, alert the appropriate DFCS office in the family's new locale. The case should be terminated upon transferring the incomplete investigation to the family's new location.

If the family relocates to another state and that state's DFCS requests information, the information regarding this family should be sent expeditiously.

Mississippi, DFCS Policy
Revised 7-22-13

Section B

INTAKE & ASSESSMENT

## IV. Appendices

67

## INTAKE & ASSESSMENT

## Appendix A

**Reports which may be screened out at intake**:

- Dirty houses or dirty children and no indication of life or health endangering situation. If school/day care officials report dirty children, they should be requested to talk to parents first. If their attempts to meet with parents or to correct situation fail, then accept report.
- Children inappropriately dressed and no indication of neglect of a life or health endangering situation.
- Allegations that speak more to the parent's behaviors rather than the child's condition; (e.g., parent drinks beer or takes drugs; mother has boyfriend) and there is no indication of neglect or life or health endangering situation. – Exception: All reports of mother/child testing positive for drugs will be screened in.
- Reports of crowded conditions or too many people living in a home and no indication of neglect or life or health endangering situation.
- Allegations that parent is not spending TANF, Food Stamps, Child Support or other income on children, and there is no indication of neglect of basic necessities, or of a life or health endangering situation. Reporters should be referred to local Economic Assistance office.
- Reports which suggest a need to be addressed by another agency and there is no indication of a life or health endangering situation. (i.e., lack of school attendance, presence of lice, delinquency, lead/asbestos poisoning). These reports should be referred to the appropriate agency for handling (i.e., school attendance officer, health department).
- Reports on teen pregnancy where there is no suspicion of abuse/neglect.
- Sufficient information is not provided to enable the Department to locate the family, and this information cannot be secured through other sources after all reasonable efforts have been made.
- Reports of incidents that occurred when a person now eighteen (18) or over was a child. When adults report that abuse/neglect was perpetrated on them as children, they must have some other information or reason to believe that children presently cared for by perpetrator are being abused/neglected.
- Reports on an unborn child and there are no other children at risk.
- Reports of sexual relations involving victims age 16 and over that meet all of the criteria below. If any one criteria does not apply, the report should be considered for investigation.

a. Alleged victim was age sixteen (16) or over at the time incident occurred, and
b. Alleged victim is a normally functioning child, and
c. Alleged victim, age 16 or over, willfully consented, and
d. Alleged perpetrator is not a parent, guardian, relative, custodian or person responsible for the child's care or support and resides in the child's home, or an employee of a residential child care facility licensed by MDHS, and or a person in a position of trust or authority.
e. No parental or caretaker neglect is suspected.

If a report is considered outside the jurisdiction of the DFCS, the report shall be documented and be referred to law enforcement of proper jurisdiction for investigation. Other services of the Department may be provided.

- Reports of rape, sexual molestation, or exploitation of any age child that meet all of the criteria below. If either (a) or (b) does not apply, the report should be considered for investigation.

    a. Alleged perpetrator is not a caretaker, friend of caretaker, relative, other person living in the home, or employee of a child care facility where the child attends or lives.
    b. No parental or caretaker neglect is suspected.
    c. Law Enforcement has been informed of the report.

If law enforcement has not been contacted, County DFCS will immediately make the report to them. Other services of County DFCS will be offered to law enforcement (i.e., interviewing children) and the family (i.e., mental health referrals, counseling) as needed.

- Reports of children who have not had their immunizations. Reporter should be referred to the County Health Department by County DFCS to contact a public health social worker or to the school attendance officer as appropriate.
- Threats or attempts of suicide by children if there is no suspicion of parental/caretaker abuse or neglect. If the nature of the report suggests that the child is in immediate danger of self harm, a referral should be made immediately to Mental Health and/or Law Enforcement. If reporter is a professional, they should be requested to refer the family to counseling. If family does not follow through, then case can be referred to DFCS for neglect. If reporter is a non-professional, the DFCS should determine if family is seeking

counseling. If not, DFCS should investigate for neglect. If reporter feels suspicion exists just because suicide attempt was made, DFCS will investigate.

- Physical injury committed by one child on another that meet all of the following criteria:

  a. Child is not in a caretaking role over the other child.
  b. No parental or caretaker neglect is suspected.
  c. Child victim and perpetrator are not in a residential child caring facility or a home licensed or approved by DFCS.

**Additional and Duplicate Reports:**

The DFCS sometimes receives additional reports regarding an incident or situation that has already been investigated. If a report regarding abuse or neglect is received and it includes any of the following information, it must be investigated as a new report if a DFCS Assessment is not currently in progress:

- A new alleged perpetrator;
- A new victim;
- A new category of child maltreatment not previously reported;
- A new incident involving the same type of child maltreatment(s).

In order to classify a report as the duplicate report and to screen it out for investigation, the CPS social worker must determine if the new information includes:

- Same alleged perpetrator(s);
- Same victim(s);
- Same types of child maltreatment(s); and
- Same incident

Before any decision is made to screen out any report as being the same report, the ASWS must always make sure the prior report was thoroughly investigated.

Second reports of abuse or neglect will not be investigated if it is the same report, same victim and same incident.

# INTAKE & ASSESSMENT

## Appendix B

Form DFCS 506
Revised 02/2011

### BEHAVIORAL INDICATORS OF ABUSE

**Preadolescent :**

1. Stylized behavior, excessive seductiveness
2. Unusual interest in sex organs of self or others (either children or adults
3. Fearful or suspicious of adults
4. Tugging at clothing in genital area
5. Tired, lethargic, sleepy appearance
6. Regressive behaviors: such as whining, negative changes in toilet habits
7. Persistent fears or overwhelming nightmares
8. Blaming or dislike of self
9. Change in school grades
10. Public or excessive masturbation
11. Developmental delays
12. Child is perceived and/or treated by parent as “bad,” unusual, and/or different
13. Behavioral extremes (e.g. extremely aggressive or passive; persistent crying)
14. Child assumes parental role (i.e., caretaker of one or both parents and/or siblings beyond normal “role playing “for child’s age)
15. Lack of peer interaction
16. Threatens or attempts suicide
17. Psychosomatic illness

**Adolescent:**

## INTAKE & ASSESSMENT

1. Stylized behavior, excessively provocative beyond the norm for the child
2. Shy, withdrawn, overburdened appearance
3. Change in school grades
4. Running away
5. Self-destructive behavior
6. Substance abuse that is more experimental
7. Unwillingness to participate in group activities
8. Stealing; shoplifting
9. Pregnancy wishes
10. Prostitution
11. Fear or distrust of men, adults
12. Statements about being “bad” or “undesirable”
13. Way of/avoidance of physical contact
14. Excessive longing for affection
15. Child assumes parental role or role as spouse of parent (i.e., care giving of one or both parents and/or siblings beyond normal “role playing” for child’s age)
16. Reluctance to change clothes for gym class
17. Lack of peer interaction
18. Threatens or attempts suicide
19. Psychosomatic illness

# Ex. 47

**Grace M. Lopes**

**From:** Grace M. Lopes [gmlopes@oymonitor.org]
**Sent:** Friday, May 04, 2012 2:24 PM
**To:** 'Rachal, Kenya'
**Cc:** 'Shirim Nothenberg'; 'Jessica Polansky'; 'Mia Caras'
**Subject:** Delays in Timely Submission of SIRS and Investigative Reports

Kenya:

As you know, recently I discovered that your clients had stopped forwarding SIRS and investigative reports to my office. In response to my inquiries, DFCS staff forwarded the missing reports to me. Because of this experience, I sought to ensure that I had received all SIRS and investigative reports involving children in custody as well as reports involving all child fatalities regardless of custody status. Mia has reconciled the DFCS tracking log for SIRS and investigative reports with the database my office maintains for this purpose. The results of the reconciliation process, which are detailed below, indicate that improvements are warranted and that your clients may need to make additional efforts to ensure I receive SIRS and investigative reports on a consistent and timely basis. I'd appreciate it if you could underscore the importance of this matter with your clients. If there is anything I can do to be helpful, please let me know. Many thanks, Grace

*Grace M. Lopes*
*Monitor, Olivia Y.*
*1350 Connecticut Avenue, N.W.*
*Suite 1000*
*Washington, D.C. 20036*
*202.232.8311*

*This email and any attachments may contain confidential and privileged information. If you are not the intended recipient, please notify the sender immediately, destroy this email, and destroy any copies. Any dissemination or use of this information by a person other than the intended recipient is unauthorized and may be illegal.*

---

**From:** Mia Caras [mailto:mcaras@sparb.org]
**Sent:** Friday, May 04, 2012 9:53 AM
**To:** 'Grace M. Lopes'
**Subject:** Reconciliation of SIRs and Investigative Reports that Court Monitor has received against DFCS Log

Grace: I reconciled our tracking database for the SIRs and investigative reports that we have received from DFCS with the log of SIRs and investigative reports that is maintained by [redacted] at DFCS. In response to our request, [redacted] provided the log to me on April 18, 2012.

Based on my review of [redacted]'s log and my subsequent review of the SIRs and investigative reports ([redacted]'s log does not provide information about a child's custody status), there were 49 SIRs and investigative reports that we should have received from DFCS that we did not receive. The dates of the incidents range from October 12, 2010 to March 31, 2012. Of the 49 SIRs and investigative reports, 43 were SIRs and investigative reports that involved children who were in custody at the time of the incident. Five of the 49 were incidents for which we had previously received the SIRs, but had not received the investigative reports. One of the incidents involved a fatality of a child who was not in custody.

There are 12 additional SIRs and/or investigative reports reflected in [redacted]'s log that may involve children in custody or fatalities (regardless of whether the children were in custody). [redacted] is checking on whether they involve children in custody or fatalities and she will forward them to us if appropriate.

Thank you. –Mia

Mia Caras
Special Assistant
Office of the Court Monitor
1350 Connecticut Avenue, N.W., Suite 1000
Washington, D.C.  20036
202.232.8311
202.232.2052 - fax

**Ex. 48**



4268 I-55 NORTH
MEADOWBROOK OFFICE PARK
JACKSON, MISSISSIPPI 39211
PHONE: 601.351 2400
FAX: 601.351.2424

www.bakerdonelson.com

KENYA KEY RACHAL., ESQ.
Direct Dial: (601) 351-8940
Direct Fax: (601) 974-8940
E-Mail Address: krachal@bakerdonelson.com

June 4, 2013

**VIA ELECTRONIC and US MAIL**

Grace Lopes
*Olivia Y* Court Monitor
1220 19th St. NW, Ste 500
Washington, DC 20036

RE: *Olivia Y., et al. v. Haley Barbour, et al*; In the United States District Court for the Southern District of Mississippi, Jackson Division; Cause No. 3:04CV251LN

Dear Grace:

Enclosed please find a DVD of the maltreatment in care investigations DFCS has provided for the time period January 1, 2012 - January 31, 2013.

Sincerely,

Kenya

Kenya Key Rachal

cc: Miriam Ingber

# Ex. 49

# DFCS LICENSURE INVESTIGATIONS PROTOCOL

The Bureau Director for the Permanency Division of DFCS is provided with emailed copies of the Mississippi Centralized Intake (MCI) reports that are generated as alleged reports of Abuse, Neglect, and Exploitation (ANE) of a Child in the custody of DFCS and that currently resides in an agency group home, emergency shelter, private child-placing agency resource home, or other facility licensed by DFCS. The Bureau Director forwards a copy of the initial ANE reports to the Division Director of DFCS Licensure Unit/Congregate Care Division. The Division Director of the Licensure Unit/Congregate Care Division documents the initial ANE report(s) on the provider's Licensure Investigation Report (LIR) **(SEE ATTACHMENT A).** Each licensing staff has an assigned list of licensed providers that they regularly monitor and review, **(SEE ATTACHMENT B).** The initial ANE report is documented on the LIR, **(SEE ATTACHMENT A),** and assigned to the appropriate licensing staff. The assigned licensing staff will weekly check the status of the ANE investigations in MACWIS and will obtain a copy of the final ANE investigation report and/or request a copy from the Child Protection Services investigator. When an ANE investigation involves an agency group home, emergency shelter, private child placing agency resource home, or other facility licensed by DFCS, a copy of the final ANE investigation report and the Notification of Findings letter must be maintained for a minimum of seven (7) years by the Licensure Unit in the DFCS State Office. After the completion of the ANE investigation and receipt of the documentation of the ANE investigation and final letter (Notification of Findings) that was sent to the provider, the DFCS licensing investigation will be conducted within ten (10) working days. The Licensure Investigation shall take place regardless of the status of the ANE, whether substantiated or unsubstantiated.

For DFCS Licensure Unit investigations of agency group homes, emergency shelters, and private child placing agency resource homes, DFCS shall undertake a separate Licensure investigation, that is in addition to, and independent of, any Child Protective Services investigations. The contract provider's compliance with DFCS Licensure Standards will be investigated by the Licensure Reviewer assigned to the contract provider. **(SEE ATTACHMENT B).** Prior to the Licensure Investigation the Reviewer will conduct MACWIS searches to obtain any and all information concerning previous ANE reports documented in MACWIS for that particular contract provider. All ANE reports will be reviewed and discussed with the contract provider as part of the Licensure Investigation.

Within 10 working days of receipt of the final report of child maltreatment (ANE) in a group home, emergency shelter, or private child-placing agency resource home, the DFCS Licensure Reviewer shall include an on-site inspection of the facility or home to determine the contract provider's compliance with DFCS licensure standards. The investigation will be documented on the DFCS review forms #539; #541A; #542; #543 **(SEE ATTACHMENTS C-G).** When the Licensure investigation is completed a narrative will be constructed with details of the Licensure investigation, and the findings. The narrative will be sent to the provider along with recommendations and/or CAP provisions. When the investigation involves a private child-placing agency resource home, the Licensure Reviewer shall contact the agency and obtain a written report from

the agency of their findings and of the measures that they took with the private resource home. That information shall be filed in the Licensure records for that individual resource home at the State Office and kept on record for seven (7) years. A narrative of the information provided to the Department by the provider will be constructed and a copy sent to the provider outlining the findings, the measures taken by the provider and the recommendations from the Department. In the event that the same private resource home has an additional documented ANE report, then at that time, the Licensure Reviewer will make an on-site visit to the private resource home for a complete licensure investigation by the assigned Licensure Reviewer. The Licensure investigation will be conducted on-site at the private resource home and at the licensing agency. The DFCS review forms #539; 541B; #542; and #543 (**SEE ATTACHMENTS C-G**) will be utilized to document the findings of the investigation along with a narrative of the findings which will be sent to the licensing agency. The narrative will outline the findings, recommendations, and/or CAP provisions. The narrative will be sent to the appropriate agency staff and to the Provider's Executive Director. If any contract provider is found to be in violation of licensure standards, the provider has thirty (30) days to submit a Corrective Action Plan (CAP) with timeframes to rectify the violation and comply with the approved CAP and timeframes. **If the provider does not comply with the licensure standards based on the approved CAP and timeframes, DFCS shall revoke the license.**

When a child-placing agency or residential child-caring agency is placed on a CAP, the Licensure Unit will monitor the facility for three (3) to six (6) months via drop-in visits, scheduled and/or unscheduled. **These visits can occur at the discretion of the Licensure Unit. If the agency fails to comply with the CAP, the Department shall revoke the license.**

Authorized licensing staff of the Department may make scheduled and/or unscheduled visits to the provider. During an on-site visit, the licensing staff will interview youth placed at the facility and the licensing staff has the authority to review all records pertaining to licensing including financial records and minutes of board meetings. (MS Code 43-15-115).

**The Licensure Investigations will take place as follows:**

- Initial ANE report emailed to Permanency Bureau Director via MCI
- Initial ANE report sent to Division Director of Licensure for review and assignment to Licensure Reviewer; assignment of Licensure Reviewer shall be recorded on the LIR
- Initial ANE is assigned to a Licensure Reviewer via the LIR and given to that Licensure Reviewer for filing and for Licensure Investigation
- Initial ANE report is placed in the Licensure file of the provider
- Weekly MACWIS searchers will be conducted to review status of the ANE investigation

- Licensure Reviewer obtains a copy of the ANE investigation report printed from MACWIS and/or contacts the Child Protection Investigator and requests a copy of the final investigation to be sent to the assigned Licensure Reviewer
- The Licensure Reviewer obtains a copy of the final ANE outcome(s) letter (Notification of Findings) sent to the provider
- Upon receipt of the final ANE investigation report and a copy of the Notification of Findings letter that was sent to the provider, the Licensure Reviewer will contact the provider to schedule a visit for the Licensure investigation. The Licensure Investigation is initiated at this point.
- Within 10 working days of receipt of the final ANE investigation report and the final Notification of Findings letter that was sent to the provider, the Licensure investigation will take place no matter weather the ANE investigation was substantiated or unsubstantiated
- Licensure Investigation will began **first** with a thorough interview of the Child involved in the allegations and documented on DFCS form #542
- Licensure Investigations will be documented on the DFCS forms #539; #541A or #541B; #542; and #543
- Licensure Reviewer will construct a narrative containing the findings, the violations, the recommendations, and/or the provisions of the CAP will be outlined. A written letter of all the licensure investigation findings will be sent to the Provider's Executive Director and to the appropriate agency staff.
- The provider will submit their CAP
- Licensure Reviewer will review the provider's CAP
- Licensure Review will accept or reject the CAP and document that information in the provider's file
- If Licensure violations are substantiated the provider will be placed on a CAP and monitored via scheduled and/or unscheduled visits for a 3-6 month period.
- If a provider fails to comply with the terms of the CAP then their license with DFCS shall be revoked
- All of the above will be documented on the LIR

# LICENSURE INVESTIGATION REPORT

## DFCS LICENSURE UNIT

### MONTH: SEPTEMBER 2013

| LICENSED CONTRACT PROVIDER | NAME OF LICENSURE INVESTIGATOR | INITIAL REPORT | MACWIS SEARCHES | FINAL ANE INVESTIGATION RECEIVED WITH NOTIFICATION OF FINDINGS LETTER | DATE OF PROVIDER CONTACT BY LICENSURE | DATE LICENSURE INVESTIGATION INITIATED | LICENSURE INVESTIGATION WITH FACILITY COMPLETED | DATE OF SUBSTANTIATED OR UNSUBSTANTIATED OUTCOME | DATE PLACED ON CAP OR NOT ON CAP BY LICENSURE | DATE CONTRACT PROVIDER SUBMITTED APPROVED CAP |
|---|---|---|---|---|---|---|---|---|---|---|
| Name | Name | MM/DD/YY | MM/DD/YY | MM/DD/YY | MM/DD/YY | MM/DD/YY | MM/DD/YY | Substantiated/ Unsubstantiated | MM/DD/YY | MM/DD/YY |
| YV-[redacted] Victim: [redacted] | [redacted] | 7/29/2013 | 7/29/2013 8/16/2013 8/23/2013 9/03/2013 | 8/26/2013 Case found unsubstantiated | | | | | | |
| MCHS/TLC Victim: [redacted] | [redacted] | 8/1/2013 | 8/01/2013 8/09/2013 8/15/2013 | 8/26/2013 Case found substantiated for Physical neglect/unsubstantiated for sexual abuse, E-mailed SW for report findings/rec'd notice 9/23/2013 | 9/03/2013 Pending letter Contact made to [redacted] on 9/24/2013 | 9/26/2013 | 9/26/2013 | 9/26/2013 Substantiated for licensure violations | | |
| Impact Missions/Girls Victim: [redacted] | [redacted] | 8/5/2013 | 8/05/2013 8/09/2013 8/15/2013 8/23/2013 | 8/23/2013 Case found unsubstantiated | 8/23/2013 | Appt scheduled for annual review 9/10/2013 | 9/10/2013 | 9/10/2013 Child admitted to the allegation/safety plan put in place | No CAP safety implemented | |
| Impact Missions/Girls Victim: [redacted] | [redacted] | 8/5/2013 | 8/05/2013 8/09/2013 8/15/2013 8/23/2013 | 8/23/2013 Case found unsubstantiated | 8/23/2013 | Appt scheduled for annual review 9/10/2013 | 9/10/2013 | 9/10/2013 Child admitted to the allegations/safety plan put in place | No CAP safety implemented | |
| UMCH[redacted] Victim: [redacted] | [redacted] | 8/12/2013 | 8/12/2013 8/23/2013 | 8/21/2013 Case found unsubstantiated/ e-mailed SW; agency revisiting the report | 8/23/2013 Pending findings letter | 8/23/2013 Agency revisiting the report | | | | |
| UMCH[redacted] Vicitm: [redacted] | [redacted] | 8/20/2013 Rec'd from sup 8/22/2013 | 8/23/2013 9/03/2013 9/10/2013 9/12/2013 | 9/11/2013 Found Unsubstantiated, Rec'd on 9/23/2013 | 9/23/2013 | 9/23/2013 Talked with the Director | 9/23/2013 | 9/23/2013 No Licensure violation | No CAP entered | |
| YV-[redacted] Victim: [redacted] | [redacted] | 8/22/2013 | 8/23/2013 9/03/2013 9/10/2013 9/19/2013 9/25/2013 | 9/20/2013 Found Unsubstantiated | | | | | | |

Appendix A

# LICENSURE INVESTIGATION REPORT

## DFCS LICENSURE UNIT

### MONTH: SEPTEMBER 2013

| LICENSED CONTRACT PROVIDER | NAME OF LICENSURE INVESTIGATOR | INITIAL REPORT | MACWIS SEARCHES | FINAL ANE INVESTIGATION RECEIVED WITH NOTIFICATION OF FINDINGS LETTER | DATE OF PROVIDER CONTACT BY LICENSURE | DATE LICENSURE INVESTIGATION INITIATED | LICENSURE INVESTIGATION WITH FACILITY COMPLETED | DATE OF SUBSTANTIATED OR UNSUBSTANTIATED OUTCOME | DATE PLACED ON CAP OR NOT ON CAP BY LICENSURE | DATE CONTRACT PROVIDER SUBMITTED APPROVED CAP |
|---|---|---|---|---|---|---|---|---|---|---|
| Name | Name | MM/DD/YY | MM/DD/YY | MM/DD/YY | MM/DD/YY | MM/DD/YY | MM/DD/YY | Substantiated/ Unsubstantiated | MM/DD/YY | MM/DD/YY |
| CIA Victim: | | 8/26/2013 | 9/03/2013 9/10/2013 9/19/2013 9/25/2013 | Found unsubstantiated sexual abuse. Found substantiated physical neglect. | | | | | | |
| SCSCY Victim: | | 9/9/2013 | 9/16/2013 | 9/16/2013 Unsubstantiated | 9/20/2013 | 9/20/2013 | 9/25/2013 | 9/25/2013 Unsubstantiated | 9/25/2013 No CAP | No CAP |
| Millcreek/TGH Victim: | | 9/12/2013 | 9/13/2013 9/20/2013 9/26/2013 | | | | | | | |
| MCHS/TLC Victim: | | 9/12/2013 | 9/12/2013 9/18/2013 | | | | | | | |
| Millcreek/TGH Victim: | | 9/19/2013 | | | | | | | | |
| Victim: | | 9/23/2013 Rec'd from sup | | | | | | | | |
| YV- Victim: | | 9/24/2013 | 9/25/2013 | | | | | | | |

Appendix A

# Licensed Providers for each License Reviewer

[redacted]

200 Million Flowers, Inc.

AGAPE Child and Family Service

Apelah

Beacon House Adoption Service, Inc.

Berean Children's Home, Inc.

Bethany Christian Services

Hope Village for Children

Impact Missions, Inc.

Jewish Family Services, Inc.

LDS Social Services

Life Choices of Memphis, Inc.

Lifeline Children's Services

Mississippi Children's Home Society, Inc.

Savior of Life Therapeutic Group Home

United Methodist Children's Home

Youth Challenge Academy

[redacted]

Acorn Adoptions, Inc.

Catholic Charities, Inc.

Christians in Action, Inc.

Faith Haven, Inc. Emergency Shelter

Garner-Simmons Home for Girls, Inc.

Mississippi Families for Kids, Inc.

New Beginnings, Inc.

Sally Kate Winter Memorial Children's Home

Sunnybrook Children's Home

The Village of Hope Adoption Agency

Water Youth Foundation, Inc.

Youth Villages, Inc.

Paul's Home for Children

[redacted]

Baptist Children's Villages

Catholic Social, and Community Services, Inc.

Millcreek Rehabilitation Centers, Inc.

Mississippi Department of Human Services Adoption

Paul's Home for Children

Pine Vale Children's Home

Positive Living, Inc.

Southern Christian Services for Children and Youth, Inc.

Volunteers of Greater New Orleans

## ATTACHMENT B

Paul's Home for Children – All Staff will Monitor

# Appendix C

Mississippi
Form DFCS 539
October 2012

## MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
Division of Family and Children's Services

## GENERAL OBSERVATIONS OF THE FACILITY

**Facility Name:** ______________________ **Name:** ______________________

**Observation Dates: From** ____________ **To** ____________

**Instructions:** Use the questions below to focus your observations of the facility. Include all locations used by residents (units, hallways, dining rooms, lounges, activity and therapy rooms, bathing areas, and resident bedroom areas). Also check other areas that affect the residents, such as storage and utility areas. Initial that there are no concern or note concerns and your follow-up in the space provided. Begin your observations as soon as possible after entering the facility and continue throughout the facility review.

### 1. LIGHTING/ELECTRICITY:

- Is there enough appropriate lighting throughout the facility?
- Do all lights have covers and/or shades?.
- Are all overhead lights covered and protected?
- Do all lights properly function?
- Are all electrical outlets protected with covers that are not cracked or broken?
- Is the electrical box covered?
- Are all electrical wires covered and no wires are exposed or damaged?
- What type of heating and cooling does the facility have?

### 2. INTERIOR/CLEANLINESS:

- Is the environment (walls, floors, drapes, furniture, ceilings) clean and free of clutter and debris?
- Is the facility free of objectionable odors?
- Are resident areas well ventilated?
- Is the facility comfortable and home like?
- Is the interior of the facility in good repair?
- Is the facility pest free?
- Does the facility show signs of insects, bugs, rodents, or pest?
- Does the facility have records of regular pest/control programs?
- Is the facility smoke free?
- Are garbage cans/containers well maintained, clean, empty, and free of spillage?

### 3. LINEN/PERSONAL HYGIENE SUPPLIES:

- Are all residents beds made and neatly maintained?
- Is the linen processed, transported, stored and handled properly?
- Are there plenty of extra linens, towels, bath clothes, pillows, blankets, sheets, and pillow cases?
- Does the facility maintain residents with plenty of soap, tissue, shampoo, tooth paste, tooth brushes, and personal hygiene supplies/products?
- Are personal hygiene supplies/products stored separately away from cleaning supplies and chemicals?
- Are all linens clean and in good repair?
- Who is responsible for the purchase of linen and personal hygiene supplies/products?

### 4. HAZARDS:

- Is the facility as free of accident hazards as possible?
- Are housekeeping/hazards, compounds, and other chemicals stored to prevent resident access?
- Is the facility smoke free?
- Is the facility handicapped accessible?

Mississippi
Form DFCS 539
October 2012

- Are locks, if provided on exit doors, free from the use of a key for operation from the inside of the building?
- Are the widths of doorways, when the door is in full open position, no fewer than thirty-two (32) inches wide?
- Do door openings onto stairs have a landing of at least a minimum of the width of the door?
- Does the minimum head room on stairs clear all obstructions and are six feet and eight inches tall (6'8") at minimum?
- Are the widths of the stairs at least thirty-two (32) inches wide?
- Are the maximum height of risers in each step no more than eight (8) inches?
- Are there guards and handrails provided on both sides of all stairs and ramps rising more than thirty (30) inches above the floor or grade and must meet the following:
  a. Guards and handrails must continue for the full length of the ramp or stairs.
  b. Handrails must provide at least two (2) inches between the inner side of the rail and support wall.
  c. Handrails must not be more than thirty-four (34) inches above the step or ramp nor less than thirty (30) inches.
- Are ramps, platforms and landings associated with the guards and handrails:
  a. Designed for not less than one hundred (100) pounds per square foot.
  b. Have a slip-resistant surface.
- Are all exits accessible at all times?
- Is there a back splash installed behind the stove?
- Are there any objects that block an escape route?
- What type of heating and cooling is provided inside the facility?
- Does the facility have water?
- What type of hot water system does the facility contain?
- Is the hot water in the residents areas at least 100°F and no warmer than 120°F?
- Are residents bathing and hand washing water temperatures safe and comfortable?
- Is the hot water system located away from resident's access?
- Do the tubs and showers contain slip resistant surfaces?
- Are sharp objects and hazardous equipment stored properly and locked away from resident access?
- Are all exits clearly equipped with exit signs?
- Are emergency phone numbers clearly posted and easily accessible at all times?

**5. FIRE and SAFETY/EMERGENCY:**

- Are all fire extinguishers adequately supplied, in date, and appropriate?
- Do all staff know how to appropriately use the fire extinguishers?
- Are emergency escape routes appropriately displayed throughout facility?
- Is there any immediate danger in or at the facility observed?
- Are all exit signs clearly marked, visible and/or lite?
- Are evacuation plans posted and at eye level and written in a clear, visible, manner and located in several areas of the facility?
- How many fire extinguishers does the facility contain?
- How many smoke detectors are located in the facility? Are smoke detectors all working?
- How many carbon dioxide detectors are located in the facility? Are they all working?
- Does the facility have a first aid kit in the facility that is stocked and easily accessible?
- Does the facility have documented fire and bad weather drills for each month?
- Does the facility have documented disaster drills at least annually?
- Does the facility have a separate disaster kit/plan?
- Does the facility contain an emergency supply of food and water?
- Does the facility have emergency power?
- Does the facility have plenty of flashlights and batteries?
- Are all staff members on all shifts aware of the emergency procedures?
- Are all staff prepared for an emergency or disaster?
  - Probe: [ask two staff and a resident to describe what they do in emergencies, include staff from different shifts.] Evaluate the responses to determine their correctness and preparedness. Are fire drills conducted at various times at least monthly? Do all exit and entrance doors easily open without keys on the inside of the building?
- Does the facility have access to twenty-four (24) hour telephone service?
- Are telephones centrally located and readily available for staff use in each living area of the facility?
- Are emergency numbers including the fire department, police department, medical services, poison control and ambulance services posted near all the telephones?
- Is the facility address clearly posted, visible and accessible?

Mississippi
Form DFCS 539
October 2012

## 6. EXTERIOR/BUILDING/GROUNDS:

- Are the facility and premises maintained in a clean sanitary comfortable and safe condition?
- Is the building in good repair?
- Are there screens on all windows?
- Are the grounds smoke fee?
- Is the address of the facility clearly visible from the street?
- Are the grounds and premises well maintained and neatly groomed?
- Are garbage containers clean, secure and free from garbage over flow and spillage? [all garbage containers must be secured in covered containers.]
- How often is garbage picked up and disposed of?
- Are there any wells, ditches, and/or holes located on the grounds?
- What type sewage and plumbing does the facility contain?
- Does the facility have a sewage and water system that has been approved by the Mississippi State Department of Health?
- Does the outside grounds contain any pooling and/or standing water?
- Does the water properly drain outside on the grounds?
- Does the grounds have at least seventy-five (75) square feet of accessible exterior space for each child.

## 7. SPACE, FURNISHINGS and EQUIPMENT:

- Does the space and furnishings appear sufficient to accommodate the residents' needs and all activities?
- Is the furniture throughout the facility in good repair?
- Does each resident have separate storage and closets for securing personal belongings?
- Does the facility contain a bathroom with a separate toilet, bath tub or shower, and sink for every four (4) residents?
- Do all the tubs and showers contain slip-resistant surfaces?
- Are the bath rooms maintained in good repair, clean, and sanitary?
- Are bathroom door locks designed to permit the opening of the locked door from the outside by staff?
- Are there separate toilets and lavatories for staff and visitors?
- Does the facility contain separate bath and toilet facilities for boys and girls/
- Does the facility have at least one (1) handicapped accessible bathroom?
- Does the facility contain any bathrooms with passage through another resident's bedroom?
- How many toilets are in the facility?
- How many sinks are in the facility?
- How many tubs/showers are in the facility?
- Do all sinks and toilets properly work and are maintained in good repair?
- Does the facility contain an indoor recreation area?
- Are the recreation supplies and equipment age appropriate for the residents living in the facility?
- Does the facility contain a separate living room and/or den for the residents?
- Are the furnishings and equipment age appropriate for the residents?
- Are the facility furnishings and equipment attractive, in good repair, and are similar to what is found in a home environment?
- Are the facility dining areas separate from the kitchen?
- Does the dining areas permit the residents, staff, and guests to eat together in small groups?
- Is the dining area clean, well lighted, ventilated and attractively furnished with home like dining items?
- Does the facility have a separate, well lighted, quite area for resident study purposes?
- Does the facility have a space that is distinct from resident living areas to serve as an administrative office for records, secretarial work and bookkeeping?
- Does the facility have a designated space to allow private discussions and counseling sessions between individual children and staff?
- Does the facility have an area for laundry that is separate from areas occupied by residents?
- Does the facility have an area for sorting, drying, and ironing?
- Are residents supervised while using the laundry area and with ironing?
- Does the facility provide bedrooms with a minimum of seventy-four (74) square feet for the initial occupant and an additional fifty (50) square feet for each additional occupant?
- Are the ceiling in resident bedrooms at least seven and one half (7 ½) feet from the floor?
- Are there a maximum of four (4) resident residing in each bedroom?
- Are there a maximum of two (2) residents per bed room that are emotionally challenged or have a behavioral disorder?
- Does each bedroom have a direct source of natural light (window) as well as a working light fixture in each room? [note: lamps may not be the sole source of light.]
- Does each resident have a safe comfortable age appropriate bed? [where bunk beds are used, they shall

have safety rails and sufficient room to allow the occupants of both bunks to sit up in bed. Bunks to sit up in bed. Bunks may contain only two (2) beds.]

- Do the residents have the opportunity to personalize their bedrooms with furnishings and possessions?
- Are resident's sheets and pillowcases changed at least once a week unless greater frequency is indicated?

## 8. TRANSPORTATION SAFETY/FACILITY VEHICLES:

- Does the vehicles used to transport residents contain age – appropriate passenger restraints?
- Are all vehicles used to transport residents well maintained and in good repair?
- Do all vehicles used to transport residents contain up-to-date, current registrations and inspections?
- Do all vehicles used to transport residents contain first aid kits and fire extinguishers that are current and up-to-date?
- Does the facility maintain documented maintenance records on each facility vehicle? [Note: each agency shall purchase a van in the agency's name within one (1) year of opening the facility. Agency staff's private cars should only be used in case of an emergency.]

## 9. FACILITY PETS:

- Are all animals kept on the premises inoculated by a veterinarian annually? [Note: efforts shall be made to keep the grounds free from stray animals and animal feces.]
- Are all animals kept in the house, house broken?

## 10. MEDICATION STORAGE:

- Are drugs and biologicals stored properly, locked and at appropriate temperatures?
- Does the facility have appropriate first aid kits in the facility?
- Are medication logs appropriately documented?
- Does the facility have policies and procedures for the storage of medications and drugs?

## 11. POSTED INFORMATION:

- Is information posted concerning Medicaid contact numbers; contact information for MDHS/DFCS; MDMH; Advocacy Agency numbers; MDHS/DFCS hotline number; Numbers for poison control?
- Are numbers/contact information posted in the facility visible and accessible for all residents, staff, and visitors?
- Are emergency numbers posted; such as Fire Department, Hospital, Ambulances, etc.
- Are activity schedules posted?
- Are current menu's posted?

Mississippi
Form DFCS 539
October 2012

## GENERAL OBSERVATIONS OF THE FACILITY

| | Source* | Reviewer Notes (including date/time) |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

*Source: O=Observation, RR=Record Review, I=Interview

Mississippi
Form DFCS 539
October 2012

## GENERAL OBSERVATIONS OF THE FACILITY

| | Source* | Reviewer Notes (including date/time) |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

*Source: O=Observation, RR=Record Review, I=Interview



Appendix D

Mississippi
Form DFCS 541A
October 2012

MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
Division of Family and Children's Services

## Residential Resource Group Home

## Resident Review Worksheet

Facility Name: ______________________________

Reviewer Name: ______________________________

Review Date: ____________________

**Records Maintenance:**
The agency shall maintain records to document services provided and administrative and fiscal accountability. Representatives of the Department shall have access to all records and reports.

All records shall be confidential and protected from fire, damage, or theft. (MISS. Code Ann. § 43-15-21 .

Required Records:
Child's Record – The facility or agency shall maintain individual records for each child in care which shall include the following:

a. A written Residential Service Application, including reason for referral;

b. Cover sheet to include child's name, birth date, race, gender, date of the admission, religious affiliation, and custodian's address and telephone;

c. Intake and medical assessment;

d. Name, address, and relationship of person with whom the child was living immediately prior to placement;

e. Social summary;

f. Psychiatric and/or psychological evaluations;

g. Copies of legal documents of importance for the child including birth certificate, Social Security card, immunization records, court orders, any agreement with parent, agency or legal custodian;

h. Current medical, dental and vision examination records, and current drug test, if applicable;

i. School records including educational placement records and reports, grade level and special education/IEP, any report notes and notices provided by the school;

j. Placement agreement;

k. Visitation plan;

l. Discharge and aftercare summary shall contain;

   i. Services provided during care, the progress and accomplishments, assessed needs which remain to be met, and recommendations of the services needed to meet these goals

   ii. Date of discharge, discharge summary, reason for discharge, and the name, address, telephone number, and relationship of the person(s) or agency to whom the child was discharged

   iii. Aftercare plans which specify the responsibility for follow-up

m. Correspondence;

n. Social and developmental history;

o. Initial treatment, six (6) month treatment plans, Individual Service Plans, clinical reports, evaluations and daily progress notes;

p. Authorization for Payment, Termination and Breaks in service (therapeutic placements only);

q. Acknowledgement of admission, grievance, and discipline policy and corporal punishment policies;

r. Acknowledgement of agency rules and regulation policy;

s. Vocational, employment, and independent living training (if applicable);

t. Referral to other agencies;

u. All child records must be marked "CONFIDENTIAL".

Mississippi
Form DFCS 541A
February 2013

# Residential Resource Group Home
# Resident Review Worksheet
*(Continued)*

| Resident's Name | Date of Admission | Date of Birth | County |
|---|---|---|---|
| R1. | | | |
| R2. | | | |
| R3. | | | |
| R4. | | | |
| R5. | | | |
| R6. | | | |

*R = Resident

| | Residents | | | | | | NON-COMPLIANCE/COMMENTS |
|---|---|---|---|---|---|---|---|
| | R1 | R2 | R3 | R4 | R5 | R6 | |
| Demographic information including child, age, address, sex, date of birth, race, religion | | | | | | | |
| Residential Services Application | | | | | | | |
| Name, address and relationship of person with whom the living with prior to placement | | | | | | | |
| Intake and Medical Assessment | | | | | | | |
| Copies of Legal Documents, birth certificates, social security card, court order, school records, immunization record | | | | | | | |
| Social Summary | | | | | | | |
| Placement Agreement | | | | | | | |
| Psychological and psychiatric Evaluation | | | | | | | |
| Dental Examination | | | | | | | |
| TB screening | | | | | | | |
| Vision Examination | | | | | | | |
| Medical Examination | | | | | | | |
| Treatment and clinical records and daily progress reports/6 month treatment plan | | | | | | | |

Mississippi
Form DFCS 541A
February 2013

**Residential Resource Group Home**
**Resident Review Worksheet**
*(Continued)*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Social and Development History | | | | | | | |
| Education records and reports notes from school/IEP | | | | | | | |
| Vocational Training/ Employment/ Independent Living training | | | | | | | |
| Correspondence | | | | | | | |
| Family Services plan: child's goals and family goals | | | | | | | |
| Admission Policies | | | | | | | |
| Acknowledgement of Rules and Regulations | | | | | | | |
| Medical Authorization/ Consent for Service | | | | | | | |
| Visitation Plan | | | | | | | |
| Acknowledgement of Grievance Policy | | | | | | | |
| Acknowledgement of Discipline Policy | | | | | | | |
| Acknowledgement of Corporal Punishment Policy | | | | | | | |
| Referral to other agencies | | | | | | | |
| Termination and after care and discharge summary | | | | | | | |
| Records dated and signed | | | | | | | |
| All records marked "CONFIDENTIAL" | | | | | | | |
| Authorization for payment (DHS)/Therapeutic only | | | | | | | |

Mississippi
Form DFCS 541A
February 2013

# Residential Resource Group Home Resident Review Worksheet
*(Continued)*

**ASSESSMENT OF DRUG THERAPIES**

Review all the over-the-counter and prescribed medications taken by the resident during the last 7 days.

- Evaluate drug therapy for indications/reason, side effects, dose, review of therapy/monitoring, and evidence of unnecessary medications including antipsychotic drugs.
- Evaluate Resident's cooperation with taking medications.
- Correlate drug therapy with resident's clinical condition.
- If you note concerns with drug therapy, see if the physician or facility has responded to recommendations or concerns.

| Medications/ Dose/ Schedule | Medications/ Dose/ Schedule | Medications/ Dose/ Schedule |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

| | | Reviewer Notes *(including dates and times)* |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Mississippi
Form DFCS 541B
October 2012

**Resource Family Home**
**Resident Review Worksheet**
*(Continued)*

MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
Division of Family and Children's Services

## Resource Family Home

## Resident Review Worksheet

Agency Name: ______________________

Reviewer Name: ______________________

Review Date: ______________

**Resource Home Records:**

1. The agency shall keep separate records for each Resource Family home which shall contain:

   a. The application;

   b. Completed home study;

   c. Current medical reports including any medical results;

   d. Criminal background and Central Registry checks which include fingerprints on all household members age 14 years and older;

   e. List of the agency workers' visits with the child and Resource Family, including dates of visits and detailed summaries for each;

   f. Four (4) letters of reference, three (3) should be personal references and one (1) from a current or previous employer;

   g. Copy of the license;

   h. Historical narrative of the care provided for each child (including all significant events) by the Resource Family;

   i. Chronological list of children/youth placed with the Resource Family, including date placed, date discharged from care and child's legal name;

   j. Narratives and all supporting documentation regarding any and all allegations of abuse, neglect, exploitation, corporal punishment, and/or other maltreatment alleged to have occurred during the time the child was placed in that home;

   k. A termination summary for closed homes including reasons for the closure:

   l. Legal documents (including current marriage license, all divorce decrees, proof of auto insurance, and valid driver's license);

   m. Copy of current annual CPR and First Aid training unless the home has a pool, then must be certified in CPR and First Aid;

   n. Verification of training;

   o. Copy of the board payment included in the agency's placement agreement;

   p. Signed copy of the agency's grievance policy;

   q. Signed copy of the Department's discipline policy and corporal/punishment policy;

   r. Transportation plan;

   s. Disaster plan/emergency plan;

   t. Current vaccination records on all pets/animals on the premises;

2. The following information regarding ALL Resource Homes shall be sent to Licensure Unit within ten (10) calendar days after a home is licensed and as information is updated:

   a. Face Sheet;

Mississippi
Form DFCS 541B
October 2012

**Resource Family Home**
**Resident Review Worksheet**
*(Continued)*

b. Copy of all parent licenses and certifications;

c. Background checks, criminal record, central registry check, sexual offender registry to include fingerprints on all household members age 14 years and older;

d. Signed copies of grievance and discipline policy;

e. Signed copies of child abuse state of compliance;

f. Home study;

g. Home inspection report of the checklist of minimum compliance.

All of the above information will be maintained by the Licensure Unit.

| Maintenance of Child's Record | Date of Arrival | Date of Birth | County |
|---|---|---|---|
| R1. | | | |
| R2. | | | |
| R3. | | | |
| R4. | | | |
| R5. | | | |
| R6. | | | |

*R = Resident

| | CHILD'S NAME/IDENTIFIER | | | | | | NON-COMPLIANCE/COMMENTS |
|---|---|---|---|---|---|---|---|
| | R1 | R2 | R3 | R4 | R5 | R6 | |
| Demographic information including child, age, address, sex, date of birth, race, religion | | | | | | | |
| Residential Services Application | | | | | | | |
| Name, address and relationship of person with whom they lived with prior to placement | | | | | | | |
| Intake and Medical Assessment | | | | | | | |
| Copies of Legal Documents: birth certificates, social security card, court order, school records, immunization record | | | | | | | |
| Social Summary | | | | | | | |
| Placement Agreement | | | | | | | |
| Psychological and Psychiatric Evaluation | | | | | | | |
| Dental Examination | | | | | | | |

Mississippi
Form DFCS 541B
October 2012

**Resource Family Home**
**Resident Review Worksheet**
*(Continued)*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Vision Examination | | | | | | | |
| Medical Examination | | | | | | | |
| Treatment and clinical records and progress reports/6 month treatment plan | | | | | | | |
| Social and Development History | | | | | | | |
| Education records and reports notes from school/IEP | | | | | | | |
| Vocational Training/ Employment/ Independent Living Training | | | | | | | |
| Correspondence | | | | | | | |
| Family Services plan: child's goals and family goals | | | | | | | |
| Admission Policies | | | | | | | |
| Acknowledgement of Rules and Regulations | | | | | | | |
| Medical Authorization/ Consent for Service | | | | | | | |
| Visitation Plan | | | | | | | |
| Acknowledgement of Grievance Policy | | | | | | | |
| Acknowledgement of Discipline Policy | | | | | | | |
| Acknowledgement of Corporal Punishment Policy | | | | | | | |
| Referral to other agencies | | | | | | | |
| Termination and aftercare and discharge summary | | | | | | | |
| Records dated and signed | | | | | | | |

Mississippi
Form DFCS 541B
October 2012

# Resource Family Home
# Resident Review Worksheet
*(Continued)*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Confidential sign on each file | | | | | | | |
| Authorization for payment (DHS)/Therapeutic only | | | | | | | |

| Foster Home Services/Foster Parent Name | Certification Date |
|---|---|
| R1. | |
| R2. | |
| R3. | |
| R4. | |
| R5. | |
| R6. | |

| STANDARDS | FOSTER PARENT(S) NAME | | | | | | NON-COMPLIANCE/COMMENTS |
|---|---|---|---|---|---|---|---|
| | R1 | R2 | R3 | R4 | R5 | R6 | |
| Application | | | | | | | |
| Completed Home Study | | | | | | | |
| Current Medical Reports including any Medical Results | | | | | | | |
| TB Screening | | | | | | | |
| Local Criminal Record Check | | | | | | | |
| Child Abuse Registry Check | | | | | | | |
| CIC/Fingerprinting check all children 14 years and older | | | | | | | |
| Agency's worker visits to children and summary | | | | | | | |
| Four letter of references/ 3 personal and one from a current or previous employer | | | | | | | |
| Copy of resource license | | | | | | | |
| Historical narrative of the care providers for each child by resource parent | | | | | | | |
| Chronological list of children/ youth place in resource home | | | | | | | |

Mississippi
Form DFCS 541B
October 2012

**Resource Family Home**
**Resident Review Worksheet**
*(Continued)*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Documentation of allegations of abuse and neglect, exploitation, corporal punishment or other maltreatment alleged at the home | | | | | | | |
| A termination summary for closed resource home | | | | | | | |
| Verification of legal documents (marriage/divorce ID, Driver's License, Insurance) | | | | | | | |
| Verification from Physician, all house members free from communicable diseases/medical report including and medical results/10 hour of ongoing training | | | | | | | |
| Verification of Training/24 hour of pre-training/path are other training, Universal blood borne pathogens, car seat safety | | | | | | | |
| Home environment/community resources Record of Compliance/ checklist of minimum compliance | | | | | | | |
| Placement Agreement/ verification of board payment | | | | | | | |
| CPR Training | | | | | | | |
| First Aid Training | | | | | | | |
| Signed copy of Child Abuse Law | | | | | | | |
| Signed copy of Agency Grievance Policy | | | | | | | |
| Signed copy of Corporal Punishment Policy | | | | | | | |
| Signed copy of Discipline Policy | | | | | | | |
| Signed copy of Confidentiality Policy | | | | | | | |
| Transportation Plan | | | | | | | |
| Disaster Plan/ Emergency Plan | | | | | | | |

Mississippi
Form DFCS 541B
October 2012

# Resource Family Home
# Resident Review Worksheet
*(Continued)*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Current vaccination records on all pets | | | | | | | |

## Responsibilities of Agency to Foster Parents

| STANDARDS | FOSTER PARENT(S) NAME | | | | | | NON-COMPLIANCE/COMMENTS |
|---|---|---|---|---|---|---|---|
| | R1 | R2 | R3 | R4 | R5 | R6 | |
| Orientation on Policies and Practice | | | | | | | |
| Placement Agreement which includes confidentiality policy, expectations and responsibility of the agency staff and the resources parents, the services to be provided, agency policies on discipline, restraints and punishment, financial arrangements, the authority the Resource parent can excise for the child place at the home, board payment, agency policy of fire arms, agency policy on transportation and reimbursement for expenses. | | | | | | | |
| Ongoing training Ten (10) hours/ showing certificate or letter of verification/ only 3 hours may be obtained through home-based or on-line training modules. | | | | | | | |
| Resource Parents working Medically Fragile children must have additional eight (8) hours of training on medication administration and recognition and response to child with behavior that jeopardize health and well-being. | | | | | | | |

## Foster Home Supervision

| STANDARDS | FOSTER PARENT(S) NAME | | | | | | NON-COMPLIANCE/COMMENTS |
|---|---|---|---|---|---|---|---|
| | R1 | R2 | R3 | R4 | R5 | R6 | |
| Agency worker shall have face to face interview with child monthly in the home and once with the child at any appropriate location without RP present. Written documentation of these interviews shall be placed in the case record. | | | | | | | |
| The agency will have a face to face contact with the Resource parent(s) at least once a month | | | | | | | |

Mississippi
Form DFCS 541B
October 2012

**Resource Family Home**
**Resident Review Worksheet**
*(Continued)*

**Foster Home Recertification**

| STANDARDS | FOSTER PARENT(S) NAME | | | | | | NON-COMPLIANCE/COMMENTS |
|---|---|---|---|---|---|---|---|
| | R1 | R2 | R3 | R4 | R5 | R6 | |
| Foster homes shall be reapproved/ recertified every two years or annual | | | | | | | |

| | | Reviewer Notes *(including dates and times)* |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Mississippi
Form DFCS 541B
October 2012

**Resource Family Home**
**Resident Review Worksheet**
***(Continued)***

| | | **Reviewer Notes** *(including dates and times)* |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

# Appendix F

Mississippi
Form DFCS 542
January 2013

MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
Division of Family and Children's Services

## QUALITY OF LIFE ASSESSMENT
## RESIDENT INTERVIEW

Facility Name: ______________________ Resident Name: ______________________

Reviewer Name: ______________________ Resident Identifier: ______________________

Interview Dates/Times: ______________________

---

**Instructions:**
For question 1, if you are meeting with the resident in a location away from the resident's room, visit the room before the interview and note anything about the room that you want to discuss.

Introduce yourself and explain the review process and the purpose of the interview using the following concepts. It is not necessary to use the exact wording.

**"[Name of facility] is inspected by [Name of State Agency] periodically to assure that all residents receive good care. While we are here, we make a lot of observations, review the records, and talk to residents to help us understand what it's like to live in this home. We appreciate your taking the time to talk to us."**

**"We ask certain questions because we want to know whether you have a say in decisions affecting your care, your schedule and the services you receive at this facility. We want to know how you feel about your life here and whether the facility has made efforts to accommodate your preferences."**

**"If it is all right with you, I'd like to meet with you again later. That will give you time to think things over and to provide additional information later."**

In asking the following questions, it is not necessary to use the exact wording. However, do use complete questions, not one-word probes.

Get the resident to talk about actual situations and examples by using open-ended probes, such as: "Can you tell me more about that?" or "How is that done here?" Avoid asking leading questions which suggest a certain response.

If a resident gives a response to any question that indicates there may be a concern with facility services, probe to determine if the resident has communicated the problem to facility staff and what their response was.

---

1. ***ROOM:*** A good approach for initiating this discussion is to make a comment about something you have noticed about the resident's room, for example, "I notice that you have a lot of plants in your room."

    - How long have you been living here?
    - Please tell me about your room and how you feel about it.
    - Do you enjoy spending time in your room?
    - Is there enough light for you?
    - Is the room temperature comfortable?
    - Have you lived in a different room in the facility? (*If yes*) What was the reason for the room change?
    - Did you have a choice about changing rooms?
    - Where was your other room? What was it like?
    - Is there anything you would like to change about your room? (*If yes*) Have you talked to the facility about this? How did they respond?
    - Do you like living here? Why or why not?
    - What would make this a better place to live?

Mississippi
Form DFCS 542
January 2013

# Resident Interview

2. *ENVIRONMENT*:

- I realize that being in a resource home is not like being in your own home, but does staff here try to make this facility seem homelike?
- We've already talked about your room. How about other places you use, like the activities room and dining room? Do they seem homelike to you?
- How are the bathrooms, showers, and toilets?
- How do you get your hygiene products?
- Does the facility provide you with linens?
- Is there anything that would make this facility more comfortable for you?
- Do you have enough bed sheets, pillow cases, blankets, towels, and bath clothes?
- Is it generally quiet or noisy here?
- What about at night?
- Is your bed comfortable?
- Is the facility usually clean and free of bad smells?
- Who does your laundry?

3. *PRIVACY*:

- Are you a person who likes to have privacy sometimes?
- Are you able to have privacy when you want it?
- Do staff and other residents respect your privacy?
- Do you have a private place to study, read, and/or be alone?
- Do you have a private place to meet with visitors?
- (*If no phone in room*) Where do you make phone calls? (*If the resident indicates any problems with privacy, probe for specific examples. Ask if they talked to staff and what was their response.*)

4. *FOOD*:

- Tell me about the food here.
- Do you have any restrictions on your diet?
- How does your food taste?
- Are you served foods that you like to eat?
- Are your hot and cold foods served at a temperature you like?
- Who cooks the food here?
- Do you know ahead of time what you will eat at each meal?
- Are the menu's posted ahead of time in order for you to know what's served.
- Have you ever refused to eat something served to you? (*If yes*) Did the facility offer you something else to eat? (*If the resident refused a food and did not get a substitute*) Did you ask for another food? What was the facility response?
- Do you have snacks available to you?

5. ACTIVITIES:

- How do you find out about the activities that are going on?
- Are there activities available on the weekends?
- Do you participate in activities?

  (If yes) What kinds of activities do you participate in? (If resident participates) Do you enjoy these activities? (If resident does not participate, probe to find out why not.)
- Do you go to school? What school do you attend?
- Are you receiving your allowance? How much allowance do you get and how often do you get money?
- Do you have an opportunity to get physical exercise?
- What type of physical exercise do you get?

- Do you have an opportunity to go outside for fresh air?
- Do you have a job?
- How do you get to school and/or work?
- Is there some activity that you would like to do that is not available here? (If yes) Which activity would you like to attend? Have you talked to anybody about this? What was the response?
- Does the facility have transportation?
- Who drives you places?
- Are you allowed to go off campus without supervision? If so, where do you go?
- Do you attend church?

---

6. ***STAFF:***

- Tell me how you feel about the staff members at this facility. Do they treat you with respect?
- Do you feel they know something about you as a person?
- Are they usually willing to take the time to listen when you want to talk about something personal or a problem you are having?
- Do they make efforts to resolve your problems?
- Is there enough staff here to meet your needs?
- How many staff are here at night?
- Do staff check on you through the night?
- Has any resident or staff member ever physically harmed you?
- Has any resident or staff member ever taken anything belonging to you without permission? (If yes) Can you tell me who did this?
- Has a staff member ever yelled or sworn at you? (If yes) Please describe what happened. Can you tell me who did this? Did you report this to someone? (If yes) How did they respond?

---

7. ***ACCESS TO WORKERS:***

- Who is your local MDHS/DFCS Worker? How often do you see a worker from MDHS/DFCS?
- What County of Service (COS) referred you here?
- How often do you have contact with your COS Worker?
- How often do you attend therapy sessions?
- Do you have individual and group therapy?
- What is your therapist(s) name(s)?
- Do you have a social worker here at the facility? What is the name of your facility social worker?
- Do you feel that you get help when you need it?
- Does staff encourage you to do as much as you can for yourself?
- Do you have access to your biological family?
- Does the facility assist you with family visits?

---

8. ***DECISIONS:***

- Here at this facility, are you involved in making choices about your daily activities?
- Are you involved in making decisions about your care and medical treatment?
- (If not, probe to determine what these choices and decisions are, and relate this information to necessary restrictions that are part of the resident's plan of care.)
- Do you participate in devising and updating your treatment/care plans?
- Has any staff member here or elsewhere explained to you what your treatment/care plans are?
- Do you have long term plans or plans for your future?
- Is a staff member assisting you with your plans for your future?
- If you are unhappy with something, or if you want to change something about your care or your daily schedule, how do you let the facility know?

- Do you feel the staff members listen to your requests and respond appropriately?
- If the staff are unable to accommodate one of your requests, do they provide a reasonable explanation of why they cannot honor the request?
- Can you choose how you spend the day?
- Have you ever refused to follow the rules? What happened? Did you receive a copy of the facility handbook and/or Rules and Regulations? Is there a "Level System"?

---

9. ***MEDICAL SERVICES:***

- Who is your physician?
- When was the last time you saw a doctor?
- Are you satisfied with the care provided by your physician?
- Can you see your doctor if you need to?
- Have you ever refused to see a doctor?
- Have you ever refused to take your medication?
- Do you see your physician here or at the office? (If they say here) Where in the facility does your doctor see you?
- Do you have privacy when you are examined by your physician?
- (If they say they go to the office) How do you get to the office?
- Does facility staff help you make doctor's appointments and help you obtain transportation?
- Can you get to see a dentist, eye doctor, or other specialist if you need to?
- Do you take any medicine?
- Do you know why you are taking this medicine?
- Do you have side effects from any medication? What are your side effects?

---

**10. (Write here any special items not already discussed that you have noted about this resident or about the facility that you would like to discuss with the resident.)**

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

---

**11. Is there anything else you would like to talk about regarding your life here?**

Thank the resident. Review your notes from this interview and determine if there are any concerns you need to investigate further.

Appendix G

Mississippi
Form DFCS 543
October 2012

MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
Division of Family and Children's Services

# FACILITY PERSONNEL REVIEW

Facility Name: ____________________ Reviewer: ____________________

Facility Address: ____________________ Date of Review: ____________________

____________________

Name of Responsible Facility Representative: ____________________

| | Employee's Files: | Position | Date hired |
|---|---|---|---|
| S1 | | | |
| S2 | | | |
| S3 | | | |
| S4 | | | |
| S5 | | | |
| S6 | | | |

*S = Staff

| STANDARDS | EMPLOYEE'S NAMES | | | | | | NON-COMPLIANCE/ COMMENTS |
|---|---|---|---|---|---|---|---|
| | S1 | S2 | S3 | S4 | S5 | S6 | |
| 1. Employment Application/ w starting and termination dates | | | | | | | |
| 2. Criminal Records Checks, | | | | | | | |
| 3. FBI finger prints | | | | | | | |
| 4. Child abuse registry Check | | | | | | | |
| 5. Sex offenders registry check | | | | | | | |
| 6. Four Reference Letters/ 3 personal and one from previous employers | | | | | | | |
| 7. Medical Information | | | | | | | |
| 8. TB Screening annually | | | | | | | |
| 9. Credentials/ Certifications | | | | | | | |
| 10. Annual Performance Evaluations/new staff 3 month evaluation | | | | | | | |
| 11. New staff 3 month evaluation | | | | | | | |
| 12. Training/ Records/ Conferences 40 hour pre-training | | | | | | | |
| 13. Annual 12 hours training | | | | | | | |

Mississippi
Form DFCS 543
October 2012

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 14. Driver's License; driver records; | | | | | | | |
| 15. Driving Records | | | | | | | |
| 16. Proof of Automobile Liability Insurance | | | | | | | |
| 17. CPR Training | | | | | | | |
| 18. First Aid Certifications | | | | | | | |
| 19. Grievance signed by staff | | | | | | | |
| 20. Corporal Punishment Policies | | | | | | | |
| 21. Discipline Policy | | | | | | | |
| 22. Time sheets | | | | | | | |
| 23. Employee Demographic sheet showing Current salary pay rate, and start date | | | | | | | |
| 24. Personnel, employment, discipline or counseling reports | | | | | | | |
| 25. Signed Acknowledgement of training on agency policies and procedures | | | | | | | |
| 26. Signed Acknowledgement for medication administration | | | | | | | |

Document concerns and follow-up on pages 3 and 4.

Mississippi
DFCS 544
October 2012

## REVIEWER NOTES WORKSHEET

| | DOCUMENTATION |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

Mississippi
DFCS 544
October 2012

MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
Division of Family and Children's Services

**REVIEWER NOTES WORKSHEET**

**Facility Name:** ______________________ **Name:** ______________________

**Observation Dates: From** ______________ **To** ______________

| | DOCUMENTATION |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

**Sample Letter for Notification of Findings**
**Resource Homes, Group Homes, and Facilities**

**MDHS Letterhead**

Date ____________

Name DFCS Resource Home, Private Provider for Resource/Group Home, or Facility
Address
Address

Dear Resource Parent, Executive Director for Private Provider, or Facility Director:

This letter is to notify you of the findings of our assessment of the (resource/group home or facility). On (date), the Division of Family and Children's Services received a report of alleged (abuse and/or neglect) regarding (child/children's names). The assessment finds the allegations (were/were not) substantiated.

In order to address safety and/or licensure concerns, the Division of Family and Children's Services recommends the following actions:

1. ________________________________
2. ________________________________
3. DFCS staff will have a minimum of two face to face contacts with the child/children placed in your care for the next three months.

We appreciate your ongoing assistance and support for the children in your care.

Sincerely,

DFCS Regional Director

PC: DFCS Director
DFCS Field Operations Director
DFCS Permanency Director
DFCS County of Responsibility ASWS
DFCS County of Service (If applicable)
DFCS Resource ASWS (If Resource Home)
Case Record for Child/Children
Youth Court that has jurisdiction of Child/Children
Guardian *ad litem* for Child/Children

  

STATE OF MISSISSIPPI
Phil Bryant, Governor
DEPARTMENT OF HUMAN SERVICES
Richard A. Berry
Executive Director

Notification of Findings
Resource Homes, Group Homes, and Facilities

Date:
Name:

Dear Mr. and Mrs.

This letter is to notify you of the findings of our assessment of the therapeutic group home. On 02/21/2013 the Division of Family and Children's Services received a report of alleged physical neglect regarding . The assessment finds the allegations were substantiated against . There were great concerns that remained outside for a substantial amount of time and was not initially allowed back in the home. There were no charges pressed against and staff also stated that he did not throw a plate at staff. After taking statements for staff and other household members it was found that was not a threat to himself or others. During the assessment there were also safety concerns with the household.

In order to address safety and/or licensure concerns, the Division of Family and Children's Services recommends the following actions:

1. Mr. and Mrs. are to remove the bolts from the window to ensure that the children have clear access to all exits
2. Do not lock the door that leads from the bedroom to the kitchen.
3. Removal of from the home for his overall well-being
4. Contact law enforcement immediately when a child runs away from the group home.
5. Provide any and all necessary services to all the children in the home.

We appreciate your ongoing assistance and support for the children in your care.

Sincerely,

Victoria Reed
DFCS Regional Director

PC: DFCS Director
DFCS Field Operations Director
DFCS Permanency Director
DFCS County of Responsibility ASWS
DFCS County of Service (If applicable)
DFCS Resource ASWS (If Resource Home)
Case Record for Child/Children
Youth Court that has jurisdiction of Child/Children
Guardian *ad litem* for Child/Children

CONFIDENTIAL

**STATE OF MISSISSIPPI**
**Phil Bryant, Governor**
**DEPARTMENT OF HUMAN SERVICES**
**Richard A. Berry**
**Executive Director**

**Notification of Findings**
**Resource Homes, Group Homes, and Facilities**

Date:
Name:

Dear

This letter is to notify you of the findings of our assessment of the **therapeutic resource home.** On 10/18/2012 the Division of Family and Children's Services received a report of alleged **physical abuse** regarding . The assessment finds the allegations were **unsubstantiated** against _________There was, however, a policy violation because no child in the custody of the State of Mississippi can receive any type of corporal punishment. If there are allegations in the future where there is evidence to show that policy has been violated the agency could possibly recommend closure of the home and the removal any children in the placement.

In order to address safety and/or licensure concerns, the Division of Family and Children's Services recommends the following actions:

1. **continues with her therapy on a regular basis**
2. **Mr. and Mrs. will refrain from any type of physical discipline.**

We appreciate your ongoing assistance and support for the children in your care.

Sincerely,

Victoria Reed
DFCS Regional Director

PC: DFCS Director
DFCS Field Operations Director
DFCS Permanency Director
DFCS County of Responsibility ASWS
DFCS County of Service (If applicable)
DFCS Resource ASWS (If Resource Home)
Case Record for Child/Children
Youth Court that has jurisdiction of Child/Children
Guardian *ad litem* for Child/Children

# Ex. 50A

**Grace M. Lopes**

**From:** Long, Gwen [glong@bakerdonelson.com]
**Sent:** Tuesday, November 05, 2013 5:33 PM
**To:** gmlopes@oymonitor.org
**Cc:** Rachal, Kenya
**Subject:** Child Fatality Review - November 2013 Resubmission
**Attachments:** child fatality review001.pdf; child fatality review - appendices001.pdf

Grace:

Attached is DFCS' resubmission of the FM Assessment dated November 5, 2013 (DHS 361609-361636). For your convenience we have also attached Appendix A and Appendix B (Involved Staff and Investigation Fatality Report) which were included in the earlier submission (DHS 345588-345608).

Gwen

**Gwen N. Long**
Paralegal
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
Meadowbrook Office Park
4268 I-55 North
Jackson, MS 39211
Direct: 601.351.8962
Fax: 601.974.8962
E-Mail: glong@bakerdonelson.com
www.bakerdonelson.com

Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C. represents clients across the U.S. and abroad from offices in Alabama, Florida, Georgia, Louisiana, Mississippi, Tennessee, Texas, Washington, D.C.

Please consider the environment before printing this e-mail

**Baker Donelson**: One of FORTUNE magazine's "100 Best Companies to Work For"

---

Under requirements imposed by the IRS, we inform you that, if any advice concerning one or more U.S. federal tax issues is contained in this communication (including in any attachments and, if this communication is by email, then in any part of the same series of emails), such advice was not intended or written by the sender or by Baker, Donelson, Bearman, Caldwell & Berkowitz, PC to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or tax-related matter addressed herein.

This electronic mail transmission may constitute an attorney-client communication that is privileged at law. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this electronic mail transmission in error, please delete it from your system without copying it, and notify the sender by reply e-mail, so that our address record can be corrected.

# CHILD FATALITY REVIEW

**Submitted by: [redacted], LSW**
**Bureau Director, Prevention/ Protection Unit**
**Division of Family and Children's Services**
**Mississippi Department of Human Services**

**Approved by: [redacted], PhD**
**Deputy Administrator**
**Division of Family and Children's Services**
**Mississippi Department of Human Services**

**Date Submitted: July 8, 2013**
**Revisions Submitted: November 5, 2013**

# TABLE OF CONTENTS

I. Purpose

II. Methodology Used to Conduct the Fatality Review

III. Case History as it Relates to Fatality Incident

A. Relevant persons Involved

B. Chronology of Case Developments

C. Ransom Home Study

D. Summary of Contacts that occurred with children in the [redacted] Resource home between 01-25-2011 and report of fatality

IV. Fatality Incident

V. Applicable Findings

A. Findings related to Policy

1. DFCS policy regarding licensure of relatives as Resource Parents

2. DFCS policy regarding on-going assessment of children's safety in resource home

B. Findings related to Practice

C. Findings related to Modified Settlement Agreement

VI. Summary and Recommendations

Appendices :

A. DFCS Staff Involved

B. Investigation of Fatality Report

# CHILD FATALITY REVIEW

Name of Deceased Child: F.M., Date of Birth [redacted]

## I. Purpose

The purpose of this Child Fatality Review is to review the circumstances leading to the death of F.M. with respect to the responsibilities of the Division of Family and Children's Services (DFCS), Mississippi Department of Human Services (MDHS) and to evaluate the DFCS' discharge of its responsibilities in this area. Where applicable, the review addresses implications for DFCS policy and practice in order to ensure the most effective responses to similar situations in the future. The provision of foster care services, case practice, and licensing practice is examined in light of DFCS policy and Modified Settlement Agreement (MSA) requirements.

*II. C. 1. By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants shall conduct an assessment of the FM fatality, including an assessment of any failings by Defendants in the provision of foster care services, in case practice, and in licensing practice. The written assessment shall be provided to the Monitor and Plaintiffs and shall include recommendations for ways to improve child safety and address any identified failings.*

## II. Methodology Used to Conduct the Fatality Review

A team of DFCS staff was formed to conduct the fatality review. This team included:

- [redacted], LSW, Special Projects Officer in the DFCS Continuous Quality Improvement Unit, has no previous involvement with or knowledge of the case before this assessment,
- [redacted], LSW, was MSW student at the time of this assessment, has since earned MSW degree and maintained LSW; Regional Director for DFCS Region II-East, which includes Quitman County, the County of Service (COS) for this case,
- [redacted], LSW, was MSW student at the time of this assessment, has since earned MSW degree and maintained LSW; now DSW student; Regional Director for DFCS Region II-West, which includes Coahoma County, the County of Responsibility (COR) for this case,
- [redacted], LMSW, DFCS Field Operations Director,
- [redacted], LSW, currently MSW student, DFCS Bureau Director of Prevention/ Protection Unit
- [redacted], DFCS Continuous Quality Improvement Director

The process that the team used to conduct the review was as follows:

- The first step was to conduct a review of the child's case file for the purpose of understanding the history of the child's involvement with DFCS and DFCS' interventions. [redacted], LSW, Special Projects Officer in the Continuous Quality Improvement Unit, reviewed the electronic (MACWIS) and paper records of the child's case file. Ms. [redacted] made notes of her case file review to share with the other members of the team.

- Next, Ms. [redacted] interviewed the DFCS staff involved in the case individually on 02-07-2012 and 02-08-2012. A number of DFCS staff have been involved with this case and their initials and roles are listed in the Appendix A of this document, "DFCS Regional and County of Service (COS) or County of Responsibility (COR) Staff Involved".

- After Ms. [redacted] conducted an independent review of the case file and completed her interviews, she provided documentation of the case review and interviews to the rest of the team. The team met to review the information compiled, review the circumstances of the case, evaluate case practice with regard to the case, and compliance with applicable requirements.

- After submission of the case review report to the Court Monitor, the case was submitted to DFCS consultant [redacted], LMSW for secondary review. Mr. [redacted] utilized the case review instrument used in the joint DFCS/Court Monitor case review in August 2010.

- In conducting its review of the fatality, the team referred to a number of documents, including the following:
  - Documents prepared by [redacted] as she reviewed the case
    - "Preliminary observations/findings"
    - "Investigation Observations: Investigative Narratives – Inconsistencies in Statements (06/15/11)"
    - "Caseworker Contact(s) / [L.R./J.W.R.] Home"
    - "Home Environment Observations"
    - "ANE History"
    - Documentation of interviews by [redacted] with DFCS involved in the case
    - "Safety Issue Found During Investigation (06-15-11)"
    - "Services Agency Provided to Relative Resource Parent" and "Services Agency Provided to Biological Parents" (included on same document)
    - "Documented Case Narratives (Brief Synopsis)

  - MACWIS Narratives of Investigations and Open Case
  - Fatality Investigation of 06-15-2011 (date of child's death)
  - Resource Family Home Study
  - Medical Records from case record
  - Pictures of resource home and child on 06-15-2011

- Continuous Quality Improvement DFCS Region 2-W Follow Up Evaluation and Monitoring Case Review of June 2011 of which FM case was part of random sample of cases to be reviewed
- Serious Incident Report (SIR) of Child Fatality
- Autopsy report received by the team on 06-12-2012
- Court Summary dated 01-27-2011
- Criminal Background Justification Form filled out by Resource Parent L.R.
- Agreement between DFCS and Resource Parent L.R. regarding transportation plan for children
- Letter written from the biological mother of F.M. dated 11-29-2010 in which she temporarily signs her "rights" over to L.R.
- MACWIS review conducted by [redacted], LCSW, USM Consultant for DFCS using case review instrument previously used during case review conducted jointly by DFCS and Court Monitor's staff.

## III. Case History as it Relates to Fatality Incident

A. Relevant persons involved in this case

Child F.M., DOB [redacted], Date of Death 06-15-2011
Child D.F. DOB [redacted], half-brother of F.M.
Adult L.M., DOB [redacted], biological mother of Children F.M. and D.F.
Adult D.F., paramour of Biological Mother L.M. and father of Child D.F.
Adult T.D., DOB [redacted], father of Child F.M., not in home of biological mother or resource parent
Adult L.R., DOB [redacted], cousin, licensed relative resource parent for these children
Adult J.W.R., DOB [redacted], married to Resource Parent L.R. since 2002, licensed resource parent
Child J.W.R., DOB [redacted], son of Resource Parents L.R. and J.W.R.
Child T.W., DOB [redacted], son of Resource Parent L.R.
Child A.R., DOB [redacted], daughter of Resource Parents L.R. and J.W.R.
Child M.W., DOB [redacted], daughter of Resource Parent L.R. and uninvolved male T.P.
Child J.B.W., DOB [redacted], son of Resource Parent L.R. and uninvolved male E.T.
Adult S.B., relative
"Mrs. B.", cousin
Adult A.B., community member who allowed Biological Mother L.M. and children to live with her at one time
Adult "D.", maternal aunt

B. Chronology of Case Developments

F.M. and D.F., half-siblings, came into DFCS' custody on 12-17-2010 following substantiated allegations of neglect and allegations of physical abuse of both children in Coahoma County.

Over the course of DFCS' involvement with this child/family, there were several reports of alleged maltreatment and contacts with family prior to DFCS custody:

- 01-07-2009 - Report alleging medical neglect of F.M.
  The report was screened out by Regional Director of Quitman County after worker M.K. made contact with the mother and child. The alleged perpetrator was the mother of the child.

- 04-01-2010 - Evidenced Neglect and Prevention Case Opened
  On this date a report alleging physical neglect of F.M. was received. The report was investigated by M.H. of Coahoma County and was determined to be substantiated. The alleged perpetrator was the mother of the child. A Prevention Case was opened to serve the family.

- 07-23-2010 - Report alleging physical abuse of F.M.
  The report was investigated by M.H. of Coahoma County and was determined to be unsubstantiated. The alleged perpetrators were the mother of the child and the mother's boyfriend.

- 07-23-2010 - Report alleging physical abuse of Adult L.M. (F.M. and D.F.'s mother)
  This report was screened out by Adult Protective Services. The alleged perpetrator was the boyfriend of L.M. and the father of her youngest child.

- 10-04-2010 – Report alleging physical neglect of F.M.
  The report was investigated by M.H. of Coahoma County and was determined to be unsubstantiated. The alleged perpetrator was the mother of the child and mother's boyfriend.

- 11-3-2010 – Allegations of physical neglect and abuse
  Worker notes allegations in narrative but no report received

- 11-10-2010 - Report alleging physical abuse of F.M.
  The report was investigated by M.H. of Coahoma County and was determined to be unsubstantiated. The alleged perpetrator was the mother of the child.

- 11-23-2010 - Mother reported that her boyfriend, D.F., was abusing her and the baby
  Report located in a medical record but not found in MACWIS as an official report

- 12-1-2010 – Family Team Meeting
  Children's whereabouts were previously unknown. Children's mother
  reported that she had placed the children in the care of L.R.

- 12-10-2010 – Walk-through of the L.R. and J.W.R. home

- F.M. and D.F. were placed in the custody of DFCS on 12-17-10. The events
  were as follows:

  A Family Team Meeting was held on 12-17-2010. A safety plan was
  attempted as there was discussion with the parents that the children would be
  left in the care of L.R. and J.W.R. The parents disapproved of the safety plan,
  but the mother had already placed the two children in the care of L.R. and
  J.W.R. A safety plan could not be agreed upon; therefore, a verbal court order
  was received from the Coahoma County Youth Court Judge, placing both
  children in custody of DFCS. The decision was made by DFCS to leave the
  children in the home and pursue licensure for L.R. and J.W.R. During this
  Family Team Meeting, the mother of the children, L.M., became irate and was
  arrested.

  After the Family Team Meeting, it was reported to worker that the mother's
  boyfriend had physically abused F.M. This was not found in MACWIS as an
  official report, but was addressed already in the Family Team Meeting on
  same date in which the verbal court order was received to place children in
  DFCS custody.

  Coahoma County was the county of responsibility (COR) for this case and
  holds legal jurisdiction.
  Quitman County was the county of service (COS) for this case, as that was
  where the resource family lived.

C. L.R./J.W.R. Home Study

The home was approved on 2-24-2011 by the resource supervisor "for placement
only until [L.R. and J.W.R.] have completed PATH training, CPR, gotten their
medicals and the screens on the windows and the doors as well as the glass
placed back in the doors."

Concerns were noted in the record:
- L.R. had no driver's license
- Criminal background check revealed that J.W.R. was charged with attempted
  rape on 10-12-2008, but the Grand Jury did not indict. J.W.R. was also
  charged on 2-25-2002 with disobeying a police officer during a domestic

violence situation. L.R. was charged by Quitman County Sheriff's Dept. with a school attendance violation on 8-4-2010 and embezzlement under contract on 9-28-2006. There were no convictions except for L.R. driving with a suspended, revoked driver's license in 2010. L.R. signed an agreement that she would not transport the children placed in her home until her driver's license was reinstated. Arrangements were made with L.R.'s aunt for transportation due to J.W.R. being a truck driver and being gone during the week.

- Incomplete Resource Home Training
- Safety issues identified in narrative of Home Study submitted by resource worker on 02-23-2011 regarding the physical environment of the L.R./J.W.R. Resource Home are detailed in the following quote: "*The windows have triple panes but the screens (sic) are missing. The front porch security door has no glass, and it does not lock. Worker is also concerned with the kitchen door not having glass in it as well. The front door is locked, but they can not find the key. Worker told [L.R.]that she had to get the key to the door for safety in case of a fire, and they needed to use the door to get out of the home. Worker is also concerned that the children in care have a door that leads to the bathroom. [L.R.] said [F.M.] goes to the bathroom alone sometime at night and sometimes he gets her up. Worker told her he is too young to go to the bathroom by himself especially at night when everyone is sleeping. Worker pointed out to her the safety risk of [F.M.] falling in the toilet or turning on the water in the tub, and he could drown from too much water in his lungs from both. Worker advised that she keeps the door closed and locked for safety measures. This home has a security system.*"

D. Summary of contacts that occurred with children in the L.R./J.W.R. resource home between 01-25-2011 and report of fatality:

- 01-25-2011- Attempted home visit by C.B., ASWS (COS). Neighbors stated family had been away from home for one week. Neighbors said there was no water in the home.
- 02-03-2011 -Attempted home visit by C.B.
- 02-08-2011 - one attempted and one successful Resource Home visit by C.B.
- 02-23-2011 - one resource home visit by M.H. (COR)
- 02-24-2011 - one attempted Resource Home visit by M.H.
- 03-22-2011 - Resource Home Visit by C.B.
- 03-24-2011 - Resource Home visit by M.H.
- 04-13-2011 - Attempted Resource Home visit by C.B.
- 04-14-2011 - Resource Home visit by C.B.
- 04-19-2011 - Resource Home visit by G.S., Family Protection Specialist Advanced (COS -Resource Home staff)
- 05-09-2011 - Attempted resource home visit by C.B.
- 05-10-2011- Attempted resource home visit by C.B.
- 05-13-2011 - Resource parent expressed desire for children to return to parents

- 05-25-2011 - Attempted resource home visit by A.S., FPSA (COS)
- 05-31-2011 - Resource Home visit by T.B. (FPS – COS) and S.R. (COS)
- 06-15-2011 - Call from resource parent to DFCS about incident; F.M. died; D.F. removed from Resource Home where sibling died

## IV.    Fatality Incident

Mississippi Centralized Intake received a report on 06-15-2011 of the fatality of F.M. and alleging physical neglect on D.F.  The neglect report on D.F. was substantiated and he was removed from the resource home. This report includes the following information:

"Reporter stated she got a call from COR worker, [M.H.], from Coahoma County around 9:46 am this morning (6/15/11).  Per [M.H.] [Resource Parent L.R.] called her screaming from the back of an ambulance saying [F.M.] fell in the toilet on 6/15/11.  [L.R.] said it was too much water in his lungs and they didn't think he was going to make it.  [L.R.], her husband, [J.W.R.], and her daughter, [A.R.], were all at home.  Reporter noted about fifteen minutes later resource worker, [G.S.], was asking [L.R.] what happened.  [L.R.] started screaming again because the doctors said [F.M.] had died.  Reporter did not confront [L.R.] regarding these allegations.  Reporter mentioned [L.R.] is a relative foster parent. Reporter stated DHS has already removed [F.M.]'s brother, [D.F.] from the home. Reporter suggested physical neglect should also be an allegation for [D.F.].  [C.M.] has been assigned to this case, per reporter.  This family does have history in MACWIS.  Safety risks are undetermined."

C.M. initiated the fatality investigation immediately on 6-15-2011 with the assistance of S.C., FPS by interviewing Resource Parent L.R. at the Quitman County DFCS office. The investigation report on the child's fatality is included as Appendix B.

## V. Applicable Findings

### A.  Findings Related to Policy

1. DFCS Policy regarding licensure of relatives as Resource Parents, including management of safety concerns and appropriateness of placement prior to licensure approval:

   a. Section F, p. 4515 :  Time Frame for Licensing Relatives as Resource Parents is **60 days.**

*Children placed in home in DFCS custody on 12-17-2010. Home was licensed on 2-24-2011. The home was not licensed in the required time frame. There is also a discrepancy with in the record as to the actual date of licensure.*

b. Section F, p, 4515: Requirement of initial walk-through of resource home as described in policy as screening of all homes, including relative placements, to occur **prior to the initial placement** of foster children.

*Initial walk-through of resource home was conducted on 12-10-2010. The mother placed the children in the L.R./J.W.R. home prior to DFCS custody. DFCS conducted a walk-through once notified the children were in this home, so that walk-through occurred after the mother placed the children in the home and before DFCS received verbal order of custody. This requirement was met.*

c. Section F, p. 4515: Criminal Background Check requirement that no foster child shall be placed in a home **prior to receipt of background check** results.

*Criminal Background checks conducted on 1-12-2011 (local), 1-21-2011, 1-27- 2011 and 2-2-2011 (NCIC). Background check process was prolonged due to L.R. not having driver's license or ID and owing a court fine. This requirement was not met.*

d. Section F, pp. 4515: Requirements for training of resource parents in expedited resource licensure process can be postponed for a **maximum of sixty days.**

*Training requirements according to policy were not met for either resource parent, as L.R. received only twelve hours of the training within sixty days and J.W.R. received none of the training. No other training was listed for either resource parent while the children were placed in the home.*

e. Bulletin 6165, dated 3-26-2008: Resource home licensing requirement regarding total number of children allowed in the home to be no more **than three foster children** or for a total of more than **five children** (including foster, biological, and adoptive children) at any time; with only exception being with special approval from DFCS Regional Director for sibling group placement if determined that children can be safely maintained in the home.

*Total number of children in home prior to placement was 5. Total number of children in home with these two children added was 7. This was not met.*

**2. DFCS Policy regarding on-going assessment of children's safety in Resource Home**

a. Section D, p. 3241 (Updated with Bulletin #6146): (Requirement that worker maintain **monthly face-to-face contact** with every child in custody.)

Dates Seen:

12-17-2010 – Office visit with children

- 12-20-2010- Children present at court with DFCS and family
- 12-23-2010 – Office visit with children
- 12-28-2010 – Worker met resource parents and children at store to purchase supplies
- 01-07-2011 – Office visit with children
- 01-25-2011- Attempted home visit by C.B., ASWS (COS). Neighbors stated family had been away from home for one week. No water in the home.

- 01-25-2011 – Office visit with children
- 02-03-2011 -Attempted home visit by C.B.
- 02-07-2011 – Office visit with children
- 02-08-2011 - One attempted and one successful Resource Home visit by C.B.
- 02-16-2011 – Office visit with children
- 02-23-2011 - Resource home visit by M.H. (COR)
- 02-24-2011 - One attempted Resource Home visit by M.H.
- 03-02-2011 – Office visit with children
- 03-22-2011 - Resource Home Visit by C.B.
- 03-24-2011 - Resource Home visit by M.H.
- 04-08-2011 – Office visit with children
- 04-13-2011 - Attempted Resource Home visit by C.B.
- 04-13-2011 – Office visit with children
- 04-14-2011 - Resource Home visit by C.B.
- 04-19-2011 – Resource Home visit by G.S.
- 05-04-2011 – Office Visit with children
- 05-09-2011 - Attempted resource home visit by C.B.
- 05-10-2011 - Attempted resource home visit by C.B.
- 05-11-2011 – Visit with F.M. and resource mother at resource mother's aunt's home
- 5-18-2011 – Office visit with children
- 05-25-2011 - Attempted resource home visit by A.S., FPSA (COS)
- 05-31-2011 - Resource Home visit by T.B. (FPS – COS) and S.R. (COS)
- 06-08-2011 – Office visit with children
- 06-10-2011 – Office visit with children

- 06-15-2011 - Call from resource parent to DFCS about incident; F.M. died; D.F. removed from Resource Home where sibling died

*Children had face to face contact with worker each month. This requirement was met.*

**b. Section D., pp. 3350-3352: (Requirement that worker assess children's medical needs and follow through with Identified Needs)**

Narratives containing references to medical needs or evaluations or medical records in file:

11- 2010 – Lab reported F.M.'s lead level testing to Aaron Henry Health Clinic, doubting validity of sample; retesting was scheduled for March 2011.

12-3- 2010 – F.M. missed medical appointment (prior to DFCS custody)

12- 28- 2010- Narrative reflects that Resource mother gave DFCS worker copy of documents from D.F.'s visit to ER over the previous weekend

12-29-2013 – Narrative reflects that F.M. and D.F. were qualified for WIC for nutritional supplements.

3-22-2011 – Narratives reflect that resource mother told worker that F.M. and D.F. had blood tests today.

3-24-2011 – Narratives on this date reflect that resource mother was concerned about F.M's frequent thirst. Resource mother told worker that she took both children to Dr. [redacted] who examined F.M's limp and said that he might be a dwarf and he may be seen by a specialist.

4-01-2011 – Narrative reflects that worker received a call from First Steps (Early Intervention Program) indicating that an evaluation had been conducted for F.M. and that she would be sending the results to the worker.

4-27-2011 – Narratives on this date reflect that the resource mother and F.M. went to LeBonheur Hospital for an orthopedic consult for F.M., but the appointment had to be rescheduled due to inclement weather.

4-29-2011 – Narrative reflects that First Steps attempted contact with F.M. at resource home but got lost and contacted worker for another phone number for the resource parents.

5-4-2011 – Narrative on this date reflects that the resource mother told the worker that she had taken F.M. back to LeBonheur and that his "teeth and everything" had been checked. The resource mother said that LeBonheur would be mailing her the next appointment time.

5-5-2011 – Narrative reflects that resource mother told worker that she and F.M. were at LeBonheur Hospital, that F.M. had been examined, and that they wanted to schedule another appointment for F.M. in order to do blood work, xrays, and CAT scan.

5-11-2011 – Narrative reflects that resource mother took child to clinic on 5-10-2011, but doctor was not available.

*Initial medicals are not evident but it does appear that the children's medical needs were identified and assessment/treatment was being sought appropriately.*

**B. Findings Related to Practice**

The review of this case found that policy standards for home licensure were not all followed. We have learned that the concerns related to the physical environment of the resource home, the additional attention needed for the background checks, completion of needed training by resource parents, and having one COS worker assigned to the case to consistently monitor the children's care would have helped to assess if the resource home was the best environment for the children and conducive to their well-being.

**C. Findings Related to Modified Settlement Agreement**

The following review was conducted by [redacted], USM Consultant, using the same Case Review Instrument that was used during case review conducted jointly by DFCS and Court Monitor's staff.

Documentation of Settlement Requirements

1. *Settlement Agreement, II.B.1.a.: Upon taking a child into custody, DFCS shall engage in a thorough screening of the child and an individualized, strengths-based, family-focused, and culturally responsive assessment of the family, with the family's participation. Information gathered during the screening and assessment shall consist of (1) internal, external, and historical factors that may contribute to concerns identified in initial risk and safety assessments and initial screenings; (2) child and family strengths, protective factors, and needs; (3) the impact of maltreatment on the child; (4) factors and characteristics pertinent to selecting an appropriate placement; (5) family resources for the child and parents; and (6) any other material pertinent for meeting service objectives. The screening and assessment shall inform the selection of an appropriate placement, the provision of needed services, and permanency*

*planning, and shall be completed within 30 calendar days of the child's entrance into custody and documented in the child's case record.*

**An initial Family Team Meeting was conducted on 12/17/2010 at which the agency gathered information for an assessment and developed the initial case plan. In attendance were the parents (mother of both siblings and father of the target child's sibling), a number of relatives, relative caretakers and agency worker. The father of the target child was located and interviewed 01/26/2011. Information gathered during this initial FTM and subsequent client and collateral contacts formed the basis for the initial Child ISP dated 12/30/2010 and Adult ISPs dated 11/30/2010 (ongoing), 03/02/2011 and 06/03/2011. Risk assessments were conducted and documented on 12/28/2010, 03/01/2011, 04/05/2011, and 06/03/2011. These assessments contained sufficient detail to substantiate that the children were at risk or would be at risk if reunified. The screening/assessment/ case planning instrument in use at the time of the child's entry into care has since been replaced with the CFA, a more comprehensive tool which should better address this settlement item.**

2. Settlement Agreement, II.B.1.b.: DFCS shall initiate the assessment process through individual team meetings (1) with the child and the assigned DFCS caseworker within the first 72 hours of *initial placement or any subsequent placement moves; (2) with the child's parents and the assigned DFCS caseworker within the first two weeks of initial placement; and (3) with the foster care provider and the assigned DFCS caseworker within the first two weeks of any placement, or within different timeframes as required by COA standards.*

**See item 1. The two siblings placed in agency custody were 26 months old and 4 months old. They were present in the office during the 12/17/2010 Family Team Meeting but not participants in that meeting due to their age. Others were engaged as described in item 1.**

3. Settlement Agreement, II.B.1.c.: In all cases in which the whereabouts of one or both parents is unknown, DFCS shall immediately institute a diligent search for the parent(s), which shall be *documented in the child's case record.*

**The biological father of the target child had been named, he was located but he questioned his paternity. Paternity tests confirmed that he was the father and the worker made attempts to engage him in case planning. The first documented contact with him was dated 01/26/2011.**

4. Settlement Agreement, II.B.2.a.: Within 30 calendar days of a child's entrance into foster care, the DFCS caseworker shall convene a team meeting with the DFCS caseworker's direct *supervisor, the child's family if appropriate, the foster family, and the child unless there is a justification for excluding the child from the planning process. During the team meeting, service plans shall be developed for both the child and the parents with the participation of all team meeting participants.*

**This team meeting was convened on the date custody was awarded the agency (12/17/2010). See item 1. Note that an ISP (11/30/2010) was already in force for the mother of the target child. The Adult ISP was updated effective 03/02/2011. The conditions and tasks remained essentially the same between the dates of the ISP's.**

5. Settlement Agreement, II.B.2.b.: Each service plan shall be reviewed and updated quarterly at a team meeting with the caseworker, the caseworker's direct supervisor, the foster parent, the *child's parents if appropriate, and the child unless there is a justification for excluding the child from the planning process. If the child's placement changes, or there is a significant change affecting the child or his/her family, a team meeting shall be convened and the service plan must be updated within 30 calendar days of the date of change.*

**Family Team Meetings were held 12/17/2010, 02/16/2011, 05/13/2011 and 06/09/2011. The agency COR supervisor was listed as a participant for the first quarterly meeting but not any others. Other appropriate FTM members, with the exception of the target child's father, attended all the sessions. Case planning issues were documented for each FTM. An Adult case plan was in effect for the mother when the child came into custody, and it was updated 03/02/2011 and 06/03/2011. There was not a case plan on the target child's father. The Child case plan was approved 12/30/2010 and updated 04/05/2011.**

6. Settlement Agreement, II.B.3.a.1.: Working with service providers, foster parents, the child, and the family, DFCS shall develop and document in the child's case record a permanency plan *within 30 calendar days of the child's initial placement that specifies the permanency goal, a timeframe for achieving permanency, and activities that support permanency.*

**The case file documents that a permanency plan of reunification and concurrent plan of relative placement was approved by the ASWS on 12/30/2010, 13 days from the date of agency custody. Discussion of this plan was documented in the 12/17/2010 FTM. The MACWIS Case Planning History tab contains information regarding the compelling reasons for the choice of the permanency plan, known medical issues, family-child interactions and engagement, emotional issues and barriers to the permanency plan. The time frame projected for permanency was six months, with a target date of 06/17/2011.**

7. *Settlement Agreement, II.B.3.a.2.:* **Not applicable. Durable legal custody was not the plan.**

8. *Settlement Agreement, II.B.3.a.4.:* **Not applicable. Emancipation was not the plan.**

9. Settlement Agreement, II.B.3.c.1.: A child's permanency plan shall be reviewed in a court or administrative case review at least every six months. DFCS will take reasonable steps, including *written notice, to ensure the participation of the child, parents, caregivers, and relevant professionals in court or administrative reviews.*

**An administrative review was held 05/24/2011, within the six month requirement. The record documents that notice was given to the required parties.**

10. *Settlement Agreement, II.B.3.c.2.:* **Not applicable. Child was not in care for 12 months and a permanency hearing was not due.**

11. Settlement Agreement, II.B.3.d.1: When the child's permanency goal is reunification, DFCS shall identify in the parents' service plan and make available directly or through referral those

*services DFCS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care and to help the parents develop strategies to facilitate permanency for the child.*

**The Adult ISP found in the electronic file does identify services needed and develops strategies to facilitate permanency. Case narratives document that the parents were engaged by the worker in case planning activities. Employment, housing, parenting classes, personal hygiene and the need for psychological assessment and services were routinely discussed with parents. The worker secured the psychological assessment on the mother, made several unsuccessful attempts to locate parenting classes and did assessments on several relatives who served as actual and potential housing resources for the parents.**

12. Settlement Agreement, II.B.3.d.2.: For a child with a permanency goal of reunification, the child's assigned DFCS caseworker shall meet with the child's biological parents at least *monthly to assess service delivery and achievement of service goals, to keep the family informed and involved in decisions about the child, and to remain current about the family's circumstances.*

**Narratives document 16 face to face meetings between the agency worker and the biological mother and step father of the target child during this six month period. Five of these meetings took place in these parents' homes. Three face to face home visits were conducted in the biological father's home during this same time period.**

13. *Settlement Agreement, II.B.3.e.1.:* **Not applicable- Child was not in care 15 of 22 months**

14. *Settlement Agreement, II.B.3.e.2.:* **Not applicable- Adoption was not the permanency plan**

15. *Settlement Agreement, II.B.3.f.1* **Not applicable- Adoption was not the permanency plan**

16. *Settlement Agreement, III.D.2* **Not applicable – rates of abuse relate to statewide data**

17. Settlement Agreement, II.B.4.e. (By the end of Implementation Period 2): All investigations into reports of maltreatment, including corporal punishment, of children in DFCS custody must be *initiated within 24 hours and completed within 30 calendar days, including supervisory approval. DFCS shall assure that such investigations and decisions are based on a full and systematic evaluation of the factors that may place a child in DFCS custody at risk.*

**The preliminary investigation was assigned and initiated on the same date as the referral was received. The report was completed in 33 days including supervisory approval.**

18. Settlement Agreement, II.B.4.f. (By the end of Implementation Period 1): Any foster child who remains in the same out-of-home placement following an investigation into a report that he or *she was maltreated, or subject to corporal punishment, in that placement shall be visited by a DFCS caseworker twice a month for three months after the conclusion of the investigation to assure the child's continued safety and well-being.*

**The surviving sibling was removed from the resource home the same day that the agency was notified of the target child's death.**

19. Settlement Agreement, II.B.4.g. (By the end of Implementation Period 1): When a maltreatment investigation involves a foster home, DFCS shall file a copy of the approved final investigative *report and any recommendations and/or corrective actions DFCS has deemed necessary, in the case record of the foster child, in the file of the foster or adoptive parents with a copy of the letter of notification to the foster or adoptive parents, and in the DFCS State Office. DFCS shall also provide those records to the Youth Court Judge with jurisdiction over the child and to the Monitor.*

**A preliminary investigation is filed in the electronic file. This investigation was completed 07/13/2011 and approved 07/18/2011. The investigation substantiated physical neglect. I found no information in the resource home electronic case file. I understand that a separate full investigation was conducted by staff of the Protection Unit. That investigation may be filed in the child's and resource home's paper records. This will need to be verified to determine compliance with this settlement agreement item.**

20. *Settlement Agreement, II.B.4.h.* **Not applicable. Home was not a group home.**

21. Settlement Agreement, II.B.5.a.: No foster child shall be placed in a foster care setting that has not been licensed or approved as meeting DFCS licensure standards, unless the child is placed *pursuant to the following relative licensing process. The licensing process for relatives shall take place in two steps: (1) an emergency process to be developed by DFCS in conjunction with COA that enables a child to be placed with relatives as soon as the child enters placement, following an initial screen (as described at II.B.5.i. below) of the relative's home, and (2) a full licensing process, to be completed no later than 60 calendar days after the child has entered placement. DFCS may waive non-safety licensing requirements for relative foster placements in individual cases, in accordance with federal regulations.*

**The emergency process was implemented but the full licensing process did not take effect within 60 days. Full licensure was approved on 3/11/2011 and the license start date was 04/26/2011.Reviewer is not clear about the difference in approval date and licensure start date.**

22. *Settlement Agreement, II.B.5.c.:* **Not applicable- Child had no known special needs**

23. Settlement Agreement, II.B.5.d.: Each foster child shall be placed in the least restrictive setting that meets his/her individual needs as determined by a review of all intake, screening,*assessment, and prior placement information on the child available at the time of placement. In order of consideration, this means placement with relatives; foster home care within reasonable proximity to the child's home community; foster home care outside of the child's home community; group home care; or institutional care.*

**The placement setting was least restrictive due to it being a relative within close proximity to the parents' homes.**

24. Settlement Agreement, II.B.5.e.: Each child shall be placed within his/her own county or within 50 miles of the home from which he/she was removed. This provision shall not apply if (1) the *child's needs are so exceptional that they cannot be met by a family or facility within his/her own county or within 50 miles of the home from which he/she was removed; (2) the child is placed through the ICPC consistent with its terms; (3) the child is appropriately placed with relatives or another planned permanent resource; (4) the child is ordered to be placed in a child-specific foster care setting by a court; or (5) the child is placed in an adoptive home.*

**The child was placed in an adjoining county, much less than 50 miles proximity.**

25. Settlement Agreement, II.B.5.f.: Siblings who enter placement at or near the same time shall be placed together unless (1) doing so would be harmful to one or more of the siblings; (2) one of *the siblings has exceptional needs that can be met only in a specialized program or facility; or (3) the size of the sibling group makes such placement impractical notwithstanding diligent efforts to place the group together. If a sibling group is separated at initial placement, the caseworker shall make immediate efforts to locate or recruit a family in whose home the siblings can be reunited. These efforts will be documented and maintained in the case file.*

**The target child and his sibling were allowed to remain and were placed in the home of this relative home which was later licensed as a resource home.**

26. Settlement Agreement, II.B.5.g.: No later than at the time of placement, DFCS shall provide foster parents or facility staff with the foster child's currently available medical, dental health, *educational, and psychological information, including a copy of the child's Medicaid card. DFCS shall gather and provide to foster parents or facility staff all additional current medical, dental health, educational, and psychological information available from the child's service providers within 15 days of placement.*

**Case documentation is not clear about which medical records were secured by the agency and which were secured by the resource parent. At the time of emergency custody there were no known medical reports in the possession of the agency. Documentation of immunizations was entered on the medical screen.**

27. Settlement Agreement, II.B.5.h.: DFCS shall take all reasonable steps to avoid the disruption of an appropriate placement and ensure placement stability for children. If a caseworker has *knowledge that a placement may disrupt, the caseworker shall immediately convene a meeting with the DFCS supervisor, the foster parents, and, if appropriate, the child to determine the following: the cause of the potential disruption; whether the placement is appropriate for the child; whether additional services are necessary to support the placement; whether the child needs another placement; and, if another placement is necessary, what that placement should be. If the placement disrupts on an emergency basis, the meeting shall be held no later than five days after the disruption to address whether the child needs additional supportive services and whether the new placement is appropriate.*

**There were no obvious indications of imminent placement disruption.**

28. Settlement Agreement, II.B.5.k. (By the end of Implementation Period 1): No foster child shall remain in an emergency or temporary facility for more than 45 calendar days, unless, in *exceptional circumstances, the Division Director has granted express written approval for the extension that documents the need for the extension.*

**The child was not placed in an emergency or a temporary facility.**

29. Settlement Agreement, II.B.5.l. (By the end of Implementation Period 2): No child shall spend more than 12 hours at a time in a DFCS office or other non-residential facility that provides *intake functions. No child shall be placed in more than one emergency or temporary facility within one episode of foster care, unless an immediate placement move is necessary to protect the safety of the child or of others as certified in writing by the Regional Director.*

**The child was not placed in an emergency or a temporary facility.**

30. Settlement Agreement, II.B.5.m. (By the end of Implementation Period 2): No child under 10 years of age shall be placed in a congregate care setting (including group homes and shelters) *unless the child has exceptional needs that cannot be met in a relative or foster family home or the child is a member of a sibling group, and the Regional Director has granted express written approval for the congregate-care placement. Such approval shall be based on the Regional Director's written determination that the child's needs cannot be met in a less restrictive setting and can be met in that specific facility, including a description of the services available in the facility to address the individual child's needs. Sibling groups in which one or more of the siblings are under the age of 10 shall not be placed in a congregate care setting for more than 45 days.*

**The child was not placed in a congregate care facility.**

31. Settlement Agreement, III.C.1.: Placement stability for children in foster care for less than 12 months from the time of removal (placement stability is two or fewer placements).

**The child experienced only one placement.**

32. Settlement Agreement, II.B.6.a.: At the time of the initial team meeting when a child enters foster care, a visitation plan for the child and his/her family shall be developed as part of the *child's service plan. This visitation plan shall be developed and regularly updated in collaboration with parents, foster parents, and the child and should be appropriate to a) the child's age and developmental stage; b) the parents' strengths and needs; c) the schedule of the foster parents and parents; d) the social and cultural context of the family; and e) the status of the case and the permanency goal. If parental visitation is appropriate based on the above factors, this visitation plan shall include a minimum of two visits per month with the parents (unless a court order in the child's case limits such visits). For all children, regardless of permanency goal, this visitation plan shall include at least one visit per month with any siblings not in the same placement (unless a court order in the child's case limits such visits).*

**The visitation plan was developed after the initial Family Team Meeting due to the mother's being arrested for disorderly conduct during the final phase of this meeting. The**

**plan which was dated 12/30/2010 included twice monthly supervised office visits. Siblings were placed together.**

33. Settlement Agreement, II.B.6.c.: DFCS caseworkers shall take all reasonable steps to ensure the implementation of each child's visitation plan. DFCS and its contracting agencies shall *implement a policy that prohibits cancellation of visits as a disciplinary action.*

**A visitation plan was implemented 12/30/2010. The plan projected twice monthly supervised visits at the agency office. Nine visits were recorded during this six month period. Narratives do not provide information about provision of transportation for the parents and whether lack of transportation was a barrier to more frequent visitation. There was no indication that visitation was withheld or that it was discouraged. Narratives suggest that the resource parents appeared to encourage visitation and provided transportation for the children to the visits. There did not appear to have been any visits in the resource parents' home.**

34. Settlement Agreement, II.B.6.b.: DFCS shall arrange contact for the child with his/her parents and with any siblings not in the same placement within 24 hours of foster care placement unless *there are documented reasons why contact should not occur. If a visit cannot be arranged within 24 hours, a telephone call to parents, siblings, or extended family members must be provided to the child.*

**A Family Team Meeting was conducted on the day the children were placed in custody (12/17/2010).**
**The mother became so threatening that she was arrested for disorderly conduct. The children were present in the office and a visit could have been arranged, otherwise. She was offered a visit on 12/20/2010 but she refused. The 24 hour timeframe was not met, but the circumstances made the safety of the visit questionable.**

35. *Settlement Agreement, II.B.7.f* **Not applicable. Child under age four.**

35. *Settlement Agreement, II.B.7.a., b., c., and d.:a) Every child entering foster care shall receive a health screening evaluation from a qualified medical practitioner within 72 hours after placement that is in accordance with the health screening recommended by the American Academy of Pediatrics. b) Within 30 days of placement in foster care, each child shall receive a comprehensive health assessment that is in accordance with the assessment recommended by the American Academy of Pediatrics. c) Nothing in the above paragraphs shall prohibit the initial health screening evaluation and the comprehensive health assessment from being conducted in one clinical visit. However, in such instances, this combined visit shall be conducted within 72 hours of placement. d) All children shall receive periodic medical examinations and all medically necessary followup services and treatment throughout the time they are in state custody in accordance with the time periods recommended by the American Academy of Pediatrics.*

**The medical screen and narratives document a medical exam which was done on 12/28/2010. Custody was awarded on 12/17/2010. There is no additional medical documentation on the medical screen (other than immunization types and dates). However,**

**case narratives indicate that the child was seen on several occasions by medical clinics during this six month placement period. There seems to be immediate follow up to any health issues that were noted. The child received an evaluation at LeBonheur hospital on 05/04/2011 related to a concern of an orthopedic impediment. The paper case record may contain further documentation of this assessment and details of the various clinic visits.**

36. Settlement Agreement, II.B.7.g.: Each foster child age birth through three shall be provided with a developmental assessment by a qualified professional, and each child older than three shall be *provided with a developmental assessment if factors indicate such an assessment is warranted. All foster children shall be provided with needed follow-up developmental services.*

**Child was referred for First Steps on 03/25/2011 and an evaluation was completed 04/01/2011. The record is not clear about these findings. The medical screen does not contain documentation of a developmental assessment or EPSDT. These may be contained in the paper record but are not documented in the electronic record.**

37. *Settlement Agreement II.B.7.e.:* **Not applicable. Child under age three**

38. Settlement Agreement, II.B.8.a.: DFCS caseworkers shall screen each child for general and special educational needs within 30 days of his/her entry into foster care.

**Child was referred for First Steps on 03/25/2011 and an evaluation was completed 04/01/2011. Child was 26 months of age at time of custody and no special educational needs were noted. If EPSDT was performed, there is no clear documentation that this may have served as a screening opportunity. The First Steps screening date was in excess of the 30 day requirement.**

39. *Settlement Agreement, II.B.8.c.:* **Not applicable- Child not school age**

40. *Settlement Agreement, II.B.11.b.*: **Not applicable- child under age 14**

41. Settlement Agreement, II.B.10.a.: Regardless of whether a child's foster care placement is being directly supervised by DFCS or by a contract agency, the assigned DFCS caseworker (either *County of Service or County of Responsibility) shall meet with the child in person and, where age-appropriate, alone at least* **twice** *monthly to assess the child's safety and well-being, service delivery, and achievement of permanency and other service goals. At least one visit per month shall take place in the child's placement. During a child's first month in foster care and after each change of placement, the assigned DFCS caseworker shall meet with the child in person, and, where age-appropriate, alone, to assess the child's adjustment to the placement and whether more frequent visits by the caseworker are necessary, This assessment may occur at a regularly scheduled visit with the child.*

**Over the course of the six month placement, there were 22 face to face visits between the agency workers and the child. Eight of these were visits in the child's placement. Due to the child's age (26 months) these visits were not conducted alone with the child.**

*Settlement Agreement, II.B.10.c.: A DFCS foster care worker shall regularly communicate with non-therapeutic foster parents who have one or more foster children residing in their home and visit the home at least monthly to (1) share all relevant and legally disclosable information concerning the foster child; (2) evaluate the foster child's safety, needs and well-being; and (3) monitor service delivery and achievement of service goals.*

**Narratives document that the agency workers communicated with the resource parents regarding the child's needs, evaluated safety and well being through monthly face to face home visits with the resource parents and monitored provision of services. Documentation by the Resource worker indicated a growing concern about the physical and safety standards of the home and grounds.**

42. *Settlement Agreement, II.B.10.d.:* **Not applicable**

43. Settlement Agreement, II.B.12.a.: For each child who has a permanency goal of reunification and who is in fact placed in the home for the purpose of reunification, DFCS shall provide, *subject to the approval of the youth court, such child with a 90-day trial home visit. During any trial home visit period, a DFCS caseworker or Family Preservation caseworker shall meet with the child in the home at least two times per month, and each meeting shall occur without the parent or caretaker present.*

**Not applicable- Child was not reunified.**

44. Settlement Agreement, II.B.12.b.: A recommendation to return a child to his/her home or to place the child in the custody of a relative shall be made at a meeting attended by the child's *DFCS caseworker, the caseworker's supervisor, the worker from the private agency if the child is placed with a private agency, the foster parents (unless DFCS determines that the foster parent's presence would be inappropriate), the biological parents or the relative assuming custody, and the child. At the meeting, the participants shall devise an after-care plan that identifies all of the services necessary to ensure that the conditions leading to the child's placement in foster care have been addressed, and that the child's safety and stability will be assured. DFCS shall take reasonable steps to provide or facilitate access to all services necessary to support the child during the trial home visit.*

**Not applicable- Child not returned to home.**

## VI. Summary and Recommendations

F.M., DOB [redacted], and his half-brother D.F. DOB [redacted], were first known to the Mississippi Department of Human Services – Division of Family and Children's Services on January 7, 2009. There were several reports of physical neglect and a home environment that included domestic violence. The children were placed in the custody of MDHS on 12-17-10. They were placed in the J.W.R. and L.R. home, who were relatives living in an adjoining county (Panola County). The parents had voluntarily left the children with these relatives a week prior to the Coahoma County Youth Court placing the children in custody. A worker did a walk through of the home upon

information being received that the children were in the J.W.R./L.R. home by the parents (prior to obtaining custody). The children were left in the home upon attaining custody and an expedited relative resource home licensure process was begun by Region II East as the county of service (Panola). The children were in the home until the death of F.M. on 06-15-11. D.F. was removed from this home on this day. A special investigation into the death of F.M. was conducted. The agency has reviewed the situation leading up to the child's death and all actions taken or not taken. Policy and practice, along with the MSA requirements were compared to the actions taken in the case. The review was conducted with a critical view to determine what could be put in place regarding policy or practice that could possibly prevent this type of situation from occurring again.

Several findings were made that show a need for improvement in practice and in following agency policy. They are as follows:

| Findings | Recommendation/ Remediation | Projected Date |
|---|---|---|
| 1. A report was not called in to MCI by the medical facility on 11-23-10. | Stakeholder and mandated reporters are instructed and educated on need to report abuse and neglect.<br><br>On-going pre-service training includes the reporting law.<br><br>DFCS staff members are reminded regularly that this should be intermittently discussed with stakeholders through one on one contact, in-services, regional implementation team meetings with stakeholders, and cross-trainings.<br><br>Child abuse/neglect awareness campaigns are incorporated into the work of the agency, i.e. blue ribbon campaign, billboards, and other awareness activities. | Completed and on-going |
| 2. Poor assessment of risk in a domestic violence situation and for physical neglect. | Worker pre-service training includes a module on domestic violence and another module on discussing the signs/symptoms/effects and possible risks of death | Pre-service training has been implemented with these topics and is on-going.<br><br>On-going training is being developed regarding |

| | | |
|---|---|---|
| | of/from physical neglect<br><br>On-going training modules include the topics of domestic violence and neglect to emphasize the high risks of harm to children in these situations. | domestic violence and physical neglect for delivery in 2014 as a part of the continued training offerings to staff. |
| 3. Needs of children and family not appropriately identified and services were not matched to needs; risk not reduced. | A week of assessment and a week of family service planning are each delivered in pre-service training. This includes an emphasis on identifying needs of the family, that if fulfilled, the risk of harm to child would be reduced and how to match needs to services.<br><br>Practice model coaches work with front line worker to model and teach quality assessments and case planning.<br><br>CSF level two training; mentoring; and pre-service supervisory training, and practice coaches include training for supervisors to help workers to identify risk and the needs that should be met along with services offered to reduce risk of harm to children. | Pre-service training includes these topics and this has been implemented.<br><br>Modules for on-going training have been developed. June 2013 is the begin date for on-going training and these topics will be a part on continued offerings to staff members.<br><br>Practice model coaches are working with staff (workers and supervisors) in each region.<br><br>Level two supervisory training was begun in 2013 and will continue as a part of the required training plan for all supervisors.<br><br>Pre-service training and mentoring is required for all new supervisors. |
| 4. No assigned worker in the COS due to staff shortage. ASWS and various workers were visiting children in the resource home. | Review with workers and supervisors the need to visit in the home of children and have one consistent worker assigned to a case.<br><br>Policy created that increased the visit requirement to two face-to-face quality contacts per month with children in active cases.<br><br>Policy enforced that no supervisor may actively work on direct services nor | Quality visit training has been offered to all staff and is incorporated into on-going training offerings.<br><br>Policy has been changed to require two face-to-face quality contacts per month with children in caseload. Emphasis has been made that workers need to remain as consistent as possible.<br><br>Policy requirement for resource worker to have |

| | | |
|---|---|---|
| | carry a caseload. Policy is enforced through monthly review by the MDHS-DFCS Deputy Administrator and the regional directors of the workload report (AR1) which details all staff making entries of direct service. If there are any issues of concern, subsequent action is taken by the MDHS-DFCS Deputy Administrator and regional directors. When an ASWS's name appears on the workload report, an inquiry is made to determine the reason. Sometimes an ASWS may have entered a general inquiry or may have met with a child or family member to prevent lack of service and attention to needs. ASWS's are counseled regarding individual situations found to make sure that practice by ASWS's is in compliance with MSA while prioritizing the needs of the child.<br><br>Review of workloads and workload validation by administration and regional directors on a regular basis. Plans to fill vacancies are discussed with supervisors with follow through monitored.<br><br>Recruitment, hiring quality staff and retention of new workers is trained and monitored. | monthly contact with resource family when children are in the home.<br><br>Developed and begun implementing recruitment and retention plan in 2013. Vacancy rate is currently below 10% and shows constant improvement.<br><br>Policy has been enforced regarding ASWS not carrying a caseload. This is monitored by administration on an on-going basis through workload reports. |
| 5. Investigation not completed within 30 days. | Tracking system for supervisors to enforce policy be developed and used. | Completed and on-going<br><br>Significant improvement over time regarding |

| | | |
|---|---|---|
| | Weekly staffings between supervisors and workers on on-going investigations is required.<br><br>Weekly reports of overdue investigations are monitored by administration and regional directors.<br><br>Remedial plans made with workers who are not completing investigations in a timely manner. Continued poor performance results in Performance Improvement Plan and continued problems result in disciplinary action. | numbers of overdue investigations. |
| 6. Resource home licensing policy not followed. Home was not licensed timely after placement. Safety concerns were not corrected prior to licensing and new safety/physical environment concerns (i.e. no water) were not corrected. Resource parents did not complete training prior to licensing. Background check issues were not adequately addressed. There is no evidence that regional director was consulted regarding approval of an exception to allow these two children to remain in the home of a relative who had five children based on whether the children could be safely maintained in the home. It is understood that worker prioritized the children's needs to maintain family connections and reduce further trauma by remaining with the relative their mother had already | Tracking system for resource supervisors and regional directors for timeliness of licensing be developed and implemented.<br><br>A system put in place for background checks to be completed and reviewed in a timely manner.<br><br>Safety concerns in resource homes to be recognized by worker, reviewed by resource supervisor and corrections made prior to licensing of the home. Safety violations that occur after licensing are recognized and corrected immediately or children are moved from the home.<br><br>Improvement of home study to enable worker to identify safety concerns and risk factors for children placed in the home.<br><br>Training for resource parents is required prior to licensing. | Tracking form is being designed for immediate use.<br><br>System for fingerprinting and background checks has been improved by hiring more staff and purchasing more fingerprinting equipment, and training for situations such as no I.D. available has been initiated for resource workers and supervisors.<br><br>A new SAFE (Structured Analysis of Family Evaluation) program for assessment of homes was implemented statewide July 1, 2013. Training of resource workers, resource supervisors and regional directors regarding the improved home study process has been completed. SAFE format requires that each concern regarding a placement be mitigated and resolution documented before approval can be made. |

| | | |
|---|---|---|
| placed them with before coming into DFCS custody. However, the balancing of the requirement and this need of the children required the consultation and approval of the regional director. | Regular staffings held by resource supervisors with resource home licensing workers to review issue prior to licensing and those that develop after licensing. | This would include any exception to the requirement regarding the number of total children in the home.<br><br>Review of training curriculum and requirements has been initiated. Improved training will be implemented in 2014.<br><br>Policy enforcement completed and on-going regarding current training requirements for resource parents. Current requirement includes 27 hours of training.<br><br>Practice initiated that includes the requirement that staffings are held on a weekly basis between resource supervisors and licensure workers, Regional Directors or regional ASWS regularly reviews on-going work and issues with resource supervisor. |
| 7. Initial medical screening not completed on children. Although child received medical care and evaluations throughout DFCS's involvement with the family and DFCS staff documented knowledge of medical evaluations either in paper record and/or MACWIS, the initial medical screening was not conducted timely when custody was transferred to DFCS and there is insufficient evidence to show that worker obtained medical evaluation results | Enforce policy and improve services for initial medical screening and follow-up for children in custody.<br><br>Through case staffings and reviews, ASWS's and workers are held accountable to ensure that medical evaluations are being obtained and that workers are identifying and matching service needs. | Developed new medical services through Magnolia Health to enable initial medical screening services and follow-up services for medical needs to be more accessible to workers.<br><br>Administrative assistance has been provided to all regions to assist in on-going tracking of eligibility needs, which includes medical evaluations following entry of a child into DFCS custody. |

| | | |
|---|---|---|
| in order to address matching service needs. | | |

Actions taken involving personnel responsible for deficiencies included an in-depth analysis of the case, including interviews with all personnel with the understanding that the information would be compiled into a report for administration in order to learn the facts of what occurred, learn from the errors, identify gaps in policy and practice and, most importantly, to improve outcomes for children. Regional directors met with staff in their regions to process through what had actually occurred, how to handle any feelings of guilt or regret, and counseled in how to move forward in ways that would benefit children and families in Mississippi in the future. The staff involved were transparent in their discussions and have taken actions to change their responsibilities altogether by retiring or resigning (G.H., L.T., C.B., S.B.), changing job duties, or by adapting their responses to their responsibilities by undergoing additional training in how to continually assess for the safety of children. Regional Directors were counseled by the Field Operations Director regarding their responsibilities in this case and in their responsibility for affecting all outcomes for children in their regions. No staff member involved in this case at any level was unaffected and unchanged by this child's death.

In summary, there were several issues that need to be addressed in practice and policy that surfaced in the review of the death of F.M. The need for improvements have been identified and either implemented or are in the process of completion. This was a tragedy that this agency does not want repeated and every effort is being made to create services that will prevent this from happening as much as possible.

# Appendix A

## DFCS Regional and County of Service (COS) or County of Responsibility (COR) Staff Involved

DFCS Regional and County of Service (COS) or County of Responsibility (COR) Staff Involved

County of Responsibility -Coahoma County, Region II-West
[redacted], Regional Director, Region II-West, COR
M.H. – COR Family Protection Specialist Advanced, Coahoma
M.K., Acting ASWS, Coahoma County
L.T. – Coahoma ASWS, Retired 04-20-12

County of Service, Quitman County, Region II-East
[redacted], Regional Director, Region II-East, COS
G.S. – Family Protection Specialist Advanced, Resource Specialist, COS
S.B. – Quitman, Family Protection Specialist, Resigned 03-30-2011
G.H. – Resource Supervisor
C.B. – Tallahatchie ASWS, COS, Retired May 2013
A.S. – Family Protection Specialist Advanced, Tallahatchie County, COS
T.B., Family Protection Specialist, COS
S.R., Family Protection Specialist, COS
C.M., investigated fatality
E.E. – Homemaker

**Appendix B**

**Investigation of Fatality Report**

DHS
345589

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

SOUTHERN DISTRICT OF MISSISSIPPI
FILED
AUG 0 5 2004
J. T. NOBLIN, CLERK
BY
DEPUTY

OLIVIA Y., et al. PLAINTIFFS

v. CIVIL ACTION NO. 3:04CV251LN

HALEY BARBOUR, as Governor of the State of Mississippi, et al. DEFENDANTS

## CONFIDENTIALITY ORDER

By agreement of the parties and for good cause shown, it is hereby ordered that:

1. This Confidentiality Order governs DHS records disclosed as part of this litigation. It does not affect the dissemination of confidential information in the ordinary course of business at DHS under existing confidentiality policies and laws.

2. Any individually-identifying information in any record maintained and produced by the Department of Human Services ("DHS"), regarding any plaintiff child, such child's family members, foster family members, and persons included in any case files as the source of information concerning the child – including but not limited to these persons' names, addresses, telephone numbers, social security numbers, dates of birth, and other individual information likely to enable a reasonable member of the general public to ascertain their identities – is hereby designated to be confidential and shall be subject to the provisions of this Order.

3. Disclosure of any such individually-identifiable information derived from records produced by DHS shall be limited to the parties and their counsel and to such

4/025256.1

DHS
345590

other personnel employed by the parties, including experts and persons employed by experts, in the litigation of the claims in the above-styled case with the following exception: Counsel for the parties are authorized to interview, depose, or otherwise contact fact witnesses and/or former DHS employees, solely for purposes connected with the litigation of the claims in the above-styled case, using individually-identifiable information derived in whole or in part from materials produced by DHS.

4. Any proper person to whom any individually-identifiable information identified in paragraph 2 is disclosed under the terms of this Order shall be provided a copy of this Order and is directed not to reveal the contents thereof for any purpose other than as permitted in this Order.

5. The use of any individually-identifiable information identified in paragraph 2 for any purpose other than the preparation and trial of the above-styled case or other proceedings related to this litigation is prohibited, except as allowed by statute or modified by subsequent order of this Court.

6. Notwithstanding any provision of this Confidentiality Order, parties and their counsel may disclose any information contained in DHS records provided that such information does not contain any individually-identifying information as defined in paragraph 2.

ENTERED this 5th Day of Aug. 2004.

S/Alfred G. Nicols, Jr.

ALFRED G. NICOLS, JR.
UNITED STATES MAGISTRATE JUDGE

**AGREED TO AND APPROVED FOR ENTRY:**

**ATTORNEYS FOR PLAINTIFFS:**

BRADLEY ARANT ROSE & WHITE LLP
WAYNE DRINKWATER (MBN 6193)
MELODY MCANALLY (MBN 101236)
188 East Capital Street, Suite 450
Jackson Mississippi 39201
(601) 498-8000

STEPHEN H. LEECH (MBN 1173)
850 East River Place, Suite 300
Jackson, Mississippi 39202
(601) 355-4013

MARCIA ROBINSON LOWRY (pro hac vice MBN 43991)
ERIC THOMPSON (pro hac vice MBN 43993)
SHIRIM NOTHENBERG (pro hac vice MBN 43990)
CORENE KENDRICK (pro hac vice MBN 43989)
CHILDREN=S RIGHTS, INC.
404 Park Avenue South, 11th Floor
New York, NY 10016
(212) 683-2210

LOEB & LOEB LLP
JOHN LANG (pro hac vice MBN 43987)
CHRISTIAN D. CARBONE (pro hac vice MBN 43986)
345 Park Ave.
New York, New York 10154
(212) 407-4000

**ATTORNEYS FOR DEFENDANTS:**

HAROLD E. PIZZETTA III (MBN 99867)
SPECIAL ASSISTANT ATTORNEY GENERAL
Civil Litigation Division
Office of Attorney General
P.O. Box 220
Jackson, MS 39205
(601) 359-3680

# Mississippi Department of Human Services

## Division of Family and Children's Services

### Investigation Report

Worker's Name : [redacted]

Incident Date : 06/15/2011

County : Quitman

Report Date : 06/15/2011

Report Time : 11:50 AM

Investigation Worker/Telephone : [redacted] / [redacted]

### Allegations Investigated

| Perpetrator | Relationship | Victim | Allegation | Pre/Post | Finding |
|---|---|---|---|---|---|
| R[redacted], L[redacted] | Relative Foster Parent | M[redacted], F[redacted] | Physical Neglect | Pre Screen | Substantiated |
| R[redacted], L[redacted] | Relative Foster Parent | F[redacted], D[redacted] | Physical Neglect | Pre Screen | Substantiated |

## Person Involved

| Name | DOB | Age | Sex | Race | SSN | ReportRole | HH Status |
|---|---|---|---|---|---|---|---|
| R[redacted],L[redacted] | [redacted] | 31 | Female | BLACK | [redacted] | Perpetrator | Primary Caretaker |
| M[redacted],F[redacted] | [redacted] | 3 | Male | BLACK | [redacted] | Victim | Member |
| F[redacted],D[redacted] | [redacted] | 1 | Male | BLACK | [redacted] | Victim | Member |
| R[redacted],JW | [redacted] | 44 | Male | BLACK | [redacted] | Uninvolved | Member |
| R[redacted],A[redacted] | [redacted] | 9 | Female | BLACK | [redacted] | Uninvolved | Member |
| Ms H[redacted] | - | - | Female | UNDET | - | Uninvolved | Non Member |
| Ms S[redacted] | - | - | Female | UNDET | - | Uninvolved | Non Member |
| S[redacted]r,A[redacted] | [redacted] | 29 | Female | BLACK | - | Reporter | Non Member |
| W[redacted],M[redacted] | [redacted] | 15 | Female | BLACK | [redacted] | - | Member |
| W[redacted],T[redacted] T | [redacted] | 14 | Male | BLACK | [redacted] | - | Member |
| R[redacted],JW Jr. | [redacted] | 11 | Male | BLACK | [redacted] | - | Member |
| W[redacted],J[redacted] | [redacted] | 13 | Male | BLACK | [redacted] | - | Member |

**Household Address :** R[redacted],L[redacted]

P. O. Box [redacted]

Marks

MS 38646-0000

**Description of the Alleged Maltreatment at the time of the Initial report :**

Reporter stated she got a call from COR worker, Ms. H[redacted], from Coahoma County around 9:46am this morning (6/15/11). Per Ms. H[redacted], L[redacted] called her screaming from the back of an ambulance saying F[redacted] fell in the toilet on 6/15/11. [redacted] said it was too much water in his lungs and they didn't think he was going to make it. L[redacted], her husband, JW, and her daughter, A[redacted], were all at home. Reporter noted about fifteen minutes later resource worker, Ms. S[redacted], was asking L[redacted] what happened. L[redacted] started screaming again because the doctors said F[redacted] had died. Reporter did not confront L[redacted] regarding these allegations. Reporter mentioned L[redacted] is a relative foster parent. Reporter stated DHS has already removed F[redacted] brother, D[redacted], from the home. Reporter suggested physical neglect should also be an allegation for D[redacted]. K[redacted] McL[redacted] has been assigned to this case, per reporter. This family does have history in MACWIS. Safety risks are undetermined.

**Worker Findings :**

The basis for finding is that the child died and the relative resource parents do not know what happened to the child. This very young child was not supervised by an adult at or around the time of his death. The case is being substantiated for ph ysical neglect. There were inconsistencies found in the family member's statements as to what happened to the child. It was also found that the family did not have any running water in the home. The agency is waiting on the autopsy report to de termine the cause of the child s death.

**In what type of placement was the maltreatment alleged to have occurred (foster care placement or adoptive placement)? If foster care then what type setting (foster home, group home, residential treatment, therapeutic foster home, relative placement, etc)?**

**Who is the Alleged Perpetrator? What is there relationship with the victim?**

**Describe the nature, frequency, and duration of the maltreatment:**

**What is the permanent plan for the child(ren)? How does the child(ren) perceive the placement where the alleged maltreatment occurred?**

**Does the Resource have a history of maltreatment with the agency? If so, were any of the allegations substantiated?**

No

Is there a violation of agency policy or licensure standards?

No

Would the child be in any danger if left in this placement?

Yes

If the child is in danger in the placement the agency will address the danger with:

Do any adults in the home/facility appear to have a substance abuse/dependency problem or display any behaviors or emotions (anger, depression, bizarre behaviors, etc.?) that affects' ability to meet the safety and basic needs of the child? If so, describe.

No

Are there possible safety concerns posed by other children in the placement, or does this child pose possible threats to other children there?

Yes

Are there any significant changes/occurrences in the past year that may affect the caregivers (staff's) ability to meet the protection and basic needs of the youth? (For example, has there been excessive staff turnover in facilities, marital or financial problems in resource homes) If so, describe.

No

**Describe the caregiver(s)/facility staffs understanding of the child's basic needs and developmental needs and how they are met within the placement setting. Include physical and behavioral health needs.**

| **Risk:** High Risk | **Safety:** Unsafe | **Well-Being:** Insufficient |
|---|---|---|

## Address Addendum

PersonName : R[redacted],L[redacted]
Address : P. O. Box [redacted]
City : Marks
State / Zip : MS 38646-0000

---

PersonName : M[redacted],R[redacted]
Address : [redacted] Highway 322
City : Lambert
State / Zip : MS 38643-0000

---

PersonName : F[redacted],D[redacted]
Address : [redacted] IOWA Avenue
City : Clarksdale
State / Zip : MS 38614-0000

---

PersonName : R[redacted],JW
Address : [redacted] Highway 322
City : Lambert
State / Zip : MS 38643-0000

---

PersonName : R[redacted],A[redacted]
Address : P. O. Box [redacted]
City : Lambert
State / Zip : MS 38643-0000

---

PersonName : S[redacted],A[redacted]
Address : PO Box [redacted]
City : Charleston
State / Zip : MS 38921-0000

---

| | |
|---|---|
| PersonName : | W[redacted],M[redacted] |
| Address : | [redacted] Hwy 322 E |
| City : | Lambert |
| State / Zip : | MS 38643-0000 |
| PersonName : | W[redacted],T[redacted] |
| Address : | [redacted] Hwy 322 E |
| City : | Lambert |
| State / Zip : | MS 38643-0000 |
| PersonName : | R[redacted],J[redacted] |
| Address : | [redacted] Hwy 322 E |
| City : | Lambert |
| State / Zip : | MS 38643-0000 |
| PersonName : | W[redacted],J[redacted] |
| Address : | [redacted] Hwy 322 E |
| City : | Lambert |
| State / Zip : | MS 38643-0000 |

**Alleged Perpetrator**

[redacted]

MCC[redacted] 12:20 PM 06/15/2011

Worker, G[redacted] M[redacted] with the assistance of S[redacted] FPSA interviewed Mrs. L[redacted] R[redacted] alone in the Quitman County DHS office. According to Mrs. R[redacted], they all slept in her bedroom because they were watching movies. She goes on to say, F[redacted] and D[redacted] were in the bed with them, and the other children slept on a mattress and a pallet on the floor. She stated, "My husband told A[redacted] to take F[redacted] to the bathroom, she took him and brought him back to their bedroom." According to Mrs. R[redacted], her husband jumped up and asked, "Where is F[redacted]?" Worker asked Mrs. R[redacted] what time did that happen. According to Mrs. R[redacted], she could not remember what time it happened. She stated that her husband went into the bathroom and brought the child out in his hand. According to Mrs. R[redacted], she started CPR on him while, J W looked for the telephone. She stated that JW asked her to call 911 as he administered CPR on the child. Mrs. R[redacted] stated that she called thePolice Department. She said she also called Social Services, but the line was busy. She said that she could remember Ms. H[redacted] telephone number, so she called her. According to Mrs. R[redacted], Chief [redacted] with the Lambert Police Department was first to arrive at their home. When Chief [redacted] arrived, she began to administer CPR on the child. According to Mrs. R[redacted], Chief [redacted] continued to do CPR until the ambulance arrived at their home. Mrs. R[redacted] stated that she and her family had been in Southaven for a week due to her home being sprayed for critters (roaches), after they had flooding in the community last month. She said that when they arrived at the home, their water was off.

Worker inquired about the time they arrived home. Mrs. R[redacted] stated June 14, 2011 at approximately 10:00 PM or later. She said that they had to bring some water from her mother's house.

According to Mrs. R[redacted], F[redacted] was not sleeping in his bed because he didn't have a mattress due to the child having had a bowel movement and "peed" on the mattress a couple of weeks ago. Mrs. R[redacted] stated they burned his mattress. She stated that F[redacted] would always stand on top of something to open doors. According to Mrs. R[redacted], "He was a very sneaky child." Mrs. R[redacted] was crying and stating that "I hate that I was asleep and did not catch him that time."

**Alleged Victim**

M[redacted] T

S[redacted] 11:52 AM 06/15/2011

VICTIM WAS SEEN AT 10:00 AM:

FPSA S[redacted] FPSA H[redacted] and Resource Specialist S[redacted] went into the examination room at the Emergency Room at Quitman County Hospital to observe the body of two year old F[redacted] T[redacted] R[redacted] LPN (Ms. R[redacted] was also the County Corner) accompanied workers in the room. Worker observed the arms, legs, face, stomach area, back area, and buttocks of F[redacted] M[redacted] Worker did not observe any bruises on the child. Worker noticed that F[redacted] had some old scaring and mosquito bites. The child was dressed in a yellow hospital gown with a sheet draped over him. Pictures were taken by Resource Specialist S[redacted] for case file.

F[redacted]

MC[redacted] 12:10 PM 06/15/2011

Worker observed D[redacted], age 10 months old, in the arms of Ms. M[redacted] H[redacted], his County of Responsibility worker. D[redacted] was very upset and crying. He was dressed in a pamper with a blanket around him. Worker checked the child and no bruises or marks were found on him. This child is too young to talk and express himself verbally.

**Attempted Contact**

No Participants

H[redacted] 04:45 PM 06/15/2011

Worker traveled to Mr. T[redacted] D[redacted] home to inform him of his son, F[redacted] death. No one came to the door when worker knocked. Worker left a card asking him to contact her as it was very important.

---

**Collateral Contact**

No Participants

MC[redacted],C[redacted] 02:30 PM 06/15/2011

S[redacted] C[redacted], FPSA and Worker M[redacted] interviewed Chief [redacted] with the Lambert Police Department. Chief [redacted] stated that she received the call at 9:17 AM and it took approximately two to three minutes to respond. She stated that she was askedby the Sheriff Department to go to the home to make sure that the ambulance knew where to go. According to Chief [redacted], the family resides in the county but since she was closer to them, she responded for the Sheriff Department. Chief [redacted] stated that when she arrived at the home, the baby was lying on the floor. According to Chief [redacted], the baby's eyes were open and she could see where he had thrown up on the floor. Chief [redacted] stated that JW was doing CPR on the baby. Chief [redacted] stated that she rubbed the baby's stomach and some liquid came out of his nose. According to Chief [redacted], the baby's body was cold and tight. Chief [redacted] stated that the baby's mouth was dry. According to Chief [redacted], she put her head on the child's chest and did not hear anything. Chief [redacted] stated, "That baby was dead." According to Chief [redacted], the ambulance attendant came into the house and scooped the baby up and ran out the door with him. According to Chief [redacted], JW [redacted] told her that his son brought the baby to him, and then she heard that the baby was found in the tub, commode and cooler. Chief [redacted] stated that she has heard three different stories.

No Participants

M[redacted] C[redacted] 02:15 PM 06/15/2011

Worker, [redacted] interviewed [redacted] Water and Court Clerk for the City of Lambert. According to Ms. [redacted], the water was turned off in the home on June 06, 2011 at 2:00 PM for non-payment. Ms. [redacted] stated that the water was registered under the name of W[redacted] D[redacted] Worker M[redacted] asked if the water in the home had been off in the past. According to Ms. [redacted], the water has been off in the past but has never stayed off for more than two weeks.

No Participants

MC[redacted],C[redacted] 09:15 AM 06/20/2011

Worker contacted Ms. R[redacted] C[redacted] Water and Court Clerk with the City of Lambert to find how much the water bill for the R[redacted] family. According to Ms. [redacted] the water bill was $52.70. She stated that they had gotten an extension on the bill which is $30, then there is a $25.00 reconnect fee. Ms. [redacted] stated that the water bill was paid on June 16, 2011 and it now back on in the home.

---

**ICWA Contact**

M[redacted] L[redacted]

H[redacted],M[redacted] 03:00 PM 06/15/2011

Ms. [redacted], the alleged victim's mother, was asked the following questions:
Is parent or child of Native American Heritage? No
Is parent eligible for tribal membership? No
Is parent registered with Native American tribe? No
Is childeligible for tribal membership? No
Has child been registered with Native American tribe? No
Does the family live on tribal land? No
Does any family member belong to the Choctaw, Cherokee, Chickasaw or any other tribe? No

D[redacted], T[redacted]

H[redacted]R,M[redacted] 10:40 AM 06/16/2011

Mr. T[redacted] D[redacted], the alleged victim's father, was asked the following questions:
Is parent or child of Native American Heritage? No
Is parent eligible for tribal membership? No
Is parent registered with Native American tribe? No
Is childeligible for tribal membership? No
Has child been registered with Native American tribe? No
Does the family live on tribal land? No
Does any family member belong to the Choctaw, Cherokee, Chickasaw or any other tribe? No

---

**Investigation Staffing**

No Participants

MC[redacted],C[redacted] 01:13 PM 06/15/2011

C[redacted] M[redacted], FPSA staffed the case with Ms. J[redacted] Mc[redacted] Regional Director. Worker informed her that the Resource Parent, Mr. JW R[redacted] stated that he found F[redacted] in a cooler upside down and he stated water was in the cooler.

---

**Judge/Court Personnel**

No Participants

MC[redacted],C[redacted] 02:39 PM 06/17/2011

Worker contacted Ms. B[redacted] M[redacted], DA for Quitman county and informed her of the report on F[redacted] M[redacted]. Worker asked Ms. M[redacted] for her fax number so that I could fax her the report. Ms. M[redacted] wanted to know what did worker want her to do with it. Worker explained to her that it was my duties to report her the death of the child, then follow up with the completed investigation. Ms. M[redacted] asked Worker which law enforcement agency was handling the case? Worker gave her Det. [redacted] with the Quitman County Sheriff Department.

Worker faxed the report to Ms. M[redacted]

No Participants

T[redacted],L[redacted] 10:41 AM 06/16/2011

This narrative is being copied and pasted by RD J[redacted] Mc[redacted] from the children's case. The contact was made by ASWS L[redacted] T[redacted] on the date and time above.

Supervisor T[redacted] received a call from the Guardian Ad Litem [redacted] this morning after worker had left a message for her to call this office on the evening of June 15, 2011. Attorney [redacted] was informed that the agency was required to inform her regarding the death of F[redacted] M[redacted], a child that was in the agency custodyduring the time of his death. Attorney [redacted] expressed her condolence regarding our lost.

---

**Law Enforcement**

No Participants

MC[redacted],C[redacted] 11:27 AM 06/17/2011

Worker received a call from Detective [redacted] with Quitman County Sheriff Department. Det. [redacted] stated that he had taken a lot of pictures of the home. According to Det. [redacted], Mr. JW R[redacted] told him that he found F[redacted] upside down in the cooler and that the child was naked. Det. [redacted] stated that Mrs. R[redacted] told him that the child did have on some underwear. According to Det. [redacted], he is getting different statement from the family members. Det. [redacted] stated that once he get the preliminary report together, he will fax it to the worker. Worker gave Det. [redacted] my cellular phone and fax number.

No Participants

MCC[redacted],C[redacted] 10:15 AM 06/28/2011

Worker contact Investigator, D[redacted] L[redacted] with the Quitman County Sheriff Department to see if he had completed his report. Investigator [redacted] stated that he was waiting on the autopsy before sending this worker a copy of his report. He stated that he had gotten one sheet from the crime lab, but it was not saying anything.

---

**Medical Contact**

No Participants

MC[redacted],C[redacted] 10:10 AM 06/17/2011

Worker contacted Ms. [redacted], coroner and informed her that F[redacted] body will go to Century Funeral Home in Clarksdale.

No Participants

MC[redacted],C[redacted] 09:44 AM 06/17/2011

Worker received a call from T[redacted] R[redacted], coroner in Quitman County. Ms. R[redacted] wanted to know which funeral home would get F[redacted] body. Worker informed Ms. R[redacted] that I would have to contact the worker in Clarksdale to fine out.

No Participants

MC[redacted],C[redacted] 02:35 PM 06/16/2011

Worker Mc[redacted] contacted Ms. [redacted] coroner for Quitman County. Worker explained to Ms. [redacted] that I will be the person handling the investigation on F[redacted] M[redacted]. Worker asked Ms. [redacted] did she know the cause of death. According to Ms. [redacted], it did not appear to her that the child had fallen into water. She stated that the child did not have on any clothes when she saw him at the hospital and his skin was dry. Ms. [redacted] stated that "the father told her that he picked the child up from beside the commode, but nothing fits." According to Ms. [redacted], the autopsy will be preformed on tomorrow, June 17, 2011. Ms. [redacted] stated that "one of the Nurses told her that F[redacted] hands were wrinkled."

Worker provided Ms. [redacted] with the office number, cellular phone and fax number.

No Participants

MC[redacted],C[redacted] 10:56 AM 07/05/2011

Worker contacted Ms. [redacted], coroner for Quitman County in reference to the autopsy on F[redacted] M[redacted]. Ms [redacted] stated that autopsy was still pending. She said she will let worker know when the autopsy comes.

No Participants

MC[redacted],C[redacted] 11:54 AM 07/18/2011

Worker contacted Ms. [redacted] Quitman County Coroner to see if she has received the autopsy on F[redacted]. Ms. [redacted] stated that she has not received it.

---

**Other**

No Participants

MC[redacted],C[redacted] 09:55 AM 06/17/2011

Worker contacted Ms. M[redacted] H[redacted] COR worker for F[redacted] Worker asked Ms. H[redacted] which funeral home will get F[redacted] body. Ms. H[redacted] stated that the child will go to Century Funeral Home in Clarksdale.

No Participants

MC[redacted],C[redacted] 12:14 PM 07/06/2011

Worker, C[redacted] M[redacted] contacted COR Worker, Ms. M[redacted] H[redacted] in regards to the condition of the R[redacted] home when she last visited. According to Ms. H[redacted], the last time she visited the R[redacted] home was in March 2011. She stated that Mrs.R[redacted] showed her the entire house, and it was clean in appearance at that time. Ms. H[redacted] stated that all of the beds in the home were made up. According to Ms. H[redacted] the home had all working utilities. She stated that she did go into the F[redacted] and D[redacted] s bedroom, and both of their beds had mattresses. Ms. H[redacted] stated that she can not say what happened to the home from that time until the death of the child.

**Other Household Member**

R[redacted],A[redacted]

MC[redacted],C[redacted] 01:07 PM 06/15/2011

Worker, Mc[redacted] interviewed A[redacted] R[redacted] age 8, alone in the Quitman County DHS office. She stated that she took F[redacted] to the bathroom to let him "pee" then she took him back to her mother's room. According to A[redacted] they played, ate popcorn and watched scary movies. Worker ended the interview at this time to go to the home so that the County of Responsibility could get clothing for the other youth in care.

R[redacted],JW[redacted]

MC[redacted],C[redacted] 02:10 PM 06/15/2011

Worker interviewed JW, age 10, alone in his parent's bedroom. According to JW, the only thing he knew was that he was asleep and he heard everybody screaming. JW stated that he woke up after hearing the screams. He stated that he slept in the bed with his parents, D[redacted] and F[redacted]. According to JW, A[redacted] took F[redacted] to the bathroom and came back to the bedroom. JW stated that his brother, T[redacted] kept checking on F[redacted] while he was sitting on the toilet. According to JW, he went to sleep leaving everyone else awake. JW stated he always goes to sleep first. According to JW, he has being staying with a relative, but he forgot who his parents went to visit. JW stated that they returned home on June 14, 2011 and it was almostdark when they got home.

[redacted]

MC[redacted],C[redacted] 01:50 PM 06/15/2011

Worker interviewed M[redacted] age 15, alone in the bedroom of their home. She stated that she and her brother, T[redacted] slept in the den. According to M[redacted] she heard her step dad say, "F[redacted] dead." The child stated that she thought she was dreaming until her stepdad say, "Get up F[redacted] is dead." According to M[redacted], she went into her parents bedroom, and saw her mother sitting on the bed trying to catch her breath. M[redacted] stated that JW was doing CPR on F[redacted]. Worker asked the child around what time was it when her stepdad said that F[redacted] was dead. M[redacted] stated that it was approximately 7:50 AM because she was texting on the cellular phone at that time. According to M[redacted] she did not see A[redacted] take F[redacted] to the bathroom. Thechild stated that the family had been in Southaven and returned home yesterday, June 14, 2011 around 7:00 PM.

[redacted],[redacted]

MC[redacted],C[redacted] 01:56 PM 06/15/2011

Worker interviewed T[redacted] age 14, alone in the bedroom of his parent's home. According to T[redacted] he and M[redacted] slept in the den. T[redacted] stated that he made sure that F[redacted] got in the bed with his parents. According to T[redacted] everyone was in their parent's room watching movies, except him and M[redacted] T[redacted] stated that he and M[redacted] was not in the room when A[redacted] took F[redacted] to the bathroom. According to T[redacted] he had being staying in [redacted] since school got out with a cousin.

T[redacted] stated that they returned home on June 14, 2011, right at dark, but he could not say the exact time. According to T[redacted] his stepdad woke him and M[redacted] up saying, "F[redacted] dead." The child stated that when he went into his parent'sroom, his mother was doing CPR on F[redacted] and crying then his stepfather started doing CPR on him.

R[redacted],A[redacted]

C[redacted],S[redacted] 01:30 PM 06/15/2011

A[redacted] R[redacted] interview started in Quitman County DFCS office by FPSA Mc[redacted] and was continued by FPSA C[redacted] in her parent's bedroom alone.

The child is eight years old and was promoted to the third grade at Lambert Elementary School of Lambert, Ms. Worker observed the child to be dressed appropriately for the weather, and to be developing normally for her age level.

According to the child they went out of town for several days and stayed with relatives. The child continued and stated that they came by the house and checked it, got clothes as the roaches were bad, and that she heard her parents say that some men sprayed the house on Saturday. According to the child they stayed with her grandmother E[redacted] W[redacted] of Marks, Ms. According to the child she also stayed a night or two with a cousin, Ms. F[redacted] F[redacted]

According to the child they returned home that morning and then she changed it to that evening before dark. According to the child she took [redacted] to the bathroom and that she then brought him back to her parent's room and he then got into the bed with her parents.

According to the child, she and F[redacted] were still looking at the movie, "Friday Christmas", when everyone else fell asleep. According tothe child F[redacted] then got out of the bed with her parents and lay on the covers that she had on the floor beside her parent's bed. Worker observed the covers still on the floor located on the right side of Mr. and Mrs. R[redacted]'s bed.

According to the child it was almost morning when she and F[redacted] finally went to sleep. According to the child she only took [redacted] to the bathroom when her parent's were awake, and that she never took him to the bathroom after everyone went to sleep. According to the child, F[redacted] was sneaky, and that he would drink anything. Worker asked the child why she said that, the child stated that F[redacted] was sneaky, and he did drink anything, and that is why he always had to be watched.

The child continued, and according to her she was awaken by the scream of her sister, M[redacted] who was hollering that F[redacted] was dead! The child stated she jumped up and saw F[redacted] on the floor with her dad giving CPR. The child was observed by Worker to speak clearly,and that she never cried during the interview.

---

Parent/Caretaker

R[redacted],W,R[redacted],L[redacted]

MC[redacted],C[redacted] 12:55 PM 06/15/2011

Worker went over the Notice of Parents/Guardian Rights-Investigation with the[redacted] They stated that they understood and signed it. Worker also went over the Client's Grievance Procedures and got them to signed a copy of it. Worker gave them acopy of what they signed.

R[redacted],JW

MC[redacted] 12:43 PM 06/15/2011

Worker interviewed J W R[redacted] L[redacted] husband alone in the Quitman County DHS office. Mr. R[redacted] stated that everyone was asleep when he got up to go the bathroom. He stated that he found F[redacted] upside down in the cooler and there was water init. According to Mr. R[redacted] he picked the child up, took him into the bedroom and his wife started CPR, then he told her to call 911. Mr. R[redacted] stated that he started doing the CPR, but the child was not responding. He said that the Sheriff came in and started doing CPR. According to Mr. R[redacted] they all were watching television in their bedroom. He said that F[redacted] and D[redacted] were in the bed with he and his wife. Mrs. R[redacted] stated that F[redacted] was already asleep when he went to sleep. Worker questioned Mr. R[redacted] about time frame on them being in the room, the last time he saw the child awake and the time he found the child. Mr. R[redacted] could not give Worker a time.

R[redacted],L[redacted]

MC[redacted],C[redacted] 12:30 PM 06/15/2011

Worker informed Mrs. L[redacted] R[redacted] that I needed to interview all of the children that resided in her home.

M[redacted],L[redacted]D,F[redacted],D[redacted]

H[redacted],M[redacted] 12:00 PM 06/15/2011

Worker spoke with Ms. L[redacted] M[redacted], the two year old deceased alleged victim, F[redacted] M[redacted]s mother, and Mr. D[redacted] F[redacted], father of the alleged victim's brother, D[redacted] F[redacted] Jr., regarding the death of F[redacted] Worker offered her condolences to Ms. M[redacted] for the loss of her son. Worker informed her that her son would be taken to Jackson, MS and an autopsy would be conducted on F[redacted] to find out the actual cause of his death. Worker informed her that she would keep her abreast of any information that is found out regarding her son's death and for her to feel free to contact her when she needs to.

D[redacted],T[redacted]

H[redacted],M[redacted] 10:25 AM 06/16/2011

Worker traveled to Mr. T[redacted] D[redacted] the two year old deceased victim, F[redacted] M[redacted] father, and informed him of F[redacted] death. Worker offered her condolences for the loss of his son. Mr. D[redacted] stated that he heard that he drowned. Worker informed him that his son was currently in Jackson, MS and an autopsy would be conducted on him to find out the actual cause of F[redacted] death. Mr. D[redacted] was also informed that the agency would be responsible for F[redacted] funeral arrangement. Worker informed him that she would keep him informed of the funeral arrangements and any other information that is found out regarding his son's death and for him to feel free to contact her when he needs to.

R[redacted],JW,R[redacted],L[redacted]

MC[redacted],C[redacted] 03:15 PM 06/15/2011

The R[redacted] and Worker McC[redacted] went over the Safety Checklist for Children and they both signed it.

---

**Physical Home Environment**

R[redacted],A[redacted],R[redacted] W Jr.,W[redacted] T[redacted] T,W[redacted] M[redacted] R:

MC[redacted],C[redacted] 01:30 PM 06/15/2011

A physical home environment was completed on the home of JW and L[redacted] R[redacted] home at [redacted] Highway 322, Lambert, Mississippi. Workers C[redacted] and Mc[redacted] trailed the R[redacted] to their home. The outer appearance of the home was checked. Worker observed a wood framed house behind the R[redacted]s home that they stated belongs to them. This house did not have doors on it, nor was it boarded up. Worker also observed two inoperable cars sitting on the land that were not working. The grass to the family home was in need of mowing.

Worker was escorted through the home by Mrs. R[redacted]. Worker observed clothing hanging all on the kitchen cabinets and the oven. Worker was shown the inside of the two refrigerators in the home by Mrs. R[redacted] One refrigerator had some cheese, flour, bread and an unidentified piece of meat wrapped in a cloth towel. The other refrigerator had about three packs of meats and an opened box of ice cream. Worker did observe two fire extinguishers in the kitchen, one hanging on the wall and one on top of the refrigerator.

There was no furniture in the living room, it only had clothes on the floor. There was a fire place in this room, which had a guard in front of it with a thick piece of wood in front of it. Worker observed an electric cord running from the fire place. There was a blind on one window and a bed sheet at the other window.

The den had a sectional couch which was very dirty in appearance. There was a ceiling fan in the ceiling which had loose wiring hanging from it. There was an orange drop light hanging on the wall. There was an air conditioner in this room.

There was a storage room off from the den, which had two doors to it. One of the doors did not have a handle. This room was filled with piles of clothing, toys, mattress and bikes.

There was a bed sheet hanging on the window located in the hall.

Bedroom one is occupied by Mr. and Mrs. R[redacted] and this is the room that the whole family slept in the night before the death of [redacted] There is a queen size bed that had no sheets were on it. There was a small table in the room, that block the main entrance. Worker observed an orange drop light hanging from the ceiling fan which was used to light the room. Worker also observed a child's play pen which was filled with clothing. Blankets were also observed on the floor in this room. Worker observed a window unit air conditioner in this room.

There is a full bathroom next to the R[redacted] bedroom. It can be entered from the bedroom. Worker observed the toilet to have a seat but not atop. This is the bathroom in which F[redacted] was found. There was a tall, orange, round cooler in there. Worker observed the electric sockets tohave the plastic electrical covers but there was not a plate to cover the socket.

Bedroom two is occupied by Mrs. R[redacted] boys. Worker observed a set of full size mattress on the floor with no sheets on it. Also in this room the closet doorwas off the hinge and torn up.

Bedroom three was occupied by F[redacted] and D[redacted] Worker observed a baby bed that was neatly fixed, this baby bed was used by D[redacted]. There was another bed in the room which did not have a mattress, and this was F[redacted] bed. There was also a dresser in this room.

Worker observed a door in this room that leads to another full bathroom. When the door was opened a really bad odor emerged. There was not a toilet seat or top on the commode. The toilet wasfilled with tissue, urine and feces.

Worker observed on the back porch which is screened in a broken washing machine.

Mrs. R[redacted] showed Worker, Mc[redacted] that there were lights in the home and she turned on the stove to show that there was gasin the home.

Pictures were taken of the R[redacted] Family's home.

DHS 345608

# Ex. 50B

# CHILD FATALITY REVIEW

**Submitted by: [REDACTED], LSW**
**Bureau Director, Prevention/ Protection Unit**
**Division of Family and Children's Services**
**Mississippi Department of Human Services**

**Approved by: [REDACTED], PhD**
**Deputy Administrator**
**Division of Family and Children's Services**
**Mississippi Department of Human Services**

**Date Submitted: July 8, 2013**

## TABLE OF CONTENTS

I. Purpose

II. Methodology Used to Conduct the Fatality Review

III. Case History as it Relates to Fatality Incident

  A. Relevant persons Involved

  B. Chronology of Case Developments

  C. Ransom Home Study

  D. Summary of Contacts that occurred with children in the [redacted] Resource home between 01-25-2011 and report of fatality

IV. Fatality Incident

V. Applicable Findings

  A. Findings related to Policy

    1. DFCS policy regarding licensure of relatives as Resource Parents

    2. DFCS policy regarding on-going assessment of children's safety in resource home

  B. Findings related to Practice

  C. Findings related to Modified Settlement Agreement

VI. Summary and Recommendations

Appendices :

A. DFCS Staff Involved

B. Investigation of Fatality Report

# CHILD FATALITY REVIEW

Name of Deceased Child: F.M., Date of Birth 

## I. Purpose

The purpose of this Child Fatality Review is to review the circumstances leading to the death of F.M. with respect to the responsibilities of the Division of Family and Children's Services (DFCS), Mississippi Department of Human Services (MDHS) and to evaluate the DFCS' discharge of its responsibilities in this area. Where applicable, the review addresses implications for DFCS policy and practice in order to ensure the most effective responses to similar situations in the future. The provision of foster care services, case practice, and licensing practice is examined in light of DFCS policy and Modified Settlement Agreement (MSA) requirements.

*II. C. 1. By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants shall conduct an assessment of the FM fatality, including an assessment of any failings by Defendants in the provision of foster care services, in case practice, and in licensing practice. The written assessment shall be provided to the Monitor and Plaintiffs and shall include recommendations for ways to improve child safety and address any identified failings.*

## II. Methodology Used to Conduct the Fatality Review

A team of DFCS staff was formed to conduct the fatality review. This team included:

- [redacted], LSW, Special Projects Officer in the DFCS Continuous Quality Improvement Unit, has no previous involvement with or knowledge of the case before this assessment,
- [redacted], LSW, was MSW student at the time of this assessment, has since earned MSW degree and maintained LSW; Regional Director for DFCS Region II-East, which includes Quitman County, the County of Service (COS) for this case,
- [redacted], LSW, was MSW student at the time of this assessment, has since earned MSW degree and maintained LSW; now DSW student; Regional Director for DFCS Region II-West, which includes Coahoma County, the County of Responsibility (COR) for this case,
- [redacted], LMSW, DFCS Field Operations Director,
- [redacted], LSW, currently MSW student, DFCS Bureau Director of Prevention/ Protection Unit
- [redacted], DFCS Continuous Quality Improvement Director

DHS
345562

The process that the team used to conduct the review was as follows:

- The first step was to conduct a review of the child's case file for the purpose of understanding the history of the child's involvement with DFCS and DFCS' interventions. [redacted], LSW, Special Projects Officer in the Continuous Quality Improvement Unit, reviewed the electronic (MACWIS) and paper records of the child's case file. Ms. [redacted] made notes of her case file review to share with the other members of the team.

- Next, Ms. [redacted] interviewed the DFCS staff involved in the case individually on 02-07-2012 and 02-08-2012. A number of DFCS staff have been involved with this case and their initials and roles are listed in the Appendix A of this document, "DFCS Regional and County of Service (COS) or County of Responsibility (COR) Staff Involved".

- After Ms. [redacted] conducted an independent review of the case file and completed her interviews, she provided documentation of the case review and interviews to the rest of the team. The team met to review the information compiled, review the circumstances of the case, evaluate case practice with regard to the case, and compliance with applicable requirements.

- After submission of the case review report to the Court Monitor, the case was submitted to DFCS consultant [redacted], LMSW for secondary review. Mr. [redacted] utilized the case review instrument used in the joint DFCS/Court Monitor case review in August 2010.

- In conducting its review of the fatality, the team referred to a number of documents, including the following:
  - Documents prepared by [redacted] as she reviewed the case
    - "Preliminary observations/findings"
    - "Investigation Observations: Investigative Narratives – Inconsistencies in Statements (06/15/11)"
    - "Caseworker Contact(s) / [L.R./J.W.R.] Home"
    - "Home Environment Observations"
    - "ANE History"
    - Documentation of interviews by [redacted] with DFCS involved in the case
    - "Safety Issue Found During Investigation (06-15-11)"
    - "Services Agency Provided to Relative Resource Parent" and "Services Agency Provided to Biological Parents" (included on same document)
    - "Documented Case Narratives (Brief Synopsis)
  - MACWIS Narratives of Investigations and Open Case
  - Fatality Investigation of 06-15-2011 (date of child's death)

- Resource Family Home Study
- Medical Records from case record
- Pictures of resource home and child on 06-15-2011
- Continuous Quality Improvement DFCS Region 2-W Follow Up Evaluation and Monitoring Case Review of June 2011 of which FM case was part of random sample of cases to be reviewed
- Serious Incident Report (SIR) of Child Fatality
- Autopsy report received by the team on 06-12-2012
- Court Summary dated 01-27-2011
- Criminal Background Justification Form filled out by Resource Parent L.R.
- Agreement between DFCS and Resource Parent L.R. regarding transportation plan for children
- Letter written from the biological mother of F.M. dated 11-29-2010 in which she temporarily signs her "rights" over to L.R.
- MACWIS review conducted by [redacted], LCSW, USM Consultant for DFCS using case review instrument previously used during case review conducted jointly by DFCS and Court Monitor's staff.

## III. Case History as it Relates to Fatality Incident

A. Relevant persons involved in this case

Child F.M., DOB [redacted] Date of Death 06-15-2011
Child D.F. DOB [redacted] half-brother of F.M.
Adult L.M., DOB [redacted] biological mother of Children F.M. and D.F.
Adult D.F., paramour of Biological Mother L.M. and father of Child D.F.
Adult T.D., DOB [redacted], father of Child F.M., not in home of biological mother or resource parent
Adult L.R., DOB [redacted], cousin, licensed relative resource parent for these children
Adult J.W.R., DOB [redacted], married to Resource Parent L.R. since 2002, licensed resource parent
Child J.W.R., DOB [redacted], son of Resource Parents L.R. and J.W.R.
Child T.W., DOB [redacted], son of Resource Parent L.R.
Child A.R., DOB [redacted], daughter of Resource Parents L.R. and J.W.R.
Child M.W., DOB [redacted], daughter of Resource Parent L.R. and uninvolved male T.P.
Child J.B.W., DOB [redacted], son of Resource Parent L.R. and uninvolved male E.T.
Adult S.B., relative
"Mrs. B.", cousin
Adult A.B., community member who allowed Biological Mother L.M. and children to live with her at one time
Adult "D.", maternal aunt

B. Chronology of Case Developments

F.M. and D.F., half-siblings, came into DFCS' custody on 12-17-2010 following substantiated allegations of neglect and allegations of physical abuse of both children in Coahoma County.

Over the course of DFCS' involvement with this child/family, there were several reports of alleged maltreatment and contacts with family prior to DFCS custody:

- 01-07-2009 - Report alleging medical neglect of F.M.
  The report was screened out by Regional Director of Quitman County after worker M.K. made contact with the mother and child. The alleged perpetrator was the mother of the child.

- 04-01-2010 - Evidenced Neglect and Prevention Case Opened
  On this date a report alleging physical neglect of F.M. was received. The report was investigated by M.H. of Coahoma County and was determined to be substantiated. The alleged perpetrator was the mother of the child. A Prevention Case was opened to serve the family.

- 07-23-2010 - Report alleging physical abuse of F.M.
  The report was investigated by M.H. of Coahoma County and was determined to be unsubstantiated. The alleged perpetrators were the mother of the child and the mother's boyfriend.

- 07-23-2010 - Report alleging physical abuse of Adult L.M. (F.M. and D.F.'s mother)
  This report was screened out by Adult Protective Services. The alleged perpetrator was the boyfriend of L.M. and the father of her youngest child.

- 10-04-2010 – Report alleging physical neglect of F.M.
  The report was investigated by M.H. of Coahoma County and was determined to be unsubstantiated. The alleged perpetrator was the mother of the child and mother's boyfriend.

- 11-3-2010 – Allegations of physical neglect and abuse
  Worker notes allegations in narrative but no report received

- 11-10-2010 - Report alleging physical abuse of F.M.
  The report was investigated by M.H. of Coahoma County and was determined to be unsubstantiated. The alleged perpetrator was the mother of the child.

- 11-23-2010 - Mother reported that her boyfriend, D.F., was abusing her and the baby
  Report located in a medical record but not found in MACWIS as an official report

- 12-1-2010 – Family Team Meeting
  Children's whereabouts were previously unknown. Children's mother reported that she had placed the children in the care of L.R.

- 12-10-2010 – Walk-through of the L.R. and J.W.R. home

- F.M. and D.F. were placed in the custody of DFCS on 12-17-10. The events were as follows:

  A Family Team Meeting was held on 12-17-2010. A safety plan was attempted as there was discussion with the parents that the children would be left in the care of L.R. and J.W.R. The parents disapproved of the safety plan, but the mother had already placed the two children in the care of L.R. and J.W.R. A safety plan could not be agreed upon; therefore, a verbal court order was received from the Coahoma County Youth Court Judge, placing both children in custody of DFCS. The decision was made by DFCS to leave the children in the home and pursue licensure for L.R. and J.W.R. During this Family Team Meeting, the mother of the children, L.M., became irate and was arrested.

  After the Family Team Meeting, it was reported to worker that the mother's boyfriend had physically abused F.M. This was not found in MACWIS as an official report, but was addressed already in the Family Team Meeting on same date in which the verbal court order was received to place children in DFCS custody.

  Coahoma County was the county of responsibility (COR) for this case and holds legal jurisdiction.
  Quitman County was the county of service (COS) for this case, as that was where the resource family lived.

C. L.R./J.W.R. Home Study

The home was approved on 2-24-2011 by the resource supervisor "for placement only until [L.R. and J.W.R.] have completed PATH training, CPR, gotten their medicals and the screens on the windows and the doors as well as the glass placed back in the doors."

Concerns were noted in the record:
- L.R. had no driver's license
- Criminal background check revealed that J.W.R. was charged with attempted rape on 10-12-2008, but the Grand Jury did not indict. J.W.R. was also charged on 2-25-2002 with disobeying a police officer during a domestic violence situation. L.R. was charged by Quitman County Sheriff's Dept. with a school attendance violation on 8-4-2010 and embezzlement under contract on 9-28-2006. There were no convictions except for L.R. driving with a suspended, revoked driver's license in 2010. L.R. signed an agreement that she would not transport the children placed in her home until her driver's license was reinstated. Arrangements were made with L.R.'s aunt for transportation due to J.W.R. being a truck driver and being gone during the week.
- Incomplete Resource Home Training
- Safety issues identified in narrative of Home Study submitted by resource worker on 02-23-2011 regarding the physical environment of the L.R./J.W.R. Resource Home are detailed in the following quote: *"The windows have triple panes but the screens (sic) are missing. The front porch security door has no glass, and it does not lock. Worker is also concerned with the kitchen door not having glass in it as well. The front door is locked, but they can not find the key. Worker told [L.R.]that she had to get the key to the door for safety in case of a fire, and they needed to use the door to get out of the home. Worker is also concerned that the children in care have a door that leads to the bathroom. [L.R.] said [F.M.] goes to the bathroom alone sometime at night and sometimes he gets her up. Worker told her he is too young to go to the bathroom by himself especially at night when everyone is sleeping. Worker pointed out to her the safety risk of [F.M.] falling in the toilet or turning on the water in the tub, and he could drown from too much water in his lungs from both. Worker advised that she keeps the door closed and locked for safety measures. This home has a security system."*

D. Summary of contacts that occurred with children in the L.R./J.W.R. resource home between 01-25-2011 and report of fatality:

- 01-25-2011- Attempted home visit by C.B., ASWS (COS). Neighbors stated family had been away from home for one week. Neighbors said there was no water in the home.
- 02-03-2011 -Attempted home visit by C.B.
- 02-08-2011 - one attempted and one successful Resource Home visit by C.B.
- 02-23-2011 - one resource home visit by M.H. (COR)
- 02-24-2011 - one attempted Resource Home visit by M.H.
- 03-22-2011 - Resource Home Visit by C.B.

- 03-24-2011 - Resource Home visit by M.H.
- 04-13-2011 - Attempted Resource Home visit by C.B.
- 04-14-2011 - Resource Home visit by C.B.
- 04-19-2011 - Resource Home visit by G.S., Family Protection Specialist Advanced (COS -Resource Home staff)
- 05-09-2011 - Attempted resource home visit by C.B.
- 05-10-2011- Attempted resource home visit by C.B.
- 05-13-2011 - Resource parent expressed desire for children to return to parents
- 05-25-2011 - Attempted resource home visit by A.S., FPSA (COS)
- 05-31-2011 - Resource Home visit by T.B. (FPS – COS) and S.R. (COS)
- 06-15-2011 - Call from resource parent to DFCS about incident; F.M. died; D.F. removed from Resource Home where sibling died

## IV.    Fatality Incident

Mississippi Centralized Intake received a report on 06-15-2011 of the fatality of F.M. and alleging physical neglect on D.F. The neglect report on D.F. was substantiated and he was removed from the resource home. This report includes the following information:

"Reporter stated she got a call from COR worker, [M.H.], from Coahoma County around 9:46 am this morning (6/15/11). Per [M.H.] [Resource Parent L.R.] called her screaming from the back of an ambulance saying [F.M.] fell in the toilet on 6/15/11. [L.R.] said it was too much water in his lungs and they didn't think he was going to make it. [L.R.], her husband, [J.W.R.], and her daughter, [A.R.], were all at home. Reporter noted about fifteen minutes later resource worker, [G.S.], was asking [L.R.] what happened. [L.R.] started screaming again because the doctors said [F.M.] had died. Reporter did not confront [L.R.] regarding these allegations. Reporter mentioned [L.R.] is a relative foster parent. Reporter stated DHS has already removed [F.M.]'s brother, [D.F.] from the home. Reporter suggested physical neglect should also be an allegation for [D.F.]. [C.M.] has been assigned to this case, per reporter. This family does have history in MACWIS. Safety risks are undetermined."

C.M. initiated the fatality investigation immediately on 6-15-2011 with the assistance of S.C., FPS by interviewing Resource Parent L.R. at the Quitman County DFCS office. The investigation report on the child's fatality is included as Appendix B.

## V. Applicable Findings

### A. Findings Related to Policy

1. DFCS Policy regarding licensure of relatives as Resource Parents, including management of safety concerns and appropriateness of placement prior to licensure approval:

    a. Section F, p. 4515 :  Time Frame for Licensing Relatives as Resource Parents is **60 days.**

    *Children placed in home in DFCS custody on 12-17-2010.  Home was licensed on 2-24-2011. The home was not licensed in the required time frame. There is also a discrepancy with in the record as to the actual date of licensure.*

    b. Section F, p, 4515:  Requirement of initial walk-through of resource home as described in policy as screening of all homes, including relative placements, to occur **prior to the initial placement** of foster children.

    *Initial walk-through of resource home was conducted on 12-10-2010. The mother placed the children in the L.R./J.W.R. home prior to DFCS custody.  DFCS conducted a walk-through once notified the children were in this home, so that walk-through occurred after the mother placed the children in the home and before DFCS received verbal order of custody. This requirement was met.*

    c. Section F, p. 4515:  Criminal Background Check requirement that no foster child shall be placed in a home **prior to receipt of background check** results.

    *Criminal Background checks conducted on 1-12-2011 (local), 1-21-2011, 1-27- 2011 and 2-2-2011 (NCIC).  Background check process was prolonged due to L.R. not having driver's license or ID and owing a court fine.  This requirement was not met.*

    d. Section F, pp. 4515:  Requirements for training of resource parents in expedited resource licensure process can be postponed for a **maximum of sixty days.**

    *Training requirements according to policy were not met for either resource parent, as L.R. received only twelve hours of the training within sixty days and J.W.R. received none of the training. No other training was listed for either resource parent while the children were placed in the home.*

e. Bulletin 6165, dated 3-26-2008: Resource home licensing requirement regarding total number of children allowed in the home to be no more **than three foster children** or for a total of more than **five children** (including foster, biological, and adoptive children) at any time, with only exception being with special approval from DFCS Regional Director for sibling group placement if determined that children can be safely maintained in the home.

*Total number of children in home prior to placement was 5. Total number of children in home with these two children added was 7. This was not met.*

**2. DFCS Policy regarding on-going assessment of children's safety in Resource Home**

a. Section D, p. 3241 (Updated with Bulletin #6146): (Requirement that worker maintain **monthly face-to-face contact** with every child in custody.)

Dates Seen:

12-17-2010 – Office visit with children

- 12-20-2010- Children present at court with DFCS and family
- 12-23-2010 – Office visit with children
- 12-28-2010 – Worker met resource parents and children at store to purchase supplies
- 01-07-2011 – Office visit with children
- 01-25-2011- Attempted home visit by C.B., ASWS (COS). Neighbors stated family had been away from home for one week. No water in the home.

- 01-25-2011 – Office visit with children
- 02-03-2011 -Attempted home visit by C.B.
- 02-07-2011 – Office visit with children
- 02-08-2011 - One attempted and one successful Resource Home visit by C.B.
- 02-16-2011 – Office visit with children
- 02-23-2011 - Resource home visit by M.H. (COR)
- 02-24-2011 - One attempted Resource Home visit by M.H.
- 03-02-2011 – Office visit with children
- 03-22-2011 - Resource Home Visit by C.B.
- 03-24-2011 - Resource Home visit by M.H.
- 04-08-2011 – Office visit with children
- 04-13-2011 - Attempted Resource Home visit by C.B.
- 04-13-2011 – Office visit with children
- 04-14-2011 - Resource Home visit by C.B.

- 04-19-2011 – Resource Home visit by G.S.
- 05-04-2011 – Office Visit with children
- 05-09-2011 - Attempted resource home visit by C.B.
- 05-10-2011 - Attempted resource home visit by C.B.
- 05-11-2011 – Visit with F.M. and resource mother at resource mother's aunt's home
- 5-18-2011 – Office visit with children
- 05-25-2011 - Attempted resource home visit by A.S., FPSA (COS)
- 05-31-2011 - Resource Home visit by T.B. (FPS – COS) and S.R. (COS)
- 06-08-2011 – Office visit with children
- 06-10-2011 – Office visit with children
- 06-15-2011 - Call from resource parent to DFCS about incident; F.M. died; D.F. removed from Resource Home where sibling died

*Children had face to face contact with worker each month. This requirement was met.*

**b. Section D., pp. 3350-3352: (Requirement that worker assess children's medical needs and follow through with Identified Needs)**

Narratives containing references to medical needs or evaluations or medical records in file:

11- 2010 – Lab reported F.M.'s lead level testing to Aaron Henry Health Clinic, doubting validity of sample; retesting was scheduled for March 2011.

12-3- 2010 – F.M. missed medical appointment (prior to DFCS custody)

12- 28- 2010- Narrative reflects that Resource mother gave DFCS worker copy of documents from D.F.'s visit to ER over the previous weekend

12-29-2013 – Narrative reflects that F.M. and D.F. were qualified for WIC for nutritional supplements.

3-22-2011 – Narratives reflect that resource mother told worker that F.M. and D.F. had blood tests today.

3-24-2011 – Narratives on this date reflect that resource mother was concerned about F.M's frequent thirst. Resource mother told worker that she took both children to Dr. [redacted] who examined F.M's limp and said that he might be a dwarf and he may be seen by a specialist.

4-01-2011 – Narrative reflects that worker received a call from First Steps (Early Intervention Program) indicating that an evaluation had been conducted for F.M. and that she would be sending the results to the worker.

4-27-2011 – Narratives on this date reflect that the resource mother and F.M. went to LeBonheur Hospital for an orthopedic consult for F.M., but the appointment had to be rescheduled due to inclement weather.

4-29-2011 – Narrative reflects that First Steps attempted contact with F.M. at resource home but got lost and contacted worker for another phone number for the resource parents.

5-4-2011 – Narrative on this date reflects that the resource mother told the worker that she had taken F.M. back to LeBonheur and that his "teeth and everything" had been checked. The resource mother said that LeBonheur would be mailing her the next appointment time.

5-5-2011 – Narrative reflects that resource mother told worker that she and F.M. were at LeBonheur Hospital, that F.M. had been examined, and that they wanted to schedule another appointment for F.M. in order to do blood work, xrays, and CAT scan.

5-11-2011 – Narrative reflects that resource mother took child to clinic on 5-10-2011, but doctor was not available.

*Initial medicals are not evident but it does appear that the children's medical needs were identified and assessment/treatment was being sought appropriately.*

## B. Findings Related to Practice

The review of this case found that policy standards for home licensure were not all followed. We have learned that the concerns related to the physical environment of the resource home, the additional attention needed for the background checks, completion of needed training by resource parents, and having one COS worker assigned to the case to consistently monitor the children's care would have helped to assess if the resource home was the best environment for the children and conducive to their well-being.

## C. Findings Related to Modified Settlement Agreement

The following review was conducted by [redacted], USM Consultant, using the same Case Review Instrument that was used during case review conducted jointly by DFCS and Court Monitor's staff.

Documentation of Settlement Requirements

1.   *Settlement Agreement, II.B.1.a.: Upon taking a child into custody, DFCS shall engage in a thorough screening of the child and an individualized, strengths-based, family-focused, and culturally responsive assessment of the family, with the family's participation. Information gathered during the screening and assessment shall consist of (1) internal, external, and historical factors that may contribute to concerns identified in initial risk and safety assessments and initial screenings; (2) child and family strengths, protective factors, and needs; (3) the impact of maltreatment on the child; (4) factors and characteristics pertinent to selecting an appropriate placement; (5) family resources for the child and parents; and (6) any other material pertinent for meeting service objectives. The screening and assessment shall inform the selection of an appropriate placement, the provision of needed services, and permanency planning, and shall be completed within 30 calendar days of the child's entrance into custody and documented in the child's case record.*

**An initial Family Team Meeting was conducted on 12/17/2010 at which the agency gathered information for an assessment and developed the initial case plan. In attendance were the parents (mother of both siblings and father of the target child's sibling), a number of relatives, relative caretakers and agency worker. The father of the target child was located and interviewed 01/26/2011. Information gathered during this initial FTM and subsequent client and collateral contacts formed the basis for the initial Child ISP dated 12/30/2010 and Adult ISPs dated 11/30/2010 (ongoing), 03/02/2011 and 06/03/2011. Risk assessments were conducted and documented on 12/28/2010, 03/01/2011, 04/05/2011, and 06/03/2011. These assessments contained sufficient detail to substantiate that the children were at risk or would be at risk if reunified. The screening/assessment/ case planning instrument in use at the time of the child's entry into care has since been replaced with the CFA, a more comprehensive tool which should better address this settlement item.**

2.   Settlement Agreement, II.B.1.b.: DFCS shall initiate the assessment process through individual team meetings (1) with the child and the assigned DFCS caseworker within the first 72 hours of *initial placement or any subsequent placement moves; (2) with the child's parents and the assigned DFCS caseworker within the first two weeks of initial placement; and (3) with the foster care provider and the assigned DFCS caseworker within the first two weeks of any placement, or within different timeframes as required by COA standards.*

**See item 1. The two siblings placed in agency custody were 26 months old and 4 months old. They were present in the office during the 12/17/2010 Family Team Meeting but not participants in that meeting due to their age. Others were engaged as described in item 1.**

3.   Settlement Agreement, II.B.1.c.: In all cases in which the whereabouts of one or both parents is unknown, DFCS shall immediately institute a diligent search for the parent(s), which shall be *documented in the child's case record.*

**The biological father of the target child had been named, he was located but he questioned his paternity. Paternity tests confirmed that he was the father and the worker made attempts to engage him in case planning. The first documented contact with him was dated 01/26/2011.**

4. Settlement Agreement, II.B.2.a.: Within 30 calendar days of a child's entrance into foster care, the DFCS caseworker shall convene a team meeting with the DFCS caseworker's direct *supervisor, the child's family if appropriate, the foster family, and the child unless there is a justification for excluding the child from the planning process. During the team meeting, service plans shall be developed for both the child and the parents with the participation of all team meeting participants.*

**This team meeting was convened on the date custody was awarded the agency (12/17/2010). See item 1. Note that an ISP (11/30/2010) was already in force for the mother of the target child. The Adult ISP was updated effective 03/02/2011. The conditions and tasks remained essentially the same between the dates of the ISP's.**

5. Settlement Agreement, II.B.2.b.: Each service plan shall be reviewed and updated quarterly at a team meeting with the caseworker, the caseworker's direct supervisor, the foster parent, the *child's parents if appropriate, and the child unless there is a justification for excluding the child from the planning process. If the child's placement changes, or there is a significant change affecting the child or his/her family, a team meeting shall be convened and the service plan must be updated within 30 calendar days of the date of change.*

**Family Team Meetings were held 12/17/2010, 02/16/2011, 05/13/2011 and 06/09/2011. The agency COR supervisor was listed as a participant for the first quarterly meeting but not any others. Other appropriate FTM members, with the exception of the target child's father, attended all the sessions. Case planning issues were documented for each FTM. An Adult case plan was in effect for the mother when the child came into custody, and it was updated 03/02/2011 and 06/03/2011. There was not a case plan on the target child's father. The Child case plan was approved 12/30/2010 and updated 04/05/2011.**

6. Settlement Agreement, II.B.3.a.1.: Working with service providers, foster parents, the child, and the family, DFCS shall develop and document in the child's case record a permanency plan *within 30 calendar days of the child's initial placement that specifies the permanency goal, a timeframe for achieving permanency, and activities that support permanency.*

**The case file documents that a permanency plan of reunification and concurrent plan of relative placement was approved by the ASWS on 12/30/2010, 13 days from the date of agency custody. Discussion of this plan was documented in the 12/17/2010 FTM. The MACWIS Case Planning History tab contains information regarding the compelling reasons for the choice of the permanency plan, known medical issues, family-child interactions and engagement, emotional issues and**

**barriers to the permanency plan. The time frame projected for permanency was six months, with a target date of 06/17/2011.**

7. *Settlement Agreement, II.B.3.a.2.:* **Not applicable. Durable legal custody was not the plan.**

8. *Settlement Agreement, II.B.3.a.4.:* **Not applicable. Emancipation was not the plan.**

9. Settlement Agreement, II.B.3.c.1.: A child's permanency plan shall be reviewed in a court or administrative case review at least every six months. DFCS will take reasonable steps, including *written notice, to ensure the participation of the child, parents, caregivers, and relevant professionals in court or administrative reviews.*

**An administrative review was held 05/24/2011, within the six month requirement. The record documents that notice was given to the required parties.**

10. *Settlement Agreement, II.B.3.c.2.:* **Not applicable. Child was not in care for 12 months and a permanency hearing was not due.**

11. Settlement Agreement, II.B.3.d.1: When the child's permanency goal is reunification, DFCS shall identify in the parents' service plan and make available directly or through referral those *services DFCS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care and to help the parents develop strategies to facilitate permanency for the child.*

**The Adult ISP found in the electronic file does identify services needed and develops strategies to facilitate permanency. Case narratives document that the parents were engaged by the worker in case planning activities. Employment, housing, parenting classes, personal hygiene and the need for psychological assessment and services were routinely discussed with parents. The worker secured the psychological assessment on the mother, made several unsuccessful attempts to locate parenting classes and did assessments on several relatives who served as actual and potential housing resources for the parents.**

12. Settlement Agreement, II.B.3.d.2.: For a child with a permanency goal of reunification, the child's assigned DFCS caseworker shall meet with the child's biological parents at least *monthly to assess service delivery and achievement of service goals, to keep the family informed and involved in decisions about the child, and to remain current about the family's circumstances.*

**Narratives document 16 face to face meetings between the agency worker and the biological mother and step father of the target child during this six month period. Five of these meetings took place in these parents' homes. Three face to face home visits were conducted in the biological father's home during this same time period.**

13. *Settlement Agreement, II.B.3.e.1.:* **Not applicable- Child was not in care 15 of 22 months**

14. *Settlement Agreement, II.B.3.e.2.:* **Not applicable- Adoption was not the permanency plan**

15. *Settlement Agreement, II.B.3.f.1* **Not applicable- Adoption was not the permanency plan**

16. *Settlement Agreement, III.D.2* **Not applicable – rates of abuse relate to statewide data**

17. Settlement Agreement, II.B.4.e. (By the end of Implementation Period 2): All investigations into reports of maltreatment, including corporal punishment, of children in DFCS custody must be *initiated within 24 hours and completed within 30 calendar days, including supervisory approval. DFCS shall assure that such investigations and decisions are based on a full and systematic evaluation of the factors that may place a child in DFCS custody at risk.*

**The preliminary investigation was assigned and initiated on the same date as the referral was received. The report was completed in 33 days including supervisory approval.**

18. Settlement Agreement, II.B.4.f. (By the end of Implementation Period 1): Any foster child who remains in the same out-of-home placement following an investigation into a report that he or *she was maltreated, or subject to corporal punishment, in that placement shall be visited by a DFCS caseworker twice a month for three months after the conclusion of the investigation to assure the child's continued safety and well-being.*

**The surviving sibling was removed from the resource home the same day that the agency was notified of the target child's death.**

19. Settlement Agreement, II.B.4.g. (By the end of Implementation Period 1): When a maltreatment investigation involves a foster home, DFCS shall file a copy of the approved final investigative *report and any recommendations and/or corrective actions DFCS has deemed necessary, in the case record of the foster child, in the file of the foster or adoptive parents with a copy of the letter of notification to the foster or adoptive parents, and in the DFCS State Office. DFCS shall also provide those records to the Youth Court Judge with jurisdiction over the child and to the Monitor.*

**A preliminary investigation is filed in the electronic file. This investigation was completed 07/13/2011 and approved 07/18/2011. The investigation substantiated physical neglect. I found no information in the resource home electronic case file. I understand that a separate full investigation was conducted by staff of the Protection Unit. That investigation may be filed in the child's and resource home's**

**paper records. This will need to be verified to determine compliance with this settlement agreement item.**

20. *Settlement Agreement, II.B.4.h.* **Not applicable. Home was not a group home.**

21. Settlement Agreement, II.B.5.a.: No foster child shall be placed in a foster care setting that has not been licensed or approved as meeting DFCS licensure standards, unless the child is placed *pursuant to the following relative licensing process. The licensing process for relatives shall take place in two steps: (1) an emergency process to be developed by DFCS in conjunction with COA that enables a child to be placed with relatives as soon as the child enters placement, following an initial screen (as described at II.B.5.I. below) of the relative's home, and (2) a full licensing process, to be completed no later than 60 calendar days after the child has entered placement. DFCS may waive non-safety licensing requirements for relative foster placements in individual cases, in accordance with federal regulations.*

**The emergency process was implemented but the full licensing process did not take effect within 60 days. Full licensure was approved on 3/11/2011 and the license start date was 04/26/2011.Reviewer is not clear about the difference in approval date and licensure start date.**

22. *Settlement Agreement, II.B.5.c.:* **Not applicable- Child had no known special needs**

23. Settlement Agreement, II.B.5.d.: Each foster child shall be placed in the least restrictive setting that meets his/her individual needs as determined by a review of all intake, screening,*assessment, and prior placement information on the child available at the time of placement. In order of consideration, this means placement with relatives; foster home care within reasonable proximity to the child's home community; foster home care outside of the child's home community; group home care; or institutional care.*

**The placement setting was least restrictive due to it being a relative within close proximity to the parents' homes.**

24. Settlement Agreement, II.B.5.e.: Each child shall be placed within his/her own county or within 50 miles of the home from which he/she was removed. This provision shall not apply if (1) the *child's needs are so exceptional that they cannot be met by a family or facility within his/her own county or within 50 miles of the home from which he/she was removed; (2) the child is placed through the ICPC consistent with its terms; (3) the child is appropriately placed with relatives or another planned permanent resource; (4) the child is ordered to be placed in a child-specific foster care setting by a court; or (5) the child is placed in an adoptive home.*

**The child was placed in an adjoining county, much less than 50 miles proximity.**

25. Settlement Agreement, II.B.5.f.: Siblings who enter placement at or near the same time shall be placed together unless (1) doing so would be harmful to one or more of the siblings; (2) one of *the siblings has exceptional needs that can be met only in a*

*specialized program or facility; or (3) the size of the sibling group makes such placement impractical notwithstanding diligent efforts to place the group together. If a sibling group is separated at initial placement, the caseworker shall make immediate efforts to locate or recruit a family in whose home the siblings can be reunited. These efforts will be documented and maintained in the case file.*

**The target child and his sibling were allowed to remain and were placed in the home of this relative home which was later licensed as a resource home.**

26. Settlement Agreement, II.B.5.g.: No later than at the time of placement, DFCS shall provide foster parents or facility staff with the foster child's currently available medical, dental health, *educational, and psychological information, including a copy of the child's Medicaid card. DFCS shall gather and provide to foster parents or facility staff all additional current medical, dental health, educational, and psychological information available from the child's service providers within 15 days of placement.*

**Case documentation is not clear about which medical records were secured by the agency and which were secured by the resource parent. At the time of emergency custody there were no known medical reports in the possession of the agency. Documentation of immunizations was entered on the medical screen.**

27. Settlement Agreement, II.B.5.h.: DFCS shall take all reasonable steps to avoid the disruption of an appropriate placement and ensure placement stability for children. If a caseworker has *knowledge that a placement may disrupt, the caseworker shall immediately convene a meeting with the DFCS supervisor, the foster parents, and, if appropriate, the child to determine the following: the cause of the potential disruption; whether the placement is appropriate for the child; whether additional services are necessary to support the placement; whether the child needs another placement; and, if another placement is necessary, what that placement should be. If the placement disrupts on an emergency basis, the meeting shall be held no later than five days after the disruption to address whether the child needs additional supportive services and whether the new placement is appropriate.*

**There were no obvious indications of imminent placement disruption.**

28. Settlement Agreement, II.B.5.k. (By the end of Implementation Period 1): No foster child shall remain in an emergency or temporary facility for more than 45 calendar days, unless, in *exceptional circumstances, the Division Director has granted express written approval for the extension that documents the need for the extension.*

**The child was not placed in an emergency or a temporary facility.**

29. Settlement Agreement, II.B.5.l. (By the end of Implementation Period 2): No child shall spend more than 12 hours at a time in a DFCS office or other non-residential facility that provides *intake functions. No child shall be placed in more than one emergency or temporary facility within one episode of foster care, unless an immediate placement*

*move is necessary to protect the safety of the child or of others as certified in writing by the Regional Director.*

**The child was not placed in an emergency or a temporary facility.**

30. Settlement Agreement, II.B.5.m. (By the end of Implementation Period 2): No child under 10 years of age shall be placed in a congregate care setting (including group homes and shelters) *unless the child has exceptional needs that cannot be met in a relative or foster family home or the child is a member of a sibling group, and the Regional Director has granted express written approval for the congregate-care placement. Such approval shall be based on the Regional Director's written determination that the child's needs cannot be met in a less restrictive setting and can be met in that specific facility, including a description of the services available in the facility to address the individual child's needs. Sibling groups in which one or more of the siblings are under the age of 10 shall not be placed in a congregate care setting for more than 45 days.*

**The child was not placed in a congregate care facility.**

31. Settlement Agreement, III.C.1.: Placement stability for children in foster care for less than 12 months from the time of removal (placement stability is two or fewer placements).

**The child experienced only one placement.**

32. Settlement Agreement, II.B.6.a.: At the time of the initial team meeting when a child enters foster care, a visitation plan for the child and his/her family shall be developed as part of the *child's service plan. This visitation plan shall be developed and regularly updated in collaboration with parents, foster parents, and the child and should be appropriate to a) the child's age and developmental stage; b) the parents' strengths and needs; c) the schedule of the foster parents and parents; d) the social and cultural context of the family; and e) the status of the case and the permanency goal. If parental visitation is appropriate based on the above factors, this visitation plan shall include a minimum of two visits per month with the parents (unless a court order in the child's case limits such visits). For all children, regardless of permanency goal, this visitation plan shall include at least one visit per month with any siblings not in the same placement (unless a court order in the child's case limits such visits).*

**The visitation plan was developed after the initial Family Team Meeting due to the mother's being arrested for disorderly conduct during the final phase of this meeting. The plan which was dated 12/30/2010 included twice monthly supervised office visits. Siblings were placed together.**

33. Settlement Agreement, II.B.6.c.: DFCS caseworkers shall take all reasonable steps to ensure the implementation of each child's visitation plan. DFCS and its contracting agencies shall *implement a policy that prohibits cancellation of visits as a disciplinary action.*

**A visitation plan was implemented 12/30/2010. The plan projected twice monthly supervised visits at the agency office. Nine visits were recorded during this six month period. Narratives do not provide information about provision of transportation for the parents and whether lack of transportation was a barrier to more frequent visitation. There was no indication that visitation was withheld or that it was discouraged. Narratives suggest that the resource parents appeared to encourage visitation and provided transportation for the children to the visits. There did not appear to have been any visits in the resource parents' home.**

34. Settlement Agreement, II.B.6.b.: DFCS shall arrange contact for the child with his/her parents and with any siblings not in the same placement within 24 hours of foster care placement unless *there are documented reasons why contact should not occur. If a visit cannot be arranged within 24 hours, a telephone call to parents, siblings, or extended family members must be provided to the child.*

**A Family Team Meeting was conducted on the day the children were placed in custody (12/17/2010).**
**The mother became so threatening that she was arrested for disorderly conduct. The children were present in the office and a visit could have been arranged, otherwise. She was offered a visit on 12/20/2010 but she refused. The 24 hour timeframe was not met, but the circumstances made the safety of the visit questionable.**

35. *Settlement Agreement, II.B.7.f* **Not applicable. Child under age four.**

35. *Settlement Agreement, II.B.7.a., b., c., and d.:a) Every child entering foster care shall receive a health screening evaluation from a qualified medical practitioner within 72 hours after placement that is in accordance with the health screening recommended by the American Academy of Pediatrics. b) Within 30 days of placement in foster care, each child shall receive a comprehensive health assessment that is in accordance with the assessment recommended by the American Academy of Pediatrics. c) Nothing in the above paragraphs shall prohibit the initial health screening evaluation and the comprehensive health assessment from being conducted in one clinical visit. However, in such instances, this combined visit shall be conducted within 72 hours of placement. d) All children shall receive periodic medical examinations and all medically necessary followup services and treatment throughout the time they are in state custody in accordance with the time periods recommended by the American Academy of Pediatrics.*

**The medical screen and narratives document a medical exam which was done on 12/28/2010. Custody was awarded on 12/17/2010. There is no additional medical documentation on the medical screen (other than immunization types and dates). However, case narratives indicate that the child was seen on several occasions by medical clinics during this six month placement period. There seems to be immediate follow up to any health issues that were noted. The child received an evaluation at LeBonheur hospital on 05/04/2011 related to a concern of an**

**orthopedic impediment. The paper case record may contain further documentation of this assessment and details of the various clinic visits.**

36. Settlement Agreement, II.B.7.g.: Each foster child age birth through three shall be provided with a developmental assessment by a qualified professional, and each child older than three shall be *provided with a developmental assessment if factors indicate such an assessment is warranted. All foster children shall be provided with needed follow-up developmental services.*

**Child was referred for First Steps on 03/25/2011 and an evaluation was completed 04/01/2011. The record is not clear about these findings. The medical screen does not contain documentation of a developmental assessment or EPSDT. These may be contained in the paper record but are not documented in the electronic record.**

37. *Settlement Agreement II.B.7.e.:* **Not applicable. Child under age three**

38. Settlement Agreement, II.B.8.a.: DFCS caseworkers shall screen each child for general and special educational needs within 30 days of his/her entry into foster care.

**Child was referred for First Steps on 03/25/2011 and an evaluation was completed 04/01/2011. Child was 26 months of age at time of custody and no special educational needs were noted. If EPSDT was performed, there is no clear documentation that this may have served as a screening opportunity. The First Steps screening date was in excess of the 30 day requirement.**

39. *Settlement Agreement, II.B.8.c.:* **Not applicable- Child not school age**

40. *Settlement Agreement, II.B.11.b.*: **Not applicable- child under age 14**

41. Settlement Agreement, II.B.10.a.: Regardless of whether a child's foster care placement is being directly supervised by DFCS or by a contract agency, the assigned DFCS caseworker (either *County of Service or County of Responsibility) shall meet with the child in person and, where age-appropriate, alone at least* **twice** *monthly to assess the child's safety and well-being, service delivery, and achievement of permanency and other service goals. At least one visit per month shall take place in the child's placement. During a child's first month in foster care and after each change of placement, the assigned DFCS caseworker shall meet with the child in person, and, where age-appropriate, alone, to assess the child's adjustment to the placement and whether more frequent visits by the caseworker are necessary, This assessment may occur at a regularly scheduled visit with the child.*

**Over the course of the six month placement, there were 22 face to face visits between the agency workers and the child. Eight of these were visits in the child's placement. Due to the child's age (26 months) these visits were not conducted alone with the child.**

*Settlement Agreement, II.B.10.c.: A DFCS foster care worker shall regularly communicate with non-therapeutic foster parents who have one or more foster children residing in their home and visit the home at least monthly to (1) share all relevant and legally disclosable information concerning the foster child; (2) evaluate the foster child's safety, needs and well-being; and (3) monitor service delivery and achievement of service goals.*

**Narratives document that the agency workers communicated with the resource parents regarding the child's needs, evaluated safety and well being through monthly face to face home visits with the resource parents and monitored provision of services. Documentation by the Resource worker indicated a growing concern about the physical and safety standards of the home and grounds.**

42. *Settlement Agreement, II.B.10.d.:* **Not applicable**

43. Settlement Agreement, II.B.12.a.: For each child who has a permanency goal of reunification and who is in fact placed in the home for the purpose of reunification, DFCS shall provide, *subject to the approval of the youth court, such child with a 90-day trial home visit. During any trial home visit period, a DFCS caseworker or Family Preservation caseworker shall meet with the child in the home at least two times per month, and each meeting shall occur without the parent or caretaker present.*

**Not applicable- Child was not reunified.**

44. Settlement Agreement, II.B.12.b.: A recommendation to return a child to his/her home or to place the child in the custody of a relative shall be made at a meeting attended by the child's *DFCS caseworker, the caseworker's supervisor, the worker from the private agency if the child is placed with a private agency, the foster parents (unless DFCS determines that the foster parent's presence would be inappropriate), the biological parents or the relative assuming custody, and the child. At the meeting, the participants shall devise an after-care plan that identifies all of the services necessary to ensure that the conditions leading to the child's placement in foster care have been addressed, and that the child's safety and stability will be assured. DFCS shall take reasonable steps to provide or facilitate access to all services necessary to support the child during the trial home visit.*

**Not applicable- Child not returned to home.**

## VI. Summary and Recommendations

F.M., DOB [redacted], and his half-brother D.F. DOB [redacted], were first known to the Mississippi Department of Human Services – Division of Family and Children's Services on January 7, 2009. There were several reports of physical neglect and a home environment that included domestic violence. The children were placed in the custody of MDHS on 12-17-10. They were placed in the J.W.R. and L.R. home, who were relatives living in an adjoining county

(Panola County). The parents had voluntarily left the children with these relatives a week prior to the Coahoma County Youth Court placing the children in custody. A worker did a walk through of the home upon information being received that the children were in the J.W.R./L.R. home by the parents (prior to obtaining custody). The children were left in the home upon attaining custody and an expedited relative resource home licensure process was begun by Region II East as the county of service (Panola). The children were in the home until the death of F.M. on 06-15-11. D.F. was removed from this home on this day. A special investigation into the death of F.M. was conducted. The agency has reviewed the situation leading up to the child's death and all actions taken or not taken. Policy and practice, along with the MSA requirements were compared to the actions taken in the case. The review was conducted with a critical view to determine what could be put in place regarding policy or practice that could possibly prevent this type of situation from occurring again.

Several findings were made that show a need for improvement in practice and in following agency policy. They are as follows:

| Findings | Recommendation/ Remediation | Projected Date |
|---|---|---|
| 1. A report was not called in to MCI by the medical facility on 11-23-10. | Stakeholder and mandated reporters are instructed and educated on need to report abuse and neglect.<br><br>On-going pre-service training includes the reporting law.<br><br>DFCS staff members are reminded regularly that this should be intermittently discussed with stakeholders through one on one contact, in-services, regional implementation team meetings with stakeholders, and cross-trainings.<br><br>Child abuse/neglect awareness campaigns are incorporated into the work of the agency, i.e. blue ribbon campaign, billboards, and other awareness activities. | Completed and on-going |
| 2. Poor assessment of risk in a domestic violence situation and for physical | Worker pre-service training includes a module on domestic violence and | Pre-service training has been implemented with these topics and is on- |

| | | |
|---|---|---|
| neglect. | another module on discussing the signs/symptoms/effects and possible risks of death of/from physical neglect<br><br>On-going training modules include the topics of domestic violence and neglect to emphasize the high risks of harm to children in these situations. | going.<br><br>On-going training is being developed regarding domestic violence and physical neglect for delivery in 2014 as a part of the continued training offerings to staff. |
| 3. Needs of children and family not appropriately identified and services were not matched to needs; risk not reduced. | A week of assessment and a week of family service planning are each delivered in pre-service training. This includes an emphasis on identifying needs of the family, that if fulfilled, the risk of harm to child would be reduced and how to match needs to services.<br><br>Practice model coaches work with front line worker to model and teach quality assessments and case planning.<br><br>CSF level two training; mentoring; and pre-service supervisory training, and practice coaches include training for supervisors to help workers to identify risk and the needs that should be met along with services offered to reduce risk of harm to children. | Pre-service training includes these topics and this has been implemented.<br><br>Modules for on-going training have been developed. June 2013 is the begin date for on-going training and these topics will be a part on continued offerings to staff members.<br><br>Practice model coaches are working with staff (workers and supervisors) in each region.<br><br>Level two supervisory training was begun in 2013 and will continue as a part of the required training plan for all supervisors.<br><br>Pre-service training and mentoring is required for all new supervisors. |
| 4. No assigned worker in the COS due to staff shortage. ASWS and various workers were visiting children in the resource home. | Review with workers and supervisors the need to visit in the home of children and have one consistent worker assigned to a case.<br><br>Policy created that increased the visit requirement to two face-to-face quality contacts per month with children in active cases. | Quality visit training has been offered to all staff and is incorporated into on-going training offerings.<br><br>Policy has been changed to require two face-to-face quality contacts per month with children in caseload. Emphasis has been made that workers need to remain as consistent as possible. |

| | | |
|---|---|---|
| | Policy enforced that no supervisor may actively work on direct services nor carry a caseload.<br><br>Review of workloads and workload validation by administration and regional directors on a regular basis. Plans to fill vacancies are discussed with supervisors with follow through monitored.<br><br>Recruitment, hiring quality staff and retention of new workers is trained and monitored. | Policy requirement for resource worker to have monthly contact with resource family when children are in the home.<br><br>Developed and begun implementing recruitment and retention plan in 2013. Vacancy rate is currently below 10% and shows constant improvement.<br><br>Policy has been enforced regarding ASWS not carrying a caseload. This is monitored by administration on an on-going basis through workload reports. |
| 5. Investigation not completed within 30 days. | Tracking system for supervisors to enforce policy be developed and used.<br><br>Weekly staffings between supervisors and workers on on-going investigations is required.<br><br>Weekly reports of overdue investigations are monitored by administration and regional directors.<br><br>Remedial plans made with workers who are not completing investigations in a timely manner. Continued poor performance results in Performance Improvement Plan and continued problems result in disciplinary action. | Completed and on-going<br><br>Significant improvement over time regarding numbers of overdue investigations. |
| 6. Resource home licensing policy not followed. Home was not licensed timely after placement. Safety concerns were not corrected prior to licensing and new safety/physical environment concerns (i.e. | Tracking system for resource supervisors and regional directors for timeliness of licensing be developed and implemented.<br><br>A system put in place for background checks to be | Tracking form is being designed for immediate use.<br><br>System for fingerprinting and background checks has been improved by hiring more staff and purchasing |

| | | |
|---|---|---|
| no water) were not corrected. Resource parents did not complete training prior to licensing. Background check issues were not adequately addressed. | completed and reviewed in a timely manner.<br><br>Safety concerns in resource homes to be recognized by worker, reviewed by resource supervisor and corrections made prior to licensing of the home. Safety violations that occur after licensing are recognized and corrected immediately or children are moved from the home.<br><br>Improvement of home study to enable worker to identify safety concerns and risk factors for children placed in the home.<br><br>Training for resource parents is required prior to licensing.<br><br>Regular staffings held by resource supervisors with resource home licensing workers to review issue prior to licensing and those that develop after licensing. | more fingerprinting equipment, and training for situations such as no I.D. available has been initiated for resource workers and supervisors.<br><br>A new SAFE (Structured Analysis of Family Evaluation) program for assessment of homes will be implemented statewide July 1, 2013. Training of resource workers, resource supervisors and regional directors regarding the improved home study process has been completed.<br><br>Review of training curriculum and requirements has been initiated. Improved training will be implemented in 2014.<br><br>Policy enforcement completed and on-going regarding current training requirements for resource parents. Current requirement includes 27 hours of training.<br><br>Practice initiated that includes the requirement that staffings are held on a weekly basis between resource supervisors and licensure workers, Regional Directors or regional ASWS regularly reviews on-going work and issues with resource supervisor. |
| 7. Initial medical screening not completed on children. | Enforce policy and improve services for initial medical screening and follow-up for children in custody. | Developed new medical services through Magnolia Health to enable initial medical screening services |

| | | |
|---|---|---|
| | | and follow-up services for medical needs to be more accessible to workers. |

In summary, there were several issues that need to be addressed in practice and policy that surfaced in the review of the death of F.M. The need for improvements have been identified and either implemented or are in the process of completion. This was a tragedy that this agency does not want repeated and every effort is being made to create services that will prevent this from happening as much as possible.

# Appendix A

## DFCS Regional and County of Service (COS) or County of Responsibility (COR) Staff Involved

DFCS Regional and County of Service (COS) or County of Responsibility (COR) Staff Involved

County of Responsibility -Coahoma County, Region II-West
[redacted], Regional Director, Region II-West, COR
M.H. – COR Family Protection Specialist Advanced, Coahoma
M.K., Acting ASWS, Coahoma County
L.T. – Coahoma ASWS, Retired 04-20-12

County of Service, Quitman County, Region II-East
[redacted], Regional Director, Region II-East, COS
G.S. – Family Protection Specialist Advanced, Resource Specialist, COS
S.B. – Quitman, Family Protection Specialist, Resigned 03-30-2011
G.H. – Resource Supervisor
C.B. – Tallahatchie ASWS, COS, Retired May 2013
A.S. – Family Protection Specialist Advanced, Tallahatchie County, COS
T.B., Family Protection Specialist, COS
S.R., Family Protection Specialist, COS
C.M., investigated fatality
E.E. – Homemaker

**Appendix B**


**Investigation of Fatality Report**

DHS
345589



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

OLIVIA Y., et al. PLAINTIFFS

v. CIVIL ACTION NO. 3:04CV251LN

HALEY BARBOUR, as Governor of the State of Mississippi, et al. DEFENDANTS

**CONFIDENTIALITY ORDER**

By agreement of the parties and for good cause shown, it is hereby ordered that:

1. This Confidentiality Order governs DHS records disclosed as part of this litigation. It does not affect the dissemination of confidential information in the ordinary course of business at DHS under existing confidentiality policies and laws.

2. Any individually-identifying information in any record maintained and produced by the Department of Human Services ("DHS"), regarding any plaintiff child, such child's family members, foster family members, and persons included in any case files as the source of information concerning the child - including but not limited to these persons' names, addresses, telephone numbers, social security numbers, dates of birth, and other individual information likely to enable a reasonable member of the general public to ascertain their identities – is hereby designated to be confidential and shall be subject to the provisions of this Order.

3. Disclosure of any such individually-identifiable information derived from records produced by DHS shall be limited to the parties and their counsel and to such

other personnel employed by the parties, including experts and persons employed by experts, in the litigation of the claims in the above-styled case with the following exception: Counsel for the parties are authorized to interview, depose, or otherwise contact fact witnesses and/or former DHS employees, solely for purposes connected with the litigation of the claims in the above-styled case, using individually-identifiable information derived in whole or in part from materials produced by DHS.

4. Any proper person to whom any individually-identifiable information identified in paragraph 2 is disclosed under the terms of this Order shall be provided a copy of this Order and is directed not to reveal the contents thereof for any purpose other than as permitted in this Order.

5. The use of any individually-identifiable information identified in paragraph 2 for any purpose other than the preparation and trial of the above-styled case or other proceedings related to this litigation is prohibited, except as allowed by statute or modified by subsequent order of this Court.

6. Notwithstanding any provision of this Confidentiality Order, parties and their counsel may disclose any information contained in DHS records provided that such information does not contain any individually-identifying information as defined in paragraph 2.

ENTERED this 5th Day of Aug. 2004.

S/Alfred G. Nicols, Jr.

ALFRED G. NICOLS, JR.
UNITED STATES MAGISTRATE JUDGE

**AGREED TO AND APPROVED FOR ENTRY:**

**ATTORNEYS FOR PLAINTIFFS:**

BRADLEY ARANT ROSE & WHITE LLP
WAYNE DRINKWATER (MBN 6193)
MELODY MCANALLY (MBN 101236)
188 East Capital Street, Suite 450
Jackson Mississippi 39201
(601) 498-8000

STEPHEN H. LEECH (MBN 1173)
850 East River Place, Suite 300
Jackson, Mississippi 39202
(601) 355-4013

MARCIA ROBINSON LOWRY (pro hac vice MBN 43991)
ERIC THOMPSON (pro hac vice MBN 43993)
SHIRIM NOTHENBERG (pro hac vice MBN 43990)
CORENE KENDRICK (pro hac vice MBN 43989)
CHILDREN=S RIGHTS, INC.
404 Park Avenue South, 11th Floor
New York, NY 10016
(212) 683-2210

LOEB & LOEB LLP
JOHN LANG (pro hac vice MBN 43987)
CHRISTIAN D. CARBONE (pro hac vice MBN 43986)
345 Park Ave.
New York, New York 10154
(212) 407-4000

DHS
345592

**ATTORNEYS FOR DEFENDANTS:**

HAROLD E. PIZZETTA III (MBN 99867)
SPECIAL ASSISTANT ATTORNEY GENERAL
Civil Litigation Division
Office of Attorney General
P.O. Box 220
Jackson, MS 39205
(601) 359-3680

# Mississippi Department of Human Services

## Division of Family and Children's Services

### Investigation Report

**Worker's Name :** [redacted]

**County :** Quitman

**Report Date :** 06/15/2011

**Incident Date :** 06/15/2011

**Report Time :** 11:50 AM

**Investigation Worker/Telephone :** [redacted] / [redacted]

### Allegations Investigated

| Perpetrator | Relationship | Victim | Allegation | Pre/Post | Finding |
|---|---|---|---|---|---|
| R[redacted] L[redacted] | Relative Foster Parent | M[redacted],F[redacted] | Physical Neglect | Pre Screen | Substantiated |
| R[redacted],L[redacted] | Relative Foster Parent | F[redacted] D[redacted] | Physical Neglect | Pre Screen | Substantiated |

## Person Involved

| Name | DOB | Age | Sex | Race | SSN | ReportRole | HH Status |
|---|---|---|---|---|---|---|---|
| R[redacted],L[redacted] | [redacted] | 31 | Female | BLACK | [redacted] | Perpetrator | Primary Caretaker |
| M[redacted],F[redacted] | [redacted] | 3 | Male | BLACK | [redacted] | Victim | Member |
| F[redacted],D[redacted] | [redacted] | 1 | Male | BLACK | [redacted] | Victim | Member |
| R[redacted],JW | [redacted] | 44 | Male | BLACK | [redacted] | Uninvolved | Member |
| R[redacted],A[redacted] | [redacted] | 9 | Female | BLACK | [redacted] | Uninvolved | Member |
| Ms H[redacted] | - | - | Female | UNDET | - | Uninvolved | Non Member |
| Ms S[redacted] | - | - | Female | UNDET | - | Uninvolved | Non Member |
| S[redacted]r,A[redacted] | [redacted] | 29 | Female | BLACK | - | Reporter | Non Member |
| W[redacted],M[redacted] | [redacted] | 15 | Female | BLACK | [redacted] | - | Member |
| W[redacted],T[redacted]T | [redacted] | 14 | Male | BLACK | [redacted] | - | Member |
| R[redacted],JW Jr. | [redacted] | 11 | Male | BLACK | [redacted] | - | Member |
| W[redacted],J[redacted] | [redacted] | 13 | Male | BLACK | [redacted] | - | Member |

**Household Address :** R[redacted],L[redacted]

P. O. Box [redacted]

Marks

MS 38646-0000

**Description of the Alleged Maltreatment at the time of the Initial report :**

Reporter stated she got a call from COR worker, Ms. H[redacted] from Coahoma County around 9:46am this morning (6/15/11). Per Ms. H[redacted], L[redacted] called her screaming from the back of an ambulance saying F[redacted] fell in the toilet on 6/15/11. [redacted] said it was too much water in his lungs and they didn't think he was going to make it. L[redacted], her husband, JW, and her daughter, A[redacted], were all at home. Reporter noted about fifteen minutes later resource worker, Ms. S[redacted], was asking L[redacted] what happened. L[redacted] started screaming again because the doctors said F[redacted] had died. Reporter did not confront L[redacted] regarding these allegations. Reporter mentioned L[redacted] is a relative foster parent. Reporter stated DHS has already removed F[redacted] brother, D[redacted], from the home. Reporter suggested physical neglect should also be an allegation for D[redacted]. K[redacted] McL[redacted] has been assigned to this case, per reporter. This family does have history in MACWIS. Safety risks are undetermined.

**Worker Findings :**

The basis for finding is that the child died and the relative resource parents do not know what happened to the child. This very young child was not supervised by an adult at or around the time of his death. The case is being substantiated for ph ysical neglect. There were inconsistencies found in the family member's statements as to what happened to the child. It was also found that the family did not have any running water in the home. The agency is waiting on the autopsy report to de termine the cause of the child s death.

**In what type of placement was the maltreatment alleged to have occurred (foster care placement or adoptive placement)? If foster care then what type setting (foster home, group home, residential treatment, therapeutic foster home, relative placement, etc)?**

**Who is the Alleged Perpetrator? What is there relationship with the victim?**

**Describe the nature, frequency, and duration of the maltreatment:**

**What is the permanent plan for the child(ren)? How does the child(ren) perceive the placement where the alleged maltreatment occurred?**

**Does the Resource have a history of maltreatment with the agency? If so, were any of the allegations substantiated?**

No

**Is there a violation of agency policy or licensure standards?**

No

**Would the child be in any danger if left in this placement?**

Yes

**If the child is in danger in the placement the agency will address the danger with:**

**Do any adults in the home/facility appear to have a substance abuse/dependency problem or display any behaviors or emotions (anger, depression, bizarre behaviors, etc.?) that affects' ability to meet the safety and basic needs of the child? If so, describe.**

No

**Are there possible safety concerns posed by other children in the placement, or does this child pose possible threats to other children there?**

Yes

**Are there any significant changes/occurrences in the past year that may affect the caregivers (staff's) ability to meet the protection and basic needs of the youth? (For example, has there been excessive staff turnover in facilities, marital or financial problems in resource homes) If so, describe.**

No

**Describe the caregiver(s)/facility staffs understanding of the child's basic needs and developmental needs and how they are met within the placement setting. Include physical and behavioral health needs.**

| **Risk:** High Risk | **Safety:** Unsafe | **Well-Being:** Insufficient |
|---|---|---|

## Address Addendum

PersonName : R[redacted],L[redacted]

Address : P. O. Box [redacted]

City : Marks

State / Zip : MS 38646-0000

---

PersonName : M[redacted],F[redacted]

Address : [redacted] Highway 322

City : Lambert

State / Zip : MS 38643-0000

---

PersonName : F[redacted],D[redacted]

Address : [redacted] IOWA Avenue

City : Clarksdale

State / Zip : MS 38614-0000

---

PersonName : R[redacted],JW

Address : [redacted] Highway 322

City : Lambert

State / Zip : MS 38643-0000

---

PersonName : R[redacted],A[redacted]

Address : P. O. Box [redacted]

City : Lambert

State / Zip : MS 38643-0000

---

PersonName : S[redacted],A[redacted]

Address : PO Box [redacted]

City : Charleston

State / Zip : MS 38921-0000

---

| | | |
|---|---|---|
| PersonName : | W[redacted],M[redacted] | |
| Address : | [redacted] Hwy 322 E | |
| City : | Lambert | |
| State / Zip : | MS | 38643-0000 |
| PersonName : | W[redacted],T[redacted] | |
| Address : | [redacted] Hwy 322 E | |
| City : | Lambert | |
| State / Zip : | MS | 38643-0000 |
| PersonName : | R[redacted],J[redacted] | |
| Address : | [redacted] Hwy 322 E | |
| City : | Lambert | |
| State / Zip : | MS | 38643-0000 |
| PersonName : | W[redacted],J[redacted] | |
| Address : | [redacted] Hwy 322 E | |
| City : | Lambert | |
| State / Zip : | MS | 38643-0000 |

**Alleged Perpetrator**

R[redacted], L[redacted]

MCC[redacted], G[redacted] 12:20 PM 06/15/2011

Worker, G[redacted] M[redacted] with the assistance of S[redacted] C[redacted], FPSA interviewed Mrs. L[redacted] R[redacted] alone in the Quitman County DHS office. According to Mrs. R[redacted], they all slept in her bedroom because they were watching movies. She goes on to say, F[redacted] and D[redacted] were in the bed with them, and the other children slept on a mattress and a pallet on the floor. She stated, "My husband told A[redacted] to take F[redacted] to the bathroom, she took him and brought him back to their bedroom." According to Mrs. R[redacted], her husband jumped up and asked, "Where is F[redacted]?" Worker asked Mrs. R[redacted] what time did that happen. According to Mrs. R[redacted], she could not remember what time it happened. She stated that her husband went into the bathroom and brought the child out in his hand. According to Mrs. R[redacted], she started CPR on him while, J W looked for the telephone. She stated that JW asked her to call 911 as he administered CPR on the child. Mrs. R[redacted] stated that she called thePolice Department. She said she also called Social Services, but the line was busy. She said that she could remember Ms. H[redacted]s telephone number, so she called her. According to Mrs. R[redacted], Chief [redacted] with the Lambert Police Department was first to arrive at their home. When Chief [redacted] arrived, she began to administer CPR on the child. According to Mrs. R[redacted], Chief [redacted] continued to do CPR until the ambulance arrived at their home. Mrs. R[redacted] stated that she and her family had been in Southaven for a week due to her home being sprayed for critters (roaches), after they had flooding in the community last month. She said that when they arrived at the home, their water was off.

Worker inquired about the time they arrived home. Mrs. R[redacted] stated June 14, 2011 at approximately 10:00 PM or later. She said that they had to bring some water from her mother's house.

According to Mrs. R[redacted], F[redacted] was not sleeping in his bed because he didn't have a mattress due to the child having had a bowel movement and "peed" on the mattress a couple of weeks ago. Mrs. R[redacted] stated they burned his mattress. She stated that F[redacted] would always stand on top of something to open doors. According to Mrs. R[redacted], "He was a very sneaky child." Mrs. R[redacted] was crying and stating that "I hate that I was asleep and did not catch him that time."

**Alleged Victim**

M[redacted], F[redacted] T

S[redacted], A[redacted] 11:52 AM 06/15/2011

VICTIM WAS SEEN AT 10:00 AM:

FPSA S[redacted], FPSA H[redacted] and Resource Specialist S[redacted] went into the examination room at the Emergency Room at Quitman County Hospital to observe the body of two year old F[redacted] T[redacted] R[redacted], LPN (Ms. R[redacted] was also the County Corner) accompanied workers in the room. Worker observed the arms, legs, face, stomach area, back area, and buttocks of F[redacted] M[redacted]. Worker did not observe any bruises on the child. Worker noticed that F[redacted] had some old scaring and mosquito bites. The child was dressed in a yellow hospital gown with a sheet draped over him. Pictures were taken by Resource Specialist S[redacted] for case file.

F[redacted], D[redacted].

MC[redacted], C[redacted] 12:10 PM 06/15/2011

Worker observed D[redacted], age 10 months old, in the arms of Ms. M[redacted] H[redacted], his County of Responsibility worker. D[redacted] was very upset and crying. He was dressed in a pamper with a blanket around him. Worker checked the child and no bruises or marks were found on him. This child is too young to talk and express himself verbally.

**Attempted Contact**

No Participants

[redacted] 04:45 PM 06/15/2011

Worker traveled to Mr. [redacted] home to inform him of his son, [redacted] death. No one came to the door when worker knocked. Worker left a card asking him to contact her as it was very important.

---

**Collateral Contact**

No Participants

[redacted],[redacted] 02:30 PM 06/15/2011

[redacted], FPSA and Worker [redacted] interviewed Chief [redacted] with the Lambert Police Department. Chief [redacted] stated that she received the call at 9:17 AM and it took approximately two to three minutes to respond. She stated that she was askedby the Sheriff Department to go to the home to make sure that the ambulance knew where to go. According to Chief [redacted], the family resides in the county but since she was closer to them, she responded for the Sheriff Department. Chief [redacted] stated that when she arrived at the home, the baby was lying on the floor. According to Chief [redacted], the baby's eyes were open and she could see where he had thrown up on the floor. Chief [redacted] stated that JW was doing CPR on the baby. Chief [redacted] stated that she rubbed the baby's stomach and some liquid came out of his nose. According to Chief [redacted], the baby's body was cold and tight. Chief [redacted] stated that the baby's mouth was dry. According to Chief [redacted], she put her head on the child's chest and did not hear anything. Chief [redacted] stated, "That baby was dead." According to Chief [redacted], the ambulance attendant came into the house and scooped the baby up and ran out the door with him. According to Chief [redacted], JW [redacted] told her that his son brought the baby to him, and then she heard that the baby was found in the tub, commode and cooler. Chief [redacted] stated that she has heard three different stories.

No Participants

[redacted],[redacted] 02:15 PM 06/15/2011

Worker, [redacted] interviewed [redacted] Water and Court Clerk for the City of Lambert. According to Ms. [redacted], the water was turned off in the home on June 06, 2011 at 2:00 PM for non-payment. Ms. [redacted] stated that the water was registered under the name of [redacted] Worker [redacted] asked if the water in the home had been off in the past. According to Ms. [redacted] the water has been off in the past but has never stayed off for more than two weeks.

No Participants

[redacted],[redacted] 09:15 AM 06/20/2011

Worker contacted Ms. [redacted] Water and Court Clerk with the City of Lambert to find how much the water bill for the [redacted] family. According to Ms. [redacted] the water bill was $52.70. She stated that they had gotten an extension on the bill which is $30, then there is a $25.00 reconnect fee. Ms. [redacted] stated that the water bill was paid on June 16, 2011 and it now back on in the home.

---

**ICWA Contact**

[redacted]

[redacted],[redacted] 03:00 PM 06/15/2011

Ms. [redacted], the alleged victim's mother, was asked the following questions:
Is parent or child of Native American Heritage? No
Is parent eligible for tribal membership? No
Is parent registered with Native American tribe? No
Is childeligible for tribal membership? No
Has child been registered with Native American tribe? No
Does the family live on tribal land? No
Does any family member belong to the Choctaw, Cherokee, Chickasaw or any other tribe? No

[redacted],[redacted]

H[redacted]R,M[redacted] 10:40 AM 06/16/2011

Mr. T[redacted] D[redacted], the alleged victim's father, was asked the following questions:
Is parent or child of Native American Heritage? No
Is parent eligible for tribal membership? No
Is parent registered with Native American tribe? No
Is childeligible for tribal membership? No
Has child been registered with Native American tribe? No
Does the family live on tribal land? No
Does any family member belong to the Choctaw, Cherokee, Chickasaw or any other tribe? No

---

**Investigation Staffing**

No Participants

MC[redacted],C[redacted] 01:13 PM 06/15/2011

C[redacted] Mc[redacted], FPSA staffed the case with Ms. J[redacted] Mc[redacted] Regional Director. Worker informed her that the Resource Parent, Mr. JW R[redacted] stated that he found F[redacted] in a cooler upside down and he stated water was in the cooler.

---

**Judge/Court Personnel**

No Participants

MC[redacted],C[redacted] 02:39 PM 06/17/2011

Worker contacted Ms. B[redacted] M[redacted], DA for Quitman county and informed her of the report on F[redacted] M[redacted]. Worker asked Ms. M[redacted] for her fax number so that I could fax her the report. Ms. M[redacted] wanted to know what did worker want her to do with it. Worker explained to her that it was my duties to report her the death of the child, then follow up with the completed investigation. Ms. M[redacted] asked Worker which law enforcement agency was handling the case? Worker gave her Det. [redacted] with the Quitman County Sheriff Department.

Worker faxed the report to Ms. M[redacted]

No Participants

T[redacted],L[redacted] 10:41 AM 06/16/2011

This narrative is being copied and pasted by RD [redacted] Mc[redacted] from the children's case. The contact was made by ASWS L[redacted] T[redacted] on the date and time above.

Supervisor T[redacted] received a call from the Guardian Ad Litem [redacted] this morning after worker had left a message for her to call this office on the evening of June 15, 2011. Attorney [redacted] was informed that the agency was required to inform her regarding the death of F[redacted] M[redacted], a child that was in the agency custodyduring the time of his death. Attorney [redacted] expressed her condolence regarding our lost.

---

**Law Enforcement**

No Participants

MC[redacted],C[redacted] 11:27 AM 06/17/2011

Worker received a call from Detective [redacted] with Quitman County Sheriff Department. Det. [redacted] stated that he had taken a lot of pictures of the home. According to Det. [redacted] Mr. JW R[redacted] told him that he found F[redacted] upside down in the cooler and that the child was naked. Det. [redacted] stated that Mrs. R[redacted] told him that the child did have on some underwear. According to Det. [redacted], he is getting different statement from the family members. Det. [redacted] stated that once he get the preliminary report together, he will fax it to the worker. Worker gave Det. [redacted] my cellular phone and fax number.

No Participants

M[redacted],C[redacted] 10:15 AM 06/28/2011

Worker contact Investigator, D[redacted] L[redacted] with the Qnitman County Sheriff Department to see if he had completed his report. Investigator [redacted] stated that he was waiting on the autopsy before sending this worker a copy of his report. He stated that he had gotten one sheet from the crime lab, but it was not saying anything.

---

**Medical Contact**

No Participants

MC[redacted],C[redacted] 10:10 AM 06/17/2011

Worker contacted [redacted], coroner and informed her that F[redacted] body will go to Century Funeral Home in Clarksdale.

No Participants

MC[redacted],C[redacted] 09:44 AM 06/17/2011

Worker received a call from T[redacted] R[redacted], coroner in Quitman County. Ms. R[redacted] wanted to know which funeral home would get F[redacted] body. Worker informed Ms. R[redacted] that I would have to contact the worker in Clarksdale to fine out.

No Participants

MC[redacted],C[redacted] 02:35 PM 06/16/2011

Worker Mc[redacted] contacted Ms. [redacted], coroner for Quitman County. Worker explained to Ms. [redacted] that I will be the person handling the investigation on F[redacted] M[redacted]. Worker asked Ms. [redacted] did she know the cause of death. According to Ms. [redacted], it did not appear to her that the child had fallen into water. She stated that the child did not have on any clothes when she saw him at the hospital and his skin was dry. Ms. [redacted] stated that "the father told her that he picked the child up from beside the commode, but nothing fits." According to Ms. [redacted], the autopsy will be preformed on tomorrow, June 17, 2011. Ms. [redacted] stated that "one of the Nurses told her that F[redacted] hands were wrinkled."

Worker provided Ms. [redacted] with the office number, cellular phone and fax number.

No Participants

MC[redacted],C[redacted] 10:56 AM 07/05/2011

Worker contacted Ms. [redacted], coroner for Quitman County in reference to the autopsy on F[redacted] M[redacted]. Ms [redacted] stated that autopsy was still pending. She said she will let worker know when the autopsy comes.

No Participants

MC[redacted],C[redacted] 11:54 AM 07/18/2011

Worker contacted Ms. [redacted], Quitman County Coroner to see if she has received the autopsy on F[redacted]. Ms, [redacted] stated that she has not received it.

---

**Other**

No Participants

MC[redacted],C[redacted] 09:55 AM 06/17/2011

Worker contacted Ms. M[redacted] H[redacted] COR worker for F[redacted] Worker asked Ms. H[redacted] which funeral home will get F[redacted] body. Ms. H[redacted] stated that the child will go to Century Funeral Home in Clarksdale.

No Participants

MC[redacted],C[redacted] 12:14 PM 07/06/2011

Worker, C[redacted] M[redacted] contacted COR Worker, Ms. M[redacted] H[redacted], in regards to the condition of the R[redacted] home when she last visited. According to Ms. H[redacted], the last time she visited the R[redacted] home was in March 2011. She stated that Mrs.R[redacted] showed her the entire house, and it was clean in appearance at that time. Ms. H[redacted] stated that all of the beds in the home were made up. According to Ms. H[redacted] the home had all working utilities. She stated that she did go into the F[redacted] and D[redacted] s bedroom, and both of their beds had mattresses. Ms. H[redacted] stated that she can not say what happened to the home from that time until the death of the child.

---

**Other Household Member**

R[redacted],A[redacted]

MC[redacted],C[redacted] 01:07 PM 06/15/2011

Worker, Mc[redacted] interviewed A[redacted] R[redacted] age 8, alone in the Quitman County DHS office. She stated that she took F[redacted] to the bathroom to let him "pee" then she took him back to her mother's room. According to A[redacted] they played, ate popcorn and watched scary movies. Worker ended the interview at this time to go to the home so that the County of Responsibility could get clothing for the other youth in care.

R[redacted],JW[redacted]

MC[redacted],C[redacted] 02:10 PM 06/15/2011

Worker interviewed JW, age 10, alone in his parent's bedroom. According to JW, the only thing he knew was that he was asleep and he heard everybody screaming. JW stated that he woke up after hearing the screams. He stated that he slept in the bed with his parents, D[redacted] and F[redacted]. According to JW, A[redacted] took F[redacted] to the bathroom and came back to the bedroom. JW stated that his brother, T[redacted] kept checking on F[redacted] while he was sitting on the toilet. According to JW, he went to sleep leaving everyone else awake. JW stated he always goes to sleep first. According to JW, he has being staying with a relative, but he forgot who his parents went to visit. JW stated that they returned home on June 14, 2011 and it was almostdark when they got home.

[redacted],[redacted]

MC[redacted],C[redacted] 01:50 PM 06/15/2011

Worker interviewed M[redacted] age 15, alone in the bedroom of their home. She stated that she and her brother, T[redacted] slept in the den. According to M[redacted] she heard her step dad say, "F[redacted] dead." The child stated that she thought she was dreaming until her stepdad say, "Get up F[redacted] is dead." According to M[redacted], she went into her parents bedroom, and saw her mother sitting on the bed trying to catch her breath. M[redacted] stated that JW was doing CPR on F[redacted]. Worker asked the child around what time was it when her stepdad said that F[redacted] was dead. M[redacted] stated that it was approximately 7:50 AM because she was texting on the cellular phone at that time. According to M[redacted] she did not see A[redacted] take F[redacted] to the bathroom. Thechild stated that the family had been in Southaven and returned home yesterday, June 14, 2011 around 7:00 PM.

[redacted],[redacted]

MC[redacted],C[redacted] 01:56 PM 06/15/2011

Worker interviewed T[redacted] age 14, alone in the bedroom of his parent's home. According to T[redacted] he and M[redacted] slept in the den. T[redacted] stated that he made sure that F[redacted] got in the bed with his parents. According to T[redacted], everyone was in their parent's room watching movies, except him and M[redacted] T[redacted] stated that he and M[redacted] was not in the room when A[redacted] took F[redacted] to the bathroom. According to T[redacted] he had being staying in Marks since school got out with a cousin.

---

T[redacted] stated that they returned home on June 14, 2011, right at dark, but he could not say the exact time. According to T[redacted] his stepdad woke him and M[redacted] up saying, "F[redacted] dead." The child stated that when he went into his parent'sroom, his mother was doing CPR on F[redacted] and crying then his stepfather started doing CPR on him.

R[redacted],A[redacted]

C[redacted],S[redacted] 01:30 PM 06/15/2011

A[redacted] R[redacted] interview started in Quitman County DFCS office by FPSA Mc[redacted] and was continued by FPSA C[redacted] in her parent's bedroom alone.

The child is eight years old and was promoted to the third grade at Lambert Elementary School of Lambert, Ms. Worker observed the child to be dressed appropriately for the weather, and to be developing normally for her age level.

According to the child they went out of town for several days and stayed with relatives. The child continued and stated that they came by the house and checked it, got clothes as the roaches were bad, and that she heard her parents say that some men sprayed the house on Saturday. According to the child they stayed with her grandmother B[redacted] W[redacted] of Marks, Ms. According to the child she also stayed a night or two with a cousin, Ms. F[redacted] F[redacted]

According to the child they returned home that morning and then she changed it to that evening before dark. According to the child she took [redacted] to the bathroom and that she then brought him back to her parent's room and he then got into the bed with her parents.

According to the child, she and F[redacted] were still looking at the movie, "Friday Christmas", when everyone else fell asleep. According tothe child F[redacted] then got out of the bed with her parents and lay on the covers that she had on the floor beside her parent's bed. Worker observed the covers still on the floor located on the right side of Mr. and Mrs. R[redacted]'s bed.

According to the child it was almost morning when she and F[redacted] finally went to sleep. According to the child she only took [redacted] to the bathroom when her parent's were awake, and that she never took him to the bathroom after everyone went to sleep. According to the child, F[redacted] was sneaky, and that he would drink anything. Worker asked the child why she said that, the child stated that F[redacted] was sneaky, and he did drink anything, and that is why he always had to be watched.

The child continued, and according to her she was awaken by the scream of her sister, M[redacted] who was hollering that F[redacted] was dead! The child stated she jumped up and saw F[redacted] on the floor with her dad giving CPR. The child was observed by Worker to speak clearly,and that she never cried during the interview.

---

Parent/Caretaker

R[redacted],JW,R[redacted],L[redacted]

MC[redacted],C[redacted] 12:55 PM 06/15/2011

Worker went over the Notice of Parents/Guardian Rights-Investigation with the[redacted]. They stated that they understood and signed it. Worker also went over the Client's Grievance Procedures and got them to signed a copy of it. Worker gave them acopy of what they signed.

R[redacted],JW

MC[redacted],C[redacted] 12:43 PM 06/15/2011

Worker interviewed J W R[redacted] L[redacted] husband alone in the Quitman County DHS office. Mr. R[redacted] stated that everyone was asleep when he got up to go the bathroom. He stated that he found F[redacted] upside down in the cooler and there was water init. According to Mr. R[redacted], he picked the child up, took him into the bedroom and his wife started CPR, then he told her to call 911. Mr. R[redacted] stated that he started doing the CPR, but the child was not responding. He said that the Sheriff came in and started doing CPR. According to Mr. R[redacted] they all were watching television in their bedroom. He said that F[redacted] and D[redacted] were in the bed with he and his wife. Mrs. R[redacted] stated that F[redacted] was already asleep when he went to sleep. Worker questioned Mr. R[redacted] about time frame on them being in the room, the last time he saw the child awake and the time he found the child. Mr. R[redacted] could not give Worker a time.

R[redacted],L[redacted]

MC[redacted],C[redacted] 12:30 PM 06/15/2011

Worker informed Mrs. L[redacted] R[redacted] that I needed to interview all of the children that resided in her home.

M[redacted],L[redacted]D,F[redacted],D[redacted]

H[redacted],M[redacted] 12:00 PM 06/15/2011

Worker spoke with Ms. L[redacted] M[redacted], the two year old deceased alleged victim, F[redacted] M[redacted]s mother, and Mr. D[redacted] F[redacted] father of the alleged victim's brother, D[redacted] F[redacted] Jr., regarding the death of F[redacted] Worker offered her condolences to Ms. M[redacted] for the loss of her son. Worker informed her that her son would be taken to Jackson, MS and an autopsy would be conducted on F[redacted] to find out the actual cause of his death. Worker informed her that she would keep her abreast of any information that is found out regarding her son's death and for her to feel free to contact her when she needs to.

D[redacted],T[redacted]

H[redacted],M[redacted] 10:25 AM 06/16/2011

Worker traveled to Mr. T[redacted] D[redacted] the two year old deceased victim, F[redacted] M[redacted] father, and informed him of F[redacted] death. Worker offered her condolences for the loss of his son. Mr. D[redacted] stated that he heard that he drowned. Worker informed him that his son was currently in Jackson, MS and an autopsy would be conducted on him to find out the actual cause of F[redacted] death. Mr. D[redacted] was also informed that the agency would be responsible for F[redacted] funeral arrangement. Worker informed him that she would keep him informed of the funeral arrangements and any other information that is found out regarding his son's death and for him to feel free to contact her when he needs to.

R[redacted],JW,R[redacted],L[redacted]

MC[redacted],C[redacted] 03:15 PM 06/15/2011

The R[redacted] and Worker McC[redacted] went over the Safety Checklist for Children and they both signed it.

---

**Physical Home Environment**

R[redacted],A[redacted],R[redacted]W Jr.,W[redacted]T[redacted]T,W[redacted]M[redacted]R

MC[redacted],C[redacted] 01:30 PM 06/15/2011

A physical home environment was completed on the home of JW and L[redacted] R[redacted] home at [redacted] Highway 322, Lambert, Mississippi. Workers C[redacted] and Mc[redacted] trailed the R[redacted] to their home. The outer appearance of the home was checked. Worker observed a wood framed house behind the R[redacted] home that they stated belongs to them. This house did not have doors on it, nor was it boarded up. Worker also observed two inoperable cars sitting on the land that were not working. The grass to the family home was in need of mowing.

Worker was escorted through the home by Mrs. R[redacted]. Worker observed clothing hanging all on the kitchen cabinets and the oven. Worker was shown the inside of the two refrigerators in the home by Mrs. R[redacted] One refrigerator had some cheese, flour, bread and an unidentified piece of meat wrapped in a cloth towel. The other refrigerator had about three packs of meats and an opened box of ice cream. Worker did observe two fire extinguishers in the kitchen, one hanging on the wall and one on top of the refrigerator.

There was no furniture in the living room, it only had clothes on the floor. There was a fire place in this room, which had a guard in front of it with a thick piece of wood in front of it. Worker observed an electric cord running from the fire place. There was a blind on one window and a bed sheet at the other window.

The den had a sectional couch which was very dirty in appearance. There was a ceiling fan in the ceiling which had loose wiring hanging from it. There was an orange drop light hanging on the wall. There was an air conditioner in this room.

There was a storage room off from the den, which had two doors to it. One of the doors did not have a handle. This room was filled with piles of clothing, toys, mattress and bikes.

There was a bed sheet hanging on the window located in the hall.

Bedroom one is occupied by Mr. and Mrs. R[redacted] and this is the room that the whole family slept in the night before the death of [redacted]. There is a queen size bed that had no sheets were on it. There was a small table in the room, that block the main entrance. Worker observed an orange drop light hanging from the ceiling fan which was used to light the room. Worker also observed a child's play pen which was filled with clothing. Blankets were also observed on the floor in this room. Worker observed a window unit air conditioner in this room.

There is a full bathroom next to the R[redacted] bedroom. It can be entered from the bedroom. Worker observed the toilet to have a seat but not atop. This is the bathroom in which F[redacted] was found. There was a tall, orange, round cooler in there. Worker observed the electric sockets tohave the plastic electrical covers but there was not a plate to cover the socket.

Bedroom two is occupied by Mrs. R[redacted]s boys. Worker observed a set of full size mattress on the floor with no sheets on it. Also in this room the closet doorwas off the hinge and torn up.

Bedroom three was occupied by R[redacted] and D[redacted] Worker observed a baby bed that was neatly fixed, this baby bed was used by D[redacted]. There was another bed in the room which did not have a mattress, and this was F[redacted] bed. There was also a dresser in this room.

Worker observed a door in this room that leads to another full bathroom. When the door was opened a really bad odor emerged. There was not a toilet seat or top on the commode. The toilet wasfilled with tissue, urine and feces.

Worker observed on the back porch which is screened in a broken washing machine.

Mrs. R[redacted] showed Worker, Mc[redacted] that there were lights in the home and she turned on the stove to show that there was gasin the home.

Pictures were taken of the R[redacted] Family's home.

# Ex. 50C

**Grace M. Lopes**

**From:** Grace M. Lopes [gmlopes@oymonitor.org]
**Sent:** Thursday, September 26, 2013 8:46 PM
**To:** 'Rachal, Kenya'; 'Miriam Ingber'
**Cc:** 'Young, Ashley Tullos'; 'Julia Davis'; 'Mia Caras'
**Subject:** Period 4 IP, III.A.3. – Recommendations in FM Fatality Assessment

Kenya and Miriam:

As a follow up to Kenya's resubmission of the autopsy report in response to my August 29, 2013 e-mail, I have considered the implications of the failure of the autopsy to determine the cause of death. Accordingly, I write to advise you that I approve the recommendations set forth in the FM fatality assessment report (*see* DHS 345583-345587) subject to defendants' supplementation of the recommendations in order to address the following omissions:

1. Finding and Recommendation No. 4: This recommendation states that policy is enforced with respect to the prohibition that an ASWS "may not actively work on direct services or carry a caseload." The projected date column indicates that the policy has been enforced but it does not describe the enforcement process. Rather, it states that the administration monitors the workload reports on an ongoing basis. This does not constitute enforcement. The recommendation should be supplemented to describe the enforcement process.

2. Finding and Recommendation No. 6: This recommendation does not address the fact that seven children were in this household in violation of DFCS policy and the MSA (*see* DHS 345570). The finding column should include this fact and a related recommendation and timeline should be developed.

3. Findings and Recommendations Nos. 2, 3, 4, 6 and 7: These findings reflect deficiencies in case practice that should be addressed through remedial action directed at the individual caseworker, supervisor and other management staff whose performance and/or supervision/management was deficient. While it is up to defendants to assess whether disciplinary action is appropriate, at a minimum, targeted remedial interventions (*e.g.*, individualized counseling, coaching, training, *etc.*) are indicated with respect to caseworkers, supervisors and managers who failed to implement established policy and/or failed to exercise minimally appropriate clinical judgment in this case. The systemic recommendations related to findings 2, 3 , 4, 6 and 7 should be supplemented to address targeted remedial interventions for the DFCS staff whose performance was deficient.

Finally, I think the finding that states "Initial medicals are not evident but it does appear that the children's medical needs were identified and assessment/treatment was being sought appropriately" is unsupported by the record – at least insofar as the record is reflected in the fatality assessment report (*see* DHS 345572). FM did not receive an initial medical screening or comprehensive exam within the requisite time period (if at all) as required by the MSA. Moreover, the chronology related to medical care and other references to the case record that appear in the assessment report suggest poor documentation in the MACWIS record and raise, but do not resolve, questions about FM's possible medical needs (e.g., there are reports of insatiable thirst, limping and dwarfism) (compare DHS 345571-345572 with DHS 345580-345581).

It is unclear whether the paper case record was reviewed by both the review team and the "secondary" reviewer. The paper record includes collateral documents such as medical records which the methodology section of the report states that the review team referred to during its assessment (*see* DHS 345564). The secondary case review that was conducted by [redacted] suggests that he did not examine the documents in the medical record. In relevant part it states: "The paper case record may contain further documentation of this assessment and details of the various clinic visits." (*See* DHS 345581). While beyond the scope of Period 4 IP III.A.3., which limits my approval authority to the recommendations contained in the assessment, I strongly recommend that a secondary review of the paper record be conducted and the findings and related recommendations in this assessment report be supplemented if appropriate.

I would be pleased to discuss these determinations with both of you.  Please let me know your thoughts about next steps.  Many thanks.  - Grace

*Grace M. Lopes*
*Monitor, Olivia Y.*
*1220 19th Street, N.W.*
*Suite 500*
*Washington, D.C.  20036*
*202.232.8311*

*This email and any attachments may contain confidential and privileged information.  If you are not the intended recipient, please notify the sender immediately, destroy this email, and destroy any copies.  Any dissemination or use of this information by a person other than the intended recipient is unauthorized and may be illegal.*

# Ex. 50D

**Grace M. Lopes**

**From:** Grace M. Lopes [gmlopes@oymonitor.org]
**Sent:** Monday, November 18, 2013 12:03 PM
**To:** 'Rachal, Kenya'; 'Julia Davis'
**Cc:** 'Young, Ashley Tullos'; 'Fortenberry, Rusty'; 'mingber@ChildrensRights.Org'; 'Marcia Robinson Lowry'; 'Mia Caras'
**Subject:** Period 4 IP, III.A.3. - Approval of Recommendations in November 5, 2013 Resubmission of the FM Fatality Assessment Report

Kenya and Julia:

I have reviewed the November 5, 2013 Resubmission of the FM Fatality Assessment Report, and approve the recommendations as revised. If you have any questions, please let me know. Thank you. - Grace

*Grace M. Lopes*
*Monitor, Olivia Y.*
*1220 19th Street, N.W.*
*Suite 500*
*Washington, D.C. 20036*
*202.232.8311*

*This email and any attachments may contain confidential and privileged information. If you are not the intended recipient, please notify the sender immediately, destroy this email, and destroy any copies. Any dissemination or use of this information by a person other than the intended recipient is unauthorized and may be illegal.*

# Ex. 51A



MDHS DIVISION OF FAMILY AND CHILDREN'S SERVICES
Safety, Permanency, and Well-Being

# DFCS CQI
# Maltreatment In Care Review Process

**Prepared By:**  **Evaluation & Monitoring Director**

***1.0***

# Protocol for Review of Maltreatment in Care Investigations

## I. Overview and Purpose

In order to improve practice surrounding investigations of children alleged to have experienced maltreatment in foster care, as well as to strengthen the Division of Family and Children's Services' (DFCS) staff skills and abilities to take necessary steps to help ensure the safety and well-being of children in custody and as a requirement of the *Olivia Y* Modified Settlement Agreement (MSA), DFCS has developed a procedure and accompanying instrument for the review of all investigations of maltreatment in care. The overarching purpose of these reviews is two-fold:

1. To ensure quality, comprehensive, and timely investigations into all allegations of maltreatment while a child is in out-of-home care; and

2. To ensure all children in custody are maintained safely in their placements, are free from harm, and any concerns regarding child(ren)'s safety and case practice deficiencies are addressed and monitored by proper authorities.

The MSA and the Year III Implementation Plan (Y3IP) provide certain specific procedures and time frames for addressing deficiencies identified through the review of MIC investigations. As stated in MSA II.B.1.d.:

*Within 30 days of completion of any investigation of maltreatment while in custody... DFCS shall review the maltreatment investigation...*including:

- *Identification of any case practice deficiencies*;

- *Identification of any remedial actions necessary to ensure the safety of the child who is the subject of the investigation as well as any other child in the home or placement* ***as well as the timeframe in which such remedial action must take place; and***

- *Identification of any corrective action that is necessary to address deficiencies in case practice demonstrated by the investigation* ***as well as the timeframe in which such remedial action must take place.***

Section II.B.1.d of the MSA requires DFCS to monitor the initiation and completion of the remedial actions (as described above) and to notify the Area Social Work Supervisor (ASWS), Regional Director (RD), and Director of Field Operations when such remedial actions have not been initiated within five (5) days of identification or timely completion.

Section II.C.3.a-e of Y3IP (found at Appendix "B" of MSA or on pg 66/81 of Doc. 571) requires DFCS to develop the training and fully implement the processes required to complete the maltreatment in care review described in MSA Section II.B.1.d., as well as:

*a. review of in-care maltreatment investigations to identify case practice deficiencies;*

*b. identification of remedial actions necessary to ensure the safety of the child who is the subject of the investigation as well as any other child in the home or placement;*

*c. identification of any corrective action that is necessary to address deficiencies in case practice demonstrated by the investigation;*

*d. monitoring of the initiation and completion of the remedial actions regarding individual child safety and notification to the ASWS, Regional Director, and Director of Field Operations when such remedial actions have not been initiated within five (5) days of identification or timely completed; and*

*e. monitoring of the initiation and completion of the remedial actions regarding case practice and notification to the ASWS, Regional Director, and Director of Field Operations when such remedial actions have not been initiated within twenty (20) working days of identification or timely completed.*

To meet these objectives, DFCS has developed the Maltreatment in Care (MIC) Review process described below. The process includes the requirement that remedial actions be initiated in the field to address any safety or practice related deficiencies. These remedial actions will be monitored by the Division of Evaluation and Monitoring within DFCS' Office of Continuous Quality Improvement (CQI).

The MIC reviews will replace the Special Safety Reviews previously conducted. A Safety Review Unit (SRU) within the Evaluation and Monitoring Unit will be developed to conduct the MIC reviews and monitor the quality of case practice in MIC investigations as well as the initiation and status of remedial actions to address issues identified in the MIC reviews. Specifically, SRU will:

- Conduct reviews on maltreatment investigations of children in foster care, as identified by data from MACWIS weekly reports;
- Monitor the status of remedial actions resulting from the reviews
- Review data reports reflecting state, regional, and county performance on various child welfare indicators associated with maltreatment in care; and
- Ultimately, provide aggregate data on safety and casework-related findings to analyze the qualitative and quantitative findings of MIC reviews and compile results into reports that identify the strengths and areas needing improvement identified in the reviews.

The results of these reviews will be used to guide further improvements to assure the safety, permanency, and well-being of children while in DFCS custody. Trends in practice will be monitored by CQI.

## II. Overview of the Maltreatment in Care (MIC) Review Process

This section provides an overview of the MIC Review process and timeframes for conducting the reviews and tracking the related remedial actions. For more detailed information on the process for reporting, implementing, and tracking of remedial and corrective actions, please see Section IV below.

MIC Reviews will be conducted on investigations of foster children alleged to have been maltreated while in care. Information on which cases to review will be derived from a MACWIS report (MWZ1271D) of children alleged to have been maltreated in care. This report runs on the 10th day of the month following the month the investigations were completed. However, a weekly run will be made specifically for the SRU in an effort to assure that the reviews are done within 30 days following the completion of the investigation.

The entries, including approved findings, on MWZ1271D will be the investigations that are subject to review since this is an indicator that the investigation has been completed. The supervisor of the SRU will make the assignments from this report to the MIC reviewer(s). After the review of the investigation has been completed, the review instrument and any findings of need for remedial action will be submitted to the SRU supervisor for review, feedback, and approval for submission to the field for further action.

A specialized tool has been developed to capture strengths and areas needing improvement in the two target areas of the MIC Reviews:

1. Are the investigations being initiated and completed timely?
2. Are children safe in their out-of-home care setting, and is any action needed to ensure their safety, permanency, and well-being?

MIC Safety Review findings are entered into the MIC Review instrument by dedicated reviewers who have been trained for this specialized review. If the reviewers identify necessary corrective action, the information is distributed to the appropriate RD via the designated reporting and tracking method (HEAT software) for developing, initiating and implementing corrective actions. The corrective actions taken by DFCS field- or facility staff are forwarded to the SRU supervisor who will track the corrective actions taken by the field. There are two types of corrective actions that might be identified through the course of the MIC Review, as described in the Y3IP.

- DFCS staff and facility staff must initiate corrective actions involving the **safety**[1] of the child, as well as other children in the home, within 5 days of the notification from the SRU of the need for corrective actions. If the corrective actions related to safety have not been initiated within this 5 day time period, the SRU shall notify the Director of Field Operations regarding remedial actions related to any identified safety issues. The Director of Field Operations will then follow-up with the appropriate RD for a response.

[1] See Sections III and IV and FN 2 below for *imminent* safety concern protocol.

- DFCS staff and facility staff must initiate corrective actions involving **casework practice deficiencies** within 20 days of the notification from the SRU of the need for corrective actions. If the corrective actions related to casework practice issues have not been initiated within this 20 working day time period, the SRU shall notify the Director of Field Operations regarding remedial actions of any identified practice issues. The Director of Field Operations will then follow-up with the appropriate RD for a response.

Depending on the type of facility subject to the maltreatment in care review, the SRU supervisor will inform different parties in the DFCS leadership of corrective actions being taken:

- If the home is licensed by an agency other than DFCS or is a congregate care facility, the information will be forwarded to the EMU Director, the DFCS Director, the Director of Field Operations and the Director of Licensure.

- If corrective action by DFCS staff is required, the information will be forwarded to the Director of Field Operations, who is responsible for follow-up actions to be conducted by DFCS staff in the field.

- The Director of Licensure is responsible for corrective actions to be conducted by resource home or facility staff licensed through DFCS, as appropriate.

If, during the course of the MIC review, any **imminent safety concerns** are identified by MIC Reviewers, they will be reported within 24 hours by the SRU supervisor to the Director of Field Operations, the appropriate RD, and the appropriate ASWS, particularly if it is a matter which requires a faster response than normal procedure described above. Examples of the types of imminent safety concerns that may be identified are described in the section below.

From the time of assignment, the MIC Reviewer will have four (4) calendar days to complete the review of the investigation and submit it to the SRU supervisor for approval. The SRU supervisor will have one (1) calendar day to approve the findings of the review or return it back to the reviewer for corrections. The data collected in the review instruments will be compiled into MIC Review reports (frequency to be determined), to be submitted to the CQI Director, EMU Director and to the Field Operations Director. These MIC Review reports will detail those cases that required corrective actions to remedy any identified safety or practice issues, and those that did not, in order to identify trends and inform practice with regard to child safety, permanency, and well-being issues while in foster care.

## III. Identification of Imminent Concerns of Safety, Case Practice Related concerns, and Case specific concerns related to Permanency and Well-being for Remedial and Corrective Actions

There are three primary types of concerns that may be identified by the MIC reviewer during the course of the review (which will require different timeframes for corrective actions):

- imminent concerns of safety for the child;
- case practice related concerns; and
- case specific concerns related to permanency and well-being.

Examples of **imminent safety** concerns which will require (1) reporting and action within 24 hours on the part of MIC Review staff and (2) implementation of corrective action by field staff within 5 calendar days[2] include, but are not limited to the following:

- An investigation of maltreatment of a child that was improperly conducted, such as not seeing the child face-to-face, not interviewing an identified perpetrator, or not addressing critical risk factors;

- The presence of risk/safety factors that violate a safety plan;

- The exposure of a child to factors/circumstances that present a safety/risk concern that the Agency may be unaware of;

- Any indication that the target child and/or other child(ren) in the home has been neglected, exploited or abused while in out-of-home care that has not been appropriately documented, reported, and/or investigated;

- Lack of substantive documentation reflecting assessment of safety/risk in the presence of maltreatment reports/safety plans or in high-risk situations;

- An assessment of a child's or parent's needs that present a safety/risk threat to the child;

- Failure to implement an appropriate safety plan in the face of identified safety/risk threats to the child;

- Failure to notify law enforcement of an allegation of felony child abuse;

[2] Upon receiving the first notification of a concern requiring corrective action, the RD is responsible for initiating and reporting back, in writing, to the Office of Field Operations and the EMU Director on corrective actions being taken to ensure the safety of the child and any other children in the home within 5 days of identifying the concern or immediately for safety concerns. ***It should be noted that waiting 5 days to initiate a child's move from a placement situation where the child is at serious risk of harm is not good case practice and every effort should be made to initiate corrective action in such cases immediately upon notification.***

DHS 339045

- Failure to initiate the report within 24 hours which includes having face-to-face contact with the alleged victims; and

- The lack of critical services being provided, such as medical, dental, or mental health care that are responsive to critical needs of the child;

Examples of **case practice or systemic issues** which require the regular 20 calendar day corrective action implementation timeframe include, but are not limited to the following:

- Failure to make collateral contacts;

- Failure by the RD (or designee, both hereinafter "RD") to approve in the investigation by the 30th calendar day;

Examples of **child or case specific concerns** for the child's timely permanency, stability or well-being, requiring the regular 20 day corrective action implementation timeframe includes but is not limited to the following:

- The threat of a placement disruption that DFCS may be unaware of or has not responded to;

- The identification of the special needs of a child that are not reflected in the case record or which the Agency seems unaware of; and

- The lack of critical services to meet a child's needs that are not specifically safety-related, such as independent living services when a child is nearing emancipation.

If any staff person conducting a MIC Review activity has a question about whether or not an identified concern meets the criteria for an imminent safety concern, s/he should immediately consult the SRU Supervisor.

## IV. Reporting, Implementing and Tracking Identified Concerns for Remedial/Corrective Action

As described above, depending on the type of concern identified through the course of the MIC review, different timeframes for initiating the process below are warranted. For **imminent safety concerns** to the child (examples provided in Section III), the reviewer will immediately (within 24 hours) initiate the process below, even if the review is not yet completed:

- The MIC Reviewer identifying the safety concern shall immediately report the concern verbally to the SRU Supervisor, the RD, responsible ASWS and investigating caseworker but in all cases within 24 hours. In the absence of one of these parties, the staff person should immediately report the concern to the next person in charge, e.g., the Regional ASWS or supervisor in charge. The RD will then follow-up with the responsible ASWS and investigating caseworker to

initiate and implement corrective actions to alleviate the issue at hand.

- Once the MIC Reviewer has initiated the reporting of the safety concern to the above listed parties, s/he will proceed with completing the rest of the MIC review. Within 24 hours of reporting the safety concern; the MIC Reviewer reporting the issue of imminent safety shall follow-up the verbal report with a written report identifying the concern to the SRU supervisor who will notify the appropriate RD (including the DFCS Director of Field Operations and EMU Director in the communication) via the reporting/tracking system.

- The RD is responsible for determining the appropriate corrective action and will follow-up with responsible ASWS and investigating caseworker regarding the issue of imminent safety and actions taken to alleviate the issue at hand. The RD is responsible for entering/reporting the determined corrective action to mitigate the concern within 24 hours of receiving notification of the issue from SRU in the reporting system.

- Upon receipt from the RD, the Director of Field Operations has 24 hours to approve or object to the proposed corrective action.

- Once 72 hours have passed since the initial identification of the issue by the MIC reviewer and development of corrective action, and period to object has passed, the RD, in consultation with the investigating worker, must initiate the corrective action.

- If the RD does not acknowledge receipt of the written report within 5 days, the SRU supervisor will notify the EMU Director who will follow-up with the Field Operations Director and the CQI Director. If no response is received within another 5 days, the issue is escalated to the Deputy Administrator of DFCS through the Director of CQI.

- After gathering and recording any additional information needed (such as medical, mental health, law enforcement records, etc.), as well as completing the MIC review instrument, the SRU staff tracking the corrective action, as described on the reporting/tracking system, will enter the additional information into the reporting/tracking system in place for purposes of tracking the response from the county/region.

For **case-practice/systemic and case/child-specific permanency and well-being concerns**, the MIC reviewers must initiate the process, outlined below, within 3 calendar days of completion of their MIC review.

- Upon completion of the instrument, the MIC review staff identifying the concern(s) shall verbally report the concern to the SRU supervisor to staff the concern in order to determine if the concern requires corrective action. Within 3 calendar days, the verbal report shall be followed up with a written report to the SRU supervisor

- After gathering and recording any needed additional information (such as medical, mental health, law enforcement records, etc.), the SRU supervisor will enter the information into the reporting/tracking system in place for purposes of tracking the corrective action response from the county/region.

- The written report will then go to the appropriate RD, EMU Director, and the DFCS Director of Field Operations. Upon receipt of the report, the RD is responsible for ultimately determining the corrective action to be undertaken, and entering the decision in the report tracking system within 3 calendar days.

- Upon notification of receipt of the proposed corrective action from the RD, the Director of Field Operations will have 2 calendar days to approve or request changes to the proposed corrective action. The county must initiate corrective actions within 20 days of identification of the concern by the MIC reviewer via the reporting/tracking system.

- If the RD does not acknowledge receipt of the written report within 20 days, the CQI Director will be notified who will notify the Director of Field Operations for a response. If no response is received within another 5 days, the issue is escalated to the Deputy Administrator of DFCS through the CQI Director.

### *Implementing Corrective Action*

- Upon receiving the first notification of a concern requiring corrective action, the RD is responsible for initiating and reporting back, in writing, to the Office of Field Operations and the EMU Director on corrective actions being taken to ensure the safety of the child *and any other children in the home w*ithin 5 days of identifying the concern or immediately for safety concerns. It should be noted that waiting 5 days to initiate a child's move from a placement situation where the child is at serious risk of harm is not good case practice and every effort should be made to initiate corrective action in such cases *immediately* upon notification.

- Within the regions, the RD may determine how and who will be responsible for developing and implementing corrective actions, depending upon the nature of the concern.

- Actions taken by the field must specifically address the concerns noted by the SRU staff for the child in question *and must also address any other children in the home. These actions shall also address timeframes in which the specified actions were taken.*

- The RD is responsible for ensuring that appropriate corrective actions are taken to address the concerns noted and for reporting in writing to the Director of Field Operations and the Office of CQI on the status of actions taken. These actions taken will be followed by the SRU to assure timely initiation of corrective actions.

- An identified corrective action is considered implemented when (1) the action has been put in place by the responsible county that addresses all identified concerns

with approval by the RD and the Director of Field Operations and (2) the Director of EMU and SRU supervisor are notified that implementation has taken place.

### *Tracking Corrective Actions*

- Utilizing the designated reporting/tracking system (e.g. HEAT Software), the RD will send notification to the appropriate county for remedial/corrective action that is to take place.

- At 5 days following identification of the safety concern by the MIC reviewer, the county of responsibility's ASWS and the assigned investigating caseworker shall have implemented the remedial/corrective action plan established by the RD to address the identified concern. The county will report this action to the RD who reports the action to the Director of Field Operations who reviews the action taken for verification and approval that it addresses the identified concern. The action is reported back to the EMU Director and the SRU Supervisor who reviews the action for verification that it addressed the identified concern and closure of the actions.

- After receiving verification from the Director of Field Operations that the corrective action taken for the safety issue(s) identified is appropriate and addresses the identified issue at hand, the Evaluation and Monitoring Unit Director will make a determination of closure of the action and the county/region is notified in writing that the matter has been closed.

- If the action taken does not address the identified issue, it shall be returned to the county/region by the Director of Field Operations within 24 hours for correction.

- If no action is taken in 5 days of receiving notification of the concern from the SRU, the matter is escalated to the Director of CQI who shall escalate the concern to the Deputy Administrator of DFCS.

At 20 days following identification of a practice (non-safety) concern, the same process as above will be followed, only within a 20 working day time-frame.

Corrective actions taken can range from the county simply entering needed documentation (which would require a check of the electronic case record for verification that the documentation was entered) or a more detailed corrective action plan such as making 2 unannounced visits a week to the home for a month or removing the child from a placement (which would require more detailed and frequent documentation from the field in order to verify that the corrective action was taken).

# Ex. 51B

# Safety Review Unit
# Maltreatment in Care Review Instrument

| A | IDENTIFYING INFORMATION | |
|---|---|---|
| 1 | Intake ID # | |
| 2 | Date Intake Report Received by Centralized Intake(mm/dd/yyyy) | |
| 3 | Date report was assigned for investigation (mm/dd/yyyy) | |
| 4 | Number of alleged victim children: | |
| 5 | Identifying information of Alleged Victim Children: | |

| Name | Child ID# | DOB | In DHS Custody? | County of Responsibility | Region | ICPC Child? | If ICPC, what state? | Allegation(s) |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

**Description of the Maltreatment in Care Report**

| | | Yes | No | |
|---|---|---|---|---|
| 6 | Were any of the alleged victim children under the age of 5? | | | |
| 7 | If "Yes" to #6, how many of the alleged victim children are under the age of 5? | | | |
| 8 | Name(s) of Alleged Perpetrator(s): | | | |
| 9 | Placement Type | | | |
| | | Yes | No | N/A |
| 10 | Is this a licensed placement/facility? (Select "N/A" only if child is in Own-Home) | | | |
| 11 | Resource ID (enter N/A if child is in Own-Home) | | | |

# Safety Review Unit
# Maltreatment in Care Review Instrument

| | | | | |
|---|---|---|---|---|
| **12** | Name of the placement (resource home/facility/own home name) where the child was placed at the time of the alleged maltreatment: | | | |
| **12a** | Have there been previous investigations of **maltreatment in care** on this placement for abuse, neglect, exploitation? | **Yes** | **No** | |
| | | | | |
| **12b** | If "yes" to 12a, how many investigations have there been? | | | |
| **12c** | If "Yes" to 12a, were any of the reports substantiated for abuse, neglect, exploitation? | **Yes** | **No** | **N/A** |
| | | | | |
| **12d** | How many of the previous reports were substantiated for abuse, neglect, exploitation? | | | |
| **12e** | Did any of the substantiated reports referenced in #12c occur within six months of the investigation of maltreatment in care currently being reviewed? | **Yes** | **No** | **N/A** |
| | | | | |
| **12f** | If "Yes" to 12e, did any of the reports of maltreatment in care involve the same or similar circumstances? | **Yes** | **No** | **N/A** |
| | | | | |
| **13** | Report Type | **ANE** | | |
| | | **Yes** | **No** | |
| **14** | Is report appropriately identified as alleged maltreatment in care? | | | |
| **15** | County where child's placement is located: | | | |
| **16** | Region where child's placement is located: | | | |
| **17** | Name of the Investigator on the maltreatment in care investigation being reviewed: | | | |
| **18** | Name of the Investigator's supervisor: | | | |
| **19** | Name of the Maltreatment in Care Reviewer: | | | |
| **20** | Date Maltreatment in Care Review Initiated (mm/dd/yyyy) | | | |
| **B** | **CASE PRACTICE** | | | |
| **21** | Date investigation initiated by the investigator (mm/dd/yyyy) | | | |
| | | **Yes** | **No** | |
| **22** | Was the investigation initiated within 24 hours of initial intake of the report? | | | |
| **23** | If no, provide the reason or note no reason identified. | | | |
| | | **Yes** | **No** | |
| **24** | Were all of the alleged victim child(ren) seen within 24 hours of initial intake of the report? | | | |
| **25** | If "No", which alleged victim children were not seen within 24 hours of the initial intake of the report? | | | |
| | | **Yes** | **No** | **N/A** |
| **26** | Did the investigator review all of the cases of those involved (victim children, other children, placement)? Select N/A only for own-home/runaway investigation in which the assigned caseworker is the investigator | | | |

# Safety Review Unit
# Maltreatment in Care Review Instrument

| | | | | | |
|---|---|---|---|---|---|
| 27 | Were all children in the home (victim children and all DFCS children) seen and interviewed privately, outside the presence of the caretaker, by the investigator? | | | | |
| 28 | If not all children were seen and interviewed privately outside the presence of the caretaker, please identify which child(ren) was not seen by the investigator: | | | | |
| | | All | Some | None | |
| 29 | Were all appropriate people interviewed as part of the investigation? | | | | |
| 30 | If not all, please identify all who were not: | | | | |
| | | All | Some | None | |
| 31 | Were any of the child(ren) in the home removed from the placement during the course of the investigation? | | | | |
| | | Alleged Victims | Non-Victims | Both | N/A |
| 32 | If all or some were removed from the placement, were they alleged victims, non-victim children or both? | | | | |
| | | Yes | No | N/A | |
| 33 | If all or some were removed from the placement, were discussions held with both the child(ren) and placement provider (if applicable) explaining why? | | | | |
| 34 | Date Safety/Risk Assessment completed (mm/dd/yyyy) | | | | |
| | | Yes | No | | |
| 35 | Was the Safety/Risk Assessment Completed Timely (within 7 calendar days of assignment)? | | | | |
| 36 | If "No", please explain (give date of investigation assignment and date the Safety/Risk Assessment was completed): | | | | |
| | | Yes | No | N/A | |
| 37 | Was the Safety/Risk Assessment thorough? | | | | |
| 38 | If “No” to #37, please explain: | | | | |
| | | Yes | No | N/A | |
| 39 | Did the Safety/Risk Assessment indicate the child(ren) were unsafe? | | | | |
| 40 | If “Yes” to #39, was a Safety Plan developed? | | | | |
| 41 | If “Yes” to #40, enter the date of the Safety Plan (mm/dd/yyyy) | | | | |

# Safety Review Unit
# Maltreatment in Care Review Instrument

| | | | | |
|---|---|---|---|---|
| 42 | If "No" or "N/A" to #40, please explain: | | | |
| | | Yes | No | N/A |
| 43 | Was the Safety Plan thorough? | | | |
| | | Yes | No | N/A |
| 44 | Was the Safety Plan appropriate to the circumstances of the investigation? | | | |
| | | Yes | No | |
| 45 | Was the placement that is the subject of the investigation thoroughly evaluated for safety, permanency, and child well-being? | | | |
| 46 | Please elaborate how the placement was evaluated: | | | |
| 47 | Date the investigation was submitted for supervisory approval (mm/dd/yyyy) | | | |
| | | Yes | No | |
| 48 | Did the Investigator complete the investigation within 25 calendar days and forward it to the supervisor or Regional Director/designee for approval? | | | |
| 49 | Date the supervisor or Regional Director/designee approved the findings of the investigation (mm/dd/yyyy) | | | |
| | | Yes | No | |
| 50 | Did the supervisor or Regional Director/designee approve the findings of the investigation by the 30th calendar day? | | | |
| C | RESOURCE HOME / OWN-HOME INVESTIGATION | | | |
| | | Yes | No | N/A |
| 51 | Is this a review of a Resource Home/Own Home Investigation? (If No, skip to section D) | | | |
| 52 | Did the **assigned** Resource Specialist accompany the assigned Investigator to the home to assess possible policy and/or licensure violations (select N/A if child(ren) is placed in Own-Home)? | | | |
| 53 | After the initial Safety/Risk Assessment was completed, was it determined that corrective action was necessary? | | | |
| 54 | If yes, were all pertinent parties informed of the necessary corrective action? | | | |

# Safety Review Unit
# Maltreatment in Care Review Instrument

| | | | | |
|---|---|---|---|---|
| **54a** | What corrective action(s) were put in place? | | | |
| | | **Yes** | **No** | **N/A** |
| **55** | Was the resource home closed? (select N/A if child(ren) is placed in Own-Home) | | | |
| **56** | If there was not a substantiation of ANE, was there a policy violation? | | | |
| **57** | What measures were taken to address the policy violation identified in #56? | | | |
| | | **Yes** | **No** | **N/A** |
| **58** | Were the measures to address the policy violation appropriate based on the findings of the investigation? | | | |
| **59** | If "No" or "N/A" to #58, please explain | | | |
| **D** | **FACILITY INVESTIGATION** | | | |
| | | **Yes** | **No** | **N/A** |
| **60** | Is this an investigation of a licensed facility? (If No, skip to Section E) | | | |
| **61** | If immediate protection was needed for the child(ren), was the Youth Court and the licensing agency contacted and protective measures taken? *(Select N/A if no immediate protection was needed for the child/ren)* | | | |
| **62** | If the allegation was felony child abuse, was law enforcement notified immediately? | | | |
| **63** | Did the investigator confer with the facility Director or staff in charge upon arrival at the facility to inform them of the report? | | | |
| | | **Yes** | **No** | **N/A** |
| **64** | Was the child(ren) referred to a physician or other professional as appropriate? | | | |
| **64a.** | Explain your answer: | | | |
| | | **All** | **Some** | **None** |
| **65** | Were all appropriate facility personnel, including the perpetrator (if approved by law enforcement) interviewed? | | | |
| **65a.** | If "Some" or "None", identify who was not interviewed: | | | |

# Safety Review Unit
# Maltreatment in Care Review Instrument

| | | Yes | No | N/A |
|---|---|---|---|---|
| 66 | Did investigator view the physical premises of the incident? | | | |
| 67 | Did the investigator review documents related to the incident? | | | |
| 68 | Did the investigator review the facility's policies and procedures on behavior management pertinent to the incident if the report involves physical abuse as a result of behavior management technique? | | | |
| 69 | Was the facility closed? | | | |
| 70 | If there was not a substantiation of ANE, was there a policy violation? | | | |
| 71 | If “Yes” to #70, what measures were taken to address the policy violation? | | | |

| | | Yes | No | N/A |
|---|---|---|---|---|
| 72 | Were the measures to address the policy violation appropriate based on the findings of the investigation? | | | |
| 73 | If “No” or “N/A” to #72, please explain | | | |
| **E** | **Summary to determine if a full and systematic evaluation was conducted of the factors that may place the child/ren in custody at risk.** | | | |

**Provide a summary of the findings of the investigation conducted:**

# Safety Review Unit
# Maltreatment in Care Review Instrument

| | | Yes | No | |
|---|---|---|---|---|
| **74** | Did the Investigator identify any present or impending danger to the child(ren)? | | | |
| **75** | If "Yes" to #74, please describe | | | |
| | | **Yes** | **No** | |
| **76** | Does **this review** of the investigation indicate any present or impending dangers that **were not** identified by the investigator? | | | |
| **77** | If "Yes" to #76, please describe | | | |
| | | **Yes** | **No** | |
| **78** | Did the Investigator identify any risk concerns for the child(ren) | | | |
| **79** | If "Yes" to #78, please describe | | | |
| | | **Yes** | **No** | |
| **80** | Does **this review** of the investigation indicate any present or impending risk factors that **were not** identified by the investigator? | | | |
| **81** | If "Yes" to #80, please describe | | | |
| | | **Yes** | **No** | |
| **82** | Does this review indicate risk or safety concerns that **were not** addressed in the investigation for any other children in the placement? | | | |

# Safety Review Unit
# Maltreatment in Care Review Instrument

| | | | | |
|---|---|---|---|---|
| 83 | If "Yes" to #82, please describe | | | |
| | | **Yes** | **No** | **N/A** |
| 84 | Were any services put in place to mitigate any safety or risk concerns? | | | |
| 85 | Please elaborate on your answer to #84: | | | |
| | | **Yes** | **No** | **N/A** |
| 86 | If remedial or corrective actions were necessary on the part of the placement, was the plan sufficient to address concerns? | | | |
| 87 | If "Yes" to #86, please elaborate on your answer | | | |
| | | **Yes** | **No** | |
| 88 | Based on the information presented throughout the investigation, are there indications that additional action is needed to ensure the safety of children in this placement, i.e., the child(ren) named in the report and any other children in the placement? | | | |

# Safety Review Unit
# Maltreatment in Care Review Instrument

| | | | |
|---|---|---|---|
| 89 | If "Yes" to #88, please explain your answer | | |
| **F** | **FINDINGS OF REVIEW OF INVESTIGATION** | | |
| 90 | Were concerns for corrective action by the field identified by the Reviewer? | **Yes** | **No** |
| | | | |
| 91 | If "Yes" to #90, describe areas of concern that were identified for corrective action by the field in the section below. | | |
| **SAFETY RELATED FINDINGS FROM REVIEW OF INVESTIGATION** | | | |
| | | | |

# Safety Review Unit
# Maltreatment in Care Review Instrument

| PRACTICE RELATED FINDINGS FROM REVIEW OF INVESTIGATION | | |
|---|---|---|
| | | |
| 92 | Date review of investigation was forwarded to SRU Supervisor for approval (mm/dd/yyyy) | |
| 93 | Date received by SRU Supervisor (mm/dd/yyyy) | |
| 94 | Date returned to MIC Reviewer by SRU Supervisor for corrections/more information (if applicable) | |
| 95 | Specify additional information/corrections needed by MIC Reviewer: | |
| 96 | Date 2nd submission received by SRU Supervisor (if applicable) | |

# Safety Review Unit
# Maltreatment in Care Review Instrument

| **G** | **Action Taken by Safety Review Unit (To be completed by the Safety Review Unit Supervisor)** | | | |
|---|---|---|---|---|
| **i** | Date MIC Review approved by SRU Supervisor | | | |
| | | **Yes** | **No** | **N/A** |
| **ii** | If a concern was identified, was it forwarded to the county/region for corrective action? | | | |
| **iii** | If "Yes", date referred for corrective action (mm/dd/yyyy): | | | |
| **iv** | Corrective Action Heat Ticket (Tracking) Number (if applicable) | | | |
| **v** | Who was the matter referred to for corrective action? (RD/designee name, Region) | **Regional Director/Designee:** | | |
| | | **Region:** | | |

**Ex. 51C**

**Grace M. Lopes**

**Attachments:** 201401130800.pdf

**From:** Robert Hamrick [mailto:Robert.Hamrick@mdhs.ms.gov]
**Sent:** Monday, January 20, 2014 11:13 AM
**To:** Grace M. Lopes; Mia Caras
**Subject:** Fw: SRU Corrective Actions

########################################################################################################

*Thank you for your attention to this matter. The "Read/Receipt" I get will serve as an acknowledgment that you have read and understand this matter unless you notify me otherwise.*

########################################################################################################

Robert A. Hamrick, Director/Division of Evaluation & Monitoring
Mississippi Division of Family & Children Services
Office of Continuous Quality Improvement
P.O. Box 352
750 North State Street / Room 633
Jackson, Ms 39205-0352
601-383-6559 (state cell)*
601-359-4018 (state office)
601-635-4014 (fax)
robert.hamrick@mdhs.ms.gov
**Primary number*

Child Abuse and Neglect Hotline 1-800-222-8000
Child Abuse/Neglect Website: https://www.msabusehotline.mdhs.ms.gov/
Adoption Information 1-800-821-9157
Foster Care Information 1-800-345-6347

##############################################################################################################

**Confidentiality Statement:** *The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential, proprietary, and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from all computers.*

 **Please consider the environment before printing this e-mail**

# Ex. 52

### 2. Resource Parent Factors to Consider

Among the factors to be considered in assessing a prospective Resource Family's suitability to care for a particular child are the Family's ability to:

- Accept and help the child understand his/her permanent plan;
- Work with the child's parents or caretakers towards the permanent plan;
- Form relationships with the specific child;
- Help the child integrate into the family;
- Accept the child's background and help the child cope with her or his past;
- Accept the behavior and personality of the specific child;
- Validate the child's cultural, racial and ethnic background; and
- Meet the child's particular educational, developmental or psychological needs.

## G. Types of Placement Resources

### 1. Relative Resource Home

A Relative Resource Home is a Resource Home in which the Resource Parents are relative caretakers to the foster child. (see definition of relative caretaker)

#### a) Admission Criteria

The Relative Resource Parents are related (within the fifth degree of kinship to the child) to the foster child. Relative placements are given priority over unrelated family settings. Support is provided to the child to maintain connections with relatives while in placement through visiting and/or other forms of contact.

#### b) Admission Procedure

- Child must be in custody of DFCS
- Child must be related to the relative (within the fifth degree of kinship)
- Contact the COR ASWS for approval
- Contact the COR/County of Supervisor (COS) Resource ASWS regarding expedited licensure options.

- Contact the COR Resource Specialist regarding placement and assistance.
- Provide identifying Information to the Relative Resource by using the "Foster Child Information Form". (see Appendix F)

### c) Emergency Placement Safety Standards

The Safety Checklist (see Section B, Appendix F) shall be completed by the Worker when the Worker visits the home prior to any placement to determine the appropriateness of the relative placement.

After completing the background check and Safety Checklist, a face-to-face contact by the children's Worker must be made within 24 hours of placement to assure the child's continued safety within the placement. The narrative shall be documented in MACWIS within 5 working days. (see Appendix G)

### d) Expedited Resource Licensure

In order for a child to be placed with a relative, on an emergency basis, an expedited home study must be completed within thirty (30) calendar days of the child's placement into the home.

After obtaining the approval of the ASWS for the emergency relative placement, the Worker must contact the Youth Court Judge and request a written order for DFCS' plan for relative placement.

All foster care settings, including relative placements, shall be screened prior to the initial placement of foster children to ensure that children receive safe, sufficient, and appropriate care. Additional screens shall be completed at least once annually thereafter and within two weeks of a reported change in the residents of a resource home. Screens shall include criminal and child welfare background checks of all household members who are at least fourteen (14) years old. No foster child shall be placed in a home prior to DFCS receipt of the background check results.

DFCS shall maintain an expedited process for licensing screened relative caregivers and court ordered non-relative placements to enable a child to be placed quickly with relatives/court ordered non-relatives upon entering foster care. The licensing process for relatives shall take place in two steps:

1. an emergency process that enables a child to be placed with relatives as soon as the child enters placement, following an initial screen of the relative's home, and
2. a full licensing process, to be completed no later than 90 calendar days after the child has entered placement.

DFCS may waive non-safety licensing requirements for relative foster placements in individual cases, in accordance with federal regulations. All relative placements approved for expedited placement shall undergo the full licensing procedure within 90 calendar days of the child's placement in the home.

Expedited relative and court ordered "non-relative" placements shall be entered as Resource Inquiries and assigned for home study completion.

The home study must be completed in MACWIS within thirty (30) calendar days of being assigned to a Resource Specialist.

Any barriers to licensure and all efforts to get the home licensed must be documented. If the home remains unlicensed after forty-five (45) calendar days of the child's placement in the home and it appears that the home will not become licensed within ninety (90) calendar days of the child's placement, the assigned Resource Specialist shall staff the case with his/her Resource Supervisor, the COR Worker, the COR Supervisor and the COS Worker to discuss barriers, solutions, other placement options, and to agree on a recommendation to the court regarding placement.

The COR Worker shall notify the court of DFCS' recommendation. This must be done even if it is a court-ordered placement. The COR Worker shall notify the Resource Specialist or Resource Supervisor of the court's decision.

All of this shall be documented appropriately in both the child's file and the resource file. (For additional information see Section F, Expedited Resource Licensure)

### e) Waivers

Federal guidelines Sec. 471(a)(10) *provides for the establishment or designation of a State authority or authorities which shall be responsible for establishing and maintaining standards for foster family homes and child care institutions which are reasonably in accord with recommended standards of national organizations concerned with standards for such institutions or homes, including standards related to admission policies, safety, sanitation, and protection of civil rights, provides that the standards so established shall be applied by the State to any foster family home or child care institution receiving funds under this part or part B of this title, and provides that a waiver of any such standard may be made only on a case-by-case basis for non-safety standards (as determined by the State) in relative foster family homes for specific children in care*.

**Ex. 53**

**Grace M. Lopes**

---

**From:** Mark Jordan [mjordan@sparb.org]
**Sent:** Tuesday, February 25, 2014 5:17 PM
**To:** krachal@bakerdonelson.com
**Cc:** 'Grace M. Lopes'; dgriffin@csfmail.org; evandusen@csfmail.org; jdavis@ChildrensRights.Org; 'Mia Caras'
**Subject:** Question Regarding Report SLS51D (MWLS51D/S)
**Attachments:** rept spec - sls51001.pdf

Kenya:

I write with a question regarding the data reports associated with Report SLS51D, which pertains to children with more than one emergency or temporary placement within one episode of foster care.

The relevant Period 3 requirement states that by the end of Period 3, "No more than 180 children shall be placed in more than one emergency or temporary facility within one episode of foster care, unless an immediate placement move is necessary to protect the safety of the child or of others as certified in writing by the Regional Director." (*See* MSA II.B.2.o., page 17 and II.B.2.p.7. page 18)

The specification associated with this report, attached to this e-mail, defines the report population as "[a]ll children in custody during the reporting period who were placed in an emergency or temporary facility 2 or more times during any custody episodes during the reporting period." Our understanding of this language is that the report should analyze this requirement against all children who had at least one custody episode of any duration the reporting period (note, reporting periods are one-month periods for the purposes of this report). Further, our understanding of the specification is that the report should reflect all children who were in custody at some point during the reporting month who were placed in more than one emergency or temporary facility *at any time* during the custody episode in the reporting period, whether or not any of the placements occurred during the reporting period.

When we review the data in the monthly reports, it appears that the reports may not conform to the specification. It appears to us that the report applies two selection criteria:

1) Children with a custody episode during the reporting period who had more than one emergency or temporary placement during the custody episode that occurred during the reporting period; and
2) At least one of the emergency or temporary placements occurred during the reporting period.

This second criterion would presumably exclude from the analysis some number of children who should be included in the analysis.

Can you confirm whether our understanding of these data reports are accurate?

Many thanks.

Mark

Mark Jordan
1220 19th St, NW, Suite 500
Washington, DC, 20036
(202) 232-8311 (ph)
(202) 232-2052 (fax)

# SLS51D

*No child shall be placed in more than one emergency or temporary facility within one episode of foster care, unless an immediate placement move is necessary to protect the safety of the child or of others as certified in writing by the Regional Director. MSA II.B.2.o.*

- Report Timeframe
  - One Month

- Report Population
  - All children in custody during the reporting period who were placed in an emergency or temporary facility 2 or more times during any custody episodes during the reporting period
    - 9330 – Emergency Shelter
    - 9315 – Court Ordered Non-Licensed Shelter
  - Special Notes: Include
    - Children who were in their second or greater temporary facility/shelter placement for any part of the reporting period
    - Report regardless of whether they are still in the facility/shelter
    - Report regardless of whether the custody is open or closed as long as it was open for some portion of the month
    - If multiple custodies for the reporting period show any custody episodes
  - RD Approval will be indicated in Case>Placement>Highlight Placement in 'History Tab'>Approval Tab
    - RD must select one or both of the exceptions as to why the placement is necessary, click the 'approval' radial, and enter text for the 'basis for decision'. The two exceptions are (see below):
      - The move is necessary to protect the safety and well being of others
      - The move is necessary to protect the safety and well being of the child

# SLS51D

- Detail report – SLS51D
  - Title – "SLS51D-*Children in Custody with 2 or More Emergency or Temporary Placements*"
  - Report Header show Region and County, with breaks between counties
  - Show ASWS and Worker above the children detail lines from Assign Transfer Tab
  - Child Name/ID
  - Date of Birth
  - Custody Start Date
  - Custody End Date
  - Facility Names
  - Placement Start Dates
  - Placement End Date(s)
  - Total Placements
  - RD Approval – "Y" if Yes or "N" for No, for placement[1]
  - Reason-Safety of Others-"Y" if Yes or "N" for No, for most current placement RD approval
  - Reason-Safety of Child-"Y" if Yes or "N" for No, for most current placement RD approval
  - County Summary –
    - Count of Children in Custody with 2 or More Emergency or Temporary Placements
    - Count with supporting Percentage of Children in Custody with 2 or More Emergency or Temporary Placements with RD Approval

---

[1] Please note that the RD approval function was added to the Placement Module in MACWIS in 2010, and therefore all shelter placement prior to that date would not have the ability to report RD approval. These placements will be marked with an * for RD approval

- Number/% of Shelter Placements with RD Approval
  - Count and Percent with Reason Safety of Others
  - Count and Percent with Reason Safety of Child
  - Count and Percent with Both Reasons
- Number/% of Shelter Placements without RD Approval
  - Of those, Number/% of Shelter Placements prior to 2010

- Summary reports – Regional and Statewide
  - Count of Children in Custody with 2 or More Emergency or Temporary Placements
  - Count with supporting Percentage of Children in Custody with 2 or More Emergency or Temporary Placements with RD Approval
  - Number/% of Shelter Placements with RD Approval
    - Count and Percent with Reason Safety of Others
    - Count and Percent with Reason Safety of Child
    - Count and Percent with Both Reasons
  - Number/% of Shelter Placements without RD Approval
    - Of those, Number/% of Shelter Placements prior to 2010

# SLS51D

Region X
County X

SLS51D-*Children in Custody with 2 or More Emergency or Temporary Placements*
July 1, 2013-July 31, 2013

| ASWS | Worker | Child Name/ID | Age | Custody Start | Custody End | Facility Names | Plct Start | Plct End | Total Plcts | RD Approval | Reason-Safety of Others | Reason-Safety of Child |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Supervisor A | Worker A | Child A/ 123 | 12 | 1/1/2012 | | Sun Shelter | 7/25/2013 | | 3 | Y | N | Y |
| | | | | | | Rain Shelter | 3/3/2013 | 3/5/2013 | | Y | Y | N |
| | | | | | | Wind Shelter | 1/10/2012 | 1/12/2012 | | Y | Y | Y |
| | | Child B/ 234 | 6 | 9/4/2006 | | Wind Shelter | 7/1/2013 | 7/5/2013 | 2 | Y | Y | Y |
| | | | | | | Hail Shelter | 9/4/2006 | 9/10/2006 | | * | | |
| | | Child C/ 345 | 10 | 12/12/2012 | 7/2/2013 | Snow Shelter | 6/1/2013 | 7/1/2013 | 2 | N | N | N |
| | | | | | | Sun Shelter | 12/12/2012 | 12/14/2012 | | Y | N | Y |
| | | Child D/ 456 | 14 | 8/8/2008 | | Rain Shelter | 7/30/2013 | | 3 | Y | Y | N |
| | | | | | | Hail Shelter | 6/5/2013 | 6/10/2013 | | Y | Y | Y |
| | | | | | | Rain Shelter | 9/9/2008 | 9/12/2008 | | * | | |
| | | Child E/ 567 | 17 | 6/15/2013 | | Wind Shelter | 7/14/2013 | 7/16/2013 | 2 | Y | N | Y |
| | | | | | | Sun Shelter | 6/15/2013 | 6/25/2013 | | Y | N | Y |
| | | Child F/ 678 | 15 | 4/4/2013 | | Snow Shelter | 7/1/2013 | | 2 | Y | Y | N |
| | | | | | | Sun Shelter | 5/1/2013 | 6/30/2013 | | Y | N | Y |

| **County X** | # | % |
|---|---|---|
| Children in Custody with 2 or More Emergency/Temporary Placements | 6 | |
| Children in Custody with 2 or More Emergency/Temporary Placements with RD Approval | 5 | 83.3% |
| Number of Shelter Placements with shelter Placements with RD Approval | 11 | 78.6% |
| Reason-Safety of Others | 3 | 27.3% |
| Reason-Safety of Child | 5 | 45.4% |
| Both Reasons | 3 | 27.3% |
| Number of Shelter Placements without RD Approval | 1 | 7.1% |
| Of those, Number of Shelter Placements prior to 2010 | 2 | 14.3% |

DHS
361561

**Ex. 54**

- Academic Functioning: Child's level of scholastic achievement in each grade. Has special education ever been recommended? If so, has it been provided? What is the reason for special education?
- Current School Placement: Name of child's school, grade, teacher. Is a school social worker involved with child? Child's academic interests, child's most recent report card grades.
- Relationships: Significant adults in child's life, any adults whom the child considers as a "psychological parent"? How does child relate to authority figures, such as teachers, counselors, therapists, etc.?
- Emotional Functioning: What are child's relationships with adults and peers? Child's existing attachments, does child play appropriately with children of the same age? Does the child act out behaviorally? What is the acting out behavior? Is there a history of lying, stealing, fire setting or any destructive behaviors? If so, what has been done to address these behaviors? Has the child been in therapy? If so, when and where? Who is the therapist, and what are the findings and recommendations? What is child's level of emotional functioning?

In instances in which it is impossible to meet with one or both parents, the assessment process will proceed as described above, notwithstanding the parent(s) absence.

When the whereabouts of one or both parent(s) is unknown, a diligent search shall commence immediately. (see Section D, Diligent Search)

## B. Consideration for Child during Placement Efforts

While locating the most appropriate placement for a child or sibling group may be difficult, the child/ren must receive full consideration while the Worker attempts to locate placement.

When children are taken to a DFCS office setting or another non-residential facility that provides intake functions, no child shall spend more than 12 hours at a time in such offices.

The child should be placed in the least restrictive setting that meets his/her individual needs, as determined by a review of all intake, screening, assessment and prior placement information available at the time of placement.

Section 475(5)(A) [42 U.S.C.675] …least restrictive (most family-like) and most appropriate setting available and in close proximity to the home of the parent(s), when the case plan goal is reunification and a discussion of how the placement is consistent with the best interests and special needs of the child.

# Ex. 55A

Request for Medicaid Cards for Title IV-E Foster Children

To obtain a Mississippi Medicaid card for Title IV-E foster children from other states living in Mississippi, the following procedure is used:

1. The child's foster care Title IV-E status information will be provided from the state of origin with the request for supervision through the Interstate Compact on the Placement of Children. This information will include the child's social security number and the child's date of birth.
2. The licensure of the home will be completed by the Regional Resource Unit. The county Worker will complete the eligibility screens in MACWIS.
3. The IV-E/Child Welfare Services (CWS) Eligibility Determination Unit will enter Title IV-E Eligibility information into MACWIS.

All requests to other states for placement and supervision of foster children through the ICPC should indicate whether the child is Title IV-E eligible. For Title IV-E eligible children the following information is needed:

1. Child's name, race, sex, date of birth and social security number; and
2. A statement as to whether the child has any third-party resources such as Champus, etc., which makes medical care available to the child.

## VII. Placement Activities

### A. Pre- Placement Activities

#### 1. Information to be shared with Resource Parents/Child Caring Facility/Child Placing Agency

Prior to placement, the Worker will discuss with the Resource Parents or the child caring agency staff when the child is being considered for placement. The Resource Parents or child caring agency staff will be given enough information about the child to enable them to make a decision as to whether or not they can accept the child.

When a child is placed in a Licensed Resource/Relative/Group Home/Facility, or Court Ordered Placement, the Worker shall provide foster parents or facility staff with the foster child's currently available medical, dental health, educational, and psychological information, including a copy of the child's Medicaid card. DFCS shall gather and provide to resource parents or facility staff all additional current medical, dental health, educational, and psychological

information available from the child's service providers within fifteen (15) calendar days of placement.

An original and copy of DFCS, "Foster Child Information Form," will be completed before the child is placed in the home or facility. The original and copy will be given to the Licensed Resource/Relative/Group Home/ Facility personnel or court ordered placement resource to sign. A copy of the signed form will be given to the provider and the original will be filed in the case record.

The information to be shared includes:

- Child's name and date of birth;
- Current medical, psychological, and dental health including the following:
  - Physical disabilities,
  - Immunizations,
  - Existing illnesses including but not limited to HIV/AIDS,
  - Medications,
  - Dental status,
  - Date of Early Periodic Screening, Diagnostic and Treatment (EPSDT) screening appointment and/or referral appointments,
  - Special care needs.
- Education (grade level, past grades, attendance patterns, tutoring needs, educational expectations, achievements)
  - School-aged child must attend school even while in temporary shelter care;
- Relationship with family (parents, siblings, extended family or significant others);
- Reason for placement in foster care (neglect, abuse, etc.). Worker needs to be specific when sharing information with Resource Parents. For example, the child does not relate well to men due to sexual abuse; or child may hoard food or search for food in garbage cans due to hunger;
- Reasons for changes in placement;
- Custody Case Plan (services to be provided to child, permanent plan);
- Visitation plan with biological parents;

- Any other information regarding the child which may be helpful to the Resource parents or child caring facility staff in determining the appropriateness of the child for the home or facility and/or if the home or facility can meet the child's needs.

### 2. Pre-Placement Planning with Licensed Child Caring Facilities and Child Placing Agencies

Because of the various types of licensed residential child caring agencies and services offered by each, it is necessary for the Worker or ASWS to determine, prior to placement, if the services, program, and policies of the child caring agency will serve the best interest and needs of the child.

The Worker will discuss with the facility staff DFCS' policies, practices and expectations of the facility in meeting the child's needs. If the facility is not willing to comply with policy regarding children in DFCS custody, placement of a child in that facility is not appropriate and another resource must be considered. Upon the placement of the child the facility becomes the Agency of Service.

The following is a non-conclusive list which the Worker and licensed child caring agency staff must discuss, and have a clear understanding of, prior to placement of child:

- Residential Services Application;
- Admission criteria (required material and forms, the agency's internal acceptance procedure, and the method of assigning the child to a group or cottage);
- Case planning responsibility;
- Family Serviced Plan (FSP) which includes the child's permanency plan. It is the responsibility (of the county Worker and Agency of Service staff to communicate information affecting the plan);
- Monthly staffing requirement with Agency of Service staff regarding the child's progress/lack of progress, continuing appropriateness of placement, etc.;
- DFCS requirements for quarterly (monthly, if contractual) progress reports from the Agency of Service, unless a specific arrangement has been made with an individual DFCS Worker. Reports shall include individualized information such as the child's progress, special needs or problems, overall adjustment, services being or to be provided, etc.;
- Provisions for Worker to have two face-to-face contacts with the child monthly (*weekly contact shall be required the first month of placement.* If necessary the COS should be asked to make these contacts and documentation of contacts filed in child's case record;

# Ex. 55B

# FOSTER CARE

## Appendix F

Form DFCS 515
Revised 02/2011

**Foster Child Information**
***Information provided in this document is confidential.***

**Child's Name**:____________________**DOB:**___________________________
**(Nickname**)______________________________________________________

Date placed in Licensed Resource/Relative/Group Home/Facility _________________

**Name of Home/Facility**____________________________________________
The following information is being provided at the time of placement and any other relevant information not available at this time will be provided within fifteen (15) calendar days of placement.

Birth Certificate (Copy)
Social Security Card (Copy)
Insurance/Medicaid Card (Copy)
School Records (Copy)
Immunization Record (Copy)
**PARENT INFORMATION:**

**Mother:**______________________________
**Father**_______________________________

**PLACEMENT REASON OR ALLEGATION**:
______________________________________________________________________________
______________________________________________________________________________
____________________________________________________________

- Behavioral Issues:
- ___________________________________________________________________________
  ________________________________________________________________
- Medical or Mental Health Diagnosis:
  ___________________________________________________________________________
  __________________________________________________________
- Medications:______Yes ________No
- If yes, please specify the name, dosage and frequency:__________________________________________________________________
  __________________________________________________________
- Have all medications been provided to caregiver?________Yes ______No

# FOSTER CARE

- Does the child have any known allergies (drugs, food, other)? _____Yes ____No

  If so List:_____________________________________________________

- Scheduled appointments and location of each. If the caregiver is needed to provide transportation for appointments, please make arrangements with them now.___________________________________________________________________________
  _________________________________________________________________
- Child's favorite Foods:____________________________________________________
- ____________________________________________________________________
- Special Diet (i.e.; formula, food etc.)Was it provided?_______________________________
- Comfort item (teddy, blanket, cup)? ______________________________________

- If child requires car seat or baby bed, was that provided? _________________________

- Visitation Plan with Parent:___________________________________________________________

- Visitation Plan with Sibling(s):_____________________________________________________

**The following information was given to _____________________________ at the time of placement for __________________________________________ in the _________________________________________________________home.**

- **Worker Contact Information (office and emergency).**

**COR Worker (COR) _________________________________**
**COS Worker (COS) ______________________________________**

**Signed:____________________________________ , Date______________________**
**COR/COS Worker**
**Signed:____________________________________, Date:_____________________**
**Licensed Resource Parent/Relative/ Group Home/ Facility Representative**

**If unable to contact any of the above in case of an emergency, please call the Mississippi Centralized Intake staff at 1-800-222-8000 and they will assist you in locating a worker or local law enforcement at 911.**

**Ex. 56**

Mississippi Department of Human Services
Division of Family and Children's Services
Permanency Planning and Placement Unit/Congregate Care

**Changes to the Therapeutic Placement Process**

The Mississippi Department of Human Services/Division of Family and Children's Services has prepared a plan to address changes to the therapeutic placement process as required by the *Olivia Y. Modified Mississippi Settlement Agreement and Reform Plan.*

*II. Foster Care Services Assessment*

*D. Defendants shall develop and begin implementing a plan with specific action steps and timeframes to address changes in the State Office's therapeutic placement process identified as necessary to ensure the most appropriate placement for children in need of therapeutic placement.*

**Introduction**

A therapeutic placement may be a resource home or group home that is both licensed by the Mississippi Department of Human Services and certified by the Mississippi Department of Mental Health to care for children with severe behavioral, emotional, psychological or physical impairments. Documentation required for therapeutic placement includes a current psychological evaluation or medical records with a recommendation for therapeutic placement and a Residential Services Application. All therapeutic placements require state office approval from the Permanency Planning and Placement Unit. Residential Service Applications are received in Congregate Care, a subdivision of the Permanency Planning and Placement Unit, reviewed by placement staff and distributed to appropriate private agencies for consideration of placement. The therapeutic placement process is outlined in Section D of the DFCS Policy Manual.

Two staff within Congregate Care are assigned to placement. Placement staff receive an average of 45 referrals for therapeutic placement each month. Residential Service Applications are transmitted via fax or e-mail. Applications are generally reviewed and referred on the day received. Admissions staff from the private agencies will generally notify placement staff if the referral is accepted within 24 hours of receipt but will work with the county worker directly to coordinate placement.

As of May 31, 2013, there were approximately 347 foster children in Mississippi in a therapeutic placement. There are currently six private agencies licensed and certified to provide child placing services. These agencies recruit and license private therapeutic resource homes and provide a total of 270 therapeutic foster homes across the state. There are nine private agencies licensed and certified to operate therapeutic group homes. These nine agencies operate a total of 23 therapeutic group homes across the state. All therapeutic placements are provided by private agencies.

The *Mississippi Foster Care Services Assessment: Final Report*, released in October 2009, found that "the current process for securing a therapeutic placement is time-consuming, ineffective, and does not ensure appropriateness of service (p.109)." The report goes on to recommend that responsibility for therapeutic placement be removed from state office and given to county workers and supervisors (p.110). However, since that time the Department has seen improvements in state office infrastructure, staffing and oversight as well as such improvements as the release of the DFCS Policy Manual, the rollout of the Practice Model across the state, and the statewide use of the automated Comprehensive Family Assessment and the Family Service Plan. All of these improvements support the identification of a child's need for therapeutic placement as well as access to needed services and placement. The Department, through its Congregate Care Unit, has also seen an improved working relationship with the Mississippi Department of Mental Health in the oversight and monitoring of therapeutic placement providers.

## Methodology

On November 27, 2012, the Congregate Care Director and Licensure Specialists met with representatives of the private agencies licensed by the Department to review the terms of the *Olivia Y. Modified Settlement Agreement* that directly impacted the work of the private agencies. Representatives of 25 private agencies attended the meeting as well as representatives from 3 other state agencies. A total of 57 people attended.

On January 02, 2013, the thirteen regional directors were polled via e-mail as to their preference for how therapeutic placements should be handled. This question was also presented for discussion at the January 24, 2013 DFCS Senior Management Meeting. The consensus was that in light of recent improvements to the therapeutic placement process and other system reforms the therapeutic placement process should remain in State Office.

The Center for the Support of Families provided consultation throughout the planning process. A CSF consultant provided guidance and direction to staff from the Permanency Planning and Placement Unit in the writing and development of this plan and participated in workgroup meetings. A workgroup was organized that consisted of state office staff, two county supervisors, and representatives from four private agencies, the Department of Mental Health, and the Division of Medicaid. The workgroup met on three occasions and surveys were conducted with representatives from five other private agencies.

Workgroup meetings and work outside of workgroup meetings focused on:
- strengths and weaknesses of the current therapeutic placement process,
- a review of tools and documents used in the therapeutic placement process,
- identifying the expectations and needs of private agencies,
- developing strategies for improvement.

A list of workgroup members, meeting agendas, notes, and provider surveys are included as an attachment to this plan.

**Problem Statement**

The workgroup identified the following needs to be addressed by strengthening the therapeutic placement process:

- Need for thorough and comprehensive information about the children to understand their individual needs and those of their families in order to select therapeutic placements whose services best match these needs.

- Need for greater coordination and collaboration between the Department and private agencies to ensure that referrals and placement are handled expeditiously.

- Need for clarity from private agencies regarding programmatic descriptions of the therapeutic approaches, services, settings, and targeted length of stay for children referred for placement.

**Strategies and Action Steps to Address Identified Needs**

A. Increase efforts and establish mechanisms and processes to collaborate and communicate with private agencies.on a regular basis.

1. Re-instate regular meetings between placement staff and private agencies. These meetings will occur at least quarterly. The Resource Development Unit will be notified as ongoing needs are identified.
2. Develop and implement a schedule for placement staff to visit private agencies at least annually.
3. Develop and implement weekly status reports for private agencies to submit to placement staff that provide current census, number of admissions, number of discharges, and number of vacant beds.
4. A tracking system will be developed and implemented to monitor the timeliness of referrals and placement decisions. Require private agencies to report to placement staff when a referral is accepted. Placement staff will notify other agencies when a referral is accepted by another agency.

B. Increase the amount and accuracy of information about the child available to state office placement staff and private agency staff at the time of placement.

1. Provide training for county and regional staff on the therapeutic placement process. This might be a simple power point presentation that can be posted on the DFCS Connection web site for supervisors to use as in-service training.

2. Establish a process for handling violations of the placement process. For example, when a child is placed in a therapeutic resource home without the knowledge or approval of placement staff and/or the private agency, notification will be sent to the worker and supervisor. The notice will be placed in the worker's file along with verification that the worker has reviewed the power point presentation on the DFCS Connection web site.
3. Revise the Residential Service Application (RSA) to create a more useful, user-friendly tool. For example, the RSA should include a copy of the Comprehensive Family Assessment, and workers should be able to complete and submit the RSA online.
4. Provide closer review of the RSA by placement staff prior to distribution to private agencies. Placement staff will randomly spot check certain fields, such as Date of Birth, to determine if the information is current and accurate.

C. Improve capacity for identifying the child's needs and selecting the most appropriate placement based on the type of therapeutic services offered, proximity of placement to county of origin, and ability to keep siblings together.

1. Provide training for placement staff and the staff of private agencies on how to read, understand, and interpret the information contained in the Psychological Evaluation and in the Comprehensive Family Assessment.
2. Develop a "matching check-list" for private agencies to complete and submit annually with licensure documents to help placement staff better match children based on the child's needs and agency services. This will also help the private agencies more clearly define the services provided and target population served.
3. Coordinate with Resource Development Unit to provide in-service training for placement staff on recognizing service needs based on information contained in RSA, such as education, medication and dosage, current treatments, diagnoses, etc.
4. Establish priority for making placement decisions in accordance with DFCS Policy: needs of the child and family, services offered, proximity of placement, and ability to keep siblings together.

**Evaluation and Monitoring**

Internal tracking will be put in place to address timeliness of referrals and placement decisions. The Congregate Care Director and placement staff will review timeliness data every two weeks to identify patterns and delays so that policy, practice and protocol can be adjusted as needed. Information regarding timeliness will be presented at the quarterly meetings between placement staff and private agencies. Additionally, the Continuous Quality Improvement Unit (CQI) as well as Regional Directors and county supervisors will provide evaluation and monitoring through the Foster Care Review process and periodic CQI reviews conducted throughout the state. Questions have been added to the

Foster Care Review instrument to address whether or not the placement is appropriate for the child and whether or not the placement is meeting the child's needs. These results will be recorded and reported on the PAD. Changes in the therapeutic process will also be supported by outcome reports now required of private agencies on contract with the Department. Congregate Care will hold quarterly staff meetings to review the plan and look at data to see how well it is working. The workgroup will be reconvened twice a year to evaluate the effectiveness of the plan and determine if revisions are necessary.

Mississippi Department of Human Services/Division of Family & Children's Services
Permanency Planning and Placement Unit/Congregate Care
Olivia Y. Modified Settlement Agreement and Reform Plan
Period 3

# Changes to the Therapeutic Process
# Work Plan

| Strategies & Action Steps | Date to be Accomplished | Primary Responsibility |
|---|---|---|
| A. Collaboration & Communication | | |
| A.1 Quarterly meetings with providers | Meetings will be scheduled by 08/30/13 with the first round of meetings to be completed by 12/30/13 | Congregate Care Director, Placement Staff |
| A.2 Placement staff to visit agencies | Site visits will be planned & discussed at the first quarterly visit. Site visits will begin in the 1st Quarter 2014 | Congregate Care Director, Placement Staff |
| A.3 Weekly status reports | Reporting format and protocol will be developed and implemented by 09/01/13 | Congregate Care Director, Placement Staff |
| A.4 Tracking system/timeliness | Tracking log will be developed and in use by 07/30/13 | Congregate Care Director, Placement Staff |
| B. Available Information | | |
| B.1 Training on therapeutic placement process | Develop plan for implementation & coordinate with Training Director by 09/30/13. Power point & training guide developed & released by end of 1st Quarter 2014 | Congregate Care Director, Placement Staff, Training Director |
| B.2 Process for handling violations | Developed and Implemented by 08/15/13 | Permanency Director, Congregate Care Director |
| B.3 Revise RSA | Revisions made by 08/30/13. Available in an electronic format by the end of 2nd Quarter 2014 | Congregate Care Director, Placement Staff, Private Agency representatives, MACWIS staff |
| B.4 Closer Review of RSA | Protocol developed and implemented by 07/30/13 | Congregate Care Director, Placement Staff |
| C. Improve Capacity | | |
| C.1 Training re: Psych Eval & CFA | Organize planning team, identify goals & objectives of training & prospective trainer by end of 1st Quarter 2014. Training will be held by the end 3rd Quarter 2014 | Congregate Care Director, Resource Development Staff, Private Agency Representatives |
| C.2 Develop "matching checklist" | Developed, trained & implemented by the end of 3rd Quarter 2014 | Congregate Care Director, Placement Staff, Licensure Specialists, Resource |

# Ex. 57

Mississippi Department of Human Services
Division of Family and Children Services
Resource Development Unit

**Physical, Dental, and Mental Health Services Plan**

The Resource Development Unit has prepared a plan per the requirements of the Period 3 Implementation Plan (Y3IP) of the Modified Settlement Agreement (MSA) which requires the following:

*F. Physical, Dental, and Mental Health*

*2. The physical, dental, and mental health program manager shall have developed a written plan for increasing the array of services available to foster children. (Period 3 Implementation Plan: II.F.2.)*

The requirements listed below are requirements agreed upon in the MSA to help ensure the wellbeing of each child upon entering and while in the foster care system. When a child is placed in the custody of Division of Family and Children Services (DFCS), DFCS must provide access for the child to the physical, dental, and mental health care services requirements included below. The goal of DFCS is to increase the services available to foster children throughout the state.

**Requirements (MSA §II.B.3.a-h)**

***3. Physical and Mental Health Care***

*a. Every child entering foster shall receive a health screening evaluation from a qualified medical practitioner within 72 hours after placement that is in accordance with the health screening recommended by the American Academy of Pediatrics.*

*b. Every child entering foster care shall receive a comprehensive health assessment within 30 days of the placement. The assessment shall be in accordance with the recommendations of the American Academy of Pediatrics, except that dental exams shall be governed by Section II.B.3.e of the Modified Settlement Agreement*

*c. Nothing in the above paragraphs shall prohibit the initial health screening evaluation and the comprehensive health assessment from being conducted in one clinical visit. However, in such instances, this combined visit shall be conducted within 72 hours of placement.*

*d. All children shall receive periodic medical examinations and all medically necessary follow-up services and treatment throughout the time they are in state custody, in accordance with the time periods recommended by the American Academy of Pediatrics.*

*e. Every child three years old and older shall receive a dental examination within 90 calendar days of foster care placement and every six months thereafter. Every foster child who reaches the age of three in care shall be provided with a dental examination within 90 calendar days of his/her third birthday and every six months thereafter. Every foster child shall receive all medically necessary dental services.*

*f. Every child four years old and older shall receive a mental health assessment by a qualified professional within 30 calendar days of foster care placement. Every foster child who reaches the age of four in care shall receive a mental health assessment within 30 calendar days of his/her fourth birthday. Every foster child shall receive recommended mental health services pursuant to his/her assessment.*

*g. Every foster child ages birth through three shall receive a developmental assessment by a qualified professional within 30 days of foster care placement and each child older than three shall be provided with a developmental assessment if there are documented factors that indicate such an assessment is warranted. All foster children shall be provided with needed follow-up developmental services*

*h. Nothing in the above paragraphs shall prohibit the developmental and the comprehensive health assessment from being conducted in one clinical visit.*

**Objectives (MSA §II.B.3.i.1-6)**

*i. By the end of Implementation Period Three:*

1) *At least 50% of children entering custody during the Period shall receive a health screening evaluation from qualified medical practitioner within 72 hours after placement that is in accordance with the health screening recommended by the American Academy of Pediatrics.*

2) *At least 50% of children entering custody during the Period shall receive a comprehensive health assessment consistent with Modified Settlement Agreement requirements within 30 calendar days of entering care.*

3) *At least 75% of children in custody during the Period shall receive periodic medical examinations and all medically necessary follow-up services and treatment consistent with Modified Settlement Agreement requirements.*

4) *At least 60% of children three years old and older entering custody during the Period or in care and turning three years old during the*

*Period shall receive a dental examination within 90 calendar days of foster care placement of their third birthday, respectively.*

5) *At least 60% of children in custody during the Period shall receive a dental examination every six months consistent with Modified Settlement Agreement requirements and all medically necessary dental services.*

6) *At least 50% of children four years old and older entering custody during the Period or in care and turning four years old during the Period shall receive a mental health assessment by a qualified professional within 30 calendar days of foster care placement or their fourth birthday, respectively.*

7) *At least 70% of children who received a mental health assessment during the Period shall receive all recommended mental health services pursuant to their assessment*

8) *At least 30% of children in custody ages birth through three during the Period, and older children if factors indicate it is warranted, shall receive a developmental assessment by a qualified professional within 30 calendar days of foster care placement and all needed developmental services*

**Improving the Array of Services to Foster Children:**

The following comprise the steps DFCS workers should take so that children entering foster care receive appropriate services. Each step includes guidelines for obtaining information necessary for matching the type of services the child needs.

1. **Obtain Medical Information on Foster Children.** Immediately upon placement into custody the social worker shall:
   - Obtain a medical history on the foster child from the birth parents as part of the Comprehensive Family Assessment (CFA) process;
   - Review all available data and medical history on the child;
   - Identify any physical health, mental health or developmental conditions requiring immediate attention;
   - Collect all medications the child is currently taking and assure they are provided to the current caretaker;
   - Consult with the medical provider about current medications to make sure they are all appropriate and are being administered as prescribed. Birth parents, resource parents, and age-appropriate youth should be part of this discussion whenever possible;
   - Share key medical information obtained from any screenings or assessments with the birth parents, resource parents, and age appropriate youth.

- Assure that as part of the youth's participation in independent living services, he/she obtains information on health insurance, Medicaid and medical care services.

2. **Initial Health Screening.** Within 72 hours of placement:
   - Every child shall receive a health screening evaluation from a qualified medical practitioner within 72 hours of placement to identify health conditions that should be considered in making placement decision.
     - Guidelines for this assessment can be viewed on the DFCS Connections Website document *Fostering Health-Health Care for Children and Adolescents in Foster Care*, 2nd Edition, American Academy of Pediatrics," Chapter 2, pages 16, 17 and 18.
     - The purpose of this screen is to identify health conditions that require prompt medical attention such as acute illnesses, chronic diseases, signs of abuse or neglect, signs of infection or communicable diseases, hygiene or nutritional problems, pregnancy, and significant developmental or mental health disturbances.
   - Birth parents and resource parents should be involved in all of the child's assessments and screenings. Participation in these appointments provides a good opportunity for shared parenting allowing the birth parent to remain involved in the regular care of their child assuming there are not safety concerns.

3. **Comprehensive Health Assessment.** Within 30 days of placement:
   - Every child entering foster care shall receive a comprehensive health assessment within 30 days of placement and yearly thereafter.
   - The assessment must be completed by a qualified pediatrician, nurse practitioner or other qualified health professional.
     - Guidelines for this comprehensive assessment may be found in the "Standards for Healthcare for Children and Adolescents in Foster Care" Chapter 1, page 4 of the *Fostering Health-Health Care for Children and Adolescents in Foster Care*, 2nd Edition, American Academy of Pediatrics, shown on the DFCS Connection Website. Components of this assessment may be viewed in Chapter 2, pages 22-26.
     - The purpose of this assessment is to review all available medical data and medical history about the child/adolescent; to identify medical conditions, to identify developmental and mental health conditions requiring immediate attention and to develop an individual treatment plan.
   - The initial health screening evaluation and the comprehensive health assessment may be conducted in one clinical visit. However, in such instances, this combined visit must be conducted within 72 hours of placement.

DHS
344537

4. **Initial Mental Health Intake Assessment.** Within 30 days of placement:
    - Every child 4 years old and older shall receive a mental health assessment by a qualified professional with expertise in the developmental, educational, and mental health conditions of children and adolescents within 30 calendar days of foster care placement. Every foster child who reaches age 4 in care shall receive a mental health assessment within 30 calendar days of his/her 4th birthday. Every foster child shall receive any mental health services that are recommended/referred in the assessment including, but not limited to, individual counseling, family counseling, group counseling, and medical treatment.
    - Psychological evaluations are not indicated initially unless ordered by the court and do not replace the 30-day mental health intake assessment.

5. **Initial and Ongoing Dental Examinations.** Within 90 days of placement:
    - Every child 3 years old and older shall receive a dental examination within 90 calendar days of foster care placement. Every foster child who reaches the age of 3 in care shall be provided with a dental examination within 90 calendar days of his/her 3rd birthday.
    - Children shall receive follow up dental services every 6 months after the initial dental examination as well as all medically necessary dental services.

6. **Periodic Ongoing Medical Examinations.** In accordance with the guidelines of the American Academy of Pediatrics:
    - More frequent preventive pediatric visits are recommended for the child/youth in foster care because of the multiple environmental and social issues that can adversely impact their health and development.
    - All children shall receive periodic medical examinations and all medically necessary follow up services and treatment throughout the time they are in state custody, in accordance with the time periods recommended by the American Academy of Pediatrics including monthly visits for infants up to 6 months and semi-annual visits for children age 2 years through adolescence. Preventive pediatric visits are recommended for the child and adolescent in foster care because of the multiple environmental and social issues that can adversely impact their health and development.
        - Components of the periodic preventative health care can be viewed on the DFCS Connections Website document *Fostering Health-Health Care for Children and Adolescents in Foster Care*, 2nd Edition, American Academy of Pediatrics, chapter 2, pages 30-32.
        - The purpose of these examinations is to promote overall wellness by fostering healthy growth and development, to identify significant medical, behavioral, emotional, developmental and school problems through periodic history, physical examination and screenings, to regularly assess for success of foster care placement, to regularly monitor for signs or symptoms of abuse or

neglect and to provide age-appropriate anticipatory guidance on a regular basis to children and adolescents in foster care and birth and resource parents.

7. **Therapeutic Services.** As needed:
   - Necessary therapeutic and rehabilitative services because of a diagnosis of significant medical, developmental, emotional or behavioral problems shall be provided to children in foster care.
   - These service needs should be identified as part of the CFA process, incorporated into the Family Service Plan and monitored as part of the case planning process.

8. **Information Gathered from Specialized Screenings and Assessment.** Prior to developing a case plan and when updating assessments and case plans:
   - Assess individual physical, dental, developmental and mental health needs of children and families.
   - Use information from medical, dental, and mental health screenings, assessments, and case file information to identify need for more in-depth evaluations.
   - Discuss need for specialized screenings or evaluations with parents and relevant family members and determine provider and/or locations that can best serve children.
   - Make prompt referrals for additional evaluations and needed services as soon as the need is identified. Involve the child's family in decisions about where to obtain the services.
   - Clarify with providers the precise need for the screening, evaluation or services and ensure provider has the information needed to proceed.
   - Identify and provide assistance that the family may need in participating in evaluations.
   - Obtain copies from service providers of the results of the evaluations, file copies in the child's case record, and include information in the child's medical passport.
   - Discuss assessment findings and recommendation with the family and seek their views and perspectives about the information and any conclusions that are drawn.
   - Provide copies of medical, dental, and mental health information on children in care to their resource parents, caretakers, and birth parents as appropriate.

9. **Ongoing Periodic Screenings and Assessments.** As needed:
   - In visits with family members, ask about changes in strengths or needs with regard to medical, dental and mental health issues of the child and identify any related emerging issues that need assessing.
   - Track and make referrals for ongoing periodic screenings and assessments, e.g. EPSDT, and follow up assessment activities for other screenings or evaluations, e.g., re-evaluation of mental health issues.

- Make prompt and clearly defined referrals for additional or updated specialized evaluations needed as circumstances change or new needs emerge.
- Obtain copies of new or updated evaluations and use them in revising plans, file them in the child's medical passport, and provide them to foster care providers.
- Make direct contact with providers of evaluations (with family's consent) to evaluate progress, identify needs, etc.
- Discuss progress needs with relevant family members and resource parents/caretakers.

**10. Ongoing Medical Care Upon The Child's Exit from Custody:**

- Review child's health conditions with birth parents and/or whoever is assuming responsibility for the child as identified during the child's stay in foster care. Be certain to include the older youth in all discussions regarding their medical/dental/mental health care.
- Identify ongoing conditions that will require intervention.
- Convey summary of child's health history to appropriate caregivers and primary physicians.
- Obtain needed supports and make referrals for services that can ensure any medical/dental/mental health issues the child may have are addressed when the case is closed.
- Provide documents to the age appropriate youth and/or caregiver.
- Provide each youth transitioning to independence with at least six months' advance notice of cessation of any health benefits.
- Inform all youth transitioning to independence that s/he is eligible for Medicaid through age twenty-one. It shall be the workers responsibility to assist the youth with completing the necessary documents to continue Medicaid services and to ensure s/he has received his/her Medicaid care prior to transitioning out of care.

**Increasing and Improving the Service Array Through Collaboration with Magnolia Health Plan**

Introduction to Magnolia

DFCS began a partnership with Magnolia Health Plan (Magnolia) on January 1, 2013, to provide services for the foster children of Mississippi. The Mississippi Division of Medicaid contracted with Magnolia to provide services for foster children age birth to 19 years of age. Children over 19 will receive Medicaid direct services. Children aging out of the foster care system will be given a copy of their electronic health record that has captured their physical, dental and mental health history.

The most critical part of this partnership is the increased number of providers DFCS and its foster children have access to, especially in areas of the state where adequate providers have consistently been problematic.

Magnolia is a subsidiary of Centene Corporation. While Centene is a national company with corporate offices in St. Louis, Missouri, its local approach to managing health plans enables it to provide accessible, high quality, culturally sensitive healthcare services to its members. This local approach allows Medicaid recipients, providers and state regulators direct access to the local health plan where its officers and staff are available and accountable.

For optimum organization and efficiency, Centene combines its local approach with centralized finance, information systems, claims processing and medical management support functions. Currently Centene provides foster care services for the states of Arizona, Arkansas, California, Florida, Georgia, Illinois, Indiana, Kansas, Massachusetts, Missouri, New Hampshire, Ohio, South Carolina, Texas, Washington, Kentucky, Louisiana, Wisconsin and Mississippi.

Centene is a multi-line health care enterprise operating primarily in two segments: Medicaid managed care and specialty services. The government services Medicaid managed care segment provides Medicaid and Medicaid-related health plan coverage to individuals through government subsidized programs, including Medicaid, the State Children's Health Insurance Program (SCHIP) and Supplemental Security Income (SSI).

The U.S. Children's Bureau estimates around 800,000 children are served in the foster care system each year. The Urban Institute found that States disburse approximately $10 billion annually in federal and state funds to meet the needs of children placed in foster care. Much of the foster care population has special behavioral and medical needs.

One study by the Urban Institute suggests that as many as 80 percent of children involved with child welfare agencies have conditions which require mental health services. Coordinating services and health information for this population has unique challenges. Keeping track of medical history including medical conditions, doctor visits, immunization, and prescription drug history is complicated by the temporary nature of care situations. Many states are turning to Medicaid managed care solutions to help coordinate the unique medical, behavioral and social services for these children.

On April 1, 2008, Centene began providing statewide managed care services to foster care children in the state of Texas under its subsidiary, Superior Health Plan. With commencement of operations, Centene became the first organization in the country to serve as a state's exclusive managed care company for the foster care population.

Children's Health Services

Magnolia is a managed care organization providing DFCS foster children under Mississippi Coordinated Access Network (MSCAN). Magnolia assists DFCS case workers in locating medical, dental and mental health services.

A list of Magnolia providers may be seen at **Attachment 1.** This attachment consists of two lists: one list is a breakdown by county and number of providers; the other list is a

breakdown by town and physician, dentist or mental health providers as well as pharmacy services. Magnolia has approximately 15,000 providers, in all 82 counties in Mississippi, and the surrounding states that are available to provide physical, mental health and dental services. This is a vast improvement in services for DFCS' foster children. Where there were previous gaps in services, mainly in the northern part of the state, those gaps have closed.

Being a part of Magnolia has greatly enhanced the service array for foster children in Mississippi. They are afforded the continuity of having a medical home, opportunities for more specialized services, case management services and follow-up care. Because of the number of Magnolia providers, Mississippi foster children will be able to be serviced within their communities. The foster children will have access to specialized services not only in Mississippi, but also with out-of-state providers who provide the best services possible to meet the children's particular needs.

Medical providers for Magnolia are supplied with and required to use the American Academy of Pediatrics Healthy Foster Care America form which includes a brief medical history as well as the initial health screening (within 72 hours of placement) and the comprehensive admission health assessment (within 30 days of placement). (**Attachment 2**). A Provider Reference Card (**Attachment 3**) is provided for the DFCS caseworkers, foster parents, parents or other caregivers and the general public listing most used services and how they can be accessed.

Magnolia has a dedicated Foster Care Case Management phone number (1-888-869-7747) for the convenience of DFCS workers and foster parents and/or other caregivers for foster children to answer questions and to assist in scheduling appointments or any other related needs.

Magnolia provides a CENTACCOUNT Card for foster children who meet certain healthy behaviors. The card is given to the foster parent for the child. The CENTACCOUNT rewards program lets the foster parent and/or child earn money onto his/her own CENTACCOUNT card simply by doing things that help the child stay healthy. The card is accepted at most local pharmacies and stores and is used only for health related items. However, the card can also be used to help pay for utilities such as gas and electricity. **Attachment 5** contains a chart that explains the amount that will be put into the account for each behavior the foster parent/child completes.

Case Management Services

In its Case Management Program, Magnolia has a specialized team of 6 foster care case managers and 4 additional staff for backup if needed. These staff include registered nurses and licensed clinical social workers.

The purpose of the Case Management Program is to define the goals and objectives of the program, the target case management population, and the methods and processes of identifying and assessing members, managing member care, and measuring the impact of

interventions. Magnolia provides foster children, under its Foster Care Case Management Program, specific plans of care that focus on organizing, securing, integrating, and modifying the resources necessary to maximize and support the wellness and autonomy of each child.

Centene and Magnolia adhere to the Case Management Society of America's definition of case management which is:

> *a collaborative process of assessment, planning, facilitation and advocacy for options and services to meet a foster child's health needs through communication and available resources to promote quality cost-effective outcomes.*

Centene and Magnolia provide both episodic and complex case management, based on member needs and the intensity of service required. Magnolia refers to its case management program as Case Management. Magnolia Case Management Program coordinates and monitors the care for members with special needs. Magnolia Case Management Program is designed to ensure the intensity of interventions provided corresponds to the member's level of need, as outlined below:

Levels of Case Management include:

- All members of Magnolia Health Plan are in Care Management Program.
- Low Level Case Management – appropriate for members with primarily psychosocial issues such as housing, financial, etc. with need for referrals to community resources or assistance with accessing health care services. Low level case management typically involves non-clinical activities performed by non-clinical staff; clinical staff may provide assistance if minor medical or behavioral health concerns arise.
- Disease Management/medium risk – appropriate for members needing a higher level of service, with clinical needs. Members in Case Management may have a complex condition or multiple co-morbidities that are generally well managed. Members in Case Management typically have adequate family or other caregiver support and are in need of moderate to minimal assistance from a case manager. In addition, this level of care may include members who have diseases that may not be impactable from a financial perspective but still require significant intervention such as those children that are frail, or at the end of life, or who have chronic diseases such as cancer or end stage renal disease.
- Complex Case Management/high risk – a high level of case management services for members with complex needs, including members classified as children or adults with special health care needs; those with catastrophic, high-cost, high-risk, or co-morbid conditions; those who have been non-adherent in less intensive programs. Complex Case Management/high risk is performed by Magnolia Case

Management staff for members who have experienced a critical event or have a complex diagnosis requiring oversight and coordination to ensure the member receives appropriate services and care. Members are generally categorized into complex Case Management/high risk based on Magnolia ability to have the greatest impact on health outcomes and cost.

The goals of Magnolia Case Management Program are to:

- Assist members in achieving optimum health outcomes, functional capability, and quality of life through improved management of their disease or condition.
- Assist members in determining and accessing available benefits and resources.
- Work collaboratively with members, family and significant others, providers, and community organizations to develop goals and assist members in achieving those goals and improving their ability to self-manage their disease or condition.
- Assist members by facilitating timely receipt of appropriate services in the most appropriate setting.
- Maximize benefits and resources through oversight and cost-effective utilization management.

Case Management functions include:

- Early identification of members who have special needs.
- Assessment of member's risk factors.
- Development of an individualized care treatment plan in collaboration with the member and/or member's family, Primary Care Provider (PCP), and managing providers.
- Identification of barriers to meeting goals included in the care treatment plan.
- Referrals and assistance to ensure timely access to providers.
- Active coordination of care linking members to providers, medical services, residential, social and other support services where needed.
- Ongoing monitoring and revision of the care treatment plan as required by the member's changing condition.
- Continuity and coordination of care.

- Ongoing monitoring, follow up, and documentation of all care coordination/Case Management activities.

- Accommodating the specific cultural and linguistic needs of all members.

- Conducting all Case Management procedures in compliance with HIPAA and state law.

Centene and Magnolia have defined a set of Case Management population criteria for use with all product lines (e.g. Aged, Blind and Disabled/ABD; Covered Families and Children/CFC; In patient utilization; Temporary Assistance for Needy Families (TANF), Children with Special Health Care Needs, etc.). This creates efficiencies such as a consistent Case Management Program Description and a consistent measurement process of Case Management program effectiveness across all Magnolia product lines. The criteria below is not all inclusive; clinical judgment should be used to determine a member's appropriateness for each level of Case Management, considering such factors as stability of the condition(s), available support system, current place of residence, etc.

| **High Risk, Complex Case Management Criteria** |
|---|
| High Risk, Complex Case Management Target will include 1% of the highest utilizing, most impactable members:<br>• Magnolia will use the Impact Pro predictive modeling program including inpatient stay probability as the primary risk score considered for member identification and targeting.<br>• Will filter for members with clinical conditions that meet the State's list of case manageable conditions and then stratify them according to the probability of an inpatient stay in the next 12 months.<br><br>Data includes:<br>• Comprehensive member profile, including all claims (FFS and Plan) for the prior 12 months, summary of episodes in the 12 month period, risk identifiers, clinical indicators, gaps in care, care team and "case definitions" (complex criteria used to identify and stratify members for Case Management).<br>• Will identify members based on clinical criteria in conjunction with future risk of inpatient stay; the initial threshold for this risk score will be a 30% probability of the member having an inpatient stay in the next 12 months. |
| **Medium Risk Criteria** |
| • One inpatient hospital readmission within 90 days for same or similar diagnosis (within a rolling 12 month period)<br>• Three or more acute inpatient hospitalizations (within a rolling 12 month period) for non-manageable conditions<br>• Diagnostic categories typically associated with high intensity of services and/or high cost, but are generally well managed in the individual or where there is minimal expectation that utilization will decrease. Diagnoses include, but are not limited to: |

| |
|---|
| ◦ HIV/AIDS<br>◦ Cancer<br>◦ High risk maternity members<br>◦ Neonates up to six months of age<br>◦ Kidney failure members on dialysis<br>◦ Members receiving home care services<br>◦ Sickle cell members who are not high utilizers<br>◦ End of life care<br>• Children with special health care needs |
| **Low Risk/Care Coordination Criteria** |
| • Primarily psychosocial issues such as housing, financial, etc. with need for referrals to community resources<br>• Need for assistance with accessing health care services<br>• Members with avoidable, preventable, PCP-treatable ED visits<br>• History of a health condition, chronic or pre-existing that places the member at risk for potential problems or complications. This includes the following diagnoses and at the discretion of the Case Manager: Asthma, Coronary Artery Disease, Congestive Heart Failure, Diabetes, Non-Mild Hypertension, Chronic Obstructive Pulmonary Disease, Severe Mental Disorder, Substance Abuse, HIV/ Aids, Sickle Cell Anemia, Hemophilia, Chronic Renal Failure, Multiple Sclerosis, or issues related to Transplant or Cancer. |

The Vice President of Medical Management (VPMM) and CEO are the senior executives responsible for implementing the Case Management Program in collaboration with the Chief Medical Director (CMD), including quality improvement, cost containment, medical review activities, outcomes tracking, and reporting relevant to case management. The CMD is involved in the implementation, monitoring, and directing of behavioral health aspects of the Case Management Program. A pharmacist oversees the implementation, monitoring, and directing of pharmacy-related services.

The CMD's responsibilities include collaboration with the VPMM in the following activities:

- Assists in the development and revision of Case Management policies and procedures as necessary to meet state statutes and regulations.
- Monitors compliance with the Case Management Program.
- Provides clinical support to the Case Management staff in the performance of their Case Management responsibilities.
- Provides a point of contact for practitioners with questions about the Case Management process.
- Communicates with practitioners as necessary to discuss Case Management issues.
- Assures there is appropriate integration of physical and behavioral health services for all members in Case Management as needed.
- Educates practitioners regarding Case Management issues, activities, reports, requirements, etc.

- Reports Case Management activities to the Quality Improvement Committee and other relevant committees.

The VPMM is a Registered Nurse with experience in Utilization Management and Case Management activities. S/he is responsible for overseeing the day-to-day operational activities of the Magnolia Case Management Program and reports to the Magnolia President and CEO. The VPMM, in collaboration with the CMD, assists with the development of the Case Management Program strategic vision in alignment with corporate and Magnolia objectives, policies, and procedures.

The CM Manager is a registered nurse or other appropriately licensed healthcare professional with Case Management experience. The CM Manager directs and coordinates the activities of the department including supervision of Case Managers, Program Specialists, Program Coordinators, and Connections Representatives. The CM Manager reports to the Regional CM Directors. The CM Supervisor works in conjunction with the CM Directors/Managers and Utilization Management staff to execute the strategic vision in conjunction with Centene Corporate and Magnolia objectives and attendant policies and procedures and state contractual responsibilities. The CM Manager/Supervisor is responsible for ensuring that the CM staff is operating within their scope of practice.

Care Coordination/Case Management (CC/CM) Teams are generally comprised of multidisciplinary clinical and non-clinical staff. This integrated approach allows non-medical personnel to perform non-clinical based health service coordination and clerical functions, and permits the licensed professional staff to focus on the more complex and clinically based service coordination needs. Case Managers work closely with the concurrent review staff to coordinate care when members are hospitalized and assist with discharge planning. The teams utilize a common clinical documentation system to maintain centralized health information for each member that includes medical, behavioral health, and all other services the member receives. The clinical staff consults with and/or seeks advice from the Medical Director as indicated. Based on severity and complexity of the member needs, a Case Manager's average care load would be 80 – 100 cases. ICT roles include:

***Medical Director***

- Physician who holds an unrestricted license to practice medicine in Mississippi and is Board Certified with experience in direct patient care.
- Serves as a clinical resource for Case Managers and members' treating providers.
- Facilitates multi-disciplinary rounds on a regular basis to discuss, educate, and provide guidance on cases.
- Provides a point of contact for providers with questions about the Case Management process.
- Communicates with practitioners as necessary to discuss Case Management issues.
- Can provide face to face member interaction as necessary based on member's specific needs.

DHS
344547

*Case Manager II (CM)*

- Licensed Nurse (CCM credential preferred)
- Accountable point of contact for all members in complex care/high risk Case Management. Responsible for oversight of non-clinical members of the integrated CC/CM team. Ensures staff is operating within their scope of practice.
- Responsible for working with the member and their physician to identify needs and create a care treatment plan to help the members achieve their goals.
- Participates in inpatient rounds with concurrent review nurses and other multidisciplinary Case Management team members to assist with discharge planning and coordination with the member's treating providers.
- Coordinates with the behavioral health Case Manager and providers as needed for members receiving services through the behavioral health delegate.
- Communicates and coordinates with the member and their caregivers, physicians, behavioral health providers, Disease Management health coaches, and other members of the Case Management multi-disciplinary team to ensure that member's needs are addressed.
- Provides face to face member interaction at point of service as determined by member's specific needs and goals of care treatment plan.

*Program (or Social Service) Specialists*

- Program Specialists are licensed social workers or college graduates with a background in social services or other applicable health related field who may or may not be licensed.
- Works under direction of Case Manager II, performing member outreach and care coordination.
- Licensed program specialists can provide face to face member interaction as directed by the CMII.

*Program Coordinator (PC) I*

- Non-clinical staff person working under the direction and oversight of a CM II.
- Provides administrative support to CC/CM team.
- Collects data for Health Risk Screening/Assessment.
- Provides educational promotion, member follow up, arranges PCP visits, and performs care coordination under direction of Case Manager II.

*MemberConnections Representative/Community Health Worker (MCR/CHW)*

- MemberConnections Representatives/Community Health Workers are typically hired from within the communities served to ensure that outreach is culturally competent and conducted by people who know the unique characteristics and needs of the local area.
- Works both in the office and in the community with face to face member interaction at point of service.
- Performs member outreach, education, and home safety assessments.
- Assists with community outreach events such as: Health Check Days, Healthy Lifestyle events, Baby Showers, Diaper Days, Library/Reading Events, etc.

- Assists with Connections Plus cell phone program, pod cast programs, etc.
- Licensed Community Health Workers can provide face to face member interaction as directed by the CMII

*Other licensed/certified staff that may be included in the Integrated Care Teams*

- Registered Social Worker Assistants (RSWA)
- Pharmacists, etc.
- Any licensed/certified staff utilized for face to face member interaction, will be fulfilling care treatment plan goals or actions within their respective scope of practice, and will do so at the direction of the CMII.

*Information Systems*

Assessments, care plans, and all Case Management activities are documented in a central clinical documentation system which facilitates automatic documentation of the individual user's name, along with date and time notations for all entries. The clinical documentation system also allows the Case Management team to generate reminder/task prompts for follow-up according to the timelines established in the Case Management care plan. Reminders/tasks can be sent to any team member, e.g. allowing Case Managers to request that non-clinical staff arrange for referrals to community resources.

The clinical documentation system contains additional clinical information, e.g. inpatient admissions, outpatient referral authorizations, reviews by Medical Directors, etc. related to the member. It also houses documentation of other activities regarding the member, such as letters sent, quality of care issues, etc. In addition, the clinical documentation system enables the Case Manager to add all providers and facilities associated with the member's care to a list which allows the information to be readily available without having to review authorization and referral data. These features permit the Case Management team to easily access all clinical information associated to a member's care in one central location.

The clinical documentation system has a biometric data reporting feature that can be utilized to manage members on a daily and ongoing basis. It contains modules that allow graphing of measures such as blood pressure, lab values, daily weights, etc. which can be used to track progress and measure effectiveness of Case Management interventions.

**MEMBER IDENTIFICATION AND ACCESS TO CASE MANAGEMENT**

A key objective of Magnolia Case Management Program is early identification of members who have the greatest need for care coordination and Case Management services. This includes, but is not limited to, those classified as children with catastrophic, high-cost, high-risk or co-morbid conditions; who have been non-compliant in less intensive programs; or are disabled, or at the end of life.

*Data sources*

Members are identified as potential candidates for Case Management through several data sources, including, but not limited to:

- Predictive modeling software (Impact Pro™)
- Administrative data: claims or encounters
- Hospital discharge data
- Pharmacy data
- UM data - e.g. hospital admission data, NICU reports, inpatient census, precertification/prior authorization data, concurrent review data
- ED Utilization reports
- Laboratory data
- Readmission reports
- State/CMS Enrollment Process and other State/CMS supplied data
- State defined groups such as Children with Special Health Care Needs and Aged, Blind, and Disabled (ABD)
- Information provided by members or their care givers, such as data gathered from Health Risk Assessments
- Information provided by practitioners, such as Notification of Pregnancy (NOP)

Reports identifying members for Case Management are reviewed by management staff at least on a monthly basis and forwarded to the Case Management team for outreach and further review for Case Management.

***Referral sources***

Additionally, direct referrals for Case Management may come from resources such as:

- Health care providers – physicians, other practitioners, and ancillary providers - are educated about the Case Management Program and referral process through the Provider Handbook, the Magnolia website, Provider Newsletters, and by Provider Services staff.
- NurseWise/Nurse Advice Line staff – NurseWise, the nurse advice/medical triage phone service for Magnolia, has policies and procedures in place for referring members to e Magnolia for Case Management screening. This may be accomplished via a "triage summary report" sent to Magnolia electronically on the next business day after member contact has occurred, or by direct communication with the designated contact person at Magnolia.
- Disease Management (DM) Health Coaches – Nurtur, the DM vendor for Magnolia, works closely with the Magnolia Medical Management department and Case Management staff to refer members who could benefit from more intensive services. Policies and procedures are in place regarding coordination of care, and regularly scheduled meetings, such as Case Management rounds, are held between the Case Management team and DM staff.
- Hospital staff, e.g. hospital discharge planning and Emergency Department staff - facility staff is notified of the Magnolia Case Management Program during interactions with Utilization Management (UM) staff throughout the utilization review process. Hospital staff is encouraged to inform Magnolia UM staff if they feel a member may benefit from Case Management services; UM staff then facilitate the referral.

- Magnolia Staff - UM staff work closely with Case Management staff on a daily basis and can initiate a referral for Case Management verbally or through a reminder/task in the clinical documentation system when a member is identified through the UM processes, including prior authorization, concurrent review, discharge planning, and cases discussed in rounds.
    - Magnolia MemberConnections/Community Health Worker Program-MemberConnections Representatives/Community Health Workers (MCRs/CHWs) are trained on all departments within Magnolia and have a full understanding of all staff functions. MCR/CHWs work closely with the Case Management team, referring members who may benefit from Case Management services.
    - Magnolia Member Services - Member Services staff is also trained on all departments within Magnolia and have a full understanding of all staff functions, including the role and function of the Case Management team.
    - Other intradepartmental referrals e.g., Provider Specialists and QI Department.
- Members and/or their families or caregivers, including parent, foster parent, guardian or medical consenter - members are educated about Case Management services in the Member Handbook, received upon enrollment and available on the Magnolia website, and through contact with Member Services and/or other Magnolia staff.
- Community/social service agencies – community agency staff are informed of the Case Management Program during interactions with the Magnolia Case Management team in the course of gathering information about available services, coordinating services, etc., and are encouraged to communicate potential Case Management needs to Magnolia staff.
- Delegated entity staff (e.g. behavioral health, vision, dental, DME/home health, etc.) – all delegates have policies and procedures in place addressing coordination of care and referring appropriate members for Case Management. Magnolia CM staff also regularly communicates with delegates through oversight meetings, Case Management rounds, coordination of care programs, etc., and makes referrals to the delegated entities as needed.
- Managed Care Enrollment Center.

The specific means which a member was identified as a potential candidate for Case Management, whether a data source or other referral source as noted above, is documented in the clinical documentation system for each referral to Case Management. Multiple referral avenues help to minimize the time between need for and initiation of Case Management services. Summary results of the number of members referred by each source are analyzed on at least an annual basis, to assure referrals are being received from a variety of sources.

## SCREENING AND ASSESSMENT

As soon as a child enters foster care, DFCS social workers call Magnolia to alert them and to provide information on the child so that the case management process can begin.

Member outreach is initiated telephonically at the earliest possible opportunity, but in all cases within 30 days of identification as potential candidates for complex case management. Case Management team staff obtain consent to complete the case management screening and/or initial assessment for Complex Case Management once member contact is made. Case Management staff also explains the case manager role and the function, value and benefits of the Case Management Program to the member and/or their authorized representative or guardian. Members identified as low and medium risk must have the assessment and care treatment plan developed no later than within 60 days of enrollment or identification of the member's health condition, and may have outreach initiated in writing.

General standardized assessments have been developed internally to address the specific issues of Magnolia's unique populations. Standardized assessments allow for consistency in application of criteria and objective appraisal of appropriateness of members for Case Management. All assessments are documented in the central clinical documentation system which date and time stamps each activity, including documentation of the staff member completing the activity.

Members unable to be contacted via telephone are mailed a letter requesting that the member call the Case Management team. MCR/CHWs may also be utilized when necessary, to assist in outreach for members who are difficult to contact. MCR/CHWs go to the member's physical address and attempt to initiate contact. They may also outreach to local community agencies and provider offices in an effort to locate a member. If a MCR/CHW is successful in locating the member, they may perform a general screening in person, including observation of the member in their home surroundings, and identify any potential needs such as safety issues, mobility assistance, living conditions, etc.

Based on application of the criteria in the screening assessment, candidates are preliminarily stratified as low, medium, or high priority in terms of frequency of contact and intensity of interventions required to achieve favorable outcomes. Generally, candidates identified as stable regarding any medical condition, and with primarily psychosocial needs are designated as low priority/low frequency of contact (minimum of once/year) and are assigned to Care Coordination. Members with complex medical conditions where the condition is mostly stable and the member has adequate care giver support are identified as a medium priority with a moderate frequency of contact (minimum of twice/year). Members designated as moderate/medium priority are assigned to a Case Management team who confirm the findings of the screening assessment and may complete a more thorough assessment with the member. A Case Manager reviews all available information, including pertinent past and present medical history gathered from the screening assessment, referral source, and/or reports. Case Managers also access pharmacy and claims data if available that provide information

regarding pharmacy utilization and treatment adherence. This review allows the Case Manager to identify specific areas of focus for the member based on their diagnosis and/or medical treatment history. Stratification as low, medium, or high priority in terms of frequency of contact and intensity of interventions, and assignment to Care Coordination, Case Management, or Complex Case Management may be revised at this time, or following further assessment.

The Case Manager then attempts outreach to the member and/or authorized representative or guardian telephonically within one week for members identified as high priority and thus appropriate for complex/high risk Case Management, to perform an in-depth assessment to more closely identify and prioritize the member's individual needs. An additional, condition-specific assessment may also be completed, to obtain even more detailed information about a member's condition(s). These condition-specific assessments, such as the Diabetes and Asthma assessment, are derived from evidence-based clinical guidelines. During the in-depth Case Management assessment, the Case Manager evaluates the full scope of the member's situation, including:

- The member's health status, including condition–specific issues and likely co-morbidities.
- Documentation of the member's clinical history, including disease onset, key events such as acute phases and inpatient stays, treatment history, current and past medications, and compliance with current and past therapies and monitoring.
- Assessment of activities and instrumental activities of daily living.
- Assessment of barriers to meeting goals, for example social barriers to treatment adherence such as transportation, childcare needs, etc.
- Assessment of mental health status (e.g. presence of depression and/or anxiety) and cognitive functioning.
- Assessment of psychosocial issues such as alcohol or drug dependency, smoking, significant life stressors, etc.
- Assessment of visual or hearing impairments.
- Assessment of life planning activities such as living wills, advance directives, etc.
- Evaluation of cultural and linguistic needs, preferences or limitations.
- Evaluation of caregiver resources and level of caregiver involvement in care plan implementation.
- Assessment of personal resources and limitations.
- Evaluation of available benefits and other financial resources; referrals to community resources.
- Assessment of educational and vocational factors.

Case Managers also frequently contact the referral sources, the member's PCP, other providers, hospital case managers, and any others involved in the member's care, to gather additional information that can assist in building a complete picture of the member's abilities and needs. The role and function of the Case Manager is also explained to the member's family, providers, etc. Member consent, as required, is always obtained prior to any contact with outside sources and is documented in the clinical documentation system.

The Case Management team reviews the gathered information and begins to build a care treatment plan. The initial assessment and care treatment plan are completed no later than 30 days after a member is identified as appropriate for complex Case Management, but in most cases is completed earlier. Case Management teams may include Case Managers, Program Coordinators, Social Workers/Program Specialists, Behavioral Health Specialists, and Member Connection Representatives/Community Health Workers. Each contributes different skills and functions to the management of the member's care. Each must work within their scope of practice and are monitored by the Case Manager and human resources department to ensure that this occurs. Other key participants in the development of the care plan may include:

- Member
- Member authorized representative or guardian
- PCP and specialty providers
- Magnolia Medical Directors
- Hospital discharge planners
- Ancillary providers (e.g.. home health, physical therapy, occupational therapy)
- Behavioral health providers
- Representatives from community social service, civic, and religious based organizations (e.g. United Cerebral Palsy, food banks, WIC programs, local church groups that may provide food, transportation; companionship, etc.)
- Other non-health care entities (e.g. Meals on Wheels, home construction companies, etc.)

***Continuity and Coordination of Care between Medical and Behavioral Health Care***

When Magnolia staff identifies a member with coexisting medical and behavioral health disorders, and the member's primary diagnosis is a behavioral health condition, the case is referred to the Severe Mental Illness (SMI) team who serves as the lead Case Manager, working in tandem with the medical Case Management team. Whether the member's primary diagnosis is physical or behavioral determines whether a medical or behavioral health Case Manager will serve as the lead Case Manager.

The lead Case Manager reviews the member's clinical information to assure the patient is receiving appropriate behavioral health care. If the patient does not appear to be receiving this care, the Case Manager:

- Contacts the medical provider to ask about a behavioral health consult.
- Assists the member, or coordinates with the behavioral health Case Manager, to make arrangements for the behavioral health consult.
- Follows up to make sure a behavioral health consult was conducted.

When appropriate (including but not limited to when the lead Case Manager is revising the care treatment plan or evaluating a member for discharge from Case Management), the medical and behavioral Case Managers confer with each other to ensure that the necessary expertise is available to monitor and guide member's care. When serving as the

lead Case Manager, the Magnolia Case Manager includes appropriate behavioral health follow-up in Case Management discharge planning.

Outreach may also occur to treating providers and individual practitioners when appropriate. The Case Manager assures proper member consent, specific to information pertaining to behavioral health treatment, is obtained prior to any communication regarding the member.

## ONGOING MANAGEMENT

### *Care Treatment Plan Development*

The initial assessment serves as the foundation for the member's care treatment plan. The Case Management team identifies issues and needs, and utilizing input from team participants, develops a proposed care treatment plan. The care treatment plan is developed in conjunction with the member; the member's authorized representative or guardian, authorized family members, and the managing physician and other members of the health care team. Behavioral health care coordination is incorporated in the care treatment plan as needed. Prioritized, short-term and long-term goals are established and barriers to meeting goals or complying with the care treatment plan are identified, as well as possible solutions to the barriers. The proposed care treatment plan is based on medical necessity, appropriateness of the discharge plan as applicable, support systems to assist the patient in the home setting, community resources/services availability, and the potential for member adherence to the prescribed care treatment plan.

The proposed care treatment plan is discussed with the member and/or member authorized representative or guardian, the PCP/SCP, and the health care team. The member's role is discussed and member/caretaker and provider input is obtained and used to modify the goals according to member's ability and willingness to participate. The Case Manager assures all parties are in agreement with the care treatment plan to ensure successful implementation.

The care treatment plan for members in high risk, complex Case Management includes, at a minimum:

- Prioritized goals and actions with timeframes for completion and member's documented progress towards achieving the goals. Goals are specific, realistic and measurable. Goals are designed to be achievable and to help the member make changes towards the most optimal recovery possible. There should be at least one short-term and one long-term goal prioritized and individualized to meet member needs.
- Identification of barriers to meeting the goals and recommended solutions for each barrier.
- Resources to be utilized, including the appropriate level of care.
- Interventions to reach those goals, including development of member self-management plans. The Case Manager assures the member has a full understanding of their responsibilities per the self-management plan and is in

agreement with it. The Case Manager ensures follow-up on the self-management plan at every subsequent contact.

- Planning for continuity of care and effective and comprehensive transitions of care between settings.
- Collaboration with and involvement of family and significant others, health care providers, etc.
- Documentation in the notes of a schedule for on-going communication with the member and other involved parties, based on individual needs and member preference including anticipated frequency of contacts
- Communication plan with PCP/SCP to ascertain the needs the provider has identified and prioritized including a process to ensure the provider's treatment plan is reflected in the treatment plan developed by Magnolia.
- Identification of providers responsible for delivering services
- Identification of referrals made to specialists or providers and confirmation that the member received these services
- Referrals to community/social/recovery support agencies including assisting members in contacting the agency and validating member received needed service.
- Continuous review and revision of the care treatment plan.
- Provision to report feedback to provider on member compliance with care treatment plan.
- Time limits – providing points in time for which successful outcomes can be determined, and agreement with the member/guardian on how progress will be demonstrated.

The care plan is derived from evidence-based goals and interventions outlined in condition-specific clinical guidelines such as for diabetes and asthma management, and nursing-based guidelines for issues such as skin integrity, mobility, safety, etc.

Members assigned to low priority Care Coordination, or members identified as moderate/medium priority assigned to Case Management have an abbreviated care treatment plan.

***Monitoring and Evaluation***

Once the care treatment plan is agreed to, agreement is documented in the clinical documentation system and timelines are put into place to evaluate and monitor the effectiveness of the plan. Revisions to the care treatment plan are made when necessary, e.g. when the member's condition progresses or regresses, when goals are reached, etc. Significant revisions to the care treatment plan are also shared with the PCP or specialist as appropriate. A schedule for continuous review and revision which includes follow-up and monitoring of the member's progress is developed, using as a minimum the intervals defined according to priority level and current needs. The Case Manager may assign tasks to other members of the Case Management team, such as a Program Specialist to manage or assist with psychosocial issues or a Program Coordinator to assist with coordination of non-clinical functions such as verifying appointments, obtaining lab results, etc.

The clinical documentation system allows for automatic reminders/task to be created for each case, alerting the Case Management team when follow-up contacts are needed. Follow-up reminders can be set for daily, weekly, monthly, etc. contacts. Intervals for follow-up are based on the goals and time lines in the Case Management care plan.

The Case Manager is responsible for oversight to ensure all information is documented by the appropriate team member and is updated after each contact with the member, providers' or other involved parties. The information documented in the clinical documentation system includes, but is not limited to:

- Member or caretaker agreement to participate in the Case Management Program (agreement may be oral or written; if oral, the Case Manager documents the discussion with the member/caretaker).

- Notes, including a summary of team conferences and all communications with the member/family, health care providers and any other parties pertaining to the member's care.

- Provider treatment plan developed by the PCP in collaboration with the member/caretaker outlining the course of treatment and/or regular care monitoring, if available.

- The Case Management care treatment plan, including:
  - Prioritized goals, barriers to meeting the goals and/or adhering to the care plan, identification of gaps between recommended care and the care that is received by the member and interventions for meeting the member's goals and overcoming barriers.
  - Provision for input to the care treatment plan by the member
  - Provision to share the care treatment plan when requested by the provider
  - Schedule for continuous review and follow-up and communication with the member, member's family, providers, etc.
  - The member's self-management plan.
  - Progress toward meeting the goals outlined in the care plan, changes to the care plan, goals attained, etc. as described below.

The Case Manager regularly evaluates the member's progress considering the following factors:

- Change in the member's medical status.
- Change in the member's social stability.
- Change in the member's functional capability and mobility.
- Progress made in reaching the defined goals.
- The member's adherence to the established care treatment plan, including adherence to the self-management plan such as monitoring of weight, activity level, glucose levels, etc.

- Changes in the member or family's satisfaction with the Case Management Program and other services addressed in the care plan.
- The member's quality of life.
- Benefit limits and financial liability.

The Case Manager completes a re-assessment at any time the member has a significant change of condition or, at a minimum, once per year if the member remains active in Case Management. The plan of care is also updated at these times and shared with the PCP or specialist, as appropriate.

The Case Manager implements necessary changes to the care treatment plan and modifies the goals based on the findings of on-going evaluation. The Case Manager contacts the PCP, or other members of the multi-disciplinary health care team, as needed to discuss modifications and obtain an updated medical treatment plan. The Case Management team considers alternatives in health care delivery settings and available funding options during the process and communicates the alternatives to the providers and the member/family. Any changes in status, goals, or outcomes are documented in the clinical documentation system. As with the initial development of the care treatment plan, the Case Manager assures all involved are in agreement with changes to the care treatment plan to ensure ongoing success. The Case Management team also monitors the care on an ongoing basis for quality indicators and, if present, makes the appropriate referral to the Quality Improvement department.

***Discharge from Case Management***

The Case Manager may receive input from the PCP, member/family/guardian/caretaker, and other health care providers involved in the member's care treatment plan to determine the appropriateness for closing the case. The following criteria are used on an ongoing basis to determine when discharge from Case Management should occur:

- Member terminates with Magnolia.
- The member reaches maximum medical improvement or reaches established goals regarding improvement or medical stability (which may include preventing further decline in condition when improvement is not medically possible) and is directed to community resources.
- Insurance benefits are exhausted and community resources are in place.
- Member expires.

If the above criteria indicate a case should be closed, the Case Manager, as appropriate:

- Coordinates care with the new medical entity and community resources as required, allowing for a smooth transition for the member.
- Contacts the PCP and other providers, when appropriate, regarding impending discharge from Case Management.
- Discusses the impending discharge from Case Management with the member/family.
- Presents community resources and assists in making arrangements with those relevant at the time of discharge.

A letter noting the member is discharged from Case Management is generated and sent to the PCP and the member. The letter documents the reason for discharge and includes, if the member has not terminated with Magnolia, a reminder to contact the Case Management team in the future should medical concerns arise. The case is closed in the clinical documentation system and the circumstances and discharge activities are thoroughly documented.

## PROGRAM ASSESSMENT, DATA COLLECTION, AND IMPACT MEASUREMENT

### *Population Assessment*

At least annually, Magnolia CMD and VPMM and designates will assess the entire member population and any relevant subpopulations (e.g. ABD, Medicare Dual-eligible Special Needs Plan, etc.) to determine if the Case Management Program meets the needs of all members eligible for Case Management. Data utilized for assessment of the entire member population includes information provided by CMS and/or the state agency and includes information such as age, gender, ethnicity, race, and/or primary language, and benefit category.

Results of the population assessment are analyzed and subsequent enhancements made to the Case Management Program if opportunities for improvement or gaps in Case Management services are identified. Potential revisions to the Case Management Program may include:

- Changes related to number of staff or staffing ratios, reduction in case loads, etc.
- Revisions to types of Case Management activities assigned to specific members of the Case Management team (e.g. clinical versus non-clinical staff responsibilities).
- Implementation of targeted training, e.g. related to cultural competency, specific medical or behavioral health conditions, cross-training for medical and behavioral health staff.
- Improvement in identification of appropriate community resources provided to members and process for assisting members in accessing resources.

The annual population assessment may be a separate document or included as part of an annual Utilization Management Program Evaluation and will be presented to the Magnolia Medical Management Sub-Committee, the Magnolia Quality Improvement Committee, and Magnolia Board of Directors for review and feedback.

### *Satisfaction*

Member satisfaction with the Case Management Program is assessed no less than annually. Member satisfaction surveys, specific to Case Management services, are completed at least annually for members enrolled in Case Management. Surveys are completed via mail or telephonically for members who have been enrolled in Case Management for $\geq$ 60 days. The results of the surveys are aggregated and evaluated

annually both quantitatively and qualitatively and are included in the overall evaluation of the Case Management Program, which is a part of the Utilization Management Program Evaluation as described below.

Member complaints and grievances regarding the Case Management Program are also monitored no less than quarterly. Results of the analysis of member satisfaction surveys and the monitoring of complaints/grievances are used to identify opportunities for improvement, set priorities and determine which opportuniteis to pursue regarding changes to the Case Management Program, as needed.

***Outcomes***

Case Management Program outcomes are evaluated at an aggregate level looking at the following key areas:

- Reduction in medical costs.
- Improved clinical outcomes.
- Member/provider satisfaction.
- Plan specific state requirements/expectations.

Magnolia measures effectiveness of complex Case Management no less than annually using at least three measures that assess the process or outcomes of care for members in complex Case Management. Measures of effectiveness may include indicators such as:

- Readmission rate for members in complex Case Management with specific diagnoses such as CHF or asthma.
- Repeat ED visits for members in complex Case Management.
- Rate of members in complex Case Management who received the annual flu vaccine
- Rate of members at risk of pre-term birth receiving 17-P for members in complex Case Management
- Rate of outpatient care following NICU discharge for members in complex Case Management

Measurement and analysis of the Case Management program is documented as part of the annual Utilization Management Program Evaluation. The Case Management Program is evaluated at least annually and modifications to the program are made as necessary. Magnolia evaluates the impact of the Case Management Program by using:

- Results of the population assessment.
- The results of member satisfaction surveys (i.e. members in Case Management).
- Member complaint, grievance, and inquiry data regarding the Case Management Program.
- Practitioner complaints and practitioner satisfaction surveys regarding the Case Management Program.
- Other relevant data as described above.

The evaluation covers all aspects of the Case Management Program. Problems and/or concerns are identified, recommendations for removing barriers to improvement are provided, and opportunities to improve satisfaction are identified. The evaluation and recommendations are submitted to the Medical Management Sub-Committee for review, action and follow-up. The final document is then submitted to the Board of Directors through the Quality Improvement Committee for approval.

**Condition Specific CM and DM Programs**

Members in condition specific care/disease management programs are identified, screened, and managed as documented in the individual programs' policies and procedures. The Case Management policies provide the instructions for identification, referrals, screening and assessment, plan of care development, implementation, monitoring and evaluation, coordination with behavioral health, and discharge from Case Management when not specifically addressed in the program. Disease Management has been delegated to Magnolia Disease Management vendor (Nurtur), and Magnolia Case Managers coordinates care and member interaction to prevent duplication of contacts and services.

Magnolia Condition Specific Case Management Programs may include, but are not limited to:

- Emergency Department Diversion Program
- Hemophilia
- Sickle Cell
- HIV/AIDS
- High Risk Pregnancy
- Transplant
- NICU
- Children with Special Health Care Needs

Magnolia Disease Management Programs may include, but are not limited to:

- Asthma
- Diabetes
- Heart Failure
- Coronary Artery Disease
- Hypertension/ Hyperlipidemia

**Electronic Health Passport**

Magnolia is currently assisting in building an Electronic Health Passport. Magnolia is using the passport model from Texas as a guide (see example at **Attachment 4)** and the Mississippi Electronic Health Passport will be specific to Mississippi. DFCS has chosen some of the components that will be included – search, demographics, allergies, medications, visits/claims, immunizations, forms, lab results, vital signs, printing,

security, and assessments. Other components will be added accordingly. The entire program is scheduled to commence by January 2014. The Electronic Health Passport will be available to Regional Directors and Area Social Work Supervisors for distribution to resource parents, parents and any other child caretaker as well as children that are aging out of the foster care system so that they will have a record that has captured their medical, dental and mental health history.

**Continuous Quality Improvement (CQI)**

As Mississippi moves to implement the provisions of the MSA, the Council on Accreditation (COA) standards, and practices within the Child and Family Services Reviews (CFSR), the vision is to have continuous quality improvement thoroughly integrated into DFCS' ongoing work. DFCS' Continuous Quality Improvement (CQI) Unit serves primarily as a means of evaluating and reinforcing the practices which are being implemented in the state. CQI is a means of keeping the mission and vision in clear focus for staff in the field and as a primary means of sustaining the improvements achieved in practice and outcomes over time.

The Evaluation and Monitoring Unit (EMU) of DFCS' CQI Unit is responsible for conducting regular reviews of child welfare activities in DFCS' regions throughout the state. EMU evaluates work for consistency with applicable laws and regulations and principles of family-centered practice. The Foster Care Review Unit (FCR) fulfills a federal requirement to conduct an administrative review for all children in foster care every six months. Among other areas, the FCR evaluates the timeliness and appropriateness of services to children and plans for achieving permanency and stability in their lives. The FCR will capture information related to physical, dental and mental health services. CQI reviews will also capture information related to physical health requirements of the MSA. Data reports are used to monitor DFCS' performance and to make decisions about how DFCS can best serve children and families. Accordingly, reports produced by the EMU and FCS, along with DFCS data reports, will be used to gauge what areas of the state need assistance in accessing and utilizing services required for foster children.

**Training**

In January 2013, a team was formed consisting of Magnolia Foster Care Case Managers (2 social workers and 2 registered nurses), DFCS' nurse program manager, and 2 representatives from the Division of Medicaid. This team began training DFCS field workers about Magnolia and the benefits and services that are available for foster children under this program.

DFCS' next step in continuing support to the regions is for DFCS' nurse program manager to conduct follow up visits to each region on an ongoing basis. She is following the original Practice Model Rollout schedule and is also available to staff by telephone for questions and assistance in assuring that foster children receive all services needed.

Two DFCS community liaison workers for resource development are also in the field to further assist workers in securing resources that families and children may need. The community liaison workers attend the Regional Implementation Team Meetings, Data-to-Action Meetings, regional and county staff meetings, and any other meetings as necessary in order to network with and assist workers with service needs.

# Ex. 58A

**Mississippi Department of Human Services**
**Division of Family and Children Services**

**Educational Plan**

**Description:**

6. *Educational Services*

*a. DFCS caseworkers shall review the educational record of each child who enters custody for the purpose of identifying the child's general and, if applicable special educational needs and shall document the child's educational needs within 30 calendar days of his/her entry into foster care. (Civil Action No. 3:04CV251LN)*

*G. Educational Services*

*2. By September 1, 2012, Defendants shall have developed a protocol and associated caseworker training for conducting a review of a child's educational record for the purpose of identifying the child's general and, if applicable, special educational needs. (Appendix "B", Modified Mississippi Settlement Agreement and Reform Plan, Period 3 Implementation Plan)*

**Protocol:**

Step 1. Caseworker will visit school to review child's school record.

Step 2. Caseworker will complete the educational review of child's school record by using the Guide for Educational Review (Attachment 1).

Step 3. Caseworker will use the information to determine if the child's general education is appropriate or if special education services are needed.

Step 4. Upon determination if additional services are needed the caseworker will contact the school to request needed services.

Step 5. Caseworker will follow-up with request to ensure appropriate services are being provided. Follow-up will be on an ongoing basis.

Step 6. All educational information to include the Guide for Educational Review will be filed in the child's case record. In addition a copy will be placed in the child's educational passport.

**Training:**

There are two primary forms of training that will be provided for the caseworkers.

1. The Educational Liaison will be providing training to all Area Social Worker Supervisors (ASWS) who will then ensure that each of their caseworkers is informed of the process. Training will be conducted in each region according to the rollout implementation plan (timeline Attachment 2).

2. New workers will be provided educational training according to the pre-service curriculum provided by DFCS Professional Development Unit.

**Attachment 1**
**Guide for Educational Review**

**To be completed within 30 days of the child entering custody.** **Date:**___________________________

Child's Name: Age:

Date of Birth: Gender: ______ Male ______ Female

Social security number:

Medicaid eligible ______ Yes _______ No Medicaid Number :

Ethnicity: Caucasian____ African American____ Hispanic____ Native American____ Other ____

Primary Language English_____ Spanish____ Other______

School District last attended (Home): School last attended (Home):

Current School District: Current School:

School Address:

School Phone Number:

Date of Enrollment: End Date of Enrollment:

Current Grade: _________ Grade Level __ above grade ___ at grade ___ below grade ___ special education ___

Child repeated any years? _______Yes ______No What grade/s were repeated? ___________________________

Has the child had poor attendance at school? ______Yes _______No If so how many days were missed and Why?

Has the child been suspended? _____Yes _______No If so how many days? ___________________________

Has the child had discipline/behavior problems? ______Yes ______No If so what type? ___________________________

If the child has been ruled for special education and suspended more than 10 days, was a functional behavioral assessment completed?

(Transcripts, Attendance report, psychological)
School records: _____ Included _____ Requested _______________ Date requested

Is the child receiving special education services? Yes_____ No _____ IEP _____ 504 accommodation _____

Date of last 504 or IEP evaluation? ___________________________

---

Has the child been referred for special education services? ________Yes ______No

If so, When? ________________________________________________________________

---

Have Parental rights been terminated? _______ Yes ________ No

Is DHS in the process of terminating parent's rights? _______ Yes _______ No

---

Does DHS have educational rights for this child through a court order? ______Yes _______ No ______ Unknown

---

Is DHS providing independent living services for this child? ______Yes ________ No ______Unknown

---

Is youth in transitional program (14-21 with special education ruling)? ______ Yes ______ No _______ Unknown

---

If so, was he referred to Vocational Rehabilitation? ______Yes ______No _______ Unknown

---

Does the child attend day care or aftercare services? _____Yes _______No If so, where? ________________________________

**Attachment 2**
**Implementation Timeline**

Training Timeline

| *Regions* | *Initial Implementation of Practice Model* | *Training of ASWS throughout the region* | *Data Tracking 3 months.* |
|---|---|---|---|
| I South<br>II West | July 2010-June 2011 | January 2013<br>February 2013 | April 2013 |
| V West | January-December 2011 | March 2013 | June 2013 |
| IV North | January 2011-June 2012 | April 2013 | July 2013 |
| I North,<br>III South<br>IV South | July 2011, June 2012 | May 2013<br>June 2013<br>July 2013 | Aug. 2013<br>Sept. 2013<br>Oct. 2013 |
| V East | January-December 2012 | August 2013 | Nov. 2013 |
| III North<br>VII East | July 2012-June 2012 | September 2013<br>October 2013 | Jan. 2014<br>Feb. 2014 |
| II East<br>VI<br>VII West | January 2013-December 2013 | November 2013<br>January 2014<br>February 2014 | Mar. 1, 2014<br>Apr. 1, 2014<br>May 1, 2014 |

# Ex. 58B

# Special Education Advocacy

## Children in Foster Care

[redacted]

Educational Liaison

[redacted] office

[redacted] cell

[redacted]

# ADVOCACY

**Ad-vo-cate:** To speak, plead or argue in favor of

1.  One that pleads in another's behalf; an intercessor advocates for abused children

2.  One that argues for a cause; a supporter or defender; an advocate of civil rights.

3.  A Lawyer



# THE SPECIAL EDUCATION PROCESS

- Of the more than 500,00 children in foster care, 30 to 40% are receiving special education services and many more may need the services but have not been identified. Learning Curves-Educational Advocacy for Children in Foster Care by Kathleen M. McNaught.

- What Signs should you look for:

  poor grades

  delays in academic achievements or developmental milestones

  lack of interest in school

  refusal to attend school

  behavior problems at school and at home.

# Educational Portrait of Children in Foster Care

Children in foster care face unique challenges to success in the school environment. The vast majority is at particular risk for medical problems, developmental delays, and disabilities that can undermine their ability to learn and function well in school.

The experience of foster care placement itself — with frequent movements in care, disruptions in schooling and educational services, and isolation from friends and teachers — can disrupt the rhythms of the already fragile life of a child in foster care and heighten the risk for poor educational outcomes. Perhaps most significantly, children in foster care too often lack the most fundamental resource for ensuring educational success — a lasting relationship with a caring adult who can observe their development over time, participate in their school lives advocate on their behalf, and consent to evaluations and services.

# Educational Portrait of Children in Foster Care

Research substantiates these grim realities:

- ☐ Children in foster care do not perform as well as other children, lagging in achievement, repeating grades and failing classes.
- ☐ A study in Washington State found that children in foster care scored 15 to 20% lower than other students on achievement tests.
- ☐ In Chicago, 96% of children in foster care scored below grade level in reading comprehension and 95% performed below grade level in math.
- ☐ A survey of high school students in foster care found that 26% repeated a grade at least once since seventh grade and 60% failed a class in the previous year.

# Educational Portrait

- Children in foster care experience frequent changes in placement, often moving from school to school. In a study of over 16,000 children in foster homes in New York City, researchers found that 70% of the children experienced one or more transfers to a new school for non educational reasons in the year following placement in foster care.

- A smaller survey found that more than 75% of children in foster care changed schools after entering foster care, and out of these children, 65% had transferred in the middle of the school year.

- Children in foster care are twice as likely to drop out of high school as their peers. In a national study following youth who exited foster care, only 50% had completed high school.

- A study of 11th graders in Washington State revealed that foster youth are 57% less likely to complete high school when compared to the general population. In Wisconsin, only 63% of youth had completed high school in the 18 months after their discharge from foster care

# Educational Portrait

- School records of children in foster care are often lost, misplaced, or inaccessible, hindering timely school enrollment and appropriate school placement and services. In a New York City study, lost or misplaced records postponed school entry for half of those who experienced a delay.

- Children in foster care often experience gaps in school because of delays in school enrollment. In a Wisconsin study, 20% of youth in foster care reported missing at least one month of school due to delays in school enrollment

# Educational Portrait

More than half the children in foster care exhibit medical problems, developmental delays and disabilities, including substantial behavioral and emotional problems that can compromise their ability to learn or function in school. Studies nationwide document that 80% of all children in foster care have at least one chronic medical illness and 25 % had three or more chronic medical conditions. Research shows that children in foster care exhibit developmental delay about four to five times the rate among the general population.

# Educational Portrait

- Children in foster care often lack consistent advocacy and support from parents or other adults to help them meet the challenges of school. A study of middle school-aged children in foster care found that adults in their lives often lacked a picture of their educational needs and that no one acknowledged primary responsibility for the educational progress of the children. In a study of foster youth, 65% of high school seniors reported that no parent or guardian had ever attended a teacher conference on their behalf and that adults in their lives were less likely to monitor homework or attend school functions.

- Children in foster care receive special education services at three to five times the national rate for all children. A study of children in foster care receiving special education found that children in foster care are nearly five times more likely to be in more restrictive settings than their disabled peers who were not in foster care.

# Red Flags for Identifying Students at Educational Risk

- Poor school attendance or frequent tardiness
- Poor academic performance on report cards, teacher progress reports, statewide assessments or standardized testing
- History of grade retention
- Poor organizational, language, attention or motor skills
- Poor or unusual school behavior or frequent disciplinary actions taken against student
- Poor or limited peer or adult relations in school
- Unaddressed medical or health needs
- Not well known to school staff
- Not involved in extracurricular and social activities
- Limited parental or caretaker involvement in child's school life

# Important Things to Remember about Being a Good Advocate

- ☐ The keys to being a good advocate are to:
  - Create relationships.
  - Communicate ideas in ways that others can understand.
  - Be prepared by knowing the facts and law that apply in a situation.

- ☐ You can be an advocate on big or small things— the most important thing is just to be there, taking action on behalf of children and youth who otherwise will have no one to advocate for them.

- ☐ There are many ways to be an advocate. Even if you don't know a lot about the laws, you can help by asking questions and letting the school know about students' needs.

# Why is there a need for education advocacy?

- ☐ School officials often fail to identify the special needs of students who experience changes in caregivers and schools.
- ☐ The uncertainty of home and family situations can profoundly affect students' ability to focus in school.
- ☐ Many children and youth who are in out-of home care have been victims of abuse and neglect that affect their ability to do well in school.

Every child or youth needs an advocate to help overcome barriers to education.

# What Advocates Do

- Gather Information-As you gather information and organize documents you learn about the student's disability and educational history.
- Learn the Rules of the Game-Educate yourself about the local school district. Know how decisions are made and by whom.
- Plan and Prepare-Advocates know that planning prevents problems. Don't expect school personnel to give you the answers to your questions study the law and school records
- Keep Written Records-Documents are often the key to success. If it was not written down it was not said.
- Ask Questions, Listen to Answers-Advocates are not afraid to ask questions and listen carefully to the answers. Use "Who, What, Why, Where, When and How and explain questions.
- Identify Problems-Advocates learn to define and describe problems from all angles. Advocates are problem solvers.
- Propose Solutions-Advocates negotiate with schools for special education services.

# Modified Settlement Agreement

- All students must be enrolled in school within 3 days of coming into custody.
- An educational review must be conducted within 30 days of student coming into custody.
- Students should remain within 50 miles of their home school district when at all possible.

# Guide to Education Review to be completed within 30 days of Child's Enrollment in School

- ☐ Is the child attending school?
- ☐ How is this child faring in school?
- ☐ How does this placement impact the child's school continuity and stability?
- ☐ Are school records in the child's case file?
- ☐ What are the medical, developmental, and emotional needs that impact this child's educational performance?
- ☐ Does this child require general education support  services?
- ☐ Does this child require special education evaluation or services?
- ☐ Who is this child's educational decision-maker? (surrogate parent)
- ☐ Is this preschool-aged child enrolled in an early childhood education program?
- ☐ What is the transition plan to address this older child's educational and vocational needs and goals?

**Attachment 1** **Guide for Educational Review**
***To be completed within 30 days of the child entering custody.*** **Date:**

Child's Name: ________________________________ Age ____ Date of Birth ____________
Gender: ___ Male _____ Female Social security number: ____________________
Medicaid eligible _______ Yes ________ No Medicaid Number :
Ethnicity: Caucasian___ African American___ Hispanic____ Native American____ Other ________
Primary Language English_____ Spanish____ Other_______
School District last attended (Home): School last attended (Home):
Current School District: ______________________ Current School: ____________________
School Address: ______________________________ School Phone Number: _______________
Date of Enrollment: ________________End Date of Enrollment: ______________
Current Grade: __________ Grade Level: __ above grade ___at grade ___below grade ___special ed
Child repeated any years? ___Yes ___No What grade/s were repeated? ____________________
Has the child had poor attendance at school? ___Yes __No If so how many days were missed and why? ________________________________________________
Has the child been suspended? __Yes __No If so how many days? __________ Has the child had discipline/behavior problems? __Yes ___No If so what type? ______________________________
If the child has been ruled for special education and suspended more than 10 days, was a functional behavioral assessment completed?

*(transcripts, attendance report, psychological)*
School records: __ Included __ Requested ____________ Date requested
Is the child receiving special education services? Yes ___ No ___ IEP ___ 504 accommodation _____
Date of last 504 or IEP evaluation? ______________________________________
Has the child been referred for special education services? __Yes __No If so, when? _____________
Have parental rights been terminated? ___ Yes __ No Is DHS in the process of terminating parent's rights? __ Yes _ No
Does DHS have educational rights for this child through a court order? __Yes __ No __ Unknown
Is DHS providing independent living services for this child? ___Yes __ No __Unknown
Is youth in transitional program (14-21 with special education ruling)? __ Yes __No __Unknown
If so, was s/he referred to Vocational Rehabilitation? __Yes __No __Unknown
~~Does the child attend day care or aftercare services? __Yes __No If so, where? _______________~~

# Typical Documentation for School Registration and Enrollment

- ☐  Birth Certificate or other proof of school age
- ☐  Immunization record
- ☐  Certificate of a physical examination
- ☐  Prior school records
- ☐  Proof of residency in the school district

# Education Law

*IDEA-Individual with Disabilities Education Act-1990* provides all children with disabilities that impact their ability to a free and appropriate education (FAPE) in their least restrictive environment (LRE).

To be appropriate, an education program that meets the student's unique education needs must be in place for each child with a disability.

# Education Law-Surrogate Parents

Surrogate Parents-When a child is in foster care, it is necessary to determine who is the parent.

Foster Care Policies and Procedures Surrogate Parents

**(b) Surrogate Parents**

**(1) Legal Base**

The *Rehabilitation Act of* 1973 (P.L. 93-112) defines a handicapped person as "any person who (1) has a physical or mental impairment which substantially limits one or more major life activities, (2) has a record of such impairment, or (3) is regarded as having such impairment."

The participation of the parent or surrogate parent is needed at all stages of the planning process for a handicapped child. This process includes the identification, evaluation, referral, individualized education plan, and placement.

**(C) Criteria**

For foster children placed in foster family home, the Resource Parent shall serve as the surrogate parent, if possible. For foster children who are placed in group homes, institutions, or other residential facilities, DFCS shall appoint a surrogate parent. The child's worker must assess the surrogate parent to ensure that the following criteria are met:

- ☐ Be competent to advocate for the child;
- ☐ Have no interest which might conflict with that advocacy;
- ☐ Is not employed by the educational or residential facility;
- ☐ Knows the child personally;
- ☐ Is familiar with the child's needs;
- ☐ Is capable of vigorously representing the child at each stage of special education for handicapped children process and;

# Surrogate Parents

- The surrogate parents shall participate in formal training sessions as scheduled and held by the State Department of Education, which includes several one-half day meetings to inform the surrogate parent of the placement process, rights of the surrogate parent, the hearing process, procedural safeguards, information about the institution and other related matters. When a foster child placed in a licensed foster family home is suspected or diagnosed as handicapped, the following procedures shall be followed:

- The COR or COS (if applicable) shall evaluate the Resource Parent as the potential surrogate parent, based on the criteria listed above.

- If the Resource Parent is unwilling or unable to serve as the surrogate parent, the Resource Parent and the Worker shall discuss other qualified persons who might serve as the surrogate parent.

- If no community person is appropriate, the Area Social Work Supervisor may appoint the COR Worker or the COS (if applicable) as the surrogate parent, with approval of the assigned Regional Director.

Mississippi, DFCS Policy Revised *07-15-11*
**(3) Procedure**
Resource Family Homes
FOSTER CARE
Section D

When a foster child placed in a licensed foster family home is suspected or diagnosed as handicapped, the following procedures shall be followed:

- The COR or COS (if applicable) shall evaluate the Resource Parent as the potential surrogate parent, based on the criteria listed above.
- If the Resource Parent is unwilling or unable to serve as the surrogate parent, the Resource Parent and the Worker shall discuss other qualified persons who might serve as the surrogate parent.
- If no community person is appropriate, the ASWS may appoint the COR Worker or the COS (if applicable) as the surrogate parent, with approval of the assigned RD.
- The COR ASWS shall appoint, in writing a person who is willing to serve as the child's surrogate parent. The roles and responsibilities shall be fully explained. A copy of this letter shall be sent to the COS and the Resource Parent (if Resource Parent is not the surrogate parent). The eligibility of the surrogate parent, according to the criteria listed, shall be documented in the child's case record.

# Surrogate Parents

- The COR ASWS shall notify the educational facility in writing of the child's surrogate parent. The eligibility of the surrogate parent, according to the criteria listed, shall be documented in the child's case record. The eligibility of the surrogate parent, according to the criteria listed, shall be documented in the child's case record.

Other Residential Facilities

When a handicapped foster child is placed in a residential facility other than a licensed foster home, the following procedures shall be used:

- The COR shall write the facility, asking that they identify a surrogate parent for the child.
- The person shall meet all the criteria listed above and be willing to serve.
- The COR shall insure that the identified surrogate parent meets the criteria and this shall be documented in the child's case record.
- The COR shall notify in writing the surrogate parent, the educational facility, and the residential facility of the appointment.

**(4) Roles and Responsibilities**

The roles and responsibilities of the surrogate parents include the following:

- Become familiar with the child's educational needs through direct contact with the child, Resource Parent (if surrogate parent is not the Resource Parent), house parents, Worker, and school or residential staff.

- Participate in training sessions conducted by the State Department of Education.

- Advocate for the child if the educational needs of the child are not being met, through the following methods:

  - Coordinate with the Worker on the needs of the child;

  - Confer with school personnel on needs of child and ability of the educational system to serve the child;

  - Sign relevant educational documents;

  - Request an appeal through the appropriate educational process;

  - Request assistance from any individual, association, or organization which has its objective the well-being of children;

  - Intervene through the judicial system, if necessary.



# Resources

*WrightsLaw*
http://wrightslaw.com/

*Learning Curves-Educational Advocacy for Children in Foster Care* by Kathleen M. McNaught

*All About IEPs* by Peter Wright, Pamela Darr Wright and Sandra Web O'Connor.

*Wrightslaw: Special Education Law* by Peter Wright and Pamela Darr Wright

*Addressing the Educational Needs of Children in Foster Care*-New York State Permanent Judicial Commission on Justice for Children

# Ex. 59A

# Mississippi Department of Human Services



# Resource Guide for Living Independently in Mississippi

Revised 2012

# Mississippi Department of Human Services

# Independent Living

750 N. State St., Jackson, MS

Telephone: (601) 359- 4983, (601) 359-4743, (601) 359-4755 Fax: (601) 359-2570

Dear Reader,

Congratulations! By opening this resource guide, you have realized that there are a variety of careers and educational programs available to you. To help you reach your goals and utilize the resources that are available to you, the Mississippi Department of Human Services' Independent Living Program has developed this resource guide for you. This guide is made up of a large number of contacts, websites, and addresses to help you create a bright future. However, if you happen to discover any problems accessing any of the resources listed in this guide, please call M.D.H.S. at (601) 359-4755.

Again, thank you so much for believing in yourself enough to use this guide as a key to a bright future as you live independently in Mississippi.

Good Luck,

M.D.H.S.

*"Reach for the Stars"*

# Independent Living Services

**Southern Christian Services**
860 East River Place, Suite 104, Jackson, MS 39202
Phone: (601) 354-0983
Toll Free: (800) 624-9075
Fax: (601) 352-8638

## State-Wide Referral Services

## Miscellaneous

- Emergency 911
- MS United Way Information line 211
- Toll Free Number for Information 1-800-555-1212
- Pesticide Hotline 1-800-858-7378
- Migrant Workers 1-888-856-9321
- Parks and Wildlife 1-800-792-1112
- National Response Center (Chemical spills, pollution, etc.) 1-800-424-8802
- National Poison Center 1-800-222-1222
- American Federation of State, County and Municipal Employees 1-202-429-1000
- Amigos de las Americas 1-800-231-7796
- Comptroller of Public Accounts 1-800-252-5555
- Federal Citizen Information Center 1-888-878-3256
- Consumer Product Safety Commission 1-800-638-2772
- Americans with Disabilities Information Line 1-800-514-0301
- Education Resource Information Center (ERIC) 1-800-538-3742
- National Weather Service 601-936-2189
- Peace Corps 1-800-424-8580
- Rural Information Center 1-800-633-7701
- The Center for Community Change 1-877- 777-1536
- National Association of Social Workers 1-202-408-8600
- P.R.E.P.A.R.E. Aftercare 1-800-624-9075
- United States Department of Health and Human Services 1-877-696-6775
- Department of Human Services State Office 1-800-345-6347
- Department of Mental Health 1-877-210-8513

## Help Lines

- CONTACT the Crisis Line (601) 713-HELP (4357)
- Hinds County Human Resources Agency 601-923-3930
- United Way of the Capital Area 601-948-4725
- First Call for Help/Link Line 662-680-5752
- MS Child Abuse and Neglect Hotline 1-800-222-8000

**Child Abuse Hotlines**

- USA National Child Abuse Hotline 1-800-4-A-CHILD (422-4453)
- Mississippi Child Abuse Hotline 1-800-222-8000

**Domestic Abuse Hotlines**

- Domestic Abuse Family Shelter 1-800-649-1092
- Jasper County Crime Line 601-764-3784
- Shelter for Battered Families 601-366-0222

**Lesbian, Bisexual Gay, Transgender, Questioning (LBGTQ)**

- GLBT National Help Center 1-800-246-7743
- Trevor Lifeline 1-866-488-7386
- Lambda Legal 404-897-1880
- Rise Above For Youth 601-922-4968

**Eating Disorders Hotlines**

- National Eating Disorder Association 1-800-931-2237
- C.A.R.E. - Comprehensive Addiction Rehabilitation Education 1-866-518-7551
- Forrest General Hospital - Pine Grove Women's Center 601-288-8100

**Drug and Alcohol Hotlines**

- 24-Hour Addictions Referral Network 1-800-577-4714
- Alcohol and Drug Addiction Referral Hotline 1-800-410-2530
- Alcohol and Drug Hotline 1-800-503-8632
- National Drug Information Treatment and Referral Hotline 1-800-662-4357
- Methodist Rehabilitation Center 601-981-2611
- Alcohol Anonymous 662-746-9962
- Alcohol Anonymous 601-982-0081
- Home of Grace 228-497-1312

**Illness/Medical Hotlines**

- Cancer Information Service 1-800-422-6237
- The CDC (Center for Disease Control) National Prevention Information Network 1-800-458-5231
- CDC Information hotline 1-800-232-4636
- Y-Me Breast Cancer Hotline 1-800-221-2141

**Sexual Assault/ Rape Hotlines**

- Nationwide (RAINN) National Rape Crisis Hotline 1-800-656-4673
- Jackson Rape Crisis Center 601-982-7273

- Domestic Violence/Rape Crisis Center 601-355-8634

**Runaway/ Exploited Children Hotlines**

- National Runaway Switch Board 1-800-786-2929
- National Hotline for Missing and Exploited Children 1-800-843-5678
- Child Find of America Hotline 1- 800-I-AM-LOST (426-5678)

**Suicide and Crisis Hotlines**

- Boys Town Suicide and Crisis Line 1-800-448-3000 or 800-448-1833 (TDD)
- The Crisis Line 601-713-4357
- National Suicide Prevention Lifeline 1-800-273-8255

*"In order for you to be successful, you must not be afraid to ask for help."*

# Organizations That Help the Homeless

- American Red Cross 601-353-5442

- Big Brother Big Sister Mississippi 601-961-9286
- Catholic Charities USA 1-703-549-1390
- Daybreak Shelter 601-355-5467
- Gateway Rescue Mission 601-353-5864
- Enterprise Foundation 1-410-964-1230
- Habitat for Humanity 1-800-422-4828
- Housing Assistance Council 202-842-8600
- HUD 601-965-4757
- Meals on Wheels 601-960-0428
- Mississippi Food Network 601-973-7086
- Mississippi Hospital Association 1-800-289-8884
- National Alliance to End Homelessness 202-638-1526
- National Association of Community Health Centers 301-347-0400
- National Association of Social Workers-MS Chapter 601-936-0557
- National Coalition for the Homeless 202-462-4822
- National Council of Churches of Christ in the USA 212-870-2228
- National Resource Center on Homeless and Mental Illness 1-800-444-7415
- Salvation Army 601-982-4881
- Stewpot Community Services 601-353-2759
- The American Institute of Architects-MS 601-360-0082
- United Way of the Capital Area 601-948-4725
- Women's Shelter of East Texas 1-800-828-7233

*"There is no better gift than a safe home"*

## Hospitals State-Wide

A   

- Alliance Health Center - 5000 Hwy 39 North, Meridian, Lauderdale County, Mississippi
  Phone: (601)-483-6211

- Alliance Healthcare System – 1430 East Salem, Holly Springs, Marshall County, Mississippi
  Phone: (662)-252-1212

B

- Baptist Memorial Hospital Booneville – 100 Hospital Street, Booneville, Prentiss County, Mississippi
  Phone: (662) 720-5000

- Baptist Memorial Hospital DeSoto – 7601 Southcrest Parkway, Southaven, DeSoto County, Mississippi
  Phone: (662) 772-4000

- Baptist Memorial Hospital Golden Triangle – 2520 Fifth Street North, Columbus, Lowndes County, Mississippi
  Phone: (662) 244-1000

- Baptist Memorial Hospital North Mississippi – 2301 South Lamar, Oxford, Lafayette County, Mississippi
  Phone: (662) 232-8100

- Baptist Memorial Hospital Union County - 200 Hwy 30 West, New Albany, Union County, Mississippi
  Phone: (662) 538-7631

- Beacham Memorial Hospital – 205 N Cherry Street, Magnolia, Pike County, Mississippi
  Phone: (601) 783-2351

- Biloxi Regional Medical Center – 150 Reynoir Street, Biloxi, Harrison County, Mississippi
  Phone: (228) 432-1571

- Blair E. Batson Children's Hospital – 2500 N State Street, Jackson, Hinds County, Mississippi
  Phone: (601)-984-1000

- Bolivar Medical Center – 901 Hwy 8 East, Cleveland, Bolivar County, Mississippi
  Phone: (662) 846-0061

C

- Calhoun Health Services – 140 Burke-Calhoun City Road, Calhoun City, Calhoun County, Mississippi
Phone: (662) 377-3000

- Choctaw County Medical Center – 148 Cherry Street, Ackerman, Choctaw County, Mississippi
Phone: (662) 285-6235

- Claiborne County Hospital – 123 McComb Ave, Port Gibson, Claiborne County, Mississippi
Phone: (601) 786-9293

- Covington County Hospital – 701 South Holly Avenue, Collins, Convigton County, Mississippi
Phone: (601) 765-6711

D

- Delta Regional Medical Center – 1400 E Union Street, Greenville, Washington County, Mississippi
Phone: (662) 378-3783

E

- East Mississippi State Hospital – 4555 Highland Park Drive, Meridian, Lauderdale County, Mississippi
Phone: (601)-482-6186

F

- Forrest General Hospital System Forrest County, Mississippi
Phone: (601)-288-7000

- Franklin County Memorial Hospital – 40 Union Church Road, Meadville, Franklin County, Mississippi
Phone: (228) 575-7000

G

- G. V. (Sonny) Montgomery VA Medical Center – 1500 E Woodrow Wilson Drive, Jackson, Hinds County, Mississippi
Phone: (601) 362-4471 or (800) 949-1009 (in-state)

- Garden Park Medical Center – 15200 Community Road. Gulfport, Harrison County, Mississippi
  Phone: (228) 575-7000

- George County Hospital – 859 Winter Street, Lucedale, George County, Mississippi
  Phone: (601) 947-3162

- Gilmore Health System, Inc. – 1105 Earl Frye Blvd, Amory, Monroe County, Mississippi
  Phone: (662) 256-7111

- Greenwood Leflore Hospital – 1401 River Road, Greenwood, Leflore County, Mississippi
  Phone: (662) 451-4570

- Grenada Lake Medical Center – 960 Avent Drive, Grenada, Grenada County, Mississippi
  Phone: (662)227-7000

- Gulf Coast Medical Center – 180 Debuys Road, Biloxi, Harrison County, Mississippi
  Phone: (228) 388-0357

- Gulfport Memorial Hospital – 4500 Thirteenth Street, Gulfport, Harrison County, Mississippi
  Phone: (228) 867-4000

H

- Hancock Medical Center – 149 Drinkwater Blvd, Bay Saint Louis, , Mississippi
  Phone: (228) 467-8600

- Hardy Wilson Memorial Hospital – 233 Magnolia Street, Hazlehurst, Copiah County, Mississippi
  Phone: (601) 894-4541

- H.C. Watkins Memorial Hospital – 605 S Archusa Avenue, Quitman, Clarke County, Mississippi
  Phone: (601) 776-5055

- Hillcrest Hospital – 140 Burke-Calhoun City Road, Calhoun City, Calhoun County, Mississippi
  Phone: (662) 628-1365

- Humphreys County Memorial Hospital – 500 CCC Road, Belzoni, Humphreys County,

Mississippi
Phone: (662) 247-3831

J 

- Jasper General Hospital - 15 South 6th Street, Bay Springs, Jasper County, Mississippi
Phone: (601) 764-2101

- Jeff Anderson Regional Medical Center – 2124 14th Street, Meridian, Lauderdale County, Mississippi
Phone: (601) 553-6881

- Jefferson County Hospital – 809 S Main Street, Fayette, Jefferson County, Mississippi
Phone: (601) 786-9789

- Jefferson Davis Community Hospital – 1102 Rose Street, Prentiss, Jefferson Davis County, Mississippi
Phone: (601) 792-4276

K 

- Kilmichael Hospital – 301 Lamar Avenue, Kilmichael, Montgomery County, Mississippi
Phone: (662) 262-4311

- King's Daughters Medical Center - 427 Hwy 51 North, Brookhaven, Lincoln County,, Mississippi
Phone: (601) 833-6011

L 

- Lackey Memorial Hospital – 330 N Broad Street, Forest, Scott County, Mississippi
Phone: (601) 469-4151

- Laird Hospital – 25117 Hwy 15, Union, Newton County, Mississippi
Phone: (601) 774-8214

- Leake Memorial Hospital – 310 Ellis Avenue, Carthage, Leake County, Mississippi
Phone: (601) 267-1290

M 

- Madison County Medical Center – 1421 E. Peace Street, Canton, Madison County, Mississippi

Phone: (601) 859-1331

- Magee General Hospital – 300 3RD Avenue Southeast, Magee, Simpson County, Mississippi
Phone: (601)-849-5070

- Magnolia Regional Health Center – 611 Alcorn Drive, Corinth, Alcorn County, Mississippi
Phone: (662) 293-1000

- Marion General Hospital – 1560 Sumrall Road, Columbia, Marion County, Mississippi
Phone: (601) 736-6303

- Memorial Hospital at Gulfport – 4500 13th Street, Gulfport, Harrison County, Mississippi
Phone: (228) 867-4000

- Methodist Rehabilitation Center – 1350 E. Woodrow Wilson, Jackson, Hinds County, Mississippi
Phone: (601) 981-2611

- Mississippi Baptist Health Systems, Inc – 1225 N State Street, Jackson, Hinds County, Mississippi
Phone: (601) 968-1000

- Mississippi State Hospital – 3550 Hwy 468 West, Whitfield, Rankin County, Mississippi
Phone: (601) 351-8018

- Monfort Jones Memorial Hospital – 220 Hwy 12 West, Kosciusko, Attala County, Mississippi
Phone: (662) 289-4311

N

- Natchez Community Hospital – 129 Jefferson Davis Blvd, Natchez, Adams County, Mississippi
Phone: (601) 445-6200

- Neshoba County General Hospital – 1001 Holland Avenue, Philadelphia, Neshoba County, Mississippi
Phone: (601) 663-1200

- North Mississippi Medical Center Eupora – 70 Medical Plaza, Eupora, Webster County, Mississippi
Phone: (662) 258-6221

- North Mississippi Medical Center Iuka – 1777 Curtis Drive, Iuka, Tishomingo County, Mississippi
  Phone: (662) 423-6051

- North Mississippi Medical Center Pontotoc – 176 S Main Street, Pontotoc, Pontotoc County, Mississippi
  Phone: (662) 489-5510

- North Mississippi Medical Center Tupelo – 830 South Gloster, Tupelo, Lee County, Mississippi
  Phone: (662) 377-3000

- North Mississippi Medical Center West Point – 835 Medical Center Drive, West Point, Clay County, Mississippi
  Phone: (662) 495-2300

- North Mississippi State Hospital – 830 South Gloster, Tupelo, Lee County, Mississippi
  Phone: (662)-690-4200

- North Oak Regional Medical Center – 401 Getwell Drive, Senatobia, Tate County, Mississippi
  Phone: (662) 562-3100

- North Sunflower County Hospital – 840 N. Oak Avenue, Ruleville, Sunflower County, Mississippi
  Phone: (662) 756-2711

- Noxubee General Hospital – 606 N Jefferson Street, Macon, Noxubee County, Mississippi
  Phone: (662) 726-4231

O 

- Ocean Springs Hospital – 1250 Pass Road, Ocean Springs, Jackson County, Mississippi
  Phone: (228)497-7470

- Okolona Community Hospital – 1217 South Street, Okolona, Chickasaw County, Mississippi
  Phone: (662) 323-4320

- Oktibbeha County Hospital - 400 Hospital Road, Starkville, Oktibbeha County, Mississippi
  Phone: (662) 323-4320

P

Parkwood Behavioral Health System – 357 Congress Blvd, Olive Branch, DeSoto County, Mississippi
Phone: (662) 895-4900

Pearl River County Hospital – 305 West Moody Street, Poplarville, Pearl River County, Mississippi
Phone: (601) 795-4543

Perry County General Hospital – 206 Bay Street, Richton, Perry County, Mississippi
Phone: (601) 788-6316

Pioneer Community Hospital of Aberdeen – 400 South Chestnut Street, Aberdeen, Monroe County, Mississippi
Phone: (662) 369-2455

Promise Specialty Hospital of Vicksburg – 850 Belva Drive, Vicksburg, Warren County, Mississippi
Phone: (601) 619-3526

Q

Quitman County Hospital – 340 Getwell Drive, Marks, Quitman County, Mississippi
Phone: (662) 326-8031

R

Rankin Medical Center – 350 Crossgates Blvd, Brandon, Rankin County, Mississippi
Phone: (601) 825-2811

Riley Hospital – 1102 Constitution Avenue, Meridian, Lauderdale County, Mississippi
Phone: (601) 693-2511

River Oaks Hospital – 1030 River Oaks, Flowood, Rankin County, Mississippi
Phone: (601) 932-1030

River Region Health System – 2100 Hwy 61 North, Vicksburg, Warren County, Mississippi
Phone: (601)-883-5000

S

Saint Dominic-Jackson Memorial Hospital – 969 Lakeland Drive, Jackson, Hinds County, Mississippi
Phone:(601) 200-2000

Sharkey-Issaquena Community Hospital – 47 South Forth Street, Rolling Fork, Sharkey County, Mississippi
Phone: (662) 873-4395

Simpson General Hospital – 1842 Simpson Hwy 149, Mendenhall, Simpson County, Mississippi
Phone: (601) 847-2221

Singing River Hospital – 2809 Denny Avenue, Pascagoula, Jackson County, Mississippi
Phone: (601) 426-4000

South Sunflower County Hospital - 121 East Baker Street, Indianola, Sunflower County, Mississippi
Phone: (662) 887-3115

South Mississippi State Hospital – 536 Baker Street, Purvis, Lamar County, Mississippi
Phone: (601)794-0100

Southwest Mississippi Regional Medical Center – 215 Marion Avenue, McComb, Pike County, Mississippi Phone: (601) 249-5500

T

Tallahatchie General Hospital – 1050 Matthew Road, Charleston, Tallahatchie County, Mississippi
Phone: (662) 647-2173

Tippah County Hospital – 201 South Market Street, Ripley, Tippah County, Mississippi
Phone: (662) 837-9221

Trace Regional Hospital - 1004 E Madison Street, Houston, Chickasaw County, Mississippi
Phone: (662) 456-3700

Tri-Lakes Medical Center – 303 Medical Center Drive, Batesville, Panola County, Mississippi
Phone: (662) 563-5611

Tyler Holmes Memorial Hospital – 409 Tyler Holmes Drive, Winona, Montgomery County, Mississippi
Phone: (662) 283-4114

U  

University of Mississippi Medical Center – 2500 N State Street, Jackson, Hinds County, Mississippi
Phone: (601) 984-1000

W  

Walthall County General Hospital – 100 Hospital Drive, Tylertown, Walthall County, Mississippi
Phone: (601) 876 -2122

Wayne General Hospital – 950 Matthew Drive, Waynesboro, Wayne County, Mississippi
Phone: (601)735-5151

Wesley Medical Center – 5001 W Hardy Street, Hattiesburg, Forrest County, Mississippi
Phone: (601) 268-8000

Woman's Hospital - 1026 N. Flowood, Drive, Jackson, Hinds County, Mississippi
Phone: (601)932-1030

Y  

Yalobusha General Hospital – 630 S Main Street, Water Valley, Yalobusha County, Mississippi
Phone: 662-473-1411



# Medical Organizations

| | |
|---|---|
| • American College of Neuropsychpharmacology | 1-615-324-2360 |
| • American Psychiatric Association | 1-703-907-7300 |
| • American Psychological Association | 1-800-374-2721 |
| • Anxiety Disorders Association of America | 240-485-1001 |
| • Boston University Center for Psychiatric Rehab | 1-617-353-3549 |

- Brain Tissue Resource Center 1-800-333-0338
- Depression and Bipolar Support Alliance 1-800-826-3632
- Fountain House 1-212-582-0340
- Madison Institute of Medicine 1-608-827-2470
- Mental Health Law Project 1-202-467-5730
- National Alliance for the Mentally Ill 1-800-950-6264
- National Association of Psychiatric Health Systems 1-202-393-6700
- National Association of State Mental Health Program 1-703-739-9333
- National Council for Community Behavioral Health Care 1-301-984-6200
- National Institute of Mental Health Information Center 1-800-647-2642
- Obsessive Compulsive Foundation 1-617-973-5801
- Eating Disorders Hotline 1-800-931-2237
- National Disability Works Network 1-202-408-9514
- American Academy of Child & Adolescent Psychiatry 1-202-966-7300
- Center for Disease Control 1-800-232-4636
- Parents Anonymous 1-909-621-6184
- Juvenile Diabetes Research Foundation 1-800-533-CURE
- Living Bank International (Natl. Organ Donor Registry) 1-800-528-2971
- Lupus Foundation of America 1-800-558-0121
- National Arthritis and Musculoskeletal and Skin Disease Info. 1-301-495-4484
- National Center for Health Statistics 1-301-458-4636
- National Down Syndrome Congress 1-800-232-6372
- National Diabetes Information Clearinghouse 1-301-654-3327

- National Health Information Center 1-800-336-4797
- National Highway Traffic Safety Administration 1-800-424-9393
- National Institute of Allergy and Infectious Diseases 1-301-496-5717
- National Institute on Deafness and Other Communications Dis. 1-800-241-1044
- National Kidney and Urologic Diseases Information Clearingh. 1-301-496-5717
- National Library Service for the Blind and Physically Handi. 1-800-424-8567
- National Parkinson's Foundation 1-800-327-4545
- Office of Minority Health Resource Center 1-800-444-6472
- American Society of Plastic Surgeons 1-800-635-0635
- Sudden Infant Death Syndrome (SIDS) 1-800-221-SIDS
- Spina Bifida Hotline 1-800-621-3141
- Stutter's Hotline 1-800-221-2483
- Tuberous Sclerosis 1-800-225-6872
- Cancer Information Service 1-800-422-6237

# Numbers To Help You Get Started

- Entergy (lights)                                          1-800-368-3749

- Mississippi Power (lights)                                1-800-532-1502

- Atmos Energy (Gas)                                        1-888-286-6700

- Mississippi North Mississippi Utility (Water)            1-877-405-1750

- Bellsouth (AT&T) (Phone, Internet)                       1-888-757-6500

- Bellsouth (AT&T) (Digital TV Services)                   1.888-757-6500

- Comcast (Cable, Internet, Phone)                         1-800-266-2278

- Nationwide (Renter's, Homeowner's Insurance, Car)   1-877-669-6877

- AllState (Renter's / Homeowner's Insurance, Car)     1-800-ALLSTATE

- Emergency Family Assistance                               601-923-3950

  (Will help you in time of need with lights, gas, rental assistance)

- Jackson-Evers International Airport      601-932-2859 or 601-939-5631

- Greyhound Bus Lines                                      1-800-231-2222

- Rail (Amtrak)                          601-355-6350 or 1-800-872-7245

- Mississippi Vital Records (birth and death certificates)   (601) 576-7981


# **Housing**

- Fair Housing HUD                                         1-202-708-4252

- Housing and Urban Development                            1-800-245-2691

- Public and Indian Housing                               1-202-708-0950

- Fair Housing and Discrimination                         1-800-896-7743

- Mississippi Faith-Based Coalition                       1-228-863-4024

# Organizations That Help with Legal Matters

- American Correctional Association 1-800-222-5646
- American Jail Association 1-301-790-3930
- International Association of Chiefs of Police 1-703-836-6767
- Legal Aid (Hinds, Madison and Rankin Co.) 601-948-6752
- Mental Health Law Project 1-202-467-5730
- Mississippi Legal Services.org 1-800-498-1804
- National Alliance for the Mentally Ill 1-800-633-3760
- North Mississippi Rural Legal Services 1-800-498-1804
- State Assosciation of State Mental Health Program Directors 1-703-739-9333
- National Center for State Courts 1-757-253-2000
- National Sheriffs Association 1-703-836-7827
- Judge Baseline Center for Mental Health Law 1-202-467-5730

# Federal Programs

- Federal Information Center Program 1-800-688-9889
- Veteran' special issue Helpline 1-800-749-8387
- Fraud Hotline 1-800-424-5454
- Medicare 1-800-633-4227
- Social Security Administration 1-800-772-1213
- Department of Veteran Affairs Information Service 1-800-827-1000

# Mississippi Area Social Security Offices

| | City | Address | Phone |
|---|---|---|---|
| • | Biloxi | 946 Tommy Munro Dr., Biloxi, MS 39532 | 228-388-1432 |
| • | Brookhaven | 1392 Johnny Johnson Dr., Brookhaven, MS 39601 | 601-833-3951 |
| • | Clarksdale | 236 Sharkey St. Rm. 226, Clarksdale, MS 38614 | 662-627-3276 |
| • | Cleveland | 407 Industrial Parkway Cleveland, MS 38732 | 662-846-6664 |
| • | Columbus | 3577 Bluecutt Rd., Columbus, MS 39705 | 662-328-5112 |
| • | Corinth | 906 S. Cass St. 38834, Corinth, MS 38834 | 662-287-9922 |
| • | Greenville | 305 Main St. Rm. 201, Greenville, MS 38701 | 662-378-2107 |
| • | Greenwood | 604 Yalobusha St., Greenwood, MS 38930 | 662-453-6411 |
| • | Grenada | 1301 Sunset Dr. Suite J, Grenada, MS 38901 | 662-227-1274 |
| • | Gulfport | 9394 Three Rivers Rd. Gulfport, MS 39503 | 228-868-2854 |
| • | Hattiesburg | Rm. 100, 701 N. Main St., Hattiesburg, MS 39401 | 601-544-7351 |
| • | Jackson | Rm. 225 100 W. Capitol St., Jackson, MS 39269 | 601-965-5377 |
| • | Kosciusko | 80 Veteran Memorial Dr., Kosciusko, MS 39090 | 662-289-4911 |
| • | Laurel | 446 N. 6th Ave., Laurel, MS 39440 | 601-649-9411 |
| • | McComb | 211 Gay St., McComb, MS 39648 | 601-684-4831 |
| • | Meridian | 4817 North Park Dr., Meridian, MS 39305 | 601-693-5010 |
| • | Moss Point | 6000 Hwy. 63, Moss Point, MS 39563 | 228-474-7021 |
| • | Natchez | 110 Lower Woodville Rd., Ground Floor, Natchez, MS 39120 | 601-442-3724 |

- Newton 558 Deer Field Dr., Forest, MS 39074 601-469-1177
- Olive Branch 8760 Mid South Dr., Olive Branch, MS 38654 662- 890-0439
- Pascagoula 1225 Jackson Ave., Pascagoula, MS 39576 228-762-3370
- Philadelphia 1120 E. Main St. E. Gate PL#28 Philadelphia, MS 39350 601-656-3211
- Starkville 101-B GT Thames Dr., Starkville, MS 39759 662-323-9211
- Tupelo 199 Saddle Creek Dr. Tupelo, MS 38801 662-842-6582
- Vicksburg 4155 Clay St., Suite 132, Vicksburg, MS 39183 601-636-0973

## Educational Organizations/Services

- Mississippi School of the Arts www.msa.k12.ms.us
- The Mississippi School for Math and Science 1-800-553-6459
- Mississippi GED Online www.colin.edu/gedonline
- My GED.com www.myged.com
- Willowood Developmental Center 601-366-0123 Willowooddevelopmentalcenter.org
- Hudspeth Regional Center 601-664-6000
- Mississippi Institution of Higher Learning www.ihl.state.ms.us
- College Access Planning 601-713-2715 www.naildowncollege.com
  - www.actstudent.org
  - www.act.org

# County Resources

## Adams County

Adams County Department of Human Services 601-442-7031
P.O. Box 852
150 E. Franklin St.
Natchez, MS 39121

Adams County Health Department 601-445-4601
415 Hwy. 61 N.
Natchez, MS 39129

Adams County Mental Health Office 601-446-6634
200 S Wall St.
Natchez, MS 39120

MS State Extension Services 601-445-8201
75A Carthage Point Rd.
Natchez, MS 39120

Natchez Community Hospital 601-454-6200
129 Jefferson Davis Blvd
Natchez, MS 39120

Natchez Regional Medical Center 601-443-2100
54 Seargent Prentiss Drive
Natchez, MS 39120

## Alcorn County

Alcorn County Department of Human Services 662-286-7738
P.O. Box 2170
3001 Hwy. 72 E.
Corinth, MS 38834

Alcorn County Health Department 662-287-6121
3706 Jo Ann Dr.
Corinth, MS 38834

Timber Hills Mental Health Center 662-286-9883
P.O. Box 839
303 N. Madison
Corinth, MS 38835-0839

MS State Extension Service 662-286-7755
P.O. Box 539
Corinth, MS 38835

Magnolia Regional Health Center 662-293-1000
611 Alcorn Drive
Corinth, MS 38835

## Amite County

Amite County Department of Human Services 601-657-8066
P.O. Box 305
185 Irene St.
Liberty, MS 39645

Amite County Health Department 601-657-8351
P.O. Box 209
Liberty, MS 39645

Amite County Mental Health Office 601-657-4354
315 Main St.
Liberty, MS 39645

Liberty Head Start Center 601-657-4022
P.O. Box 400
West Freedom Dr.
Liberty, MS 39645

## Attala County

Mississippi Department of Human Services 662-289-4881
P.O. Box 729
717 Fairground Rd.
Kosciusko, MS 39090

Attala County Health Department 662-289-2351
999 Martin L. King Dr.
Kosciusko, MS 39090

MS Extension Service 662-289-5431
P.O. Box 160
715 Fairground Rd.
Kosciusko, MS 39090

Region 6 Mental Health Center 662-453-6211

Life Help
Old Browning Road
P.O. Box 1505
Greenwood, MS 38935-1505

Monfort Jones Memorial Hospital 662-289-4311
220 Hwy 12 West
Kosciusko, MS 39090

## Benton County

Mississippi Department of Human Services 662-224-6271
P.O. Box 37
Hwy 370
Ashland, MS 38603

Benton County Health Department 662-224-6442
105 4th St.
Ashland, MS 38603

MS State Extension Service 662-224-6330
382 Ripley Ave.
Ashland, MS 38603

Region 3 Mental Health Center 662-844-1717
2434 E. Eason Blvd.
Tupelo, MS 38804

Bolivar Energy Authority 731-658-5257
815 Tennessee Street
Bolivar, Tennessee

Holly Springs Utility Department 662-224-4411
Hwy 4 East
Holly Springs, Mississippi

New Albany Gas, Light and Water 662-534-1041
PO Drawer 727
New Albany, Mississippi

Tippah Electric Power Association 662-837-8139
109 E. Cooper Street
Ripley, Mississippi
Ashland Water, Gas and Sewer 662-224-6282
1587 Boundary Drive
Ashland, Mississippi 38603

Falkner Water 662-837-4940
PO Box 479
Falkner, Mississippi

Hickory Flat Water 662-333-7884
PO Box 479
Hickory Flat, Mississippi

Bond Memorial Library 662-224-6400
PO Box 308
Ashland, Mississippi 38603

Hickory Flat Library 662-333-7663
1067 Spruce Street
Hickory Flat, MS

## Bolivar County

Mississippi Department of Human Services 662-843-0294
Bolivar East
P.O. Box 367
206 Pearman Ave.
Cleveland, MS 38732

Bolivar West 662-759-3551
P.O. Box 368
706 Bradford St.
Rosedale, MS 38769

Bolivar County Health Department 662-843-2706
P.O. Box 550
711 3rd St.
Cleveland, MS 38732

MSU Extension Service 662-843-8371
P.O. Box 1678
406 N. Martin Luther King Dr.
Cleveland, MS 38732

Region 5 Mental Health 662-335-5274
Delta community Mental Health Services
1654 E. Union St.
Greenville, MS 38704

Bolivar Medical Center 662-846-0061
901 Hwy 8 East
Cleveland, MS 38732

## Calhoun County

Mississippi Department of Human Services                    662-412-3183
P.O. Box 99
235 S. Murphree St.
Pittsboro, MS 38951

Calhoun County Health Department                    662-412-3260
P.O. Box 59
Pittsboro, MS 38951

MSU Extension Service                    662-412-3177
P.O. Box 118
121 Parker St.
Pittsboro, MS 38951

Region 2 Mental Health                    662-234-7521
Communicare
152 Hwy. 7, South
Oxford, MS 38655

Calhoun Health Services                    662-377-3000
140 Burke-Calhoun City Road
Calhoun City, MS

## Carroll County

Mississippi Department of Human Services                    662-237-9235
P.O. Box 176
101 Jefferson St.
Carrollton, MS 38917

At&t Phone Company                    1-800-222-0300

Cable One                    662-226-2000
2247 Commerce Street

Carroll County Health Department                    662-237-9224
P.O. Box 87
7225 MS Hwy. 17 Suite 8
North Carrollton, MS 38917

Delta Electric                    662-453-6352
1700 Hwy 82 W.
Greenwood, Mississippi

Library                                    662-237-6268
1102 Lexington Street
Carrollton, Mississippi

MSU Extension Service                      662-237-6926
P.O. Box 59
105-B E. Washington St.
Carrollton, MS 38917

Region 6 Mental Health                     662-453-6211
Life Help
P.O. Box 1
2504 Old Browning Rd.
Greenwood, MS 38930

Tallahatchie Valley Electric               1-800-368-3749
250 Power Drive
Batesville, MS 38606

## Chickasaw County

Mississippi Department of Human Services   662-447-5497
Chickasaw East
234 W. Main St.
Okolona, MS 38860

Mississippi Department of Human Services
Chickasaw West                             662-456-3978
101 Castle St.
Houston, MS 38851

Ms State Extension Service                 662-456-4269
Lee Horn Dr., Suite 4
Houston, MS 38851-2204

Chickasaw County Health Department         662-456-3737
332 N. Jefferson
Houston, MS 38851

Region 3 Mental Health                     662-844-1717
2434 S. Eason Blvd.
Tupelo, MS 38804

Okolona Community Hospital                 662-323-4320
1217 South Street
Okolona, MS

## Choctaw County

Mississippi Department of Human Services 662-285-3782
P.O. Box 280
583 W. Main St.
Ackerman, MS 39735

Choctaw County Health Department 662-285-6213
P.O. Box 400
123 Chester St.
Ackerman, MS 39735

Region 7 Mental Health 662-323-9261
Community Counseling Services
P.O. Box 1188
302 N. Jackson St.
Starkville, MS 39760-1188

MSU Extension Service 662-285-6337
P.O. Box 370
Harmon Circle-Courthouse Annex
Ackerman, MS 39735-0370

Choctaw County Medical Center 662-285-6235
148 Cherry Street
Ackerman, MS 39735

## Claiborne County

Claiborne County Department of Human Services 601-437-5159
P.O. Box 1013
417 Industrial Dr.
Port Gibson, MS 39150

Claiborne County Health Department 601-437-5184
P.O. Box 447
902 S. Market St.
Port Gibson, MS 39150

Claiborne County Mental Health Office 601-437-8185
2090 Hwy 61 N.
Port Gibson, MS 39150

Claiborne County Hospital 601-786-9293
123 McComb Avenue

Port Gibson, MS 39150

## Clarke County

Clarke County Department of Human Services — 601-776-3529
P.O. Box 30
29 Harris Ave.
Quitman, MS 39355-0030

Clarke County Health Department — 601-776-2149
426 W. Donald St.
Quitman, MS 39355

Weems Community Mental Health Center — 601-483-4821
P. O. Box 4378
1415 College Rd.
Meridian, MS 39304

H.C. Watkins Memorial Hospital — 601-776-5055
605 S Archusa Avenue
Quitman, MS 39355

## Clay County

Mississippi Department of Human Services — 662-494-8987
P.O. Drawer 777
360 Washington St.
West Point, MS 39773

Clay County Health Department — 662-494-4514
P.O. Box 331
138 S. Division
West Point, MS 39773

North Mississippi Medical Center — 662-495-2300
835 Medical Center Drive
West Point, MS 39773

Region 7 Mental Health — 662-323-9261
Community Counseling Services
P.O. Box 1188
302 North Jackson St.
Starkville, MS 39760-1188

MS Extension Service — 662-494-5371
218 W. Broad St.
West Point, MS 39773

## Coahoma County

Mississippi Department of Human Services 662-624-3050
P.O. Box 310
917 Ohio Ave.
Clarksdale, MS 38614

Coahoma County Health Department 662-624-8316
1850 Cheryl Street
Clarksdale, MS 38614

## Copiah County

Copiah County Department of Human Services 601-894-4666
640 Georgetown St.
Hazlehurst, MS 39083

Copiah County Health Department 601-894-2271
640 Georgetown Rd.
Hazlehurst, MS 39083

Region 8 Mental Health Center 601-894-2018
P.O. Box 728
1019 Carroll Dr.
Hazelhurst, MS 39083

Copiah County Extension Services 601-892-1809
P.O. Box 789
2040 W. Gallman Rd.
Hazlehurst, Mississippi 39083

AJFC 601-894-4547
301 W. Gallatin Street
Hazlehurst, Mississippi 39083

Jefferson Regional Library 601-894-1681
200 S Jackson Street
Crystal Springs, MS 39059

Friends of Children of Mississippi 601-892-5991
400 Harmony Road
Crystal Springs, Mississippi 39059

Hardy Wilson Memorial Hospital 601-894-4514
233 Magnolia Street
Hazlehurst, MS 39083

## Covington County

Covington County Department of Human Services 601-765-5005
P.O. Box 1179
502 Arrington Ave.
Collins, MS 39428

Covington County Health Department 601-765-4291
P.O. Box 940
600 South Arrington
Collins, MS 39428

MAP Team "Make a Plan" Multi disciplinary 601-582-1149
Team for Children at risk for placement
P.O. Box 1030
110 Patton Ave.
Hattiesburg, MS 39403

Pine Belt Mental Healthcare 601-765-4514
P.O. 1364
22 Westview Dr.
Collins, MS 39428

Covington County Hospital 601-765-6711
701 South Holly Avenue
Collins, MS 39428

## Desoto County

Desoto County Department of Human Services 662-429-1480
P.O. Drawer 240
3246 Hwy. 51 S., Suite 2
Hernando, MS 38632

Desoto County Health Department 662-429-9814
2705 Hwy. 51 South
Hernando, MS 38632

MSU Extension Service 662-429-1343
3260 Hwy. 51 South
Hernando, MS 38632

Region 2 Mental Health 662-234-7521
Communicare
152 Hwy 7 South
Oxford, MS 38655

Parkwood Behavioral Health System 662-895-4900

357 Congress Blvd
Olive Branch, MS

## Forrest County

Forrest County Department of Human Services 601-554-4354
P.O. Box 1938
1604 W. Pine St.
Hattiesburg, MS 39401

Forrest County Health Department 601-583-0291
5008 Hwy. 42
Hattiesburg, MS 39401

Mental Health Center 601-544-4641
PO Box 1030
103 S. 19th Avenue
Hattiesburg, MS 39403

MAP Team "Make a Plan" Multi disciplinary 601-582-1149
Team for children at-risk for placement

Forrest General Hospital System 601-288-7000
711 W Lincoln Street
Hattiesburg, MS 39403

Wesley Medical Center 601-268-8000
5001 W Hardy Street
Hattiesburg, MS 39403

## Franklin County

Franklin County Department of Human Services 601-384-2369
P.O. Box 428
90 Mill Rd.
Bude, MS 39630

Franklin County Health Department 601-384-5871
P.O. Box 99
Bude, MS 39630

Franklin County Mental Health Office 601-384-2261
47 Main St. E

Meadville, MS 39653

MSU Extension Service 601-384-2349
Walnut Street
Meadville, MS 39653

Franklin County Memorial Hospital 228-575-7000
40 Union Church Road
Meadville, MS 39653

## George County

George County Department of Human Services 601-947-0230
P.O. Box 177
204 London St. Suite A
Lucedale, MS 39452

George County Health Department 601-947-4217
166 W. Ratliff St.
Lucedale, MS 39452

Singing River Services 228-497-0690
3407 Shamrock Court
Gautier, MS 39553

MAP Team "Make a Plan" Multi disciplinary 601-947-4274
Team for children at-risk for placement

George County Hospital 601-947-3162
859 Winter Street
Lucedale, MS 39452

## Greene County

Greene County Department of Human Services 601-394-2730
P.O. Box 40
1008 Jackson Ave.
Leakesville, MS 39451

Greene County Health Department 601-394-2389
P.O. Box 130
1799 S. Davis St.
Leakesville, MS 39451

Mental Health Center 601-394-5047
P.O. Box 526
1501 Lackey Street

Leakesville, MS 39451

MAP Team "Make a Plan" Multi disciplinary Team for children at-risk for placement — 601-582-1149

MS Extension Services — 601-394-2702
P.O. Box 730
#2 Oak Street
Leakesville, MS 39451

## Grenada County

Greene County Department of Human Services — 662-226-1990
P.O. Box 945
1240 Fairground Rd.
Grenada, MS 38901

Grenada County Health Department — 662-226-3711
1241 S. Mound St.
Grenada, MS 38901

Elizabeth Jones Library — 662-226-2072
1050 Fairfield Avenue
Grenada, Mississippi 38901

MSU Extension Service — 662-226-2061
1240 Fairground Road, Suite E
Grenada, MS 38901

Region 6 Mental Health — 662-453-6211
Life Help
Old Browning Rd.
P.O. Box 1505
Greenwood, MS 38935-1505

Atmos Energy — 800-286-6700
1456 S. Commerce
Grenada, Mississippi 38901

Scott Petroleum — 662-226-4014
22360 Hwy 6
East Grenada, Mississippi 38901

G T & Y Utility District — 662-226-0201
12065 Hwy 51

North Grenada, Mississippi 38901

Greenwood-Leflore Hospital 662-451-4570
1401 River Road
Greenwood, MS 38935
Grenada Lake Medical Center 662-227-7000
960 Avent Drive
Grenada, MS 38901

## Hancock County

Hancock County Department of Human Services 228-467-4100
3058 Longfellow Dr. Trailer #17
Bay St. Louis, MS 39520

Hancock County Health Department 228-467-5236
3206 Longfellow Rd.
Bay St. Louis, MS 39520

Mental Health Center 228-467-1881
819-B Central Ave.,
Bay St. Louis, MS 39520-3913

## Harrison County

Harrison County Department of Human Services 228-897-5790
P.O. Box 3408
10260 Larkin Smith Dr.
Gulfport, MS 39505-3408

Harrison County Health Department 228-863-1036
1102 45th Avenue
Gulfport, MS 39501

Gulf Coast Mental Health 228-863-1132
Broad Ave.
Gulfport, MS 39501-3603

Biloxi Regional Medical Center 228-432-1571
150 Reynoir Street
Biloxi, MS

Gulf Coast Medical Center 228-388-0357
180 Debuys Road
Biloxi, MS

Gulfport Memorial Hospital 228-867-4000

4500 Thirteenth Street
Gulfport, MS 39501

## Hinds County

| | |
|---|---|
| Hinds County Department of Human Services<br>P.O. Box 11677<br>4777 Medgar Evers Blvd.<br>Jackson, MS 39283-1677 | 601-364-7447 |
| Hinds County Health Department<br>P.O. Box 20<br>Jackson Medical Mall Suite 411<br>Jackson, MS 39213 | 601-364-2666 |
| Region 9 Mental Health Center<br>Hinds Behavioral Health Services<br>P.O. Box 7777<br>3450 Hwy. 80 W.<br>Jackson, MS 39209 | 601-321-2400 |
| MSU Extension Service<br>1735 Wilson Blvd.<br>Jackson, MS 39204 | 601-372-4651 |
| Catholic Charities<br>N. Congress Suite 100<br>Jackson,MS 39202 | 601-355-8634 |
| Blair E. Batson Children's Hospital<br>2500 N State Street<br>Jackson, MS 39202 | 601-984-1000 |
| Methodist Rehabilitation Center<br>1350 E Woodrow Wilson<br>Jackson, MS 39202 | 601-981-2611 |
| Mississippi Baptist Health Systems<br>1225 N State Street<br>Jackson, MS 39202 | 601-968-1000 |
| Saint Dominic-Jackson Memorial Hospital<br>969 Lakeland Drive<br>Jackson, MS 39202 | 601-200-2000 |
| University Medical Center<br>2500 N State Street | 601-984-1000 |

Jackson, MS 39202

## Hinds County Libraries

| | |
|---|---|
| The Eudora Welty Library<br>300 North State Street<br>Jackson, MS 39201 | 601- 968-5811 |
| Fannie Lou Hammer Library<br>3450 Albermarle Road<br>Jackson, MS 39213 | 601- 362-3012 |
| Margaret Walker Alexander Library<br>2525 Robinson Road<br>Jackson, MS 39209-0358 | 601-924-5684 |
| Annie Thompson Jeffers Library<br>P.O. Box 358/111 Madison<br>Bolton, MS 39041-0358 | 601-866-4247 |
| Beverly J. Brown Library<br>5795 S.Siwell Road<br>Jackson, MS. 39212 | 601-372-0954 |
| A.E. Wood Memorial Library<br>111 Clinton Blvd.<br>Clinton, MS 39056-5121 | 601-924-5684 |
| Willie Morris Library<br>4912 Old Canton Rd.<br>Jackson, MS 39211 | 601-987-8181 |
| Edwards Public Library<br>105 Williamson Avenue<br>Edwards, MS 39066-0140 | 601-852-2230 |
| Medgar Evers Library<br>4215 Medgar Evers Blvd.<br>Jackson, MS 39213 | 601-982-2867 |
| Northside Library | 601-366-0021 |

807 East Northside Drive
Jackson. MS 39206-5537

Raymond Public Library                              601-857-8721
126 West Court Street
Raymond, MS 39154

Richard Wright Library                              601-372-1621
515 West McDowell Road
Jackson, MS 39204

Ella Bess Austin Library                           601-878-5336
320 West Cunningham Avenue
Terry, MS 39170-0155

Evelyn Taylor Majure Library                       601-885-8381
217 West Main Street
Utica, MS 39175

R.G. Bolden/Anna Belle-Moore Library               601-922-6076
1450 Wiggins Raod
Jackson, MS 39209


## Holmes County

Holmes County Department of Human Services         662-834-0010
P.O. Box 620
Hwy 12 East
Lexington, MS 39095

Holmes County Health Department                    662-834-3142
106 Westwood Ave.
Lexington, MS 39095

Region 6 Mental Health                             662-453-6211
Life Help
Old Browning Rd.
P.O. Box 1505
Greenwood, MS 38935
MSU Extension Service                              662-834-2795
P.O. Box 330
113 W. China St.
Lexington, MS 39095

# Humphreys County

Humphreys County Department of Human Services 601-247-2117
P.O. Box 714
102 Castleman St.
Belzoni, MS 39038

Humphreys County Health Department 662-247-1861
P.O. Box 118
107 South Hayden St.
Belzoni, MS 39038

Region 6 Community Mental-Retardation Center 662-453-6211
Life Help
P.O. Box 1505
Greenwood, MS 38930

MS Extension Services 662-247-2915
P.O. Box 239
103 Castleman Street
Belzoni, MS 39038-0239

Humphrey's County Memorial Hospital 662-247-3831
500 CCC Road
Belzoni, MS 39038

# Issaquena County

Issaquena County Department of Human Services 662-873-2441
P.O. Box 99
Mayersville, MS 39113

Issaquena County Health Department 662-873-6202
297 Race Street
Rolling Fork, Mississippi 39159

Region 5 Mental Health 662-873-6228
Delta Community Mental Health Services
317 W. Race St.
Rolling Fork, MS 39159

# Itawamba County

Itawamba County Department of Human Services 662-862-4851
P.O. Box 637

305 W. Cedar St.
Fulton, MS 38843

Itawamba County Health Department 662-862-3710
P.O. Box 626
110 Crane St.
Fulton, MS 38843

Region 3 Mental Health 662-844-1717
2434 S. Eason Blvd.
Tupelo, MS 38804

MS State Extension Service 662-862-3201
304 C. Wiygul
Fulton, MS 38843

## Jackson County

Jackson County Department of Human Services 228-769-3275
P.O. Box 789
5343 Jefferson St.
Moss Point, MS 39563

Jackson County Health Department 228-762-1117
P.O. Box 1366
1702 Telephone Rd.
Pascagoula, MS 39568

Singing River Services Mental Health Center 228-497-0690
3407 Shamrock Court
Gautier, MS 39553

Ocean Springs Hospital 228-497-7470
1250 Pass Road
Ocean Springs, MS

Singing River Hospital 228-426-4000
2809 Denny Avenue
Pascagoula, MS 39568

## Jasper County

Jasper County Department of Human Services 601-764-3219
P.O. Box 350

37 W. 8th Ave.
Bay Springs, MS 39422

Jasper County Health Department — 601-764-2419
P.O. Box Drawer K
2761 Highway 15
Bay Springs, MS 39422

Region 3 Mental Health — 662-844-1717
2434 S. Eason Blvd.
Tupelo, MS 38804

MS State Extension Service — 662-862-3201
304 C. Wiygul
Fulton, MS 38843

Jasper General Hospital — 601-764-2101
15 South 6th Street
Bay Springs, MS 39422

## Jefferson County

Jefferson County Department of Human Services — 601-786-6010
P.O. Drawer 97
235 Medgar Evers Blvd.
Fayette, MS 39069

Jefferson County Health Department — 601-786-3061
P.O. Box 446
700 Main St.
Fayette, MS 39069

Jefferson County Mental Health Office — 601-786-8091
1555 Main St.
P.O. Box 369
Fayette, MS 39069
Jefferson County Hospital — 601-786-9789

## Jefferson Davis County

Jefferson Davis County Department of Human Services — 601-792-4206
P.O. Box 1167
1185- B Frontage Rd.
Prentiss, MS 39474

Jefferson Davis County Health Department 601-792-5135
1185 –A Frontage Rd.
Prentiss, MS 39474

Mental Health Center 601-792-4872
P.O. Box 979
116 J. E. Johnson Rd.
Prentiss, MS 39474

Southern Pine Electric Power Company 601-649-2711
110 Risher Street
Taylorsville, MS

Windstream Phone Company 800-501-1754

Herring Gas Company 601-792-5416
Meadville, MS

Prentiss Butane Gas Company 601-792-5349
1206 S Columbia Avenue
Prentiss, MS 39474

Pearl River Valley Opportunity 601-792-5356
756 Hwy 98 By-Pass
Columbia, MS 39429

## Jones County

Jones County Department of Human Services 601-426-2266
P.O. Box 1943
923 Sawmill Rd.
Laurel, MS 39441-1943

Jones County Health Department 601-426-3258
5168 Hwy. 11 South
Laurel, MS 39440

Pinebelt Children's Services 601-582-1149
110 Patton Ave.
Hattiesburg, MS 39401

South Central Regional Medical Center 601-426-4000
1220 Jefferson Street
Laurel, MS 39440

## Kemper County

Kemper County Department of Human Services 601-743-9366
P.O. Box 326
Hwy. 39 N.
Dekalb, MS 39328

Kemper County Health Department 601-743-9366
Hwy. 16 West
Dekalb, MS 39328

Region 10 Mental Health Center 601-743-5616
Weems Community Mental Health Center
P.O. Box 344
110 Hopper Avenue
DeKalb, MS 39328

## Lafayette County

Lafayette County Department of Human Services 662-234-1863
P.O. Box 1027
1301-B. Monroe Ave.
Oxford, MS 38655

North MS Regional Center, NMRC 662-234-1476
967 Regional Center Dr.
Oxford, MS 38655

Lafayette County Health Department 662-234-5231
P. O. Box 1395
101 Veterans Dr.
Oxford, MS 38655

Region 2 Mental Health 662-234-7521
Communicare
152 Hwy 7 South
Oxford, MS 38655

MS State Extension Service 662-234-4451
101 Veterans Dr.
Oxford, MS 38655

## Lamar County

Lamar County Department of Human Services 601-794-1080
P.O. Box 779
303 Court St.
Purvis, MS 39475

Lamar County Health Department 601-794-1055
207 Main St.
Purvis, MS 39475

Mental Health Center 601-794-6543
P.O. Box 489
805 Hwy 589
Purvis, MS 39475

South Mississippi State Hospital 601-794-0100
423 Shell Road W
Purvis, MS 39475

## Lauderdale County

MS Department of Human Services 601-484-5124
P.O. Box 4444
5224 Valley St.
Meridian, MS 39304-4444

Lauderdale County Health Department 601-693-2451
5224 Valley St.
Meridian, MS 39304

Region 10 Mental Health Center 601-483-4821
Weems Community Health Center
P.O. Box 4378
1415 College Dr.
Meridian, MS 39304

Alliance Health Center 601-483-6211
5000 Hwy 39 N
Meridian, MS 39304

East Mississippi State Hospital 601-482-6186
4555 Highland Park Drive
Meridian, MS 39304

Jeff Anderson Regional Medical Center 601-553-6881
2124 14th Street
Meridian, MS 39304

Riley Hospital 601-693-2511
1102 Constitution Avenue
Meridian, MS 39304

## Lawrence County

Lawrence County Department of Human Services 601-587-4892
P.O. Box 557
1200 Nola Rd.
Monticello, MS 39654

Lawrence County Health Department 601-587-2561
1230 Nola Rd.
Monticello, MS 39654

Lawrence County Mental Health Office 601-587-4674
1230 Nola Rd.
Monticello, MS 39654

MS State Extension Services 601-587-2271
435 Brinson St., Apt. B
Courthouse Square
Monticello, MS 39654-6003

Southern Pine Electric Power Company 601-649-2711

Magee Gas 601-587-2880
515 3rd Avenue SE
Magee, MS 39111

AJFC Community Action 601-587-4370
1038 A N Union Street
Natchez, MS 39120

Lawrence County Public Library 601-587-2471
142 Washington Street
Monticello, MS 39654

Lawrence County Hospital 601-587-4051
1065 Hwy 84 East
Monticello, MS 39654

## Leake County

Leake County Health Department of Human Services 601-267-8093
P.O. Box 227
115 N. Pearl St.
Carthage, MS 39051

Leake County Health Department 601-267-3072
204 Chipley St.
Carthage, MS 39051

Region 10 Mental Health Center 601-267-3551
Weems Community Mental Health Center
P.O. Box 49
529 Main St.
Carthage, MS 39051

Leake Memorial Hospital 601-267-1290
310 Ellis Avenue
Carthage, MS 39051

## Lee County

Lee County Department of Human Services 662-841-9737
P.O. Box 7057
220 S. Industrial Rd.
Tupelo, MS 38802

Lee County Health Department 662-841-9096
P.O. Box 408
532 S.Church St.
Tupelo, MS 38802

Region 3 Mental Health 662-844-1717
2434 S. Eason Blvd.
Tupelo, MS 38801

MS State Extension Service 662-841-9000
P.O. Box 2297
5338 Cliff Gookin Blvd.
Tupelo, MS 38801

North Mississippi Medical Center 662-377-3000
830 South Gloster
Tupelo, MS 38801

## Leflore County

Leflore County Department of Human Services 662-455-7917
P.O. Box 1848
216 Hwy. 7 North
Greenwood, MS 38930

Leflore County Health Department 662-453-0284
2600 Browning Rd.
Greenwood, MS 38930

Region 6 Mental Health Center 662-453-6211
Life Help
P.O. Box 1505
Old Browning Rd.
Greenwood, MS 38935-1505

MS State Extension Services 662-453-6803
Lock Drawer C
309 W. Market
Greenwood, MS 38935-0419

## Lincoln County

Lincoln County Department of Human Services 601-835-2838
P.O. Box 538
300 E. Chickasaw St.
Brookhaven, MS 39601

Lincoln County Health Department 601-833-3314
P.O. Box 630
1212 Northpark Lane N.E.
Brookhaven, MS 39602

Lincoln County Mental Health Office 601-833-5386
511 Brookman Dr.
Brookhaven, MS 39601

MS State Extension Services 601-835-3460
301 South First Street Room 201
Brookhaven, MS 39601

King's Daughters Medical Center 601-833-6011
427 Hwy 51 North
Brookhaven, MS 39601

## Lowndes County

Lowndes County Department of Human Services 662-329-5744
P.O. Box 1347
3748 Hwy. 45 N.
Columbus, MS 39701

Lowndes County Health Department 662-328-6091
1112 Military Rd.
Columbus, MS 39701

Community Counseling Services 662-328-9225
1001 Main St.
Columbus, MS 39701

Baptist Memorial Hospital 662-244-1000
2520 5th Street N
Columbus, MS 39701

## Madison County

Madison County Department of Human Services 601-859-5858
P.O. Box 203
867 Martin Luther King
Canton, MS 39046

Madison County Health Department 601-859-3316
317 N. Union St.
Canton, MS 39046

Region 8 Mental Health Center 601-859-8371
P.O. Box 526
103 S. Lake Circle
Canton, MS 39046

MS State Extension Services 601-859-3842
P.O. Box 112
152 Watford Parkway
Canton, MS 39046

Madison County Medical Center 601-859-1331
1421 E. Peace Street
Canton, MS 39046

## Marion County

Marion County Department of Human Services 601-736-6044
226 Broad St., Suite 1
Columbia, MS 39429

Marion County Health Department 601-736-2676
908 Sumrall St.

Columbia, MS 39429

Mental Health Center 601-736-6799
P.O. Box 965
217 Dewey St.
Columbia, MS 39429

MS State Extension Services 601-736-8251
1060 Hwy 13, South
Columbia, MS 39429

Marion General Hospital 601-736-6303
1560 Sumrall, Rd
Columbia, MS 39429

## **Marshall County**

Marshall County Department of Human Services 662-252-3465
P.O. Box 218
230 E. College St.
Holly Springs, MS 38635

Marshall County Health Department 662-252-4621
P.O. Box 340
225 S. Market St.
Holly Springs, MS 38635

Region 2 Mental Health Center 662-252-4140
Communicare
P.O. Box 917
820 Hwy. 178 East
Holly Springs, MS 38635

MS State Extension Service 662-252-3541
P.O. Box 489
810 Highway 178 East
Holly Springs, MS 38635

## **Monroe County**

Monroe County Department of Human Services 662-369-2876
P.O. Box 788
104 ½ N. Mattuba St., Aberdeen, MS 39730
300 S. Front St., Suite 1, Amory, MS 38821

Monroe County Health Department 662-256-5341

Amory Clinic
1300 Highway 25 South
Amory, MS 38821

Monroe County Health Department 662-369-8132
307 E. Jefferson St.
Aberdeen, MS 39730

Region 3 Mental Health Center 662-844-1717
2434 S. Eason Blvd.
Tupelo, MS 38801

MS State Extension Service 662-369-4951
517 Hwy. 145 N., Suite 1
Aberdeen, MS 39730

Pioneer Community Hospital of Aberdeen 662-369-2455
400 South Chestnut Street
Aberdeen, MS 39730

## Montgomery County

Montgomery County Department of Human Services 662-283-3430
P.O. Box 149
416 Tyler Holmes Dr.
Winona, MS 38967

Montgomery County Health Department 662-283-3655
707 Alberta Dr.
Winona, MS 38967

Region 6 Mental Health Center 662-288-2529
Life Help
718 Alberta Dr.
Winona, MS 38967

Entergy 800-358-3749

Delta Electric Power Association 662-283-2544
605 North Applegate Street
Winona, Mississippi 38967

Winona Public Utility Co. 662-283-2931
116 North Quitman Street
Winona, Mississippi 38967

| | |
|---|---|
| Hayes Creek Water Association<br>801 Summit Street<br>Winona, Mississippi 38967 | 662-283-3506 |
| Cable One<br>2247 Commerce Street<br>Grenada, Mississippi 38901 | 662-226-2000 |
| Winona Public Library<br>115 North Quitman Street<br>Winona, Mississippi 38967 | 662-283-3443 |
| Kilmichael Public Library<br>102 First Street<br>Kilmichael, Mississippi 39747 | 662-262-7615 |
| Duck Hill Public Library<br>127 North State Street<br>Duck Hill, Mississippi 38925 | 662-565-2391 |
| Atmos Energy | 1-888-283-6700 |
| Tyler Holmes Memorial Hospital<br>409 Tyler Holmes Drive<br>Winona, MS 38967 | 662-283-4114 |

## Neshoba County

| | |
|---|---|
| Neshoba County Department of Human Services<br>301 Main St.<br>Philadelphia, MS 39350 | 601-656-5175 |
| Neshoba County Health Department<br>1014 Holland Ave.<br>Philadelphia, MS 39350 | 601-656-4371 |
| Weems Community Health Center<br>P.O. Box 423<br>1011 Posey Avenue<br>Philadelphia, MS 39350<br>601-656-3451 | 601-656-3451 |
| MS State Extension Services | 601-656-4011 |

12000 Hwy. 15 N., Suite 2
Philadelphia, MS 39350

Neshoba County General Hospital 601-663-1200
1001 Holland Avenue
Philadelphia, MS 39350

## Newton County

Newton County Department of Human Services 601-635-2798
P.O. Box 158
Hwy 15 South
Decatur, MS 39327

Newton County Health Department 601-635-2337
Decatur Office
15776 Hwy 15 North
Decatur, MS 39327

Newton County Health Department 601-683-3331
Newton Clinic
500 Decatur St.
Newton, MS 39345

Region 10 Mental Health Services 601-635-3342
P.O. Box 281
92 South 6th Ave.
Decatur, MS 39327

Laird Hospital 601-774-8214
25117 Hwy 15
Newton, MS 39345

## Noxubee County

Noxubee County Department of Human Services 662-726-5885
P.O. Box 347
601 W. Pearl St.
Macon, MS 39341
Noxubee County Health Department 662-726-4451
480 W. Pearl St.
Macon, MS 39341

Region 7 Mental Health Center 662-726-5042
Community Counseling Services
200 W. Martin Luther King St.

Macon, MS 39341

MS State Extension Service 662-726-5723
107 E. Adams St.
Macon, MS 39341

Noxubee General Hospital 662-726-4231
606 N Jefferson Street
Macon, MS 39341

## Oktibbeha County

Oktibbeha County Department of Human Services 601-323-1573
P.O. Box 865
213 Yeates
Starkville, MS 39760

Oktibbeha County Health Department 662-323-4565
203 Yates St.
Starkville, MS 39759

Region 7 Mental Health 662-323-9261
Community Counseling Services
302 N. Jackson St.
Starkville, MS 39759

MS State Extension Service 662-323-5916
106 Felix Long Dr.
Starkville, MS 39759

Oktibbeha County Hospital 662-323-4320
400 Hospital Road
Starkville, MS 39759

## Panola County

Panola County Department of Human Services 662-487-2098
P.O. Box 128
203 S. Main St.
Sardis, MS 38666

Panola County Health Department 662-563-4616
381 Hwy 51 South
Batesville, MS 38606

Communicare 662-487-2746

100 E. Frontage Road
Sardis, MS 38666

Panola County Extension Service                             662-563-6260
245-C Eureka St.
Batesville, MS 38606
Tallahatchie Valley Electric Power Association              662-563-4742
250 Power Drive
Batesville, Mississippi 38606

Energy Mississippi                                         662-560-1030
114 N. Center Street
Senatobia, Mississippi 38668

Enon Locke Station Curtis water Association                662-578-5230
3036 Waldrup Road
Batesville, Mississippi 38606

Hebron Water Association                                   662-563-5189
PO Box 324
Sardis, Mississippi 38666

Liberty Hill Water Association                             662-417-1400
PO Box 81
Pope, Mississippi 38658

North Panola Water District                               662-487-2092
2174 Dunlap Road
Como, Mississippi 38619

Batesville Public Library                                 662-563-1038
206 Highway 51 North
Batesville, Mississippi 38606

Sardis Public Library                                     662-487-2126
101 E. Mclaurin Street
Sardis, Mississippi 38666

Emily J Pointer Public Library                            662-526-5283
104 N. Main Street
Como, Mississippi 38619

Sam Lapidus Memorial Library                              662-382-7479
108 E. Missouri Avenue
Crenshaw, Mississippi 38619

Tri-Lakes Medical Center 662-563-5611
303 Medical Center Drive
Batesville, MS 38606

## Pearl River County

Pearl River County Department of Human Services 601-795-4507
167 Savannah Millard Rd.
Poplarville, MS 39470

Pearl River County Health Department 601-798-6212
7547 Hwy. 11 North
Carriere, MS 39426

Gulf Coast Mental Health Center 601-798-7001
211 Highway 11 South
Picayune, MS 39466-4503

MS State Extension Services 601-403-2280
417 Hwy. 11 N.
Poplarville, MS 39470

Pearl River County Hospital 601-795-4543
305 W Moody Street
Poplarville, MS 39470

## Perry County

Perry County Department of Human Services 601-964-8374
P.O. Box 407
101 Main St.
New Augusta, MS 39462

Perry County Health Department 601-964-3288
P.O. Box 126
102 Main St.
New Augusta, MS 39462

Mental Health Center 601-788-6308
P.O. Box 1167
91180 Hwy. 42 West
Richton, MS 39476

MS State Extension Services 601-964-3668
P.O. Box 405

103-B 2nd St. West
New Augusta, MS 39462

Perry County General Hospital 601-788-6316
206 Bay Street
Richton, MS 39476

## Pike County

Pike County Department of Human Services 601-684-0915
P.O. Box 665
1002 Warren Krout Rd.
McComb, MS 39648

Pike County Health Department 601-684-1030
114 E. Presley Blvd.
McComb, MS 39648

Pike County Mental Health Office 601-684-2173
1701 White St.
McComb, MS 39648

MS State Extension Services 601-783-5321
P.O. Box 510
1140 N. Clark Ave.
Magnolia, MS 39652

Beacham Memorial Hospital 601-783-2351
205 N Cherry Street
Magnolia, MS 39652

## Pontotoc County

Pontotoc County Department of Human Services 662-489-3970
P.O. Box 419
341 Ridge Rd.
Pontotoc, MS 38863

Pontotoc County Health Department 662-489-1241
341 Ridge Rd.
Pontotoc, MS 38863

Region 3 Mental Health 662-509-9300
339 Legion Lane
Pontotoc, MS 38863

Pontotoc Extension Services 662-489-3910
171 Hwy 15 N.

Pontotoc, MS 38863

North Mississippi Medical Center 662-489-5510
176 S Main Sreet
Pontotoc, MS 38863

## Prentiss County

Prentiss County Department of Human Services 662-728-8010
P.O. Box 728
110 N. Main St.
Booneville, MS 38829

Prentiss County Health Department 662-728-3518
615 E. Parker Dr.
Booneville, MS 38829

Region 4 Mental Health 662-728-3174
Timber Hills Mental Health Services
P.O. Box 716
2100 E. Chambers Dr.
Booneville, MS 38829

Prentiss County Extension Service 662-728-5631
P.O. Box 130
2301 N. 2nd St.
Booneville, MS 38829

Baptist Memorial Hospital 662-720-5000
100 Hospital Street
Booneville, MS 38829

## Quitman County

Quitman County Department of Human Services 662-326-7913
P.O. Box F
Hwy 3 South
Marks, MS 38646

Quitman County Health Department 662-326-2861
235 Chestnut St.
Marks, MS 38646

Region I Mental Health 662-326-4445
P.O. Box 1046

421 1st St.
Marks, MS 38646

Quitman County Extension Service — 662-326-8939
225 Peach St.
Marks, MS 38646

Quitman County Library — 662-326-7141
315 E. Main Street
Marks, Mississippi 38646

City of Marks (water) — 662-326-3161
340 Pecan Street
Marks, Mississippi 38646

Graber Bros. (gas) — 662-326-2481
Pecan Street
Marks, Mississippi 38646

FO James Gas Company — 662-382-5255
10 S. Main Street
Sledge, Mississippi 38670

Quitman County Hospital — 662-326-8031
340 Getwell Drive
Marks, MS 38646

## Rankin County

Rankin County Department of Human Services — 601-825-1040
P.O. Box 1809
603 Marquette Rd.
Brandon, MS 39043-1809

Rankin County Health Department — 601-825-2141
100 Tamberlin St.
Brandon, MS 39042

Region 8 Mental Health Center — 601-824-0342
613 Marquette Rd.
Brandon, MS 39042

MS State Extension Services — 601-825-1462
601 Marquette Road
Brandon, MS 39042

Mississippi State Hospital 601-351-8018
3550 Hwy 468 W
Whitfield, MS

Rankin Medical Center 601-825-2811
350 Crossgates Blvd
Brandon, MS 39042

River Oaks Hospital 601-932-1030
1030 River Oaks Drive
Flowood, MS 39232

Woman's Hospital 601-932-1030
1026 N Flowood Drive
Flowood, MS 39232

## Scott County

Scott County Department of Human Services 601-469-2010
301 S. Main
Forest, MS 39074

Scott County Health Department 601-469-4941
Forrest Office
519 Airport Rd.
Forest, MS 39074

Scott County Health Department 601-732-8080
Morton Office
235 Hwy 13 S.
Morton, MS 39117

Region 10 Mental Health Services 601-469-2211
Weems Community Mental Health Center
P.O. Box 839
3717 Hwy. 80 West
Forest, MS 39074

MS State Extension Services 601-469-4241
230 South Davis Street
Forest, MS 39074

Lackey Memorial Hospital 601-469-4151
330 N Broad Street
Forest, MS 39074

## Sharkey County

Sharkey County Department of Human Services 662-873-2655
P.O. Box 488
1000 Chestnut St.
Rolling Fork, MS 39159

Sharkey-Issaquena County Health Department 662-873-6202
297 Race St.
Rolling Fork, MS 39459

Region 5 Mental Health 662-873-6228
Delta Community Mental Health Services
317 W. Race St.
Rolling Fork, MS 39159

MS State Extension Services 662-873-4246
120 Locust Suite 3
Rolling Fork, MS 39159

Sharkey-Issaquena Community Hospital 662-873-4395
47 South 4th Street
Rolling Fork, MS 39159

## Simpson County

Simpson County Department of Human Services 601-847-4081
P.O. Box 217
109 W. Pine
Mendenhall, MS 39114

Simpson County Health Department 601-847-2755
2789 Simpson Hwy. 49
Mendenhall, Mississippi 39114

Region 8 Mental Health Center 601-847-4410
P.O. Box 578
3100 Simpson Hwy. 13
Mendenhall, MS 39114

MS State Extension Services 601-847-1335
2785 Simpson Highway 49
Mendenhall, MS 39114

Simpson General Hospital 601-847-2221
1842 Simpson Hwy 149

Mendenhall, MS 39114

Magee General Hospital 601-849-5070
300 3rd Avenue Southeast
Magee, MS

## Smith County

Smith County Department of Human Services 601-782-9807
P.O. Box 100
Hwy 37 South
Raleigh, MS 39153

Smith County Health Department 601-782-4472
Raleigh Clinic
352 Magnolia Dr.
Raleigh, MS 39153

Weems Community Mental Health Center 601-782-9461
P.O. Box 1077
355 Hwy. 37 South
Raleigh, MS 39153

MS State Extension Services 601-782-4454
P.O. Box 127
212 Sylvarena Avenue - Smith County Office Bldg.
Raleigh, MS 39153-0127

## Stone County

Stone County Department of Human Services 601-928-2510
P.O. Box 247
648 Fairgrounds St.
Wiggins, MS 39577

Stone County Health Department 601-928-5293
305-A Central Ave.
Wiggins, MS 39577

Gulf Coast Mental Health Center 601-928-2357
217 Parker St.
Wiggins, MS 39577-2728

MS State Extension Services 601-928-5286

214 N. Critz St. Suite A
Wiggins, MS 39577

## Sunflower County

Sunflower County Department of Human Services 662-887-2795
P.O. Box 928
204 E. Baker St.
Indianola, MS 38751

Sunflower County Health Department 662-887-4951
412 Hwy 49 South
Indianola, MS 38751

Sunflower County Health Department 662-756-4881
Ruleville Clinic
628 Byron Street
Ruleville, MS 38771

Region 6 Mental Health 662-887-5441
Life Help
200 E. Baker St.
Indianola, MS 38751

Sunflower County Extension Service 662-887-4601
200 Main St.- Courthouse
Indianola, MS 38751

North Sunflower County Hospital 662-756-2711
840 N Oak Avenue
Ruleville, MS 38771

South Sunflower County Hospital 662-887-3115
121 E Baker Street
Indianola, MS 38751

## Tallahatchie County

Tallahatchie County Department of Human Services 662-647-2202
P.O. Box 48
201 S. Market St.
Charleston, MS 38921

Tate County Health Department 662-562-4428
P.O. Box 129
100 Preston McKay
Senatobia, MS 38668

Region 2 Mental Health Center 662-234-7529
Hwy 7 Bypass
Route 4, Box 32
Oxford, MS 38655

Tate County Extension Service 662-562-4274
#1 French's Alley
Senatobia, MS 38668

North Oak Regional Medical Center 662-562-3100
401 Getwell Drve
Senatobia, MS 38668

Tallahatchie General Hospital 662-837-9221
186 Pine Belt Road
Charleston, MS

## Tippah County

Tippah County Department of Human Services 662-837-1198
P.O. Box 209
412 Water St.
Ripley, MS 38663

Tippah County Health Department 62-837-3215
129 Hospital Street
Ripley, MS 38663

Region 4 Mental Health Center 662-837-8154
Timber Hills Mental Health Services
P.O. 216
2441-A Cr. 501
Ripley, MS 38663

Tippah County Extension Service 662-837-8184
P.O. Box 489
10791B Hwy 15 S. - Fairgrounds
Ripley, MS 38663

Tippah County Hospital 662-837-9221
201 S Market Street

Ripley, MS 38663

## Tishomingo County

Tishomingo County Department of Human Services 662-423-7041
1505 Betty Dale Dr.
Iuka, MS 38852

Tishomingo County Health Department 662-423-6100
1508 Bettydale Dr.
Iuka, MS 38852

Region 4 Mental Health 662-423-3332
Timber Hills Mental Health Services
1213 Maria Lane
P.O. Box 1290
Iuka, MS 38852

Tishomingo County Extension Service 662-423-7016
1008 Battleground Dr., Rm. 106
Iuka, MS 38852

North Mississippi Medical Center 662-423-6051
1777 Curtis Drive
Iuka, MS 38852

## Tunica County

Tunica County Department of Human Services 662-363-1771
972 E. Edward
P.O. Box 1026
Tunica, MS 38676

Tunica County Health Department 662-363-2166
2073 Old Hwy. 61 North Suite 4
Tunica, MS 38676

Region 1 Mental Health Center 662-627-7267
P.O. Box 1046
1742 Cheryl St.
Clarksdale, MS 38614

Tunica County Extension Service 662-363-2911
P.O. Box 1077

1221 Kenny Hill Ave., Suite 3
Tunica, MS 38676

Coahoma Electric Power Association — 662-363-2931
3970 White Oak Road
Tunica, Mississippi 38676

Water and Sewer Departments — 662-363-2358
Tunica County Utility District

Comcast — 800-872-8047

Tunica County Library — 662-363-2162
1285 Kenny Hill
Tunica, Mississippi 38676

## Union County

Union County Department of Human Services — 662-534-1986
252 Carter Avenue
New Albany, MS 38652

Union County Health Department — 662-534-1926
252 Carter Ave.
New Albany, MS 38652

Region 3 Mental Center — 662-844-1717
2434 Eason Blvd.
Tupelo, MS 38804

Union County Extension Service — 662-534-1917
112 Fairground Cir.
New Albany, MS 38652

Baptist Memorial Hospital — 662-783-2351
200 Hwy 30 W
New Albany, MS 38652

## Walthall County

Walthall County Department of Human Services — 601-876-3238
P.O. Box 430
901 Union Rd.
Tylertown, MS 39667

Walthall County Health Department — 601-876-4924

903 Union Rd.
Tylertown, MS 39667

Walthall County Mental Health Office 601-876-4721
219 Ball Ave.
Tylertown, MS 39667

MS State Extension Services 601-876-4021
250 Ball Avenue
Tylertown, MS 39667

Walthall County General Hospital 601-876-2122
100 Hospital Drive
Tylertown, MS 39667

## Warren County

Warren County Department of Human Services 601-636-1597
P.O. Box 1829
1100 Grove St., Suite E.
Vicksburg, MS 39181

Warren County Health Department 601-636-4356
807 Monroe St.
Vicksburg, MS 39180

Region 15 Mental Health Services 601-638-0031
Warren-Yazoo Mental Health Services
3444 Wisconsin Ave.
Vicksburg, MS 39182

MS State Extension Services 601-636-5391
1100-C Grove Street
Vicksburg, MS 39180

River Region Health System 601-883-5000
2100 Hwy 61 N
Vicksburg, MS 39180

## Washington County

Washington County DHS 662-378-0319
240 S. Theobald St.
Greenville, MS 38702

Washington County Health Department 662-332-8177
1633 Hospital St.
Greenville, MS 38701

Washington County Health Department 662-686-7711
Leland Clinic
801 North Broad St.
Leland, MS 38756

Region 5 Mental Health Center 662-355-5274
Delta Community Health Services
1654 E. Union St.
P.O. Box 5365
Greenville, MS 38704

MS State Extension Services 662-334-2670
P.O. Box 915
Greenville, MS 38702

## Wayne County

Wayne County Department of Human Services 601-735-6254
P.O. Box 1729
1104-A Cedar St.
Waynesboro, MS 39367

Wayne County Health Department 601-735-2351
1108 Bradley Drive
Waynesboro, MS 39367

Wayne County Mental Health Center 601-735-3350
PO Box 611
1104B Cedar Street
Waynesboro, MS 39367

MS State Extension Services 601-735-2243
810-A Chickasawhay Street
Waynesboro, MS 39367

Wayne General Hospital 601-735-5151
950 Matthew Drive
Waynesboro, MS 39367

## Webster County

Webster County Department of Human Services 662-258-4771
P.O. Box Drawer E
319 E. Gould Ave.
Eupora, MS 39744

Webster County Health Department 662-258-3761
319 E. Gould St.
Eupora, MS 39744

Webster County Community Counseling Services 662-258-8147
1660 Veterans Memorial Blvd.
Eupora, MS 39744

MS State Extension Services 662-258-3971
16 East Fox Ave.
Eupora, MS 39744

## Wilkinson County

Wilkinson County Department of Human Services 601-888-4311
P.O. Box 726
1391 U.S. Hwy. 61 South
Woodville, MS 39669

Wilkinson County Health Department 601-888-4202
P.O. Box 398
991 First S. St.
Woodville, MS 39669

Wilkinson County Mental Health Office 601-888-3022
1495 Hwy 61S
Woodville, MS 39669

MS State Extension Services 601-888-3211
P.O. Box 834
982 2nd South St.
Woodville, MS 39669

## Winston County

Winston County Department of Human Services 662-773-8034
P.O. Box 150
458 Vance St.
Louisville, MS 39339

Winston County Health Department                   662-773-8087
 P.O. Box 525
260 Vance St.
Louisville, MS 39339

Region 7 Mental Health Center                      662-773-9377
Community Counseling Services
507 W. Main St.
Louisville, MS 39759

Winston County Extension Service                   662-773-3091
460 Vance St.
Louisville, MS 39339

Winston Medical Center                             662-773-6211
562 E Main Street
Louisville, MS 39339

## Yalobusha County

Yalobusha County Department of Human Services      662-473-1071
P.O. Box 1071
400 Main St..
Water Valley, MS 38965

Yalobusha County Health Department                 662-473-1424
209 Simmons St.
Water Valley, MS 38965

Yalobusha County Health Department                 662-675-9453
Coffeeville Clinic
719 Center St.
Coffeeville, MS 38922

Region 2 Mental Health                             662-562-5216
Communicare
101 Preston McKay Drive
Senatobia, MS 38668

Yalobusha County Extension Service                 662-675-2730
P.O. Box 610
18025 Hwy. 7
Coffeeville, MS 38922

Tallahatchie Valley Electric Power Association      662-563-4742
250 Power Drive
Batesville, Mississippi 38606

| | |
|---|---|
| Entergy | 800-368-3749 |
| Northeast Mississippi Electric Power Association<br>Highway 30<br>Oxford, Mississippi 38655 | 662-234-6331 |
| Water Valley Electric Department<br>101 Blackmur Drive<br>Water Valley, Mississippi 38965 | 662-473-3326 |
| Tennessee Valley Authority<br>8513 CR 212<br>Coffeeville, Mississippi 38922 | 662-675-8289 |
| Water Valley Water Department<br>101 Blackmur Drive<br>Water Valley, Mississippi | 662-473-3326 |
| Center Point Energy | 800-371-5417 |
| Oakland Yalobusha Natural Gas<br>286 Holly Street<br>Oakland, Mississippi 38948 | 662-623-5005 |
| Oakland Public Library<br>324 Holly Street<br>Oakland, Mississippi 38948 | 662-623-8651 |
| Blackmur Drive Memorial Library<br>608 Blackmur Drive<br>Water Valley, Mississippi 38965 | 662-473-2444 |
| Coffeeville Public Library<br>14432 Main Street<br>Coffeeville, Mississippi 38922 | 662-675-8822 |
| Utility Assistance Program<br>Central Mississippi INC<br>17398 Okahoma Street<br>Coffeeville, Mississippi 38922 | 662-675-8282 |
| Yalobusha General Hospital<br>630 S Main Street<br>Water Valley, MS 38965 | 662-473-1411 |

## **Yazoo County**

Yazoo County Department of Human Services 662-751-8735
P.O. Box 570
1315 Grady Ave.
Yazoo City, MS 39194

Yazoo County Health Department 662-746-2453
230 E. Broadway St.
Yazoo City, Mississippi 39194

Region 15 Warren-Yazoo Mental Health Services 662-746-5712
2303 Gordon Ave.
Yazoo City, MS, 39194

MS State Extension Services
P.O. Box 1068
212 E. Broadway St.
Yazoo City, MS 39194

# WIC Services

If you're eligible for WIC, you'll receive at no cost:

A monthly package of delicious, nutritious foods

Valuable tips on healthy eating

Health care referrals

Breastfeeding support

---

WIC food package

The WIC food package provides nutritious foods to supplement your regular meals. You can choose some or all of the following, free of charge:

A variety of hot and cold cereals, including infant cereal

* Eggs *Cheese *Baby formula *Beans *Peanut butter

*Canned tuna and carrots for breastfeeding mothers

*A selection of 100% fruit juices

---

Who is eligible?

To be eligible for the program, a woman, infant, or child must meet the income guidelines and be at medical or nutritional risk. Low iron levels in the blood (anemia), underweight, overweight, or poor diet are typical examples. A nurse or nutritionist will determine if an applicant is eligible for the WIC program.

You can check your income against the current guidelines to see if you may qualify.

# **The WIC Income Table**

| WIC Income Eligibility Guidelines (effective April 2007 through March 2008) | | | |
|---|---|---|---|
| | If family income is no more than | | |
| Family Size | Per year | Per month | Per week |
| 1 | $18,889 | $1,575 | $364 |
| 2 | $25,327 | $2,111 | $488 |
| 3 | $31,765 | $2,648 | $611 |
| 4 | $38,203 | $3,184 | $735 |
| 5 | $44,641 | $3,721 | $859 |
| 6 | $51,079 | $4,257 | $983 |
| 7 | $57,517 | $4,794 | $1,107 |
| 8 | $63,955 | $5,330 | $1,230 |
| Each additional family member, add | + $6,438 | + $537 | + $124 |

---

*If you receive TANF, Food Stamps or Medicaid, you automatically meet WIC income guidelines.

Apply in person

USDA policy requires that applicants must apply in person for WIC benefits at their local WIC clinic. Parents not wanting to bring their newborns in to the WIC clinic have a 60-day period during which the newborn must be seen at the WIC clinic

## What to bring to your WIC appointment

Applicants must bring proof of income, residence, and identification to their WIC appointment.

Examples of proof of income:

A current pay stub less than 60 days old
A signed statement from an employer indicating gross income earnings for a specified pay period
Current W-2 forms
An income tax return for the most current year
Proof of Medicaid, TANF, or Food Stamps

Examples of proof of residence:

Pieces of mail that include the client's current address (e.g. current utility bill, bank statement, etc.)
A valid driver's license with the current address
A mortgage/rental agreement

Examples of proof of identification:

A valid driver license
A social security card
A valid U.S. passport
A current shot record
A military ID
A newborn crib card

# WIC Offices in Mississippi

## Public Health District 1

| | | | |
|---|---|---|---|
| Coahoma | 521 Medical Drive, Clarksdale | 662-627-3511 | 5 |
| DeSoto | 1939 Oak Tree Lane, Hernando | 662-449-0807 | 5 |
| Grenada | 52 Cherry St, Grenada | 662-226-1047 | 5 |
| Panola | 365 Hwy 51 South, Batesville | 662-563-4549 | 5 |
| Quitman | 201 Cherry St, Marks | 662-326-4855 | 5 |
| Tallahatchie (Charleston) | 305 N. Waverly, Charleston | 662-647-3475 | 5 |
| Tallahatchie (Sumner) | 109-C South Court St., Sumner | 662-375-8637 | 5 |
| Tate | 470 Scott Street, Senatobia | 662-562-7121 | 5 |
| Tunica | 2092 Old Hwy 61 North, Tunica | 662-363-3910 | 5 |
| Yalobusha | 220 Blackmur Dr., Water Valley | 662-473-2274 | 5 |

## Public Health District 2

| | | | |
|---|---|---|---|
| Alcorn | 501 Pinecrest, Corinth | 662-287-9442 | 5 |
| Benton | 16025 Boundary, Ashland | 662-224-3335 | 5 |
| Itawamba | 503 Lindsey St., Fulton | 662-862-4686 | 5 |
| Lafayette | 101 Veterans Drive/ Box 1395, Oxford | 662-234-2060 | 5 |
| Lee | 578 Carnation, Tupelo | 662-844-4170 | 5 |
| Marshall (Holly Springs) | 690 H 4 East, Holly Springs | 662-252-5246 | 5 |
| Marshall (Byhalia) | 8478 Hwy 178 West, Byhalia | 662-838-4911 | 5 |
| Pontotoc | 379 E. Oxford, Pontotoc | 662-489-6169 | 5 |
| Prentiss | 2405 E. Chambers Booneville | 662-728-3212 | 5 |
| Tippah | 105 Hospital Drive, Ripley | 662-837-3837 | 5 |
| Tishomingo | 1250 Bettydale, Iuka | 662-423-3148 | 5 |
| Union | 207 Carter Avenue, New Albany | 662-534-4131 | 5 |

## Public Health District 3

| | | | |
|---|---|---|---|
| Attala | 312 N. Wells, Kosciusko | 662-289-5569 | 5 |
| Bolivar – Cleveland | 927 Charlie Capps, Cleveland | 662-843-9476 | 5 |
| Bolivar – Rosedale | 503 Bruce St., Rosedale | 662-759-3063 | 5 |
| Carroll | 108 Main St. N., Carrollton | 662-237-6918 | Tu, Th |
| Holmes | 318 Yazoo, Lexington | 662-834-2140 | 5 |
| Humphreys | 309 North Hayden St., Belzoni | 662-247-3534 | 5 |
| Leflore | 2600 Browning, Greenwood | 662-453-2119 | 5 |
| Montgomery | 108 N. Applegate, Winona | 662-283-3694 | 5 |
| Sunflower – Indianola | 266 Hwy 82 West, Indianola | 662-887-5986 | 5 |
| Sunflower – Ruleville | 620 Hwy 8 East, Ruleville | 662-756-2084 | M, Th, F |
| Washington – Greenville | 1700 E. Union St., Greenville | 662-332-0726 | 5 |
| Washington – Leland | 210 Baker St, Leland | 662-686-4033 | 5 |

## Public Health District 4

| | | | |
|---|---|---|---|
| Calhoun | 107 E. Main St., Pittsboro | 662-412-2555 | 5 |
| Chickasaw – Houston | 210-A N. Monroe, Houston | 662-456-5446 | 5 |
| Chickasaw – Okolona | 400 North Church, Okolona | 662-447-3686 | M, Tu, Th |
| Choctaw | 234 Hwy. 15 N., Ackerman | 662-285-6030 | M, Tu, Th |

| | | | |
|---|---|---|---|
| Clay | 1342 N. Eshman Ave., West Point | 662-494-4771 | 5 |
| Lowndes | 7220 Hwy 45 North Columbus | 662-328-7809 | 5 |
| Monroe – Aberdeen | 109 South Chestnut St., Aberdeen | 662-369-8580 | 5 |
| Monroe – Amory | 403 S. Main St., Amory | 662-256-8833 | 5 |
| Noxubee | 205 W. Green St., Macon | 662-726-2466 | 5 |
| Oktibbeha | 1203 Highway 25 S., Starkville | 662-324-0171 | 5 |
| Webster | 200 Mississippi Street, Eupora | 662-258-8592 | M,W,F |
| Winston | 305 Vance St., Louisville | 662-773-8571 | 5 |

# Public Health District 5

| | | | |
|---|---|---|---|
| Claiborne | 226 Carroll St., Port Gibson | 601-437-8793 | 5 |
| Copiah | 640 Georgetown, Hazlehurst | 601-894-4300 | 5 |
| Hinds – Jackson | 350 W. Woodrow Wilson | 601-961-4719 | 5 |
| Hinds – Raymond | 304 Raymond/Clinton Rd | 601-857-8287 | 5 |
| Hinds – Utica | Hwy 27 North, Utica | 601-885-9693 | Tu, W, F |
| Hinds – So. Jackson | 3276 Lynch Street, Jackson | 601-969-5730 | 5 |
| Madison | 722 ½ E. Peace St., Canton | 601-859-1717 | 5 |
| Rankin | 110 Crosspark Drive, Pearl | 601-939-0450 | 5 |
| Sharkey-Issaquena | 600 Walnut St., Rolling Fork | 662-873-4428 | 5 |
| Simpson | 206 E. Jackson, Mendenhall | 601-847-1300 | 5 |
| Warren | 809 Walnut Street, Vicksburg | 601-636-5831 | 5 |
| Yazoo | NW Plaza, H. 49W, Yazoo | 662-746-2484 | 5 |

# Public Health District 6

| | | | |
|---|---|---|---|
| Clarke | 203 N. Archusa, Quitman | 601-776-3085 | M-F |
| Jasper | 35 Third Street, Bay Springs | 601-764-4085 | M-F |
| Kemper | Hwy. 16, DeKalb | 601-743-5537 | M, W, F |
| Lauderdale | 2119 Hwy. 19 N., Meridian | 601-693-5507 | M-F |
| Leake | 1120 Hwy 35 S., Carthage | 601-267-3280 | M-F |
| Neshoba | 107 St. Francis Drive, Philadelphia | 601-656-2202 | M-F |
| Newton | 75 WIC Road., Decatur | 601-635-2129 | M-F |
| Scott | 2047 Hwy. 35 S., Forest | 601-469-4507 | M-F |
| Smith | 147 Main St., Raleigh | 601-782-9495 | M, W, F |

# Public Health District 7

| | | | |
|---|---|---|---|
| Adams | 110 1/2 Northgate Road, Natchez | 601-445-2098 | M-F |
| Amite | 147 West Freedom, Liberty | 601-657-8400 | M-F |
| Franklin | 19 Holly Street, Bude | 601-384-2219 | M-F |
| Jefferson | 425 E. Harrison St., Fayette | 601-786-3541 | M-F |

| | | | |
|---|---|---|---|
| Lawrence | 1157 W. Broad St., Monticello | 601-587-7061 | M-F |
| Lincoln | 758 Industrial Park Rd., Brookhaven | 601-833-8880 | M-F |
| Pike | 1029 Phillips Road | 601-249-4641 | M-F |
| Walthall | 1508 Beulah Ave., Tylertown | 601-876-6219 | M-F |
| Wilkinson | 212 First West Street South, Woodville | 601-888-3580 | M-F |

## Public Health District 8

| | | | |
|---|---|---|---|
| Covington | 0220 East Street, Collins | 601-765-4097 | M-F |
| Forrest | 1515 Florida Ave., Hattiesburg | 601-582-2081 | M-F |
| Greene | 208 Lafayette St., Leakesville | 601-394-2391 | M-F |
| Jefferson Davis | 675 Columbia Ave., Prentiss | 601-792-4823 | M-F |
| Jones | 1222 Hillcrest Dr., Hattiesburg | 601-428-4178 | M-F |
| Lamar | 47 Deep South Lane, Purvis | 601-794-6294 | M-F |
| Marion | 1931 N. Main St., Columbia | 601-736-4054 | M-F |
| Perry | 503 Third Ave, New Augusta | 601-964-3600 | M-F |
| Wayne | 1105 Bradley Drive, Waynesboro | 601-735-5447 | M-F |

## Public Health District 9

| | | | |
|---|---|---|---|
| George | 10 Suzanne St., Lucedale | 601-947-6352 | M-F |
| Hancock | 10221 Hwy 603, Bay St. Louis | 228-467-1086 | M-F |
| Harrison – Biloxi | 4046 Suzanne Dr., D'Iberville | 228-396-5194 | M-F |
| Harrison – Gulfport | 330 Courthouse Road, Gulfport | 228-897-7630 | M-F |
| Harrison – Gulfport | 12451 Dedeaux Road, Gulfport | 228-539-4220 | M-F |
| Jackson | 4400 Chicot Road, Pascagoula | 228-769-0163 | M-F |
| Pearl River | 7063 Hwy 11, Carriere | 601-798-5635 | M-F |
| Stone | 1061 Central Avenue West, Wiggins | 601-928-2139 | M-F |

## Mississippi Colleges and Universities

- Alcorn State University
  1000 ASU Ste 359, Alcorn State, MS 39096
  Admissions Office Phone: (601) 877-6100
  www.alcorn.edu

- Belhaven College
  1500 Peachtree St, Jackson, MS 39202
  Admissions Office Phone: (601) 968-5940
  www.belhaven.edu

- Delta State University
  Hwy 8 West, Cleveland, MS 38733
  Admissions Office Phone: (662) 846-4020
  www.deltastate.edu

- Jackson State University
  1440 J R Lynch St, Jackson, MS 39217
  Admissions Office Phone: (601) 979 – 2100
  www.jsums.edu

- Magnolia Bible College
  822 S Huntington St., Kosciusko, MS 39090
  Admissions Office Phone: (662) 289 – 2896
  www.magnolia.edu

- Millsaps College
  1701 N State St., Jackson, MS 39210
  Admissions Office Phone: (601) 974 – 1050
  www.millsaps.edu

- Mississippi College
  200 South Capitol Street, Clinton, MS 39058
  Admissions Office Phone: (601) 925 – 3240
  www.mc.edu

- Mississippi State University
  Mississippi State, MS 39762
  Admissions Office Phone: (662) 325- 2224
  www.msstate.edu

- Mississippi University for Women
  1100 College Street, Columbus, MS 39701
  Admissions Office Phone: (662) 329 - 7106
  www.muw.edu

- Mississippi Valley State University
  14000 Highway 82 West, Itta Bena, MS 38941
  Admissions Office Phone: (662) 254 - 3344
  www.mvsu.edu

- Rust College
  150 Rust Ave., Holly Springs, MS 38635
  Admissions Office Phone: (662) 252-8000
  www.rustcollege.edu

- Southeastern Baptist College
  4229 Hwy 15 N., Laurel, MS 39440
  Admissions Office Phone: (601) 426-6346
  www.southeasternbaptist.edu

- Tougaloo College
  500 W County Line Rd., Tougaloo, MS 39174
  Admissions Office Phone: (601) 977-7765
  www.tougaloo.edu

- University of Mississippi- Main Campus
  Oxford Mississippi, University, MS 38677
  Admissions Office Phone: (662) 915-7226
  www.olemiss.edu

- University of Mississippi Medical Center
  2500 N State St., Jackson, MS 39216
  Admissions Office Phone: (601) 964-1080
  www.umc.edu

- 
- University of Southern Mississippi
  118 College Drive, Hattiesburg, MS 39406
  Admissions Office Phone: (601) 266-5000
  www.usm.edu

- Wesley Biblical Seminary
  787 E. Northside Drive, Jackson, MS 39286
  Admissions Office Phone: (601) 8880
  www.wbs.edu

- Wesley College
  787 E. Northside Drive, Jackson, MS 39286
  Admissions Office Phone: (601) 845-2265
  www.wbs.edu

❖ William Carey College
498 Tuscan Ave., Hattiesburg, MS 39401
Admissions Office Phone: (601) 318-6103
www.wmcarey.edu

---

*"Reach for the stars"*

---

## Community Colleges/ Technical/Vocational Schools

❖ Antonelli College
2323 Lakeland Drive, Jackson, MS 39232
Admissions Office Phone: (601) 362-9991
www.antonellic.com

❖ Academy of Hair Design Four
3167 Hwy 80 E., Pearl, MS 39208
Admissions Office Phone: (601) 939 - 4441

www.academyofhair.com

- Academy of Hair Design One
  2003-b S Commerce, Grenada, MS 38901
  Admissions Office Phone: (662) 226 - 2464
  www.academyofhair.com

- Academy of Hair Design Seven
  215 Hwy 35 N., Carthage, MS 39051
  Admissions Office Phone: (601) 267 - 8031
  www.academyofhair.com

- The Academy of Hair Design Six
  Cloverleaf Mall D-4, Hattiesburg, MS 39401
  Admissions Office Phone: (601) 583 - 1290
  www.academyofhair.com

- Academy of Hair Design Three
  1815 Terry Rd., Jackson, MS 39204
  Admissions Office Phone: (601) 372 - 9800
  www.academyofhair.com

- Blue Cliff College
  2200 25th Avenue, Gulfport, MS 39501
  Admissions Office Phone: (228) 896 - 9727

- Chris Beauty College
  1265 Pass Rd., Gulfport, MS 39501
  Admissions Office Phone: (228) 864 - 2920
  www.chrisbeautycollege.com

-
- Coahoma Community College
  3240 Friars Point Rd., Clarksdale, MS 38614
  Admissions Office Phone: (662) 621 - 4205
  www.coahomacc.edu

- Copiah-Lincoln Community College
  1001 Copiah Lincoln Lane, Wesson, MS 39191
  Admissions Office Phone: (601) 643 - 8307
  www.colin.edu

- Copiah-Lincoln Community College Simpson County Center
  151 Co-lin Dr., Mendenhall, MS 39114
  Admissions Office Phone: (601) 849 - 0124
  www.colin.edu

- Copiah-Lincoln Community College-Natchez Campus
  11 Co-lin Cir., Natchez, MS 39120
  Admissions Office: (601) 442 - 9111
  www.colin.edu

- Creations College of Cosmetology
  2419 W Main St., Tupelo, MS 38801
  Admissions Office Phone: (662) 844 - 9264
  www.creationscosmetology.com

- Day Spa Career College
  3900 Bienville Blvd., Ocean Spring, MS 39564
  Admissions Office Phone: (228) 875 – 4809

- Delta Beauty College
  697 Delta Plaza, Greenville, MS 38701
  Admissions Office Phone: (662) 332 - 0587

- Delta Technical College
  1090 Main St., Southaven, MS 38671
  Admissions Office Phone: (662) 280 - 1443 ext. 228
  www.deltatechnicalcollege.com

- East Central Community College
  275 West Broad Street, Decatur, MS 39327
  Admissions Office Phone: (601) 635 - 2111 ext. 206
  www.eccc.edu

- East Mississippi Community College
  1512 Kemper Street, Scooba, MS 39358
  Phone: (662) 476-5000

- Final Touch Beauty School
  5700 North Hills Street, Meridian, MS 39307
  Admissions Office Phone: (601) 485 – 7733

- Fosters Cosmetology College
  1813 Hwy 15 N., Ripley, MS 38663
  Admissions Office Phone: (662) 837 – 9334

- Gibson Barber and Beauty College
  120 E Main St., West Point, MS 39773
  Admissions Office Phone: (662) 494 – 5444

- Hinds Community College
  501 E Main St., Raymond, MS 39154

- J & J Hair Design College
  333 Pass Road., Gulfport, MS 39507
  Admissions Office Phone: (228) 864-4663

- Jones County Junior College
  900 S Court St., Ellisville, MS 39437
  Admissions Office Phone: (601) 477 – 4025
  www.jcjc.edu

- Magnolia College of Cosmetology
  4725 I55 N., Jackson, MS 39206
  Admissions Office Phone: (601) 362 - 6940

- Meridian Community College
  910 Hwy 19 N., Meridian, MS 39307
  Admissions Office Phone : (601) 484 - 8621 ext. 895
  www.meridiancc.edu

- Mississippi College of Beauty Culture
  732 Sawmill Rd., Laurel, MS 39440
  Admissions Office Phone : (601) 428 – 7127

- Mississippi Delta Community College
  Hwy 3 And Cherry St., Moorhead, MS 38761
  Admissions Office Phone: (662) 246 - 6306
  www.msdelta.edu

- Mississippi Gulf Coast Community College
  51 Main Street, Perkinston, MS 39573
  Admissions Office: (601) 928 - 6333
  www.mgccc.edu

- Northeast Mississippi Community College
  Cunningham Blvd., Booneville, MS 38829
  Admissions Office Phone: (662) 720 - 7239
  www.nemcc.edu

- Northwest Mississippi Community College
  4975 Hwy 51 N., Senatobia, MS 38668
  Admissions Office Phone: (662) 562 - 3219
  www.northwestms.edu

- Pearl River Community College
  101 Hwy 11 N., Poplarville, MS 39470
  Admissions Office Phone: (601) 403 – 1214
  www.prcc.edu

- Southwest Mississippi Community College
  College Dr., Summit, MS 39666
  Admissions Office Phone: (601) 276 - 2001
  www.smcc.edu

- Traxlers School of Hair
  2845 Suncrest Dr., Jackson, MS 39212
  Admissions Office: (601) 371 – 3253

- Virginia College-Jackson
  5360 Interstate 55 N., Jackson, MS 39211
  Admissions Office Phone: (601) 977 - 0960 ext. 2703
  www.vc.edu

## Additional Resources

Job Corps

Job Corps is a no-cost education and vocational training program (e.g. high school diploma, G.E.D., and a trade) that helps young people ages 16 through 24 get a better job, make more money, and take control of their lives. Job Corps provides housing and a minimal personal allowance. Contact an admissions counselor at 1-800-733-JOBS (5627)

❖ Marines

Marines enjoy a lifestyle of travel and adventure, an important role in Marine Corps missions, and many benefits (medical insurance, housing, clothing, financial assistance), including the opportunity to continue their formal education with the financial support of the United States government. Contact Staff Sergeant Carruthers at (601) 238-1835 or (601) 353-2031

❖ Army

The training and salary you get as a Soldier are only some of the ways the Army strengthens you for tomorrow. The Army also offers money for education, comprehensive health care, generous vacation time, family services and support groups, special pay for special duties, and cash allowances to cover the cost of living. For more information, contact a recruiter at 1-800-USA-ARMY, ext. 181

❖ Navy

The Navy takes care of its Sailors. When you join, you will receive an impressive array of benefits designed to keep you healthy, comfortable and secure. And the best part is that all of these benefits are above and beyond your Navy pay and allowances. The Navy also offers Opportunities to earn advanced degrees at Navy expense. For more information, contact PS2 Roger Davis at (662) 436-7823

❖ Air Force

The Air Force is a branch of the military which provides free medical and dental, educational benefits, pays 100% of your tuition, free travel, and quality job experiences, For more information contact SSGT Sergeant at (601)936-9948

❖ The National Guard

The National Guard enables you to serve your country, serve your community, and at the same time allow you to further your education and have a normal everyday life. The National Guard also offers financial assistance, health benefits, and educational assistance. For more information, contact the career counselor, Bryan Clevenger, at (601) 954-2773

❖ Win Job Centers

WIN Job Centers (also know as one-stops) combines federal, state, and community workforce development programs and services into one location to help individuals and businesses find employment and training services. (601) 321-7923

❖ Physician Shadowing

Students in the Physician Shadowing Program must have  completed their second year of college in pursuit of a medical career. During the program, they spend time with family physicians, surgeons, radiologists, cardiologists and emergency physicians. Each student receives hourly compensation, a lab coat and support materials. For more information, call (662) 377-3245 or 1-800-THE DESK (1-800-843-3375).

❖ Mississippi Faith-Based Coalition

MFBCCR is a statewide interfaith network committed to developing the capacity and resources of religious groups to engage in life-changing ministry to the needy and enhance the quality of life in materially depressed communities. MFBCCR also provides housing counseling. If you would like to talk with someone about possibly owning your own home, contact Jacqueline Johnson at (601) 346- 7503 or
Mack Magee at (228) 863-4024.

# Helpful Websites

http://www.mdhs.state.ms.us
http://www.dmh.state.ms.us
http://www.health.ms.gov
http://www.knowtheredflags.com/
http://www.womenslaw.org/
http://www.breakthecycle.org/
http://www.ncvc.org/ncvc/Main.aspx
http://www.teenwire.com/
http://www.amazon.com/
http://www.askkids.com/
http://www.awesomelibrary.org/student5.html

http://www.bookdivas.com/
http://encarta.msn.com/encnet/departments/homework/
http://encarta.msn.com/encnet/departments/college/
http://school.discoveryeducation.com/homeworkhelp/index.html
http://kids.aol.com/KOL/
http://kidshealth.org/teen/
http://www.drivers.com/
http://www.insure.com/articles/carinsurance/teenstates.html
http://adtsea.iup.edu/nssp/
http://quizhub.com/quiz/quizhub.cfm
http://www.dosomething.org/
http://memory.loc.gov/ammem/
https://www.ms.gov/hp/drivers/license/Main.do
http://www.mississippi.gov/online_services_sub_sub.jsp?Category_ID=50#etrans
http://www.mlc.lib.ms.us/ServicesToLibraries/StateDocuments.htm
http://www.ms.gov/

REACH FOR THE STARS

# Ex. 59B



Texas Foster Youth Justice Project

www.TexasFosterYouth.org

# A Guide For Those "Aging Out" Of Foster Care In Texas

Second Edition

# Education

## High School

See "General Education Development (GED) Test" beginning on page 16 for information about getting a GED certificate.

Finishing high school or earning a GED certificate before you age out of foster care is very important. In fact, this is probably one of the best things that you can do to help yourself prepare to be an adult. The law changed in 2009 and made it much easier for foster youth who are 18 or older to voluntary stay in foster care while they are getting an education. (The options for youth born before September 30, 1992 to stay in foster care after the age of 18 may be more limited. For more information contact the Texas Foster Youth Justice Project at (877)313-3688, info@texasfosteryouth.org.)

You have the right to stay in foster care past the age of 18 in the following cases:[3]

3 Texas Family Code § 264.101.

1. If you are going to high school full time or are in another program (including an Independent Education Plan program talked about below) that will let you receive a high school diploma or are in a GED Program, then you can stay in foster care as long as you stay in high school or that program or until the last day of the month you turn 22, whichever comes first.

2. If you are attending college or a postsecondary vocational or technical program or participating in a program or activity that helps you get employment skills, you can stay in foster care until the last day of the month you turn 21.

3. Even if you have completed an educational program or are no longer attending it, you can stay in foster care as long as you are working at least 80 hours a month; or can't be in an educational or training program or can't work due to a documented medical condition. This means you should be working at a part-time job well before you finish school, because it not only gives you important skills and income, it will allow you to stay in foster care for some time right after you finish your education and get your life organized.

While you can ask to return to foster care after you leave, if you meet one of the necessary conditions, you should know that it is often very difficult to find a foster care placement for those that want to return. **It is much easier to voluntarily stay in foster care then to try to return to it.** Staying in foster care will help you save up your transitional money benefits for when you are really prepared to move out on your own.

While in college, some groups or foster parents will even help you find a place to stay over the summer and holidays (like Christmas) if your dorm closes and you don't have some other place to go. You should talk to your foster parents and caseworker to figure out your options.

## Independent Education Plans (IEP) (If you are NOT in special education, then this section does not apply to you.)

If you are in special education, then you should have an IEP. (If you are not in special education, then this section does not apply to you.) If you are a student with learning or other disabilities and you do not have an IEP, please tell your caseworker, foster parents and school supervisors and request an IEP evaluation. An IEP has many benefits that you should not miss.

An IEP is an individual education plan for youth in special education. This plan should be truly individual and specific to each student. Under law, every public school student who receives special education services must have an IEP to help the student meet his or her educational and social goals. If you are in special education, then your school system should schedule IEP meetings with your IEP team. The IEP team includes you, someone from the school system, your foster parents, a special education teacher, a regular education teacher, a person to help explain your IEP evaluation results, a person to help with services that will help you leave school and anyone else with knowledge about you. The IEP team must review your IEP at least once a year. You and your foster parents should also talk about your IEP at other times.

Beginning at age 14, your IEP must list the classes you need to take to reach your goals. Beginning at age 16, your IEP must list the services that you will need to help you get ready to leave school. These services should focus on your specific needs and interests and can include plans for more education or training, social skills development and help finding and keeping a job. If you do not feel that your IEP or your IEP team is meeting your goals, you should talk to your caseworker.

## General Education Development (GED) Certificate

If you don't finish high school but still want a high school diploma, you should contact your old high school about whether you can take classes that would let you finish. If that option does not work for you, then you should think about getting a GED certificate.

The GED certificate shows that you have learned the skills that would have let you graduate from high school. Most employers and many colleges view a GED certificate the same as a high school diploma. People who do not have their GED certificate or high school diploma usually have a harder time finding a job and get paid less than people who have a GED or high school diploma.

To get your GED certificate, you must pass five tests in reading, writing, math, science and social studies and get an overall passing score. The test is given over two days and is available in English and Spanish. It is made up of multiple-choice questions and an essay. If you pass part of the test but not all of it, you may only need to retake the parts that you didn't pass. To take a retest, you must wait six months between tests or have a letter signed by a certified teacher stating that you should be allowed to retest before the end of the six-month period.

For information about the GED, contact the Texas Education Agency GED Unit at (512) 463-9292 or visit *www.tea.state.tx.us/ged*.

Eligibility

You may take the GED test if you are:

At least 18 years old,
A resident of Texas,
Not enrolled in high school, and
Not a high school graduate.

Some people do not have to meet all of these requirements. You should talk with your caseworker or PAL coordinator if you are not sure whether you are eligible to take the test.

Registration and Costs

The GED exam is offered at many places all around Texas. To find the testing center nearest you, visit the "GED Test Centers" link at www.*tea.state.tx.us/ged*. Once you choose a testing center, you should ask the center for an application and ask about their fees. You can't get your GED certificate over the Internet or by mail so register only at an *official* GED testing center. There are many dishonest companies pretending to be official test centers—so only pick a center listed on the TEA website. Test fees are different for each location and can range from $50 to $100 for first time test takers. You should talk to your caseworker to see if DFPS or another program can pay these fees for you. You should check with the place where you will take the test to see what identification and other things you will need to bring when you take the test.

Test Preparation

As with any test, you should study before taking the GED exam. The PAL program offers help in preparing you for each of the GED tests.

There are many groups that offer free guides on the Internet to help you study for the GED test, including:

- Steck Vaughn offers free online practice tests and study material in English and Spanish (*www.steckvaughn.harcourtachieve.com/en-US/gedpractice*),
- InterLingua Publishing offers free study material in English and Spanish (*www.spanishged.org*), and
- Diversified Computer Services offers free study material in English and Spanish (*www.gedonline.org*).

In addition, other places offer private tutoring and group classes for a fee. You can find some of these places by searching the Internet, but you should check the qualifications of these providers carefully. Your testing center may also have suggestions for test preparation, or you can talk to your PAL coordinator about GED classes.

### After High School

If you already have your high school diploma or GED certificate—congratulations! That is an impressive and important accomplishment. You have already increased your ability to get a job and earn more money. But, you may not want to stop there.

For more information, see "Training and Placement Assistance If You Have a Disability" beginning on page 26.

You have probably heard that people with college degrees or vocational training earn a lot more than those with high school diplomas or GED certificates. If college or a vocational school interests you, do not be scared of the costs or of going back to school. There are many groups that will help you apply to these schools and there is a huge amount of money available to help you pay for this education.

If you have a physical or mental disability, the Texas Department of Assistive and Rehabilitative Services (or DARS) can help you with counseling, training and job placement assistance, as well as other services after you leave high school.

To help get you started on planning for life after high school, visit *www.twc.state.tx.us/svcs/youthinit/youth_links.html* for information about college, vocational school and job opportunities.

### Applying for College and Vocational Schools

If you are thinking about going to a college or vocational school, you must apply for admission. The application process will have strict deadlines. To be sure you don't miss these deadlines and to find out exactly what the schools will need from you, you should contact the admissions department at the schools of your choice as soon as possible. This is important because some types of information, like your Social Security card, a photo ID or immunization records, may take time to get if you do not already have them.

To go to college, you probably need to take either the ACT or SAT standardized tests. Schools usually want your test scores before the application deadline. You should speak with your caseworker and school guidance counselor about registering for and taking these tests in time to meet all deadlines. The PAL program may help you to pay for the costs of getting ready for and taking these tests. Your PAL coordinator can tell you more about that assistance.

Case 3:04-cv-00251-HSO-ASH Document 604-5 Filed 05/08/14 Page 690 of 744

## Financial Aid

Financial aid basically means money for paying for college or vocational school. There are many different types of financial aid that you may be able to get. Some aid may be based on need (in other words, based on how much money and income you have). Other financial aid is given based on grades, test scores, activities (like sports) or credit. There are grants and scholarships that don't have to be repaid, loans that you must repay after you graduate, and work-study programs that let you work part-time at the school. There's even a good chance that you can go to a Texas college or vocational school for free! (See "State Tuition and Fee Waiver" on page 20.)

Basically, you should not let money stop you from going to college or vocational school. This is true even of private schools that you may think are too expensive. There are billions of dollars of financial aid available, but you will need to ask and do some work to find it. The financial aid departments at the schools in which you are interested can help you find these funds. For more information, you can also visit www.studentaid.ed.gov, www.edfund.org/students or www.fastweb.com. You may also want to visit www.twc.state.tx.us/svcs/youthinit/youth_links.html for helpful information about financial aid programs.

To apply for financial aid, your first step is to fill out one of the following forms: FAFSA or TASFA. FAFSA stands for Free Application for Federal Student Aid. It is free to apply. No matter how many schools you are applying to, you only need to fill out one FAFSA application. Once your application is processed, you and the schools you have selected will be notified of the results and the schools can then start figuring out what financial aid is available to you. It is very important that you return your FAFSA as soon as possible after January 1st for the following school year because the sooner you send in your FAFSA, the better your chances of getting financial aid.It is very important that you get help filling out the FAFSA by someone who is familiar with how foster youth should fill it out. There are some questions about foster care and ward of the court that need to be answered a certain way to help you get the most financial aid. PAL staff should be able to assist you. (See page 8 for internet link to PAL staff.)

If you are a Texas resident but not a U.S. citizen, then you may need to use the TASFA (or Texas Application for State Financial Aid) instead of the FAFSA. There is no fee to apply. Follow the "FAFSA or TASFA" link under "Paying for College" at www.collegefortexans.com to see which form you should use.

Once you send in your FAFSA or TASFA, you should contact the schools of your choice to see if any of them need more information or applications. Understand that applying to school usually is not the same as applying for financial aid—you probably will need to do both.

If you drop out or leave school before the end of the term and if you received cash funds to use for living expenses, it is very important that you return the cash funds. You should talk to the financial aid office about what to do or you risk being unable to get financial aid in the future.

Case 3:04-cv-00251-HSO-ASH Document 604-5 Filed 05/08/14 Page 691 of 744

## State Tuition and Fee Waiver

Many former foster youth may go to publicly funded Texas vocational schools, colleges or universities without having to pay tuition or fees, including for dual credit high school and college courses.[4] You may be able to get free tuition if you were in the conservatorship of DFPS:

4 §54.211 of the Texas Education Code.

On the day before your 18th birthday,
On the day you graduated from high school or got your GED,
On or after your 14th birthday, if you were eligible for adoption on or after that day,
OR
During an academic term in which you took dual credit course or other course for which a high school student earns joint high school and college credit

If you qualify for free tuition and fees, then you must also enroll in a qualifying vocational school, college or university, no later than your 25th birthday.

A list of qualifying schools can be found at the "Applying for College" link at www.collegefortexans.com; only the Public Institutions are covered by the tuition and fee waiver.

To apply for the State Tuition and Fee Waiver, you must fill out a FAFSA or TASFA form and give the college registrar written proof from DFPS of your eligibility for the program. To find out more about how to get that proof, contact PAL staff:, see page 8 for internet link to PAL staff

## Educational Training Voucher (ETV) Program

For more information, see "Training and Placement Assistance If You Have a Disability" beginning on page 26.

The Texas Education and Training Voucher (or ETV) program provides additional money for former foster youth who enroll in a college or training program. You may be eligible to receive up to $5,000 per year under the ETV program to help with tuition, housing, food, books, childcare, computer equipment, medical insurance, tuition and some other expenses. The best part is that this benefit is in addition to the Texas tuition waiver program. (See "State Tuition and Fee Waiver" above.) If you qualify for both programs, you could go to a qualifying school for free and use the funds from the ETV program to meet other expenses. If you have a physical or mental disability, you may also qualify for financial or other assistance through the Vocational Rehabilitation (VR) program of the Texas Department of Assistive and Rehabilitative Services (or DARS).

Generally, you should be able to receive funds under the ETV Program if:

You are 16 or 17 and in DFPS foster care and likely to stay in care until you are 18,
You are not yet 21 but aged out of DFPS foster care,
OR
You are not yet 21 and were adopted from DFPS foster care after turning 16.

If you believe you are eligible, then you must apply for the ETV funds by a deadline.

As long as you begin getting ETV before you turn 21, you can keep getting it until you are 23 if you are making satisfactory progress toward completing your education.

In order to continue receiving ETV funds, you must send information to the ETV program from time-to-time showing that you are in good standing and you must continue working on your degree or other certification. You can find out more about the ETV program by contacting your PAL Coordinator or by visiting *www.bcfs.net/NetCommunity/Page.aspx?&pid=988.*

## Other College Assistance

You may be eligible for scholarships and/or housing assistance that some Texas colleges and universities offer to former foster youth. Please visit *www.dfps.state.tx.us/Child_Protection/Preparation_For_Adult_Living/default.asp* or ask your caseworker or PAL coordinator for more information.

Several schools offer additional financial aid and other programs to help former foster youth. The financial aid departments at the schools you are interested in attending can give you information about the financial aid programs.

You may also be eligible for a scholarship through the Casey Family Scholars Program. This program is operated by the Orphan Foundation of America (or OFA). It provides scholarships of up to $10,000 per year to people under the age of 25 who have spent at least 12 months in foster care and who were not adopted out of foster care. The scholarships are awarded for college or vocational/technical training and can be renewed each year you are in school based on your progress and financial need. You can visit the “Scholarships” link under “Programs” at *www.orphan.org* for more information on this scholarship program.

If you were released from the Texas Youth Commission, you may qualify for Aftercare Educational Funding. Contact the TYC district office at *www.tyc.state.tx.us* for more information.

Case 3:04-cv-00251-HSO-ASH Document 604-5 Filed 05/08/14 Page 693 of 744

You can also find out about scholarships for foster youth by visiting *www.dfps.state.tx.us/child_protection/preparation_for_adult_living/other_scholarships.asp*.

### Learning a Profession Outside of College

College is not your only choice for learning new skills after you finish high school or get your GED. Other types of schools can also get you ready for a career:

Vocational schools and trade schools offer certifications for many jobs that do not require a college degree, such as welding, computer repair, auto repair, truck driving, cosmetology (which includes hairstylists, make-up artists and beauticians) and other skilled fields.

Technical institutes generally offer two year or shorter programs in skilled professions, such as medical assistant, electrician, dental hygienist and computer programmer.

It is important to remember that you may still be eligible for the ETV program if you attend a vocational school, trade school or technical institute—so please do not forget to ask. Plus, if you have a physical or mental disability, you could also qualify for vocational training and assistance from the Texas Department of Assistive and Rehabilitative Services (or DARS).

For more information, see "Educational Training Voucher (ETV) Program" beginning on page 20.

For more information, see "Training and Placement Assistance If You Have a Disability" beginning on page 26.

Also, many high schools now offer classes that let their students earn the same certifications that they could get through a vocational or trade school. By taking those classes in high school, you could get a certification and obtain a skill that would make it easier to find a job and earn more money as soon as you graduate from high school.

You can also learn skills for a trade outside of a classroom. A great way to learn new skills is by becoming an apprentice. This means that you would receive on-the-job training by working with others in that field. Apprenticeships are available in many industries, ranging from aerospace to health care to homeland security. Visit the "Apprenticeship" link at *www.careervoyages.gov* for more information.

### Mentors

During the PAL process, you will work with your Circle of Support or transition team to set goals and make a plan for meeting those goals. Those same people can also help you prepare for college or vocational training. Once you go to college or enter a vocational program, your school may offer guidance counselors to help you adjust to your new life. Other groups, like the OFA, offer mentoring programs for former foster youth in college or vocational schools. Please visit *www.orphan.org* for additional information on OFA's mentor program.



Case 3:04-cv-00251-HSO-ASH Document 604-5 Filed 05/08/14 Page 694 of 744

# Employment

## Training

Job training ranges from basic classes that prepare you for what an employer expects (for example, the importance of being on time, being organized and speaking properly) to programs that teach you how to master a profession. Your PAL coordinator or similar local centers should be able to tell you about basic classes that teach you how to interview for, apply for and handle a job. You will need to look to other sources to learn the skills necessary to succeed in your chosen profession. To help plan for your job and living on your own, you should take the Ansell-Casey Life Skills Assessment, which is an easy-to-use on-line test that provides instant, private feedback. Visit the "Assessments" link at *www.caseylifeskills.org/pages/assess/assess_aclsa.htm* to access this resource.

No matter what plans you have for education, it is never too early to start thinking about getting a job. Even while you are still in high school, having a job can get you ready for your future by teaching you necessary work skills and allowing you to earn and manage your own money. To help get you started on finding a job that is right for you, visit *www.twc.state.tx.us/svcs/youthiit/youth_links.html.*

While you may choose to attend college or a vocational school to prepare for a career, you could also select a different path. If you decide that school is not right for you (or not right for you at this time), then it is important to think about how you will earn money to support yourself. Getting training in at least one area will give you more job choices and increase the amount of money you can earn.

**See the following Texas Workforce Commission site for some helpful resources for youth on training and employment.**

*www.twc.state.tx.us/svcs/youthinit/youth_links.html.*

## Job Assistance Programs

You have access to many programs that will give you experience and increase your job options, even if you have not finished high school. A few of these programs are discussed below.

Job Corps

Job Corps is a free program that helps youth aged 16 through 24 learn a trade, obtain a high school diploma or GED certificate and find a permanent job. Job Corps offers hands-on training in more than 100 job areas. The program is self-paced—which means how long it will take to finish the program depends on your career goals and how quickly you learn. It can take from eight months to two years to complete the Job Corps program.

While enrolled in the Job Corps program, you receive free housing, meals, basic medical care and a living allowance.

If you want to apply for Job Corps, you must be a U.S. resident or legally eligible to work in the U.S., have limited financial resources (in other words, not have a lot of money), not be on probation or under the supervision of a court and not use illegal drugs.

Texas currently has four Job Corps sites. These sites are in Laredo, El Paso, San Marcos and McKinney. To learn more about Job Corps in Texas and how you can apply, visit the Job Corps website at *www.jobcorps.dol.gov* or call (800) 733-5627.

YouthBuild

YouthBuild is a program that trains unemployed, out-of-school young adults aged 16 through 24 to build and repair affordable housing within their communities. You will receive a stipend (a form of payment or salary) while participating in YouthBuild. Texas currently has eight YouthBuild programs:

| LOCATION | NAME AND ADDRESS OF CENTER | PHONE |
|---|---|---|
| Austin | American Youth Works<br>216 East 4th Street<br>Austin, TX 78701 | (512) 236-6100 |
| | American Youth Works<br>1901 E. Ben White Blvd<br>Austin, TX 78741 | (512) 744-1900 |

Case 3:04-cv-00251-HSO-ASH Document 604-5 Filed 05/08/14 Page 696 of 744

| | | |
|---|---|---|
| Brownsville | YouthBuild Brownsville<br>815 Arthur St<br>Brownsville, TX 78521 | (956) 548-2302 |
| Dallas | YouthBuild Dallas<br>2721 Lyola St<br>Dallas, TX 75241 | (214) 372-4620 |
| El Paso | La Fe YouthBuild Academy<br>52 S. Ochoa St<br>El Paso, TX 79901 | (915) 533-6800 |
| New Waverly | New Waverly YouthBuild<br>143 Forest Service Rd. #233<br>New Waverly, TX 77358-0515 | (936) 344-6677 |
| San Antonio | Alamo City YouthBuild<br>1215 W. Poplar St<br>P.O. Box 7844<br>San Antonio, TX 78207-0844 | (210) 223-3131 |
| | YouthBuild San Antonio<br>George Gervin Youth Center, Inc<br>6903 S. Sunbelt Dr<br>San Antonio, TX 78218-3336 | (210) 804-1786 |

Visit *www.youthbuild.org* for more information, or to see if a new YouthBuild program was added in your area. If there is not a YouthBuild program near you, you may be able to join one in another area. You should contact YouthBuild to find out.

AmeriCorps

AmeriCorps provides programs to youth aged 17 or older who work full or part-time in nonprofit, faith-based and government organizations. An allowance is provided to all young adults in the programs. Some programs provide housing. The programs last ten to twelve months. You may also be able to get additional money for college if you finish the AmeriCorps program.

AmeriCorps also offers a few other programs in Texas:

- SeniorCorps: High school seniors all over Texas contribute their time and talents in one of three SeniorCorps programs. Volunteering for this program while in high school is a great way to get job references and experience.
- AmeriCorps VISTA: VISTA members help lift people and communities out of poverty by serving full-time to fight illiteracy, improve health services, create businesses and increase housing opportunities.
- AmeriCorps NCCC (National Civilian Community Corps): This is a ten month, full-time residential program for youth between the ages of 18 and 24. Participants work with charities and government groups to complete service projects.

Visit *www.americorps.org* or call (800) 942-2677 for more information about any of the AmeriCorps programs.

**Training and Placement Assistance If You Have a Disability**

The Texas Department of Assistive and Rehabilitative Services (or DARS) offers a Vocational Rehabilitation (or VR) program that can help you prepare for, find and keep a job if you suffer from a disability. To be eligible for the VR program, you must have a physical or mental disability, such as:

Mental illness,
Alcoholism or drug addiction,
Impaired functioning of arms or legs,
Mental retardation,
Hearing impairment,
Back injury,
Traumatic brain injury, or
Other physical or mental disabilities that prevent you from finding and keeping a job.

Case 3:04-cv-00251-HSO-ASH Document 604-5 Filed 05/08/14 Page 698 of 744

If you qualify, then you can receive services and benefits designed to help you with your unique needs. These services and benefits may include financial help, counseling, training, medical care, assistive devices, job placement assistance, and other services. The VR program also helps students with disabilities plan the jump from school to work. Gaining skills needed for a career, learning how to prepare for a job interview or knowing how to stay employed are just a few ways the VR program helps people with disabilities have successful careers.

To find out whether you qualify for the VR program, contact the DARS office nearest you and ask for an appointment with one of the counselors. To find the nearest DARS office, call (800) 628-5115 or get a list of all of the DARS offices at *www.dars.state.tx.us/drs/DRSoffices.asp*.

More information about the VR program, including its services and how to apply, get the Vocational Rehabilitation Guide to Applicants at www.dars.state.tx.us/drs/VRguide_english.pdf.

## Finding a Job

To find a job, you can look online (www.careerbuilder.com, www.monster.com and www.hotjobs.com are some of the major sites), check the classified ads in the local newspaper or just visit places where you think you would like to work and ask if they are accepting applications. Whenever you visit a place about a job, remember to dress neatly because first impressions are very important. The PAL program or other local transition centers can also help you get ready for and find a job. When applying for a job, you will need proper identification and your Social Security number. Once you apply for a job, it is important to follow up with the businesses where you applied—following up shows interest, is very professional, and could set you apart from others who apply.

One problem facing many young people is that employers are looking to hire people with experience, but you may not have any work experience yet! A great way to gain experience is by volunteering with a group that interests you, like a charity, hospital or church. By volunteering, you will get valuable experience, help your community, and get potential job references.

State of Texas Hiring Preference:
Foster youth and former foster youth who are 25-years-old or younger have a hiring preference for state jobs. That means a current or former foster youth who applies for a state job should be hired for a position before any other applicant who has the same level of qualifications.

# Ex. 59C

## Resource Guide Implementation

To fulfill settlement agreement terms for SA III. B.3.8(C) P3IP II H-1 Transition to Independent Living, the Division of Independent Living utilized several methods of ensuring the Independent Living Resource Guide was offered to youth in care ages 16 and older. To determine youth eligibility, a monthly batch report was developed and implemented to extract demographic and case record data from the Mississippi Automated Child Welfare System (MACWIS). The report is sorted by region/county and displays the following detailed demographic data:

1. Youth's name and person ID – The person ID is a unique system generated identifier
2. Date of birth and age
3. County of Service name (COS) – This is the county location where the youth is placed
4. County of Service worker – This is the name of the worker assigned to the manage the youth's case while placed in the county
5. Custody start date – The date the youth entered care
6. Placement location – The name of the resource home or facility where the youth is living

### Method # 1

Based on the report generated from MACWIS, Independent Living state office staff began working with all thirteen regions to schedule special Independent Living meetings to offer the resource guide to eligible youth in care.   Due to low attendance and/or no attendance to the scheduled meeting this method was unsuccessful.  Independent Living Staff scheduled these meetings through the Area Social Work Supervisors.

### Method # 2

Utilizing the same but updated report from MACWIS the contracted Independent Living staff was engaged to assist with offering the resource guides to eligible youth.  Resource guides were offered and hand receipts were obtained from youth participating in the Independent Living Skills Group Sessions.  This method proved to be partially successful.  While we reached all the youth actively participating in Independent Living activities there was still a large number of youth who did not participate in Independent Living activities.

### Method # 3

The Strategies for Accessing Independent Living Skills (SAILS Team) were engaged with this process on June 15, 2012.  The SAILS team is comprised of Regional Independent Living Specialist.  To capture youth who are not actively participating in Independent Living activities, a regional report of uncaptured youth was developed.   This regional report of uncaptured youth was e-mailed along with specific instructions to the Regional Directors for assistance with this effort.  Incomplete responses were received from regions:

- I South
- II West
- III South
- III North

- IV South
- IV North
- V East
- Region VI
- VII West

No responses were received from Regions:

- I North
- II East
- V West
- VII East

Receiving cooperation from the Regional Directors, Regional Independent Living Staff and County Workers was difficult to obtain in our pursuits to offer the resource guide to uncaptured youth. The regional Independent Living staff is not accountable to the Division of Independent Living therefore it proved to be difficult to coordinate distribution of the resource guide to the youth in their regions.

**Method # 5**

Our preference was to make face to face contact with eligible youth to offer the resource guide. To accomplish this we enlisted the help of contracted Independent Living Specialists, Regional Independent Living Specialists, and County staff. Despite our efforts, face to face contact to offer the resource guide was not 100% achieved. To ensure uncaptured youth were offered an Independent Living Resource Guide, a letter and resource guide has been sent to them through certified mail. The return receipts will serve as our documentation the letter and guide was received.

**Offered Resource Guides at a Glance**

747-Youth captured by the report generated from MACWIS
8- Youth documented in MACWIS with no active Placement.
30- Youth documented in MACWIS as institutionalized or in a correctional Facility.
74-Youth documented in MACWIS on Run-Away Status or youth's location not determined.
64-Youth documented in MACWIS that are no longer in custody.
307-Youth offered the Resource guide through face to face contact.
264-Youth offered the resource guide through certified mail.

---

**571 Resource Guides offered to youth age 16 and up.**
**176 youth not offered the resource guide (reasons documented on Spreadsheet).**

**Attached Documents Include:**
- MACWIS report of youth age 16 and up.
- Independent Living Resource Guide
- Signed hand receipts
- Letter to the youth
- E-mail Correspondence

# Ex. 60A

Case 3:04-cv-00251-TSL-FKB Document 571 Filed 07/06/12 Page 74 of 81

**APPENDIX "D"**
Modified Mississippi Settlement Agreement and Reform Plan

Mississippi Diligent Recruitment of Families for Children

# Implementation Plan - Phase II, Version A

| Cooperative Agreement Items | Goal/Activity | Year 2 | Year 3 | Year 4 | Year 5 | Responsibility |
|---|---|---|---|---|---|---|
| **1. Recruitment Activities** | | | | | | |
| **A. Targeted Recruitment: Market Segmentation** | | | | | | |
| D,E,F | 1. Map current resources against predicted need based on survey analysis | X | X | | | Evaluator; CSF; Project Team |
| D,E,F | 2. Generate a series of maps showing where recruitment activities should be directed | X | X | | | Evaluator; CSF; Project Team |
| D,E,F | 3. Identify specific mediums of communication most used by potential resource families in identified recruitment areas | X | X | | | Evaluator; CSF; Project Team |
| D,E,F | 4. Identify Specific recruitment strategies for engaging targeted families | X | X | | | Evaluator; CSF; Project Team |
| D,E,F | 5. Prioritize recruitment plans for most critical needs of children entering care | X | X | | | Evaluator; CSF; Project Team |
| **B. Targeted Recruitment Diligent Recruitment Specialists** | | | | | | |
| J,K,U | 1. Evaluate current training | X | | | | Project Team |
| J,K,U | 2. Identify areas needing development & strengthening | X | | | | Project Team; CSF; Training Unit |
| J,K,U | 3. Determine areas that should be included in pre-service and/or in-service training | X | | | | Project Team; CSF; Training Unit |
| J,K,U | 4. Make modifications as necessary | | X | | | Project Team |
| J,K,U | 5. Develop a plan to ensure diversity training is offered on a consistent basis | | X | X | X | Project Team; Training Unit |

Case 3:04-cv-00251-TSL-FKB Document 571 Filed 07/06/12 Page 75 of 81

**APPENDIX "D"**
Modified Mississippi Settlement Agreement and Reform Plan

| Cooperative Agreement Items | Goal/Activity | Year 2 | Year 3 | Year 4 | Year 5 | Responsibility |
|---|---|---|---|---|---|---|
| D,E,F | 6. Develop a plan for disseminating market segmentation information to regions & private agencies | X | X | | | Project Director |
| D,E,F | 7. Disseminate market segmentation data including family portraits and recruitment strategies reports to Regional Implementation Teams | X | X | | | Recruitment Support Specialists |
| D,E,F | 8. Develop or update Regional Recruitment Plans based on market segmentation data including family portraits and recruitment strategies reports | X | X | | | Recruitment Support Specialists; Regional Implementation Team |
| D,E,F | 9. Develop and implement a plan for including LPCAs in targeted recruitment activities | X | X | | | Project Team |
| D,E,F | 10. Recruitment Support Specialists will act as supports to the regions and LCPAs and assist in securing tools necessary to implement recruitment strategies outlined Regional Recruitment Plans | X | X | X | X | Recruitment Support Specialists |
| **C. Child Specific Recruitment** | | | | | | |
| D,E,G,P,Q | 1. Fully implement the expedited licensure process for related resource homes | | X | | | Project Team; Policy Director |
| D,E,P,Q | 2. Evaluate Mississippi's current utilization of AdoptUSKids adoption photo listing exchange | | X | | | Project Director; State Co-Leads |
| D,E,P,Q | 3. Determine feasibility to modify current usage of AdoptUSKids photo exchange for both children in care and resource parents. | | X | | | Project Director; State Co-Leads |
| D,E,P,Q | 4. Develop Mississippi statewide adoption photo exchange if needed | | | X | | Project Director; State Co-Leads |
| **D. General Recruitment** | | | | | | |
| D,E,G | 1. Develop plan for ensuring inquires from prospective resource families are handled in a timely and consistent manor | X | | | | Project Team |

**APPENDIX "D"**
Modified Mississippi Settlement Agreement and Reform Plan

| Cooperative Agreement Items | Goal/Activity | Year 2 | Year 3 | Year 4 | Year 5 | Responsibility |
|---|---|---|---|---|---|---|
| D,E,G | 2. Implement plan for ensuring inquiries from prospective resource families are handled in a timely and consistent manor | | X | X | | Project Team |
| D,E,G | 2. Establish a toll-free number for prospective resource families to call | | X | | | Project Director; State Co-Leads |
| D,E,G | 3. Add to MDHS web site to address recruitment | X | | | | Project Director; State Co-Leads; CSF |
| D,E,G | 4. Develop and implement statewide broadcast activities | | | X | X | Project Team, Grant Implementation Team, CSF |
| L | 5. MDHS has 3 Spanish translators on staff and that they are available to assist staff in working with clients and in translating materials | X | X | X | X | DFCS Translators |
| T | 6. MDHS Practice Model implementation moves the program towards a philosophy of working on permanency from the first day children enter the child welfare system | X | X | X | X | CSF; Project Team; Field Staff; Regional Resource Staff |
| **2. Resource Licensure** | | | | | | |
| **A. Resource Applicants** | | | | | | |
| H | 1. Define current application process | X | | | | Project Director; State Co-Leads |
| H | 2. Develop and implement internal tracking procedures to monitor application process | X | | | | Evaluator; Project Director |
| H | 3. Train resource staff on utilization of internal tracking tools | X | X | | | Project Director; Recruitment Support Specialists |

**APPENDIX "D"**
Modified Mississippi Settlement Agreement and Reform Plan

| Cooperative Agreement Items | Goal/Activity | Year 2 | Year 3 | Year 4 | Year 5 | Responsibility |
|---|---|---|---|---|---|---|
| H | 4. Develop and implement exit survey to identify dropout rates/reasons at various states of the process | X | | | | Evaluator; Project Team |
| H | 5. Adapt procedures for receiving and responding to applications and inquires based on data | | X | | | Evaluator; Project Team |
| H | 6. Train resource staff on skills and strategies for responding to inquires and retaining families throughout the licensure process | X | X | | | Project Team |
| H | 7. Design and implement coaching process to ensure resource staff are using learned skills and strategies | X | | | | Project Team; Director of Field Operations |
| **B. Resource Family Training** | | | | | | |
| I,K,U | 1. Evaluate current training in regards to characteristics, needs & issues of children in care/adoption clinical issues | | X | | | Project Team |
| I,K,U | 2. Modify training or develop additional training as needed | | | X | | Project Team; Grant Implementation Team work group |
| I,K,U | 3. Address shared parenting and supporting family relationships | X | X | X | X | Project Team; Regional Resource Staff |
| **C. Home Study Format** | | | | | | |
| N | 1. Evaluate current home study format | X | | | | Project Director; State Co-Leads; MACWIS |
| N | 2. Identify a home study format that would provide necessary information in a consistent manner | X | | | | Project Director; State Co-Leads |
| G,N | 3. Develop plan to ensure all resource workers are utilizing the same home study format | | X | | | Project Director; State Co-Leads |

Case 3:04-cv-00251-TSL-FKB Document 571 Filed 07/06/12 Page 78 of 81

**APPENDIX "D"**
Modified Mississippi Settlement Agreement and Reform Plan

| Cooperative Agreement Items | Goal/Activity | Year 2 | Year 3 | Year 4 | Year 5 | Responsibility |
|---|---|---|---|---|---|---|
| G,N | 4. Provide training to resource staff on revised home study format | | X | | | Project Director; State Co-Leads |
| G,N | 5. Design coaching process to ensure resource staff are using learned skills and strategies | | X | | | Project Team; Director of Field Operations |
| **D. Home Study Process** | | | | | | |
| G | 1. All prospective parents currently have access to the home study process | X | X | X | X | Project Team; Regional Resource Staff |
| E,G | 2. Ensure home studies are completed in a timely manner | X | X | X | X | Evaluator; Project Team; Regional Resource Staff |
| E,G,N,O | 3. Mississippi Resource homes are licensed for both foster care and adoption in a single application process which facilitates concurrent planning. | X | X | X | X | Regional Resource Staff |
| **3. Customer Service Model** | | | | | | |
| H,I,P | 1. Schedule site visit with AdoptUSKids | X | | | | Project Director |
| H,I,P | 2. Determine which staff members will participate in AUK “train the trainer” site visit | X | | | | Project Director; State Co-Leads; Training Unit |
| H,I,P | 3. Develop and Implement plan for providing customer service model training to MDHS field staff | X | X | | | Project Director; State Co-Leads; Training Unit |
| H,I,P | 4. Make needed changes to policy and procedure to include customer service related issues | | X | | | Project Director; State Co-Leads; Policy Director |
| H,I,P | 5. Ensure customer service model techniques are being implemented by staff and are sustainable. | | X | X | X | Project Team; Field Operations |

Case 3:04-cv-00251-TSL-FKB Document 571 Filed 07/06/12 Page 79 of 81

**APPENDIX "D"**
Modified Mississippi Settlement Agreement and Reform Plan

| Cooperative Agreement Items | Goal/Activity | Year 2 | Year 3 | Year 4 | Year 5 | Responsibility |
|---|---|---|---|---|---|---|
| **4. Contract with the Licensed Child Placing Agencies** | | | | | | |
| R | 1. Release RFP | X | | | | Congregate Care Director; Permanency Unit Director; DFCS Finance and Administration |
| R | 2. Review proposals | X | | | | Congregate Care Director; Permanency Unit Director; DFCS Finance and Administration |
| R | 3. Prepare contracts and issue | X | | | | Congregate Care Director; Permanency Unit Director; DFCS Finance and Administration |
| R | 4. Plan for contract monitoring | | X | X | X | Congregate Care Director; Permanency Unit Director; DFCS Finance and Administration |
| **5. Family/Child Matching** | | | | | | |
| **A. Characteristics of Children in Care** | | | | | | |
| A,Q | 1. Establish baseline and benchmarks 3-6 months prior to regional implementation roll out | X | X | | | Evaluator; Project Team |
| A,Q | 2. Aggregate data by county & make available to regions, counties, and private agencies | X | X | | | Evaluator; Project Team |
| A,Q | 3. Develop and implement plan for consistently updating the characteristics of children in care | | X | X | X | Project Director; State Co-Leads, MACWIS; Evaluator |
| A,Q | 4. Work with MACWIS to ensure regular characteristic reports are available | | | X | X | Project Director; State Co-Leads, MACWIS; Evaluator |
| A,Q | 5. Address characteristics of children in care and their placement needs though regular placement committee meetings | | | X | X | Project Team; Regional Resource Staff |

Case 3:04-cv-00251-TSL-FKB Document 571 Filed 07/06/12 Page 80 of 81

**APPENDIX "D"**
Modified Mississippi Settlement Agreement and Reform Plan

| Cooperative Agreement Items | Goal/Activity | Year 2 | Year 3 | Year 4 | Year 5 | Responsibility |
|---|---|---|---|---|---|---|
| **B. Resource Family Characteristics** | | | | | | |
| B,Q | 1. Develop and implement plan for consistently updating the characteristics of licensed resource families | | X | | | Project Team; CSF; Evaluator |
| B,Q | 2. Develop a database of characteristics of current resource families by county | | X | X | X | Project Team; Evaluator; CSF, MACWIS |
| B,Q | 4. Work with MACWIS to ensure regular resource family characteristic reports are available | | X | X | X | Project Team; Evaluator; CSF, MACWIS |
| B,Q | 5. Address placement needs by matching children with families though regular placement committee meetings | X | X | X | X | Project Team; Regional Resource Staff |
| **8. Collaboration/Public-Private Partnerships** | | | | | | |
| C | 1. Use consumer data to determine communities with highest placement rates by zip code | X | X | | | CSF; MACWIS; Project Team |
| C | 2. Identify prospective neighborhoods for recruitment activities | X | X | | | CFS; Project Team |
| C | 3. Adapt Regional Implementation Plans to address community outreach | X | X | X | X | Project Team; Regional Resource Staff |
| C | 4. Adapt staff and resource families to include/work with community partners | X | X | X | X | Project Team; CSF; Regional Resource Staff |
| **10. Website** | | | | | | |
| I,K,Q,U | 1. Consult with MACWIS related to website modification and development | | X | | | Project Director; State Co-Leads; CSF; MACWIS |
| I,K,Q,U | 2. Assess information currently available on MDHS website | | X | | | Project Director |

**APPENDIX "D"**
Modified Mississippi Settlement Agreement and Reform Plan

| | | | | | | |
|---|---|---|---|---|---|---|
| **Cooperative Agreement Items** | **Goal/Activity** | **Year 2** | **Year 3** | **Year 4** | **Year 5** | **Responsibility** |
| I,K,Q,U | 3. Identify what type of modifications and additions are needed | | X | | | Project Team; MACWIS; CSF |
| I,K,Q,U | 4. Gather or develop needed information | | X | | | Project Team; MACWIS; CSF |
| I,K,Q,U | 5. Develop a plan for adding and maintaining information | | | X | | Project Director; MACWIS; CSF |
| **11. Evaluation Activities** | | | | | | |
| | 1. See attached evaluation plan | X | X | X | X | Evaluator |

# Ex. 60B



**STATE OF MISSISSIPPI**
Phil Bryant, Governor
**DEPARTMENT OF HUMAN SERVICES**
Richard A. Berry
Executive Director

May 30, 2013

Mr. Bernard Morgan
Grants Management Specialist
U.S. Department of Health and Human Services
Administration for Children and Families
Office of Grants Management/Division of Discretionary Grants
370 L'Enfant Promenade, SW
Aerospace Building - 6th Floor East
Washington, DC 20447

Ms. Taffy B. Compain, CPM
National Foster Care Specialist
Children's Bureau, ACF, HHS
1250 Maryland Avenue Suite 8151
Washington, DC 20024

Dear Mr. Morgan and Ms. Compain:

I am pleased to submit our renewal application for the Diligent Recruitment of Families for Children in the Foster Care System Grant. If any additional information is needed please contact [redacted], Diligent Recruitment Grant Coordinator, at [redacted] or email [redacted]

Sincerely,

Richard A. Berry

RB:cb

# Ex. 60C

HHS-2011-ACF-CONT-ACYF-CB-CO, Diligent Recruitment of Families for Children in the Foster Care System in the State of Mississippi; Grant No. 90CO1052

**PROGRAM & BUDGET NARRATIVE:**

The Mississippi Department of Human Services (MDHS) continues with the implementation of its Diligent Recruitment grant known as *Mississippi GRITS: Guided Recruitment Initiatives Targeting Special Kids*. This grant funded initiative is designed to recruit, prepare, and support resource families for children in the State's foster care system and focuses on locating families for children who are considered to be hardest to place:

- Sibling groups of 3 or more children,
- Sexually abused children,
- Children who are sexually active,
- Pregnant girls or teen moms with young children,
- Children who regularly act out aggressively or sexually,
- Teens of both genders (ages 13+), and
- Children with physical (including medically fragile), emotional, or intellectual challenges.

Major activities of the grant include a three faceted recruitment and retention program of general recruitment, targeted recruitment, and child-specific recruitment. The diligent recruitment initiative is also linked to two other major reforms in the State – the implementation of a practice model in phases statewide and a Continuous Quality Improvement (CQI) process, both of which will institutionalize and sustain the diligent recruitment effort.

Year I

Activities in Year I primarily focused on infrastructure and data. The first steps of building infrastructure were hiring and training staff, developing an evaluation plan, and establishing a grant implementation team. Grant staff received an excellent response to staff and resource parent surveys, but not all data collection went so smoothly. The Mississippi Automated Child Welfare Information System (MACWIS) harnesses a variety of valuable information; however, the system was not designed with flexible reporting mechanisms, which makes gathering certain information virtually impossible. The MACWIS staff were supportive of the diligent recruitment initiative and assisted the grant team when possible. Case reviews were scheduled for Year II to gather additional data.

Year II

*MS GRITS* is a statewide initiative with recruitment and retention activities rolled out in phases by region. Initial planning activities in each region included: orientation for the Regional Director and staff, establishing a regional recruitment team (which included private agency staff), training for the team, and the development of a written, regional recruitment plan. In Year II, *MS GRITS* was active in four regions with two regions in the planning phase (Regions IV-N, V-W) and two in the implementation phase (Regions I-S, II-W). Other Year II activities included product development, revision of the training manual and training process for resource parents, and the development of customer service training for staff. Consultants from Adopt US Kids worked with the grant team to develop the customer service training. Grant staff provided (and will continue to provide) customer service training as a part of the roll-out process in each

1

HHS-2011-ACF-CONT-ACYF-CB-CO, Diligent Recruitment of Families for Children in the Foster Care System in the State of Mississippi; Grant No. 90CO1052

region, but the MDHS Professional Development Unit has incorporated the customer service training into its schedule of ongoing trainings. To help with sustainability, the MDHS Professional Development Unit agreed to offer customer service training to all staff on a quarterly basis. New protocol was put in place for responding to inquiries from persons who want to know more about foster care or adoption. This protocol applies to county, regional, and state office staff and is designed to help track families from inquiry to licensure and to ensure families are not prematurely screened out and do not fall through the cracks. Because contracting with licensed child placing agencies required modifications to MACWIS, this item was delayed until Year III.

Year III
Grant activities rolled out in two additional regions in Year III. Regions I-N and IV-S began planning activities in the summer and fall of 2012 with implementation in January 2013. Grant activities were scheduled to roll out in Region III-S as well but were delayed due to staffing concerns, high caseloads, and other opportunities for improved practice within the region. Region III-S includes Hinds County where the City of Jackson is located. Jackson is Mississippi's capitol and largest city and has the second highest number of children in care.

By the end of Year III planning activities will begin in the final seven regions. Mississippi has chosen the *Structured Analysis Family Evaluation* (S.A.F.E.) home study, developed and offered by the Consortium for Children in California, as its preferred home study format. Training and implementation began in Year III for implementation within the agency statewide. Private agencies will be invited to participate in Year IV. Other Year III activities include web site modification which will continue into Year IV. The process of putting all private placement providers on contract continues. In Year III new contracts were issued with diagnostic and emergency shelter providers and regular group home providers. New contracts for therapeutic services will be issued in Year IV. As a sustainability measure, MDHS is considering including the S.A.F.E. home study as a term of the contract.

Year IV
While Mississippi continues to support ongoing grant activities in six regions, grant activities will roll out into Mississippi's remaining seven regions in Year IV. Implementing grant activities in seven regions at one time will necessitate a different format than was previously used. Initial planning will be done during the summer and fall of 2013. Grant staff will hold individual meetings with Regional Directors as their schedules allow. Conference calls and multi-regional meetings may be necessary. Training and the drafting of an initial recruitment plan will be done at a conference with representatives from the seven regions. Representatives from the existing regions will be used as trainers and facilitators at the conference.

Other Year IV activities will include continued web site development to accommodate Mississippi's own photo listing. In Year III, Mississippi initiated a child-specific recruitment initiative with 200 Million Flowers, a private adoption agency in Mississippi. 200 Million Flowers has agreed to take professional photographs and write professional biographical sketches of Mississippi's children who are free for adoption but have no identified adoptive placement. 200 Million Flowers has taken this on at their own expense and has agreed that the products of the partnership will also be featured on AdoptUSKids. Plans will be developed and

2

HHS-2011-ACF-CONT-ACYF-CB-CO, Diligent Recruitment of Families for Children in the Foster Care System in the State of Mississippi; Grant No. 90CO1052

implemented in Year IV to designate and train at least one MDHS resource staff from each region to post and update information on AdoptUSKids about children in that region who need an adoptive placement.

Other child-specific recruitment activities will be incorporated into the grant evaluation. Mississippi has designated a staff person – at no cost to the grant – for the purpose of child specific recruitment. This staff person carries a caseload of 6-8 and works with adolescent males who are free for adoption and who need an adoptive placement. This staff person has been trained using the recruitment information and strategies of the grant.

Plans for general media recruitment will be developed in Year IV for implementation in Year V.

Summary

Implementation of Mississippi's diligent recruitment and retention initiative continues in accordance with its Implementation Plan. Positive energy and enthusiasm among staff are beginning to translate into results. Some delays and barriers experienced include an outdated data management system that struggles to keep up with the demands, conflicting priorities for staff in some areas, a cumbersome and inflexible state purchasing system, and inconsistent implementation of new protocol related to data collection and tracking; however, these delays and barriers have been manageable. Year IV will surely bring its own challenges as the grant rolls into counties that already struggle to keep up with demands.

Mississippi has a strong grant leadership team and strong support from MDHS executive management. CSF consultants have provided sound training and coaching for grant staff which enabled *MS GRITS* staff to step out in the lead until the loss of two staff persons, including the project director. CSF consultants have stepped in to support the state in continuing grant work while short-handed and in helping to train new staff.

Mississippi's diligent recruitment and retention initiative is not a specially funded project but rather an opportunity to fundamentally change the way the state approaches the recruitment and retention of resource parents. At the end of the grant, Mississippi staff will have a different set of skills, additional tools, and a new approach to the recruitment and retention of resource families for children in Mississippi's foster care system. When the grant has ended and the money is gone, the work will continue.

3

**Ex. 60D**

SAI NUMBER:

PMS DOCUMENT NUMBER:

# DEPARTMENT OF HEALTH AND HUMAN SERVICES
# ADMINISTRATION FOR CHILDREN AND FAMILIES
# NOTICE OF AWARD

**1. AWARDING OFFICE:** ACYF - Children's Bureau

**2. ASSISTANCE TYPE:** Coop Agreement

**3. AWARD NO.:** 90CO1052-04-00

**4. AMEND. NO.** 0

**5. TYPE OF AWARD:** Demonstration

**6. TYPE OF ACTION:** Non-Competing Continuation

**7. AWARD AUTHORITY:** 42 USC 5113 ET SEQ.

**8. BUDGET PERIOD:** 09/30/2013 THRU 09/29/2014

**9. PROJECT PERIOD:** 09/30/2010 THRU 09/29/2015

**10. CAT NO.:** 93.652

**11. RECIPIENT ORGANIZATION:**
Mississippi Dept. of Human Services
750 N State St
Jackson, MS 39202-3033
Grantee Authorizing Official: Richard Berry , Executive Director

**12. PROJECT / PROGRAM TITLE:** Diligent Recruitment of Families for Children in the Foster Care System in the State of Mississippi

**13. COUNTY:** Hinds

**14. CONGR. DIST:** 03

**15. PRINCIPAL INVESTIGATOR OR PROGRAM DIRECTOR:** Angie Williams, Director of Permanency Planning and Placement

**16. APPROVED BUDGET:**

| | | |
|---|---|---|
| Personnel | $ | 0.00 |
| Fringe Benefits | $ | 0.00 |
| Travel | $ | 0.00 |
| Equipment | $ | 0.00 |
| Supplies | $ | 0.00 |
| Contractual | $ | 0.00 |
| Facilities/Construction | $ | 0.00 |
| Other | $ | 390,986.00 |
| Direct Costs | $ | 390,986.00 |
| Indirect Costs<br>At % of $ | $ | 0.00 |
| In Kind Contributions | $ | 0.00 |
| Total Approved Budget | $ | 390,986.00 |

**17. AWARD COMPUTATION:**

| | | |
|---|---|---|
| A. NON-FEDERAL SHARE $ | 0.00 | 0% |
| B. FEDERAL SHARE $ | 390,986.00 | 100% |

**18. FEDERAL SHARE COMPUTATION:**

| | |
|---|---|
| A. TOTAL FEDERAL SHARE $ | 390,986.00 |
| B. UNOBLIGATED BALANCE FEDERAL SHARE $ | 0.00 |
| C. FED. SHARE AWARDED THIS BUDGET PERIOD $ | 0.00 |

**19. AMOUNT AWARDED THIS ACTION:** $ 390,986.00

**20. FEDERAL $ AWARDED THIS PROJECT PERIOD:** $ 1,590,944.00

**21. AUTHORIZED TREATMENT OF PROGRAM INCOME:** Additional Costs

**22. APPLICANT EIN:** 646000807

**23. PAYEE EIN:** 1646000807A3

**24. OBJECT CLASS:** 41.45

**25. FINANCIAL INFORMATION:** DUNS 809399918

| ORGN | DOCUMENT NO. | APPROPRIATION | CAN NO. | NEW AMT. | UNOBLIG. | NONFED % |
|---|---|---|---|---|---|---|
| | 90CO105204 | 75131536 | 3-G998016 | $390,986.00 | | |

**26. REMARKS:** (Continued on separate sheets)

RESTRICTION PLACED ON FEDERAL FUNDS:
Within thirty (30) days from the start date of this award, the grantee will be contacted by the Office of Grants Management (OGM) to finalize the budgetary aspects of this award.
All funds have been placed in the category 'Other' during this interim period.

**27. SIGNATURE - ACF GRANTS OFFICER** Robin Bunch **DATE:** 09/18/2013

**28. SIGNATURE(S) CERTIFYING FUND AVAILABILITY** Rosa Trent 09/16/2013

**29. SIGNATURE AND TITLE - PROGRAM OFFICIAL(S)** Mr. Joseph Bock - Associate Commissioner **DATE:** 09/17/2013

DGCM-3-785 (Rev. 86)

**SAI NUMBER:**

**PMS DOCUMENT NUMBER:**

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**ADMINISTRATION FOR CHILDREN AND FAMILIES**
**NOTICE OF AWARD**

| 1. AWARDING OFFICE: | 2. ASSISTANCE TYPE: | 3. AWARD NO.: | 4. AMEND. NO. |
|---|---|---|---|
| ACYF - Children's Bureau | Coop Agreement | 90CO1052-04-00 | 0 |

| 5. TYPE OF AWARD: | 6. TYPE OF ACTION: | 7. AWARD AUTHORITY: |
|---|---|---|
| Demonstration | Non-Competing Continuation | 42 USC 5113 ET SEQ. |

| 8. BUDGET PERIOD: | 9. PROJECT PERIOD: | 10. CAT NO.: |
|---|---|---|
| 09/30/2013 THRU 09/29/2014 | 09/30/2010 THRU 09/29/2015 | 93.652 |

**11. RECIPIENT ORGANIZATION:**

Mississippi Dept. of Human Services

## STANDARD TERMS

1. Paid by DHHS Payment Management System (PMS), see attached for payment information. This award is subject to the requirements of the HHS Grants Policy Statement (HHS GPS) that are applicable to you based on your recipient type and the purpose of this award. This includes requirement in Parts I and II (available at http://www.hhs.gov/grantsnet/adminis/gdp/index.htm) of the HHS GPS. Although consistent with the HHS GPS, any applicable statutory or regulatory requirements, including 45 CFR Part 74 or 92, directly apply to this award apart from any coverage in the HHS GPS. This award is subject to requirements or limitations in any applicable Appropriations Act. This award is subject to the requirements of Section 106 (g) of the Trafficking Victims Protection Act of 2000, as amended (22 U.S.C. 7104).
   For the full text of the award term, go to the http://www.acf.hhs.gov/grants/awards_term.html.
   This grant is subject to the requirements set forth in 45 CFR Part 87. Attached are terms and condition, reporting requirements, and payment instructions.
   (**) Reflects only federal share of approved budget.

## Reporting Requirements

1. Starting with awards issued in fiscal year 2013, ACF will require use of the SF-428 (Tangible Personnel Property Form) and the SF-429 (Real Property Status Report). The reporting frequency will be on an annual basis at the end of each fiscal year. If the report is not applicable, submission is not required. Fillable forms are available at http://www.acf.hhs.gov/grants-forms.

# Ex. 61A



Mississippi PATH
Parents As Tender Healers
Resource Applicant Handbook
Photo by George Bennett, Starkville High School. Senior, 2012

# MDHS

## Division of Family & Children's Services

## Mississippi PATH

## (Parents as Tender Healers)

### A Curriculum for Foster, Adoptive and Kinship Care Parents

### (Resource Families)

Certain passages in each Session as well as several articles are copied, with permission from Training and Resource Center – Spaulding for Children

---

Revision (February 2012) Contributors: [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted] and [redacted].

Original Contributors: [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted], [redacted] (National Resource center), and the Adoption and Licensure Specialist for the Division of Family and Children's Services.

Funding through the Adoption and Licensure Unit and Diligent Recruitment and Retention Grant

# Mississippi PATH

## TABLE OF CONTENTS

### *Session I Teamwork & the Children Served*

Session Objectives 7
Agency Mission 8
The MS Code 9
Intake Flow Chart 10
Court Hearing Flow Chart 12
MEPA 13
Cultural Diversity 15
Permanency Planning 16
Licensure Checklist 19
Parental Roles 21
Brandon's Case Study 24
Shared Parenting 29
Foster Child Visitation 34
Shared Parenting Questionaire 36
Charateristics of Successful Resource Families 38
Issues for Relative Resource Parents 40

### *Session II Separation & Attachment*

Session Objectives 43
Designating Support Systems 43
Trauma & Removal Issues 45
Recovery & Resilience 55
Separation & Loss 57
Separation from Birth Parents 61
Attachment Development 66
Encouraging Attachment 68

## *Session III Developmental Stages*

Session Objectives ____ 72
Maslow Hierarchy ____ 74
Erikson's Stages of Development ____ 75
Beyond Sexual Abuse ____ 76
Developmental Process for Children ____ 81
Charateristics of Critical Tasks ____ 82

## *Session IV Behavior Management*

Session Objectives ____ 93
Case Scenarios ____ 95
Underlying Emotional Issues of Survival Behaviors ____ 100
Discipline: Responding to Children's Behaviors ____ 102
Ten Techniques to Shape Behavior ____ 116
Ten Myths About Spanking ____ 117
Policy on Corporal Punishment ____ 118
Medication Management ____ 121

## *Session V Permanent Connections*

Session Objectives ____ 125
Life Books ____ 127
Adoption Clinical Issues ____ 128
Adoption Paperwork Flow Chart ____ 132
Subsidy Criteria ____ 133
MS State Subsidy Profile ____ 134
Adoption Assistance Negotiation ____ 142

## Purpose and Objectives of PATH:

- Increase your understanding of children in the child welfare system.
- Understand the different roles of birth parents, legal parents, care giving parents and resource parents.
- Understand the dual licensing process for resource families.
- Identify the characteristics of a successful resource family.
- Understand survival behaviors developed by children in the child welfare system.
- Understand how human beings become emotionally attached.
- Identify existing and future family strengths and supports.
- Help children from the child welfare system form attachments.
- Learn disciplinary techniques that work well for children who have experienced physical and emotional trauma.
- Identify your current strengths and resources in dealing with crisis.
- Understand Permanent Connections.

Welcome Prospective Resource Family!

**Ex. 61B**

Resource ASWS,

As you are beginning to receive your newly updated and printed MS PATH Applicant Handbook, I wanted to remind you and highlight some of the major changes/additions to the curriculum. It is highly encouraged that you review each section with your Resource staff in preparation of training new resource home applicants.

**Session 1 – Teamwork and Children Served**
- The Multiethnic Placement Act (MEPA) has been added to the curriculum and can be found on pages 13-14.
- A piece on cultural diversity has been added and can be found on page 15.
- The updated licensure standards can be found on pages 19-20.
- Take note that Richard's Story has been changed to Brandon's Story, which offers more simplicity while telling the story of a child in care. Most of the questions throughout the curriculum are the same. Brandon's story and Brandon's Mom's story can be found on pages 24-28.
- A piece on shared parenting has been added, which begins on page 29. This piece includes a birth parent testimonial, feelings and emotions parents experience, teamwork and trust, and family interactions.
- DFCS policy regarding foster child visitations has been included on page 34.
- A questionnaire regarding resource parents working with birth parents has been added and can be found on pages 36-37.
- Characteristics of successful resource families has been updated; page 38.
- Specific issues for relative resource parents have been added; page 40.

**Session 2 – Separation and Attachment**
- A piece on trauma and removal issues has been added and begins on page 45 with an individual activity. It discusses what a traumatic event is, realistic expectations of children, brain development, effects of maltreatment on brain development, the role of caregivers, and supporting maltreated children. There are 2 additional new activities in that piece.

**Session 3 – Developmental Stages**
- A new article was added, Beyond Sexual Abuse: Families Can Promote Healing, pages 76-79

**Session 4 – Behavior Management**
- The Underlying Socio-Emotional Issues chart has been updated, page 100.
- A new piece on discipline has been added; Discipline: Responding to Children's Behavior, which begins on page 102. This includes information on misbehavior, responding to behavior, types of parenting styles, DFCS discipline policy, and techniques to shape behavior.
- DFCS policies and practices regarding foster children and medications has been added, pages 121-123.

**Session 5 – Permanent Connections**
- The piece on life books has been updated, page 127.
- Adoption clinical issues have been added and can be found on pages 128-131. This includes issues for which some families seek post adoption services, number of children with clinical needs, milestones that may trigger a need for services, common triggers, and types of post adoption services.
- The updated Mississippi State Subsidy Profile has been added, pages 134-141.
- The Application for Re-negotiation of Adoption Assistance has been added, page 142-143.

As you review the handbook, please do not hesitate to contact me with any questions, concerns, or feedback.

Sincerely,

# Ex. 62A

**Grace M. Lopes**

**From:** Grace M. Lopes [gmlopes@oymonitor.org]
**Sent:** Friday, January 10, 2014 4:02 PM
**To:** 'Rachal, Kenya'; 'Julia Davis'
**Cc:** 'Fortenberry, Rusty'; 'Tullos, Ashley C.'; 'Marcia Robinson Lowry'; 'Mark.Smith@mdhs.ms.gov'; 'Kim Shackelford'; 'Mark Jordan'; 'Mia Caras'
**Subject:** Maltreatment in Care Rates
**Attachments:** Maltreatment in Care Rates 7.31.12 to 10.31.13.pdf

Kenya and Julia:

Please see attached for my office's analyses of the updated maltreatment in care data produced by defendants for the 12-month period ending July 31, 2013 and the 12-month period ending October 31, 2013. Mark also analyzed the rate of maltreatment in care for the 2012 calendar year, which, according to the updated data defendants have submitted was .9 percent. Because this differs from the 1.65 percent reported by defendants for 2012 to ACF, it would be helpful to understand the reasons for the difference in the reported 2012 rate. Toward that end, I would appreciate any information that defendants can provide regarding this matter. Many thanks, Grace

*Grace M. Lopes*
*Monitor, Olivia Y.*
*1220 19th Street, N.W.*
*Suite 500*
*Washington, D.C. 20036*
*202.232.8311*

*This email and any attachments may contain confidential and privileged information. If you are not the intended recipient, please notify the sender immediately, destroy this email, and destroy any copies. Any dissemination or use of this information by a person other than the intended recipient is unauthorized and may be illegal.*

# Ex. 62B

*Abuse/Neglect/Maltreatment in Care (This measure shall apply to reports of abuse, neglect, or maltreatment of children while in DFCS custody.) The rate of abuse or maltreatment in care in the last year shall not exceed 0.33%. (MSA II.C.2)*

- Timeframe: Rolling Year Report
    - Based on Federal measuring of rate of maltreatment

- Report Population:
    - Children in custody who had an investigation where the alleged perpetrator was a caretaker in a resource home or facility
        - Child does not need to be in active custody, as it could be a disclosure about a prior incident
        - Child does not need to currently be in the resource home or facility, but Placement History should show child was placed at the alleged perpetrator's Home, whether currently or previously
    - Then check to see if the child has an Intake (report into hotline), listed as 'special handling-resource report'
    - Exclude the original intakes (report into hotline) which removed children from their family home
    - Check to see if the child has an allegation of ANE as a victim. (any child who is a victim will have an allegation attached to their id)
    - When a child who has an Intake (ie report into hotline-the date of which is located in the field Report Date) has an allegation as a victim, do the following.
        - Include both victims identified PRE and POST Intake. This includes children who may have been confirmed at intake with a different role and/or children who weren't known at the time of intake and allegations were added during the investigation
        - Check Intake Details and accept for the following
            - Intake is ANE type of report, labeled a 'special handling-resource report'
            - Findings Approved Date is within the reporting period (investigation is complete and the supervisor has approved the results)
            - Intake is linked to a Resource and not a parent or family caretaker. These will include the facility and staff members, (exclude the original intake that brought them into custody)
                - Include 'out of home resource not on file' (sometimes utilized by MCI for facilities)
        - Check for a Maltreatment (Allegation) finding(s) in the Investigation, accept if with or without substantiation. There may be multiple allegations in a single report
    - All of the above criteria is necessary for the child to show on the report
    - Resource Parent or Staff Member listed as Perpetrator on Person Detail Summary of Intake
        - Name of Resource Parent/Facility as Perpetrator may be identified PRE or POST intake.

- Investigation findings completed (Supervisor Approved) and fall within the PUR of report
- If child has more than one intake during the rolling year period, list all
- List all allegations of maltreatment and their findings (substantiated or not substantiated)

- Detail Report:
  - Title of Report: 'Rate of Maltreatment in Care'
  - Region, County
  - Child ID, Child Name
  - Intake ID (number of report that has come into the hotline)
    - Intake/Investigation Tab
  - Report Date (date of report that has come into the hotline and noted in the Intake report)
    - Intake/Investigation Tab>Intake Report>Report Date
  - Incident Date (date noted in the Intake report that the alleged maltreatment occurred)
    - Intake/Investigation Tab>Intake Report>Incident Date
  - Date Investigation Findings Approved
    - Intake/Investigation Tab>Investigation Report> Supervisory Approval Tab of the Investigation>Findings Approved
  - Investigation Findings: Substantiated, Unsubstantiated (results of the investigation)
    - Intake/Investigation Tab>Investigation Report> Supervisory Approval Tab of the Investigation
  - Count/List of Maltreatments: Number of Allegations and their types
    - Intake/Investigation Tab>Intake Report> Intake/Allegations Tab
  - Allegation of Maltreatment Finding: Substantiated, Unsubstantiated (for each allegation listed for the child in a given investigation, note whether that allegation was substantiated or not)
    - Intake/Investigation Tab>Investigation Report> Supervisory Approval Tab of the Investigation
  - County Summary:
    - For the 12 Month Period:
      - Number of Children in Custody
        - Unique Count of Children Served during the Report Period (this does not equate to the number of children in custody when the report is run): If child is in custody, leaves, and comes back in and shows on the report more than once (due to multiple investigations), count only once
      - Number of Custody Children Involved in ANE Investigations
        - Unique count: If child has more than one ANE Investigation, regardless of results of the investigation, count only once

- Number of Incidents with Substantiated Findings that Occurred During the Report Period
- Number of Children who experienced more than one substantiated investigation
- Number of Investigations (these are tied to the intake id's from the hotline)
- Number of Allegations of Maltreatment Findings (total number of allegations associated with the above investigations. Number will be greater than or equal to number of investigations)
- Number of Substantiated Allegations of Maltreatment Findings (of the total number of allegations, how many were substantiated)
- Number of Substantiated Investigations (tied to intake id from hotline)
- Number of Children with a Substantiated Investigation
    - Unique count. If child has more than one substantiated investigation, count only once
- % of Investigations substantiated
    - Number of Substantiated Investigations / Total Number of Investigations
- % of Children in Custody with Substantiated Investigations
    - Number of Children with a Substantiated Investigation / Number of Children in Custody
- % of Children in Custody with Substantiated Investigations whose Report Date falls within Report Period
    - Number of Children with a Report Date and a Substantiated Investigation in Report Period / Number of Children in Custody
- % of Children in Custody with Substantiated Investigations whose Incident Date falls within Report Period
    - Number of Children with a Incident Date and a Substantiated Investigation in Report Period / Number of Children in Custody

- For Current Month:
    - Number of Children in Custody
        - Unique Count of Children Served during the Report Period (this does not equate to the number of children in custody when the report is run): If child is in custody, leaves, and comes back in and shows on the report more than once (due to multiple investigations), count only once
    - Number of Custody Children Involved in ANE Investigations
        - Unique count: If child has more than one ANE Investigation, regardless of results of the investigation, count only once
    - Number of Incidents with Substantiated Findings that Occurred During the Report Period

- Number of Children who experienced more than one substantiated investigation
        - Number of Investigations (these are tied to the intake id's from the hotline)
        - Number of Allegations of Maltreatment Findings (total number of allegations associated with the above investigations. Number will be greater than or equal to number of investigations)
        - Number of Substantiated Allegations of Maltreatment Findings (of the total number of allegations, how many were substantiated)
        - Number of Substantiated Investigations (tied to intake id from hotline)
        - Number of Children with a Substantiated Investigation
            - Unique count. If child has more than one substantiated investigation, count only once
        - % of Investigations substantiated
            - Number of Substantiated Investigations / Total Number of Investigations
        - % of Children in Custody with Substantiated Investigations
            - Number of Children with a Substantiated Investigation / Number of Children in Custody
        - % of Children in Custody with Substantiated Investigations whose Report Date falls within Report Period
            - Number of Children with a Report Date and a Substantiated Investigation in Report Period / Number of Children in Custody
        - % of Children in Custody with Substantiated Investigations whose Incident Date falls within Report Period
            - Number of Children with a Incident Date and a Substantiated Investigation in Report Period / Number of Children in Custody

- Summary Report: Regional, Statewide
    - Title of Report: 'Rate of Maltreatment in Care'
    - For the 12 Month Period:
        - Number of Children in Custody
            - Unique Count of Children Served during the Report Period (this does not equate to the number of children in custody when the report is run): If child is in custody, leaves, and comes back in and shows on the report more than once (due to multiple investigations), count only once
        - Number of Custody Children Involved in ANE Investigations
            - Unique count: If child has more than one ANE Investigation, regardless of results of the investigation, count only once
        - Number of Incidents with Substantiated Findings that Occurred During the Report Period

- Number of Children who experienced more than one substantiated investigation
- Number of Investigations (these are tied to the intake id's from the hotline)
- Number of Allegations of Maltreatment Findings (total number of allegations associated with the above investigations. Number will be greater than or equal to number of investigations)
- Number of Substantiated Allegations of Maltreatment Findings (of the total number of allegations, how many were substantiated)
- Number of Substantiated Investigations (tied to intake id from hotline)
- Number of Children with a Substantiated Investigation
  - Unique count. If child has more than one substantiated investigation, count only once
- % of Investigations substantiated
  - Number of Substantiated Investigations / Total Number of Investigations
- % of Children in Custody with Substantiated Investigations
  - Number of Children with a Substantiated Investigation / Number of Children in Custody
- % of Children in Custody with Substantiated Investigations whose Report Date falls within Report Period
  - Number of Children with a Report Date and a Substantiated Investigation in Report Period / Number of Children in Custody
- % of Children in Custody with Substantiated Investigations whose Incident Date falls within Report Period
  - Number of Children with a Incident Date and a Substantiated Investigation in Report Period / Number of Children in Custody

o For Current Month:
- Number of Children in Custody
  - Unique Count of Children Served during the Report Period (this does not equate to the number of children in custody when the report is run): If child is in custody, leaves, and comes back in and shows on the report more than once (due to multiple investigations), count only once
- Number of Custody Children Involved in ANE Investigations
  - Unique count: If child has more than one ANE Investigation, regardless of results of the investigation, count only once
- Number of Incidents with Substantiated Findings that Occurred During the Report Period
- Number of Children who experienced more than one substantiated investigation
- Number of Investigations (these are tied to the intake id's from the hotline)

- Number of Allegations of Maltreatment Findings (total number of allegations associated with the above investigations. Number will be greater than or equal to number of investigations)
- Number of Substantiated Allegations of Maltreatment Findings (of the total number of allegations, how many were substantiated)
- Number of Substantiated Investigations (tied to intake id from hotline)
- Number of Children with a Substantiated Investigation
    - Unique count. If child has more than one substantiated investigation, count only once
- % of Investigations substantiated
    - Number of Substantiated Investigations / Total Number of Investigations
- % of Children in Custody with Substantiated Investigations
    - Number of Children with a Substantiated Investigation / Number of Children in Custody
- % of Children in Custody with Substantiated Investigations whose Report Date falls within Report Period
    - Number of Children with a Report Date and a Substantiated Investigation in Report Period / Number of Children in Custody
- % of Children in Custody with Substantiated Investigations whose Incident Date falls within Report Period
    - Number of Children with a Incident Date and a Substantiated Investigation in Report Period / Number of Children in Custody

# Ex. 62C

**Grace M. Lopes**

---

**From:** Rachal, Kenya [mailto:krachal@bakerdonelson.com]
**Sent:** Friday, January 17, 2014 4:02 PM
**To:** Grace Lopes (gmlopes@oymonitor.org); Julia Davis
**Subject:** RE: Maltreatment in Care Rates

Hi Grace and Julia:

My understanding from DFCS is that the ACF data you are referring to is calculated from two sources (NCANDS and AFCARS). There are some differences between this data and the BRD06 report. NCANDS counts incidents of maltreatment that could have occurred within 2 years prior to the period under review end date but received findings within the period under review. This is in contrast to BRD06 which counts incidents of maltreatment that occurred during the period under review only.

Also ACF's "in custody" denominator is different from that of BRD06. ACF excludes some children from the denominator such as children who are in non-IV-E type placements (hospitals, own home placements, etc.). If this type of placement was the child's only placement then the child would not be included in the AFCARS population of children in care.

Thanks,
Kenya

# Ex. 62D

**Grace M. Lopes**

**From:** Rachal, Kenya [mailto:krachal@bakerdonelson.com]
**Sent:** Thursday, February 06, 2014 4:12 PM
**To:** Grace Lopes (gmlopes@oymonitor.org)
**Cc:** Julia Davis; mjordan@sparb.org; mcaras@sparb.org
**Subject:** RE: Discrepancy in Maltreatment in Care Rates

Hi Grace:

Yes, the methodology is different. In developing specifications for the MSA reports that have some similarity to Federal measures used in the Child and Family Services Review (CFSR), DFCS has consistently tried to align reports to the extent possible with the Federal measures, particularly where reporting populations are defined and addressed. For example, with regard to BRD06, DFCS has been consistent in using a definition of maltreatment in foster care that conforms to the Federal definition that such maltreatment only includes incidents where the foster caretakers are the perpetrators. However, there are some differences in the process of the determination of maltreatment in foster care between BRD06 and the Federal measure that are important to understand, primarily because the methodology used in the Federal measure would not address all the needs for monitoring this indicator in consistent with the MSA.

The Federal measure combines information from two sources to make the calculation – the State's twice annual AFCARS submission and the annual NCANDS submission, whereas BRD06 comes from a rolling year period of information taken directly from a single source, MACWIS. The State's programming for the AFCARS and NCANDS submissions has been in place for many years and does not conform to report specifications for BRD06. Therefore, we should not expect these sources of information, and therefore the populations, to align totally.

One important difference in the two reports is that BRD06 requires that a child be in DFCS' custody at the time of the alleged maltreatment in order to be included on the report since the MSA only addresses children who are in DFCS custody. In BRD06, maltreatment reports involving children in foster care alleged to have been maltreated by resource parents or facility staff are designated as "special handling resource reports." The federal measure does not take this designation into account. Instead the federal measure looks at whether the maltreatment report was within the period being considered and whether the perpetrator's relationship to the alleged victim was listed as a foster parent. DFCS has looked into the discrepancy issue further and learned that some children were ending up in the AFCARS submission and not on BRD06 because of errors at intake in wrongly selecting foster parents from a drop down box as the alleged perpetrators. In those cases the children were actually not in DFCS custody so they were correctly excluded from BRD06.

As indicated previously, there are differences in the population of children used as a denominator in the calculation of the Federal measure and BRD06. The denominator for the Federal measure is derived from the AFCARS population which excludes some children who are included in the BRD06 denominator, which is based on the MSA requirements. The AFCARS measure does not include children who are in non-IV-E type placements (hospitals, own home placements, etc.). If this type of placement was the child's only placement then the child would not be included in the AFCARS population of children in care. BRD06 addresses all children in custody with reports of maltreatment for the reporting period, which we believe is more consistent with the MSA requirements.

Thanks,
Kenya

# Ex. 62E

**Grace M. Lopes**

**From:** Rachal, Kenya [mailto:krachal@bakerdonelson.com]
**Sent:** Friday, February 28, 2014 6:49 PM
**To:** Grace M. Lopes; Julia Davis
**Cc:** Tullos, Ashley C.; Fortenberry, Rusty; Kim Shackelford; Cynthia Greer; evandusen@csfmail.org; Donald Griffin; Elissa L. Glucksman; Mark Jordan; Mia Caras; Jerry Milner (jmilner@csfmail.org)
**Subject:** Re: Follow Up from February 24, 2014 Conference Call

Hi Grace and Julia:

I am writing in follow up to my e-mail of Feb. 25, 2014.

With regard to issue III. below, Defendants have a plan to address this which was discussed during our call on the 24th. Based on the non-compliance letter received last night from Plaintiffs, it appears they Plaintiffs do not agree with the timing of the plan. Defendants are reviewing Plaintiffs' letter will respond regarding this issue in accordance with section VII.B of the MSA that has been invoked by Plaintiffs.

As to issue IV. below, in addition to the items pointed out in my correspondence of Feb. 6th, please also see the following information provided by CSF in response to the Monitor and Plaintiffs' questions:

*SWBRD06 was developed to conform with the Federal definition of maltreatment in care, namely children in foster care who have been found to be the victim of a substantiated report where the perpetrator is either the foster caretaker or the facility staff. This definition has remained true in SWBRD06, though the methodology for obtaining this indicator includes some differences and similarities with the Federal methodology, as follows:*

- *The Federal government obtains its data from the NCANDS and AFCARS submission whereas SWBRD06 pulls directly from MACWIS. Since NCANDS and AFCARS are submitted to the Federal government from the States on a periodic basis (annually or semi-annually) and we need to provide monthly reports on this indicator, going to those files would not work.*

- *In trying to ensure that we are being true to the definition of maltreatment of children in care, SWBRD06 first checks to confirm that the child is in foster care at some point during the 12 month period, then looks at the investigation tab to see if there has been an investigation. Our understanding is that the Feds go straight to the intake (report date) and look to see for the intake (report date) in the period, was the perpetrator labeled a 'foster caretaker or a facility staff'. This means that if there is any data entry error at the intake level (due to misinformation at the time of entry or user error) and perpetrators are labeled incorrectly, they will be included in the report. SWBRD06 has the extra checks and balance of confirming custody status. When we looked at the 43 children that showed in the Numerator of the federal maltreatment in care that did not show on the SWBRD06, we found that 39 of these children (88.6%) were not in custody at the time of the report, and in 21 of these 39 cases (53.8%), the child had never been in custody. DHS is looking further into these cases and plans to resubmit the NCANDS data profile by the deadline of March 15, 2014.*

- *As an added precaution, SWBRD06 confirms that the intake/investigation is for a child in care by looking to see if the 'special-handling resource report' radial button, as well as the labeling of the alleged perpetrator. As indicated above, we believe that the Federal measure just looks at the substantiated perpetrator. When looking at the details between the Federal measure and SWBRD06, the Federal indicator reported 39 records more in the numerator because it does not look at the 'special handling resource' radial.*

- *SWBRD06 looks at 12 months of data in order to produce monthly statistics; the Feds compile FFY NCANDS data for the numerator and determine the denominators by combining two AFCARS 6-months submissions that cover the same FFY.*

- *SWBRD06 includes all children in custody during the PUR in its denominator. The Feds include in its denominator all children in foster care, with the exception of non-IV-E type placements (DYS residential facilities, hospitals, jail, lock-up, or detention and trial home visits). Due to the different timeframes of the report, the denominators will probably never be exactly the same. The timeframes are the same at the end of a FY, but the denominators will likely never be exactly the same due to the excluded living arrangements mentioned above.*

· *The number of unique children in care (denominator) on the BRD06 report for (10/1/12 - 09/30/13) was a total of 6246. The Federal denominator reported 5993 total children in custody. The difference of 253 children is presumably these excluded non-IV-E placements, although we cannot verify that at this point. Our projection of the calculation of percent of MIC for these two reports is as following if the 39 cases in question (which, as noted earlier, are still under review by DHS) can be removed from the Federal files: (**BRD06** - 58 / 6246 = .93% vs. **Fed MIC** - 56 / 5993 = .93%.) (rounded)*

It is important to understand that for BRD06, there is a report validation process in place and there is no such validation process in place for the NCANDS and AFCARS data submitted to the Federal government. As indicated in the call, DHS is planning on taking the following steps to address the findings of the discrepancies in the NCANDS data profile. First, they are planning on investigating and making corrections to known data entry errors in the data profile and re-submitting by the federal deadline of March 15, 2014. Second, [redacted] is looking into implementing a query process on the NCANDS profile to check for these known data entry errors prior to all NCANDS submissions.

Thanks,

Kenya

Kenya Key Rachal
Of Counsel
Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C.
4268 I-55 North
Meadowbrook Office Park
Jackson, Mississippi 39211
Telephone: 601.351.8940
Facsimile: 601.974.8940
E-mail: krachal@bakerdonelson.com
Website: www.bakerdonelson.com