IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

OLIVIA Y., by and through her next friend, James D. Johnson;
JAMISON J., by and through his next friend, Clara Lewis;
DESIREE, RENEE, TYSON, and MONIQUE P., by and through
their next friend, Sylvia Forster; JOHN A., by and through his next
friend, James D. Johnson; CODY B., by and through his next
friend, Sharon Scott; MARY, TOM, MATTHEW, and DANA W.,
by and through their next friend, Zelatra W.; AND SAM H., by and
through his next friend, Yvette Bullock; on their own behalf and
behalf of all others similarly situated,

                                        Plaintiffs,

                                                          CIVIL ACTION
        v.                                                NO.  3:04CV251LN

PHIL BRYANT, as Governor of the State of Mississippi;
DONALD TAYLOR, as Executive Director of the Department of
Human Services; AND BILLY MANGOLD, as Director of the
Division of Family and Children's Services,

                                        Defendants.

---

**Declaration of Viola Miller In Support Of Plaintiffs'
Renewed Motion For Contempt and For the Appointment of a Receiver**

**INTRODUCTION**

VIOLA MILLER declares as follows:

1.      My name is Dr. Viola Miller.  I am over 21 years old, I understand the nature of an oath, and I am otherwise competent to testify to matters stated in this declaration.  This testimony is based on my personal knowledge, and the facts stated herein are true and correct.

2.      I am submitting this affidavit in response to a request from the plaintiffs' counsel in the above-captioned case, *Olivia Y v. Bryant*.  I have reviewed the Modified Settlement Agreement (hereinafter "MSA"), the May 2014 Monitor's Report, (Court Monitor's Report to the Court Regarding Implementation Period 3, (hereinafter "Monitor's Report"), and the June 24, 2013, Order (Dkt. No. 604).  Based on the material I have reviewed, it is clear that the defendants are failing to comply with their court-ordered obligation to reform their child welfare system and as a result are continuing to subject children to harm and risk of harm.  Mississippi is not providing services to its vulnerable children in a manner reasonably expected to keep them safe, provide for their well-being needs while in the custody of the state, and move them as quickly as possible to a permanent family in order for these children to be on a path to a successful adulthood.

3.      Reforming a child welfare system is not quick.  It is not easy, and it is not cheap.  These are Mississippi's children.  If the state determines that it is in a better position to "parent" its children than the homes from which the children are removed, it has an ethical and moral obligation to provide these young people with a better and safer environment than the one from which they were removed and, at the very least, to do no harm.  States and jurisdictions around the country have reformed and are reforming their child welfare systems to be family-focused, strength-based, and culturally responsive.  They understand that states do not make good parents,

1

no matter how well-intentioned they may be.  They understand that no child should ever come into the custody of the state unless there is absolutely no alternative to keep that child safe and that no child should ever spend one day more in state custody than is absolutely necessary to either safely return that child to her home or to an alternative permanent loving family. Mississippi must and can reform its system by complying with the Modified Settlement Agreement.

4.    As someone who has been responsible for reforming the child welfare systems in two states, I firmly believe that the requirements contained in Mississippi's Modified Settlement Agreement represent only the most basic requirements  which any state system should be required to provide to the children in its custody.  Moreover, based on my own experience, and my knowledge of what this kind of reform requires, I firmly believe that the requirements of the Modified Settlement Agreement can be achieved by committed and competent leadership provided with adequate resources.

## QUALIFICATIONS

5.    Essentially all of my 40-plus years of professional experience has involved working with and advocating on behalf of children and families.  Much of my early career was focused on special-needs children, particularly the severely disabled.  My research work included early childhood development with an emphasis in communicative and language development in young children, skills directly linked to early attachment and bonding.  My doctoral work was in special education with a minor in early childhood development.  Both my undergraduate and master's degrees were in speech language pathology.

6.    For 15 years, I served as a chief executive officer for public child welfare.  For eight years I was Secretary of the Cabinet for Families and Children in Kentucky.  This agency

2

has a service array that includes Temporary Assistance for Needy Families, food stamps, developmental disabilities determination, child support, medicaid eligibility, and aging services as well as child welfare. There were approximately 7,500 children in custody, and the agency's budget was slightly less than $1 billion. From 2003 to 2011, I was Commissioner of the Department of Children's Services in Tennessee, which serves approximately 5,500 foster children and has a budget of approximately $650 million. In both positions, I led major reforms in organization, administration, quality assurance, and direct service delivery, taking both child welfare agencies to national accreditation by the Council on Accreditation. I have served on the executive committee of both the American Public Human Services Association and the National Association of Public Child Welfare Administrators. I have held numerous administrative positions over the years and done extensive work in organizational change management and leadership.

7.     Given my educational and professional background, I have extensive experience in the areas of children's services, social services agency management, quality assurance, and minimum practice standards. A current copy of my *curriculum vitae* is attached as Appendix A.

## EXPERIENCE IN CHILD WELFARE REFORM

8.     When I became the Commissioner in the Tennessee Department of Children's Services, the state had already been sued in federal court and had entered into a settlement agreement requiring reforms that were at least as extensive as the reforms required by the Mississippi Modified Settlement Agreement, *Brian A. v. Haslam*, if not more so. At the point I became Commissioner, the state was the subject of a contempt motion filed as a result of non-compliance with the *Brian A.* settlement agreement. The Governor asked me to head the agency specifically to reform the system and bring it into compliance with the requirements of the

3

ongoing federal court lawsuit.  I took the job because I knew that with the support of the

governor, I could accomplish the reforms required by that lawsuit and, more importantly,

because I believed that those reforms were absolutely necessary for the Tennessee child welfare

system to protect children.  Similarly, I believe the reforms required by the Mississippi

settlement agreement are absolutely necessary to protect the children of the state.  Equally

importantly, I believe those reforms can be achieved, and I am very concerned about the capacity

of any child welfare system that has made as little progress toward achieving that reform as is

described in the Mississippi Monitor's Report to the Court Regarding Implementation Plan

Period 3.   I have no independent knowledge of what has taken place in Mississippi and am

basing my opinion on the material that I have reviewed.

