## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

OLIVIA Y., by and through her next friend, James D.  Johnson;
JAMISON J., by and through his next friend, Clara Lewis;
DESIREE, RENEE, TYSON, and MONIQUE P., by and through
their next friend, Sylvia Forster; JOHN A., by and through his next
friend, James D.  Johnson; CODY B., by and through his next
friend, Sharon Scott; MARY, TOM, MATTHEW, and DANA W.,
by and through their next friend, Zelatra W.; AND SAM H., by and
through his next friend, Yvette Bullock; on their own behalf and
behalf of all others similarly situated,

|  | | |
|---|---|---|
| | Plaintiffs, | CIVIL ACTION NO. |
| v. | | 3:04-CV-251-TSL-FKB |

PHIL BRYANT, as Governor of the State of Mississippi;
DONALD TAYLOR, as Executive Director of the Department of
Human Services; AND BILLY MANGOLD, as Director of the
Division of Family and Children's Services,

                                                  Defendants.

---

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
## THEIR RENEWED MOTION FOR CONTEMPT, FOR AN EVIDENTIARY HEARING,
## AND FOR THE APPOINTMENT OF A RECEIVER

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. iii

I.    INTRODUCTION. ................................................................................1

II.   BACKGROUND: SEVEN YEARS OF NON-COMPLIANCE. ........................4

III.  DISCUSSION. ...................................................................................9

   A.   The Monitor's May 2014 Report Shows that Defendants Have Failed to
        Comply with the Modified Settlement Agreement and the Period 3
        Plan. ........................................................................................9

        1.   Human Resources Management. ..............................................10

        2.   Child Safety. ..........................................................................20

        3.   Child Placement. ....................................................................21

        4.   Physical and Mental Health Care. ..........................................24

             a.   Physical Health Screening Evaluations ...........................25

             b.   Dental Examinations ......................................................25

             c.   Mental and Developmental Health Assessments .............26

        5.   Therapeutic Services. .............................................................27

        6.   Worker Contact and Monitoring - Children Do Not Receive
             Mandated Twice-Monthly Caseworker Visits. ..........................28

        7.   Maltreatment in Care .............................................................30

   B.   The Practical Effects of Defendants' Continuing Violations on
        Mississippi's Children. ................................................................31

   C.   Defendants Violated the July 9, 2014, Order Regarding the Hiring of a
        Director for Sustainable Transformation. .....................................34

   D.   Plaintiffs Have Demonstrated – and There Is Again No Genuine
        Dispute Concerning – the Essential Elements of Civil Contempt. ......35

        1.   The Element of a Court Order is Satisfied. ..............................36

        2.   The Element of an Order Requiring Certain Conduct in Clear
             Terms is Satisfied. .................................................................37

        3.   The Element of Non-Compliance is Satisfied. ..........................37

4.      Courts Have Consistently Held State Officials in Contempt in Analogous Circumstances.......................................................................38

        a.      LaShawn A. v. Kelly.....................................................................39

        b.      *G.L. v. Zumwalt*.........................................................................41

        c.      *Aspira of New York, Inc. v. Board of Education of New York.*..........................................................................................42

E.      The Court Should Appoint a Receiver to Effectuate the Necessary Remedial Measures........................................................................................44

        1.      The Dire Circumstances of This Case Warrant the Appointment of a Receiver. ...............................................................................45

        2.      Courts in Similar Cases Have Appointed Receivers for Dysfunctional Public Agencies..................................................................46

                a.      *LaShawn A. v. Kelly.*................................................................47

                b.      *Shaw v. Allen*............................................................................48

IV.     CONCLUSION...........................................................................................50

CERTIFICATE OF SERVICE ............................................................................52

# TABLE OF AUTHORITIES

## Cases

*Aspira of New York, Inc. v. Board of Education of New York,*
423 F. Supp. at 651 ............................................................................ 42, 43

*Carty v. Farrelly,*
957 F. Supp. 727 (D.V.I. 1997) .................................................................... 39

*Cobell v. Babbitt,*
37 F. Supp. 2d 6, 16 (D.D.C. 1999) .......................................................... 37, 38

*Dixon v. Barry,*
967 F. Supp. 535 (D.D.C. 1997) ............................................................... 44, 46

*Gates v. Collier,*
616 F.2d 1268 (5th Cir. 1980) ...................................................................... 35

*Glover v. Johnson,*
934 F.2d 703 (6th Cir. 1991) ........................................................................ 46

*Ho v. Martin Marietta Corp.,*
845 F.2d 545 (5th Cir. 1988) ........................................................................ 36

*Hutto v. Finney,*
437 U.S. 678, 57 C.Ed. 2d 523, 98 S. Ct. 2565 (1978)............................................ 35

*LaShawn A. v. Kelly,*
887 F. Supp. 297 (D.D.C.  1995), *aff'd sub nom. LaShawn A. v. Barry*, 107
F.3d 923 (D.C. Cir. 1996) ................................................................. passim

*Lelsz v. Kavanagh,*
673 F. Supp. 828 (N.D. Tex. 1987) ............................................................ 36, 39

*Maness v. Meyers,*
419 U.S. 449, 95 S. Ct. 584 42 L. Ed. 2d 574 (1975).............................................. 35

*Martin v. Trinity Indus.,*
959 F.2d 45 (5th Cir. 1992) .......................................................................... 36

*McCord v. Maggio,*
927 F.2d 844 (5th Cir. 1991) ........................................................................ 37

*Morgan v. McDonough,*
540 F.2d 527 (1st Cir. 1976)..................................................................... 44, 46

*Perez v. Bos. Hous. Auth.,*
400 N.E. 2d 1231 (Mass. 1980) .................................................................... 46

*Petroleos Mexicanos v. Crawford Enters., Inc.,*
826 F.2d 392 (5th Cir. 1987) ........................................................................ 37

*S.E.C. v. AMX International, Inc.*,
    7 F.3d 71 (5th Cir. 1993) ........................................................................ 36

*Shaw v. Allen*,
    771 F. Supp. 760 (S.D. W. Va. 1990) .................................... 44, 46, 48, 49

*Thyssen, Inc. v. S/S Chuen On*,
    693 F.2d 1171 (5th Cir. 1982) .............................................................. 35

*United States v. Alcoa, Inc.*,
    533 F.3d 278 (5th Cir. 2008) ................................................................ 36

*United States v. City of Jackson*,
    318 F. Supp. 2d 395 (S.D. Miss. 2002) ............................................ 37, 39

*United States v. Detroit*,
    476 F. Supp. 512 (E.D. Mich. 1979) ...................................................... 46

*United States v. Tennessee*,
    925 F. Supp. 1292 (W.D. Tenn. 1995) ............................................... 37, 38

*United States v. United Mine Workers*,
    330 U.S. 258, 67 S. Ct. 677, 91 L.Ed. 884 (1947) .................................. 48

## **Other Authorities**

Fed. R. Civ. p. 66 and 70(e) ............................................................ 3, 44

The data that defendants have produced combined with the capacity deficits addressed in this report highlight substantial shortcomings in the defendants performance *that put children at a continuing and unreasonable risk of harm*.

> Court Monitor's May 8, 2014 Report to the Court, p. 23; (emphasis added)

## I.    INTRODUCTION.

Plaintiffs – thousands of neglected and abused foster care children in Mississippi – bring this renewed motion for contempt and for the appointment of a receiver for Mississippi's still dysfunctional child welfare system.  Plaintiffs filed their first motion seeking this relief in 2010. The Court found, and indeed it was undisputed, that defendants had failed to comply with the requirements of the 2008 settlement, the Period 1 and 2 Implementation Plans, and an interim "Bridge Plan." The Court declined to hold defendants in contempt at that time.  Now, four years later, and after a Herculean effort to obtain usable data from defendants, requiring the entry of a specific and detailed court order, the 2013 Data Order [Project Schedule for Defendants' Production of Data Reports per App. C of the MSA, (Dkt. No. 589)(the "2013 Data Order")] entered on June 24, 2013; the Court-appointed Monitor has filed another report indicating continued failure by defendants to comply with the MSA [Modified Mississippi Settlement Agreement and Reform Plan (Dkt. No. 571) (the "MSA")] entered by the Court on July 6, 2012, and the Period 3 Implementation Plan.  The list of defendants' failures to achieve MSA compliance is voluminous and only a few of them will be discussed in detail in the accompanying Memorandum. They include: 1) failure to produce either any data or reliable data on key standards in the MSA; 2) virtually no reliable information on hiring and worker attrition and thus, no reliable information on which to determine worker caseloads; 3) lack of information

about maltreatment in care and no information and feedback from the field about remediation steps and , 4) a barely functioning continuing quality improvement system, with no data to demonstrate that it has indeed improved quality.

In addition, and in an effort to find an alternative to returning to court, plaintiffs negotiated a court-ordered remedial plan that was "an alternative at this point to Plaintiffs' filing a motion for contempt." [Corrected Order Creating Director for Sustainable Transformation and Transformation Team, July 9, 2014, (Dkt. No. 607) ("July 9 Order"), p. 1]  However, Defendants also failed to comply with a critical term of that order, rendering it a nullity.[1]

Defendants have now failed for seven years to comply with plans to which they agreed and which they agreed should be contained in a binding court order.  Since defendants have shown by their continuing conduct that they have "capacity deficits" that they cannot or will not remedy, a finding of civil contempt is the only way to ensure that plaintiff children will receive the benefits necessary to protect their safety and well-doing.  Defendants have neither achieved the standards of the Modified Settlement Agreement the court directed the parties to renegotiate and implement in its 2011 Court Order, nor have they made sufficient progress to indicate that they are likely to be able to do so in any reasonable period of time.  The children of Mississippi who are the plaintiffs in this lawsuit have no recourse other than to appeal to this Court for its intervention and for the enforcement of this Court's orders.  To put these issues in perspective, plaintiffs have submitted in further support of its renewed motion the Declaration of Dr. Viola Miller (March 4, 2015) (hereinafter "Miller Dec."), an expert who has successfully run child welfare systems in both Kentucky and Tennessee. Dr. Miller is familiar with the Modified

---

[1] Although the Monitor has not yet filed the Period 4 report, the data tables she has prepared and provided to the parties show that defendants remain significantly out of compliance with the applicable provisions of the renegotiated MSA and the implementation plans.

Settlement Agreement in this case, and also has reviewed the Court Monitor's May 8, 2014, Report. Dr. Miller's declaration puts into context the significance of defendants' failings with regard to their ability to achieve compliance with the MSA, and also makes clear that the requirements of the MSA can be accomplished in a reasonably well-run child welfare system. However, the actions of the defendants in this lawsuit make clear that the requirements will not be accomplished by these defendants.

As discussed in Section III below, a finding of contempt as the predicate to the appointment of a receiver is needed to ensure that the necessary steps will finally be taken without further delay to protect the health, well-being, and safety of the children who are dependent upon the state, often for their very lives.

Plaintiffs believe that the facts set out in this Memorandum and supporting papers provide compelling grounds for a finding of contempt – indeed, as in 2010, defendants' non-compliance cannot be seriously disputed – and the appointment of a receiver.[2]

To further demonstrate the depth and intractability of the systemic problems, Plaintiffs plan to conduct expedited discovery and ask the Court to schedule an evidentiary hearing no later than three months from now. [3]

Plaintiffs also urge the Court to appoint a group of experts with expertise in implementing child welfare system reform to conduct an organizational analysis. This group can identify the systemic deficiencies that need to be addressed in order to achieve compliance with

---

[2] This motion is filed pursuant to Fed. R. Civ. p. 66 and 70(e) and Section II.H. of the Corrected Order Creating Director for Sustainable Transformation and Transformation Team filed July 9, 2014 (Dkt. No. 607).

