UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION


JAMES D. JOHNSON
as next friend to Olivia Y          PLAINTIFF

VS.                          CIVIL NO. 3:04cv00251

HALEY BARBOUR, ET AL.             DEFENDANTS




STATUS CONFERENCE



BEFORE THE HONORABLE TOM S. LEE,
UNITED STATES DISTRICT JUDGE
FEBRUARY 21, 2013
JACKSON, MISSISSIPPI



APPEARANCES:

FOR THE PLAINTIFF:    MS. MARCIA LOWRY
                      MS. MIRIAM INGBER
                      MR. WAYNE DRINKWATER

FOR THE DEFENDANT:    MS. KENYA RACHAL
                      MS. ASHLEY TULLOS
                      MR. RUSTY FORTENBERRY



REPORTED BY:  CHERIE GALLASPY BOND
              Registered Merit Reporter
              Mississippi CSR #1012

_____

501 E. Court Street, Suite 2.500
Jackson, Mississippi  39201
(601) 608-4186

1          THE COURT:  The case before the Court is Olivia Y and

2     others, plaintiffs, versus the Governor of the State and

3     others, defendants.  There is before the court the court

4     monitor's status report regarding progress during period 3 to

5     which there have been responses by the counsel for the

6     plaintiffs and defendants.  I have read those responses.

7          Of course, I anticipate counsel for both sides

8     expressing yourselves with regard to the responses of the

9     others to the monitor's report and perhaps Ms. Lopes will have

10    comment also.  I'd like to hear counsel for both sides on what

11    you suggest should be the procedure and format for this hearing

12    and whether you anticipate any action in regard to the court in

13    regard that this is a hearing in regard to a status report.

14    First, counsel for the plaintiffs, will you tell me what your

15    thinking will be the substance of this hearing?  Yes, ma'am.

16          For the record, let counsel all identify yourselves.

17          MS. LOWRY:  Your Honor, my name is Marcia Lowry.  I'm

18    counsel for plaintiffs with Children's Rights.  And with me at

19    counsel table are Miriam Ingber, an attorney at Children's

20    Rights, and Wayne Drinkwater from the Mississippi law firm of

21    Bradley Arant.

22          THE COURT:  All right.  And also for the defendants.

23          MS. RACHAL:  Good morning, Your Honor.  My name is

24    Kenya Rachal.  That last name is spelled R-A-C-H-A-L.  And I'm

25    counsel for DHS in the Olivia Y case with the Baker Donelson

1    law firm.  Seated next to me is Ashley Tullos -- that's

2    T-U-L-L-O-S -- and Rusty Fortenberry at the far end of the

3    table.

4              THE COURT:  All right.  Okay.

5              MS. LOWRY:  Thank you, Your Honor.  The plaintiffs

6    believe it is very important to keep the court informed about

7    the status of this case, and we're very grateful for the

8    monitor's comprehensive report.  What we would propose is that

9    perhaps the monitor could speak briefly or as long as she wants

10   and summarize what she has in the report and then perhaps the

11   parties could each address the court on points that we would

12   like to highlight and where we think things are going.

13             From plaintiff's standpoint, we don't anticipate

14   calling for any action from the court today, but we do want to

15   keep the court informed on where we see this case going over

16   the next six to 12 months based on the information that's

17   before the court.  That's what we would propose, Your Honor.

18             THE COURT:  You suggest that first Ms. Lopes speak or

19   make comments and then you and counsel for the defendants would

20   give some responses or comment on that?

21             MS. LOWRY:  That's what we would propose, Your Honor.

22             THE COURT:  All right.

23             MS. RACHAL:  We're in agreement with that, Your Honor.

24             THE COURT:  Very well.  Ms. Lopes, then, will you come

25   forward and address the court?  And, as I said, after the

1    conclusion of the hearing, I may want to just talk to you some

2    about it.

3         MS. LOPES:  I would be pleased to, Your Honor.  For

4    the record, I'm Grace Lopes, L-O-P-E-S.

5         THE COURT:  We have all this amplification, but yet it

6    seems like we can't get any real communication unless you stand

7    in front of the microphone.  The court reporter has difficulty

8    hearing without the mics, even though she could probably hear

9    better if there was no system in the courtroom.  We just dealt

10   with that in a trial, and it gets a little bit irksome.  But go

11   ahead.

12        THE DEFENDANT:  Good morning, Your Honor.  For the

13   record, Grace Lopes, L-O-P-E-S.  I'm the court monitor in

14   Olivia Y.  I don't think it would be appropriate to go into

15   detail and restate everything in my report at this juncture,

16   Your Honor.

17        THE COURT:  Things that you think are -- the word

18   "highlight" was given.  Things that you think maybe need to be

19   emphasized.

20        THE DEFENDANT:  Absolutely.  I think the goal would be

21   to outline progress in the most general terms and then outline

22   some of the barriers to continued progress in the most general

23   terms and then answer any questions that the court may have

24   that I will avoid the detail that's set out in the report.

25         We're in the sixth year of the remedial process now in

1   this lawsuit, and there has been progress in key areas with

2   respect to developing a training program, with respect to

3   developing policies and procedures, with respect to increasing

4   staffing, which had been what seemed like an intractable

5   problem.  There has been progress, and that has accelerated in

6   period 3.

