**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION**

OLIVIA Y., *et al*.                                          PLAINTIFFS

v.                                          CIVIL ACTION NO.  3:04CV251LN

PHIL BRYANT, as Governor of the State of Mississippi, *et al.*          DEFENDANTS

---

**THE COURT MONITOR'S REPORT TO THE COURT
REGARDING IMPLEMENTATION PERIOD 4**

---

**Table of Contents, Report Narrative, Index to Exhibits,
Appendix A: Exhibits 1A - 30, and Appendix B: Exhibits 1 - 33**

**June 15, 2015**

# TABLE OF CONTENTS

I.     BACKGROUND AND SUMMARY OF FINDINGS ...................................................3

       A. Progress under the Settlement Agreement ...............................................................4
       B. The Introduction of the MSA and the Practice Model ............................................5

              • Practice Model Rollout Schedule .......................................................................7

       C. Progress During Period 3 and Related Remedial Action ........................................9
       D. Data Considerations ................................................................................................12
       E. Progress During Period 4 .......................................................................................14

              • Summary Table: Statewide Performance ..........................................................21
              • Summary Table: Practice Model Performance ..................................................28

II.    METHODOLOGY .......................................................................................................36

III.   FINDINGS ...................................................................................................................38

              Initial Period 4 Implementation Plan ("IP") §§I.A. and I.B. ..................................39
              Final Period 4 IP §I.B. .............................................................................................41
              Ongoing Requirement, Period 3 IP §I.A.1.a. ...........................................................41
              Ongoing Requirement, Period 3 IP §I.A.1.b. ...........................................................43
              Ongoing Requirement, Period 3 IP §I.A.1.c. ...........................................................44
              Initial Period 4 IP §II.A.1. .......................................................................................45
              Final Period 4 IP §§II.A.1., II.A.2., and II.A.3. ......................................................45
              Final Period 4 IP §II.A.4.a. ......................................................................................57
              Final Period 4 IP §§II.A.4.b.i. and II.A.4.b.ii. ........................................................60
              Final Period 4 IP §II.A.4.c. ......................................................................................60
              Final Period 4 IP §II.A.4.d. ......................................................................................61
              Final Period 4 IP §II.A.4.e. ......................................................................................62
              Final Period 4 IP §II.A.4.f. .......................................................................................62
              Final Period 4 IP §II.A.4.g. ......................................................................................63
              Ongoing Requirement, Period 3 IP §I.A.2.a. ...........................................................63
              Modified Settlement Agreement ("MSA") §II.A.2.a.10.a. .......................................66
              MSA §II.A.2.a.10.b. ..................................................................................................69
              Ongoing Requirement, Period 3 IP §I.A.3.a.2. ........................................................70
              Ongoing Requirement, Period 3 IP §I.A.3.a.4. ........................................................71
              Ongoing Requirement, MSA, §II.A.2.c.6.b. .............................................................72
              MSA §II.A.2.c.7.a. ....................................................................................................72
              MSA §II.A.2.c.7.b. ....................................................................................................73
              Ongoing Requirement, Period 3 IP §I.B.2. ..............................................................74
              Ongoing Requirement, Period 3 IP §I.B.3. ..............................................................79
              Initial Period 4 IP §II.B.1.a. .....................................................................................79
              Initial Period 4 IP §II.B.1.b. .....................................................................................80

Initial Period 4 IP §II.B.1.c. ........................................................................80
Initial Period 4 IP §II.B.1.d. ........................................................................81
Initial Period 4 IP §II.B.1.e. ........................................................................81
Initial Period 4 IP §II.B.1.f. ........................................................................81
Initial Period 4 IP §II.B.1.g. ........................................................................81
Initial Period 4 IP §II.B.1.h. ........................................................................82
Initial Period 4 IP §II.B.1.i. ........................................................................82
Initial Period 4 IP §II.B.1.j. ........................................................................82
Initial Period 4 IP §II.B.1.k. ........................................................................83
Initial Period 4 IP §II.B.1.l. ........................................................................83
Final Period 4 IP §II.B.1. ........................................................................83
Final Period 4 IP §II.B.2. ........................................................................84
Final Period 4 IP §II.B.3.a. ........................................................................85
Final Period 4 IP §II.B.3.b. ........................................................................89
Final Period 4 IP §II.B.3.c. ........................................................................89
Initial Period 4 IP §II.C.1. ........................................................................89
Initial Period 4 IP §II.C.2. ........................................................................90
Initial Period 4 IP §II.C.3. ........................................................................91
Final Period 4 IP §II.C.1. ........................................................................92
Final Period 4 IP §II.C.2. ........................................................................98
MSA §II.A.5.d.1. ........................................................................99
MSA §II.A.7.a. ........................................................................101
MSA §II.B.1.d and Ongoing Requirement, Period 3 IP §II.C.4. ........................102
Ongoing Requirement, MSA §II.B.1.e.2. ........................................................................107
Ongoing Requirement, MSA §II.B.1.e.3. ........................................................................109
Ongoing Requirement, MSA §II.B.1.e.4. ........................................................................110
Ongoing Requirement, MSA §II.B.1.e.5. ........................................................................110
Ongoing Requirement, MSA §II.B.1.e.6. ........................................................................111
Initial Period 4 IP §III.A.1. ........................................................................111
Initial Period 4 IP §III.A.2. ........................................................................112
Initial Period 4 IP §III.A.3. ........................................................................112
Final Period 4 IP §III.A.1. ........................................................................114
Final Period 4 IP §III.A.2. ........................................................................116
Final Period 4 IP §III.A.3. ........................................................................119
Final Period 4 IP §III.A.4. ........................................................................119
MSA §II.B.2.m ........................................................................119
Ongoing Requirement, MSA §II.B.2.p.1. ........................................................................121
Ongoing Requirement, MSA §II.B.2.p.2. ........................................................................121
Ongoing Requirement, MSA §II.B.2.p.8. ........................................................................122
MSA §II.B.2.q.1. ........................................................................123
MSA §II.B.2.q.2. ........................................................................124
MSA §II.B.2.q.3. ........................................................................124
MSA §II.B.2.q.4. ........................................................................124
MSA §II.B.2.q.5. ........................................................................125
MSA §II.B.2.q.6. ........................................................................125
MSA §II.B.2.q.7. ........................................................................126

MSA §II.B.2.q.8..........................................................................................126
MSA §II.B.2.q.9..........................................................................................127
MSA §II.B.2.q.10........................................................................................128
MSA §II.B.2.q.11........................................................................................128
MSA §§II.B.2.s.1. and II.B.2.t.1................................................................129
Ongoing Requirement, Period 3 IP §II.F.1................................................129
MSA §II.B.3.j.1. .........................................................................................130
MSA §II.B.3.j.2. .........................................................................................131
MSA §II.B.3.j.3. .........................................................................................132
MSA §II.B.3.j.4. .........................................................................................132
MSA §II.B.3.j.5. .........................................................................................133
MSA §II.B.3.j.6. .........................................................................................134
MSA §II.B.3.j.7. .........................................................................................135
MSA §II.B.3.j.8. .........................................................................................136
MSA §§II.B.3.l.1. and II.B.3.m.1..............................................................136
MSA §II.B.4.c.1..........................................................................................137
MSA §§II.B.4.e.1. and II.B.4.f.1 ...............................................................137
MSA §II.B.5.f.1...........................................................................................138
MSA §II.B.5.f.2...........................................................................................139
MSA §II.B.5.f.3...........................................................................................139
MSA §§II.B.5.h.1. and II.B.5.i.1. ..............................................................141
MSA §§II.B.5.h.2. and II.B.5.i.2. ..............................................................142
MSA §§II.B.5.h.3. and II.B.5.i.3. ..............................................................143
MSA §II.B.6.b.1..........................................................................................145
MSA §II.B.6.b.2..........................................................................................145
MSA §II.B.7.b .............................................................................................146
MSA §§II.B.7.d. and II.B.7.e.....................................................................147
MSA §II.C.1.c.1..........................................................................................148
MSA §II.C.2.c.1..........................................................................................148
Final Period 4 IP §IV.A .............................................................................149
Final Period 4 IP §V.A ...............................................................................149
Final Period 4 IP §V.B ...............................................................................151
MSA §III.A.1.a. ..........................................................................................152
Initial Period 4 IP §III.B.1. ........................................................................152
Initial Period 4 IP §III.B.2. ........................................................................153
Initial Period 4 IP §III.B.3. ........................................................................154
MSA §III.B.1.d.1.........................................................................................156
MSA §§III.B.1.e.1. and III.B.1.f.1.............................................................157
MSA §§III.B.1.e.2. and III.B.1.f.2.............................................................158
MSA §§III.B.2.c.1. and III.B.2.d.1.............................................................159
MSA §§III.B.2.c.2. and III.B.2.d.2.............................................................159
MSA §§III.B.3.a.6.a. and III.B.3.a.7.a. .....................................................161
MSA §§III.B.3.a.6.b. and III.B.3.a.7.b. .....................................................162
MSA §§III.B.3.b.2.a. and III.B.3.b.3.a. .....................................................164
MSA §§III.B.3.c.4.a. and III.B.3.c.5.a. ......................................................165
MSA §§III.B.3.c.4.b. and III.B.3.c.5.b. ......................................................166

MSA §§III.B.3.d.4.a. and III.B.3.d.5.a. .................................................................167
MSA §§III.B.3.e.2.a. and III.B.3.e.3.a.................................................................169
MSA §§III.B.3.e.2.b. and III.B.3.e.3.b.................................................................170
MSA §§III.B.4.b.1. and III.B.4.c.1.......................................................................171
MSA §III.B.5.a. .....................................................................................................172
MSA §§III.B.5.d.1. and III.B.5.e.1.......................................................................173
MSA §III.B.6.c. .....................................................................................................174
MSA §§III.B.6.d.1. and III.B.6.e.1.......................................................................175
MSA §§III.B.6.d.2. and III.B.6.e.2.......................................................................176
MSA §III.B.7.d. .....................................................................................................177
MSA §§III.B.7.e.1. and III.B.7.f.1........................................................................178
MSA §§III.B.7.e.2. and III.B.7.f.2........................................................................179
MSA §III.B.8.c. .....................................................................................................181
MSA §III.B.8.d.1. and III.B.8.e.1.........................................................................181
MSA §§III.C.1.a.1. and III.C.1.b.1.......................................................................183
MSA §§III.C.2.a.1. and III.C.2.b.1.......................................................................184
MSA §IV.................................................................................................................185

IV.       CONCLUSION.................................................................................................186


APPENDICES

Index to Exhibits...................................................................... Index-1 – 10

Appendix A
      App. A, Ex. 1A – App. A, Ex. 30

Appendix B
      App. B, Ex. 1 – App. B, Ex. 33

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION


OLIVIA Y., *et al*.                                              PLAINTIFFS


v.                                              CIVIL ACTION NO.  3:04CV251LN


PHIL BRYANT, as Governor of the State of Mississippi, *et al.*          DEFENDANTS

---

**THE COURT MONITOR'S REPORT TO THE COURT
REGARDING IMPLEMENTATION PERIOD 4**

---

This report sets forth the Court Monitor's ("Monitor") findings regarding defendants' progress toward meeting the requirements of the Modified Settlement Agreement ("MSA"),[1] including the requirements contained in the Initial and Final Period 4 Implementation Plans ("Period 4 IPs").[2]  It also addresses to a much more limited extent progress during Period 5.  A detailed report regarding defendants' progress during Period 5 will be filed after Period 5 ends.

A draft version of this report was provided to the parties for review and comment on June 1, 2015.  All written comments and related information regarding the draft were submitted to the Monitor by June 10, 2015.  The Monitor has considered the parties' comments, and to the extent appropriate, addressed them in this report.

---

[1]  The MSA was approved by the Court on July 6, 2012.
[2]  The Initial Period 4 IP was filed on July 18, 2013 and the Final Period 4 IP was filed on January 8, 2014.

The evidence shows that in most instances defendants did not meet Period 4 performance requirements. Based on the history of defendants' performance since 2008 when the remedial stage of this lawsuit began, it appears that defendants do not have the capacity to meet many of the MSA's most basic requirements. Defendants' ongoing failure to meet these requirements has a substantial and continuing impact on the safety and well being of the thousands of children in defendants' custody every year and their timely placement in permanent and nurturing homes. The parties and the Court must confront this reality and determine a course that will protect the children in defendants' custody on an urgent timeline.

The report is divided into five sections. The Background and Summary of Findings section presents the relevant procedural history and provides an overview of the progress that has been made in this case. It also includes tabular summaries of statewide and regional performance relative to MSA outcome requirements. The Methodology section explains the process used by the Monitor to evaluate defendants' progress. The Findings section addresses Period 4 requirements that defendants were required to implement on a statewide and regional basis during Period 4.

The Conclusion is followed by an Appendix with the report's exhibits.[3] The Appendix is divided into two sections. Appendix A ("App. A") includes tables summarizing the status of the data reports required by the June 24, 2013 Order, Initial Period 4 IP, and Final Period 4 IP.[4] All

---

[3] Certain exhibits have been redacted to delete any information that may fall within the purview of the August 5, 2004 Confidentiality Order. *See* Confidentiality Order, August 5, 2004.

[4] For the convenience of the Court and the parties, App. A includes App. A, Ex. 1A, Attachment Two to the June 24, 2013 Order (which lists all data reports defendants were required by the June 24, 2013 Order to produce), App. A, Ex. 1B, Initial Period 4 Implementation Plan, Appendix 1 (which lists all data reports defendants were required by the Initial Period 4 Implementation Plan to produce), and App. A, Ex. 1C, Final Period 4 Implementation Plan, Appendix 3 (which lists all data reports defendants were required by the Final Period 4 Implementation Plan to produce). The tables summarizing the status of each required data report are included as App. A, Ex. 2A, Status of Data Reports Required by June 24, 2013 Order and Initial Period 4 Implementation Plan; App. A, Ex. 2B, Status of Data Reports Required By July 18, 2013 Initial Period 4 IP at Appendix 1; and App. A, Ex. 2C, Status of Data Reports Required By January 8, 2014 Final Period 4 IP at Appendix 3.

charts reflecting analyses of the underlying data supporting the Monitor's findings related to the

MSA's Period 4 outcome requirements are contained in App. A.[5]  Appendix B ("App. B")

includes other documentary evidence supporting the Monitor's findings.[6]


I.    **BACKGROUND AND SUMMARY OF FINDINGS**[7]

The Mississippi Settlement Agreement and Reform Plan ("Settlement Agreement"),

which was approved by the Court on January 4, 2008, was intended to ensure the safety and well-

being of children in defendants' custody and their timely placement in permanent and nurturing

homes.  Since January 2008, the defendants have been ordered to implement five annual

implementation plans, a corrective action plan, a remedial order related to data accuracy,

validation and reporting, and an additional remedial order intended to address capacity deficits

and improve performance related to the requirements in this case.[8]

In July 2012, at the time the Court approved the Period 3 IP, the MSA was adopted.  The

MSA reflects a regionally-based approach to implementation of the requirements imposed by this

lawsuit.  This approach is designed to reduce, on an interim basis, the number of statewide

requirements the defendants must meet while they phase-in, on a region-by-region basis, a

family-centered Practice Model that has served as the centerpiece of the defendants' reform

strategy.  Like the Settlement Agreement, the MSA requires defendants to report monthly, or to a

---

[5]  An index to the exhibits contained in the Appendix follows immediately after the Conclusion.  All charts graphically depicting performance related to specific Period 4 requirements are included as App. A, Ex. 5A - App. A, Ex. 30.

[6]  Like the exhibits in App. A, the exhibits in App. B are identified by a prefix followed by a number (followed by a letter in some instances) (*e.g.*, "App. B, Ex. 1" or "App. B, Ex. 1A").

[7]  This section of the report condenses the discussion of the procedural background that is presented in *The Court Monitor's Status Report to the Court Regarding Progress During Period Three* [hereinafter *January 2013 Report*], filed January 25, 2013 [Dkt. No. 580], and *The Court Monitor's Report to the Court Regarding Implementation Period 3 and the June 24, 2013 Order* [hereinafter *May 2014 Report*], filed May 8, 2014 [Dkt. No. 604].  For more detailed information, *see January 2013 Report* at 4-13 and *May 2014 Report* at 3-12.

[8]  Defendants are currently working to implement the Period 5 IP, which ends in July 2015.

lesser extent, quarterly, on a series of measures related to their performance relative to the requirements imposed in this lawsuit. As described below, the defendants have experienced very significant challenges satisfying both the MSA's reporting and substantive requirements.

### A. Progress under the Settlement Agreement

The first implementation plan, referred to as the Period 1 Implementation Plan ("Period 1 IP"), extended from January 4, 2008 through April 30, 2009.[9] The Period 1 requirements focused on building the capacity of the Mississippi Department of Human Services ("MDHS") Division of Family and Children's Services ("DFCS") to achieve the Settlement Agreement's goals and outcomes, and also addressed interim initiatives related to child safety. Because defendants made limited progress meeting Period 1 requirements, they were required to meet many Period 1 requirements during Period 2. Period 2 began on May 1, 2009 and ended on April 30, 2010. Defendants made efforts to satisfy many Period 2 requirements, but in large part these efforts were belated and, at least in some circumstances, they were not minimally adequate. In specific instances, there was no evidence of credible efforts to satisfy Period 2 requirements, including requirements that dated back to Period 1.

In light of defendants' performance, instead of developing a Period 3 IP, the parties finalized an agreement requiring implementation of certain corrective action measures according to a series of deadlines between May 1 and September 1, 2010.[10] This agreement, referred to as the "Bridge Plan," was approved by the Court in an Agreed Order issued on June 10, 2010.[11] It required the defendants to demonstrate the ability to satisfy a very narrow subset of unmet Period

---

[9] Period 1 was extended on two occasions pursuant to consent orders issued on January 6, 2009 and March 27, 2009.
[10] This four-month period is referred to in the Agreed Order as the "Bridge Period."
[11] Conceptually, the Bridge Plan was intended to serve as a bridge between Period 2 and Period 3.

1 and Period 2 requirements[12] by supplementing their management and planning capabilities through a contract for technical assistance with the Center for the Support of Families ("CSF").[13] Most, albeit not all, of the Bridge Plan's requirements were satisfied with substantial technical assistance from CSF.

During October 2010, based on violations of the Settlement Agreement and the Period 2 Implementation Plan ("Period 2 IP"), plaintiffs filed a motion requesting that the Court find defendants in contempt and appoint a general receiver with full authority to administer Mississippi's child welfare system.[14]  On May 17, 2011, the Court issued an order denying the motion and directing the parties to work toward a modified agreement.[15]

### B.  The Introduction of the MSA and the Practice Model

In the wake of the May 2011 Order, the parties negotiated the terms of the MSA, which was approved by the Court on July 6, 2012.  The MSA supersedes the initial Settlement

---

[12]  The Bridge Plan addressed contracting for a fiscal assessment and related strategic plan to maximize federal funding.  Other requirements included policy development, data collection and reporting, staffing, training, and planning activities related to mandated improvements in the array and quality of services and placements available to children in defendants' custody as well as planning for the expansion of the DFCS workforce.  In addition, the Bridge Plan required specified corrective action related to child safety, including mandated training for all DFCS caseworkers assigned to conduct maltreatment investigations.

[13]  Defendants had an existing contractual relationship with CSF dating to January 2009.

[14]  Plaintiffs' Motion for Contempt and for the Appointment of a Receiver, filed October 5, 2010.

[15]  Order, filed May 17, 2011, at 10.  The Court found that plaintiffs had made a *prima facie* showing of contempt, recognizing that the defendants had not complied with most of the Period 1 and Period 2 requirements and also had not complied fully with the Bridge Plan.  The Court noted it was "undisputed" that defendants had failed to comply with "nearly all" of the Period 1 requirements, *id.* at 5-6, and "most" of the Period 2 requirements, *id.* at 4.  Nonetheless, the Court did not issue a finding of contempt because it was "apparent to the court that defendants lacked the capability to comply fully, or even substantially, with all the requirements of the Period Two Plan within the time frame established."  *Id.* at 7.  The Court indicated that the additional requirements and related time frames for meeting these requirements in the Period 2 IP were "highly ambitious" and seemed to be "ultimately unrealistic." *Id.*  The Court also determined that a contempt finding would not "serve any fruitful purpose."  *Id.* at 10.  The Court clarified that by denying the contempt motion, it was not excusing defendants' performance or minimizing the gravity of the problems identified in the motion.  *Id.*  Indeed, the Court asserted "that the shortcomings identified by plaintiffs and the Court Monitor must be confronted and rectified."  *Id.* at 9.  The Court directed the parties "to work together, in consultation with the Court Monitor, to craft appropriate modifications of their existing agreements."  *Id.*  Among other directives, the Court required the parties to prioritize goals and objectives and establish realistic timelines for their achievement.  *Id.*

Agreement and incorporates the Period 3 IP.[16]  As noted above, it reflects a very different approach to the remedial process, substantially reducing defendants' obligations to meet many MSA requirements on a statewide basis through Periods 3 and 4.  This new approach aligns the MSA with the sequential, region-by-region implementation schedule that is a cornerstone of defendants' "Practice Model" reform strategy.

The planning process for implementation of the Practice Model began in 2009.  During January 2009, defendants contracted with CSF to work with DFCS managers and staff on the development of the Practice Model, which is intended to guide improvements in case practice.[17]  As conceptualized, implementation of the model is promoted through a data-driven continuous quality improvement ("CQI") process that is used to monitor each DFCS region's progress.

The introduction of the Practice Model started in January 2010, over the course of a two-year period, at staggered intervals, in each of DFCS's 13 regions.[18]  On a regional basis, the Practice Model is phased-in through a multi-stage process: 1) a six-month planning phase;[19] 2) a one-year initial implementation stage;[20] and 3) a one-year full/ongoing implementation stage.

---

[16]  *See* MSA, Appendix B, for the text of the Period 3 IP.

[17]  The Practice Model incorporates six groups of activities that are designed to promote safety, permanency and the well-being of children and families.  The activities fall within the following categories:  1) safety assurance and risk management; 2) strengths and needs assessments; 3) involving children and families in case planning and decision-making; 4) individualizing case planning; 5) mobilizing appropriate services timely; and 6) preserving and maintaining connections.

[18]  During 2015, the defendants supplemented the management of one of the 13 regions, Region VII-W, creating what may ultimately be considered a 14th DFCS region.  If a 14th region is formally established, the parties will need to determine how to address this in the context of the MSA's regional performance measures.

[19]  Practice Model implementation started in each Region with the six-month planning phase.  During this phase, DFCS staff and stakeholders participated in an orientation program.  In addition, barriers to implementation were identified and plans to address the barriers were expected to be formulated, implemented, and revised on an ongoing basis.  A CQI review was conducted at the conclusion of the planning phase to establish baseline performance measures, which have served as a basis for measuring regional progress.

[20]  A 12-month initial implementation phase follows the planning phase.  During this phase, supervisors and caseworkers were trained on the Practice Model and participated in an intensive coaching program.  Thereafter, a two-month period was used for follow-up CQI reviews and planning for the full implementation stage based on the preliminary results of the review.

These stages are followed by a data-tracking year.  The Practice Model implementation schedule

as it appears in the MSA is set forth below:

**Practice Model Rollout Schedule[21]**

| Regions | Implementation Phase Dates | | | |
|---|---|---|---|---|
| | Planning (6 months) | Initial Implementation (One Year) | Full/Ongoing Implementation (One Year) | Data Tracking (One Year) |
| I-South, II-West | January – June 2010 | July 2010 – June 2011 | Approx. Sept. 2011 – August 2012 | September 2012 – August 2013 |
| V-West | July – December 2010 | January – December 2011 | Approx. March 2012 – February 2013 | March 2013 – February 2014 |
| IV-North | July – December 2010 | January 2011 – June 2012 (18 months) | Approx. Sept. 2012 – August 2013 | September 2013 – August 2014 |
| I-North, III-South, IV-South | January – June 2011 | July 2011 – June 2012 | Approx. Sept. 2012 – August 2013 | September 2013 – August 2014 |
| V-East | July – December 2011 | January – December 2012 | Approx. March 2013 – February 2014 | March 2014 – February 2015 |
| III-North, VII-East | July 2011 – June 2012 (12 months) | July 2012 – June 2013 | Approx. Sept. 2013 – August 2014 | September 2014 – August 2015 |
| II-East, VI, VII-West | July – December 2012 | January – December 2013 | Approx. March 2014 – February 2015 | March 2015 – February 2016 |

The MSA has two sets of requirements related to systemic infrastructure standards, foster

care service standards and outcome measures.  These requirements are reflected in §§II and III of

the MSA.  Section II of the MSA includes two types of requirements that defendants must

satisfy:[22] 1) requirements that are subject to statewide performance measures; and, to a lesser

degree, 2) requirements that are subject to both statewide performance measures and regional

performance measures.[23]  Section III of the MSA relates exclusively to regional performance

requirements.  With respect to the regional performance measures in §§II and III, there are two

performance thresholds triggered at different points.  The first is triggered when a region has

fully implemented the Practice Model; the second, which institutes higher performance

---

[21] MSA, Appendix A.
[22] In certain instances, defendants are not required to meet the statewide requirements in §II of the MSA until the end of the remedial phase, and thus there are no interim implementation requirements.  *See, e.g., id.* §II.A.2.b.  In other instances, performance related to some but not all implementation periods is specified.  *See, e.g., id.* §II.A.2.c.  And in some instances, statewide measures as well as separate regional measures related to Practice Model implementation are specified in §II.  *See, e.g., id.* §II.B.5.e.-i.
[23] *See, e.g., id.* §§II.B.4.a.-f. and II.B.7.a.-e.

standards, is triggered when a region has reached the 12-month mark following full implementation.[24]  For purposes of the regional measurement requirements in §§II and III of the MSA, a region is deemed to have fully implemented the Practice Model at the start of the data-tracking year.[25]  Accordingly, at a minimum,[26] during the two and two-third years that a region is undergoing the Practice Model phase-in process, regional performance under the MSA is not measured.[27]

The first two DFCS regions introduced to the Practice Model, Regions I-S and II-W, began implementation planning in January 2010 and commenced the data-tracking year in September 2012.  The other DFCS regions have been added to the implementation process at intervals of six to twelve months.  The last three DFCS regions to implement the Practice Model began the planning phase in July 2012.  After all 13 DFCS regions have fully implemented the Practice Model,[28] the MSA requires that all of its standards, benchmarks and outcome measures shall be measured and required statewide and shall no longer be measured on a region-by-region basis.[29]

---

[24] *Id.* §I.A.

[25] According to the MSA, "[a]djustments may be made to the timing of the planning and/or implementation phases based on a region's progress. The two-month period between the end of the Initial Implementation phase and the beginning of the Full Implementation phase is in place to permit the follow-up CQI review after the first 12 months of implementation and an opportunity to revise the Regional Implementation Plan based on preliminary results of the review going into the next phase of implementation."  *Id.* Appendix A.

[26] In the following three regions, defendants extended the implementation process because a determination was made that additional time was needed for a specific implementation phase:  Region III-N (afforded an additional six months for planning); Region IV-N (afforded an additional six months for coaching); and Region VII-E (afforded an additional six months for planning).

[27] The MSA expressly recognizes that for those requirements that must be met from the time that a region has fully implemented the Practice Model, regional compliance is not measured by looking back in time at practice that pre-dates full implementation.  For requirements that must be met 12 months after full implementation of the Practice Model, compliance is not measured by practice that pre-dates the 12-month period following full implementation. *Id.* §§II and III.

[28] The Practice Model implementation schedule is based on the division of DFCS field operations into 13 administrative regions.

[29] *Id.* §III.

As noted above, defendants began phasing-in the Practice Model over five years ago.  As of the end of Period 4, eight of the 13 regions in the state had fully implemented the Practice Model, and, as of February 2015, all 13 regions in the state had fully implemented the Practice Model.  Thus, as of February 2016, 12 months after the final three regions have fully implemented the Practice Model, the regional requirements will cease and DFCS will be accountable once again for meeting all requirements on a statewide basis.  This was intended to serve as an important landmark to test the efficacy of defendants' adopted regional implementation strategy.

**C.  Progress During Period 3 and Related Remedial Action**

Defendants struggled to satisfy the MSA's data reporting requirements during Period 3.  Because these requirements were not satisfied, a remedial order was issued on June 24, 2013, before the end of Period 3, requiring the defendants to undertake the following, among other actions: 1) export relevant performance data from their existing data system into an independent database to facilitate report production; 2) establish and implement a data cleansing and validation plan to improve the quality of performance data; 3) develop specifications for required data reports; and 4) complete any indicated analyses to identify required data that are not collected and/or reported and to implement alternative data collection and reporting methods for certain data.[30]

While data for Period 3, which spanned from July 6, 2012 through July 6, 2013, was ultimately produced after the end of the period, it was noteworthy in the history of this lawsuit for the increased volume of analyzable data regarding defendants' performance during the period relative to prior performance periods, notwithstanding the documented limitations of the data.

---

[30]  Project Schedule for Defendants' Production of Data Reports Required By Appendix C of the Modified Settlement Agreement [hereinafter June 24, 2013 Order], filed June 24, 2013 [Dkt. No. 589].

The availability of data in a format that could be readily analyzed enabled a much broader and more nuanced view of defendants' performance relative to MSA requirements than was historically possible.

As explained in more detail in the Monitor's May 2014 Report, while they did not do so during Period 3, the defendants eventually produced "validated"[31] data related to Period 3 performance for most, but not all, required reports.[32]  In many instances these data did not address the complete MSA requirement.  In some of these instances, the MSA requirement is subject to a qualitative assessment for which relevant data cannot be captured in a management information system.  In others, defendants had not developed the capacity to either collect and/or report on the required data.  While recognizing that there was substantial progress building data validation and reporting functions in response to the June 24, 2013 Order, the Monitor noted that additional progress was needed to satisfy the MSA's reporting requirements.

Defendants' performance during Period 3 evidenced wide regional variations in progress implementing MSA requirements and, generally, by the end of Period 3, the evidence established a substantial gap between reported and required performance levels with respect to both statewide and regionally-based requirements, for those regions to which the latter applied.  The

---

[31]  Defendants' validation efforts included implementation of certain processes designed to test the accuracy of the data contained in the data reports and were intended to improve the quality of the data contained in the reports. While the validation processes were not intended to ensure 100 percent data accuracy, they were intended to result in minimally adequate data that could be used to assess performance.  However, the Monitor documented various problems with data contained in a number of reports produced by defendants after the data had undergone defendants' validation processes.  As the Monitor has reported, in a number of instances these problems rendered the data unanalyzable.  In the Monitor's view, the shortcomings should have been identified by defendants' validation activities.  *See May 2014 Report* at 40.  It is expected that as defendants use the data and develop more effective accountability mechanisms, the quality of the data will improve.  Nevertheless, while there have been some improvements, defendants must increase the efficacy of their data validation activities.
[32]  *Id.* at 12-13.

Monitor found that defendants had not demonstrated essential regional capacities to implement and sustain reform efforts.[33]

The Monitor also reported that during Period 3, there were continuing, long-standing capacity deficits, notably in the areas of human resource management, including the absence of reliable data on caseworker and supervisory caseloads.[34]  The Monitor also determined that while certain required CQI activities had been undertaken, corrective action was not consistently timely and accountability mechanisms were not consistently effective.[35]  Moreover, the Monitor reported on uncorrected performance deficits dating back to Period 1, including the absence of a performance-based contracting system.[36]

Based on the Monitor's findings regarding defendants' performance during Period 3, and in order to avoid a contempt motion, the parties jointly proposed certain remedial actions to address the documented capacity deficits documented by the Monitor and to improve performance required by the MSA, which the Court ordered on July 9, 2014.[37]  Among other provisions, the Order required defendants to employ a "Director of Sustainable Transformation," subject to the approval of the parties with input from the Monitor, responsible for the following matters: 1) developing and administering a diagnostic process to identify staffing practices to immediately improve performance; 2) developing a framework for a "Transformation Team," including necessary positions such as a senior child welfare information officer;[38] 3) overseeing implementation of necessary reforms to improve defendants' compliance with the MSA; and 4)

---

[33] *Id.* at 4.

[34] *Id.* at 4-5.

[35] *Id.* at 5.

[36] *Id.*

[37] *See* Corrected Order Creating Director For Sustainable Transformation and Transformation Team [hereinafter July 2014 Corrected Order], filed July 9, 2014 [Dkt. No. 607].

[38] In relevant part, the July 2014 Corrected Order states:  "The Transformation Team shall include, but is not limited to, a senior child welfare information officer who will oversee and be responsible for generating and maintaining information, data analysis, verification and validation to support both DFCS operations and provide reporting required by the MSA."  *Id.* §II.C.ii.d.  This is a very critical function that remains unaddressed.

providing monthly progress reports to the parties and the Monitor. Ultimately, however, the

parties did not agree upon a candidate and a Director of Sustainable Transformation was not

hired.

### D. Data Considerations

During Period 4, and in some instances in Period 5, the parties agreed upon remedial

actions to address the remaining gaps in the data that defendants are required to produce.[39]  In

order to address gaps in data collection, it was necessary for defendants to change, and in some

cases to augment, certain existing data collection practices.  For example, the data collection

instrument used by defendants to implement federally-mandated requirements for periodic

administrative reviews of the case records of children in the custody of DFCS through the foster

care review ("FCR") process was expanded and modified to address certain data collection and

reporting gaps.[40]  The instrument, which is referred to as the Periodic Administrative

Determination ("PAD"), was adapted on an incremental basis starting in 2012 to collect data

used to assess defendants' performance regarding numerous MSA requirements pending the

development of a new automated data management and reporting system.

While the changes to data collection that the parties have agreed upon were necessary,

they come at a cost.  Performance data related to specific requirements collected prior to and after

multiple changes to the PAD were made are not precisely comparable.  Furthermore, because of

the method by which data from the PAD are used to produce monthly data reports, a minimum of

---

[39]  *See* App. B, Ex. 11A, *infra* note 184 (for tables summarizing the parties' agreements related to how each
identified data reporting gap will be addressed).
[40]  The FCR represents an administrative case review process that is conducted at six-month intervals for all children
who have been in foster care at least six months.

six months of data must be collected after a modification is made to the PAD before valid data is produced.[41]

Changes in the PAD effected during Period 4 impacted data regarding eight requirements reported on in this report.  Where there are issues regarding comparability of performance data related to certain specific requirements over time, those issues are discussed in the relevant sections of this report.  It is noteworthy that defendants made a number of changes to the PAD during Period 5, which will impact the comparability of data in additional reports that will be produced in the future. The parties should remain cognizant of this issue.[42]

Notwithstanding the parties' agreements regarding how to address gaps in defendants' reporting, numerous limitations in defendants' data collection and reporting continue to exist. For example, with respect to various reporting requirements, the parties agreed that valid data collection would necessitate targeted case record reviews during Periods 5 and 6.[43]  Additionally, there are certain structural limitations in defendants' data collection methods.  As noted above, defendants use the FCR process to collect data regarding many performance requirements.  The FCR process is limited to children who have been in custody at least six months and thus any findings derived from data collected through the FCR process exclude findings for children who have been in custody for short periods of time.

---

[41]  The monthly reports that defendants produce that are based on the PAD include data derived from six rolling months of data collection.  Thus, after a modification is made to the PAD, six months of data collection must occur before a monthly report will reflect data based only on the modified PAD.

[42]  Because of changes to the PAD, there will not be historical baseline data to use as a precise basis of comparison to assess defendants' progress over time.  In the same way that these changes impact the Monitor's ability to report on defendants' progress over time in this report, these changes will have the same impact on the Monitor's future reporting.

[43]  For example, the parties agreed that performance concerning multiple requirements, including requirements related to medical, dental and mental health screenings and assessments, would be measured through a targeted case record review conducted by the Monitor in collaboration with the defendants during Period 5.  *See* Period 5 IP §II.C.3.  The preliminary results of the case record review were distributed to the parties on May 22, 2015 and they are addressed herein as applicable to specific requirements.

### E. Progress During Period 4

Period 4 marked a critical test for defendants' efforts.  As noted above, the MSA was crafted in part to afford defendants the opportunity to implement their preferred regionally-based implementation strategy, grounded in a new Practice Model.  The MSA offered defendants temporary relief from numerous statewide requirements, instead emphasizing regional requirements in those areas of the state in which defendants were phasing in their new model.  The intent was to allow defendants to target their resources and thereby increase their chances of successfully meeting performance requirements.  Thus, Period 4, like Period 3, was an opportunity for defendants to focus and accelerate their reforms in advance of Period 5, during which the final regions would fully implement the Practice Model, and the subsequent end of temporary relief from statewide performance requirements in February 2016.

As documented in the Monitor's May 2014 Report, defendants entered Period 4 already underperforming relative to MSA requirements.  By the end of Period 3, defendants met or exceeded 10 of 23 (43 percent) statewide performance requirements for which the Monitor could make a finding based on the data defendants produced, and, among the seven regions that had fully implemented the Practice Model, the most successful region met or exceeded seven of 16 (44 percent) regional requirements.  The burden was on defendants during Period 4 to improve relative to Period 3; however, defendants' performance declined.

During Period 4, defendants met or exceeded six of the 25 (24 percent) statewide requirements for which the Monitor could make a finding, failing to satisfy three-quarters of the statewide Period 4 requirements.  As a general matter, regional performance was worse.  Among the five regions that fully implemented the Practice Model during Period 4, the two highest performing regions met or exceeded eight of 21 (38 percent) regional requirements.  Among the

14

three regions that had implemented the Practice Model for at least 12 months during Period 4 (*i.e.*, the regions that had implemented defendants' model for the longest time), the two highest performing regions met or exceeded five of 21 (24 percent) regional requirements.  Thus, as summarized below, there is little evidence that defendants' implementation strategy is positioning defendants to satisfy the MSA's requirements.

This report presents the Monitor's detailed assessment of defendants' performance relative to 21 regionally-based performance requirements for the eight regions that either fully implemented the Practice Model during Period 4 or had fully implemented for at least 12 months during Period 4.[44]  Among the five regions that fully implemented the Practice Model during Period 4, two regions met or exceeded eight of 21 applicable regional requirements,[45] one region met or exceeded four of 21 applicable regional requirements,[46] and two regions met or exceeded three of 21 applicable regional requirements.[47]  Among the three regions that fully implemented the Practice Model for at least 12 months during Period 4, two regions met or exceeded five of 21 applicable regional requirements[48] and one region met or exceeded three of 21 applicable regional requirements.[49]

In the Monitor's report on Period 3, the Monitor documented wide disparities in regional performance that required, among other resources, enhanced management systems and investments in human capital.  The most concrete effort intended to address these deficiencies during Period 4, the hiring of a "Director of Sustainable Transformation," was not implemented,

---

[44] As described below, there are different regional performance standards for regions that fully implement the Practice Model and for regions that have fully implemented the Practice Model for at least 12 months.  *See supra* at 7-8.

[45] Data were unavailable to assess performance in these two regions with respect to two of the 21 requirements.

[46] Data were unavailable to assess performance in this region with respect to two of the 21 requirements.

[47] Data were unavailable to assess performance in one of these two regions with respect to two of the 21 requirements.

[48] Data were unavailable to assess performance in one of these two regions with respect to two of the 21 requirements.

[49] Data were unavailable to assess performance in this region with respect to two of the 21 requirements.

15

nor was any functional substitute.[50]  Most of the organizational shortcomings that were evident

during Period 3 – inadequate regional management capacity and accountability systems, largely

unenforced corrective action processes, an inadequate and at times unreliable automated

management information system, and insufficient numbers of caseworkers and supervisors[51] –

were not addressed effectively during Period 4.  Moreover, during Period 4, in response to

challenges generated by staffing shortages, the defendants undercut their own reform strategy by

diverting dedicated management and coaching staff from responsibility for oversight and

implementation of the Practice Model to other functions.

In the limited instances in which defendants did meet Period 4 requirements, success was

frequently the fruit of efforts made by defendants' expert consultants.  As the Monitor has

documented in prior reports, this is a recurrent theme dating back to the Bridge Period.

Defendants continue to rely to a significant extent on the knowledge and efforts of consultants to

meet core MSA requirements because they have failed to build sufficient internal capacity.  To

meet and ultimately sustain the performance requirements of the MSA, defendants eventually

will need to internalize elements of the expertise for which they maintain contractual services.

As previously noted, approximately eight months from now, in February 2016,

defendants will be required to meet all MSA requirements on a statewide basis rather than on a

regional basis.  Historically, there has been a correlation between regions with the largest

percentage of children in custody and persistently low regional performance relative to MSA

performance standards.[52]  As regional requirements disappear and all requirements are calculated

---

[50] *See* July 2014 Corrected Order.
[51] Although defendants were not able to provide validated data regarding caseworker caseloads during Period 4,
there is a substantial body of evidence indicating that there were insufficient numbers of both caseworkers and
supervisory staff during Period 4.
[52] *See*, *e.g.*, *May 2014 Report* at App. A, Ex. 60 for an illustration of relative regional performance during Period 3.
As of June 30, 2014, Regions VII-W and III-S accounted for approximately 40 percent of all children in custody.

on a statewide basis, these lower performing regions with high percentages of children in custody will likely pose a particularly challenging obstacle to defendants' ability to meet statewide obligations under the MSA.

While defendants' obligations will apply at the statewide level, this will not change the fact that defendants will have to manage the organizational transformation process at smaller geographical levels (*i.e.,* at a regional or in some cases county level). It was in recognition of this fact that the MSA phased in the regional requirements over time based on defendants' Practice Model implementation schedule.  And it was based on varying regional needs that the parties crafted a remedy to establish a Director of Sustainable Transformation position that would be charged with marshalling the resources to guide statewide implementation on a regional basis.

Notwithstanding defendants' efforts, and in addition to regional challenges, there are long-standing, system-wide deficits in key agency operations and functional areas that have not been addressed in an effective way.  Ongoing shortages in caseworker and supervisory staffing levels continue to result in high caseloads.  This phenomenon, in turn, compromises the safety and well being of children and their timely placement in permanent and nurturing homes. Additionally, there are an inadequate number and array of licensed placements for the children in defendants' custody, contributing to large numbers of children placed in unlicensed or otherwise inappropriate placements, which may not meet even the most basic standards essential to ensure child safety.  There also is continuing evidence that many children in defendants' custody continue to have inadequate access to timely and essential services, including medical, dental, and mental health services.

Compounding these deficiencies is the failure to maintain an automated case management system that is consistently available and which can be relied upon by caseworkers and their

17

supervisors. Staff report frequent periods of system inoperability, delaying, or, worse, preventing them from entering important information about children's cases. This creates inefficiencies and compromises the integrity of the management information that managers need to track child safety, well being and permanency indicators.

Many of the performance challenges documented in this report vary from one region to the next and require solutions tailored to the problem. For example, during the month of June 2014, Regions VII-W and I-S had the most investigations related to maltreatment in care open, 26 and 20 respectively. Whereas 100 percent of investigations were initiated and completed consistent with MSA timeline requirements in Region I-S, only 12 percent were initiated and completed on time in Region VII-W. This is precisely the type of regional variation that the defendants must be equipped to monitor, identify, and address over time.

The evidence indicates that the systems that defendants have established to diagnose and address these regional performance issues, such as the Regional Implementation Teams, have not been effective at producing the intended result. As the report documents, the tracking and accountability processes designed to identify and correct basic safety and case practice issues has not led to demonstrable improvements and, in fact, the evidence suggests some backsliding during Period 4. Too often, in response to one performance problem, defendants reallocated resources from within DFCS rather than adding needed resources, which ultimately only redistributed performance deficits within the agency rather than reducing them. This is emblematic of the crisis-driven and non-strategic approach to MSA implementation that characterized Period 4.

This report presents the performance outcomes that defendants have reached for both statewide and regional MSA requirements. It does not assess the factors contributing to

18

defendants' performance levels.  As the example regarding maltreatment investigation initiation and completion rates, described above, illustrates, understanding what drives performance levels even on an individual indicator requires a deep look at regional data that is beyond the scope of this type of report.  As the Monitor has recommended in prior reports, it is of the essence that defendants develop systems and processes to analyze the factors driving performance across the state and implement solutions to correct low performance in applicable regions.

Defendants have launched several initiatives during Period 5 in an apparent effort to improve regional and statewide performance.  For example, in recent weeks the defendants have required each DFCS region to implement a regional improvement plan and have issued a request for information to foster care service providers related to a renewed effort to improve resource family home operations on a statewide basis.  Moreover, defendants have augmented the management in Region VII-W, a low-performing region with a very high concentration of children in custody, by adding a Regional Director.  Furthermore, additional staff members have been hired to support the development and implementation of a new automated case management system that is expected to be available in 2020.  Finally, with substantial assistance from external consultants, defendants have developed a blueprint for a performance-based contracting system and launched a new leadership training program that they plan to introduce on an incremental basis in each DFCS Region.

Each of these efforts offers some promise of improved performance under the MSA, but even in combination they will not promote the scope and depth of improvement that is necessary for the defendants to satisfy the MSA's most basic requirements.  Some of these initiatives are not new, but rather are continuations of or renewed attempts to implement past efforts. Defendants, for example, have been required, but unable to successfully develop a performance-

19

based contracting system since Period 1.  While a blueprint is cause for optimism, it also must be considered within the context of historical performance.  It is encouraging that defendants have taken steps to augment management capacity in Region VII-W, a region in which defendants have historically struggled to meet MSA requirements.  But adding management staff, by itself, will not solve the substantial performance problems that have been evident.  The ultimate test of defendants' efforts will be whether they are able to demonstrate measureable progress where they have not been able to in the past.

The following tables summarize the Monitor's findings regarding the status of defendants' performance relative to each Period 4 statewide and regional outcome standard. Presentation of the regional findings follow the statewide findings.[53]

---

[53]  For ease of reference, the table reflecting the statewide requirements is included in the Appendix as App. A, Ex. 3 and the table reflecting the Practice Model requirements is reflected as App. A, Ex. 4.

**Summary Table:  Statewide Performance for Period 4 through June 30, 2014 Based on Analyses of Data Received Through March 24, 2015[54]**
**[Prepared by the Office of the Court Monitor Based on DFCS Data]**

| Cite | MSA Requirement | DFCS Report Name(s) (Legacy and Current) | Period 4 Performance Requirement | Statewide Performance as of June 30, 2014 (unless otherwise specified below) |
|---|---|---|---|---|
| | **MSA II.A.2.  Human Resources Management** | | | |
| MSA II.A.2.a.1. and II.A.2.a.10.a.<br><br>II.A.2.a.9.a. | MSA requires by the end of Period 4, at least 85% of caseworkers shall carry a caseload that does not exceed MSA requirements.  No more than 5% of caseworkers shall carry a caseload exceeding twice the MSA requirements. [No caseworkers shall carry a caseload exceeding three times the MSA requirements.]  Hancock, Harrison, Hinds, and Jackson Counties are exempt during Period 4.<br><br>[Note:  Defendants report separately on workload data for caseworkers with dedicated and mixed caseloads.  For the purposes of MSA requirements, the workload data must be analyzed together.  When analyzed together (including carve-out counties), 61% of caseworkers are carrying a caseload that does not exceed MSA requirements; 7% of caseworkers carry a caseload that exceeds twice the MSA requirements; 3% of caseworkers carry a caseload that exceeds three times the MSA requirements.] | Manual Report AR3 AR3K<br><br>[Dedicated Caseload] | Performance requirement if carve-out counties were excluded from the analysis:<br><br>85%<br><br>≤5%<br><br>0%<br><br><br>85%<br><br>≤5%<br><br>0% | **Note: Carve-out counties could not be excluded from AR3 analysis based on how data were submitted.  Reliable workload data unavailable before 10/14/14.**<br><br>**Including carve-out counties and excluding certain non-DFCS employees employed by a contractor, as of 10/14/14:**<br>• **61% of caseworkers carrying a caseload not exceeding MSA requirements**<br>• **12% of caseworkers carrying a caseload exceeding twice the MSA requirements**<br>• **4% of caseworkers carrying a caseload exceeding three times the MSA requirements**<br><br>**Including carve-out counties and certain non-DFCS employees employed by a contractor, as of 10/14/14:**<br>• **68% of caseworkers carrying a caseload not exceeding MSA requirements**<br>• **10% of caseworkers carrying a caseload exceeding twice the MSA requirements**<br>• **3% of caseworkers carrying a caseload exceeding three times the MSA requirements** |

---

[54] In some instances the data defendants produced do not reflect performance related to the full MSA requirement.  Thus the performance levels set forth in this table may not be indicative of performance related to the full requirement.

| Cite | MSA Requirement | DFCS Report Name(s) (Legacy and Current) | Period 4 Performance Requirement | Statewide Performance as of June 30, 2014 (unless otherwise specified below) |
|---|---|---|---|---|
| MSA II.A.2.a.2. and II.A.2.a.10.a.<br><br>II.A.2.a.9.a | MSA requires by the end of Period 4, at least 85% of caseworkers shall carry a caseload that does not exceed MSA requirements.  No more than 5% of caseworkers shall carry a caseload exceeding twice the MSA requirements.  [No caseworkers shall carry a caseload exceeding three times the MSA requirements.] Hancock, Harrison, Hinds, and Jackson Counties are exempt during Period 4.<br><br>[Note:  Defendants report separately on workload data for caseworkers with dedicated and mixed caseloads.  For the purposes of MSA requirements, the workload data must be analyzed together.  When analyzed together (including carve-out counties), 61% of caseworkers are carrying a caseload that does not exceed MSA requirements; 7% of caseworkers carry a caseload that exceeds twice the MSA requirements; 3% of caseworkers carry a caseload that exceeds three times the MSA requirements.] | Manual Report AR1 AR1K<br><br>[Mixed Caseload] | 85%<br><br>≤5%<br><br>0%<br><br>Performance requirement does not apply to carve-out counties | **Excluding carve-out counties, as of 10/14/14:**<br>• **70% of caseworkers carrying a caseload not exceeding MSA requirements**<br>• **4% of caseworkers carrying a caseload exceeding twice the MSA requirements**<br>• **3% of caseworkers carrying a caseload exceeding three times the MSA requirements**<br><br>**Including carve-out counties, as of 10/14/14:**<br>• **58% of caseworkers carrying a caseload not exceeding MSA requirements**<br>• **6% of caseworkers carrying a caseload exceeding twice the MSA requirements**<br>• **3% of caseworkers carrying a caseload exceeding three times the MSA requirements** |
| MSA II.A.2.a.6. and II.A.2.a.10.b. | MSA requires by the end of Period 4, no more than 10% of supervisors who are responsible for supervising caseworkers shall be responsible for directly supervising more than five caseworkers.  Hancock, Harrison, Hinds, and Jackson Counties are exempt during Period 4. | Manual Report AR2 | < 10% | **Excluding carve-out counties, as of 10/14/14:  13%**<br>**Including carve-out counties, as of 10/14/14:  19%** |
| MSA II.A.2.c.2. II.A.2.c.3., and II.A.2.c.6.b. | MSA requires that by the end of Period 3 [and thereafter] all new caseworkers and supervisors will complete their pre-service training consistent with MSA requirements before they assume their respective responsibilities for carrying cases and supervising. | Manual Report<br><br>[MDHS Human Resources Data and DFCS Training Data] | 100% | **Period 4, Caseworkers: 100%**<br>**Period 4, Supervisors: 100%** |

| Cite | MSA Requirement | DFCS Report Name(s) (Legacy and Current) | Period 4 Performance Requirement | Statewide Performance as of June 30, 2014 (unless otherwise specified below) |
|---|---|---|---|---|
| MSA II.A.2.c.4. and II.A.2.c.7.a. | MSA requires that by the end of Period 4 all caseworkers shall receive a minimum of 40 hours of structured ongoing in-service training each year, and all supervisors shall receive a minimum of 24 hours of ongoing in-service training each year. | Manual Report [Caseworker Ongoing Training Report and Regional Director Ongoing Training Report] | 100% | **Period 4, Caseworkers: 94%** **Period 4, Supervisors: 100%** |
| **MSA II.A.7. Recruitment and Retention of Foster Families and Therapeutic Service Providers** | | | | |
| MSA II.A.7.a. (Final IP4, Appendix 3) | MSA requires that all licensed resource families (regardless of whether they are supervised directly by DFCS or by private providers) receive at least the minimum reimbursement rate for a given level of service as established pursuant to the MSA. | MACWIS SWIP42 | [Note: Although not a Period 4 performance requirement, defendants were required to report on this during Period 4. Pursuant to the MSA, a 100% performance standard is required by the final implementation period.] | **Period 4: 98%** |
| **MSA II.B.1.  Child Safety** | | | | |
| MSA II.B.1.b. and II.B.1.e.6. | MSA requires by the end of Period 3 [and thereafter], upon receipt of a report of child maltreatment in a group home, emergency shelter, or private child placing agency, DFCS shall undertake an investigation that is in addition to, and independent of, any child protective investigation to determine the contract provider's compliance with DFCS licensure standards. | Manual Report Licensure Investigation Report | 100% | **Period 4: 100%** |
| MSA II.B.1.d. | MSA requires within 30 days of the completion of any investigation of maltreatment of a child in custody, DFCS shall review the maltreatment investigation in the manner set forth in the MSA. | Manual Report MIC Review Report | 100% | **Period 4: 98%** |

| Cite | MSA Requirement | DFCS Report Name(s) (Legacy and Current) | Period 4 Performance Requirement | Statewide Performance as of June 30, 2014 (unless otherwise specified below) |
|---|---|---|---|---|
| MSA II.B.1.e.2. | MSA requires by end of Period 3 [and thereafter], 100% of maltreatment investigations shall be initiated within 24 hours and completed with supervisory approval within 30 days. | MWZ1271G SWZ1271G | 100% | **Period 3: 36%[55]** **Period 4: 56%** |
| MSA II.B.1.e.3. | MSA requires by end of Period 3 [and thereafter], 100% of children who remain in the same out of home placement following an investigation of maltreatment or corporal punishment in that placement shall be visited by a caseworker two times per month for three months after the conclusion of the investigation. | MWLS55SA SLS55AD&S | 100% | **Period 3: 88%** **Period 4: 75%** |
| **MSA II.B.2.  Child Placement** | | | | |
| MSA II.B.2.a., II.B.2.p.2., and II.B.2.p.4.-5. | MSA requires by the end of Period 3 [and thereafter], 100% of children shall be placed or remain in a foster care setting that meets licensure standards consistent with MSA requirements, unless so ordered by the Youth Court over DFCS objection. | MWLS319D (originally MWZ0151) SLS319D | 0 children | **Period 3: 471 children** **Period 4: 482 children** **Placements do not meet licensure standards** |
| | | PAD7 S-PAD7 | 100% | **Period 3: 90%** **Period 4: 93%** **Placements despite objections** |
| Changes were made to answer responses to a question on the PAD related to Report 7 in December 2013 and April 2014. Data for the period ending June 30, 2013 are based upon responses to the pre-modified answer options. Data for the period ending June 30, 2014 include responses based on answer options that were available after the modifications. The first monthly report reflecting responses based only on answer options that were available after April 2014 is the October 2014 report, which is after the end of Period 4.  Data for the period ending June 30, 2014 are based on questions included in the PAD prior to the December 2013 and April 2014 modifications and are identified in red above. | | | | |
| MSA II.B.2.f. and II.B.2.q.7. | MSA requires by the end of Period 4, 85% of children in custody shall be placed in the least restrictive setting that meets their individual needs, consistent with MSA requirements. | PAD-9 SPAD9 | 85% | **Period 3: 97%** **Period 4: 96%** |
| The wording of a question on the PAD related to Report 9 was modified in December 2013. Data for the period ending June 30, 2013 are based upon responses to the pre-modified question. Data for the period ending June 30, 2014 are based upon responses to the modified question and are identified in red above. | | | | |

---

[55] Findings related to Period 3 are not presented for all requirements because either the data were not required to be produced, were not produced, or were produced but not reliable.

| Cite | MSA Requirement | DFCS Report Name(s) (Legacy and Current) | Period 4 Performance Requirement | Statewide Performance as of June 30, 2014 (unless otherwise specified below) |
|---|---|---|---|---|
| MSA II.B.2.g. and II.B.2.q.11. | MSA requires that by the end of Period 4 at least 90% of children who entered DFCS custody shall be placed within his/her own county or within 50 miles of the home from which he/she was removed unless one of the exceptions provided in the MSA is documented as applying. | MWLS314 SLS314 | 90% | **Period 3 (excludes sibling exception): 94%** **Period 4 (excludes sibling exception): 95%** **Period 3 (includes sibling exception): 98%** **Period 4 (includes sibling exception): 99%** |
| MSA II.B.2.h. and II.B.2.q.8. | MSA requires by the end of Period 4, 90% of siblings who entered custody at or near the same time be placed together consistent with MSA requirement. | MWLS316 SLS316 | 90% | **Period 3: 85%** **Period 4: 75%** |
| MSA II.B.2.i. and II.B.2.q.9. | MSA requires by the end of Period 4, 60% of children placed in a new placement during the period shall have their currently available medical, dental, educational, and psychological information provided to their resource parents or facility staff no later than at the time of any new placement during the period. | PAD-10 SPAD10 | 60% | **Period 3: 19%** **<span style="color:red">Period 4: 20%</span>** |

In December 2013 a question was added, the wording of one question was amended, and the instructions were changed for one question on the PAD related to Report 10. Data based only on responses to the amended PAD were available beginning with the period ending May 2014. However, defendants did not produce the data based on responses to the amended PAD prior to the period ending October 2014, which was after the end of Period 4. Data for the period ending June 30, 2014 are based on questions included in the PAD prior to the December 2013 modification and addition and are identified in red above.

| Cite | MSA Requirement | DFCS Report Name(s) (Legacy and Current) | Period 4 Performance Requirement | Statewide Performance as of June 30, 2014 (unless otherwise specified below) |
|---|---|---|---|---|
| MSA II.B.2.k. and II.B.2.p.8. | MSA requires by end of Period 3 [and thereafter], no foster children shall remain in an emergency or temporary facility for more than 45 days unless exceptional circumstances and Field Operations Director has granted express written approval. | MWLS50D SLS50D | 0 children | **Period 3: 24 children** **Period 4: 17 children** |
| MSA II.B.2.m. | MSA requires that sibling groups in which one or more of the siblings are under the age of 10 shall not be placed in congregate care settings for more than 45 days. | MWLS53HS SLS53H | [Note: Defendants were required to report on this starting in Period 3. Pursuant to the MSA, a 100% performance standard is not required until the final implementation period.] | **Period 3: 13 sibling groups** **Period 4: 17 sibling groups** |

25

| Cite | MSA Requirement | DFCS Report Name(s) (Legacy and Current) | Period 4 Performance Requirement | Statewide Performance as of June 30, 2014 (unless otherwise specified below) |
|---|---|---|---|---|
| MSA II.B.2.m. and II.B.2.q.2. | MSA requires by end of Period 4, no children under 10 placed in congregate care unless exceptional needs and/or sibling group member and express written approval by Regional Director. | MWLS52HS SLS52H | 0 children | **Period 3: 11 children** **Period 4: 50 children** |
| **MSA II.B.3.  Physical and Mental Health Care** | | | | |
| MSA II.B.3.a. and II.B.3.j.1. | MSA requires by the end of Period 4, 70% of children entering custody receive a health screening evaluation as recommended by American Academy of Pediatrics from a qualified medical practitioner within 72 hours after placement. | MWLS315 SLS315 | 70% | **Period 3: 28%** **Period 4: 27%** |
| MSA II.B.3.b. and II.B.3.j.2. | MSA requires by the end of Period 4, 70% of children entering custody receive a comprehensive health assessment within 30 calendar days consistent with MSA requirement. | MWLS315 SLS315 | 70% | **Period 3: 34%** **Period 4: 33%** |
| MSA II.B.3.e. and II.B.3.j.4. | MSA requires by the end of Period 4, 75% of children three years old and older entering custody or in care and turning three years old during the Period shall receive a dental examination within 90 days of placement or their third birthday. | PAD-27m1m3 SPAD27m1 | 75% | **Period 3: 49%**[56] **Period 4: 55%** |
| MSA II.B.3.e. and II.B.3.j.5. | MSA requires that by the end of Period 4, at least 80% of children in custody during the Period shall receive a dental examination every six months consistent with MSA requirements and all medically necessary dental services. | PAD-27m2m3 SPAD27m2 | 80% | **Period 3: 54%** **Period 4: 52%** |
| MSA II.B.3.f. and II.B.3.j.6. | MSA requires that by the end of Period 4 at least 70% of children four years old and older entering custody during the Period or in care and turning four years old during the Period shall receive a mental health assessment by a qualified professional within 30 calendar days of foster care placement or their fourth birthday, respectively. | PAD-25 S-PAD25 | 70% | **Period 3: 49%** **Period 4: 47%** |
| A modification was made to the PAD in November 2013 impacting Report 25 to allow for data collection about children turning four-years old during the period.  Monthly data reports including data on this cohort of children was submitted to the Monitor beginning with the period ending September 30, 2014. Consequently, this chart excludes children who turned four during the period ending June 30, 2014. | | | | |

---

[56]  In the Monitor's May 2014 Report, defendants' performance during Period 3 was reported as 47%.  That analysis, which was based on the data submitted by defendants, excluded data regarding children who were in care and turned three during the period under review.  In order to include this cohort in the analysis presented above, the Monitor combined data from a different data report and reanalyzed Period 3 performance, which is reported above as 49%.

| Cite | MSA Requirement | DFCS Report Name(s) (Legacy and Current) | Period 4 Performance Requirement | Statewide Performance as of June 30, 2014 (unless otherwise specified below) |
|---|---|---|---|---|
| MSA II.B.5.  Worker Contact and Monitoring | | | | |
| MSA II.B.5.a. and II.B.5.f.1. | MSA requires by the end of Period 4, 80% of children shall receive documented twice-monthly in-person visits by the assigned caseworker consistent with MSA requirement. | MWZWC5D SWZC5D | 80% | **Period 3: 53%[57]** **Period 4: 67%** |
| MSA II.B.5.b. and II.B.5.f.2. | MSA requires by end of Period 4, 60% of children with a goal of reunification shall have their assigned DFCS caseworker meet monthly with the child's parents, during the Period, consistent with MSA requirements, and the visit shall be documented in the case record. | MWZWCR3 SZWCR3 | 60% | **Period 3: accurate data not available** **Period 4: 38%** |
| MSA II.B.5.c. and II.B.5.f.3. | MSA requires by the end of Period 4, 60% of therapeutic resource parents have a worker visit the home monthly to share relevant information, evaluate the child's safety, needs, and well being, and monitor service delivery and achievement of service goals. | PAD3 SPAD3 | 60% | **Period 3: 70%** **Period 4: 73%**  **Content and frequency of visit** **(for placements subject to FCR)** |
| MSA II.B.5.c. and II.B.5.f.3. | MSA requires by the end of Period 4, 60% of non-therapeutic resource parents have a worker visit the home monthly to share relevant information, evaluate the child's safety, needs, and well being, and monitor service delivery and achievement of service goals. | MWZPLMC SZPLMC | 60% | **Period 3: 45%** **Period 4: 49%**  **Frequency of visit** **(for all applicable placements)** |
|  |  | PAD2 SPAD2 | 60% | **Period 3: 70%** **Period 4: 70%**  **Content and frequency of visit** **(for placements subject to FCR)** |
| MSA II.C.  Outcome Measures | | | | |
| MSA II.C.1.a. and II.C.1.c.1. | MSA requires by the end of Period 4, at least 75% of children state-wide in care less than 12 months from the time of latest removal from home shall have had two or fewer placements. | MWZPLM5S SZPLM5 | 75% | **Period 3: 77%** **Period 4: 79%** |
| MSA II.C.2.a. and II.C.2.c.1. | MSA requires that by the end of Period 4, the rate of abuse or maltreatment in care shall not exceed 0.5%. | MWBRD06 SMWBRD06 | < 0.5% | **Defendants notified the Monitor that they are submitting revised data responsive to this requirement.  As of May 27, 2015, the revised data was not submitted.** |

---

[57] In the Monitor's May 2014 Report, defendants' performance during Period 3 was reported as 55%.  In April 2014, defendants submitted revised data reports and reproduced historical data back to July 2012.  The submission was made too late for the Monitor to analyze for the May 2014 report.  The performance for Period 3 that is reflected above is based on the data submitted by defendants in April 2014.

**Summary Table: Practice Model Performance through June 30, 2014 Based on Analyses of Data Received Through March 24, 2015[58]**
**[Prepared by the Office of the Court Monitor Based on DFCS Data]**

| Cite | MSA Requirement | DFCS Report Name(s) (Legacy and Current) | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 End of Period 4: 6/30/14 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 End of Period 4: 6/30/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | | Practice Model Full Implementation: 2/28/14 12 Months Following: 2/28/15 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S | V-E |
| **MSA II.B.5. Worker Contact and Monitoring** | | | | | | | | | | | |
| MSA II.B.5.a. and II.B.5.b.1. | MSA requires by the date region fully implements, at least 70% of children in custody in that region shall have received documented twice-monthly in-person visits by the assigned DFCS caseworker during the preceding 12-month period, consistent with MSA requirements. | MWGWTS® SWZCS® | 70% | 44% (N=330) (8/31/12) | 72% (N=162) (6/31/12) | 66% (N=109) (2/28/13) | 44% (N=485)* (8/31/13) | 68% (N=262)* (8/31/13) | 65% (N=175) (8/31/13) | 75% (N=128) (8/31/13) | 66% (N=162) (2/28/14) |
| MSA II.B.5.a. and II.B.5.b.1. | MSA requires that by 12 months following the date that a Region fully implements (and thereafter), at least 90% of children in custody in that region shall receive documented twice-monthly in-person visits by the assigned DFCS caseworker, consistent with MSA requirements. | MWGWTS® SWZCS® | 90% | 85% (N=294) (8/31/13) 84% (N=319) (6/30/14) | 79% (N=155) (8/31/13) 92% (N=145) (6/30/14) | 64% (N=107) (2/28/14) 68% (N=114) (6/30/14) | | | | | |
| | SWZCSD does not reflect performance related to the full MSA requirement. The numbers above represent the percentage of children with two face-to-face visits, including at least one in the placement by the assigned caseworker. In the May 2014 report, the performance reflected above is based on the data submitted by defendants in April 2014. * In the Monitor's May 2014 Report, as of 8/31/13 defendants' performance in Regions III-S and I-N was reported as 45% and 70%, respectively. In April 2014, defendants submitted revised data reports and reproduced historical data back to July 2012. The submission was made too late for the Monitor to analyze for the May 2014 report. | | | | | | | | | | | |
| MSA II.B.5.a. and II.B.5.c. | MSA requires by the date region fully implements, at least 80% of children in that region with a goal of reunification shall have had their assigned DFCS caseworker meet monthly with the child's biological parent(s) with whom the child is to be reunified, consistent with MSA requirements, as documented in the child's case record. | MWGO3 S2WO3 | 80% | Data unreliable; MACWIS modified in October 2013 and therefore data analyzable as of October 2013 | Data unreliable; MACWIS modified in October 2013 and therefore data analyzable as of October 2013 | Data unreliable; MACWIS modified in October 2013 and therefore data analyzable as of October 2013 | Data unreliable; MACWIS modified in October 2013 and therefore data analyzable as of October 2013 | Data unreliable; MACWIS modified in October 2013 and therefore data analyzable as of October 2013 | Data unreliable; MACWIS modified in October 2013 and therefore data analyzable as of October 2013 | Data unreliable; MACWIS modified in October 2013 and therefore data analyzable as of October 2013 | 42% (N=107) (2/28/14) |
| MSA II.B.5.a. and II.B.5.c. | MSA requires that by 12 months following the date that a Region fully implements (and thereafter), at least 90% of children in that region with a goal of reunification shall have their assigned DFCS caseworker meet monthly with the child's parent(s) with whom the child is to be reunified, consistent with MSA requirements, as documented in the child's case record. | MWGO3 S2WO3 | 90% | Data unreliable; MACWIS modified in October 2013 and therefore data analyzable as of October 2013 79% (N=189) (6/30/14) | Data unreliable; MACWIS modified in October 2013 and therefore data analyzable as of October 2013 60% (N=67) (6/30/14) | 41% (N=61) (2/28/14) 30% (N=67) (6/30/14) | | | | | |
| | S2WO3 does not reflect performance related to the full MSA requirement. The numbers above represent the percentage of children with a goal of reunification whose assigned caseworker met monthly with the parent(s) with whom child was to be reunified. | | | | | | | | | | | |

---

[58] In some instances the data defendants produced do not reflect performance related to the full MSA requirement. Thus the performance levels set forth in this table may not be indicative of performance related to the full requirement.

| Cite | MSA Requirement | DFCS Report Name(s) (Legacy and Current) | Performance Requirement | Practice Model Full Implementation: 8/31/12 — 12 Months Following: 8/31/13 — End of Period 4: 6/30/14 | | Practice Model Full Implementation: 2/28/13 — 12 Months Following: 2/28/14 — End of Period 4: 6/30/14 | Practice Model Full Implementation: 8/31/13 — 12 Months Following: 8/31/14 | | | | Practice Model Full Implementation: 2/28/14 — 12 Months Following: 2/28/14 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S | V-E |
| MSA II.B.5.c. and II.B.5.h.1. | MSA requires by the date region fully implements, at least 80% of foster parents in that region with at least one foster child residing in their home during the preceding 12-month period shall have had a DFCS worker visit the home monthly, consistent with MSA requirements, as documented in the children's case records. | MRO2PLMC 52PLMC — PAD Report 2 9PAD2 — [Non-Therapeutic Placement Setting] | 80% | MACWIS Report: 73% (N=161) (8/31/12) — PAD Report: Data unreliable; PAD corrected October 2012 and therefore data analyzable as of April 2013 | MACWIS Report: 89% (N=64) (8/31/13) — PAD Report: Data unreliable; PAD corrected October 2012 and therefore data analyzable as of April 2013 | MACWIS Report: 76% (N=48) (2/28/13) — PAD Report: Data unreliable; PAD corrected October 2012 and therefore data analyzable as of April 2013 | MACWIS Report: 32% (N=124) — PAD Report: 60% (N=167) (8/31/13) | MACWIS Report: 43% (N=131) — PAD Report: 71% (N=106) (8/31/13) | MACWIS Report: 68% (N=75) — PAD Report: 94% (N=99) (8/31/13) | MACWIS Report: 67% (N=52) — PAD Report: 78% (N=108) (8/31/13) | MACWIS Report: 63% (N=65) — PAD Report: 90% (N=109) (1/28/14) |
| MSA II.B.5.c. and II.B.5.h. | MSA requires that by 12 months following the date that a Region fully implements (and thereafter), at least 90% of resource parents in that region with at least one foster child residing in their home monthly, consistent with MSA requirements, as documented in the children's case records. | MRO2PLMC 52PLMC — PAD Report 2 9PAD2 — [Non-Therapeutic Placement Setting] | 90% | MACWIS Report: 80% (N=133) — PAD Report: 57% (N=170) (8/31/13) — MACWIS Report: 87% (N=132) — PAD Report: 99% (N=216) (6/30/14) | MACWIS Report: 87% (N=60) — PAD Report: 77% (N=77) (8/31/13) — MACWIS Report: 82% (N=60) — PAD Report: 72% (N=61) (6/30/14) | MACWIS Report: 43% (N=44) — PAD Report: 100% (N=60) (1/28/14) — MACWIS Report: 49% (N=49) — PAD Report: 95% (N=63) (6/30/14) | | | | | |

52PLMC does not reflect performance related to the full MSA requirement. For 52PLMC, the numbers above represent the percentage of non-therapeutic homes with at least one child that were visited by a caseworker at least once monthly during report period. PAD Report 2 does not reflect performance related to the full MSA requirement. For PAD Report 2, the numbers above represent the percentage of children for whom the caseworker met the content of the visit requirements pursuant to MSA II.B.5.c.

**MSA III.B.1. Comprehensive Family Assessments**

| MSA III.B.1.a and III.B.1.e.1. | MSA requires by the date region fully implements, at least 80% of foster children in that region who enter custody shall have a thorough screening and assessment, consistent with MSA requirements, within 30 calendar days of entering custody. | PAD Report 12 PAD-12 9PAD012 | 80% | Data unreliable; PAD corrected October 2012 and therefore data analyzable as of April 2013 | Data unreliable; PAD corrected October 2012 and therefore data analyzable as of April 2013 | Data unreliable; PAD corrected October 2012 and therefore data analyzable as of April 2013 | 13% (N=53) (8/31/13) | 34% (N=29) (8/31/13) | 82% (N=28) (8/31/13) | 73% (N=15) (8/31/13) | 44% (N=34) (2/28/14) |
| MSA III.B.1.a. and III.B.1.f.1. | MSA requires that by 12 months following the date that a Region fully implements (and thereafter), at least 90% of foster children in that region who enter custody shall have a thorough screening and assessment, consistent with MSA requirements, within 30 calendar days of entering custody. | PAD Report 12 PAD-12 9PAD012 | 90% | 74% (N=78) (8/31/13) — 80% (N=90) (6/30/14) | 62% (N=13) (8/31/13) — 41% (N=22) (6/30/14) | 58% (N=19) (2/26/14) — 48% (N=23) (6/30/14) | | | | | |

The numbers above represent the percentage of children with a comprehensive family assessment completed within 30 days of being taken into custody consistent with MSA requirements. This analysis excludes children for whom this requirement did not apply at the time the PAD was completed.

**MSA III.B.2. Individualized Case Planning**

| MSA III.B.2.b and III.B.2.e.2. | MSA requires that by date Region fully implements, 80% of children shall have a family team meeting quarterly, and service plans updated quarterly, as well as within 30 days of any placement or other significant change, consistent with MSA requirement. | PAD Report 20 PAD-20m3m2 5-PAD20 | 80% | 11% (N=204) (8/31/12) | 21% (N=145) (8/31/12) | 2% (N=111) (2/28/13) | 5% (N=319) (8/31/13) | 6% (N=146) (8/31/13) | 13% (N=145) (8/31/13) | 10% (N=131) (8/31/13) | 22% (N=143) (2/26/14) |
| MSA III.B.2.b and III.B.2.e.2. | MSA requires that by 12 months following the date that a Region has fully implemented (and thereafter), 90% of children shall have a family team meeting quarterly, and service plans updated quarterly, as well as within 30 days of any placement or other significant change, consistent with MSA requirement. | PAD Report 20 PAD-20m3m2 5-PAD20 | 90% | 33% (N=251) (8/31/13) — 47% (N=292) (6/30/14) | 19% (N=120) (8/31/13) — 17% (N=83) (6/30/14) | 26% (N=96) (2/26/14) — 23% (N=95) (6/30/14) | | | | | |

The numbers above represent the percentage of children who had a family team meeting and their service plans reviewed and updated quarterly, including within 30 days of placement change. In December 2013, modifications were made to three questions on the PAD related to the report for this MSA requirement. Data above for any periods ending prior to December 2013 are based only on the questions included in the PAD prior to the December 2013 modifications. In the table any data beginning with the period ending May 31, 2014 are based only on PAD questions as modified in December 2013. Data for periods ending between December 2013 and May 2014 are based on a mixture of questions included in the PAD prior to and subsequent to the December 2013 modifications, and are identified in red above.

| | | | | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/12 End of Period 4: 6/30/14 | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/13 End of Period 4: 6/30/14 | | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/13 | | | | Practice Model Full Implementation: 2/28/14 12 Months Following: 2/28/14 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Cite | MSA Requirement | DFCS Report Name(s) (Legacy and Current) | Performance Requirement | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S | V-E |
| **MSA III.B.3. Child and Youth Permanency** | | | | | | | | | | | |
| MSA III.B.3.a 2-6. and III.B.3.a 6.b. | MSA requires by the date Region fully implements, at least 90% of foster children in that region shall have a permanency plan that is consistent with MSA requirements. | PAD Report 21 PAD-21 SPAD21 | 90% | 100% (N=10) (8/31/12) | 100% (N=18) (8/31/12) | 100% (N=19) (2/28/13) | 95% (N=42) (8/31/13) | 100% (N=27) (8/31/13) | 93% (N=14) (8/31/13) | 75% (N=4) (8/31/13) | 88% (N=8) (2/28/14) |
| MSA III.B.3.a 3-9. and III.B.3.a 7.b. | MSA requires that by 12 months following the date that a Region fully implements [and thereafter], at least 95% of children in that region shall have a permanency plan in that region that is consistent with MSA requirements. | PAD Report 21 PAD-21 SPAD21 | 95% | 100% (N=8) (8/31/13) <br><br> 100% (N=5) (6/30/14) | 100% (N=14) (8/31/13) <br><br> 100% (N=8) (6/30/14) | 80% (N=15) (2/28/14) <br><br> 75% (N=16) (6/30/14) | | | | | |
| | The numbers above represent the percentage of children with an appropriate permanency goal for children with permanency goals of durable legal custody/guardianship, APPLA, living independently, long term foster care, or permanent foster care. One child in Region III-W was excluded from the analysis for the period ending June 30, 2014 because PAD Report 21 reflected conflicting data that the Monitor could not resolve. | | | | | | | | | | |
| MSA III.B.3.a 1-2 and III.B.3.a 4.a. | MSA requires that by date Region fully implements, 90% of children shall have a permanency plan within 30 calendar days of their entry into care consistent with MSA requirement. | MWI:LS3120 SLS312 PAD Report 19 SPAD19 | 90% | MACWIS Report: 53% (N=216)* PAD Report: 35% (N=56) (8/31/12) | MACWIS Report: 63% (N=57)* PAD Report: 41% (N=17) (8/31/12) | MACWIS Report: 57% (N=65) PAD Report: 36% (N=25) (2/28/13) | MACWIS Report: 28% (N=246)* PAD Report: 14% (N=51) (8/31/13) | MACWIS Report: 30% (N=186)* PAD Report: 21% (N=28) (8/31/13) | MACWIS Report: 38% (N=106) PAD Report: 58% (N=26) (8/31/13) | MACWIS Report: 17% (N=52) PAD Report: 44% (N=25) (8/31/13) | MACWIS Report: 26% (N=81) PAD Report: 26% (N=38) (2/28/14) |
| MSA III.B.3.a 1-2 and III.B.3.a 7.a. | MSA requires that by 12 months following the date that a Region has fully implemented [and thereafter], 95% of children shall have a permanency plan within 30 calendar days of their entry into care consistent with MSA requirement. | MWI:LS3120 SLS312 PAD Report 19 SPAD19 | 95% | MACWIS Report: 77% (N=181)* PAD Report: 68% (N=71) (8/31/13) <br><br> MACWIS Report: 70% (N=187) PAD Report: 75% (N=89) (6/30/14) | MACWIS Report: 75% (N=55)* PAD Report: 82% (N=17) (8/31/13) <br><br> MACWIS Report: 78% (N=64) PAD Report: 42% (N=15) (6/30/14) | MACWIS Report: 51% (N=51) PAD Report: 39% (N=23) (2/28/14) <br><br> MACWIS Report: 41% (N=63) PAD Report: 33% (N=27) (6/30/14) | | | | | |
| | SLS312 does not reflect performance related to the full MSA requirement. For SLS312, the numbers above represent the percentage of children with a permanency plan by their 30th day of custody. For PAD Report 19, the numbers above represent the percentage of children who had a permanency plan developed within 30 days of initial placement specifying permanency goal, a timeframe, and activities to support the goal of permanency. In December 2013, modifications were made to two questions on the PAD related to PAD Report 19. Thereafter, in April 2014, a new question was added to the PAD related to PAD Report 19. The data above for any periods ending prior to December 2013 are based only on the questions in the PAD prior to the December 2013 modifications and April 2014 addition. Any data beginning with the period ending October 31, 2014 are based on a mixture of questions included in the PAD prior to and subsequent to the December 2013 modifications and April 2014 addition and are identified in red above. <br> * In the Monitor's May 2014 Report, as of 8/21/12 the defendants' performance in Region I-S was reported as 52% and Region III-W was 61% and as of 8/31/13 defendants' performance in Region I-S was reported as 76%, Region III-W was 73%, Region III-S was 26%, and Region I-N was 28%. In April 2014, defendants submitted revised data reports and reproduced historical data back to July 2012. The submission was made too late for the Monitor to analyze for her May 2014 report. The performance reflected above is based on the data submitted by defendants in April 2014. | | | | | | | | | | |
| MSA III.B.3.b 1-2 and III.B.3.b 4.a | MSA requires that by date Region fully implements, 90% of children shall have the goal of reunification shall have case record documentation reflecting active concurrent permanency planning, consistent with MSA requirement. | PAD Report 22 PAD-22 SPAD22 | 90% | 26% (N=38) (8/31/12) | 86% (N=7) (8/31/12) | 43% (N=14) (2/28/13) | 35% (N=37) (8/31/13) | 73% (N=26) (8/31/13) | 50% (N=13) (8/31/13) | 81% (N=16) (8/31/13) | 42% (N=26) (2/28/14) |
| MSA III.B.3.b 1. and III.B.3.b 3.a. | MSA requires that by 12 months following the date that a Region has fully implemented [and thereafter], 95% of children with the goal of reunification shall have case record documentation reflecting active concurrent permanency planning, consistent with MSA requirement. | PAD Report 22 PAD-22 SPAD22 | 95% | 79% (N=48) (8/31/13) <br><br> 55% (N=66) (6/30/14) | 91% (N=11) (8/31/13) <br><br> 74% (N=19) (6/30/14) | 21% (N=14) (2/28/14) <br><br> 47% (N=19) (6/30/14) | | | | | |
| | The numbers above represent the percentage of children with a goal of reunification with documentation in their case record reflecting active concurrent permanency planning. | | | | | | | | | | |

| Cite | MSA Requirement | DFCS Report Name(s) (Legacy and Current) | Performance Requirement | Practice Model Full Implementation: 8/31/12, 12 Months Following: 8/31/13, End of Period 4: 6/30/14 | | Practice Model Full Implementation: 2/28/13, 12 Months Following: 2/28/14, End of Period 4: 6/30/14 | Practice Model Full Implementation: 8/31/13, 12 Months Following: 8/31/14 | | | | Practice Model Full Implementation: 2/28/14, 12 Months Following: 2/28/15 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S | V-E |
| MSA III.B.1.c.1. and III.B.3.c.4.a. | MSA requires that by date Region fully implements, 90% of children in custody for at least six months shall have a timely court or administrative case review consistent with MSA requirement. | MRKZTACR SZTACR | 90% | 91% (N=466) (8/31/12) | 95% (N=187) (8/31/12) | 97% (N=162) (2/28/13) | 86% (N=502) (8/31/13) | 99% (N=339) (8/31/13) | 97% (N=231) (8/31/13) | 100% (N=203) (8/31/13) | 94% (N=245) (2/28/14) |
| MSA III.B.1.c.1. and III.B.3.c.5.a. | MSA requires that 12 months following the date a Region has fully implemented [and thereafter], 95% of children in custody for at least six months shall have a timely court or administrative case review consistent with MSA requirement. | MRKZTACR SZTACR | 95% | 95% (N=440) (8/31/13) 98% (N=414) (6/30/14) | 98% (N=197) (8/31/13) 100% (N=186) (6/30/14) | 92% (N=143) (2/28/14) 89% (N=137) (6/30/14) | | | | | |

SZTACR does not reflect performance related to the full MSA requirement. The numbers above represent the percentage of children in custody for six months or more with an administrative review every six months. The percentages above reflect an analysis of the most recent administrative review per custody episode.

| Cite | MSA Requirement | DFCS Report Name(s) (Legacy and Current) | Performance Requirement | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S | V-E |
|---|---|---|---|---|---|---|---|---|---|---|---|
| MSA III.B.1.c.2. and III.B.3.c.4.b. | MSA requires that by date Region fully implements, at least 90% of foster children in that region who have been in custody for at least 12 months shall have a timely annual court review consistent with MSA requirements. | MRKZTPHR SZTPHRD | 90% | 86% (N=297) (8/31/12) | 97% (N=156) (8/31/12) | 94% (N=129) (2/28/13) | 39% (N=401) (8/31/13) | 87% (N=244) (8/31/13) | 81% (N=182) (8/31/13) | 83% (N=157) (8/31/13) | 89% (N=174) (2/28/14) |
| MSA III.B.1.c.2. and III.B.3.c.5.b. | MSA requires that by 12 months following the date that a Region has fully implemented [and thereafter], at least 95% of foster children in that region who have been in custody for at least 12 months shall have a timely annual court review consistent with MSA requirements. | MRKZTPHR SZTPHRD | 95% | 89% (N=291) (8/31/13) 94% (N=265) (6/30/14) | 93% (N=162) (8/31/13) 99% (N=144) (6/30/14) | 80% (N=109) (2/28/14) 85% (N=102) (6/30/14) | | | | | |

The numbers above represent the percentage of children in custody for 12 months or more with a timely permanency hearing. The percentages above reflect an analysis of whether the most recent permanency hearing was timely.

| Cite | MSA Requirement | DFCS Report Name(s) (Legacy and Current) | Performance Requirement | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S | V-E |
|---|---|---|---|---|---|---|---|---|---|---|---|
| MSA III.B.3.d.4.a. | MSA requires that by date Region fully implements, at least 90% of children in that region with a permanency goal of reunification shall have service plans for their parents that identify those services DFCS deems necessary to address the behaviors or conditions resulting in the child's placement, and documentation that DFCS has made services available directly or through referral. | PAD Report 30 FCR SPAD30 | 80% | Data not available | Data not available | Data not available | 49% (N=115) (8/31/13) | 70% (N=69) (8/31/13) | 97% (N=39) (8/31/13) | 66% (N=73) (8/31/13) | 66% (N=62) (2/28/14) |
| MSA III.B.3.d.1. and III.B.3.d.5.a. | MSA requires that by 12 months following the date a Region has fully implemented [and thereafter], at least 90% of children in that region with a permanency goal of reunification shall have service plans for their parents that identify those services DFCS deems necessary to address the behaviors or conditions resulting in the child's placement, and documentation that DFCS has made services available directly or through referral. | PAD Report 30 FCR SPAD30 | 90% | 91% (N=78) (8/31/13) 96% (N=111) (6/30/14) | 82% (N=33) (8/31/13) 75% (N=20) (6/30/14) | 100% (N=31) (2/28/14) 89% (N=36) (6/30/14) | | | | | |

The numbers above represent the percentage of children with a permanent or concurrent plan of reunification whose parent(s) with whom they are to be reunified have a service plan that identifies services necessary to address conditions that led to custody and the services were made available to the parent(s).

| Cite | MSA Requirement | DFCS Report Name(s) (Legacy and Current) | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 End of Period 4: 6/30/14 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 End of Period 4: 6/30/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/15 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S | V-E |
| MSA III.B.1.e.1. and III.B.1.e.2.a | MSA requires that by date Region fully implements, at least 80% of children in that region who have reached the point at which they have spent 17 of the previous 22 months in care shall have a TPR petition filed on their behalf or an available exception under ASFA documented by the end of their 17th month in care. | MW0017D S2017L | 80% | 93% (N=103) (8/31/12) | 85% (N=78) (8/31/12) | 78% (N=49) (2/28/13) | 87% (N=253) (8/31/13) | 94% (N=93) (8/31/13) | 88% (N=81) (8/31/13) | 98% (N=66) (8/31/13) | 92% (N=66) (2/28/14) |
| MSA III.B.1.e.1. and III.B.1.e.2.a | MSA requires that by 12 months following the date a Region has fully implemented (and thereafter), at least 90% of children in that region who have reached the point at which they have spent 17 of the previous 22 months in care shall have a TPR petition filed on their behalf or an available exception under ASFA documented by the end of their 17th month in care. | MW0017D S2017L | 90% | 95% (N=112) (8/31/13) / 93% (N=119) (6/30/14) | 69% (N=76) (8/31/13) / 83% (N=71) (6/30/14) | 90% (N=42) (2/28/14) / 88% (N=41) (6/30/14) | | | | | |
| | The numbers above represent the percentage of children in custody at least 17 of the previous 22 months for whom a TPR petition was filed or an available ASFA exception has been documented by the last day of the child's 17th month in care. The analysis includes children in custody at least 18 of the previous 22 months in order to assess whether the requirement was met by the end of month 17. | | | | | | | | | | |
| MSA III.B.1.e.1. and III.B.1.e.2.b. | MSA requires that by date Region fully implements, at least 80% of children in that region who have spent more than 17 of the previous 22 months in care without a TPR petition filed or an available ASFA exception documented shall have a petition filed or available exception documented. | MW0017D S2017L | 80% | 100% (N=7) (8/31/12) | 100% (N=12) (8/31/12) | 18% (N=11) (2/28/13) | 76% (N=34) (8/31/13) | 33% (N=6) (8/31/13) | 60% (N=10) (8/31/13) | 100% (N=1) (8/31/13) | 20% (N=5) (2/28/14) |
| MSA III.B.1.e.1. and III.B.1.e.1.b | MSA requires that by 12 months following the date a Region has fully implemented (and thereafter), at least 90% of children in that region who have spent more than 17 of the previous 22 months in care without a TPR petition filed or an available ASFA exception documented shall have a petition filed or available exception documented. | MW0017D S2017L | 90% | 50% (N=6) (8/31/13) / 63% (N=8) (6/30/14) | 100% (N=8) (8/31/13) / 33% (N=12) (6/30/14) | 50% (N=4) (2/28/14) / 20% (N=5) (6/30/14) | | | | | |
| | The numbers above represent the percentage of children in custody at least 17 of the previous 22 months without a TPR petition filed or an available ASFA exception documented by the last day of the child's 17th month in care for whom subsequently a TPR petition was filed or an available ASFA exception was documented. The analysis includes children in custody at least 18 of the previous 22 months in order to assess whether the requirement was met by the end of month 17. | | | | | | | | | | |
| **MSA III.B.5. Developing and Maintaining Connections** | | | | | | | | | | | |
| MSA III.B.5.b. and III.B.5.d.1 | MSA requires that by date Region fully implements, at least 80% of children in that region be provided with contacts with their parents and any siblings not in the same placement consistent with MSA requirements, unless it is documented that a parent or sibling failed to make himself or herself available. | PAD Report 6 MRRL S31B S-PAD6 | 80% | Data unavailable before October 2012; data analyzable as of April 2013 | Data unavailable before October 2012; data analyzable as of April 2013 | Data unavailable before October 2012; data analyzable as of April 2013 | 2% (N=43) (8/31/13) | 26% (N=27) (8/31/13) | 40% (N=25) (8/31/13) | 13% (N=23) (8/31/13) | 16% (N=38) (2/28/14) |
| MSA III.B.5.b. and III.B.5.e.1 | MSA requires that by 12 months following the date a Region has fully implemented (and thereafter), at least 90% of children in that region be provided with contacts with their parents and any siblings not in the same placement consistent with MSA requirements, unless it is documented that a parent or sibling failed to make himself or herself available. | PAD Report 6 MRRL S31B S-PAD6 | 90% | 39% (N=87) (8/31/13) / 40% (N=89) (6/30/14) | 0% (N=16) (8/31/13) / 29% (N=17) (6/30/14) | 27% (N=22) (2/28/14) / 31% (N=26) (6/30/14) | | | | | |
| | PAD Report 6 does not reflect performance related to the full MSA requirement. The numbers above represent the percentage of child contacts with parents/siblings within 24 hours of custody. In December 2013, modifications were made to three questions on the PAD related to PAD Report 6. In April 2014, a new question was added to the PAD related to PAD Report 6. Data for any periods ending prior to December 2013 are based only on the questions in the PAD prior to the December 2013 modifications and April 2014 addition. Any data beginning with the period ending October 31, 2014 are based only on PAD questions as modified in December 2013 and April 2014. (Note: The above data reflects performance only through June 30, 2014, which was the end of Period 4.) Data for periods ending between December 2013 and October 2014 are based on a mixture of questions included in the PAD prior to and subsequent to the December 2013 modifications and April 2014 addition and are identified in red above. | | | | | | | | | | |

| Cite | MSA Requirement | DFCS Report Name(s) (Legacy and Current) | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 End of Period 4: 6/30/14 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 End of Period 4: 6/30/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | | Practice Model Full Implementation: 2/28/14 12 Months Following: 2/28/15 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S | V-E |
| **MSA III.B.6. Educational Services** | | | | | | | | | | | |
| MSA III.B.6.a. and III.B.6.d.1. | MSA requires that by date Region fully implements, 90% of school-age children shall have their educational records reviewed and their educational needs documented within 30 days of entry into care, consistent with MSA requirement. | PAD Report 15 PAD-15 SPAD15 | 80% | 54% (N=63) (8/31/12) | 57% (N=21) (8/31/12) | 69% (N=29) (2/28/13) | 20% (N=56) (8/31/13) | 28% (N=29) (8/31/13) | 89% (N=28) (8/31/13) | 80% (N=25) (8/31/13) | 45% (N=38) (2/28/14) |
| MSA III.B.6.a. and III.B.6.d.1. | MSA requires that by 12 months following the date that a Region has fully implemented (and thereafter), 90% of school-age children shall have their educational records reviewed and their educational needs documented within 30 days of entry into care, consistent with MSA requirement. | PAD Report 15 PAD-15 SPAD15 | 90% | 90% (N=79) (8/31/13) <br><br> 70% (N=90) (6/30/14) | 61% (N=18) (8/31/13) <br><br> 41% (N=22) (6/30/14) | 48% (N=21) (2/28/14) <br><br> 46% (N=26) (6/30/14) | | | | | |
| The numbers above represent the percentage of children who had their educational record reviewed timely for general and special education needs. | | | | | | | | | | | |
| MSA III.B.6.b. and III.B.6.d.2. | MSA requires by the date region fully implements, at least 80% of school-age foster children in that region who enter custody or are subject to a change in schools due to a placement move shall be registered for and attending an accredited school within three business days of the initial placement or placement change, including while placed in shelters or other temporary placements, unless delayed by the Youth Court. | PAD Report 16 PAD-16m1m2 SPAD16 | 80% | 78% (N=55) (8/31/12) | 44% (N=45) (8/31/12) | 94% (N=17) (2/28/13) | 64% (N=58) (8/31/13) | 79% (N=42) (8/31/13) | 89% (N=44) (8/31/13) | 83% (N=24) (8/31/13) | 80% (N=30) (2/28/14) |
| MSA III.B.6.b. and III.B.6.d.2. | MSA requires that by 12 months following the date that a Region fully implements (and thereafter), at least 90% of school-age foster children in that region who enter custody or are subject to a change in schools due to a placement move shall be registered for and attending an accredited school within three business days of the initial placement or placement change, including while placed in shelters or other temporary placements, unless delayed by the Youth Court. | PAD Report 16 PAD-16m1m2 SPAD16 | 90% | 79% (N=52) (8/31/13) <br><br> 85% (N=89) (6/30/14) | 26% (N=27) (8/31/13) <br><br> 43% (N=23) (6/30/14) | 96% (N=24) (2/28/14) <br><br> 90% (N=31) (6/30/14) | | | | | |
| The numbers above represent the percentage of children who enter custody or change placements who are registered for and attending school within three days of entering custody or of the placement change. | | | | | | | | | | | |

| | | | | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 End of Period 4: 6/30/14 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 End of Period 4: 6/30/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | | Practice Model Full Implementation: 2/28/14 12 Months Following: 2/28/15 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Cite | MSA Requirement | DFCS Report Name(s) (Legacy and Current) | Performance Requirement | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S | V-E |
| **MSA III.B.7. Transition to Independent Living** | | | | | | | | | | | |
| MSA III.B.7.b. and III.B.7.e.1. | MSA requires by the date region fully implements, 90% of children who are 14-20 shall be provided with Independent Living services as set forth in their service plans. | MW8RD16 SX8RD16 PAD Report 5 SX8RD16-PAD5 | 90% | MACWIS Report: 66% (N=106) PAD Report: 76% (N=49) (8/31/12) | MACWIS Report: 68% (N=95) PAD Report: 84% (N=55) (8/31/12) | MACWIS Report: 64% (N=87) PAD Report: 83% (N=40) (2/28/13) | MACWIS Report: 29% (N=272) PAD Report: 53% (N=96) (8/31/13) | MACWIS Report: 40% (N=129) PAD Report: 52% (N=52) (8/31/13) | MACWIS Report: 74% (N=76) PAD Report: 75% (N=36) (8/31/13) | MACWIS Report: 36% (N=50) PAD Report: 78% (N=23) (8/31/13) | MACWIS Report: 45% (N=103) PAD Report: 60% (N=40) (2/28/14) |
| MSA III.B.7.b. and III.B.7.f.1. | MSA requires that by 12 months following the date a Region has fully implemented [and thereafter], 95% of children who are 14-20 shall be provided with Independent Living services as set forth in their service plans. | MW8RD16 SX8RD16 PAD Report 5 SX8RD16-PAD5 | 95% | MACWIS Report: 69% (N=106) PAD Report: 83% (N=42) (8/31/13) MACWIS Report: 89% (N=101) PAD Report: 81% (N=47) (6/30/14) | MACWIS Report: 75% (N=92) PAD Report: 87% (N=52) (8/31/13) MACWIS Report: 70% (N=93) PAD Report: 80% (N=35) (6/30/14) | MACWIS Report: 47% (N=55) PAD Report: 84% (N=32) (2/28/14) MACWIS Report: 48% (N=62) PAD Report: 85% (N=34) (6/30/14) | | | | | |
| SX8RD16 does not reflect performance related to the full MSA requirement. For SX8RD16, the numbers above represent the percentage of children ages 14-20 who completed all of the independent living skills or services in their independent living plan. The data in this report may undercount the number of children ages 14-20 who are receiving independent living services. Defendants explain the reason for this in the specification for this report as follows: "a 'No' answer [regarding whether a child is receiving services] may not be an accurate reflection of services being received, as the IL Services class has a set schedule and services being delivered ('Passed') may not be reflected until a future month, but the child may be attending class regularly in the current month." PAD Report 5 does not reflect performance related to the full MSA requirement. For PAD Report 5, the numbers above represent the percentage of children ages 14-20 receiving independent living services as set forth in their service plans. In December 2013, modifications were made to one question and three questions were added to the PAD related to PAD Report 5. Data in the table for any periods ending prior to December 2013 are based only on the questions in the PAD prior to the December 2013 modification and additions. Any data beginning with the period ending May 31, 2014 are based only on PAD questions as modified or added in December 2013. Data for periods ending between December 2013 and May 2014 are based on a mixture of questions included in the PAD prior to and subsequent to the December 2013 modification and additions and are identified in red above. | | | | | | | | | | | |
| MSA III.B.7.c. and III.B.7.e.2. | MSA requires by the date region fully implements, at least 80% of foster children in that region who are transitioning to independence shall have available an adequate living arrangement, a source of income, health care, independent living stipends, and education and training vouchers. | PAD Report 23 PAD-23ie1ie2ie3ie4 SPAD23 | 80% | 67% (N=9) (8/31/12) | 50% (N=4) (8/31/12) | 91% (N=11) (2/28/13) | 60% (N=35) (8/31/13) | 50% (N=4) (8/31/13) | 100% (N=1) (8/31/13) | 100% (N=1) (8/31/13) | 33% (N=6) (2/28/14) |
| MSA III.B.7.c. and III.B.7.f.2. | MSA requires that by 12 months following the date that a Region fully implements [and thereafter], at least 90% of foster children in that region who are transitioning to independence shall have available an adequate living arrangement, a source of income, health care, independent living stipends, and education and training vouchers. | PAD Report 23 PAD-23ie1ie2ie3ie4 SPAD23 | 90% | 44% (N=9) (8/31/13) 80% (N=15) (6/30/14) | 25% (N=4) (8/31/13) 0% (N=9) (6/30/14) | 100% (N=2) (2/28/14) 67% (N=3) (6/30/14) | | | | | |
| PAD Report 23 does not reflect performance related to the full MSA requirement. The numbers above represent the percentage of foster children transitioning to independence who have available an adequate living arrangement, a source of income, health care, independent living stipends, and education and training vouchers. In December 2013, modifications were made to one question and one question was added to the PAD related to PAD Report 23. Data in the table for any periods ending prior to December 2013 are based only on the questions in the PAD prior to the December 2013 modification and addition. In the table any data beginning with the period ending May 31, 2014 are based only on PAD questions as modified or added in December 2013. Data for periods ending between December 2013 and May 2014 are based on a mixture of questions included in the PAD prior to and subsequent to the December 2013 modification and addition and are identified in red above. | | | | | | | | | | | |

| | | | | Practice Model Full Implementation: 8/31/12 — 12 Months Following: 8/31/12 — End of Period 4: 6/30/14 | | Practice Model Full Implementation: 2/28/13 — 12 Months Following: 2/28/14 — End of Period 4: 6/30/14 | Practice Model Full Implementation: 8/31/13 — 12 Months Following: 8/31/14 | | | | Practice Model Full Implementation: 2/28/13 — 12 Months Following: 2/28/15 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Cite | MSA Requirement | DFCS Report Name(s) (Legacy and Current) | Performance Requirement | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S | V-E |
| **MSA III.B.8. Case Closing and Aftercare** | | | | | | | | | | | |
| MSA III.B.8.a. and III.B.8.b. | MSA requires that by date Region fully implements, 70% of children who are reunified and in custody longer than 90 days shall receive a 90 day TMV; during the TMV the child's caseworker or family preservation caseworker shall meet with the child in the home at least two times per month without parent or caretaker present, consistent with MSA requirements. | MWLSS4A SLSS4AO&S | 70% | In September 2014 defendants submitted corrected data, dating back only to September 2013 | In September 2014 defendants submitted corrected data, dating back only to September 2013 | In September 2014 defendants submitted corrected data, dating back only to September 2013 | In September 2014 defendants submitted corrected data, dating back only to September 2013 | In September 2014 defendants submitted corrected data, dating back only to September 2013 | In September 2014 defendants submitted corrected data, dating back only to September 2013 | In September 2014 defendants submitted corrected data, dating back only to September 2013 | 50% (N=2) (2/28/14) |
| MSA III.B.8.a.i. and III.B.8.b. | MSA requires that by 12 months following the date a Region has fully implemented [and thereafter], 90% of children who are reunified and in custody longer than 90 days shall receive a 90 day TMV; during the TMV the child's caseworker or family preservation caseworker shall meet with the child in the home at least two times per month without parent or caretaker present, consistent with MSA requirements. | MWLSS4A SLSS4AO&S | 90% | In September 2014 defendants submitted corrected data, dating back only to September 2013  80% (N=15) (6/30/14) | In September 2014 defendants submitted corrected data, dating back only to September 2013  75% (N=4) (6/30/14) | 0% (N=1) (2/28/14)  0% (N=3) (6/30/14) | | | | | |

SLSS4AO&S does not reflect performance related to the full MSA requirement. The numbers above represent the percentage of children who, during trial home visit period, met with their caseworker or family preservation caseworker in the home twice in a one-month period or at least once monthly if 15 days or less, for 90 days.

| | | | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S | V-E |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **MSA III.C. Outcome Measures** | | | | | | | | | | | |
| MSA III.C.1.a.i. | MSA requires that by date Region fully implements, 60% of children who are discharged from custody and reunified with parents or caretakers shall be reunified within 12 months from the latest removal from home. | MWSRD005 SXBRD05& | 60% | 56% (N=151) (8/31/12) | 43% (N=40) (8/31/12) | 59% (N=29) (2/28/14) | 73% (N=226) (8/31/13) | 69% (N=112) (6/31/13) | 50% (N=60) (8/31/13) | 62% (N=55) (6/31/13) | 47% (N=83) (2/28/14) |
| MSA III.C.1.b.i. | MSA requires that by 12 months following the date a Region has fully implemented [and thereafter], 70% of children who are discharged from custody and reunified within 12 months from the latest removal from home. | MWSRD005 SXBRD05& | 70% | 55% (N=122) (8/31/13)  73% (N=123) (6/30/14) | 44% (N=36) (8/31/13)  51% (N=49) (6/30/14) | 42% (N=36) (2/28/14)  37% (N=35) (6/30/14) | | | | | |

The numbers above represent the percentage of children reunified with parent or caretaker in under 12 months from latest removal.

| MSA III.C.2.a.i. | MSA requires that by date Region fully implements, 25% of children who were discharged upon finalization of an adoption shall have the adoption finalized within 24 months from the latest removal from home. | MWSRD010 SBRD10 | 25% | 42% (N=52) (8/31/12) | 15% (N=13) (8/31/12) | 50% (N=22) (2/28/13) | 0% (N=13) (8/31/13) | 17% (N=36) (6/31/13) | 0% (N=22) (8/31/13) | 8% (N=13) (6/31/13) | 13% (N=15) (2/28/14) |
| MSA III.C.2.b.i. | MSA requires that by 12 months following the date a Region has fully implemented [and thereafter], 30% of children who were discharged upon finalization of an adoption shall have the adoption finalized within 24 months from the latest removal from home. | MWSRD010 SBRD10 | 30% | 29% (N=62) (8/31/13)  28% (N=54) (6/30/14) | 9% (N=22) (8/31/13)  0% (N=15) (6/30/14) | 45% (N=11) (2/28/14)  45% (N=11) (6/30/14) | | | | | |

The numbers above represent the percentage of children with adoption finalized within 24 months from latest removal from home.

II.    **METHODOLOGY**

The Monitor's assessment of defendants' progress toward meeting Period 4 IP

requirements included site visits to the MDHS State Office as well as to certain DFCS regional

and county offices.[59]  In addition, during Period 4, both face-to-face and telephone interviews

were conducted with MDHS and DFCS managers, supervisors, caseworkers, trainers and practice

coaches.[60]  Service providers from private agencies that contract with DFCS, child welfare

practice and information technology consultants under contract with the defendants, and other

public and private child welfare system stakeholders also were interviewed.

Relevant documents, memoranda and other records maintained by MDHS/DFCS,[61] have

been reviewed and analyzed, including the following: minutes of meetings generated by the

Statewide Implementation Team ("SIT"); electronic and paper case records for children in foster

care and their families; serious incident reports ("SIRs") concerning reports of maltreatment in

care; maltreatment investigation reports and documents associated with the maltreatment in care

review process; the CQI plan as well as reports and tracking documents generated by the CQI

process, including Evaluation and Monitoring Unit ("EMU") reports, and corrective action

tracking records generated by the "HEAT" system;[62] staffing and personnel data, including

organizational charts, records related to hiring and attrition, position descriptions and vacancy

---

[59]  Site visits to DFCS county offices during Period 4 included Hancock, Harrison, Forrest, and Hinds Counties, some of which were visited on multiple occasions.

[60]  Structured face-to-face interviews were conducted during Period 4 with over 85 DFCS staff and managers.  Some staff and managers were interviewed on multiple occasions for significant time periods.  Consistent with past practice, the Monitor has continued to interview MDHS and DFCS managers and staff on an ongoing basis about performance during Period 4 and thereafter.  Telephone interviews were conducted with various MDHS/DFCS managers throughout Period 4 as a supplement to in-person interviews.  Additionally, telephone interviews were conducted with managers and staff in many DFCS regional and county offices.

[61]  These records were either obtained directly by the Monitor from MDHS/DFCS staff or submitted more formally by defendants' counsel.

[62]  The Help Desk Expert Automated Tool, referred to as the "HEAT" system, provides detailed information for tracking service issues related to MDHS/DFCS information technology operations.  It has been adapted by the defendants to track corrective actions identified by the CQI process.

postings; requests for proposals ("RFPs") and contracting documents; staff recruitment materials and associated sign-in sheets reflecting participants at staff recruitment presentations; training records; data reports generated by the Mississippi Automated Child Welfare Information System ("MACWIS") and by the FCR process; policies and practice guides; and progress reports and other submissions concerning implementation activities associated with federal grant programs. The Monitor also has evaluated various planning documents and protocols submitted by defendants pursuant to MSA requirements.[63]

The Monitor analyzed statewide and regional performance data and related records submitted by defendants during Period 4 and thereafter, covering the period through June 30, 2014.[64] The Monitor also consulted with child welfare system and information technology experts during Period 4.[65] In January 2014, the Monitor engaged two child welfare experts to conduct a case record review related to maltreatment in care prevalence, investigation quality, contributing factors and remedial strategies. The methodology used to conduct the case record review and the findings from the review are described in a June 2014 report, which is included in the Appendix and addressed herein, as applicable, in the narrative related to several Period 4 requirements.[66]

As a general matter, defendants have cooperated fully with the Monitor and assisted her, in specific circumstances, with information gathering activities.

---

[63] Included among these documents are the Workforce Development Plan required by the Initial Period 4 IP §II.A.1., *infra* at 45.
[64] The quantitative analysis in this report was conducted by Sarah Kaye and Mark Jordan, consultants to the Office of the Court Monitor. Dr. Kaye's professional experience and credentials are summarized in her curriculum vitae, which is included in the Appendix as App. B, Ex. 23B, *infra* note 244. Mr. Jordan's academic background and professional experience are summarized in the *September 2013 Report* at Ex. 28. Mia Caras, Special Assistant to the Court Monitor, also conducted data analysis and provided extensive support to Dr. Kaye and Mr. Jordan.
[65] In situations in which an expert assisted the Monitor with a specific assessment of defendants' performance during Period 4, the expert is identified in the corresponding text of this report.
[66] *See* App. B, Ex. 23D, *infra* note 245, for the assessment report; *see also infra* at 105-107.

III.     **FINDINGS**

As a threshold matter, it is helpful to consider certain contextual information about the thousands of children in defendants' custody at any point in time to whom the requirements of the MSA apply.  According to data produced by defendants, between June 30, 2013 and June 30, 2014, the population of children in custody grew by approximately 14 percent, from just over 3,900 to nearly 4,500 children in custody, over the course of Period 4.  The population grew by another eight percent over the next seven months, and by February 28, 2015, the population of children in custody approached 4,900.  Period 4 growth was driven in large part by growth in four of the five regions with the largest number of children in custody.  Regions I-N, III-S, and VII-W all experienced growth over 20 percent during Period 4, and the population of children in custody in Region VI grew by nearly 50 percent.

On a statewide basis, there were no significant changes in placement trends between Period 3 and Period 4.  In both Period 3 and Period 4, approximately 50 percent of children in custody were placed in non-relative or relative foster homes.  Additionally, in both periods, approximately 15 percent of children in custody were placed in their own homes.  Also in both periods, 10 percent of children in custody were in unlicensed placements or placements pending licenses.  Half of all unlicensed placements or placements with pending licenses were in Region VII-W, which accounts for 26 percent of children in custody statewide.

These data are presented visually in the chart below:

Children in Foster Care By Placement Type, By Region
One-Day Snapshots, 6/30/13 And 6/30/14
[Prepared by the Office of the Court Monitor Based on DFCS Data, MACWIS SZ0510]

Total Children in Foster Care:
6/30/13 = 3936
6/30/14 = 4497
2/28/15 = 4874 (not presented in chart)

        The Monitor's findings concerning defendants' performance relative to the MSA's Period

4 requirements are set forth below.

> **Initial Period 4 Implementation Plan ("IP") §§I.A. and I.B.**
> **I.  Reform Planning and Implementation**
>     **A.  Implementation Period 3 will conclude before Defendants
>     have produced the accurate and validated reports required
>     by the Period 3 Implementation Plan.  Therefore, the Parties
>     and the Monitor have not been able to utilize such reports as
>     intended for monitoring purposes during Implementation
>     Period 3.  Therefore, the Parties, working with the Monitor,
>     shall revisit this Initial Period 4 Implementation Plan by
>     December 1, 2013 and renegotiate its scope to determine
>     what, if any, additional requirements must be added.**
>     **B.  The Final Period 4 Implementation Plan will be finalized no later
>     than January 8, 2014, and will reflect the additional steps, if any,
>     Defendants must take by the end of Period 4.  The time period from
>     December 1, 2013 to January 8, 2014 shall be termed the
>     "Negotiation Period."**

**Status of Progress, Initial Period 4 IP §§I.A. and I.B.:**  These Period 4 requirements were satisfied.  As explained above, for the most part, the defendants did not produce the accurate and validated reports about their performance relative to MSA standards that they had been required to produce during Period 3.[67]  Consequently, the Court issued a remedial order on June 24, 2013 that required the defendants to produce this body of performance data on a monthly basis according to a staggered schedule beginning in September 2013 and ending in mid-January 2014.  Because Period 3 performance data were unavailable to inform negotiation of the Period 4 IP, the parties elected to bifurcate implementation planning for Period 4.  The Initial Period 4 IP, filed on July 18, 2013, included the data reporting obligations in the June 24, 2013 Order and contemplated that this information about the defendants' progress relative to MSA requirements would inform the development, approximately six months later, of a Final Period 4 IP that would supplement, but not supersede, the Initial Period 4 IP.[68]

During a meeting conducted on November 7, 2013, the parties reached agreement on a schedule to guide the negotiation of the Final Period 4 IP.  The schedule contemplated that the Monitor would provide the parties with her analyses of all data reports submitted pursuant to the June 24, 2013 Order for which there were no major and apparent accuracy or validation issues. The Monitor submitted the contemplated analyses to the parties starting on December 6, 2013, and this information informed the negotiation process.  Negotiations were ongoing during December 2013 and early January 2014.  The parties reached agreement on the Final Period 4 IP, which was filed on January 8, 2014.[69]

---

[67] *See also supra* at 10.

[68] *See* Final Period 4 IP §I.A. (stating the Final Period 4 IP supplements the Initial Period 4 IP).

[69] For a general summary of progress during Period 4, *see supra* at 14-20.

> Final Period 4 IP §I.B.
> I. **Reform Planning and Implementation**
>   B. **Pursuant to Section I.E of the MSA, the Parties, working with the Monitor, shall begin to negotiate the Period Five Implementation Plan by April 7, 2014.**

**Status of Progress, Final Period 4 IP §I.B.:** This requirement was not satisfied. The negotiation of the Period 5 IP did not commence by the April 7, 2014 deadline. The Period 5 IP was filed on December 23, 2014, over five months after Period 4 ended. The Period 5 IP has retroactive applicability and it became effective for a 12-month period beginning July 7, 2014.

> Ongoing Period 3 IP Requirement §I.A.1.a.[70]
> A. **Human Resources Management**
>   1. **Management**
>     a. **By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants shall establish a Statewide Implementation Team. The Statewide Implementation Team will be responsible for prioritizing, managing, and making decisions relating to implementation of the requirements of the Modified Settlement Agreement, this Plan, and the Practice Model. The Statewide Implementation Team will consist of the MDHS Executive Director, MDHS Deputy Executive Director, DFCS Deputy Administrator, DFCS Director, DFCS Field Operations Director, DFCS CQI Director, and a CSF Officer or designee.**

**Status of Progress, Period 3 IP §I.A.1.a. (Ongoing Requirement):** This requirement was partially satisfied during Period 4. Although the evidence indicates that the SIT met regularly during Period 4, it did not manage the implementation of the Practice Model and the MSA on an ongoing basis during Period 4. Moreover, no other management entity was in place throughout Period 4 to do so.[71] The basis for this finding is addressed below.

---

[70] The Initial and Final Period 4 IPs acknowledge that, as applicable, ongoing obligations of the Period 3 IP remain in effect. *See* Initial and Final Period 4 IPs at 1 and n.1. The parties did not specify in the Initial and Final Period 4 IPs which requirements among the list of Period 3 requirements cited in the Period 4 IP would remain applicable during Period 4. Thus, the Monitor has not reported herein on certain Period 3 requirements that represent time-limited and discrete initiatives.

[71] In the May 2014 Report the Monitor stated that the SIT was not a Period 4 requirement. *May 2014 Report* at 41. This representation was correct at that time because the Initial Period 4 IP, which makes this subsection an ongoing Period 3 requirement, was not finalized until July 18, 2013. *See* Initial Period 4 IP at 1 and n.1.

41

As explained in the Monitor's May 2014 Report, before the start of Period 3 the defendants established the SIT and generally used it to manage implementation of the MSA and the Practice Model.[72]  However, during Period 4, the minutes from SIT meetings and interview data indicate that the SIT did not regularly review, consider, or take specific action on performance data related to implementation of the MSA and the Practice Model.  Moreover, with very limited exceptions, the SIT did not direct or guide the work of the statewide implementation sub-teams during Period 4, as required.[73]  The Monitor has been unable to identify any evidence that establishes the SIT or an equivalent entity was involved in the ongoing management of the MSA and the Practice Model.  Indeed, while the SIT addressed some matters that implicate the MSA during Period 4, it did not function in the manner contemplated by this requirement.

Moreover, there is evidence that indicates tracking of MSA requirements during Period 4 was not conducted in an ongoing and systematic manner as contemplated by this requirement. Indeed, during the Bridge Period and at least part of Period 3, a consultant from the University of Southern Mississippi ("USM") coordinated a Settlement Team that tracked activities related to specific MSA requirements and reported regularly to the SIT.  DFCS managers report that this Settlement Team, while not required by the MSA or any of its implementation plans, helped to promote progress during the Bridge Period and part of Period 3, but it was not convened during Period 4.  There is evidence that indicates several Period 4 requirements involving specific

---

[72] *May 2014 Report* at 41.
[73] *See infra* at 43-44 for the narrative related to §I.A.1.b. of the Period 3 IP, an ongoing requirement which addresses the SIT's sub-teams and requires that the sub-teams report to and receive direction from the SIT.  A review of meeting minutes indicates that the SIT received updates and reviewed requests from some of the sub-teams on an *ad hoc* basis during Period 4.  In addition, the SIT referred at least one matter to a sub-team.  However, this evidence does not establish that the SIT directed, guided or otherwise coordinated the work of all the sub-teams in an ongoing and strategic way throughout Period 4.

deliverables were not satisfied because of the failure of DFCS management to track, monitor and follow through on required implementation activities.[74]

> **Ongoing Period 3 IP Requirement §I.A.1.b.[75]**
> **A. Human Resources Management**
>   **1. Management**
>     **b. By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants shall establish the following Statewide Implementation Sub-Teams: CQI, Training, Resource Development, Policy, Legal and Judicial, Resource Parent Recruitment and Retention, and Caseload/Staffing. These Statewide Implementation Sub-Teams will be responsible for designing and guiding the work plans necessary to implement the requirements of the Modified Settlement Agreement and this Plan in their respective functional areas. The Statewide Implementation Sub-Teams will report to and be directed by the Statewide Implementation Team. The Statewide Implementation Sub-Teams shall meet no less frequently than monthly, with the exception of the CQI Sub-Team and the Resource Home Recruitment and Retention Sub-team which shall meet at least quarterly, and shall issue progress reports to the Statewide Implementation Team no less frequently than every three months and which shall discuss accomplishments, challenges, and anticipated next steps. The Statewide Implementation Sub-Teams' membership will include the Unit Director responsible for that Sub-Team's particular function, a Regional Director, and such other staff persons the Statewide Implementation Team has deemed responsible for carrying out the particular Sub-Team's function. Sub-Teams may also include representatives of other state agencies or stakeholders the Statewide Implementation Team has deemed necessary to carry out the Sub-Team's function.**

**Status of Progress, Period 3 IP §I.A.1.b. (Ongoing Requirement):** This requirement was partially satisfied during Period 4. As indicated in the Monitor's May 2014 Report, the required sub-teams and several additional sub-teams were established on a timely basis and they generally functioned as contemplated by the Period 3 IP.[76] However, the Monitor reported that

---

[74] *See, e.g.,* narrative related to Final Period 4 IP §V.B. *infra* at 151 (failure to submit report on progress related to action steps required by Final Period 4 IP §V.A. regarding multiple improvement plans); narrative related to Final Period 4 IP §II.B.2. *infra* at 84-85 (failure to submit monthly reports documenting obligation to ensure timely implementation of corrective actions required by CQI corrective action tracking process).
[75] *See* Initial and Final Period 4 IPs at 1, n.1.
[76] *May 2014 Report* at 42.

the work products produced by several sub-teams during Period 3 raised substantial concerns about the defendants' capacity to implement certain specific MSA requirements.[77]  Although there is evidence that many of the sub-teams continued to meet during Period 4, for the most part the sub-teams were not guided by concrete work plans related to MSA and Practice Model implementation in their functional areas.  Moreover, the sub-teams were not required to submit periodic progress reports to the SIT, addressing accomplishments, challenges and next steps.[78]

> **Ongoing Period 3 IP Requirement §I.A.1.c.[79]**
> **A.  Human Resources Management**
>     **1.  Management**
>         **c.  By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants shall establish Regional Implementation Teams in Regions I-N, I-S, II-W, III-S, IV-N, IV-S, V-E and V-W.  The Regional Implementation Teams will be chaired by the respective Regional Director and the membership will consist of appropriate staff persons and may also include representatives of other state agencies or stakeholders the Statewide Implementation Team has deemed necessary to carry out the Team's function.  The Regional Implementation Teams shall meet no less frequently than quarterly and shall issue progress reports to the Statewide Implementation Team no less frequently than quarterly.  These reports shall discuss accomplishments, challenges, and anticipated next steps. The Regional Implementation Teams will include Sub-Teams in the following practice areas: CQI and Resource Parent Recruitment and Retention.**

**Status of Progress, Period 3 IP §I.A.1.c. (Ongoing Requirement):**  This requirement was partially satisfied during Period 4.  A primary purpose of the Regional Implementation Team ("RIT") is to guide implementation of the Practice Model in each of DFCS's administrative regions.  In May 2014 the Monitor reported on substantial shortcomings in the RITs that were identified during Period 3 and that had not yet been remedied by the start of May 2014, as Period

---

[77] *Id. See also id.* at 44 (addressing defendants' performance related to Period 3 IP §I.A.1.d., which required the sub-teams to finalize the work plan referred to in Period 3 IP §I.A.1.b., and noting that with few exceptions the documents that defendants submitted were insufficient to guide the work of the sub-teams).

[78] Defendants report that at least some of the sub-teams submitted meeting minutes periodically to a DFCS staff member who participated on the SIT.  The Monitor requested the sub-teams' meeting minutes, but as of June 10, 2015 the minutes had not been produced.

[79] *See* Initial and Final Period 4 IPs at 1, n.1.

4 was coming to an end.[80]  Interviews with DFCS managers and other stakeholders during Period

4 indicate that many regional managers had continued difficulty implementing the regional

implementation team process as intended notwithstanding efforts by DFCS management to

strengthen the RITs.  During the first quarter of 2015, defendants initiated efforts to address

regional performance deficits by requiring the development of regional improvement plans for

certain DFCS regions.  Defendants report that the plans, which were submitted to DFCS

executive leadership for approval during May 2015, have been approved and will be provided to

the Monitor in the near term.

> **Initial Period 4 IP §II.A.1.**
> **A.  Human Resources Management**
>    1.  **By August 15, 2013, the Monitor shall determine whether to approve Defendants' April 8, 2013 Workforce Development Plan (the "Plan"), as described in Section I.A.2.b of the Period 3 Implementation Plan.  If the Monitor does not approve the Plan, Defendants shall expeditiously revise the Plan and resubmit it to the Monitor, and the Monitor shall expeditiously review the revised Plan and determine whether to approve it.  Once approved, Defendants shall implement the Plan in accordance with its terms.**

**Status of Progress, Initial Period 4 IP §II.A.1.:**  The defendants did not satisfy this

Period 4 requirement.  The Monitor did not approve defendants' April 8, 2013 submission nor

did she approve a revised version of the Work Force Development Plan that defendants

submitted on November 6, 2013 because neither version satisfied MSA requirements.[81]  The

Monitor's findings, including all supporting evidence, are presented, in detail, in the Monitor's

May 2014 Report.[82]

> **Final Period 4 IP §§II.A.1., II.A.2., and II.A.3.**
> **A.  Human Resources Management**
>    1.  **By January 15, 2014, Defendants, in consultation with the Monitor, shall undertake a process for correcting the**

---

[80]  *May 2014 Report* at 43.
[81]  *See May 2014 Report* at Exs. 8F and 8H.  Unless otherwise specified, all references in this report to exhibits of the May 2014 Report refer to exhibits contained in Appendix B of the May 2014 Report.
[82]  *See May 2014 Report* at 63-67 and at Exs. 8A-8H.

       caseworker mixed caseload data reports submitted to the
       Monitor for caseloads as of November 1 and November 30,
       2013 and any subsequent monthly caseworker mixed
       caseload data reports with regard to supervisory caseload
       assignments.

2. **By January 24, 2014, Defendants shall produce to the
Monitor supplemental information to correct the caseworker
mixed caseload data reports submitted to the Monitor for
caseloads as of November 1 and November 30, 2013 with
regard to supervisory caseload assignments.**

3. **Defendants shall produce to the Monitor and Plaintiffs
caseworker mixed caseload data reports once each week for
a period of three months beginning the week of February 1,
2014. Following production of these first three months of
data, Defendants, in consultation with Plaintiffs and the
Monitor, will determine whether the caseworker mixed
caseload data report shall be produced on a weekly, bi-
weekly, or monthly basis.**

**Status of Progress, Final Period 4 IP §§II.A.1., II.A.2., and II.A.3.:** This requirement
was not satisfied. As explained below, as required, the defendants consulted with the Monitor
and undertook a process for correcting the mixed caseload data that they had submitted to the
Monitor; however, defendants were unable to correct the November 1 and 30, 2013 data.
Following a protracted data validation process and subsequent development of a revised report
specification, defendants produced complete, validated data for the first time in mid-October
2014, after the end of Period 4. The data defendants were able to produce in mid-October has
been analyzed by the Monitor and the results of the analyses are presented in this report.[83]

The defendants have been required to produce accurate and validated monthly reports on
caseworker caseloads during each annual implementation period since 2008, the beginning of
Period 1.[84] The ability to report accurately and at regular intervals on caseworker caseloads is a
prerequisite for maintaining an adequate workforce and for balancing the workload among

---

[83] *See infra* at 66-69. In May 2015, defendants notified plaintiffs and the Monitor that there were problems with the
Excel versions of the dedicated caseload data that defendants produced for the months of November and December
2014 and January 2015. The dedicated caseload data was resubmitted on May 20, 2015.

[84] Settlement Agreement §§II.A.2.a.7. and II.A.2.a.10.

caseworkers,[85] and is essential to building the capacity for defendants to meet the MSA's core

service delivery requirements.

The Monitor's previous reports detail substantial limitations in defendants' performance

and describe many of the challenges they have confronted during repeated efforts to meet

caseload reporting obligations.[86]  This history underscores a recurrent theme throughout the

remedial stage of this lawsuit regarding the absence of fundamental management tools to drive

improvement.  While there has been progress developing caseload data reports, particularly over

the past year, the depth of defendants' capacity deficits is revealed by the fact that so

fundamental an issue would remain unresolved for a nearly seven-year period between January

2008 and October 2014.

Because defendants failed to produce accurate and validated caseload reports on a

monthly basis during Period 3, both the June 24, 2013 Order and the Initial Period 4 IP required

the defendants to produce the monthly mixed caseload reports that were due during Period 3 by

September 1, 2013, and thereafter, to produce monthly reports on an ongoing basis by October 1,

2013.[87]

The defendants worked with plaintiffs' counsel and the Monitor to develop specifications

for the mixed caseload report, as required.[88]  The collaborative process that was used for

developing the report's specifications was protracted and, as a result, the specifications were not

---

[85]  The Monitor has reported on the importance of these data in many of her prior reports.  *See, e.g., May 2014 Report* at 45.

[86]  *See, e.g., The Court Monitor's Report to the Court Regarding Defendants' Progress Toward Meeting Period-1 Requirements* [hereinafter *June 2009 Report*], filed June 5, 2009 [Dkt. No. 488], at 25-35; *The Court Monitor's Report to the Court Regarding Defendants' Progress Toward Meeting Period 2 Requirements* [hereinafter *September 2010 Report*], filed September 8, 2010 [Dkt. No. 503], at 18-25; *The Court Monitor's November 23, 2010 Report to the Court Regarding the June 10, 2010 Agreed Order for Corrective Action* [hereinafter *November 2010 Report*], filed November 23, 2010 [Dkt. No. 528], at 22-23; *January 2013 Report* at 22-25; and *May 2014 Report* at 22, 45-55.

[87]  June 24, 2013 Order §VI.E. Attachment One, and Attachment Two, Report 9; and Initial Period 4 IP §II.C.1.

[88]  As noted above, pursuant to the June 24, 2013 Order, the defendants were required to develop specifications for all outstanding data reports in consultation with the plaintiffs and the Monitor.  June 24, 2013 Order §VI.A.3.

finalized until late August 2013.[89]  While there was agreement that a point-in-time measurement

of all caseworker caseloads would be reflected in the report, the parties and the Monitor did not

have sufficient information about the factors impacting variations in caseloads to determine how

sensitive point-in-time measurement results were to the moment when the point-in-time report

was produced (*i.e.,* whether there was a wide variation over time, which could render any

individual point-in-time measurement not representative of general caseload levels).

Accordingly, the specifications provided that caseloads would be measured once monthly on a

different day each month until certain software was operational,[90] and thereafter the measurement

would be conducted weekly for a three-month period.  In turn, the specifications recognize that

this discrete body of caseload data would be used to inform the defendants' determination, in

consultation with plaintiffs and the Monitor, about whether the caseload reports should be

produced prospectively on a weekly, bi-weekly, or monthly basis.[91]

      Because the development of the mixed caseload specifications was the result of a

protracted process, there was an informal agreement between the parties to afford defendants

some flexibility with respect to the September 1, 2013 deadline.  During October 2013,

defendants reported that none of the historical caseload data that was required by both the June

24, 2013 Order and the July 2013 Initial Period 4 IP had been maintained in MACWIS.

Thereafter, at the start of November 2013, defendants reported that programming issues would

---

[89]  *See* App. B, Ex. 1, Final Specifications for Mixed Caseload Data Report (DHS 351488-351501).  The
specifications for the mixed caseload report were finalized on August 22, 2013.
[90]  *Id.* at 1, n.1.  Initially, defendants' caseload data reporting production was constrained by a practice that was
limited to once monthly data extracts from MACWIS.  The data were transferred to a relational database, which was
used as the data source for many of defendants' monthly reporting requirements.  Defendants installed a software
program that enabled much more frequent data transfers from MACWIS to the relational database, which allowed
for the possibility of the production of caseload reports on more frequent intervals.
[91]  *Id.*

delay submission of the monthly mixed caseload reports.[92]  Defendants stated that a report for November 1, 2013 would be submitted by December 1, 2013, following the required two-stage validation process.[93]

On December 6, 2013, defendants produced a November 1, 2013 point-in-time report for mixed caseloads.[94]  An additional point-in-time report for November 30, 2013 was produced on December 20, 2013.[95]  As the Monitor reported in her May 2014 Report, her analysis of the November 1, 2013 point-in-time data indicated that over 10 percent of the employees reflected in the data as carrying cases were supervisors instead of caseworkers.[96]  Because the MSA expressly prohibits the defendants from assigning primary casework responsibility to supervisors,[97] and because interview data collected by the Monitor throughout Period 3 did not suggest that supervisory assignments to cases were as prevalent as the November 1, 2013 data indicated, the Monitor notified the parties of her concerns about the accuracy of the defendants' submissions.

The Final Period 4 IP, which was filed at the start of January 2014, included three specific requirements to address these issues.  First, it required defendants to correct the November 1 and

---

[92]  On November 1, 2013, the defendants reported on a need for multiple programming "fixes" that were discovered during the report validation process.  *See May 2014 Report* at 48-49 and Ex. 5D.  The Monitor's May 2014 Report presents a detailed summary of defendants' efforts to meet the Period 4 mixed caseload reporting requirements as well as the challenges that they encountered in their attempts to do so.  *Id.* at 47-53.

[93]  *Id.* at 48-49 and Ex. 5D.  The June 24, 2013 Order required defendants to develop and implement a plan to improve the completeness, accuracy and validation of data reports required by the MSA.  June 24, 2013 Order §VI.D.2.  The plan, which was submitted by the defendants on November 26, 2013 and clarified on March 17, 2014, requires a two-stage validation process: a face validity check and a "manual validation" process involving comparing data from reports to data from other data sources, including MACWIS.  As explained *infra* at 51, for the caseload reports, defendants initially instituted a 100 percent field validation process, but subsequently modified it in 2014 based on practicality concerns after problems were detected with the completeness and accuracy of the caseload data following serial report productions.

[94]  *See May 2014 Report* at 49 and Ex. 5F.

[95]  *Id.* at 49 and Ex. 5G.

[96]  *Id.* at 49.

[97]  MSA §II.A.2.a.9.d. (prohibiting, by the end of Period 3, supervisors to be assigned primary responsibility for providing direct casework for any cases absent extenuating circumstances and only for a time-limited duration with management approval); *id.* §II.A.2.a.7.

November 30, 2013 point-in-time data as well as any subsequent monthly mixed caseload reports insofar as supervisory caseload assignments.[98]  Second, it required defendants to produce supplemental information to the Monitor to correct supervisory assignments in the November 2013 mixed caseload data submissions.[99]  Finally, it required the defendants to produce mixed caseload reports once each week for a three-month period beginning the week of February 1, 2014, and thereafter to consult with plaintiffs and the Monitor and determine whether the reports should be produced on a weekly, bi-weekly or monthly basis.[100]

In response to these Final Period 4 IP requirements, the defendants engaged in a process, in consultation with the Monitor, to correct the mixed caseload reports on a timely basis.  During January 2014, defendants submitted a narrative explaining why the November 2013 data reports incorrectly listed supervisors as well as spreadsheets accounting for the cause of each error.[101]  They also submitted "corrected" case assignment data for November 1 and 30, 2013.[102]  As the Monitor has reported, defendants' explanations for the inaccuracies in the mixed caseload data raised very serious concerns about the reliability of the DFCS data validation process, which, in the Monitor's view, should have identified the errors in the supervisory assignment data.[103]

Defendants did not produce mixed caseload reports on a monthly basis starting the week of February 1, 2014 as required by the Final Period 4 IP.  On February 3, 2014, defendants reported that they had detected certain errors in the report that they were working to address.[104]  Thereafter, in response to the Monitor's inquiry about whether the errors that had been detected

---

[98] Final Period 4 IP §II.A.1.
[99] *Id.* §II.A.2.
[100] *Id.* §II.A.3.  The Monitor has reported previously on defendants' Period 4 performance related to these requirements.  *May 2014 Report* at 50-51.
[101] The narrative was submitted on January 24, 2014.  *Id.* at 50-51 and Ex. 5I.
[102] *Id*. at Ex. 5I.
[103] *Id.* at 52.
[104] *Id.* at 52 and Ex. 5M.

50

affected the validity, accuracy and/or completeness of the "corrected" November 1 and 30, 2013 mixed caseload reports, defendants advised that identical errors had been found in the "corrected" November 2013 reports and the data could not be corrected.[105]  On February 25, 2014, defendants reported they had made a series of changes in MACWIS and would institute a 100 percent field validation process on a region-by-region basis in order to improve the accuracy of the mixed caseload reports.[106]  They indicated that they would begin to run reports that would presumably benefit from these new processes starting the week of March 3, 2014.[107]

Pursuant to MSA §VII.B., plaintiffs submitted a notice of noncompliance related to the mixed caseload reports on February 27, 2014.  In response to the notice, on March 31, 2014, defendants reported that they would be submitting mixed caseload data for March 3, 12 and 20, 2014.  Defendants also indicated that as a result of the report validation process, they determined that it would be helpful to revise the report specifications for the mixed caseload report as well as for a related report.  Defendants proposed additional discussion between the parties regarding the specifications.  Thereafter, on April 2, 2014, the Monitor received the three March 2014 reports that defendants had indicated they would produce.

As the Monitor reported in her May 2014 Report, because of the history associated with the defendants' efforts to produce accurate mixed caseload data, the Monitor assessed the processes that the defendants implemented to improve the accuracy of the reports that she received on April 2, 2014.  During the course of the Monitor's assessment, she learned from DFCS staff responsible for the validation process that a report programming error resulted in excluding caseload carrying caseworkers from the March 2014 reports that defendants submitted

---

[105]  *Id.* at 52-53 and Exs. 5N and 5O.
[106]  *Id.* at 53 and Ex. 5O.
[107]  *Id.*

to the Monitor on April 2, 2014.[108]  Defendants reported that they had corrected the data beginning with the data report for April 10, 2014, which was submitted to the Monitor on May 29, 2014 along with data reports for April 17 and 24 and May 1, 8, 15 and 22, 2014.

During May 2014, defendants initiated discussions with the Monitor, and later on in the month with plaintiffs' counsel, about the need to modify the specifications for the caseload reports.  Defendants indicated that they were not finding the reports to be as useful as they could be for management purposes and they reported that in certain instances specific caseworkers were being counted on both the mixed and the dedicated caseload reports.  In light of these concerns, defendants proposed modifications to the report specifications.  Thereafter, on June 11, 2014, the parties reached agreement on the following, among other, matters: 1) defendants would stop issuing the then-current version of the mixed caseloads reports and the reports that had been produced would not be analyzed; 2) the specifications for the data report would be revised and revised reports would be produced at the intervals required by the initial specifications for a three-month period and at the conclusion of the period the parties would decide on the appropriate reporting intervals; and 3) the Monitor would analyze the revised mixed caseload reports starting with the first point-in-time report produced pursuant to the revised specifications.[109]

The modifications to the specifications were agreed upon by the parties and endorsed by the Monitor on July 3, 2014.[110]  Shortly thereafter, on July 9, 2014, defendants were ordered to produce valid and accurate caseload reports by October 15, 2014.[111]  While defendants began to

---

[108]  *See May 2014 Report* at 53 for a more detailed account of this matter.
[109]  *See* App. B, Ex. 2, June 11, 2014 e-mail from Grace M. Lopes to Rusty Fortenberry, *et al.*, redacted (summarizing the terms of this agreement).
[110]  A copy of the final version of the revised specifications was transmitted to the Monitor and plaintiffs' counsel on January 16, 2015, and it is included in the Appendix to this report as App. B, Ex. 3A.
[111]  *See* July 2014 Corrected Order §IV.

produce caseload reports responsive to the revised specification on October 14, 2014, the data produced has been limited to a single point-in-time for each month between October 2014 and April 2015.  Contrary to the requirements of §II.A.3. of the Final Period 4 IP, defendants have failed to produce weekly reports for a three-month period.  As noted above,[112] these data are necessary in order to inform the parties' decision-making about the appropriate reporting interval.  The data defendants produce regarding caseworkers with dedicated caseloads do not include a county variable, which precludes the possibility of excluding any caseworkers from analyses notwithstanding the fact that certain county exclusions are necessary to measure performance consistent with MSA requirements.

While this report presents the results of the Monitor's analysis of the mixed caseload data defendants produced for October 14, 2014, which shows defendants had not satisfied MSA caseload requirements at a point-in-time over 90 days after Period 4 concluded,[113] this is the first time the Monitor has been able to analyze this vital information since defendants were required to produce such data in 2008.[114]  To make progress with caseload requirements, defendants must begin to produce accurate, complete, up-to-date data, analyze that data, and respond to findings on a consistent basis over time.  Defendants not only have to consider the impact of vacancies over time, but, as the data regarding the growth of the population of children in custody over Period 4 and part of Period 5 illustrate, population level changes can be substantial and rapid, which directly impacts caseloads.  Up-to-date caseload data would enable, for example, defendants to assess how the 50 percent growth in the population of children in custody in Region VI during Period 4 impacted caseload levels.

---

[112]  *Supra* at 48.
[113]  *See infra* at 66-68.
[114]  *See supra* at 46-47 for relevant background information.

Despite the absence of caseload data that could be analyzed for Period 4, there is a body of evidence that indicates that very serious staffing deficits in some DFCS regions were evident during Period 4 and had a significant impact on case practice. For example, various monthly reports issued during Period 4 by CSF, related to implementation of the Practice Model, comment on the impact of caseworker and supervisory staffing shortages in some DFCS regions.[115] The Monitor's interviews with DFCS staff and managers during Period 4 also confirmed the severity of the problem and provided insight into the consequences of supervisory and caseworker staffing shortages in regions with high concentrations of children in custody.[116]

---

[115] *See, e.g.,* App. B, Ex. 3B, Monthly Status Report – Practice Model Implementation, August 2013, redacted excerpt, at 6 (noting that in Region I-N both "[t]he Resource Unit and at least one other county are understaffed and are feeling the burden of working over an extended period of time with large workloads and minimal staff."); App. B, Ex. 3C, Monthly Status Report – Practice Model Implementation, September 2013, redacted excerpt, at 17 (noting as concern/barrier that "[s]ome regions continue to report a shortage of staff and/or supervisors."); App. B, Ex. 3D, Monthly Status Report – Practice Model Implementation, November 2013, excerpt, redacted at 17 (noting as concern/barrier that supervisors in Region VI "have expressed a desire for a well-thought out plan on how to address vacancies and help raise the morale of the staff"); *id.* (noting that in Region V-E there were "several supervisory vacancies (with available pins) for an extended period of time which is resulting in existing supervisors feeling overwhelmed and stressed. Attention needs to be focused on filling these positions promptly."); App. B, Ex. 3E, Monthly Status Report – Practice Model Implementation, December 2013, excerpt, redacted at 17 (noting as concern/barrier "[s]upervisors in several regions continue to voice the concern regarding having the time to adequately supervise staff with so many supervisory vacancies."); App. B, Ex. 3F, Monthly Status Report – Practice Model Implementation, February 2014, excerpt, redacted at 15 (noting as concern/barrier "[w]orkers not being able to assign COS [county of service; *i.e.*, county where child in DFCS custody is placed] workers for their children and parents that are living in other counties because of high caseloads in the receiving county."); App. B, Ex. 3G, Monthly Status Report – Practice Model Implementation, March 2014, excerpt, redacted at 14 (noting as concern/barrier that several regions were reporting staffing concerns); App. B, Ex. 3H, Monthly Status Report – Practice Model Implementation, June 2014, excerpt, redacted at 18 (noting that "[i]n Region VII-West and in Region VI (Forrest County) the instability of Supervisors, Workers, and caseloads continues to impact the delivery of services to the children and families."); App. B, Ex. 3I, Monthly Status Report – Practice Model Implementation, July 2014, excerpt, redacted at 14 (noting as concern/barrier the following: "Continued high caseloads and the need for additional staff has impacted several regions, manifesting itself in several ways including the DHS Practice Model coach assuming a caseload, monitoring and assigning new cases, consistency in supervisors for workers and workers for families, and the workers need for emotional support aimed at retention."); App. B, Ex. 3J, Monthly Status Report – Practice Model Implementation, May 2014, excerpts, redacted at 4 and 17 (reporting that in region IV-N there were vacancies in three counties, one supervisor was on special assignment in another region, and the DFCS practice coach was on a 90-day special assignment as an acting supervisor in a county office).

[116] For example, despite gains in caseworker staffing that resulted from the short-term management strategy launched in the carve-out counties at the end of the 2012 calendar year, during Period 4, some supervisors in the carve-out counties (*i.e.*, Hinds, Harrison, Hancock and Jackson counties) reported carrying their own caseloads and supervising between eight and 14 caseworkers. They described a work environment that was, at times, chaotic, and often very challenging. *See also January 2013 Report* at Ex. 37 for a description of the management strategy that defendants initiated in the carve-out counties. The lack of a sufficient number of supervisors has been a long-standing problem in other DFCS regions as well. For example, in Region I-N, management staff reported having

Instead of filling many of these critical vacancies with permanent staff, DFCS management relied on the use of special assignments, whereby DFCS practice coaches, trainers, and other staff were reassigned from their positions to serve as caseworkers and supervisors in other counties in their own regions or in other regions. Although initially for a 90-day period, many of these reassignments were made with very little planning or notice and extended for much longer than 90 days.[117] This initiative had a substantial impact on the quality of case practice in the regions and counties from which staff were reassigned.[118]

Notwithstanding the evidence of significant and continuing caseworker and supervisory staffing deficits in multiple regions and its impact on case practice,[119] the evidence shows that

four supervisors on board in DeSoto County in October 2013, three of whom were assigned to supervise more than five caseworkers, and one acting supervisor assigned to Marshall County with responsibility for managing nine caseworkers. In Region VI, management staff reported during August 2013 having supervisory staffing deficits in every county in the region, including a staffing deficit in Stone County that resulted in one supervisor charged with managing 11 caseworkers. Long-standing supervisory vacancies also were reported in March 2014 by management staff in Region V-E in Covington, Smith and Simpson Counties. At times, supervisory vacancies are filled on a temporary basis by caseworkers and practice coaches whose positions remain vacant during the period of the reassignment. Defendants have reported that in these situations, the "acting" supervisors have received pre-service supervisory training. The Monitor has not had an opportunity to confirm the training status of all "acting" supervisors; however, training records indicate that pre-service supervisory training has been afforded to a cohort of non-supervisory staff and some "acting" supervisors have confirmed during interviews with the Monitor that they received the pre-service supervisory training before their temporary reassignments.

[117] *See, e.g., infra* at 64-66 for the narrative related to the temporary reassignment of the DFCS director assigned to oversee implementation of the Practice Model. There is evidence that defendants have continued to rely on these practices during Period 5. For example, shortly after Period 4 ended, five of the nine trainers assigned to the DFCS training unit were reassigned on a temporary basis to serve in casework and supervisory positions in Forrest County for over a five-month period between August 11, 2014 and January 22, 2015. Some of the trainers remained in Forrest County until January 26, 2015. These reassignments were instituted without adequate notice or planning. The Monitor has not had an opportunity to assess the impact the reassignments may have had on training unit operations. *See infra* at 70-71 for the related ongoing Period 3 IP requirement concerning Period 3 IP §I.A.3.a.2.

[118] *See, e.g.,* App. B, Ex. 3I, *supra* note 115. *See also infra* at 64-66 (regarding the practice of reassigning on a temporary basis the practice coaches to supervisory and other positions).

[119] Understaffing also affected defendants' implementation of the diligent recruitment grant during Period 4. *See, e.g.,* App. B, Ex. 3K, ACF Performance Progress Report, excerpt, submitted by DFCS to the Department of Health and Human Services Administration for Children, Youth and Families Children's Bureau on April 30, 2014 for the six-month reporting period ending March 31, 2014, at 6 (commenting on limitations in DFCS data collection activities necessary for grant evaluation purposes and stating: "During this reporting period data for evaluation purposes continues to be a challenge in some of our regions due to a lack of staff and more demands of other duties that are not related to grant."); *id.* (commenting on the failure of a region to begin to implement the plan for recruitment of resource homes, stating: "Region I-N was unable to carry out their recruitment plan for the fall due to staffing issues but plans have been revised and approved for the 2014 year."). This was not an isolated issue. Staffing deficits in other regions have affected implementation of the grant. *See, e.g.,* App. B, Ex. 3L, May 30, 2013 correspondence from Richard A. Berry to Bernard Morgan and Taffy B. Compain with attached excerpt from

defendants failed to address these staffing shortages in an effective way during Period 4.

Analysis of hiring and attrition data submitted to the Monitor by DFCS human resources staff is presented graphically below. The analysis indicates there was a net loss of at least 17 caseworker staff during Period 4.[120]



renewal application for federal assistance, Program and Budget Narrative, at 2 (stating: "Grant activities were scheduled to roll out in Region III-S as well but were delayed due to staffing concerns, high caseloads, and other opportunities for improved practice within the region.").

[120] During the process of validating training data submitted by the defendants, the Monitor discovered that certain individuals reflected as hires in the data did not ultimately begin working for DFCS. In other instances, individuals reflected as being hired during Period 4 appear to have started employment with DFCS after the end of Period 4. In their comments on the draft version of this report, defendants identified individuals in training data who they reported were hired during January 2014. These individuals did not appear in the hiring data submitted by MDHS/DFCS human resources management staff. This discrepancy underscores the Monitor's concerns about the accuracy and completeness of the hiring and separation data that have been produced by the defendants.

The Monitor also analyzed hiring and attrition data for the Area Social Work Supervisors ("ASWS"), the supervisory staff charged with managing caseworkers in all DFCS County offices.  According to the data provided by defendants, presented graphically below, there was a net loss of seven ASWSs during Period 4.



Final Period 4 IP §II.A.4.a.

**A.  Human Resources Management**

    **4.  In an effort to address the recruitment of area social worker supervisors ("ASWS"), Defendants shall undertake the following efforts during Implementation Period 4:**

        **a)  Defendants shall undertake recruitment efforts through the Master of Social Work ("MSW") programs at the following universities:  Jackson State University, Mississippi Valley State University, Union University, University of Alabama, Louisiana State University, Tulane University, University of Arkansas-Little Rock, University of Mississippi, and University of Southern Mississippi.**

            **i.  The recruitment efforts will be overseen by a region-based recruitment team which will consist of either a**

        **Regional Director, Regional ASWS, and an ASWS, or a Regional Director, ASWS and a caseworker.**

    ii.  **Each recruitment team will be required to make one visit in the spring semester of 2014 to the MSW program at their assigned university and visit with students at various levels of MSW attainment. The recruitment team will present opportunities for employment at the Mississippi Division of Family and Children Services ("DFCS") and also provide the students with an information packet on DFCS employment opportunities and benefits that will be prepared by the DFCS Director of Workforce Development.**

    iii.  **The recruitment team will also be required to visit and present to at least one class of undergraduate social work ("BSW") students at their assigned university in the spring semester of 2014 to discuss opportunities for employment at DFCS, the offering of the MSW education as part of the DFCS benefits package, and internship opportunities at DFCS.**

ASWSs are the backbone of defendants' reform effort. Defendants must maintain a sufficient number of qualified supervisors to support caseworkers and hold them accountable for satisfying DFCS policy guidelines and MSA practice standards. In May 2014, commenting on defendants' performance during Period 3, the Monitor reported on the critical need for the defendants to more effectively address vacancies in the supervisory workforce.[121] In fact, instead of increasing the supervisory workforce during Period 3, hiring did not outpace attrition and there was a net loss of 17 supervisors.[122] This was a significant loss. According to defendants' workload data, as of October 14, 2014, there were 179 supervisory staff with caseloads; thus, using that total as a proxy for the number of supervisors employed at DFCS in Period 3, a net loss of 17 supervisors represents a decrease approaching ten percent of the supervisory workforce. For this reason, the Final Period 4 IP incorporated a series of initiatives related to ASWS recruitment, including activities through the graduate and undergraduate Social Work

---

[121] *See, e.g., May 2014 Report* at 58.
[122] *Id.* at 57-58.

programs at nine specified universities.  Defendants' performance relative to the Period 4

requirements concerning these university programs is described below.

**Status of Progress, Final Period 4 IP §§II.A.4.a.i., II.A.4.a.ii., and II.A.4.a.iii.:**  As

explained below, the requirements in §II.A.4.a.i. were satisfied and the requirements in

§§II.A.4.a.ii. and II.A.4.a.iii. were satisfied in part.

The DFCS Director for Workforce Development coordinated this initiative, developing a

PowerPoint presentation and basic informational materials for the regional recruitment teams to

use.[123]  Each region established a recruitment team as required, and there is evidence that the

teams conducted recruitment activities at each of the targeted universities.[124]  However, except

for the presentation at the University of Arkansas, which included both Master of Social Work

("MSW") and Bachelor of Social Work ("BSW") students, the documentation defendants

collected and interview data establish that the presentations at each educational institution were

made to either MSW or BSW students but not, as required, to students in both programs.[125]

Defendants have explained that in these instances the university did not permit the recruitment

---

[123]  According to the DFCS Director for Workforce Development, the PowerPoint presentation was provided to the regional teams as a guide and the teams were not required to use it.  Interviews with members of several recruitment teams indicate that they used the PowerPoint as a handout during at least some of the university presentations.  The PowerPoint is included in the Appendix as App. B, Ex. 4.  Students who attended the presentations were also provided with a one-page hand-out describing the available DFCS positions, including salaries, benefits, and application information.  A copy of this document is included in the Appendix as App. B, Ex. 5.

[124]  On June 5, 2014, the defendants submitted attendance sheets for the university presentations to plaintiffs' counsel and the Monitor.  This submission did not include documentation for presentations at two of the targeted universities.  However, the Monitor was able to obtain the missing documentation and other supplemental records, which established that recruitment presentations were conducted at 20 unique university sites between February 19 and May 1, 2014.

[125]  The evidence presented indicates the following: 1) Mississippi Valley State University, BSW students visited on April 7, 2014; 2) Jackson State University, MSW students visited on May 1, 2014; 3) University of Arkansas-Little Rock, MSW and BSW students visited on April 22, 2014; 4) Union University, MSW students visited on April 7, 2014; 5) University of Alabama, MSW students visited on April 14, 2014; 6) University of Southern Mississippi, MSW students visited on April 24, 2014; 7) Louisiana State University, MSW students visited on March 24, 2014; 8) Tulane University, MSW students visited on April 8, 2014; and 9) University of Mississippi, MSW students visited on April 30, 2014.

team to visit classes, but offered alternative forums which did not guarantee participation by both undergraduate and graduate students.

> **Final Period 4 IP §§II.A.4.b.i. and II.A.4.b.ii.**
> **A. Human Resources Management**
>     **4.  In an effort to address the recruitment of area social worker supervisors ("ASWS"), Defendants shall undertake the following efforts during Implementation Period 4:**
>         **b)  Defendants shall undertake recruitment efforts through the undergraduate social work ("BSW") programs at the following universities: Alcorn State University, Rust College, University of Mississippi-Southaven and Tupelo campuses, Delta State University, Belhaven University, Mississippi College, and Mississippi State University-Starkville and Meridian campuses.**
>             **i.   The recruitment efforts will be overseen by a region-based recruitment team which will consist of either a Regional Director, Regional ASWS, and an ASWS, or a Regional Director, ASWS and a caseworker.**
>             **ii.  The recruitment team will be required to visit and present to at least one class of undergraduate social work students at their assigned universities in the spring semester of 2014 to discuss opportunities for employment at DFCS, the offering of the MSW education as part of the DFCS benefits package, and internship opportunities at DFCS.**

> **Status of Progress, Final Period 4 IP §§II.A.4.b.i. and II.A.4.b.ii.:** These requirements were satisfied. According to interview data and the relevant records maintained by DFCS, during Period 4 regional recruitment teams made the required presentations to one class of BSW students at each of the targeted universities.[126]

> **Final Period 4 IP §II.A.4.c.**
> **A. Human Resources Management**
>     **4.  In an effort to address the recruitment of area social worker supervisors ("ASWS"), Defendants shall undertake the following efforts during Implementation Period 4:**
>         **c)  The assignments for the region-based recruitment teams discussed in II.A.4.a.-b. above are as follows:**
>         **Region 1 North  Union University in Jackson, TN (MSW)**
>                              **Rust College (BSW)**
>                              **University of Mississippi-Southaven (BSW)**
>         **Region 1 South  University of Mississippi-Oxford, MS (MSW)**

---

[126] According to the available documentation, the presentations were made at each university on the following dates: 1) Alcorn State University, March 31, 2014; 2) Rust College, March 21, 2014; 3) University of Mississippi/Southaven, February 19, 2014; 4) University of Mississippi/Tupelo, March 25, 2014; 5) Delta State University, March 17, 2014; 6) Belhaven University, March 27, 2014; 7) Mississippi College, March 21, 2014; 8) Mississippi State University-Starkville, April 9, 2014; and 9) Mississippi State University-Meridian, April 11, 2014.

|                | University of Mississippi-Tupelo (BSW) |
|----------------|----------------------------------------|
| Region 2 East  | MS Valley State University (MSW)       |
| Region 2 West  | University of Arkansas, Little Rock (MSW) |
|                | Delta State University (BSW)           |
| Region 3 North | Belhaven University (BSW)              |
|                | Mississippi College (BSW)              |
| Region 3 South | Jackson State University (MSW)         |
| Region 4 North | University of Alabama (MSW)            |
|                | Mississippi State University-Starkville (BSW) |
| Region 4 South | Mississippi State University, Meridian (BSW) |
| Region 5 East  | University of Southern Mississippi (MSW) |
|                | Alcorn State University (BSW)          |
| Region 5 West  | Louisiana State University (MSW)       |
| Region 6       | University of Southern MS (MSW)        |
| Region 7 East  | University of Alabama- Mobile (MSW)    |
| Region 7 West  | Tulane University (MSW)                |

**Status of Progress, Final Period 4 IP §II.A.4.c.:**  As a general matter, this requirement was satisfied.  Based on interviews and relevant documents provided by defendants, the regional recruitment teams made the required presentations at each of the targeted universities during Period 4, with some variation.[127]

> Final Period 4 IP §II.A.4.d.
> **A. Human Resources Management**
>   4. **In an effort to address the recruitment of area social worker supervisors ("ASWS"), Defendants shall undertake the following efforts during Implementation Period 4:**
>     d) **By March 1, 2014, Defendants shall request that the Mississippi State Personnel Board revise and approve requirements for the position of ASWS to require two years of experience.  Nothing in this provision alters the supervisor qualifications as set forth in MSA Section II.A.2.b.**

**Status of Progress, Final Period 4 IP §II.A.4.d.:**  The defendants satisfied this requirement.  On February 26, 2014 the DHS executive director requested the required change in the ASWS position qualifications.[128]  While it appears that a formal approval letter was not

---

[127]  There were some minor deviations.  For example, the Region II-E team met with BSW and not MSW students at Mississippi Valley University; the Region II-W team met with both MSW and BSW students at the University of Arkansas; and the Region VII-E team met with BSW and not MSW students at the University of South Alabama-Mobile.

[128]  *See* App. B, Ex. 6A, February 26, 2014 correspondence from Richard A. Berry to Deanne Mosley (requesting that State Personnel Board [hereinafter SPB] change minimum qualifications for ASWS position to licensed MSW with two years of social work or human services experience or one of the following alternatives:  1) a licensed BSW with a Master's degree in social work or a related field or enrolled in or accepted into a graduate level social work or related educational program at an accredited educational institution and two years' experience in social work or human services; or 2) a licensed BSW and five years' experience in social work or human services).

issued, the evidence indicates that the change in educational qualifications was approved by the

Mississippi State Personnel Board ("SPB") during April 2014.[129]

> **Final Period 4 IP §II.A.4.e.**
> **A. Human Resources Management**
>     **4.  In an effort to address the recruitment of area social worker
>        supervisors ("ASWS"), Defendants shall undertake the
>        following efforts during Implementation Period 4:**
>        **e)  Defendants shall conduct a training session on the
>           licensure examination at no cost to caseworkers once
>           every other month during Period 4, with the first
>           training commencing February 2014.**

**Status of Progress, Final Period 4 IP §II.A.4.e.:**  This requirement was satisfied.

Defendants conducted licensure examination preparation training for DFCS staff during

February, April and June 2014.[130]  The sessions, which were conducted by the DHS deputy

director responsible for DFCS, were free and participants were reimbursed for travel expenses.

> **Final Period 4 IP §II.A.4.f.**
> **A. Human Resources Management**
>     **4.  In an effort to address the recruitment of area social worker
>        supervisors ("ASWS"), Defendants shall undertake the
>        following efforts during Implementation Period 4:**
>        **f)  By January 31, 2014, Defendants shall advertise salary
>           increases for ASWS in the Carve-Out Counties
>           (Hancock, Harrison, Hinds, and Jackson counties).**

**Status of Progress, Final Period 4 IP §II.A.4.f.:**  The defendants satisfied this

requirement.  The evidence indicates that advertisements to fill an unspecified number of ASWS

positions in Hancock, Harrison, Hinds, and Jackson counties were transmitted to the SPB on

---

[129]  According to defendants, a formal approval document was not issued by the SPB; however, in response to the Monitor's inquiries, defendants have submitted e-mail communications which indicate that the request was approved.  Moreover, the qualifications for the ASWS position that are posted on the SPB website indicate that the modification in the qualifications for the position related to educational requirements was effective on April 1, 2014. *See* App. B, Ex. 6B, DHS Area Social Work Supervisor Job Description, http://agency.governmentjobs.com/mississippi/default.cfm?action=specbulletin&ClassSpecID=797424&headerfooter=0 (last visited June 12, 2015).

[130]  The three sessions were conducted in different DFCS regions on February 1, April 5 and June 21, 2014.

January 8, 2014 and appeared on the SPB website starting on January 10, 2014.  The

advertisements reflected the salary increases.[131]

> Final Period 4 IP §II.A.4.g.
> A.  Human Resources Management
>    4.  In an effort to address the recruitment of area social worker
>        supervisors ("ASWS"), Defendants shall undertake the
>        following efforts during Implementation Period 4:
>        g)  By February 1, 2014, Defendants shall provide to the
>            Monitor and Plaintiffs information about comparable
>            salaries for supervisors at other state child welfare
>            agencies in the Southeast United States and similar
>            Mississippi social service agencies reviewed by
>            Defendants.

**Status of Progress, Final Period 4 IP §II.A.4.g.:**  Defendants satisfied this requirement

on February 3, 2014 by submitting salary information for supervisory positions in child welfare

agencies operated by state governments in Alabama, Arkansas, Georgia, Louisiana, South

Carolina and Tennessee.  Based on the position descriptions that were submitted, these

supervisory positions appear to be comparable to the DFCS ASWS position.  Defendants'

submission also included salary information for social worker supervisors employed by

Mississippi state government in medical, psychiatric or institutional settings.[132]

> Ongoing Period 3 IP Requirement §I.A.2.a.[133]
> A.  Human Resources Management
>    2.  Workforce
>        a.  By August 1, 2012, Defendants shall maintain a practice
>            coach in Regions I-N, I-S, II-E, II-W, III-N, III-S, IV-N,
>            IV-S, V-E, V-W, VI, VII-E, and VII-W to facilitate
>            Practice Model implementation.

---

[131]  *See* App. B, Ex. 7A, DHS-Area Social Work Supv, Hancock County; App. B, Ex. 7B, DHS-Area Social Work Supv, Harrison County (noting position is time-limited); App. B, Ex. 7C, DHS-Area Social Work Supv, Hinds County; and App. B, Ex. 7D, DHS-Area Social Work Supv, Jackson County (noting position is time-limited).  The Monitor was unable to confirm why the ASWS positions in Harrison and Jackson Counties were advertised as time-limited positions.  However, it is the Monitor's understanding that the "time-limited" designation means that the position does not have civil service protection.

[132]  See App. B, Ex. 8, February 3, 2014 e-mails from Gwen Long to Julia Davis and Grace M. Lopes with attached salary chart and related documents.  According to defendants' submission, social work supervisors employed by the State of Mississippi in medical, psychiatric or institutional settings receive salaries that are substantially higher than the DFCS ASWS salaries.

[133]  *See* Initial and Final Period 4 IPs at 1, n.1.

**Status of Progress, Period 3 IP §I.A.2.a. (Ongoing Requirement)**:  This requirement was not satisfied during Period 4.  The Monitor's findings are described more fully below.

Interviews with DFCS managers, supervisors, caseworkers, practice coaches, and CSF contractors, as well as a review of the monthly status reports on Practice Model implementation that are prepared by CSF, establish that the defendants did not adequately staff practice coaching positions in Regions II-E, III-N, IV-N, IV-S, and VI for significant time periods during Period 4.  As a consequence, and especially during the last half of Period 4, this affected the availability of ongoing coaching in each of these regions and in other regions whose coaches were assigned, on an episodic basis, to provide limited coaching in some but not all of the regions that were inadequately staffed.[134]

---

[134]  For example, there was no dedicated DFCS Practice Model coach working in Region II-E from January 2014 through June 2014.  During January 2014, the coach assigned to Region II-E was unable to provide coaching services because she was on leave for part of the month and then worked on CQI and Council on Accreditation [hereinafter COA] site visit preparation activities.  *See* App. B, Ex. 9A, Monthly Status Report – Practice Model Implementation, January 2014, excerpt, redacted version at 12 (stating that the assigned DHS coach "did not complete any individual coaching during the month of January because of being out on family medical leave and working on preparations for an upcoming CQI and COA visit.").  Thereafter, during February and March 2014, the Region II-E practice coach was on a special assignment in Region VI.  *See* App. B, Ex. 9B, Monthly Status Report – Practice Model Implementation, February 2014, excerpt, redacted version at 11 (stating the DHS coach "was on special assignment during the month of February and was unable to complete any coaching."); App. B, Ex. 9C, Monthly Status Report – Practice Model Implementation, March 2014, excerpt, redacted version at 11 (noting DHS coach was on special assignment during March and retired at the end of the month).  The Region II-E coach retired in April 2014 and the Region II-E coaching position remained vacant throughout May and June 2014.  *See* App. B, Ex. 9D, Monthly Status Report – Practice Model Implementation, April 2014, excerpt, redacted version at 11 (noting that two coaches from Region II-W were providing limited coaching support to staff in Region II-E since the retirement of the full-time practice coach).  Between February and June 2014, very limited coaching support was provided to a small number of staff in Region II-E by the practice coaches assigned to Region II-W, who were diverted from their own coaching responsibilities in Region II-W to assist in Region II-E. *See, e.g.,* App. B, Ex. 9E, Monthly Status Report – Practice Model Implementation, February 2014, excerpt, redacted version at 3; June 2014, excerpt, redacted version at 4.  A practice coach from Region IV-N also provided limited coaching assistance in Region II-E during March 2014.  *See* App. B, Ex. 9F, Monthly Status Report – Practice Model Implementation, March 2014, excerpt, redacted version at 4 (noting Region IV-N practice coach was assisting on a limited basis in Regions II-E and I-N).  Similarly, during February and March 2014, the practice coach assigned to Region III-N was on special assignment in Region VI and then assumed a different position upon her return.  *See* App. B, Ex. 9G, Monthly Status Report – Practice Model Implementation, February 2014, excerpt, redacted version at 9; March 2014, excerpt, redacted version at 9.  Thereafter, the Region III-N coaching position remained vacant through June 2014.  During this period, limited coaching support was provided to the staff in Region III-N by the practice coaching staff from Region III-S.  For example, during April 2014, a Region III-S practice coach provided one day of coaching services to help a caseworker who had resigned close out her cases.  *See* App. B, Ex. 9H, Monthly Status Report – Practice Model Implementation, April 2014, excerpt, redacted version at 10.  In addition, during May 2014,

Several factors contributed to the limitations in practice coaching that were evident during the latter half of Period 4.  First, a significant number of practice coaches were reassigned temporarily to other positions in their own regions or in other regions to address supervisory staffing shortfalls.[135]  Second, practice coaches were reassigned temporarily to special projects in order to address critical workload backlogs engendered by understaffing.[136]  Third, vacancies in several practice coach positions were not filled in a timely manner.[137]  Moreover, during Period 4, even when practice coaches remained in their assigned regions in coaching positions, they were required, in several noteworthy instances, to perform other duties unrelated to practice coaching for significant time periods.[138]

---

two coaches from Region III-S met with a total of two workers in Region III-N during the month.  *See* App. B, Ex. 9I, Monthly Status Report – Practice Model Implementation, May 2014, excerpt, redacted version at 10. Moreover, there was no practice coaching conducted whatsoever in Region IV-S during February, March and part of April 2014 because the coach was on special assignment.  *See* App. B, Ex. 9J, Monthly Status Report – Practice Model Implementation, February 2014, excerpt, redacted version at 7; March 2014, excerpt, redacted version at 8; April 2014, excerpt, redacted version at 8.  Finally, in Region VI, both of the assigned coaches were on special assignment and there was no coaching whatsoever from March through June 2014.  *See* App. B, Ex. 9K, Monthly Status Report – Practice Model Implementation, March 2014, excerpt, redacted version at 11-12; April 2014, excerpt, redacted version at 12; May 2014, excerpt, redacted version at 13; June 2014, excerpt, redacted version at 14.

[135]  For example, during May and June 2014, a Region IV-N practice coach was on a 90-day special assignment serving as an ASWS in Lowndes County, a county office in Region IV-N that experienced a long-standing shortage of supervisors.  *See* App. B, Ex. 9L, Monthly Status Report – Practice Model Implementation, May 2014, excerpt, redacted version at 4; June 2014, excerpt, redacted version at 5.  Similarly, during May and June 2014, one of two assigned practice coaches in Region V-W was temporarily assigned to serve as an ASWS due to the critical number of supervisory vacancies in the region. *See* App. B, Ex. 9M, Monthly Status Report – Practice Model Implementation, May 2014, excerpt, redacted version at 5; June 2014, excerpt, redacted version at 6.

[136]  For example, according to the CSF monthly report for February 2014, four practice coaches "were on special assignment in Forest [sic] County assisting with investigations which impacted the amount of coaching provided in their regions as well as other regions as several of their peers assisted in covering those regions."  *See* App. B, Ex. 9N, Monthly Status Report – Practice Model Implementation, February 2014, excerpt, redacted version at 2.

[137]  According to the relevant CSF monthly reports, the coaching position in Region II-E was vacant from at least April – July 2014.  *See* App. B, Ex. 9O, Monthly Status Report – Practice Model Implementation, April 2014, excerpt, redacted version at 11; July 2014, excerpt, redacted version at 11.  The Region III-N position was vacant from April through June 2014, and although filled in July, according to CSF, no coaching was conducted during July.  *See* App. B, Ex. 9P, Monthly Status Report – Practice Model Implementation, April 2014, excerpt, redacted version at 10; July 2014, excerpt, redacted version at 9.

[138]  For example, during October 2013, both coaches who were assigned to Region V-E did not perform any coaching activities.  Instead, their work was limited to preparation for a COA site visit.  *See* App. B, Ex. 9Q, Monthly Status Report – Practice Model Implementation, October 2013, redacted excerpt at 8.  Similarly, there was no practice coaching conducted during the month of January 2014 in Region II-E at least in part because the coach worked to prepare for a COA site visit, and during the month of June 2014 in Region VII-E in large part because the coach worked on preparation for a COA site visit.  *See* App. B, Ex. 9R, Monthly Status Report – Practice Model

In addition to the failure to maintain minimally adequate staffing levels for practice coaches throughout Period 4 in all DFCS regions, defendants also failed to maintain the administrative management structure that had been in place to support the coaches and guide the implementation of the Practice Model.  In fact, in mid-September 2013, the DFCS manager assigned to oversee statewide implementation of the Practice Model began serving on a temporary assignment as an acting manager in an understaffed DFCS region.[139]  This temporary reassignment persisted until at least March 2015.[140]  During this nearly 18-month period, the Practice Model director position was vacant, and additionally, for a substantial part of the period, one of two key Practice Model deputy positions remained vacant.[141]

> **Modified Settlement Agreement ("MSA") §II.A.2.a.10.a.**
> **2.  Human Resources Management**
>   **a.  Workforce**
>     **10)  By the end of Implementation Period Four:**
>       **(a)  At least 85% of DFCS caseworkers shall carry a caseload that does not exceed Modified Settlement Agreement caseload requirements.  No more than 5% of caseworkers shall carry a caseload exceeding twice the Modified Settlement Agreement caseload requirements.  Hancock, Harrison, Hinds, and Jackson Counties are exempt from these requirements during Implementation Period Four.**

**Status of Progress, MSA §II.A.2.a.10.a.:**  This requirement was not satisfied.  As explained in the Monitor's May 2014 Report[142] and above in the narrative related to Final Period

---

Implementation, January 2014, excerpt (regarding Region II-E), redacted version at 12; June 2014, excerpt (regarding Region VII-E), redacted version at 12.

[139]  Because of the shortage of supervisory staff in Region VI, the Practice Model director was assigned on September 16, 2013 to serve on a temporary basis as an ASWS in Forrest County and thereafter as one of two temporarily assigned regional directors in Region VI.  After a new regional director was hired in late April 2014, the Practice Model director began serving an additional temporary assignment as a regional supervisor in Region VI.

[140]  During March 2015, the manager responsible for statewide implementation of the Practice Model resigned from that position, electing to serve as a supervisor in the region in which she had been "temporarily" reassigned.

[141]  The statewide manager responsible for Practice Model implementation has two deputies.  Each deputy is responsible for Practice Model implementation activities and oversight of the practice coaches in certain designated DFCS Regions, which are determined by geographic boundaries (*i.e.*, the northern regions and the southern regions).  The deputy responsible for the southern regions resigned from DFCS effective May 31, 2014.  Defendants report that as of at least May 1, 2015, this position had not been filled.

[142]  *See May 2014 Report* at 46-54.

4 IP §§II.A.1., II.A.2., and II.A.3.,[143] defendants have been required to produce accurate and validated reports on caseworker caseloads since the start of Period 1 in 2008, but repeatedly failed to do so.  In October 2014, after the end of Period 4, defendants submitted to the Monitor for the first time validated caseworker caseload data that could be analyzed.

The MSA requires by the end of Period 4, at least 85 percent of caseworkers shall carry a caseload that does not exceed MSA requirements.  Additionally, the MSA requires that no more than five percent of caseworkers shall carry a caseload that exceeds twice the MSA requirements and that no caseworkers shall carry a caseload that exceeds three times the MSA requirements.[144] Four counties, referred to in the MSA as the carve-out counties, are exempt from this requirement during Period 4: Hancock, Harrison, Hinds, and Jackson.[145]

The parties agreed to measure caseworker caseloads using "snapshots," which reflect caseworker caseloads at a point-in-time on an individual day.  The earliest date for which defendants produced validated caseworker caseload data was for October 14, 2014, after the end of Period 4.  Defendants report separately on caseworkers who carry mixed caseloads and caseworkers who carry dedicated caseloads.  The data submitted by defendants regarding caseworkers who carry dedicated caseloads does not include a variable to enable an analysis excluding the four carve-out counties.  Consequently, the Monitor's analysis included all caseworkers who carried a dedicated caseload on October 14, 2014, irrespective of the county to which they were assigned.

---

[143]  *See supra* at 45-55.

[144]  MSA §II.A.2.a.9.a. requires that no caseworkers shall carry a caseload exceeding three times the MSA by the end of Period 3.  This is an ongoing requirement.

[145]  Hancock, Harrison, Hinds, and Jackson Counties were exempted from these specific MSA requirements because of the parties' shared recognition that long-standing staffing deficits justified subjecting these counties to different requirements.  Hence, they are referred to in the MSA as the "carve-out" counties.

The data reflect that on October 14, 2014, 60 percent of all DFCS caseworkers, including those assigned to the carve-out counties, carried a dedicated caseload that did not exceed MSA requirements, seven percent carried a dedicated caseload that exceeded twice the MSA requirements, and three percent carried a dedicated caseload that exceeded three times the MSA requirements. Comparable data were not available for Period 3 to determine whether improvements were made.

Among caseworkers with mixed caseloads, excluding those assigned to the carve-out counties, 70 percent carried a mixed caseload that did not exceed MSA requirements and were not supervisors carrying a caseload; four percent carried a mixed caseload that exceeded twice the MSA requirements or were supervisors carrying a caseload; and three percent carried a mixed caseload that exceeded three times the MSA requirements or were supervisors carrying a caseload.[146]

As previously stated, among caseworkers with dedicated caseloads, based on the data submitted by defendants, it was not possible to exclude carve-out counties from the analysis, as required by the MSA. Additionally, the dedicated caseload data submitted by defendants include certain non-DFCS contract employees who operate the statewide hotline for reporting child abuse and/or neglect. Among all caseworkers with dedicated caseloads, and excluding the contract employees, the data indicate the following: 61 percent of caseworkers with dedicated caseloads did not carry a caseload that exceeded MSA caseload requirements and were not a supervisor carrying a caseload; 12 percent of caseworkers with dedicated caseloads carried caseloads that exceeded twice the MSA requirements or were supervisors carrying a caseload; and four percent

---

[146] *See* App. A, Ex. 3, *supra* note 53, and App. A, Ex. 5A, chart prepared by the Office of the Court Monitor, Caseworkers With Mixed Caseloads Meeting MSA Requirements, By Region, One-Day Snapshot 10/14/14. The analysis included in App. A, Ex. 5A also includes for comparative purposes the same calculations with data from the carve-out counties.

of caseworkers with a dedicated caseload carried a caseload that exceeded three times the MSA

requirements or were supervisors carrying a caseload.[147]  When non-DFCS contract employees

are included in the analysis, the data indicate the following:  68 percent of caseworkers with a

dedicated caseload did not carry a caseload that exceeded MSA requirements and were not a

supervisor carrying a caseload; 10 percent of caseworkers with a dedicated caseload did not carry

a caseload that exceeded twice the MSA requirements or were a supervisor carrying a caseload;

and three percent of caseworkers with a dedicated caseload did not carry a caseload that exceeded

three times the MSA requirements or were a supervisor carrying a caseload.

> MSA §II.A.2.a.10.b.
> 2.  Human Resources Management
>  a.  Workforce
>   10)  <u>By the end of Implementation Period Four</u>:
>     (b)  No more than 10% of supervisors who are responsible
>          for supervising DFCS caseworkers shall be responsible
>          for directly supervising more than five caseworkers.
>          Hancock, Harrison, Hinds, and Jackson Counties are
>          exempt from this requirement during Implementation
>          Period Four.

**<u>Status of Progress, MSA §II.A.2.a.10.b.</u>:**  This requirement was not satisfied.  The MSA

requires that by the end of Period 4 no more than 10 percent of supervisors shall be responsible

for directly supervising more than five caseworkers.  The four carve-out counties are exempt

from this requirement during Period 4: Hancock, Harrison, Hinds, and Jackson.

As with the caseload data discussed above, the first date for which defendants provided

validated data regarding supervisory workloads was October 14, 2014.  On that date, excluding

carve-out counties, 13 percent of supervisors responsible for directly supervising DFCS

caseworkers supervised more than five caseworkers.[148]

---

[147]  *See* App. A, Ex. 3, *supra* note 53, and App. A, Ex. 5B, chart prepared by the Office of the Court Monitor,
Caseworkers With Dedicated Caseloads Meeting MSA Requirements, By Region, One-Day Snapshot 10/14/14.
[148]  *See* App. A, Ex. 3, *supra* note 53, and App. A, Ex. 6, chart prepared by the Office of the Court Monitor,
Supervisors Responsible For Supervising DFCS Caseworkers Meeting MSA Requirements, By Region, One-Day

Ongoing Period 3 IP Requirement §I.A.3.a.2.[149]
A.  Human Resources Management
    3.   Training
        a.   Pre-Service Training
            2)  By July 1, 2012, Defendants shall maintain nine (9)
                full-time trainers.

**Status of Progress, Period 3 IP §I.A.3.a.2. (Ongoing Requirement):**  Defendants

continued to satisfy this requirement during Period 4; however, as explained below, this

performance has not been sustained during Period 5.

In May 2014, the Monitor reported that by the end of Period 3, the defendants established

a viable training unit with the capacity to administer the required pre-service training program

and with a significantly improved in-service training program.[150]  This was an important

accomplishment, especially because defendants had been required since Period 1 to establish a

training unit but had failed to do so.

The Monitor also reported that the training unit was staffed with nine full-time training

coordinators by the end of Period 3 and that 13 full-time trainers had been assigned to the unit by

mid-September 2013.  Additionally, the Monitor noted that the defendants were attempting to fill

six additional training coordinator vacancies in order to provide specialized training to resource

and adoption staff as well as to expand the array of in-service training classes.[151]

Defendants were able to maintain a complement of nine training coordinators during

Period 4; however, they were unable to fill the existing vacancies.  Moreover, as noted above, on

August 11, 2014, shortly after Period 4 ended, the defendants temporarily reassigned, for a five-

month period, five of the nine trainers assigned to the training unit.  The employees were

reassigned to serve in a DFCS county office as supervisors and caseworkers.  In September 2014,

---

Snapshot 10/14/14.  The analysis included in App. A, Ex. 6 also includes for comparative purposes the same
calculations with data from the carve-out counties.
[149] *See* Initial and Final Period 4 IPs at 1, n.1.
[150] *May 2014 Report* at 75-78.
[151] *Id.* at 83.

shortly after the reassignments were instituted, the DFCS training director resigned.  Neither the

training director position nor any of the training coordinator position vacancies that were

identified in the Monitor's May 2014 Report have been filled.  However, as of June 9, 2015,

defendants reported that hiring recommendations were pending for five training coordinators and

for the training director position.

> **Ongoing Period 3 IP Requirement §I.A.3.a.4.**[152]
> **A.  Human Resources Management**
>    **3.  Training**
>       **a.  Pre-Service Training**
>          **4)  Defendants shall have implemented an accurate and**
>             **reliable system to track staff participation in all**
>             **required training.**

**Status of Progress, Period 3 IP §I.A.3.a.4. (Ongoing Requirement):**  This requirement

was satisfied.  Defendants implemented a system during Period 4 to track staff participation in

pre-service and in-service training.  The system is designed to track all pre-service and in-service

training provided to DFCS staff over defined time periods.

Pursuant to the June 24, 2013 Order and the Initial Period 4 IP, defendants are required to

produce certain data reports regarding pre-service and in-service training. The reports that

defendants produced to satisfy these reporting requirements appear to be copies from an

electronic data tracking system that has been implemented, as required, pursuant to specifications

that have been agreed upon by the parties and endorsed by the Monitor.[153]  While this reporting

method provides complete information regarding the training administered to staff, unlike other

reports defendants produce in response to MSA reporting requirements, this reporting method

does not provide a direct measure of performance in terms of MSA training requirements.  In

order to produce an analysis of applicable MSA pre-service and in-service training requirements,

the Monitor has cross referenced training data with hiring and attrition data provided by

---

[152] *See* Initial and Final Period 4 IPs at 1, n.1.
[153] Defendants track pre-service and in-service training in detailed spreadsheets.

MDHS/DFCS human resources management staff.  This methodology has revealed data

discrepancies that the Monitor has attempted to resolve with the defendants.  For these reasons,

the Monitor recommends that the parties address refinements to the report specifications that

have been agreed upon related to the MSA's pre-service and in-service training requirements.

> **Ongoing Requirement MSA §II.A.2.c.6.b.**
> **2. Human Resources Management**
>   **c.  Training**
>     **6)  By the end of Implementation Period Three [and thereafter]:**
>       **(b)  All new caseworkers and supervisors will complete**
>         **their pre-service training consistent with the Modified**
>         **Settlement Agreement requirements before they**
>         **assume their respective responsibilities for carrying**
>         **cases and supervising.**

**Status of Progress, MSA §II.A.2.c.6.b. (Ongoing Requirement):**  This requirement

was satisfied.  The data produced by defendants indicate that 100 percent of caseworkers who

were newly hired during Period 4 completed the requisite training prior to September 30, 2014

and did not carry cases before completing the training.[154]  The data produced by defendants also

indicate that 100 percent of supervisors who were newly hired or promoted into their supervisory

positions during Period 4 completed the pre-service training prior to September 30, 2014[155] and

before assuming supervisory responsibilities.[156]  This is consistent with information obtained

through interviews with newly hired caseworkers, supervisors and members of the training unit.

> **MSA §II.A.2.c.7.a.**
> **2. Human Resources Management**
>   **c.  Training**
>     **7)  By the end of Implementation Period Four:**
>       **(a)  All caseworkers shall receive a minimum of 40 hours**
>         **of structured ongoing in-service training each year,**

---

[154] *See* App. A, Ex. 3, *supra* note 53, and App. A, Ex. 7A, chart prepared by the Office of the Court Monitor, Pre-Service Training Status As Of September 30, 2014 Among Newly Hired Caseworkers, By Position Start Date, One Year Period Ending 6/30/14.  The Monitor received training data through September 30, 2014, after the end of Period 4, to account for staff who were hired during the latter part of Period 4 and who participated in pre-service training that extended into Period 5.

[155] One supervisor included in the analysis completed training in October 2014.

[156] *See* App. A, Ex. 3, *supra* note 53, and App. A, Ex. 7B, chart prepared by the Office of the Court Monitor, Pre-Service Training Status Among ASWSs Newly Hired or Promoted Into Position During Period 4 Through September 30, 2014, By Position Start Date, One-Year Period Ending 6/30/14.

**and all supervisors shall receive a minimum of 24
hours of ongoing in-service training each year.**

**Status of Progress, MSA §II.A.2.c.7.a.:**  This requirement was not satisfied for caseworkers, but was satisfied for supervisors.  The data produced by defendants indicate that 94 percent of caseworkers to whom this requirement applied received a minimum of 40 hours of in-service training for the one-year period ending June 30, 2014.[157]  The data also indicate that 100 percent of supervisors to whom the requirement applied received a minimum of 24 hours of ongoing in-service training during the one-year period ending June 30, 2014.[158]  This appears to be consistent with information obtained through interviews with caseworkers, supervisors and members of the training unit.

Defendants' capacity to deliver in-service training to caseworkers during Period 5 was compromised by the temporary reassignment, starting in August 2014 and ending in January 2015, of over half of the trainers assigned to the training unit.[159]  The Monitor will assess what if any impact the temporary reassignments had on the DFCS in-service training program and report fully on this matter in her forthcoming report on Period 5.[160]

> MSA §II.A.2.c.7.b.
> **2.  Human Resources Management**
>  **c.  Training**
>   **7)  By the end of Implementation Period Four:**
>     **(b)  Supervisory personnel will not be detailed from the field to provide the required pre-service and in-service training.**

---

[157] *See* App. A, Ex. 3, *supra* note 53, and App. A, Ex. 8A, chart prepared by the Office of the Court Monitor, Ongoing In-Service Training Received By Caseworkers, By Region, Annual Report Ending 6/30/14.  The analysis excludes caseworkers who were excused from the full in-service training requirement because they were newly hired or separated during Period 4 and caseworkers who were reported to be on medical leave for an extended period during Period 4.

[158] *See* App. A, Ex. 3, *supra* note 53, and App. A, Ex. 8B, chart prepared by the Office of the Court Monitor, Ongoing In-Service Training Received By ASWSs, By Region, Annual Report Ending 6/30/14.

[159] *See supra* at 55, 70-71 for a discussion of this matter.

[160]  At this juncture, it appears unlikely that the temporary reassignments affected defendants' capacity to deliver in-service supervisory training, which is provided for the most part by CSF consultants.

**Status of Progress, MSA §II.A.2.c.7.b.:**  This requirement has been satisfied.  There is no evidence of this practice, which was once widespread.[161]

> **Ongoing Period 3 IP Requirement §I.B.2.[162]**
> **B. Continuous Quality Improvement**
>    **2.  By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants, in conjunction with CSF or another consultant, shall revise and begin implementing a written plan to implement a continuous quality improvement (CQI) system.  That written plan shall explicitly specify the resources and staffing necessary to adequately operate the CQI unit in both the state and regional offices.**

**Status of Progress, Period 3 IP §I.B.2. (Ongoing Requirement):**  This requirement was satisfied during Period 3.  However, significant shortcomings related to implementation of the CQI plan that were identified in the Monitor's May 2014 Report must be corrected.  As explained below, these shortcomings were not remedied during Period 4.  And while there has been notable progress during Period 5 in one aspect of defendants' performance, overall defendants' corrective action process is not adequately addressing identified safety and case practice issues.

In May 2014, the Monitor reported that defendants had finalized the required CQI plan during July 2012, and made demonstrable progress implementing the program during Period 3.  The Monitor explained that the plan addressed the conceptual and structural framework for implementation of an appropriate CQI system with ongoing quality assurance and quality improvement processes.[163]  The Monitor described the accountability process embedded in the plan, which contemplates that when deficiencies in case practice are identified through various

---

[161] *See, e.g., June 2009 Report* at 39-41 for background information related to this matter.

[162] *See* Initial and Final Period 4 IPs at 1, n.1.

[163] *See May 2014 Report* at 93.  The Monitor noted specific limitations in the CQI plan related to staffing levels for certain CQI-related functions.  *Id.* at 94-95.  On June 5, 2015, during the comment period on the draft version of this report, the defendants submitted a copy of the updated CQI Plan to plaintiffs' counsel and the Monitor.  Defendants' counsel have reported that a draft of the plan was produced in January 2015 and the plan ultimately was finalized and released on June 2, 2015.

types of CQI reviews and evaluations, they are documented, reported to the appropriate managers, tracked, followed up and resolved.[164]  The corrective action process, which implicates reviews conducted by the CQI program's Safety Review, Foster Care Review and Evaluation and Monitoring Units, requires that safety issues are addressed within five calendar days and case practice issues within 20 business days.  This is an essential safeguard designed to mitigate the risk of harm to children in DFCS custody and promote improvements in case practice.

The Monitor found substantial limitations in the timeliness and efficacy of the corrective action process implemented by DFCS during Period 3.  This very serious deficiency persisted during Period 4.   As explained below, it appears that after Period 4, defendants made substantial progress improving the timeliness and efficacy of the corrective action process related to safety and case practice issues identified by the Safety Review Unit and this progress is laudable.  Over the same time period, however, it appears that defendants were unable to respond timely to a ballooning number of safety issues and case practice issues identified through the Foster Care Review process.[165]

In the May 2014 Report, the Monitor presented her analysis of open, overdue corrective actions related to CQI activities conducted by the Safety Review and Foster Care Review units as of November 4, 2013.[166]  More recently, the Monitor analyzed comparable data submitted by defendants from June 30, 2014 and May 18, 2015.[167]  The findings are presented in the table below.  The table, which includes both safety issues and case practice issues identified through

---

[164]  *Id.* at 95.

[165]  The Monitor has also reviewed the timeliness of the corrective action process that is triggered when safety and case practice issues are identified by the CQI program's Evaluation and Monitoring Unit [hereinafter EMU]. However, because these data include non-class members who cannot be readily identified, the Monitor's analysis of these data is not presented herein.  The data suggest it is likely there are substantial delays in the associated corrective action process related to class members.

[166]  *Id*. at 95-96, n.288.

[167]  The updated data is from the DFCS Continuous Quality Improvement Corrective Actions Open Report as of 06/30/2014 and DFCS Continuous Quality Improvement Corrective Actions Open Report as of 05/18/2015.

both CQI processes, is broken down by the CQI process that identified the issue for corrective action.

| | November 4, 2013 | June 30, 2014 | May 18, 2015 |
|---|---|---|---|
| | **Safety Review Unit** | | |
| Number of overdue issues | 56 | 150 | 10 |
| Range of days overdue | 1-126 days | 1-238 days | 1-111 days |
| Median | 29 days | 84.5 days | 25 days |
| | **Foster Care Review** | | |
| Number of overdue issues | 20 | 71 | 247 |
| Range of days overdue | 3-125 days | 2-272 days | 1-594 days |
| Median | 29 days | 76 days | 92 days |

Comparing the aggregated totals from the Safety Review and Foster Care Review Units from a point-in-time in 2013, 2014, and 2015, it is evident that the total number of open, overdue corrective action issues increased each year from 76 in 2013 to 221 in 2014, to 257 in 2015. At the same time, the median number of days overdue increased for the point-in-time each year from 29 days in 2013, to 83 days in 2014, to 91 days in 2015. Analyzed separately by category, however, the data reveal that while the number of overdue corrective action issues identified by the Safety Review Unit increased nearly threefold between 2013 and 2014 (*i.e.,* over the course of Period 4), the number of overdue corrective action issues dropped by over 90 percent between 2014 and 2015 (*i.e.,* after the end of Period 4), from 150 to 10. The trend among issues identified through the Foster Care Review process was different, however. The number of overdue corrective action issues identified through that process saw a 250 percent increase from 2013 to 2014 and, unlike issues identified through the Safety Review Unit, another approximately 250 percent increase between 2014 and 2015. By May 18, 2015, the number of overdue corrective action issues identified through the Foster Care Review process had swelled to 247.

In order to assess changes in geographic trends in the number of overdue corrective action issues, for the 2014 and 2015 data, the Monitor parsed the corrective action data generated as a

result of the Safety Review and Foster Care Review processes by both safety and case practice issues and by region in order to identify any changes over time. The analysis indicates that as of June 30, 2014 there were 104 safety-related corrective action issues identified statewide that were open and overdue by between one and 272 days. The median days corrective action was overdue for these issues was 85 days. Of these 104 safety issues, 83 percent were from Region VII-W, nine percent were from Region VI, and the remaining nine percent were from Regions III-N, III-S, and V-E. Approximately 11 months later, as of May 18, 2015, there were 88 safety issues identified statewide that were open and overdue by between one and 594 days. The median days these issues were overdue was 121.5 days. Of the 88 safety issues for which corrective action was overdue, 68 percent were from Region VII-W, 10 percent were from Region VI, 15 percent were from Region III-S, and the remaining six percent were from Regions III-N, VII-E, and V-E. The data indicate that while there were fewer overdue safety issues, overdue corrective action issues tended to remain open for longer periods of time. The findings are reflected in the table below:

| | Safety Review Unit and Foster Care Review | |
|---|---|---|
| | As of June 30, 2014 | As of May 18, 2015 |
| | Safety Issues | |
| Number of open and overdue issues | 104 | 88 |
| Range of days overdue | 1 - 272 days | 1 - 594 days |
| Median | 85 days | 121.5 days |
| | Number of Safety Issues By Region | |
| Region III-N | 2 (2%) | 3 (3%) |
| Region III-S | 6 (6%) | 13 (15%) |
| Region V-E | 1 (1%) | 1 (1%) |
| Region VI | 9 (9%) | 9 (10%) |
| Region VII-E | 0 | 2 (2%) |
| Region VII-W | 86 (83%) | 60 (68%) |

Insofar as case practice issues identified through the safety review and foster care review processes, the data defendants have submitted indicate that as of June 30, 2014 there were 117 case practice-related corrective action issues identified through the CQI process statewide that were open and overdue by between two and 259 days.  The median days overdue for these issues was 76 days.  Of these 117 case practice issues, 77 percent were from Region VII-W, nine percent were from Region III-N, seven percent were from Region III-S and seven percent were from Region VI.  According to the data defendants have submitted, as of May 18, 2015 there were 169 corrective action issues related to case practice identified statewide that were open and overdue by between one and 581 days.  The median days corrective action was overdue was 82 days.  Of the 169 overdue case practice-related corrective action issues, 41 percent were from Region VI, 27 percent were from Region VII-W, 16 percent were from Region III-N, 14 percent were from Region III-S, and the remaining three percent were from Regions I-N and II-W. Region VII-W experienced a substantial decrease in the number of overdue case practice issues while Regions VI, III-N, and III-S experienced increases.  These findings are reflected in the following table:

| | Safety Review Unit and Foster Care Review | |
|---|---|---|
| | As of June 30, 2014 | As of May 18, 2015 |
| | Case Practice Issues | |
| Number of open and overdue issues | 117 | 169 |
| Range of days overdue | 2 - 259 days | 1 - 581 days |
| Median | 76 days | 82 days |
| | Number of Safety Issues By Region | |
| Region I-N | 0 | 4 (2%) |
| Region II-W | 0 | 1 (1%) |
| Region III-N | 11 (9%) | 27 (16%) |
| Region III-S | 8 (7%) | 23 (14%) |
| Region VI | 8 (7%) | 69 (41%) |
| Region VII-W | 90 (77%) | 45 (27%) |

The evidence shows that despite improvements in the corrective action process related to safety and case practice issues identified by the Safety Review Unit, there are still substantial limitations in the corrective action process related to the FCR unit.  In the aggregate, the number of overdue corrective action issues has grown.  And while there has been a notable improvement in Region VII-W, in other regions the number of overdue corrective action issues grew substantially since the end of Period 4.  This is a troubling issue defendants must address.

> **Ongoing Period 3 IP Requirement §I.B.3.**[168]
> **B. Continuous Quality Improvement**
>   3.  **By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants shall maintain one (1) Program Administrator, Sr. to work in the Evaluation and Monitoring Unit.**

**Status of Progress, Period 3 IP §I.B.3. (Ongoing Requirement)**:  Defendants satisfied this requirement in Period 3 and they have continued to do so.  Two program administrators were assigned to the Evaluation and Monitoring Unit throughout Period 4 and they continue to staff these positions.[169]

> **Initial Period 4 IP §II.B.1.a.**
> **B. Continuous Quality Improvement**
>   1.  **Within 60 business days of completing each CQI Review set forth in the sections below, Defendants shall complete a report regarding that review.  Within five business days of completing each report, Defendants shall provide a copy of the report to Plaintiffs and the Monitor.**
>     a)  **By August 1, 2013, Defendants shall complete a third follow-up CQI Review for Regions I-South and II-West.**

**Status of Progress, Initial Period 4 IP §II.B.1.a.:**  This requirement was substantially satisfied.  As explained below, there was a delay in completing the Region I-S report, but it was *deminimis.*

---

[168]  *See* Initial and Final Period 4 IPs at 1, n.1.
[169]  One of the two current program administrators began to work in the Unit on March 1, 2012.  The other program administrator began to work in the Unit on September 1, 2013, replacing an employee who left the agency in June 2013.

Although the Region I-S review was conducted between June 10 and 13, 2013, substantially in advance of the August 1, 2013 deadline, the report related to the review was not completed until September 10, 2013, two business days after the 60-day period lapsed. The report was submitted to plaintiffs and the Monitor on September 16, 2013, within five business days.

Like the Region I-S review, the Region II-W review was conducted in advance of the August 1, 2013 deadline, between June 25 and 28, 2013. The Region II-W report was completed on September 23, 2013 and submitted to plaintiffs and the Monitor on September 27, 2013, within required timelines.

**b) By August 15, 2013, Defendants shall complete a follow-up CQI Review for Region III-North.**

**Status of Progress, Initial Period 4 IP §II.B.1.b.:** This requirement was substantially satisfied for the Region III-N review, which was conducted between July 30 and August 2, 2013, in advance of the August 15, 2013 deadline. The report related to the review was completed on a timely basis on October 24, 2013 and submitted to plaintiffs and the Monitor on October 31, 2013.[170]

**c) By September 1, 2013, Defendants shall complete a second follow-up CQI Review for Region IV-North.**

**Status of Progress, Initial Period 4 IP §II.B.1.c.:** This requirement was satisfied for the Region IV-N review. The review was conducted between August 27 and 30, 2013, in advance of the September 1, 2013 deadline. Both the Region IV-N report, which was completed on

---

[170] The delay in the submission was limited to one business day. The Monitor received an unredacted version of the Region III-N report from the defendants on October 25, 2013. Defendants routinely submit CQI annual review reports to the Monitor in unredacted form shortly after they are completed. The reports are redacted to eliminate information about non-class members before they are provided to counsel for the plaintiff class. The five-business day requirement is intended to apply to the redacted version of the report.

November 15, 2013, and its submission to plaintiffs and the Monitor on November 21, 2013, were timely.

>    **d)  By October 1, 2013, Defendants shall complete a second
>         follow-up CQI Review for Region IV-South.**

**Status of Progress, Initial Period 4 IP §II.B.1.d.:**  This requirement was satisfied for the Region IV-S review.  The review was conducted between September 17 and 20, 2013, in advance of the October 1, 2013 deadline.  Both the Region IV-S report, which was completed on December 2, 2013, and its submission to plaintiffs and the Monitor on December 6, 2013, were timely.

>    **e)  By November 1, 2013, Defendants shall complete a second
>         follow-up CQI Review for Region III-South.**

**Status of Progress, Initial Period 4 IP §II.B.1.e.:**  This requirement was satisfied for the Region III-S review.  The review was conducted between October 22 and 25, 2013, in advance of the November 1, 2013 deadline.  Both the Region III-S report, which was completed on January 21, 2014, and its submission to plaintiffs and the Monitor on January 24, 2014, were timely.

>    **f)  By December 1, 2013, Defendants shall complete a
>         second follow-up CQI Review for Region I-North.**

**Status of Progress, Initial Period 4 IP §II.B.1.f.:**  This requirement was satisfied for the Region I-N review.  The review was conducted between November 19 and 22, 2013, in advance of the December 1, 2013 deadline.  Both the Region I-N report, which was completed on February 20, 2014, and its submission to plaintiffs and the Monitor on February 26, 2014, were timely.

>    **g)  By January 1, 2014, Defendants shall complete a follow-up
>         CQI Review for Region VII-West.**

**Status of Progress, Initial Period 4 IP §II.B.1.g.:**  This requirement was partially satisfied for Region VII-W.  Although the review was conducted between December 17 and 20,

2013, in advance of the January 1, 2014 deadline, it does not appear the report was completed

within the required timeline,[171] and its submission to plaintiffs and the Monitor on April 2, 2014,

was untimely.

> **h) By February 1, 2014, Defendants shall complete a
> follow-up CQI Review for Region VI.**

**<u>Status of Progress, Initial Period 4 IP §II.B.1.h.</u>:** This requirement was partially

satisfied for the Region VI review, which was conducted between January 21 and 24, 2014, in

advance of the February 1, 2014 deadline.  The report related to the review was completed on a

timely basis on April 18, 2014; however, it was not submitted to plaintiffs and the Monitor until

May 5, 2014, six business days late.[172]

> **i) By March 1, 2014, Defendants shall complete a follow-up
> CQI Review for Region II-East.**

**<u>Status of Progress, Initial Period 4 IP §II.B.1.i.</u>:** This requirement was satisfied for the

Region II-E review.  The review was conducted between February 4 and 7, 2014 in advance of

the March 1, 2014 deadline.  Both the Region II-E report, which was completed on May 1, 2014,

and its submission to plaintiffs and the Monitor on May 6, 2014, were timely.

> **j) By April 1, 2014, Defendants shall complete a third
> follow-up CQI Review for Region V-West.**

**<u>Status of Progress, Initial Period 4 IP §II.B.1.j.</u>:** This requirement was partially

satisfied for the Region V-W review, which was conducted between March 18 and 21, 2014, in

advance of the April 1, 2014 deadline.  The report related to the review was completed on a

---

[171]  The cover page of the report is intended to reflect the date that it is completed.  Thus, for purposes of the calculations contemplated by this set of requirements, the Monitor has relied on the date on the cover page.  In this instance, the cover page indicates the report was completed on March 24, 2014.  This is incorrect because the final version of the report was transmitted to the Monitor in unredacted form on March 22, 2014.
[172]  The Monitor received an unredacted version of the Region VI report from the defendants on April 17, 2014.  The cover page of the report indicates that it was completed on April 18, 2014.  *See supra* note 171.

timely basis on June 9, 2014; however, it was not submitted to plaintiffs and the Monitor until

June 23, 2014, six business days late.[173]

> **k) By May 1, 2014, Defendants shall complete a second follow-up CQI Review for Region V-East.**

**Status of Progress, Initial Period 4 IP §II.B.1.k.:**  This requirement was satisfied for

the Region V-E review.  The review was conducted between April 22 and 25, 2014, in advance

of the May 1, 2014 deadline.  Both the Region V-E report, which was completed on July 21,

2014, and its submission to plaintiffs and the Monitor on July 24, 2014, were timely.

> **l) By June 1, 2014, Defendants shall complete a second follow-up CQI Review for Region VII-East.**

**Status of Progress, Initial Period 4 IP §II.B.1.l.:**  This requirement was partially

satisfied for Region VII-E.  Although the review was conducted between May 13 and 16, 2014,

in advance of the June 1, 2014 deadline, the report, which was completed on August 14, 2014[174]

and submitted on August 22, 2014, was neither completed nor submitted on a timely basis.[175]

> **Final Period 4 IP §II.B.1.**
> **B.  Continuous Quality Improvement**
>   **1.  Defendants shall maintain a minimum of at least two reviewers in the Safety Review Unit to review maltreatment in care investigations.**

**Status of Progress, Final Period 4 IP §II.B.1.:**  This requirement has been satisfied.

Defendants maintained two reviewers in the Safety Review Unit during Period 4.  Both reviewers

started working in the Unit during May 2013, and a dedicated supervisor was added in June

2014.

---

[173]  The Monitor received an unredacted version of the report on June 13, 2014.  It appears there was an error in transmitting the redacted version of the report.  An initial effort was made to transmit the report in electronic format to plaintiffs and the Monitor on June 18, 2014.  However, the June 18, 2014 transmission did not include the report, which was ultimately submitted on June 23, 2014.  Even if the June 18, 2014 date is used for the purpose of calculating performance relative to this timeline requirement, the transmission was untimely.

[174]  The cover page of the report states that the completed date was August 14, *2013* instead of August 14, *2014*.

[175]  The report was completed in 63 business days and submitted seven business days thereafter.

Final Period 4 IP §II.B.2.

**B. Continuous Quality Improvement**

    **2. By March 1, 2014, Defendants shall provide to Plaintiffs and the Monitor a CQI corrective action tracking process. This process will outline how recommendations and corrective actions identified through the CQI Foster Care Review ("FCR"), Evaluation and Monitoring Unit ("EMU"), and Safety Review Unit ("SRU") review processes are distributed to and addressed by Regional Directors with supervisors and caseworkers through the HEAT system and how those corrective actions are prioritized, tracked, and followed-up on by CQI staff (the "CQI Corrective Action Tracking Process"). Defendants shall provide monthly reporting to the Monitor documenting Defendants' obligation to ensure timely implementation of corrective actions required by the CQI Corrective Action Tracking Process.**

**<u>Status of Progress, Final Period 4 IP §II.B.2.</u>:** This requirement was satisfied in part by the defendants' submission of a summary which describes the tracking process. However, the defendants did not submit the required monthly reports documenting their obligation to ensure that corrective actions related to issues identified by the CQI process are undertaken and completed on a timely basis. These findings are explained in more detail below.

The record in this case indicates that one of the major shortcomings in the CQI processes that defendants have implemented is the failure to institute timely and effective corrective actions related to safety, practice and systemic issues identified through various CQI activities on a consistent basis. In May 2014, the Monitor reported that "corrective action is not consistently timely and accountability mechanisms are not consistently effective."[176] Significantly, as a general matter, the Monitor found this limitation was evident "even in instances when serious safety concerns were identified."[177] In an effort to address this issue, the Final Period 4 IP included this subsection's dual requirement: 1) the submission of an outline or summary of the corrective action tracking process; and 2) the submission of monthly reports documenting defendants' obligation to ensure corrective action is timely.

---

[176] *See May 2014 Report* at 5; *id.* at 156.
[177] *Id.* at 110.

On March 5, 2014, defendants submitted a document describing the CQI corrective action tracking process.[178] The defendants' submission describes adequately the elements of the tracking process that are addressed by this requirement; however, the defendants did not submit monthly reports to the Monitor as required by this subsection.[179] In late May 2014, in response to the Monitor's inquiry about the status of the monthly reports, defendants indicated that they would consult with the Monitor about the content of the required report. They did not do so. In response to the Monitor's more recent inquiries about the status of the reports, the defendants have expressed a continued willingness to work in consultation with the Monitor to develop the required report, or supplement an existing DFCS internal report, in response to this requirement.[180]

As described above in the narrative related to Period 3 IP §I.B.2., an ongoing Period 3 requirement,[181] the timeliness of the corrective action process did not improve during Period 4, and while there was demonstrable improvement in one aspect of the process during Period 5, substantial limitations in the process continue to be evident.

> Final Period 4 IP §II.B.3.a.
> B. Continuous Quality Improvement
>    3. Defendants shall take steps to improve the quality of the data to be collected to meet data reporting requirements of the MSA through the FCR process, through the following means:
>       a) By March 30, 2014, Defendants shall provide training to FCR reviewers on the areas needing attention as identified in Defendants' Monthly Data Quality Reports,

---

[178] *See* App. B, Ex. 10, March 5, 2014 e-mail from Gwen Long to Julia Davis and Grace M. Lopes with attached DFCS CQI Corrective Action Tracking Process, redacted. Except for the document related to the CQI tracking process, the documents transmitted with the March 5, 2014 e-mail are not included with this exhibit.
[179] *Id.* at 5 (DHS 362700).
[180] It is noteworthy that defendants' March 5, 2014 summary states that existing reports from the DFCS automated tracking system would be submitted to the Monitor beginning on May 1, 2014. The existing reports provide data on some but not all of the information necessary to document defendants' obligation to ensure timely implementation of corrective action. For example, the reports do not address oversight activities conducted by the DFCS Field Operations Director and the CQI Director. These activities are necessary safeguards for ensuring corrective action is completed. Indeed, the oversight role is described in the March 5, 2014 submission as "follow up to ensure corrective action is taken and the corrective action loop is closed." *Id.* at 4 (DHS 362699).
[181] *Supra* at 74-79.

**produced pursuant to the Project Schedule for Defendants' Production of Data Reports Required by Appendix C of the Modified Settlement Agreement, dated June 24, 2013 (Dkt. No. 589) (the "June Order") and will revise the FCR PAD Reference Guide to address issues that were identified by the Monitor and Plaintiffs during the report specification development process. Defendants shall consult with the Monitor regarding those revisions to the FCR PAD Reference Guide.**

**Status of Progress, Final Period 4 IP §II.B.3.a.:** As explained in more detail below, these requirements were satisfied.

This subsection of the Final Period 4 IP was intended to address data quality by requiring two initiatives related to data collection, validation and reporting that are derived at least in part from requirements established by the June 24, 2013 Order: 1) specialized training for FCR reviewers on certain issues identified in monthly data quality reports;[182] and 2) revisions to the written guidance provided to FCR reviewers to address the agreements reached by the parties as a result of the report specification and gap analysis process. As explained below, the required training was conducted and the guidance provided to the FCR reviewers was revised in a manner consistent with the parties' agreements.

The gap analysis addressed by the June 24, 2013 Order required the defendants to develop specifications for each data report reflected in Appendix C to the MSA and to complete any indicated analyses in order to identify required data that were not being collected and/or reported. In instances in which a gap was identified, defendants were required to implement

---

[182] Among other initiatives crafted to improve data quality, the June 24, 2013 Order required the defendants to develop a plan to address findings from initial data validation activities. *See* June 24, 2013 Order §VI.D.3. The defendants submitted a plan on September 3, 2013, which described various findings from initial data scrubbing and validation activities as well as then-current and prospective data validation initiatives, including the submission of trend reports describing findings from the monthly validation processes and identifying related training needs. Defendants began to issue the trend reports starting in late September 2013. The trend reports are the Monthly Data Quality Reports referred to in this subsection.

alternative data collection and reporting methods.[183]  As report specifications were developed and gaps identified, the parties engaged in a collaborative process with the Monitor which led to serial agreements during Period 4 and thereafter on alternative data collection and reporting methods intended to expand and improve the quality of DFCS's data collection and reporting processes.[184]

Among other alternatives, the parties agreed to modify discrete aspects of the data collected and reported through the FCR process.[185]  As described elsewhere in this report,[186] the FCR process constitutes an administrative case review process that is conducted at six-month intervals for all children who have been in foster care at least six months.  Foster care reviewers, who are assigned to the FCR section of the DFCS CQI Unit, conduct these structured reviews using an automated instrument that was developed during 2012 in response to specific MSA requirements.[187]  The defendants refer to the automated instrument as the periodic administrative determination ("PAD").

Foster care reviewers began to collect data that was intended to be responsive to MSA reporting obligations with an expanded version of the PAD in February 2012.  Within less than six months, starting in July 2012, DFCS introduced an automated version of the PAD.  This

---

[183]  *See* June 24, 2013 Order §VI.B.; *see also supra* at 12-14 and *May 2014 Report* at 11-12 for additional background information related to the gap analysis.
[184]  The parties' agreements are summarized in three tables that were prepared by the Monitor and distributed to the parties on February 2, 2015.  The tables reflect the gap status for every data report related to over 70 substantive requirements included in the June 24, 2013 Order as well as in the Initial and Final Period 4 IPs.  A copy of each table is included in the Appendix as an attachment to App. B, Ex. 11A, February 2, 2015 e-mail from Grace M. Lopes to Kenya Rachal and Sara Glasser with attached tables.  The summaries in the tables were supplemented by the parties in e-mail correspondence transmitted by the defendants on February 24, 2015 and by plaintiffs on March 9, 2015.  *See* App. B, Ex. 11B, February 24, 2015 e-mail from Kenya Rachal to Grace M. Lopes, Sara Glasser and Mark Jordan; App. B, Ex. 11C, March 9, 2015 e-mail from Sara Glasser to Grace M. Lopes and Kenya Rachal.
[185]  In some instances, in order to capture data relevant to a specific MSA requirement, the parties agreed to changes in MACWIS.  In other instances the parties agreed to rely on the results of case record reviews conducted during future implementation periods.
[186]  *See supra* at 12-14.
[187]  *See* MSA §II.A.5.c.3.; *see also id.* Appendix C at 3-5.

innovation ultimately led to the defendants' submission of PAD reports to the Monitor and plaintiffs' counsel beginning in April 2013, before the start of Period 4.

As part of the gap analysis contemplated by the June 24, 2013 Order, the parties and the Monitor considered the scope and quality of the data relevant to MSA requirements that were collected through the FCR process. As a result, the parties agreed to modify various PAD questions and/or to revise the related guidance provided to the FCR reviewers in order to capture certain data elements related to specific MSA requirements.[188] This series of modifications to the PAD and to the related reviewer guidance, combined with DFCS's findings from the process associated with validating the then-existing PAD reports, constituted the required subject matter for the reviewer training that defendants were required to complete by March 30, 2014.

The training was conducted by a CSF consultant for 19 participants via video-conference on February 13, 2014. A review of the training materials and interviews with several participants indicates that the training addressed the agreed modifications to the PAD and PAD guidance, trends and findings derived from data quality reports, data entry issues and discrepancies applicable to FCR reviewers, and reported performance outcomes based on selected PAD reports issued between June 1 and November 30, 2013.[189] In addition to conducting the required

---

[188] In some instances, although a PAD question was not added or modified, the PAD guidance was revised because it did not conform to the related MSA requirement. *See May 2014 Report* at 109 (noting limitations in the PAD instruction guide used by the reviewers).

[189] The training materials reflect a thoughtful and detailed approach to the subject matter. Because the training materials are extensive, an excerpt from the PowerPoint presentation that was used is included in the Appendix for illustrative purposes only. The excerpt includes a copy of the slides used to present the overview of the training session and a change to one specific PAD question. *See* App. B, Ex. 12A, Periodic Administrative Review Work Shop, Center for Support of Families (includes agenda, overview and sample reflecting presentation related to one modified PAD question). The training materials include a presentation on data entry and discrepancies that addresses issues identified through the data validation process related to how reviewers answered specific PAD questions. Various checklists related to data collection are included among the training materials such as a checklist of the PAD questions that require documentation (*see* App. B, Ex. 12B), a checklist of incorrect sequential answer responses (*see* App. B, Ex. 12C), and a checklist of answer responses that may require corrective action (*see* App. B, Ex. 12D). During the training, FCR reviewers were also provided with a checklist of answer responses that met MSA requirements. *See* App. B, Ex. 12E. This checklist, titled PAD Reports with Accompanying Questions, provides the reviewers with a roadmap of "correct" responses. Given that the goal is for the reviewers to answer the

training, the defendants revised the PAD guidance on multiple occasions to address the parties'

agreements.

> **b)  By April 30, 2014, Defendants shall provide guidance to the FCR supervisors on monitoring the reviews conducted by their reviewers.**

**Status of Progress, Final Period 4 IP §II.B.3.b.:**  This requirement was satisfied.  On

April 1, 2014, a CSF consultant and the DFCS FCR supervisor participated in a telephone

conference with both FCR supervisors to review the terms of both a monthly quality assurance

process and a process for follow up on the results of the DFCS data validation unit's findings

relative to the monthly PAD reports.[190]

> **c)  By April 30, 2014, Defendants shall revise the PAD instrument to include specific questions if appropriate to the PAD instrument and FCR process in order to reduce the total number of MSA requirements that will require a case record review for reporting.**

**Status of Progress, Final Period 4 IP §II.B.3.c.:**  This requirement was satisfied.

Defendants began to use the revised PAD on May 1, 2014.

> **Initial Period 4 IP §II.C.1.**
> **C.  Information Use and Management**
> **1.  Pursuant to the Project Schedule for Defendants' Production of Data Reports Required by Appendix C of the Modified Settlement Agreement, dated June 24, 2013 (Dkt. No. 589), Defendants shall produce to the Monitor and Plaintiffs complete, accurate and validated data reports on a monthly basis and at such other intervals as required by the Modified Settlement Agreement.**
>> **a)  The first production of each report shall contain all reports that were due during Implementation Period 3 (starting with the month of July 2012) through the most recent month.  The parties recognize that it may not be possible to produce the FCR Reports starting with the report from the month of July 2012; however, Defendants will produce all available FCR Reports.**

---

questions based on the facts presented regardless of whether the answers constitute the correct responses, it may be appropriate for defendants to monitor how the checklists are being used.

[190]  *See* App. B, Ex. 13, Notes from FCR-PAD QA Discussion, with attached template for required documentation (outlining both QA processes).  DFCS supervisors report that fewer reviews than anticipated have been conducted and that the ability to follow up on the data validation unit's findings is limited because the underlying data related to the findings have not been made available to the management of the FCR unit.

b) **With the exception of the FCR Reports, each monthly report shall contain data about the most recent month, separate from information about any prior months, except as otherwise required by the Modified Settlement Agreement.  Reports may also contain information aggregated in other ways.**

c) **Data reports shall be produced in a live excel file or comparable format for ease of use by the Monitor and Plaintiffs.**

**<u>Status of Progress, Initial Period 4 IP §II.C.1.</u>:**  This requirement was satisfied in substantial part during Period 4.  The June 24, 2013 Order was issued in response to defendants' failure to respond to the 53 reporting requirements they were required to satisfy pursuant to the Period 3 IP.  Defendants planned to respond to these reporting requirements by issuing 63 data reports.  Of these 63 reports, defendants produced a number of reports that were subsequently withdrawn and not produced thereafter pursuant to a series of agreements that were reached by the parties.[191]  In total, as detailed in the Appendix, the Monitor was able to analyze data contained in 49 of the 63 reports for this report.[192]  With certain exceptions, reports were provided timely and in the required reporting formats.  However, as addressed in the narrative related to MSA §II.A.2.a.10.a., above, accurate reports pertaining to caseload requirements were not produced during Period 4.[193]

**Initial Period 4 IP §II.C.2.**
**C.  Information Use and Management**
  **2.  Defendants shall produce to the Monitor and Plaintiffs accurate and validated reports as set forth in Appendix 1.**
    **a)  With the exception of Report Nos. 5 and 6 as identified in Appendix 1, the first production of each report shall**

---

[191]  *See, e.g.,* PAD Report 8, which pertained to children with special needs matched to placements that could meet their therapeutic and medical needs.

[192]  *See,* App. A, Ex. 2A, *supra* note 4, for a table summarizing the status of each of the 63 reports.  Of the 14 reports that the Monitor was not able to analyze as it pertains to defendants' Period 4 performance, defendants either did not produce or stopped production of six reports pursuant to the parties' agreement and with the understanding that reports would be supplanted by case record reviews; four reports were determined to be insufficiently responsive to the relevant requirement and were therefore subject to changes in the PAD whose data will not be available until after Period 4; two reports were subject to modified report specifications and Period 4 data pursuant to the modified specifications were not produced for analysis in time for this report; one report included data containing data entry errors rendering the data unanalyzable; and one report was superseded by a subsequent version of the report that was more responsive to the applicable requirement.

[193]  *See supra* at 66-69.

> b) **contain all reports that were due during Implementation Period 4 (starting with the month of July 2013) through the most recent month.**
> b) **With the exception of Report Nos. 3, 4, 7 and 8 as identified in Appendix 1, each monthly report shall contain data about the most recent month with available data, separate from information about any prior months.  Reports may also contain information aggregated in other ways.**
> c) **Data reports shall be produced in a live excel file or comparable format for ease of use by the Monitor and Plaintiffs.**

**Status of Progress, Initial Period 4 IP §II.C.2.:**  This requirement was satisfied in part during Period 4.  The Initial Period 4 IP created eight new reporting requirements.  Defendants planned to respond to these eight reporting requirements by issuing eight data reports.  In total, the defendants produced five data reports and the Monitor was able to analyze data contained in four of those reports.[194]  Three of the eight data reports that defendants were required to produce either were not produced by the required date or defendants did not provide notification that the required data production would be delayed.

> **Initial Period 4 IP §II.C.3.**
> **C.  Information Use and Management**
> 3.  **During the Negotiation Period, the parties, in consultation with the Monitor, shall develop a process and detailed timeline for production of those reports listed in Appendix 2, including the method by which each report shall be produced (i.e., MACWIS, FCR, manual or other).  The parties recognize that it may be necessary to make modifications to Appendix 2 during the Negotiation Period.**

**Status of Progress, Initial Period 4 IP §II.C.3.:**  This requirement was satisfied.

Appendix 2 to the Initial Period 4 IP lists 11 substantive MSA requirements that defendants did not report on as of July 18, 2013, which was the filing date of the Initial Period 4 IP.  As required

---

[194]  *See* App. A, Ex. 2B, *supra* note 4, for a table summarizing the status of each of the eight reports.  Of the four reports the Monitor was not able to analyze, defendants did not produce one report, which the parties agreed would be assessed through a case record review; one report contained data entry errors rendering the data unanalyzable; one report was expected to be produced by May 31, 2015 but it had not been received by the Monitor as of June 11, 2015; and, one report was determined by the parties to be satisfied by a different report submitted pursuant to the June 24, 2013 Order.

by this subsection, during the "Negotiation Period"[195] that led to finalization of the Final Period 4

IP, the parties agreed on methodologies and related timelines for reporting on these MSA

requirements or timelines for resolving when reporting would occur.[196]

> **Final Period 4 IP §II.C.1.**
> **C. Information Management and Use**
> > 1. **By March 1, 2014, Defendants shall provide to Plaintiffs and**
> > **the Monitor a timeline for the development and**
> > **implementation of its replacement SACWIS system.**

**Status of Progress, Final Period 4 IP §II.C.1.:**  This requirement was satisfied.[197]  On

March 3, 2014, defendants submitted a project planning document that included a detailed series

of tasks and milestones with corresponding timelines associated with the development of the

replacement system.[198]  The planning document provides limited information regarding the

implementation schedule.[199]  This is understandable in light of the fact that the planning

document was prepared even before a draft request for proposals had been developed soliciting

bids from vendors to replace MACWIS.  During Period 5, in response to the Monitor's request,

the defendants submitted a more detailed and updated development and implementation

schedule.  According to the updated schedule, testing of the new system will begin in mid-May

---

[195]  The Initial Period 4 IP defines the "Negotiation Period" as the time period from December 1, 2013 to January 8, 2014."  *See* Initial Period 4 IP §I.B.

[196]  *See* Final Period 4 IP at Appendix 3.  In several instances, the parties agreed to a case record review process to collect data relative to a specific requirement.  However, the parties deferred resolution of the timelines for these case record reviews until March 30, 2014.  The parties ultimately agreed on the timelines for the case record reviews and these timelines are reflected in App. B, Ex. 11A, *supra* note 184.  *See also* Initial Period 4 IP §II.C.4. (recognizing that certain specific information required by the MSA could not be captured by data reports when the Initial Period 4 IP was filed and acknowledging the parties' agreement that this information would be collected through case record reviews conducted in consultation with the Monitor).

[197]  The March 1, 2014 deadline fell on a Saturday and defendants' submission was made on the first business day thereafter.

[198]  *See* App. B, Ex. 14, March 3, 2014 e-mail from Gwen Long to Julia Davis and Grace M. Lopes with attached SACWIS Project Planning Schedule.  The other documents that were transmitted with the March 3, 2014 e-mail are not included in the Appendix.  The defendants' submission was a multi-page Gantt chart – a format typically used for project management purposes.

[199]  It refers to a 673-day implementation project management plan commencing in August 2015 as well as a 262-day task starting in March 2018 which is described as "warranty/maintenance/operations."  *See* App. B, Ex. 14, *supra* note 198, at 3 (DHS 362533).

2019 and end in mid-January 2020.  Following the testing period, the system is expected to be operational on January 21, 2020.[200]

In light of the historical representations defendants have made regarding the MACWIS replacement schedule, it is difficult to assess whether the current schedule reflects an accurate timeline.  In January 2013, for example, the defendants reported that the new system would be introduced in late 2015 or 2016.[201]  According to the schedule defendants submitted on March 3, 2014, an RFP for a replacement system was scheduled to be issued in October 2014.[202]  However, according to the schedule defendants submitted in April 2015, the RFP for a replacement system will be issued in June 2016.[203]  Against this backdrop of ever-changing project deadlines, it is difficult to assess the likelihood of defendants meeting the latest version of the schedule that has been submitted.

Since the start of 2008 when the Settlement Agreement was approved by this Court, the development of a more functional management information system has been a priority.  Among other provisions,[204] the Settlement Agreement required that by the end of Period 1, DFCS staff would have access to basic computer services,[205] and that a capacity assessment of MACWIS relative to the requirements imposed by the Settlement Agreement would be completed.[206]  These

---

[200] In response to the Monitor's request, defendants submitted an updated 136-page schedule to the Monitor on April 17, 2015 and a condensed version of the updated schedule on April 6, 2015.  The condensed version is included in the Appendix as App. B, Ex. 15, April 6, 2015 e-mail from Diane Mobley to Grace M. Lopes with attached New SACWIS Project Timeline Starting with Phase II and New SACWIS Project Timeline Starting with Phase III.
[201] *See January 2013 Report* at 31.
[202] *See* App. B, Ex. 14, *supra* note 198, at 2 of Gantt chart.
[203] *See* App. B, Ex. 15, *supra* note 200, at 1 of Gantt chart.
[204] Period 1 requirements also included the obligation to collect, analyze and disseminate to DFCS county and regional staff  MACWIS data related to compliance with all of the Settlement Agreement's foster care services standards.  Settlement Agreement §II.A.5.c.
[205] *Id*. §II.A.5.b.  According to the Settlement Agreement, access to MACWIS, word processing and electronic mail constitute access to basic computer services.  *Id.*
[206] Period 1 IP §I.e.

93

requirements were not satisfied,[207] and although incorporated into the Period 2 IP,[208] they were

not satisfied by the end of Period 2.[209]  Pursuant to the corrective action process mandated by the

Bridge Plan, it was not until July 2010 that defendants issued the Request for Proposals for the

MACWIS capacity assessment that should have been conducted during Period 1.[210]  The actual

assessment report was not finalized until late June 2012.[211]  Approximately four months

thereafter, defendants notified the Administration for Children and Families ("ACF") in the U.S.

Department of Health and Human Services ("HHS") of their intent to develop a new automated

case management system to replace MACWIS.[212]  However, it was not until February 28, 2014

that the defendants finalized a contractual arrangement with a vendor to help them develop the

actual RFP that will eventually lead to a contract with a different vendor for replacement of the

system.[213]  DFCS staff are working currently with their contractor on developing requirements

---

[207]  *June 2009 Report* at 20 (finding that assessment of MACWIS conducted during Period 1 did not address reliability of MACWIS data, efficacy of management reports generated, nor consider whether MACWIS was capable of meeting the functionality requirements established by the Settlement Agreement); *id.* at 51-55 (finding that for the most part MACWIS does not report accurately and as required on Settlement Agreement standards).

[208]  Period 2 IP §I.5. (requiring, among other things, that defendants provide access to basic computer services and issue an RFP and contract for an assessment of MACWIS).

[209]  *September 2010 Report* at 59-64.  Pursuant to the Period 2 IP, at least some of these Period 1 carry-over requirements were due before the conclusion of Period 2.  *See, e.g.,* Period 2 IP §I.5.c. (requiring that an RFP be issued by September 1, 2009 for a comprehensive analysis of MACWIS).

[210]  June 10, 2010 Agreed Order at ¶6.  *See November 2010 Report* at 17-18 for a summary of defendants' progress. The RFP was issued on July 27, 2010.  *See id.* at Ex. 3, Mississippi Department of Information Technology Services, RFP No. 3583.  The contract for the assessment was finalized on March 18, 2011.  For a copy of the contract, *see The Court Monitor's Report to the Court Regarding Findings From the Second Case Record Review and Other Matters Relevant to Defendants' Progress Toward Satisfying the Requirements of the Settlement Agreement,* filed June 29, 2012 [hereinafter *June 2012 Report*], at Ex. 30, Project No. 37921, Professional Services Agreement Between Walter R. McDonald & Associates, Inc. and Mississippi Department of Information Technology Services as Contracting Agent for the Mississippi Department of Human Services.

[211]  For a copy of the report, s*ee January 2013 Report* at Ex. 17, Walter R. McDonald & Associates, Inc., Mississippi MACWIS Alternatives Analysis, Final Project Report, April 20, 2012; *see also id.* at 30 and n.141.

[212]  For a copy of the notification letter *see id.* at Ex. 18A, October 29, 2012 correspondence from Richard Berry to Joe Bock.

[213]  As the initial step, defendants contracted for services from MAXIMUS Human Services Inc., a Quality Assurance/Independent Verification and Validation [hereinafter QA/IVV] vendor.  MAXIMUS consultants have been engaged to work with MDHS/DFCS staff during the planning, system design, development and implementation stages for the new system.  *See* App. B, Ex. 16A, Project Number 40123, Professional Services Agreement Between Maximus Human Services, Inc. and Mississippi Department of Information Technology Services as Contracting Agent for the Mississippi Department of Human Services.

for the new system that will inform the RFP that is anticipated in June 2016 for the development and implementation of the replacement system.

Defendants' currently-projected MACWIS replacement date in 2020 is noteworthy in light of the relevant history.  There are long-standing and well-documented system limitations[214] which have compromised the reliability of MACWIS case records and undercut defendants' ability to use system performance data to change case practice to comport to the MSA's most fundamental requirements.[215]  These limitations in the ability to collect and report on performance data hobble defendants' reform efforts.  The time it has taken thus far to replace MACWIS is costly, requiring workaround information systems and ultimately inhibiting the pace of reform.  The limitations in MACWIS have also been an impediment to defendants' efforts to achieve accreditation from the Council on Accreditation ("COA") as required by the MSA.[216]  While defendants attribute the delay in implementation of a new system to the planning process required by the federal agency that is expected to fund a significant part of the cost of the replacement system, as well as to the protracted procurement processes established by the

---

[214] *See, e.g.*, *June 2009 Report* at 26-35, 47-48, 51-55 and 67-69; *September 2010 Report* at 7, 21-23, 57-58, 59-66, 75 and 91;  *June 2012 Report* at 42-45; *January 2013 Report* at 31-32; and  *May 2014 Report* at 105-106.

[215] *See January 2013 Report* at 31-33; *May 2014 Report* at 105-106.

[216] The MSA requires the defendants to achieve COA accreditation.  *See* MSA §IV.  COA is an independent, non-profit, accrediting organization that accredits human services entities, including public sector child and family services agencies.  The accreditation process is a multi-year process, which involves training and assessments, including site visits to DFCS county offices and remedial site visits to county offices in DFCS Regions that have failed to satisfy COA standards.  Pursuant to COA standards, DFCS must achieve accreditation by July 2015.  As explained more fully below in the narrative related to the MSA accreditation requirement, *infra* at 185-186, COA has notified the defendants that because of various deficiencies, including shortcomings related to MACWIS, defendants will be unable to achieve accreditation by the July 2015 deadline.  *See* App. B, Ex. 33, *infra* note 439.  *See also, e.g.,* App. B, Ex. 16B, Council on Accreditation, Remedial Site Visit – Commission Report, Division of Family and Children's Services Region: 1-North, Corinth, MS., excerpt, at 1 (describing results of a remedial site visit in Region I-North conducted during December, 2014, and stating:  "[i]n spite of "efforts to upgrade lines and increase communication between Regional and Central office staff, glitches and slow computer speeds continue.  New servers will be added after the first of the year, more than double, which may help address the issues.  More efforts need to be spent investigating why hardware upgrade has not been more successful until the new SACWIS system is in place."); *id.* at 2-3 (multiple entries that appear to be from a March 13, 2014 site visit, stating: "[d]ue to glitches in the MACWIS system, staff reported data loss and the slowness of the system.").

Mississippi Department of Information Technology Services ("ITS"), there have been significant periods of delay that do not appear to be attributable to the federal funders.

Although there has been progress in addressing limitations in the hardware and network infrastructure that supports MACWIS, as well as progress in addressing shortcomings in data reporting in response to the requirements imposed by the June 24, 2013 Order, significant issues remain, highlighting the need for defendants to implement the replacement system on a more accelerated timeline.

For example, the ability to access and/or use MACWIS on a consistent basis has been a significant problem for caseworkers and their supervisors statewide.[217]  In order to correct this problem, the June 24, 2013 Order required the defendants to develop and implement, on an expedited basis, a written plan to improve, on an expedited basis, the hardware and network infrastructure that support MACWIS.[218]  The plan submitted by the defendants required a two-track approach:[219] 1) specific software and hardware upgrades to the network infrastructure supporting MACWIS, an initiative that is referred to as the Citrix Project; and 2) specific upgrades in communications switches, cables, routers and other equipment in all DFCS county offices.  According to the timeline established by the plan, the Citrix Project was required to be completed by the end of December 2013 and the county office improvements were required to be completed by June 30, 2014.

---

[217]  These limitations, which are described in the Monitor's January 2013 Report, among others, include the following: 1) delays of up to several hours logging into MACWIS; 2) difficulty remaining logged on to MACWIS; 3) loss of data entered into MACWIS; 4) very slow response times: and 5) system freezes and shut downs.

[218]  *See* June 24, 2013 Order §VI.D.1.

[219]  The defendants submitted the plan, which was subject to the Monitor's approval, on July 1, 2013.  Because the Monitor determined that the July 1, 2013 submission did not satisfy the requirements of the June 24, 2013 Order, defendants submitted a revised plan on August 23, 2013 which addressed key concerns identified by the Monitor and her expert consultants.  The Monitor approved the revised plan on September 25, 2013.  A copy of the approved plan is included in the Appendix as App. B, Ex. 17, Mississippi Department of Human Services, Division of Family and Children's Services, Mississippi Automated Child Welfare Information System Connectivity and Response Time Improvement Plan.

Defendants report that the required upgrades were completed in all DFCS county offices before the June 30, 2014 deadline.  However, delays in procuring necessary services from qualified vendors combined with the failure to resolve on a timely basis a technical issue related to the compatibility of the upgraded Citrix software with MACWIS, appear to have contributed to continuing limitations in user access during Periods 4 and 5.  Reports from DFCS managers and staff regarding access limitations indicate that DFCS staff experience continued limitations in access to the system.  Because key records were not maintained by the defendants, it is not possible to determine whether these limitations are less severe and/or less pervasive than they have been in the past.[220]

---

[220]  In January 2013, the Monitor reported DFCS records showed that between February 1 and November 30, 2012, DFCS staff experienced a minimum of 385.8 hours of unplanned, limited access to MACWIS due to recurrent problems with the existing information technology infrastructure.  *See January 2013 Report* at 32.  The Monitor obtained this data from a document maintained by DFCS that is referred to as the "MACWIS Down Time Tracking" report.  This form is used to track the length of time MACWIS is unavailable to users and it includes the following fields: 1) date and time downtime began; 2) date and time downtime ended; 3) whether downtime was the result of a planned event, and if so, the approximate planned downtime in hours; 4) the approximate unplanned downtime in hours; 5) the approximate unplanned limited access in hours; 6) the reason for the downtime; 7) a description of the incident (*i.e.,* the result); and, 8) the contact person or responsible party.  For the convenience of the Court and the parties, a copy of the downtime report that was included in the Appendix to the Monitor's *January 2013 Report* as Ex. 19 is also included in the Appendix to this report as App. B, Ex. 18, MACWIS Down Time Tracking 2012.  During March 2015, in the wake of repeated reports about recurrent access issues from DFCS managers and staff, the Monitor requested that defendants produce an updated copy of the MACWIS Down Time Report.  In response, on March 30, 2015, defendants transmitted the 2014 and 2015 MACWIS Down Time Reports.  *See* App. B, Ex. 19, March 30, 2015 e-mail from Diane Mobley to Grace M. Lopes with attached reports, MACWIS Down Time Tracking 2014 and MACWIS Down Time Tracking 2015.  In contrast to the MACWIS downtime reports previously submitted to the Monitor, the reports submitted on March 30, 2015 do not include any information about the duration of the downtime.  All of the relevant fields are blank.  *Compare* App. B, Ex. 19 *with* App. B, Ex. 18.  Although the Monitor requested complete copies of the 2014 and 2015 reports in mid-April 2015, these documents were not produced prior to the submission of the draft version of this report to the parties for review and comment.  *See* App. B, Ex. 20, April 14, 2015 e-mail from Mark Allen to Grace Lopes and April 14, 2015 e-mail from Grace M. Lopes to Mark Allen, without attachments (follow up on April 13, 2015 telephone conference with the MDHS Chief Information Officer, Mark Allen, confirming the Monitor's request for complete copies of the downtime reports and inquiring whether the omitted information regarding the duration of downtime could be produced).  Aside from an acknowledgement of the Monitor's request and an assurance it would be addressed the following week, the defendants did not respond to the Monitor's April 14, 2015 e-mail until June 10, 2015 in response to the draft version of this report, which included the Monitor's renewed request for these records.  On June 10, 2015, defendants advised that they had stopped recording the duration of downtime but started to do so again in April 2015.  No explanation for the failure to maintain these records was provided; however, defendants did provide downtime reports reflecting some amount of downtime during seven days in April and 15 days in May 2015.  On its face, the reported downtime appears inaccurate because for each day the duration of planned downtime, unplanned downtime and limited access is recorded as identical.  In light of the long-standing nature and significant operational

Moreover, although defendants were required to complete the Citrix Project by December 30, 2013, user testing did not begin until early December 2014.  Thereafter, the testing process was reportedly truncated in order to "upgrade" all users on a statewide basis by early February 2015.[221]  Notwithstanding the implementation of the upgrade in early February 2015, DFCS caseworkers and their supervisors have continued to experience limitations in their ability to access MACWIS.  Moreover, since the upgrade was implemented, DFCS staff and managers report that they frequently cannot print documents from MACWIS – a limitation that the defendants have attributed to the upgrade and one that has critical implications for case practice.[222]  Defendants report that they have been working with several vendors to address these problems.

Beyond these issues, there are the deeper and inherent limitations in MACWIS's reporting capacity.  Defendants' ability to generate performance reports responsive to MSA requirements has been a pervasive issue since Period 1.  Various remedial efforts have been developed and ordered by the Court to address these limitations.  Ultimately, however, these remedies are no substitute for the implementation of a new system that is based on current information management standards with robust and customizable report production capabilities.

> **Final Period 4 IP §II.C.2.**
> **C.  Information Management and Use**
>    2.  **Defendants shall produce to the Monitor and Plaintiffs accurate and validated reports listed in Appendix 2 of the Initial Plan as set forth in Appendix 3.**
>       a)  **The first production of each report shall contain all reports that were due during Implementation Period 4**

---

impact on the agency this issue has had, it is inexplicable that defendants failed to track downtime closely during 2014 and the first quarter of 2015 in an effort to diagnose system problems and develop permanent solutions.

[221]  The Monitor raised her concerns about the delays in the Citrix Project with defendants on multiple occasions during Periods 4 and 5.  In early December 2014, in response to an inquiry from the Monitor, defendants reported that they anticipated the statewide transition to the upgraded environment would be completed by February 6, 2015.  MDHS and DFCS managers have reported that because the testing process was inadequate, implementation issues that should have been resolved prior to the statewide conversion were unaddressed.

[222]  Caseworkers and their supervisors print information that is stored in MACWIS on a routine basis, including forms that foster parents must sign and reports that must be submitted to the Youth Courts.

       **(starting with the month of July 2013) through the most recent month.[223]**

    b)  **Each monthly report shall contain data about the most recent month with available data, separate from information about any prior months.  Reports may also contain information aggregated in other ways.**

    c)  **Data reports shall be produced in a live excel file or comparable format for ease of use by the Monitor and Plaintiffs.**

    d)  **Data reports listed in Appendix 3 shall be created and validated following the process outlined for Appendix C Reports in the June Order.**

**Status of Progress, Final Period 4 IP §II.C.2.:**  This requirement was satisfied in part during Period 4.  The Final Period 4 IP established 11 additional reporting requirements.  Defendants planned to respond to these 11 reporting requirements by issuing 12 data reports.  In total, the defendants produced four data reports; however due to limitations in the reported data, the Monitor was not able to analyze data contained in two of those four reports.[224]

    **MSA §II.A.5.d.1.**

    **5.  Information Management and Use**

      **d)  By the end of Implementation Period Four:**

        **1)  Defendants' foster care review instrument shall be revised to include reviews of all children placed in therapeutic settings – whether home-based or congregate.  The foster care review of therapeutic placements shall include an assessment, reflected in the revised instrument, of whether: (1) the therapeutic placement is meeting the individual child's needs; (2) any additional services are necessary to ensure that the placement meets the individual child's needs; and (3) the placement is appropriate as a therapeutic placement.  If the foster care review identifies any concerns as to the capacity of the placement to provide therapeutic care, such concerns shall be documented and provided to the Regional Director who oversees**

---

[223] This subsection of the Final Period 4 IP notes:  "The parties recognize that certain information required by the MSA cannot currently be captured by existing MACWIS data or FCR PAD reports. The parties agree that this information will be collected through periodic case record reviews conducted in consultation with the Monitor and may not be available retrospectively or on a monthly basis."  *Id.* at 5, n.2.

[224] *See* App. A, Ex. 2C, *supra* note 4, for a table summarizing the status of each of the 12 reports.  Both of the reports defendants produced that the Monitor was not able to analyze contained data with limitations rendering the data unanalyzable.  Among the eight reports that defendants did not produce, seven reports were not produced because the parties agreed the applicable requirements would be assessed through case record reviews.  For the last report, SWIP45, defendants did not produce a report because available data was not sufficiently responsive to the applicable requirement.  Defendants indicated that they would explore alternative data collection methods and follow up with the Monitor and the plaintiffs.  The Monitor looks forward to resolving this outstanding issue with the parties.

the county of responsibility for that child.  Defendants
will develop and begin implementing a protocol for
informing private agencies of concerns regarding the
capacity of the private agency's placement to provide
therapeutic care.  Defendants shall ensure that no
child remains in a therapeutic placement where a
foster care reviewer has identified concerns, unless a
remediation plan is being implemented to address
those concerns.  No new child shall be placed in a
therapeutic placement where a foster care reviewer
has identified concerns until a remediation plan has
been fully implemented and all necessary remediation
has occurred.

**Status of Progress, MSA §II.A.5.d.1.:**  This requirement was not satisfied.  The

foster care review instrument was not modified in response to this requirement during Period 4.

The review instrument does not focus on the required assessment of each child relative to their

therapeutic placement in the manner contemplated by this requirement.  Nevertheless, it is

noteworthy that the current version of the instrument, which represents revisions made as of

August 18, 2014, includes questions which generally address the following matters related to all

placements types: 1) whether the placement is conducive to the safety of the child;[225] 2) whether

the placement is the least restrictive with regard to the needs of the child;[226] 3) placement type,

including therapeutic foster and group homes;[227] 4) whether the current placement provider is

meeting the needs of the child;[228] and 5) whether the current placement is the most appropriate

with regard to the needs of the child.[229]  If concerns related to these questions are identified by

the FCR reviewer, notification to the applicable Regional Director is required.  In combination,

the questions in the instrument explore some but not all key aspects of the requirement.

---

[225] *See* FCR Periodic Administrative Determination Reference Guide, updated 8-18-14, at Q24.
[226] *Id.* at Q30.
[227] *Id.* at Q121.
[228] *Id.* at Q47.  Reviewers are instructed that this question applies to "universal needs of the child."  The following
examples are provided in the reference guide for illustrative purposes: "food, shelter, clothing, finances,
transportation, emotional support, mentoring, visits with biological or extended family members, meeting the safety
needs of the child, meeting the child's medical/dental/mental health care needs (transportation to visits, monitoring
medicines, etc), education needs, etc."
[229] *Id.* at Q50.

Significantly, however, even in combination, these questions do not constitute the qualitative

assessment of the capacity of the placement to provide therapeutic care that is contemplated by

this requirement.

In addition to the failure to revise the instrument, the required protocol for notification to

private agencies was not developed.  Further, there is no evidence indicating that the remediation

plans contemplated by this requirement were implemented during Period 4.

> **MSA §II.A.7.a.**
> **7. Recruitment and Retention of Foster Families and Therapeutic**
>    **Service Providers**
>    **a. Defendants shall ensure that all licensed resource families**
>    **(regardless of whether they are supervised directly by DFCS**
>    **or by private providers) receive at least the minimum**
>    **reimbursement rate for a given level of service as established**
>    **pursuant to the Modified Settlement Agreement.**

**Status of Progress, MSA §II.A.7.a.:**  This requirement has been satisfied in part.

Defendants were required to report on their performance relative to this MSA requirement during

Period 4; however, defendants were not required to meet a specific performance standard during

Period 4.  Defendants produced two data reports in response to this requirement.  One of the data

reports reflects reimbursement rates for resource families licensed by MDHS.  The second data

report reflects reimbursement rates for families licensed by entities other than MDHS.  The data

indicate that 98 percent of resource families licensed by MDHS received at least the minimum

reimbursement rate established pursuant to the MSA.[230]  The Monitor was not able to analyze the

data pertaining to reimbursement rates for families licensed by entities other than MDHS

because of limitations in the data.  Rather than reporting on reimbursements to individual

---

[230]  *See* App. A, Ex. 3, *supra* note 53, and App. A, Ex. 9, chart prepared by the Office of the Court Monitor, Licensed Resource Families Receiving The Minimum Reimbursement Rate Established Pursuant To The MSA, By Region, One-Month Period Ending 6/30/14.

resource families as required, the data report reflects reimbursement rates by "facility," which appear to constitute the umbrella licensing agencies and not the individual resource families.[231]

> **MSA §II.B.1.d.**
> **1. Child Safety**
>> **d. Within 30 days of the completion of any investigation of maltreatment of a child in custody, as required in Section II.B.1, DFCS shall review the maltreatment investigation. This review shall include: (1) identification of any case practice deficiencies; (2) identification of any remedial actions necessary to ensure the safety of the child who is the subject of the investigation as well as any other child in the home or placement as well as the timeframe in which such remedial action must take place; and (3) identification of any corrective action that is necessary to address deficiencies in case practice demonstrated by the investigation as well as the timeframe in which such remedial action must take place. DFCS will monitor the initiation and completion of the remedial actions regarding individual child safety and case practice. DFCS shall notify the Area Social Work Supervisor (ASWS), Regional Director, and Director of Field Operations when such remedial actions have not been initiated within five days of identification or timely completed.**
>
> **Ongoing Period 3 IP Requirement §II.C.4.[232]**
> **C. Child Safety**
>> **4. The maltreatment investigation review process shall be fully implemented.**

### Status of Progress, MSA §II.B.1.d. and Period 3 IP §II.C.4. (Ongoing Requirement):

These requirements were satisfied in part. The maltreatment in care ("MIC") review process was not fully implemented as required during Period 4. The relevant background and the basis for this finding are set out below. This is a Period 3 requirement that was not satisfied.[233]

At least in part, MIC reviews were required by the Period 3 IP to address deficiencies in the quality of maltreatment investigations. An important safeguard designed to ensure that children in DFCS custody remain safe, the reviews also have the potential to promote improvements in case practice. MIC reviews are conducted by two staff members assigned to the

---

[231] Among the data submitted by defendants, only six facility names appear: Apelah; Catholic Charities; MCHS; SCSCY; UMCH; and Youth Villages.
[232] *See* Initial and Final Period 4 IPs at 1, n.1.
[233] *May 2014 Report* at 154.

DFCS safety review unit ("SRU").[234]  The SRU was established during Period 3 specifically to review investigations related to reports of maltreatment involving children in DFCS custody according to required processes and procedures.[235]

During Period 3, the defendants were required to develop processes and staff training related to MIC reviews for the following defined purposes: 1) to identify deficiencies in case practice; 2) to identify remedial actions necessary to ensure the safety of all children in the home or placement; 3) to monitor the timeliness of remedial action related to child safety and case practice; and 4) to provide notification to supervisory and management staff when remedial action has not been completed on a timely basis, or when it has not been initiated within five calendar days in situations in which individual child safety is implicated, or within 20 business days in situations in which deficiencies in case practice are identified.[236]

In May 2014, the Monitor reported on defendants' performance relative to this Period 3 requirement, finding that the required MIC review process was not fully implemented for two key reasons.  First, the Monitor found that defendants had failed to review all investigations involving children in custody as required because a MACWIS report DFCS developed to identify all investigations subject to review failed to capture all maltreatment investigations related to children in custody.[237]  Second, the Monitor found that the defendants failed to institute timely corrective action on a consistent basis and failed to implement the corrective action process as

---

[234]  The SRU is part of the Division of Evaluation and Monitoring.  As noted above, the EMU is an administrative entity within the DFCS Office of Continuous Quality Improvement.

[235]  *See* Period 3 IP §II.C.3.a.-e.  For a copy of the required MIC review processes and procedures, *see May 2014 Report* at Ex. 51A, DFCS CQI Maltreatment in Care Review Process.

[236]  Period 3 IP §II.C.3.a.-e.

[237]  *May 2014 Report* at 154-155.  To their credit, defendants disclosed this problem, which they did not discover until over seven months after the MIC review process was implemented.  *Id.* at 155.

intended.[238]  These findings, which also addressed activities that occurred during Period 4, are explained in more detail below.

On March 31, 2014, in response to a February 27, 2014 notice of noncompliance submitted by plaintiffs' counsel,[239] defendants reported that 125 investigations involving 170 children that were completed between July 1, 2013 and February 23, 2014, were inadvertently omitted from the MIC review process.[240]  At that time, defendants indicated that they had instituted a corrective action plan and that documentation for the omitted reviews of the 125 investigations would be provided to plaintiffs and the Monitor by April 30, 2014.[241]  Thereafter, on April 30, 2014, defendants submitted documentation indicating that MIC reviews were conducted for a total of 122 investigations of maltreatment in care that were completed between July 1, 2013 and February 23, 2014, but that had not been subject to the MIC review process. Defendants did not provide an explanation for the variance between the number of investigations reported as unreviewed on March 31, 2014 and the number reported as unreviewed on April 30, 2014.  However, in their comments on the draft version of this report defendants explained that three cases were misidentified initially due to a reporting-related issue that has been corrected.[242]

---

[238]  *Id.* at 156.

[239]  The notice was issued pursuant to MSA §VII.B.

[240]  On March 31, 2014, defendants reported that a total of 125 investigations that should have been reviewed were not reviewed.  At that time, defendants stated that by April 30, 2014 they would produce manual reports with monthly breakdowns reflecting reviews for each of the 125 investigations.  *See* App. B, Ex. 21, March 31, 2014 correspondence from Dewitt L. ("Rusty") Fortenberry, Jr. to Marcia Lowry.  Thereafter, on April 30, 2014, defendants submitted spreadsheets documenting that MIC reviews were conducted for 122 investigations completed between July 1, 2013 and February 25, 2014 that had not been subject to MIC reviews.  A copy of the summary spreadsheet is included in the Appendix as App. B, Ex. 22, April 30, 2014 e-mail from Gwen Long to Julia Davis and Grace M. Lopes with attached Summary for MIC Review Report.  Additional spreadsheets detailing the MIC review process for each of the 122 investigations were transmitted with the summary but they are not included in the Appendix to this report.

[241]  *See* App. B, Ex. 21, *supra* note 240.

[242]  It is, however, noteworthy that defendants' April 30, 2014 submission indicates that of the 122 MIC reviews that were completed for the investigations that had not been reviewed timely, remedial or corrective action was indicated for 106 investigations.  *See* App. B, Ex. 22, *supra* note 240.

Further, as noted above, in May 2014 the Monitor reported that defendants had failed to institute timely corrective action on a consistent basis and failed to implement the corrective action process as intended by the MIC review process.[243]

In early June 2014, shortly after the Monitor's May 2014 Report was filed, a report documenting the major findings from an assessment of maltreatment in care prevalence, investigation quality, and remedial strategies was issued by two child welfare experts engaged by the Monitor, Dr. Diane DePanfilis and Dr. Sarah Kaye.[244]  The report, which was provided to the parties, addressed key aspects of the MIC review process.[245]  Based on a sample of what the report describes as "20 recent MIC reviews" and follow up responses in the regions, Dr. DePanfilis and Dr. Kaye found that 31 percent of the reviews in the sample were completed on a timely basis.[246]  Moreover, they determined that although each MIC review report is required to be reviewed and approved by a supervisor, and, in turn, the supervisor is required to initiate the corrective action notification and tracking process, only 37 percent of the reviews in the sample were approved by a supervisor.[247]

Dr. DePanfilis and Dr. Kaye reported on additional limitations in the corrective action process associated with MIC reviews, finding that 56 percent of identified safety issues in the sample were addressed within five days and 50 percent of practice issues were addressed within

---

[243]  *See May 2014 Report* at 156.

[244]  Dr. DePanfilis is a national expert in child maltreatment prevention and child welfare practice.  Her academic credentials and experience are reflected in her curriculum vitae which is included in the Appendix to this report as App. B, Ex. 23A.  Dr. Kaye has extensive experience evaluating child welfare practices and operations.  Her academic credentials and experience are reflected in her curriculum vitae, which is included in the Appendix to this report as App. B, Ex. 23B.

[245]  The Monitor transmitted a copy of the report to the parties on June 3, 2014.  *See* App. B, Ex. 23C, June 3, 2014 e-mail from Grace M. Lopes to Kenya Rachal and Julia Davis with attached report, which is included in the Appendix as App. B, Ex. 23D, Sarah Kaye, Ph.D. and Diane DePanfilis, Ph.D., MSW, Maltreatment in Out-of-Home Care in Mississippi, June 2014, at 41-43.

[246]  *Id.* at 41-42.  The reviews are required to be completed within a 30-day period.  According to the report, the average review took 37.3 days to complete.  *Id*. at 42

[247]  *Id.* at 42.  According to the report, the average time between approval and notifying the region of the need for corrective action was 38 days.  *Id.*

the required 20 days.[248]  Finally, deficiencies in the quality of the MIC reviews are described in

the report, including the failure of the MIC reviewers to identify significant deficiencies in a

number of the maltreatment investigations that were included in the sample.[249]

The data produced by defendants indicate there was substantial improvement in

timeliness of the MIC review process by the end of Period 4.  For the one-month period ending

June 30, 2014, defendants reported that 98 percent of the required reviews of investigations of

maltreatment of children in custody were completed within 30 days.[250]  The data also indicate

that there was a precipitous improvement in defendants' performance starting with the one-month

period ending January 31, 2014, which defendants sustained through the one-month period

ending June 30, 2014, the end of the period reported on in this report.[251]

As reflected in the tables included in the narrative related to Period 3 IP §I.B.2., an

ongoing requirement,[252] the evidence indicates there were continuing and very substantial

deficiencies in the timeliness of the corrective actions identified through MIC reviews by the end

of Period 4.[253]  In May 2014, the Monitor presented an analysis of overdue corrective actions

identified through the MIC review process as of a January 10, 2014 tracking report submitted by

---

[248]  *Id.*

[249]  *Id.* at 42-43.  For example, the report indicates that for the 20 cases in the sample, Dr. DePanfilis and Dr. Kaye identified material deficiencies in the investigations that were not identified by the MIC reviewers, including "four cases in which required interviews were not completed, two cases in which preparation and review activities were not completed as part of the investigation, three cases in which the Resource Specialist did not accompany the investigator to assess for policy violations, and one case in which required timeframes were not achieved."  *Id.* at 42. Dr. DePanfilis and Dr. Kaye also found  that some of the investigations evidenced "serious [investigative] practice issues" that were not identified by the MIC reviewers, including the following:  1) insufficient information in six of the 20 investigations in the sample to make a determination about substantiation but a determination had been made; 2) failure to focus the investigation on all allegations of maltreatment in three case with multiple allegations; and 3) failure to make a determination consistent with DFCS policy in two of the investigations that were reviewed.  *Id.* at 42-43.

[250]  *See* App A, Ex. 3, *supra* note 53, and App. A, Ex. 10, chart prepared by the Office of the Court Monitor, DFCS Review of Maltreatment In Care Investigations, One-Month Periods Ending 7/31/13 Through 6/30/14.

[251]  *See* App. A, Ex. 10.

[252]  *See supra* at 74-79 for the tables and related narrative.

[253]  The MIC reviews are conducted by the Safety Review Unit [hereinafter SRU] referred to in the narrative related to Period 3 IP §I.B.2.

the defendants.[254]  The Monitor's analysis showed that as of that date there were 67 corrective

action issues identified though the MIC review process that were overdue for between one and

193 days and the median number of days overdue was 48 days.[255]  In contrast, based on updated

tracking data submitted by defendants,[256] as of June 30, 2014, the end of Period 4, there were 150

overdue issues identified by the MIC review process that were overdue for between one and 238

days and the median number of days corrective action was overdue was 84.5 days.[257]  It is

important to note, however, unlike the timeliness of the corrective action process associated with

other types of CQI reviews, defendants have made significant progress addressing delays in the

timeliness of the corrective actions identified by MIC reviews during Period 5.  As of May 18,

2015, tracking data maintained by DFCS indicate that there were 10 overdue issues associated

with the MIC review process, which were overdue for between one and 111 days with a median

of 25 days.[258]

> **Ongoing Requirement MSA §II.B.1.e.2.**
> 1. **Child Safety**
>    e. **By the end of Implementation Period Three [and thereafter]:**
>       2) **All investigations into reports of maltreatment, including corporal punishment, of children in DFCS custody must be initiated within 24 hours and completed within 30 calendar days, including supervisory approval.  Defendants shall assure that such investigations and decisions are based on a full and systematic evaluation of the factors that may place a child in custody at risk.**

**Status of Progress, MSA §II.B.1.e.2. (Ongoing Requirement):**  This requirement was

not satisfied by the end of Period 4.  The data produced by defendants indicate that for the one-

---

[254] *See May 2014 Report* at 156, n.500.

[255] *Id.*

[256] As noted *supra* at 76-78, this data is reflected in the DFCS Continuous Quality Improvement Corrective Actions Open Report as of 06/30/2014.  The defendants are not required to produce this report as part of the monthly data reporting process; however, they have done so on several occasions in response to specific requests from the Monitor.

[257] *See supra* at 76-78 for a discussion of the June 30, 2014 data.

[258] As noted *supra* at 76-78, these data are reflected in the DFCS Continuous Quality Improvement Corrective Actions Open Report as of 05/18/2015.

month period ending June 30, 2014, 56 percent of maltreatment investigations were initiated within 24 hours and completed with supervisory approval within 30 days.[259]  This is an improvement over defendants' Period 3 performance of 36 percent,[260] but still far short of the MSA's initiation and completion timeline requirements, which serve as essential safeguards designed to mitigate the risk of harm to children in custody.

In addition to substantial shortcomings in the timeliness of investigations conducted during Period 4, there is other evidence of continuing and serious deficits in the quality of the maltreatment in care investigations that have been conducted by DFCS investigators and approved by their supervisors and Regional Directors.[261]  For example, as part of their assessment, Dr. DePanfilis and Dr. Kaye addressed factors related to the quality of investigations conducted for a three-month period during Period 4.[262]  The assessment was based on a sample of 35 investigations, which represented 33 percent of the investigations completed between November 2013 and January 2014.[263]  Among other deficiencies, Dr. DePanfilis and Dr. Kaye found that for 20 percent of the investigations in the sample there was insufficient information for the investigator to make a determination about whether or not maltreatment occurred; however, despite this limitation the determinations were made.[264]  They also found that nine percent of the unsubstantiated allegations in the sample "should or could have been substantiated

---

[259] *See* App. A, Ex. 3, *supra* note 53, and App. A, Ex. 11, chart prepared by the Office of the Court Monitor, Maltreatment Investigations Initiated Within 24 Hours And Completed With Supervisory Approval Within 30 Days, By Region, By Month Investigation Initiated, One-Month Periods Ending 6/30/13 and 6/30/14.
[260] *Id.*
[261] All maltreatment investigations involving children in custody are required by DFCS policy to be approved by the investigator's supervisors and the Regional Director.  The Monitor has reported previously about significant deficiencies in the quality of maltreatment in care investigations.  *See, e.g., September 2010 Report* at 77-79; *January 2013 Report* at 46-47; and *May 2014 Report* at 154.
[262] *See* App. B, Ex. 23D, *supra* note 245, at 12 -25.  Dr. DePanfilis and Kaye found that 66 percent of the investigations in the sample they reviewed were initiated and completed within MSA-required timeframes.  *Id.* at 14.
[263] Defendants submitted 105 maltreatment in care investigation reports completed between November 2013 and January 2014 to the Monitor.  *Id.* at 12.
[264] *Id.* at 21.

for abuse or neglect but were not."[265]  Moreover, they found deficiencies in the safety/risk assessments conducted by investigators, including the failure to identify risks to children in 11 percent of the investigations in the sample.[266]  These assessments play a critical role in ensuring children are protected from harm.

The Final Period 4 IP includes a series of remedial strategies designed to remedy these shortcomings,[267] and they are addressed in detail below.[268]  For example, in July 2014, as Period 4 ended, defendants began to operate a centralized investigative unit devoted exclusively to the investigation of all maltreatment in care reports statewide.  Defendants report that this unit has made significant progress toward meeting the MSA's timelines.  On December 23, 2014, pursuant to the Period 5 IP,[269] defendants reported that 70.15 percent of maltreatment investigations were initiated within 24 hours and completed with supervisory approval within 30 days.[270]  As noted below, although it appears there has been improvement with respect to some investigations during Period 5, the Monitor continues to have concerns about the overall quality of maltreatment in care investigations. The Monitor expects to conduct a systematic evaluation and report on defendants' more recent progress in a forthcoming report.[271]

> **Ongoing Requirement MSA §II.B.1.e.3.**
> **1. Child Safety**
>> **e.  By the end of Implementation Period Three [and thereafter]:**
>>> **3)  Any foster child who remains in the same out-of-home placement following an investigation into a report that he or she was maltreated or subject to corporal punishment in that placement shall be visited by a DFCS caseworker twice a month for three months after the conclusion of the investigation to assure the child's continued safety and well-being.**

---

[265]  *Id.* at 22.

[266]  *Id.* at 25.

[267]  *See* Final Period 4 IP §III.A.

[268]  *See infra* at 114-119 for the discussion of these requirements.

[269]  *See* Period 5 IP §III.A.1.

[270]  *See* App. B, Ex. 24, December 23, 2014 e-mail from Gwen Long to Marcia Lowry and Grace M. Lopes with attached memorandum dated December 1, 2014, Maltreatment in Care Investigation Timeliness, at 3.

[271]  *See also infra* at 116.

**Status of Progress, MSA §II.B.1.e.3. (Ongoing Requirement):** This requirement, which is fundamental to ensuring the safety of certain children in custody, was not satisfied by the end of Period 4. The data produced by defendants indicate that as of June 30, 2014, 75 percent of children remaining in the same placement following an investigation subject to this requirement were visited by a DFCS caseworker two times per month for three months after the conclusion of the investigation.[272] Defendants' performance during Period 4 represents a decrease relative to their performance during Period 3, when statewide performance relative to this requirement was 88 percent.[273]

> **Ongoing Requirement MSA §II.B.1.e.4.**
> **1. Child Safety**
>    **e. By the end of Implementation Period Three [and thereafter]:**
>       **4) When a maltreatment investigation involves a resource home, DFCS shall file a copy of the approved final investigative report, and any recommendations and/or corrective actions DFCS has deemed necessary, in the case record of the foster child, in the file of the foster or adoptive parents with a copy of the letter of notification to the foster or adoptive parents, and in the DFCS State Office. DFCS shall also provide those records to the Youth Court Judge with jurisdiction over the child and to the Monitor.**

**Status of Progress, MSA §II.B.1.e.4. (Ongoing Requirement):** The Monitor makes no finding related to this requirement. The parties agreed that defendants' performance related to this requirement would be measured through a case record review conducted during Period 6.[274]

> **Ongoing Requirement MSA §II.B.1.e.5.**
> **1. Child Safety**
>    **e. By the end of Implementation Period Three [and thereafter]:**
>       **5) When a maltreatment investigation involves an agency group home, emergency shelter, private child placing agency resource home, or other facility licensed by DFCS, a copy of the final investigative report shall be**

---

[272] *See* App. A, Ex. 3, *supra* note 53, and App. A, Ex. 12, chart prepared by the Office of the Court Monitor, Children In Custody Remaining In The Same Placement Following Maltreatment Investigation Who Met Face-To-Face With Worker Twice In A One-Month Period (Or At Least Once If 15 Days Or Less) For Three Months Following Completed Maltreatment Investigation, By Region, One-Month Periods Ending 6/30/13 and 6/30/14.

[273] *Id.*

[274] *See* Final Period 4 IP at Appendix 3, Report 3 and App. B, Ex. 11A, *supra* note 184.

> filed in the child's case record, in the DFCS State
> Office licensing file, and sent to the licensed provider
> facility. DFCS shall provide the report to the Youth
> Court Judge with jurisdiction over the child and to the
> Monitor.

**Status of Progress, MSA §II.B.1.e.5. (Ongoing Requirement):** The Monitor makes no finding related to this requirement. The parties agreed that defendants' performance related to this requirement would be measured through a case record review conducted during Period 6.[275]

> Ongoing Requirement MSA §II.B.1.e.6.
> 1. **Child Safety**
>    e. **By the end of Implementation Period Three [and thereafter]:**
>       6) **For investigations of agency group homes, emergency shelters, and private child placing agency resource homes, DFCS shall undertake a separate investigation of the contract provider's compliance with DFCS licensure standards.**

**Status of Progress, MSA §II.B.1.e.6. (Ongoing Requirement):** This requirement was satisfied. Defendants reported on this requirement for the first time during Period 4. The data produced indicate that as of June 30, 2014, defendants' performance with respect to this requirement was 100 percent.[276] Interview with DFCS managers and staff responsible for conducting these investigations indicate that processes were implemented during Period 4 to ensure that required licensure investigations were conducted. The Monitor expects to audit these investigations at an appropriate time in the future to ensure conformity with these requirements.

> Initial Period 4 IP §III.A.1.
> A. **Child Safety**
>    1. **By July 31, 2013, Defendants will provide to the Monitor all investigative reports described in Sections II.B.1.e.4 and 5 of the Modified Settlement Agreement for the time period from January 1, 2012 through January 31, 2013 that have not been previously provided.**

---

[275] *See* Final Period 4 IP at Appendix 3, Report 4 and App. B, Ex. 11A, *supra* note 184.

[276] *See* App. A, Ex. 3, *supra* note 53, and App. A, Ex. 13, chart prepared by the Office of the Court Monitor, Licensure Investigations Of Agency Group Homes, Emergency Shelters, And Private Child Placing Agency Resource Homes, One Month Periods Ending 8/31/13 Through 6/30/14.

**Status of Progress, Initial Period 4 IP §III.A.1.:**  This requirement was satisfied.  The defendants submitted these investigations, which were not initially produced as required, to the Monitor and counsel for the plaintiffs on June 4, 2013.[277]

> **Initial Period 4 IP §III.A.2.**
> **A.  Child Safety**
> 2.  **By July 31, 2013, Defendants shall provide to Plaintiffs and the Monitor a protocol for accurately identifying and producing to the Monitor all investigative reports described in Sections II.B.1.e.4 and 5 of the Modified Settlement Agreement.  Once approved by the Monitor, Defendants shall implement the protocol in accordance with its terms.**

**Status of Progress, Initial Period 4 IP §III.A.2.:**  This requirement was satisfied.  The defendants submitted a draft protocol to the Monitor on July 19, 2013.  Following a collaborative process involving counsel for plaintiffs and defendants, the defendants revised the protocol.  The revised protocol was submitted on November 13, 2013 and approved by the Monitor on November 18, 2013.[278]

> **Initial Period 4 IP §III.A.3.**
> **A.  Child Safety**
> 3.  **By September 1, 2013, the Monitor shall determine whether to approve the recommendations set forth in Defendants' July 8, 2013 FM Fatality Assessment, as described in Section II.C.1 of the Period 3 Implementation Plan (the "Recommendations").  If the Monitor does not approve the Recommendations, Defendants shall expeditiously revise the Recommendations and resubmit the Recommendations to the Monitor, and the Monitor shall expeditiously review the revised Recommendations and determine whether to approve them.  Once approved, Defendants shall implement the Recommendations in accordance with their terms.**

**Status of Progress, Initial Period 4 IP §III.A.3.:**  This requirement was satisfied in part.

The relevant background and the basis for the Monitor's findings are explained below.

---

[277] For background information related to this requirement, *see May 2014 Report* at 146-147.

[278] *See* App. B, Ex. 25A, November 13, 2013 correspondence from Kenya Key Rachal to Grace M. Lopes, with attached Protocol for Accurately Identifying and Producing Maltreatment Investigative Reports to the Court Monitor [DHS 361726-361729]; App. B. Ex. 25B, November 18, 2013 e-mail from Grace M. Lopes to Kenya Key Rachal and Julia Davis, without attachment (approving revised version of protocol).

As the Monitor has reported, in order to improve case practice, the defendants must develop the capacity to assess practices in situations in which a child is seriously injured or dies while in DFCS custody. For this reason, the defendants were required during Period 3 to conduct an assessment related to the death of F.M., a two-year old child who died approximately six months after entering the defendants' custody, while placed in a relative foster home that was licensed by DFCS.[279] Because the Monitor determined that defendants' initial assessments of case practice related to this fatality had substantial shortcomings, the Period 4 IP included this subsection's requirements.

In May 2014, the Monitor reported that on August 30, 2013 she requested additional information related to the July 8, 2013 fatality assessment report.[280] Thereafter, on September 26, 2013, the Monitor notified the parties that she approved the recommendations set forth in the modified assessment report subject to certain supplementation that was necessary to address several significant omissions.[281] A superseding assessment report issued on November 5, 2013, was approved by the Monitor on November 18, 2013.[282]

Defendants have implemented a number of the recommendations included in the assessment report. For example, the defendants have revised and delivered recommended training to caseworkers and their supervisors and bolstered requirements related to home studies. Nevertheless, interviews with resource workers and their supervisors during Period 4 and thereafter indicate that not all recommendations have been implemented, including required staffings, which are not conducted consistently on a weekly basis statewide due at least in part to

---

[279] *See* Period 3 IP §II.C.1.

[280] *See May 2014 Report* at 149-151.

[281] For example, as the Monitor noted in the *May 2014 Report*, the recommendations failed to address the fact that seven children were in the relative placement in violation of DFCS policy and the MSA. *Id.* at 151, n.481.

[282] *See id.* at Ex. 50A for a copy of the revised child fatality review report and at Ex. 50D for the documentation of the Monitor's approval.

staffing shortages. Moreover, the very recent death of a child in DFCS custody who was in a relative resource home licensed by the defendants underscores the need for a much more comprehensive review of the licensure and placement process.[283] The Monitor has advised the parties of her preliminary and very serious concerns about the death of this child and expects to report in more detail on this matter in a forthcoming report.[284]

> **Final Period 4 IP §III.A.1.**
> **A. Child Safety**
> 1. **By February 15, 2014, Defendants shall provide to Plaintiffs and the Monitor a letter identifying the barriers to Defendants' timely initiation and completion of maltreatment in care investigations as required by MSA Section II.B.1.e.2 (the "MIC Timeliness Letter"). The MIC Timeliness Letter will include specific action steps and a timeline prior to the end of Period 4 for immediately addressing the failure to timely initiate and complete investigations. Once the action steps and timeline are approved by the Monitor, Defendants shall implement the specific action steps and timelines contained therein.**

**Status of Progress, Final Period 4 IP §III.A.1.:** This requirement was satisfied in part by the end of Period 4.

The MSA requires the defendants to initiate within 24 hours and complete within 30 days investigations of all reports of maltreatment of children in DFCS custody.[285] By the end of Period 3, the Monitor reported that as of June 30, 2013, statewide performance related to this requirement was 36 percent.[286] Accordingly, the Period 4 IP included the remedial requirements reflected in this subsection.

---

[283] As noted above, defendants appear to recognize the need to improve these processes and have initiated a request for information from vendors regarding products or solutions that could help improve resource family operations. *See supra* at 19 for a brief discussion of this initiative.

[284] The Monitor, in consultation with her child welfare expert, is reviewing this case. While defendants have responded to the Monitor's requests for certain information and records, they have not yet produced all of the information and records that the Monitor requested on May 5, 2015.

[285] MSA §II.B.1.e.2.

[286] *See May 2014 Report* at 144-145

On February 18, 2014,[287] in response to this subsection, defendants submitted a memorandum and action plan, identifying eight barriers to timely initiation and completion of maltreatment in care investigations.[288]  Thereafter, on February 24, 2014, the Monitor notified the parties that subject to a series of specified revisions, the Monitor would approve the action plan.[289]  On July 11, 2014, the defendants submitted a revised action plan that addressed most but not all of the issues identified by the Monitor.[290]  Defendants have not provided any explanation for their failure to address all of the issues that the Monitor identified on February 24, 2014.  Thus, contrary to the requirements of this subsection, the action steps and timelines have not been approved by the Monitor.

The Period 5 IP required the defendants to report by December 23, 2014 on the status of their implementation of the action steps reflected in the July 11, 2014 submission.[291]  Defendants did so and in addition to addressing the status of progress toward satisfying each action step, defendants reported that as of July 5, 2014, all investigations of maltreatment in care were being handled by a centralized special investigation unit.  Moreover, defendants reported that as of an unspecified date in October 2014, defendants had initiated and completed approximately 70 percent of all maltreatment in care investigations on a timely basis.[292]

---

[287]  Because the February 15, 2014 deadline fell on a Saturday, the submission would have been due on Monday, February 17, 2014.  However, because February 17, 2014 was a holiday, the submission was timely.

[288]  *See* App. B, Ex. 26A, February 18, 2014 correspondence from Kenya Key Rachal to Julia Davis (transmitting, *inter alia*, the memorandum and action plan); App. B, Ex. 26B, February 10, 2014 memorandum to *Olivia Y* Court Monitor Grace Lopes and Julia Davis of Children's Rights Inc., with attached Maltreatment in Care Timeliness Action Plan (the action plan is referred to by this title in the memorandum).

[289]  *See* App. B, Ex. 26C, February 24, 2014 e-mail from Grace M. Lopes to Kenya Rachal without attachments.  The Monitor identified necessary revisions related to the actions steps associated with each of the eight barriers identified by the defendants.

[290]  *See* App. B, Ex. 26D, July 11, 2014 e-mail from Gwen Long to Julia Davis and Grace M. Lopes, with attached revised version of the action plan.

[291]  *See* Period 5 IP §III.A.1.

[292]  *See* App. B, Ex. 24, *supra* note 270.

Defendants' December 2014 submission provides significant detail on defendants'

implementation activities.  The Monitor has not had an opportunity to verify all of the

representations reflected in defendants' submission and will report more fully on defendants'

progress, as required, in her Period 5 report.  As noted above, while it appears there have been

certain improvements and that the timeliness of the investigative process has improved,[293] the

Monitor has continuing and serious concerns about the overall quality of the investigations.[294]

For this reason, the Monitor expects to conduct a follow up assessment of the investigative

process during the current calendar year.

> **Final Period 4 IP §III.A.2.**
> **A.  Child Safety**
> > **2.   Within 30 calendar days of receiving the Monitor's written
> > findings from the maltreatment in care investigation expert
> > assessment, Defendants shall provide to Plaintiffs and the
> > Monitor a letter identifying strategies for reducing the rate
> > of maltreatment in care (the "MIC Reduction Letter"),
> > having considered the information provided in the expert
> > assessment in determining the strategies.  Defendants shall
> > begin implementing the strategies within 30 calendar days of
> > completion of the MIC Reduction Letter.**

**Status of Progress, Final Period 4 IP §III.A.2.:**  This requirement was satisfied in part

in that the defendants submitted a letter identifying several strategies to reduce maltreatment in

care and they began implementing at least some of the strategies identified in the letter within 30

days, as required.  As explained below, there are shortcomings in defendants' submission,

including the fact that the letter does not reflect a review of the information and findings

---

[293] *See supra* at 109.
[294]  At least preliminarily, there appears to be a substantial variance in the quality of the investigations conducted by
the investigators assigned to the centralized investigative unit. The Monitor recently expressed significant concerns
to the parties about the grossly substandard quality of an investigation, which was conducted by an investigator
assigned to the centralized unit and approved by her supervisors.

presented by Dr. DePanfilis and Dr. Kaye nor does it reflect consideration of the key remedial recommendations advanced in their report.[295]

In their June 2014 assessment report, Dr. DePanfilis and Dr. Kaye identified the key factors that may be contributing to the rate of maltreatment in care in Mississippi, which as they noted, was reported by the federal government as the highest in the nation as of the last report submitted to Congress by the U.S. Department of Health and Human Services for the 2012 fiscal year.[296]  These factors constitute the following: 1) ineffective foster parent licensing, training and support; 2) insufficient caseworker contacts for ongoing safety/risk assessment; and 3) absent or ineffective corrective actions following findings of substantiated maltreatment or policy violations.[297]  Dr. DePanfilis and Dr. Kaye presented recommendations to address each factor, as well as recommendations intended to bolster the remedial strategies that DFCS had implemented or was in the process of implementing at the time of their assessment.[298]

The defendants submitted the required MIC Reduction Letter to plaintiffs and the Monitor on July 9, 2014.  However, the letter does not reflect consideration of key information presented in the June 2014 assessment report.  In fact, the letter expressly states that the defendants received the assessment report and only considered the information in one section of the report in

---

[295]  *See*, App. B, Ex. 27A, July 9, 2014 e-mail from Gwen Long to Julia Davis and Grace M. Lopes.  The July 9, 2014 e-mail transmitted the MIC Reduction Letter, which is dated July 2, 2014.  The other attachments to the July 9, 2014 e-mail are not included in the Appendix to this report.  *See* App. B, Ex. 27B, July 2, 2014 memorandum to *Olivia Y.* Court Monitor Grace Lopes and Julia Davis of Children's Rights Inc. regarding Reduction of Maltreatment in Care.

[296]  *See* App. B, Ex. 23D, *supra* note 245, at 29 (reporting that the rate of maltreatment in out-of-home care in Mississippi for FY 2012 was 1.65 percent compared to the national average of .4 percent and citing http://cwoutcomes.acf.hhs.gov/data/overview).  Due to issues related to data quality, the rate of maltreatment in care was not reported for the 2013 federal fiscal year in the CFSR [Child and Family Services Review] Round 3 Statewide Data Indicator Workbook published by the U.S. Department of Health and Human Services Administration for Children and Families Children's Bureau.  *See* https://training.cfsrportal.org/resources/3044 (last visited June 12, 2015).  Defendants reported that after reviewing their 2013 data submission, they transmitted corrected and superseding data regarding the rate of maltreatment to the federal government.

[297]  *See* App. B, Ex. 23D, *supra* note 245, at 29.

[298]  *See, e.g., id.* at 4 for a summary of some of these recommendations.

117

developing the strategies that they submitted in the MIC reduction letter.[299]  And while the letter addresses some of the recommendations reflected in the report, it provides no explanation for why certain key information and associated recommendations were not addressed.[300] Defendants' submission does not evidence substantive consideration of the report's findings and recommendations.  It is limited to a handful of initiatives that were already underway when the assessment report was issued.[301]  While some of these initiatives have appeared promising, with limited exceptions,[302] there have been very serious delays in implementation.[303]  Defendants provided an update on their implementation activities in December 2014 pursuant to Period 5 IP

---

[299]  The July 2, 2014 memorandum from defendants states the following:  "The recommended Remedial Strategies, beginning on page 35, section 4, of the MIC Assessment were considered in determining the included strategies." *Id.* at 1.  It appears defendants may have misread this section of the report submitted by Dr. DePanfilis and Dr. Kaye. Section 4 of the report presents their evaluation of the remedial strategies DFCS had already implemented or had planned to implement to reduce maltreatment in care – not all of the remedial strategies recommended by Dr. DePanfilis and Dr. Kaye.  While Section 4 of the report includes some recommendations for bolstering the DFCS strategies that were underway or planned, Section 4 does not include all of the information and recommendations presented in the assessment report.  Indeed, the introduction to Section 4 states:  "Mississippi DFCS has implemented, or plans to implement, a number of strategies to reduce maltreatment and improve the quality of investigations of maltreatment in care across the state.  This section of the report assesses each strategy . . . ."  *See* App. B, Ex. 23D, *supra* note 245, at 35.

[300]  For example, defendants' submission fails to address the recommendations presented by Dr. DePanfilis and Dr. Kaye to correct shortcomings in the MIC review process.  *See id.* at 43 for the recommendations and the related discussion at 41-43.  The letter also fails to recognize other deficiencies identified in the June 2014 assessment report.  *See, e.g., id.* at 33-35 (describing limitations in the DFCS corrective action process following substantiated findings of maltreatment in care).

[301]  According to DFCS staff and managers, Multidisciplinary Assessment and Planning [hereinafter MAP] teams and mobile crisis response teams, which are identified as strategies in the defendants' submission, were already existing resources operated by a different public agency.  Moreover, DFCS staff and managers report that at least at times access to both MAP teams and mobile crisis response teams has been limited yet defendants' submission does not address strategies related to this shortcoming.

[302]  Defendants cite the special investigations unit [hereinafter SIU] as a strategy to reduce the rate of maltreatment in care.  The defendants launched the SIU prior to the release of the June 2014 assessment report.  The unit began to investigate all reports of maltreatment in care in early July 2014.  *See* the narrative related to Final Period 4 IP §III.A.3., *infra* at 119, regarding the February 2014 hiring deadline for the SIU director.

[303]  Despite various efforts, defendants have not contracted for an external entity to provide resource parent training on a statewide basis nor have they implemented the new curriculum for resource parents, which is identified in defendants' submission as a strategy to reduce the rate of maltreatment in care.  Moreover, as of May 15, 2015, no home studies had been conducted by an external entity.  The home studies were an additional strategy described in defendants' submission.  However, defendants report that contracts have been executed and two private organizations are expected to start conducting an "extremely limited" number of home studies in the near term.

requirements.[304]  The Monitor will report on Period 5 implementation activities in a future

report.[305]

> **Final Period 4 IP §III.A.3.**
> **A.  Child Safety**
> 3.  **By February 1, 2014, Defendants shall hire a supervisor to lead the Special Investigations Unit.  This supervisor will report directly to the MDHS-DFCS Deputy Administrator.**

**Status of Progress, Final Period 4 IP §III.A.3.:**  This requirement was satisfied.  The

defendants hired the unit supervisor and her appointment was effective January 6, 2014.

> **Final Period 4 IP §III.A.4.**
> **A.  Child Safety**
> 4.  **By the end of Period 4, Defendants shall hire 13 investigators to staff the Special Investigations Unit.**

**Status of Progress, Final Period 4 IP §III.A.4.:**  This requirement was not satisfied on a

timely basis.  As of the end of Period 4, 10 investigators had been hired for the Special

Investigation Unit ("SIU") and an additional investigator was working in the unit in an acting

capacity.[306]  Defendants were able to increase staffing levels in the SIU.  By late October 2014

there were 14 investigators assigned to the unit and efforts were underway to hire two

supervisors, who were subsequently hired and report to the SIU director.

> **MSA §II.B.2.m.**
> **2.  Child Placement**
> m.  **No child under 10 years of age shall be placed in a congregate care setting (including group homes and shelters) unless the child has exceptional needs that cannot be met in a relative or foster family home or the child is a member of a sibling group, and the Regional Director has granted express written approval for the congregate-care placement.  Such**

---

[304]  *See* Period 5 IP §III.A.2.

[305]  The update is included in the Appendix to this report as App. B, Ex. 27C, December 23, 2014 e-mail from Gwen Long to Marcia Lowry and Grace M. Lopes with attached December 15, 2014 memorandum to *Olivia Y.* Court Monitor and Parties regarding Maltreatment in Care Reduction.  The other attachments to the December 23, 2014 e-mail are not included in the Appendix to this report.  Defendants, relying on a MACWIS report, SBRD06, indicate that there has been "an overall downward trend in the percentage of children in custody in the course of a 12-month period with a substantiated allegation of maltreatment in care."  *Id.* at DHS 364411.  As noted *infra* at 148-149, defendants have notified the Monitor that they will be resubmitting the SBRD06 data.  Accordingly, the Monitor cannot assess the accuracy of these representations.

[306]  At that time, the investigator positions for Regions VI, VII-W and VII-E were vacant; however, a staff member was assigned to the Region VII-E position in an acting capacity.

> approval shall be based on the Regional Director's written
> determination that the child's needs cannot be met in a less
> restrictive setting and can be met in that specific facility,
> including a description of the services available in the facility
> to address the individual child's needs.  Sibling groups in
> which one or more of the siblings are under the age of 10
> shall not be placed in congregate care settings for more than
> 45 days.

**Status of Progress, MSA §II.B.2.m.:**  This requirement was satisfied in part; however the part of this requirement pertaining to housing children under 10 years of age or older in congregate care settings consistent with MSA requirements was not satisfied.  Defendants were required to report during Period 4 on the part of this requirement limiting the amount of time sibling groups with at least one sibling under age 10 are placed in a congregate care setting; however, defendants were not required to meet a specific performance standard regarding this part of the requirement during Period 4.

The data produced by defendants indicate that as of June 30, 2014, 50 children under age 10 were housed in a congregate care setting without an applicable exception and approval by a regional director.[307]  This represents an approximately five-fold increase in the number of children under the age of 10 housed in a congregate care setting relative to one-year earlier.[308]  A substantial portion of the increase was attributable to increases in Regions I-N, I-S, and VII-W.[309]

The data defendants produced also indicate that as of June 30, 2014 there were 17 sibling groups with at least one sibling under the age of 10 housed in a congregate care setting for more than 45 days.[310]  This performance represents an increase in sibling groups with at least one

---

[307] *See* App. A, Ex. 3, *supra* note 53, and App. A, Ex. 14A, chart prepared by the Office of the Court Monitor, Children Under Age 10 Housed In A Congregate Care Setting With And Without Exception And Regional Director Approval, By Region, One-Month Periods Ending 6/30/13 and 6/30/14.
[308] *Id.*
[309] *See* App. A, Ex. 14A, *supra* note 307.  In Region VII-W, of the 19 children in a congregate care setting without an exception and approval, 17 were placed in the Harrison County Shelter.
[310] *See* App. A, Ex. 3, *supra* note 53, and App. A, Ex. 14B, chart prepared by the Office of the Court Monitor, Number Of Sibling Groups With At Least One Sibling Under Age 10 Placed In Congregate Care Housing For More Than 45 Days, One-Month Periods Ending 6/30/13 and 6/30/14.

sibling under 10 housed in congregate care relative to defendants' performance one-year earlier.

As of June 30, 2013, there were 13 sibling groups with at least one child under the age of 10

housed in a congregate care setting for more than 45 days.[311]

> **Ongoing Requirement MSA §II.B.2.p.1.**
> **2. Child Placement**
> **p. By the end of Implementation Period Three [and thereafter]:**
> **1) All foster care settings, including relative placements, shall be screened prior to the initial placement of foster children in accordance with this Modified Settlement Agreement.**

**Status of Progress, MSA §II.B.2.p.1. (Ongoing Requirement):** The Monitor makes no

finding related to this requirement.  This was a performance requirement beginning in Period 3;

however, defendants were not required to report on their performance relative to this requirement

until Period 4.  Defendants made efforts to develop data reports responsive to this MSA

requirement; however, because of limitations in available data to report on defendants'

performance relative to this requirement, the parties agreed that defendants would not produce

data during Period 4.[312]  Defendants report that they are exploring options to report on their

performance consistent with this subsection.[313]

> **Ongoing Requirement MSA §II.B.2.p.2.**
> **2. Child Placement**
> **p. By the end of Implementation Period Three [and thereafter]:**
> **2) No foster child shall be placed or remain in a foster care setting that does not meet DFCS licensure standards consistent with Modified Settlement Agreement requirements, unless so ordered by the Youth Court over DFCS objection.**

**Status of Progress, MSA §II.B.2.p.2. (Ongoing Requirement):** This requirement was

not satisfied.  Defendants produced data from MACWIS and the FCR process addressing

performance related to this requirement.  The MACWIS data indicate that for the one-month

---

[311] *Id.*

[312] For example, using existing data, defendants would not be able to report on performance regarding foster care settings licensed by entities other than DFCS, including therapeutic resource homes.

[313] The Monitor looks forward to resolving outstanding reporting issues regarding this requirement with the parties.

period ending June 30, 2014, 482 children were placed in a foster care setting that did not meet DFCS licensure standards.[314] This monthly total is within approximately two percent of the total from the same month one-year prior, when 471 children were placed in foster care settings that did not meet DFCS licensure standards.[315] Data derived from the FCR process indicate that for the six-month period ending June 30, 2014, 93 percent of children who were reviewed through the FCR process were in foster care settings that either met the DFCS licensure standards or were ordered by the Youth Court into their placement over DFCS objection.[316] Certain changes were made to the PAD during Period 4, which impacted DFCS data collection related to this requirement.[317] Thus data derived from the FCR process for the six-month period ending June 30, 2014 are not precisely comparable to the data for the six-month period ending June 30, 2013.

> Ongoing Requirement MSA §II.B.2.p.8.
> 2. Child Placement
>> p. By the end of Implementation Period Three [and thereafter]:
>>> 8) No foster child shall remain in an emergency or temporary facility for more than 45 calendar days, unless, in exceptional circumstances, the Field Operations

---

[314] *See* App. A, Ex. 3, *supra* note 53, and App. A, Ex. 15A, chart prepared by Office of the Court Monitor, Children Placed in Unlicensed Foster Care Settings That Do Not Meet DFCS Licensure Standards And Children Placed In Expedited Pending Relative Resource Homes For More Than 90 Days, One-Month Periods Ending 6/30/13 and 6/30/14.

[315] *Id.*

[316] *See* App. A, Ex. 3, *supra* note 53, and App. A, Ex. 15B, chart prepared by the Office of the Court Monitor, Children Placed Or Remaining In A Foster Care Setting Meeting DFCS Licensure Standards Consistent With MSA Requirements, Unless Ordered By The Youth Court Over DFCS Objections, Six-Month Periods Ending 6/30/13 and 6/30/14.

[317] Changes to the PAD, which could include, as described below, addition or deletion of answer response options, but could also include addition or deletion of questions and/or revisions to the guidance provided to FCR reviewers who complete the PAD, were recurrent issues impacting data pertaining to defendants' performance with MSA requirements. With respect to this particular report, in December 2013 and April 2014, defendants made changes to answer response options to the following question on the PAD, which pertains to children placed in a setting that does not meet DFCS licensure standards: "If [the answer is] yes to the placement is court ordered, is the objection of DFCS noted in the court order?" In December 2013, defendants disabled answer options related to that question that enabled a reviewer to select an answer response other than "Yes," "No," or "N/A." These responses are necessary to make a determination about defendants' performance. Concurrently, defendants added two answer options, "& - Yes – Court Report" and "! – Yes – Case Record," which enabled reviewers to answer the question based on a review of documentation other than the court order. In April 2014, the answer option "& - Yes – Court Report" was removed as an answer option. These additions and deletions of answer options on the PAD could have had a material impact on reviewers' responses to applicable questions contained in the PAD, which would, in turn, impact the performance data reported by defendants. Throughout this report, the Monitor has noted where changes to the PAD had implications for the comparability of data from Period 3 and Period 4.

**Director has granted express written approval for the
extension that documents the need for the extension.**

**Status of Progress, MSA §II.B.2.p.8. (Ongoing Requirement):**  This requirement was
not satisfied.  The data produced by defendants indicate that for the one-month period ending
June 30, 2014, there were 17 children in an emergency shelter or temporary facility for over 45
days without the approval of the Field Operations Director.[318]  For the one-month period ending
June 30, 2013, there were 24 children in these placements without the required approval.

> **MSA §II.B.2.q.1.**
> **2.  Child Placement**
>   **q)  By the end of Implementation Period Four:**
>     **1)  DFCS shall ensure that each county office has access
> to resource workers within its region having the ability
> to ascertain the placement resources available and
> their suitability for each particular child needing
> placement.**

**Status of Progress, MSA §II.B.2.q.1.:**  This requirement was not satisfied.  Although
caseload data was unavailable through Period 4, interviews with staff and supervisors in several
DFCS regions with high concentrations of children in custody indicate that there have been an
insufficient number of resource workers and even in regions with sufficient staffing, the
availability of a sufficient number and array of appropriate placements has been limited.[319]  The
shortage of an adequate number of resource workers statewide has had a significant impact on
placement and licensure activities as well as on implementation of the diligent recruitment
grant.[320]

---

[318] *See* App. A, Ex. 3, *supra* note 53, and App. A, Ex. 16, chart prepared by the Office of the Court Monitor,
Children In Emergency Shelter Or Temporary Facility For Over 45 Days With And Without Approval, By Region,
One-Month Periods Ending 6/30/13 and 6/30/14.
[319] This is an issue that is identified on multiple occasions in various records, including the CSF monthly reports.
*See, e.g.*, Monthly Status Report – Practice Model Implementation, December 2013 at 17 and Monthly Status Report
– Practice Model Implementation, January 2014 at 17.
[320] *See infra* at 154-156 for the narrative related to Initial Period 4 IP §III.B.3. related to implementation of the
diligent recruitment grant.

**MSA §II.B.2.q.2.**
**2. Child Placement**
    q) <u>By the end of Implementation Period Four</u>:
        2) **No child under 10 years of age shall be placed in a congregate care setting (including group homes and shelters) unless the child has exceptional needs that cannot be met in a relative or foster family home or the child is a member of a sibling group, and the Regional Director has granted express written approval for the congregate-care placement.**

**Status of Progress, MSA §II.B.2.q.2.:** This requirement was not satisfied. The data produced by defendants indicate that during the one-month period ending June 30, 2014, there were 50 children under age 10 housed in a congregate care setting without an exception and approval from a regional director, 39 more children in such settings without an exception and approval as during the one-month period ending June 30, 2013.[321]

**MSA §II.B.2.q.3.**
**2. Child Placement**
    q) <u>By the end of Implementation Period Four</u>:
        3) **No child shall be placed in more than one emergency or temporary facility within one episode of foster care, unless an immediate placement move is necessary to protect the safety of the child or of others as certified in writing by the Regional Director.**

**Status of Progress, MSA §II.B.2.q.3.:** The Monitor makes no finding related to this requirement. The Monitor is awaiting data regarding defendants' performance relative to this requirement based on a revised report specification agreed upon by the parties.[322] Data produced historically by the defendants regarding their performance did not accurately track performance in terms of the MSA requirement.[323]

**MSA §II.B.2.q.4.**
**2. Child Placement**
    q) <u>By the end of Implementation Period Four</u>:
        4) **No more than 10% of foster children shall be moved from his/her existing placement to another foster placement unless DFCS specifically documents in the**

---

[321] *See* App. A, Ex. 3, *supra* note 53, and App. A, Ex. 14A, *supra* note 307.
[322] *See* App. B, Ex. 11A, *supra* note 184, Status of Gaps in Data Reports Required by June 24, 2013 Order at Attachment 2, Report No. 31.
[323] *See May 2014 Report* at 160.

child's case record justifications for that move and the
move is approved by a DFCS supervisor.

**Status of Progress, MSA §II.B.2.q.4.:**  The Monitor makes no finding related to this

requirement.  Because of limitations in available data in MACWIS, the parties agreed that this

performance requirement will be assessed by means of a case record review.[324]

> MSA §II.B.2.q.5.
> 2.  Child Placement
>   q)  **By the end of Implementation Period Four:**
>       5)  **No more than 20% of resource homes shall provide
>           care to a number of children in excess of the Modified
>           Settlement Agreement resource home population
>           limitations.**

**Status of Progress, MSA §II.B.2.q.5.:**  The Monitor makes no finding with respect to

defendants' performance relative to this requirement.  Defendants produced data in response to

this requirement;[325] however, the Monitor's review of the data identified significant limitations,

compromising the ability of the data to measure performance relative to this requirement.  After

discussing the limitations with defendants, defendants reported in February 2015 that they were

working to improve the quality of these data and that they would notify the Monitor when they

believe the data are sufficiently accurate, noting that it is possible they would be able to produce

data that could be analyzed before the end of Period 5.  As of June 12, 2015, defendants had not

notified the Monitor that the data are accurate enough to analyze.

> MSA §II.B.2.q.6.
> 2.  Child Placement
>   q)  **By the end of Implementation Period Four:**
>       6)  **At least 85% of children with special needs shall be
>           matched with placement resources that can meet their
>           therapeutic and medical needs.**

---

[324]  *See* App. B, Ex. 11A, *supra* note 184, Status of Gaps in Data Reports Required by July 18, 2013 Initial Period 4 IP at Appendix 1, Report No. 6.
[325]  *Id.* Status of Gaps in Data Reports Required by July 18, 2013 Initial Period 4 IP at Appendix 1, Report No. 5. These data were produced in the SWIP 415 report.

**Status of Progress, MSA §II.B.2.q.6.:** The Monitor makes no finding related to this requirement. The parties have agreed that performance will be measured in a prospective case record review.[326]

> MSA §II.B.2.q.7.
> **2. Child Placement**
>    q) <u>**By the end of Implementation Period Four:**</u>
>       7) **At least 85% of children in DFCS custody shall be placed in the least restrictive setting that meets their individual needs consistent with Modified Settlement Agreement requirements.**

**Status of Progress, MSA §II.B.2.q.7.:** This requirement was not satisfied. As the Monitor reported in May 2014, the data that defendants used to track this requirement are obtained from the FCR process which did not address the full requirement.[327] Based upon identified gaps in the data, the parties and the Court Monitor agreed upon revisions to the FCR process, which were implemented in October 2014, after the end of Period 4.

Data derived from the FCR process that was subject to these limitations indicate that for the six-month period ending June 30, 2014, 96 percent of children were placed in the least restrictive setting that met their individual needs, a one percent difference in defendants' performance relative to the six-month period ending June 30, 2013.[328]

> MSA §II.B.2.q.8.
> **2. Child Placement**
>    q) <u>**By the end of Implementation Period Four:**</u>
>       8) **At least 90% of siblings who entered DFCS custody at or near the same time shall be placed together consistent with Modified Settlement Agreement requirements.**

---

[326] *See* App. B, Ex. 11A, *supra* note 184, Status of Gaps in Data Reports Required by June 24, 2013 Order at Attachment 2, Report No. 47. Defendants produced data related to this requirement in PAD Report 8, which was discontinued after July 31, 2014.

[327] *See May 2014 Report* at 162.

[328] *See* App. A, Ex. 3, *supra* note 53, and App. A, Ex. 17, chart prepared by the Office of the Court Monitor, Children Placed In Least Restrictive Setting That Meets Their Individual Needs, By Region, Six-Month Periods Ending 6/30/13 and 6/30/14.

**Status of Progress, MSA §II.B.2.q.8.:**  This requirement was not satisfied.  The data produced by defendants indicate that for the 12-month period ending June 30, 2014, 75 percent of sibling groups who entered custody at or around the same time were placed together, a performance level that was 10 percentage points lower than defendants' performance for the 12-month period ending June 30, 2013.[329]

> MSA §II.B.2.q.9.
> **2. Child Placement**
> **q)  By the end of Implementation Period Four:**
> **9)  At least 60% of children in DFCS custody placed in a new placement during the Period shall have their currently available medical, dental, educational, and psychological information provided to their resource parents or facility staff no later than at the time of any new placement during the Period.**

**Status of Progress, MSA §II.B.2.q.9.:**  This requirement was not satisfied.  Data regarding this performance requirement are collected through the FCR process.  As the Monitor documented in her May 2014 Report, defendants' data collection regarding the requisite information transfer does not reflect what information was transferred at the time of a new placement, but rather information that was transferred within 15 days of placement.[330]  Thus, the parties agreed this requirement would be subject to a case record review during Period 5.[331]

Notwithstanding its limitations, the data produced by defendants indicate that the performance requirement was not satisfied.  The data indicate that for the six-month period ending June 30, 2014, 20 percent of children in DFCS custody placed in a new placement during the period had their currently available medical, dental, educational, and psychological information provided to resource parents or facility staff no later than at the time of the new

---

[329] *See* App. A, Ex. 3, *supra* note 53, and App. A, Ex. 18, chart prepared by the Office of the Court Monitor, Sibling Groups Who Entered Custody At Or Around The Same Time Placed Together, By Region, 12-Month Periods Ending 6/30/13 and 6/30/14.
[330] *See May 2014 Report* at 163-164.
[331] *See* App. B, Ex. 11A, *supra* note 184, Status of Gaps in Data Reports Required by June 24, 2013 Order at Attachment 2, Report No. 53.

placement.[332]  This is comparable to defendants' performance level for the six-month period

ending June 30, 2013, 19 percent.[333]

The findings from the Period 5 case record review, which covered all children who

entered custody between July 1, 2013 and December 31, 2014 and remained in custody for at

least 90 days, will be presented in a forthcoming report.  These findings indicate that this MSA

requirement was not satisfied.

> **MSA §II.B.2.q.10.**
> **2. Child Placement**
>    q) <u>By the end of Implementation Period Four:</u>
>       10) **At least 60% of children in DFCS custody with a documented indication that they were to be subject to an actual placement disruption during the Period shall receive a meeting to address placement stability consistent with Modified Settlement Agreement requirements.**

**<u>Status of Progress, MSA §II.B.2.q.10.:</u>**  The Monitor makes no finding related to this

requirement.  Due to limitations in the data produced by defendants, the parties and the Monitor

agreed that defendants would make changes to the data collection process regarding this

requirement.[334]  Defendants implemented the changes after the end of Period 4 and,

consequently, the Monitor could not analyze data pertaining to this requirement.

> **MSA §II.B.2.q.11.**
> **2. Child Placement**
>    q) <u>By the end of Implementation Period Four:</u>
>       11) **At least 90% of children who entered DFCS custody shall be placed within his/her own county or within 50 miles of the home from which he/she was removed unless one of the exceptions provided in the Modified Settlement Agreement is documented as applying.**

---

[332] *See* App. A, Ex. 3, *supra* note 53, and App. A, Ex. 19, chart prepared by the Office of the Court Monitor, Children For Whom Their Resource Parents Or Facility Staff Were Provided The Foster Care Information Form Within 15 Days of Placement, By Region, Six-Month Periods Ending 6/30/13 and 6/30/14.

[333] *See* App. A, Ex. 19, *supra* note 332.

[334] *See* App. B, Ex. 11A, *supra* note 184, Status of Gaps in Data Reports Required by June 24, 2013 Order at Attachment 2, Report No. 52.

**Status of Progress, MSA §II.B.2.q.11.:**  This requirement was satisfied.  The data produced by defendants indicate that for the one-month period ending June 30, 2014, 99 percent of children who entered DFCS custody were placed within their own county or within 50 miles of the home from which they were removed.[335]  This performance level is nearly identical to defendants' performance for the one-year period ending June 30, 2013, which was 98 percent.[336]

> MSA §§II.B.2.s.1. and II.B.2.t.1.
> 2. **Child Placement**
>    s) **Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
>        1) **At least 80% of the foster children in that region who enter custody or experience a placement change shall be placed in accordance with each of the child placement requirements of Section II.B.2.**
>
>    t) **Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
>        1) **At least 90% of the foster children in that region who enter custody or experience a placement change shall be placed in accordance with each of the child placement requirements of Section II.B.2.**

**Status of Progress, MSA §§II.B.2.s.1. and II.B.2.t.1.:**  The Monitor makes no finding related to this requirement.  Defendants have produced data responsive to some, but not all, of the child placement requirements of MSA §II.B.2.  The Monitor expects to finalize with the parties a plan related to ongoing collection and reporting of these data.

> Ongoing Period 3 IP Requirement §II.F.1.[337]
> F. **Physical, Dental, and Mental Health**
>    1. **By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants shall maintain a staff person in the Resource Development Unit whose job responsibility it will be to develop and coordinate a broader**

---

[335] *See* App. A, Ex. 3, *supra* note 53, and App. A, Ex. 20, chart prepared by the Office of the Court Monitor, Percentage Of Children Who Entered DFCS Custody Who Were Placed Within Own County Or Within 50 Miles Of The Home From Which Removed Consistent With MSA Requirements, By Region, One-Month Periods Ending 6/30/13 and 6/30/14.  As the Monitor did in the May 2014 Report, the reported percentage includes placing siblings together as a qualifying exception.  App. A, Ex. 20 also includes a calculation of defendants' performance excluding placing siblings together as a qualifying exception.  Using either calculation methodology, defendants' performance exceeded the MSA performance requirement.

[336] *See* App. A., Ex. 20, *supra* note 335.

[337] *See* Initial and Final Period 4 IPs at 1, n.1.

> and more geographically diverse array of physical, dental,
> and mental health services available to foster children.

**Status of Progress, Period 3 IP §II.F.1. (Ongoing Requirement)**:  This requirement was not satisfied.  The initial program director assigned to this position started working at DFCS on February 1, 2012.  She resigned on September 9, 2013 and was not replaced until August 1, 2014, after Period 4 concluded.  The initial program director's replacement resigned from DFCS on March 31, 2015, and as of June 1, 2015 the position remained vacant.  Defendants reported that they would begin interviewing applicants for the position in early June 2015.

> **MSA §II.B.3.j.1.**
> **3.  Physical and Mental Health Care**
>> **j)  By the end of Implementation Period Four:**
>>> **1)  At least 70% of children entering custody during the Period shall receive a health screening evaluation from a qualified medical practitioner within 72 hours after placement that is in accordance with the health screening recommended by the American Academy of Pediatrics.**

**Status of Progress, MSA §II.B.3.j.1.:**  This requirement was not satisfied.  The data produced by defendants report on only the timeliness of initial health screening evaluations and not on whether the screenings were conducted by a qualified medical practitioner nor whether they were conducted in accordance with the recommendations of the American Academy of Pediatrics.  Nonetheless, the data produced by defendants indicate that for the 12-month period ending June 30, 2014, 27 percent of children entering custody received an initial health screening within 72 hours after placement, one percentage point lower than defendants' performance for the 12-month period ending June 30, 2013.[338]

---

[338] *See* App. A, Ex. 3, *supra* note 53, and App. A, Ex. 21, chart prepared by the Office of the Court Monitor, Children Entering Custody Who Received An Initial Health Screening Within 72 Hours After Placement, 12-Month Periods Ending 6/30/13 and 6/30/14.

Because of the limitations in the data produced by defendants, the parties agreed that this requirement would be subject to a case record review during Period 5.[339]  The findings from the Period 5 case record review, which covered all children in custody for at least 90 days, who entered custody between July 1, 2013 and December 31, 2014, will be presented in a forthcoming report.  These findings indicate that this MSA requirement was not satisfied.

> MSA §II.B.3.j.2.
> **3.  Physical and Mental Health Care**
>    **j)  <u>By the end of Implementation Period Four</u>:**
>       **2)  At least 70% of children entering custody during the Period shall receive a comprehensive health assessment consistent with Modified Settlement Agreement requirements within 30 calendar days of entering care.**

**<u>Status of Progress, MSA §II.B.3.j.2.</u>:**  This requirement was not satisfied.  The data produced by defendants report only on the timeliness of comprehensive health assessments and not on whether the assessment was consistent with the recommendations of the American Academy of Pediatrics, as required by the MSA.  The data produced by defendants indicate that for the period ending June 30, 2014, 33 percent of children in custody more than 30 days received a comprehensive health assessment within 30 days of placement, one percentage point lower than defendants' performance for the 12-month period ending June 30, 2013.[340]

Because of the limitations in the data produced by defendants, the parties agreed that this requirement would be subject to a case record review during Period 5.[341]  The findings from the Period 5 case record review, which covered all children in custody for at least 90 days, who

---

[339]  *See* App. B, Ex. 11A, *supra* note 184, Status of Gaps in Data Reports Required by June 24, 2013 Order at Attachment 2, Report No. 22.

[340]  *See* App. A, Ex. 3, *supra* note 53, and App. A, Ex. 22, chart prepared by the Office of the Court Monitor, Children In Custody 30+ Days Who Received A Comprehensive Health Assessment Within 30 Days Of Placement, 12-Month Periods Ending 6/30/13 and 6/30/14.

[341]  *See* App. B, Ex. 11A, *supra* note 184, Status of Gaps in Data Reports Required by June 24, 2013 Order at Attachment 2, Report No. 22.

entered custody between July 1, 2013 and December 31, 2014, will be presented in a forthcoming

report.  These findings indicate that this MSA requirement was not satisfied.

> **MSA §II.B.3.j.3.**
> **3.  Physical and Mental Health Care**
>   **j)  By the end of Implementation Period Four:**
>     **3)  At least 85% of children in custody during the Period
>     shall receive periodic medical examinations and all
>     medically necessary follow-up services and treatment
>     consistent with Modified Settlement Agreement
>     requirements.**

**Status of Progress, MSA §II.B.3.j.3.:**  The Monitor makes no finding with respect to

defendants' performance relative to this requirement as of the end of Period 4.  The parties

agreed that defendants' performance relative to this requirement would be measured during a

case record review conducted during Period 5.[342]  Analysis of the data collected during the case

record review indicates that this requirement was not satisfied for all children who entered DFCS

custody between July 1, 2013 and December 31, 2014 and who remained in custody for at least a

90-day period.  The Monitor will report in detail on these findings in a forthcoming report.

> **MSA §II.B.3.j.4.**
> **3.  Physical and Mental Health Care**
>   **j)  By the end of Implementation Period Four:**
>     **4)  At least 75% of children three years old and older
>     entering custody during the Period or in care and
>     turning three years old during the Period shall receive
>     a dental examination within 90 calendar days of foster
>     care placement or their third birthday, respectively.**

**Status of Progress, MSA §II.B.3.j.4.:**  This requirement was not satisfied.  Defendants

collected data pertaining to this requirement through the FCR process.  The data produced by

defendants indicate that for the six-month period ending June 30, 2014, 55 percent of children

three years old and older who entered custody during the period and children in custody who

turned three years old during the period, and who were reviewed through the FCR process,

---

[342] *See* App. B, Ex. 11A, *supra* note 184, Status of Gaps in data Reports Required by June 24, 2013 Order at
Attachment 2, Report 44.

received a dental examination within 90 calendar days of their placement or their third birthday, as applicable.[343]  This represents a six percent increase over defendants' performance for the six-month period ending one year earlier, on June 30, 2013.[344]  The findings from the Period 5 case record review, which covered all children who entered custody between July 1, 2013 and December 31, 2014 and remained in custody for at least 90 days, will be presented in a forthcoming report.  These findings indicate that this MSA requirement was not satisfied.

> **MSA §II.B.3.j.5.**
> **3.  Physical and Mental Health Care**
>    **j)  <u>By the end of Implementation Period Four:</u>**
>       **5)  At least 80% of children in custody during the Period shall receive a dental examination every six months consistent with Modified Settlement Agreement requirements and all medically necessary dental services.**

**<u>Status of Progress, MSA §II.B.3.j.5.</u>:**  This requirement was not satisfied.  Defendants collected data regarding this performance requirement through the FCR process and that data report only on the timeliness of the applicable dental examinations and not whether the assessment was consistent with MSA requirements and whether the children received all medically necessary dental services.

The data produced by defendants indicate that for the six-month period ending June 30, 2014, 52 percent of children ages three and older at the start of the period under review were

---

[343] *See* App. A, Ex. 3, *supra* note 53, and App. A, Ex. 23, chart prepared by the Office of the Court Monitor, Children Three Years Old And Older Who Received A Dental Examination Within 90 Calendar Days of Placement And Children Who Turned Three While In Custody And Received A Dental Examination Within 90 Calendar Days Of Their Third Birthday, By Region, Six Month Periods Ending 6/30/13 and 6/30/14.

[344] *See* App. A, Ex. 23, *supra* note 343.  In the *May 2014 Report*, the Monitor reported separately on performance for children older than three years old and children who turned three years old, based on the data produced by defendants.  *See May 2014 Report* at 171-172.  Thus, in that report, defendants' performance relative to the precise MSA requirement was not presented.  In this report, the Monitor has combined defendants' data submissions to report on the precise MSA requirement and represented defendants' Period 3 performance.

provided a dental exam every six months, two percentage points lower than the defendants' performance for the six-month period ending one year earlier, on June 30, 2013.[345]

Because of the limitations in the data produced by defendants, the parties agreed that this requirement would be subject to a case record review during Period 5. The findings from the Period 5 case record review, which covered all children who entered custody between July 1, 2013 and December 31, 2014 and remained in custody for at least 90 days, will be presented in a forthcoming report. These findings indicate that this MSA requirement was not satisfied.

> **MSA §II.B.3.j.6.**
> **3. Physical and Mental Health Care**
>  **j) By the end of Implementation Period Four:**
>    **6) At least 70% of children four years old and older entering custody during the Period or in care and turning four years old during the Period shall receive a mental health assessment by a qualified professional within 30 calendar days of foster care placement or their fourth birthday, respectively.**

**Status of Progress, MSA §II.B.3.j.6.:** This requirement was not satisfied. Defendants collected data regarding the timeliness element of this performance requirement through the FCR process. In the May 2014 Report, the Monitor documented that during Period 3, defendants produced data reports that were limited to the cohort of children entering custody who were four years old or older.[346] Defendants modified the PAD in November 2013 to allow for the collection of data related to all children in custody for at least six months who were four when they entered custody or who turned four while in custody; however, the first data report defendants produced that included the cohort of children in custody and turning four during the period under review was for the period ending September 30, 2014, after the end of Period 4.

---

[345] *See* App. A, Ex. 3, *supra* note 53, and App. A, Ex. 24, chart prepared by the Office of the Court Monitor, Children Ages Three And Older At The Start Of The Period Under Review Who Were Provided A Dental Exam Every Six Months, By Region, Six-Month Periods Ending 6/30/13 and 6/30/14.

[346] *See May 2014 Report* at 173.

Consequently, the analysis presented below is limited to children entering custody who were four years old or older.

The data produced by defendants indicate that for the six-month period ending June 30, 2014, 47 percent of children four years old or older entering custody during the period received a mental health assessment within 30 days of placement, which reflects a two percentage point decrease relative to the six-month period ending June 30, 2013.[347]

Because the data produced by defendants do not address the full MSA requirement related to the qualifications of the provider who performs the assessment, the parties agreed that this requirement would be subject to a case record review during Period 5.[348]  The findings from the Period 5 case record review, which covered all children who entered custody between July 1, 2013 and December 31, 2014 and remained in custody for at least 90 days, will be presented in a forthcoming report.  These findings indicate that this MSA requirement was not satisfied.

> **MSA §II.B.3.j.7.**
> **3.  Physical and Mental Health Care**
>    **j)  <u>By the end of Implementation Period Four</u>:**
>       **7)  At least 80% of children who received a mental health assessment during the period shall receive all recommended mental health services pursuant to their assessment.**

**<u>Status of Progress, MSA §II.B.3.j.7.</u>:**  The Monitor makes no finding with respect to defendants' performance relative to this requirement by the end of Period 4.  The parties agreed that defendants' performance relative to this requirement would be measured during a case record review conducted during Period 5.[349]  Analysis of the data collected during the review indicates that this requirement was not satisfied for all children who entered DFCS custody between July

---

[347] *See* App. A, Ex. 3, *supra* note 53, and App. A, Ex. 25, chart prepared by the Office of the Court Monitor, Percentage Of Children Four Years Old Or Older Entering Custody During The Period Who Received A Mental Health Assessment Within 30 Days Of Placement, By Region, Six-Month Periods Ending 6/30/13 and 6/30/14.

[348] *See* App. B, Ex. 11A, *supra* note 184, Status of Gaps in Data Reports Required by June 24, 2013 Order at Attachment 2, Report No. 39.

[349] *See* App. B, Ex. 11A, *supra* note 184, Status of Gaps in Data Reports Required by June 24, 2013 Order at Attachment 2, Report 43.

1, 2013 and December 31, 2014 and remained in custody for at least 90 days.  The Monitor will

report in detail on these findings in a forthcoming report.

> MSA §II.B.3.j.8.
> 3.  **Physical and Mental Health Care**
>> j)  **By the end of Implementation Period Four:**
>>> 8)  **At least 60% of children in custody ages birth through three during the Period, and older children if factors indicate it is warranted, shall receive a developmental assessment by a qualified professional within 30 calendar days of foster care placement and all needed developmental services.**

**Status of Progress, MSA §II.B.3.j.8.:**  The Monitor makes no finding with respect to

defendants' performance relative to this requirement by the end of Period 4.  The parties agreed

that defendants' performance relative to this requirement would be measured during a case record

review conducted during Period 5.[350]  Analysis of the data collected during the review indicates

that this requirement was not satisfied for all children who entered DFCS custody between July

1, 2013 and December 31, 2014 and remained in custody for at least a 90-day period.  The

Monitor will report in detail on these findings in a separate report.

> MSA §§II.B.3.l.1. and II.B.3.m.1.
> 3.  **Physical and Mental Health Care**
>> l)  **Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
>>> 1)  **At least 80% of foster children in that region who enter custody shall receive physical and mental health care in accordance with each of the Modified Settlement Agreement Requirements.**
>>
>> m)  **Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
>>> 1)  **At least 90% of foster children in that region who enter custody shall receive physical and mental health care in accordance with each of the Modified Settlement Agreement requirements.**

**Status of Progress, MSA §§II.B.3.l.1. and II.B.3.m.1.:**  The Monitor makes no finding

with respect to this requirement.  Neither the June 24, 2013 Order nor the Initial or Final Period 4

---

[350] *See* App. B, Ex. 11A, *supra* note 184, Status of Gaps in Data Reports Required by June 24, 2013 Order at Attachment 2, Report 38.

IPs set forth a reporting schedule related to these requirements.  The Monitor plans to work with the parties to resolve how performance related to these requirements will be measured.

> **MSA §II.B.4.c.1.**
> **4.  Therapeutic Services**
>> c)  **By the end of Implementation Period Four:**
>>> 1)  **At least 80% of children in custody during the Period requiring therapeutic and/or rehabilitative foster care services because of a diagnosis of significant medical, developmental, emotional, or behavioral problems shall be provided with a treatment plan and services in accordance with their plan.**

**Status of Progress, MSA §II.B.4.c.1.:**  The Monitor makes no finding with respect to defendants' performance relative to this requirement by the end of Period 4.  The parties agreed that defendants' performance relative to this requirement would be measured during a case record review conducted during Period 5.[351]  Analysis of the data collected during the review indicates that this requirement was not satisfied for all children who entered DFCS custody between July 1, 2013 and December 31, 2014 and who remained in custody for a 90-day period.  The Monitor will report in detail on these findings, which are not specific to Period 4, in a separate report.

> **MSA §§II.B.4.e.1. and II.B.4.f.1.**
> **4.  Therapeutic Services**
>> e)  **Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
>>> 1)  **At least 80% of the foster children in that region who are in custody and require therapeutic and/or rehabilitative foster care services because of a diagnosis of significant medical, developmental, emotional, or behavioral problems shall be provided with a treatment plan and services during that period in accordance with their plan.**
>>
>> f)  **Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
>>> 1)  **At least 90% of the foster children in that region who are in custody and require therapeutic and/or rehabilitative foster care services because of a diagnosis of significant medical, developmental, emotional, or behavioral problems shall be provided**

---

[351] *Id.* Status of Gaps in Data Reports Required by June 24, 2013 Order at Attachment 2, Report 37.

**with a treatment plan and services during that period
in accordance with their plan.**

**Status of Progress, MSA §§II.B.4.e.1. and II.B.4.f.1.:**  The Monitor makes no finding

with respect to this requirement.  The parties agreed performance would be measured through a

case record review.[352]  The statewide sample of case records used for the Period 5 case record

review was designed to ensure proportional regional distribution of the sample relative to the

regional distribution of children in custody.  Nevertheless, the size of the sample was determined

with a goal of making findings on a statewide level, not at a regional level.  It would not have

been practical to have drawn a sample large enough to provide meaningful findings both at a

regional level and for the various Practice Model implementation dates associated with these

MSA requirements.

> **MSA §II.B.5.f.1.**
> **5.  Worker Contact and Monitoring**
>    **f)  By the end of Implementation Period Four:**
>       **1)  At least 80% of children in custody shall receive
>       documented twice-monthly in-person visits by the
>       assigned DFCS caseworker during the Period,
>       consistent with Modified Settlement Agreement
>       requirements.**

**Status of Progress, MSA §II.B.5.f.1.:**  This requirement was not satisfied.  The MSA

includes both statewide and regional requirements relative to required in-person visits by the

assigned DFCS caseworker.  The regional requirements are addressed below in the narrative

related to MSA §§II.B.5.h.1. and II.B.5.i.1.[353]  Twice-monthly in-person visits by the assigned

DFCS caseworker are critical to ensuring the safety of the children in defendants' custody.

The data produced by defendants indicate that for the one-month period ending June 30,

2014, 67 percent of children statewide received a twice monthly in-person visit by their assigned

---

[352] *Id.* Status of Gaps in Data Reports Required by June 24, 2013 Order at Attachment 2, Report 37.
[353] *See infra* at 141-142.

caseworker.[354]  This is a 14 percentage point increase in defendants' performance relative to statewide performance for the one-month period ending June 30, 2013.[355]

> **MSA §II.B.5.f.2.**
> **5. Worker Contact and Monitoring**
>     **f)  By the end of Implementation Period Four:**
>         **2)  At least 60% of children with a goal of reunification shall have their assigned DFCS caseworker meet monthly with the child's parents, during the Period, consistent with Modified Settlement Agreement requirements, as documented in the child's case record.**

<u>**Status of Progress, MSA §II.B.5.f.2.:**</u>  This requirement was not satisfied.  The MSA includes both statewide and regional performance requirements with respect to caseworker visits for children with a goal of reunification.  The regional requirements are addressed below in the narrative related to MSA §§II.B.5.h.2. and II.B.5.i.2.[356]

The data produced by defendants indicate that for the one-month period ending June 30, 2014, 38 percent of children with a goal of reunification had their assigned caseworker meet monthly with the parent(s) with whom the children were to be reunified.[357]  Due to limitations in the data defendants produced regarding their performance related to this requirement, the Monitor was not able to report on defendants' performance during Period 3.[358]

> **MSA §II.B.5.f.3.**
> **5. Worker Contact and Monitoring**
>     **f)  By the end of Implementation Period Four:**
>         **3)  At least 60% of resource parents (therapeutic and non-therapeutic) with at least one foster child residing in their home during the Period shall have a DFCS worker visit the home monthly, consistent with Modified Settlement Agreement requirements, as documented in the children's case records.**

---

[354] *See* App. A, Ex. 3, *supra* note 53, and App. A, Ex. 26, chart prepared by the Office of the Court Monitor, Twice Monthly In-Person Visits With Child By Assigned Caseworkers, By Region, One-Month Periods Ending 6/30/13 and 6/30/14.
[355] *See* App. A, Ex. 26, *supra* note 354.
[356] *See infra* at 143.
[357] *See* App. A, Ex. 3, *supra* note 53, and App. A, Ex. 27, chart prepared by the Office of the Court Monitor, Children With A Goal Of Reunification Whose Assigned Caseworker Met Monthly With The Parent(s) With Whom The Child Was To Be Reunified, By Region, One-Month Period Ending 6/30/14.
[358] *See May 2014 Report* at 186.

**Status of Progress, MSA §II.B.5.f.3.:**  This requirement was not satisfied.  Defendants produced data from MACWIS regarding the frequency of worker visits and from the FCR process addressing both the frequency and content of worker visits regarding this requirement. Additionally, defendants report separately on non-therapeutic placement settings and therapeutic placement settings.  Due to limitations in the MACWIS data collected by defendants regarding the frequency of worker visits to children placed in therapeutic settings, the Monitor was not able to analyze data related to that aspect of the requirement.[359]

The MACWIS data defendants produced regarding non-therapeutic placements indicate that for the one-month period ending June 30, 2014, 49 percent of non-therapeutic resource parents with at least one foster child residing in their home had a worker visit the home monthly, a four percentage point increase over performance for the one-month period ending June 30, 2013.[360]  Data derived from the FCR process use both a different timeframe as the basis of analysis (*i.e.,* six months of data rather than one month of data) and use children as the unit of analysis (*i.e.,* not resource parents, the unit of analysis relevant to this requirement).  The data derived from the FCR process indicate that the content of home visits for children placed in non-therapeutic settings met MSA requirements for 70 percent of children for the six-month period

---

[359]  Defendants report this data in report MACWIS SZPLMBD.  Many therapeutic placements utilized by DFCS are licensed by entities other than DFCS.  Analysis of the data revealed that frequently for therapeutic placements licensed by entities other than MDHS, workers recorded in MACWIS the licensing entity of a child's placement settings, rather than the individual, licensed setting itself.  Because of this, it was not possible to disaggregate the data by placement setting in order to analyze the data consistent with the requirement.
[360]  *See* App. A, Ex. 3, *supra* note 53, and App. A, Ex. 28A, chart prepared by the Office of the Court Monitor, Non-Therapeutic Placement Setting Contacts, By Region, One-Month Periods Ending 6/30/13 and 6/30/14.

ending June 30, 2014.[361]  Defendants' performance for the six-month period ending June 30,

2013 was also 70 percent.[362]

The data defendants produced regarding therapeutic placements indicate that the content

of home visits for children placed in therapeutic settings met MSA requirements for 73 percent of

children for the six-month period ending June 30, 2014, three percentage points higher than

performance for the six-month period ending June 30, 2013.[363]

> **MSA §§II.B.5.h.1. and II.B.5.i.1.**
> 5. **Worker Contact and Monitoring**
>    h) <u>Beginning by the date set forth in Appendix "A" that a
>       DFCS region has fully implemented the Practice Model</u>:
>       1) **At least 70% of children in custody in that region shall
>          have received documented twice-monthly in-person
>          visits by the assigned DFCS caseworker during the
>          preceding 12-month period, consistent with Modified
>          Plan requirements.**
>
>    i) <u>Beginning by 12 months following the date set forth in
>       Appendix "A" that a DFCS region has fully implemented the
>       Practice Model</u>:
>       1) **At least 90% of foster children in custody in that
>          region shall receive documented twice-monthly in-
>          person visits by the assigned DFCS caseworker,
>          consistent with Modified Settlement Agreement
>          requirements.**

**<u>Status of Progress, MSA §§II.B.5.h.1. and II.B.5.i.1.</u>:**  During Period 4, five regions

fully implemented the Practice Model and three regions fully implemented the Practice Model

for at least 12 months and thus were responsible for satisfying the associated performance

standards.  Defendants produced data from MACWIS addressing performance regarding the

frequency of worker contacts as prescribed by this requirement.

---

[361] *See* App. A, Ex. 3, *supra* note 53, and App. A, Ex. 28B, chart prepared by the Office of the Court Monitor, Content And Frequency Of Non-Therapeutic Placement Setting Contacts, By Region, Six-Month Periods Ending 6/30/13 and 6/30/14.

[362] *See* App. A, Ex. 28B, *supra* note 361.

[363] *See* App. A, Ex. 3, *supra* note 53, and App. A, Ex. 29, chart prepared by the Office of the Court Monitor, Content and Frequency Of Therapeutic Placement Setting Contacts, By Region, Six-Month Periods Ending 6/30/13 and 6/30/14.

Among the five regions that fully implemented during Period 4, one region satisfied the worker contact frequency performance requirement. None of the three regions that fully implemented the Practice Model for at least 12 months satisfied the performance requirement at the 12-month-post full implementation mark.[364] The Monitor's findings are summarized in the table below, which also includes for informational purposes updated performance data as of the end of Period 4 for the three regions that were 12-months-post full implementation.

| Start Date for Performance Measurement | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 End of Period 4: 6/30/14 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 End of Period 4: 6/30/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | | Practice Model Full Implementation: 2/28/14 12 Months Following: 2/28/15 |
|---|---|---|---|---|---|---|---|---|---|
| | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S | V-E |
| Findings for Practice Model Full Implementation Date | 70% | 44% (N=330) (8/31/12) | 72% (N=162) (8/31/12) | 66% (N=109) (2/28/13) | 44% (N=485)* (8/31/13) | 68% (N=282)* (8/31/13) | 65% (N=175) (8/31/13) | 75% (N=128) (8/31/13) | 66% (N=162) (2/28/14) |
| Findings for 12 Months Following Implementation Date | 90% | 85% (N=294) (8/31/13) 84% (N=310) (6/30/14) | 79% (N=155) (8/31/13) 92% (N=145) (6/30/14) | 64% (N=107) (2/28/14) 68% (N=114) (6/30/14) | | | | | |

**MSA §§II.B.5.h.2. and II.B.5.i.2.**
**5. Worker Contact and Monitoring**
   h) <u>Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model</u>:
      2) At least 80% of children in that region with a goal of reunification shall have had their assigned DFCS caseworker meet monthly with the child's biological parent(s) with whom that child is to be reunified consistent with Modified Plan requirements, as documented in the child's case record.

   i) <u>Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model</u>:
      2) At least 90% of foster children in that region with a goal of reunification shall have their assigned DFCS caseworker meet monthly with the child's parent(s) with whom the child is to be reunified, consistent with Modified Settlement Agreement requirements, as documented in the child's case record.

---

[364] As indicated in the table, one region – Region II-W – subsequently satisfied the performance requirement at the end of Period 4.

**Status of Progress, MSA §§II.B.5.h.2. and II.B.5.i.2.:**  As noted above, during Period 4, five regions fully implemented the Practice Model and three regions fully implemented the Practice Model for at least 12 months and thus were responsible for satisfying the associated performance standards.  Defendants produced data from MACWIS addressing performance regarding the frequency of worker contacts as prescribed by this requirement.

Defendants modified MACWIS in October 2013 and MACWIS data regarding this requirement prior to the modifications were not analyzable.  Consequently, the Monitor was able to analyze defendants' performance in one of the five regions that fully implemented the Practice Model during Period 4 and one of the three regions that fully implemented the Practice Model for at least 12 months during Period 4.  As reflected in the table below, neither region satisfied the applicable performance requirement.

| | | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 End of Period 4: 6/30/14 | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 End of Period 4: 6/30/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | | Practice Model Full Implementation: 2/28/14 12 Months Following: 2/28/15 |
|---|---|---|---|---|---|---|---|---|
| **Start Date for Performance Measurement** | **Performance Requirement** | **I-S** | **II-W** | **V-W** | **III-S** | **I-N** | **IV-N** | **IV-S** | **V-E** |
| Findings for Practice Model Full Implementation Date | 80% | Data unreliable; MACWIS modified in October 2013 and therefore data analyzable as of October 2013 | Data unreliable; MACWIS modified in October 2013 and therefore data analyzable as of October 2013 | Data unreliable; MACWIS modified in October 2013 and therefore data analyzable as of October 2013 | Data unreliable; MACWIS modified in October 2013 and therefore data analyzable as of October 2013 | Data unreliable; MACWIS modified in October 2013 and therefore data analyzable as of October 2013 | Data unreliable; MACWIS modified in October 2013 and therefore data analyzable as of October 2013 | Data unreliable; MACWIS modified in October 2013 and therefore data analyzable as of October 2013 | **42% (N=107) (2/28/14)** |
| Findings for 12 Months Following Implementation Date | 90% | Data unreliable; MACWIS modified in October 2013 and therefore data analyzable as of October 2013   **79% (N=189) (6/30/14)** | Data unreliable; MACWIS modified in October 2013 and therefore data analyzable as of October 2013   **60% (N=67) (6/30/14)** | **41% (N=61) (2/28/14)**   **30% (N=67) (6/30/14)** | | | | | |

MSA §§II.B.5.h.3. and II.B.5.i.3.
5.  **Worker Contact and Monitoring**
    h)  **Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
        3)  **At least 80% of foster parents in that region with at least one foster child residing in their home during the preceding 12-month period shall have had a DFCS worker visit the home monthly, consistent with**

143

**Modified Plan requirements, as documented in the children's case records.**

i) **Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**

    3) **At least 90% of resource parents in that region with at least one foster child residing in their home shall have a DFCS worker visit the home monthly, consistent with Modified Settlement Agreement requirements, as documented in the children's case records.**

**Status of Progress, MSA §§II.B.5.h.3. and II.B.5.i.3.:** As noted above, during Period 4, five regions fully implemented the Practice Model and three regions fully implemented the Practice Model for at least 12 months and thus were responsible for satisfying the associated performance standards. Defendants produced data from MACWIS and the FCR process addressing performance related to this requirement.

None of the five regions that fully implemented during Period 4 satisfied the performance requirement. Likewise, none of the three regions that fully implemented the Practice Model for at least 12 months satisfied the performance requirement at the 12-month-post full implementation mark. The Monitor's findings are summarized in the table below, which also includes for informational purposes updated performance data as of the end of Period 4 for the three regions that were 12-months-post full implementation:

144

| Start Date for Performance Measurement | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 End of Period 4: 6/30/14 | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 End of Period 4: 6/30/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | | | Practice Model Full Implementation: 2/28/14 12 Months Following: 2/28/15 |
|---|---|---|---|---|---|---|---|---|---|
| | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S | V-E |
| Findings for Practice Model Full Implementation Date | 80% | MACWIS Report: 73% (N=151) (8/31/12)<br><br>PAD Report: Data unreliable; PAD corrected October 2012 and therefore data analyzable as of April 2013 | MACWIS Report: 83% (N=64) (8/31/12)<br><br>PAD Report: Data unreliable; PAD corrected October 2012 and therefore data analyzable as of April 2013 | MACWIS Report: 75% (N=48) (2/28/13)<br><br>PAD Report: Data unreliable; PAD corrected October 2012 and therefore data analyzable as of April 2013 | MACWIS Report: 32% (N=124)<br><br>PAD Report: 60% (N=167) (8/31/13) | MACWIS Report: 43% (N=131)<br><br>PAD Report: 71% (N=100) (8/31/13) | MACWIS Report: 68% (N=75)<br><br>PAD Report: 94% (N=99) (8/31/13) | MACWIS Report: 67% (N=52)<br><br>PAD Report: 73% (N=108) (8/31/13) | MACWIS Report: 63% (N=65)<br><br>PAD Report: 90% (N=109) (2/28/14) |
| Findings for 12 Months Following Implementation Date | 90% | MACWIS Report: 80% (N=133) PAD Report: 97% (N=178) (8/31/13)<br><br>MACWIS Report: 87% (N=132) PAD Report: 99% (N=216) (6/30/14) | MACWIS Report: 87% (N=60) PAD Report: 77% (N=77) (8/31/13)<br><br>MACWIS Report: 82% (N=60) PAD Report: 72% (N=61) (6/30/14) | MACWIS Report: 43% (N=44) PAD Report: 100% (N=60) (2/28/14)<br><br>MACWIS Report: 49% (N=49) PAD Report: 95% (N=63) (6/30/14) | | | | | |

MSA §II.B.6.b.1.
6. **Permanency**
   b) <u>**By the end of Implementation Period Four**</u>:
      1) **Defendants shall hold training sessions for DFCS's Training Unit Staff on the Permanency Values Training and Permanency Skills Training Curricula.**

<u>**Status of Progress, MSA §II.B.6.b.1.:**</u>  The Monitor makes no finding about whether this requirement was satisfied. Defendants report that this requirement was satisfied; however, the Monitor has not had an opportunity to confirm these representations.

MSA §II.B.6.b.2.
6. **Permanency**
   b) <u>**By the end of Implementation Period Four**</u>:
      2) **Defendants shall conduct permanency roundtables in three additional regions.**

<u>**Status of Progress, MSA §II.B.6.b.2.:**</u>  As explained below, this requirement was satisfied.

145

As the Monitor has reported, defendants introduced the permanency roundtable process in 2010, with substantial support from Casey Family Programs.[365]  Permanency roundtables are an intervention designed to promote permanency for targeted children in DFCS custody.[366]  The roundtables function as structured case consultations, involving multiple participants, including the assigned caseworker, her/his supervisor, a scribe, a facilitator, and a master practitioner.  By the end of Period 3, 10 of DFCS's 13 regions had participated in the roundtable process.[367]  During Period 4, defendants completed permanency roundtables in the remaining three DFCS regions that had not participated in the roundtable process.[368]

> MSA §II.B.7.b.
> **7. Adoption**
>   b.   **By the end of Implementation Period Four:**
>        **Defendants shall maintain a process for advising all**
>        **potential adoptive families, including any resource family**
>        **caring for a child who has become legally available for**
>        **adoption, of the availability of adoption subsidies.  This**
>        **notification shall be documented in the child's record, and**
>        **the family's access to such subsidies shall be facilitated.**

**Status of Progress, MSA §II.B.7.b.:**  This requirement was satisfied in part by the end of Period 4.  As the Monitor reported in May 2014, the training curriculum for foster and adoptive families was revised during February 2012 and is designed to provide information about the adoption subsidy program.[369]  Additionally, DFCS policy requires the assigned adoption specialist to inform resource families of the possibility of adoption assistance if it appears the

---

[365]  For additional information about the permanency roundtable process *see* http://www.casey.org/Resources/Initiatives/PermanencyRoundtables/default.htm (last visited June 12, 2015).
[366]  MACWIS reports identifying all children in custody for three years or more are generated and validated by regional staff in order to identify the cohort of children whose cases will be subject to review.
[367]  *See May 2014 Report* at 129-130.
[368]  Permanency roundtables were conducted pursuant to the following schedule: Region III-S, August 12-15, 2013; Region III-N, October 16-18; and Region VII-W, February 20-21, 2014.  Additionally, a second series of roundtables were conducted in Regions II-W and II-E during Period 4.
[369]  *See May 2014 Report* at Ex. 44A, MDHS Division of Family & Children's Services, Mississippi PATH (Parents as Tender Healers), A Curriculum for Foster, Adoptive and Kinship Care Parents (Resource Families), redacted excerpt at 2, 125, 132-141.

child is eligible.[370]  However, until recently, DFCS policy did not require staff to document this

notification in the case record.  The Monitor reported on this limitation in the May 2014

Report.[371]  Thereafter, the parties added a provision to the Period 5 IP requiring the defendants to

revise DFCS policy to require staff to document this notification in the child's case record.[372]

The final version of the revised policy was issued on April 29, 2015.

> **MSA §§II.B.7.d. and II.B.7.e.**
> **7.  Adoption**
> > d.  <u>Beginning by the date set forth in Appendix "A" that a
> > DFCS region has fully implemented the Practice Model</u>:
> > At least 90% of children in custody in that region with the
> > primary permanency goal of adoption during the Period
> > shall have an assigned adoption specialist and an adoption
> > plan that identifies the child-specific activities that
> > Defendants will undertake to achieve adoption, and shall
> > receive regular adoption status meetings consistent with
> > Modified Settlement Agreement requirements during the
> > Period.
> >
> > e.  <u>Beginning by 12 months following the date set forth in
> > Appendix "A" that a DFCS region has fully implemented the
> > Practice Model</u>:
> > At least 95% of children in custody in that region with the
> > primary permanency goal of adoption during the Period
> > shall have an assigned adoption specialist and an adoption
> > plan that identifies the child-specific activities that
> > Defendants will undertake to achieve adoption, and shall
> > receive regular adoption status meetings consistent with
> > Modified Settlement Agreement requirements during the
> > Period.

**Status of Progress, MSA §§II.B.7.d. and II.B.7.e.:**  The Monitor makes no finding

related to this requirement.  The defendants have been unable to report on their performance

relative to this requirement.  During the gap analysis process, the parties agreed that the foster

care review instrument will capture data related to part of the requirement.  The defendants

indicated that they expected to submit the applicable PAD report to the plaintiffs and Monitor by

---

[370] *Id* . at Ex. 44B, Mississippi, DFCS Policy, Section D, Foster Care, Revised 7-22-13, §VII.C.5.b., at 106-108.
[371] *See May 2014 Report* at 140.
[372] Period 5 IP §III.B.3.

May 31, 2015, but as of June 12, 2015 the reports had not been submitted.[373]  The parties also

agreed that the balance of data relevant to the requirement that is not captured by the PAD will be

collected in a prospective case record review.[374]

> **MSA §II.C.1.c.1.**
> **1. Number of Placements**
>    **c.    By the end of Implementation Period Four:**
>       **1)    In the last year, at least 75% of children state-wide in
>               care less than 12 months from the time of latest
>               removal from home shall have had two or fewer
>               placements.**

**Status of Progress, MSA §II.C.1.c.1.:**  This requirement was satisfied.  The data

produced by defendants indicate that for the 12-month period ending June 30, 2014, 79 percent

of children in custody fewer than 12 months from their latest removal from home had two or

fewer placements.[375]  Defendants' performance was two percentage points higher than

performance for the 12-month period ending June 30, 2013.[376]

> **MSA §II.C.2.c.1.**
> **2. Abuse/Neglect/Maltreatment in Care (This measure shall apply
>    to reports of abuse, neglect, or maltreatment of children while
>    in DFCS custody.)**
>    **c.    By the end of Implementation Period Four:**
>       **1)    The rate of abuse or maltreatment in care in the last
>               year shall not exceed 0.50%.**

**Status of Progress, MSA §II.C.2.c.1.:**  The Monitor makes no finding with respect to

defendants' performance relative to this requirement at the end of Period 4.  On May 6, 2015,

defendants informed the Monitor that they planned to submit revised Period 4 data for this

requirement.  Thereafter, on May 27, 2015, defendants informed the Monitor that they were still

working to resolve certain technical issues regarding the production of the revised reports and,

---

[373]  The data report is referred to as PAD Report 29.  *See* App. B, Ex. 11A, *supra* note 184, Status of Gaps in Data Required by July 1, 2013 Initial Period 4 IP at Appendix 1, Report 4.

[374]  *Id.*

[375]  *See* App. A, Ex. 3, *supra* note 53, and App. A, Ex. 30, chart prepared by the Office of the Court Monitor, Number Of Children In Custody Fewer Than 12 Months From Latest Removal From Home, By Number Of Placements, 12-Month Periods Ending 6/30/13 and 6/30/14.

[376]  *Id.*

after these issues are resolved and the data are validated, defendants will produce the revised

reports.  The Monitor will analyze the data after the revised reports are submitted.

> **Final Period 4 IP §IV.A.**
> **A.  Defendants shall receive practice model implementation**
> **reports from Defendants' consultant Center for Support of**
> **Families ("CSF") at least quarterly and produce to Plaintiffs**
> **and the Monitor copies of any such practice model**
> **implementation reports whenever they are received, but in no**
> **event less than quarterly, within 30 calendar days of receipt.**
> **Prior to producing the practice model implementation reports**
> **to Plaintiffs, Defendants will redact any information that**
> **pertains to non-class members.**

**Status of Progress, Final Period 4 IP §IV.A.:**  This requirement was satisfied.

Defendants produced the reports as required.  Moreover, CSF has submitted non-redacted

versions of the reports to the Monitor on a regular basis.

> **Final Period 4 IP §V.A.**
> **A.  By March 15, 2014, Defendants shall provide to Plaintiffs and**
> **the Monitor a letter identifying the barriers to, and action**
> **steps and timelines for improvement in, the following areas of**
> **Defendants' performance:**
> **1.  Timely Case Planning**
> **2.  Parent and Sibling Contacts While in Custody**
> **3.  Regions VII West and III South**

**Status of Progress, Final Period 4 IP §V.A.:**  This requirement was satisfied in part in

that defendants submitted documents identifying barriers, action steps and time lines in each of

the targeted areas, as required.  However, as explained below, while the regional improvement

plans represent thoughtful and detailed approaches to addressing a handful of serious systemic

challenges, the timely case planning submission fails to meet even minimal standards.

On March 17, 2014, defendants submitted a cover letter from the DHS Deputy

Administrator charged with oversight of DFCS that included the following documents:[377]

---

[377] *See* App. B, Ex. 28A, March 17, 2014 correspondence from Kim Shackelford to Grace Lopes, without
attachments.

149

1) Timely Case Planning Barriers and Strategies;[378] 2) Parent and Sibling Contacts while in

Custody Barriers and Strategies;[379] 3) Region VII-W Improvement Plan;[380] and 4) Region III-S

Improvement Plan.[381]  There is substantial variation in the quality of these submissions.

For example, the Region VII-W Improvement Plan indicates that it was based on a focus

group's review of performance data and their assessment of staff skill levels.  The plan targets

seven areas, identifying the applicable MSA requirement and the barriers that have impeded

performance in each area.[382]  The plan advances four strategies tailored to strengthen overall

capacity as well to promote improvement in the targeted areas.  The rationale for each strategy is

clearly presented along with a series of corresponding action steps.[383]  A responsible individual is

identified and concrete deadlines are specified for each action step.[384]  In contrast, the Timely

Case Planning Barriers and Strategies document indicates that discussions in various meetings

identified 10 barriers to timely case planning statewide.[385]  The barriers, which are formulated in

terms of very broad systemic issues, are each described as if they should be afforded identical

weight and as if they have identical applicability in each of DFCS's regions.[386]  Unlike the

Region VII-W improvement plan, no concrete strategies are presented.  Instead a series of

activities are listed under the heading "Strategy" and there are no action steps associated with

---

[378] *See* App. B, Ex. 28B, Timely Case Planning Barriers and Strategies, March 17, 2014.
[379] *See* App. B, Ex. 28C, Parent and Sibling Contacts While in Custody Barriers and Strategies, March 17, 2014.
[380] *See* App. B, Ex. 28D, Region VII-West Improvement Plan Period IV– March 2014.
[381] *See* App. B, Ex. 28E, Region III-South Improvement Plan Period IV – March 2014.
[382] *See* App. B, Ex. 28D, *supra* note 380, at DHS 362738-372741.
[383] The action steps are detailed.  For example, Strategy # 1 includes 19 action steps that appear appropriately sequenced.  *Id.* at DHS 362742-362743.
[384] *Id.* at DHS 362742-362748.
[385] *See* App. B, Ex. 28B, *supra* note 378, at DHS 362749.
[386] Among the 10 barriers listed are the following: high caseloads/unbalanced caseloads; MACWIS connectivity issues; lack of needed resources for clients to obtain services/lack of awareness of existing resources; varying MACWIS proficiency; time management/competing priorities; inconsistent supervision; and data entry errors. *Id.* at DHS 362749.

these activities.[387]  Moreover, instead of identifying a responsible individual to carry out the activities listed in the plan, entire administrative units comprised of supervisory and line employees, and in some instances members of several administrative units, are listed.[388] Furthermore, in some instances, the timeline for a particular activity spans over a six-month period.[389]

The purpose of this subsection was to require defendants to refocus efforts on a number of the most intractable and important problems facing the agency.  Timely case planning and parent and sibling contacts are bedrock requirements.  Additionally, Regions VII-W and III-S are not only among the most populous in the state, but also the regions that historically have evidenced some of the lowest performance levels in the state.  The performance data defendants have produced do not indicate that the plans required by this subsection had the intended effects on outcomes.

**Final Period 4 IP §V.B.**
**B.    By the end of Period 4, Defendants shall report to the Monitor and Plaintiffs progress made on the action steps identified in the letter described in Section V.A.**

**Status of Progress, Final Period 4 IP §V.B.:**  This requirement was not satisfied.

Although defendants confirmed that a report regarding progress would be submitted by the end of Period 4, it has not been submitted.[390]

---

[387]  The activities listed under the heading "Strategies" include "MACWIS refresher training" and the following: "Ensure that ASWs are staffing cases per policy with workers and documenting the staffing. Failure to hold regular staff meetings will result in disciplinary action.  Require ASWs to note current timeliness of FSPs in staffing notes; RDs will review."  *Id.* at DHS 362750.

[388]  For example, under the heading "Who Responsible," the following, among other groups, are listed:  1) professional development unit; 2) MACWIS unit; 3) Resource Development Unit, Regional Directors, Field Operations Director; 4) MACWIS sub-team and MACWIS unit; 5) Regional Directors, Field Operations Director and ASWSs; and 6) Special Projects Unit, Regional Directors and Field Operations Director.  *Id.*

[389]  For example, May 1, 2014 – February 1, 2015 and April 1, 2014 – November 1, 2014.  *Id.*

[390]  *See* App. B, Ex. 28A, *supra* note 377 (stating:  "Per the Plan, by the end of Year 4, we will report to you and the Plaintiffs regarding our progress on these initiatives.").

151

MSA §III.A.1.a.
1. **Continuous Quality Improvement**
   a.  **No later than the date set forth in Appendix "A" by which a region shall have fully implemented the Practice Model, the CQI system shall measure compliance in that region with the foster care service standard requirements of this Modified Settlement Agreement and shall ensure remediation of any identified deficiencies.**

**Status of Progress, MSA §III.A.1.a.:** This requirement has been satisfied in part. As the Monitor reported in May 2014,[391] there is a substantial body of evidence that establishes the CQI system has been measuring compliance with the foster care service standards of the MSA for regions that have fully implemented the Practice Model.[392] However, as evidenced by the data charts and tables included in Appendix A of this report, there are very substantial gaps in performance relative to many regional MSA requirements in the five DFCS regions that had fully implemented the Practice Model during Period 4 and the additional three regions that reached the 12-months-post full implementation mark during Period 4. In addition to the failure to implement the RITs as intended to promote implementation of the Practice Model,[393] there is substantial evidence addressed in significant detail in this report that indicate the defendants have not fully implemented the corrective action processes that are designed to ensure remediation of the deficiencies identified through various CQI activities.[394]

Initial Period 4 IP §III.B.1.
B.  **Recruitment and Retention of Resource Families and Therapeutic Service Providers**
   1.  **Defendants will continue to make all reasonable efforts, in conjunction with other state agencies, to ensure the timely resubmission of the Treatment Foster Care per diem rate of $131.00 to the Centers for Medicare and Medicaid Services, and to seek approval by the Centers for Medicare and Medicaid Services for the Treatment Foster Care per diem rate of $131.00.**

---

[391] *See May 2014 Report* at 197.
[392] *See, e.g.*, narrative related to Initial Period 4 IP §II.B.1.a. (third follow-up CQI Review for Regions I-S and II-W), *supra* at 79-80; *id.* §II.B.1.j. (third follow-up CQI review for Region V-W), *supra* at 82-83; *id.* §II.B.1.k. (second follow-up CQI review for Region V-E), *supra* at 83.
[393] *See supra* at 44-45.
[394] *See supra* at 74-79.

**Status of Progress, Initial Period 4 IP §III.B.1.:**  This requirement was satisfied.  The Mississippi Division of Medicaid submitted a proposed Medicaid State Plan Amendment to the Department of Health and Human Services Center for Medicare and Medicaid Services ("CMS") on January 30, 2014.  The amendment sought to add treatment foster care to the array of rehabilitative services benefits for children in foster care under age 21 with certain diagnoses who are placed in therapeutic foster or group homes.  On October 14, 2014, following a review process, CMS disapproved the amendment because it was limited to this specific cohort of children and, among other reasons, empirical evidence to support the limitation was not submitted.[395]

> Initial Period 4 IP §III.B.2.
> **B.  Recruitment and Retention of Resource Families and Therapeutic Service Providers**
> **2.  By August 2, 2013, Defendants agree to provide Plaintiffs and the Monitor with a draft notice to all therapeutic group homes informing them about the intensive outpatient services rate of approximately $122.00 per day available from the Division of Medicaid.  This notice must be accessible to the lay reader, and must contain information about (i) the intensive outpatient services rate and how it is different from the current "fee for service" payment structure; (ii) how a provider can obtain information about the eligibility and/or certification requirements; and (iii) contact information for a hotline and/or another point of contact regarding (i) and (ii).  The notice must be finalized and provided to all therapeutic group homes by no later than August 16, 2013.**

**Status of Progress, Initial Period 4 IP §III.B.2.:**  This requirement was satisfied.  A draft of the memorandum was transmitted to plaintiffs' counsel and the Monitor on August 8, 2013.  Thereafter, in response to plaintiffs' comments, defendants revised the memorandum and transmitted it in revised form to therapeutic group home providers by August 16, 2013.[396]

---

[395] *See* App. B, Ex. 29, October 14, 2014 correspondence from Marilyn Tavenner to David J. Dzielak, Ph.D. (denying proposed State Plan Amendment).

[396] *See* App. B, Ex. 30, August 8, 2013 e-mail from Ashley C. Tullos to Miriam Ingber, Julia Davis and Grace M. Lopes with attached memorandum to MDHS Therapeutic Group Homes.

Initial Period 4 IP §III.B.3.
B.  Recruitment and Retention of Resource Families and
    Therapeutic Service Providers
    3.  By September 30, 2013, Defendants shall meet the Year 3
        requirements as set forth in its implementation plan for the
        Diligent Recruitment of Families for Children as shown in
        Appendix "D" to the Modified Settlement Agreement.  The
        implementation plan for the Diligent Recruitment of
        Families for Children shall become an enforceable part of
        this Initial Period 4 Implementation Plan.

**Status of Progress, Initial Period 4 IP §III.B.3.:**  The U.S. Department of Health and

Human Services Administration on Children Youth and Families ("ACF") made a determination

to continue funding of the diligent recruitment grant following the conclusion of grant Year 3,

presumably finding that defendants had made sufficient progress on implementation activities to

justify continued grant expenditures.  The grant is currently in its fifth and final year and will

expire on September 30, 2015.  The grant has been instrumental in promoting the DFCS

community education program and has illuminated staffing deficits and other limitations in the

resource family licensure program.  At least for now, however, it does not appear that the grant

has had a demonstrable impact on recruitment of new resource families – an important objective

that must be addressed in order for defendants to satisfy many key MSA requirements.

Background information about the grant and a summary of progress during Year 3 of the grant

are presented below.

During the last quarter of 2010, defendants were awarded $2 million dollars over five

years through a federal grant[397] intended to subsidize MDHS/DFCS initiatives to recruit families

for children in foster care who wait the longest for permanency.[398]  The implementation plan for

---

[397] *See November 2010 Report* at 41 for additional background information related to the grant.
[398] This includes the following cohorts:  children from large sibling groups, children who have been sexually
abused, teenagers, pregnant girls who plan to keep their babies, and children with physical, medical, emotional,
intellectual and/or severe behavioral challenges.

the second through the fifth year of the grant is included in Appendix D to the MSA.[399]  The implementation schedule for many of the initiatives required by the grant is intended to follow a regional approach introduced on the heels of the Practice Model phase-in schedule.  The schedule is structured to address activities related to the following topical areas:  recruitment activities; resource licensure; the customer service model; contracting with licensed child placing agencies; family/child matching; collaboration/public-private partnerships; the DFCS website; and evaluation activities.

Interviews with DFCS managers and staff responsible for grant implementation activities and a review of related progress reports, grant renewal applications and other documents submitted by the defendants to federal officials indicate that at the outset of the grant the defendants hired staff to manage and coordinate grant activities; retained consultants to provide technical assistance; developed an evaluation plan; and established a grant implementation team. Additionally, regional recruitment teams and various regional recruitment plans were developed and approved initially by a federal official with oversight responsibility for the grant and later by a designated DFCS manager.  By the end of Year Two, recruitment materials were developed, the resource parent training manual was revised, and related staff training was developed and delivered in several regions that were engaged in the early phases of implementation activities. Moreover, a protocol was developed to track all inquiries from prospective resource families. Thereafter, by the end of the third year of the grant, six regions were engaged in grant implementation activities, which centered predominantly on community education and data

---

[399] *See* App. B, Ex. 31, Appendix "D" Modified Mississippi Settlement Agreement and Reform Plan, Mississippi Diligent Recruitment of Families for Children, Implementation Plan - Phase II, Version A (included in the Appendix to this report for the convenience of the Court and the parties).  Two action steps were added to the implementation plan in consultation with federal funders.  The new action steps clarify required broadcast activities and add a recruitment initiative for targeting Spanish-speaking families during Year-Five of the grant.

collection. Implementation in at least one other region was delayed due to staffing shortages.[400] During Year Four of the grant, defendants report that all regions had begun implementation activities. While community education activities under the grant are reported to be far more robust than they have been in the past, defendants report continuing challenges implementing targeted recruitment activities throughout the state.

The defendants contemplated that resource workers, the regional staff who are assigned to respond to inquiries from prospective resource parents and who are charged with performing all casework activities associated with licensing resource homes, would collect the data that would be used throughout the grant evaluation process. However, defendants reported significant challenges implementing data collection activities at least in part due to staffing shortages in some regional resource units.[401] Moreover, defendants reported that there are substantial delays in the resource home licensure process and that only a small percentage of applicants are getting licensed. For this reason, defendants requested technical assistance from the National Resource Center ("NRC") at the U.S. Department of Health and Human Services.[402] Defendants report that they are currently working with NRC staff on this issue.

> MSA §III.B.1.d.1.
> 1. **Comprehensive Family Assessments**
>    d. **Beginning by the date set forth in Appendix "A" that a DFCS region has undergone the Initial Practice Model Implementation Period:**
>       1) **All caseworkers assigned to active cases, and their supervisors, will have undergone training on the family team meeting protocols.**

---

[400] *See* App. B, Ex. 3K, *supra* note 119, at 6.

[401] *See, e.g.*, *id.*; *see also* App. B, Ex. 32, ACF Performance Progress Report, excerpt, submitted by DFCS to the Department of Health and Human Services Administration for Children, Youth and Families Children's Bureau on October 31, 2014 for the six-month reporting period ending September 30, 2014, at 7 (commenting on challenges during the reporting period, and stating in relevant part: "During this reporting period data for evaluation purposes continues to be a challenge in IV-South regions [sic] due to a lack of staff and more demands of other duties that are not related to grant.").

[402] *Id.* Defendants have been receiving technical assistance from the NRC since November 2014.

**Status of Progress, MSA §III.B.1.d.1.:** This requirement was satisfied in that all caseworkers and supervisors were required to participate in extensive initial training prior to implementation of the Practice Model.[403] The training addressed the family team meeting ("FTM") practice guide and related protocols during each of six training modules. Coaching labs related to the FTM process were also delivered in each region early in the Practice Model implementation process. The initial pre-implementation training on the Practice Model was ultimately incorporated into the DFCS pre-service training curriculum.

> MSA §§III.B.1.e.1. and III.B.1.f.1.
> 1. **Comprehensive Family Assessments**
>    e. <u>Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model</u>:
>       1) **At least 80% of foster children in that region who enter custody shall have a thorough screening and assessment, consistent with Modified Settlement Agreement requirements, within 30 calendar days of entering custody.**
>
>    f. <u>Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model</u>:
>       1) **At least 90% of foster children in that region who enter custody shall have a comprehensive family assessment, consistent with Modified Settlement Agreement requirements, within 30 calendar days of entering custody.**

**Status of Progress, MSA §§III.B.1.e.1. and III.B.1.f.1.:** As noted above, during Period 4, five regions fully implemented the Practice Model and three regions fully implemented the Practice Model for at least 12 months and thus were responsible for satisfying the associated performance standards. Among the five regions that fully implemented during Period 4, one region satisfied the performance requirement. None of the three regions that fully implemented

---

[403] Defendants have not maintained centralized records related to all staff statewide who participated in the initial Practice Model training. Because it would have been impractical for the Monitor to audit each region's Practice Model training records to ensure that all caseworkers and their supervisors were present for each training module that addressed the FTM practice guide and protocols, in making this finding, the Monitor is relying on her understanding of the Practice Model training based on a review of various training materials, the FTM practice guide, and interview data.

the Practice Model for at least 12 months satisfied the performance requirement.  The Monitor's

findings are summarized in the table below, which also includes for informational purposes

updated performance data as of the end of Period 4 for the three regions that were 12-months-

post full implementation:

| Start Date for Performance Measurement | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 End of Period 4: 6/30/14 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 End of Period 4: 6/30/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | | Practice Model Full Implementation: 2/28/14 12 Months Following: 2/28/15 |
|---|---|---|---|---|---|---|---|---|---|
| | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S | V-E |
| Findings for Practice Model Full Implementation Date | 80% | Data unreliable; PAD corrected October 2012 and therefore data analyzable as of April 2013 | Data unreliable; PAD corrected October 2012 and therefore data analyzable as of April 2013 | Data unreliable; PAD corrected October 2012 and therefore data analyzable as of April 2013 | 13% (N=53) (8/31/13) | 34% (N=29) (8/31/13) | 82% (N=28) (8/31/13) | 73% (N=15) (8/31/13) | 44% (N=34) (2/28/14) |
| Findings for 12 Months Following Implementation Date | 90% | 74% (N=78) (8/31/13)  80% (N=90) (6/30/14) | 62% (N=13) (8/31/13)  41% (N=22) (6/30/14) | 58% (N=19) (2/28/14)  48% (N=23) (6/30/14) | | | | | |

MSA §§III.B.1.e.2. and III.B.1.f.2.
1.  **Comprehensive Family Assessments**
    e.  **Beginning by the date set forth in Appendix "A" that a
        DFCS region has fully implemented the Practice Model:**
        2)  **In at least 80% of placement cases in that region in
            which the whereabouts of one or both parents is
            unknown, DFCS shall immediately institute a diligent
            search for the parent(s), which shall be documented in
            the child's case record.**

    f.  **Beginning by 12 months following the date set forth in
        Appendix "A" that a DFCS region has fully implemented the
        Practice Model:**
        2)  **In at least 90% of placement cases in that region in
            which the whereabouts of one or both parents is
            unknown, DFCS shall immediately institute a diligent
            search for the parent(s), which shall be documented in
            the child's case record.**

**Status of Progress, MSA §§III.B.1.e.2. and III.B.1.f.2.:**  The Monitor makes no finding

related to this requirement for Period 4.  Because of limitations in defendants' data collection

related to this requirement, the Monitor was not able to analyze data regarding defendants'

performance.  Defendants produced data from the FCR process addressing performance related to

this requirement.  Certain changes were made to the PAD in fall 2013, which impacted the data

that defendants collected related to this requirement.[404]  Defendants produced data incorporating

the changes made to the PAD for the first time in May 2015 and the data covered the six-month

period ending March 31, 2015.

> **MSA §§III.B.2.c.1. and III.B.2.d.1.**
> **2.  Individualized Case Planning**
>   **c.  Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
>     **1)  At least 80% of foster children in that region who enter custody shall have a family team meeting and service plans shall be developed for both the child and the parents, consistent with Modified Settlement Agreement requirements, within 30 calendar days of entry into foster care.**
>
>   **d.  Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
>     **1)  At least 90% of foster children in that region who enter custody shall have a family team meeting and service plans shall be developed for both the child and the parents, consistent with Modified Settlement Agreement requirements, within 30 calendar days of entry into foster care.**

**Status of Progress, MSA §§III.B.2.c.1. and III.B.2.d.1.:**  The Monitor makes no finding

related to defendants' performance.  The parties have agreed that defendants' performance will

be measured through a case record review conducted after Period 5.[405]

> **MSA §§III.B.2.c.2. and III.B.2.d.2.**
> **2.  Individualized Case Planning**
>   **c.  Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
>     **2)  At least 80% of foster children in that region who enter custody shall have family team meetings at least quarterly, and their service plans shall be updated quarterly, as well as within 30 calendar days of any placement or other significant change, consistent with Modified Settlement Agreement requirements.**
>
>   **d.  Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
>     **2)  At least 90% of foster children in that region who enter custody shall have family team meetings at least

---

[404]  *See supra* note 317 for a discussion addressing how changes to the PAD impact defendants' data collection.
[405]  *See* App. B, Ex. 11A, *supra* note 184, at Status of Gaps in Data Reports Required by June 24, 2013 Order at Attachment 2, Report No. 33.

> quarterly, and their service plans shall be updated
> quarterly, as well as within 30 calendar days of a
> placement change, consistent with Modified
> Settlement Agreement requirements.

**Status of Progress, MSA §§III.B.2.c.2. and III.B.2.d.2.:**  As noted above, during Period 4, five regions fully implemented the Practice Model and three regions fully implemented the Practice Model for at least 12 months and thus were responsible for satisfying the associated performance standards.  Defendants produced data from the FCR process addressing performance related to this requirement.  Certain changes were made to the PAD in December 2013, which impacted the data collected by defendants related to this requirement.[406]  Thus data derived from the FCR process for six-month periods ending before December 2013 are not precisely comparable to data derived from the FCR process after that date.[407]

Among the five regions that fully implemented during Period 4, none satisfied the performance requirement.  Additionally, none of the three regions that fully implemented the Practice Model for at least 12 months satisfied the performance requirement at the 12-month-post full implementation mark.  The Monitor's findings are summarized in the table below, which also includes for informational purposes updated performance data as of the end of Period 4 for the three regions that were 12 months-post-full implementation:[408]

---

[406] *See supra* note 317 for a discussion addressing how changes to the PAD impact defendants' data collection.

[407] The first monthly data submission produced by defendants including only data based on the changes made to the PAD in December 2013 was the data submission for the six-month period ending on May 31, 2014.

[408] Values in red in the table indicate that the underlying data were based on a mixture of questions from prior to and subsequent to the December 2013 PAD changes.

| Start Date for Performance Measurement | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 End of Period 4: 6/30/14 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 End of Period 4: 6/30/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | | Practice Model Full Implementation: 2/28/14 12 Months Following: 2/28/15 |
|---|---|---|---|---|---|---|---|---|---|
| | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S | V-E |
| Findings for Practice Model Full Implementation Date | 80% | 11% (N=204) (8/31/12) | 21% (N=145) (8/31/12) | 2% (N=111) (2/28/13) | 5% (N=319) (8/31/13) | 6% (N=146) (8/31/13) | 13% (N=145) (8/31/13) | 10% (N=131) (8/31/13) | 22% (N=143) (2/28/14) |
| Findings for 12 Months Following Implementation Date | 90% | 33% (N=251) (8/31/13) 47% (N=292) (6/30/14) | 19% (N=120) (8/31/13) 17% (N=83) (6/30/14) | 26% (N=96) (2/28/14) 23% (N=95) (6/30/14) | | | | | |

MSA §§III.B.3.a.6.a. and III.B.3.a.7.a.
3. Child and Youth Permanency
   a. Permanency Plan
     6) **Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
      **(a) At least 90% of foster children in that region who enter custody shall have a permanency plan within 30 calendar days of their entry into care consistent with Modified Settlement Agreement requirements.**

     7) **Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
      **(a) At least 95% of foster children in that region who enter custody shall have a permanency plan within 30 calendar days of their entry into care consistent with Modified Settlement Agreement requirements.**

**Status of Progress, MSA §§III.B.3.a.6.a. and III.B.3.a.7.a.:** As noted above, during Period 4, five regions fully implemented the Practice Model and three regions fully implemented the Practice Model for at least 12 months and thus were responsible for satisfying the associated performance standards. Defendants produced data from MACWIS and the FCR process addressing performance related to this requirement. Certain changes were made to the PAD in December 2013 and April 2014, which impacted the data defendants collected related to this requirement.[409] Thus data derived from the FCR process for six-month periods ending before

---

[409] *See supra* note 317 for a discussion addressing how changes to the PAD impact defendants' data collection.

December 2013 are not precisely comparable to data derived from the FCR process after that date.[410]

None of the five regions that fully implemented during Period 4 satisfied the performance requirement. Additionally, none of the three regions that fully implemented the Practice Model for at least 12 months satisfied the performance requirement at the 12-month-post full implementation mark. The Monitor's findings are summarized in the table below, which also includes for informational purposes updated performance data as of the end of Period 4 for the three regions that were 12-months-post full implementation:[411]

| Start Date for Performance Measurement | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 End of Period 4: 6/30/14 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 End of Period 4: 6/30/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | | Practice Model Full Implementation: 2/28/14 12 Months Following: 2/28/15 |
|---|---|---|---|---|---|---|---|---|---|
| | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S | V-E |
| Findings for Practice Model Full Implementation Date | 90% | MACWIS Report: 53% (N=216)* PAD Report: 36% (N=56) (8/31/12) | MACWIS Report: 63% (N=57)* PAD Report: 41% (N=17) (8/31/12) | MACWIS Report: 57% (N=65) PAD Report: 36% (N=25) (2/28/13) | MACWIS Report: 28% (N=246)* PAD Report: 14% (N=51) (8/31/13) | MACWIS Report: 30% (N=186)* PAD Report: 21% (N=28) (8/31/13) | MACWIS Report: 38% (N=106) PAD Report: 58% (N=26) (8/31/13) | MACWIS Report: 17% (N=52) PAD Report: 44% (N=25) (8/31/13) | MACWIS Report: 26% (N=81) PAD Report: 26% (N=38) (2/28/14) |
| Findings for 12 Months Following Implementation Date | 95% | MACWIS Report: 77% (N=181)* PAD Report: 68% (N=71) (8/31/13) MACWIS Report: 70% (N=187) PAD Report: 75% (N=89) (6/30/14) | MACWIS Report: 75% (N=55)* PAD Report: 82% (N=17) (8/31/13) MACWIS Report: 78% (N=64) PAD Report: 42% (N=19) (6/30/14) | MACWIS Report: 51% (N=51) PAD Report: 39% (N=23) (2/28/14) MACWIS Report: 41% (N=63) PAD Report: 33% (N=27) (6/30/14) | | | | | |

MSA §§III.B.3.a.6.b. and III.B.3.a.7.b.
**3. Child and Youth Permanency**
    **a. Permanency Plan**
        **6) Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
            **(b) At least 90% of foster children in custody in that region shall have a permanency plan that is consistent with Modified Settlement Agreement requirements.**

---

[410] The first monthly data submission produced by defendants including only data based on the changes made to the PAD in December 2013 and April 2014 was the data submission for the six-month period ending on October 31, 2014, after the end of Period 4.
[411] Values in red in the table indicate that the underlying data were based on a mixture of questions from prior to and subsequent to the December 2013 and April 2014 PAD changes.

7) **Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
   (b) **At least 95% of foster children in custody in that region shall have a permanency plan that is consistent with Modified Settlement Agreement requirements.**

**<u>Status of Progress, MSA §§III.B.3.a.6.b. and III.B.3.a.7.b.:</u>** As noted above, during Period 4, five regions fully implemented the Practice Model and three regions fully implemented the Practice Model for at least 12 months and thus were responsible for satisfying the associated performance standards. Defendants produced data from the FCR process addressing performance related to this requirement.

Among the five regions that fully implemented during Period 4, three regions satisfied the performance requirement. Two of the three regions that fully implemented the Practice Model for at least 12 months satisfied the performance requirement at the 12-month-post full implementation mark. The Monitor's findings are summarized in the table below, which also includes for informational purposes updated performance data as of the end of Period 4 for the three regions that were 12-months-post full implementation:[412]

| | | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 End of Period 4: 6/30/14 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 End of Period 4: 6/30/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | | Practice Model Full Implementation: 2/28/14 12 Months Following: 2/28/15 |
|---|---|---|---|---|---|---|---|---|---|
| Start Date for Performance Measurement | Performance Requirement | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S | V-E |
| Findings for Practice Model Full Implementation Date | 90% | 100% (N=10) (8/31/12) | 100% (N=18) (8/31/12) | 100% (N=19) (2/28/13) | 95% (N=42) (8/31/13) | 100% (N=27) (8/31/13) | 93% (N=14) (8/31/13) | 75% (N=4) (8/31/13) | 88% (N=8) (2/28/14) |
| Findings for 12 Months Following Implementation Date | 95% | 100% (N=8) (8/31/13)  100% (N=5) (6/30/14) | 100% (N=14) (8/31/13)  100% (N=8) (6/30/14) | 80% (N=15) (2/28/14)  75% (N=16) (6/30/14) | | | | | |

---

[412] The Monitor excluded one child in her analysis of data pertaining to Region II-W for the six-month period ending June 30, 2014. The data produced by defendants for this child reflected conflicting values that the Monitor could not resolve.

MSA §§III.B.3.b.2.a. and III.B.3.b.3.a.
3. **Child and Youth Permanency**
   b. **Concurrent Planning**
      2) <u>**Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model**</u>**:**
         (a) **At least 90% of children in custody in that region with the goal of reunification shall have case record documentation reflecting active concurrent permanency planning consistent with Modified Settlement Agreement requirements.**

      3) <u>**Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model**</u>**:**
         (a) **At least 95% of children in custody in that region with the goal of reunification shall have case record documentation reflecting active concurrent permanency planning consistent with Modified Settlement Agreement requirements.**

<u>**Status of Progress, MSA §§III.B.3.b.2.a. and III.B.3.b.3.a.:**</u> As noted above, during Period 4, five regions fully implemented the Practice Model and three regions fully implemented the Practice Model for at least 12 months and thus were responsible for satisfying the associated performance standards. Defendants produced data from the FCR process addressing performance related to this requirement.

None of the five regions that fully implemented during Period 4 satisfied the performance requirement. Similarly, none of the three regions that fully implemented the Practice Model for at least 12 months satisfied the performance requirement at the 12-month-post full implementation mark. The Monitor's findings are summarized in the table below, which also includes for informational purposes updated performance data as of the end of Period 4 for the three regions that were 12-months-post full implementation:

| Start Date for Performance Measurement | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 End of Period 4: 6/30/14 | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 End of Period 4: 6/30/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | | Practice Model Full Implementation: 2/28/14 12 Months Following: 2/28/15 |
|---|---|---|---|---|---|---|---|---|
| | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S | V-E |
| Findings for Practice Model Full Implementation Date | 90% | 26% (N=38) (8/31/12) | 86% (N=7) (8/31/12) | 43% (N=14) (2/28/13) | 35% (N=37) (8/31/13) | 73% (N=26) (8/31/13) | 50% (N=18) (8/31/13) | 81% (N=16) (8/31/13) | 42% (N=26) (2/28/14) |
| Findings for 12 Months Following Implementation Date | 95% | 79% (N=48) (8/31/13)  55% (N=66) (6/30/14) | 91% (N=11) (8/31/13)  74% (N=19) (6/30/14) | 21% (N=14) (2/28/14)  47% (N=19) (6/30/14) | | | | | |

MSA §§III.B.3.c.4.a. and III.B.3.c.5.a.
   **3. Child and Youth Permanency**
      **c. Permanency Plan Updating and Review**
         **4)** **Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
            **(a) At least 90% of foster children in that region who have been in custody for at least six months shall have a timely court or administrative case review consistent with Modified Settlement Agreement requirements.**

         **5)** **Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
            **(a) At least 95% of foster children in that region who have been in custody for at least six months shall have a timely court or administrative case review consistent with Modified Settlement Agreement requirements.**

   **Status of Progress, MSA §§III.B.3.c.4.a. and III.B.3.c.5.a.:** As noted above, during

Period 4, five regions fully implemented the Practice Model and three regions fully implemented

the Practice Model for at least 12 months and thus were responsible for satisfying the associated

performance standards. Defendants produced data from the FCR process addressing

performance related to this requirement.[413]

---

[413] The data that defendants produce reflect only whether children subject to the FCR process had their most recent court or administrative review conducted timely.

Among the five regions that fully implemented during Period 4, four regions satisfied the performance requirement. Two of the three regions that fully implemented the Practice Model for at least 12 months satisfied the performance requirement at the 12-month-post full implementation mark. The Monitor's findings are summarized in the table below, which also includes for informational purposes updated performance data as of the end of Period 4 for the three regions that were 12-months-post full implementation:

| Start Date for Performance Measurement | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 End of Period 4: 6/30/14 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 End of Period 4: 6/30/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | | Practice Model Full Implementation: 2/28/14 12 Months Following: 2/28/15 |
|---|---|---|---|---|---|---|---|---|---|
| | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S | V-E |
| Findings for Practice Model Full Implementation Date | 90% | 91% (N=466) (8/31/12) | 95% (N=187) (8/31/12) | 97% (N=162) (2/28/13) | 86% (N=502) (8/31/13) | 99% (N=339) (8/31/13) | 97% (N=231) (8/31/13) | 100% (N=203) (8/31/13) | 94% (N=245) (2/28/14) |
| Findings for 12 Months Following Implementation Date | 95% | 95% (N=440) (8/31/13) 98% (N=414) (6/30/14) | 98% (N=197) (8/31/13) 100% (N=186) (6/30/14) | 92% (N=143) (2/28/14) 89% (N=137) (6/30/14) | | | | | |

MSA §§III.B.3.c.4.b. and III.B.3.c.5.b.
3. Child and Youth Permanency
   c. Permanency Plan Updating and Review
      4) **Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model**:
        (b) **At least 90% of foster children in that region who have been in custody for at least 12 months shall have a timely annual court review consistent with Modified Settlement Agreement requirements.**

      5) **Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model**:
        (b) **At least 95% of foster children in that region who have been in custody in that region for at least 12 months shall have a timely annual court review consistent with Modified Settlement Agreement.**

**Status of Progress, MSA §§III.B.3.c.4.b. and III.B.3.c.5.b.:** As noted above, during Period 4, five regions fully implemented the Practice Model and three regions fully implemented the Practice Model for at least 12 months and thus were responsible for satisfying the associated

166

performance standards.  Defendants produced data from the FCR process addressing performance related to this requirement.

None of the five regions that fully implemented during Period 4 satisfied the performance requirement.  Similarly, none of the three regions that fully implemented the Practice Model for at least 12 months satisfied the performance requirement at the 12-month-post full implementation mark.[414]  The Monitor's findings are summarized in the table below, which also includes for informational purposes updated performance data as of the end of Period 4 for the three regions that were 12-months-post full implementation:

| Start Date for Performance Measurement | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 End of Period 4: 6/30/14 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 End of Period 4: 6/30/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | | Practice Model Full Implementation: 2/28/14 12 Months Following: 2/28/15 |
|---|---|---|---|---|---|---|---|---|---|
| | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S | V-E |
| Findings for Practice Model Full Implementation Date | 90% | 86% (N=297) (8/31/12) | 97% (N=156) (8/31/12) | 94% (N=123) (2/28/13) | 39% (N=401) (8/31/13) | 87% (N=244) (8/31/13) | 81% (N=182) (8/31/13) | 83% (N=157) (8/31/13) | 89% (N=174) (2/28/14) |
| Findings for 12 Months Following Implementation Date | 95% | 89% (N=291) (8/31/13) 94% (N=265) (6/30/14) | 93% (N=162) (8/31/13) 99% (N=144) (6/30/14) | 80% (N=109) (2/28/14) 85% (N=102) (6/30/14) | | | | | |

MSA §§III.B.3.d.4.a. and III.B.3.d.5.a.
3.  **Child and Youth Permanency**
   d.  **Reunification Services**
      4)  **Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
         (a)  **At least 80% of foster children in that region with a permanency goal of reunification shall have service plans for their parents that identify those services DFCS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care, and case record documentation that DFCS made those identified services available directly or through referral.**

      5)  **Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**

---

[414]  As indicated in the table, one region – Region II-W – satisfied the performance requirement at the end of Period 4.

(a) **At least 90% of foster children in that region with a
permanency goal of reunification shall have service
plans for their parents that identify those services
DFCS deems necessary to address the behaviors or
conditions resulting in the child's placement in foster
care and case record documentation that DFCS made
those identified services available directly or through
referral.**

**Status of Progress, MSA §§III.B.3.d.4.a. and III.B.3.d.5.a.:**  As noted above, during

Period 4, five regions fully implemented the Practice Model and three regions fully implemented

the Practice Model for at least 12 months and thus were responsible for satisfying the associated

performance standards.  Defendants produced data from the FCR process addressing

performance related to this requirement.

Among the five regions that fully implemented during Period 4, one region satisfied the

performance requirement.  Two of the three regions that fully implemented the Practice Model

for at least 12 months satisfied the performance requirement at the 12-month-post full

implementation mark.[415]  The Monitor's findings are summarized in the table below, which also

includes for informational purposes updated performance data as of the end of Period 4 for the

three regions that were 12-months-post full implementation:

| | | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 End of Period 4: 6/30/14 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 End of Period 4: 6/30/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/15 |
|---|---|---|---|---|---|---|---|---|---|
| **Start Date for Performance Measurement** | **Performance Requirement** | **I-S** | **II-W** | **V-W** | **III-S** | **I-N** | **IV-N** | **IV-S** | **V-E** |
| Findings for Practice Model Full Implementation Date | 80% | Data not available | Data not available | Data not available | 49% (N=115) (8/31/13) | 70% (N=69) (8/31/13) | 97% (N=39) (8/31/13) | 66% (N=73) (8/31/13) | 66% (N=62) (2/28/14) |
| Findings for 12 Months Following Implementation Date | 90% | 91% (N=78) (8/31/13)<br><br>96% (N=111) (6/30/14) | 82% (N=33) (8/31/13)<br><br>75% (N=20) (6/30/14) | 100% (N=31) (2/28/14)<br><br>89% (N=36) (6/30/14) | | | | | |

---

[415]  As indicated in the table, performance in one of these two regions – Region V-W – dropped just below the 90 percent performance requirement at the end of Period 4.

MSA §§III.B.3.e.2.a. and III.B.3.e.3.a.
3. Child and Youth Permanency
  e. Termination of Parental Rights
    2) __Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model__:
      (a) At least 80% of foster children in that region who reach the point at which they have spent 17 of the previous 22 months in foster care shall have a petition to TPR filed on their behalf or an available exception under the federal ASFA documented by the end of their seventeenth month in care.

    3) __Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model__:
      (a) At least 90% of foster children in that region who reach the point at which they have spent 17 of the previous 22 months in foster care shall have a petition to TPR filed on their behalf or an available exception under the federal ASFA documented by the last day of their seventeenth month in care.

__Status of Progress, MSA §§III.B.3.e.2.a. and III.B.3.e.3.a.:__ As noted above, during Period 4, five regions fully implemented the Practice Model and three regions fully implemented the Practice Model for at least 12 months and thus were responsible for satisfying the associated performance standards. Defendants produced data from MACWIS regarding performance related to this requirement.

All five regions that fully implemented during Period 4 satisfied the performance requirement. Two of the three regions that fully implemented the Practice Model for at least 12 months satisfied the performance requirement at the 12-month-post full implementation mark.[416] The Monitor's findings are summarized in the table below, which also includes for informational purposes updated performance data as of the end of Period 4 for the three regions that were 12-months-post full implementation:

---

[416] As indicated in the table, performance in one of these two regions – Region V-W – dropped below the 90 percent performance requirement at the end of Period 4.

| Start Date for Performance Measurement | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 End of Period 4: 6/30/14 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 End of Period 4: 6/30/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | | Practice Model Full Implementation: 2/28/14 12 Months Following: 2/28/15 |
|---|---|---|---|---|---|---|---|---|---|
| | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S | V-E |
| Findings for Practice Model Full Implementation Date | 80% | 93% (N=103) (8/31/12) | 85% (N=78) (8/31/12) | 78% (N=49) (2/28/13) | 87% (N=253) (8/31/13) | 94% (N=93) (8/31/13) | 88% (N=81) (8/31/13) | 98% (N=66) (8/31/13) | 92% (N=66) (2/28/14) |
| Findings for 12 Months Following Implementation Date | 90% | 95% (N=112) (8/31/13)  93% (N=119) (6/30/14) | 89% (N=76) (8/31/13)  83% (N=71) (6/30/14) | 90% (N=42) (2/28/14)  88% (N=41) (6/30/14) | | | | | |

MSA §§III.B.3.e.2.b. and III.B.3.e.3.b.
3. **Child and Youth Permanency**
    e. **Termination of Parental Rights**
      2) <u>Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model</u>:
        (b) **At least 80% of foster children in that region who have spent more than 17 of the previous 22 months in foster care without a TPR petition filed on their behalf or an available ASFA exception documented shall have such a petition filed or an available exception documented.**

      3) <u>Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model</u>:
        (b) **At least 90% of foster children in that region who have spent more than 17 of the previous 22 months in foster care without a TPR petition filed on their behalf or an available ASFA exception documented shall have such a petition filed or an available exception documented.**

<u>**Status of Progress, MSA §§III.B.3.e.2.b. and III.B.3.e.3.b.**</u>:  As noted above, during Period 4, five regions fully implemented the Practice Model and three regions fully implemented the Practice Model for at least 12 months and thus were responsible for satisfying the associated performance standards.  Defendants produced data from MACWIS regarding performance related to this requirement.

Among the five regions that fully implemented during Period 4, one region satisfied the performance requirement.  Similarly, one of the three regions that fully implemented the Practice Model for at least 12 months satisfied the performance requirement at the 12-month-post full

170

implementation mark.[417]  The Monitor's findings are summarized in the table below, which also

includes for informational purposes updated performance data as of the end of Period 4 for the

three regions that were 12-months-post full implementation:

| Start Date for Performance Measurement | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 End of Period 4: 6/30/14 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 End of Period 4: 6/30/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | | Practice Model Full Implementation: 2/28/14 12 Months Following: 2/28/15 |
|---|---|---|---|---|---|---|---|---|---|
| | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S | V-E |
| Findings for Practice Model Full Implementation Date | 80% | 100% (N=7) (8/31/12) | 100% (N=12) (8/31/12) | 18% (N=11) (2/28/13) | 76% (N=34) (8/31/13) | 33% (N=6) (8/31/13) | 60% (N=10) (8/31/13) | 100% (N=1) (8/31/13) | 20% (N=5) (2/28/14) |
| Findings for 12 Months Following Implementation Date | 90% | 50% (N=6) (8/31/13)  63% (N=8) (6/30/14) | 100% (N=8) (8/31/13)  33% (N=12) (6/30/14) | 50% (N=4) (2/28/14)  20% (N=5) (6/30/14) | | | | | |

MSA §§III.B.4.b.1. and III.B.4.c.1.
4. **Case Recordings**
    b. **Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
        1) **At least 90% of child welfare case records in that region will be current and complete.**

    c. **Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
        1) **At least 95% of child welfare case records in that region will be current and complete.**

**Status of Progress, MSA §§III.B.4.b.1. and III.B.4.c.1.:**  The Monitor makes no finding

related to this requirement as of the end of the required implementation periods for the regions

that had fully implemented or were 12-months-post full implementation as of the end of Period 4.

The parties agreed this requirement would be addressed during a case record review conducted

during Period 5.[418]  The case record review conducted during Period 5 focused on health records,

a subset of child welfare case records, and addressed statewide performance and not regional

---

[417]  As indicated in the table, performance in this region – Region II-W – dropped below the 90 percent performance requirement at the end of Period 4.
[418]  *See* App. B, Ex. 11A, *supra* note 184, Status of Gaps in Data Reports Required by January 8, 2014 Final Period 4 IP at Appendix 3, Report No. 6.

performance related to this requirement.  As explained above,[419] the statewide sample of case records used for the Period 5 case record review was designed to ensure proportional regional distribution of the sample relative to the regional distribution of children in custody. Nevertheless, the size of the sample was determined with a goal of making findings on a statewide level, not at a regional level.  It would not have been practical to have drawn a sample large enough to provide meaningful findings both at a regional level and for the various Practice Model implementation dates associated with these MSA requirements.

> **MSA §III.B.5.a.**
> **5.  Developing and Maintaining Connections**
>   **a.   For all children entering foster care, a visitation plan for the child and his/her family shall be developed as part of the service plan.  This visitation plan shall be developed and regularly updated in collaboration with parents, resource parents, and the child.  If parental visitation is appropriate based on the above factors, this visitation plan shall include a minimum of two visits per month with the parents (unless a court order in the child's case limits such visits).  For all children, regardless of permanency goal, this visitation plan shall include at least one visit per month with any siblings not in the same placement (unless a court order in the child's case limits such visits).**

**Status of Progress, MSA §III.B.5.a.:**  The Monitor makes no finding related to this requirement.  Defendants were required to report on their performance relative to this MSA requirement during Period 4; however defendants are not required to satisfy the performance levels indicated in this performance requirement until all regions have fully implemented the Practice Model.  Defendants produced data from MACWIS addressing performance related to this requirement.  Because of limitations in the MACWIS data, the Monitor was unable to analyze data regarding defendants' performance pertaining to this requirement during Period 4.

---

[419] *See supra* at 138.

The parties agreed to measure progress related to certain aspects of this performance requirement through a case record review during Period 6.[420]

> MSA §§III.B.5.d.1. and III.B.5.e.1.
> 5.  **Developing and Maintaining Connections**
>     d.  <u>Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model</u>:
>         1)  **At least 80% of foster children in that region shall be provided with contacts with their parents and with any siblings not in the same placement consistent with Modified Settlement Agreement requirements, unless it is documented that a parent or sibling failed to make himself or herself available.**
>
>     e.  <u>Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model</u>:
>         1)  **At least 90% of foster children in that region shall be provided with contacts with their parents and with any siblings not in the same placement consistent with Modified Settlement Agreement requirements, unless it is documented that a parent or sibling failed to make himself or herself available.**

<u>**Status of Progress, MSA §§III.B.5.d.1. and III.B.5.e.1.:**</u>  As noted above, during Period 4, five regions fully implemented the Practice Model and three regions fully implemented the Practice Model for at least 12 months and thus were responsible for satisfying the associated performance standards.  Defendants produced data from the FCR process addressing performance related to this requirement.  Certain changes were made to the PAD in December 2013 and April 2014, which impacted the data defendants collected related to this requirement.[421] Thus, data derived from the FCR process for six-month periods ending before December 2013 are not precisely comparable to data derived from the FCR process after that date.[422]

None of the five regions that fully implemented during Period 4 satisfied the performance requirement.  Likewise, none of the three regions that fully implemented the Practice Model for

---

[420] *See* App. B, Ex. 11A, *supra* note 184, Status of Gaps in Data Reports Required by January 8, 2014 Final Period 4 IP at Appendix 3, Report No. 7.

[421] *See supra* note 317 for a discussion addressing how changes to the PAD impact defendants' data collection.

[422] The first monthly data submission produced by defendants included only data based on the changes made to the PAD in December 2013.  The April 2014 data submission included performance data for the six-month period ending on October 31, 2014, after Period 4.

at least 12 months satisfied the performance requirement at the 12-month-post full

implementation mark.  The Monitor's findings are summarized in the table below, which also

includes for informational purposes updated performance data as of the end of Period 4 for the

three regions that were 12-months-post full implementation:[423]

| Start Date for Performance Measurement | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 End of Period 4: 6/30/14 | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 End of Period 4: 6/30/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | | Practice Model Full Implementation: 2/28/14 12 Months Following: 2/28/15 |
|---|---|---|---|---|---|---|---|---|
| | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S | V-E |
| **MSA III.B.5. Developing and Maintaining Connections** | | | | | | | | | |
| Findings for Practice Model Full Implementation Date | 80% | Data unavailable before October 2012; data analyzable as of April 2013 | Data unavailable before October 2012; data analyzable as of April 2013 | Data unavailable before October 2012; data analyzable as of April 2013 | 2% (N=43) (8/31/13) | 26% (N=27) (8/31/13) | 40% (N=25) (8/31/13) | 13% (N=23) (8/31/13) | 16% (N=38) (2/28/14) |
| Findings for 12 Months Following Implementation Date | 90% | 39% (N=67) (8/31/13) 40% (N=89) (6/30/14) | 0% (N=16) (8/31/13) 29% (N=17) (6/30/14) | 27% (N=22) (2/28/14) 31% (N=26) (6/30/14) | | | | | |

MSA §III.B.6.c.
6. **Educational Services**
   c. **DFCS shall make all reasonable efforts to ensure the continuity of a child's educational experience by keeping the child in a familiar or current school and neighborhood, when this is in the child's best interests and feasible, and by limiting the number of school changes the child experiences.**

**Status of Progress, MSA §III.B.6.c.:**  The Monitor makes no findings related to

this requirement as of the end of Period 4.  This performance measure is not triggered until all

regions have fully implemented the Practice Model.  Defendants were required, however, to

report on their performance during Period 4.[424]  Because of the limitations in the data produced

by defendants, the parties agreed that this requirement would be subject to a case record review

---

[423] Values in red in the table indicate that the underlying data were based on a mixture of questions from prior to and subsequent to the December 2013 and April 2014 PAD changes.
[424] Final Period 4 IP, Appendix 3 at Report No. 8.

during Period 5.[425]  The findings from the Period 5 case record review, which covered all

children in custody for at least 90 days, who entered custody between July 1, 2013 and December

31, 2014, will be presented in a forthcoming report.  These findings indicate that this MSA

requirement was not satisfied.

> **MSA §§III.B.6.d.1. and III.B.6.e.1.**
> **6.  Educational Services**
>     d.  <u>Beginning by the date set forth in Appendix "A" that a</u>
>        <u>DFCS region has fully implemented the Practice Model</u>:
>        1)  At least 80% of school-age foster children in that region
>           who enter custody shall have their educational records
>           reviewed and their educational needs documented by
>           their DFCS caseworker within 30 calendar days of their
>           entry into foster care.
>
>     e.  <u>Beginning by 12 months following the date set forth in</u>
>        <u>Appendix "A" that a DFCS region has fully implemented the</u>
>        <u>Practice Model</u>:
>        1)  At least 90% of school-age foster children in that region
>           who enter custody shall have their educational records
>           reviewed and their educational needs documented by
>           their DFCS caseworker within 30 calendar days of their
>           entry into foster care.

**Status of Progress, MSA §§III.B.6.d.1. and III.B.6.e.1.:**  As noted above, during Period

4, five regions fully implemented the Practice Model and three regions fully implemented the

Practice Model for at least 12 months and thus were responsible for satisfying the associated

performance standards.  Defendants produced data from the FCR process addressing

performance related to this requirement.

Among the five regions that fully implemented during Period 4, two regions satisfied the

performance requirement.  One of the three regions that fully implemented the Practice Model for

at least 12 months satisfied the performance requirement at the 12-month-post full

implementation mark.[426]  The Monitor's findings are summarized in the table below, which also

---

[425]  *See* App. B, Ex. 11A, *supra* note 184, Status of Gaps in Data Reports Required by January 28, 2014 Final Period
4 IP at Appendix 3, Report No. 8.
[426]  As indicated in the table, performance in this region – Region I-S – dropped below the required performance
level at the end of Period 4.

includes for informational purposes updated performance data as of the end of Period 4 for the

three regions that were 12-months-post full implementation:

| Start Date for Performance Measurement | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 End of Period 4: 6/30/14 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 End of Period 4: 6/30/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | | Practice Model Full Implementation: 2/28/14 12 Months Following: 2/28/15 |
|---|---|---|---|---|---|---|---|---|---|
| | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S | V-E |
| Findings for Practice Model Full Implementation Date | 80% | 54% (N=63) (8/31/12) | 57% (N=21) (8/31/12) | 69% (N=29) (2/28/13) | 20% (N=56) (8/31/13) | 28% (N=29) (8/31/13) | 89% (N=28) (8/31/13) | 80% (N=25) (8/31/13) | 45% (N=38) (2/28/14) |
| Findings for 12 Months Following Implementation Date | 90% | 90% (N=79) (8/31/13)  70% (N=90) (6/30/14) | 61% (N=18) (8/31/13)  41% (N=22) (6/30/14) | 48% (N=21) (2/28/14)  46% (N=26) (6/30/14) | | | | | |

MSA §§III.B.6.d.2. and III.B.6.e.2.
6.  **Educational Services**
    d.  **Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
        2)  **At least 80% of school-age foster children in that region who enter custody or are subject to a change in schools due to a placement move shall be registered for and attending an accredited school within three business days of the initial placement or placement change, including while placed in shelters or other temporary placements, unless delayed by the Youth Court.**

    e.  **Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
        2)  **At least 90% of school-age foster children in that region who enter custody or are subject to a change in schools due to a placement move shall be registered for and attending an accredited school within three business days of the initial placement or placement change, including while placed in shelters or other temporary placements, unless delayed by the Youth Court.**

**Status of Progress, MSA §§III.B.6.d.2. and III.B.6.e.2.:**  As noted above, during Period

4, five regions fully implemented the Practice Model and three regions fully implemented the

Practice Model for at least 12 months and thus were responsible for satisfying the associated

performance standards.  Defendants produced data from the FCR process addressing

performance related to this requirement.

176

Among the five regions that fully implemented during Period 4, three regions satisfied the performance requirement.  One of the three regions that fully implemented the Practice Model for at least 12 months satisfied the performance requirement at the 12-month-post full implementation mark.[427]  The Monitor's findings are summarized in the table below, which also includes for informational purposes updated performance data as of the end of Period 4 for the three regions that were 12-months-post full implementation:

| Start Date for Performance Measurement | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 End of Period 4: 6/30/14 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 End of Period 4: 6/30/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | | Practice Model Full Implementation: 2/28/14 12 Months Following: 2/28/15 |
|---|---|---|---|---|---|---|---|---|---|
| | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S | V-E |
| Findings for Practice Model Full Implementation Date | 80% | 78% (N=55) (8/31/12) | 44% (N=45) (8/31/12) | 94% (N=17) (2/28/13) | 64% (N=58) (8/31/13) | 79% (N=42) (8/31/13) | 89% (N=44) (8/31/13) | 83% (N=24) (8/31/13) | 80% (N=30) (2/28/14) |
| Findings for 12 Months Following Implementation Date | 90% | 79% (N=52) (8/31/13)  85% (N=89) (6/30/14) | 26% (N=27) (8/31/13)  43% (N=23) (6/30/14) | 96% (N=24) (2/28/14)  90% (N=31) (6/30/14) | | | | | |

MSA §III.B.7.d.
7.  **Transition to Independent Living**
 d.  **DFCS shall assist youth in obtaining or compiling the following documents and such efforts shall be documented in the child's case record:**
  1.  **an identification card;**
  2.  **a social security or social insurance number;**
  3.  **a resume, when work experience can be described;**
  4.  **a driver's license, when the ability to drive is a goal;**
  5.  **an original copy of the youth's birth certificate;**
  6.  **religious documents and information;**
  7.  **documentation of immigration, citizenship, or naturalization, when applicable;**
  8.  **documentation of tribal eligibility or membership;**
  9.  **death certificates when parents are deceased;**
  10.  **a life book or a compilation of personal history and photographs, as appropriate;**
  11.  **a list of known relatives, with relationships, addresses, telephone numbers, and permissions for contacting involved parties;**
  12.  **previous placement information; and**

---

[427]  As indicated in the table, this region – Region V-W – sustained performance at the required performance level at the end of Period 4.

> 13. **educational records, such as a high school diploma or general equivalency diploma, and a list of schools attended, when age-appropriate**.

**Status of Progress, MSA §III.B.7.d.:** The Monitor makes no findings related to this requirement. The parties have agreed that defendants' performance relative to this subsection will be measured in a case record review conducted during Period 6.[428]

> **MSA §§III.B.7.e.1. and III.B.7.f.1.**
> 7. **Transition to Independent Living**
>   e. **Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
>     1) **At least 90% of foster children in that region who are 14-20 years old shall be provided with Independent Living services as set forth in their service plan.**
>
>   f. **Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
>     1) **At least 95% of foster children in that region who are 14-20 years old shall be provided with Independent Living services as set forth in their service plan during the Period.**

**Status of Progress, MSA §§III.B.7.e.1. and III.B.7.f.1.:** As noted above, during Period 4, five regions fully implemented the Practice Model and three regions fully implemented the Practice Model for at least 12 months and thus were responsible for satisfying the associated performance standards. Defendants produced data from MACWIS and the FCR process addressing performance related to this requirement. Certain changes were made to the PAD in December 2013, which impacted the data defendants collected related to this requirement.[429] Thus data derived from the FCR process for six-month periods ending before December 2013 are not precisely comparable to data derived from the FCR process after that date.[430]

---

[428] *See* App. B, Ex. 11A, *supra* note 184, Status of Gaps in Data Reports Required by January 28, 2014 Final Period 4 IP at Appendix 3, Report No. 9.

[429] *See supra* note 317 for a discussion addressing how changes to the PAD impact defendants' data collection.

[430] The first monthly data submission produced by defendants including only data based on the changes made to the PAD in December 2013 was the data submission for the six-month period ending on May 31, 2014.

None of the five regions that fully implemented during Period 4 satisfied the performance requirement.  Furthermore, none of the three regions that fully implemented the Practice Model for at least 12 months satisfied the performance requirement at the 12-month-post full implementation mark.  The Monitor's findings are summarized in the table below, which also includes for informational purposes updated performance data as of the end of Period 4 for the three regions that were 12-months-post full implementation:[431]

| Start Date for Performance Measurement | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 End of Period 4: 6/30/14 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 End of Period 4: 6/30/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | | Practice Model Full Implementation: 2/28/14 12 Months Following: 2/28/15 |
|---|---|---|---|---|---|---|---|---|---|
| | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S | V-E |
| **MSA III.B.7. Transition to Independent Living** | | | | | | | | | |
| Findings for Practice Model Full Implementation Date | 90% | MACWIS Report: 66% (N=106)  PAD Report: 76% (N=49) (8/31/12) | MACWIS Report: 68% (N=95)  PAD Report: 84% (N=55) (8/31/12) | MACWIS Report: 64% (N=87)  PAD Report: 83% (N=40) (2/28/13) | MACWIS Report: 29% (N=272)  PAD Report: 53% (N=96) (8/31/13) | MACWIS Report: 40% (N=129)  PAD Report: 52% (N=52) (8/31/13) | MACWIS Report: 74% (N=76)  PAD Report: 75% (N=36) (8/31/13) | MACWIS Report: 36% (N=50)  PAD Report: 78% (N=23) (8/31/13) | MACWIS Report: 45% (N=103)  **PAD Report: 60% (N=40) (2/28/14)** |
| Findings for 12 Months Following Implementation Date | 95% | MACWIS Report: 63% (N=108) PAD Report: 83% (N=42) (8/31/13)  MACWIS Report: 89% (N=101) PAD Report: 81% (N=47) (6/30/14) | MACWIS Report: 75% (N=92) PAD Report: 87% (N=52) (8/31/13)  MACWIS Report: 70% (N=93) PAD Report: 80% (N=35) (6/30/14) | MACWIS Report: 47% (N=55) **PAD Report: 84% (N=32) (2/28/14)**  MACWIS Report: 48% (N=62) PAD Report: 85% (N=34) (6/30/14) | | | | | |

**MSA §§III.B.7.e.2. and III.B.7.f.2.**
**7.  Transition to Independent Living**
    **e.  Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
        **2)  At least 80% of foster children in that region who are transitioning to independence shall have available an adequate living arrangement, a source of income, health care, independent living stipends, and education and training vouchers.  DFCS shall also assist such children in obtaining, prior to transitioning to independent living, the necessary documents and information identified in the COA standard PA-FC 13.06 for emancipating youth. Those efforts shall be documented in the child's case record.**

---

[431] Values in red in the table indicate that the underlying data were based on a mixture of questions from prior to and subsequent to the December 2013 PAD changes.

**f.  Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**

    **2)  At least 90% of foster children in that region who are transitioning to independence shall have available an adequate living arrangement, a source of income, health care, independent living stipends, and education and training vouchers.  DFCS shall assist such children in obtaining, prior to transitioning to independent living, the necessary documents and information identified in the COA standard PA-FC 13.06 for emancipating youth. Those efforts shall be documented in the child's case record.**

**Status of Progress, MSA §§III.B.7.e.2. and III.B.7.f.2.:**  As noted above, during Period 4, five regions fully implemented the Practice Model and three regions fully implemented the Practice Model for at least 12 months and thus were responsible for satisfying the associated performance standards.  Defendants produced data from the FCR process addressing performance related to this requirement.  Certain changes were made to the PAD in December 2013, which impacted the data defendants collected related to this requirement.[432]  Thus data derived from the FCR process for the six-month periods ending before December 2013 are not precisely comparable to data derived from the FCR process after that date.[433]

Among the five regions that fully implemented during Period 4, two regions satisfied the performance requirement.  One of the three regions that fully implemented the Practice Model for at least 12 months satisfied the performance requirement at the 12-month-post full implementation mark.[434]  The Monitor's findings are summarized in the table below, which also includes for informational purposes updated performance data as of the end of Period 4 for the three regions that were 12-months-post full implementation:[435]

---

[432] *See supra* note 317 for a discussion addressing how changes to the PAD impact defendants' data collection.

[433] The first monthly data submission produced by defendants including only data based on the changes made to the PAD in December 2013 was the data submission for the six-month period ending on May 31, 2014.

[434] As indicated in the table, this region – Region V-W – did not satisfy the performance requirement four months later, at the end of Period 4.

[435] Values in red in the table indicate that the underlying data were based on a mixture of questions from prior to and subsequent to the December 2013 PAD changes.

| Start Date for Performance Measurement | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 End of Period 4: 6/30/14 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 End of Period 4: 6/30/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | | Practice Model Full Implementation: 2/28/14 12 Months Following: 2/28/15 |
|---|---|---|---|---|---|---|---|---|---|
| | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S | V-E |
| Findings for Practice Model Full Implementation Date | 80% | 67% (N=9) (8/31/12) | 50% (N=4) (8/31/12) | 91% (N=11) (2/28/13) | 60% (N=35) (8/31/13) | 50% (N=4) (8/31/13) | 100% (N=1) (8/31/13) | 100% (N=1) (8/31/13) | 33% (N=6) (2/28/14) |
| Findings for 12 Months Following Implementation Date | 90% | 44% (N=9) (8/31/13) 80% (N=15) (6/30/14) | 25% (N=4) (8/31/13) 0% (N=9) (6/30/14) | 100% (N=2) (2/28/14) 67% (N=3) (6/30/14) | | | | | |

MSA §III.B.8.c.
8. **Case Closing and Aftercare**
   c. **Before the end of any trial home visit period, there shall be a final family team meeting, which shall include the child's caseworker, the caseworker's supervisor, the child, and the parent or relative assuming custody, to determine the appropriateness of a final discharge. If final discharge is determined to be appropriate, DFCS shall make the appropriate application to the court to be relieved of custody.**

**Status of Progress, MSA §III.B.8.c.:** The Monitor makes no finding regarding performance related to this requirement as of the end of Period 4. This requirement is not triggered until all DFCS regions have fully implemented the Practice Model. The parties have agreed the defendants' performance relative to this requirement will be measured through a case record review conducted during Period 6.[436]

MSA §§III.B.8.d.1. and III.B.8.e.1.
8. **Case Closing and Aftercare**
   d. **Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
      1) **At least 70% of foster children in that region who are reunified and who were in custody longer than 90 days shall receive a 90-day trial home visit period or have case record documentation reflecting the Youth Court's objection to such a trial home visit. During that trial home visit period, the child's caseworker or a Family Preservation caseworker shall meet with the child in the home at least two times per month, and DFCS shall provide or facilitate access to all services identified in the child's after-care plan, consistent with Modified Settlement Agreement requirements.**

---

[436] *See* App. B, Ex. 11A, *supra* note 184, Status of Gaps in Data Reports Required by January 8, 2014 Final Period 4 IP at Appendix 3, Report No. 11.

    **e.**  <u>Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model</u>:

      **1)** **At least 90% of foster children in that region who are reunified and who were in custody longer than 90 days shall receive a 90-day trial home visit period or have case record documentation reflecting the Youth Court's objection to such a trial home visit. During that trial home visit period, the child's caseworker shall meet with the child in the home at least two times per month, and DFCS shall provide or facilitate access to all services identified in the child's after-care plan, consistent with Modified Settlement Agreement requirements.**

    <u>**Status of Progress, MSA §§III.B.8.d.1. and III.B.8.e.1.**</u>**:** As noted above, during Period 4, five regions fully implemented the Practice Model and three regions fully implemented the Practice Model for at least 12 months and thus were responsible for satisfying the associated performance standards. Defendants produced data from MACWIS addressing performance related to this requirement.

    Defendants produced valid data regarding this requirement dating back only to September 2013, three months after the start of Period 4. Consequently, the Monitor was able to analyze defendants' performance in one of the five regions that fully implemented the Practice Model during Period 4 and one of the three regions that fully implemented the Practice Model for at least 12 months during Period 4. As reflected in the table, below, neither region satisfied the applicable performance requirement.

| Start Date for Performance Measurement | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 End of Period 4: 6/30/14 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 End of Period 4: 6/30/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | | Practice Model Full Implementation: 2/28/14 12 Months Following: 2/28/15 |
|---|---|---|---|---|---|---|---|---|---|
| | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S | V-E |
| Findings for Practice Model Full Implementation Date | 70% | In September 2014 defendants submitted corrected data, dating back only to September 2013 | In September 2014 defendants submitted corrected data, dating back only to September 2013 | In September 2014 defendants submitted corrected data, dating back only to September 2013 | In September 2014 defendants submitted corrected data, dating back only to September 2013 | In September 2014 defendants submitted corrected data, dating back only to September 2013 | In September 2014 defendants submitted corrected data, dating back only to September 2013 | In September 2014 defendants submitted corrected data, dating back only to September 2013 | 50% (N=2) (2/28/14) |
| Findings for 12 Months Following Implementation Date | 90% | In September 2014 defendants submitted corrected data, dating back only to September 2013 80% (N=15) (6/30/14) | In September 2014 defendants submitted corrected data, dating back only to September 2013 75% (N=4) (6/30/14) | 0% (N=1) (2/28/14) 0% (N=3) (6/30/14) | | | | | |

MSA §§III.C.1.a.1. and III.C.1.b.1.
1. **Reunification**
   a. **Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
      1) **At least 60% of foster children in that region who are discharged from custody and reunified with their parents or caretakers shall be reunified within 12 months of the latest removal from home.**

   b. **Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
      1) **At least 70% of foster children in that region who are discharged from custody and reunified with their parents or caretakers shall be reunified within 12 months of the latest removal from home.**

**Status of Progress, MSA §§III.C.1.a.1. and III.C.1.b.1.:** As noted above, during

Period 4, five regions fully implemented the Practice Model and three regions fully implemented

the Practice Model for at least 12 months and thus were responsible for satisfying the associated

performance standards.  Defendants produced data from MACWIS addressing performance

related to this requirement.

Among the five regions that fully implemented during Period 4, three regions satisfied the

performance requirement.  None of the three regions that fully implemented the Practice Model

for at least 12 months satisfied the performance requirement at the 12-month-post full

implementation mark.[437]  The Monitor's findings are summarized in the table below, which also

includes for informational purposes updated performance data as of the end of Period 4 for the

three regions that were 12-months-post full implementation:

| Start Date for Performance Measurement | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 End of Period 4: 6/30/14 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 End of Period 4: 6/30/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | | Practice Model Full Implementation: 2/28/14 12 Months Following: 2/28/15 |
|---|---|---|---|---|---|---|---|---|---|
| | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S | V-E |
| Findings for Practice Model Full Implementation Date | 60% | 56% (N=151) (8/31/12) | 43% (N=40) (8/31/12) | 59% (N=29) (2/28/13) | 73% (N=126) (8/31/13) | 69% (N=112) (8/31/13) | 50% (N=60) (8/31/13) | 62% (N=55) (8/31/13) | 47% (N=83) (2/28/14) |
| Findings for 12 Months Following Implementation Date | 70% | 55% (N=122) (8/31/13)  73% (N=123) (6/30/14) | 44% (N=36) (8/31/13)  51% (N=49) (6/30/14) | 42% (N=36) (2/28/14)  37% (N=35) (6/30/14) | | | | | |

       MSA §§III.C.2.a.1. and III.C.2.b.1.
       2. **Time of Adoption Finalization**
          a. **Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
            1) **At least 25% of foster children in that region who are discharged upon finalization of an adoption shall have had the adoption finalized within 24 months of the latest removal from home.**

          b. **Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
            1) **At least 30% of foster children in that region who are discharged upon finalization of an adoption shall have had the adoption finalized within 24 months of the latest removal from home.**

**Status of Progress, MSA §§III.C.2.a.1. and III.C.2.b.1.:**  As noted above, during

Period 4, five regions fully implemented the Practice Model and three regions fully implemented

the Practice Model for at least 12 months and thus were responsible for satisfying the associated

performance standards.  Defendants produced data from MACWIS addressing performance

related to this requirement.

---

[437]  As indicated in the table, one region – Region I-S – subsequently satisfied the performance requirement at the end of Period 4.

None of the five regions that fully implemented during Period 4 satisfied the performance requirement. One of the three regions that fully implemented the Practice Model for at least 12 months satisfied the performance requirement at the 12-month-post full implementation mark.[438] The Monitor's findings are summarized in the table below, which also includes for informational purposes updated performance data as of the end of Period 4 for the three regions that were 12-months-post full implementation:

| Start Date for Performance Measurement | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 End of Period 4: 6/30/14 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 End of Period 4: 6/30/14 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 | | | | Practice Model Full Implementation: 2/28/14 12 Months Following: 2/28/15 |
|---|---|---|---|---|---|---|---|---|---|
| | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S | V-E |
| Findings for Practice Model Full Implementation Date | 25% | 42% (N=52) (8/31/12) | 15% (N=13) (8/31/12) | 50% (N=22) (2/28/13) | 0% (N=13) (8/31/13) | 17% (N=36) (8/31/13) | 0% (N=22) (8/31/13) | 8% (N=13) (8/31/13) | 13% (N=15) (2/28/14) |
| Findings for 12 Months Following Implementation Date | 30% | 29% (N=62) (8/31/13) 28% (N=54) (6/30/14) | 9% (N=22) (8/31/13) 0% (N=15) (6/30/14) | 45% (N=11) (2/28/14) 45% (N=11) (6/30/14) | | | | | |

**MSA §IV.**
**COA ACCREDITATION**
**DFCS's foster care services shall be accredited by COA pursuant to COA's relevant management and service standards.**

**Status of Progress, MSA §IV.:** The Monitor makes no finding related to this MSA requirement at this time, pending a final decision on accreditation by the COA Accreditation Commission, which is expected within the next several months. Nevertheless, at this juncture, it appears likely DFCS will not be accredited by COA. On March 26, 2015, defendants were informed by COA's Chief Executive Officer that COA recognized, respected and applauded the work that DFCS regional staff have devoted to the accreditation process, but that DFCS would be unable to achieve accreditation by the July 2015 deadline that has been established by COA

---

[438]   As indicated in the table, this region – Region V-W – sustained its performance at the end of Period 4.

because of the failure to meet certain COA standards, including standards related to MACWIS and "pervasive, ongoing issues with assessment and service planning."[439]

## IV.    CONCLUSION

In May 2014, the Monitor reported that defendants' Period 3 performance levels "underscore the need for defendants to act with far greater urgency to marshal the resources and build the necessary capacity to meet the requirements of the MSA."[440]  The evidence from defendants' performance during Period 4 supports the identical conclusion.  To date, defendants have demonstrated an inability to meet most of the requirements of the MSA.

While there was evidence of certain capacity building during Period 3, including progress hiring caseworkers, revisions to policies and procedures, and the establishment of a viable pre-service and in-service training program, Period 4 was marked more by backsliding in areas in which defendants previously made progress and reactive responses to urgent issues, rather than strategic organizational advancement.  For example, unlike Period 3, during Period 4, defendants experienced a net loss of caseworker and supervisory staff.  Furthermore, in response to staffing shortages, defendants reallocated resources that were created to fuel their reform effort by temporarily reassigning, for substantial time periods, key management and coaching staff who were central to the implementation of the Practice Model, a cornerstone of the DFCS regional reform initiative.

There is little evidence at this point that the regional strategy that defendants have adopted is positioning them to satisfy the MSA's standards.  The temporary relief from statewide requirements afforded by the MSA is almost at an end.  Because of an unresolved dispute

---

[439]  App. B, Ex. 33, March 26, 2015 correspondence from Richard Klarberg to Richard Berry and related March 26, 2015 e-mail from Richard Klarberg to Richard Berry.
[440]  *See May 2014 Report* at 220.

between the parties, an effort intended to address the acute need to better manage the reform effort, the establishment of a Director of Sustainable Transformation position and related initiatives, was never implemented. Corrective action and accountability systems with a documented history of shortcomings remain deficient. Actions that defendants are implementing presently to improve performance, including the recent development of regional improvement plans, are limited and not likely to address the breadth and depth of defendants' long-standing performance deficits in a minimally adequate way.

Behind each performance indicator presented in this report are the lives of children, and their safety, well being and placement in permanent and nurturing homes depends on defendants' ability to build a system that protects and safeguards them. To be sure, there are innumerable dedicated staff at every level of DFCS who work every day in the interests of the children in defendants' care. But these staff, in sufficient numbers, must have the tools necessary to do their jobs, essential supports, and the oversight needed to ensure consistent, quality service delivery.

Since 2008, the parties and the Court have attempted a wide array of remedial strategies. The original Settlement Agreement proved too ambitious for defendants to implement, and after two and a half years without meaningful progress, the parties agreed to a much narrower, shorter-term set of interim requirements embodied in the Bridge Plan, which the Court approved. Thereafter, the Court ordered the parties to craft a new approach, which would ultimately result in the MSA. The MSA represented a more manageable strategy for system-wide reform with a new business model, allowing defendants to focus on parts of the state over long periods of time, with substantial assistance from external consultants. When long-overdue performance data became available indicating that defendants' performance under the MSA was falling short, the

187

parties agreed on a remedial initiative intended to modify the DFCS management structure. Although ordered by the Court, this remedy was never implemented.

The parties and the Court must now consider this history to develop a remedial strategy that promises far more success than defendants have achieved since 2008. It is imperative to address the ongoing limitations in defendants' performance on an urgent basis. The Monitor stands ready to immediately assist the Court and the parties with this necessary undertaking.

Respectfully submitted,

_____/ s /_____

Grace M. Lopes (MBN 45693 *pro hac vice*)
Court Monitor
1220 19th Street, N.W.
Suite 500
Washington, D.C.  20036
(202) 232-8311
gmlopes@oymonitor.org

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2015, the Court Monitor's Report to the Court Regarding Implementation Period 4, was transmitted electronically to the following counsel of record in this matter:

Dewitt L. ("Rusty") Fortenberry Jr.
Kenya Key Rachal
Ashley Tullos Young
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
428 I-55 North
Meadowbrook Office Park
Jackson, Mississippi  39211

188

Harold E. Pizzetta, III
Assistant Attorney General
General Civil Division
Carroll Gartin Justice Building
430 High Street
Jackson, MS 39201

W. Wayne Drinkwater, Jr.
Michael J. Bentley
BRADLEY ARANT ROSE & WHITE LLP
188 East Capital Street, Suite 450
Jackson, Mississippi  39201

Marcia Robinson Lowry
Sara Robinson Glasser
A Better Childhood, Inc.
1095 Hardscrabble Road
Chappaqua, NY  10514

Christian D. Carbone
Dan Friedman
LOEB & LOEB LLP
345 Park Ave.
New York, New York  10154


_____/ s /_____
Grace M. Lopes

189

**Index to Exhibits**

<u>Appendix A</u>

App. A, Ex. 1A      June 24, 2013 Order, Attachment Two

App. A, Ex. 1B      Initial Period 4 Implementation Plan, Appendix 1

App. A, Ex. 1C      Final Period 4 Implementation Plan, Appendix 3

App. A, Ex. 2A      Status of Data Reports Required By June 24, 2013 Order and Initial Period
                    4 Implementation Plan, Prepared by the Office of the Court Monitor Based
                    on DFCS Data

App. A, Ex. 2B      Status of Data Reports Required By July 18, 2013 Initial Period 4
                    IP, Prepared by the Office of the Court Monitor Based on DFCS Data

App. A, Ex. 2C      Status of Data Reports Required By January 8, 2014 Final Period 4
                    IP, Prepared by the Office of the Court Monitor Based on DFCS Data

App. A, Ex. 3       Summary Table: Statewide Performance for Period 4 through June 30,
                    2014 Based on Analyses of Data Received Through March 24, 2015,
                    Prepared by the Office of the Court Monitor Based on DFCS Data

App. A, Ex. 4       Summary Table: Practice Model Performance through June 30, 2014
                    Based on Analyses of Data Received Through March 24, 2015,
                    Prepared by the Office of the Court Monitor Based on DFCS Data

App. A, Ex. 5A      Chart prepared by the Office of the Court Monitor, Caseworkers With
                    Mixed Caseloads Meeting MSA Requirements, By Region, One-Day
                    Snapshot 10/14/14

App. A, Ex. 5B      Chart prepared by the Office of the Court Monitor, Caseworkers With
                    Dedicated Caseloads Meeting MSA Requirements, By Region, One-Day
                    Snapshot 10/14/14

App. A, Ex. 6       Chart prepared by the Office of the Court Monitor, Supervisors
                    Responsible For Supervising DFCS Caseworkers Meeting MSA
                    Requirements, By Region, One-Day Snapshot 10/14/14

App. A, Ex. 7A      Chart prepared by the Office of the Court Monitor, Pre-Service Training
                    Status As Of September 30, 2014 Among Newly Hired Caseworkers, By
                    Position Start Date, One Year Period Ending 6/30/14

App. A, Ex 7B       Chart prepared by the Office of the Court Monitor, Pre-Service Training
                    Status Among ASWSs Newly Hired or Promoted Into Position During
                    Period 4 Through September 30, 2014, By Position Start Date, One-Year
                    Period Ending 6/30/14

App. A, Ex. 8A     Chart prepared by the Office of the Court Monitor, Ongoing In-Service Training Received By Caseworkers, By Region, Annual Report Ending 6/30/14

App. A, Ex. 8B     Chart prepared by the Office of the Court Monitor, Ongoing In-Service Training Received By ASWSs, By Region, Annual Report Ending 6/30/14

App. A, Ex. 9     Chart prepared by the Office of the Court Monitor, Licensed Resource Families Receiving The Minimum Reimbursement Rate Established Pursuant To The MSA, By Region, One-Month Period Ending 6/30/14

App. A, Ex. 10     Chart prepared by the Office of the Court Monitor, DFCS Review of Maltreatment In Care Investigations, One-Month Periods Ending 7/31/13 Through 6/30/14

App. A, Ex. 11     Chart prepared by the Office of the Court Monitor, Maltreatment Investigations Initiated Within 24 Hours And Completed With Supervisory Approval Within 30 Days, By Region, By Month Investigation Initiated, One-Month Periods Ending 6/30/13 and 6/30/14

App. A, Ex. 12     Chart prepared by the Office of the Court Monitor, Children In Custody Remaining In The Same Placement Following Maltreatment Investigation Who Met Face-To-Face With Worker Twice In A One-Month Period (Or At Least Once If 15 Days Or Less) For Three Months Following Completed Maltreatment Investigation, By Region, One-Month Periods Ending 6/30/13 and 6/30/14

App. A, Ex. 13     Chart prepared by the Office of the Court Monitor, Licensure Investigations Of Agency Group Homes, Emergency Shelters, And Private Child Placing Agency Resource Homes, One Month Periods Ending 8/31/13 Through 6/30/14

App. A, Ex. 14A     Chart prepared by the Office of the Court Monitor, Children Under Age 10 Housed In A Congregate Care Setting With And Without Exception And Regional Director Approval, By Region, One-Month Periods Ending 6/30/13 and 6/30/14

App. A, Ex. 14B     Chart prepared by the Office of the Court Monitor, Number Of Sibling Groups With At Least One Sibling Under Age 10 Placed In Congregate Care Housing For More Than 45 Days, One-Month Periods Ending 6/30/13 and 6/30/14

App. A, Ex. 15A     Chart prepared by the Office of the Court Monitor, Children Placed In Unlicensed Foster Care Settings That Do Not Meet DFCS Licensure Standards And Children Placed In Expedited Pending Relative Resource Homes For More Than 90 Days, One-Month Periods Ending 6/30/13 and 6/30/14

App. A, Ex. 15B     Chart prepared by the Office of the Court Monitor, Children Placed Or Remaining In A Foster Care Setting Meeting DFCS Licensure Standards Consistent With MSA Requirements, Unless Ordered By The Youth Court Over DFCS Objections, Six-Month Periods Ending 6/30/13 and 6/30/14

App. A, Ex. 16     Chart prepared by the Office of the Court Monitor, Children In Emergency Shelter Or Temporary Facility For Over 45 Days With And Without Approval, By Region, One-Month Periods Ending 6/30/13 and 6/30/14

App. A, Ex. 17     Chart prepared by the Office of the Court Monitor, Children Placed In Least Restrictive Setting That Meets Their Individual Needs, By Region, Six-Month Periods Ending 6/30/13 and 6/30/14

App. A, Ex. 18     Chart prepared by the Office of the Court Monitor, Sibling Groups Who Entered Custody At Or Around The Same Time Placed Together, By Region, 12-Month Periods Ending 6/30/13 and 6/30/14

App. A, Ex. 19     Chart prepared by the Office of the Court Monitor, Children For Whom Their Resource Parents Or Facility Staff Were Provided The Foster Care Information Form Within 15 Days of Placement, By Region, Six-Month Periods Ending 6/30/13 and 6/30/14

App. A, Ex 20     Chart prepared by the Office of the Court Monitor, Percentage Of Children Who Entered DFCS Custody Who Were Placed Within Own County Or Within 50 Miles Of The Home From Which Removed Consistent With MSA Requirements, By Region, One-Month Periods Ending 6/30/13 and 6/30/14

App. A, Ex. 21     Chart prepared by the Office of the Court Monitor, Children Entering Custody Who Received An Initial Health Screening Within 72 Hours After Placement, 12-Month Periods Ending 6/30/13 and 6/30/14

App. A, Ex. 22     Chart prepared by the Office of the Court Monitor, Children In Custody 30+ Days Who Received A Comprehensive Health Assessment Within 30 Days Of Placement, 12-Month Periods Ending 6/30/13 and 6/30/14

App. A, Ex. 23     Chart prepared by the Office of the Court Monitor, Children Three Years Old And Older Who Received A Dental Examination Within 90 Calendar Days Of Placement And Children Who Turned Three While In Custody And Received A Dental Examination Within 90 Calendar Days Of Their Third Birthday, By Region, Six Month Periods Ending 6/30/13 and 6/30/14

App. A, Ex. 24     Chart prepared by the Office of the Court Monitor, Children Ages Three And Older At The Start Of The Period Under Review Who Were Provided A Dental Exam Every Six Months, By Region, Six-Month Periods Ending 6/30/13 and 6/30/14

App. A, Ex. 25     Chart prepared by the Office of the Court Monitor, Percentage Of Children Four Years Old Or Older Entering Custody During The Period Who Received A Mental Health Assessment Within 30 Days Of Placement, By Region, Six-Month Periods Ending 6/30/13 and 6/30/14

App. A, Ex. 26     Chart prepared by the Office of the Court Monitor, Twice Monthly In-Person Visits With Child By Assigned Caseworkers, By Region, One-Month Periods Ending 6/30/13 and 6/30/14

App. A, Ex. 27     Chart prepared by the Office of the Court Monitor, Children With A Goal Of Reunification Whose Assigned Caseworker Met Monthly With The Parent(s) With Whom The Child Was To Be Reunified, By Region, One-Month Period Ending 6/30/14

App. A, Ex. 28A    Chart prepared by the Office of the Court Monitor, Non-Therapeutic Placement Setting Contacts, By Region, One-Month Periods Ending 6/30/13 and 6/30/14

App. A, Ex. 28B    Chart prepared by the Office of the Court Monitor, Content And Frequency Of Non-Therapeutic Placement Setting Contacts, By Region, Six-Month Periods Ending 6/30/13 and 6/30/14

App. A, Ex. 29     Chart prepared by the Office of the Court Monitor, Content and Frequency Of Therapeutic Placement Setting Contacts, By Region, Six-Month Periods Ending 6/30/13 and 6/30/14

App. A, Ex. 30     Chart prepared by the Office of the Court Monitor, Number Of Children In Custody Fewer Than 12 Months From Latest Removal From Home, By Number Of Placements, 12-Month Periods Ending 6/30/13 and 6/30/14

Appendix B

App. B, Ex. 1      Final Specification for Mixed Caseload Data Report

App. B, Ex. 2      June 11, 2014 e-mail from Grace M. Lopes to Rusty Fortenberry, *et al.*, redacted

App. B, Ex. 3A     Final Specification for Direct Service Workload Report

App. B, Ex. 3B     Monthly Status Report – Practice Model Implementation, August 2013, redacted excerpt

App. B, Ex. 3C     Monthly Status Report – Practice Model Implementation, September 2013, redacted excerpt

App. B, Ex. 3D     Monthly Status Report – Practice Model Implementation, November 2013, excerpt, redacted

App. B, Ex. 3E        Monthly Status Report – Practice Model Implementation, December 2013, excerpt, redacted

App. B, Ex. 3F        Monthly Status Report – Practice Model Implementation, February 2014, excerpt, redacted

App. B, Ex. 3G        Monthly Status Report – Practice Model Implementation, March 2014, excerpt, redacted

App. B, Ex. 3H        Monthly Status Report – Practice Model Implementation, June 2014, excerpt, redacted

App. B, Ex. 3I        Monthly Status Report – Practice Model Implementation, July 2014, excerpt, redacted

App. B, Ex. 3J        Monthly Status Report – Practice Model Implementation, May 2014, excerpts, redacted

App. B, Ex. 3K        ACF Performance Progress Report, excerpt, submitted by DFCS to the Department of Health and Human Services, Administration for Children, Youth and Families, Children's Bureau on April 30, 2014

App. B, Ex. 3L        May 30, 2013 correspondence from Richard A. Berry to Bernard Morgan and Taffy B. Compain with attached excerpt from renewal application for federal assistance

App. B, Ex. 4        Mississippi Department of Human Services, Division of Family & Children's Services, PowerPoint presentation for regional recruitment teams

App. B, Ex. 5        Mississippi Department of Human Services, Division of Family & Children's Services, Position Announcements

App. B, Ex. 6A        February 26, 2014 correspondence from Richard A. Berry to Deanne Mosley

App. B, Ex. 6B        DHS Area Social Work Supervisor, Job Description

App. B, Ex. 7A        DHS-Area Social Work Supv, Position Announcement, Hancock County

App. B, Ex. 7B        DHS-Area Social Work Supv, Position Announcement, Harrison County

App. B, Ex. 7C        DHS-Area Social Work Supv, Position Announcement, Hinds County

App. B, Ex. 7D        DHS-Area Social Work Supv, Position Announcement, Jackson County

App. B, Ex. 8          February 3, 2014 e-mails from Gwen Long to Julia Davis and Grace M. Lopes with attached salary chart and related documents

App. B, Ex. 9A          Monthly Status Report – Practice Model Implementation, January 2014, excerpt, redacted

App. B, Ex. 9B          Monthly Status Report – Practice Model Implementation, February 2014, excerpt, redacted

App. B, Ex. 9C          Monthly Status Report – Practice Model Implementation, March 2014, excerpt, redacted

App. B, Ex. 9D          Monthly Status Report – Practice Model Implementation, April 2014, excerpt, redacted

App. B, Ex. 9E          Monthly Status Report – Practice Model Implementation, February and June 2014, excerpts, redacted

App. B, Ex. 9F          Monthly Status Report – Practice Model Implementation, March 2014, excerpt, redacted

App. B, Ex. 9G          Monthly Status Report – Practice Model Implementation, February and March 2014, excerpts, redacted

App. B, Ex. 9H          Monthly Status Report – Practice Model Implementation, April 2014, excerpt, redacted

App. B, Ex. 9I          Monthly Status Report – Practice Model Implementation, May 2014, excerpt, redacted

App. B, Ex. 9J          Monthly Status Report – Practice Model Implementation, February, March, and April 2014, excerpts, redacted

App. B, Ex. 9K          Monthly Status Report – Practice Model Implementation, March, April, May, and June 2014, excerpts, redacted

App. B, Ex. 9L          Monthly Status Report – Practice Model Implementation, May and June 2014, excerpts, redacted

App. B, Ex. 9M          Monthly Status Report – Practice Model Implementation, May and June 2014, excerpts, redacted

App. B, Ex. 9N          Monthly Status Report – Practice Model Implementation, February 2014, excerpt, redacted

App. B, Ex. 9O          Monthly Status Report – Practice Model Implementation, April and July 2014, excerpts, redacted

App. B, Ex. 9P    Monthly Status Report – Practice Model Implementation, April and July 2014, excerpts, redacted

App. B, Ex. 9Q    Monthly Status Report – Practice Model Implementation, October 2013, redacted excerpt

App. B, Ex. 9R    Monthly Status Report – Practice Model Implementation, January and June 2014, excerpts, redacted

App. B, Ex. 10    March 5, 2014 e-mail from Gwen Long to Julia Davis and Grace M. Lopes with attached DFCS CQI Corrective Action Tracking Process, redacted

App. B, Ex. 11A    February 2, 2015 e-mail from Grace M. Lopes to Kenya Rachal and Sara Glasser with attached tables

App. B, Ex. 11B    February 24, 2015 e-mail from Kenya Rachal to Grace M. Lopes, Sara Glasser and Mark Jordan

App. B, Ex. 11C    March 9, 2015 e-mail from Sara Glasser to Grace M. Lopes and Kenya Rachal

App. B, Ex. 12A    Periodic Administrative Review Work Shop, Center for Support of Families, training materials

App. B, Ex. 12B    Cheat Sheet 1: PAD Questions that Require Documentation of Answer Response

App. B, Ex. 12C    Cheat Sheet 2: Incorrect Answer Responses

App. B, Ex. 12D    Cheat Sheet 4: PAD Questions that Require Corrective Action of Answer Response

App. B, Ex. 12E    Cheat Sheet 3: PAD Reports with Accompanying Questions

App. B, Ex. 13    Notes from FCR-PAD QA Discussion with Template for Documentation

App. B, Ex. 14    March 3, 2014 e-mail from Gwen Long to Julia Davis and Grace M. Lopes with attached SACWIS Project Planning Schedule

App. B, Ex. 15    April 6, 2015 e-mail from Diane Mobley to Grace M. Lopes with attached New SACWIS Project Timeline Starting with Phase II and New SACWIS Project Timeline Starting with Phase III

App. B, Ex. 16A    Project Number 40123, Professional Services Agreement Between Maximus Human Services, Inc. and Mississippi Department of Information Technology Services as Contracting Agent for the Mississippi Department of Human Services

App. B, Ex. 16B    Council on Accreditation, Remedial Site Visit – Commission Report, Division of Family and Children's Services Region: 1-North, Corinth, MS, excerpt

App. B, Ex. 17    Mississippi Department of Human Services, Division of Family and Children's Services, Mississippi Automated Child Welfare Information System Connectivity and Response Time Improvement Plan

App. B, Ex. 18    MACWIS Down Time Tracking 2012

App. B, Ex. 19    March 30, 2015 e-mail from Diane Mobley to Grace M. Lopes with attached MACWIS Down Time Tracking 2014 and MACWIS Down Time Tracking 2015

App. B, Ex. 20    April 14, 2015 e-mail from Mark Allen to Grace M. Lopes and April 14, 2015 e-mail from Grace M. Lopes to Mark Allen, without attachments

App. B, Ex. 21    March 31, 2014 correspondence from Dewitt L. ("Rusty") Fortenberry, Jr. to Marcia Lowry

App. B, Ex. 22    April 30, 2014 e-mail from Gwen Long to Julia Davis and Grace M. Lopes with attached Summary for MIC Review Report

App. B, Ex. 23A    Diane DePanfilis, Ph.D., M.S.W., Curriculum Vitae

App. B, Ex. 23B    Sarah Kaye, Ph.D., Curriculum Vitae

App. B, Ex. 23C    June 3, 2014 e-mail from Grace M. Lopes to Kenya Rachal and Julia Davis

App. B, Ex. 23D    Sarah Kaye, Ph.D. and Diane DePanfilis, Ph.D., MSW, Maltreatment in Out-of-Home Care in Mississippi, June 2014

App. B, Ex. 24    December 23, 2014 e-mail from Gwen Long to Marcia Lowry and Grace M. Lopes with attached December 1, 2014 memorandum, Maltreatment in Care Investigation Timeliness

App. B, Ex. 25A    November 13, 2013 correspondence from Kenya Key Rachal to Grace M. Lopes with attached Protocol for Accurately Identifying and Producing Maltreatment Investigative Reports to the Court Monitor

App. B, Ex. 25B    November 18, 2013 e-mail from Grace M. Lopes to Kenya Key Rachal and Julia Davis, without attachment

App. B, Ex. 26A    February 18, 2014 correspondence from Kenya Key Rachal to Julia Davis, without attachments

App. B, Ex. 26B    February 10, 2014 memorandum to *Olivia Y* Court Monitor Grace Lopes and Julia Davis of Children's Rights Inc. with attached Maltreatment in Care Investigation Timeliness Table

App. B, Ex. 26C    February 24, 2014 e-mail from Grace M. Lopes to Kenya Rachal without attachments

App. B, Ex. 26D    July 11, 2014 e-mail from Gwen Long to Julia Davis and Grace M. Lopes with attached Timely Initiation and Completion of Maltreatment in Care Investigations (MSA Section II.B.1.e.2)

App. B, Ex. 27A    July 9, 2014 e-mail from Gwen Long to Julia Davis and Grace M. Lopes, without attachments

App. B, Ex. 27B    July 2, 2014 memorandum to *Olivia Y.* Court Monitor Grace Lopes and Julia Davis of Children's Rights Inc., Reduction of Maltreatment in Care

App. B, Ex. 27C    December 23, 2014 e-mail from Gwen Long to Marcia Lowry and Grace M. Lopes with attached December 15, 2014 memorandum to *Olivia Y.* Court Monitor and Parties regarding Maltreatment in Care Reduction

App. B, Ex. 28A    March 17, 2014 correspondence from Kim Shackelford to Grace M. Lopes, without attachments

App. B, Ex. 28B    Timely Case Planning Barriers and Strategies, March 17, 2014

App. B, Ex. 28C    Parents and Sibling Contacts While in Custody Barriers and Strategies, March 17, 2014

App. B, Ex. 28D    Region VII-West Improvement Plan Period IV - March 2014

App. B, Ex. 28E    Region III-South Improvement Plan Period IV - March 2014

App. B, Ex. 29    October 14, 2014 correspondence from Marilyn Tavenner to David J. Dzielak, Ph.D.

App. B, Ex. 30    August 8, 2013 e-mail from Ashley C. Tullos to Julia Davis, Miriam Ingber, and Grace M. Lopes with attached memorandum to MDHS Therapeutic Group Homes

App. B, Ex. 31    Appendix "D" Modified Mississippi Settlement Agreement and Reform Plan, Mississippi Diligent Recruitment of Families for Children, Implementation Plan - Phase II, Version A

App. B, Ex. 32    ACF Performance Progress Report, excerpt, submitted by DFCS to the Department of Health and Human Services, Administration for Children, Youth and Families, Children's Bureau on October 31, 2014 for the six-month reporting period ending September 30, 2014

App. B, Ex. 33    March 26, 2015 correspondence from Richard Klarberg to Richard Berry and related March 26, 2015 e-mail from Richard Klarberg to Richard Berry