# Appendix B

# App. B, Ex. 1

*Individual DFCS caseworkers with generic caseloads shall not carry a mixed caseload requiring more than a total of 6,960 minutes or 100 Workload Units of case-related work per month as enumerated below. MSA II.A.2.a.2*

| Service Type | Minutes | Caseload Units |
|---|---|---|
| • Adoption COS | 300 | 4.3 |
| • ICPC Incoming | 106 | 1.6 |
| • ICPC Outgoing | 106 | 1.6 |
| • Placement COR | 254 | 3.7 |
| • Placement COS | 253 | 3.6 |
| • Placement R&S | 507 | 7.3 |
| • Prevention COR | 138 | 2.0 |
| • Prevention COS | 137 | 2.0 |
| • Prevention R&S | 275 | 4.0 |
| • Protective Services COR | 210 | 3.0 |
| • Protective Services COS | 200 | 2.9 |
| • Protective Services R&S | 410 | 5.9 |
| • Case Management Intake | 59 | 0.9 |
| • Court Ordered Relative Appl. | 282 | 4.1 |
| • ICPC Application | 282 | 4.1 |
| • Investigation Level 2 | 484 | 7.0 |
| • Investigation Level 3 | 484 | 7.0 |
| • General Intake | 59 | 0.9 |
| • Resource Inquiry | 59 | 0.9 |
| • Adoption Addendum | 191 | 2.8 |
| • Foster Home Addendum | 191 | 2.8 |
| • Resource Home Study | 470 | 6.8 |
| • Resource Home Supervision | 140 | 2.0 |
| • Resource Renewal | 191 | 2.8 |
| • Courtesy Interviews | 65 | 1.0 |

- Timeframe:    Point in Time, reflecting a day to be chosen[1]

---

[1] All activities will be measured on a point in time basis. This means that if the report **for parameter "day" is set**, it will reflect that **parameter "day" from the refreshed** data at the point in time the extract is conducted (once DFCS moves to nightly refreshes of the data with the Treehouse software). The report will measure all services/activities that are open on a workers caseload at the point in time **of the parameter "day" set** and will not reflect any 'completed' information **of the parameter "day" set**, except for the 4 defined 'short duration activities (General Intake, Case Management Intake, Resource Inquiries, and Courtesy Interviews), which will be measured both by 'opened' and 'opened and completed' on the chosen parameter day. This report will be run once a month on a different day each month until Treehouse software is in place (allowing nightly refreshes of data), at which point the report will be run weekly for a three-month period. At the conclusion of the three-month period, the defendants, in consultation with plaintiffs and the Monitor, will determine whether the workload report should be produced on a weekly, bi-weekly, or monthly basis going forward.

- Report Population
    - Sort report by Region, then County for the Fine Detail and Detail report. Region and statewide for the Summary report.
        - All Counties should be included in this report, including 'State Office County' which will only be the MCI staff conducting ANE intakes (Hotline PRN is the Title)
    - Sort by Supervisor, then Worker, then organize by Service type (ie all of the Supervisor's workers doing Direct Service be listed first, then Resource-Adoption, then Resource-Licensure, then Intake-if applicable)
        - Based on worker's PIN-Unit Title for the Worker (this is from the Position Maintenance screen from the Unit Title field) and their direct supervisor, the report will include all workers who have any 'open' services/activities, with no end dates, for **the parameter "day" set** (except for short duration activities, where services/activities opened and closed on that day are included)
    - Report should include the Unit Title for the Worker (this is from the Position Maintenance screen from the Unit Title field.)
    - The Service Types are divided into 4 groups:  Direct Service; Resource-Adoption; Resource-Licensure; and Intake (formerly titled 'Other').
    - <u>Direct Service</u>: The services or activities in Direct Service are calculated on an ongoing basis, not completed activities. So if a child in Placement COS is on the caseload of a worker at a given point, the full 'minute/unit' amount associated with that activity is assigned. These activities are all measured on an ongoing basis, so the calculation will be based on the number of cases assigned ('open' with no 'end' days) **for the parameter "day" set** and the full minutes/units allotted. Courtesy Interviews (defined as a short duration activity) will be calculated by adding the number of open cases and the number of opened and closed cases on the parameter "day" set. So if on the parameter "day" set, one courtesy interview was opened but not closed, and two inquiries were opened AND closed, the report will reflect a number of '3'. These service/activities are pulled from the FSP/Direct Service

        - ICPC Incoming             106mins              1.6units
        - ICPC Outgoing             106mins              1.6units
        - Placement R&S             507mins              7.3units
        - Placement COR             254mins              3.7units
        - Placement COS             253mins              3.6units
        - Prevention R&S             275mins              4.0units
        - Prevention COR             138mins              2.0units
        - Prevention COS             137mins              2.0units
        - Protection R&S             410mins              5.9units
        - Protection COR             210mins              3.0units
        - Protection COS             200mins              2.9units
        - Courtesy Interviews       65mins               1.0unit
    - There is a hierarchy for some of the Direct Service Types, based on the logic of the workload study and the negotiations between the parties.

- Placement R&S, Placement COR and Placement COS are always counted.
- Protection R&S is counted only once for the worker (based on case) no matter how many children in the household have this service.
- Protection COR is counted only once for the worker (based on case) no matter how many children in the household have this service.
- Protection COS is counted only once for the worker (based on case) no matter how many children in the household have this service. Also, if there is more than one county with a Protection COS service, the minutes/units will be divided by the number of counties.
  - For example, child 1 has Worker A and county A as the service county, child 2 has Worker B and county B as the service county and child 3 has Worker C and county C as the service county, the minutes/units for the Protection COS will be divided equally by 3 and the result counted for each worker with the Protection COS service.
- Prevention R&S service is always counted if it is the only direct service for any household member. Only one Prevention R&S is counted for a worker no matter how many adults in the household have this service.
- Prevention R&S is counted once for a worker if there is a child less than 18 years of age that has no direct service. (Other children in the household may have Placement or Protection services)
- Prevention COR service is always counted if it is the only direct service for any household member.
- Prevention COR is counted once for a worker if there is a child less than 18 years of age that has no direct service. (Other children in the household may have Placement or Protection services)
- Prevention COS is counted once for a worker no matter how many adults in the household have this service.

- Resource-Adoption: The services or activities in Resource Adoption are calculated on an ongoing basis, not completed activities. So if a child in Adoption COS is open on the caseload of a worker on a given date, the full 'minute/unit' amount associated with that activity is assigned. These activities are all measured on an ongoing basis, so the calculation will be based on the number of open cases (with no end dates)assigned for the **parameter "day" is set** and the full minutes/units allotted. The following services/activities will be listed under this category
  - Adoption COS                    300mins                    4.3units
    - This is pulled from the FSP>Direct Service or Case Planning>Direct Service
  - Adoption Addendum                    191mins                    2.8units
    - (Found in the Resource module)

<u>Resource-Licensure</u>: The services or activities in Resource Licensure are calculated on an ongoing basis, not completed or ended activities. So if a worker has a Resource Home Study on their caseload at a given point in time, with no end date, the full 'minute/unit' amount associated with that activity is assigned. These activities are all measured on an ongoing basis, so the calculation will be based on the number of open cases assigned at the point in time **of the parameter "day" set** and the full minutes/units allotted. Resource Inquiries (defined as a short duration activity) will be calculated by adding the number of open cases and the number of opened and closed cases on the parameter "day" set. So if on the parameter "day" set, one inquiry was opened but not closed, and two inquiries were opened AND closed, the report will reflect a number of '3'. The following services/activities will be listed under this category:

- Resource Inquiry      59mins      0.9units
  - (Found in the Intake module)
- Resource Home Study      470mins      6.8units
  - (Found in the Intake module)
- Foster Home Addendum      191mins      2.8 units
  - (Found in the Resource module)
- Resource Home Supervision      140mins      2.0units
  - (Found in the Resource module)
- Resource Renewal      191mins      2.8units
  - (Found in the Resource module)

o <u>Intake</u>: The services or activities in Intake (formerly labeled Other) are calculated on an ongoing basis, not completed activities. So if a worker has an Investigation 3 open on their caseload at a given point in time, the full 'minute/unit' amount associated with that activity is assigned. These activities are all measured on an ongoing basis, so the calculation will be based on the number of open cases assigned at the point in time **of the parameter "day" is set** and the full minutes/units allotted. General Intakes and Case Management Intakes (defined as a short duration activities) will be calculated by adding the number of open cases and the number of opened and closed cases on the parameter "day" set. So if on the parameter "day" set, one intake was opened but not closed, and two intakes were opened AND closed, the report will reflect a number of '3'. These are all found in the Intake Module. Services/activities in this Intake category includes:

- ICPC Application      282mins      4.1units
- Investigation Level 2      484mins      7.0units
- Investigation Level 3      484mins      7.0units
- General Intake      59mins      0.9units
- Case Management Intake      59mins      0.9units
- Court Order Relative App      282mins      4.1units

DHS
351491

- Please Note: This service is not supposed to be utilized anymore, but some workers still utilize the service code.

o The number of 'units of measurement' should be determined for each Service Type(ie Direct Service, Resource-Adoption, Resource-Licensure, Intake) listed above. Then that number is multiplied by the above minutes and by the units. These amounts should be shown in separate columns.

- For example, if Worker A has 5 open Investigation Level 3's and 4 Placement COR's on their caseload, the report would read:

|  | # of Clients | Minute | Unit |
|---|---|---|---|
| Supervisor A | 19 | 8272 | 119.6 |
| Worker A | 9 | 3436 | 49.8 |
| Direct Service |  |  |  |
| Placement COR | 4 | 1016 | 14.8 |
| Intake |  |  |  |
| - Investigation 3 | 5 | 2420 | 35 |
| Worker B | 10 | 1400 | 20 |
| Resource-Licensure |  |  |  |
| - Resource Home Sup | 10 | 1400 | 20 |

- The Fine Detail Report will Also include the Names (child, head of household, resource depending on service type) and ID numbers for each Activity

|  | # of Clients | Minute | Unit |
|---|---|---|---|
| Supervisor A | 19 | 8272 | 119.6 |
| Worker A | 9 | 3436 | 49.8 |
| Direct Service |  |  |  |
| - Placement COR | 4 | 1016 | 14.8 |
| David/321 |  |  |  |
| Arnie/432 |  |  |  |
| Johns/543 |  |  |  |
| Tope/654 |  |  |  |
| Intake |  |  |  |
| - Investigation 3 | 5 | 2420 | 35 |
| Jones/123 |  |  |  |
| Smith/234 |  |  |  |
| Peck/345 |  |  |  |
| Toms/456 |  |  |  |
| Art/567 |  |  |  |
| Worker B | 10 | 1400 | 20 |
| Resource-Licensure |  |  |  |

| | | | | |
|---|---|---|---|---|
| - | Resource Home Sup | 10 | 1400 | 20 |
| | Bob/111 | | | |
| | Gage/222 | | | |
| | Hugh/333 | | | |
| | Frank/444 | | | |
| | Gary/555 | | | |
| | Nonnie/666 | | | |
| | Sara/777 | | | |
| | Lucy/888 | | | |
| | Pete/999 | | | |
| | Suki/1010 | | | |

- o A Worker's Total should be shown for each worker for Services/Activities, Minutes and Units.
- o This MSA requirement looks at the number/percentage of workers that are under the number of minutes allowed (6960 or 100 units), have more than 2 times the 6960 total minutes allowed (13920 minutes) or 2 times 100 units (200 units), or have more than 3 times the 6960 total minutes allowed (20880 minutes) or 3 times 100 units (300 units). These are all indicated with a (Y/N) on the report

- Fine Detail Report
  - o Title of Report: 'Workloads Exceeding 2X the Required Minutes, County-Fine Detail'
  - o Supervisor
    - Total Number of Workers assigned to Supervisor
    - Total Number of Clients, Minutes/Units for Supervisors Unit (sum of mins/units for all workers assigned to that Supervisor)
  - o Worker. For each worker (under assigned Supervisor's name, grouped by service type in the following order: Direct Service, Resource-Adoption, Resource-Licensure an Intake. If a worker has minutes in multiple service type categories, organize worker based on the first service type they have to show in the above order list:
    - Unit Title (PIN from Position Maintenance Screen)
    - Total Number of Minutes and Units
    - Each Service Type the worker performs (as described above)
      - The number of clients/activities for the worker in each service type and the total number of minutes/units.[2]
      - The Names and IDs for each client under the service type
      - Each service type will show in a separate row, with a number for minutes and units in separate columns
    - Under 6960/100 (Y if Yes, N if No)

---

[2] For example: If a worker has two ICPC applications on parameter day report is run, under the workers name it will say 'ICPC application', '2', '564minutes/8.2units'

- - Exceed 6960/100 but less than 13920 (Y if Yes, N if No)
    - Exceed 13920/200 but less than 20880 (Y if Yes, N if No)
    - Exceed 20880/300 (Y is Yes, N if No)
    - Between 100-125 Units (Y is Yes, N is No)
    - Short Duration Activities Opened but Not Completed
    - Short Duration Activities Completed
- Count Summary: The summary section below will be organized by the 4 service types (Direct Service, Resource-Adoption, Resource-Licensure, Intake), and an 'overall' section for the County. This means each bullet listed below will be reported for: Direct Service, Resource-Adoption, Resource-Licensure, Intake, and Overall Summary
    - MSA Related Summary Results
        - Total Workers under 6960/100 – this is the sum of all workers who are under 6960 minutes or 100 units on his/her workload.  Also the percentage of workers under 6960 and 100 units should be shown (based on the Y indicator in the detail).
        - Total Workers over 6960 minutes or/100 workload units but less than 13920 minutes or/200 workload units– this is the sum of all workers who have over 6960 minutes or 100 units on his/her workload.  Also the percentage of workers over 6960 or 100 units should be shown (based on the Y indicator in the detail).
        - Total Worker 2X over (13920 minutes or/200 workload units) but less than 20880  – this is the sum of all workers who have over 2 times 6960 minutes or 2 times 100 units.  Also the percentage of workers 2 times over 6960 minutes or 2 times 100 units should be shown (based on the Y indicator in the detail)
        - Total Worker 3X over (20880 minutes or/300 workload units) – this is the sum of all workers who have over 3 times 6960 minutes or 3 times 100 units.  Also the percentage of workers 3 times over 6960 minutes or 3 times 100 units should be shown (based on the Y indicator in the detail)
    - Additional Summary Results
        - Total Workers – this should only include workers with a Unit Title of Direct Service, Resource or Intake (Hotline PRN) and the job titles of Family Protection Worker I, Family Protection Worker II, Family Protection Specialist, Family Protection Specialist Senior or Family Protection Specialist Advanced, Intake (Hotline PRN).
        - Total Workers without Intake-this should only include workers with a Unit Title of Direct Service, Resource or Intake and the job titles of Family Protection Worker I, Family Protection Worker II, Family Protection Specialist, Family Protection Specialist Senior or Family Protection Specialist Advanced

- Total Services/Activities – this is the sum of all the Services/Activities for the county.
- Total Services/Activities without Intake – this is the sum of all the Services/Activities for the county that aren't central intakes (Hotline PRN unit title).
- Total Minutes – this is the sum of all the minutes for the county.
- Total Units – this is the sum of all the units for the county.
- Total Minutes without Intake (Hotline PRN)– this is the sum of all the minutes for the county without the numbers from Intake.
- Total Units without Intake – this is the sum of all the units for the county without the numbers from Intake.
- Total Workers under 6960/100 – this is the sum of all workers who are under 6960 minutes or 100 units on his/her workload.  Also the percentage of workers under 6960 and 100 units should be shown (based on the Y indicator in the detail).
- Total Workers over 6960 minutes or/100 workload units but less than 13920 minutes or/200 workload units– this is the sum of all workers who have over 6960 minutes or 100 units on his/her workload.  Also the percentage of workers over 6960 or 100 units should be shown (based on the Y indicator in the detail).
- Total Worker 2X over (13920 minutes or/200 workload units) but less than 20880  – this is the sum of all workers who have over 2 times 6960 minutes or 2 times 100 units.  Also the percentage of workers 2 times over 6960 minutes or 2 times 100 units should be shown (based on the Y indicator in the detail)
- Total Worker 3X over (20880 minutes or/300 workload units) – this is the sum of all workers who have over 3 times 6960 minutes or 3 times 100 units.  Also the percentage of workers 3 times over 6960 minutes or 3 times 100 units should be shown (based on the Y indicator in the detail)
- Total Workers between 100-125 Units
- Total Number of Investigation (Levels 2 and 3) initiated during the previous 30 days
- Total Number of Investigation (Levels 2 and 3) completed during the previous 30 days
- Total Number of Resource Inquiries completed in the previous 30 days
- Total Number of General Intakes completed in the previous 30 days
- Total Number of Case Management Intakes completed in the previous 30 days
- Total Number of Courtesy Interviews completed in the previous 30 days
- Workers Needed to Cover Workload– this is the Total Minutes *divided* by 6960 and rounded up.

- Workers Needed to Cover Workload without Intake– this is the Total Minutes without Intake **divided** by 6960 and rounded up.
- Additional workers needed to meet need- Workers Needed to Cover Workload **Minus** Total Number of Workers
  - This should be separated out by the three service Types: Direct Service, Resource Adoption, Resource-Licensure,, Intake
- Additional workers needed to meet need without Intake- Workers Needed to Cover Workload without Intake **Minus** Total Number of Workers without Intake
  - This should be separated out by the three service Types: Direct Service, Resource Adoption, Resource-Licensure,Intake

- Detailed Report
  - Title of Report: 'Workloads Exceeding 2X the Required Minutes, County-Detail'
  - Supervisor
    - Total Number of Workers assigned to Supervisor
    - Total Number of Clients, Minutes/Units for Supervisors Unit (sum of mins/units for all workers assigned to that Supervisor)
  - Worker. For each worker (under assigned Supervisor's name grouped by service type in the following order: Direct Service, Resoure-Adoption, Resource-Licensure an Intake. If a worker has minutes in multiple service type categories, organize worker based on the first service type they have to show in the above order) list:
    - Unit Title (PIN from Position Maintenance Screen)
    - Total Number of Minutes and Units
    - Each Service Type the worker performs (as described above)
      - The number of clients/activities for the worker in each service type and the total number of minutes/units.[3]
      - Each service type will show in a separate row, with a number for minutes and units in separate columns
    - Under 6960/100 (Y if Yes, N if No)Exceed 6960/100 but less than 13920 (Y if Yes, N if No)
    - Exceed 13920/200 but less than 20880 (Y if Yes, N if No)
    - Exceed 20880/300 (Y is Yes, N if No)
    - Between 100-125 Units (Y is Yes, N is No)
    - Short Duration Activities Opened But Not Completed
    - Short Duration Activities Completed
  - Count Summary The summary section below will be organized by the 4 service types (Direct Service, Resource-Adoption, Resource-Licensure, Intake), and an 'overall' section for the County. This means each bullet listed below will be reported for: Direct Service, Resource-Adoption, Resource-Licensure, Intake, and Overall Summary

---

[3] For example: If a worker has two ICPC applications open on parameter day report is run, under the workers name it will say 'ICPC application', '2', '564minutes/8.2units'

DHS
351496

- ▪ MSA Related Summary Results
  - • Total Workers under 6960/100 – this is the sum of all workers who are under 6960 minutes or 100 units on his/her workload.  Also the percentage of workers under 6960 and 100 units should be shown (based on the Y indicator in the detail).
  - • Total Workers over 6960 minutes or/100 workload units but less than 13920 minutes or/200 workload units– this is the sum of all workers who have over 6960 minutes or 100 units on his/her workload.  Also the percentage of workers over 6960 or 100 units should be shown (based on the Y indicator in the detail).
  - • Total Worker 2X over (13920 minutes or/200 workload units) but less than 20880  – this is the sum of all workers who have over 2 times 6960 minutes or 2 times 100 units.  Also the percentage of workers 2 times over 6960 minutes or 2 times 100 units should be shown (based on the Y indicator in the detail)
  - • Total Worker 3X over (20880 minutes or/300 workload units) – this is the sum of all workers who have over 3 times 6960 minutes or 3 times 100 units.  Also the percentage of workers 3 times over 6960 minutes or 3 times 100 units should be shown (based on the Y indicator in the detail)
- ▪ Additional Summary Results
  - • Total Workers – this should only include workers with a Unit Title of Direct Service, Resource or Intake (Hotline PRN) and the job titles of Family Protection Worker I, Family Protection Worker II, Family Protection Specialist, Family Protection Specialist Senior or Family Protection Specialist Advanced, Intake (Hotline PRN).
  - • Total Workers without Intake-this should only include workers with a Unit Title of Direct Service, Resource or Intake and the job titles of Family Protection Worker I, Family Protection Worker II, Family Protection Specialist, Family Protection Specialist Senior or Family Protection Specialist Advanced
  - • Total Services/Activities – this is the sum of all the Services/Activities for the county.
  - • Total Services/Activities without Intake – this is the sum of all the Services/Activities for the county that aren't central intakes (Hotline PRN unit title).
  - • Total Minutes – this is the sum of all the minutes for the county.
  - • Total Units – this is the sum of all the units for the county.
  - • Total Minutes without Intake (Hotline PRN)– this is the sum of all the minutes for the county without the numbers from Intake.
  - • Total Units without Intake – this is the sum of all the units for the county without the numbers from Intake.

- Total Workers under 6960/100 – this is the sum of all workers who are under 6960 minutes or 100 units on his/her workload.  Also the percentage of workers under 6960 and 100 units should be shown (based on the Y indicator in the detail).
- Total Workers over 6960 minutes or/100 workload units but less than 13920 minutes or/200 workload units– this is the sum of all workers who have over 6960 minutes or 100 units on his/her workload.  Also the percentage of workers over 6960 or 100 units should be shown (based on the Y indicator in the detail).
- Total Worker 2X over (13920 minutes or/200 workload units) but less than 20880  – this is the sum of all workers who have over 2 times 6960 minutes or 2 times 100 units.  Also the percentage of workers 2 times over 6960 minutes or 2 times 100 units should be shown (based on the Y indicator in the detail)
- Total Worker 3X over (20880 minutes or/300 workload units) – this is the sum of all workers who have over 3 times 6960 minutes or 3 times 100 units.  Also the percentage of workers 3 times over 6960 minutes or 3 times 100 units should be shown (based on the Y indicator in the detail)
- Total Workers between 100-125 Units
- Total Number of Investigation (Levels 2 and 3) initiated during the previous 30 days
- Total Number of Investigation (Levels 2 and 3) completed during the previous 30 days
- Total Number of Resource Inquiries completed in the previous 30 days
- Total Number of General Intakes completed in the previous 30 days
- Total Number of Case Management Intakes completed in the previous 30 days
- Total Number of Courtesy Interviews completed in the previous 30 days
- Workers Needed to Cover Workload– this is the Total Minutes **divided** by 6960 and rounded up.
- Workers Needed to Cover Workload without Intake– this is the Total Minutes without Intake **divided** by 6960 and rounded up.
- Additional workers needed to meet need- Workers Needed to Cover Workload **Minus** Total Number of Workers
  - This should be separated out by the three service Types: Direct Service, Resource Adoption, Resource-Licensure,, Intake
- Additional workers needed to meet need without Intake- Workers Needed to Cover Workload without Intake **Minus** Total Number of Workers without Intake
  - This should be separated out by the three service Types: Direct Service, Resource Adoption, Resource-Licensure,Intake

- Region/Statewide Summary: The summary section below will be organized by the 4 service types (Direct Service, Resource-Adoption, Resource-Licensure, Intake), and an 'overall' section for the Region. This means each bullet listed below will be reported for: Direct Service, Resource-Adoption, Resource-Licensure, Intake, and Overall Summary. For Region III-S there will be an additional sub section with all of the bullets below for 'Overall-Exclude Hinds County'. For Region VII-E there will be an additional sub section with all of the bullets below for 'Overall-Exclude Jackson County'. For the Statewide Summary, there will only be two sections, with each of the bullets below listed: Overall Summary and Overall Summary-Carve Out Counties Excluded (all results from Hinds, Jackson, Hancock and Harrison will be excluded)
  - Title of Report: 'Workloads Exceeding 2X the Required Minutes-Regional/Statewide Summary'
    - MSA Related Summary Results
      - Total Workers under 6960/100 – this is the sum of all workers who are under 6960 minutes or 100 units on his/her workload.  Also the percentage of workers under 6960 and 100 units should be shown (based on the Y indicator in the detail).
      - Total Workers over 6960 minutes or/100 workload units but less than 13920 minutes or/200 workload units– this is the sum of all workers who have over 6960 minutes or 100 units on his/her workload.  Also the percentage of workers over 6960 or 100 units should be shown (based on the Y indicator in the detail).
      - Total Worker 2X over (13920 minutes or/200 workload units) but less than 20880  – this is the sum of all workers who have over 2 times 6960 minutes or 2 times 100 units.  Also the percentage of workers 2 times over 6960 minutes or 2 times 100 units should be shown (based on the Y indicator in the detail)
      - Total Worker 3X over (20880 minutes or/300 workload units) – this is the sum of all workers who have over 3 times 6960 minutes or 3 times 100 units.  Also the percentage of workers 3 times over 6960 minutes or 3 times 100 units should be shown (based on the Y indicator in the detail)
    - Additional Summary Results
      - Total Workers – this should only include workers with a Unit Title of Direct Service, Resource or Intake (Hotline PRN) and the job titles of Family Protection Worker I, Family Protection Worker II, Family Protection Specialist, Family Protection Specialist Senior or Family Protection Specialist Advanced, Intake (Hotline PRN).
      - Total Workers without Intake-this should only include workers with a Unit Title of Direct Service, Resource or Intake and the job titles of Family Protection Worker I, Family Protection Worker II, Family Protection

DHS
351499

Specialist, Family Protection Specialist Senior or Family Protection Specialist Advanced

- Total Services/Activities – this is the sum of all the Services/Activities for the county.
- Total Services/Activities without Intake – this is the sum of all the Services/Activities for the county that aren't central intakes (Hotline PRN unit title).
- Total Minutes – this is the sum of all the minutes for the county.
- Total Units – this is the sum of all the units for the county.
- Total Minutes without Intake (Hotline PRN)– this is the sum of all the minutes for the county without the numbers from Intake.
- Total Units without Intake – this is the sum of all the units for the county without the numbers from Intake.
- Total Workers under 6960/100 – this is the sum of all workers who are under 6960 minutes or 100 units on his/her workload.  Also the percentage of workers under 6960 and 100 units should be shown (based on the Y indicator in the detail).
- Total Workers over 6960 minutes or/100 workload units but less than 13920 minutes or/200 workload units– this is the sum of all workers who have over 6960 minutes or 100 units on his/her workload.  Also the percentage of workers over 6960 or 100 units should be shown (based on the Y indicator in the detail).
- Total Worker 2X over (13920 minutes or/200 workload units) but less than 20880  – this is the sum of all workers who have over 2 times 6960 minutes or 2 times 100 units.  Also the percentage of workers 2 times over 6960 minutes or 2 times 100 units should be shown (based on the Y indicator in the detail)
- Total Worker 3X over (20880 minutes or/300 workload units) – this is the sum of all workers who have over 3 times 6960 minutes or 3 times 100 units.  Also the percentage of workers 3 times over 6960 minutes or 3 times 100 units should be shown (based on the Y indicator in the detail)
- Total Workers between 100-125 Units
- Total Number of Investigation (Levels 2 and 3) initiated during the previous 30 days
- Total Number of Investigation (Levels 2 and 3) completed during the previous 30 days
- Total Number of Resource Inquiries completed in the previous 30 days
- Total Number of General Intakes completed in the previous 30 days
- Total Number of Case Management Intakes completed in the previous 30 days
- Total Number of Courtesy Interviews completed in the previous 30 days

- Workers Needed to Cover Workload– this is the Total Minutes **divided** by 6960 and rounded up.
- Workers Needed to Cover Workload without Intake– this is the Total Minutes without Intake **divided** by 6960 and rounded up.
- Additional workers needed to meet need- Workers Needed to Cover Workload **Minus** Total Number of Workers
  - This should be separated out by the three service Types: Direct Service, Resource Adoption, Resource-Licensure,, Intake
- Additional workers needed to meet need without Intake- Workers Needed to Cover Workload without Intake **Minus** Total Number of Workers without Intake
  - This should be separated out by the three service Types: Direct Service, Resource Adoption, Resource-Licensure, Intake

**App. B, Ex. 2**

**Grace M. Lopes**

---

**From:** Grace M. Lopes [mailto:gmlopes@oymonitor.org]
**Sent:** Wednesday, June 11, 2014 1:07 PM
**To:** 'Fortenberry, Rusty'; 'Rachal, Kenya'; 'Tullos, Ashley C.'; 'Marcia Robinson Lowry'; 'Julia Davis'; 'Kate Wood'; 'Elissa Glucksman Hyne'
**Cc:** 'Kim Shackelford'; 'Cynthia Greer (cindy.greer@mdhs.ms.gov)'; 'Nancy Meaders'; 'Donald Griffin'; 'Jerry Milner (jmilner@csfmail.org)'; 'Ginger Gibson'; 'mjordan@sparb.org'; 'Mia Caras'
**Subject:** Follow Up from June 11, 2014 Conference Call - **REDACTED**

Rusty, Kenya, Ashley, Marcia, Julia, Kate and Elissa:

Please see below for a summary of next steps agreed upon during today's conference call.  If this summary is incorrect, or if there are any material omissions, please contact me.  I appreciate your time and efforts to resolve these matters.  Many thanks, Grace

**REDACTED**

## II.  Caseload Reporting

- Defendants will stop issuing current mixed caseload reports.
- Mixed caseload reports that have been produced to date will not be analyzed.
- Revised specifications for the mixed caseload reports will be submitted by defendants to plaintiffs' counsel and to my office by Monday, June 16.  All comments on the revised specifications will be transmitted to defendants by Thursday, June 19.
- On or about June 23, defendants will inform plaintiffs' counsel and me of the date by which mixed caseload reports will be produced pursuant to the revised specifications.
- The assumption is revised mixed caseload data reports will be produced in early July subject to the validation process, and that the initial point in time report will be validated by mid-July.
- The revised mixed caseload reports will be produced at the intervals required by the current specifications for the period required by the current specifications.  At the conclusion of that period, the parties will  decide the final reporting schedule (*e.g.,* several times per month on different days and at different times each day, etc).
- My Office will analyze the revised mixed caseload reports starting with the first point in time report produced pursuant to the revised specifications.  Mark, Grace and/or Mia will contact Nancy Meaders if there are any questions or issues.

**REDACTED**

*Grace M. Lopes*
*Monitor, Olivia Y.*
*1220 19th Street, N.W.*
*Suite 500*
*Washington, D.C.  20036*
*202.232.8311*

*This email and any attachments may contain confidential and privileged information.  If you are not the intended recipient, please notify the sender immediately, destroy this email, and destroy any copies.  Any dissemination or use of this information by a person other than the intended recipient is unauthorized and may be illegal.*

# App. B, Ex. 3A

# AR1K - Direct Service Workload

Activities listed below are Direct Service activities (CSF 062414)

| Service Type | Minutes | Caseload Units |
|---|---|---|
| Adoption COS | 300 | 4.3 |
| ICPC Incoming | 106 | 1.6 |
| ICPC Outgoing | 106 | 1.6 |
| Placement COR | 254 | 3.7 |
| Placement COS | 253 | 3.6 |
| Placement R&S | 507 | 7.3 |
| Prevention COR | 138 | 2.0 |
| Prevention COS | 137 | 2.0 |
| Prevention R&S | 275 | 4.0 |
| Protective Services COR | 210 | 3.0 |
| Protective Services COS | 200 | 2.9 |
| Protective Services R&S | 410 | 5.9 |
| Case Management Intake | 59 | 0.9 |
| Court Ordered Relative Appl. | 282 | 4.1 |
| ICPC Application | 282 | 4.1 |
| Investigation Level 2 | 484 | 7.0 |
| Investigation Level 3 | 484 | 7.0 |
| General Intake | 59 | 0.9 |
| Courtesy Interviews | 65 | 1.0 |

- Timeframe:        Point in Time, reflecting a day to be chosen[1]

- Report Population
  - Sort report by Region, then County for the Fine Detail and Detail report. Region and statewide for the Summary report.
  - All Counties should be included in this report
  - Sort by Supervisor, then Worker, then organize by Service type (ie all of the Supervisor's workers doing Direct Service be listed first, then Intake-if applicable)
    - Based on worker's PIN-Unit Title for the Worker (this is from the Position Maintenance screen from the Unit Title field) and their direct supervisor, the report will include all workers who have any 'open' services/activities, with no end dates, for **the parameter "day" set** (except for short duration activities, where services/activities opened and closed on that day are included)
  - Report should include all employees who carry minutes from services/activities with a Unit Title of Direct Service only(CSF 062414).. This includes those job titles of <u>Social Serv Regional Dir (CSF 062614)</u>, ASWS, FPW I, FPW II, FPS, FPS Sr., FPS Adv.
  - Report should include the Unit Title for the Worker (this is from the Position Maintenance screen from the Unit Title field.)

---

[1] All activities will be measured on a point in time basis. This means that if the report **for parameter "day" is set**, it will reflect **that parameter "day" from the refreshed data** at the point in time. The report will measure all services/activities that are open on a workers caseload at the point in time **of the parameter "day" set** and will not reflect any 'completed' information **of the parameter "day" set**.

6/24/2014

DHS
364523

# AR1K - Direct Service Workload

o The Service Types are divided into 2 groups:  Direct Service and (CSF 062414) Intake (formerly titled 'Other').

o Direct Service: The services or activities in Direct Service are calculated on an ongoing basis, not completed activities. So if a child in Placement COS is on the caseload of a worker at a given point, the full 'minute/unit' amount associated with that activity is assigned. These activities are all measured on an ongoing basis, so the calculation will be based on the number of cases assigned ('open' with no 'end' days) **for the parameter "day" set** and the full minutes/units allotted. Courtesy Interviews (defined as a short duration activity) will be calculated by adding the number of open cases and the number of opened and closed cases on the parameter "day" set. So if on the parameter "day" set, one courtesy interview was opened but not closed, and two inquiries were opened AND closed, the report will reflect a number of '3'. For direct services, only include active direct services from the most recent FSP with an Approval Date by the Supervisor.  (This will be the FSP with the highest ID number with approval.) (CSF 062414)  These service/activities are pulled from the ISP or FSP/Direct Service

- ICPC Incoming (by child)                106mins              1.6units
- ICPC Outgoing (by child)               106mins              1.6units
- Placement R&S (by child)              507mins              7.3units
- Placement COR (by child)             254mins              3.7units
- Placement COS (by child)             253mins              3.6units
- Prevention R&S (by case)             275mins              4.0units
- Prevention COR (by case)            138mins              2.0units
- Prevention COS (by case)            137mins              2.0units
- Protection R&S (by case)             410mins              5.9units
- Protection COR (by case)            210mins              3.0units
- Protection COS (by case)            200mins              2.9units
- Courtesy Interviews (by child)       65mins               1.0unit
- There is a hierarchy for some of the Direct Service Types, based on the logic of the workload study and the negotiations between the parties.
  - Placement R&S, Placement COR and Placement COS are always counted.
  - Protection R&S is counted only once for the worker (based on case) no matter how many children in the household have this service.
  - Protection COR is counted only once for the worker (based on case) no matter how many children in the household have this service.
  - Protection COS is counted only once for the worker (based on case) no matter how many children in the household have this service.  Also, if there is more than one county with a Protection COS service, the minutes/units will be divided by the number of counties.
    - For example, child 1 has Worker A and county A as the service county, child 2 has Worker B and county B as the service county and child 3 has Worker C and county C as the service county, the minutes/units for the Protection COS will be divided equally by 3 and the result counted for each worker with the Protection COS service.

6/24/2014

DHS
364524

# AR1K - Direct Service Workload

- Prevention R&S service is always counted if it is the only direct service for any household member.  Only one Prevention R&S is counted for a worker no matter how many adults in the household have this service.
- Prevention R&S is counted once for a worker if there is a child less than 18 years of age that has no direct service.  (Other children in the household may have Placement or Protection services)
- Prevention COR service is always counted if it is the only direct service for any household member.
- Prevention COR is counted once for a worker if there is a child less than 18 years of age that has no direct service.  (Other children in the household may have Placement or Protection services)
- Prevention COS is counted once for a worker no matter how many adults in the household have this service.

o  <u>Intake</u>: The services or activities in Intake (formerly labeled Other) are calculated on an ongoing basis, not completed activities. So if a worker has an Investigation 3 open on their caseload at a given point in time, the full 'minute/unit' amount associated with that activity is assigned. These activities are all measured on an ongoing basis, so the calculation will be based on the number of open cases assigned (by intake date and screening supervisor decision date) at the point in time **of the parameter "day" is set** and the full minutes/units allotted. General Intakes and Case Management Intakes (defined as a short duration activities) will be calculated by adding the number of open cases and the number of opened and closed cases on the parameter "day" set. So if on the parameter "day" set, one intake was opened but not closed, and two intakes were opened AND closed, the report will reflect a number of '3'. These are all found in the Intake Module. Services/activities in this Intake category includes:

- ICPC Application (by intake date)          282mins            4.1units
- Investigation Level 2 (by investigation)        484mins         7.0units
- Investigation Level 3 (by investigation)        484mins         7.0units
- General Intake (by intake)          59mins            0.9units
  - General Intake will include intakes labeled in the Intake log as: ANE, I&R, and Vol/Chins/SafeBaby
- Case Management Intake (by intake)        59mins          0.9units
- Court Order Relative App (by intake date)      282mins         4.1units
  - Please Note: This service is not supposed to be utilized anymore, but some workers still utilize the service code.

o  The number of 'units of measurement' should be determined for each Service Type (ie Direct Service, Intake) listed above.  Then that number is multiplied by the above minutes and by the units.  These amounts should be shown in separate columns.

- For example, if Worker A has 5 open Investigation Level 3's and 4 Placement COR's on their caseload, the report would read:

|  | # of Clients | Minute | Unit |
|---|---|---|---|
| Supervisor A | 9 | 3436 | 49.8 |
| Worker A | 9 | 3436 | 49.8 |

6/24/2014

DHS
364525

# AR1K - Direct Service Workload

|  |  |  |  |
|---|---|---|---|
| Direct Service Placement COR | 4 | 1016 | 14.8 |
| Intake |  |  |  |
| -    Investigation 3 | 5 | 2420 | 35 |

- ▪ The Fine Detail Report will Also include the Names (child, head of household, depending on service type) and ID numbers for each Activity

|  | # of Clients | Minute | Unit |
|---|---|---|---|
| Supervisor A | 9 | 3436 | 49.8 |
| Worker A | 9 | 3436 | 49.8 |
| Direct Service |  |  |  |
| -    Placement COR | 4 | 1016 | 14.8 |
| David/321 |  |  |  |
| Arnie/432 |  |  |  |
| Johns/543 |  |  |  |
| Tope/654 |  |  |  |
| Intake |  |  |  |
| -    Investigation 3 | 5 | 2420 | 35 |
| Jones/123 |  |  |  |
| Smith/234 |  |  |  |
| Peck/345 |  |  |  |
| Toms/456 |  |  |  |
| Art/567 |  |  |  |

- o A Worker's Total should be shown for each worker for Services/Activities, Minutes and Units.
- o This MSA requirement looks at the number/percentage of workers that are under the number of minutes allowed (6960 or 100 units), have more than 2 times the 6960 total minutes allowed (13920 minutes) or 2 times 100 units (200 units), or have more than 3 times the 6960 total minutes allowed (20880 minutes) or 3 times 100 units (300 units).  These are all indicated with a (Y/N) on the report

- • Fine Detail Report
  - o Title of Report: 'AR1K- Direct Service Workloads Exceeding 2X the Required Minutes, County-Fine Detail'(CSF 062414)
  - o Supervisor
    - ▪ Total Number of Workers assigned to Supervisor
    - ▪ Total Number of Clients, Minutes/Units for Supervisors Unit (sum of mins/units for all workers assigned to that Supervisor)
  - o Worker. For each worker (under assigned Supervisor's name, grouped by service type in the following order: Direct Service and(CSF 062414) Intake. If a worker has minutes in multiple service type categories, organize worker based on the first service type they have to show in the above order list:

# AR1K - Direct Service Workload

- Job Title (CSF 062414)
  - Report abbreviations of job titles as follows:
    - RD,(CSF 062614)
    - ASWS,
    - FPWI
    - FPWII
    - FPS
    - FPSSr
    - FPSA
- Total Number of Minutes and Units
- Each Service Type the worker performs (as described above)
  - The number of clients/activities for the worker in each service type and the total number of minutes/units.[2]
  - The Names and IDs for each client under the service type
  - Each service type will show in a separate row, with a number for minutes and units in separate columns
- Under 6960/100 (Y if Yes, N if No)
- Exceed 6960/100 but less than 13920 (Y if Yes, N if No)
- Exceed 13920/200 but less than 20880 (Y if Yes, N if No)
- Exceed 20880/300 (Y is Yes, N if No)
- Between 100-125 Units (Y is Yes, N is No)
- Short Duration Activities Opened but Not Completed
- Short Duration Activities Completed
- Count Summary:
  - MSA Related Summary Results
    - Total Workers under 6960/100 – this is the sum of all workers who are under 6960 minutes or 100 units on his/her workload. Also the percentage of workers under 6960 and 100 units should be shown (based on the Y indicator in the detail).
    - Total Workers over 6960 minutes or/100 workload units but less than 13920 minutes or/200 workload units– this is the sum of all workers who have over 6960 or 100 units on his/her workload. Also the percentage of workers over 6960 or 100 units should be shown (based on the Y indicator in the detail).
    - Total Worker 2X over (13920 minutes or/200 workload units) but less than 20880  – this is the sum of all workers who have over 2 times 6960 minutes or 2 times 100 units. Also the percentage of workers 2 times over 6960 minutes or 2 times 100 units should be shown (based on the Y indicator in the detail)
    - Total Worker 3X over (20880 minutes or/300 workload units) – this is the sum of all workers who have over 3 times 6960 minutes or 3 times 100 units.  Also the

---

[2] For example: If a worker has two ICPC applications on parameter day report is run, under the workers name it will say 'ICPC application', '2', '564minutes/8.2units'

DHS
364527

# AR1K - Direct Service Workload

percentage of workers 3 times over 6960 minutes or 3 times 100 units should be shown (based on the Y indicator in the detail)
- Total Supervisors with workloads. (CSF 062614)
  - o Include ASWS with workloads (MPIN_OCCUP_CODE = 3745) (CSF 062614)
  - o Include RD's with workloads (MPIN_OCCUP_CODE = 3754) (CSF 062614)
- Additional Summary Results(CSF 062414)
  - Total Workers – this should only include workers with a Unit Title of Direct Service and the job titles of Family Protection Worker I, Family Protection Worker II, Family Protection Specialist, Family Protection Specialist Senior or Family Protection Specialist Advanced(CSF 062414)
  - Total Services/Activities – this is the sum of all the Services/Activities for the county. (from # of Clients column). This should only include workers with a Unit Title of Direct Service with the job titles of *Social Serv Regional Dir (CSF 062614),* ASWS, Family Protection Worker I, Family Protection Worker II, Family Protection Specialist, Family Protection Specialist Senior or Family Protection Specialist Advanced(CSF 062414)
  - Total Minutes – this is the sum of all the minutes for the county (this should only include workers with a Unit Title of Direct Service with the job titles of *Social Serv Regional Dir (CSF 062614),* ASWS, Family Protection Worker I, Family Protection Worker II, Family Protection Specialist, Family Protection Specialist Senior or Family Protection Specialist Advanced). (CSF 062414)
  - Total Units – this is the sum of all the units for the county. (this should only include workers with a Unit Title of Direct Service with the job titles of *Social Serv Regional Dir (CSF 062614),* ASWS, Family Protection Worker I, Family Protection Worker II, Family Protection Specialist, Family Protection Specialist Senior or Family Protection Specialist Advanced) (CSF 062414)
  - Total Workers between 100-125 Units (this should only include workers with a Unit Title of Direct Service with the job titles of *Social Serv Regional Dir (CSF 062614),* ASWS, Family Protection Worker I, Family Protection Worker II, Family Protection Specialist, Family Protection Specialist Senior or Family Protection Specialist Advanced) (CSF 062414)
  - Workers Needed to Cover Workload– this is the Total Minutes **divided** by 6960 and rounded up. (this should only include workers with a Unit Title of Direct Service with the job titles of *Social Serv Regional Dir (CSF 062614),* ASWS, Family Protection Worker I, Family Protection Worker II, Family Protection Specialist, Family Protection Specialist Senior or Family Protection Specialist Advanced) (CSF 062414)
  - Additional workers needed to meet need- Workers Needed to Cover Workload **Minus** Total Number of Workers. (this should only include workers with a Unit Title of Direct Service with the job titles of *Social Serv Regional Dir (CSF 062614),* ASWS, Family Protection Worker I, Family Protection Worker II, Family Protection Specialist, Family Protection Specialist Senior or Family Protection Specialist Advanced) (CSF 062414)
- Detailed Report

6/24/2014                                                    DHS
                                                           364528

# AR1K - Direct Service Workload

- o Title of Report: 'AR1K – Direct Service Workloads Exceeding 2X the Required Minutes, County-Detail'(CSF 062414)
- o Supervisor
  - Total Number of Workers assigned to Supervisor
  - Total Number of Clients, Minutes/Units for Supervisors Unit (sum of mins/units for all workers assigned to that Supervisor)
- o Worker. For each worker (under assigned Supervisor's name grouped by service type in the following order: Direct Service and Intake. If a worker has minutes in multiple service type categories, organize worker based on the first service type they have to show in the above order) list:
  - Total Number of Minutes and Units
  - Each Service Type the worker performs (as described above)
    - The number of clients/activities for the worker in each service type and the total number of minutes/units.[3]
    - Each service type will show in a separate row, with a number for minutes and units in separate columns
  - Under 6960/100 (Y if Yes, N if No)Exceed 6960/100 but less than 13920 (Y if Yes, N if No)
  - Exceed 13920/200 but less than 20880 (Y if Yes, N if No)
  - Exceed 20880/300 (Y is Yes, N if No)
  - Between 100-125 Units (Y is Yes, N is No)
  - Short Duration Activities Opened But Not Completed
  - Short Duration Activities Completed
- o Count Summary
  - MSA Related Summary Results
    - Total Workers under 6960/100 – this is the sum of all workers who are under 6960 minutes or 100 units on his/her workload. Also the percentage of workers under 6960 and 100 units should be shown (based on the Y indicator in the detail).
    - Total Workers over 6960 minutes or/100 workload units but less than 13920 minutes or/200 workload units– this is the sum of all workers who have over 6960 minutes or 100 units on his/her workload. Also the percentage of workers over 6960 or 100 units should be shown (based on the Y indicator in the detail).
    - Total Worker 2X over (13920 minutes or/200 workload units) but less than 20880 – this is the sum of all workers who have over 2 times 6960 minutes or 2 times 100 units. Also the percentage of workers 2 times over 6960 minutes or 2 times 100 units should be shown (based on the Y indicator in the detail)
    - Total Worker 3X over (20880 minutes or/300 workload units) – this is the sum of all workers who have over 3 times 6960 minutes or 3 times 100 units. Also the percentage of workers 3 times over 6960 minutes or 3 times 100 units should be shown (based on the Y indicator in the detail)
    - Total Supervisors with workloads. (CSF 062614)

---

[3] For example: If a worker has two ICPC applications open on parameter day report is run, under the workers name it will say 'ICPC application', '2', '564minutes/8.2units'

## AR1K - Direct Service Workload

- o Include ASWS with workloads (MPIN_OCCUP_CODE = 3745) (CSF 062614)
- o Include RD's with workloads (MPIN_OCCUP_CODE = 3754) (CSF 062614)
- ▪ Additional Summary Results(CSF 062414)
  - Total Workers – this should only include workers with a Unit Title of Direct Service and the job titles of Family Protection Worker I, Family Protection Worker II, Family Protection Specialist, Family Protection Specialist Senior or Family Protection Specialist Advanced(CSF 062414)
  - Total Services/Activities – this is the sum of all the Services/Activities for the county. (from # of Clients column).  This should only include workers with a Unit Title of Direct Service with the job titles of *Social Serv Regional Dir (CSF 062614),* ASWS, Family Protection Worker I, Family Protection Worker II, Family Protection Specialist, Family Protection Specialist Senior or Family Protection Specialist Advanced(CSF 062414)
  - Total Minutes – this is the sum of all the minutes for the county (this should only include workers with a Unit Title of Direct Service (CSF 062414) with the job titles of *Social Serv Regional Dir (CSF 062614),* ASWS, Family Protection Worker I, Family Protection Worker II, Family Protection Specialist, Family Protection Specialist Senior or Family Protection Specialist Advanced).
  - Total Units – this is the sum of all the units for the county. (this should only include workers with a Unit Title of Direct Service with the job titles of *Social Serv Regional Dir (CSF 062614),* ASWS, Family Protection Worker I, Family Protection Worker II, Family Protection Specialist, Family Protection Specialist Senior or Family Protection Specialist Advanced) (CSF 062414)
  - Total Workers between 100-125 Units (this should only include workers with a Unit Title of Direct Service with the job titles of *Social Serv Regional Dir (CSF 062614),* ASWS, Family Protection Worker I, Family Protection Worker II, Family Protection Specialist, Family Protection Specialist Senior or Family Protection Specialist Advanced) (CSF 062414)
  - Workers Needed to Cover Workload– this is the Total Minutes *divided* by 6960 and rounded up.  (this should only include workers with a Unit Title of Direct Service with the job titles of *Social Serv Regional Dir (CSF 062614),* ASWS, Family Protection Worker I, Family Protection Worker II, Family Protection Specialist, Family Protection Specialist Senior or Family Protection Specialist Advanced) (CSF 062414)
  - Additional workers needed to meet need- Workers Needed to Cover Workload *Minus* Total Number of Workers. (this should only include workers with a Unit Title of Direct Service with the job titles of *Social Serv Regional Dir (CSF 062614),* ASWS, Family Protection Worker I, Family Protection Worker II, Family Protection Specialist, Family Protection Specialist Senior or Family Protection Specialist Advanced) (CSF 062414)

- Region/StatewideSummary:
  - o Title of Report: ''AR1K – Direct Service Workloads Exceeding 2X the Required Minutes-Regional/Statewide(CSF 062414)

6/24/2014

# AR1K - Direct Service Workload

- MSA Related Summary Results
  - Total Workers under 6960/100 – this is the sum of all workers who are under 6960 minutes or 100 units on his/her workload.  Also the percentage of workers under 6960 and 100 units should be shown (based on the Y indicator in the detail).
  - Total Workers over 6960 minutes or/100 workload units but less than 13920 minutes or/200 workload units– this is the sum of all workers who have over 6960 minutes or 100 units on his/her workload.  Also the percentage of workers over 6960 or 100 units should be shown (based on the Y indicator in the detail).
  - Total Worker 2X over (13920 minutes or/200 workload units) but less than 20880 – this is the sum of all workers who have over 2 times 6960 minutes or 2 times 100 units.  Also the percentage of workers 2 times over 6960 minutes or 2 times 100 units should be shown (based on the Y indicator in the detail)
  - Total Worker 3X over (20880 minutes or/300 workload units) – this is the sum of all workers who have over 3 times 6960 minutes or 3 times 100 units.  Also the percentage of workers 3 times over 6960 minutes or 3 times 100 units should be shown (based on the Y indicator in the detail)
  - Total Supervisors with workloads. (CSF 062614)
    - Include ASWS with workloads (MPIN_OCCUP_CODE = 3745) (CSF 062614)
    - Include RD's with workloads (MPIN_OCCUP_CODE = 3754) (CSF 062614)

- Additional Summary Results (CSF 62414)
  - Total Workers – this should only include workers with a Unit Title of Direct Service and the job titles of Family Protection Worker I, Family Protection Worker II, Family Protection Specialist, Family Protection Specialist Senior or Family Protection Specialist Advanced(CSF 062414)
  - Total Services/Activities – this is the sum of all the Services/Activities for the county. (from # of Clients column).  This should only include workers with a Unit Title of Direct Service with the job titles of *Social Serv Regional Dir (CSF 062614),* ASWS, Family Protection Worker I, Family Protection Worker II, Family Protection Specialist, Family Protection Specialist Senior or Family Protection Specialist Advanced(CSF 062414)
  - Total Minutes – this is the sum of all the minutes for the county (this should only include workers with a Unit Title of Direct Service  with the job titles of *Social Serv Regional Dir (CSF 062614),* ASWS, Family Protection Worker I, Family Protection Worker II, Family Protection Specialist, Family Protection Specialist Senior or Family Protection Specialist Advanced). (CSF 062414)
  - Total Units – this is the sum of all the units for the county. (this should only include workers with a Unit Title of Direct Service with the job titles of ASWS, Family Protection Worker I, Family Protection Worker II, Family Protection Specialist, Family Protection Specialist Senior or Family Protection Specialist Advanced) (CSF 062414)
  - Total Workers between 100-125 Units (this should only include workers with a Unit Title of Direct Service with the job titles of *Social Serv Regional Dir (CSF 062614),* ASWS,

DHS
364531

# AR1K - Direct Service Workload

Family Protection Worker I, Family Protection Worker II, Family Protection Specialist, Family Protection Specialist Senior or Family Protection Specialist Advanced) (CSF 062414)

- Workers Needed to Cover Workload– this is the Total Minutes *divided* by 6960 and rounded up. (this should only include workers with a Unit Title of Direct Service with the job titles of *Social Serv Regional Dir (CSF 062614),* ASWS, Family Protection Worker I, Family Protection Worker II, Family Protection Specialist, Family Protection Specialist Senior or Family Protection Specialist Advanced) (CSF 062414)

- Additional workers needed to meet need- Workers Needed to Cover Workload *Minus* Total Number of Workers. (this should only include workers with a Unit Title of Direct Service with the job titles of *Social Serv Regional Dir (CSF 062614),* ASWS, Family Protection Worker I, Family Protection Worker II, Family Protection Specialist, Family Protection Specialist Senior or Family Protection Specialist Advanced) (CSF 062414)Statewide Summary: (Exclude carve-out counties - Hancock, Harrison, Jackson and Hinds)
  - MSA Related Summary Results

    - Total Workers under 6960/100 (excluding carve-out counties(CSF 062414)– this is the sum of all workers who are under 6960 minutes or 100 units on his/her workload. Also the percentage of workers under 6960 and 100 units should be shown (based on the Y indicator in the detail).
    - Total Workers over 6960 minutes or/100 workload units but less than 13920 minutes or/200 workload units (excluding carve-out counties(CSF 062414)– this is the sum of all workers who have over 6960 minutes or 100 units on his/her workload. Also the percentage of workers over 6960 or 100 units should be shown (based on the Y indicator in the detail).
    - Total Worker 2X over (13920 minutes or/200 workload units) but less than 20880 (excluding carve-out counties(CSF 062414) – this is the sum of all workers who have over 2 times 6960 minutes or 2 times 100 units. Also the percentage of workers 2 times over 6960 minutes or 2 times 100 units should be shown (based on the Y indicator in the detail)
    - Total Worker 3X over (20880 minutes or/300 workload units) (excluding carve-out counties(CSF 062414) – this is the sum of all workers who have over 3 times 6960 minutes or 3 times 100 units. Also the percentage of workers 3 times over 6960 minutes or 3 times 100 units should be shown (based on the Y indicator in the detail)
    - Total Supervisors with workloads. (excluding carve-out counties (CSF 62414)
      - Include ASWS with workloads (MPIN_OCCUP_CODE = 3745) (CSF 062614)
      - Include RD's with workloads (MPIN_OCCUP_CODE = 3754) (CSF 062614)
  - Additional Summary Results (CSF 62414)
    - Total Workers (excluding COC) – this should only include workers with a Unit Title of Direct Service and the job titles of Family Protection Worker I, Family Protection Worker II, Family Protection Specialist, Family Protection Specialist Senior or Family Protection Specialist Advanced(CSF 062414)

DHS
364532

# AR1K - Direct Service Workload

- Total Services/Activities (excluding COC – this is the sum of all the Services/Activities for the county. (from # of Clients column). This should only include workers with a Unit Title of Direct Service with the job titles of *Social Serv Regional Dir (CSF 062614),* ASWS, Family Protection Worker I, Family Protection Worker II, Family Protection Specialist, Family Protection Specialist Senior or Family Protection Specialist Advanced(CSF 062414)

- Total Minutes (excluding COC) – this is the sum of all the minutes for the county (this should only include workers with a Unit Title of Direct Service with the job titles of *Social Serv Regional Dir (CSF 062614),* ASWS, Family Protection Worker I, Family Protection Worker II, Family Protection Specialist, Family Protection Specialist Senior or Family Protection Specialist Advanced). (CSF 062414)

- Total Units (excluding COC) – this is the sum of all the units for the county. (this should only include workers with a Unit Title of Direct Service with the job titles of *Social Serv Regional Dir (CSF 062614),* ASWS, Family Protection Worker I, Family Protection Worker II, Family Protection Specialist, Family Protection Specialist Senior or Family Protection Specialist Advanced) (CSF 062414)

- Total Workers between 100-125 Units (excluding COC)  - this should only include workers with a Unit Title of Direct Service with the job titles of *Social Serv Regional Dir (CSF 062614),* ASWS, Family Protection Worker I, Family Protection Worker II, Family Protection Specialist, Family Protection Specialist Senior or Family Protection Specialist Advanced) (CSF 062414)

- Workers Needed to Cover Workload– this is the Total Minutes **divided** by 6960 and rounded up. (excluding COC) -  this should only include workers with a Unit Title of Direct Service with the job titles of *Social Serv Regional Dir (CSF 062614),* ASWS, Family Protection Worker I, Family Protection Worker II, Family Protection Specialist, Family Protection Specialist Senior or Family Protection Specialist Advanced) (CSF 062414)

Additional workers needed to meet need- Workers Needed to Cover Workload **Minus** Total Number of Workers. (excluding COC) - this should only include workers with a Unit Title of Direct Service with the job titles of *Social Serv Regional Dir (CSF 062614),* ASWS, Family Protection Worker I, Family Protection Worker II, Family Protection Specialist, Family Protection Specialist Senior or Family Protection Specialist Advanced) (CSF 062414)

# AR1K - Direct Service Workload

Region X

AR1K- Direct Service Workloads Exceeding 2X the *Required* Minutes, County-Detail'

County X

27-Jun-    2013

| ASWS Supervisor A | Worker | Job Title(CSF 062414) | Service Type | # of Clients | Minutes | Units | Under 6960/ 100 | 6960/100< 13920/ 200 | 13920/ 200< 20880/300 | Exceed 20880/ 300 | Bet. 100-125 Units | Short Duration Open | Short Duration Completed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 51 | 11632 | 167.8 | | | | | | | |
| | Worker A | FPWI | | 11 | 3554 | 51.6 | Y | N | N | N | N | | |
| | | | Direct Service Placement | | | | | | | | | | |
| | | | COR | 4 | 1016 | 14.8 | | | | | | | |
| | | | Intake | | | | | | | | | | |
| | | | Investigation 3 | 5 | 2420 | 35 | | | | | | | |
| | | | Case Mngt Intake | 2 | 118 | 1.8 | | | | | | | |
| | Worker B | FPWI | | 40 | 8078 | 116.2 | N | Y | N | N | Y | | |
| | | | Direct Service Placement | | | | | | | | | | |
| | | | COR | 30 | 4200 | 60 | | | | | | | |
| | | | Protective Serv | 8 | 3760 | 54.4 | | | | | | | |
| | | | ICPC Outgoing | 2 | 118 | 1.8 | | | | | | | |

County X Summary

| | Number | Percent |
|---|---|---|
| **MSA Related Summary Results** | | |
| Total Workers under 6960/100 | 1 | 50% |
| Total Workers Over 6960 Under 13920 | 1 | 50% |
| Total Workers Over 13920 Under 20880 | 0 | 0% |
| Total Workers Over 20880 | 0 | 0% |
| Total Supervisors with workloads | 0 | 0% (CSF 062414(\ |

**Additional Summary Results**

6/24/2014    DHS 364534

## AR1K - Direct Service Workload

| | | |
|---|---|---|
| Total workers | 2 | |
| Total Services/Activities | 51 | |
| Total Minutes | 11632 | |
| Total Units | 167.8 | |
| Total Workers between 100-125 Units | 1 | 50% |
| Workers Needed to Cover Load | 2 | |
| Add'l Workers Needed | 0 | |

6/24/2014

DHS
364535

# AR1K - Direct Service Workload

| Region X | | | AR1K- Direct Service Workloads Exceeding 2X the Required Minutes, County-Detail' | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| County X | | | | | 27-Jun- | 2013 | | | | | | |

| ASWS | Worker | Job Title(CSF 062414) | Service Type | # of Clients | Minutes | Units | Under 6960/ 100 | 6960/100< 13920/ 200 | 13920/ 200< 20880/300 | Exceed 20880/ 300 | Bet. 100-125 Units | Short Duratio Open |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Supervisor A | | | | 51 | 11632 | 167.8 | | | | | | |
| | Worker A | FPWII | | 11 | 3554 | 51.6 | Y | N | N | N | N | |
| | | | Direct Service | | | | | | | | | |
| | | | Placement COR | 4 | 1016 | 14.8 | | | | | | |
| | | | Child A/123 | | | | | | | | | |
| | | | Child B/234 | | | | | | | | | |
| | | | Child C/345 | | | | | | | | | |
| | | | Child D/456 | | | | | | | | | |
| | | | Intake | | | | | | | | | |
| | | | Investigation 3 | 5 | 2420 | 35 | | | | | | |
| | | | Inv A/121 | | | | | | | | | |
| | | | Inv B/232 | | | | | | | | | |
| | | | Inv C/343 | | | | | | | | | |
| | | | Inv D/454 | | | | | | | | | |
| | | | Inv E/565 | | | | | | | | | |
| | | | Case Mngt Intake | 2 | 118 | 1.8 | | | | | | |

6/24/2014

DHS
364536

## AR1K - Direct Service Workload

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Intake A/989 | | | | | | | | | |
| | | Intake B/878 | | | | | | | | | |
| Worker B | FPWII | | 40 | 8078 | 116.2 | N | Y | N | N | Y | |
| | | **Direct Service** | | | | | | | | | |
| | | Placement COR | 30 | 4200 | 60 | | | | | | |
| | | Child A/111 | | | | | | | | | |
| | | Child B/112 | | | | | | | | | |
| | | Child C/113 | | | | | | | | | |
| | | Child D/114 | | | | | | | | | |
| | | Child E/115 | | | | | | | | | |
| | | Child F/116 | | | | | | | | | |

| ASWS | Worker | Job Title(CSF 062414) | Service Type | # of Clients | Minutes | Units | Under 6960/ 100 | 6960/100< 13920/ 200 | 13920/ 200< 20880/300 | Exceed 20880/ 300 | Bet. 100-125 Units | Short Duratio Open |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Child G/117 | | | | | | | | | |
| | | | Child H/118 | | | | | | | | | |
| | | | Child I/119 | | | | | | | | | |
| | | | Child J/120 | | | | | | | | | |
| | | | Child K/121 | | | | | | | | | |
| | | | Child L/122 | | | | | | | | | |

6/24/2014

DHS
364537

# AR1K - Direct Service Workload

| | | | |
|---|---|---|---|
| Child M/123 | | | |
| Child N/124 | | | |
| Child O/125 | | | |
| Child P/126 | | | |
| Child Q/127 | | | |
| Child R/128 | | | |
| Child S/129 | | | |
| Child T/130 | | | |
| Child U/131 | | | |
| Child V/132 | | | |
| Child W/133 | | | |
| Child X/134 | | | |
| Child Y/135 | | | |
| Child Z/136 | | | |
| Child AA/137 | | | |
| Child BB/138 | | | |
| Child CC/139 | | | |
| Child DD/140 | | | |
| Protective Serv | 8 | 3760 | 54.4 |
| Case EE/141 | | | |
| Case FF/142 | | | |

DHS
364538

# AR1K - Direct Service Workload

Case GG/143

Case HH/144

Case II/145

| ASWS | Worker | Job Title(CSF 062414) | Service Type | # of Clients | Minutes | Units | Under 6960/ 100 | 6960/100< 13920/ 200 | 13920/ 200< 20880/300 | Exceed 20880/ 300 | Bet. 100-125 Units | Short Duratio Open |
|------|--------|----------------------|--------------|--------------|---------|-------|-----------------|---------------------|----------------------|-------------------|--------------------|--------------------|
| | | | Case JJ/146 | | | | | | | | | |
| | | | Case KK/147 | | | | | | | | | |
| | | | Case LL/148 | | | | | | | | | |
| | | | ICPC Outgoing | 2 | 118 | 1.8 | | | | | | |
| | | | ChildEE/222 | | | | | | | | | |
| | | | ChildFF/333 | | | | | | | | | |

**Region /Statewide Summary**

| | Number | Percent | |
|---|--------|---------|---|
| **MSA Related Summary Results** | | | |
| Total Workers under 6960/100 | 1 | 50% | |
| Total Workers Over 6960 Under 13920 | 1 | 50% | |
| Total Workers Over 13920 Under 20880 | 0 | 0% | |
| Total Workers Over 20880 | 0 | 0% | |
| Total Supervisors with workloads | 0 | 0% | (CSF 062414) |
| **Additional Summary Results** | | | |
| Total workers | 2 | | |

6/24/2014

DHS
364539

# AR1K - Direct Service Workload

| | | |
|---|---|---|
| Total Services/Activities | 51 | |
| Total Minutes | 11632 | |
| Total Units | 167.8 | |
| Total Workers between 100-125 Units | 1 | 50% |
| Workers Needed to Cover Load | 2 | |
| Add'l Workers Needed | 0 | |

# AR1K - Direct Service Workload

| Statewide Summary (Exclude carve-out counties - Hancock, Harrison, Jackson and Hinds) | Number | Percent | |
|---|---|---|---|
| **MSA Related Summary Results** | | | |
| Total Workers under 6960/100 (excluding COC) | 1 | 50% | |
| Total Workers Over 6960 Under 13920 (excluding COC) | 1 | 50% | |
| Total Workers Over 13920 Under 20880 (excluding COC) | 0 | 0% | |
| Total Workers Over 20880 (excluding COC) | 0 | 0% | |
| Total Supervisors with workloads (excluding COC) | 0 | 0% | (CSF 062414) |
| **Additional Summary Results** | | | |
| Total workers (excluding COC) | 2 | | |
| Total Services/Activities (excluding COC) | 51 | | |
| Total Minutes (excluding COC) | 11632 | | |
| Total Units (excluding COC) | 167.8 | | |
| Total Workers between 100-125 Units (excluding COC) | 1 | 50% | |
| Workers Needed to Cover Load (excluding COC) | 2 | | |
| Add'l Workers Needed (excluding COC) | 0 | | |

# App. B, Ex. 3B

**Mississippi Child Welfare Practice Model Implementation Project Summary**

**Introduction**

This report will cover the activities of CSF staff and the DHS Practice Coaches as it relates to the overall implementation of the Child Welfare Practice Model for the month of August 2013.

# REDACTED

*Monthly Status Report- Practice Model Implementation*

# REDACTED

*Region I-North Coaching Activities*

# REDACTED

CSF Practice Coach Varrie Richmond conducted the small group session with eight supervisors during the month of August. During the group session it was necessary to allow the participants to process the frustrations they were currently experiencing regarding their work. The Resource Unit and at least one other county are understaffed and are feeling the burden of working over an extended period of time with large workloads and minimal staff. They discussed both the things that were out of their control and those that they did have some control over. They also discussed Module Two and what they had taken away from the training which they can apply to their day to day work.

# App. B, Ex. 3C

*Monthly Status Report- Practice Model Implementation*

---

**Mississippi Child Welfare Practice Model Implementation Project Summary**

**Introduction**

This report will cover the activities of CSF staff and the DHS Practice Coaches as it relates to the overall implementation of the Child Welfare Practice Model for the month of September 2013.

# REDACTED

---

*Monthly Status Report- Practice Model Implementation*

REDACTED

Concerns/Barriers

REDACTED

- Some regions continue to report a shortage of staff and/or supervisors.

REDACTED

# App. B, Ex. 3D

**Mississippi Child Welfare Practice Model Implementation Project Summary**
**Introduction**

This report will cover the activities of CSF staff and the DHS Practice Coaches as it relates to the overall implementation of the Child Welfare Practice Model for the month of November 2013.

# REDACTED

*Monthly Status Report- Practice Model Implementation*

**Feedback from Coaches- Strengths and Concerns**

REDACTED

**Concerns/Barriers**

REDACTED

- Region VI is experiencing low morale throughout the region. The Supervisors have expressed a desire for a well-thought out plan on how to address vacancies and help raise the morale of the staff.

REDACTED

- Region V-E has had several supervisory vacancies (with available pins) for an extended period of time which is resulting in existing supervisors feeling overwhelmed and stressed. Attention needs to be focused on filling these positions promptly.

# App. B, Ex. 3E

*Monthly Status Report- Practice Model Implementation*

**Mississippi Child Welfare Practice Model Implementation Project Summary**
**Introduction**

This report will cover the activities of CSF staff and the DHS Practice Coaches as it relates to the overall implementation of the Child Welfare Practice Model for the month of December 2013.

**Training/Staff Development**

The following training sessions or coaching labs were delivered during the month of December:

| Name of Training/Lab | Region/ County | Date(s) | Facilitated by | Approximate Number of Participants |
|---|---|---|---|---|
| Quality Visits | I-S | 12/4, 12/5, 12/11, 12/17. 12/18 & 12/19 | Cristina Boone and Tamara Roberts | 76 |
| Safety Assessment Framework | II West | 12/4 & 12/5 | Cindi Manuel and ReGina Hardiman | 20 |
| Safety Assessment Framework | VI | 12/10 & 12/11 | Margaret Baklini, Kendon Ellerman and Sandra Brown | 16 |
| Documentation | VII-East – Jackson County | 12/12 | Yvonne Willis and Blair Sullivan | 30 |
| Total DHS Staff trained | | | | 142 |

**Intensive Supervisory Training – Level Two and Three**

CSF staff is working on a draft outline for the Level Three training which will focus on the safety assessment framework and the supervisor's role in assuring staff are making appropriate safety decisions. The tentative plan is to begin delivering the training in April. The training will include a series of small group coaching labs followed by small group sessions to support the transfer of learning and application of the concepts introduced in the coaching lab. This series of coaching labs builds upon the Safety Assessment Framework Coaching lab which is currently being delivered by CSF and DHS coaches in each region.

*Monthly Status Report- Practice Model Implementation*

**Concerns/Barriers**

- Availability of appropriate placements for hard to place children/youth including youth with suicide attempt history, youth with runaway behaviors, child with low IQ, and youth with sexual acting out behavior.

- Supervisors in several regions continue to voice the concern regarding having the time to adequately supervise staff with so many supervisory vacancies.

- Continued concern regarding the goals and tasks not being linked to the Family Service Plan in MACWIS and some workers perceptions that because they are not required by MACWIS they don't have to be completed.  In some cases they rely on what the court orders or a verbal agreement between the worker and family for what the family needs to accomplish rather than utilizing the case planning process.

- MACWIS continues to be seen as a barrier to documentation.

- Supervisors who approve work to meet a deadline even when they recognize that the quality of the work is poor.

- One region reports that mileage reimbursement is approximately two months behind which is causing problems for some workers who are financially unable to keep gas in their car to make home visits.

- One supervisor noted that new workers did not receive access to MACWIS and/or agency email until later in the new employee training process which impacts the on the job training process.

- Many workers and supervisors continue to struggle with time management issues, which impacts the delivery of services and meeting timelines.

**Permanency Competencies**

As part of the monthly reports submitted by both the DHS and CSF Coaches we are now asking that they identify any activities which they facilitate to support the permanency competencies. The following are examples of their work which is linked to the achievement of permanency for the children in MS:

- Small group coaching to build skills in supportive supervision which should lead to a better trained, more stable front-line work force that can more effectively address permanency and well-being for children.

**App. B, Ex. 3F**

*Monthly Status Report- Practice Model Implementation*

**Mississippi Child Welfare Practice Model Implementation Project Summary**

**Introduction**

This report will cover the activities of CSF staff and the DHS Practice Coaches as it relates to the overall implementation of the Child Welfare Practice Model for the month of February 2014.

**Training/Staff Development**

The following training sessions or coaching labs were delivered during the month of February:

| Name of Training/Lab | Region/County | Date(s) | Facilitated by | Approximate Number of Participants |
|---|---|---|---|---|
| Safety Assessment Framework | V-W | 02/05/2014 | Cathy Welsh and Selisa Wilkinson | 17 |
| Safety Assessment Framework for Resource and Adoption Staff | V-W | 02/19/2014 | Cathy Welsh | 7 |
| Safety Assessment Framework | I-S | 02-24-02-27-2014 | Carolyn Townes, Cristina Boone, Tamara Roberts and Tawnya Langley | 113 |
| COA and Best Practice | III-S – Warren | 02-05-2014 | Carolyn Townes | 7 |
| | | | | |
| Total DHS Staff trained | | | | **144** |

**Ongoing Practice Model Support**

The following sections detail examples of the individual and group coaching which the CSF and DHS coaches conducted during the month of February. In addition to those activities the Coaches also participated in a wide range of practice related activities including but not limited to: adoption status meetings, Foster Care Reviews (FCR), Regional Staff Meetings, Regional Implementation Team Meetings, Regional CQI meetings, reviewers in a CQI annual review, practice related training, MAP Team Meetings, Permanency Roundtables, COA site preparation and Regional Meetings for the Diligent Recruitment Grant. Both CSF and DHS Coaches will begin to focus at least some of their time in each region on a review of the Comprehensive Family Assessment process and tool. The number of days of coaching for both CSF and DHS Coaches was impacted by the severe weather in Mississippi during the month of February.

DHS
363092

*Monthly Status Report- Practice Model Implementation*

- Workers not adequately nor correctly reflecting their interactions with families in MACWIS.

- Workers not being able to assign COS workers for their children and parents that are living in other counties because of high caseloads in the receiving county.

- Region I-N reports that law enforcement is not able to do verbal background children or formal background checks after hours which impacts placement with relatives.

- Severe lack of placement resources is a source of frustration for the staff and a disservice to the children. (Region III-S)

## Permanency Competencies

As part of the monthly reports submitted by both the DHS and CSF Coaches are now required to identify any activities which they facilitate to support the permanency competencies. The following are examples of their work which is linked to the achievement of permanency for the children in MS:

- The Resource Supervisor in Region V-W was interviewed by the local paper regarding the need to recruit resource homes and the article featured a resource family that has had a very positive experience and are actively engaged in shared parenting.

- Participation in the Permanency Roundtable process.

- Use of the Adoption Status Meetings to support permanency.

- Increased use of data reports to inform practice.

## Leadership, CQI and Other Activities

## State Office Management Support

Jerry Milner was onsite in Mississippi twice during the month – on February 4-6 in Region VII-West, and on February 18-20 in Jackson. During the visit to VII-West, CSF assisted the Region in developing the improvement plan required by the IP4 court order. Jerry met with supervisors in Harrison County to discuss performance indicators that would be the focus of the plan and to identify barriers to achieving the county's goals with regard to the indicators. He also developed a template for the plan. During this visit, Jerry also met with CSF coach in Hancock County, Lori Woodruff, to plan for ongoing coaching and mentoring in Hancock County, and met with Kim Shackelford in Harrison County to discuss contracting issues. One potential change in the CSF contract

**App. B, Ex. 3G**

*Monthly Status Report- Practice Model Implementation*

**Mississippi Child Welfare Practice Model Implementation Project Summary**
**Introduction**

This report will cover the activities of CSF staff and the DHS Practice Coaches as it relates to the overall implementation of the Child Welfare Practice Model for the month of March 2014.

**Training/Staff Development**

The following training sessions or coaching labs were delivered during the month of March:

| Name of Training/Lab | Region/County | Date(s) | Facilitated by | Approximate Number of Participants |
|---|---|---|---|---|
| Safety Assessment Framework for Resource and Adoption | V-E | 3-26 | Cathy Welsh & Jayne Riley | 9 |
| CFA | IV-S | 03-27- | Pam Green | 8 |
| FTM | VII-W (Harrison) | 03-25 &26 | Sue Berry | 52 |
| Practice Model Training | VII-W (Harrison) | 3-20-3-21 | Jackie Purifoy, Rhoda McCovery, & Deena Asfour | 25 |
| Safety Assessment Framework | VII-E | 3-5 & 6 | Sue Berry & Blair Sullivan | 30 |
| COA and Best Practices | III-S | 3-24 | Carolyn Townes | 6 |
| Safety Assessment Framework | VII-W (Hancock) | 3-25 | Lori Woodruff | 6 |
| Total DHS Staff trained | | | | 111 |

Cindi Manuel worked with Jennifer Walker to identify the participants for the second delivery of Level Two Clinical Supervisory Training. The training will begin in April with three groups of the three modules being delivered between April and August. Small groups with specific activities and a pre-determined agenda will be convened to operationalize the key learnings from the training. The Level Three coaching labs are still under development and will be delivered beginning in June. The Train the Trainer session for the Level Three Coaching Labs is scheduled for May 28 – 29. A session for Regional Directors is scheduled for June 11th and a separate session for the Regional ASWS will be July 8th. These sessions will provide an overview of the labs.

DHS
363201

*Monthly Status Report- Practice Model Implementation*

- Observed a Supervisor do an excellent job with an Employee Conference in which she was able to verbalize the employee's failure to follow instructions while providing the information both verbally and in writing.

## Feedback from Coaches- Strengths and Concerns

### Strengths

- .More and more Workers are seeking the assistance of the Practice Coaches.

- Workers and Supervisors acknowledging the deficits in the completion of the CFA and their openness to learning more about the tool.

- More Workers are starting to use the CFA Instructional Guide as a tool to support the completion of a quality CFA.

- More Workers are using individualized agendas for the FTM.

- More Workers are making a serious effort to see their children timely and to complete thorough home visits.

### Concerns/Barriers

- In Region VII-East the CSF Practice Coach does not believe there is a commitment or a sense of urgency to correct identified practice deficits on the part of some Supervisors.

- Several regions are reporting staffing concerns.

- Time management continues to be a barrier for many Workers and Supervisors.

- MACWIS issues continue to cause delays and is a source of frustration for the staff.

- Supervisors are feeling pressure to meet the timeframes for CFAs and FSPs so they are concerned that if they pend either document back for corrections they run the risk of it being sent back for final approval late. They seem to more often go for timeliness rather than quality.

- Difficulty of finding an appropriate placement for teens with mental health issues and conduct problems.

- If a foster child is expelled from school there are limited options for education to keep the child from failing in school once he/she returns.

# App. B, Ex. 3H

**Mississippi Child Welfare Practice Model Implementation Project Summary**

**Introduction**

This report will cover the activities of CSF staff and the DHS Practice Coaches as it relates to the overall implementation of the Child Welfare Practice Model for the month of June 2014.

**Training/Staff Development**

The following training sessions or coaching labs were delivered during the month of April:

| Name of Training/Lab | Region/County | Date(s) | Facilitated by | Approximate Number of Participants |
|---|---|---|---|---|
| Level Three Overview for RDs | Statewide | 06-11 | Cindi Manuel and Pam Green | 12 |
| CFA | Region IV-South | 06-12 | Pam Green and Yvone Willis | 14 |
| Level Two Module Two | Statewide | 06-18 - 19, & 06-25-26 | Pam Green, Carolyn Townes, Sue Berry, Lori Woodruff | 31 |
| Safety Assessment Framework | Region III-North | 06-24 | Pam Green and Tawnya Langley | 9 |
| Level Three Module One | Statewide | Various dates through out the month | All CSF Coaches | 83 |
| FTM | Region VII-W (Hancock) | 06-19 | Lori Woodruff | 6 |
| From Practice Guide to Practice Implementation | Region VII-W (Hancock) | 06-30 | Lori Woodruff and Buffie Taylor | 25 |
| Tasks and Goals | Region VII-W (Hancock) | 6-20 & 6-27 | Jayne Riley | 22 |
| Linkages | Region VII-W (Hancock) | 06-24 | Jayne Riley and Buffie Taylor | 14 |
| CFA | Region VII-W (Hancock) | 06-27 | Jayne Riley | 4 |
| Practice Model | Region IV-S (Lauderdale) | 06-18,19 & 24 | Yvonne Willis | 10 |
| Practice Model Overview | Statewide | 06-16, 17,18 & 19 | Christina Boone, Sheila Nabors, Carla Holeman & | 140 (20 – 25 in each three hour |

DHS
363500

*Monthly Status Report- Practice Model Implementation*

- In Region VII-West and in Region VI (Forrest County) the instability of Supervisors, Workers, and caseloads continues to impact the delivery of services to the children and families.

- Supervisors need to become more comfortable with monitoring for compliance to assure children are safe.

- While some regions report more timely initiation of investigations the information is still not being put into MACWIS timely.

- Region VII-East's Coach voiced concerns that the Supervisors do not acknowledge difficulty with safety assessments, but when reviewed, they have been limited in scope and focused on the report of maltreatment.

## Permanency Competencies

**As part of the monthly reports submitted by both the DHS and CSF Coaches are now required to identify any activities which they facilitate to support the permanency competencies. The following are examples of their work which is linked to the achievement of permanency for the children in MS:**

- Small group activities, which promote thorough assessments, time management and critical thinking skills in order to promote achievement of permanency goals.

- Timely foster care reviews support the delivery of quality services.

- Strong emphasis on quality CFAs will support more timely and appropriate decision making.

- Assuring TPR packets are completed timely and correctly.

## Leadership, CQI and Other Activities

**State Office Management Support**
Jerry Milner participated in the State Implementation Team meetings on June 3 and June 24. He also participated in the CQI Sub-Team Meeting on June 4.

A good bit of time was spent in June on planning for the upcoming statewide supervisors' meeting in July, which CSF is planning through its contract with DHS. The meeting will occur on July 15 and 16 in Jackson. We worked on preparing the agenda, which will include the Teen Advisory Board presentation of a play and panel discussion, a session and small groups on fidelity measures to the practice model, and a discussion of successes and remaining challenges to practice model implementation.

CSF helped DHS in planning for potential IP5 regional activities, and in drafting sections of the Federal Comprehensive Family Services Plan (CFSP) for the next 5 years.

DHS
363517

# App. B, Ex. 3I

*Monthly Status Report- Practice Model Implementation*

**Mississippi Child Welfare Practice Model Implementation Project Summary**

**Introduction**

This report will cover the activities of CSF staff and the DHS Practice Coaches as it relates to the overall implementation of the Child Welfare Practice Model for the month of July 2014.

**Training/Staff Development**

The following training sessions or coaching labs were delivered during the month of July:

| Name of Training/Lab | Region/County | Date(s) | Facilitated by | Approximate Number of Participants |
|---|---|---|---|---|
| Statewide ASWS and Coaches Meeting | Statewide | July 15-July 16 | CSF, Kim Shackleford | 200 |
| Level 3, Module 2 | V-East | July 30th | Jayne Riley | 7 |
| Linkages Training | Simpson | July 23rd | Jayne Riley | 7 |
| Level 3, Module 1 | Hancock | July 31st | Jayne Riley | 1 |
| Level 3, Module 2 | VI | July 25th | Jayne Riley | 6 |
| Guide to Home Visits (Quality and Reqs per Policy) | Forrest | July 10th | Jayne Riley | 10 |
| Level 3, Module 2 | II-E | July 8th | Varrie Richmond | 3 |
| Level 3, Module 2 | I-North | July 10th | Varrie Richmond | 9 |
| Safety Assessment Framework Coaching Lab | III-North | July 24th | Tawnya Langley and Pam Green | 43 |
| Level 3 Overview for Regional ASWS Staff | Statewide | July 8th | Cathy Welsh and Pam Green | 14 |
| Level 3, Module 2 | V-West | July 28th | Cathy Welsh and Sue Berry | 7 |
| Level 3, Module 2 Make Up Session | V-West, V-East, VII-East, IV-South | July 29th | Cathy Welsh and Sue Berry | 8 |
| Level 3, Module 2 | VII-East | July 25th | Sue Berry | 9 |
| Level 3, Module 2 Learning Lab | III-South | July 11th | Carolyn Townes | 5 |
| Level 3, Module 2 Small Group | III-South | July 25th | Carolyn Townes | 5 |
| Total DHS Staff trained | | | | 334 |

*Monthly Status Report- Practice Model Implementation*

- Pam Cross, Regional ASWS, is providing strong leadership in VII-W, and Brigette Schupay is providing strong leadership for Region VI.

- ASWSs and workers are making case determinations and court recommendations based on the Practice Model and family-centered practice in Hancock County.

- Team work is becoming more evident across the units in this Hancock County. Staff are working together as a team.

- In Hancock County, two social workers from the resources unit have been promoted to supervisors. Khaalia Blanks will be a resource supervisor and Demetrist Nealous will be a front line supervisor. There are now five new supervisors, one of whom has staff assigned.

- In Region III-S, two new ASWSs have just finished their training and are ready to begin supervising. A third ASWS has just begun on-the-job-training. This is helping to move most of the ASWSs to be at or near the standard of five workers.

- Several practice coaches stressed that workers continue to show an interest and are making efforts to carry out best practices, desiring to do a better job in keeping children safe.

**Concerns/Barriers**

- Court demands and relationships with court continue to be a struggle in some Regions.

- Continued high caseloads and the need for additional staff has impacted several regions, manifesting itself in several ways including the DHS practice model coach assuming a caseload, monitoring and assigning new cases, consistency in supervisors for workers and workers for families, and the workers need for emotional support aimed at retention.

- Issues addressed by Council on Accreditation need to continue to be addressed, monitored and resolved.

- Some supervisors are sometimes more focused on meeting standards than on outcomes for families. They struggle with implementing changes in the way they practice and rarely show enthusiasm for their work.

- The lack of resource homes continues to be an issue in multiple Regions. Resource staff are working diligently to get expedited homes completed and there is not enough staff to complete regular home studies.

# App. B, Ex. 3J

**Mississippi Child Welfare Practice Model Implementation Project Summary**
**Introduction**

This report will cover the activities of CSF staff and the DHS Practice Coaches as it relates to the overall implementation of the Child Welfare Practice Model for the month of May 2014.

**Training/Staff Development**

The following training sessions or coaching labs were delivered during the month of May:

| Name of Training/Lab | Region/County | Date(s) | Facilitated by | Approximate Number of Participants |
|---|---|---|---|---|
| CFA | Region IV-South | 05-20-2014 | Pam Green and Yvone Willis | 17 |
| Safety Assessment Framework | Region IV-South | 05-22 & 05-27 | Pam Green and Yvone Willis | 35 |
| Safety Assessment Framework | Region V-E | 05-05 & 05-06 | Jayne Riley | 37 |
| Goals and Tasks | Region I-N | 05-15 | Varrie Richmond and Carla Holeman | 10 |
| Documentation | Region VII-W (Hancock) | 05-16 | Buffie Taylor | 9 |
| Documentation | Region VII-W (Harrison) | 05-22& 05-23 | Deena Asfour, Rhoda McCovery, Jacqueline Purifoy | 35 |
| TOT for Level Three | Statewide | 05-29-30 | Marge Gildner | 15 |
| | | | | |
| Total DHS Staff trained | | | | 158 |

**Ongoing Practice Model Support**

The following sections detail examples of the individual and group coaching which the CSF and DHS coaches conducted during the month of May. In addition to those activities the Coaches also participated in a wide range of practice related activities including but not limited to: adoption status meetings, Foster Care Reviews, case reviews as part of the monthly CQI process, Regional Staff Meetings, Regional CQI meetings, practice related training, MAP Team Meetings, Permanency Roundtables, Permanency Summits and preparation for COA site visits.

during the visit. The Worker asked the children about their last visit with their mother and assessed their developmental skills by asking questions regarding colors and shapes. The Worker also completed a walk-through of the home to assess for safety and risk concerns.



CSF Practice Coach Cindi Manuel, was unable to schedule the two groups during the month of May due to conflicts in both her schedule and the participants. The hours will be made up later in the contract year.

## Regions V-West and IV-North (Phase Two)

### *Region IV-North Coaching Activities*

The DHS Coach, Ryakko Williams, is currently on a 90 day special assignment as an acting supervisor in Lowndes County. Region I-S Practice Coach, Cristina Boone met with four Workers on an individual basis during the month of May. Examples of individual coaching activities included the following:

- Accompanied a Worker on a home visit to complete a physical home walk-through on an investigation. The Worker completed the Safety Checklist and did not identify any safety concerns. Afterwards the DHS Coach discussed with the Worker the importance of being aware of safety concerns as they may relate to the age group of the children.

- Observed a Worker facilitate a FTM which included an agenda and allowed for discussion by the participants. The Worker handled the FTM and the family's emotions appropriately. The meeting was informative and purposeful.

CSF Practice Coach Pam Green facilitated two small group sessions and met with the RD during the month of May. The RD, Iris Joiner, provided an update on staffing (Worker vacancies in three counties, one Supervisor is on special assignment in Forrest County and the DHS PMC is on a 90 day assignment as an Acting Supervisor in a county. The Region had been recently hit by a tornado so many of the staff were still working in emergency shelters. The RD asked that the CSF Coach provide some supportive coaching as many of the Supervisors are overwhelmed with all that has been happening.

As a result of the RD's request the initial time in the small groups focused on county updates and processing the Supervisor's reactions to the recent disaster. The groups then spent time participating in several role play scenarios which illustrated the importance and use of critical thinking skills. The group reports learning from the role play activities and demonstrated knowledge of the importance of supporting the Workers' development

DHS
363459

- More Workers are identifying a purpose for their monthly contacts rather than simply going out to "complete the monthly contact."

- Region III-South has been able to hire two case aides which has made a significant positive time-saving difference for the staff.

- Many CFAs are showing improvement as a result of the extra attention from Supervisors and Coaches.

**Concerns/Barriers**

-  Region VII-West continues to experience instability in their workforce which is directly impacting their ability to implement the practice model and provide appropriate and adequate services to families.

- Region VII-West (Hancock County) continues to deal with Court issues including the amount of time Workers and Supervisors must spend at the Court both during hearings but also the downtime in between cases.

- Vacancies in coaching positions and placing Coaches on special assignment as Supervisors or other positions impact the amount and level of coaching that is being delivered throughout the state.

- MACWIS issues continue to cause delays and frustration for the staff.

- Adoption staff in some regions voiced concern regarding the amount of required work that they do not believe is reflected in the workload units/minutes.

**Permanency Competencies**

As part of the monthly reports submitted by both the DHS and CSF Coaches  are now required to identify any activities which they facilitate to support the permanency competencies.   The following are examples of their work which is linked to the achievement of permanency for the children in MS:

- Thorough and timely CFAs which support better FSPs and better decisions regarding the family's strengths and needs.

- The small group activities which Supervisors are participating in are promoting through assessments, enhanced time management skills, critical thinking skills and the proper use of the FTM in order to promote the timely achievement of permanency goals.

DHS
363472

# App. B, Ex. 3K

# ACF PERFORMANCE PROGRESS REPORT
## COVER PAGE
### ACF-OGM-SF-PPR

| | Page 1 | of Pages 26 |
|---|---|---|

| 1.Federal Agency and Organization Element to Which Report is Submitted<br><br>Department of Health & Human Services<br>Administration for Children, Youth, and Families<br>Children's Bureau | 2. Federal Grant or Other Identifying Number Assigned by Federal Agency<br><br>90CO1052/01 | 3a. DUNS<br>8093999180000<br><br>3b. EIN<br>1-646000807-A3 | 4. Reporting Period End Date<br>*03/31/2014* |
|---|---|---|---|

| 4. Recipient Organization (Name and complete address including zip code)<br><br>Mississippi Department of Human Services<br>Division of Family & Children's Services<br>750 North State Street<br>Jackson, MS 39202 | 5. Recipient Identifying Number or Account Number |
|---|---|

| 6. Project/Grant Period<br><br>Start Date: *09/30/2010*   End Date: *09/30/2015* | 7. Reporting Period End Date<br><br>*03/31/2014* | 8. Final Report?   ☐ Yes   ☒ No |
|---|---|---|
| | | 9. Report Frequency<br>☐ annual   ☒ semi-annual<br>☐ quarterly   ☐ other<br>*(If other, describe: _____)* |

10. See ACF-OGM-SF-PPR Program Indicators - Attachment B

11. Other Attachments    *(attach other documents as needed or as instructed by the awarding Federal Agency)*

12. Certification: I certify to the best of my knowledge and belief that this report is correct and complete for performance of activities for the purposes set forth in the award documents.

| 12a. Typed or Printed Name and Title of Authorized Certifying Official<br><br>Angie Williams | 12c. Telephone<br>*(601) 359-4280* |
|---|---|
| | 12d. Email Address<br>angie.williams@mdhs.ms.gov |
| 12b. Signature of Authorized Certifying Official<br><br>*Angie M. Williams* | 12e. Date Report Submitted<br>*04-30-2014* |
| | 13. Agency use only |

OMB Approval Number: 0970-0334<br>Expiration Date: 6/30/2009

After the conference, recruitment support specialists worked with each of their regions to help finalize plans. All plans were submitted on February 28, 2014 and have been approved by the Federal Project Officer. The next step is ordering materials and implementation in May.

This reporting period focused on continuous support in Regions I-S, II-W, IV-N, and V-W. In addition to the work that the recruitment support specialists were doing with the regions, grant leadership began conducting individual calls with each region during this reporting period to discuss progress on the implementation of strategies and any technical assistance or support needed.

Region I-N was unable to carry out their recruitment plan for the fall due to staffing issues but plans have been revised and approved for the 2014 year.

**Product Development** – Product development during this reporting period consisted of a Heart Gallery Display by 200 Million Flowers. This product was purchased with other funds. Regions continue to work with previously developed products such as the Fosterware Party Kits, talking points, resource parent business cards, digital frame slide shows, posters, and yard signs.

**Resource Parent Training** – During this reporting period resource parents were invited from each region to attend the conference, share grant activities that were going on in their regions, and receive training hours for the DGR Conference held in January.

**Customer Service Workshop** – During this reporting period customer service training was provided quarterly statewide. The Professional Development Unit now offers this workshop to all DFCS staff as a part of its ongoing trainings. The Practice Model Coaches are coaching on customer service as they work with staff in their regions.

**B-02 Problems (Delays/Challenges)**

During this reporting period data for evaluation purposes continues to be a challenge in some of our regions due to a lack of staff and more demands of other duties that are not related to grant. To address this delay, the grant staff maintains continuous communications with the evaluation regions to review and check intake forms before submitting them to the evaluator and constant communication with the evaluator to address questions and concerns as they arise.

The requirement that relative placements must also be licensed and must be licensed within 90 days (if the child is left in the home prior to licensure) is another challenge in licensing non-relative applicants. To address this concern, the DFCS Permanency Unit

6

# App. B, Ex. 3L



**STATE OF MISSISSIPPI**
Phil Bryant, Governor
**DEPARTMENT OF HUMAN SERVICES**
Richard A. Berry
Executive Director


May 30, 2013


Mr. Bernard Morgan
Grants Management Specialist
U.S. Department of Health and Human Services
Administration for Children and Families
Office of Grants Management/Division of Discretionary Grants
370 L'Enfant Promenade, SW
Aerospace Building - 6th Floor East
Washington, DC 20447

Ms. Taffy B. Compain, CPM
National Foster Care Specialist
Children's Bureau, ACF, HHS
1250 Maryland Avenue Suite 8151
Washington, DC 20024

Dear Mr. Morgan and Ms. Compain:

I am pleased to submit our renewal application for the Diligent Recruitment of Families for Children in the Foster Care System Grant. If any additional information is needed please contact Angie Williams, Diligent Recruitment Grant Coordinator, at (601) 359-4280 or email angie.williams@mdhs.ms.gov.

Sincerely,

Richard A. Berry

RB:cb

HHS-2011-ACF-CONT-ACYF-CB-CO, Diligent Recruitment of Families for Children in the Foster Care System in the State of Mississippi; Grant No. 90CO1052

## PROGRAM & BUDGET NARRATIVE:

The Mississippi Department of Human Services (MDHS) continues with the implementation of its Diligent Recruitment grant known as *Mississippi GRITS: Guided Recruitment Initiatives Targeting Special Kids*. This grant funded initiative is designed to recruit, prepare, and support resource families for children in the State's foster care system and focuses on locating families for children who are considered to be hardest to place:

- Sibling groups of 3 or more children,
- Sexually abused children,
- Children who are sexually active,
- Pregnant girls or teen moms with young children,
- Children who regularly act out aggressively or sexually,
- Teens of both genders (ages 13+), and
- Children with physical (including medically fragile), emotional, or intellectual challenges.

Major activities of the grant include a three faceted recruitment and retention program of general recruitment, targeted recruitment, and child-specific recruitment. The diligent recruitment initiative is also linked to two other major reforms in the State – the implementation of a practice model in phases statewide and a Continuous Quality Improvement (CQI) process, both of which will institutionalize and sustain the diligent recruitment effort.

Year I
Activities in Year I primarily focused on infrastructure and data. The first steps of building infrastructure were hiring and training staff, developing an evaluation plan, and establishing a grant implementation team. Grant staff received an excellent response to staff and resource parent surveys, but not all data collection went so smoothly. The Mississippi Automated Child Welfare Information System (MACWIS) harnesses a variety of valuable information; however, the system was not designed with flexible reporting mechanisms, which makes gathering certain information virtually impossible. The MACWIS staff were supportive of the diligent recruitment initiative and assisted the grant team when possible. Case reviews were scheduled for Year II to gather additional data.

Year II
*MS GRITS* is a statewide initiative with recruitment and retention activities rolled out in phases by region. Initial planning activities in each region included: orientation for the Regional Director and staff, establishing a regional recruitment team (which included private agency staff), training for the team, and the development of a written, regional recruitment plan. In Year II, *MS GRITS* was active in four regions with two regions in the planning phase (Regions IV-N, V-W) and two in the implementation phase (Regions I-S, II-W). Other Year II activities included product development, revision of the training manual and training process for resource parents, and the development of customer service training for staff. Consultants from Adopt US Kids worked with the grant team to develop the customer service training. Grant staff provided (and will continue to provide) customer service training as a part of the roll-out process in each

1

HHS-2011-ACF-CONT-ACYF-CB-CO, Diligent Recruitment of Families for Children in the Foster Care System in the State of Mississippi; Grant No. 90CO1052

region, but the MDHS Professional Development Unit has incorporated the customer service training into its schedule of ongoing trainings. To help with sustainability, the MDHS Professional Development Unit agreed to offer customer service training to all staff on a quarterly basis. New protocol was put in place for responding to inquiries from persons who want to know more about foster care or adoption. This protocol applies to county, regional, and state office staff and is designed to help track families from inquiry to licensure and to ensure families are not prematurely screened out and do not fall through the cracks. Because contracting with licensed child placing agencies required modifications to MACWIS, this item was delayed until Year III.

Year III

Grant activities rolled out in two additional regions in Year III. Regions I-N and IV-S began planning activities in the summer and fall of 2012 with implementation in January 2013. Grant activities were scheduled to roll out in Region III-S as well but were delayed due to staffing concerns, high caseloads, and other opportunities for improved practice within the region. Region III-S includes Hinds County where the City of Jackson is located. Jackson is Mississippi's capitol and largest city and has the second highest number of children in care.

By the end of Year III planning activities will begin in the final seven regions. Mississippi has chosen the *Structured Analysis Family Evaluation* (S.A.F.E.) home study, developed and offered by the Consortium for Children in California, as its preferred home study format. Training and implementation began in Year III for implementation within the agency statewide. Private agencies will be invited to participate in Year IV. Other Year III activities include web site modification which will continue into Year IV. The process of putting all private placement providers on contract continues. In Year III new contracts were issued with diagnostic and emergency shelter providers and regular group home providers. New contracts for therapeutic services will be issued in Year IV. As a sustainability measure, MDHS is considering including the S.A.F.E. home study as a term of the contract.

Year IV

While Mississippi continues to support ongoing grant activities in six regions, grant activities will roll out into Mississippi's remaining seven regions in Year IV. Implementing grant activities in seven regions at one time will necessitate a different format than was previously used. Initial planning will be done during the summer and fall of 2013. Grant staff will hold individual meetings with Regional Directors as their schedules allow. Conference calls and multi-regional meetings may be necessary. Training and the drafting of an initial recruitment plan will be done at a conference with representatives from the seven regions. Representatives from the existing regions will be used as trainers and facilitators at the conference.

Other Year IV activities will include continued web site development to accommodate Mississippi's own photo listing. In Year III, Mississippi initiated a child-specific recruitment initiative with 200 Million Flowers, a private adoption agency in Mississippi. 200 Million Flowers has agreed to take professional photographs and write professional biographical sketches of Mississippi's children who are free for adoption but have no identified adoptive placement. 200 Million Flowers has taken this on at their own expense and has agreed that the products of the partnership will also be featured on AdoptUSKids. Plans will be developed and

2

HHS-2011-ACF-CONT-ACYF-CB-CO, Diligent Recruitment of Families for Children in the Foster Care System in the State of Mississippi; Grant No. 90CO1052

implemented in Year IV to designate and train at least one MDHS resource staff from each region to post and update information on AdoptUSKids about children in that region who need an adoptive placement.

Other child-specific recruitment activities will be incorporated into the grant evaluation. Mississippi has designated a staff person – at no cost to the grant – for the purpose of child specific recruitment. This staff person carries a caseload of 6-8 and works with adolescent males who are free for adoption and who need an adoptive placement. This staff person has been trained using the recruitment information and strategies of the grant.

Plans for general media recruitment will be developed in Year IV for implementation in Year V.

Summary

Implementation of Mississippi's diligent recruitment and retention initiative continues in accordance with its Implementation Plan. Positive energy and enthusiasm among staff are beginning to translate into results. Some delays and barriers experienced include an outdated data management system that struggles to keep up with the demands, conflicting priorities for staff in some areas, a cumbersome and inflexible state purchasing system, and inconsistent implementation of new protocol related to data collection and tracking; however, these delays and barriers have been manageable. Year IV will surely bring its own challenges as the grant rolls into counties that already struggle to keep up with demands.

Mississippi has a strong grant leadership team and strong support from MDHS executive management. CSF consultants have provided sound training and coaching for grant staff which enabled *MS GRITS* staff to step out in the lead until the loss of two staff persons, including the project director. CSF consultants have stepped in to support the state in continuing grant work while short-handed and in helping to train new staff.

Mississippi's diligent recruitment and retention initiative is not a specially funded project but rather an opportunity to fundamentally change the way the state approaches the recruitment and retention of resource parents. At the end of the grant, Mississippi staff will have a different set of skills, additional tools, and a new approach to the recruitment and retention of resource families for children in Mississippi's foster care system. When the grant has ended and the money is gone, the work will continue.

# App. B, Ex. 4



# Mississippi Department of Human Services

## Division of Family & Children's Services

# Agency Vision

*"A New Day"* – We have a clean slate, we offer new opportunities for clients, staff, and stakeholders; we think with imagination and creativity; we ask how we can do something better and we ask not why, but why not.

# Agency Mission

Our Mission is to lead Mississippi in protecting children and youth from abuse, neglect, and exploitation by providing services to promote safe and stable families.

# DFCS Values

- Competence
- Integrity
- Responsibility
- Respect
- Personal Courage
- Collaboration

# Division of Family & Children's Services Regional Map



# MDHS Benefits

- 10 paid holidays annually

- 18 personal days of leave annually

- 12 paid major medical leave days annually

- One of the best state retirement systems in the nation

- Great opportunities for advancement

- Excellent ongoing training with opportunities to earn CEUs

- Opportunity to pursue an advanced degree in Social Work by utilizing the Professional Enhancement Scholarship.

# Family Protection Specialist

- Develops and assists in the development of service plans to meet the needs of children and their families

- Completes investigations, special assignments, and training requirements

- Provides support and education to families in order to improve their functioning

- Maintains case history records and documentation

- Collaborates with other agencies and professionals to meet the needs of clients

# Family Protection Specialist

## Experience/Educational Requirements

- BSW from an accredited college or university

**and/or**

- Licensed to practice Bachelor's level social work in Mississippi (LSW)

## Salary Range

$27,615.55 - $48,327.21 annually

\* Positions in Hinds County have a %15 Recruitment Flex

\* Positions in Hancock, Harrison, & Jackson Counties offer a %30 Recruitment Flex

# Area Social Work Supervisor (ASWS)

- Provides supervision and support to direct service staff through regular case staffings

- Attend court hearings and Family Team Meetings

- Provides technical assistance to county staff as needed

- Reviews and approves client services and documentation

# Area Social Work Supervisor (ASWS)

## Experience/Educational Requirements

LMSW + 4 yrs. Experience in social work related field

**OR**

LSW + 30 semester hours of graduate level social work education

**OR**

LSW + 5 years of experience in social work related field
(contingent on obtaining advanced degree)

## Salary Range

$37,511.76 - $65,645.58 annually

* Positions in Hinds County have a %15 Recruitment Flex

* Positions in Hancock, Harrison, & Jackson Counties offer a %30 Recruitment Flex

Questions/Comments???

To inquire about available positions, contact

Shannon Toth

Director of Workforce Development, DFCS

# 601.359.4862

Shannon.Toth@mdhs.ms.gov

# App. B, Ex. 5

**MISSISSIPPI DEPARTMENT OF HUMAN SERVICES**

The Mississippi Department of Human Services, Division of Family & Children's Services currently has positions available throughout the state and we are looking for qualified, energetic individuals to join our team! Mississippi Department of Human Services offers its employees many great benefits including but certainly not limited to:

- 10 paid holidays annually;
- 18 personal days of leave annually;
- 12 paid major medical leave days annually;
- One of the best state retirement systems in the nation;
- Advancement opportunities
- Opportunities to further advance your degree in Social Work while employed with the agency through our Professional Development Scholarship

Each of these positions comes with an opportunity to touch the lives of Mississippi's most vulnerable children and families. You can find an application online at http://mspb.ms.gov. If we can be of ANY assistance to you during the application process, please feel free to contact our Director of Workforce Development, Shannon Toth, via email at Shannon.Toth@mdhs.ms.gov or by phone at (601) 359-4862.

**Positions Available with MDHS-DFCS**

| | | |
|---|---|---|
| Family Protection Specialist | $27,615.55 - $48,327.21 | BSW or LSW |
| Family Protection Specialist, Sr. | $30,049.94 - $52, 587.40 | LSW + 2 years SW experience |
| Family Protection Specialist, Advanced | $32,700.43 - $57,225.75 | LSW + 4 years SW experience |
| Area Social Work Supervisor | $37,511.76 - $65,645.58 | LMSW + 4 years SW experience OR LSW + completion of 30 semester hours of graduate level SW education |

**\* Positions in Hancock, Harrison, and Jackson Counties are receiving a 30% recruitment incentive in addition to base salary. Hinds County positions are receiving a 15% incentive.**

# App. B, Ex. 6A



**STATE OF MISSISSIPPI**
Phil Bryant, Governor
**DEPARTMENT OF HUMAN SERVICES**
Richard A. Berry
Executive Director

February 26, 2014

Ms. Deanne Mosley
Executive Director
Mississippi State Personnel Board
210 East Capitol, Suite 800
Jackson, Mississippi 39201

Dear Ms. Mosley:

The Mississippi Department of Human Services (MDHS) is seeking your favorable consideration of our request to modify the job description for DHS - Area Social Work Supervisor, occupational code 3745. Our request involves making changes to the experience and education requirements in order to satisfy certain requirements of the Olivia Y. lawsuit Modified Settlement Agreement. We are proposing that the current minimum qualifications be replaced with the following:

**<u>Education:</u>**

Must be licensed to practice Master's Level Social Work (LMSW) in the State of Mississippi;

**AND**

**<u>Experience:</u>**

Two (2) years of experience in social work or human services.

**OR**

**<u>Education:</u>**

Must be licensed to practice Bachelor's Level Social Work (LSW) in the State of Mississippi and have a Master's degree in social work or a related field or be enrolled in and/or accepted into (proof required) a graduate level social work or related field education program at an accredited institution of higher learning;



DHS
362544

**AND**

**Experience:**

Two (2) years of experience in social work or human services.

**OR**

**Education:**

Must be licensed to practice Bachelor's Level Social Work (LSW or above) in the State of Mississippi;

**AND**

**Experience:**

Five (5) years of experience in social work or human services.

We believe that through continued intensive recruitment efforts we can find suitable candidates in this classification with the requested modified minimum requirements. The proposed changes to the minimum qualifications will allow us to promote current licensed employees who are enrolled in the specified master's degree programs and may inspire current licensed employees to pursue their master's degree. Additionally, we would be able to hire new employees who are working towards their master's degree in order for us to build our workforce.

Our intent is to notify new hires and obtain their acknowledgment that failure to complete the master's program that qualified them for the Area Social Work Supervisor position will be grounds for dismissal or demotion to a position that they qualify for.

If you need additional information or have any questions, please contact Daren T. Vandevender, Director, Division of Human Resources, at 601-359-4328.

Sincerely,

Richard A. Berry
Executive Director

RAB:DV

DHS
362545

App. B, Ex. 6B



# DHS-AREA SOCIAL WORK SUPV

Class Code: 3745

Bargaining Unit: N/A

STATE OF MISSISSIPPI
Established Date: Jul 1, 2007
Revision Date: Apr 14, 2014

## SALARY RANGE
$37,511.76 - $65,645.58 Annually

**CHARACTERISTICS OF WORK:**
This is professional social work of a supervisory nature. Incumbents are responsible for the supervision of social service program for families, children, and adults and maintenance of program operations. Work is performed under the general supervision of the Social Services Regional Director. Incumbents remain on-call on a 24 hour basis.

**EXAMPLES OF WORK:**
**Examples of work performed in this classification include, but are not limited to, the following:**

Ensures maintenance of acceptable standards of social work practice in geographic area of responsibility.

Supervises and is administratively in charge of the area of service and the area social workers.

Provides performance evaluations and performance improvement plans as needed.
Provides in-service and on-the-job training.

Assists the area social workers in difficult cases when needed, particularly where life/health, public contact, and community organization are concerned.

Prepares reports and trend analyses on the operations of geographic area of responsibility.

Makes presentations to community, civic, and church groups on abuse/neglect and other timely topics.

Assists county staffs in the development and utilization of resources necessary for carrying out programs.

Performs related or similar duties as required or assigned.

**MINIMUM QUALIFICATIONS:**
These minimum qualifications have been agreed upon by Subject Matter Experts (SMEs) in this job class and are based upon a job analysis and the essential functions. However, if a candidate believes he/she is qualified for the job although he/she does not have the minimum qualifications set forth below, he/she may request special consideration through substitution of related education and experience, demonstrating the ability to perform the essential functions of the position. Any request to substitute related education or experience for minimum qualifications must be addressed to the Mississippi State Personnel Board in writing, identifying the related education and experience which demonstrates the candidate's ability to perform all essential functions of the position.

**EXPERIENCE/EDUCATIONAL REQUIREMENTS:**

Education:

Must be licensed to practice Master's Level Social Work (LMSW) in the State of Mississippi;

AND

Experience:
Two (2) years of experience in social work or human services;

OR

Education:
Must be licensed to practice Bachelor's Level Social Work (LSW) in the State of Mississippi and have a Master's degree in social work or a related field or be enrolled in and/or accepted into (proof required) a graduate level social work or related field education program at an accredited institution of higher learning;

AND

Experience:
Two (2) years of experience in social work or human services;

**NOTE: Effective 4-1-2014, the <u>following</u> Education/Experience level applies <u>ONLY</u> to employees hired into this classification <u>prior to 4-1-2014</u>, and who have maintained continuous employment in this classification. New applicants will <u>NOT</u> be hired at the Education/Experience level below.**

Education:
Must be licensed to practice Bachelor's Level Social Work (LSW or above) in the State of Mississippi;

AND

Experience:
Five (5) years of experience in social work.

Documentation Required:

Applicant must attach a copy of his/her current license in Social Work.

Note:

Incumbent must have a valid driver license and proof of insurance which will be verified by the hiring agency.

**ESSENTIAL FUNCTIONS:**
**Additional essential functions may be identified and included by the hiring agency. The essential functions include, but are not limited to, the following:**

1. Provides supervisory and administrative duties for social workers and general clerks.

2. Provides technical assistance to county staff for various problems.

3. Reviews and improves client services.

**PHYSICAL REQUIREMENTS:**
These physical requirements are not exhaustive, and additional job related physical requirements may be added to these by individual agencies on an as needed basis. Corrective devices may be used to meet physical requirements. These are typical requirements; however, reasonable accommodations may be possible.

Moderate Work: May frequently exert force equivalent to lifting up to approximately 25 pounds and/or occasionally exert force equivalent to lifting up to approximately 50 pounds.

Vision: Requires the ability to perceive the nature of objects by the eye.

Near Acuity: Clarity of vision at 20 inches or less.
Midrange: Clarity of vision at distances of more than 20 inches and less than 20 feet.
Far Acuity: Clarity of vision at 20 feet or more.
Peripheral: Ability to observe an area that can be seen up and down or left and right while eyes are fixed on a given point.
Depth Perception: Three-dimensional vision. Ability to judge distances and spatial relationships so as to see objects where and as they actually are.
Ability to adjust focus: Ability to adjust the eye to bring an object into sharp focus.

Speaking/Hearing: Possesses the ability to give and receive information through speaking and listening skills.

Taste/Smell: Possesses the ability to use the sense of smell to recognize and distinguish odors. Possesses the ability to use the sense of taste to recognize and distinguish flavors.

Motor Coordination: While performing the duties of this job, the incumbent is regularly required to use hands to finger, handle, or feel objects, tools, or controls; and reach with hands and arms. The incumbent is frequently required to sit; stand; and walk. The incumbent is occasionally required to stoop, kneel, crouch, or bend; and climb or balance.

**INTERVIEW REQUIREMENTS:**

Any candidate who is called to an agency for an interview must notify the interviewing agency in writing of any reasonable accommodation needed prior to the date of the interview.

**COMPETENCIES:**
The following competencies describe the knowledge, skills, abilities, and attributes that lead to a successful employee in this position. An applicant will be expected to exhibit these competencies or the ability to reach competency achievement within a specified time. These competencies are linked to the essential functions of the job. Employees in this position may be evaluated on these competencies as part of the performance appraisal system. Example behaviors are listed below each competency and are used for illustrative purposes only. Specific behaviors may be identified and included later by the hiring agency. It is understood that some of these behaviors might not be acquired until a reasonable time after hire. Failure of an employee to successfully demonstrate some or all of these competencies, as deemed important by his or her reporting official, may result in the employee being placed on a performance improvement plan. If after a reasonable period of time, usually three (3) months, the employee fails to demonstrate successful performance, the employee may be terminated. These competencies include, but are not limited to, the following:

**PUBLIC SECTOR COMPETENCIES:**

Integrity and Honesty: Demonstrates a sense of responsibility and commitment to the public trust through statements and actions.

Models and demonstrates high standards of integrity, trust, openness, and respect for others. Demonstrates integrity by honoring commitments and promises. Demonstrates integrity by maintaining necessary confidentiality.

Work Ethic: Is productive, diligent, conscientious, timely, and loyal.

Conscientiously abides by the rules, regulations, and procedures governing work.

Service Orientation: Demonstrates a commitment to quality public service through statements and actions.

Seeks to understand and meets and/or exceeds the needs and expectations of customers. Treats customers with respect, responding to requests in a professional manner, even in difficult circumstances. Provides accurate and timely service. Develops positive relationships with customers.

Accountability: Accepts responsibility for actions and results.

Is productive and carries fair share of the workload. Focuses on quality and expends the necessary time and effort to achieve goals. Demonstrates loyalty to the job and the agency and is a good steward of state assets. Steadfastly persists in overcoming obstacles and pushes self for results. Maintains necessary attention to detail to achieve high-level performance. Deals effectively with pressure and recovers quickly from setbacks. Takes ownership of tasks, performance standards, and mistakes. Has knowledge of how to perform one's job. Knows the organization's mission and functions and how it fits into state government.

Self Management Skills: Effectively manages emotions and impulses and maintains a positive attitude.

Encourages and facilitates cooperation, pride, trust, and group identity; fosters commitment and team spirit; works effectively and cooperatively with others to achieve goals. Treats all people with respect, courtesy, and consideration. Communicates effectively. Remains open to new ideas and approaches. Avoids conflicts of interest. Promotes cooperation and teamwork. Continuously evaluates and adapts; copes effectively with change. Allows self and others to make mistakes and learns from those mistakes. Adheres to high ethical standards.

Interpersonal Skills: Shows understanding, courtesy, tact, empathy, and concern to develop and maintain relationships.

Demonstrates cross cultural sensitivity and understanding. Identifies and seeks to solve problems and prevent or resolve conflict situations. Encourages others through positive reinforcement. Models appropriate behavior. Recognizes and develops potential in others; mentors.

Communication Skills: Receives, attends to, interprets, and responds to verbal messages and expresses information to individuals or groups effectively.

Receives other cues such as body language in ways that are appropriate to listeners and situations. Takes into account the audience and nature of the information; listens to others, attends to nonverbal cues, and responds appropriately. May make oral presentations. Communicates ideas, suggestions, and concerns, as well as outcomes and progress throughout the process of an activity. Provides thorough and accurate information.

Self-Development: Adapts behavior or work methods in response to new information, changing conditions, or unexpected obstacles.

Seeks efficient learning techniques to acquire and apply new knowledge and skills; uses training, feedback, or other opportunities for self-learning and development. Develops and enhances skills to adapt to changing organizational needs. Remains open to change and new information and ideas.

**TECHNICAL COMPETENCIES:**

Assessment: Assigns cases to Social Workers to determine the social needs of children and adults.

Supervises and is administratively in charge of the area of service and the area social workers. Gathers relevant data. Identifies, assesses, and analyzes information. Communicates effectively with family. Conducts intake interviews and refers for public assistance, family, and children services, and related services. Investigates immediately all reports of neglect, abuse, or exploitation of children.

Social Work Supervision: Coordinates a group of social workers engaged in providing and securing

appropriate social services

Provides technical assistance to social workers. Ensures maintenance of acceptable standards of social work practice in geographic area of responsibility. Provides in-service and on-the-job training. Assists county staffs in the development and utilization of resources necessary for carrying out programs. Develops and maintains a plan and program of service for each family applying for or receiving support. Refers clients to agencies that provide services enabling heads of families or older children within the family to become self-supporting members of society. Discusses family planning with families and individuals as needed. Assists those wishing such services to find and utilize appropriate resources. Assists families and individuals in planning and securing appropriate services related to their social, medical, financial, child care, home management, and emotional needs.

Placement Supervision: Supplies protective and placement services for homeless, dependent, or neglected children.

Places and supervises children requiring foster home placement. Recruits, studies, and recommends foster homes for approval. Initiates placement of neglected, abused, or exploited of children as needed.

Case Management: Supervises social workers engaged in managing caseloads of children or vulnerable adults.

Ensures accurate documentation of all cases. Remains on-call on a 24-hour basis. Prepares reports documenting information on a step-by-step basis. Prepares reports and trend analyses on the operations of geographic area of responsibility. Assists the area social workers in difficult cases when needed. Assists social workers in preparing for court. Testifies in court. Conducts home studies for placement purposes.

**MANAGEMENT COMPETENCIES:**

Emotional Maturity: Conducts oneself in a professional, consistent manner when representing the organization.

Has the ability to work through adversity and hold self and others accountable for work actions.

Macro Oriented: Exercises good judgment; makes sound, well-informed decisions.

Understands and appropriately applies procedures, requirements, and regulations related to specialized areas of expertise.

Working Through Others: Supports, motivates, and is an advocate for staff.

Reinforces and rewards team efforts and positive behaviors. Is fair, yet firm with others. Monitors workloads and provides feedback.

Results Oriented: Plans effectively to achieve or exceed goals; sets and meets deadlines.

**App. B, Ex. 7A**



**STATE OF MISSISSIPPI**
**invites applications for the position of:**

# DHS-Area Social Work Supv

**SALARY:**        $37,511.76 /Year

**OPENING DATE:** 01/10/14

**CLOSING DATE:** 04/10/14 11:59 PM

**JOB TYPE:** Full-Time

**LOCATION:** 23 - HANCOCK

**SHIFT SCHEDULE:** Day Shift Only

**TRAVEL SCHEDULE:** None

**TIME LIMITED POSITION:** No

**AGENCY INFORMATION:** .DHS-Area Social Work Supervisors in Hancock, Harrison and Jackson counties will be hired at a start salary of: 37,511.76 plus; 15% Recruitment Flex: ($5,626.64); = $43,138.52 plus an additional 20% Duty Location Pay (8,627.70);equals a total amount of $51,766.22 annually. DHS, Ms. Betty Purvis can answerer any questions concerning this posting at (601) 359-2899

**CHARACTERISTICS OF WORK:**
This is professional social work of a supervisory nature. Incumbents are responsible for the supervision of social service program for families, children, and adults and maintenance of program operations. Work is performed under the general supervision of the Social Services Regional Director. Incumbents remain on-call on a 24 hour basis.

**EXAMPLES OF WORK:**
Examples of work performed in this classification include, but are not limited to, the following:

Ensures maintenance of acceptable standards of social work practice in geographic area of responsibility.

Supervises and is administratively in charge of the area of service and the area social workers.

Provides performance evaluations and performance improvement plans as needed.
Provides in-service and on-the-job training.

Assists the area social workers in difficult cases when needed, particularly where life/health, public contact, and community organization are concerned.

Prepares reports and trend analyses on the operations of geographic area of responsibility.

Makes presentations to community, civic, and church groups on abuse/neglect and other timely

DHS
362409

topics.

Assists county staffs in the development and utilization of resources necessary for carrying out programs.

Performs related or similar duties as required or assigned.

**MINIMUM QUALIFICATIONS:**

These minimum qualifications have been agreed upon by Subject Matter Experts (SMEs) in this job class and are based upon a job analysis and the essential functions. However, if a candidate believes he/she is qualified for the job although he/she does not have the minimum qualifications set forth below, he/she may request special consideration through substitution of related education and experience, demonstrating the ability to perform the essential functions of the position. Any request to substitute related education or experience for minimum qualifications must be addressed to the State Personnel Board in writing, identifying the related education and experience which demonstrates the candidate's ability to perform all essential functions of the position.

EXPERIENCE/EDUCATIONAL REQUIREMENTS:

Education:
Must be licensed to practice Master's Level Social Work (LMSW) in the State of Mississippi;

AND

Experience:
Four (4) years of experience in social work.

OR

Education:
Must be licensed to practice Bachelor's Level Social Work (LSW) in the State of Mississippi and must have completed thirty (30) semester hours of graduate level social work education;

AND

Experience:
Four (4) years of experience in social work.

OR

Education:
Must be licensed to practice Bachelor's Level Social Work (LSW or above) in the State of Mississippi;

AND

Experience:
Five (5) years of experience in social work.

Documentation Required:

Applicant must attach a copy of his/her current wallet-size license in Social Work.

Note:

DHS
362410

Incumbent must have a valid driver license and proof of insurance which will be verified by the hiring agency.

**ESSENTIAL FUNCTIONS:**
Additional essential functions may be identified and included by the hiring agency. The essential functions include, but are not limited to, the following:

1. Provides supervisory and administrative duties for social workers and general clerks.

2. Provides technical assistance to county staff for various problems.

3. Reviews and improves client services.

---

APPLICATIONS MAY BE FILED ONLINE AT:
http://www.mspb.ms.gov

210 East Capitol Street
Suite 800
Jackson, MS 39201
601-359-1406
601-359-1406

Position #3745-0662-20140108Ha
DHS-AREA SOCIAL WORK SUPV
C1

---

An Equal Opportunity Employer


DHS
362411

**DHS-Area Social Work Supv Supplemental Questionnaire**

* 1. What is the highest level of social work licensure in the State of Mississippi that you have obtained?
  - ❑ Licensed Social Worker (LSW)
  - ❑ Licensed Master Social Worker (LMSW)
  - ❑ Licensed Certified Social Worker (LCSW)
  - ❑ None of the above

* 2. How many years of experience do you have in social work?
  - ❑ No Experience
  - ❑ 1 Year of Experience
  - ❑ 2 Years of Experience
  - ❑ 3 Years of Experience
  - ❑ 4 Years of Experience
  - ❑ 5 Years of Experience
  - ❑ 6 Years of Experience
  - ❑ 7 Years of Experience
  - ❑ 8 Years of Experience
  - ❑ 9 Years of Experience
  - ❑ 10 Years of Experience
  - ❑ More than 10 Years of Experience

* 3. Have you completed thirty (30) semester hours of graduate level social work eduation?
  - ❑ Yes
  - ❑ No

* Required Question

DHS
362412

# App. B, Ex. 7B



**STATE OF MISSISSIPPI**
**invites applications for the position of:**

# DHS-Area Social Work Supv

**SALARY:**          $37,511.76 /Year

**OPENING DATE:** 01/10/14

**CLOSING DATE:** 04/10/14 11:59 PM

**JOB TYPE:** Full-Time

**LOCATION:** 24 - HARRISON

**SHIFT SCHEDULE:** Day Shift Only

**TRAVEL SCHEDULE:** None

**TIME LIMITED POSITION:** Yes

**AGENCY INFORMATION:** This is a time-limited position. DHS-Area Social Work Supervisors in Hancock, Harrison and Jackson counties will be hired at a start salary of: 37,511.76 plus; 15% Recruitment Flex: ($5,626.64); = $43,138.52 plus an additional 20% Duty Location Pay (8,627.70);equals a total amount of $51,766.22 annually. DHS , Ms. Betty Purvis can answerer any questions concerning this posting at (601) 359-2899.

**CHARACTERISTICS OF WORK:**
This is professional social work of a supervisory nature. Incumbents are responsible for the supervision of social service program for families, children, and adults and maintenance of program operations. Work is performed under the general supervision of the Social Services Regional Director. Incumbents remain on-call on a 24 hour basis.

**EXAMPLES OF WORK:**
Examples of work performed in this classification include, but are not limited to, the following:

Ensures maintenance of acceptable standards of social work practice in geographic area of responsibility.

Supervises and is administratively in charge of the area of service and the area social workers.

Provides performance evaluations and performance improvement plans as needed.
Provides in-service and on-the-job training.

Assists the area social workers in difficult cases when needed, particularly where life/health, public contact, and community organization are concerned.

Prepares reports and trend analyses on the operations of geographic area of responsibility.

Makes presentations to community, civic, and church groups on abuse/neglect and other timely

DHS
362413

topics.

Assists county staffs in the development and utilization of resources necessary for carrying out programs.

Performs related or similar duties as required or assigned.

## MINIMUM QUALIFICATIONS:

These minimum qualifications have been agreed upon by Subject Matter Experts (SMEs) in this job class and are based upon a job analysis and the essential functions. However, if a candidate believes he/she is qualified for the job although he/she does not have the minimum qualifications set forth below, he/she may request special consideration through substitution of related education and experience, demonstrating the ability to perform the essential functions of the position. Any request to substitute related education or experience for minimum qualifications must be addressed to the State Personnel Board in writing, identifying the related education and experience which demonstrates the candidate's ability to perform all essential functions of the position.

EXPERIENCE/EDUCATIONAL REQUIREMENTS:

Education:
Must be licensed to practice Master's Level Social Work (LMSW) in the State of Mississippi;

AND

Experience:
Four (4) years of experience in social work.

OR

Education:
Must be licensed to practice Bachelor's Level Social Work (LSW) in the State of Mississippi and must have completed thirty (30) semester hours of graduate level social work education;

AND

Experience:
Four (4) years of experience in social work.

OR

Education:
Must be licensed to practice Bachelor's Level Social Work (LSW or above) in the State of Mississippi;

AND

Experience:
Five (5) years of experience in social work.

Documentation Required:

Applicant must attach a copy of his/her current wallet-size license in Social Work.

Note:

DHS
362414

Incumbent must have a valid driver license and proof of insurance which will be verified by the hiring agency.

**ESSENTIAL FUNCTIONS:**
Additional essential functions may be identified and included by the hiring agency. The essential functions include, but are not limited to, the following:

1. Provides supervisory and administrative duties for social workers and general clerks.

2. Provides technical assistance to county staff for various problems.

3. Reviews and improves client services.

---

APPLICATIONS MAY BE FILED ONLINE AT:
http://www.mspb.ms.gov

210 East Capitol Street
Suite 800
Jackson, MS 39201
601-359-1406
601-359-1406

Position #3745-0662-20140108Hr
DHS-AREA SOCIAL WORK SUPV
C1

An Equal Opportunity Employer

---

DHS
362415

**DHS-Area Social Work Supv Supplemental Questionnaire**

* 1. What is the highest level of social work licensure in the State of Mississippi that you have obtained?
  - ❏ Licensed Social Worker (LSW)
  - ❏ Licensed Master Social Worker (LMSW)
  - ❏ Licensed Certified Social Worker (LCSW)
  - ❏ None of the above

* 2. How many years of experience do you have in social work?
  - ❏ No Experience
  - ❏ 1 Year of Experience
  - ❏ 2 Years of Experience
  - ❏ 3 Years of Experience
  - ❏ 4 Years of Experience
  - ❏ 5 Years of Experience
  - ❏ 6 Years of Experience
  - ❏ 7 Years of Experience
  - ❏ 8 Years of Experience
  - ❏ 9 Years of Experience
  - ❏ 10 Years of Experience
  - ❏ More than 10 Years of Experience

* 3. Have you completed thirty (30) semester hours of graduate level social work eduation?
  - ❏ Yes
  - ❏ No

* Required Question

DHS
362416

# App. B, Ex. 7C



**STATE OF MISSISSIPPI**
**invites applications for the position of:**

# DHS-Area Social Work Supv

**SALARY:**        $37,511.76 /Year

**OPENING DATE:** 01/10/14

**CLOSING DATE:** 04/10/14 11:59 PM

**JOB TYPE:** Full-Time

**LOCATION:** 25 - HINDS

**SHIFT SCHEDULE:** Day Shift Only

**TRAVEL SCHEDULE:** None

**TIME LIMITED POSITION:** No

**AGENCY INFORMATION:** DHS-Area Social Work Supervisors in Hinds county will be hired at a start salary of: $37,511.76 plus; 15% Recruitment Flex: ($5,626.64); = a total of $43,138.52 DHS, Ms. Betty Purvis can answerer any questions concerning this posting at (601) 359-2899.

**CHARACTERISTICS OF WORK:**
This is professional social work of a supervisory nature. Incumbents are responsible for the supervision of social service program for families, children, and adults and maintenance of program operations. Work is performed under the general supervision of the Social Services Regional Director. Incumbents remain on-call on a 24 hour basis.

**EXAMPLES OF WORK:**
Examples of work performed in this classification include, but are not limited to, the following:

Ensures maintenance of acceptable standards of social work practice in geographic area of responsibility.

Supervises and is administratively in charge of the area of service and the area social workers.

Provides performance evaluations and performance improvement plans as needed.
Provides in-service and on-the-job training.

Assists the area social workers in difficult cases when needed, particularly where life/health, public contact, and community organization are concerned.

Prepares reports and trend analyses on the operations of geographic area of responsibility.

Makes presentations to community, civic, and church groups on abuse/neglect and other timely topics.

DHS
362417

Assists county staffs in the development and utilization of resources necessary for carrying out programs.

Performs related or similar duties as required or assigned.

**MINIMUM QUALIFICATIONS:**

These minimum qualifications have been agreed upon by Subject Matter Experts (SMEs) in this job class and are based upon a job analysis and the essential functions. However, if a candidate believes he/she is qualified for the job although he/she does not have the minimum qualifications set forth below, he/she may request special consideration through substitution of related education and experience, demonstrating the ability to perform the essential functions of the position. Any request to substitute related education or experience for minimum qualifications must be addressed to the State Personnel Board in writing, identifying the related education and experience which demonstrates the candidate's ability to perform all essential functions of the position.

EXPERIENCE/EDUCATIONAL REQUIREMENTS:

Education:
Must be licensed to practice Master's Level Social Work (LMSW) in the State of Mississippi;

AND

Experience:
Four (4) years of experience in social work.

OR

Education:
Must be licensed to practice Bachelor's Level Social Work (LSW) in the State of Mississippi and must have completed thirty (30) semester hours of graduate level social work education;

AND

Experience:
Four (4) years of experience in social work.

OR

Education:
Must be licensed to practice Bachelor's Level Social Work (LSW or above) in the State of Mississippi;

AND

Experience:
Five (5) years of experience in social work.

Documentation Required:

Applicant must attach a copy of his/her current wallet-size license in Social Work.

Note:

Incumbent must have a valid driver license and proof of insurance which will be verified by the



DHS
362418

Job Bulletin

hiring agency.

**ESSENTIAL FUNCTIONS:**

Additional essential functions may be identified and included by the hiring agency. The essential functions include, but are not limited to, the following:

1. Provides supervisory and administrative duties for social workers and general clerks.

2. Provides technical assistance to county staff for various problems.

3. Reviews and improves client services.

---

APPLICATIONS MAY BE FILED ONLINE AT:
http://www.mspb.ms.gov

210 East Capitol Street
Suite 800
Jackson, MS 39201
601-359-1406
601-359-1406

Position #3745-0662-20140108hi
DHS-AREA SOCIAL WORK SUPV
C1

An Equal Opportunity Employer

---



**DHS-Area Social Work Supv Supplemental Questionnaire**

* 1. What is the highest level of social work licensure in the State of Mississippi that you have obtained?
  - ❏ Licensed Social Worker (LSW)
  - ❏ Licensed Master Social Worker (LMSW)
  - ❏ Licensed Certified Social Worker (LCSW)
  - ❏ None of the above

* 2. How many years of experience do you have in social work?
  - ❏ No Experience
  - ❏ 1 Year of Experience
  - ❏ 2 Years of Experience
  - ❏ 3 Years of Experience
  - ❏ 4 Years of Experience
  - ❏ 5 Years of Experience
  - ❏ 6 Years of Experience
  - ❏ 7 Years of Experience
  - ❏ 8 Years of Experience
  - ❏ 9 Years of Experience
  - ❏ 10 Years of Experience
  - ❏ More than 10 Years of Experience

* 3. Have you completed thirty (30) semester hours of graduate level social work eduation?
  - ❏ Yes
  - ❏ No

* Required Question

DHS
362420

**App. B, Ex. 7D**



**STATE OF MISSISSIPPI**
**invites applications for the position of:**

# DHS-Area Social Work Supv

**SALARY:**        $37,511.76 /Year

**OPENING DATE:** 01/10/14

**CLOSING DATE:** 04/10/14 11:59 PM

**JOB TYPE:** Full-Time

**LOCATION:** 30 - JACKSON

**SHIFT SCHEDULE:** Day Shift Only

**TRAVEL SCHEDULE:** None

**TIME LIMITED POSITION:** Yes

**AGENCY INFORMATION:** This is a time-limited position. DHS-Area Social Work Supervisors in Hancock, Harrison and Jackson counties will be hired at a start salary of: 37,511.76 plus; 15% Recruitment Flex: ($5,626.64); = $43,138.52 plus an additional 20% Duty Location Pay (8,627.70);equals a total amount of $51,766.22 annually. DHS , Ms. Betty Purvis can answer any questions concerning this posting at (601) 359-2899.

**CHARACTERISTICS OF WORK:**
This is professional social work of a supervisory nature. Incumbents are responsible for the supervision of social service program for families, children, and adults and maintenance of program operations. Work is performed under the general supervision of the Social Services Regional Director. Incumbents remain on-call on a 24 hour basis.

**EXAMPLES OF WORK:**
Examples of work performed in this classification include, but are not limited to, the following:

Ensures maintenance of acceptable standards of social work practice in geographic area of responsibility.

Supervises and is administratively in charge of the area of service and the area social workers.

Provides performance evaluations and performance improvement plans as needed.
Provides in-service and on-the-job training.

Assists the area social workers in difficult cases when needed, particularly where life/health, public contact, and community organization are concerned.

Prepares reports and trend analyses on the operations of geographic area of responsibility.

Makes presentations to community, civic, and church groups on abuse/neglect and other timely

DHS 36242l

topics.

Assists county staffs in the development and utilization of resources necessary for carrying out programs.

Performs related or similar duties as required or assigned.

**MINIMUM QUALIFICATIONS:**

These minimum qualifications have been agreed upon by Subject Matter Experts (SMEs) in this job class and are based upon a job analysis and the essential functions. However, if a candidate believes he/she is qualified for the job although he/she does not have the minimum qualifications set forth below, he/she may request special consideration through substitution of related education and experience, demonstrating the ability to perform the essential functions of the position. Any request to substitute related education or experience for minimum qualifications must be addressed to the State Personnel Board in writing, identifying the related education and experience which demonstrates the candidate's ability to perform all essential functions of the position.

EXPERIENCE/EDUCATIONAL REQUIREMENTS:

Education:
Must be licensed to practice Master's Level Social Work (LMSW) in the State of Mississippi;

AND

Experience:
Four (4) years of experience in social work.

OR

Education:
Must be licensed to practice Bachelor's Level Social Work (LSW) in the State of Mississippi and must have completed thirty (30) semester hours of graduate level social work education;

AND

Experience:
Four (4) years of experience in social work.

OR

Education:
Must be licensed to practice Bachelor's Level Social Work (LSW or above) in the State of Mississippi;

AND

Experience:
Five (5) years of experience in social work.

Documentation Required:

Applicant must attach a copy of his/her current wallet-size license in Social Work.

Note:



Incumbent must have a valid driver license and proof of insurance which will be verified by the hiring agency.

**ESSENTIAL FUNCTIONS:**
Additional essential functions may be identified and included by the hiring agency. The essential functions include, but are not limited to, the following:

1. Provides supervisory and administrative duties for social workers and general clerks.

2. Provides technical assistance to county staff for various problems.

3. Reviews and improves client services.

---

APPLICATIONS MAY BE FILED ONLINE AT:
http://www.mspb.ms.gov

210 East Capitol Street
Suite 800
Jackson, MS 39201
601-359-1406
601-359-1406

Position #3745-0662-20140108ja
DHS-AREA SOCIAL WORK SUPV
C1

An Equal Opportunity Employer

---



DHS
362423

**DHS-Area Social Work Supv Supplemental Questionnaire**

* 1. What is the highest level of social work licensure in the State of Mississippi that you have obtained?
    - ❑ Licensed Social Worker (LSW)
    - ❑ Licensed Master Social Worker (LMSW)
    - ❑ Licensed Certified Social Worker (LCSW)
    - ❑ None of the above

* 2. How many years of experience do you have in social work?
    - ❑ No Experience
    - ❑ 1 Year of Experience
    - ❑ 2 Years of Experience
    - ❑ 3 Years of Experience
    - ❑ 4 Years of Experience
    - ❑ 5 Years of Experience
    - ❑ 6 Years of Experience
    - ❑ 7 Years of Experience
    - ❑ 8 Years of Experience
    - ❑ 9 Years of Experience
    - ❑ 10 Years of Experience
    - ❑ More than 10 Years of Experience

* 3. Have you completed thirty (30) semester hours of graduate level social work eduation?
    - ❑ Yes
    - ❑ No

* Required Question

DHS
362424

# App. B, Ex. 8

**Grace M. Lopes**

| | |
|---|---|
| **From:** | Long, Gwen [glong@bakerdonelson.com] |
| **Sent:** | Monday, February 03, 2014 6:38 PM |
| **To:** | jdavis@ChildrensRights.Org; gmlopes@oymonitor.org |
| **Cc:** | Mia Caras (mcaras@sparb.org); Mark.Smith@mdhs.ms.gov; Rachal, Kenya |
| **Subject:** | February 3, 2013 Production - email #1 |
| **Attachments:** | asws training oct-dec 2013001.pdf; worker training oct-dec 2013001.pdf; Emailed from JACK-011001.pdf; ASWS Report Oct 2013-Dec 2013.xlsx; October 2013 - December 2013 (3).xlsx |

Julia and Grace:

Attached please find the cover letter for today's production as well as the PDF & Excel versions of training reports. Following will be an email containing the following:

- Advertisements for ASWS positions in the Carve Out Counties (DHS 362409-362424).
- Chart of Southern state salaries for supervisors with back-up documentation (DHS 362425-362453)
- CSF Practice Model Report for December 2013 (DHS 362366-362385)

Gwen

**Gwen N. Long**
Paralegal
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
Meadowbrook Office Park
4268 I-55 North
Jackson, MS  39211
Direct:  601.351.8962
Fax:     601.974.8962
E-Mail: glong@bakerdonelson.com
www.bakerdonelson.com

Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C. represents clients across the U.S. and abroad from offices in Alabama, Florida, Georgia, Louisiana, Mississippi, Tennessee, Texas, Washington, D.C.

Please consider the environment before printing this e-mail
**Baker Donelson**: One of FORTUNE magazine's "100 Best Companies to Work For"

Under requirements imposed by the IRS, we inform you that, if any advice concerning one or more U.S. federal tax issues is contained in this communication (including in any attachments and, if this communication is by email, then in any part of the same series of emails), such advice was not intended or written by the sender or by Baker, Donelson, Bearman, Caldwell & Berkowitz, PC to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or tax-related matter addressed herein.

This electronic mail transmission may constitute an attorney-client communication that is privileged at law. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this electronic mail transmission in error, please delete it from your system without copying it, and notify the sender by reply e-mail, so that our address record can be corrected.

**Grace M. Lopes**

| | |
|---|---|
| **From:** | Long, Gwen [glong@bakerdonelson.com] |
| **Sent:** | Monday, February 03, 2014 6:39 PM |
| **To:** | jdavis@ChildrensRights.Org; gmlopes@oymonitor.org |
| **Cc:** | Mia Caras (mcaras@sparb.org); Mark.Smith@mdhs.ms.gov; Rachal, Kenya |
| **Subject:** | 2-3-14 Production - #2 |
| **Attachments:** | asws comparison salaries001.pdf; asws ads001.pdf; csf pm rept 12-13001.pdf |

Julia and Grace:

This should complete the production for today.  Let me know if you have any problems receiving.

Gwen

**Gwen N. Long**
Paralegal
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
Meadowbrook Office Park
4268 I-55 North
Jackson, MS  39211
Direct:  601.351.8962
Fax:    601.974.8962
E-Mail: glong@bakerdonelson.com
www.bakerdonelson.com

Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C. represents clients across the U.S. and abroad from offices in Alabama, Florida, Georgia, Louisiana, Mississippi, Tennessee, Texas, Washington, D.C.

🌲 Please consider the environment before printing this e-mail
**Baker Donelson**: One of FORTUNE magazine's "100 Best Companies to Work For"

Under requirements imposed by the IRS, we inform you that, if any advice concerning one or more U.S. federal tax issues is contained in this communication (including in any attachments and, if this communication is by email, then in any part of the same series of emails), such advice was not intended or written by the sender or by Baker, Donelson, Bearman, Caldwell & Berkowitz, PC to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or tax-related matter addressed herein.

This electronic mail transmission may constitute an attorney-client communication that is privileged at law. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this electronic mail transmission in error, please delete it from your system without copying it, and notify the sender by reply e-mail, so that our address record can be corrected.

| STATE | POSITION | PAY | EDUCATION | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ALABAMA | SW SUPERVISOR | $ 41,258.00 | MSW+LIC | | | | | | | | | | | |
| | Per Capita Income | $ 23,587.00 | | | | | | | | | | | | |
| ARKANSAS | SW SUPERVISOR | $ 39,199.00 | MSW+LIC | | | | | | | | | | | |
| | Per Capita Income | $ 22,007.00 | | | | | | | | | | | | |
| GEORGIA | SW SUPERVISOR | $ 37,080.00 | MSW+LIC | | | | | | | | | | | |
| | Per Capita Income | $ 25,309.00 | | | | | | | | | | | | |
| LOUISIANA | SW SUPERVISOR | $ 38,813.00 | BACHELOR 5YR EXP | | | | | | | | | | | |
| | Per Capita Income | $ 24,264.00 | | | | | | | | | | | | |
| MISSISSIPPI | SW SUPERVISOR | $ 37,512.00 | MSW+LIC | | | | | | | | | | | |
| | Per Capita Income | $ 20,670.00 | | | | | | | | | | | | |
| SOUTH CAROLINA | SW SUPERVISOR | $ 31,182.00 | MSW+LIC | | | | | | | | | | | |
| | Per Capita Income | $ 23,906.00 | | | | | | | | | | | | |
| TENNESSEE | SW SUPERVISOR | $ 36,276.00 | BACHELOR 5YR EXP | | | | | | | | | | | |
| | Per Capita Income | $ 24,294.00 | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| OTHER STATE AGENCIES IN MS | | | | | | | | | | | | | | |
| SW SUPERVISOR | | $ 46,928.00 | MEDICAL OR PSYCHIATRIC SETTING | | | | | | | | | | | |
| | | MSW + LIC + 7YRS EXP | | | | | | | | | | | | |

DHS
362425

**State of Alabama**
**Personnel Department**
**64 North Union Street**
**P. O. Box 304100**
**Montgomery, AL 36130-4100**
**Phone: (334) 242-3389**
**Fax: (334) 242-1110**
www.personnel.alabama.gov

Continuous Announcement

# SENIOR SOCIAL WORK SUPERVISOR - 50224

**Salary:** $41,258.40 - $62,529.60
Announcement Date: May 19, 2004
Revised Date: September 1, 2008

## JOB INFORMATION
The Senior Social Work Supervisor is a permanent full-time position with the Department of Human Resources. Positions are located throughout the state. This is advanced supervisory service social work. Employees in this class plan, organize, and supervise difficult child protective services, adult protective services, Medicaid waiver, child and adult foster care, and/or adoption operations within a county Human Resources office.

## MINIMUM REQUIREMENTS
- Master's degree in Social Work from a social work program accredited by the Council on Social Work Education
- For the promotional register, current permanent status with the Department of Human Resources as a Social Service Caseworker, Social Worker, Senior Social Worker, Service Supervisor, or Human Resources Program Specialist
- Two years of professional social work experience in child welfare and/or adult services in a public welfare agency

## ADDITIONAL REQUIREMENTS
- Applicants must possess licensure as issued by the Alabama Board of Social Work Examiners at or above the LGSW level in order to be considered for this position. **Please include this information on the application.**
- Per Alabama Act Number 2000-775, beginning November 1, 2000, persons who apply for child welfare jobs will be subjected to a criminal background investigation prior to employment with the Department of Human Resources.
- Applicants must have available, suitable transportation for use on the job.

## BENEFITS
- Low-Cost Health/Dental Insurance (Single Coverage)
- Accrue Thirteen Annual Leave Days per Year
- Thirteen Paid Holidays per Year
- Flexible Employee Benefit Plans
- Optional Family Coverage (Health/Dental)
- Accrue Thirteen Sick Days per Year
- Retirement Plan
- Optional Deferred Compensation Plans

## EXAMINATION
- **Open-Competitive** to all applicants and **Promotional** to current state employees
- An **Evaluation of Training and Experience** will comprise 95% of the applicant's final score for the promotional register, with the remaining 5% being based on the average of the applicant's service ratings for the last three years. Scores from the **Evaluation of Training and Experience** will comprise 100% of the final score for the open-competitive register.

## HOW TO APPLY
- Complete an Application for Examination Form available at *www.personnel.alabama.gov*, the above address, or any Alabama Career Center Office.
- Apply by mail or by fax. *Applications will be accepted until further notice.*

*Individuals currently on the register MUST reapply to remain eligible for employment.*
*Veteran's credits are NOT allowed on promotional examinations.*

**THE STATE OF ALABAMA IS AN EQUAL OPPORTUNITY EMPLOYER**

Please refer to the back of this announcement for complete information on State Personnel's policy for accepting post-secondary and advanced degrees.

DHS
362426

Except for pretest information provided by State Personnel to all applicants, you should not directly or indirectly obtain information about examinations. If you do, the State Personnel Director may do several things. One, you may not be given an examination. Two, you may be disqualified after an examination. Three, your name may be removed from a register. Or four, your name may not be certified from the register. (Rules of the State Personnel Board, Chapter 670-x-9). According to the Code of Alabama, 36-26-47, a willful violation of exam security is a misdemeanor. Any person who is convicted of this type of misdemeanor will not get a state job. If they are officers or employees of the state, they will be required to forfeit their office or position for five years.

If you know of anyone who has violated this policy, you should contact the Examination Manager at the State Personnel Department.

**State of Alabama Personnel Department Policy on Accepting College Coursework, Post-Secondary and Advanced Degrees**

1.  Specific college coursework required for a job, as well as Bachelor's, graduate, post graduate, and doctoral degrees will be accepted from the schools accredited by any of the six regional accreditation associations in the United States. These associations are listed below.

- Southern Association of Colleges and Schools (SACS)
- Middle States Association of Colleges and Schools (MSA)
- Northwest Commission on Colleges and Universities (NWCCU)
- North Central Association of Colleges and Schools – The Higher Learning Commission (NCA-HLC)
- New England Association of Schools and Colleges – Commission on Institutions of Higher Education (NEASC-CIHE)
- Western Association of Schools and Colleges – Accrediting Commission for Senior Colleges and Universities (WASC-ACSCU)

2.  Coursework or degrees from schools that have not been accredited by a regional accreditation association will be accepted if a regionally accredited school considers the coursework or degree to be an acceptable prerequisite for admission to an advanced degree program. For example, if a regionally accredited school accepts an applicant's bachelor's degree for admittance into a graduate degree program, State Personnel will accept the degree. In the case of required college coursework (but no degree requirement), State Personnel will accept the college coursework if a regionally accredited school accepts the coursework towards a post-secondary degree (e.g., a bachelor's degree). *__This must be documented by a letter of acceptance from the regionally accredited school.__* State Personnel will review such requests on a case-by-case basis.

Note: This policy is subject to change. Certain state agencies may have additional requirements.

DHS
362427

Pay Plan (Salary Schedule)                                                                    Page 1 of 1



## Pay Plan (Salary Schedule)

**Class:** 50224 Senior Social Work Supervisor
**Grade:** 75

Act# 2005-316 REQUIRES STATE EMPLOYEES TO BE PAID AT A SEMI MONTHLY RATE.

THE COMPARISON TABLE IS PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

|          | Semi-Monthly | Annual      | Hourly  | BiWeekly   |
|----------|--------------|-------------|---------|------------|
| Step 01: | $1,719.10    | $41,258.40  | $19.84  | $1,586.86  |
| Step 02: | $1,761.10    | $42,266.40  | $20.32  | $1,625.63  |
| Step 03: | $1,805.80    | $43,339.20  | $20.84  | $1,666.89  |
| Step 04: | $1,850.70    | $44,416.80  | $21.35  | $1,708.33  |
| Step 05: | $1,895.90    | $45,501.60  | $21.88  | $1,750.06  |
| Step 06: | $1,942.30    | $46,615.20  | $22.41  | $1,792.89  |
| Step 07: | $1,989.90    | $47,757.60  | $22.96  | $1,836.83  |
| Step 08: | $2,038.50    | $48,924.00  | $23.52  | $1,881.69  |
| Step 09: | $2,088.30    | $50,119.20  | $24.10  | $1,927.66  |
| Step 10: | $2,140.70    | $51,376.80  | $24.70  | $1,976.03  |
| Step 11: | $2,194.30    | $52,663.20  | $25.32  | $2,025.50  |
| Step 12: | $2,249.80    | $53,995.20  | $25.96  | $2,076.73  |
| Step 13: | $2,305.30    | $55,327.20  | $26.60  | $2,127.96  |
| Step 14: | $2,361.90    | $56,685.60  | $27.25  | $2,180.21  |
| Step 15: | $2,420.20    | $58,084.80  | $27.93  | $2,234.03  |
| Step 16: | $2,479.90    | $59,517.60  | $28.61  | $2,289.13  |
| Step 17: | $2,541.30    | $60,991.20  | $29.32  | $2,345.81  |
| Step 18: | $2,605.40    | $62,529.60  | $30.06  | $2,404.98  |

( Search Again )    (        Job Classes in this Pay Grade        )

Note: ***By Law, Act# 2005-316 requires salaries of State Employees to be paid at a semi-monthly rate. The semi-monthly rates reflected in this Pay Plan are the official rates of pay. Other rates included in the Comparison Table are provided for informational purposes only. Standard rounding principals are used in the calculations. See ALA. CODE 36-6-1 (2005 CUM. SUPP.)

The information presented here is updated regularly and is accurate as of: 12/01/2013

SPD © 2013    My Profile-OES    Contact Us
Board Notices/Annual Reports    Site Map

DHS
362428

CLASS SPECIFICATION

CLASS TITLE: LICENSED CERTIFIED SOCIAL WORKER
Class Code: M009C

CLASS SUMMARY
The Licensed Certified Social Worker is responsible for supervising social work and counseling activities, providing technical assistance, and developing program plans. This position is governed by state and federal laws and agency/institution policy.

TYPICAL FUNCTIONS
Performs a lead role in coordinating predetermined work assignments of co-workers and/or subordinate employees by communicating prioritization of activities and project deadlines. Provides technical assistance to staff and clients by offering consultation concerning specific requests, explaining laws and regulations, and monitoring certification standards. Develops program plans by determining goals and objectives, assessing programs, and making recommendations for policy and procedure changes in conjunction with other staff. Conducts individual group counseling sessions to increase client self-esteem and to aid client's social, emotional, psychological, and physical wellbeing. Refers clients to other sources of help, monitors client's progress, writes release summaries, and notifies appropriate personnel. Testifies in court concerning client's compliance with court order and psychiatric stability. Prepares and maintains reports, including logs of daily progress of patients, quality assurance records, documentation of sessions, and case work records. Performs other duties as assigned.

KNOWLEDGES, ABILITIES, AND SKILLS
Knowledge of principles and practices of counseling and social work. Knowledge of agency, community, and state human service resources. Knowledge of state laws and agency policy governing specific program area. Knowledge of computer operating software systems. Ability to plan, organize, and direct work of others. Ability to interview, obtain, evaluate, and diagnose information related to problems and services needed. Ability to provide treatment, guidance, and counseling to clients. Ability to serve as a social advocate for clients by providing information and evaluating and monitoring treatment plans.

MINIMUM QUALIFICATIONS
The formal education equivalent of a master's degree from an accredited social work program in an accredited institution approved by the Council on Social Work Education; plus two years of supervised social work experience in a clinical or nonclinical concentration by a licensed certified social worker. Must be licensed as a Licensed Certified Social Worker by the Arkansas Social Work Licensing Board as required by ACA 17-103-306. Additional requirements determined by the agency for recruiting purposes require review and approval by the Office of Personnel Management. OTHER JOB RELATED EDUCATION AND/OR EXPERIENCE MAY BE SUBSTITUTED FOR ALL OR PART OF THESE BASIC REQUIREMENTS, EXCEPT FOR CERTIFICATION OR LICENSURE REQUIREMENTS, UPON APPROVAL OF THE QUALIFICATIONS REVIEW COMMITTEE.

DHS
362429

**Class Code:** M009C
**Job Title:** LICENSED CERTIFIED SOCIAL WORKER
**Fair Labor Standards Act (FLSA) Exemption Status: E**
　　　　　　　Exempt
**Grade:** C121
**Pay Scale:**

| Level | Annual | Hourly |
|-------|--------|--------|
| **Entry** | 39,199 | 18.8457 |
| **Base** | 41,612 | 20.0057 |
| **Midpoint** | 53,264 | 25.6076 |
| **Maximum** | 64,915 | 31.2091 |
| **Career** | 70,108 | 33.7057 |

NOTE: Salaries can only increase past the Maximum level for employees with 15 or more years of service.
Click here to view the class specification

DHS
362430



## Social Services Protect and Placement Supervisor
## Division of Family and Children Services

**Position Number: 00177135**                    **Vacancy Posting Date: 12.16.13**

### Overview

The Georgia Department of Human Services (DHS), Division of Family and Children Services (DFCS) is seeking candidates for the position of **Social Services Protect and Placement Supervisor**. This position will serve **Region 4, Spalding County.**

DHS delivers a wide range of human services designed to promote self-sufficiency and well-being for all Georgians. The department is one of the largest agencies in state government with an annual budget of $1.8 billion and approximately 8500 employees.  DHS is comprised of three divisions and seven offices.

DFCS is the division within DHS that investigates child abuse, identifies foster homes for abused and neglected children; helps low income and out-of-work families get back on their feet; assists with childcare costs for low income parents who are working or in job training programs; and provides a number of additional support services and innovative programs to provide aid to troubled families.

### Summary of Responsibilities

This position reports to the Social Services Administrator.  Under limited supervision, the Social Services Protect and Placement Supervisor manage a social services unit that provides investigative and comprehensive case management for child/adult abuse or neglect.

The Social Services Protect and Placement Supervisor:
1. Directs professional staff in the delivery of services.
2. Establishes unit goals.
3. Regulates workloads in accordance with agency goals.
4. Ensures that immediate and follow-up actions for at risk clients occur in a timely manner.
5. Ensures efficient and timely delivery of services.
6. Directs professional staff in developing their skills, delivering quality services and documenting efforts.
7. Promotes awareness of programs within the community.
8. Performs other professional responsibilities as assigned by supervisor.

### Core Competencies

1. Demonstrated successful leadership skills:
   A. *Leading Change*:  Demonstrated ability to lead change as evidenced by an ability to develop and implement an organizational vision.
   B. *Leading People*:  Demonstrated ability to achieve organizational objectives by creatively managing and motivating staff.
   C. *Results Driven Leadership*:  Demonstrated knowledge of and ability to plan, prioritize and coordinate large and complex programs.

DHS
362431

D. *Business Acumen*:   Demonstrated ability to properly utilize human capital, financial resources and information in a manner that instills public trust and accomplishes the organization's mission; demonstrated ability to take advantage of new technologies to enhance the effectiveness of decision making.

2. Ability to work effectively at multiple levels of the organization and with multiple project teams
3. Excellent oral, written, presentation and interpersonal communication skills
4. Strong proficiency in the use of Microsoft Office Suite and/or standard software applications typically used in a corporate office environment

Candidates selected for an interview will be expected to discuss the content of the "*Life As A Georgia Case Manager*" video.  Interested applicants should refer to the **Related Links** section of http://www.dhsjobs.org to view this video prior to applying for the position.

*DHS provides services to ensure the health and welfare of all Georgians.  In the event of an emergency, any employee may be required to assist in meeting the emergency responsibilities of the department.*

| Required Qualifications:  Education, Experience and Credentials |
| --- |

1. Bachelor's degree in behavioral science from an approved accredited college or university **and** twenty four (24) months of case management experience in a social services program of the Division of Family and Children Services or similar social services case management experience in a human services delivery program (child support, family/children services, juvenile justice, public health, mental health, military health care/morale, welfare and recreation, or comparable private social services agencies)

Educational achievement does not substitute for required case management experience.

| Preferred Qualifications:  Education, Experience and Credentials |
| --- |

*The ideal candidate will meet the required qualifications as well as the following:*

1. Master's degree in behavioral science from an approved accredited college or university **and** twenty four (24) months of case management experience in a social services program of the Division of Family and Children Services or similar social services case management experience in a human services delivery program (child support, family/children services, juvenile justice, public health, mental health, military health care/morale, welfare and recreation, or comparable private social services agencies)
2. DFCS experience preferred in the Resource Development Unit.

Educational achievement does not substitute for required case management experience.

| Competitive Total Rewards Package:  Compensation and Benefits |
| --- |

Pay Level 15.    Salary:  Up to $37,080.00

Salary is dependent upon DHS/DFCS salary practices, candidate's experience and/or available funds. Current state government employees are subject to DHS and/or State Personnel Board rules and practices regarding salary designations.

Benefits:    Generous benefits package that includes an employee retirement plan, deferred compensation, 12 annual paid vacation days and sick leave. Flexible benefits include selection options for life, dental and vision insurance and long-term health care.

| Georgia On My Mind:  It Doesn't Get Any Better Than This |
| --- |

Social Services Placement Supervisor, Spalding County, Region 4

DHS
362432

Georgians enjoy a quality of life that would be hard to find in any area across the nation. Lower taxes and a lower cost of living enable you to do more with the money you make and maintain a higher standard of living.

Within Georgia you will find an unlimited supply of recreational and cultural opportunities. Enjoy boating, camping, fishing, golf, hiking, picnicking, swimming, tennis or just relaxing against Georgia's many scenic backdrops. Georgia is a 57,906 square-mile playground filled with natural beauty and immaculate resources.

From the mountains to the coast from ballet to baseball, Georgia offers you a livability and quality of life that can help you achieve your dreams.

**Apply Now:  Your Career is Waiting. The Only Thing Missing is You!!!**

To begin your new career:

1. Scroll to the bottom of this page;
2. Click on the CLICK HERE TO APPLY tab;
3. Upload a cover letter and résumé in Microsoft Word (.doc, .docx, .txt or .pdf format) for the desired position. The cover letter and résumé will be used to initially assess written communication skills and the ability to effectively use standard software applications.

Interested applicants should adhere to these submission requirements and apply without delay. Primary consideration will be given to applicant packages that comply with submission guidelines. Vacancy advertisements are removed as soon as a viable applicant pool is established.

**You will receive an email to acknowledge receipt of your documents. Due to the volume of submissions received, we are unable to respond directly, either by telephone, letter or email, to requests to verify receipt of application documents.  The email acknowledgement will serve as confirmation of receipt of requested documents.**

Social Services Placement Supervisor, Spalding County, Region 4

DHS
362433



# State of Louisiana
## DEPARTMENT OF STATE CIVIL SERVICE

www.civilservice.la.gov

166770
CHILD WELFARE SUPERVISOR
SS417    $38,813 - $81,682
Creation Date: 03/03/2003
Change Date: 06/21/2013

FUNCTION OF WORK:
Provides services in child welfare program areas administered by the Department of Children and Family Services by supervising a unit of professional child welfare staff.

LEVEL OF WORK:
Supervisor.

SUPERVISION RECEIVED:
Broad from a Child Welfare Manager 1 or other equivalent level personnel.

SUPERVISION EXERCISED:
Direct over lower level professional Child Welfare positions. May exercise supervision over clerical personnel as needed.

LOCATION OF WORK:
Department of Children and Family Services.

JOB DISTINCTIONS:
Differs from Child Welfare Support Specialist and Child Welfare Specialist 3 by the presence of supervisory responsibility.

Differs from Child Welfare Manager 1 by the absence of managerial duties exercised over subordinate Child Welfare Consultants and/or Child Welfare Supervisors.

See allocation criteria memo.

EXAMPLES OF WORK:
EXAMPLES BELOW ARE A BRIEF SAMPLE OF COMMON DUTIES ASSOCIATED WITH THIS JOB TITLE. NOT ALL POSSIBLE TASKS ARE INCLUDED.

Guides employees in the assessment of services or placement needs of clients, the development of psychosocial assessment of case goals/objectives and/or case plans for clients and their families, and the implementation of the case plan.

Reviews child protection complaints and assigns investigations.

May serve as a consultant to other supervisors or employees.

May design and deliver training curricula or on-the-job training.

Approves the plan to request removal of children from the care and custody of their parents or caretakers to place them in agency custody, relative custody, or other alternative placement plans for the child.

Reviews recommendations of employees relative to the determination of the validity of abuse and/or neglect reports.

May lead family team conferences and multi-disciplinary team staffings for case plans/objectives which are formalized in

DHS
362434

a written contract form; case plans are reviewed with clients, their family, and community resource partners.

May act as a parish manager in assuming responsibility for administrative functions.

Gathers and analyzes data in order to design and implement recruitment campaigns to recruit potential adoptive and foster family resources to meet the placement needs of children in agency custody.

Reviews and approves foster and adoptive home certifications and adoptive placements.

May supervise quality assurance staff engaged in conducting case reviews and providing Quality Assurance consultations.

QUALIFICATION REQUIREMENTS:

MINIMUM QUALIFICATIONS:
Any of the following will qualify:

1. A baccalaureate degree in social work; psychology; psychiatric nursing; psychiatry; mental health counseling; rehabilitation counseling; psychological counseling; criminal justice; sociology; applied sociology; human services counseling; education with a concentration in special education; family and consumer sciences with a concentration in child, family and social services; guidance and counseling; human development counseling; social services counseling; vocational rehabilitation; or human services plus four years of professional social services experience, three years of which must have been in child welfare.

2. A baccalaureate degree in a non-related field plus five years of professional social services experience, three years of which must have been in child welfare.

3. A master's degree in social work; psychology; psychiatric nursing; psychiatry; mental health counseling; rehabilitation counseling; psychological counseling; criminal justice; sociology; applied sociology; human services counseling; education with a concentration in special education; family and consumer sciences with a concentration in child, family and social services; guidance and counseling; human development counseling; social services counseling; vocational rehabilitation; or human services plus three years of professional child welfare social services experience.

4. A master's degree in a non-related field plus four years of professional social services experience, three years of which must have been in child welfare.

NECESSARY SPECIAL REQUIREMENT:
A valid driver's license and access to a personal vehicle.

NECESSARY SPECIAL REQUIREMENT:
Individuals occupying this job who are subject to state licensing or registration laws administered by the Louisiana State Board of Social Work Examiners must possess and keep current the license or registration.

NOTE:
Preference will be given to qualified candidates with a master's degree in social work.

NOTE:
The incumbent of this position must not have been convicted or pled nolo contendere to a crime listed in R.S. 15.587.1 (c).

NOTE:
Any college hours or degree must be from a school accredited by one of the following regional accrediting bodies: the Middle States Commission on Higher Education; the New England Association of Schools and Colleges; the North Central Association of Colleges and Schools; the Northwest Commission on Colleges and Universities; the Southern Association of Colleges and Schools; and the Western Association of Colleges and Schools.

DHS
362435

State of Mississippi - Class Specification Bulletin                          Page 1 of 5



# DHS-AREA SOCIAL WORK SUPV

Class Code:
3745

Bargaining Unit: N/A

STATE OF MISSISSIPPI
Established Date: Jul 1, 2007
Revision Date: Jul 1, 2007

### SALARY RANGE
$37,511.76 - $65,645.58 Annually

**CHARACTERISTICS OF WORK:**
This is professional social work of a supervisory nature. Incumbents are responsible for the supervision of social service program for families, children, and adults and maintenance of program operations. Work is performed under the general supervision of the Social Services Regional Director. Incumbents remain on-call on a 24 hour basis.

**EXAMPLES OF WORK:**
**Examples of work performed in this classification include, but are not limited to, the following:**

Ensures maintenance of acceptable standards of social work practice in geographic area of responsibility.

Supervises and is administratively in charge of the area of service and the area social workers.

Provides performance evaluations and performance improvement plans as needed.
Provides in-service and on-the-job training.

Assists the area social workers in difficult cases when needed, particularly where life/health, public contact, and community organization are concerned.

Prepares reports and trend analyses on the operations of geographic area of responsibility.

Makes presentations to community, civic, and church groups on abuse/neglect and other timely topics.

Assists county staffs in the development and utilization of resources necessary for carrying out programs.

Performs related or similar duties as required or assigned.

**MINIMUM QUALIFICATIONS:**
These minimum qualifications have been agreed upon by Subject Matter Experts (SMEs) in this job class and are based upon a job analysis and the essential functions. However, if a candidate believes he/she is qualified for the job although he/she does not have the minimum qualifications set forth below, he/she may request special consideration through substitution of related education and experience, demonstrating the ability to perform the essential functions of the position. Any request to substitute related education or experience for minimum qualifications must be addressed to the State Personnel Board in writing, identifying the related education and experience which demonstrates the candidate's ability to perform all essential functions of the position.

**EXPERIENCE/EDUCATIONAL REQUIREMENTS:**

DHS
362436

**Education:**
Must be licensed to practice Master's Level Social Work (LMSW) in the State of Mississippi;

**AND**

**Experience:**
Four (4) years of experience in social work.

**OR**

**Education:**
Must be licensed to practice Bachelor's Level Social Work (LSW) in the State of Mississippi and must have completed thirty (30) semester hours of graduate level social work education;

**AND**

**Experience:**
Four (4) years of experience in social work.

OR

**Education:**
Must be licensed to practice Bachelor's Level Social Work (LSW or above) in the State of Mississippi;

**AND**

**Experience:**
Five (5) years of experience in social work.

**Documentation Required:**

Applicant must attach a copy of his/her current wallet-size license in Social Work.

**NOTE:**

Incumbent must have a valid driver license and proof of insurance which will be verified by the hiring agency.

**ESSENTIAL FUNCTIONS:**
**Additional essential functions may be identified and included by the hiring agency. The essential functions include, but are not limited to, the following:**

1. Provides supervisory and administrative duties for social workers and general clerks.

2. Provides technical assistance to county staff for various problems.

3. Reviews and improves client services.

**PHYSICAL REQUIREMENTS:**
These physical requirements are not exhaustive, and additional job related physical requirements may be added to these by individual agencies on an as needed basis. Corrective devices may be used to meet physical requirements. These are typical requirements; however, reasonable accommodations may be possible.

Moderate Work: May frequently exert force equivalent to lifting up to approximately 25 pounds and/or occasionally exert force equivalent to lifting up to approximately 50 pounds.

DHS
362437

Vision: Requires the ability to perceive the nature of objects by the eye.

Near Acuity: Clarity of vision at 20 inches or less.
Midrange: Clarity of vision at distances of more than 20 inches and less than 20 feet.
Far Acuity: Clarity of vision at 20 feet or more.
Peripheral: Ability to observe an area that can be seen up and down or left and right while eyes are fixed on a given point.
Depth Perception: Three-dimensional vision. Ability to judge distances and spatial relationships so as to see objects where and as they actually are.
Ability to adjust focus: Ability to adjust the eye to bring an object into sharp focus.

Speaking/Hearing: Possesses the ability to give and receive information through speaking and listening skills.

Taste/Smell: Possesses the ability to use the sense of smell to recognize and distinguish odors. Possesses the ability to use the sense of taste to recognize and distinguish flavors.

Motor Coordination: While performing the duties of this job, the incumbent is regularly required to use hands to finger, handle, or feel objects, tools, or controls; and reach with hands and arms. The incumbent is frequently required to sit; stand; and walk. The incumbent is occasionally required to stoop, kneel, crouch, or bend; and climb or balance.

**INTERVIEW REQUIREMENTS:**

Any candidate who is called to an agency for an interview must notify the interviewing agency in writing of any reasonable accommodation needed prior to the date of the interview.

**COMPETENCIES:**
The following competencies describe the knowledge, skills, abilities, and attributes that lead to a successful employee in this position. An applicant will be expected to exhibit these competencies or the ability to reach competency achievement within a specified time. These competencies are linked to the essential functions of the job. Employees in this position may be evaluated on these competencies as part of the performance appraisal system. Example behaviors are listed below each competency and are used for illustrative purposes only. Specific behaviors may be identified and included later by the hiring agency. It is understood that some of these behaviors might not be acquired until a reasonable time after hire. Failure of an employee to successfully demonstrate some or all of these competencies, as deemed important by his or her reporting official, may result in the employee being placed on a performance improvement plan. If after a reasonable period of time, usually three (3) months, the employee fails to demonstrate successful performance, the employee may be terminated. These competencies include, but are not limited to, the following:

**PUBLIC SECTOR COMPETENCIES:**

Integrity and Honesty: Demonstrates a sense of responsibility and commitment to the public trust through statements and actions.

Models and demonstrates high standards of integrity, trust, openness, and respect for others. Demonstrates integrity by honoring commitments and promises. Demonstrates integrity by maintaining necessary confidentiality.

Work Ethic: Is productive, diligent, conscientious, timely, and loyal.

Conscientiously abides by the rules, regulations, and procedures governing work.

Service Orientation: Demonstrates a commitment to quality public service through statements and actions.

Seeks to understand and meets and/or exceeds the needs and expectations of customers. Treats customers with respect, responding to requests in a professional manner, even in difficult circumstances. Provides accurate and timely service. Develops positive relationships with customers.

Accountability: Accepts responsibility for actions and results.

Is productive and carries fair share of the workload. Focuses on quality and expends the necessary time and effort to achieve goals. Demonstrates loyalty to the job and the agency and is a good steward of state assets. Steadfastly persists in overcoming obstacles and pushes self for results. Maintains necessary attention to detail to achieve high-level performance. Deals effectively with pressure and recovers quickly from setbacks. Takes ownership of tasks, performance standards, and mistakes. Has knowledge of how to perform one's job. Knows the organization's mission and functions and how it fits into state government.

Self Management Skills: Effectively manages emotions and impulses and maintains a positive attitude.

Encourages and facilitates cooperation, pride, trust, and group identity; fosters commitment and team spirit; works effectively and cooperatively with others to achieve goals. Treats all people with respect, courtesy, and consideration. Communicates effectively. Remains open to new ideas and approaches. Avoids conflicts of interest. Promotes cooperation and teamwork. Continuously evaluates and adapts; copes effectively with change. Allows self and others to make mistakes and learns from those mistakes. Adheres to high ethical standards.

Interpersonal Skills: Shows understanding, courtesy, tact, empathy, and concern to develop and maintain relationships.

Demonstrates cross cultural sensitivity and understanding. Identifies and seeks to solve problems and prevent or resolve conflict situations. Encourages others through positive reinforcement. Models appropriate behavior. Recognizes and develops potential in others; mentors.

Communication Skills: Receives, attends to, interprets, and responds to verbal messages and expresses information to individuals or groups effectively.

Receives other cues such as body language in ways that are appropriate to listeners and situations. Takes into account the audience and nature of the information; listens to others, attends to nonverbal cues, and responds appropriately. May make oral presentations. Communicates ideas, suggestions, and concerns, as well as outcomes and progress throughout the process of an activity. Provides thorough and accurate information.

Self-Development: Adapts behavior or work methods in response to new information, changing conditions, or unexpected obstacles.

Seeks efficient learning techniques to acquire and apply new knowledge and skills; uses training, feedback, or other opportunities for self-learning and development. Develops and enhances skills to adapt to changing organizational needs. Remains open to change and new information and ideas.

**TECHNICAL COMPETENCIES:**

Assessment: Assigns cases to Social Workers to determine the social needs of children and adults.

Supervises and is administratively in charge of the area of service and the area social workers. Gathers relevant data. Identifies, assesses, and analyzes information. Communicates effectively with family. Conducts intake interviews and refers for public assistance, family, and children services, and related services. Investigates immediately all reports of neglect, abuse, or exploitation of children.

Social Work Supervision: Coordinates a group of social workers engaged in providing and securing appropriate social services

Provides technical assistance to social workers. Ensures maintenance of acceptable standards of social

DHS
362439

work practice in geographic area of responsibility. Provides in-service and on-the-job training. Assists county staffs in the development and utilization of resources necessary for carrying out programs. Develops and maintains a plan and program of service for each family applying for or receiving support. Refers clients to agencies that provide services enabling heads of families or older children within the family to become self-supporting members of society. Discusses family planning with families and individuals as needed. Assists those wishing such services to find and utilize appropriate resources. Assists families and individuals in planning and securing appropriate services related to their social, medical, financial, child care, home management, and emotional needs.

Placement Supervision: Supplies protective and placement services for homeless, dependent, or neglected children.

Places and supervises children requiring foster home placement. Recruits, studies, and recommends foster homes for approval. Initiates placement of neglected, abused, or exploited of children as needed.

Case Management: Supervises social workers engaged in managing caseloads of children or vulnerable adults.

Ensures accurate documentation of all cases. Remains on-call on a 24-hour basis. Prepares reports documenting information on a step-by-step basis. Prepares reports and trend analyses on the operations of geographic area of responsibility. Assists the area social workers in difficult cases when needed. Assists social workers in preparing for court. Testifies in court. Conducts home studies for placement purposes.

**MANAGEMENT COMPETENCIES:**

Emotional Maturity: Conducts oneself in a professional, consistent manner when representing the organization.

Has the ability to work through adversity and hold self and others accountable for work actions.

Macro Oriented: Exercises good judgment; makes sound, well-informed decisions.

Understands and appropriately applies procedures, requirements, and regulations related to specialized areas of expertise.

Working Through Others: Supports, motivates, and is an advocate for staff.

Reinforces and rewards team efforts and positive behaviors. Is fair, yet firm with others. Monitors workloads and provides feedback.

Results Oriented: Plans effectively to achieve or exceed goals; sets and meets deadlines.

DHS
362440

State of Mississippi - Class Specification Bulletin                    Page 1 of 5



# SOCIAL WORKER SUPERVISOR

Class Code:
4730

Bargaining Unit: N/A

STATE OF MISSISSIPPI
Established Date: Nov 1, 2008
Revision Date: Nov 1, 2008

## SALARY RANGE
$46,928.20 - $82,124.35 Annually

### CHARACTERISTICS OF WORK:
This is social work in a medical, psychiatric or institutional setting. An employee in this class is responsible for guiding and coordinating the activities of a group or unit of social services assistants or social workers engaged in casework, individual therapy, group work, and community services primarily in an institution or health center environment. Work involves the assignment of cases to workers for investigation, diagnosis, and treatment or referral; the review of cases for quality of service and compliance with regulations; the training and supervision of workers through individual conferences and departmental staff meetings; and the performance of direct casework and group work services. Work is performed under the general supervision of a Social Services Director and/or Unit Director, Review of the incumbent's performance is periodically made through conferences and reports.

### EXAMPLES OF WORK:
Examples of work performed in this classification include, but are not limited to, the following:

Coordinates the responsibilities of professional social workers by providing guidance for the staff in the execution of their services to the hospitals, after care patients, and families of patients and by assigning cases to the staff.

Provides direct casework and group work services and conducts marital case conferences with patients and families.

Serves as liaison between staff and departmental, county, state officials regarding policies, procedures, and directives.

Conducts meetings periodically to increase the workers understanding of policies and procedures.

Monitors, reviews, and assesses patients case records and charts.

Assists in developing policies and procedures for designated unit.

Serves on hospital committees as assigned.

Performs related or similar duties as required or assigned.

### MINIMUM QUALIFICATIONS:
These minimum qualifications have been agreed upon by Subject Matter Experts (SMEs) in this job class and are based upon a job analysis and the essential functions. However, if a candidate believes he/she is qualified for the job although he/she does not have the minimum qualifications set forth below, he/she may request special consideration through substitution of related education and experience,

DHS
362441

demonstrating the ability to perform the essential functions of the position. Any request to substitute related education or experience for minimum qualifications must be addressed to the State Personnel Board in writing, identifying the related education and experience which demonstrates the candidate's ability to perform all essential functions of the position.

EXPERIENCE/EDUCATIONAL REQUIREMENTS:

Education:
Must be licensed to practice Masters level social work (LMSW or above) in the State of Mississippi.


AND

Experience:
Seven (7) years of experience related to the described duties.

Documentation Required: Applicants must attach a valid copy of his/her current wallet-size social worker license.


**ESSENTIAL FUNCTIONS:**


**PHYSICAL REQUIREMENTS:**
INTERVIEW REQUIREMENTS:

Any candidate who is called to an agency for an interview must notify the interviewing agency in writing of any reasonable accommodation needed prior to the date of the interview.


**COMPETENCIES:**
The following competencies describe the knowledge, skills, abilities, and attributes that lead to a successful employee in this position. An applicant will be expected to exhibit these competencies or the ability to reach competency achievement within a specified time. These competencies are linked to the essential functions of the job. Employees in this position may be evaluated on these competencies as part of the performance appraisal system. Example behaviors are listed below each competency and are used for illustrative purposes only. Specific behaviors may be identified and included later by the hiring agency. It is understood that some of these behaviors might not be acquired until a reasonable time after hire. Failure of an employee to successfully demonstrate some or all of these competencies, as deemed important by his or her reporting official, may result in the employee being placed on a performance improvement plan. If after a reasonable period of time, usually three (3) months, the employee fails to demonstrate successful performance, the employee may be terminated. These competencies include, but are not limited to, the following:

**PUBLIC SECTOR COMPETENCIES:**

**Integrity:** Demonstrates a sense of responsibility and commitment to the public trust through statements and actions.

Models and demonstrates high standards of integrity, trust, openness, and respect for others. Demonstrates integrity by honoring commitments and promises. Demonstrates integrity by maintaining necessary confidentiality.

**Work Ethic:** Is productive, diligent, conscientious, timely, and loyal.

DHS
362442

Conscientiously abides by the rules, regulations, and procedures governing work. Meets deadlines. Work product is of a high quality. Follows through on assigned tasks until they are completed correctly. Takes ownership of tasks and duties.

**Service Orientation:** Demonstrates a commitment to quality public service through statements and actions.

Seeks to understand and meet and/or exceed the needs and expectations of customers. Treats customers with respect, responding to requests in a professional manner, even in difficult circumstances. Provides accurate and timely service. Develops positive relationships with customers. Obtains first-hand customer information and uses it to improve projects and/or services.

**Accountability:** Accepts responsibility for actions and results.

Is productive and carries fair share of the workload. Focuses on quality and expends the necessary time and effort to achieve goals. Demonstrates loyalty to the job and the agency and is a good steward for state assets. Steadfastly persists in overcoming obstacles and pushes self for results. Maintains necessary attention to detail to achieve high level performance. Deals effectively with pressure and recovers quickly from setbacks. Takes ownership of tasks, performance standards and mistakes. Knows the organization's mission and functions and how it fits into state government.

**Self Management Skills:** Effectively manages emotions and impulses and maintains a positive attitude.

Encourage and facilitates cooperation, pride, trust and group identity. Fosters commitment and team spirit. Works effectively and cooperatively with others to achieve goals. Treats all people with respect, courtesy, and consideration. Communicates effectively. Remains open to new ideas and approaches. Avoids conflicts of interest. Promotes cooperation and teamwork. Continuously evaluates, adapts, and copes effectively with change. Allows self and others to make mistakes and learns from those mistakes. Adheres to high ethical standards.

**Interpersonal Skills:** Shows understanding, courtesy, tact, empathy, and concern to develop and maintain relationships.

Demonstrates cross-cultural sensitivity and understanding. Identifies and seeks to solve problems and prevent or resolve conflict issues. Encourages others through positive reinforcement. Expresses facts and ideas both verbally and in writing in a clear, convincing and organized manner, helping others translate vision into action. Models appropriate behavior. Recognizes and develops potential in others; mentors. Builds constructive and effective relationships.

**Communication Skills:** Receives, attends to, interprets, and responds to verbal messages and expresses information to individuals or groups effectively.

Receives nonverbal cues, such as body language in ways that are appropriate to listeners and situations. Takes into account the audience and nature of the information. Listens to others and responds appropriately. May make oral presentations. Communicates ideas, suggestions and concerns as well as outcomes and progress throughout the course of an activity. Provides thorough and accurate information. Can accurately restate the opinions of others even when he/she disagrees.

**Self-Development:** Adapts behavior or work methods in response to new information, changing conditions, or unexpected obstacles.

Seeks efficient learning techniques to acquire and apply new knowledge and skills. Uses training, feedback, or other opportunities for self-learning and development. Develops and enhances skills to adapt to changing organizational needs. Remains open to change and new information and ideas. Is committed to and actively works to continuously improve himself/herself.

**TECHNICAL COMPETENCIES:**

DHS
362443

**Technical Proficiency:** The ability and willingness to exhibit competency in the technical areas needed to do a specific job.

Reads, comprehends, and correctly applies all rules, regulations, and policies applicable to work assignments. Performs work with a minimum amount of supervision in areas that are familiar

**Workflow Management:** The ability and willingness to perform work within defined specifications and timelines and to manage conflicting priorities.

Operates under specific time constraints and within specified deadlines. Effectively prioritizes tasks in order to meet deadlines. Works on appropriate priorities to get the job done.

**Problem Solving/Decision Making:** The ability and willingness cooperate with other employees in identifying and solving problems in order to effectively and efficiently complete assigned tasks

Exhibits ability to identify and address issues. Ensures that all problems encountered are addressed at the appropriate level and communicates all relevant information on a timely basis with accuracy and completeness. Exercises sound reasoning. Displays the ability and willingness to work with other offices or other divisions in order to collectively complete assigned tasks or problems as that arise

**Stakeholder Relations:** The ability and willingness to interact and communicate effectively with stakeholders.

Proactively provides stakeholders with proper information in an effort to reduce occurrences of future problems. Supports the agency mission and goals in all interactions with internal and external stakeholders. Acts as an advocate for agency policy.

**MANAGEMENT COMPETENCIES:**

**Emotional Maturity:** Conducts oneself in a professional, consistent manner when representing the organization.

Has the ability to work through adversity and hold self and others accountable for work actions. Takes risks appropriate to one's level of responsibility. Acts as a settling influence in a crisis. Exhibits the ability to work through challenges and create opportunities.

**Macro-Oriented:** Exercises good judgment and makes sound, well-informed decisions.

Understands and appropriately applies procedures, requirements, and regulations related to specialized areas of expertise. Understands the effects of decisions on the organization and on other organizations. Acts as a change agent by initiating and supporting change within the agency when necessary.

**Working Through Others:** Supports, motivates, and is an advocate for staff

Creates effective teams; shows a willingness to get work done through others. Clearly and comfortably delegates work, trusting and empowering others to perform. Reinforces and rewards team efforts and positive behaviors. Is fair, yet firm with others. Monitors workloads and provides feedback.

**Results Oriented:** Plans effectively to achieve or exceed goals, sets and meets deadlines.

Identifies, analyzes, and solves problems. Develops standards of performance and know what and how to measure.

**Resource Management:** Acquires, effectively and efficiently administers, and allocates human, financial, material, and information resources.

Demonstrates ability to plan, prioritize, and organize.

DHS
362444

State of Mississippi - Class Specification Bulletin

Page 5 of 5

**MSPB/AGENCY USE ONLY - NOTES/COMMENTS:**

DHS
362445

Human Resources Division - State Job Classification Details                     Page 1 of 2

 **HUMAN RESOURCES**

SC Budget and Control Board

Home Page

jobs.sc.gov

Hot Topics

Career Opportunities

Employee Services

Employer Services

Training & Development

How to Contact Us

OHR Webmail

Other Agencies

State Employees
Weather Alert

Sam Wilkins, Director
South Carolina Office
of Human Resources
8301 Parklane Road
Suite A220
Columbia, SC 29223
Phone: (803) 896-5300

INSPECTOR
GENERAL'S
FRAUD HOTLINE

(State Agency fraud only)

1-855-SCFRAUD
or
1-855-723-7283

### State Job Classification Details

### Social Worker III - (GB65)

**General Nature of Work**

Directs social work activities performed by a staff of social workers and
supporting personnel; develops, implements and coordinates a major
program within a social service agency or treatment unit; or delivers
advanced social work services of considera

**Guidelines for Class Use/Distinguishing Characteristics**

Positions in this class are capable of delivering social work services to a
highly vulnerable client population with difficult psychosocial problems.
Work may involve the supervision of lower-level social work and human
services staff.

**Examples of Work**

Interviews clients and/or family to assess the client's current
developmental level, ego strengths and deficits, situation strengths and
weaknesses and mental status. Discusses the proposed plan with the
client detailing the recommendations and the reasoning for them, and
identifies alternative interventions and methods. Evaluates social work
program effectiveness; implements procedural changes to ensure proper
compliance. Teaches concepts of appropriate social work principles
internally and externally. Coordinates external services for clients and
serves as client advocate to ensure continuing services are received.
Meets with community groups to discuss and review available programs
and to identify areas where resources need to be expanded or
reallocated. Develops treatment plans through consultation with
professionals from areas such as nursing, psychology, psychiatry,
medicine and chaplaincy. Monitors and documents progress of clients and
makes service/treatment plan adjustments. Provides individual/group
supervision of lower-level social service staff. Conducts community
planning, needs assessment and evaluation concerning societal conditions
which impact on social functioning.

**Knowledge, Skills and Abilities**

Knowledge of social work principles, practices and techniques. Knowledge
of human behavior, group dynamics and personality principles.
Knowledge of human growth and behavior. Knowledge of interpersonal
intervention techniques. Knowledge of federal, state and local laws that
apply to social service programs. Ability to integrate and coordinate social
service activities with social work staff and those of other disciplines.
Ability to conduct group, family and marital therapy with multiproblem
clients. Ability to engage clients in problem solving. Ability to identify
needs for technical assistance/consultation and develop resources to
meet those needs. Ability to communicate effectively.

**Special Requirements**

Licensure by the South Carolina Board of Social Work Examiners.

**Minimum Requirements**

A bachelor's degree in a social work or social welfare program accredited
by the Council on accredited institution, plus experience as a professional
social worker.

**Pay Band - 05**

| Minimum Salary | Salary Mid Point | Maximum Salary |
|---|---|---|
| $31,182.00 | $44,438.00 | $57,695.00 |

DHS
362446

Human Resources Division - State Job Classification Details

**Browse More Job Descriptions**

THE LANGUAGE USED IN THIS DOCUMENT DOES NOT CREATE AN EMPLOYMENT CONTRACT BETWEEN THE EMPLOYEE AND THE AGENCY. THIS DOCUMENT DOES NOT CREATE ANY CONTRACTUAL RIGHTS OR ENTITLEMENTS. THE AGENCY RESERVES THE RIGHT TO REVISE THE CONTENT OF THIS DOCUMENT, IN WHOLE OR IN PART. NO PROMISES OR ASSURANCES, WHETHER WRITTEN OR ORAL, WHICH ARE CONTRARY TO OR INCONSISTENT WITH THE TERMS OF THIS PARAGRAPH CREATE ANY CONTRACT OF EMPLOYMENT.

DHS
362447



# DCS CASE MANAGER 4

Class Code:
079186

STATE OF TENNESSEE
Established Date: Sep 6, 2008
Revision Date: Mar 27, 2013

## MINIMUM QUALIFICATIONS:

**Education and Experience:** Graduation from an accredited college or university with a master's degree in social work or a related behavioral science field with a child or family focus and experience equivalent to three years of full-time professional child welfare case work including, but not limited to, one or a combination of the following: social, psychological, or correctional counseling or case management; volunteer services coordination for a children's service program; and/or juvenile classification coordination.

**OR**

Graduation from an accredited college or university with a bachelor's degree and experience equivalent to five years of full-time professional child welfare case work including, but not limited to, one or a combination of the following: social, psychological, or correctional counseling or case management; volunteer services coordination for a children's service program; and/or juvenile classification coordination.

## OTHER REQUIREMENTS:

**Necessary Special Qualifications:** *Applicants for this class must:*

1. complete a criminal history disclosure form in a manner approved by the appointing authority;
2. agree to release all records involving their criminal history to the appointing authority;
3. supply a fingerprint sample in a manner prescribed by the TBI for a fingerprint based criminal history records check;
4. submit to a review of their status on the Department of Health's vulnerable persons registry;
5. possess a valid motor vehicle operator's license at the time of appointment in some positions;
6. upon appointment, successfully complete a prescribed course of training offered by the Tennessee Department of Children's Services.

**Examination Method:** Education and Experience,100%, for Preferred Service positions.

## JOB OVERVIEW:

**Summary:** Under general supervision, is responsible for professional case management supervisory work of average difficulty; and performs related work as required.

**Distinguishing Features:** This is the first full supervisory class in the DCS Case Manager job series. An employee in this class is responsible for the supervision of staff who are providing case management services for children under the State's supervision, in State



custody, or at risk of State custody, and their families. This class differs from DCS Case Manager 3 in that an incumbent of the latter performs lead level case management work. This class differs from DCS Team Coordinator in that an incumbent of the latter is responsible for managing operations and programs in a regional or field office or multiple/large residential programs and supervises members of this class.

**WORK ACTIVITIES:**
**Making Decisions and Solving Problems:**

1. Models a holistic approach to problem solving through exploring multiple sources and "thinking outside the box" to promote child welfare outcomes.
2. Determines if abuse or neglect has occurred, who the abuser is, the level of risk or harm to the child, and the need for a safety plan.
3. Compares child's needs to family capabilities to appropriately match child with family.
4. Reviews and assess cases for closure or transfer based on knowledge of policy requirements for case tasks to ensure safety, permanency, and well-being.
5. Utilizes data to make decisions and plans to address issues, trends, and concerns to choose the best solutions.
6. Makes recommendations for reunification or termination of parental rights to ensure permanency.

**Judging the Qualities of Things, Services, or People:**

1. Assesses the underlying needs and core family concerns in order to address key issues that will ensure safety.
2. Evaluates the quality of service providers and resources such as counseling, placements, and case management in order to ensure families receive high quality services.

**Interpreting the Meaning of Information for Others:**

1. Interprets the meaning and intent of policies and procedures for staff, community partners, and clients.

**Resolving Conflicts and Negotiation with Others:**

1. Addresses conflicts among co-workers and leadership using conflict resolution skills to provide a harmonious working environment.

**Getting Information:**

1. Oversees intake interviews with individuals reporting suspected child abuse or neglect to ensure interviews are correctly prioritized.
2. Discusses case information with subordinates to guide decision making process regarding case needs, resource allocation and outcomes.
3. Ensures subordinates locate and identify natural, formal and informal supports to ensure diligent searches are conducted and documented in order to promote permanency.
4. Reviews case information to assess appropriate case manager assignment in order to match the best fit for the case and rotation of schedule.

**Evaluating Information to Determine Compliance with Standards:**

DHS
362449

1. Ensures that the rights of families are recognized and acknowledged to promote best practices.
2. Reviews new and updated laws and policies, disseminate to staff to ensure compliance.
3. Tracks, creates, and communicates reports on regional data to ensure State and Federal compliance.
4. Tracks assessments to ensure data elements are meeting required time frames.
5. Ensures information being submitted to outside entities (e.g. courts, service providers, law enforcement) are professional, accurate and consistent with DCS policies and procedures to provide high quality work.

**Coaching and Developing Others:**

1. Coaches subordinates on understanding the underlying needs and core family concerns in order to address key issues that will ensure safety.
2. Completes performance documents with subordinates using tools such as Performance Briefings, Performance Evaluations, Interims, Job Performance Plans, in order to ensure continuous professional development.
3. Coaches, directs, and demonstrates job duties of staff for continuous professional development.
4. Demonstrates tasks in computer programs for staff (e.g. Microsoft Excel, Microsoft Word, Microsoft Outlook, departmental system for entering child welfare information (TFACTS), etc.).

**Updating and Using Relevant Knowledge:**

1. Completes training and knowledge as required by the Department to be in compliance with policy.
2. Reviews departmental policies for revisions and updates to provide accurate supervision.
3. Communicates to field staff new policies, techniques, procedures, issues and systems.
4. Demonstrates training techniques and knowledge as implemented by the Department to stay up-to-date with current child welfare best practices.

**Developing and Building Teams:**

1. Develops corrective action plans with underperforming subordinates, addresses specific behaviors with action steps to meet performance goals.
2. Sets goals, establishes action steps, and addresses professional behavior of subordinates to meet desired outcomes.

**Training and Teaching Other:**

1. Utilizes a strength based approach to identify areas for professional growth and development of subordinates.
2. Identifies areas of deficiencies, develops training.

**Performing Administrative Activities:**

1. Maintains and update personnel files and supervisory notebooks for employees to document to support employee evaluation.

DHS
362450

**Staffing Organizational Units:**

1. Interviews, selects, and hire in-coming staff in accordance with human resources guidelines.

**Guiding, Directing, and Motivating Subordinates:**

1. Develops and administers disciplinary actions as required to correct undesired outcomes.
2. Conducts case conferences with subordinates to provide guidance, feedback, direction and next steps to promote safety, permanency and well being.
3. Ensures subordinates accurately complete demographic information from the child and family (e.g. Genogram, Ecomap, Lexus Nexus, etc.).
4. Ensures subordinates enter all documentation regarding the child and family, to include case notes, legal petitions, adjudications, and assessments into child welfare information departmental systems (TFACTS).

**Analyzing Data or Information:**

1. Identifies, reviews, and compiles data from multiple sources to recognize trends in the child welfare and juvenile justice systems.
2. Reviews and monitors ongoing assessments of subordinates to ensure quality case management.
3. Analyzes data, response time, overdue reports, CFTM, placement reports, resource home reports, EPSDT and dental, face-to-face visits, review mega-report through use of Sharepoint and Excel to track child welfare outcomes.
4. Approves required assessments in a timely manner (e.g. Family Functional, CANS, YLS, FAST, etc.).

**Establishing and Maintaining Interpersonal Relationships:**

1. Engages with staff, children, and families to build a trustful relationship.
2. Responds timely to follow-up with action steps.
3. Encourages clients to be self-sufficient to overcome barriers and promote permanency.
4. Communicates issues effectively to build solutions.
5. Arrives prepared and on time to meetings.
6. Responds timely, appropriately, and respectfully with families, providers, and staff.

**Communication with Supervisor, Peers or Subordinates:**

1. Represents directives from regional management to subordinates in order to ensure a positive work environment and maintain professional relationships.
2. Identifies pertinent information about cases that require decisions and/or actions from leadership and DCS legal staff.
3. Responds to phone calls and all correspondences in a professional, timely manner to model this behavior for subordinates.

**Developing and Building Teams:**

1. Participates as an active member of a team; provide support and rely on team members for knowledge and assistance as needed.

DHS
362451

2. Builds multi-disciplinary team to conduct peer reviews for cases to ensure quality case management services.
3. Assists with identifying team members for a Child and Family Team Meeting who will work collaboratively with the Case Manager to develop action steps and goals to be accomplished by the child and family.

**Communicating with Persons Outside Organization:**

1. Participates in multi-disciplinary teams including Child Protective Investigative Team, Foster Care Review Board, Care Team, Community Advisory Board in order to gain a global perspective about case planning decisions.
2. Provides high quality customer service with clients and community partners to promote effective outcomes.
3. Follow-ups on complaints from community partners, legislative services, and others in a timely professional manner in order to build community teams.
4. Exhibits a self- presentation of respectful, professional conduct to gain respect from community partners.

**Interacting with Computers:**

1. Performs advanced tasks in computer programs (e.g. Microsoft Office and TFACTS).
2. Directs and assists staff with trouble shooting in computer programs (e.g. Microsoft Office, Excel, etc.).

**Assisting and Caring for Others:**

1. Provides subordinates with tools such as Employee Assistance Program, information about coping skills for secondary trauma, and other stress management supports.
2. Directs staff to appropriate services during times of medical leave, FMLA, and bereavement.
3. Directs staff to appropriate first aid-safety kits, and procedures during times of need to ensure safety and well-being of staff.

**Coordinating the Work and Activities of Others:**

1. Assigns cases and work assignments to DCS Case Managers through use of departmental systems for entering child welfare information (TFACTS) in order to meet work requirements.
2. Creates on-call schedules for DCS Case Managers to allocate personnel in a fair and consistent manner.

**Processing Information:**

1. Audits case files and departmental systems for entering child welfare information (TFACTS) to ensure State and Federal laws to remain in compliance.

**Scheduling Work and Activities:**

1. Ensures subordinate schedule home visits in a timely manner per policy requirements.
2. Works flexible hours including on-call, weekends, holidays and after hours.
3. Ensures on-call, after hours schedule is developed, posted and entered into TFACTS (when required).

DHS
362452

Alpha Comp Plan
January 2, 2014

| Job Description | Short Job Title | Job Code | Salary Plan | Salary Grade | Minimum Salary | Maximum Salary | Class Status Code | Overtime Status | Months of Probation |
|---|---|---|---|---|---|---|---|---|---|
| DATA PROCESSING OPERATIONS SPV | DP OPS SV | 002773 | BPP | 021 | $ 2,045.00 | $ 3,273.00 | Preferred | Cash | 12 Months |
| DATA PROCESSING OPERATOR 1 | DP OP 1 | 002771 | BPP | 018 | $ 1,767.00 | $ 2,827.00 | Preferred | Cash | 12 Months |
| DATA PROCESSING OPERATOR 2 | DP OP 2 | 002774 | BPP | 019 | $ 1,856.00 | $ 2,968.00 | Preferred | Cash | 12 Months |
| DATA PROCESSING OPERATOR 3 | DP OP 3 | 002772 | BPP | 020 | $ 1,949.00 | $ 3,117.00 | Preferred | Cash | 12 Months |
| DATABASE ADMINISTRATOR 2* | DBA 2* | 075506 | BPP | 035 | $ 4,050.00 | $ 6,480.00 | Preferred | Comp | 12 Months |
| DATABASE ADMINISTRATOR 3 | DBA 3 | 075507 | BPP | 040 | $ 5,170.00 | $ 8,270.00 | Both | Comp | 12 Months |
| DATABASE ADMINISTRATOR 4 | DBA 4 | 075508 | BPP | 041 | $ 5,428.00 | $ 8,684.00 | Preferred | Comp | 12 Months |
| DATABASE ADMINISTRATOR-ADV | DBA ADV | 075617 | BPP | 042 | $ 5,700.00 | $ 9,118.00 | Preferred | Cash | 12 Months |
| DATABASE ADMINISTRATOR-INT | DBA INT | 075616 | BPP | 040 | $ 5,170.00 | $ 8,270.00 | Preferred | Comp | 12 Months |
| DATABASE ADMINISTRATOR-LEAD | DBA LEAD | 075618 | BPP | 044 | $ 6,284.00 | $ 10,052.00 | Preferred | Comp | 12 Months |
| DCS ADMIN SERVICES MANAGER | DCS AS MG | 073550 | BPP | 033 | $ 3,673.00 | $ 5,877.00 | Both | None | 12 Months |
| DCS BRIAN A. TAC MONITOR | DCS B A M | 079231 | ESPP | 101 | $ 2,631.00 | $ 4,733.00 | Executive | Comp | None |
| DCS CALL CENTER CONSULTANT | DCS CC CON | 079218 | ESPP | 105 | $ 3,197.00 | $ 5,753.00 | Executive | None | None |
| DCS CASE MANAGER 1* | DCS CM 1* | 079183 | BPP | 025 | $ 2,486.00 | $ 3,978.00 | Preferred | Cash | 12 Months |
| DCS CASE MANAGER 2* | DCS CM 2* | 079184 | BPP | 026 | $ 2,611.00 | $ 4,177.00 | Preferred | Cash | 12 Months |
| DCS CASE MANAGER 3 | DCS CM 3 | 079185 | BPP | 028 | $ 2,879.00 | $ 4,605.00 | Preferred | Cash | 12 Months |
| DCS CASE MANAGER 4 | DCS CM 4 | 079186 | BPP | 029 | $ 3,023.00 | $ 4,835.00 | Preferred | Comp | 12 Months |
| DCS CORPORAL | DCS CORP | 044272 | BPP8 | 024 | $ 2,369.00 | $ 3,789.00 | Preferred | Cash | 12 Months |
| DCS EXECUTIVE DIRECTOR 1 | DCS ED 1 | 079215 | ESPP | 118 | $ 6,027.00 | $ 10,849.00 | Executive | None | None |
| DCS EXECUTIVE DIRECTOR 2 | DCS ED 2 | 079216 | ESPP | 119 | $ 6,329.00 | $ 11,391.00 | Executive | None | None |
| DCS INSPECTOR GENERAL | DCS IG | 079220 | ESPP | 125 | $ 8,481.00 | $ 15,265.00 | Executive | None | None |
| DCS INSTITUTION SUPERINTENDENT | DCS INST S | 073652 | ESPP | 112 | $ 4,497.00 | $ 8,095.00 | Executive | None | None |
| DCS LIEUTENANT | DCS LT | 044274 | BPP8 | 029 | $ 3,023.00 | $ 4,835.00 | Preferred | Comp | 12 Months |
| DCS OFFICER | DCS OF | 044271 | BPP8 | 022 | $ 2,148.00 | $ 3,436.00 | Non-Comp | Cash | 12 Months |
| DCS PROGRAM COORDINATOR | DCS PG CR | 079205 | BPP | 031 | $ 3,333.00 | $ 5,331.00 | Both | Comp | 12 Months |
| DCS PROGRAM DIRECTOR 1 | DCS PG D 1 | 079203 | BPP | 033 | $ 3,673.00 | $ 5,877.00 | Both | None | 12 Months |
| DCS PROGRAM DIRECTOR 2 | DCS PG D 2 | 079202 | BPP | 034 | $ 3,857.00 | $ 6,171.00 | Both | None | 12 Months |
| DCS PROGRAM DIRECTOR 3 | DCS PG D 3 | 079201 | ESPP | 112 | $ 4,497.00 | $ 8,095.00 | Executive | None | None |
| DCS PROGRAM MANAGER | DCS PG MG | 079204 | BPP | 032 | $ 3,498.00 | $ 5,598.00 | Both | None | 12 Months |
| DCS PROGRAM SPECIALIST | DCS PG SP | 079206 | BPP | 029 | $ 3,023.00 | $ 4,835.00 | Preferred | Comp | 12 Months |
| DCS REGIONAL ADMINISTRATOR | DCS R ADR | 079189 | ESPP | 114 | $ 4,959.00 | $ 8,925.00 | Executive | None | None |
| DCS SECURITY MANAGER | DCS S MG | 073525 | BPP8 | 030 | $ 3,173.00 | $ 5,077.00 | Preferred | None | 12 Months |
| DCS SERGEANT | DCS SGT | 044273 | BPP8 | 025 | $ 2,486.00 | $ 3,978.00 | Preferred | Cash | 12 Months |
| DCS SPECIAL INVESTIGATOR 1 | DCS SP I 1 | 079207 | BPP | 026 | $ 2,611.00 | $ 4,177.00 | Preferred | Cash | 12 Months |

DHS
362453

App. B, Ex. 9A

**Mississippi Child Welfare Practice Model Implementation Project Summary Introduction**

This report will cover the activities of CSF staff and the DHS Practice Coaches as it relates to the overall implementation of the Child Welfare Practice Model for the month of January 2014.

**Training/Staff Development**

The following training sessions or coaching labs were delivered during the month of January:

| Name of Training/Lab | Region/County | Date(s) | Facilitated by | Approximate Number of Participants |
|---|---|---|---|---|
| CFA/FSP | I-N | 1/7,1/8, 1/9 and 1/10 (7 labs) | Carla Holeman and Terry Phillips | 80 |
| Practice Model training (Modules 1-3) | VII-West (Harrison | 1/23-24 | Deena Asfour, Jacqueline Purifoy, Rhoda McCovery | 30 |
| Fatality Roundtable Findings Presentation | V-W | 1/8 | Cathy Welsh | 19 |
| Investigation/TPR | IV-S – Lauderdale | 1/13 | Yvonne Willis | 18 |
| Safety Assessment Framework | II-W (Washington and Coahoma) | 1.15 & 1.16 | Mary Randall and Cindi Manuel | 20 |
| COA & Best Practices | III-South | 1/8 & 1/27 | Carolyn Townes | 30 |
| Fatality Roundtable Findings Presentation | V-E | 1/14 | Cathy Welsh | 8 |
| Total DHS Staff trained | | | | 205 |

**Intensive Supervisory Training – Level Two**

During January CSF developed and submitted to Kim Shackelford and Jennifer Walker an outline and work plan for the Level Three Supervisory Training. Level Three is designed to provide supervisors with the skills needed to make, model and supervise sound safety decisions throughout the life of a child welfare case. Level Three focuses on applying the knowledge and skills to real Worker/family situations in a coaching lab venue with additional small group sessions to reinforce the learning. Level Three

unit members. They discussed ways to "work smarter" and how the Supervisor can model this approach.

### *Region VII –East Coaching Activities*

The DHS Coach, Blair Sullivan, was able to meet with approximately nine Workers on an individual basis during the month of January. Examples of individual coaching activities included the following:



- Assisted a Worker with completing an investigation in MACWIS by reviewing narratives and provided feedback regarding the overall investigation process including the importance of meeting deadlines.

- Accompanied a Worker on a visit to a resource home to meet with three siblings who are placed together in this home. The Worker met with the youngest girl individually and then met with the two brothers as one of the boys in non-verbal and will interact more with the Worker when his brother is present. The Worker also talked with the resource parents about possible services and the adoption process.



CSF Practice Coach Sue Berry was unable to coach in the region during the month of January due to travel issues related to the weather.

### Region II-East, Region Six and Region VII-West (Phase Six)

### *Region II-East Coaching Activities*

The DHS Coach Rubijo Purifoy did not complete any individual coaching during the month of January because of being out on family medical leave and working on preparations for an upcoming CQI and COA visit.

CSF Practice Coach Varrie Richmond met with four supervisors individually and facilitated one small group session during the month of January. Her activities included

- Discussed with a Supervisor issues related to problematic behavior with a new employee; what the underlying issues with the Worker may be and ways to

DHS
362764

# App. B, Ex. 9B

*Monthly Status Report- Practice Model Implementation*

**Mississippi Child Welfare Practice Model Implementation Project Summary**

**Introduction**

This report will cover the activities of CSF staff and the DHS Practice Coaches as it relates to the overall implementation of the Child Welfare Practice Model for the month of February 2014.

**Training/Staff Development**

The following training sessions or coaching labs were delivered during the month of February:

| Name of Training/Lab | Region/County | Date(s) | Facilitated by | Approximate Number of Participants |
|---|---|---|---|---|
| Safety Assessment Framework | V-W | 02/05/2014 | Cathy Welsh and Selisa Wilkinson | 17 |
| Safety Assessment Framework for Resource and Adoption Staff | V-W | 02/19/2014 | Cathy Welsh | 7 |
| Safety Assessment Framework | I-S | 02-24-02-27-2014 | Carolyn Townes, Cristina Boone, Tamara Roberts and Tawnya Langley | 113 |
| COA and Best Practice | III-S – Warren | 02-05-2014 | Carolyn Townes | 7 |
| | | | | |
| Total DHS Staff trained | | | | **144** |

**Ongoing Practice Model Support**

The following sections detail examples of the individual and group coaching which the CSF and DHS coaches conducted during the month of February. In addition to those activities the Coaches also participated in a wide range of practice related activities including but not limited to: adoption status meetings, Foster Care Reviews (FCR), Regional Staff Meetings, Regional Implementation Team Meetings, Regional CQI meetings, reviewers in a CQI annual review, practice related training, MAP Team Meetings, Permanency Roundtables, COA site preparation and Regional Meetings for the Diligent Recruitment Grant. Both CSF and DHS Coaches will begin to focus at least some of their time in each region on a review of the Comprehensive Family Assessment process and tool. The number of days of coaching for both CSF and DHS Coaches was impacted by the severe weather in Mississippi during the month of February.

DHS
363290

*Monthly Status Report- Practice Model Implementation*

**Region II-East, Region Six and Region VII-West (Phase Six)**

*Region II-East Coaching Activities*

The DHS Coach Rubijo Purifoy was on special assignment during the month of February and was unable to complete any coaching. The Coaches from Region II-W were able to meet with nine workers during the month. Examples of individual coaching activities included the following:

- Reviewed what would occur during the upcoming COA site visit and answered questions from the Workers based on the II-W experience.

- Reviewed several CFAs and FSPs and provided feedback to the Workers on areas needing clarification.

- Discussed with a Worker her observations from an investigation she had recently initiated. They discussed the information to determine if enough information had been gathered to make a determination.

CSF Practice Coach Varrie Richmond met with two supervisors on an individual basis and facilitated a small group during the month of February. Her activities included

- Facilitated a small group session which was focused on the preparation for the upcoming COA site visit. The group also completed an activity on ethics which involved reviewing the six core values from the NASW Code of Ethics (service, social justice, dignity and worth of the person, importance of human relationships, integrity and competence. Three scenarios were reviewed by addressing a series of questions. The participants were engaged in the activity and provided suggestions and opinions on how to handle the situations shared by the participants.

- Observed a case staffing and discussed the use of critical thinking skills to assess safety concerns and determine if a safety plan could be implemented or if removal was more appropriate (which it was.)

- Reviewed CFAs and identified areas of strengths as well as area which were lacking in detail. The Supervisor said she would send CFAs back to workers but when returned and still not up to standards she at times would feel pressured to approve them to meet the time constraints.

*Region VI Coaching Activities*

The DHS Coach, Kendon Ellerman, was able to meet with approximately ten workers on an individual basis during the month of February. DHS Coach Sandra Brown was on special assignment in Forest County during February completing investigations and was

# App. B, Ex. 9C

*Monthly Status Report- Practice Model Implementation*

**Mississippi Child Welfare Practice Model Implementation Project Summary**
**Introduction**

This report will cover the activities of CSF staff and the DHS Practice Coaches as it relates to the overall implementation of the Child Welfare Practice Model for the month of March 2014.

**Training/Staff Development**
The following training sessions or coaching labs were delivered during the month of March:

| Name of Training/Lab | Region/County | Date(s) | Facilitated by | Approximate Number of Participants |
|---|---|---|---|---|
| Safety Assessment Framework for Resource and Adoption | V-E | 3-26 | Cathy Welsh & Jayne Riley | 9 |
| CFA | IV-S | 03-27- | Pam Green | 8 |
| FTM | VII-W (Harrison) | 03-25 &26 | Sue Berry | 52 |
| Practice Model Training | VII-W (Harrison) | 3-20-3-21 | Jackie Purifoy, Rhoda McCovery, & Deena Asfour | 25 |
| Safety Assessment Framework | VII-E | 3-5 & 6 | Sue Berry & Blair Sullivan | 30 |
| COA and Best Practices | III-S | 3-24 | Carolyn Townes | 6 |
| Safety Assessment Framework | VII-W (Hancock) | 3-25 | Lori Woodruff | 6 |
| Total DHS Staff trained | | | | 111 |

Cindi Manuel worked with Jennifer Walker to identify the participants for the second delivery of Level Two Clinical Supervisory Training. The training will begin in April with three groups of the three modules being delivered between April and August. Small groups with specific activities and a pre-determined agenda will be convened to operationalize the key learnings from the training. The Level Three coaching labs are still under development and will be delivered beginning in June. The Train the Trainer session for the Level Three Coaching Labs is scheduled for May 28 – 29. A session for Regional Directors is scheduled for June 11th and a separate session for the Regional ASWS will be July 8th. These sessions will provide an overview of the labs.

DHS
363201

*Monthly Status Report- Practice Model Implementation*

- Reviewed an updated CFA and was able to identify some family needs which could be addressed in the FSP including parents' sobriety, child's mental health, family structure and communication and discipline.

## Region II-East, Region Six and Region VII-West (Phase Six)

### *Region II-East Coaching Activities*

The DHS Coach Rubijo Purifoy was on special assignment during March and retired from the agency at the end of the month. DHS is in the process of filling her position. In the meantime, three DHS Coaches from other regions provided coaching support to this region during March. The DHS Coaches were ReGina Hardiman and Mary Randall from Region II-West and Ryakko Williams, Region IV-North. They were able to meet with approximately fifteen workers during the month of March. Examples of their activities include:

- Several small group sessions focused on the CFA were completed. The PMC utilized the CFA Instructional Guide to assist workers in understanding the type and level of information needed to improve the quality of the CFA. The PMC used the sample questions from the Guide to encourage Workers to think about how they can incorporate the questions into their home visits.

- Provided feedback on a safety plan and discussed the overall dynamics of the family. The PMC discussed the importance of the FTM and how to manage the meeting when there is a large support system.

- Assisted a Worker in locating a placement alternative for a youth whose resource parent wanted him removed.

- Reviewed a case scheduled for a FCR by using the FCR Checklist to determine if the case had the necessary information.

CSF Practice Coach Varrie Richmond met with one supervisor on an individual basis and facilitated a small group during the month of March. The CSF Coach observed a case staffing and provided the Supervisor feedback on the staffing process. She also facilitated a small group session in which they reviewed CFAs by discussing each section and determining the type and level of information to be included in the appropriate section. While the Supervisors acknowledged that the quality of the work was poor for the most part they felt powerless to change anything, due to time frames/deadlines. They discussed the consequences of signing off on work that was not through and adequate and what that may say about the Supervisor and his or her knowledge base.

### *Region VI Coaching Activities*

DHS
363211

# App. B, Ex. 9D

*Monthly Status Report- Practice Model Implementation*

**Mississippi Child Welfare Practice Model Implementation Project Summary**

**Introduction**

This report will cover the activities of CSF staff and the DHS Practice Coaches as it relates to the overall implementation of the Child Welfare Practice Model for the month of April 2014.

**Training/Staff Development**

The following training sessions or coaching labs were delivered during the month of April:

| Name of Training/Lab | Region/County | Date(s) | Facilitated by | Approximate Number of Participants |
|---|---|---|---|---|
| Safety Assessment Framework | Region II-E | 04-2&04-3 | Ryakko Williams, ReGina Hardiman, Mary Randall, Tawnya Langley, Varrie Richmond | 62 |
| Safety Assessment Framework for Resource and Adoption Staff | Region II-W | 04-23- | Cindi Manuel & Mary Randall | 15 |
| Safety Assessment Framework | Region IV-N | 04-16 & 04-17 | Pam Green & Ryakko Williams | 70 |
| Safety Assessment Framework | Region I-N | 04-21 – 24 | Carla Holeman, Varrie Richmond, Tawnya Langley, & Tamara Roberts | 85 |
| Safety Assessment Framework | Region V-W | 04-24-2014 | Cathy Welsh | 19 |
| Safety Assessment Framework | Region III-S | 04-9 & 04-10 | Indiana Brown, Melody Vaughn, Carolyn Townes, Varrie Richmond, Tawnya Langley | 60 |
| Level II Clinical Supervision Training (Module One) (two separate deliveries) | Statewide | 04-15 - 16; 04-23-24; 04-30 – 05-1 | Pam Green,  Sue Berry, Carolyn Townes, Lori Woodruff & Margaret Baklini | 49 |
| | | | | |
| Total DHS Staff trained | | | | **360** |

DHS
363437

Worker's active investigations and she was commended for having initiated them on time and completing six of seven on time.

CSF Practice Coach Sue Berry met with seven supervisors individually, facilitated one small group and met with the RD during the month of April. Examples of her activities included

- Met with the Resource Supervisor and the Casework Supervisor to discuss concerns regarding a resource home which has asked that the children be removed. The CSF Coach was able to facilitate a good discussion between the two Supervisors which led to the identification of possible options.

- Reviewed a CFA and FSP and discussed what was needed to make both more useful documents. They discussed how goals must be measurable and what that might look like.

- Facilitated a small group session which involved reviewing the updated CFA that the group used last month for role play and provided feedback on the CFA which had a great deal more information than it had previously. They discussed how the FSP should be based on the information in the CFA and that the goals need to reflect behavioral or environmental changes for a child to be safe and their needs be met; not just the completion of services.

- Discussed the progress of completing more thorough CFAs with the RD. While some efforts have been evident, there seems to continue to be a lack of urgency. The CSF Coach shared examples of CFAs with the RD and they discussed what is needed to make them more impactful.

## Region II-East, Region Six and Region VII-West (Phase Six)

### *Region II-East Coaching Activities*

Mary Randall and ReGina Hardiman, Region II-West Coaches are providing limited coaching support to staff in Region II-East since the retirement of the full-time coach. They were able to meet with approximately eight workers on an individual basis and met with groups of workers from several counties as an introduction during the month of April. Examples of coaching activities included the following:

- Reviewed a CFA with a Worker by utilizing the CFA Instructional Guide and the Promoting Critical Thinking Worksheet. The PMC discussed underlying needs and protective capacities with the Worker.

- Reviewing the documentation for an investigation and introduced the use of the Promoting Critical Thinking Worksheet as a way to identify serious harm or imminent threat, contributing factors, underlying conditions and protective capacities.

DHS
363447

# App. B, Ex. 9E

*Monthly Status Report- Practice Model Implementation*

**Mississippi Child Welfare Practice Model Implementation Project Summary**

**Introduction**

This report will cover the activities of CSF staff and the DHS Practice Coaches as it relates to the overall implementation of the Child Welfare Practice Model for the month of February 2014.

**Training/Staff Development**

The following training sessions or coaching labs were delivered during the month of February:

| Name of Training/Lab | Region/County | Date(s) | Facilitated by | Approximate Number of Participants |
|---|---|---|---|---|
| Safety Assessment Framework | V-W | 02/05/2014 | Cathy Welsh and Selisa Wilkinson | 17 |
| Safety Assessment Framework for Resource and Adoption Staff | V-W | 02/19/2014 | Cathy Welsh | 7 |
| Safety Assessment Framework | I-S | 02-24-02-27-2014 | Carolyn Townes, Cristina Boone, Tamara Roberts and Tawnya Langley | 113 |
| COA and Best Practice | III-S – Warren | 02-05-2014 | Carolyn Townes | 7 |
| | | | | |
| Total DHS Staff trained | | | | **144** |

**Ongoing Practice Model Support**

The following sections detail examples of the individual and group coaching which the CSF and DHS coaches conducted during the month of February. In addition to those activities the Coaches also participated in a wide range of practice related activities including but not limited to: adoption status meetings, Foster Care Reviews (FCR), Regional Staff Meetings, Regional Implementation Team Meetings, Regional CQI meetings, reviewers in a CQI annual review, practice related training, MAP Team Meetings, Permanency Roundtables, COA site preparation and Regional Meetings for the Diligent Recruitment Grant. Both CSF and DHS Coaches will begin to focus at least some of their time in each region on a review of the Comprehensive Family Assessment process and tool. The number of days of coaching for both CSF and DHS Coaches was impacted by the severe weather in Mississippi during the month of February.

DHS
363290

*Monthly Status Report- Practice Model Implementation*

- Accompanied a Worker to complete a follow-up on an investigation and accompanying paperwork. It was evident that the Worker had gained a rapport with the family and the PMC observed the Worker complete the safety checklist and address the identified safety concerns.

CSF Practice Coach, Carolyn Townes, assisted with the delivery of four days of the Safety Assessment Framework Coaching lab, therefore, did not convene any groups. Group work will return in March.

### Region Two-West Coaching Activities

The DHS Coaches, ReGina Hardiman and Mary Randall, were able to meet with approximately 16 workers on an individual basis during the month of February. Both Coaches also provided coaching support in Region II-E while the assigned Coach was on special assignment in Region VI. Examples of individual coaching activities included the following:

- Accompanied a Worker to initiate an investigation. The PMC discussed with the Worker the types of questions to be asked and what to look for with the children. The PMC assisted the Worker with the interview and they were able to gather some needed information.

- Observed a FCR in which the youth was actively involved in the discussions and was knowledgeable about her case plan.

- Reviewed a CFA with a Worker and discussed the concepts of underlying conditions and contributing factors. They also discussed the importance of using critical thinking skills to analyze the information gathered during interactions with the family.

- Assisted a Worker with completing a TPR packet including discussing the importance of gathering as much medical history information as possible.

CSF Practice Coach Cindi Manuel met with the Regional Director (RD) but had two group sessions and a coaching lab cancelled due to the weather. The RD and CSF Coach reviewed the draft "Guide to Individual Conference" which was adapted for her use by the CSF Coach. Discussed interruptions and how all staff can better manage their time by dealing more effectively with interruptions.

DHS
363292

*Monthly Status Report- Practice Model Implementation*

**Mississippi Child Welfare Practice Model Implementation Project Summary**

**Introduction**

This report will cover the activities of CSF staff and the DHS Practice Coaches as it relates to the overall implementation of the Child Welfare Practice Model for the month of June 2014.

**Training/Staff Development**

The following training sessions or coaching labs were delivered during the month of April:

| Name of Training/Lab | Region/County | Date(s) | Facilitated by | Approximate Number of Participants |
|---|---|---|---|---|
| Level Three Overview for RDs | Statewide | 06-11 | Cindi Manuel and Pam Green | 12 |
| CFA | Region IV-South | 06-12 | Pam Green and Yvone Willis | 14 |
| Level Two Module Two | Statewide | 06-18 - 19, & 06-25-26 | Pam Green, Carolyn Townes, Sue Berry, Lori Woodruff | 31 |
| Safety Assessment Framework | Region III-North | 06-24 | Pam Green and Tawnya Langley | 9 |
| Level Three Module One | Statewide | Various dates through out the month | All CSF Coaches | 83 |
| FTM | Region VII-W (Hancock) | 06-19 | Lori Woodruff | 6 |
| From Practice Guide to Practice Implementation | Region VII-W (Hancock) | 06-30 | Lori Woodruff and Buffie Taylor | 25 |
| Tasks and Goals | Region VII-W (Hancock) | 6-20 & 6-27 | Jayne Riley | 22 |
| Linkages | Region VII-W (Hancock) | 06-24 | Jayne Riley and Buffie Taylor | 14 |
| CFA | Region VII-W (Hancock) | 06-27 | Jayne Riley | 4 |
| Practice Model | Region IV-S (Lauderdale) | 06-18,19 & 24 | Yvonne Willis | 10 |
| Practice Model Overview | Statewide | 06-16, 17,18 & 19 | Christina Boone, Sheila Nabors, Carla Holeman & | 140 (20 – 25 in each three hour |

DHS
363500

CSF Practice Coach, Carolyn Townes, facilitated two small group sessions during the month of June. This region was the first to roll out the Practice Model and in many ways they are more skilled than some other regions. They enjoyed the graphic recording after some initial hesitancy. They had no difficulty with the any of the interactive activities and were able to demonstrate their supervisory skills particularly in the dyad activity. They had some difficulty with their supervisory staffing documentation segment, but it is clear that they are documenting their staffings with workers.

Level Two small group activities from this region are reported under Region IV-North as they group consists of Supervisors from three regions (I-South, IV-North and IV-South.)

### *Region Two-West Coaching Activities*

The DHS Coaches, ReGina Hardiman and Mary Randall, were able to meet with approximately 12 Workers on an individual basis during the month of June. There are also coaching in Region II-East. Examples of individual coaching activities included the following:



- Reviewed with Worker all of the maltreatment reports which were currently active on her workload. They discussed the importance of addressing all allegations and to make sure that when talked to a child/youth the questions are asked in an age-appropriate manner.

- Accompanied a Worker to initiate an investigation. The PMC modeled interviewing techniques to engage a sibling who seemed reluctant to talk. The Worker and PMC interviewed the identified child who was very open in describing the abuse. The PMC met with the Worker and the Supervisor before going out on the interview and afterwards.

- Assisted a Worker in preparing for Court by reviewing the Court Summary, the case file and MACWIS to determine if all identified needs of the family had been addressed and appropriate services provided. Discussed with Worker how to prepare a family for both a FTM and the upcoming Court hearing. They attempted to visit the family but did not find anyone at home.

CSF Practice Coach Cindi Manuel facilitated two small group sessions during the month of June. The Level Two small group shared and discussed their individual plans for change that each Supervisor had developed during the Level Two, Module One training session. Examples of the individual plans included: 1) follow up with Workers on tasks assigned during supervision; identify ways to enhance placement stability; 3) enhance the

# App. B, Ex. 9F

*Monthly Status Report- Practice Model Implementation*

**Mississippi Child Welfare Practice Model Implementation Project Summary**
**Introduction**

This report will cover the activities of CSF staff and the DHS Practice Coaches as it relates to the overall implementation of the Child Welfare Practice Model for the month of March 2014.

**Training/Staff Development**
The following training sessions or coaching labs were delivered during the month of March:

| Name of Training/Lab | Region/County | Date(s) | Facilitated by | Approximate Number of Participants |
|---|---|---|---|---|
| Safety Assessment Framework for Resource and Adoption | V-E | 3-26 | Cathy Welsh & Jayne Riley | 9 |
| CFA | IV-S | 03-27- | Pam Green | 8 |
| FTM | VII-W (Harrison) | 03-25 &26 | Sue Berry | 52 |
| Practice Model Training | VII-W (Harrison) | 3-20-3-21 | Jackie Purifoy, Rhoda McCovery, & Deena Asfour | 25 |
| Safety Assessment Framework | VII-E | 3-5 & 6 | Sue Berry & Blair Sullivan | 30 |
| COA and Best Practices | III-S | 3-24 | Carolyn Townes | 6 |
| Safety Assessment Framework | VII-W (Hancock) | 3-25 | Lori Woodruff | 6 |
| Total DHS Staff trained | | | | 111 |

Cindi Manuel worked with Jennifer Walker to identify the participants for the second delivery of Level Two Clinical Supervisory Training. The training will begin in April with three groups of the three modules being delivered between April and August. Small groups with specific activities and a pre-determined agenda will be convened to operationalize the key learnings from the training. The Level Three coaching labs are still under development and will be delivered beginning in June. The Train the Trainer session for the Level Three Coaching Labs is scheduled for May 28 – 29. A session for Regional Directors is scheduled for June 11th and a separate session for the Regional ASWS will be July 8th. These sessions will provide an overview of the labs.

DHS
363201

*Monthly Status Report- Practice Model Implementation*

- What do you see as your role with the CFA/HS/CCA?
- Do you send back if incomplete or accept them as they are?
- Do you think workers see the link between the FTM/CFA and FSP?

The groups also reviewed several completed CFAs section by section to discuss the quality, completeness and appropriateness of the documentation in the tool. The resource and adoption supervisors were able to link the discussions on the information in a CFA to the tools which their staff complete (homestudy and CCA.)

## Regions V-West and IV-North (Phase Two)

### Region IV-North Coaching Activities

The DHS Coach, Ryakko Williams, met with five workers on an individual basis during the month of March. Additionally, Marco Williams is completing her Master's level internship by coaching in this region. Ryakko is also assisting on a limited basis in Region II-E and I-N. Examples of individual coaching activities included the following:

- Observed a FTM in which the Worker was very engaged with her family and was able to provide the participants with pertinent information on the child and family.

- Reviewed a Worker's first CFA and FSP by walking through each section of the tools with the Worker.



CSF Practice Coach Pam Green conducted two small group sessions during the month of March. The two small groups focused on quality CFAs. All agreed that it is critical to conduct thorough assessments in order to correctly identify needs of the family. The group then talked at length about making this a clear expectation with staff, even though we know their jobs are difficult. We then spent some time looking at barriers to good assessments and strategizing to overcome barriers. There was much discussion regarding how MACWIS is a barrier to the "process" of family assessments. The participants also looked at strategies that would encourage the process of assessment as opposed to looking at just the tool (completing the document). They also reviewed actual CFAs as a group and provided feedback which lead to a discussion on the best ways to provide feedback.

### Region V-West Coaching Activities

The DHS Coaches Selisa Wilkinson and Jennifer Smith were able to meet with approximately 13 workers on an individual basis during the month of March. Examples of individual coaching activities included the following:

DHS
363204

**App. B, Ex. 9G**

*Monthly Status Report- Practice Model Implementation*

**Mississippi Child Welfare Practice Model Implementation Project Summary**
**Introduction**

This report will cover the activities of CSF staff and the DHS Practice Coaches as it relates to the overall implementation of the Child Welfare Practice Model for the month of February 2014.

**Training/Staff Development**
The following training sessions or coaching labs were delivered during the month of February:

| Name of Training/Lab | Region/County | Date(s) | Facilitated by | Approximate Number of Participants |
|---|---|---|---|---|
| Safety Assessment Framework | V-W | 02/05/2014 | Cathy Welsh and Selisa Wilkinson | 17 |
| Safety Assessment Framework for Resource and Adoption Staff | V-W | 02/19/2014 | Cathy Welsh | 7 |
| Safety Assessment Framework | I-S | 02-24-02-27-2014 | Carolyn Townes, Cristina Boone, Tamara Roberts and Tawnya Langley | 113 |
| COA and Best Practice | III-S – Warren | 02-05-2014 | Carolyn Townes | 7 |
| | | | | |
| Total DHS Staff trained | | | | **144** |

**Ongoing Practice Model Support**

The following sections detail examples of the individual and group coaching which the CSF and DHS coaches conducted during the month of February. In addition to those activities the Coaches also participated in a wide range of practice related activities including but not limited to: adoption status meetings, Foster Care Reviews (FCR), Regional Staff Meetings, Regional Implementation Team Meetings, Regional CQI meetings, reviewers in a CQI annual review, practice related training, MAP Team Meetings, Permanency Roundtables, COA site preparation and Regional Meetings for the Diligent Recruitment Grant. Both CSF and DHS Coaches will begin to focus at least some of their time in each region on a review of the Comprehensive Family Assessment process and tool. The number of days of coaching for both CSF and DHS Coaches was impacted by the severe weather in Mississippi during the month of February.

DHS
363290

*Monthly Status Report- Practice Model Implementation*

## Region III-North and VII-East (Phase Five)

### *Region III North Coaching Activities*

The DHS Coach, April Edwards, was on special assignment in Region VI during the month of February and therefore did not complete any coaching. The DHS Coaches from Region III-South were able to meet with six workers in Region III-N during the month of February. Examples of individual coaching activities included the following:



- Accompanied a Worker to place a young teenager at a facility. The Worker was concerned about the drive due to the youths past behaviors. The PMC was able to engage the youth in a discussion regarding her goals and plans for the future.

- Assisted a Worker with facilitating a FTM for a placement case. The FTM supported the determination that the family was not ready for reunification at this time.

CSF Practice Coach, Pam Green, met with one supervisor and her unit, the Regional ASWS, and RD and facilitated two small supervisory groups during the month of February. Her activities included:

- Facilitated two small groups which continued the discussion from the previous month regarding stress management and supportive supervision. The group practiced positive reframing when presenting information to both front-line workers and management.

- Met with the RD to discuss the strengths and needs of the region. They also discussed the COA review and issues which would need to be addressed based on the review. They discussed the court order which requires DHS to place into DHS custody all children in the home of an alleged sexual abuse perpetrator without the approval of the judge. The worker is not to interview or talk to the alleged perpetrator and the worker is to not tell the caretaker anything about the allegations other than "DHS is conducting an investigation." The RD has asked for assistance from the state office.

- Facilitated a unit meeting to review the basics of completing the CFA tool and overall assessment process. The Workers admitted that sometimes the CFA feels like "just another deadline" as opposed to a process that lasts throughout the life of the case. Time constraints and MACWIS were identified as barriers for the completion of the CFA. An actual CFA was reviewed and feedback on the quality of the tool was discussed.

DHS
363298

*Monthly Status Report- Practice Model Implementation*

**Mississippi Child Welfare Practice Model Implementation Project Summary**
**Introduction**

This report will cover the activities of CSF staff and the DHS Practice Coaches as it relates to the overall implementation of the Child Welfare Practice Model for the month of March 2014.

**Training/Staff Development**
The following training sessions or coaching labs were delivered during the month of March:

| Name of Training/Lab | Region/County | Date(s) | Facilitated by | Approximate Number of Participants |
|---|---|---|---|---|
| Safety Assessment Framework for Resource and Adoption | V-E | 3-26 | Cathy Welsh & Jayne Riley | 9 |
| CFA | IV-S | 03-27- | Pam Green | 8 |
| FTM | VII-W (Harrison) | 03-25 &26 | Sue Berry | 52 |
| Practice Model Training | VII-W (Harrison) | 3-20-3-21 | Jackie Purifoy, Rhoda McCovery, & Deena Asfour | 25 |
| Safety Assessment Framework | VII-E | 3-5 & 6 | Sue Berry & Blair Sullivan | 30 |
| COA and Best Practices | III-S | 3-24 | Carolyn Townes | 6 |
| Safety Assessment Framework | VII-W (Hancock) | 3-25 | Lori Woodruff | 6 |
| Total DHS Staff trained | | | | 111 |

Cindi Manuel worked with Jennifer Walker to identify the participants for the second delivery of Level Two Clinical Supervisory Training. The training will begin in April with three groups of the three modules being delivered between April and August. Small groups with specific activities and a pre-determined agenda will be convened to operationalize the key learnings from the training. The Level Three coaching labs are still under development and will be delivered beginning in June. The Train the Trainer session for the Level Three Coaching Labs is scheduled for May 28 – 29. A session for Regional Directors is scheduled for June 11th and a separate session for the Regional ASWS will be July 8th. These sessions will provide an overview of the labs.

DHS
363201

*Monthly Status Report- Practice Model Implementation*

The CSF Coach, Cathy Welsh, introduced Jayne Riley who will be assuming the coaching responsibilities in this region. They facilitated one small group session conducted one session of the Safety Assessment Framework Coaching Lab and met with the RD, DHS Coach and DHS Coaching Supervisor during the month of March.
As part of the small group session the CFA was discussed with the participants reporting that they had seen some progress with CFAs being completed but continue to see areas where the content and level of detail could be improved. The group discussed that one of their biggest barriers is locating placements for teens with behavior problems. They were able to provide examples of several teens who had been placed at an acute care facility but the facilities are now refusing to have the youth return due to the potential for violence. The group also discussed the number of youth in custody who should also be followed by Youth Services and the difficulty of getting Youth Service Counselors to share the responsibility of assisting with these teens. The group noted that a "Prom Dress Closet" had been established for the teens in custody.

The meeting with the RD and coaches involved reviewing various reports and data pertaining to the frequency of visits with parents/caretaker with whom children are to be reunified. Lawrence County had 100% compliance with these visits during February. The group also reviewed data related to investigations. They discussed the importance of supervisors "supervising" workers and not doing the work for the worker. They also discussed the importance of regular case staffing and ways the coaches could support those staffings.

## Region III-North and VII-East (Phase Five)

### *Region III North Coaching Activities*

The DHS Coach, April Edwards, was promoted to a supervisory position upon her return from a special assignment in Forrest County and therefore did not participate in any coaching in Region III-North during the month of March. Indiana Brown, DHS Coach from Region III-South was able to meet with four workers in this region. Examples of her individual coaching activities included the following:



- Assisted a new worker with documenting her activities related to planning a FTM and then waited for the family to show for the FTM which, unfortunately they did not. The DHS Coach and Worker then reviewed FSPs and CFAs with the PMC sharing the CFA Instructional Guide with the Worker.

- Assisted a Worker with updating FSPs and CFAs in MACWIS and assisted in the development of an Independent Living Plan in MACWIS.

DHS
363209

App. B, Ex. 9H

*Monthly Status Report- Practice Model Implementation*

**Mississippi Child Welfare Practice Model Implementation Project Summary**

**Introduction**

This report will cover the activities of CSF staff and the DHS Practice Coaches as it relates to the overall implementation of the Child Welfare Practice Model for the month of April 2014.

**Training/Staff Development**

The following training sessions or coaching labs were delivered during the month of April:

| Name of Training/Lab | Region/County | Date(s) | Facilitated by | Approximate Number of Participants |
|---|---|---|---|---|
| Safety Assessment Framework | Region II-E | 04-2&04-3 | Ryakko Williams, ReGina Hardiman, Mary Randall, Tawnya Langley, Varrie Richmond | 62 |
| Safety Assessment Framework for Resource and Adoption Staff | Region II-W | 04-23- | Cindi Manuel & Mary Randall | 15 |
| Safety Assessment Framework | Region IV-N | 04-16 & 04-17 | Pam Green & Ryakko Williams | 70 |
| Safety Assessment Framework | Region I-N | 04-21 – 24 | Carla Holeman, Varrie Richmond, Tawnya Langley, & Tamara Roberts | 85 |
| Safety Assessment Framework | Region V-W | 04-24-2014 | Cathy Welsh | 19 |
| Safety Assessment Framework | Region III-S | 04-9 & 04-10 | Indiana Brown, Melody Vaughn, Carolyn Townes, Varrie Richmond, Tawnya Langley | 60 |
| Level II Clinical Supervision Training (Module One) (two separate deliveries) | Statewide | 04-15 - 16; 04-23-24; 04-30 – 05-1 | Pam Green,  Sue Berry, Carolyn Townes, Lori Woodruff & Margaret Baklini | 49 |
| | | | | |
| Total DHS Staff trained | | | | **360** |

DHS
363437

*Monthly Status Report- Practice Model Implementation*

**Region III-North and VII-East (Phase Five)**

*Region III North Coaching Activities*

The DHS coaching position in this region is currently vacant. Indiana Brown from Region III-South was in the Region one day during April and met with a Worker to assist her in closing out cases as the Worker is leaving the agency in the near future.

CSF Practice Coach, Pam Green, facilitated two small supervisory groups and met with the RD, Trudy Miller during the month of April. In both small groups a role play activity was facilitated. One supervisor played the role of supervisor and another the role of a worker while the remaining participants were observers who provided feedback. They use scenarios which were based on case experiences and provided each other with insightful feedback. The supervisors indicated that staffings are occurring regularly but are usually not being documented in a timely manner.

The CSF Coach met with the RD who reported that things were progressing within the region with the hiring new workers and supervisors. The RD believes that she has seen a decrease in the level of stress among the supervisors since the addition of new supervisors and once the Workers complete the training expects this will be true for the Workers as well. She has also promoted a supervisor to the position of Regional ASWS which means there will now be two for the region.

*Region VII –East Coaching Activities*

The DHS Coach, Blair Sullivan, was able to meet with approximately four workers on an individual basis during the month of April. However, it is important to note that she met with one Worker on ten different dates at the request of the RD and in an effort to assist with overdue work. She also spent two days reviewing cases in preparation of the upcoming COA site visit. Examples of individual coaching activities included the following

- Assisted a Worker with organizing and prioritizing overdue investigations. Provided the Worker with a to-do list of tasks to be completed by the following coaching session. Accompanied the Worker to initiate an investigation and observed his interview with a young child. Provided feedback on how the interview was handled including the fact that the Worker took a call during the interview. Continued to assist the Worker with initiating and completing investigations.

- Accompanied a Worker on a return visit to a home (investigation) which had an active safety plan. The Worker was firm but fair with the family when discussing what was expected of them and the care of their children.

- Reviewed a Worker's workload with the Worker which included reading several CFAs which were of high quality and full of information. They discussed the

# App. B, Ex. 9I

**Mississippi Child Welfare Practice Model Implementation Project Summary**
**Introduction**

This report will cover the activities of CSF staff and the DHS Practice Coaches as it relates to the overall implementation of the Child Welfare Practice Model for the month of May 2014.

**Training/Staff Development**
The following training sessions or coaching labs were delivered during the month of May:

| Name of Training/Lab | Region/County | Date(s) | Facilitated by | Approximate Number of Participants |
|---|---|---|---|---|
| CFA | Region IV-South | 05-20-2014 | Pam Green and Yvone Willis | 17 |
| Safety Assessment Framework | Region IV-South | 05-22 & 05-27 | Pam Green and Yvone Willis | 35 |
| Safety Assessment Framework | Region V-E | 05-05 & 05-06 | Jayne Riley | 37 |
| Goals and Tasks | Region I-N | 05-15 | Varrie Richmond and Carla Holeman | 10 |
| Documentation | Region VII-W (Hancock) | 05-16 | Buffie Taylor | 9 |
| Documentation | Region VII-W (Harrison) | 05-22& 05-23 | Deena Asfour, Rhoda McCovery, Jacqueline Purifoy | 35 |
| TOT for Level Three | Statewide | 05-29-30 | Marge Gildner | 15 |
| | | | | |
| Total DHS Staff trained | | | | 158 |

**Ongoing Practice Model Support**

The following sections detail examples of the individual and group coaching which the CSF and DHS coaches conducted during the month of May. In addition to those activities the Coaches also participated in a wide range of practice related activities including but not limited to:  adoption status meetings, Foster Care Reviews, case reviews as part of the monthly CQI process, Regional Staff Meetings, Regional CQI meetings, practice related training, MAP Team Meetings, Permanency Roundtables, Permanency Summits and preparation for COA site visits.

- As part of the small group the CSF Coach reviewed with participants the Social Worker Visits Practice Guide. They discussed the importance of monitoring that visits are occurring with the Supervisors sharing their individual process for monitoring the visits. They discussed that visits should be purposeful with the Worker always assessing the child's physical and emotional safety. They also discussed the importance of meeting with resource families at the threat of a disrupted placement. As a follow-up to the Fatality Roundtable discussion held in April, the group reviewed and discussed some common factors that are often part of an initial investigation including mental illness, drug and alcohol abuse, domestic violence, lack of communication, and post screening allegations.

- Observed a case staffing in which both the Supervisor and Worker were well-informed regarding the dynamics of the case. As Ms. Riley has recently begun working with this Supervisor they also spent time discussing the unit and what the Supervisor saw as strengths for her staff. They also discussed the importance of purposeful visits and how to address safety and stability during visits.

**Region III-North and VII-East (Phase Five)**

***Region III North Coaching Activities***

Region III-North continues to have two DHS Coaching vacancies. As a result the following DHS Coaches from other regions are assisting on a limited basis (Indiana Brown and Melody Vaughn), Region III-South. These Coaches were able to meet with two workers on an individual basis during the month of May. Examples of individual coaching activities included the following:

- Reviewed a CFA and FSP and provided feedback. They discussed the information needed for the CFA. They also worked on entering narratives and completing a TPR packet.

- Reviewed a case with the Worker and provided feedback on the importance of scheduling FTMs prior to updating CFAs and FSPs. The PMC encouraged the Worker to schedule FTMs as soon as a reunification is scheduled in order to assure that the appropriate services are in place prior to the reunification. They discussed the types of things that would need to be addressed during the FTM to help assure a smooth transition.

CSF Practice Coach, Pam Green, facilitated one small supervisory group during the month of May. The focus of the group was on role playing case staffings. The role play provided a great example of a Supervisor using non-verbal actions to calm down a worker. The group provided the role play participants with feedback identifying both the things done well and areas for improvement or that could have been approached differently. The group also discussed the role personal bias can play and ways to address any concerns related to a Worker or Supervisor's bias..

# App. B, Ex. 9J

*Monthly Status Report- Practice Model Implementation*

**Mississippi Child Welfare Practice Model Implementation Project Summary**

**Introduction**

This report will cover the activities of CSF staff and the DHS Practice Coaches as it relates to the overall implementation of the Child Welfare Practice Model for the month of February 2014.

**Training/Staff Development**

The following training sessions or coaching labs were delivered during the month of February:

| Name of Training/Lab | Region/County | Date(s) | Facilitated by | Approximate Number of Participants |
|---|---|---|---|---|
| Safety Assessment Framework | V-W | 02/05/2014 | Cathy Welsh and Selisa Wilkinson | 17 |
| Safety Assessment Framework for Resource and Adoption Staff | V-W | 02/19/2014 | Cathy Welsh | 7 |
| Safety Assessment Framework | I-S | 02-24-02-27-2014 | Carolyn Townes, Cristina Boone, Tamara Roberts and Tawnya Langley | 113 |
| COA and Best Practice | III-S – Warren | 02-05-2014 | Carolyn Townes | 7 |
| | | | | |
| Total DHS Staff trained | | | | **144** |

**Ongoing Practice Model Support**

The following sections detail examples of the individual and group coaching which the CSF and DHS coaches conducted during the month of February. In addition to those activities the Coaches also participated in a wide range of practice related activities including but not limited to: adoption status meetings, Foster Care Reviews (FCR), Regional Staff Meetings, Regional Implementation Team Meetings, Regional CQI meetings, reviewers in a CQI annual review, practice related training, MAP Team Meetings, Permanency Roundtables, COA site preparation and Regional Meetings for the Diligent Recruitment Grant. Both CSF and DHS Coaches will begin to focus at least some of their time in each region on a review of the Comprehensive Family Assessment process and tool. The number of days of coaching for both CSF and DHS Coaches was impacted by the severe weather in Mississippi during the month of February.

DHS
363290

*Monthly Status Report- Practice Model Implementation*

- Accompanied a Worker to initiate an investigation. The Worker asked relevant questions which allowed them to determine that there were no safety concerns.

- Accompanied a Worker on several face to face contacts with children in foster care. The DHS Coach provided feedback regarding the visits and encouraged the Worker to spend more time listening to the youth and discussing their case plans.

CSF Practice Coach, Carolyn Townes, met with four supervisors individually and facilitated two small groups during the month of February. Examples of the activities include:

- Observed a case staffing and supported the Supervisor in helping the worker discern the difference between imminent danger and risk.

- Reviewed with a Supervisor deadlines she has imposed upon herself and her unit regarding the completion of certain work. The TPR referrals had all been submitted but one was returned and the PMC encouraged the Worker to find out why it had been returned. They discussed how to continue to achieve timeliness for case activities.

- Continued working with a Supervisor on the development and actual use of a calendar as a means to manage the workload of her unit. Observed a case staffing for an investigation which had just been assigned.

### Region IV-South Coaching Activities

The DHS Coach, Yvonne Willis, was on special assignment in Region VI during the month of February and was unable to complete any coaching. No one was assigned to assist this region during February.

CSF Practice Coach Pam Green met with three supervisors individually and facilitated two small groups during the month of February. Her activities included:

- Observed a case staffing with a new Worker. The Supervisor used a combination of open-ended questions and directives to prompt the Worker to use critical thinking skills. The staffing appeared to be thorough and meaningful.

- Strategized ways to address concerns regarding a worker and the PMC encouraged the Supervisor to meet with the Worker to try to resolve the concerns as soon as possible.

- Facilitated two small groups which had the completion of CFAs as the primary focus. They discussed the quality, timeliness and importance of the CFA. It was agreed the quality varied by worker. Most of the identified barriers were related to time constraints. They acknowledged occasionally approving "sub-par" work

*Monthly Status Report- Practice Model Implementation*

**Mississippi Child Welfare Practice Model Implementation Project Summary**
**Introduction**

This report will cover the activities of CSF staff and the DHS Practice Coaches as it relates to the overall implementation of the Child Welfare Practice Model for the month of March 2014.

**Training/Staff Development**

The following training sessions or coaching labs were delivered during the month of March:

| Name of Training/Lab | Region/County | Date(s) | Facilitated by | Approximate Number of Participants |
|---|---|---|---|---|
| Safety Assessment Framework for Resource and Adoption | V-E | 3-26 | Cathy Welsh & Jayne Riley | 9 |
| CFA | IV-S | 03-27- | Pam Green | 8 |
| FTM | VII-W (Harrison) | 03-25 &26 | Sue Berry | 52 |
| Practice Model Training | VII-W (Harrison) | 3-20-3-21 | Jackie Purifoy, Rhoda McCovery, & Deena Asfour | 25 |
| Safety Assessment Framework | VII-E | 3-5 & 6 | Sue Berry & Blair Sullivan | 30 |
| COA and Best Practices | III-S | 3-24 | Carolyn Townes | 6 |
| Safety Assessment Framework | VII-W (Hancock) | 3-25 | Lori Woodruff | 6 |
| Total DHS Staff trained | | | | 111 |

Cindi Manuel worked with Jennifer Walker to identify the participants for the second delivery of Level Two Clinical Supervisory Training. The training will begin in April with three groups of the three modules being delivered between April and August. Small groups with specific activities and a pre-determined agenda will be convened to operationalize the key learnings from the training. The Level Three coaching labs are still under development and will be delivered beginning in June. The Train the Trainer session for the Level Three Coaching Labs is scheduled for May 28 – 29. A session for Regional Directors is scheduled for June 11th and a separate session for the Regional ASWS will be July 8th. These sessions will provide an overview of the labs.

DHS
363201

*Monthly Status Report- Practice Model Implementation*

- Observed a case staffing and facilitated a discussion regarding the timeliness of decisions which impact achieving permanency for children.

### Region IV-South Coaching Activities

The DHS Coach, Yvonne Willis, continued on special assignment in Region VI during the month of March and was unable to complete any coaching. No one was assigned to assist this region during March.

CSF Practice Coach Pam Green met with one supervisor individually and facilitated two small groups during the month of March. Her activities included:

- Met with a Worker who was recently promoted to a supervisory position to begin to develop the coaching relationship and provide support during and after the transition from worker to supervisor.

- Facilitated two small groups with the primary focus on the CFA. The participants reviewed actual examples of CFAs and SAFE home assessments and looked at individual sections as a group. After reviewing the CFA tool, the group discussed the barriers to quality assessments and discussed ways to overcome the barriers. Several indicated that lack of staff has been a barrier with some workers being in a hurry to meet deadlines and don't focus on quality, but rather just "getting it done". The supervisors all agreed that it is imperative to set the expectation for quality and not just accept "sub-par" work.

## Region V--East (Phase Four)

### Region V-East Coaching Activities

The DHS Coach, Shonda Brooks was able to meet with three workers on an individual basis during the month of March. She also participated in a meeting regarding county case reviews, the CQI sub-team meeting, met with her RD and Coaching Supervisor and spent a day with the new Coach from Hancock County sharing information regarding coaching. Examples of individual coaching activities included the following:

- Accompanied a Worker on a visit to a relative placement. The Worker met with the child privately and discussed the child's upcoming visits with his father which are to begin in the near future.

- Accompanied a Worker on a visit with a teen mom who is placed in her father's home on a trial home visit. The placement is going well and the youth appears able to meet her own child's basic needs.

- Reviewed several investigations, CFAs and FSPs and provided feedback on each to the Worker.

DHS
363208

**Mississippi Child Welfare Practice Model Implementation Project Summary**

**Introduction**

This report will cover the activities of CSF staff and the DHS Practice Coaches as it relates to the overall implementation of the Child Welfare Practice Model for the month of April 2014.

**Training/Staff Development**

The following training sessions or coaching labs were delivered during the month of April:

| Name of Training/Lab | Region/County | Date(s) | Facilitated by | Approximate Number of Participants |
|---|---|---|---|---|
| Safety Assessment Framework | Region II-E | 04-2&04-3 | Ryakko Williams, ReGina Hardiman, Mary Randall, Tawnya Langley, Varrie Richmond | 62 |
| Safety Assessment Framework for Resource and Adoption Staff | Region II-W | 04-23- | Cindi Manuel & Mary Randall | 15 |
| Safety Assessment Framework | Region IV-N | 04-16 & 04-17 | Pam Green & Ryakko Williams | 70 |
| Safety Assessment Framework | Region I-N | 04-21 – 24 | Carla Holeman, Varrie Richmond, Tawnya Langley, & Tamara Roberts | 85 |
| Safety Assessment Framework | Region V-W | 04-24-2014 | Cathy Welsh | 19 |
| Safety Assessment Framework | Region III-S | 04-9 & 04-10 | Indiana Brown, Melody Vaughn, Carolyn Townes, Varrie Richmond, Tawnya Langley | 60 |
| Level II Clinical Supervision Training (Module One) (two separate deliveries) | Statewide | 04-15 - 16; 04-23-24; 04-30 – 05-1 | Pam Green,  Sue Berry, Carolyn Townes, Lori Woodruff & Margaret Baklini | 49 |
| | | | | |
| Total DHS Staff trained | | | | **360** |

DHS
363437

- Discussed the educational function within supervision and ways a Supervisor could utilize her knowledge/skills to support her staff. Discussed the Supervisor's plan to reassign cases based on workload but also on the skill level/expertise of the staff.

- Attended a Unit Meeting which was well-planned with an agenda. Discussed the lack of progress of one worker in spite of Supervisor's efforts. Supervisor will discuss with RD and develop a plan of action.

- Discussed importance of supportive supervision in the retention of staff and praised the Supervisor for her recognition of her staff (she had treated her unit to lunch the previous month in honor of Social Work Month.) Provided feedback to the Supervisor regarding her often doing too much for her workers, rather than teaching them to do the tasks. This will be a focus of future individual coaching.

- Facilitated two small groups which provided the Supervisor's an opportunity to discuss difficult cases and get feedback from their peers. Discussed the challenges Hinds County has with its relationship with law enforcement with Warren County providing some examples of their activities which improved their relationship with the law enforcement units in their county.

### *Region IV-South Coaching Activities*

The DHS Coach, Yvonne Willis, was able to meet with approximately five workers on an individual basis during the month of April. She also met with several Supervisors during the month to discuss areas they would like her coaching to focus on. Ms. Willis was on special assignment in Region Six for part of the month thus limiting her time available to coach within this region. Examples of individual coaching activities included the following:



- Assisted a Worker in reviewing tasks that needed completed including the completion of a CFA and FSP.

- Assisted a Worker with learning how to change the direct service line in MACWIS.

CSF Practice Coach Pam Green facilitated two small group sessions during the month of April. The groups participated in several role play activities in which one participant is the supervisor and the other is the worker. They are recreating a case staffing with the other group members providing feedback on the use of critical thinking skills, the

DHS
363444

**App. B, Ex. 9K**

*Monthly Status Report- Practice Model Implementation*

**Mississippi Child Welfare Practice Model Implementation Project Summary**
**Introduction**

This report will cover the activities of CSF staff and the DHS Practice Coaches as it relates to the overall implementation of the Child Welfare Practice Model for the month of March 2014.

**Training/Staff Development**

The following training sessions or coaching labs were delivered during the month of March:

| Name of Training/Lab | Region/County | Date(s) | Facilitated by | Approximate Number of Participants |
|---|---|---|---|---|
| Safety Assessment Framework for Resource and Adoption | V-E | 3-26 | Cathy Welsh & Jayne Riley | 9 |
| CFA | IV-S | 03-27- | Pam Green | 8 |
| FTM | VII-W (Harrison) | 03-25 &26 | Sue Berry | 52 |
| Practice Model Training | VII-W (Harrison) | 3-20-3-21 | Jackie Purifoy, Rhoda McCovery, & Deena Asfour | 25 |
| Safety Assessment Framework | VII-E | 3-5 & 6 | Sue Berry & Blair Sullivan | 30 |
| COA and Best Practices | III-S | 3-24 | Carolyn Townes | 6 |
| Safety Assessment Framework | VII-W (Hancock) | 3-25 | Lori Woodruff | 6 |
| Total DHS Staff trained | | | | 111 |

Cindi Manuel worked with Jennifer Walker to identify the participants for the second delivery of Level Two Clinical Supervisory Training. The training will begin in April with three groups of the three modules being delivered between April and August. Small groups with specific activities and a pre-determined agenda will be convened to operationalize the key learnings from the training. The Level Three coaching labs are still under development and will be delivered beginning in June. The Train the Trainer session for the Level Three Coaching Labs is scheduled for May 28 – 29. A session for Regional Directors is scheduled for June 11th and a separate session for the Regional ASWS will be July 8th. These sessions will provide an overview of the labs.

DHS
363201

*Monthly Status Report- Practice Model Implementation*

- Reviewed an updated CFA and was able to identify some family needs which could be addressed in the FSP including parents' sobriety, child's mental health, family structure and communication and discipline.

## Region II-East, Region Six and Region VII-West (Phase Six)

### *Region II-East Coaching Activities*

The DHS Coach Rubijo Purifoy was on special assignment during March and retired from the agency at the end of the month. DHS is in the process of filling her position. In the meantime, three DHS Coaches from other regions provided coaching support to this region during March. The DHS Coaches were ReGina Hardiman and Mary Randall from Region II-West and Ryakko Williams, Region IV-North. They were able to meet with approximately fifteen workers during the month of March. Examples of their activities include:

- Several small group sessions focused on the CFA were completed. The PMC utilized the CFA Instructional Guide to assist workers in understanding the type and level of information needed to improve the quality of the CFA. The PMC used the sample questions from the Guide to encourage Workers to think about how they can incorporate the questions into their home visits.

- Provided feedback on a safety plan and discussed the overall dynamics of the family. The PMC discussed the importance of the FTM and how to manage the meeting when there is a large support system.

- Assisted a Worker in locating a placement alternative for a youth whose resource parent wanted him removed.

- Reviewed a case scheduled for a FCR by using the FCR Checklist to determine if the case had the necessary information.

CSF Practice Coach Varrie Richmond met with one supervisor on an individual basis and facilitated a small group during the month of March. The CSF Coach observed a case staffing and provided the Supervisor feedback on the staffing process. She also facilitated a small group session in which they reviewed CFAs by discussing each section and determining the type and level of information to be included in the appropriate section. While the Supervisors acknowledged that the quality of the work was poor for the most part they felt powerless to change anything, due to time frames/deadlines. They discussed the consequences of signing off on work that was not through and adequate and what that may say about the Supervisor and his or her knowledge base.

### *Region VI Coaching Activities*

DHS
363211

*Monthly Status Report- Practice Model Implementation*

The DHS Coaches, Sandra Brown and Kendon Ellerman, were both on a special assignment in Forrest County during the month of March and therefore, did not complete any coaching activities during the month.

CSF Practice Coaches Margaret Baklini and Jayne Riley completed the transition from MS. Baklini to Ms. Riley during March. Their work this month included the facilitation of two small groups and individual coaching with four supervisors. Examples of their individual activities included:

- Facilitated two small groups with a focus on reviewing CFA's and Face to Face contacts in a timely manner and discussing how the workers and ASWS's utilize the CFA as a helpful tool. The group determined several possible ways to incorporate the CFA into all of their work more positively:

  1. Discussing one question on the CFA in each unit meeting so that the entire unit benefits from learning how to better assess and address that particular question on the CFA.
  2. When the permanency goal is not reunification, and the question is directed towards the parent, the worker could indicate the permanency goal as an explanation of why the parent's information does not have a major impact on the current case.
  3. ASWS could print the CFA and make notes on the hardcopy to review with the worker as opposed to pending it back to the worker several times.
  4. The ASWS will need to clearly explain expectations for completing the CFA during weekly conferences (positive feedback as well as areas needing change).
  5. Some ASWS's suggested that if workers would complete the initial CFA in a Word document, that information can be used in completing Court Reports and Social Summaries.

- Discussed with a Supervisor the importance of weekly case staffings and that setting a regular schedule would support the staffings occurring more regularly. They also discussed face to face contacts and the importance of the Supervisor asking questions of the Workers to assure the visits are occurring and are being documented.

- Discussed the progress a Supervisor is seeing with having regularly scheduled case staffings. This Supervisor has been maintaining the staffing log and provides feedback to the Workers on what was discussed during the staffing. They reviewed a case in which the teen is in acute residential care and they are having difficulties in finding an appropriate placement.

### *Region VII-West Coaching Activities*

The DHS Coaches, Rhoda McCovery, and Deena Asfour were able to meet with approximately eight workers on an individual basis during the month of March.

**Mississippi Child Welfare Practice Model Implementation Project Summary**
**Introduction**

This report will cover the activities of CSF staff and the DHS Practice Coaches as it relates to the overall implementation of the Child Welfare Practice Model for the month of April 2014.

**Training/Staff Development**

The following training sessions or coaching labs were delivered during the month of April:

| Name of Training/Lab | Region/County | Date(s) | Facilitated by | Approximate Number of Participants |
|---|---|---|---|---|
| Safety Assessment Framework | Region II-E | 04-2&04-3 | Ryakko Williams, ReGina Hardiman, Mary Randall, Tawnya Langley, Varrie Richmond | 62 |
| Safety Assessment Framework for Resource and Adoption Staff | Region II-W | 04-23- | Cindi Manuel & Mary Randall | 15 |
| Safety Assessment Framework | Region IV-N | 04-16 & 04-17 | Pam Green & Ryakko Williams | 70 |
| Safety Assessment Framework | Region I-N | 04-21 – 24 | Carla Holeman, Varrie Richmond, Tawnya Langley, & Tamara Roberts | 85 |
| Safety Assessment Framework | Region V-W | 04-24-2014 | Cathy Welsh | 19 |
| Safety Assessment Framework | Region III-S | 04-9 & 04-10 | Indiana Brown, Melody Vaughn, Carolyn Townes, Varrie Richmond, Tawnya Langley | 60 |
| Level II Clinical Supervision Training (Module One) (two separate deliveries) | Statewide | 04-15 - 16; 04-23-24; 04-30 – 05-1 | Pam Green,  Sue Berry, Carolyn Townes, Lori Woodruff & Margaret Baklini | 49 |
| | | | | |
| Total DHS Staff trained | | | | **360** |

DHS
363437

- Accompanied a Worker to initiate an investigation. The Worker met with the youth individually and asked questions regarding the youth feeling safe. The PMC provided feedback after the interview on the type and manner of the questions asked which she found to be somewhat leading.

- Conducted a CFA Learning Circle which involved a small group of Workers reviewing CFAs they had completed and providing feedback to each other. The PMC encouraged the use of the CFA Instructional Guide as a tool to become more familiar with the information needed to complete a through CFA

CSF Practice Coach Varrie Richmond assisted with the delivery of the Safety Assessment Coaching Lab and facilitated a small group. During the group session they reviewed the CFA process and the Supervisor's role in assuring quality work from the staff. The group also discussed the COA site visit and the resulting action plan.

### Region VI Coaching Activities

The DHS Coaches, Sandra Brown and Kendon Ellerman, remained on special assignment within the region during the month of April and therefore no coaching activities were provided.

CSF Practice Coach Jayne Riley facilitated two small groups, met with two supervisors individually and with the acting RD, Ramona Lockett and Regional ASWS, Lorrie Hall during the month of April. Examples of the coaching activities included:

- The two small groups spent part of their time together discussing the COA preparations. They also discussed the concept of shared parenting and reviewed several data standards. They discuss the importance of weekly case staffings which all but one supervisor reported having regularly. They also discussed the importance of staffing an investigation before the worker makes the first contact and then regularly throughout the investigation.

- Met with the Resource Home Supervisor and discussed the status of her unit as well as the back log of relative home study inquiries.

- Met with a Supervisor who had two staff resign and how the supervisor was managing the work until it could be reassigned.

- Met with the RD and Regional ASWS and reviewed the status of the practice coaches' special assignment and the steps being taken to replace the two recent vacancies. They also discussed the importance regular case staffings.

DHS
363448

**Mississippi Child Welfare Practice Model Implementation Project Summary**
**Introduction**

This report will cover the activities of CSF staff and the DHS Practice Coaches as it relates to the overall implementation of the Child Welfare Practice Model for the month of May 2014.

**Training/Staff Development**
The following training sessions or coaching labs were delivered during the month of May:

| Name of Training/Lab | Region/County | Date(s) | Facilitated by | Approximate Number of Participants |
|---|---|---|---|---|
| CFA | Region IV-South | 05-20-2014 | Pam Green and Yvone Willis | 17 |
| Safety Assessment Framework | Region IV-South | 05-22 & 05-27 | Pam Green and Yvone Willis | 35 |
| Safety Assessment Framework | Region V-E | 05-05 & 05-06 | Jayne Riley | 37 |
| Goals and Tasks | Region I-N | 05-15 | Varrie Richmond and Carla Holeman | 10 |
| Documentation | Region VII-W (Hancock) | 05-16 | Buffie Taylor | 9 |
| Documentation | Region VII-W (Harrison) | 05-22& 05-23 | Deena Asfour, Rhoda McCovery, Jacqueline Purifoy | 35 |
| TOT for Level Three | Statewide | 05-29-30 | Marge Gildner | 15 |
| | | | | |
| Total DHS Staff trained | | | | 158 |

**Ongoing Practice Model Support**

The following sections detail examples of the individual and group coaching which the CSF and DHS coaches conducted during the month of May. In addition to those activities the Coaches also participated in a wide range of practice related activities including but not limited to: adoption status meetings, Foster Care Reviews, case reviews as part of the monthly CQI process, Regional Staff Meetings, Regional CQI meetings, practice related training, MAP Team Meetings, Permanency Roundtables, Permanency Summits and preparation for COA site visits.

DHS
363456

underlying conditions.  Utilized the CFA Instructional Guide as a way for the Worker to identify areas to discuss and assess during the next face to face contact.

- Accompanied a worker to initiate an investigation which involved allegations of domestic violence, substance use concerns and supervision concerns.  The PMC modeled interviewing techniques during the engaging process with the primary caretaker.  The PMC was able to reassure the parent when she discussed some of her fears regarding agency involvement and through the use of full disclosure was able to get the parent to open up and discuss the home situation openly with them.

CSF Practice Coach Varrie Richmond facilitated a small group during the month of May. The focus of the was to identify issues related to the CFA and to have Supervisors explore their role s in the quality of the work and what they can do to improve the work product.  The Supervisors concluded that their close review of the tool, taking the time to send back when additional/corrected information was needed and requiring quality work before approvals would greatly impact the work with children and families.

### Region VI Coaching Activities

The DHS Coaches, Sandra Brown and Kendon Ellerman, continue on special assignment within their region and therefore did not complete any coaching during the month of May.

CSF Practice Coach Jayne Riley facilitated two small groups and met individually with two Supervisors during the month of May.  The small group discussions centered on the skills needed to be an effective supervisor with the participants asked to identify those skills.  Their answers included presence, listening, reflecting/clarifying, questioning, creating accountability, being supportive, planning and goal setting, and meeting ethical and professional standards.  The group discussed the individual strengths of each supervisor as well as their progress in measuring goals and being accountable for goals established.  They also discussed their progress with weekly case staffings and most of the participants' reported having regular staffings as well as staffing their investigations regularly.  They did acknowledge that they do not regularly document the staffings on investigations.

The CSF Coach discussed currently workloads with a Supervisor and the importance of the weekly case staffing.  They also discussed the importance of Workers conducting purposeful visits and making sure they address both the physical and emotional safety of the children they visit.

### Region VII-West Coaching Activities

DHS
363468

*Monthly Status Report- Practice Model Implementation*

**Mississippi Child Welfare Practice Model Implementation Project Summary**

**Introduction**

This report will cover the activities of CSF staff and the DHS Practice Coaches as it relates to the overall implementation of the Child Welfare Practice Model for the month of June 2014.

**Training/Staff Development**

The following training sessions or coaching labs were delivered during the month of April:

| Name of Training/Lab | Region/County | Date(s) | Facilitated by | Approximate Number of Participants |
|---|---|---|---|---|
| Level Three Overview for RDs | Statewide | 06-11 | Cindi Manuel and Pam Green | 12 |
| CFA | Region IV-South | 06-12 | Pam Green and Yvone Willis | 14 |
| Level Two Module Two | Statewide | 06-18 - 19, & 06-25-26 | Pam Green, Carolyn Townes, Sue Berry, Lori Woodruff | 31 |
| Safety Assessment Framework | Region III-North | 06-24 | Pam Green and Tawnya Langley | 9 |
| Level Three Module One | Statewide | Various dates through out the month | All CSF Coaches | 83 |
| FTM | Region VII-W (Hancock) | 06-19 | Lori Woodruff | 6 |
| From Practice Guide to Practice Implementation | Region VII-W (Hancock) | 06-30 | Lori Woodruff and Buffie Taylor | 25 |
| Tasks and Goals | Region VII-W (Hancock) | 6-20 & 6-27 | Jayne Riley | 22 |
| Linkages | Region VII-W (Hancock) | 06-24 | Jayne Riley and Buffie Taylor | 14 |
| CFA | Region VII-W (Hancock) | 06-27 | Jayne Riley | 4 |
| Practice Model | Region IV-S (Lauderdale) | 06-18,19 & 24 | Yvonne Willis | 10 |
| Practice Model Overview | Statewide | 06-16, 17,18 & 19 | Christina Boone, Sheila Nabors, Carla Holeman & | 140 (20 – 25 in each three hour |

DHS
363500

CSF Practice Coach Varrie Richmond met with the RD, attended the Regional Staff meeting and facilitated a small group during the month of June. The small group reviewed a CFA and discussed improvements in the quality of the CFA and what they thought the reasons might be. The group also discussed the personal vs position power activity and analyzed the power base they used with problem Workers. They were asked to consider the way they use their power and be prepared to discuss at the next group. The Supervisors were all willing to change their approach with particular staff and evaluate their use of power and how it affects the quality of work. The CSF Coach met with the RD to discuss needs for individual coaching in the region and was asked to begin working with new Supervisors in two counties.

### Region VI Coaching Activities

The DHS Coaches, Sandra Brown and Kendon Ellerman, remained on special assignments during the month of June and therefore did not complete any coaching activities.

CSF Practice Coach Jayne Riley facilitated one small group, conducted the Level Three Module One coaching lab, reviewed the Level Two, Module One Training Session with a Supervisor in order to keep her with her group and facilitated the Fatality Roundtable with 20 participants during the month of June. The Level Three group centered on the skills needed to be an effective supervisor, including effectively staffing investigations and cases each week with staff. Each Supervisor was asked to review a feedback tool related to "danger" and how danger is being assessed during the Supervisor's staffing with the Worker. The group discussed that certain issues must be considered when conducting case staffings, including relating the Worker's experience and their expertise to the quality of their investigations and casework. The group also discussed that the Supervisor must be clear when informing the Worker of their expectations for the staffing and what needs to be prepared ahead of time, as well as what to being to the staffing. The participants also discussed mutual accountability and the importance of follow-up staffings. They ended the group with a discussion on strategies the Supervisor could use to assess for safety during discussions with the Worker and what sets to take to help ensure Workers are making decisions with safety being their first concern.

### Region VII-West Coaching Activities

The DHS Coaches for Harrison County, Jackie Purifoy, Rhoda McCovery, and Deena Asfour were able to meet with approximately 16 workers on an individual basis during the month of June. Examples of individual coaching activities included the following:

- Accompanied a Worker to see a set of parents incarcerated at the Harrison County Jail to inform them of a maltreatment incident involving their child. The Worker with support from the MPMC was able to explain what happened and what the agency and resource family were dong to assure it never happens again. They also discussed the parents writing to the child. The PMC provided feedback

# App. B, Ex. 9L

**Mississippi Child Welfare Practice Model Implementation Project Summary**

**Introduction**

This report will cover the activities of CSF staff and the DHS Practice Coaches as it relates to the overall implementation of the Child Welfare Practice Model for the month of May 2014.

**Training/Staff Development**

The following training sessions or coaching labs were delivered during the month of May:

| Name of Training/Lab | Region/County | Date(s) | Facilitated by | Approximate Number of Participants |
|---|---|---|---|---|
| CFA | Region IV-South | 05-20-2014 | Pam Green and Yvone Willis | 17 |
| Safety Assessment Framework | Region IV-South | 05-22 & 05-27 | Pam Green and Yvone Willis | 35 |
| Safety Assessment Framework | Region V-E | 05-05 & 05-06 | Jayne Riley | 37 |
| Goals and Tasks | Region I-N | 05-15 | Varrie Richmond and Carla Holeman | 10 |
| Documentation | Region VII-W (Hancock) | 05-16 | Buffie Taylor | 9 |
| Documentation | Region VII-W (Harrison) | 05-22& 05-23 | Deena Asfour, Rhoda McCovery, Jacqueline Purifoy | 35 |
| TOT for Level Three | Statewide | 05-29-30 | Marge Gildner | 15 |
| | | | | |
| Total DHS Staff trained | | | | 158 |

**Ongoing Practice Model Support**

The following sections detail examples of the individual and group coaching which the CSF and DHS coaches conducted during the month of May. In addition to those activities the Coaches also participated in a wide range of practice related activities including but not limited to:  adoption status meetings, Foster Care Reviews, case reviews as part of the monthly CQI process, Regional Staff Meetings, Regional CQI meetings, practice related training, MAP Team Meetings, Permanency Roundtables, Permanency Summits and preparation for COA site visits.

during the visit. The Worker asked the children about their last visit with their mother and assessed their developmental skills by asking questions regarding colors and shapes. The Worker also completed a walk-through of the home to assess for safety and risk concerns.



CSF Practice Coach Cindi Manuel, was unable to schedule the two groups during the month of May due to conflicts in both her schedule and the participants. The hours will be made up later in the contract year.

**Regions V-West and IV-North (Phase Two)**

*Region IV-North Coaching Activities*

The DHS Coach, Ryakko Williams, is currently on a 90 day special assignment as an acting supervisor in Lowndes County. Region I-S Practice Coach, Cristina Boone met with four Workers on an individual basis during the month of May. Examples of individual coaching activities included the following:

- Accompanied a Worker on a home visit to complete a physical home walk-through on an investigation. The Worker completed the Safety Checklist and did not identify any safety concerns. Afterwards the DHS Coach discussed with the Worker the importance of being aware of safety concerns as they may relate to the age group of the children.

- Observed a Worker facilitate a FTM which included an agenda and allowed for discussion by the participants. The Worker handled the FTM and the family's emotions appropriately. The meeting was informative and purposeful.

CSF Practice Coach Pam Green facilitated two small group sessions and met with the RD during the month of May. The RD, Iris Joiner, provided an update on staffing (Worker vacancies in three counties, one Supervisor is on special assignment in Forrest County and the DHS PMC is on a 90 day assignment as an Acting Supervisor in a county. The Region had been recently hit by a tornado so many of the staff were still working in emergency shelters. The RD asked that the CSF Coach provide some supportive coaching as many of the Supervisors are overwhelmed with all that has been happening.

As a result of the RD's request the initial time in the small groups focused on county updates and processing the Supervisor's reactions to the recent disaster. The groups then spent time participating in several role play scenarios which illustrated the importance and use of critical thinking skills. The group reports learning from the role play activities and demonstrated knowledge of the importance of supporting the Workers' development

DHS
363459

**Mississippi Child Welfare Practice Model Implementation Project Summary**

**Introduction**

This report will cover the activities of CSF staff and the DHS Practice Coaches as it relates to the overall implementation of the Child Welfare Practice Model for the month of June 2014.

**Training/Staff Development**

The following training sessions or coaching labs were delivered during the month of April:

| Name of Training/Lab | Region/County | Date(s) | Facilitated by | Approximate Number of Participants |
|---|---|---|---|---|
| Level Three Overview for RDs | Statewide | 06-11 | Cindi Manuel and Pam Green | 12 |
| CFA | Region IV-South | 06-12 | Pam Green and Yvone Willis | 14 |
| Level Two Module Two | Statewide | 06-18 - 19, & 06-25-26 | Pam Green, Carolyn Townes, Sue Berry, Lori Woodruff | 31 |
| Safety Assessment Framework | Region III-North | 06-24 | Pam Green and Tawnya Langley | 9 |
| Level Three Module One | Statewide | Various dates through out the month | All CSF Coaches | 83 |
| FTM | Region VII-W (Hancock) | 06-19 | Lori Woodruff | 6 |
| From Practice Guide to Practice Implementation | Region VII-W (Hancock) | 06-30 | Lori Woodruff and Buffie Taylor | 25 |
| Tasks and Goals | Region VII-W (Hancock) | 6-20 & 6-27 | Jayne Riley | 22 |
| Linkages | Region VII-W (Hancock) | 06-24 | Jayne Riley and Buffie Taylor | 14 |
| CFA | Region VII-W (Hancock) | 06-27 | Jayne Riley | 4 |
| Practice Model | Region IV-S (Lauderdale) | 06-18,19 & 24 | Yvonne Willis | 10 |
| Practice Model Overview | Statewide | 06-16, 17,18 & 19 | Christina Boone, Sheila Nabors, Carla Holeman & | 140 (20 – 25 in each three hour |

DHS
363500

Workers' understanding and use of data; and 4) identify ways to enhance IL activities resulting in better data. The group also began to discuss the change model introduced during the training and how it can be used in their practice. The CSF Coach pointed out the parallel between the supervisor using the change model with staff and the staff potentially using the change model with their families. The Level Three, Module One Coaching Lab was delivered in June. The group has decided to meet once a month for a full day with the lab half the day and the group session the other half. During this month's lab nearly the entire day was spent on the lab work. The participants were actively engaged in the activities (dyad, fish bowl and graphic recording) and seemed to find the four steps to supervision particularly helpful. The steps are identified as: Accessing Worker's experience and expertise; assuring mutual understanding and expertise; stating clear expectations and providing support that includes a commitment to follow up. The group discussed the value of incorporating these steps into their case staffings.

**Regions V-West and IV-North (Phase Two)**

***Region IV-North Coaching Activities***

The DHS Coach, Ryakko Williams, continues on a 90 day special assignment as a Supervisor in Lowndes County.
CSF Practice Coach Pam Green facilitated two small group sessions during the month of June.

- The Level Two small group focused on using data to improve practice and to encourage case staffing as a planned scheduled event. The group discussed different data reports that they had identified as an area to focus upon within their individual units. One example for discussion was Family Visits with Siblings which lead the group to discuss setting goals/dates each month for the visits to occur and assuring the Worker documented the visit correctly. The group also reviewed their calendars and brainstormed ways to ensure weekly case staffings consistently occur. The primary barrier identified that prevents weekly staffings from occurring was the other demands on their time that pulls them away from the office (school, training, other meetings, etc.) This group was a combination of three regions due to the limited number of new and acting supervisors in certain areas. The regions were I-South, IV-South and IV-North. (The detailed information is just being reported here but applies to Region I-South and IV-South as well.)

- The Level Three small group participated in the coaching lab and the small group activities. The goal for the session was to develop Supervisors' ability to outline a strategy for assessing safety during the initial investigation, to help supervisors coach workers to design an effective plan for engaging the family in determining if there is present danger and to evaluate the documentation of current safety assessments for quality. The group used dyad, "fish bowl" and triad structured

DHS
363504

**App. B, Ex. 9M**

**Mississippi Child Welfare Practice Model Implementation Project Summary**
**Introduction**

This report will cover the activities of CSF staff and the DHS Practice Coaches as it relates to the overall implementation of the Child Welfare Practice Model for the month of May 2014.

**Training/Staff Development**
The following training sessions or coaching labs were delivered during the month of May:

| Name of Training/Lab | Region/County | Date(s) | Facilitated by | Approximate Number of Participants |
|---|---|---|---|---|
| CFA | Region IV-South | 05-20-2014 | Pam Green and Yvone Willis | 17 |
| Safety Assessment Framework | Region IV-South | 05-22 & 05-27 | Pam Green and Yvone Willis | 35 |
| Safety Assessment Framework | Region V-E | 05-05 & 05-06 | Jayne Riley | 37 |
| Goals and Tasks | Region I-N | 05-15 | Varrie Richmond and Carla Holeman | 10 |
| Documentation | Region VII-W (Hancock) | 05-16 | Buffie Taylor | 9 |
| Documentation | Region VII-W (Harrison) | 05-22& 05-23 | Deena Asfour, Rhoda McCovery, Jacqueline Purifoy | 35 |
| TOT for Level Three | Statewide | 05-29-30 | Marge Gildner | 15 |
| | | | | |
| Total DHS Staff trained | | | | 158 |

**Ongoing Practice Model Support**

The following sections detail examples of the individual and group coaching which the CSF and DHS coaches conducted during the month of May. In addition to those activities the Coaches also participated in a wide range of practice related activities including but not limited to:  adoption status meetings, Foster Care Reviews, case reviews as part of the monthly CQI process, Regional Staff Meetings, Regional CQI meetings, practice related training, MAP Team Meetings, Permanency Roundtables, Permanency Summits and preparation for COA site visits.

of critical thinking skills, involving absent parents, the use of FTMs and the importance of Workers' completing thorough assessments.

### *Region V-West Coaching Activities*

The DHS Coach Selisa Wilkinson is currently on special assignment as a supervisor in a county within V-West.   Jennifer Smith was able to meet with approximately nine Workers on an individual basis during the month of May.  Examples of individual coaching activities included the following:



- Prior to accompanying a Worker to a school to initiate an investigation the PMC discussed with the Worker the process to follow with any new investigation which involved reviewing the entire report and any history and to write down questions she may want to ask.  Once at the school, the Worker relied on the PMC to ask many of the questions.  The PMC discussed the confidentiality forms and then modeled asking questions to initiate the investigation.

- Assisted a Worker with interviewing a mother whose young infant was in placement.  The Worker discussed the mother's treatment needs and the visitation plan.  They also discussed the importance of regular visits particularly with such a young child.

- Prior to accompanying a Worker on a home visit for a placement case the PMC discussed with the Worker the agency's responsibilities to assist and support the families.  The Worker felt that mother locating a new home as she must vacate her current home in a week.  The children are on a 90 day trial home visit.  Upon arriving at the home the Worker told the mother she had to locate housing by next week and did not offer any agency support.  As part of the debriefing they again discussed the importance of assisting families with finding appropriate services timely.

The CSF Coach, Cathy Welsh, facilitated one small group, and had a phone conversation with the RD during the month of May.  The small group activities focused on discussing the highs and lows that each Supervisor experienced during the week and discussing an investigation which one Supervisor asked for feedback on.  The group provided suggestions for ways to handle the identified concerns and the CSF Coach facilitated a

DHS
363460

**Mississippi Child Welfare Practice Model Implementation Project Summary**

**Introduction**

This report will cover the activities of CSF staff and the DHS Practice Coaches as it relates to the overall implementation of the Child Welfare Practice Model for the month of June 2014.

**Training/Staff Development**

The following training sessions or coaching labs were delivered during the month of April:

| Name of Training/Lab | Region/County | Date(s) | Facilitated by | Approximate Number of Participants |
|---|---|---|---|---|
| Level Three Overview for RDs | Statewide | 06-11 | Cindi Manuel and Pam Green | 12 |
| CFA | Region IV-South | 06-12 | Pam Green and Yvone Willis | 14 |
| Level Two Module Two | Statewide | 06-18 - 19, & 06-25-26 | Pam Green, Carolyn Townes, Sue Berry, Lori Woodruff | 31 |
| Safety Assessment Framework | Region III-North | 06-24 | Pam Green and Tawnya Langley | 9 |
| Level Three Module One | Statewide | Various dates through out the month | All CSF Coaches | 83 |
| FTM | Region VII-W (Hancock) | 06-19 | Lori Woodruff | 6 |
| From Practice Guide to Practice Implementation | Region VII-W (Hancock) | 06-30 | Lori Woodruff and Buffie Taylor | 25 |
| Tasks and Goals | Region VII-W (Hancock) | 6-20 & 6-27 | Jayne Riley | 22 |
| Linkages | Region VII-W (Hancock) | 06-24 | Jayne Riley and Buffie Taylor | 14 |
| CFA | Region VII-W (Hancock) | 06-27 | Jayne Riley | 4 |
| Practice Model | Region IV-S (Lauderdale) | 06-18,19 & 24 | Yvonne Willis | 10 |
| Practice Model Overview | Statewide | 06-16, 17,18 & 19 | Christina Boone, Sheila Nabors, Carla Holeman & | 140 (20 – 25 in each three hour |

*Monthly Status Report- Practice Model Implementation*

demonstration activities to practice concepts presented in the lab.  Graphic recording was used to illustrate concepts and assess the knowledge level of participants.  All participants interacted and participated I the discussions and activities.  The group found the 20 Safety Factors and "Is there present danger" flowchart particularly helpful.

- Met with RD, Iris Joiner, regarding concerns voiced to the CSF Coach that the small groups, training and mentoring being offered were too much for one of her supervisors.  The CSF Coach reassured the RD that there was flexibility within the month for scheduling the group and if she had known of the conflict a different time for the group could have been arranged.

### Region V-West Coaching Activities

The DHS Coach Jennifer Smith was able to meet with approximately six Workers on an individual basis during the month of June.  Selisa Wilkinson remains on special assignment and therefore, did not complete any coaching activities.  Examples of individual coaching activities included the following:

- Reviewed a CFA with a Worker and discussed the type of information to be included and the level of detail which is needed.  As they discussed the case it became apparent that the Worker was very knowledgeable about the family circumstances but had not documented the information in the CFA.

- Prior to attending a Review Hearing with a Worker, the PMC and Worker reviewed the case and discussed the type of questions she may be asked.  The PMC accompanied the Worker to Court and while she was nervous during her testimony she was able to provide the Court with detailed information and the reasons behind the agency's recommendations.

- Accompanied a Worker to initiate an investigation.  The Worker asked questions but did not go into the detail that was needed.  The PMC discussed with the Worker the reasons behind asking detailed questions and what type of information should be gathered as part of the investigation.  The PMC stressed the importance of being able to assess for the children's safety during every contact and ways to make sure it is accomplished.

The CSF Coach, Cathy Welsh, is transitioning out of the coaching work in V-W and therefore the new Coach, Sue Berry, was in the region this month to meet staff.  They facilitated the Level Three Module One, Coaching Lab and small group, met with one Supervisor individually, attended the RIT meeting, met with Selisa Wilkinson, DHS Coach and with the RD during the month of June.  The activities for the month included:

DHS
363505

# App. B, Ex. 9N

*Monthly Status Report- Practice Model Implementation*

**Mississippi Child Welfare Practice Model Implementation Project Summary**

**Introduction**

This report will cover the activities of CSF staff and the DHS Practice Coaches as it relates to the overall implementation of the Child Welfare Practice Model for the month of February 2014.

**Training/Staff Development**

The following training sessions or coaching labs were delivered during the month of February:

| Name of Training/Lab | Region/County | Date(s) | Facilitated by | Approximate Number of Participants |
|---|---|---|---|---|
| Safety Assessment Framework | V-W | 02/05/2014 | Cathy Welsh and Selisa Wilkinson | 17 |
| Safety Assessment Framework for Resource and Adoption Staff | V-W | 02/19/2014 | Cathy Welsh | 7 |
| Safety Assessment Framework | I-S | 02-24-02-27-2014 | Carolyn Townes, Cristina Boone, Tamara Roberts and Tawnya Langley | 113 |
| COA and Best Practice | III-S – Warren | 02-05-2014 | Carolyn Townes | 7 |
| | | | | |
| Total DHS Staff trained | | | | **144** |

**Ongoing Practice Model Support**

The following sections detail examples of the individual and group coaching which the CSF and DHS coaches conducted during the month of February. In addition to those activities the Coaches also participated in a wide range of practice related activities including but not limited to: adoption status meetings, Foster Care Reviews (FCR), Regional Staff Meetings, Regional Implementation Team Meetings, Regional CQI meetings, reviewers in a CQI annual review, practice related training, MAP Team Meetings, Permanency Roundtables, COA site preparation and Regional Meetings for the Diligent Recruitment Grant. Both CSF and DHS Coaches will begin to focus at least some of their time in each region on a review of the Comprehensive Family Assessment process and tool. The number of days of coaching for both CSF and DHS Coaches was impacted by the severe weather in Mississippi during the month of February.

DHS
363290

*Monthly Status Report- Practice Model Implementation*

Four DHS Coaches were on special assignment in Forest County assisting with investigations which impacted the amount of coaching provided in their regions as well as other regions as several of their peers assisted in covering those regions.

**Intensive Supervisory Training – Level Two**

Work continued on the development of the Level 3 supervisory training curriculum, with Marge Gildner and Cindi Manuel working on that deliverable, and other CSF staff reviewing and commenting on draft materials. Cindi Manuel finished a review and update to the Level Two curriculum. Cindi Manuel's meeting with Jennifer Walker to discuss the logistics of both the second delivery of Level Two and the initial deliveries of Level Three had to be rescheduled due to the severe weather.

**Regions I-South and II-West (Phase One)**

*Region I-South Coaching Activities*

The DHS Coaches, Cristina Boone and Tamara Roberts, were able to meet with approximately 17 workers on an individual basis during the month of February. They also provided coaching support to Region I-N. Examples of individual coaching activities included the following:

- Accompanied a Worker on a visit with a parent whose child was recently returned for a trial home visit. The child is five months old so the Worker discussed the child's care, the doctor's visits, and early intervention services.

- Discussed with a new Worker the overall FTM process and discussed how both the planning for and actual FTM should be documented in MACWIS. They also reviewed MACWIS and discussed how to use it to support their work and meet deadlines.



- Accompanied a Worker to initiate an investigation alleging physical neglect and drug usage in the home. While attempting to discuss the report with the father he became upset and the PMC intervened to assist the Worker with calming the father down and asses his reason for refusing to cooperate.

# App. B, Ex. 9O

**Mississippi Child Welfare Practice Model Implementation Project Summary**
**Introduction**

This report will cover the activities of CSF staff and the DHS Practice Coaches as it
relates to the overall implementation of the Child Welfare Practice Model for the month
of April 2014.

**Training/Staff Development**
The following training sessions or coaching labs were delivered during the month of
April:

| Name of Training/Lab | Region/County | Date(s) | Facilitated by | Approximate Number of Participants |
|---|---|---|---|---|
| Safety Assessment Framework | Region II-E | 04-2&04-3 | Ryakko Williams, ReGina Hardiman, Mary Randall, Tawnya Langley, Varrie Richmond | 62 |
| Safety Assessment Framework for Resource and Adoption Staff | Region II-W | 04-23- | Cindi Manuel & Mary Randall | 15 |
| Safety Assessment Framework | Region IV-N | 04-16 & 04-17 | Pam Green & Ryakko Williams | 70 |
| Safety Assessment Framework | Region I-N | 04-21 – 24 | Carla Holeman, Varrie Richmond, Tawnya Langley, & Tamara Roberts | 85 |
| Safety Assessment Framework | Region V-W | 04-24-2014 | Cathy Welsh | 19 |
| Safety Assessment Framework | Region III-S | 04-9 & 04-10 | Indiana Brown, Melody Vaughn, Carolyn Townes, Varrie Richmond, Tawnya Langley | 60 |
| Level II Clinical Supervision Training (Module One) (two separate deliveries) | Statewide | 04-15 - 16; 04-23-24; 04-30 – 05-1 | Pam Green, Sue Berry, Carolyn Townes, Lori Woodruff & Margaret Baklini | 49 |
| | | | | |
| Total DHS Staff trained | | | | **360** |

*Monthly Status Report- Practice Model Implementation*

Worker's active investigations and she was commended for having initiated them on time and completing six of seven on time.

CSF Practice Coach Sue Berry met with seven supervisors individually, facilitated one small group and met with the RD during the month of April. Examples of her activities included

- Met with the Resource Supervisor and the Casework Supervisor to discuss concerns regarding a resource home which has asked that the children be removed. The CSF Coach was able to facilitate a good discussion between the two Supervisors which led to the identification of possible options.

- Reviewed a CFA and FSP and discussed what was needed to make both more useful documents. They discussed how goals must be measurable and what that might look like.

- Facilitated a small group session which involved reviewing the updated CFA that the group used last month for role play and provided feedback on the CFA which had a great deal more information than it had previously. They discussed how the FSP should be based on the information in the CFA and that the goals need to reflect behavioral or environmental changes for a child to be safe and their needs be met; not just the completion of services.

- Discussed the progress of completing more thorough CFAs with the RD. While some efforts have been evident, there seems to continue to be a lack of urgency. The CSF Coach shared examples of CFAs with the RD and they discussed what is needed to make them more impactful.

## Region II-East, Region Six and Region VII-West (Phase Six)

### *Region II-East Coaching Activities*

Mary Randall and ReGina Hardiman, Region II-West Coaches are providing limited coaching support to staff in Region II-East since the retirement of the full-time coach. They were able to meet with approximately eight workers on an individual basis and met with groups of workers from several counties as an introduction during the month of April. Examples of coaching activities included the following:

- Reviewed a CFA with a Worker by utilizing the CFA Instructional Guide and the Promoting Critical Thinking Worksheet. The PMC discussed underlying needs and protective capacities with the Worker.

- Reviewing the documentation for an investigation and introduced the use of the Promoting Critical Thinking Worksheet as a way to identify serious harm or imminent threat, contributing factors, underlying conditions and protective capacities.

DHS
363447

*Monthly Status Report- Practice Model Implementation*

**Mississippi Child Welfare Practice Model Implementation Project Summary**

**Introduction**

This report will cover the activities of CSF staff and the DHS Practice Coaches as it relates to the overall implementation of the Child Welfare Practice Model for the month of July 2014.

**Training/Staff Development**

The following training sessions or coaching labs were delivered during the month of July:

| Name of Training/Lab | Region/County | Date(s) | Facilitated by | Approximate Number of Participants |
|---|---|---|---|---|
| Statewide ASWS and Coaches Meeting | Statewide | July 15-July 16 | CSF, Kim Shackleford | 200 |
| Level 3, Module 2 | V-East | July 30th | Jayne Riley | 7 |
| Linkages Training | Simpson | July 23rd | Jayne Riley | 7 |
| Level 3, Module 1 | Hancock | July 31st | Jayne Riley | 1 |
| Level 3, Module 2 | VI | July 25th | Jayne Riley | 6 |
| Guide to Home Visits (Quality and Reqs per Policy) | Forrest | July 10th | Jayne Riley | 10 |
| Level 3, Module 2 | II-E | July 8th | Varrie Richmond | 3 |
| Level 3, Module 2 | I-North | July 10th | Varrie Richmond | 9 |
| Safety Assessment Framework Coaching Lab | III-North | July 24th | Tawnya Langley and Pam Green | 43 |
| Level 3 Overview for Regional ASWS Staff | Statewide | July 8th | Cathy Welsh and Pam Green | 14 |
| Level 3, Module 2 | V-West | July 28th | Cathy Welsh and Sue Berry | 7 |
| Level 3, Module 2 Make Up Session | V-West, V-East, VII-East, IV-South | July 29th | Cathy Welsh and Sue Berry | 8 |
| Level 3, Module 2 | VII-East | July 25th | Sue Berry | 9 |
| Level 3, Module 2 Learning Lab | III-South | July 11th | Carolyn Townes | 5 |
| Level 3, Module 2 Small Group | III-South | July 25th | Carolyn Townes | 5 |
| Total DHS Staff trained | | | | 334 |

impressions that Supervisors tended to be compliance focus, and there being a need to refocus on outcomes for families.

## Region II-East, Region Six and Region VII-West (Phase Six)

### *Region II-East Coaching Activities*

The DHS coaching position in this region remains vacant.

CSF Practice Coach Varrie Richmond met with one supervisor individually, one unit and facilitated one small group session during the month of July.  Her activities included:

- Participated in a unit meeting and was able to support supervisor and coach group on the importance of critical thinking to assure safety as well as the importance of obtaining supervisory support in decision making and case planning.
- Met individually with a Supervisor for the purpose of improving the quality of staffing and coached on the use of clinical supervision and constructive feedback. She then observed the supervisory approach to staffing, and noted the Supervisors use of utilize clinical skill in allowing worker to talk about findings and present a plan of action.
- Led a small group discussion with three Supervisors, the focus of which was to improve supervisory skills in helping workers assess safety, and developing worker's skills around assessing for safety, as well as the improved documentation of staffing. Supervisors were noted as very involved, verbalized value in targeted staffing of investigations, and in making the workers aware that the question to be answered initially is "is there danger".
- The CSF Practice Coach also attended regional staff meeting and was able to review data with supervisory and hear responses to problem areas and discussions related to individual plans of action.

### *Region VI Coaching Activities*

The DHS coaches, Sandra Brown and Kendon Ellerman, remained on special assignments during the month of July and therefore did not complete any coaching activities.

The CSF practice coach, Jayne Riley, conducted one small group discussion and participated in one conference call. The small group meeting which had six participants, was focused on discussion and review of safety plans and how the ASWSs are ensuring these plans are being monitored and reviewed by staff. Several ASWS's in this group commented that it has been helpful discussing the safety plans and the procedures at each staffing, reviewing and documenting the use of the safety plan with the worker. The conference call the CSF practice coach participated in was with the regional leadership and the Director of Field Operations to discuss staffing issues and the transition of the new Regional Director into her position.

DHS
364020

# App. B, Ex. 9P

**Mississippi Child Welfare Practice Model Implementation Project Summary**
**Introduction**

This report will cover the activities of CSF staff and the DHS Practice Coaches as it relates to the overall implementation of the Child Welfare Practice Model for the month of April 2014.

**Training/Staff Development**

The following training sessions or coaching labs were delivered during the month of April:

| Name of Training/Lab | Region/County | Date(s) | Facilitated by | Approximate Number of Participants |
|---|---|---|---|---|
| Safety Assessment Framework | Region II-E | 04-2&04-3 | Ryakko Williams, ReGina Hardiman, Mary Randall, Tawnya Langley, Varrie Richmond | 62 |
| Safety Assessment Framework for Resource and Adoption Staff | Region II-W | 04-23- | Cindi Manuel & Mary Randall | 15 |
| Safety Assessment Framework | Region IV-N | 04-16 & 04-17 | Pam Green & Ryakko Williams | 70 |
| Safety Assessment Framework | Region I-N | 04-21 – 24 | Carla Holeman, Varrie Richmond, Tawnya Langley, & Tamara Roberts | 85 |
| Safety Assessment Framework | Region V-W | 04-24-2014 | Cathy Welsh | 19 |
| Safety Assessment Framework | Region III-S | 04-9 & 04-10 | Indiana Brown, Melody Vaughn, Carolyn Townes, Varrie Richmond, Tawnya Langley | 60 |
| Level II Clinical Supervision Training (Module One) (two separate deliveries) | Statewide | 04-15 - 16; 04-23-24; 04-30 – 05-1 | Pam Green,  Sue Berry, Carolyn Townes, Lori Woodruff & Margaret Baklini | 49 |
| | | | | |
| Total DHS Staff trained | | | | **360** |

DHS
363437

*Monthly Status Report- Practice Model Implementation*

**Region III-North and VII-East (Phase Five)**

### *Region III North Coaching Activities*

The DHS coaching position in this region is currently vacant. Indiana Brown from Region III-South was in the Region one day during April and met with a Worker to assist her in closing out cases as the Worker is leaving the agency in the near future.

CSF Practice Coach, Pam Green, facilitated two small supervisory groups and met with the RD, Trudy Miller during the month of April. In both small groups a role play activity was facilitated. One supervisor played the role of supervisor and another the role of a worker while the remaining participants were observers who provided feedback. They use scenarios which were based on case experiences and provided each other with insightful feedback. The supervisors indicated that staffings are occurring regularly but are usually not being documented in a timely manner.

The CSF Coach met with the RD who reported that things were progressing within the region with the hiring new workers and supervisors. The RD believes that she has seen a decrease in the level of stress among the supervisors since the addition of new supervisors and once the Workers complete the training expects this will be true for the Workers as well. She has also promoted a supervisor to the position of Regional ASWS which means there will now be two for the region.

### *Region VII –East Coaching Activities*

The DHS Coach, Blair Sullivan, was able to meet with approximately four workers on an individual basis during the month of April. However, it is important to note that she met with one Worker on ten different dates at the request of the RD and in an effort to assist with overdue work. She also spent two days reviewing cases in preparation of the upcoming COA site visit. Examples of individual coaching activities included the following

- Assisted a Worker with organizing and prioritizing overdue investigations. Provided the Worker with a to-do list of tasks to be completed by the following coaching session. Accompanied the Worker to initiate an investigation and observed his interview with a young child. Provided feedback on how the interview was handled including the fact that the Worker took a call during the interview. Continued to assist the Worker with initiating and completing investigations.

- Accompanied a Worker on a return visit to a home (investigation) which had an active safety plan. The Worker was firm but fair with the family when discussing what was expected of them and the care of their children.

- Reviewed a Worker's workload with the Worker which included reading several CFAs which were of high quality and full of information. They discussed the

*Monthly Status Report- Practice Model Implementation*

**Mississippi Child Welfare Practice Model Implementation Project Summary**
**Introduction**

This report will cover the activities of CSF staff and the DHS Practice Coaches as it relates to the overall implementation of the Child Welfare Practice Model for the month of July 2014.

**Training/Staff Development**
The following training sessions or coaching labs were delivered during the month of July:

| Name of Training/Lab | Region/County | Date(s) | Facilitated by | Approximate Number of Participants |
|---|---|---|---|---|
| Statewide ASWS and Coaches Meeting | Statewide | July 15-July 16 | CSF, Kim Shackleford | 200 |
| Level 3, Module 2 | V-East | July 30th | Jayne Riley | 7 |
| Linkages Training | Simpson | July 23rd | Jayne Riley | 7 |
| Level 3, Module 1 | Hancock | July 31st | Jayne Riley | 1 |
| Level 3, Module 2 | VI | July 25th | Jayne Riley | 6 |
| Guide to Home Visits (Quality and Reqs per Policy) | Forrest | July 10th | Jayne Riley | 10 |
| Level 3, Module 2 | II-E | July 8th | Varrie Richmond | 3 |
| Level 3, Module 2 | I-North | July 10th | Varrie Richmond | 9 |
| Safety Assessment Framework Coaching Lab | III-North | July 24th | Tawnya Langley and Pam Green | 43 |
| Level 3 Overview for Regional ASWS Staff | Statewide | July 8th | Cathy Welsh and Pam Green | 14 |
| Level 3, Module 2 | V-West | July 28th | Cathy Welsh and Sue Berry | 7 |
| Level 3, Module 2 Make Up Session | V-West, V-East, VII-East, IV-South | July 29th | Cathy Welsh and Sue Berry | 8 |
| Level 3, Module 2 | VII-East | July 25th | Sue Berry | 9 |
| Level 3, Module 2 Learning Lab | III-South | July 11th | Carolyn Townes | 5 |
| Level 3, Module 2 Small Group | III-South | July 25th | Carolyn Townes | 5 |
| Total DHS Staff trained | | | | 334 |

utilizing data standards in supervision.   The participants felt they see benefits and applicability to their roles as supervisors.

- Facilitated one small group session with seven ASWS, with the primary focus on discussing and reviewing how Safety Plans are currently being developed, and how they are monitored by ASWS.

- Met with two supervisors individually. CSF coach discussed the case staffing and safety plan development and monitoring process with one supervisor, who reports having a good rapport with her staff and regular staffings, and that her workers are getting their work done timely.  The CSF coach met with a second supervisor to discuss safety and adoption placements, as well as current staffing techniques utilized. CSF coach observed strength in the detail and quality of the life books in this region.

## Region III-North and VII-East (Phase Five)

### *Region III North Coaching Activities*

The DHS coaching position was recently filled for this region by Audrey Woods. However, she did not conduct any coaching activities in the month of July.

The CSF practice coach, Pam Green facilitated two small group sessions during the month of July.  Her activities included:

- One small group session, which included nine participants was focused on using data to monitor performance, as well as planning for case staffing meetings. Supervisors discussed data elements they were most concerned with and several shared tools they use to monitor various data elements and techniques used with staff to improve. A discussion was also held on conducting and documenting case staffing meetings and the importance of reviewing CFA, FSP and case narrative material. The participants were engaged in the discussion of data and case staffings.

- One small group session, which included eight participants, focused on helping supervisors coach workers to develop effective safety plans to assure there is no immediate threat of danger to family members, as well as monitoring and revising safety plans. The feedback given by participants indicated that the information presented will be useful in their practice.  They mentioned protective capacities, documentation of the safety plan and monitoring the safety plan as key take-aways.  The participants were highly engaged and seemed to be willing to take risks during the role-play.

DHS
364018

# App. B, Ex. 9Q

**Mississippi Child Welfare Practice Model Implementation Project Summary**
**Introduction**

This report will cover the activities of CSF staff and the DHS Practice Coaches as it relates to the overall implementation of the Child Welfare Practice Model for the month of October 2013.

# REDACTED

*Monthly Status Report- Practice Model Implementation*

# REDACTED

**Region V--East (Phase Four)**

***Region V-East Coaching Activities***

The DHS Coaches, Shonda Brooks and Desmond Griffith, did not complete any one on one coaching during October primarily due to the region's preparation for the COA site visit during the month of October.

# App. B, Ex. 9R

**Mississippi Child Welfare Practice Model Implementation Project Summary**
**Introduction**

This report will cover the activities of CSF staff and the DHS Practice Coaches as it relates to the overall implementation of the Child Welfare Practice Model for the month of January 2014.

**Training/Staff Development**

The following training sessions or coaching labs were delivered during the month of January:

| Name of Training/Lab | Region/County | Date(s) | Facilitated by | Approximate Number of Participants |
|---|---|---|---|---|
| CFA/FSP | I-N | 1/7,1/8, 1/9 and 1/10 (7 labs) | Carla Holeman and Terry Phillips | 80 |
| Practice Model training (Modules 1-3) | VII-West (Harrison | 1/23-24 | Deena Asfour, Jacqueline Purifoy, Rhoda McCovery | 30 |
| Fatality Roundtable Findings Presentation | V-W | 1/8 | Cathy Welsh | 19 |
| Investigation/TPR | IV-S – Lauderdale | 1/13 | Yvonne Willis | 18 |
| Safety Assessment Framework | II-W (Washington and Coahoma) | 1.15 & 1.16 | Mary Randall and Cindi Manuel | 20 |
| COA & Best Practices | III-South | 1/8 & 1/27 | Carolyn Townes | 30 |
| Fatality Roundtable Findings Presentation | V-E | 1/14 | Cathy Welsh | 8 |
| Total DHS Staff trained | | | | 205 |

**Intensive Supervisory Training – Level Two**

During January CSF developed and submitted to Kim Shackelford and Jennifer Walker an outline and work plan for the Level Three Supervisory Training. Level Three is designed to provide supervisors with the skills needed to make, model and supervise sound safety decisions throughout the life of a child welfare case. Level Three focuses on applying the knowledge and skills to real Worker/family situations in a coaching lab venue with additional small group sessions to reinforce the learning. Level Three

unit members. They discussed ways to "work smarter" and how the Supervisor can model this approach.

### *Region VII –East Coaching Activities*

The DHS Coach, Blair Sullivan, was able to meet with approximately nine Workers on an individual basis during the month of January. Examples of individual coaching activities included the following:



- Assisted a Worker with completing an investigation in MACWIS by reviewing narratives and provided feedback regarding the overall investigation process including the importance of meeting deadlines.

- Accompanied a Worker on a visit to a resource home to meet with three siblings who are placed together in this home. The Worker met with the youngest girl individually and then met with the two brothers as one of the boys in non-verbal and will interact more with the Worker when his brother is present. The Worker also talked with the resource parents about possible services and the adoption process.



CSF Practice Coach Sue Berry was unable to coach in the region during the month of January due to travel issues related to the weather.

### Region II-East, Region Six and Region VII-West (Phase Six)

### *Region II-East Coaching Activities*

The DHS Coach Rubijo Purifoy did not complete any individual coaching during the month of January because of being out on family medical leave and working on preparations for an upcoming CQI and COA visit.

CSF Practice Coach Varrie Richmond met with four supervisors individually and facilitated one small group session during the month of January. Her activities included

- Discussed with a Supervisor issues related to problematic behavior with a new employee; what the underlying issues with the Worker may be and ways to

*Monthly Status Report- Practice Model Implementation*

**Mississippi Child Welfare Practice Model Implementation Project Summary**

**Introduction**

This report will cover the activities of CSF staff and the DHS Practice Coaches as it relates to the overall implementation of the Child Welfare Practice Model for the month of June 2014.

**Training/Staff Development**

The following training sessions or coaching labs were delivered during the month of April:

| Name of Training/Lab | Region/County | Date(s) | Facilitated by | Approximate Number of Participants |
|---|---|---|---|---|
| Level Three Overview for RDs | Statewide | 06-11 | Cindi Manuel and Pam Green | 12 |
| CFA | Region IV-South | 06-12 | Pam Green and Yvone Willis | 14 |
| Level Two Module Two | Statewide | 06-18 - 19, & 06-25-26 | Pam Green, Carolyn Townes, Sue Berry, Lori Woodruff | 31 |
| Safety Assessment Framework | Region III-North | 06-24 | Pam Green and Tawnya Langley | 9 |
| Level Three Module One | Statewide | Various dates through out the month | All CSF Coaches | 83 |
| FTM | Region VII-W (Hancock) | 06-19 | Lori Woodruff | 6 |
| From Practice Guide to Practice Implementation | Region VII-W (Hancock) | 06-30 | Lori Woodruff and Buffie Taylor | 25 |
| Tasks and Goals | Region VII-W (Hancock) | 6-20 & 6-27 | Jayne Riley | 22 |
| Linkages | Region VII-W (Hancock) | 06-24 | Jayne Riley and Buffie Taylor | 14 |
| CFA | Region VII-W (Hancock) | 06-27 | Jayne Riley | 4 |
| Practice Model | Region IV-S (Lauderdale) | 06-18,19 & 24 | Yvonne Willis | 10 |
| Practice Model Overview | Statewide | 06-16, 17,18 & 19 | Christina Boone, Sheila Nabors, Carla Holeman & | 140 (20 – 25 in each three hour |

*Monthly Status Report- Practice Model Implementation*

- The focus of the Level Two Small group was to use the Individualized Action Plan for Improved Practice which they developed during Module One to show the development of the skills of the Supervisors. They group also discussed the Simple Model for Change that was also an activity from Module One. The group discussed their plans and the participants provided feedback and suggestions. An example of one plan was to improve consistency in making face-to-face contacts and visits in the home. Barriers to completing the contacts that were identified included lack of knowledge and limited skills in being able to prioritize the work. The group also discussed how to apply the change model within unit meetings so Workers could become comfortable with this concept and use it with their families.

- The Level Three small group participated in the coaching lab and the small group activities. The goal for the session was to develop Supervisors' ability to outline a strategy for assessing safety during the initial investigation, to help supervisors coach workers to design an effective plan for engaging the family in determining if there is present danger and to evaluate the documentation of current safety assessments for quality. The group used dyad, "fish bowl" and triad structured demonstration activities to practice concepts presented in the lab. They also practiced documenting the case staffing after the demonstrations. The group indicated that having the list of 20 Safety Factors and the "Is there present danger" flowchart are very helpful and plan to provide copies to each worker.

### *Region VII –East Coaching Activities*

The DHS Coach, Blair Sullivan, did not meet with any Workers on an individual basis during the month of June. She delivered two small coaching labs; attended a one-day training in Jackson and participated in the COA site visit including being interviewed as part of the review.

CSF Practice Coach Sue Berry facilitated small groups, delivered Level Three Module One Coaching Lab and met with a Supervisor and her unit during the month of June. There will not be a Level Two Small Group for this region.

The goal for the small group was for Supervisors to be able to evaluate their practice and take steps to improve. During the group they discussed what they had learned from the recent CQI review. The participants identified the areas of medical evaluations, visits with parents, siblings and resource parents and father involvement as areas still needing the most improvement. They also acknowledged the need for continued work on CFAs and FSPs. Planning was identified as an area that should be a focus. The Supervisors reported seeing the value of the CFA but did not feel that any of their Workers did. The Supervisors did not acknowledge difficulty with safety assessments but when reviewed the CS Coach found them to have been limited in scope and focused only on the report of maltreatment. They also discussed feelings of frustration around the expectations that

DHS
363511

# App. B, Ex. 10

**Grace M. Lopes**

**Attachments:**    cqi corrective action tracking001.pdf

---

**From:** Long, Gwen [mailto:glong@bakerdonelson.com]
**Sent:** Wednesday, March 05, 2014 6:48 PM
**To:** jdavis@ChildrensRights.Org; gmlopes@oymonitor.org
**Cc:** Mia Caras (mcaras@sparb.org)); Rachal, Kenya
**Subject:** Production

Julia and Grace:

Attached, please find the following documents:

- MIC Review Reports for July-December 2013 (DHS 362630-362688)

- Protocol for Conducting QA of Completed MIC Reviews (DHS 362689-362690)

- Verification of Data/MIC Reporting Spreadsheet (DHS 362691-362695)

- CQI Corrective Action Tracking Process (DHS 362696-362711),  produced pursuant to provision II.B.2. of the Final Period 4 Plan

Gwen

**Gwen N. Long**
Paralegal
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
Meadowbrook Office Park
4268 I-55 North
Jackson, MS  39211
Direct:  601.351.8962
Fax:    601.974.8962
E-Mail: glong@bakerdonelson.com
www.bakerdonelson.com

Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C. represents clients across the U.S. and abroad from offices in Alabama, Florida, Georgia, Louisiana, Mississippi, Tennessee, Texas, Washington, D.C.

🌲 Please consider the environment before printing this e-mail
**Baker Donelson**: One of FORTUNE magazine's "100 Best Companies to Work For"

---

Under requirements imposed by the IRS, we inform you that, if any advice concerning one or more U.S. federal tax issues is contained in this communication (including in any attachments and, if this communication is by email, then in any part of the same series of emails), such advice was not intended or written by the sender or by Baker, Donelson, Bearman, Caldwell & Berkowitz, PC to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or tax-related matter addressed herein.

This electronic mail transmission may constitute an attorney-client communication that is privileged at law. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this electronic mail transmission in error, please delete it from your system without copying it, and notify the sender by reply e-mail, so that our address record can be corrected.

MDHS DIVISION OF FAMILY AND CHILDREN'S SERVICES

# Safety, Permanency, and Well-Being

# Division of Family & Children's Services (DFCS) Continuous Quality Improvement (CQI) Corrective Action Tracking Process

Quality Plan Version Control

| Version | Date | Author | Change Description |
|---------|------|--------|--------------------|
| 1.0 | March 5, 2014 | C Greer | Initial Release |
| | | | |
| | | | |

*DFCS CQI Corrective Action Tracking Process*

*1.0*

## Overview

During the course of the CQI review process, reviewers or other staff performing the review activity may identify an issue which meets the criteria for an imminent safety concern constituting the need for corrective action. Case practice or systemic issues that warrant follow up and corrective action in addition to child-specific threat to a child's permanency, stability, or well-being should also be identified and reported through the corrective action process. The Office of CQI uses the same corrective action procedures and time frames for all review processes in order to ensure consistency in corrective action tracking across all review activities. The detailed process that follows addresses the distribution, prioritization, tracking and follow-up of all reported corrective actions as identified in the CQI review activities of the Foster Care Review (FCR) Unit, Evaluation and Monitoring Unit (EMU) and Safety Review Unit (SRU).

## I.    Distribution of Corrective Actions

➢  As safety concerns are identified during the review process, staff identifying the concern immediately notifies the county office Regional Director or his/her designee and a CQI review unit supervisor of the findings. The CQI review unit supervisor is responsible for ensuring all pertinent information is entered in the HelpDesk Expert Automation Tool (HEAT) tracking system, creating a HEAT tracking number for the case in which the concern was identified. The CQI review unit supervisor completes a HEAT assignment detailing the concern(s) the same day or within 24 hours the concern is identified to the Regional Director or his/her designee for follow up of corrective action with the appropriate field staff.

➢  As the HEAT assignment is made, a system generated email is sent to the person(s) receiving the HEAT assignment notifying them a HEAT assignment exists for corrective action follow up. The assignee must log in to the HEAT software (a web-based software application) and acknowledge they have received notification of the HEAT assignment.

➢  For safety concerns, the time to initiate corrective action is five (5) calendar days. For practice concerns, the time to initiate is twenty (20) working days. The HEAT system is designed to send a system generated notification emails at various stages during the corrective action HEAT tracking. **Appendix A** lists all system generated notification emails and who the emails are sent to as a tool to assist in notification of deadlines approaching for corrective action completions.

➢  The HEAT tracking system CQI module was designed for tracking of safety and case practice corrective actions identified through all CQI review processes. **Appendix B** 'DFCS CQI  HEAT Instructions provides screen prints and detailed instructions of how to navigate through the HEAT system to update HEAT tickets with corrective action information.

DHS
362697

## II.    Prioritizing and Addressing Corrective Actions

### *Safety Concerns*

➢ As imminent safety concerns are identified through any CQI review process, CQI staff report to CQI review team supervisors who report the concern to the Regional Director or his/her designee, Field Operations Director and CQI Director and enter a corrective action HEAT assignment detailing the concern(s) the same day or within 24 hours the concern is identified. All safety concerns are entered in HEAT as a 'Priority 1' assignment (5 calendar day initiation period). NOTE: FCR staff report all maltreatment in care not previously reported to the Abuse Neglect Hotline for investigation. The Regional Director or his/her designee is responsible for immediate corrective action follow up with the responsible Area Social Work Supervisor (ASWS) and/or worker concerning the imminent safety of a child(ren).

➢ Upon receiving the system-generated email notification of a HEAT ticket assignment for corrective actions involving the safety of a child, the Regional Director or his/her designee is responsible for initiating follow up action within 5 calendar days of the HEAT corrective action assignment date. The Regional Director and/or Regional ASWS determine who will be responsible for planning and initiating corrective actions and how the plan will be carried out in the event of an imminent concern, depending upon the nature of the concern. The Regional Director and/or Regional ASWS are responsible for oversight of the corrective action taken prior to the closing information being entered in HEAT concerning the assignment to ensure the steps taken completely addressed the concern, followed policy and practice, and eliminated the safety risk for the child or children. Actions taken must specifically address the safety (or other) concerns noted by the CQI reviewer for the child(ren) in question *and must also address the safety of any other children in the home.* Corrective action steps must be documented in HEAT within the 5 calendar day period.

### *Practice Concerns*

➢ As practice concerns and/or systemic issues that warrant corrective action in addition to child-specific threat to a child's permanency, stability, or well-being are identified through any CQI review process, CQI staff report to CQI review team supervisors who enter a corrective action HEAT assignment detailing the concerns within three (3) working days of the concern being identified. All practice concerns are entered in HEAT as 'Priority 2' assignments (20 working day initiation). Corrective action steps must be documented in HEAT within the 20 working day period.

➢ The Regional Director or his/her designee is responsible for corrective action follow up with the responsible ASWS and/or worker for planning and

DHS
362698

initiating corrective action and how the plan will be carried out. The Practice Model (PM) supervisory staff is responsible for oversight of the corrective action taken by reviewing the follow-up information being entered in HEAT concerning the assignment to ensure the steps taken completely addressed the concern and followed policy and practice. Actions taken must specifically address the practice (or other) concerns noted by the CQI reviewer for the child(ren) in question. Reported practice issues that may potentially affect an entire region will be assigned by the PM supervisory staff to the PM coaches for targeted training for the staff of their respective regions. Targeted training with worker/county/region is an ongoing task with PM coaching staff and will continue outside of the 20 working day period noted for the corrective action to be completed.

## III.   CQI Follow-Up of Corrective Actions

### *Resolved Assignments*

➢ When the HEAT assignee enters a closing description and resolved date for any assignment, a system generated email is sent to the CQI staff that made the assignment. After receiving the system generated email, CQI staff review each HEAT assignment to ensure all actions taken specifically addressed the concern(s) identified during the review process. During the final review of each assignment if CQI staff determines that the information does not support the correction of all identified concerns for the assignment, the Regional Director or his/her designee, Field Operations Director and CQI Director will be notified to point out concerns for follow up.

➢ The Regional Director or his/her designee is responsible for additional follow up to resolve the concerns from CQI. If no action is taken to resolve the additional concerns, CQI supervisor staff notifies the Director of CQI who alerts the Office of Field Operations and the DFCS Deputy Administrator escalating the safety concern to ensure action is taken. The Office of Field Operations with support from the Deputy Administrator if needed alert the responsible field staff requiring immediate action to resolve the situation. If immediate action is not taken, disciplinary action will be completed by the Field Operations Director who will then be responsible for oversight of the corrective action being completed immediately. The CQI Director will continue follow up to ensure corrective action is taken and the corrective action loop is closed. Once the corrective action loop is closed completely, CQI supervisor staff will close the HEAT assignment meaning all identified concerns for the assignment were resolved.

### *Unresolved Assignments*

➢ *Safety Concerns* – If there has been no action taken for a safety concern HEAT assignment within 4 days of assignment, a system generated email is sent to the CQI supervisor staff that made the assignment who in turn notifies the Director of CQI who alerts the Office of Field Operations and the DFCS Deputy Administrator escalating the safety concern to ensure action is

DHS
362699

taken. The Office of Field Operations with support from the Deputy Administrator if needed alert the responsible field staff requiring immediate action to resolve the situation. If immediate action is not taken, disciplinary action will be completed by the Field Operations Director who will then be responsible for oversight of the corrective action being completed immediately. The CQI Director will continue follow up to ensure corrective action is taken and the corrective action loop is closed. Once the corrective action loop is closed completely, CQI supervisor staff will close the HEAT assignment meaning all identified concerns for the assignment were resolved.

> _Practice Concerns_ – If there has been no action taken for a practice concern (or other) HEAT assignment within 19 days of assignment, a system generated email is sent to the CQI supervisor staff that made the assignment who in turn notifies the Director of CQI who alerts the Office of Field Operations and the DFCS Deputy Administrator to ensure action is taken to resolve the reported concern(s). The Office of Field Operations with support from the Deputy Administrator if needed alert the responsible field staff requiring immediate action to resolve the situation. If immediate action is not taken, disciplinary action will be completed by the Field Operations Director who will then be responsible for oversight of the corrective action being completed. The CQI Director will continue follow up to ensure corrective action is taken and the corrective action loop is closed. Once the corrective action loop is closed completely, CQI supervisor staff will close the HEAT assignment meaning all identified concerns for the assignment were resolved.

For timely completion of all reported safety concerns DFCS currently implements a five (5) day completion period. For timely completion of all reported practice concerns, DFCS currently implements a twenty (20) day completion period. The MSA does not specify a time frame for "timely completion" of corrective actions related to either safety concerns or case practice concerns.  In the event circumstances beyond DFCS' control prevent a timely completion of the corrective action, the details of the situation will be documented in the HEAT corrective action description by the assignee.

## IV.    CQI Corrective Action Data Reporting

> The Office of CQI generates reports from the HEAT tracking system to assist management in tracking overdue correction action assignments. These reports are distributed to Regional Directors or his/her designee, the CQI Director, Field Operations Director and Deputy Administrator to alert them of overdue corrective action assignments. All are responsible for continued follow up and improvements with responsible staff in meeting the time frames for timely completion of corrective actions. These reports will be submitted to the Court Monitor on a monthly basis beginning May 1, 2014.

DHS
362700

# VI. Appendices

**APPENDIX A**

## HEAT Notification EMAIL Messages

| | Global or Division | Condition for Email to be sent | EMAIL Notification Sent To | |
|---|---|---|---|---|
| | | | Ticket Owner | Assignee |
| 1 | Global | When an Assignment is created and a Assignee is selected | | X |
| 2 | Global | When an Assignment is Acknowledged by the Assignee | X | |
| 3 | Global | When an Assignment is NOT Acknowledged by the Assignee within 24 hours | X | X |
| 4 | Global | When All Assignments are resolved | X | |
| 5 | Global | When each Assignment is resolved | X | |
| 6 | Global | Ticket is closed.  (closed only by Tracker after all Assignments have been closed) | X | |
| 7 | ALL CQI | Any field changed on the Ticket | X | |
| 8 | ALL CQI | Priority 1 (Safety Issue) Assignments is NOT resolved in 4 days | X | X |
| 9 | ALL CQI | Priority 2 (Practice Issue) Assignments is NOT resolved in 19 days | X | X |

DHS
362701

**APPENDIX B**

## DFCS CQI HEAT Instructions for CQI Corrective Action
## Updated 02/24/2014



User ID will be your mw number. The password is heatt. After entering this
password, you will be prompted to create your own, unique, password.

DHS
362702



This is the Call Logging tab. It is the tab that the Safety Review Unit, Foster Care Review, AFCARS, Data Validation, Complaints, and Evaluation and Monitoring will enter basic information such as the review type, region, county, and an opening description as to the nature of the call (Heat ticket). It is also the tab that the <u>above units</u> will use to close the ticket once the field completes their portions of the assignment tabs.

DHS
362703



This is the Details tab. This is where the Safety Review Unit, Foster Care Review, and Evaluation and Monitoring will enter child specific information (Child MACWIS ID number, first and last name).

3/5/2014

DHS
362704



This is the Attachments tab. This is where the Safety Review Unit, Foster Care Review, and Evaluation and Monitoring will (if applicable) attach any needed files for your information such as the Maltreatment in Care Review Instrument, copies of court orders, copies of case narratives, etc.)

3/5/2014

DHS
362705



**To go to a particular "ticket", click on "File". In the drop down menu, select "Go to Call".**

DHS
362706



In the box illustrated above, enter the HEAT ticket number for the call for which you want to go work. The ticket number will be in the bpam generated email you received when an assignment is made to you by Safety Review Unit, Foster Care Review, or Evaluation and Monitoring.

DHS
362707



**This is the Assignment tab.** This is where Safety Review Unit, Foster Care Review, and Evaluation and Monitoring will enter the assignment for the applicable region and assignee. In this case, this was an assignment to a Regional Director from the Safety Review Unit. The Safety Review Unit entered it as a Priority 2 (Practice Issues) which require a 20 day response. Also notice that the Assignments tab has a "2" next to it in parenthesis. This means that there are two assignments (this one, and another one on another Assignments tab). On these tabs, the Safety Review Unit, Foster Care Review, and Evaluation and Monitoring will enter the specific details describing the identified issue. Once this is done, you will receive a system generated email as notification of the assignment in HEAT. **This will require you to log into HEAT, go to the Assignment tab(s), and acknowledge the assignments by right clicking (as illustrated above) next to the "Acknowledge By" (not in the actual box) and selecting "Acknowledge Assignment". You will then "save" your changes (click on the blue icon that looks like a computer disc located above the header "CQI Reviewer Subset". Once you click save, HEAT will generate the MW number of the person acknowledging the assignment and add a date and time of the acknowledgement.**

DHS
362708

**This is a continuation of the Assignment tab (scrolling down). You have acknowledged the assignment(s), now you are ready to document your corrective action. To do this you will click on the drop down box next to Resolution Code (as illustrated above). You have several options but if you are completing your assignment you will click "Completed".**



DHS
362709



Continuing on the Assignment tab(s), you have entered your Resolution Code. You now want to log that you have resolved the assignment by right clicking next to "Resolved By" (not in the box). In the drop-down menu, you will select "Resolve Assignment". This will log your MW number, date, and time the ticket/issue was resolved.

<u>IT IS IMPORTANT TO REMEMBER THAT YOU ARE TO ACKNOWLEDGE AND RESOLVE ALL ASSIGNMENTS IN ORDER FOR THE HEAT TICKET TO CLOSE.</u>

DHS
362710



After you have resolved the assignment(s), you will go back to the "Call Log" tab and enter in the Close Description box (in detail) what corrective action steps you and your staff took. <u>If you are going to copy and paste a narrative into this Close Description box (for example, from an email or a Word document), you can right click and copy from the email or Word document but in order to paste it into the Close Description box in Heat, you will need to press Ctrl V.</u> After you have done this you will click on the "save" icon which looks like a blue computer disc and is located above the header "CQI Reviewer Subset" (see arrow).

**App. B, Ex. 11A**

## Grace M. Lopes

| | |
|---|---|
| **From:** | Grace M. Lopes [gmlopes@oymonitor.org] |
| **Sent:** | Monday, February 02, 2015 7:11 PM |
| **To:** | 'Rachal, Kenya'; 'Sara Glasser (srglasser@abetterchildhood.org)'; 'srglasserlaw@gmail.com' |
| **Cc:** | 'Fortenberry, Rusty'; 'Young, Ashley Tullos'; 'Marcia Lowry'; 'Mark Jordan'; 'mcaras@sparb.org' |
| **Subject:** | Gap Status for All Required Data Reports |
| **Attachments:** | Gaps in 6 24 13 Order Initial Period 4 IP and Final Period 4 IP Data Reports - GML 2 02 15.xlsx |

Kenya and Sarah:

Attached please find a spreadsheet with three tabs.  Tab 1 lists all the data reports required by the June 24, 2013 Order.  Tab 2 lists all the data reports required by the Initial Period 4 IP at App. 1.  (Note:  It omits App. 2 reports because they are addressed by the Final Period 4 IP). Tab 3 lists all the data reports required by the Final Period 4 IP at App. 3.

Each tab identifies the data reports by the report number as it appears in the June 24, 2013 order (e.g., Reports 1-53) or in the initial or final Period 4 IPs.  Relevant MSA cites and page references also are included for each report along with all corresponding DFCS report numbers and a notation regarding my understanding of the current gap status.

Please review the information on each tab and let me know whether your records regarding gap status conform to the summaries in the attached spreadsheet.  According to my records, there are a handful of unresolved matters, which are highlighted in green on the spreadsheet. I hope this is helpful.  If you have any questions, please do not hesitate to contact me, Mark or Ma.  Many thanks, Grace

*Grace M. Lopes*
*Monitor, Olivia Y.*
*1220 19th Street, N.W.*
*Suite 500*
*Washington, D.C.  20036*
*202.232.8311*

*This email and any attachments may contain confidential and privileged information.  If you are not the intended recipient, please notify the sender immediately, destroy this email, and destroy any copies.  Any dissemination or use of this information by a person other than the intended recipient is unauthorized and may be illegal.*

**Status of Gaps in Data Reports Required By June 24, 2013 Order (*See* June 24, 2013 Order at Attachment 2)**

| Report Set | Report Number as Reflected on June 24, 2013 Order at Attachment 2 | Statewide or Practice Model | MSA Cite IF SW - General cite / Period 3 / Period 4 IF PM - General / PM Imp cite / 12 months after cite | MACWIS, Manual, or FCR Report Number Reflected on June 24, 2013 Order at Attachment 2 | Report Numbers Reflected on PDF Submissions | Gap Status |
|---|---|---|---|---|---|---|
| 1 | 1 | Practice Model | III.B.8.b. (pg. 44) III.B.8.d.1. (pg. 44) III.B.8.e.1. (pgs. 44-45) | MWLS54A | SLS54AD&S | Gaps in SLS54AD&S and parties reached agreement; see 8/22/14 table. (Agreement is that no changes will be made to address one of the two gaps identified, but changes will be made to address second gap.) |
| 1 | 2 | Statewide | | MWZ1271 | SZ1271 | Gap in SZ1271 and parties reached agreement; see 8/22/14 table. |
| 1 | 2 | Statewide | II.B.1.e.2. (pg. 14) | MWZ1271 | SWZ1271G | Gap in SZ1271G and parties reached agreement; see 8/22/14 table. |
| 1 | 3 | Statewide | II.B.1.e.3. (pg. 14) | MWLS55SA | SLS55AD&S | Gap in SLS55AD&S and parties agreed to defer resolution until after DePanfilis assessment (assessment transmitted on 6/3/14); see 8/22/14 table. |
| 1 | 4 | Statewide and Practice Model | II.B.5.b. (pg. 26) II.B.5.e.2. (pg. 27) II.B.5.f.2. (pg. 27) II.B.5.h.2. (pg. 28) II.B.5.i.2. (pg. 28) | MWZWCR3 | SZWCR3 | Gaps in SZWCR3 and parties reached agreement; see 8/22/14 table. |
| 1 | 5 | Statewide and Practice Model | II.B.5.c. (pg. 26) II.B.5.e.3. (pg. 27) II.B.5.f.3. (pg. 27) II.B.5.h.3. (pg. 28) II.B.5.i.3. (pg. 28) | MWZPLMC | SZPLMC | Gap in SZPLMC and parties reached agreement; see 8/22/14 table. Parties agreed, if indicated at some point in future, that a case record review would be conducted (timeline for review not specified). |
| 1 | 5 | Statewide and Practice Model | | MWZPLMC | SPAD2 | Gap in PAD Report 2 and parties reached agreement; see 8/22/14 table. |
| 1 | 6 | Statewide and Practice Model | II.B.5.c. (pg. 26) II.B.5.e.3. (pg. 27) II.B.5.f.3. (pg. 27) II.B.5.h.3. (pg. 28) II.B.5.i.3. (pg. 28) | MWZPLMB | SZPLMBD | Gap in SZPLMBD and parties reached agreement for continued data reporting notwithstanding gap. Parties also agreed, if indicated at some point in the future, that a case record review would be conducted (timeline for review not specified); see 8/22/14 table. (Note: Court Monitor will not present analysis of data produced due to limitations in the data identified in December 2014.) |
| 1 | 6 | Statewide and Practice Model | | MWZPLMB | SPAD3 | Gap in PAD Report 3 and parties reached agreement; see 8/22/14 table. |
| 1 | 7 | Statewide | II.C.2.b.1. (pg. 32) II.C.2.c.1. (pg. 32) | MWBRD06 | SMWBRD06 | Specification for BRD06 report to be revised per parties' agreement to clarify report includes all class members and not limited by federal measurement methodology. (Note: Coding errors to be corrected and reports to be resubmitted. Awaiting date for transmission of revised reports.) |
| 1 | 8 | Statewide and Practice Model | II.B.5.a. (pg. 26) II.B.5.e.1. (pg. 26) II.B.5.f.1. (pg. 27) II.B.5.h.1. (pgs. 27-28) II.B.5.i.1. (pg. 28) | MWZWC5D | SWZC5D | Gaps in SWZC5D and parties reached agreement. Parties reached agreement on one gap and on addressing a second gap as part of a case record review after IP 5; see 8/22/14 table. |
| 1 | 9 | Statewide | II.A.2.a.1. (pg. 3-4) | Manual Report | AR1 | Gap in AR1 and parties reached agreement; *see* 8/22/14 table. |
| 1 | 10 | Statewide | II.A.2.a.6. (pg. 5) II.A.2.a.9.b. (pg. 5) II.A.2.a.10.b. (pg. 6) | Manual Report | AR2 | Gap in AR2 and parties reached agreement; *see* 8/22/14 table. |
| 2 | 11 | Statewide | II.A.2.a.1. (pg. 3-4) II.A.2.a.9.a. (pg. 5) II.A.2.a.10.a. (pg. 6) | Manual Report | AR3 | Gap in AR3 and parties reached agreement; *see* 8/22/14 table. |
| 2 | 12 | Statewide | II.A.2.c.2. (pg. 7) II.A.2.c.6.b. (pg. 8) | Manual Report | | No gaps identified. |
| 2 | 12 | Statewide | II.A.2.c.3. (pg. 7) II.A.2.c.6.b. (pg. 8) | Manual Report | | No gaps identified. |
| 2 | 13 | Statewide | II.C.1.b.1. (pg. 31) II.C.1.c.1. (pg. 31) | MWZPLM5S | SZPLM5 | No gaps identified. |
| 2 | 14 | Practice Model | III.C.1.a.1. (pg. 45) III.C.1.b.1. (pg. 45) | MWBRD05 | SXBRD05B | No gaps identified. |

**Status of Gaps in Data Reports Required By June 24, 2013 Order (*See* June 24, 2013 Order at Attachment 2)**

| Report Set | Report Number as Reflected on June 24, 2013 Order at Attachment 2 | Statewide or Practice Model | MSA Cite IF SW - General cite / Period 3 / Period 4 IF PM - General / PM Imp cite / 12 months after cite | MACWIS, Manual, or FCR Report Number Reflected on June 24, 2013 Order at Attachment 2 | Report Numbers Reflected on PDF Submissions | Gap Status |
|---|---|---|---|---|---|---|
| 2 | 15 | Practice Model | III.C.2.a.1. (pg. 46) III.C.2.b.1. (pg. 46) | MWBRD10 | SBRD10 | No gaps identified. |
| 2 | 16 | Practice Model | III.B.7.b. (pg. 42) III.B.7.e.1. (pg. 43) III.B.7.f.1. (pg. 43) | MWBRD16 | SXBRD16 | Reporting gap to be addressed through changes to PAD Report 5, *see* below. |
| | | Practice Model | | | SXBRD16-PAD 5 | Gap in PAD Report 5 and parties reached agreement; *see* 8/22/14 table. |
| 2 | 17 | Practice Model | III.B.3.a.1. and 2. (pg. 35) III.B.3.a.6. (pg. 36) III.B.3.a.7.a. (pg. 36) | MWLS312D | S312 | No gaps identified. |
| | | Practice Model | | | SPAD19 | Gap identified in PAD Report 19 and parties reached agreement; *see* 8/22/14 table. |
| 2 | 18 | N/A | No MSA requirement | MWZRESL | SZRESL | (Note: Limitations in historical data) |
| 2 | 19 | N/A | No MSA requirement | MWZRESPD | SZRESP | (Note: Limitations in historical data) |
| 2 | 20 | N/A | No MSA requirement | MWZ0510 | SZ0510 | (Note: Limitations in historical data) |
| 3 | 21 | Statewide | II.B.2.a. (pg. 15) II.B.2.p.2. (pg. 17) | MWLS319D (originally MWZ0151) | SLS319D | Gap to be addressed through changes to PAD Report 7, *see* below. |
| | | Statewide | II.B.2.a. (pg. 15) II.B.2.p.2. (pg. 17) II.B.2.p.4.-5. (pgs. 17-18) | | S-PAD7 | Gap in PAD Report 7 and parties reached agreement; *see* 8/22/14 table. |
| 3 | 22 | Statewide | II.B.3.a. (pg. 21) II.B.3.i.1. (pg. 22) II.B.3.j.1. (pg. 23) | MWLS315 | SLS315 | Gap in SLS315. Parties agreed that gap would be addressed by case record review during IP 5; 8/22/14 table. |
| | | Statewide | II.B.3.b. (pg. 21) II.B.3.i.2. (pg. 22) II.B.3.j.2. (pg. 23) | | SLS315 | Gap in SLS315. Parties agreed  that gap would be addressed by case record review during IP 5; *see* 8/22/14 table. |
| 3 | 23 | Practice Model | III.B.3.c.1. (pg. 37) III.B.3.c.4.a. (pg. 37) III.B.3.c.5.a. (pg. 37) | MWZTACR | SZTACR | Gap to be addressed through changes to PAD Report 4, *see* below. |
| | | Practice Model | III.B.3.c.1. (pg. 37) III.B.3.c.4.a. (pg. 37) III.B.3.c.5.a. (pg. 37) | | S-PAD4 | Gaps in PAD Report 4 and parties reached agreement; *see* 8/22/14 table. |
| 3 | 24 | Practice Model | III.B.3.c.2. (pg. 37) III.B.3.c.4.b. (pg. 37) III.B.3.c.5.b. (pg. 37) | MWZTPHR | SZTPHRD | No gaps identified. |
| 3 | 25 | Practice Model | III.B.3.e.1. (pg. 39) III.B.3.e.2.a. (pg. 39) III.B.3.e.3.a. (pg. 39) | MWZ017D (MACWIS Report Number TBD in Appendix C) | SZ0171 | No gaps identified. |
| | | Practice Model | III.B.3.e.1. (pg. 39) III.B.3.e.2.b. (pg. 39) III.B.3.e.3.b. (pg. 39) | MWZ014D1 and MWZ14D2 | SZ0171 | No gaps identified. |
| 3 | 26 | Practice Model | III.B.5.b. (pg. 40) III.B.5.d.1. (pg. 40) III.B.5.e.1. (pg. 41) | MWLS318 (MACWIS Report Number TBD in Appendix C) | S-PAD6 | Gaps in PAD Report 6 and parties reached agreement; *see* 8/22/14 table. |
| 3 | 27 | Statewide | II.B.2.h. (pg. 16) II.B.2.p.13. (pg. 18) II.B.2.q.8. (pg. 20) | MWLS316 | SLS316 | Gap in SLS316. Parties agreed that a case record review would be conducted after IP 5; *see* 8/22/14 table. |
| 3 | 28 | Statewide | II.B.2.k. (pg. 17) II.B.2.p.8. (pg. 18) | MWLS50D | SLS50D | Gap in SLS50D and parties agreed gap cannot be closed.  Parties agreed, if indicated at some point in the future, that a case record review would be conducted after IP 5; *see* 8/22/14 table. |

Status of Gaps in Data Reports Required By June 24, 2013 Order (*See* June 24, 2013 Order at Attachment 2)

| Report Set | Report Number as Reflected on June 24, 2013 Order at Attachment 2 | Statewide or Practice Model | MSA Cite IF SW - General cite / Period 3 / Period 4 IF PM - General / PM Imp cite / 12 months after cite | MACWIS, Manual, or FCR Report Number Reflected on June 24, 2013 Order at Attachment 2 | Report Numbers Reflected on PDF Submissions | Gap Status |
|---|---|---|---|---|---|---|
| 3 | 29 | Statewide | II.B.2.m. (pg. 17) II.B.2.p.6. (pg. 18) II.B.2.q.2. (pg. 19) | MWLS52HS | MWSLS52H | Gap in MWSLS52H and parties agreed gap cannot be closed.  Parties agreed, if indicated at some point in the future, that a case record review would be conducted after IP 5; *see* 8/22/14 table. |
| 4 | 30 | Statewide | II.B.2.m. (pg. 17) | MWLS53HS | SLS53H | No gaps identified. |
| 4 | 31 |  | II.B.2.o. (pg. 17) II.B.2.p.7. (pg. 18) II.B.2.q.3. (pg. 19) | MWLS51D/S | SLS51D | Gap in SLS51D and parties reached agreement. Defendants are developing a specification for an additional report to address gap. |
| 4 | 32 | Statewide | II.B.2.g. (pg.16) II.B.2.p.16. (pg. 19) II.B.2.q.11. (pg. 20) | MWLS314 | SLS314 | No gaps identified. |
| 4 | 33 | Practice Model | III.B.2.b. (pg. 34) III.B.2.c.2. (pg. 34) III.B.2.d.2. (pg. 35) | PAD-20m1m2 | S-PAD20 | Gap in PAD Report 20.  Parties agreed that a case record review would be conducted at some point in the future after IP 5, if indicated; *see* 8/22/14 table. |
| 4 | 34 | Practice Model | III.B.3.b.1. (pg. 36) III.B.3.b.2.a. (pg. 36) III.B.3.b.3.a. (pg. 36) | PAD-22 | SPAD22 | No gaps identified. |
| 4 | 35 | Practice Model | III.B.7.c. (pg. 42) III.B.7.e.2. (pg. 43) III.B.7.f.2. (pg. 43) | PAD-23m1m2m3m4 | SPAD23 | Gaps in PAD Report 23 and parties reached agreement; *see* 8/22/14 table. |
| 4 | 36 | Practice Model | III.B.3.a.3.-5. (pg. 35) III.B.3.a.6.b. (pg. 36) III.B.3.a.7.b. (pg. 36) | PAD-21 | SPAD21 | No gaps identified. |
| 4 | 37 | Statewide and Practice Model | II.B.4.a. (pg. 25) II.B.4.b.1. (pg. 25) II.B.4.c.1. (pg. 25) II.B.4.e.1. (pg. 26) II.B.4.f.1. (pg. 26) | PAD-17m1m2m3 | SPAD17 | Gap in PAD Report 17.  Parties agreed that a case record review would be conducted during IP 5;  *see* 8/22/14 table. |
| 4 | 38 | Statewide | II.B.3.g. (pg. 22) II.B.3.i.8. (pg. 23) II.B.3.j.8. (pg. 24) | PAD-26m1m2m3 | SPAD26 | Gaps in PAD Report 26 and parties reached agreements; see 8/22/14 table.  Parties agreed one gap would be addressed by a case record review during IP 5. |
| 4 | 39 | Statewide | II.B.3.f. (pg. 22) II.B.3.i.6. (pg. 23) II.B.3.j.6. (pg. 24) | PAD-25 | S-PAD25 | Gaps in PAD Report 25.  Parties agreed the gaps would be addressed by a case record review during IP 5;  *see* 8/22/14 table. |
| 5 | 40 | Statewide | II.B.3.e. (pg. 22) II.B.3.i.4. (pg. 22) II.B.3.j.4. (pg. 23) | PAD-27m1m3 | SPAD27m1 | Gap in PAD Report 27m1 and parties reached agreement; *see* 8/22/14 table. |
| 5 | 41 | Statewide | II.B.3.e. (pg. 22) II.B.3.i.5. (pg. 22) II.B.3.j.5. (pg. 23) | PAD-27m2m3 | SPAD27m2 | No gaps identified. |
|  |  | Statewide | II.B.3.e. (pg. 22) II.B.3.i.4. (pg. 22) II.B.3.j.4. (pg. 23) |  | SPAD27m2 | No gaps identified. |
| 5 | 42 | N/A | II.B.3.g. (pg. 22) | PAD-14 | N/A | Gap in PAD Report 14 and parties reach agreement.  Reports will not be produced and parties agreed that gap would be addressed by a case record review during IP 5; see 8/22/14 table. |
| 5 | 43 | N/A | II.B.3.f. (pg. 22) | PAD-13 | N/A | Gap in PAD Report 13 and parties reach agreement.  Reports will not be produced and parties agreed gap would be addressed by a case record review during IP 5; see 8/22/14 table. |
| 5 | 44 | Statewide | II.B.3.d. (pg. 21) II.B.3.i3. (pg. 22) II.B.3.j.3. (pg. 23) | PAD-24 | SPAD24 | Gap in PAD Report 24.  Parties agreed gap would be addressed by a case record review during IP 5; see 8/22/14 table. |

Status of Gaps in Data Reports Required By June 24, 2013 Order (*See* June 24, 2013 Order at Attachment 2)

| Report Set | Report Number as Reflected on June 24, 2013 Order at Attachment 2 | Statewide or Practice Model | MSA Cite IF SW - General cite / Period 3 / Period 4 IF PM - General / PM Imp cite / 12 months after cite | MACWIS, Manual, or FCR Report Number Reflected on June 24, 2013 Order at Attachment 2 | Report Numbers Reflected on PDF Submissions | Gap Status |
|---|---|---|---|---|---|---|
| 5 | 45 | Practice Model | III.B.1.a. (pg. 33) III.B.1.e.1. (pg. 33) III.B.1.f.1. (pg. 34) | PAD-12 | SPAD12 | Gap in PAD Report 12 and parties reached agreement; *see* 8/22/14 table. |
| 5 | 46 | Practice Model | III.B.6.a. (pg. 41) III.B.6.d.1. (pg. 41) III.B.6.e.1. (pg. 42) | PAD-15 | SPAD15 | Gap in PAD Report 15 and parties reached agreement; *see* 8/22/14 table. |
| 5 | 47 | Statewide | II.B.2.e. (pg. 15) II.B.2.p.11 (pg. 18) II.B.2.q.6. (pg. 19) | PAD-8m1m2m3 | SPAD8 | Gaps in PAD Report 8. The report was discontinued after July 31, 2014. Parties agreed the requirement would be addressed by a future case record review (timeline for review not specified); *see* 8/22/14 table. |
| 5 | 48 | Statewide | II.B.2.f. (pg. 16) II.B.2.p.12. (pg. 18) II.B.2.q.7. (pg. 19) | PAD-9 | SPAD9 | Gap in PAD Report 9 and parties reached agreement; *see* 8/22/14 table. |
| 5 | 49 | N/A | III.B.2.a. (pg. 34) | PAD-19 | N/A | Gap in PAD Report 19 and parties reached agreement; *see* 8/22/14 table. |
| 6 | 50 | N/A | III.B.1.b. (pg. 33) | TPAD-18 | N/A | Gap in PAD Report 18 and parties reached agreement; see 8/22/14 table. Report has not been produced. [Note: Reports not transmitted to the Court Monitor as of 1/27/15.] |
| 6 | 51 | Practice Model | III.B.6.b. (pg. 41) III.B.6.d.2. (pg. 41) III.B.6.e.2. (pg. 43) | [PAD-16, m1, m2] | SPAD16 | No gaps identified. |
| 6 | 52 | Statewide | II.B.2.j. (pg. 16) II.B.2.p.15. (pg. 19) II.B.2.q.10. (pg. 20) | PAD-11 | S-PAD11 | Gap in PAD Report 11 and parties reached agreement; *see* 8/22/14 table. |
| 6 | 53 | Statewide | II.B.2.i. (pg. 16) II.B.2.p.14. (pgs. 18-19) II.B.2.q.9. (pg. 20) | PAD-10 | SPAD10 | Gap in PAD Report 10 and parties reached agreement. Parties agreed gap would be addressed by a case record review during IP 5; *see* 8/22/14 table. |
| N/A | N/A | N/A | N/A | PAD Reports | PAD Reports | PAD reports not completed for children in custody less than six months. |

Status of Gaps in Data Reports Required By July 18, 2013 Initial Period 4 IP at Appendix 1

| Report # | Data Report | Statewide or Practice Model | MSA Cite | Report Type | Status of Report |
|---|---|---|---|---|---|
| 1 | For investigations of agency group homes, emergency shelters, and private child placing agency resource homes, DFCS shall undertake a separate investigation of the contract provider's compliance with DFCS licensure standards. *(MSA II.B.1.e.6)* | Statewide | II.B.1.b. (pg. 13) II.B.1.e.6. (pg. 14) | Manual | No gaps identified. |
| 2 | All relative placements approved for expedited placement shall undergo the full licensing procedure within 90 calendar days of the child's placement in the home. *(MSA II.B.2.c; MSA II.B.2.p.3; MSA II.B.2.p.5)* | Statewide | II.B.2.c. (pg. 15) II.B.2.p.3. (pg. 17) II.B.2.p.5. (pg. 18) | Manual | Parties agreed report will not be produced; *see* 8/22/14 table. |
| 3 | Percent of children with a permanency goal of reunification that have service plans for their parents that identify those services DFCS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care, and case record documentation that DFCS made those identified services available directly or through referral. *(MSA III.B.3.d.4-5)* | Practice Model | III.B.3.d.1. (pg. 38) III.B.3.d.4.a. (pg. 38) III.B.3.d.5.a. (pg. 38) | FCR [PAD Report 30] | No gaps identified. |
| 4 | Children in custody with the primary permanency goal of adoption shall have an assigned adoption specialist and an adoption plan that identifies the child-specific activities that Defendants will undertake to achieve adoption and the timeframes in which the activities will be undertaken. An adoption status meeting with the DFCS caseworker, the adoption specialist, and the caseworker's direct supervisor to review the progress being made in achieving the goal of adoption shall occur weekly for infants and monthly for all other children awaiting adoption, and shall be noted in the child's case record. *(MSA II.B.7.a; MSA II.B.7.c.3)* | Statewide and Practice Model | II.B.7.a. (pg. 29) II.B.7.c.3. (pg. 30) II.B.7.d. (pg. 30) II.B.7.e. (pg. 31) | FCR [PAD Report 29] | Gap in PAD Report 29. Defendants proposed resolving through case record review. Report will be produced by May 31, 2015. *See* 8/22/14 table. |
| 5 | No more than 30% of resource homes shall provide care to a number of children in excess of the Modified Settlement Agreement resource home population limits. *(MSA II.B.2.p.10)* | Statewide | II.B.2.d. (pg. 15) II.B.2.p.10. (pg. 18) II.B.2.q.5. (pg. 19) | MACWIS [SWIP 415] | Court Monitor not analyzing because of data limitations reported to parties in December 2014. |
| 6 | No more than 10% of foster children shall be moved from his/her existing placement to another foster placement unless DFCS specifically documents in the child's case record justifications for that move and the move is approved by a DFCS supervisor. *(MSA II.B.2.q.4)* | | II.B.2.n. (pg. 17) II.B.2.q.4. (pg. 19) | MACWIS | No report being produced. Defendants have proposed measuring performance through case record review (timeline for review not specified); *see* 8/22/14 table. |
| 7 | All caseworkers shall receive a minimum of 40 hours of structured ongoing in-service training each year. *(MSA II.A.2.c.7.a)* | Statewide | II.A.2.c.4. (pg. 7) II.A.2.c.7.a. (pg. 8) | Manual | No gaps identified. |
| 8 | All supervisors shall receive a minimum of 24 hours annual on-going in-service training each year. *(MSA II.A.2.c.7.a)* | Statewide | II.A.2.c.4. (pg. 7) II.A.2.c.7.a. (pg. 8) | Manual | No gaps identified. |

[1] Data availability may be limited initially for those fields that require a MACWIS system change.
[2] Data availability may be limited initially for those fields that require a MACWIS system change.
[3] Annual report.
[4] Annual report.

Status of Gaps in Data Reports Required By January 8, 2014 Final Period 4 IP at Appendix 3

| Report # | Data Report | Statewide or Practice Model | MSA Cite | Report Type | Status of Report |
|---|---|---|---|---|---|
| 1 | Within 30 days of the completion of any investigation of maltreatment of a child in custody DFCS shall review the maltreatment investigation in the manner set forth in the MSA. *(MSA II.B.1.d)* | Statewide | II.B.1.d. (pgs. 13-14) | Manual - MIC Review Report [MRIP4MRR] | No gaps identified. |
| 2 | Defendants shall ensure that all licensed resource families receive at least the minimum reimbursement rate for a given level of service as established pursuant to the MSA. *(MSA II.A.7.a)* | Statewide | II.A.7.a. (pg. 12) | Manual [Facilities Reimbursement] and MACWIS [SWIP42] | No gaps identified. |
| 3 | When a maltreatment investigation involves a resource home, DFCS shall file a copy of the approved final investigative report, and any recommendations and/or corrective actions DFCS has deemed necessary, in the case record of the foster child, in the file of the foster or adoptive parents with a copy of the letter of notification to the foster or adoptive parents, and in the DFCS State Office. DFCS shall also provide those records to the Youth Court Judge with jurisdiction over the child and to the Monitor. *(MSA II.B.1.e.4)* | Statewide | II.B.1.e.4. (pg. 14) | Case Record Review | Parties agreed on case record review during IP 6; *see* 8/22/14 table. |
| 4 | When a maltreatment investigation involves an agency group home, emergency shelter, private child placing agency resource home, or other facility licensed by DFCS, a copy of the final investigative report shall be filed in the child's case record, in the DFCS State Office licensing file, and sent to the licensed provider facility. DFCS shall provide the report to the Youth Court Judge with jurisdiction over the child and to the Monitor. *(MSA II.B.1.e.5)* | Statewide | II.B.1.e.5. (pg. 14) | Case Record Review | Parties agreed on case record review during IP 6; *see* 8/22/14 table. |
| 5 | All foster care settings, including relative placements, shall be screened prior to the initial placement of foster children to ensure that children receive safe, sufficient, and appropriate care. Additional screens shall be completed at least once annually thereafter and within two weeks of a reported change in the residents of a resource home. Screens shall include criminal and child welfare background checks of all household members who are at least 14 years old. No foster child shall be placed in a home prior to DFCS receipt of the background check results. *(MSA II.B.2.b; MSA II.B.2.p.1)* | Statewide | II.B.2.b. (pg. 15) II.B.2.p.1. (pg. 17) | MACWIS [SWIP45] | Unresolved issues with SWIP45. *See* 1/20/15 email from Grace M. Lopes to Kenya Rachal. |
| 6 | DFCS caseworkers shall compile, maintain, and keep current complete child welfare case records. *(MSA III.B.4.a )* | Practice Model | III.B.4.a. (pg. 39) III.B.4.b.1. (pg. 40) III.B.4.c.1. (pg. 40) | Case Record Review | Parties agreed on case record review during IP 5; *see* 8/22/14 table. |
| 7 | For all children entering foster care, a visitation plan for the child and his/her family shall be developed as part of the service plan. This visitation plan shall be developed and regularly updated in collaboration with parents, resource parents, and the child. If parental visitation is appropriate based on the above factors, this visitation plan shall include a minimum of two visits per month with the parents (unless a court order in the child's case limits such visits). For all children, regardless of permanency goal, this visitation plan shall include at least one visit per month with any siblings not in the same placement (unless a court order in the child's case limits such visits). *(MSA III.B.5.a)* | Practice Model | III.B.5.a. (pg. 40) | MACWIS and Case Record Review [SWIP47] | Gaps in SWIP47. Parties proposed case record review during IP 6; *see* 8/22/14 table. |
| 8 | DFCS shall make all reasonable efforts to ensure the continuity of a child's educational experience by keeping the child in a familiar or current school and neighborhood, when this is in the child's best interests and feasible, and by limiting the number of school changes the child experiences. *(MSA III.B.6.c)* | Practice Model | III.B.6.c. (pg. 41) | Case Record Review | Parties proposed case record review during IP 5; *see* 8/22/14 table. |

Status of Gaps in Data Reports Required By January 8, 2014 Final Period 4 IP at Appendix 3

| Report # | Data Report | Statewide or Practice Model | MSA Cite | Report Type | Status of Report |
|---|---|---|---|---|---|
| 9 | DFCS shall assist youth in obtaining or compiling the following documents and such efforts shall be documented in the child's case record: 1. an identification card; 2. a social security or social insurance number; 3. a resume, when work experience can be described; 4. a driver's license, when the ability to drive is a goal; 5. an original copy of the youth's birth certificate; 6. religious documents and information; 7. documentation of immigration, citizenship, or naturalization, when applicable; 8. documentation of tribal eligibility or membership; 9. death certificates when parents are deceased; 10. a life book or a compilation of personal history and photographs, as appropriate; 11. a list of known relatives, with relationships, addresses, telephone numbers, and permissions for contacting involved parties; 12. previous placement information; and 13. educational records, such as a high school diploma or general equivalency diploma, and a list of schools attended, when age-appropriate.  (MSA III.B.7.d) | Practice Model | III.B.7.d. (pg. 42) | Case Record Review | Parties agreed on case record review during IP 6; *see*  8/22/14 table. |
| 10 | An after-care plan shall be developed that identifies all of the services necessary to ensure that the conditions leading to the child's placement in foster care have been addressed, and that the child's safety and stability will be assured.  (MSA III.B.8.a) | Practice Model | III.B.8.a. (pg. 44) | Case Record Review | Parties agreed on case record review during IP 6; *see*  8/22/14 table. |
| 11 | Before the end of any trial home visit period, there shall be a final family team meeting, which shall include the child's caseworker, the caseworker's supervisor, the child, and the parent or relative assuming custody, to determine the appropriateness of a final discharge. (MSA III.B.8.c) | Practice Model | III.B.8.c. (pg. 44) | Case Record Review | Parties agreed on case record review during IP 6; *see*  8/22/14 table. |

# App. B, Ex. 11B

## Grace M. Lopes

| | |
|---|---|
| **From:** | Rachal, Kenya [krachal@bakerdonelson.com] |
| **Sent:** | Tuesday, February 24, 2015 11:36 AM |
| **To:** | Grace Lopes (gmlopes@oymonitor.org); Sara Glasser (srglasser@abetterchildhood.org); Sara Glasser (srglasser@gmail.com); mjordan@sparb.org |
| **Cc:** | Fortenberry, Rusty; Tullos, Ashley C.; Cynthia Greer (cindy.greer@mdhs.ms.gov); evandusen@csfmail.org; Tracy Aynes |
| **Subject:** | RE: Gap Status for All Required Data Reports |

Defendants have reviewed the gap status chart that the Monitor's office provided earlier this month.  Defendants have provided the updates/clarifying comments below.  Plaintiffs, where indicated below, we would appreciate if you could let us know your position as soon as possible this week.

MWBRD06 - The specifications were clarified and provided to parties on Feb. 9, 2015 and on Feb. 20th the Monitor and DFCS participated in a conference call to discuss Monitor's questions.  It's my understanding based on the Monitor's Feb. 20, 2015, e-mail that the Monitor is agreeable to the Feb. 9th specifications.  It will take approximately 1 month to make the changes and have the report ready for production to the parties.  Plaintiffs please let us know if you are agreeable with the revised specs.  Once we get your approval, Defendants will move forward with revising the report in accordance with the specs.

SLS51D - Defendants provided revised specifications on Feb. 11, 2015 and on Feb. 20th the Monitor and DFCS participated in a conference call to discuss the specifications.  The Monitor's office proposed an alternative approach to the revised specifications in the Feb. 20th e-mail.  In the interest of moving forward, Defendants agree with revising the report in this way. If Plaintiffs are agreeable, Defendants will revise the specifications.  Please let us know your position.  Defendants would be able to provide the revised specifications within 1 week.

SPAD 18 - As indicated in Defendants' 08.22.2014 chart, the revised language was discussed with the FCRs in September and the report that will reflect this new data will be available 6 months from that time.  Defendants anticipate that the report will be produced to the parties by March 31, 2015.

SWIP415 - Defendants discussed this report with the Monitor on Feb. 20, 2015.  As explained in the Monitor's e-mail of that same date, Defendants have taken steps to improve the quality of data prospectively and corrections are being made through the HEAT ticket process.  As agreed, Defendants will inform the Monitor's office when they believe the SWIP415 data more accurately reflects individual child placements.  Thus, it may be possible for the Monitor to begin analyzing the Period 5 data prior to the end of Period 5.

SWIP45 - DFCS is looking into the feasibility of doing an annual report.  The work involved would be rather labor intensive and presently the information that is gathered annually is a hardcopy paper process.  DFCS is looking at all the data that is gathered and considering the best way to proceed.  Defendants anticipate being able to follow up with the parties on this issue by March 6, 2014.  Defendants may wish to get the Monitor and Mark J.'s thoughts in advance of that date and if so, my clients may contact you directly to request a brief call.


Thanks,
Kenya

**From:** Grace M. Lopes [mailto:gmlopes@oymonitor.org]
**Sent:** Monday, February 02, 2015 6:11 PM
**To:** Rachal, Kenya; 'Sara Glasser'; srglasserlaw@gmail.com
**Cc:** Fortenberry, Rusty; Tullos, Ashley C.; 'Marcia Lowry'; 'Mark Jordan'; mcaras@sparb.org
**Subject:** Gap Status for All Required Data Reports

Kenya and Sarah:

Attached please find a spreadsheet with three tabs. Tab 1 lists all the data reports required by the June 24, 2013 Order. Tab 2 lists all the data reports required by the Initial Period 4 IP at App. 1. (Note: It omits App. 2 reports because they are addressed by the Final Period 4 IP). Tab 3 lists all the data reports required by the Final Period 4 IP at App. 3.

Each tab identifies the data reports by the report number as it appears in the June 24, 2013 order (e.g., Reports 1-53) or in the initial or final Period 4 IPs. Relevant MSA cites and page references also are included for each report along with all corresponding DFCS report numbers and a notation regarding my understanding of the current gap status.

Please review the information on each tab and let me know whether your records regarding gap status conform to the summaries in the attached spreadsheet. According to my records, there are a handful of unresolved matters, which are highlighted in green on the spreadsheet. I hope this is helpful. If you have any questions, please do not hesitate to contact me, Mark or Ma. Many thanks, Grace

*Grace M. Lopes*
*Monitor, Olivia Y.*
*1220 19th Street, N.W.*
*Suite 500*
*Washington, D.C. 20036*
*202.232.8311*

*This email and any attachments may contain confidential and privileged information. If you are not the intended recipient, please notify the sender immediately, destroy this email, and destroy any copies. Any dissemination or use of this information by a person other than the intended recipient is unauthorized and may be illegal.*

---

Under requirements imposed by the IRS, we inform you that, if any advice concerning one or more U.S. federal tax issues is contained in this communication (including in any attachments and, if this communication is by email, then in any part of the same series of emails), such advice was not intended or written by the sender or by Baker, Donelson, Bearman, Caldwell & Berkowitz, PC to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or tax-related matter addressed herein.

This electronic mail transmission may constitute an attorney-client communication that is privileged at law. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this electronic mail transmission in error, please delete it from your system without copying it, and notify the sender by reply e-mail, so that our address record can be corrected.

# App. B, Ex. 11C

**Grace M. Lopes**

| | |
|---|---|
| **From:** | Sara Robinson Glasser [srglasser@abetterchildhood.org] |
| **Sent:** | Monday, March 09, 2015 4:49 PM |
| **To:** | gmlopes@oymonitor.org; Rachal, Kenya |
| **Subject:** | Plaintiffs' Responses to the Feb. 24, 2015 email from Kenya |

Dear Grace and Kenya -

Please forgive my tardiness in responding to Kenya's February 24, 2015 email concerning Plaintiffs' comments concerning the gap status for all required data reports. My understanding of the 2/24/15 email is that Plaintiffs still "owe" responses to the revised specifications for report MWBRD06 and SLS51D.

**MWBRD06** -- As long as the revised specifications include a COS field (Monitor's email of Feb 20, 2015), Plaintiffs have no other changes to suggest for the specifications for this report

**SWLS51D** -- Plaintiffs agree with the alternate approach suggested by the Monitor in her February 20 2015 email, which includes two different methods for calculating the data.

If there are some additional responses I should provide, please let me know and I will attend to them immediately.

Thank you - Sara

Sara Robinson-Glasser
A Better Childhood, Inc.
Phn: (541) 660-3763
Eml: srglasser@abetterchildhood.org

*This email and any attachments may contain confidential and privileged information.*
*If you are not the intended recipient, please notify the sender immediately, destroy*
*this email, and destroy any copies. Any dissemination or use of this information by*
*a person other than the intended recipient is unauthorized and may be illegal.*

# App. B, Ex. 12A



PERIODIC ADMINISTRATIVE REVIEW

WORK SHOP

ADDITIONS, SUBTRACTIONS AND FINDINGS

AGENDA

- Overview of Why Changes were Made
- New Questions Added
- Old Questions Modified
- Former Guidance Enhanced
- Themes, Trends and Findings from the Data Quality Report: Data Entry and Discrepancies
- Data Results from the PAD Reports: implications for practice






## OVERVIEW

### WHY CHANGES WERE MADE

---

## OVERVIEW

- June 24th Court Order to produce reports on 54 requirements in Appendix C of the MSA
  - Some from MACWIS, Some from the PAD

- Gap Analyses conducted to determine if data available in system adequately and accurately addressed the MSA requirements
  - If gaps identified, modifications required

- Gaps Identified in 39 of 54 requirements




## OVERVIEW

- Solutions to Gaps
  - Not PAD related
    - Modifications to MACWIS
    - Case Review

  - PAD related
    - New questions to the PAD
    - Modified questions to the PAD
    - Enhanced guidance to FCR reviewers




## OVERVIEW

- **HOT OFF THE PRESSES!!!**
  - Deliberations on Gaps between Parties Occurred as recent as Yesterday afternoon.
    - Decisions:
      - 13 questions with guidance enhanced
      - 3 new questions added
      - 2 questions modified; 3 questions with new answer responses
      - ALL QUESTIONS RELATING TO MEDICAL, DENTAL, DEVELOPMENTAL, MENTAL HEALTH THAT ARE NOT TIMELINESS RELATED WILL BE **REMOVED** FROM THE PAD: 26 questions
  - Next PAD changes, including the above, will occur **April 30, 2014**
    - *In the interim, these questions still must be answered*




## Q75

- MSA Requirement
  - III.B.7.c DFCS shall ensure that each youth transitioning to independence has available an adequate living arrangement, a source of income, health care, independent living stipends, and education and training vouchers. DFCS shall assist youth in locating and/or enrolling in educational or vocational programs appropriate to their needs, interests, abilities, and goals, such as high school or GED programs; colleges or universities; vocational training programs; and special education services.

 

## Q75

- Old Question
  - Q75. If the child is transitioning to living independently, is there evidence that the child has a plan with available services to provide health care after custody or information to obtain health care? [Yes / No / * (NA - child not transitioning to independence)]

- New Question
  - Q75. If the child is transitioning to living independently, is there evidence that the child has a plan with available services to provide health care after custody? [Yes / No / * (NA - child not transitioning to independence)]

 

# App. B, Ex. 12B

# Cheat Sheet 1: PAD Questions that Require Documentation of Answer Response

| # | Question | Answer Choices Requiring Explanation | Applicable Practice Guides |
|---|----------|--------------------------------------|----------------------------|
| 3 | Did the child participate in or attend the County Conference or PAR? [Yes / No / NA] | NA | - Involving Children and Families |
| 5 | Did the assigned COR worker attend / participate in the County Conference or PAR? [Yes / No] | No | - Supervisory |
| 7 | Was agency staff prepared for County Conference or PAR? [Yes / No] | No | - Supervisory |
| 9 | Were there evidence that the child was registered for/attending an accredited school within 3 business days of initial placement? [Yes / No / * (NA - not age appropriate/school not in session at placement)] | No, NA | - Education |
| 14a | If the child is age three or older, was a dental examination provided within 90 calendar days of placement? [Yes / No / * (NA - child younger than three)] | No, NA | - Mobilizing Services Timely <br> - Specialized Assessments |
| 14b, 14b2 | Did the reviewer find evidence DFCS arranged for visitation between the child and Mother/Father within 24 hours of custody? [Yes / No / NA] | NA | - Preserving Connections <br> - Visitation |
| 14c, 14c2 | IF NO VISIT OCCURRED within 24 hours with **the mother/father**, did reviewer find evidence that circumstances existed at the time that required no visit to take place within 24 hours? [Yes / No / *(NA)] | NA | - Preserving Connections <br> - Visitation |
| 16 | Was there evidence that the child was registered for/attending an accredited school within 3 business days after any placement change? [Yes / No / * (NA - not age appropriate, or summer session) / # (NA - no placement change) | No, *NA | - Education |
| 20 | Was documentation found in the case file indicating that the child was seen monthly (in any setting) by an agency representative? [Yes / No] | No | - FTM <br> - Assuring Safety <br> - Visitation |
| 21 | Was documentation found in the file indicating that the child was seen monthly by an agency representative in the child's placement setting? [Yes / No] | No | - FTM <br> - Assuring Safety <br> - Visitation |
| 22 | Was documentation found in the case file that an agency representative had monthly contact with the caregiver/placement provider of the child? [Yes / No] | No | - FTM <br> - Assuring Safety <br> - Visitation |
| 23 | During the review period, did the reviewer note any safety concerns that may require further assessment by the agency? [Yes / No] | No | - Safety Plan <br> - Assuring Safety |
| 24 | Does the current placement appear to be conducive to the safety of the children? [Yes / No / * (Unable to determine due to lack of documentation and/or participation in the PAD)] | No | - Safety Plan <br> - Assuring Safety |
| 28 | Child is placed with all siblings in state custody unless there is clear evidence through documentation and/testimony that the separation is necessary to meet the needs of the child/ren? [Yes / No / * (NA - no sibs in custody)] | No | - Preserving Connections |
| 29 | Is the child visiting with separated siblings? [Yes / No / * (NA - no siblings, siblings not in custody, or no siblings separated)] | No | - Preserving Connections |

# Cheat Sheet 1: PAD Questions that Require Documentation of Answer Response

| 30 | Is the current placement the least restrictive placement with regard to the needs of the child as determined by a review of all intake, screening, assessment, and prior placement information on the child? [Yes / No / * (NA - lack of supporting documentation/information) | ALL ANSWER RESPONSES | - Preserving Connections |
|---|---|---|---|
| 38 | Did the child receive follow up developmental/medical services? [Yes / No] | ALL ANSWER RESPONSES | - Mobilizing Services Timely <br> - Specialized Assessments |
| 46 | Did the child receive recommended/follow up services pursuant to the general/special educational needs assessment/recommendations? [Yes / No / * (Treatment plan not in file, but evidence of follow up)] | No | - Education <br> - Mobilizing Services Timely |
| 50 | Is the current placement the most appropriate with regard to the needs of the child? [Yes / No / * (Lack of supporting documentation/information)] | ALL ANSWER RESPONSES | - Individualized Case Planning <br> - Preserving Connections |
| 50a | If the child reached the age of three during the PUR, was there evidence that the child received a dental examination within 90 days of their third birthday? [Yes / No / * (NA)] | ALL ANSWER RESPONSES | - Mobilizing Services Timely <br> - Specialized Assessments |
| 50b | If older than three, has the child received regular (at least every six months) dental examinations? [Yes / No / * (NA - child younger than three)] | ALL ANSWER RESPONSES | - Mobilizing Services Timely <br> - Specialized Assessments |
| 50c | Did the child receive any necessary follow up dental services? [Yes / No / * (NA - follow-up services not needed)] | ALL ANSWER RESPONSES | - Mobilizing Services Timely <br> - Specialized Assessments |
| 52a | Is the plan documented in the FSP accurate? [Yes / No] | No | - CFA <br> - Individualized Case Planning |
| 58 | Did reviewer find evidence that exceptions exist to not refer the case for TPR? [Yes / No] | No | - Mobilizing Services Timely |
| 70 | Is there evidence the child is receiving Independent Living services? [Yes / No/ *N/A answer option] | No | - Individualized Case Planning |
| 73 | If the child is transitioning to living independently, is there evidence that the child has a plan with available services to provide an adequate living arrangement? [Yes / No (explain) / * (NA - child not transitioning to independence)] | ALL ANSWER RESPONSES | - Individualized Case Planning |
| 74 | If the child is transitioning to living independently, is there evidence that the child has a plan with available services to provide a source of income? [Yes / No (explain) / * (NA - child not transitioning to independence)] | ALL ANSWER RESPONSES | - Individualized Case Planning |

# Cheat Sheet 1: PAD Questions that Require Documentation of Answer Response

| 75 | If the child is transitioning to living independently, is there evidence that the child has a plan with available services to provide health care after custody? [Yes / No / * (NA - child not transitioning to independence)] | ALL ANSWER RESPONSES | -Individualized Case Planning |
|---|---|---|---|
| 76 | If the child is transitioning to living independently, is there evidence that the child has a plan with available services regarding independent living stipend information? [Yes / No / * (NA - child not transitioning to independence)] | ALL ANSWER RESPONSES | -Individualized Case Planning |
| 76a | If the child is transitioning to independent living, is there evidence that DFCS has assisted the youth in locating and / or enrolling in educational or vocational programs appropriate to their needs, interests abilities and goals? [Yes / No / * (NA - Child not transitioning to independence)] | ALL ANSWER RESPONSES | -Individualized Case Planning |
| 70a | If Yes, are the services received tied to the Independent Living Plan? [Yes / No / * (NA - not eligible) / # (NA - no plan) / @ (not receiving services)] | No | -Individualized Case Planning |
| 70b | Are there any services listed in the independent living plan that the child has not received or is not currently receiving as specified in the plan? [Yes / No / * (NA - no plan)] | ALL ANSWER RESPONSES | -Individualized Case Planning |
| 80 | If a no contact court order prohibiting visitation/contact exists, is there evidence that contact between the child(ren) and the parent(s) would be detrimental to the safety and/or the well-being of the child(ren)? [Yes / No / * (NA - 'no contact' order not in place) / # (other - specify)] | Yes, No | -Safety Plan -Assuring Safety |
| 82 | Is the permanent plan for the child appropriate based on case information and policy guidelines? [Yes / No] | No | -CFA -Individualized Case Planning |
| 84 | If the whereabouts of one or both parents were or are unknown, did DFCS immediately institute a diligent search for the parent(s), and document those efforts in the case record? [Yes-whereabouts remain unknown despite diligent efforts/No-whereabouts unknown and no diligent efforts documented / #NA-whereabouts of both parents known] | ALL ANSWER RESPONSES | -Involving Children and Families -Preserving Connections |
| 85 | Evidence in case file that Rights and Responsibilities were signed or that parent was asked to sign/provided with form? [Yes / No / * (NA - whereabouts unknown)] | No | -Mobilizing Services Timely |
| 93 | For those cases in which the parent is not actively participating, despite available services, did reviewer find evidence of efforts by the agency to engage the parents to identify/address/develop alternate solutions to barriers? [Yes / No / * (NA - whereabouts unknown) / # (NA - plan not Reunification) / @N/A – Parents actively participating answer option] | ALL ANSWER RESPONSES | -CFA -Involving Children and Families -Visitation |
| 94 | Did Reviewer find evidence that services were made available to the parent effectively addressing conditions that led to custody? [Yes / No / * (Supporting evidence lacking) / # (NA - whereabouts unknown) / @ (NA - plan not Reunification)] | Yes | -FTM -Mobilizing Services Timely |

# Cheat Sheet 1: PAD Questions that Require Documentation of Answer Response

| 95 | Has there been agency compliance with the Family Service Plan? [Yes / No / * (NA - whereabouts unknown) / # (NA - plan not Reunification)] | No | -CFA<br>-FTM<br>-Visitation |
|---|---|---|---|
| 96 | Is there evidence that the parent is regularly attending visits and other activities offered/encouraged by the county/placement provider? [Yes / No / * (Lack of evidence that county has offered this service monthly to parent) / # (NA - whereabouts unknown) / @ (NA - plan not Reunification)] | No, * | -CFA<br>-FTM<br>-Involving Children and Families |
| 97 | Is there evidence that the parent is actively participating in/making diligent efforts to complete the service agreement? [Yes / No / * (NA - whereabouts unknown) / # (NA - plan not Reunification)] See case narratives and county conference discussion. | No | -CFA<br>-FTM<br>-Involving Children and Families |
| 98 | Has parental progress been made toward alleviating or mitigating the causes which necessitated the placement of the child(ren) in state's custody? [Yes / No / * (NA - whereabouts unknown) / # (NA - plan not Reunification)] | No | -FTM<br>-Mobilizing Services Timely<br>-Involving Children and Families |
| 103 | Did reviewer find evidence of monthly contact with resource caregiver that included discussion of service delivery, issues related to the ongoing needs of the child, planning for future permanency? [Yes / No] | No | -FTM<br>-Visitation |
| 104 | Did reviewer find evidence of monthly assessment of the needs of the resource caregiver by the COR or COS during the Period Under Review (PUR)? [Yes / No] | No | -FTM<br>-Visitation |
| 105 | Were services/referrals provided to assist or meet the needs of the resource caregiver? [Yes / No] | No | -FTM<br>-Mobilizing Services Timely |
| 106 | Was a report of maltreatment investigated during the PAR? [Yes / No / *(NA)] | No | -Safety Plan<br>-Assuring Safety |
| 108 | Was a CFA (Child and Family Assessment) completed within 30 calendar days of custody [Yes / No / *(NA)] | ALL ANSWER RESPONSES | -CFA |
| 110 | Did the child receive medical services in accordance with DFCS policy during the PAR? [Yes / No / *(lack of supporting documentation)] | No | -Mobilizing Services Timely<br>-Specialized Assessments |
| 113 | Did the reviewer find lack of/inadequate/inaccessible mental health services? [Yes / No / *(NA)] | Yes | -Mobilizing Services Timely<br>-Specialized Assessments |
| 115 | Did the reviewer find lack of/inadequate/inaccessible educational services? [Yes / No / *(NA)] | Yes | -Education<br>-Mobilizing Services Timely<br>-Specialized Assessments |

# Cheat Sheet 1: PAD Questions that Require Documentation of Answer Response

| 120 | If the child has special needs or the child has been diagnosed with a condition or disability, is there evidence that the child's needs were considered prior to the placement? [Yes / No / *(NA)] | ALL ANSWER RESPONSES | - Individualized Case Planning |
|---|---|---|---|

# App. B, Ex. 12C

# Cheat Sheet 2: Incorrect Answer Responses

## Question Series

- Questions 14B-14G
  - If 14B, 14B2, 14E=YES
    - 14C, 14C2, 14D, 14D2, 14F, 14G=NA
  - If 14B, 14B2, 14E=No
    - 14C, 14C2, 14D, 14D2, 14F, 14G=Yes or No
  - If 14B, 14B2, 14E=NA
    - 14C, 14C2, 14D, 14D2, 14F, 14G=NA
- Questions 25-26
  - If 25= No
    - 26 = Yes or No
  - If 25 = Yes
    - 26 = NA
- Questions 72-76a
  - If 72 = Yes
    - 73, 74, 75, 76, 76a = Yes or No
  - If 72 = No
    - 73, 74, 75, 76, 76a = NA
- Questions 117-119
  - If 117 = Yes
    - 118 = Yes or No
  - If 118 =Yes
    - 119 = Yes or No
  - If 117 =No
    - 118 and 119 = NA
  - If 117 = NA
    - 118 and 119 = NA

## Incorrect Answer Options

- 13 is NEVER NA, If child is 4+
- 32 is NEVER #
- 34a is NEVER NA, just in skip sequence
- 39a is NEVER NA, If child is 0-3
- 69a is NEVER NA, just in skip sequence
- 69b is NEVER NA, just in skip sequence
- 70a is NEVER NA, just in skip sequence
- 70b is NEVER NA, just in skip sequence
- 76a is NEVER NA, just in skip sequence
- 108 is NEVER NA, If initial PAD

# App. B, Ex. 12D

# Cheat Sheet 4: PAD Questions that Require Corrective Action of Answer Response

| # | Question | Answer Choices Requiring Corrective Action |
|---|----------|---------------------------------------------|
| 19 | If the child is on runaway status or child's whereabouts are otherwise unknown, were efforts to locate the child in collaboration with law enforcement, public agencies and other community organizations documented monthly during the review period? [Yes / No / * (NA - child not on runaway/whereabouts known)] | No |
| 21 | Was documentation found in the file indicating that the child was seen monthly by an agency representative in the child's placement setting? [Yes / No] | No |
| 23 | During the review period, did the reviewer note any safety concerns that may require further assessment by the agency? [Yes / No] | Yes |
| 24 | Does the current placement appear to be conducive to the safety of the children? [Yes / No / * (Unable to determine due to lack of documentation and/or participation in the PAD)] | No |
| 26 | If no, to question above, did reviewer find evidence that the agency is taking all reasonable steps to avoid the disruption and ensure placement stability? [Yes / No / * (NA)] | No |
| 32 | Is there evidence that the agency is receiving ICPC services from the other state in which the child is placed? [Yes / No / * (Court ordered, receiving state has not accepted ICPC jurisdiction) / # (ICPC services requested, but no documentation from other state) | No |
| 81 | Is there a continuing need for custody of the child? [Yes / No] | No |

**App. B, Ex. 12E**

# Cheat Sheet 3: PAD Reports with Accompanying Questions

| Number | Description | Related Questions | Answer Responses Meeting the Requirement[1] |
|---|---|---|---|
| 1 | Quality of Visits with Parents | **Q95**: Has there been agency compliance with the Family Service Plan? [Yes / No / * (NA - whereabouts unknown) / # (NA - plan not Reunification)] | PAD Report To Be Developed |
| 2 | Quality of Visits with Non-Therapeutic Foster Parents | **Q24**: Does the current placement appear to be conducive to the safety of the children? [Yes / No / * (Unable to determine due to lack of documentation and/or participation in the PAD)]<br>**Q103**: Did reviewer find evidence of monthly contact with resource caregiver that included discussion of service delivery, issues related to the ongoing needs of the child, planning for future permanency? [Yes / No] | Q24=Yes<br>Q103=Yes |
| 3 | Quality of Visits with Therapeutic Foster Parents | **Q24**: Does the current placement appear to be conducive to the safety of the children? [Yes / No / * (Unable to determine due to lack of documentation and/or participation in the PAD)]<br>**Q103**: Did reviewer find evidence of monthly contact with resource caregiver that included discussion of service delivery, issues related to the ongoing needs of the child, planning for future permanency? [Yes / No] | Q24=Yes<br>Q103=Yes |
| 4 | Invited/Participated in County Conference | **Q3**: Did the child participate in or attend the County Conference or PAR? [Yes / No / NA /# invited by written notice]<br>**Q5:** Did the assigned COR worker attend / participate in the County Conference or PAR? [Yes / No]<br>**Q6:** Did the assigned COR ASWS attend / participate in the County Conference or PAR? [Yes / No]<br>**Q88:** Was the parent invited to PAR? [Yes / No / * (NA - whereabouts unknown # Yes – Attended/Participated)]<br>**Q100:** Was the resource caregiver invited to PAR? [Yes/No/# Yes –Attended/Participated]<br>**Q116:** Did the GAL attend/participate in the county conference? [Yes-Attended/Participated / No / # (Yes-Invited)]<br>**Q116a:** Did any other relevant professionals attend/participate in the county conference? [Yes / No / *NA-no other relevant professionals / # (Yes – invited by written notice)] | <u>Current</u><br>Q3=Yes<br>Q5=Yes or Q6=Yes<br>Q88=Yes<br>Q100=Yes<br>Q116=Yes<br><br><u>Future</u><br>Q3=Yes or #<br>Q5=Yes or Q6=Yes<br>Q88=Yes or #<br>Q100=Yes or #<br>Q116=Yes or #<br>Q116a=Yes or # |

---

[1] Does not factor in new questions added (in red), or new answer responses (in red) as data reports have not been updated yet.

## Cheat Sheet 3: PAD Reports with Accompanying Questions

| Number | Description | Related Questions | Answer Responses Meeting the Requirement[1] |
|--------|-------------|-------------------|------------------------------------------|
| 5 | Youth Receive IL Services in IL Plan | **Q69:** Is the child eligible for Independent Living services? [Yes / No]<br>**Q69a:** If Yes, does the child have an Independent Living Plan? [Yes / No / * (NA - not eligible)]<br>**Q69b:** If the child has a plan, was the child provided the opportunity to participate in the development of the Independent Living Plan? [Yes / No / * (NA - not eligible) / # (NA - no plan)]<br>**Q70:** Is there evidence the child is receiving Independent Living services? [Yes / No/ *N/A answer option]<br>**Q70a:** If Yes, are the services received tied to the Independent Living Plan? [Yes / No / * (NA - not eligible) / # (NA - no plan) / @ (not receiving services)]<br>**Q70b:** Are there any services listed in the independent living plan that the child has not received or is not currently receiving as specified in the plan? [Yes / No / * (NA - no plan)] | <u>Current</u><br>Q69=Yes and Q70 is Yes<br><br><u>Future</u><br>Q69=Yes<br>Q69a=Yes<br>Q69b=Yes<br>Q70=Yes<br>Q70a=Yes<br>Q70b=Yes |

## Cheat Sheet 3: PAD Reports with Accompanying Questions

| Number | Description | Related Questions | Answer Responses Meeting the Requirement[1] |
|---|---|---|---|
| 6 | Visits/Phone Calls within 24 hours of Custody | **Q14b:** Did the reviewer find evidence DFCS arranged for visitation between the child and Mother within 24 hours of custody? [Yes / No / NA]<br>**Q14b2:** Did the reviewer find evidence DFCS arranged for visitation between the child and **Father** within 24 hours of custody? [Yes / No / NA<br>**Q14c:** IF NO VISIT OCCURRED within 24 hours with **the mother**, did reviewer find evidence that circumstances existed at the time that required no visit to take place within 24 hours? [Yes / No / *(NA)]<br>**Q14c2:** IF NO VISIT OCCURRED within 24 hours with **the father**, did reviewer find evidence that circumstances existed at the time that required no visit to take place within 24 hours? [Yes / No / *(NA)]<br>**Q14d:** If visitation between the child and mother was not possible within 24 hours of custody, was the child able speak to the mother by telephone? Yes/NO/*NA/#Court Would Not Allow Phone Call<br>**Q14d2:** If visitation between the child and father was not possible within 24 hours of custody, was the child able speak to the father by telephone? Yes/NO/*NA/ #Court Would Not Allow Phone Call<br>**Q14e:** Did the reviewer find evidence DFCS arranged for visitation between the child and separated sibling(s) within 24 hours of custody? [Yes / No / *(NA)]<br>**Q14f:** Did the reviewer find evidence DFCS arranged for visitation between the child and separated sibling(s) within 24 hours of custody? [Yes / No / *(NA)]<br>**Q14g:** If visitation between the child and separated sibling(s) was not possible within 24 hours of custody, was the child able to speak to the sibling(s) by telephone? [Yes / No / *(NA)/ #Court Would Not Allow Phone Call ]<br>**Q14h:** If visitation or a phone call between the child and his/her parent(s) and siblings was not possible within 24 hours of custody, was the child able to speak to his/her extended family member(s) by telephone? [Yes / No / * (NA) / # (Court would not allow Phone Call)] | <u>Current</u><br>Q14b=Yes, Q14c=NA, Q14d=NA<br>Q14b=No, Q14c=Yes, Q14d=Yes<br><br>Q14b2=Yes, Q14c2=NA, Q14d2=NA<br>Q14b2=No, Q14c2=Yes, Q14d2=Yes<br><br>Q14e=Yes, Q14f=NA, Q14g=NA<br>Q14e=No, Q14f=Yes, Q14g=Yes<br><br><u>Future</u><br>Q14b=Yes, Q14c=NA, Q14d=NA<br>Q14b=No, Q14c=Yes, Q14d=Yes or #<br>Q14b=No, Q14c=Yes, Q14d=No, 14h=Yes<br><br>Q14b2=Yes, Q14c2=NA, Q14d2=NA<br>Q14b2=No, Q14c2=Yes, Q14d2=Yes or #<br>Q14b2=No, Q14c2=Yes, Q14d2=No, 14h=Yes<br><br>Q14e=Yes, Q14f=NA, Q14g=NA<br>Q14e=No, Q14f=Yes, Q14g=Yes or #<br>Q14e=No, Q14f=Yes, Q14g=No, 14h=Yes |

## Cheat Sheet 3: PAD Reports with Accompanying Questions

| Number | Description | Related Questions | Answer Responses Meeting the Requirement[1] |
|---|---|---|---|
| 7 | Youth Court Objection to Permanency Plan | **Q117:** Is the child placed in a placement that does not meet DFCS licensure standards? [Yes / No / *(NA)]<br>**Q118:** If yes, is the placement court ordered?  [Yes / No / *(NA)]<br>**Q119:** Q119.If yes to the placement is court ordered, is the objection of DFCS noted in the court order? [Yes / No / *(NA) / #(other-worker objected in court report/not documented in court order ) / &-Yes, Court Report / !-Yes, Case Record] | <u>Current</u><br>Q117=Yes, Q118=Yes, Q119=Yes or #<br><br><u>Future</u><br>Q117=Yes, Q118=Yes, Q119=Yes, #, &, ! |
| 8 | Special Needs Matched to Placement | **Q120:** If the child has special needs or the child has been diagnosed with a condition or disability, is there evidence that the child's needs were considered prior to the placement? [Yes / No / *(NA)]<br>**Q120a:** Is the placement provider meeting the therapeutic needs of the child? [Yes/No/*NA-child does not have therapeutic needs]<br>**Q120b:** Is the placement provider meeting the medical needs of the child? [Yes/No/*NA-child does not have medical needs] | <u>Current</u><br>Q120=Yes<br><br><u>Future</u><br>Q120=Yes, Q120a=Yes or NA, Q120b=Yes or NA |
| 9 | Least Restrictive Placement | **Q30:** Is the current placement the least restrictive placement with regard to the needs of the child as determined by a review of all intake, screening, assessment, and prior placement information on the child? [Yes / No / * (NA - lack of supporting documentation/information) | Q30=Yes |
| 10 | Information to Foster Parent at Time of Placement | **Q9a:** Did Reviewer locate a signed copy of the foster care information form in the case record for the child's initial placement into foster care? [Yes / No]<br>**Q17:** Did Reviewer locate a signed copy of the foster care information form in the case record for each placement change? [Yes / No / * (NA - child on home trial placement / # (NA – no placement change)] | <u>Current</u><br>Q17=Yes<br><br><u>Future</u><br>Q17=Yes<br>Q9a=Yes |
| 11 | Prevention of Placement Disruption | **Q25:** The child has experienced no unplanned disruptions or moves that are not directly related to the achievement of the child's permanency goal in any of his/her placements during the PUR and the child's current placement setting appears to be free from the risk of an unplanned disruption or a move that is not directly related to the achievement of the child's permanency goal in the foreseeable future. [Yes / No]<br>**Q26:** If no, to question above, did reviewer find evidence that the agency is taking all reasonable steps to avoid the disruption and ensure placement stability? [Yes / No / * (NA)] | Q25=No<br>Q26=Yes |

## Cheat Sheet 3: PAD Reports with Accompanying Questions

| Number | Description | Related Questions | Answer Responses Meeting the Requirement[1] |
|--------|-------------|-------------------|---------------------------------------------|
| 12 | CFA within 30 Days | **Q108:** Was a CFA (Child and Family Assessment) completed within 30 calendar days of custody [Yes / No / *(NA)] | Q108=Y |
| 13 | Receipt of Mental Health Services | **Q42:** Did the child receive recommended mental health services pursuant to his/her mental health assessment/ treatment plan? [Yes / No / * (Treatment plan not in file, but evidence of follow up)] | PAD Report Not Developed |
| 14 | Receipt of Developmental Services | **Q35a:** Did the child receive all necessary follow up services based on their assessment? [Yes / No / * (NA - Child did not need follow up services)] | PAD Report Not Developed |
| 15 | General and Special Education Screening | **Q12:** Was screening (CFA or other DFCS assessment) completed to address general and special educational needs of the child within 30 calendar days of entry into foster care? [Yes / No] | Q12=Yes |
| 16 | Timely Registration for School | **Q9:** Were there evidence that the child was registered for/attending an accredited school within 3 business days of initial placement? [Yes / No / * (NA - not age appropriate/school not in session at placement)]<br>**Q16:** Was there evidence that the child was registered for/attending an accredited school within 3 business days after any placement change? [Yes / No / * (NA - not age appropriate, or summer session) / # (NA - no placement change) | Q9 =Yes<br><br>Q16=Yes |

## Cheat Sheet 3: PAD Reports with Accompanying Questions

| Number | Description | Related Questions | Answer Responses Meeting the Requirement[1] |
|---|---|---|---|
| 17 | Diagnosis, Treatment Plan and Services in Plan | **Q35:** Does the child have a developmental diagnosis? [Yes / No] **Q36:** Did the child receive a treatment plan regarding the diagnosis? [Yes / No / * (Treatment plan not in file, but documentation of plan in narratives)] **Q37:** Did the child receive services pursuant to the treatment plan? [Yes / No / * (Treatment plan not in file, but follow up services documented)] **Q40:** Does the child have a therapeutic/ emotional/ behavioral (mental health) diagnosis? [Yes / No] **Q41:** If yes, did the child receive a treatment plan? [Yes / No / * (Treatment plan not in file, but documentation of plan in narratives) / #(No documentation of treatment plan)] **Q42:** Did the child receive recommended mental health services pursuant to his/her mental health assessment/ treatment plan? [Yes / No / * (Treatment plan not in file, but evidence of follow up)] **Q110a:** Does the child have a *significant medical* diagnosis? [Yes / No] **Q110b:** Did the child receive a treatment plan regarding the diagnosis? [Yes/No/NA] **Q110c:** Did the child receive services pursuant to the treatment plan? [Yes/No/NA] | <u>Current</u><br>Q35=Yes<br>Q36=Yes<br>Q37=Yes<br><br><u>Future</u><br>Q35=Yes<br>Q36=Yes<br>Q37=Yes<br>Q110a=Yes<br>Q110b=Yes<br>Q110c=Yes |
| 18 | Diligent Search for Parents | **Q84:** If the whereabouts of one or both parents were or are unknown, did DFCS immediately institute a diligent search for the parent(s), and document those efforts in the case record? [Yes-whereabouts remain unknown despite diligent efforts/No-whereabouts unknown and no diligent efforts documented / #NA-whereabouts of both parents known] | Q84=Yes |
| 19 | Quality of Service Plan, Result of FTM | See PAD Report 312 Below | |
| 20 | FSP updated quarterly and after placement change | **Q51:** Were the FSP's that were due in the review period updated quarterly? [Yes / No / * (Not updated timely, however, FSP was reviewed and updated prior to PAD) / # (Updated timely, however, updates are needed for accuracy) **Q52:** Was the most recent FSP updated as a result of a FTM? [Yes / No] **Q18:** Was the FSP updated within 30 days of the placement change? [Yes / No / # (NA - no placement change)] | Q51=Yes<br>Q52=Yes<br>Q18=Yes |

# Cheat Sheet 3: PAD Reports with Accompanying Questions

| Number | Description | Related Questions | Answer Responses Meeting the Requirement[1] |
|--------|-------------|-------------------|---------------------------------------------|
| 21 | Appropriate Permanency Goal | **Q82:** Is the permanent plan for the child appropriate based on case information and policy guidelines? [Yes / No] | Q82=Yes |
| 22 | Concurrent Planning for Reunification | **Q54:** Did reviewer find evidence of efforts to actively work towards a concurrent plan? [Yes / No / * (NA - Current plan for child is attainable) / # (NA - TPR / Child free for adoption)]<br><br>**Q90:** Is the permanent or concurrent plan reunification? [Yes / No (If No, answer NA - Plan not Reunification for questions 91-98) / * (No, but parent is involved in case planning activities) / # (NA - whereabouts unknown)] | Q50=Yes<br>Q90=Yes |
| 23 | Transitioning Youth Receive IL Services and Stipends | **Q72:** Is the child transitioning to living independently? [Yes / No (If no select NA - Child not transitioning to independence for questions 73-76)]<br><br>**Q73:** If the child is transitioning to living independently, is there evidence that the child has a plan with available services to provide an adequate living arrangement? [Yes / No (explain) / * (NA - child not transitioning to independence)]<br><br>**Q74:** If the child is transitioning to living independently, is there evidence that the child has a plan with available services to provide a source of income? [Yes / No (explain) / * (NA - child not transitioning to independence)]<br><br>**Q75:** If the child is transitioning to living independently, is there evidence that the child has a plan with available services to provide health care after custody? [Yes / No / * (NA - child not transitioning to independence)]<br><br>**Q76:** If the child is transitioning to living independently, is there evidence that the child has a plan with available services regarding independent living stipend information? [Yes / No / * (NA - child not transitioning to independence)]<br><br>**Q76a:** If the child is transitioning to independent living, is there evidence that DFCS has assisted the youth in locating and / or enrolling in educational or vocational programs appropriate to their needs, interests abilities and goals? [Yes / No / * (NA - Child not transitioning to independence)] | <u>Current</u><br>Q72=Yes<br>Q73=Yes<br>Q74=Yes<br>Q75=Yes<br>Q76=Yes<br><br><u>Future</u><br>Q72=Yes<br>Q73=Yes<br>Q74=Yes<br>Q75=Yes<br>Q76=Yes<br>Q76a=Yes |
| 24 | Routine Medical Follow Up | **Q110:** Did the child receive medical services in accordance with DFCS policy during the PAR? [Yes / No / *(lack of supporting documentation)] | Q110=Yes |

## Cheat Sheet 3: PAD Reports with Accompanying Questions

| Number | Description | Related Questions | Answer Responses Meeting the Requirement[1] |
|---|---|---|---|
| 25 | Mental Health Assessment within 30 Days, Follow Up Services | **Q13**: Was a screening provided to address mental health/emotional/therapeutic needs of the child within 30 calendar days of entry into foster care? [Yes / No]<br>**Q40a**: If the child reached the age of four during the PUR, was there evidence that the child received a mental health assessment within 30 days of their fourth birthday? [Yes / No / * (NA - child did not turn four during the PUR)] | Q13 =Yes |
| 26 | Developmental Assessment within 30 Days, Follow Up Services | **Q39a**: Has the child received a developmental assessment by a qualified professional as specified in DFCS policy Section D, pg. 75? [Yes / No / * (NA - child over age three and assessment not warranted)] | Q39a=Yes |
| 27m1 | Dental Exam within 90 Days of Custody | **Q14a**: If the child is age three or older, was a dental examination provided within 90 calendar days of placement? [Yes / No / * (NA - child younger than three)] | Q14a=Yes |
| 27m2 | Dental Exam within 90 Days of Turning 3 and Routine Follow Up | **Q50a**: If the child reached the age of three during the PUR, was there evidence that the child received a dental examination within 90 days of their third birthday? [Yes / No / * (NA)]<br>**Q50b**: If older than three, has the child received regular (at least every six months) dental examinations? [Yes / No / * (NA - child younger than three)] | Q50a=Yes<br>Q50b=Yes |
| 312 | Quality of Permanency Plan, Result of FTM[2] | **Q10**: Was a FTM held to develop the child's FSP within 30 days of entry into foster care? [Yes / No]<br>**Q11**: If the FSP was developed within 30 days of custody, did it include a permanency goal, timeframes and activities to achieve/ support permanency? [Yes / No / * (FSP NOT developed within 30 days of custody)<br>**Q11a**: If the FSP / ISP was developed within 30 days of custody, did the service plan address the strengths, needs and services required for both the child and the parents as explored during that family team meeting? [Yes/No/ * (FSP NOT developed within 30 days of custody) ] | <u>Current</u><br>Q10=Yes<br>Q11=Yes<br><br><u>Future</u><br>Q10=Yes<br>Q11=Yes<br>Q11a=Yes |

---

[2] It has been determined that there is enough overlap between PAD 312 and PAD 19 that it can be combined into one report

# App. B, Ex. 13

# Notes from FCR-PAD QA Discussion

## MSA Requirement

> ### 11.B.3: Defendants shall take steps to improve the quality of data collected to meet data reporting requirements of the MSA through the FCR process
>
> > ### b) By April 30, 2014 Defendants shall provide guidance to the FCR supervisors on monitoring the reviews conducted by their reviewers

## Process

- **Monthly QA**
  - FCR Supervisors will conduct 5 full QA reviews a month, for a total of 15
  - Supervisors will vary who they review (not just their supervisees), to ensure consistency among QA and practice
  - Supervisors will review as many reviewers as possible, so likely one case each per reviewer
  - Supervisors will look back two months to ensure all documentation is complete in the PAD and County Conference. For example, if the QA month is April, supervisors will pull cases reviewed in February
  - Supervisors will review all children in case, so while they may be only reviewing one case by one reviewer, if there are multiple children in the case, they are QA'ing and documenting each separately
  - Feedback is given directly to the worker via email and goes into their personnel file
- **Validation QA**
  - Once functionality is in place, supervisors will QA the feedback from the validation unit
  - If changes are required, they will be entered into the QA excel sheet by the end of the following month. For example, if Validation was completed and feedback was provided in April, changes to the PAD and documentation on the QA excel sheet is required by the end of May
  - If review of Validation determines changes are not made, feedback is provided back to the validation unit

## Documentation

- Both Monthly QA and Validation QA will be documented in the QA excel spreadsheet, and differentiated in the first column by review type
- All columns will be filled out for monthly QA
- All columns will be filled out for validation QA with the following exceptions:
  - Only applicable columns P through U(based on change needed) will be filled out for validation QA
  - Columns M, N, O, V and W are not required to be completed

| Type of Review | QA Reviewer | FCR Reviewer | Date of QA | Region | County | Child ID | County Conference Date | # of Siblings involved in FCR (including Child) | Was County Conference Feedback Needed? | PAD Completed Date | Was PAD Completed Timely? | Did Reviewer identify CASE PRACTICE Corrective Action in the case? | If Yes, which PAD Question(s)? | Did Reviewer identify any DOCUMENTATION Corrective Action in the Case | Did any PAD questions require a change, due to date entry | If Yes, which PAD Question(s)? | Did any PAD comments require a change, due to lack of or inadequate comment explanation? | If Yes, which PAD Question(s)? | Did any PAD questions require a change, due to inaccurate answer responses and comments? | If Yes, which PAD Question(s)? | Did the Supervisor identify any needed CASE PRACTICE or DOCUMENTATION corrective action through their review of the case that was not identified by the reviewer? | If Yes, briefly describe | Date Reviewer was provided Feedback on their PAD Instrument | Date Changes Made |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

# App. B, Ex. 14

**Grace M. Lopes**

Attachments:                SACWIS Timeline001.pdf

**From:** Long, Gwen [mailto:glong@bakerdonelson.com]
**Sent:** Monday, March 03, 2014 7:03 PM
**To:** jdavis@ChildrensRights.Org; gmlopes@oymonitor.org
**Cc:** Mia Caras (mcaras@sparb.org); Mark.Smith@mdhs.ms.gov; Rachal, Kenya
**Subject:** March 3, 2014 Production

Julia and Grace:

Attached is the cover letter and the following documents which Defendants are producing today:

    MACWIS data reports (DHS 362530) which is coming to you via CD in the mail;
    SACWIS Project Planning Schedule (DHS 362531-36) – attached;
    Licensure Investigation Report for January 2014 (DHS 362537-39)  - attached
    Memo from COA to DFCS (DHS 362542-43) and Memo from DFCS to State Personnel Board (DHS 362544-45) re
ASWS educational requirements - attached

Gwen

**Gwen N. Long**
Paralegal
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
Meadowbrook Office Park
4268 I-55 North
Jackson, MS  39211
Direct:  601.351.8962
Fax:    601.974.8962
E-Mail: glong@bakerdonelson.com
www.bakerdonelson.com

Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C. represents clients across the U.S. and abroad from offices in Alabama, Florida, Georgia, Louisiana, Mississippi, Tennessee, Texas, Washington, D.C.

🌲 Please consider the environment before printing this e-mail
**Baker Donelson**: One of FORTUNE magazine's "100 Best Companies to Work For"

Under requirements imposed by the IRS, we inform you that, if any advice concerning one or more U.S. federal tax issues is contained in this communication (including in any attachments and, if this communication is by email, then in any part of the same series of emails), such advice was not intended or written by the sender or by Baker, Donelson, Bearman, Caldwell & Berkowitz, PC to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or tax-related matter addressed herein.

This electronic mail transmission may constitute an attorney-client communication that is privileged at law. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this electronic mail transmission in error, please delete it from your system without copying it, and notify the sender by reply e-mail, so that our address record can be corrected.

| ID | ❶ | Task Mode | Task Name | Duration | Start | Finish | Predecessors | Resource Names | | Jul |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | **State Project Project - System Development** | **1523 days** | **Mon 4/30/12** | **Wed 2/28/18** | | | | |
| 2 | | | **Project Proposal** | **1456 days** | **Wed 8/1/12** | **Wed 2/28/18** | | | | |
| 3 | | | Draft State Project Proposal | 20 days | Wed 8/1/12 | Tue 8/28/12 | | DFCS & ITS Staff | | |
| 4 | | | Submit Project Proposal to ITS Board | 1 day | Wed 8/29/12 | Wed 8/29/12 | 3 | DFCS & ITS Staff | | |
| 5 | | | ITS Review and Approval of Project Proposal | 1 day | Thu 8/30/12 | Thu 8/30/12 | 4 | ITS Procument Board | | |
| 6 | | | WRMA analysis of the MACWIS System and requirements for a new SACWIS system | 343 days | Thu 1/6/11 | Mon 4/30/12 | | DFCS & WRMA Staff | | |
| 7 | | | Determine if QA IV & V will be conducted In-house or by a Vendor | 1 day | Mon 4/30/12 | Mon 4/30/12 | | DFCS & WRMA Staff | | |
| 8 | | | **QA IV & V (Quality Assurance/Independent Verification and Validation)** | **1523 days** | **Mon 4/30/12** | **Wed 2/28/18** | | | | |
| 9 | | | Draft RFP for QA IV & V Vendor with assistance from ITS Procurement Staff | 110 days | Fri 11/2/12 | Thu 4/4/13 | | DFCS & ITS Staff | | |
| 10 | | | Submit RFP for QA IV & V Vendor to ITS Review Board for Approval | 1 day | Wed 2/20/13 | Wed 2/20/13 | | DFCS & ITS Staff | | |
| 11 | | | ITS Board Review and Approval of QA IV & V RFP | 1 day | Thu 2/21/13 | Thu 2/21/13 | 10 | ITS Procument Board | | |
| 12 | | | Submit RFP for QA IV & V Vendor to ACF for Approval | 1 day | Wed 3/6/13 | Wed 3/6/13 | | DFCS | | |
| 13 | | | ACF Review and Approval of QA IV & V RFP | 4 days | Thu 3/7/13 | Tue 3/12/13 | 12 | ACF Staff | | |
| 14 | | | Receive ACF Approval of QA IV & V RFP | 1 day | Wed 3/13/13 | Wed 3/13/13 | 13 | DFCS | | |
| 15 | | | Issue QA IV & V RFP | 1 day | Tue 2/26/13 | Tue 2/26/13 | | ITS Procurment Staff | | |
| 16 | | | Vendors Submit Written Questions for QA IV & V RFP | 24 days | Wed 2/27/13 | Mon 4/1/13 | 15 | | | |
| 17 | | | Answers to Vendor Questions Posted for QA IV & V RFP Due | 12 days | Tue 4/2/13 | Wed 4/17/13 | 16 | DFCS & ITS Staff | | |
| 18 | | | Vendor Proposals for QA IV & V RFP Due | 43 days | Tue 3/5/13 | Thu 5/2/13 | | | | |
| 19 | | | Review Vendor Proposals for QA IV & V RFP | 53 days | Wed 5/15/13 | Fri 7/26/13 | | DFCS & ITS Staff | | |
| 20 | | | Select QA IV & V Vendor and obtain approval from ITS Board | 39 days | Mon 7/29/13 | Thu 9/19/13 | 19 | DFCS & ITS Staff | | |
| 21 | | | Contract negoations with awarded QA IV&V Vendor and they sign Contract | 92 days | Tue 10/1/13 | Wed 2/5/14 | 20FS+7 days | DFCS,MAXIMUS & ITS Staff | | |
| 22 | | | Send QA IV&V vendor signed Contract to ACF for review and approval | 10 days | Thu 2/6/14 | Wed 2/19/14 | 21 | DFCS | | |
| 23 | | | MDHS\DFCS signs Contract | 7 days | Thu 2/20/14 | Fri 2/28/14 | 22 | MDHS Executive Director | | |
| 24 | | | **QA IV & V Contractor Begins** | **0 days** | **Mon 3/3/14** | **Mon 3/3/14** | 23FS+1 day | MAXIMUS Staff | | |
| 25 | | | DFCS & QA IV & V develop the SACWIS system requirements | 87 days | Mon 3/3/14 | Tue 7/1/14 | 24FS-1 day | DFCS & MAXIMUS Staff | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Project: Project_Planning_Schedu Date: Mon 3/3/14 | Task | | External Tasks | | Manual Task | | Finish-only | ] |
| | Split | | External Milestone | ◆ | Duration-only | | Deadline | ↓ |
| | Milestone | ◆ | Inactive Task | | Manual Summary Rollup | | Progress | |
| | Summary | | Inactive Milestone | | Manual Summary | | | |
| | Project Summary | | Inactive Summary | | Start-only | [ | | |

Page 1

DHS
·362531

| ID | ⓘ | Task Mode | Task Name | Duration | Start | Finish | Predecessors | Resource Names | 1st Q Jul |
|---|---|---|---|---|---|---|---|---|---|
| 26 | 👤 |  | **IAPD (Implementation Advanced Planning Document)** | **167 days** | **Mon 3/3/14** | **Tue 10/21/14** |  | DFCS & MAXIMUS Staff |  |
| 27 | ▦ 👤 |  | QA IV & V assist DFCS in development of the SACWIS System requirements for the IAPD. DFCS prepares the IAPD. | 86 days | Tue 3/4/14 | Tue 7/1/14 | 24 | DFCS & MAXIMUS Staff |  |
| 28 | ▦ |  | Submit IAPD to ACF for review and approval | 0 days | Tue 8/19/14 | Tue 8/19/14 | 27FS+30 days | DFCS |  |
| 29 | ▦ 👤 |  | ACF Review and Approval of the IAPD | 45 days | Tue 8/19/14 | Mon 10/20/14 | 28 | ACF Staff |  |
| 30 | ▦ |  | Receive ACF Approval for the IAPD | 0 days | Tue 10/21/14 | Tue 10/21/14 | 29FS+1 day | DFCS |  |
| 31 |  |  | **DDI (Design, Development and Implementation) RFP** | **365 days** | **Mon 3/3/14** | **Fri 7/24/15** |  |  |  |
| 32 | ▦ |  | ITS and QA IV & V assist DFCS in development of the requirements for the System Design, Development, Implementation Vendor RFP. DFCS and ITS Procurement Staff prepare the DDI RFP. | 86 days | Tue 3/4/14 | Tue 7/1/14 | 24 | DFCS,MAXIMUS & ITS Staff |  |
| 33 | ▦ |  | Submit PAPD-3 to ACF for review and approval | 1 day | Thu 5/1/14 | Thu 5/1/14 |  | DFCS |  |
| 34 | ▦ |  | ACF Review and Approval of the PAPD-3 | 45 days | Fri 5/2/14 | Thu 7/3/14 | 33 | ACF Staff |  |
| 35 | ▦ |  | Receive ACF Approval for the PAPD-3 | 0 days | Fri 7/4/14 | Fri 7/4/14 | 34FS+1 day | DFCS |  |
| 36 | ▦ |  | Submit RFP for DDI Vendor to ACF for Approval | 0 days | Tue 8/19/14 | Tue 8/19/14 | 32FS+30 days | DFCS |  |
| 37 | ▦ 👤 |  | ACF Review and Approval of DDI RFP | 45 days | Tue 8/19/14 | Mon 10/20/14 | 36 | ACF Staff |  |
| 38 | ▦ |  | Receive ACF Approval of DDI RFP | 0 days | Tue 10/21/14 | Tue 10/21/14 | 37FS+1 day | DFCS |  |
| 39 | ▦ |  | **Issue DDI RFP** | 53 days | Tue 10/28/14 | Thu 1/8/15 | 38FS+4 days | ITS Procurment Staff |  |
| 40 | ▦ |  | Bidders Conference | 1 day | Thu 11/13/14 | Thu 11/13/14 | 39SS+3 days | DFCS & ITS Staff |  |
| 41 | ▦ |  | Vendors written questions to the DDI RFP due | 17 days | Tue 10/28/14 | Wed 11/19/14 | 39SS | DFCS |  |
| 42 | ▦ |  | Answered questions from vendors on DDI RFP | 12 days | Thu 11/20/14 | Fri 12/5/14 | 41 | DFCS & ITS Staff |  |
| 43 | ▦ |  | **DDI Vendor Propsals Due** | 0 days | Thu 1/8/15 | Thu 1/8/15 | 42FS+5 days | DFCS |  |
| 44 | ▦ |  | Review Vendor Responses to DDI RFP | 66 days | Fri 1/9/15 | Fri 4/10/15 | 43FS+1 day | DFCS,MAXIMUS & ITS Staff |  |
| 45 | ▦ 👤 |  | Select DDI Vendor & obtain ITS Board approval | 12 days | Wed 4/1/15 | Thu 4/16/15 | 44FS-9 days | DFCS & ITS Staff |  |
| 46 | ▦ 👤 |  | Send selected DDI Vendor Proposal to ACF for review | 46 days | Wed 4/1/15 | Wed 6/3/15 | 45SS | DFCS |  |
| 47 | ▦ 👤 |  | Submit PAPD-4 to ACF for review and approval | 1 day | Fri 5/1/15 | Fri 5/1/15 |  | DFCS |  |
| 48 | ▦ |  | ACF Review and Approval of the PAPD-4 | 45 days | Mon 5/4/15 | Fri 7/3/15 | 47 | ACF Staff |  |
| 49 | ▦ |  | Receive ACF Approval for the PAPD-4 | 0 days | Mon 7/6/15 | Mon 7/6/15 | 48FS+1 day | DFCS |  |

| | | | | | | |
|---|---|---|---|---|---|---|
| Task | ▬▬▬ | External Tasks | ▬▬▬ | Manual Task | ▭▭▭ | Finish-only ⊐ |
| Split | ·········· | External Milestone | ◆ | Duration-only | | Deadline ↓ |
| Milestone | ◆ | Inactive Task | | Manual Summary Rollup | ▬▬▬ | Progress ▬▬▬ |
| Summary | ▬▬▬ | Inactive Milestone | ✧ | Manual Summary | ▭▭▭ | |
| Project Summary | ▭▭▭ | Inactive Summary | ▽▽▽ | Start-only | ⊏ | |

Project: Project_Planning_Schedu
Date: Mon 3/3/14

Page 2

| ID | ⓘ | Task Mode | Task Name | Duration | Start | Finish | Predecessors | Resource Names | Jul | 1st C |
|----|----|----|----|----|----|----|----|----|----|----|
| 50 | | 👤 | Contract negoations with awarded DDI Vendor and they sign Contract | 32 days | Wed 4/1/15 | Thu 5/14/15 | 46SS | DFCS & ITS Staff | | |
| 51 | | | DDI Vendor signed contract sent to ACF for review and approval | 44 days | Fri 5/15/15 | Wed 7/15/15 | 50 | DFCS | | |
| 52 | | | ITS, MDHS/DFCS and awarded DDI Vendor sign Contract | 7 days | Thu 7/16/15 | Fri 7/24/15 | 51 | DFCS & ITS Staff | | |
| 53 | | | **DDI Contractor** | **672 days** | **Tue 8/4/15** | **Wed 2/28/18** | | | | |
| 54 | | | MDHS/DFCS submits DDI Contractor's Project Plan and Schedule to DFCS & ACF for review and approval | 22 days | Mon 8/3/15 | Tue 9/1/15 | 52FS+5 days | DFCS | | |
| 55 | | | QA IV & V Contractor performs QA IV & V processes on all work done by the DDI Contractor | 673 days | Mon 8/3/15 | Wed 2/28/18 | 52FS+5 days | MAXIMUS Staff | | |
| 56 | | | Execute SACWIS Implementation Project Management Plan | 673 days | Mon 8/3/15 | Wed 2/28/18 | 52FS+5 days | | | |
| 57 | | | ACF SACWIS Implementation Review | 0 days | Wed 2/28/18 | Wed 2/28/18 | 56 | ACF Staff | | |
| 58 | | | Warranty/Maintenance/Operations | 262 days | Thu 3/1/18 | Fri 3/1/19 | | | | |
| 59 | | | **Annual APD** | **48 days** | **Fri 12/1/17** | **Tue 2/6/18** | | | | |
| 60 | | | Submit  Annual APD to ACF for review and approval | 1 day | Fri 12/1/17 | Fri 12/1/17 | | DFCS | | |
| 61 | | | ACF Review and Approval of the Annual APD | 45 days | Mon 12/4/17 | Fri 2/2/18 | 60 | ACF Staff | | |
| 62 | | | Receive ACF Approval for the Annual APD | 0 days | Tue 2/6/18 | Tue 2/6/18 | 61FS+1 day | DFCS | | |

| | | | | | |
|----|----|----|----|----|----|
| Project: Project_Planning_Schedu | Task | ▬▬▬ | External Tasks | ▬▬▬ | Manual Task | ▬▬▬ | Finish-only | ⊐ |
| Date: Mon 3/3/14 | Split | ·········· | External Milestone | ◆ | Duration-only | ▬▬▬ | Deadline | ↓ |
| | Milestone | ◆ | Inactive Task | | Manual Summary Rollup | ▬▬▬ | Progress | ▬▬▬ |
| | Summary | ▬▬▬ | Inactive Milestone | ◇ | Manual Summary | ▬▬▬ | | |
| | Project Summary | ▬▬▬ | Inactive Summary | ▽▽ | Start-only | ⊏ | | |

DHS
362533



DHS
362534



DHS
362535



DHS
362536

# App. B, Ex. 15

**Grace M. Lopes**

---

**Attachments:**          SACWIS Project Summary Timeline v2.pdf

---

**From:** Diane Mobley [mailto:Diane.Mobley@mdhs.ms.gov]
**Sent:** Monday, April 06, 2015 6:35 PM
**To:** Grace M. Lopes
**Subject:** SACWIS Project Schedule

Attached is a condensed version of the SACWIS Project Schedule.

If you need additional information, please let me know.

Thanks.

**Diane Mobley**
**MACWIS Director**
**MDHS State Office**
**Division of Family and Children's Services**
Phone: 601-359-4894
Cell:  601-906-7867
Fax: 601-359-4340
Email: diane.mobley@mdhs.ms.gov
Child Abuse and Neglect Hotline: 1-800-222-8000

Confidentiality Statement: The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential, proprietary, and/or privileged material. Any review, transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from all computers.

1

# NEW SACWIS PROJECT Timeline Starting with Phase II



# NEW SACWIS PROJECT Timeline Starting with Phase III



# App. B, Ex. 16A

**PROJECT NUMBER 40123**
**PROFESSIONAL SERVICES AGREEMENT**
**BETWEEN**
**MAXIMUS HUMAN SERVICES, INC.**
**AND**
**MISSISSIPPI DEPARTMENT OF INFORMATION TECHNOLOGY SERVICES**
**AS CONTRACTING AGENT FOR THE**
**MISSISSIPPI DEPARTMENT OF HUMAN SERVICES**

This Professional Services Agreement (hereinafter referred to as "Agreement") is entered into by and between MAXIMUS Human Services, Inc., a Virginia corporation having its principal place of business at 1891 Metro Center Drive, Reston, Virginia 20190 (hereinafter referred to as "Contractor"), and Mississippi Department of Information Technology Services having its principal place of business at 3771 Eastwood Drive, Jackson, Mississippi 39211 (hereinafter referred to as "ITS"), as contracting agent for the Mississippi Department of Human Services located at 750 North State Street, Jackson, Mississippi 39201 (hereinafter referred to as "Customer"). ITS and Customer are sometimes collectively referred to herein as "State".

**WHEREAS,** Customer, pursuant to Request for Proposals ("RFP") No. 3713 requested proposals for the acquisition of a contractor to provide independent verification and validation (IV&V) services for the Customer's Mississippi Automated Child Welfare Information System ("MACWIS") replacement project, and

**WHEREAS,** Contractor was the successful proposer in an open, fair and competitive procurement process to provide the services described herein;

**NOW THEREFORE,** in consideration of the mutual understandings, promises and agreements set forth, the parties hereto agree as follows:

**ARTICLE 1     PERIOD OF PERFORMANCE**
**1.1**     Unless this Agreement is extended by mutual agreement or terminated as prescribed elsewhere herein, this Agreement shall begin on the date it is signed by all parties and shall continue until the close of business on February 28, 2018. At the end of the initial term, this Agreement may, upon the written agreement of the parties, be renewed for an additional term, the length of which will be agreed upon by the parties. Sixty (60) days prior to the expiration of the initial term or any renewal term of this Agreement, Contractor shall notify Customer and ITS of the impending expiration and Customer shall have thirty (30) days in which to notify Contractor of its intention to either renew or cancel the Agreement.

**1.2**     This Agreement will become a binding obligation on the State only upon the issuance of a valid purchase order by the Customer following contract execution and the issuance by ITS of the CP-1 Acquisition Approval Document.

**ARTICLE 2     SCOPE OF SERVICES**
Contractor shall perform all work specified in RFP No. 3713 and Contractor's proposal, as accepted by Customer in response thereto, both of which are incorporated herein by reference. A Summary of the deliverables to be provided by Contractor are set forth in the Payment Schedule and Deliverables List attached hereto as "Exhibit A" and incorporated herein by

reference.

## ARTICLE 3    CONSIDERATION AND METHOD OF PAYMENT

**3.1**     Except as provided in the Change Order Rate and Procedure Article of this Agreement, the total compensation to be paid to the Contractor by Customer for all products, services, travel, performances and expenses under this Agreement shall not exceed the fixed price of $6,330,974.00, and shall be payable as set forth in the Payment Schedule and Deliverables List attached hereto as Exhibit A.

**3.2**     The Contractor and the Customer agree to the Deliverable Schedule as set forth in the Payment Schedule and Deliverables List included as Exhibit A to this Agreement. The Contractor will receive payment in the amount indicated in Article 3.1 herein, less retainage to be withheld in accordance with the Retainage Article herein, upon written acceptance by the Customer of each of the deliverables defined therein. The parties agree that as the project work plan is revised by written agreement of the parties during the term of this Agreement, the anticipated dates for acceptance of deliverables and for the corresponding payments to the Contractor, but not the amounts of those payments, may likewise be revised only by written agreement of the parties.

**3.3**     Customer shall have up to fifteen (15) working days to review each deliverable and to either notify Contractor of acceptance or to provide Contractor a detailed list of deficiencies that shall be remedied prior to payment being made. In the event the Customer notifies the Contractor of deficiencies, the Contractor shall correct such deficiencies within seven (7) working days unless the Customer consents in writing to a longer period of time.

**3.4**     Upon written acceptance, as set forth in Article 3.3 herein, by the Customer of a deliverable which has an associated payment, the Contractor will invoice the Customer for the invoice amount of that payment as indicated in the attached Exhibit A, less retainage to be withheld in accordance with the Retainage Article herein. Contractor shall certify that the billing is true and correct. Contractor shall submit invoices and supporting documentation to Customer electronically during the term of this Agreement using the processes and procedures identified by the State. Customer agrees to make payment in accordance with Mississippi law on "Timely Payments for Purchases by Public Bodies", Section 31-7-301, et seq. of the 1972 Mississippi Code Annotated, as amended, which generally provides for payment of undisputed amounts by Customer within forty-five (45) days of receipt of the invoice. Contractor understands and agrees that Customer is exempt from the payment of taxes. All payments shall be in United States currency. Payments by state agencies using the Statewide Automated Accounting System ("SAAS") shall be made and remittance information provided electronically as directed by the State. These payments by SAAS agencies shall be deposited into the bank account of the Contractor's choice. No payment, including final payment, shall be construed as acceptance of defective or incomplete work, and the Contractor shall remain responsible and liable for full performance. Notwithstanding the foregoing, prior written acceptance by the Contractor of a deliverable shall be binding on the parties.

**3.5**     Acceptance by the Contractor of the last payment from the Customer shall operate as a release of all claims against the State by the Contractor and any subcontractors or other persons supplying labor or materials used in the performance of the work under this Agreement.

## ARTICLE 4    WARRANTIES

**4.1** The Contractor represents and warrants that its services hereunder shall be performed by competent personnel and shall be of professional quality consistent with generally accepted industry standards for the performance of such services and shall comply in all respects with the requirements of this Agreement. For any breach of this warranty, the Contractor shall, for a period of ninety (90) days from performance of the service, perform the services again, at no cost to Customer, or if Contractor is unable to perform the services as warranted, Contractor shall reimburse Customer the fees paid to Contractor for the unsatisfactory services.

**4.2** If applicable under the given circumstances, Contractor represents and warrants that it will ensure its compliance with the Mississippi Employment Protection Act, Section 71-11-1, et seq. of the Mississippi Code Annotated (Supp2008), and will register and participate in the status verification system for all newly hired employees. The term "employee" as used herein means any person that is hired to perform work within the State of Mississippi. As used herein, "status verification system" means the Illegal Immigration Reform and Immigration Responsibility Act of 1996 that is operated by the United States Department of Homeland Security, also known as the E-Verify Program, or any other successor electronic verification system replacing the E-Verify Program. Contractor agrees to maintain records of such compliance and, upon request of the State, to provide a copy of each such verification to the State. Contractor further represents and warrants that any person assigned to perform services hereunder meets the employment eligibility requirements of all immigration laws of the State of Mississippi. Contractor understands and agrees that any breach of these warranties may subject Contractor to the following: (a) termination of this Agreement and ineligibility for any state or public contract in Mississippi for up to three (3) years, with notice of such cancellation/termination being made public, or (b) the loss of any license, permit, certification or other document granted to Contractor by an agency, department or governmental entity for the right to do business in Mississippi for up to one (1) year, or (c) both. In the event of such termination/cancellation, Contractor would also be liable for any additional costs incurred by the State due to contract cancellation or loss of license or permit.

**4.3** Contractor represents and warrants that no official or employee of Customer or of ITS, and no other public official of the State of Mississippi who exercises any functions or responsibilities in the review or approval of the undertaking or carrying out of the project shall, prior to the completion of said project, voluntarily acquire any personal interest, direct or indirect, in this Agreement. The Contractor warrants that it has removed any material conflict of interest prior to the signing of this Agreement, and that it shall not acquire any interest, direct or indirect, which would conflict in any manner or degree with the performance of its responsibilities under this Agreement. The Contractor also warrants that in the performance of this Agreement no person having any such known interests shall be employed.

**4.4** The Contractor represents and warrants that no elected or appointed officer or other employee of the State of Mississippi, nor any member of or delegate to Congress has or shall benefit financially or materially from this Agreement. No individual employed by the State of Mississippi shall be admitted to any share or part of the Agreement or to any benefit that may arise therefrom. The State of Mississippi may, by written notice to the Contractor, terminate the right of the Contractor to proceed under this Agreement if it is found, after notice and hearing by the ITS Executive Director or his/her designee, that gratuities in the form of entertainment, gifts, jobs, or otherwise were offered or given by the Contractor to any officer or employee of the State of Mississippi with a view toward securing this Agreement or securing favorable treatment with respect to the award, or amending or making of any determinations with respect to the

performing of such contract, provided that the existence of the facts upon which the ITS Executive Director makes such findings shall be in issue and may be reviewed in any competent court. In the event this Agreement is terminated under this article, the State of Mississippi shall be entitled to pursue the same remedies against the Contractor as it would pursue in the event of a breach of contract by the Contractor, including punitive damages, in addition to any other damages to which it may be entitled at law or in equity.

**4.5** Contractor represents and warrants that it will comply with all of the requirements defined in IRS Publication 1075 and the provisions as set forth in Exhibit B which is attached to Agreement and incorporated herein by reference.

## ARTICLE 5    EMPLOYMENT STATUS

**5.1** Contractor shall, during the entire term of this Agreement, be construed to be an independent contractor. Nothing in this Agreement is intended to nor shall be construed to create an employer-employee relationship, or a joint venture relationship.

**5.2** Contractor represents that it is qualified to perform the duties to be performed under this Agreement and that it has, or will secure, if needed, at its own expense, applicable personnel who shall be qualified to perform the duties required under this Agreement. Such personnel shall not be deemed in any way, directly or indirectly, expressly or by implication, to be employees of Customer.

**5.3** Any person assigned by Contractor to perform the services hereunder shall be the employee of Contractor, who shall have the sole right to hire and discharge its employee. Customer may, however, direct Contractor to replace any of its employees under this Agreement.

**5.4** Contractor shall pay when due, all salaries and wages of its employees and it accepts exclusive responsibility for the payment of federal income tax, state income tax, social security, unemployment compensation and any other withholdings that may be required. Neither Contractor nor employees of Contractor are entitled to state retirement or leave benefits.

**5.5** It is further understood that the consideration expressed herein constitutes full and complete compensation for all services and performances hereunder, and that any sum due and payable to Contractor shall be paid as a gross sum with no withholdings or deductions being made by Customer for any purpose from said contract sum, except as permitted herein in the article titled "Termination".

## ARTICLE 6    BEHAVIOR OF EMPLOYEES/SUBCONTRACTORS

Contractor will be responsible for the behavior of all its employees and subcontractors while on the premises of any Customer location.  Any employee or subcontractor acting in a manner determined by the administration of that location to be detrimental, abusive or offensive to any of the staff will be asked to leave the premises and may be suspended from further work on the premises. All Contractor employees and subcontractors who will be working at such locations shall be covered by Contractor's comprehensive general liability insurance policy.

## ARTICLE 7    MODIFICATION OR RENEGOTIATION

This Agreement may be modified only by written agreement signed by the parties hereto, and any attempt at oral modification shall be void and of no effect. The parties agree to renegotiate

MAXIMUS Human Services, Inc.-MDHS-40123-3713-Jan2014-Professional Services

the Agreement if federal and/or state revisions of any applicable laws or regulations make changes in this Agreement necessary.

## ARTICLE 8    AUTHORITY, ASSIGNMENT AND SUBCONTRACTS

**8.1**    In matters of proposals, negotiations, contracts, and resolution of issues and/or disputes, the parties agree that Contractor represents all contractors, third parties, and/or subcontractors Contractor has assembled for this project.   The Customer is required to negotiate only with Contractor, as Contractor's commitments are binding on all proposed contractors, third parties, and subcontractors.

**8.2**    Neither party may assign or otherwise transfer this Agreement or its obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld. Any attempted assignment or transfer of its obligations without such consent shall be null and void. This Agreement shall be binding upon the parties' respective successors and assigns.

**8.3**    Contractor shall obtain the written approval of Customer before subcontracting any portion of this Agreement. No such approval by Customer of any subcontract shall be deemed in any way to provide for the incurrence of any obligation of Customer in addition to the total fixed price agreed upon in this Agreement. All subcontracts shall incorporate the terms of this Agreement and shall be subject to the terms and conditions of this Agreement and to any conditions of approval that Customer may deem necessary.

**8.4**    Contractor represents and warrants that any subcontract agreement Contractor enters into shall contain a provision advising the subcontractor that the subcontractor shall have no lien and no legal right to assert control over any funds held by the Customer, and that the subcontractor acknowledges that no privity of contract exists between the Customer and the subcontractor and that the Contractor is solely liable for any and all payments which may be due to the subcontractor pursuant to its subcontract agreement with the Contractor. The Contractor shall indemnify and hold harmless the State from and against any and all claims, demands, liabilities, suits, actions, damages, losses, costs and expenses of every kind and nature whatsoever arising as a result of Contractor's failure to pay any and all amounts due by Contractor to any subcontractor, materialman, laborer or the like.

**8.5**    All subcontractors shall be bound by any negotiation, arbitration, appeal, adjudication or settlement of any dispute between the Contractor and the Customer, where such dispute affects the subcontract.

## ARTICLE 9    AVAILABILITY OF FUNDS

It is expressly understood and agreed that the obligation of Customer to proceed under this Agreement is conditioned upon the appropriation of funds by the Mississippi State Legislature and the receipt of state and/or federal funds for the performances required under this Agreement.  If the funds anticipated for the fulfillment of this Agreement are not forthcoming, or are insufficient, either through the failure of the federal government to provide funds or of the State of Mississippi to appropriate funds, or if there is a discontinuance or material alteration of the program under which funds were available to Customer for the payments or performance due under this Agreement, Customer shall have the right to immediately terminate this Agreement, without damage, penalty, cost or expense to Customer of any kind whatsoever. The effective date of termination shall be as specified in the notice of termination.   Customer shall

have the sole right to determine whether funds are available for the payments or performances due under this Agreement.

## ARTICLE 10   TERMINATION

**10.1**    Notwithstanding any other provision of this Agreement to the contrary, this Agreement may be terminated, in whole or in part, as follows: (a) upon the mutual, written agreement of the parties; (b) If either party fails to comply with the terms of this Agreement, the non-defaulting party may terminate the Agreement upon the giving of thirty (30) days written notice unless the breach is cured within said thirty (30) day period; (c) Customer may terminate the Agreement in whole or in part without the assessment of any penalties upon thirty (30) days written notice to Contractor if Contractor becomes the subject of bankruptcy, reorganization, liquidation or receivership proceedings, whether voluntary or involuntary, or (d) Customer may terminate the Agreement for any reason without the assessment of any penalties after giving thirty (30) days written notice specifying the effective date thereof to Contractor. The provisions of this Article do not limit either party's right to pursue any other remedy available at law or in equity.

**10.2**    In the event Customer terminates this Agreement pursuant to Article 9 or Article 10, Contractor shall be paid for satisfactory work completed by Contractor and accepted by Customer prior to the termination. Such compensation shall be based upon the amounts set forth in the Article herein on "Consideration and Method of Payment", but in no case shall said compensation exceed the total fixed price of this Agreement.

**10.3**    Notwithstanding the above, Contractor shall not be relieved of liability to Customer for damages sustained by Customer by virtue of any breach of this Agreement by Contractor, and Customer may withhold any payments to Contractor for the purpose of set off until such time as the exact amount of damages due Customer from Contractor are determined.

## ARTICLE 11   GOVERNING LAW

This Agreement shall be construed and governed in accordance with the laws of the State of Mississippi and venue for the resolution of any dispute shall be Jackson, Hinds County, Mississippi. Contractor expressly agrees that under no circumstances shall Customer be obligated to pay an attorney's fee, prejudgment interest or the cost of legal action to Contractor. Further, nothing in this Agreement shall affect any statutory rights Customer may have that cannot be waived or limited by contract.

## ARTICLE 12   WAIVER

Failure of either party hereto to insist upon strict compliance with any of the terms, covenants and conditions hereof shall not be deemed a waiver or relinquishment of any similar right or power hereunder at any subsequent time or of any other provision hereof, nor shall it be construed to be a modification of the terms of this Agreement. A waiver by the State, to be effective, shall be in writing, shall set out the specifics of what is being waived, and shall be signed by an authorized representative of the State.

## ARTICLE 13   SEVERABILITY

If any term or provision of this Agreement is prohibited by the laws of the State of Mississippi or declared invalid or void by a court of competent jurisdiction, the remainder of this Agreement shall be valid and enforceable to the fullest extent permitted by law provided that the State's purpose for entering into this Agreement can be fully achieved by the remaining portions of the Agreement that have not been severed.

MAXIMUS Human Services, Inc.-MDHS-40123-3713-Jan2014-Professional Services

## ARTICLE 14   CAPTIONS

The captions or headings in this Agreement are for convenience only, and in no way define, limit or describe the scope or intent of any provision or Article in this Agreement.

## ARTICLE 15   HOLD HARMLESS

To the fullest extent allowed by law, Contractor shall indemnify, defend, save and hold harmless, protect and exonerate Customer, ITS and the State, its Board Members, officers, employees, agents and representatives from and against any and all third party claims, demands, liabilities, suits, actions, damages, losses, costs and expenses of every kind and nature whatsoever, including without limitation, court costs, investigative fees and expenses, attorney fees and claims for damages arising out of or caused by the negligence or willful misconduct of Contractor and/or its partners, principals, agents, employees or subcontractors in the performance of or failure to perform this Agreement. The parties agree that the Contractor shall not be responsible for any damages or liability resulting from the negligence or willful misconduct of Customer and/or its employees, consultants or agents.

## ARTICLE 16   THIRD PARTY ACTION NOTIFICATION

Contractor shall notify Customer in writing within five (5) business days of Contractor filing bankruptcy, reorganization, liquidation or receivership proceedings or within five (5) business days of its receipt of notification of any action or suit being filed or any claim being made against Contractor or Customer by any entity that may result in litigation related in any way to this Agreement and/or which may affect the Contractor's performance under this Agreement. Failure of the Contractor to provide such written notice to Customer shall be considered a material breach of this Agreement and the Customer may, at its sole discretion, pursue its rights as set forth in the Termination Article herein and any other rights and remedies it may have at law or in equity.

## ARTICLE 17   AUTHORITY TO CONTRACT

Contractor warrants that it is a validly organized business with valid authority to enter into this Agreement; that entry into and performance under this Agreement is not restricted or prohibited by any loan, security, financing, contractual or other agreement of any kind, and notwithstanding any other provision of this Agreement to the contrary, that there are no existing legal proceedings, or prospective legal proceedings, either voluntary or otherwise, which may adversely affect its ability to perform its obligations under this Agreement.

## ARTICLE 18   NOTICE

Any notice required or permitted to be given under this Agreement shall be in writing and personally delivered or sent by electronic means provided that the original of such notice is sent by certified United States mail, postage prepaid, return receipt requested, or overnight courier with signed receipt, to the party to whom the notice should be given at their business address listed herein. ITS' address for notice is: Craig P. Orgeron, Ph.D., Executive Director, Mississippi Department of Information Technology Services, 3771 Eastwood Drive, Jackson, Mississippi 39211. Customer's address for notice is: Mr. Mark Allen, Chief Systems Information Officer, Mississippi Department of Human Services, 750 North State Street, Jackson, Mississippi 39201. The Contractor's address for notice is: Mr. Akbar M. Piloti, Chief Executive Officer and President, MAXIMUS Human Services, Inc., 1891 Metro Center Drive, Reston, Virginia 20190 with a copy to the General Counsel of MAXIMUS Human Services, Inc., 1891 Metro Center Drive, Reston, Virginia 20190. Notice shall be deemed given when actually received or when

refused. The parties agree to promptly notify each other in writing of any change of address.

## ARTICLE 19    RECORD RETENTION AND ACCESS TO RECORDS

19.1    Contractor shall establish and maintain financial records, supporting documents, statistical records and such other records as may be necessary to reflect its performance of the provisions of this Agreement. The Customer, ITS, any state or federal agency authorized to audit Customer, and/or any of their duly authorized representatives, shall have unimpeded, prompt access to this Agreement and to any of the Contractor's proposals, books, documents, papers and/or records that are pertinent to this Agreement to make audits, copies, examinations, excerpts and transcriptions at the State's or Contractor's office as applicable where such records are kept during normal business hours. All records relating to this Agreement shall be retained by the Contractor for three (3) years from the date of receipt of final payment under this Agreement. However, if any litigation or other legal action, by or for the state or federal government has begun that is not completed at the end of the three (3) year period, or if an audit finding, litigation or other legal action has not been resolved at the end of the three (3) year period, the records shall be retained until resolution.

19.2    Customer shall allow the United States Department of Health and Human Services (HHS), Administration for Children and Families (ACF) (hereinafter referred to as "Department") access to the system in all of its aspects, including pertinent state staff, design developments, operation, and cost records of contractors and subcontractors at such intervals as are deemed necessary by the Department to determine whether the conditions for approval are being met and to determine the efficiency, economy and effectiveness of the system. [43 FR 44853, Sept. 29, 1978, as amended at 45 FR 10794, Feb. 19, 1980 and 75 FR 66319, October 28, 2010]

## ARTICLE 20    INSURANCE

Contractor represents that it will maintain workers' compensation insurance as prescribed by law which shall inure to the benefit of Contractor's personnel, as well as comprehensive general liability insurance. Contractor will, upon request, furnish Customer with a certificate of conformity providing the aforesaid coverage.

## ARTICLE 21    DISPUTES

Any dispute concerning a question of fact under this Agreement which is not disposed of by agreement of the Contractor and Customer, shall be decided by the Executive Director of ITS or his/her designee. This decision shall be reduced to writing and a copy thereof mailed or furnished to the parties. Disagreement with such decision by either party shall not constitute a breach under the terms of this Agreement. Such disagreeing party shall be entitled to appeal the decision to a court of competent jurisdiction and seek such other rights and remedies it may have at law or in equity.

## ARTICLE 22    COMPLIANCE WITH LAWS

22.1    Contractor shall comply with, and all activities under this Agreement shall be subject to, all Customer policies and procedures, and all applicable federal, state, and local laws, regulations, policies and procedures as now existing and as may be amended or modified. Specifically, but not limited to, Contractor shall not discriminate against any employee nor shall any party be subject to discrimination in the performance of this Agreement because of race, creed, color, sex, age, national origin or disability. Further, if applicable, Contractor shall comply with the provisions of the Davis-Bacon Act including, but not limited to, the wages, recordkeeping, reporting and notice requirements set forth therein.

**22.2**    Contractor represents and warrants that it will comply with the state's data breach notification laws codified at Section 75-24-29 of the Mississippi Code Annotated (Supp. 2012). Further, to the extent applicable, Contractor represents and warrants that it will comply with the applicable provisions of the HIPAA Privacy Rule and Security Regulations (45 CFR Parts 160, 162 and 164) ("Privacy Rule" and "Security Regulations", individually; or "Privacy and Security Regulations", collectively); and the provisions of the Health Information Technology for Economic and Clinical Health Act, Title XIII of the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5 (the "HITECH Act").

## ARTICLE 23    CONFLICT OF INTEREST
Contractor shall notify the Customer of any potential conflict of interest resulting from the representation of or service to other clients. If such conflict cannot be resolved to the Customer's satisfaction, the Customer reserves the right to terminate this Agreement.

## ARTICLE 24    SOVEREIGN IMMUNITY
By entering into this Agreement with Contractor, the State of Mississippi does in no way waive its sovereign immunities or defenses as provided by law.

## ARTICLE 25    CONFIDENTIAL INFORMATION
**25.1**    Contractor shall treat all Customer data and information to which it has access by its performance under this Agreement as confidential and shall not disclose such data or information to a third party without specific written consent of Customer. In the event that Contractor receives notice that a third party requests divulgence of confidential or otherwise protected information and/or has served upon it a subpoena or other validly issued administrative or judicial process ordering divulgence of such information, Contractor shall promptly inform Customer and thereafter respond in conformity with such subpoena to the extent mandated by state and/or federal laws, rules and regulations. This Article shall survive the termination or completion of this Agreement and shall continue in full force and effect and shall be binding upon the Contractor and its agents, employees, successors, assigns, subcontractors or any party or entity claiming an interest in this Agreement on behalf of, or under the rights of the Contractor following any termination or completion of this Agreement.

**25.2**    With the exception of any attached exhibits which are labeled as "confidential", the parties understand and agree that this Agreement, including any amendments and/or change orders thereto, does not constitute confidential information, and may be reproduced and distributed by the State without notification to Contractor. ITS will provide third party notice to Contractor of any requests received by ITS for any such confidential exhibits so as to allow Contractor the opportunity to protect the information by court order as outlined in ITS Public Records Procedures.

## ARTICLE 26    EFFECT OF SIGNATURE
Each person signing this Agreement represents that he or she has read the Agreement in its entirety, understands its terms, is duly authorized to execute this Agreement on behalf of the parties and agrees to be bound by the terms contained herein. Accordingly, this Agreement shall not be construed or interpreted in favor of or against the State or the Contractor on the basis of draftsmanship or preparation hereof.

## ARTICLE 27    OWNERSHIP OF DOCUMENTS AND WORK PRODUCTS

27.1    All data, electronic or otherwise, collected by Contractor and all documents, notes, programs, data bases (and all applications thereof), files, reports, studies, and/or other material collected and prepared by Contractor in connection with this Agreement, whether completed or in progress, shall be the property of Customer upon completion of this Agreement or upon termination of this Agreement. Customer hereby reserves all rights to the databases and all applications thereof and to any and all information and/or materials prepared in connection with this Agreement. Contractor is prohibited from use of the above described information and/or materials without the express written approval of Customer.

27.2    (a) General: Customer shall include a clause in all procurement instruments that provides that the Customer will have all ownership rights in software or modifications thereof and associated documentation designed, developed or installed with Federal financial participation (FFP) under this subpart.
        (b) Federal License: The United States Department of Health and Human Services (HHS), Administration for Children and Families (ACF) (hereinafter referred to as "Department") reserves a royalty-free, nonexclusive, and irrevocable license to reproduce, publish, or otherwise use and to authorize others to use for Federal Government purposes, such software, modifications, and documentation.
        (c) Proprietary Software: Proprietary operating/vendor software packages which are provided at established catalog or market prices and sold or leased to the general public shall not be subject to the ownership provisions in paragraphs (a) and (b) of this section. FFP is not available for proprietary applications software developed specifically for the public assistance programs covered under this subpart.

## ARTICLE 28   NON-SOLICITATION OF EMPLOYEES

Contractor agrees not to employ or to solicit for employment, directly or indirectly, any of the Customer's employees until at least one (1) year after the expiration/termination of this Agreement unless mutually agreed to the contrary in writing by the Customer and the Contractor and provided that such an agreement between these two entities is not a violation of the laws of the State of Mississippi or the federal government.

## ARTICLE 29   ENTIRE AGREEMENT

29.1    This Contract constitutes the entire agreement of the parties with respect to the subject matter contained herein and supersedes and replaces any and all prior negotiations, understandings and agreements, written or oral, between the parties relating thereto. The RFP No. 3713 and Contractor's Proposal in response to RFP No. 3713 are hereby incorporated into and made a part of this Contract.

29.2    The Contract made by and between the parties hereto shall consist of, and precedence is hereby established by the order of the following:

A.      This Agreement signed by the parties hereto;
B.      Any exhibits attached to this Agreement;
C.      RFP No. 3713 and written addenda, and
D.      Contractor's Proposal, as accepted by Customer, in response to RFP No. 3713.

29.3    The intent of the above listed documents is to include all items necessary for the proper execution and completion of the services by the Contractor. The documents are complementary, and what is required by one shall be binding as if required by all. A higher order

document shall supersede a lower order document to the extent necessary to resolve any conflict or inconsistency arising under the various provisions thereof; provided, however, that in the event an issue is addressed in one of the above mentioned documents but is not addressed in another of such documents, no conflict or inconsistency shall be deemed to occur by reason thereof. The documents listed above are shown in descending order of priority, that is, the highest document begins with the first listed document ("A. This Agreement") and the lowest document is listed last ("D. Contractor's Proposal").

## ARTICLE 30   STATE PROPERTY

Contractor shall be responsible for the proper custody of any Customer-owned property furnished for Contractor's use in connection with work performed pursuant to this Agreement. Contractor shall reimburse the Customer for any loss or damage, normal wear and tear excepted.

## ARTICLE 31   SURVIVAL

Articles 4, 11, 15, 19, 24, 25, 27, 28, and all other articles which, by their express terms so survive or which should so reasonably survive, shall survive any termination or expiration of this Agreement.

## ARTICLE 32   DEBARMENT AND SUSPENSION CERTIFICATION

Contractor certifies that neither it nor its principals: (a) are presently debarred, suspended, proposed for debarment, declared ineligible or voluntarily excluded from covered transactions by any federal department or agency; (b) have, within a three (3) year period preceding this Agreement, been convicted of or had a civil judgment rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain or performing a public (federal, state or local) transaction or contract under a public transaction; violation of federal or state anti-trust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements or receiving stolen property; (c) are presently indicted of or otherwise criminally or civilly charged by a governmental entity with the commission of fraud or a criminal offense in connection with obtaining, attempting to obtain or performing a public (federal, state or local) transaction or contract under a public transaction; violation of federal or state anti-trust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements or receiving stolen property, and (d) have, within a three (3) year period preceding this Agreement, had one or more public transaction (federal, state or local) terminated for cause or default.

## ARTICLE 33   SPECIAL TERMS AND CONDITIONS

It is understood and agreed by the parties to this Agreement that there are no special terms and conditions.

## ARTICLE 34   COMPLIANCE WITH ENTERPRISE SECURITY POLICY

Contractor and Customer understand and agree that all products and services provided by Contractor under this Agreement shall be and remain in compliance with the State of Mississippi's Enterprise Security Policy.   The parties understand and agree that the State's Enterprise Security Policy is based on industry-standard best practices, policy, and guidelines at the time of contract execution.   The State reserves the right to introduce a new policy during the term of this Agreement and require the Contractor to comply with same in the event the industry introduces more secure, robust solutions or practices that facilitate a more secure posture for the State of Mississippi.

## ARTICLE 35  STATUTORY AUTHORITY

By virtue of Section 25-53-21 of the Mississippi Code Annotated, as amended, the executive director of ITS is the purchasing and contracting agent for the State of Mississippi in the negotiation and execution of all contracts for the acquisition of information technology equipment, software and services. The parties understand and agree that ITS as contracting agent is not responsible or liable for the performance or non-performance of any of Customer's or Contractor's contractual obligations, financial or otherwise, contained within this Agreement. The parties further acknowledge that ITS is not responsible for ensuring compliance with any guidelines, conditions, or requirements mandated by Customer's funding source.

## ARTICLE 36  PERSONNEL ASSIGNMENT GUARANTEE

Contractor guarantees that the key personnel designated in the Contractor's proposal (Jon Lemelin, Project Director; Karen Edgecomb, Project Manager, and Tamara Nash, Lead QA/IV&V Analyst) and assigned to this project will remain a part of the project throughout the duration of the Agreement as long as the personnel are employed by the Contractor and are not replaced by Contractor pursuant to the third paragraph of the Article herein titled "Employment Status". Contractor further agrees that the assigned personnel will function in the capacity for which their services were acquired throughout the life of the Agreement, and any failure by Contractor to so provide these persons shall entitle the State to terminate this Agreement for cause. Contractor agrees to pay the Customer sixty thousand dollars ($60,000.00) per day per person up to a maximum of one million five hundred thousand dollars ($1,500,000.00) until such time as a qualified substitute person acceptable to the Customer is assigned to the project if any of the assigned personnel is removed from the project prior to the ending date of the contract for reasons other than (a) departure from Contractor's employment; (b) replacement by Contractor pursuant to the third paragraph of the Article herein titled "Employment Status", or (c) circumstances beyond the Contractor's reasonable control, including without limitation, circumstances such as death, extended illness, disability, personal or family emergencies, and military service with verification and supporting documentation.  Subject to the State's written approval, the Contractor may substitute qualified persons acceptable to the State in the event of the separation of the incumbents therein from employment with Contractor or for other compelling reasons that are stated in the preceding sentence, and may assign additional staff to provide technical support to Customer within thirty calendar days or within such other mutually agreed upon period of time, or the Customer may, in its sole discretion, terminate this Agreement immediately without the necessity of providing thirty (30) days notice. The replacement personnel shall have equal or greater ability, experience and qualifications than the departing personnel, and shall be subject to the prior written approval of the Customer. The Contractor shall not permanently divert any staff member from meeting work schedules developed and approved under this Agreement unless approved in writing by the Customer. In the event of Contractor personnel loss or redirection, the services performed by the Contractor shall be uninterrupted and the Contractor shall report in required status reports its efforts and progress in finding replacements and the effect of the absence of those personnel.

## ARTICLE 37  LIQUIDATED DAMAGES

**37.1**  It is agreed by the parties hereto that time is of the essence, and that in the event of a delay in the satisfactory completion and acceptance of the services provided for herein, damage shall be sustained by Customer. In the event of a delay as described herein, Contractor shall pay Customer, within five (5) calendar days from the date of receipt of notice, fixed and liquidated damages of one thousand dollars ($1,000.00) per day for each calendar day of delay

caused by Contractor. Customer may offset amounts due it as liquidated damages against any monies due Contractor under this Agreement. Customer will notify Contractor in writing of any claim for liquidated damages pursuant hereto on or before the date Customer deducts such sums from money payable to Contractor. Any liquidated damages assessed are in addition to and not in limitation of any other rights or remedies of Customer.

**37.2**     In the event of a liquidated damage arising from a delay under this Agreement by Contractor, Contractor will be liable to the Customer only for the proportionate amount of the liquidated damage attributable to Contractor's delay. Contractor's liability to the Customer for liquidated damages will be reduced if and to the extent Contractor can demonstrate to the Customer or to a lawful authority that any action or inaction by any of the following entities contributed to the delay: (a) State, its employees, agents or contractors; (b) a health and human services agency; (c) another State of Mississippi or Federal agency that oversees, approves, monitors or audits the Customer or this Agreement; (d) a third party (other than a subcontractor, supplier, affiliate or other entity related to Contractor) outside of Contractor's reasonable control; and (e) Contractor could not, by taking reasonable and appropriate steps to mitigate the delay, have reduced the amount of its proportionate liability.

## ARTICLE 38   PERFORMANCE BOND

As a condition precedent to the formation of this Agreement, the Contractor shall provide a performance bond as herein described. To secure the Contractor's performance, the Contractor shall procure, submit to the State with this executed Agreement, and maintain in effect at all times during the course of this Agreement, a performance bond in the amount of one million dollars ($1,000,000.00). The bond shall be accompanied by a duly authenticated or certified document evidencing that the person executing the bond is a licensed Mississippi agent for the bonding company. This certified document shall identify the name and address of the person or entity holding the performance bond, and shall identify a contact person to be notified in the event the State is required to take action against the bond. The term of the performance bond shall be concurrent with the term of this Agreement, with the exception of post-warranty maintenance and support, and shall not be released to Contractor until final acceptance of all products and deliverables required herein or until the warranty period, if any, has expired, whichever occurs last. If applicable, and at the State's sole discretion, the State may, at any time during the warranty period, review Contractor's performance and performance of the products/services delivered and determine that the Contractor's performance bond may be reduced or released prior to expiration of the full warranty period.  The performance bond shall be procured at Contractor's expense and be payable to the Customer.  The cost of the bond may be invoiced to the Customer after project initiation only if itemized in the Contractor's cost proposal and in the attached Exhibit A.  Prior to approval of the performance bond, the State reserves the right to review the bond and require Contractor to substitute an acceptable bond in such form as the State may reasonably require. The premiums on such bond shall be paid by Contractor. The bond shall specifically refer to this Agreement and shall bind the surety to all of the terms and conditions of this Agreement. If the Agreement is terminated due to Contractor's failure to comply with the terms thereof, Customer may claim against the performance bond.

## ARTICLE 39   RETAINAGE

To secure the Contractor's performance under this Agreement, the Contractor agrees the Customer shall hold back as retainage twenty percent (20%) of each amount payable under this Agreement. The retainage amount will continue to be held until final acceptance of all deliverables by the Customer. On each anniversary date of this Agreement, the parties will

confer in good faith to determine if Customer is willing to release any portion of the retainage in the upcoming contract year.

## ARTICLE 40  CHANGE ORDER RATE AND PROCEDURE

**40.1**   It is understood that the State may, at any time by a written order, make changes in the scope of the project. No changes in scope are to be conducted or performed by the Contractor except by the express written approval of the State. The Contractor shall be obligated to perform all changes requested by the Customer, which have no price or schedule effect.

**40.2**   The Contractor shall have no obligation to proceed with any change that has a price or schedule effect until the parties have mutually agreed in writing thereto. Neither the State nor the Contractor shall be obligated to execute such a change order; and if no such change order is executed, the Contractor shall not be obliged or authorized to perform services beyond the scope of this Agreement and the contract documents. All executed change orders shall be incorporated into previously defined deliverables.

**40.3**   With respect to any change orders issued in accordance with this Article, the Contractor shall be compensated for work performed under a change order according to the hourly change order rate in the attached Exhibit A. If there is a service that is not defined in the change order rate, the Contractor and the State will negotiate the rate. The Contractor agrees that this change order rate shall be a "fully loaded" rate, that is, it includes the cost of all materials, travel expenses, per diem, and all other expenses and incidentals incurred by the Contractor in the performance of the change order. The Contractor shall invoice the Customer upon acceptance by the Customer of all work documented in the change order, and the Customer shall pay invoice amounts on the terms set forth in this Agreement.  The Contractor acknowledges and agrees that the fully-loaded change order hourly rates in Exhibit A shall remain valid for the duration of the Agreement, with annual increases not to exceed the lesser of a five percent increase or an increase in the consumer price index, all Urban Consumer U.S. City Average (C.P.I.-U).

**40.4**   Upon agreement of the parties to enter into a change order, the parties will execute such a change order setting forth in reasonable detail the work to be performed thereunder, the revisions necessary to the specifications or performance schedules of any affected project work plan, and the estimated number of professional services hours that will be necessary to implement the work contemplated therein. The price of the work to be performed under any change order will be determined based upon the change order rate; however, the change order will be issued for a total fixed dollar amount and may not be exceeded regardless of the number of hours actually expended by the Contractor to complete the work required by that change order. The project work plan will be revised as necessary.

**40.5**   The Contractor will include in the progress reports delivered under this Agreement, the status of work performed under all then current change orders.

**40.6**   In the event the Contractor and the State enter into a change order which increases or decreases the time required for the performance of any part of the work under this Agreement, the Contractor shall submit to the Customer a revised version of the project work plan, clearly indicating all changes, at least five (5) working days prior to implementing any such changes.

**40.7**   The Customer shall promptly review all revised project work plans submitted under this

MAXIMUS Human Services, Inc.-MDHS-40123-3713-Jan2014-Professional Services

Agreement, and shall notify the Contractor of its approval or disapproval, in whole or in part, of the proposed revisions, stating with particularity all grounds for any disapproval, within ten (10) working days of receiving the revisions from the Contractor. If the Customer fails to respond in such time period or any extension thereof, the Customer shall be deemed to have approved the revised project work plan.

## ARTICLE 41   SMALL, MINORITY AND WOMEN'S BUSINESSES

**41.1**   It is the federal grantor agency's policy to award a fair share of contracts to small, minority and women's businesses. The Contractor shall ensure, to the fullest extent possible, that at least the applicable fair share objectives for supplies, equipment and services are made available to Minority Business Enterprises (MBE)/Women's Business Enterprises (WBE). The Contractor shall also include in its bid documents for subcontractors these fair share objectives. The fair share objectives are as follows: (a) equipment: 6.8% MBE and 5.1% WBE; (b) supplies: 7.7% MBE and 3.4% WBE, and (c) services: 1.1% MBE and 2.2% WBE.

**41.2**   Contractor's awarded contracts with full or partial federal funding will abide by the following affirmative steps and will include this clause in any subcontracts at any tier: (a) including small, minority, and women's businesses on solicitation lists; (b) assuring that small, minority and women's businesses are solicited whenever they are potential sources; (c) dividing total requirements, when economically feasible, into small tasks or quantities to permit maximum participation of small, minority and women's businesses; (d) establishing delivery schedules, where the requirements of the work permits, which will encourage participation by small, minority and women's businesses; (e) using the services and assistance of the Small Business Administration and the Office of Minority Business Enterprise of the U.S. Department of Commerce, as appropriate, and (f) including these steps in any subcontracts awarded under this Agreement.

## ARTICLE 42   RECYCLED PAPER

Pursuant to EPA Order 1000.25, dated January 24, 1990, the Contractor agrees to use recycled paper for all reports which are prepared as a part of the Agreement and delivered to Customer. This requirement applies even when the cost of recycled paper is higher than that of virgin paper.

## ARTICLE 43   HOTEL/MOTEL FIRE SAFETY ACT OF 1990

If, in the course of this Agreement, the Contractor conducts meetings at hotels or motels, including but not limited to, conferences, conventions, training sessions, and seminars, the Contractor shall conduct such meetings at hotels or motels that are in compliance with the Hotel and Motel Fire Safety Act of 1990 (P.L. 101-391). A list of certified hotels and motels will be provided upon the request of the Contractor. It is possible to have additional facilities added to the list if sufficient time is allowed.

## ARTICLE 44   LOBBYING DISCLOSURE ACT OF 1995

If the Contractor is an organization described in Section 501 (c) (4) of the Internal Revenue Code of 1986, then the Contractor warrants that it does not and will not, engage in lobbying activities prohibited by the Lobbying Disclosure Act of 1995. The Contractor agrees to refrain from entering into any subcontract under this Agreement with any organization described in Section 501 (c) (4) of the Internal Revenue Code of 1986, unless such organization warrants that it does not, and will not, engage in lobbying activities prohibited by the Act as a special condition of this Agreement.

## ARTICLE 45   TRANSPARENCY

In accordance with the Mississippi Accountability and Transparency Act of 2008, §27-104-151, et seq., of the Mississippi Code of 1972, as Amended, the American Accountability and Transparency Act of 2009 (P.L. 111-5), where applicable, and §31-7-13 of the Mississippi Code of 1972, as amended, where applicable, a fully executed copy of this Agreement shall be posted to the State of Mississippi's accountability website at: https://www.transparency.mississippi.gov. Prior to Customer posting the Agreement to the website, any attached exhibits which contain trade secrets or other proprietary information and are labeled as "confidential" will be redacted by Customer.

## ARTICLE 46   LIABILITY ISSUES

Unless jointly agreed otherwise in writing, Contractor's liability shall not exceed the total amount paid by Customer to Contractor under this Agreement, including any amounts paid pursuant to amendments and change orders. In no event will Contractor be liable to Customer for special, indirect, consequential or incidental damages including lost profits, lost savings or lost revenues of any kind. Excluded from this or any liability limitation are claims related to fraud, bad faith, infringement issues, bodily injury, death, physical damage to tangible personal property and real property, and the intentional and willful misconduct or gross negligent acts of Contractor. The language contained herein tending to limit the liability of the Contractor will apply to Customer to the extent it is permitted and not prohibited by the laws or constitution of Mississippi. Further, the parties understand and agree that the Contractor is precluded from relying on any contractual damages limitation language within this Agreement where the Contractor acts fraudulently or in bad faith.

For the faithful performance of the terms of this Agreement, the parties hereto have caused this Agreement to be executed by their undersigned authorized representatives.

**State of Mississippi, Department of Information Technology Services, on behalf of Mississippi Department of Human Services**

By: _____
        Authorized Signature

Printed Name: Craig P. Orgeron, Ph.D.

Title: Executive Director

Date: _____ 2/28/14 _____

**MAXIMUS Human Services, Inc.**

By: _____
        Authorized Signature

Printed Name: Bruce Perkins
~~Senior Vice-President~~
Deputy General Counsel

Title: _____

Date: _____ 2/14/14 _____


**Mississippi Department of Human Services**

By: _____
        Authorized Signature
        JOHN DAVIS
Printed Name: Richard A. Berry
        DEPUTY ADMINISTRATOR
Title: Executive Director

Date: _____ 2/28/14 _____

MAXIMUS Human Services, Inc.-MDHS-40123-3713-Jan2014-Professional Services

**EXHIBIT A**
**Payment Schedule and Deliverables List**

| Deliverable | Deliverable Due Date | Cost | 20% Retainage | Amount Paid |
|---|---|---|---|---|
| Initial QA Project Work Plan | within 3 wks of contract execution | $444,375.00 | $88,875.00 | $355,500.00 |
| Initial QM Plan | within 5 wks of contract execution | $345,625.00 | $69,125.00 | $276,500.00 |
| Revised QA Project Work Plan | 07/02/2015 | $49,375.00 | $9,875.00 | $39,500.00 |
| Revised QM Plan | 07/02/2015 | $24,688.00 | $4,937.60 | $19,750.40 |
| Project Plan Assessment Report | 07/12/2015 | $74,063.00 | $14,812.60 | $59,250.40 |
| Post Implementation Analysis Report | Dependent on DDI Contractor's statewide implementation | $74,063.00 | $14,812.60 | $59,250.40 |
| QA Project Completion Report | 02/28/2018 | $19,750.00 | $3,950.00 | $15,800.00 |
| Total | | $1 0  1 939 00 | $2  6 837 80 | $825,551 20 |
| **Project Management Services** | | | | |
| Monthly QA Status Reports – first 6 months | Multiple | $948,000.00 | $189,600.00 | $758,400.00 |
| Monthly QA Status Reports – Months 6-12 | Multiple | $177,750.00 | $35,550.00 | $142,200.00 |
| Monthly QA Status Reports – Months 13-18 | Multiple | $913,437.50 | $182,687.50 | $730,750.00 |
| Monthly QA Status Reports – Months 19-24 | Multiple | $913,437.50 | $182,687.50 | $730,750.00 |
| Monthly QA Status Reports – Months 25-30 | Multiple | $913,437.50 | $182,687.50 | $730,750.00 |
| Monthly QA Status Reports – Months 31-project end | Multiple | $913,437.50 | $182,687.50 | $730,750.00 |
| Total | | $4 779 50 0. 0 | $955 9 00.00 | $3,823,600.00 |
| **Design, Development, and Implementation (DDI) Contractor's Deliverable** | | | | |
| DDI Deliverable Review (small) | Multiple – Based on DDI Contractor's Plan | $44,438.00 | $8,887.60 | $35,550.40 |
| DDI Deliverable Review (medium) | Multiple – Based on DDI Contractor's Plan | $88,875.00 | $17,775.00 | $71,100.00 |
| DDI Deliverable Review (large) | Multiple – Based on DDI Vendor's Plan | $177,750.00 | $35,550.00 | $142,200.00 |

MAXIMUS Human Services, Inc.-MDHS-40123-3713-Jan2014-Professional Services

| DDI Deliverable Review (extra -large) | Multiple – Based on DDI Vendor's Plan | $158,000.00 | $31,600.00 | $126,400.00 |
|---|---|---|---|---|
| Total: | | $469,063.00 | $93,812.60 | $375,250.40 |
| Performance Bond Cost: | | $50,472.00 | N/A | $50,472.00 |
| Sub-Total: | | $6,330,974.00 | $1,256,100.40 | $5,074,873.60 |
| Release Retainage per Article 39: | | N/A | N/A | $1,256,100.40 |
| GRAND TOTAL: | | $6,330,974.00 | N/A | $6,330,974.00 |

## Change Order Rates

| Item Description | Base Rate | Fully-Loaded Rate |
|---|---|---|
| Project Executive | $295.00 | $325.00 |
| Project Manager | $245.00 | $275.00 |
| Team Leader | $220.00 | $250.00 |
| Senior Subject Matter Expert | $220.00 | $250.00 |
| Junior Subject Matter Expert | $170.00 | $200.00 |

MAXIMUS Human Services, Inc.-MDHS-40123-3713-Jan2014-Professional Services

**EXHIBIT B**
**CONTRACT LANGUAGE FOR GENERAL SERVICES**

## I. PERFORMANCE

In performance of this Agreement, the Contractor agrees to comply with and assume responsibility for compliance by his or her employees with the following requirements:

(1) All work will be done under the supervision of the Contractor or the Contractor's employees.

(2) Any return or return information made available in any format shall be used only for the purpose of carrying out the provisions of this Agreement. Information contained in such material will be treated as confidential and will not be divulged or made known in any manner to any person except as may be necessary in the performance of this Agreement. Disclosure to anyone other than an officer or employee of the Contractor will be prohibited.

(3) All returns and return information will be accounted for upon receipt and properly stored before, during, and after processing. In addition, all related output will be given the same level of protection as required for the source material.

(4) The Contractor certifies that the data processed during the performance of this Agreement will be completely purged from all data storage components of his or her computer facility, and no output will be retained by the Contractor at the time the work is completed. If immediate purging of all data storage components is not possible, the Contractor certifies that any IRS data remaining in any storage component will be safeguarded to prevent unauthorized disclosures.

(5) Any spoilage or any intermediate hard copy printout that may result during the processing of IRS data will be given to the agency or his or her designee. When this is not possible, the Contractor will be responsible for the destruction of the spoilage or any intermediate hard copy printouts, and will provide the agency or his or her designee with a statement containing the date of destruction, description of material destroyed, and the method used.

(6) All computer systems processing, storing, or transmitting Federal tax information shall meet the requirements defined in IRS Publication 1075. To meet functional and assurance requirements, the security features of the environment shall provide for the managerial, operational, and technical controls. All security features shall be available and activated to protect against unauthorized use of and access to Federal tax information.

(7) No work involving Federal tax information furnished under this Agreement will be subcontracted without prior written approval of the IRS.

(8) The Contractor will maintain a list of employees authorized access. Such list will be provided to the agency and, upon request, to the IRS reviewing office.

(9) The agency will have the right to void the Agreement if the Contractor fails to provide the safeguards described above.

(10) (Include any additional safeguards that may be appropriate.)

## II. CRIMINAL/CIVIL SANCTIONS:

(1) Each officer or employee of any person to whom returns or return information is or may be disclosed will be notified in writing by such person that returns or return information disclosed to such officer or employee can be used only for a purpose and to the extent authorized herein, and that further disclosure of any such returns or return information for a purpose or to an extent unauthorized herein constitutes a felony punishable upon conviction by a fine of as much as $5,000.00 or imprisonment for as long as five (5) years, or both, together with the costs of prosecution. Such person shall also notify each such officer and employee that any such unauthorized further disclosure of returns or return information may also result in an award of civil damages against the officer or employee in an amount not less than $1,000.00 with respect to each instance of unauthorized disclosure. These penalties are prescribed by IRC sections 7213 and 7431 and set forth at 26 CFR 301.6103(n)-1.

(2) Each officer or employee of any person to whom returns or return information is or may be disclosed shall be notified in writing by such person that any return or return information made available in any format shall be used only for the purpose of carrying out the provisions of this Agreement. Information contained in such material shall be treated as confidential and shall not be divulged or made known in any manner to any person except as may be necessary in the performance of the Agreement. Inspection by or disclosure to anyone without an official need to know constitutes a criminal misdemeanor punishable upon conviction by a fine of as much as $1,000.00 or imprisonment for as long as one (1) year, or both, together with the costs of prosecution. Such person shall also notify each such officer and employee that any such unauthorized inspection or disclosure of returns or return information may also result in an award of civil damages against the officer or employee (United States for Federal employees) in an amount equal to the sum of the greater of $1,000.00 for each act of unauthorized inspection or disclosure with respect to which such defendant is found liable or the sum of the actual damages sustained by the plaintiff as a result of such unauthorized inspection or disclosure plus in the case of a willful inspection or disclosure which is the result of gross negligence, punitive damages, plus the costs of the action. These penalties are prescribed by IRC section 7213A and 7431.

(3) Additionally, it is incumbent upon the Contractor to inform its officers and employees of the penalties for improper disclosure imposed by the Privacy Act of 1974, 5 U.S.C. 552a. Specifically, U.S.C. 552a(i)(1), which is made applicable to contractors by 5 U.S.C. 552a(m)(1), provides that any officer or employee of a contractor, who by virtue of his/her employment or official position, has possession of or access to agency records which contain individually identifiable information, the disclosure of which is prohibited by the Privacy Act or regulations established thereunder, and who knowing that disclosure of the specific material is prohibited, willfully discloses the material in any manner to any person or agency not entitled to receive it, shall be guilty of a misdemeanor and fined not more than $5,000.00.

## III. INSPECTION:

The IRS and the Customer shall have the right to send its officers and employees into the offices and plants of the Contractor for inspection of the facilities and operations provided for the performance of any work under this Agreement. On the basis of such inspection, specific measures may be required in cases where the Contractor is found to be noncompliant with contract safeguards.

# App. B, Ex. 16B



# Remedial Site Visit - Commission Report

## Division of Family and Children's Services Region : 1 – North
### Corinth, MS

### 4620.01

| | | | |
|---|---|---|---|
| **PCR Report Sent:** | November 22, 2013 | **PCR Response Due:** | January 29, 2014 |
| **Commission Report Sent:** | April 11, 2014 | **Commission Response Due:** | November 17, 2014 |
| **Commission Report Sent:** | **January 20, 2015** | **Commission Response Due:** | **May 11, 2015** |
| **Commission Report Sent:** | | **Commission Response Due:** | |

**Summary of ratings and justifications for standards that must be addressed prior to achieving accreditation:**

| Standard | Rating | Justifications |
|---|---|---|
| *PA-RPM* | 2 | SITE REVIEW TEAM COMMENTS: |
| *PA-RPM 5* | 3 | REMEDIAL SITE VISIT REVIEW COMMENTS:<br><br>12/9/2014: In spite of efforts to upgrade lines and increase communication between Regional and Central office staff, glitches and slow computer speeds continue. New servers will be added after the first of the year, more than double, which may help address the issues. More efforts need to be spent investigating why hardware upgrade has not been more successful until the new SACWIS system is in place.<br><br>COMMISSION COMMENTS:<br><br>3/13/2014: Incremental steps have been made to resolve key issues with the MACWIS System. This time- |

COUNCIL ON ACCREDITATION

45 Broadway, 29th Floor, New York, NY  10006  •  toll free: 866-262-8088   tel: 212.797.3000   fax: 212.797.1428   www.coanet.org

| Standard | Rating | Justifications |
|---|---|---|
| | | line looks good. However, of the nine pieces of evidence presented, we do not have a recent test of the factors that are out of compliance for this standard. The time-line addresses the changes that need to occur. Further incremental up-grades may resolve some or all of the issues noted above. However, the replacement of the system and up-grade to county offices line to a higher speed is not scheduled until 6/1/2014.  At that time, we can judge the impact of this change. Replacement of the system is not due until 6/30/2016.<br><br>COMMISSION RECOMMENDATION:<br><br>1. Narrative, updated forms or worksheets, data reports, and other documentation that demonstrates or supports that the region has implemented the standard. Refer to prior requested evidence for that standard for examples of what information is appropriate<br>to submit.<br>SITE REVIEW TEAM COMMENTS:<br>Due to glitches in the MACWIS system, staff reported data loss and the slowness of the system operating. |
| *PA-RPM 5.01* | 3 | REMEDIAL SITE VISIT REVIEW COMMENTS:<br>12/9/2014:  See PA-RPM 5.<br><br>COMMISSION COMMENTS:<br>3/13/2014: See PA-RPM 5.<br>SITE REVIEW TEAM COMMENTS:<br>Due to glitches in the MACWIS system, staff reported data loss and the slowness of the system operating. |
| *PA-RPM 5.02* | 3 | REMEDIAL SITE VISIT REVIEW COMMENTS:<br>12/9/2014:  See PA-RPM 5.<br><br>COMMISSION COMMENTS:<br>3/13/2014: See PA-RPM 5.<br>SITE REVIEW TEAM COMMENTS:<br>Due to glitches in the MACWIS system, staff reported data loss and the slowness of the system |

| Standard | Rating | Justifications |
|---|---|---|
| | | operating. |
| PA-RPM 5.03 | 3 | REMEDIAL SITE VISIT REVIEW COMMENTS: 12/9/2014:  See PA-RPM 5. <br><br> COMMISSION COMMENTS: <br> 3/13/2014: See PA-RPM 5. <br> SITE REVIEW TEAM COMMENTS: <br> Due to glitches in the MACWIS system, staff reported data loss and the slowness of the system operating. |
| PA-ASE | 2 | SITE REVIEW TEAM COMMENTS: |
| PA-ASE 1 | 2 | REMEDIAL SITE VISIT REVIEW COMMENTS: 12/9/2014:  See PA-ASE 1.01. <br><br> COMMISSION COMMENTS: <br> 3/13/2014: See PA-ASE 1.01 <br> SITE REVIEW TEAM COMMENTS: |
| PA-ASE 1.01 | 3 | REMEDIAL SITE VISIT REVIEW COMMENTS: <br><br> 12/19/2014: <br> Prentiss County facility will be moving to a new facility, hopefully by 6/1/15. Observation of the construction site indicates staff will have large individual offices, large conference rooms, family visitation room, and break room. It will be ADA accessible with a secure lobby and large parking lot. Current site was not visited. <br> Marshall County facility has been partially remodeled. The two supervisors have individual, remodeled offices. Staff now have individual offices as a result of new wall petitions and extra doors being constructed. What remains to be done is an ADA ramp at the entry and a wall petition in the break room to separate utilities from the rest of the room. The County Director assures that the 2 final improvements will be completed in early 2015. <br> Desoto County facility has not been able to move due to the loss of a grant which would have paid for their remodeling. The office is inadequate as it is with extremely cramped conditions. The plan continues to be to add the additional space in the existing building. Once this is done, their office space will double |

# App. B, Ex. 17

**Mississippi Department of Human Services**
**Division of Family and Children's Services**

# Mississippi Automated Child Welfare Information System Connectivity and Response Time Improvement Plan

The Mississippi Automated Child Welfare Information System (MACWIS) is the statewide, automated system utilized to manage and track data concerning children in foster care. The infrastructure for MACWIS was implemented in 2000 and the MACWIS application was deployed statewide in 2001. The architecture of the current system is based on technology that dates back to the late nineties. Maintenance of the system and its infrastructure, now past the end-of-life-cycle, continues to be a challenge. Modifications and enhancements have been made to the network infrastructure for improvements in connectivity and response time to correct limitations in user access to MACWIS.

The Mississippi Automated Child Welfare Information System Connectivity and Response Time Improvement Plan will further address MACWIS application connectivity and response time issues statewide. The plan will consist of two phases and a Preventative Maintenance Plan (PMP). During Phase One and Phase Two, the Citrix Xenapp environment will be upgraded and replaced.  Mississippi Department of Human Services (MDHS) Division of Family and Children Services (DFCS) county offices will be reviewed and analyzed remotely for MACWIS response time, communication configuration, equipment and cabling.  Based on recommendations from the review and analysis, changes or replacements will be completed.  Details of the two phases are as follows:

1. **Phase One – (June 2013 – December 2013) –Citrix XenApp 6.5 Platinum Project**

   The current network infrastructure is based on a Citrix environment. This environment is the means by which users connect to the MACWIS application from county offices statewide through wide area connectivity utilizing a Wyse terminal computer.

   On June 17, 2013, the contract was finalized with Venture Technologies to start the Citrix XenApp 6.5 Platinum Project. The contract covers the upgrade and replacement of the Citrix Xenapp environment, inclusive of installation, setup, configuration, testing and implementation of software and hardware.

   The contract also includes the setup, configuration testing and implementation of two Citrix NetScalers MPX 8200 Enterprise Edition appliances and software.  The Citrix NetScalers will provide application switching and traffic management features for load balancing, application acceleration features, application security and firewall features, and an application visibility feature for the Citrix Environment.  These units automatically control

1 | August 23, 2013

DHS
351524

the load balancing for the Citrix Server Environment to ensure that the user sessions will have enough processing power.  The Citrix NetScalers will also be used as the Citrix Gateway to provide a secure user access to applications in the Citrix environment from any location.  One of the Citrix NetScalers will be the primary and the other a failover secondary unit.

The Citrix EdgeSight Software will be setup and configured to monitor and provide information for performance and availability of the Citrix Environment.  Citrix EdgeSight is a performance and availability management solution for XenDesktop, XenApp and endpoint systems. EdgeSight monitors applications, devices, sessions, license usage, and the network in real time, allowing administrators to quickly analyze, resolve, and proactively prevent problems. Administrative tasks can be completed using the Citrix EdgeSight Server Console.

The contract end date as well as the estimated project completion date is December 31, 2013.

The Citrix XenApp 6.5 Platinum Project will provide:
* Up-to-date Citrix XenApp 6.5 system with new features
* The new Citrix XenApp 6.5 Environment will reside at the State ITS Data Center. Since the new Citrix XenApp 6.5 Environment will be in the same location as the state mainframe where the MACWIS application and data are hosted and connections for the communication lines to each MDHS county office and the state office are based, an improvement in access and response time is anticipated.
* Two Citrix NetScaler MPX 8200 Enterprise Edition Appliance and software will be installed, configured and used to provide traffic management for load balancing, gateway access and other features.
* The Citrix EdgeSight Software will be setup and configured to monitor and provide information for performance and availability of the Citrix Environment.
* New hardware (high availability servers, controllers).
* Hardware expansion capabilities within 24 hours if needed.
* New platform will be Microsoft 2008r2 64-Bit Servers in a virtual environment.
* Hardware and System Failover Protection.
* Secure and scheduled backup of Citrix XenApp 6.5 Environment.
* Faster access to the MDHS Network and MACWIS.
* Configuration enhancements to the MACWIS application will provide response time improvements.
* The MACWIS front end software will need to be modified for the new 64-bit version in order to function in the new Citrix XenApp 6.5 Environment.
* The current Citrix XenApp 4.5 Environment will be maintained until all users are moved to the new Citrix XenApp 6.5 Environment.
* A 100 user pilot testing of a Citrix XenApp 6.5 environment will be installed, setup and configured.  Testing will include network testing, performance of the hardware, applications and software and user response time, load testing and balance of the Citrix servers and all features of Citrix XenApp 6.5.  The Citrix NetScalers will be setup, installed and tested for the control and monitoring of the Citrix Environment.

DHS
351525

Testing will be done on the MACWIS application response time between the user's computer equipment, Citrix XenApp 6.5 Environment and the Mainframe. The Citrix Contractor, MDHS MIS and DFCS technical staff will work with the AT&T and ITS Data Center technical staff to configure the best and fastest communication path for the Routers and Switches located in the county offices, MDHS and ITS Data Center. Testing of performance will be conducted in peak times from State Office to locations over the state. The pilot Citrix XenApp 6.5 Environment will become the production environment after testing is completed (See Attachment One - MACWIS Response Time Improvement Plan Schedule).

- **Phase Two – (September 1, 2013 – June 30, 2014) <u>County Office Improvements</u>**
- To improve the data communication transportation between the county offices and the MDHS Data Center and ITS Data Center, MDHS\DFCS will replace the communication switches with new equipment and replace some of the old copper cables with fiber cables.
  - Analysis of the type of switch and fiber cable installation will be completed remotely by the MDHS MIS, DFCS and other Divisions' technical staff and onsite county staff. The hardware inventory counts of computers, printers and other connected devices will be used in the analysis to determine the type of switch and ports needed on the switches at each location. Fiber cabling analysis will consist of distance between wiring closets, location of the Communication Line DMark and the number of switches and routers to be connected in each location.
  - Contractors with Cisco Certified Engineers will be obtained to assist the MDHS MIS and DFCS technical staff in configuration and installation of the communication switches. An experienced fiber cable contractor will be obtained to install any long distance of fiber cabling where a fiber patch cable cannot be used.
  - Due to the project's large cost amount and Mississippi state purchasing laws, the equipment and services will have to be procured through the state ITS procurement process. MDHS MIS and DFCS technical staff will assist and work with the awarded contractors to ensure the equipment and cables are installed properly and that the communication and response time are adequate at all locations.
  - There are 82 counties in the state. It will be requested of the awarded contractors to start project work in the four 'Carve Out Counties' (Hinds, Hancock, Harrison, and Jackson) as detailed on page 3. The remainder of the offices will be completed under this plan in keeping with the attached schedule (see Attachment One - MACWIS Response Time Improvement Plan Schedule). Project scheduled dates of work in each location will be tentative upon contractors negotiated best and fastest completion efforts.

**3 | August 23, 2013**

- Phase Two (A): will address the largest county offices during the time frame of June 2013 – December 2013. Included are: Desoto, Forrest, Lee, Rankin, Washington and Region I-S county offices.

- Phase Two (B): will include county offices in Region I-N, Region II-E, Region II-W and Region III-N during the time frame of January 2014 – March 2014.

- Phase Two (C): will include county offices in Region III-N, Region IV-5, Region V-W, Region V-E and Region VI during the time frame of April 2014 – June 2014.

## Work in Progress - County Offices Improvements

MDHS DFCS MACWIS and MIS staff, along with an external vendor, Business Communication Inc. (BCI), will continue work currently in progress to address connectivity and response time issues. Accomplishments and work in progress include:

- **All County Offices**
  - New high availability routers installed and configured as of January 2013.

  - Virus remediation for all servers PCs, laptops and Wyse terminals was completed on July 30, 2013.

  - New Wyse terminals installed and configured completed March 14, 2013.

  - eHealth software is used daily to determine any communication line problems and bandwidth usage. This software is used to determine if a data communication line is over utilized and needs to be upgraded to a larger and faster speed.

  - After the Citrix Project is completed in December 31, 2013, a second review will be completed for all high availability router configurations. Changes will be implemented if needed to provide the best and fastest path for the data communication.

- **Carve Out County Offices**

  - **Hinds County Office** - All communication equipment will be replaced. Switches will be replaced with new models and configured for better performance. Fiber cabling will be installed from each wiring closet to the main wiring closet to give a direct path to the router. This work is scheduled to begin in August 2013 and be completed by September 30, 2013.

  - **Jackson County Office** - The work to be conducted includes replacement of switches, installation of fiber cables, tracing and labeling of the numbers from the wall jack to

**4 | August 23, 2013**

DHS
351527

the punch-down rack, checking length of cable run from wall jack, and connecting any remaining cables to the rack and switch.   A request for a vendor quote was made in July, 2013.  The estimated work completion date is September 30, 2013.

o  **Harrison County Office** - DFCS' switches have recently been replaced however the MDHS Economic Assistance Division (EA) old switches need to be replaced.   The cable between the DCFS wiring closet and the EA wiring closet needs to be replaced with a fiber cable to provide a faster connectivity to the router.     The estimated work completion date is August 31, 2013.

o  **Hancock County Office** -In July 2013, the Hancock County Office moved to a new location.   Prior to the move, new switches, cabling, and a fiber cable from the DFCS and EA wiring closets were installed.  The project was completed July 31, 2013.

2.  **Preventative Maintenance Plan (PMP)**

   ♦  Since the physical hardware for the Citrix Environment and Mainframe for the MACWIS application and all communications lines will reside at the ITS Data Center.  The PMP has been provided by MDHS MIS Division and ITS Data Center.  (See Attachment Two - MDHS DFCS PMP)

DHS
351528

# Attachment One

## Mississippi Department of Human Services
## Division of Family and Children's Services
## MACWIS Unit
## MACWIS Response Time Improvement Plan Schedule 2013 - 2014

8/23/13 1:43 PM

| Location | Scope of Work | Start Date | Completion Date |
|---|---|---|---|
| Main Office | Phase I - Citrix XenApp 4.5 with Citrix XenApp 6.5 Project | June-13 | December-13 |
| | ▪ Up-to-date Citrix XenApp 6.5 system with new features. | | |
| | ▪ New hardware. | | |
| | ▪ Hardware expansion capabilities if needed. | | |
| | ▪ New platform will be Microsoft 2008r2 64-Bit Servers in a virtual environment. | | |
| | ▪ Hardware and System Failover Protection. | | |
| | ▪ Secure and scheduled backup of Citrix XenApp 6.5 Environment. | | |
| | ▪ Faster access to the MDHS Network and MACWIS. | | |
| | ▪ Two Citrix NetScaler MPX 8200 Enterprise Edition Appliance and software will be installed, configured and used to provide traffic management for load balancing, gateway access and other features. | | |
| | ▪ The new Citrix XenApp 6.5 Environment will reside at the State ITS Data Center.  Since the new Citrix XenApp 6.5 Environment will be in the same location as the State Mainframe where the MACWIS application and data are hosted and MDHS connections for the communication lines to each MDHS county office and state agencies reside, should provide an improvement in access and response time. | | |
| | ▪ Configuration enhancements to the MACWIS web application, providing response time improvements. | | |
| | ▪ The MACWIS front end software will need to be converted from 32-bit to 64-bit versions in order to function in the new Citrix XenApp 6.5 Environment. | | |
| | ▪ Contracted Vendor will perform the new Citrix XenApp 6.5 Design, Setup, Testing and Implementation. | 6/11/2013 | |

DHS
351529

# Mississippi Department of Human Services
## Division of Family and Children's Services
## MACWIS Unit
## MACWIS Response Time Improvement Plan Schedule 2013 - 2014

8/23/13 1:43 PM

| Location | Scope of Work | Start Date | Completion Date |
|---|---|---|---|
| | • Contracted Vendor will setup a 100 user Pilot Citrix XenApp 6.5 Environment for Testing hardware, applications, software, response and all features of Citrix. This Pilot Environment will be come the Production Enviornment after testing is completed. Install, setup and configure a one hundred user pilot testing of the Citrix XenApp 6.5 environment. Testing will include performance of the hardware, applications, software, response time, load balance of the Citrix servers and all features of Citrix. Also testing of the MACWIS application response from the user's computer equipment, Citrix Environment to and from the Mainframe. Testing of performance will be conducted in peak times from State Office to locations over the state. This pilot environment will become the production environment after testing is complete | | |
| III-S Hinds County Office | Phase I - Region III-S Hinds County Office Communication Improvement Project | May-13 | September-13 |
| | Site visit to review and analyze response time, communication configuration and recommend changes or replacements to the configurations, equipment and cabling. | May-13 | May-13 |
| | | | |
| | Switches will be replaced with new models and configured for better performance. | August-13 | |
| | Fiber cabling will be installed from each Wiring Closets to the main Wiring Close to give a direct path to the Router. | August-13 | |
| | Analyze and test Wyse Terminal response time back to the MDHS Network. | August-13 | |
| | Analyze response time as well as communication line speed thru the eHealth reports. If needed, request increase line speed and make changes to the Router and Switch configurations to improve performance. | August-13 | |
| | Resolve any response time issues and problems. | September-13 | |
| VII-E Jackson County Office | Phase I - Region VII-E Jackson County Office Communication Improvement Project | June-13 | December-13 |
| | Site visit to review and analyze response time, communication configuration and recommend changes or replacements to the configurations, equipment and cabling. | June-13 | June-13 |
| | | | |
| | Switches will be replaced with new models and configured for better performance. | | |

DHS
351530

# Mississippi Department of Human Services
# Division of Family and Children's Services
# MACWIS Unit
# MACWIS Response Time Improvement Plan Schedule 2013 - 2014

8/23/13 1:43 PM

| Location | Scope of Work | Start Date | Completion Date |
|---|---|---|---|
| | Tracing and labeling of the numbers from the wall jack to the punch-down rack, checking length of cable run from wall jack, connecting any remaining cables to the rack and switch. | | |
| | Analyze and test Wyse Terminal response time back to the MDHS Network. | | |
| | Analyze communication line thru the eHealth reports. If needed, request increase line speed and make changes to the Router and Switch configurations to improve performance. | | |
| | Resolve any response time issues and problems. | | |
| VII-W Harrison County Office | Phase I - Region VII-W Harrison County Office Communication Improvement Project | June-13 | December-13 |
| | Site visit to review and analyze response time, communication configuration and recommend changes or replacements to the configurations, equipment and cabling. | June-13 | June-13 |
| | | | |
| | Switches will be replaced in the EA Wiring Closet with new models and configured for better performance. DFCS Switches are new and adequate at this time router. | July-13 | July-13 |
| | Analyze and test Wyse Terminal response time back to the MDHS Network. | July-13 | July-13 |
| | Analyze response time as well as communication line speed thru the eHealth reports. If needed, request increase line speed and make changes to the Router and Switch configurations to improve performance. | August-13 | August-13 |
| | Resolve any response time issues and problems. | August-13 | August-13 |
| VII-W Hancock County Office | Phase I - Region VII-W Hancock County Office Communication Improvement Project | June-13 | July-13 |
| New Location (June 24, 2013) | Site visit to review and analyze response time, communication configuration and recommend changes or replacements to the configurations, equipment and cabling. | June-13 | June-13 |
| | | | |
| | Switches will be replaced with new models and configured for better performance in the new location. | June-13 | June-13 |
| | Fiber cabling will be installed from each Wiring Closets to the main Wiring Close to give a direct path to the Router. | June-13 | June-13 |
| | Communication Line will be upgraded to a 10MB at new location. | June-13 | June-13 |
| | Analyze and test Wyse Terminal response time back to the MDHS Network. | June-13 | July-13 |

DHS
351531

# Mississippi Department of Human Services
## Division of Family and Children's Services
## MACWIS Unit
## MACWIS Response Time Improvement Plan Schedule 2013 - 2014

8/23/13 1:43 PM

| Location | Scope of Work | Start Date | Completion Date |
|---|---|---|---|
| | Analyze response time as well as communication line speed thru the eHealth reports.  If needed, request increase line speed and make changes to the Router and Switch configurations to improve performance. | June-13 | June-13 |
| | Resolve any response time issues and problems. | June-13 | July-13 |
| Region III-N Rankin County Office | Phase 2 (A) - Region III-N Rankin County Office Communication Improvement Project | July-13 | December-13 |
| | Site visit to review and analyze response time, communication configuration and recommend changes or replacements to the configurations, equipment and cabling. | July-13 | July-13 |
| | | | |
| | Make changes and replacements from the Site Visit recommendations. | November-13 | |
| | Analyze and test Wyse Terminal response time back to the MDHS Network. | November-13 | |
| | Analyze response time as well as communication line speed thru the eHealth reports.  If needed, request increase line speed and make changes to the Router and Switch configurations to improve performance. | November-13 | |
| | Resolve any response time issues and problems. | November-13 | |
| Region VI Forrest County Office | Phase 2 (A) - Region VI Forrest County Office Communication Improvement Project | July-13 | December-13 |
| | Review and analyze switches, routers, communication lines and configurations.  Recommend changes or replacements to the configurations, equipment and cabling based on the analysis. | August-13 | |
| | | | |
| | Make changes and replacements from the above recommendations. | November-13 | |
| | Analyze and test Wyse Terminal response time back to the MDHS Network. | November-13 | |
| | Analyze response time as well as communication line speed thru the eHealth reports.  If needed, request increase line speed and make changes to the Router and Switch configurations to improve performance. | November-13 | |
| | Resolve any response time issues and problems. | November-13 | |
| Region II-W Washington County Office | Phase 2 (A) - Region II-W Washington County Office Communication Improvement Project | July-13 | December-13 |
| | Review and analyze switches, routers, communication lines and configurations.  Recommend changes or replacements to the configurations, equipment and cabling based on the analysis. | August-13 | |
| | | | |
| | Make changes and replacements from the above recommendations. | November-13 | |

# Mississippi Department of Human Services
## Division of Family and Children's Services
## MACWIS Unit
## MACWIS Response Time Improvement Plan Schedule 2013 - 2014

8/23/13 1:43 PM

| Location | Scope of Work | Start Date | Completion Date |
|---|---|---|---|
| | Analyze and test Wyse Terminal response time back to the MDHS Network. | November-13 | |
| | Analyze response time as well as communication line speed thru the eHealth reports. If needed, request increase line speed and make changes to the Router and Switch configurations to improve performance. | November-13 | |
| | Resolve any response time issues and problems. | November-13 | |
| Region I-N DeSoto County Office | Phase 2 (A) - Region I-N DeSoto County Office Communication Improvement Project | July-13 | December-13 |
| | Review and analyze switches, routers, communication lines and configurations. Recommend changes or replacements to the configurations, equipment and cabling based on the analysis. | August-13 | |
| | Make changes and replacements from the above recommendations. | December-13 | |
| | Analyze and test Wyse Terminal response time back to the MDHS Network. | December-13 | |
| | Analyze response time as well as communication line speed thru the eHealth reports. If needed, request increase line speed and make changes to the Router and Switch configurations to improve performance. | December-13 | |
| | Resolve any response time issues and problems. | December-13 | |
| Region I-S Lee County Office | Phase 2 (A) - Region I-S Lee County Office Communication Improvement Project | July-13 | December-13 |
| | Review and analyze switches, routers, communication lines and configurations. Recommend changes or replacements to the configurations, equipment and cabling based on the analysis. | August-13 | |
| | Make changes and replacements from the above recommendations. | December-13 | |
| | Analyze and test Wyse Terminal response time back to the MDHS Network. | December-13 | |
| | Analyze response time as well as communication line speed thru the eHealth reports. If needed, request increase line speed and make changes to the Router and Switch configurations to improve performance. | December-13 | |
| | Resolve any response time issues and problems. | December-13 | |

DHS
351533

# Mississippi Department of Human Services
## Division of Family and Children's Services
## MACWIS Unit
## MACWIS Response Time Improvement Plan Schedule 2013 - 2014

8/23/13 1:43 PM

| Location | Scope of Work | Start Date | Completion Date |
|---|---|---|---|
| Region I-S Lafayette, Union, Pontotoc, Itawamba. Calhoun,West Chickasaw, East Chickasaw & Monroe County Offices | **Phase 2 (A) - Region I-S Lafayette, Union, Pontotoc, Itawamba. Calhoun,West Chickasaw, East Chickasaw & Monroe County Offices County Office Communication Improvement Project** | July-13 | December-13 |
| | Review and analyze switches, routers, communication lines and configurations.  Recommend changes or replacements to the configurations, equipment and cabling based on the analysis. | August-13 | |
| | | | |
| | Make changes and replacements from the above recommendations. | December-13 | |
| | Analyze and test Wyse Terminal response time back to the MDHS Network. | December-13 | |
| | Analyze response time as well as communication line speed thru the eHealth reports.  If needed, request increase line speed and make changes to the Router and Switch configurations to improve performance. | December-13 | |
| | Resolve any response time issues and problems. | December-13 | |
| Region I-N Marshall, Benton, Tippah, Alcorn, Prentiss, Tishomingo County Offices | **Phase 2 (B) - Region I-N Marshall, Benton, Tippah, Alcorn, Prentiss, Tishomingo County Office Communication Improvement Project** | January-14 | March-14 |
| | Review and analyze switches, routers, communication lines and configurations.  Recommend changes or replacements to the configurations, equipment and cabling based on the analysis. | August-13 | |
| | | | |
| | Make changes and replacements from the above recommendations. | January-14 | |
| | Analyze and test Wyse Terminal response time back to the MDHS Network. | January-14 | |
| | Analyze response time as well as communication line speed thru the eHealth reports.  If needed, request increase line speed and make changes to the Router and Switch configurations to improve performance. | January-14 | |
| | Resolve any response time issues and problems. | January-14 | |

DHS
351534

# Mississippi Department of Human Services
## Division of Family and Children's Services
## MACWIS Unit
## MACWIS Response Time Improvement Plan Schedule 2013 - 2014

8/23/13 1:43 PM

| Location | Scope of Work | Start Date | Completion Date |
|---|---|---|---|
| Region II-E Tunica, Tate, Quitman, Panola, Tallahatchie, Yalobusha, Grenda, Leflore, Carroll, Montgomery County Offices | Phase 2 (B) - Region II-E Tunica, Tate, Quitman, Panola, Tallahatchie, Yalobusha, Grenda, Leflore, Carroll, Montgomery County Offices Communication Improvement Project | January-14 | March-14 |
| | Site visit to review and analyze response time, communication configuration and recommend changes or replacements to the configurations, equipment and cabling. | August-13 | August-13 |
| | Make changes and replacements from the Site Visit recommendations. | February-14 | |
| | Analyze and test Wyse Terminal response time back to the MDHS Network. | February-14 | |
| | Analyze response time as well as communication line speed thru the eHealth reports.  If needed, request increase line speed and make changes to the Router and Switch configurations to improve performance. | February-14 | |
| | Resolve any response time issues and problems. | February-14 | |
| Region II-W Coahoma, West Bolivar, East Bolivar, Sunflower, Humphreys County Offices | Phase 2 (B) - Region II-W Coahoma, West Bolivar, East Bolivar, Sunflower, Humphreys County Offices Communication Improvement Project | January-14 | March-14 |
| | Review and analyze switches, routers, communication lines and configurations.  Recommend changes or replacements to the configurations, equipment and cabling based on the analysis. | August-13 | |
| | Make changes and replacements from the above recommendations. | March-14 | |
| | Analyze and test Wyse Terminal response time back to the MDHS Network. | March-14 | |
| | Analyze response time as well as communication line speed thru the eHealth reports.  If needed, request increase line speed and make changes to the Router and Switch configurations to improve performance. | March-14 | |
| | Resolve any response time issues and problems. | March-14 | |

DHS
351535

# Mississippi Department of Human Services
## Division of Family and Children's Services
## MACWIS Unit
## MACWIS Response Time Improvement Plan Schedule 2013 - 2014

8/23/13 1:43 PM

| Location | Scope of Work | Start Date | Completion Date |
|---|---|---|---|
| Region III-N Issaquena, Sharkey, Yazoo, Holmes, Attala, Madison, Leake, Scott County Offices. Region III-S Warren County Office | Phase 2 (B) - Region III-N Isssaquena, Sharkey, Yazoo, Holmes, Attala, Madison, Leake, Scott County Offices & Region III-S Warren County Office Communication Improvement Project | January-14 | March-14 |
| | Site visit to review and analyze response time, communication configuration and recommend changes or replacements to the configurations, equipment and cabling. | August-13 | August-13 |
| | Make changes and replacements from the Site Visit recommendations. | March-14 | |
| | Analyze and test Wyse Terminal response time back to the MDHS Network. | March-14 | |
| | Analyze response time as well as communication line speed thru the eHealth reports.  If needed, request increase line speed and make changes to the Router and Switch configurations to improve performance. | March-14 | |
| | Resolve any response time issues and problems. | March-14 | |
| Region IV-N Webster, Clay, Choctaw, Oktibbeha, Lowndes, Winston, Noxubee, Neshoba, Kemper County Offices | Phase 2 (C) - Region III-N Isssaquena, Sharkey, Yazoo, Holmes, Attala, Madison, Leake, ScottCounty Offices Communication Improvement Project | April-14 | June-14 |
| | Review and analyze switches, routers, communication lines and configurations.  Recommend changes or replacements to the configurations, equipment and cabling based on the analysis. | August-13 | |
| | Make changes and replacements from the above recommendations. | April-14 | |
| | Analyze and test Wyse Terminal response time back to the MDHS Network. | April-14 | |
| | Analyze response time as well as communication line speed thru the eHealth reports.  If needed, request increase line speed and make changes to the Router and Switch configurations to improve performance. | April-14 | |
| | Resolve any response time issues and problems. | April-14 | |
| Region IV-S Newton, Lauderdale, Jasper, Clarke, Jones, Wayne County Offices | Phase 2 (C) - Region IV-S Newton, Lauderdale, Jasper, Clarke, Jones, Wayne County Offices Communication Improvement Project | April-14 | June-14 |

# Mississippi Department of Human Services
# Division of Family and Children's Services
# MACWIS Unit
# MACWIS Response Time Improvement Plan Schedule 2013 - 2014

8/23/13 1:43 PM

| Location | Scope of Work | Start Date | Completion Date |
|---|---|---|---|
| | Review and analyze switches, routers, communication lines and configurations.  Recommend changes or replacements to the configurations, equipment and cabling based on the analysis. | August-13 | |
| | | | |
| | Make changes and replacements from the above recommendations. | May-14 | |
| | Analyze and test Wyse Terminal response time back to the MDHS Network. | May-14 | |
| | Analyze response time as well as communication line speed thru the eHealth reports.  If needed, request increase line speed and make changes to the Router and Switch configurations to improve performance. | May-14 | |
| | Resolve any response time issues and problems. | May-14 | |
| Region V-W Claiborne, Jefferson, Adams, Franklin, Wilkinson, Amite, Pike, Walthall County Offices | Phase 2 (C) - Region V-W Claiborne, Jefferson, Adams, Franklin, Wilkinson, Amite, Pike, Walthall County Offices Communication Improvement Project | April-14 | June-14 |
| | Review and analyze switches, routers, communication lines and configurations.  Recommend changes or replacements to the configurations, equipment and cabling based on the analysis. | August-13 | |
| | | | |
| | Make changes and replacements from the above recommendations. | May-14 | |
| | Analyze and test Wyse Terminal response time back to the MDHS Network. | May-14 | |
| | Analyze response time as well as communication line speed thru the eHealth reports.  If needed, request increase line speed and make changes to the Router and Switch configurations to improve performance. | May-14 | |
| | Resolve any response time issues and problems. | May-14 | |
| Region V-E Copiah, Simpson, Smith, Lincoln, Lawrence, Jefferson Davis, Covington County Offices | Phase 2 (C) - Region V-E Copiah, Simpson, Smith, Lincoln, Lawrence, Jefferson Davis, Covington  County Offices Communication Improvement Project | May-14 | June-14 |
| | Review and analyze switches, routers, communication lines and configurations.  Recommend changes or replacements to the configurations, equipment and cabling based on the analysis. | August-13 | |
| | | | |
| | Make changes and replacements from the above recommendations. | June-14 | |

DHS
351537

# Mississippi Department of Human Services
# Division of Family and Children's Services
# MACWIS Unit
# MACWIS Response Time Improvement Plan Schedule 2013 - 2014

8/23/13 1:43 PM

| Location | Scope of Work | Start Date | Completion Date |
|---|---|---|---|
| | Analyze and test Wyse Terminal response time back to the MDHS Network. | June-14 | |
| | Analyze response time as well as communication line speed thru the eHealth reports. If needed, request increase line speed and make changes to the Router and Switch configurations to improve performance. | June-14 | |
| | Resolve any response time issues and problems. | June-14 | |
| Region VI Marion, Lamar, Perry, Pearl River, Stone County Offices.        Region VII-E Greene, George County Offices | Phase 2 (C) - Region VI Marion, Lamar, Perry, Pearl River, Stone County Offices.        Region VII-E Greene, George County Offices County Offices Communication Improvement Project | April-14 | June-14 |
| | Review and analyze switches, routers, communication lines and configurations. Recommend changes or replacements to the configurations, equipment and cabling based on the analysis. | August-13 | |
| | | | |
| | Make changes and replacements from the above recommendations. | June-14 | |
| | Analyze and test Wyse Terminal response time back to the MDHS Network. | June-14 | |
| | Analyze response time as well as communication line speed thru the eHealth reports. If needed, request increase line speed and make changes to the Router and Switch configurations to improve performance. | June-14 | |
| | Resolve any response time issues and problems. | June-14 | |

DHS
351538

# Attachment Two

DHS
351539

**Mississippi Department of Human Services**
**Division of Family and Children Services**
**MACWIS Network and Hardware Preventative Maintenance Plan (PMP)**

August 21, 2013

I.    **INTRODUCTION**

Below is the Preventative Maintenance Plan (PMP) in place for the Mississippi Department of Human Services (MDHS) and Department of Information Technology Services (ITS) for support of the MACWIS System and for the Division of Family and Children Services (DFCS) End Users.

The PMP is designed to improve the reliability of the network and hardware used to support the MACWIS System and DFCS End Users. The PMP is designed to minimize unscheduled outages and downtime for the End Users.

II.   **PREVENTATIVE MAINTENANCE PLAN COMPONENTS**

1- **General Data Center Cleaning Activities**

MDHS and ITS staff routinely monitor Data Center cleanliness and operations to ensure all systems are adequately cleaned and supported to ensure proper operations. MDHS maintains a Data Center that houses the Citrix Server Farm, SAN and other servers. The Data Center is cooled by two Liebert cooling systems that work in tandem and are under a maintenance contract by Service Experts of Jackson. Service Expert technicians arrive onsite quarterly and perform AC filter replacements and check for problems. They also perform annual maintenance. MIS operations personnel work daily in the Data Center and promptly report any warning lights or warning signals to the Operations Manager. Servers are air cleaned on a regular basis.

In the ITS Data Center, facility personnel change the AC filters every three months. ITS uses a robotic vacuum cleaner that cleans the floor every day. The Data Center is sealed with no doors open to the outside. All foot traffic is restricted and tightly controlled. The floors are dust mopped regularly using an antistatic dust attractant. The floors are damp mopped once a quarter.

DHS
351540

2- **Maintenance Procedures for Servers**

ITS shared servers are monitored by Computer Associates (CA) Spectrum-Health for hardware and software issues which are reported up for resolution. All ITS server software is maintained at current support levels and patched maintenance levels. Since the ITS server clusters run on a virtual environment, Vmotion allows for "Live" migration of any failed virtual machine over to another host server. Servers located at MDHS are monitored by VMWare VSphere 5.1 which MIS staff monitor on a daily basis. Issues such as abnormal CPU load, low memory and low hard drive space are checked. Citrix servers that host the MACIW application are monitored daily by MIS staff utilizing Citrix Delivery Services console. Citrix servers are re-booted on a staggered weekly schedule to free memory and ensure optimum performance.

MDHS has a project underway to migrate all of the MACWIS serversto the ITS Data Center. Once this project is completed, all MACWIS servers will reside at the ITS Data Center and there will no longer be any MACWIS Servers at the MDHS Data Center.

3- **Maintenance Procedures for Network**

MDHS utilizes the CA eHealth and Spectrum systems to monitor network components to ensure all systems are fully functional and to identify issues that may need attention. MDHS and ITS maintain Cisco SmartNet maintenance coverage on all ITS core Network infrastructure. AT&T provides 8x5xNBD maintenance coverage on MDHS remote site routers. ITS utilizes various tools including Computer Associates Spectrum, Computer Associates eHealth and Infoblox NetMRI for 24/7 proactive monitoring of all core network infrastructure for root cause analysis, service level management, fault detection, performance management, capacity planning and configuration management. Standard IOS upgrades are monitored at the core network but are not applied unless specific issues arise that warrant an upgrade. In addition, ITS actively monitors all released patches, including security patches, and those are applied when deemed necessary. ITS contracts with an external entity to perform annual security assessments/penetration testing and monthly vulnerability scans. ITS also is actively involved with external entities including the National Association of State Technology Directors (NASTD) and Multi-State Information Sharing and Analysis Center (MS-ISAC)

DHS
351541

for the sharing of information and ideas pertaining to Network infrastructure management.

4- **Maintenance Procedures for Generators**

MDHS and ITS Data Center generators have an automated Weekly Test Run to ensure operations of batteries and fuel. To fulfill the requirement for a full load test each year, ITS keeps a record of utility power failures that cause the ITS Data Center to run totally on uninterruptable power supply (UPS) and generators. If twelve months pass without an outage, a full load test will be scheduled to certify that all systems can carry the load.

5- **Maintenance Procedures for UPS**

MDHS staff monitor UPS on a daily basis to ensure all units are operational. Any exceptions are reported to the MIS Hardware Group for timely resolution. The MDHS Data Center is protected by a Liebert UPS system with batteries that are load tested monthly for proper operation and replaced on a three year cycle. Additionally, each server rack is powered by APC UPS systems that are checked on a regular basis. ITS performs preventative maintenance on all UPS units and batteries annually.

6- **Maintenance Procedures for Workstations Including OS, Software & Anti-Virus**

MDHS utilizes Symantec Anti-Virus to protect all personal computers, Wyse terminals and servers. MDHS uses Wyse Device Manager (WDM) to push windows updates to Wyse terminals. MDHS uses Dell KACW to push windows updates to personal computers.

7- **Monthly Defragmentation of Server Hard Drives**

The storage platform for the MACWIS server platform is provided on a Storage Area Network (SAN) that does not require periodic defragmenting. The storage platform for the MACWIS Mainframe platform is Direct Access Storage Device (DASD) that does not require periodic defragmenting.

8- **Review of System Event Logs**

MACWIS system events are logged in the FrontRange Heat system by the MACWIS Help Desk Group for review, follow up and corrective action. System issues that are logged are analyzed and resolved by the MACWIS Programming Group in MIS.

DHS
351542

**9- Review of Application Event Logs**

DFCS has a full time Help Desk Group that monitors the MACWIS application and logs issues in the Heat Help Desk system. The MACWIS Help Desk works in partnership with the MACWIS Programming Group, the Network Group and the Hardware Group in MIS to identify and resolve issues affecting the MACWIS application.

**10- Review of Security Event Logs**

ITS utilizes Intrusion Prevention and Malware scanning to identify and malicious network traffic or virus infections impacting MDHS systems. MDHS takes immediate action to identify and resolve issues affecting any hardware or systems within the agency.

**11- Review of Anti-Virus Event Logs**

ITS scans all MDHS outgoing traffic for malware. If there are any malware issues detected, ITS reports those to MDHS so that action can be taken to identify and resolve the issue. Anti-Virus event logs are monitored to identify and resolve any issues reported.

**12- Review of Server Event Logs**

Server Event Logs are monitored periodically to identify and troubleshoot operational and application issues. Event IDs are researched online and used in conjunction with support from Microsoft, Citrix, ITS and outside vendors to identify and resolve issues in the production environment.

**13- Review of Hardware and Network Health using Automated Tools such as CA Spectrum VM V Center or Equivalent**

ITS Command Center has 24x7x365 monitoring of ITS hardware, the Wide Area Network (WAN) and the VMWare server environment. ITS provides intrusion prevention and malware monitoring tools that provide protection for the MDHS network. MDHS and ITS partner in the support of the MACWIS system using the ITS CA Help Desk and CA Spectrum monitoring tool.

**14- Assurance of Preventative Maintenance Clauses in Outsource Service Contracts for Hardware and Network Components**

MDHS maintains a service contract with Business Communications Incorporated (BCI) for support of some hardware and network equipment. The vendor is responsible for preventative maintenance for supported equipment. The MACWIS servers located at the MDHS State Office are covered by preventative maintenance by BCI.

DHS
351543

**15- <u>Data Backup Policy</u>**

A weekly full backup of the MACWIS application is done every Saturday.  A nightly incremental backup is done before and after the nightly batch reporting cycles are run.   ITS provides a weekly disaster recovery backup of all volumes on the Mainframe at ITS.

**16- <u>Disaster Recovery Policy</u>**

ITS backs up systems on site for operational recovery.  A weekly disc volume backup is stored offsite.  Tape media is supplemented by agency generated backups based on business cycles.

**17- <u>Disaster Recovery Exercise</u>**

ITS maintains a contract with IBM Business Continuity and Recovery Services for Warm Site/Hot Site hardware to be available to support the critical systems stored in the ITS Data Center.  The contract provides for an annual disaster recovery exercise.  The most current exercise was executed in January 2013.   The next disaster recovery exercise is scheduled for January 2014.   (Presently funding is not available for six month disaster recovery exercises.)

DHS
351544

# App. B, Ex. 18

## MACWIS DOWN TIME TRACKING
## 2012

DEFINITIONS:
PLANNED DOWNTIME- an event scheduled by MIS, notice to staff given of dates/times/length of expected unavailability. All users affected.
UNPLANNED DOWNTIME-an unscheduled event that affects all users ability to access MACWIS.
UNPLANNED LIMITED ACCESS-an unscheduled even that does not affect all users. Access may be sporadic, response time slow.

| MONTH | Downtime Begin/Reported date/time | Downtime end date/time | Planned Event? | Approximate PLANNED Downtime (in hours) | Approximate UNPLANNED Downtime (in hours) | Approximate UNPLANNED LIMITED ACCESS (in hours) | Reason | Result | MIS Contact person/Responsible Party |
|---|---|---|---|---|---|---|---|---|---|
| FEBRUARY | | | | | | | | | |
| | 02/02/2012 5:00PM | 02/02/2012 10:00PM | Yes | 5 | | | Core Switch Migration | MACWIS and all desktop applications unavailable. All MIS-hosted websites also unavailable during this time - including DFCS Connection (http://dfcsmacweb/DFCSWEB/), Centralized Intake (www.msabusehotline.mdhs.ms.gov), MACWIS portal system (DFCSWEB and DFCSMACWEB). | |
| | 02/16/2012 approximately 7:00AM | 02/16/2012 9:00AM | No | | 2 | | Servers had to be rebooted | All staff received "service not registered" message when trying to access MACWIS | |
| | 2/26/2012 1:00:00PM | 02/26/2012 10:00PM | Yes | 9 | | | Core Switch Migration | MACWIS and all desktop applications unavailable. All MIS-hosted websites also unavailable during this time - including DFCS Connection (http://dfcsmacweb/DFCSWEB/), Centralized Intake (www.msabusehotline.mdhs.ms.gov), MACWIS portal system (DFCSWEB and DFCSMACWEB). | |
| | 02/29/2012 2:00PM | 03/01/2012 10:00AM | No | | 20 | | Network issues | MACWIS and all desktop applications unavailable. | |
| | FEBRUARY TOTAL DOWN TIME | | | 14 | 22 | 0 | | | |
| MARCH | | | | | | | | | |
| | 03/05/2012 7:00AM | 03/05/2012 8:45AM | No | | 1.75 | | Servers had to be rebooted | Workers received "service not registered" message when trying to access MACWIS | Desmond F. |
| | 03/11/2012 5:00PM | 03/11/2012 9:00PM | Yes | 4 | | | "IPL" issues on Mainframe | MACWIS and all desktop applications unavailable. | |
| | 03/14/2012 7:00AM | 03/14/2012 9:00AM | No | | | 2 | Servers 17/18 down | Limited access to MACWIS | Bill Suthoff/Larry Allen |
| | 03/27/2012 7:00AM | 3/27/2012 10:00:00AM | No | | | 3 | Server 3 (SSL server) down | access to MACWIS unavailable for SO staff, and those who access MACWIS via the web portal (those using laptops, remote access) | Bill Suthoff/Larry Allen |
| | 3/27/2012 1:00:00PM | 03/28/2012 11:00AM | NO | | | 22 | Server 3 (SSL server) down | access to MACWIS unavailable for SO staff, and those who access MACWIS via the web portal (those using laptops, remote access) | Bill Suthoff/Larry Allen |
| | MARCH DOWN TIME | | | 4 | 1.75 | 27 | | | |
| APRIL | | | | | | | | | |
| | 4/9/2012 7:00 | 4/9/2012 8:30AM | NO | | | 1.5 | various, workers receiving "roaming profile" message, server 10 down and rebooted. | sporadic access | Bill Suthoff/Larry Allen |

## MACWIS DOWN TIME TRACKING
## 2012

DEFINITIONS:
PLANNED DOWNTIME- an event scheduled by MIS, notice to staff given of dates/times/length of expected unavailability. All users affected.
UNPLANNED DOWNTIME-an unscheduled event that affects all users ability to access MACWIS.
UNPLANNED LIMITED ACCESS-an unscheduled even that does not affect all users. Access may be sporadic, response time slow.

| MONTH | Downtime Begin/Reported date/time | Downtime end date/time | Planned Event? | Approximate PLANNED Downtime (in hours) | Approximate UNPLANNED Downtime (in hours) | Approximate UNPLANNED LIMITED ACCESS (in hours) | Reason | Result | MIS Contact person/Responsible Party |
|---|---|---|---|---|---|---|---|---|---|
| | 4/9/2012 7:00am | 4/9/2012 1:30pm | NO | | | 6.5 | Server 20 (helpdesk database housed) is down and requires a new driver | this should only affect state office staff with access to helpdesk database-mainly MACWIS unit staff | Bill Suthoff/Larry Allen |
| | 4/10/2012 7:00am | 4/10/2012 12:45pm | no | | | 5.75 | MACWIS Test server crashed and incorrect version of database was loaded. Database had to be reloaded with current version of MACWIS | Only MACWIS UNIT staff affected. MACWIS Staff unable to access test database to analyze staff issues. | Bill Suthoff/Larry Allen |
| | 04/12/2012 8:30am | 4/12/2012 4:30:00PM | no | | | 8 | Seven servers down. Users being disconnected from MACWIS. Error messages received stating "citrix Presentation Server Connection Interrupted, Attempting to reconnect…" | sporadic access, MACWIS very slow, locking up. As of 11:00, four servers were back up, three were still down. As of 4:30 pm one server (server #7) was still down. Access and response time was slow, but staff were able to access MACWIS | Bill Suthoff/Larry Allen |
| | 4/24/2012 6:30am | 4/24/2012 10:00:00AM | no | | | 3.5 | five servers down. Application stalls at "loading personal settings". MIS states that some of the components for the test environment are missing, they are unsure how this happened but plan on reloading a backed-up version to the server which should resolve the problem regarding access to the test environment. | appears to be affecting SO staff mainly. Received a few calls from county staff around 9:00 AM and throughout the day, but most field staff have been able to get in. | Bill Suthoff/Larry Allen |
| | 4/24/2012 6:30am | 05/01/2012 3:45pm | no | | | 27 | Server 20 (helpdesk database housed) is down | MACWIS Staff unable to access the TEST environment, which prevents HD staff from being able to work out some heat ticket/user issues, the analysts can't validate reports, and are limited as to what can be done regarding writing requirements for reports and FRDs as access to the test environment is what allows MACWIS staff to navigate the system as a workers/ASWS/RD. MACWIS staff affected only, hours shown for access issue are number of normal business hours for Thursday, Friday and Tuesday (Monday was a holiday) | Bill Suthoff/Larry Allen |

## MACWIS DOWN TIME TRACKING
## 2012

DEFINITIONS:
PLANNED DOWNTIME- an event scheduled by MIS, notice to staff given of dates/times/length of expected unavailability. All users affected.
UNPLANNED DOWNTIME-an unscheduled event that affects all users ability to access MACWIS.
UNPLANNED LIMITED ACCESS-an unscheduled even that does not affect all users. Access may be sporadic, response time slow.

| MONTH | Downtime Begin/Reported date/time | Downtime end date/time | Planned Event? | Approximate PLANNED Downtime (in hours) | Approximate UNPLANNED Downtime (in hours) | Approximate UNPLANNED LIMITED ACCESS (in hours) | Reason | Result | MIS Contact person/Responsible Party |
|---|---|---|---|---|---|---|---|---|---|
| | APRIL DOWN TIME (as of 5/01/2012) | | | 0 | 0 | 52.25 | | | |
| MAY | | | | | | | | | |
| | 5/7/2012 | | no | | | | | | |
| | 05/10/2012 7:00am | 05/10/2012 8:30am | no | | | 1.5 | Servers 2, 16 and 20 needed to be rebooted | Helpdesk staff had difficulty accessing Production or the helpdesk database. No calls were received from the field. Server 20 was up at 8:00, remaining servers by 8:30. | Bill Suthoff, Larry Allen |
| | 5/29/2012 7:00:00AM | 05/29/2012 8:30am | no | | | 1.5 | servers 18, 21 and JCSMFS10 had to be rebooted | Affected Help Desk and South East portion of the state | Bill Suthoff, Larry Allen |
| | 05/31/2012 6:00am | 5/31/2012 10:00 | no | | | 4.5 | four servers down | slow response time across the state. Two servers restored by 8:30, a third by 9:30, all were up by 10am | Bill Suthoff, Larry Allen |
| | MAY DOWNTIME (as of 05/31/2012) | | | 0 | 0 | 7.5 | | | |
| JUNE | | | | | | | | | |
| | 06/05/2012 11:45am | 06/05/12 12:10pm | no | | | 0.5 | power outage in Sunflower county, when power came back staff unable to access MACWIS | Ruleville office in Sunflower county unable to access MACWIS. | |
| | 6/5/2012 2:45:00PM | 06/15/2012 3:00pm | no | | | 0.25 | server 10 had to be rebooted | no calls received regarding issues, MIS noted it was starting to have problems and rebooted server before it went down | Bill Suthoff, Larry Allen |
| | 06/06/2012 8:00am | 06/06/2012 9:00am | no | | | 1 | server 17 and 2 down, had to be rebooted | no calls received regarding issues, MIS notified MACWIS help desk that the servers were down. | Bill Suthoff, Larry Allen |
| | 06/07/2012 7:00am | 06/07/2012 7:45am | no | | | 0.75 | seven servers down, had to be rebooted | MIS notified MACWIS that seven servers were down, at the time there was only 25 people logged into MACWIS. All servers rebooted, no calls regarding not being able to access MACWIS were received by help desk. | Bill Suthoff, Larry Allen |
| | 6/27/2012 8:00 | 06/27/2012 8:00pm | no | | | 12 | end of month and end of fiscal year processes running, 897 users trying to access system as well | slow response time, error messages | |
| | JUNE DOWNTIME | | | 0 | 0 | 14.5 | | | |
| JULY | | | | | | | | | |
| | | | | | | | | | |
| | 7/2/2012 8:00:00AM | 7/2/2012 11:30am | no | | | 3.5 | Server issues | The system has been up and down this morning. By 8:15, Lawrence, E. Bolivar and Clark all called with "can't copy profile" messages.  the directory server had to be brought down. Since, still getting profile error and SPHARS calls. Also had to take down 20. | Bill Suthoff, Larry Allen |

## MACWIS DOWN TIME TRACKING
## 2012

DEFINITIONS:
PLANNED DOWNTIME- an event scheduled by MIS, notice to staff given of dates/times/length of expected unavailability. All users affected.
UNPLANNED DOWNTIME-an unscheduled event that affects all users ability to access MACWIS.
UNPLANNED LIMITED ACCESS-an unscheduled even that does not affect all users. Access may be sporadic, response time slow.

| MONTH | Downtime Begin/Reported date/time | Downtime end date/time | Planned Event? | Approximate PLANNED Downtime (in hours) | Approximate UNPLANNED Downtime (in hours) | Approximate UNPLANNED LIMITED ACCESS (in hours) | Reason | Result | MIS Contact person/Responsible Party |
|---|---|---|---|---|---|---|---|---|---|
| | 7/30/12 8:00am | 7/30/12 9AM | no | | | 1 | Profile server had to be rebooted | Slow response time, staff receiving profile errors | Bill Suthoff, Larry Allen |
| | JULY DOWNTIME | | | 0 | 0 | 4.5 | | | |

## MACWIS DOWN TIME TRACKING
## 2012

DEFINITIONS:
PLANNED DOWNTIME- an event scheduled by MIS, notice to staff given of dates/times/length of expected unavailability. All users affected.
UNPLANNED DOWNTIME-an unscheduled event that affects all users ability to access MACWIS.
UNPLANNED LIMITED ACCESS-an unscheduled even that does not affect all users. Access may be sporadic, response time slow.

| MONTH | Downtime Begin/Reported date/time | Downtime end date/time | Planned Event? | Approximate PLANNED Downtime (in hours) | Approximate UNPLANNED Downtime (in hours) | Approximate UNPLANNED LIMITED ACCESS (in hours) | Reason | Result | MIS Contact person/Responsible Party |
|---|---|---|---|---|---|---|---|---|---|
| AUGUST | | | | | | | | | |
| | 08/01/2012 10:00am | 08/01/2012 10:30am | no | | | 0.5 | server issues, server had to be rebooted | Slow response time, staff receiving profile errors | Bill Suthoff, Larry Allen |
| | 08/07/2012 1:00pm | 08/07/12 1:30pm | no | | | 0.5 | server 5 had to be rebooted | Slow response time, staff receiving profile errors | Bill Suthoff, Larry Allen |
| | 8/9/2012 7:00 | 8/9/12 8:45am | No | | | 1.5 | Profile server had to be rebooted | Slow response time, staff receiving profile errors | Bill Suthoff, Larry Allen |
| | 8/10/12 3:30pm | 8/10/12 5:00pm | no | | | 1.5 | servers 7 and 9 had to be cleaned and rebooted | Slow response time, staff receiving profile errors | Bill Suthoff, Larry Allen |
| | 8/14/12 7:00am | 8/16/12 12:00pm | no | | | 52 | The MACWIS SQL Database cluster failed, License Server issues. Servers cleaned for optimized use, as of morning of the 15th still had users unable to access MACWIS, Venture called in for on-site support. | unable to access MACWIS production for some users, slow response time for others. | Bill Suthoff, Larry Allen |
| | 08/22/12 2:00pm | 8/22/12 4:00pm | no | | | 2 | Profile server had to be rebooted | Slow response time, staff receiving profile errors | Bill Suthoff, Larry Allen |
| | 8/24/2012 8:00am | 8/24/12 8:30am | no | | | 0.5 | Servers 1, 2, 6 and 12 were unreachable after weekly reboot. Rebooted all and they came back up in a reachable state.  30 minutes to get all back up. | Slow response time for staff attempting to connect or connected to servers listed, staff receiving profile errors | Bill Suthoff, Larry Allen |
| | 8/24/12 9:45pm | 8/24/12 10:05pm | no | | | 0.25 | in an effort to stabilize server issues uninstalled and reinstalled the RDAC Multipath Driver on JCMSFS10.  It required 2 reboots after both the uninstall and reinstall. | Slow response time for staff attempting to connect or connected to servers listed, staff receiving profile errors | Bill Suthoff, Larry Allen |
| | 8/31/12 6:45am | 8/31/2012 7:55am | no | | | 1.2 | servers down after weekly reboot. | Slow response time for staff attempting to connect or connected to servers listed. Servers 2,3,8,10,11 had to be rebooted. | Bill Suthoff, Larry Allen |
| | 8/31/2012 5:30pm | 8/31/2012 8:30pm | no | | | 2.25 | Server Maintenance, Server 13 | Slow response time for staff attempting to connect or connected to servers listed. Profile and Registry Cleaned | Bill Suthoff, Larry Allen |
| | AUGUST DOWNTIME | | | 0 | 0 | 62.2 | | | |

## MACWIS DOWN TIME TRACKING
## 2012

DEFINITIONS:
PLANNED DOWNTIME- an event scheduled by MIS, notice to staff given of dates/times/length of expected unavailability. All users affected.
UNPLANNED DOWNTIME-an unscheduled event that affects all users ability to access MACWIS.
UNPLANNED LIMITED ACCESS-an unscheduled even that does not affect all users. Access may be sporadic, response time slow.

| MONTH | Downtime Begin/Reported date/time | Downtime end date/time | Planned Event? | Approximate PLANNED Downtime (in hours) | Approximate UNPLANNED Downtime (in hours) | Approximate UNPLANNED LIMITED ACCESS (in hours) | Reason | Result | MIS Contact person/Responsible Party |
|---|---|---|---|---|---|---|---|---|---|
| SEPTEMBER | | | | | | | | | |
| NOTE: AS OF SEPT 2012 WEEKLY SUMMARY INFO PROVIDED BY MIS TO MACWIS RE: SERVER ISSUES AND DOWNTIME. | 9/1/2012 8:30am | 9/1/2012 10:00am | no | | | 1.5 | Server Maintenance Servers 5,7,9,11,12,14,15 | Slow response time for staff attempting to connect or connected to servers listed, error messages | Bill Suthoff, Larry Allen |
| PRIOR TO SEPT 2012 ONLY ISSUES REPORTED TO HELPDESK WERE DOCUMENTED IN SPREADSHEET | 9/1/2012 10:25am | 9/1/2012 1:15pm | no | | | 2.8 | Server Reboot required, server 17 | Slow response time for staff attempting to connect or connected to server listed | Bill Suthoff, Larry Allen |
| | 9/2/2012 3:25pm | 9/2/2012 4:25pm | no | | | 1 | Server down after weekly reboot, multiple reboot attempts, server 14 | Slow response time for staff attempting to connect or connected to server listed | Bill Suthoff, Larry Allen |
| | 9/4/2012 7:00am | 9/4/2012 7:15am | no | | | 0.25 | Server reboot required, due to Machine Checks, server 6 | staff attempting to connect to that server would receive errors and slow response time | Bill Suthoff, Larry Allen |
| | 9/4/2012 8:30am | 9/4/2012 12:30pm | no | | | 4 | Server Maintenance Server 18, Profile and registry cleaned | staff attempting to connect to that server would receive errors and slow response time. | Bill Suthoff, Larry Allen |
| | 9/7/2012 7:15am | 9/7/2012 11:45am | no | | | 4.5 | Servers down after weekly reboot, servers 12, 2, 5, 11, 6, 7. Possible bad drive, Server Maintenance. Reboots required, Disk check ran and rebooted, profiles and registry cleaned | Slow response time for staff attempting to connect or connected to servers listed, error messages | Bill Suthoff, Larry Allen |
| | 9/8/2012 4:35pm | 9/8/2012 9:10pm | no | | | 4.6 | Server Maintenance, servers 2, 8, 11, 17,19. Profiles and registry cleaned, servers rebooted | Slow response time for staff attempting to connect or connected to servers listed, error messages | Bill Suthoff, Larry Allen |
| | 9/9/12 1:30pm | 9/9/12 1:45p | no | | | 0.25 | Server Maintenance, Server 19 rebooted | slow response time for staff attempting to connect or connected to server listed | Bill Suthoff, Larry Allen |
| | 9/10/12 7:30am | 9/10/12 9 8:30am | no | | | 1 | unable to login to servers 20 10 15 | staff attempting to connect to server unable to log in | Bill Suthoff, Larry Allen |
| | 9/10/12 8:00pm | 9/10/12 10:00pm | no | | | 2 | Servers logging users off network. Servers 6 7 12 13. logical disk timing error | Staff connected to server logged off network. | Bill Suthoff, Larry Allen |

## MACWIS DOWN TIME TRACKING
## 2012

DEFINITIONS:
PLANNED DOWNTIME- an event scheduled by MIS, notice to staff given of dates/times/length of expected unavailability. All users affected.
UNPLANNED DOWNTIME-an unscheduled event that affects all users ability to access MACWIS.
UNPLANNED LIMITED ACCESS-an unscheduled even that does not affect all users. Access may be sporadic, response time slow.

| MONTH | Downtime Begin/Reported date/time | Downtime end date/time | Planned Event? | Approximate PLANNED Downtime (in hours) | Approximate UNPLANNED Downtime (in hours) | Approximate UNPLANNED LIMITED ACCESS (in hours) | Reason | Result | MIS Contact person/Responsible Party |
|---|---|---|---|---|---|---|---|---|---|
| | 9/11/12 6:30am | 9/10/12 12:00pm | no | | | 5.50 | Servers logging users off network. Servers 12 15 18 0 21 4 6. logical disk timing error | Staff connected to server logged off network. | Bill Suthoff, Larry Allen |
| | 9/12/12 9:30am | 9/12/12 12:30pm | no | | | 3 | Hard drive issues (Ghosting), server 6. Logical Disk Timing error | Slow response time for staff attempting to connect or connected to servers listed, error messages | Bill Suthoff, Larry Allen |
| | 9/12/12 4:30pm | 9/12/12 5:00pm | no | | | 0.5 | hard drive issues (rebuilding), server 6. Logical Disk Timing error | Slow response time for staff attempting to connect or connected to servers listed, error messages | Bill Suthoff, Larry Allen |
| | 9/13/12 6:45am | 9/13/12 5:00pm | no | | | 10.25 | Hard drive Issues (rebuilding), servers logins users off, servers 6 7 9 10 15. logical disk timing error, profile and registry cleaned, logical disk space error (reboot required). | Slow response time for staff attempting to connect or connected to servers listed, error messages | Bill Suthoff, Larry Allen |
| | 9/14/12 6:30am | 9/14/12 1:15pm | no | | | 6.75 | Hard drive issues (rebuilding) Servers down after weekly reboot, servers 1, 5, 6. logical disk timing error, reboot required | Slow response time for staff attempting to connect or connected to servers listed, error messages | Bill Suthoff, Larry Allen |
| | Report not received from MIS for the week of Sept 17-21, Bill Suthoff was out of the office | | | | | | | | |
| | | | | | | | | | |
| | 9/24/2012 6:45am | 9/24/12 7:15am | no | | | 0.5 | Servers down from weekend reboot. Servers 14 15 16 17 23 | Slow response time for staff attempting to connect or connected to servers listed, error messages | Bill Suthoff, Larry Allen |
| | 9/24/12 10:00am | 9:24/12 5:00pm | yes | | | | building new server, server DFCSC24 | No effect on field staff, server not yet in place. | Bill Suthoff, Larry Allen |
| | 9/25/12 7:00am | 9/25/12 5:00pm | yes | | | | building new server, server DFCSC24 | No effect on field staff, server not yet in place. | Bill Suthoff, Larry Allen |
| | 9/25/12 8:00am | 9/25/12 9:00am | no | | | 1 | Server freezing. Server 4 | rebooted server. Slow response time for staff attempting to connect or connected to server listed, error messages | Bill Suthoff, Larry Allen |
| | 9/26/12 7:00am | 9/26/12 8:00am | yes | | | 1 | building new server, server DFCSC24 | build complete. No effect on field staff, server not yet in place. | Bill Suthoff, Larry Allen |
| | 9/27/12 7:00am | 9/27/12 9:15am | no | | | 2.25 | servers down from overnight reboot. Servers 1 2 3 4 5 6 9 10 11 17 21 | rebooted server. Slow response time for staff attempting to connect or connected to servers listed, error messages | Bill Suthoff, Larry Allen |
| | 9/28/12 7:15am | 9/27/12 8:30am | no | | | 1.25 | servers down from overnight reboot. Servers 1 2 3 4 10 | rebooted server. Slow response time for staff attempting to connect or connected to servers listed, error messages | Bill Suthoff, Larry Allen |
| | 09/30/12 1:00pm | 9/30/12 1:30pm | no | | | 0.5 | servers down from overnight reboot. Servers 15 17 22 | servers rebooted, Slow response time for staff attempting to connect or connected to servers listed, error messages | Bill Suthoff, Larry Allen |

## MACWIS DOWN TIME TRACKING
## 2012

DEFINITIONS:
PLANNED DOWNTIME- an event scheduled by MIS, notice to staff given of dates/times/length of expected unavailability. All users affected.
UNPLANNED DOWNTIME-an unscheduled event that affects all users ability to access MACWIS.
UNPLANNED LIMITED ACCESS-an unscheduled even that does not affect all users. Access may be sporadic, response time slow.

| MONTH | Downtime Begin/Reported date/time | Downtime end date/time | Planned Event? | Approximate PLANNED Downtime (in hours) | Approximate UNPLANNED Downtime (in hours) | Approximate UNPLANNED LIMITED ACCESS (in hours) | Reason | Result | MIS Contact person/Responsible Party |
|---|---|---|---|---|---|---|---|---|---|
| | SEPTEMBER DOWNTIME | | | 0 | 0 | 54.4 | | | |
| OCTOBER | | | | | | | | | |
| | 10/1/2012 6:00am | 10/1/12 7:15am | no | | | 1.25 | server down from overnight reboot. Server 22 | server rebooted, Slow response time for staff attempting to connect or connected to server listed, error messages | Bill Suthoff, Larry Allen |
| | 10/3/12 8:30pm | 10/3/12 11:30pm | no | | | 3 | profile and registry cleaning. Servers 5 15 17 | cleaned profiles and registry and rebooted servers. Scheduled for after hours so that minimum number of staff affected. Slow response time for staff attempting to connect or connected to servers listed, error messages | Bill Suthoff, Larry Allen |
| | 10/5/12 7:00am | 10/5/12 4:00PM | no | | | | Server Rebuild, server 24 | New server, not yet online, no staff affected by rebuild | Bill Suthoff, Larry Allen |
| | 10/08/12 9:00AM | 10/08/12 9:30AM | no | | | 0.5 | Servers down from weekend reboot, servers 15 and 20 | server rebooted, Slow response time for staff attempting to connect or connected to server listed, error messages | Bill Suthoff, Larry Allen |
| | 10/8/2012 8:00 | 10/8/2012 5:00PM | no | | | | Server Rebuild, server 24 | New server, not yet online, no staff affected by rebuild | Bill Suthoff, Larry Allen |
| | 10/8/2012 10:00 | 10/8/2012 5:00PM | no | | | 7 | Server Rebuild, server 4 | Server rebuilt. Slow response time for staff attempting to connect or connected to server, error messages | Bill Suthoff, Larry Allen |
| | 10/8/2012 10:00 | 10/8/2012 10:30AM | no | | | 0.5 | server down from weekend reboot. Server 15 | slow response time for staff attempting to connect to server, error messages | Bill Suthoff, Larry Allen |
| | 10/9/12 10:30am | 10/9/12 11:00am | no | | | 0.5 | Server down. Server JCMSFS10 | Users unable to log in, server rebooted | Bill Suthoff, Larry Allen |
| | 10/9/12 7:00am | 10/9/12 5:00pm | no | | | | server rebuild, server 24 | New server, not yet online, no staff affected by rebuild | Bill Suthoff, Larry Allen |
| | 10/10/12 6:30am | 10/10/12 5:00pm | no | | | | server rebuild, server 25 | New server, not yet online, no staff affected by rebuild | Bill Suthoff, Larry Allen |
| | 10/10/12 7:00am | 10/10/12 5:00pm | no | | | 10 | server rebuild, server 4 | slow response time for staff attempting to connect to server, error messages | Bill Suthoff, Larry Allen |
| | 10/10/12 7:30am | 10/10/12 10:45am | no | | | 3.25 | Servers down from overnight reboot, servers 2 3 7 14 17 18 | slow response time for staff attempting to connect to servers, error messages | Bill Suthoff, Larry Allen |
| | 10/11/2012 7:00am | 10/11/12 10:00am | no | | | 3 | Servers down from overnight reboot, servers 2 3 8 10 11 12 | slow response time for staff attempting to connect to servers, error messages | Bill Suthoff, Larry Allen |
| | 10/17/2012 7:00am | 10/17/2012 8:30am | no | | | 1.5 | Servers in an unstable state | rebooted servers 5 12 | Bill Suthoff, Larry Allen |
| | 10/19/2012 7:30am | 10/19/2012 3:30pm | no | | | 8 | Server Space Allocation. VM server lost network card | purge registry and profiles, servers 1 2 5 9 10 17 18. ITS added network card for server 42 | Bill Suthoff, Larry Allen |
| | 10/22/2012 8:20am | 10/22/2012 8:45am | no | | | 0.25 | servers down | rebooted servers | Larry Allen |
| | 10/22/2012 2:00pm | 10/22/2012 3:40pm | no | | | 1.5 | servers down | rebooted servers | Larry Allen |
| | 10/22/2012 3:30pm | 10/22/2012 3:45pm | no | | | 0.25 | servers down | rebooted servers | Larry Allen |
| | 10/22/2012 4:00pm | 10/22/2012 4:15pm | no | | | 0.25 | servers down | rebooted servers | Larry Allen |
| | 10/23/2012 2:00pm | 10/23/2012 4:00pm | no | | | 2 | SAN space low on k drive | Extended space 100 gb | Larry Allen |
| | 10/23/2012 4:30pm | 10/23/2012 5:30pm | no | | | 1 | server down, server 14 | rebooted servers | Larry Allen |
| | 10/23/2012 6:30pm | 10/23/2012 9:30pm | no | | | 3 | servers running slow | cleaned servers | Larry Allen |

## MACWIS DOWN TIME TRACKING
## 2012

DEFINITIONS:
PLANNED DOWNTIME- an event scheduled by MIS, notice to staff given of dates/times/length of expected unavailability. All users affected.
UNPLANNED DOWNTIME-an unscheduled event that affects all users ability to access MACWIS.
UNPLANNED LIMITED ACCESS-an unscheduled even that does not affect all users. Access may be sporadic, response time slow.

| MONTH | Downtime Begin/Reported date/time | Downtime end date/time | Planned Event? | Approximate PLANNED Downtime (in hours) | Approximate UNPLANNED Downtime (in hours) | Approximate UNPLANNED LIMITED ACCESS (in hours) | Reason | Result | MIS Contact person/Responsible Party |
|---|---|---|---|---|---|---|---|---|---|
| | 10/24/12 8:00am | 10/24/12 12:30pm | no | | | 4.5 | server 14 down, server 10 slow, server 1 dll missing | rebooted servers, replaced missing dll | Larry Allen |
| | 10/25/12 7:45am | 10/25/12 8:00am | no | | | 0.25 | no login on server 2 | recreated LHC restart services | Larry Allen |
| | 10/25/12 7:00am | 10/26/12 7:00am | NO | | 24 | | ITS issues with UPS and IBM SAN. | Several State Agencies affected. All MDHS locations affected, MACWIS and several other applications were down | ITS |
| | 10/26/12 7:00am | 10/26/12 12:00pm | NO | | | 5 | servers 3 and 5 down | recreate LHC, restart IMA services, reboot servers | unsure if issue was  MIS or ITS |
| | 10/26/12 11:45am | 10/26/12 12:00pm | NO | | | 0.25 | dfcsweb,dfcsccsg unavailable log file full on CSG gateway server | rebooted | Larry Allen |
| | 10/27/12 8:00am | 10/27/2012 12:00pm | NO | | 4 | | unknown | MACWIS DOWN, bounced brokers | Larry Allen |
| | 10/28/12 3:00pm | 10/28/12 4:00pm | NO | | 1 | | unknown | MACWIS DOWN, bounced brokers | Larry Allen |
| | 10/29/2012 9:00am | 10/29/12 5:00pm | no | | | 8 | Web Server not communicating with server farm, GW server not communicating with server farm | XML services for STA not working was restarted, server 20 & SG server | Bill Suthoff |
| | 10/30/12 9:00am | 10/30/12 5:00pm | no | | | 8 | Windows Search - IE 8 Problems | Stopped and Disabled Windows Search. Servers 1 2 3 4 5 6 | Bill Suthoff |
| | 10/31/12 9:00am | 10/31/12 5:00pm | no | | | 8 | Windows Search - IE 8 Problems | Stopped and Disabled Windows Search. Servers 7 8 9 10 11 12 13 | Bill Suthoff |
| NOVEMBER | OCTOBER downtime | | | 0 | 29 | 80.75 | | | |
| | 11/1/12 9:00am | 11/1/12 5:00pm | no | | | 8 | Windows Search - IE 8 Problems | Stopped and Disabled Windows Search. Servers 14 15 16 17 18 19 20 | Bill Suthoff |
| | 11/2/2012 9:00am | 11/2/12 5:00pm | no | | | 8 | Windows Search - IE 8 Problems | Stopped and Disabled Windows Search. Servers 9 12 | Bill Suthoff |
| | 11/2/2012 9:00am | 11/2/12 10:30am | no | | | 1.5 | Server not allowing login | Restart IMA, SMA & WMI Services & Reboot. Servers 4 5 9 12 | Bill Suthoff |
| | 11/2/2012 9:30am | 11/2/12 9:45am | NO | | | 0.25 | Server Network interface disabled | Reenabled NIC. Server 9 | Bill Suthoff |
| | 11/5/2012 7:00am | 11/5/12 7:45am | NO | | | 0.25 | Server down from weekend boot | Restart IMA, SMA & WMI Services & Reboot. Server 20 | Bill Suthoff |
| | 11/5/12 8:00am | 11/5/12 12:00pm | NO | | | 2 | server issues | users unable to log in. Cleaned registry and profiles. Server 17 | Bill Suthoff |
| | 11/5/12 11:00am | 11/5/12 2:00pm | NO | | | 2 | server issues | users unable to log in. Cleaned registry and profiles. Server 7 | Bill Suthoff |
| | 11/6/12 6:30am | 11/6/12 6:45am | NO | | | 0.25 | hardware malfunction | shutdown server and restarted | Bill Suthoff |
| | 11/8/12 9:00am | 11/8/12 10:30am | NO | | | 1.5 | server issues | users unable to log in. Cleaned registry and profiles. Server 7 | Bill Suthoff |
| | 11/9/2012 7:00am | 11/9/12 7:15am | NO | | | 0.25 | servers down from overnight reboot | users unable to log in. rebooted servers 4 9 11 | Bill Suthoff |
| | 11/12/12 9:00am | 11/12/2012 9:45 | NO | | | 0.45 | servers down from weekend boot | rebooted servers 13 18 22, slow response time for staff attempting to connect to servers, error messages | Bill Suthoff |

## MACWIS DOWN TIME TRACKING
## 2012

DEFINITIONS:
PLANNED DOWNTIME- an event scheduled by MIS, notice to staff given of dates/times/length of expected unavailability. All users affected.
UNPLANNED DOWNTIME-an unscheduled event that affects all users ability to access MACWIS.
UNPLANNED LIMITED ACCESS-an unscheduled even that does not affect all users. Access may be sporadic, response time slow.

| MONTH | Downtime Begin/Reported date/time | Downtime end date/time | Planned Event? | Approximate PLANNED Downtime (in hours) | Approximate UNPLANNED Downtime (in hours) | Approximate UNPLANNED LIMITED ACCESS (in hours) | Reason | Result | MIS Contact person/Responsible Party |
|---|---|---|---|---|---|---|---|---|---|
| | 11/14/12 9:00am | 11/14/12 12:00pm | no | | | 3 | Server Space Issues | Cleaned profiles, server 11, slow response time for staff attempting to connect to server, error messages | Bill Suthoff |
| | 11/15/12 7:15am | 11/15/12 1:00pm | NO | | | 4.25 | Server Space Issues | Cleaned registry and profiles, servers 5 12. slow response time for staff attempting to connect to servers, error messages | Bill Suthoff |
| | 11/15/12 2:00pm | 11/15/12 5:00pm | NO | | | 3 | URL issues | disconnected users from server and rebooted server 15, slow response time for staff attempting to connect to server | Bill Suthoff |
| | 11/16/12 7:30am | 11/1612 9:30am | NO | | | 2 | servers down from overnight reboot | rebooted servers 1 2 4 7, slow response time for staff attempting to connect to servers, error messages | Bill Suthoff |
| | 11/19/12 7:30am | 11/19/12 3:30pm | NO | | | 8 | Citrix servers low on disk space | deleted profiles. slow response time for staff attempting to connect to servers, error | Larry Allen |
| | 11/20/12 7:30pm | 11/20/12 2:30pm | NO | | | 7 | four servers out of disk space | deleted profiles. slow response time for staff attempting to connect to servers, error messages | Larry Allen |
| | 11/20/12 2:45pm | 11/20/12 4:30pm | NO | | | 1.75 | Server 24 crashed | build server. slow response time for staff attempting to connect to server, error messages | Larry Allen |
| | 11/21/12 7:30am | 11/21/12 12:30pm | NO | | | 5 | Two servers infected with virus | clean virus from servers 6 17. slow response time for staff attempting to connect to servers, error messages | Larry Allen |
| | 11/26/12 6:30am | 11/26/12 7:45am | NO | | | 1.25 | servers down from weekend boot | rebooted servers 2 4 5 12 17. slow response time for staff attempting to connect to servers, error messages | Bill Suthoff |
| | 11/27/12 8:00am | 11/27/12 5:00pm | NO | | | 9 | virus removal | server 6. removed virus and rebooted. Slow response time for staff attempting to access server. Error messages | Bill Suthoff |
| | 11/28/12 6:45am | 11/28/12 8:00am | NO | | | 1.25 | slow response time | rebooted servers 1 2 17 22. Slow response time for staff attempting to access server. Error messages | Bill Suthoff |
| | 11/29/12 7:00pm | 11/29/2012 9:30pm | NO | | | 2.5 | Lost connection to Datastore | recreated connection to Datastore for servers 2 9 11 14 17 18 22 24 25 26 CRS. Slow response time for staff attempting to access server. Error messages | Bill Suthoff |
| | 11/30/12 6:45am | 11/30/12 5:00pm | NO | | | 10.25 | virus removal and server low on disk space | removed virus and rebooted, cleaned registry and profiles on servers 6 9 12 18 26. Slow response time for staff attempting to access server. Error messages | Bill Suthoff |
| | NOVEMBER DOWNTIME | | | 0 | 0 | 82.7 | | | |
| DECEMBER | | | | | | | | | |
| | 12/01/12 12:00AM | 12/01/12 1:00AM | yes | 1 | | | Implementation of FSP. Program moves and file changes | MACWIS unavailable | MIS |

## MACWIS DOWN TIME TRACKING
## 2012

DEFINITIONS:
PLANNED DOWNTIME- an event scheduled by MIS, notice to staff given of dates/times/length of expected unavailability. All users affected.
UNPLANNED DOWNTIME-an unscheduled event that affects all users ability to access MACWIS.
UNPLANNED LIMITED ACCESS-an unscheduled even that does not affect all users. Access may be sporadic, response time slow.

| MONTH | Downtime Begin/Reported date/time | Downtime end date/time | Planned Event? | Approximate PLANNED Downtime (in hours) | Approximate UNPLANNED Downtime (in hours) | Approximate UNPLANNED LIMITED ACCESS (in hours) | Reason | Result | MIS Contact person/Responsible Party |
|---|---|---|---|---|---|---|---|---|---|
| | 12/01/12 3:00PM | 12/01/12 5:00PM | yes | 2 | | | Implementation of FSP. deployment of the Executable for Windows | MACWIS unavailable | MIS |
| | December downtime as of 12/01/12 | | | 3 | 0 | 0 | | | |
| | | | | | | | | | |
| | down-time totals from 02/01/2012-11/30/2012 | | | 21 | 52.75 | 385.8 | | | |

# App. B, Ex. 19

**Grace M. Lopes**

**Attachments:**            Downtime tracking_2014_.xlsx; Downtime tracking_2015_.xlsx

---

**From: Diane Mobley [mailto:Diane.Mobley@mdhs.ms.gov]**
**Sent:** Monday, March 30, 2015 4:30 PM
**To:** Grace M. Lopes
**Subject:** MDHS Downtime List

Attached is the MDHS Downtime report for 2014 & 2015

**Diane Mobley**
**MACWIS Director**
**MDHS State Office**
**Division of Family and Children's Services**
Phone: 601-359-4894
Cell:  601-906-7867
Fax: 601-359-4340
Email: diane.mobley@mdhs.ms.gov
Child Abuse and Neglect Hotline: 1-800-222-8000

Confidentiality Statement: The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential, proprietary, and/or privileged material. Any review, transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from all computers.

## MACWIS DOWN TIME TRACKING
## 2014

DEFINITIONS:

| MONTH | Downtime Begin/Reported date/time | Downtime end date/time | Planned Event? | Approximate PLANNED Downtime (in hours) | Approximate UNPLANNED Downtime (in hours) | Approximate UNPLANNED LIMITED ACCESS (in hours) | Reason | Result | MIS Contact person/Responsible Party |
|---|---|---|---|---|---|---|---|---|---|
| JANUARY - missing from MIS | | | | | | | | | |
| FEBRUARY | | | | | | | | | |
| | 2/6/2014 | 2/6/2014 | | | | | Servers down | Rebooted Citrix Servers | Bill Suthoff |
| | 2/6/2014 | 2/6/2014 | | | | | Site was down yesterday | Checked with user for connection | Bill Suthoff |
| | 2/6/2014 | 2/6/2014 | | | | | Add space to servers | Sent ticket to service center to add space | Bill Suthoff |
| | 2/7/2014 | 2/7/2014 | | | | | Check Servers @ ITS | 3 Citrix Servers needs reboot | Bill Suthoff |
| | 2/7/2014 | 2/7/2014 | | | | | Check Citrix Servers after EXE | 3 Servers w/o IMA loaded | Bill Suthoff |
| | 2/7/2014 | 2/7/2014 | | | | | Check Citrix Servers after EXE | 3 Servers w/o IMA loaded | Bill Suthoff |
| | 2/24/2014 | 2/24/2014 | | | | | Profiles on Citrix Servers | Cleaned profiles | |
| | 2/25/2014 | 2/25/2014 | | | | | Profile | Cleaned profile | |
| | 2/26/2014 | 2/26/2014 | | | | | Macwis Problem | Logged user off and back on to another server | |
| | 2/26/2014 | 2/26/2014 | | | | | Switch Upgrade | Installed switches and reconnected phone system | |
| | 2/26/2014 | 2/26/2014 | | | | | Switch Upgrade | Installed switch | |
| | 2/26/2014 | 2/26/2014 | | | | | Switch Upgrade | Installed switch | |
| | 2/26/2014 | 2/26/2014 | | | | | Restore data | Restored data | |
| | 2/26/2014 | 2/26/2014 | | | | | Check Servers | Server 7 was unresponsive | |
| | 2/26/2014 | 2/26/2014 | | | | | Disk Space allocation | Extended Drive partitions fl-tcvision-p | |
| | 2/27/2014 | 2/27/2014 | | | | | Switch Check | Logged in to Switch from State Office | |
| | 2/27/2014 | 2/27/2014 | | | | | Disk Space allocation | Extended Drive partitions Wapdev | |
| | 2/27/2014 | 2/27/2014 | | | | | Trust relationship | Re-added terminal to domain | |
| | 2/27/2014 | 2/27/2014 | | | | | Trust relationship | Re-added terminal to domain | |
| | 2/27/2014 | 2/27/2014 | | | | | Trust relationship | Re-added terminal to domain | |
| | 2/28/2014 | 2/28/2014 | | | | | Profile | Deleted and recreated | |
| | 2/28/2014 | 2/28/2014 | | | | | Check Servers | Rebooted Server 43 49 | |
| | 2/28/2014 | 2/28/2014 | | | | | Add PC to Domain | Added PC to Domain | |
| | | | | | | | | | |
| March | | | | | | | | | |
| | 3/3/2014 | 3/3/2014 | | | | | Checked Servers | All Servers up | |
| | 3/3/2014 | 3/3/2014 | | | | | Switch Upgrade | Installed Switches | |
| | 3/3/2014 | 3/3/2014 | | | | | Switch Upgrade | Installed Switches | |
| | 3/3/2014 | 3/3/2014 | | | | | Switch Upgrade | Installed Switches | |
| | 3/4/2014 | 3/4/2014 | | | | | Switch Upgrade | Installed Switches | |
| | 3/4/2014 | 3/4/2014 | | | | | Switch Upgrade | Installed Switches | |
| | 3/4/2014 | 3/4/2014 | | | | | Switch Upgrade | Installed Switches | |
| | 3/5/2014 | 3/5/2014 | | | | | Switch Upgrade | Installed Switches | |
| | 3/5/2014 | 3/5/2014 | | | | | Switch Upgrade | Installed Switches | |
| | 3/6/2014 | 3/6/2014 | | | | | Java/Sametime | Problems with Java causing issue | |
| | 3/6/2014 | 3/6/2014 | | | | | Rename Terminal | Renamed terminal | |
| | 3/6/2014 | 3/6/2014 | | | | | Profile | Deleted and Recreated | |
| | 3/7/2014 | 3/7/2014 | | | | | Check Servers after Thursday night reboot | 7 10 17 18 43 44 45 47 48 49 | 1 EA |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 3/7/2014 | 3/7/2014 | | | | Profile | Deleted and Recreated | 1 DFCS |
| | 3/7/2014 | 3/7/2014 | | | | Profile | Deleted and Recreated | 2 Stacked |
| | 3/7/2014 | 3/7/2014 | | | | Profile | User was logged in to a nonresponsive Server | 1 DFCS |
| | 3/10/2014 | 3/10/2014 | | | | Check Citrix Servers | Cleaning Citrix Servers | ? |
| | 3/10/2014 | 3/10/2014 | | | | Profile | Profile Server unresponsive | |
| | 3/10/2014 | 3/10/2014 | | | | Unable to Login | Profile Server was rebooting | |
| | 3/11/2014 | 3/11/2014 | | | | Install Switches | Installed switches | |
| | 3/11/2014 | 3/11/2014 | | | | Install Switches | Installed switches | |
| | 3/11/2014 | 3/11/2014 | | | | Install Switches | Installed switches | Most out of space |
| | 3/12/2014 | 3/12/2014 | | | | Install Switches | Installed switches | |
| | 3/12/2014 | 3/12/2014 | | | | Install Switches | Installed switches | |
| | 3/12/2014 | 3/12/2014 | | | | Install Switches | Installed switches | x2 |
| | 3/12/2014 | 3/12/2014 | | | | Check switch install site | Analyzed install site for later install | Rebooted |
| | 3/13/2014 | 3/13/2014 | | | | Install Switches | Installed Switches | |
| | 3/13/2014 | 3/13/2014 | | | | Install Switches | Not ready for switch install | |
| | 3/14/2014 | 3/14/2014 | | | | Check servers | 2 servers off line | 10 13 17 23 48 49 50 |
| | 3/14/2014 | 3/14/2014 | | | | Check servers | Cleaning Servers | |
| | 3/14/2014 | 3/14/2014 | | | | Profile | Deleted and Recreated | |
| | 3/15/2014 | 3/15/2014 | | | | MCI | MainFrame was down | Amory |
| | 3/16/2014 | 3/16/2014 | | | | MainFrame | MainFrame was down | Houston |
| | 3/18/2014 | 3/18/2014 | | | | Check Servers | All servers up | Ackerman |
| | 3/18/2014 | 3/18/2014 | | | | Profile cleanup | Cleaned 4 6 11 14 16 | May need vendor |
| | 3/18/2014 | 3/18/2014 | | | | Profile | Deleted and Recreated | 7 12 |
| | 3/18/2014 | 3/18/2014 | | | | No Server available | Gave to Joe Burks | 10 17 |
| | 3/19/2014 | 3/19/2014 | | | | Check Servers | | |
| | 3/19/2014 | 3/19/2014 | | | | Profile Cleanup | Cleaned 22 23 24 26 | |
| | 3/20/2014 | 3/20/2014 | | | | Switch Project | Travel to Oktibbeha - Lowndes | 5:45 PM- ? PM |
| | 3/21/2014 | 3/21/2014 | | | | Switch Project | Travel to Noxubee from Lowndes | 12:30 AM |
| | 3/24/2014 | 3/24/2014 | | | | Check Servers | Cleaning servers | 2:30 AM |
| | 3/24/2014 | 3/24/2014 | | | | Server Crash | Rebooted DFCSFS1 | 9:00 PM-12 PM |
| | 3/25/2014 | 3/25/2014 | | | | Check Servers | All seem ok | |
| | 3/25/2014 | 3/25/2014 | | | | Install Switches | Removed and re worked racks | |
| | 3/26/2014 | 3/26/2014 | | | | Check Servers | All seem ok | |
| | 3/26/2014 | 3/26/2014 | | | | Sever Room Cleanup | Cleaned out Server Room Racks | |
| | 3/27/2014 | 3/27/2014 | | | | Checking Servers | All seem ok | |
| | 3/27/2014 | 3/27/2014 | | | | Cleaning profiles | Cleaned Profiles | Installed Switches |
| | 3/28/2014 | 3/28/2014 | | | | Checking Servers | All seem ok | |
| | 3/28/2014 | 3/28/2014 | | | | Cleaning profiles | Cleaned Profiles | |
| | 3/28/2014 | 3/28/2014 | | | | Can't get to Maximus2 Folder | Reloacated folder to original spot | Put in basement |
| | | | | | | | | |
| APRIL | | | | | | | | |
| | 4/1/2014 | 4/1/2014 | | | | Checking Servers | All seem ok | |
| | 4/1/2014 | 4/1/2014 | | | | Profile | Deleted and Recreated | Continue Cleaning |
| | 4/1/2014 | 4/1/2014 | | | | Disk Space on servers | Move data from C: to E: | Worked |
| | 4/1/2014 | 4/1/2014 | | | | Disk Space on servers | Create new drive for data transfer | |
| | 4/1/2014 | 4/1/2014 | | | | Disk Space on servers | Increased Disk Space from 10 to 15 GB | Jeff restored to wrong dir |
| | 4/2/2014 | 4/2/2014 | | | | Checking Servers | All seem ok - looks like all rebooted over night | |
| | 4/2/2014 | 4/2/2014 | | | | Webmail Server down | Rebooted x2 and services are up | |
| | 4/2/2014 | 4/2/2014 | | | | Clean Servers | Cleaning Servers | |
| | 4/2/2014 | 4/2/2014 | | | | Connectivity | System came up | Liwap |
| | 4/3/2014 | 4/3/2014 | | | | Checking Servers | Several are lacking in space | |
| | 4/3/2014 | 4/3/2014 | | | | Clean Servers | Cleaned and rebooted Servers | |
| | 4/3/2014 | 4/3/2014 | | | | Profile | Deleted and Recreated | 17 45 |

| | 4/4/2014 | 4/4/2014 | | | | | Checking Servers | All seem to be working fine | |
|---|---|---|---|---|---|---|---|---|---|
| | 4/4/2014 | 4/4/2014 | | | | | Clean Servers | Cleaning servers | |
| | 4/4/2014 | 4/4/2014 | | | | | Errors in Macwis | Logged on to Macwis x 2 same server | Sent to Joe |
| | 4/7/2014 | 4/7/2014 | | | | | Checking Servers | All good but 49 | |
| | 4/7/2014 | 4/7/2014 | | | | | Clean Servers | Cleaned Servers | |
| | 4/7/2014 | 4/7/2014 | | | | | Profile | Deleted and Recreated | x2 |
| | 4/7/2014 | 4/7/2014 | | | | | Profile | Deleted and Recreated | 7 8 12 17 21 |
| | 4/7/2014 | 4/7/2014 | | | | | Printer problem | Deleted Print Job | 7 8 12 17 21 42 43 46 48 50 |
| | 4/7/2014 | 4/7/2014 | | | | | Login Problem | Profile server down | |
| | 4/8/2014 | 4/8/2014 | | | | | Checking Servers | All good | |
| | 4/8/2014 | 4/8/2014 | | | | | Clean Servers | Cleaned Servers | |
| | 4/8/2014 | 4/8/2014 | | | | | Profile | Deleted and Recreated | |
| | 4/8/2014 | 4/8/2014 | | | | | Label Printer | Reinstalled Label Printer | 9 10 12 15 |
| | 4/8/2014 | 4/8/2014 | | | | | Profile can't be loaded | Profile server was restarted | |
| | 4/8/2014 | 4/8/2014 | | | | | Profile Problem | Deleted and Recreated | |
| | 4/8/2014 | 4/8/2014 | | | | | Printer problem | Rebooted Print Server | Restarted services |
| | 4/8/2014 | 4/8/2014 | | | | | Unable to print | User was logged in multiple times | 6 8 13 49 |
| | 4/9/2014 | 4/9/2014 | | | | | Checking Servers | All good but 2 18 49 | |
| | 4/9/2014 | 4/9/2014 | | | | | Cleaning Servers | Continue to clean 18 49 | |
| | 4/9/2014 | 4/9/2014 | | | | | Profile | Deleted and Recreated | DFCSFS1 |
| | 4/9/2014 | 4/9/2014 | | | | | Profile | Deleted and Recreated | |
| | 4/9/2014 | 4/9/2014 | | | | | Question about printer | Sent to Randy's group | 5 17 18 23 44 45 |
| | 4/9/2014 | 4/9/2014 | | | | | Profile | Deleted and Recreated | |
| | 4/9/2014 | 4/9/2014 | | | | | Profile | Deleted and Recreated | |
| | 4/9/2014 | 4/9/2014 | | | | | Network Sluggish | All users on different servers | |
| | 4/9/2014 | 4/9/2014 | | | | | Profile | Deleted and Recreated | |
| | 4/10/2014 | 4/10/2014 | | | | | Checking Servers | All good but 7 | |
| | 4/10/2014 | 4/10/2014 | | | | | Clean Servers | 1 2 3 4 5 6 7 17 | |
| | 4/10/2014 | 4/10/2014 | | | | | Profile | Deleted and Recreated | Rebooted |
| | 4/10/2014 | 4/10/2014 | | | | | Slowness | Problem with server 7 | 18 49 |
| | 4/10/2014 | 4/10/2014 | | | | | Profile | User resolved before called | |
| | 4/10/2014 | 4/10/2014 | | | | | Profile | Deleted and Recreated | |
| | 4/10/2014 | 4/10/2014 | | | | | Profile | Deleted and Recreated | |
| | 4/10/2014 | 4/10/2014 | | | | | Login Problem | Problem with server 48 | |
| | 4/10/2014 | 4/10/2014 | | | | | Profile | Deleted and Recreated | |
| | 4/10/2014 | 4/10/2014 | | | | | Slowness | Problem with Server 10 | |
| | 4/10/2014 | 4/10/2014 | | | | | Login Problem | User not in when called | |
| | 4/10/2014 | 4/10/2014 | | | | | Profile | User not in when called | |
| | 4/10/2014 | 4/10/2014 | | | | | Profile | Deleted and Recreated | |
| | 4/11/2014 | 4/11/2014 | | | | | Checking Servers | All Good but 7 | Working on |
| | 4/11/2014 | 4/11/2014 | | | | | Clean Servers | 8 9 10 11 12 13 14 17 | |
| | 4/11/2014 | 4/11/2014 | | | | | DFCSWEB Unavailable | Restarted server | |
| | 4/11/2014 | 4/11/2014 | | | | | Profile | Deleted and Recreated | User not present |
| | 4/11/2014 | 4/11/2014 | | | | | Profile | Deleted and Recreated | |
| | | | | | | | | | |
| | 4/21/2014 | 4/21/2014 | | | | | Checking Servers | All good but 7 49 | |
| | 4/21/2014 | 4/21/2014 | | | | | Cleaning Servers | Cleaning Servers | |
| | 4/21/2014 | 4/21/2014 | | | | | Profile | Deleted and Recreated | |
| | 4/21/2014 | 4/21/2014 | | | | | Unable to see files | Server FS1 was rebooting | |
| | 4/21/2014 | 4/21/2014 | | | | | Profile | Deleted and Recreated | |
| | 4/21/2014 | 4/21/2014 | | | | | Profile | Deleted and Recreated | |
| | 4/22/2014 | 4/22/2014 | | | | | Checking Servers | All Good but 7 | |
| | 4/22/2014 | 4/22/2014 | | | | | Clean Servers | Cleaning Servers | |

| | 4/22/2014 | 4/22/2014 | | | | | Unable to get into app | No Problem with App | |
|---|---|---|---|---|---|---|---|---|---|
| | 4/22/2014 | 4/22/2014 | | | | | Icons missing on desktop | Added Icons to desktop and printers | Restarted services |
| | 4/22/2014 | 4/22/2014 | | | | | Profile | Deleted and Recreated | 15 |
| | 4/22/2014 | 4/22/2014 | | | | | H Drive | Server is rebooting | |
| | 4/22/2014 | 4/22/2014 | | | | | Profile | Deleted and Recreated | |
| | 4/22/2014 | 4/22/2014 | | | | | Profile | Deleted and Recreated | |
| | 4/22/2014 | 4/22/2014 | | | | | Profile | Deleted and Recreated | DFCSFS1 |
| | 4/22/2014 | 4/22/2014 | | | | | Profile | Deleted and Recreated | |
| | 4/23/2014 | 4/23/2014 | | | | | Checking Servers | All good but 7 | Bob Burt Printer |
| | 4/23/2014 | 4/23/2014 | | | | | Clean Servers | Cleaned Servers | Bob Burt Printer |
| | 4/23/2014 | 4/23/2014 | n | | | | Profile | Unable to locate User | 15 18 |
| | 4/23/2014 | 4/23/2014 | N | | | | Problem with Apps | Had user log off and back on to another server | |
| | 4/23/2014 | 4/23/2014 | N | | | | Profile | Deleted and Recreated | |
| | 4/23/2014 | 4/23/2014 | N | | | | Profile | Deleted and Recreated | DFCSFS1 |
| | 4/23/2014 | 4/23/2014 | N | | | | Can't access a folder on Public | Had user log off and back on | |
| | 4/23/2014 | 4/23/2014 | n | | | | Server 46 down | Rrestarted OS and rebooted | |
| | 4/23/2014 | 4/23/2014 | n | | | | Server 49 down | Restarted Services | |
| | 4/23/2014 | 4/23/2014 | n | | | | Server 50 down | Restarted Services | |
| | 4/23/2014 | 4/23/2014 | n | | | | Server 7 down | Rebooted Server | |
| | 4/24/2014 | 4/24/2014 | n | | | | Checking Servers | All Good but 8 15 43 49 | Symantec |
| | 4/24/2014 | 4/24/2014 | n | | | | Clean Servers | Cleaning Servers | 15 18 |
| | 4/24/2014 | 4/24/2014 | | | | | Profile | Deleted and Recreated | |
| | 4/24/2014 | 4/24/2014 | | | | | Profile | Deleted and Recreated | |
| | 4/24/2014 | 4/24/2014 | | | | | Profile | Deleted and Recreated | |
| | 4/24/2014 | 4/24/2014 | | | | | Space Allocation | EACSFSREG7 out of space on D partition | |
| | 4/25/2014 | 4/25/2014 | n | | | | Checking Servers | All Good but 43 46 | |
| | 4/25/2014 | 4/25/2014 | n | | | | Clean Servers | Cleaning Servers | |
| | 4/25/2014 | 4/25/2014 | n | | | | Profile | Deleted and Recreated | |
| | 4/25/2014 | 4/25/2014 | n | | | | Add user to DFCS/AD | Added User/Configured Profile | Restarted Srvs |
| | 4/25/2014 | 4/25/2014 | N | | | | Remove users from a group | Removed users from a group | 8 15 17 |
| | 4/26/2014 | 4/26/2014 | N | | | | Image DFCSWEB | Imaged DFCSWEB 4.5 hrs | |
| | 4/27/2014 | 4/27/2014 | N | | | | P2V DFCSWEB | Virtualized DFCSWEB (2 hours) | |
| | 4/28/2013 | 4/28/2013 | N | | | | Reconfigure DFCSWEB | Reconfigured DFCSWEB with correct NIC | |
| | 4/29/2013 | 4/29/2013 | N | | | | Checking Servers | All good | |
| | 4/29/2013 | 4/29/2013 | N | | | | Clean Servers | Cleaned Servers | |
| | 4/29/2013 | 4/29/2013 | N | | | | Profile | Deleted and Recreated | |
| | 4/29/2013 | 4/29/2013 | N | | | | Profile | User not answering when called | |
| | 4/29/2013 | 4/29/2013 | N | | | | Profile | Changed password/Deleted and Recreated | |
| | 4/29/2013 | 4/29/2013 | | | | | Profile | Deleted and Recreated | |
| | 4/29/2013 | 4/29/2013 | | | | | Profile | Deleted and Recreated | |
| | 4/30/2014 | 4/30/2014 | n | | | | Checking Servers | All good | |
| | 4/30/2014 | 4/30/2014 | n | | | | Clean Servers | Cleaned Servers | Cleaned Servers |
| | 4/30/2014 | 4/30/2014 | n | | | | Unable to login to Macwis | Nothing wrong when called | Cleaned servers |
| | 4/30/2014 | 4/30/2014 | N | | | | ? about Macwis Placement | Sent to Ron Martin/Help Desk | 2 5 8 11 14 17 |
| | 4/30/2014 | 4/30/2014 | N | | | | Profile | Deleted and Recreated | |
| | 4/30/2014 | 4/30/2014 | | | | | Profile | Deleted and Recreated | |
| | 4/30/2014 | 4/30/2014 | | | | | Profile | Deleted and Recreated | |
| | 4/30/2014 | 4/30/2014 | N | | | | Profile | Deleted and Recreated | |
| | 4/30/2014 | 4/30/2014 | N | | | | Profile | Deleted and Recreated | |
| | 4/30/2014 | 4/30/2014 | N | | | | Profile | Deleted and Recreated | |
| | 4/30/2014 | 4/30/2014 | N | | | | Profile | User not answering when Called left msg on console | Sent msg on console |
| | 4/30/2014 | 4/30/2014 | N | | | | Profile | User logged back in but ignored console msg | |
| | 4/30/2014 | 4/30/2014 | N | | | | Profile | Deleted and Recreated | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **May** | | | | | | | |
| | 5/1/2014 | 5/1/2014 | | | | Checking Servers | All good 8 12 46 48 50 | |
| | 5/1/2014 | 5/1/2014 | | | | Profile | Deleted and Recreated | |
| | 5/1/2014 | 5/1/2014 | | | | Unable to login | Nothing wrong when called | |
| | 5/1/2014 | 5/1/2014 | | | | Profile | Deleted and Recreated | |
| | 5/1/2014 | 5/1/2014 | | | | Profile | User not in when called | |
| | 5/1/2014 | 5/1/2014 | | | | Profile | Deleted and Recreated | |
| | 5/1/2014 | 5/1/2014 | | | | Profile | Deleted and Recreated | |
| | 5/2/2014 | 5/2/2014 | | | | Checking Servers | All good but 12 | |
| | 5/5/2014 | 5/5/2014 | | | | Checking Servers | All good | |
| | 5/5/2014 | 5/5/2014 | | | | Profile | Deleted and Recreated | |
| | 5/6/2014 | 5/6/2014 | | | | Checking servers | All good but 17 46 | |
| | 5/6/2014 | 5/6/2014 | | | | Clean servers | Cleaning Servers | |
| | 5/6/2014 | 5/6/2014 | | | | Server Error | Restarted Services | |
| | 5/6/2014 | 5/6/2014 | | | | Server Error | Restarted Services | |
| | 5/6/2014 | 5/6/2014 | | | | Profile | Deleted and Recreated | |
| | 5/6/2014 | 5/6/2014 | | | | Profile | Cleaned Profile | No Space/Clean |
| | 5/6/2014 | 5/6/2014 | | | | Profile | Was working when observed | |
| | 5/7/2014 | 5/7/2014 | | | | Checking servers | All good but 48 49 | |
| | 5/7/2014 | 5/7/2014 | | | | Profile | Deleted and Recreated | Pulled Blade from MM |
| | 5/7/2014 | 5/7/2014 | | | | Profile | Deleted and Recreated | |
| | 5/8/2014 | 5/8/2014 | | | | Checking servers | All good | |
| | 5/8/2014 | 5/8/2014 | | | | P2V servers | Servers DFCSCLS and CLS1 | |
| | 5/8/2014 | 5/8/2014 | | | | Profile | Deleted and Recreated | Restarted 46 |
| | 5/8/2014 | 5/8/2014 | | | | Macwis | Had user logoff and Logon again | 1 10 17 18 24 46 |
| | 5/8/2014 | 5/8/2014 | | | | Connection | Sent to Randy and crew | 46 |
| | 5/8/2014 | 5/8/2014 | | | | Profile | Deleted and Recreated | |
| | 5/8/2014 | 5/8/2014 | | | | Profile | Deleted and Recreated | 49 |
| | 5/8/2014 | 5/8/2014 | | | | Player not reading disk | Had user open CD and double click file | 42 |
| | 5/9/2014 | 5/9/2014 | | | | Checking servers | All good but 42 43 | |
| | 5/9/2014 | 5/9/2014 | | | | Credentials | Reset password | Restarted |
| | 5/9/2014 | 5/9/2014 | | | | Profile | Deleted and Recreated | |
| | 5/13/2014 | 5/13/2014 | | | | Check Servers | All Good | 5 48 |
| | 5/13/2014 | 5/13/2014 | | | | Clean Servers | 12 17 18 | |
| | 5/13/2014 | 5/13/2014 | | | | Add to DFCS-OGT Group | Added to Group | |
| | 5/13/2014 | 5/13/2014 | | | | Profile | Deleted and Recreated | |
| | 5/13/2014 | 5/13/2014 | | | | Profile | Deleted and Recreated | |
| | 5/13/2014 | 5/13/2014 | | | | Profile | Had user log out and back in | |
| | 5/13/2014 | 5/13/2014 | | | | Profile | Deleted and Recreated | |
| | 5/15/2014 | 5/15/2014 | | | | Check Servers | All Good | Restarted |
| | 5/15/2014 | 5/15/2014 | | | | Clean Servers | Clean 42 46 48 | |
| | 5/15/2014 | 5/15/2014 | | | | Profile | Deleted and Recreated | |
| | 5/15/2014 | 5/15/2014 | | | | Profile | Deleted and Recreated | |
| | 5/15/2014 | 5/15/2014 | | | | Citrix Receiver not current | Downloaded and installed Receiver | |
| | 5/15/2014 | 5/15/2014 | | | | Login to Copier | User just had to maximise her browser | |
| | 5/16/2014 | 5/16/2014 | | | | Check Servers | All Good | |
| | 5/16/2014 | 5/16/2014 | | | | Clean Servers | Clean 48 50 | |
| | 5/16/2014 | 5/16/2014 | | | | Profile | Deleted and Recreated | |
| | 5/16/2014 | 5/16/2014 | | | | Profile | Deleted and Recreated | |
| | 5/16/2014 | 5/16/2014 | | | | Profile | Deleted and Recreated | |
| | 5/17/2014 | 5/17/2014 | | | | Clean Profiles MCI | Deleted and Recreated a list of user profiles | |
| | 5/19/2014 | 5/19/2014 | | | | Check Servers | All Good | |

| | 5/19/2014 | 5/19/2014 | | | | | Clean Servers | 42 43 44 45 46 47 48 49 50 | |
|---|---|---|---|---|---|---|---|---|---|
| | 5/19/2014 | 5/19/2014 | | | | | Profile | Deleted and Recreated | |
| | 5/19/2014 | 5/19/2014 | | | | | Profile | Deleted and Recreated | |
| | 5/19/2014 | 5/19/2014 | | | | | Profile | Deleted and Recreated | |
| | 5/20/2014 | 5/20/2014 | | | | | Check Servers | All Good | |
| | 5/20/2014 | 5/20/2014 | | | | | Clean Servers | 3 6 9 12 13 | |
| | 5/20/2014 | 5/20/2014 | | | | | Profile | Deleted and Recreated | |
| | 5/20/2014 | 5/20/2014 | | | | | Profile | Deleted and Recreated | |
| | 5/20/2014 | 5/20/2014 | | | | | Profile | Deleted and Recreated | |
| | 5/21/2014 | 5/21/2014 | | | | | Check Servers | All Good | |
| | 5/21/2014 | 5/21/2014 | n | | | | Clean Servers | 13 | |
| | 5/21/2014 | 5/21/2014 | | | | | Login problem DFCSMACWEB | Showed user correct way to login | |
| | 5/21/2014 | 5/21/2014 | | | | | Profile | Had user log off and back on | |
| | 5/20/2014 | 5/20/2014 | | | | | Profile | User not in when called | |
| | 5/21/2014 | 5/21/2014 | | 0 | | | Upgrading The DD environment | EMC William Thompson EMC Upgraded | |
| | 5/21/2014 | 5/21/2014 | | | 0 | | Health Check for Ava environment | Samantha Serenko-Oswald Completed | |
| | 5/22/2014 | 5/22/2014 | n | | | | Check Servers | All Good but 42 | |
| | 5/22/2014 | 5/22/2014 | | | | | Clean Servers | | |
| | 5/22/2014 | 5/22/2014 | | | | | Profile | Deleted and Recreated | |
| | 5/23/2014 | 5/23/2014 | | | | | Check Servers | All Good but 10 17 18 | |
| | 5/23/2014 | 5/23/2014 | | | | | Clean Servers | 10 12 17 18 | |
| | 5/23/2014 | 5/23/2014 | | | | | Profile | Deleted and Recreated | |
| | 5/23/2014 | 5/23/2014 | | | | | Profile | Deleted and Recreated in Absensia | |
| | 5/27/2014 | 5/27/2014 | | | | | Check Servers | All Good but 46 | |
| | 5/27/2014 | 5/27/2014 | | | | | Clean Servers | Continue Clean of 10 12 17 18 | Upgrade set for 6/9-10 |
| | 5/27/2014 | 5/27/2014 | | | | | Profile | Deleted and Recreated | |
| | 5/27/2014 | 5/27/2014 | | | | | Profile | User not in when Called | Restarted Services |
| | 5/27/2014 | 5/27/2014 | | | | | Profile not loading | Gave to Brian Magee | |
| | 5/27/2014 | 5/27/2014 | | | | | Access for DFCS OGT | Granted Access for several users | |
| | 5/29/2014 | 5/29/2014 | | | | | Check Servers | All Good | |
| | 5/29/2014 | 5/29/2014 | | | | | Move servers | Moved Servers from MM4 15 18 21 22 to MM 3 | |
| | 5/29/2014 | 5/29/2014 | | | | | Profile | Deleted and Recreated | Started Friday at Home |
| | 5/29/2014 | 5/29/2014 | | | | | Profile | Deleted and Recreated | |
| | 5/29/2014 | 5/29/2014 | | | | | Profile | Deleted and Recreated | |
| | 5/29/2014 | 5/29/2014 | | | | | Profile | Deleted and Recreated | |
| | 5/29/2014 | 5/29/2014 | | | | | Profile | Deleted and Recreated | |
| | 5/29/2014 | 5/29/2014 | | | | | Profile | Deleted and Recreated | Needs to call me |
| | 5/29/2014 | 5/29/2014 | | | | | Profile | Deleted and Recreated | |
| | 5/29/2014 | 5/29/2014 | | | | | Profile | Deleted and Recreated | |
| | 5/29/2014 | 5/29/2014 | | | | | Profile | Deleted and Recreated | 2x |
| | 5/29/2014 | 5/29/2014 | | | | | Profile | Not in, Left message on Terminal Desktop | |
| | 5/29/2014 | 5/29/2014 | | | | | Profile | Not in, Left message on Terminal Desktop | |
| | 5/30/2014 | 5/30/2014 | | | | | Check Servers | All good but 42 44 45 49 | |
| | 5/30/2014 | 5/30/2014 | | | | | Profile | Deleted and Recreated | |
| | 5/30/2014 | 5/30/2014 | | | | | Profile | Called and not answering phone | |
| | 5/30/2014 | 5/30/2014 | | | | | Profile | Deleted and Recreated | |
| | 5/30/2014 | 5/30/2014 | | | | | Profile | Deleted and Recreated | BladeCenter 3 |
| | 5/30/2014 | 5/30/2014 | | | | | Profile | Deleted and Recreated | |
| | 5/30/2014 | 5/30/2014 | | | | | Profile | Deleted and Recreated | |
| | 5/30/2014 | 5/30/2014 | | | | | Profile | Deleted and Recreated | |
| | 5/30/2014 | 5/30/2014 | | | | | Profile | Deleted and Recreated | |
| | 5/30/2014 | 5/30/2014 | | | | | Profile | Deleted and Recreated | |
| | | | | | | | | | |

| June | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 6/2/2014 | 6/2/2014 | | | | Move FCSMACPS | Moved FCSMACPS to MM3 | |
| | 6/2/2014 | 6/2/2014 | | | | Clean Servers | Cleaned 1 - 10 | |
| | 6/2/2014 | 6/2/2014 | | | | Profile | Deleted and Recreated | |
| | 6/2/2014 | 6/2/2014 | | | | Profile | Deleted and Recreated | |
| | 6/2/2014 | 6/2/2014 | | | | Profile | Deleted and Recreated | |
| | 6/2/2014 | 6/2/2014 | | | | Profile | Deleted and Recreated | Restarted |
| | 6/2/2014 | 6/2/2014 | | | | Profile | Deleted and Recreated | |
| | 6/2/2014 | 6/2/2014 | | | | Profile | Deleted and Recreated | |
| | 6/2/2014 | 6/2/2014 | | | | Login | User was working when called | |
| | 6/2/2014 | 6/2/2014 | | | | Profile | Deleted and Recreated | |
| | 6/2/2014 | 6/2/2014 | | | | Profile | User was working when called | |
| | 6/2/2014 | 6/2/2014 | | | | Profile | User was working when called | |
| | 6/2/2014 | 6/2/2014 | | | | Profile | User was working when called | |
| | 6/2/2014 | 6/2/2014 | | | | Profile | Added Icons to Desktop | |
| | 6/2/2014 | 6/2/2014 | | | | Profile | Deleted and Recreated | |
| | 6/2/2014 | 6/2/2014 | | | | Profile | Deleted and Recreated | MM4 is now blank |
| | 6/3/2014 | 6/3/2014 | | | | Check Servers | All Good but 42 | |
| | 6/3/2014 | 6/3/2014 | | | | Profile | Deleted and Recreated | |
| | 6/3/2014 | 6/3/2014 | | | | Profile | Deleted and Recreated | |
| | 6/3/2014 | 6/3/2014 | | | | Profile | User was working when called | |
| | 6/3/2014 | 6/3/2014 | | | | Profile | User not in when called | |
| | 6/3/2014 | 6/3/2014 | | | | Profile | Deleted and Recreated | |
| | 6/4/2014 | 6/4/2014 | | | | Check Servers | All Good but 42 | |
| | 6/4/2014 | 6/4/2014 | | | | Profile | Deleted and Recreated | |
| | 6/4/2014 | 6/4/2014 | | | | Profile | Deleted and Recreated | |
| | 6/4/2014 | 6/4/2014 | | | | Profile | Deleted and Recreated | |
| | 6/4/2014 | 6/4/2014 | | | | Profile | Deleted and Recreated | |
| | 6/4/2014 | 6/4/2014 | | | | Profile | User was working when called | |
| | 6/5/2014 | 6/5/2014 | | | | Check Servers Check Backups | All Good but 42 Restarted services | |
| | 6/5/2014 | 6/5/2014 | | | | Profile | Deleted and Recreated | |
| | 6/5/2014 | 6/5/2014 | | | | Profile | Deleted and Recreated | |
| | 6/5/2014 | 6/5/2014 | | | | Profile | Deleted and Recreated | |
| | 6/6/2014 | 6/6/2014 | | | | Profile | Deleted and Recreated | |
| | 6/6/2014 | 6/6/2014 | | | | Check Servers | All good but 8 18 42 49 | Restarted Services |
| | 6/6/2014 | 6/6/2014 | | | | Clean Servers | Cleaning and restarting services | |
| | 6/30/2014 | 6/30/2014 | | | | Checking Servers | All Good but 25 42 | |
| | 6/30/2014 | 6/30/2014 | | | | Cleaning servers | 25 | and other questions |
| | 6/30/2014 | 6/30/2014 | | | | Printer Issue | Created Printer with PCL6 driver | Deleted profiles |
| | 6/10/2014 | 6/10/2014 | | | | Grant Access to DFCS OGT | Access Granted | |
| | 6/10/2014 | 6/10/2014 | | | | Profile | Deleted and Recreated | |
| | 6/10/2014 | 6/10/2014 | | | | Profile | Deleted and Recreated | x2 |
| | 6/10/2014 | 6/10/2014 | | | | Profile | Deleted and Recreated | |
| | 6/10/2014 | 6/10/2014 | | | | Checking Servers | All good | |
| | 6/11/2014 | 6/11/2014 | | | | Clean Servers | 17 | No problem |
| | 6/11/2014 | 6/11/2014 | | | | Profile | Deleted and Recreated | |
| | 6/11/2014 | 6/11/2014 | | | | Checking Servers | All good | Consulting with Cheryl |
| | 6/11/2014 | 6/11/2014 | | | | Clean Servers | 49 | |
| | 6/11/2014 | 6/11/2014 | | | | Configured Server | Configured MISSRV01 for Backup | Hosea called ITS |
| | 6/11/2014 | 6/11/2014 | | | | Profile | Deleted and Recreated | Services restart 25 |
| | 6/11/2014 | 6/11/2014 | | | | Profile | Deleted and Recreated | |
| | 6/12/2014 | 6/12/2014 | | | | Profile | Deleted and Recreated | |
| | 6/12/2014 | 6/12/2014 | | | | Profile | Deleted and Recreated | |

| | 6/12/2014 | 6/12/2014 | | | | | Profile | Deleted and Recreated | 42 |
|---|---|---|---|---|---|---|---|---|---|
| | 6/12/2014 | 6/12/2014 | | | | | Profile | Deleted and Recreated | |
| | 6/12/2014 | 6/12/2014 | | | | | Profile | Deleted and Recreated | |
| | 6/12/2014 | 6/12/2014 | | | | | Checking Servers | All good | |
| | 6/12/2014 | 6/12/2014 | | | | | Clean Servers | 1 2 3 4 5 6 7 8 9 10 | |
| | 6/12/2014 | 6/12/2014 | | | | | Profile | Deleted and Recreated | 42 |
| | 6/12/2014 | 6/12/2014 | | | | | Profile | Deleted and Recreated | |
| | 6/12/2014 | 6/12/2014 | | | | | Profile | Deleted and Recreated | |
| | 6/12/2014 | 6/12/2014 | | | | | Change Security settings on servers | Changed security settings on 8 servers | |
| | 6/13/2014 | 6/13/2014 | | | | | Checking Servers | All Good | |
| | 6/13/2014 | 6/13/2014 | | | | | Update Pubdir 1 2 | Continued updating pubdir 1 2 | Multiple servers full |
| | 6/13/2014 | 6/13/2014 | | | | | Profile | Deleted and Recreated | |
| | 6/13/2014 | 6/13/2014 | | | | | Profile | Had user logoff and back on | |
| | 6/13/2014 | 6/13/2014 | | | | | Macwis Login | Logged user out and had user log back in | |
| | 6/13/2014 | 6/13/2014 | | | | | Profile | Deleted and Recreated | |
| | 6/13/2014 | 6/13/2014 | | | | | Lotus Activex | Loaded Lotus Activex | |
| | 6/14/2014 | 6/14/2014 | | | | | Forgot password | Called back and said fixed | |
| | 6/14/2014 | 6/14/2014 | | | | | Clear Root kit | Eacspubdir1 | |
| | 6/16/2014 | 6/16/2014 | | | | | Checking Servers | All Good | 42 |
| | 6/16/2014 | 6/16/2014 | | | | | Clean Servers | 12 18 44 | |
| | 6/16/2014 | 6/16/2014 | | | | | Users slow and can't login | Rebooted FS3 | |
| | 6/16/2014 | 6/16/2014 | | | | | Users slow and can't login | Rebooted FS10 | |
| | 6/17/2014 | 6/17/2014 | | | | | Checking Servers | All Good | |
| | 6/17/2014 | 6/17/2014 | | | | | Clean Servers | 12 15 18 | |
| | 6/17/2014 | 6/17/2014 | | | | | Profile | Deleted and Recreated | |
| | 6/17/2014 | 6/17/2014 | | | | | Profile | Deleted and Recreated | |
| | 6/17/2014 | 6/17/2014 | | | | | Profile | Deleted and Recreated | |
| | 6/17/2014 | 6/17/2014 | | | | | Profile | Deleted and Recreated | Who Fixed? 7:30am |
| | 6/17/2014 | 6/17/2014 | | | | | Profile | Deleted and Recreated | Fixed |
| | 6/17/2014 | 6/17/2014 | | | | | Add server to domain | Added BCS server to domain | 42 |
| | 6/17/2014 | 6/17/2014 | | | | | Profile | Deleted and Recreated | |
| | 6/17/2014 | 6/17/2014 | | | | | Profile | Deleted and Recreated | |
| | 6/17/2014 | 6/17/2014 | | | | | Profile | Deleted and Recreated | |
| | 6/18/2014 | 6/18/2014 | | | | | Checking Servers | All Good | |
| | 6/18/2014 | 6/18/2014 | | | | | Clean Servers | 18 21 43 44 | |
| | 6/18/2014 | 6/18/2014 | | | | | Profile | Deleted and Recreated | |
| | 6/18/2014 | 6/18/2014 | | | | | EMC Support | Talking to EMC about VNX5300 | |
| | 6/18/2014 | 6/18/2014 | | | | | Profile | Deleted and Recreated | |
| | 6/19/2014 | 6/19/2014 | | | | | State Office | Checking Servers | |
| | 6/19/2014 | 6/19/2014 | | | | | State Office | Clean Servers | |
| | 6/20/2014 | 6/20/2014 | | | | | Checking Servers | All Good | |
| | 6/20/2014 | 6/20/2014 | | | | | Profile | Deleted and Recreated | SR 63847454 |
| | 6/20/2014 | 6/20/2014 | | | | | Profile | Deleted and Recreated | |
| | | | | | | | | | |
| **July** | | | | | | | | | |
| | 7/1/2014 | 7/1/2014 | | | | | Checking Servers | All Good but 18 42 | |
| | 7/1/2014 | 7/1/2014 | | | | | Cleaning servers | 18 | |
| | 7/1/2014 | 7/1/2014 | | | | | Profile | Deleted and Recreated | |
| | 7/1/2014 | 7/1/2014 | | | | | Question about FS10 | Server is rebooting | |
| | 7/1/2014 | 7/1/2014 | | | | | Profile | Deleted and Recreated | |
| | 7/1/2014 | 7/1/2014 | | | | | Profile | Deleted and Recreated | All Good |
| | 7/1/2014 | 7/1/2014 | | | | | Profile | Had user log off and back on | 18 |
| | 7/1/2014 | 7/1/2014 | | | | | Profile | Deleted and Recreated | 17 44 46 47 49 |

| | 7/1/2014 | 7/1/2014 | | | | | Profile | Deleted and Recreated | |
|---|---|---|---|---|---|---|---|---|---|
| | 7/1/2014 | 7/1/2014 | | | | | Profile | Deleted and Recreated | |
| | 7/1/2014 | 7/1/2014 | | | | | Profile | Deleted and Recreated | |
| | 7/1/2014 | 7/1/2014 | | | | | Virtualize JCMSFS10 | Virtualized Server | |
| | 7/2/2014 | 7/2/2014 | | | | | Checking Servers | All good but 17 43 44 | |
| | 7/2/2014 | 7/2/2014 | | | | | Cleaning servers | 12 15 18 | |
| | 7/2/2014 | 7/2/2014 | | | | | Profile | Deleted and Recreated | Had to trunk switch |
| | 7/2/2014 | 7/2/2014 | | | | | Profile | Deleted and Recreated | |
| | 7/2/2014 | 7/2/2014 | | | | | Profile | Deleted and Recreated | |
| | 7/2/2014 | 7/2/2014 | | | | | Profile | Deleted and Recreated | |
| | 7/2/2014 | 7/2/2014 | | | | | Profile | Deleted and Recreated | |
| | 7/2/2014 | 7/2/2014 | | | | | Profile | Deleted and Recreated | |
| | 7/2/2014 | 7/2/2014 | | | | | Profile | Deleted and Recreated | |
| | 7/3/2014 | 7/3/2014 | | | | | Checking Servers | All Good 7 10 12 17 23 43 44 | |
| | 7/3/2014 | 7/3/2014 | | | | | Cleaning Servers | 7 10 12 17 18 23 43 44 | |
| | 7/3/2014 | 7/3/2014 | | | | | Profile | Deleted and Recreated | |
| | 7/3/2014 | 7/3/2014 | | | | | Profile | Deleted and Recreated | |
| | 7/3/2014 | 7/3/2014 | | | | | Profile | Deleted and Recreated | |
| | 7/8/2014 | 7/8/2014 | | | | | Check Servers | All Good but 15 | |
| | 7/8/2014 | 7/8/2014 | | | | | Clean Servers | 15 | |
| | 7/8/2014 | 7/8/2014 | | | | | Profile | Deleted and Recreated | |
| | 7/8/2014 | 7/8/2014 | | | | | Profile | Deleted and Recreated | |
| | 7/8/2014 | 7/8/2014 | | | | | Profile | Sent message on console and no reply | |
| | 7/8/2014 | 7/8/2014 | | | | | Profile | Sent message on console and no reply | |
| | 7/8/2014 | 7/8/2014 | | | | | Profile | Deleted and Recreated | |
| | 7/9/2014 | 7/9/2014 | | | | | Check Servers | All Good | |
| | 7/9/2014 | 7/9/2014 | | | | | Clean Servers | None | |
| | 7/9/2014 | 7/9/2014 | | | | | Profile | Deleted and Recreated | |
| | 7/9/2014 | 7/9/2014 | | | | | Profile | Deleted and Recreated | |
| | 7/9/2014 | 7/9/2014 | | | | | Problem with Ace | Network problem | Reboot |
| | 7/9/2014 | 7/9/2014 | | | | | Profile | Deleted and Recreated | |
| | 7/9/2014 | 7/9/2014 | | | | | Profile | Deleted and Recreated | |
| | 7/9/2014 | 7/9/2014 | | | | | Profile | Deleted and Recreated | |
| | 7/9/2014 | 7/9/2014 | | | | | Profile | Deleted and Recreated | |
| | 7/9/2014 | 7/9/2014 | | | | | Eleaveweb | Created new shortcut | |
| | 7/9/2014 | 7/9/2014 | | | | | Start Convert process | Started convert process on DFCSFS3 | 4:52 PM |
| | 7/9/2014 | 7/9/2014 | | | | | Stop Convert process | Stopped convert process on DFCSFS3 | 8:45 PM |
| | 7/10/2014 | 7/10/2014 | | | | | Check Servers | All Good but 2 7 17 18 43 45 46 48 49 | All online |
| | 7/10/2014 | 7/10/2014 | | | | | Clean Servers | Cleaning profiles | |
| | 7/10/2014 | 7/10/2014 | | | | | Profile | Deleted and Recreated | |
| | 7/10/2014 | 7/10/2014 | | | | | Profile | Deleted and Recreated | |
| | 7/10/2014 | 7/10/2014 | | | | | Profile | Deleted and Recreated | |
| | 7/10/2014 | 7/10/2014 | | | | | Profile | Deleted and Recreated | |
| | 7/10/2014 | 7/10/2014 | | | | | Profile | Deleted and Recreated | |
| | 7/10/2014 | 7/10/2014 | | | | | Profile | Deleted and Recreated | |
| | 7/10/2014 | 7/10/2014 | | | | | Profile | Deleted and Recreated | |
| | 7/10/2014 | 7/10/2014 | | | | | Profile | Deleted and Recreated | |
| | 7/10/2014 | 7/10/2014 | | | | | Profile | Deleted and Recreated | |
| | 7/10/2014 | 7/10/2014 | | | | | Profile | Working when called | |
| | 7/10/2014 | 7/10/2014 | | | | | Profile | Working when called | 4:48 PM |
| | 7/11/2014 | 7/11/2014 | | | | | Check Servers | All Good | 8:50 PM |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 7/11/2014 | 7/11/2014 | | | | Clean Servers | 7 15 18 | Delete files restarted |
| | 7/11/2014 | 7/11/2014 | | | | Profile | User was working when called back | |
| | 7/11/2014 | 7/11/2014 | | | | Profile | Deleted and Recreated | |
| | 7/11/2014 | 7/11/2014 | | | | Profile | Deleted and Recreated | |
| | 7/11/2014 | 7/11/2014 | | | | Push out EXE | Pushed out EXE to all profile and Citrix Servers | |
| | 7/11/2014 | 7/11/2014 | | | | Convert DFCSFS3 | Started process to Convert DFCSFS3 | |
| | 7/12/2014 | 7/12/2014 | | | | Convert DFCSFS3 | Process still going (1 day and 1 hour) | |
| | 7/13/2014 | 7/13/2014 | | | | Convert DFCSFS3 | Conversion Completed | |
| | | | | | | | | |
| **August** | | | | | | | | |
| | 8/5/2014 | 8/5/2014 | | | | Checking Servers | All Good but 42 | |
| | 8/5/2014 | 8/5/2014 | | | | Clean Servers | | |
| | 8/5/2014 | 8/5/2014 | | | | Profile | Deleted and Recreated | |
| | 8/5/2014 | 8/5/2014 | | | | EMC on Webex | Completed fix on SpA and SpB | |
| | 8/6/2014 | 8/6/2014 | | | | Checking Server | All good but 42 | |
| | 8/6/2014 | 8/6/2014 | | | | Clean Servers | All Clean | |
| | 8/6/2014 | 8/6/2014 | | | | Citrix Receiver | Sent easy citrix receiver install | |
| | 8/6/2014 | 8/6/2014 | | | | Profile | Deleted and Recreated | |
| | 8/6/2014 | 8/6/2014 | | | | Add Printer in user office | Added printer to Print server | |
| | 8/6/2014 | 8/6/2014 | | | | Add Printer in user office | Added printer to Print server | |
| | 8/7/2014 | 8/7/2014 | | | | Checking Servers | All good but 42 | |
| | 8/7/2014 | 8/7/2014 | | | | Clean Servers | 1 7 | |
| | 8/7/2014 | 8/7/2014 | | | | Add Space to fl-sqldev01-t | Sent to ITS to add space to server | |
| | 8/7/2014 | 8/7/2014 | | | | ActiveX | Loaded ActiveX | |
| | 8/7/2014 | 8/7/2014 | | | | Create VM from Template | Created and tested and converted | |
| | 8/8/2014 | 8/8/2014 | | | | Checkding Servers | All good but 42 | |
| | 8/8/2014 | 8/8/2014 | | | | Clean Servers | All Clean | |
| | 8/8/2014 | 8/8/2014 | | | | Profile | Deleted and Recreated | Kicked user out |
| | 8/8/2014 | 8/8/2014 | | | | Profile | Deleted and Recreated | |
| | 8/11/2014 | 8/11/2014 | | | | Check Servers | All Good but 42 | |
| | 8/11/2014 | 8/11/2014 | | | | Clean Servers | All Clean | |
| | 8/11/2014 | 8/11/2014 | | | | Profile | Deleted and recreated | |
| | 8/11/2014 | 8/11/2014 | | | | Profile | User not in when called | |
| | 8/11/2014 | 8/11/2014 | | | | Profile | Deleted and recreated | |
| | 8/12/2014 | 8/12/2014 | | | | Check Servers | All Good but 8 10 17 18 42 43 49 | |
| | 8/12/2014 | 8/12/2014 | | | | Clean Servers | 8 10 17 18 42 43 49 | |
| | 8/12/2014 | 8/12/2014 | | | | Profile | Deleted and recreated | |
| | 8/12/2014 | 8/12/2014 | | | | Profile | Deleted and recreated | |
| | 8/12/2014 | 8/12/2014 | | | | Profile | Deleted and recreated | |
| | 8/12/2014 | 8/12/2014 | | | | Profile | Deleted and recreated | |
| | 8/13/2014 | 8/13/2014 | | | | Check Servers | 17 42 | |
| | 8/13/2014 | 8/13/2014 | | | | Clean Servers | 1 17 | |
| | 8/13/2014 | 8/13/2014 | | | | Profile | Deleted and Recreated | |
| | 8/13/2014 | 8/13/2014 | | | | Profile | Deleted and Recreated | |
| | 8/13/2014 | 8/13/2014 | | | | Profile | Deleted and Recreated | |
| | 8/13/2014 | 8/13/2014 | | | | Profile | Deleted and Recreated | |
| | 8/142014 | 8/142014 | | | | Check Servers | All Good but 45 49 50 | |
| | 8/142014 | 8/142014 | | | | Clean Servers | 27 45 49 50 | |
| | 8/15/2014 | 8/15/2014 | | | | Check Servers | All Good but 42 | |
| | 8/15/2014 | 8/15/2014 | | | | Clean Servers | Finished cleaning 27 | Reboot 17 |
| | 8/15/2014 | 8/15/2014 | | | | Profile | Deleted and Recreated | |
| | 8/15/2014 | 8/15/2014 | | | | Profile | Deleted and Recreated | |
| | 8/25/2014 | 8/25/2014 | | | | Check Servers | 12 17 18 25 42 48 | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 8/25/2014 | 8/25/2014 | | | | Clean Servers | 12 17 18 25 48 | |
| | 8/25/2014 | 8/25/2014 | | | | Sphrs problem | Had user log off and back on | Restart Services |
| | 8/25/2014 | 8/25/2014 | | | | Sphrs problem | Sent User to | |
| | 8/26/2014 | 8/26/2014 | | | | Check Servers | 42 49 | |
| | 8/26/2014 | 8/26/2014 | | | | Clean Server | 12 25 | |
| | 8/26/2014 | 8/26/2014 | | | | Profile | Deleted and Recreated | |
| | 8/26/2014 | 8/26/2014 | | | | Profile | Deleted and Recreated | |
| | 8/26/2014 | 8/26/2014 | | | | Profile | Deleted and Recreated | |
| | 8/28/2014 | 8/28/2014 | | | | Check Servers | 25 42 49 | |
| | 8/28/2014 | 8/28/2014 | | | | Clean Servers | 3 5 7 9 13 | |
| | 8/28/2014 | 8/28/2014 | | | | Profile | Deleted and Recreated | |
| | 8/28/2014 | 8/28/2014 | | | | Restore file | Restored file for user | Restarted services 49 |
| | 8/29/2014 | 8/29/2014 | | | | Check Servers | 42 | |
| | 8/29/2014 | 8/29/2014 | | | | Clean Servers | All good | |
| | | | | | | | | |
| September | | | | | | Check Servers | 8 25 32 42 | |
| | 9/22/2014 | 9/22/2014 | | | | Clean Servers | 49 | |
| | 9/22/2014 | 9/22/2014 | | | | Disable User | Disabled User Account | |
| | 9/23/2014 | 9/23/2014 | | | | Check Servers | All Good but 26 42 | 49 |
| | 9/23/2014 | 9/23/2014 | | | | Clean Servers | All Good | 25 |
| | 9/23/2014 | 9/23/2014 | | | | Profile | Deleted & recreated Profile | |
| | 9/23/2014 | 9/23/2014 | | | | Profile | Deleted & recreated Profile | |
| | 9/23/2014 | 9/23/2014 | | | | Profile | Deleted & recreated Profile | |
| | 9/24/2014 | 9/24/2014 | | | | Check Servers | All Good but 42 | |
| | 9/24/2014 | 9/24/2014 | | | | Clean Servers | 12 17 18 | Restart services 8 25 32 |
| | 9/24/2014 | 9/24/2014 | | | | Profile | Deleted & Recreated | |
| | 9/24/2014 | 9/24/2014 | | | | Profile | Deleted & Recreated | |
| | 9/24/2014 | 9/24/2014 | | | | Called because she got a popup | It was a knowledge msg that I sent to all users | Restarted 26 |
| | 9/24/2014 | 9/24/2014 | | | | Build New VM | Built new VM DFCSC37 | |
| | 9/24/2014 | 9/24/2014 | | | | Profile | Deleted & Recreated | |
| | 9/25/2014 | 9/25/2014 | | | | Check Servers | 25 42 | |
| | 9/25/2014 | 9/25/2014 | | | | Clean Servers | Cleaned Servers 1 - 9 & 25 | |
| | 9/25/2014 | 9/25/2014 | | | | Profile | Deleted & Recreated | Linda Washington |
| | 9/26/2014 | 9/26/2014 | | | | Check Servers | 10 | |
| | 9/26/2014 | 9/26/2014 | | | | Clean Servers | 10 42 | |
| | 9/26/2014 | 9/26/2014 | | | | Profile | Deleted & Recreated | |
| | 9/26/2014 | 9/26/2014 | | | | Profile | Deleted & Recreated | |
| | 9/26/2014 | 9/26/2014 | | | | Profile | Deleted & Recreated | |
| | 9/24/2014 | 9/24/2014 | | | | Check Servers | All Good but 42 | Restarted 25 |
| | 9/24/2014 | 9/24/2014 | | | | Clean Servers | 12 17 18 | Restarted 1 |
| | 9/24/2014 | 9/24/2014 | | | | Profile | Deleted & Recreated | |
| | 9/24/2014 | 9/24/2014 | | | | Profile | Deleted & Recreated | |
| | 9/24/2014 | 9/24/2014 | | | | Profile | Deleted & Recreated | |
| | 9/25/2014 | 9/25/2014 | | | | Check Servers | 25 42 | |
| | 9/25/2014 | 9/25/2014 | | | | Clean Servers | Cleaned Servers 1 - 9 & 25 | |
| | 9/25/2014 | 9/25/2014 | | | | Profile | Deleted & Recreated | Linda Washington |
| | 9/26/2014 | 9/26/2014 | | | | Check Servers | 10 | |
| | 9/26/2014 | 9/26/2014 | | | | Clean Servers | 10 42 | |
| | 9/26/2014 | 9/26/2014 | | | | Profile | Deleted & Recreated | |
| | 9/26/2014 | 9/26/2014 | | | | Profile | Deleted & Recreated | |
| | 9/26/2014 | 9/26/2014 | | | | Profile | Deleted & Recreated | |
| | 9/30/2014 | 9/30/2014 | | | | Check Servers | 42 | Restarted 25 |
| | 9/30/2014 | 9/30/2014 | | | | Clean Servers | 12 17 18 | Restarted 1 |

|  | 9/30/2014 | 9/30/2014 |  |  |  |  | Profile | Deleted & Recreated |  |
|  |  |  |  |  |  |  |  |  |  |
| **October** |  |  |  |  |  |  |  |  |  |
|  | 10/2/2014 | 10/2/2014 |  |  |  |  | Check Servers | All Good |  |
|  | 10/2/2014 | 10/2/2014 |  |  |  |  | Clean Servers | 42 | Restarted |
|  | 10/2/2014 | 10/2/2014 |  |  |  |  | Profile | Deleted & Recreated |  |
|  | 10/2/2014 | 10/2/2014 |  |  |  |  | Profile | Deleted & Recreated |  |
|  | 10/3/2014 | 10/3/2014 |  |  |  |  | Check Servers | All Good | Restarted Services |
|  | 10/3/2014 | 10/3/2014 |  |  |  |  | Clean Servers | 42 |  |
|  | 10/3/2014 | 10/3/2014 |  |  |  |  | Profile | Deleted & Recreated | Sent to Joe |
|  | 10/3/2014 | 10/3/2014 |  |  |  |  | Configure new VM | Configuring DFCSC55 |  |
|  | 10/3/2014 | 10/3/2014 |  |  |  |  | Terminal frozen | Had user unplug and replug n/w cable |  |
|  | 10/3/2014 | 10/3/2014 |  |  |  |  | Install Remote D/T services | Installed Remote D/T services |  |
|  | 10/5/2014 | 10/5/2014 |  |  |  |  | Caller from MCI | Wanted to let me know that Macwis was down |  |
|  | 10/6/2014 | 10/6/2014 |  |  |  |  | Check Servers | All good | Unchecked |
|  | 10/6/2014 | 10/6/2014 |  |  |  |  | Clean Servers | 25 |  |
|  | 10/6/2014 | 10/6/2014 |  |  |  |  | Profile | Deleted & Recreated | Ran Malware again |
|  | 10/7/2014 | 10/7/2014 |  |  |  |  | Check Servers | All Good |  |
|  | 10/7/2014 | 10/7/2014 |  |  |  |  | Clean Servers | 42 |  |
|  | 10/7/2014 | 10/7/2014 |  |  |  |  | Profile | Deleted & Recreated |  |
|  | 10/7/2014 | 10/7/2014 |  |  |  |  | Profile | Deleted & Recreated |  |
|  | 10/7/2014 | 10/7/2014 |  |  |  |  | Profile | Deleted & Recreated |  |
|  | 10/8/2014 | 10/8/2014 |  |  |  |  | Check Servers | All Good |  |
|  | 10/8/2014 | 10/8/2014 |  |  |  |  | Clean Servers | None to clean |  |
|  | 10/8/2014 | 10/8/2014 |  |  |  |  | Profile | Deleted & Recreated | 12:15 AM |
|  | 10/28/2014 | 10/28/2014 |  |  |  |  | Check Servers | 36 37 40 42 55 |  |
|  | 10/28/2014 | 10/28/2014 |  |  |  |  | Clean Servers | 8 13 |  |
|  | 10/28/2014 | 10/28/2014 |  |  |  |  | Profile | Deleted & Recreated |  |
|  | 10/28/2014 | 10/28/2014 |  |  |  |  | Profile | Deleted & Recreated |  |
|  | 10/28/2014 | 10/28/2014 |  |  |  |  | Profile | Deleted & Recreated |  |
|  | 10/29/2014 | 10/29/2014 |  |  |  |  | Check Servers | 37 38 55 57 |  |
|  | 10/29/2014 | 10/29/2014 |  |  |  |  | Clean Servers | 42 |  |
|  | 10/29/2014 | 10/29/2014 |  |  |  |  | 2X Sales & Techs Onsite | Worked with 2x installing agents on Citrix servers | Recreated |
|  | 10/9/2014 | 10/9/2014 |  |  |  |  | Check Servers | All Good |  |
|  | 10/9/2014 | 10/9/2014 |  |  |  |  | Clean Servers | None | x2 |
|  | 10/9/2014 | 10/9/2014 |  |  |  |  | Network card | Added network card |  |
|  | 10/9/2014 | 10/9/2014 |  |  |  |  | Profile | Deleted & Recreated | Restarted |
|  | 10/10/2014 | 10/10/2014 |  |  |  |  | Check Servers | 31 |  |
|  | 10/10/2014 | 10/10/2014 |  |  |  |  | Clean Servers | 42 |  |
|  | 10/10/2014 | 10/10/2014 |  |  |  |  | Add IP addresses to Web Portal | Added IP Addresses to both Web Portal Servers |  |
|  |  |  |  |  |  |  |  |  | 42 |
| **November** |  |  |  |  |  |  |  |  |  |
|  | 11/13/2014 | 11/13/2014 |  |  |  |  | Check Servers | 34 36 52 54 57 42 |  |
|  | 11/13/2014 | 11/13/2014 |  |  |  |  | Clean Servers | 12 18 34 36 | 32 |
|  | 11/13/2014 | 11/13/2014 |  |  |  |  | Profile | Deleted & Recreated |  |
|  | 11/13/2014 | 11/13/2014 |  |  |  |  | Profile | Deleted & Recreated |  |
|  | 11/13/2014 | 11/13/2014 |  |  |  |  | Password reset | User not answering phone |  |
|  | 11/14/2014 | 11/14/2014 |  |  |  |  | Check Servers | 36 56 42 |  |
|  | 11/14/2014 | 11/14/2014 |  |  |  |  | Clean Servers | 10 11 12 13 14 15 16 17 18 |  |
|  | 11/14/2014 | 11/14/2014 |  |  |  |  | Profile | Deleted & Recreated |  |
|  | 11/17/2014 | 11/17/2014 |  |  |  |  | Check Servers | All Good but 1 (down) 36 41 dropped NW card |  |
|  | 11/17/2014 | 11/17/2014 |  |  |  |  | Clean Servers |  |  |
|  | 11/17/2014 | 11/17/2014 |  |  |  |  | Profile/Password | Reset P/W & deleted & Recreated Profile | Dropped Network Card |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 11/17/2014 | 11/17/2014 | | | | | Profile | Deleted & Recreated | |
| | 11/17/2014 | 11/17/2014 | | | | | Profile | Deleted & Recreated | |
| | 11/18/2014 | 11/18/2014 | | | | | Check Servers | All good but 1 (down) | |
| | 11/18/2014 | 11/18/2014 | | | | | Clean Servers | 57 | server 26 |
| | 11/18/2014 | 11/18/2014 | | | | | Profile | Deleted & Recreated | Using Mozilla |
| | 11/18/2014 | 11/18/2014 | | | | | Profile | User was logged into DFCSC01 (No Apps on server) | |
| | 11/18/2014 | 11/18/2014 | | | | | Profile | Deleted & Recreated | |
| | 11/18/2014 | 11/18/2014 | | | | | Rebuild DFCSC01 | Rebuilding DFCSC01 | CS-Quickrv-P-Ttl 100 GB |
| | 11/19/2014 | 11/19/2014 | | | | | Check Servers | 42 | CS-Quickrv-P |
| | 11/19/2014 | 11/19/2014 | | | | | Clean Servers | 57 | |
| | 11/19/2014 | 11/19/2014 | | | | | Profile | Deleted & Recreated | |
| | 11/19/2014 | 11/19/2014 | | | | | Profile | Deleted & Recreated | 42 |
| | 11/19/2014 | 11/19/2014 | | | | | Profile | Deleted & Recreated | |
| | 11/20/2014 | 11/20/2014 | | | | | Check Servers | 42 | |
| | 11/20/2014 | 11/20/2014 | | | | | Clean Servers | 42 | |
| | 11/20/2014 | 11/20/2014 | | | | | Profile | Deleted & Recreated | |
| | 11/21/2014 | 11/21/2014 | | | | | Check Servers | All Good | 12:30:00 AM-1:00 AM |
| | 11/21/2014 | 11/21/2014 | | | | | Clean Servers | 12 42 | |
| | 11/21/2014 | 11/21/2014 | | | | | Needed Citrix Rx | Sent Citrix Rx in email | |
| | | | | | | | | | |
| December | | | | | | | | | |
| | 12/17/2014 | 12/17/2014 | | | | | Check Servers | 7 25 39 54 | |
| | 12/17/2014 | 12/17/2014 | | | | | Clean Servers | 7 25 | |
| | 12/18/2014 | 12/18/2014 | | | | | Check Servers | 31 42 49 | |
| | 12/18/2014 | 12/18/2014 | | | | | Clean Servers | 42 | Can't recover |
| | 12/18/2014 | 12/18/2014 | | | | | Profile | Deleted & Recreated | |
| | 12/19/2014 | 12/19/2014 | | | | | Check Servers | 31 | |
| | 12/19/2014 | 12/19/2014 | | | | | Clean Servers | None | |
| | 12/19/2014 | 12/19/2014 | | | | | Citrix Receiver | Installed Citrix Receiver | |
| | 12/19/2014 | 12/19/2014 | | | | | Paper work to change user name | Changed user name | Dropped Nic 39 54 |
| | 12/26/2014 | 12/26/2014 | | | | | Check Servers | 40 42 | |
| | 12/26/2014 | 12/26/2014 | | | | | Clean Servers | 12 18 | |
| | 12/26/2014 | 12/26/2014 | | | | | Profile | Deleted & Recreated | |
| | 12/26/2014 | 12/26/2014 | | | | | Profile | Deleted & Recreated | Logged her out |
| | 12/26/2014 | 12/26/2014 | | | | | EMC Contact | Contacting EMC | fl-sqldev01-t |
| | 12/29/2014 | 12/29/2014 | | | | | Check Servers | 42 | EACSPUBDIR |
| | 12/29/2014 | 12/29/2014 | | | | | Clean Servers | All Clean | Lost Nic |
| | 12/29/2014 | 12/29/2014 | | | | | Profile | Deleted & Recreated | |
| | 12/29/2014 | 12/29/2014 | | | | | Profile | Deleted & Recreated | |
| | 12/29/2014 | 12/29/2014 | | | | | Profile | Deleted & Recreated | |
| | 12/29/2014 | 12/29/2014 | | | | | Profile | Deleted & Recreated | |
| | 12/29/2014 | 12/29/2014 | | | | | Profile | Deleted & Recreated | |
| | 12/29/2014 | 12/29/2014 | | | | | Delete print Q | Printer 14/1 | 40 Lost Nic |
| | 12/30/2014 | 12/30/2014 | | | | | Check Servers | All Good | |
| | 12/30/2014 | 12/30/2014 | | | | | Clean Servers | All Clean | |
| | 12/30/2014 | 12/30/2014 | | | | | Webportal | Restarted Webserver | |
| | 12/30/2014 | 12/30/2014 | | | | | Printer problem | Restarted Printserver | |
| | 12/30/2014 | 12/30/2014 | | | | | Profile | Deleted & Recreated | |
| | 12/31/2014 | 12/31/2014 | | | | | Check Servers | 10 42 | |
| | 12/31/2014 | 12/31/2014 | | | | | Clean Servers | 10 | |
| | 12/31/2014 | 12/31/2014 | | | | | Profile | Deleted & Recreated | 42 |
| | 12/31/2014 | 12/31/2014 | | | | | Profile | Deleted & Recreated | |
| | 12/31/2014 | 12/31/2014 | | | | | Profile | Deleted & Recreated | |

| | 12/31/2014 | 12/31/2014 | | | | | Profile | Deleted & Recreated | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | No problem |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

## MACWIS DOWN TIME TRACKING
## 2015

DEFINITIONS:
PLANNED DOWNTIME- an event scheduled by MIS, notice to staff given of dates/times/length of expected unavailability. All users affected.
UNPLANNED DOWNTIME-an unscheduled event that affects all users ability to access MACWIS.
UNPLANNED LIMITED ACCESS-an unscheduled even that does not affect all users. Access may be sporadic, response time slow.

| MONTH | Downtime Begin/Reported date/time | Downtime end date/time | Planned Event? | Approximate PLANNED Downtime (in hours) | Approximate UNPLANNED Downtime (in hours) | Approximate UNPLANNED LIMITED ACCESS (in hours) | Reason | Result | MIS Contact person/Responsible Party |
|---|---|---|---|---|---|---|---|---|---|
| JANUARY | | | | | | | | | |
| | 1/3/2015 | 1/3/2015 | n | | | | ReconfigureTraveler-T | Reconf from 1 CPU to 4 CPU's Start Snapshot | 12:00 PM |
| | 1/6/2015 | 1/6/2015 | n | | | | Check Servers | 17 42 | |
| | 1/6/2015 | 1/6/2015 | n | | | | Clean Servers | 17 | |
| | 1/7/2015 | 1/7/2015 | n | | | | Check Servers | 42 57 | 57 Dropped Nic |
| | 1/7/2015 | 1/7/2015 | n | | | | Clean Servers | 17 | |
| | 1/8/2105 | 1/8/2105 | | | | | Check Servers | 30 42 | 30 Dropped Nic |
| | 1/8/2105 | 1/8/2105 | | | | | Clean Servers | 17 | |
| | 1/9/2015 | 1/9/2015 | | | | | Check Servers | 42 | Ran malware scan |
| | 1/9/2015 | 1/9/2015 | | | | | Clean Servers | None | |
| | 1/9/2015 | 1/9/2015 | | | | | Profile | Deleted & Recreated | |
| | 1/9/2015 | 1/9/2015 | | | | | Build 2012 Server | Built 2012 Server eDRS for Rita Agrawal | 4CPU 8GB 300GB |
| | 1/12/2015 | 1/12/2015 | | | | | Check Servers | 12 42 | |
| | 1/12/2015 | 1/12/2015 | | | | | Clean Servers | 5 10 12 18 | |
| | 1/12/2015 | 1/12/2015 | | | | | Unable to Access Server | Turned RDP on Server eDRS | x4 |
| | 1/13/2015 | 1/13/2015 | | | | | Check Servers | 42 | |
| | 1/13/2015 | 1/13/2015 | | | | | Clean Servers | 12 18 | |
| | 1/13/2015 | 1/13/2015 | | | | | Update new 3 Citrix Servers | Updated Macwis on 3 servers | |
| | 1/13/2015 | 1/13/2015 | | | | | Terminal Locked up | Logged off and back on to another server | |
| | 1/14/2015 | 1/14/2015 | | | | | Check Servers | Restart Services on 38 49 51 | |
| | 1/14/2015 | 1/14/2015 | | | | | Clean Servers | 12 18 42 49 | |
| | 1/15/2015 | 1/15/2015 | | | | | Check Servers | 42 50 | |
| | 1/15/2015 | 1/15/2015 | | | | | Clean Servers | 50 | |
| | 1/15/2015 | 1/15/2015 | | | | | Assisting with server update | Updating MyCids on Server 54 | Failed |
| | 1/16/2015 | 1/16/2015 | | | | | Check Servers | 42 | |
| | 1/16/2015 | 1/16/2015 | | | | | Clean Servers | 44 | |
| | 1/16/2015 | 1/16/2015 | | | | | Assisting with server update | Updating MyCids on Server 54 | Suceeded |
| | 1/20/2015 | 1/20/2015 | | | | | Check Servers | 42 | |
| | 1/20/2015 | 1/20/2015 | | | | | Clean Servers | No cleaning needed | |
| | 1/21/2015 | 1/21/2015 | | | | | Check Servers | 42 | |
| | 1/21/2015 | 1/21/2015 | | | | | Clean Servers | 16 | |

## MACWIS DOWN TIME TRACKING
## 2015

DEFINITIONS:
PLANNED DOWNTIME- an event scheduled by MIS, notice to staff given of dates/times/length of expected unavailability. All users affected.
UNPLANNED DOWNTIME-an unscheduled event that affects all users ability to access MACWIS.
UNPLANNED LIMITED ACCESS-an unscheduled even that does not affect all users. Access may be sporadic, response time slow.

| MONTH | Downtime Begin/Reported date/time | Downtime end date/time | Planned Event? | Approximate PLANNED Downtime (in hours) | Approximate UNPLANNED Downtime (in hours) | Approximate UNPLANNED LIMITED ACCESS (in hours) | Reason | Result | MIS Contact person/Responsible Party |
|---|---|---|---|---|---|---|---|---|---|
|  | 1/22/2015 | 1/22/2015 |  |  |  |  | Check Servers | 42 |  |
|  | 1/22/2015 | 1/22/2015 |  |  |  |  | Clean Servers | 16 17 |  |
|  | 1/23/2015 | 1/23/2015 |  |  |  |  | Check Servers | 42 |  |
|  | 1/23/2015 | 1/23/2015 |  |  |  |  | Clean Servers |  |  |
|  | 1/23/2015 | 1/23/2015 |  |  |  |  | Unable to access Citrix | User is bringing PC to State Office |  |
|  | 1/29/2015 | 1/29/2015 |  |  |  |  | Check Servers | 42 |  |
|  | 1/29/2015 | 1/29/2015 |  |  |  |  | Clean Servers | 10 12 18 22 25 42 44 45 |  |
|  | 1/30/2015 | 1/30/2015 |  |  |  |  | Check Servers | 42 |  |

## MACWIS DOWN TIME TRACKING
## 2015

DEFINITIONS:
PLANNED DOWNTIME- an event scheduled by MIS, notice to staff given of dates/times/length of expected unavailability. All users affected.
UNPLANNED DOWNTIME-an unscheduled event that affects all users ability to access MACWIS.
UNPLANNED LIMITED ACCESS-an unscheduled even that does not affect all users. Access may be sporadic, response time slow.

| MONTH | Downtime Begin/Reported date/time | Downtime end date/time | Planned Event? | Approximate PLANNED Downtime (in hours) | Approximate UNPLANNED Downtime (in hours) | Approximate UNPLANNED LIMITED ACCESS (in hours) | Reason | Result | MIS Contact person/Responsible Party |
|---|---|---|---|---|---|---|---|---|---|
| | 1/30/2015 | 1/30/2015 | | | | | Clean Servers | 22 25 42 44 45 | |
| | | | | | | | | | |
| | | | | | | | | | |
| Feb-15 | 2/3/2015 | 2/3/2015 | | | | | Check Servers | 42 | |
| | 2/3/2015 | 2/3/2015 | | | | | Clean Servers | None to Clean | |
| | 2/3/2015 | 2/3/2015 | | | | | Add Names to AD | Added Names to AD and Profile Server | |
| | 2/4/2015 | 2/4/2015 | | | | | Check Servers | 42 | |
| | 2/4/2015 | 2/4/2015 | | | | | Clean Servers | None to Clean | |
| | 2/4/2015 | 2/4/2015 | | | | | Build 5 new Xen Servers | Built 5 new Xen Servers per Michael | |
| | 2/5/2015 | 2/5/2015 | | | | | Check Servers | 41 | |
| | 2/5/2015 | 2/5/2015 | | | | | Clean Servers | | |
| | 2/5/2015 | 2/5/2015 | | | | | No Resources Available | Moved back to old system | |
| | 2/6/2015 | 2/6/2015 | | | | | Check Servers | 42 | |
| | 2/6/2015 | 2/6/2015 | | | | | Clean Servers | | |
| | 2/6/2015 | 2/6/2015 | | | | | Errors on Server 12 | Error 18 | Vendor working on |

## MACWIS DOWN TIME TRACKING
## 2015

DEFINITIONS:
PLANNED DOWNTIME- an event scheduled by MIS, notice to staff given of dates/times/length of expected unavailability. All users affected.
UNPLANNED DOWNTIME-an unscheduled event that affects all users ability to access MACWIS.
UNPLANNED LIMITED ACCESS-an unscheduled even that does not affect all users. Access may be sporadic, response time slow.

| MONTH | Downtime Begin/Reported date/time | Downtime end date/time | Planned Event? | Approximate PLANNED Downtime (in hours) | Approximate UNPLANNED Downtime (in hours) | Approximate UNPLANNED LIMITED ACCESS (in hours) | Reason | Result | MIS Contact person/Responsible Party |
|---|---|---|---|---|---|---|---|---|---|
| | 2/6/2015 | 2/6/2015 | | | | | Network line or NIC | Sent to Bryan or Jason | |
| | 2/6/2015 | 2/6/2015 | | | | | Service Problem | Error 401 | Vendor working on |
| | 2/6/2015 | 2/6/2015 | | | | | Service Problem | Error 401 | Vendor working on |
| | 2/6/2015 | 2/6/2015 | | | | | No Apps | Moved back to old system | |
| | 2/9/2015 | 2/9/2015 | | | | | Check Servers | 42 | |
| | 2/9/2015 | 2/9/2015 | | | | | Clean Servers | | |
| | 2/9/2015 | 2/9/2015 | | | | | Unable to login | Getting Error 18 License Error | Fixed |
| | 2/9/2015 | 2/9/2015 | | | | | No Icons | Deleted Profile and had user log in again | |
| | 2/9/2015 | 2/9/2015 | | | | | No Icons | Deleted Profile and had user log in again | |
| | 2/9/2015 | 2/9/2015 | | | | | Login and no Icons | Deleted Profile and had user log in again | |

## MACWIS DOWN TIME TRACKING
## 2015

DEFINITIONS:
PLANNED DOWNTIME- an event scheduled by MIS, notice to staff given of dates/times/length of expected unavailability. All users affected.
UNPLANNED DOWNTIME-an unscheduled event that affects all users ability to access MACWIS.
UNPLANNED LIMITED ACCESS-an unscheduled even that does not affect all users. Access may be sporadic, response time slow.

| MONTH | Downtime Begin/Reported date/time | Downtime end date/time | Planned Event? | Approximate PLANNED Downtime (in hours) | Approximate UNPLANNED Downtime (in hours) | Approximate UNPLANNED LIMITED ACCESS (in hours) | Reason | Result | MIS Contact person/Responsible Party |
|---|---|---|---|---|---|---|---|---|---|
| | 2/9/2015 | 2/9/2015 | | | | | Gets kicked out of Macwis | Deleted profile in all 2x Servers | |
| February 2015 Total | | | | | | | | | |
| | | | | | | | | | |
| March 2015 Downtime | | | | | | | | | |
| | 3/5/2015 | 3/5/2015 | | | | | Service no reg | Logged off fixed server | |
| | 3/5/2015 | 3/5/2015 | | | | | Log on issues | Add printer no logon issue | |
| | 3/5/2015 | 3/5/2015 | | | | | Logon Problems | Add Printer no login pro | |
| | 3/13/2015 | 3/13/2015 | | | | | | Win 7 not Genuine | |

# App. B, Ex. 20

**Grace M. Lopes**

---

**From:** Mark Allen [mailto:mark.allen@mdhs.ms.gov]
**Sent:** Tuesday, April 14, 2015 6:02 PM
**To:** Grace M. Lopes
**Cc:** 'Mark Jordan'
**Subject:** RE: Downtime Tracking Reports

Grace,

As we discussed a few weeks ago when setting up our meeting for yesterday, I am out on personal leave the rest of this week.  I will get on this when I return next week.

Thank you,

Mark Allen
Chief Information Officer
Mississippi Department of Human Services
P.O. Box 352
Jackson, MS 39205
601-359-4600
mark.allen@mdhs.ms.gov

---

**From:** Grace M. Lopes [mailto:gmlopes@oymonitor.org]
**Sent:** Tuesday, April 14, 2015 2:08 PM
**To:** Mark Allen
**Cc:** 'Mark Jordan'
**Subject:** Downtime Tracking Reports

Mark:

Thank you for your time yesterday.  As a follow up to our call, attached please find copies of the Downtime Tracking Reports that I referred to during our telephone conference.  As you will see, the 2012 and 2013 reports reflect how much time was implicated in each of the limitations in system access that were tracked in the reports.  However, I recently received the 2014 and 2015 reports, which omit this information.  I would appreciate complete copies of the 2014 and 2015 Downtime Tracking Reports with all time fields filled in.  Please advise whether this information can be produced.  Many thanks, Grace

*Grace M. Lopes*
*Monitor, Olivia Y.*
*1220 19th Street, N.W.*
*Suite 500*
*Washington, D.C.  20036*
*202.232.8311*

*This email and any attachments may contain confidential and privileged information.  If you are not the intended recipient, please notify the sender immediately, destroy this email, and destroy any copies.  Any dissemination or use of this information by a person other than the intended recipient is unauthorized and may be illegal.*

# App. B, Ex. 21



BAKER DONELSON
BEARMAN, CALDWELL & BERKOWITZ, PC

MEADOWBROOK OFFICE PARK
4268 I-55 NORTH
JACKSON, MISSISSIPPI 39211

PHONE:  601.351.2400
FAX:      601.351.2424

www.bakerdonelson.com

DEWITT L. ("RUSTY") FORTENBERRY, JR.
**Direct Dial**: 601.351.8948
**Direct Fax**: 601.974.8948
**E-Mail Address**: rfortenberry@bakerdonelson.com

March 31, 2014

**VIA ELECTRONIC & UNITED STATES MAIL**

Marcia Robinson Lowry
Children's Rights Incorporated
330 Seventh Avenue, 4th Floor
New York, NY 10001

RE:    *Olivia Y., et al. v. Phil Bryant, et al*; In the United States District Court for the
Southern District of Mississippi, Jackson Division; Cause No. 3:04CV251LN

Dear Marcia:

This letter is in response to yours of February 27, 2014, in which you provided notice that you believed that Defendants had failed to comply with their obligations pursuant to Section VII.B of the Modified Mississippi Settlement Agreement and Reform Plan, dated July 6, 2012, (the "MSA"), the Period 3 Implementation Plan, the Court's Order dated June 24, 2013, (the "Data Order"), and the Final Period 4 Implementation Plan (the "Final IP4").  As dictated by Section VII. B of the MSA, I offer the following response to your allegations.

**Failure to Produce Valid and Accurate Caseworker Mixed Caseload Reports**

As previously communicated, in light of the difficulties associated with re-producing accurate and validated caseload data reports for past points in time, Defendants made the decision to focus their resources on the production of accurate and valid reports going forward.

In order to improve the face validity check process for the AR1 mixed caseload reports, Defendants have developed a more refined face validity checklist.  Enclosed are the AR1, AR2 and AR3 caseload data reports (CD - DHS 362793) and the Face Validity Checklist Reviews for AR1 Reports for March 3 (DHS 362772-362778), March 12 (DHS 362779-362785) and March 20, 2014 (DHS 362786-362792).  Defendants will continue running the AR1, AR2, and AR3

ALABAMA • FLORIDA • GEORGIA • LOUISIANA • MISSISSIPPI • TENNESSEE • TEXAS • WASHINGTON, D.C.

Marcia Robinson Lowry
March 31, 2014
Page 2

data reports weekly through May 2014. Additionally, to identify and decrease data entry errors, Defendants are conducting a 100% validation of the AR1 data report over a period of two-and-a-half months. Three regions are being 100% validated for each weekly report. On average it takes approximately two to three weeks to complete a 100% validation of a region. This process will be repeated until all regions have been validated.

As a result of what Defendants have learned in conducting the face validity check as well as the 100% validation, they have determined that it would be helpful to further revise the report specifications for the dedicated and mixed caseload reports to which the parties previously agreed. Defendants propose further discussion between the parties on this issue.

## Completion of Maltreatment in Care Investigation Reviews

The Defendants identified 108 investigations (involving 147 children) related to alleged maltreatment during trial home visits or in unlicensed placements that should have been reviewed as part of the CQI Safety Review Unit (the "SRU") maltreatment in care ("MIC") review process for the period of July 1, 2013, through January 31, 2014. Additionally, 17 investigations (involving 23 children) were identified for the period of February 1, 2014, through February 23, 2014. Therefore, 125 investigations were not completed by the SRU between July 1, 2013, and February 23, 2014. To review all 125 investigations and ensure that all MIC investigations are reviewed in the future, Defendants have initiated the following corrective action.

1.    *Corrective Action Plan for Completing MIC Investigation Reviews*

CQI selected eight individuals to serve on a special review team to complete the 125 MIC investigation reviews. Each reviewer has experience conducting investigations. The SRU MIC reviewers are not a part of the special review team so that they can keep up to date with the ongoing MIC investigation review schedule.

On March 6, 2014, the special review team met for a one day MIC review process training session and mock review. The SRU supervisor completed quality assurance checks on the mock reviews for consistency as well as training on how to complete quality assurance on MIC reviews. Assignments for the first 108 investigations were then made and on March 7, 2014, the special review team began working on their review assignments.

Upon completion of each assigned review, the special review team members will submit each review to the supervisory staff for completion of quality assurance. As quality assurance approval is granted, any safety and/or practice concern in need of corrective action will be reported for Helpdesk Expert Automation Tool ("HEAT") data entry and assignment to the respective region. The CQI corrective action tracking process will be followed for all corrective actions assigned to the respective region or county.

On March 13, 2014, the additional 17 investigations identified for the period of February 1, 2014, through February 23, 2014, were assigned to the special review team members.

Marcia Robinson Lowry
March 31, 2014
Page 3

It is anticipated that between April 1 and 4, 2014, the special review team will meet for an exit meeting to finalize any incomplete reviews, discuss the review process, findings, corrective action assignments, and data from the 125 MIC investigation reviews.

On April 30, 2014, the CQI SRU will produce to the Court Monitor and Plaintiffs manual MIC monthly reports reflecting data for the 125 investigations reviewed for the period of July 1, 2013, through February 23, 2014.

2.     *Remediation of MACWIS Report MWZ1271D Weekly Version - Timeliness of Investigations for Custody Children in a Resource Setting*

This remedial action plan addresses correction of the MACWIS report for assignments of MIC investigations to be reviewed.

Between February 21 and 28, 2014, DFCS and CSF reviewed the new version of the SWZ1271 data report to determine whether, if run on a weekly basis, it will provide the information necessary to ensure that SRU reviews all MIC investigations within 30 days. As a result of this review, BCS was requested to set up a weekly run of the SWZ1271 data report which will be used for assignment of all future MIC investigation reviews. The original weekly run of data report MWZ1271D has been canceled and is no longer in use.

On March 4, 2014, the SRU received the first weekly run of SWZ1271. That data report, as well as each future version of the report, will include data for the previous week's seven day reporting period. Thus, all future MIC investigation reviews will be scheduled for a timely review by the SRU.

3.     *CQI SRU Staffing*

It is believed that the SRU is adequately staffed in order to timely complete MIC investigation reviews. Nevertheless, the SRU is in the process of hiring an additional person to ensure completion of the increased workload. This position is currently being advertised in order to fill this position as expeditiously as possible, but no later than June 30, 2014.

Finally, Defendants are willing to work in good faith with Plaintiffs to refine necessary corrective actions and avoid an enforcement action so that the parties can focus on negotiation of the Period 5 Implementation Plan as required by Section I.E. of the MSA.

Marcia Robinson Lowry
March 31, 2014
Page 4

Sincerely,

BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC

Dewitt L. ("Rusty") Fortenberry, Jr.

DLF/fdb

cc:    Ms. Grace Lopes
       Mr. Rickey Berry
       Mr. Mark Smith
       Dr. Kimberly Shackelford
       Mr. Jack Wilson
       Mr. Harold Pizzetta

# App. B, Ex. 22

## Grace M. Lopes

**Attachments:**                mic backlog rpt001.pdf

---

**From:** Long, Gwen [mailto:glong@bakerdonelson.com]
**Sent:** Wednesday, April 30, 2014 6:14 PM
**To:** jdavis@ChildrensRights.Org; gmlopes@oymonitor.org
**Cc:** Mia Caras (mcaras@sparb.org); Mark.Smith@mdhs.ms.gov; Rachal, Kenya
**Subject:** Productions for today

Julia and Grace:

Attached are the following documents:

        DHS 362927-362945 - manual MIC backlog report produced in follow-up to Rusty Fortenberry's letter of March 31, 2014 (PDF and Excel)
        Unbates'd SWIP-42 – *Reimbursement of Resource Families* Report for 3/1-31/14 (Excel and PDF)

Gwen

**Gwen N. Long**
Paralegal
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
Meadowbrook Office Park
4268 I-55 North
Jackson, MS  39211
Direct:  601.351.8962
Fax:    601.974.8962
E-Mail: glong@bakerdonelson.com
www.bakerdonelson.com

Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C. represents clients across the U.S. and abroad from offices in Alabama, Florida, Georgia, Louisiana, Mississippi, Tennessee, Texas, Washington, D.C.

🌲 Please consider the environment before printing this e-mail
**Baker Donelson**: One of FORTUNE magazine's "100 Best Companies to Work For"

---

Under requirements imposed by the IRS, we inform you that, if any advice concerning one or more U.S. federal tax issues is contained in this communication (including in any attachments and, if this communication is by email, then in any part of the same series of emails), such advice was not intended or written by the sender or by Baker, Donelson, Bearman, Caldwell & Berkowitz, PC to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or tax-related matter addressed herein.

This electronic mail transmission may constitute an attorney-client communication that is privileged at law. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this electronic mail transmission in error, please delete it from your system without copying it, and notify the sender by reply e-mail, so that our address record can be corrected.

| Summary for MIC Review Report | # | % |
|---|---|---|
| Total MIC Reviews Completed | 122 | |
| Total MIC Reviews Completed w/ Identified Safety / Case Practice Deficiencies? | 106 | 86.89% |
| Total MIC Reviews Completed w/ Remedial or Corrective Actions Identified? | 106 | 86.89% |
| Timeframes for MIC Reviews Completed w/ Remedial or Corrective Actions Identified? | 106 | 86.89% |
| Investigation and Decisions Based on Full and Systematic Review of Factors? | 104 | 85.25% |
| Identified Needed Corrective Actions Been Completed by the Field | 84 | 79.25% |
| Identified Needed Corrective Actions Been Not Completed by the Field | 1 | 0.94% |
| | | |
| Total Safety (Level 1) assigned in Heat | 96 | |
| Remedial or Corrective Action Safety Issue Initiated Timely? | 52 | 54.17% |
| Remedial or Corrective Action Safety Issue Initiated Untimely? | 44 | 45.83% |
| No Remedial or Corrective Action Safety Issue Initiated? | 0 | 0.00% |
| If Safety Issue Initiated Untimely, ASWS, RD, DFO Notified? | 44 | 100.00% |
| Remedial or Corrective Action Resolved Safety Issue Timely? | 35 | 67.31% |
| | | |
| Total Practice (Level 2) assigned in Heat | 81 | |
| Remedial or Corrective Action Practice Issue Initiated Timely? | 52 | 64.20% |
| Remedial or Corrective Action Practice Issue Initiated Untimely? | 28 | 34.57% |
| No Remedial or Corrective Action Practice  Issue Initiated? | 1 | 1.23% |
| If Practice Issue Initiated Untimely, ASWS, RD, DFO Notified? | 28 | 100.00% |
| Remedial or Corrective Action Resolved Practice Issue Timely? | 46 | 88.46% |

DHS
362927

**App. B, Ex. 23A**

**CURRICULUM VITAE**

**DIANE DEPANFILIS, Ph.D., M.S.W.**
ORCID 0000-0001-5435-809X

April 2015

**Education:**

| | | |
|---|---|---|
| Ph.D. | 1996 | University of Maryland, Baltimore; Social Work **DISSERTATION** - DePanfilis, D. E. (1996). The epidemiology of child maltreatment recurrences. *Dissertation Abstracts International, 56,* (12). |
| M.S.W. | 1982 | University of Wisconsin-Milwaukee; Social Work **THESIS** - Consideration of citizen review: A baseline study of the characteristics and case dynamics of children in foster care and the implications for permanency planning |
| B.A. | 1973 | Villa Maria College; Sociology, Social Welfare |

**Experience in Higher Education:**

| | |
|---|---|
| 2015 | Professor, Silberman School of Social Work at Hunter College |
| 2014 – 2015 | Visiting Professor, Silberman School of Social Work at Hunter College |
| 2013 – 2014 | Moses Distinguished Visiting Professor, Silberman School of Social Work at Hunter College |
| 2008 – 2015 | Professor, University of Maryland School of Social Work |
| 2006 – 2014 | Director, Ruth H. Young Center for Families and Children |
| 2005 – 2013 | Associate Dean for Research University of Maryland School of Social Work |
| 2002 – 2005 | Assistant Dean for Research University of Maryland School of Social Work |
| 2000 – 2008 | Associate Professor |
| 2000 – 2006 | Co-Director – University of Maryland Center for Families |
| 1996 – 2000 | Assistant Professor |

1

**Teaching**

Sabbatical                **2013-2014 Academic Year**


**Ph.D. Courses**

| | |
|---|---|
| Spring 2015 | SOWK 814: Social Work Intervention Research (2 sections) |
| Spring 2013 | SOWK 814: Social Work Intervention Research |
| Spring 2012 | SOWK 838: Special Topics in Intervention Research |
| Spring 2011 | SOWK 838: Special Topics in Intervention Research |
| Spring 2010 | SOWK 838: Special Topics in Intervention Research |
| Fall 2008 | SOWK 838 Doctoral Seminar in Teaching (Co-Taught with Donna Harrington) |
| Fall 2003 | SOWK 838 Doctoral Seminar, Special Topics in Social Work: Outcomes Measurement |
| Fall 2000 | SOWK 838 Doctoral Seminar, Special Topics in Social Work: Outcomes Measurement |

**MSW Courses**

| | |
|---|---|
| Fall 2007 | SOWK 777 Research in Child Welfare (classroom) |
| Spring 2007 | SOWK 777 Research in Child Welfare (classroom) |
| Fall 2006 | Sabbatical Leave |
| Spring 2006 | SOWK 777 Research in Child Welfare (classroom) |
| Fall 2005 | SOWK 777 Research in Child Welfare (web-based) |
| Spring 2005 | SOWK 789 Independent Research: Evaluation of a Child Maltreatment Preventive Intervention |
| Fall 2004 | SOWK 789 Independent Research: Evaluation of a Child Maltreatment Preventive Intervention |
| Spring 2004 | SOWK 777 Research in Child Welfare (web-based) |
| Spring 2003 | SOWK 777 Research in Child Welfare (web-based) |
| Fall 2002 | SOWK 777 Research in Child Welfare (web-based) |
| Spring 2002 | SOWK 777 Research in Child Welfare (2 web-based sections) |
| Fall 2001 | SOWK 630 Social Work Practice with Individuals (1 regular section, 1 hybrid partially web-based) |
| Spring 2001 | SOWK 777 Research in Child Welfare |
| Fall 2000 | SOWK 630 Social Work Practice with Individuals |
| Spring 2000 | SOWK 777 Research in Child Welfare |
| Fall 1999 | SOWK 630 Clinical Practice with Individuals |
| Spring 1999 | SOWK 777 Research in Child Welfare |
| Fall 1998 | SOWK 630 Clinical Practice with Individuals SWCL 727 Clinical Practice with Families & Children in Child Welfare |
| Spring 1998 | SOWK 677 Research in Child Welfare |
| Fall 1997 | SOWK 630 Clinical Practice with Individuals SWCL 627 Clinical Practice with Families & Children in Child Welfare |
| Spring 1997 | SWCL 627 Clinical Practice with Families & Children in Child Welfare SOWK 689 Using Outcome Based Measures of Intervention Effectiveness |
| Fall 1996 | SOWK 630 Clinical Practice with Individuals and Families SWCL 627 Clinical Practice with Families & Children in Child Welfare |

2

1992-1996          **Adjunct Faculty.** School of Social Work, University of Maryland
                   MSW Courses
                             SOWK 670 Social Work Research Methods (1)
                             SOWK 615 Children and Social Services Policy (2)
                             SOWK 689 Independent Research Group Project (7)
                             SOWK 630 Clinical Practice with Individuals and Families (1)
                             SWCL 627 Clinical Practice with Families & Children in Child Welfare
                             (2)

1996-Present       **Ph.D. Dissertations**
                   *Chair:*
                   Leah Bartley, Making it happen: Understanding factors related to improved worker and
                   organizational fidelity to a child maltreatment prevention program. (2014 - 2015)[1].

                   Fatima Mirza, Understanding American Muslim youth of Arab and South Asian
                   ancestries: An exploratory study on the factors related to risk behaviors among
                   child immigrants and children of immigrants (2006-2014). Ph.D. 2014.

                   Karen Rice, Change over time in implementation fidelity of a child welfare practice
                   model. (2009 – 2011). Ph.D. 2011.

                   R. Anna Hayward, Neighborhood conditions, father involvement, parenting competence,
                   and behavior problems in a sample of children at risk for neglect: A structural equation
                   model (2006-2009). Ph.D. 2009.

                   Pamela Love, Examining factors that impact transfer of training by Department of Social
                   Services Workers (2002-2007). Ph.D. 2007.

                   Clara Daining, Resilience of youth in transition from out-of-home care to adulthood
                   (2002-2004). Ph.D. 2004.

                   Subadra Panchanadeswaran, A longitudinal exploration of the factors that affect the
                   timing of women's decisions to leave abusive relationships (2001-2003). Ph.D. 2003.[2]

                   ***Committee Member:***
                   Michelle Tuten, A comparison of treatment outcomes for participants receiving
                   Reinforcement-Based Treatment (RBT) versus participants receiving RBT plus Recovery
                   Housing (RBT+RH) (2012-2013). Ph.D. 2013.

                   Francesca Robertson, An exploration of the effect of a tobacco-related harm reduction
                   strategy on parents in the hard-to-reach population. (2012). The University of Western
                   Australia. Ph.D. 2012.

                   Crystal Williams, The System of Care mental health service experience: Differences in
                   perceptions between African American and Caucasian youth and its impact on service

---

1  Received a Doris Duke Fellowship for the Promotion of Child Well-Being to support this dissertation.

2  Received a Society for Social Work and Research Honorable Mention for this dissertation.

use and the relationship between service use and mental health outcomes (2010 - 2012). Ph.D. 2012.

Kristen Woodruff, Assessing developmental pathways of young children investigated for neglect and predictors of persistent problems (2009-2012). Ph.D. 2012.

Karen Castellanos, Youth risk factors and educational outcomes of mentored and non-mentored youth. (2008-2010). Ph.D. 2010

Claudietta Johnson, The leadership experiences of child welfare supervisors in the State of Maryland Department of Human Resources: Impacts on the dynamics of retaining supervisory leadership. University of Baltimore Doctor of Public Administration Program (2007-2010). Ph.D. 2010

Martha D. Clark, Factors affecting out-of-home placement decisions for drug-exposed newborn infants –Catholic University School of Social Work (2002-2004). Ph.D. 2004.

Pamela L. Smith, Adaptive coping strategies of othermothers: An examination of spirituality, social support, stress and depression among African American Surrogate Mothers (2001-2003). Ph.D. 2003.

Gaynell Simpson, An exploration of social support and coping and the impact on caregiver well-being among African American grandmothers who provide care for their grandchildren (2001-2003). Ph.D. 2003.

Kelly Hyde, Contextual correlates of urban child maltreatment (1996-2002). Ph.D. 2002.

Elizabeth Bowman, The Wage Connection Program: A case study of local implementation in a Federal system (1999-2001). Ph.D. 2001.

Deborah A. Mathews, Welfare recidivism: When a job might not be enough (1999-2000). Ph.D. 2000.

Pamela J. Caudill, Welfare reform two years later: The impact of caseload decline and development of policies for those still receiving assistance –, University of Maryland, Baltimore County, Department of Psychology (1999-2000). Ph.D. 2000.

Joy Swanson Ernst, The neighborhood correlates of child maltreatment: Montgomery County, Maryland (1996-1999). Ph.D. 1999.

Robert Fletcher, An examination of alternate causal models of child maltreatment (1996-1998). Ph.D. 1999.

Joan Levy Zlotnik, Using Title IV-E training funds to support social work education: Examining the implementation of federal policy (1997-1998). Ph.D. 1998.

**Ph.D. Independent Study**

2009    Time to CPS referral:  Individual, family, and social predictors for at-risk families – Karen Rice

4

| | |
|---|---|
| 2006 | Children of incarcerated parents in foster care: Review of the literature and secondary data analysis – R. Anna Hayward |
| 2001 | Effectiveness of parenting education:  An analytical review of theory and research – Clara Daining |
| 2000 | Exploring the relationship between alcohol abuse and woman abuse - Subadra Panchanadeswaran |
| 1997 | Factors that predict foster care placement - Cynthia Fontanella |

**PhD. Teaching Mentor**

| | |
|---|---|
| 2007 | Fatima Mirza - SOWK 777 Research in Child Welfare |
| 2004 | Mindy Thiel - SOWK 777 Research in Child Welfare |

1997-1998    **Ph.D. Post Doctoral Study Mentor**
Provided research consultation as part of a mentoring team for a study of the Air Force Family Advocacy Program

1996-1997    <u>MSW Field Liaison</u>
1997-1998    Liaison to approximately 15-20 students in field agencies.
1998-1999
1999-2000

1994-1995    <u>MSW Field Instructor</u>
1997-1998    M.S.W. students assigned to the Maryland Chapter of the American Professional Society on the Abuse of Children for part of their internships.

<u>Research Mentor</u>
1994    Loyola University sociology student
1993    Coppin State University, 2 McNair Minority Fellowship Program students

1993-Present    <u>Guest Lecturer</u>
796.53 Practice Issues in Child Welfare, Silberman School of Social Work at Hunter College (Fall, 2013) for Professor Gerald P. Mallon.
SWCL 627 - Clinical Social Work Practice with Families an  Children in Child Welfare - for Instructor Christine Risley-Curtiss
SOWK 615 - Children and Social Services Policy - for Professor Donald Fandetti
SWCL 600 - Clinical Social Work Practice in Maternal and Child Health - for Professor Julia Rauch – Spring 1998
SWCL 700 - Clinical Social Work Practice in Maternal and Child Health - for Professor Edward Pecukonis – Spring 1999 & 2000
Child Abuse Class at Johns Hopkins School of Hygiene and Public Health Understanding and working with Child Protective Services. Invited lectures for Dr. Mary Benedict.. Baltimore. April 12, 2000, April, 22, 1998, and May 7, 1996.
Child Welfare Class at Goucher College - for Instructor Joanne Hesmiller-Trego

5

SOWK 670 - Social Work Research Methods - Lecture on Evaluation Research for
Professor Susan Zuravin

**Experience in Other than Higher Education**

1990-present    **Private Consultant**. Involved in providing a range of consultation services regarding child maltreatment prevention and child welfare practice including: analyzing and reviewing policies; writing and editing publications, curriculum, and proposals; providing training; planning and coordinating national meetings; providing consultation regarding child welfare related reform and litigation; and providing research consultation related to methodology and design. Selected consultations include:

2013 – 2015    Consultation to ACTION for Child Protection in the implementation of Family Connections in Florida, New Mexico, New York, and Texas

2013 – 2014    Consultation to the Office of the Court Monitor – Oliva Y. v. Bryant related to a qualitative assessment of the maltreatment in care investigative process in Mississippi

2012    Consultation to the Attorney General's Office of the Commonwealth of Massachusetts.

2007 – 2009    Faculty for the National Breakthrough Series Collaborative (BSC) on Safety & Risk Assessments in Child Welfare facilitated by the American Humane Association and Casey Family Programs.

2005 - 2006    Consultation regarding child welfare litigation in New York.

2005    Consultation to ACTION for Child Protection in their review of the quality of child welfare practice in New Jersey.

2005    Consultation to Annie E. Casey Foundation in their review of the quality of child welfare practice in New Jersey.

2004 – 2006    Consultation to Caliber Associates in their development of a DHHS funded publication on Child Neglect.

2002 - 2003    Consultation regarding child welfare litigation in Oklahoma.

2001 – 2002    **California Department of Social Services, Child Welfare Services Redesigning Child Welfare Stakeholder Group**
Consultation on the redesign of child welfare services in California. Co-facilitated a work group focused on early intervention and differential response systems. Consulted on the overall implementation of system reforms in California.

2001 – 2005    **External Advisory Committee for the Chapin Hall Center for Children evaluation of the Community Partnerships for Protecting Children (CPPC) initiative.**
Consultation on the methods, analysis, and findings from this study funded by the Edna McConnell Clark Foundation. The initiative sought to reduce child maltreatment in four target communities of 30,000-80,000 people within the cities of Cedar Rapids, Iowa;

6

Louisville, Kentucky; Jacksonville, Florida; and St. Louis, Missouri.

2000    **National Data Archive on Child Abuse and Neglect, Family Life Development Center, College of Human Ecology, Cornell University.** Review of the Archive's products and services over five years and consultation regarding future directions.

2000-2003    Consultation regarding child abuse litigation in Michigan.

1997    Consultation regarding child welfare litigation in West Virginia.

1992-2003    Monitored compliance by court appointment to an expert panel for a federal consent decree pertinent to Ohio child welfare services (**Roe v. Staples**).

1999-2001    Consultation regarding child welfare litigation in Washington state.

1997    Consultation regarding child welfare litigation in North Carolina.

1998    Consultation regarding research design for a study of substantiated and unsubstantiated cases at the George Warren Brown School of Social Work, Washington University.

1998    Consultation regarding child welfare litigation in New Mexico.

1997    Served on an Expert Panel – Decision-Making in CPS for the **National Resource Center on Child Abuse and Neglect funded by the National Center on Child Abuse and Neglect.**

1996    Consultation regarding child welfare litigation in New Mexico.

1995    Expert Team member provided consultation on the privatization of Milwaukee County child welfare services; served on a subcommittee on needs assessment design with Theresa Costello, Mark Courtney, and Peter Pecora.

1995    Provided consultation to a Pittsburgh based law firm regarding a civil suit involving a trans-racial adoptive placement.

1994-1995    Provided consultation to **the Clearinghouse on Child Abuse and Neglect Information** in the implementation of new programs.

1994    Reviewed curriculum based on a co-authored user manual for Child Protective Services workers for **the American Humane Association's Children Division.**

1994    Served on an expert panel to review sample child welfare decision-making cases for **Chapin Hall Center for Children's placement decision-making study, University of Chicago.**

1994    Served as an expert consultant for a Pittsburgh based law firm on behalf of a county children and youth services agency that was involved in malpractice litigation.

| 1992-1994 | Consulted on the development of two successful proposals to manage the **Clearinghouse on Child Abuse and Neglect Information for Caliber Associates.** |
|---|---|

1993-1994 | Reviewed curriculum on interviewing and risk assessment for child welfare workers on behalf of the **Georgia Academy.**

1992 | Served on an advisory panel to curriculum developers on the relationship between parental use of alcohol or other drugs (AOD) and child maltreatment on behalf of **the University of Maryland, School of Social Work, Training Department.**

1991 | Planned and coordinated a meeting for CPS state liaison officers, a national child maltreatment prevention symposium, and a national risk assessment symposium for **the National Center on Child Abuse and Neglect (NCCAN).**

1990 | Developed resource materials for the design of needs assessment instruments for **Hamilton County, Ohio Department of Human Services**.

**Social Work Practice**

1996-2001 | **Executive Director.** Family Connections, University of Maryland, School of Social Work. Facilitated the development of prevention services to high-risk families in West Baltimore, combining service to the community, education of MSW students, and research. Managed and supervised the work of five clinical instructors, a research director, a research coordinator, two Ph.D. students, and eighteen MSW interns.

1984-1990 | **Director, Washington, D.C. Office** for ACTION for Child Protection. Responsible for management of the Washington Office. Activities included: communicating with federal programs; analyzing policies; developing proposals; networking with national organizations; developing training curriculum and other resources; providing training and technical assistance; and evaluating child protective service programs and demonstration projects.

Involved in developing and/or delivering skill based caseworker, supervisory, and/or inter-disciplinary training and/or technical assistance in the development and implementation of service programs in the following states: Alabama, Delaware, Georgia, Kentucky, Maine, Maryland, Nebraska, New York, North Carolina, Oklahoma, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, Washington, and Wisconsin.

Contributed to the development of a child welfare practice model - The Child at Risk Field Decision-Making System and the Child Safety Evaluation Framework and provided ongoing case consultation to caseworkers and supervisors in multiple states. Case consultation was provided primarily on site, however in one state, caseworkers and supervisors were able to call during working hours for consultation regarding crisis cases.

1982-1984 | **Staff Associate.** American Humane Association. Direct responsibility for national advocacy efforts of the association's Children's Division in Washington, D.C. This included monitoring relevant action in U.S. Congress, advocating for policy and programs that served to protect children and strengthen families, analyzing proposed and

8

existing federal regulations, preparing position papers, managing projects that surveyed the status of CPS nationally, and coordinating grass roots lobbying efforts.  Also involved in training, program evaluation, and technical assistance projects of the Division.

1982          **Consultant.**  Milwaukee County Board of Supervisors.  In conjunction with a volunteer steering committee, developed and implemented a pilot project of citizen review boards to review the status of children in foster care in Milwaukee County.  This included developing policies and procedures, recruiting and selecting citizen members, and training review board members and foster care staff.

1972-1981     Children's Services of Erie County, 606 West Second Street, Erie, Pennsylvania 15608

1979-1981 **Program Director**. Responsible for administration of the county-wide public Child Protective Services (CPS) Program providing intake and treatment services to children and families experiencing child abuse and neglect problems.  Activities included budget preparation, policy development and implementation, program planning and evaluation, and administration of program services provided by approximately forty professional staff. Wrote three successful funding proposals, including designing and evaluating a service delivery model to encourage parents to self-refer.  Community activities included managing a community based case consultation multidisciplinary team and developing and participating in a community council on child abuse and neglect.  Maintained on call functions for responding to after-hours child maltreatment reports, on a weekly basis every two months.

1978-1979 **Casework Supervisor**. Supervised the casework activity of a protective services unit of five caseworkers assigned specialized caseloads of families with sexual abuse or serious physical abuse problems.  Provided direct services to after hour's reports of child abuse and neglect on a rotation basis.

1974-1978 **Court Coordinator**. Responsible for coordination of all referrals to juvenile court.  Prepared witnesses for the court process, developed uniform policies and procedures for court referrals including standards for child removal, and facilitated coordination between agency attorneys, child welfare staff, and the juvenile court.

1973-1974  **Caseworker.** Managed and provided services to a child welfare caseload in the following service areas:  child protective services; adolescent/family services; foster care; teenage pregnancy; adoption; custody evaluations; and truancy prevention.

1972-1973 **Student Caseworker**. Maintained a caseload of 20 children in a variety of service areas. This was full time employment during the summer and part-time field placement during the academic year.

**Honors Nominated and Received and Professional Development**

2014          Selection by the University of Maryland, Baltimore leadership as a UMB Champion of Excellence.  Champions of Excellence are individuals and teams that exemplify extraordinary accomplishment and represent excellence at the University.

| | |
|---|---|
| 2014 | Selection as a Fellow of the American Academy of Social Work and Social Welfare (Academy). The Academy is an honorific society of distinguished scholars and practitioners dedicated to achieving excellence in the field of social work and social welfare through high impact work that advances social good. |
| 2013 | Appointed to the Inaugural class of Fellows of the Society for Social Work and Research (SSWR) based on service with distinction to advance the mission of the Society – to advance, disseminate, and translate research that addresses issues of social work practice and policy and promotes a diverse, equitable and just society. |
| 2012 | Selection as the Aaron Rosen Lecturer by the Brown School of Social Work, Washington University in St. Louis and the Society for Social Work and Research (SSWR). Lecture on the integration of research and social work practice was delivered at the 17th National Conference of SSWR in San Diego on January 18, 2013. |
| 2009 | Paper, "Prevention of child abuse and neglect and improvements in child development" co-authored with Mogens Christoffersen was ranked by *Child Abuse Review* as one of the top ten papers downloaded in 2009, having been downloaded 1464 times. |
| 2005 | Nominated by the University of Maryland, Baltimore for a University System of Maryland Board of Regents' Faculty Award for Excellence in Scholarship/Research |
| 2004 | Awarded University of Maryland, Baltimore Founders Research Lecturer of the Year |
| 2003 | Family Connections recognized as a "Demonstrated Effective Program" by the U.S. Department of Health & Human Services, Administration for Children and families, Administration on Children, Youth and Families, Office on Child Abuse and Neglect. |
| 2003 | Participation in an 8-Week Summer Online Continuing Education Course: *Using Web Tools in Your Classroom*, which represented 40 hours of online and offline effort. Harvard University, Graduate School of Education. |
| 2002 | Recipient of the APSAC Service Award from the American Professional Society on the Abuse of Children |
| 2001 | Acceptance of a University of Maryland Dr. Martin Luther King Diversity Award, on behalf of the Family Connections Program. This award recognizes achievements in the areas of diversity and inclusiveness and represents equality, justice and opportunity for all peoples. The recipients serve as models for the entire campus of the personal and professional commitment to the ideals epitomized by the life and work of Dr. King. |
| 2001 | Technology in Teaching fellowship. Institute for Teaching and Learning Through Technology in the Health Sciences and Human Services. University of Maryland School of Nursing. |
| 2000 | Paper selected as one of the top 100-social work research papers. Society for Social Work and Research. SSWR Annual Conference, Atlanta. |

1992            National Data Archive on Child Abuse and Neglect Summer Research Institute on Secondary Data Analysis, Cornell University.

## Research Support

**Principal Investigator:**

2013 – 2015     Technical Assistance to Support Family Connections Replication by Community Based Organizations in Florida.  Original funding by Kids Central to ACTION for Child Protection.  Sub-contract to the Ruth Young Center at the University of Maryland School of Social Work for training and fidelity assessments.  Salary support – none.

2013 – 2015     Technical Assistance to Support Family Connections Replication by Preventive Service Programs in NY City.  Original funding by the New York City Administration for Children Services (ACS) to nine preventive service programs. Contracts to ACTION for Child Protection, sub-contract to the Ruth Young Center at the University of Maryland School of Social Work.  $82,457. Salary support 10% in partial months of 2013.

2010 – 2015     Technical Assistance to the Washoe County, Nevada Initiative to Prevent Long-Term Foster Care. Funding by the US DHHS, Children's Bureau [90CT0157] to Washoe County, ACTION for Child Protection, and the Ruth H. Young Center for Families and Children at the University of Maryland School of Social Work.  Sub-contract between ACTION and UMB $1,705,726 (9/10 – 9/15). Salary support 5-50% (depending on year).

2010 – 2011     Replicating Family Connections in Texas: Arrow Child and Family Ministries of Texas. $27,243 (9/10 – 8/11).  Salary support approximately 2%.

2010 – 2011     Replicating Family Connections in Texas: Unity Partners. $19,635 (9/10 – 8/11). Salary support approximately 1%.

2010 – 2011     Caring for Our Family – Family Connections LA Model Training. Special Services for Groups. $43,556 (3/10 – 6-11), Salary support range from 1 to 2% over time

2010 – 2011     Replicating Family Connections in Camden City, New Jersey – MOU Center for Family Services. $41,587. Salary support approximately 1%.

2009 – 2011     Evaluation of Place Matters through Kin Connections funded by the Maryland Department of Human Resources and DHHS, ACY, ACYF – Children's Bureau. (90CF0013)  $914, 968.  Salary support: 5%. (Transferred PI status to Kantahyanee Murray - summer, 2011).

2009 – 2014     Evaluating the Process and Outcomes of Training and Technical Assistance Services provided by the National Resource Center for Child Protective Services (NRCCPS), funded by ACTION for Child Protection and DHHS/ACY/ACYF-Children's Bureau. (90CZ0015) $496,968.  Salary support: 5%.

2009 – 2010    DHR Family Connections Program. Maryland Department of Human Resources, Social Services Administration (7/1/2009 – 6/30/2010). $194,948  Salary support: None. (Transferred PI status to Frederick Strieder in Fall, 2010).

2009  - 2010    Research in Support of Child Welfare Policy & Programs. Funded by the Maryland Department of Human Resources, Social Services Administration (7/1/2009 – 6/30/2010). $622,776. (Transferred PI status to Terry Shaw - Fall, 2010). Salary support: 10%.

2009 – 2010    National Child Welfare Workforce Institute Traineeship Award – Workforce Development in Urban Areas, Funded by the National Child Welfare Workforce Institute and  DHHS/ACY/ACYF-Children's Bureau. $550,000.  (Transferred PI Status to Elizabeth Greeno – Spring 2011).  Salary support: none.

2008 – 2014    Atlantic Coast Child Welfare Implementation Center (Federal Regions III-IV), Funded by DHHS/ACY/ACYF-Children's Bureau (90CO1042). $8,810,000. Salary support: 30% through 2010, reduced to 10 to 20% through 2013.

2008 – 2010    Implementation and Evaluation of Maryland KEEP. Funded by the Maryland Department of Human Resources, Social Services Administration through a cooperative agreement from DHHS/ACY/ACYF-Children's Bureau. $1,833,303. Salary support: 5%

2008 – 2010    Evaluation of the Family Tree Parenting Programs.  Funded by the Family Tree. $60,000. (Transferred PI Status to Kantahyanee Murray Fall 2010).  Salary support: None

2008 – 2009    Research in Support of Child Welfare Policy & Programs. Funded by the Maryland Department of Human Resources, Social Services Administration (7/1/2008 – 6/30/2009). $622,776. Salary support: 10%.

2008 - 2010    Title IV-E Public Child Welfare Education Program. Funded by the Maryland Department of Human Resources, Social Services Administration FY09-11  $10,032,542 (total contract), $3,257,524 (FY09),  $3,340,657 (FY10), $3,434,361 (FY11)   Salary support: 5% to none.  (Transferred PI Status to Debra Linsenmeyer, January 2011).

2008 – 2011    Child Welfare Academy Training Contract.  Funded by the Maryland Department of Human Resources, Social Services Administration . FY09-11 $6,199,623 (total contract), $1,978,490 (FY09), $2,065,214 (FY10), $2, 155, 919 (FY11).  Salary support: 5%  to none. (Transferred PI Status to Leslie Rozeff, January 2011).

2008 – 2009    Collaborative Research Concerning Truancy Intervention Programs. Funded by the Maryland Judiciary, Administrative Office of the Courts through a grant from the State Justice Institute. $184,000.  Salary support: 5%. (Transferred PI status to Professor Llewellyn Cornelius, July 2009).

2008 – 2009    DHR Family Connections Program. Maryland Department of Human Resources, Social Services Administration (7/1/2008 – 6/30/2009). $194,948  Salary support: None.

2007 - 2008        Maryland Department of Juvenile Services Interagency Youth Services Planning Project. (In collaboration with the School of Medicine – Co-PI -Kenneth Rodgers). $385,008. Salary support: 10%

2007 – 2013        ACTION for Child Protection and Alabama Family Services through grant support from the USDHHS, Children's Bureau (90CA1751) – Funding Opportunity HHS-2007-ACF-ACYF-CA-0023. Evaluation of Alabama's Implementation of a Family Centered Comprehensive Assessment Process for Children, Youth, and Families. $746,205. Salary support: 5-10%.

2007              Lutheran Immigration and Refugee Services, Field Coordination Program. Outcome-Based Evaluation Development. (9/30/07 – 11/30/07). $8,946. Salary support: None.

2007 – 2008        Baltimore County Office of Community Conservation through support from Baltimore County United Way.  Technical Assistance for Continuous and Comprehensive Services. (10/1/2007 – 3/31/07). $5,000. Salary support: None.

2007 – 2009        Maryland Judiciary, Administrative Office of the Courts Collaborative Research Program. (6/30/2007 – 6/30/2010). $105,000 (first year). $405,000 (2nd year). Salary support: 5%.

2007 – 2008        DHR Family Connections Program. Maryland Department of Human Resources, Social Services Administration (7/1/2007 – 6/30/2008). $268,701.  Salary support: None.

2007 - 2008        Child Welfare Accountability: Efficiency and Effectiveness of Child Welfare Services. Maryland Higher Education Commission (MHEC -1/1/2007 – 12/31/2007. $433,072), (Maryland Department of Human Resources, Social Services Administration - 1/1/2008 – 6/30/2008  $189,852). Salary support: 25%.

2006 - 2007        Mentoring agreements with seven organizations (Black Family Development – Detroit; Child and Family Tennessee; Children's Institute International – Los Angeles; DePelchin Children's Center – Houston; Respite Care of San Antonio; Special Services for Groups – Los Angeles; Youth Health Services, Inc. – West Virginia) that are replicating Family Connections.  (9/30/2006-9/29/2007). Agreements total $394,646. Salary support: None.

2006 - 2007        Supplemental grant to contribute to the cross-site evaluation of the replication of Family Connections, US DHHS, Children's Bureau. $87,500.  (9/30/2006-9/29/2007). Salary support: 5%.

2006 - 2007        DHR Family Connections Program. Maryland Department of Human Resources, Social Services Administration (7/1/2006-6/30/2007). $231,984.  Salary support: None.

2006-2007          Foster Parent Reimbursement: Establishing Adequate and Reasonable Rates. Children's Rights International . $50,000.  Salary support: 2%.

2005-2008          Systematic review of the impact of cognitive behavioral therapy with parents of physically abused children.  Nordic Campbell Center (NC-2), Danish National Institute of Social Research. $12,000. Salary support: none.

| | |
|---|---|
| 2005-2006 | Supplemental grant to contribute to the cross-site evaluation of the replication of Family Connections, US DHHS, Children's Bureau. $87,500.  (9/30/2005-9/29/2006). Salary support: 5%. |
| 2005-2006 | Mentoring agreements with seven organizations (Black Family Development – Detroit; Child and Family Tennessee; Children's Institute International – Los Angeles; DePelchin Children's Center – Houston; Respite Care of San Antonio; Special Services for Groups – Los Angeles; Youth Health Services, Inc. – West Virginia) that are replicating Family Connections.  (9/30/2005-9/29/2006). Agreements total $394,646. Salary support: None. |
| 2005-2006 | DHR Family Connections Project. Maryland Department of Human Resources, Social Services Administration. (7/1/2005-6/30/2006). $227,269. Salary support: None. |
| 2004-2005 | Mentoring agreements with seven organizations (Black Family Development – Detroit; Child and Family Tennessee; Children's Institute International – Los Angeles; DePelchin Children's Center – Houston; Respite Care of San Antonio; Special Services for Groups – Los Angeles; Youth Health Services, Inc. – West Virginia) that are replicating Family Connections. (9/30/2004-9/29/2005) Agreements total $42,000. Salary support: None. |
| 2005 | Foster Parent Reimbursement: Establishing Adequate and Reasonable Rates. Children's Rights International Planning Phase Grant. $24,072.  Salary support: 2%. |
| 2004-2005 | DHR Family Connections Project. Maryland Department of Human Resources, Social Services Administration.  (7/1/2004-6/30/2006). $213,965 per year. Salary support: None. |
| 2004-2005 | Systematic Review of Research on the Recruitment & Retention of Competent Child Welfare Staff. Institute for the Advancement of Social Work Research (IASWR). $56,650. Salary support: 5%. |
| 2003-2009 | Replication of Family Connections with Intergenerational Families. Funded by the U.S. Department of Health and Human Services, Office on Child Abuse and Neglect for $1,575,000 (90-CW1126).  Match of $195,000 provided by Annie E. Casey Foundation. Salary support: 25%  (average). |
| 2003-2004 | Mentoring agreements with seven organizations (Black Family Development – Detroit; Child and Family Tennessee; Children's Institute International – Los Angeles; DePelchin Children's Center – Houston; Respite Care of San Antonio; Special Services for Groups – Los Angeles; Youth Health Services, Inc. – West Virginia) that are replicating Family Connections.  Agreements range between $4,000 and $7,300 for a total of $33,700. (9/30/2003 – 9/29/2004). Salary support approximately 17%. |
| 2003-2008 | Evaluation of Excellence in Child Welfare Supervision Project.  Funded by the U.S. Department of Health and Human Services. $56,500. Salary support variable based on the year of the evaluation (most support is for a junior faculty member and a doctoral student). |
| 2003 | Review of Investigations of Suspected Instances of Child Abuse and Neglect In Out-of-Home Care, Children's Rights. $35,518. Salary support: 10%. |

14

2002-2003    Healthy Grandparent Families Start-Up Grant, Maryland Department of Human Resources, Social Services Administration. $90, 946. Salary support: 5%.

2002-2003    Healthy Grandparent Families Saturday Youth Academy, Maryland Children's Trust Fund, Governor's Office for Children, Youth, & Families. $25,000. Salary support: None

2002-2004    DHR Family Connections Project. Maryland Department of Human Resources, Social Services Administration.  $189,831. Salary support: None.

2002-2003    Replication of the Project Healthy Grandparent Family Program. Georgia State University and the Hasbro Foundation. $25,000. Salary support: None

2002-2003    Designing and Piloting a Protocol for Evaluating Independent Living Outcomes. Baltimore County Department of Social Services.  Award amount: $24,916.  Salary support: 5%

2001-2002    Using a Family Advocate in the Family Connections Program.  Maryland Children's Trust Fund, Governor's Office for Children, Youth, & Families.  Award amount: $33,190. Salary support:  None.

2001-2002    Exploring Screened out Reports of Child Abuse and Neglect in Maryland.  Maryland Department of Human Resources. $13,103.  Salary support: None

2001-2003    Evaluation of Independent Living Outcomes.  Baltimore City Department of Social Services. Award amount: $128,523. Salary support: 10%

2001-2002    Technical Assistance on the Design and Implementation of an Outcome Evaluation of a Therapeutic Visiting Pilot Project. Baltimore County Department of Social Services. Award amount: $25,000. Salary support: 5%

2001    Supplementary support to enhance replication of the family strengthening initiative. Funded by the Annie E. Casey Foundation's Baltimore Direct Services Grants Program. One year renewable to two years. Award amount: $17,628. Salary support: none.

1999-2002    Family Connections' family strengthening initiative.  Funded by the U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, Center for Substance Abuse Prevention (CSAP), Cooperative Agreement No: 1UD1 SPO8766-01. Two years. Award amount: $192,242.  Salary support: 5%.

1999-2000    Helping families reunify when their children are placed in out of home care.  Funded by the Baltimore City Department of Social Services.  One year. Award amount: $356,399. Salary support: 15%.

1999-2000    Predicting child maltreatment recurrences: Comparison of models with archival data versus self reported data.  Secondary analysis supported by The Lois and Samuel Silberman Fund. One year. Award amount: $6,000.

| | |
|---|---|
| 1996-2002 | Helping parents prevent neglect.  Funded by the U.S. Department of Health and Human Services, National Center on Child Abuse and Neglect. Grant No.  90-CA1580. Five ½ years.  Award amount:  $750,000. Salary support average of 20% over 5 ½ years. |
| 1979-1981 | Encouraging parents to self-refer to child protective services.  Funded by the U.S. Department of Health and Human Services, National Center on Child Abuse and Neglect. Grant No. 90CA2101.  Two years.  Award amount:  $200,000.  Authored proposal.  No salary support. |

***Co-principal Investigator:***

| | |
|---|---|
| 1992-1996 | Child Maltreatment Recurrences Among Families Served by Child Protective Services. Funded by U.S. Department of Health and Human Services, National Center on Child Abuse and Neglect. Grant No. 90-CA-1497. Three years. Award amount: $605,103.  Co-authored proposal and shared PI responsibilities with Zuravin.  Salary support: 100% (1992-1993) and 80% (1993-1995). |

***Research Project Director:***

| | |
|---|---|
| 1992-1993 | Synthesis of the child protective services systems improvement projects. Contract funded to Caliber Associates by the U.S. Department of Health and Human Services, National Center on Child Abuse and Neglect.  Contract No. 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, BOA I, Task Order Two.  Salary support:  20%. |
| 1992-1993 | Predicting the recurrence of child maltreatment.  Funded by ACTION for Child Protection. 18 months.  Award amount: $23, 323.  Authored proposal.  Salary support: 10%. |
| 1991-1993 | Teenage motherhood:  Its relationship to child abuse and neglect.  Funded by the U.S. Department of Health and Human Services, National Center on Child Abuse and Neglect 1988-1993. Grant No. 90CA1376.  Salary support:  50%. |
| 1989-1990 | Pilot implementation of the Child At Risk Field decision making system.  Contract funded to ACTION for Child Protection by the Maryland Social Services Administration. Salary support:  40%. |
| 1987-1989 | Pilot implementation of the Child At Risk Field decision making system. Contract funded to ACTION for Child Protection by the New York Department of Social Services.  Salary support: 40%. |
| 1986-1988 | Enhancing sexual abuse community intervention and treatment demonstration project. Funded by the U.S. Department of Human Services, National Center on Child Abuse and Neglect and a Sub-Contract to ACTION for Child Protection from the South Carolina Department of Social Services.   Authored federal proposal.  Salary support:  30%. |
| 1986-1988 | Pilot study of safety and child placement decisions.  Funded to ACTION for Child Protection by the Edna McConnell Clark Foundation.  Salary support: 30%. |

| 1984 | Survey of the Status of Child Protective Services 1984.  Supported by the American Humane Association, Children's Division. |
|---|---|
| 1983 | Survey of the Status of Child Protective Services 1983.  Supported by the American Humane Association, Children's Division. |

### *Research Analyst/Assistant:*

| 1991 | Teenage motherhood: Its relationship to child abuse and neglect.  Funded by the U.S. Department of Health and Human Services, National Center on Child Abuse and Neglect 1988-1993. Grant No. 90CA1376.  Salary support: 50% for 3 months. |
|---|---|
| 1990 | Survey of the training and technical assistance needs of professionals involved in the protection of drug exposed infants.  Funded to the American Bar Association's Center on Children and the Law by the Robert Wood Johnson Foundation.  Salary support 30% for 2 months. |
| 1985-1986 | Statewide evaluation of Child Protective Services.  Funded to ACTION for Child Protection by the West Virginia Department of Public Welfare.  Salary support:  30%. |
| 1983-1984 | Child abuse and neglect reporting in the state of Virginia.  Funded to the American Humane Association, Children's Division by the Virginia Department of Social Services.  Salary support: 20%. |
| 1983-1984 | A comprehensive assessment of child protective services in South Carolina. Funded to American Humane Association, Children's Division.  Salary support: 30%. |
| 1983 | Assessment of sexual abuse intervention in Marion County, Indiana.  Funded to American Humane Association, Children's Division.  Salary support: 10%. |
| 1983 | Evaluation of the response to family violence.  Funded to the American Humane Association, Children's Division by the U.S. Navy Family Advocacy Program.   Salary support: 10%. |

### Publications:

### *Books*

Pecora, P.J., Barth, R. P., Maluccio, A. N., Whittaker, J. K., & **DePanfilis, D.** (2009). *Child welfare challenge: Policy, practice, and research.* New York: Aldine.

### *Edited Books:*

Dubowitz, H., & **DePanfilis, D.** (Eds.).  (2000). *Handbook for child protection practice.*  Thousand Oaks, CA: Sage.

Dubowitz, H., **DePanfilis, D**., & Junichi, S. (Eds.). (2000). *Handbook for child protection practice*. Thousand Oaks, CA: Japanese Translation by arrangement with Sage Publications, Inc. through The English Agency (Japan) Ltd.

***Guest Editor Peer Reviewed Journals:***

Herman, D., & **DePanfilis, D.** (Scheduled, 2015). *Journal of the Society for Social Work & Research: Social Work Intervention Research.*

**DePanfilis, D.** (2014). *Journal of Public Child Welfare*: *Special Issue on Building, Implementing, & Sustaining Effective Child Welfare Practice, 8*(4).

**DePanfilis, D.**, Filene, J. H,, & Brodowski, M. L. (2009). *Protecting Children, 24*(3)*.*

Dubowitz, H**., DePanfilis, D**., Boyce, C. A., & Runyon, D. (2005). Child neglect research: Initial papers from the NIH and ACYF Neglect Projects – Issue II. *Child Maltreatment, 10*(1).

Dubowitz, H., **DePanfilis, D.**, Boyce, C. A., & Runyon, D. (2004). Child neglect research: Initial papers from the NIH and ACYF Neglect Projects – Issue I. *Child Maltreatment, 9*(4)*.*

***Articles in Refereed Journals:***
Christoffersen, M. N., Mohs, B., **DePanfilis, D**., & Vammen, K. S. (In Press, corrected proof, available online November 2014). Non-suicidal self-injury – does social support make a difference? An epidemiological investigation of a Danish national sample. *Child Abuse & Neglect.* doi: 10.1016/j.chiabu.2014.10.023

**DePanfilis, D.** (2014). Building, implementing, and sustaining effective child welfare practice: An introduction. *Journal of Public Child Welfare, 8,* 329-332.. doi: 10.1080/15548732.2014.939520

Testa, M. F., **DePanfilis, D**., Huebner, R., & Dionne, R. (2014). Bridging the gap between research and practice: The work of the steering team for child welfare research and evaluation translational framework workgroup. *Journal of Public Child Welfare, 8*, 333-353. doi: 10.1080/15548732.2014.915910

**DePanfilis, D.** *(*2014). Back to the future: Using social work research to improve social work practice. *Journal of the Society for Social Work and Research, 5*(1), 1-21. doi: 10.1086/675852

Kaye, S., **DePanfilis, D.,** Bright, C. L., & Fisher, C. (2012). Applying implementation drivers to child welfare systems change: Examples from the field. *Journal of Public Child Welfare, 6*, 512-530. doi: /10.1080/15548732.2012.701841

Kaye, S., Shaw, T., **DePanfilis, D**., & Rice, K. (2012). Estimating staffing needs for in-home child welfare services based on a weighted caseload calculation formula.  *Child Welfare, 61-76.*

Collins, K. S., Strieder, F., **DePanfilis, D.,** Tabor, M., Freeman, P., Linde, L., & Greenberg, P. (2011). Trauma Adapted Family Connections (TA-FC): Reducing developmental and complex trauma symptomatology to prevent child abuse and neglect. *Child Welfare, 90,* 29-47.

Lindsey, M. A., Hayward, R. A., & **DePanfilis, D.** (2010). Gender differences in behavioral outcomes

among children at risk of neglect: Findings from a family-focused prevention intervention. *Research on Social Work Practice, 20,*572-581. doi: 10.1177/1049731509349713

Christoffersen, M.N., & **DePanfilis, D**. (2010). Psychological maltreatment and adolescents' suicidal behavior: A nationwide sample of 1,055 children at risk. *Journal of Child & Adolescent Trauma 3,* (3), 109-124.

Hayward, R.A**., DePanfilis, D**., & Woodruff, K. (2010). Parental methamphetamine use and implications for child welfare intervention: A review of the literature. *Journal of Public Child Welfare, 4*(1), 25-60.

**DePanfilis, D**., Filene, J. H., & Brodowski, M. L. (2009). Introduction to Family Connections and the national replication effort. *Protecting Children, 24*(3), 4-14.

Sharpe, T., **DePanfilis, D.**, Strieder, F. , & Gregory, G. (2009). Replication of Family Connections: Lessons learned from grandparents. *Protecting Children, 24*(3), 58-68.

Dubowitz, H., & **DePanfilis, D.** (2009). Child welfare in the USA: In theory and practice. *International Journal on Child Health and Human* Development, *2*(3), 305-312.

Kaplan, C., Schene, P., **DePanfilis, D**., & Gilmore, D. (2009). Introduction: Shining light on chronic neglect. *Protecting Children, 24*(1), 1-7.

**DePanfilis, D** (2009). Using prevention science to reduce the risk of child neglect. *Children Australia*, *34*(1), 40-44.

Christoffersen, M.N., & **DePanfilis, D.** (2009). Prevention of child abuse and neglect and improvements in child development. *Child Abuse Review, 18*, 24-40.

**DePanfilis, D.**, & Zlotnik, J., (2008). Retention of front-line staff in child welfare: A systematic review of research. *Children & Youth Services Review, 30*, 995-1008.

**DePanfilis, D**., Dubowitz, H., & Kunz, J. (2008). Assessing the cost-effectiveness of Family Connections. *Child Abuse & Neglect, 32,* 335-351. doi:10.1016/j.chiabu.2007.06.005

Girvin, H., **DePanfilis, D**., & Daining, C. (2007). Predicting program completion among families enrolled in a child neglect preventive intervention. *Research on Social Work Practice, 17*, 674-685. doi: 10.1177/1049731507300285

Hayward, R. A., & **DePanfilis, D.** (2007). Foster children with an incarcerated parent: Predictors of reunification. *Children & Youth Services Review, 29*, 1320-1334.

Daining, C, & **DePanfilis, D.** (2007). Resilience of youth in transition from out-of-home care to adulthood. *Children & Youth Services Review, 29,* 1158-1178.

**DePanfilis, D.** (2006). Commentary – Compassion fatigue, burnout, and compassion satisfaction: Implications for retention of workers. *Child Abuse and Neglect, 30*, 1067-1069.

19

**DePanfilis, D**., & Dubowitz, H. (2005). Family Connections: A program for preventing child neglect. *Child Maltreatment,10,* 108-123. doi: 10.1177/1077559505275252

**DePanfilis, D**., & Girvin, H. (2005).  Investigating child maltreatment in out-of-home care: Barriers to good decision-making. *Children & Youth Services Review,27,* 353-374.

Swanson Ernst, J., Meyer, M., & **DePanfilis, D.** (2004). Housing characteristics and adequacy of physical care of children: An exploratory analysis. *Child Welfare, Special Issue on Housing and Homelessness, 83,* 437-452.

**DePanfilis, D**., Okundaye, J., Glazer-Semmel, E., Kelly, L., & Swanson-Ernst, J. (2002).  Principles of the strengths perspective: Views from families and providers. *Family Preservation Journal, 6*(2), 1-14.

Harrington, D., Zuravin, S. J., **DePanfilis, D**., Dubowitz, H., & Ting, L. (2002). The Neglect Scale: Confirmatory factor analysis in a low-income sample.  *Child Maltreatment, 7*, 359-368.

**DePanfilis, D**., & Zuravin, S. J. (2002). The effect of services on the recurrence of child maltreatment. *Child Abuse and Neglect, 26*, 187-205.

**DePanfilis, D**., & Zuravin, S. J. (2001). Assessing risk to determine the need for services. *Children and Youth Services Review, 23*, 3-20.

**DePanfilis, D**., & Zuravin, S. J. (1999).   Predicting child maltreatment recurrences during treatment. *Child Abuse and Neglect, 23* (8), 729-743.

**DePanfilis, D**., & Zuravin, S. J. (1999). Epidemiology of child maltreatment recurrences.  *Social Services Review, 73,* 218-239.

**DePanfilis, D**., & Zuravin, S. J.  (1998). Rates, patterns, and frequency of child maltreatment recurrences among public CPS families. *Child Maltreatment, 3*, 27-42.

Zuravin, S. J., & **DePanfilis, D** (1997). Factors affecting foster care placement of children receiving child protective services. *Social Work Research, 21*, 34-42.

Zuravin, S., McMillen, C., **DePanfilis, D**., & Risley-Curtiss, C. (1996). The intergenerational cycle of child maltreatment continuity versus discontinuity. *Journal of Interpersonal Violence, 11*, 315-334.

**DePanfilis, D**. (1996).  Implementing child mistreatment risk assessment systems: Lessons from theory. *Administration in Social Work, 20*(2), 41-59.

**DePanfilis, D.** (1996). Social isolation of neglectful families: A review of social support assessment and intervention models.  *Child Maltreatment. 1*, 37-52. doi: 10.1177/1077559596001001005

**DePanfilis, D**., and Scannapieco, M. (1994). Assessing the safety of children at risk for maltreatment: Decision-making models. *Child Welfare, 73*, 229-245.

Doueck, H. J., English, D.J., **DePanfilis, D.**, & Moote, G. T. (1993). Decision-Making in Child Protective Services:  A comparison of selected risk-assessment systems.  *Child Welfare, 72*, 441-452.

**DePanfilis, D.** (1984). Child abuse and neglect in cults and religious sects. *UPDATE, A Quarterly Journal of New Religious Movements, 8* (3/4), 17-19.

**DePanfilis, D.** (1982). Clients who refer themselves to Child Protective Services. *Children Today, 11* (2), 21-25.

*Manuscripts under Review*

Hayward, R. A. & **DePanfilis, D** (Resubmitted for review – July 2013). Child behavior problems in children at risk for neglect: Neighborhood and family factors.

*Articles in Refereed Newsletters:*

**DePanfilis, D**., & Hayward, R. A. (2007. Responding to methamphetamine use, abuse, and addiction by families. *The APSAC Advisor, 19*(3), 13-19.

**DePanfilis, D**., & Wilson. C. (1996). Applying the strengths perspective with maltreating families. *The APSAC Advisor, 9*(3), 15-20.

**DePanfilis, D**., Daro, D., & Wells, S. (Eds). (1995). Special issue on risk assessment. *The APSAC Advisor, 8*(4), 1-44.

Zuskin, R., & **DePanfilis, D**. (1995).  Working with CPS families with alcohol or other drug (AOD) problems.  *The APSAC Advisor, 8*(1), 7-11.

Scannapieco, M., & **DePanfilis, D**. (1994). Keeping maltreated children at home: When is it safe? *The APSAC Advisor, 7*(3), 3-4, 22-23.

*Book Chapters:*

**DePanfilis, D.** & Dubowitz, H. (Accepted, 2014).  Promising approaches for preventing neglect. In S. Alexander, R. Alexander, & N. Guterman (Eds.). *Prevention of child maltreatment.* St. Louis: GW Medical Publishing.

**DePanfilis, D.** & Costello, T. (2014). Child Protective Services In G. P. Mallon & P. M. Hess (Ed.), *Child welfare for the 21st century: A handbook of practices, policies, and programs* (2nd Ed). New York: Columbia Press.

**DePanfilis, D.** (2014). Intervening with families when children are neglected. In R. M. Reece, R. F. Hanson, & J. Sargent (Editors).  *Treatment of child abuse: Common ground for mental health, medical, and legal practitioners* (2nd Edition), (pp. 208-219). Baltimore:  Johns Hopkins University Press.

**DePanfilis, D**. (2011). Child Protection System.  In J. E.B. Myers (Ed.). The *APSAC handbook on child maltreatment* (third edition). (pp. 39-52).  Thousand Oaks, CA:  Sage.

**DePanfilis, D**. (2007). Risk factors and risk assessment in child welfare.  In P. R.Popple &, F. J. Vecchiolla (Eds). *Child Welfare Social Work* (pp. 85-118). Boston: Allyn & Bacon.

**DePanfilis, D**. (2006). Therapeutic interventions for children who have experienced neglect and their families in the U.S.. In  C. McAuley, P. Pecora. & W. Rose (Eds.) *Enhancing the well being of children and families through effective Interventions- UK and USA evidence for practice* (pp. 131-142).  London & Philadelphia: Jessica Kingsley Publishers.

**DePanfilis, D**. (2005).  Child Protection. In G. P. Mallon & P. M. Hess (Ed.), *Child welfare for the 21st century: A handbook of practices, policies, and programs* (pp. 290-301). New York:  Columbia University Press.

**DePanfilis, D**. (2005). Using existing child welfare data to answer questions about decision-making. In L.B. Alexander & P. Solomon (Eds.) *The research process in the social services: Myths and realities* (pp. 418-442). Pacific Grove, CA: Brooks/Cole.

**DePanfilis, D**. (2000). How do I assess the strengths in families? In H. Dubowitz, H., & D. DePanfilis (Eds.). *Handbook for child protection practice* (pp. 337-340).  Thousand Oaks, CA: Sage.

**DePanfilis, D**. (2000). How do I assess a caregiver's motivation and readiness to change? In H. Dubowitz,  & D. DePanfilis (Eds.).  *Handbook for child protection practice* (pp. 324-328). Thousand Oaks, CA: Sage.

**DePanfilis, D**. (2000). How do I determine if a child is neglected? In H. Dubowitz & D. DePanfilis (Eds.). *Handbook for child protection practice* (pp. 121-126).  Thousand Oaks, CA: Sage.

**DePanfilis, D**. (2000). How do I develop a helping alliance with the family? In H. Dubowitz & D. DePanfilis (Eds.).  *Handbook for child protection practice* (pp. 36-40).  Thousand Oaks, CA: Sage.

**DePanfilis, D**. (2000). How do I match risks to client intervention outcomes? In H. Dubowitz & D. DePanfilis (Eds.).  *Handbook for child protection practice* (pp. 367-372).   Thousand Oaks, CA: Sage.

**DePanfilis, D**. (2000). How do I use case record keeping to assist with intervention and provide accountability? In H. Dubowitz & D. DePanfilis (Eds.).  *Handbook for child protection practice* (pp. 598-603). Thousand Oaks, CA: Sage.

**DePanfilis, D**. (2000). What is inadequate supervision? In H. Dubowitz & D. DePanfilis (Eds.). *Handbook for child protection practice* (pp. 134-136).  Thousand Oaks, CA:  Sage.

**DePanfilis, D**. (1999). Intervening with families when children are neglected.  In H. Dubowitz (Ed). *Neglected children: Research, practice, and policy* (pp. 211-236) Thousand Oaks, CA: Sage.

Zuravin, S. J., & **DePanfilis, D.** (1999). Predictors of Child Protective Service intake decisions: Case closure, referral to continuing services, or foster care placement.  In  P.A. Curtis & G. Dale (Eds.). *The foster care crisis: Translating research into policy and practice*  (pp. 63-83). Omaha: The Nebraska Press.

22

### *Opinions and Book Reviews:*

**DePanfilis, D.** (2014). [Review of the book *Youth leaving foster care – A developmental, relationship-based approach to practice]. Australian Social Work. 67*(1), 151-152, DOI: 10.1080/0312407X.2013.857635.

**DePanfilis, D**. (2005). Book review. [Review of the book *Treating families and children in the child protective system]. Children and Youth Services Review, 27.*

**DePanfilis, D**. (1997). The lessons of the Louise Woodward case. *APSAC Advisor, 10,*(4), 4.

**DePanfilis, D**. (1997). Books in brief regarding three books: (1) *Protecting children and supporting families* by G. Cameron and J. Vanderwoerd (1997); (2) *Risk and resilience in childhood* by M. Fraser (1997); and (3) *Culture-centered counseling interventions* by P. Pedersen (1997). *APSAC Advisor, 10,* (2), 19.

**DePanfilis, D**. (1987). Book review. [Review of the book, *A sourcebook on child abuse]. Child Abuse and Neglect, 11,* 297.

### *Non-Refereed Publications & Reports:*

Bartley, Clarkson Freeman, P., & DePanfilis, D. (2014, July). *Astor Family Services readiness & organizational context re-assessment report*. . Baltimore, MD:  Ruth H. Young Center for Families & Children at the University of Maryland School of Social Work.

Bartley, Clarkson Freeman, P., & DePanfilis, D. (2014, June). *Catholic Guardian Services (CGS) readiness & organizational context re-assessment report*. . Baltimore, MD:  Ruth H. Young Center for Families & Children at the University of Maryland School of Social Work.

Bartley, Clarkson Freeman, P., & DePanfilis, D. (2014, June). *Cardinal McCloskey Community Services (CMCS) readiness & organizational context re-assessment report*. . Baltimore, MD:  Ruth H. Young Center for Families & Children at the University of Maryland School of Social Work.

Bartley, Clarkson Freeman, P., & DePanfilis, D. (2014, June). *Episcopal Social Services (ESS) readiness & organizational context re-assessment report*. . Baltimore, MD:  Ruth H. Young Center for Families & Children at the University of Maryland School of Social Work.

Bartley, Clarkson Freeman, P., & DePanfilis, D. (2014, June). *Leake and Watts Services, Inc*. *readiness & organizational context re-assessment report*. . Baltimore, MD:  Ruth H. Young Center for Families & Children at the University of Maryland School of Social Work.

Bartley, Clarkson Freeman, P., & DePanfilis, D. (2014, June). *New Alternatives for Children (NAC) readiness & organizational context re-assessment report*. . Baltimore, MD:  Ruth H. Young Center for Families & Children at the University of Maryland School of Social Work.

Bartley, Clarkson Freeman, P., & DePanfilis, D. (2014, June). *Northside Center for Child Development (NCCD) readiness & organizational context re-assessment report*. . Baltimore, MD:  Ruth H. Young Center for Families & Children at the University of Maryland School of Social Work.

Bartley, Clarkson Freeman, P., & DePanfilis, D. (2014, June). *St. Dominic's Home (SDH) readiness &*

*organizational context re-assessment report*.  . Baltimore, MD:  Ruth H. Young Center for Families & Children at the University of Maryland School of Social Work.

Bartley, Clarkson Freeman, P., & DePanfilis, D. (2014, June). *The Family Center (TFC) readiness & organizational context re-assessment report*.  . Baltimore, MD:  Ruth H. Young Center for Families & Children at the University of Maryland School of Social Work.

Clarkson Freeman, P., **DePanfilis, D.,** & Bartley, L. (2014, April).  *New York City Family Connections Collaborative (NYC-FCC) fidelity assessment report: Catholic Guardian Services*. Baltimore, MD:  Ruth H. Young Center for Families & Children at the University of Maryland School of Social Work.

Clarkson Freeman, P., **DePanfilis, D**., & Bartley, L. (2014, April).  *New York City Family Connections Collaborative (NYC-FCC) fidelity assessment report: Northside Center for Child Development*. Baltimore, MD:  Ruth H. Young Center for Families & Children at the University of Maryland School of Social Work.

Clarkson Freeman, P., **DePanfilis, D**., & Bartley, L. (2014, April).  *New York City Family Connections Collaborative (NYC-FCC) fidelity assessment report: The Family Center*. Baltimore, MD:  Ruth H. Young Center for Families & Children at the University of Maryland School of Social Work.

Bartley, L., Clarkson Freeman, P., & **DePanfilis, D**. (2014, April).  *Report: SAFE-FC Fidelity Assessment*.  Baltimore, MD:  Ruth H. Young Center for Families & Children at the University of Maryland School of Social Work. [Washoe County Permanency Innovations Initiative, Award Number - 90CT0157].

Clarkson Freeman, P., **DePanfilis, D**., & Bartley, L. (2014, March).  *New York City Family Connections Collaborative (NYC-FCC) fidelity assessment report: Astor Family Services*. Baltimore, MD:  Ruth H. Young Center for Families & Children at the University of Maryland School of Social Work.

Clarkson Freeman, P., **DePanfilis, D**., & Bartley, L. (2014, March).  *New York City Family Connections Collaborative (NYC-FCC) fidelity assessment report: Cardinal McCloskey Community Services*. Baltimore, MD:  Ruth H. Young Center for Families & Children at the University of Maryland School of Social Work.

Clarkson Freeman, P., **DePanfilis, D**., & Bartley, L. (2014, March).  *New York City Family Connections Collaborative (NYC-FCC) fidelity assessment report: Episcopal Social Services*. Baltimore, MD:  Ruth H. Young Center for Families & Children at the University of Maryland School of Social Work.

Clarkson Freeman, P., **DePanfilis, D**., & Bartley, L. (2014, March).  *New York City Family Connections Collaborative (NYC-FCC) fidelity assessment report: Leake and Watts Services, Inc*. Baltimore, MD:  Ruth H. Young Center for Families & Children at the University of Maryland School of Social Work.

Clarkson Freeman, P., **DePanfilis, D.,** & Bartley, L. (2014, March).  *New York City Family Connections Collaborative (NYC-FCC) fidelity assessment report: New Alternatives for Children*. Baltimore, MD:  Ruth H. Young Center for Families & Children at the University of Maryland School of

Social Work.

Clarkson Freeman, P., **DePanfilis, D.,** & Bartley, L. (2014, March). *New York City Family Connections Collaborative (NYC-FCC) fidelity assessment report: St. Dominic's Home*. Baltimore, MD: Ruth H. Young Center for Families & Children at the University of Maryland School of Social Work.

Bartley, L., Clarkson Freeman, P., & **DePanfilis, D.** (2014, January). *Report: SAFE-FC Fidelity Assessment*. Baltimore, MD: Ruth H. Young Center for Families & Children at the University of Maryland School of Social Work. [Washoe County Permanency Innovations Initiative, Award Number - 90CT0157].

Framework Workgroup. (2013, September). *A framework to design, test, spread, and sustain effective practice in child welfare.* Washington, DC: Children's Bureau, Administration for Children and Families, U.S. Department of Health and Human Services.

Clarkson Freeman, P., **DePanfilis, D.,** & Bartley, L. (2013, August). *Report: Protective Capacity Family Assessment (PCFA) and Case Planning March 2013 Fidelity Review*. Baltimore, MD: Ruth H. Young Center for Families & Children at the University of Maryland School of Social Work. [Washoe County Permanency Innovations Initiative, Award Number - 90CT0157].

Clarkson Freeman, P., **DePanfilis, D.,** & Bartley, L. (2013, May). *Report: Protective Capacity Family Assessment (PCFA) and Case Planning March 2013 Fidelity Review*. Baltimore, MD: Ruth H. Young Center for Families & Children at the University of Maryland School of Social Work. [Washoe County Permanency Innovations Initiative, Award Number - 90CT0157].

Clarkson Freeman, P. , Bartley, L., & **DePanfilis, D.** (2013, March). *Washoe County PII readiness and organizational climate survey: Results from the readiness to change and organizational climate reassessment*. Baltimore, MD: Ruth H. Young Center for Families & Children at the University of Maryland School of Social Work. [Washoe County Permanency Innovations Initiative, Award Number - 90CT0157].

**DePanfilis, D.,** Durand, J., Meline, D., & Myers, K. (2013, February). Chapter 1 - Introduction and purpose (pp. 1-7). *SAFE-FC Intervention Manual*. Reno, NV: The Permanency Innovations Initiative Washoe County Department of Social Services. [Award Number - 90CT0157].

Holder, T., Holder, W., & **DePanfilis, D.** (2013, February). Chapter 8 – Protective Capacity Family Assessment (PCFA) (pp. 1-132). *SAFE-FC Intervention Manual*. Reno, NV: The Permanency Innovations Initiative Washoe County Department of Social Services. [Award Number - 90CT0157].

Holder, T., Holder, W., & **DePanfilis, D.** (2013, February). Chapter 9 – SMART case planning (pp. 1-25). *SAFE-FC Intervention Manual*. Reno, NV: The Permanency Innovations Initiative Washoe County Department of Social Services. [Award Number - 90CT0157].

**DePanfilis, D.,** Holder, W., & Holder, T. (2003, February). Chapter 10 – Changes focused intervention and safety management (pp. 1-73). *SAFE-FC Intervention Manual*. Reno, NV: The Permanency Innovations Initiative Washoe County Department of Social Services. [Award Number - 90CT0157].

Holder, T., Holder, W., & **DePanfilis, D.** (2013, February). Chapter 11 – Protective Capacity Progress Assessment (PCPA) (pp. 1-65). *SAFE-FC Intervention Manual*. Reno, NV*:* The Permanency Innovations Initiative Washoe County Department of Social Services. [Award Number - 90CT0157].

Clarkson Freeman, P., & **DePanfilis, D.** (2013, February). Chapter 7 – Using standardized assessment instruments (pp. 1-18). *SAFE-FC Intervention Manual*. Reno, NV: The Permanency Innovations Initiative Washoe County Department of Social Services. [Award Number - 90CT0157].

Clarkson Freeman, P., Bartley, L., & **DePanfilis, D.** (2013, February). *Initial Intake Asessment (IA) and Nevada Initial Assessment (NIA) fidelity review report*. Baltimore, MD: Ruth H. Young Center for Families & Children at the University of Maryland School of Social Work. [Washoe County Permanency Innovations Initiative, Award Number - 90CT0157].

Clarkson Freeman, P., Reiman, S., Bartley, L., & **DePanfilis, D.** (2013, January). *Safety Assessment Family Evaluation – Family Connections (SAFE-FC) foundational training report*. Baltimore, MD: Ruth H. Young Center for Families & Children at the University of Maryland School of Social Work. [Washoe County Permanency Innovations Initiative, Award Number - 90CT0157].

Durand, J. Marsh, J. , Negron, D., Meline D., Sandoval, K. Kleinedler, J., Holder, C., Holder, W., Capello, M., Gebhardt, M., Holder, T., & **DePanfilis, D.** (2011, July). *Washoe County Permanency Innovation Initiative Implementation Plan* (482 pages). Reno: Washoe County Department of Social Services. Award Number – 90CT0157.

Clarkson Freeman, P., & **DePanfilis, D.** (2011, June). *Implementation capacity assessment: Survey results from the readiness to change and organizational context assessment*. Baltimore, MD: Ruth H. Young Center for Families & Children at the University of Maryland School of Social Work. [Washoe County Permanency Innovations Initiative, Award Number - 90CT0157].

**DePanfilis, D**., Collins, K., Strieder, F., & Tabor, M. (2009). Family Connections intervention manual adapted for Trauma Adapted Family Connections. Baltimore, MD: University of Maryland School of Social Work.

Shaw, T., Ahn, H., & **DePanfilis, D**. (December 2009). *Maryland child welfare performance indicators: 3rd Annual child welfare accountability report.* Baltimore, MD: Ruth H. Young Center for Families & Children at the University of Maryland School of Social Work.

**DePanfilis, D**., Esaki, N., Gregory, G., Hayward, R.A., & Shaw, T. (December 2009). *Quality assurance process in Maryland child welfare:3rd Annual child welfare accountability report.* Baltimore, MD: Ruth H. Young Center for Families & Children at the University of Maryland School of Social Work.

Shaw, T., Kaye, S., & **DePanfilis, D**. (December 2008). *Maryland child welfare performance indicators: 2nd Annual child welfare accountability report.* Baltimore, MD: Ruth H. Young Center for Families & Children at the University of Maryland School of Social Work.

Kaye, S., **DePanfilis, D**., & Shaw, T. (December 2008). *Quality assurance process in Maryland child welfare: 2nd Annual child welfare accountability report.* Baltimore, MD: Ruth H. Young Center for Families & Children at the University of Maryland School of Social Work.

Faraldi, S., & **DePanfilis, D**. (December 2007). *Child welfare accountability: Evaluating quality assurance processes in Maryland.* Baltimore, MD: Ruth H. Young Center for Families & Children at the University of Maryland School of Social Work.

Faraldi, S., Ovwigho, P.C., Shaw, T.V., & **DePanfilis, D**. (December 2007). *Child welfare accountability: Annual report of Maryland performance indicators.* Baltimore, MD: Ruth H. Young Center for Families & Children at the University of Maryland School of Social Work.

**DePanfilis, D**., Daining, C., Frick, K., Farber, J., & Levinthal, L. (2007). *Hitting the M.A.R.C. Establishing foster care Minimum Adequate Rates for Children, Technical Report.* New York: Children's Rights, Inc.

**DePanfilis, D**., Daining, C., Frick, K., Farber, J., & Levinthal, L. (2007). *Hitting the M.A.R.C. Establishing foster care Minimum Adequate Rates for Children.* New York: Children's Rights, Inc.

**DePanfilis, D**., McDermott Lane, M., Girvin, H., & Strieder, F. (2006). *Family Connections intervention manual* (6th edition). Baltimore, MD: University of Maryland School of Social Work.

**DePanfilis, D**., & Hayward, R.A. (2006). *Ongoing child protective services (CPS) with methamphetamine using Families: Implementing promising practices.* Prepared for the National Resource Center for Child Protective Services, A program of the USDHHS, Children's Bureau. Available at http://www.nrccps.org/PDF/Ongoing_CPS_with_Meth_Using_Families_Implementing_Promising_Practice10302006.pdf

**DePanfilis, D**. (2006). *Child neglect: A guide for prevention, assessment, and intervention.* Washington, DC: U.S. Department of Health and Human Services, Administration on Children and Families, Administration for Children, Youth, and Families, Children's Bureau, Office on Child Abuse and Neglect.

Saarsgard, D., & **DePanfilis, D**. (2006). Preventing child neglect via Family Connections, *The Child Welfare Compass, 1(1), 5.*

**DePanfilis, D**., McDermott Lane, M., Girvin, H., & Strieder, F. (2006). *Family Connections intervention manual* (6th edition). Baltimore, MD: University of Maryland School of Social Work.

Zlotnik, J. L., **DePanfilis, D**., Daining, C., & McDermott Lane, M. (2005). Retaining competent child welfare workers: Lessons from research. *IASWR research brief 1 child welfare workforce series.* Washington, DC: Institute for the Advancement of Social Work Research.

Zlotnik, J. L., **DePanfilis, D**., Daining, C., & McDermott Lane, M. (2005). Professional education for child welfare practice: Improving retention in public child welfare agencies. *IASWR research brief 2 child welfare workforce series.* Washington, DC: Institute for the Advancement of Social Work Research.

Zlotnik, J. L., **DePanfilis, D**., Daining, C., & McDermott Lane, M. (2005). Understanding retention in child welfare: suggestions for further research and evaluation. *IASWR research brief 3 child*

*welfare workforce series*.  Washington, DC:  Institute for the Advancement of Social Work Research.

**DePanfilis, D**., McDermott Lane, M., Girvin, H., & Strieder, F. (2004). *Family Connections intervention manual* (4th edition). Baltimore, MD:  University of Maryland School of Social Work.

**DePanfilis, D**., & Salus, M. (2003). *Child Protective Services:  A guide for caseworkers.*  Washington, DC: U.S. Department of Health and Human Services, Administration on Children and Families, Administration for Children, Youth, and Families, Children's Bureau, Office on Child Abuse and Neglect.

**DePanfilis, D**. (2001). Child neglect: The need for differential program strategies.  In T.D. Morton, & B. Salovitz (Eds.). *The CPS response to child neglect* (pp. 7-1 through 7-34). Duluth, GA:  The National Resource Center on Child Maltreatment.

**DePanfilis, D**. (2001). Using research to select interventions and measure outcomes. In T.D. Morton, T. D, & B. Salovitz (Eds.). *The CPS response to child neglect* (pp. 8-1 through 8-32). Duluth, GA: The National Resource Center on Child Maltreatment.

**DePanfilis, D.** (2000). Research on risk factors associated with victimization. *Proceedings: Managing risk in child protection: European perspectives* (pp. 38-46).  London, UK. September 15-16, 2000.

**DePanfilis, D**. (2000). Neighborhood neglect prevention: Interdisciplinary View, Emphasis on strengths: An important ingredient in community outreach.  *The APSAC-MD Advisor*, *1*(3), pp. 7-8.

Zlotnik, J., Rome, S., & **DePanfilis, D**. (1998). *Educating for child welfare practice a compendium of exemplary syllabi*   Alexandria, VA:  Council on Social Work Education.

**DePanfilis, D**. (1999, August). *Child maltreatment recurrences: Implications for child welfare reform*. Briefing paper prepared for Secretary Linda Fox, Department of Human Resources.  Baltimore: University of Maryland School of Social Work.

**DePanfilis, D**., Glazer-Semmel, E., Farr, M., & Ferretto, G. (1999). *Family Connections intervention manual*. Baltimore: University of Maryland, Baltimore.

**DePanfilis, D**., & Ernst, J. (1999). *Family Connections interview coordinators' manual: Specifications for facilitating research interviews*. Baltimore: University of Maryland, Baltimore. Retrieved January 17, 2005 from University of Maryland Center for Families Web site: http://www.family.umaryland.edu/

**DePanfilis, D**. (1997). *Family Connections baseline protocol manual specifications for facilitating baseline interviews*. Baltimore: University of Maryland School of Social Work.

**DePanfilis, D**. (1997). Is the child safe?  How do we respond to safety concerns?  In T. Morton and W. Holder (Eds.). *The evolution and revolution of decision making in child protective services*. Atlanta, GA: The National Resource Center on Child Abuse and Neglect.

**DePanfilis, D**., & Wilson, C. (1996, June). Annotated bibliography related to finding strengths in chaotic families. Prepared for the APSAC Fourth National Colloquium, The American Professional Society on the Abuse of Children.

**DePanfilis, D**., & Kelly, S. (1996, June). Selected annotated bibliography on coordinating interventions in multiproblem families: child maltreatment, chemical dependency, and domestic violence. Prepared for the APSAC Fourth National Colloquium, The American Professional Society on the Abuse of Children.

**DePanfilis, D**., Pierce, R., & St. George, S. (1995, June). Selected annotated bibliography on the role of social support with neglectful families. Prepared for the APSAC Third National Colloquium, The American Professional Society on the Abuse of Children.

Starr, R. H., **DePanfilis, D**., & Morris Hyde, M. (1994). Current issues in risk assessment. *Seventh National Roundtable on CPS Risk Assessment Summary of Highlights* (pp. 183-198). Washington, DC: American Public Welfare Association.

**DePanfilis, D**. (1994). Program 3: Child development. *Family Based Child Protective Services Self-Directed Learning Curriculum*. Charlotte, NC: ACTION for Child Protection and the Wisconsin Department of Health and Human Services.

**DePanfilis, D**. (1994). Program 4: Personality development and human behavior concepts and theories. *Family Based Child Protective Services Self-Directed Learning Curriculum*. Charlotte, NC: ACTION for Child Protection and the Wisconsin Department of Health and Human Services.

**DePanfilis, D**. (1994). Program 16: Effective use of services. *Family Based Child Protective Services Self-Directed Learning Curriculum*. Charlotte, NC: ACTION for Child Protection and the Wisconsin Department of Health and Human Services.

**DePanfilis, D**., St. George, S., & Dolan, M. (1993, June). *Selected annotated bibliography on family reunification*. Prepared for the First National Colloquium, The American Professional Society on the Abuse of Children. June 26, 1993.

Salus, M., & **DePanfilis, D**. (1993). *Building service planning competencies*. Developed for the Maryland Social Services Administration, Child Protective Services.

**DePanfilis, D**., & Zuravin, S. Adolescent versus older mothers: Type, perpetrator, and severity of maltreatment. *Proceedings, 1993 National Association for Welfare Research and Statistics 33rd Annual Workshop*. Phoenix, AZ. August 10, 1993.

**DePanfilis, D**., & Salus, M. (1992). *A coordinated response to child abuse and neglect: A basic manual*. [DHHS Publication No. (ACF) 92-30362.] Washington, DC: National Center on Child Abuse and Neglect.

**DePanfilis, D**., & Salus, M. (1992). *Child Protective Services: A guide for caseworkers*. [U.S. Government Printing Office No. 1992-625-670/60577]. Washington, D.C.: National Center on Child Abuse and Neglect.

**DePanfilis, D**., & Salus, M. (1992). *Building interviewing competencies.* Developed for the Maryland Social Services Administration, Child Protective Services.

**DePanfilis, D**., & Birch, T. (Eds.) *Proceedings - National Center on Child Abuse and Neglect Symposium on the Prevention of Child Maltreatment.* Washington, D.C.: Administration on Children, Youth and Families, Administration for Children and Families, U.S. Department of Health and Human Services. June 6-7, 1991.

**DePanfilis, D**., & Birch, T. Preventing child maltreatment highlights of what we know and don't know. In D. DePanfilis and T. Birch (Eds.). *Proceedings - National Center on Child Abuse and Neglect Symposium on the Prevention of Child Maltreatment*. Washington, D.C.: Administration on Children, Youth and Families, Administration for Children and Families, U.S. Department of Health and Human Services. June 6-7, 1991.

**DePanfilis, D**. (1991). *Research support for elements within the Child At Risk Field system.* Charlotte, NC: ACTION for Child Protection.

**DePanfilis, D**. (1991). *The use of the Child At Risk Field system in Juvenile/Family Court.* Charlotte, NC: ACTION for Child Protection.

**DePanfilis, D**. (1990, August). *Resource materials and needs assessment of pre-placement preventive and reunification services for children and families at risk of abuse and neglect.* Report submitted to Hamilton County, Ohio Department of Human Services.

**DePanfilis, D**. (1990). Community based child sexual abuse intervention. In W. Holder (Ed.). *Alabama standard guidelines for developing local community protocols for intervention in child sexual abuse* (pp. 6-16). Charlotte, NC: ACTION for Child Protection.

**DePanfilis, D**. (1990). Community based collaboration. In W. Holder (Ed.). *Alabama standard guidelines for developing local community protocols for intervention in child sexual abuse* (pp. 78-89). Charlotte, NC: ACTION for Child Protection.

**DePanfilis, D**. (1990). Appendix A, the dynamics of sexually abusive families. In W. Holder (Ed.). *Alabama standard guidelines for developing local community protocols for intervention in child sexual abuse* (pp. 1-44). Charlotte, NC: ACTION for Child Protection.

**DePanfilis, D**., & Brooks, G. (1989). *Child maltreatment and woman abuse: A guide for workers.* Washington, D.C.: National Woman Abuse Prevention Project. Funded by the U.S. Department of Justice.

**DePanfilis, D**. (1988, May). Child sexual abuse: A selected annotated bibliography. *Research Symposium on Child Sexual Abuse.* Washington, D.C.: National Center on Child Abuse and Neglect.

**DePanfilis, D**. (1988). *Selected annotated bibliography on child neglect.* (Second Edition). Washington, D.C.: National Center on Child Abuse and Neglect.

**DePanfilis, D**. (1988). Defining and measuring child welfare competencies, what are the issues? *National Child Welfare Resource Center Training Newsletter, 1* (2).

Salus, M., **DePanfilis, D**., Holder, W., & Corey, M. (1988). Investigation in Child Protective Services. *Tennessee Department of Human Services Social Counselor Certification.* Nashville, TN: Tennessee Department of Human Services.

Holder, W., & **DePanfilis, D**. (1988). *Wisconsin Supervisory Training Program.* Prepared by ACTION for Child Protection for Wisconsin Department of Health and Social Services.

**DePanfilis, D**. (1988). Introduction: Philosophy and purposes of Child Protective Services. In D. DePanfilis (Ed.). *Enhancing Child Protective Service Competency Selected Readings* (pp. 1-9). Charlotte, NC: ACTION for Child Protection.

**DePanfilis, D**. (1988). Human behavior and personality development. In D. DePanfilis (Ed.). *Enhancing Child Protective Service Competency Selected Readings* (pp. 19-37). Charlotte, NC: ACTION for Child Protection.

**DePanfilis, D**. (1988). Interviewing and treatment technology. In D. DePanfilis (Ed.). *Enhancing Child Protective Service Competency Selected Readings* (pp. 108-145). Charlotte, NC: ACTION for Child Protection.

**DePanfilis, D**., & Sheppard, R. (1988). Selected annotated bibliography. In D. DePanfilis (Ed*.). Enhancing Child Protective Service Competency Selected Readings* (pp. 206-213). Charlotte, NC: ACTION for Child Protection.

**DePanfilis, D.** (Ed.). (1988). *Enhancing Child Protective Service Competency Selected Readings* Charlotte, NC: ACTION for Child Protection.

**DePanfilis, D**. (Ed) (1987). *Enhancing Child Protective Service competency selected readings.* Charlotte, NC: ACTION for Child Protection.

**DePanfilis, D**. (1987). Introduction. In D. DePanfilis (Ed.). *Enhancing Child Protective Service competency selected readings* (pp. 1-8). Charlotte, NC: ACTION for Child Protection.

**DePanfilis, D**. (1987). Human behavior. In D. DePanfilis (Ed.). *Enhancing Child Protective Service competency selected readings* (pp. 18-32). Charlotte, NC: ACTION for Child Protection.

**DePanfilis, D**., & Sheppard, R. (1987). Selected annotated bibliography. In D. DePanfilis (Ed.). *Enhancing Child Protective Service competency selected readings* (pp. 103-110). Charlotte, NC: ACTION for Child Protection.

Costello, T., and **DePanfilis, D**. (Eds.). (1987). *Child protective services risk management: A decision making handbook.* Charlotte, NC: ACTION for Child Protection.

**DePanfilis, D**., Holder, W., Corey, W., Salus, M., Oleson, E., & Plum, H. (1987). *Wisconsin comprehensive CPS training program curriculum and trainer's guide.* Prepared by ACTION for Child Protection for Wisconsin Department of Health and Social Services.

Morton, T., & **DePanfilis, D.** (1987). *Supervisory effectiveness in child welfare services training curriculum and resource guide.* Atlanta, GA: Child Welfare Institute.

**DePanfilis, D**. (1986). *Literature review of child sexual abuse.* Washington, DC:  U.S. Government Printing Office.

Salus, M. K., Ragan, C. K., & **DePanfilis, D**. (1986). *Supervision in child protection.*  New York, NY:  Child Protective Services Training Academy.

**DePanfilis, D**. (1985). *Child neglect: A selected annotated bibliography.* Washington, DC:  National Center on Child Abuse and Neglect.

Salus, M.K., Alderson, J., Broadhurst, D., **DePanfilis, D**., Nickle, N. S., & Sonkin, D. J. (1985) *Child Advocacy Committee Workshop.*  Washington, D.C.: Creative Associates for the U.S. Air Force.

Holder, W., & **DePanfilis, D**. (1984). *Supervisory guide for assessing casework effectiveness.* Denver, CO: The American Humane Association.

DePanfilis, D. (1984). Encouraging parents to self refer: An increasing trend?  *Protecting Children, 1* (2).

**DePanfilis, D**. (Ed.). (1983, Fall). *National Child Protective Services Newsletter.*  Denver, CO:  The American Humane Association.

**DePanfilis, D**. (1983). Advocacy for children and families - an annotated bibliography.  *Midwest Parent Child Review, 8* (3), 10-11.

**DePanfilis, D**. (Ed.). (1983, Spring). *National Child Protective Services Newsletter.* Denver, CO:  The American Humane Association.

*Final Reports:*

Murray, K. W. & DePanfilis, D. (August, 2009). Evaluation of the *Alabama Comprehensive Assessment Process (CAP): Final progress report.*  Submitted to the Alabama Department of Human Resources and the USDHHS, Children's. Bureau [Cooperative agreement number: 90CA1751]. Baltimore, MC:  Ruth H. Young Center for Families & Children, University of Maryland School of Social Work.

DePanfilis, D., Daining, C., Strieder, F., & Clark, T. (Fall, 2009). *Family Connections with intergenerational families final report* (CW-1226). Submitted to the USDHHS, ACY, ACYF, Children's Bureau.  Baltimore MD: Ruth H. Young Center for Families & Children, University of Maryland School of Social Work.

Linsenmeyer, D., Ferretto, G., Daining, C., & DePanfilis, D. (Fall, 2009). *Excellence in public child welfare supervision program final report.* Report submitted to the USDHHS, ACY, ACYF, Children's Bureau.  Baltimore, MD:  Ruth H. Young Center for Families & Children, University of Maryland School of Social Work.

DePanfilis, D., Daining, C., Frick, K., Farber, J., & Levinthal, L. (2007). Hitting the M.A.R.C. – Establishing foster care Minimum Adequate Rates for Children.  Baltimore & New York: University of Maryland School of Social Work & Children's Rights, Inc.

Zlotnik, J., DePanfilis, D., Daining, C., & McDermott Lane, M. (2005). *Factors influencing retention of child welfare staff: A systematic review of research.* Funded by Annie E. Casey Foundation. Washington, DC: Institute for the Advancement of Social Work Research (IASWR).

DePanfilis, D., & Daining, C. (2003). *Aftercare study: Outcomes of independent living final report.* Funded by Baltimore County Department of Social Services. Baltimore, MD: University of Maryland School of Social Work, Center for Families.

DePanfilis, D., & Daining, C. (2003). *Assessment of outcomes of independent living final report*. Study funded by Baltimore City Department of Social Services. Baltimore, MD: University of Maryland School of Social Work, Center for Families and Family Welfare Research and Training Group.

DePanfilis, D. (2003). *Final report. Review of IAIU investigations of suspected children abuse and neglect in DYFS out-of-home care settings in New Jersey.* Study funded by Children's Rights, Inc. Baltimore, MD: University of Maryland School of Social Work, Center for Families and Institute for Human Services Policy.

DePanfilis, D. (2002). *Family Connections' family strengthening initiative final report.* Study funded by the U.S. Department of Health and Human Services, Substance Abuse Mental Health Services Administration, Center for Substance Abuse Prevention. (Cooperative agreement 1 UD1 SPO8766). Baltimore, MD: University of Maryland School of Social Work.

DePanfilis, D. (2002). *Helping families prevent neglect final report.* Study funded by the U.S. Department of Health and Human Services, Children's Bureau 1996-2002 (Grant Number 90CA1580). Baltimore, MD: University of Maryland School of Social Work.

DePanfilis, D., Daining, C., & Wechsler, J. (2002). *Therapeutic visiting pilot project technical assistance final report*. Report prepared by the University of Maryland Center for Families for the Baltimore County Department of Social Services.

DePanfilis, D., & Simpson, G. (2000). *Helping families and children: What works? (Rapid reunification project).* Study funded by the Baltimore City Department of Social Services. Baltimore, MD: University of Maryland School of Social Work.

Zuravin, S. J., & DePanfilis, D. (1996). *Child maltreatment recurrences among families served by Child Protective Services final report.* Study funded by the U.S. Department of Health and Human Services, National Center on Child Abuse and Neglect 1992-1996 (Grant Number 90CA1497). Baltimore, MD: University of Maryland School of Social Work.

Zuravin, S. J., DePanfilis, D., & Masnyk, K. (1993). *Teenage motherhood: Its relationship to child abuse and neglect final report.* Study funded by the National Center on Child Abuse and Neglect 1988-1993 (Grant No. 90CA1376). Baltimore, MD: University of Maryland School of Social Work.

DePanfilis, D. (1993, November). A proximate test of the construct and predictive validity of the elements and influences represented in the ACTION for Child Protection Child At Risk Field risk assessment and decision making system final report. Submitted by the University of Maryland at Baltimore, School of Social Work to ACTION for Child Protection.

DePanfilis, D., Goldman, J., & Hughes, C. (1993, July). *Synthesis of the child protective services systems improvement projects sponsored by the National Center on Child Abuse and Neglect.  Draft Final Report.*  Submitted by Caliber Associates to the National Center on Child Abuse and Neglect, Contract # 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, BOA I, Task Order Two.

DePanfilis, D. (1990, September). *Survey of the training and technical assistance needs of professionals involved in the protection of drug exposed infants*.  Report prepared for the ABA Center on Children and the Law, Washington, D.C. through a grant from the Robert Wood Johnson Foundation.

DePanfilis, D. (1988, August). *Evaluation report: UNISYS Child Protection Services System (CPSS).*  Annapolis, MD:  ACTION for Child Protection.

DePanfilis, D. (1988, September). *Enhancing sexual abuse community intervention and treatment final report.* Prepared for the South Carolina Department of Social Services and the National Center on Child abuse and Neglect.

DePanfilis, D. (1988, May). *Final report: Determining safety in child protective services and child placement decisions.*  Prepared by ACTION for Child Protection for the Edna McConnell Clark Foundation.

DePanfilis, D., & Costello, T. (1986) *Report to the Presidential Partnership on Child Safety.*  Prepared for the U.S. Department of Justice.

DePanfilis, D., & Oleson, E. (1986, May). *Report to task force on institutional abuse.* Prepared by ACTION for Child Protection for Delaware Department of Services for Children, Youth, and Their Families.

DePanfilis, D. (1984, September). *Findings and implications - survey of the status of child protective services 1984.*  Denver, CO:  The American Humane Association.

Brown, L., Hayes, K., & DePanfilis, D. (1984, June). *A comprehensive assessment of child protective services in South Carolina.* Report prepared by the American Humane Association for South Carolina Department of Social Services.

DePanfilis, D. (1983, August). *Findings and implications - survey of the status of child protective services 1983.* Denver, CO:  The American Humane Association.

Mohr Trainor, C., DePanfilis, D., & Fluke, J. (1984, August). *Child abuse and neglect reporting and disposition in the state of Virginia final report.*  Prepared by the American Humane Association for the Virginia Department of Social Services.

**Presentations:**

*Refereed Presentations:*

DePanfilis, D.,  & Clarkson Freeman, P. Exploring the influence of individual and organizational factors that affect the fidelity of a child maltreatment preventive intervention: Implementing evidence

based child maltreatment preventive intervention in the real world. *XXth ISPCAN International congress on Child Abuse and Neglect.* Nagoya, Japan, 9/14/14 – 9/17/14.

DePanfilis, D., Durand, J., & Negron, D. Using decision-support data systems to drive implementation of an intervention to increase safety and reduce long-term foster care. *19th National Conference on Child Abuse and Neglect.* New Orleans, April 30, 2014.

Testa, M., DePanfilis, D., & Russell, T. Conceptualizing a framework for building evidence and bringing evidence-supported interventions to scale in child welfare. *19th National Conference on Child Abuse and Neglect.* New Orleans, April 30, 2014.

Bartley, L., Clarkson Freeman, P., & DePanfilis, D. Using organizational assessments to inform implementation and build sustainable capacity. Workshop. Child Welfare Services and Systems. *Society for Social Work and Research Annual Conference.* San Antonio, TX, January 16, 2014.

Bright, C. L., DePanfilis, D., Fitzgerald, M. E., Greeno, E. J. Fidelity and child welfare system reform: Creating measures of fidelity to large-scale practice changes. Roundtable Session 49, Research Design and Measurement. *Society for Social Work and Research Annual Conference.* San Antonio, TX, January 17, 2014.

Rushovich, B., Murray, K. W., DePanilis, D., Bright, C., & Greeno, E. Implementation drivers: How do we use this framework to evaluate change efforts in child welfare and help build capacity? [Roundtable]. *America Evaluation Association: Evaluation Practice in the Early 21st Century.* Washington, DC, October 14-19, 2013.

DePanfilis, D., Strieder, F., Collins, K., Clarkson Freeman, P. , & Costello, T. Adapting a promising multi-faceted child maltreatment preventive intervention to respond to differences in target populations. (Symposium). *13th International Society for the Prevention of Child Abuse and Neglect (ISPCAN) European Regional Conference.*, Dublin, September 15-18, 2013.

DePanfilis, D. Replicating a family strengthening intervention to prevent child maltreatment. *13th International Society for the Prevention of Child Abuse and Neglect (ISPCAN) European Regional Conference.*, Dublin, September 15-18, 2013.

Collins, K., Strider, F., Clarkson Freeman, P., & DePanfilis, D. Trauma Adapted Family Connections. *13th International Society for the Prevention of Child Abuse and Neglect (ISPCAN) European Regional Conference.*, Dublin, September 15-18, 2013.

Clarkson Freeman, P., Strider, F., & DePanfilis, D. Grandparent Family Connections. *13th International Society for the Prevention of Child Abuse and Neglect (ISPCAN) European Regional Conference.*, Dublin, September 15-18, 2013.

DePanfilis, D., Clarkson Freeman, P., & Costello, T. Families with children determined to be unsafe (SAFE-Family Connections). *13th International Society for the Prevention of Child Abuse and Neglect (ISPCAN) European Regional Conference.*, Dublin, September 15-18, 2013.

DePanfilis, D., Testa, M., Dionne, R., & Huebner. R. (With contributions by the Child Welfare Research and Evaluation Workgroup). Conceptualizations of a framework for building evidence and

scaling evidence-supported interventions in child welfare. *Global Implementation Conference (GIC)*. Washington, DC, August 19-21, 2013.

DePanfilis, D., Akin, B., Bright, C., Freeman, P.C., & Bryson, S. Measuring the implementation of social work interventions: Options and examples. *Society for Social Work and Research 17th Annual Conference, Social Work for a Just Society: Making Visible the Stakes and Stakeholders.* San Diego, January 16-20, 2013.

DePanfilis, D. Workshop: Conducting intervention research to increase child safety. *18th National Conference on Child Abuse & Neglect: Celebrating the Past – Imagining the Future.* Washington, DC, April 16-20, 2012.

DePanfilis, D., Akin, B., & Webster, D. Symposium: Exploring case and service characteristics of children in long-term foster care to guide organizational decision-making for implementing practice and system reforms. *Society for Social Work & Research 16th Annual Conference: Research that Makes a Difference – Advancing Practice and Shaping Public Policy.* Washington, DC, January 11-15, 2012.

DePanfilis, D., Clarkson Freeman, P., & Reiman, S. Using quantitative and qualitative methods to explore barriers to permanency for children who entered care because they were unsafe at home. *Society for Social Work & Research 16th Annual Conference: Research that Makes a Difference – Advancing Practice and Shaping Public Policy.* Washington, DC, January 11-15, 2012.

McCrae, J., Graef, M., Armstrong, M., & DePanfilis, D. Developing a shared process measure for implementation projects in child welfare. USDHHS, ACY, ACYF, Children's Bureau 2011 *National Child Welfare Evaluation Summit.* Washington, DC, August 30, 2011.

Cohen, L., Smithgall, C., DePanfilis, D., DeJohn, T., Pietruszkiewic, S., & Washington, P. The successes and challenges of random assignment in child welfare program evaluation. *National Child Welfare Evaluation Summit.* Washington, DC, August 30, 2011.

DePanfilis, D., Collins, K., Bellin, M., Rice, K., & Williams, C. Workshop - Back to the future: Designing and implementing social work intervention research. *Society for Social Work & Research 15th Annual Conference: Emerging Horizons for Social Work Research.* Tampa, FL, January 16-20, 2011.

DePanfilis, D., Esaki, N., & Greeno, E. Symposium - Policy research to guide child welfare organizational decision-making. *Society for Social Work & Research 15th Annual Conference: Emerging Horizons for Social Work Research.* Tampa, FL, January 16-20, 2011.

DePanfilis, D., & Ahn, H. Estimating the costs associated with caring for children in foster care in the United States. *Society for Social Work & Research 15th Annual Conference: Emerging Horizons for Social Work Research.* Tampa, FL, January 16-20, 2011.

Esaki, N., Ahn, H., & DePanfilis, D. Conducting surveys of foster parents to guide recruitment and retention efforts. *Society for Social Work & Research 15th Annual Conference: Emerging Horizons for Social Work Research.* Tampa, FL, January 16-20, 2011.

DePanfilis, D. *Family Connections* presented in the following symposium: Daro, D., DePanfilis, D.,

36

Lutzker, J., & Prinz, R. Replicating with quality: Important lessons from the home visitation field. *IVIII ISPCAN International Congress: Strengthening Children and Families Affected by Personal, Intra-Familial and Global Conflict.* Honolulu, Hawaii, September 26-29.2010.

DePanfilis, D., Filene, J. H., & Smith, E.G. Multi-site findings from the replication of a family strengthening program with diverse populations to prevent child maltreatment symposium. *IVIII ISPCAN International Congress: Strengthening Children and Families Affected by Personal, Intra-Familial and Global Conflict.* Honolulu, Hawaii, September 26-29.2010.

Filene, J. H., DePanfilis, D., & Smith E.G. Multi-site findings from the replication of a family strengthening program with diverse populations to prevent child maltreatment: Cultural adaptations and assessment of fidelity. *IVIII ISPCAN International Congress: Strengthening Children and Families Affected by Personal, Intra-Familial and Global Conflict.* Honolulu, Hawaii, September 26-29.2010.

Smith, E.G., Filene, J. H., & DePanfilis, D. Multi-site findings from the replication of a family strengthening program with diverse populations to prevent child maltreatment: Assessing intermediate outcomes - increasing protective factors and decreasing risk factors with ethnically diverse families. *IVIII ISPCAN International Congress: Strengthening Children and Families Affected by Personal, Intra-Familial and Global Conflict.* Honolulu, Hawaii, September 26-29.2010.

DePanfilis, D., Smith, E.G., & Filene, J. H. Multi-site findings from the replication of a family strengthening program with diverse populations to prevent child maltreatment: Assessing final outcomes: Comparing differences in CPS reports by Ethnically Diverse Client Families. *IVIII ISPCAN International Congress: Strengthening Children and Families Affected by Personal, Intra-Familial and Global Conflict.* Honolulu, Hawaii, September 26-29.2010.

Costello, T. & DePanfilis, D. Using implementation science to protect children in diverse communities. *IVIII ISPCAN International Congress: Strengthening Children and Families Affected by Personal, Intra-Familial and Global Conflict.* Honolulu, Hawaii, September 26-29.2010.

DePanfilis, D. Replicating with quality: Lessons from the field of home visitation – Family Connections. *24th Annual San Diego International Conference on Child and Family Maltreatment.* San Diego, January 24-26-2010.

DePanfilis, D., Filene, J. H., & Smith, E.G. Symposium: Replicating a social work practice intervention: Multi-site findings from Family Connections. *Society for Social Work & Research 14th Annual Conference, Social Work Research: A World of Possibilities.* San Francisco, January 14-17. 2010.

Filene, J. H., DePanfilis, D., & Smith, E. G. A multi-method approach for assessing fidelity to Family Connections. *Society for Social Work & Research 14th Annual Conference, Social Work Research: A World of Possibilities.* San Francisco, January 14-17. 2010.

Smith, E. G., Filene, J. H., & DePanfilis, D. Assessing intermediate outcomes: Increasing protective factors and decreasing risk factors. *Society for Social Work & Research 14th Annual Conference, Social Work Research: A World of Possibilities.* San Francisco, January 14-17. 2010.

DePanfilis, D., Smith, E. G., Filene J. H., & Rice, K. Assessing final outcomes: Predicting time to CPS report. *Society for Social Work & Research 14th Annual Conference, Social Work Research: A World of Possibilities*.  San Francisco, January 14-17. 2010.

DePanfilis, D. Targeting risk and protective factors to strengthen families and prevent neglect – Child protection: Lessons learned, future priorities – research, practice, and policy.  Pediatric Academic Society 2009.  Baltimore, May 3, 2009.

DePanfilis, D., & Strieder, F. Using prevention science to design, implement, and evaluate prevention strategies: Lessons from Family Connections. *17th National Conference on Child Abuse and Neglect – Focusing on the future: Strengthening families and communities,* Atlanta, March 31 – April 4, 2009.

Hayward, R. A., DePanfilis, D., & Gregory, G. The relative importance of father involvement for child behavior among African American children. *Society for Social Work & Research 13th Annual Conference – Research that Promotes Sustainability and Rebuilds Strengths*, New Orleans, January 16-18, 2009.

Lindsey, M., & DePanfilis, D. Gender differences in behavioral outcomes among children in the Family Connections Program. *Society for Social Work & Research 13th Annual Conference – Research that Promotes Sustainability and Rebuilds Strengths*, New Orleans, January 16-18, 2009.

Woodruff, K., DePanfilis, D., & Strieder, F. Changes in child behavior following Family Connections intervention as reported by parent versus grandparent caregivers. *Society for Social Work & Research 13th Annual Conference – Research that Promotes Sustainability and Rebuilds Strengths*, New Orleans, January 16-18, 2009.

DePanfilis, D., Kaye, S., Mols, C.., Coppage, S., & Shaw, T. Calculating caseload and staffing needs: In-home services redesign in Maryland.  *American Humane Time and Effort: Perspectives on Workload Roundtable*, Santa Fe, New Mexico, December 3-5, 2008.

DePanfilis, D., Mols, C., Kaye, S., Shaw, T., & Ayers, D. Improving the efficiency and effectiveness of child welfare services through state, stakeholder, and university collaboration.  *Child Welfare Leadership in Action,* Conference sponsored by the Administration for Children and Families, Children's Bureau.  Washington, DC, October 20-21, 2008.

Lee, S., Guterman, N. B., Taylor, C. A., & DePanfilis, D. Modeling risk for maternal physical child abuse and neglect using the Fragile Families and Child Wellbeing Study. *Society for Social Work and Research 12th Annual Conference.*  Washington, D.C., January 20, 2008.

Farber, J., DePanfilis, D., & Jorgenson, K. Establishing foster care Minimum Adequate Rates for Children. *Child Welfare League of America 2007 Adoption and Foster Care Training Conference. Shared Beliefs . . .Shared Values . . .Achieving Excellence in Adoption and Foster Care.*  New Orleans, December 10-12, 2007.

Wulczyn, F., Shaw, T., & DePanfilis, D. Integrating data into the curriculum: Innovations in child welfare research curriculum.  *Council on Social Work Education, SAN FRANCISCO, Preparing the Next Generation of Educators, 53rd Annual Program Meeting*. San Francisco, October 27-30, 2007.

Daining, C., & DePanfilis, D. Resilience of youth in transition from out-of-home care to adulthood. *Eleventh Annual Conference of the Society for Social Work and Research*, San Francisco, January 11-14, 2007.

DePanfilis, D., Hayward, R.A., & Daining, C. The impact of prior CPS reports on the efficacy of a neglect prevention program. *11th International Family Violence and Child Victimization Research Conference*, Portsmouth, NH, July 9-11, 2006.

DePanfilis, D., Teaching how to assess and measure the achievement of child welfare outcomes. *Social Justice through Social Reform, Council on Social Work Education 52nd Annual Program Meeting*, Chicago, February 16-19, 2006.

DePanfilis, D., Girvin, H., Hayward, A., & Mirza, F. Combining social work education and intervention research: Lessons learned from a multi-methods course. *Social Justice through Social Reform, Council on Social Work Education 52nd Annual Program Meeting,* Chicago, February 16-19, 2006.

Zlotnik, J. L., & DePanfilis, D. Retention of child welfare staff: Implications for social work education and research, *Social Justice through Social Reform, Council on Social Work Education 52nd Annual Program Meeting*, Chicago, February 16-19, 2006.

Girvin, H., Strieder, F., & DePanfilis, D. Working with intergenerational families to increase safety, well-being, and permanency. *15th National Conference on Child Abuse and Neglect*. Boston, April 21, 2005.

DePanfilis, D., & Lutzker, J. Strategies for assessing and measuring fidelity. *15th National Conference on Child Abuse and Neglect*. Boston, April 20, 2005.

DePanfilis, H., & Girvin, H. Measuring program fidelity: Replicating child maltreatment programs across agency lines. *Children 2005, Crossing the Cultural Divide*, Child Welfare League of America National Conference, Washington, DC, March 9-11, 2005.

Girvin, H., Strieder, F., & DePanfilis, D. Grandparent Family Connections: Working with intergenerational families to increase safety, well-being, and permanency. *Children 2005, Crossing the Cultural Divide*, Child Welfare League of America National Conference, Washington, DC, March 9-11, 2005.

DePanfilis, D. Outcomes oriented child welfare practice. *11th Annual Governor's Conference on Child Abuse and Neglect*.  Baltimore, April 29, 2004.

Girvin, H., Strieder, F., & DePanfilis, D. Working with intergenerational families to increase safety, well-being, and permanency. *11th Annual Governor's Conference on Child Abuse and Neglect*. Baltimore, April 29, 2004.

DePanfilis, D., Girvin, H., & Daining, C. The influence of risk and protective factors on motivation to change at intake. *Eighth Annual Conference of the Society for Social Work and Research*, New Orleans, January 16-19, 2004.

Morano, C., Zuravin, S., Harrington, D., & DePanfilis, D. Predictors of caregiver ability to provide for the physical and psychological care of their children. *Eighth Annual Conference of the Society for Social Work and Research,* New Orleans, January 16-19, 2004.

Kunz, J., & DePanfilis, D. Assessing the cost effectiveness of a child neglect preventive intervention. *Eighth Annual Conference of the Society for Social Work and Research*, New Orleans, January 16-19, 2004.

DePanfilis, D., & Dubowitz, H. Family Connections: Promoting safety and well-being in families at risk for neglect. *8th International Family Violence Research Conference*, New Hampshire, July 13-16, 2003.

DePanfilis, D., & Dubowitz, H. Increasing safety and well-being of children: Results of a selective prevention intervention. *11th Annual Meeting of the Society for Prevention Research: Research to Policy*. Washington, DC, June 11-13, 2003.

DePanfilis, D., Dubowitz, H., Berry, S., Ortiz, P., & Martin, W. Community based child protection: Is Maryland ready for this idea. 10th Annual Governor's Conference on Child Abuse and Neglect. Baltimore, April 29, 2003.

Morano, C., Cornelius, L., & DePanfilis, D. Using web-based technology to teach advanced practice, policy, and research courses:  Demonstrating methods and results. Council on Social Work Education 49th Annual Program Meeting, Atlanta, February 27th-March 2nd, 2003.

DePanfilis, D., & Dubowitz, H. Increasing protective factors and decreasing risk factors to achieve child safety and well-being outcomes among families at risk for neglect. 17th Annual San Diego Conference on Child and Family Maltreatment. San Diego,  February 3-7, 2003.

DePanfilis, D., Daining, C., Ting, L., Park, E., & Haynes, K. Increasing safety and well-being for families at risk for child neglect: Preliminary results from a five-year demonstration project. Seventh Annual Conference of the Society for Social Work and Research, Washington, DC, January 16-19, 2003.

Ernst, J. S., Meyer, M., & DePanfilis, D. The effects of structural characteristics of housing on adequacy of physical child care: An exploratory analysis. Seventh Annual Conference of the Society for Social Work and Research, Washington, DC, January 16-19, 2003.

Panchanadeswaran, S., DePanfilis, D., & McCloskey, L.   Woman abuse and the factors associated with leaving abusive relationships.  Seventh Annual Conference of the Society for Social Work and Research, Washington, DC, January 16-19, 2003.

Koverola, C., Harrington, D., DePanfilis, D. & Daining, C. Increasing social support through an intensive home based child maltreatment intervention program. 14th International Congress on Child Abuse and Neglect. Denver, July 7-10, 2002.

DePanfilis, D., Daining, C., & Park, E. Outcomes of the helping families prevent child neglect project. 9th Annual Governor's Conference on Child Abuse and Neglect.  Baltimore, April 25-26, 2002.

DePanfilis, D., & Glazer-Semmel, E. Child neglect: Promising strategies for early intervention. 10th

Annual Colloquium of the American Professional Society on the Abuse of Children.  New Orleans, May 29-June1, 2002.

DePanfilis, D., Daining, C., Park, E., & Haynes, K. Designing and implementing computer assisted interviews. 5th National Child Welfare Data Conference - Making it Work: Using Data for Program Improvement, National Resource Center for Information Technology in Child Welfare. Arlington, VA, April 12, 2002.

DePanfilis, D., & Zuravin, S. J. Exploring the relationship between services and the recurrence of child maltreatment. Sixth Annual Conference of the Society for Social Work and Research.  San Diego, January 17-20, 2002.

Harrington, D., Zuravin, S. J., DePanfilis, D., Dubowtiz, H., & Ting, L.  The Neglect Scale: Confirmatory factor analysis in a low income sample.  7th International Family Violence Research Conference. Portsmouth, NH, July 22-25, 2001.

Ernst, J.S., DePanfilis, D., Dubowitz, H., & Ting, L. Screening for neglect prevention: Can the community identify families at risk for neglect?  Research presentation at the Ninth National Colloquium of the American Professional Society on the Abuse of Children, Washington, D.C., June 21, 2001.

DePanfilis, D., Dubowitz, H., & Kelley, S. Working with families to reduce the risk of neglect:  Results from two demonstration projects. Faces of change: Embracing diverse cultures and alternative approaches. 13th National Conference on Child Abuse and Neglect. Albuquerque, April 23-28, 2001.

DePanfilis, D. & Zuravin, S.  Decision making at CPS Intake. The 8th Annual Colloquium of the American Professional Society on the Abuse of Children. Chicago, July 12-15, 2000.

DePanfilis, D., Glazer-Semmel, E., & Camp, W. Helping families connect to meet their needs today and tomorrow. Black Administrators in Child Welfare Annual Symposium. Washington, DC, February 28-29, 2000.

DePanfilis, D., Swanson Ernst, J., & Glazer-Semmel, E. Back to the future: Measuring the effects of community based practice. National Association for Family-Based Services 13th Annual Empowering Families Conference. Baltimore, December 1-4, 1999.

Glazer-Semmel, DePanfilis, D., & Tyler, L. Educating practitioners to work with families in tomorrow's world. National Association for Family-Based Services 13th Annual Empowering Families Conference. Baltimore, December 1-4, 1999.

Glazer-Semmel, E., DePanfilis, D., & Farr, M. Helping families connect to meet their children's needs. National Association for Family-Based Services 13th Annual Empowering Families Conference. Baltimore, December 1-4, 1999.

Dubowitz, H., DePanfilis, D., & Glazer-Semell, E. Developing a neglect prevention project: Bridging research and practice. 12th National Conference on Child Abuse and Neglect. Cincinnati, November 16-21, 1998.

DePanfilis, D., & Glazer-Semell, E. Back to the future: Measuring the effects of community based practice. Take Charge of Change – Social Work '97. Baltimore. October 4-7, 1997.

DePanfilis, D. Epidemiology of child maltreatment recurrences.  Presented at the Council on Social Work Education 43rd Annual Program Meeting. Chicago. March 6-9, 1997.

DePanfilis, D., & Zuravin, S.  The role of stress and social support to child maltreatment recurrences. Presented at the 11th IPSCAN International Congress. Dublin, Ireland, August 18-21, 1996.

DePanfilis, D., & Susan Zuravin.  Predicting child maltreatment recurrences.    Presented at the Fourth National Colloquium of the American Professional Society on the Abuse of Children. Chicago, June 26-28, 1996.

DePanfilis, D. Foster care decision-making: The influence of maternal substance use.  Presented at a Symposium - The Foster Care Crisis: Translating Research into Practice and Policy.  103rd Convention of the American Psychological Association.  New York, NY, August 11-15, 1995.

DePanfilis, D., Zuravin, S., & Taylor, R. Epidemiology of child maltreatment recurrences.  Presented at the Third National Colloquium of the American Professional Society on the Abuse of Children. Tucson, AZ, June 7-11, 1995.

Zuravin, S., & DePanfilis, D.  The foster care placement decision: Predictive strength of maternal substance problems.  Presented at the Third National Colloquium of the American Professional Society on the Abuse of Children. Tucson, AZ, June 7-11, 1995.

DePanfilis, D., & Zuravin, S.  Maternal use of alcohol or other drugs: Relationship to maltreatment type, severity, and perpetrator. Presented at Advancing Knowledge for Human Services A National Conference of Social Work Researchers.  Arlington, VA, April 9-11, 1995.

Zuravin, S. J., & DePanfilis, D.  The foster care placement decision: Predictive strength of maternal substance problems.  Presented at Advancing Knowledge for Human Services A National Conference of Social Work Researchers.  Arlington, VA, April 9-11, 1995.

DePanfilis, D., & Zuravin, S.  The foster care placement decision:  Predictive strength of maternal substance use.  Presented at the San Diego Conference on Responding to Child Maltreatment. January 23-27, 1995.

DePanfilis, D., & Scannapieco, M.  Assessing safety of the child at risk of maltreatment:  Decision-making models.  Presented at the Second National Colloquium of the American Professional Society on the Abuse of Children, Cambridge, Massachusetts.  May 4-7, 1994.

Festinger, T., Gaudin, J., Zuravin, S. J., & DePanfilis, D.  Social isolation of neglectful parents. 71st Annual Meeting of the American Orthopsychiatric Association.  Alexandria, VA.  April 27-30, 1994.

DePanfilis, D., & Zuravin, S.  Maternal use of alcohol and other drugs among child protective services clients.  Presented at the Children's Hospital San Diego Conference on Responding to Child Maltreatment.  January 24-28, 1994.

42

Starr, R. H., DePanfilis, D., & Morris Hyde, M.  Assessing risk assessment:  A survey.  Presented at the Children's Hospital San Diego Conference on Responding to Child Maltreatment.  San Diego, CA. January 24-28, 1994.

DePanfilis, D., Zuravin, S., Gelles, S., Burton, C., Majka, E., & Hamilton, R.  Maternal substance use and child maltreatment. Presented at the 10th National Conference on Child Abuse and Neglect. Pittsburgh, PA.  November 30, 1993 - December 4, 1993.

DePanfilis, D., & Zuravin, S.  Adolescent versus older mothers:  Type, severity, perpetrator of maltreatment.  National Welfare Research and Statistics Conference.  Phoenix, AZ.  August  7-11, 1993.

McMillen, C., Zuravin, S., & DePanfilis, D.  Which adverse childhood experiences affect the intergenerational cycle of child maltreatment?  Ninth International Congress on Child Abuse and Neglect.  Chicago, IL.  September 1-3, 1992.

DePanfilis, D., & Zuravin, S.  Predicting the recurrence of child maltreatment.  Ninth International Congress on Child Abuse and Neglect.   Chicago, IL.  September 1-3, 1992.

McMillen C., Zuravin, S., & DePanfilis.  The intergenerational transmission of child maltreatment:  A test of Rutter's hypothesis.  National Symposium on Child Victimization.  Washington, D.C.  May 19-22, 1992.

DePanfilis, D., Zuravin, S., & Masnyk, K..  The effect of maternal age on type and severity of child maltreatment.  2nd National and 1st International Symposium on Child Abuse and Neglect.  Philadelphia, October 18, 1991.

DePanfilis, D.  Risk management safety decision making.  National Symposium on Child Victimization.  Anaheim, CA. April 1988.

Holder, W., & DePanfilis, D.  Pressing issues for child abuse professionals:  Credentialing, supervision, and liability.  Seventh National Conference on Child Abuse and Neglect.  Chicago, IL. November 1985.

DePanfilis, D., & Wechsler, J.  An assessment of computer utilization by child abuse and neglect programs.  Fifth International Congress on Child Abuse and Neglect. Montreal, Canada. September 16-19, 1984.

**Refereed Posters:**

Bartley, L., Bright, C. L., DePanfilis, D., & Fitzgerald, M. Strategies for measuring staff perceptions of implementation components. *Global Implementation Conference (GIC).* Washington, DC, August 19-21, 2013.

DePanfilis, D. Estimating the costs of caring for foster children in the United States.  Refereed poster presentation at the *Council on Social Work Education 54th Annual Meeting.* Philadelphia, 10-30-11-2-2008.

Ryder, P.T., Daining, C., & DePanfilis, D. Perceived health status in mother and grandmother caregivers in a child neglect prevention program. Refereed poster presentation at the Gerontological Society of America's 59th Annual Scientific Meeting, Education and The Gerontological Imagination, Dallas, TX, November 16-20, 2006.

DePanfilis, D. Illustrations of using web-based technologies to teach social work practice and research. Electronic poster presentation at the Council on Social Work Education 48th Annual Program Meeting. Nashville, TN. February 24-47-2002.

Ernst, J S., Zuravin, S., & DePanfilis, D. Maltreatment of children of adolescent and older mothers: Differences in type, severity, and perpetrator. Poster presentation at the Third National Colloquium of the American Professional Society on the Abuse of Children. Tucson, AZ. June 7-11, 1995.

Ernst, J. S., Zuravin, S., & DePanfilis, D. Characteristics of child abuse and neglect: Do they differ by maternal substance use status? Advancing Knowledge for Human Services A National Conference of Social Work Researchers. Arlington, VA. April 9-11, 1995.

***Invited Presentations:***

DePanfilis, D. Master class: Engaging families in prevention: The potential of in-home and neighbourhood work to prevent child maltreatment from Maryland and New York. *The Centre for Excellence in Child and Family Welfare,* August 22, 2014.

DePanfilis, D. Webinar. Using implementation science to drive child welfare reforms. Presentation for the New South Wales Department of Family and Community Services (FACS). Sydney, Australia, August 21, 2014.

DePanfilis, D. Seminar. Implementing new practices in child welfare and sustaining positive change' seminar. Presentation for the Association of Children's Welfare Agencies implementation leadership team. Sydney, Australia, August 21, 2014.

DePanfilis, D. Master class: Effectively implementing and sustaining child maltreatment prevention programs. *Association of Children's Welfare Agencies Conference 2014.* Sydney, Australia, August 20, 2014.

DePanfilis, D. Keynote address: Using successful implementation strategies and tracking outcomes for children and families. *Association of Children's Welfare Agencies Conference 2014.* Sydney, Australia, August 18, 2014.

DePanfilis, D. Pre-Conference Institute. Using implementation science to assess and strengthen individual and organizational readiness for practice research. *Third International Conference on Practice Research: Building bridges not pipelines – promoting two-way traffic between practice and research.* New York City, June 9, 2014.

DePanfilis, D., Costello, T., Collins, D., Bauta, B., & Martin, P. Using implementation science to guide the installation and implementation of evidence based practice in child welfare. *Children's Justice Act and CPS State Liaison Officers Annual Meeting.* New Orleans, April 29, 2014.

DePanfilis, D. Using implementation science to guide the replication of Family Connections as a child welfare preventive program in NYC: A real world perspective. NYU Silver School of Social Work Colloquium Series. New York City, April 8, 2014.

DePanfilis, D. Building collaboratives across organizations to support installation and implementation. *The house that evidence based practice built: Moving from program development to real world outcomes.* Washington, DC, February 11, 2014.

DePanfilis, D. Intervention research: The importance of a well specified and stable intervention. *First Haruv PhD Workshop on Child Maltreatment,* Haruv Institute, Hebrew University Mt. Scopus campus, Jerusalem, Israel, October 6-8. 2013.

DePanfilis, D., Bauta, B., Martin, P., & Rubien, D. Using implementation science to guide the replication of Family Connections as a preventive program in New York City. Silberman School of Social Work at Hunter College, September 23, 2013.

DePanfilis, D. 2013 Aaron Rosen Lecture - Back to the future: Using social work research to improve social work practice. *Society for Social Work and Research 17th Annual Conference, Social Work for a Just Society: Making Visible the Stakes and Stakeholders.* San Diego, January 16-20, 2013.

DePanfilis, D., Richardson, S., & Haidi, A. Engaging child welfare staff to effectively use data to support implementation: Exemplars from West Virginia & New Jersey. *HHS/ACY/ACYF/Children's Bureau 2011 Policy to Practice Dialogue,* Arlington, VA, October 12-13, 2011.

DePanfilis, D. Promoting child and family well-being. *University of Maryland School of Social Work's 50th Anniversary Kick-Off Event.* Baltimore, MD, September 24, 2011.

DePanfilis, D., Murray, Kantahyanee, & Rushovich, B. Evaluation feedback from SLOs and CJA Grantees: Planning collaboration in the future. *Office of Child Abuse and Neglect, SLO and CJA Grantee Meeting.* Arlington, VA, June 21, 2011.

DePanfilis, D. Keeping children safe at home. *Federation of Community Social Services of British Columbia Invitational Conference,* Vancouver, October 20, 2010.

DePanfilis, D. Strengthening and supporting families to keep children safe – Protection, prevention and planning – a child's right to be safe. *Champions for Children & Youth: 2010 British Columbia Summit,* Vancouver, October 18-19, 2010.

DePanfilis, D. Assessing fidelity of a child maltreatment preventive intervention in a multi-site replication: Trials and tribulations. *Pediatric Topics in Growth and Development Seminar Series.* University of Maryland School of Medicine, Department of Pediatrics. Baltimore. February 2, 2010.

DePanfilis, D., & White, C. Applying logic models in plans for systemic change and evaluation. National Child Welfare Evaluation Summit. Washington, DC, May 27-29, 2009.

DePanfilis, D. Chronic neglect: Assessment and decision-making. American Humane Association Chronic Neglect Meeting. Denver, January 8-9, 2009.

DePanfilis, D., Daining, C., Frick, K., & O'Neale, S. Estimating the costs associated with caring for foster children in the United States. *University of Maryland School of Social Work Research Lunch Time Seminar*, Baltimore, December 11, 2008.

DePanfilis, D. Designing & implementing an evidence-based child maltreatment prevention program: Lessons from Family Connections. *Evidence-Based Practice for Kids: Roadmap for Preventing Child Maltreatment*, co-sponsored by the Family Resource Center and the George Warren Brown School of Social Work at Washington University, St. Louis, December 1, 2008.

DePanfilis, D., & Keegan, K. Transitions to independent living:  What works?  *Maryland's Eleventh Annual Child Abuse and Delinquency Judicial Conference*, Ocean City, October 22-24, 2008.

DePanfilis, D. Prevention of child abuse and neglect key note address. *Prevention of Child Abuse and Neglect and Wellbeing of Children – a Comparison Across Countries.* Centre for Excellence in Child and Family Welfare and Social Work at the University of Melbourne, Melbourne Victoria, Australia, August 22, 2008.

DePanfilis, D. Working with children and families at risk of child abuse and neglect master class.  Centre for Excellence in Child and Family Welfare, Melbourne Victoria, Australia, August 22, 2008.

DePanfilis, D. Using prevention science to reduce the risk of child neglect. *International Perspective on child welfare practice. DoCS Research to Practice Seminar.* New South Wales (NSW) Government, Centre for Parenting and Research, NSW Department of Community Services. Belmore, NSW, Australia, August 21, 2008.

DePanfilis, D. Designing and implementing a selective child maltreatment prevention program: Lessons from Family Connections master class. Association of Children's Welfare Agencies Conference (ACWA), Sydney Convention and Exhibition Centre, Sydney, New South Wales (NSW), Australia, August 20, 2008.

DePanfilis, D. Using prevention science to reduce the risk of child neglect key note. Association of Children's Welfare Agencies Conference (ACWA), Sydney Convention and Exhibition Centre, Sydney, New South Wales (NSW), Australia, August 18, 2008.

DePanfilis, D., Strieder, F., Woodruff, K., & Daining, C. Family Connections with intergenerational families: Preliminary outcome analyses & brief reflections about lessons learned. *OCAN Prevention Replications Final Grantee Cluster Meeting.* Arlington, VA, July 24-25, 2008.

DePanfilis, D., Pettaway, S., Watkins-Tribbitt, T., Gary, H., & Woodruff, K. Identifying and overcoming barriers to reunification and adoption.  *Place Matters in Maryland: Achieving Outcomes Through Data Driven Best Practices.*  The Maritime Institute, Linthicum, MD, April 15-18, 2008.

Keegan, K., DePanfilis, D., Lambert, J., Rae, J. & Randolph, S. A discussion on independent living services: What works? *Place Matters in Maryland: Achieving Outcomes Through Data Driven Best Practices.*  The Maritime Institute, Linthicum, MD, April 15-18, 2008.

DePanfilis, D., Hayward, R. A., Shaw, T., & Woodruff, K. Using data to inform our practice: Examples from Chapin Hall's multi-state foster care data archive.  Maryland Department of Human

Resources, Social Services Administration, *Local Department of Social Services Regional Conference,* Community College of Baltimore County, Catonsville, August 22, 2007.

DePanfilis, D., Hayward, R. A., & Woodruff, K. Using data to inform our practice: Examples from Chapin Hall's multi-state foster care data archive.  Maryland Department of Human Resources, Social Services Administration, *Local Department of Social Services Regional Conference – Allegany, Baltimore City, Baltimore County, Harford County, St. Mary's, Wicomico, & Worcester,* Community College of Baltimore County – Essex Campus, Baltimore, August 9, 2007.

DePanfilis, D., Hayward, R. A., & Woodruff, K. Using data to inform our practice: Examples from Chapin Hall's multi-state foster care data archive.  Maryland Department of Human Resources, Social Services Administration, *Local Department of Social Services Regional Conference – Eastern Shore, Southern Region, & Montgomery County.*  Miller Senate Office Building, Annapolis, July 25, 2007.

DePanfilis, D., Hayward, R. A., & Woodruff, K. Using data to inform our practice: Examples from Chapin Hall's multi-state foster care data archive.  Maryland Department of Human Resources, Social Services Administration *Local Department of Social Services Western Regional Conference*, Hagerstown, MD, June 27, 2007.

DePanfilis, D., Hayward, R. A., & Woodruff, K. Using data to understand trends in out-of-home placement:  Examples from Chapin Hall's multi-state foster care data archive.  *Maryland Department of Human Resources, Social Services Administration Quality Assurance Advisory Committee Meeting*, Baltimore, June 21, 2007.

DePanfilis, D. Quantitative Methods for Developing Evidence for Social Work Practice.  University of Maryland School of Social Work Research Brown Bag Seminar – *Conducting Research to Create Evidence for Social Work Practice*, February 8, 2007.

DePanfilis, D. Presentation on Differential Response. Maryland House of Delegates' Appropriations Committee's Child Welfare Workgroup, February 6, 2007.

DePanfilis, D. Ecology of neglect: Working with families to enhance protective factors and decrease risk factors. *San Diego International Conference on Child & Family Maltreatment.* San Diego, January 22-26, 2007.

DePanfilis, D. Outcome based intervention to reduce the risk of child neglect. *San Diego International Conference on Child & Family Maltreatment.* San Diego, January 22-26, 2007.

DePanfilis D. Working with families to enhance protective factors and decrease risk factors: Positive improvements in child behavior. *Children Uniting Nations: Keeping the Promise to At-Risk Youth Washington DC Conference,* Washington, DC, October 3, 2006.

DePanfilis, D. Design, implementation, and evaluation of Family Connections: A program for preventing neglect. *Children in a Changing World, Getting it Right – XVI International Society for the Prevention of Child Abuse and Neglect International Congress on Child Abuse and Neglect*, University of York, United Kingdom, September 3-6, 2006.

47

DePanfilis, D. Workload: Accountability and Liability. *A National Forum on Child Welfare Workload.* Santa Fe, NM, December 12-14, 2005

Zlotnik, J. & DePanfilis, D. Recruitment and retention of front-line child welfare workers: What the research can tell us. *A National Forum on Child Welfare Workload.* Santa Fe, NM, December 12-14, 2005

DePanfilis, D. Targeting and achieving program outcomes in human services organizations. Continuing Professional Education Workshop, University of Maryland School of Social Work, October 18 2005.

DePanfilis, D. What does national research tell us about parenting programs? Meeting sponsored by the Baltimore Women's Giving Circle, Baltimore, September 28, 2005.

DePanfilis, D. Accountability in child welfare. Presentation for the Maryland House of Delegates, Appropriations Committee Workgroup on Child Welfare, Baltimore, September 15, 2005.

DePanfilis, D. Service provision to grandparent-headed families: Lessons learned. *National Center on Grandparents Raising Grandchildren Symposium, A Second Chance for Children: Embracing the Future.* Atlanta, May 12, 2005.

DePanfilis, D., & Lutzker, J. Strategies for assessing and measuring fidelity. *Community Based Child Abuse Prevention Program (CBCAP) - Promoting Safe and Stable Families Program (PSSF) Grantee Meeting.* Boston, April 19, 2005.

DePanfilis, D. The art and science of developing and evaluating Family Connections. Community Based Health Promotion & Economics Seminar, Johns Hopkins University, Baltimore, February 8, 2005.

DePanfilis, D. Collecting and using data from case records. *Strengthening Data Use and Analysis in Class Action Litigation Conference*, Chapin Hall Center for Children, Chicago; January 6-7, 2005.

DePanfilis, D. Targeting and achieving program outcomes in human services organizations. Continuing Professional Education Workshop, University of Maryland School of Social Work, November 9, 2004.

DePanfilis, D. Child welfare reform: Consideration of differential response system in Maryland. Presentation for the Maryland House Appropriations Committee Child Welfare Workgroup, Annapolis, October 26, 2004.

DePanfilis, D. Using prevention science to enhance the safety and well-being of children. University of Maryland, Baltimore Research Lecture of the Year, October 13, 2004.

DePanfilis, D. Family Connections: Program and research. *USDHHS, Children's Bureau sponsored conference, Evidence Based Practice*, Washington, DC, June 29, 2004.

DePanfilis, D. Invited testimony before the Subcommittee on Human Resources of the House of Representatives, Committee on Ways and Means.  Hearing on Failure to Protect Child Safety, June 17, 2004.

DePanfilis, D. Child Neglect: Working to increase safety and well-being. Sponsored by the *Family Advocacy Training Section, Soldier & Family Support Branch, Department of Preventive Health Services, Army Medical Department Center & School*, San Antonio, June 14, 2004.

DePanfilis, D. Family Connections.  Baltimore City Department of Social Services, Leadership Team. Baltimore, June 2, 2004.

DePanfilis, D. Family Connections: Response to the health and safety needs of children and families. *Health Care: The Challenges & Opportunities*, Conference Sponsored by the Association of Academic Health Centers and the University of Maryland, Baltimore President's Office, Baltimore, May 12, 2004.

DePanfilis, D. Targeting and achieving program outcomes in human services organizations.  Continuing Professional Education Workshop, University of Maryland School of Social Work, March 25, 2004.

DePanfilis, D. Discussion of common outcomes and measures. *Children's Bureau Prevention Replication Grantees Meeting,* Washington, DC, March 4, 2004.

DePanfilis, D. The practical side of measuring outcomes of family support programs. Healthy Families/Thriving Communities Collaborative Council Meeting. Washington, DC, March 3, 2004.

Schene, P., Clarke Balzano, L., & DePanfilis, D. Meeting each family's needs:  Using differential response in reports of child maltreatment. *San Diego Conference on Child and Family Maltreatment*, January 26-30, 2004.

DePanfilis, D., & Dubowitz, H. The practical side of evaluating outcomes of prevention programs. *San Diego Conference on Child and Family Maltreatment*, January 26-30, 2004.

DePanfilis, D., & Clarke Balzano, L. Outcomes oriented child welfare casework. *San Diego Conference on Child and Family Maltreatment*, January 26-30, 2004.

DePanfilis, D., & Ruffolo, M. The heart of the research proposal: Developing your research question and your specific aims.  *Eighth Annual Conference of the Society for Social Work and Research,* New Orleans, January 16-19, 2004.

DePanfilis, D. Investigating child maltreatment in out-of-home care: Barriers to good decision-making. *International Symposium on Decision-Making in Child Welfare*, University of California, Berkeley, December 4, 2003.

DePanfilis, D. Making Family Connections: Mentoring, training, and technical assistance. *Office of Child Abuse and Neglect Prevention Replication Grantees Kick-Off Meeting*, Washington, DC, December 2, 2003.

DePanfilis, D. Working with families to prevent neglect. University of Alabama School of Social Work Colloquium Series. Tuscaloosa, September 15, 2003.

DePanfilis, D., & Dubowitz, H. Family Connections: Promoting safety & well-being in families at risk for neglect. *Helfer Society Annual Meeting*, Montebello, Canada, September 2003.

Girvin, H., & DePanfilis, D. Family Connections: Promoting safety and well-being outcomes among families at risk for neglect. *14th Annual National Family Preservation Conference*, San Antonio, September 3-5, 2003.

DePanfilis, D. Family intervention strategies to prevent child maltreatment in high risk communities. Social work contributions to public health bridging research and practice in violence prevention and treatment: *Lessons from child maltreatment and domestic violence. Meeting sponsored by the Institute for the Advancement of Social Work Research (IASWR) and the US Centers for Disease Control (CDC)*, Atlanta, July 8-9, 2003.

DePanfilis, D. Developing sound research questions and aims. Developing Successful Research Grants: A Technical Assistance Workshop Co-Sponsored by Casey Family Services & IASWR. Lowell, MA, June 2, 2003.

DePanfilis, D. Measurement outcomes and analysis. Developing Successful Research Grants: A Technical Assistance Workshop Co-Sponsored by Casey Family Services & IASWR. Lowell, MA, June 2, 2003.

DePanfilis, D. Outcomes of independent living project. Baltimore City Department of Social Services, Independent Living Workgroup Meeting. Baltimore, April 1, 2003.

DePanfilis, D. Key themes: Research on the "front end" of the child welfare system. *Northwestern University/University of Chicago Joint Center for Poverty Research Child Welfare Services Research & Its Policy Implications Conference.* Washington, DC, March 20-21, 2003

DePanfilis, D. Recurrences of Child Maltreatment in Baltimore City. University of Maryland Child Protection Team. Baltimore, March 6, 2003.

DePanfilis, D. Outcomes of independent living project. Baltimore City Department of Social Services, Administrators meeting. Baltimore, February 25, 2003.

DePanfilis, D., Daining, C., Ting, L., Park, E., & Haynes, K. Increasing safety and well-being for families at risk for child neglect: Preliminary results from a five-year demonstration project. University of Maryland School of Social Work Research Brown Bag Seminar. Baltimore, February 14, 2003.

DePanfilis, D. Child neglect: Working effectively to increase safety and well-being outcomes for children and families. Sponsored by the Southern California Regional Child Welfare Training Academy. San Diego, February 7, 2003.

DePanfilis, D., & Dubowitz, H. Child neglect: Confronting the challenges. *Advanced APSAC Institute, 17th Annual San Diego Conference on Child and Family Maltreatment,* San Diego. February 3, 2003.

DePanfilis, D. Restoring hope: Intervening successfully to increase safety for neglected children. Title IV-E, Education for Child Welfare, I dream a world conference. Baltimore, January 8, 2003.

DePanfilis, D. Neglect changes strategies. Plenary Panel presented at Within Our Reach 2002: CWS Redesign – Our Commitment for Change, Child Welfare Services Stakeholders Summit. Anaheim, CA, May 16-17, 2002.

Clarke, L., DePanfilis, D., & Hay, L. A. Strengthening families with quality practice and ensuring children thrive through practice development. Workshop presented at Within Our Reach 2002: CWS Redesign – Our Commitment for Change, Child Welfare Services Stakeholders Summit. Anaheim, CA, May 16-17, 2002.

Carroll, E., Chase, C., Clark, S., DePanfilis, D., Grayson, N., Guckert, K., Schene, P., Sladen, S., & Wilson, C. Creating a differential response strategy in California. Workshop presented at Within Our Reach 2002: CWS Redesign – Our Commitment for Change, Child Welfare Services Stakeholders Summit. Anaheim, CA, May 16-17, 2002.

Carroll, E., Chase, C., Clark, S., DePanfilis, D., Grayson, N., Guckert, K., Schene, P., Sladen, S., & Wilson, C. Strategies for working together with families to achieve positive outcomes. Workshop presented at Within Our Reach 2002: CWS Redesign – Our Commitment for Change, Child Welfare Services Stakeholders Summit. Anaheim, CA, May 16-17, 2002.

DePanfilis, D. Measuring outcomes of child welfare programs. Annual Maryland DSS Assistant Directors and Supervisors Retreat. Ellicott City, Maryland, May 10, 2002.

DePanfilis, D. Too little… too late! When Trauma Begins at Home. University of Maryland, Casey Journalism Center, College Park, MD, April 22, 2002.

DePanfilis, D. Measuring outcomes of social work programs. Social Work Month Lecture. Baltimore County Department of Social Services. Towson, MD, March 26, 2002.

DePanfilis, D. Performance measures and case management strategies for family preservation and support. Ensuring Safety, Permanency and Child and Family Well-Being, The 2002 National Summit on Performance Measurement and Case Management Strategies for Child & Family Welfare Programs. Washington, DC, October 24-25, 2002.

DePanfilis, D. Strengthening families to keep children safe from harm. In Harm's Way: Breaking the Cycle of Drugs and Violence Against Children and Families, University of Maryland Community Issues Forum. Baltimore, November 9, 2001.

DePanfilis, D., Barron, B., Strieder, F., & Koverola, C. Multi-D teams: Working together effectively. Maryland Department of Human Resources, Social Services Administration 3rd Annual Best Practices Symposium. Baltimore, October 11-12, 2001.

DePanfilis, D. The state of child neglect research: Past, present and future plenary. *Child Neglect: Promising Approaches to Achieve Safety, Permanency and Well-Being, A National Symposium*. Baltimore, July 31-August 2, 2001.

DePanfilis, D. Design of equivalent social work practice learning activities in online versus classroom teaching.  The Institute through Teaching and Learning through Technology in the Health Sciences and Human Services Fellows Seminar. University of Maryland, Baltimore, September 28, 2001.

DePanfilis, D. Identifying intervention strategies and meeting reasonable effort requirements. *Child Neglect: Promising Approaches to Achieve Safety, Permanency and Well-Being, A National Symposium*.  Baltimore, July 31-August 2, 2001.

DePanfilis, D., & Harrington, D. Using survival analysis methods: The basics. *Pre-conference Institute. 7th International Family Violence Research Conference.* Portsmouth, NH, July 22-25, 2001.

DePanfilis, D. Working with families to reduce the risk of neglect:  Preliminary results.  Presentation for the Maryland Department of Human Resources Child Welfare Advisory Council. Baltimore, July 11, 2001.

DePanfilis, D., & Ting, L. Measuring child welfare outcomes: Safety, well being, and permanency. *The 9th Annual Colloquium of the American Professional Society on the Abuse of Children.* Washington, D.C., June 20-23, 2001.

DePanfilis, D., & Ting, L. Applying an outcomes framework to measure the results of prevention and intervention programs. The Governor's Eighth Conference on Child Abuse and Neglect. Baltimore. April 17, 2001.

Read, C., Koverola, C., & DePanfilis, D. Making stone soup: The challenges and rewards of multidisciplinary responses to child maltreatment. The Governor's Eighth Conference on Child Abuse and Neglect. Baltimore, April 17, 2001.

DePanfilis, D. Testimony before the National Center for Policy Research (CPR) Policy Forum on Women and Families, Featuring the New Women Senators, March 15, 2001

DePanfilis, D., Dubowitz, H., Burry, C., Nair, P., Shubin, C., & Zuskin, R. Protecting children: Highlights of best practice from multidisciplinary perspectives. Insights Forum.  University of Maryland School of Social Work.  Baltimore, October 4, 2000.

DePanfilis, D., & Okundaye, J. Motivating clients toward change.  Keeping Children Safe, Partnering for the New Millennium: Department of Human Resources, Social Services Administration 2nd Annual Best Practices Symposium. Baltimore. October 2-3, 2000.

DePanfilis, D. Research on risk factors associated with victimization. *Managing risk in child protection: European perspectives*. London, England. September 15-16, 2000.

DePanfilis, D. & Glazer-Semmel, E. Neglect:  Targeting outcomes and measuring risk reduction. *The 8th Annual Colloquium of the American Professional Society on the Abuse of Children*. Chicago, July 12-15, 2000.

DePanfilis, D. Decision making at CPS Intake. Invited lecture. University of Chicago, School of Social Services Administration, Chapin Hall Center for Children. Chicago, July 12, 2000.

DePanfilis, D. & Okundaye J. Applying the stages of change model with families at risk for maltreatment. Governor's Seventh Conference on Child Abuse and Neglect. Baltimore. April 18, 2000.

DePanfilis, D. Targeting outcomes to reduce the risk of child maltreatment. 6th Annual South Carolina Professional Colloquium on Child Abuse. Charleston, SC, February 17-18, 2000.

DePanfilis, D. Developing and measuring clinical outcomes with families and children. University of Maryland School of Social Work, Office of Continuing Education . Baltimore. October 14, 1999.

DePanfilis, D. Targeting outcomes to reduce the risk of neglect. 7th Oklahoma Conference on Child Abuse and Neglect & Healthy Family Oklahoma ' 99 Conference.  Tulsa, OK, September 8-10, 1999.

DePanfilis, D. Developing neglect intervention. Child Neglect Task Force. Seattle, August 10, 1999.

DePanfilis, D. Implementing outcome based intervention to reduce the risk of neglect. *The 7th Annual Colloquium of the American Professional Society on the Abuse of Children.* San Antonio, June 2-5, 1999.

DePanfilis, D. Targeting outcomes to measure risk reduction. Governor's Sixth Conference on Child Abuse and Neglect. College Park. April 22, 1999.

DePanfilis, D. Targeting outcomes to measure risk reduction. *The Fifteenth National Symposium on Child Sexual Abuse.*  Huntsville, March 9-12, 1999.

DePanfilis, D. APSAC presidential address: Ingredients for a successful professional response to child maltreatment. *San Diego Conference on Responding to Child Maltreatment.*  San Diego, January 25-29, 1999.

Abney, V., & DePanfilis, D. Managing resistance and engaging families in the treatment process. *San Diego Conference on Responding to Child Maltreatment*.  San Diego, January 25-29, 1999.

DePanfilis, D. Structured decision making and risk assessment: Assessing neglect. *12th National Conference on Child Abuse and Neglect*. Cincinnati, November 16-21, 1998.

DePanfilis, D., & Dubowitz, H. Working with families to reduce the risk of neglect.  *The American Professional Society on the Abuse of Children Sixth Annual National Colloquium.*  Chicago.  July 8-12, 1998.

DePanfilis, D. Targeting and measuring child welfare outcomes.  Child Welfare Reunification Training Program.  Seattle. June 11, 1998.

DePanfilis, D. Developing and measuring clinical outcomes with families and children. University of Maryland School of Social Work, Office of Continuing Education . Baltimore. May 26, 1998.

DePanfilis, D. Engaging families as partners to reduce the risk of neglect.  *14th National Symposium on Child Sexual Abuse.* Huntsville. March 18-20, 1998.

53

DePanfilis, D. Decision making and treatment outcomes. *Evolution and Revolution in CPS Decision Making sponsored by the National Resource Center on Child Maltreatment.* Ft. Lauderdale. November 6-8, 1997.

DePanfilis, D. Child neglect. State-wide conference, "Child neglect: A national and local perspective." Dover, DE. June 24, 1997.

DePanfilis, D. Issues and needs for child welfare professionals. Presented at a joint strategic planning meeting between the *American Professional Society on the Abuse of Children and the National Association of Children's Hospitals*. Miami. June 21, 1997.

DePanfilis, D., & Holder, W.  Managing resistance, and engaging involuntary maltreating families in the treatment process.  *The Fifth National Colloquium of the American Professional Society on the Abuse of Children.*  Miami, June 26-28, 1997.

DePanfilis, D., & Holder, W.  Translating risks to positive treatment outcomes.  *The Fifth National Colloquium of the American Professional Society on the Abuse of Children.*  Miami, June 26-28, 1997.

DePanfilis, D., & Holder, W.  Using the Outlook for Intervention in CPS case planning. *Fifth National Colloquium of the American Professional Society on the Abuse of Children.*  Miami, June 26-28, 1997.

DePanfilis, D. Planning for the millennium: Opportunities and challenges of inter-professional education. Presented at the *Council on Social Work Education 43rd Annual Program Meeting.* Chicago. March 6-9, 1997.

DePanfilis, D., & Kelly, S. Coordinating interventions in multi-problem families: Child maltreatment, chemical dependency, and domestic violence.  *The APSAC Advanced Institutes at the San Diego Conference on Responding to Child Maltreatment.*  San Diego, CA.  January 27, 1997.

DePanfilis, D. Applying the Strengths Perspective with Maltreating Families. 8th Annual Mid-Atlantic Conference to Prevent Child Abuse. Lancaster, PA, November 21, 1996.

DePanfilis, D., Dubowitz, H., McFarlane, K., Reid, T., and Wilson, C.  Training for the marathon: Maintaining multidisciplinary teams. *11th National Conference on Child Abuse and Neglect.* Washington, DC, September 17, 1996.

DePanfilis, D. Building risk reduction competencies with maltreating families. Council on Child Abuse and Neglect 21st Annual Conference, Advanced Training Institute. Columbia, SC, September 11, 1996.

DePanfilis, D. The relationship between child maltreatment and substance abuse in Baltimore.  Baltimore City Grand Jury, Baltimore, August 29, 1996.

DePanfilis, D. The recurrence of child maltreatment among families served by Baltimore City DSS, Child Protective Services. BCDSS, Child Protective Services Brown Bag Lunch Seminar, Baltimore. August 6, 1996.

DePanfilis, D., & Wilson, C. Finding strengths in chaotic families: A family-centered assessment process. *The Fourth National Colloquium of the American Professional Society on the Abuse of Children.* Chicago, June 26-28, 1996.

DePanfilis, D., & Kelly, S. Coordinating interventions in multi-problem families: Child maltreatment, chemical dependency, and domestic violence. *The Fourth National Colloquium of the American Professional Society on the Abuse of Children.* Chicago, June 26-28, 1996.

DePanfilis, D., & Zuskin, R. The contribution of parental chemical dependency and woman abuse to the psychological maltreatment of children. The Governor's Fourth Conference on Child Abuse and Neglect Shared Responsibilities: Shared Solutions. Baltimore. April 12, 1996.

DePanfilis, D. Evaluating child safety in CPS cases involving woman abuse. *The Twelfth National Symposium on Child Sexual Abuse.* Huntsville, AL. March 26-29, 1996.

Pence, D., Stern, P., & DePanfilis, D. Understanding decision making from a multidisciplinary point of view. *The Twelfth National Symposium on Child Sexual Abuse.* Huntsville, AL. March 26-29, 1996.

DePanfilis, D. Promoting family strengths to reduce recurrence of child maltreatment. *The San Diego Conference on Responding to Child Maltreatment.* San Diego, CA. January 22-26, 1996.

DePanfilis, D. Intervening with neglectful families. Networking in the 'Nineties. 7th Annual TPSAC Conference on Child Maltreatment. Nashville, TN. November 20-21, 1995.

DePanfilis, D., & Pierce, R. Intervening with neglectful families: The role of social support. *Third National Colloquium of the American Professional Society on the Abuse of Children.* Tucson, AZ. June 7-11, 1995.

DePanfilis, D. Collecting data from CPS records. *National Center on Child Abuse and Neglect Research Grantees Meeting.* Washington, DC. March 29-30, 1995.

DePanfilis, D. Assessing family violence among CPS families. South Carolina DSS Training Conference – "Assessment and Safety". Hilton Head Island, SC. March 12-14 and 15-16 1995.

DePanfilis, D. Pros and cons of risk assessment. Conference sponsored by the Metropolitan Washington Council of Governments, Fairfax, VA. April 22, 1994.

Zuravin, S., & DePanfilis, D. Maternal substance use and child maltreatment. The Governor's Second Conference on Child Abuse and Neglect, Baltimore. April 18, 1994.

DePanfilis, D., & Scannapieco, M. Assessing the safety of children at risk of maltreatment: Decision-making models. Guest presentation for Social Work Month. Baltimore County Department of Social Services. Towson. March 29, 1994.

DePanfilis, D., Pierce, R., & Wilson, C. Reunifying families: When is it time, when is it safe? *First National Colloquium. The American Professional Society on the Abuse of Children.* Chicago, IL. June 26, 1993.

DePanfilis, D., & Zuravin, S.  Occurrence versus recurrence of child maltreatment:  Implications for practitioners.  1st Annual Governor's Conference on Child Abuse and Neglect.  Baltimore. April 1993.

DePanfilis, D. Preliminary findings from the NCCAN Child Maltreatment Prevention Symposium:  Where do we go from here? *NCCAN State Grant Programs Meeting.* Washington, DC. April 13-16, 1992.

DePanfilis, D., & Holder, W.  Assessing safety of the child at risk of maltreatment.  Paper presented at the *National Center on Child Abuse and Neglect Symposium on Risk Assessment in Child Protective Services.*  Washington, D.C.. December 9-11, 1991.

DePanfilis, D. Overview of the Child at Risk Field system:  A social work approach to decision making and risk assessment.  *NASW Social Work '90 National Conference.*  Boston, MA. November 1990.

DePanfilis, D., & Jones, W. G.  Interpreting and applying agency risk assessment models in the courtroom:  A social work and a legal perspective.  *Fifth National Conference on Children and the Law.*  Arlington, VA.  November 1990.

DePanfilis, D.  Assessing risk of maltreatment.  *National Association of Social Workers National Conference.*  Philadelphia, PA. November 1989.

DePanfilis, D., & Jones, W. G. Child maltreatment risk assessment.  The Maryland Judicial Conference.  Baltimore. May 4-5, 1989.

DePanfilis, D. CPS training and competency building.  *NCCAN CPS State Liaison Meeting.*  Washington, D.C. April 1989.

DePanfilis, D. Child maltreatment and woman abuse.  APWA Regional Conference.  San Antonio, TX. August 1988.

DePanfilis, D. Risk assessment in CPS. Twelfth Annual Child Abuse Conference. Reading, PA. June 1-3, 1988.

DePanfilis, D.  Safety and well-being of children growing up in violent homes.  *NCCAN CPS State Liaison Meeting.*  Washington, D.C. November 1987.

DePanfilis, D. Risk assessment tools. *Directions 88, Valuing the American Family.* Tampa, FL. October 30-31 & November 1, 1987.

DePanfilis, D.  Motivating and working with difficult CPS clients in treatment.  *National Child Welfare Training Symposium.*  Atlanta, GA. June 1987.

DePanfilis, D.  Case planning to reduce risk in child protective services.  *National Child Welfare Training Symposium.*  Atlanta, GA. June 1987.

DePanfilis, D.  Developing and communicating performance expectations.  *1987 National Child Welfare Supervisors' Institute.*  Atlanta, GA. April, 1987.

56

DePanfilis, D. Risk assessment.  *Children '87 Child Welfare League of America Conference.*
Washington, D.C. March 1987.

DePanfilis, D. Self referral in child sexual abuse. *1986 National Child Welfare Training Symposium, Take an Idea and Develop It.*  Atlanta. May 11-14, 1986.

DePanfilis, D. Supervision in Child Protective Services. *1986 National Child Welfare Training Symposium, Take an Idea and Develop It.*  Atlanta. May 11-14, 1986.

DePanfilis, D. Child sexual abuse investigation.  *Naval Investigative Service.*  Washington, D.C. December 1985.

DePanfilis, D. Determining the risk for abuse and neglect: An outcome-oriented assessment model.  *Child Abuse Prevention and Treatment sponsored - Institute for the Advancement of Human Behavior.* Washington, D.C. September 20-22, 1985.

DePanfilis, D. Research: State of knowledge about family violence and future directions on the national scene.  The 1985 John W. Umstead Lecture Series – Family Violence: Its Impact, Management, and Prevention. Raleigh, NC.  March 13-15, 1985.

DePanfilis, D. Child abuse in foster care.  Maryland Foster Care Review Board Annual Conference. October 1984.

Holder, W., and DePanfilis, D.  Supervisory assessment of casework effectiveness.  Southeast Regional Conference on Child Abuse and Neglect.  Nashville, TN. November 1983.

DePanfilis, D.  A prevention strategy:  Encouraging parental self-referrals, program approaches. *Sixth National Conference on Child Abuse and Neglect.*  Baltimore, MD. September 1983.


**Professional Activities:**

*Professional Associations:*
American Professional Society on the Abuse of Children
Advisory Board (2000-2003); Past President (1999-2000); President (1998-1999); President Elect (1997-1998); Vice President (1996-1997)
Council on Social Work Education
International Society for the Prevention of Child Abuse and Neglect
National Association of Social Workers
Society for Social Work and Research

*Board Memberships:*
American Professional Society on the Abuse of Children (1995-2000)
Maryland Chapter of the American Professional Society on the Abuse of Children (1992-2002)
Society for Social Work and Research (2007-2010; 2015-2018)

*Advisory Board  & Committee Memberships:*

USDHHS, ACY, ACYF, Children's Bureau. Work Group and Steering Committee - Framework for Building Evidence and Scaling up Evidence-Supported Innovations in Child Welfare. (2012-2014).

Inter-University Consortium for Political and Social Research (ICPSR) – Institutional Organizational Representative for the University of Maryland, Baltimore (2012-2013)

Chadwick Trauma-Informed Systems Project National Advisory Committee (2010-2013)

Anne Arundel County Child Welfare Service Array Strategic Planning Committee (2008)

Baltimore City Department of Social Services Kinship Care (1997)

Baltimore Strong Families Committee, Baltimore City Government and the Family League of Baltimore (2007)

Breakthrough Series Collaborative (BSC) on Safety & Risk Assessments in Child Welfare Expert National Panel (2007)

California Evidence-Based Clearinghouse for Child Welfare (2006-2007).

Child Abuse and Neglect User Manual Series (2001-2005)

Child Welfare League of America CPS Standards (1997-1998)

Council on Social Work Education Curriculum Review (1997)

Crimes Against Children Research Center (2000)

The Children's Guild (2000-2002)

Domestic Abuse Program of Erie County, Pennsylvania (1975-1981)

Drug Court Initiative for Family Dependency Treatment in Maryland (2003-2004)

Governor's Conference on Child Abuse and Neglect (1998-2002)

Howard County CASA Program (1992-1993)

Maryland Commission on Improving Child Welfare (2007-2010)

Maryland Department of Human Resources, Social Services Administration, Search Committee – Executive Director (2009)

Maryland Department of Human Resources, Social Services Administration, Family Centered Practice Model Steering Committee (2008)

Maryland Department of Human Resources, Social Services Administration, Differential Response Implementation Planning Committee (2007-2008)

Maryland Department of Human Resources, Social Services Administration Quality Assurance Committee (Co-Chair) (2006-2007)

Maryland Department of Human Resources, Child Abuse and Neglect Differential Response System Study Planning Committee (2006-2007)

Maryland Foster Care Review Board, Anne Arundel County (1983-1986)

Maryland Health Care Commission Task Force on the Development of a Plan to Guide the Future Mental Health Service Continuum (2008)

Maryland State Council on Child Abuse and Neglect (1998-2004)

National Data Archive on Child Abuse and Neglect (2001-2005)

North American Resource Center for Child Welfare, Judge for the 2005 Pro Humanitate Literary Awards.

SAMHSA Systems of Care Proposal Group Planning Reforms for Children and Youth in the Maryland Child Welfare System who have Mental Health Problems (2007-2008).


***National Conference Committees***

Co-Chair, Child Welfare Cluster, Society for Social Work & Research Annual Conferences (2007-2014)


***Grant Reviews:***

Lois and Samuel Silberman Fund Faculty Grant Program (2012, 2013, 2014)

Centers for Disease Control and Prevention (CDC) (May 2013, July 2007, May 2007, April 2004)

The Social Work Innovation Initiative Grant Program, University of Texas-Arlington (2010)
Canada Foundation for Innovation Research Hospital Fund – Large-scale Institutional Endeavours (LSIE)
(December 2007)
Social Sciences and Humanities Research Council of Canada (January 2007, January 2004)
Minority Biomedical Research Support (MBRS) Program at York College of The City University of New
York. (2005)
University of North Carolina Injury Prevention Center (2003)
Minority Biomedical Research Support (MBRS) Program at York College of The City University of New
York. (2003)
California Department of Social Services (November 2003)
USDHHS, Children's Bureau (June-July, 2000)
USDHHS, National Center on Child Abuse and Neglect (August 1997)

***PhD Program Review:***
University of Texas-Arlington, School of Social Work (February - May 2008)

***Ad-Hoc Scientific Review and/or Research Development***
California Evidence Based Practice Clearinghouse for Child Welfare (May 2008)
CONSORT – Social and Psychological Intervention Trial development, Delphi contributor (2013)

***Editorial Review Boards:***

*Australian Social Work* (2010-2012)
*Child Maltreatment* (1999-2007)
*Journal of Child Sexual Abuse* (1999-2010)
*Journal of Family Strengths* (2011-2013)
- October 2013
-January 2013
-August 2011
*Journal of Public Child Welfare* (2005-2015)
- October 2014
-Special Issue Editor (2013-2014) – Building, Implementing, & Sustaining Effective
Child Welfare Practice
-July 2013
-February 2013
-January 2013 (2)
-September 2012
-June 2012
-April 2012
-December 2011
-November 2011
-September 2010
-November 2011
*Journal of the Society for Social Work & Research (2010-2012)*
-December 2010
-January 2012
-January 2013

*Journal of the Society for Social Work & Research – Associate Editor (2013-2016)*

-October 2013
- Special Issue Co-Editor (2014-2015)
-March 2015 (2)

**Consulting Editor:**
Social Work Research (2001-2003)

**Ad-Hoc Editorial Reviews**
Child Abuse and Neglect (1997-2013)
Recent Reviews:
-December 2014
-August 2012
-June 2012
-December 2011
-December 2010
-September 2010
-July 2010
-March 2010

Child and Family Social Work (2012)
Recent Reviews:
-December 2012

Child Maltreatment (1995-1998, 2008-present)
Recent Reviews:
-July 2011
-June 2010
-February 2010

Child Welfare (2000, 2013)
-May 2013
Children & Youth Services Review
Recent Reviews:
-July 2012
-May 2011
-December 2010
-September 2010
-March 2010

Evaluation and Program Planning (2013)
Recent Reviews:
-October 2013
-July 2013
-January 2013

Infant Mental Health Journal (2000-2001)

Journal of the American Medical Association (JAMA) (2005)

60

*Journal of Marriage and Family* (2003)

*Journal of Child Sexual Abuse* (1997-1998)

*Journal of Interpersonal Violence* (1997-2006)

*Journal of Social Service Research* (2005)

*Journal of Social Work Education* (2004)

*Psychosomatic Medicine* (2005)

*Research on Social Work Practice* (2003)

*Social Services Review* (1999-2007, 2013)
      Recent Reviews:
      -October 2013

*Social Work Research* (2000, 2004)

**Faculty Mentor (External):**
    Darcey Merritt, Silver School of Social Work, New York University (2013-2014)
    Cassandra Simmell, Rutgers University School of Social Work (2006-2009)
    Tricia Gardner, Oklahoma University (2006-2007)

**Tenure Reviewer (External):**
    Adelphi University School of Social Work (2004, 2007)
    Arizona State University Department of Social Work, College of Human Services (2004, 2013)
    Case Western Reserve University, Mandel School of Applied Social Sciences (2008)
    Cleveland State University School of Social Work (2013)
    George Warren Brown School of Social Work, Washington University (1997, 2010, 2011)
    Georgia State University School of Social Work (2003, 2011)
    New York University, Silver School of Social Work (2010)
    Ohio State University College of Social Work (2004, 2013)
    Rutgers University School of Social Work (2015)
    University at Albany School of Social Welfare (2011)
    University of Alabama School of Social Work (2002)
    University of California Los Angeles, Department of Social Welfare (2008)
    University of Chicago, School of Social Service Administration (2002, 2003)
    University of Georgia (2010)
    University of Kansas School of Social Welfare (2011)
    University of Kentucky School of Social Work (2010)
    University of Missouri – St. Louis School of Social Work (2013)
    University of Tennessee, College of Social Work (2003, 2008)
    University of Texas at Arlington School of Social Work (2002)
    University of Washington, Tacoma School of Social Work (2007)
    University of Wisconsin, Madison (2008)
    Yale University School of Medicine, Department of Psychiatry (2009)

**University Service - UMB**

| | |
|---|---|
| 2013 | University of Maryland Interdisciplinary Grant Review Committee |
| 2012 – 2013 | Internal Advisory Board/Committee of the Clinical and Translational Scientific Award (CTSA) |
| 2008 – 2011 | Chair, University of Maryland Advisory Committee for Human Research Protection |
| 2007 - 2012 | Editorial Board, University of Maryland, Baltimore – *Maryland Magazine* |
| 2003 - 2010 | School of Social Work representative on the University of Maryland, Baltimore Institutional Review Board, Panel 3 |
| 2002 - 2013 | University of Maryland, Baltimore Office of Research and Development Advisory Committee (Associate Deans for Research) |
| 2007 - 2009 | Steering Committee & Community Engagement Workgroup, Clinical and Translational Science Award Proposal |
| 2006 - 2007 | University of Maryland, Baltimore Community Outreach Advisory Committee |
| 2006 - 2007 | Member of the Faculty Search Committee for Chair of Family and Community Nursing, UMB School of Nursing |
| 2005 - 2006 | Member of the Search Committee for Dean of the School of Social Work |
| 2005 - 2007 | School of Social Work representative on the University of Maryland, School of Medicine's Human Research Protection Office Committee |
| 2002 | Ad Hoc Member, University of Maryland, Baltimore Graduate Council Student Grievance Committee. |
| 2001 | Interview team member, Candidate for Director, Institutional Research in the Office of the Vice President for Academic Affairs. |

**University Service – School of Social Work**

| | |
|---|---|
| 2015 | Secretary, Faculty Organization (Shared with 3 other faculty members) |
| 2015 | Appointment, Promotion, Tenure (APT) Committee |
| 2010 - 2011 | Chair, Joint KKI Family Center and SSW-RYC Research Assistant Professor Search Committee |
| 2009 – 2011 | Appointment, Promotion, & Tenure (APT) Committee |
| 2007 – 2013 | Member, Dean's Advisory Group |
| 2011 – 2013 | Research Mentor – Pamela Clarkson Freeman's NICHD Loan Repayment Project |
| 2006 – 2010 | Member, Social Work Administrative Group |
| 2007 – 2011 | Chair, Ruth H. Young Center for Families & Children Research Assistant Professor Search Committee |
| 2009 – 2010 | School of Social Work Faculty Search Committee |

| | |
|---|---|
| 2006 – 2010 | Member, Doctoral Program Committee |
| 2009 - 2012 | Mentoring Committees for Melissa Bellin, Charlotte Bright, Bethany Lee, Philip Osteen, Terry Shaw, Corey Shdaimah |
| 2008 - 2009 | Mentoring Committees for Melissa Bellin, Charlotte Bright, Bethany Lee, Michael Lindsey, Philip Osteen, Terry Shaw, Tanya Sharpe, Corey Shdaimah |
| 2007 – 2008 | Mentoring Committees for Melissa Bellin, Bethany Lee, Michael Lindsey, Terry Shaw, Tanya Sharpe, Corey Shdaimah |
| 2006 - 2007 | Chair, School of Social Work Faculty Search Committee |
| 2006 – 2007 | Mentoring Committees for Michael Lindsey & Corey Shdaimah |
| 2005 - 2009 | Chair, Family and Children's Specialization Committee |
| 2004 - 2013 | School of Social Work Human Subjects Protection Review Committee |
| 2003 - 2013 | Chair, Designated Research Initiative Fund Committee |
| 2005 - 2007 | Member, Faculty Executive Committee |
| 2005 - 2008 | Member, Masters Program Committee |
| 2005 - 2007 | Member, Student Grievance Committee |
| 2005 - 2008 | Course Coordinator, SOWK 777 – Research in Child Welfare |
| 2004 - 2005 | Member, Strategic Planning Committee |
| 2003 - 2008 | Member, Title IVE Education for Child Welfare Advisory Committee |
| 1999 - 2005 | Member, Jimmie Swartz Endowment Fund Advisory Committee |
| 1996 - 2006 | Member, Clinical Advisory Committee to Professional Continuing Education |
| 2001 - 2003 | Member, School of Social Work Institutional Review Board Committee |
| 2001 - 2005 | Member, ERIC committee |
| 2002 - 2004 | Member, School of Social Work APT committee |
| 1996 - 2004 | Member, Family and Children's Specialization Committee |
| 2001 - 2002 | Leader, Outcomes Measurement of Faculty Field Based Instruction Units Work Group |
| 2001 | Member, School of Social Work Research Professor Search Committee |
| 1999 - 2002 | Member, Doctoral Program Committee |
| 1998 - 2002 | Course Coordinator, SOWK 630, Clinical Practice with Individuals |
| 1996 - 2002 | Member, Foundation Committee |
| 2000 - 2001 | Member, Strategic Planning Committee |
| 2000 | Leader, Developed synthesis of Children and Family Initiatives within the School of Social Work for a campus wide initiative on children, youth, and families. |
| 1999 - 2001 | Member, Faculty Executive Committee |
| 1996 - 2000 | Member, Faculty Field Committee |
| 1999 | Member, Distance Education Work Group of the ERIC Committee |
| 1997 - 2001 | Member, Social Work Community Outreach Faculty Committee |
| 1996 - 1999 | Course Coordinator, SWCL 727, Clinical Practice with Families and Children in Child Welfare |
| 1996 - 2001 | Member, Clinical Faculty Committee |
| 1999 | Member, Search Committee – Family Connections' Faculty Field Instructors |
| 1998 | Chair, Search Committee – Title IVE Faculty Field Instructors (2) |
| 1997 - 1999 | Member, Admissions Committee |
| 1998 - 1999 | Member, Masters Program Committee |
| 1996 - 1997 | Member, SOWK 630, Clinical Practice with Individuals Faculty Planning Group |
| 1996 - 1997 | Member, Undergraduate Committee |
| 1997 | Member, Search Committee - Director of the School of Social Work Computer Lab |
| 1996 - 1997 | Member, Search Committee - Social Work Community Outreach Faculty Field Instructor |

Revised 4.2.15

I certify that this curriculum vita is accurate and up to date.

_____

                                        4.2.15
                            _____
                                        **Date**

# App. B, Ex. 23B

## Sarah Kaye, Ph.D.

4511 Oliver Street • Riverdale Park, MD  20737 • 410.428.8150 • sarah.kaye@live.com

**Education**

| | |
|---|---|
| 2007 | Ph.D. in Family Studies, University of Maryland, School of Public Health |
| | *Thesis*: "Internalizing and externalizing behaviors of adolescents in kinship and foster care: Findings from the National Survey of Child and Adolescent Well-being (NSCAW)" advised by Sandra Hofferth, Ph.D. |

2006      Graduate Certificate in Policy Analysis, University of Maryland, School of Public Policy

2003      M.A. in Sociology, Lehigh University
              *Thesis*: "Identifying service gaps in residential treatment: A case study of one private child welfare agency" advised by Roy Herrenkohl, Ph.D.

2001      B.A. in Health and Human Services, Summa cum Laude
              State University of New York at Buffalo
              CONCENTRATION: Community mental health

**Experience**

2011-        *Principal*, Kaye Implementation & Evaluation, LLC

2007-2012   University of Maryland, Baltimore
              *Visiting Assistant Professor*, School of Medicine, Division of Child & Adolescent Psychiatry, Innovations Institute (2011-2012)
              *Research Assistant Professor*, School of Social Work, Ruth H. Young Center for Families and Children (2007-2010)
              *Director of Research & Evaluation*, Atlantic Coast Child Welfare Implementation Center (2008-2010)

2005-2007   *Grants Program Coordinator*, Strengthening Rural Maryland Families Grants Program

2006        *Research Consultant*, Maryland Coalition of Families for Children's Mental Health

2005        *Child Welfare Research Intern*, The Urban Institute

2004        *Research to Practice Intern*, Child Welfare League of America

2003-2007   *Graduate Research Assistant*, University of Maryland Department of Family Studies

1998-2003   *Research Assistant/Legislative Aide*, Gateway-Longview, Inc. (nonprofit child welfare agency)

1999-2001   *Volunteer Victim Advocate*, Crisis Services, Inc. (nonprofit mental health service agency)

**Certifications & Trainings**

2010        Change Management Professional Certification, Prosci Change Management Learning Center

2010        Social Network Analysis, Society for Social Work Research

2010        Geographic Information System (GIS) Analysis, University of Maryland

2010        Implementation Research, Society for Social Work Research

2008        Advanced Qualitative Analysis, Society for Social Work Research

2007        Propensity Score Matching, Society for Social Work Research

2004        Gay, Lesbian, Bisexual, Transgender Ally Training, University of Maryland

1999        Crisis Counselor Paraprofessional Certification, Crisis Services, Inc.

**Honors and Awards**

2005        Outstanding Graduate Student Research Award
            National Council on Family Relations, Association of Councils

2005        Jewell E. Taylor National Fellowship (Most Promising Graduate Student)
            American Association on Family and Consumer Sciences

2004        Outstanding Student/New Professional Award
            National Council on Family Relations, Family Policy Section

**Local and National Service**

2012        Grant Review Panel Chair, USDHHS, ACF, Children's Bureau

2011        Instrument Review Taskforce Member, Seattle Implementation Research Conference

2011        Implementation Science Expert Panel Member, Center for the Application of Prevention
            Technologies (CAPT) Training and Technical Assistance Workgroup, USDHHS, Substance Abuse
            and Mental Health Services Administration (SAMHSA)

2011        "Synthesizer", Implementation Research Group, Global Implementation Conference

2011        Grant Review Panel Member, USDHHS, ACF, Children's Bureau

2008-2010   Chair, National Implementation Center Evaluators Workgroup, USDHHS, ACF, Children's Bureau

**Local and National Service (continued)**

2008          Co-Chair, Quality Assurance Workgroup, Maryland Department of Human Resources Statewide Assessment

2007-2008     Co-Chair, Maryland Department of Human Resources, Quality Assurance Committee

2007          Maryland Child and Family Services Review: Stakeholder Interviewer, Frederick County DSS; Case Reviewer, Carroll County & Baltimore City DSS

2005, 2006    Grant Review Coordinator, Rural Maryland Council, Strengthening Rural Maryland Families Direct Services Grants Program

2005          Grant Review Panel Member, USDHHS, ACF, Office of Community Services

2004          Grant Review Panel Member, USDHHS, ACF, Family and Youth Services Bureau

**Competitive Grant Awards**

2012-2014     Evaluation of Efforts to Expand Maternal, Infant and Early Childhood Home Visiting (MIECHV) in the District of Columbia
              $400,000, USDHHS, Health Services Research Administration

2011-2012     Evaluation of the Systems of Care Expansion Planning Grant
              USDHHS, Substance Abuse Mental Health Services Association

2009-2014     Evaluation of the National Resource Center for Child Protective Services
              $519,290, USDHHS, ACF, Children's Bureau

2008-2013     Atlantic Coast Child Welfare Implementation Center
              $8,800,000, USDHHS, ACF, Children's Bureau

2008-2013     Implementation and Evaluation of Maryland KEEP
              $1,833,303, USDHHS, ACF, Children's Bureau

2002-2005     Families United
              $813,000, USDHHS, Substance Abuse Mental Health Services Association

**Projects**

<u>Principal Investigator</u>

2012-2013    Developing an implementation science informed national training and technical assistance model to support the implementation of Wendy's Wonderful Kids child-focused adoption recruitment program.  Funded by the Annie E. Casey Foundation.

2012-2013    Assessing the capacity of community-based mental health and substance abuse treatment organizations to deliver integrated behavioral health services to children and adolescents: A pilot of the Dual Diagnosis Capability in Youth Treatment instrument. Funded by USDHHS, SAMHSA, SM-11-008.

2011-2012    Assessing Collaboration among Maryland's Behavioral Health System of Care.  Funded by USDHHS, SAMHSA, SM-11-008.

2011-2012    Integrating the CANS Assessment and Decision Support Tools into Child Welfare Decision Making. Funded by the Annie E. Casey Foundation.

2011-2012    Evaluating Implementation of the CANS Algorithm to Support Caseworker Decision Making. Funded by Maryland DHR, SSA/CPS-11-500.

<u>Co-Principal Investigator</u>

2012-2014    Evaluating the implementation of Healthy Families American in the District of Columbia Department of Health: Examining implementation strategies and outcomes.  Funded by USDHHS, HRSA, under contract with Georgetown University.

2009-2010    Developing and Implementing a Technical Assistance Program in North Carolina Division of Social Services. ACCWIC Implementation project evaluation.  Funded by USDHHS, Children's Bureau, HHS-2008-ACF-ACYF-CO-0058. PI: Diane DePanfilis, Ph.D. Salary support: 15%

2009-2010    An Organizational/Systems Approach to Strengthening In-Home Services in Tennessee. ACCWIC Implementation project evaluation.  Funded by USDHHS, Children's Bureau, HHS-2008-ACF-ACYF-CO-0058. PI: Diane DePanfilis, Ph.D. Salary support: 20%

2009-2010    Enhancing Youth Engagement in Maryland Child Welfare Policy and Practice.  ACCWIC Implementation project evaluation.  Funded by USDHHS, Children's Bureau, HHS-2008-ACF-ACYF-CO-0058. PI: Diane DePanfilis, Ph.D. Salary support: 10%

2009-2010    Assessing and Enhancing Organizational Health and Climate in Mississippi Child Welfare. ACCWIC Implementation project evaluation.  Funded by USDHHS, Children's Bureau, HHS-2008-ACF-ACYF-CO-0058. PI: Diane DePanfilis, Ph.D. Salary support: 20%

2009-2010    Evaluating Statewide Implementation of the Safety Assessment and Management (SAMS) Model in West Virginia.  ACCWIC Implementation project evaluation.  Funded by USDHHS,

Children's Bureau, HHS-2008-ACF-ACYF-CO-0058. PI: Diane DePanfilis, Ph.D. Salary support: 20%

2008-2010    Technical Assistance to Support Implementation of Systems Change in Child Welfare: Evaluation of the Atlantic Coast Child Welfare Implementation Center (ACCWIC).  Funded by USDHHS, Children's Bureau, HHS-2008-ACF-ACYF-CO-0058.  $479,190. PI: Diane DePanfilis, Ph.D. Salary support: 10%

2007-2009    Evaluation of Alabama's Comprehensive Assessment Process.  Mixed method evaluation of demonstration project under contract with the Alabama Department of Human Resources and ACTION for Child Protection.  Funded by USDHHS, Children's Bureau, HHS-2007-ACF-ACYF-CA-0023.  $746,205. PI: Diane DePanfilis, Ph.D. Salary support: 40%

2007-2009    Evaluating the Efficiency and Effectiveness of Child Welfare Services in Maryland.  Evaluation of child welfare performance and quality assurance processes under contract with the Maryland Department of Human Resources. $622,766. PI: Diane DePanfilis, Ph.D.  Salary support: 40%.

## Research Director

2005-2007    Strengthening Rural Maryland Families.  Coordinated competitive grants review process and provided consultation and technical assistance to build grantee capacity in program planning and evaluation.  Funded by the Annie E. Casey Foundation, PI: Bonnie Braun, Ph.D.

2005-2006    Transition to Fatherhood Research Project.  Mixed method study of father involvement funded by the National Institute for Child Health and Human Development, project number 5-R03-HD-42074-2. PI: Kevin Roy, PhD.

## Investigator

2011    Children's Health Insurance Program Reauthorization Act (CHIPRA): Evaluation of Maryland care management entity's implementation of wraparound services for youth with severe behavioral health needs.  Funded by USDHHS, CMS, HHS-2010-CMS-CHIPRA-0002.  PI: Sharon H. Stephan, PhD. Salary support: 40%.

2011    Evaluation of Rural Cares System of Care for services to youth with severe mental health needs on Maryland's eastern shore.  Funded by USDHHS, SAMHSA, SM059052.  PI: Terry V. Shaw, PhD. Salary support: 25%.

2011    Evaluation of Maryland Cares System of Care for services to youth with severe mental health needs in Baltimore City.  Funded by USDHHS, SAMHSA, SM058522.  PI: Terry V. Shaw, PhD. Salary support: 25%

2011    Multi-state evaluation of technical assistance to support the 1915 Residential Treatment Center waiver demonstration project.  Funded by USDHHS, CMS.  PI: Sharon H. Stephan, PhD. Salary support: 10%

2007        Evaluation of the SAFE Home Study.  Mixed method evaluation of the SAFE home study method in six states under contract with the Consortium of Children.  Funded by USDHHS Children's Bureau, CFDA#93.652.  PI: Richard Barth, Ph.D.

2007        Achieving Safety and Well-being for Unaccompanied Immigrant Children.  Technical assistance on outcomes measurement and placement and reunification decision making, under contract with Lutheran Immigration and Refugee Services.  PI: Diane DePanfilis, Ph.D.

2006        Listening and Learning from Families and Transition-age Youth.  Qualitative study conducted as a volunteer for the Maryland Coalition of Families for Children's Mental Health.  PI: Jane Walker, MSW.

2005        Child Welfare Agencies Efforts to Identify, Locate and Involve Nonresident Fathers.  Managed analyzed quantitative database of interviews with child welfare workers with the Urban Institute under contract of USDHHS, Office of the Assistant Secretary for Planning and Evaluation, contract number HHS-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.  PI: Rob Geen, M.S.W. and Karin Malm, M.S.

2004        Engaging Unheard Voices in Public Policy.  Qualitative study exploring the challenges and supports influence engagement of rural, low-income citizens in public policy, with funding from the Kettering Foundation.  PI: Bonnie Braun, Ph.D.

2003        Graduate Research Practicum.  Assessed the psychometric properties of a new outcomes measurement tool with data collected from children in foster and residential care at Kidspeace, Inc.  PI: Roy Herrenkohl, Ph.D.

**Teaching and Training**

August 2011    *Fidelity 101: How to develop, validate and use fidelity measures to inform implementation in child welfare.*  National Children's Bureau Evaluation Summit.  Workshop developer/presenter.

June 2011    *Implementation Science for the Non-Scientist*. Maryland Systems of Care Training Institute. Workshop developer/presenter.

Fall 2007    *SOWK 670 Social Work Research*. University of Maryland School of Social Work.  Guest lecturer: state and national policy analysis.

Spring 2003    *SSP 101 Introduction to Sociology and Social Psychology*. Lehigh University. Teaching Assistant.

Fall 2002    *SSP 101 Introduction to Sociology and Social Psychology*. Lehigh University. Teaching Assistant.

**Professional Society Memberships**
2013-present  American Evaluation Association
2006-2011     Society for Social Work and Research
2003-2007     National Council on Family Relations
2003-2007     University of Maryland Council on Family Relations
                Social Action Chair (2003-04), Vice President (2004-05), President (2005-06)

**Publications**

<u>Peer-Reviewed Journal Articles</u>

1. **Kaye, S**., Lardner, M., & Chow, W.Y. (in development). Using profiles to describe the needs of children in out-of-home care: Comparing clinically-defined and data-driven profiles.

2. Harburger, D.H., Stephan, S.H., & **Kaye, S**. (2013). Children's mental health system transformation in Maryland: Strategic evolution punctuated by revolutionary episodes. *Journal of Behavioral and Health Services & Research*.

3. **Kaye, S**., Shaw, T.V., DePanfilis, D., & Rice, K. (2013). Estimating staffing needs for in-home child welfare services with a weighted caseload formula. *Child Welfare*.

4. **Kaye, S**., DePanfilis, D., Bright, C., & Fisher, C. (2012). Applying implementation drivers to child welfare systems change: Examples from the field. *Journal of Public Child Welfare,* 6(4), 512-530.

5. **Kaye, S**. & Osteen, P.J. (2011). Developing and validating measures for child welfare agencies to self-monitor fidelity to a child safety intervention. *Children and Youth Services Review.* doi:10.1016/j.childyouth.2011.06.020

<u>Technical Reports</u>

1. **Kaye, S**. (2013). *Technical Assistance model for Wendy's Wonderful Kids.* Report to the Dave Thomas Foundation for Adoption. Washington, DC: Kaye Implementation and Evaluation, LLC.

2. **Kaye, S**. & Lardner, M. (2012). *Using the Maryland CANS to support child welfare service planning: Implementation and evaluation of the service intensity algorithm.* Report to Maryland Department of Human Resources. Baltimore, MD: Innovations Institute, University of Maryland School of Medicine.

3. Steward, R., Hrapczynski, K., & **Kaye, S**. (2010). *Results of the case record review: Assessment, planning and service delivery in In-Home Services.* Report to Tennessee Department of Children's Services. Baltimore, MD: Atlantic Coast Child Welfare Implementation Center at the University of Maryland School of Social Work.

4. **Kaye, S**. (2010). Practitioner perspectives on change: Readiness for implementing the Reaching for Excellence and Accountability in Practice (REAP) model. Report to North Carolina Division of Social Services. Baltimore, MD: Atlantic Coast Child Welfare Implementation Center at the University of Maryland School of Social Work.

5. **Kaye, S**. (2010). *Practitioner perspectives on change: Findings from focus groups with North Carolina Technical Assistance teams*. Report to North Carolina Division of Social Services. Baltimore, MD: Atlantic Coast Child Welfare Implementation Center at the University of Maryland School of Social Work.

6. **Kaye, S**. & Steward, R. (2010). *Results of Comprehensive Organizational Health Assessment.* Reports to 15 geographic regions in the Mississippi Department of Human Services. Baltimore, MD: Atlantic Coast Child Welfare Implementation Center at the University of Maryland School of Social Work.

7. Closson, S., & **Kaye, S.** (2009). *Findings from the 2008 Local Supervisory Review*.  Annual report to the Maryland Department of Human Resources. Baltimore, MD: Ruth H. Young Center for Families and Children at the University of Maryland School of Social Work.

8. **Kaye, S.** & Morales, J. (2009). *Framework for evaluating systems change in Implementation Projects. Report to USDHHS Children's Bureau.* Baltimore, MD: Atlantic Coast Child Welfare Implementation Center at the University of Maryland School of Social Work.

9. **Kaye, S.** (2009). Assessing the National Implementation Research Network (NIRN) Measures of Implementation Components for evaluating implementation projects. Report to Implementation Center Evaluators Workgroup. Baltimore, MD: Atlantic Coast Child Welfare Implementation Center at the University of Maryland School of Social Work.

10. **Kaye, S.** (2009). *Exploring the use of Goal Attainment Scaling (GAS) in evaluating implementation projects*. Report to Implementation Center Evaluators Workgroup. Baltimore, MD: Atlantic Coast Child Welfare Implementation Center at the University of Maryland School of Social Work.

11. **Kaye, S.**, Fisher, C., Williams, C., & Fry, L. (2009). *SAMS communication and implementation planning with pilot districts*. Report to West Virginia SAMS Implementation Committee. Baltimore, MD: Atlantic Coast Child Welfare Implementation Center at the University of Maryland School of Social Work.

12. Ahn, H., Shaw, T., **Kaye, S.**, & DePanfilis, D. (2009). *Statewide Report of the Maryland Child and Family Services Review. Final report to the Maryland Department of Human Resources*. Baltimore, MD: Ruth H. Young Center for Families and Children at the University of Maryland School of Social Work.

13. Gregory, G., & **Kaye, S.** (2009). *"The experience of being a foster parent is invaluable to children" Annual report of the Maryland Foster Parent Survey*. Annual report to the Maryland Department of Human Resources. Baltimore, MD: Ruth H. Young Center for Families and Children at the University of Maryland School of Social Work.

14. **Kaye, S.** (2008). Final Report on the Baltimore City Department of Social Services Maryland Child and Family Services Review.  Report written for the Maryland Department of Human Resources.

15. **Kaye, S.**, White, S., & DePanfilis, D. (2008). *Findings from the 2007 Local Supervisory Review.* Annual report to the Maryland Department of Human Resources.

16. Shaw, T., **Kaye, S.**, & DePanfilis, D. (2008). *Maryland Child Welfare Performance Indicators. 2nd Annual Child Welfare Accountability Report.* Baltimore, MD: Ruth H. Young Center for Families and Children at the University of Maryland School of Social Work.

17. **Kaye, S.**, DePanfilis, D., & Shaw, T. (2008). *Quality Assurance Processes in Maryland Child Welfare. 2nd Annual Child Welfare Accountability Report.* Baltimore, MD: Ruth H. Young Center for Families and Children at the University of Maryland School of Social Work.

18. **Kaye, S.** & DePanfilis, D. (2007). *Maryland Child and Family Service Review progress report.* Report to the USDHHS Children's Bureau.

19. **Kaye, S.** & DePanfilis, D. (2007). Maryland Child and Family Service Review baseline data and proposal for improved child welfare monitoring. Report to the USDHHS Children's Bureau.

20. **Kaye, S.**, Ovwigho, P., Shaw, T.V., & DePanfilis, D. (2007). *Child welfare accountability: Annual report on Maryland child welfare performance indicators*. Annual report to the Maryland Department of Human Resources.

21. **Kaye, S.**, DePanfilis, D. (2007). *Child welfare accountability: Evaluating quality assurance processes in Maryland*. Annual report to the Maryland Department of Human Resources.

22. **Kaye, S.**, Braun, B., Anderson, E. (2005). Under what conditions can, and will, limited resource citizens engage in the deliberative public policy process? Final report to the Kettering Foundation.

Proffered Communications

1. **Kaye, S.**, Quick, H., Shaw, T.V., Stephan, S.H. (2012, March). Who gets in to Wraparound and what do they get out of it?  Examining CME referrals and child welfare outcomes using propensity score matching.  Poster presentation at the Children's Mental Health Research and Policy Conference. Tampa, FL.

2. **Kaye, S.** (2011, October). *Competency development trajectories of Wraparound facilitators: A research proposal.* Poster presentation at the Seattle Implementation Research Conference. Seattle, WA.

3. **Kaye, S.** (2011, August). *Integrated implementation evaluation: Providing relevant data in real time.* Poster presentation at the Global Implementation Conference. Washington, DC.

4. **Kaye, S.** (2010, September). *Safety Assessment Management System (SAMS) fidelity: Findings from year one*. Report to West Virginia Bureau of Children's Services. Baltimore, MD: Atlantic Coast Child Welfare Implementation Center at the University of Maryland School of Social Work.

5. **Kaye, S.** (2010, July). *Framework for individual and organizational change management.* Presentation to North Carolina Division of Social Services. Raleigh, North Carolina.

6. **Kaye, S.** & Fisher, C. (2010, June). Technical assistance to support implementation of systems change. Presentation at the *Atlantic Coast Child Welfare Regional Forum*, Annapolis, Maryland.

7. **Kaye, S.** (2010, May). *Safety Assessment and Management System (SAMS) fidelity workshop*. Presentation to Bureau of Children and Families statewide management meeting. Fairmont, West Virginia.

8. **Kaye, S.** & Potter, (2010, March). *Evaluation collaboration: Lessons from the Implementation Center Evaluators*. Presentation at the National Resource Center Evaluator's Meeting.

9. **Kaye, S.**, & Fisher, C. (2009, September). *Atlantic Coast Child Welfare Implementation Center: Approach and early accomplishments*. Retrieved from www.accwic.org.

10. **Kaye, S.** (2009, March). Using evaluation to inform systems change in child welfare. Presentation at the Atlantic Coast Child Welfare Regional Forum, Atlanta, Georgia.

11. **Kaye, S.** (2009, January). Internalizing and externalizing behaviors of kinship and foster care. Paper presentation. Social for Social Work Research annual conference, New Orleans, Louisiana, January 16-18, 2009.

12. DePanfilis, D., **Kaye, S.**, Mols, C., Coppage, S., & Shaw, T. (2008, December). Calculating caseload and staffing needs: In-home services redesign in Maryland. *American Humane Time and Effort: Perspectives on Workload Roundtable*, Santa Fe, New Mexico, December 3-5, 2008.

13. DePanfilis, D., Mols, C., **Kaye, S.**, Shaw, T., & Ayers, D. (2008, October). Improving the efficiency and effectiveness of child welfare services through state, stakeholder, and university collaboration. *Child Welfare Leadership in Action*, Conference sponsored by the Administration for Children and Families, Children's Bureau. Washington, DC, October 20-21, 2008.

14. **Kaye, S.** & Lee, B. (2008, April). *Measuring, documenting and assessing well-being*. Presentation at *Place Matters in Maryland* conference hosted by Maryland Department of Human Resources.

15. **Kaye, S.** & White, C. (2008, April). *Placement matters: Promoting placement stability*. Presentation at *Place Matters in Maryland* conference hosted by Maryland Department of Human Resources.

16. **Kaye, S.**, Shaw, T.V., & Ayer, D. (2008, April). *Using data for program improvement: Quality Assurance technical assistance.* Presentation regional meetings of Maryland Department of Social Services.

17. Geddes, A. & **Kaye, S.** (2006). "It's scary out there": The voices of families and youth with mental health needs on transitioning to adulthood. Paper presentation, *Transition Age Youth Conference,* Maryland State Department of Education, Columbia, Maryland.

18. Roy, K., **Kaye, S.**, & Fitzgerald, M. (2006). Multi-partner parenting as a process: Low-income fathers' perspectives on transitions across family systems. Paper presentation, National Council on Family Relations Annual Conference, Minneapolis, Minnesota.

19. **Kaye, S.** & Grutzmacher, S. (2006) Discipline socialization among National Council on Family Relations student affiliates. Poster presentation, National Council on Family Relations Annual Conference, Minneapolis, Minnesota.

20. Roy, K. & **Kaye, S.** (2005). Transitory fatherhood: Longitudinal patterns of involvement for men with children in multiple families. Poster presentation, *Society for the Study of Human Development*.

21. **Kaye, S.** & Kuvalanka, K. (2005). Evaluating the impact of anti-gay adoption laws on children in the foster care system. Poster presentation, *Congressional Briefing: Linking Family Research to Family Policy*, National Council on Family Relations and American Association of Family and Consumer Sciences, Washington, DC.

22. **Kaye, S.** & Fitzgerald, M. (2005). Substance abuse treatment and child welfare: Systemic change is needed. *Family Focus*, National Council on Family Relations.

23. **Kaye, S.** (2005). Father involvement. *Children's Voice*, 14(1), 20-21.

24. **Kaye, S.** & Hofferth, S. (2005). Analyzing the foster care population to inform child welfare policy design. Panel presentation, Association of Public Policy Analysis and Management annual conference, Washington, DC.

25. **Kaye, S.** & Braun, B. (2004). Engaging unheard voices through participatory action research. Presentation at *Crossroads in Community Research* conference.

**App. B, Ex. 23C**

**Grace M. Lopes**

**Attachments:**                FINAL MIC Report 060214.pdf

---

**From:** Grace M. Lopes [mailto:gmlopes@oymonitor.org]
**Sent:** Tuesday, June 03, 2014 6:34 PM
**To:** 'Rachal, Kenya'; 'Julia Davis'
**Cc:** 'Fortenberry, Rusty'; 'Tullos, Ashley C.'; 'Kim Shackelford (Kim.shackelford@mdhs.ms.gov)'; 'Mark Smith'; 'Marcia Robinson Lowry'; 'Kate Wood'; 'Elissa Glucksman Hyne'; 'mjordan@sparb.org'; 'Mia Caras'
**Subject:** Final Report on Maltreatment in Out of Home Care

Kenya and Julia:  Please see attached for the final report from Drs. Kaye and DePanfilis on findings from the case record review related to maltreatment in care.  I hope the report will be helpful in promoting improvements in the investigative process.   If you have questions, or would like to discuss the report, please let me know. Thank you. - Grace

*Grace M. Lopes*
*Monitor, Olivia Y.*
*1220 19th Street, N.W.*
*Suite 500*
*Washington, D.C.  20036*
*202.232.8311*

*This email and any attachments may contain confidential and privileged information.  If you are not the intended recipient, please notify the sender immediately, destroy this email, and destroy any copies.  Any dissemination or use of this information by a person other than the intended recipient is unauthorized and may be illegal.*

**App. B, Ex. 23D**

June 2014

# Maltreatment in Out-of-Home Care in Mississippi

An assessment of report prevalence, investigation quality, contributing factors, and remedial strategies

Sarah Kaye, PhD & Diane DePanfilis, PhD, MSW

Expert consultants | Office of the Court Monitor

# Contents

Purpose ........................................................................................................................................... 2
Executive Summary......................................................................................................................... 2
   Statewide prevalence of maltreatment reports ......................................................................... 2
   Quality of investigations .............................................................................................................. 2
   Factors contributing to maltreatment in care ........................................................................... 3
   Remedial strategies to address maltreatment in care ............................................................... 4
Methodology.................................................................................................................................... 5
   MIC data analysis ........................................................................................................................ 5
   Review of MIC investigations ...................................................................................................... 5
   Investigator survey...................................................................................................................... 6
   Informant interviews .................................................................................................................. 6
   Review of remedial materials ..................................................................................................... 6
   SRU review .................................................................................................................................. 7
   Report format .............................................................................................................................. 7
1. Prevalence .................................................................................................................................. 8
   Reports of maltreatment in care by placement type ................................................................. 8
   Reports of maltreatment in care by type of allegation and substantiation status.................... 9
   Regional variation in maltreatment in care allegations and substantiations ...........................10
2. Quality of Investigations ...........................................................................................................12
   Description of the case review sample ......................................................................................12
   Investigation timeliness ............................................................................................................14
   Investigation information collection ..........................................................................................15
   Investigative interviews ............................................................................................................16
   Quality of information collected................................................................................................19
   Information analysis and decision making.................................................................................20
   Safety Assessment and Planning ..............................................................................................23
   Notifications...............................................................................................................................26
   Insights from State Interviews ..................................................................................................27
3. Contributing Factors .................................................................................................................29
   Foster parent licensing, training and support...........................................................................29
   Caseworker contacts for ongoing safety/risk assessment........................................................31
   Corrective action plans and investigation follow up .................................................................33
4. Remedial Strategies ..................................................................................................................35
   4.1 Policy ...................................................................................................................................36
   4.2 Investigation Staffing ..........................................................................................................37
   4.3 Maltreatment Training.........................................................................................................38
   4.4 Coaching and continued learning opportunities .................................................................39
   4.5 Safety Review Unit ..............................................................................................................41
Concluding Remarks.......................................................................................................................44

## Purpose

In January 2014, the Federal Court Monitor engaged Drs. Sarah Kaye and Diane DePanfilis as expert reviewers to conduct an assessment of maltreatment in out-of-home care in Mississippi.  The assessment was designed to answer four primary research questions:

1. What is the prevalence of maltreatment reports in out-of-home care in Mississippi?

2. What is the current quality of investigations of reports of maltreatment in out-of-home care?

3. What factors contribute to maltreatment in out-of-home care?

4. Do the remedial strategies that have been implemented by Division of Family and Children's Services, Mississippi Department of Human Services (MDHS/DFCS) adequately address the issues identified during this assessment?

The purpose of this report is to answer the research questions, and to offer recommendations on how MDHS/DFCS can improve their prevention of and response to maltreatment in out-of-home care.

## Executive Summary

A mixed methods approach was used to answer the research questions.  Methods included (1) a case review of 35 maltreatment in care (MIC) investigations from across the state, (2) an online survey of 17 MIC investigators, (3) telephone interviews with eight individuals who regularly review MIC investigations and/or are involved in remedial strategies, and (4) a review of documents related to five remedial strategies designed to improve maltreatment in care investigations that are required by the Modified Settlement Agreement (MSA; e.g., policy, staffing, training, coaching and continued learning, and the Safety Review Unit process and completed reviews).  Detailed information about methodology and findings from each of the components are provided in the pages that follow.  This Executive Summary highlights key findings to briefly answer the major research questions.

### Statewide prevalence of maltreatment reports

- In 2013, an average of nearly 50 maltreatment reports a month were received for children in out-of-home care; 14% of the reports were substantiated.

- The highest rates of maltreatment were in residential treatment and foster care.

- Regions VII-W, I-S and III-S had the largest number of maltreatment reports.

- After adjusting for the size of their out-of-home care population, regions I-N, I-S, and III-N had the highest rates of maltreatment reports.  Regions III-N and II-W had the highest rates of substantiated maltreatment.

### Quality of investigations

- Two thirds (67%) of investigations in this sample initiated contact within 24 hours and had supervisory review within 30 days—as required by the MSA.  Less than one third of MIC investigations in this review achieved all timeframes outlined in state policy.  Most investigations were approved within 30 days (86%).  Three quarters of investigations had face-

2

to-face contact within 24 hours (74%). Over half completed the safety/risk assessment within seven days (60%).

■ About half of investigations in this review documented that the investigator reviewed the child victim's case file, looked for previous maltreatment reports, and were accompanied by the Resource Specialist during a visit to the resource family home to assess for policy violations.

■ Less than 30% of investigations in the review sample included interviews with all of the required parties (29%). Child victims and alleged perpetrators were interviewed in almost all cases (100% and 97%, respectively). Most cases (82%) included at least one collateral interview. Fewer investigations included interviews with the child's worker (65%) and the caregiver's Resource Specialist (41%). Interviews with children typically explored the allegations in the report and how they feel about their placement. Interviews with caregivers were typically more narrowly focused on the allegations.

■ Most investigations in the review sample were rated as having documented adequate information about placement dynamics, the extent of maltreatment, and child functioning. Fewer investigations documented information about caregiver's functioning and general parenting practices. Some investigations were rated as missing critical information. Reviewers believed that 20% of investigations reviewed did not include sufficient information from which to make a determination regarding whether to substantiate or not.

■ The determinations made in over 70% of cases reviewed appeared consistent with Mississippi state policy. Nine percent of cases reviewed were unsubstantiated when reviewers believed the information documented in the record appeared to meet the definition of maltreatment. Decisions made about substantiating physical abuse and citing policy violations for corporal punishment were not consistent across cases.

■ Notification requirements outlined in state policy and/or the MSA were not consistently completed in the cases reviewed. Over 80% of child workers and caregiver Resource Specialists were notified of the allegations. Around one third of the child victim's biological parents and Guardians ad litem were notified of the allegations. Less than one quarter of resources families or placement facilities were notified of the findings of the investigation after the investigation was approved.

## Factors contributing to maltreatment in care

■ A number of "red flags" were identified indicating that alleged child victims may have been at increased risk of maltreatment in their current placement setting at the time of the investigation, including: caregiver history of maltreatment, out-of-control child behavior, chronic child/caregiver interaction problems, caregiver belief in physical discipline to control behavior, and others.

■ Most of the safety/risk assessments were minimally adequate, however reviewers identified red flags in 4 cases that were not reflected in the safety/risk assessment and determination.

■ Regular contact with workers and children in care provides the opportunity for ongoing safety/risk assessment, which is important for prevention of maltreatment in care. In this review sample, workers were making twice monthly contacts for most cases before the maltreatment report, and for all cases after the maltreatment report. However, ongoing case practice appears to be disconnected from the allegations in the report. Based on the cases reviewed, the child's worker was not re-assessing risk and safety on an ongoing basis with the child or the caregiver.

- Monitoring and follow up after substantiated maltreatment incidents or policy violations is important for preventing future incidents. In the expanded review of cases with substantiated maltreatment or policy violations, few had formal corrective action plans. Reviewers believe that having caregivers sign a form acknowledging that the agency forbids corporal punishment is not a sufficient action plan. Additional steps that are needed include ensuring the links are made between the results of completed investigations and follow up that needs to occur to prevent future incidents.

## Remedial strategies to address maltreatment in care

- The current MSA and MDHS/DFCS policy requirements outline reasonable timeframes, appropriate information gathering activities, and individuals to interview. Policy could be enhanced with additional guidance about selecting collaterals to interview, and providing additional information and decision making criteria about safety/risk. Inconsistent decision making across investigators in the case review sample suggests that additional guidance appears to be needed to clarify when to substantiate physical abuse and when to cite policy violations.

- The child maltreatment training offered to investigators beginning in 2010 is consistent with, and reinforces, policy requirements. Training could be enhanced with additional time to practice engagement, interviewing, analysis, and decision making.

- Coaching and continued learning opportunities are not directly focused on MIC, but are approaches that are consistent with effective practice improvement strategies and could focus on MIC to improve practice in that area as well. The online investigator survey revealed that more investigators receive consultation from their supervisor than any other source of support. This finding suggests that focusing on strengthening supervision with respect to specific practice areas (such as through the Center for Support of Families (CSF) learning labs and ongoing coaching of supervisors) is an efficient way to reach many workers.

- Carefully selecting investigators for the new centralized special investigations unit and providing them with ongoing consultation and supervision could lead to dramatic improvements in investigation quality and result in more consistent decision making during investigations.

- The Safety Review Unit uses a review instrument that could be enhanced to capture notifications, corrective actions, and whether determinations are consistent with MDHS/DFCS policy.

The remainder of this report provides a more detailed discussion of methodology and the results.

4

## Methodology

A mixed methods approach was used to gather and analyze data from multiple sources that would provide a qualitative assessment of maltreatment in care (MIC) investigations, licensure investigations, corrective action plans, and remediation strategies required by the MSA.  This section describes the methodology for each of the data sources.

### MIC data analysis

Data submitted to the Court Monitor by DFCS from January through October 2013 were analyzed to identify trends in MIC reports.  This dataset included all completed MIC investigations in the state during that time period.  Aggregate data analyses were designed to examine patterns in MIC reports statewide by exploring differences between regions, placement settings, and types of maltreatment.

Findings from the analysis of MIC data are presented in section 1. Prevalence.

### Review of MIC investigations

The case review was designed to describe and analyze the current level of quality of MIC investigations and responses to substantiated reports and policy violations.  A thorough assessment of the investigation process, including timeliness, information collection, decision making, and notifications was conducted on all cases.  An extended review that examined the six months leading up to the report and three months following the investigation was conducted on cases with substantiated maltreatment or policy violations to examine corrective actions and explore whether preventive actions could have been taken by workers in the case prior to the report.[1]

*Sampling methodology.* Thirty five completed investigations were purposively selected from each region and included in the case review.  The sampling methodology was designed to yield a recent sample that was inclusive of all regions and reflective of the trends observed in the aggregate data analysis.  First, sampling criteria were identified for each region based on the results of the aggregate data analysis.  Regional sampling criteria were designed to highlight trends in each region's data.  Then, working backward from investigations completed in January 2014, the most recent case which met the sampling criteria for each region was selected until the sample size was equal to or greater than 20% of all of the MIC investigations completed in that region between November 2013 and January 2014.[2]

*"Best" practice.* One of the strategies used in this assessment was to assess best practice to help inform ingredients needed for improvement.  To ensure that some of the "best" cases were included in the case review sample, state staff who review MIC investigations were asked to nominate cases for inclusion.  48 cases were nominated—46% of all completed investigations during that timeframe.  When the sample selected through the objective sampling criteria was compared to the sample of "best" cases nominated by DFCS, 34% of investigations in the case review sample overlapped with those nominated by state staff.  Overlap was likely to occur because all cases were sampled from a relatively small

---

[1] The extended time period focuses on the placement with alleged maltreatment.  If the child was placed fewer than 6 months before the report, the review focuses on the time in that placement.  If the child was moved fewer than 3 months after the investigation, the review focuses on the remaining time in the placement.

[2] This sampling methodology is consistent with quality improvement approaches which use trends in aggregate population-level data to develop a data-informed approach to deeper inquiry into a meaningful sub-sample.  Because the sample was not randomly selected, it is not necessarily "representative" of all MIC investigations in the state.

number of completed MIC investigations in each region during the period of review. This exercise affirmed that perceived "best" practice was already included in this sample; therefore no additional "best" practice cases were selected to avoid oversampling.

All of the cases were coded by Dr. Sarah Kaye, drawing from investigation reports and narratives, MACWIS case records, paper file records, SRU reviews, licensure investigation files, and resource home files.[3]  Some of the review items (e.g., sufficiency of information, consistency of substantiation decision with state policy) required reviewer judgment.  Those items were consensus coded with Dr. DePanfilis to reduce subjectivity and increase reliability.

Findings from the case review are presented in section 2. Quality of Investigations.

## Investigator survey

Investigators of the 35 cases reviewed were asked to participate in an online survey.  The survey was designed to collect information about investigators' training and experience, and resources or supports they use during investigations (e.g., policy, training, supervision, consultation).  The survey also asked for barriers investigators experienced during the investigations included in the case review sample, and asked investigators to reflect about whether they would do anything differently if they were assigned the case for investigation today.

Statewide, 50 staff were assigned MIC investigations during the period under review; 22 investigated the cases included in the case review sample (44% of all investigators during that period).  DFCS leadership alerted all staff of the assessment being completed by the Court Monitor's office. Investigators of cases in the case review sample received an email from the Court Monitor requesting that they complete the survey online.  Investigators were given a week and one-half to respond, with two reminders and an extension.  At the end of the two week extension period, 17 of 22 investigators responded to the survey (77% response rate, 34% of all investigators during that period).

Findings from the investigator survey are presented in section 4. Remediation Strategies.

## Informant interviews

Eight informant interviews were conducted with MDHS/DFCS leadership, members of the Safety Review Unit, Center for the Support of Families (CSF) consultants, and consultants to the Court Monitor.  These interviews were designed to gather impressions and insights about MIC in Mississippi.  The individuals who were interviewed are regularly involved reviewing MIC investigations and/or overseeing remediation strategies designed, in part, to improve response to maltreatment in care.

Findings from the informant interviews can be found in sections 2, 3, and 4.

## Review of remedial materials

Documents describing steps MDHS/DFCS has planned or implemented in an effort to improve MIC investigations were reviewed to assess how MIC is currently being addressed.  The remediation strategies assessed were identified by the Court Monitor and/or were mentioned during interviews with informants, including:

---

[3] Relying on document review introduces the possibility that relevant case activities that occurred were not documented—or were not consistently documented.  It is possible that findings from the case review could underrepresent activities in practice.

- MDHS/DFCS policy regarding MIC investigation,
- Centralized MIC Investigation Unit,
- Maltreatment in Care special investigation training,
- CSF symposium, coaching, and learning labs,
- Safety Review Unit (SRU) protocol and review instrument.

## SRU review

A subsample of cases included in the case review received an additional review of the SRU's report and any resulting corrective actions entered into the HEAT tracking system. The subsample was selected to include different allegations, placement types, and substantiation determinations. The purpose of the SRU review was to assess the quality assurance process designed to improve the safety and practice related to responding to alleged MIC.

Findings from the review of remedial materials can be found in section 4. Remedial Strategies.

## Report format

The remainder of this report is organized to answer the four research questions using each of these data sources, as outlined in Table 1 below.

Table 1. Research questions and data sources

| Research Question | Data Source(s) |
| --- | --- |
| 1. What is the prevalence and nature of maltreatment in out-of-home care in Mississippi? | MIC data analysis |
| 2. What is the current quality of investigations of reports of maltreatment in out-of-home care? | Review of MIC investigations<br>Informant interviews |
| 3. What factors contribute to maltreatment in out-of-home care? | Review of MIC investigations<br>Informant interviews |
| 4. Do the remediation strategies that have been implemented by MDHS/DFCS adequately address the issues identified during this assessment? | Review of remediation materials<br>Informant interviews<br>Investigator survey |

7

## 1. Prevalence

This section describes the prevalence of alleged and substantiated maltreatment reports for children in out-of-home care.  From January through October 2013, the average census count indicated that approximately 2988 children were in out-of-home care in Mississippi on any given day.[4]  During that same time period, there were 488 reports of maltreatment in out-of-home care. Of MIC reports received during that timeframe, 14% were substantiated for one or more allegations.[5]

### Reports of maltreatment in care by placement type

Statewide, the highest rates of reports were found in *residential facilities* (2.9 reports per 100 children in care) and *foster homes* (2.3).  Foster homes and residential facilities also had the highest rates of *substantiated* reports (0.4 per 100 children in care).  Comparing the distribution of reports to the distribution of children in care, foster homes house 41% of children, yet have 61% of MIC reports. Residential facilities house 8% of children, yet have 15% of MIC reports (see Figure 1).

Figure 1. Distribution of children in care and MIC reports by placement type



---

[4] Data source: monthly placement data submitted to the Court Monitor by DFCS.
[5] Data source: MIC investigation data submitted to the Court Monitor by DFCS.

Reports of maltreatment in care by type of allegation and substantiation status

The most frequent allegations in MIC reports were for physical neglect (52% of all reports) and physical abuse (48%), followed by emotional abuse/neglect (23%), sexual abuse (9%) and medical neglect (3%) (see Figure 2).[6]  Fourteen percent of MIC reports were substantiated.  The most frequently substantiated allegations were emotional abuse/neglect (18% of alleged emotional abuse/neglect), followed by physical neglect (13%), sexual abuse (11%) and physical abuse (9%).  No reports of medical neglect were substantiated.

Figure 2. Number of MIC allegations and substantiations



There were some noteworthy differences in allegation and substantiation by placement type:

- Allegation and substantiation of *physical neglect* was comparable across foster homes (50% alleged, 16% substantiated), relative homes (57% alleged, 11% substantiated), and residential facilitates (50% alleged, 13% substantiated).

- Allegation of *physical abuse* was comparable across placement types (49% foster, 45% relative, 47% residential).  Relative foster homes had no cases of substantiated physical abuse, but foster homes (10%) and residential facilities (12%) were comparable with one another.

- The highest rates of substantiation of any type of maltreatment was *emotional abuse/neglect* in foster homes (23%).  Residential facilities had significantly lower rates of emotional abuse/neglect (4%) than foster homes (28%) or relative foster homes (24%).

- Residential facilities had significantly higher rates of *sexual abuse* allegations (17%) than foster homes (10%) or relative foster homes (3%).  However, only foster homes had any substantiated reports of sexual abuse (17% of allegations were substantiated).

- Residential facilitates had significantly higher rates of alleged *medical neglect* (8%) compared to foster homes and relative foster homes (2%).  No medical neglect allegations were substantiated in any placement type.

---

[6] Each report could contain multiple allegations, so percentages add up to more than 100.

Regional variation in maltreatment in care allegations and substantiations

As illustrated in Figure 3, the largest number of MIC reports come from Region VII-W (16% of all MIC reports), followed by I-S and III-S (12%), I-N (11%), and III-N and VI (10%). Region VII-W also has the largest number of children in the state (20% of all children in out-of-home care). The graph below compares the distribution of MIC reports by region to the distribution of children in care to reveal several regions with disproportionately high reports of maltreatment—including I-N, IV-N, and I-S. Several regions were also identified with disproportionately low rates of maltreatment reports—including VII-W, VII-E, and V-E.

Figure 3. Distribution of MIC reports by region



To take variations in size of the out-of-home care population into account, average monthly rates of maltreatment reports were calculated per 100 children in care. Average rate of report and substantiation was calculated for each placement type within each region to pinpoint the locations and placement types with the highest rates of MIC, which is provided in Table 2 on the following page. The numbers printed in red highlight regions with allegation and substantiation rates that are considerably higher than the rest of the state—which could warrant further inquiry.

Table 2. Average monthly allegation and substantiation rates per 100 children in care

| | Foster Home | Relative Foster Home | Residential Facility | Group Home | Unlicensed Relative Placement | Specialized/ Therapeutic Foster Home | Total |
|---|---|---|---|---|---|---|---|
| **Statewide** | | | | | | | |
| Allegation rate | 2.3 | 1.8 | 2.9 | 0.1 | 0.1 | 0.0 | 1.6 |
| Substantiation rate | 0.4 | 0.2 | 0.4 | 0.0 | 0.0 | 0.0 | 0.2 |
| **Region I-N** | | | | | | | |
| Allegation rate | 3.0 | 2.2 | 10.5 | 0.0 | 0.0 | 0.0 | 2.5 |
| Substantiation rate | 0.1 | 0.6 | 2.0 | 0.0 | 0.0 | 0.0 | 0.3 |
| **Region I-S** | | | | | | | |
| Allegation rate | 2.3 | 2.6 | 3.1 | 0.0 | 1.5 | 0.0 | 2.2 |
| Substantiation rate | 0.4 | 0.0 | 0.6 | 0.0 | 0.7 | 0.0 | 0.3 |
| **Region II-E** | | | | | | | |
| Allegation rate | 1.0 | 4.4 | 6.4 | 0.0 | 0.0 | 0.0 | 1.4 |
| Substantiation rate | 0.0 | 0.0 | 1.6 | 0.0 | 0.0 | 0.0 | 0.1 |
| **Region II-W** | | | | | | | |
| Allegation rate | 1.9 | 1.9 | 0.9 | 0.0 | 0.0 | 0.0 | 1.6 |
| Substantiation rate | 0.7 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.4 |
| **Region III-N** | | | | | | | |
| Allegation rate | 2.7 | 4.4 | 2.1 | 0.0 | 0.0 | 0.0 | 2.1 |
| Substantiation rate | 0.1 | 1.7 | 0.0 | 0.0 | 0.0 | 0.0 | 0.3 |
| **Region III-S** | | | | | | | |
| Allegation rate | 2.6 | 1.7 | 3.5 | 0.0 | 0.0 | 0.0 | 1.5 |
| Substantiation rate | 0.6 | 0.1 | 0.3 | 0.0 | 0.0 | 0.0 | 0.3 |
| **Region IV-N** | | | | | | | |
| Allegation rate | 2.4 | 2.4 | 5.2 | 0.0 | 0.0 | 0.0 | 2.3 |
| Substantiation rate | 0.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.5 |
| **Region IV-S** | | | | | | | |
| Allegation rate | 3.3 | 0.3 | 0.0 | 0.0 | 0.0 | 0.0 | 1.9 |
| Substantiation rate | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Region V-E** | | | | | | | |
| Allegation rate | 1.5 | 0.0 | 1.6 | 0.7 | 0.0 | 0.0 | 1.0 |
| Substantiation rate | 0.0 | 0.0 | 0.5 | 0.0 | 0.0 | 0.0 | 0.1 |
| **Region V-W** | | | | | | | |
| Allegation rate | 1.1 | 2.0 | 1.0 | 0.0 | 1.1 | 0.0 | 1.1 |
| Substantiation rate | 0.0 | 0.0 | 1.0 | 0.0 | 0.0 | 0.0 | 0.1 |
| **Region VI** | | | | | | | |
| Allegation rate | 2.0 | 4.4 | 1.6 | 0.3 | 0.0 | 0.0 | 1.7 |
| Substantiation rate | 0.4 | 0.5 | 0.3 | 0.0 | 0.0 | 0.0 | 0.2 |
| **Region VII-E** | | | | | | | |
| Allegation rate | 1.8 | 0.2 | 1.9 | 0.7 | 0.0 | 0.0 | 1.0 |
| Substantiation rate | 0.4 | 0.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.2 |
| **Region VII-W** | | | | | | | |
| Allegation rate | 3.0 | 1.3 | 2.0 | 0.0 | 0.0 | 0.0 | 1.3 |
| Substantiation rate | 0.6 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.2 |

## 2. Quality of Investigations

This section of the report describes the quality of recent MIC investigations. The primary data source for this portion of the assessment is the case review. Informant interviews also provided valuable insights.

### Description of the case review sample

A total of 35 cases were selected from the 105 MIC investigations completed between November 2013 and January 2014 (33% sample). Table 3 provides a snapshot description of the sample, including region, placement type, length of time in placement, household composition, and alleged maltreatment. Each of these sample characteristics are described in more detail in the paragraphs that follow.

Table 3. Description of case review sample

|  | % sample | Mean | Min | Max |
|---|---|---|---|---|
| Region |  |  |  |  |
| 1N | 11.4 |  |  |  |
| 1S | 14.3 |  |  |  |
| 2E | 2.9 |  |  |  |
| 2W | 5.7 |  |  |  |
| 3N | 11.4 |  |  |  |
| 3S | 8.6 |  |  |  |
| 4N | 2.9 |  |  |  |
| 4S | 8.6 |  |  |  |
| 5E | 5.7 |  |  |  |
| 5W | 2.9 |  |  |  |
| 6 | 5.7 |  |  |  |
| 7E | 2.9 |  |  |  |
| 7W | 17.1 |  |  |  |
| Placement type |  |  |  |  |
| Foster care | 37% |  |  |  |
| Therapeutic foster care | 20% |  |  |  |
| Relative foster care | 17% |  |  |  |
| Unlicensed relative care | 3% |  |  |  |
| Residential facility | 23% |  |  |  |
| Time in placement (in months)[1] |  | 6.8 | .5 | 20.7 |
| Less than 1 month | 12% |  |  |  |
| 1-6 months | 41% |  |  |  |
| 6-12 months | 29% |  |  |  |
| 12 months or more | 18% |  |  |  |
| Household composition (Resource Families) |  |  |  |  |
| Bio/adopted children | 40% | 0.6 | 0 | 2 |
| DFCS children |  | 2.5 | 1 | 5 |
| Adults/caregivers |  | 1.7 | 1 | 4 |
| Adult: child ratio |  | 0.7 | 0.2 | 2 |

Table 3. Description of case review sample

|  | % sample | Mean | Min | Max |
|---|---|---|---|---|
| Youngest child |  | 5.1 | 0 | 15 |
| Oldest child |  | 10.2 | 2 | 20 |
| Age range |  | 5.1 | 0 | 20 |
| Alleged maltreatment |  |  |  |  |
| Physical abuse | 60% |  |  |  |
| Physical neglect | 51% |  |  |  |
| Emotional abuse/neglect | 26% |  |  |  |
| Medical neglect | 6% |  |  |  |

[1]calculated at the time of report

*Placement.* Children had been in their placement an average of 6.8 months at the time of the report, with a range between less than one month and over 20 months. A third of the case review sample were in non-relative foster homes. Twenty percent were in therapeutic foster homes. Under 20% were in relative foster homes. The remaining 20% were in residential facilities.

*Household composition.* Resource families[7] frequently had many individuals living in the home, though none of the homes exceeded the number of children allowed by their license. About 40% of resource families also had biological or adopted children living in the house. Resources families had an average of 2.5 DFCS children placed with them. There were an average of 1.7 adult caregivers living in the home as well. Children typically outnumbered adults with an adult: child ratio of 0.7. Ages of children living in resource homes ranged from infants less than one year old born to foster youth, to 20 year olds who aged out of foster care. The youngest child in each home was an average of 5 years; the oldest was an average of 10. Within each home, ages of children ranged an average of 5 years.

*Alleged maltreatment.* Over half of the reports alleged physical abuse, about half alleged physical neglect, about a quarter alleged emotional abuse/neglect, and a few alleged medical neglect in addition to physical neglect. Examples of physical abuse allegations included reports that caregivers are spanking children as punishment, or children displaying marks or bruises. Examples of neglect allegations included caregivers using drugs, providing inadequate supervision, or not providing for basic needs. A couple of reports alleged that children were intimidated or threatened by their caregivers. Three of the allegations were believed by the investigators to be a false report.

In two cases, children were injured during restraints in residential facilities—one resulting in a broken ankle that required multiple surgeries and change in placement to a location that could accommodate the child's recovery. Other injuries included a two-year-old child who pulled a hot iron down on to her face, and welts left on another child's back as a result of being whipped with a belt.

The remainder of this section describes the quality of MIC investigations. It is organized by quality standards developed with the Court Monitor during project planning. The quality standards were defined by the MSA requirements and MDHS/DFCS state policy, and informed by best practice in investigating allegations of MIC and assessing safety/risk of children in out-of-home care.

---

[7] The term "resource families" is inclusive of all family placement settings: foster care, relative foster care, unlicensed relative placements, and specialized/therapeutic foster care.

## Investigation timeliness

The governing legal standard set forth in the MSA is to initiate contact within 24 hours and receive supervisory approval of the investigation within 30 days. MDHS/DFCS policy complies with the MSA requirements and adds additional timeframes to other investigation activities.  Timeliness of each required activity is summarized in Table 4 and described below.

| Table 4. Investigation timeliness | % within timeframe | Mean (days) | Min | Max |
|---|---|---|---|---|
| **Achieved MSA-required timeframes | 66% | | | |
| *Achieved all MDHS/DFCS-required timeframes | 31% | 20.0 | 12 | 27 |
| Face-to-face contact within 24 hours | 74% | 1.0 | 0 | 4 |
| Complete safety/risk assessment within 7 days | 60% | 18.3 | 0 | 53 |
| Complete investigation within 25 days | 69% | 24.9 | 11 | 53 |
| Approve investigation within 30 days | 86% | 27.6 | 12 | 60 |

*Face-to-face contact.*  The MSA requires that all maltreatment reports on children in out-of-home care are classified as Level 3, which requires initiation of the investigation within 24 hours.  Almost 75% of cases had face-to-face contact with victims within 24 hours of the report to MCI.  The average number of days between report and initial contact was 1.0, with a range between 0 and 4 days.  In almost all cases where contact could not be made, attempts to make contact were documented.  The assigned investigator typically made initial contact with the victims (79%).[8]

*Safety/risk assessments.*  MDHS/DFCS state policy requires safety/risk assessments to be completed within 7 days of intake.  Safety/risk assessments were completed on all cases.  About 60% were completed within 7 days of intake.  The average time to complete the safety/risk assessment was 18.3 days.  The 40 percent that were not completed timely were frequently started within 7 days and finalized when the investigation was submitted for approval.

*Investigation completion and approval.*  MSA requires investigations to be completed with supervisory approval within 30 days.  MDHS/DFCS policy reflects the MSA requirement, and specifies that investigations must be completed within 25 days of intake and approved by the supervisor within 5 days of completion.  Almost 70% of investigations reviewed were completed within the 25 day timeframe.  The average time to completion was 24.9 days with a range between 11 and 53 days.  The average number of days between investigation completion and approval was 2.7.  Almost 90% of investigations were approved within 5 days of completion.  Over 85% of investigations were completed and approved within 30 days of intake.

Looking across all of the required timeframes, the majority of investigations in this sample achieved some of the guidelines for initiating and completing investigations.  Two thirds of cases (66%) achieved the MSA requirements of investigation initiation and completion.  Just over 30% achieved all of the investigation timeframes required by MDHS/DFCS policy.  Among the cases that met all of the timeframes, the investigation was completed in an average of 20 days.

---

[8] In some instances, the child's worker made initial contact either because she was seeing the child already or the investigator could not make it in time.  Even if the investigator did not make initial contact, she almost always saw the alleged child victim at some point during the investigation (94%).

Investigation information collection

MDHS/DFCS state policy defines several activities that are necessary to gather information, in addition to interviews with relevant parties.  Each of the activities, and the degree to which they were completed for the investigations included in this sample, are summarized in Table 5 and described in the paragraphs that follow.

| Table 5. Information collection | % sample |
|---|---|
| Reviewed case files | 51% |
| Reviewed previous allegations against caregivers | 54% |
| Resource Specialist accompanied investigator | 56% |
| Completed safety checklist | 66% |
| Other information* | 17% |

*forensic interview, police report, video, facility documents

*Review of child's case file.*  MDHS/DFCS policy requires a thorough review of the family history with DFCS as part of the investigation.  The case review data indicated that over half of the investigation notes included reference to reviewing the child's case files (51%).

*Review of previous allegations against caregivers.*  Over half of the cases reviewed included information about previous allegations in the investigation narrative (54%).

*Home visit with Resource Specialist.*  MDHS/DFCS state policy requires Resource Specialists to accompany investigators to the resource family home to assess for policy violations.  Investigation narratives indicated that resource specialists accompanied investigators to the home in over half of resource family investigations included in the sample (56%).  In a few additional instances, investigators indicated that the resource specialist could not be reached or was not available during the time of investigation.

*Safety checklist.*  MDHS/DFCS state policy requires the Safety Checklist to be completed on all children and provided to the parent/caregiver.  The checklist is designed to guide the evaluation of the physical home environment for safety hazards.  Review of investigation narratives and MACWIS safety assessments indicated that the checklist had been completed in 66% of investigations.

*Additional sources of information.*  In addition to the required elements outlined in MDHS/DFCS policy, a few cases (17%) used additional sources of information during the investigation.  Examples of other information sources include forensic interviews, police reports, video of incidents at residential facilities.  These types of information were not relevant for most cases.  In the online survey, investigators noted video evidence as one of the things that helped the investigation go well in cases where it was available.

15

## Investigative interviews

MDHS/DFCS policy lists individuals who must be interviewed during MIC investigations, including: child victim, all DFCS children in the home, child's COR/COS, resource family's Resource Specialist, all household members, alleged perpetrators, and a non-relative collateral.  Table 7 summarizes the percent of cases with interviews completed for each of the individuals required by policy.

| Table 6. Investigative interviews | % sample | Mean | Min | Max |
|---|---|---|---|---|
| Total number of interviews | | 7 | 2 | 17 |
| All required interviews completed | 29% | | | |
| Victim | 100% | | | |
| Alleged perpetrators | 97% | | | |
| DFCS children | 79% | | | |
| COR/COS | 65% | | | |
| Resource Specialist[1] | 41% | | | |
| Household members | 80% | | | |
| DFCS children formerly placed | 0% | | | |
| Collateral | 82% | | | |
|    Professional working with child | 40% | | | |
|    Family member | 31% | | | |
|    Friend | 14% | | | |
|    Residential facility staff | 14% | | | |
|    Professional working with caregiver | 3% | | | |
| Collateral had information about | | | | |
|    Alleged child victim | 60% | | | |
|    Alleged perpetrator/caregiver | 49% | | | |
|    Caregiver/child interaction | 14% | | | |

[1]Children placed in residential facilities were "Not Applicable" for this item and removed from the denominator because the state licensure office conducts an independent investigation of licensed residential facilities. Children placed in therapeutic foster homes were counted as "completed" if the worker at the private agency licensing the home was interviewed, and "not completed" if that worker was not interviewed because there is no DFCS resource specialist assigned to families licensed by private organizations.

*Child victim interviews.*  Every victim was interviewed by a staff person.  Investigators personally saw and interviewed children in 94% of reviewed cases.  The remainder relied on the person making initial contact (e.g., the child's worker, another investigator) for the child's perspective.

*Alleged perpetrator interviews.*  Alleged perpetrators were interviewed in all but one of the cases in this sample (97%).  In one case, an interview was not conducted with a staff member at a residential facility who was no longer working at the facility.  No attempts were documented to locate and interview the alleged perpetrator.

*Household member interviews.*  All members of the household were interviewed in 80% of resource family investigations. In almost 80% of cases reviewed, all other DFCS children placed in the resource were interviewed (or observed, if not age-appropriate for interviews).  The investigation notes or the

16

online survey did not explain why other children were not interviewed in the remaining 20% of cases. No interviews were conducted with DFCS children formerly placed with the family or in the facility.

*Worker interviews.*  The worker assigned to the child' foster care case and the Resource Specialists assigned to oversee the resource family[9] were not consistently interviewed in this sample (65% and 41%, respectively).  As will be discussed later, the percent of caseworkers notified of the investigation is much higher (84% and 81%, respectively), indicating some contact between the investigator and the other staff.  However, investigations were only recorded as having included interviews with these staff if the investigator sought and recorded information obtained from them.

*Collateral interviews.*  MDHS/DFCS policy requires at least one collateral contact during the course of the investigation.  Collaterals must not live in the household.  If a relative is used as a collateral, a non-relative must also be used as a second collateral.  Case review data indicates that collaterals were interviewed in over 80% of cases reviewed.  Collaterals were most frequently professionals working with the child, or other family members.  Of the 11 cases that used a family member as a collateral contact, only two (18%) also included an interview with a non-relative collateral, as required by policy.  Almost two thirds of the collaterals interviewed had knowledge of the child, and nearly half had knowledge of the caregiver.  A smaller percentage (14%) had firsthand knowledge of caregiver/child interaction.

Case review data revealed that an average of 7 interviews were conducted for each investigation, with a range between 2 and 17.  Nearly 30% of cases reviewed included interviews with all of the parties required by MDHS/DFCS state policy.

*Interview content.*  In addition to tracking whether interviews were completed, interview content (as documented in the record) was also coded.  Investigators discussed an average of 3.2 topics during interviews with alleged child victims, and 1.5 topics during interviews with alleged perpetrators.  The topics listed below were generated from qualitative analysis of the interviews. Table 7 summarizes the percent of cases reviewed that discussed each of the topics.

| Table 7. Information collected during interviews | % sample | Mean | Min | Max |
|---|---|---|---|---|
| Child interview topics | | 3.2 | 1 | 7 |
| Alleged maltreatment incident | 66% | | | |
| Placement dynamics | 51% | | | |
| Marks or bruises | 34% | | | |
| Disciplinary practices | 26% | | | |
| Feelings of safety in the placement | 23% | | | |
| Observations of child | 23% | | | |
| Daily care of child | 17% | | | |
| Child's functioning | 9% | | | |
| Child's history | 3% | | | |
| Alleged perpetrator interview topics | | 1.5 | 0 | 3 |
| Alleged maltreatment incident | 63% | | | |
| Disciplinary practices | 34% | | | |

---

[9] In some cases, the assigned Resource Specialist is the person who originally licensed the home.  In other cases, a different Resource Specialist licensed the home, but the family was transferred to a new Resource Specialist at some point during their experience with the agency.

| Table 7. Information collected during interviews | % sample | Mean | Min | Max |
|---|---|---|---|---|
| Challenges parenting children in their care | 29% | | | |
| Caregiver feelings about child | 9% | | | |
| Supports needed or received by caregiver | 9% | | | |
| Alternative strategies for responding to child | 3% | | | |

The most frequent topic of conversation with child victims was the alleged maltreatment incident (66%). About half of the time (51%), children were also asked about how they like living in their current placement.  Other common topics include marks or bruises on the child (34%), how the child is punished if he or she gets in trouble (26%), and whether the child feels safe in the home (23%).  Investigators also documented observations of the child's appearance, behavior, and interaction with the alleged perpetrator and others in the home (23%).

Interviews with alleged perpetrators tended to be more narrowly focused on specific maltreatment incidents (63%), and their use of discipline (34%).  Foster parents volunteered information about challenges they are having with the children living their home (29%).  Occasionally caregivers expressed their feelings about the child (9%).  Investigators sometimes inquired about supports the caregiver has in place—or needs (9%).  In a couple of cases (3%), the investigator discussed potential alternatives with caregiver using corporal punishment.

Strengths noted during interviews included:

- Some investigators asked background questions about the child to build rapport before focusing on  to specific allegations,

- Some investigators asked age-appropriate questions in language that children can understand.

Challenges noted during interviews included:

- Some investigators did not following up on important lines of inquiry, like asking for examples when a caregiver states that they believe that sometimes physical discipline is necessary.

- Investigators did not always read the case history before starting interviews.  For example, in one case reviewed, the relative caregiver had a previous substantiated physical abuse report for hitting the child with a belt—but in the current investigation, the caregiver said she never hit the child before.  If the investigator had reviewed for previous history of allegations, she could have done a more thorough interview to better understand the history of physical discipline in this family.

## Quality of information collected

The purpose of all of the information gathering activities described above is to develop an understanding of the situation in order to make sound decisions. MDHS/DFCS state policy defines substantiation criteria that should be used to determine whether child maltreatment has occurred, including:

> (1) Medical or psychological information,

> (2) Statement of credible witness,

> (3) Child victim's statement, and

> (4) Indicators and circumstance of abuse or neglect (i.e., physiological indicators, physical evidence, behavioral indicators, circumstantial evidence).

In addition to substantiation decisions, investigators must also make decisions about whether a child is safe in their placement. While the four criteria outlined in MDHS/DFCS policy are relevant for determining whether maltreatment has occurred, additional information is necessary to assess risk and safety going forward. The case review included an additional seven categories of information that are useful in assessing risk and safety of the placement, including:

> (1) extent of maltreatment,

> (2) circumstances surrounding maltreatment,

> (3) child functioning,

> (4) parenting practices,

> (5) disciplinary practices,

> (6) caregiver functioning, and

> (7) placement dynamics.

The first six categories are not in policy, but are included in the MDHS/DFCS child maltreatment training. The seventh category, placement dynamics, is not in policy or training but is critical for capturing unique circumstances and vulnerabilities for children in out-of-home placements. The extent of information collected in each of these categories is described for the investigations reviewed in this sample.

*Information collected across sources.* Looking across information gathered and documented from all sources across the entire investigation, most cases reviewed in this sample included much of the relevant information needed to inform decisions about substantiation and risk/safety. Table 8 lists each of the seven information categories along with the percent of cases in this sample for which there was sufficient information collected in each category. Each category is described below.

| Table 8. Information collected across sources | % sample |
|---|---|
| Placement dynamics | 91% |
| Extent of maltreatment | 89% |
| Child functioning | 80% |
| Circumstances surrounding maltreatment | 74% |
| Discipline | 63% |
| Parenting | 49% |
| Caregiver functioning | 11% |

Almost all cases (91%) included at least a basic assessment of *placement dynamics*, which addressed whether the child liked the placement, felt safe in the placement, and/or how caregivers perceived the child.

Most cases (89%) described the *extent of maltreatment*.  At a minimum, this included a description of the incident and whether it resulted in harm to the child (e.g., whether it hurt the child to be "tapped in the mouth").  It also included history and frequency of maltreatment.

Most cases (80%) included some assessment of *child functioning*, which was usually focused on the child's behavior.  Frequently this information was gathered from caregivers or other professionals working with the child.

Three quarters of cases (74%) described *circumstances* surrounding the allegations.  Most frequently, this included a description of why the perpetrator hit the child, or whether there were times when there was not enough food in the house.

The majority of cases (63%), including most of the corporal punishment/physical abuse cases, included a description of *discipline* in the home.  This information was most frequently collected from children, caregivers, or both.  Other household members and collaterals also provided this information.

General *parenting practices* (49%) included statements about caregivers going "above and beyond" for children in their care, and how active or involved the caregiver is in the child's activities.  This information was collected from collaterals and/or caregivers.

*Caregiver functioning* was infrequently assessed (11%).  How the caregiver is doing was not a typical part of investigation inquiry.  This area was most frequently assessed when reports alleged specific caregiver behavior that was detrimental to the child (e.g., drug use, gambling).

## Information analysis and decision making

After all of the information collection activities described above were completed and the information analyzed, 11% of the reports in this sample were substantiated.  Almost one third of the sample (31%) were unsubstantiated reports, but had a policy violation—including using corporal punishment, refusing a drug test, and discussing allegations with the children after being told not to.  Over half (57%) were unsubstantiated without policy violations.

Table 9 summarizes the determinations made in the cases reviewed, and whether--based upon review of all available documentation—reviewers agreed that the determinations that were made were consistent with MDHS/DFCS policy.

| Table 9. Determinations | % sample |
|---|---|
| Determination | |
| Substantiated | 11% |
| Unsubstantiated, policy violation | 31% |
| Unsubstantiated, no policy violation | 57% |

| Table 9. Determinations | % sample |
|---|---|
| Consistent with MDHS/DFCS policy | |
| Yes, reviewers agree with investigator's finding | 71% |
| No, reviewers believe there was Insufficient information provided to make a determination | 20% |
| No, reviewers believe unsubstantiated findings could meet definition of maltreatment | 9% |

The majority of determinations (71%) appeared to be consistent with MDHS/DFCS policy based on the documentation provided in files.  A few of the cases reviewed exhibited high quality information gathering.  For example,

- One child was exhibiting severe emotional distress and the investigator diligently explored whether the child's distress was induced by a traumatic event.  The investigator was extremely thorough in her review of the child's history, previous allegations of maltreatment, as well as the current placement setting.  She interviewed numerous medical and psychological professionals in addition to biological family members in multiple living arrangements, and ordered forensic interviews for several of the siblings.

- An older youth alleged maltreatment in a residential facility, and the investigator spoke to numerous children, staff, administrators in the facility, in addition to collateral contacts at the youth's school.  She assessed the alleged incident and ruled out the possibility that the youth or other youth in the home are being mistreated.

Reviewers found there was insufficient information to determine whether or not maltreatment occurred in one fifth (20%) of the investigations in this sample.[10]

- In two cases, none of the individuals interviewed as part of the investigation could identify the cause of marks left on the children.  One had a bite on his cheek.  Another had bruises on his face and arms.  Neither of these cases were evaluated by a medical professional to assess whether the nature of the injuries was consistent with abuse.

- In two cases, only one allegation was investigated among multiple allegations that were made in the report.  In one case, allegations that the foster parents threatened to use guns if the children's parents came to their home, and threatened the  children with not being able to see their parents if they don't behave were not addressed.  In another case, allegations that the foster parents did not adequately supervise the teenage girl who was sexually assaulted while in their care were not addressed because all investigation activities focused on the sexual assault.

- Physical abuse was not substantiated in an investigation that determined that even though a foster parent did not use a paddle to spank the child, the parent does use a paddle to threaten the child.  The investigator noted during her interview that the use of threats could be damaging for children with a history of maltreatment, but no further investigation was done to assess for potential emotional abuse/neglect.

---

[10] Five of the seven cases with insufficient information were found in region VII-W.  The others were in I-S and III-N.

- Neglect was not substantiated in a report that a foster parent was allegedly using drugs in the home with the child. The only two interviews conducted were with the child and the foster parent; no collaterals or DFCS staff were interviewed. No information was collected about the child's day to day care.

- Another report alleged that a staff member in a residential facility slapped a child. The staff member was not interviewed; she had been terminated and no efforts were made to locate her. There were no witnesses, no video, no marks or bruises left on the child. The only evidence was the child's statement, and the child could not remember any details. The report was substantiated for physical abuse but reviewers believed that there was not sufficient information in this case to determine whether abuse had occurred.

Unlike the cases just described where key information necessary to make a determination was missing, reviewers also identified other instances when the information documented during the investigation was sufficient for decision making—yet could result in a different decision. Nine percent of the unsubstantiated allegations should or could have been substantiated for abuse or neglect but were not. Upon review of all available documentation, reviewers believed that documented information appeared to be consistent with MDHS/DCFS definition of abuse.[11]

- Two of these cases include the same investigator and the same perpetrator—a staff person working at a residential facility. In one case, the staff member pinched a child on his chest, leaving a bruise that was observed by the investigator and medical staff at the facility. In the other case, the staff member slapped a child on the leg, leaving a hand print that was observed by medical staff at the facility. The second case had a witness who saw the staff member hit the child. The staff member denied both allegations. The investigator did not find physical abuse in either case, citing inconsistent stories as the reason. However, most of the evidence suggests that the staff member acted in a way that caused harm for two children.

- Another case that appeared to meet the definition of abuse was not substantiated, but was cited as a policy violation. Information collected indicates that the foster parent pinches the child whenever she "pees herself" although both foster parents deny the allegations. The investigator justifies the unsubstantiated decision by saying there is "no physical evidence". However, several people have seen pinch marks on the child's arms and backside, and both the babysitter and the father showed the investigator pictures on their phones. The child says the foster parent pinches her, and the sister says she has seen the foster parent pinch her sister and heard her scream and cry.

While most investigations reviewed as part of this sample appeared to make sound decisions that are well-documented with relevant information, consistency in information collection and analysis seems to be a challenge among investigators in this sample.

---

[11] Two of the three cases that appeared not to be consistent with MDHS/DCFS policy were in I-S. The other was in IV-S.

## Safety Assessment and Planning

In addition to determinations about whether maltreatment occurred, investigators must also assess the safety of the children and potential risk of maltreatment. "Red flags" are warning signs that a child is at higher risk for maltreatment in a placement setting because of caregiver issues, child issues, or issues in the child/caregiver match.  Several red flags were identified during the case review that should raise awareness of investigators and ongoing caseworkers responsible for assessing and continually re-assessing safety/risk.

*Caregiver has a history of maltreatment reports.*  Among resource families in this sample, almost half had prior allegations of maltreatment and just over 11% had prior *substantiated* reports of maltreatment. One third had multiple (non-duplicated) prior allegations.  One third had allegations that were similar to the current report.

*Child exhibits behavior that is out-of-control.* Twenty percent of the reports in this sample included circumstances in which adult caregivers were attempting to manage the child's out-of-control behavior—including yelling, cursing, hitting, kicking and destruction of property.  Most of the children exhibiting those behaviors were in residential facilities (and injured during restraint episodes), but three were placed in home settings with single female caregivers.  Two of those caregivers reported that they struck the child, and their response to hit back was a "reflex".  One reported that she was placing her hands on the child in an attempt to calm her down.

*Chronic child/caregiver interaction problems.*  Examples of interaction problems in the sample were most frequent among teenage girls and single female caregivers whose arguments over cell phones, tight clothes, and inappropriate pictures escalated into the child's out-of-control behavior and altercations described in the previous paragraph.

*Caregiver believes that physical discipline is necessary.*  During investigation interviews, some caregivers indicated that they believe that physical discipline is necessary to control child behavior.  All of alleged perpetrators of corporal punishment reports in this sample were aware of agency policy and chose to "spank", "whoop", "tap", or "slap" anyway.  One took the child to school and requested that the child be paddled.

*Caregiver is not concerned about child's injuries.* Two cases in this sample included marks or bruises on children that could not be explained—and the caregiver did not exhibit any concern over how the child was injured.  Even if the caregiver did not hurt the child directly, caregiver's concern over injuries is an indicator of protectiveness for the child.

*Caregiver has inappropriate expectations of the child.*  One example of inappropriate expectations of children in this sample was a caregiver who stated that a three year old child wet the bed because he was lazy.

## Quality of safety/risk assessments

Safety/risk assessments are intended to identify and explore red flags, along with additional information about caregiver protective capacities and other protective resources or supports available to the child and the caregivers.  The (verbatim) questions on the MDHS/DHCS safety/risk assessment for placement resource investigations include:

1.  In what type of placement was the maltreatment alleged to have occurred?
2.  Who is the alleged perpetrator? What is their relationship with the victim?

23

3. Describe the nature, frequency and duration of the maltreatment.

4. What is the permanent plan for the child(ren)? How does the child(ren) perceive the placement where the alleged maltreatment occurred?

5. Does the resource have a history of maltreatment with the agency? If so, were any of the allegations substantiated?

6. Is there a violation of agency policy or licensure standards?

7. Would the child be in any danger if left in this placement? If the child is in danger, the agency with assess the danger with…

8. Do any adults in the home appear to have a substance abuse/dependency problem or display any behaviors or emotions that affects their ability to meet the safety and basic needs of the child? If so, describe.

9. Are there possible safety concerns posed by other children in the placement or does the child pose possible threats to other children there?

10. Are there any significant changes/occurrences in the past year that may affect the caregiver's ability to meet the protection and basic needs of the youth?

11. Describe the caregiver's understanding of the child's basic needs and developmental needs and how they are met within the placement setting. Include physical and behavioral health needs.

Minimally adequate safety/risk assessments document information gathering in the context of the investigation related to every question listed above. Quality safety/risk assessments provide supporting "evidence" based on information gathered and critically analyze how the answers to the questions relate to one another. Review of the assessments completed on cases in this sample revealed two common shortcomings:

▪ Information about the previous maltreatment reports in #5 was often minimal (i.e., whether there were previous reports) and frequently did not include important details about the nature of the allegations and parties involved—which is necessary to form a more complete picture of the history leading up to the current report. At least two cases reviewed indicated that there was no history of reports, when a MACWIS search indicated previous reports. This area could be improved with an analytical examination of how previous reports are relevant (or not) to the current report.

▪ Responses to #11 about caregiver's understanding of child's needs and how they are met in the placement were frequently described in general terms like, "the foster parent understands the child's basic needs". This area could be improved with a description of the child's needs—including any special medical, emotional or behavioral needs—and more specific examples of how the child's needs were being met by the caregiver.

After completing the safety assessment, investigators are asked to determine whether the child is safe or unsafe, and at low, medium, or high risk. Safety/risk assessments could over-identify risks to children by concluding risks are present that are not supported by the information gathered. Assessments could also under-identify risks by minimizing or failing to consider legitimate risks to the child in the placement. Table 10 summarizes findings from the case review that describe determinations about risk and safety in this sample.

| Table 10. Safety/risk determinations | % sample |
|---|---|
| Safety assessment | |
|    Safe | 100% |
|    Unsafe | 0% |
| Risk assessment | |
|    Low | 89% |
|    Medium | 9% |
|    High | 3% |
| Over-identified safety/risks | 0% |
| Under-identified safety/risks | 11% |

All of the cases reviewed in this sample were determined to be safe.  Most were determined to be low-risk (89%).  When investigators' safety/risk assessments were compared with reviewer-identified red flags in the case review sample, there were no cases in which investigators over-identified risks to children.  There were, however several cases in which investigators under-identified risks to children (11%).  Reviewers noted under-identified risks when information about risks was documented in the investigation narrative but not included in the safety/risk assessment, and the safety/risk assessment had a determination of safe and low risk when, based on the information provided, reviewers believed that a determination of medium risk was more appropriate.  Those cases included:

- A nine-year-old boy in a foster placement was determined to be safe and at low risk during an investigation of his foster parent spanking him at home and requesting for him to be paddled at school.  Reviewers believed that the child was at medium risk because the foster parent was rigid, believed the physical discipline was necessary, told the children that "what happens in the home stays in the home", and admitted that his wife (who was not interviewed as part of the investigation) thinks he is too hard on the children.  The case file noted that the child's sister who lives in the home (also not interviewed as part of the investigation) reported to the caseworker that she does not feel comfortable in the placement.

- A nine-year-old boy in a foster placement was determined to be safe and at low risk during an investigation of his foster parent using a paddle to spank him.  Reviewers believed that the child was at medium risk because the caregivers admit to using the paddle as a "visual cue" to threaten and intimidate the child.  The caregivers also believed that the child's behavior was becoming more difficult to manage.

- A two-year-old boy was determined to be safe and at low risk during an investigation of a bite on his cheek.  Reviewers believed that the child was a medium risk because the bite could not be explained, and the foster parent did not appear to be concerned about the injury.  The caregiver was not behaving in a protective way to attempt to understand the cause of the injury and prevent it from occurring again.

- A five-year-old boy was determined to be safe and at low risk during an investigation of inadequate supervision and spanking in his foster home.  Reviewers believed that the child was at medium risk because the caregiver had a history of explosive and out-of-control behavior with the child's caseworker and child's mother (noted in the case narrative), the caregiver believes that sometimes physical discipline is necessary, and the caregiver has inappropriate expectations of the children in her care.

### Safety planning

If safety and risk are identified, safety plans are needed to ensure protection of children. The most common safety plan used in the cases in this review was changing the child's placement. MDHS/DFCS allows for the removal of children during the investigation if necessary to ensure safety until a determination is made. Of the cases reviewed, almost 70% remained in the placement where the alleged maltreatment occurred during the investigation.

- Of the four substantiated investigations, one was moved as a result of the investigation. The other three remained in the same placement. In two cases, the staff members who were the perpetrators had been terminated. In the last case, the child remained in the placement and the caregiver agreed to use alternative forms of punishment (the caregiver was leaving the four-year-old child in time out on the kitchen floor for time periods up to an entire day).

- Of the 20 unsubstantiated investigations, 75% remained in the same placement, 20% moved as a result of case planning outside of the investigation, and one case (5%) moved the child at his request to another placement where he felt more comfortable.

- Of the 11 unsubstantiated investigations with policy violations, 55% remained in the same placement. 18% were moved as part of case planning. Twenty-seven percent were moved as a result of the investigation. In most of these cases, there was not a good match between the child and the caregiver and the moves were intended to provide a more stable placement.

Findings about under-identifying risk and safety threats in reports of corporal punishment raise questions about whether corporal punishment allegations are thoroughly investigated. It appears possible that some investigators discount spanking as a problem that must be addressed with serious action. In those instances, circumstances surrounding incidents of spanking—which could be red flags for future maltreatment—may also be overlooked or discounted.

### Notifications

The MSA and MDHS/DFCS policy require a number of notifications when reports are made and when the investigation is completed, including:

- Child's COR/COS, COR/COS for all the children in the house, and the resource unit must be notified (no timeframe given).
- Child's parents/caregivers from whom the child was removed and Guardian ad litem must be notified of the report by the COR Worker within 24 hours.
- Staff report initial findings to Regional Director ("RD") within 3 days and give a verbal report to the RD at the conclusion of the investigation.
- District Attorney must be provided written notice within 48 of finding evidence that a child has been abused.

Table 11 summarizes the percent of cases in the case review sample where required notifications were made, and the number of days between report intake and notifications (measured in days).

| Table 11. Notifications | % sample | Mean | Min | Max |
|---|---|---|---|---|
| Notification of allegation | | | | |
| COR/COS | 84% | 1.8 | 0 | 10 |
| Resource unit | 81% | | | |

| Table 11. Notifications | % sample | Mean | Min | Max |
|---|---|---|---|---|
| Parents/caregivers | 36% | 3.1 | 0 | 13 |
| GAL | 35% | 4.4 | 0 | 13 |
| Report of findings | | | | |
| Regional Director staffing | 30% | | | |
| Resource family/facility | 23% | 2.9 | 0 | 18 |
| DA[1] | 100% | | | |

[1]only one case required DA notification

A search of the investigation narrative, case narrative, and paper case record revealed that the child's COR/COS worker and the resource unit were notified of allegations in over 80% of cases. Parents/caregivers and GAL were notified of allegations in about a third of cases. There was documentation of staffing the report with the Regional Director (at any point during the investigation) in 30% of cases. Copies of letters to resource families/facilities were found in 20% of cases.

Based on this review, communication with other staff and partners—particularly following completion of the investigation—appears to be a challenge for the cases included in this sample. This has important implications for the prevention of future maltreatment, as will be discussed in the "3. Contributing factors" section of this report.

## Insights from State Interviews

In addition to the in-depth case review, telephone interviews were conducted with MDHS/DFCS administrators and staff, CSF consultants, and consultants to Court Monitor--who are involved in reviewing maltreatment in care investigations on a regular basis. Informants were asked for their insights and impressions based on trends they have seen. Overall, all but one informant interviewed had concerns about the quality of MIC investigations. Most noted that the quality of investigations is inconsistent across the state. Data from the case review was typically consistent with the informants' impressions. Table 12 summarizes insights along with findings from the case review.

Table 12. Informant insights and results of the case review

| Informants' Impressions | Results of Case Review |
|---|---|
| Timeliness | |
| Several informants believed that timeliness has improved in recent months, both in initiation and completion. | Two thirds (67%) achieved the legally required initiation and approval timeframes outlined in the MSA. Less than one third (31%) of cases achieved all timeframes outlined in MDHS/DFCS policy. In this recent sample, approval within 30 days occurred most frequently (86% of cases in this sample) followed by initiation within 24 hours (74%). Completing the safety/risk assessment within 7 days (60%) and completing the investigation within 25 days (69%) requirements were the least frequently achieved in this sample. |

Table 12. Informant insights and results of the case review

| Informants' Impressions | Results of Case Review |
|---|---|
| **Information Collection** | |
| Several informants indicated that investigators may not be doing a sufficient or thorough review of the case before meeting with the child and beginning their investigation. | Half of the sample reviewed indicated review of case files (51%). |
| Some informants noted that previous allegations against the resource home may not be taken into consideration in a new investigation. | Half of the sample reviewed previous allegations (54%) against the resource family. |
| During the investigation, the degree to which collaterals are interviewed is inconsistent— though a couple of informants have seen improvement in this area. | Most of the cases (82%) included interviews with at least one collateral.  Most of the collaterals that were interviewed knew the child (60%), nearly half knew the caregiver/alleged perpetrator (49%), and 14% had firsthand knowledge of interaction between the caregiver and the child. |
| A couple of informants mentioned that the investigators are not consistently going out with the resource worker as they are supposed to. | Just over half (56%) of Resource Specialists accompanied the investigator to the placement to assess for policy violations. |
| **Quality of Information** | |
| Some suggested that interviews seem rushed and are not consistently well documented. | There is a wide range of interviewing practice among the cases reviewed in this sample.  Most of the interviews reviewed as part of the investigations in this sample covered the most basic information needed for decision making, but many did not go beyond investigation of a specific incident to better understand safety/risk and dynamics of the placement.  There are, however, examples of investigators who conducted and documented thorough interviews as part of the investigation. |
| Several informants noted that "questions go unasked" when speaking with children, alleged perpetrators or collaterals. | There were examples of "unasked questions" observed in the review.  For example, a couple of investigators did not pursue further questioning about when caregivers believe physical discipline is necessary. |
| The most frequent concern noted with the quality of information collected is a "laser focus" or "tunnel vision" on the allegations in the report— rather than a broader assessment of placement dynamics. | The most detailed information collection is in the areas of extent of maltreatment (89%) and circumstances surrounding maltreatment (74%).  Additionally, cases included at least a minimal assessment of placement dynamics (91%), child functioning (80%), and disciplinary practices (63%).  Information about general parenting (49%) and caregiver functioning (11%) was assessed less frequently. |

28

Table 12. Informant insights and results of the case review

| Informants' Impressions | Results of Case Review |
|---|---|
| Analysis and Decision Making | |
| Several informants were suspicious about the low rate of substantiated allegations—particularly when children are moved around the same time as the investigation. | Mississippi has the highest MIC substantiation rate in the nation, so base rates of substantiated reports are high.  Nonetheless, nine percent of the case review sample were reports that were not substantiated, but could have been based on MDHS/DFCS policy. Reviewing the case files in addition to the investigation files helped to clarify why children without substantiations were being moved (in this sample).  Ten children in this sample were moved without having substantiated abuse. Three had policy violations, six were preparing for reunification or placement change as part of case planning, and one requested the move. Most moves were intended to result in a better match and more stable placement. |

## 3. Contributing Factors

According to data collected and reported by the Children's Bureau, Mississippi has the highest rate of substantiated maltreatment in out-of-home care in the country (1.65% compared to the national average of .4%).[12]  This section explores factors that could be contributing to high rates of maltreatment. They include:

- Ineffective foster parent licensing, training and support (e.g., culture of corporal punishment, child ongoing support, inadequate supervision),

- Insufficient caseworker contacts for ongoing safety/risk assessment, and

- Absent or ineffective corrective actions following substantiated maltreatment or policy violations.

The factors described here were identified based on insights from informant interviews, and findings from the case reviews.

### Foster parent licensing, training and support

When asked what contributes to the high MIC rates in Mississippi, informants frequently raised issues related to the quality of foster parent selection, training and support.  The case review was not designed to directly evaluate these issues, however, some findings from the case review are relevant as examples of how these issues may influence maltreatment in care.

---

[12] USDHHS-ACF-ACYF-CB Outcomes Report Data (FY12) http://cwoutcomes.acf.hhs.gov/data/overview

29

## Corporal punishment

The most frequently mentioned contributor to MIC in Mississippi among informants was the use of corporal punishment.  Several informants noted the culture in Mississippi is one that uses corporal punishment, and it is challenging for foster parents to understand or accept that they are not allowed to "swat" the foster children in their care.  The incidents do not meet the definition of physical abuse and as a result, most of these reports are not substantiated—but recorded as a policy violation.  Most informants believed this was particularly true with relative foster parents.

Case review findings included examples of corporal punishment reports in both foster families and relative foster families.  The line between substantiated physical abuse and policy violation seemed to be drawn based on marks or bruises left on the child, but this is not consistent across investigators.

The foster parents and relative foster parents in this sample were familiar with the agency's policy—and had signed the form acknowledging the agency's policy—which forbids corporal punishment.  Consistent with informants' description of the corporal punishment culture in Mississippi, several of the caregivers' attitudes favored corporal punishment as the only effective way to get through to the children.  Several caregivers admitted that they do not know what else to do when the child misbehaves.

## Ongoing support of foster parents

Most informants believed that resource families are poorly prepared for the children coming in to their home.  A related concern noted by some informants include children with behavioral needs that require specialized placements but are placed with regular or relative foster parents.  Several informants noted that resource families frequently ask for assistance but do not receive it.  A couple of informants discussed that the child's worker does not see herself as a support for resource families.

The review of cases with substantiated maltreatment or policy violations revealed very little contact between resource families and Resource Specialists, even after a MIC report had been made and challenges had been identified in the home.  Resource families in this sample had much higher levels of contact with the worker of the children placed in their home.  Caregivers frequently expressed challenges with the child behavior—primarily for information sharing purposes, so that the worker was aware of what was happening with the child.  The most common response from the child's worker was to sympathize with the caregiver and talk with the child about his or her behavior.  Workers did not regularly assess whether additional supports were needed for the caregiver, nor did they typically offer services to support caregivers.  Based on the child's case files before and after the investigation, it was not common for caregivers to explicitly ask for help, though they may threaten to have the child removed from their home.  The only documented requests from foster parents were for temporary respite (which were granted).

The review of cases for children with intensive behavior needs placed in home-based settings revealed that while the children may be receiving therapy outside of the home, very little was occurring inside the home to support the caregiver and stabilize the placement.  There was one example of MYPAC services in the home at the time of the report, and another built MYPAC services into the corrective action plan as a support for the caregiver—but these examples were not typical of the sample of cases reviewed.

Inadequate supervision

During interviews, informants noted that inadequate supervision by placement resources was another contributor to high levels of MIC in Mississippi. Several informants recounted cases of child-on-child incidents in residential facilities with poor supervision. A couple of informants noted concerns about foster families with too many children in the house.

Based on the case review, inadequate supervision appeared to be a problem in at least one of the residential facilities. A neglect allegation was substantiated after a child-on-child incident, but review of that child's case file revealed at least four other incidents where the victim was assaulted by other children in the facility. Taken together, these incidents suggest a chronic supervision problem in the facility.

The MSA specifies that no foster home shall provide care for more than three foster children or for a total of more than five children (including foster, biological, and adoptive children) at any given time unless there is written permission from the Regional Director to place a sibling group together. One case had six children (total) in the home to accommodate a sibling group of five and one biological child. Three cases had more than three children in DFCS custody in the home to accommodate sibling groups (one group of four and two groups of five). None of the homes hosted more DFCS children than their license allowed.

Assessment and recommendations

While the case review could offer a couple of insights into selection and training issues for resource families, this assessment was not designed to examine foster parent training and support. Further assessment into this area—including a review of how foster parents are recruited, assessed, licensed, trained, and supported would be beneficial in more systematically identifying needs in this area. Some areas of particular interest should include:

- How resource families are trained in what to expect from children in foster care—including the effects of trauma and maltreatment on children, how to manage children's problem behaviors, how to promote prosocial behavior in traumatized youth, and other topics.

- How a culture of corporal punishment in Mississippi has implications for the selection, training, monitoring and support of resource families.

- How the child's caseworker and the resource worker assess caregivers' needs for support and providing resource families with assistance when needed to promote safety and preserve placement stability.

Caseworker contacts for ongoing safety/risk assessment

An important practice for preventing maltreatment in out-of-home care is for workers to visit children in their placement on a regular basis, and to continually assess safety and risk. The MSA requires two private monthly visits with at least one in the placement setting. Table 13 summarizes caseworker visit data collected during the extended review of cases with determinations made of policy violations and substantiated maltreatment.

Table 13. Caseworker contacts before, during and after MIC reports

|  | % sample | Mean | Min | Max |
|---|---|---|---|---|
| 2+ visits per month before the report | 73% | 2.8 | 1.3 | 5.5 |
| % visits in placement setting |  | 56% | 24% | 100% |
| Visits during investigation | 100% |  |  |  |
| % visits in placement setting |  | 49% | 0% | 100% |
| 2+ visits per month after investigation | 100% | 3.2 | 2.0 | 4.3 |
| % visits in placement setting |  | 43% | 0% | 100% |

*Contacts before the MIC report.* Results of the extended case record review indicated that the 15 children in this sample with determinations of substantiated maltreatment or policy violation received an average of 2.8 visits each month in the six months leading up to the report. Over half (56%) of those visits were in the placement setting—other visit locations included school, DHS office or other locations for visits with the child's family. Nearly three quarters of the subsample (72%) received an average of two or more visits each month prior to the report, as required by the MSA.

One of the cases reviewed offered an example of using regular visits to gather information about safety/risk on an ongoing basis. In this case, the child's worker was visiting regularly and documenting conversations with each child in the placement. Over a period of weeks, the placement deteriorated and the worker observed the alleged victim becoming more withdrawn and less happy as the caregiver and other children in the home were saying increasingly negative things about the child. The worker staffed the case with her supervisor to share her concerns that the child was being singled out by the family, which placed her at increased risk. The worker focused her next visits on risk to the child and learned that the child and others in the home were being spanked as punishment, the child was regularly left in the care of people who were not approved by DHS, and the children were all told not to share these facts with anyone from DHS. The worker and her supervisor were able to detect changes in placement stability as well and risk and safety of the child using good assessment, critical thinking, and focused information gathering.

*Contacts after the MIC report.* The extended review of cases with determinations of policy violation or substantiated maltreatment, all 11 children who remained in the placement with alleged maltreatment received two or more face-to-face contacts with their caseworker during the time that the investigation was being conducted—in addition to any visits they may have received from the investigator and/or resource worker as part of the investigation. Nearly half of those visits were in the placement setting.

After the investigation was completed, all eight children who continued to remain in the placement received two or more visits each month for an average of 3.2 face-to-face visits each month. An average of 41% of those visits were in the placement setting.

Results of the extended case review indicate the children are receiving at least the minimum required contact with their caseworker—sometimes more. However, only one of the cases included in the extended review demonstrated any change in the content of caseworker contacts following the MIC report—even after findings of corporal punishment or maltreatment. The determinations made during the investigation indicate that the child victims are at higher risk of future maltreatment in these placement settings. Caseworkers assigned to the case on an ongoing basis should continue to re-assess for the potential for similar behavior in the future.

32

Corrective action plans and investigation follow up

Review of MDHS/DFCS policy, interviews with state informants, and review of case records suggest that Corrective Action Plans can be developed for placement resources by three entities following a substantiated incident of maltreatment or other policy violation:[13]

- The Licensure/Resource Specialist develops plans to respond to policy violations found during an investigation of resource family homes licensed by DFCS.

- The DFCS Licensure Unit/Congregate Care Division identifies corrective action steps needed by residential facilities licensed by DFCS.

- Private organizations contracted to provide care can also develop their own plans to address incidents that occur.

Informants who reviewed corrective action plans described a very similar approach: increase visits, review policy with foster parent, no new children placed while under corrective action.  Informants noted that referrals to services or other supports are not typically included in the plans.

Table 14 summarizes corrective actions that were taken by licensing agency.  Of the 15 reports in the extended review of cases with determinations of substantiated maltreatment or policy violations, ten were licensed by DFCS and five were licensed by other organizations (i.e., specialized therapeutic foster care agencies, non-DFCS residential facilities).  Corrective actions were taken in three of the five placement resources licensed by other organizations, and four of the ten placement resources licensed by DFCS--47% of all cases with determinations of substantiated maltreatment or policy violation.

Table 14. Corrective actions by licensing agency

|  | Licensed by DFCS | Licensed by Other | Total |
| --- | --- | --- | --- |
| Corrective action taken | 4 | 3 | 7 |
| No corrective plan | 6 | 2 | 8 |
| Total | 10 | 5 | 15 |

Corrective actions

Corrective actions taken to address cases of substantiated maltreatment or policy violations in the extended review sample include:

- During the investigation of a DFCS-licensed relative foster home, a family team meeting was held to identify another placement resource for the child who was a difficult match with the caregiver (and her sister, to keep them together).  Two other half-siblings who had been placed with the caregiver most of their lives and were well-bonded remained in the home with the caregiver.  MYPAC family preservation services were identified to work with the caregiver on alternative forms of discipline.  All parties signed the Corrective Action Plan that was developed to acknowledge that they understood and agreed to the terms.  In the three months following the investigation, MYPAC services were provided, the child's caseworker continued to visit the children in their homes to assess safety and well-being, and the Resource Specialist made

---

[13] Corrective Action Plans developed by the Safety Review Unit about safety and practice issues related to the investigation will be discussed under Section 4: Remedial Strategies.  The section focuses on corrective actions related to the placement resource.

monthly contacts with the caregiver to discuss her use of the alternative discipline strategies introduced by MYPAC.

- A private agency closed the resource home they licensed after a report that the foster parent whipped the child with a belt was substantiated.

- A non-DFCS-licensed residential facility terminated staff for reasons unrelated to the allegations in a substantiated abuse report when a staff member slapped a child.

- A non-DFCS-licensed residential facility terminated a staff member because the staff member violated agency protocol in a substantiated investigation of neglect for inadequate supervision.

- In a DFCS-licensed residential facility, the perpetrator was terminated and the licensure unit recommended that the facility revisit policies on corporal punishment with all remaining staff. The agency was mailed a letter which described the required next steps.  Later, the licensure unit reviewed the list of attendees at the training to ensure that all staff had received the required trainings.

- The children were removed and a DFCS-licensed resource home was closed until the foster parent complied with the request to take a drug test (refused during the investigation) and passed the test.  In this case, one of the foster parents wrecked the family car while driving under the influence.

Based on the documented information in the investigation, child's case files, and resource home licensure files, reviewers believed that the first corrective action response to a policy violation described above offers an example of best practice in Mississippi.  The corrective action plan was appropriate to address the circumstances of the case by preserving stability and promoting safety and well-being to the extent possible.  The plan was well documented and communicated to all relevant parties, and all parties followed up as outlined in the plan.

Reviewers believed that the other cases were adequate to address the circumstances of the case. However, the final example described above should be expanded beyond passing a drug test to include an additional assessment of the ability of the foster parents to protect children in their care.  The assessment of caregiver's protective capacities will be important when considering the placement of children in that home in the future.

### Review policy on corporal punishment

Six resource families were asked to sign a form acknowledging that corporal punishment is forbidden, but no additional action or monitoring occurred with the resource family.  The circumstances of those investigations included:

- A foster parent licensed by a private agency "tapped a child on the mouth with the back of her hand" when the child was in her face yelling at her.  The child was not hurt and there were no marks or bruises.  The report was unsubstantiated with a policy violation.

- A DFCS-licensed foster parent was leaving the four-year-old child in time out in the middle of the kitchen floor for 2-3 hours and up to a full day as punishment.  The report was substantiated for emotional neglect/abuse.

- A DFCS-licensed foster parent picked a 10-year-old child up by her collar and threw her on the bed.  The report was unsubstantiated with a policy violation.  It was also alleged (but not investigated) that the foster parents threatened that the children could not see their parents if they misbehaved.

- A DFCS-licensed foster parent whipped a seven-year-old child with a belt for punishment, but did not leave marks or bruises.  The child allegedly received less care and attention than other children in the home.  The report was unsubstantiated for abuse and neglect with a policy violation.

- A DFCS-licensed foster parent spanked the children in her care, ages three and five, with her hand as punishment, but did not leave marks or bruises.  The report was unsubstantiated for abuse with a policy violation.

- A DFCS-licensed fictive kin caregiver spanked a nine-year-old child twice at home, and took him to school and requested that he be paddled by the principal.  The report was unsubstantiated for abuse with a policy violation.

Reviewers believed that, based on the available documentation, signing a form is not a sufficient corrective action plan for these cases.  Informing caregivers about prohibitions on corporal punishment will only correct the issue if caregivers are unaware of the agency's policy—and that lack of awareness is the only reason why caregivers are using physical or otherwise inappropriate forms of punishment.  However, findings from the case review confirmed that foster parents had already been aware of the policy and had signed the form forbidding corporal punishment of any kind for children in DFCS custody.

No corrective action with resource family

In two cases, no corrective actions were taken with the caregivers. Both of these cases involved the caregiver reacting as a reflex to teenage girls in their face or hitting them, and neither of the children were harmed.  In both of these cases, the girls' behavior was becoming increasingly defiant and out-of-control prior to the report, during the investigation, and continuing beyond the investigation.  Both placements disrupted shortly after the investigation and the children were each placed in higher levels of care.

## 4. Remedial Strategies

Mississippi DFCS has implemented, or plans to implement, a number of strategies to reduce maltreatment and improve the quality of investigations of maltreatment in care across the state.  This section of the report assesses each strategy, drawing from:

- Review of documents and related materials related to each strategy (e.g., policy, training, SRU protocol and review instrument).

- Interviews with state informants who have reviewed MIC investigations and are involved in one or more of the remediation strategies,

- Online survey of a sample of the staff who investigated the cases in the case review sample,

- Review of Safety Review Unit quality assurance reviews of MIC investigations.

The state remedial strategies included in this review were identified by the Court Monitor and/or by informants during interviews.  The remedial strategies reviewed include: (1) MDHS/DFCS policy, (2) MIC investigation staffing, (3) MIC investigation training, (4) coaching and continued learning for investigators, and (5) quality assurance provided by the Safety Review Unit.  Each of the remediation strategies is assessed and recommendations are offered when warranted.

## 4.1 Policy

The MSA sets legal standards for MIC investigation in Mississippi.  MDHS/DCFS policy is designed to adhere to the MSA requirements by outlining investigation practice requirements, including: timeframes, interviews, information collection, and substantiation criteria.

*Timeframes.*  Based on MSA requirements, all reports of MIC are screened in as Level Three and assigned a 24 hour response time to initiate (via face-to-face contact with child), and 30 days to complete the investigation.

*Interviews*.  Policy identifies which individuals should be interviewed during the investigation—including:

- Alleged victim
- All children in DFCS custody placed in the home
- COR/COS of alleged victim
- Resource Specialist
- All household members
- DFCS children formerly placed in the home (when relevant)
- Alleged perpetrators
- Non-relative collateral

*Information collection and decision making.*  Information that should be collected is outlined, but tends to be focused on substantiation of a specific incident of maltreatment rather than being supplemented by a comprehensive assessment of safety in the home.  Similarly, detailed guidelines are provided for substantiation decisions.  Substantiation criteria include:

> (1) Medical or psychological information,
>
> (2) Statement of credible witness,
>
> (3) Child victim's statement, and
>
> (4) Indicators and circumstance of abuse or neglect (i.e., physiological indicators, physical evidence, behavioral indicators, circumstantial evidence).

## Policy assessment and recommendations

MDHS/DFCS policy sets reasonable guidelines for investigating maltreatment in out-of-home care.  The rapid investigation timeframes are appropriate because the state has a high standard to protect the children in its custody.  The list of individuals who must be interviewed is appropriate for quality information gathering.  Policy could be enhanced in a couple of areas to strengthen investigation quality and improve safety/risk assessment:

- Additional guidance could be provided about when to select collaterals and the type of collaterals to interview.  For example, policy or supporting documents could identify the kinds of information investigators should attempt to gain from collaterals to assist the investigator in identifying individuals who might be most useful in gathering the required information.

Structuring collateral interviews around information to be collected could help ensure that investigators are selecting collaterals to interview based on criteria rather than convenience.

▪ To improve the information and decision making area of policy, information and decision making criteria relevant to assessing risks/threats and protective capacities tied to decisions about safety could be included. While not part of the policy, the Comprehensive Family Assessment (CFA) Instructional Guide describes information needed, where that information might be obtained, and sample questions that could be used to gather relevant information. If tailored for MIC investigations and expanded to include safety decision making criteria, this kind of a layout could potentially be a helpful resource for MIC investigators.

## 4.2 Investigation Staffing

State informants highlighted the importance of selecting the right staff to conduct MIC investigations. Acknowledging the difficult tasks of working in a complex, high-stress environment, social work practitioners around the country have developed competencies for child welfare caseworkers that include a mix of skills and knowledge. For example, the Maine Child Welfare Casework Competency Model includes 34 competencies organized into the five categories of: (1) work management skills, (2) conceptual knowledge and skills, (3) interpersonal knowledge and skills, (4) self-management skills, and (5) technical knowledge.

### Current Staffing: Specially Trained Investigators

Current MDHS/DFCS policy is designed to assign specially trained investigators in each region to reports of maltreatment in out-of-home care. MIC investigators are required to have completed the maltreatment in care investigation training, and state informants noted that the assigned investigators should have more investigation experience. The online survey of the investigators assigned to cases included in the case review sample offered an opportunity to explore the characteristics of staff currently assigned to MIC investigations.

*Education.* Of the 17 investigators who responded to the survey, most had Bachelor of Social Work degrees (77%), three had a Bachelor's degree in Psychology (17%), and one had a Masters in Rehabilitation Counseling.

*Training*. All of the investigators indicated that they received the maltreatment in care training or the resource/facility investigation training, as required by MDHS/DFCS policy. Three participated in the Child First Mississippi training on forensic interviewing. Two participated in risk/safety assessment training and learning labs.

*Years of experience.* Investigations that were reviewed as part of this assessment were investigated by staff with an average of 6.9 years of child welfare experience (range of 2-34 years), and had been conducting investigations for an average of 2.6 years (range of 1-6 years).

*Completed investigations.* Investigators had completed between 1 and 300 investigations of children in their home (average of 93), and had completed between 3 and 200 investigations of children in out-of-home care. There was a wide range in the number of investigations completed by investigators in this sample—as illustrated in the Figure 4. Investigators ranged from having completed only 5 investigations to over 330. The mix of investigations of in-home and out-of-home reports also varied. Most investigators have completed a larger proportion of in-home investigations. For five investigators, 75% or more of their completed investigations have been MIC.

Figure 4. Number of investigations completed for each investigator



Future Staffing: Centralized Maltreatment in Care investigation unit

Mississippi DFCS has plans to implement a new, centralized special investigation unit that will be responsible for all of the MIC reports across the state.  Several informants described the new unit—and all of them were optimistic about the potential for positive impacts on investigations.  Several people believe that a centralized unit will increase the consistency of the quality of investigations.  A few mentioned the opportunity that this unit has for the careful selection of staff, and many spoke highly of the Director who has already been hired.

Staffing assessment and recommendations

Based on this assessment, a centralized unit offers the best opportunity for carefully selected workers to specialize in the complexity that is required for MIC investigations.  This is particularly true when workers receive quality training and regular consultation and decision making support from an experienced supervisor.

The Director proposes to hire 13 investigators for this special unit.  Between January 2013 and October 2013 there were an average of under 50 reports per month.  If this trend continued in the future, up to four reports would be assigned to each special investigator each month.  It appears that the proposed staffing plan would create a reasonable workload for timely completion of thorough investigations.

4.3 Maltreatment Training

Beginning in 2010, a special training was offered to Family Protection Workers and Family Protection Specialists statewide.  The focus of the training was on investigating maltreatment in out-of-home care. Several informants had critical feedback about the maltreatment investigation training that all staff received.  None of the informants interviewed were optimistic about the efficacy of the training in supporting quality investigations.  One of the informants provided context which revealed that the training was delivered in a very short timeframe.  Many trainers were involved in an effort to quickly train the entire state.  The informant described that under those circumstances, there was little opportunity to assure quality training.

Training assessment and recommendations

Based on review of the training curriculum, the timeframes and other procedural elements of investigation requirements were consistent with—and reinforced—what was defined in policy. However there is not sufficient time allotted to skills development or the opportunity to practice and receive feedback during the training.

There are several areas in which this training could be improved, based on this assessment and suggestions from informants during interviews:

- The discussion of interviewing collaterals primarily focused on confidentiality and information sharing. Training about collaterals could be enhanced with discussion of purposeful information gathering. Training exercises could include selecting collaterals to interview based on the topics (outlined in the safety/risk assessment) that the investigator needs to explore.

- The training introduces role vs. personal power of investigators along with the importance of engagement. This could be enhanced with introduction of engagement and interviewing skills, and coupled with lots of opportunity to practice and receive feedback in the training environment.

- The training offers limited discussion of the unique risks and vulnerabilities to children in an out-of-home care environment. Training materials could be enhanced with a more comprehensive introduction to some of the considerations that may increase stress on foster parents, as well as abuse-reactive behavior in children. The Child Welfare League of America identifies several unique vulnerabilities, including: (1) crowding foster homes, (2) placing children with challenging behaviors with foster parents who are not prepared to successful manage behaviors and address needs, (3) asking foster parents to care for a child with whom they do not feel comfortable, (4) providing inadequate contact and resources to foster families.

While training activities are important for communicating expectations and introducing concepts, transfer of learning research indicates that most of the information required to produce quality investigations will come from ongoing coaching and supervision.

## 4.4 Coaching and continued learning opportunities

To supplement the required training described above, DFCS and partners at the Center for the Support of Families (CSF) have implemented and are planning a number of other opportunities for continued learning and practice for staff. MDHS/DFCS has convened fatality roundtables as learning opportunities about cases in which children known to DFCS have died. A few informants highlighted work that CSF is doing to support practice model implementation—including coaching supervisors, supporting DHS coaches of workers, hosting an investigation symposium, and conducting coaching labs based on their safety assessment framework. Most of the learning opportunities are not currently focused on MIC, but are helpful to review for potential applications to address MIC.

Fatality roundtables

A few interview informants shared that the fatality roundtables hosted by DHS leadership provide a helpful format for facilitating conversations where multiple individuals involved in a child's life could discuss their experience with the child and their family. Feedback from informants suggested that the roundtables allow an opportunity for staff to "self-realize" red flags that could have prevented the child's death.

39

## Investigation symposium

In August 2013, MDHS/DFCS hosted an investigation symposium for DFCS trainers and practice coaches, UM staff, and CSF staff.  Key investigation support documents (e.g., definitions, practice guides, Comprehensive Family Assessment and Instructional Guide) were reviewed with a focus on how to support transfer of learning of the concepts into practice for staff.  Commonalities that emerged from the fatality roundtables described above were shared, along with other case studies of child fatalities.

## Coaching labs

The Safety Assessment Framework Coaching Lab developed by CSF has been used with DFCS supervisors to enhance their ability to evaluate safety and risk assessments, and to coach workers to make good decisions with families about safety and risk.   The coaching lab has been adapted for use with resource and adoptive staff in an attempt to translate safety assessment and safety action planning to the out-of-home care setting—and to begin to address the role of resource workers in corrective action planning to promote safety and reduce risk.

## Findings from the investigator survey

The online survey of the investigators assigned to cases included in the case review sample offered an opportunity to explore how the training, coaching, and continued learning remedial strategies are reaching workers currently conducting MIC investigations.

The survey asked investigators what resources they typically use to guide their work.  All investigators reported using state policy and the risk/safety assessment to guide their decision making.  75% refer to the training manual, and 70% refer to a practice guide.  Other resources used include a documentation checklist that was developed in the region.

In addition to the general resources available for all investigations, investigators receive additional consultation on each case.  Table 15 summarizes which sources provided consultation on the cases included in the case review.  Investigators in this sample most frequently reported receiving consultation from their supervisor, the Regional Director, and Co-workers.  No coaching was received from CSF or DCFS for any of the cases in this sample.[14]

| Table 15. Consultation on the investigation | % sample |
|---|---|
| Supervisor | 79 |
| Regional Director | 41 |
| Coworker | 31 |
| Other* | 21 |
| No consultation | 4 |
| CSF practice coach | 0 |
| DFCS practice coach | 0 |

*Regional ASWS, Resource ASWS

Most investigators received consultation from multiple sources on the cases in the case review sample. Two thirds of the sample included consultation from two or more individuals.

---

[14] We attempted to include cases that had received practice coaching in the sample, but no coaching was provided to MIC investigations during the review period.

Coaching and continued learning assessment and recommendations

Best practice in professional development underscore the importance of review of feedback and consultation and coaching to develop and maintain new skills.  Based on this assessment, MDHS/DFCS and partners appear to be aware of the importance of ongoing coaching and consultation in improving practice, and have committed resources to continuing to provide critical supports to supervisors and staff.  Findings from the online investigator survey suggest that CSF's focus on supervisors in the coaching labs is an efficient choice because most investigators received consultation from their supervisors (79%) while there were no investigations that received coaching from DFCS coaches during the review period.

While most of the current coaching activities are not directly focused on maltreatment in care, the efforts underway to improve safety and risk assessment more broadly provide a strong base from which to focus on MIC investigations.  Specifically:

- Using a similar "fatality review" process for near-fatality or complex cases could also serve to identify themes that could be the focus of program improvement.

- MIC investigators could likely benefit from a coaching lab similar to the lab that has been developed for resource workers.  A MIC lab could apply concepts of safety and risk assessment to the out-of-home care setting, and discuss some of the unique vulnerabilities of resource families as well as risks to children in out-of-home placements.

## 4.5 Safety Review Unit

The Safety Review Unit (SRU) reviews every MIC report as part of quality assurance.  The review instrument includes history of allegations against the resource home, timeliness of investigation, completion of risk/safety assessments, and adequacy of safety plans.  SRU reviews "cite" violations of policy and communicate corrective actions that are needed in the HEAT system.  Interviews with reviewers indicated that reviewers spend approximately 1-2 hours on each review—looking at the investigation summary report and notes in MACWIS as needed.

Twenty recent reviews completed by the SRU and follow up responses in the regions were reviewed to assess the quality assurance process.  The purpose of the SRU review was to assess timeliness of the SRU process, explore what issues were identified during the SRU review, and explore whether follow-up actions were taken in the region to address identified issues.  Table 16 summarizes findings about the timeliness of the SRU process and regional response.

Table 16. Timeliness of the Safety Review Unit (SRU) review process

|  | % | Mean | Min | Max |
|---|---|---|---|---|
| SRU unit timeliness |  |  |  |  |
| Completed SRU review within 30 days of investigation approval | 31% | 37.3 | 23 | 49 |
| SRU approved by unit supervisor | 37% |  |  |  |
| Notify regions of corrective action | 19% | 38.0 | 23 | 53 |
| Region timeliness |  |  |  |  |
| Acknowledge safety issues within 5 days | 56% | 30.8 | 0 | 113 |
| Respond to safety issues within 5 days | 56% | 33.8 | 0 | 113 |
| Acknowledge practice issues within 20 days | 67% | 27 | 0 | 113 |
| Respond to practice issues within 20 days | 50% | 35.8 | 0 | 113 |

*Timeliness of SRU review.* According to the SRU protocol, the SRU review should be completed within 30 days of the completed investigation being approved.  When interviewed, both reviewers felt like they have adequate time to review cases and meet their 30 day deadline, however less than one third of the 20 cases in the SRU review (31%) were completed within this timeframe.  The average review took 37.3 days to complete.  The average time between approval of the investigation and notifying the region of corrective actions was 38.0 days.

*Supervisory approval.*  The unit supervisor is supposed to review every completed review and enter corrective actions into the HEAT system, but informant interviews found that the supervisor also has many other responsibilities and demands on his time.  Only 37% of the reviews in this sample were approved by the unit supervisor.

*Timeliness of regional response.* The HEAT system has the technical capacity to track corrective actions and responses in the field.  However, informants suggested that it is not consistently used in the regions—and is frequently ignored by staff and leadership in regions with many competing demands. Results of the review were consistent with that observation.  Once notified, the regions have 5 days to address safety issues and 20 days to address practice issues.  In this sample, 56% of identified safety issues were addressed within 5 days.  It took regions an average of 30.8 days to respond to safety issues. 50% of practice issues were addressed within 20 days.  The average length of time to respond to practice issues was 35.8 days.  There was a wide range of response times across cases, ranging from immediately addressing issues the same day to 113 days (and counting) without being addressed.

*Issues identified.* The SRU review also explored the issues most frequently identified by MIC reviewers. Findings about issues identified are summarized in Table 17.

Table 17. Issues identified by MIC reviewers and expert reviewers

| Issues identified by MIC reviewers | MIC reviewers |
|---|---|
| Timeframes not achieved | 63% |
| Interviews not completed | 58% |
| Preparation and review not completed | 47% |
| Resource Specialist did not accompany investigator | 26% |
| Child interview not private | 21% |
| No issues identified | 11% |
| Lack of follow up | 11% |

The most frequently cited issues in the 20 case SRU review sample included: missed timeframes (63%), interviews not completed (58%), and preparation or review activities not completed (47%).  Other issues identified included Resource Specialist not accompanying the investigator (26%), child not interviewed privately (21%), and lack of follow up on corrective actions (11%).  A few cases had no issues identified (11%).

While the issues listed above were the most commonly identified during the SRU review, MIC reviewers did not cite these issues in every relevant case.  Expert reviewers identified an additional four cases in which required interviews were not completed, two cases in which preparation and review activities were not completed as part of the investigation, three cases in which the Resource Specialist did not accompany the investigator to assess for policy violations, and one case in which required timeframes were not achieved.

The expert review of cases identified some serious practice issues that were not captured by the SRU review, including:

▪ Expert reviewers did not believe there was sufficient information to make a determination about substantiation in six cases in which a determination had been made by investigators.

▪ Expert reviewers believed that investigations focused on only one of multiple allegations in three cases.

▪ Expert reviewers did not believe the decisions reached by investigators in two cases were consistent with state policy.

Recommendations for SRU review process

Based on feedback from the review team and this assessment, the SRU review process could be improved in several ways, which are summarized below.

▪ Notifications are not currently tracked in the SRU instrument, but this review found that the required notifications are not made about allegations and findings (e.g., less than one quarter (23%) of placement resources were notified of the results of the investigation; see Table 10 for more information). Including notification of the placement resource about the results of the report could be a helpful addition to the SRU process that would remind regions to send any notification letters that they have not.

▪ As of February, 2014, no reports had been compiled to highlight trends across investigations for the purpose of system-wide quality improvement. Instead all efforts have been focused on "citing" investigations that have already been completed. This unit could be more effective if utilized as part of Continuous Quality Improvement—in addition to quality assurance.

▪ During the first year of implementation, investigations related to over 140 unlicensed placements were not reviewed by the SRU because of an error in or misunderstanding about the scope of the MACWIS report that reviewers relied on for identifying the investigations subject to their review. Safeguards are needed to ensure that all relevant cases are reviewed.

▪ Although management stated that six months leading up to the investigation should be reviewed, the reviewers reportedly begin their review at the time of investigation. Reviewing the case file prior to the report would allow for more careful examination of red flags and potential preventive measures.

▪ A considerable amount of work is done on paper, then typed into Word to share electronically in the HEAT system, then entered into an Excel document for aggregation across reviews. This process could be much more efficient with a data collection system that is automated, can communicate with the HEAT system, and can easily produce aggregate reports.

## Concluding Remarks

While MDHS/DFCS has several challenges achieving the MIC investigation standards required by the MSA and described in policy, there are strengths from which to build.  Throughout this assessment insights of informants were consistent with findings from case reviews, which indicates that state leadership and key partners are aware of practice issues throughout the state.  Informants also expressed commitment to improving MIC investigation practice.

The remedial strategies that have been implemented, or are planned—particularly the coaching and continued learning opportunities—are consistent with research-supported approaches to improve practice. Based on this assessment, the centralized special investigation unit provides an opportunity to carefully select quality staff and provide targeted training, coaching and consultation.  By focusing efforts in a specific unit, the quality of investigations and consistency in decision making has an opportunity to make tremendous improvements.

Meanwhile, quality assurance processes could be improved to identify and address investigative practice limitations in specific reports—and aggregate trends across reports to inform practice improvement efforts for practice improvements.  Ongoing case practice can continue making required visits with children in care, and all staff can focus on connecting the dots and ensuring that information continues to support safety, permanency and well-being for children in out-of-home care in Mississippi.

# App. B, Ex. 24

**Grace M. Lopes**

Attachments:                    MIC Invest Timeliness001.pdf

**From:** Long, Gwen [mailto:glong@bakerdonelson.com]
**Sent:** Tuesday, December 23, 2014 1:34 PM
**To:** lowrymarcia@gmail.com; Grace M. Lopes
**Cc:** srglasserlaw@gmail.com; Mia Caras (mcaras@sparb.org); Mark Smith; Rachal, Kenya; Tullos, Ashley C.; Fortenberry, Rusty; Ginger Gibson
**Subject:** Production for today

Marcia and Grace:

Attached please find the following documents in response to Year 5 Implementation Plan (which was filed a bit earlier today):

        MIC Reduction Memo          DHS 364411-364415
        MIC Investigation Timeliness  DHS 364416-364421
        TPR Tracking Improve. Letter  DHS 364422-364424

Happy and Safe Holidays.

Gwen

**Gwen N. Long**
Paralegal
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
Meadowbrook Office Park
4268 I-55 North
Jackson, MS  39211
Direct:  601.351.8962
Fax:    601.974.8962
E-Mail: glong@bakerdonelson.com
www.bakerdonelson.com

Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C. represents clients across the U.S. and abroad from offices in Alabama, Florida, Georgia, Louisiana, Mississippi, Tennessee, Texas, Washington, D.C.

Please consider the environment before printing this e-mail

**Baker Donelson**: One of FORTUNE magazine's "100 Best Companies to Work For"

Under requirements imposed by the IRS, we inform you that, if any advice concerning one or more U.S. federal tax issues is contained in this communication (including in any attachments and, if this communication is by email, then in any part of the same series of emails), such advice was not intended or written by the sender or by Baker, Donelson, Bearman, Caldwell & Berkowitz, PC to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or tax-related matter addressed herein.

This electronic mail transmission may constitute an attorney-client communication that is privileged at law. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this electronic mail transmission in error, please delete it from your system without copying it, and notify the sender by reply e-mail, so that our address record can be corrected.



**STATE OF MISSISSIPPI**
Phil Bryant, Governor
DEPARTMENT OF HUMAN SERVICES
Richard A. Berry, Executive Director

---

December 1, 2014
To: *Olivia Y.* Court Monitor and Parties
Re: Maltreatment in Care Investigation Timeliness

---

## Introduction

The Year 5 Implementation Plan (III.A.1) contains the following requirement:

> *By December 23, 2014, Defendants shall submit a letter describing their implementation of the activities contained in their MIC Timeliness Letter required under the Final Period 4 Implementation Plan section III.A.1.*

This letter serves to fulfill the stated requirement. Eight barriers to timely initiation and completion of maltreatment in care investigations were identified in MIC Timeliness Letter, and strategies were developed for addressing each barrier. (The MIC Timeliness Letter was initially submitted on February 18, 2014. Following receipt of feedback from the Monitor, a revised version was submitted on July 11, 2014. This letter tracks the strategies listed in the revised version.)

Timeliness of maltreatment in care investigations is a priority for the agency and a primary reason that the Special Investigations Unit was formed. For performance during this calendar year, upward trend lines can be observed for both timely initiation and timely completion of these investigations, as well as for the combined standard. (*See* Figures A-C, respectively.) Continued, regular work with the hotline operator and implementation of the Special Investigations Unit are expected to contribute to further improvement in these statistics in the future.

This letter was contributed to by the Regional Directors, the Special Projects Unit, Continuous Quality Improvement, DFCS Prevention/Protection Unit, the Special Investigations Unit, and DFCS leadership.

DHS
364416



PO Box 352, 750 N. State Street
Jackson, Mississippi 39205
Phone (601) 359-4500
www.mdhs.state.ms.us

Figure A



Figure B





Figure C



**Implementation of Planned Actions**

Implementation of Planned Actions for Barrier #1:

a.  Written guidance regarding notification protocol for maltreatment in care reports was provided to MCI in February, 2014. This guidance was updated in November, 2014 to reflect staffing changes and a new requirement regarding timeliness of e-mail notifications to DFCS. Numerous in-person meetings between DFCS and MCI leadership have occurred during this calendar year to address notifications and related issues. These meetings have all been attended by staff of the Prevention/Protection Unit, and also by members of the Specials Investigations Unit and/or the Special Projects Unit when available. The consensus of DFCS is that many MCI workers have improved their notification practices in recent months. (For example, the Staff Attorney on the MIC notification list calculated a 190% increase in receipt of e-mail notifications comparing January 2014 to October 2014.) Further steps to aid MCI in fulfilling this duty are planned for early 2015, and include a disciplinary procedure for workers with repeated troubling performance, and additional training by DFCS.

DHS
364418



   b.  Instances of untimely notification are reported back to MCI leadership through feedback forms submitted by the Prevention/Protection Unit. (Feedback forms are also used to report other errors in the intake process.) Systemic issues or repeated mistakes by a particular worker are discussed with MCI as needed to achieve resolution. Issues are elevated to the CEO of the MCI contractor when necessary.

Implementation of Planned Actions for Barrier #2:

   a.  Written guidance regarding handling of "resource reports" and other reports involving children in DFCS custody was provided to MCI in February, 2014.

   b.  A meeting to discuss intake/investigation modifications to MACWIS was held on February 26, 2014, and included representatives of CQI/MACWIS, MIS, Prevention/Protection, Special Investigations Unit, and Special Projects Unit.

   c.  The Functional Requirements Document for the changes determined necessary in the February 26, 2014 meeting was submitted to MIS on June 13, 2014. On September 16, 2014, representatives from CQI/MACWIS, MIS, Prevention/Protection, Special Investigations Unit, and Special Projects Unit met to resolve additional issues and questions that arose during MIS' design process for the modifications. MIS is currently preparing the modifications for testing in early 2015.

Implementation of Planned Actions for Barrier #3:

   a.  For the February through June monthly reporting periods, Region II-W timely initiated all maltreatment in care investigations. Regional Directors for Regions I-N, I-S, II-E, IV-S, V-E and Harrison County (VII-W) reported that when proper notification was received from MCI and the investigation was timely assigned, yet the assigned worker failed to initiate timely, the worker received informal counseling. No formal disciplinary action due to untimely initiation was administered in Region III-S. (Due to recent leadership changes, information is unavailable regarding any informal counseling that may have occurred.) The remaining regions/counties reported no formal disciplinary action or counseling.

   b.  The Bureau Director for Special Investigations was designated to track elements of timeliness of maltreatment investigations during February through June, and would have notified the DFCS Deputy Administrator and Field Operations Director had a report been overdue for assignment. However, there was no instance during this time period in which the Bureau Director was notified of a report and it was not then timely assigned by the Regional Director.

DHS 364419



PO Box 352, 750 N. State Street
Jackson, Mississippi 39205
Phone (601) 359-4500
www.mdhs.state.ms.us

Implementation of Planned Actions for Barrier #4:

The Bureau Director for Special Investigations addressed the Regional Directors regarding common data entry errors in maltreatment in care investigations during the March 5, 2014 Regional Directors meeting.

Implementation of Planned Actions for Barrier #5:

    a. Regional Directors were assisted by the Bureau Director for Special Investigations and the Special Projects Unit Staff Attorney to prioritize adherence to policy regarding initiation and proper documentation of initiation of individual maltreatment in care investigations between February 15, 2014 and July 5, 2014.

    b. The Bureau Director for Special Investigations engaged the Regional Directors regarding maltreatment in care investigation policy during the March 5, 2014 Regional Directors meeting.

Implementation of Planned Actions for Barrier #6:

All workers who conducted maltreatment in care investigations between February 15, 2014 and the present first received maltreatment in care investigation training. Additional maltreatment in care investigation training was provided to 49 workers in April, 2014. The training sessions were offered in Hinds County and Lee County. Henry Goodman, Tonya Rogillio and Brian Lewis presented the training. All Regional Directors had the opportunity to send workers to the training. The majority of workers attending the training had not previously been trained to conduct maltreatment in care investigations, and these workers were given priority during the registration process.

Regional Directors were informed of the 3/5 limits for investigations per worker. Historical workload reports are unavailable for the portion of Year 4 prior to the institution of the Special Investigations Unit; however, preliminary results of the MIC Timeliness Letter efforts indicate that these limits are conservative. *Olivia Y.* allows a dedicated investigator to handle 14 Level 2 or Level 3 investigations at one time. All of the Special Investigators are dedicated. As maltreatment in care investigations often require additional work, the intention of the agency is that the caseload of a Special Investigator will not approach the upper limit of the general *Olivia Y.* requirement. (The two AR3 reports available to date show that in October and November, most of the Special Investigators' workloads did not exceed 5 investigations.) As a sign of this commitment, an additional worker was recently allocated for the unit (for a total of 14 workers, exceeding the *Olivia Y.* Year 4 requirement).

Implementation of Planned Actions for Barrier #7:

DHS
364420



PO Box 352, 750 N. State Street
Jackson, Mississippi 39205
Phone (601) 359-4500
www.mdhs.state.ms.us

Between February 15, 2014 and July 5, 2014, the Bureau Director for Special Investigations and the Special Projects Unit Staff Attorney jointly tracked the progress of open maltreatment in care investigations and communicated with the appropriate Regional Directors when investigations were nearing 30 days open or overdue. When necessary, concerns were elevated to the DFCS Deputy Administrator and/or Field Operations Director for resolution. In certain circumstances, it was agreed that an investigation should remain open past the 30 days to obtain additional information/documentation, such as medical records, or for the worker to answer questions raised by the supervisor after the investigation was submitted for approval. There were also occasional MACWIS issues (which have since been resolved) preventing timely approval.

Implementation of Planned Actions for Barrier #8:

A Family Protection Specialist was identified to cover Regions III-N and III-S and was placed on special assignment under the direction of the Bureau Director for Special Investigations on or before April 1, 2014. Subsequently, the first worker hired for the Special Investigations Unit, a Family Protection Specialist - Advanced, began work on April 28, 2014, and split the maltreatment in care investigations for those two regions with the special assignment worker. We were unable to identify a worker for the special assignment in Region 6 and Harrison County. As of July 5, 2014, workers with the Special Investigations Unit handle all maltreatment in care reports in these regions and Harrison County.

DHS
364421



# App. B, Ex. 25A



**BAKER DONELSON**
BEARMAN, CALDWELL
& BERKOWITZ, PC

4268 I-55 NORTH
MEADOWBROOK OFFICE PARK
JACKSON, MISSISSIPPI 39211
PHONE:    601.351.2400
FAX:        601.351.2424

www.bakerdonelson.com

KENYA KEY RACHAL., ESQ.
Direct Dial: (601) 351-8940
Direct Fax: (601) 974-8940
E-Mail Address: krachal@bakerdonelson.com

November 13, 2013

**VIA ELECTRONIC MAIL**

Grace Lopes
*Olivia Y* Monitor
1220 19th St. NW, Suite 500
Washington, DC  20036

RE:    *Olivia Y., et al. v. Haley Barbour, et al*; In the United States District Court for the
        Southern District of Mississippi, Jackson Division; Cause No. 3:04CV251LN

Dear Grace:

In follow up to our recent conversations, attached is the revised "Protocol for Accurately
Identifying and Producing  Maltreatment Investigative Reports to the Court Monitor" (DHS
361726-361729).

Defendants have accepted all of your proposed changes and, in keeping with our conversation
today, the word "reports" has been removed from the page labeled DHS 361728.   The only other
change was a minor grammatical correction in footnote 3.

Defendants anticipated being able to send  SLS316 "Siblings Who Enter Placement At/Near the
Same Time are Placed Together (with Exceptions)" to you and Plaintiffs today but there is one
final issue that must be corrected in the report.  BCS is presently working on that issue; however
we anticipate that the correction will not be complete until after hours today.  As a result, we will
be unable to produce the report to you today but anticipate being able to provide it to you
tomorrow.

Sincerely,

*Kenya*

Kenya Key Rachal

ALABAMA • GEORGIA • LOUISIANA • MISSISSIPPI • TENNESSEE • WASHINGTON, D.C.

cc:    Miriam Ingber
       Julia Davis
       Mark Smith
Enclosure

**Protocol for Accurately Identifying and Producing  Maltreatment**

**Investigative Reports to the Court Monitor**

<u>Requirement</u>

The Modified Settlement Agreement requires that by the end of the Period Three Implementation Plan, DFCS will provide to the Court Monitor copies of all maltreatment investigations (a) involving a resource home or (b) involving an agency group home, emergency shelter, private child placing agency resource home, or other facility licensed by DFCS.  MSA II(B)(1)(e)(4)&(5).  The July 18, 2013 Period Four Implementation Plan requires that Defendants provide Plaintiffs and the Monitor with a protocol for accurately identifying and producing to the Monitor all investigative reports that are required under MSA II(B)(1)(e)(4)&(5).  In accordance with the July 18, 2013 order, Defendants' protocol follows.

<u>Protocol</u>

I.      Who is responsible?

      The DFCS Senior Attorney[1] is responsible for this requirement.

II.     How will the requirement be fulfilled?

    *a.  How will the relevant investigations be identified?*

      i.    MWZ1271D

         The monthly report identified as MWZ1271D lists all investigations involving custody children that were open during the last calendar month.[2] (For example, the report produced in February shows all such investigations that were open at some point between January 1 and January 31.) The report also indicates whether each investigation has been completed or remains open.

         Each month, when MWZ1271D is published to the P: drive, DFCS staff in the Special Projects and Initiatives Unit ("Special Projects Unit") identifies each

---

[1] The DFCS Senior Attorney is supervised by the DFCS Deputy Administrator, and supervises DFCS Staff Attorney(s), who will assist in carrying out this protocol.

[2] The purpose of MWZ1271D is to show timeliness of investigations for custody children. The BCS version of this report will, as stated, identify all investigations involving custody children that were open during the relevant timeframe. The BCS report is currently in the design/testing phase. The current MIS version of this report excludes a small population of investigations that will appear on the BCS version: investigations involving custody children where "resource report" is not checked at intake (for example, if the alleged maltreatment occurred during a trial home visit or at school). The cross-checking process described later in this protocol will identify such investigations that do not appear on the current MIS version but will appear on the BCS version. (Those investigations would be categorized as type "2" under the schema discussed *infra*.)  We will exclusively utilize the BCS version for this protocol once it is finalized and in production.

DHS
361726

investigation on the report that was completed during the prior month. All such investigations are printed from the MACWIS case record and scanned. They are saved by the first (or only) victim's name and the intake ID number. Each investigation is read to determine whether it fits into the criteria of the relevant MSA sections. For example, an investigation appearing on the report could fall into one of three categories:

1. An investigation listing a custody child as a victim AND involving a resource home, agency group home, emergency shelter, private child placing agency resource home, or other facility licensed by DFCS.

2. An investigation listing a custody child as a victim but NOT involving a resource home, agency group home, emergency shelter, private child placing agency resource home, or other facility licensed by DFCS. This could occur if the custody child was abused during a trial home visit or at school, for example.

3. An investigation listing a NON-custody child as a victim. (Such an investigation should not appear on MWZ1271D, but could appear as a result of an incorrect assessment of a child's custody status at intake. We would expect this to happen rarely, if at all.)

Investigations categorized as type "1" must be produced to the Monitor per the MSA. The MSA does not require that investigations categorized as type "2" be provided to the Monitor; however, on July 10, 2013, she requested that such investigations also be provided to her. Beginning in July, 2013, type "2" investigations will also be provided to the Monitor, separately from the type "1" investigations. Type "3" investigations, in which the victims are not *Olivia Y.* class members, will not be provided to the Monitor.

ii.    Additional Assurance

MWZ1271D is  subject to the validation process developed pursuant to the June 24, 2013 court order.  In addition, MCI (Centralized Intake) has its own Quality Assurance Department, which conducts a detailed assessment of a sample of intakes on a regular basis to ensure that calls were coded correctly (for example, was "resource report" checked if the allegations involved a child in custody and a resource home?).  Mistakes at intake (which could impact the accuracy of reports) are corrected by MIS, and the MCI workers are counseled and trained on areas needing improvement.

Specifically, the Special Projects Unit verifies the identification of the relevant investigations each month as follows:

1.  When MCI takes a report involving a custody child (an automatic Level 3 ANE), an e-mail is sent to the appropriate Regional Director for him or her to assign the investigation to a worker. (The Regional Director also automatically receives a tickler in MACWIS.) A Staff Attorney in the office of the Senior Attorney is copied on all such e-mails from MCI.

2.  The Staff Attorney logs all such intakes onto a spreadsheet and notates on the spreadsheet when each investigation is completed (determined by monitoring and reviewing the individual case record in MACWIS).

3.  When the monthly MWZ1271D report is made available, the Staff Attorney cross-checks the spreadsheet and the report to confirm that the report accurately lists the investigations (type "1" and "2") completed in the prior month.  If inaccuracies are identified, the Special Projects Unit reports these issues to the appropriate DFCS, MIS and MCI manager(s)who shall be responsible to make the necessary corrections to the implicated records.  The Special Projects Unit will maintain a tracking spreadsheet to confirm that such corrections are made and will follow up with the appropriate managers if such corrections are not made in a timely manner.

4.  In addition to the steps set forth above, following issuance of the SQL version of MWBRD06, the Staff Attorney will compare the Type 1 monthly data in MWBRD06 with the relevant monthly data in MWZ1271D to determine whether there are any discrepancies between the reports insofar as the data related to the investigations listed in each report.  In the event discrepancies are identified, the Staff Attorney will reconcile the discrepancies by reviewing the applicable MACWIS case record and by other methods as appropriate.  Additionally, if inaccuracies in the reports are identified, the Special Projects Unit staff will follow up with the appropriate DFCS, MIS and MCI managers and track corrective action to ensure the implicated records are corrected.

5.  The steps listed in point 4, above, will be undertaken for at least an initial three-month period.  If the comparison between MWBRD06 and MWZ1271D does not identify discrepant information for three consecutive months, either during the initial three-month period or any three-month period thereafter, the Special Projects Unit shall no longer be obligated to compare the reports.

b.  *How will the relevant investigations be provided to the Monitor?*

Within seven business days of MWZ1271D being published to the P: drive each month, DFCS will e-mail to the Monitor the following:

1. A copy of MWZ1271D.

2. Copies of each investigation categorized as type "1" per the foregoing schema, saved by child (victim) name. (If such an investigation is identified through the Staff Attorney's cross-checking process but does not appear on MWZ1271D, the investigation will be provided and this will be noted.)

3. A list of any investigations on MWZ1271D categorized as type "2" or "3," and a description of the reasoning for that categorization.[3]

---

[3] As stated, per the Monitor's request, any type "2" investigations (identified through MWZ1271D and/or the monthly cross-checking process) will also be provided to the Monitor. They will be provided separately from the production of the MSA-required type "1" investigations that this protocol is intended to address. (Any such investigation will be provided on the same day that the monthly batch of type "1" investigations are sent to the Monitor.)

# App. B, Ex. 25B

## Grace M. Lopes

**Attachments:**         mic protocol001.pdf

**From:** Grace M. Lopes [mailto:gmlopes@oymonitor.org]
**Sent:** Monday, November 18, 2013 12:33 PM
**To:** 'Rachal, Kenya'; 'Julia Davis'
**Cc:** 'Fortenberry, Rusty'; 'Young, Ashley Tullos'; 'Marcia Robinson Lowry'; 'mingber@ChildrensRights.Org'; 'Mia Caras'
**Subject:** Protocol for Accurately Identifying and Producing Investigative Reports Regarding Maltreatment in Care: Period 4 IP Section III.A.3.

Kenya and Julia:

I have reviewed and now approve the revised protocol for accurately identifying and producing investigative reports regarding maltreatment in care that defendants resubmitted on November 13, 2013.  As you know, my approval is required pursuant to Period 4 IP Section III.A.3.  Thank you. - grace

*Grace M. Lopes*
*Monitor, Olivia Y.*
*1220 19th Street, N.W.*
*Suite 500*
*Washington, D.C.  20036*
*202.232.8311*

*This email and any attachments may contain confidential and privileged information.  If you are not the intended recipient, please notify the sender immediately, destroy this email, and destroy any copies.  Any dissemination or use of this information by a person other than the intended recipient is unauthorized and may be illegal.*

**App. B, Ex. 26A**



**BAKER
DONELSON**
BEARMAN, CALDWELL
& BERKOWITZ, PC

4268 I-55 NORTH
MEADOWBROOK OFFICE PARK
JACKSON, MISSISSIPPI 39211
PHONE:  601.351.2400
FAX:      601.351.2424

www.bakerdonelson.com

KENYA KEY RACHAL., ESQ.
Direct Dial: (601) 351-8940
Direct Fax: (601) 974-8940
E-Mail Address: krachal@bakerdonelson.com

February 18, 2014

**Via Email and U.S. Mail**

Julia Davis
Children's Rights Inc.
330 Seventh Avenue, 4th Floor
New York, NY 10001

RE:    *Olivia Y., et al. v. Haley Barbour, et al*; In the United States District Court for the
Southern District of Mississippi, Jackson Division; Cause No. 3:04CV251LN

Dear Julia:

Following are documents Defendants are producing today:

Announcement of Licensure Prep workshops and sign-in sheets for the February 1, 2014
workshop  - produced in accordance with F-Y4IP - II.A..4.e. - (DHS 362454-362456)
(attached)

MIC Timeliness Investigation Letter -  produced in accordance with § III.A.1. of F-Y4IP.
(DHS 362457-362460) (attached in PDF and Word)

Named Plaintiff Records - Quarterly Production - DHS W-T 000282-000327 and DHS
W-M 000671-000779 (via U.S. Mail)

Sincerely,

*Kenya*

Kenya Key Rachal

Enclosure
cc:    Grace Lopes
Mark Smith

ALABAMA • GEORGIA • LOUISIANA • MISSISSIPPI • TENNESSEE • WASHINGTON, D.C.

**App. B, Ex. 26B**



**STATE OF MISSISSIPPI**
PHIL BRYANT, GOVERNOR
**DEPARTMENT OF HUMAN SERVICES**
RICHARD A. BERRY
EXECUTIVE DIRECTOR

February 10, 2014

To: *Olivia Y* Court Monitor Grace Lopes and Julia Davis of Children's Rights Inc.

Re: Maltreatment in Care Investigation Timeliness

As required by the Final Period 4 Implementation Plan (Section III.A.1.), this letter is submitted in order to address barriers to timely initiation and completion of maltreatment in care investigations. For the purpose of this letter, 'maltreatment in care' means any investigation in which a foster child is an alleged victim.

Please see the attached Maltreatment in Care Timeliness Action Plan that identifies barriers to timely initiation and includes specific strategies, action steps and timelines to immediately address deficiencies in the timely initiation and completion of maltreatment in care investigations. Once approved by the Monitor, this plan will be implemented within the timeframes contained therein.

## Timely Initiation and Completion of Maltreatment in Care Investigations (MSA Section II.B.1.e.2)

*(For the purpose of this letter required by the Year 4 IP, 'maltreatment in care' means any investigation in which a foster child is an alleged victim).*

**GOAL:** 100% of Maltreatment in Care Reports will be initiated and completed timely; 24 hours and 30 days respectively.

**ACTION PLAN:** Identify actions to be taken to immediately address the failure to timely initiate and complete investigations of maltreatment in care:

| BARRIERS IDENTIFIED | ACTIONS TO BE TAKEN | DATE BY WHICH ACTION WILL BE IMPLEMENTED | PERSON(S) RESPONSIBLE |
|---|---|---|---|
| 1.    Regional Directors have reported that they are not **consistently** receiving timely notification that a report of MIC has been taken and entered in MACWIS for their Region. | 1.    During work hours and after hours Social Work P.R.N. will send email notifications of all resource reports and reports of children in custody to the following persons; RASWS, RD, OD I for Field Operations,  BD of Permanency, Program Manager for Prevention/Protection Unit , Staff Attorney, BD of Special Investigations, and BD for Prevention/Protection. In addition, BD for Prevention/Protection, Program Manager for Prevention/Protection, and a member of the Special Investigations Unit (Staff Attorney or BD) will meet monthly with P.R.N. staff to ensure compliance and address any ongoing issues with consistent timely notifications. | March 15, 2014 | Program Manager with Prevention/Protection Unit will provide MCI with a list of required notifications and MCI will be responsible for making the correct email notifications. BD for Prevention/Protection, Program Manager for Prevention/Protection, Staff Attorney, and BD for Special Investigations. |
| 2.    The inappropriate use of the Resource Report designation (i.e. an ANE report entered when a house parent called to notify the agency that a child was in need of a medical procedure with no allegation of maltreatment and no indication that a child is being maltreated by a caregiver) is causing resource investigators to spend unnecessary time following up on reports while at the same time artificially inflating numbers of ANE reports designated as Resource Reports. | 2.    Guidance will be provided to MCI to better define what an ANE report is and what should be entered as an Information and Referral. | March 15, 2014 | BD for Prevention/Protection and Program Manager with Prevention/Protection. |

DHS
362458

| 3. | Assigned investigator is not making face to face contact with the alleged victim within the first 24 hours of the report being received. | 3. | a. If assigned investigator fails to initiate timely, appropriate disciplinary action will be taken to address the insubordination and failure to follow established policy. OD for Filed Operations will ensure that RD's are taking appropriate disciplinary action when needed.<br><br>b. If RD fails to assign timely, appropriate disciplinary action will be taken to address the insubordination and failure to follow established policy. Deputy Administrator for DFCS will ensure that OD for Filed Operations is taking appropriate action when needed. | March 15, 2014 | Regional Directors, OD for Field Operations and Deputy Administrator. |
| 4. | Data Entry error recording correct initiation date and time, and data entry error failing to enter the alleged perpetrator and/or victim into the "participants box" which causes the data to not be captured for reporting. | 4. | Regional Directors responsible for approving MIC investigations will be reminded to carefully review submitted investigations for timeliness and accuracy and to contact investigators if there are questions or corrections that need to be made. | March 15, 2014 | OD for Field Operations and BD for Special Investigations |
| 5. | COR/COS or other worker receives initial disclosure of ANE from the child and then makes a report to centralized intake. The report is later assigned to the MIC trained investigator to complete the investigation but the first worker fails to enter narratives from the initial disclosure. | 5. | a. Regional Director must ensure that communication occurs between workers and ensure that MIC report is assigned timely to a worker who has been trained to do MIC investigations and that all narratives from initial disclosure are entered.<br><br>b. Policy will be reviewed with Regional Directors regarding MIC investigations to ensure that policy is being adhered to. | March 15, 2014 | Regional Directors<br><br>OD for Field Operations, Deputy Administrator, BD for Special Investigations |
| 6. | Investigative workers in some regions are assigned too many MIC investigations and are having difficulty keeping up due to volume of investigations. | 6. | Regional Directors will assign each dedicated investigator no more than five special investigations to be open at any one time and a worker with a mixed caseload will be assigned no more than three special investigations to be open at any one time. **All workers assigned investigations of maltreatment in care are required to have successfully completed Maltreatment Training. If any region has a shortage of trained investigators, additional training will be provided.** | April 1, 2014 | Regional Directors |

| | | | |
|---|---|---|---|
| 7. MIC reports are submitted by the investigators for approval and are not approved or pended back timely by Regional Directors. | 7. Bureau Director for SIU, Staff Attorney, or designee will maintain a tracking system, utilizing MACWIS data reports to ensure that progress is being documented on active MIC investigations and notify the appropriate parties: e.g. RD and Director of Field Operations if there is a lack of progress on MIC investigations that could delay the timely completion, submission, and approval of the MIC investigations. If Regional Directors fail to take timely action on submitted investigations, appropriate disciplinary action will be initiated | April 1, 2014 | Bureau Director for SIU, Staff Attorney, Deputy Administrator, and OD for Field Operations |
| 8. Regions III N, III S, VI, and Harrison County consistently have deficits in initiating and completing MIC investigations timely and require additional support. | 8. Two FPS Advanced will be put on 90 day Special Assignment to complete MIC investigations. One will cover Regions III N and III S, and one will cover Region VI and Harrison County. These two FPSA will be put on MACWIS workload of Bureau Director for SIU and report directly to Bureau Director for SIU or designee for 90 days. | April 1, 2014 | Deputy Administrator, Staff Attorney, and Bureau Director for SIU, along with input from RDs will identify and recruit two FPSA for special assignment. |

DHS
362460

**App. B, Ex. 26C**

**Grace M. Lopes**

---

**Attachments:**    JACKSON-#1279440-v3-MIC_Investigation_Timeliness_Letter_and_Plan.doc; MIC
Invest001.pdf

---

**From:** Grace M. Lopes [mailto:gmlopes@oymonitor.org]
**Sent:** Monday, February 24, 2014 2:33 PM
**To:** 'Rachal, Kenya'
**Cc:** 'Julia Davis'
**Subject:** Final Period 4 IP, III.A.1. -- Barriers to Timely Initiation and Completion

Kenya:

I have reviewed defendants' February 18, 2014 submissions required by §III.A.1, attached.  I write to advise
you that, subject to the following revisions, I will approve the action steps/timelines.

Barrier One:
- The identified barrier should include the failure to provide timely notification to the Bureau Director for
  Special Investigations.
- As an additional action step, DFCS should monitor to ensure timely e-mail notifications are transmitted
  by MCI.  A responsible entity should be designated for this purpose and should follow up with MCI with
  respect to any identified deficits in performance.  Appropriate deadlines should be established.
- Defendants should consider modifying the MCI contract to include incentives/penalties related to the
  required performance.

Barrier Two:
- Defendants should consider modifying the MCI contract to include incentives/penalties related to the
  required performance.
- As an additional action step, MACWIS must be adapted to permit over-rides/screen-outs by the RD and
  the Bureau Director for Special Investigations if a report related to a child in custody is screened in by
  MCI, but does not concern maltreatment in care.  Appropriate deadlines should be established.
- As an additional action step, MACWIS should be adapted to consolidate duplicate reports and reports
  regarding the identical matter under one case number.  Appropriate deadlines should be established.

Barrier Three:
- It appears clarification of the barrier would be helpful.  The phenomenon listed is not a barrier – it is a
  consequence.  It is my understanding that the barrier is insubordination and that the consequence is
  limited to circumstances in which caseloads are at or below required levels.

Barrier Four:
- As an additional action step, it appears that appropriate controls should be implemented in MACWIS to
  address these errors.  Appropriate deadlines should be established.

Barrier Five:
- It is my understanding that in some circumstances the worker assigned to the investigation does not
  timely initiate because there is confusion about whether the worker who took the report initiated the
  investigation when s/he took the report.  It would be helpful to clarify this point in the description of the
  barrier and to include an action step and corresponding deadline related to training of the investigators
  regarding the obligation to timely initiate the investigation in circumstances in which the report is made
  by the assigned COS or COR worker.

Barrier Six:

- The implicated regions should be listed in the description of the barrier. It is my understanding that this is an interim action step that will only be in place until the centralized investigation unit is fully trained and adequately staffed. It appears that the April 1 timeline could be advanced.

Barrier Eight:
- The 90-day details should be renewed as needed pending the establishment of a fully trained and adequately staffed centralized investigation unit.

If you have any questions, or would like to discuss this matter, please let me know. Thank you. - Grace

*Grace M. Lopes*
*Monitor, Olivia Y.*
*1220 19th Street, N.W.*
*Suite 500*
*Washington, D.C. 20036*
*202.232.8311*

*This email and any attachments may contain confidential and privileged information. If you are not the intended recipient, please notify the sender immediately, destroy this email, and destroy any copies. Any dissemination or use of this information by a person other than the intended recipient is unauthorized and may be illegal.*

sender by reply e-mail, so that our address record can be corrected.

# App. B, Ex. 26D

**Grace M. Lopes**

**Attachments:**                 mic timeliness 001.pdf

---

**From:** Long, Gwen [mailto:glong@bakerdonelson.com]
**Sent:** Friday, July 11, 2014 4:46 PM
**To:** jdavis@ChildrensRights.Org; Grace M. Lopes
**Cc:** kwood@childrensrights.org; Mia Caras (mcaras@sparb.org); Mark.Smith@mdhs.ms.gov; Rachal, Kenya
**Subject:** Production for Today

Julia and Grace:

Attached is Defendants' production for today:

        MIC Timeliness Investigation Letter -  produced in accordance with § III.A.1. of F-Y4IP - (DHS 363333-363336)


Gwen


**Gwen N. Long**
Paralegal
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
Meadowbrook Office Park
4268 I-55 North
Jackson, MS  39211
Direct:  601.351.8962
Fax:    601.974.8962
E-Mail: glong@bakerdonelson.com
www.bakerdonelson.com


Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C. represents clients across the U.S. and abroad from offices in Alabama, Florida, Georgia, Louisiana, Mississippi, Tennessee, Texas, Washington, D.C.

🌲 Please consider the environment before printing this e-mail
**Baker Donelson**: One of FORTUNE magazine's "100 Best Companies to Work For"

---

Under requirements imposed by the IRS, we inform you that, if any advice concerning one or more U.S. federal tax issues is contained in this communication (including in any attachments and, if this communication is by email, then in any part of the same series of emails), such advice was not intended or written by the sender or by Baker, Donelson, Bearman, Caldwell & Berkowitz, PC to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or tax-related matter addressed herein.

This electronic mail transmission may constitute an attorney-client communication that is privileged at law. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this electronic mail transmission in error, please delete it from your system without copying it, and notify the sender by reply e-mail, so that our address record can be corrected.

**Timely Initiation and Completion of Maltreatment in Care Investigations (MSA Section II.B.1.e.2)** (For the purpose of this letter required by the Year 4 IP, 'maltreatment in care' means any investigation in which a foster child is an alleged victim).

**GOAL:** 100% of Maltreatment in Care Reports will be initiated and completed timely; 24 hours and 30 days respectively.

**ACTION PLAN:** Identify actions to be taken to immediately address the failure to timely initiate and complete investigations of maltreatment in care:

| BARRIERS IDENTIFIED | ACTIONS TO BE TAKEN | DATE BY WHICH ACTION WILL BE IMPLEMENTED | PERSON(S) RESPONSIBLE |
|---|---|---|---|
| 1. Regional Directors and Bureau Director for Special Investigations have reported that they are not **consistently** receiving timely notification that a report of MIC has been taken and entered in MACWIS for their Region. | 1. a. During work hours and after hours Social Work prn will send email notifications of all resource reports and reports of children in custody to the following persons; RASWS, RD, OD I for Field Operations, BD of Permanency, Program Manager for Prevention/Protection Unit , Staff Attorney, BD of Special Investigations, and BD for Prevention/Protection. In addition, BD for Prevention/Protection, Program Manager for Prevention/Protection, and a member of the Special Investigations Unit (Staff Attorney or BD) will meet monthly with Social Work prn staff to ensure compliance and address any ongoing issues with consistent timely notifications.<br><br>b. DFCS will monitor to ensure timely notifications are transmitted by MCI. Bureau Director for Prevention/ Protection will be responsible for Monitoring, tracking, and notifying MCI of errors in notifications. | March 15, 2014 | Program Manager with Prevention/Protection Unit will provide MCI with a list of required notifications and MCI will be responsible for making the correct email notifications. BD for Prevention/Protection, Program Manager for Prevention/Protection, Staff Attorney, and BD for Special Investigations.<br><br><br>Bureau Director for Prevention/Protection or designee. |
| 2. The inappropriate use of the Resource Report designation (i.e. an ANE report entered when a house parent called to notify the agency that a child was in need of a medical procedure with no allegation of maltreatment and no indication that a child is being maltreated by a caregiver) is causing resource investigators to spend | 2. a. Guidance will be provided to MCI to better define what an ANE report is and what should be entered as an Information and Referral.<br><br>b. A meeting will be held with appropriate representatives from DFCS (including representatives from the Prevention/Protection Unit, Special | March 15, 2014<br><br><br><br><br>May 1, 2014 | BD for Prevention/Protection and Program Manager with Prevention/Protection.<br><br><br>DFCS and MIS staff |

DHS
363333

| | | | |
|---|---|---|---|
| unnecessary time following up on reports while at the same time artificially inflating numbers of ANE reports designated as Resource Reports. | Investigations Unit, and MACWIS Unit ) and MIS to discuss the necessity and feasibility of modifications to intake/investigation in MACWIS including but not limited to:<br><br>• Ability to over-ride/screen-out by the RD and the Bureau Director for Special Investigations if a report related to a child in custody is screened in by MCI, but does not concern maltreatment in care.<br>• Consolidation of duplicate reports. | | |
| | c. Following the meeting described in "b," a Functional Requirements Document for submission to MIS will be drafted by MACWIS staff and circulated for comments. The final FRD will be submitted to MIS by June 15, 2014. | June 15, 2014 | MACWIS staff |
| 3. Insubordination | 3.  a. If assigned investigator fails to initiate timely, appropriate disciplinary action will be taken to address the insubordination and failure to follow established policy. OD for Filed Operations will ensure that RD's are taking appropriate disciplinary action when needed.<br><br>b. If RD fails to assign timely, appropriate disciplinary action will be taken to address the insubordination and failure to follow established policy. Deputy Administrator for DFCS will ensure that OD for Filed Operations is taking appropriate action when needed. | March 15, 2014 | Regional Directors, OD for Field Operations and Deputy Administrator. |
| 4. Data Entry error recording correct initiation date and time, and data entry error failing to enter the alleged perpetrator and/or victim into the "participants box" which causes the data to not be captured for reporting. | 4.  Regional Directors responsible for approving MIC investigations will be reminded to carefully review submitted investigations for timeliness and accuracy and to contact investigators if there are questions or corrections that need to be made. | March 15, 2014 | OD for Field Operations and BD for Special Investigations |

| | | | |
|---|---|---|---|
| 5. | COR/COS or other worker makes ANE report to MCI and receives initial disclosure of ANE from the child, and then the report is later reassigned to the MIC trained investigator who will complete it, and the first worker fails to enter narratives from the initial disclosure, or there is confusion as to whether the report is actually initiated if done by the original worker who receives disclosure and makes report. | 5. a. Regional Director must ensure that communication occurs between workers and ensure that MIC report is reassigned timely to a worker who has been trained to do MIC investigations and that all narratives from initial disclosure are entered.<br><br>b. Policy will be reviewed/clarified with Regional Directors regarding MIC investigations to ensure that policy is being adhered to. | March 15, 2014 | Regional Directors<br><br><br><br>OD for Field Operations, Deputy Administrator, BD for Special Investigations |
| 6. | Investigative workers in Hinds and Harrison counties are assigned too many investigations into MIC and are having difficulty keeping up due to volume of investigations. | 6. Regional Directors will assign no dedicated investigator any more than five special investigations to be open at any one time and a worker with a mixed caseload will be assigned no more than three special investigations to be open at any one time. **All workers assigned investigations of maltreatment in care are required to have successfully completed Maltreatment Training. If any region has a shortage of trained investigators, additional training will be provided.** | April 1, 2014 | Regional Directors |
| 7. | MIC reports are submitted by the investigators for approval and are not approved or pended back timely by Regional Directors. | 7. Bureau Director for SIU, Staff Attorney, or designee will maintain a tracking system, utilizing MACWIS data reports to ensure that progress is being documented on active MIC investigations and notify the appropriate parties: e.g. RD and Director of Field Operations if there is a lack of progress on MIC investigations that could delay the timely completion, submission, and approval of the MIC investigations. If Regional Directors fail to take timely action on submitted investigations, appropriate disciplinary action will be initiated | March 15, 2014 | Bureau Director for SIU, Staff Attorney, Deputy Administrator, and OD for Field Operations |
| 8. | Regions III N, III S, VI, and Harrison County consistently have deficits in initiating and completing MIC investigations timely and require | 8. Two FPS will be put on 90 day Special Assignment to complete MIC investigations. One will cover Regions III N and III S, and one will cover Region VI | April 1, 2014 | Deputy Administrator, Staff Attorney, and Bureau Director for SIU, along with input from RDs will identify and recruit two FPS for special assignment. |

DHS
363335

| | | | |
|---|---|---|---|
| additional support. | and Harrison County. These two FPS will be put on MACWIS workload of Bureau Director for SIU and report directly to Bureau Director for SIU or designee for 90 days. If number of MIC investigations exceeds standards indicated in number 6, additional MIC trained investigators will be assigned to cover excess investigations. | | |

**App. B, Ex. 27A**

**Grace M. Lopes**

**Attachments:**                 mic red ltr001.pdf

---

**From:** Long, Gwen [mailto:glong@bakerdonelson.com]
**Sent:** Wednesday, July 09, 2014 4:57 PM
**To:** jdavis@ChildrensRights.Org; Grace M. Lopes
**Cc:** kwood@childrensrights.org; Mia Caras (mcaras@sparb.org); Mark.Smith@mdhs.ms.gov; Rachal, Kenya
**Subject:** Production for 7/9/14

Julia and Grace:

Attached is the cover letter for today's production of MACWIS documents (DHS 363332).  As usual, this CD is coming via US Mail.

Also attached is the MIC Reduction Letter (DHS 363327-363331)

Gwen

**Gwen N. Long**
Paralegal
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
Meadowbrook Office Park
4268 I-55 North
Jackson, MS  39211
Direct:  601.351.8962
Fax:    601.974.8962
E-Mail:  glong@bakerdonelson.com
www.bakerdonelson.com

Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C. represents clients across the U.S. and abroad from offices in Alabama, Florida, Georgia, Louisiana, Mississippi, Tennessee, Texas, Washington, D.C.

Please consider the environment before printing this e-mail
**Baker Donelson**: One of FORTUNE magazine's "100 Best Companies to Work For"

---

Under requirements imposed by the IRS, we inform you that, if any advice concerning one or more U.S. federal tax issues is contained in this communication (including in any attachments and, if this communication is by email, then in any part of the same series of emails), such advice was not intended or written by the sender or by Baker, Donelson, Bearman, Caldwell & Berkowitz, PC to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or tax-related matter addressed herein.

This electronic mail transmission may constitute an attorney-client communication that is privileged at law. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this electronic mail transmission in error, please delete it from your system without copying it, and notify the sender by reply e-mail, so that our address record can be corrected.

**App. B, Ex. 27B**



**STATE OF MISSISSIPPI**
PHIL BRYANT, GOVERNOR
**DEPARTMENT OF HUMAN SERVICES**
RICHARD A. BERRY
EXECUTIVE DIRECTOR

July 2, 2014

To:  *Olivia Y.* Court Monitor Grace Lopes and Julia Davis of Children's Rights Inc.

Re:  Reduction of Maltreatment in Care

The *Olivia Y.* Modified Settlement Agreement, Year 4 Plan, stipulates that

> *within 30 calendar days of receiving the Monitor's written findings from the maltreatment in care investigations assessment, Defendants shall provide to Plaintiffs and the Monitor a letter identifying strategies for reducing the rate of maltreatment in care (the 'MIC Reduction Letter'), having considered the information provided in the expert assessment in determining the strategies. Defendants shall begin implementing the strategies within 30 calendar days of completion of the MIC Reduction Letter*
> Y4IP §.II.A.2.

The aforementioned assessment was received at MDHS/DFCS on June 3, 2014. The recommended Remedial Strategies, beginning on page 35, section 4, of the MIC Assessment were considered in determining the included strategies.

The prevention of child maltreatment, whether in birth families, resource families, or other settings outside of the home, is a priority for MDHS/DFCS. In efforts to prevent child maltreatment in care[1] (MIC) specifically, we are implementing an Agency-wide preventive approach including but not limited to the careful selection, preparation, and training of resource parents; utilizing performance-based contracting to improve the care provided to children in therapeutic foster homes, group homes and emergency shelters; and, implementing a plan to improve the quality and timeliness of investigations of maltreatment in care with the establishment of a centralized maltreatment in care investigation unit designed to respond consistently to reports of MIC. In addition, the Agency has agreed to seek and facilitate access to

---

[1] For the purpose of this letter, "maltreatment in care" refers to the maltreatment of any child in DFCS custody, whether the maltreatment is caused by a resource parent or other perpetrator.

community resources to help prevent child maltreatment and placement disruption in resource homes.

**Foster Parent Selection, Preparation, and Training**

A team consisting of staff from the State Office Permanency Unit, resource and adoption staff from the regions, and contracted placement providers was called upon to make a recommendation for new resource parent training curriculum. The team reviewed a number of different curricula and recommended that MDHS/DFCS adopt the PS-MAPP training curriculum. PS-MAPP stands for Permanence & Safety-Model Approach to Partnerships in Parenting.

PS-MAPP provides a structural format by which prospective foster and adoptive families make decisions about their ability, willingness and readiness to participate in the foster care and adoptive program. An important decision for families is to determine their desire and ability to work as partners in permanency planning. Making an informed decision requires that families assess their current skills as parents and their ability to develop the skills necessary for success in fostering or adopting.

The ten sessions are one of several preparation and mutual selection components[2] that comprise the training. Each component is designed to enable participants to develop ability and skills to be effective and satisfied foster parents or adoptive parents, as well as to assess their willingness and readiness to assume the roles.

The PS-MAPP Program is designed to help prospective adoptive and foster families develop five abilities that are essential for resource parents to promote children's safety, permanence and well-being:

- Foster and foster/adoptive parents will be able to meet the developmental and well-being needs of children and youth coming into foster care, or being adopted through foster care.
- Foster and foster/adoptive parents will be able to meet the safety needs of children and youth coming into foster care, or being adopted through foster care.
- Foster parents will be able to share parenting with a child's family.
- Foster parents will be able to support concurrent planning for permanency.
- Foster and foster/adoptive parents will be able to meet their family's needs in ways that assure a child's safety and well-being.

These goals are supported through a mutual selection process which emphasizes open communication and trust between prospective foster families, adoptive families and child welfare workers, using common criteria for assessment and a problem-solving approach to areas of concern.

As the needs of children in foster care and adoptive placement continually grow more challenging, persons wishing to become adoptive or foster parents need a complete

---

[2] "Mutual selection" refers to the process by which families decide whether they want to pursue licensure and the agency determines whether the family is appropriate for licensure at the same time.

DHS
363328

understanding of their roles along with the rights and obligations that accompany the delivery of foster care services. For foster parents, this partnership requires fulfilling tasks as diverse as helping a child go home or becoming that child's adoptive parent. The PS-MAPP approach emphasizes shared decision-making and problem-solving, which are integral to building mutual trust and teamwork. Administering appropriate, non-physical discipline and helping children learn to control their behaviors are part of this approach.

In addition to the new curriculum, MDHS/DFCS is exploring the possibility of contracting the training for new resource parents. This will provide for consistency in training, while freeing up current licensure staff to provide more support to existing resource families. It is the expectation that the increased time and attention provided to resource families, in combination with better and more consistent training for new families, will contribute to an overall reduction in MIC. Existing resource parents will also have opportunities for ongoing training that will focus on the reduction of MIC. This training will be offered across the state and the MIC Assessment will be utilized in identifying and/or developing on-going training curriculum. Developing and providing the ongoing training consistently across the state and making it accessible to all resource parents should also contribute to a reduction in MIC.

Along with the above strategies, a request for proposals (RFP) is under development for proposals from providers to conduct the S.A.F.E. Home studies for prospective resource homes. The chosen contractor(s) will present the home studies to the Agency which will then make the final licensing decisions and issue resource parent licenses. The goal is to increase the numbers of available homes in order to provide for better matching of children to families, increase the number of children placed within close proximity to their families of origin, and enable more parent and sibling visits. Contracting out the home study process will allow existing staff to focus more time and energy on licensing relative foster homes and to providing more and better supervision and oversight to all resource homes.

**Performance Based Contracting**

MDHS/DFCS is developing a performance-based contracting system that will apply to the following places where MIC is a concern: group homes, emergency shelters and privately-licensed foster homes. Five subcommittees have been formed to plan the conversion to performance-based contracts: data, monitoring/reporting, administrative, clinical, and fiscal. The subcommittees are made up of MDHS staff and representatives of private agencies. Each subcommittee will be co-chaired by an MDHS employee and a private agency representative. Co-chairs from each subcommittee will join the executive steering committee (which also includes MDHS/DFCS upper management) and present the subcommittees' recommendations. It is anticipated that the new contracts will start to roll out in 2016. The subcommittees will recommend the indicators to be tied to the incentives and/or penalties. MDHS/DFCS members of the subcommittees and the executive steering committee will propose and consider indicators related to MIC, such as the absence of MIC and placement stability.

**Special Investigations Unit**

MDHS/DFCS is in the process of implementing a new, centralized special investigation unit that will be responsible for investigating all of the MIC reports statewide. This unit is known as the Special Investigations Unit (SIU) and the goal of the SIU is to improve both quality and consistency of MIC investigations. The SIU will be fully staffed by June 30, 2014, with special investigators who are classified as Family Protection Specialist Advanced; meaning that each special investigator is licensed to practice social work in Mississippi and has at least four years of experience in social work. Every special investigator will have the ability to assess the complex situations that are presented in MIC investigations and make good decisions and recommendations that will prevent repeat MIC.

In addition to having qualified staff, having a centralized unit will provide for consistent consultation and decision making across the state. (*Remedial Strategies, pages 37 and 38, section 4.2*). During each MIC investigation, the SIU investigator will work with the regional resource unit as required by policy and the MSA and will share all relevant information with the resource staff that may impact the home's licensure status.  All of the investigations completed by the SIU have and will continue to conclude with sending a notification of findings letter.

The SIU currently consists of the Director and thirteen special investigator positions. However, MDHS/DFCS Administration has allocated two additional DD II Pins; one for the northern half of the state and one for the southern half, who will directly supervise the special investigators thereby providing an additional layer of supportive supervision and coaching to the thirteen special investigators. Advertisement of these positions has been requested with the following special qualifications: MSW, social work license, and five years of supervisory experience.

Once all of the positions in the SIU are filled, the team will participate in specialized trainings regarding investigations, and the intent is that these trainings are of a multidisciplinary nature. These trainings will be in addition to the one-day MIC Investigation training that the workers must all complete prior to assuming any investigatory responsibilities.[3] From January through June of 2014, the emphasis has been on recruiting and hiring the investigators; now, efforts will be shifted to identifying the most effective training options. The Children's Justice Act board has committed an unspecified amount of funds for training for the unit. (*Remedial Strategies, page 38, section 4.3*).

As a result of the development and staffing of the SIU, policy revisions will be required. Policy review and assessment is currently ongoing and any revisions will take into account the assessments and recommendations from page 36, section 4.1 of the MIC Assessment.

**Community Resources**

MDHS/DFCS recognizes that the engagement of the community in child welfare issues leads to better outcomes for the children in care. MDHS/DFCS has recently (beginning March 2014) provided additional training and support to the leaders of the Regional Implementation Teams,

---

[3] Three of the new special investigators were hired from outside of the agency and will have to complete pre-service training prior to assuming any investigative duties or participating in any other specialized training.

focusing on developing needed community resources and building relationships with existing resources.

The Mississippi Department of Mental Health has established a network of Mobile Crisis Response Teams to provide community-based crisis services that deliver solution-focused and recovery-oriented behavioral health assessments and stabilization of crisis in the location where the individual is experiencing the crisis; including resource homes. Mobile Crisis Response Teams work hand-in-hand with MDHS/DFCS, local law enforcement, Chancery Judges and Clerks, and the Crisis Stabilization Units to ensure a seamless process. Mobile Crisis Response Teams ensure an individual has a follow-up appointment with their preferred provider and monitors the individual until the appointment takes place. Mobile Crisis Response Teams target individuals experiencing a situation where the individual's behavioral health needs exceed the individual's resources to effectively handle the circumstances. Information regarding this program has been distributed to each MDHS/DFCS Region to provide to resource families to utilize in times of crisis; thereby reducing our numbers of MIC.

The Department of Mental Health MAP teams (Multidisciplinary Assessment and Planning teams) are also being utilized to provide services to foster children, which may increase placement stability and decrease maltreatment in care due to foster children's medical/behavioral challenges.

**Continuous Quality Improvement**

A supervisor has now been hired for the CQI-Safety Review Unit (SRU). The Unit is appropriately staffed for the volume of investigations it reviews. Safety and practice concerns identified by SRU may prevent repeat maltreatment and continually remind the field of policy and best practices.

CQI-Evaluation & Monitoring (EMU) plans to conduct a case review of a sample of recent MIC investigations to determine whether face-to-face contacts were made with both foster children *and* their resource parents in the months leading up to the MIC allegations, and whether those visits were of quality when they occurred. The results of this review will be presented to the State Implementation Team for further action.

Sincerely,

/s/  Kim Shackelford

Kim Shackelford
Deputy Administrator, DFCS

# App. B, Ex. 27C

**Grace M. Lopes**

Attachments:                    MIC Reduction memo001.pdf

**From:** Long, Gwen [mailto:glong@bakerdonelson.com]
**Sent:** Tuesday, December 23, 2014 1:34 PM
**To:** lowrymarcia@gmail.com; Grace M. Lopes
**Cc:** srglasserlaw@gmail.com; Mia Caras (mcaras@sparb.org); Mark Smith; Rachal, Kenya; Tullos, Ashley C.; Fortenberry, Rusty; Ginger Gibson
**Subject:** Production for today

Marcia and Grace:

Attached please find the following documents in response to Year 5 Implementation Plan (which was filed a bit earlier today):

>     MIC Reduction Memo          DHS 364411-364415
>     MIC Investigation Timeliness   DHS 364416-364421
>     TPR Tracking Improve. Letter   DHS 364422-364424

Happy and Safe Holidays.

Gwen

**Gwen N. Long**
Paralegal
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
Meadowbrook Office Park
4268 I-55 North
Jackson, MS  39211
Direct:   601.351.8962
Fax:      601.974.8962
E-Mail:  glong@bakerdonelson.com
www.bakerdonelson.com

Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C. represents clients across the U.S. and abroad from offices in Alabama, Florida, Georgia, Louisiana, Mississippi, Tennessee, Texas, Washington, D.C.

Please consider the environment before printing this e-mail
**Baker Donelson**: One of FORTUNE magazine's "100 Best Companies to Work For"

Under requirements imposed by the IRS, we inform you that, if any advice concerning one or more U.S. federal tax issues is contained in this communication (including in any attachments and, if this communication is by email, then in any part of the same series of emails), such advice was not intended or written by the sender or by Baker, Donelson, Bearman, Caldwell & Berkowitz, PC to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or tax-related matter addressed herein.

This electronic mail transmission may constitute an attorney-client communication that is privileged at law. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this electronic mail transmission in error, please delete it from your system without copying it, and notify the sender by reply e-mail, so that our address record can be corrected.



**STATE OF MISSISSIPPI**
Phil Bryant, Governor
DEPARTMENT OF HUMAN SERVICES
Richard A. Berry, Executive Director

December 15, 2014

To: _Olivia Y._ Court Monitor and Parties

Re: Maltreatment in Care Reduction

## Introduction

The Year 5 Implementation Plan (III.A.2) contains the following requirement:

> _**By December 23, 2014, Defendants shall submit a letter describing their implementation of the activities contained in their MIC Reduction Letter required under the Final Period 4 Implementation Plan Section III.A.2.**_

This letter serves to fulfill the stated requirement. Implementation of the action steps delineated in the MIC Reduction Letter is ongoing; this update references progress made between July and early December (2014).

Reduction of maltreatment in care continues to be of highest priority to MDHS/DFCS. An analysis of the last twelve months of available data (from the SBRD06 report) shows an overall downward trend in the percentage of children in custody in the course of a twelve-month period with a substantiated allegation of maltreatment in care. See Figure A (0-2% scale). It was anticipated that a temporary uptick in substantiated investigations might occur following establishment of the Special Investigations Unit (SIU), and the data for the last eight months (each covering a rolling year ending that month) is consistent with this prediction: the rate was lower for the March through June reports than it was for the July through October reports.

Though it is not an _Olivia Y._ standard, the SBRD06 report also indicates the number of children in a twelve-month period with more than one substantiated investigation. There has been a downward trend in this number over the last twelve reporting periods, while the number of children in custody has steadily risen over the same time period. _See_ Figure B.



PO Box 352, 750 N. State Street
Jackson, Mississippi 39205
Phone (601) 359-4500
www.mdhs.state.ms.us

DHS
364411

Figure A



Figure B





<u>**Progress and Next Steps**</u>

*Foster Parent Selection, Preparation and Training*

MDHS/DFCS continues the planning process for transitioning to the PS-MAPP curriculum. In the meantime, steps have been taken to improve the delivery and effectiveness of the PATH training. The Families First Resource Centers of North Mississippi ("Families First") and Mississippi Community Education Center (MCEC) are preparing to provide training to MDHS/DFCS resource parents. A preliminary train-the-trainer session for both organizations was held in October. In November and December, learning labs were conducted for MCEC staff in preparation for their first training classes to be conducted in January 2015 in Region VII-W. (MCEC will subsequently add classes in the Jackson Metro Area, followed by Forrest County and the surrounding area. These are the highest needs areas, and were prioritized for this service while MCEC is building its infrastructure to provide additional training.) A meeting with Families First to plan for the transition is scheduled for January, 2015. Families First will begin conducting resource parent training in Desoto County, followed by Lee County (based on need).

A Request for Proposals to outsource home studies was released in summer, 2014. Two agencies answered the RFP; unfortunately each withdrew during the contracting process due to internal issues (budgeting, lack of staff). MDHS/DFCS is preparing to release an Invitation for Bids and will target agencies which cover the areas of the state in which we have the largest number of resource inquiries (particularly the coast).

*Performance Based Contracting*

The timeline for accomplishing performance based contracting has been set by the Year 5 plan. The subcommittees have continued to meet regularly. In addition, on December 2, 2014, an all-day meeting was held with CSF, Chapin Hall, all of the subcommittee co-chairs, and other necessary MDHS/DFCS staff to plan next steps for the emergency shelter contracts and to familiarize providers and MDHS/DFCS with what to expect from the Chapin Hall work. CSF, Chapin Hall and MDHS/DFCS will begin work with the group home providers, therapeutic group home providers, and therapeutic resource home providers (licensing agencies) on January 7, 2015.

*Special Investigations Unit*

The Special Investigations Unit now has fourteen dedicated investigators. Caseloads are manageable and under *Olivia Y.* requirements. Recommendations have been made to the State Personnel Board for the two Division Director II (supervisor) positions. One of the persons who have been recommended joined the unit in an acting role as of December 1, 2014. The other supervisor will join the unit in January. Based on the historic distribution



PO Box 352, 750 N. State Street
Jackson, Mississippi 39205
Phone (601) 359-4500
www.mdhs.state.ms.us

DHS
364413

of maltreatment in care reports across the state, it was decided that the supervisors should split the state east and west rather than north and south.

Most of the investigators received forensic interview training prior to joining the unit. One other investigator has since received that training through the Children's Advocacy Center. All of the investigators (except those who could not leave their part of the state to travel to the training due to being in the process of initiating investigations within the required 24 hour period) attended the Trauma-Informed Care Conference in September. The Bureau Director is currently working with the Children's Justice Act liaison to evaluate a potential multi-day training that the CJA would fund for the unit to attend ("Crimes Against Children: Investigation to Subject Interrogation" through Wicklander-Zulawski).

The SIU Bureau Director and DFCS Policy Director are drafting policy regarding the unit for presentation to the Policy Sub-team in early 2015.

Investigation quality and timeliness have improved since the implementation of the new unit. Quality of maltreatment in care investigations will be discussed in the CQI section of this letter. (Timeliness statistics were shared in the Maltreatment in Care Timeliness Letter update.)

### Community Resources

The Department of Mental Health's Mobile Crisis Response Teams and MAP teams continue to be available to serve the needs of children in care. MAP Teams are frequently utilized to meet a variety of needs and are a pre-requisite to State Level Case Review. DMH has agreed to aggregate and share available data regarding use of the Mobile Crisis Response Teams for children in care (this information has not been received as of the date of this letter).

### Continuous Quality Improvement

The Safety Review Unit has remained fully staffed and is appropriately staffed for the volume of the work. SRU enters HEAT tickets for the field when safety or practice concerns are identified in their review of maltreatment in care investigations. With the SIU Bureau Director and Special Projects Staff Attorney carefully monitoring these investigations between February and June of this year, and SIU taking over these investigations in July, there has been a steep decline in errors found by SRU. *See* Figure C.

DHS
364414



PO Box 352, 750 N. State Street
Jackson, Mississippi 39205
Phone (601) 359-4500
www.mdhs.state.ms.us

Figure C



Source: Safety Review Unit Manual Reports

The Evaluation and Monitoring Unit assigned three liaisons to the case review detailed in the MIC Reduction Letter. The liaisons will complete their individual work in December, 2014. Their results will be aggregated and presented to the MDHS/DFCS leadership by February 28, 2015.

*Other Initiatives*

In October, 2014, all resource and adoption workers and ASWSs, Regional Directors, State Office Bureau Directors, DFCS executive leadership, and SIU investigators convened for two days to brainstorm on how to recruit and maintain quality resource parents. Prevention of maltreatment in care was a central theme. Each region identified its needs, set goals and formulated strategies accordingly.

DHS
364415



# App. B, Ex. 28A



**STATE OF MISSISSIPPI**
**Phil Bryant, Governor**
**DEPARTMENT OF HUMAN SERVICES**
**Richard A. Berry**
**Executive Director**

March 17, 2014

Grace M. Lopes
Court Monitor
1220 19th Street, N.W.
Suite 500
Washington, D.C.  20036

Dear Grace,

Enclosed please find the following documents required by the Final Year 4 Plan:

- Region III-South Improvement Plan
- Region VII-W Improvement Plan
- *Timely Case Planning* barriers and strategies
- *Parent and Sibling Contacts While in Custody* barriers and strategies

Per the Plan, by the end of Year 4, we will report to you and the Plaintiffs regarding our progress on these initiatives.

Sincerely,

Kim Shackelford
Deputy Administrator

cc:     Julia Davis, Children's Rights

Enc. (4)

DHS
362727

**App. B, Ex. 28B**

Timely Case Planning

Barriers and Strategies

March 17, 2014

Introduction

The MSA requires that based on the date each region has implemented the Practice Model, a certain percentage of foster children in that region shall have a permanency plan within 30 calendar days of their entry into care consistent with MSA standards. *MSA III.B.3.a.* Eight of the thirteen regions are now fully implemented and the last of the regions will be fully implemented as of February 2015.

Report SLS312 covering the year 3/1/2013 through 2/28/2014 reveals the following regarding statewide performance on this standard:

- For the 12-month rolling period, 31.44% of children had a permanent plan developed within 30 days.
- For the period of one month prior to the current month, 45.94% of children had a permanent plan developed within 30 days.

The permanency plan is noted in MACWIS on the FSP, thus it is required that an FSP be completed before a child is considered to have a permanency plan.

Barriers

Discussions in Senior Management meetings, Regional Director meetings, regional ASWS staff meetings, practice model coach meetings, and discussions with frontline staff have identified the following barriers to meeting this MSA measure:


- High caseloads/unbalanced caseloads
- Logistical difficulty of convening family team meetings (which must be convened prior to completing an FSP), most often due to parents' work schedules and/or lack of transportation and children's school schedules
- MACWIS connectivity issues
- Lack of needed resources for clients to obtain services/lack of awareness of existing resources
- Varying MACWIS proficiency
- Time management/competing priorities
- Inconsistent supervision
- Lack of worker understanding regarding the value of the plan
- Data entry errors
- Supervisors not approving in a timely manner

Strategies

| STRATEGY | WHO RESPONSIBLE | DATE |
|---|---|---|
| MACWIS refresher training | Professional Development Unit | Remind workers by April 1, 2014 of the ongoing availability of this training. |
| Increase connectivity in county offices | MACWIS Unit | Ongoing, per the Connectivity Plan |
| Monitor distribution of workloads | ASWSs, RDs, Field Operations Director | Ongoing |
| Utilize Regional Implementation Team meetings to increase field's knowledge regarding available resources via attendance of the Resource Development Unit, and to inform State Office of additional needs throughout the state | Resource Development Unit, RDs, Field Operations Director | May 1, 2014 – February 1, 2015 |
| MACWIS sub-team will obtain data from the Help Desk regarding common errors/complaints on the CFA and/or FSP and analyze to determine whether it is a system issue or user error. System issues will be referred to MIS; the field will be given guidance regarding common user errors. | MACWIS sub-team, MACWIS Unit | By August 1, 2014 |
| Research/develop and offer new training regarding Advanced Engagement. (This is for the CFA.) | Professional Development Unit | Research/development to begin by June 30, 2014. Training to be offered by January 15, 2015. |
| Research/develop and offer new training regarding Advanced Case Planning. (This is for the CFA.) | Professional Development Unit | Research/development to begin by June 30, 2014. Training to be offered by January 15, 2015. |
| Research/develop and offer new training regarding Advanced Assessment. (This is for the CFA.) | Professional Development Unit | Research/development to begin by June 30, 2014. Training to be offered by January 15, 2015. |
| Ensure that ASWSs are staffing cases per policy with workers and documenting the staffings. Failure to hold regular staffings will result in disciplinary action. Require ASWSs to note current timeliness of FSPs in staffing notes; RDs will review. | RDs, Field Operations Director, ASWSs | May 1, 2014 – November 1, 2014 |
| Track overdue initial FSPs in custody cases and send list to RDs and Field Operations Director monthly. Require completion of overdue initial FSPs and explanation for tardiness. Field Operations Director to report to State Implementation Team regarding progress/status. | Special Projects Unit, RDs, Field Operations Director | April 1, 2014 – November 1, 2014 |

**App. B, Ex. 28C**

Parent and Sibling Contacts While in Custody

Barriers and Strategies

March 17, 2014

Introduction

The MSA requires that based on the date each region has implemented the Practice Model, a certain percentage of foster children in that region shall be provided with contacts with their parents and any siblings not in the same placement consistent with MSA standards, unless it is documented that a parent or sibling failed to make himself or herself available. *MSA III.B.5.* Eight of the thirteen regions have been fully implemented, and the last of the regions will be fully implemented as of February 8, 2015. A new data report is under development in Year 4 to more accurately assess this requirement; in the meantime, MACWIS report MWLS318 is informative.

The most recent MWLS318, covering the month of February, 2014, indicates the following about statewide performance:

- Met father contacts requirement: 5.66%
- Met mother contacts requirement: 7.97%
- Met siblings contacts requirement: 19.80%
- Met all contact requirements: 5.84%

Barriers

Discussions in Senior Management meetings, Regional Director meetings, regional ASWS staff meetings, practice model coach meetings, and discussions with frontline staff have identified the following barriers to meeting this MSA measure:

- Clients lack transportation
- Parents in jail/prison
  - o Worker attitudes/beliefs about visitation at jails/prisons
  - o Jail/prison policies
- Child placed far away from parents/siblings
- Lack of documentation of shared parenting between foster and biological parents
- Failure to document "no contact orders" in MACWIS
- High caseloads/unbalanced caseloads
- Time management/competing priorities
- Inconsistent supervision
- Improper documentation of lack of parent cooperation

Strategies

| STRATEGY | WHO RESPONSIBLE | DATE |
|---|---|---|
| Collaborate with Mississippi Department of Corrections to allow regular visitation | Resource Development Unit, Resource Development sub-team | We have been negotiating an agreement with MDOC and finalization is expected approximately July 1, 2014. |
| Reinforce to workers that shared parenting contacts can and should be documented | ASWSs, RDs, Field Operations Director | Discuss in staff meetings by May 1, 2014. |
| Monitor distribution of workloads | ASWSs, RDs, Field Operations Director | Ongoing |
| If possible, hire more case aides to assist with transportation | ASWSs, RDs | Dependent on pending appropriations bill |
| Evaluate current policy regarding visitation in jails/prison | Policy sub-team, Policy Director | Evaluate by June 30, 2014. Make any necessary changes by November 1, 2014. |
| Offer extra sessions of "Diligent Search" ongoing training to areas or persons not improving. Require staff to attend who show consistent lack of progress in this area. | Professional Development Unit, ASWSs, RDs, Field Operations Director | Assess needs by June 1, 2014. Begin conducting additional training by November 30, 2014. |
| Reinforce to workers that "no contact orders" should be documented appropriately. Ensure that workers are aware of how to do this in MACWIS. | ASWSs, RDs, Field Operations Director | Discuss in staff meetings by May 1, 2014. Assist individuals with MACWIS training needs by June 15, 2014. |
| MACWIS refresher training | Professional Development Unit | Remind workers by April 1, 2014 of the ongoing availability of this training. |
| Ensure that ASWSs are staffing cases per policy with workers and documenting the staffings. Failure to hold regular staffings will result in disciplinary action. During staffings, encourage extra effort regarding parent/sibling contacts. | RDs, Field Operations Director, CSF practice coaches | May 1, 2014 – November 1, 2014 |
| Identification of workers who need to attend MACWIS refresher training. Ensure that said workers attend the training by the end of the next training quarter. | ASWSs, RDs, Field Operations Director | Identify workers by May 30, 2014 |
| Explore community resources/volunteer programs for transportation of parents to visits with their children. | Regional Implementation Teams, RDs | August 15, 2014 |
| Design a tool for RDs and ASWSs to report to the Field Operations Director (who will in turn report to the State Implementation Team) regarding each region's progress towards improved performance on this standard and the action steps required by this strategy set. | Deputy Administrator, Special Projects Unit | May 1, 2014 |

**App. B, Ex. 28D**

**Region VII-West Improvement Plan**

**Period IV – March 2014**

## Introduction

There are several data indicators that have been identified in the Modified Settlement Agreement. VII-West has showed promise with reunification within 12 months and adoption within 24 months. In order to address change, VII-West has identified 7 target areas of focus. A focus group was comprised to address strategies and methods to improve the 7 identified indicators. In the focus group several trends and common data entry errors were identified, such as untimely documentation, lapse in data entry, and lack of service providers. Due to the large number of employees and their current skill sets, cross-cutting strategies were identified to be the most effective method of implementation. In order to effectively manage implementation of these strategies, we feel that focusing on the target areas will allow us to improve our performance and outcomes across the board. Region VII-W will be in full implementation of the Practice Model February 28, 2015.

The areas that Region VII-West has chosen to focus on are as follows:

- Initiation and completion of investigations of maltreatment-in-care reports
- Face-to-face caseworker contacts with custody children
- Family Service Plans
- Termination of parental rights packets
- Expedited relative placements
- Parent/sibling contacts with custody children in out-of-home placements
- Initial medical and dental examinations and psychological assessments

## Barriers and Status of Performance

*Initiation and Completion of Investigations of Maltreatment-in-care Reports*

- Barriers
  - Not entering initiation in MACWIS
  - Competing priorities

DHS
362738

- o Lack of sense of urgency
- o Lack of supervisory tracking/follow-up

- Requirement is 100% timely initiation and completion of maltreatment-in-care investigations.

*Face-to-Face Contacts with Custody Children*

- Barriers
  - o Unbalanced caseloads among workers
  - o Lack of prioritization/planning
  - o Time management
  - o Demands on time, such as court appearances
  - o Cooperation/communication issues with County of Service workers

- Requirement is 70% by full implementation.

*Family Service Plans*

- Barriers
  - o Untimely Family Team Meetings
  - o Incorrect FSPs and need to re-do
  - o Lack of understanding about correct lines of service, e.g., prevention vs. protection, COR vs. COS
  - o Court-driven plans and family team meetings
  - o Starting "behind" because prior worker did not complete actions
  - o Lack of understanding of how to do an FSP
  - o MACWIS issues limiting concurrent plans
  - o Cases not showing up on adoption work load

- Requirement is 90% by full implementation.

*Termination of Parental Rights Packets*

- Barriers
  - Inadequate filing system
  - Lack of information, e.g., birth certificates, SSNs, etc.
  - Incorrect spelling/dates on court orders and vital statistics records
  - Transferring cases to new workers who do not know the case
  - Workers not taking responsibility for entire case file (lack of ownership)
  - Need to begin planning at the beginning of the case
  - Lack of real concurrent planning, i.e., not working the concurrent plan until the primary permanency goal fails

- Note: Untimely completion of the packet has been an impediment to filing a TPR petition within the required timeframe. There is not a report that tracks timely completion of the packet; however, Region VII-W will track this internally. Related requirement (petition filed or exception documented) is 80% by full implementation. This standard applies to both children who have been in custody for 17 of the past 22 months and children who have been in custody for more than 17 of the past 22 months.

*Expedited Relative Placements*

- Barriers
  - Court ordering children into specific placements that may not be able to become licensed
  - Lack of updating placement moves and still showing as expedited placements
  - Resource staffing
  - Placement emergencies (disruptions)
  - Numbers of children in custody
  - Amount of training required for relatives

- Requirement: expedited relative placements should be licensed within 90 days pursuant to DFCS policy.

*Parent/Sibling Contacts with Custody Children in Out-of-Home Placements*

- Barriers
  - Court will not allow contact prior to shelter hearing and clear drug screens
  - Placement proximity

- o Therapeutic placements policies
- o Parents unavailable or in jail (jail policies/workers' beliefs sometimes impede progress)
- o Lack of sense of urgency/priority by workers
- o Lack of documentation and understanding of shared parenting between foster and biological parents
- o Need for specific training for relative caregivers regarding family dynamics

- Requirement is 80% by full implementation.

*Initial medical and dental examinations and psychological assessments*

- Barriers
  - o Service providers do not accept Magnolia Health Care
  - o Children not entering foster care with Medicaid coverage
  - o Backlog at the facilities that accept Magnolia
  - o Lack of follow-up on court orders to establish eligibility
  - o Use of only one provider for psychological evaluations

- Requirement: 80% receive physical and mental healthcare in accordance with MSA by full implementation. (Note: Region VII-W plans to first focus its attention on the *initial* medical needs and psychological assessments.)


**Strategies to Address Priority Areas**

In order to address the preceding areas needing improvement and the identified barriers to reaching our goals, we are focusing efforts on implementing a small number of substantive strategies that are cross-cutting in nature, designed to affect multiple areas of performance. We are choosing this approach in order to make improvements not only in the areas we have identified in this plan, but in order to strengthen our overall capacity to make improvements wherever they are needed and to sustain the progress that we make. We have carefully identified the cross-cutting strategies that we believe will most directly affect the areas that are the focus of this plan and that will help us to continue making needed progress. The four strategies that we will be implementing are described below:

*Strategy #1:* **Hire the staff needed to meet caseload standards and supervisor-to-worker ratios, and retain the staff that we have hired.**

The rationale for implementing this strategy is that we must have adequate staff in order to carry out our responsibilities, and having adequate supervision is central to managing the quantity and quality of work. We must also focus on retaining the staff that we hire in order to avoid a cycle of constant re-hiring and re-training staff to do the work. The action steps and time frames for implementing this strategy are as follows:

| Action Step | Person Responsible | Time Frames |
|---|---|---|
| 1. For Hancock County, fill the worker positions needed to achieve caseload standards. | Regional Director | June 23, 2014 |
| 2. For Hancock County, hire ASWSs needed to achieve supervisor to worker ratios. | Regional Director | June 23, 2014 |
| 3. For Hancock County, select a Regional ASWS. | Regional Director | May 31, 2014 |
| 4. For Hancock County, provide pre-service training for the newly hired supervisors. | Regional Director & Training Unit | September 30, 2014 |
| 5. For Hancock County, initiate pre-service training for the newly hired workers. | Regional Director & Training Unit | September 30, 2014 |
| 6. For Hancock County, identify and hire a practice coach specifically for Hancock County. | Regional Director | April 15, 2014 |
| 7. For Hancock and Harrison Counties, recruit social worker interns while recruiting workers and ASWSs as specified in the IP4 Plan. | Regional Director | Time frames are specified in the IP4 Plan |
| 8. For Harrison County, fill the worker positions needed to achieve caseload standards. | Regional Director | June 23, 2014 |
| 9. For Harrison County, fill the ASWS positions needed to achieve the supervisor to worker ratios. | Regional Director | June 23, 2014 |
| 10. For Harrison & Hancock Counties, hire a Regional ASWS to cover resource unit. | Regional Director | April 15, 2014 |
| 11. For Harrison County, provide pre-service training for the newly hired supervisors. | Regional Director and Training Unit | September 30, 2014 |
| 12. For Harrison County, initiate pre-service training for the newly hired workers. | Regional Director & Training Unit | September 30, 2014 |
| 13. Ensure individual case staffing by supervisors with workers (as | See Below | See Below |

DHS
362742

| | | |
|---|---|---|
| noted below in Strategy #2 – this is also related to retention) | | |
| 14. Provide Level 1 ASWS mentoring for appropriate supervisors. | See Below | See Below |
| 15. Provide Level 2 supervisory training for all supervisors who have completed Level One (as noted below in Strategy #2 – this is also related to retention) | See Below | See Below |
| 16. For both counties, Regional Director or Regional ASWS will conduct individual staffing with supervisors on a weekly basis. | Regional Director or Designee | Begin by April 1, 2014 |
| 17. For the Region, provide workshop on Secondary Traumatic Stress for staff. | DFCS Deputy Administrator | September 1, 2014 |
| 18. Ensure that all workers are aware of tuition reimbursement program. | Regional Director & ASWS, Director of Workforce Development | Ongoing |
| 19. Invite university representatives to speak to staff meetings about opportunities for BSW and MSW programs. | Regional Director | June 30, 2014 |

**Strategy #2:  Strengthen supervisory capacity and oversight.**

The rationale for implementing this strategy is that we believe that effective supervision of staff, particularly with so many new social workers in the Region, is a key factor in ensuring that social workers are effective in their work with children and families. The action steps and time frames for implementing this strategy are as follows:

| Action Step | Person Responsible | Time Frames |
|---|---|---|
| 1. Assign mentors to all new supervisors during Level 1 training. | Training Unit | Begin by July 1, 2014 |
| 2. Provide Level 2 supervisory training to all supervisors who have completed Level 1. | CSF & Practice Coaches | Begin by July 1, 2014 |
| 3. Provide Level 3 supervisory training to all supervisors who have completed Level 2. | CSF & Practice Coaches | June 2014 – November 2014 |
| 4. Provide six days of coaching per month in each county to supervisors. | CSF & Practice Coaches | Currently ongoing |
| 5. Ensure individual case staffing by supervisors with workers. | Regional Director, ASWSs | Begin April 1, 2014 |
| 6. For both counties, Regional Director or Regional ASWS will conduct individual staffing with supervisors on a weekly basis. | Regional Director or Designee | Begin by April 1, 2014 |
| 7. Conduct periodic focus groups to identify strategies that are | Regional Director & Practice | Currently ongoing |

| | | |
|---|---|---|
| working well/need improvement. | Coaches & ASWSs | |
| 8. Supervisors will document their weekly staffing with workers. RD or Regional ASWS will document weekly staffing with supervisors. | Regional Director or Designee & ASWSs | Currently ongoing |
| 9. Use practice model coaches to model and provide feedback regarding workers' fidelity to the practice model, as noted in strategy #4. | CSF & DHS practice coaches | See below |
| 10. Hire for the CQI liaison position for VII-W which will provide for feedback and guidance to supervisors on outcomes and performance. | CQI Division | September 1, 2014 |

**Strategy #3: Increase staff competency in MACWIS.**

We believe that staff confidence and skills in MACWIS are critical to accurate reporting and that ongoing, on-the-ground support will result in improved performance. The action steps and time frames for implementing this strategy are as follows:

| Action Step | Person Responsible | Time Frames |
|---|---|---|
| 1. Provide to all existing staff copies of the MACWIS training guide. | Training Director & Regional Director | May 1, 2014 |
| 2. Practice model coaches conduct sessions for individual units to teach critical MACWIS data entry and location and use of reports and data in MACWIS. | DHS practice coaches | Ongoing |
| 3. Practice model coaches provide individual step-by-step assistance to workers in MACWIS procedures.  This is done in conjunction with coaching in practice and then following through with entry of the activities into MACWIS. | DHS practice coaches | Ongoing |
| 4. Skilled MACWIS worker in Harrison County will assist new workers in achieving MACWIS proficiency by meeting with individual workers.  (This worker will not have a caseload.) | Regional Director to assign/Assigned worker | Begin April 1, 2014 |
| 5. Provide MACWIS refresher training to staff on an as-needed basis. | Regional Director, ASWSs, Training Unit | Currently upon request |
| 6. Track and ensure that user entry errors are corrected when notified through the HEAT system. | ASWS's and Regional Director/Designee | June 1, 2014 |

| | | |
|---|---|---|
| 7. Conduct an analysis of user entry errors from the HEAT system in order to identify patterns of errors and to focus training/coaching activities described above on correcting commonly reported errors. | Regional Director or Designee | September 30, 2014 |

**Strategy #4:** **Establish and monitor fidelity measures for the Mississippi child welfare practice model.**

The rationale for selecting this strategy is that the practice model is the Department's primary approach to ensuring implementation of the Modified Settlement Agreement (MSA). We have invested heavily in the practice model as a means of bringing the practices in the MSA to the field, and the early implementing regions have demonstrated the success of this approach. We believe that if we are implementing the practice model effectively, many of the barriers to reaching our performance and outcome goals will be addressed. As a means of ensuring that staff in Region VII-W are practicing with children and families in ways that are consistent with the practice model, we will identify key practices in each of the six components of the practice model, develop a tool for observing and monitoring these practices, and work with supervisors and practice coaches to evaluate workers' fidelity to the practice model in their interactions with children and families and to make needed practice improvements.

| Action Step | Person Responsible | Time Frames |
|---|---|---|
| 1. Develop a list of key fidelity measures that correspond to each component of the practice model. | CSF | June 1, 2014 |
| 2. Revise supervisory case staffing tool to include PM fidelity measures. | CSF | June 1, 2014 |
| 3. Meet with supervisors to orient them to the use of the revised supervisory case staffing tool. | Practice Coaches (CSF and DHS) | June 30, 2014 |
| 4. Use CSF coaches to model the use of the supervisory case staffing tool to evaluate workers' fidelity to the practice model and how to provide feedback to workers regarding their fidelity to the practice model. | CSF/ASWS's | Begin June 30, 2014 |
| 5. Implement the revised supervisory case staffing tool. | Regional Director, Regional ASWS, and ASWS's | Begin August 1, 2014 and ongoing |
| 6. Supervisors provide feedback to workers on an ongoing basis regarding their fidelity to the practice model. | Regional Director, Regional ASWS, & ASWS's | Begin August 1, 2014 and ongoing |
| 7. Regularly assess the fidelity of practice to the practice model as reflected in data reports and in supervisors' observations of | Regional Director, Regional ASWS, CQI liaison & | Begin September 1, 2014 and ongoing |

| | | |
|---|---|---|
| their workers' practice, for example, in each ASWS meeting and in Unit Meetings and in all-staff meetings. | ASWS's | |
| 8. Provide regular updates to the CQI Sub-Team on findings regarding fidelity to the practice model so that the team can assist in designing improvement strategies where needed to improve fidelity. | Regional Director and CQI Liaison | Begin September 1, 2014 and at least quarterly |

## Relationship of Strategies to Priority Areas

We believe that implementing these cross-cutting strategies will broadly improve practice, beyond the specific priority areas targeted herein. The following chart shows the linkages of the strategies to the barriers identified with regard to each priority area.

| Priority Area and Identified Barriers | Strategy or Other Action that Addresses the Barriers |
|---|---|
| **Initiation and Completion of Investigations of Maltreatment-in-Care Reports** | |
| o  Not entering initiation in MACWIS | Strategy #3 |
| o  Competing priorities | Strategy #2 |
| o  Lack of sense of urgency | Strategies #2 and #4 |
| o  Lack of supervisory tracking/follow-up | Strategies #2, #3, #4 |
| **Face-to-Face Contacts with Custody Children** | |
| o  Unbalanced caseloads among workers | Strategies #1 and #2 |
| o  Lack of prioritization/planning | Strategy #2 |
| o  Time management | Strategy #2 |
| o  Demand on time, such as court appearances | Refer issues to Legal Sub-team. See Youth Court Strategies Plan. |
| o  Cooperation/communication issues with County of Service workers | Strategy #4 |

| **Family Service Plans** | |
|---|---|
| o    Untimely Family Team Meetings | Strategies #1, #2, #4 |
| o    Incorrect FSPs and need to re-do | Strategies #1, #2, #3, #4 |
| o    Lack of understanding about correct lines of service, e.g., prevention vs. protection, COR vs. COS | Strategies #2, #3 |
| o    Court-driven plans and family team meetings | Strategies #2, #4 |
| o    Starting "behind" because prior worker did not complete actions | Strategies #1, #2 |
| o    Lack of understanding of how to do an FSP | Strategies #1, #2, #3, #4 |
| o    MACWIS issues limiting concurrent plans | This was recently resolved by MIS. |
| o    Cases not showing up on adoption work load | This was recently resolved by MIS. |
| **Termination of Parental Rights Packets** | |
| o    Inadequate filing system | Strategies #1, #2, #4 |
| o    Lack of information, e.g., birth certificates, SSNs, etc. | Strategies #1, #2 |
| o    Incorrect spelling/dates on court orders and vital statistics records | Strategies #1, #2 |
| o    Transferring cases to new workers who do not know the case | Strategies #1, #2 |
| o    Workers not taking responsibility for entire case file (lack of ownership) | Strategies #2, #4 |
| o    Need to begin planning at the beginning of the case | Strategies #1, #2, #3, #4 |
| o    Lack of real concurrent planning, i.e., not working the concurrent plan until the primary permanency goal fails | Strategy #1, #2, #4 |
| **Expedited Relative Placements** | |
| o    Court ordering children into specific placements that may not be able to become licensed | Strategy #4 |

DHS
362747

| | | |
|---|---|---|
| o | Lack of updating placement moves and still showing as expedited placements | Strategy #1, #2, #3 |
| o | Resource staffing | Strategy #1 |
| o | Placement emergencies (disruptions) | Strategies #1, #2, #4 |
| o | Numbers of children in custody | Strategies #1, #4 |
| o | Amount of training required for relatives | Strategy #1, #3 |
| **Parent/Sibling Contacts with Custody Children in Out-of-Home Placements** | | |
| o | Court will not allow contact prior to shelter hearing and clear drug screens | Strategy #4 |
| o | Placement proximity | Strategies #1, #2, #3, #4 |
| o | Therapeutic placement policies | Strategy #4 |
| o | Parents unavailable or in jail | Strategies #2, #4 |
| o | Lack of sense of urgency/priority by workers | Strategies #1, #2, #4 |
| o | Lack of documentation and understanding of shared parenting between foster and biological parents | Strategies #2, #4 |
| o | Need for specific training for relative caregivers regarding family dynamics | Strategies #1, #2, #4 |
| **Initial Medical and Dental Examinations and Psychological Assessments** | | |
| o | Service providers do not accept Magnolia Health Care | Strategy #4 (plus refer to Resource Development Unit) |
| o | Children not entering foster care with Medicaid coverage | Refer to State Implementation Team and Resource Development Unit |
| o | Backlog at the facilities that accept Magnolia | Refer to Resource Development Unit |
| o | Lack of follow up on court orders to establish eligibility | Strategies #1, #2 |
| o | Use of only one provider for psychological evaluations | Resolved on 02-28-2014 |

DHS
362748

# App. B, Ex. 28E

**Region III-South Improvement Plan**

**Period IV – March 2014**

**Introduction:**

Region III-South has not performed well in various data indicators identified in the Modified Settlement Agreement but has made significant progress within the past six (6) months in several areas. During regular supervisory meetings, discussions are held focusing on areas needing improvement with specific emphasis on timely documentation issues, data entry errors and barriers to actual delivery of service. Upon identification, methods to address identified areas, and to facilitate and sustain improvement are put in place. In addition, focus groups were recently convened with DFCS leadership and CSF to further define where our efforts should be concentrated. Region III-South has hired a significant number of employees within the past several months, all with different skill levels which require varied ongoing training as well as supportive and educational supervision. Because of the large number of data indicators, the region has chosen cross-cutting strategies as the most effective method of implementation to address the identified issues that are identified below, and practice overall. Region III-S was fully implemented as of August 31, 2013.

The areas that Region III-South has prioritized as critical for child safety and family-centered practice are as follows:

- Initiation and completion of investigations of all maltreatment-in-care reports

- Face-to-face caseworker contacts with custody children

- Expedited relative placements

- Parent/sibling contacts with custody children in out-of-home placements

- Court strategies/Systemic barriers

**Barriers and Status of Performance**

*Initiation and Completion of Investigations of Maltreatment-in-Care Reports*

1

DHS
362728

- Barriers

  - Not entering initiation of investigation/not documenting activities in MACWIS

  - Competing priorities (court expectations/protocols, weekly multi-disciplinary team)

  - Lack of sense of urgency

  - Lack of supervisory tracking/follow-up (Lack of supervisory support/staffings)

  - Varying MACWIS proficiency

  - Supervisory vacancies

- Requirement is 100% timely initiation and completion.

  - Note: The Maltreatment in Care Timeliness Letter (for the entire state) was submitted in February 2015.

*Face-to-Face Caseworker Contacts with Custody Children*

- Barriers

  - Lack of time management regarding competing priorities

  - Untimely and inaccurate documentation of contacts made

  - COS issues (children placed outside of the Region)

  - Inconsistent supervisory tracking/follow-up (infrequent staffings)

  - Supervisory vacancies

- Requirement is 70% by full implementation.

2

DHS
362729

*Expedited Relative Placements*

- Barriers

    o Untimely entry of resource inquiry/assignment to resource ASWS

    o Untimely assignment of inquiry to licensure specialist

    o Untimely follow up/completion of licensure process

    o Resource workers' ongoing adjustment to new Safe Home study process

    o Placement practices inconsistent with Practice Model

- Requirement: expedited relative placements should be licensed within 90 days pursuant to DFCS policy.

*Parent/Sibling Contacts with Custody Children in Out-of-Home Placements*

- Barriers

    o Court will not allow contact prior to shelter hearing and clear drug screens

    o Placement proximity

    o Lack of sense of urgency/priority by workers

    o Worker values and attitudes regarding parental and children's rights

    o Lack of understanding and documentation of shared parenting between foster and biological parents

- Requirement is 80% by full implementation.

3

Court strategies/Systemic barriers

- Barriers

  - No contact orders are not accurately documented in MACWIS

  - No contact orders are sometimes inconsistent with the Practice Model (judges not engaging in family-centered practice)

  - Untimely scheduling of permanency hearings/reviews

  - Compliance with Standing Court Order/protocol

  - Untimely termination of parental rights (untimely court orders, hearings, submitting the packets, overall follow through)

- Requirement for timely permanency hearing is 90% at full implementation.

- Requirement for TPR (petition filed or exception documented) is 80% at full implementation. This standard applies to both children who have been in custody for 17 of the past 22 months and children who have been in custody for more than 17 of the past 22 months.

**Strategies to Address Priority Areas**

In order to address the preceding areas needing improvement and the identified barriers to reaching our goals, we are focusing efforts on implementing a small number of substantive strategies that are cross-cutting in nature, designed to affect multiple areas of performance. We are choosing this approach in order to make improvements not only in the areas we have identified in this plan, but in order to strengthen our overall capacity to make improvements wherever they are needed and to sustain the progress that we make. We have carefully identified the cross-cutting strategies that we believe will most directly affect the areas that are the focus of this plan and that will help us to continue making needed progress. The four strategies that we will be implementing are described below:

DHS
362731

***Strategy #1:*** **Hire the staff needed to meet caseload standards, supervisor-to-worker ratios, and retain the current staff that we have hired.**

The rationale for implementing this strategy is that we must have adequate staff in order to carry out our responsibilities, and having adequate supervision is central to managing the quantity and quality of work. The action steps and time frames for implementing this strategy are as follows

| Action Step | Person Responsible | Time Frames |
|---|---|---|
| 1. Hire frontline workers in Hinds County to meet caseload standards | ASWS / RD | June 30, 2014 |
| 2. Hire ASWSs for Hinds County to meet MSA ratio | RD | June 30, 2014 |
| 3. Additional advertisement / recruitment for ASWS (media) | RD / Division Director Professional Development | June 30, 2014 |
| 4. Recruitment via Jackson State University's Department of Social Work | Region 3S Recruitment Team | May 31, 2014 and ongoing |
| 5. Recruit via social work internships | RD | April 1, 2014 and ongoing |

***Strategy #2:*** **Strengthen Supervisory Capacity and Oversight.**

The rationale for implementing this strategy is that we believe that effective supervision of staff, particularly with so many new workers in the Region, is a key factor in ensuring that workers are effective in their work with children and families. We must also focus on retaining the staff that we hire in order to avoid a cycle of constant re-hiring and re-training staff to do the work. The action steps and time frames for implementing this strategy are as follows:

| Action Step | Person Responsible | Time Frames |
|---|---|---|
| 1. Training ASWSs about supportive supervision in Level 2 and 3 CSF training as appropriate | RD / CSF Coach | Beginning by June 30, 2014 |
| 2. CSF coaches will provide six (6) days monthly of one-on-one coaching and small groups regarding application of supervisory skills to practice | RD / CSF Coach | April 1, 2014 & on-going |
| 3. Weekly staffings with ASWSs | RD or Regional ASWS | April 1, 2014 & on-going |
| 4. Weekly staffings with frontline staff / each individual worker | ASWSs | April 1, 2014 & on-going |
| 5. Recognition of worker's accomplishments and performance | ASWSs / Practice Model Coaches | April 1, 2014 & on-going |
| 6. Supervisors maintain documentation of weekly case staffings with each worker | ASWSs | April 1, 2014 & on-going |
| 7. RD will maintain documentation of weekly case staffings with each ASWS | RD | April 1, 2014 & on-going |

*Strategy #3:* **Increase staff competency in MACWIS.**

We believe that staff confidence and skills in MACWIS are critical to accurate reporting and that ongoing, on-the-ground support will result in improved performance. The action steps and time frames for implementing this strategy are as follows:

| Action Step | Person Responsible | Time Frames |
|---|---|---|
| 1. Provide a copy of the revised MACWIS training guide to all ASWS and direct service staff. | RD and Professional Development Director | May 1, 2014 |
| 2. Utilize CQI reviews/feedback to identify training needs relative to MACWIS entries | RD/ASWS/and Regional CQI Team | May 31, 2014 and ongoing |
| 3. Provide training on the MACWIS training guide which is in the pre-service training. | RD in conjunction with Professional Development Unit | June 30, 2014 |
| 4. Provide refresher training on MACWIS to staff on an as needed basis. | RD & Professional Development Unit Director | Currently upon request. |

***Strategy #4:*** **Establish and monitor fidelity measures for the Mississippi child welfare practice model.**

The rationale for selecting this strategy is that the practice model is the Department's primary approach to ensuring implementation of the Modified Settlement Agreement (MSA). We have invested heavily in the practice model as a means of bringing the practices in the MSA to the field, and the early implementing regions have demonstrated the success of this approach. We believe that if we are implementing the practice model effectively, many of the barriers to reaching our performance and outcome goals will be addressed. As a means of ensuring that staff in Region III-S are practicing with children and families in ways that are consistent with the practice model, we will identify key practices in each of the six components of the practice model, develop a tool for observing and monitoring these practices, and work with supervisors and practice coaches to evaluate workers' fidelity to the practice model in their interactions with children and families and to make needed practice improvements.

| Action Step | Person Responsible | Time Frames |
|---|---|---|
| 1. Develop a list of key fidelity measures that correspond to each component of the practice model. | CSF | June 1, 2014 |
| 2. Revise supervisory case staffing tool to include PM fidelity measures. | CSF | June 1, 2014 |
| 3. Meet with supervisors to orient them to the use of the revised supervisory case staffing tool. | Practice Coaches (CSF and DHS) | June 30, 2014 |
| 4. Use CSF coaches to model the use of the tool to evaluate workers' fidelity to the practice model and how to provide feedback to workers regarding their fidelity to the practice model. | CSF/ASWSs | Begin June 30, 2014 |
| 5. Implement the revised supervisory case staffing tool. | Regional Director, Regional ASWS, and ASWSs | Begin August 1, 2014 and ongoing |
| 6. Supervisors provide feedback to workers on an ongoing basis regarding their fidelity to the practice model. | Regional Director, Regional ASWS, & ASWSs | Begin August 1, 2014 and ongoing |
| 7. Regularly assess the fidelity of practice to the practice model as reflected in data reports and in supervisors' observations of their workers' practice, | Regional Director, Regional ASWS, CQI liaison & | Begin September 1, 2014 and ongoing |

| for example, in each ASWS meeting and in Unit Meetings and in all-staff meetings. | ASWSs | |
| 8. Provide regular updates to the CQI Sub-Team on findings regarding fidelity to the practice model so that the team can assist in designing improvement strategies where needed to improve fidelity. | Regional Director and CQI Liaison | Begin September 1, 2014 and at least quarterly |

**Relationship of Strategies to Priority Areas**

We believe that implementing these cross-cutting strategies will broadly improve practice, beyond the specific priority areas targeted herein. The following chart shows the linkages of the strategies to the barriers identified with regard to each priority area.

| Priority Area and Identified Barriers | Strategy or Other Action that Addresses the Barriers |
|---|---|
| **Timely Initiation and Completion of Investigations of Maltreatment-in-Care Reports** | |
| • Not entering initiation of investigation/not documenting activities in MACWIS | Strategy # 3 |
| • Competing priorities (court expectations/protocols, weekly MDT) | Strategy # 2 |
| • Lack of sense of urgency | Strategy # 2 |
| • Lack of supervisory tracking/follow-up (Lack of supervisory support/staffings) | Strategy # 2 |
| • Varying MACWIS proficiency | Strategy # 3 |
| • Supervisory vacancies | Strategy # 1 |
| **Face-to-Face Contacts with Custody Children** | |
| • Lack of time management regarding competing priorities | Strategy # 2 |
| • Untimely and inaccurate documentation of contacts made | Strategy # 3 |

DHS
362735

| | |
|---|---|
| • COS issues (children placed outside of the Region) | Strategy # 2 |
| • Inconsistent supervisory tracking/follow up (infrequent staffings) | Strategy # 2 |
| • Supervisory vacancies | Strategy # 1 |
| **Expedited Relative Placements** | |
| • Untimely entry of resource inquiry/assignment to resource ASWS | Strategy # 2 & 3 |
| • Untimely assignment of inquiry to licensure specialist | Strategy # 2 |
| • Untimely follow up/completion of licensure process | Strategy # 2 |
| • Placement practices inconsistent with Practice Model | Strategy # 4 |
| • Ongoing adjustment to new Safe Home Training | Strategy # 2 |
| **Parent/Sibling Contacts with Custody Children in Out-of-Home Placements** | |
| o Court will not allow contact prior to shelter hearing and clear drug screens | Strategy # 4 |
| o Placement proximity | Strategy # 2 |
| o Lack of sense of urgency/priority by workers | Strategy # 2 |
| o Worker values and attitudes regarding parental and children's rights | Strategy # 4 |
| o Lack of understanding and documentation of shared parenting between foster and biological parents | Strategies # 2 & 4 |
| **Court strategies/Systemic issues** | |
| o No contact orders are not accurately documented in MACWIS | Strategy # 3 & 4 |
| o No contact orders are sometimes inconsistent with the Practice Model | Strategy #4; also refer to Legal sub-team |
| o Untimely scheduling of permanency hearings/reviews | Strategy # 2 & 4 |

9

| o Compliance with Standing Court Order/protocol | Strategy # 2 & 4 |
|---|---|
| o Untimely termination of parental rights (untimely court orders, hearings, submitting the packets, overall follow through) | Strategy # 2 & 4 |

# App. B, Ex. 29



DEPARTMENT OF HEALTH & HUMAN SERVICES          Centers for Medicare & Medicaid Services

OCT 14 2014                    **Administrator**
                               Washington, DC 20201

David J. Dzielak, Ph.D.
Executive Director
Division of Medicaid, Office of the Governor
550 High Street, Suite 1000
Jackson, MS 39201

Dear Dr. Dzielak:

I am responding to your request to approve a proposed Medicaid State Plan Amendment (SPA) 14-005, received by the Centers for Medicare & Medicaid Services (CMS) on January 30, 2014. The 90th day for this SPA is October 16, 2014. This proposed amendment would add an array of mental health services entitled, "Treatment Foster Care" (TFC) to the rehabilitative services benefit, but the services would be limited only to foster care children under age 21 with severe emotional disturbance who live in a "Therapeutic Foster Care Home" or a "Therapeutic Group Home." CMS has reviewed this proposal, and is unable to approve SPA 14-005 as submitted because Mississippi has not documented that the limitation on the services to children in only one setting would be consistent with the requirements of section 1902(a)(10)(B) of the Social Security Act (Act) or with EPSDT requirements.

CMS informed the State of this issue in a request for additional information (RAI) sent on April 21, 2014. State officials responded on July 18, 2014. On August 25, 2014, CMS held a call with the State and advised the State that the limitation of the service to children in the two specific settings would prevent CMS from approving the SPA. In the RAI and during the call, CMS suggested a path to approval for this SPA that would ensure the State was offering the mental health services without regard to diagnosis or setting to all children under age 21 for whom these services are medically necessary. Although the State declined to take this action, we would be happy to work with the state on this or a different path to approval for this SPA.

Section 1902(a)(10)(B) of the Act and implementing regulations at 42 CFR 440.240 contain what are known as "service comparability requirements" that states provide coverage for the same amount, duration and scope of benefits for all categorically eligible individuals. Section 1905(a)(4)(B) defines one of those benefits (Early and Periodic Screening, Diagnosis and Treatment, or EPSDT) as specific to children under age 21. Together these provisions assure that children will receive all medically necessary section 1905(a) services in an amount, duration and scope that could be greater for children than adults and that states cover the same amount, duration and scope of benefits for all categorically eligible children.

In this SPA, the State proposed to cover TFC as a new EPSDT rehabilitative benefit only for foster care children under age 21 who have severe emotional disturbance and who live in a "Therapeutic Foster Care Home" or a "Therapeutic Group Home." Children who are not in

Page 2 – David J. Dzielak, Ph.D.

foster care and who are not residing in one of these foster care home settings who have severe emotional disturbance would not receive the same treatment services available for other categorically needy children, for whom these services are medically necessary, who reside in other home settings. In other words, the State would cover a different amount, duration and scope of EPSDT rehabilitative services to children who are in foster care and reside in a "Therapeutic Foster Care Home" or a "Therapeutic Group Home" than it would cover for other children with the same health care needs. Mississippi argued that TFC constitutes a distinct service that is specifically tailored to the needs of children in foster care, and is available to all children with those needs. However, Mississippi did not provide any empirical evidence or studies demonstrating that children in other settings did not have similar needs, and the proposed limitation was not based on an individualized needs analysis, solely on the setting. As a result, I have to conclude that Mississippi has not documented that the limitation on the proposed coverage to particular foster care settings would be consistent with the comparability requirements of section 1902(a)(10)(B) of the Act.

We appreciate that the State seeks to furnish mental health services to children with intensive needs, and the law requires the provision of such a service. The EPSDT requirements at section 1905(r) of the Act indicate that individuals under age 21 must receive "all necessary health care, diagnostic services, treatment, and other measures described in section 1905(a) to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan." This provision requires states to furnish all medically necessary services that can be covered under section 1905(a) to all children to treat their mental health needs.

I have consulted with the Secretary about this disapproval as required by 42 CFR 430.15(c). If you are dissatisfied with this determination, you may petition for reconsideration within 60 days after receipt of this letter in accordance with the procedures set forth at 42 CFR 430.18. Your request for reconsideration may be sent to Barbara Washington, Centers for Medicare & Medicaid Services, Center for Medicaid and CHIP Services, 7500 Security Boulevard, Mail Stop S2-01-01, Baltimore, MD 21244-1850.

If you have any questions or wish to discuss this determination further, please contact Jackie Glaze, Associate Regional Administrator, CMS, Division of Medicaid and Children's Health, Region IV, 61 Forsyth Street, Suite 4T20, Atlanta, Georgia 30303.

Sincerely,

Marilyn Tavenner

cc:  Regional Administrator, Atlanta RO
     Associate Regional Administrator, Atlanta RO

# App. B, Ex. 30

**Grace M. Lopes**

**Attachments:**          Olivia Y-_Notice_from_DOM_to_Therapeutic_Group_Homes (Final).pdf

---

**From:** Tullos, Ashley C. [mailto:atullos@bakerdonelson.com]
**Sent:** Thursday, August 08, 2013 5:05 PM
**To:** Julia Davis (jdavis@ChildrensRights.Org); Miriam Ingber (mingber@ChildrensRights.Org); Grace Lopes (gmlopes@oymonitor.org) (gmlopes@oymonitor.org)
**Cc:** Rachal, Kenya; Fortenberry, Rusty
**Subject:** Final Notice from Medicaid re Intensive Outpatient Services (revised per Plaintiffs' comments)

Miriam, Julia and Grace,
I have attached for your reference the Notice from Medicaid re Intensive Outpatient Services (Final Version) that incorporates the changes and information requested by Plaintiffs in Julia's email of August 6th.  In accordance with the Period 4 requirement, DFCS plans to send the notice to the therapeutic group home providers next week.

Thanks and have a good evening!

**Ashley C. Tullos**
Attorney at Law
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
4268 I-55 North
Meadowbrook Office Park
Jackson, MS 39211
Direct:  601-351-8949     Cell:  601-214-0223
Fax:  601-974-8949
E-mail:  atullos@bakerdonelson.com
www.bakerdonelson.com

**Baker Donelson**: One of FORTUNE magazine's "100 Best Companies to Work For"

Baker, Donelson, Bearman, Caldwell & Berkowitz
is a full service regional law firm with offices in
Alabama, Florida, Georgia, Louisiana, Mississippi, Tennessee, Texas and
Washington, D.C.

---

Under requirements imposed by the IRS, we inform you that, if any advice concerning one or more U.S. federal tax issues is contained in this communication (including in any attachments and, if this communication is by email, then in any part of the same series of emails), such advice was not intended or written by the sender or by Baker, Donelson, Bearman, Caldwell & Berkowitz, PC to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or tax-related matter addressed herein.

This electronic mail transmission may constitute an attorney-client communication that is privileged at law. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this electronic mail transmission in error, please delete it from your system without copying it, and notify the sender by reply e-mail, so that our address record can be corrected.

OFFICE OF THE GOVERNOR | MISSISSIPPI DIVISION OF MEDICAID

# MEMO

**To:**    **MDHS Therapeutic Group Homes**

**From: Division of Medicaid, Bureau of Mental Health**

**Date:  August 16, 2013**

**Re:     Intensive Outpatient Psychiatric Services**

The purpose of this memo is to inform you of the availability and potential to provide Intensive Outpatient Psychiatric (IOP) services to eligible Medicaid beneficiaries. IOP is family stabilization and intensive outpatient psychiatric treatment provided to children and youth with serious emotional disturbance.

Therapeutic Group Homes that provide IOP services can receive a rate of $122.54 per day, in lieu of the usual fee for service pay structure. IOP services are limited to two hundred seventy (270) days of service per state fiscal year (July 1 to June 30), per child, and require prior authorization by HealthSystems of Mississippi (460 Briarwood Dr., Suite 300, Jackson, Mississippi 39206; Tel.: 601-352-6353; www.hsom.org).

In order to seek payment for IOP services, a provider must: (1) be a Mississippi Medicaid provider, and (2) be certified to provide IOP services by the Department of Mental Health.

To find information about IOP services or how to become a Medicaid provider, please contact the Division of Medicaid, Bureau of Mental Health at 601-359-9545 or toll free at 1-800-421-2408.

To find information regarding IOP certification visit the Department of Mental Health's website at http://www.dmh.ms.gov/providers (Operational Standards) or call 601-359-1288 or toll free at 1-877-210-8513.

**App. B, Ex. 31**

APPENDIX "D"
Modified Mississippi Settlement Agreement and Reform Plan

| Mississippi Diligent Recruitment of Families for Children | | | | | | |
|---|---|---|---|---|---|---|
| **Implementation Plan - Phase II, Version A** | | | | | | |
| **Cooperative Agreement Items** | **Goal/Activity** | **Year 2** | **Year 3** | **Year 4** | **Year 5** | **Responsibility** |
| **1. Recruitment Activities** | | | | | | |
| **A. Targeted Recruitment: Market Segmentation** | | | | | | |
| D,E,F | 1. Map current resources against predicted need based on survey analysis | X | X | | | Evaluator; CSF; Project Team |
| D,E,F | 2. Generate a series of maps showing where recruitment activities should be directed | X | X | | | Evaluator; CSF; Project Team |
| D,E,F | 3. Identify specific mediums of communication most used by potential resource families in identified recruitment areas | X | X | | | Evaluator; CSF; Project Team |
| D,E,F | 4. Identify Specific recruitment strategies for engaging targeted families | X | X | | | Evaluator; CSF; Project Team |
| D,E,F | 5. Prioritize recruitment plans for most critical needs of children entering care | X | X | | | Evaluator; CSF; Project Team |
| **B. Targeted Recruitment Diligent Recruitment Specialists** | | | | | | |
| J,K,U | 1. Evaluate current training | X | | | | Project Team |
| J,K,U | 2. Identify areas needing development & strengthening | X | | | | Project Team; CSF; Training Unit |
| J,K,U | 3. Determine areas that should be included in pre-service and/or in-service training | X | | | | Project Team; CSF; Training Unit |
| J,K,U | 4. Make modifications as necessary | | X | | | Project Team |
| J,K,U | 5. Develop a plan to ensure diversity training is offered on a consistent basis | | X | X | X | Project Team; Training Unit |

**APPENDIX "D"**
Modified Mississippi Settlement Agreement and Reform Plan

| Cooperative Agreement Items | Goal/Activity | Year 2 | Year 3 | Year 4 | Year 5 | Responsibility |
|---|---|---|---|---|---|---|
| D,E,F | 6. Develop a plan for disseminating market segmentation information to regions & private agencies | X | X | | | Project Director |
| D,E,F | 7. Disseminate market segmentation data including family portraits and recruitment strategies reports to Regional Implementation Teams | X | X | | | Recruitment Support Specialists |
| D,E,F | 8. Develop or update Regional Recruitment Plans based on market segmentation data including family portraits and recruitment strategies reports | X | X | | | Recruitment Support Specialists; Regional Implementation Team |
| D,E,F | 9. Develop and implement a plan for including LPCAs in targeted recruitment activities | X | X | | | Project Team |
| D,E,F | 10. Recruitment Support Specialists will act as supports to the regions and LCPAs and assist in securing tools necessary to implement recruitment strategies outlined Regional Recruitment Plans | X | X | X | X | Recruitment Support Specialists |
| **C. Child Specific Recruitment** | | | | | | |
| D,E,G,P,Q | 1. Fully implement the expedited licensure process for related resource homes | | X | | | Project Team; Policy Director |
| D,E,P,Q | 2. Evaluate Mississippi's current utilization of AdoptUSKids adoption photo listing exchange | | X | | | Project Director; State Co-Leads |
| D,E,P,Q | 3. Determine feasibility to modify current usage of AdoptUSKids photo exchange for both children in care and resource parents. | | X | | | Project Director; State Co-Leads |
| D,E,P,Q | 4. Develop Mississippi statewide adoption photo exchange if needed | | | X | | Project Director; State Co-Leads |
| **D. General Recruitment** | | | | | | |
| D,E,G | 1. Develop plan for ensuring inquires from prospective resource families are handled in a timely and consistent manor | X | | | | Project Team |

**APPENDIX "D"**
Modified Mississippi Settlement Agreement and Reform Plan

| Cooperative Agreement Items | Goal/Activity | Year 2 | Year 3 | Year 4 | Year 5 | Responsibility |
|---|---|---|---|---|---|---|
| D,E,G | 2. Implement plan for ensuring inquiries from prospective resource families are handled in a timely and consistent manor | | X | X | | Project Team |
| D,E,G | 2. Establish a toll-free number for prospective resource families to call | | X | | | Project Director; State Co-Leads |
| D,E,G | 3. Add to MDHS web site to address recruitment | X | | | | Project Director; State Co-Leads; CSF |
| D,E,G | 4. Develop and implement statewide broadcast activities | | | X | X | Project Team, Grant Implementation Team, CSF |
| L | 5. MDHS has 3 Spanish translators on staff and that they are available to assist staff in working with clients and in translating materials | X | X | X | X | DFCS Translators |
| T | 6. MDHS Practice Model implementation moves the program towards a philosophy of working on permanency from the first day children enter the child welfare system | X | X | X | X | CSF; Project Team; Field Staff; Regional Resource Staff |
| **2. Resource Licensure** | | | | | | |
| **A. Resource Applicants** | | | | | | |
| H | 1. Define current application process | X | | | | Project Director; State Co-Leads |
| H | 2. Develop and implement internal tracking procedures to monitor application process | X | | | | Evaluator; Project Director |
| H | 3. Train resource staff on utilization of internal tracking tools | X | X | | | Project Director; Recruitment Support Specialists |

**APPENDIX "D"**
Modified Mississippi Settlement Agreement and Reform Plan

| Cooperative Agreement Items | Goal/Activity | Year 2 | Year 3 | Year 4 | Year 5 | Responsibility |
|---|---|---|---|---|---|---|
| H | 4. Develop and implement exit survey to identify dropout rates/reasons at various states of the process | X | | | | Evaluator; Project Team |
| H | 5. Adapt procedures for receiving and responding to applications and inquires based on data | | X | | | Evaluator; Project Team |
| H | 6. Train resource staff on skills and strategies for responding to inquires and retaining families throughout the licensure process | X | X | | | Project Team |
| H | 7. Design and implement coaching process to ensure resource staff are using learned skills and strategies | X | | | | Project Team; Director of Field Operations |
| **B. Resource Family Training** | | | | | | |
| I,K,U | 1. Evaluate current training in regards to characteristics, needs & issues of children in care/adoption clinical issues | | X | | | Project Team |
| I,K,U | 2. Modify training or develop additional training as needed | | | X | | Project Team; Grant Implementation Team work group |
| I,K,U | 3. Address shared parenting and supporting family relationships | X | X | X | X | Project Team; Regional Resource Staff |
| **C. Home Study Format** | | | | | | |
| N | 1. Evaluate current home study format | X | | | | Project Director; State Co-Leads; MACWIS |
| N | 2. Identify a home study format that would provide necessary information in a consistent manner | X | | | | Project Director; State Co-Leads |
| G,N | 3. Develop plan to ensure all resource workers are utilizing the same home study format | | X | | | Project Director; State Co-Leads |

**APPENDIX "D"**
Modified Mississippi Settlement Agreement and Reform Plan

| Cooperative Agreement Items | Goal/Activity | Year 2 | Year 3 | Year 4 | Year 5 | Responsibility |
|---|---|---|---|---|---|---|
| G,N | 4. Provide training to resource staff on revised home study format | | X | | | Project Director; State Co-Leads |
| G,N | 5. Design coaching process to ensure resource staff are using learned skills and strategies | | X | | | Project Team; Director of Field Operations |
| **D. Home Study Process** | | | | | | |
| G | 1. All prospective parents currently have access to the home study process | X | X | X | X | Project Team; Regional Resource Staff |
| E,G | 2. Ensure home studies are completed in a timely manner | X | X | X | X | Evaluator; Project Team; Regional Resource Staff |
| E,G,N,O | 3. Mississippi Resource homes are licensed for both foster care and adoption in a single application process which facilitates concurrent planning. | X | X | X | X | Regional Resource Staff |
| **3. Customer Service Model** | | | | | | |
| H,I,P | 1. Schedule site visit with AdoptUSKids | X | | | | Project Director |
| H,I,P | 2. Determine which staff members will participate in AUK "train the trainer" site visit | X | | | | Project Director; State Co-Leads; Training Unit |
| H,I,P | 3. Develop and Implement plan for providing customer service model training to MDHS field staff | X | X | | | Project Director; State Co-Leads; Training Unit |
| H,I,P | 4. Make needed changes to policy and procedure to include customer service related issues | | X | | | Project Director; State Co-Leads; Policy Director |
| H,I,P | 5. Ensure customer service model techniques are being implemented by staff and are sustainable. | | X | X | X | Project Team; Field Operations |

**APPENDIX "D"**
Modified Mississippi Settlement Agreement and Reform Plan

| Cooperative Agreement Items | Goal/Activity | Year 2 | Year 3 | Year 4 | Year 5 | Responsibility |
|---|---|---|---|---|---|---|
| **4. Contract with the Licensed Child Placing Agencies** | | | | | | |
| R | 1. Release RFP | X | | | | Congregate Care Director; Permanency Unit Director; DFCS Finance and Administration |
| R | 2. Review proposals | X | | | | Congregate Care Director; Permanency Unit Director; DFCS Finance and Administration |
| R | 3. Prepare contracts and issue | X | | | | Congregate Care Director; Permanency Unit Director; DFCS Finance and Administration |
| R | 4. Plan for contract monitoring | | X | X | X | Congregate Care Director; Permanency Unit Director; DFCS Finance and Administration |
| **5. Family/Child Matching** | | | | | | |
| **A. Characteristics of Children in Care** | | | | | | |
| A,Q | 1. Establish baseline and benchmarks 3-6 months prior to regional implementation roll out | X | X | | | Evaluator; Project Team |
| A,Q | 2. Aggregate data by county & make available to regions, counties, and private agencies | X | X | | | Evaluator; Project Team |
| A,Q | 3. Develop and implement plan for consistently updating the characteristics of children in care | | X | X | X | Project Director; State Co-Leads, MACWIS; Evaluator |
| A,Q | 4. Work with MACWIS to ensure regular characteristic reports are available | | | X | X | Project Director; State Co-Leads, MACWIS; Evaluator |
| A,Q | 5. Address characteristics of children in care and their placement needs though regular placement committee meetings | | | X | X | Project Team; Regional Resource Staff |

**APPENDIX "D"**
Modified Mississippi Settlement Agreement and Reform Plan

| Cooperative Agreement Items | Goal/Activity | Year 2 | Year 3 | Year 4 | Year 5 | Responsibility |
|---|---|---|---|---|---|---|
| **B. Resource Family Characteristics** | | | | | | |
| B,Q | 1. Develop and implement plan for consistently updating the characteristics of licensed resource families | | X | | | Project Team; CSF; Evaluator |
| B,Q | 2. Develop a database of characteristics of current resource families by county | | X | X | X | Project Team; Evaluator; CSF, MACWIS |
| B,Q | 4. Work with MACWIS to ensure regular resource family characteristic reports are available | | X | X | X | Project Team; Evaluator; CSF, MACWIS |
| B,Q | 5. Address placement needs by matching children with families though regular placement committee meetings | X | X | X | X | Project Team; Regional Resource Staff |
| **8. Collaboration/Public-Private Partnerships** | | | | | | |
| C | 1. Use consumer data to determine communities with highest placement rates by zip code | X | X | | | CSF; MACWIS; Project Team |
| C | 2. Identify prospective neighborhoods for recruitment activities | X | X | | | CFS; Project Team |
| C | 3. Adapt Regional Implementation Plans to address community outreach | X | X | X | X | Project Team; Regional Resource Staff |
| C | 4. Adapt staff and resource families to include/work with community partners | X | X | X | X | Project Team; CSF; Regional Resource Staff |
| **10. Website** | | | | | | |
| I,K,Q,U | 1. Consult with MACWIS related to website modification and development | | X | | | Project Director; State Co-Leads; CSF; MACWIS |
| I,K,Q,U | 2. Assess information currently available on MDHS website | | X | | | Project Director |

**APPENDIX "D"**
Modified Mississippi Settlement Agreement and Reform Plan

| Cooperative Agreement Items | Goal/Activity | Year 2 | Year 3 | Year 4 | Year 5 | Responsibility |
|---|---|---|---|---|---|---|
| I,K,Q,U | 3. Identify what type of modifications and additions are needed | | X | | | Project Team; MACWIS; CSF |
| I,K,Q,U | 4. Gather or develop needed information | | X | | | Project Team; MACWIS; CSF |
| I,K,Q,U | 5. Develop a plan for adding and maintaining information | | | X | | Project Director; MACWIS; CSF |
| **11. Evaluation Activities** | | | | | | |
| | 1. See attached evaluation plan | X | X | X | X | Evaluator |

# App. B, Ex. 32

# ACF PERFORMANCE PROGRESS REPORT
## COVER PAGE
### ACF-OGM-SF-PPR

| | Page 1 | of Pages 62 |
|---|---|---|

| 1.Federal Agency and Organization Element to Which Report is Submitted<br><br>Department of Health & Human Services<br>Administration for Children, Youth, and Families<br>Children's Bureau | 2. Federal Grant or Other Identifying Number Assigned by Federal Agency<br><br>90CO1052/01 | 3a. DUNS<br>8093999180000<br><br>3b. EIN<br>1-646000807-A3 | 4. Reporting Period End Date<br>*09/30/2014* |
|---|---|---|---|

| 4. Recipient Organization (Name and complete address including zip code)<br><br>Mississippi Department of Human Services<br>Division of Family & Children's Services<br>750 North State Street<br>Jackson, MS 39202 | 5. Recipient Identifying Number or Account Number |
|---|---|

| 6. Project/Grant Period<br><br>Start Date: *09/30/2010*    End Date: *09/30/2015* | 7. Reporting Period End Date<br>*09/30/2014* | 8. Final Report?  ☐ Yes  ☒ No |
|---|---|---|
| | | 9. Report Frequency<br>☐ annual    ☒ semi-annual<br>☐ quarterly    ☐ other<br>*(If other, describe: _____)* |

10. See ACF-OGM SF-PPR Program Indicators – Attachment B

11. Other Attachments    *(attach other documents as needed or as instructed by the awarding Federal Agency)*

**12. Certification:  I certify to the best of my knowledge and belief that this report is correct and complete for performance of activities for the purposes set forth in the award documents.**

| 12a. Typed or Printed Name and Title of Authorized Certifying Official<br><br>Angie Williams | 12c. Telephone<br>*(601) 359-4280* |
|---|---|
| | 12d. Email Address<br>angie.williams@mdhs.ms.gov |
| 12b. Signature of Authorized Certifying Official<br>*Angie M. Williams* | 12e. Date Report Submitted<br>*10-31-2014* |
| | 13. Agency use only |

1

OMB Approval Number: 0970-0334<br>Expiration Date: 6/30/2009

**Customer Service Workshop** – During this reporting period customer service training was provided quarterly statewide. The Professional Development Unit offers this workshop to all DFCS staff as a part of its ongoing trainings. The Practice Model Coaches are coaching on customer service as they work with staff in their regions.

## B-02 Problems (Delays/Challenges)

During this reporting period data for evaluation purposes continues to be a challenge in IV-South regions due to a lack of staff and more demands of other duties that are not related to grant. To address this issue the evaluator that we stop collecting data due to lack of recruitment and focus on maintain continuous communications and support to help this region carry out their existing recruitment plan.

The requirement that relative placements must also be licensed and must be licensed within 90 days (if the child is left in the home prior to licensure) is another challenge in licensing non-relative applicants. To address this concern, the DFCS Permanency Unit has developed an RFP to solicit help from private agencies with completing home studies on families (non-relatives) trying to be licensed by DFCS. The RFP was released in the reporting period. Contracts are expected to go into effect next reporting period. The DFCS Permanency Unit is also exploring other ways to deliver pre-service and ongoing training to resource parents in order to take this responsibility from resource staff freeing them up to do more recruitment and other licensure activities.

Also during this reporting period, contracts with two on-line trainings companies were implemented to give resource parents additional options for ongoing training on topic identified in the resource parent survey. This is being paid for with other funds a sustainability measure.

## B-03 Significant findings and events

During this reporting period, grant staff noticed the licensure process is taking too long to get applicants licensed and we're only licensing a small percentage of those applicants. Mississippi has reached out to the NRC to help us with this finding. Mississippi has also found that Mississippi need to make more progress in terms of improving customer service where recruitment & retention is concerned. The NRC is helping with this as well.

The DRG Staff decided to focus on the evaluation region giving them more support, coaching, and modeling of grant activities.

7

# App. B, Ex. 33



**COA**
COUNCIL ON
ACCREDITATION
FOUNDED
1977

**Richard Klarberg**
President & Chief Executive Officer

**Markus Trice**
Chair, Board of Trustees

**Sponsoring Organizations**

Alliance for Children and Families

Association of Jewish Family and
Children's Agencies

Catholic Charities USA

Children's Home Society of America

Child Welfare League of America

Foster Family-based
Treatment Association

Joint Council on International
Children's Services

Lutheran Services in America

National Council For Adoption

National Foundation for
Credit Counseling

National Network for Youth

National Organization of State
Associations for Children

Volunteers of America

**Council on Accreditation**

45 Broadway
29th Floor
New York, NY 10006
Toll Free 866.COA.8088
212.797.3000
Fax 212.797.1428
www.COAnet.org

March 26, 2015

Mr. Richard Berry
Director
Mississippi Department of Human Services
750 North Street
Jackson, MS 39202

Rickey

Dear Mr. Berry,

In response to your recent letter, I am pleased to advise you that COA will respect DFCS's intention to continue through the process, including the remaining five (5) remedial site visits (IV-N, VI, VII-E, VII-W, and the State Office). We recognize, respect and applaud the work that the regional staff has devoted to the accreditation process and the progress that has been made to implement quality practice with children and families.

Nonetheless, I must reiterate that COA's rating system is such that DFCS will not be unable to achieve accreditation by the July deadline. At this time, DCFS as a whole remains out of implementation for RPM 5 (MACWIS) and ASE 6 (Driving Records). As a consequence, none of the regions can be considered to be "in compliance".

Moreover, even were these agency-wide issues to be successfully addressed, the pervasive, ongoing issues with assessment and service planning as revealed in the remedial site visits conducted at regional offices to date preclude accreditation. We encourage the agency to conduct its own internal review as a means to identify strategies for improving the important components of practice as noted by our Peer Reviewers.

In that regard and as I previously explained, the final opportunity for a region to demonstrate implementation of the standards in these casework practice areas is at the remedial site visit. A region's case records will not be reviewed subsequent to that time, including at the remedial site visit of the state office.

Please note that although COA's Accreditation Commission will review the agency's status in its July meeting, we will consider this as part of the current 2014-2015 contract.

At the conclusion of the process, I would welcome the opportunity to visit with you again to discuss all aspects of DFCS' experience and whether there is any future work that we can undertake together.

Sincerely,

Richard Klarberg
President & CEO

CC: Dr. Shackelford

**Grace M. Lopes**

---

**From:** "Richard Klarberg" <Rklarberg@coanet.org>
**Date:** March 26, 2015 at 11:29:21 AM CDT
**To:** "Richard \"Rickey\" Berry (richard.berry@mdhs.state.ms.us)" <richard.berry@mdhs.state.ms.us>
**Cc:** "Kim Shackelford (kim.shackelford@mdhs.ms.gov)" <kim.shackelford@mdhs.ms.gov>
**Subject: Correction to my letter**

Rickey – In the letter I sent to you earlier today,  I inadvertently included a double negative in the first sentence in the second paragraph. The sentence should read: "Nonetheless, I must reiterate that COA's rating system is such that DFCS will be unable to achieve accreditation by the July deadline."

       My apologies.

Richard