United States General Accounting Office

# GAO

Testimony

Before the Subcommittee on the District of Columbia, Committee on Government Reform, House of Representatives

For Release on Delivery
Expected at 2:00 p.m.
Friday, May 5, 2000

# FOSTER CARE

# Status of the District of Columbia's Child Welfare System Reform Efforts

Statement of Cynthia M. Fagnoni, Director
Education, Workforce, and Income Security Issues
Health, Education, and Human Services Division





GAO
Accountability * Integrity * Reliability



EXHIBIT
C

GAO/T-HEHS-00-109

# Foster Care: Status of the District of Columbia's Child Welfare System Reform Efforts

Mr. Chairman and Members of the Subcommittee:

I am pleased to be here today to discuss the status of the court-appointed receivership for the District of Columbia's child welfare system. Numerous problems in serving the children at risk of placement and those already in foster care in the District led the U.S. District Court for the District of Columbia in 1994 to develop a modified final order (MFO)[1] requiring over 100 corrective actions. In 1995, the Court removed the child welfare agency from the auspices of the District's Department of Human Services and from local government control, putting a child welfare receivership in place to implement the MFO requirements.[2] Recently, your Subcommittee has raised concerns about the proper operation of the receivership following the death of a child who had been returned to her mother, and whether significant risk to the safety and well-being of children exists.

Today, I would like to focus my remarks on our preliminary observations of (1) the progress the receivership has made to comply with the requirements of the MFO and (2) key elements that are essential for additional reforms to occur. My testimony is based on our ongoing work for the Subcommittee, including a review of progress reports prepared by the Center for the Study of Social Policy (CSSP)—the court-appointed monitor—and documentation provided by the receiver and other organizations, as well as our past work on organizational reform in general and child welfare system reforms in particular. (See related GAO products listed at the end of this testimony.)

In summary, our work has shown that resolving the long-standing systemic problems plaguing the District's child welfare system will take a concerted effort that goes beyond addressing the specific requirements of the MFO. While the receiver has made progress in correcting important child welfare agency deficiencies, our previous work shows that the responsibility for the safety and well-being of children cannot rest solely on an overwhelmed child welfare agency. The receiver has begun to fulfill her role in addressing the specific MFO requirements, such as developing and implementing a new child welfare information system that began operating in October 1999 and establishing a training project in January 1999 to enhance caseworker skills. The receiver acknowledges that

---

[1]The Court approved a final order in 1991 and subsequently approved an MFO in 1994 incorporating additional activities and requirements.

[2]A receivership is an arrangement whereby a court appoints a person to temporarily manage, in this case, a local agency, with broad authority to ensure full compliance with the court order in an expeditious manner.

Page 1                                                                  GAO/T-HEHS-00-109

changes to date address approximately 50 percent of the requirements in the MFO. However, implementing changes to address the MFO requirements alone cannot resolve the many systemic challenges that permeate the child welfare system. Many of the problems facing the District's system are similar to those faced by other jurisdictions around the country, and long-standing systemic weaknesses, such as poor working relationships between the agencies and the courts, hamper child welfare agencies' capacity to protect children. Our previous work found that in order to achieve tangible progress in eliminating these barriers, effective working relationships must exist among all stakeholders—such as private foster care providers, the court system, and other local government agencies—that have a role in keeping children safe. Some jurisdictions have fostered this collaboration by creating multidisciplinary advisory groups that work to resolve turf battles and dispel mistrust, or by pooling or blending funds from various state and federal sources to gain leverage in obtaining needed resources. District of Columbia officials and child welfare experts familiar with the District agree that this collaboration, while key to protecting children, is not fully developed in the District.

