

Center
for the
Study
of
Social
Policy

*LAShAWN A. v. GRAY PROGRESS REPORT*
*FOR THE PERIOD JULY 1 – DECEMBER 31, 2013*



**May 14, 2014**



*LaShawn A. v. Gray*
**Progress Report for the Period July 1– December 31, 2013**

## TABLE OF CONTENTS

I. INTRODUCTION .................................................................................1

A. Methodology ...............................................................................1
B. Report Structure ..........................................................................3

II. SUMMARY OF PERFORMANCE ....................................................4

A. Progress on IEP Exit Standards ..................................................5
B. Overall Performance in Substantive Areas ................................6

III. SUMMARY TABLES OF *LASHAWN A. v. GRAY*
IMPLEMENTATION AND EXIT PLAN PERFORMANCE...................11

Table 1: Performance on IEP Exit Standards for Outcomes
to be Achieved Between July 1 and December 31, 2013 .......... 11-26

Table 2: Performance on IEP Exit Standards for Outcomes
to be Maintained Between July 1 and December 31, 2013.................... 27-58

IV. DISCUSSION OF *LASHAWN A. v. GRAY*
IMPLEMENTATION AND EXIT PLAN OUTCOMES ...........................59

A. GOAL: CHILD SAFETY ....................................................................59

1. Hotline…..................................................................................61
2. Investigations ..........................................................................62
3. Family Assessments ................................................................74
4. Services to Families and Children to Promote Safety,
   Permanency and Well-Being ..................................................76
5. Visitation ................................................................................82

B.  GOAL: PERMANENCY .................................................................................91

    1.  Relative Resources........................................................................91
    2.  Placement of Children ..................................................................92
    3.  Reduction of Multiple Placements for Children in Care .................................96
    4.  Timely Approval of Foster Parents.............................................................103
    5.  Appropriate Permanency Goals ................................................................105
    6.  Timely Adoption and Permanency ...........................................................108
    7.  Case Planning Process ........................................................................114

C.  GOAL: CHILD WELL-BEING .................................................................120

    1.  Sibling Placements and Visits ...............................................................120
    2.  Assessments for Children Experiencing a Placement Disruption..................120
    3.  Health and Dental Care ....................................................................122

D.  RESOURCE DEVELOPMENT AND
    SYSTEM ACCOUNTABILITY ...............................................................134

    1.  Caseloads ........................................................................................134
    2.  Staff Training ...................................................................................138
    3.  Training for Foster and Adoptive Parents ................................................138
    4.  Special Corrective Action ..................................................................139
    5.  Reviewing Child Fatalities ................................................................141
    6.  Quality Assurance............................................................................144
    7.  Financing.........................................................................................146

APPENDICES
    A.  Glossary of Acronyms
    B.  2013 *LaShawn* Strategy Plan with modifications
    C.  2014 *LaShawn* Strategy Plan

# LIST OF TABLES

**TABLE**

1. Performance on IEP Exit Standards for Outcomes to be
   Achieved Between July 1 and December 31, 2013 ................................................... 11-26

2. Performance on IEP Exit Standards for Outcomes to be
   Maintained Between July 1 and December 31, 2013 ................................................ 27-58

3. Number of Calls to Child Abuse and Neglect Hotline by DR Pathway
   (July – June 2013) ..................................................................................................... 61

4. Service Referrals to Collaborative or Community-based Agency for
   Family Assessments (July – December 2013) ................................................................. 75

5. Demographics of Children in Out-of-Home Placement
   as of December 31, 2013 ............................................................................................ 94

6. Children and Youth Exiting to Permanency by Cohort
   as of September 30, 2013 ........................................................................................... 113

7. Percentage of Foster Parents who Received Child's
   Medicaid Number within Five Days of the Child's Placement
   (July – December 2013) ............................................................................................. 132

8. Percentage of Foster Parents who Received Child's Medicaid
   Card within 45 Days of the Child's Placement (July – December 2013) ...................... 132

9. Investigative Social Workers Exceeding Caseload Limits
   (July – December 2013) ............................................................................................. 136

10. Family Assessment (FA) Social Workers Caseloads
    (July – December 2013) ............................................................................................. 137

11. Number of Children in Special Corrective Action Categories
    by Month (July – December 2013) ............................................................................. 140

12. Actual and Budgeted Gross Title IV-E Federal Funds Operating Budget
    (FY2009 – FY2015) ................................................................................................... 147

# LIST OF FIGURES

**FIGURE**

1. Timely Initiation of Investigations (December 2012 – December 2013) ........................63

2. Timely Initiation of Investigations (July – December 2013) ...........................................64

3. Timely Completion of Investigations (June 2011 – December 2013) .............................65

4. Timely Completion of Investigations (July – December 2013) .......................................66

5. Completion of Comprehensive Reviews of Case History and
   Current Circumstances for Families Subject to a New Investigation
   for Whom the Current Report is the Fourth or Greater Report
   Within the Last 12 Months (December 2012 – December 2013) ....................................67

6. Completion of Reviews for Families Subject to a New Investigation
   for Whom the Current Report is the Fourth or Greater Report
   Within the Last 12 Months (July – December 2013) ......................................................68

7. Investigations Determined to be of Acceptable Quality
   (June 2011 – December 2013)........................................................................................69

8. Community-based Services Referrals for Low and
   Moderate Risk Families (October 2012 – December 2013).............................................72

9. Community-based Services Referrals for Low and
   Moderate Risk Families (July – December 2013)............................................................73

10. QSR Implementing Supports and Services Indicator Parameters to
    Consider and Description of Acceptable/Unacceptable Performance .............................77

11. QSR Pathway to Case Closure Indicator Parameters to Consider
    and Description of Acceptable/Unacceptable Performance ...........................................78

12. QSR Findings on Services to Families and Children to
    Promote Safety, Permanency and Well-Being (CY2010 - CY2013)...............................79

13. QSR Findings on Services to Children and Families to Promote
    Safety, Permanency and Well-Being (January – December 2013) .................................80

14. Required Number of Visits to Children in New Placements
    (July – December 2013) .................................................................................84

15. Required Number of Worker Visits to Children in New Placements
    (July – December 2013) .................................................................................85

16. Percentage of Households with Twice Monthly Visits between Workers
    and Parents with Goal of Reunification (December 2011 – December 2013)................86

17. Percentage of Households with Twice Monthly Visits between Workers and
    Parents with Goal of Reunification (October – December 2013) ....................................87

18. Percentage of Children with Goal of Reunification who Visit Weekly
    with the Parent with whom Reunification is Sought
    (December 2011 – December 2013) ...............................................................88

19. Percentage of Children with Goal of Reunification who Visit Weekly with
    the Parent with whom Reunification is Sought (October – December 2013) .................89

20. Number of Children in Out-of-Home Placements by Year
    (CY2005 – CY2013) .....................................................................................93

21. Placement Service Type for Children in
    Out-of-Home Care as of December 31, 2013...............................................................95

22. Children in Foster Care at Least 8 Days and Less than 12 Months
    with 2 or Fewer Placements (June 2011 – December 2013)...........................................97

23. Children in Foster Care at Least 8 Days and Less than 12 Months
    with 2 or Fewer Placements (July – December 2013).....................................................98

24. Children in Foster Care at Least 12 Months but Less than
    24 Months with 2 or Fewer Placements (June 2011 – December 2013).........................99

25. Children in Foster Care at Least 12 Months but Less Than
    24 Months with 2 or Fewer Placements (July – December 2013) .................................100

26. Children in Foster Care at Least 24 Months with 2 or Fewer
    Placements During a 12-Month Period (June 2011 – December 2013).........................101

27. Children in Foster Care at Least 24 Months with 2 or Fewer
    Placements During a 12-Month Period (July – December 2013) ..................................102

28. Approval of Foster Parents within 150 Days of Beginning Training
    (July 2012 – December 2013) ......................................................................103

29. Youth Ages 18 and Older with a Youth Transition Plan
    (January 2012 – December 2013) ...................................................................106

30. Children Placed in Pre-Adoptive Home Within 9 Months
    of Goal Change to Adoption (January 2012 – December 2013)....................109

31. Timely Permanency for Children (September 2011 – September 2013)......................111
        i.   Timely Permanency for Children in Care for 8 days or longer
        ii.  Timely Permanency for Children in Care between 12 and 25 months
        iii. Timely Permanency for Children in Care for 25 months or longer

32. QSR Planning Interventions Indicator Parameters to Consider
    and Description of Acceptable/Unacceptable Performance..............................116

33. QSR Pathway to Case Closure Indicator Parameters to Consider
    and Description of Acceptable/Unacceptable Performance..............................117

34. QSR Findings on Case Planning Process (CY2010 – CY2013) ....................118

35. QSR Findings on Case Planning Process (January – December 2013) .........119

36. Percentage of Children who Received a Health Screening
    Prior to Placement (Initial or Re-Entries) (June 2011 – June 2013) ..............122

37. Percentage of Placement Activities where Children Received a Health
    Screening Prior to Re-Placement (for Children with Multiple Placements)
    (June 2011 – December 2013)........................................................................123

38. Percentage of Children who Received a Health Screening Prior to
    Placement (Initial and Re-Entries) and Re-Placement
    (January – December 2013) ...........................................................................124

39. Percentage of Children who Received a Full Medical Evaluation
    Within 30 Days of Placement (December 2010 – December 2013) ...............125

40. Percentage of Children who Received a Full Medical Evaluation
    Within 60 Days of Placement (December 2010 – December 2013) ...............125

41. Percentage of Children who Received a Full Medical Evaluation
    Within 30 and 60 Days of Placement (July – December 2013) .....................126

42. Percentage of Children who Received a Full Dental Evaluation
    Within 30 Days of Placement (December 2010 – December 2013) ...............127

43. Percentage of Children who Received a Full Dental Evaluation
    Within 60 Days of Placement (December 2010 – December 2013) ...............128

44.  Percentage of Children who Received a Full Dental Evaluation
     Within 90 Days of Placement (December 2010 – December 2013) ..............................128

45.  Percentage of Children who Received a Full Dental Evaluation
     (July – December 2013) .................................................................................................129

46.  Medicaid Number and Medicaid Card Distribution to Foster Parents
     (June – December 2013).................................................................................................131

47.  Percentage of Investigative Workers who Met Exit Standard Requirements for
     Caseloads (December 2011 – December 2013) .............................................................135

48.  Percentage of Foster/Adoptive Parents with 15 Hours of Pre-Service Training
     (June 2012 – December 2013).......................................................................................139

## LaShawn A. v. Gray
## Progress Report for the Period July 1 – December 31, 2013

## I.    INTRODUCTION

This report on performance of the District of Columbia's child welfare system for the period of July 1 through December 31, 2013 is prepared by the Center for the Study of Social Policy (the *LaShawn A. v. Gray* Court-appointed Monitor). The Center for the Study of Social Policy (CSSP) is responsible to the Honorable Thomas F. Hogan of the United States District Court for the District of Columbia as Federal Monitor of the class action lawsuit *LaShawn A. v. Gray.* As Monitor, CSSP is required to assess independently the District of Columbia's performance in accordance with the *LaShawn* Modified Final Order (MFO)[1] and in meeting the outcomes and Exit Standards set by the Implementation and Exit Plan (IEP).[2]

The IEP includes four sections: Section I: Outcomes to be Achieved; Section II: Outcomes to be Maintained; Section III: Sustainability and Exit; and Section IV: Strategy Plan, which is updated annually.[3] The IEP establishes the Court's expectations regarding the outcomes and performance levels to be achieved and sustained in order to fulfill the requirements of the *LaShawn* MFO. For each of the outcomes, an Exit Standard(s) has been identified.

The Monitor's last report on *LaShawn* implementation was released on November 21, 2013. With few exceptions, this report is based on data and performance from July through December 31, 2013 to determine progress in meeting the IEP Exit Standards and the objectives of the 2013 Strategy Plan.

### A.    <u>Methodology</u>

The primary sources of information about performance are data provided by the Children and Family Services Agency (CFSA) and verified by the Monitor. The Monitor receives extensive aggregate and back-up data and has access to staff and FACES.NET[4] to verify performance.

---

[1] Modified Final Order (Dkt. No. 222 (order adopting MFO); Dkt. No. 222-2 (MFO)), January 27, 1994.

[2] Implementation and Exit Plan (Dkt. No. 1073), December 17, 2010.

[3] The 2010-2011 Strategy Plan was entered by the Court on December 17, 2010 as Section IV of the IEP. The District filed the 2012 Strategy Plan with the Court on March 27, 2012. *See* 2012 Strategy Plan (Dkt. No. 1095-1). The District filed the 2013 Strategy Plan with the Court on February 20, 2013. *See* 2013 Strategy Plan (Dkt. No. 1108-1). Appendix B of this report includes the 2013 Strategy Plan with modifications. The District filed the 2014 Strategy Plan with the Court on February 18, 2014 (Dkt. No. 1121-1).

[4] FACES.NET is CFSA's automated child welfare information system.

The Monitor conducted the following supplementary verification and data collection activities during this period:

➤ *__Review of Young Children Placed in Congregate Care Settings__*

Monitor and CFSA staff reviewed all children under the age of 12 who were placed in a congregate care setting for more than 30 days, including those children under the age of six who were placed in congregate care settings for any length of time, during the review period to determine if these placements were appropriate and met an agreed upon placement exception.

➤ *__Validation of Training Data__*

The Monitor conducted an independent validation of data on pre- and in-service training for CFSA and private agency staff, and foster and adoptive parents.

➤ *__Validation of Timely Licensure of Foster and Adoptive Parents__*

The Monitor conducted additional validation of licensure data for those foster and adoptive parents whose licensure took more than 150 days to determine if the delay was due to circumstances outside the District's control.

➤ *__Validation of Caseload Data__*

The Monitor conducted an independent validation of caseload data for CFSA and private agency social workers for the period between July and December 2013.

➤ *__Quality Service Reviews (QSR)__*

Most of the Exit Standards are assessed using administrative data from FACES.NET, which are reviewed and in many areas independently validated by the Monitor. CFSA also provides manual data, both from case record reviews and Quality Service Reviews (QSR)[5], for some Exit Standards. Using a structured protocol, QSR reviewers synthesize the information gathered and objectively rate how well the child is functioning and how the system is performing to support the child and family. Reviewers provide feedback to social workers and supervisors as well as a written summary of findings to expand and justify QSR ratings.

---

[5] The QSR is a case-based qualitative review process that requires interviews with all of the key persons who are working with and familiar with the child whose case is under review.

Between January and December 2013, a total of 100 QSRs were completed by CFSA and CSSP staff to assess case planning and service delivery outcomes. Twenty-seven of the 100 QSRs were completed in a condensed time period (September and October) as part of a grand review to understand overall system performance and elevate themes and recommendations for continuous quality improvement. As part of *LaShawn* monitoring, the Monitor conducts some of the QSRs, participates in oral case presentations[6] and verifies data from QSR reviews conducted by CFSA.

> ### *Other Monitoring Activities*

The Monitor attends numerous CFSA meetings including management team meetings, policy workgroup meetings, CPS Grand Rounds and CFSA Internal Child Fatality Review Committee, as well as the City-wide Child Fatality Review Committee. The Monitor meets frequently with senior leadership and managers throughout the Agency and during this monitoring period, observed several Trauma Systems Therapy (TST) trainings, RED (review, evaluate and direct) Team implementation meetings and several different types of RED Team meetings. Additionally, the Monitor interviewed and collected information from external stakeholders of the District of Columbia's child welfare system, including contracted service providers, Collaborative agencies and advocacy organizations. In October 2013, the Monitor completed a site visit to the homeless family shelter located on the campus of DC General Hospital in the District where approximately 40 families with CFSA involvement were residents.

## B.    Report Structure

This monitoring report assesses the District of Columbia child welfare system's performance in meeting the IEP Exit Standards, as defined in the December 17, 2010 Court Order, during July through December 2013. Section II provides a summary of the District's progress in improving outcomes in 2013. In Section III, the summary tables provide the Court with a consolidated update of the District's performance as of December 2013 on IEP Outcomes to be Achieved and Outcomes to be Maintained Exit Standards. Section IV provides further discussion of the data, an assessment of whether the District has met the required Exit Standards for IEP Outcomes to be Achieved and for some measures, maintained required performance for IEP Outcomes to be Maintained, and progress in implementing specific strategies identified in the 2013 Strategy Plan.

---

[6] After completing a QSR, the lead reviewer and partner, if available, present the findings of the case and ratings on the indicators to a small panel of CFSA, CSSP and Department of Behavioral Health (DBH) staff, when applicable, in order to ensure inter-rater reliability. All participants on the panel are trained and certified lead QSR reviewers.

## II.    SUMMARY OF PERFORMANCE

Throughout CY2013, the Child and Family Services Agency (CFSA) has continued its deliberate efforts to improve the quality and effectiveness of its work with children, youth and families, implementing significant initiatives to change its engagement with families, support workers' critical thinking and create new processes through which decisions about maltreatment, entry to foster care and service delivery are made and reviewed. Notable elements of change include:

- Full implementation of a Differential Response (DR) system[7] with staffing changes to allow for assignment of hotline referrals alleging abuse or neglect to the most appropriate pathway to meet child(ren) and family needs;
- Full implementation of the RED (Review, Evaluate and Direct) Team framework[8] in the entire spectrum of child welfare services. CFSA has begun to integrate information collected and decisions made in the RED Teams into the FACES.NET data system structure;
- Continued implementation of the Trauma Systems Therapy (TST) model[9] through training child welfare staff and other community members and enhanced assessment and practice development strategies;
- Anticipated expansion of intensive home and community-based services available through the Title IV-E Waiver, specifically Homebuilders[10] and Project Connect[11], to begin in early 2014; and
- Appointment of a Director of CFSA's Office of Well Being, which has begun developing and implementing strategies to improve services in the areas of education, child care, substance abuse treatment and domestic violence.

Additional practice improvements and change strategies will be implemented in CY2014 including use of Icebreaker meetings between foster and birth parents to improve outcomes of parent and child visitation and timely permanency; utilization of a new functional assessment for parents and caregivers to assess for change in behavior following service interventions; and an increased focus on concurrent planning to improve the timeliness of permanency for children. The 2014 *LaShawn* Strategy Plan, which was filed with the Court on February 18, 2014 after

---

[7] DR provides alternative pathways for response to referrals received by the child abuse and neglect hotline. These pathways include traditional investigation or Family Assessment (FA). FA facilitates the provision of community-based services to families where there are no safety concerns without labeling the families with a finding of child abuse or neglect.

[8] The RED Team framework provides guidance on meaningful ways to share information about a child and family and provides workers and supervisors with consultation opportunities at critical decision points in a child welfare case.

[9] In 2012, CFSA was awarded a $3.2 million grant from the U.S. Department of Health and Human Services Administration for Children and Families (ACF) for use over 5 years to utilize a trauma-informed practice as a foundational component of child welfare services for children in the District. The TST Model being utilized by CFSA was pioneered by Dr. Glenn Saxe from the NYU Child Study Center and addresses trauma using a comprehensive and multi-pronged approach that includes the child's support system and home environment.

[10] Home Builders is an intensive crisis intervention model which provides counseling and life skills education for families who have children at imminent risk of placement in foster care.

[11] Project Connect provides services to high-risk families affected by parental substance abuse, mental health issues and domestic violence.

consultation with the Monitor and Plaintiffs' counsel, includes specific strategies to address the Exit Standards which have not yet been achieved. The plan is attached as Appendix C.

During this monitoring period, CFSA continued to make progress toward meeting the requirements of the IEP. CFSA newly achieved one Exit Standard, partially achieved seven Exit Standards and all Exit Standards that have been previously met were maintained. Additionally, of those remaining Exit Standards not yet achieved and not partially achieved, seven demonstrated improvement toward meeting the required performance level. The Monitor's overall assessment of the District's focus on and progress toward meeting the remaining requirements of the IEP remains positive.

The remainder of this section summarizes progress on IEP Exit Standards and CFSA's overall performance within substantive areas of child welfare practice and structure.

A.    **Progress on IEP Exit Standards**

As of December 31, 2013, of the 88 Exit Standards included in the IEP, CFSA has achieved and maintained required performance for 66, leaving 22 Exit Standards remaining to be achieved.[12] During the current monitoring period, CFSA newly achieved one Exit Standard and partially achieved an additional seven. The newly achieved Exit Standard reflects improved performance on in-service training for foster and adoptive parents (IEP citation I.D.29.b.).

The majority of Exit Standards that were partially achieved or for which CFSA demonstrated improved performance are measures related to either investigations or provision of health care to children. The partially achieved Exit Standards include:

- Completion of a comprehensive review of families subject to a new investigation for whom the current report of child maltreatment is the fourth or greater report, with the most recent report occurring within the last 12 months (IEP citation I.A.1.c.);
- Reduction of multiple placements for children in care (IEP citation I.B.13.);
- Timely permanency through reunification, adoption or legal guardianship (IEP citation I.B.16.c.);
- Health screening for children entering foster care or experiencing a placement change (I.C.22.a.);
- Medical evaluations for children in foster care (IEP citation I.C.22.b.i.);
- Dental evaluations for children in foster care (IEP citation I.C.22.b.ii.); and

---

[12] There are several Exit Standards for Outcomes to be Achieved for which performance were not newly assessed during the current monitoring period, including IEP citation I.A.4.c. (social worker assessment of safety during in-home visit); I.A.5.d. (social worker assessment of safety during out-of-home placement visit); I.A.6.d. (social worker conversation with resource parent during first four weeks of placement to assess if assistance is needed); and I.A.6.e. (social worker assessment of safety for children experiencing a new placement or placement change). One Exit Standard, I.B.12.c. (transitional planning with youth ages 18 and older), is pending verification by the Monitor. Performance data on these Exit Standards will be provided in the next monitoring report.

- Reviewing child fatalities through the Internal CFSA Committee and City-wide Child Fatality Review Committee (IEP citation II.A.4.).

Those Exit Standards with improved performance include:
- Timely initiation of investigations (IEP citation I.A.1.a.);
- Timely completion of investigations (IEP citation I.A.1.b.);
- Services to families and children to promote safety, permanency and well-being (IEP citation I.A.3.);
- Timely approval of foster and adoptive parent licensure (IEP citation I.B.14.);
- Case planning (IEP citation I.B.17.);
- Community-based service referrals for low and moderate risk families (IEP citation I.C.19.); and
- Provision of Medicaid number and card to the placement provider after placement (IEP citation I.C.22.d.).

Three Exit Standards had declined performance, all related to visitation, which include:
- Worker visitation to children experiencing a new placement or placement change (IEP citation I.A.6.a-c.);
- Visitation between parents with a goal of reunification and workers (IEP citation I.B.10.); and
- Visitation between parents and children with a goal of reunification (IEP citation I.B.11.).

## B.    **Overall Performance in Substantive Areas**

The discussion below provides a brief, descriptive summary of CFSA's recent performance within the *LaShawn* IEP goals and subject areas.

➢    ***Entry Services***

CFSA's Entry Services includes two administrations responsible for responding to allegations of abuse and neglect – Child Protective Services Investigation Administration (CPS-I) which includes the hotline and traditional investigations and Family Assessment Administration (CPS-FA)[13]. Between July and December 2013, CFSA rebalanced staffing by redistributing units within Entry Services to provide sufficient staffing for referrals that qualify for FA as well as those requiring a traditional investigation in accordance with the Differential Response (DR) protocols. As of August 2013, Entry Services included 12 investigations units (six after hours,

---

[13] Family Assessment (FA) response is utilized when the information provided in the hotline report does not raise any safety concerns for the child(ren), however, the family situation still raises concerns. The goal is to ensure the safety, well-being and stability of the child(ren) while assisting parents to resolve issues without a traditional investigation.

two hotline and four day shift units), 10 FA units and one educational triage unit. During this reporting period, four of the FA units were temporarily designated to support the investigations units.

In November and December 2013, investigative worker caseloads were in compliance with IEP standards, a significant improvement over previous periods. With lower caseloads, CFSA exhibited improved practice performance for nearly all Exit Standards related to investigative practice, including timely initiation, timely completion and community-based service referrals for low and moderate risk families. For the first time and likely attributable to implementation of the Hotline and 10/15 Day RED Team reviews, CFSA partially met the Exit Standard requiring a comprehensive review of families subject to a new investigation who have had four or more reports of maltreatment. Ensuring consistent quality investigations continues to be an area where CFSA struggles and strategies are included in the 2014 *LaShawn* Strategy Plan related to this area, including increased supervision and monitoring of practice.

Limited quantitative and qualitative data are currently available for review regarding FA practice. The Monitor has requested data from CFSA which is included in the *Child Safety* section of this report. CFSA reports that standardized reporting is being developed and work has begun with national partners to develop a broader evaluation plan for CFSA's DR system.

➢ ***Placement of Children in Out-of-Home Care***

The number of children in foster care has continued to decline. As of December 31, 2013, 1,215 children were placed in out-of-home care, a 15 percent reduction since the same time in 2012. This reduction follows trends seen nationally by child welfare systems. CFSA anticipates that this number will continue to decline slightly; however, based on experiences elsewhere, the Monitor expects that the rate at which foster care continues to decline will slow and the number of children in foster care will plateau or even slightly increase.

Most children entering foster care in the District are now placed in family-based settings. As of December 31, 2013, 20 percent of children in out-of-home care were placed with relatives. Additionally, 83 percent of children who entered foster care with their siblings or within 30 days of their siblings during the monitoring period were placed with some or all of their siblings as of December 31, 2013. These data demonstrate CFSA's continuing commitment to family-based care and to placing children with relatives and with their siblings whenever appropriate and possible.

The majority of the *LaShawn* Exit Standards pertaining to the placement of children have been previously achieved and performance on those standards was maintained at the required levels during the current monitoring period. These Exit Standards include limiting placement of young

children in congregate care or emergency settings; placing siblings together; and conducting assessments of children experiencing a placement disruption. Beginning in early 2014, CFSA modified their Child Needs Assessment (CNA) protocol to incorporate feedback from staff and providers and provide for greater inter-rater reliability.

CFSA's performance on the Exit Standard related to reduction of multiple placements continues to be partially achieved. Specifically, CFSA met the sub-part of the Exit Standard which requires that 75 percent of children in foster care who were in care for at least 24 months have two or fewer placements during the previous 12 month period. CFSA is close to meeting the required Exit Standard levels for the sub-parts pertaining to children in care less than 12 months and less than 24 months. Performance on this measure has not changed significantly, remaining slightly below the required level for the past five monitoring periods.

Finally, while CFSA maintained required performance on social worker visits to families with in-home services and children in out-of-home placement, performance for the remaining visitation Exit Standards remained unchanged or has declined slightly. These include social worker visits to children with a new placement or placement change; social worker visits to parents with a goal of reunification; and visits between parents and children. CFSA has implemented several strategies to identify barriers and practice concerns impacting performance on visitation requirements including monthly data meetings with private providers and improved case transfer staffing between investigative workers and ongoing social workers.

➢ *Services to Children and Families and Case Planning*

QSR performance data for CY2013 reflect improvements since CY2012 in both provision of services to families and children to promote safety, permanency and well-being (from 42% in CY2012 to 51% in CY2013) and case planning processes (from 50% in CY2012 to 61% in CY2013).[14] The Exit Standard requirement for both of these measures is 80 percent and there remains a gap between requirement and current performance. Continued work is planned for CY2014 with more regular reviews of QSR performance by CFSA management and real time review of QSR data and findings to assess practice strengths and weaknesses in order to more quickly identify and implement needed direct practice and strategy changes.

➢ *Timely Permanency*

CFSA continues efforts to have children and youth exit foster care through timely and safe reunification, adoption or legal guardianship. CFSA is assessed on their ability to achieve timely permanency for three cohorts of children—children who have been in care 8 days to 12 months; children in care between 12 and 24 months; and children in care 25 months or longer. CFSA has

---

[14] Data for CY2012 reflect ratings from 86 cases. Data for CY2013 reflect ratings from 100 cases.

continued to achieve the timely permanency standard for children in care the shortest period of time with most of these children returning home or to family. This period, there was improved performance for children in foster care between 12 and 24 months exiting to timely permanency; however, CFSA continues to struggle to achieve timely permanency for children in care 25 months of longer.

➢ *Services to Older Youth*

As a high priority, CFSA is focused on improving outcomes for older youth in out-of-home care. As of December 31, 2013, 44 percent of children and youth in foster care were age 15 or older. During this monitoring period, CFSA began implementation of a new transitional planning process for older youth exiting care which utilizes the Foster Club of America's Youth Transition Toolkit. The Monitor and CFSA continue to work on developing a methodology to review transition planning and will report on performance related to this Exit Standard for the January through June 2014 monitoring period in the next monitoring report. The Monitor will also be observing 21JumpStart meetings (meetings designed specifically to support youth ages 20.5 and older).

➢ *Well-Being*

CFSA partially achieved three of the four remaining health and dental health Exit Standards (health screening prior to placement or re-placement, medical evaluations for children in foster care and dental evaluations for children in foster care) and demonstrated improved performance for the other one (foster parent receipt of Medicaid numbers and cards for children placed in their care). This performance reflects the work CFSA managers have done over the monitoring period to use data to understand performance barriers and to remedy practice and documentation issues.

➢ *Infrastructure and Resource Development*

Required caseload standards continue to be maintained for in-home, permanency and home study staff. During the last two monitoring periods, CFSA struggled to meet caseload standards for investigative workers. After hiring additional Entry Services staff and redistributing staffing among investigations and FA units, CFSA met the required caseload standard for investigative workers in November and December 2013.

Improvements have been made in timely licensure of adoptive and foster homes over the previous monitoring period, with 59 percent of foster and adoptive homes licensed within 150 days compared to 47 percent the previous period. CFSA and private agency staff continue to identify barriers to the licensure process, including timely receipt of required documentation and inspections, and are creating strategies to bring performance into IEP compliance.

CFSA maintained required performance for pre-service training for social workers and foster parents and for the first time met the required performance for in-service training for foster parents whose licenses are renewed.

Finally, while CFSA continues to operate a functioning and compliant Internal Child Fatality Review Committee, reviewing child fatalities through the City-wide Child Fatality Review Committee remains out of compliance with MFO and IEP requirements. The City-wide Committee did not hold monthly meetings in September, October or November 2013 and the Annual Report for 2012 was not released until March 2014. A strategy commitment to achieve this Exit Standard is included in the 2014 *LaShawn* Strategy Plan. With the District's recent appointment of a new Chief Medical Examiner, the Monitor is hopeful that progress will be made this year toward meeting this longstanding *LaShawn* requirement.

# III. SUMMARY TABLES OF *LaSHAWN A. v. GRAY* IMPLEMENTATION AND EXIT PLAN PERFORMANCE

## Table 1: Performance on IEP Exit Standards for Outcomes to be Achieved Between July 1 and December 31, 2013

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance[15] | Exit Standard Achieved[16] | Direction of Change[17] |
|---|---|---|---|---|---|
| 1. *Investigations*: Investigations of alleged child abuse and neglect shall be initiated or documented good faith efforts shall be made to initiate investigations within 48 hours after receipt of a report to the hotline of child maltreatment.<br><br>(IEP citation I.A.1.a.) | 95% of all investigations will be initiated within 48 hours or there will be documented good faith efforts to initiate investigations whenever the alleged victim child(ren) cannot be immediately located. | Monthly range of 76 – 89% | Monthly range of 83 – 90% | No | ← |
| 2. *Investigations*: Investigations of alleged child abuse and neglect shall be completed within 30 days after receipt of a report to the hotline of child maltreatment and the final report of findings for each investigation shall be completed within five days of the completion of the investigation.<br><br>(IEP citation I.A.1.b.) | 90% of investigations will be completed and a final report of findings shall be entered in FACES.NET within 35 days. | Monthly range of 44 – 61% | Monthly range of 58 – 74%[18] | No | ← |

[15] In some instances where December 2013 performance data are not available, the most recent performance data are cited with applicable timeframes. For some Exit Standards, the Monitor provides a range of data over the monitoring period to better illustrate performance and for a limited number of Exit Standards, current performance is not currently available. More detailed information on CFSA's performance toward specific Exit Standards is provided in subsequent sections of this report.

[16] "Yes" indicates that, in the Monitor's judgment based on presently available information, CFSA's performance satisfies the Exit Standard requirement. "Yes" may be used for Outcomes to be Maintained in Table 2 of this report if performance deviation from the Exit Standard requirement is determined by the Monitor to be insubstantial or temporary. "Partially" is used when CFSA has come very close but has not fully met an Exit Standard requirement or in instances where Exit Standards have more than one part and CFSA has fulfilled some but not all parts of the Exit Standard requirement. "No" indicates that, in the Monitor's judgment, CFSA's performance falls below the designated Exit Standard requirement.

[17] Where applicable, "↑" indicates that, in the Monitor's judgment based on data and an understanding of case practice, performance is trending upwards generally by at least three percentage points; "↓" indicates performance is trending downward generally by at least three percentage points; "←" indicates that, in the Monitor's judgment, there has been no change in performance; and "N/A" indicates a judgment regarding direction of change is not applicable to the Exit Standard during the monitoring period.

[18] During this monitoring period, CFSA reports the following backlog: July 2013, 95%; August 2013, 98%; September 2013, 74; October 2013, 79; November 2013, 70; December 2013, 56.

**Table 1: Performance on IEP Exit Standards for Outcomes to be Achieved Between July 1 and December 31, 2013**

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance[15] | Exit Standard Achieved[16] | Direction of Change[17] |
|---|---|---|---|---|---|
| 3. *Investigations*: For families who are subject to a new investigation for whom the current report of child maltreatment is the fourth or greater report of child maltreatment, with the most recent report occurring within the last 12 months, CFSA will conduct a comprehensive review of the case history and the current circumstances that bring the family to CFSA's attention.<br><br>(IEP citation I.A.1.c.) | 90% of the case records for families subject to a new investigation for whom the current report of child maltreatment is the fourth or greater report of child maltreatment, with the most recent report occurring within the last 12 months will have documentation of a comprehensive review. | Monthly range of 30 – 92% | Monthly range of 76 – 94% | Partially[19] | ← |
| 4. *Acceptable Investigations*: CFSA shall routinely conduct investigations of alleged child abuse and neglect.[20]<br><br>(IEP citation I.A.2.) | 80% of investigations will be of acceptable quality. | 70% of investigations of acceptable quality.[21] | 65% of investigations of acceptable quality.[22] | No | ←→ |

---

[19] CFSA met the required level of performance for three of the six months during the monitoring period; the Monitor considers this Exit Standard to be partially achieved.

[20] Evidence of acceptable investigations includes: (a) Use of CFSA's screening tool in prioritizing response times for initiating investigations; (b) Interviews with and information obtained from the five core contacts – the victim child(ren), the maltreater, the reporting source (when known), medical resources, and educational resources (for school-aged children); (c) Interviews with collateral contacts that are likely to provide information about the child's safety and well-being; (d) Interviews with all children in the household outside the presence of the caretaker, parents or caregivers, or documentation, by the worker, of good-faith efforts to see the child and that the worker has been unable to locate the child; (e) Medical and mental health evaluations of the children or parents when the worker determines that such evaluations are needed to complete the investigation, except where a parent refuses to consent to such evaluations. When a parent refuses to consent to such an evaluation, the investigative social worker and supervisor shall consult with the Assistant Attorney General to determine whether court intervention is necessary to ensure the health and safety of the child(ren); (f) Use of risk assessment protocol in making decisions resulting from an investigation; and (g) Initiation of services during the investigation to prevent unnecessary removal of children from their homes.

[21] Results of a review of 20 investigations closed between January and June 2013. Investigations were reviewed by CFSA and findings were validated by the Monitor.

[22] Results of a review of 20 investigations closed between July and December 2013. Investigations were reviewed by CFSA and findings were validated by the Monitor.

