# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

JAMES D. JOHNSON, AS NEXT FRIEND TO
OLIVIA Y., ET AL.                                                      PLAINTIFFS


VS.                                                          CIVIL ACTION NO.
                                                             3:04-CV-251-TSL-FKB


PHIL BRYANT, AS GOVERNOR OF THE
STATE OF MISSISSIPPI, ET AL.                                          DEFENDANTS

---

### DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR RESPONSE IN OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR CONTEMPT AND FOR THE APPOINTMENT OF A RECEIVER

---

Dewitt L. ("Rusty") Fortenberry, Jr.
(MSB #5435)
Kenya Key Rachal (MSB # 99227)
Ashley Christin Tullos (MSB # 101839)
BAKER, DONELSON, BEARMAN,
CALDWELL  & BERKOWITZ, PC
4268 I-55 North
Meadowbrook Office Park
P.O. Box 14167
Jackson, Mississippi 39211
Telephone: (601) 351-2400
Facsimile: (601) 351-2424


Harold Pizzetta, III, Esq.
Assistant Attorney General
General Civil Division
Carroll Gartin Justice Building
430 High Street
Jackson, MS 39201
Telephone: (601) 359-3816
Facsimile: (601) 359-2003

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

I.  PRELIMINARY STATEMENT ..................................................................... 1

II.  STANDARD FOR CONTEMPT ..................................................................... 3

III.  INABILITY TO COMPLY WITH COURT'S ORDER IS A DEFENSE TO
      CONTEMPT ..................................................................................................... 4

IV.  IF THERE IS A FINDING OF CONTEMPT, THE LEAST RESTRICTIVE
     SANCTION MUST BE IMPOSED ................................................................ 6

V.  THE APPOINTMENT OF A GENERAL RECEIVER WITH FULL AUTHORITY
    TO ADMINISTER MISSISSIPPI'S CHILD WELFARE SYSTEM IS NEITHER
    WARRANTED NOR PROPER ....................................................................... 7
    A.  The Two Cases Cited by Plaintiffs are Distinguishable ......................... 8
        1.  *LaShawn A. v. Kelley* ................................................................... 8
        2.  *Shaw v. Allen* ............................................................................... 11
        3.  Contrasting *LaShawn A* with *David C*. is instructive ................ 11
    B.  Plaintiffs' Reliance on Dr. Miller's Opinion that a Receiver Should be
        Appointed is Misplaced .......................................................................... 13

VI.  A FINDING OF CONTEMPT IS INAPPROPRIATE BECAUSE DEFENDANTS
     HAVE MADE, IN GOOD FAITH, ALL REASONABLE EFFORTS TO COMPLY
     WITH THE MSA ............................................................................................ 15
     A.  Defendants Established a Statewide Implementation Team and Statewide
         Implementation Sub-Teams ................................................................... 15
     B.  The June 24, 2013 Data Order and Contemplated Data Project Was a Success and
         Reliable Data Are Being Produced by Defendants;  However, the Caseload Data
         Report Proved to be Extremely Complex and Production Was Delayed .................. 16
     C.  Defendants Have Made Substantial Gains in Hiring Caseworker Staff And Are
         Working to Build an Educated Workforce ............................................. 22
     D.  Defendants Have Improved Their Training Capacity ............................. 24
     E.  Defendants Have Worked to Improve Timeliness And The Review Process for
         Maltreatment In Care Investigations ..................................................... 25
     F.  Defendants Worked to Improve Their Child Placement Practices and Complied
         With or Exceeded Many Child Placement MSA Regulations ................ 27
     G.  Defendants Have Implemented a Viable CQI System ............................ 28
     H.  Defendants Have Worked to Build Their Capacity and Implement Initiatives to
         Maximize Federal Funding ..................................................................... 33
     I.  The "Danger Signs" Identified by Plaintiffs and Dr. Miller are Misleading ................ 34

VII.  CONCLUSION ................................................................................................ 36

     INDEX OF EXHIBITS ................................................................................... 40

i

# TABLE OF AUTHORITIES

**CASES**

*Anderson v. Dunn,* 19 U.S. 204, 231 (1821) ..........................................................................................6

*Aspira of New York, Inc. v. Board of Ed. of City of New York*, 423 F. Supp. 647, 654 (D.C.N.Y. 1976) ......................5

*Bracco v. Lackner*, 462 F.Supp. 436, 456 (N.D. Cal. 1978) ....................................................................7

*Chairs v. Burgess*, 143 F.3d 1432, 1436 (11th Cir. 1998) ....................................................................4

*Chambers v. NASCO, Inc.,* 501 U.S. 32, 43-44 (1991)............................................................................3

*Citronelle-Mobile Gathering, Inc.* v. *Watkins,* 943 F.2d 1297, 1301 (11th Cir. 1991) .................................4

*David C. v. Leavitt*, No. 93-C-206, slip op. at 25 (D. Utah March 17, 1997). ..........................................3

*Flaksa v. Little River Marine Constr. Co.,* 389 F.2d 885, 887 (5th Cir.), *cert. denied,* 392 U.S. 928, 88 S.Ct. 2287, 20 L.Ed.2d 1387 (1968) ..................................................................................................................3

*Gebetsberger v. East*, 627 So. 2d 823, 826 (Miss. 1993) ....................................................................4

*Glover v. Johnson*, 934 F.2d 703, 714 (6th Cir. 1991) ......................................................................7

*LaShawn A. v. Kelly,* 887 F. Supp. 297 (D.D.C. 1995) .......................................................................8

*Maggio v. Zeitz*, 333 U.S. 56, 74-76 (1948)......................................................................................5

*Morgan v. McDonough*, 540 F.2d 527, 533 (1st Cir. 1976)......................................................................7

*National Resources Defense Council, Inc. v. Train*, 510 F.2d 692, 713 (C.A.D.C. 1975) ............................5

*Newman v. Graddick*, 740 F.2d 1513, 1525 (11th Cir. 1984) ..................................................................5

*Perez v. Bos. Hous. Auth.*, 400 N.E. 2d 1231, 1247 (Mass. 1980) ..........................................................8

*Petitpren v. Taylor Sch. Dist.*, 304 N.W.2d 553, 557 (Mich. App. 1981) ................................................7

*Reed v. Iowa Marine & Repair Co.*, 16 F.3d 82, 84 (5th Cir. 1994) ........................................................4

*Riccard v. Prudential Ins. Co., Inc.*, 307 F.3d 1277, 1296 (11th Cir. 2002). ..........................................4

*Shaw v. Allen*, 771 F. Supp. 760, 762 (S.D. W. Va. 1990) ....................................................................7

*Shaw v. Allen.*, 771 F. Supp. 760 (S.D. W. Va. 1990) ........................................................................8

*Spallone v. United States,* 493 U.S. 265, 280 (1990)..........................................................................6

*United States v. Detroit*, 476 F. Supp. 512, 520 (E.D. Mich. 1979) ......................................................8

*United States v. Hayes*, 722 F.2d 723, 725 (11th Cir. 1984) ................................................................4

*United States v. Prestonwood Properties, Inc.*, No. 3-99-CV-0495-R,  2001 WL 1076125, *2 (N.D. Tex. Sept 10, 2001) ..................................................................................................................................4

*United States v. Rizzo*, 539 F.2d 458, 466 (5th Cir. 1976) ..................................................................4

*United States v. Ryan*, 402 U.S. 530, 534 (1971), ............................................................................5

*United States v. Rylander,* 460 U.S. 752, 755 (1983). ........................................................................4

*United States v. United Mine Workers*, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947),............................6

ii

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

JAMES D. JOHNSON, as next friend to                          **PLAINTIFFS**
Olivia Y., et al.

**vs.**                                                      CIVIL ACTION NO.
                                                             **3:04-CV-251-TSL-FKB**

PHIL BRYANT, as Governor of the                             **DEFENDANTS**
State of Mississippi, et al.

---

### DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR RESPONSE IN OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR CONTEMPT AND FOR THE APPOINTMENT OF A RECEIVER

---

Defendants submit this Memorandum in support of their Response in Opposition to Plaintiffs' Renewed Motion for Contempt and for the Appointment of a Receiver ("Motion for Contempt").[1]

## I. PRELIMINARY STATEMENT

Defendants do not deny that they did not comply with all of the 150 plus components of the Modified Mississippi Settlement Agreement and Reform Plan ("MSA") and Period 3 Implementation Plan that were evaluated by the Court Monitor ("Monitor") in her Implementation Period 3 Final Report issued in May 2014.[2] However, Defendants made demonstrable progress during Implementation Period 3 ("Period 3") and the cornerstones of a successful child welfare system have been put in place.

---

[1] As set forth in the Amended Scheduling Order, the Defendants may amend this Memorandum prior to July 15, 2015, to address findings made in the Monitor's Report regarding Implementation Period 4, which is scheduled to be issued on or about June 15, 2015. [Dkt. 646].

[2] The Period 3 Final Report [Dkt. 604] was issued on May 8, 2014, and covered Period 3 which spanned from July 6, 2012, to July 6, 2013, as well as Defendants' compliance with the June 24, 2013 Data Order. [Dkt. 589].

During Period 3, it was necessary that Defendants hire a new Mississippi Department of Human Services ("MDHS") Deputy Administrator for the Division of Family and Children's Services ("DFCS")[3] in addition to continuing to hire caseworkers, expending a tremendous amount of resources establishing the technological infrastructure and an internal process for creating reliable data reports, proceeding with the process of developing a new case management system, implementing and bolstering their Continuous Quality Improvement ("CQI") system, beginning efforts to establish performance-based contracting, and continuing the roll out of the family-centered Practice Model.  Undeniably, these efforts at times encountered stumbling blocks and unexpected challenges, but Defendants did not act in a contemptuous manner, worked in good faith to implement these initiatives, and made all reasonable efforts to meet the other requirements contained in the MSA and the Period 3 Plan.

