```
 1                UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF MISSISSIPPI
 2                     JACKSON DIVISION


 3


 4   JAMES D. JOHNSON, AS NEXT
     FRIEND TO OLIVIA Y, ET AL
 5
              vs.              Civil Action No. 3:04-cv-00251-TSL-FKB
 6
     HALEY BARBOUR, AS GOVERNOR
 7   OF THE STATE OF MISSISSIPPI,
     ET AL
 8

 9            COURT REPORTER'S TRANSCRIPT OF HEARING

10
                  BEFORE HONORABLE TOM S. LEE
11               UNITED STATES DISTRICT JUDGE

12                     November 8, 2013
                     Jackson, Mississippi
13

14   APPEARANCES:

15   FOR THE PLAINTIFF(S):

16       MS. MARCIA ROBINSON LOWRY, ESQ.
         MR. W. WAYNE DRINKWATER, JR., ESQ.
17       MS. JULIA L. DAVIS, ESQ.

18
     FOR THE DEFENDANT(S):
19
         MS. KENYA KEY RACHAL, ESQ.
20

21   ALSO PRESENT:

22       MS. GRACE LOPES, COURT MONITOR

23   COURT REPORTER:

24   Brenda D. Wolverton, RPR-CRR
     Jackson, Mississippi
25
```

```
 1          (COURT CALLED TO ORDER)

 2              THE COURT:  The case that is before the court today

 3     for consideration is Number 3:251 on the civil docket,

 4     3:04-251, Olivia Y. and others, plaintiffs, versus the State.

 5     Before the court on the report or update by Ms. Lopes, the

 6     court appointed monitor in the case, to which an amended

 7     response has been filed by counsel for the plaintiffs, and

 8     we're going to have a discussion with regard to the update.

 9     And I will ask counsel and Ms. Lopes, how do you prefer to

10     present what you have this morning?

11              MS. LOWRY:  Your Honor, I think that we anticipated

12     that Ms. Lopes would present a report to the court and then the

13     parties -- I don't speak for the State.  The plaintiffs would

14     like to comment.  I don't know if the State would, but however

15     the State and we want to proceed, but Ms. Lopes would start off

16     the presentation.

17              THE COURT:  After Ms. Lopes, then Ms. Lowery and then

18     counsel for the --

19              THE CLERK:  Could you turn your microphone on?  And

20     your name was?

21              MS. RACHAL:  My name is Kenya Rachal.

22              THE COURT:  I was looking at the list of attorneys

23     this morning and not remembering whether it was R-A-C-H-A-L the

24     correct pronunciation of your name but I have it here now.

25              MS. RACHAL:  Got it.
```

1                    THE COURT:  Okay.

2                    MS. LOWRY:  Your Honor, I'm sorry, one more thing.  I

3    want to introduce the court to my co-counsel on the case, Wayne

4    Drinkwater and Julia Davis, Your Honor.  Julia Davis is not

5    admitted to this court.  She will be filing a pro hac

6    application and we're asking for the court permission to allow

7    her to sit at counsel table.  We have discussed it with the

8    defendants, if that's permissible with the court.  And as I

9    say, we will be filing a pro hac application.

10                    THE COURT:  That is approved by the court.

11                    MS. LOWRY:  Thank you, Your Honor.

12                    THE COURT:  Ms. Lopes.

13                    MS. LOPES:  Good morning, Your Honor.

14                    THE COURT:  Good morning.

15                    MS. LOPES:  For the record, Grace Lopes, L-O-P-E-S,

16    the court monitor in this matter.

17                    Your Honor, I have a fairly lengthy update for you,

18    and some context setting is in order with respect to the

19    update.  So it will take a while.  I just want to forewarn you.

20    With respect to the context setting, as you may recall, we were

21    before you in person in February at a hearing where we

22    discussed key findings from my January 2013 report.  There were

23    three key findings in that report that I'm going to address

24    this morning.

25                    One was related to deficiencies in the management

1    information system that defendants maintain and the failure to

2    generate reports that measure performance related to the

3    settlement agreement requirements.  Another was staffing

4    deficiencies at the Department of Family and Children Services

5    related to caseworker staffing and supervisory staffing.  And

6    the third related to limitations in some of the remedial plans

7    that defendants at that point were required to submit.

8         In the wake of that hearing, two of those issues were

9    addressed through the remedial process.  The first, as you may

10   recall, was in June 2013, you issued a remedial order.  That

11   order addresses the management information system and efforts

12   and required initiatives to ensure that that system generates

13   the reports that are necessary to measure compliance with many,

14   many of the substantive requirements in the settlement

15   agreement.

16        The second initiative was the initial period for

17   implementation plan.  That plan the court approved less than a

18   month later in July 2013, and that plan incorporated the data

19   reporting requirements in the June order, addressed the

20   outstanding remedial plans and significantly indicated that it

21   was an initial plan, that the full plan could not be developed

22   because the parties did not have the data, the validated data

23   to inform their decision making and inform their negotiations

24   fully with respect to the period for a plan, so there is a

25   placeholder basically in the period for a plan that permits the

1   parties to open negotiations again with respect to that plan

2   starting at the beginning of December and concluding by

3   January 8th, to revisit the scope and make any modifications or

4   supplementations, really supplementations and not

5   modifications, that are necessary.  And all that context will

6   come into play I think as I go through my update.

7           Focusing first on the June order, then the remedial

8   plans and the staffing issues, Your Honor, the order had

9   several overarching requirements.  The first was requiring

10  defendants to extract data from their management information

11  system, and the court may recall that there is an acronym used

12  for that system, MACWIS, and I will use that -- and I think the

13  parties will probably be referring to it, and I will use that

14  acronym this morning.  Extracting data from that system through

15  a process that allows defendants to extract the data relevant

16  to the modified settlement agreement requirements.  Not all the

17  data, but all the data necessary to report on those

18  requirements.