       9.      I am not suggesting that achieving reform is easy.  It takes commitment,

persistence, very hard work, a carefully thought-out implementation plan that lays out the steps

to achieve the reform, strong management and leadership, and support from the governor's

office.

       10.     During my tenure in Tennessee, we faced many challenges, but the state moved

from a very chaotic and dysfunctional system that was in place when I took over the position to a

system in which we were able to achieve major reforms.  We significantly reduced the number of

children in care, eliminated congregate placements except in those circumstances where the

child's treatment needs were so great that those needs could not be met in a family environment,

and increased the numbers and range of foster family homes that could provide safe and

nurturing environments for our children.  We reduced the length of stay for children in any type

of out-of-home care.  We increased adoptions even for our most difficult-to-place young people.

We did all this with careful planning and extensive use of data to determine where our problems

were, and why, and whether the plans we put in place were achieving the results we wanted. Using the data enabled us to track the impact of our efforts and to make adjustments as necessary.

**OPINIONS**

11.     In my professional opinion, there are two major components to any child welfare reform initiative: developing a strong infrastructure and high quality casework.

**I.     Developing a Strong Infrastructure**

     **A.  <u>Adequate Workforce and Strong Leadership</u>**

12.     Reform is led from the top but must happen from the bottom up.  Both a strong leadership team and a well-trained and capable work force are essential components of an effective infrastructure.  In both Kentucky and Tennessee, my first task was to develop the human-resource capacity of the agency.  We implemented plans to raise salaries to a level comparable to the private social-services agencies, and we deployed staff to manage workloads according to professional standards.

13.     We invited all public and private universities with accredited social-work programs to form a consortium to serve the training needs of the agency.  Because recruiting adequate staff was a challenge, we created an undergraduate "pipeline" to enhance our workforce.  Using IVE funds, students were recruited to complete an undergraduate certification in public child welfare during their final two years of college.  The state provided scholarships, and the recipients were contracted to work for the state child welfare agency for at least two years following graduation.  These graduates entered our workforce prepared to begin working immediately with our children and families.  We also provided scholarships for employees to

5

complete a master's degree and worked with the universities to make these programs as accessible as possible for our workforce.

14.     We restructured our workforce to include specialized investigation, multiple response, and permanency units in all regions of the state.  We also made certain that supervisors were responsible for no more than five direct service workers.

15.     Most importantly, we tracked everything we were doing and held all our staff, from top on down, accountable for performing the tasks we needed them to carry out.   Senior staff was always interacting with regional staff and reviewing  data to determine whether we were reaching the goals we had set and, in Tennessee, the goals to which we had made a commitment in the settlement agreement.  When things weren't working, for whatever reason, we took action to find out why and made the necessary changes.

### B. Access to Accurate Reliable Data to Inform Decision-Making

16.     When I began work in both states there was a dearth of access to data that could be used to measure progress and to ensure accountability.  In Tennessee we struggled with developing metrics that were formatted in a way that everyone could evaluate and understand what the data were saying.  Over time  we developed a comprehensive set of data that could be used effectively to inform daily practice.  We also had invaluable assistance from Chapin Hall Center for Child Welfare Research at the University of Chicago.  It is not possible to do a competent job managing any system as complex and nuanced as child welfare is without the accountability that data supplies when it is both accurate and when it is actually used.  Data becomes more accurate when a system's managers actually rely on it and its workers know that the data matter, are being used to help everyone do their job better and better serve the needs of the children and families for whom these systems exist.

### C. **Placement and Service Array**

17.     A child welfare system must have an adequate array of high quality placements and services, particularly foster homes both basic and therapeutic.  These resources must be located across the state in all communities and must be licensed and monitored according to best practice standards.

18.     In Tennessee, we  implemented performance-based contracting.  Providers were rewarded for good permanency outcomes and penalized for failing to improve outcomes for children.  It is my understanding that although Mississippi has been legally obligated to develop performance-based contracting since early in implementation process, it has still not yet done so. In my opinion, in any state that relies on private providers to provide services, and I can't think of any systems that do not, the best way to improve the quality of the provision of services, and to ensure that scarce public funds are being expended to produce the best value, is through performance-based contracting.   States set out their expectations to its contractors and provide fiscal incentives to those who meet those expectations and disincentives to those who do not. Although we measured and reported to the providers on multiple factors, including placements close to home and siblings placed together, the three outcome measures that could result in incentives or penalties were length of stay (bed days), exits to permanency, and reentry. Providers' performance was measured against their own historic outcomes on these measures rather than against the performance of other providers.  A portion of the rather significant funds saved by reducing length of stay without increasing reentry and increasing exits to permanency were reinvested with the providers to continue to improve their work toward permanency for children.  We implemented a standardized assessment process, Child and Adolescent Needs and Strengths (CANS), for determining the level of service need and used the results of this process

7

to inform our service array and our payment rate structure.  These changes were possible because of two overarching factors.  The first factor was that we had access to and implemented a sophisticated and detailed data analysis that resulted in metrics that had integrity with the private provider community as well as within the agency.  The second factor was that we had implemented a practice model, the core of which was Child and Family Team Meetings (CFTM), that established a model for agency/provider collaboration in casework management.  The private/public collaboration on case management espoused by our practice model and our CFTMs was essential in obtaining and maintaining private-provider buy-in on the performance-based contract scheme tied to permanency outcomes.