[3] Plaintiffs respectfully request that a scheduling conference be scheduled at the Court's earliest convenience to set the date for the hearing and resolve any issues with regard to the evidence to be presented at that hearing.

the MSA and devise an organizational and staffing framework to serve as the road map for addressing them.  With that specific guidance, the Court can then fashion an order setting out both the Receiver's powers and the duration of the Receiver's mandate, as well as the standards for a transition out of the receivership.

## II.     BACKGROUND: SEVEN YEARS OF NON-COMPLIANCE.

In 2008, seven years ago, the state of Mississippi settled this lawsuit, which asserted that the state was violating the constitutional rights of the foster children in its custody and that those constitutional violations were causing them significant harm.  In the settlement, the state made binding and enforceable commitments to protect these children by thoroughly reforming its foster care system.  The 2008 settlement required the state to formulate with the plaintiffs and then implement reform plans, subject to oversight and reporting by a neutral, court-appointed monitor.  The settlement created a phased-in series of obligations, agreed to by the state, which would reduce the caseloads of workers, create and maintain a functional and accurate data management system, and establish and maintain standards for planning and providing basic services for children.  The settlement also mandated other improvements that would produce better outcomes for children, keep them safe, and provide necessary services.

In addition, the state was required to work with plaintiffs and the Monitor to develop detailed annual Implementation Plans that would set forth the steps the state would be required to take during successive 12-month periods to meet the interim benchmarks and phased-in obligations contained within the settlement.  Both the Settlement Agreement and the annual Implementation Plans were approved by the Court and are therefore enforceable as court Orders.

After serious failings by defendants became evident in Periods 1 and 2, the parties negotiated an interim, court-approved corrective action plan (known as the Bridge Plan) in 2009. However, as the Court subsequently found, defendants did not comply with the Bridge Plan.

Plaintiffs thereupon filed a motion in 2010 to have defendants held in contempt for violations of the Settlement Agreement and the Period 2 Implementation Plan. The fact of defendants' widespread violations was not in dispute. In its May 2011 Order, the court found that "plaintiffs obviously have met their burden to present a prima facie case" of contempt and "[a]s plaintiffs note, defendants' shortcomings in the performance of the duties prescribed by the parties' agreements are in virtually all areas covered by the agreements." [May 17, 2011 Order (Dkt. No. 557), pp. 4, 8.]

Nevertheless, the Court declined to hold defendants in contempt, because it did not believe that contempt "would serve any fruitful purpose." [May 17, 2011, Order, p. 10.] The Court also declined to appoint a receiver, stating that a receiver might create "a new set of problems." [May 17, 2011, Order, p. 8.] Instead the Court directed the parties, in consultation with the Monitor, "to establish realistic timelines for the accomplishment of the parties' shared goals and objectives." [May 17, 2011, Order, p. 9.]

The parties, following the Court's directive, negotiated a Modified Mississippi Settlement Agreement and Reform Plan (the "MSA"), and a Period 3 Implementation Plan ("Period 3 Plan"), which were approved by the Court in July 2012. These agreements reflected a different framework for implementation, relying heavily on a regional approach and on a child welfare consulting group which the state had retained for assistance. As described by the Monitor in her most recent report, "the MSA reflects a regionally-based approach to implementation of the requirements imposed by this lawsuit. This approach is designed to reduce, on an interim basis,

the number of statewide requirements the defendants must meet while they phase-in, on a region-by-region basis, a family-centered Practice Model that serves as the centerpiece of the defendants' reform strategy." [Court Monitor's Report to the Court Regarding Implementation Period 3 and the June 24, 2013 Order (Dkt. No. 604) (hereinafter "Monitor's Report"), p. 4.]

Notwithstanding this new approach, the Monitor's Report, filed on May 8, 2014, describes continuing and widespread violations of the provisions of the Period 3 Plan and the MSA, both of which were the result of negotiations with the state, and very limited success in reaching improved outcomes in the regions where the Practice Model, "the centerpiece of the defendants' reform strategy," has been implemented.  The Monitor noted:

> [B]roadly speaking, by the end of Period 3 [July 6, 2013], and in a number of instances through September 2013, the evidence establishes a substantial gap between reported and required performance levels with respect to both statewide and regionally-based requirements, for those regions to which the latter applied. Furthermore, defendants have not demonstrated consistent regional capacities to implement and sustain reform efforts.  Given the regionally-based structure of defendants' reform effort, regional capacity is essential.
>
> The evidence establishes that there are continuing capacity deficits that must be addressed in order for defendants to satisfy the terms of the MSA.

[Monitor's Report, p. 4.]

Even though the Monitor found widespread and continuing violations by the defendants, Plaintiffs entered into further negotiations with the state "as an alternative . . .  to plaintiffs filing a motion for contempt" of the MSA.  [July 9 Order, p. 1.]  These negotiations resulted in the July 9 Order "setting forth specific remedial activities and timelines to address Defendants' capacity deficits and to improve performance required by the MSA, the June 24, 2013, Data Order . . .  and each of the Implementation Plans incorporated into the MSA . . . ." [July 9 Order, p. 1.]

This stipulated order, entered by the court, required defendants to employ a Director of Sustainable Transformation within the Mississippi Division of Family and Children Services to identify staffing and practices necessary to improve the state's compliance with the MSA, develop a framework for a Transformation Team to work with the Director of Sustainable Transformation, and oversee implementation of necessary reforms. [July 9 Order, pp. 1–3.] The selection of the Director was to be subject to both the state's and plaintiffs' approval. [July 9 Order, p. 2.] To increase the chances of finding a qualified candidate, the July 9 Order also provided that if a suitable candidate could not be identified because of the state's salary limitations, plaintiffs would seek an order from the court waiving the applicable salary limitations. [July 9 Order, p. 4.]

The July 9, 2014, Order provided that it would become null and void, and that plaintiffs could proceed with a motion for contempt based on the Monitor's May 2014 report, if, among other things, no acceptable Director had been hired by November 1, 2014. [July 9 Order, p. 4.] Defendants proffered only one candidate for consideration; that candidate was not acceptable to plaintiffs. November 1, 2014, came and went without the hiring of a Director.

Defendants thwarted the core purpose of the July 9 Order – that of finding a qualified individual to work within the state agency and play a key role in moving defendants toward compliance with the MSA – by limiting their search for applicants only to those who would accept the current, inadequate state salary. [Declaration of Marcia Robinson Lowry, March 4, 2015 (hereinafter "Lowry Dec.") at § 7.] In fact, without telling plaintiffs, the state directed the person hired to conduct the search to consider only those candidates who would accept the current salary limitations despite the fact that the July 9 Order explicitly provided that plaintiffs could seek a state salary waiver from the Court, if necessary. Moreover, the person conducting

the search has stated that there were qualified candidates if the salary limitation was lifted. *Id.* Thus, the defendants willfully disregarded a key provision of an order negotiated to find the best possible candidate for this critically important position and were, in fact, unable to come up with a candidate whose qualifications were acceptable to plaintiffs.

In sum, the defendants are clearly in contempt of their obligations under the MSA and several implementation plans. They have also violated a remedial order negotiated as an alternative to a contempt motion and whose purpose was to find a qualified individual who would be able to remedy the state's long-standing inability to comply with the provisions of the MSA.

For over seven years, the court-ordered effort to safeguard Mississippi's children has been marked by repeated failings on the part of the state, then by negotiations, renegotiations, a court-ordered revision of the initial Settlement Agreement, efforts at alternative approaches, and several additional, targeted court orders – all without producing better protections for Mississippi's children. The most recent effort to avoid this motion for contempt – the stipulated July 9 Order requiring the hiring of a key official and the development of an implementation process that could actually produce long-overdue results – was thwarted when defendants willfully circumvented one of the key provisions of that order. The obligations imposed by the MSA are readily achievable in a reasonably well-run child welfare system. *See* Miller Dec., *passim,* filed contemporaneously herein. But defendants' course of conduct over the last seven years has made it clear that Mississippi children will never receive the protections to which they are entitled unless this Court steps in and takes the child welfare system out of the state's hands. *See LaShawn A. v. Kelly*, 887 F. Supp. 297, 299-301, 317 (D.D.C. 1995), *aff'd sub nom. LaShawn A. v. Barry*, 107 F.3d 923 (D.C. Cir. 1996) (holding the District of Columbia in

contempt for four years of failure to comply with court-approved steps for remediating the child welfare system; a prior contempt motion had been denied and the district court had "repeatedly expressed its reluctance to impose contempt sanctions").

Finally, the failings documented by the Monitor in 2013 and continued in 2014 demonstrate that the state has been unable to heed the Monitor's concern that "the data that the defendants have produced bring into sharper focus the need to refine and accelerate the current reform effort. The children in defendants' custody represent a vulnerable population. Defendants' burden to protect their safety and ensure their well-being is a heavy one, and the cost of failing to do so can have tragic and lifelong consequences. While progress in every area cannot occur immediately, the current pace of the reform effort must be accelerated." Monitor's Report at p. 6. The state has amply demonstrated that it does not have the capacity or the ability to remedy these egregious shortcomings on its own.

## III.    DISCUSSION.

Defendants are in violation of the MSA, the Implementation Plans, and the July 9, 2014, Order. Just as in 2010, when plaintiffs filed their first contempt motion, there is no genuine dispute concerning the Monitor's findings that defendants are in violation of numerous Court-ordered mandates to fix Mississippi's still dysfunctional child welfare system. Defendants have not filed any objections to the Monitor's May 2014 report.

### A.    The Monitor's May 2014 Report Shows that Defendants Have Failed to Comply with the Modified Settlement Agreement and the Period 3 Plan.

In her May 2014 Report, the Monitor evaluated thirty-three (33) broadly defined statewide requirements imposed by the MSA and the Period 3 Plan. She found that defendants met only ten, failed to meet thirteen, and that the data provided by defendants was so inadequate that she could not make a finding as to the remaining ten. [Monitor's Report, p. 16.] She also

found that the vast majority of the regional requirements were unmet. [Monitor's Report, pp. 17–19.] According to the Monitor, "[t]he data that defendants have produced combined with the capacity deficits addressed in this report highlight substantial shortcomings in the defendants' performance *that put children at a continuing and unreasonable risk of harm*." [Monitor's Report, p. 23; emphasis added.] This is an unacceptable state of affairs at any time, [4] but especially seven years into the remediation process. It is time for the Court to intervene. We summarize below only some examples of the violations as found by the Monitor. The Court Monitor's Report to the Court Regarding Implementation Period 3 and the June 24, 2013 Order, filed with the Court on May 8th, 2014, contains an exhaustive recounting of violations in virtually every area of defendants' operations relating to the MSA. Although data reporting has improved from the point at which the state was unable to produce almost any reliable data as a result of the June 24th order entered by the court, many areas still remain in which data are either unavailable or cannot be validated by the Monitor.