7          The defendants have also established a quality

8   improvement function that heretofore did not exist.  It needs

9   further development, but it is viable.  It is growing, and it

10  is credible.

11         Defendants are also making progress meeting

12  accreditation standards that are required by the settlement

13  agreement from the counsel on accreditation.

14         I think one of the features of the progress in this

15  case that should be highlighted and underscored is that it has

16  been very slow.  It has not been what was anticipated at the

17  advent of the remedial process, and it was not what has been

18  anticipated in each and every implementation period.  And that

19  has an effect, as my report points out.

20         There has not been sufficient progress developing

21  internal capacity in the department of family and children

22  services.  And while defendants have grown a very talented and

23  capable management team, developed some parts of their

24  infrastructure, I think there are two features to the capacity

25  deficits that ought to be highlighted.  The first is with

1    respect to the internal capacity for planning and developing

2    some of the required plans and assessments.  There were

3    significant deficits in period 3 as there had been in the past.

4    And then I would highlight what those were with respect to a

5    workforce development plan, with respect to an assessment of

6    the fatality that was critical and with respect to strategies

7    for addressing impediments created in the youth court system.

8            Defendants are working to address those limitations,

9    and there has been at least in one area where I've seen the

10   evidence and there has been progress in the workforce

11   development plan.

12           I think that one of the most critical barriers to

13   moving forward has been the development of data reports and the

14   barriers and challenges created by the inherent limitations in

15   defendant's information system, management information system

16   and defendant's inability to effectively address those

17   limitations in the short term.

18           There were delays in moving forward that have improved

19   in period 3 to develop a replacement system for MACWIS, which

20   is the management information system they currently have that

21   has improved in period 3.  But right now, defendants don't

22   expect to replace that system until the earliest 2005 and I

23   have been told more likely -- 2005.  Excuse me.  2015.  And I

24   have been told in all likelihood more probably 2016.

25           The issue becomes what happens in this interim period,

1   how does the court obtain reliable data with which to measure

2   defendant's progress in the interim period and how do

3   defendants extract reliable data in order to guide management's

4   decisions, allocate resources, make adjustments in their reform

5   strategies, et cetera.  The limitations in the data are

6   profound, Your Honor, and I am not overstating that, profound

7   in many, many respects.  And while there has been progress, it

8   is very, very far from where it needs to be.

9           Defendants need to accelerate and develop the capacity

10   to provide and produce on a regular basis reports that conform

11   to the settlement agreement requirements.  And what defendants

12   have done in period 3 is produce as defendants point out in

13   their pleading, 25,000 pages, I believe they said, of data, but

14   a lot of it, certainly not all of it, but a lot of it is not

15   responsive to the requirements in the settlement, and it's

16   problematic.  They can't move forward without the data.  They

17   need it to guide their decisions and move forward as quickly as

18   they could, and we can't measure where they are reliably

19   without the data.  So that is the biggest barrier, Your Honor.

20           THE COURT:  Is there any -- of course, you're making

21   the report and maybe that's all that is in order to do, but do

22   you have any suggestion or do you say that there's something

23   that's just obvious that should be done or done more

24   efficiently that is not being done that could specifically be

25   utilized to improve performance?

1          THE DEFENDANT:  Yes.  Well, when I first came on board

2     when we learned about the limitations in the data system, I

3     brought in an expert in this kind of system and met with the

4     defendants to talk about the limitations in the system and also

5     to brainstorm about strategies for improving it.  That expert

6     recommended that defendants consider what's called a data

7     warehouse where the data in the system is extracted.  It's put

8     in a server.  It's placed in a special database that can then

9     sort the data in terms of the fields that are required to meet

10    settlement agreement reporting requirements.

11         For some period of time, the defendants advised me that

12    they were working on that data warehouse process.  That became

13    derailed.  I'm not clear on the reasons why, and it may be that

14    that solution is not going to be effective, but I haven't heard

15    the evidence on why it isn't effective.  I'm certainly open to

16    hearing it and open to working with the defendants and any

17    experts we can bring in to figure out what the solution is.

18    But that was one solution that everyone said, including

19    defendants' consultants, one of their key consultants said

20    appeared to be a viable solution for the interim period, store

21    the data somewhere else, extract it on a periodic basis,

22    develop the templates and reports, bolster their programming

23    capacity so that they have programmers, more programmers who

24    can program in the precise language that is necessary and move

25    forward with producing those reports.

1    So it appears, Your Honor, I cannot say this

2    conclusively because defendants have not moved forward with

3    this, and I'm not sure why, but it appears that may be a

4    solution.  And there may be other solutions that have not been

5    explored.  So, but they need more programmers.  They need more

6    capacity and they need to be able to extract the reports.  And

7    I'm committed to working with them and trying to identify ways

8    to do that.

9         That is, you know, I believe the biggest barrier right

10   now to moving forward, the data issue.  And as I said, and it's

11   a barrier in terms of measuring their progress and figuring out

12   where they are at the end of period 3.  It's a significant

13   impediment, and efforts really have to be stepped up to address

14   it effectively and to develop a capacity to do that effectively

15   and program effectively and design the reports that really meet

16   the requirements in this case.