## Background

The appointment of a child welfare receivership began with the filing of a class action in 1989 on behalf of abused and neglected children in the District of Columbia. The trial and subsequent opinions the District Court produced detailed the many problems within the child welfare system and led to a finding of liability on the part of the District. For example, the U.S. District Court determined that, as a result of inept management and the indifference of the then Mayor's administration, the District had failed to comply with reasonable professional standards in almost every area of its child welfare system. The District had failed to investigate reports of abuse or neglect in a timely manner or provide needed services for children outside the foster care system; and, for children who entered the foster care system, the District had failed to place them appropriately, monitor their care, or adequately ensure permanent homes. Court documents traced these failures to staffing and resource problems, such as staff shortages, inconsistent application of policies and procedures, and an inadequate automated information system to track the placement and status of children in the District's care. The parties to the class action—the plaintiffs and the defendants—developed a remedial action plan to correct

the deficiencies.[3] The resulting MFO was established in January 1994. However, because the defendants did not comply with this order, the Court found the defendants to be in contempt and ordered the child welfare agency to be placed in receivership in 1995. Since then, the Court has twice appointed an individual to serve as a receiver to manage the child welfare agency's efforts to institute the changes outlined in the MFO. The first receiver served from August 1995 through June 1997 and the second and current receiver was appointed in October 1997. Throughout this time period, CSSP was appointed as court monitor of these efforts and, as of 1997, was required to file quarterly reports on the receiver's progress in meeting the MFO requirements. Court actions pertaining to the receivership are summarized in table 1.

**Table 1: Major Court Actions Leading to Child Welfare Receivership**

| Date | Court actions |
|---|---|
| 6/89 | The American Civil Liberties Union (ACLU) filed a class action suit, *LaShawn A. v. Barry*, on behalf of neglected and abused children in the District of Columbia. |
| 4/91 | The U.S. District Court for the District of Columbia issued a memorandum opinion holding that the defendants operated a child welfare system that violated the federal and local statutory rights of all children in the plaintiff class.[a] |
| 8/91 | District Court Judge Thomas Hogan signed a final order, jointly developed by the District's Department of Human Services and ACLU. The order set forth specific requirements for the District to improve its child welfare system. |
| 2/92 | The Court approved an implementation plan developed by CSSP, which had been appointed as court monitor. |
| 1/94 | The court approved an MFO. The court monitor subsequently developed a revised implementation plan incorporating the additional activities and requirements set forth in the MFO. |
| 8/95 | Because the defendants did not comply with the MFO, the Court issued a general receivership order to ensure full compliance with the order and the implementation plan. |

[a]*LaShawn A. v. Dixon*, 762 F. Supp. 959 (D.C.C. 1991).

Source: *District of Columbia Child and Family Services Agency Strategic Plan*, 1998-1999.

Requirements that the receiver must address in the MFO encompass the full scope of duties for which the District's Child and Family Services Agency is responsible. The District Court required the defendants to

---

[3]The class action named seven children as plaintiffs on behalf of the class. The defendants, who were sued in their official capacities, were the Mayor of the District, the Director of the Department of Human Services, the Commissioner of Social Services, the Acting Administrator of the Family Services Administration, and the Chief of the Child and Family Services Division.

Foster Care: Status of the District of
Columbia's Child Welfare System Reform
Efforts

comply with all provisions of the MFO by June 1995, with the exception of the computerized information system, which the defendants were to develop by December 1995. The MFO includes many requirements for improving the agency, such as provisions related to intake and assessment of cases; staff caseload standards; the provision of services to children and their families; and the placement of children in foster homes or other facilities. Examples of the more than 100 MFO requirements are shown in the appendix. In addition to meeting the MFO requirements, the receivership must also comply with provisions of the Adoption and Safe Families Act of 1997, which placed additional responsibilities on all child welfare agencies nationwide.[4]

## Some Aspects of the Child Welfare Agency's Operations Have Improved

Many changes to the District's child welfare agency have been put in place that begin to address the deficiencies identified in the MFO. The improvements made by the receiver focus on many important areas, including (1) strategic planning and organizational structure; (2) staff recruitment, training, and working conditions; and (3) initiatives for improving services to children. Some local officials have criticized the receiver's choice of which problems to address first. These officials believed the receiver should have focused more fully on improvements in how families' needs are met. However, child welfare experts acknowledged that currently no recommended approach to reforming child welfare systems exists. Most agree that both improvements to infrastructure and improvements directly related to child protection and service provision need to be addressed.