## Table 1: Performance on IEP Exit Standards for Outcomes to be Achieved Between July 1 and December 31, 2013

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance[15] | Exit Standard Achieved[16] | Direction of Change[17] |
|---|---|---|---|---|---|
| 5. *Services to Families and Children to Promote Safety, Permanency and Well-Being:* Appropriate services, including all services identified in a child or family's safety plan or case plan shall be offered and children/families shall be assisted to use services to support child safety, permanence and well-being.<br><br>CFSA shall provide for or arrange for services through operational commitments from District of Columbia public agencies and/or contracts with private providers. Services shall include:<br><br>a.  Services to enable children who have been the subject of an abuse/neglect report to avoid placement and to remain safely in their own homes;<br><br>b.  Services to enable children who have or will be returned from foster care to parents or relatives to remain with those families and avoid replacement into foster care; | In 80% of cases, appropriate services, including all services identified in a child's or family's safety plan or case plan shall be offered along with an offer of instruction or assistance to children/families regarding the use of those services. The Monitor will determine performance-based on the QSR Implementation and Pathway to Safe Closure indicators. | 42% of cases were acceptable based on CY2012 QSR data.[23] | 51% of cases were acceptable based on CY2013 QSR data.[24] | No | ← |

---

[23] CY2012 performance is provided for comparison purposes. In CY2012, 65 percent of cases (56 of 86) reviewed were acceptable on the Implementation of Supports and Services indicator, 56 percent (48 of 86) were acceptable on the Pathway to Case Closure indicator and 42 percent (36 of 86) were acceptable on both indicators.

[24] Data collected during QSRs conducted in CY2013 determined that 63 percent of cases (63 of 100) were acceptable on the Implementation of Supports and Services indicator, 64 percent (64 of 100) were acceptable on Pathway to Case Closure indicator and 51 percent (51 of 100) were acceptable on both indicators.

**Table 1: Performance on IEP Exit Standards for Outcomes to be Achieved Between July 1 and December 31, 2013**

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance[15] | Exit Standard Achieved[16] | Direction of Change[17] |
|---|---|---|---|---|---|
| c.   Services to avoid disruption of an adoptive placement that has not been finalized and avoid the need for replacement; and<br>d.   Services to prevent the disruption of a beneficial foster care placement and avoid the need for replacement.<br><br>(IEP citation I.A.3.) | | | | | |
| 7. *Worker Visitation to Families with In-Home Services:* Workers are responsible for assessing and documenting the safety (e.g., health, educational and environmental factors and the initial safety concerns that brought this family to the attention of the Agency) of each child at every visit and each child must be separately interviewed at least monthly outside of the presence of the caretaker.<br><br>(IEP citation I.A.4.c.) | 90% of cases will have documentation verifying each child was visited and seen outside the presence of the caretaker and that safety was assessed during each visit. | 25% of children had documentation indicating that safety was fully assessed during all visits in June 2013.[25] | Not newly assessed[26] | No | N/A |

---

[25] Performance data based upon case record review of a statistically significant sample of cases from June 2013. Sampling represents a ±9 percent margin of error with 95 percent confidence in its results. In the 108 in-home service cases reviewed safety was fully assessed in 25 percent of cases; safety was fully assessed during one visit in 16 percent of cases; safety was partially assessed at two visits in 35 percent of cases; and safety was not adequately assessed in 24 percent of cases.

[26] CFSA is currently collecting data for the January through June 2014 monitoring period which the Monitor will validate and include in the next monitoring report.

**Table 1: Performance on IEP Exit Standards for Outcomes to be Achieved Between July 1 and December 31, 2013**

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance[15] | Exit Standard Achieved[16] | Direction of Change[17] |
|---|---|---|---|---|---|
| 9. *Worker Visitation to Children in Out-of-Home Care:* Workers are responsible for assessing and documenting the safety (e.g., health, educational and environmental factors and the initial safety concerns that brought this family to the attention of the Agency) of each child at every visit and each child over two years old must be separately interviewed at least monthly outside of the presence of the caretaker.<br><br>(IEP citation I.A.5.d.) | 90% of cases will have documentation verifying each child was seen outside the presence of the caretaker by a worker and that safety was assessed during each visit. | 32% of children had documentation indicating that safety was fully assessed during all visits in June 2013.[27] | Not newly assessed[28] | No | N/A |

[27] Performance data based upon case record review of a statistically significant sample of cases from June 2013. Sampling represents a ±9 percent margin of error with 95 percent confidence in its results. In the 111 out-of-home service cases reviewed, safety was fully assessed in 32 percent of cases; safety was fully assessed during one visit in 9 percent of cases; safety was partially assessed at two visits in 34 percent of cases; and safety was not adequately assessed in 25 percent of cases.
[28] CFSA is currently collecting data for the January through June 2014 monitoring period which the Monitor will validate and include in the next monitoring report.

**Table 1: Performance on IEP Exit Standards for Outcomes to be Achieved Between July 1 and December 31, 2013**

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance[15] | Exit Standard Achieved[16] | Direction of Change[17] |
|---|---|---|---|---|---|
| 10. *Visitation for Children Experiencing a New Placement or a Placement Change:*<br><br>a. A CFSA social worker or private agency social worker with case management responsibility shall make at least two visits to each child during the first four weeks of a new placement or a placement change.<br><br>b. A CFSA social worker, private agency social worker, family support worker or nurse care manager shall make two additional visits to each child during the first four weeks of a new placement or a placement change.<br><br>c. At least one of the above visits during the first four weeks of a new placement or a placement change shall be in the child's home.<br><br>d. At least one of the visits during the first four weeks of a new placement or a placement change shall include a conversation between the social worker and the resource parent to assess assistance needed by the resource parent from the Agency.<br>(IEP citation I.A.6.a-d.) | 90% of children newly placed in foster care or experiencing a placement change will have four visits in the first four weeks of a new placement or placement change as described. | a.-c. Monthly range of 82 – 89% of applicable children had four visits in first four weeks of new placement or placement change.<br><br>d. 63% of children had documentation indicating that a social worker from the agency had a conversation with the resource parent to assess their needs in caring for the child.[29] | a.-c. Monthly range of 75 – 87% of applicable children had four visits in first four weeks of new placement or placement change.[30]<br><br>d. Not newly assessed[31] | No | a.-c. → <br><br> d. N/A |

---

[29] Performance data based upon case record review of a statistically significant sample of cases from June 2013. Sampling represents a ±10 percent margin of error with 95 percent confidence in its results. Five youth were excluded from this calculation due to their placement change being to a correctional facility.

[30] Monthly performance data are as follows: July 2013, 78%; August 2013, 86%; September 2013, 81%; October 2013, 75%; November 2013, 78%; December 2013, 87%. Data were also provided for children who received at least two or more visits each month. The number of children who received at least two or more visits during the first four weeks of a new placement or placement change are as follows: July 2013, 94%; August 2013, 96%; September 2013, 93%; October 2013, 91%; November 2013, 93%; December 2013, 96%.

[31] CFSA is currently collecting data for the January through June 2014 monitoring period which the Monitor will validate and include in the next monitoring report.

## Table 1: Performance on IEP Exit Standards for Outcomes to be Achieved Between July 1 and December 31, 2013

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance[15] | Exit Standard Achieved[16] | Direction of Change[17] |
|---|---|---|---|---|---|
| 11. *Visitation for Children Experiencing a New Placement or a Placement Change:* Workers are responsible for assessing and documenting the safety (e.g., health, educational and environmental factors and the initial safety concerns that brought this family to the attention of the Agency) of each child at every visit and each child must be separately interviewed at least monthly outside of the presence of the caretaker.<br><br>(IEP citation I.A.6.e.) | 90% of cases will have documentation verifying each child was seen outside the presence of the caretaker by a social worker and that safety was assessed during each visit. | 20% of children had documentation indicating that safety was fully assessed during all visits in June 2013.[32] | Not newly assessed[33] | No | N/A |
| 18. *Visits between Parents and Workers:*<br>a.  For children with a permanency goal of reunification, in accordance with the case plan, the CFSA social worker or private agency social worker with case-management responsibility shall visit with the parent(s) at least one time per month in the first three months post-placement.<br>b.  A CFSA social worker, nurse care manager or family support worker shall make a second visit during each month for the first three months post-placement.<br><br>(IEP citation I.B.10.) | 80% of parents will have twice monthly visitation with workers in the first three months post-placement.[34] | Monthly range of 62 – 71% | Between October – December 2013, monthly range of 48 – 72%[35] | No | → |

---

[32] Performance data based upon case record review of a statistically significant sample of cases from June 2013. Sampling represents a ±10 percent margin of error with 95 percent confidence in its results. Of the 65 cases applicable cases, safety was fully assessed in 20 percent of cases; safety was fully assessed during some visits in 45 percent of cases; safety was partially assessed at four visits in nine percent of cases; and safety was not adequately assessed in 26 percent of cases.
[33] CFSA is currently collecting data for the January through June 2014 monitoring period which the Monitor will validate and include in the next monitoring report.
[34] This Exit Standard is also satisfied when there is documentation that the parent(s) is(are) unavailable or refuses to cooperate with the Agency.
[35] Performance data for this Exit Standard are only reported for October through December 2013 when CFSA modified the logic of the FACES.NET report to include instances when there is documentation that the parent(s) is(are) unavailable or refuses to cooperate with the Agency, which also satisfies this requirement. Between October and December 2013, documentation did not indicate that any of these instances occurred. Monthly performance are as follows: October 2013, 72%; November 2013, 48%; December 2013, 65%.

**Table 1: Performance on IEP Exit Standards for Outcomes to be Achieved Between July 1 and December 31, 2013**

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance[15] | Exit Standard Achieved[16] | Direction of Change[17] |
|---|---|---|---|---|---|
| 19. *Visits between Parents and Children:* There shall be weekly visits between parents and children with a goal of reunification unless clinically inappropriate and approved by the Family Court. In cases in which visitation does not occur, the Agency shall demonstrate and there shall be documentation in the case record that visitation was not in the child's best interest, is clinically inappropriate or did not occur despite efforts by the Agency to facilitate it.<br><br>(IEP citation I.B.11.) | 85% of children with the goal of reunification will have weekly visitation with the parent with whom reunification is sought.[36] | Monthly range of 67 – 73% | Between October – December 2013, monthly range of 64 – 66%[37] | No | → |

---

[36] This Exit Standard is also satisfied when there is documentation that a visit is not in the child's best interest, is clinically inappropriate or did not occur despite efforts by the Agency to facilitate it.

[37] Performance data for this Exit Standard are only reported for October through December 2013 when CFSA modified the logic of the FACES.NET report to include instances when there is documentation that a visit is not in the child's best interest, is clinically inappropriate or did not occur despite efforts by the Agency to facilitate it, which also satisfies this requirement. Two cases in November 2013 and four cases in December 2013 are considered compliant as there was documentation indicating that efforts were made to facilitate the visit, however, the visit did not occur. Monthly performance are as follows: October 2013, 65%; November 2013, 64%; December 2013, 66%.

## Table 1: Performance on IEP Exit Standards for Outcomes to be Achieved Between July 1 and December 31, 2013

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance[15] | Exit Standard Achieved[16] | Direction of Change[17] |
|---|---|---|---|---|---|
| 22. *Appropriate Permanency Goals:* Youth ages 18 and older will have a plan to prepare them for adulthood that is developed with their consultation and includes, as appropriate, connections to housing, health insurance, education, continuing adult support services agencies (e.g., Rehabilitation Services Administration, the Department on Disability Services, the Department of Mental Health, Supplemental Security Income (SSI) and Medicaid), work force supports, employment services and local opportunities for mentors.<br><br>(IEP citation I.B.12.c.) | 90% of youth ages 18 and older will have a plan to prepare them for adulthood that is developed with their consultation. No later than 180 days prior to the date on which the youth will turn 21 years old (or on which the youth will emancipate), an individualized transition plan will be created that includes as appropriate connections to specific options on housing, health insurance, and education and linkages to continuing adult support services agencies (e.g., Rehabilitation Services Administration, the Department of Mental Health, Supplemental Security Income (SSI) and Medicaid), work force supports, employment services, and local opportunities for mentors. | Between January – June 2013, 96% of youth ages 18 and older had a timely YTP. | Between July-December 2013, 92% of youth ages 18 and older had a timely YTP.[38] | Yes, pending Monitor verification of YTPs in CY2014.[39] | N/A |
| 23. *Reduction of Multiple Placements for Children in Care:*<br><br>(IEP citation I.B.13.) | a. Of all children served in foster care during the previous 12 months who were in care at least 8 days and less than 12 months, 83% shall have had two or fewer placements. | Monthly range of 78 – 81% | Monthly range of 79 – 82% | Partially[40] | ↕ |

[38] 308 out of 324 youth (16 youth excluded due to absondence, DD, refused) were eligible for YTPs. 283 youth (92%) had a YTP during the monitoring period.

[39] The Monitor will validate performance through a case record review, or similar methodology, for the January through June 2014 monitoring period when the new, enhanced YTP process is expected to be fully implemented.

[40] CFSA met one of the sub-parts of this Exit Standard which requires children in care 25 months or longer to have two or fewer placements during the previous 12 months, but did not meet the other two sub-parts for cohorts of children in care less than 12 months and children in care 12 to 24 months. CFSA believes that the sub-parts of this Exit Standard should be considered separately for Exit Standard achievement; however, the Monitor considers these sub-parts together for the requirement toward placement stability.

**Table 1: Performance on IEP Exit Standards for Outcomes to be Achieved Between July 1 and December 31, 2013**

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance[15] | Exit Standard Achieved[16] | Direction of Change[17] |
|---|---|---|---|---|---|
| | b. Of all children served in foster care during the previous 12 months who were in care for at least 12 months but less than 24 months, 60% shall have had two or fewer placements. | Monthly range of 56 – 58% | Monthly range of 47 – 56% | | |
| | c. Of all children served in foster care during the previous 12 months who were in care for at least 24 months, 75% shall have had two or fewer placements in that 12 month period. | Monthly range of 75 – 77% | Monthly range of 74 – 78% | | |
| 24. *Timely Approval of Foster/Adoptive Parents:* CFSA shall have in place a process for recruiting, studying and approving families, including relative caregivers, interested in becoming foster or adoptive parents that results in the necessary training, home studies and decisions on approval being completed within 150 days of beginning training. (IEP citation I.B.14.) | 70% of homes licensed beginning November 1, 2010, will have been approved, and interested parties will have been notified within 150 days.[41] | 47% of foster homes licensed between January –June 2013 received their license within 150 days.[42] | 59% of foster homes licensed between July – December 2013 received their license within 150 days.[43] | No | ← |

---

[41] The Exit Standard is satisfied where there is documentation that establishes that failure to meet the 150 day timeline is due to delays that are beyond the control of the District of Columbia.

[42] Reconciled data for January through June 2013 indicate that subsequent to previous reporting, an additional 4 homes received their license within 150 days, bringing 52% of foster homes into compliance for that period.

[43] Of the 65 homes that were licensed in the current monitoring period, two homes were considered compliant within the 150 day period required by the IEP due to circumstances that were beyond the District's control.

**Table 1: Performance on IEP Exit Standards for Outcomes to be Achieved Between July 1 and December 31, 2013**

| Implementation and Exit Plan Requirement | | Exit Standard | January – June 2013 Performance | July – December 2013 Performance[15] | Exit Standard Achieved[16] | Direction of Change[17] |
|---|---|---|---|---|---|---|
| 32. *Timely Adoption*: Timely permanency through reunification, adoption or legal guardianship. (IEP citation I.B.16.c.) | i. | Of all children who entered foster care for the first time in FY2012 and who remain in foster care for 8 days or longer, 45% will achieve permanency (reunification, kinship guardianship, adoption or non-relative guardianship) by September 30, 2013. | As of June 30, 2013, 42% of children in this cohort achieved permanency. | As of September 30, 2013, 48% of the children in this cohort achieved permanency. | Partially | ← |
| | ii. | Of all children who are in foster care for more than 12 but less than 25 months on September 30, 2011, 45% will be discharged from foster care to permanency (reunification, kinship guardianship, adoption or non-relative guardianship) by September 30, 2013. | As of June 30, 2013, 33% of children in this cohort achieved permanency. | As of September 30, 2013, 38% of children in this cohort achieved permanency. | | |
| | iii. | Of all children who are in foster care for 25 months or longer on September 30, 2011, 40% will be discharged through reunification, adoption, legal guardianship prior to their 21st birthday or by September 30, 2013, whichever is earlier. | As of June 30, 2013, 18% of children in this cohort achieved permanency. | As of September 30, 2013, 20% of children in this cohort achieved permanency. | | |

**Table 1: Performance on IEP Exit Standards for Outcomes to be Achieved Between July 1 and December 31, 2013**

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance[15] | Exit Standard Achieved[16] | Direction of Change[17] |
|---|---|---|---|---|---|
| 33. *Case Planning Process:*<br>a. CFSA, with the family, shall develop timely, comprehensive and appropriate case plans in compliance with District law requirements and permanency timeframes, which reflect family and children's needs, are updated as family circumstances or needs change, and CFSA shall deliver services reflected in the current case plan.<br><br>b. Every reasonable effort shall be made to locate family members and to develop case plans in partnership with youth and families, the families' informal support networks, and other formal resources working with or needed by the youth and/or family.<br><br>c. Case plans shall identify specific services, supports and timetables for providing services needed by children and families to achieve identified goals.<br><br>(IEP citation I.B.17.) | 80% of cases reviewed through the Quality Service Reviews (QSR) will be rated as acceptable. | 50% of cases were acceptable based on CY2012 QSR data.[44] | 61% of cases were acceptable based on CY2013 QSR data.[45] | No | ← |

[44] CY2012 performance is provided for comparison purposes. In CY2012, 72 percent of cases were acceptable on the Case Planning Process indicator, 56 percent were acceptable on the Progress to Case Closure indicator and 50 percent were acceptable on both indicators.

[45] Data collected during QSRs conducted in CY2013 determined that 70 percent of the cases were acceptable on the Planning Interventions indicator, 64 percent were acceptable on the Pathway to Case Closure indicator and 61 percent were acceptable on both indicators.

**Table 1: Performance on IEP Exit Standards for Outcomes to be Achieved Between July 1 and December 31, 2013**

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance[15] | Exit Standard Achieved[16] | Direction of Change[17] |
|---|---|---|---|---|---|
| 35. *Community-based Service Referrals for Low & Moderate Risk Families:* (IEP citation I.C.19.) | 90% of families who have been the subject of a report of abuse and/or neglect, whose circumstances are deemed to place a child in their care at low or moderate risk of abuse and neglect and who are in need of and agree to additional supports shall be referred to an appropriate Collaborative or community agency for follow-up. Low and moderate risk cases for which CFSA decides to open an ongoing CFSA case are excluded from this requirement. | 45% of applicable investigations closed in June 2013 were referred to a Collaborative or community agency.[46] | Monthly range of 43 – 89% of applicable closed investigations were referred to a Collaborative or community agency.[47] | No | ← |
| 39. *Health and Dental Care:* Children in foster care shall have a health screening prior to placement. (IEP citation I.C.22.a.) | 95% of children in foster care shall have a health screening prior to an initial placement or re-entry into care. 90% of children in foster care who experience a placement change shall have a replacement health screening. | Initial and re-entries: monthly range of 85 – 100% Replacements: monthly range of 74 – 87% | Initial and re-entries: monthly range of 87 – 100% Replacements: monthly range of 83 – 87% | Partially[48] | ← |

[46] Due to modifications made to FACES.NET report between January and May 2013, performance data only available for June 2013.

[47] Monthly performance data are as follows: July 2013, 60%; August 2013, 43%; September 2013, 56%; October 2013, 83%; November 2013, 89%; and December 2013, 79%.

[48] During five of the six months of the current monitoring period, CFSA met the sub-part of the Exit Standard requiring 95 percent of children receive a health screening prior to an initial placement or re-entry into care.

**Table 1: Performance on IEP Exit Standards for Outcomes to be Achieved Between July 1 and December 31, 2013**

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance[15] | Exit Standard Achieved[16] | Direction of Change[17] |
|---|---|---|---|---|---|
| 40. *Health and Dental Care:* Children in foster care shall receive a full medical evaluation within 30 days of placement.<br><br>(IEP citation I.C.22.b.i.) | 85% of children in foster care shall receive a full medical evaluation within 30 days of placement.<br><br>95% of children in foster care shall receive a full medical evaluation within 60 days of placement. | Within 30 days: monthly range of 62 – 76%<br><br>Within 60 days: monthly range of 85 – 97% | Within 30 days: monthly range of 74 – 84%<br><br>Within 60 days: monthly range of 86 – 97%[49] | Partially[50] | ← |
| 41. *Health and Dental Care:* Children in foster care shall receive a full dental evaluation within 30 days of placement.<br><br>(IEP citation I.C.22.b.ii.) | 25% of children shall receive a full dental evaluation within 30 days of placement.<br><br>50% of children shall receive a full dental evaluation within 60 days of placement.<br><br>85% of children shall receive a full dental evaluation within 90 days of placement. | Within 30 days: monthly range of 24 – 46%<br><br>Within 60 days: monthly range of 56 – 79%<br><br>Within 90 days: monthly range of 59 – 80% | Within 30 days: monthly range of 51 – 79%<br><br>Within 60 days: monthly range of 75 – 90%<br><br>Within 90 days: monthly range of 79 – 92% | Partially[51] | ← |

---

[49] During the final three months of the monitoring period, CFSA met the sub-part of this Exit Standard which requires 95 percent of children in care receive a full medical evaluation within 60 days of placement.

[50] *Ibid.*

[51] CFSA met the sub-part of this Exit Standard which requires 25 percent of children in care receive a full dental evaluation within 30 days of placement and the sub-part which requires 50 percent of children in care receive a full dental evaluation within 60 days of placement. For the remaining sub-part which requires 85 percent of children in care receive a full dental evaluation within 90 days of placement, CFSA met the required level during two of the six month monitoring period.

**Table 1: Performance on IEP Exit Standards for Outcomes to be Achieved Between July 1 and December 31, 2013**

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance[15] | Exit Standard Achieved[16] | Direction of Change[17] |
|---|---|---|---|---|---|
| 43. _Health and Dental Care:_ CFSA shall ensure the prompt completion and submission of appropriate health insurance paperwork, and shall keep records of, e.g., Medicaid application dates, HMO severance dates, and enrollment dates. CFSA shall provide caregivers with documentation of Medicaid coverage within 5 days of every placement and Medicaid cards within 45 days of placement.  (IEP citation I.C.22.d.) | 90% of children's caregivers shall be provided with documentation of Medicaid coverage within 5 days of placement and Medicaid cards within 45 days of placement. | Between March – June 2013, monthly range of 23 – 75% of foster parents received the Medicaid number within five days of the child's placement.  Between February – June 2013, a monthly range of 0 – 12% of foster parents received the Medicaid card within 45 days of the child's placement. | Monthly range of 0 – 92% of foster parents received the Medicaid number within five days of the child's placement.[52]  Monthly range of 0 – 35% of foster parents received the Medicaid card within 45 days of the child's placement. | No | ← |
| 54. _Training for Foster Parents:_ CFSA and contract agency foster parents shall receive 30 hours of in-service training every two years.  (IEP citation I.D.29.b.) | 95% of foster parents whose licenses are renewed shall receive 30 hours of in-service training. | 85% | 96% | Yes | ← |

---

[52] During two months of the current monitoring period, CFSA met the sub-part of this Exit Standard which requires foster parents to receive the Medicaid number within five days of the child's placement.

**Table 1: Performance on IEP Exit Standards for Outcomes to be Achieved Between July 1 and December 31, 2013**

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance[15] | Exit Standard Achieved[16] | Direction of Change[17] |
|---|---|---|---|---|---|
| 64. *Reviewing Child Fatalities*: The District of Columbia, through the City-wide Child Fatality Committee, and an Internal CFSA Committee, shall conform to the requirements of the MFO regarding the ongoing independent review of child fatalities of members of the plaintiff class, with procedures for (1) reviewing child deaths; (2) making recommendations concerning appropriate corrective action to avert future fatalities; (3) issuing an annual public report; and (4) considering and implementing recommendations as appropriate.<br><br>(IEP citation II.A.4.) | Ongoing Compliance | Internal: Ongoing Compliance<br><br>City-wide: Monitoring ongoing | Internal: Ongoing Compliance<br><br>City-wide: Monitoring ongoing[55] | Partially | ↕ |

---

[55] The City-wide Child Fatality Committee Annual Report for 2012 was not released until March 2014 and during this monitoring period, the City-wide Committee did not hold monthly meetings in September, October or November 2013. The Monitor will continue to assess performance over the next monitoring period.

**Table 2: Performance on IEP Exit Standards for Outcomes to be Maintained Between July 1 and December 31, 2013**

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance | Exit Standard Maintained |
|---|---|---|---|---|
| **6. _Worker Visitation to Families with In-Home Services:_** | | | | |
| a. A CFSA social worker or private agency social worker shall make at least one visit monthly to families in their home in which there has been a determination that child(ren) can be maintained safely in their home with services. | 95% of families will be visited monthly by a CFSA social worker or private agency social worker and 85% of families will be visited a second time monthly by a CFSA social worker, family support worker, private agency social worker or a Collaborative family support worker. | a. Monthly range of 89 – 94% of families were visited monthly | a. Monthly range of 92 – 94% of families were visited monthly | Yes[54] |
| b. A CFSA social worker, family support worker, private agency social worker or a Collaborative family support worker shall make a second monthly visit at the home, school or elsewhere. <br><br> (IEP Citation I. A.4.a-b.) | | b. Monthly range of 86 – 92% of families were visited twice during the month | b. Monthly range of 89 – 92% of families were visited twice during the month | |
| **8. _Worker Visitation to Children in Out-of-Home Care:_** | | | | |
| a. A CFSA social worker or private agency social worker with case management responsibility shall make monthly visits to each child in out-of-home care (foster family homes, group homes, congregate care, independent living programs, etc.). | 95% of children should be visited at least monthly and 90% of children shall have twice-monthly visits. | a. Monthly range of 95 – 98% had monthly visits | a. Monthly range of 95 – 98% had monthly visits | Yes |
| b. A CFSA social worker, private agency social worker, family support worker or nurse care manager shall make a second monthly visit to each child in out-of-home care (foster family homes, group homes, congregate care, independent living programs, etc.). | | b. Monthly range of 93 – 98% had twice monthly visits | b. Monthly range of 92 – 96% had twice monthly visits | |
| c. At least one of the above visits each month shall be in the child's home. <br><br> (IEP citation I.A.5.a-c.) | | | | |

---

[54] Although performance for monthly visitation by social worker to families receiving in-home services was below the required level this monitoring period, performance was not more than three percent below. The Monitor considers this an insubstantial deviation and this outcome is considered to be maintained.

**Table 2: Performance on IEP Exit Standards for Outcomes to be Maintained Between July 1 and December 31, 2013**

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance | Exit Standard Maintained |
|---|---|---|---|---|
| 12. _Relative Resources_: CFSA shall identify and investigate relative resources by taking necessary steps to offer and facilitate pre-removal Family Team Meetings (FTM) in all cases requiring removal of children from their homes.<br><br>(IEP citation I.B.7.a.) | CFSA will take necessary steps to offer and facilitate pre-removal FTMs in 70% of applicable cases requiring child removal from home. | Between January and June 2013, CFSA took necessary steps to offer/facilitate pre-removal FTMs in 94% of applicable cases. | Between July and December 2013, CFSA took necessary steps to offer/facilitate pre-removal FTMs in 92% of applicable cases. | Yes |
| 13. _Relative Resources_: In cases where a child(ren) has been removed from his/her home, CFSA shall make reasonable efforts to identify, locate and invite known relatives to the FTM.<br><br>(IEP citation I.B.7.b.) | In 90% of cases where a child(ren) has been removed from his/her home, CFSA will make reasonable efforts to identify, locate and invite known relatives to the FTM. | Of the 152 families who had children removed during this monitoring period, CFSA made reasonable efforts to identify, locate and invite known relatives to the FTM in 98% of cases. | Of the 106 families who had children removed during this monitoring period, CFSA made reasonable efforts to identify, locate and invite known relatives to the FTM in 91% of cases. | Yes |

**Table 2: Performance on IEP Exit Standards for Outcomes to be Maintained Between July 1 and December 31, 2013**

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance | Exit Standard Maintained |
|---|---|---|---|---|
| 14. *Placement of Children in Most Family-Like Setting*: Children in out-of-home care shall be placed in the least restrictive, most family-like setting appropriate to his or her needs.  (IEP citation I.B.8.a.) | 90% of children will be in the least restrictive, most family-like setting appropriate to his or her needs. | In March 2013, an estimate of 96% of children were in the most family-like setting based on his/her needs. [55] | Not newly assessed [56] | Yes |
| 15. *Placement of Children in Most Family-like Setting*: No child shall remain in an emergency, short-term or shelter facility or foster home for more than 30 days.  (IEP citation I.B.8.b.) | No child shall remain in an emergency, short-term or shelter facility or foster home for more than 30 days. | Between January-June 2013, no child was placed in an emergency, short-term or shelter facility for more than 30 days. | Between July-December 2013, no child was placed in an emergency, short-term or shelter facility for more than 30 days. [57] | Yes |

---

[55] Performance is based upon data from a case record review of a statistically significant sample of children and youth who were in non-family based settings at the end of March 2013. Sampling represents a margin of error of ±6.8 percent with 95 percent confidence in its results. The review found that 71 percent of the sample were in the most appropriate setting to meet his/her needs. These data combined with the number of children and youth placed in family settings yields an estimate of 96 percent of children meeting the Exit Standard requirement.

[56] The method of determining performance on this Exit Standard requires a case record review; performance data for March 2012 and March 2013 indicate that CFSA exceeded the required level of performance. The Monitor will periodically verify performance on this Exit Standard in the future.

[57] One child was placed in an emergency foster home for 34 days during the period; however, efforts were made during this time to secure an appropriate placement to meet her mental health and behavioral needs and contractual issues prolonged the process.

**Table 2: Performance on IEP Exit Standards for Outcomes to be Maintained Between July 1 and December 31, 2013**

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance | Exit Standard Maintained |
|---|---|---|---|---|
| 16. *Placement of Young Children:* Children under age 12 shall not be placed in congregate care settings for more than 30 days unless the child has special needs that cannot be met in a home-like setting and unless the setting has a program to meet the child's specific needs.<br><br>(IEP citation I.B.9.a.) | No child under 12 will be placed in congregate care settings for more than 30 days without appropriate justification that the child has special treatment needs that cannot be met in a home-like setting and the setting has a program to meet the child's specific needs. | Between January-June 2013, a total of 5 children under 12 were applicable to this standard and 4 children met an agreed upon exception. The 1 child under 12 who did not meet an agreed upon exception was moved in June 2013 to an appropriate setting. | Between July – December 2013, a total of 5 children under 12 were applicable to this standard and all met an agreed upon exception. | Yes |
| 17. *Placement of Young Children:* CFSA shall place no child under six years of age in a group care non-foster home setting, except for those children with exceptional needs that cannot be met in any other type of care.<br><br>(IEP citation I.B.9.b.) | No child under 6 years of age will be placed in a group care non-foster home setting without appropriate justification that the child has exceptional needs that cannot be met in any other type of care. | Between January – June 2013, no child under 6 years of age was placed in a group care non-foster home setting. | Between July – December 2013, no child under 6 years of age was placed in a group care non-foster home setting. | Yes |

## Table 2: Performance on IEP Exit Standards for Outcomes to be Maintained Between July 1 and December 31, 2013

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance | Exit Standard Maintained |
|---|---|---|---|---|
| 20. *Appropriate Permanency Goals*: Children shall have permanency planning goals consistent with the Federal Adoption and Safe Families Act (ASFA) and District law and policy guidelines.<br><br>(IEP citation I.B.12.a.) | 95% of children shall have permanency planning goals consistent with ASFA and District law and policy guidelines. | Performance was 97% for all but one month of reporting period, when performance fell to 91%. | Performance ranged from 93-97%, with all months but one being at 95% or higher. | Yes |
| 21. *Appropriate Permanency Goals*: Children shall have permanency planning goals consistent with the Federal Adoption and Safe Families Act (ASFA) and District law and policy guidelines.<br><br>(IEP citation I.B.12.b.) | Beginning July 1, 2010, children shall not be given a goal of APPLA without convening a Family Team Meeting (FTM) or Listening to Youth and Families as Experts (LYFE) meeting with participation by the youth and approval by the CFSA Director, or a court order directing the permanency goal of APPLA. | There were 33 youth whose goal changed to APPLA between January – June 2013. Twenty-five of the 33 (78%) had LYFE/FTM conferences. The Agency supported the goal change in 1 case. | There were 16 youth whose goal changed to APPLA between July – December 2013. Nine of the 16 (56%) had LYFE/FTM conference. The Agency supported the goal change in 3 cases (2 are youth who are unaccompanied minors). | Yes |

**Table 2: Performance on IEP Exit Standards for Outcomes to be Maintained Between July 1 and December 31, 2013**

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance | Exit Standard Maintained |
|---|---|---|---|---|
| 25. *Legal Action to Free Children for Adoption*: Children with a permanency goal of adoption shall have legal action initiated to free them for adoption and Office of the Attorney General, on behalf of CFSA, shall facilitate the Court's timely hearing and resolution of legal action to terminate parental rights.                    (IEP citation I.B.15.a.) | For 90% of children with a permanency goal of adoption, where freeing the child for adoption is necessary and appropriate to move the child more timely to permanency, OAG, on behalf of CFSA shall file a motion to terminate parental rights or confirm that appropriate legal action has been taken within 45 days of their permanency goal becoming adoption. | 95% | 87%[58] | Yes[59] |

[58] There were a total of 38 applicable children who had a permanency goal of adoption and required legal action to free them for adoption; 33 had legal action to free them for adoption within 45 days. The five children without timely legal action were part of a sibling group.

[59] The Monitor has determined that this performance remains in compliance due to the small number of children involved and the fact that all but 5 children had legal action to free them for adoption within 45 days and these children were part of the same sibling group.

**Table 2: Performance on IEP Exit Standards for Outcomes to be Maintained Between July 1 and December 31, 2013**

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance | Exit Standard Maintained |
|---|---|---|---|---|
| 26. *Legal Action to Free Children for Adoption:* Children with a permanency goal of adoption shall have legal action initiated to free them for adoption and Office of the Attorney General, on behalf of CFSA, shall facilitate the Court's timely hearing and resolution of legal action to terminate parental rights. (IEP citation I.B.15.b.) | For 90% of children for whom a petition to terminate parental rights has been filed in order to achieve permanency, CFSA shall take and document appropriate actions by the assigned social worker and the assistant attorney general to facilitate the court's timely hearing and resolution of legal action to terminate parental rights. | 100% | 100%[60] | Yes |
| 27. *Timely Adoption:* Children with a permanency goal of adoption shall be in an approved adoptive placement within nine months of their goal becoming adoption. (IEP citation I.B.16.a.i.) | For children whose permanency goal changed to adoption July 1, 2010 or thereafter, 80% will be placed in an approved adoptive placement by the end of the ninth month from when their goal changed to adoption. | 80% | 76%[61] | Yes[62] |

---

[60] There were 20 cases that required legal action to terminate parental rights. Documentation showed that steps were taken in all cases to schedule a hearing, or the matter was currently in trial, to resolve the legal action to terminate parental rights. The amount of time between the filing of the TPR and the next court date ranged between one day and six months.

[61] Forty-nine (49) children had their permanency goal changed to adoption, 37 of whom were placed in an approved adoptive placement by the end of the ninth month from when their goal changed to adoption.

[62] The Monitor considers the current drop in performance to be insubstantial and will continue monitoring this Exit Standard to determine if required performance resumes.