In their Motion for Contempt, Plaintiffs highlight Defendants' alleged failures and then contrast Defendants' efforts and activities during Period 3 with the activities and initiatives Dr. Viola Miller[4] administered during her tenure as director of children's services in Kentucky and later Tennessee.  Dr. Miller admits in her Declaration that she reviewed only the MSA, the June 24, 2013 Data Order [Dkt. 604], and the Monitor's Final Period 3 Report, and that she has no independent knowledge of what has taken place in Mississippi other than her reading of those

---

[3]    On June 30, 2012, approximately one week prior to this Court's approval of the MSA and Period 3 Implementation Plan [Dkt. 571], Lori Woodruff, the Deputy Administrator for DFCS, retired.  MDHS Deputy Administrator, Mark Smith, served as the interim Deputy Administrator of DFCS until Dr. Kim Shackelford began work on or about April 1, 2013.

[4]    Defendants are currently evaluating  Dr. Miller's expert report filed on June 12, 2015, and anticipate filing a *Daubert* or similar motion challenging Dr. Miller's opinions prior to the August 5, 2015 deadline established by the Amended Scheduling Order for Plaintiffs' Motion for Contempt [Dkt. 646].

JM DLF 1394010 v4
2902819-000001  06/15/2015

three documents.[5]  This is troubling since some of the alleged deficiencies she highlights have already been addressed.

Ironically, although Dr. Miller is critical of Defendants' activities during Period 3, the components that Dr. Miller declares in her Declaration are necessary for any child welfare reform initiative have been or are in the process of being implemented by the Defendants. Though those components may not have been implemented at the speed Defendants strived for and aimed to meet in every instance,  progress is being made and it should not be derailed at this juncture.  As courts have recognized, these types of reform efforts are complex and effectuating genuine change takes time.[6]  This point is driven home when you consider that the State of Tennessee, which Dr. Miller lauds the accomplishments of, entered into a consent decree in 2001 and remains under a consent decree today.[7]

## II.  STANDARD FOR CONTEMPT

Federal courts have inherent powers necessary to achieve the orderly and expeditious disposition of their dockets. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43-44 (1991).  These powers include the authority to punish for contempt in order to maintain obedience to court orders.  *Flaksa v. Little River Marine Constr. Co.,* 389 F.2d 885, 887 (5th Cir.), *cert. denied,* 392 U.S. 928, 88 S.Ct. 2287, 20 L.Ed.2d 1387 (1968).  However, because of the potency of inherent powers, they must be used with great restraint and caution. *Chambers,* 501 U.S. at 44.

---

[5]     [Dkt. 622-11] at ¶¶2 and 8.

[6]     *See* Exhibit "A," *David C. v. Leavitt*, No. 93-C-206, slip op. at 25 (D. Utah March 17, 1997)  ("The problems of child-welfare are very complex, Defendants' task is large, and the recognition that to effectuate change requires time reflects no more than a healthy sense of realism.").  *See also* MSA [Dkt. 571] at 48, § VII.A. ("The parties agree that the systemic and comprehensive nature of this Modified Settlement Agreement will require implementation and refinement of policies and programs over a number of years.").

[7]     *See* Exhibit "B," The State of Tennessee's latest Modified Settlement Agreement in the *Brian A.* lawsuit was filed in April 2015.

JM DLF 1394010 v4
2902819-000001  06/15/2015

Accordingly, the threshold for the use of the inherent power sanction is high. *Reed v. Iowa Marine & Repair Co.,* 16 F.3d 82, 84 (5th Cir. 1994).

A finding of civil contempt—willful disregard of the authority of the court—must be supported by "clear and convincing" evidence, a higher standard than the "preponderance of the evidence" standard, common in civil cases. *United States v. Rizzo*, 539 F.2d 458, 466 (5th Cir. 1976). The clear and convincing evidence must establish that "1) the allegedly violated order was valid and lawful; 2) the order was clear and unambiguous; and 3) the alleged violator had the ability to comply with the order." *Riccard v. Prudential Ins. Co.*, *Inc.*, 307 F.3d 1277, 1296 (11th Cir. 2002). Once this prima facie showing of a violation is made, the burden then shifts to the alleged contemnor to produce evidence explaining his noncompliance. *United States v. Prestonwood Properties, Inc.*, No. 3-99-CV-0495-R, 2001 WL 1076125, *2 (N.D. Tex. Sept 10, 2001), *see also United States v. Rylander,* 460 U.S. 752, 755 (1983).

### III. INABILITY TO COMPLY WITH A COURT'S ORDER IS A DEFENSE TO CONTEMPT

"A contemnor may be excused because of an 'inability' to comply with the terms of the order." *Chairs v. Burgess*, 143 F.3d 1432, 1436 (11th Cir. 1998) (citing *Citronelle-Mobile Gathering, Inc.* v. *Watkins*, 943 F.2d 1297, 1301 (11th Cir. 1991)); *see also Gebetsberger v. East*, 627 So. 2d 823, 826 (Miss. 1993) ("Even where there has been established a prima facie case of contempt, the defendant may avoid judgment of contempt by establishing that he is without present ability to discharge his obligation."). In satisfying this burden, the alleged contemnor must offer proof beyond "a mere assertion of inability" and introduce evidence supporting his claim. *United States v. Hayes*, 722 F.2d 723, 725 (11th Cir. 1984).

Parties subject to a court's order demonstrate an inability to comply by showing that they have made "in good faith all reasonable efforts to comply." *United States v. Ryan*, 402 U.S. 530,

534 (1971), *see also Newman v. Graddick,* 740 F.2d 1513, 1525 (11th Cir. 1984) ("[A] person who attempts with reasonable diligence to comply with a court order should not be held in contempt.").    Failure of a district court to fully consider a state's ability, or inability, to comply with an order in the light of this "reasonable efforts" standard is reversible error.    *Chairs*, 143 F.3d at 1437.

    "Inability," as a defense to contempt, does not mean that compliance must be totally impossible.    Indeed, where the consent decree, as in this case, "calls for elaborate and complex performance, a contempt adjudication is not required or justified merely because the results are found to be incomplete or postponed.    It is a sufficient defense…if a defendant official 'has in good faith employed the utmost diligence in discharging his responsibilities.'"    *Aspira of New York, Inc. v. Board of Ed. of City of New York*, 423 F. Supp. 647, 654 (D.C.N.Y. 1976) (quoting *National Resources Defense Council, Inc. v. Train*, 510 F.2d 692, 713 (C.A.D.C. 1975)).    In sum, "[t]he sound discretion of an equity court does not embrace enforcement through contempt of a party's duty to comply with an order that calls him 'to do an impossibility.'"    *National Resources Defense Council, Inc.*, 510 F.2d at 713 (quoting *Maggio v. Zeitz*, 333 U.S. 56, 74-76 (1948)).

    In *David C. v. Leavitt*, a class-action brought against the governor of the state of Utah and other state officials involved in Utah's child-welfare system alleging a failure of Utah's child-welfare system to protect children in its custody, the court recognized that "[a] court may legitimately decline to exercise its authority to enforce a prior order for a number of practical or policy-related reasons."[8]    The court explained that one reason not to intervene is when the "noncomplying party has and is taking every reasonable step within its power to comply with the

---

[8]         Exhibit "A," *David C. v. Leavitt*, No. 93-C-206, slip op. at 22 (D. Utah March 17, 1997).

prior order but, for some reason, has not been successful."[9]  In such a situation, "an enforcement order may not only be futile, but obstructive to ongoing corrective measures."[10]  That is precisely the case here.

### IV.  IF THERE IS A FINDING OF CONTEMPT, THE LEAST RESTRICTIVE SANCTION MUST BE IMPOSED[11]

Should the power of contempt be necessary to preserve the authority of this Court, the sanction chosen must employ "the least possible power adequate to the end proposed." *Anderson v. Dunn,* 19 U.S. 204, 231 (1821), *quoted in Spallone v. United States,* 493 U.S. 265, 280 (1990). If there is a reasonable probability that a lesser sanction will have the desired effect, the court must try the less restrictive measure first.  *Spallone,* 493 U.S. at 280.  Further, as stated by this Court, "[I]n *United States v. United Mine Workers,* 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947), the Supreme Court detailed the factors to be considered in the imposition of a civil contempt sanction as follows: (1) the harm from noncompliance; (2) the probable effectiveness of the sanction; (3) the financial resources of the contemnor and the burden the sanctions may impose; and (4) the willfulness of the contemnor in disregarding the court's order."[12]

Thus, if this Court decides to exercise its power of contempt, consideration must be given to the *United Mine Workers* factors and the least restrictive sanction should be employed. Appointment of a general receiver with full authority to administer Mississippi's child welfare system is certainly not the least restrictive measure.

---

[9]      Exhibit "A," *David C. v. Leavitt*, No. 93-C-206, slip op. at 22 (D. Utah March 17, 1997).
[10]     Exhibit "A," *David C. v. Leavitt*, No. 93-C-206, slip op. at 22 (D. Utah March 17, 1997).
[11]     Defendants' position is that a finding of contempt is neither necessary, nor proper. However, Plaintiffs argue that appointment of "…a general receiver with full authority to administer Mississippi's child welfare system…" is the appropriate remedy for noncompliance. [Dkt. 622] at 1.  Therefore, it is necessary that Defendants address the issues of remedy and the appointment of a general receiver.
[12]     [Dkt. 557] at 8, fn. 3.

JM DLF 1394010 v4
2902819-000001  06/15/2015

## V.  THE APPOINTMENT OF A GENERAL RECEIVER WITH FULL AUTHORITY TO ADMINISTER MISSISSIPPI'S CHILD WELFARE SYSTEM IS NEITHER WARRANTED, NOR PROPER

Pursuant to its equity jurisdiction, a federal court has the power to take remedial action to effectuate compliance with its orders and this power includes the power to appoint a receiver. *Morgan v. McDonough*, 540 F.2d 527, 533 (1st Cir. 1976).  The decision to appoint a receiver is one of reasonableness under the circumstances.  *Shaw v. Allen*, 771 F. Supp. 760, 762 (S.D. W. Va. 1990).  The most significant factor in determining whether the appointment of a receiver is appropriate is whether any other remedy is likely to be successful.  *Shaw*, 771 F. Supp. at 762; *see also Bracco v. Lackner*, 462 F.Supp. 436, 456 (N.D. Cal. 1978) (holding that a receiver is a "remedy of last resort; a receiver should not be appointed if a less drastic remedy exists"); *Petitpren v. Taylor Sch. Dist.*, 304 N.W.2d 553, 557 (Mich. App. 1981) (finding that the appointment of a receiver is appropriate only when "other approaches have failed to bring compliance with a court's orders, whether through intransigence or incompetence.").