19          To store then the data that's extracted in an

20  independent database.  And you may recall at the January

21  hearing we talked about this and we talked about the need for a

22  data warehouse.  And that's essentially what this repository,

23  this SEQUEL database is that's required by the order.

24          To develop a process to collect and store additional

25  data that defendants don't collect and store routinely but that

1    is necessary in order to measure compliance with, you know, the

2    full range of requirements in this case.  And to issue monthly

3    reports on a staggered schedule related to the requirements.

4    The staggered schedule is from September 1, 2013 through

5    January 15, 2014.  Not all the requirements, but related to 53

6    different reports related to substantive requirements.

7            Now, in order to accomplish those overarching

8    objectives, the order required the defendants to undertake

9    certain activities.  The first was to hire a consulting firm of

10   defendants' choosing to establish this database and conduct

11   data cleansing activities so to ensure that the integrity of

12   the data in the database.  They did this promptly.  They have a

13   contract in place.  They've had it in place, and this

14   consulting firm has established this independent database.

15           Defendants were also required to engage another

16   consulting firm of their choosing to serve as project manager

17   to coordinate all the activities related to maintaining the

18   database and relating to data cleansing and validation, related

19   to all the efforts to ensure that the data that was extracted

20   and put in this database was accurate and valid and we could

21   rely on it to measure progress.  They did that promptly and

22   contracted with that vendor.

23           The order also required defendants to develop and

24   finalize report specifications.  And so for each of these 53

25   reports, defendants were required to identify all of the fields

1    necessary, map out the requirements against those fields, and

2    then extract the data relevant to those requirements.  The

3    order contemplated the collaborative process between the

4    parties and involving me to develop those report

5    specifications.  It is a -- I will say a tedious, cumbersome

6    and challenging process developing those specifications.  And

7    again, defendants have met those requirements with respect to

8    the specification development and worked collaboratively with

9    plaintiffs and with me in order to do so.  I would say between

10   half and three quarters of the specifications have been

11   finalized.  That process has worked well.

12            Defendants were also required to develop gap analyses

13   by the order which essentially are the difference between the

14   data that's stored and collected and the data that's required

15   by the settlement agreement, identifying what that data is and

16   figuring out ways to collect it and maintain collecting it and

17   then reporting on it.  And defendants have produced those gap

18   analyses as required and there has been a collaborative process

19   related to that as well.

20            Now, the order requires two very important initiatives

21   related to improving the quality of the data that the

22   defendants report on because, as the court may recall, quality

23   of the data is one of the major issues that led to the June

24   order, having data that we can rely on, that we can use to

25   measure progress with respect to defendants' performance in

1    this case and with respect to any changes in that performance,

2    improvements in that performance or limitations in that

3    performance.  And there were two requirements intended and

4    crafted to address the quality of the data.

5           The first was defendants were required to develop and

6    implement a plan on an expedited basis to improve the hardware

7    and the infrastructure of their entire computer system

8    statewide that's used by their caseworkers and supervisors in

9    over 80 offices around the state to enter case record data.

10   This was -- is referred to as the hardware and network

11   infrastructure improvement plan.  And the rationale for doing

12   that is to ensure that caseworkers and their supervisors can

13   actually get on the system, maintain their ability to get on

14   the system, enter case record data as contemporaneously as

15   possible and help promote the accuracy of the data because

16   there had been and are continuing deficits with respect to

17   connectivity.  And while there have been some improvements, it

18   has quite a long way to go in terms of appropriate performance.

19          Defendants developed the plan.  I had concerns with

20   the plan.  I ultimately am required to approve the plan.  They

21   resubmitted the plan, supplemented it.  I have approved it and

22   they are implementing it, and they are moving forward

23   appropriately on implementation.

24          The second requirement with respect to the quality of

25   the data and efforts to improve the quality of the data was a

1    plan for initial and ongoing data scrubbing and validation.

2    And the purpose of that is to ensure two things:  One, that the

3    reports defendants are required to submit pursuant to the

4    orders related to their performance are accurate and complete

5    and valid and we can rely on them; and, two, to identify errors

6    because there will always be some level of errors, to identify

7    errors whether they're in the programming or in data entry by

8    the supervisors and caseworkers who enter the data, and to

9    develop the corrective action process to ensure that those

10    errors are corrected and promote higher quality of data and

11    more accurate and complete data in the system.

12            THE COURT:  Ms. Lopes, I think I have a general

13    understanding of the term "scrubbing," but will you precisely

14    define that word for me, please?

15            MS. LOPES:  I will try, Your Honor.  I have had quite

16    an education in the last nine months or 10 months.

17    Scrubbing -- the scrubbing that is required is through an

18    automated system that -- so automated electronically through a

19    computer program where the data from MACWIS is extracted based

20    on a program.  It's put in a server.  When it's in the server,

21    various programs and various configurations and sorting are

22    applied to the data to ensure that generic and kind of systemic

23    overarching shortcomings are identified.

24            For example, is there -- are there mistakes in the

25    programming?  Are there blank fields?  Are there errors based

1    on a set of rules that are applied?  The rules are based on the

2    fields that are identified, and it's all reviewed.  A lot of it

3    is automated to ensure a greater level of accuracy.  And the

4    idea is that when it goes through this cleansing process or

5    scrubbing process, that the data is more reliable and more

6    closely tracks the fields in the original database in the

7    MACWIS system.  So it's quite an elaborate electronic process,

8    the data scrubbing.  And that's part one of really a three-part

9    process that's contemplated to make the data reliable.