19.     Once we developed an adequate placement array, outcomes improved for children in Tennessee.  With constant attention to placement array, we reduced the use of congregate care, placed children with their siblings and kept them close to their home community.       Our development of an adequate placement array also supported our efforts to stabilize placements for our children and prevent the damage that results from multiple placement moves.    Being able to keep children close to home, with their siblings, and in stable placements contributed to improved rates of children's placements into permanent families.  The number of children in care declined in part because children were exiting the system more quickly, which was better for them, our primary goal, but also providing the added benefit of conserving state funds.

### D. Finances

20.     Many child welfare systems struggle with adequate funding.  We were able to reduce our dependency on state funds by maximizing federal funds.  We used a number of federal funding streams and were careful to allocate costs in a manner that allowed us to take maximum advantage of the federal dollars available to the states.  We were also keenly aware of

our responsibility as stewards of taxpayer dollars. We annually completed a right-sizing exercise

to determine that our human resources were effectively allocated and that we kept as many

resources as possible in direct service delivery. One of the most expensive activities of state

government is out-of-home care for children in the custody of the state. As we decreased

dependency on high-cost congregate care and reduced the length of stay and number of children

in custody, we were able to effectively manage the funds available in the best interest of the

vulnerable children and families we served.


    II.      **High-Quality Casework, Including Accountability and Outcomes**

        A.  **<u>Accountability</u>**

    21.      A high-performing child welfare system will have a robust Continuous Quality

Improvement (CQI) system in place that engages all members of the agency and other relevant

individuals and groups involved in assuring good outcomes for children. The CQI process will

measure and evaluate the progress of the agency against the Practice Model the agency has

implemented. Critical elements of that model focus on how the child comes into custody, what

strategies were used to prevent the child from entering the system, what happens to the child and

family while the child is in custody, what happens to the child to effect exit from the system, and

how quickly and safely the child exits the system while minimizing the possibility that the child

will reenter custody. This process is essential to constant monitoring of the work being done,

both through process and outcomes data analysis and continuous case reviews.

    22.      The work of child welfare actually happens at the level of one child, one family,

one day. The only way an agency can know, monitor, and hold itself accountable for the

children and families that it serves is with an institutionalized process for ongoing case review

involving all levels of the staff.  We instituted several levels of case review which were intense, systematic, and focused.  We reduced the number of children in care 15 of the past 22 months by more than 75%.  We significantly reduced the time for filing termination of parental rights, decreasing the time to adoption.  Through a specific targeted initiative we were able to find homes for many children who had been in the system for long periods of time and had significant behavioral, emotional, and/or physical challenges that mitigated against their ever having a forever family.  These system improvements were made possible by our commitment to teaming and intensive and ongoing case review.

### B.  Outcomes

23.     The singularly most important outcome for any child is to grow up in a home with loving adults.  This yardstick is the one by which a child welfare agency experiences excellence. No child should ever age out of care without a family to provide the support young people need if they are to successfully enter adulthood.  Children should be safe while they are in the care of the state and should exit the system as quickly as possible.  The longer a child stays in care, the more difficult it becomes for that child to exit to a family.  An agency manages itself most effectively by ensuring that only those children who cannot be kept safe in their own home or with extended family, even with high-quality intensive in-home services, actually enter the system and that children exit the system to permanency as quickly as possible.

### III.  Problems Observed in Mississippi

24.     I have noted through my review of the Mississippi Monitor's report the many areas of non-compliance that the Monitor has found with regard to even the most fundamental aspects of the operation of the Mississippi child welfare system.  It is particularly troubling that

this non-compliance on so many basic issues has continued for so many years since the Settlement Agreement went into effect.

25.    I am submitting this affidavit to the Court because what I have read in the Monitor's report should be extremely troubling to anyone who is concerned about how abused and neglected children are being treated by a state that has taken custody of them, with the obligation of keeping them safe and providing for their well-being. The Monitors' report is replete with big, red danger signs about how this system is treating its children.

- Workers and supervisors who have high caseloads simply cannot protect children, let alone ensure that children get necessary services or appropriate placements or have any chance of securing a permanent home. The fact that so much of the data concerning caseloads cannot be validated, and the state does not even know how many workers it needs to meet required caseload standards – still, seven years into this implementation period – is unconscionable and without any doubt puts children at risk every day. [Monitor's Report at pp. 55, 67 ]

- The fact that workers are not even receiving mandatory training according to data submitted by the Monitor (see Monitor's Report at p. 85) only compounds the problem of high caseloads, leaving children vulnerable to untrained workers who do not even know how to do what is an incredibly difficult and sensitive job. No matter how well-intentioned any individual worker may be, without the skills and supervision necessary to do this job adequately, children in Mississippi are at serious risk of harm.

- The fact that the state does not have a continuous quality improvement plan is another danger sign. (See Monitor's report at pp. 93–94) An internal process for

11

regular, routine reviews of quality are an absolute essential for any child welfare system in which so many difficult decisions must be made every day. The system must be continually evaluating what and how it is making decisions for children and families and continually examining what needs to be improved to make those decisions better.

- The fact that the state's process for investigating and reporting back on the safety of children where serious safety concerns are reported, or initiating reports and completing timely reports on mistreatment of children, means that children in the state of Mississippi are not even safe at the most basic level (Monitor's Report at 144–145, pp. 154–156).

- The fact that nearly 500 children are living in foster care settings that don't even meet the state's licensure standards is something that no state should ever allow. (See Monitor's Report at p. 157)

26. The list is a long one and is not even an exhaustive listing of the problems and likely harm to children identified as a result of the findings in the Monitor's report. The purpose of this affidavit is to provide my opinion to the Court that almost each and every one of these violations of basic standards for the operating of a child welfare system create very real and actual danger for the children of Mississippi. It is hard to know, given the state's dysfunctional data systems, how many children are actually being harmed every day; I have no doubt that many are.