### 1.    Human Resources Management.

The Period 3 Plan required the defendants to establish sub-teams to design plans "necessary to implement the requirements of the [MSA] and [Period 3 Plan] in their respective functional areas." [Period 3 Plan, § I.A.1.b.] The Monitor reported that, with few exceptions, "the documents that were submitted do not provide the basic detail necessary to guide the work of the sub-teams in their respective functional areas." [Monitor's Report, p. 44.]

The MSA required defendants to formulate by October 2012 a methodology for producing accurate and validated monthly caseload reports on a county-by-county basis. [MSA,

---

[4] Moreover, although the Monitor's Period 4 Report has not yet been filed with the court, the Monitor provided copies of the charts showing Period 4 data to the parties in November 2014 and January 2015. Defendants did not file formal objections to the data presented therein. The data showed a continuing lack of progress with regard to implementation.

§ II.A.2.a.8.]  The MSA further required defendants to provide reports on caseloads within 120 days of the filing date of the MSA or by November 3, 2012.  *Id*.  The Monitor reported that "the required methodology was not developed and the reports were not produced."  [Monitor's Report, p. 46.]  The Monitor further reported that the lack of these reports prevented her from assessing the impact of defendants' hiring on caseload levels.  [Monitor's Report, p. 55.]

Under the MSA, no more than 10% of caseworker supervisors in the non-carve-out counties may supervise more than five caseworkers.  [MSA, § II.A.2.a.9.b.]  The Monitor found that as of July 31, 2013, 16.8% of these supervisors were supervising more than five caseworkers; on August 31, 2013, the figure was 19.4%; and on September 30, 2013, the figure had increased to 20.6%.  The Monitor further found that during Period 3, despite the fact that "[s]upervisors are a lynchpin in defendants' reform strategy," defendants had a *net loss* of 17 supervisors.  [Monitor's Report, pp. 57–58.]

The MSA provides that by the end of the Period 3 Plan, supervisors may not have primary responsibility for providing direct casework, other than in special circumstances.  [MSA, § II.A.2.a.9.d.]  The Monitor reported that defendants "failed to report on this requirement during Period 3, and notwithstanding the requirements of the June 24, 2013, Order and the Initial Period 4 IP, they have been unable to produce accurate and validated data related to this requirement." [Monitor's Report, p. 60.]

Under the Period 3 Plan, defendants were required to maintain a practice coach in each of thirteen specified regions by August 1, 2012, to facilitate the implementation of the Practice Model, a key strategy of the defendants' approach to reform.  The Monitor reported that while defendants have in some instances done this, "the coaches and the DFCS manager charged with oversight of Practice Model Implementation have been subject to temporary, and sometimes

protracted, reassignments to address staffing deficits in their own or other DFCS regions."

[Monitor's Report, p. 61.] "These reassignments undercut defendants' efforts to improve case

practice." [Monitor's Report, p. 62.]

Within nine months of the commencement of the Period 3 Plan, defendants were required

to complete and begin implementation of a Workforce Development Plan. [Period 3 Plan,

§§ I.A.2.b., I.A.2.c.3.] The Monitor reported that although defendants submitted revised

versions of a plan, she was not able to approve the plan "because it failed to address with

sufficient specificity the following requirements…: strategies, financial resources, short- and

long-term staffing goals, and related time frames. For example, the Plan failed to address how

many caseworkers, supervisors, and support staff are needed statewide to meet MSA

requirements and whether there was a gap between the number of positions that were funded and

the number of positions needed to satisfy MSA requirements." [Monitor's Report, p. 67.]

Defendants were required during Period 3 to implement an accurate and reliable system

to track staff participation in mandatory training efforts. [Period 3 Plan, § I.A.3.a.4.] The

Monitor found that while defendants made efforts to do so, "the system is not working as

intended." [Monitor's Report, p. 85.] In August 2013, of 14 new case workers hired, none

completed even their pre-service training before assuming their respective responsibilities.

[Exhibit H – Court Monitor's Unofficial Chart for Period 4 (One Year Period Ending 6/30/14) –

"Newly Hired Caseworkers."].[5] In September 2013, of 20 caseworkers hired, only 37%, far less

than half, completed their pre-service training before getting caseloads. *Id.*

---

[5] This Period 4 Chart, and all other Period 4 Charts cited herein, have not yet been filed
by the Monitor with the Court. But the charts have been shared with the parties and the parties
have had an opportunity to review and comment on the data contained therein; the Monitor has
made changes based on the parties' comments. The Plaintiffs expect that these charts will be
filed with the Court as they appear

Furthermore, "as of March 12, 2014, a review of the tracking data required to be submitted by DFCS managers indicates that managers in only three of DFCS's 13 regions have submitted any information whatsoever regarding staff participation in in-service training sessions since July 2013." [Monitor's Report, p. 85.]

By the end of Period 3, defendants were required to develop a plan with specific steps and timeframes for a performance-based contracting system, including the capacity to monitor and enforce contract performance. [Period 3 Plan, § I.A.4.] The Monitor reported that this requirement was not satisfied. [Monitor's Report, p. 90.] The Monitor further found: "The history of defendants' performance related to this requirement indicates that defendants do not have the capacity to complete the required plan even when they have engaged external consultants to provide technical assistance." [Monitor's Report, p. 92.]

During Period 3, defendants were required to begin implementation of a continuous quality improvement (CQI) plan, including a specification of the resources and staffing needed to successfully implement the plan. [Period 3 Plan, § I.B.2.] The Monitor reported that although defendants submitted revisions to the CQI plan, there were numerous "shortcomings related to the implementation of the CQI plan that must be addressed," including the failure of the CQI plan to address the staffing or resources needed to satisfy numerous critical functions. [Monitor's Report, pp. 93-94.]

However as Dr. Miller, plaintiffs' expert witness, opines, a child welfare system needs to have a robust Continuous Quality Improvement (CQI) system in place that engages all members of the agency and other relevant individuals and groups involved in assuring good outcomes for children. [Miller Dec., ¶21.] Unlike defendants' CQI process, which has numerous short-comings related to implementation, the CQI process Dr. Miller implemented in Tennessee

measured and evaluated the progress of the agency against the Practice Model which the agency developed. *Id.* Some of the critical elements of that model identified by Dr. Miller focus on how the child comes into custody, what strategies were used to prevent the child from entering the system, what happens to the child and family while the child is in custody, what happens to the child to effect exit from the system, and how quickly and safely the child exits the system while minimizing the possibility that the child will reenter custody. *Id.* Dr. Miller notes that this process is essential to constant monitoring of the work being done, both through process and outcomes data analysis and continuous case reviews. *Id.*

The MSA required defendants, by the end of Period 3, to provide all county agency child welfare staff with access to basic computer services, including MACWIS,[6] word processing, and email. [MSA, § II.A.5.c.1.] The Monitor reported that county staff still lack basic computer capabilities and that the system is plagued by numerous deficiencies, "including lengthy delays logging into MACWIS; loss of data entered into MACWIS; very slow response times; and system freezes and shutdowns." [Monitor's Report, p. 105.]

The MSA required defendants, by the end of Period 3, to collect data and disseminate reports related to MSA compliance consistent with certain requirements. [MSA, § II.A.5.c.2.] The Monitor reported that this requirement was not satisfied. [Monitor's Report, p. 106.] The Monitor found that during Period 3, defendants failed to produce some reports that have been required *since Period 1,* while defendants submitted some reports in Period 3 which "did not reflect performance relative to the MSA's actual requirements." [Monitor's Report, p. 107.] As the Monitor noted, for defendants to comply with the requirements of the MSA, it is "essential

---

[6] The Mississippi Automated Child Welfare Information System.

14

that the data [produced by defendants] be timely, complete and accurate." It wasn't. [Monitor's Report, p. 108.]

Similarly, when Dr. Miller began her work in both Tennessee and in Kentucky there was a dearth of access to data that could be used to measure progress and to ensure accountability. [Miller Dec., ¶16] In Tennessee the state struggled with developing metrics that were formatted in a way that everyone could evaluate and understand what the data were saying. *Id.* However, in direct contrast with Mississippi's "do very little" approach to the critical problem of collecting accurate data, Dr. Miller's Tennessee plan demonstrates that action can be taken and plans made to collect accurate and usable data. As part of Dr. Miller's plan for remediation, a "Data Czar" (someone who actually understood their work and practice as well as how to format data for extraction from their case-management system) was hired. Then, over time and with the assistance of the Data Czar, Tennessee developed a comprehensive set of data that could be used effectively to inform daily practice. *Id.* According to Dr. Miller, it is not possible to do a competent job managing any system as complex and nuanced as child welfare is without the accountability that data supplies when it is both accurate and when it is actually used. *Id.* To assist in this work under Dr. Miller, Tennessee utilized the invaluable assistance of Chapin Hall Center for Child Welfare Research at the University of Chicago. *Id.* However, unlike Mississippi, which has also had the assistance of Chapin Hall but still produces no consistently accurate or usable data, Tennessee utilized that assistance in a way to produce data upon which its system's managers actually relied. *Id.* Further, Tennessee's child welfare workers knew that the data mattered and was being used to help everyone do their job better and thus better serve the needs of the children and families for whom these systems exist. *Id.*

By the end of Period 3, the Director of the Foster Care Review Division of the DFCS ("FCR Director") was required to review the foster care reports at six-month intervals and to identify issues of concern that affected the immediate safety of children in DFCS custody. The FCR Director was then required to provide a written report of the safety issues to DFCS management for prompt follow-up. [MSA, § II.A.5.c.4; *see also* Monitor's Report, p. 110.] However, the Monitor reported that "as a general matter, and contrary to the requirements of this subsection [of the MSA], the remedial process was not timely *even in instances when serious safety concerns were identified*." [Monitor's Report, p. 110, and App. B, Exhs. 26A and 26B thereto; emphasis added.]

Moreover, examples from Mississippi's own data, included in the following excerpt from Appendix B, Exh. 26B to the Monitor's Report, show that the remedial actions, even when they existed, were often untimely and consisted of e-mails, directing someone to go interview a child or statements that corrective action was "N/A," not-applicable.

| Issue | Date Reported to District Director (DD) | Corrective Action Taken by County |
|---|---|---|
| [child] disclosing that foster father making sexual advances toward her. Exh. 26B, p. 540. | 3/1/2013 – Lafayette County | Refer to email |
| In a report dated 4/26/13, [child] said that when he was in Millcreek, he was raped by a staff member. Investigation not complete as of 6/21/2013 and child has not received a | 6/24/2013 – Grenada County | Directing SW to go speak immediately with the child and not wait for a forensic interview |

16

| | | |
|---|---|---|
| forensic interview.  *Id.*, p. 542. | | |
| Agency ordered by Court in November 2011 to refer the case for TPR.  No evidence that it was ever done.  *Id.*, p. 543 | 1/31/2013 | N/A |
| Possible physical abuse at previous stay at Diamond Grove in Jan. 2013; no information concerning medical follow up.  *Id* p. 547. | 3/18/2013 – Neshoba County | N/A |
| Maternal grandmother reported that she witnessed children's' paternal grandmother put soap in their mouths because she saw one bite the other.  Grandfather may have been shaking the children.  *Id.*, p. 549 | 2/14/2013 – Simpson County | Report made to Central Intake by reviewer. |

Thus, the material presented in the Monitor's Report demonstrates that children are being placed at risk and are suffering substantial physical harm because the State cannot or will not address its deficiencies.