17        My report points out the cost and the costs to children

18   that has occurred, and I'm not going to overstate that and try

19   to inflame the court's passions about that.  We all know it's a

20   serious problem.  Defendants are working very hard and are very

21   committed to addressing that problem.  But time is an issue,

22   and childhoods are lost.  And so there is ever more reason to

23   move forward with respect to the data issue, Your Honor, and

24   with respect to developing their internal capacity more.  And

25   that does not in any way demean or diminish the respect I have

1    for the progress they have made in the areas of it I have

2    identified, because they have made progress.  But they need to

3    step it up, and they need much more of a sense of urgency with

4    respect to these issues and with respect to meeting

5    requirements related to these issues on a timely basis.

6              THE COURT:  Does either side prefer to go first?  Go

7    ahead.  Yes, ma'am.  Go ahead.

8              MS. LOWRY:  I'll be happy to.  I'll be happy to go

9    first, Your Honor.  Your Honor, as Ms. Lopes just pointed out,

10   we are six years into reform here, and we don't have reform and

11   we don't even know what we have because of the data.  And the

12   idea that the state still does not have accurate data to

13   measure what is happening to children is frankly appalling.

14             As the court is aware, based on the data that was

15   available, the court had before it plaintiff's motion for

16   contempt in 2010.  And although the court found significant

17   noncompliance, the court directed the parties to go back and

18   renegotiate and come up with different time periods, and the

19   state actually adopted a different approach and the obligations

20   that were imposed on them were set to play out over a longer

21   period of time and then have more time to try to get into

22   compliance.  It is -- so it's been renegotiated.  One of the

23   things that was renegotiated that went into effect last July

24   was an obligation that they agreed to last year to produce 56

25   reports.  And this was something they agreed to last year when

 1   they knew what the problems were with their data system.

 2   They've always known what the problems were with the data

 3   system, and those reports were to be produced by January

 4   31st of this year.

 5        Of those 56 reports, 24 were not produced at all, and

 6   many of those that were produced had calculation errors, didn't

 7   track the requirements of the modified settlement agreement and

 8   were not actually useful.  That is detailed in our submission

 9   to the court.  And when those reports are ever going to get

10   produced and how useful they ever are going to be is very

11   unclear.  So we are going to get to the end of period 3 which

12   is the period that was extended for them and runs out I think

13   in July of this year, and we are not going to know where the

14   state stands on how it is protecting its children now seven

15   years into this settlement agreement.

16        And from plaintiff's standpoint, Your Honor, there are

17   a couple of things going on.  There has not been strong

18   management in charge of this agency.  And the idea frankly that

19   a system on which children's lives are dependent can't count

20   what's happening to children, what the actual case loads are,

21   whether children are getting medical services is frankly

22   frightening, combined with the fact that Mississippi has ranked

23   either first or second in the last four years at the rate at

24   which it maltreats children in state custody.  Now, that's just

25   what they are counting now, because one of the other concerns

1    that is expressed in plaintiff's report and is referred to in

2    the monitor's report is that the state's investigations of

3    children in state custody who have alleged to be

4    maltreatment -- maltreated is very deficient.  That's something

5    the monitors expressed concern about over a period of time and

6    that's something we've expressed concern.  That is they are not

7    following the requirements of state law.  It's not our opinion;

8    it's what the law requires in terms of the timeliness of these

9    investigations and the people with whom the employees are

10   supposed to check with.  They are not doing it.

11          So Mississippi is one of the worst states, either the

12   first or second worst state under this court order in terms of

13   the rate at which it maltreats kids who are under state

14   protection, and we think they are very well -- that very well

15   may be an undercount.  So it could be worse worst.

16          That's very troubling to plaintiffs, and I think we are

17   going to urge it should be troubling to the court as well.  You

18   cannot operate a system, you can operate a business, but you

19   cannot operate a system responsible for the lives of helpless

20   children if you don't know what's going on.  And there has been

21   an absence of strong management of this agency for a very long

22   time.  As the court knows from the monitor's report, the prior

23   head of the agency, the operative head of the agency was --

24   gave her notice of resignation a year ago.  A new person was

25   just appointed a few days ago, hasn't taken office yet.  This

1    is a person who is well qualified in some areas but who does

2    not have experience in the administration of a large

3    bureaucracy.  This agency needs a strong and experienced hand.

4    We wish her well.  We hope that she can bring the agency

5    around.  We are concerned.  But, in fact, this is a critical

6    problem.

7         What plaintiffs have done under the modified settlement

8    agreement is we have given the state formal notice that we are

9    very concerned about this particular issue, this data issue,

10   this provision of reports issue.  And the settlement agreement

11   provides that there's a period for them to respond, for us to

12   communicate with them to try to resolve this and then we can

13   come back to court.  We hope we can resolve it.  Based on

14   history, we're not sure we can.  We are certainly going to make

15   good faith efforts to do that, but we may well be back before

16   the court on this issue, on the data issue.

17        We do believe based on what we have received so far and

18   the data reports we have received so far, and we don't know how

19   reliable they are, that the state is not at the end of period 3

20   going to meet many of the important requirements that are set

21   out in period 3.  The monitor says that as well, but the

22   monitor also appropriately says, *Well, I'm not going to predict*

23   *the future, but I have concerns about it*.  Well, plaintiff

24   has -- plaintiffs have very strong concerns that at the end of

25   period 3 there is going to be very significant noncompliance on

1  specific agreements with regard to outcomes for children that

2  were renegotiated at the court's instruction to give the state

3  more time and to have more opportunities to bring the system

4  into compliance with reasonable practice and constitutional

5  standards.