### Strategic Planning and Organizational Structure

The court monitor reported in December 1997 that, at the time the District Court appointed the current receiver, the child welfare agency lacked leadership, focus, and lines of accountability. To address these issues, the receiver restructured the organization by placing the functions of the child welfare agency under two units—operations and programs—each headed by a deputy receiver. The operations unit is responsible for fiscal operations, facilities management, human resources, and child information systems. The programs unit is accountable for intake and family services, permanency and planning, community services, and resource development. Together, the receiver and unit heads developed a

---

[4]For example, the act requires states to file a court petition to terminate the parental rights of the child's parents if the child has been in foster care for 15 of the most recent 22 months, and to hold a permanency planning hearing no later than 12 months after the child is considered to have entered foster care.

mission statement and goals in 1998 for moving the agency forward and produced a comprehensive strategic plan. The strategic plan has recently been updated to reflect progress toward meeting those goals. The receiver's objective for this restructuring and planning effort was to create, among other things, clear lines of responsibility, authority, and accountability for all management, supervisory, and direct service staff.

According to our study on improving organizations' management and performance, the magnitude of challenges that many organizations face necessitates substantive planning to establish clear goals and objectives for instituting reforms and to define the concrete steps and key milestones the organization will follow to track implementation status and progress.[5] Similarly, in developing the child welfare agency's strategic plan, the receiver identified specific milestones, completion dates, and expected outcomes for each goal, with links to specific MFO requirements. These actions represent initial steps in establishing the requisite managerial and planning frameworks for improving the child welfare system.

Of critical importance in supporting agency strategic planning and MFO compliance efforts is the development and implementation in October 1999 of the FACES[6] information system, designed to provide the agency with timely and reliable information on the children and families in its care. To ensure that the information system functions as intended and provides the necessary data for workers to assess families' situations over time, information on children's history—such as the date they entered foster care, prior incidences of abuse or neglect, and the number of placements a child has had—still needs to be added.

## Staff Recruitment, Training, and Working Conditions

The District Court reported in 1991 that staff caseloads consistently exceeded reasonable professional standards and prevented the agency from carrying out its responsibilities under federal and district law, in part because of staff shortages. Recent reports by the court monitor confirm that staff shortages continue. Compounding this shortage of staff is the MFO requirement that all social workers have a Master of Social Work (MSW) degree. According to the monitor's reports, a general shortage of MSW applicants exists. To increase the number of qualified staff to a level

---

[5] *Management Reform: Elements of Successful Improvement Initiatives* (GAO/T-GGD-00-26, Oct. 15, 1999).

[6] An agencywide contest provided the name for the new information system.

that meets required caseload ratios,[7] the receiver has acted on two fronts. The receiver identified the types of agency work that could be done by staff who have degrees such as Bachelor of Social Work, and will provide a justification to the U.S. District Court for approval to hire such staff. Also, to shorten recruitment and hiring time frames, the receiver obtained authority from the Office of the Mayor to directly process incoming personnel. According to the receiver, 10 anticipated new hires will lower the number of vacancies from 61 to 51. Given the number of employment applications received, the receiver believes the agency will be fully staffed by June 2000.

The District Court's concerns over the availability and adequacy of staff training led to an MFO provision requiring the agency to (1) develop a full-time unit to provide staff comprehensive child welfare training, (2) provide new hires a minimum of 80 hours of classroom and 80 hours of field pre-service training, and (3) provide all social workers a minimum of 40 hours in-service training each calendar year. To meet these requirements, the receiver established a training project operated for the agency by Virginia Commonwealth University in association with Howard and Catholic Universities. In January 1999, the project began offering courses covering a variety of topics such as special needs adoption, coping with grief and loss, and family violence. As of September 1999, the receiver reported that 734 staff had been trained, and the court monitor reported in March 2000 that many more staff now have access to training on an ongoing basis.

Although the MFO does not specifically require improvements in staff working conditions, the receiver and her management team identified poor working conditions as a major issue affecting the delivery of services to children. The receiver's strategic plan stated that staff were housed in seven separate locations, many of them in unsafe and unsanitary conditions, and lacked the basic tools to accomplish their work. To address these issues, the receiver consolidated all staff in one facility in February 2000. This building accommodates all the equipment and telecommunication needs of the agency and places staff nearer the Court and subway lines. In addition, to accommodate the growing demand for transportation services, the receiver restructured the agency's in-house transportation system by revising the shuttle service and replacing an

---

[7]The caseload ratios required by the MFO vary by the type of work the staff are conducting. For example, the ratio of caseloads to staff conducting investigations is 12 to 1, the ratio of foster children with special needs to staff is 12 to 1, and the ratio of all other foster children to staff is 20 to 1. The MFO also outlined ratios for other categories of workers.

unsafe van. The receiver believes these changes will (1) improve communications, coordination, and efficiencies among staff; (2) increase management and supervisory control; and (3) increase productivity.