## Table 2: Performance on IEP Exit Standards for Outcomes to be Maintained Between July 1 and December 31, 2013

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance | Exit Standard Maintained |
|---|---|---|---|---|
| 28. *Timely Adoption:* Children with a permanency goal of adoption shall be in an approved adoptive placement within nine months of their goal becoming adoption.  (IEP citation I.B.16.a.ii.) | For children whose permanency goal changed to adoption prior to July 1, 2010 who are not currently in an approved adoptive placement, 40% will be placed in an approved adoptive placement by December 31, 2010 and an additional 20% will be placed in an approved adoptive placement by June 30, 2011. | Review period has expired; Monitor is no longer tracking performance. | Review period has expired; Monitor is no longer tracking performance. | N/A |
| 29. *Timely Adoption:* CFSA shall make all reasonable efforts to ensure that children placed in an approved adoptive home have their adoptions finalized within 12 months of the placement in the approved adoptive home.  (IEP citation I.B.16.b.i.) | By September 30, 2010, 40% of the 203 children in pre-adoptive homes as of October 1, 2009 will achieve permanence. | Review period has expired; Monitor is no longer tracking performance. | Review period has expired; Monitor is no longer tracking performance. | N/A |
| 30. *Timely Adoption:* CFSA shall make all reasonable efforts to ensure that children placed in an approved adoptive home have their adoptions finalized within 12 months of the placement in the approved adoptive home.  IEP citation I.B.16.b.ii.) | By June 30, 2011, 45% of the children in pre-adoptive homes as of July 1, 2010 will achieve permanence. | Review period has expired; CFSA met compliance; Monitor is no longer tracking performance. | Review period has expired; Monitor is no longer tracking performance. | N/A |

**Table 2: Performance on IEP Exit Standards for Outcomes to be Maintained Between July 1 and December 31, 2013**

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance | Exit Standard Maintained |
|---|---|---|---|---|
| 31. *Timely Adoption*: CFSA shall make all reasonable efforts to ensure that children placed in an approved adoptive home have their adoptions finalized within 12 months of the placement in the approved adoptive home. (IEP citation I.B.16.b.iii.) | 90% of children in pre-adoptive homes will have their adoption finalized within 12 months or have documented reasonable efforts to achieve permanence within 12 months of the placement in the approved adoptive home. | From January 1-June 30, 2013, 94% of adoptions were completed or reasonable efforts were made to complete adoptions within 12 months of the child being placed in a pre-adoptive home. | From July 1-December 31, 2013, 97% of adoptions were completed or reasonable efforts were made to complete adoptions within 12 months of child being placed in a pre-adoptive home. [63] | Yes |
| 34. *Placement Licensing*: Children shall be placed in foster homes and other placements that meet licensing and other MFO placement standards and have a current and valid license. (IEP citation I.B.18.) | 95% of foster homes and group homes with children placed will have a current and valid license. | Foster homes: Monthly range of 96 – 98% <br><br> Group homes: Monthly range of 93 – 98% | Monthly range of 96 – 98% [64] | Yes |

---

[63] CFSA reports that 32 adoptions were finalized during this monitoring period; 23 were finalized within 12 months and reasonable efforts were made to finalize adoptions within 12 months on an additional eight.

[64] Reported performance now includes combined compliance for both foster and group homes.

## Table 2: Performance on IEP Exit Standards for Outcomes to be Maintained Between July 1 and December 31, 2013

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance | Exit Standard Maintained |
|---|---|---|---|---|
| 36. *Sibling Placement and Visits:* Children in out-of-home placement who enter foster care with their siblings should be placed with some or all of their siblings, unless documented that the placement is not appropriate based on safety, best interest needs of child(ren) or a court order requiring separation.<br><br>(IEP citation 1.C.20.a.) | 80% of children who enter foster care with their siblings or within 30 days of their siblings will be placed with some of their siblings. | 87% of children placed with their siblings or within 30 days of their siblings between January – June 2013 were placed with some of their siblings as of June 30, 2013. | 83% of children placed with their siblings or within 30 days of their siblings between July – December 2013 were placed with some of their siblings as of December 31, 2013.[65] | Yes |
| 37. *Sibling Placement and Visits:* Children placed apart from their siblings should have at least twice monthly visitation with some or all of their siblings unless documented that the visitation is not in the best interest of the child(ren).<br><br>(IEP citation 1.C.20.b.) | 80% of children shall have monthly visits with their separated siblings and 75% of children shall have twice monthly visits with their separated siblings. | Monthly range of 87 – 90% with at least monthly visits<br><br>Monthly range of 81 – 85% with at least twice monthly visits | Monthly range of 78 – 89% with at least monthly visits[66]<br><br>Monthly range of 69 – 82% with at least twice monthly visits[67] | Yes[68] |

---

[65] CFSA has also provided data for all children in care at a point in time (not limited to those who entered care between July and December 2013) for this Exit Standard. As of December 31, 2013, 73% of children currently in foster care who entered care with their siblings or within 30 days of their siblings were placed with one or more sibling.

[66] Monthly performance data are as follows for at least monthly sibling visits: July 2013, 88%; August 2013, 89%; September 2013, 81%; October 2013, 82%; November 2013, 82%; December 2013, 78%.

[67] Monthly performance data are as follows for twice monthly sibling visits: July 2013, 82%; August 2013, 80%; September 2013, 78%; October 2013, 70%; November 2013, 72%; December 2013, 69%.

[68] The Monitor considers October through December 2013 performance on sibling visitation to be a temporary deviation in performance and will continue monitoring this Exit Standard to determine if required performance resumes.

## Table 2: Performance on IEP Exit Standards for Outcomes to be Maintained Between July 1 and December 31, 2013

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance | Exit Standard Maintained |
|---|---|---|---|---|
| 38. _Assessments for Children Experiencing a Placement Disruption_: CFSA shall ensure that children in its custody whose placements are disrupted are provided with a comprehensive and appropriate assessment and follow-up action plans to determine their service and re-placement needs no later than within 30 days of re-placement. A comprehensive assessment is a review, including as applicable the child, his/her family, kin, current and former caregiver and the GAL, to assess the child's current medical, social, behavioral, educational and dental needs to determine the additional evaluations/services/ supports that are required to prevent future placement disruptions.<br>(IEP citation I.C.21.) | 90% of children experiencing a placement disruption will have a comprehensive assessment and an action plan to promote stability developed. | Monthly range of 94 – 100% | Monthly range of 95 – 100% | Yes |
| 42. _Health and Dental Care_: Children in foster care shall have timely access to health care services to meet identified needs<br>(IEP citation I.C.22.c.) | 80% of cases reviewed through Quality Service Reviews (QSR) will be rated as acceptable. | 94% of cases were acceptable based on CY2012 QSR data.[69] | 91% of cases were acceptable based on CY2013 QSR data[70] | Yes |

---

[69] CY2012 performance is provided for comparison purposes.
[70] Of the 85 cases reviewed through QSR in CY2013 where the child or youth was placed in foster care at the time of the review, 77 (91%) were rated as acceptable on the Health Status indicator. Of the three children and youth who were not rated as acceptable on both the Physical Health status and Receipt of Care indicators, one rated unacceptable on Receipt of Care and two rated unacceptable of Physical Health status. None were rated as unacceptable on both indicators.

## Table 2: Performance on IEP Exit Standards for Outcomes to be Maintained Between July 1 and December 31, 2013

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance | Exit Standard Maintained |
|---|---|---|---|---|
| 44. *Resource Development Plan:* The District shall implement the CFSA Resource Development Plan, which is to be developed by June 30 each year. The Resource Development Plan shall include all of the components listed in item 21b of the Outcomes to be Maintained section of the IEP.<br><br>(IEP citation I.D.23.) | The District shall implement the CFSA Resource Development Plan, which is to be developed by June 30 each year. The Resource Development Plan shall include all of the components listed in Item 21b of "Outcomes to be Maintained" Needs Assessment and Resource Development Plan. | Resource Development Plan updates completed June 30, 2013. | Resource Development Plan updates completed June 30, 2013. | Yes |

**Table 2: Performance on IEP Exit Standards for Outcomes to be Maintained Between July 1 and December 31, 2013**

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance | Exit Standard Maintained |
|---|---|---|---|---|
| 45. *Financial Support for Community–Based Services*: The District shall provide evidence of financial support for community- and neighborhood-based services to protect children and support families.<br><br>(IEP citation I.D.24.) | The District shall provide evidence each year of financial support for community- and neighborhood-based services to protect children and support families. | No change in FY2013 finding to support community-based agencies. | CFSA reports that the FY 2014 base funding level for the Collaboratives is $9,912,351. In FY 2014, the Collaboratives will receive an additional $2,909,525 for Project Connect ($1,069,665), Project Homebuilders ($1,139,860) and mini-grants for specific service needs (gap services) ($700,000). | Yes |

## Table 2: Performance on IEP Exit Standards for Outcomes to be Maintained Between July 1 and December 31, 2013

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance | Exit Standard Maintained |
|---|---|---|---|---|
| 46. *Caseloads:* | 90% of investigators and social workers will have caseloads that meet the above caseload requirements. No individual investigator shall have a caseload greater than 15 cases. No individual social worker shall have a caseload greater than 18 cases. No individual worker conducting home studies shall have a caseload greater than 35 cases. | a. Monthly range of 55 – 92% of investigators met the caseload requirements. Monthly range of 0 – 27 investigators had a caseload of more than 15.<br><br>b. & c. Monthly range of 93 – 99% of ongoing workers met the caseload requirements. Monthly range of 0 – 1 social workers had a caseload of 18 or more.<br><br>d.100% of workers conducting home studies met required performance of no greater than 30 cases. | a. Monthly range of 76 – 100% of investigators met the caseload requirements. Monthly range of 0 – 5 investigators had a caseload of more than 15.<br><br>b. & c. Monthly range of 94 – 99% of ongoing workers met the caseload requirements. Monthly range of 0 – 1 social workers had a caseload of 18 or more.<br><br>d.100% of workers conducting home studies met required performance of no greater than 30 cases. | Yes |
| a. The caseload of each worker conducting investigations of reports of abuse and/or neglect shall not exceed the MFO standard, which is 1:12 investigations. | | | | |
| b. The caseload of each worker providing services to children and families in which the child or children in the family are living in their home shall not exceed 1:15 families. | | | | |
| c. The caseload of each worker providing services to children in placement, including children in Emergency Care and children in any other form of CFSA physical custody, shall not exceed 1:15 children for children in foster care. | | | | |
| d. The caseload of each worker having responsibility for conducting home studies shall not exceed 30 cases. | | | | |

**Table 2: Performance on IEP Exit Standards for Outcomes to be Maintained Between July 1 and December 31, 2013**

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance | Exit Standard Maintained |
|---|---|---|---|---|
| e. There shall be no cases unassigned to a social worker for more than five business days, in which case, the supervisor shall provide coverage but not for more than five business days. (IEP citation I.D.25.) | | e. Monthly range of 29 – 63 (1 – 3% of total open cases) cases unassigned to a social worker for more than five business days.[71] | e. Monthly range of 22 – 93 (1 – 5% of total open cases) cases unassigned to a social worker for more than five business days.[72] | |
| 47. *Supervisory Responsibilities:* <br><br> a. Supervisors who are responsible for supervising social workers who carry caseloads shall be responsible for no more than six workers, including case aids or family support workers, or five caseworkers. <br><br> b. No supervisor shall be responsible for the on-going case management of any case. <br><br> i. Supervisors shall be responsible for no more than five social workers and a case aide or family support worker. (IEP citation I.D.26. a.& b.i.) | 90% of supervisors shall be responsible for no more than five social workers and a case aide or family support worker. | Monthly range of 87 – 92% of supervisors met the required standard. | Monthly range of 91 – 96% of supervisors met the required standard. | Yes |

---

[71] Between January and June 2013, in addition to the cases cited above, a monthly range of between 45 and 60 in-home services or placement cases were assigned to investigative social workers.

[72] Between July and December 2013, in addition to the cases cited above, a monthly range of between 28 and 56 in-home services or placement cases were assigned to investigative social workers. This range is consistent with the previous monitoring period and the Monitor continues to have concerns regarding delays in transferring cases after completion of an investigation.

**Table 2: Performance on IEP Exit Standards for Outcomes to be Maintained Between July 1 and December 31, 2013**

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance | Exit Standard Maintained |
|---|---|---|---|---|
| 48. *Supervisory Responsibilities:*<br>a. Supervisors who are responsible for supervising social workers who carry caseloads shall be responsible for no more than six workers, including case aids or family support workers, or five caseworkers.<br>b. No supervisor shall be responsible for the on-going case management of any case.<br>  ii.  Cases shall be assigned to social workers.<br>(IEP citation I.D.26. a.&b.ii.) | 95% of cases are assigned to social workers. | Monthly range of 95 – 97% cases assigned to social workers. | Monthly range of 93 – 96% cases assigned to social workers. | Yes[73] |
| 49. *Training for New Social Workers:* New direct service staff[74] shall receive the required 80 hours of pre-service training through a combination of classroom, web-based and/or on-the-job training.<br>(IEP citation I.D.27.a.) | 90% of newly hired CFSA and private agency direct service staff shall receive 80 hours of pre-service training. | 92% | 93%[75] | Yes |

---

[73] CFSA met this Exit Standard for five of the six months of the monitoring period.
[74] Direct service staff includes social workers, nurse care managers and family supports workers who provide direct services to children, youth and families.
[75] Between July and December 2013, 53 of 57 newly hired direct service staff who were applicable to this measure completed 80 hours of pre-service training.

**Table 2: Performance on IEP Exit Standards for Outcomes to be Maintained Between July 1 and December 31, 2013**

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance | Exit Standard Maintained |
|---|---|---|---|---|
| 50. *Training for New Supervisors*: New supervisors shall complete a minimum of 40 hours of pre-service training on supervision of child welfare workers within eight months of assuming supervisory responsibility.<br><br>(IEP citation I.D.27.b.) | 90% of newly hired CFSA and private agency supervisors shall complete 40 hours of pre-service training on supervision of child welfare worker within eight months of assuming supervisory responsibility. | 80% | N/A[76] | Yes |
| 51. *Training for Previously Hired Social Workers*: Previously hired direct service staff[77] shall receive annually a minimum of 5 full training days (or a minimum of 30 hours) of structured in-service training geared toward professional development and specific core and advanced competencies.<br><br>(IEP citation I.D.28.a.) | 80% of CFSA and private agency direct service staff shall receive the required annual in-service training. | 93% | In process | N/A[78] |
| 52. *Training for Previously Hired Supervisors and administrators*: Supervisors and administrators shall receive annually a minimum of 24 hours of structured in-service training.<br><br>(IEP citation I.D.28.b.) | 80% of CFSA and private agency supervisors and administrators who have casework responsibility shall receive annual in-service training. | 96% | In process | N/A[79] |

---

[76] Eight supervisors were hired during the eight months prior to December 31, 2013 and a full eight months have not passed since hiring so the Monitor cannot assess whether or not performance meets the requirement. However, of the eight supervisors hired, three completed their training prior to their eighth month of employment. Five are still in training but have not yet been employed for eight months.

[77] Twelve of the 30 hours required for the nurse care managers may be met with continuing education requirements of the licensing board.

[78] The training schedule for CFSA employees is calculated on a July to June cycle. Staff are required to complete training hours by June 30, 2014.

[79] *Ibid.*

**Table 2: Performance on IEP Exit Standards for Outcomes to be Maintained Between July 1 and December 31, 2013**

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance | Exit Standard Maintained |
|---|---|---|---|---|
| 53. *Training for Foster Parents:* CFSA and contract agency foster parents shall receive a minimum of 15 hours of pre-service training.<br>(IEP citation I.D.29.a.) | 95% of CFSA and contract agency foster parents shall receive a minimum of 15 hours of pre-service training. | 94% | 97% | Yes |
| 55. *Special Corrective Action:*<br>a. CFSA shall produce accurate monthly reports, shared with the Monitor, which identify children in the following categories:<br>i. All cases in which a child has been placed in four or more different placements, with the fourth or additional placement occurring in the last 12 months and the placement is not a permanent placement;<br>ii. All cases in which a child has had a permanency goal of adoption for more than one year and has not been placed in an adoptive home;<br>iii. All children who have been returned home and have reentered care more than twice and have a plan of return home at the time of the report;<br>iv. Children with a permanency goal of reunification for more than 18 months;<br>v. Children placed in emergency facilities for more than 90 days;<br>vi. Children placed in foster homes or facilities that exceed their licensed capacities or placed in facilities without a valid license;<br>vii. Children under 14 with a permanency goal of APPLA; and<br>viii. Children in facilities more than 100 miles from the District of Columbia.<br>b. CFSA shall conduct a child-specific case review by the Director or Director's designee(s) for each child identified and implement a child-specific corrective action plan, as appropriate.<br>(IEP citation I.D.30.) | For 90% of children identified in corrective action categories, required reviews will occur and corrective action plans will be developed and implemented as appropriate. | a. CFSA produces a monthly report that identifies the children/ families that have been flagged for discussion during applicable case reviews.<br><br>b.100% of children requiring a special corrective action plan(s) for one or more special corrective action category had a plan developed. | a. CFSA produces a monthly report that identifies the cases of these children/families that have been flagged for discussion during applicable case reviews.<br><br>b.100% of children requiring a special corrective action plan(s) for one or more special corrective action category had a plan developed. | Yes |

## Table 2: Performance on IEP Exit Standards for Outcomes to be Maintained Between July 1 and December 31, 2013

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance | Exit Standard Maintained |
|---|---|---|---|---|
| 56. *Performance-Based Contracting*: CFSA shall have in place a functioning performance-based contracting system that (a) develops procurements for identified resource needs, including placement and service needs; (b) issues contracts in a timely manner to qualified service providers in accordance with District laws and regulations; and (c) monitors contract performance on a routine basis. (IEP citation I.D.31.) | Evidence of functionality and ongoing compliance. Evidence of capacity to monitor contract performance on a routine basis. | Infrastructure for performance based contracting remains in place and CFSA uses data to make decisions about placement and future contracts. | Infrastructure for performance based contracting remains in place and CFSA uses data to make decisions about placement and future contracts. | Yes |
| 57. *Interstate Compact for the Placement of Children (ICPC)*: CFSA shall continue to maintain responsibility for managing and complying with the ICPC for children in its care. IEP citation I.D.32.) | Elimination of the backlog of cases without ICPC compliance. | CFSA has eliminated the backlog. There are no children placed without ICPC approval. | CFSA has eliminated the backlog. There are no children placed without ICPC approval. | Yes |

**Table 2: Performance on IEP Exit Standards for Outcomes to be Maintained Between July 1 and December 31, 2013**

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance | Exit Standard Maintained |
|---|---|---|---|---|
| 58. *Licensing Regulations*: CFSA shall have necessary resources to enforce regulations effectively for original and renewal licensing of foster homes, group homes, and independent living facilities.<br><br>(IEP citation I.D.33.) | CFSA shall have necessary resources to enforce regulations effectively for original and renewal licensing of foster homes, group homes, and independent living facilities. | As of June 2013, 35 of 36 FTE positions for Family-Based Contracts Monitoring were filled.<br><br>22 of 23 FTE positions were filled for Congregate Care Contracts Management Division.<br><br>25 of 27 FTE positions were filled for Family Licensing Division. | As of December 2013, 21 of 21 FTE positions for Family-Based Contracts Monitoring were filled.[80]<br><br>25 of 27 FTE positions were filled for Family Licensing Division. | Yes |

[80] Congregate care contracts management is reported within the family-based contract management division.

| | | | Table 2: Performance on IEP Exit Standards for Outcomes to be Maintained Between July 1 and December 31, 2013 | | |
| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance | Exit Standard Maintained |
|---|---|---|---|---|
| 59. *Budget and Staffing Adequacy:* The District shall provide evidence that the Agency's annual budget complies with Paragraph 7 of the October 23, 2000 Order providing customary adjustments to the FY 2001 baseline budget and adjustments to reflect increases in foster parent payments and additional staff required to meet caseload standards, unless demonstrated compliance with the MFO can be achieved with fewer resources.<br><br>The District shall provide evidence of compliance with Paragraph 4 of the October 23, 2000 Order that CFSA staff shall be exempt from any District-wide furloughs and from any District-wide Agency budget and/or personnel reductions that may be otherwise imposed.<br><br>(IEP citation I.D.34.) | The District shall provide evidence that the Agency's annual budget complies with Paragraph 7 of the October 23, 2000 Order providing customary adjustments to the FY 2001 baseline budget and adjustments to reflect increases in foster parent payments and additional staff required to meet caseload standards, unless demonstrated compliance with the MFO can be achieved with fewer resources. | The FY2013 budget is $257.1 million and provides adequate funding for required staffing, services and supports. | The FY2014 budget is $237.6 million and provides adequate funding for required staffing, services and supports. | Yes |

**Table 2: Performance on IEP Exit Standards for Outcomes to be Maintained Between July 1 and December 31, 2013**

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance | Exit Standard Maintained |
|---|---|---|---|---|
| 60. *Federal Revenue Maximization:* CFSA shall demonstrate compliance with Sections A and B of Chapter XVIII of the Modified Final Order concerning federal revenue maximization and financial development.<br><br>IEP citation I.D.35.) | Evidence of consistent and appropriate claiming of all appropriate and available federal revenue. | CFSA has completed work necessary for maximizing Title IV-E revenue and is increasing claiming of Supplemental Security Income or Social Security Disability Income for eligible children. The District of Columbia's federal Title IV-E waiver plan has been approved. | CFSA now has a Title IV-E Waiver approved. CFSA will be claiming this federal revenue on a quarterly basis. Additionally, CFSA increased claiming Supplemental Security Income or Social Security Disability Income for eligible children. | Yes |
| 61. *Entering Reports Into Computerized System:* CFSA shall immediately enter all reports of abuse or neglect into its computerized information systems and shall use the system to determine whether there have been prior reports of abuse or neglect in that family or to that child.<br><br>(IEP citation II.A.1.) | Ongoing Compliance | Ongoing compliance | Ongoing compliance | Yes |

**Table 2: Performance on IEP Exit Standards for Outcomes to be Maintained Between July 1 and December 31, 2013**

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance | Exit Standard Maintained |
|---|---|---|---|---|
| 62. _Maintaining 24 Hour Response System_: CFSA shall staff and maintain a 24-hour system for receiving and responding to reports of child abuse and neglect, which conforms to reasonable professional standards.<br><br>(IEP citation II.A.2.) | Ongoing Compliance | Ongoing compliance | Ongoing compliance | Yes |
| 63. _Checking for Prior Reports_: Child abuse and/or neglect reports shall show evidence that the investigator checked for prior reports of abuse and/or neglect.<br><br>(IEP citation II.A.3.) | Ongoing Compliance | Ongoing compliance | Ongoing compliance | Yes |
| 65. _Investigations of Abuse and Neglect in Foster Homes and Institutions_: Reports of abuse and neglect in foster homes and institutions shall be comprehensively investigated; investigations in foster homes shall be completed within 35 days and investigations involving group homes, day care settings or other congregate care settings shall be completed within 60 days.<br><br>(IEP citation II.A.5.) | 90% of reports of abuse and neglect in foster homes shall be completed within 35 days and within 60 days for investigations involving group homes, day care settings or other congregate settings. | Foster homes: Monthly range of 80 – 100%<br><br>Group homes: Monthly range of 89 – 100% | Monthly range of 80 – 100%[81] | Yes |
| 66. _Policies for General Assistance Payments_: CFSA shall have in place policies and procedures for appropriate use of general assistance payments for the care of children by unrelated adults, including provision of any applicable oversight and supervision.<br><br>(IEP citation II.B.6.) | Ongoing Compliance | Ongoing Compliance | Ongoing compliance | Yes |

---

[81] Reported performance includes combined compliance for both foster and group homes. All months met the Exit Standard except July 2013, when performance was at 80 percent. This performance was based on only nine investigations.

| Table 2: Performance on IEP Exit Standards for Outcomes to be Maintained Between July 1 and December 31, 2013 | | | | |
|---|---|---|---|---|
| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance | Exit Standard Maintained |
| 67. *Use of General Assistance Payments*: CFSA shall demonstrate that District General Assistance payment grants are not used as a substitute for financial supports for foster care or kinship care for District children who have been subject to child abuse or neglect.<br><br>(IEP citation II.B.7.) | Ongoing Compliance | Ongoing Compliance | Ongoing compliance | Yes |
| 68. *Placement of Children in Most Family-Like Setting*: No child shall stay overnight in the CFSA Intake Center or office building.<br><br>(IEP citation II.B.8.) | Ongoing Compliance | No child has been reported staying overnight at CFSA during this monitoring period. | No child has been reported staying overnight at CFSA during this monitoring period. | Yes |
| 69. *Timely Approval of Foster/Adoptive Parents*: CFSA should ensure training opportunities are available so that interested families may begin training within 30 days of inquiry.<br><br>(IEP citation II.B.9.) | Ongoing Compliance | Training was offered during the current monitoring period. | Training was offered during the current monitoring period. | Yes |
| 70. *Placement within 100 Miles of the District*: No more than 82 children shall be placed more than 100 miles from the District of Columbia. (Children placed in college, vocational programs, correctional facilities, or kinship or pre-adoptive family-based settings under the ICPC shall be exempt from this requirement.)<br><br>(IEP citation II.B.10.) | Ongoing Compliance for no more than 82 children. | Monthly range of 24 – 32 children | Monthly range of 22 – 24 children | Yes |

## Table 2: Performance on IEP Exit Standards for Outcomes to be Maintained Between July 1 and December 31, 2013

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance | Exit Standard Maintained |
|---|---|---|---|---|
| 71. *Licensing and Placement Standards* | Ongoing compliance for 95% of children. | | | Yes |
| a. Children shall be placed in foster homes and other placements that meet licensing and other MFO placement standards. | | a. Monthly range of foster homes: 96-98%; Monthly range of group homes: 93-98% | a. Monthly range of foster and group homes: 96-98%[82] | |
| b. Children in foster home placements shall be in homes that (a) have no more than three foster children or (b) have six total children including the family's natural children; (c) have no more than two children under two years of age or (d) have more than three children under six years of age. The sole exception shall be those instances in which the placement of a sibling group, with no other children in the home, shall exceed these limits. | | b. Monthly range of children over placed in foster homes: 1-3% | b. Monthly range of children over placed in foster homes: 1-2% | |
| c. No child shall be placed in a group-care setting with a capacity in excess of eight (8) children without express written approval by the Director or designee based on written documentation that the child's needs can only be met in that specific facility, including a description of the services available in the facility to address the individual child's needs. | | c. Monthly range of children in group care settings with capacity in excess of eight children – 0-6% | c. Children in group care settings with capacity in excess of eight children – 0% | |
| d. Children shall not be placed in a foster care home or facility in excess of its licensed capacity. The sole exception shall be those instances in which the placement of a sibling group, with no other children in the home, shall exceed the limits.<br><br>(IEP citation II.B.11.) | | | | |

---

[82] Reported performance includes combined compliance for both foster and group homes.

**Table 2: Performance on IEP Exit Standards for Outcomes to be Maintained Between July 1 and December 31, 2013**

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance | Exit Standard Maintained |
|---|---|---|---|---|
| 72. *Case Planning Process*: Case plans shall be developed within 30 days of the child entering care and shall be reviewed and modified as necessary at least every six months thereafter, and shall show evidence of appropriate supervisory review of case plan progress.<br><br>(IEP citation II.B.12.) | 90% of case plans shall be developed within 30 days of the child entering care and shall be reviewed and modified as necessary at least every six months thereafter. | Monthly range of 95 – 98% | Monthly range of 93 – 97% | Yes |
| 73. *Appropriate Permanency Goals*: No child under the age of 12 shall have a permanency goal of legal custody with permanent caretakers unless he or she is placed with a relative who is willing to assume long-term responsibility for the child and who has legitimate reasons for not adopting the child and it is in the child's best interest to remain in the home of the relative rather than be considered for adoption by another person. No child under the age of 12 shall have a permanency goal of continued foster care unless CFSA has made every reasonable effort, documented in the record, to return the child home, to place the child with an appropriate family member, and to place the child for adoption, and CFSA has considered and rejected the possibility of the child's foster parents assuming legal custody as permanent caretakers of the child.<br><br>(IEP citation II.B.13.) | Ongoing Compliance | Ongoing Compliance | Ongoing Compliance[83] | Yes |

[83] As of December 31, 2013, CFSA reports that no child under the age of 12 had a non-court ordered goal of legal custody and one child under the age of 12 had a goal of APPLA. This is the same child that was identified in the previous monitoring period.

## Table 2: Performance on IEP Exit Standards for Outcomes to be Maintained Between July 1 and December 31, 2013

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance | Exit Standard Maintained |
|---|---|---|---|---|
| 74. *Timely Adoption:* Within 95 days of a child's permanency goal becoming adoption, CFSA shall convene a permanency planning team to develop a child-specific recruitment plan which may include contracting with a private adoption agency for those children without an adoptive resource.<br><br>(IEP citation II.B.14.) | For 90% of children whose permanency goal becomes adoption, CFSA shall convene a permanency planning team to develop a child-specific recruitment plan which may include contracting with a private adoption agency for those children without an adoptive resource. | 100% | 100% | Yes |
| 75. *Post-Adoption Services Notification:* Adoptive families shall receive notification at the time that the adoption becomes final of the availability of post-adoption services.<br><br>(IEP citation II.B.16.) | Ongoing compliance for 90% of cases. | CFSA continues to report all adoptive families receive notification in a variety of ways. | CFSA continues to report all adoptive families receive notification in a variety of ways. | Yes |
| 76. *Family Court Reviews:* A case review hearing will be conducted in Family Court at least every six months for every child as long as the child remains in out-of-home placement, unless the child has received a permanency hearing within the past six months.<br><br>(IEP citation II.D.16.) | Ongoing Compliance for 90% of cases. | As of June 30, 2013, 95% of applicable children had required review. | As of December 31, 2013, 97% of applicable children had required review. | Yes |
| 77. *Permanency Hearings:* CFSA shall make every reasonable effort to ensure that children in foster care have a permanency hearing in Family Court no later than 14 months after their initial placement.<br><br>(IEP citation II.D.17.) | Ongoing compliance for 90% of cases. | Monthly range of 90 – 98% | Monthly range of 95 – 99% | Yes |

**Table 2: Performance on IEP Exit Standards for Outcomes to be Maintained Between July 1 and December 31, 2013**

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance | Exit Standard Maintained |
|---|---|---|---|---|
| 78. *Use of MSWs and BSWs*: Unless otherwise agreed, all social worker hires at CFSA shall have an MSW or BSW before being employed as trainees. (IEP citation II.E.18.) | Ongoing compliance for all social work hires. | Ongoing Compliance | Ongoing compliance | Yes |
| 79. *Social Work Licensure*: All social work staff shall meet District of Columbia licensing requirements to carry cases independently of training units. (IEP citation II.E.19) | Ongoing compliance for all social workers. | Ongoing Compliance | Ongoing compliance | Yes |
| 80. *Training for Adoptive Parents*: Adoptive parents shall receive a minimum of 30 hours of training, excluding the orientation process. (IEP citation II.F.20.) | Ongoing compliance for 90% of adoptive parents. | 90% | 97% | Yes |
| 81. *Needs Assessment and Resource Development Plan:*  a. CFSA shall complete a needs assessment every two years, which shall include an assessment of placement support services, to determine what services are available and the number and categories of additional services and resources, if any, that are necessary to ensure compliance with the MFO. The needs assessment shall be a written report. The needs assessment, including the report, shall be repeated every two years. CFSA shall provide evidence of adequate Resource Development capacity within the Agency, with sufficient staff and other resources to carry out MFO resource development functions. | Ongoing Compliance | a. Needs Assessment completed December 2011  b. Resource Development Plan updates completed June 30, 2013 | a. Needs Assessment completed December 2013  b. Resource Development Plan updates completed June 30, 2013 | Yes |

**Table 2: Performance on IEP Exit Standards for Outcomes to be Maintained Between July 1 and December 31, 2013**

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance | Exit Standard Maintained |
|---|---|---|---|---|
| b. The District shall develop a Resource Development Plan, which shall be updated annually by June 30th of each year. The Resource Development Plan shall: (a) project the number of emergency placements, foster homes, group homes, therapeutic foster homes and institutional placements that shall be required by children in CFSA custody during the upcoming year; (b) identify strategies to assure that CFSA has available, either directly or through contract, a sufficient number of appropriate placements for all children in its physical or legal custody; (c) project the need for community-based services to prevent unnecessary placement, replacement, adoption and foster home disruption; (d) identify how the Agency is moving to ensure decentralized neighborhood and community-based services; and (e) include an assessment of the need for adoptive families and strategies for recruitment, training and retention of adoptive families based on the annual assessment. The Plan shall specify the quantity of each category of resources and services, the time period within which they shall be developed, and the specific steps that shall be taken to ensure that they are developed. CFSA shall then take necessary steps to implement this plan.<br><br>(IEP citation II.G.21.) | | | | |
| 82. *Foster Parent Licensure:* CFSA shall license relatives as foster parents in accordance with District law, District licensing regulations and ASFA requirements.<br><br>(IEP citation II.G.22.) | Ongoing Compliance | Ongoing Compliance | Ongoing compliance | Yes |

## Table 2: Performance on IEP Exit Standards for Outcomes to be Maintained Between July 1 and December 31, 2013

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance | Exit Standard Maintained |
|---|---|---|---|---|
| 83. *Quality Assurance*: CFSA shall have a Quality Assurance system with sufficient staff and resources to assess case practice, analyze outcomes and provide feedback to managers and stakeholders. The Quality Assurance system must annually review a sufficient number of cases to assess compliance with the provisions of the MFO and good social work practice, to identify systemic issues, and to produce results allowing the identification of specific skills and additional training needed by workers and supervisors.     (II.G.23.) | Ongoing Compliance | Ongoing Compliance<br><br>As of June 30, 2013, there was one Quality Assurance Supervisor responsible for managing three child fatality specialists and three quality assurance specialists. All of these positions were filled. There was one QSR Supervisor who was responsible for supervising four professional positions and one support staff. All QSR positions were filled. | Ongoing Compliance<br><br>There has been no change in staffing since the previous monitoring period. | Yes |

| Table 2: Performance on IEP Exit Standards for Outcomes to be Maintained Between July 1 and December 31, 2013 | | | | |
|---|---|---|---|---|
| **Implementation and Exit Plan Requirement** | **Exit Standard** | **January – June 2013 Performance** | **July – December 2013 Performance** | **Exit Standard Maintained** |
| 84. *Maintaining Computerized System:* | Ongoing Compliance | Ongoing Compliance | Ongoing compliance | Yes |
| a. CFSA shall develop and maintain a unitary computerized information system and shall take all reasonable and necessary steps to achieve and maintain accuracy. | | | | |
| b. CFSA shall provide evidence of the capacity of FACES.NET Management Information System to produce appropriate, timely, and accurate worker/supervisor reports and other management reports that shall assist the Agency in meeting goals of safety, permanence and well-being and the requirements of the MFO and Court-ordered Implementation and Exit Plan.<br><br>(IEP citation II.H.24.) | | | | |
| 85. *Contracts to Require the Acceptance of Children Referred:* CFSA contracts for services shall include a provision that requires the provider to accept all clients referred pursuant to the terms of the contract, except for a lack of vacancy.<br><br>(IEP citation II.H.25.) | Ongoing Compliance | Ongoing Compliance | Ongoing Compliance | Yes |
| 86. *Provider Payments:* CFSA shall ensure payment to providers in compliance with DC's Quick Payment Act for all services rendered.<br><br>(IEP citation II.H.26.) | 90% of payments to providers shall be made in compliance with DC's Quick Payment Act for all services rendered. | Ongoing Compliance<br><br>Monthly range of 85 – 99% of providers were paid timely | Ongoing Compliance<br><br>Monthly range of 93–100% of providers were paid timely | Yes |

## Table 2: Performance on IEP Exit Standards for Outcomes to be Maintained Between July 1 and December 31, 2013

| Implementation and Exit Plan Requirement | Exit Standard | January – June 2013 Performance | July – December 2013 Performance | Exit Standard Maintained |
|---|---|---|---|---|
| 87. *Foster Parent Board Rates*: There shall be an annual adjustment at the beginning of each fiscal year of board rates for all foster and adoptive homes to equal the USDA annual adjustment to maintain rates consistent with USDA standards for costs of raising a child in the urban south.<br><br>(IEP citation II.H.27.) | Ongoing Compliance | Ongoing compliance | Ongoing compliance | Yes |
| 88. *Post-Adoption Services*: CFSA shall make available post-adoption services necessary to preserve families who have adopted a child committed to CFSA.<br><br>(IEP citation II.H.28.) | Ongoing Compliance | FY2013 budget provides $816,897 for the Post-Permanency Family Center and $123,537 for the Center for Adoption Support and Education. | FY2014 budget provides $891,509 for the Post-Permanency Family Center, $246,145 for the Center for Adoption Support and Education and $39,301,000 for the Adoption and Guardianship Subsidy Program.[84] | Yes |

[84] The proposed FY2015 budget includes $36,992,000 for Adoption and Guardianship Subsidy Program.