While Plaintiffs insinuate that courts are not hesitant to appoint receivers to operate state or local agencies, this contention is not supported by the precedent offered by Plaintiffs. The common thread in the cases presented by Plaintiffs is that the appointment of a receiver was a decision that was not taken lightly and was implemented only after long and careful deliberation. For example, in *Dixon v. Berry*, the court found that its use of a "remedy of last resort" was warranted because the District of Columbia had been unable to comply with the court's orders for 17 years, the court had "tried every conceivable remedy," and the actions of the District in evading the court's prior orders supported a finding of bad faith.  967 F. Supp. 535, 554 (D.D.C. 1997).  A comparable line of reasoning is apparent in the remaining cases cited by the Plaintiffs. *Glover v. Johnson*, 934 F.2d 703, 714 (6th Cir. 1991) (requiring the Department to hire a special

administrator to bring Department into compliance with court's order was appropriate because the Department was given ample opportunity during the last 10 years to comply with the court's order); *Morgan,* 540 F.2d at 535 ("Obviously the substitution of a court's authority for that of elected and appointed officials is an extraordinary step warranted only by the most compelling circumstances."); *United States v. Detroit*, 476 F. Supp. 512, 520 (E.D. Mich. 1979) ("Whenever a federal court is involved in the affairs of local government and a remedy is sought which may interfere with traditional notions of separation of powers, great care must be taken to reach a balance that does not summarily deny to such local government the full exercise of its authority over its affairs."); *Perez v. Bos. Hous. Auth.*, 400 N.E. 2d 1231, 1247 (Mass. 1980) ("Of course an injunction is never lightly granted and, like other judicial remedies, should be no more intrusive than it ought reasonably be to ensure the accomplishment of the legally justified result. This rule of the reasonably-confined remedy has obvious and peculiar relevance where public officials are the objects of injunction").

**A.  The Two Cases Cited By Plaintiffs Are Distinguishable**

<u>1.  *LaShawn A. v. Kelly*</u>

Plaintiffs rely on two cases to support their request for a general receiver, *LaShawn A. v. Kelly,* 887 F. Supp. 297 (D.D.C. 1995) and *Shaw v. Allen.*, 771 F. Supp. 760 (S.D. W. Va. 1990). *LaShawn A.* involves the District of Columbia child welfare system.  In that case, the court was "faced with increasing resistance on the part of the defendants," had previously ordered three limited receiverships, and "was forced to begin issuing a series of piecemeal orders directing compliance with extant orders when it became apparent that the defendants had no plans to comply." *LaShawn A.*, 887 F. Supp. at 300.  Furthermore, after the limited receivers were appointed by the court, they encountered "resistance and hostility to their court-ordered efforts"

and they informed the court "that extremely basic resources were absent or in short supply, thus making it almost impossible for various sectors of the child welfare to function." *Id.*  It was under this backdrop that the court in *LaShawn A.* decided whether or not the remedy of a full receivership was warranted.  None of those facts exist in this case.  Defendants have not been resistant to this Court's orders and they are making every effort to comply.  Also, other, less drastic remedies had been tried in *LaShawn A.* and were not successful.  That is simply not the case here.

The *LaShawn A.* court also questioned whether the defendants were acting in good faith. *Id.* at 314. Plaintiffs have not alleged that Defendants are not acting in good faith in their efforts to comply with the MSA.  Indeed, when Plaintiffs' counsel has been asked by this Court during status conferences whether Defendants have been acting in good faith in their efforts to comply with MSA, counsel has stated that Defendants have been acting in good faith.[13]  Thus, this case is different than the *LaShawn A.* case and this Court should certainly take Defendants' good faith efforts into consideration when determining whether contempt is appropriate and whether the imposition of "the remedy of last resort" is warranted.

Finally, as this Court aptly noted in its 2011 Order on Plaintiffs' Motion for Contempt, it is appropriate for the Court to evaluate whether a receiver could implement the requirements of the MSA any better or more expeditiously than Defendants.[14] If you consider the *LaShawn A.* case relied on by Plaintiffs, which is the only case where a receivership has been used to remedy

---

[13]    Counsel for Defendants have attempted to get transcripts from the status conferences occurring during the relevant timeframes.  As of the date of the filing of this Memorandum, they have been unsuccessful in their efforts to get transcripts for all of the status conferences. Therefore, this statement is based on the recollection of counsel for Defendants.  If counsel for Defendants are able to secure the transcripts, Defendants will amend their contention if it is found to be unsupported.

[14]    [Dkt. 557] at 8, fn. 3.

JM DLF 1394010 v4
2902819-000001  06/15/2015

noncompliance in a child welfare case, the answer to this question is "no." *LaShawn A.* was filed June 20, 1989, and in August 1991, the court granted the parties' joint motion for entry of a remedial order. *LaShawn A.*, 887 F. Supp. at 297-298. The District of Columbia child welfare system remains under that remedial order today, some 24 years later. While the receivership has since ended, the receiver was unable to bring the District into full, or even substantial, compliance with the remedial order. Almost 5 years after the receivership in *LaShawn A.* was ordered by the federal court, the United States General Accounting Office ("GAO") heard testimony regarding and discussed the status of the court-appointed receivership and concluded that only 50 percent of the requirements in the remedial order had been met by the District.[15] Fourteen years following the GAO report and 23 years after the court entered its remedial order, the District had still not met all of the requisite requirements. In a report issued in May 2014, the monitor reported that while the District was performing well in some areas, the District had yet to achieve 22 of the 88 exit standards and was still struggling with finding permanent homes for children who remained in custody more than a year, often failed to complete investigations timely, and only 65% of investigations were found to be of acceptable quality.[16] Thus, there is no evidence that a receiver will be able to achieve full or substantial compliance at a faster pace than Defendants can accomplish and Plaintiffs' request for a receiver should be denied.

---

[15]     Exhibit "C," United States General Accounting Office, Foster Care: Status of the District of Columbia's Child Welfare System Reform Efforts, published May 5, 2000. This report can be found at http://www.gao.gov/products/T-HEHS-00-109

[16]     Exhibit "D," *LaShawn A. v. Gray* Progress Report for the Period July 1-December 31, 2013 (May 14, 2014) written by Center for the Study of Social Policy. This report can be found at http://www.cssp.org/publications/child-welfare/class-action-reform/2014/LaShawn-A-v.-Gray-Progress-Report_May-14-2014.pdf

JM DLF 1394010 v4
2902819-000001  06/15/2015

2.  *Shaw v. Allen*

The *Shaw v. Allen* case concerned conditions at a jail located in West Virginia.  771 F. Supp. 760 (S.D. W. Va. 1990).  In that case, a comprehensive remedial order was entered in April 1983 and plaintiffs initiated contempt proceedings in April 1985, July 1987, October 1988, and August 1990.  *Shaw*, 771 F. Supp. at 761.  In response to the various contempt motions, the court employed several remedial approaches including the ordering of a prison inspection and written report, ordering that the inmate population be reduced to 24 inmates, and the appointment of a monitor.  *Id.*  None of these court-ordered remedies proved to be effective.  *Id.* at 761-762. After acknowledging that receivership is "an intrusive remedy which should only be resorted to in extreme cases," the court appointed a receiver to oversee the jail.  *Id.* at 762-763. Interestingly, the court noted that the appointment of receiver was not as drastic and intrusive as the ultimate course of action the court could effectuate which would be the closing of the jail.  *Id.* at 763.

*Shaw* is different from the case at hand because the *Shaw* court had previously ordered less drastic remedies on multiple occasions and saw no improvement.  Less drastic remedies have not been necessitated or ordered in this case.  Also, while both are extreme measures, placing a receiver over a single jail, as the *Shaw* court did, is a far cry from appointing a "general receiver with full authority to administer Mississippi's child welfare system" as the Plaintiffs' request in this case.[17]

3.  Contrasting *LaShawn A.* with *David C.* is instructive

In *David C. v. Leavitt*, the court refused to appoint a receiver over Utah's child-welfare system despite the court's finding that the Utah officials had failed to comply with the settlement

---

[17]    Plaintiffs' Motion for Contempt [Dkt. 622] at 1.