10           The second part is a face validity check where once

11   the data is exported and cleansed and gone through this

12   automated scrubbing process, a report is generated.  And once

13   the report is generated, various validators engaged by the

14   defendants and validators who work for the defendants as state

15   employees review the reports to ensure that they are -- they

16   have facial integrity, that all of the fields that are required

17   are there, that the fields meet all of the specifications

18   defendants were required to develop, that the calculations that

19   the reports make on the various percentage requirements in the

20   case are correct, et cetera.  That's the face validity check.

21           Then there is also an automated validation process

22   where other -- once the data from these reports passes the face

23   validity process, it goes to an automated validation process

24   where there is a one-on-one check, 100 percent check from a

25   sample of all the data fields in a case to ensure that the

1  report accurately reflects what is in the case record, the

2  electronic case record.  And then errors are identified and a

3  system is in place to correct them.  It's quite an elaborate

4  process.  And there are various quality assurance components

5  that are also part of that process.

6          Defendants were required to submit that plan by

7  June 30th.  They submitted it.  I had concerns with that plan.

8  They submitted a superseding version of that plan that they

9  supplemented.  But at this point I still have not approved that

10 plan.  The parties and I discussed this issue this week.

11 Defendants will be resubmitting that plan and it will be their

12 final opportunity for resubmission on November 27th, and my

13 final determination will be due on December 6th with respect to

14 that plan.  It's something that does need to be finalized.  I

15 have plans to meet with the defendants to discuss my concerns

16 further and to talk about the supplementation effort.  And they

17 have, as I will explain, supplemented some of their validation

18 activities in light of what issues that they have identified

19 and I have identified.

20          Now we're getting to the reports which are required by

21 the June order.  And as I said, defendants were required to

22 produce 53 complete, accurate and validated reports according

23 to this staggered schedule beginning in September on the 1st

24 day of September and concluding on January 15th.  They were

25 required to produce them in what's referred to as an Excel

1    format.  And an Excel format enables defendants, plaintiffs and

2    me to manipulate the data, more readily analyze the data,

3    understand the data, and helps inform the remedial process both

4    from a management point of view and from an evaluation of

5    defendants' performance viewpoint as well.

6            They were also required to produce the reports in sets

7    of ten, generally sets of ten, with less than a handful on the

8    final installment.  The reports were required to be produced

9    historically as well so that, as the court may recall, we did

10   not have accurate validated data dating back to Period 3.

11   Period 3 started in July of 2012 and concluded in July of 2013.

12   So defendants' data reporting obligations under the June 2013

13   order extended all the way back to monthly reports -- issuing

14   monthly reports for each of these 53 reports starting in July

15   of 2012.  So at a minimum, 13 reports for each of the 53

16   requirements are required by the order, one for each month

17   during that time period.  It is a lot of data.

18           Now, my comments are limited to my -- right now

19   defendants have submitted two sets, the September 1 set, the

20   October 1 set, and just this week I received the November 1

21   set.  My comments are limited to my experience with the

22   September and October 1 set and not the November set because I

23   have not had an opportunity to review the data in that set.

24           Notwithstanding defendants' success, as I mentioned

25   earlier, extracting the data, converting it into the database,

1  developing very complex and detailed report specifications, and

2  implementing the plan to address the connectivity issues I

3  talked about, defendants have had enormous challenges in

4  producing the required accurate and validated reports on a

5  timely basis.  As of October 1, for the first two sets of

6  reports, defendants were required to submit 25 of them, 25

7  accurate and validated reports.  Now, as of today, they have

8  submitted 23 of them, and the two that they haven't submitted,

9  there is appropriate justification for not submitting them,

10 very appropriate justification.  But I am aware of significant

11 limitations in the accuracy of 10 of the 23 reports.  Most of

12 those limitations were discovered post submission to me and

13 plaintiffs by the defendants and some of those limitations were

14 discovered by my office.

15          Because of the limitations that have been discovered,

16 and they were I believe mostly discovered in October,

17 defendants are addressing how they are producing and validating

18 these reports and they have elected to resubmit 10 of the 23

19 reports that had limitations, and some significant accuracy

20 limitations.  They intend to resubmit them in two sets, the

21 first on November 18th and the second on November 25th.

22          Insofar as this two sets of reports, not all of them

23 were submitted timely as required and not all of the required

24 months were submitted timely.  Initially most were not produced

25 in the required format, this Excel format, but several were

1    produced in that format only to be withdrawn by defendants

2    within a day's time.  For five of the 23 reports that we have

3    received thus far, only the current month of data was produced

4    and not the historical data because defendants learned that

5    that data was not available and not collected -- not available

6    and not maintained in their computer system, so they couldn't

7    provide the historical data.

8           Not all of the data that was submitted underwent what

9    I believe is the appropriate validation process even under the

10   initial plan that defendant submitted that I have not approved.

11   The defendants contend the process they used was appropriate

12   and in hindsight they have characterized it as cursory.  I

13   disagree that it was appropriate, Your Honor, but I don't

14   believe their position is unreasonable.

15          At a minimum, it's my view that their performance,

16   however, speaks to the strained capacity if not a significant

17   capacity deficit.  Saying that, there are a number of factors

18   that I think are important, however, to underscore.  This

19   project has been marked by a sense of urgency by defendants

20   that I have not seen during my tenure in this case.

21          THE COURT:  It has been marked over the last few

22   months --

23          MS. LOPES:  Since June.

24          THE COURT:  -- by urgency.  Okay.

25          MS. LOPES:  Since February, really.  Since the

1    February hearing, Your Honor.  Since February.  A tremendous
2    sense of urgency.  And defendants have devoted tremendous
3    resources to it.  There are many talented and hard-working
4    people who have made this a priority and who have worked very,
5    very hard and taken the deadline seriously.  They are learning
6    from the process.  They're making modifications and adaptations
7    as they go, and that's a very positive sign.  And we now have
8    data that, assuming it meets minimum standards for quality, we
9    have data that will be much easier to manipulate.