27. I have been a public official for many years. I know how hard a job it is to run a child welfare system, particularly in a state in which funding is not plentiful. I also know that a contempt motion is a drastic and contentious move and would not readily lend my expertise in

12

support of one if I did not believe that the situation in Mississippi is dire.  This system can be

changed, but it has not been.  I know from my experience as the administrator of two child

welfare systems that sometimes external pressure, supplied by a court, is necessary to

accomplish necessary reforms which have not been achieved otherwise.  From what I have read

in the Monitor's Report, it is seems highly likely that the child welfare agency in Mississippi

lacks the capacity and/or the will to do what is necessary for the children of the state and to act in

accordance with the court order which the state negotiated and by which it agreed to be bound.

28.     While I am mindful of the fact that plaintiffs are seeking drastic action, it is my

expert opinion that an experienced, qualified group of neutral experts can quickly assess the

organizational and resource issues that have been impediments to the implementation of the

MSA in Mississippi, and that a receivership created by this Court based on the recommendations

of such an assessment and aided by an expert panel of advisors can accomplish what the state has

failed to accomplish in the last seven years.  It is also my opinion that based on what I know

about the course of implementation over these last seven years that Mississippi's children will

not be protected otherwise.

**CONCLUSION**

29.     Both Kentucky and Tennessee are relatively poor states, not unlike Mississippi.

We were able even with financial challenges to significantly reform those child welfare systems

and improve our outcomes for our children and families.  While doing this work my "yardstick"

has always been, "Would this be good enough for my children or grandchild?"  If the answer was

"no," then it wasn't good enough for my child-welfare children either.

Pursuant to 28 U.S.C § 1746, I, Viola Miller, declare under penalty of perjury that the

foregoing is true and correct.

13

EXECUTED this the ___4ᵗʰ___ day of March 2015, at ___Nashville___, Tennessee.

_Viola Miller_

DR. VIOLA MILLER

14

# RESUME

## Viola P. Miller

**1614 5th Avenue North**
**Nashville, TN 37208**
**615-251-1657**
**(Cell) 270-293-8268**

## PROFESSIONAL EXPERIENCE – CHILD WELFARE

**Commissioner, Department of Children's Services, Tennessee – appointed by Governor  Phil Bredesen, December 2003 – January 2011**

Responsibilities:    One of twenty-one Cabinet Members of the Executive Branch of Tennessee State Government. Responsible for approximately 5,000 employees and a budget of six-hundred and forty million dollars. Program areas include Child Protective Services, Foster Care and Adoption, Child Permanency, Juvenile Justice and Independent Living.

**Secretary, Cabinet for Families and Children, Commonwealth of Kentucky - appointed by Governor Paul E. Patton, December 1995 – December 2003**

Responsibilities:    One of twelve Cabinets in the Executive Branch of Kentucky State Government. Responsible for approximately 10,000 employees and a budget of nine hundred and fifty million dollars. Program areas include Temporary Assistance for Needy Families (TANF), Child Support, Child and Adult Protective Services, Foster Care and Adoption, Guardianship, Family Resources and Youth Services Centers, Food Stamps and Medicaid Eligibility, Disabilities Determination.

**Dean for Continuing Education; Assistant Vice-President for Academic Outreach, Murray State University, 1988-1995**

Responsibilities:    Supervised and managed all aspects of the University's Center for Continuing Education and Academic Outreach including extended campus activities, Distance learning, the Bachelor of Independent Studies Degree, community Education, professional conferences and workshops, special events and adult student services. Taught two courses per year for the Department of Special Education, provided clinical supervision assistance, served on graduate committees and advised students.

**Chair, Department of Special Education, Murray State University, 1985 (Interim) 1986-1988**

Responsibilities:    Directed all aspects of departmental activity including fiscal, curricular and personnel management; student recruitment and retention; responded to university, state and national evaluative and accreditation requests; maintained appropriate departmental, academic and practicum/clinical data; 50% teaching load.

APPENDIX A

**Director, Division of Communication Disorders, Department of Special Education, Murray State University, 1976-1984**

<u>Responsibilities:</u>    Directed activities of the undergraduate and graduate programs in communication disorders; taught 75% load; reported to the department chair on divisional curricular and personnel matters. Successfully lead the division to national accreditation by the American Speech, Language and Hearing Association.

## PROFESSIONAL HISTORY (Overview)

**Murray State University, Murray, Kentucky**

Assistant Professor, Division Director of Speech and Hearing, 1976-1978
Associate Professor, Division Director of Communication Disorders, 1978
Associate Professor, Chair, Department of Special Education Consultant, Project Independence for
    Older Americans Consultant, Program for Early Education of Exceptional Children
Consultant, Area Health Education Service, Field Based
Communicative Disorders Program
Consultant, Headstart Screening
Consultant, Wendell Foster Center for the Physically Handicapped
Consultant, West Kentucky Diagnostic Center Consultant, Henry County Schools, Paris, Tennessee
Director, Murray State University Handicapped Infant/Toddler Intervention  Program
Chair, Presidential Scholars Committee

**University of Alabama, University, Alabama**

Doctoral Student, 1975-76
Taught 1 Course Per Semester
Supervised Student Teachers