The material in the Monitor's report also demonstrates that the State cannot fulfill its obligations to supervise and contact children because it does not maintain and is losing

17

significant numbers of workers who are charged with that very task. From 2010 to 2014 the State suffered a significant net loss in Family Protection Specialists, Senior and Family Protection Specialists, Advanced. From January 2010 to October 2014, the State suffered a net loss of 13 Family Protection Specialists, Senior (there was a net loss of 8 in Period 4). [Exhibit D – Court Monitor's Unofficial Chart for Period 4 (January 1, 2010 – October 31, 2014) – "Hires and Separations Among DFCS Caseworker Staff."] In that same time period, there was a net loss of 22 FPS, Adv. (net loss of 10 in Period 4). *Id.*

Supervisory staffing was no better. From January 1, 2010 to October 31, 2014, there was a net loss of 36 supervisory staff – in Period 4, there was a net loss of 7 supervisors. [Exhibit E – Court Monitor's Unofficial Chart for Period 4 (January 1, 2010 – October 31, 2014) – "Hires and Separations Among Social Work Supervisory Staff."] Thus, the State's protection worker staffing is on a downward spiral, signaling a worse future for children in its care.

Difficult staffing questions can be addressed and solved. In both Kentucky and Tennessee, Dr. Miller's first task was to develop the human-resource capacity of the agency. [Miller Dec., ¶12] She implemented plans to raise salaries to a level comparable to the private social-services agencies, and they deployed staff to manage workloads according to professional standards. *Id.*

Under Dr. Miller's guidance, Tennessee then invited all public and private universities with accredited social-work programs to form a consortium to serve the training needs of the agency. [Miller Dec., ¶13] Because recruiting adequate staff was a challenge, Dr. Miller worked to create an undergraduate "pipeline" to enhance their workforce. *Id.* Using Title IV-E funds, students were recruited to complete an undergraduate certification in public child welfare during their final two years of college. *Id.* Tennessee provided scholarships, and the recipients were

contracted to work for the state child welfare for at least two years following graduation. *Id.*
These graduates entered the state workforce prepared to begin working immediately with
children and families. *Id.* Investing in its employees, under Dr. Miller's guidance, Tennessee
established scholarships for current state employees to complete a master's degree and work was
done with the universities to make these programs as accessible as possible for the workforce.
*Id.*

Dr. Miller worked on ways to restructure the workforce to include specialized
investigation, multiple response, and permanency units in all regions of the state. *Id., ¶14.*
Supervisors were responsible for no more than five direct service workers, *id.*, but unlike
Mississippi, in Tennessee, that goal was attained. *Id.*

Most importantly, utilizing Dr. Miller's expertise, senior staff tracked everything they
were doing and she held all staff, from the top down, accountable for performing the needed
tasks. [Miller Dec., ¶15] Senior staff was always interacting with regional staff and reviewing
data to determine whether they were reaching the goals and, in Tennessee, the goals to which
they had made a commitment in the court-ordered settlement agreement. *Id.* When things
weren't working, for whatever reason, senior staff was required to and took action to find out
why and made the necessary changes. *Id.*

Given that children can be removed from abusive or neglectful homes, and that it might
not be appropriate for all children to be returned to their families, some children will only have a
permanent family if they are freed for adoption and placed in a new permanent family.
Mississippi defendants were required to begin implementation of a Termination of Parental
Rights ("TPR") remedial plan by the end of Period 3. [Period 3 Plan, §II.B.4.b.] The Monitor
found that although defendants began to implement a plan, "the corrective action process is not

working as intended due to an apparent failure to hold managers in certain DFCS regions accountable for remedying processing delays, to provide sufficient support to managers, or some combination of these factors." [Monitor's Report, p. 135.] The Monitor further reported that TPR packets for 88 children whose cases were reviewed between June 2012 and February 2014 reflected that the packets were overdue for periods of 20 to 1,638 days (4½ years), with the median number of days overdue at 381. Only six of the 88 packets were overdue for less than 100 days. [Monitor's Report, p. 138.] Thus, not only did defendants fail to develop a plan to file timely TPR petitions, even the petitions which were eventually prepared were woefully overdue in being presented to the court for action.

## 2.    Child Safety.

By the end of Period 3, the MSA required defendants to initiate all investigations into reports of mistreatment of children in DFCS custody, including corporal punishment, within 24 hours and to complete the investigations within 30 days. [MSA, § II.B.1.e.2.] The Monitor reported this requirement as not satisfied because "[d]efendants were unable to produce validated data reports addressing both initiation and completion of investigations during Period 3." Even if one gave credence to the data eventually produced, that data showed that by June 30, 2013, statewide compliance with this requirement was only 36%. [Monitor's Report, pp. 144–145.] The Monitor concluded that "[i]n light of the significant safety concerns implicated throughout the investigative process, there is a critical need for defendants to improve the timeliness of the investigative process on an expedited basis." [Monitor's Report, p. 145.] The evidence only underscores the critical importance of this observation.

By the end of Period 3, defendants were required to have fully implemented the maltreatment investigation review process. [Period 3 Plan, § II.C.4.] The Monitor reported that this requirement was not satisfied, because although defendants indicated they were

implementing remedial strategies, "two critical shortcomings must be addressed." [Monitor's Report, p. 154.] First, defendants failed to review *all* investigations of mistreatment involving children in custody. Second, defendants "failed to ensure on a consistent basis that field managers and staff take timely corrective action." [Monitor's Report, pp. 154-156.] Thus, for all practical purposes, maltreatment reports were not being investigated thoroughly, and no corrective action, let alone timely corrective action, was being taken.

### 3. Child Placement.

Under the MSA, by the end of Period 3 no foster child was permitted to be placed or remain in a foster care setting that does not meet DFCS licensure standards consistent with the MSA, with limited exceptions. [MSA, § II.B.2.p.2.] The Monitor reported that this requirement was not satisfied. [Monitor's Report, p. 157.] The Monitor further found that during the one-month period ending June 30, 2013, there were 471 children in a foster care setting that did not meet DFCS licensure standards. *Id.*[7] By June 2014, the number of children statewide placed in homes not meeting DFCS licensure standards increased to 482. [Exhibit G – Court Monitor's Unofficial Chart for Period 4 (One-Month Periods Ending 6/30/13 and 6/30/14) – "Children Placed in Unlicensed Foster Care Settings That Do Not Meet DFCS Licensure Standards and Children Placed in Expedited Pending Relative Resource Homes for More Than 90 Days."]

By the end of Period 3, no foster child was permitted to remain in an emergency or temporary facility for more than 45 days, absent exceptional circumstances. [MSA, § II.B.2.p.8.] The Monitor reported that the data produced by defendants indicated this requirement was not

---

[7] With regard to placement with relatives, by the end of Period 3, all placements with relatives were required to undergo full licensure within 90 days of the child's placement. [MSA, § II.B.2.p.5.] However, the Monitor found that defendants did not produce data for Period 3, and the data defendants produced for Period 4 indicated that as of June 30, 2013, "there were 277 children in 176 unlicensed relative placements…." [Monitor's Report, p. 159.]

satisfied at the end of Period 3, and that for the month ending June 30, 2013, "there were 24 children in an emergency or temporary facility for over 45 days without the requisite management approval." [Monitor's Report, p. 161.] By June 30, 2014, although slight improvement had been made, more than half of that number of children were still in an emergency shelter or temporary facility for more than 45 days without approval. [Exhibit F – Court Monitor's Unofficial Chart for Period 4 (One-Month Periods Ending 6/30/13 and 6/30/14) – "Children in Emergency Shelter or Temporary Facility for Over 45 Days With and Without Approval."].

Under the MSA, by the end of Period 3 at least 60% of children with special needs were required to be matched with placement resources that could address their therapeutic and medical needs. [MSA, § II.B.2.p.11.] The Monitor found that the data defendants provided indicated that this requirement was not satisfied during Period 3, and that as of June 30, 2013, this requirement was satisfied in only 45% of cases. [Monitor's Report, p. 162.]

In Tennessee, Dr. Miller understood that in order to serve children's needs effectively, the system must have an adequate array of high quality placements and services, particularly foster homes both basic and therapeutic. *Id.*, ¶17. Moreover, in her opinion, those resources cannot be in just one or two places but rather, since services must be provided where children are, these resources must be located across the state in all communities and they must be licensed and monitored according to best practice standards. *Id.*

Moving children to less restrictive levels of care can have a negative fiscal impact on providers. *Id.* In Tennessee under Dr. Miller, the state first implemented a continuum model of services that minimized the negative fiscal impact of moving children to less restrictive levels of care and it also forced providers to offer a variety of placement types. *Id.,* ¶18. According to Dr.

Miller, as the system was reformed and the number of children in care declined, the state was then in a position to reinvest in the system, allowing development and implementation of performance-based contracting ("PBC".) *Id.* By contrast with Mississippi, which has yet to issue even its first request for proposal for a performance based contract, Dr. Miller is knowledgeable about and utilized PBC in Tennessee, showing that providers could be rewarded for good permanency outcomes and penalized for failing to improve outcomes for children. *Id.* Although Mississippi has been legally obligated to develop performance-based contracting since early in implementation process, it has still not yet done so. *Id.* In Dr. Miller's opinion and experience, in any state that relies on private providers to provide services, and most do, the best way to improve the quality of the provision of services, and to ensure that scarce public funds are being expended to produce the best value, is through performance-based contracting. *Id.* Despite a common argument that private providers will leave if required to enter into a performance based contract, Dr. Miller's experience demonstrates that when the states set out their expectations to contractors and provide fiscal incentives to those who meet those expectations and disincentives to those who do not, child welfare systems improve. *Id.*

Dr. Miller's Tennessee experience shows that although Tennessee measured and reported to the providers on multiple factors, including placements close to home and siblings placed together, the three outcome measures that could result in incentives or penalties were length of stay (bed days), exits to permanency, and reentry. *Id.* Dr. Miller's senior staff was concerned that even as the length of stay declined, they did not want the reentry rate to increase. *Id.* Importantly, providers' performance was measured against their own historic outcomes on these measures rather than against the performance of other providers. *Id.* This enabled a provider to improve its own results, without being in "competition" with any other provider for agency

23

dollars. Under Dr. Miller, a portion of the rather significant funds saved by reducing length of stay without increasing reentry and increasing exits to permanency were reinvested *with the providers* to continue to improve their work toward permanency for children. *Id.* Unlike Mississippi, which apparently has no standardized assessment process to measure reductions in length of stay and re-entry rates, Tennessee implemented a standardized assessment process, Child and Adolescent Needs and Strengths (CANS), for determining the level of service need and used the results of this process to inform their service array and the payment rate structure. *Id.*

In Dr. Miller's experience, these changes in Tennessee's ability to measure length of stay and re-entry were accomplished due to two overarching factors. *Id.* The first factor was that access to and implementation of a sophisticated and detailed data analysis resulted in metrics that had integrity with the private provider community as well as within the agency. *Id.* The second factor was the implementation of a practice model, the core of which was Child and Family Team Meetings (CFTM), that established a model for agency/provider collaboration in casework management. *Id.* The private/public collaboration on case management espoused by that practice model and CFTMs was essential in obtaining and maintaining private-provider buy-in on the performance-based contract scheme tied to permanency outcomes. *Id.* In Mississippi, there appears to be little or no agency/provider collaboration so there is little or no incentive for the private providers to buy-in to a performance based strategy.