6         One of the things that is particularly troubling about

7  the data we have seen so far is that the state chose this

8  practice model that they wanted to implement on the phased in

9  basis, and that was acceptable to us because we want to see

10  good practice implemented.  And the rate of maltreatment and

11  care in the regions that are under this practice model where

12  this has been in effect have maltreatment rates as high as the

13  state average.  They don't show any improvement in the rate of

14  maltreatment and care, and in the monitor's report we see that

15  part of the problem, at least part of the problem, has been

16  staffing in those regions.  Whether this model is going to work

17  or not, we don't know, but we do know that staffing problems

18  have, in fact, been an issue in the regions in which the

19  practice model has been put into effect.

20         So, Your Honor, we are very concerned about what is

21  going on in this system.  We are very concerned about the

22  leadership of the child welfare agency previously, now with its

23  delay in having appointing somebody.  There's a year that's

24  gone by when they knew their current administrator was out and

25  they did not fill that position.  And, in fact, there's going

1  to be a short gap.  And, of course, it's a short gap.  They

2  have hired somebody.  But that person is going to take time to

3  get up to speed.  Your Honor, there's no sense of urgency

4  whatsoever.  The people in good faith don't appear in good

5  faith at all, but there is no sense of urgency and no

6  consequence to the state continuing to fail to protect children

7  as they agreed to do and as this court has ordered them to do.

8        So today we are -- we are here just to give the court,

9  and we appreciate the opportunity, our views of where things

10  stand.  But we think that we are entering into a very, very

11  critical period.  We negotiated new time periods.  There looks

12  like they are not going to make many of them, and it's certain

13  that they are not producing the reports that are necessary.

14        And, Your Honor, there are child welfare systems all

15  over the country, and they have varying degrees of difficulty

16  with their data, but the length of time the data problems have

17  existed in Mississippi without being significantly addressed in

18  any meaningful way is very alarming.  And maybe the data

19  warehouse was a good idea.  Maybe there's another good idea.

20  But, Your Honor, this is something that can be fixed.  Data is

21  complicated, but companies -- bureaucracies all over the

22  country have data.  And the fact that Mississippi continues not

23  to have accurate data at this stage in this case is certainly

24  something that must be addressed and must be addressed on an

25  urgent basis.  And we believe the state needs to realize that

1   it needs its highest level of attention or we are going to come

2   back to Your Honor and ask Your Honor to address it when we

3   have gone through the process that we have agreed to in the

4   modified settlement order.  So the other things are of great

5   concern to us.  They are not ripe because period 3 hasn't

6   ended, but things are not going well, and the data issue is

7   absolutely critical.

8          That's where plaintiffs stand today, and we have grave

9   concern that we will be back before this court before long

10  asking the court for direct action.  But the state just cannot

11  continue this way and protect its children.  It is not

12  protecting its children.  Thank you, Your Honor.

13         THE COURT:  Thank you.

14         MS. TULLOS:  Good morning, Your Honor.  My name is

15  Ashley Tullos, and I am on behalf of the defendants.  I think

16  we need to start in our response by addressing an issue that

17  defendants have been well aware of, plaintiffs have been well

18  aware of, and, in fact, this court has been well aware of, and

19  that is our data system.  Defendants have been struggling with

20  our data system.  We have been up front about the fact that it

21  is antiquated, it is outdated, it is not Web based, it has a

22  lot of data reporting limitations.  And in response to that,

23  when we renegotiated the modified settlement agreement,

24  defendants sought to limit the number of reports that we could

25  produce because we knew those limitations.  And I think it's

1    important to first talk about the priority that's been placed

2    on producing these data reports.  And it's really been a

3    two-fold approach.  One has been our recognition that a new

4    system has to be put into place, and we have been actively

5    pursuing a new system.  And as the court monitor pointed out,

6    that progress is moving along.  In fact, we put a long timeline

7    of all the activities that have taken place regarding securing

8    a new system in our response, and, you know, we would like for

9    the court to take note of that.

10         I think it's also important to note that just today the

11   RP for the quality assurance vendor for the company and vendor

12   that will help us write the RP for the new system.  The RP for

13   the selection of that QA vendor was just issued this morning,

14   so that process is continuing to move.

15         The second part of the process has been working to

16   create reports.  As we say in our response, we produced a lot

17   of reports.  However, we acknowledged that certain reports we

18   have been delayed on, as the inherent problems in this system

19   create.  As we have tried to create additional reports, we have

20   run into some problems.

21         As plaintiffs said, we've received a notice of

22   noncompliance from plaintiffs.  We are working currently with

23   our clients and with our consultant to formulate a response of

24   some corrective action.  We also plan to involve the monitor as

25   she's offered to provide assistance on coming up with some

1    corrective action for these data issues.  We're not going to

2    stand here today and say that our reporting is what we want it

3    to be, because it's not, Your Honor.  And we're not happy with

4    that, and we understand plaintiff's concern and the monitor's

5    concern.  And our hopes are that once we provide the response

6    to the plaintiff's notice of noncompliance that we can work

7    with the plaintiffs and the monitor and come up with a solution

8    to avoid court involvement in this issue.  As defendants

9    understand, this is the key to getting out of this reform

10   effort and that we have to have good, solid, reliable data.