## Initiatives to Improve Services to Children

The MFO contains many requirements related to improving services to children, such as requirements related to (1) intake and investigation services, (2) health care services provided to children in foster care, (3) community-based services to help prevent children from entering the child welfare system, (4) foster care placement services, and (5) permanency planning services to ensure children's time in out-of-home care is as short as possible. Examples of these requirements and the actions the receiver has taken to address the issues follow:

- The MFO requires the agency to establish, staff, and maintain a 24-hour system for receiving reports of child abuse and neglect. To address this provision, in April 1999 the receiver established a central hotline for reporting suspected child abuse and neglect. The hotline operates 24 hours a day, 7 days a week. The intake process uses information obtained through the hotline to help designate cases as urgent or nonurgent and to indicate recommended response times. However, although the hotline is fully staffed, the receiver acknowledged that the quality of work in responding to hotline calls needs upgrading.

- The MFO also requires that all children receive a medical screening within 24 hours of the agency's physical custody of a child, as well as a full medical and dental examination within 2 weeks. In addition, the December 1998 court monitor report stated that, prior to the MFO, the agency had little capacity to assess the health needs of children in foster care and to routinely provide access to services to meet those needs.[8] To provide health services for children when they enter foster care, in October 1999 the receiver launched D.C. KIDS—a health care case management system and provider network. The system was set up to provide children with more timely medical screening and comprehensive medical and psychological assessments and to track data on children's health throughout their tenure in foster care.

- The District Court expressed concern in 1991 over the absence of direct service resources—such as those for substance abuse, mental health, and housing—to prevent the placement of children in foster care, as well as the absence of agreements with other agencies or organizations to provide

---

[8]CSSP, *LaShawn A. v. Barry, Progress Report as of December 31, 1998* (Mar. 11, 1999).

those services. Provisions in the MFO address these concerns and require the agency to develop community-based services, such as crisis intervention, mental health, substance abuse, housing, and child care, to prevent the unnecessary placement or re-placement of children in the system. To meet MFO requirements, the receiver has continued work begun by her predecessor to transform the centralized child welfare system into a neighborhood-based system that empowers community collaboratives to partner with agency staff to provide needed services. By 1998, eight Healthy Families/Thriving Communities Collaboratives—comprising private agencies, community agencies, health centers, churches, universities, and resident groups—as well as the Ferebee Hope Community Services Center were established to develop a community-based, outcome-driven child and family services delivery approach. According to the Collaboratives' mission statement, the Collaboratives base their approach on community partnerships to provide early intervention, family support, and violence prevention services. These entities also work to build provider capacity and experiment with practice innovations. For example, the Far Southeast Family Strengthening Collaborative has supported four local family centers that provide services such as parent support groups and domestic violence programs. The receiver reported in 1999 that these community-based preventive services are beginning to have an effect because fewer children entered out-of-home care in fiscal year 1999 than in previous years.

The receiver has also begun work on developing and supporting out-of-home placements for children who need to be removed from their homes. This work addresses provisions in the MFO that require the agency to take the steps necessary to ensure it has a sufficient number of foster homes, group homes, therapeutic foster homes, and residential treatment facilities to allow it to place children promptly in the most family-like setting and in close proximity to their homes and communities.[9] In addition, the MFO requires the agency to place children with their relatives whenever possible and appropriate. To address these provisions, the receiver is working with the Casey Family Program—a private foundation that provides and promotes permanency for children in a variety of settings—to identify resources to move children who are placed far from the District back in local homes and facilities, and with the Annie E. Casey Foundation—a private entity that works to improve the futures of disadvantaged children—to recruit additional foster homes. In addition,

---

[9]Children with special needs, who would not ordinarily be placed in traditional family foster care, may be placed in a therapeutic family foster home as an alternative to group care or residential treatment.

Foster Care: Status of the District of
Columbia's Child Welfare System Reform
Efforts

the receiver established a Kinship Care Division and applied for, and the District was designated as, a site for a 5-year federal kinship care demonstration project.