## IV.    DISCUSSION OF *LaSHAWN A. v. GRAY* IMPLEMENTATION AND EXIT PLAN OUTCOMES

### A.    GOAL: CHILD SAFETY

CFSA maintains a 24-hour, seven day a week hotline to accept reports of alleged child abuse and neglect in the District of Columbia. CFSA utilizes a Differential Response (DR) system to determine the appropriate system response to referrals which include one of the following pathways: 1) screened out because the referral does not include an allegation of abuse or neglect, 2) initiate an investigation, 3) initiate a Family Assessment (FA)[85, 86] or 4) Information and Referral (I&R).[87] These determinations are made by hotline staff and through the Hotline RED Team. The Hotline RED Team is a multi-disciplinary team that currently meets three times per weekday and weekends to review referrals received by the hotline and determine which DR pathway is appropriate. Typically, I&Rs, screened out calls and referrals that are linked to an already open investigation and calls that require immediate response are not referred to the Hotline RED Team but are reviewed by supervisors within the hotline unit.[88] Of the 6,561 referrals received by the hotline between July and December 2013, 1,950 (30%) were reviewed by the Hotline RED Team.

CFSA is currently designing and developing a DR Evaluation Plan which would include an evaluation of pathway assignment decisions and quality of investigation and family assessment practice. While the specific design and inquiries of the evaluation plan are still under consideration, the data collected should help to assess if families are being directed to the appropriate DR pathway; if pathway criteria are applied consistently; if families are better off as a result of a FA response or investigation response; if families are satisfied with the FA response; if social workers are effectively engaging families in FA and investigations; and if families are getting the services needed from FA practice.

Throughout 2013, CFSA rebalanced staffing within investigation and FA units to ensure that caseloads for each met required standards. By August 2013, CFSA's Entry Services had a total of 10 FA units; 12 investigative units and one educational triage unit.[89] High investigative

---

[85] Family Assessment response is utilized when the information provided in the hotline report does not raise any safety concerns for the child(ren), however, the family situation still raises concerns. The goal is to ensure the safety, well-being and stability of the child(ren) while assisting parents to resolve issues without a traditional investigation.

[86] Beginning October 1, 2013, CFSA in consultation with CRC, added additional allegations to FA acceptance criteria. The current allegations which are not acceptable for FA are child fatality, sex abuse, institutional abuse, substance abuse impacts parenting including PCP or other lethal drug and immediate response.

[87] Information and Referral is the pathway for requests from other jurisdictions and information or reports outside the parameters of CFSA involvement. Some examples include requests for courtesy interviews, notice of child or youth abscondence, notice of child or youth return from abscondence, non-CPS assaults or child or youth curfew violations.

[88] CFSA is working with CRC to develop a plan to review the screen outs and I&Rs approved at the hotline.

[89] In April 2013, in response to the substantial number of educational neglect referrals CFSA was receiving from District public and charter schools, an educational neglect triage unit was created to review referrals based on school absences only when additional allegations of child abuse and neglect were not indicated.

worker caseloads have been a concern noted in prior monitoring reports; however, during the current monitoring period, investigative worker caseloads were compliant in July, November and December 2013. FA worker caseloads rarely exceeded 12 assessments per worker, with only one FA worker carrying more than 12 assessments during the months of September and December 2013.

As indicated by data in this section, due to increased FA staffing capacity and additional allegations added to FA acceptance criteria, the number of referrals accepted for FA has increased substantially this period, from four percent of all hotline referrals in September 2013 to 17 percent in October 2013. Both public and charter schools within the District continue to report truancy concerns to the hotline in accordance with District law on unexcused absences; between July and December 2013, CFSA reports that 782 educational neglect referrals were received; 84 (11%) were assigned as investigations, 152 (19%) were assigned as family assessments and 546 (70%) were screened out as not requiring either an investigation or assessment.

In addition to the use of the Hotline RED Teams to determine appropriate pathway assignment for hotline referrals, CFSA has continued use of the 10/15 Day RED Teams, which review investigations and family assessments that have been open for 10 to 15 days, to direct the continuation of the investigation or assessment and determine if service referrals are needed and can be made. Beginning in October 2013, CFSA reports that Collaborative staff began consistently attending 10/15 Day RED Teams to facilitate service referrals to community-based agencies when appropriate. 10/15 Day RED Team meetings can directly impact the quality of investigations by providing consultation and direction for workers on such things as reviewing and understanding case history, identifying additional core or collateral contacts that should be made, suggesting service referrals that are needed and supporting sound decision making on making next steps. CFSA is in the process of developing a data collection process linked to FACES.NET for reviews conducted by 10/15 Day RED Teams.

CFSA has partnered with the Children's Research Center (CRC) in developing a Hotline-specific Structured Decision Making (SDM) Screening and Response Priority Assessment tool to guide consistent decision-making among staff. This tool was launched on March 1, 2014, and CFSA continues to work with CRC on implementation and inter-rater reliability tests to assess consistency and fidelity of practice.

In this section of the report, the Monitor closely examines CFSA's performance in hotline, investigations and family assessment, all critical areas of practice for a child welfare system.

1.    **Hotline**

Table 3 below shows the number of calls the hotline received between July and December 2013 and specifies the DR pathway selected for each referral. The volume of calls to the hotline this monitoring period ranged between 935 and 1,268 a month. Hotline calls designated as I&R remained relatively unchanged each month this period, ranging between 28 and 33 percent. As referenced above, data demonstrate an increase in referrals to the FA pathway as staff capacity has increased. Calls accepted or linked for investigation and calls screened out by the hotline or the Hotline RED Team fluctuated this period; between 24 and 50 percent of calls a month were accepted or linked for investigation and between 14 and 37 percent of calls a month were screened out.[90]

**Table 3: Number of Calls to
Child Abuse and Neglect Hotline by DR Pathway\*\*
July – December 2013**

| Month | Total | Information and Referral (I&R) | Investigation | | Family Assessment (FA) | | Screened Out by Hotline or Hotline RED Team |
|---|---|---|---|---|---|---|---|
| | | Accepted | Accepted | Linked | Accepted | Linked | |
| July 2013 | 1,268 | 352 (28%) | 373 (29%) | 37 (3%) | 41 (3%) | 0 | 465 (37%) |
| Aug 2013 | 935 | 296 (32%) | 411 (44%) | 40 (4%) | 45 (5%) | 1 (<1%) | 142 (15%) |
| Sept 2013 | 966 | 304 (31%) | 436 (45%) | 50 (5%) | 42 (4%) | 2 (<1%) | 132 (14%) |
| Oct 2013 | 1,174[91] | 358 (30%) | 346 (29%) | 45 (4%) | 194 (17%) | 7 (1%) | 223 (19%) |
| Nov 2013 | 1,123 | 344 (31%) | 317 (28%) | 34 (3%) | 187 (17%) | 12 (1%) | 229 (20%) |
| Dec 2013 | 1,095 | 365 (33%) | 244 (22%) | 26 (2%) | 159 (15%) | 1 (<1%) | 300 (27%) |
| **Total** | **6,561** | **2,019 (31%)** | **2,127 (32%)** | **232 (4%)** | **668 (10%)** | **23 (<1%)** | **1,491 (23%)** |

Source: CFSA Administrative Data, FACES.NET report INT003
*Percentages may not equal 100% due to rounding.
**Linked indicates that the Agency already had an open investigation or FA and the new referral was linked to the previously open referral. A referral may be screened out when the information provided by the reporter does not indicate allegations of abuse or neglect in the District of Columbia.

---

[90] During this monitoring period, there were 1,845 children involved in the 1,491 referrals that were screened out. Of those 1,845 children, 208 (11%) were the subject of a subsequent report within six months and 50 (2.7%) were the subject of a substantiated finding of abuse or neglect.
[91] At the time the data were run, one hotline call was awaiting approval and not otherwise designated.

2.    **Investigations**

Referrals which allege serious safety concerns for children, including severe neglect, physical and sexual abuse, require an investigation. The IEP requires CFSA to:

- initiate an investigation within 48 hours of the referral to the hotline or document good faith efforts to initiate the investigation when the alleged victim child(ren) cannot be immediately located;
- complete the investigation and enter the final report of findings into FACES.NET within 35 days of the referral to the hotline;
- comprehensively review families who are subject to a new investigation for whom the current report of child maltreatment is the fourth or greater report with the most recent report occurring within the last 12 months;
- conduct investigations of acceptable quality; and refer families whose circumstances are deemed to place a child in their care at low or moderate risk of abuse and who are in need of and agree to additional supports to an appropriate Collaborative or community agency for follow up.

Performance this monitoring period shows improvement in timely initiation and completion of investigations as well as completion of community-based service referrals for low and moderate risk families. New this period and attributable to the Hotline and 10/15 Day RED Team processes, CFSA has partially met the required performance for completion of reviews for families subject to a new investigation for whom the current report is the fourth or greater within the last 12 months. Improving the consistency and quality of investigations has been a priority focus of CFSA work as additional progress is still needed.

*Initiating Investigations*

| IEP Requirement | 1. *Investigations*: Investigations of alleged child abuse and neglect shall be initiated or documented good faith efforts shall be made to initiate investigations within 48 hours after receipt of a report to the hotline of child maltreatment.<br><br>(IEP citation I.A.1.a.) |
|---|---|
| Exit Standard | 95% of all investigations will be initiated within 48 hours or there will be documented good faith efforts to initiate investigations whenever the alleged victim child(ren) cannot be immediately located.[92] |

**Figure 1: Timely Initiation of Investigations**
**December 2012 – December 2013**



IEP Exit Standard - 95%

Source: CFSA Administrative Data, FACES.NET report INT052

*Performance for the period July 1 through December 31, 2013:*

Initiation of an investigation includes seeing all alleged victim children and talking with them outside the presence of the caretaker, or making all applicable good faith efforts to locate all alleged victim children within the 48-hour time frame.[93] Between July and December 2013, a monthly range of 83 to 90 percent of investigations were initiated timely, either by the social

[92] Documented good faith efforts to see alleged victim children within the first 48 hours shall satisfy this requirement if they include: 1) visiting the child's home at different times of the day; 2) visiting the child's school and/or day care in an attempt to locate the child if known; 3) contacting the reporter, if known, to elicit additional information about the child's location; 4) reviewing the CFSA information system and other information systems (e.g. ACEDS, STARS) for additional information about the child and family; and 5) contacting the police for all allegations that a child(ren)'s safety or health is in immediate danger.
[93] For younger and non-verbal children, observation is acceptable.

worker seeing and interviewing all alleged victim children outside the presence of the caretaker within 48 hours of the report to the hotline or by documenting completion of all applicable good faith efforts (see Figure 2). For example, in December 2013, 336 investigations were completed; in 270 (80%) investigations, a social worker saw all alleged victim children within 48 hours of the report to the hotline and in an additional 32 (10%) investigations, there was documentation that good faith efforts were made to initiate the investigation, for a total of 90 percent of investigations initiated timely. CFSA is close to meeting the 95 percent performance requirement for this Exit Standard.

**Figure 2: Timely Initiation of Investigations**
**July – December 2013**



Source: CFSA Administrative Data, FACES.NET report INT052

*Timely Completion of Investigations*

| IEP Requirement | 2. *Investigations*: Investigations of alleged child abuse and neglect shall be completed within 30 days after receipt of a report to the hotline of child maltreatment and the final report of findings for each investigation shall be completed within five days of the completion of the investigation.<br><br>(IEP citation I.A.1.b.) |
|---|---|
| Exit Standard | 90% of investigations will be completed and a final report of findings shall be entered in FACES.NET within 35 days. |

**Figure 3: Timely Completion of Investigations**
**June 2011 – December 2013**



Source: CFSA Administrative Data, FACES.NET report INV004

***Performance for the period July 1 through December 31, 2013:***

Between July and December 2013, a monthly range of 58 to 74 percent of investigations were completed timely (see Figure 4). For example, in December 2013, there were 328 non-institutional abuse investigations completed; 242 (74%) were completed and had findings entered in FACES.NET within 35 days after receipt of the report.[94] While performance has improved since the previous monitoring period, it does not yet meet the level required by the IEP.

---

[94] During this monitoring period, CFSA reports the following backlog: July 2013, 98; August 2013, 78; September 2013, 74; October 2013, 79; November 2013, 70; December 2013, 56.

**Figure 4: Timely Completion of Investigations**
**July – December 2013**



Source: CFSA Administrative Data, FACES.NET report INV004

## *Reviews of Repeat Reports*

| IEP Requirement | 3. *Investigations*: For families who are subject to a new investigation for whom the current report of child maltreatment is the fourth or greater report of child maltreatment, with the most recent report occurring within the last 12 months, CFSA will conduct a comprehensive review of the case history and the current circumstances that bring the family to CFSA's attention. (IEP citation I.A.1.c.) |
|---|---|
| Exit Standard | 90% of the case records for families subject to a new investigation for whom the current report of child maltreatment is the fourth or greater report of child maltreatment, with the most recent report occurring within the last 12 months will have documentation of a comprehensive review. |

**Figure 5: Completion of Comprehensive Reviews of Case History and
Current Circumstances for Families Subject to a New Investigation
for Whom the Current Report is the Fourth or Greater Report Within the Last 12 Months
December 2012 – December 2013**



Source: CFSA Manual Data

*Performance for the period July 1 through December 31, 2013:*
The purpose of this requirement is to ensure a more intensive upfront review of a family's
history and current case circumstances when a family has had multiple reports alleging abuse or
neglect. Between July and December 2013, monthly performance for this Exit Standard ranged
from 76 to 94 percent (see Figure 6). For example, in December 2013, there were 72 families
eligible for a review as the current report of child maltreatment was the fourth or greater report
of child maltreatment with the most recent report occurring within the last 12 months; 68 (94%)
of these investigations had documentation in FACES.NET indicating that a comprehensive
review of the case history and current circumstances that brought the family to CFSA's attention
had occurred. CFSA has demonstrated dramatic improvement in performance on this Exit
Standard throughout this year. In January 2013, performance was 30 percent and by the end of
2013, performance had increased significantly to 94 percent. CFSA now has a consistent process
to identify and review these investigations through its RED Team framework. In addition, CFSA
conducts reviews an audit on performance of conducting reviews of families with four or more
reports. The findings are reported to CPS management and used to coach supervisors on this
performance measure. As CFSA met the required performance for three of the six months during
the period, the Monitor considers this Exit Standard to be partially achieved.

**Figure 6: Completion of Reviews for Families Subject
to a New Investigation for Whom the Current Report is
the Fourth or Greater Report Within the Last 12 Months
July – December 2013**



Source: CFSA Manual Data

### Performance on Strategy Plan:

CFSA has employed the following strategy to increase performance on reviews of repeat reports:

> ➢ *CFSA is enhancing the structured decision-making (SDM) process, with the assistance of the Children's Research Center, to be used throughout the investigation process. The SDM will improve the process of gathering information at the hotline, facilitate a process to discuss critical elements of the allegations, and allow for more consistent practice. The steps to implement the new process include: By March 1, 2013, CFSA will implement the RED (review, evaluate and direct) team process which will replace the morning review panel. The RED Team will review investigations that require a "four plus" staffing. (2013 Strategy Plan).*

CFSA implemented this strategy and as demonstrated by the performance data above, use of RED Teams has contributed to substantial improvement in performance for this Exit Standard.

*Quality of Investigations*

| IEP Requirement | 4. *Acceptable Investigations*: CFSA shall routinely conduct investigations of alleged child abuse and neglect.[95]<br><br>(IEP citation I.A.2.) |
|---|---|
| **Exit Standard** | 80% of investigations will be of acceptable quality. |

**Figure 7: Investigations Determined to be of Acceptable Quality**
**June 2011 – December 2013**



Source: Data for December 2012 were collected during a case record review of a statistically significant sample of investigations closed in October 2012. Data presented for June 2011, December 2011, June 2012, June 2013 and December 2013 are from a secondary review of 20 investigations closed during each six month monitoring period.

---

[95] Evidence of acceptable investigations includes: (a) Use of CFSA's screening tool in prioritizing response times for initiating investigations; (b) Interviews with and information obtained from the five core contacts – the victim child(ren), the maltreater, the reporting source (when known), medical resources, and educational resources (for school-aged children); (c) Interviews with collateral contacts that are likely to provide information about the child's safety and well-being; (d) Interviews with all children in the household outside the presence of the caretaker, parents or caregivers, or documentation, by the worker, of good-faith efforts to see the child and that the worker has been unable to locate the child; (e) Medical and mental health evaluations of the children or parents when the worker determines that such evaluations are needed to complete the investigation, except where a parent refuses to consent to such evaluations. When a parent refuses to consent to such an evaluation, the investigative social worker and supervisor shall consult with the Assistant Attorney General to determine whether court intervention is necessary to ensure the health and safety of the child(ren); (f) Use of risk assessment protocol in making decisions resulting from an investigation; and (g) Initiation of services during the investigation to prevent unnecessary removal of children from their homes.

*Performance for the period July 1 through December 31, 2013:*
The Monitor validated data through a secondary review of 20 randomly selected closed investigations that CFSA reviews quarterly. Review findings for the 20 investigations closed between July and December 2013 indicate that 13 investigations (65%) were of acceptable quality. CFSA's performance continues to be below the level required by the IEP.

*Performance on Strategy Plan:*
CFSA has employed the following strategies to improve the quality of investigations:

> *CFSA will continue to use the investigation assignment daily forum, weekly supervision, RED Teams and grand rounds to review investigative practice. (2013 Strategy Plan with modification).*[96]

CFSA continues to use supervision, Hotline and 10/15 Day RED Teams and Grand Rounds facilitated by CFSA's Quality Assurance (QA) unit to review quality of investigations. Beginning December 2013, Hotline RED Teams increased from two to three per weekday with meetings occurring at 8AM, 1PM and 5PM each weekday.

> *By August 1, 2013, CFSA will begin to use a structured decision-making (SDM) screening and response priority assessment tool at the hotline to assist in triaging reports of abuse and neglect to the appropriate pathway and ensuring an appropriate response timeframe. (2013 Strategy Plan with modification).*[97]

Throughout CY2012 and 2013, CFSA worked with the CRC to develop and operationalize a SDM tool for use at the hotline. The purpose of the tool is to provide hotline staff with a clearly articulated and commonly understood process for gathering information and making decisions on referrals. In developing the tool, CFSA reviewed the allegation types currently being used by staff and made revisions as necessary. Detailed definitions were developed for each allegation and can be accessed and reviewed through the online version of the SDM tool.

When a call is made to the hotline, staff use the SDM tool to guide the collection of information necessary to answer questions that pertain to preliminary screening information[98] and determine if information meets one or more of the maltreatment types. A decision is then made to either screen the referral in for immediate response (investigation) or RED Team review, or screen the referral out.

---

[96] This strategy was modified in April 2013 to replace "18-day reviews" with "RED Teams."
[97] This strategy was modified in April and June 2013 to change the date of implementation.
[98] Preliminary screening information includes determining if the alleged victim is a child or over the age of 18, if CFSA has jurisdiction over the family and if the alleged abuse occurred within the District and if the alleged perpetrator is a parent, guardian or custodian.

In late-2013 and early-2014, CFSA and CRC, trained staff and supervisors on the Hotline SDM tool and developed coaching and mentoring plans for staff as needed. The SDM template has been integrated into FACES.NET and use of the tool began March 1, 2014.

> *By February 1, 2013, each supervisor will conduct a CQI review (using the same tool that measures acceptable investigations – Exit Standard 2) on two closed investigations per month for review by the program manager. Monthly, the program managers will review three of these investigations as a part of a secondary review and will present the results to the CPS administrator and deputy director for entry services. CPS management will track trends and provide feedback to workers. (2013 Strategy Plan with modification).[99]*

Between July and December 2013, CPS supervisors and program managers continued to utilize the CQI review tool for internal quality improvement purposes. CFSA has planned a more robust process for CY2014, included in the 2014 *LaShawn* Strategy Plan, which will include peer reviews within CPS management, increased sample size and increased frequency of reviews. Findings will be collected monthly and will provide information for targeted training opportunities and coaching by supervisors.

> *CFSA will add strategies related to acceptable investigations (Exit Standard 2), if necessary, based on the December 2012 case record review conducted jointly by the monitor and CFSA. (2013 Strategy Plan).*

CFSA reports no additional strategy updates since the November 2013 monitoring report.

*Community-based Service Referrals for Low & Moderate Risk Families*

| IEP Requirement | 35. *Community-based Service Referrals for Low & Moderate Risk Families*: (IEP citation I.C.19.) |
|---|---|
| **Exit Standard** | 90% of families who have been the subject of a report of abuse and/or neglect, whose circumstances are deemed to place a child in their care at low or moderate risk of abuse and neglect and who are in need of and agree to additional supports shall be referred to an appropriate Collaborative or community agency for follow-up. Low and moderate risk cases for which CFSA decides to open an ongoing CFSA case are excluded from this requirement. |

---

[99] This strategy was modified in October 2013, changing the number of investigations reviewed by program manager from all investigations reviewed by supervisors to three of the investigations reviewed by supervisors.

**Figure 8: Community-based Services Referrals for Low and Moderate Risk Families
October 2012 – December 2013**



Source: October 2012 performance data collected during case record review of a statistically significant sample of investigations closed in October 2012. Sampling represents a ± 5% margin of error with 95 percent confidence in the results. June and December 2013 performance data from FACES.NET report INV089.

*Performance for the period July 1 through December 31, 2013:*
Between July and December 2013, monthly performance for this Exit Standard ranged between 43 and 89 percent (see Figure 9). For example, of the 328 investigations closed during December 2013, 127 investigations had a risk rating of low or moderate. Of these 127 investigations, one was connected to an open case, three were opened as an ongoing case for services, five families were already receiving needed services, seven did not require a referral for additional supports or services and in 87 investigations, the family demonstrated service needs but declined a referral. Of the remaining 24 investigations, 19 (79%) families received a referral to a Collaborative or community agency for follow-up. In the remaining five applicable investigations, documentation did not indicate that the investigative social worker made the required referral.

Despite efforts by CFSA to make community services available to families assessed at low or moderate risk of repeat maltreatment, the rate of referral and rate of service acceptance by families is low. The Monitor is interested in working with CFSA to better understand these data and to identify barriers to families use of community-based services.

**Figure 9: Community-based Services Referrals for Low and Moderate Risk Families
July – December 2013**



Source: CFSA Administrative Data, FACES.NET report INV089

***Performance on Strategy Plan:***

CFSA has employed the following strategy to increase performance on community-based referrals for low and moderate risk families:

➢ *By March 1, 2013, CFSA will have a standard process to connect families for whom CFSA has identified a safety concern to immediate services during the course of the investigation. CFSA will launch a process of including the Collaboratives into the investigation process via the RED Team process. Child Protective Services (CPS) will begin to refer families who need brief intervention services that have a low to moderate risk to the Collaboratives to start working with the family immediately. The Collaboratives will provide regular reports to the Agency during the course of the investigations on the services offered and provided. For families with a high or intensive risk level, CPS will refer the family to the in-home units for an open case and begin to work with the on-going worker to help meet the needs of the family (2013 Strategy Plan).*

CFSA reports that Collaborative staff are participating in 10/15 Day RED Team meetings; however, data on the frequency of attendance during the current monitoring period is not available. Data collection on participation and results of these meetings began in February 2014. CFSA also reports that discussions are underway with Collaborative representatives to

devise a plan for a standardized tracking system for each referral to determine what happens. Despite requests, no additional specific information was provided to the Monitor.

### 3.  **Family Assessment**

CFSA is in the process of finalizing data collection and reporting for FA practice, including both quantitative and qualitative data to assess the FA process and outcomes. For the current monitoring period, only limited data are available on FA practice and the information discussed below does not provide a comprehensive assessment of this important area of practice. Beginning in March 2014, several FACES.NET reports became available including data on timely initiation; length of time FA case is open; and reason for FA closure. CFSA anticipates having additional FA quantitative data more readily available in the future. Qualitative data regarding FA practice, if families are better off and if families are satisfied with the FA response are currently being considered as components of the broader CFSA DR Evaluation Plan now being designed with national experts.

*FA Referrals*

Between July 1 and December 31, 2013, 691 referrals were accepted or linked for FA assignment, representing 11 percent of all referrals received by the hotline. A safety assessment is done for every family with a FA referral. Following the safety assessment, FA is a voluntary process and families must agree to participate unless there is an identified safety concern at which time the referral is converted to an investigation. Based on CFSA data, of the 691 FA referrals received, 394 referrals were subsequently closed during the monitoring period; 117 (30%) families whose referrals were closed are reported to have declined participation in the FA process.[100] The number of families declining participation has increased substantially since the previous monitoring period when 10 percent of referred families were reported to have declined participation. Even these very limited data raise questions– particularly about how families are engaged to seek and receive help.

*Repeat Maltreatment*

As part of its assessment of the effectiveness of the FA intervention, CFSA collects data on the number of families with closed FAs who have a subsequent investigation which was substantiated for child abuse or neglect within six months of FA case closure. Data for the 258

---

[100] The Monitor has requested additional data including an ability to track the status of all 691 referrals received during this monitoring period.

FA referrals closed during the previous monitoring period (January 1 and June 30, 2013) indicate that 18 (7%) children had a substantiated investigation within six months of the FA closure.[101]

*Community-based Service Referrals*

CFSA reports that of the 394 FA referrals that opened and closed between July and December 2013, 42 (11%) were referred to a community service provider. Table 4 below details the Collaborative or community-based agency to which the family was referred. As noted earlier, CFSA is in the process of meeting with the Collaboratives to enhance the business process related to Collaborative referrals from all administrations within CFSA. The Monitor does not fully understand why Collaborative and community-based service referrals are so low given other indicators of the needs of residents in the District.

**Table 4: Service Referrals to Collaborative or**
**Community-based Agency for Family Assessments**
**July – December 2013**
**N=42**

| Collaborative or Community-Based Agency | Total Referrals |
|---|---|
| Columbia Heights/Shaw Collaborative | 2 |
| East of the River Collaborative | 12 |
| Edgewood/Brookland Collaborative | 3 |
| Far Southeast Collaborative | 14 |
| Georgia Avenue Collaborative | 7 |
| Department of Human Services | 3 |
| Department of Mental Health | 1 |
| **Total** | 42 |

Source: CFSA Manual Data

---

[101] Of the 860 children with a substantiated investigation during the same timeframe, 51 (6%) children had a substantiated investigation within six months of the investigation closure.

4.    **Services to Families and Children to Promote Safety, Permanency and Well-Being**

| | |
|---|---|
| **IEP Requirement** | 5. *Services to Families and Children to Promote Safety, Permanency and Well-Being*: Appropriate services, including all services identified in a child or family's safety plan or case plan shall be offered and children/families shall be assisted to use services to support child safety, permanence and well-being.<br><br>CFSA shall provide for or arrange for services through operational commitments from District of Columbia public agencies and/or contracts with private providers. Services shall include:<br><br>a.  Services to enable children who have been the subject of an abuse/neglect report to avoid placement and to remain safely in their own homes;<br>b.  Services to enable children who have or will be returned from foster care to parents or relatives to remain with those families and avoid replacement into foster care;<br>c.  Services to avoid disruption of an adoptive placement that has not been finalized and avoid the need for replacement; and<br>d.  Services to prevent the disruption of a beneficial foster care placement and avoid the need for replacement.<br><br>(IEP citation I.A.3.) |
| **Exit Standard** | In 80% of cases, appropriate services, including all services identified in a child's or family's safety plan or case plan shall be offered along with an offer of instruction or assistance to children/families regarding the use of those services. The Monitor will determine performance-based on the QSR Implementing Supports and Services and Pathway to Case Closure indicators. |

As required by the IEP, two indicators from the QSR protocol are used to measure CFSA's performance on the Exit Standard pertaining to appropriate service provision to families and children to promote safety, permanency and well-being. These indicators, Implementing Supports and Services and Pathway to Case Closure, are described in further detail in Figures 10 and 11, which include the parameters reviewers consider in rating performance in the selected areas, as well as descriptions of minimally acceptable performance and unacceptable performance as contained within the QSR protocol.

**Figure 10: QSR Implementing Supports and Services Indicator Parameters to Consider and Description of Acceptable/Unacceptable Performance**[102]

### *Implementing Supports and Services Indicator*

➢ *Parameters Reviewers Consider:* Degree to which: (1) strategies, formal and informal supports, and services planned for the child, parent or caregiver, and family are available and provided on a timely and adequate basis. (2) The combination of supports and services fit the child and family situation so as to maximize potential results and benefits while minimizing conflicting strategies and inconveniences. (3) Delivery of planned interventions is sufficient and effective to help the child and family make adequate progress toward attaining the life outcomes and maintaining those outcomes beyond case closure.

➢ *Description of Acceptable/Unacceptable Performance:*

Minimally Acceptable Implementation means that a fair array of supports and services somewhat matches the intervention strategies identified in the case plan and is minimally to fairly helping the child and family meet near-term needs and make progress toward planned outcomes. A minimally adequate to fair set of supports and services is usually available, used, and seen as somewhat satisfactory by the family. The array provides few options, limiting professional judgment and family choice in the selection of providers. The team is considering taking steps to mobilize additional resources to give the family choice and/or provide resources to meet the particular family needs but has not yet taken any steps.

Unacceptable Implementation means that supports and services identified in the case plan are at least somewhat limited or may not be readily accessible or available to the family. A limited set of supports and services may be inconsistently available and used but may be seen as partially unsatisfactory by the family. The service/support array provides few options, substantially limiting use of professional judgment and family choice in the selection of providers. The team has not yet considered taking steps to mobilize additional resources to give the family greater choice and/or provide resources to meet particular family needs.

---

[102] *Quality Service Review Protocol for a Child and Family: Reusable Protocol for Examination of Child Welfare and Mental Health Services for a Child and Family*, Shared Practice Protocol. Human Services and Outcomes, November 2013, p. 66-67.

**Figure 11: QSR Pathway to Case Closure Indicator Parameters to Consider
and Description of Acceptable/Unacceptable Performance**[103]

---

### *Pathway to Case Closure Indicator*

➤ *Parameters Reviewers Consider:* To what degree: (1) Is there a clear, achievable case goal including concurrent and alternative plans? (2) Does everyone involved, including family members, know and agree on what specific steps need to be achieved in order to achieve the case goal and close the case safely? (3) Is the child/family making progress on these steps and informed of consequences of not meeting the necessary requirements within the required timelines? (4) Are team members planning for the youth's transition from care in APPLA cases? (5) Are reasonable efforts being made to achieve safe case closure for all case goals?

➤ *Description of Acceptable/Unacceptable Performance:*

Minimally Acceptable Pathway to Case Closure means some people involved in the case understand the case goal, including any plan alternatives. Minimally adequate to fair efforts are being made to achieve the permanency goal and to remove any barriers to permanency. Some people have agreed upon the steps that must be accomplished and requirements that must be met for safe case closure. Some team members are aware of timelines and consequences for not meeting requirements and the team is making some progress towards closure, though not in a timely manner - or - the team has established a good plan but has not made sufficient progress on it.

Unacceptable Pathway to Case Closure means few people involved in the case understand or agree with the case goal, including any plan alternatives. Marginal or inconsistent efforts are being made to achieve the permanency goal and to remove any barriers to permanency. Few steps that must be accomplished or requirements that must be met for safe case closure, timelines, and consequences for not meeting requirements have been defined and/or agreed upon by family members and providers. The case is not making sufficient progress towards closure - or - the team has established a fair plan but has not made progress on it.

---

[103] *Quality Service Review Protocol for a Child and Family: Reusable Protocol for Examination of Child Welfare and Mental Health Services for a Child and Family,* Shared Practice Protocol. Human Services and Outcomes, November 2013, p. 58-59.



Figure 12: QSR Findings on Services to Families and Children
to Promote Safety, Permanency and Well-Being
CY2010 – CY2013

Source: QSR data

***Performance for the period January 1 through December 31, 2013:***
A total of 100 cases were reviewed using the QSR methodology during CY2013; 54 were reviewed between January and June and an additional 46 cases were reviewed between July and December 2013. As Figure 13 indicates, approximately half of the cases reviewed (51%; 51 of 100) were rated as acceptable on *both* the Implementing Supports and Services and Pathway to Case Closure indicators. Slightly less than two-thirds, (63%; 63 of 100) of cases, were rated acceptable on the Implementing Supports and Services indicator and 64 percent of cases (64 of 100) were rated acceptable on the Pathway to Case Closure indicator. Performance on this Exit Standard has improved nine percent since CY2012; but does not yet meet the Exit Standard requirement of 80 percent for services to families and children to promote safety, permanency and well-being.



**Figure 13: QSR Findings on Services to Children and Families
to Promote Safety, Permanency and Well-Being
January – December 2013
N=100**

Source: QSR data, January – December 2013

Critical to CFSA's ability to meet child and family needs are the engagement, assessment and teaming elements of case practice. Further data analyses of the 100 cases reviewed in CY2013 support the importance of engagement and assessment of the child and caregivers in predicting overall practice performance.[104] In order to implement appropriate supports and services for families it is also necessary for the professional team to function well and coordinate services across agencies and providers. Data analyses indicate that team functioning is a significant predictor of overall practice performance and team coordination is a significant predictor of pathway to case closure. While performance for team formation has improved since previous periods and remains high (85% rated as acceptable), fewer cases are rated acceptable for team functioning (69%) and team coordination (66%).[105] Improvement in these two areas of teaming are necessary to further acceptable overall practice performance and pathway to case closure.

It is particularly important to support and engage both birth parents as the agency pursues work toward family reunification. For children in foster care with a permanency goal of reunification,

---

[104] CSSP conducted secondary regression analyses to identify significant predictors of overall practice performance. Separate regressions were run for each practice indicator (engagement-child, engagement-mother, assessment-child, etc.). The regressions analyses indicate that engagement of the child, mother and substitute caregiver are each significant predictors of overall practice performance after accounting for any difference in the control variables: age, sex, race, agency with case management responsibility, months in out-of-home care and permanency goal. Analyses indicate that the assessment of the child is a significant predictor of overall practice when including the control variables.
[105] Data analyses indicate that team functioning is a significant predictor of overall practice performance and pathway to case closure when including control variables.

analyses of QSR data indicate that engagement of the father is a significant predictor of pathway to successful case closure.[106]

***Performance on Strategy Plan:***

CFSA has employed the following strategies to increase performance on the services provided to children and families to promote safety, permanency and well-being:

> ➢ *By February 1, 2013, case plans will be reviewed monthly to ensure that appropriate services that move children toward permanency or allow them to remain safely in their homes are identified and implemented (2013 Strategy Plan with modification).*[107]

CFSA continues to integrate the RED Team framework into regular case planning activities involving both the family and their professional team. CFSA reports that the RED Team framework is used for case planning purposes with the child and family every 30 days to track progress, assess the family needs and adjust planning as needed. CFSA reports they will begin modifying the case plan document to include Child and Adolescent Functional Assessment Scale (CAFAS)[108] and trauma screening tools in 2014.