JM DLF 1394010 v4
2902819-000001  06/15/2015

agreement.[18]  The court stated that "[t]here are few, if any, remedies within a federal court's arsenal more drastic than the appointment of a receiver to take over a state agency" and "[g]iven the reluctance of federal courts to encroach upon traditional state functions, receivership is a remedy of last resort, warranted only in the most compelling circumstances."[19] Thus, "for [the] court to fashion such a remedy, [p]laintiffs would have to show more than noncompliance with the [settlement agreement].  Plaintiffs would have to convince the court that [d]efendants are so incompetent or antagonistic as to be entirely unable or unwilling to comply with the [settlement agreement]."[20]  The court found that the plaintiffs failed to meet this extraordinarily high burden.[21]  Although the monitoring reports found the defendants in noncompliance with many of the settlement agreement provisions, such findings did not "convince the court that the [d]efendants were unwilling or unable to correct the problems."[22]  The court also explained that "[t]he problems of child-welfare are very complex, [d]efendants' task is large, and the recognition that to effectuate change requires time reflects no more than a healthy sense of realism."[23]

The court also noted that the plaintiffs failed to show that the appointment of a receiver was the least intrusive remedy needed to ensure compliance with the settlement agreement.[24] Since the court had not previously ordered other, less radical, enforcement, the court doubted that a receiver was the only way to ensure compliance.[25]  The court also questioned "whether a receiver could implement the necessary changes any better or more expediently than the current

---

[18]     Exhibit "A," No. 93-C-206, slip op. at 29 (D. Utah March 17, 1997).
[19]     Exhibit "A," No. 93-C-206, slip op. at 24 (D. Utah March 17, 1997).
[20]     Exhibit "A," No. 93-C-206, slip op. at 25 (D. Utah March 17, 1997).
[21]     Exhibit "A," No. 93-C-206, slip op. at 25 (D. Utah March 17, 1997).
[22]     Exhibit "A," No. 93-C-206, slip op. at 25 (D. Utah March 17, 1997).
[23]     Exhibit "A," No. 93-C-206, slip op. at 25 (D. Utah March 17, 1997).
[24]     Exhibit "A," No. 93-C-206, slip op. at 28 (D. Utah March 17, 1997).
[25]     Exhibit "A," No. 93-C-206, slip op. at 28 (D. Utah March 17, 1997).

management."[26]    Ultimately, the court found that despite plaintiffs' accusations that the defendants were acting in "bad faith," plaintiffs failed to evidence the "defendants' complete defiance to the settlement agreement or total incompetence that would convince the court to conclude that the defendants are unwilling or unable to comply with the [settlement agreement.]"[27]  Thus, "[t]he drastic remedy of appointing a receiver [was] simply not justified."[28]

Although the court chose not to appoint a receiver in *David C.*, the State of Utah child welfare agencies continued to work to comply with the terms of the settlement agreement and to improve their child welfare system.  In fact, on January 5, 2009, the United States District Court for the District of Utah dismissed plaintiffs' claims with prejudice after the parties and the court monitor agreed that the State of Utah had complied with the terms of the settlement agreement.[29] Thus, the State of Utah—wherein the court appreciated the amount of time necessary to effectuate meaningful change and refused to appoint a receiver—was able to succeed and free itself of court oversight.   The same cannot be said for the District of Columbia, which was placed under receivership for a period of time yet remains under court oversight some 20 years after the receivership was ordered.

**B.  Plaintiffs' Reliance on Dr. Miller's Opinion That a Receiver Should Be Appointed is Misplaced**

First, it is the duty of this Court—not Dr. Miller—to determine whether the appointment of a receiver is appropriate.  Indeed, as Plaintiffs' cite in their Motion for Contempt, in determining whether to appoint a receiver, "**the court** should consider whether there were repeated failures to comply with the court's order … if there is a lack of leadership to turn the

---

[26]      Exhibit "A," No. 93-C-206, slip op. at 28 (D. Utah March 17, 1997).
[27]      Exhibit "A," No. 93-C-206, slip op. at 29 (D. Utah March 17, 1997).
[28]      Exhibit "A," No. 93-C-206, slip op. at 29 (D. Utah March 17, 1997).
[29]      Exhibit "E," *David C. v. Huntsman, Jr.*, No. 2:93-CV-00206TC, Order of Dismissal with Prejudice dated January 5, 2009.

tide within a reasonable time period, whether there was bad faith, whether resources are being wasted [and] …whether a receiver can provide a quick and efficient remedy."[30]

However, if Dr. Miller's opinion on the appropriateness of the appointment of a receiver is considered, she admits that she has only reviewed three documents, the MSA, the June 24, 2013 Data Order, and the Monitor's Period 3 Report.  Certainly, the decision of whether a receiver should be appointed—which is the most drastic remedy a federal court can impose—cannot and should not be based on the review of three documents.[31]  Those documents simply do not provide enough information to weigh the requisite factors that must be considered.

Second, Dr. Miller provides no factual basis for her "expert opinion" that "a receivership created by this Court…can accomplish what the state has failed to accomplish in the last seven years."[32]  She does not claim to have personal experience with an agency under receivership nor does she provide any empirical evidence that receiverships in child welfare situations are beneficial or that they can provide a quick and efficient remedy.  To Defendants' knowledge, a receiver has only been ordered once in the context of a child welfare reform case and that was in the *LaShawn A.* case which is discussed above.  If *LaShawn A.* is her measuring stick, Dr. Miller's opinion certainly seems questionable.

In summary, the drastic remedy sought by Plaintiffs of appointing a "general receiver with full authority to administer Mississippi's child welfare system" is neither justified, nor warranted.[33]  Defendants have never been found to be in contempt of any Order of this Court, and, as will be detailed below, Defendants have made, in good faith, all reasonable efforts to

---

[30]    [Dkt. 623] at 44, citing *Dixon v. Barry*, 967 F. Supp. 535, 550 (D.C.C. 1997) (emphasis added).
[31]    [Dkt. 622-12] at §2.
[32]    [Dkt. 623] at 46, citing Declaration of Viola Miller [Dkt. 622-12 at §28].
[33]    [Dkt. 622] at 1.

comply with their obligations.  Under these circumstances, where no other, less drastic, remedy has ever been employed and Defendants are moving judicially toward compliance, it would be inappropriate to order the remedy of last resort, the appointment of a receiver.

## VI.  A FINDING OF CONTEMPT IS INAPPROPRIATE BECAUSE DEFENDANTS HAVE MADE, IN GOOD FAITH, ALL REASONABLE EFFORTS TO COMPLY WITH THE MSA

**A.    Defendants Established a Statewide Implementation Team and Statewide Implementation Sub-teams**

The Period 3 Plan called for a new management structure to facilitate and implement the requirements of the MSA.  That management structure included the establishment of a Statewide Implementation Team ("SIT") and SIT sub-teams for various functional areas.[34]  The SIT is to serve as the governing group for the implementation of the provisions of the MSA, the annual implementation plans, and the Practice Model.  The SIT is chaired by the MDHS Executive Director and also includes the MDHS Deputy Administrator, the MDHS Deputy Administrator for DFCS, the Director of DFCS, the DFCS Field Operations Director, the DFCS CQI Director, and a Center for Support of Families ("CSF") consultant.  The Monitor reported that Defendants established the SIT and that the SIT generally managed the implementation of the MSA and the Practice Model as contemplated by the Period 3 Plan.[35]  She also noted that Defendants continue to utilize the SIT for these purposes. [36]

There are also SIT functional area sub-teams that meet regularly and report directly to the SIT.  The sub-teams to be established during Period 3 were CQI, Training, Resource Development, Policy, Legal and Judicial, Resource Parent Recruitment and Retention, and

---

[34]    Period 3 Plan [Dkt. 571] §I.A.1.a.
[35]    Monitor's Report [Dkt. 604] at p. 41.
[36]    Monitor's Report [Dkt. 604] at p. 41.

Caseload/Staffing.[37]   The Monitor reported that these sub-teams were established on a timely basis and that Defendants even established two additional sub-teams (MACWIS/Data and Finance) that were not required during Period 3.[38]   The Monitor also reported that "a review of work plans, progress reports, scheduling documents and meeting summaries, combined with interviews indicated that the sub-teams generally functioned as contemplated."[39]   Unfortunately, the Monitor did find that the written work plans of some of these sub-teams fell short.[40]   But, notwithstanding that one area needing improvement, the SIT and its sub-teams which are to guide MSA and Practice Model implementation were established and functioning as intended by the end of Period 3.

**B.   The June 24, 2013 Data Order And Contemplated Data Project Was A Success And Reliable Data Are Being Produced By Defendants; However, The Caseload Data Report Proved To Be Extremely Complex And Production Was Delayed**

As this Court is well aware, Defendants have an outdated data information system (Mississippi Automated Child Welfare Information System - "MACWIS") that has contributed to the challenges in producing reliable data reports that track the requirements of the MSA.   To remedy this historical issue, the parties negotiated and entered into the June 24, 2013 Data Order.[41] The Monitor reported that "by January 15, 2014, Defendants had submitted data reports responsive to 49 of the 53 reporting requirements included in the June 24, 2013 Order" and emphasized that this was "no small feat."[42]   The Monitor also acknowledged that "over a relatively short time frame in the context of this lawsuit, [D]efendants have made accelerated,

---

[37]      IP3 Plan [Dkt. 571]§I.A.1.b.
[38]      Monitor's Report [Dkt. 604] at p. 42.
[39]      Monitor's Report [Dkt. 604] at p. 42.
[40]      Monitor's Report[Dkt. 604] at p. 44.
[41]      [Dkt. No. 589].
[42]      Monitor's Report [Dkt. 604] at 12-13.  Since that time, additional reports responsive to the remaining 4 reporting requirements have been submitted.

albeit long overdue, progress producing more accurate data regarding their performance relative to key elements of many MSA requirements.[43]

To appreciate the magnitude of Defendants' efforts to comply with the June 24, 2013 Data Order, an examination of the funds expended and the manpower used is informative. Defendants spent more than $4,500,000.00 complying with the requirements of the June 24, 2013 Data Order. That Order also required Defendants to design and implement a SQL database to provide the capability to produce accurate reports, to work collaboratively with Plaintiffs and the Monitor to develop specifications for 57 reports,[44] to develop and implement a Data Cleansing and Report Validation Plan, to create a new unit to oversee the validation of the reports, and to also upgrade and overhaul hardware and software throughout the state.[45]

This was not only an expensive endeavor, it was also a labor-intensive project. Indeed, the total number of personnel involved in complying with the June 24, 2013 Data Order exceeded 225 when you include all of the personnel who worked for the vendors providing assistance with the project, the contractors involved in the project, and the number of DFCS personnel devoting time to the project.[46]

Instead of acknowledging Defendants' progress in producing data reports as called for by the June 24, 2013 Data Order, Plaintiffs cite Defendants' failure to produce accurate and reliable data during Period 3—a fact that Defendants previously acknowledged and which was the impetus for the June 24, 2013 Data Order—and contrast that failure with Dr. Miller's Tennessee plan "which demonstrates that action can be taken and plans made to collect accurate and useable

---

[43]     Monitor's Report [Dkt. 604] at 12.
[44]     For each report developed, a PDF version and a live Excel version (which included break out tabs for state, regional and county data) were created and produced. Thus, the total number of reports actually created and produced was over 100.
[45]     Exhibit "F," Affidavit of Mark R. Smith.
[46]     Exhibit "F," Affidavit of Mark R. Smith.