10            But given the experience I have had in the receipt of
11    these reports and how they were produced and the issues that
12    have been revealed, I have not had confidence in the process
13    that defendants have implemented.  And so I have undergone and
14    undertaken a fairly extensive fact finding and review process.
15    I have interviewed the report specification developers.  I have
16    interviewed many of the defendants' data and their contractors'
17    data validators.  I have interviewed project managers for all
18    of the entities, the consulting entities and the agency
19    entities involved.  I have interviewed programmers.  Some of
20    this I have done in collaboration with my experts, my data and
21    IT experts.  I have also interviewed managers at the child
22    welfare agency.  I have reviewed the plans and protocols that
23    have been submitted and I have reviewed validation logs and --
24    or reports that have been generated by the validators and by
25    the contractors.

1          Based on this preliminary review related to the first

2    and second set of the reports, I have drawn some conclusions

3    that I want to share with the court.  And I've shared them with

4    the parties.  It's my view that this entire enterprise with

5    respect to the report production got off to a very difficult

6    start.  Defendants had to create processes virtually from

7    scratch for every aspect of this project, how to extract the

8    data, how to develop the specifications, how to validate the

9    data.  They had to overcome -- and to a lesser extent they

10   continued to struggle to overcome communication gaps between

11   the child welfare program professionals who are working on the

12   report specifications and the technical side contractors who

13   were trying to implement the specifications, and all of this

14   impacted defendants' production schedule, created unanticipated

15   delays resulting in a very collapsed time period within which

16   defendants validated these reports.  For a number of the

17   reports required to be produced in September, the validation

18   occurred in a handful of days making it, you know, virtually I

19   think impossible to do an appropriate job.

20          So not surprisingly we have the accuracy limitations

21   that I discussed in the 10 reports that have been identified.

22   Also contributing to those limitations is the fact that the

23   methodology that the defendants used at least initially to

24   conduct the validation needed to be more robust and I think

25   they recognized this and have expanded and supplemented it

1    subsequently so that they report for the second set of reports

2    and the third set of reports they have employed an expanded

3    process.  I am reading through the records related to that

4    validation process and waiting to review those records, but

5    they have reported and all of that has been corroborated by my

6    interviews with various staffing consultants that they have

7    expanded the validation process to address the limitations.

8         I believe the proof will be in the product, Your

9    Honor, that defendants produce now for the third set of reports

10   and for the 10 reports that defendants have found to be

11   deficient and are rerunning and will resubmit later this month.

12   What I plan to do in terms of next steps is to review all of

13   these submissions:  The first set, the second set, the

14   resubmission of the deficient reports in the first and second

15   set, and now the third set that I just received on Monday.

16   Assuming those reports meet minimum accuracy standards, that

17   there aren't apparent errors in calculations and in the fields

18   that are reported and that the logic is consistent and

19   appropriate, I will analyze all of that data and make it

20   available to both parties by December 6.  I will also analyze,

21   assuming there are no issues with the data, the reports that

22   defendants are required to submit on December 1st, and I have

23   not yet provided the parties with a deadline by which I can do

24   that but I intend to provide them with a deadline sometime next

25   week by which I can review the December 1st submission.  And

1    then the parties will have, if all of this works out,

2    sufficient information to negotiate the balance of Period 4 and

3    it will help inform those negotiations, which is critical.

4         If, however, Your Honor, my review of this data

5    identifies significant accuracy issues or issues related to the

6    integrity of the data in the reports, I will be filing an

7    appropriate pleading with the court and at that point I would

8    be recommending some form of intervention, because this has

9    been a long process, it has been a difficult and challenging

10   process.  But in my view, there would be no excuse for that

11   level of error.  And I am really hoping that we will not be in

12   a position where that occurs.

13        I do not at this point -- having gone through all of

14   the interviews I've gone through, I do not at this point have

15   confidence yet, full confidence in the reports.  I am hoping

16   that I will get there and I am hoping that I will be able to

17   report to the court that I do, and I am working as hard as I

18   can to make sure that I have reviewed every appropriate

19   document and interviewed every appropriate person in order to

20   develop the confidence or in order to reveal issues or

21   limitations that I'm currently unaware of.

22        Defendants have worked very hard on this and made, you

23   know, significant progress, but where the rubber meets the

24   road, Your Honor, is in getting at least minimally accurate

25   reports.  We will always have errors and this is an iterative

1    process.  The data will get better over time.  I expect to see

2    errors but I don't expect to see gross errors that defendants

3    should identify before they ever, ever produce these reports,

4    not at this stage and not after the investment they've made in

5    resources and time and money.

6           That, Your Honor, in a nutshell is the situation with

7    respect to the June order.

8           There are two other matters I wanted to address.  The

9    first is with respect to hiring and staffing.  As you may

10   recall as I indicated at the outset, my January report and

11   subject at the hearing in February was the caseworker

12   understaffing issue and the supervisory understaffing issue.  I

13   am very pleased to report that defendants have made tremendous

14   progress with respect to caseworker staffing.  They have hired

15   a very high number of caseworkers since January of 2013.  They

16   have adopted initiatives, recruitment initiatives that have

17   been effective.  They have brought those caseworkers into

18   counties that had an urgent need for caseworker staffing levels

19   to increase and they have streamlined the hiring process and

20   done a very, very commendable and appropriate job.