**Northern State College, Aberdeen, South Dakota**

Assistant Professor, 1970-1975
Speech Correction Program Director, 1971-75
Consultant, Aberdeen Public School Program for Hearing Impaired
Consultant, Gettysburg Public School Therapy Program
Consultant, Headstart Program, Cheyenne River Indian Reservation
Consultant, Headstart Program, Sisseton, South Dakota
Consultant, St Francis Mission Indian School, Rosebud, South Dakota
Consultant, State Department of Special Education, Advisory Committee on State Plan for Special
    Education
Consultant, State Department of Education, Exceptional Children Advisory Board for Speech and
Hearing Therapy Consultant, Americana Nursing Homes Consultant, South Dakota State School for
    the Visually Impaired
Co-Director, Multi-County Hearing Screening Services for Older Americans


Co-Director, Multi-County Communication Disorders Education Program for Older Americans

**Duke University Medical Center, Durham, North Carolina**

Speech Pathologist, 1968-1970
Consultant, Cleft Palate Board  Consultant,
Stroke Team
Consultant, Developmental Evaluation Clinic, Duke Hospital
Consultant, Developmental Evaluation Clinic, Henderson, North Carolina  Consultant,
Head Start Program, Public Health Center

**Northwestern State University of Louisiana, Natchitoches, Louisiana**

Instructor, Department of Special Education, 1966-68
Speech and Hearing Consultant, Northwestern State College Special
Diagnostic Evaluation Team

**Caddo School for Exceptional Children, Shreveport, Louisiana**

Speech Therapist, 1964-65

**Tulane University, New Orleans, Louisiana**

Graduate Assistant, 1964-65
Speech Pathology Consultant, U.S. Merchant Marine Hospital
Research Assistant, Birth Cry Study

## PUBLICATIONS

Miller, V. (2012). Life under a consent decree: A conversation with Viola Miller. For the Welfare of
Children: Lessons Learned from Class Action Litigation. Center for the Study of Social
Policy.

Miller, V. (2003). Congress should use welfare to target the true enemy: poverty. Stateline: State
Policy and Politices – Pew Center on the States. December, 02.

Huebner, R., and Miller, V., Hommrich, B., Hiemstra, H. (2002). The Kentucky foster fare census:
profiles in permanency. Child Welfare League of America.
ww.cwla.org/programs/trieschman/2003

Huebner, R. and Jones, B., Miller, V., Custer. M, Crutchfield, B. (2002). Comprehensive family
services and customer satisfaction outcomes. Child Welfare Vol. 85., No. 4.

Burnham, D. and Fox, S., Miller, V. (1999). Site pre-service certification programs garners praise in
Kentucky. Partners for Child Welfare Newsletter Vol. 6., No. 2.

Burnham D. and Fox, S., Miller, V. (1997). Reengineering the child welfare training and
professional development system in Kentucky. Public Child Welfare. APHSA.

Miller, V. and Weaver, J. (1993). More on teachers: The new academy. Issues in Kentucky Higher
Education: Essays by Kentucky Educators. The Prichard Committee for Academic
Excellence.

Miller, V. (1991). Distance learning alternative instructional strategies. Humanities and Technology Association Review. 10.

Miller, V. and Blodgett, E. (1991). Practice power for phonology. LinguiSystems: Moline, IL.

Blodgett, E. and Miller, V. (1989). Easy does it for phonology (2 volumes). LinguiSystems: Moline, IL.

Miller, V. (author, scripter), Homback, M. and Blodgett, F. (1985). An overview of handicapped infant/toddler intervention [videotape]. Department of Special Education, Murray State University, Murray, Kentucky. (Funded by U.S. Department of Education, Grant Number G008401376).

Miller, V. (author; scripter), Homback, M. and Blodgett, F. (1987). The impact of nurses on the families of young handicapped children [videotape]. Department of Special Education, Murray State University, Murray, Kentucky. (Funded by U.S. Department of Education, Grant Number G008401376).

Miller, V. (author; scripter), Homback, M., and Blodgett, F. (1987). The impact of social workers on families of young handicapped children [videotape]. Department of Special Education, Murray State University, Murray, Kentucky. (Funded by U.S. Department of Education, Grant Number G008401376).

Miller, V. (1983). Creative resource identification for providing services to rural handicapped students. A reservice curriculum module for preparation of qualification rural special educators. National Rural Research and Personnel Preparation Project, Murray State University, Murray, Kentucky.

Miller, V. (1979). Book Review of Early intervention-A team approach. ASHA. XXL 32.

Condon, M., Miller, V. and Blodgett, E. (1979). Phonetic analysis: Educational training and clinical application. Proceedings of Mid-South Educational Research Association (abstract - complete text in archives of the association).

Schillit, J. and Miller, V. (1977). Semantics and mental retardation. Research and the Retarded. 4(1).

Miller, V., Condon, M., Schallenkamp, K. (1976). Use of computerized satellite clinics to provide hearing testing services to rural senior citizens. South Dakota Speech and Hearing Association Journal. 5(1).

Miller, V., Condon, M., Schallenkamp, K. (1975). Hearing testing survey of 1200 geriatric patients in rural United States. Convention Abstracts International Congress on Gerontology. Jerusalem, Israel.

Miller, V. (Task Force Author). (1975). Speech and Hearing Program Guidelines and Standards for the State of South Dakota. State Department of Education, Pierre, South Dakota.

Miller, V. ( 1972). Communication Aids. <u>South Dakota Speech and Hearing Association Journal.</u> 2
(R

Miller, V. (1969). Language development: An analysis of difficulty and proficiency. <u>North  Carolina
Medical Journal.</u> 30.

Miller, V. (1969). Book review of <u>The World of Sound! Journal of Speech and Hearing Disorders.</u>
34.

Miller, V. (1965). Speech correction facilities available in Louisiana. <u>Louisiana Speech and Hearing
Association Newsletter.</u>

## <u>REPRESENTATIVE PROFESSIONAL ACTIVITIES</u>  <u>Grants Developed and Funded</u>

Kentucky Telelinking Network. Funded 1994 ($3.6 million for first year, $4.0 million for second
year) by the Office of Education Research and Innovation, U. S. Department of Education.