### 4.    Physical and Mental Health Care.

By the end of Period 3, the MSA mandates that at least 40% of children in DFCS custody in a new placement were required to have their currently available medical, dental, educational, and psychological information provided to their resource parents or facility staff at the time of the placement. [MSA, § II.B.2.p.14.] The Monitor reported that the data defendants provided

showed that this requirement was not satisfied during Period 3, and that for the six-month period

ending June 30, 2013, this was satisfied for only 19% of children reviewed during the period.

### a.    Physical Health Screening Evaluations

The MSA mandates that by the end of Period 3, at least 50% of children entering custody

were required to receive a health screening evaluation from a qualified medical practitioner in

accordance with the standards of the American Academy of Pediatrics ("AAP") within 72 hours

of placement.  [MSA, § II.B.3.i.l.]  The Monitor reported that the data defendants provided

reflected that this requirement was not satisfied during Period 3, and that the statewide data for

the twelve-month period ending June 30, 2013 indicated that only 28% of children entering

custody received some form of initial health screening within 72 hours.  [Monitor's Report, pp.

169–170.]  In Period 4, statewide performance for health screening evaluations did not improve

but actually declined slightly.  [Exhibit A - Court Monitor's Unofficial Chart for Period 4 (12-

Month Periods Ending 6/30/13 and 6/30/14) – "Children Entering Custody Who Received An

Initial Health Screening Within 72 Hours After Placement."]  By June 30, 2014, only 27% of

children entering custody received an initial health screening within 72 hours.  In Region VII-W,

which includes Harrison County, one of Mississippi's largest counties by population, by June 30,

2014, only 6% of children entering custody had an initial health screening within 72 hours, up

from only 2% in June 2013.  In Region V-W, including eight counties, the percentage of timely

initial health screenings declined from 70% to 31% from June 2013 to June 2014.

### b.    Dental Examinations

Statistics for children three years old and older who received a dental examination within

90 calendar days of placement were similarly dismal.  The MSA required that, by the end of

Period 3, 60% of children in this category were required to receive a dental examination.  The

statewide percentage achieved by June 30, 2013, was only 49%. [Exhibit B – Court Monitor's

Unofficial Chart for Period 4 (Six-Month Periods Ending 6/30/13 and 6/30/14) – "Children

Three Years Old and Older Who Received a Dental Examination Within 90 Calendar Days of

Placement and Children Who Turned Three While In Custody and Received a Dental

Examination Within 90 Calendar Days of Their Third Birthday."] By the end of Period 4, 75%

of children should have had a dental examination, but, by June 30, 2014, only 55% of children

three and older received a dental exam within 90 calendar days of placement. *Id.*

### c.    Mental and Developmental Health Assessments

Mental health assessments within 30 days of placement for children four years old or

older fared no better. For example, in Region V-E, which includes seven counties, timely mental

health assessments, by a qualified professional, declined from 73% in June 2013 to 27% in June

2014. [Exh. C – Court Monitor's Unofficial Chart for Period 4 (Six-Month Periods Ending

6/30/13 and 6/30/14) – "Percentage of Children Four Years Old or Older Entering Custody

During the Period Who Received A Mental Health Assessment Within 30 Days of Placement."].

Moreover, the data defendants submitted did not show whether the screenings were conducted by

a qualified medical practitioner or were in accordance with AAP standards. [Monitor's Report,

p. 169.] The conclusion is inescapable: these problems are endemic to the state, not simply

isolated in one region or one county.

The MSA requires that by the end of Period 3, at least 30% of children in custody ages

0–3, and older children if circumstances warrant, were required to receive a developmental

assessment within 30 days of foster care placement and all needed developmental services.

[MSA, § II.B.3.1.8.] The Monitor found that the data provided by defendants indicated that this

requirement was not satisfied during Period 3, and that data for the six-month period ending June

30, 2013, indicated that only 7% of children reviewed received a timely developmental assessment and necessary follow up services.  [Monitor's Report, p. 174.]

### 5.    Therapeutic Services.

The MSA mandates that when a DFCS region has implemented the Practice Model, at least 80% of the foster children in that region who are in custody and require therapeutic or rehabilitative foster care services due to a diagnosis of significant developmental or other problems shall be provided with a treatment plan and services in accordance with the plan.  [MSA, § II.B.4.e.1.]  This requirement increases to 90% beginning 12 months after the region's implementation of the Practice Model.  [MSA, § II.B.4.f.1.]  The Monitor reported that five of the seven regions subject to these requirements failed to satisfy them.  [Monitor's Report, p. 181.]

Many child welfare systems struggle with adequate funding.  [Miller Dec., ¶20.] Although defendants may argue that they are financially disadvantaged, Tennessee too is a poor state. However, Tennessee, under Dr. Miller's leadership, was able to reduce its dependency on state funds by maximizing federal funds.  *Id.*  Tennessee officials used a number of federal funding streams and were careful to allocate costs in a manner that allowed them to take maximum advantage of the federal dollars available to the states.  *Id.*  They were also keenly aware of their responsibility as stewards of taxpayer dollars.  *Id.*  Tennessee annually completed a right-sizing exercise to ensure that human resources were effectively allocated and that as many resources as possible were kept in direct service delivery.  *Id.*  Dr. Miller determined that one of the most expensive activities of state government is out-of-home care for children in the custody of the state.  *Id.*  As dependency on high-cost congregate care decreased and reduced the length of stay and number of children in custody, Tennessee was able to effectively manage the funds available in the best interest of the vulnerable children and families they served.  *Id.*

**6.    Worker Contact and Monitoring - Children Do Not Receive Mandated Twice-Monthly Caseworker Visits.**

The MSA mandates that by the end of Period 3, at least 60% of children in custody are required to receive twice-monthly in-person visits by the assigned DFCS caseworker, consistent with MSA standards.  [MSA, § II.B.5.e.1.]  The Monitor found that the data produced by defendants did not indicate whether certain MSA visitation standards were satisfied, but that even disregarding this factor the requirement was not satisfied.  [Monitor's Report, p. 184.]

The MSA also mandated in-person visits by the assigned caseworker for 70% of the region's children in custody upon that region's implementation of the Practice Model, and for 90% of such children 12 months after implementation.  [MSA, §§ II.B.5.h.1. and II.B.5.i.1.]  The Monitor found non-compliance with the 70% requirement in four of the seven applicable regions, and non-compliance with the 90% requirement in both of the two applicable regions. [Monitor's Report, p. 185.]

The MSA mandates that by the end of Period 3, at least 40% of children with a goal of reunification shall have their DFCS caseworker meet monthly with the child's parents, consistent with MSA requirements.  [MSA, § II.B.5.e.2.]  The Monitor found not only did defendants provide incomplete data, but that for the one-month period ending November 30, 2013, only 29% of applicable children received the required visitation.  [Monitor's Report, p. 186.]  The Monitor further found that the MSA's requirements for monthly visits was not met in any of the applicable regions.  [MSA, §§ II.B.5.h.2 and II.B.5.i.2; Monitor's Report, p. 187.]

The State's failure to properly maintain contact with the foster children in its care is pervasive and ongoing.  During a case record review in Harrison and Hancock counties which took place in August and September 2012, the following incidents were recorded in the FCR Corrective Action Spreadsheet [Monitor's Period 3 Report, App. B, Exh. 26A]:

| Issue | Date Reported to DD | Corrective Action Taken by County |
|---|---|---|
| No documented face-to-face contact reported since 4/3/12 Exh. 26A, p. 522 | 8/7/2012 | N/A |
| No documented contact for March, April, June & July 2012; Child diagnosed with autism; no medical records in case file supporting therapy. *Id.* | 8/27/2012 | RD responded (not specified) |
| Face-to-face contact. One child not seen by agency since 12/29/11; other child not seen since 1/28/12. *Id. p.* 523 | 9/17/12 | RD Response (not specified) |
| 12 documented cases in which there was no agency contact with child for 4–5 months. *Id.*, p. 524 | 10/3/2012 | N/A (no response noted) |
| Child not receiving medical, mental health or dental care; resource parent allegedly "too busy" to sign child up for Medicaid; child having | 10/5/12 | N/A |

| | | |
|---|---|---|
| difficulty hearing and may need glasses. *Id.*, p. 525 | | |
| No documented face to face contact in Aug., Sept., Oct. or Nov. 2012; Child placed in Louisiana without IPC approval. *Id.*, p. 530. | 12/18/2012 | Email from RD: We are diligently working on concerns in Hancock County. **We had a massive exit of workers; therefore newly assigned worker and out of county workers are assigned the cases.** (Emphasis added). |

These issues are not unique to Harrison or Hancock counties, nor, as the State may argue, are the issues essentially "benign." Rather, lack of home visitation deprives the child of the protection of an extra pair of eyes, which should be focused on protecting the child from harm. If the visits don't occur, then incidents of mistreatment often go unnoticed or unreported and adequate planning to address the child's service needs, including her plan for permanence, cannot take place.

### 7.    Maltreatment in Care

The MSA provides that by the end of Period 3, the rate of abuse or maltreatment of children in DFCS custody may not exceed 1.00%. [MSA, § II.C.2.b.1.] The Monitor reported that she found disparities between the data defendants provided and the figures defendants had reported to federal authorities. [Monitor's Report, pp. 194–195.] The Monitor further reported that because she had not yet resolved these disparities with defendants, she "cannot make a finding concerning defendants' performance relative to this requirement." [Monitor's Report, p.

30

196.] Thus, on the critical issue of children being harmed while in state custody, the state failed to report data that the Monitor found reliable.

> ### B.    The Practical Effects of Defendants' Continuing Violations on Mississippi's Children.

Once Tennessee developed an adequate placement array, outcomes improved for children in Tennessee. [Miller Dec., ¶19]  With constant attention to placement array, Tennessee was able to place over 90% of all children entering custody in a foster home. *Id.* As of 2009, the number of children placed in congregate care had been reduced to 9%, less than half what it was in 2002. *Id.* However, by contrast, in Mississippi in June 2013, there were 11 children statewide under age 10 housed in a congregate care setting without qualifying for an exception and without Regional Director approval; by June 2014, that number had risen to 50 children. [Exhibit I – Court Monitor's Unofficial Chart for Period 4 (One-Month Periods Ending 6/30/13 and 6/30/14) – "Children Under Age 10 Housed in Congregate Care Setting With And Without Exception And Regional Director Approval."]  As part of Dr. Miller's plan, Tennessee's foster homes were all dual-certified to both foster and adopt, and over 80% of adoptions occurred in these homes. *Id.* As of 2010, 84% of their sibling groups were placed together and 89% of their foster children were placed within 75 miles of their home community. *Id.* By contrast, in Mississippi, the placement of siblings together took a turn in the wrong direction. In June 2013, the placement of sibling groups who entered custody at or around the same time who were placed together was 85% statewide; by June 30, 2014, it had fallen to 75%. [Exhibit J – Court Monitor's Unofficial Chart for Period 4 (12-Month Periods Ending 6/30/13 and 6/30/14) – "Sibling Groups Who Entered Custody at or Around the Same Time Placed Together."]

Tennessee's development of an adequate placement array also supported efforts to stabilize placements for children and prevent the damage that results from multiple placement

moves.  *Id.* As of 2009 in Tennessee, 84% had two or fewer moves in the previous 24 months.