11            I want to next turn to the issue of maltreatment and

12   care.

13            THE COURT:  Let me ask you about the suggestion made

14   about a data warehouse.  I can't articulate other than just to

15   give the term.  Why not the data warehouse?

16            MS. TULLOS:  Your Honor, I think that's a fair

17   question, and it's something that we have certainly looked at.

18   As the monitor said, she's brought this to our attention.  We

19   have considered the issue.  And what we believe was that

20   because the system has certain programming limitations and

21   because of the way that the data is stored because of the

22   interface where the information is put in, we were not

23   confident at that time that that method was going to be

24   successful.  And instead of putting a lot of time and effort at

25   that point, we decided to go another route and choose to try to

1    come up with an accelerated process to create more data

2    reports, put our programmers on trying to create more reliable

3    reports.  We, in fact, came up with another sort of system in

4    order to track children and all of the things that go along

5    with tracking the requirements in the settlement agreement.

6    That system ended up because of the limitations in MACWIS being

7    a little bit more complicated, I think we are to the point

8    particularly in light of the fact that the specifications and

9    those kind of things have caused some delays in the report.  We

10   are to the point of exploring other options.  We are meeting

11   with consultants.  We're working with our client.  We are

12   willing to look at that option, other options.  Those are all

13   on the table.  We plan to -- and the monitor has been very

14   willing to give her assistance, and we are looking at all of

15   those options.

16        THE COURT:  What's your response to the assertion

17   that -- well, that the agency is plodding along this steady

18   progress perhaps but no sense of urgency when, in fact, it is

19   an urgent situation?  What do you say about that?

20        MS. TULLOS:  Your Honor, we dispute that.  Has there

21   been issues with our data system and data reporting?  We stand

22   here and acknowledge that.  In other areas, we certainly say

23   that there's been tremendous progress.  You can't deny that the

24   shear number of hires that we have had.  We have instituted a

25   very robust training system to make sure our workers are well

```
 1   trained and give appropriate care to children.  We have -- in

 2   order to make sure that everything that the agency is putting

 3   into place is to make sure the quality is there, we have been

 4   working on a CQI quality improvement program that is going to

 5   do case reviews and check all of the services and the care that

 6   the children are receiving.  You know, there's many areas.  We

 7   have been working on our policy.  We are working on the

 8   implementation of the practice model.  We've got practice

 9   coaches in the field all over the state working with case

10   workers telling them how to take care of -- give children the

11   care that we believe that they deserve.  We've instituted a new

12   carve-out county initiative where we're going to the counties

13   whereas the monitor points out most of our kids are located.

14   And we're doing an all-out blitz in those counties with putting

15   qualified people there to move along the hiring process to get

16   people in place.  I mean there's -- I could go on and on, but

17   we certainly dispute the fact that -- is progress maybe as fast

18   as in a dream world as everybody would like it?  No.  But it

19   takes time to make substantive long-term change.  And I think

20   with the implementation of the practice model and things like

21   that, that's the way -- that's what we're trying to do.

22              THE COURT:  With regard to the expressed concern or

23   maybe even expectation that we're not going to meet a number of

24   deadlines, the response to the monitor's report suggested let's

25   wait and see because it's a good bit of time.  What about that?
```

1    Is it apparent that some deadlines are not going to be met?  Or

2    maybe -- what is your comment about that?

3            MS. TULLOS:  Well, Your Honor, there were several

4    things that were pointed out.  For example, issues with

5    maltreatment and care and investigations that correlate with

6    that.  Defendants recognize that that was an issue.  And, in

7    fact, in the period -- a period 3 requirement is that we are

8    coming up with a new process, a maltreatment and care

9    investigation review process, what we call a moot review

10   process.  It is not due until the end of period 3.  And, you

11   know, at this point, we believe that that process is on track

12   to be in place.  We're creating the process as we speak.  We're

13   creating the instrument that will review.  It will mean that

14   there will be 100 percent rolling review of every maltreatment

15   and care investigation.  That's part of our CQI unit.  Those

16   are some of the things that we're talking about making progress

17   on, and that's an end of period 3 requirement.

18            There are several things that we feel -- the staffing,

19   for example, in our carve-out counties.  A lot of those

20   requirements that are period 3 requirements we're very close to

21   meeting.  And we have been diligently working on that.  So our

22   position is there are a lot of things that are pointed out that

23   we may very well meet and are working very diligently to meet.

24   And so our position is that we can't be criticized until the

25   time actually comes, because there's a lot of steps in place

1    that are being done to make sure that we're doing everything

2    that we possibly can to meet those.

3           THE COURT:  You may have generally answered this

4    question, but with respect specifically to the 56 reports and

5    24 of which have not been produced, what's the expectation

6    there with respect to getting all of those reports produced?