A key expectation for out-of-home services for children is ensuring that children are in out-of-home care for as short a time as possible and that they are placed in a permanent home in a timely manner. After the development of the MFO and its related permanency planning requirements, the Congress passed the Adoption and Safe Families Act of 1997 (ASFA), which shortened the time frames that children may remain in care before action on permanency is required.[10] To address the ASFA provisions, the receiver recently began to collaborate with representatives of the District of Columbia Superior Court, the Metropolitan Police Department, and the District's Office of Corporation Counsel to develop joint procedures to implement ASFA's provisions. In addition, the American Bar Association is drafting court rules to implement the ASFA legislation and the new procedures. Local officials believe, however, that problems within the court system could hinder implementation of ASFA. For example, child welfare cases are spread among 59 Superior Court judges, no family court exists, and overcrowded court calendars and numerous case continuances are typical.[11] As a result, these officials believe the ability of the court to move cases more quickly to meet ASFA time frames is limited.

## Effective Working Relationships Essential for Additional Reforms to Occur

Although progress has been made in complying with the MFO, further movement toward meeting these requirements depends upon the District's ability to create an environment for additional reforms to occur. While the problems of the District's child welfare system are formidable, they are similar to those faced by other jurisdictions around the country. Our previous work found that effective working relationships among key child welfare system stakeholders who play a role in keeping children safe are essential to successful reform efforts.[12]

---

[10]ASFA requires states and localities to file a court petition to terminate the parental rights of the child's parents if the child has been in foster care for 15 of the most recent 22 months, and to hold a permanency planning hearing no later than 12 months after the child is considered to have entered foster care. ASFA changed the definition of when a child is considered to have entered foster care from that of previous laws. A child is considered to have entered care the earlier of (1) the date of the first judicial finding that the child has been subjected to abuse or neglect or (2) 60 days after the date on which the child is removed from the home.

[11]When a continuance is granted by the judge, the case is rescheduled for another day.

[12]*Juvenile Courts: Reforms Aim to Better Serve Maltreated Children* (GAO/HEHS-99-13, Jan. 11, 1999).

District of Columbia officials and child welfare experts familiar with the District agree that this collaboration is key to protecting children and is not fully developed in the District. Some jurisdictions have fostered this collaboration by creating multidisciplinary advisory groups that work to resolve turf battles and dispel mistrust, or by pooling or blending funds from various state and federal sources to gain leverage in obtaining needed resources. Other jurisdictions have built partnerships at the decision-making level for individual cases.

## Collaboration Among Key Stakeholders Not Fully Developed

In order to function effectively, child welfare agencies need a rich array of services to meet the needs of abused and neglected children and their families. Rarely, however, does a single state or local agency have control over acquiring all the needed services. Many needed services, such as mental health care and drug treatment, are outside the control of the child welfare agency. Therefore, strong collaboration among all stakeholders who play a role in helping children and families, such as private provider agencies, neighborhood collaboratives, the police department, local government leaders, substance abuse and mental health agencies, and agency legal counsel, is essential to obtaining the necessary services. Although stakeholders in the District have taken initial steps to work together in limited areas—such as in developing procedures for implementing ASFA and building partnerships with the Healthy Families/Thriving Communities Collaboratives—District executive branch officials indicated that cooperative working relationships still do not fully exist. For example, a 1999 report to the District's Mayor stated that the child welfare agency existed as an independent entity, lacking functional, symbiotic relationships with critical executive branch agencies such as the Department of Health, Fire and Medical Emergency Services, District public schools, and the Office of Corporation Counsel.[13],[14] The lack of these relationships impedes the agency's efforts to conduct its work efficiently. For instance, the Health Department has responsibility for issuing licenses to enable families to house and care for foster children. But because of the Health Department's inadequacies—such as low staffing and funding levels—and its perception that it did not have to coordinate with the receivership, it placed low priority on approving foster home applications. Similarly, the 1999 report to the Mayor stated that the Department of Human Services, which formerly administered the child

---

[13]The Office of the Corporation Counsel's Family Services Division prosecutes civil child abuse and neglect, termination of parental rights, and adult protective services cases for the District of Columbia.