CFSA has recently implemented Permanency BIG RED Team meetings which are essentially management and supervisory reviews of cases using the RED Team framework. The goal is to improve timely permanency outcomes through increasing supervisory accountability and providing CFSA management the opportunity to review the status of every permanency case. Each CFSA managed case is presented by the supervisor to the rest of the RED Team attendees, which include the Deputy Director of Programs, Permanency Program Administrator, Program Manager and attorney section head. Through these meetings the participants assess barriers and complicating factors to achieving timely permanency, identify systemic barriers created by policy and actions that are dependent on interagency communication and collaboration and develop next steps to move the case toward the projected permanency outcome and date. The Case Practice Specialist and supervisor are responsible for ensuring that identified next steps are completed and case plan implementation continues to move the case to permanency. Permanency BIG RED Team meetings for cases managed by private providers began in early 2014. Once a Permanency BIG RED Team meeting has been conducted for each child in out-of-home care, subsequent Permanency BIG RED Team meetings will be held at the request of the Case Practice Specialist or other team member.

---

[106] Engagement of father is significant when including the control variables. Engagement of the father was not found to be significant in predicting overall practice performance in this analysis; however, it was found to be a significant predictor of pathway to case closure when the goal for the child is reunification.
[107] This strategy was modified in April 2013 to correct a drafting error as the original strategy indicates that case plans will be developed monthly; however, case plans are developed every six months.
[108] The CAFAS tool is used to assess behaviors, strengths and goals and inform decisions about type and intensity of treatment, placement, level of care and need for referral.

Beginning in CY2014, cases that have been reviewed through the QSR process will receive a follow-up review through a Permanency BIG RED Team meeting 60 days after the QSR is completed to both ensure appropriate follow-up and accountability and allow for CFSA management to identify and understand common themes, including both strengths and challenges, across case practice.

➢ *CFSA selected the Trauma Systems Therapy (TST) model which will be implemented in 2013. This work is associated with the following activities:*[109]

  *By August 1, 2013, CFSA will submit its request for approval to the Children's Bureau, to implement the Child and Adolescent Functional Assessment Scale (CAFAS). Upon receiving approval, CFSA will implement the CAFAS through a planned roll-out, beginning in fiscal year 2014 (2013 Strategy Plan with modification).*[110]

CFSA received formal approval on March 6, 2014 from the Children's Bureau to implement the Child and Adolescent Functional Assessment Scale/Preschool and Early Childhood Functional Assessment Scale (CAFAS/PECFAS). CFSA reports that integration of the assessment tools into FACES.NET will take approximately 12 weeks. Once the integration has occurred, training sessions will be conducted and by October 2013 CFSA anticipates being able to fully implement the assessment tools in FACES.NET. As this work moves forward, CFSA will reassess and revise its case plan documents to better integrate with the functional assessment tools.

5.    <u>Visitation</u>

The visits of children with their caseworkers, their parents and their siblings can ensure children's safety, maintain and strengthen family connections and increase opportunities to achieve permanency. Social worker visits with children in out-of-home placement and with their families promote placement stability and increase the likelihood that reunification will occur. They also allow social workers to assess safety and progress, link children and families to needed services and adjust case plans as indicated.

CFSA has maintained performance in compliance with the Exit Standard on social worker visits to families with in-home services and social worker visits to children in out-of-home care.[111]

---

[109] The Administration on Children, Youth and Families (ACYF) selected CFSA as a grant recipient to implement a trauma-focused system. Implementation of the above strategies is subject to approval from the ACYF under the terms of the cooperative grant agreement.
[110] This strategy was modified in June and October 2013 to indicate the date by which CFSA would submit a request for approval to the Children's Bureau for implementation of the Child and Adolescent Functional Assessment Scale (CAFAS) and to include the date when implementation of the tool would begin.
[111] See Table 2: *Performance on IEP Exit Standards for Outcomes to be Maintained*, of this report for performance during this monitoring period.

However, visitation standards require more frequent visitation during the first four weeks a child enters placement or is moved to a new placement. Current performance, while improved and improving, does not yet meet the requirement. Lastly, performance for parent visits with workers when the child's goal is reunification and parent visits with children with a goal of reunification continue to be below required levels.

Performance on the Exit Standards pertaining to social worker visits with parents and parent visits with children are only reported for the months of October through December 2013 as CFSA changed their methodology mid-period to better capture those instances when parents refuse to cooperate or are legitimately unavailable for visits.[112]

During the previous monitoring period, a case record review was conducted to gather performance data on the three Exit Standards requiring assessment and documentation of safety during every worker visit for in-home, out-of-home and placement change cases.[113] CFSA is currently collecting data on these measures for the January through June 2014 monitoring report; therefore, these three Exit Standards are not newly assessed this monitoring period.

*Social Worker Visits – Children Experiencing a New Placement or a Placement Change*

| | |
|---|---|
| **IEP Requirement** | 10. *Visitation for Children Experiencing a New Placement or a Placement Change*:<br><br>c.  A CFSA social worker or private agency social worker with case management responsibility shall make at least two visits to each child during the first four weeks of a new placement or a placement change.<br>d.  A CFSA social worker, private agency social worker, family support worker or nurse care manager shall make two additional visits to each child during the first four weeks of a new placement or a placement change.<br>e.  At least one of the above visits during the first four weeks of a new placement or a placement change shall be in the child's home.<br>f.  At least one of the visits during the first four weeks of a new placement or a placement change shall include a conversation between the social worker and the resource parent to assess assistance needed by the resource parent from the Agency.<br><div align="right">(IEP citation I.A.6.a-d.)</div> |
| **Exit Standard** | 90% of children newly placed in foster care or experiencing a placement change will have four visits in the first four weeks of a new placement or placement change as described. |

---

[112] These changes in data collection methodology are consistent with the requirements of the IEP. See further discussion in this section regarding reasons a parent may be unavailable.
[113] The three Exit Standards are IEP citation I.A.4.c., I.A.5.d. and I.A.6.e.

**Figure 14: Required Number of Visits to Children in New Placements July – December 2013**



Source: CFSA Administrative Data, FACES.NET report CMT014

*Performance for the period July 1 through December 31, 2013:*

Between July and December 2013, monthly performance ranged between 75 and 87 percent of children who were newly placed or experienced a placement change had the required number of visits (see Figure 15). For example, during the month of December 2013, there were 132 individual child placements applicable to this measure; 115 (87%) had the required number of visits by a CFSA social worker, private agency social worker, family support worker or nurse care manager with at least one visit occurring in the child's home. Additional data were also provided which indicate a monthly range of 91 to 96 percent of applicable children received at least two or more worker visits this monitoring period.[114]

CFSA's performance varied over this monitoring period and did not meet the required level; however, in December 2013, CFSA was close to meeting the Exit Standard requirement with 87 percent of children having the appropriate frequency of social worker visits.

---

[114] The number of children who received at least two or more visits during the first four weeks of a new placement or placement change are as follows: July 2013, 94%; August 2013, 96%; September 2013, 93%; October 2013, 91%; November 2013, 93%; December 2013, 96%.



**Figure 15: Required Number of Worker Visits
to Children in New Placements
July – December 2013**

Source: CFSA Administrative Data, FACES.NET report CMT014

The Exit Standard also requires that at least one of the visits during the first four weeks of a new placement or a placement change include a conversation between the social worker and the resource parent to determine what, if any assistance is needed from the Agency. Performance data are not available for the current monitoring period. CFSA is currently collecting data for the January through June 2014 monitoring period which the Monitor will validate and include in the next report.

*Visits between Parents and Workers*

| IEP Requirement | 18. *Visits between Parents and Workers*:<br><br>a. For children with a permanency goal of reunification, in accordance with the case plan, the CFSA social worker or private agency social worker with case-management responsibility shall visit with the parent(s) at least one time per month in the first three months post-placement.[115]<br>b. A CFSA social worker, nurse care manager or family support worker shall make a second visit during each month for the first three months post-placement.<br><br>(IEP citation I.B.10.) |
|---|---|
| Exit Standard | 80% of parents will have twice monthly visitation with workers in the first three months post-placement. |

**Figure 16: Percentage of Households with Twice Monthly Visits between Workers and Parents with Goal of Reunification December 2011 – December 2013**



Source: CFSA Administrative Data, FACES.NET report CMT267

---

[115] This Exit Standard is also satisfied when there is documentation that the parent(s) is(are) unavailable or refuses to cooperate with the Agency.

*Performance for the period July 1 through December 31, 2013:*

In October 2013, CFSA began collecting information to determine if efforts were made to complete visits between workers and parents but the parent was unavailable or refused to cooperate with the Agency, which also satisfies compliance with this Exit Standard. Performance data for October through December 2013 are presented below; during this period,

Between October and December 2013, monthly performance on this measure ranged between 48 and 72 percent (see Figure 17 below).[116] For example, in December 2013, there were 43 households of children with a goal of reunification applicable to this measure; parents in 28 (65%) households received two worker visits. This performance does not meet the level required by the IEP.

**Figure 17: Percentage of Households with Twice Monthly Visits between Workers and Parents with Goal of Reunification October – December 2013**



Source: CFSA Administrative Data, FACES.NET report CMT267

---

[116] Between October and December 2013, documentation did not indicate that any cases met the Exit Standard requirement by making efforts to complete visits between workers and parents but the parent was unavailable or refused to cooperate with the Agency.

*Visits between Parents and Children*

| IEP Requirement | 19. *Visits between Parents and Children*: There shall be weekly visits between parents and children with a goal of reunification unless clinically inappropriate and approved by the Family Court. In cases in which visitation does not occur, the Agency shall demonstrate and there shall be documentation in the case record that visitation was not in the child's best interest, is clinically inappropriate or did not occur despite efforts by the Agency to facilitate it. <br><br> (IEP citation I.B.11.) |
|---|---|
| Exit Standard | 85% of children with the goal of reunification will have weekly visitation with the parent with whom reunification is sought.[117] |



**Figure 18: Percentage of Children with Goal of Reunification who Visit Weekly with the Parent with whom Reunification is Sought December 2011 – December 2013**

Source: CFSA Administrative Data, FACES.NET report CMT012

***Performance for the period July 1 through December 31, 2013:***
In October 2013, CFSA began collecting information to determine if documentation indicated that a visit was not in the child's best interest, was clinically inappropriate or did not occur despite efforts by the Agency to facilitate it, which also satisfies compliance with this Exit Standard. Performance data for October through December 2013 are presented below which include these cases.

---

[117] This Exit Standard is also satisfied in cases where it is documented that a visit is not in the child's best interest, is clinically inappropriate or did not occur despite efforts by the Agency to facilitate it.

Between October and December 2013, monthly performance on this measure ranged between 64 and 66 percent (see Figure 19 below).[118] For example, in December 2013, 324 children were applicable to this measure; 214 (66%) had weekly visits with the parent with whom reunification is sought.[119] This performance does not meet the level required by the IEP.

**Figure 19: Percentage of Children with Goal of Reunification who
Visit Weekly with the Parent with whom Reunification is Sought
October – December 2013**



Source: CFSA Administrative Data, FACES.NET report CMT012

### *Performance on Strategy Plan:*

CFSA has employed the following strategies to increase performance on visitation:

➢ *CFSA developed a dashboard for workers and supervisors that provides monthly data
on requirements, including visitation requirements. The dashboard was introduced to
workers and supervisors in November 2012. Continuing in 2013, workers and
supervisors will use the dashboard to track visitation. (2013 Strategy Plan).*

The dashboard was used by workers and supervisors throughout 2013 to monitor worker progress on numerous requirements. Some supervisors and managers have requested development of a dashboard that includes performance of all workers within their unit; this option is currently being explored.

---

[118] Two cases in November 2013 and four cases in December 2013 are considered compliant as there was documentation indicating that efforts were made to facilitate the visit, however, the visit did not occur.

[119] Of the total children who may have been included in this measure, 19 were excluded due to suspended visits by court order; 8 were excluded due to being classified as in abscondence for the whole month; and 31 were excluded due to "other suspended visits," which includes when a parent or child is incarcerated more than 100 miles away or when a child is placed outside of DC, Maryland, Virginia or placed in a residential treatment facility greater than 100 miles away.

> *By August 1, 2013, CFSA will develop additional strategies, if necessary, to address any barriers to visitation that are identified through the use of the dashboard and during supervision. (2013 Strategy Plan).*

As reported in the November 2013 monitoring report, beginning July 1, 2013, CFSA implemented changes to its case transfer process for children who are removed from their homes in order to initiate engagement with parents and develop visitation schedules and visitation plans early on. This process requires that the newly assigned ongoing social worker attend a case transfer staffing RED Team prior to the initial family team meeting (FTM); attend the initial FTM; and attend the initial court hearing in order to have them involved with the family earlier and to provide opportunities to engage the family, set up visitation schedules and collect valuable information to structure their own work with the family. Additionally, beginning in February 2014, CFSA's Office of Agency Performance began monthly "data drill sessions" with CFSA and private agency staff to review performance on specific measures including visitation performance and discuss barriers and strategies for improvement.

> *By March 1, 2013, CFSA will incorporate instructions on the process of assessing for safety during each visit and documenting the assessment in the revision of the POM. By April 1, 2013, all supervisors will be trained and will subsequently train the workers they supervise and will use a visitation/safety assessment tool to assess the appropriateness of the safety assessment. (2013 Strategy Plan).*

In January 2013, the In-Home and Out-of-Home Practice Model Operation Manual (POM) was modified to include processes for assessing for safety. CFSA reports that supervisors were trained in March 2013 and provided with a tip sheet, checklist and sample contact note which detail the requirements for safety assessments and necessary documentation. CFSA reports that refresher trainings are offered to CFSA and private agency staff as needed. Beginning in October 2013, supervisors within CFSA's Permanency Administration conduct random reviews of two to three cases a month to evaluate workers' documentation of safety assessments during visits with children and families. The 2014 *LaShawn* Strategy Plan requires CFSA to formalize this process with supervisors and contract monitoring staff reviewing 20 cases a quarter to determine whether safety was adequately assessed and documented during visits.

## B.    GOAL: PERMANENCY

### 1.    Relative Resources

CFSA continues to implement strategies to support kin as placement and family support resources through early identification, temporary licensure support and striving to make a kinship home the first placement for children upon entering care. CFSA's Kinship Support unit is responsible for many of these strategies as well as coordinating FTMs as soon as CFSA is involved with a family where out-of-home placement is indicated. As a matter of policy, CFSA requires a referral to the Diligent Search unit to locate parents, grandparents and other relatives at the same time a FTM referral is made. It is CFSA's practice, and a requirement of the IEP, to identify family members who may be able to join in the FTM planning process in order to provide information and support to children and parents and also be considered as placement options.[120] CFSA continues to provide the Monitor quarterly data regarding the use of FTMs with sufficient back up data to demonstrate efforts to identify and invite family members to FTMs.

CFSA has previously met both Exit Standards applicable to identification and use of relative resources and performance was maintained during this monitoring period.

| IEP Requirement | 12. _Relative Resources_: CFSA shall identify and investigate relative resources by taking necessary steps to offer and facilitate pre-removal Family Team Meetings (FTM) in all cases requiring removal of children from their homes. (IEP citation I.B.7.a.) |
|---|---|
| Exit Standard | CFSA will take necessary steps to offer and facilitate pre-removal FTMs in 70% of applicable cases requiring child removal from home. |

*Performance for the period July 1 through December 31, 2013:*
Between July and December 2013, of the 103 families at-risk of having their children removed, CFSA took necessary steps to offer/facilitate pre-removal FTMs in 95 cases (92%).

---

[120] The Kinship Family Licensing Unit and Diligent Search Unit work in tandem to assess the homes of potential kinship resources and complete necessary background checks. Additionally, staff is available to conduct fingerprinting on-site, which increases the speed and ease of licensing kinship resources.

| | |
|---|---|
| **IEP Requirement** | 13. _Relative Resources_: In cases where a child(ren) has been removed from his/her home, CFSA shall make reasonable efforts to identify, locate and invite known relatives to the FTM.<br><br>(IEP citation I.B.7.b.) |
| **Exit Standard** | In 90% of cases where a child(ren) has been removed from his/her home, CFSA will make reasonable efforts to identify, locate and invite known relatives to the FTM. |

***Performance for the period July 1 through December 31, 2013:***
Of the 106 families who had children removed during this monitoring period, CFSA made reasonable efforts to identify, locate and invite known relatives to the FTM in 96 cases (91%). The work to identify, locate and engage relatives has been a priority for CFSA leadership over the past two years.

## 2.    Placement of Children

Children enter foster care when they cannot be kept safely in their own homes. The *LaShawn* IEP has multiple requirements regarding the placement of children in out-of-home care to ensure their safety, permanency and well-being.

Figure 20 below shows the number of children in out-of-home placement in the District of Columbia between December 31, 2005 and December 31, 2013. These data reflect a continued reduction in the number of children in foster care in CY2013, specifically a 15 percent reduction since the same time in 2012 and a 30 percent reduction since 2011. CFSA's strategic plan is directed to further limiting out-of-home placement by increasing availability of intensive in-home services through the IV-E Waiver and pursuing timely permanency through safe and supported reunification and more timely decisions leading to adoption and guardianship when needed. The Monitor will continue to follow availability of these services as additional services are made available in the community through full implementation of the IV-E Waiver.

**Figure 20: Number of Children in Out-of-Home Placements by Year
CY2005 – CY2013**



Source: CFSA Administrative Data, FACES.NET report PLC156
Note: 2005 through 2013 data are point in time data taken on the last day of the calendar year.

_Demographics of Children in Out-of-Home Care_

Table 5 below shows the number of children in out-of-home placement in the District as of December 31, 2013 with basic demographic information. There were 1,215 children between the ages of birth and 21 years in out-of-home placement. The majority of children are African American (97%)[121] and are either under the age of six (25%) or age 15 or older (44%) (see Table 5).

For children entering foster care, the Exit Standards discussed below require that children are placed in the most family-like setting appropriate to their needs and restrict the placement of young children in congregate care settings.

---

[121] As reported in the previous monitoring report, as of June 30, 2013, CFSA data indicate that 89 percent of children in care were African American and nine percent were of unknown race. The current data do not suggest that there has been an increase in the number of African American children in care over the last six months, but appears to be the result of data clean-up efforts as less than one percent of children as of December 31, 2013 had no race data reported.

**Table 5: Demographics of Children in Out-of-Home Placement**
**as of December 31, 2013**
**N=1,215***

| Gender | Number | Percent |
|---|---|---|
| Male | 610 | 50% |
| Female | 605 | 50% |
| **Total** | **1,215** | **100%** |

| Race | Number | Percent |
|---|---|---|
| Black or African American | 1,174 | 97% |
| White | 34 | 3% |
| No Race Data Reported | 7 | <1% |
| **Total** | **1,215** | **100%** |

| Ethnicity | Number | Percent |
|---|---|---|
| Hispanic | 109 | 9% |
| Non-Hispanic | 1,070 | 88% |
| Unable to Determine | 2 | <1% |
| Unknown | 34 | 3% |
| **Total** | **1,215** | **100%** |

| Age | Number | Percent |
|---|---|---|
| 1 year or less | 98 | 8% |
| 2-5 years | 210 | 17% |
| 6-8 years | 118 | 10% |
| 9-11 years | 122 | 10% |
| 12-14 years | 138 | 11% |
| 15-17 years | 209 | 17% |
| 18-21 years | 320 | 26% |
| **Total** | **1,215** | **100%** |

Source: CFSA Administrative Data, FACES.net report PLC156
*Totals may equal more or less than 100 percent due to rounding

*Placement of Children in Most Family-Like Setting*

Of the 1,215 children in out-of-home care on December 31, 2013, 1,000 (82%) were placed in family-based settings, including 282 (23%) in kinship service homes. Figure 21 below displays the placement types for children in out-of-home care as of December 31, 2013.

**Figure 21: Placement Service Type for Children
in Out-of-Home Care as of December 31, 2013
N=1,215**



Source: CFSA Administrative Data, FACES.NET report CMT232 and CMT389
*Other includes college/vocational, developmentally delayed facilities, hospitals and not in legal placement.

CFSA has previously achieved both Exit Standards related to placement of children in the most family-like setting.[122] The Exit Standard that requires 90 percent of children be placed in the least restrictive, most family-like setting appropriate to meet his or her needs was not newly assessed as determining whether a non-family-based setting is least restrictive to a child's needs requires a case record review. However, CFSA performance data for March 2012 and March 2013 indicate that the Exit Standard has continued to be met. The Monitor will periodically verify performance on this Standard in the future.

---

[122] See IEP citation I.B.8.a. and 8.b. in Table 2: *Performance on IEP Exit Standards for Outcomes to be Maintained* of this report for performance during the monitoring period.

*Placement of Young Children*

Research evidence is clear that children do best when they are living with families. The IEP specifically limits the use of congregate care placements for young children without appropriate justification that the child has special treatment or exceptional needs that cannot be met in a home-like setting.[123] CFSA has previously met both IEP Exit Standards for this measure and performance was maintained during this monitoring period. Specifically, no child under six years of age was placed in a group care, non-foster home setting and the circumstances of each of the five children under 12 years of age who were applicable to this standard met an agreed upon exception.

**3.    Reduction of Multiple Placements for Children in Care**

The Exit Standard on placement stability has different required performance levels based on the length of time children are in care, recognizing the different placement trajectories for children who have been in care for shorter to longer periods of time. The overall goal is to minimize placement moves for all children to the greatest extent possible recognizing the importance of placement stability to a child's well-being and the substantial evidence that now exists that demonstrates how children are harmed by multiple placements.

CFSA continues to meet the required performance for the Exit Standard sub-part that requires children in foster care for at least eight days and less than 12 months have two or fewer placements. There has been little change in performance for the two sub-parts that are not yet at the required level.

---

[123] Placement exceptions were agreed upon in July 2011 and include: 1) medically fragile needs where there is evidence in the child's record and documentation from the child's physician that the child's needs can only be met in a hospital or skilled nursing facility or another highly specialized treatment facility; 2) developmentally delayed or specialized cognitive needs where there is evidence that the child's condition places the child in danger to himself or others and that insuring the child's safety or the safety of others requires placement in a congregate treatment program which can meet the child's needs; or 3) Court order where the Court has ordered that the child remain in the group care setting.

| IEP Requirement | 23. *Reduction of Multiple Placements for Children in Care*: *Children in care for eight days to one year* (IEP citation I.B.13.a.) |
|---|---|
| Exit Standard | a.  Of all children served in foster care during the previous 12 months who were in care at least 8 days and less than 12 months, 83% shall have had two or fewer placements. |

**Figure 22: Children in Foster Care at Least 8 Days and Less than 12 Months with 2 or Fewer Placements June 2011 – December 2013**



Source: CFSA Administrative Data, FACES.NET report PLC234

*Performance for the period July 1 through December 31, 2013:*

Between July and December 2013, a monthly range of 79 to 82 percent of children in foster care for eight days to one year had two or fewer placements (see Figure 23). For example, as of December 31, 2013, there were 361 children in foster care during the previous 12 months who were in care at least eight days and less than 12 months; 287 (80%) had two or fewer placements. As illustrated in Figure 22 above, CFSA's performance while close to meeting the requirement for this sub-part of the Exit Standard, remains below the required level.



Figure 23: Children in Foster Care at Least 8 Days and
Less than 12 Months with 2 or Fewer Placements
July – December 2013

Source: CFSA Administrative Data, FACES.NET report PLC234

| IEP Requirement | 23. _Reduction of Multiple Placements for Children in Care_: <br> _Children in care between 12 and 24 months_ <br> (IEP citation I.B.13.b.) |
|---|---|
| Exit Standard | b. Of all children served in foster care during the previous 12 months who were in care for at least 12 months but less than 24 months, 60% shall have had two or fewer placements. |

**Figure 24: Children in Foster Care at Least 12 Months but
Less than 24 Months with 2 or Fewer Placements
June 2011 – December 2013**



Source: CFSA Administrative Data, FACES.NET report PLC234

*Performance for the period July 1 through December 31, 2013:*
Between July and December 2013, a monthly range of 47 to 56 percent of children in foster care
for 12 to 24 months had two or fewer placements (see Figure 25). For example, as of December
31, 2013, there were 237 children in foster care during the previous 12 months who were in care
for at least 12 months, but less than 24 months; 126 (53%) had two or fewer placements.
Performance for this sub-part of the Exit Standard continues to be below the required level.

**Figure 25: Children in Foster Care at Least 12 Months but
Less than 24 Months with 2 or Fewer Placements
July – December 2013**



Source: CFSA Administrative DATA, FACES.NET report PLC234

| IEP Requirement | 23. _Reduction of Multiple Placements for Children in Care_: _Children in care over two years_ (IEP citation I.B.13.c.) |
| --- | --- |
| Exit Standard | c.  Of all children served in foster care during the previous 12 months who were in care for at least 24 months, 75% shall have had two or fewer placements in that 12 month period. |



**Figure 26: Children in Foster Care at Least 24 Months
with 2 or Fewer Placements During a 12-Month Period
June 2011 – December 2013**



Source: CFSA Administrative Data, FACES.NET report PLC234

*Performance for the period July 1 through December 31, 2013:*
For this group of children, the measure is purposely focused on the child's placement experiences in the past 12 months, since many of these children have had long foster care histories with multiple placements in the past. The analysis is focused on whether these children have achieved stability in the most recent 12 month period. Between July and December 2013, a monthly range of 74 to 78 percent of children in care over two years had two or fewer placements within the past year (see Figure 27). For example, as of December 31, 2013, there were 804 children served in foster care during the previous 12 months who were in care for at least 24 months; 601 (75%) had two or fewer placements during the previous 12 months. CFSA's performance continues to meet this sub-part of the Exit Standard requirement.

**Figure 27: Children in Foster Care at Least 24 Months
with 2 or Fewer Placements During a 12-Month Period
July – December 2013**



Source: CFSA Administrative Data, FACES.NET report PLC234

Overall, CFSA has partially achieved the Exit Standard on placement stability as it has met one sub-part and is close to meeting the other two sub-parts.

***Performance on Strategy Plan:***
CFSA has employed the following strategy to increase performance on reduction of multiple placements:

> ➢ *By February 15, 2013, CFSA will release a solicitation for a behavioral crisis stabilization support service for foster parents throughout the District of Columbia and for kinship foster parents. The contract with the services provider will be implemented by November 1, 2013. (2013 Strategy Plan with modification).[124]*

CFSA released a solicitation to provide behavioral crisis stabilization services including individual therapy, behavior modification, family services, evaluation services, specialty services and substance abuse services for children in Maryland and the District of Columbia. Beginning in November 2013, behavioral crisis stabilization services became available to CFSA foster parents and in January 2014, mobile crisis stabilization services became available to private agency foster parents (many of whom are in Maryland) to assist in handling crises involving children placed in their care. These services use a tiered model approach, which requires the foster parent to first work with the foster parent support worker or child's social worker to deescalate any crisis. If these workers are not successful, the mobile crisis service

---

[124] This strategy was modified in October 2013 to change the date of implementation from June 1, 2013 to November 1, 2013.

provider is contacted to assess the situation and make a recommendation regarding service provision for the family. CFSA reports meeting monthly with the mobile crisis service providers to discuss processes and improvements as needed.

Utilization of these services has been lower than expected in this start-up period. As of March 31, 2014, CFSA reports that a total of 45 referrals were processed for mobile crisis stabilization services and in 35 instances, the child's placement was maintained.[125]

## 4.    Timely Approval of Foster Parents

CFSA is responsible for licensing and monitoring foster homes and placement facilities in the District of Columbia, while CFSA contracts with private child placing agencies in the states of Maryland and Virginia to license homes and facilities in those states. CFSA has been focusing its recruitment efforts to increase the number of licensed homes in the District.



| IEP Requirement | 24. *Timely Approval of Foster/Adoptive Parents*: CFSA shall have in place a process for recruiting, studying and approving families, including relative caregivers, interested in becoming foster or adoptive parents that results in the necessary training, home studies and decisions on approval being completed within 150 days of beginning training. <br><br> (IEP citation I.B.14.) |
|---|---|
| Exit Standard | 70% of homes licensed beginning November 1, 2010, will have been approved, and interested parties will have been notified within 150 days. |

**Figure 28: Approval of Foster Parents within 150 Days of Beginning Training**
**July 2012 – December 2013**



Source: CFSA Administrative Data, FACES.NET report PRD202

---

[125] Of those children whose placements were not maintained, seven children were replaced and three went into abscondance.

***Performance for the period July 1 through December 31, 2013:***
Between July and December 2013, CFSA and private agencies licensed 110 family foster homes. Sixty-five (59%) of these foster homes were licensed within the 150 day timeframe and with the required number of pre-service training hours.[126] Performance on this Exit Standard increased by 12 percent since the previous monitoring period but remains below 70 percent as required by the IEP.

***Performance on Strategy Plan:***
CFSA has employed the following strategies to increase performance on timely approval of foster parents:

> ➢ *By February 1, 2013, CFSA's monitoring unit will add timely licensure of foster homes to the private agencies' monthly QA spreadsheet and have agencies report on their performance. In addition to reporting on their success with homes that are licensed, agencies will also be required to report on the potential foster parents still in process (2013 Strategy Plan).*

Based on the assessment of the monthly QA spreadsheets, in December 2013, CFSA began providing technical assistance to private agencies to improve performance on timely licensure. CFSA's Family Licensing Division (FLD) staff met with each of the private agencies that were not meeting required performance and conducted onsite training. FLD staff also met with the licensing team at each private agency to identify and address barriers and assist in the development of strategies to improve performance. Common barriers that were identified across agencies include a lack of knowledge of how to navigate FACES.NET, lack of staff and resources and not assigning a social worker to conduct the home study until after the pre-service training was completed. In order to address these barriers, CFSA staff provided technical assistance around navigating FACES.NET, encouraged agencies to submit a request for a social worker to conduct the home study while the perspective foster parent was enrolled in pre-service training and refer these parents for lead and fire inspections earlier in the process and using the case review tool to regularly track each perspective foster parent's progress on achieving licensure. The onsite training sessions for private agencies continue on an as needed basis.

> ➢ *By February 1, 2013, timely licensure will be added to private agency evaluations as a component of the existing Foster Parent Licensure indicator. Contracted private agencies not currently meeting the benchmark will receive a Performance Improvement Plan (PIP) request. The PIP will address timeliness moving forward to ensure that licensure of homes adheres to the 150 day licensing timeframe (2013 Strategy Plan).*

---

[126] Of the 65 homes that were licensed in the current monitoring period, two homes were considered compliant within the 150 day period required by the IEP due to circumstances that were beyond the District's control.

Nine private providers were placed on a Performance Improvement Plan (PIP) between February and April 2013 for not meeting the IEP timely licensure standard. As of the date of this report, eight of the nine providers have resolved their PIP. The private provider who has not resolved its PIP was given an extension and CFSA reports that the provider's performance has subsequently improved.

## 5.    Appropriate Permanency Goals

The IEP requires that children have permanency planning goals consistent with the federal Adoption and Safe Families Act (ASFA) and District law and policy guidelines. There are a number of Exit Standards associated with this outcome that focus specifically on older youth in foster care and those children and youth with a permanency goal of Another Planned Permanent Living Arrangement (APPLA). CFSA has previously met and continues to maintain these IEP Exit Standards.[127]

The remaining requirement to be met in this area focuses on the transition services and planning with older youth 18 years of age and older, who comprise 26 percent of the children in CFSA custody as of December 31, 2013. Youth ages 18 and older must have individualized transition plans developed with their participation and with appropriate connections to specific options on housing, health insurance, education and linkages to continuing adult support services agencies.

| IEP Requirement | 22. *Appropriate Permanency Goals*: Youth ages 18 and older will have a plan to prepare them for adulthood that is developed with their consultation and includes, as appropriate, connections to housing, health insurance, education, continuing adult support services agencies (e.g., Rehabilitation Services Administration, the Department on Disability Services, the Department of Mental Health, Supplemental Security Income (SSI) and Medicaid), work force supports, employment services and local opportunities for mentors.<br><br>(IEP citation I.B.12.c.) |
|---|---|
| Exit Standard | 90% of youth ages 18 and older will have a plan to prepare them for adulthood that is developed with their consultation. No later than 180 days prior to the date on which the youth will turn 21 years old (or on which the youth will emancipate), an individualized transition plan will be created that includes as appropriate connections to specific options on housing, health insurance, and education and linkages to continuing adult support services agencies (e.g., Rehabilitation Services Administration, the Department on Disability Services, the Department of Mental Health, Supplemental Security Income (SSI) and Medicaid), work force supports, employment services, and local opportunities for mentors. |

---

[127] See Table 2: *Performance on IEP Exit Standards for Outcomes to be Maintained* of this report for performance during this monitoring period.

**Figure 29: Youth Ages 18 and Older with a Youth Transition Plan**
**January 2012 – December 2013**



Source: CFSA Manual Data

*Performance for the period July 1 through December 31, 2013:*
CFSA has worked to enhance practice with adolescents to support earlier and ongoing engagement and planning with youth around their transition from foster care. The required youth transition plan summarizes work to date and provides guidance on next steps required to support the youth in transitioning from foster care. These plans must be individualized and developed with the youth and his/her identified, supportive team. Further, plans should provide the youth with appropriate connections to specific options on housing, health insurance, education and linkages to continuing adult support services agencies. CFSA reports that of the 324 youth ages 18 and older under CFSA care between July and December 2013, 16 youth were in abscondence, incarcerated or refused to participate in the development of a Youth Transition Pan (YTP) and were excluded from analysis. Thus, out of 308 applicable youth, 283 (92%) had a YTP plan.

The Monitor considers performance on this Exit Standard met, pending verification. Because the previous YTP tool is being replaced with the Foster Club of America's Youth Transition Toolkit, performance will be assessed for the January through June 2014 monitoring period when the new process will be fully implemented. In that monitoring period, CFSA proposes to validate performance on this Exit Standard using two methodologies. First, for youth ages 18 and older, CFSA will review documentation from 20 percent of youth receiving a YTP each month. CSSP will be provided with the monthly sample for independent review. Second, for youth ages 20.5 and older, CFSA will use an agreed upon tool to review the quality of transition planning for each youth. CSSP will participate in these reviews.

***Performance on Strategy Plan and other developments:***
CFSA's Office of Youth Empowerment (OYE) continues its efforts to enhance supports and services for older youth, particularly those on the verge of aging out of foster care. As mentioned previously, OYE has formed partnerships or identified programs to support older youth in attending college, developing meaningful vocational skills that lead to internships and careers and amassing savings before leaving foster care. In addition, OYE created a unit of workers (Generations Unit) whose caseload are exclusively teen parents in order to provide specialized supports for these parents and their children. The total caseload for the Generations Unit is 36 cases or nine cases per worker. As of December 31, 2013, there were a total of 60 pregnant or parenting youth in the total foster care population.