data."[47]   However, Plaintiffs' reliance on Dr. Miller's Tennessee plan and the Tennessee data system is misguided because the Tennessee Department of Children's Services continues to struggle with the data system that Dr. Miller sought to have created.  Indeed, in a October 15, 2012 article, the *Chattanooga Times Free Press* reported:

> The Tennessee Department of Children's Services is tasked with, among other things, tracking children in the state's care, maintaining a database on cases of child abuse and neglect, monitoring the state's foster care system, and making sure that payments to foster care parents are made quickly and accurately. Such serious responsibilities require a sophisticated computer system.
>
> A capable computer system is particularly important for DCS, given that a dozen years ago, a federal court order required that Tennessee develop a system to monitor the state's foster care system after a number of problems were revealed, including placing young children in emergency shelters for months on end.
>
> In 2008, then-Gov. Phil Bredesen and then-DCS Commissioner Viola Miller, sought to create a computer system that could address DCS's monitoring needs. That system became known as the Tennessee Family and Child Tracking System (TFACTS). Like so many things championed by Gov. Bredesen, TFACTS came at a surprisingly high cost. When it was finally unveiled in 2010, the price tag for TFACTS exceeded $27 million.
>
> Despite the system's expense, TFACTS has been a tremendous failure. It has put children in jeopardy, shortchanged foster parents and placed the state at risk of being out of federal compliance with the court order.[48]

Similarly, on June 17, 2014, *The Tennessean* newspaper reported:

> The Tennessee Family and Child Tracking System, also called TFACTS, cost taxpayers $27 million to get up and running in 2010 and has been plagued with problems.  Since 2012, DCS officials have requested—and received—an additional $11.8 million to patch the system.
>
> The technology is supposed to hold the official case record of every child and family in the DCS system.

---

[47]      Plaintiffs' Memo [Dkt. 623] at 15.

[48]      Exhibit "G," TFACTS Is A Pricey Failure, The Chattanooga Times Free Press, October 15, 2012, http://www.timesfreepress.com/news/opinion/freepress/story/2012/oct/15/tfacts-is-a-pricey-failure-chattanooga-free-press/90270/

But it has experienced hundreds of glitches — from failing to generate automatic payments to foster parents to an inability to accurately track child abuse, neglect and child deaths.[49]

Consequently, based on these articles, it is clear that Plaintiffs' reliance on Dr. Miller and the State of Tennessee to support their argument that creating and implementing a reliable child welfare data system that can track MSA requirements can be done easily and quickly misses the mark. The State of Tennessee has been working on improving its child welfare data system since they entered into a consent decree in 2001, has spent more than $38,000,000.00 and countless man-hours in the process, and, as late as June 2014, the system was still experiencing glitches.

Likewise, Plaintiffs' claim that Mississippi has taken a "do very little" approach and that Mississippi "still produces no consistently accurate or useable data" is incorrect and misleading.[50] The Monitor acknowledged that she was ultimately able to produce final analyses for 53 of the 57 (93%) data reports Defendants submitted.[51] In the meantime, Defendants continued to refine, improve and work to produce the remaining four reports as quickly as possible so that all of the parties and the Monitor would have the MSA-related data. Defendants' efforts and the resources devoted by Defendants to create accurate and reliable reports and remedy longstanding software and MACWIS connectivity problems in accordance with the June 24, 2013 Data Order demonstrate that Mississippi is not taking a "do very little" approach. Defendants understand and appreciate the need for accurate and reliable data in order to more

---

[49]    Exhibit "H," *More Glitches, Costs Reported in DCS Computer System*, The Tennessean, June 17, 2014, http://www.tennessean.com/story/news/local/2014/06/17/glitches-costs-reported-dcs-computer-system/10664229/

[50]    Plaintiffs' Memo [Dkt. 623] at 15. Plaintiffs also claim that Mississippi utilized the assistance of Chapin Hall to create data reports. This is incorrect. Defendants retained Chapin Hall to assist them with the development and implementation of a performance-based contracting system.

[51]    Monitor's Report [Dkt. 604] at 40.

effectively provide services to the children in their custody and also measure and improve compliance with the MSA. Their efforts in complying with the June 24, 2013 Data Order confirm that Defendants are working in good faith and making all reasonable efforts to comply with the MSA.

Despite Defendants making all reasonable efforts to comply with the June 24, 2013 Data Order, production of the data report on social worker caseloads proved to be more challenging than the other MSA reports. This challenge is not unique to Mississippi. In fact, Dr. Miller's (and apparently Plaintiffs') flagship state, Tennessee, has experienced the very same challenge. In a June 11, 2014 Report from the State of Tennessee monitoring committee, the committee found that "[t]here remains one critical area for aggregate reporting—caseloads—for which the Department continues to use **manual** data tracking, aggregation and reporting."[52] Thus, as of June 11, 2014, the State of Tennessee's data system was still not able to produce automated caseload reports and, according to its monitoring report, would not be able to start producing automated reports until October 2014 at the earliest.[53]

Defendants' production of the caseload report has been challenging in large part due to the fact that the report itself is very complex. Most DFCS caseworkers carry a mixed caseload, which means that the worker handles different types of cases and performs a variety of services.[54] For purposes of measuring mixed caseloads, the MSA identifies 25 distinct service categories and each of those service categories is allotted a certain number of units/minutes per

---

[52]     Exhibit "I," Report of the *Brian A.* Technical Assistance Committee, Update on Developments Related to the TFACTS Evaluation Findings and Recommendation (June 11, 2014) at 3.

[53]     Exhibit "I," Report of the *Brian A.* Technical Assistance Committee, Update on Developments Related to the TFACTS Evaluation Findings and Recommendation (June 11, 2014) at 3.

[54]     Monitor's Report [Dkt. 604] at 45.

month.[55]  Therefore, the caseload report must have the capability to effectively capture all of the service categories that a worker is performing at a specific moment in time and compare that to the MSA requirements, which require that a caseworker's mixed caseload not exceed 6,960 minutes/100 units per month.[56]

> As did the State of Tennessee over the course of many years, Defendants encountered issues with the production of the caseload report.   Some issues were the result of trying to pull data from a system that has inherent limitations in the data structure, others were the result of the need for clarification of report specifications originally developed by Defendants and approved by the Monitor and data entry errors also contributed to programming difficulties.   However, Defendants have continually worked to understand the inaccuracies with the report and to find solutions.   For example, in an attempt to identify and decrease data entry errors in the caseload report, Defendants undertook a 100% validation process on a region by region basis.[57]

> To further improve the accuracy of all of Defendants' data reports, Defendants began assigning corrective action "HEAT" tickets for data entry errors discovered during validation efforts.   In August 2013, Defendants began issuing a monthly Data Quality Report that provides information to field staff to address the most common data quality issues that are identified during the data report validation process.[58]   In addition to these monthly Data Quality Reports, Defendants have continued to provide Technical Assistance Bulletins which remind workers of the many changes to MACWIS and also makes them aware of how earlier problems with MACWIS are, or will be, remedied.[59]

---

[55]    Monitor's Report [Dkt. 604] at 45-46.
[56]    Monitor's Report [Dkt. 604] at 46.
[57]    Monitor's Report [Dkt. 604] at 53.
[58]    Exhibit "J," Data Quality Reports for August 2013 through April 2014.
[59]    Exhibit "K," Affidavit of Cindy Greer.

Although production of the caseload data report was delayed, Defendants understand and appreciate the need for valid caseload data and Defendants have worked tirelessly to see that caseload reports that comply with the MSA are produced according to the specifications agreed upon by the parties and the Monitor.  These caseload reports, like the other data reports produced, continue to be re-validated on the six month validation schedule by the MACWIS Validation Unit in order to detect and resolve any inaccuracies in the report.  More importantly, Defendants' failure to produce the caseload report timely did not impede Defendants in their efforts to increase their workforce.

## C.   Defendants Have Made Substantial Gains In Hiring Caseworker Staff And Are Working To Build An Educated Workforce

From January 1, 2010, to October 31, 2014, Defendants had an overall net gain of 134 caseworker staff.[60]  Hence, Plaintiffs' claim that Defendants are "losing significant numbers of workers" is inaccurate.[61]  Instead of focusing on the overall net caseworker staffing gains achieved by Defendants, Plaintiffs point to net losses in specific caseworker positions (*i.e.* Family Protection Worker Specialist, Senior and Family Protection Specialist, Advanced).  However, those numbers are misleading because many caseworker positions were re-classified and instead of hiring caseworkers in those specifically-named positions, caseworkers were hired as "Family Protection Specialists," a classification which saw a net overall gain from January 2010 to October 2014 of 177 caseworkers.[62]

After criticizing Defendants for allegedly losing significant numbers of workers, Plaintiffs lay out the activities that Dr. Miller undertook during her tenures at Kentucky and

---

[60]    [Dkt. 622], Exhibit D.  Hires and Separation Among DFCS Caseworker Staff January 1, 2010 - October 31, 2014 (With Period 4 Breakouts) prepared by the Monitor.

[61]    Plaintiffs' Memo [Dkt. 623] at 18.

[62]    [Dkt. 622], Exhibit D.  Hires and Separation Among DFCS Caseworker Staff January 1, 2010 - October 31, 2014 (With Period 4 Breakouts) prepared by the Monitor.

22

Tennessee. First, Dr. Miller raised salaries. Defendants have done this in the areas where hiring has been an issue. The Period 3 Plan required Defendants to increase the starting salaries to specific levels in the Carve-Out Counties[63] where staffing has been a challenge and Defendants satisfied this requirement.[64] Moreover, Defendants determined that the initial salary increase was insufficient for the coastal counties and Defendants sought and obtained approval from the Mississippi State Personnel Board to increase the pay for those counties by 20% through Type Duty Location Special Compensation.[65] Combined with the previous salary adjustments, this resulted in a total increase of 35% for the coastal counties of Jackson, Harrison, and Hancock.[66] The Period 3 Plan also required Defendants to maintain a specific number of full time caseworkers assigned to each of Carve-Out Counties.[67] The Monitor reported that Defendants well exceeded those caseworker staffing requirements by the end of Period 3.[68] Indeed, Defendants were required to have: 16 caseworkers in Hancock County and they had 26 as of July 1, 2013; 42 caseworkers in Harrison County and they had 79 as of July 1, 2013; 50 caseworkers in Hinds County and they had 72 as of July 1, 2013, and 32 in Jackson County and they had 48 as of July 1, 2013.[69] The Monitor also reported that, with the exception of Hinds County, staffing levels continued to increase in the Carve-Out Counties.[70] In sum, as the Monitor concluded, "[d]uring Period 3, there was notable progress hiring caseworkers, particularly in

---

[63]     The "Carve-Out Counties" are Hancock, Harrison, Hinds are Jackson Counties. [MSA §II.a.2.a.9.a.]