21          However, they have been unable to address shortages in

22   supervisory staffing.  And this was always an issue, but the

23   issue is magnified by the fact that supervisory hiring has not

24   kept pace with caseworker hiring.  So there is a requirement in

25   this lawsuit that every supervisor supervise no more than five

1    workers.  And the reasons for that are obvious and evident.

2    You hire a new caseworker, they need to be appropriately

3    supervised.  They're dealing with children and children's

4    lives.  They need the wise hand and guidance of a seasoned

5    professional with the appropriate training and management

6    skills to do that.

7              Defendants -- the data shows, and I am pleased also to

8    report that the data report that defendants recently submitted

9    on supervisory staffing appears to be an accurate report, and I

10   have gone behind the data in that report and validated it.  And

11   based on that data, defendants have not met the Period 3

12   requirement and nor are they currently meeting what is the

13   Period 4 requirement with respect to supervisory staffing.

14   That is an issue that requires attention.

15             It's not as if defendants haven't given it attention.

16   They have.  And they have launched initiatives to address them.

17   Those initiatives have not been effective and they are going to

18   need to redouble their efforts and address that deficiency.

19   Because what will and can happen is that all of these new

20   caseworkers they've hired or some number of them, some

21   appreciable number, and if past is prelude, that will be the

22   case, will leave because they're not properly supervised.  And

23   so all this work in bringing them on and training them, these

24   new caseworkers, will be for naught.

25             Defendants really need to move aggressively to address

1    the supervisory staffing issue.  And I believe they know that

2    and appreciate that.  But that is an issue I want to bring to

3    your attention.  I expect it will be an issue I will report on

4    in more detail and report on their progress henceforth in my

5    next written report.

6           The third thing I wanted to address, Your Honor, is

7    these remedial plans I talked about earlier.  So there have

8    been several remedial plans where I have been required to

9    approve the plans.  And, you know, I have employed a

10   reasonableness standard in terms of those submissions.  I

11   haven't been able to approve those plans, and defendants have

12   made a number of resubmissions.  We're at the stage where the

13   parties have agreed that defendants will be making final

14   resubmissions, and they've made some this week, and I will be

15   making a final determination about whether I can approve them

16   or not.  If I can't approve them, I will certainly be

17   addressing that in my next report as well.  I'm very hopeful

18   and optimistic that I will be able to and I will do everything

19   I can to work with the defendants to ensure that we get there.

20          I didn't know if the court has any questions but those

21   are the matters I wanted to update the court on.

22          THE COURT:  You have indicated to me your findings and

23   assessments and what you think is the degree of progress made,

24   and I think you made a complete report and I don't right now

25   have any questions to ask you.  It may be that something is

1  raised or said by counsel that I will end up asking you about

2  that.

3          MS. LOPES:  Very well, Your Honor.  Thank you.

4          THE COURT:  Thank you, ma'am.

5          Ms. Lowry?

6          MS. LOWRY:  Thank you, Your Honor.

7          THE COURT:  Let me ask you this question.

8          MS. LOWRY:  Yes, sir.

9          THE COURT:  I perhaps should let you finish before I

10  ask anything but is there any area -- or when you make your

11  comments, are there any responses that you have to what

12  Ms. Lopes said wherein perhaps you disagree to some extent with

13  what she found or suggested or just your reaction to her --

14          MS. LOWRY:  Your Honor, let me answer that --

15          THE COURT:  -- presentation?

16          MS. LOWRY:  -- in two ways.  Number one, plaintiffs

17  have the highest regard for the diligence and the

18  professionalism and the skill with which Ms. Lopes is doing her

19  job.  And the parties put her in place to not only monitor

20  what's going on but to approve various aspects of the

21  defendants' actions, and we have no quarrel with the decisions

22  that she is making or the thoroughness with which she is

23  approaching her task.  So we don't have problems with that.  We

24  do have comments about what is going on, but in terms of us

25  saying she should have approved it and she didn't or

1  vice versa, we don't have anything like that to present to the

2  court.

3         I do think, though, that it's important to put this in

4  the context of the fact that this settlement agreement is

5  almost six years old and what the court hears today from

6  Ms. Lopes and certainly were necessary and she said it very,

7  very thoroughly, we would say it as well.  We do not have

8  complete, accurate, validated data about what's happening to

9  the children for whose benefit this court order was entered.  I

10  think that it was enormously important at the February hearing

11  that concern was expressed about this and even more important

12  that in June the court entered an order to address the

13  specifics of this and not just to say this is terrible but to

14  say here are the specific steps that have to be taken to get us

15  out of this, in our view, inexcusable position.  And I think

16  Ms. Lopes put a very, very good perspective on this because she

17  really has gotten into the operations of the organization as

18  doing her absolute best to understand what's going on and says

19  to the court this morning since February there has been some

20  sense of urgency.

21         Well, you know, we can't undo the past.  I think it is

22  troubling that there was not a sense of urgency before that.

23  There has been a sense of urgency since then and there has been

24  a lot of activity.  Whether the activity is sufficient and

25  whether the capacity is there to deliver what's necessary and

1    what is required by the June court order, which is not just

2    data, there has been data, but complete, accurate, validated

3    data has not been in existence.  Whether that is going to be

4    sufficient remains to be seen.  And as we stand here today, we

5    still do not have the complete, accurate, validated data that

6    is required by the June order.

7           Now, there is a plan, and the plan has deadlines in

8    it.  And it is obviously very important to pay very great

9    attention to that.  But -- and as I say, we can't undo the

10   past.  We need to move forward with great dispatch to remedy

11   this situation which is the intent of the June order.  But as

12   of today, we do not have that accurate data.  The defendants,

13   as Ms. Lopes said, have not submitted the data on time.  And

14   when they have submitted it, she has had to send it back.  And

15   now the parties have all agreed and Ms. Lopes has committed to

16   making a decision about whether the data from those three

17   periods, September, October and November, are -- satisfy the

18   order.