West Kentucky Interactive Telecommunications Distance Learning and Medical Link Network.
Funded 1994 ($319,376 for one year) by The Rural Electrification Administration, U. S. Department
of Agriculture.

Adult Basic Education Program. Funded 1993-ongoing, by the Kentucky Cabinet for Workforce
Development ($84,739 for first year). (With Dot Newbem)

Training Resource Center. Funded (1991-95) by the Kentucky Department for Social Services
($54,746/annually, 1991-95). (With Tamikia Dumas)

Alternative Special Education Certification Program. Funded 1987-1990 (3 years -$95,000 annually)
by the Office of Special Education and Rehabilitative Services, Department of Special Education.
(With Allan Beane)

Improving Services to Minority Handicapped Children Through Pre-service Training and Minority
Recruitment in Communication Disorders. Funded 1987-1990 (3 years - $71,010 annually) by the
Office of Special Education and Rehabilitative Services, Department of Education. (With E. Blodgett
and C. Richardson)

Training Related Services Personnel for Professional Involvement with Handicapped Infants,
Toddlers, and Families. Funded 1984-1987 ($54,423 annually). Handicapped Personnel Preparation,
U.S. Department of Education, Washington, D.C.

Environmental Communication Intervention for the Aging. Funded 1978, 1979 ($56,000 annually)
Department of Health, Education and Welfare, Administration on Aging, Washington, D.C.
Multi-Disciplinary Career Training in Gerontology. Funded 1979-1981 ($80,000 annually). Health,
Education and Welfare, Administration on Aging, Washington, D.C. (with M. Simpson).

Program Assistance Grant — Preservice Early Childhood Handicapped Infant Intervention Specialty
Training Subcomponent and Preservice Personnel Preparation in Severely Handicapped. Funded
1981-84 ($67,000 annually). Bureau for Education of Handicapped, Washington, D.C.

**Juried Presentations**

"Reengineering the Child Welfare Training and Professional Development System in Kentucky," National Staff Development and Training Association Annual Conference, Washington, D.C, 1997 (with S. Fox).

"The Delivery of Academic Programs to a Rural Area Via a Telecommunications Network: One University's Experience," First International Conference on Distance Education, Moscow, Russia, July 1994 (with A. Lawson, M. Hobbs, and M. Posey).

"Taking Charge of Change in Academic Technology: A Case Study for Challenge in Planning," The Society for College and University Planning Annual Conference, San Francisco, California, July 1994 (with A. Lawson).

"High Tech! High Touch! Training SLP's for Rural Service Delivery," American Speech-Language-Hearing Association Annual Convention, San Antonio, Texas, November 1992 (with Ann Beth Deily, Gary Adamson and Cheryl Prichard).

"Interactive Educational Telecommunications: The Future's Now," National University Continuing Education Association 77th Annual Conference, San Diego, California, April 1992.

"Murray State University Interactive Telecommunications Network (TTN)," America SpeechLanguage-Hearing Association Annual Conference, Atlanta, Georgia, November 1991 (with Communication Disorders graduate students).

"Distance Learning - Alternative Instructional Strategies," Interface '90 - The Fourteenth Annual Humanities Technology Conference, Atlanta, Georgia, October 1990.

"Establishing Extended Campus Centers: The Excellence/Access Dilemma," Adult Learning Conference, Columbia, South Carolina, May 1990.

"Establishing Extended Campus Centers: The Excellence/Access Dilemma," Kentucky Deans and Directors of Continuing Education, Bowling Green, Kentucky, May 1990.

"Phonological Awareness: A Metalinguistic Approach," American Speech-Language-Hearing Association Annual Convention, Boston, Massachusetts, 1988 (with E. Blodgett).

"Establishing Phonological Targets: Is There Life After Processes?" Kentucky Speech-LanguageHearing Association Annual Convention, Louisville, Kentucky, 1988 (with E. Blodgett).

"A Description of Phonological Processes in Preschool Communicatively Disordered Children," Kentucky Speech-Language-Hearing Association, Louisville, Kentucky, 1986 (with E. Blodgett). "Internationalizing the Honors Program," Southern Regional Honors Council Conference, Clemson, South Carolina, April 1986 (with Anita Lawson and Milton Grimes).

"The Effect of Imitation and Utterance Length on the Phonology of Preschool Communicatively Disordered Children," American Speech-Language-Hearing Association Annual Convention, Detroit, Michigan, 1986 (with E. Blodgett).

"A Description of Phonological Processes in Preschool Communicatively Disordered Children," American Speech-Language-Hearing Association Annual Convention, Washington, D.C., 1985 (with E. Blodgett).

"Communicative Approach to Phonological Structure," American Speech-Language-Hearing Association Annual Convention, Washington, D.C., 1985 (with E. Blodgett).

"Training Communicative Interaction in Severely/Profoundly Handicapped Infants and Children," American Speech-Language-Hearing Association Annual Convention, Cincinnati, Ohio, 1983 (with E. Blodgett).

"Phonological Analysis of Spontaneous and Imitated Speech Samples," American Speech-Language-Hearing Association Annual Convention, Cincinnati, Ohio, 1983 (with E. Blodgett).

"Phonological Process Analysis: Traditional Articulation Vs. Conversational Sample," American Speech-Language-Hearing Association Annual Convention, Cincinnati, Ohio, 1983 (with R. Simmons and E. Blodgett).

"Teaching Communicative Interaction to Severely/Profoundly Handicapped Infants and Young Children," Kentucky Speech and Hearing Association Convention, Lexington, Kentucky, April 1983 (with E. Blodgett).