*Id.*  In Dr. Miller's opinion, being able to keep children close to home, with their siblings, and in

stable placements contributed to improved rates of children's placements into permanent

families.  *Id.*  The number of children in care declined in part because children were exiting the

system more quickly, which was better for them, the primary goal, but also providing the added

benefit of conserving state funds.  *Id.*

Dr. Miller has noted through her review of the Mississippi Monitor's report the many

areas of non-compliance that the Monitor has found with regard to even the most fundamental

aspects of the operation of the Mississippi child welfare system.  *Id.*, ¶ 24.  Dr. Miller found it

particularly troubling that this non-compliance on so many basic issues has continued for so

many years since the Settlement Agreement went into effect.  *Id.*

In Dr. Miller's experience and opinion the Monitors' report is replete with big, red danger

signs about how Mississippi's system is treating its children. *Id.*, ¶ 25.

- •    Dr. Miller stated that workers and supervisors who have high caseloads simply
     cannot protect children, let alone ensure that children get necessary services or
     appropriate placements or have any chance of securing a permanent home.  In Dr.
     Miller's opinion, the fact that so much of the data concerning caseloads cannot be
     validated, and the state does not even know how many workers it needs to meet
     required caseloads standards – still, seven years into this implementation period –
     is unconscionable and without any doubt puts children at risk every day. *Id.*

- •    In Dr. Miller's experience the fact that workers are not even receiving mandatory
     training according to data submitted by the Monitor (see Monitor's Report at p.
     85) only compounds the problem of high caseloads, leaving children vulnerable to

untrained workers who do not even know how to do what is an incredibly difficult and sensitive job. No matter how well-intentioned any individual workers may be, without the skills and supervision necessary to do this job adequately, children in Mississippi are at serious risk of harm in Dr. Miller's opinion.

- The fact that the state does not have an adequate continuous quality improvement plan is another danger sign, according to Dr. Miller. (See Monitor's report at pp. 93–94) An internal process for regular, routine reviews of quality are an absolute essential for any child welfare system in which so many difficult decisions must be made very day. The system must be continually evaluating what and how it is making decisions for children and families and continually examining what needs to be improved to make those decisions better.

- The fact that the state's process for investigating and reporting back on the safety of children where serious safety concerns are reported, or initiating reports and completing timely reports on mistreatment of children, means that children in the state of Mississippi are not even safe at the most basic level (Monitor's Report at 144–145, pp. 154–156).

- The fact that nearly 500 children are living in foster care settings that don't even meet the state's licensure standards is something that no state should ever allow. (See Monitor's Report at p. 157)

In Dr. Miller's expert opinion, based on her education, training and experience, the problems in Mississippi's child welfare system can be remedied but not without "external pressure supplied by [the] court." [Miller Dec., ¶ 29.]

### C.    Defendants Violated the July 9, 2014, Order Regarding the Hiring of a Director for Sustainable Transformation.

As noted above, the defendants have also violated the provisions of the agreed July 9 Order calling for the hiring of a Director for Sustainable Transformation by November 1, 2014, the staffing of a Transformation Team, and the creation and implementation of a remedial plan, which were all negotiated after the Period 3 Monitor's report showed massive non-compliance and the state's lack of capacity to meet the requirements of the renegotiated settlement agreement and implementation plans.  Since the state had not developed its own implementation structure, and was in fact failing to achieve implementation of long-overdue requirements, plaintiffs proposed and secured the state's agreement to creating an internal process in an attempt to avoid once again seeking Court intervention.  The July 9 Order was negotiated, as recited in its first paragraph, precisely to avoid a contempt motion.  Yet defendants failed to hire a Director for the implementation effort, hence a Transformation Team has not been created nor has a remedial plan been developed or implemented.  Moreover, the defendants, without informing plaintiffs, instructed their search firm to not propose candidates unless they would accept the state salary limit.  [Lowry Dec. at ¶¶ 7, 9.]  The July 9 Order specifically provides:

> Defendants agree to work in good faith to maximize the available resources for the Director for Sustainable Transformation's salary in an effort to hire the best available candidate.  If the Parties are unable to agree upon a candidate for the Director for Sustainable Transformation position and Plaintiffs believe applicable salary limits are a factor, Plaintiffs will seek an order from this Court waiving the applicable salary limitations for the sole purpose of hiring the Director for Sustainable Transformation.

[July 9 Order, § II.F.]

Here, the defendants did not tell plaintiffs that they had instructed their search firm *not* to even interview or present prospective candidates for the Director position for whom the state's salary limit was unacceptable, even though the parties had considered that issue being an

impediment and had built into the order, entered by this Court, the option to seek a waiver of the

state salary limit.  Moreover, the firm hired to conduct the search stated that more qualified

candidates were available but were not considered because the state had directed the firm not to

consider them unless they were willing to accept the state's salary. [Lowry Dec., ¶ 7.]  Thus,

although no acceptable candidate was located, plaintiffs never sought the Court's waiver of the

salary limitations because plaintiffs were unaware of defendants' instructions to the search firm.

Defendants not only violated the clear mandate of the July 9 Order to hire a Director by

November 2014, they also breached their obligation to work with plaintiffs "in good faith."

### D.    Plaintiffs Have Demonstrated – and There Is Again No Genuine Dispute Concerning – the Essential Elements of Civil Contempt.

Contempt proceedings are based upon "the basic proposition that all orders and

judgments of courts must be complied with promptly." *Maness v. Meyers*, 419 U.S. 449, 458, 95

S. Ct. 584, 591, 42 L. Ed. 2d 574, 583 (1975).  "[F]ederal courts are not reduced to issuing

[judgments] against state officers and hoping for compliance." *Gates v. Collier*, 616 F.2d 1268,

1271 (5th Cir. 1980), quoting *Hutto v. Finney*, 437 U.S. 678, 690, 57 L. Ed. 2d 523, 98 S. Ct.

2565 (1978).

The purpose of civil contempt is simply to compel compliance.  *Thyssen, Inc. v. S/S*

*Chuen On*, 693 F.2d 1171, 1173–74 (5th Cir. 1982).  We emphasize that plaintiffs are not

seeking the imposition of any fines or other punitive measures.  Rather, plaintiffs only seek

through civil contempt a recognition that defendants have failed over a period of several years to

implement numerous provisions of orders and implementation plans to which they had agreed, a

fact which is not in genuine dispute.

Contempt is appropriate where a party fails "in meaningful respects to achieve substantial

and diligent compliance with a clear and unambiguous court decree." *Lelsz v. Kavanagh*, 673 F.

Supp. 828, 839 (N.D. Tex. 1987) (citations and internal quotation marks omitted).  The elements

of civil contempt are simple and straightforward.  To demonstrate civil contempt, a party must

establish: (1) that a court order was in effect, (2) that the order required in clear terms certain

conduct by the respondent, and (3) that the respondent failed to comply with the order.  *Martin v.*

*Trinity Indus*., 959 F.2d 45, 47 (5th Cir. 1992).  Plaintiffs submit that, as in 2010, there is no

genuine dispute that each of the elements of civil contempt is satisfied.

### 1.    The Element of a Court Order is Satisfied.

The MSA, the Period 3 Implementation Plan, and the July 9 Order were all negotiated by

the parties, and approved by the Court.  As this Court noted in its May 2011 order on the first

contempt motion, while agreements between parties are in the nature of a contract, "an

agreement between litigants ...  entered as a judgment of the court ... takes on an added

significance," having "attributes both of contracts and of judicial decrees." *S.E.C. v. AMX*

*International, Inc.*, 7 F.3d 71, 75 (5th Cir. 1993) (citations omitted).   "Thus, a consent order

entered based on the parties' settlement and related agreements is properly enforceable by the

court's contempt power." May 2011 Order, p. 5 (n. 1), citing *AMX International*, 7 F.3d at 76.

Accordingly, the contempt power indisputably includes the authority to enforce consent

decrees and settlement agreements.  *Ho v. Martin Marietta Corp*., 845 F.2d 545, 548 (5th Cir.

1988).  Indeed, "district courts have the power and ordinarily *must* hold parties to the terms of a

consent decree ....  [and] have wide discretion to enforce decrees and to implement remedies for

decree violations" through declarations of contempt.  *United States v. Alcoa, Inc.*, 533 F.3d 278,

286 (5th Cir. 2008) (emphasis added).

## 2.    The Element of an Order Requiring Certain Conduct in Clear Terms is Satisfied.

Defendants did not claim in 2010, and cannot claim in good faith today, that the requirements of the MSA, the Period 3 Plan or the July 9 Order are ambiguous.  The defendants *agreed* to the terms of all three.  A court order is unlikely to be found ambiguous when it was consented to by the contemnor.  *Cobell v. Babbitt*, 37 F. Supp. 2d 6, 16 (D.D.C. 1999).  As another court observed: "Where a party participates in drafting the relevant order, it does (or is held to have done) so 'with an understanding of what it can necessarily accomplish.'"  *United States v. Tennessee*, 925 F. Supp. 1292, 1302 (W.D. Tenn. 1995).  Accordingly, there can be no genuine dispute that the defendants have known at all relevant times what they were required to do under the provisions of the MSA, the Period 3 Implementation Plan, and the July 9 Order.

## 3.    The Element of Non-Compliance is Satisfied.

Finally, as in 2010, there is no genuine issue of the defendants' widespread non-compliance.  The most recent report of the Court-appointed monitor details dozens of inexplicable lapses and failures by the defendants to comply with the terms of the MSA and the Period 3 Plan.  The defendants have not filed any objections to the Monitor's May 2014 report.  In addition, as discussed previously, the defendants failed to comply with the July 9 Order.

Contempt does not require a showing of willfulness or intent.  *Petroleos Mexicanos v. Crawford Enters., Inc*., 826 F. 2d 392, 401 (5th Cir. 1987).  Good faith is not a defense to civil contempt, and "the mere fact that a party may have taken steps toward achieving compliance is not a defense to a contempt charge." *United States v. City of Jackson*, 318 F. Supp. 2d 395, 417-418 (S.D. Miss. 2002).  Furthermore, "lack of funds is not a sufficient justification for neglect of a citizen's constitutional rights."  *McCord v. Maggio,* 927 F. 2d 844, 847 (5th Cir. 1991)

Here, the fact that the defendants agreed to the remedial actions, but then failed to perform them, further supports a finding of contempt. "Courts have been particularly unsympathetic to purported excuses for less than substantial compliance where the contemnor has participated in drafting the order against which compliance is measured." *United States v. Tennessee*, 925 F. Supp. at 1302. When a party "fails to live up to its own expectations which have subsequently been embodied in a court order, it should, at the very least, notify the court and move for an enlargement of time. For if the party and its attorneys sit idly by, they run the risk of contempt of court." *Cobell,* 37 F. Supp. 2d at 10.

There is no genuine issue that seven years after the original settlement agreement was executed, the defendants are not in compliance with a myriad of requirements set forth in the MSA and the Period 3 Plan, as the Monitor found and detailed in her most recent report.