7           MS. TULLOS:  Your Honor, we have concerns about the

8    fact that these reports have been delayed, and we understand

9    plaintiff's concerns.  And as plaintiff mentioned, they have

10   given us a notice of noncompliance.  Since receiving that

11   notice of compliance (sic), we have been meeting with our

12   client.  We have been meeting with our consultant.  We right

13   now are, one, continuing to work on those reports as diligently

14   as we can, but, two, we're also exploring other options.  And

15   it may be something like the data warehouse.  It may be

16   something else.  In meeting with experts, we're trying to

17   figure out if these reports can't be created at the speed and

18   with the quality that we think that they should be.  Then we

19   may be at the point we have given all of our efforts and been

20   working as diligently as possible but the production speed of

21   these reports, it hasn't been what we were hoping for.  And we

22   really were -- we were deliberate in trying to come up with a

23   timeline and a list of reports that was meetable, but

24   unfortunately due to our system, which continually causes us

25   problem after problem after problem when trying to create these

1    reports, it hasn't happened as quickly as we hoped.

2         And so we are planning to respond to plaintiff's notice

3    of noncompliance with an affirmative way that we believe that

4    we can hopefully work through this issue.  I think it's also

5    important to point out that there's two things that make sort

6    of creating reports in MACWIS difficult.  One is that it simply

7    wasn't created when it was designed in 1998 to report on the

8    multifaceted requirements that we have in the MSA.  It simply

9    when it was created wasn't designed to capture -- some of these

10   requirements have seven and eight items.  A lot of them are

11   qualitative items.  But it wasn't created to do that.  So when

12   you're trying to make a system that wasn't created to do that,

13   create these reports, it takes hundreds of manhours many times

14   for each report.  And even sometimes when you put in hundreds

15   and hundreds of manhours, it doesn't come out and look the way

16   that we want it to.

17        I think the second important thing to consider is when

18   the report was designed, we had a different case model.  We

19   were on an individual case model where we just looked at the

20   child.  Now that we have moved to a family center practice

21   model, a lot of our reports and the things that we do are

22   family centered.  And it wasn't set up to track things the way

23   that we look at things now with the family service plan, family

24   team meet, et cetera.  So I think it's just important to

25   understand some of those complexities.  But it's our intent,

1  we're working on it now to respond to plaintiff's notice of

2  noncompliance hopefully with a schedule of reports of when they

3  will be produced or another methodology where we can produce

4  reliable data, Your Honor.

5        THE COURT:  I interrupted you when you were moving on

6  to another topic.

7        MS. TULLOS:  Let me see, Your Honor.  I think I was

8  talking about maltreatment and care.  And, well, speaking about

9  maltreatment and care and investigation, I wanted to highlight

10  the fact of -- and I said as we were moving along that we are

11  creating 100 percent roll and review of maltreatment and care

12  investigations.  That's under our CQI unit.

13        I think secondly it's important to point out that

14  because plaintiffs have questioned the reliability of our

15  specific maltreatment and care MACWIS report, we right now are

16  conducting and in the process of conducting 100 percent

17  validation on our report.  We're going to go through that

18  report, look at all of the cases.  Normally our validation

19  method looks at a sample of those cases, but we're going to

20  make sure that what we are reporting is accurate.  And so I

21  wanted to give the court some acknowledgment that we are

22  following up on that issue.

23        I think that one other thing that is important to

24  realize is that there is a lot of training ongoing also

25  regarding maltreatment and care and these investigations.

1   We've had our practice coaches working on that.  We have had

2   our consultants providing training on conducting

3   investigations.  They are out in the field.  And so this isn't

4   an issue that we are not addressing.  So I want the court to

5   have comfort and to understand that it's a priority.  It's a

6   priority for us, and we are taking all steps that we can to

7   address that.

8          And I am going to turn it over.  Kenya is going to talk

9   a little bit about some hiring and leadership issues for the

10  agency.

11         THE COURT:  All right.

12         MS. RACHAL:  Your Honor, I'm going to readjust this

13  for my height a little bit better.  I'm going to talk a little

14  bit about the efforts that DHS has made in hiring.  As the

15  monitor has talked about, as plaintiffs have talked about, we

16  have had our most critical issues going on in what's called the

17  carve-out counties.  And those carve-out counties were

18  addressed in the period 3 plan.  The carve-out counties are the

19  three coastal counties and also includes Hinds County.  Those

20  counties have a unique set of circumstances that seem to result

21  in a lot of case worker turnover, a lot of supervisor turnover.

22  Those issues range from issues with the judiciary.  It ranges

23  to other issues involving the number of children in custody.

24  In that part of the state, as the monitor pointed out,

25  40 percent of the children in our custody statewide are

1    concentrated in those carve-out counties.  So it's critical

2    that the agency get a handle on those counties, figure out what

3    is going on.

4         The monitor has pointed out that there were

5    limitations, that there were issues with the workforce

6    development plan that defendants produced in response to the

7    requirement to develop a way to hire the workforce in those

8    carve-out counties and to retain them.  Our people who wrote

9    the plan, they are not plan writers or grant writers, no

10   particular expertise in writing, but the defendants, having

11   talked to the monitor about her concerns, has actually retained

12   a consultant to help us with technical assistance on getting

13   that plan written.

14        Defendants have not sat here waiting for the plan to be

15   tweaked.  Defendants have actually instituted a plan called a

16   management team strategy.  As a part of that plan, management

17   sent top-level managers into those carve-out counties to try to

18   figure out what is going on.  You know, what's causing the

19   turnover?  How can we make hires?  That has been very fruitful.