[14]Carolyn N. Graham and Kennedy S. Khabo, *Report to Anthony A. Williams, Mayor, The District of Columbia Safe Passages to Permanency Initiative* (Oct. 1999).

welfare agency, does not have a relationship with the agency that sufficiently allows for resource sharing. For example, no formal relationship exists to encourage the ongoing transfer of resources, such as Temporary Assistance for Needy Families (TANF) assistance and child care resources, that would benefit the agency's operation.[15] The report's authors believed that the independence of the receivership affects the way in which these agencies work together.

## Collaborative Efforts Can Occur on Two Levels

Our previous work shows that collaborative approaches can occur on two levels—some focus on integrating the key child welfare system participants to develop joint solutions to crosscutting problems and others focus on building collaboration in making decisions on individual child welfare cases. These approaches may provide important illustrations of ways the District can further improve its child welfare system. For example, jurisdictions in five states—California, Florida, Illinois, North Carolina, and Ohio—convened multidisciplinary advisory committees to (1) work on resolving turf battles, (2) dispel the mistrust among system participants, and (3) develop and implement reforms. Committees were typically composed of representatives from key groups, such as child welfare agencies, attorneys, judges, court-appointed special advocates,[16] and other advocates. For example, Cook County, Illinois, established a Child Protection Advisory Group composed of 32 individuals representing all offices of the court, the child welfare agency, private social service agencies, legal service providers, advocacy groups, and universities. The group is divided into subcommittees that focus on various issues, such as alternatives to court intervention, making decisions in the best interests of the child, and terminating parental rights.

Other jurisdictions across the country have taken a different approach to building collaboration by pooling or blending funds to obtain the needed services. For example, Boulder County, Colorado, pooled its child welfare allocation from the state with funding from the mental health agency and the youth corrections agency to provide joint programming and placement decision-making for adolescents in need of out-of-home care in group or residential settings. Similarly, the Wraparound Milwaukee program in

---

[15]TANF is a block grant for state-designed programs that provide time-limited aid to families with children, such as employment assistance and child care. For example, TANF allows states to operate programs designed to aid needy families so that children may be cared for in their homes or the homes of relatives.

[16]Court-appointed special advocates, usually volunteers, are trained to provide assistance to the court and to oversee a child's case.

**Foster Care: Status of the District of Columbia's Child Welfare System Reform Efforts**

Wisconsin blended Medicaid, child welfare, and federal grant funds into a single buying pool to purchase individualized, family-based services to help children placed in residential treatment centers return to their families, foster homes, or other living arrangements in the community.[17] The Annie E. Casey Foundation recently reported on the experiences of Scott County, Iowa, where an underlying cause of the child welfare crisis was the state's inflexible and uncoordinated system of services for troubled children and their families.[18] In response, a pilot project in Scott County combined several separate state and state/federal funding sources into a single, locally controlled fund. According to the report, this process encouraged the local development of a full range of preventive and treatment services and allowed communities to experiment and innovate. The pilot has since spread to 98 of Iowa's 99 counties, and results were measurable. For example, statewide results include a 21-percent decline in out-of-home placements between 1994 and 1998 and a systemwide shift in child welfare spending, such as a 30-percentage-point increase in spending for in-home services.

Other collaborative efforts focused on improving decision-making on individual cases, intervening at key points to gather and share comprehensive information among participants. For example, Day One Conferences in North Carolina's District 20 are held on the first business day after a child is taken into custody by the child welfare agency. In attendance are the parents, child welfare caseworkers, guardians <u>ad litem</u>,[19] public and mental health liaisons, attorneys, public education liaisons, child support liaisons, and law enforcement officers. These meetings provide a forum to arrange services for the family immediately and provide an opportunity to reach agreement on many aspects of the case outside the courtroom, thus reducing the number of times a case is continued in court.

## Concluding Observations

The receiver has been tasked by the District Court to correct the numerous deficiencies outlined in the MFO. However, responsibility for the safety and well-being of the District's children cannot rest solely on an

---

[17]The county child welfare agency and the state health care financing agency each agreed to pay a specific monthly rate for services to children. These funds were pooled with a federal grant to pay the costs of residential treatment, group and foster care, and all other services except physical health care.