CFSA has employed the following strategies to increase performance on this Exit Standard:

> ➢ *By June 1, 2013, CFSA will implement the Foster Care Club's youth transition planning process and will continue to use the youth benchmarks developed in 2012 (2013 Strategy Plan with modification[128]).*

As described in the last monitoring report, CFSA decided to replace their former YTP format with a planning process modeled after the Foster Club of America's Youth Transition Toolkit, a youth-driven living document. The Youth Transition Toolkit will be used with all youth ages 15 and older. OYE designed an implementation plan to train staff and providers on the toolkit and phase in use of the toolkit with youth ages 15 to 20. The roll-out strategy is bulleted below:

- In May 2013, Foster Club of America staff conducted an orientation training for OYE staff on the toolkit. In June 2013, CFSA and private agency social workers were introduced to the new tool.
- In May and June 2013, OYE staff identified a small cadre of youth to use a hardcopy version of the toolkit.
- In July 2013, OYE social workers began using the toolkit with 18 year old youth and began to support (non-OYE) CFSA and private agencies social workers in using the toolkit.
- In August 2013, OYE workers began to use the toolkit with youth ages 19 to 20; other CFSA and private agency social workers were expected to use the toolkit with 18 year old youth.
- In September 2013, OYE workers began to use the toolkit with youth ages 15 to 17; other CFSA and private agency social workers were expected to use the toolkit with youth ages 19 to 20.
- In October 2013, other CFSA and private agency social workers are expected to use the toolkit with youth ages 15 to 17.

---

[128] This strategy was modified in April 2013 to delay the implementation date from February 1, 2013 to June 1, 2013 to account for contractual and tool development timelines.

- In November and December 2013, OYE provided technical assistance to workers at CFSA and in private agencies on the use of the toolkit.
- On January 1, 2014, use of the new toolkit to prepare for the YTP became mandatory.

Although the toolkit is intended to be an on-line, living document, CFSA has encountered some technical difficulties and the toolkit is not yet available on-line. OYE, Child Information Systems Administration and Foster Club of America are working to finalize the on-line version of the toolkit so that it will be compatible with FACES.NET. The on-line version will be tested, if possible, in May 2014, by staff at OYE and then rolled out to the field after any needed adjustments. It is too soon to know if the hard copy version of the instrument is being consistently implemented.

> *CFSA will continue to track key performance measures for older youth in the monthly scorecard instituted in November 2012 (2013 Strategy Plan).*

In November 2012, CFSA designed a scorecard to track key performance measures for youth in CFSA care. Examples of scorecard measures and data include: YTP completion; youth attending middle or high school, or GED classes; youth not suspended or expelled from school; youth enrolled in college; youth attending trade/vocational/technical or postsecondary school settings; youth currently employed; teens not parenting; and the number of disconnected youth. These scorecards are used, in part, as a management tool with CFSA staff and private agencies to focus workers on improving outcomes for older youth in their care. CFSA has no additional updates on this strategy for the current monitoring period.

## 6. Timely Adoption and Permanency

There are a number of IEP outcomes that track processes that are designed to facilitate timely achievement of permanency goals for children. These include:

- Placing children in approved adoptive homes within nine months of their goal becoming adoption.
- Making reasonable efforts to finalize adoptions within 12 months of placement in the approved adoptive home.
- Achieving permanency within established timeframes through adoption, guardianship and reunification.

*Approved Adoptive Placement*

The IEP requires that children with a goal of adoption be placed in an approved adoptive placement within nine months of their goal becoming adoption.[129] There are two Exit Standards to measure this outcome; one for children whose goal changed to adoption prior to July 1, 2010 and the other for children whose goal changed to adoption on July 1, 2010 or thereafter. Both of these IEP Exit Standards have been designated as an Outcome to be Maintained.[130] However, CFSA has struggled to maintain performance on the timely adoption of children whose permanency goal changed to adoption July 1, 2010 or thereafter.

| IEP Requirement | 27. *Timely Adoption*: Children with a permanency goal of adoption shall be in an approved adoptive placement within nine months of their goal becoming adoption. <br><br> (IEP citation I.B.16.a.i.) |
|---|---|
| Exit Standard | For children whose permanency goal changed to adoption July 1, 2010 or thereafter, 80% will be placed in an approved adoptive placement by the end of the ninth month from when their goal changed to adoption. |

**Figure 30: Children Placed in Pre-Adoptive Home
Within 9 Months of Goal Change to Adoption
January 2012 – December 2013**



Source: CFSA Administrative Data, FACES.NET report ADP070

---

[129] Pursuant to the IEP, the Monitor considers a placement an approved adoptive placement based on documentation of an intent to adopt, filing of an adoption petition or indication in the FACES.NET services line of an approved adoptive placement.
[130] CFSA sufficiently achieved performance on the Exit Standard for children whose permanency goal changed to adoption prior to July 1, 2010 and because the review period for this IEP Exit Standard has expired and CFSA ultimately achieved compliance, the Monitor is no longer tracking performance for this measure.

*Performance for the period July 1 through December 31, 2013:*

This Exit Standard requires that 80 percent of the children whose goal changed to adoption on July 1, 2010 or thereafter be placed in an approved adoptive placement by the end of the ninth month from when their goal changed to adoption. From July 1 through December 31, 2013, 37 (76%) out of 49 eligible children were placed in an approved adoptive placement by the end of the ninth month from the goal change; this performance is below the required level. However, due to the small number of children involved, the Monitor does not recommend redesignating this Exit Standard as an Outcome to be Achieved at this time.

As evident from Figure 30 above, performance on this Exit Standard has fluctuated over the last few monitoring periods. Performance dropped during the January through June 2012 monitoring period, but then met or exceeded the Exit Standard for both the July through December 2012 and January through June 2013 monitoring periods.[131]

*Reasonable Efforts to Finalize Adoptions*

CFSA is required to ensure that 90 percent of children are adopted, or reasonable efforts are made to have them adopted, within 12 months of being placed in a pre-adoptive home. CFSA continues to meet this Exit Standard, which is an Outcome to be Maintained. From July 1 through December 31, 2013, 97 percent of adoptions were completed or reasonable efforts were made to complete adoptions within 12 months of child being placed in a pre-adoptive home. CFSA reports that 32 adoptions were finalized during this monitoring period. Of those 32, 23 cases were finalized within 12 months and reasonable efforts were made to finalize adoptions within 12 months for an additional eight children. Monitor Staff participated in the review of the children's cases that took longer than 12 months to finalize and agreed that reasonable efforts had been made despite the delays.

---

[131] During the January through June 2012 monitoring period, 71 percent of applicable children achieved placement in an adoptive home by the end of the ninth month from when their goal changed to adoption. Due to the small number of children involved, the Monitor did not recommend redesignating this Exit Standard as an Outcome to be Achieved despite the drop in performance.

*Permanency Exits through Adoption, Guardianship and Reunification*

| IEP Requirement | 32. *Timely Adoption*: Timely permanency through reunification, adoption or legal guardianship.<br><br>(IEP citation I.B.16.c.) |
|---|---|
| Exit Standard | i.  Of all children who entered foster care for the first time in FY2012 and who remain in foster care for 8 days or longer, 45% will achieve permanency (reunification, kinship guardianship, adoption or non-relative guardianship) by September 30, 2013.<br>ii.  Of all children who are in foster care for more than 12 but less than 25 months on September 30, 2012, 45% will be discharged from foster care to permanency (reunification, kinship guardianship, adoption or non-relative guardianship) by September 30, 2013.<br>iii.  Of all children who are in foster care for 25 months or longer on September 30, 2012, 40% will be discharged through reunification, adoption, legal guardianship prior to their 21st birthday or by September 30, 2013, whichever is earlier. |

**Figures 31i-iii: Timely Permanency for Children**
**September 2011 – September 2013**





Sources: CFSA Administrative Data, FACES.NET report CMT384 and CMT385

*Performance for the period September 30, 2012 through September 30, 2013:* [132]
The IEP requires CFSA to achieve an agreed upon number and percentage of timely exits for children to a permanent family through adoption, guardianship or reunification. This Exit Standard has three sub-parts that must be met before compliance can be reached for the entire Exit Standard, with different compliance percentages for entry cohorts of children based on their length of stay in foster care. The sub-parts are measured annually as of the end of the fiscal year, so performance on this Exit Standard is measured as of September 30, 2013. Overall, the Monitor considers this Exit Standard partially met.

*The first part of the Exit Standard requires that of all children who entered foster care for the first time in FY2012 and who remain in foster care for 8 days or longer, 45% will achieve permanency (reunification, kinship guardianship, adoption or non-relative guardianship) by September 30, 2013.* Of the 314 children who entered foster care in FY 2012 and remained in foster care for eight days or more, 152 (48%) exited to positive permanency by September 30, 2013. CFSA met this sub-part of the Exit Standard.

*The second part of the Exit Standard requires that of all children who are in foster care for more than 12 but less than 25 months on September 30, 2012, 45% will be discharged from foster care to permanency (reunification, kinship guardianship, adoption or non-relative guardianship) by September 30, 2013.* Of the 268 children who were in care more than 12 months and less than 25 months on September 30, 2012, 101 (38%) achieved positive permanency by September 30, 2013. While CFSA did not meet this sub-part of the Exit Standard, performance has improved since last year.

*The third and last part of the Exit Standard requires that of all children who are in foster care for 25 months or longer on September 30, 2012, 40% will be discharged through reunification, adoption, legal guardianship prior to their 21st birthday or by September 30, 2013, whichever is earlier.* For the 899 children who had been in care 25 or more months on September 30, 2012, 182 (20%) achieved permanency by September 30, 2013. Performance has improved since last year but is still far below the Exit Standard requirement.

Similar to performance in previous years, these data reflect that CFSA performs better in achieving permanency, mostly through reunification and guardianship to kin, for children in care for one year or less (see Table 6 below).

---

[132] This timeframe differs from other sections as performance on this Exit Standard is measured through the fiscal year.

**Table 6:**
**Children and Youth Exiting to Permanency by Cohort as of September 30, 2013**

| Length of time in out of home care during FY2012 | Total number of children/ youth in cohort | Exit to Reunification | Exit to Guardianship – Kin | Exit to Guardianship – NonKin | Adoption | Total exits to permanency by Sep. 30, 2013 |
|---|---|---|---|---|---|---|
| 8 days-12 months | 314 | 143 (45.5%) | 5 (1.6%) | 2 (.64%) | 2 (.64%) | 152 (48%) |
| 12-24 months | 268 | 50 (18.7%) | 23 (8.6%) | 6 (2.2%) | 22 (8.2%) | 101 (38%) |
| 25 months or more | 899 | 42 (4.7%) | 42 (4.7%) | 31 (3.5%) | 67 (7.5%) | 182 (20%) |

Sources: FACES.NET reports CMT384 and CMT385

*Performance on Strategy Plan:*
CFSA has employed the following strategies to increase performance on timely adoption.

> ➢ *By April 1, 2013, CFSA will initiate monthly case reviews (30, 60, 90 days and monthly thereafter) and teaming meetings from the point of entry into foster care until permanency is achieved. The meetings will engage parties necessary to develop a concrete permanency plan, with specific action steps and timelines necessary to achieve an appropriate and expeditious permanency outcome for the child. The reviews will include development of a corrective action plan, as needed, for children in a special corrective action category related to permanency (2013 Strategy Plan).*

CFSA reports implementing RED Team meetings to support children in achieving appropriate and expeditious permanency. First, CFSA convenes a Case Transfer RED Team within the next business day of child removal into out-of-home placement. Case Transfer RED Teams are designed to ensure that newly assigned staff are aware of the case plan and next steps that need to be taken to support the child and family. Permanency RED Team meetings then occur on a monthly basis thereafter. The RED Team framework requires that participants assess information shared about the family and barriers and complicating factors to achieving timely permanency. Participants usually include the social worker, a supervisory social worker, a case practice specialist, an assistant attorney general, a facilitator and a scribe. CFSA reports that monthly Permanency RED Teams help ensure that follow-up has occurred on the action steps identified to achieve permanency.[133]

---

[133] For additional information, see discussion in *Services to Children and Families to Promote Safety, Permanency and Well-Being,* section IV.A.4. of this report.

> *CFSA Permanency Leadership will complete meetings with each CFSA administration and private agencies by January 15, 2013. Each administration and private agency is required to submit a strategic plan to expedite permanency for the children in care for 24 months or more. The plans are due by February 1, 2013 (2013 Strategy Plan).*

As previously reported, CFSA implemented a "Permanency on the Move" Initiative which focused on specific cohorts of children who required more attention to achieve permanent outcomes. As part of this initiative, CFSA met with leadership from private agencies and with CFSA's permanency administrators to discuss barriers and strategies to achieve permanency for identified children. Both the private agencies and CFSA administrators submitted plans and updates on children who were in care for 24 months or longer. The Permanency on the Move initiative was completed in the spring of 2013. The initiative is no longer used as the RED team framework was expanded and applied to permanency cases starting in June 2013. Thus, permanency strategies for the remainder of this year focused on using the RED Team process and TST approach to track and adjust plans for all children in out-of-home care.

> *By April 2013, CFSA will work with Casey Family Programs to revise the In and Out-of-Home Practice Manual to include key permanency decision points and viable permanency strategies throughout the life of the case. CWTA will revise the new and ongoing worker training to reflect the changes in the revised POM. The training for all staff will be delivered from May 1 through June 30, 2013. (2013 Strategy Plan).*

CFSA worked with Casey Family Programs to revise the In-Home and Out-of-Home POM to focus on promoting permanency at different decision points in a case. Revisions were completed in January 2013 and included in staff pre-service and ongoing training that took place in May and June 2013.

CFSA is currently working on revisions to the POM which will incorporate RED Team procedures, SDM Caregiver Strengths and Barriers Assessment (Family Functional Assessment) and TST processes. CFSA anticipates that these changes will be complete by June 30, 2014.

7.    **Case Planning Process**

The case planning process Exit Standard requires CFSA to work with families: (1) to develop timely, comprehensive and appropriate case plans in compliance with District law requirements and permanency timeframes which reflect the family's and child(ren)'s needs and are updated as family circumstances or needs change and (2) to deliver services reflected in the current case plan. Every effort should be made to locate family members and develop case plans in

partnership with children and families, the families' informal support networks and other formal resources working with or needed by the child and/or family. Case plans should identify specific services, supports and timetables for providing services needed by children and families to achieve identified goals. The Monitor measures performance on this requirement through ratings from the QSR.

| IEP Requirement | 33. *Case Planning Process*: <br> a. CFSA, with the family, shall develop timely, comprehensive and appropriate case plans in compliance with District law requirements and permanency timeframes, which reflect family and children's needs, are updated as family circumstances or needs change, and CFSA shall deliver services reflected in the current case plan. <br> b. Every reasonable effort shall be made to locate family members and to develop case plans in partnership with youth and families, the families' informal support networks, and other formal resources working with or needed by the youth and/or family. <br> c. Case plans shall identify specific services, supports and timetables for providing services needed by children and families to achieve identified goals. <br> (IEP citation I.B.17.) |
|---|---|
| Exit Standard | 80% of cases reviewed through the Quality Service Reviews (QSR) will be rated as acceptable on both the Pathway to Case Closure and Plan Implementation indicators. |

As required by the IEP, two indicators from the QSR protocol are used to measure CFSA's performance on the Exit Standard pertaining to appropriate case planning. These indicators, Planning Interventions and Pathway to Case Closure, are described in further detail in Figures 32 and 33, which summarize the parameters which reviewers consider in rating performance for Planning Interventions and Pathway to Case Closure, as well as descriptions of minimally acceptable performance and unacceptable performance as contained within the QSR protocol.

**Figure 32: QSR Planning Interventions Indicator Parameters to Consider
and Description of Acceptable/Unacceptable Performance[134]**

---

*Planning Interventions*

➢ *Indicator Focus:* the planning interventions are a set of strategies and actions, based on assessed needs, which result in changes for the child, youth and family. Intervention planning is an ongoing process throughout the life of the case and the interventions should be consistent with the long-term view for the child, youth and family.

➢ *Parameters Reviewers Consider:* to what degree meaningful, measurable, and achievable life outcomes (e.g. safety, permanency, well-being, family functioning in fulfilling life roles, transition and life adjustment) for the child and family are supported by well-reasoned, agreed-upon goals, intervention strategies and actions for attainment.

➢ *Indicator sub-parts:*
   • Safety and Protection
   • Permanency
   • Well-Being
   • Daily Functioning and Life Role Fulfillment
   • Transition and Life Adjustment
   • Other Planned Outcomes and Interventions

➢ *Description of Acceptable/Unacceptable Performance:*

Minimally Acceptable Planning means a minimally reasoned, periodic planning process is used to match intervention strategies to stated goals that are somewhat consistent with the long-term view. Choices are at least minimally supported by the child and family and by a slim team consensus. The strategies selected reflect a minimally adequate to fair assessment and are loosely linked to the planned goals and outcomes to meet the needs of the child and family and to help them be successful in daily living after exiting the service system. Plans include a minimally described set of steps to which key participants are somewhat committed. Strategies and actions across providers and funding sources are somewhat aligned and minimally integrated.

Unacceptable Planning is evident from a somewhat or substantially inadequately reasoned, occasional planning process. Intervention strategies may not have clear goals and may be somewhat inconsistent with the long-term view. Choices may be marginally supported by the child and family. A vague or shifting consensus may exist around some goals and strategies. Interventions described may reflect an authorized services category rather than a clear strategy for change. The intervention may be related to an inferred area of need by my lack clear goals or strategies. Plans may include some general activities for which some participants are authorized to provide services. Planning across providers and funding sources is somewhat misaligned or inconsistently integrated.

---

[134] *Quality Service Review Protocol for a Child and Family: Reusable Protocol for Examination of Child Welfare and Mental Health Services for a Child and Family*, Shared Practice Protocol. Human Services and Outcomes, November 2013. p. 62-65.

**Figure 33: QSR Pathway to Case Closure Indicator Parameters to Consider
and Description of Acceptable/Unacceptable Performance[135]**

### *Pathway to Case Closure*

➢ *Parameters Reviewers Consider:* To what degree: (1) Is there a clear, achievable case goal including concurrent and alternative plans? (2) Does everyone involved, including family members, know and agree on what specific steps need to be achieved in order to achieve the case goal and close the case safely? (3) Is the child/family making progress on these steps and informed of consequences of not meeting the necessary requirements within the required timelines? (4) Are team members planning for the youth's transition from care in APPLA cases? (5) Are reasonable efforts being made to achieve safe case closure for all case goals?

➢ *Description of Acceptable/Unacceptable Performance:*

Minimally Acceptable Pathway to Case Closure means some people involved in the case understand the case goal, including any plan alternatives. Minimally adequate to fair efforts are being made to achieve the permanency goal and to remove any barriers to permanency. Some people have agreed upon the steps that must be accomplished and requirements that must be met for safe case closure. Some team members are aware of timelines and consequences for not meeting requirements and the team is making some progress towards closure, though not in a timely manner - or - the team has established a good plan but has not made sufficient progress on it.

Unacceptable Pathway to Case Closure means few people involved in the case understand or agree with the case goal, including any plan alternatives. Marginal or inconsistent efforts are being made to achieve the permanency goal and to remove any barriers to permanency. Few steps that must be accomplished or requirements that must be met for safe case closure, timelines, and consequences for not meeting requirements have been defined and/or agreed upon by family members and providers. The case is not making sufficient progress towards closure - or - the team has established a fair plan but has not made progress on it.

---

[135] *Quality Service Review Protocol for a Child and Family: Reusable Protocol for Examination of Child Welfare and Mental Health Services for a Child and Family,* Shared Practice Protocol. Human Services and Outcomes, November 2013. p. 58-59.

**Figure 34: QSR Findings on Case Planning Process**
**CY2010 – CY2013**



Source: QSR Data

*Performance for the period January 1 through December 31, 2013:*
During CY2013, 100 cases were reviewed using the QSR methodology. As Figure 35 indicates, 61 percent (61 of 100) were rated as acceptable on *both* the overall Planning Interventions and Pathway to Case Closure indicators. In some cases, reviewers rated practice on one indicator as acceptable, while their assessment of practice in the other area was unacceptable and needed refinement or improvement. Specifically, 70 percent of cases (70 of 100) were rated acceptable overall on the Planning Interventions indicator and 64 percent of cases (64 of 100) were rated acceptable on the Pathway to Case Closure indicator. The percentage of cases rated acceptable on both Planning Interventions and Pathway to Case Closure increased 11 percent from CY2012 to CY2013. Although improved, this does not meet the Exit Standard requirement of 80 percent.

**Figure 35: QSR Findings on Case Planning Process**
**January – December 2013**
**N=100**



Source: QSR, January – December 2013

***Performance on Strategy Plan:***

CFSA has employed targeted strategies to increase performance on the case planning process. For discussion of these strategies, see the *Services to Children and Families to Promote Safety, Permanency and Well-Being* section of this report.

C.    **GOAL: CHILD WELL-BEING**

1.    **Sibling Placements and Visits**

By placing siblings together, CFSA is able to reduce some of the trauma children experience when they must enter out-of-home care and can help children sustain their critically important lifelong connections and supports. CFSA has previously met both Exit Standards related to sibling placement and visitation between siblings if they are placed apart. Required performance for both standards has been maintained between July and December 2013. As of December 31, 2013, 83 percent of children placed in care with their siblings or within 30 days of their siblings between July and December 2013 were placed with some or all of their siblings. Regarding sibling visitation, during this monitoring period a monthly range of 78 to 89 percent of siblings had at least monthly visits and 69 to 82 percent of siblings had at least twice monthly visits with their brothers and/or sisters.[136]

2.    **Assessments for Children Experiencing a Placement Disruption**

In an effort to increase children's placement stability, the IEP requires CFSA to ensure that children in its custody whose placements are disrupted are provided with a comprehensive and appropriate assessment to determine their service and re-placement needs with a follow-up action plan developed no later than within 30 days of a child's re-placement. In February 2013, CFSA began using the Child Needs Assessment (CNA) tool for all children who entered care or required a placement change. The CNA tool is structured to collect information about the child in the following areas:

- mental health and behavioral health needs;
- interventions necessary to manage mental health, behavioral or developmental needs;
- medical and physical characteristics;
- personal care needs due to developmental and/or medical and physical needs;
- psychotherapy and counseling needs;
- educational information; and
- cultural and linguistic needs.

Resource Development Specialists (RDS) within the Placement Services Administration are responsible for ensuring that when there is notice of the need for a placement change, a CNA is completed with the child's team, to include the social worker, GAL, placement provider and other appropriate individuals identified by the social worker. Data indicate that participation

---

[136] The IEP Exit Standard requires 75% of children have twice monthly visits with their separated sibling groups. Performance for October through December 2013 dropped below the required level. The Monitor considers this to be a temporary deviation and will continue to monitor performance to determine if lower than required performance continues.

from staff and providers outside of the RDS and social worker is inconsistent, possibly due to how quickly these meetings are scheduled and held. In March 2014, after soliciting feedback from staff and providers, CFSA made revisions to the CNA tool and quality assurance process to ensure greater inter-rater reliability and to improve the quality of the information being collected. In mid-March 2014, CFSA conducted training for RDS staff on the new tool and process which includes a testing requirement for each RDS to ensure appropriate understanding and use of the CNA tool moving forward.

CFSA met the required level of performance for this Exit Standard during the previous monitoring period and this Exit Standard was redesignated as an Outcome to be Maintained. During the current monitoring period, between 16 to 22 placement disruptions occurred each month and between 95 and 100 percent of children experiencing a disruption had a CNA completed within 30 days of notification of the need for a placement change, demonstrating continued compliance with this Exit Standard.

***Performance on Strategy Plan:***
CFSA has employed the following strategies to increase performance on the assessment of children experiencing a placement disruption:

> ➢ *As part of the placement service's redesign, CFSA will implement a utilization management process that reinforces the integrated teaming approach to identify, coordinate and link appropriate resources/services to meet the needs of children currently in, or at risk of, a restrictive level of care. The placement and matching tool will be used during key points in a case, such as: at removal (initial or replacement), disruptions, or when a child needs a higher level of care. By February 1, 2013, the tool will be used for all new removals and for disruptions (2013 Strategy Plan).*

CFSA began implementation of this strategy in early CY2013 and reports that the CNA is now used for all new removals, disruptions and at other key points in a child's case. In July 2013, CFSA began utilizing the Placement Matching RED Team to reinforce teaming to identify and link children to appropriate resources and services. This meeting occurs weekly and is used to discuss the needs of children needing placement and to match their needs with capacities of potential placement service providers.

> ➢ *By March 1, 2013, 2013, all children in care will be assigned a resource development specialist and the process will be in place to conduct assessments for all children in out-of-home care (2013 Strategy Plan).*

CFSA began implementation of this strategy earlier in CY2013 and uses the following schedule to complete or update CNAs – every 30 days for children placed in residential treatment centers; every 90 days for children placed in traditional, therapeutic or specialized group homes or

therapeutic or specialized foster homes; and every six months for children placed in traditional foster homes.

## 3.    Health and Dental Care

*Health Screening Prior to Placement*

The IEP requires children in foster care to have a health screening prior to an initial placement, re-entry into care or change in placement. The purpose of the health screening prior to placement is to identify health conditions that require prompt medical attention such as acute illnesses, chronic diseases, signs of abuse or neglect, signs of infection or communicable diseases, hygiene or nutritional problems and developmental or mental health concerns. Additionally, the screening gathers information about the child's health care needs to be shared with the child's foster parent or caregiver, social worker and other service providers. Overall, CFSA's performance on the Exit Standards related to health and dental care for children in foster care improved during the current monitoring period, with three of the Exit Standards being partially achieved.

| IEP Requirement | 39. *Health and Dental Care*: Children in foster care shall have a health screening prior to placement.<br><br>(IEP citation I.C.22.a.) |
|---|---|
| Exit Standard | 95% of children in foster care shall have a health screening prior to an initial placement or re-entry into care.<br><br>90% of children in foster care who experience a placement change shall have a replacement health screening. |

**Figure 36: Percentage of Children who Received a Health Screening Prior to Placement (Initial or Re-Entries) June 2011 – December 2013**



Source: CFSA Administrative Data, FACES.NET report HTH004



**Figure 37: Percentage of Placement Activities where Children Received a Health Screening Prior to Re-Placement (for Children with Multiple Placements) June 2011 – December 2013**

Source: CFSA Administrative Data, FACES.NET report HTH004

*Performance for the period July 1 through December 31, 2013:*
Between July and December 2013, performance related to health screening prior to placement for children who initially entered or re-entered foster care ranged between 87 and 100 percent monthly (see Figure 38 below) with all but one month meeting or exceeding the Exit Standard requirement. For example, in December 2013, all 31 children who were initially placed or re-entered foster care received a health screening prior to being placed.

Performance related to health screening for children prior to a placement change ranged between 83 and 87 percent monthly from July through December 2013 (see Figure 38 below). For example, there were 107 child placement change activities during the month of December. In 89 (83%) of the 107 placement changes, the child received a health screening prior to the change in placement.

Based on these data, performance on this measure was partially met for the first time. CFSA met the sub-part of this Exit Standard requiring 95 percent of children receive a health screening prior to an initial placement or re-entry into care during five of the six months of the current monitoring period but did not meet the performance level required by the IEP for children experiencing a placement change.

**Figure 38: Percentage of Children who Received a
Health Screening Prior to Placement (Initial and Re-Entries) and Re-Placement
July – December 2013**



Source: CFSA Administrative Data, FACES.NET report HTH004

*Full Medical Evaluation within 30 and 60 Days of Placement*

| | |
|---|---|
| **IEP Requirement** | 40. *Health and Dental Care*: Children in foster care shall receive a full medical evaluation within 30 days of placement.<br><br>(IEP citation I.C.22.b.i.) |
| **Exit Standard** | 85% of children in foster care shall receive a full medical evaluation within 30 days of placement.<br><br>95% of children in foster care shall receive a full medical evaluation within 60 days of placement. |

**Figure 39: Percentage of Children who Received a Full Medical Evaluation Within 30 Days of Placement December 2010 – December 2013\***



Source: CFSA Administrative Data, FACES.NET report HTH005
\*June 2011 data are reconciled across April – June 2011.

**Figure 40: Percentage of Children who Received a Full Medical Evaluation Within 60 Days of Placement December 2010 – December 2013\***



Source: CFSA Administrative Data, FACES.NET report HTH005
\*June 2011 data are reconciled across April-June 2011.

*Performance for the period July 1 through December 31, 2013:*

From July through December 2013, a monthly range of 74 to 84 percent of children in foster care received a full medical evaluation within 30 days of placement and by 60 days post-placement, 86 to 97 percent of children per month had received the required evaluation (see Figure 41 below). For example, in December 2013, there were 82 children applicable to this measure; 65 (79%) had a medical evaluation within 30 days of placement and an additional 14 (17%) had a medical evaluation within 60 days of placement.

CFSA performance on the sub-part of this Exit Standard requiring that 85 percent of children entering foster care receive a full medical evaluation within 30 days of their placement in care remains below the IEP requirement. CFSA met the required performance for the sub-part of this Exit Standard requiring that 95 percent of children entering foster care receive a full medical evaluation within 60 days of their placement in the final three of the six months of the current monitoring period for the first time. Therefore, this Exit Standard is partially achieved.



**Figure 41: Percentage of Children who Received a Full Medical Evaluation Within 30 and 60 Days of Placement July – December 2013**

Source: CFSA Administrative Data, FACES.NET report HTH005

*Full Dental Evaluation within 30, 60 and 90 Days of Placement*

| IEP Requirement | 41. *Health and Dental Care*: Children in foster care shall receive a full dental evaluation within 30 days of placement. (IEP citation I.C.22.b.ii.) |
|---|---|
| Exit Standard | 25% of children shall receive a full dental evaluation within 30 days of placement. 50% of children shall receive a full dental evaluation within 60 days of placement. 85% of children shall receive a full dental evaluation within 90 days of placement. |

**Figure 42: Percentage of Children who Received a Full Dental Evaluation
Within 30 Days of Placement
December 2010 – December 2013***



Source: CFSA Administrative Data, FACES.NET report HTH005
*June 2011 data are reconciled across the January – June 2011 monitoring period.

**Figure 43: Percentage of Children who Received a Full Dental Evaluation
Within 60 Days of Placement[137]
December 2010 – December 2013***



Source: CFSA Administrative Data, FACES.NET report HTH005
*June 2011 data are reconciled across the January – June 2011 monitoring period.

**Figure 44: Percentage of Children who Received a Full Dental Evaluation
Within 90 Days of Placement[138]
December 2010 – December 2013***



Source: CFSA Administrative Data, FACES.NET report HTH005
*June 2011 data are reconciled across the January – June 2011 monitoring period.

---

[137] Data include children who received full dental evaluation within 30 days.
[138] Data include children who received full dental evaluation within 30 and 60 days.

*Performance for the period July 1 through December 31, 2013:*

From July through December 2013, between 51 and 79 percent of children per month received a full dental evaluation within 30 days of placement (see Figure 45 below). A total of between 75 and 90 percent of children per month received a full dental evaluation within 60 days and between 79 and 92 percent of children per month received a full dental within 90 days. For example in December 2013, this Exit Standard applied to 45 children; 24 (53%) had a dental evaluation within 30 days of placement, an additional 10 (23%) had a dental evaluation within 60 days of placement and three (6%) additional children had a dental evaluation within 90 days of placement. The remaining eight children did not receive a full dental evaluation within 90 days of placement.

CFSA met the performance level required by the IEP for the sub-part requiring 25 percent of children to receive a full dental evaluation within 30 days of placement and the sub-part requiring 50 percent of children to receive a full dental evaluation within 60 days of placement.

**Figure 45: Percentage of Children who Received a Full Dental Evaluation July – December 2013**



Source: CFSA Administrative Data, FACES.NET report HTH005

*Performance on Strategy Plan:*
CFSA has employed the following strategy to increase performance on the receipt of comprehensive medical and dental evaluations by children upon placement in foster care:

> ➤ *CFSA has incorporated the health and dental Exit Standards into the private agencies' performance evaluations and scorecards. Performance issues are addressed through performance improvement plans submitted by private agencies and are monitored closely for achievement of goals and improved performance (2013 Strategy Plan).*

CFSA continues to monitor private agency performance on health and dental Exit Standards through performance evaluations and scorecards and CFSA monitoring staff are available to provide technical assistance in order to support performance in this area. CFSA reports that this strategy has been and continues to be effective in supporting improved practice and accountability around these Exit Standards and increased performance in these areas support that conclusion.

> ➤ *CFSA's Healthy Horizon's Clinic will hold health assessment marathons one Saturday per month. The marathons will allow caregivers and social workers to bring children for their assessment without an appointment (2013 Strategy Plan).*

The Health Horizon's Assessment Center ceased conducting monthly comprehensive marathons in December 2013 due to a lack of participation. Health Services Administration (HSA) now facilitates weekly meetings with the CFSA management team to identify and provide updates regarding children with out-of-compliance medical and dental evaluations and children who are coming up due for an evaluation. Barriers that have been identified at the weekly meetings have centered on communication and compliance with appointments. In order to address these barriers, HSA includes follow-up appointment information and a Healthy Horizons Assessment Center checklist in placement packets given to foster parents when a child is placed in their care.

*Medicaid Coverage*

| | |
|---|---|
| **IEP Requirement** | 43. *Health and Dental Care*: CFSA shall ensure the prompt completion and submission of appropriate health insurance paperwork, and shall keep records of, e.g., Medicaid application dates, HMO severance dates, and enrollment dates. CFSA shall provide caregivers with documentation of Medicaid coverage within 5 days of every placement and Medicaid cards within 45 days of placement.<br><br>(IEP citation I.C.22.d.) |
| **Exit Standard** | 90% of children's caregivers shall be provided with documentation of Medicaid coverage within 5 days of placement and Medicaid cards within 45 days of placement. |

**Figure 46: Medicaid Number and Medicaid Card Distribution to Foster Parents June 2013 - December 2013**



Source: CFSA Manual Data

***Performance for the period July 1 through December 31, 2013:***
CFSA has continued tracking the distribution of Medicaid numbers and cards to foster parents when a child is placed in their care regardless of whether or not it is the child's first placement in foster care or a placement change. CFSA's performance on the distribution of Medicaid numbers improved significantly in the current monitoring period. Between July and December 2013, performance ranged from zero to 92 percent per month (see Table 7). For example in December 2013, 32 children experienced a placement activity and remained in that placement for at least five days. Of these 32 children, CFSA was able to verify that 27 foster parents (84%) received the child's Medicaid number within five days of their placement in that home.

**Table 7: Percentage of Foster Parents who Received Child's**
**Medicaid Number within Five Days of the Child's Placement**
**July – December 2013**

| Month | Number of Children Experiencing a Placement Activity | Number of Foster Parents who Received the Child's Medicaid Number within 5 Days of the Child's Placement |
|---|---|---|
| July 2013 | 32 | 9 (28%) |
| August 2013 | 38 | 0 (0%) |
| September 2013 | 26 | 23 (88%) |
| October 2013 | 39 | 36 (92%) |
| November 2013 | 24 | 22 (92%) |
| December 2013 | 32 | 27 (84%) |

Source: CFSA Manual Data

CFSA's performance on providing Medicaid cards to foster parents continues to fall below the level required by the Exit Standard. Between July and December 2013, CFSA was able to verify that between zero and 35 percent of foster parents each month received the child's Medicaid card within 45 days of the child's placement (see Table 8).

**Table 8: Percentage of Foster Parents who Received Child's**
**Medicaid Card within 45 Days of the Child's Placement**
**July – December 2013**

| Month | Number of Children Experiencing a Placement Activity | Number of Foster Parents who Received the Child's Medicaid Card within 45 Days of the Child's Placement |
|---|---|---|
| July 2013 | 32 | 3 (9%) |
| August 2013 | 37 | 13 (35%) |
| September 2013 | 24 | 7 (29%) |
| October 2013 | 39 | 8 (21%) |
| November 2013 | 24 | 0 (0%) |
| December 2013 | 31 | 2 (6%) |

Source: CFSA Manual Data

CFSA has not yet met the performance required by this Exit Standard.