[64]     Monitor's Report [Dkt. 604] at 72-73.

[65]     Exhibit "F," Affidavit of Mark R. Smith.

[66]     Exhibit "F," Affidavit of Mark R. Smith.

[67]     IP3 Plan [Dkt. 571] §I.A.2.c.6.

[68]     Monitor's Report [Dkt. 604] at 73-74.

[69]     Monitor's Report [Dkt. 604] at 74.

[70]     Monitor's Report [Dkt. 604] at 74-75.

some DFCS regions that have had substantial difficulties recruiting and retaining qualified staff."[71]

Plaintiffs also point out that "[i]nvesting in its employees, under Dr. Miller's guidance, Tennessee established scholarships for current state employees to complete a master's degree and work was done with the universities to make these programs as accessible as possible for the workforce."[72]  Mississippi also invests in its employees and DFCS is proactive in its efforts to offer educational advancement opportunities to staff.  DFCS' Professional Development Unit has contracts with University of Southern Mississippi's and University of Mississippi's Schools of Social Work that offer coursework on DFCS' compressed days to make classes as accessible as possible for staff that are pursuing a Master's Degree in Social Work.[73]  The Agency also offers scholarships to state employees who are pursuing a Master's Degree in Social Work.[74]  In exchange for receiving scholarship monies, the state employees are obligated to work for DFCS for a set number of years based on the amount of scholarship funds received.[75]  Thus, contrary to Plaintiffs' contentions, Defendants understand the importance of building a strong, well-educated workforce and have been taking the requisite steps to do so.

**D.  Defendants Have Improved Their Training Capacity**

Plaintiffs also discuss Dr. Miller's formation of a consortium with the public and private universities to serve the training needs of her agency.[76]  Defendants have initiated a similar program and have worked in collaboration with staff from the University of Mississippi to develop the pre-service and in-service training curriculum and provide training for the

---

[71]    Monitor's Report [Dkt. 604] at 221.
[72]    Plaintiffs' Memo [Dkt. 623] at 19.
[73]    Exhibit "L," Affidavit of Jennifer Walker.
[74]    Exhibit "L," Affidavit of Jennifer Walker.
[75]    Exhibit "L," Affidavit of Jennifer Walker.
[76]    Plaintiffs' Memo [Dkt. 623] at 18.

24

caseworkers and supervisors.[77]  The pre-service training program, which involves trainers from the University of Mississippi, has been in place since 2012 and the in-service program was introduced on July 1, 2013.[78] The in-service training sessions are conducted by both DFCS trainers and University of Mississippi consultants and the curriculum incorporates all of the training on the Practice Model so that newly-hired workers enter the workforce fully trained on the Practice Model.[79]  Defendants also supplemented the in-service offerings with specialized training initiatives and the Monitor stated that these represent important additions to the DFCS in-service training program.[80]  The Monitor did note in her Period 3 Final Report that the Defendants' tracking system for in-service training was not functioning as intended and should be improved.[81]  Defendants appreciated this deficit and enhanced their tracking system for in-service training.  Recently, the Monitor reported that 100% of caseworkers and supervisors completed their pre-service training consistent with MSA requirements and 94% of caseworkers and 100% of supervisors completed their in-service training consistent with MSA requirements.[82]  It is clear that Defendants have a viable pre-service and in-service training system in place as well an effective system to track staff participation in training.

## E.    Defendants Have Worked to Improve Timeliness and the Review Process for Maltreatment in Care Investigations

During Period 3, Defendants established a process for the review of maltreatment of care ("MIC") investigations.[83]  The MIC review process is intended to assess case practices associated with all investigations of reports of maltreatment related to children in custody within 30 days

---

[77]    Monitor's Report [Dkt. 604] at 77-78, 80-81.
[78]    Monitor's Report [Dkt. 604] at 77-78,80-81.
[79]    Monitor's Report [Dkt. 604] at 80.
[80]    Monitor's Report [Dkt. 604] at 81.
[81]    Monitor's Report [Dkt. 604] at 85.
[82]    Exhibit "M," Monitor's Summary Table: Statewide Performance for Period 4 through June 30, 2014 Based on Analyses of Data Received Through March 24,  2015.
[83]    Monitor's Report [Dkt. 604] at 152.

following the completion of the MIC investigation. In order to accomplish this task, Defendants hired two reviewers, piloted a review instrument, and began undertaking regular review of the MIC investigations.[84] In an effort to identify all MIC investigations for review, Defendants developed a special MACWIS report to be run weekly that was intended to capture all MIC investigations.[85] Unfortunately, after using this newly developed report for several months, Defendants realized that the report was not capturing all of the requisite investigations.[86] As soon as Defendants realized this, they notified the Monitor, corrected the report, and agreed to review the MIC investigations that were inadvertently not included in the report.[87] Defendants continued to utilize and refine the MIC review process during Period 4. During Period 4, the MIC review process was completed timely for 98% of applicable cases.[88] Additionally, during Period 4, following the receipt of a report of child maltreatment in a group home, emergency shelter, or a private child placing agency, Defendants undertook an additional and independent investigation in 100% of applicable cases to determine the contractor's compliance with DFCS licensure standards.[89]

Defendants also continued to work to improve MIC investigation timeliness and to reduce the rate of maltreatment in care. On February 18, 2014, Defendants submitted a memorandum and action plan that identified barriers to timely initiation and completion of MIC

---

[84]    Monitor's Report [Dkt. 604] at 152-153.

[85]    Monitor's Report [Dkt. 604] at 155.

[86]    Monitor's Report [Dkt. 604] at 155.

[87]    Monitor's Report [Dkt. 604] at 155.

[88]    Exhibit "M," Summary Table: Statewide Performance for Period 4 through June 30, 2014 Based on Analyses of Data Received Through March 24,2015.

[89]    Exhibit "M," Summary Table: Statewide Performance for Period 4 through June 30, 2014 Based on Analyses of Data Received Through March 24,2015.

investigations and a revised action plan in July 2014.[90]   Defendants also produced a MIC

reduction letter in July 2014.[91]

## F.  Defendants Worked to Improve Their Child Placement Practices and Complied with or Exceeded Many Child Placement MSA Requirements

Plaintiffs' criticism of Defendants' performance on child placement requirements is

undeserved.   Defendants generally performed well on the child placement requirements.   First,

Plaintiffs state that 471 children in Period 3 were in a foster care setting that setting that does not

meet DFCS licensure standards.   While this may be true, these numbers don't paint the whole

picture.   The MSA requirement states that "[n]o foster child shall be placed or remain in a foster

care setting that does not met DFCS licensure standards consistent with MSA requirements,

**unless so ordered by the Youth Court over DFCS objection**."[92]   The figure cited by Plaintiffs

does not exclude children who are court-ordered to unlicensed placements over DFCS objection

and therefore are not a true reflection of Defendants' performance.[93]   The data set that excludes

children who are court-ordered to unlicensed placements over DFCS objections found that for

the six-month period ending June 30, 2013, 90% of children who were reviewed through the

Foster Care Review process were in a foster care setting that either met the MSA licensure

standards or were ordered by the Youth Court over DFCS objection.[94]   Hence, although not

perfect, the Defendants are in substantial compliance with this requirement.

One of the foundations of a successful child welfare system is the placement of children

in the least restrictive placement that meets their individual needs.   Defendants are doing this.

For the six-month period ending June 30, 2013, 97% percent of children in DFCS custody who

---

90    Exhibit "N," MIC Investigation Letter and Plan (DHS 362457-362460) and Revised Timely Initiation and Completion of MIC Investigations (DHS 363333-363336).
91    Exhibit "O," MIC Reduction Letter (DHS 363327-363331).
92    MSA [Dkt. 571] §II.B.2.p.2 (emphasis added).
93    Monitor's Report [Dkt. 604] at 157, fn. 505.
94    Monitor's Report [Dkt. 604] at 157-158.

were reviewed through the Foster Care Review process were placed in the least restrictive setting that met their individual needs.[95] This 97% percent performance rate is well above the 75% MSA requirement. Likewise, ensuring that children are placed close to their home community and with their siblings is also vital. The data shows that Defendants are also performing well in these important areas. During Period 3, 98% of children were placed within their own county or within 50 miles of the home from which they were removed unless one of the exceptions in the MSA was documented as applying and 85% of siblings who entered custody at or near the same time were placed together consistent with MSA requirements.[96]

Finally, one of the four major outcome measures in the MSA, and one that comports with the federal measure, is the placement stability or number of placements measure. The MSA requires that by the end of Period 3, at least 60% of children statewide in care less than 12 months from the time of latest removal from home shall have had two or fewer placements.[97] At the end of Period 3, Defendants were at 77%, well above the MSA requirement.[98] Thus, the data evidences that Defendants are generally performing well with regards to child placement.

## G. Defendants Have Implemented a Viable CQI System

Plaintiffs, relying on Dr. Miller, assert that a child welfare system needs to have a robust CQI system. Defendants worked during Period 3 to develop and implement such a system. According to the Monitor, Defendants' CQI plan finalized in July 2012 "provides a conceptual and structural framework for implementation of an appropriate CQI system with ongoing quality assurance and quality improvement processes."[99] [100]

---

[95]     Monitor's Report [Dkt. 604] at 162-163.
[96]     Monitor's Report [Dkt. 604] at 163,165.
[97]     MSA [Dkt. 571] §II.C.1.b
[98]     Monitor's Report [Dkt. 604] at 194.
[99]     Monitor's Report [Dkt. 604] at 93-94.