19          Ms. Lopes has still not approved the process.  She

20   says she hopes she can and we hope she can.  But as of today,

21   there is not an approved process from the monitor saying this

22   is the process for scrubbing the data about which there was

23   discussion before.  There needs to be, and if she cannot -- and

24   she doesn't know that today.  She is working on it.  If that

25   process is not approved, then I think I would propose to the

1  court on behalf of plaintiffs that we are in a critical

2  situation and we need to return to the court.  We don't know

3  that's going to be the result today.  Everything may be

4  wonderful.  But today we still don't know, notwithstanding the

5  concern at the February hearing, notwithstanding the June

6  order.  So that is a matter of the utmost urgency.

7          We don't know how the State is performing with regard

8  to its obligations to the children we represent.  Maybe things

9  are going well.  I hope so.  Maybe they're not, in which case

10 there is going -- there needs to be further attention paid and

11 further remedies adopted.

12         So we have great concern, notwithstanding the fact

13 that the defendants have been active since February to be sure,

14 notwithstanding the fact that Ms. Lopes has been extremely

15 active, understanding and trying to analyze and sending back

16 the State its data, trying to see that whether the State can

17 get it right.  So far they have not.  So we have concern about

18 that.

19         But as you heard, Ms. Lopes has made a commitment to

20 determine by December 6th whether the process is valid and

21 whether the data is valid.  And we don't know what that

22 determination will be, but if it's negative, we think -- and

23 she said that she will advise the court immediately if in fact

24 it is not satisfactory, and then I think we need to return to

25 court very quickly on that.

1          The other -- there are other issues, Ms. Lopes

2     referred to them, about various plans that have been due, some

3     of them for more than a year, that have been submitted to her

4     that she has not been able to approve.  And she has not been

5     able to approve them because they weren't satisfactory.  Again,

6     that's her job, is to make those determinations.  We do not in

7     any way question those determinations.  We do think that final

8     determinations need to be made because we need to move on if

9     they can't do it, and she has made a commitment and I think

10    it's important to note for the record that on the three

11    outstanding reports, that is, the FM fatality report, the work

12    force development plan, and the protocol for investigation, she

13    will make a final determination by November 18th.  And again,

14    we hope that she can approve them because they're satisfactory.

15    And if they're not, then I think we have to consider what else

16    needs to be done about that.

17          What we would -- so, and she mentions the failure to

18    have an adequate number of supervisors and did, of course, a

19    very good job explaining why supervisors are critical.  They

20    are critical to everything.  They are critical to the safety of

21    children.  And if the State cannot bring in the supervisors

22    that are necessary, the supervisors supervise the workers that

23    they've hired, children's safety is at issue as well as the

24    fact that they will lose the workers they have.

25          And one of the reasons apparently that they have not

1    brought on the supervisors they need is because the salary

2    levels are very low and have not been increased in seven years.

3    And that is an important issue.  And if that cannot be resolved

4    quickly, Your Honor, I think it's a matter that we also need to

5    bring to the court for assistance.  Because it's clear when the

6    court becomes involved, things happen, and that's very, very

7    important for the class that we represent.

8            We believe that there needs to be another in person

9    hearing before the court if not brought on by Ms. Lopes'

10   finding that the data is not sufficient, we hope that won't

11   happen.  If she does, we think we need to return to the court

12   quickly because that's going to be an emergency situation.  We

13   must have this complete, accurate validated data called for in

14   the court's June order.  Assuming that proceeds all right,

15   assuming that we get the data we need to understand what's

16   happening to our clients, then we think we need to appear

17   before the court in late February after the parties have had

18   the opportunity to review that data, after we've had the

19   opportunity to do the rest of the year for the implementation

20   Plan 4 and after we have seen what the data shows and whether

21   there are issues that we need to bring to the court as well.

22   And we've discussed this with Ms. Lopes and the State as well,

23   but it is clear that this case needs scrutiny in order for us

24   not to be at Year 7, 8 and 9 saying, *Your Honor, things aren't*

25   *happening.*  I think now is the time.

```
 1              I think -- so, Your Honor, I think those are our
 2     concerns today.  We need to get this data.  There is a
 3     commitment made to produce it.  We need to get Ms. Lopes'
 4     opinion on whether it's accurate or not.  There is a commitment
 5     and a date set for that.  That's good progress.  And we need to
 6     see where we are and we need to come back to the court at the
 7     latest we would propose -- and, of course, depending on the
 8     court's schedule -- at the end of February and see whether in
 9     fact these children are in jeopardy, whether they're getting
10     the protections that are the subject of the order entered by
11     this court or whether we need to ask the court for more
12     assistance here.
13              THE COURT:  Thank you.
14              MS. LOWRY:  Thank you, Your Honor.
15              THE COURT:  Ms. Rachal, I will hear from you now.
16              MS. RACHAL:  Thank you, Your Honor.  I would like to
17     mention, too, that one of our co-counsel is missing today,
18     Rusty Fortenberry.  He planned to be here but his daddy is
19     gravely ill.  So we anticipate Mr. Fortenberry will be back
20     next time but unfortunately he can't be with us today.
21              I think that the monitor's assessment of our
22     performance is accurate.  It's correct.  But I would like to
23     give you a little bit of background of everything that goes
24     into producing these reports so that you can get an
25     understanding of how difficult a process this is.
```

1            Ms. Lopes talked about the fact that we have to

2    produce the historical data that goes back to the beginning of

3    Period 3.  So, as a result, we've got these 53 reports but

4    every one of those has 13 PDF reports going back 13 months and

5    in some cases 14 and 15, and also Excel reports.  So in total,

6    for example, in our November production, which it wasn't our

7    biggest one, we had over 300 reports that we had to produce to

8    plaintiffs and to the monitor, go through that information, go

9    through our validation process and get it out.  So it is a

10   great amount of data that we're dealing with and we try to

11   reduce the incidence of error.  It has definitely been a

12   learning curve.  Myself and plaintiffs and the monitor have

13   been very involved in developing the report specifications to

14   try to make sure that those reports actually reflect what we

15   need, those outcomes in the settlement, so that we can get that

16   information from the data reports.