"New Approaches in the Diagnosis and Treatment of Articulation Disorders," Council for Exceptional Children Kentucky Federation Convention, Fort Mitchell, Kentucky, April 1982 (with E. Blodgett).

"Communicative Approach to Phonological Structure," Kentucky Speech and Hearing Convention, Lexington, Kentucky, 1982 (with E. Blodgett).

"Clinical Implications of Two Interactive Settings," American Speech-Language-Hearing Association Annual Convention, Los Angeles, California, 1981 (with E. Blodgett).

"Facilitating Communicative Interaction in the Adult-Handicapped Infant-Dyad," American Association on Mental Deficiency Convention, Detroit, Michigan, 1981 (with E. Blodgett).

"Communication Intervention in Normal and Disordered Child-Adult Dyads," Kentucky Council on Exceptional Children, Louisville, Kentucky, 1981 (with E. Blodgett).

"Facilitative Language Model," Kentucky Speech-Language-Hearing Association Annual Convention, Louisville, Kentucky, 1980.

"Facilitating Language Training and Management for Parents of Language Deficient Children," American Speech-Language-Hearing Association Annual Convention, Atlanta, Georgia, 1979 (with E. Blodgett).

"Modified Melodic Intonation Therapy with an Autistic Child," American Speech-Language-Hearing Association Annual Convention, Atlanta, Georgia, 1979 (with E. Blodgett).

"Facilitating Communicative Interaction in Normal and Disordered Infant-Mother Dyads," Association for Mental Deficiency Convention, Detroit, Michigan, 1979.

"Use of Computerization and Satellite Clinics for Providing Hearing Testing Services to the Geriatric Population in a Rural Area," American Speech and Hearing Association Annual Convention, Washington, D.C., 1975 (with M. Condon and K. Schallenkamp).

"Language Characteristics of Public School Hearing Impaired Children," American Speech and Hearing Association Annual Convention, New York, 1970 (with Marilyn Condon).

"Educational Planning Considerations for Hard of Hearing Children," North Carolina Speech and Hearing Association Spring Convention, 1970 (with M. Condon).

"Supportive Speech Therapy in Traumatic Injury Cases," North Carolina Speech and Hearing Association Convention, Durham, Norm Carolina, 1970.

"The Use of the Continuous Tone Masking Test in Diagnosing Conductive Hearing Impairments," American Speech and Hearing Association Convention, Washington, D.C., 1968.

**Selected Invited Presentations/Workshops**

"Changing the Way We Deliver Our Services - Access to Education-Telecommunications," Governor's Conference on Higher Education Trusteeship, Lexington, Kentucky, October 2-3,1994 (with R. Geoghegan).

"State Networking Update (KTLN) State Backbone RFP, NTIA-NIL" KHECC Conference, Louisville, Kentucky, September 1994.

"Therapy for Young Children with Speech Sound Disorders: They Are Not Short Sixth Graders," West Virginia Speech-Language-Hearing Association, Huntingdon, West Virginia, April 1994 (with E. Blodgett).

"Language Intervention Models for Public School Speech-Language Pathologists," Caddo Parish School Board, Shreveport, Louisiana, October 1993.

"SACS Criteria and Continuing Education," Kentucky Continuing Education Deans and Directors, Owensboro, Kentucky, June 1992.

"Establishing and Maintaining Successful Distance Learning Programs, Part I," The Society for College and University Planning, Lexington, Kentucky, April 1992.

"Pre-school Language and Metalinguistics," South Dakota Speech-Language-Hearing Association," Rapid City, South Dakota, April, 1991.

"Facilitating Language Learning in Very Young Children: They are Not Short Fourth Graders," Kentucky Speech-Language-Hearing Association Annual Convention, Lexington, Kentucky, March 1991 (with E. Blodgett).

"Talking about Talking: Metalinguistics in the Treatment of Phonological Disorders," Seventh Annual National Language Conference in Orlando, Florida, October 1990; Chicago, Illinois, October 1990; and San Francisco, California, February 1991. Sponsored by LinguiSystems, Inc (with E. Blodgett).

"How Telecommunications Technology Changes the Way We Work," American Association for Higher Education Telecommunications Action Committee Meeting, AAHE National Conference on Higher Education, San Francisco, California, April 1990.

"Ethical Issues in Speech-Language Pathology," Kentucky Speech-Language-Hearing Association, Louisville, Kentucky, April 1990.

"Excellence in the Service Environment," Keynote Address National Association of Educational Buyers Fall Regional Workshop, Berkley State Resort, Kentucky, September 1989.

"Phonology Therapy for Preschool," Mississippi Bend Area Education Agency, Bettendorf, Iowa, June 1989 (with E. Blodgett).

"Phonological Disorders in Young Children-Diagnosis and Remediation," Jordanhill College, Glasgow, Scotland, 1988.

"Language Disorders in Pre-School Children," Northwest Tennessee Headstart Program, 1985.

"Communicative Approach to Phonological Structure," Kentucky Speech-Language-Hearing Fall Conference, Bowling Green, Kentucky, 1986 (with E. Blodgett).

"Communicative Approach to phonological Structure," Western Kentucky University Department of Special Education and regional speech-language pathologfets, Bowling Green, Kentucky, 198S (with E. Blodgett).

"Communicative Approach to Phonological Structure: An Articulation Therapy Approach for Public School Clinicians," Department of Communication Disorders, North Dakota State University and the North Dakota State Board of Examiners in Audiology and Speech Pathology, Fargo, North Dakota, March, 1983 (with E. Blodgett).