### 4.    Courts Have Consistently Held State Officials in Contempt in Analogous Circumstances.

In its 2011 order on the first motion by plaintiffs requesting a finding of contempt, the Court found that it was "unquestionably true" that defendants had failed to comply with "most of the requirements established by the court-approved Period Two Implementation Plan" and that plaintiffs had "obviously…met their burden to present a *prima facie* case" of contempt. [May 17, 2011 Order, p.4.] The Court nevertheless, declined to formally hold the defendants in contempt due to concern whether such a finding would "serve any fruitful purpose." [*Id.* at p. 10.] However, now that the defendants have failed to comply with the agreed-upon settlement and remedial plans for an additional four years, a finding of contempt would serve the essential purpose of compelling compliance with Court orders which were issued to protect the constitutional rights of at-risk children. Courts have consistently held state officials in contempt in analogous circumstances, namely, when they have persistently failed over long periods of time

to comply with consent decrees where constitutional rights are at stake. We discuss three such cases below. [8]

### a.    LaShawn A. v. Kelly.[9]

In *LaShawn A. v. Kelly*, the plaintiffs, a class of "abused and neglected children" residing in the District of Columbia, alleged that the child welfare system in the District of Columbia failed to provide the necessary services and protections. Following a bench trial in 1991, the Court found that the plaintiff children were "routinely denied the protections and services that local and federal law require." The parties thereupon negotiated a course of remedial action, including the appointment of a Monitor. In August 1991, the Court granted the parties' joint motion for entry of a remedial order and approved an implementation plan. *LaShawn A.*, 887 F. Supp. at 297–299.

In 1992, the plaintiffs filed their first contempt motion, claiming that the defendants were not complying with the plan. Plaintiffs withdrew the motion in 1993 upon reaching agreement with defendants for further reforms. In 1994, plaintiffs filed a second contempt motion, again alleging non-compliance, and sought two limited receiverships. The District Court granted the request for the limited receiverships but declined to enter a finding of contempt even though it found that "contempt may well [have been] justified." *LaShawn A.*, 887 F. Supp. at 299–300.

---

[8] *See also City of Jackson*, 318 F. Supp. 2d at 417-419 (holding City of Jackson in contempt of consent decree prohibiting city from discriminating in housing decisions relative to handicapped persons); *Carty v. Farrelly*, 957 F. Supp. 727, 744 (D.V.I. 1997) (holding governmental officials in contempt for failing to conform with settlement agreement regarding conditions at prison complex); *Lelsz v. Kavanagh*, 673 F. Supp. 828, 831-32, 863-64 (N.D. Tex. 1987) (holding defendants in contempt for failing to comply with settlement agreement governing state institution for mentally retarded persons).

[9] 887 F.Supp. 297, 299-301, 317 (D.D.C. 1995), *aff'd sub nom. LaShawn A. v. Barry*, 107 F.3d 923 (D.C. Cir. 1996).

Plaintiffs filed a third motion for contempt in 1995 based upon continuous and widespread violations by defendants of the Court-approved reforms, as found by the Monitor. The Court concluded that the Monitor's report and other evidence "showed that the defendants remain in non-compliance with many court-ordered requirements. It is important to note that most of these requirements … have been voluntarily proposed by the defendants." *LaShawn A.*, 887 F. Supp. at 300. After detailing defendants' non-compliance in areas such as staffing, training, information systems, quality assurance, licensure, and services, the Court found that "abused and neglected children continue to suffer under these conditions." *Id*. at 300, 314. The court specifically noted "the critical staffing shortages, the dearth of basic administrative support, the severely delayed installation of the [information system], and the inaction on revenue maximization." *Id*. at 314. Therefore, and emphasizing that civil contempt has no punitive aspect, the Court held the District of Columbia in civil contempt even though the Court noted that it had "repeatedly expressed its reluctance to impose contempt sanctions …" *Id*. at 313–314, 317. The Court explained that it "cannot tolerate widespread non-compliance with its orders…. The pattern of delay and inaction that has characterized this case for the last few years must end now." *Id*. at 317.

Here, the same series of events has occurred. There was an initial motion for contempt in 2010; the court was reluctant to formally find the defendants in contempt even though there was "obviously" widespread non-compliance; defendants have continued to violate the court-ordered remedial requirements for several years; and the plaintiffs have filed another motion seeking contempt. Here, just as in the *LaShawn A*. action, defendants' long-standing failure to comply with the consent orders, and the interests of vulnerable children in the State's custody, should allay the Court's initial (and understandable) concern that the defendants had not yet had time, at

that point, relatively early in the implementation process, to comply with the requirements of the

Settlement Agreement and Implementation Plans.  For that very reason, the Court explicitly

required the parties to renegotiate the applicable remedial steps and the time periods within

which the state had to perform them.  The parties have done this, but several more years have

now passed during which Mississippi's children have been without the benefits and protections

required by the Court's orders.  Accordingly, the facts now weigh overwhelmingly in favor of a

finding of contempt, notwithstanding the concern raised by the Court in its 2011 order of

whether contempt would serve a "fruitful purpose."

**b.    _G.L. v. Zumwalt._[10]**

In _G.L. v. Zumwalt_, the plaintiffs – children in the custody of the Jackson County,

Missouri office of the Division of Family Services ("DFS") – alleged that DFS's policies and

practices violated their constitutional right to be protected from harm while in state custody.

[December 7, 1992 order ("12/7/92 Order"),  p. 1.]  In 1983, the parties settled by entering into a

consent decree mandating "comprehensive reform" of Jackson County's foster care system.  [_Id_.]

In 1985, plaintiffs filed a motion seeking to hold the defendants in contempt due to their failure

to satisfy the requirements of the consent decree.  [_Id_.]  In response, the parties entered into a

supplemental consent decree.  [_Id_.]

Thereafter, reports by a three-person monitoring committee found continuing non-

compliance with the consent decree.  [12/7/92 Order, p. 3.]  In 1989, plaintiffs served defendants

with a notice of non-compliance, which was followed by negotiations from July 1989 to January

1990.  [_Id_.]  The parties did not resolve their differences, hence plaintiffs filed a motion in

---

[10] No. 77-0242-CV-W-1 (W.D. Mo. Dec. 7, 1992).

January 1990 to hold the defendants in contempt.  [12/7/92 Order, p. 4.]  In August 1991, plaintiffs filed an additional motion for contempt.  [*Id*.]

The court held a two-day evidentiary hearing.  [12/7/92 Order, p. 4.]  Among other defenses, the defendants claimed lack of adequate funding by the state legislature.  [*Id*.]  The Court, after detailing its findings of non-compliance, including excessive caseloads, understaffing, inadequate foster parent training, and insufficient levels of visits by caseworkers, held the defendants in contempt.  [12/7/92 Order, p 30.]

The Court found a continuous and long-standing failure by the defendants to comply with the consent decree:  "It is obvious from the statistics cited above that the defendants are not and have not been in compliance with the Consent Decree since they entered into it in 1983."  12/7/92 Order, p. 27.  The Court concluded:  "It is time to begin the work necessary to make the Consent Decree work and to begin the process to withdraw the Court from having to oversee the DFS Foster Care program."  [12/7/92 Order, p. 29.]

        **c.**      ***Aspira of New York, Inc. v. Board of Education of New York.[11]***

In *Aspira*, the plaintiff class, comprised of Hispanic public students in New York City, entered into a consent decree which required the City to provide bilingual education, including the hiring and training of competent staff and the issuance of periodic progress reports.  In December 1975, plaintiffs filed a motion seeking contempt on the grounds that the defendants were in violation of the 1974 consent decree and two orders issued thereunder.  *Aspira*, 423 F. Supp. at 651.  Among other things, plaintiffs alleged that the defendants were not providing the required services, failed to hire or train the necessary personnel, and failed to submit the

---

[11] 423 F. Supp. 647 (S.D.N.Y. 1976).

information needed to determine the status of compliance. *Id*. After a lengthy evidentiary

hearing, the Court found the defendants in contempt. *Id*. The Court began by noting that civil

contempt does not suggest willful disobedience:

> The word 'contempt' rings fiercely; if its connotations in law
> included only lay notions like scorn and willful disobedience,
> plaintiffs could not prevail. But the idea in this context includes
> failures in meaningful respects to achieve substantial and diligent
> compliance. In this sufficient sense, the defendants are found to
> have been in contempt, and it has become the court's duty to
> declare it.

*Aspira*, 423 F. Supp. at 649. The Court then made a finding of contempt based on the

following facts, which bear a striking resemblance to this case:

> Upon the facts disclosed in this proceedings defendants have fallen
> far short of the requisite diligence. They have neglected to marshal
> their own resources…and demand the results needed from
> subordinate persons and agencies in order to effectuate the course
> of action required by the consent decree. They have allowed
> deadlines to pass without advance announcements or volunteered
> explanations, awaiting complaints by the plaintiffs…They have
> borne with seeming equanimity long periods of nonperformance,
> inadequate performance, or outright defiance from key
> constituents…They have tolerated slipshod procedures. They have
> failed to enlist or order the placement of needed and available
> personnel. They have displayed an evident sense of nonurgency
> bordering on indifference….

*Aspira*, 423 F. Supp. at 649. The Court noted that although it had been placed in the "delicate

and difficult" role of supervising the performance of state officials, and was reluctant to do so,

nonetheless "the rights of the people under the law, where they are duly brought to issue before

the court, must be forthrightly declared and enforced." *Aspira*, 423 F. Supp. at 648.

*  *  *  *

This case has all of the core elements of the *LaShawn A., Zumwalt* and *Aspira* cases. A

plaintiff class, seeking to vindicate constitutional rights, enters into a consent decree with public

43

entity defendants who unfortunately fail to perform.  The failure continues for an extended period of time.  Despite an initial reluctance to hold the public entities in contempt, the Courts in the three cases noted above were ultimately compelled by a duty to uphold the constitutional rights of innocent citizens.  As the Court in *Aspira* stated, the rights of citizens "duly brought to issue before the Court, must be forthrightly declared and enforced."  When, as here, this calls for a finding of civil contempt, then the Court should not hesitate to do so, particularly where the action implicates the rights of the most vulnerable of Mississippi's citizens.

### E.    The Court Should Appoint a Receiver to Effectuate the Necessary Remedial Measures.

The court's power to effectuate compliance with its orders includes the equitable power to appoint a receiver.  *Morgan v. McDonough*, 540 F.2d 527, 533 (1st Cir. 1976); see also Fed. R. Civ. P. 66.  "[I]t is abundantly clear that a court may appoint a receiver to force public officials to comply with court orders."  *Dixon v. Barry*, 967 F. Supp. 535, 550 (D.D.C. 1997). "Where more traditional remedies, such as contempt proceedings or injunctions, are inadequate under the circumstances, a court is justified … in implementing less common remedies, such as a receivership, so as to achieve compliance with a constitutional mandate."  *Shaw v. Allen*, 771 F. Supp. 760, 762 (S.D. W. Va. 1990).

In determining whether to appoint a receiver, "the court should consider whether there were repeated failures to comply with the Court's orders ...  if there is a lack of sufficient leadership to turn the tide within a reasonable time period, whether there was bad faith, whether resources are being wasted [and] ...  whether a receiver can provide a quick and efficient remedy." *Dixon*, 967 F. Supp. at 550 (citations omitted).  The most significant factor in the decision to appoint a receiver is whether any other remedy is likely to be successful.  *Id*.; *Shaw*, 771 F. Supp. at 762.

44

1.      **The Dire Circumstances of This Case Warrant the Appointment of a Receiver.**

In a span of seven years, the defendants have failed to comply with the original settlement, the Period 1 Plan, the Period 2 Plan, the Bridge Plan, the MSA, the Period 3 Plan, and the July 9 Order.  The Monitor is likely to soon report that the defendants are not in compliance with the Period 4 Plan.  There are still widespread violations of both statewide and regional requirements.  According to the Monitor, children are still "at a continuing and unreasonable risk of harm."  It is time to change course.