20   As a matter of fact, in those carve-out counties, under the

21   period 3 plan, we are to meet certain requirements, have so

22   many hires.  We have, in fact, met that in three of the four

23   carve-out counties.  And in the fourth carve-out county, we are

24   only one worker short.  I should note that in that county there

25   are five applications in the very final approval process, so we

1    anticipate meeting that requirement, and that's the requirement

2    not due to be met until July 5th of this year.

3          Also, Your Honor, the monitor's report talked about our

4    issues with supervisors.  And yes, supervision is very

5    important.  Studies show that supervisors, having good

6    supervisors in place keep your people there, gives them a sense

7    of support.  Well, that's one reason why state office sent in

8    these management teams to serve as a support system for the

9    workers there through the hiring process, to shadow them in

10   court, see what is going on, what can we do, what are the

11   issues to try to keep these employees there.  The information

12   that our agency has learned from this process has been very

13   valuable.  As a result of the management team efforts, we have

14   made great progress in hiring ASWSs.  That stands for area

15   social work supervisors.  And that's the title that our

16   supervisors at DHS have that manage the case workers.

17         These ASWSs, we were to have 158 statewide, and I'm

18   pleased to say that as of today, we have meet those 158.  One

19   thing that the agency did was in looking at the issues in the

20   carve-out counties is that what's going on.  So back in 2011,

21   they went to State Personnel Board seeking a bump-up in the

22   salaries for all for the carve-out counties.  We got that for

23   15 percent.  The efforts that the agency made and the

24   management team progress in Hinds County resulted in major

25   hires, but we still had issues on the coast.  And part of the

1    issue is we have got other providers down there who are

2    offering higher salaries.  There are housing issues there.  So

3    at that point, January of this year, DHS went again to the

4    state personnel board and said, *We really need to hire these*

5    *workers.  This is going to help with our maltreatment*

6    *investigation rate.  This is critical*.  State personnel board

7    responded and gave a 20 percent increase.  And that is to the

8    workers and supervisors who were there in that county as well

9    as those who will come on new.

10        As a result, that has, we believe, helped in allowing

11    us to get these new hires.  And the management team that's down

12    there in these carve-out counties, they are going to remain for

13    some time as mentors to these workers as we continue to staff

14    up with the supervisors.

15        Also with regard to the deputy administrator position,

16    it was March 14th when Lori Woodruf gave notice to the agency

17    that she was going to leave that position.  At that time, we

18    notified plaintiffs.  We asked them if there was anyone they

19    could think of who was qualified and interested in this

20    position, please tell them to apply.  We didn't get any

21    response from that.  We also ran ads.  We had two separate

22    rounds of interviews.  We got lots of applications.  But to be

23    blunt, most of the applicants were not qualified for the

24    position.  In the end, DHS sought an increase in the salary

25    from state personnel board.  They brought up that salary by

1    over $7,000 and after that time was able to secure a qualified

2    deputy administrator.  She is actually a professor with Ole

3    Miss.  She is a well-regarded child welfare expert.  She has

4    had management experience at the agency as a case work -- as a

5    supervisor.  She also managed the training unit.  She is a

6    well-known child welfare expert who specializes in training.

7    And her name is Dr. Kim Shackleford.

8           Your Honor, I believe that that's all that I have

9    today.  If you have any questions for me?

10          THE COURT:  Thank you.  It doesn't appear that there

11   is any significant dispute about the facts of this case.

12   Ms. Lowry, do you want to say anything further or have you

13   pretty much expressed your position about it all?  Is there

14   anything in response that you would want to state?

15          MS. LOWRY:  Your Honor, thank you for the opportunity.

16   Just very, very briefly.  There's a lot of motion and activity.

17   There are not results.  And our clients are entitled to the

18   results.  And that's I think what ultimately the court needs

19   to -- I don't want to presume.  That's what I think is the

20   standard by which the state needs to be judged, whether they

21   are actually producing results.  So I think what you're hearing

22   is acknowledgment of problems.  That's good.  And lots of

23   motion.  No results.

24          THE COURT:  Thank you.  There were representations

25   made and I feel like good faith representations with regard to

1    the data issue.  And it would seem to be in order and is

2    reasonable that the court direct the defendants to report to

3    the court in a certain period of time, 30 days or 45 days, and

4    I will hear your response to that, as to the progress on the

5    data issue.  And, of course, you understand implicitly, but

6    specifically you're directed to work with the monitor on that

7    issue.

8         Is 30 days or 40 days more reasonable from your

9    perspective?

10         MR. FORTENBERRY:  Your Honor, if I may respond, the

11   response we have in accordance with the modified settlement

12   agreement is due on March 10th.  I would ask the court to allow

13   us to continue meeting with the client and the consultants and

14   formally respond to the notice of noncompliance on the data

15   issue.

16         THE COURT:  I didn't have a full appreciation of that.

17   Well, I don't think -- well, I didn't have an understanding

18   about that.  Go head.

19         MR. FORTENBERRY:  And then at that point I know under

20   the modified settlement agreement we're to have another

21   quarterly telephonic conference with the court I believe in

22   April perhaps.  And I may have to consult with the monitor.

23   That hasn't been scheduled.  But we're to have a telephonic

24   conference in April, and I would suggest that if the defendants

25   are allowed to file a response and part of that response will

 1    be offering to meet with the court monitor which we had planned

 2    to do before that with her but also meet with the plaintiffs to

 3    talk through the issues and then would I suggest a response

 4    during the April telephonic conference.