[18]The Annie E. Casey Foundation, *Decat in the Hat: Iowa's Successful First Step Toward Devolving Resources, Responsibility, and Accountability for Child and Family Outcomes* (Spring 1999), http://www.aecf.org/publications/advocasey/decat/index.htm (cited Mar. 17, 2000).

[19]Guardians *ad litem* are attorneys or trained volunteers who represent the child in court, investigate the case, and monitor case progress.

**Foster Care: Status of the District of Columbia's Child Welfare System Reform Efforts**

overwhelmed child welfare agency. While progress has been made in addressing certain deficiencies in the agency's infrastructure, improving the child welfare system in the longer term requires a concerted and sustained collaborative effort by all organizations that have a role in protecting and serving the needs of children. Because the receivership is intended to be a temporary vehicle for correcting specific problems in the agency, the Court and the District will at some point need to determine when the receivership should end and governance of the child welfare agency should transfer back to local government. However, unless collaboration among all key stakeholders is embedded in each organization's day-to-day operations, the long-standing cycle of organizational divisiveness will continue to threaten attempts to successfully reform the child welfare system and hinder the ability of the District to keep children safe.

Mr. Chairman, this concludes my prepared statement. I would be pleased to respond to any questions that you or other Members of the Subcommittee may have.

# GAO Contact and Acknowledgments

For further contacts regarding this testimony, please call Cynthia M. Fagnoni at (202) 512-7215. Individuals making key contributions to this testimony included Clarita Mrena, Diana Pietrowiak, and Mark Ward.

# Examples of Major MFO Requirements

| Categories of requirements | Selected examples of required actions |
|---|---|
| Named plaintiffs | • Maintain continual and steady progress toward permanency with regard to the named plaintiffs.<br>• Ensure that plaintiffs' counsels receive quarterly reports concerning the children's status, services provided, and implementation plans for the named plaintiffs. |
| Protective services | • Establish, staff, and maintain a 24-hour system for receiving and responding to reports of child neglect and abuse that conforms with reasonable professional standards.<br>• Initiate investigations of all reports of abuse or neglect within 48 hours.<br>• Develop policies and procedures to conduct risk assessments and to ensure that investigations and decisions are based on a full and systematic analysis of the family. |
| Services to children and families | • Develop policies and procedures for determining and ensuring that families are referred to and receive the intensity and level of services necessary to preserve family relationships, prevent additional abuse/neglect, promote better parental care, and ensure good care for the child.<br>• Review and revise children's case plans to determine additional services needed if a foster home placement or adoptive home placement is in danger of disruption.<br>• Develop a range of community services, such as homemaker services, parent education/counseling, mental health services, substance abuse programs, and housing assistance. |
| Placement, supervision, and review of children in foster care | • Develop policies and procedures for voluntary placement of children, and follow specific guidelines in the MFO regarding the use of this option.<br>• Establish and maintain a placement office with sufficient staff and other resources to ensure all children are placed promptly and appropriately.<br>• Do not place children under age 6 in a group care setting unless the child's exceptional needs cannot be met in any other type of care. Do not place children under age 12 in a group care setting for more than 30 days unless the child has special treatment needs that cannot be met in any other way.<br>• Provide a medical screening for each child within 24 hours of the agency taking physical custody and provide a full medical and dental exam within 2 weeks.<br>• Establish a planning process to work intensively with the child's parents and other appropriate family members to allow the child to remain at home, if appropriate; work intensively and collaboratively with the family to return the child home under appropriate circumstances if removal was necessary; and ensure alternative, appropriate, permanent placements as quickly as possible for children who cannot return home.<br>• Follow specific MFO guidance on the assignment of permanency goals for each child.<br>• Visit the child in the foster home no less than once per week during the first 8 weeks of placement. Thereafter, visit the child no less than every 2 weeks.<br>• Develop and implement a case review system that ensures (1) all children in foster care receive timely and meaningful case reviews, and (2) management personnel are able to monitor the compliance with policies and procedures, District law, and the provisions of the MFO. |
| Adoption | • Begin seeking an adoptive placement as soon as the child's permanency goal becomes adoption, following the specific time frames set forth in the MFO.<br>• Transfer adoption cases to the Adoption Branch within 5 days of when the permanency goal becomes adoption. Prepare a transition plan, developed jointly by the foster care worker and the adoption worker, detailing the individualized procedures to prepare the child and to facilitate and expedite the child's placement.<br>• Begin individual, child-specific adoptive home recruitment for any child for whom an |