***Performance on Strategy Plan:***

CFSA has employed the following strategies to increase performance on the receipt of Medicaid numbers and cards by foster parents:

> ➤ *CFSA will explore options for expediting the Medicaid card distribution with the Department of Health Care Finance and by May 1, 2013, will make a decision on the most feasible way(s) to address Medicaid card distribution (2013 Strategy Plan).*

CFSA met with the Department of Health Care Finance (DHCF) and the Department of Human Services (DHS) to discuss two options for temporary Medicaid cards. CFSA reports these options include providing temporary Medicaid cards to foster parents or providing foster parents with access to the child's medical insurance immediately. The two agencies agreed to grant temporary Medicaid cards to foster parents once the child is placed in their home. CFSA reports that the protocol for temporary Medicaid cards will be finalized by May 1, 2014 with full implementation by the end of May 2014.

**D.    RESOURCE DEVELOPMENT AND SYSTEM ACCOUNTABILITY**

**1.    Caseloads**

Exit Standards pertaining to caseloads and supervisory responsibilities are currently designated as Outcomes to be Maintained. Given the critical importance of caseload size, this section provides current information on worker and supervisory caseloads.

CFSA increased the number of FA units during the current monitoring period primarily by transferring workers previously assigned to investigations and as a result, caseloads in investigative units fluctuated. Shortly thereafter, CFSA saw an increase in investigative worker caseloads and addressed this increase by temporarily shifting workers back from FA to investigations and requiring some workers to carry mixed caseloads. In December 2013, no investigative was responsible for more than 12 investigations and the monitoring period ended with CFSA meeting the Exit Standard requirement for investigative workers in November and December 2013.

CFSA maintained performance on the Exit Standards pertaining to caseloads for workers conducting home studies (100%) and in-home and permanency workers (94-99%).[139] The number of in-home and permanency cases unassigned for more than five days ranged from 22 to 93 (one to five percent) per month during the current monitoring period.[140]

CFSA continued to meet the Exit Standard pertaining to supervisory responsibilities with supervisors responsible for supervising no more than five case carrying social workers and a case aid, family support worker or non-case carrying social worker.[141]

The discussion below highlights investigative and FA caseloads.

---

[139] See Table 2: *Performance on IEP Exit Standards for Outcomes to be Maintained*, of this report for performance during this monitoring period.
[140] *Ibid.*
[141] *Ibid.*

*Investigative Caseloads*

| IEP Requirement | 46. *Caseloads*:<br>a.  The caseload of each worker conducting investigations of reports of abuse and/or neglect shall not exceed the MFO standard, which is 1:12 investigations.<br><div align="right">(IEP citation I.D.25.a.)</div> |
|---|---|
| Exit Standard | 90% of investigators and social workers will have caseloads that meet the above caseload requirements. No individual investigator shall have a caseload greater than 15 cases. |

**Figure 47: Percentage of Investigative Workers who
Met Exit Standard Requirements for Caseloads
December 2011 – December 2013**



Source: CFSA Administrative Data, FACES.NET report INV068

***Performance for the period July 1 through December 31, 2013:***
Between July and December 2013, a monthly range of 76 to 100 percent of investigative workers met the required caseload standard by not exceeding 12 investigations per month (see Table 9). Additionally, during this same time period, a monthly range of zero to five investigators had a caseload exceeding 15 investigations each month, which is outside of compliance. This represents a significant improvement from the previous monitoring period where the number of workers carrying over 15 investigations peaked at 27 workers in March 2013.

In addition to investigative caseworkers, between three and eight supervisors and program managers carried investigations each month during this monitoring period. To deal with caseload pressures, CPS supervisors and program managers were collectively responsible for between five to 27 investigations each month which accounted for one to five percent of all investigations each month. Nine to 21 FA workers[142], FA supervisors and an OYE worker also were collectively responsible for between 28 to 159 investigations each month. Table 9 below illustrates caseloads of investigative workers by month.

**Table 9: Investigative Social Workers Exceeding Caseload Limits**
**July – December 2013**

| Month | Workers Carrying no more than 12 Investigations: Met Exit Standard | Workers Carrying 13-15 Investigations | Workers Carrying More Than 15 Investigations | Total Workers Carrying More Than 12 Investigations |
|---|---|---|---|---|
| July-13 (N=68) | 65 (96%) | 2 (3%) | 1 (1%) | **3 (4%)** |
| August-13 (N=57) | 46 (81%) | 10 (18%) | 1 (2%) | **11 (19%)** |
| Sept-13 (N=58) | 44 (76%) | 9 (16%) | 5 (9%) | **14 (25%)** |
| Oct-13 (N=62) | 53 (85%) | 9 (15%) | 0 (0%) | **9 (15%)** |
| Nov-13 (N=48) | 46 (96%) | 2 (4%) | 0 (0%) | **2 (4%)** |
| Dec-13 (N=48) | 48 (100%) | 0 (0%) | 0 (0%) | **0 (0%)** |

Source: CFSA Administrative Data, FACES.NET report INV068
*Percentages may not total 100% due to rounding
**N does not include the 3-21 FA workers, FA supervisors or investigative supervisors who held case responsibility for investigations and family assessments during the same month.

*Family Assessment (FA) Caseloads*

Caseloads for FA workers ranged from one to 13 during the months of July to December 2013. For every month except December 2013, no FA worker was responsible for more than 12 assessments. In December 2013, one FA worker had a caseload of 12 FAs and one investigation. Between zero and nine FA supervisors were collectively responsible for carrying between zero and 18 FAs each month during the current monitoring period. Between one and eight investigators, supervisors and in-home social workers were also responsible for collectively carrying one to 14 FAs each month.

---

[142] These FA workers were responsible for both family assessments and investigations during the month. FA workers who were only responsible for investigations during a given month were coded as investigative workers for that month for data validation purposes.

**Table 10: Family Assessment (FA) Social Workers Caseloads***
**July – December 2013**

| Month | Workers Carrying no more than 12 FAs | Workers Carrying 13-15 FAs | Workers Carrying More Than 15 FAs | Total Workers Carrying More Than 12 FAs |
|---|---|---|---|---|
| July-13 (N=19) | 19 (100%) | 0 (0%) | 0 (0%) | **0 (0%)** |
| August-13 (N=22) | 22 (100%) | 0 (0%) | 0 (0%) | **0 (0%)** |
| Sept-13 (N=26) | 25 (96%) | 1 (4%) | 0 (0%) | **1 (4%)** |
| Oct-13 (N=36) | 36 (100%) | 0 (0%) | 0 (0%) | **0 (0%)** |
| Nov-13 (N=34) | 34 (100%) | 0 (0%) | 0 (0%) | **0 (0%)** |
| Dec-13 (N=35) | 34 (97%) | 1 (3%) | 0 (0%) | **0 (0%)** |

Source: CFSA Administrative Data, FACES.NET INV068

*N does not include the 3-12 FA supervisors, investigative supervisors, investigative workers, in-home workers or in-home supervisors who carried family assessments.

***Performance on Strategy Plan:***

CFSA has employed the following strategy to decrease caseloads for investigative workers:

> ➢ *CFSA is creating an "overflow" CPS unit to act as a pipeline to immediately fill vacancies and positions where staff are on extended leave. Staff to fill current vacancies will be hired by February 1, 2013. CFSA will continue to monitor the caseloads of investigative workers and will utilize this strategy of hiring workers, as needed, to address any increase of new investigations and maintaining an overflow unit (2013 Strategy Plan).*

CFSA reports that during the monitoring period, the "overflow" CPS unit was no longer staffed and staff from that unit were deployed to fill vacant positions in both the investigations and FA units. At the time of writing this report, CFSA indicated that due to investigative caseloads rising beginning in February 2014, the overflow unit is expected to be reinstated and the estimated time for reinstatement is June 1, 2014.

As a part of investigation and FA staff training, all new workers are cross-trained so they are able to appropriately address each type of referral when CFSA management identifies a need to shift workers in order to maintain caseload standards.

2. **Staff Training**

Training is a core function of any child welfare agency and is a primary mechanism to ensure that social workers, supervisors, managers and foster parents have the competencies necessary to carry out their jobs effectively. During the current monitoring period, CFSA maintained required performance on pre-service training for social workers. Specifically, 93 percent (53 of 57) of newly hired direct service staff received the required 80 hours of pre-service training. CFSA continues to maintain performance on this Exit Standards.

3. **Training for Foster and Adoptive Parents**

The IEP requirement for pre-service training for foster parents was previously designated as an Outcome to be Maintained and current performance remains at compliance levels. Nearly all (97%) of foster parents complete 15 hours of pre-service training prior to licensure.[143]

*In-Service Training for Foster Parents*

| IEP Requirement | 54. *Training for Foster Parents*: CFSA and contract agency foster parents shall receive 30 hours of in-service training every two years.<br><br>(IEP citation I.D.29.b.) |
|---|---|
| Exit Standard | 95% of foster parents whose licenses are renewed shall receive 30 hours of in-service training. |

---

[143] See Table 2: *Performance on IEP Exit Standards for Outcomes to be Maintained*, of this report for performance during this monitoring period.

**Figure 48: Percentage of Foster/Adoptive Parents with
30 hours of In-Service Training
June 2012 - December 2013**



Source: CFSA Administrative Data, FACES.NET report TRN009

*Performance for the period July 1 through December 31, 2013:*
Of the 289 foster parents applicable to this measure, 278 (96%) completed the required hours of in-service training.[144, 145] Performance on this Exit Standard achieved the level required by the IEP for the first time.

**4.    Special Corrective Action**

Between January through June 2013, CFSA newly achieved the Exit Standard that requires production of monthly reports identifying children in special corrective action categories and the completion of child-specific case reviews to develop corrective action plans as appropriate. CFSA continued compliance with this Exit Standard during the current period. Two categories have shown notable improvement since December 2012 by reducing the number of children in corrective action status. First, children with four or more placements with a placement change in the last 12 months dropped 11 percent from 411 children in December 2012 to 367 children in December 2013. Second, children with a goal of adoption for more than 12 months who are not in an approved adoptive placement declined 15 percent from 91 children in December 2012 to 77 children during the same month in 2013.

---

[144] Foster parents with a one-year license are expected to complete 15 hours of in-service training; foster parents with a two-year license are expected to complete 30 hours of in-service training during the licensure period. Of the 289 foster parents, the majority, 235 (81%), had a one-year license.
[145] The Monitor conducted a secondary analysis of FACES.NET data to evaluate performance on foster/adoptive parent in-service training and used manual data provided by CFSA to correct any data entry errors.

CFSA reports that a review was conducted and a corresponding plan developed for every child who newly entered a corrective action category and required a plan.[146] Data on the number of children in special corrective action categories between July and December 2013 are presented in Table 11 below.

**Table 11: Number of Children in Special Corrective Action Categories by Month\***
**July – December 2013**

| Special Corrective Action Category | July 2013 | Aug 2013 | Sept 2013 | Oct 2013 | Nov 2013 | Dec 2013 |
|---|---|---|---|---|---|---|
| **Placement Categories** | | | | | | |
| CFSA Children with 4 or More Placements with a Placement Change in the Last 12 Months and the Placement is not a Permanent Placement | 383 | 387 | 378 | 376 | 365 | 367 |
| Children Placed in Emergency Facilities Over 90 Days | 0 | 0 | 0 | 0 | 0 | 0 |
| Children Placed in Foster Homes without Valid Permits/Licenses or Foster Homes that Exceed their Licensed Capacity | 43 | 45 | 44 | 28 | 46 | 56 |
| Children in Residential Treatment More than 100 Miles from DC | 19 | 21 | 21 | 22 | 24 | 23 |
| **Permanency Categories** | | | | | | |
| Children with the Goal of Adoption for More than 12 Months who are not in an Approved Adoptive Home | 77 | 74 | 74 | 69 | 75 | 77 |
| Children in Care who Returned Home twice and Still have the Goal of Reunification | 0 | 1 | 1 | 2 | 2 | 2 |
| Children under 14 with a Goal of APPLA | 1 | 1 | 1 | 1 | 1 | 1 |
| Children with the Goal of Reunification for More than 18 Months | 38 | 45 | 51 | 52 | 45 | 46 |

Source: CFSA Administrative Data, FACES.NET report COR013
\* Individual children may be included and counted in more than one category.

---

[146] Between July and December 2013, 414 children newly entered a special corrective action category. Of those 414 children, 199 did not require a plan for at least one of the following reasons: by the time the case was being reviewed, the case was closed; child was removed from category and into compliance; FACES.NET had not been updated to show compliance; child's goal had been changed into compliance; home was licensed; move did not occur; move was for respite purposes; move was to permanent placement; corrective action plan already in place; or youth not available due to incarceration or abscondence. CFSA reports reviews were conducted and plans were developed for the remaining 215 children.

5.     **Reviewing Child Fatalities**

The District of Columbia's City-wide Child Fatality Committee, a requirement of the *LaShawn* MFO and IEP, was created by Mayoral Order in October 1992 and in subsequent legislation.[147] It is charged with reviewing the circumstances surrounding the deaths of children who are residents or wards of the District of Columbia including those children or families who were known to the child welfare system at any point during the four years prior to their death. The Committee is required to be composed of representatives from the Department of Human Services, Department of Health, Office of the Chief Medical Examiner, CFSA, Metropolitan Police Department, Fire and Emergency Medical Services Department, DC Public Schools, Department of Housing and Community Development, Office of the Corporation Counsel, Superior Court of DC, Office of the US Attorney, DC hospitals where children are born or treated, college or university schools of social work, Mayor's Committee on Child Abuse and Neglect and eight community representatives. The Child Fatality Committee review examines past events and circumstances surrounding the child's death through a review of documentation of public and private agencies responsible for serving children and families in order to determine systemic, legal or policy and practice deficits and to make recommendations for improvement. The Committee is currently located and staffed within the Office of the Chief Medical Examiner.

CFSA also facilitates an Internal Child Fatality Committee which reviews the deaths of resident children who were known to the child welfare agency within four years prior to their death. The review assesses the quality of CFSA service delivery to the child and family, identifies patterns of risks and trends in cases involved with CFSA and determines any systemic issues that need further attention. The Committee is composed of a multidisciplinary team including representatives from Quality Assurance, Training, Health Services, Clinical Practice, Program Operations, General Counsel and other related parties. The Internal Committee reviews cases within 45 days of notification of the child's death.

Since the initial creation of the Fatality Review Committees, consistent with the MFO, the Monitor has served as a member of both the City-wide and Internal Child Fatality Review Committees.

---

[147] D.C. Code §4-1371

| | |
|---|---|
| **IEP Requirement** | 64. _Reviewing Child Fatalities_: The District of Columbia, through the City-wide Child Fatality Committee, and an Internal CFSA Committee, shall conform to the requirements of the MFO regarding the ongoing independent review of child fatalities of members of the plaintiff class, with procedures for (1) reviewing child deaths; (2) making recommendations concerning appropriate corrective action to avert future fatalities; (3) issuing an annual public report; and (4) considering and implementing recommendations as appropriate.<br><br>(IEP citation II.A.4.) |
| **Exit Standard** | Ongoing Compliance |

**_Performance for the period July 1 through December 31, 2013:_**

_Internal Child Fatality Committee:_

CFSA's Internal Child Fatality Committee met every month except December 2013 during this monitoring period and reviewed 12 applicable child deaths within 45 days of notification. Of the 12 cases reviewed, one involved an open in-home case, one involved an open investigation, five involved families who had at least one investigation but never an open case and five cases involved families who had a prior case with CFSA. CFSA reports that one recommendation was made during these reviews concerning appropriate corrective action to avert future fatalities. Specifically, in September 2013, the Committee recommended that CFSA continue to develop procedures and train staff on the use of preventive discussions with parents during safety assessments and development of safety plans when safety and risk concerns are observed. Preventive discussions may include asking parents who cares for their children when they are not home and exploring appropriate substitute caregivers. CFSA reports that implementation of safety plans are being reviewed and reinforced during multiple RED Team forums and by improving the clinical skills of workers and supervisors. Additionally, the Office of Policy, Planning and Program Support (OPPPS) is identifying the most appropriate method to address worker training on preventive discussions with parents.

CFSA issued the Internal Child Fatality Committee's Annual Report for 2012 in March 2013.[148] The report summarizes the findings from the 24 child deaths that occurred in 2012. Recommendations identified from these reviews and based upon observed trends include:

---

[148] The Internal Child Fatality Committee's Annual Report for 2012 can be found at:
http://cfsa.dc.gov/sites/default/files/dc/sites/cfsa/publication/attachments/Annual%20Child%20Fatality%20Report%20for%202020 12_Final.pdf

- Bed sharing and unsafe sleeping arrangements continue to be an issue that needs to be addressed comprehensively by CFSA and other agencies;
- Staff remain unclear regarding their responsibilities toward siblings, non-committed children and the children of CFSA wards and CFSA should reiterate its position on worker responsibilities toward these children to avoid further confusion.
- CFSA needs to identify more comprehensive interventions for youth suffering from obesity and obesity-related conditions.

CFSA anticipates issuing the Internal Child Fatality Committee's Annual Report for 2013 in mid-May 2014.

*City-wide Child Fatality Committee:*

Between July and December 2013, the City-wide Committee held intermittent meetings; monthly meetings were cancelled in September, October and November. The Annual Report for 2012 was released in March 2014 and included five recommendations for District agencies as well as the agency responses to these recommendations.[149] These recommendations were related to the following topics:

- CFSA should develop a protocol to address issues related to poor living conditions (e.g., mold, poor air quality) found in publicly funded housing that may present health risks to the home's residents. Additionally, CFSA should provide agencies with a review of the Mandated Reporter Law for child abuse and neglect to ensure that employees and their contractors are aware and adhere to this statute to ensure the safety of children residing in publically funded housing.
- Collaboration between the Office of the State Superintendent for Education and the District of Columbia Fire and Emergency Medical Services Department to disseminate information about fire safety and prevention to children and youth attending DC public charter schools.
- Identification and dissemination of information regarding community-based mental health providers that support children and youth struggling with gender identity as well as their parents and caretakers.
- Metropolitan Police Department should provide information regarding domestic violence and child abuse to parents involved in domestic disputes.
- The Department of Youth Rehabilitative Services should outline and comply with established aftercare protocols to ensure discharge plans for committed youth are developed, implemented and tracked prior to and after the youth's discharge from treatment and adult correction.

---

[149] The City-wide Child Fatality Committee Annual Reports are not currently available online. OCME staff are currently exploring this option.

The Office of the Chief Medical Examiner (OCME) is administratively responsible for the City-wide Committee and a new Chief Medical Examiner was appointed in March 2014. The Monitor has scheduled a meeting with him to discuss the Committee's functioning and needs including the comprehensiveness of reviews, vacancies in Committee membership, participation by Committee representatives, recommendations developed by the Committee and follow-up on these recommendations, potential back-log of child deaths to be reviewed and issuance of annual reports. Additionally, the 2014 *LaShawn* Strategy Plan includes a strategy to address these issues, specifically, "By March 31, 2014, CFSA will work with the Office of the Deputy Mayor to meet the newly appointed Chief Medical Examiner to review the status of the City-wide Child Fatality Committee (CFRC) and its requirements to identify actions/resources needed to bring the CFRC into compliance." This Exit Standard is partially met for the current monitoring period based on the functioning of CFSA's Internal Child Fatality Review Committee.

### 6.   Quality Assurance

*Quality Assurance*

Continuous quality assurance is essential to CFSA's practice improvement and system functioning. CFSA has a strong interest in continuous quality improvement (CQI) and has developed and implemented numerous processes for data collection and analysis. CFSA has focused on extending their CQI emphasis to include the private agencies with whom they work. CFSA has also been involved in an examination of all of its current quality assurance work to develop a more integrated plan which relies on both quantitative and qualitative data and provides relevant and timely feedback for management and practice improvement. The Monitor continues to work with CFSA as it takes actions to improve its overall CQI plan.

***Performance on Strategy Plan:***

> ➢ *By February 15, 2013, CFSA will engage the Child Welfare Policy and Practice Group to provide consultation on the current continuous quality improvement (CQI) plan (2013 Strategy Plan).*

In response to the ACF's August 2012 Information Memorandum on *Establishing and Maintaining Continuous Quality Improvement (CQI) Systems in State Child Welfare Agencies* and to begin to plan for how internal CFSA's CQI processes could replace external monitoring, CFSA engaged the Child Welfare Policy and Practice Group (CWG) to provide guidance and recommendations on their overall CQI plan including long-term planning and implementation to strengthen front-line practice.[150]

---

[150] Recommendations provided in The Child Welfare Practice and Policy Group report on *An Assessment of Continuous Quality Improvement Processes; The Child and Family Services Agency, Washington, DC.* March 13, 2014.

> *CFSA will also obtain technical assistance through the National Resource Center for Organizational Improvement to assure the CQI framework addresses the expected elements of the Administration for Children and Families' August 2012 information memorandum on Establishing and Maintaining Continuous Quality Improvement (CQI) Systems in State Child Welfare Agencies (2013 Strategy Plan).*

In January of 2014, ACF provided a preliminary assessment of CFSA's CQI system. The preliminary assessment addressed and provided feedback in five key areas of CQI[151]. In response to the feedback and recommendations provided by ACF, CFSA has engaged the ACF directly and has begun preliminary discussions with the National Resource Center for Organizational Improvement (NCROI) to obtain assistance with its CQI plan. The NCROI provides technical assistance to child welfare agencies around strategic planning, CQI and the federal Child and Family Services Review process.

*Data and Technology*

CFSA is increasingly using data for management purposes and to assess the quality of its practice. The Monitor and CFSA continue to meet on an ongoing basis to discuss ways to improve data collection methods and clarify and make more useful current data reports.

Currently CFSA is working to integrate the RED Team framework into FACES.NET so that information from meetings and next steps are readily available to social workers and supervisors. CFSA is also beginning work to update other templates in FACES.NET, including the case plan document, to incorporate the RED Team framework as well as information gathered from the CAFAS and trauma screens.

The Mayor's proposed FY2015 budget includes a significant investment of $2.3 million in technology development. CFSA has purchased mobile devices for investigative social workers and is planning to provide these devices for all CFSA social workers in order to increase the ability of worker's to input information into FACES.NET in real time. Mobile applications are being developed to increase efficiency of worker's in the field. In order to better meet the needs of families, CFSA has invested in data analytics and software enhancements based on predictive analytics. Through the software enhancements, it is hoped that social workers will be able to better match families and individuals with appropriate services based on identifiable family and individual characteristics. Additional technology investments include ensuring that various automated systems can communicate and improving the FACES.NET dashboard used by social workers to manage their cases.

---

[151] District of Columbia Child and Family Services Agency (CFSA) Continuous Quality Improvement (CQI) Summary provided by ACF January 2014.

7.    **Financing**

*Federal Revenue*

| IEP Requirement | 60. *Federal Revenue Maximization*: CFSA shall demonstrate compliance with Sections A and B of Chapter XVIII of the Modified Final Order concerning federal revenue maximization and financial development.<br><br>(IEP citation I.D.35.) |
|---|---|
| Exit Standard | Evidence of consistent and appropriate claiming of all appropriate and available federal revenue. |

Last monitoring period, CFSA completed significant initiatives to maximize its Title IV-E revenue. Work continues to appropriately file for and obtain Supplemental Security Income or Social Security Disability Income for eligible children.[152] The District of Columbia's federal Title IV-E Waiver plan was approved in September 2013 and will be implemented in 2014. Although revenue maximization work is a continuous activity, the Monitor previously determined that CFSA's multi-year efforts to maximize federal revenue were sufficient to meet the IEP requirement and that CFSA now has the infrastructure and direction to continue this work. This Exit Standard was redesignated an Outcome to be Maintained, and CFSA has sustained performance on this standard.

Table 12 presents the actual, approved or proposed Title IV-E federal resources used to support services to children and families involved with CFSA. For July through December 2013, CFSA reports its Title IV-E penetration rate of 59 percent for foster care cases and 82 percent for adoption cases.

---

[152] In 2012, CFSA received federal approval for a new rate methodology and for a Title IV-E State Plan Amendment on foster care eligibility which resulted in increased Title IV-E reimbursement. The Monitor was satisfied that appropriate efforts were made to maximize Title IV-E revenue and that as a result of these efforts, CFSA was able to retroactively claim federal Title IV-E revenue as well as allowable revenue going forward.

**Table 12: Actual and Budgeted Gross**
**Title IV-E Federal Funds Operating Budget**
**FY2009 – FY2015**

| Fiscal Year | Total Title IV-E Federal Resources (in millions) | Overall Budget (in millions) |
|---|---|---|
| FY2009 (actual) | $49.7 | $289.1 |
| FY2010 (actual) | $58.1 | $277.3 |
| FY2011(actual) | $52.4 | $249.4 |
| FY2012 (actual) | $55.5 | $238.5 |
| FY2013 (actual) | $56.8 | $227.3 |
| FY2014 (approved) | $51.1 | $237.6 |
| FY2015 (proposed) | $61.9 | $249.2 |

Source: CFSA FY2015 Proposed Budget and Financial Plan and District's Financial System (SOAR)

*Performance on Strategy Plan:*

For this monitoring period, CFSA reports the following strategies were employed to maximize federal revenue:

> ➢ *By July 1, 2013, CFSA and the Department of Health Care Finance (DHCF) will explore the feasibility of the Medicaid Rehabilitation Services option (2013 Strategy Plan).*

CFSA reports no longer pursuing targeted case management services and other specific Medicaid options.[153] Rather, CFSA began intensified work to claim Supplemental Security Income/Social Security Disability Income (SSI/SSDI) for eligible children to enhance federal revenue for the agency and resources for children in CFSA custody.[154]

---

[153] As previously reported, CFSA and DHCF submitted a revised State Plan Amendment (SPA) to the Centers for Medicare and Medicaid Services (CMS) to provide Medicaid funds for Nurse Care Management services but it was never approved. DHCF reportedly is unwilling to pursue additional Medicaid financing initiatives until the SPA is approved. CFSA decided to continue to fund the Nurse Care Management program with local funds.

[154] For calendar year 2013, CFSA reports that 305 children and youth were not Title-IV-E eligible, 264 children were screened for SSI, 189 children were screened in for SSI, 87 applications were made to SSA, 10 applications had been approved by SSA, 12 applications had been denied by SSA, 2 applications had been appealed, and 65 applications were pending.

> *On January 15, 2013, CFSA submitted an IV-E Waiver application to the Administration*
> *for Children and Families (ACF) (2013 Strategy Plan).*

On September 20, 2013, CFSA received final approval for the IV-E waiver from the Children's Bureau, ACF, which will allow for claiming approximately $33.2 million in IV-E waiver funds in FY2014 and $39.6 million in FY2015. As part of the waiver, CFSA will expand their in-home and community-based services to prevent foster care entry using evidence-based practices from two programs, Homebuilders and Project Connect, to effectively work with high risk families. CFSA presented these models to the Collaboratives and their providers in August 2013. In January 2014, CFSA modified the Collaboratives' contracts so they, in turn, can contract with providers to offer Homebuilders and Project Connect services.

The Homebuilders program will target families with children ages birth to 6 and mothers ages 17 to 25. Homebuilders provides intensive in-home crisis intervention and family treatment for children at imminent risk of out-of-home placement. Project Connect will target families affected by parental substance abuse whose children have been in out-of-home care for six to 12 months and who have the goal of reunification. Project Connect provides intensive, in-home services and has a team that includes a case manager, nurse, parent educator and supervisor. It is expected that Homebuilders and Project Connect will each provide services to 225 families over the next year beginning in June 2014 with the Far Southeast Collaborative. Full implementation of Homebuilders and Project Connect is expected for the other Collaboratives by October 2014.

Also during this monitoring period, CFSA submitted and received approval on its Cost Development Plan (October 2013), finalized a contract with independent evaluators of the Title IV-E Waiver (December 2013) and submitted a strategic plan for implementation of the waiver, known as the Initial Design and Implementation Report (December 2013).

*Budget*

CFSA's approved FY2014 budget is for $237,643,927 of which $170,893,000 (72%) is local funding.[155] CFSA reports that even after repurposing funds within CFSA there is a surplus in the FY2014 budget primarily due to fewer children in foster care, a reduction in costly and low performing congregate care contracts and an increase in management efficiencies. As the final surplus amount is determined, the Mayor may transfer the surplus funds to fund other District initiatives.

The Mayor's proposed FY2015 budget for CFSA is $249,213,191 of which $171,324,829 (69%) is local funding.[156] This represents an overall 4.9 percent increase from the FY2014 approved budget. Most of the increase in the current budget reflects the additional federal funds expected

---

[155] FY2015 Proposed Budget and Financial Plan, Child and Family Services Agency.
[156] FY2015 Proposed Budget and Financial Plan, Child and Family Services Agency.

through the Title IV-E Waiver, which will allow CFSA to use Title IV-E funds for intensive foster care prevention and reunification services. CFSA has also enhanced its Title IV-E claiming and negotiated with the Department of Health and Human Services to allow for reimbursement of case management services for youth placed in congregate care settings. As a result, the Mayor's proposed FY2015 budget includes a 19.8 percent net increase ($10.8 million) in federal revenue.

CFSA's proposed FY2015 FTEs will remain at 817 positions, with an assumed vacancy rate of 6.5 percent, representing no change in staffing authorization since FY2014. CFSA continues to report that given the decrease in foster care placements and the reduction in congregate care, they believe that the Mayor's proposed budget is sufficient to meet all staffing and service needs while also allowing for flexibility in service delivery. The FY2015 budget has been submitted to the Council for the District of Columbia for consideration and approval.

*Realignment of Resources and Organizational Structure*

The proposed FY2015 budget reflects the reorganization of the agency's Entry Services, In-Home and Permanency administrations – organizing staffing and funding for both administrations within Entry Services – Child Protective Services and Family Assessment. Overall, an additional fifteen staff were collectively added to these units compared to the Child Protective Services Administration in the FY2014 approved budget. The proposed FY2015 budget also reflects the restructuring of the In-Home and Permanency Administrations into what is now the Community Partnership Administration and the Permanency Administration. This reorganization allows CFSA to streamline administrative costs.

*Title IV-E Waiver*

Through the $6.5 million in additional federal funding provided through the IV-E Waiver, CFSA is anticipating expanding the service array available to families in the community. The largest investment is the implementation of two intensive evidence-based models to keep families together, as previously discussed (Homebuilders and Project Connect). Both intervention models will be sub-contracted and monitored through the Collaboratives with CFSA oversight.[157] CFSA is also funding an expansion of some primary prevention programs, including home visiting and parent support and education services to meet the needs of those families receiving services in the community.

Renewed attention and funding is being directed to the Collaboratives to enable them to function better as Neighborhood Hubs. As such, in conjunction with sub-contracting Project Connect and Homebuilders through the Collaboratives, CFSA also has indicated that they will invest IV-E waiver funds to co-located infant/maternal health specialists and mental health/substance abuse

---

[157] Staff from Project Connect and Homebuilders will provide training on the models, coaching and technical assistance to those providers selected through the RFP process to ensure proper implementation and fidelity to the models.

specialists from the DHS and DBH at the Collaboratives. CFSA has designated a small amount of additional funds for Gap Services that are designated for the Collaboratives to use to expand the capacity of community-based organizations to address the needs of the family and children in their respective communities. CFSA will reevaluate quarterly the use of the services, identify gaps in services and develop strategies to address these gaps.

*Education Investments in the Office of Well-Being*

The proposed FY2015 budget includes a strategic investment of $972,000 for education services housed within the Office of Well-Being. The education investments focus on improving access to quality early childhood education and daycare and academic outcomes for school aged children. CFSA partnered with the Office of the State Superintendent (OSSE) to create a more streamlined process for foster parents, teen parents in placements and parents with children living at home under protective supervision to access child care vouchers. Additionally, CFSA increased daycare subsidy rates by 39 percent. For school aged children, $427,000 have been designated to support educational outcomes, tutoring services and educational assessments for all children and youth who enter care in FY2015. In addition, CFSA engaged the American Bar Association's Center on Foster Care and Education to assist in the development of CFSA's educational achievement strategy, *Blueprint for Change: Educational Success for Children in Foster* Care, which includes eight goals and 56 corresponding benchmarks for direct case practice and system reform efforts. Overall, $6,023,000 of the proposed FY2015 budget has been designated to the Office of Well-Being.

*Substance Abuse Services*

The Mayor's proposed FY2015 budget for CFSA includes a $1.5 million allocation for substance abuse services, also housed within the Office of Well-Being. This funding will support an in-home treatment model of mobile assessments for youth and adults, two recovery specialists, expanded substance abuse services for youth placed in Maryland and the development of a youth peer-to-peer recovery support program. CFSA's goal in proposing this budget increase is to improve access to substance abuse assessment and facilitate quicker referrals and subsequent engagement in treatment. CFSA has also provided funding for in-home substance abuse treatment, evidence-based peer-to-peer recovery support and incentives for youth. Additionally the Office of Juvenile Justice and Delinquency Prevention awarded CFSA a one-year grant to support the expansion of the District's Family Treatment Court. This grant is under the oversight of the Office of Well-Being.

*Older Youth Investments*

The proposed FY2015 budget includes $4.4 million in strategic investments in services for older youth. Specifically, $895,000 has been designated for college prep and support for youth beginning in 11th grade[158], $954,000 has been designated for the career pathways program and $498,000 has been designated for transition services.

---

[158] College prep support for youth prior to 11th grade is budgeted through the Office of Well-Being.

# APPENDIX A
## *Glossary of Acronyms Used in Monitoring Report*

**ACEDS:** Automated Client Eligibility Determination System
**ACF:** Administration for Children and Families
**APPLA:** Another Planned Permanent Living Arrangement
**ASFA:** Adoption and Safe Families Act
**BSW:** Bachelor of Social Work
**CAFAS:** Child and Adolescent Functional Assessment Scale
**CNA:** Child Needs Assessment
**CFSA:** Children and Family Services Agency
**CMS:** Centers for Medicare and Medicaid Services
**CPS:** Child Protective Services
**CQI:** Continuous Quality Improvement
**CRC:** Children's Research Center
**CSSP:** Center for the Study of Social Policy
**CWG:** Child Welfare Policy and Practice Group
**CWTA:** Child Welfare Training Academy
**DBH:** Department of Behavioral Health
**DHCF:** Department of Health Care Finance
**DHS:** Department of Human Services
**DR:** Differential Response
**FA:** Family Assessment
**FAC:** Family Assessment Center
**FACES.NET:** CFSA's automated child welfare information system
**FTE:** Full Time Employment
**FTM:** Family Team Meeting
**FY:** Fiscal Year
**HMO:** Health Maintenance Organization

**ICPC:** Interstate Compact for the Placement of Children
**IEP:** Implementation and Exit Plan
**I&R:** Information and Referral
**LYFE:** Listening to Youth and Families as Experts
**MFO:** Modified Final Order
**MSW:** Master of Social Work
**NCROI:** National Resource Center for Organizational Improvement
**OAG:** Office of the Attorney General
**OCME:** Office of the Chief Medical Examiner
**OPPPS:** Office of Policy, Planning and Program Support
**OYE:** Office of Youth Empowerment
**PIP:** Program Improvement Plan
**POM:** Procedural Operational Model
**QA:** Quality Assurance
**QSR:** Quality Service Review
**RDS:** Resource Development Specialists
**RED:** Review, Evaluate and Direct
**SDM:** Structured Decision Making
**SPA:** State Plan Amendment
**SSDI:**   Social Security Disability Income
**SSI:** Supplemental Security Income
**STARS:** Student Tracking and Reporting System
**TPR:** Termination of Parental Rights
**TST:** Trauma Systems Therapy
**USDA:** United States Department of Agriculture
**YTP:** Youth Transition Plan

## **APPENDIX B**

### *2013 LaShawn Strategy Plan with Modifications*

*LaShawn A. v. Gray*

**Implementation and Exit Plan**
**Section IV:**
**2013 Strategy Plan**

**Introduction**

Pursuant to the Implementation and Exit Plan entered December 17, 2010 (Exit Plan), the Child and Family Services Agency (CFSA), after consultation with the Court Monitor and Counsel for Plaintiffs, submits the following 2013 Strategy Plan.  The strategies and action steps in the 2013 Plan relate to outcomes and exit standards in the Outcomes to be Achieved section (as modified) in the Exit Plan.  The 2013 Plan is a means to achieve compliance with the exit standards.  Absent a substantial or unjustifiable disparity, the Court will not find deviations to constitute noncompliance.  Moreover, the 2013 Plan, including applicable due dates, can be modified with timely consultation with the Court Monitor.  In the event that the District has not satisfied the exit standards remaining in the Exit Plan by December 31, 2013, the District, after consultation with the Monitor and Counsel for Plaintiffs, will review, modify as appropriate, and submit to the Court an updated Strategy Plan for 2014.