JM DLF 1394010 v4
2902819-000001  06/15/2015

Generally, the CQI process written and implemented by Defendants is designed to align with the Defendants' Practice Model, and thereby support its implementation and sustainability.[101]  The Practice Model includes the major requirements of the MSA, federal review requirements, and Counsel on Accreditation Standards, best practices in child welfare, and is based on Defendants' mission statement and values.[102]  It includes six broad categories of activities in working with children and families.  Those categories are as follows:

- •    Mobilizing Appropriate Services Timely,
- •    Safety Assurance and Risk Management,
- •    Involving Families and Children in Case Planning and Decision Making,
- •    Strengths and Needs Assessments of Children and Families,
- •    Preserving Connections and Relationships, and
- •    Individualized and Timely Case Planning.[103]

The entity responsible for administering CQI functions statewide is the State Office CQI Unit, which is comprised of several units including the Evaluation and Monitoring Unit, Foster Care Review Unit, and the Safety Review Unit.[104]  The Evaluation and Monitoring Unit and Safety Review Unit were created in response to the MSA, with only the Foster Care Review Unit existing previously since the Foster Care Review Unit relates to a Mississippi statutory requirement.[105]  In addition, the State Office CQI Unit is responsible for oversight of the MACWIS Unit, Data Reporting Unit, and the Complaints Review Unit.[106] The State Office CQI Unit specifically carries out the following responsibilities:

---

[100]    A description of the operational structure of the CQI Unit is detailed and too lengthy to describe in this Memorandum.  Should the Court desire to become more familiar with the organizational structure and operational details of the CQI Unit and process, please refer to the affidavit of Cindy Greer which is attached hereto as Exhibit "K"

[101]    Exhibit "K," Affidavit of Cindy Greer.

[102]    Exhibit "K," Affidavit of Cindy Greer.

[103]    Exhibit "K," Affidavit of Cindy Greer.

[104]    Exhibit "K," Affidavit of Cindy Greer.

[105]    Exhibit "K," Affidavit of Cindy Greer.

[106]    Exhibit "K," Affidavit of Cindy Greer.

- Develops and updates the instruments and tools needed to carry out CQI responsibilities, such as case review tools, procedures manual, and sampling criteria;

- Conducts regional and county specific CQI case reviews (including Evaluation and Monitoring and Foster Care Review);

- Provides training and orientation to state and local stakeholders on the CQI process;

- Assists Regional Directors in reviewing and approving county program improvement plans resulting from the Evaluation and Monitoring Unit baseline and/or annual follow-up case reviews, and in determining if the goals and progress measures identified in the plans have been achieved;

- Ensures that other oversight and monitoring functions within DFCS are coordinated and aligned; and,

- Conducts special studies as needed or requested to evaluate specific areas.[107]

Defendants received feedback from the Children's Bureau of the Administration for Children and Families - U.S. Department of Health and Human Services on the CQI process. The feedback was in the form of an assessment stating as follows:

I. Foundational Administrative Structure

As a result of the Olivia Y. Settlement Agreement (SA), Mississippi is in the process of implementing a statewide CQI system framed within a new child welfare practice model. To assist in developing and implementing the practice model and the CQI system, Mississippi contracted with the Center for the Support of Families (CSF) in February 2009. The CQI system was implemented concurrently with the practice model with interim CQI activities that was to be implemented statewide. The State's CQI structure includes four components: 1) State Office CQI Unit; 2) Local CQI processes; 3) State CQI Team; and 4) Local CQI Teams. The State Office CQI Unit is responsible for administering statewide CQI functions which include case record reviews, the Mississippi Automated Child Welfare Information System (MACWIS) Unit, and coordinating of Council on Accreditation (COA) and court improvement activities. The Mississippi CQI system reportedly includes local CQI processes that supplement state CQI activities, engagement of both internal and external stakeholders and program improvement activities. There are written policies and procedures for the statewide CQI process and it appears as if some training is offered for CQI staff, such as data-related training and monthly webinars and Data-to-Action meetings with regional offices.

---

[107]    Exhibit "K," Affidavit of Cindy Greer.

II. Quality Data Collection

Mississippi collects both quantitative and qualitative data that helps inform outcomes for children and families, agency and staff practices and key systems that impact the child welfare system in the state. The primary sources of data are reported to be from MACWIS, Foster Care Reviews (FCR) Periodic Administrative Reviews (PAD), and the Evaluation and Monitoring Unit's (EMU) case record reviews.[108]

Further, during a site visit from federal Administration for Children and Families representatives in March, 2014, those representatives actually observed a week-long onsite case record review, and Defendants received this feedback related to the functionality of the process:

This observational experience of the Case Record Review portion of the CQI afforded us the opportunity to confirm the existence of current review practices and identify strategies that will help inform practice and support program improvement efforts in your state's CQI system. The following provides a summary of our understanding of Mississippi's current CQI system functioning for the Case Review Component as identified in Information Memorandum ACYF CB-IM-12-07 (IM 12-07). Within your review structure, as it relates to the upcoming Round 3 of the Child and Family Services Review (CFSR), it was observed that the state has in place:

- A statewide, consistent case record review process of in-home and foster care cases;
- A training process for reviewers;
- A process to prevent conflict of interest by ensuring that peer reviewers are recruited from other counties;
- A quality assurance process to review consistency and accuracy of ratings;
- Post-review debriefing sessions in the evenings; however, we recommend that this process be strengthened by a more structured process that includes the recording of what was discussed during each meeting with the goal of enhancing and improving practice within the region;
- A consistent method of case selection and case elimination process;
- A case participant interview process.[109]

---

[108]    Exhibit "P," January 15, 2014 Letter from Department of Health & Human Services, Administration on Child, Youth and Families to Richard Berry, Executive Director of MDHS (DHS 374506, 374508, 374510, 374526, 374528).

[109]    Exhibit "Q," June 19, 2014 Letter from Department of Health & Human Services, Administration on Child, Youth and Families to Richard Berry, Executive Director of MDHS (DHS 374504-374505).

Defendants believe the feedback from Administration for Children and Families is an independent and external validation of the functionality of their CQI process relative to federal expectations.

Additionally, during Period 3, Defendants completed the following CQI-related requirements and reports:

- Baseline CQI Review for Region V-East;
- Follow-up CQI Review for Region 1-North;
- Annual CQI report covering June 1, 2010 through June 30, 2011;
- Second Follow-up CQI Review for Region 1-South;
- Second Follow-up CQI Review for Region 2-West;
- Baseline CQI Review for 3-North.
- Follow-up CQI Review for Region 4-South;
- Baseline CQI Review for Region 7-West;
- Baseline CQI Review for 6;
- Baseline CQI Review for Region 2-East;
- Second Follow-up CQI Review for 5-West;
- Follow-up CQI Review for Region V-East; and,
- Follow-up CQI Review for Region 7-East.[110]

The Monitor has also recognized Defendants' implementation of a CQI system and acknowledged that "Defendants have, to their credit, designed, staffed and made demonstrable progress implementing a CQI program since the start of Period 3."[111]  Even so, the Monitor did point out some areas of the CQI system that needed improvement.  One of the areas that needed strengthening was the timeliness and effectiveness of the corrective action process related to the findings from the CQI reviews. [112]  In an effort to remedy this shortcoming, Defendants agreed to provide the Monitor and the Plaintiffs a CQI corrective action tracking process.[113]  Defendants produced this tracking process which outlined how recommendations and corrective actions identified through the Foster Care Review Unit, Evaluation and Monitoring Unit, and Safety

---

[110]     Monitor's Report [Dkt. 604] at 97-102.
[111]     Monitor's Report [Dkt. 604] at 95.
[112]     Monitor's Report [Dkt. 604] at 95.
[113]     Final IP4 Plan [Dkt. 595-1] § II.B.2.

JM DLF 1394010 v4
2902819-000001  06/15/2015

Review Unit review processes would be distributed to and addressed by Regional Directors with Assistant Social Work Supervisors and caseworkers, through an automated electronic tracking system ("HEAT" system) and how those corrective actions would be prioritized, tracked, and followed up on by CQI Staff.[114]

In summary, Defendants are continually attempting to strengthen the effectiveness of the CQI processes in place, understanding that the best hope of sustaining progress over time is through ongoing CQI processes that always remind staff of priorities, reinforce best practices, and provide meaningful feedback on the current status of work in the field. Defendants continue to use technical assistance from CSF, including consulting staff who have developed and administered statewide child welfare CQI systems in other states and who have expertise in data collection, validation, and usage to make program improvements. While Defendants are engaged in ongoing improvement efforts and anticipate that the current CQI system will continue to grow, there can be no doubt that the existing CQI structures are functional and comport with not only MSA requirements but also federal CQI guidance.

## H.  Defendants Have Worked To Build Their Capacity And Implement Initiatives To Maximize Federal Funding

In their Motion, Plaintiffs praise Dr. Miller's efforts in Tennessee to maximize federal funding and reduce the child welfare agency's dependence on state funding.[115] Defendants have made similar efforts in Mississippi and the Monitor has applauded those efforts. During Period 3, Defendants implemented the recommendations made by Hornby Zeller Associates,[116] an organization hired by Defendants to do an assessment of actual and anticipated funding levels

---

| [114] | Exhibit "P," DFCS CQI Corrective Action Tracking Process (DHS 362696-362711) |
| [115] | Plaintiffs' Memo [Dkt. 623] at 27. |
| [116] | Hornby Zeller is an organization with substantial expertise in financial/fiscal assessments in the public sector human services context. *See* http://www.hornbyzeller.com for background on this organization. |

and to develop an implementation plan to guide the establishment of the resources or infrastructure necessary to maximize the amount of federal funds received by Defendants.[117] The Monitor reported that Defendants implemented the majority of the Hornby Zeller action steps that were agreed to by the parties[118] and that "[D]efendants have made encouraging progress building their capacity to increase federal revenue."[119] Moreover, the Monitor also acknowledged that "[n]ew accounting systems and related processes were developed to increase federal revenue streams, which in turn helped to subsidize effective efforts to strengthen the pre-services and in-service training programs for DFCS caseworkers and supervisors."[120] Thus, like Tennessee, Defendants have been diligent in their effort to maximize federal funding and decrease their reliance on state funds.