17           Just to give you an idea before those report

18   specifications ever get to the plaintiffs and the monitor,

19   there is a long process that we have to go through to even get

20   there.  And it involves looking at those actual MSA

21   requirements, then going back and looking at our older reports,

22   going back and looking at the pending changes, the things that

23   we identified that were wrong with those.  Then we go back and

24   look at information the monitor has given us, the plaintiff has

25   given us regarding what issues they spotted with those reports.

1    From that, we then develop those report specifications.

2          At that time, our clients then have what they're

3    calling a WebEx meeting, and this is something new that was

4    instituted after that first set of reports.  The first set of

5    reports we sent out, there were a lot of bumps in the road.  It

6    was a lot of data.  We got the reports late and, as the monitor

7    pointed out, that review process was very, very hurried.  We

8    learned from that experience and put these new meetings in

9    place so that our programmatic people who know about child

10   welfare -- I'm sorry?  -- so that our programmatic people who

11   work in child welfare can actually see these reports as well as

12   our techie people and they can see the prototypes of these

13   reports and give feedback on it.  And we believe that that has

14   helped our second and third set of reports.  It seems like each

15   time things are getting better.

16         My order has really tight time frames and there has

17   been a great sense of urgency.  And we have to have that in

18   order to try to make those time frames.

19         THE COURT:  Are you hopeful or are you optimistic that

20   you are going to be able to meet this schedule?  And, of

21   course, as far as the court is concerned, it will be for

22   Ms. Lopes to determine whether your reports and submissions are

23   satisfactory.  But are you optimistic that you are going to be

24   able to comply?  Do you think you have the solution to the

25   problems and the questions that she has raised and that you are

1    in a posture to be able to respond positively and effectively

2    now to this schedule?

3            MS. RACHAL:  We are definitely optimistic about that,

4    Your Honor.  You know, sometimes there are bumps in the road

5    that happen, and I will give you an example.  In the beginning,

6    these reports we were having to manually go in and have a

7    person sit there and enter the date parameters, what period of

8    time would this report cover.  Well, now we're moving to the

9    point where we can automate some of that and eventually

10   automate all of that.  So that's an example of something that

11   looks like a small thing but it's going to save a great amount

12   of time and just make the process go smoother.  So each time

13   we've done one, that's the better we've gotten, so I feel like

14   we will make it.  Sometimes there are bumps in the road with

15   the antiquated system that we're working on.  Even, for

16   example, when we tried to get the Excel reports that the court

17   order requires, trying to transfer that information from our

18   old system to the SEQUEL system and then convert it into Excel

19   was not as easy as we thought, so we were 18 days late

20   producing that first set of Excel reports, and now it has

21   occurred more smoothly.  But we have learned and we feel like

22   based on the things that we learned that it's going to get

23   better and better and that we will be able to hit these

24   deadlines.  But it's very tight, Your Honor.

25            Also, Your Honor, I would like to talk a little bit

1    about the fact that we've got issues with our ASWS hiring.  We

2    have definitely made great strides in hiring those caseworkers.

3    In fact, this year alone we have hired over 100 new

4    caseworkers.  The issue we've had in recruiting the ASWS's --

5    that stands for Area Social Work Supervisors -- is that,

6    according to the terms of Olivia Y, we are seeking

7    accreditation by COA.

8         COA requires that our supervisors have an advanced

9    degree.  They must have a masters in social work.  That has

10   been an issue trying to recruit masters level workers to our

11   agency.  We have stepped up recruiting processes.  We have even

12   contacted local colleges and set up programs, and the one that

13   comes to mind right now is Mississippi College, to try to get a

14   pipeline of supervisors coming into our system.

15        The other thing that I will say is that we instituted

16   two years ago a tuition reimbursement program, and that allows

17   someone to come to DHS and work and they have to commit to

18   working with us for a certain period of time.  In exchange for

19   that, we pay for their tuition expenses as well as for their

20   books.  Once they complete that degree, they then have to stay

21   with the agency for a minimum number of years or they have to

22   repay that money back.  That has been really helpful in getting

23   our staff better educated and getting additional supervisors.

24   I believe right now we have over 70 enrolled in the tuition

25   reimbursement program, and those are going to be 70 people in

1    line to become supervisors.

2          One thing that I will also say is that we did go to

3    COA in light of all the issues we were having trying to

4    recruit, especially in some of our "carve out" counties, our

5    counties where it's really hard to recruit workers.  We went to

6    them and told them our issues and they understood.  And then we

7    said, *Look, you've got this tuition reimbursement program in*

8    *place.  If you will go ahead and say we will hire you -- as*

9    *long as you're enrolled in the program, we will hire you as a*

10   *supervisor,* then COA gave us that exception and was allowing us

11   to do that for now until we get our staffing up.  So we're

12   hopeful that that will help us increase the number of

13   supervisors.  And again, we are really trying our best to get

14   those supervisors in place.

15          And that's all I have, Your Honor, unless you have

16   some additional questions for me.

17          THE COURT:  I do not.  Thank you.

18          MS. RACHAL:  Thank you very much.

19          THE COURT:  Does counsel for either the plaintiffs or

20   the State or Ms. Lopes have any further comment to make to the

21   court with regard to the status of this case?