"The Cognitive Interactional Model of Instruction for the Severe/Profound Multihandicapped Child," Mucatatuck Special Education Center, Special Services Unit, North Vernon, Indiana. November 1983 (with E. Blodgett).
"Mother-Infant Interaction," Keynote Address, West Kentucky Association for Education of Young Children, 1981.

"Melodic Intonation Therapy for an Autistic Child," Bloomsburg Conference, Terre Haute, Indiana, 1980 (with E. Blodgett).

"Suggested Practices of working with abnormal speech development in young children," Multihandicapped Workshop for Pennyroyal Mental Health/Mental Retardation Center Early Childhood Handicapped Personnel, Hopkinsville, Kentucky, 1977.

"Neuromuscular Disorders," Cerebral Palsy Institute, University of Alabama, University, Alabama, 1976.

"Hearing Testing Survey of 1200 Geriatric Patients in Rural United States," International Congress on Gerontology, Jerusalem, Israel, 1975 (with M. Condon and K. Schallenkamp).

"Communication Disorders of the Aging," Nursing Home Association of South Dakota. Presented for Americana Nursing Homes, Inc., of South Dakota and Council on Aging, Aberdeen, South Dakota, 1974.

"Language Development and Disorders of Early Childhood," Indian Child Service, Bismarck, North Dakota, 1972.

## **Professional Activities**

Board of Directors, Renewal House - Substance abuse treatment program for women and children. 2011-present

Board of Directors, East Nashville Hope Exchange - Reading program for at risk children and families. 2012-present

Board of Trustees, Bethel University. 2012-present

Foster Care Review Board - Court advisory group for child welfare. 2012-present

National Association of Public Child Welfare, Executive Committee, 2006

Excellence in Child Welfare Leadership Project, American Public Human Services Association, 2001

Child Welfare Advisory Group, American Public Human Services Association (APHSA), 1999

Governor's Council on Substance Abuse Prevention, 1999

American Public Human Services Association Executive Committee, 1998-99.

Governor's Early Childhood Task Force, 1998

Task Force on Children in Placement, 1997-1999

Distance Learning Advisory Committee, 1997

Strategic Committee on Postsecondary Education, 1997

State Advisory Panel for Exceptional Children, 1996

Workforce Partnership Council, 1996

National Council of State Human Service Administrators, American Public Human Services Association, 1996

Housing Policy Advisory Committee, 1996

Kentucky Commission on the Deaf and Hard of Hearing, 1996

Governor's Council on Domestic Violence Executive Committee, 1996

Job Training Coordinating Council, 1996

Advisory Council for Adult Education and Literacy, 1996

USDA State Outreach Council, 1996

National Council of State Human Service Administrators, 1996

Multi-Agency Collaborative to Increase Outreach to Minorities with Disabilities, 1996

Child Sexual Abuse and Exploitation Prevention Board, 1996

Site Visit Peer Reviewer, Southern Association of Colleges and Schools, 1993-1995.

Editor, Newsletter for Committee on the Status of Women in the Profession, NUCEA,  1993-1995.

Developed and implemented the Murray State University Interactive Telecommunications Network (UN), 1990.

Three Month International Faculty Exchange with Jordanhill Teachers College, Glasgow, Scotland, April-June, 1988

Teacher Education Member, Internship Supervision Teams (Certified Observer, Florida  Performance Measurement System), 1986-1990

Kentucky Board of Speech-Language Pathology and Audiology Appointed by Governor Martha

Layne Collins, 1986-1989; re-appointed 1989-1992 by Governor Wallace Wilkinson

Charter Executive Committee Member (representing Kentucky), Southern Rural Education Association, 1985

Executive Committee, Kentucky Speech-Language-Hearing Association, 1984-1995 Chair, Ethical Practices Committee, 1985-90 Chair, Multicultural Issues Committee

Initiated Handicapped Infant/Toddler Program, 1980

Evaluative Consultant, Excepticon-Outwood Institution, 1979

Journal Editor, South Dakota Speech and Hearing Association Newsletter, 1972-1974

Member, Third Party Evaluation Team Mountain-Plains Regional Center for Services to Deaf-Blind Children, Denver, Colorado, 1975

President Elect, South Dakota Speech and Hearing Association, 1974

Membership Chairman, Louisiana Speech and Hearing Association, 1966

## **ORGANIZATIONS**

American Speech and Hearing Association (Certificate of Clinical Competence, Speech-Language Pathology)

Kentucky Speech and Hearing Association

National University Continuing Education Association

Institutional Representative
Division of Educational Telecommunications Program Planning Committee 1991-92

NUCEA Region II Representative

Economic Development Task Force
SACS Criteria for Continuing Education Task Force

Phi Delta Kappa Education Society

## **PROFESSIONAL HONORS, SOCIETIES.**

Phi Kappa Phi – National Scholastic Honor Society – Northwestern State University

Kappa Delta Pi – National Educational Honor Society – Northwestern State University

Bush Foundation Leadership Fellows Award, 1975-76
        Mid-Career Recognition for Leadership

Omicron Delta Kappa National Leadership Honor Society
        Elected as a faculty member at Murray State University  Faculty
        Secretary, 1978-80

Tennessee Connections, Winter 2005  Public
        Official of the Year

Thirty One Most Powerful Women In Tennessee – The Tennessean, 2010

## **EDUCATION**

Ed.D. Special Education, University of Alabama, Tuscaloosa, Alabama - 1978

Speech-Language Pathology, University of Iowa, Iowa City, Iowa - 1966

Residency in Speech Pathology, Duke University Medical Center, Durham, North Carolina –  1968-69

M.S., Speech-Pathology and Audiology, Tulane University, New Orleans, Louisiana - 1966

B.A. Speech and Hearing Therapy, Northwestern State University, Natchitoches, Louisiana – 1964