As discussed above, plaintiffs have submitted an affidavit from Dr. Viola Miller, an expert on reforming state child welfare systems.  She served as the chief executive officer of two such systems for 15 years – eight years in Kentucky, and seven years in Tennessee.  [Miller Dec., ¶6].  In her affidavit, Dr. Miller spells out the essential components of any successful child welfare reform effort: a well-trained and capable work force; strong leadership; and accurate and reliable data.  [Miller Dec., ¶¶12-17.]  Once this infrastructure is in place, Dr. Miller discusses the steps that must be taken to implement meaningful reform, including an array of high quality placements and services, maximization of Federal funds, and high-quality casework.  [Miller Dec., ¶¶18-24.]

Dr. Miller has read the Monitor's May 2014 report and finds it "extremely troubling to anyone who is concerned about how abused and neglected children are being treated by a state that has taken custody of them…."  [Miller Dec., ¶26.]  After describing the many deficiencies in the Mississippi system, Dr. Miller states:

> I know from my experience as the administrator of two child welfare systems that sometimes external pressure, supplied by a court, is necessary to accomplish necessary reforms which have not been achieved otherwise.  From what I have read in the Monitor's Report, it is seems highly likely that Mississippi leadership lacks the capacity and/or the will to do what is

45

> necessary for the children of the state and to act in accordance with the court order which the state negotiated and by which it agreed to be bound.

[Miller Dec., ¶28.]

Dr. Miller further states, however, that with the assistance of court-appointed experts and the appointment of a receiver, meaningful change can occur in Mississippi's child welfare system:

> While I am mindful of the fact that plaintiffs are seeking drastic action, it is my expert opinion that an experienced, qualified group of neutral experts can quickly assess the organizational and resource issues that have been impediments to the implementation of the MSA in Mississippi, and that a receivership created by this Court based on the recommendations of such an assessment and aided by an expert panel of advisors can accomplish what the state has failed to accomplish in the last seven years. It is also my opinion that based on what I know about the course of implementation over these last seven years that Mississippi's children will not be protected otherwise.

[Miller Dec., ¶28.]

As Dr. Miller explains, there is a path to a successful reform of the State's foster care system, but only if the Court intervenes and appoints a receiver.

## 2.    Courts in Similar Cases Have Appointed Receivers for Dysfunctional Public Agencies.

Federal courts have utilized receivers where public agencies have failed to comply with consent decrees requiring constitutionally mandated change. We discuss two exemplar cases below.[12]

---

[12] Receiverships have been used to remedy noncompliance in cases regarding prisons, water treatment plants, public housing, mental health, and school desegregation, as well as child welfare. *See, e.g., Glover v. Johnson*, 934 F.2d 703 (6th Cir. 1991) (prisons); *Morgan v. McDonough*, 540 F.2d 527 (1st Cir. 1976) (school desegregation); *Dixon v. Barry*, 967 F. Supp. 535 (D.D.C. 1997) (mental health); *Shaw v. Allen*, 771 F. Supp. 760 (S.D. W. Va. 1990) (prisons); *United States v. Detroit*, 476 F. Supp. 512 (E.D. Mich. 1979) (water treatment plant); *Perez v. Bos. Hous. Auth.*, 400 N.E. 2d 1231 (Mass. 1980) (public housing).

46

a.    *LaShawn A. v. Kelly*.

In *LaShawn A. v. Kelly,* discussed previously*,* the District Court in its 1995 ruling

appointed a receiver for the District of Columbia's child welfare system.  As noted, the ruling

followed several years of continued non-compliance by the defendants with the terms of agreed

orders.  *LaShawn A.*, 887 F. Supp.  at 299–300.  In appointing a receiver (who replaced two

previously appointed receivers with limited authority), the District Court rejected the defendants'

contention that a receiver was not needed because "substantial progress" was being made:

> While it is true that the defendants have made some progress in various areas, the
> above factual findings show the urgent need for a new, more fundamental
> approach to change.  Otherwise, each report of incremental progress will be
> mitigated by regression in another area or future inaction on that first step
> forward.  Much of the progress originally made is now slipping back into the
> same tired way or doing business that brought these parties before the Court.

*LaShawn A.*, 887 F. Supp. at 315.

The District Court also rejected defendants' assertion that a receiver was unnecessary due

to a proposal for a "viable restructuring plan" which the defendants had made in response to the

motion:

> Four years ago the Court was told that the defendants had a 'plan' to rebuild the
> agency.  Now facing contempt and full receivership, the defendants again put
> forth a proposed solution.  There is no reason to believe this plan has more chance
> of success than the one the defendants presented at trial and quickly.
>
> Therefore, the Court today imposes a full receivership over the child welfare
> system for the District of Columbia.

*LaShawn A.*, 887 F. Supp. at 316.

The *LaShawn A.* case is highly relevant on the issue of a receiver.  This Court has been

told for years that the defendants are on a path to remediation, but as the Monitor's report shows,

three years after this Court's approval of the MSA and the Period 3 Plan, scores of requirements

remain unmet, to the detriment of the children in the care of Mississippi.  Here, as in *LaShawn*

47

*A.*, "[a]bused and neglected children … are not receiving the services and protection which are their desert and legal entitlement." *LaShawn A.*, 887 F. Supp. at 317.[13]

### b.    *Shaw v. Allen.*[14]

In *Shaw*, the plaintiff class, comprised of inmates at the McDowell County Jail in West Virginia filed suit in 1981 alleging violations of their constitutional rights.  In 1983, the court entered an order specifying various actions which the defendants were required to take to comply with constitutional and statutory mandates.  *Shaw*, 771 F. Supp. at 761.

The plaintiffs filed motions seeking contempt in 1985, 1987, 1988 and 1990, contending defendants failed to comply with the 1983 order.  *Shaw*, 771 F. Supp. at 760.  In response to the plaintiffs' 1989 contempt motion, the court found the defendants to be in non-compliance with the 1983 order and appointed a monitor.  *Id.*  In 1989, the monitor reported to the court that "the McDowell County Jail is in serious non-compliance with many aspects of the April 1983 court order." *Id.*  The court found that the jail "remains in substantial non-compliance with [the 1983] Order" and that conditions in the jail created "health and sanitation hazards to inmates." *Id.* Moreover, "the defendants' repeated failure to achieve good faith, substantial compliance with this Court's comprehensive Order as well as Orders entered subsequent thereto has placed them in constant contempt of such Orders which they have failed to purge." *Shaw*, 771 F. Supp. at 762.

---

[13] In its 2011 order on the first contempt motion, the Court, citing *United States v. United Mine Workers*, 330 U.S. 258, 67 S. Ct. 677, 91 L. Ed. 884 (1947), stated that in considering whether to appoint a receiver, relevant considerations included whether the contempt was willful, and the financial resources of the contemnor. [May 17, 2011 order, p. 8.]  In fact, in *United Mine Workers* the Supreme Court was considering the propriety of monetary fines that had been imposed on the UMW's president ($10,000), and on the UMW itself ($3.5 million) for initiating a nationwide strike of coal miners in contravention of law.  There was no issue in the case concerning the appointment of a receiver.  Plaintiffs accordingly contend that *United Mine Workers* is not relevant to whether a receiver should be appointed in this case.

[14] 771 F. Supp. 760 (S.D.W.Va. 1990).

Based on this factual record, the district court found that the appointment of a receiver was necessary:

> [T]he Court is of the opinion that the appointment of a receiver for the McDowell County Jail is both necessary and reasonable. It has been nearly eight (8) years since the entry of the Court's comprehensive Order and yet the McDowell County Jail still remains in substantial noncompliance. Throughout the tumultuous history of this case, the Court has exercised restraint attempting to give due deference to McDowell County elected officials' ability to observe and obey the duties and obligations placed upon them by federal and state law. Such exercise of deference, however, has been unavailing, and it now appears that a more intrusive course of action is warranted.

*Shaw*, 771 F. Supp. at 762.

In sum, seven years of non-compliance is long enough in our case. Plaintiffs should not be forced to bring seriatim contempt motions. At this point, given the Monitor's findings and expressions of concern about the state's "capacity deficits," there is no reason to believe that state defendants will function differently in the future. Dr. Miller, a true expert on the reform of public child welfare systems, has reached the same conclusion. [Miller Dec., pp. 28-29.] Plaintiffs respectfully urge this Court to intervene, to exercise its authority in light of the compelling facts of continuing non-compliance, to find defendants in contempt, and to appoint a receiver to remedy the contempt. In addition, plaintiffs further request that the Court appoint an expert panel, upon the recommendation of plaintiffs and the Monitor, to immediately conduct an organizational analysis and a remedial plan to guide the work of the receiver and to help the Court shape the terms of the receivership. Plaintiffs also request the opportunity to present factual and expert witnesses before the Court at an evidentiary hearing to be scheduled as expeditiously as possible.

IV.    **CONCLUSION**

For the foregoing reasons, plaintiffs request that this Court find that defendants are in noncompliance with the MSA, the Period 3 Implementation Plan and the July 9 Order, hence in contempt of court; appoint an expert panel upon the recommendations of plaintiffs and the monitor; appoint a general receiver with full authority to administer Mississippi's child welfare system and to bring it into compliance with the orders of this Court;; and grant such other and further relief as this Court deems necessary and proper.

RESPECTFULLY SUBMITTED, this the 9th day of March 2015.

/s/ Marcia Robinson Lowry
Marcia Robinson Lowry (*pro hac vice*)
Sara Robinson-Glasser (*pro hac vice*)
A Better Childhood, Inc.
1095 Hardscrabble Road
Chappaqua, NY  10514
Telephone (646) 808-7344
Facsimile: (914) 238-0365
Email: mlowry@abetterchildhood.org
          srglasser@abetterchildhood.org


W. Wayne Drinkwater, Jr. (MBN 6193)
Michael J. Bentley (MBN 102631)
BRADLEY ARANT BOULT CUMMINGS LLP
One Jackson Place, Suite 400
188 East Capitol Street
Jackson, Mississippi 39201
Telephone: (601) 948-8000
Facsimile: (601) 948-3000
Email: wdrinkwater@babc.com
          mbentley@babc.com


John Lang (*pro hac vice*)
Attorney at Law
60 East 42nd Street
Suite 4600
New York, NY 10165
Telephone: (212) 300-0646

Email: john.lang@attomeylang.com


Christian Carbone (*pro hac vice*)
LOEB & LOEB LLP
345 Park Avenue
New York, New York 10154
Telephone: (212) 407-4000
Email: ccarbone@loeb.com

*Plaintiffs' Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on March 9, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing and deliver copies to all counsel of record, including:

Dewitt L. "Rusty" Fortenberry, Jr, Esq.
John T. Rouse, Esq.
Kenya Key Rachal, Esq.
Ashley Tullos Young, Esq.
Gretchen L. Zmitrovich, Esq.
BAKER DONELSON BEARMAN CALDWELL
& BERKOWITZ, P.C.
Post Office Box 14167
Jackson, Mississippi 39236

Harold E. Pizzetta, III, Esq.
Assistant Attorney General
General Civil Division
Carroll Gartin Justice Building
430 High Street
Jackson, MS 39201

*Attorneys for Defendants*
.

*/s/ Marcia Robinson Lowry*
_____
One of the Plaintiffs' Counsel

52