 5          THE COURT:  Ms. Lowry, do you have anything to say

 6    about that?

 7          MS. LOWRY:  Well, Your Honor, I do think that there's

 8    a process underway, because we have filed a formal notice of

 9    noncompliance which is a predicate to -- if it doesn't resolve

10    things, a predicate to filing a motion for contempt.  And the

11    defendants are aware of that.  And we will -- we hope we can

12    resolve it, but we are not any longer going to consider it

13    satisfactory that they are considering new options.  It's time

14    for them to deliver.  And we will proceed to bring a motion to

15    the court if there's not a concrete resolution.

16          THE COURT:  So my indication of a 30 or 45-day report

17    is really somewhat extraneous or not called for here today?

18          MS. LOWRY:  I think it's moving along.  I appreciate

19    that, Your Honor, but I do think it's moving along and we have

20    a formal process underway.

21          MR. FORTENBERRY:  Your Honor, also the settlement

22    agreement calls once we file our response to the notice of

23    noncompliance, I believe we then have another 30 days to try to

24    work through the issue with the plaintiffs.  So I think there

25    is a structure here, and certainly we intend on trying to work

1    through that process to resolve the issue.

2              THE COURT:  All right.  Ms. Lopes, may I speak to you

3    here at the bench a moment, please, ma'am?

4        (At the bench, off the record)

5              THE COURT:  Ms. Lopes has another matter to bring

6    before the court and for counsel to be aware of.

7              MS. LOPES:  For the record, during our bench

8    conference I just mentioned to the court that there is a

9    related matter that I didn't mention that I think I should and

10   that should be on the record, and that is a particular

11   challenge that the defendants face right now is that they are

12   moving forward on the replacement of their data system.  They

13   have been notified by their federal partners that they need to

14   undertake certain activities related to the replacement of that

15   data system.  Those activities include forming of a dedicated

16   group that will work with their federal partners on that

17   effort.  That dedicated group will take employees of DFCS who

18   have been working on all of these reporting issues, and it will

19   develop them at least on a part-time basis if not more to this

20   replacement system creating and compounding I think creating

21   many problems and compounding the challenges that defendants

22   have.  So it will take our resources that are stretched very

23   tightly away from this reporting and take them into this

24   replacement system issue.  And I just would like to underscore

25   in the interim defendants must garner their resources or

1    augment their resources in order to provide the data on an

2    interim basis.  They cannot to the exclusion of doing that

3    proceed exclusively on the replacement system and putting

4    resources into the replacement system.

5         THE COURT:  And do counsel for the defendants fully

6    understand that, that you can't do one and not the other?

7         MS. RACHAL:  We fully understand that, and the feds

8    would not allow us to do that.  We have to keep our ongoing

9    system operational.  We understand that we need to produce

10   these reports, Your Honor, that we're delayed on.

11        THE COURT:  Yes, ma'am.

12        MS. LOWRY:  Your Honor, as this has developed, it may

13   well be that given the challenges here, it might -- if we can't

14   work this out successfully given all of the challenges and the

15   need for additional resources, it may well be that we will need

16   to ask the court to appoint someone on a limited basis to, in

17   fact, ensure that data is produced as necessary to monitor

18   what's happening to children while the state is working out a

19   longer term plan for working with the federal government.  But

20   it can't be that there's going to be no data concerning the

21   well-being of children, no reliable data six years into the

22   implementation of an agreement that is required to ensure the

23   protection of children.

24        So it may well be that given this, it will be all the

25   more important.  We'll see what happens during this discussion

1    period for us to ask the court to act and do something like

2    create a limited receivership for the purposes of ensuring that

3    reliable data is produced.

4         THE COURT:  All right.  I assume you take the position

5    that would not be necessary, but that is broached, and you can

6    speak to that if you want to.

7         MR. FORTENBERRY:  Yes, sir.  We take the position

8    that's not necessary.  We're certainly willing to do everything

9    we can to work through this issue with the plaintiffs, and

10   there's nothing pending before the court on that issue.  So

11   it's hard for me to address it, and I don't want to speculate

12   until I see something in writing that's before the court.

13        THE COURT:  All right.  If there's nothing further,

14   then this hearing will conclude.  And, of course, it's been

15   emphasized by the monitor and by counsel for the plaintiffs and

16   apparently appreciated and understood by counsel for the

17   defendants the importance and the emergent nature of all of

18   these issues, and I trust that you're going to utilize and

19   dedicate your best efforts to accomplishing the goals that are

20   set out in this modified settlement agreement.  Nothing

21   further, then court will adjourn.

22        (Recess)

23

24

25

1                    CERTIFICATE OF REPORTER

2

3          I, CHERIE GALLASPY BOND, Official Court Reporter, United

4    States District Court, Southern District of Mississippi, do

5    hereby certify that the above and foregoing pages contain a

6    full, true and correct transcript of the proceedings had in the

7    aforenamed case at the time and place indicated, which

8    proceedings were recorded by me to the best of my skill and

9    ability.

10         I certify that the transcript fees and format comply

11   with those prescribed by the Court and Judicial Conference of

12   the United States.

13

14         This the 8th day of August, 2013.

15

16                    s/ *Cherie G. Bond*
                      Cherie G. Bond
17                    Court Reporter

18

19

20

21

22

23

24

25