**Examples of Major MFO Requirements**

| | |
|---|---|
| | adoptive home has not been identified within 90 days after the child was referred to the Adoption Branch. |
| Caseloads, staffing, and training | • Follow the maximum caseloads outlined in the MFO, such as 1:12 staff to investigations, 1:17 staff to families with children remaining in the home, 1:12 staff to foster children with special needs, 1:20 staff to all other foster children, and 1:12 staff to children for adoption placement.<br>• Develop and implement a plan to ensure sufficient staff for all work are available at all times.<br>• Hire social workers who have a master's degree in social work, unless the requirement is changed with consent of the plaintiffs.<br>• Establish a full-time unit to provide comprehensive child welfare training to staff.<br>• Provide new hires a minimum of 80 hours in class and 80 hours of field pre-service training.<br>• Provide all social workers a minimum of 40 hours in-service training each calendar year. |
| Resource development and contract review | • Determine the need for an adequate number of community-based services to prevent unnecessary placement, re-placement, adoption, and foster home disruption.<br>• Develop decentralized community-based services and ensure the availability of needed resources in each ward of the District.<br>• Develop an annual adoptive home recruitment plan to recruit, train, and retain potential adoptive families.<br>• Approve and monitor all foster homes following the specific time frames and guidelines in the MFO.<br>• Develop policies and procedures to outline and review specific contract performance for each contract with private providers and agencies. |
| Information system | • Develop a unitary computerized information system that contains mandated data elements and sufficient information to permit social workers and administrators to achieve compliance with all MFO provisions and relevant District law. |
| Financial development | • Develop and implement policies and procedures to maximize funds available to the agency through titles IV-B and IV-E of the Adoption Assistance and Child Welfare Act of 1980, the Medicaid Act, and the Supplemental Security Income Act. |
| Special corrective action | • Develop a plan to immediately take all necessary action for children in specific categories, such as those (1) in emergency care more than 90 days, (2) in foster homes or facilities that exceed licensed capacity or that are not licensed, (3) who have had a permanency goal of adoption for more than 90 days, (4) under age 12 with a permanency goal of long-term foster care or independent living, and (5) in facilities more than 100 miles from the District. |

Source: *LaShawn A. v. Dixon, Modified Final Order* (Nov. 18, 1993).

# Related GAO Products

*Foster Care: States' Early Experiences Implementing the Adoption and Safe Families Act* (GAO/HEHS-00-1, Dec. 22, 1999).

*Foster Care: HHS Could Better Facilitate the Interjurisdictional Adoption Process* (GAO/HEHS-00-12, Nov. 19, 1999).

*Management Reform: Elements of Successful Improvement Initiatives* (GAO/T-GGD-00-26, Oct. 15, 1999).

*Juvenile Courts: Reforms Aim to Better Serve Maltreated Children* (GAO/HEHS-99-13, Jan. 11, 1999).

*Child Welfare: Early Experiences Implementing a Managed Care Approach* (GAO/HEHS-99-8, Oct. 21, 1998).

*Foster Care: Agencies Face Challenges Securing Stable Homes for Children of Substance Abusers* (GAO/HEHS-98-182, Sept. 30, 1998).

*Child Protective Services: Complex Challenges Require New Strategies* (GAO/HEHS-97-115, July 21, 1997).

*Child Welfare: States' Progress in Implementing Family Preservation and Support Services* (GAO/HEHS-97-34, Feb. 18, 1997).

*Child Welfare: Opportunities to Further Enhance Family Preservation and Support Activities* (GAO/HEHS-95-112, June 15, 1995).

(116041)

| | |
|---|---|
| **Ordering Information** | *Orders by Internet* <br><br> For information on how to access GAO reports on the Internet, send an e-mail message with "info" in the body to: <br><br> Info@www.gao.gov <br><br> or visit GAO's World Wide Web home page at: <br><br> http://www.gao.gov |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | *Contact one:* <br><br> Web site: http://www.gao.gov/fraudnet/fraudnet.htm <br><br> E-mail: fraudnet@gao.gov <br><br> 1-800-424-5454 (automated answering system) |