As described in the 2012 Plan, the 2013 Plan is presented in the context of CFSA's overall strategic framework, which is comprised of four pillars.

1

*LaShawn A. v. Gray*
Implementation and Exit Plan
Section IV:
2013 Strategy Plan

| Strategic Framework ("Four Pillars") | *LaShawn* Requirements | *LaShawn* Strategies |
|---|---|---|
| | | 1. CFSA will continue to use the investigation assignment daily forum, weekly supervision, 18-day reviews, and grand rounds to review investigative practice. |
| | | CFSA is enhancing the structured decision-making (SDM) process, with the assistance of the Children's Research Center, to be used throughout the investigation process. The SDM will improve the process of gathering information at the hotline, facilitate a process to discuss critical elements of the allegations, and allow for more consistent practice. The steps to implement the new process include: |
| | Initiating Investigations [Exit Standard 1(a)] | 2. By March 1, 2013, CFSA will implement the RED (review, evaluate and direct) team process which will replace the morning review panel. The RED team will review investigations that require a "four plus" staffing. |
| | | 3. By May 1, 2013, CFSA will begin to use a structured decision-making (SDM) screening and response priority assessment tool at the hotline to assist in triaging reports of abuse and neglect to the appropriate pathway and ensuring an appropriate response timeframe. |
| **Front Door** | Quality Investigations [Exit Standard 2] | 4. By March 1, 2013, CFSA will have a standard process to connect families for whom CFSA has identified a safety concern to immediate services during the course of the investigation. CFSA will launch a process of including the Collaboratives into the investigation process via the RED team process. Child Protective Services (CPS) will begin to refer families who need brief intervention services that have a low to moderate risk to the Collaboratives to start working with the family immediately. The Collaboratives will provide regular reports to the Agency during the course of the investigations on the services offered and provided. For families with a high or intensive risk level, CPS will refer the family to the in-home units for an open case and begin to work with the on-going worker to help meet the needs of the family. |
| | | CFSA will implement a continuous quality improvement (CQI) process to enhance the consistency in practice. In addition, this process will increase the overall sample size of investigations reviewed. |

Case 1:89-cv-01754-TFH    Document 1108-1    Filed 02/20/13    Page 3 of 6

**2013 Strategy Plan**

| Strategic Framework ("Four Pillars") | LaShawn Requirements | LaShawn Strategies |
|---|---|---|
| | | 5. By February 1, 2013, each supervisor will conduct a CQI review (using the same tool that measures acceptable investigations – Exit Standard 2) on two closed investigations per month for review by the program manager. Monthly, the program managers will review all of these investigations as a part of a secondary review and will present the results to the CPS administrator and deputy director for entry services. CPS management will track trends and provide feedback to workers. |
| | | 6. CFSA will add strategies related to acceptable investigations (Exit Standard 2), if necessary, based on the December 2012 case record review conducted jointly by the monitor and CFSA. |
| | Caseload standards for investigative workers [Exit Standard 25] | 7. CFSA is creating an "overflow" CPS unit to act as a pipeline to immediately fill vacancies and positions where staff are on extended leave. Staff to fill current vacancies will be hired by February 1, 2013. CFSA will continue to monitor the caseloads of investigative workers and will utilize this strategy of hiring workers, as needed, to address any increase of new investigations and maintaining an overflow unit. |
| | Visitation [Exit Standards 4(c), 5(d), 6, 10, and 11] | 8. CFSA developed a dashboard for workers and supervisors that provides monthly data on requirements, including visitation requirements. The dashboard was introduced to workers and supervisors in November 2012. Continuing in 2013, workers and supervisors will use the dashboard to track visitation. |
| | | 9. By August 1, 2013, CFSA will develop additional strategies, if necessary, to address any barriers to visitation that are identified through the use of the dashboard and during supervision. |
| | | 10. By March 1, 2013, CFSA will incorporate instructions on the process of assessing for safety during each visit and documenting the assessment in the revision of the POM. By April 1, 2013, all supervisors will be trained and will subsequently train the workers they supervise and will use a visitation/safety assessment tool to assess the appropriateness of the safety assessment. |
| Temporary Safe Haven | Reduction of Multiple Placements for Children in Care [Exit Standard 13, a & b] | 11. By February 15, 2013, CFSA will release a solicitation for a behavioral crisis stabilization support service for foster parents throughout the District of Columbia and for kinship foster parents. The contract with the services provider will be implemented by June 1, 2013. |

3

Case 1:89-cv-01754-TFH    Document 1108-1    Filed 02/20/13    Page 4 of 6

## 2013 Strategy Plan

| Strategic Framework ("Four Pillars") | LaShawn Requirements | LaShawn Strategies |
|---|---|---|
| | Assessment for children experiencing a placement disruption [Exit Standard 21]<br><br>Special Corrective Action – categories related to placement [Exit Standard 30(a)(i) & (v)] | As part of the placement service's redesign, CFSA will implement a utilization management process that reinforces the integrated teaming approach to identify, coordinate and link appropriate resources/services to meet the needs of children currently in, or at risk of, a restrictive level of care. The placement and matching tool will be used during key points in a case, such as: at removal (initial or replacement), disruptions, or when a child needs a higher level of care.<br>12. By February 1, 2013, the tool will be used for all new removals and for disruptions.<br>13. By March 1, 2013, all children in care will be assigned a resource development specialist and the process will be in place to conduct assessments for all children in out-of-home care. |
| | Services to families and children to promote safety, permanency and well-being [Exit Standard 3]<br><br>Case planning process [Exit Standard 17] | 14. By February 1, 2013, team meetings will be used to develop case plans that will be reviewed monthly to ensure that appropriate services that move children toward permanency or allow them to remain safely in their homes are identified.<br><br>CFSA selected the Trauma Systems Therapy (TST) model which will be implemented in 2013. This work includes the following activities:[1]<br>15. By July 1, 2013, CFSA will implement an evidence-based functional assessment that will inform case planning. |
| Well Being | Health and Dental Care [Exit Standard 22] | 16. CFSA has incorporated the health and dental Exit Standards into the private agencies' performance evaluations and scorecards. Performance issues are addressed through performance improvement plans submitted by private agencies and are monitored closely for achievement of goals and improved performance.<br>17. CFSA's Healthy Horizon's Clinic will hold health assessment marathons one Saturday per month. The marathons will allow caregivers and social workers to bring children for their assessment without an appointment.<br>18. By February 1, 2013, CFSA's placement administration will send and track the delivery of Medicaid cards to resource parents.<br>19. CFSA will explore options for expediting the Medicaid card distribution with the |

[1] The Administration of Children, Youth, and Families (ACYF) selected CFSA as a grant recipient to implement a trauma-focused system.  Implementation of the above strategies is subject to approval from the ACYF under the terms of the cooperative grant agreement.

Case 1:89-cv-01754-TFH   Document 1108-1   Filed 02/20/13   Page 5 of 6

**2013 Strategy Plan**

| Strategic Framework ("Four Pillars") | LaShawn Requirements | LaShawn Strategies |
|---|---|---|
| | | Department of Health Care Finance and by May 1, 2013, will make a decision on the most feasible way(s) to address Medicaid card distribution.<br>20. By February 1, 2013, CFSA will implement a "welcome call" to resource parents who have a new placement. Among other things, CFSA will ask if the resource parent has the Medicaid number (the caller will identify the placement packet) and will provide the number should the resource parent be unable to locate it in the placement packet. In addition, CFSA will inquire about appointments for health and dental evaluations, as needed. |
| | Appropriate Permanency Goals - Older Youth [Exit Standards 12(c)] | The Foster Club of America's Youth Transition Toolkit is a planning tool designed to assist youth and their adult supports take inventory of their strengths, identify their resources, and map out a plan for the challenges youth may face after foster care. The tool kit is designed as a youth initiated tool that they can use to track their own progress.<br>21. By February 1, 2013, CFSA will implement the Foster Care Club's youth transition planning process and will continue to use the youth benchmarks developed in 2012.<br>22. CFSA will continue to track key performance measures for older youth in the monthly scorecard instituted in November 2012. |
| Exit to Permanence | Timely adoption (Timely Permanence to include reunification, adoption and guardianship) [Exit Standard 16]<br><br>Special Corrective Action – categories related to permanency [Exit Standard 30(a)(ii) & (iv)] | In October 2012, CFSA integrated Out-of-Home and Adoptions staff into a team of case practice specialists to support the development and execution of permanency strategic plans in each private agency and CFSA administrations.<br>23. By April 1, 2013, CFSA will initiate monthly case reviews (30, 60, 90 days and monthly thereafter) and teaming meetings from the point of entry into foster care until permanency is achieved. The meetings will engage parties necessary to develop a concrete permanency plan, with specific action steps and timelines necessary to achieve an appropriate and expeditious permanency outcome for the child. The reviews will include development of a corrective action plan, as needed, for children in a special corrective action category related to permanency.<br>24. CFSA Permanency Leadership will complete meetings with each CFSA administration and private agencies by January 15, 2013. Each administration and private agency is required to submit a strategic plan to expedite permanency for the children in care for 24 months or more. The plans are due by February 1, 2013.<br>25. By April, 2013, CFSA will work with Casey Family Programs to revise the In and Out-of- |

Case 1:89-cv-01754-TFH    Document 1108-1    Filed 02/20/13    Page 6 of 6

## 2013 Strategy Plan

| Strategic Framework ("Four Pillars") | LaShawn Requirements | LaShawn Strategies |
|---|---|---|
| | | Home Practice Manual to include key permanency decision points and viable permanency strategies throughout the life of the case. CWTA will revise the new and on-going worker training to reflect the changes in the revised POM. The training for all staff will be delivered from May 1 through June 30, 2013. |
| | Timely Approval of Foster/Adoptive Parents [Exit Standard 14] | 26. By February 1, 2013, CFSA will implement a web-based application process for foster/adoptive parents to submit licensing documentation on-line to expedite the timely assessment of potential foster and adoptive parents. <br> 27. By February 1, 2013, CFSA's monitoring unit will add timely licensure of foster homes to the private agencies' monthly QA spreadsheet and have agencies report on their performance. In addition to reporting on their success with homes that are licensed, agencies will also be required to report on the potential foster parents still in process. <br> 28. By February 1, 2013, timely licensure will be added to private agency evaluations as a component of the existing Foster Parent Licensure indicator. Contracted private agencies not currently meeting the benchmark will receive a Performance Improvement Plan (PIP) request. The PIP will address timeliness moving forward to ensure that licensure of homes adheres to the 150 day licensing timeframe. |
| Organizational Capacity | Quality Assurance | 29. By February 15, 2013, CFSA will engage the Child Welfare Policy and Practice Group to provide consultation on the current continuous quality improvement (CQI) plan. <br> 30. CFSA will also obtain technical assistance through the National Resource Center for Organizational Improvement to assure the CQI framework addresses the expected elements of the Administration for Children and Families' August 2012 information memorandum on *Establishing and Maintaining Continuous Quality Improvement (CQI) Systems in State Child Welfare Agencies.* <br> 31. In September 2013, CFSA will conduct a grand QSR review to include CFSA and the private agencies. |
| | Federal Revenue Maximization [Exit Standard 35] | 32. By July 1, 2013, CFSA and DHCF will explore the feasibility of the Medicaid Rehabilitation Services option. <br> 33. On January 15, 2013, CFSA submitted an IV-E Waiver application to the Administration for Children and Families (ACF). |

**CFSA'S MODIFICATIONS TO THE 2013 STRATEGY PLAN
SUBMITTED TO CSSP ON APRIL 29, 2013**

| *LaShawn* Requirement | Original Strategy | Modified Strategy (changes in bold) | Reason for the Modification |
|---|---|---|---|
| Initiating Investigations [Exit Standard 1(a)]<br><br>Quality Investigations [Exit Standard 2] | 1. CFSA will continue to use the investigation assignment daily forum, weekly supervision, 18-day reviews, and grand rounds to review investigative practice. | 1. CFSA will continue to use the investigation assignment daily forum, weekly supervision, **R.E.D. Teams** ~~18-day reviews~~, and grand rounds to review investigative practice. | Over the last few months, the Child Protective Services Administration (CPS) has incorporated the R.E.D. Team process to review hotline calls. The R.E.D. Team process allows a multidisciplinary team to critically review incoming reports to evaluate the allegations and family history with the Agency and to direct CFSA's response.  The process has positive results and has been expanded to review the progress on investigations approximately ten to 15 days into an investigation (informally known as the ten-day R.E.D. Team).  This process has made the 18-day reviews superfluous so CPS will discontinue having 18-day reviews when the 10 day RED teams are fully implemented in late Spring. |
| | 3. By May 1, 2013, CFSA will begin to use a structured decision-making (SDM) screening and response priority assessment tool at the hotline to assist in triaging reports of abuse and neglect to the appropriate pathway and ensuring an appropriate response timeframe. | 3. By ~~May 1, 2013~~ **July 1, 2013**, CFSA will begin to use a structured decision-making (SDM) screening and response priority assessment tool at the hotline to assist in triaging reports of abuse and neglect to the appropriate pathway and ensuring an appropriate response timeframe. | CFSA and the CRC have been working on a draft tool for the last few months. On April 10, 2013, the CRC shared with CFSA the "final" draft.  Interrater reliability of the final draft of the tool will occur for weeks and modifications will be made to it.  Concurrently, FACES.NET is developing a work plan to place the tool in the system.  Assuming the testing goes well, we anticipate that the tool will be ready by July 1, 2013.  In the meantime, we will have engagement training for the hotline social workers on May 1st & May 2nd.  We will be providing real time coaching to hotline social workers by supervisors and CRC starting 6th. |
| Services to families and children to promote safety, permanency and wellbeing | 14. By February 1, 2013, team meetings will be used to develop case plans that will be reviewed monthly to ensure that appropriate services that move children toward permanency or allow | 14. By February 1, 2013, ~~team meetings will be used to develop case plans that will be reviewed monthly~~ **case plans will be reviewed monthly** to ensure that appropriate services that | The modification corrects a drafting error.  The original strategy states that case plans will be developed each month.  Case plans are developed every six months. The monthly meetings (known as 30-60-90 reviews) will not develop a case plan, rather |

CFSA's Modifications to the 2013 Strategy Plan
April 29, 2013

| *LaShawn* Requirement | Original Strategy | Modified Strategy (changes in bold) | Reason for the Modification |
|---|---|---|---|
| [Exit Standard 3]<br><br>Case planning process [Exit Standard 17] | them to remain safely in their homes are identified. | move children toward permanency or allow them to remain safely in their homes are identified **and implemented.** | they are an opportunity for everyone to review the progress of the case plan and address any current issues.<br><br>In addition, we should note that this strategy and strategy no. 23 refer to the same meeting/review, the monthly review of ongoing cases. |
| Appropriate Permanency Goals - Older Youth [Exit Standards 12(c)] | 21. By February 1, 2013, CFSA will implement the Foster Care Club's youth transition planning process and will continue to use the youth benchmarks developed in 2012. | 21. By **June 1, 2013,** ~~February 1, 2013~~, CFSA will implement the Foster Care Club's youth transition planning process and will continue to use the youth benchmarks developed in 2012. | This date was delayed for several reasons. First, CFSA had to enter into a formal contractual agreement with the Foster Club to move forward with the design of the DC Toolkit. This process has now been finalized.<br><br>Additional delays were due to development of additional components to be added to the original toolkit designed by the Foster Club. CFSA provided guidance on the development of a pregnant and parenting teen component within the toolkit, along with DC specific information and resources links that are now built into the toolkit for youth and their teams to readily access while utilizing the toolkit. These additions have been finalized and we have scheduled a train the trainer session with the Foster Club for mid-May. This will be onsite training at CFSA. |

**CFSA'S MODIFICATIONS TO THE 2013 STRATEGY PLAN**
**SUBMITTED TO CSSP ON JUNE 28, 2013**

| *LaShawn* Requirement | Current Strategy | Modified Strategy (changes in bold) | Reason for the Modification |
|---|---|---|---|
| Initiating Investigations [Exit Standard 1(a)]

Quality Investigations [Exit Standard 2] | 3. By July 1, 2013, CFSA will begin to use a structured decision-making (SDM) screening and response priority assessment tool at the hotline to assist in triaging reports of abuse and neglect to the appropriate pathway and ensuring an appropriate response timeframe. | By ~~July 1, 2013~~, **August 1, 2013**, CFSA will begin to use a structured decision-making (SDM) screening and response priority assessment tool at the hotline to assist in triaging reports of abuse and neglect to the appropriate pathway and ensuring an appropriate response timeframe. | CFSA has been working with the CRC to complete the SDM Hotline tool. The paper form of the tool will be finalized in mid- July and training of Hotline staff will follow. The tool will be used in paper form while the CISA team works on design and first phase of integration of the tool into the FACES system. This work will be in conjunction with the overall RED Team portal design in FACES.NET which will ensure that important facets of the CPS entry process are captured. |
| Services to families and children to promote safety, permanency and wellbeing [Exit Standard 3]

Case planning process [Exit Standard 17] | CFSA selected the Trauma System Therapy (TST) model which will be implemented in 2013. This work includes the following activities.[1]

15. By July 1, 2013, CFSA will implement an evidence-based functional assessment that will inform case planning. | 15. CFSA selected the Trauma Systems Therapy (TST) model which will be implemented in 2013. This work **is associated with** ~~includes~~ the following activities. [2]

15. By **August 1, 2013**~~July 1, 2013, CFSA will implement an evidence- based functional assessment that will inform case planning.~~ **CFSA will submit its request for approval Children's Bureau, to implement the Child and Adolescent Functional Assessment Scale (CAFAS). Upon receiving approval, CFSA will implement the CAFAS through a planned roll-out, beginning in fiscal year 2014.** | As previously explained, CFSA is implementing the TST model  as part of  a five year grant from the Administration of Children, Youth and Families (ACYF).  All strategies for implementation require approval from the Children's Bureau.  Under the requirements of the cooperative agreement for grant funding, implementation of the evidence-based functional assessment requires approval by the federal grant project officer (FPO) as part of the grant's Phase II activities. The modification accounts for the FPO review and approval process.  To date, CFSA has researched a number of evidence-based functional assessment tools and identified the CAFAS as the preferred tool to support the intended outcomes of the grant related to case planning and progress monitoring.  Pending the FPO approval of CAFAS, CFSA will implement a phased roll-out for the CAFAS beginning in FY 14. |
| Quality | 31. In September 2013, CFSA | 31. ~~In September 2013~~ **In** | As discussed, the grand QSR review is |

---

[1] The Administration of Children, Youth and Families (ACYF) selected CFSA as a grant recipient to implement a trauma-focused system. Implementation of the above strategies is subject to approval from the ACYF under the terms of the cooperative grant agreement.
[2] The Administration of Children, Youth and Families (ACYF) selected CFSA as a grant recipient to implement a trauma-focused system. Implementation of the above strategies is subject to approval from the ACYF under the terms of the cooperative grant agreement.

CFSA's Modifications to the 2013 Strategy Plan
June 28, 2013

| *LaShawn* Requirement | Current Strategy | Modified Strategy (changes in bold) | Reason for the Modification |
|---|---|---|---|
| Assurance process | will conduct a grand QSR review to include CFSA and the private agencies. | **the fall of 2013**, CFSA will conduct a grand QSR review to include CFSA and the private agencies. | scheduled to occur over a 2-week period (beginning on/around September 23, 2013) and the review findings will be presented at the Agency's management team meeting on November 4, 2013. The date was selected in collaboration with CSSP to account for the schedules of CFSA and CSSP reviewers. |

**CFSA'S MODIFICATIONS TO THE 2013 STRATEGY PLAN**
**SUBMITTED TO CSSP ON OCTOBER 3, 2013**

| LaShawn Requirement | Current Strategy | Modified Strategy (changes in bold) | Reason for the Modification |
|---|---|---|---|
| Quality Investigations [Exit Standard 2] | 5. By February 1, 2013, each supervisor will conduct a CQI review (using the same tool that measures acceptable investigations—Exit Standard 2) on two closed investigations per month for review by the program manager. Monthly, the program managers will review all of these investigations as a part of a secondary review and will present the results to the CPS administrator and deputy director for entry services. CPS Management will track trends and provide feedback to workers. | 5. By February 1, 2013, each supervisor will conduct a CQI review (using the same tool that measures acceptable investigations—Exit Standard 2) on two closed investigations per month for review by the program manager. Monthly, the program managers will review ~~all~~ **three** of these investigations as a part of a secondary review and will present the results to the CPS administrator and deputy director for entry services. CPS Management will track trends and provide feedback to workers. | This is a technical change to reflect the actual review of the closed CPS investigations conducted by the program managers. |
| Reduction of Multiple Placements for Children in Care [Exit Standard 13, a & b] | 11. By February 15, 2013, CFSA will release a solicitation for a behavioral crisis stabilization support service for foster parents throughout the District of Columbia and for kinship foster parents. The contract with the service provider will be implemented by June 1, 2013. | 11. By February 15, 2013, CFSA will release a solicitation for a behavioral crisis stabilization support service for foster parents throughout the District of Columbia and for kinship foster parents. The contract with the service provider will be implemented by ~~June 1, 2013.~~ **November 1, 2013.** | The solicitation for the behavioral crisis stabilization support services was completed. The provider was chosen. CFSA engaged the provider in the final negotiations regarding the method of service delivery to include centralizing the service delivery. Full implementation of the contract along with services will be completed by November 1, 2013. |
| Services to families and children to promote safety, permanency and wellbeing [Exit Standard 3] | 15. CFSA selected the Trauma Systems Therapy (TST) model which will be implemented in 2013. This work is associated with the following activities. [1]<br><br>15. By August 1, 2013, CFSA will submit its request for | 15. CFSA selected the Trauma Systems Therapy (TST) model which will be implemented in 2013. This work is associated with the following activities. [2]<br><br>15. By August 1, 2013, CFSA will submit its request for | On August 1, 2013, CFSA submitted to the Children's Bureau for approval the request to utilize the CAFAS as a functional assessment to inform coordinated case planning, service array provision and progress monitoring. CFSA is awaiting approval from the Children's Bureau to implement the Child and Adolescent |

---

[1] The Administration of Children, Youth and Families (ACYF) selected CFSA as a grant recipient to implement a trauma-focused system. Implementation of the above strategies is subject to approval from the ACYF under the terms of the cooperative grant agreement.

[2] The Administration of Children, Youth and Families (ACYF) selected CFSA as a grant recipient to implement a trauma-focused system. Implementation of the above strategies is subject to approval from the ACYF under the terms of the cooperative grant agreement.

CFSA's Modifications to the 2013 Strategy Plan
October 3, 2013

| *LaShawn* Requirement | Current Strategy | Modified Strategy (changes in bold) | Reason for the Modification |
|---|---|---|---|
| Case planning process [Exit Standard 17] | approval Children's Bureau, to implement the Child and Adolescent Functional Assessment Scale (CAFAS). Upon receiving approval, CFSA will implement the CAFAS through a planned roll-out, beginning in fiscal year 2014. | approval Children's Bureau, to implement the Child and Adolescent Functional Assessment Scale (CAFAS). Upon receiving approval, CFSA will implement the CAFAS through a planned roll-out, beginning ~~in fiscal year~~ **February** 2014. | Functional Assessment Scale (CAFAS). |

# APPENDIX C
## *2014 LaShawn Strategy Plan*

*LaShawn A. v. Gray*

**Implementation and Exit Plan
Section IV:
2014 Strategy Plan**

**Introduction**

  Pursuant to the Implementation and Exit Plan entered December 17, 2010 (Exit Plan), the

Child and Family Services Agency (CFSA), after consultation with the Court Monitor and

Counsel for Plaintiffs, submits the following 2014 Strategy Plan. The strategies and action steps

in the 2014 Plan relate to outcomes and exit standards in the Outcomes to be Achieved section

(as modified) in the Exit Plan. The 2014 Plan is a means to achieve compliance with the exit

standards. Absent a substantial or unjustifiable disparity, the Court will not find deviations to

constitute noncompliance. Moreover, the 2014 Plan, including applicable due dates, can be

modified with timely consultation with the Court Monitor. In the event that the District has not

satisfied the exit standards remaining in the Exit Plan by December 31, 2014, the District, after

consultation with the Monitor and Counsel for Plaintiffs, will review, modify as appropriate, and

submit to the Court an updated Strategy Plan for 2015.

  As described in the 2012 and 2013 Plans, the 2014 Plan is presented in the context of

CFSA's overall strategic framework, which is comprised of four pillars.

*LaShawn A. v. Gray*
Implementation and Exit Plan
Section IV:
2014 Strategy Plan

| Strategic Framework ("Four Pillars") | *LaShawn* Requirements | *LaShawn* Strategies |
|---|---|---|
| **Front Door** | Initiation of Investigations [Exit Standard 1(a)] | CFSA is focused on improving performance in timely initiation of investigations; collecting sufficient information from core and collateral contacts; conducting adequate risk assessments; and monitoring initiation of services to prevent unnecessary removals. Throughout 2014, CFSA will adopt and incorporate the following: |
| | Timely Closure of Investigations [Exit Standard 1 (b)] | 1. To ensure investigations are initiated timely (inclusive of good faith efforts), effective December 2013, CFSA increased the frequency of the Hotline RED teams using the group decision-making process framework. Previously, CFSA held two Hotline RED teams per weekday. Beginning December 2013, the teams were increased to three per weekday to manage the volume of the referrals, assign the referrals to the appropriate pathway, track assignment and response time, and ensure that multidisciplinary membership is a part of the decision-making process. |
| | Acceptable Investigations [Exit Standard 2] | 2. CFSA will continue the 10-Day RED Teams, which will address barriers to timely and effective completion of investigations. In addition, the Big RED Team reviews will be scheduled with supervisors to address investigations open for 35 days or more. The next steps developed in the RED Teams will be documented and shared with social workers and supervisors for follow up. The next steps will be reviewed during supervision. |
| | | 3. To effectively complete investigations, CPS management will continue to equalize the caseloads, remove investigative workers out of rotation as appropriate, and quickly fill social worker vacancies as needed. |
| | | 4. As a continuing quality improvement practice, the process for completing, reviewing, and reporting on acceptable investigations will continue in 2014 with the assistance of the Office of Agency Performance. The revised process, which began in February 2014, includes peer reviews within CPS management, an increased sample size and frequency of the reviews and reporting out. Each supervisor will conduct a review on two closed investigations per month for review by the program manager. The results will be shared monthly and will include detailed information to allow for targeted training and coaching |

2

| Strategic Framework ("Four Pillars") | LaShawn Requirements | LaShawn Strategies |
|---|---|---|
| | | by supervisor. |
| | | The Functional Family Assessment tool is designed to identify the appropriate needs and services for parents and caregivers. |
| | | 5. By April 1, 2014, CFSA will test the Functional Family Assessment tool for in-home and out-of-home cases. Full implementation of the tool is expected by May 1, 2014. |
| | | During the grand review in November 2013, the Office of Policy, Planning and Program Support presented the QSR findings to CFSA management. The findings highlighted strengths and areas of improvement. |
| | Services to families and children to promote safety, permanency and well-being [Exit Standard 3] | 6. Based on the QSR findings, Agency Performance is conducting an analysis on case plans and services. The analysis will include a review of ten percent of the in-home and foster care cases. The findings will be completed and shared with management in March 2014 and will be used to modify practice, policy, and trainings, as needed. |
| Well Being | Case planning process [Exit Standard 17] | 7. CFSA will continue to provide immediate feedback on the QSR findings and practice examples about the case to the supervisor and social worker and discuss next steps. The QSR team will follow up with the supervisor and social worker within 30 days. A permanency big RED team will be scheduled 60 days following the QSR to review the findings and follow up. The case practice specialist will track the steps identified through the QSR and permanency Big RED and will report to the permanency Big RED team if the steps are not occurring. |
| | | The Child and Adolescent Functioning Assessment Scale (CAFAS) is a tool used for assessing a youth's day-to-day functioning across critical life subscales and for determining whether a youth's functioning improves over time. CFSA has requested approval from the Children's Bureau (submitted October 31, 2013) to use this tool as part of its work under the federal grant on trauma-informed practice. |
| | | 8. Within six months of receiving approval from the Children's Bureau, CFSA will integrate |

3

| Strategic Framework ("Four Pillars") | LaShawn Requirements | LaShawn Strategies |
|---|---|---|
| | | the CAFAS into FACES.NET. Thereafter, staff will be trained and begin using the tool. |
| | | The Department of Behavioral Health maintains a network of Choice Providers within the District for the timely and coordinated access to all clinically necessary behavioral health services and supports. |
| | | 9. Beginning February 1, 2014, the Choice Providers will participate in the case transfer RED team at the point of removal and the initial family team meeting (FTM) to enhance family engagement and improve the identification of and timely referral to services needed for children and families. |
| | Health and Dental Care (distribution of Medicaid cards) [Exit Standard 22(d)] | 10. CFSA, in conjunction with the Office of the Deputy Mayor, will continue to work with the Department of Health Care Finance to streamline the process for sending Medicaid cards to foster parents. By June 30, 2014, the group will provide CSSP with a written business process for distributing Medicaid cards to foster parents with an explanation of how the process has been streamlined. |
| **Temporary Safe Haven** | Visitation [Exit Standards 4(c), 5(d), 6, 10, and 11] | The goal of Icebreaker meetings is to build a relationship between the birth and foster parents to support a child who has just entered out-of-home care. While other meetings may focus on making decisions, Icebreaker meetings focus on initiating a relationship between a child's parents and the person serving as his or her out-of-home caregiver.<br><br>11. By March 1, 2014, CFSA will implement Icebreaker meetings following the initial FTM. The Icebreaker meetings will include the attendance of birth parents and foster parents to begin building a relationship. This engagement strategy will assist parents in connecting quicker with the foster parents and begin to develop a line of communication to better support the children. The process will also allow social workers to schedule and coordinate visits with parents and children from the beginning of the case.<br><br>12. CFSA has revised its placement policy effective March 1, 2014, which identifies that temporary situations such as respite and planned extended visits with relatives and/or parents are not counted as placement moves. By March 1, 2014, CFSA will operationalize |

4

| Strategic Framework ("Four Pillars") | LaShawn Requirements | LaShawn Strategies |
|---|---|---|
| | | the policy into FACES.NET. This system update will have a direct impact on the performance on weekly visits during a child's first four weeks of a new placement because these temporary situations will no longer be incorrectly identified as placement changes that require weekly visits. |
| | | 13. Effective September 2013, CFSA constructed and fully implemented a case transfer process that occurs no later than the initial Family Team Meeting (FTM) following the removal of a child from the home. This parental engagement process requires the assigned on-going social worker (CFSA and private agency) to attend a Removal RED team meeting (prior to the initial FTM), the initial FTM, and the initial court hearing. This requirement is designed to allow the social worker to complete the initial worker/parent visits and engage the parent(s) in scheduling the visitation with the child(ren) and ongoing visits with the worker. |
| | Reduction of Multiple Placements for Children in Care [Exit Standards 13(a) and 13(b)] | 14. Beginning February 2014, CFSA will conduct a monthly data analysis for the required parent-child and parent-worker visits to determine barriers to meeting the standards. Findings from the analysis will be shared with CFSA and private agencies monthly. |
| | | 15. CFSA will continue to utilize a behavioral crisis stabilization support service for foster parents and kinship foster parents. CFSA will continue to utilize a management process that reinforces the integrated teaming approach to identify, coordinate, and link appropriate supports/services to meet the needs of children currently in, or at risk of, a restrictive level of care. |
| Exit to Permanence | Timely adoption (Timely Permanence to include reunification, adoption and guardianship) [Exit Standard 16] | CFSA is modifying the approach to concurrent planning by incorporating the resources and framework provided by the National Resource Center on Permanency and Family Connections (NRCPFC). |
| | | 16. Throughout 2014 CFSA will work with the National Resource Center (NRCPRC) and the CRC to develop alerts for concurrent planning discussions during the RED team meetings. |
| | Appropriate Permanency | 17. Throughout 2014 the NRCPRC and National Center on Data and Technology will work with |

5

| Strategic Framework ("Four Pillars") | LaShawn Requirements | LaShawn Strategies |
|---|---|---|
| | Goals (Youth Transition Plans) [Exit Standard 12(c)] | 18. CFSA to further analyze and examine reunification prognosis indicators and re-entry data based on the concurrent planning framework. |
| | | 19. By August 1, 2014, CFSA, working with the National Resource Center for Adoptions, will develop a scope of work for redesigning guardianship practices with a goal of promoting more timely permanency. |
| | | 20. Throughout 2014, CFSA will continue to utilize the RED teams at various phases of the permanency process and will use RED teams to facilitate decisions and timely action about case transfer, placement matching, guardianship, and adoption. |
| | | 21. Beginning February 2014, CFSA will monitor and validate the creation and implementation of youth transition plans using the Foster Care Club toolkit. Each month CFSA will review a 20 percent sample of YTPs completed during the performance period to determine if the youth was involved in the plan development. CFSA will also review the YTPs for all youth who age out during each month to ensure that the plans include the appropriate connections. |
| | Timely Approval of Foster/ Adoptive Parents [Exit Standard 14] | 21. By September 30, 2014, four CFSA staff members will receive Approved Trainer (Master Trainer) status. CFSA currently utilizes the PS MAPP foster parent training curriculum. The Approve Trainers will have the flexibility to offer the PS MAPP training to foster parents more frequently and with flexibility of location, to include foster parents' homes. |
| Organizational Capacity | | 22. CFSA will continue to utilize the services of the KVC consultant to implement solutions to timely licensing of foster homes, including challenges around kin, worker delays, data entry issues, family delays with scheduling, and rescheduling fire inspections. |
| Organizational Capacity | Continuous Quality Improvement (CQI) | In accordance with the guidance received from the Administration of Children and Families, CFSA will continue to measure the quality of services and outcomes for children and families through the following Continuous Quality Improvement (CQI ) processes: |

| Strategic Framework ("Four Pillars") | LaShawn Requirements | | LaShawn Strategies |
|---|---|---|---|
| | | 23. | Throughout 2014, CFSA will continue the weekly "Big RED" process to address the barriers to timely case closure. Participants include program administrators, managers and supervisors. The RED team framework includes concrete next steps to case closures. |
| | | 24. | Throughout 2014, CFSA Program Operations will continue to implement a quality assurance process to include a review of supervisors' work in permanency on a regular basis ("BIG RED," a coaching and mentoring model for supervisors) based on the length of time a child is in foster care. |
| | | 25. | Beginning February 20, 2014, and continuing on a quarterly basis, the Deputy Directors for Community Partnerships and Program Operations will institute and formalize a quality assurance process for assessing safety during visits for in-home and out-of-home cases. CFSA supervisors and contract monitoring staff will conduct 20 case reviews to determine whether safety was assessed and documented during visits. Findings from these reviews will be shared with workers, supervisors and management and will be used to inform ongoing worker training and coaching. |
| | City-Wide Child Child Fatality Review Committee [Exit Standard II(4)] | 26. | By March 31, 2014, CFSA will work with the Office of the Deputy Mayor to meet with the newly appointed Chief Medical Examiner to review the status of the City-wide Child Fatality Committee (CFRC) and its requirements and to identify actions/resources needed to bring the CFRC into compliance. |

7