### I. The "Danger Signs" Identified by Plaintiffs And Dr. Miller Are Misleading

Towards the end of their Motion, Plaintiffs, relying on Dr. Miller, identify "danger signs" that allegedly support their argument that Mississippi's child welfare system cannot be remedied without "external pressure supplied by the court."[121] These "danger signs" are misleading and do not paint the whole or a fair picture.

First, Plaintiffs and Dr. Miller criticize Defendants for the fact that data reports concerning caseworker caseloads cannot be validated.[122] As explained above, Defendants have worked diligently to develop and produce accurate caseload data reports that conform to the

---

[117]    Monitor's Report [Dkt. 604] at 113-115.
[118]    A detailed discussion of Defendants' implementation of the action steps is discussed over 11 pages of the Monitor's Report.   Monitor's Report [Dkt. 604] at 113- 124.
[119]    Monitor's Report [Dkt. 604] at 114.
[120]    Monitor's Report [Dkt. 604] at 221.
[121]    Plaintiffs' Memo [Dkt. 623] at 32-33.
[122]    Plaintiffs' Memo [Dkt. 623] at 32.

JM DLF 1394010 v4
2902819-000001  06/15/2015

revised specifications that were developed by the parties and the Monitor.[123]  More importantly, the lack of validated caseload data reports did not prevent Defendants from continuing their hiring efforts.[124]  Moreover, as discussed above, the State of Tennessee—which Dr. Miller cites to as her measuring stick—still lacked automated caseload reporting and was relying on manual caseloads reports as of June 2014.[125]

Plaintiffs and Dr. Miller also fault Defendants for the fact that caseworkers are allegedly not receiving mandatory training.  While the Monitor did note in her Period 3 report that Defendants' tracking system for yearly in-service training was not functioning as intended, Defendants worked to improve their process during Period 4 and the Monitor recently reported that 100% of caseworkers and supervisors completed their pre-service training consistent with MSA requirements and 94% of caseworkers and 100% of supervisors completed their in-service training consistent with MSA requirements.[126]  Thus, contrary to Plaintiffs' and Dr. Miller's claims, caseworkers are receiving mandatory pre-service and in-service training.

Likewise, Plaintiffs and Dr. Miller claim that the fact that the State does not have an adequate CQI plan is another "danger sign."[127]  As discussed above, Defendants have a thorough and quality CQI plan and have implemented a strong CQI process.[128]  In fact, the Monitor

---

| 123 | *Supra* at 20-22. |
| 124 | "[D]uring Period 3, there was notable progress hiring caseworkers, particularly in some DFCS regions that have had substantial difficulties recruiting and retaining qualified staff." Monitor's Report [Dkt. 604] at 221. |
| 125 | *Supra* at 20. |
| 126 | Exhibit "M," Monitor's Summary Table: Statewide Performance for Period 4 through June 30, 2014 Based on Analyses of Data Received Through March 24, 2015. |
| 127 | Plaintiffs' Memo [Dkt. 623] at 33. |
| 128 | *Supra* at 28-33. |

acknowledged that "Defendants have, to their credit, designed, staffed and made demonstrable progress implementing a CQI program since the start of Period 3."[129]

Finally, Plaintiffs and Dr. Miller disparage the State's process for investigating and reporting on the safety of children where concerns have been reported and the fact that nearly 500 children are living in unlicensed foster home settings.[130] As explained above, during Period 4, Defendants worked to improve maltreatment in care investigation initiation and completion timeliness and worked to strengthen the maltreatment in care review process.[131] And, as for the claim that there are nearly 500 children living in unlicensed foster home settings, while this may be true, this figure fails to take into consideration those placements that are ordered by the Youth Court over DFCS objection, which are to be excluded under the MSA requirement.[132] The data set that more closely mirrors the language of the MSA requirement and does exclude children who are court-ordered to unlicensed placements over DFCS objection found that for the six-month period ending June 30, 2013, 90% of children who were reviewed through the Foster Care Review process were in a foster care setting that either met the MSA licensure standards or were ordered by the Youth Court over DFCS objection.[133] Thus, as presented above, Plaintiffs' and Dr. Miller's "danger signs" are not an accurate portrayal of the complete facts and this Court should review them with a cautious eye.

## V. CONCLUSION

Defendants did not comply with all of the 150 plus requirements of the very complex MSA and Period 3 Plan. However, the systemic nature of the MSA requires implementation and

---

[129]    Monitor's Report [Dkt. 604] at 95.
[130]    Plaintiffs' Memo [Dkt. 623] at 33.
[131]    *Supra* at 25-27.
[132]    Monitor's Report [Dkt. 604] at 157, fn. 505.
[133]    Monitor's Report [Dkt. 604] at 157-158.

refinement over many years. Progress is being made and the elements of a successful child welfare system are being put in place. In fact, many of the fundamental changes suggested by Dr. Miller have been, or are, being implemented. The fact that reform has not progressed at the pace predicted or hoped for should not be justification for holding the Defendants in contempt of Court.

Defendants' noncompliance has not been willful and Defendants have acted in good faith. The appointment of a general receiver to oversee Mississippi's entire child welfare system may not lead to full or substantial compliance and there is no evidence that it will. The appointment of a general receiver in *LaShawn A.* did not lead to compliance and that system remains under remedial order some 24 years after it was initiated. Further, this Court must impose the least restrictive sanction and the decision to exercise the remedy of last resort must be weighed against whether it might exacerbate the situation and create a new and unanticipated set of problems. Defendants believe that it certainly will.

WHEREFORE, Defendants respectfully request that this Court deny Plaintiffs' Motion for Contempt and their request for the appointment of a general receiver to oversee Mississippi's child welfare system.

Respectfully submitted, this the 15th day of June, 2015.

/s/ Dewitt L. ("Rusty") Fortenberry, Jr.
Dewitt L. ("Rusty") Fortenberry, Jr. (MSB #5435)
Kenya Key Rachal (MSB # 99227)
Ashley Tullos Young (MSB # 101839)
BAKER, DONELSON, BEARMAN, CALDWELL
& BERKOWITZ, PC
4268 I-55 North
Meadowbrook Office Park
P.O. Box 14167
Jackson, Mississippi 39211
Telephone: (601) 351-2400
Facsimile: (601) 351-2424

JM DLF 1394010 v4
2902819-000001  06/15/2015

Harold Pizzetta, III, Esq.
Assistant Attorney General
General Civil Division
Carroll Gartin Justice Building
430 High Street
Jackson, MS 39201
Telephone: (601) 359-3816
Facsimile: (601) 359-2003

38

## **CERTIFICATE OF SERVICE**

I, Dewitt L. Fortenberry, Jr., do herby certify that I have on this day, electronically filed a true and correct copy of the forgoing document with the Clerk of Court using the ECF system which sent notifications of such to counsel as follows:

Marcia Robinson Lowry
Sara R. Robinson-Glasser
A BETTER CHILDHOOD, INC.
1095 Hardscrabble Road
Chappaqua, New York 10510

W. Wayne Drinkwater, Jr.
BRADLEY ARANT ROSE & WHITE, LLP
188 East Capitol Street, Suite 450
Jackson, MS 39201

Christian D. Carbone
John Piskora
LOEB & LOEB, LLP
345 Park Avenue
New York, New York 10154

SO CERTIFIED, this the 15th day of June, 2015.

/s/  Dewitt L. ("Rusty") Fortenberry, Jr.

JM DLF 1394010 v4
2902819-000001  06/15/2015

# INDEX OF EXHIBITS
## to Defendants' Response to Plaintiffs'
## Motion for Contempt and Appointment of Receiver

Ex. "A"    *David C. v. Leavitt.* No. 93-C-206, slip op. at 25 (D. Utah March 17, 1997).

Ex. "B"    Tennessee's April 2015 Modified Settlement Agreement in the *Brian A* lawsuit.

Ex. "C"    United States General Accounting Office, Foster Care: Status of the District of Columbia's Child Welfare System Reform Efforts, published May 5, 2000.

Ex. "D"    *LaShawn A. v. Gray* Progress Report for the Period July 1-December 31, 2013 (May 14, 2014) written by Center for the Study of Social Policy.

Ex. "E"    *David C. v. Huntsman, Jr.*, No. 2:93-CV-00206TC, Order of Dismissal with Prejudice dated Jan. 5, 2009.

Ex. "F"    Affidavit of Mark R. Smith.

Ex "G"    "TFACTS Is A Pricey Failure", *The Chattanooga Times Free Press*, Oct.15, 2012

Ex. "H"    "More Glitches, Costs Reported in DCS Computer System", *The Tennessean*, June 17, 2014

Ex. "I"    June 11, 2014 Report of the *Brian A.* Technical Assistance Committee, "Update on Developments Related to the TFACTS Evaluation Findings and Recommendation".

Ex. "J"    Data Quality Reports for Aug. 2013 through Apr. 2014.

Ex. "K"    Affidavit of Cindy Greer.

Ex. "L"    Affidavit of Jennifer Walker.

Ex. "M"    Monitor's Summary Table: Statewide Performance for Period 4 through June 30, 2014 Based on Analyses of Data Received Through March 24, 2015.

Ex. "N"    MIC Investigation Letter and Plan and Revised Timely Initiation and Completion of MIC Investigations.

Ex. "O"    MIC Reduction Letter.

Ex. "P"    Jan. 15, 2014 Letter from Department of Health & Human Services, Administration on Child, Youth and Families to Richard Berry, Exec. Dir.

Ex. "Q"    June 19, 2014 Letter from Department of Health & Human Services Administration on Child, Youth and Families to Richard Berry, Exec. Dir.

JM DLF 1394010 v4
2902819-000001  06/15/2015

Ex. "R"          DFCS CQI Corrective Action Tracking Process.

JM DLF 1394010 v4
2902819-000001  06/15/2015