22          MS. LOPES:  I have one thing, Your Honor.

23          THE COURT:  Okay.

24          MS. LOPES:  One thing that is happening as kind of a

25   corollary to the data initiative is that defendants are

1    continuing to implement their reform model.  And that is this

2    practice model that has been the subject of my previous

3    reports.  And it's also the subject and addressed in my

4    September report.  They have put a lot of resources into this.

5    They have trained staff.  They're coaching staff.  They are

6    working on it.  And this is -- this is the engine that is

7    intended to drive the reform process.  The defendants -- this

8    is the vehicle that will get them to meet the requirements in

9    the case in effect.  That's how it's conceptualized and that's

10   how it's operationalized.  And defendants' ability to -- and

11   defendants have done a very admirable job in terms of the

12   implementation effort and the investment, but their ability to

13   make that work and to work effectively is really contingent

14   upon the receipt of the accurate data and using it as an

15   effective management tool to move the system forward.  So there

16   is a lot -- there is a lot at stake in terms of that initiative

17   and the efficacy of it if we don't have the accurate data.

18           THE COURT:  Thank you, ma'am.

19           Ms. Lowry, you looked like you were poised to stand to

20   say something a moment ago.

21           MS. LOWRY:  Thank you very much, Your Honor, for

22   reading that.  Ms. Lopes' point is very important.  The State

23   is trying.  It is hard.  This is a child welfare system

24   responsible for thousands of children.  "It's hard" isn't the

25   answer.  Six years in, this hasn't happened before; it must

1    happen now.  So we renew our request, Your Honor, for a court

2    hearing as soon as possible after the issuance of Ms. Lopes'

3    report which will give everybody, the parties and the court,

4    the analysis of where things stand on how these children are

5    doing.  And we urge it to be at the soonest possible date.

6    That's assuming she doesn't find that the current process has

7    to be reexamined with regard to the data.  And that will be

8    determined in the beginning of December.

9            But we need the assistance of the court at this point.

10   We've gotten the assistance of the court through that --

11   frequently, and certainly the June order was a tremendous step

12   forward.  The real problems with it, maybe it's okay, we don't

13   know, but we just renew our request for an early hearing, Your

14   Honor.  Thank you.

15           THE COURT:  All right.

16           MS. RACHAL:  Your Honor, may I have a few words?

17           THE COURT:  Yes, ma'am.

18           MS. RACHAL:  Your Honor, I would just like to convey

19   that the State is really trying hard.  We have taken any advice

20   that the monitor has given us and tried to work with that.  And

21   as the monitor pointed out with regard to our data validation

22   and scrubbing process, she is going to be meeting with us now

23   that we've kind of had these lessons learned to see what we can

24   improve in the process.  And we have no objection to the

25   hearing happening in February.  In fact, I mean, it should

1  happen.  Ms. Lopes is going to present her next report and so

2  we are in full agreement with that.  And I think we're all

3  available the last week of February.

4          Thank you, Your Honor.

5          THE COURT:  All right.  The court's schedule is not so

6  wrecked that I can't -- that I don't have a good bit of

7  flexibility.  I am not going to set a date this morning but

8  will tell you that I will accede to your request to have a

9  hearing and that it will be during the time frame of the latter

10 part of February.  I am convinced, and it was acknowledged by

11 Ms. Lowry, I believe she said the State is trying, and

12 Ms. Lopes stated that there has been a sense of urgency since

13 at least February, so that's sustained diligent efforts for

14 seven or eight months.

15         And, of course, the court expects that that will

16 continue until a satisfactory level of compliance with the

17 court orders has been reached.  I'm not going to try to

18 characterize or summarize what Ms. Lopes said.  I accept all

19 that she said in her report and will await the submission of

20 her report that she expects to have within the reasonable

21 foreseeable future sometime in December, and then we will

22 proceed from there.

23         Court is adjourned.  But, Ms. Lopes, I would like to

24 speak with you just briefly before you leave.

25         MS. LOPES:  Yes, sir, Your Honor.  Could I clarify

1    something on the record?

2              THE COURT:  Yes, ma'am.

3              MS. LOPES:  With respect to my next report, assuming

4    the data is fine and there are no accuracy issues, then I will

5    be filing a comprehensive report on the end of Period 3,

6    Period 4, and the June order in February.  If there are issues

7    with the data, the September, October and November data, then I

8    will be filing a pleading in December.

9              THE COURT:  All right.

10             MS. LOPES:  So there may not be a December report.  In

11   any event, there will always be a February report.

12             THE COURT:  In the event that the court doesn't have a

13   report until February, we may need a little more time in order

14   to schedule the hearing, but I will do so with the input from

15   counsel and with the suggestion of Ms. Lopes, we will have a

16   hearing, a timely hearing in the case.

17             Court is adjourned.

18             MS. LOPES:  Thank you, Your Honor.

19        (Hearing adjourned.)

20

21

22

23

24

25

1

2                        CERTIFICATE OF REPORTER

3

4          I, BRENDA D. WOLVERTON, Official Court Reporter,

5  United States District Court, Southern District of Mississippi,

6  do hereby certify that the above and foregoing pages contain a

7  full, true and correct transcript of the proceedings had in the

8  aforenamed case at the time and place indicated, which

9  proceedings were recorded by me to the best of my skill and

10 ability.

11         I certify that the transcript fees and format comply

12 with those prescribed by the Court and Judicial Conference of

13 the United States.

14         This the 13th day of December, 2013.

15

16                    s/Brenda D. Wolverton
                      _____
17                    U.S. DISTRICT COURT REPORTER

18

19

20

21

22

23

24

25