# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### JACKSON DIVISION

OLIVIA Y., *et al*.                                             PLAINTIFFS

v.                                          CIVIL ACTION NO.  3:04CV251LN

PHIL BRYANT, as Governor of the State of Mississippi, *et al.*            DEFENDANTS

---

## THE COURT MONITOR'S INTERIM REPORT TO THE COURT REGARDING DEFENDANTS' PERFORMANCE DURING PERIOD 5

---

**Table of Contents, Report Narrative,**
**Index to Exhibits, Appendix: Exhibits 1-5**

**January 6, 2016**

# TABLE OF CONTENTS

I.    BACKGROUND AND SUMMARY OF FINDINGS ...................................................3

II.   METHODOLOGY ...............................................................................................7

III.  FINDINGS ...........................................................................................................10

      Modified Settlement Agreement ("MSA") §II.A.2.a.11.a. ...................................11
      MSA §II.A.2.a.11.b. .............................................................................................14
      MSA §II.A.2.a.11.c. .............................................................................................16
      MSA §II.A.2.a.11.d. .............................................................................................17
      Period 5 Implementation Plan ("IP") §II.C.3. ....................................................18
            • Period 5 Case Record Review Findings, Summary Table ....................21
      Ongoing Requirement, MSA, §II.B.1.e.2. ............................................................26
      Ongoing Requirement, MSA, §II.B.1.e.3. ............................................................27
      MSA §II.B.2.m. ....................................................................................................29
      Ongoing Requirement, MSA, §II.B.2.p.2. ............................................................31
      Ongoing Requirement, MSA, §II.B.2.p.8. ............................................................33
      Ongoing Requirement, MSA, §II.B.2.q.2. ............................................................34
      Ongoing Requirement, MSA, §II.B.2.r.4. .............................................................35
      Ongoing Requirement, MSA, §II.B.2.r.5. .............................................................37
      Ongoing Requirement, MSA, §II.B.2.r.6. .............................................................38
      Ongoing Requirement, MSA, §II.B.2.r.7. .............................................................41
      Ongoing Requirement, MSA, §II.B.2.r.8. .............................................................42
      MSA §II.B.3.k.1. ..................................................................................................43
      MSA §II.B.3.k.2. ..................................................................................................46
      MSA §II.B.3.k.3. ..................................................................................................48
      MSA §II.B.3.k.4. ..................................................................................................49
      MSA §II.B.3.k.5. ..................................................................................................50
      MSA §II.B.3.k.6. ..................................................................................................53
      MSA §II.B.3.k.7. ..................................................................................................53
      MSA §II.B.3.k.8. ..................................................................................................54
      MSA §II.B.4.d.1. ..................................................................................................55
      MSA §II.B.5.g.1. ..................................................................................................55
      MSA §II.B.5.g.2. ..................................................................................................57
      MSA §II.B.5.g.3. ..................................................................................................59
      MSA §§II.B.5.h.1. and II.B.5.i.1. .........................................................................62
      MSA §§II.B.5.h.3. and II.B.5.i.3. .........................................................................65
      MSA §II.C.1.d.1. ..................................................................................................70
      MSA §§III.B.3.a.6.a. and III.B.3.a.7.a. ................................................................71
      MSA §§III.B.4.b.1. and III.B.4.c.1. ......................................................................74
      MSA §§III.B.6.c. and III.B.6.f. .............................................................................75
      MSA §§III.B.8.d.1. and III.B.8.e.1. ......................................................................75
      MSA §§III.C.1.a.1. and III.C.1.b.1. ......................................................................79
      MSA §§III.C.2.a.1. and III.C.2.b.1. ......................................................................81

IV.      CASE SUMMARY AND ASSESSMENT ...................................................83

      A.  Overview................................................................................................83
      B.  Licensure and Monitoring of the Resource Home ................................84
      C.  Training of the Resource Parents .........................................................91
      D.  The Placement Process .........................................................................92
      E.  The Investigations ................................................................................96
      F.  The Fatality Review Process.................................................................98
      G.  The Quality and Completeness of Case Records and Documentation ...............99

V.       CONCLUSION.........................................................................................101

      APPENDIX

      Index to Exhibits ........................................................................... Index-1

      Appendix
          Ex. 1 – Ex. 5

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

OLIVIA Y., *et al*.                                                    PLAINTIFFS


v.                                                    CIVIL ACTION NO.  3:04CV251LN


PHIL BRYANT, as Governor of the State of Mississippi, *et al.*            DEFENDANTS

---

## THE COURT MONITOR'S INTERIM REPORT TO THE COURT REGARDING DEFENDANTS' PERFORMANCE DURING PERIOD 5

---

This interim report sets forth the Court Monitor's ("Monitor") findings regarding

defendants' progress toward meeting certain key Period Five requirements established by the

July 6, 2012 Modified Settlement Agreement ("MSA") and Period 5 Implementation Plan

("IP").[1]  A follow up report regarding Period 5 requirements that are not addressed herein will be

issued, as required, within the next six-month interval.  A draft version of this report was

provided to the parties for review and comment.  The Monitor considered the parties' comments,

and to the extent appropriate, addressed them in this report.[2]

---

[1]  The Period 5 Implementation Plan was filed on December 23, 2014.

[2]  The report presents the results of the Monitor's analyses of defendants' performance during Period 5, based in substantial part on data submitted by defendants or collected by the Monitor during a structured case record review process.  By and large, these analyses are limited to descriptions of defendants' performance against required performance levels and are not explanatory.  As the Monitor has indicated in prior reports, assessing the root causes of defendants' performance and any changes to performance over time is an essential undertaking and one DFCS management must carry out on an ongoing basis in order to improve performance.  However, analyzing those causes against a broad array of requirements across regions and time is beyond the scope of this interim report.

On December 14, 2015, in anticipation of the December 21, 2015 status hearing, the Monitor submitted a version of this report to the Court for *in camera* review.  Thereafter, the Monitor conferred with the parties in order to address certain information reflected in the Monitor's *in camera* submission that may fall within the purview of the August 5, 2004 Confidentiality Order.  Among other revisions, in the version of this report that is being filed in the public record, redactions have been made to one of the report's exhibits and the narrative in Section IV has been revised to ensure conformity with the mandates of the Confidentiality Order.

The report establishes that on a statewide level, defendants' performance declined during Period 5 relative to Period 4 performance.  Furthermore, defendants' performance on a regional level declined as well.  Indeed, nearly every region performed worse in Period 5 than it did during Period 4.

Defendants' performance during Period 5 has been impeded by systemic issues that defendants have been unable to address in an effective way.  These systemic issues include a recent and rapid growth in the number of children in defendants' custody, caseworkers with excessive caseloads and inadequate supervision, an insufficient number of licensed and appropriate placements for all children who need them, and an inadequate array of essential services.  Most, albeit not all of these systemic issues, are long-standing and well-documented.  In combination with ongoing deficiencies in case practice, many of which are also documented in this report, these issues contribute to unreasonable risks for class members.  The risk of harm to class members is illustrated in the report through the presentation of a case study related to the death of an infant that occurred during Period 5 within five days of the infant's entry into the defendants' custody.

On July 23, 2015, in the wake of the Monitor's June 2015 Report, the Court approved a remedial order, requiring, *inter alia,* an organizational analysis of the Mississippi Department of Human Services ("MDHS") Division of Family and Children's Services ("DFCS"), and new DFCS leadership at the executive-level with direct reporting to the Governor.  The Order contemplated that the organizational assessment would result in a report within a four-month period that would be used by the parties to inform the development of a proposed remedial order.

The organizational assessment report was issued on November 24, 2015, by the required deadline.  According to the express terms of the July 23, 2015 Order, the parties had a three-week period following the report's issuance to reach agreement on a remedial order.  An agreement was reached and it is embodied in an interim remedial order that was issued on December 22, 2015.  Several weeks before the order was issued, on December 7, 2015, the defendants announced the appointment of DFCS's new Executive Director.  These circumstances present an important opportunity for the parties and for the Court to put the remedial process on a sustainable track toward advancing the underlying objectives of this lawsuit.

## I.    BACKGROUND AND SUMMARY OF FINDINGS

The population of children in the custody of MDHS DFCS has risen precipitously in recent years.  Period 5, which began at the start of July 2014 and ended one year later, saw a ten percent increase in the total population of children in custody from approximately 4,500 children as of the end of Period 4 to nearly 5,000 children by the end of Period 5.  That gain came on the heels of a similar increase in the total number of children in custody during Period 4.  Thus, over the two-year period from June 30, 2013 to June 30, 2015, DFCS experienced a 26 percent increase in the population of children in custody.  This increase created an increase in demand for placements and services, which were already inadequate to meet the needs of children in

3

custody, and, in turn, placed significant strain on the agency's understaffed workforce, contributing to a decline in defendants' performance during Period 5.

As the Monitor documented in her June 2015 Report,[3] defendants struggled to meet statewide performance requirements during Period 4, but certain DFCS regions[4] that were early implementers of defendants' Practice Model reform plan, such as Regions I-S, II-W, and a later-implementer, Region II-E, showed signs of progress.  During Period 5, however, performance levels at both the statewide and regional level tended to decline.  The chart below presents a comparative analysis of defendants' performance relative to the same 19 statewide performance requirements in both Period 4 and Period 5.[5]  Although defendants are not required to meet statewide performance requirement thresholds in any particular regions, analyzing regional performance against statewide performance thresholds is a way to determine which regions are performing better and which are performing worse.

The chart reflects defendants' performance on a statewide and on a regional level in both Period 4 and Period 5.  For any individual region, the green bar indicates the subtotal of the 19 analyzed requirements for which defendants' regional performance met or exceeded the statewide performance threshold during the relevant period (*e.g*., if a given statewide performance requirement is 90 percent, the analysis assesses whether each individual region met or exceeded 90 percent).  Conversely, the red bar indicates the number of the 19 requirements for which defendants regional performance did not meet statewide performance thresholds during

---

[3]  *See The Court Monitor's Report to the Court Regarding Implementation Period 4* [hereinafter *June 2015 Report*], filed June 15, 2015 [Dkt. No. 655].
[4]  DFCS is divided into 13 administrative regions.
[5]  These 19 requirements concern the following: the timeliness of maltreatment investigations; the frequency of caseworker visits to children, their biological parents, and foster parents; placements, including whether children are placed in the least restrictive setting consistent with their individual needs, placement stability, placement proximity, placement of siblings, and placement in congregate care settings; the licensure status of placement settings; medical, dental and mental health care; and the information provided to foster parents and facility staff at the time of placement.  For the 19 specific MSA requirements subject to this specific analysis, *see* Ex. 1.

the relevant period.  Gray bars indicate requirements for which there were no applicable cases in the region or requirements that were not analyzed during the period.

The chart illustrates that in 12 of DFCS's 13 regions, defendants' performance levels dropped in Period 5 relative to Period 4.



* Regions are organized from left to right along the horizontal axis according to the sequential order in which they implemented the Practice Model.

As in Period 4, there were regional differences in performance during Period 5; however, during Period 5 the differences between the highest and lowest performing regions were less pronounced and, importantly, no region met even half of the analyzed requirements.

5

The requirements of the MSA enabled defendants to adopt a phased-in, regionally-based implementation strategy that was intended to allow a focused rollout of the Practice Model over time in discrete areas of the state.  By the end of Period 5, eight of DFCS's 13 regions had fully implemented the Practice Model for at least 12 months, an event that triggers for those regions specific regional performance requirements with specific performance levels.  The Monitor analyzed six requirements applicable to those eight DFCS regions to assess whether regions that implemented the Practice Model for at least 12 months tended to meet the applicable regional performance requirements.[6]  Of the 48 regional requirements analyzed (*i.e.,* six requirements across eight regions), defendants met or exceeded eight, or 17 percent.  One region met or exceeded two regional requirements, six regions met or exceeded one regional requirement, and one region met or exceeded none of the six regional requirements.

The decline in regional performance during Period 5 appears to have been fueled, at least in part, by the increase in the population of children in custody, the increasing and unmet demand for placements and services, and the enormous strain these factors placed on the DFCS workforce, which has not grown in proportion to these demands.  However, as the Monitor described in her June 2015 Report, other key factors affected regional performance during Period 5, especially the failure to allocate previously dedicated resources to Practice Model implementation activities[7] as well as demonstrable shortcomings in management capacity and accountability systems.[8]

In addition to presenting more specific analyses of statewide and regional performance data for certain Period 5 requirements, this report also presents the results of a required Period 5

---

[6]  The six requirements analyzed concern caseworker visits with children and resource parents, reunification and adoption.  For a list of the six requirements subject to this specific analysis, *see* Ex. 2.

[7]  *See June 2015 Report* at 18, 186.

[8]  *Id*. at 16, 18.

case record review conducted by the Monitor in collaboration with defendants,[9] which found significant deficits in statewide performance insofar as MSA requirements related to the medical, mental health and dental care afforded to children in DFCS custody.

Finally, the report demonstrates the impact that high caseloads and an insufficient number of appropriate placements may have on the lives of children and their families by presenting the findings of an assessment of case practice conducted, in consultation with the Monitor, by Judith Meltzer, the Monitor's child welfare expert.[10]  In her June 2015 Report the Monitor stated that it was imperative to address the ongoing limitations in defendants' performance on an urgent basis.  The findings from the assessment of case practice underscore the need to do so.

## II.   <u>METHODOLOGY</u>

The Monitor's assessment of defendants' progress toward meeting the Period 5 requirements that are addressed in this report was informed by site visits to the MDHS State Office and certain regional and county offices as well as face-to-face and telephone interviews with MDHS and DFCS managers, supervisors, front line caseworkers, resource workers, trainers, practice coaches, contractors and other child welfare system stakeholders.  Relevant documents, memoranda and other records maintained by DFCS have been reviewed and analyzed, including data generated by the Mississippi Automated Child Welfare Information System ("MACWIS") and the foster care review ("FCR") process; personnel and training records; policies; and case records.

---

[9]  *See* Period 5 IP §II.C.3.
[10]  Judith Meltzer is the co-director of the Center for the Study of Social Policy in Washington, D.C.  *See* www.cssp.org for additional information related to Ms. Meltzer's qualifications and experience.  Ms. Meltzer has served as a consultant to the Monitor on other aspects of child welfare practice since Period 1.

During Period 5 the Monitor engaged a child welfare expert, Dr. Sarah Kaye, to coordinate, in consultation with the Monitor's Office, a case record review required by the Period 5 IP.[11]  The final report, which presents detailed findings from the case record review, was authored by Dr. Kaye, and it is included in the Appendix to this report.[12]  The Monitor also engaged an expert in the delivery of health care to children in foster care, Dr. Moira Szilagyi, and a child welfare and statistical expert with expertise in the analyses of child welfare administrative data, Dr. Terry Shaw, to assist with this project.[13]  The case record review was designed to assess statewide performance related to the delivery of medical care, dental care, therapeutic and rehabilitative services, mental health care, the transfer of information at the time of placement, certain aspects of the case record, and the continuity of the educational experience for children in custody.

The review targeted a sample of DFCS case records drawn from the 4,704 entries into foster care that defendants reported between July 1, 2013 and December 31, 2014.[14]  To ensure the sample would be adequate for purposes of evaluating the completion of required assessments and follow up on any issues identified in the assessments, an additional 893 cases were excluded because the length of time in DFCS custody was shorter than 90 days.  After these exclusions, the target population was 3,802 entries involving children ages 18 and younger who entered DFCS custody between July 1, 2013 and December 31, 2014 and remained in custody for more than 90 days.

---

[11]  Period 5 IP §II.C.3.  Dr. Kaye's curriculum vitae is included in the Appendix to this report as Ex. 3.

[12]  *See* Ex. 4, Findings from the Period 5 Case Record Review, Sarah Kaye, PhD, October 14, 2015. The final report was provided to the parties on October 14, 2015.

[13]  Dr. Shaw provided consultative services related to the sampling methodology used for the review and Dr. Szilagyi consulted on the development of the review instrument as well as on various aspects of the data analyses. *See* Ex. 4, *supra* note 12, at Appendices B and D for copies of the curricula vitae of Dr. Szilagyi and Dr. Shaw.

[14]  For the purpose of the case record review, nine entries into foster care were excluded because the child was reported to be over 18 at the time of entry, which was likely the result of data entry errors into MACWIS.

8

A representative statewide sample was drawn from this population that ensured the proportional regional distribution of the entry cohort.  The review oversampled by 10 percent to address potential cases in the sample that needed to be excluded for coding or other reasons.  In addition, because the goal was overall representativeness across all questions, some of which only pertain to children of certain ages, the review oversampled for these age cohorts to ensure there would be a sufficient number of cases in the sample with the applicable age requirements.  The sample size was determined in order to review a sufficient number of cases that would result in a margin of error between five and seven and a half percent when extrapolating sample estimates to the total target population.  The final analysis sample included 321 cases of which 198 received a full review and 123 received a targeted review that was limited to the age-specific MSA requirements included in the data collection instrument.

In some instances, requirements applied to small subsets of the sample (*e.g.,* requirements pertaining only to the subset of children in the sample who needed certain follow up services).  In these cases in which requirements applied to a small subset of the sample, calculations of defendants' performance levels are presented in the report's findings; however, because of the small denominator used for the calculations, the margins of error for these calculations increases substantially relative to the margins of error for findings based on larger sample sizes.  This was an unavoidable by-product of the case record review design.  It would not have been practical to have drawn a sample large enough to provide small margins of error for every requirement.

A review instrument was developed by Dr. Kaye in consultation with the Monitor through a collaborative process involving Dr. Szilagyi and the parties, who were afforded an opportunity to review and comment on the instrument.  A team composed of 22 experienced DFCS case reviewers participated in the review, which was coordinated by the Monitor's Office

9

in collaboration with the DFCS Continuous Quality Improvement ("CQI") Unit.  Reviewers

considered case activity between July 1, 2013 and February 28, 2015.  A team of quality

assurance reviewers comprised of representatives from the Monitor's Office, DFCS's CQI Unit

and the Center for the Support of Families ("CSF")[15] also served on the review team.  Additional

information about the methodology used to conduct the review is detailed in the report submitted

by Dr. Kaye.

### III.   <u>FINDINGS</u>

The Monitor's findings on defendants' performance relative to a series of key statewide

and regional performance requirements are summarized below.[16]  For the most part, these

findings are based on the Monitor's independent analysis of performance data collected and

produced by the defendants.

Defendants report on their performance using data from several different data sources.

One of the primary sources of performance data defendants rely on is the DFCS information

management system, MACWIS.  Because of certain inherent limitations in the data reports

defendants are able to produce based on MACWIS, defendants supplement their performance

data with data collected by means of an instrument used to implement federally-mandated

requirements for periodic administrative reviews of the case records of children in the custody of

DFCS through the foster care review ("FCR") process.  That instrument, referred to as the

Periodic Administrative Determination ("PAD"), is employed to collect a wide range of case-

---

[15]  CSF provides child welfare consultative services to DFCS.  For additional background related to CSF's work
with DFCS *see June 2015 Report* at 5-6.

[16]  Defendants made significant progress implementing requirements related to performance-based contracting
during Period 5.  *See* Period 5 IP §II.A.  They also experienced more significant challenges producing reliable
performance data responsive to some Period 5 requirements.  The Monitor expects to report in detail on these
matters, and on additional aspects of defendants' performance, in her final report on Period 5.

level data, including certain qualitative data that is used to assess defendants' performance in meeting specific MSA requirements.

In many instances defendants produce two data reports based on data extracted from MACWIS and data derived from the FCR process to report on a single MSA requirement.  In these instances, the Monitor reports defendants' performance based on an independent analysis of the data contained in both sets of data reports.

**Modified Settlement Agreement ("MSA") §II.A.2.a.11.a.**
**2.  Human Resources Management**
 **a.  Workforce**
   **11)  <u>By the end of Implementation Period Five:</u>**
     **(a)  At least 80% of DFCS caseworkers in Hancock, Harrison, Hinds, and Jackson Counties shall carry a caseload that does not exceed Modified Settlement Agreement caseload requirements.  No more than 15% of caseworkers in Hancock, Harrison, Hinds, and Jackson Counties shall carry a caseload exceeding twice the Modified Settlement Agreement caseload requirements.  No caseworkers in Hancock, Harrison, Hinds, and Jackson Counties shall carry a caseload exceeding three times the Modified Settlement Agreement caseload requirements.**

<u>**Status of Progress, MSA §II.A.2.a.11.a.:**</u>  This requirement was not satisfied.  As documented in the Monitor's prior reports, defendants report separately on caseworkers who carry mixed caseloads and caseworkers who carry dedicated caseloads.[17]  The data defendants submit regarding caseworkers with dedicated caseloads does not include a variable to enable an analysis differentiating carve-out counties[18] and therefore this finding is limited to caseworkers carrying mixed caseloads in the four carve-out counties identified by the MSA: Hancock, Harrison, Hinds, and Jackson.

Analyses of the data submitted by defendants indicated that as of June 30, 2015, 36 percent of caseload carrying DFCS employees in the carve-out counties carried a mixed caseload

---

[17]  *See June 2015 Report* at 67.
[18]  Hancock, Harrison, Hinds, and Jackson Counties were exempted from MSA caseload requirements because of the parties' shared recognition that long-standing staffing deficits justified subjecting these counties to different requirements.  Hence, they are referred to in the MSA as the "carve-out" counties.

that did not exceed MSA caseload requirements or were not supervisors carrying a caseload.  As of the same date, 17 percent of caseload carrying DFCS employees in the carve-out counties who carried mixed caseloads carried a caseload exceeding twice the MSA caseload requirements or were supervisors carrying a caseload.  Finally, seven percent of caseload carrying DFCS employees in the carve-out counties who carried mixed caseloads carried a caseload exceeding three times the MSA caseload requirements or were supervisors carrying a caseload.  These findings are illustrated in the chart set out below:



* Relevant to MSA  II.A.2.a.2., page 4, and II.A.2.a.11.a., page 6.

Defendants' performance reported in this section intentionally tracks the structure of the caseload requirements set forth in MSA §II.A.2.a.11.a.  The structure of those requirements, however, can make consideration of the related performance data challenging.  For example, the requirements first set forth a *floor* (*i.e.,* a minimum percentage) on the percentage of caseworkers in the carve-out counties who *do not exceed* MSA caseload requirements.  The requirements then set a *ceiling* (*i.e.*, a maximum percentage) on the percentage of caseworkers in the carve-out counties who are *permitted to exceed* the MSA caseload standards by twice the MSA caseload requirements and a ceiling on the percentage of caseworkers in the carve-out counties who are *permitted to exceed* the MSA caseload standards by three times the MSA caseload requirements.  This asymmetry in the design of these caseload requirements obscures quick assessment of the distribution of caseload volume among caseworker staff using a single metric (*e.g.,* the total percentage of caseworkers in the carve-out counties with caseloads exceeding the MSA caseload requirements, the percentage with caseloads exceeding twice the MSA caseload requirements, and the percentage with caseloads exceeding three times the MSA caseload requirements).

To address this issue, and for ease of reference, the Monitor presents defendants' performance using a standard metric below:

- 64% of DFCS employees carrying a mixed caseload in the carve-out counties carried a caseload exceeding the MSA caseload requirements;
- 17% of DFCS employees carrying a mixed caseload in the carve-out counties carried a caseload exceeding twice the MSA caseload requirements; and
- 7% of DFCS employees carrying a mixed caseload in the carve-out counties carried a caseload exceeding three times the MSA caseload requirements.

Alternatively, expressed as a percentage of employees carrying caseloads not exceeding MSA caseload requirements, defendants' performance is presented below:

- 36% of DFCS employees carrying a mixed caseload in the carve-out counties carried a caseload not exceeding the MSA caseload requirements;

13

- 83% of DFCS employees carrying a mixed caseload in the carve-out counties carried a caseload not exceeding twice the MSA caseload requirements; and
- 93% of DFCS employees carrying a mixed caseload in the carve-out counties carried a caseload not exceeding three times the MSA caseload requirements.

**MSA §II.A.2.a.11.b.**
**2. Human Resources Management**
 **a. Workforce**
  **11) By the end of Implementation Period Five:**
     **(b) No more than 5% of DFCS caseworkers in a non-Carve Out County shall carry a caseload that exceeds Modified Settlement Agreement caseload requirements.**

**Status of Progress, MSA §II.A.2.a.11.b.:** This requirement was not satisfied.  As explained above,[19] for caseworkers with dedicated caseloads, due to limitations in the data provided by defendants, data regarding caseworkers in carve-out counties could not be distinguished from the data regarding caseworkers in the non-carve-out counties.  Among all caseworkers (*i.e.,* caseworkers carrying dedicated caseloads and caseworkers carrying mixed caseloads), including the carve-out counties, 38.5 percent of caseworkers carried a caseload that exceeded MSA standards or were supervisors carrying a caseload. As explained below, there were 127 caseworkers with mixed caseloads in non-carve-out counties who exceeded MSA caseload requirements or were supervisors carrying a caseload, a total that exceeds five percent of caseworkers or supervisors carrying a caseload.  Thus, notwithstanding the limitations in the data as reported by the defendants, the data indicate this requirement has not been satisfied.  Caseworkers with dedicated and mixed caseloads are addressed separately, below.

For caseworkers with dedicated caseloads, the Monitor's analysis included all caseworkers who carried a dedicated caseload, irrespective of the county to which they were assigned.  The data reflect that as of June 30, 2015, 37 percent of all DFCS caseworkers with

---

[19] *See supra* at 11.

dedicated caseloads carried a caseload exceeding MSA requirements, or were supervisors carrying a caseload.

The dedicated caseload data includes certain non-DFCS contract employees who operate the statewide hotline for reporting child abuse and/or neglect.  Excluding these contract employees, the data indicate that 48 percent of caseworkers with dedicated caseloads exceeded MSA caseload requirements or were supervisors carrying a caseload as of June 30, 2015.  These findings are reflected in the following chart:



* Relevant to MSA  II.A.2.a.2., page 4, and II.A.2.a.11.b., page 6.  As noted above, due to data limitations, Carve Out Counties could not be excluded from the analysis.

For caseworkers carrying mixed caseloads, as of June 30, 2015, 29 percent of caseload carrying DFCS employees in non-cave-out counties carried a caseload exceeding MSA requirements or were supervisors carrying a caseload.  This finding is presented in the chart below:



* Relevant to MSA II.A.2.a.2., page 4, and II.A.2.a.11.b., page 6.

> **MSA §II.A.2.a.11.c.**
> **2.  Human Resources Management**
> **a.  Workforce**
> **11)  By the end of Implementation Period Five:**
> **(c)  No more than 15% of supervisors in Hinds, Hancock, Harrison, and Jackson Counties who are responsible for directly supervising DFCS caseworkers shall be responsible for directly supervising more than five caseworkers.**

**Status of Progress, MSA §II.A.2.a.11.c.:**  This requirement was not satisfied.  As of June 30, 2015, 34 percent of supervisors in the carve-out counties directly supervised more than five caseworkers.  These findings are presented in the following chart:



\* Relevant to MSA  II.A.2.a.6., page 5, and II.A.2.a.11.c., page 6.

MSA §II.A.2.a.11.d.
**2.  Human Resources Management**
 **a.  Workforce**
  **11)  By the end of Implementation Period Five:**
    **(d)  No more than 5% of supervisors in a non-Carve Out County who are responsible for supervising DFCS caseworkers shall be responsible for directly supervising more than five caseworkers.**

**Status of Progress, MSA §II.A.2.a.11.d.:**  This requirement was not satisfied.  As of June 30, 2015, 15 percent of supervisors in the non-carve-out counties directly supervised more than five caseworkers.  The following chart presents these findings, depicting regional distribution excluding the four carve-out counties.



* Relevant to MSA  II.A.2.a.6., page 5, and II.A.2.a.11.d., page 6.

**Period 5 Implementation Plan ("IP") §II.C.3.**
**3.  By June 1, 2015, the Monitor shall produce a report to the Parties on the results of a case record review which shall measure Defendants' performance related to: the maintaining of complete records;  the provision of physical health, dental, mental and behavioral health assessments and services;  and educational continuity as required by MSA Sections III.B.4.a; II.B.3.a and b; II.B.3.f and g; II.B.4.a; II.B.3.d; II.B.2.e; and**

III.B.6.c (the "Health and Education Care Case Record Review").

a)  The Monitor shall work in consultation with the parties and any subject matter experts she deems appropriate on the design of the case record review, including the formulation of a data collection instrument to guide the review.  The case record review shall be conducted by the Monitor, in collaboration with Defendants.  The Defendants shall assign a sufficient number of staff experienced in case reviews to work with the Monitor on this project.

b)  Within 45 days of receipt of the Monitor's final report on the results of the case record review, Defendants shall develop and submit a plan and timeline for reporting on the physical health, dental, mental, and behavioral health assessment and services required by MSA Section II.B.3.a and b; II.B.3.f and g; and II.B.3.d. (the "Health Care Reporting Plan") to Plaintiffs and to the Monitor for the Monitor's review and approval.

c)  Defendants shall implement the Health Care Reporting Plan following the Monitor's approval.

**Status of Progress, Period 5 IP §II.C.3.**:  This requirement was satisfied in part insofar as the requirements related to subsection II.C.3.a., regarding the case record review design and implementation process.  However, as explained more fully below, the defendants did not develop and implement the Health Care Reporting Plan required by subsections II.C.3.b. and c.

As explained in the Methodology section of this report and in the final report on the case record review included in the Appendix to this report as Ex. 4, the Monitor worked in consultation with the parties and three subject matter experts on the design of the case record review data collection instrument.[20]  Dr. Sarah Kaye, an expert in child welfare with expertise in evaluation of human services programs, coordinated the case record review in consultation with the Monitor's office.  Dr. Moira Szilagyi, an expert in the delivery of health services to children in foster care and a principal author of the American Academy of Pediatric ("AAP") Standards for Children in Foster Care, consulted on the design of the data collection instrument as well as

---

[20]  A copy of the instrument is included in the Appendix to the final case record review report.  *See* Ex. 4, *supra* note 12, at Appendix A.  *See supra* at 8, Ex. 3, *supra* note 11, and Ex. 4, *supra* note 12, at Appendices B and D for additional information about the credentials and qualifications of the experts who were engaged by the Monitor to work on this project.

19

various aspects of data analyses.  Dr. Terry Shaw, an expert in the analyses of child welfare administrative data, consulted on the sampling methodology.

The Monitor collaborated with the defendants on all key aspects of the review process, including the development and delivery of a training program for the review team and piloting of the review instrument.  The review team included 22 experienced DFCS reviewers and a cohort of seven quality assurance reviewers comprised of DFCS supervisory staff as well as representatives from CSF and the Monitor's Office.[21]  The review included data collection from a statewide random sample of case records,[22] totaling 321 case records of children who entered DFCS custody between July 1, 2013 and December 31, 2014 and who remained in custody for at least 90 days.  The review was conducted on-site in the MDHS State Office during a one-week period in April 2015.

Preliminary findings from the review were provided to the parties in tabular form for review and comment on May 22, 2015.  The Monitor considered the parties' comments in consultation with her expert consultants, and the final report authored by Dr. Kaye was issued and distributed to the parties on October 14, 2015.  The findings from the review show very substantial disparities between required performance levels and performance levels related to the delivery of essential health services to the children in the sample during the period under review.

The findings relative to both Period 4 and Period 5 MSA requirements are presented in the summary table, below:

---

[21]  *See* Ex. 4, *supra* note 12, at Appendix C for a list of review team members.
[22]  Both the electronic and paper record were reviewed for each of the 321 cases in the sample.

*Period 5 Case Record Review Findings, Summary Table*

| MSA Requirement | Period 4 and Period 5 MSA Requirements | Findings of the Period 5 Case Record Review |
|---|---|---|
| Every child entering foster care shall receive a health screening evaluation from a qualified medical practitioner within 72 hours after placement that is in accordance with the health screening recommended by the American Academy of Pediatrics. (MSA II.B.3.a) | By the end of Implementation Period Four: At least 70% of children entering custody during the Period shall receive a health screening evaluation from a qualified medical practitioner within 72 hours after placement that is in accordance with the health screening recommended by the American Academy of Pediatrics.  (MSA II.B.3. j. 1.)  By the end of Implementation Period Five: At least 90% of children entering custody during the Period shall receive a health screening evaluation from a qualified medical practitioner within 72 hours after placement that is in accordance with the health screening recommended by the American Academy of Pediatrics.  (MSA II.B.3.k.1.) | - 2% of children entering foster care received an initial health screening (IHS) by a qualified medical practitioner within 72 hours that is in accordance with the health screening recommended by AAP.  - 42% of children had an IHS completed within 72 hours.  - 50% of IHS completed by qualified medical practitioner.  - 3% IHS included all recommended AAP components. |
| Every child entering foster care shall receive a comprehensive health assessment within 30 days of the placement. The assessment shall be in accordance with the recommendations of the American Academy of Pediatrics, except that dental exams shall be governed by Section II.B.3.e of the Modified Settlement Agreement. (MSA II.B.3.b) | By the end of Implementation Period Four: At least 70% of children entering custody during the Period shall receive a comprehensive health assessment consistent with Modified Settlement Agreement requirements within 30 calendar days of entering care.  (MSA II.B.3.j.2.)  By the end of Implementation Period Five: At least 90% of children entering custody during the Period shall receive a comprehensive health assessment consistent with Modified Settlement Agreement requirements within 30 calendar days of entering care.  (MSA II.B.3.k.2.) | - 1% of children entering foster care received a comprehensive health assessment (CHA) by a qualified medical practitioner within 30 days of placement that is in accordance with the health assessment recommended by AAP.  - 57% CHA completed within 30 days.  - 48% CHA completed by qualified medical practitioner.  - 2% CHA included all recommended AAP components. |
| All children shall receive periodic medical examinations and all medically necessary follow-up services and treatment throughout the time they are in state custody, in | By the end of Implementation Period Four: At least 85% of children in custody during the Period shall receive periodic medical examinations and | - Periodic medical examinations could not be analyzed due to concerns about data quality.  - 58% of children with |

*Period 5 Case Record Review Findings, Summary Table*

| MSA Requirement | Period 4 and Period 5 MSA Requirements | Findings of the Period 5 Case Record Review |
|---|---|---|
| accordance with the time periods recommended by the American Academy of Pediatrics. (MSA II.B.3.d) | all medically necessary follow-up services and treatment consistent with Modified Settlement Agreement requirements. (MSA II.B.3.j.3.)<br><br>By the end of Implementation Period Five: At least 95% of children in custody during the Period shall receive periodic medical examinations and all medically necessary follow-up services and treatment consistent with Modified Settlement Agreement requirements. (MSA II.B.3.k.3.) | recommended medical follow-up services, treatment and/or equipment were provided with all recommended follow-up. |
| Every child three years old and older shall receive a dental examination within 90 calendar days of foster care placement and every six months thereafter. Every foster child who reaches the age of three in care shall be provided with a dental examination within 90 calendar days of his/her third birthday and every six months thereafter. Every foster child shall receive all medically necessary dental services. (MSA II.B.3.e) | By the end of Implementation Period Four: At least 75% of children three years old and older entering custody during the Period or in care and turning three years old during the Period shall receive a dental examination within 90 calendar days of foster care placement or their third birthday, respectively. (MSA II.B.3.j.4.)<br><br>At least 80% of children in custody during the Period shall receive a dental examination every six months consistent with Modified Settlement Agreement requirements and all medically necessary dental services. (MSA II.B.3.j.5.)<br><br>By the end of Implementation Period Five: At least 90% of children three years old and older entering custody during the Period or in care and turning three years old during the Period shall receive a dental examination within 90 calendar days of foster care placement or their third birthday, respectively. (MSA II.B.3.k.4.)<br><br>At least 90% of children in custody | - 44% of children three or turning three while in care received a dental examination within 90 days of entering custody or their third birthday, and all applicable follow-up dental services.<br><br>- 47% of children three or turning three while in care received a dental examination within 90 days of entering custody or their third birthday.<br><br>- 48% of children three or turning three while in care who needed follow-up dental services received all recommended services.<br><br>- Periodic dental examination data could not be analyzed due to concerns about data quality. |

*Period 5 Case Record Review Findings, Summary Table*

| MSA Requirement | Period 4 and Period 5 MSA Requirements | Findings of the Period 5 Case Record Review |
|---|---|---|
| | during the Period shall receive a dental examination every six months consistent with Modified Settlement Agreement requirements and all medically necessary dental services.  (MSA II.B.3.k.5.) | |
| Every child four years old and older shall receive a mental health assessment by a qualified professional within 30 calendar days of foster care placement. Every foster child who reaches the age of four in care shall receive a mental health assessment within 30 calendar days of his/her fourth birthday. Every foster child shall receive recommended mental health services pursuant to his/her assessment.  (MSA II.B.3.f) | By the end of Implementation Period Four: At least 70% of children four years old and older entering custody during the Period or in care and turning four years old during the Period shall receive a mental health assessment by a qualified professional within 30 calendar days of foster care placement or their fourth birthday, respectively. (MSA II.B.3.j.6.)

At least 80% of children who received a mental health assessment during the period shall receive all recommended mental health services pursuant to their assessment.  (MSA II.B.3.j.7.)

By the end of Implementation Period Five: At least 90% of children four years old and older entering custody during the Period or in care and turning four years old during the Period shall receive a mental health assessment by a qualified professional within 30 calendar days of foster care placement or their fourth birthday, respectively. (MSA II.B.3.k.6.)

At least 90% of children who received a mental health assessment during the period shall receive all recommended mental health services pursuant to their assessment.  (MSA II.B.3.k.7.) | - 10% of children age four at entry or who turned four while in DFCS custody received a mental health assessment by a qualified professional within 30 days of entry or their fourth birthday, and received all recommended follow-up services.

- 26% of children aged four at entry or who turned four while in DFCS custody received a mental health assessment within 30 days.

- 39% of children aged four at entry or who turned four while in DFCS custody received a mental health assessment by a qualified professional.

- 47% of children aged four at entry or who turned four while in DFCS custody who needed follow-up mental health services received all recommended services. |
| Every foster child ages birth through three shall receive a developmental assessment by a qualified professional within 30 days of foster care placement, and | By the end of Implementation Period Four: At least 60% of children in custody ages birth through three during the Period, and older children if factors | - 17% of children ages birth through three or older if warranted received a developmental assessment by a qualified professional within 30 days of foster care placement, and |

23

*Period 5 Case Record Review Findings, Summary Table*

| MSA Requirement | Period 4 and Period 5 MSA Requirements | Findings of the Period 5 Case Record Review |
|---|---|---|
| each child older than three shall be provided with a developmental assessment if there are documented factors that indicate such an assessment is warranted. All foster children shall be provided with needed follow-up developmental services. (MSA II.B.3.g) | indicate it is warranted, shall receive a developmental assessment by a qualified professional within 30 calendar days of foster care placement and all needed developmental services.  (MSA II.B.3.j.8.)<br><br>By the end of Implementation Period Five:<br>At least 80% of children in custody ages birth through three during the Period, and older children if factors indicate it is warranted, shall receive a developmental assessment by a qualified professional within 30 calendar days of foster care placement and all needed developmental services.  (MSA II.B.3.k.8.) | received all applicable follow-up developmental services.<br><br>- 23% of children ages birth through three or older if warranted received a developmental assessment within 30 days of foster care placement.<br>- 17% of children ages birth through three or older if warranted received developmental assessment by qualified professional.<br><br>- 69% of children ages birth through three or older if warranted who needed follow-up developmental services received all recommended services. |
| Each foster child requiring therapeutic and rehabilitative foster care services because of a diagnosis of significant medical, developmental, emotional, or behavioral problems shall be provided with a treatment plan and shall be provided with these services in accordance with the plan. (MSA II.B.4.a) | By the end of Implementation Period Four:<br>At least 80% of children in custody during the Period requiring therapeutic and/or rehabilitative foster care services because of a diagnosis of significant medical, developmental, emotional, or behavioral problems shall be provided with a treatment plan and services in accordance with their plan.  (MSA II.B.4.c.1.)<br><br>By the end of Implementation Period Five:<br>At least 90% of children in custody during the Period requiring therapeutic and/or rehabilitative foster care services because of a diagnosis of significant medical, developmental, emotional, or behavioral problems shall be provided with a treatment plan and services in accordance with their plan.  (MSA II.B.4.d.1.) | - 45% of children with significant medical, developmental, and/or behavioral problems were provided with a treatment plan and all recommended services. |
| No later than at the time of placement, Defendants shall provide resource parents or facility staff with the foster child's | By the end of Implementation Period Four:<br>At least 60% of children in DFCS custody placed in a new placement | - 2% of children's placement resources were provided with all applicable information/items within 15 days of placement. |

*Period 5 Case Record Review Findings, Summary Table*

| MSA Requirement | Period 4 and Period 5 MSA Requirements | Findings of the Period 5 Case Record Review |
|---|---|---|
| currently available medical, dental health, educational, and psychological information, including a copy of the child's Medicaid card. Defendants shall gather and provide to resource parents or facility staff all additional current medical, dental health, educational, and psychological information available from the child's service providers within 15 days of placement. (MSA II.B.2.i) | during the Period shall have their currently available medical, dental, educational, and psychological information provided to their resource parents or facility staff no later than at the time of any new placement during the Period.  (MSA II.B.2.q.9.)<br><br>Under the end of Implementation Period Five:<br>At least 80% of children in DFCS custody placed in a new placement during the Period shall have their currently available medical, dental, educational, and psychological information provided to their resource parents or facility staff no later than at the time of any new placement during the Period.  (MSA II.B.2.r.6.) | The MSA specifies that the foster child's "currently available" information shall be provided to placement resources at the time of placement and all additional information shall be provided within 15 days.  It was not possible to determine from the review of electronic or paper case records what information was available at the time of placement. Therefore this analysis is limited to whether applicable information was provided within the 15-day timeframe. |
| DFCS caseworkers shall compile, maintain, and keep current complete child welfare case records.  (MSA III.B.4.a ) | Beginning by the date as set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:<br>At least 90% of child welfare case records in that region will be current and complete.  (MSA III.B.4.b.)<br><br>Beginning by 12 months following the date as set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:<br>At least 95% of child welfare case records in that region will be current and complete.  (MSA III.B.4.c.) | 6% of children statewide had all applicable medical, dental, mental health, and developmental assessments documented in the electronic case record and included a copy in the paper case record. |
| DFCS shall make all reasonable efforts to ensure the continuity of a child's educational experience by keeping the child in a familiar or current school and neighborhood, when this is in the child's best interests and feasible, and by limiting the number of school changes the child experiences. (MSA III.B.6.c) | As of the date upon which the last region has fully implemented the Practice Model [February 2016], performance on these educational requirements shall be measured and required state-wide and shall no longer be measured on a region-by-region basis.  (MSA III.B.6.f.) | 69% of school aged children statewide did not experience school changes or DFCS made reasonable efforts to prevent school changes when in the child's best interests and feasible. |

The final report on the case record review intentionally presents detailed analyses on the delivery of health services to children in DFCS custody in order to inform remedial action and promote resolution of several interpretive issues raised by the data.  Neither party responded to the final report.  Defendants did not submit the Health Care Reporting Plan required by this subsection of the Period 5 IP.  They have explained that they did not do so for several reasons, including the fact that the organizational assessment required by the July 23, 2015 Order was underway and likely to result in the restructuring of the agency.

> **Ongoing Requirement MSA §II.B.1.e.2.**
> **1. Child Safety**
>     **e.  By the end of Implementation Period Three [and thereafter]:**
>         **2)   All investigations into reports of maltreatment, including corporal punishment, of children in DFCS custody must be initiated within 24 hours and completed within 30 calendar days, including supervisory approval.  Defendants shall assure that such investigations and decisions are based on a full and systematic evaluation of the factors that may place a child in custody at risk.**

**Status of Progress, MSA §II.B.1.e.2. (Ongoing Requirement):**  This requirement was not satisfied by the end of Period 5.  The data produced by defendants indicate that for the one-month period ending June 30, 2015, 71 percent of maltreatment investigations were initiated within 24 hours and completed with supervisory approval within 30 days.  This is an improvement over defendants' Period 4 performance of 56 percent, but still far short of the MSA's initiation and completion timeline requirements, which serve as essential safeguards designed to mitigate the risk of harm to children in custody.  Moreover, as addressed in Section IV of this report[23] and in the Monitor's June 2015 Report, there is other evidence of continuing

---

[23] *See infra* at 96-99.

and serious deficits in the quality of the maltreatment in care investigations that have been conducted by DFCS investigators and approved by their supervisors.[24]

The Monitor's findings for Period 5 are presented in the chart below:



*Relevant to MSA II.B.1.e.2., page 14.  There were no maltreatment in care intakes during June 2013 in Regions II-E or IV-S. There were no maltreatment in care intakes during June 2015 in Region IV-S.

Ongoing Requirement MSA §II.B.1.e.3.
  1. Child Safety
      e. By the end of Implementation Period Three [and thereafter]:

---

[24]  *See June 2015 Report* at 108-109.  The Monitor has reported on multiple occasions about significant deficiencies in the quality of maltreatment in care investigations.  *See, e.g., The Court Monitor's Report to the Court Regarding Defendants' Progress Toward Meeting Period 2 Requirements* [hereinafter *September 2010 Report*], filed September 8, 2010 [Dkt. No. 503], at 77-79; *The Court Monitor's Status Report to the Court Regarding Progress During Period Three* [hereinafter *January 2013 Report*], filed January 25, 2013 [Dkt. No. 580], at 46-47; and *The Court Monitor's Report to the Court Regarding Implementation Period 3 and the June 24, 2013 Order* [hereinafter *May 2014 Report*], filed May 8, 2014 [Dkt. No. 604], at 154.

> **3)** Any foster child who remains in the same out-of-home placement following an investigation into a report that he or she was maltreated or subject to corporal punishment in that placement shall be visited by a DFCS caseworker twice a month for three months after the conclusion of the investigation to assure the child's continued safety and well-being.

**Status of Progress, MSA §II.B.1.e.3. (Ongoing Requirement):**  This requirement, which is fundamental to ensuring the safety of certain children in custody, was not satisfied by the end of Period 5.  The data produced by defendants indicate that as of June 30, 2015, 70 percent of children remaining in the same placement following an investigation subject to this requirement were visited by a DFCS caseworker two times per month for three months after the conclusion of the investigation.  This represents a continuing decrease in performance levels, which were 88 percent at the end of Period 3 and 75 percent at the end of Period 4.

The Monitor's findings for Period 5 are presented in the chart below:



Children In Custody Remaining In The Same Placement Following Maltreatment Investigation Who Met Face-To-Face With Worker Twice In A One-Month Period (Or At Least Once If 15 Days Or Less) For Three Months Following Completed Maltreatment Investigation, By Region
One-Month Periods Ending 6/30/13, 6/30/14, & 6/30/15*
[Prepared by the Office of the Court Monitor Based on DFCS Data, MACWIS SLS55AD&S]

* Relevant to MSA II.B.1.e.3., page 14.  Neither SLS55AD nor this chart reflect performance related to full requirement.

**MSA §II.B.2.m.**
**2.  Child Placement**
    **m.  No child under 10 years of age shall be placed in a congregate care setting (including group homes and shelters) unless the child has exceptional needs that cannot be met in a relative or foster family home or the child is a member of a sibling group, and the Regional Director has granted express written approval for the congregate-care placement.  Such approval shall be based on the Regional Director's written determination that the child's needs cannot be met in a less restrictive setting and can be met in that specific facility, including a description of the services available in the facility to address the individual child's needs.  Sibling groups in which one or more of the siblings are under the age of 10 shall not be placed in congregate care settings for more than 45 days.**

**Status of Progress, MSA §II.B.2.m.:**  Substantive performance requirements related to this provision are addressed in the narrative concerning MSA §II.B.2.q.2.[25]  However, pursuant to the Period 5 IP, defendants were required to report on their performance regarding sibling groups in which one or more of the siblings under the age of ten are placed in a congregate care setting for more than 45 days.[26]

The data defendants produced indicate that as of June 30, 2015, there were nine sibling groups with at least one sibling under the age of 10 housed in a congregate care setting for more than 45 days.  The regional distribution of these sibling groups is depicted in the following chart:

---

[25] *See infra* at 34-35.
[26] *See* Period 5 IP §II.C.2.



Number Of Sibling Groups With At Least One Sibling Under Age 10 Placed In Congregate Care Housing For More Than 45 Days
One-Month Periods Ending 6/30/13, 6/30/14, & 6/30/15*
[Prepared by the Office of the Court Monitor Based on DFCS Data, MACWIS SLS53HS]

Period 5 Statewide Performance as of 6/30/15:  9 Sibling Groups

MSA requires that by the final implementation period zero sibling groups in which one or more of the siblings are under the age of 10 shall be placed in congregate care settings for more than 45 days.

Period 3 Statewide Performance: 13 Sibling Groups
Period 4 Statewide Performance: 17 Sibling Groups
Period 5 Statewide Performance:  9 Sibling Groups

□ Sibling Groups With At Least 1 Sibling Under 10 Placed In Congregate Care For > 45 Days
■ Sibling Groups With At Least 1 Sibling Under 10 Placed In Congregate Care For Not More Than 45 Days

* Relevant to MSA II.B.2.m., page 17.  Neither SLS53HS nor this chart reflect performance related to full requirement.  The absence of regional data for a specific implementation period indicates there were no applicable sibling placements reported.

**Ongoing Requirement MSA §II.B.2.p.2.**
**2.  Child Placement**
   **p.   By the end of Implementation Period Three [and thereafter]:**
      **2)   No foster child shall be placed or remain in a foster care setting that does not meet DFCS licensure standards consistent with Modified Settlement Agreement requirements, unless so ordered by the Youth Court over DFCS objection.**

   <u>**Status of Progress, MSA §II.B.2.p.2. (Ongoing Requirement)**</u>:  This requirement was

not satisfied.  Defendants produced data from MACWIS and the FCR process addressing

performance related to this requirement.[27]  The MACWIS data indicate that for the one-month

period ending June 30, 2015, 697 children were placed in a foster care setting that did not meet

---

[27] The Monitor has not yet analyzed the FCR data for Period 5 for this requirement.

DFCS licensure standards.  One year earlier, for the one-month period ending June 30, 2014, there were 482 children placed in a foster care setting that did not meet DFCS licensure standards.

The Monitor's findings for Period 5 are presented in the chart below:



*Relevant to MSA II.B.2.a., page 15, and II.B.2.p.2., page 17.  Neither MWLS319D nor this chart reflect performance related to full requirement.

**The data do not specify which placements, if any, were ordered by the Youth Court over DFCS objection.

The Monitor, at the request of the parties, recently reviewed a targeted sample of case records related to unlicensed placements as part of an effort to validate certain data defendants reported subsequent to the conclusion of Period 5.  On November 18, 2015, the Monitor provided the parties with a detailed summary of the findings from this targeted review.  Among

other matters, the Monitor reported that her analyses of unlicensed placements between July 2014 and September 2015 showed a clear upward trend in the total number of children in unlicensed placements that appeared to be attributable more to an increase in the duration of the placements rather than to an increase in the number of new placements into unlicensed settings. Beyond the long-standing need for defendants to implement a strategic approach to address the incidence of unlicensed placements, the Monitor informed the parties that her review of the case records indicated a need for more immediate action to address the status of children who remain in placements that cannot be licensed as well as to address limitations in the frequency of caseworker visits to children in unlicensed settings.  While it is important for defendants to proceed on a strategic path, it is critical that defendants take steps on an expedited basis to ensure the safety of children in unlicensed placements.

> **Ongoing Requirement MSA §II.B.2.p.8.**
> **2.  Child Placement**
>  **p.  By the end of Implementation Period Three [and thereafter]:**
>    **8)  No foster child shall remain in an emergency or temporary facility for more than 45 calendar days, unless, in exceptional circumstances, the Field Operations Director has granted express written approval for the extension that documents the need for the extension.**

**Status of Progress, MSA §II.B.2.p.8. (Ongoing Requirement):**  This requirement was not satisfied.  The data produced by defendants indicate that for the one-month period ending June 30, 2015, there were 28 children in an emergency shelter or temporary facility for over 45 days without the approval of the Field Operations Director.  For the one-month period ending June 30, 2014, there were 17 children in these placements without the required approval.

The Monitor's findings for Period 5 are presented in the chart below:



* Relevant to MSA II.B.2.k., page 17, and II.B.2.p.8., page 18.

Ongoing Requirement MSA §II.B.2.q.2.
2. Child Placement
   q) By the end of Implementation Period Four [and thereafter]:
      2)  No child under 10 years of age shall be placed in a
          congregate care setting (including group homes and
          shelters) unless the child has exceptional needs that
          cannot be met in a relative or foster family home or
          the child is a member of a sibling group, and the
          Regional Director has granted express written
          approval for the congregate-care placement.

Status of Progress, MSA §II.B.2.q.2. (Ongoing Requirement):  This requirement was

not satisfied.  The data produced by defendants indicate that during the one-month period ending

June 30, 2015, there were 100 children under age 10 housed in a congregate care setting without

an exception and approval from a regional director, 50 more children in such settings without an exception and approval as during the one-month period ending June 30, 2014.

The Monitor's findings for Period 5 are presented in the chart below:



*Relevant to MSA II.B.2.m., page 17, II.B.2.p.6., page 18, and II.B.2.q.2., page 19.  Neither SLS52H nor this chart reflect performance related to full requirement.

**MSA §II.B.2.r.4.**
**2.  Child Placement**
    **r)  By the end of Implementation Period Five:**
        **4)  At least 85% of children in DFCS custody shall be placed in the least restrictive setting that meets their individual needs consistent with Modified Settlement Agreement requirements.**

**Status of Progress, MSA §II.B.2.r.4.:**  This requirement was satisfied.  As the Monitor reported in May 2014, the data that defendants used to track this requirement are obtained from

35

the FCR process which did not address the full requirement.[28]  Based upon identified gaps in the

data, the parties and the Monitor agreed upon revisions to the FCR process, which were

implemented in October 2014, during Period 5.

Data derived from the FCR process indicate that for the six-month period ending June 30,

2015, 95 percent of children were placed in the least restrictive setting that met their individual

needs, a one percent decrease in defendants' performance relative to the six-month period ending

June 30, 2014.  The Monitor's findings for Period 5 are presented in the chart below:



*Relevant to MSA II.B.2.f., page 16, II.B.2.p.12., page 18, II.B.2.q.7., page 19, and II.B.2.r.4., page 20.

---

[28] *See May 2014 Report* at 162.

**MSA §II.B.2.r.5.**

**2.  Child Placement**

   **r)  <u>By the end of Implementation Period Five</u>:**

       **5)  At least 95% of siblings who entered DFCS custody at or near the same time shall be placed together consistent with Modified Settlement Agreement requirements.**

    **<u>Status of Progress, MSA §II.B.2.r.5.</u>:**  This requirement was not satisfied.  The data produced by defendants indicate that for the 12-month period ending June 30, 2015, 76 percent of sibling groups who entered custody at or around the same time were placed together, a performance level that was one percentage point higher than defendants' performance for the 12-month period ending June 30, 2014, but a performance level that represents a significant decline relative to performance during Period 3.

    The Monitor's findings for Period 5 are presented in the chart below:



MSA §II.B.2.r.6.
2.  **Child Placement**
  r)  **By the end of Implementation Period Five:**
      6)  **At least 80% of children in DFCS custody placed in a new placement during the Period shall have their currently available medical, dental, educational, and psychological information provided to their resource parents or facility staff no later than at the time of any new placement during the Period.**

    **Status of Progress, MSA §II.B.2.r.6.:**  This requirement was not satisfied.  Data regarding this performance requirement are collected through the FCR process.  As the Monitor documented in her May 2014 Report, defendants' data collection regarding the requisite information transfer does not reflect what information was transferred at the time of a new

38

placement, but rather information that was transferred within 15 days of placement.[29]  Thus, the parties agreed this requirement would be subject to a case record review during Period 5.

Notwithstanding its limitations, the data produced by defendants indicate that the performance requirement was not satisfied.  The data indicate that for the six-month period ending June 30, 2015, 29 percent of children in DFCS custody placed in a new placement during the period had their currently available medical, dental, educational, and psychological information provided to resource parents or facility staff within 15 days of their placement.  This is an increase over the defendants' performance level for the six-month period ending June 30, 2014, which was 20 percent.

The Monitor's findings for Period 5 are presented in the chart below:

---

[29]  *See May 2014 Report* at 163-164.



*Relevant to MSA II.B.2.i., page 16, II.B.2.p.14., page 18-19, II.B.2.q.9., page 20, and II.B.2.r.6., page 20.  Neither PAD Report 10 nor this chart reflect performance related to full requirement.

Because of the limitations in the data produced by defendants, the parties agreed that this requirement would be subject to a case record review[30] during Period 5.[31] The findings from the Period 5 case record review, which covered all children in custody for at least 90 days, who entered custody between July 1, 2013 and December 31, 2014, indicate that two percent of children's placement resources were provided with all applicable information and items within

---

[30]  *See supra* at 8-10, 18-20, 24-25.
[31]  Period 5 IP §II.C.3.

15 days of placement.[32]  These findings provide further support for the conclusion that this MSA requirement was not satisfied.

> **MSA §II.B.2.r.7.**
> **2.  Child Placement**
>   **r)  By the end of Implementation Period Five:**
>       **7)  At least 80% of children in DFCS custody with a documented indication that they were to be subject to a potential or actual placement disruption during the Period shall receive a meeting to address placement stability consistent with Modified Settlement Agreement requirements.**

**Status of Progress, MSA §II.B.2.r.7.:**  This requirement was not satisfied. Data regarding this performance requirement are collected through the FCR process.  Due to historical limitations in the data collected through the FCR process regarding this requirement, the parties and the Monitor agreed that defendants would make changes to the data collection process related to this requirement.  Thus, Period 5 was the first implementation period for which reliable performance data was available for analysis.  The data indicate that for the six-month period ending June 30, 2015, DFCS staff took all reasonable steps to ensure placement stability and avoid placement disruption for 59 percent of children whose placements were disrupted during the period under review or whose placements were at risk of disruption at the time of the FCR.

The Monitor's findings for Period 5 are presented in the chart below:

---

[32] *See* Ex. 4, *supra* note 12, at 44-47.  This estimate is based on a sample and had a margin of error of +/- two percent.  This estimate is not comparable to the data from the FCR.  The case record review data comparable to the FCR data indicate that between 15 and 25 percent of children had a completed Child Information Form completed and signed within 15 days of placement.  *Id*. at 46.



\* Relevant to MSA II.B.2.j., page 16, and II.B.2.r.7., page 21. Neither PAD Report 11 nor this chart reflect performance related to full requirement.  Accurate data for IP3 and IP4 were unavailable.

MSA §II.B.2.r.8.
2. **Child Placement**
   r) **By the end of Implementation Period Five:**
      8) **At least 95% of children who entered DFCS custody shall be placed within his/her own county or within 50 miles of the home from which he/she was removed unless one of the exceptions provided in the Modified Settlement Agreement is documented as applying.**

**Status of Progress, MSA §II.B.2.r.8.:**  This requirement was satisfied.  The data

produced by defendants indicate that for the one-month period ending June 30, 2015, 96 percent

of children who entered DFCS custody were placed within their own county or within 50 miles of the home from which they were removed.[33]

The Monitor's findings for Period 5 are presented in the chart below:



* Relevant to MSA II.B.2.g., page 16, II.B.2.p.16., page 19, II.B.2.q.11., page 20, and II.B.2.r.8., page 21.

> **MSA §II.B.3.k.1.**
> **3. Physical and Mental Health Care**
>     **k)**   <u>**By the end of Implementation Period Five**</u>**:**
>         **1)**   **At least 90% of children entering custody during the Period shall receive a health screening evaluation from a qualified medical practitioner within 72 hours after placement that is in accordance with the health**

---

[33] As the Monitor indicated in her May 2014 and June 2015 Reports, the reported percentage includes placing siblings together as a qualifying exception. *See May 2014 Report* at 165 and *June 2015 Report* at 129. The chart also includes a calculation of defendants' performance excluding placing siblings together as a qualifying exception. Using either calculation methodology, defendants' performance exceeded the MSA performance requirement.

**screening recommended by the American Academy of Pediatrics.**

**Status of Progress, MSA §II.B.3.k.1.:**  This requirement was not satisfied.  The data produced by defendants report on only the timeliness of initial health screening evaluations and not on whether the screenings were conducted by a qualified medical practitioner nor whether they were conducted in accordance with the other substantive AAP recommendations. Nonetheless, the data produced by defendants indicate that for the 12-month period ending June 30, 2015, 30 percent of children entering custody received an initial health screening within 72 hours after placement, three percentage points higher than defendants' performance for the 12-month period ending June 30, 2014.

The Monitor's findings for Period 5 are presented in the chart below:



Children Entering Custody Who Received An Initial Health Screening Within 72 Hours After Placement
12-Month Periods Ending 6/30/13, 6/30/14, & 6/30/15*
[Prepared by the Office of the Court Monitor Based on DFCS Data, MACWIS SLS315]

*Relevant to MSA II.B.3.a., page 21, II.B.3.i.1., page 22, II.B.3.j.1., page 23, and II.B.3.k.1., page 24. Neither SLS315 nor this chart reflect performance related to full requirement.

Because of the limitations in the data produced by defendants, the parties agreed that this requirement would be subject to a case record review during Period 5.[34]  The findings from the Period 5 case record review, which covered all children in custody for at least 90 days, who entered custody between July 1, 2013 and December 31, 2014, indicate that two percent of children received an initial health screening by a qualified medical practitioner within 72 hours

---

[34]  Period 5 IP §II.C.3.

that was conducted in accordance with the health screening recommended by the AAP.[35]  These

findings provide further support for the conclusion that this MSA requirement was not satisfied.

> **MSA §II.B.3.k.2.**
> **3.  Physical and Mental Health Care**
> **k)  By the end of Implementation Period Five:**
> **2)  At least 90% of children entering custody during the Period shall receive a comprehensive health assessment consistent with Modified Settlement Agreement requirements within 30 calendar days of entering care.**

**Status of Progress, MSA §II.B.3.k.2.:**  This requirement was not satisfied.  The data

produced by defendants report only on the timeliness of comprehensive health assessments and

not on whether the assessment was consistent with the recommendations of the AAP, as required

by the MSA.  The data produced by defendants indicate that for the period ending June 30, 2015,

35 percent of children in custody more than 30 days received a comprehensive health assessment

within 30 days of placement, two percentage points higher than defendants' performance for the

12-month period ending June 30, 2014.

The Monitor's findings for Period 5 are presented in the chart below:

---

[35]  *See* Ex. 4, *supra* note 12, at 15-19.  This estimate was based on a sample and had a margin of error of +/- two percent.  This estimate is not comparable to data derived from the FCR process, which capture only whether an initial health screening was performed within 72 hours, and not whether it was in accordance with the health screening recommended by the AAP.  The case record review data comparable to the data derived from the FCR process indicate that, for the cohort analyzed, between 35 and 49 percent of children received an initial health screening within 72 hours.  *Id*. at 18.



*Relevant to MSA II.B.3.b., page 21, II.B.3.i.2., page 22, II.B.3.j.2., page 23, and II.B.3.k.2., page 24. Neither SLS315 nor this chart reflect performance related to full requirement.

Because of the limitations in the data produced by defendants, the parties agreed that this requirement would be subject to a case record review during Period 5.[36]  The findings from the Period 5 case record review, which covered all children in custody for at least 90 days, who entered custody between July 1, 2013 and December 31, 2014, indicate that one percent of children entering foster care received a comprehensive health assessment by a qualified medical practitioner within 30 days of placement that was in accordance with the health assessment

---

[36]  Period 5 IP §II.C.3.

recommended by the AAP.[37]  These findings further support the conclusion that this MSA

requirement was not satisfied.

> **MSA §II.B.3.k.3.**
> **3.  Physical and Mental Health Care**
>> k)   <u>By the end of Implementation Period Five</u>:
>>> 3)   **At least 95% of children in custody during the Period shall receive periodic medical examinations and all medically necessary follow-up services and treatment consistent with Modified Settlement Agreement requirements.**

<u>**Status of Progress, MSA §II.B.3.k.3.**</u>:  The parties agreed that defendants' performance

relative to this requirement would be measured by a case record review conducted during Period

5,[38] which of necessity could not measure performance as of the end of the implementation

period.  Analysis of the data collected during the case record review indicates that this

requirement was not satisfied for all children who entered DFCS custody between July 1, 2013

and December 31, 2014 and who remained in custody for at least a 90-day period.  The Monitor

found that for the cohort of children entering custody during that time period, 58 percent of

children with recommended medical follow-up services, treatment and/or equipment were

provided with all recommended follow up.[39]  As explained in greater detail in the report on the

findings from the case record review, periodic medical examinations could not be analyzed due

to concerns about data quality.[40]

---

[37] *See* Ex. 4, *supra* note 12, at 20-26.  This estimate was based on a sample and had a margin of error of +/- one percent.  This estimate is not comparable to data derived from the FCR process, which captures only whether children received a comprehensive health assessment within 30 days and not whether it was performed by a qualified medical practitioner in accordance with the health assessment recommended by the AAP.  The case record review data comparable to the data derived from the FCR process indicate that, for the cohort analyzed, between 50 and 64 percent of children in the cohort analyzed received a comprehensive medical assessment within 30 days.  *Id.* at 24.
[38] Period 5 IP §II.C.3.
[39] *See* Ex. 4, *supra* note 12, at 28.  This estimate was based on a sample and has a margin of error of +/- 12 percent.
[40] *Id.* at 27-28

**MSA §II.B.3.k.4.**

**3.  Physical and Mental Health Care**

   **k)**   <u>**By the end of Implementation Period Five**</u>**:**

       **4)**  **At least 90% of children three years old and older entering custody during the Period or in care and turning three years old during the Period shall receive a dental examination within 90 calendar days of foster care placement or their third birthday, respectively.**

<u>**Status of Progress, MSA §II.B.3.k.4.:**</u>  This requirement was not satisfied.  Defendants collected data pertaining to this requirement through the FCR process.  The data produced by defendants indicate that for the six-month period ending June 30, 2015, 47 percent of children three years old and older who entered custody during the period and children in custody who turned three years old during the period, and who were reviewed through the FCR process, received a dental examination within 90 calendar days of their placement or their third birthday, as applicable.  This represents an eight percent decrease over defendants' performance for the six-month period ending one year earlier, on June 30, 2014.

The Monitor's findings for Period 5 are presented in the chart below:



Children Three Years Old And Older Who Received A Dental Examination Within
90 Calendar Days Of Placement And Children Who Turned Three While In Custody And Received
A Dental Examination Within 90 Calendar Days Of Their Third Birthday, By Region
Six Month Periods Ending 6/30/13, 6/30/14, & 6/30/15*
[Prepared by the Office of the Court Monitor Based on DFCS Data, PAD Report 27, Measures 1 and 2]

Period 5 Statewide Performance Requirement: 90%

Period 3 Statewide Performance Requirement: 60%, Actual 49%
Period 4 Statewide Performance Requirement: 75%, Actual 55%
Period 5 Statewide Performance Requirement: 90%, Actual 47%

Period 5 Statewide Performance as of 6/30/15: 47%

☐ Children Three Years and Older Who Did Not Receive a Dental Exam Within 90 Days of Placement or Their Third Birthday
▥ Children Three Years and Older Who Received a Dental Exam Within 90 Days of Placement or Their Third Birthday

\* Relevant to MSA II.B.3.e., page 22, II.B.3.j.4., page 23, and II.B.3.k.4., page 24. Neither PAD Report 27, Measures 1 and 2 nor this chart reflect performance related to full requirement.

The findings from the Period 5 case record review, which covered all children in custody for at least 90 days between July 1, 2013 and December 31, 2014, indicate that 47 percent of children to whom this requirement applied received a dental examination within 90 days.[41] These findings indicate that this MSA requirement was not satisfied.

> **MSA §II.B.3.k.5.**
> **3. Physical and Mental Health Care**
>   **k)** **By the end of Implementation Period Five:**
>     **5)** **At least 90% of children in custody during the Period shall receive a dental examination every six months consistent with Modified Settlement Agreement**

---

[41] *See* Ex. 4, *supra* note 12, at 29-31.  This estimate was based on a sample and has a margin of error of +/- six percent.

**requirements and all medically necessary dental services.**

**Status of Progress, MSA §II.B.3.k.5.:**  This requirement was not satisfied.  Defendants collected data regarding this performance requirement through the FCR process and those data report only on the timeliness of the applicable dental examinations and not whether the assessment was consistent with MSA requirements and whether the children received all medically necessary dental services.

The data produced by defendants indicate that for the six-month period ending June 30, 2015, 43 percent of children ages three and older at the start of the period under review were provided a dental exam every six months, nine percentage points lower than the defendants' performance for the six-month period ending one year earlier, on June 30, 2014.

The Monitor's findings for Period 5 are presented in the chart below:



\* Relevant to MSA II.B.3.e., page 22, II.B.3.i.5., page 22, II.B.3.j.5., page 23, and II.B.3.k.5., page 24.  Neither PAD Report 27, Measure 2 nor this chart reflect performance related to full requirement.

Because of the limitations in the data produced by defendants, the parties agreed that this requirement would be subject to a case record review during Period 5.[42]  A case record review was conducted during Period 5, which covered all children in custody for at least 90 days, who entered custody between July 1, 2013 and December 31, 2014.  The findings from that review pertaining to six-month periodic dental examinations could not be analyzed due to concerns about data quality.  Among children age three or older or turning age three while in care who

---

[42]  Period 5 IP §II.C.3.

received a dental examination, 48 percent received all recommended follow up services.[43]   These

findings further support the conclusion that this MSA requirement was not satisfied.

> MSA §II.B.3.k.6.
> 3. **Physical and Mental Health Care**
>> k) <u>By the end of Implementation Period Five:</u>
>>> 6) **At least 90% of children four years old and older entering custody during the Period or in care and turning four years old during the Period shall receive a mental health assessment by a qualified professional within 30 calendar days of foster care placement or their fourth birthday, respectively.**

**Status of Progress, MSA §II.B.3.k.6.:**  The parties agreed that defendants' performance

relative to this requirement would be measured by a case record review conducted during Period

5,[44] which of necessity could not measure performance as of the end of the implementation

period.  Analysis of the data collected during the case record review indicates that this

requirement was not satisfied for all children who entered DFCS custody between July 1, 2013

and December 31, 2014 and who remained in custody for at least a 90-day period.  The Monitor

found that for the cohort of children entering custody during that period, 26 percent received a

mental health assessment within 30 days and 39 percent received a mental health assessment that

was conducted by a qualified professional within the 30-day period or after it lapsed.[45]

> MSA §II.B.3.k.7.
> 3. **Physical and Mental Health Care**
>> k) <u>By the end of Implementation Period Five:</u>
>>> 7) **At least 90% of children who received a mental health assessment during the period shall receive all recommended mental health services pursuant to their assessment.**

**Status of Progress, MSA §II.B.3.k.7.:**  The parties agreed that defendants'

performance relative to this requirement would be measured by a case record review conducted

---

[43]  *See* Ex. 4, *supra* note 12, at 29-31.  This estimate was based on a sample and has a margin of error of +/- 21 percent.
[44]  Period 5 IP §II.C.3.
[45]  *See* Ex. 4, *supra* note 12, at 32-34.  These estimates were based on a sample and have a margin of error of +/- six percent.  Defendants produce a data report based on the FCR review process pertaining to a portion of this MSA requirement.  The Period 5 data contained in that report has not yet been analyzed and presented to the parties.

during Period 5,[46] which of necessity could not measure performance as of the end of the

implementation period.  Analysis of the data collected during the case record review indicates

that this requirement was not satisfied for all children who entered DFCS custody between July

1, 2013 and December 31, 2014 and who remained in custody for at least a 90-day period.  The

Monitor found that for the cohort of children entering custody during that time period, 47 percent

who needed follow up mental health services received all recommended services.[47]

> MSA §II.B.3.k.8.
> 3.  **Physical and Mental Health Care**
>     k)  **By the end of Implementation Period Five:**
>         8)  **At least 80% of children in custody ages birth through
>             three during the Period, and older children if factors
>             indicate it is warranted, shall receive a developmental
>             assessment by a qualified professional within 30
>             calendar days of foster care placement and all needed
>             developmental services.**

**Status of Progress, MSA §II.B.3.k.8.:**  The parties agreed that defendants'

performance relative to this requirement would be measured by a case record review conducted

during Period 5,[48] which of necessity could not measure performance as of the end of the

implementation period.  Analysis of the data collected during the case record review indicates

that this requirement was not satisfied for all children who entered DFCS custody between July

1, 2013 and December 31, 2014 and who remained in custody for at least a 90-day period.  The

Monitor found that for the cohort of children entering custody during that time period, 17 percent

of children ages birth through three, or older if an assessment was warranted, received a

---

[46]  Period 5 IP §II.C.3.
[47]  *See* Ex. 4, *supra* note 12, at 32-34.  This estimate was based on a sample and has a margin of error of +/- 11
percent.
[48]  Period 5 IP §II.C.3.

developmental assessment within 30 days of foster care placement and received all needed

follow-up developmental services.[49]

> MSA §II.B.4.d.1.
> **4.  Therapeutic Services**
> > **d)  By the end of Implementation Period Five:**
> > > **1)  At least 90% of children in custody during the Period
> > > requiring therapeutic and/or rehabilitative foster care
> > > services because of a diagnosis of significant medical,
> > > developmental, emotional, or behavioral problems
> > > shall be provided with a treatment plan and services
> > > in accordance with their plan.**

**Status of Progress, MSA §II.B.4.d.1.:**  The parties agreed that defendants' performance

relative to this requirement would be measured by a case record review conducted during Period

5,[50] which of necessity could not measure performance as of the end of the implementation

period.  Analysis of the data collected during the case record review indicates that this

requirement was not satisfied for all children who entered DFCS custody between July 1, 2013

and December 31, 2014 and who remained in custody for at least a 90-day period.  The Monitor

found that for the cohort of children entering custody during that time period, 45 percent of

children with significant medical, developmental and/or behavioral problems were provided with

a treatment plan and all recommended services.[51]

> MSA §II.B.5.g.1.
> **5.  Worker Contact and Monitoring**
> > **g)  By the end of Implementation Period Five:**
> > > **1)  At least 90% of children in custody shall receive
> > > documented twice-monthly in-person visits by the
> > > assigned DFCS caseworker during the Period,
> > > consistent with Modified Settlement Agreement
> > > requirements.**

**Status of Progress, MSA §II.B.5.g.1.:**  This requirement was not satisfied.  The MSA

includes both statewide and regional requirements relative to required in-person visits by the

---

[49]  *See* Ex. 4, *supra* note 12, at 35-39.  This estimate was based on a sample and has a margin of error of +/- seven
percent.  Defendants produce a data report based on the FCR review process pertaining to a portion of this MSA
requirement.  The Period 5 data contained in that report has not yet been analyzed and presented to the parties.
[50]  Period 5 IP §II.C.3.
[51]  *See* Ex. 4, *supra* note 12, at 40-43.  This estimate was based on a sample and has a margin of error of +/- 10
percent.

assigned DFCS caseworker.  The regional requirements are addressed below in the narrative

related to MSA §§II.B.5.h.1. and II.B.5.i.1.[52]  Twice-monthly in-person visits by the assigned

DFCS caseworker are critical to ensuring the safety of the children in defendants' custody.

The data produced by defendants indicate that for the one-month period ending June 30,

2015, 59 percent of children statewide received a twice monthly in-person visit by their assigned

caseworker.[53]  This is an eight percentage point decrease in defendants' performance relative to

statewide performance for the one-month period ending June 30, 2014.

The Monitor's findings for Period 5 are presented in the chart below:

---

[52] *See infra* at 62-64.

[53] Defendants' calculation of their Period 5 performance for this requirement is approximately two percentage points higher.  The difference in these totals appears to be due to a calculation error in defendants' reports.



* Relevant to MSA II.B.5.e.1., page 26, II.B.5.a., page 26, II.B.5.f.1., page 27, and II.B.5.g.1., page 27. Neither SWZC5D nor this chart reflect performance related to full requirement.

MSA §II.B.5.g.2.
5. **Worker Contact and Monitoring**
    g) **By the end of Implementation Period Five:**
       2) **At least 90% of children with a goal of reunification shall have their assigned DFCS caseworker meet monthly with the child's parents, during the Period, consistent with Modified Settlement Agreement requirements, as documented in the child's case record.**

**Status of Progress, MSA §II.B.5.g.2.:**  This requirement was not satisfied.  The MSA

includes both statewide and regional performance requirements with respect to caseworker visits

with parents in instances in which children have a goal of reunification.  Regional performance will be addressed in the Monitor's final report on Period 5.

The data produced by defendants indicate that for the one-month period ending June 30, 2015, 33 percent of children with a goal of reunification had their assigned caseworker meet monthly with the parent(s) with whom the children were to be reunified.  This represents a five percentage point decrease relative to defendants' performance for the one-month period ending June 30, 2014.

The Monitor's findings for Period 5 are presented in the chart below:



* Relevant to MSA II.B.5.b., page 26, II.B.5.f.2., page 27, and II.B.5.g.2., page 27.  Neither SZWCR3 nor this chart reflect performance related to full requirement.

MSA §II.B.5.g.3.
5. **Worker Contact and Monitoring**
   g) <u>By the end of Implementation Period Five</u>:
      3) **At least 90% of resource parents (therapeutic and non-therapeutic) with at least one foster child residing in their home during the Period shall have a DFCS worker visit the home monthly, consistent with Modified Settlement Agreement requirements, as documented in the children's case records.**

    <u>**Status of Progress, MSA §II.B.5.g.3.:**</u>  This requirement was not satisfied.  Defendants produced data from MACWIS regarding the frequency of caseworker visits and from the FCR process addressing both the frequency and content of caseworker visits related to this requirement.  Additionally, defendants report separately on non-therapeutic placement settings and therapeutic placement settings.  Due to limitations in the MACWIS data collected by defendants regarding the frequency of caseworker visits to children placed in therapeutic settings, the Monitor was not able to analyze data related to that aspect of the requirement.[54]

    The MACWIS data defendants produced regarding non-therapeutic placements indicate that for the one-month period ending June 30, 2015, 42 percent of non-therapeutic resource parents with at least one foster child residing in their home had a caseworker visit the home monthly, a seven percentage point decrease over performance for the one-month period ending June 30, 2014.

---

[54] Defendants report this data in report MACWIS SZPLMBD.  Many therapeutic placements utilized by DFCS are licensed by entities other than MDHS.  Analysis of the data revealed that frequently for therapeutic placements licensed by entities other than MDHS, caseworkers recorded in MACWIS the licensing entity associated with a child's placement settings, rather than the individual, licensed setting itself.  Because of this, it was not possible to disaggregate the data by placement setting in order to analyze the data consistent with the MSA requirement.  The Monitor reported on this data problem in her June 2015 Report.  *See June 2015 Report* at 140, n.359.  On November 24, 2015 defendants reported that this data problem was not resolved.



*Relevant to MSA II.B.5.c., page 26, II.B.5.e.3., page 27, II.B.5.f.3., page 27, and II.B.5.g.3, page 27. Neither SZPLMC nor this chart reflect performance related to full requirement.

Data derived from the FCR process use both a different timeframe as the basis of analysis (*i.e.,* six months of data rather than one month of data) and use children as the unit of analysis (*i.e.,* not resource parents, the unit of analysis relevant to this requirement).  The data derived from the FCR process indicate that the content of home visits for children placed in non-therapeutic settings met MSA requirements for 55 percent of children for the six-month period ending June 30, 2015, a 15 percentage point decrease over performance for the six-month period ending June 30, 2014.

The Monitor's analysis of the data derived from the FCR process for children placed in non-therapeutic settings for the six-month period ending June 30, 2015 is presented in the chart below:



*Relevant to MSA II.B.5.c., page 26, II.B.5.e.3., page 27, II.B.5.f.3., page 27, and II.B.5.g.3., page 27. Neither PAD Report 2 nor this chart reflect performance related to the full requirement.

The data defendants produced regarding therapeutic placements indicate that the content of home visits for children placed in therapeutic settings met MSA requirements for 51 percent of children for the six-month period ending June 30, 2015, 22 percentage points lower than performance for the six-month period ending June 30, 2014.

The Monitor's analysis of the data derived from the FCR process for children placed in therapeutic settings for the six-month period ending June 30, 2015 is presented in the chart below:



*Relevant to MSA II.B.5.c., page 26, II.B.5.e.3., page 27, II.B.5.f.3, page 27, and II.B.5.g.3., page 27. Neither PAD Report 3 nor this chart reflect performance related to the full requirement.

**MSA §§II.B.5.h.1. and II.B.5.i.1.**
**5. Worker Contact and Monitoring**
    **h) Beginning by the date set forth in Appendix "A" that a
        DFCS region has fully implemented the Practice Model:**
        **1) At least 70% of children in custody in that region
            shall have received documented twice-monthly in-
            person visits by the assigned DFCS caseworker during
            the preceding 12-month period, consistent with
            Modified Plan requirements.**

     i)  **Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**

         1)  **At least 90% of foster children in custody in that region shall receive documented twice-monthly in-person visits by the assigned DFCS caseworker, consistent with Modified Settlement Agreement requirements.**

       **Status of Progress, MSA §§II.B.5.h.1. and II.B.5.i.1.:**  During Period 5, five regions fully implemented the Practice Model and eight regions fully implemented the Practice Model for at least 12 months and thus were responsible for satisfying the associated performance standards.  Defendants produced data from MACWIS addressing performance regarding the frequency of caseworker contacts as prescribed by this requirement.

       Among the five regions that fully implemented during Period 5, one region satisfied the frequency of caseworker contacts for this performance requirement.  None of the eight regions that fully implemented the Practice Model for at least 12 months satisfied the performance requirement at the 12-month-post full implementation mark.  Similarly, none of those eight regions met the performance requirement as of the end of Period 5;  however, the first three regions to implement the Practice Model – Regions I-S, II-W, and V-W – performed best and all were within three percent of meeting the performance requirement as of the end of Period 5.[55] The Monitor's findings are summarized in the table below, which also includes for informational purposes updated performance data as of the end of Period 5 for the eight regions that were 12-months-post full implementation.[56]

---

[55] Defendants' calculation of regional performance for this requirement as of the end of Period 5 differs slightly from the Monitor's calculations.  The difference in the calculated totals appears to be due to a calculation error in defendants' reports.

[56] The table also includes performance data as of the end of Period 4 for the three regions that had implemented the Practice Model for at least 12 months as of the end of Period 4.

## Regional Performance: MSA §§II.B.5.h.1. and II.B.5.i.1.
### (Based on DFCS Data, MACWIS SWZC5D)

| Start Date for Performance Measurement | Performance Requirement | Practice Model Full Implementation: 8/31/12 — 12 Months Following: 8/31/13 — End of Period 4: 6/30/14 — End of Period 5: 6/30/15 | | Practice Model Full Implementation: 2/28/13 — 12 Months Following: 2/28/14 — End of Period 4: 6/30/14 — End of Period 5: 6/30/15 | Practice Model Full Implementation: 8/31/13 — 12 Months Following: 8/31/14 — End of Period 5: 6/30/15 | | | | Practice Model Full Implementation: 2/28/14 — 12 Months Following: 2/28/15 — End of Period 5: 6/30/15 | Practice Model Full Implementation: 8/31/14 — 12 Months Following: 8/31/15 | | Practice Model Full Implementation: 2/28/15 — 12 Months Following: 2/28/16 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S | V-E | III-N | VII-E | II-E | VI | VII-W |
| Findings for Practice Model Full Implementation Date | 70% | 44% (N=330) (8/31/12) | 72% (N=162) (8/31/12) | 66% (N=109) (2/28/13) | 44% (N=485)* (8/31/13) | 68% (N=282)* (8/31/13) | 65% (N=175) (8/31/13) | 75% (N=128) (8/31/13) | 66% (N=162) (2/28/14) | 64% (N=290) (8/31/14) | 63% (N=234) (8/31/14) | 86% (N=88) (2/28/15) | 68% (N=472) (2/28/15) | 54% (N=1062) (2/28/15) |
| Findings for 12 Months Following Implementation Date | 90% | 85% (N=294) (8/31/13) — 84% (N=310) (6/30/14) — 87% (N=335) (6/30/15) | 79% (N=155) (8/31/13) — 92% (N=145) (6/30/14) — 89% (N=133) (6/30/15) | 64% (N=107) (2/28/14) — 68% (N=114) (6/30/14) — 88% (N=100) (6/30/15) | 54% (N=537) (8/31/14) — 37% (N=591) (6/30/15) | 79% (N=326) (8/31/14) — 65% (N=335) (6/30/15) | 81% (N=181) (8/31/14) — 83% (N=184) (6/30/15) | 80% (N=120) (8/31/14) — 65% (N=150) (6/30/15) | 79% (N=156) (2/28/15) — 76% (N=140) (6/30/15) | | | | | |

SWZC5D does not reflect performance related to the full MSA requirement. The numbers above represent the percentage of children with two face-to-face visits, including at least one in the placement by the assigned caseworker.
* In the Monitor's May 2014 Report, as of 8/31/13 defendants' performance in Regions III-S and I-N was reported as 45% and 70%, respectively. In April 2014, defendants submitted revised data reports and reproduced historical data back to July 2012. The submission was made too late for the Monitor to analyze for the May 2014 report. The performance reflected above is based on the data submitted by defendants in April 2014.

MSA §§II.B.5.h.3. and II.B.5.i.3.

5. **Worker Contact and Monitoring**

    h) <u>Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model</u>:

        3) At least 80% of foster parents in that region with at least one foster child residing in their home during the preceding 12-month period shall have had a DFCS worker visit the home monthly, consistent with Modified Plan requirements, as documented in the children's case records.

    i) <u>Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model</u>:

        3) At least 90% of resource parents in that region with at least one foster child residing in their home shall have a DFCS worker visit the home monthly, consistent with Modified Settlement Agreement requirements, as documented in the children's case records.

**Status of Progress, MSA §§II.B.5.h.3. and II.B.5.i.3.:**  As noted above, during Period 5, five regions fully implemented the Practice Model and eight regions fully implemented the Practice Model for at least 12 months and thus were responsible for satisfying the associated performance standards.  Defendants produced data from MACWIS and the FCR process addressing performance related to this requirement for both non-therapeutic and therapeutic resource homes.  Analysis of the MACWIS data produced for therapeutic resource homes has not been analyzed because of ongoing limitations in the data that were identified in December 2014.[57]

The MACWIS and FCR data defendants produced regarding non-therapeutic resource homes indicate that among the five regions that fully implemented during Period 5, no regions satisfied the performance requirement.  None of the eight regions that fully implemented the Practice Model for at least 12 months satisfied the performance requirement at the 12-month-post full implementation mark.  None of those eight regions met the performance requirement at the end of Period 5.  The Monitor's findings are summarized in the table below, which also

---

[57] *See supra* note 54.

includes for informational purposes updated performance data as of the end of Period 5 for the

eight regions that were 12-months-post full implementation.[58]

---

[58]  The table also includes performance data as of the end of Period 4 for the three regions that had implemented the Practice Model for at least 12 months as of the end of Period 4.

## Regional Performance: MSA §§II.B.5.h.3. and II.B.5.i.3.
### (Based on DFCS Data, MACWIS SZPLMC and PAD Report 2)

| | Performance Requirement | Practice Model Full Implementation: 8/31/12; 12 Months Following: 8/31/13; End of Period 4: 6/30/14; End of Period 5: 6/30/15 | | Practice Model Full Implementation: 2/28/13; 12 Months Following: 2/28/14; End of Period 4: 6/30/14; End of Period 5: 6/30/15 | Practice Model Full Implementation: 8/31/13; 12 Months Following: 8/31/14; End of Period 5: 6/30/15 | | | | Practice Model Full Implementation: 2/28/14; 12 Months Following: 2/28/15; End of Period 5: 6/30/15 | Practice Model Full Implementation: 8/31/14; 12 Months Following: 8/31/15 | | Practice Model Full Implementation: 2/28/15; 12 Months Following: 2/28/16 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start Date for Performance Measurement | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S | V-E | III-N | VII-E | II-E | VI | VII-W |
| Findings for Practice Model Full Implementation Date | 80% | MACWIS Report: 73% (N=151) (8/31/12) — PAD Report: Data unreliable: PAD corrected October 2012 and therefore data analyzable as of April 2013 | MACWIS Report: 83% (N=64) (8/31/12) — PAD Report: Data unreliable: PAD corrected October 2012 and therefore data analyzable as of April 2013 | MACWIS Report: 75% (N=48) (2/28/13) — PAD Report: Data unreliable: PAD corrected October 2012 and therefore data analyzable as of April 2013 | MACWIS Report: 32% (N=124) — PAD Report: 60% (N=167) (8/31/13) | MACWIS Report: 43% (N=131) — PAD Report: 71% (N=100) (8/31/13) | MACWIS Report: 68% (N=75) — PAD Report: 94% (N=99) (8/31/13) | MACWIS Report: 67% (N=52) — PAD Report: 73% (N=108) (8/31/13) | MACWIS Report: 63% (N=65) — PAD Report: 90% (N=109) (2/28/14) | MACWIS Report: 30% (N=84) — PAD Report: 72% (N=146) (8/31/14) | MACWIS Report: 45% (N=93) — PAD Report: 48% (N=168) (8/31/14) | MACWIS Report: 73% (N=41) — PAD Report: 100% (N=58) (2/28/15) | MACWIS Report: 54% (N=188) — PAD Report: 44% (N=289) (2/28/15) | MACWIS Report: 27% (N=479) — PAD Report: 22% (N=456) (2/28/15) |
| Findings for 12 Months Following Implementation Date | 90% | MACWIS Report: 80% (N=133) PAD Report: 97% (N=178) (8/31/13); MACWIS Report: 87% (N=132) PAD Report: 99% (N=216) (6/30/14); MACWIS Report: 85% (N=148) PAD Report: 100% (N=223) (6/30/15) | MACWIS Report: 87% (N=60) PAD Report: 77% (N=77) (8/31/13); MACWIS Report: 82% (N=60) PAD Report: 72% (N=61) (6/30/14); MACWIS Report: 83% (N=53) PAD Report: 75% (N=95) (6/30/15) | MACWIS Report: 43% (N=44) PAD Report: 100% (N=60) (2/28/14); MACWIS Report: 49% (N=49) PAD Report: 95% (N=63) (6/30/14); MACWIS Report: 63% (N=41) PAD Report: 90% (N=73) (6/30/15) | MACWIS Report: 25% (N=157) PAD Report: 75% (N=178) (8/31/14); MACWIS Report: 21% (N=172) PAD Report: 32% (N=137) (6/30/15) | MACWIS Report: 64% (N=141) PAD Report: 80% (N=184) (8/31/14); MACWIS Report: 54% (N=147) PAD Report: 78% (N=244) (6/30/15) | MACWIS Report: 76% (N=79) PAD Report: 95% (N=137) (8/31/14); MACWIS Report: 69% (N=84) PAD Report: 99% (N=136) (6/30/15) | MACWIS Report: 48% (N=65) PAD Report: 88% (N=80) (8/31/14); MACWIS Report: 54% (N=68) PAD Report: 77% (N=91) (6/30/15) | MACWIS Report: 64% (N=61) PAD Report: 68% (N=99) (2/28/15); MACWIS Report: 63% (N=56) PAD Report: 78% (N=86) (6/30/15) | | | | | |

SZPLMC does not reflect performance related to the full MSA requirement. For SZPLMC, the numbers above represent the percentage of non-therapeutic homes with at least one child that were visited by a caseworker at least once monthly during report period. PAD Report 2 does not reflect performance related to the full MSA requirement. For PAD Report 2, the numbers above represent the percentage of children for whom the caseworker met the content of the visit requirements pursuant to MSA II.B.5.c. In September 2014, the PAD reviewer guidance was revised to include qualitative aspects of this requirement. In the table any data beginning with the period ending February 2015 are based only on PAD questions answered based on the guidance revisions that were made in September 2014. Data for periods ending between September 2014 and January 2015 are based on a mixture of questions answered based on the guidance provided both prior to and subsequent to the September 2014.

As noted above, defendants did not produce reliable data for the frequency of caseworker visits to therapeutic resource homes.  In addition to the frequency of visits, this MSA requirement also includes standards concerning the content of visits.  The FCR data defendants produced indicate that among the five regions that fully implemented during Period 5, two regions satisfied the performance requirement insofar as the content of caseworker visits.  Five of the eight regions that fully implemented the Practice Model for at least 12 months satisfied the content standards for caseworker visits at the 12-month-post full implementation mark.  Four of those eight regions met the caseworker visit content standards at the end of Period 5.  The Monitor's findings are summarized in the table below, which also includes for informational purposes updated performance data as of the end of Period 5 for the eight regions that were 12-months-post full implementation.[59]

---

[59]  The table also includes performance data as of the end of Period 4 for the three regions that had implemented the Practice Model for at least 12 months as of the end of Period 4.

## Regional Performance: MSA §§II.B.5.h.3. and II.B.5.i.3.
### (Based on DFCS Data, PAD Report 3)

| Start Date for Performance Measurement | Performance Requirement | Practice Model Full Implementation: 8/31/12  12 Months Following: 8/31/13  End of Period 4: 6/30/14  End of Period 5: 6/30/15 | | Practice Model Full Implementation: 2/28/13  12 Months Following: 2/28/14  End of Period 4: 6/30/14  End of Period 5: 6/30/15 | Practice Model Full Implementation: 8/31/13  12 Months Following: 8/31/14  End of Period 5: 6/30/15 | | | | Practice Model Full Implementation: 2/28/14  12 Months Following: 2/28/15  End of Period 5: 6/30/15 | Practice Model Full Implementation: 8/31/14  12 Months Following: 8/31/15 | | Practice Model Full Implementation: 2/28/15  12 Months Following: 2/28/16 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S | V-E | III-N | VII-E | II-E | VI | VII-W |
| Findings for Practice Model Full Implementation Date | 80% | PAD Report: Data unreliable; PAD corrected October 2012 and therefore data analyzable as of April 2013 | PAD Report: Data unreliable; PAD corrected October 2012 and therefore data analyzable as of April 2013 | PAD Report: Data unreliable; PAD corrected October 2012 and therefore data analyzable as of April 2013 | PAD Report: 38% (N=63) (8/31/13) | PAD Report: 100% (N=1) (8/31/13) | PAD Report: 100% (N=7) (8/31/13) | PAD Report: N/A (N=0) (8/31/13) | PAD Report: 100% (N=1) (2/28/14) | PAD Report: 36% (N=11) (8/31/14) | PAD Report: 67% (N=9) (8/31/14) | PAD Report: 100% (N=5) (2/28/15) | PAD Report: 83% (N=12) (2/28/15) | PAD Report: 26% (N=19) (2/28/15) |
| Findings for 12 Months Following Implementation Date | 90% | PAD Report: 100% (N=15) (8/31/13)  PAD Report: 100% (N=12) (6/30/14)  PAD Report: 85% (N=13) (6/30/15) | PAD Report: 33% (N=3) (8/31/13)  PAD Report: 100% (N=2) (6/30/14)  PAD Report: 100% (N=1) (6/30/15) | PAD Report: 100% (N=1) (2/28/14)  PAD Report: 50% (N=2) (6/30/14)  PAD Report: 100% (N=1) 6/30/15 | PAD Report: 87% (N=68) (8/31/14)  PAD Report: 11% (N=27) (6/30/15) | PAD Report: 67% (N=6) (8/31/14)  PAD Report: 80% (N=5) (6/30/15) | PAD Report: 100% (N=8) (8/31/14)  PAD Report: 100% (N=3) (6/30/15) | PAD Report: 100% (N=1) (8/31/14)  PAD Report: 0% (N=1) (6/30/15) | PAD Report: 100% (N=3) (2/28/15)  PAD Report: 100% (N=3) (6/30/15) | | | | | |

* The Monitor will not present analysis of the data produced in MWZPLMB due to ongoing limitations in the data that were identified in December 2014.  PAD Report 3 does not reflect performance related to the full MSA requirement.  For PAD Report 3, the numbers above represent the percentage of children for whom the caseworker met the content of the visit requirements pursuant to MSA II.B.5.c.  In September 2014, the PAD reviewer guidance was revised to include qualitative aspects of this requirement.  In the table any data beginning with the period ending February 2015 are based only on PAD questions answered based on the guidance revisions that were made in September 2014.  Data for periods ending between September 2014 and January 2015 are based on a mixture of questions answered based on the guidance provided both prior to and subsequent to the September 2014.

MSA §II.C.1.d.1.
1. **Number of Placements**
   d. <u>**By the end of Implementation Period Five:**</u>
      1) **In the last year, at least 86.7% of children state-wide in care less than 12 months from the time of latest removal from home shall have had two or fewer placements.**

<u>**Status of Progress, MSA §II.C.1.d.1.:**</u>  This requirement was not satisfied.  The data produced by defendants indicate that for the 12-month period ending June 30, 2015, 81 percent of children in custody fewer than 12 months from their latest removal from home had two or fewer placements.  Defendants' performance was two percentage points higher than performance for the 12-month period ending June 30, 2014.

The Monitor's findings for Period 5 are presented in the chart below:



* Relevant to MSA II.C.1.a., page 31, II.C.1.b.1., page 31, II.C.1.c.1., page 31, and II.C.1.d.1., page 31.

MSA §§III.B.3.a.6.a. and III.B.3.a.7.a.
3. **Child and Youth Permanency**
   a. **Permanency Plan**
      6) <u>Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model</u>:
         (a) At least 90% of foster children in that region who enter custody shall have a permanency plan within 30 calendar days of their entry into care consistent with Modified Settlement Agreement requirements.

      7) <u>Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model</u>:
         (a) At least 95% of foster children in that region who enter custody shall have a permanency plan within 30 calendar days of their entry into care consistent with Modified Settlement Agreement requirements.

**Status of Progress, MSA §§III.B.3.a.6.a. and III.B.3.a.7.a.:** As noted above, during Period 5, five regions fully implemented the Practice Model and eight regions fully implemented the Practice Model for at least 12 months and thus were responsible for satisfying the associated performance standards. Defendants produced data from MACWIS and the FCR process addressing performance related to this requirement. Certain changes were made to the PAD in December 2013 and April 2014, which impacted the data defendants collected related to this requirement. Thus data derived from the FCR process for six-month periods ending before December 2013 are not precisely comparable to data derived from the FCR process after that date.[60] The Monitor has not had an opportunity to analyze the data derived from the FCR process produced with the agreed upon changes, but will do so and will report the results to the parties.

Among the five regions that fully implemented during Period 5, no regions satisfied the performance requirement. None of the eight regions that fully implemented the Practice Model

---

[60] The first monthly data submission produced by defendants including only data based on the changes made to the PAD in December 2013 and April 2014 was the data submission for the six-month period ending on October 31, 2014, after the start of Period 5.

for at least 12 months satisfied the performance requirement at the 12-month-post full

implementation mark.  However, one of those eight regions, Region II-W, met the performance

requirement as of the end of Period 5.  The Monitor's findings are summarized in the table

below, which also includes for informational purposes updated performance data as of the end of

Period 5 for the eight regions that were 12-months-post full implementation.[61]

---

[61]  The table also includes performance data as of the end of Period 4 for the three regions that had implemented the Practice Model for at least 12 months as of the end of Period 4.

## Regional Performance: MSA §§III.B.3.a.6.a. and III.B.3.a.7.a.
### (Based on DFCS Data, MACWIS SLS312 and PAD Report 19)

| Start Date for Performance Measurement | Performance Requirement | Practice Model Full Implementation: 8/31/12 · 12 Months Following: 8/31/13 · End of Period 4: 6/30/14 · End of Period 5: 6/30/15 | | Practice Model Full Implementation: 2/28/13 · 12 Months Following: 2/28/14 · End of Period 4: 6/30/14 · End of Period 5: 6/30/15 | Practice Model Full Implementation: 8/31/13 · 12 Months Following: 8/31/14 · End of Period 5: 6/30/15 | | | | Practice Model Full Implementation: 2/28/14 · 12 Months Following: 2/28/15 · End of Period 5: 6/30/15 | Practice Model Full Implementation: 8/31/14 · 12 Months Following: 8/31/15 | | Practice Model Full Implementation: 2/28/15 · 12 Months Following: 2/28/16 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S | V-E | III-N | VII-E | II-E | VI | VII-W |
| Findings for Practice Model Full Implementation Date | 90% | MACWIS Report: 53% (N=216)* / PAD Report: 36% (N=56) (8/31/12) | MACWIS Report: 63% (N=57)* / PAD Report: 41% (N=17) (8/31/12) | MACWIS Report: 57% (N=65) / PAD Report: 36% (N=25) (2/28/13) | MACWIS Report: 28% (N=246)* / PAD Report: 14% (N=51) (8/31/13) | MACWIS Report: 30% (N=186)* / PAD Report: 21% (N=28) (8/31/13) | MACWIS Report: 38% (N=106) / PAD Report: 58% (N=26) (8/31/13) | MACWIS Report: 17% (N=52) / PAD Report: 44% (N=25) (8/31/13) | MACWIS Report: 26% (N=81) / PAD Report: 26% (N=38) (2/28/14) | MACWIS Report: 19% (N=165) / PAD Report: Not Analyzed as of 10/8/15 (8/31/14) | MACWIS Report: 17% (N=152) / PAD Report: Not Analyzed as of 10/8/15 (8/31/14) | MACWIS Report: 47% (N=45) / PAD Report: Not Analyzed as of 10/8/15 (2/28/15) | MACWIS Report: 22% (N=326) / PAD Report: Not Analyzed as of 10/8/15 (2/28/15) | MACWIS Report: 16% (N=772) / PAD Report: Not Analyzed as of 10/8/15 (2/28/15) |
| Findings for 12 Months Following Implementation Date | 95% | MACWIS Report: 77% (N=181)* / PAD Report: 68% (N=71) (8/31/13) · MACWIS Report: 70% (N=187) / PAD Report: 75% (N=89) (6/30/14) · MACWIS Report: 85% (N=186) / PAD Report: Not Analyzed as of 10/8/15 (6/30/15) | MACWIS Report: 75% (N=55)* / PAD Report: 82% (N=17) (8/31/13) · MACWIS Report: 78% (N=64) / PAD Report: 42% (N=19) (6/30/14) · MACWIS Report: 97% (N=58) / PAD Report: Not Analyzed as of 10/8/15 (6/30/15) | MACWIS Report: 51% (N=51) / PAD Report: 39% (N=23) (2/28/14) · MACWIS Report: 41% (N=63) / PAD Report: 33% (N=27) (6/30/14) · MACWIS Report: 61% (N=44) / PAD Report: Not Analyzed as of 10/8/15 (6/30/15) | MACWIS Report: 34% (N=374) / PAD Report: Not Analyzed as of 10/8/15 (8/31/14) · MACWIS Report: 26% (N=355) / PAD Report: Not Analyzed as of 10/8/15 (6/30/15) | MACWIS Report: 48% (N=253) / PAD Report: Not Analyzed as of 10/8/15 (8/31/14) · MACWIS Report: 43% (N=203) / PAD Report: Not Analyzed as of 10/8/15 (6/30/15) | MACWIS Report: 67% (N=112) / PAD Report: Not Analyzed as of 10/8/15 (8/31/14) · MACWIS Report: 56% (N=85) / PAD Report: Not Analyzed as of 10/8/15 (6/30/15) | MACWIS Report: 68% (N=66) / PAD Report: Not Analyzed as of 10/8/15 (8/31/14) · MACWIS Report: 49% (N=86) / PAD Report: Not Analyzed as of 10/8/15 (6/30/15) | MACWIS Report: 27% (N=90) / PAD Report: Not Analyzed as of 10/8/15 (2/28/15) · MACWIS Report: 31% (N=90) / PAD Report: Not Analyzed as of 10/8/15 (6/30/15) | | | | | |

SLS312 does not reflect performance related to the full MSA requirement. For SLS312, the numbers above represent the percentage of children with a permanency plan by their 30th day of custody. For PAD Report 19, the numbers above represent the percentage of children who had a permanency plan developed within 30 days of initial placement specifying permanency goal, a timeframe, and activities to support the goal of permanency. In December 2013, modifications were made to two questions on the PAD related to PAD Report 19. Thereafter, in April 2014, a new question was added to the PAD related to PAD Report 19. The data above for any periods ending prior to December 2013 are based only on the questions in the PAD prior to the December 2013 modifications and April 2014 addition. Any data beginning with the period ending October 31, 2014 are based only on PAD questions as modified in December 2013 and April 2014. Data for periods ending between December 2013 and October 2014 are based on a mixture of questions included in the PAD prior to and subsequent to the December 2013 modifications and April 2014 addition and are identified in red above.

* In the Monitor's May 2014 Report, as of 8/31/12 the defendants' performance in Region I-S was reported as 52% and Region II-W was 61% and as of 8/31/13 defendants' performance in Region I-S was reported as 76%, Region II-W was 73%, Region III-S was 26%, and Region I-N was 28%. In April 2014, defendants submitted revised data reports and reproduced historical data back to July 2012. The submission was made too late for the Monitor to analyze for her May 2014 report. The performance reflected above is based on the data submitted by defendants in April 2014.

MSA §§III.B.4.b.1. and III.B.4.c.1.
4.   **Case Recordings**
   b.   **Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
       1)   **At least 90% of child welfare case records in that region will be current and complete.**

   c.   **Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
       1)   **At least 95% of child welfare case records in that region will be current and complete.**

**Status of Progress, MSA §§III.B.4.b.1. and III.B.4.c.1.:**   The Monitor makes no

finding related to this requirement as of the end of the required implementation periods for the

regions that had fully implemented or were 12-months-post full implementation as of the end of

Period 5.  The case record review conducted during Period 5 focused on a subset of child welfare

case records, and addressed statewide performance and not regional performance related to this

requirement.  The statewide sample of case records used for the Period 5 case record review was

designed to ensure proportional regional distribution of the sample relative to the regional

distribution of children in custody.  The size of the sample was determined with a goal of making

findings on a statewide level, not at a regional level.[62]

Analysis of the data collected during the case record review indicates that this

requirement was not satisfied on a statewide level for all children who entered DFCS custody

between July 1, 2013 and December 31, 2014 and who remained in custody for at least a 90-day

period.  The Monitor found that for the cohort of children entering custody during that time

period, six percent of children statewide had all applicable medical, dental, mental health, and

---

[62]  It would not have been practical to have drawn a sample large enough to provide meaningful findings both at a regional level and for the various Practice Model implementation dates associated with these MSA requirements.

developmental assessments documented in the electronic case record or included in the paper

case record.[63]

> MSA §§III.B.6.c. and III.B.6.f.
> **6. Educational Services**
>   **c. DFCS shall make all reasonable efforts to ensure the continuity of a child's educational experience by keeping the child in a familiar or current school and neighborhood, when this is in the child's best interests and feasible, and by limiting the number of school changes the child experiences.**
>
>   **f. As of the date upon which the last region has fully implemented the Practice Model [February 2016], performance on these educational requirements shall be measured and required state-wide and shall no longer be measured on a region-by-region basis.**

**Status of Progress, MSA §§III.B.6.c. and III.B.6.f.:**  The Monitor makes no finding

related to these requirements, which are not triggered until February 2016.  Nevertheless, the

parties agreed defendants' performance would be measured through a case record review

conducted during Period 5.[64]  Analysis of the data collected during the case record review

indicates that for all children who entered DFCS custody between July 1, 2013 and December

31, 2014 and who remained in custody for at least a 90-day period, 69 percent of school-age

children statewide either did not experience school changes or DFCS made reasonable efforts to

prevent school changes when in the child's best interest and feasible.[65]

> MSA §§III.B.8.d.1. and III.B.8.e.1.
> **8. Case Closing and Aftercare**
>   **d. <u>Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model</u>:**
>     **1) At least 70% of foster children in that region who are reunified and who were in custody longer than 90 days shall receive a 90-day trial home visit period or have case record documentation reflecting the Youth Court's objection to such a trial home visit.  During that trial home visit period, the child's caseworker or a Family Preservation caseworker shall meet with the child in the home at least two times per month, and DFCS shall**

---

[63] *See* Period 5 IP §II.C.3. and Ex. 4, *supra* note 12, at 48-50.  This estimate was based on a sample and has a margin of error of +/- three percent.

[64] Period 5 IP §II.C.3.  *See supra* note 62 and related text regarding sampling limitations.

[65] *See* Ex. 4, *supra* note 12, at 51-52.  This estimate was based on a sample and has a margin of error of +/- eight percent.

provide or facilitate access to all services identified in the child's after-care plan, consistent with Modified Settlement Agreement requirements.

e. **Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
   1) At least 90% of foster children in that region who are reunified and who were in custody longer than 90 days shall receive a 90-day trial home visit period or have case record documentation reflecting the Youth Court's objection to such a trial home visit. During that trial home visit period, the child's caseworker shall meet with the child in the home at least two times per month, and DFCS shall provide or facilitate access to all services identified in the child's after-care plan, consistent with Modified Settlement Agreement requirements.

**Status of Progress, MSA §§III.B.8.d.1. and III.B.8.e.1.:** As noted above, during Period 5, five regions fully implemented the Practice Model and eight regions fully implemented the Practice Model for at least 12 months and thus were responsible for satisfying the associated performance standards. Defendants produced data from MACWIS addressing performance regarding the frequency of caseworker contacts as prescribed by this requirement.

Among the five regions that fully implemented during Period 5, two regions had no children to whom this requirement applied at the time of full implementation. Among the remaining three regions, none satisfied the frequency of caseworker contacts performance requirement. For two of the eight regions that fully implemented the Practice Model for at least 12 months, reliable data were not available at the 12-month-post full implementation mark. Of the remaining six regions that fully implemented the Practice Model for at least 12 months, none satisfied the performance requirement at the 12-month-post full implementation mark. Of those eight regions that fully implemented the Practice Model for at least 12 months, as of the end of Period 5, one region had no children to whom this requirement applied and none of the remaining seven regions met this performance requirement. The Monitor's findings are summarized in the table below, which also includes for informational purposes updated

76

performance data as of the end of Period 5 for the eight regions that were 12-months-post full

implementation.[66]

---

[66] The table also includes performance data as of the end of Period 4 for the three regions that had implemented the Practice Model for at least 12 months as of the end of Period 4.

## Regional Performance: MSA §§III.B.8.d.1. and III.B.8.e.1.
### (Based on DFCS Data, MACWIS SLS54AD&S)

| Start Date for Performance Measurement | Performance Requirement | Practice Model Full Implementation: 8/31/12<br>12 Months Following: 8/31/13<br>End of Period 4: 6/30/14<br>End of Period 5: 6/30/15 I-S | II-W | Practice Model Full Implementation: 2/28/13<br>12 Months Following: 2/28/14<br>End of Period 4: 6/30/14<br>End of Period 5: 6/30/15 V-W | Practice Model Full Implementation: 8/31/13<br>12 Months Following: 8/31/14<br>End of Period 5: 6/30/15 III-S | I-N | IV-N | IV-S | Practice Model Full Implementation: 2/28/14<br>12 Months Following: 2/28/15<br>End of Period 5: 6/30/15 V-E | Practice Model Full Implementation: 8/31/14<br>12 Months Following: 8/31/15 III-N | VII-E | Practice Model Full Implementation: 2/28/15<br>12 Months Following: 2/28/16 II-E | VI | VII-W |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Findings for Practice Model Full Implementation Date | 70% | In September 2014 defendants submitted corrected data, dating back only to September 2013 | In September 2014 defendants submitted corrected data, dating back only to September 2013 | In September 2014 defendants submitted corrected data, dating back only to September 2013 | In September 2014 defendants submitted corrected data, dating back only to September 2013 | In September 2014 defendants submitted corrected data, dating back only to September 2013 | In September 2014 defendants submitted corrected data, dating back only to September 2013 | In September 2014 defendants submitted corrected data, dating back only to September 2013 | 50% (N=2)<br>(2/28/14) | N/A (N=0)<br>(8/31/14) | 15% (N=13)<br>(8/31/14) | N/A (N=0)<br>(2/28/15) | 8% (N=12)<br>(2/28/15) | 6% (N=48)<br>(2/28/15) |
| Findings for 12 Months Following Implementation Date | 90% | In September 2014 defendants submitted corrected data, dating back only to September 2013<br><br>80% (N=15)<br>(6/30/14)<br><br>8% (N=12)<br>(6/30/15) | In September 2014 defendants submitted corrected data, dating back only to September 2013<br><br>75% (N=4)<br>(6/30/14)<br><br>50% (N=2)<br>(6/30/15) | 0% (N=1)<br>(2/28/14)<br><br>0% (N=3)<br>(6/30/14)<br><br>33% (N=6)<br>(6/30/15) | 0% (N=5)<br>(8/31/14)<br><br>0% (N=11)<br>(6/30/15) | 27% (N=11)<br>(8/31/14)<br><br>17% (N=12)<br>(6/30/15) | 0% (N=6)<br>(8/31/14)<br><br>33% (N=3)<br>(6/30/15) | 0% (N=1)<br>(8/31/14)<br><br>N/A (N=0)<br>(6/30/15) | 50% (N=2)<br>(2/28/14)<br><br>0% (N=1)<br>(6/30/15) | | | | | |

SLS54AD&S does not reflect performance related to the full MSA requirement.  The numbers above represent the percentage of children who, during trial home visit period, met with their caseworker or family preservation caseworker in the home twice in a one-month period or at least once monthly if 15 days or less, for 90 days.

MSA §§III.C.1.a.1. and III.C.1.b.1.
1. **Reunification**
   a. **Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
      1) At least 60% of foster children in that region who are discharged from custody and reunified with their parents or caretakers shall be reunified within 12 months of the latest removal from home.

   b. **Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:**
      1) At least 70% of foster children in that region who are discharged from custody and reunified with their parents or caretakers shall be reunified within 12 months of the latest removal from home.

**Status of Progress, MSA §§III.C.1.a.1. and III.C.1.b.1.:**  As noted above, during Period 5, five regions fully implemented the Practice Model and eight regions fully implemented the Practice Model for at least 12 months and thus were responsible for satisfying the associated performance standards.  Defendants produced data from MACWIS addressing performance regarding this requirement.

All five regions that fully implemented during Period 5 satisfied the performance requirement.  One of the eight regions that fully implemented the Practice Model for at least 12 months satisfied the performance requirement at the 12-month-post full implementation mark.  Two of those eight regions met the performance requirement as of the end of Period 5.  The Monitor's findings are summarized in the table below, which also includes for informational purposes updated performance data as of the end of Period 5 for the eight regions that were 12-months-post full implementation.[67]

---

[67] The table also includes performance data as of the end of Period 4 for the three regions that had implemented the Practice Model for at least 12 months as of the end of Period 4.

**Regional Performance: MSA §§III.C.1.a.1. and III.C.1.b.1.**
**(Based on DFCS Data, MACWIS SXBRD05B)**

| Start Date for Performance Measurement | Performance Requirement | Practice Model Full Implementation: 8/31/12 12 Months Following: 8/31/13 End of Period 4: 6/30/14 End of Period 5: 6/30/15 | | Practice Model Full Implementation: 2/28/13 12 Months Following: 2/28/14 End of Period 4: 6/30/14 End of Period 5: 6/30/15 | Practice Model Full Implementation: 8/31/13 12 Months Following: 8/31/14 End of Period 5: 6/30/15 | | | | Practice Model Full Implementation: 2/28/14 12 Months Following: 2/28/15 End of Period 5: 6/30/15 | Practice Model Full Implementation: 8/31/14 12 Months Following: 8/31/15 | | Practice Model Full Implementation: 2/28/15 12 Months Following: 2/28/16 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S | V-E | III-N | VII-E | II-E | VI | VII-W |
| Findings for Practice Model Full Implementation Date | 60% | 56% (N=151) (8/31/12) | 43% (N=40) (8/31/12) | 59% (N=29) (2/28/13) | 73% (N=126) (8/31/13) | 69% (N=112) (8/31/13) | 50% (N=60) (8/31/13) | 62% (N=55) (8/31/13) | 47% (N=83) (2/28/14) | 65% (N=113) (8/31/14) | 78% (N=90) (8/31/14) | 65% (N=20) (2/28/15) | 68% (N=104) (2/28/15) | 67% (N=400) (2/28/15) |
| Findings for 12 Months Following Implementation Date | 70% | 55% (N=122) (8/31/13) 73% (N=123) (6/30/14) 63% (N=136) (6/30/15) | 44% (N=36) (8/31/13) 51% (N=49) (6/30/14) 38% (N=29) (6/30/15) | 42% (N=36) (2/28/14) 37% (N=35) (6/30/14) 59% (N=29) (6/30/15) | 82% (N=176) (8/31/14) 72% (N=157) (6/30/15) | 69% (N=143) (8/31/14) 69% (N=135) (6/30/15) | 62% (N=69) (8/31/14) 48% (N=42) (6/30/15) | 40% (N=48) (8/31/14) 72% (N=47) (6/30/15) | 63% (N=70) (2/28/15) 69% (N=88) (6/30/15) | | | | | |

The numbers above represent the percentage of children reunified with parent or caretaker in under 12 months from latest removal.

80

MSA §§III.C.2.a.1. and III.C.2.b.1.

2. **Time of Adoption Finalization**

    a.  <u>Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model</u>:

        1)  At least 25% of foster children in that region who are discharged upon finalization of an adoption shall have had the adoption finalized within 24 months of the latest removal from home.

    b.  <u>Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model</u>:

        1)  At least 30% of foster children in that region who are discharged upon finalization of an adoption shall have had the adoption finalized within 24 months of the latest removal from home.

**<u>Status of Progress, MSA §§III.C.2.a.1. and III.C.2.b.1.</u>:**  As noted above, during Period 5, five regions fully implemented the Practice Model and eight regions fully implemented the Practice Model for at least 12 months and thus were responsible for satisfying the associated performance standards.  Defendants produced data from MACWIS addressing performance regarding this requirement.

Among the five regions that fully implemented during Period 5, no regions satisfied the performance requirement.  Two of the eight regions that fully implemented the Practice Model for at least 12 months satisfied the performance requirement at the 12-month-post full implementation mark.  Two of those eight regions met the performance requirement as of the end of Period 5.  The Monitor's findings are summarized in the table below, which also includes for informational purposes updated performance data as of the end of Period 5 for the eight regions that were 12-months-post full implementation.[68]

---

[68]  The table also includes performance data as of the end of Period 4 for the three regions that had implemented the Practice Model for at least 12 months as of the end of Period 4.

**Regional Performance: MSA §§III.C.2.a.1. and III.C.2.b.1.**
**(Based on DFCS Data, MACWIS SBRD10)**

| | | Practice Model Full Implementation: 8/31/12, 12 Months Following: 8/31/13, End of Period 4: 6/30/14, End of Period 5: 6/30/15 | | Practice Model Full Implementation: 2/28/13, 12 Months Following: 2/28/14, End of Period 4: 6/30/14, End of Period 5: 6/30/15 | Practice Model Full Implementation: 8/31/13, 12 Months Following: 8/31/14, End of Period 5: 6/30/15 | | | | Practice Model Full Implementation: 2/28/14, 12 Months Following: 2/28/15, End of Period 5: 6/30/15 | Practice Model Full Implementation: 8/31/14, 12 Months Following: 8/31/15 | | Practice Model Full Implementation: 2/28/15, 12 Months Following: 2/28/16 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start Date for Performance Measurement | Performance Requirement | I-S | II-W | V-W | III-S | I-N | IV-N | IV-S | V-E | III-N | VII-E | II-E | VI | VII-W |
| Findings for Practice Model Full Implementation Date | 25% | 42% (N=52) (8/31/12) | 15% (N=13) (8/31/12) | 50% (N=22) (2/28/13) | 0% (N=13) (8/31/13) | 17% (N=36) (8/31/13) | 0% (N=22) (8/31/13) | 8% (N=13) (8/31/13) | 13% (N=15) (2/28/14) | 0% (N=2) (8/31/14) | 10% (N=29) (8/31/14) | 14% (N=7) (2/28/15) | 12% (N=26) (2/28/15) | 22% (N=17) (2/28/15) |
| Findings for 12 Months Following Implementation Date | 30% | 29% (N=62) (8/31/13)<br><br>28% (N=54) (6/30/14)<br><br>25% (N=53) (6/30/15) | 9% (N=22) (8/31/13)<br><br>0% (N=15) (6/30/14)<br><br>5% (N=21) (6/30/15) | 45% (N=11) (2/28/14)<br><br>45% (N=11) (6/30/14)<br><br>25% (N=8) (6/30/15) | 38% (N=8) (8/31/14)<br><br>38% (N=16) (6/30/15) | 27% (N=45) (8/31/14)<br><br>55% (N=29) (6/30/15) | 13% (N=30) (8/31/14)<br><br>21% (N=24) (6/30/15) | 0% (N=19) (8/31/14)<br><br>8% (N=13) (6/30/15) | 0% (N=12) (2/28/15)<br><br>0% (N=15) (6/30/15) | | | | | |

The numbers above represent the percentage of children with adoption finalized within 24 months from latest removal from home.

IV.    **CASE SUMMARY AND ASSESSMENT**[69]

The performance data presented in the preceding section of this report establishes that by the end of Period 5, with limited exceptions, the defendants failed to meet the statewide and regional MSA requirements addressed in this report by considerable margins.  Among the most critical performance requirements are those that are intended to ensure the safety of children in DFCS custody.  These requirements include maintaining a sufficient number of properly licensed and supervised placements and an adequate number of qualified, trained and properly supervised caseworkers who are not overburdened by excessive caseloads.  The following case summary concerning CD,[70] an infant who died while in DFCS custody during Period 5, illustrates how the failure to maintain these standards may increase the risk of tragic outcomes.

**A.  Overview**

CD was a very young infant who died during the first quarter of 2015, five days after entering DFCS custody.  CD's death occurred in a licensed relative resource home that was located in a DFCS region that has experienced severe and persistent staffing challenges that have been compounded by steep increases in the number of children in custody and a dearth of licensed placements.

A review of DFCS records related to the circumstances surrounding CD's death was conducted by the Court Monitor and her expert consultant, Judith Meltzer.[71]  Ms. Meltzer's

---

[69]  The case summary in the version of this report that was submitted to the Court for *in camera* review included certain information that may fall within the purview of the August 5, 2004 Confidentiality Order.  In the version of this report that is being filed in the public record, the Monitor has revised the case summary in consultation with the parties in order to ensure conformity with the mandates of the Confidentiality Order.

[70]  The initials "CD" are used in this report to identify the infant who is the subject of this case summary.  The initials are not derivative of the infant's true name and are used herein solely for ease of reference.

[71]  *See supra* note 10 for information concerning Ms. Meltzer's background and experience.  Because of Ms. Meltzer's substantial expertise in child welfare case practice, the Court Monitor engaged her to assess case practices associated with CD's death.

written assessment is included in the Appendix to this report.[72]  As explained below, DFCS

records reveal substantial deficiencies in key aspects of the agency's case practice, including the

licensure and approval process associated with the resource home in which CD died; the training

provided to CD's resource parents; the placement process; the investigation of child abuse and

neglect triggered by the report that led to CD's custody episode as well as the investigation of

CD's death; the fatality review process; and the quality and completeness of case records and

documentation.  Each of these deficiencies is explained below.

Ms. Meltzer's report also identifies deficiencies in other areas of case practice associated

with the custody episode involving CD's sibling.  These shortcomings are significant but not

addressed in detail in this summary.[73]

## B.  Licensure and Monitoring of the Resource Home

The relative resource home in which CD died was licensed by DFCS nearly one year

earlier.  As explained below, there are significant questions about whether it should have been

licensed as well as whether the license should have been revoked and/or whether supports should

have been offered to the resource family prior to CD's placement in the home.  DFCS tacitly

approved the decision made by CD's biological father to put CD in the relative resource home in

which CD resided at the time CD died and, although that home was licensed, it had not been

monitored by DFCS as required.  At the time of placement, no one from DFCS had ever set foot

---

[72]  A draft version of Ms. Meltzer's report was provided to defendants for review and comment on August 31, 2015.
Ms. Meltzer considered the defendants' comments, which were submitted on September 11, 2015, in finalizing the
report.  A nonredacted version of Ms. Meltzer's final report was included in the Appendix to the draft version of this
report that was provided to the parties for review and comment and also in the Appendix to the version of this report
that was submitted to the Court for *in camera* review.  Ms. Meltzer's final report is included in the Appendix to this
report in redacted form as Ex. 5, Confidential Independent Review of Child Death, [CD], Judith Meltzer, The Center
for the Study of Social Policy, November 23, 2015.  The redactions to Ms. Meltzer's final report were undertaken in
consultation with the parties and with Ms. Meltzer to remove information that may be subject to the August 5, 2004
Confidentiality Order.

[73]  Significant limitations in the placement process involving CD's sibling, the quality and comprehensiveness of
child and family assessments, and the depth and quality of service planning for families were also identified and are
described in detail in Ms. Meltzer's report.  *See* Ex. 5, *supra* note 72, at 21-27, and 30.

in the resource home and, unbeknownst to DFCS, the resource mother recently had been convicted of a criminal offense and had lost her job.  During key periods related to the events that preceded CD's death, both the resource worker assigned to monitor the home and the caseworker who authorized CD's placement in the home carried caseloads that substantially exceeded MSA requirements.

The resource parents in the home in which CD was placed applied to DFCS for licensure during the first quarter of 2014.  During the application process, they informed DFCS that the prospective resource mother had a history of "deep depression" and was taking an anti-depressant used to treat major depression as well as a different prescription medication for sleep.  At that time, the family had a young child.  The prospective resource mother acknowledged additional pregnancies resulting in multiple miscarriages as well as the live birth of an infant who died at a very young age.  That infant's death, which was attributed to Sudden Infant Death Syndrome ("SIDS"), occurred during the last quarter of 2013, several months before the submission of the licensure application.  The resource parents' baby died while sleeping in the same bed as the resource parents – the same circumstance, as explained more fully below, in which CD died.  The American Academy of Pediatrics recommends against a caretaker sleeping in the same bed as an infant for safety reasons.[74]  DFCS policy also recognizes the risks associated with this practice and requires that children under the age of 18 months sleep in a crib.[75]  According to DFCS records, the coroner preliminarily commented that the cause of CD's death was positional asphyxia; however, the autopsy report states that while asphyxiation could not be ruled out, the cause of death could not be determined.

---

[74]  *See* http://pediatrics.aappublications.org/content/128/5/1030 for the American Academy of Pediatrics' "Policy Statement: SIDS and Other Sleep-Related Infant Deaths: Expansion of Recommendations for a Safe Infant Sleeping Environment," *Pediatrics,* November 2011.
[75]  Mississippi, DFCS Policy, Section F, Licensure, Revised 3-12-15, §II.B.2.3.h.

Licensing records maintained by DFCS indicate that none of the issues related to the prospective resource home that were revealed during the licensure application process were assessed as part of the licensure decision-making process. The MSA requires that defendants place children in foster care settings that meet DFCS licensure standards.[76] These standards function as critical safeguards designed to minimize the risk of harm and promote the safety and well-being of the children in defendants' custody. DFCS policy addresses resource home licensure standards, requiring a multi-faceted assessment and approval process. Central to this process is a required evaluation of whether the prospective resource family has the capacity to meet the needs of children in DFCS custody, including consideration of the family's physical, cognitive, mental and emotional capacities.[77] As Ms. Meltzer points out, it is crucial for the licensing worker to have a full understanding of the history, strengths and needs of potential foster parents;[78] however, the information collected during the licensure process was largely superficial.[79] Although the significant issues raised by the prospective foster parents' history should have been acknowledged and discussed, and the decision-making process should have been documented in the licensing records[80] as DFCS policy contemplates,[81] there was no evidence of a comprehensive analysis. In fact, there was no indication that the information collected during the application process was considered at any time before CD's placement in the resource home.[82]

---

[76] MSA §II.B.2.a.

[77] Mississippi, DFCS Policy, Section F, Licensure, Revised 3-12-15, §II.C.3.

[78] Ex. 5, *supra* note 72, at 19.

[79] *Id.* at 19-21.

[80] *Id.* at 14, 21.

[81] Mississippi, DFCS Policy, Section F, Licensure, Revised 3-12-15, §V.A. Among other matters, DFCS policy requires documentation of particular family strengths and identification of areas of concern.

[82] Ex. 5, *supra* note 72, at 21. As part of her assessment, Ms. Meltzer also reviewed the records related to the licensure and approval process of two resource homes in which CD's sibling was placed. She identified significant shortcomings, including evidence of a failure to conduct pre-placement background checks on certain household members, *id.* at 22. For further information related to the licensure process concerning these additional homes, *see*

Even if the decision to license the home had been appropriate, substantial questions remain about whether the license should have been revoked, or at the very least about whether the resource parents should have received additional supports before CD was placed in the home. During 2014, shortly after the home was licensed, two different sets of siblings were placed in the home by DFCS.  After the first set of four siblings was placed in the home, DFCS received reports that the resource mother had used inappropriate discipline with several children in the sibling group.[83]  During the course of the ensuing investigation, the resource mother reported that she had made numerous calls to the assigned DFCS caseworker throughout the week for advice concerning age-appropriate disciplinary techniques but she never heard back from the caseworker.  The resource mother admitted that after trying other forms of discipline, she told a three-year-old foster child to squat and hold his/her arms out.  Although the maltreatment report was unsubstantiated, the sibling group was removed from the resource home.

On the heels of this investigation, a second sibling group of three children was placed in the resource home.  Within one week following the removal of the first sibling group, DFCS received a report that the resource family's biological child was biting and choking one of the foster children in the second sibling group and that the resource mother had not intervened to ensure the child's safety.  A DFCS caseworker observed bite marks and scratches on the child and the resource mother admitted that her biological child had bitten one of the children.  The second maltreatment report also was unsubstantiated, and the second set of siblings was removed from the resource home one week after DFCS received the report.

Although the resource home remained licensed, no children were placed in the home for the roughly nine-month period between the time the second sibling group was removed and the

---

*id*. at 21-23.  Ms. Meltzer concluded that the licensure records she reviewed did not reflect appropriate assessment of the prospective foster parents, including comprehensive documentation or thoughtful decision-making.  *Id*. at 19.
[83]  *See id*. at 10-11 for more detailed background information about this placement episode.

time that DFCS approved CD's placement in the home.  There is no evidence in the record of any assessment of the propriety of continued licensure nor of any efforts to provide supplemental training or other support to the resource parents prior to CD's placement.  DFCS policy recognizes that licensed resource parents need regular ongoing consultation and supervision.[84] Even when children are not placed in the home, DFCS policy requires resource workers to maintain monthly contact with all resource families[85] and to visit the home every six months following licensure in order to complete a home environment checklist, which is used to assess continuing compliance with home environment standards.[86]  As explained below, these policy directives were not satisfied.

The Monitor's review of the DFCS resource file indicates that between the time of the placement of the second sibling group and the time of CD's placement in the resource home, the only documented contact DFCS had with the resource family was a January 12, 2015 telephone call that appears to have been initiated by the assigned resource worker.  The related record entry is limited to an acknowledgement that no children were placed in the home at that time and that the worker "spoke with parent regarding home visit."  The physical home environment of the resource home was assessed in mid-2014, and, although DFCS policy would have required a follow-up assessment by mid-December 2014, it was not conducted until shortly before the end of the first quarter of 2015, three days after CD's placement in the home.  Analysis of DFCS caseload data indicates that at least during the last two months of 2014 and the first quarter of

---

[84]  Mississippi, DFCS Policy, Section F, Licensure, Revised 3-12-15, §VI.
[85]  *Id.*
[86]  *Id.* §VI.A.

2015, the resource worker assigned to monitor the resource home had a caseload that at times substantially exceeded MSA standards.[87]

The circumstances that gave rise to the home environment assessment that was conducted three days after CD's placement in the resource home are especially noteworthy. DFCS records document that on the day CD was placed in the resource home, the resource mother contacted DFCS and informed the assigned resource worker that CD had been removed from the home of a relative and she was "in route to pick [CD] up."[88] The resource worker documented that she informed the resource mother "that she could not arbitrarily take a child into her home for placement simply because she [was] licensed." The resource worker explained that "[CD had] to be placed in her home by a representative of the agency." During the course of the discussion, the resource mother told the resource worker that CD had a sibling, but stated that she wanted only CD placed in her home. After the resource worker explained the need to place siblings together and inquired about space for the sibling, the resource mother mentioned that she had moved recently and the family did not have sufficient space for CD's sibling in their new home.[89] At that point, the records indicate that the worker told the resource mother she could not recommend CD's placement in her home until the new home could be assessed. Thus, according to the documentation in the case record, the resource worker scheduled a visit to assess the home

---

[87] The monthly caseload data that defendants produce is measured at a different point in time each month. Thus, the caseload data accessible to the Monitor is limited by the point in time that is measured and reported on each month. Nevertheless, analysis of the data that defendants produce indicates that the assigned resource worker was carrying a caseload of 115.6 units, 133.7 units, 170.9 units, 126.3 units, and 110.1 units at a different point in time each month during this five-month period. The MSA requires that caseworkers with mixed caseloads do not carry caseloads that exceed 100 units. The specifications agreed upon by the parties to measure caseloads apply the 100-unit standard to measure dedicated caseloads. Approximately one month after CD's death, the resource worker's caseload was below 100 units. MSA §II.A.2.a.2.

[88] According to the resource file, the resource parent contacted the previously assigned resource worker first and was ultimately referred to the currently assigned resource worker.

[89] DFCS policy requires licensed resource parents to notify the agency of any changes in life circumstances and specifically addresses the obligation to do so when the family moves to a new home. Mississippi, DFCS Policy, Section F, Licensure, Revised 3-12-15, §VI.C.1. There is no evidence that the resource family provided the required notification to the agency.

three days later.  As explained in more detail below in the section related to the placement

process,[90] according to the case record entries made by the resource worker, the resource worker

had no knowledge that CD's placement in this resource home was "authorized" by another

DFCS worker at some point later on the same day that she spoke by telephone with the resource

mother.[91]  Instead, the resource worker discovered CD was in the resource home three days after

the telephone call when she visited the home to conduct the home environment assessment.  This

was two days before CD's death.

During the home visit, CD was asleep.  The resource worker was told CD had a cold and

that another DFCS worker was making a medical appointment for CD.  According to the MSA[92]

and DFCS policy,[93] CD should have received a medical screening within 72 hours of being

placed in DFCS custody.  The screening was not conducted.  In any event, during the home visit,

DFCS records indicate that the resource worker counseled the resource family "about their

license renewal, and changes/repairs needed to the home."  The nature of the changes/repairs are

not specified in the record.  Furthermore, there is no documentation that the resource worker

reviewed the family's history and inquired about basic information related to the licensed

resource parents such as changes in employment, medical and mental health status or new arrests

and convictions.  As Ms. Meltzer points out, the resource home records do not reveal any

evidence of adherence to a protocol for updating information related to licensed resource

parents.[94]  Before leaving CD in the resource home, the resource worker considered neither the

resource mother's recent criminal conviction nor her related loss of employment because she did

---

[90] *Infra* at 92-96.
[91] As explained herein, the authorization took the form of tacit approval.  *Id.*
[92] MSA §II.B.3.a.
[93] Mississippi, DFCS Policy, Section D, Foster Care, Revised 7-30-15, §VII.B.7.
[94] Ex. 5, *supra* note 72, at 20 -21.

not know about these matters.  In fact, it appears DFCS only learned about the conviction and loss of employment during the investigation of CD's death.

### C.  Training of the Resource Parents

As a pre-requisite to licensure, DFCS policy requires prospective resource parents to attend 27 hours of pre-service training.[95] The training is intended to ensure that resource parents understand their roles and obligations and that children who enter DFCS custody are protected from harm and have all their needs met.[96]  In response to the Monitor's inquiries, defendants confirmed that the prospective resource parents with whom CD was eventually placed, did not receive the comprehensive resource parent training that is a prerequisite to licensure.  The comprehensive training is required to be conducted over the course of a multi-week period, including participation in a series of five, three-hour classroom sessions once each week for five weeks.[97]  Rather than participating in the five-week classroom training, defendants reported that the classroom training afforded to CD's resource parents was delivered within one day.

During the course of ongoing monitoring, the Monitor discovered that the pre-service training provided to other resource families in the DFCS region implicated in this case study was also truncated.  In fact, during June 2015, in response to the Monitor's inquiries, defendants reported that they had identified this problem and were taking steps to address it.  Thereafter, in early July 2015, defendants reported that there were a total of 132 resource families in the region who completed five of the required three-hour sessions in a one-day period.  Defendants indicated that 117 of the 132 resource families had a total of 253 foster children placed in them and that defendants were in the process of retraining all of the families who had been identified.

---

[95]  Mississippi, DFCS Policy, Section F, Licensure, Revised 3-12-15, §III.A.  This training requirement extends to all caretakers in the home.
[96]  *See, e.g.,* Ex. 5, *supra* note 72, at 19 (describing certain purposes of the training).
[97]  Mississippi, DFCS Policy, Section F, Licensure, Revised 3-12-15, §III.A.

According to defendants, all families that required re-training received it.  However, in subsequent discussions defendants provided updated information that is not fully consistent with their earlier representations.  They have attributed this variance to data "clean up" activities.  The Monitor has had several recent discussions with the defendants about this matter and expects to resolve all outstanding questions in the near term.

### D.  The Placement Process

DFCS records related to CD's placement in the resource home are disjointed and do not clearly explain how the placement process unfolded and how and by whom key decisions were made.  The defendants produced the records in piecemeal fashion.  Notwithstanding the Monitor's multiple inquiries and requests, a complete set of records related to the placement decision was never produced.  As explained more fully below, critical information regarding the placement process was omitted from the records that were submitted by the defendants and only acknowledged by DFCS representatives after the Monitor discovered the information through her own independent search of the electronic records.

Defendants explained the omission as an inadvertent copying error.  There is no evidence the information was deliberately withheld.  However, in light of the Monitor's repeated inquiries about the placement process, the omission is perplexing.  Nevertheless, at a minimum, the defendants failed to properly discharge their obligation to provide the Monitor with complete and accurate information.  Because the Monitor made repeated efforts to obtain clarification of the placement process from the defendants, and because of the significance of the information that was not produced, the Monitor has elected to address this matter in this report.  The sequence of events related to CD's placement in the resource home and the significance of the data that defendants failed to produce are described below.

The case record indicates that during the first quarter of 2015, CD's biological parents were involved in what appears to have been a serious domestic violence incident on the day before CD's placement in the resource home.  The police responded to the incident and in turn contacted an on-call DFCS caseworker at an unspecified time that evening, which was the evening before CD's placement.  The on-call caseworker reported this law enforcement referral the next morning.  The report states that a police officer informed the on-call worker that there had been a very serious domestic violence incident,[98] the father ran off, the mother was hospitalized for a mental health assessment, and CD and CD's sibling were with the maternal grandmother (who it appears was on the scene when the police responded to the incident).  The police officer reported that the mother initially asked the police to give both children to their maternal grandmother; however, the mother contacted the police several hours later and said she did not want her mother to have her children.  The on-call worker reported that the police officer stated that he denied the mother's request.

The report was screened in as a maltreatment report by a DFCS supervisor on the morning after the incident and a caseworker was assigned to investigate.  According to DFCS personnel data, the assigned caseworker was hired during the last quarter of 2014.[99]  DFCS training records establish that she completed pre-service training by mid-December 2014.[100]  Analysis of DFCS caseload data indicates that at the time she was assigned to conduct the investigation, just over three months after she completed pre-service training and was eligible for

---

[98]  The on-call worker reported that the police officer stated the mother had attacked the father's girlfriend.

[99]  DFCS New Hire Report, submitted to the Monitor on April 29, 2015 by the Mississippi Department of Human Services, Human Resources Unit.

[100]  According to the quarterly training records produced by DFCS, the caseworker completed 320 hours of pre-service training.  This exceeds the minimum 270-hour requirement.

case assignments, the investigator had a caseload that was likely to have exceeded MSA standards by approximately 100 percent.[101]

According to the investigative report, the DFCS investigator visited the home of the maternal grandmother late on the afternoon of the day after the domestic violence incident.[102] The grandmother informed the investigator that CD's father had taken CD to some other location earlier in the day. Thereafter, the investigator went to the paternal grandparents' home where it appears CD's biological parents may have lived.[103] CD's biological father told the investigator that he had taken CD to a relative's home earlier in the day and wanted CD to be placed in that relative's home. The father's relative and the relative's spouse are the resource parents who were licensed by DFCS.

The investigative report indicates that the investigator arranged to meet the relative and CD at a Dollar General Store parking lot where the worker observed CD sleeping in the backseat of a car. She noted that CD appeared to be "physically healthy" and essentially tacitly approved the biological father's placement decision, allowing CD to remain with the relative.[104] The investigative report does not reflect any inquiry by the investigator regarding the licensure status of the relative's home or for that matter any communication between the investigator and the resource worker who was assigned to monitor the relative's home. However, the investigator

---

[101] As noted above, *supra* note 87, the monthly caseload data that defendants produce is measured at a different point in time each month. Thus, the caseload data accessible to the Monitor is limited by the point in time that is measured and reported on each month. Nevertheless, analysis of the data that defendants produce indicates that the caseworker assigned to the investigation was carrying a mixed caseload of 194.5 units approximately three weeks before the investigation of the domestic violence incident and 237.6 units approximately two weeks later. The MSA requires that caseworkers do not carry caseloads that exceed 100 units. MSA §II.A.2.a.2.

[102] As Ms. Meltzer's report emphasizes, gaining an understanding of the sequence of events in this case was complicated by the very poor quality of documentation and the lack of organization of the case record. *See* Ex. 5, *supra* note 72, at 2 and 13-16. This shortcoming was especially evident insofar as the events surrounding the placement process.

[103] When the investigator arrived at the home, there was a confrontation between the investigator and CD's biological mother, which is described in some detail in the investigative report. It appears the confrontation escalated, resulting in the exchange of threats and the investigator's call to the police for assistance. The police responded and arrested the biological mother on an outstanding warrant of unspecified origin.

[104] The worker noted CD had red marks on the right upper thigh to the waist that appeared to be insect marks.

was later interviewed by a special DFCS investigator during the course of the subsequent DFCS investigation of CD's death.  According to the special investigator's report, the investigator who allowed CD to remain with the relative told the special investigator that she did not interview the resource family or visit their home because "the resource unit told her the home was fine/ok." This representation is inconsistent with the records in the resource home file that the defendants failed to produce but that the Monitor discovered.

As described more fully above,[105] according to entries made in the resource file by the resource worker assigned to monitor the relative's resource home, the resource mother contacted the resource worker by telephone on the date of CD's placement stating she was "in route to pick [CD] up."[106]  During the telephone call, the resource worker learned that the family had moved and told the resource mother she could not recommend CD's placement in her home until the home environment was evaluated.  According to the resource file, after the resource worker scheduled a home visit for a date three days subsequent to the telephone call (*i.e.*, three days after CD was placed in the resource home), the resource mother "stated she had made it to the home to meet with the social worker."  In response, the resource worker documented that she asked to speak with the social worker (*i.e.*, the DFCS investigator) "so that information could be directly provided."

The resource worker also documented the ensuing discussion between the resource worker and the investigative worker.  The resource worker noted that she "explained the case status" to the investigative worker and in response the investigative worker stated that the paternal grandmother would accept both CD and CD's sibling in her home "and placement

---

[105]  *Supra* at 89.
[106]  According to the resource file, this discussion occurred at 6 p.m. on the date CD was placed with the relative.  A review of the investigative record indicates that this would have been close to the time of the encounter in the Dollar General Store parking lot.

would be made with her."  The investigative worker asked the resource worker to provide the same information to the investigative worker's supervisor.  According to the related record entry, the resource worker contacted the investigator's supervisor, who stated that CD would be placed with the sibling in the paternal grandmother's home.

As Ms. Meltzer points out, when a child welfare agency removes a child and places them in the agency's custody, clear protocols must be followed to ensure resource families have sufficient information to ensure the child's safety, ensure the child's needs are met and minimize trauma to the child.[107]  Moreover, the placement must be the right fit for the child.[108]  According to Ms. Meltzer, such a protocol should include an initial medical screening, an exchange of medical information, an introduction to the home environment, a visitation plan, and information pertinent to child safety such as information about the dangers of co-sleeping with infants.[109]  There was no evidence such a protocol, which is in large part required by the MSA[110] and DFCS policy,[111] was followed in this case.  Indeed, it appears there was nothing more than a tacit approval of the biological father's placement decision as the result of a drive-by in a parking lot.

### E.  The Investigations

DFCS conducted two investigations related to CD's custody episode:  an investigation into the alleged child abuse and neglect that triggered the custody episode and a special investigation into CD's death.  Ms. Meltzer assessed the investigations[112] and determined that both investigations failed to meet fundamental quality standards.[113]  For example, with respect to the abuse and neglect investigation, Ms. Meltzer determined that there were gaps in the

---

[107] Ex. 5, *supra* note 72, at 23.
[108] *Id*.
[109] *Id*. at 24.
[110] MSA §II.B.2.i.
[111] Mississippi, DFCS Policy, Section D, Foster Care, Revised 7-30-15, §VII.A.1.
[112] For important background about the investigative process *see* Ex. 5, *supra* note 72, at 16-17.
[113] *Id.* at 17-19.

assessment of the family, major delays in conducting medical and forensic examinations, and a lack of information gathering that impeded both the ability to understand the family's strengths and needs and effective planning with the family to ensure the safety and well-being of CD and CD's sibling.[114]  Furthermore, among other limitations, Ms. Meltzer found that the investigation related to CD's death did not include a thorough review of the circumstances surrounding the death.[115]  For example, there was no review of the child's medical profile.  Although CD's biological parents reported CD had a "breathing condition" and had been taken to the hospital several days before CD died, there are no details of the hospital visit included in the investigative report except that "they [*i.e.*, presumably the biological parents and CD] were ignored."[116]

In the Monitor's view, it is especially noteworthy that the investigation related to CD's death was conducted under the auspices of a centralized special investigation unit established in July 2014 specifically to address long-standing and well-documented deficiencies in the quality of DFCS investigations.[117]  The investigative report related to CD's death presents a largely disjointed narrative.  Inexplicably, it makes no attempt to acknowledge or reconcile the conflicting information provided by the investigator, who claimed she was told by an unspecified resource worker that the home was "fine/ok," with the information documented in the case record by the resource worker, which flatly contradicts this representation.  Information concerning the key actors and decision points in a state-sanctioned placement decision involving a child in foster care is among the most fundamental information a child welfare agency must maintain.  However, the investigative report fails to even address the resource worker's case record entries.

---

[114] *Id*. at 17-18.
[115] *Id*. at 18-19.
[116] *See also id.* at 19.
[117] *See June 2015 Report* at 102-109, 115-116 for relevant background information.

### F.  The Fatality Review Process

After CD's death, DFCS scheduled a mortality roundtable to review the related circumstances.  The roundtable was scheduled for May 13, 2015.  Prior to the roundtable, on May 5, 2015, the Monitor requested all documents produced in response to it.  After a nearly seven-week delay, on June 22, 2015, defendants reported that they had conducted the roundtable on May 13, 2015, listed the attendees, and stated that "no documents were produced in response to or as the result of the mortality roundtable for [CD]."[118]  Later that same day, the Monitor asked defendants to identify the actions they had taken in response to the roundtable.[119]  In a June 26, 2015 response, defendants identified three issues:  1) breakdown in communication between frontline workers and licensure/resource workers; 2) inconsistencies and unaddressed red flags in the home study; and 3) policy violation regarding on time medical examination and updating placement in MACWIS.[120]  No explanation of these issues was submitted.

The defendants' June 26, 2015 response also listed seven recommendations attributed to the roundtable panel, including recommendations concerning personnel actions, the health and safety of CD's sibling, and for verification of information related to the status of the resource home.  Defendants reported that the roundtable panel also made suggestions about how to address disagreements between caseworkers and resource workers; closing resource homes that should be closed rather than not using them for placements and waiting for the licenses to expire; and for reminding resource workers to thoroughly review the original home study when an already licensed resource home is assigned to them.[121]  No explanation for these recommendations was provided to the Monitor.

---

[118]  June 22, 2015 e-mail from Kenya Rachal to Grace M. Lopes.
[119]  June 22, 2015 e-mail from Grace M. Lopes to Kenya Rachal.
[120]  June 26, 2015 e-mail from Kenya Rachal to Grace M. Lopes.
[121]  *Id.*

Even assuming these recommendations were appropriate in nature and scope, defendants' claim that none of the recommendations were documented underscores the gravity of the deficiencies in the agency's corrective action and accountability systems – an issue of long standing in this lawsuit.[122]  Based on her review of the information provided by defendants, Ms. Meltzer concluded that "[t]here does not appear to be any systematic way in which the DFCS responds to and reviews cases in which there is a fatality of a child in [DFCS] custody."[123]  She noted the need for documentation, recognizing that "[f]ormal and institutionalized child fatality review protocols and [inter-departmental] forums are a best practice for reviewing the case practice and system response when a child fatality occurs."[124]

The MSA requires the defendants to implement a continuous quality improvement ("CQI") system that can identify areas of needed improvement and it requires improvement plans to support achieving performance targets, program goals, client satisfaction, and positive client outcomes.[125]  As Ms. Meltzer points out, formal fatality review protocols and forums are a key component of any CQI system.[126]  Defendants have not implemented these essential processes, which are contemplated by the MSA.

### G.  The Quality and Completeness of Case Records and Documentation

Ms. Meltzer's report describes the purpose of the child welfare case record, characterizing it as "a foundational document for understanding a child and family's involvement with and progress in addressing the issues that require child welfare intervention."[127]  She explains that the case record must provide a clear understanding of the information an agency

---

[122] *See e.g., May 2014 Report* at 93-96, 136; *see also June 2015 Report* at 74-79, 84-85, 152.
[123] Ex. 5, *supra* note 72, at 28.
[124] *Id.*
[125] MSA §II.A.3.
[126] Ex. 5, *supra* note 72, at 28.
[127] *Id.* at 13.

relies upon for decision-making as well as the actions taken and underway "to assure a child's safety, permanency and well-being."[128]  She notes that the case record must be well organized so that information is readily accessible, especially given the multiple points of decision-making, the number of individuals both internal and external to the agency that are involved in the case, and the fact that there is frequent caseworker turnover.[129]

Based on her review of the DFCS case files associated with CD's death, Ms. Meltzer observed significant issues, also apparent to the Monitor, which are associated with both the completeness and quality of the documentation in the case record.  For example, Ms. Meltzer found that that the investigation narratives were "repetitive, unclear, at times incomprehensible and occasionally inconsistent."[130]  She also noted many incomplete case record entries, including missing dates for specific entries.  Moreover, she identified many examples of information in the record that was unexplained or contradicted by other information in the record without acknowledgement, much less any effort to reconcile it.

In the Monitor's experience reviewing many other case records of children in DFCS custody, the deficiencies in case practice evident in the records related to CD's death are not unusual.  Indeed, the data related to defendants' performance during Period 5 that is presented in this report firmly supports this conclusion.  Notwithstanding these findings, it is important to recognize that there are many talented and committed DFCS caseworkers and supervisors who labor under enormous challenges to make critical decisions that affect families at their core.  The defendants must ensure that this workforce is appropriately trained, managed and supported, and that it has manageable workloads.  As the Monitor has documented in many prior reports, until this occurs, defendants will be unable to achieve and sustain the progress required by the MSA.

---

[128] *Id*.
[129] *Id*. at 13-14.
[130] *Id*. at 14.

V.     **CONCLUSION**

Period 5 was defined by defendants' backsliding on many critical performance

requirements.  Regions that performed relatively well during Period 4 performed worse during

Period 5.  The already-overburdened workforce faced a substantial increase in the number of

children in custody and had neither sufficient placement resources nor an adequate array of

services at its disposal.  Long-standing management deficits remained unaddressed or, in some

cases, deepened as critical resources within DFCS were shuffled rather than supplemented as

needed.  There are many devoted employees in the ranks of DFCS, motivated by the agency's

vital mission.  But for too long, agency performance has languished and children and their

families have borne the cost.

As required by the Court's July 23, 2015 order, a new organizational assessment was

completed in November 2015, which presented recommendations for a path forward.  Informed

by that assessment, the parties negotiated an agreement that adopted numerous recommendations

contained in the assessment report.  The parties' agreement was embodied in a proposed interim

remedial order, which was presented to the Court during the December 21, 2015 status hearing.

The Court issued the Interim Remedial Order one day later, on December 22, 2015.

The Interim Remedial Order contemplates that the defendants will transform DFCS from

its existing status as a subordinate division within the larger MDHS into an "independent child

welfare agency" over a phased-in schedule, and by no later than July 1, 2018.  Until this

objective is accomplished, defendants are required to ensure that DFCS remain independent

of MDHS management and oversight.  For example, the Interim Remedial Order affirms the

requirement in the July 23, 2015 order that DFCS will be led by an Executive Director reporting

directly to the Governor, and it requires that many essential administrative functions, such as

budget and personnel management as well as management information systems and information technology are subject to DFCS oversight.  Establishing DFCS as an independent agency is intended to align resources more appropriately to support the agency's mission and to remove certain long-standing obstacles that have impeded defendants' performance.[131]

The Interim Remedial Order includes a number of requirements intended to infuse DFCS with additional and critically needed resources over the next several months.  From determining the appropriate number of caseworkers and supervisors sufficient to meet the MSA's caseload standards, to harmonizing salaries of certain staff positions with comparable positions in other Mississippi state agencies, to raising the compensation of certain senior-level managers to more appropriately reflect their roles and responsibilities, the Interim Remedial Order calls for multiple initiatives that are intended to build and stabilize the DFCS workforce.  It also requires defendants to effect certain internal organizational changes to promote improved performance.

Defendants already have begun the process of moving the agency in a new direction. Last month, defendants announced new, executive-level, agency leadership.  Strong, consistent agency leadership will be an essential component of any effective reform effort and the newly appointed DFCS executive director represents cause for optimism.  Additionally, as required by the Interim Remedial Order, the parties will receive technical assistance from Public Catalyst, the organization that completed the organizational assessment and crafted recommendations upon which the order was based.

Defendants have a short window of time to demonstrate an ability to effect change.  By the terms of the Interim Remedial Order, on or before April 1, 2016 the parties must meet to renegotiate the terms of the MSA.  Significantly, the Interim Remedial Order also includes its

---

[131]  The order also addresses temporary exemptions from contracting and procurement requirements, which have at times undercut the pace of the reform effort.

own enforcement provisions, which require Public Catalyst to certify to the parties by May 1 and July 1, 2016, whether DFCS has satisfied its obligations under the order.  The failure to approve certain plans specified in the order or to provide the requisite certification constitutes noncompliance with the terms of the order.  The order continues the remedy phase of the pending contempt motion until May 15, 2016, at which time the parties are required to submit a Final Remedial Order to the Court.  If the parties do not reach agreement on a Final Remedial Order, the remedy phase of the pending contempt motion must be instituted.

The Interim Remedial Order presents defendants with one more critical opportunity to alter the trajectory of this lawsuit and the lives of the children in DFCS custody.  It is not the first time defendants have been presented with such an opportunity nor is it the first time that the requirements in this lawsuit have been winnowed and reformulated from outcome-based requirements to structural reform-based requirements.  It is now incumbent upon the defendants to capitalize on this opportunity in a manner that they have been unwilling or unable to in the past.  Success will demand not only the development of new plans, but the more elusive capacity to execute, evaluate, and refine them.  Consistent, sustained leadership will be essential and investments in agency infrastructure and staff will be critical.  As the recent death of CD makes clear, the risk of harm to children in DFCS custody can, at the extreme, be enormous. Defendants must build an agency that can reliably mitigate the unreasonable risks to which children in DFCS custody are exposed and that can consistently promote positive outcomes.

At this juncture, there is a tremendous amount at stake for the children and families whose lives are affected by DFCS.  Similarly, there is much at stake for defendants if they are unable to demonstrate an ability to satisfy their obligations in the near term and this litigation proceeds to the remedy phase of the pending contempt motion.

Respectfully submitted,


_____/ s /_____
Grace M. Lopes (MBN 45693 *pro hac vice*)
Court Monitor
1220 19th Street, N.W.
Suite 500
Washington, D.C.  20036
(202) 232-8311
gmlopes@oymonitor.org


## CERTIFICATE OF SERVICE

I hereby certify that on January 6, 2016, the Court Monitor's Interim Report to the Court Regarding Defendants' Performance During Period 5, was transmitted electronically to the following counsel of record in this matter:

> Dewitt L. ("Rusty") Fortenberry Jr.
> Kenya Key Rachal
> Ashley Tullos Young
> Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
> 428 I-55 North
> Meadowbrook Office Park
> Jackson, Mississippi  39211

> Harold E. Pizzetta, III
> Assistant Attorney General
> General Civil Division
> Carroll Gartin Justice Building
> 430 High Street
> Jackson, MS 39201

> W. Wayne Drinkwater, Jr.
> Michael J. Bentley
> BRADLEY ARANT ROSE & WHITE LLP
> 188 East Capital Street, Suite 450
> Jackson, Mississippi  39201

> Marcia Robinson Lowry
> Sara Robinson Glasser
> A Better Childhood, Inc.
> 1095 Hardscrabble Road
> Chappaqua, NY  10514

Christian D. Carbone
Dan Friedman
LOEB & LOEB LLP
345 Park Ave.
New York, New York  10154


_____/ s /_____
Grace M. Lopes

# Appendix

## Index to Exhibits

Ex. 1       List of certain specific MSA statewide requirements subject to
            comparative analysis in Section I

Ex. 2       List of certain specific MSA Practice Model requirements used to assess
            regional performance in Section I

Ex. 3       Sarah Kaye, Ph.D., Curriculum Vitae

Ex. 4       Findings from the Period 5 Case Record Review, Sarah Kaye, PhD,
            October 14, 2015

Ex. 5       Confidential Independent Review of Child Death, [Redacted], Judith
            Meltzer, The Center for the Study of Social Policy, November 23, 2015

**Ex. 1**

The following 19 MSA requirements were subject to comparative analysis:[1]

- Investigations of reports of maltreatment of children in DFCS custody must be initiated within 24 hours and completed within 30 calendar days.
- Children remaining in the same out-of-home placement following an investigation into a report of maltreatment are visited by a DFCS caseworker twice a month for 3 months.
- For children with goal of reunification, the assigned DFCS caseworker will meet with the child's biological parents at least once a month to assess service delivery and achievement.
- A DFCS caseworker will visit the home of non-therapeutic resource parents, who have at least one foster child residing in the home, at least once a month.
- A DFCS caseworker will visit the home of therapeutic resource parents, who have at least one foster child residing in the home, at least once a month.
- Assigned DFCS caseworker (COR or COS) will meet with child in person and, where age appropriate, alone at least twice a month to assess child's safety and wellbeing. At least one visit during the month will take place in the child's placement.
- Children in care fewer than 12 months from time of latest removal from home shall have had two or fewer placements.
- Children are not placed in a foster care setting that has not been licensed or approved as meeting DFCS licensure standards unless placed pursuant to relative licensing process.
- Children entering foster care shall receive a health screening evaluation from a qualified medical practitioner within 72 hours of placement.
- Within 30 calendar days of placement in foster care, children shall receive a comprehensive health assessment.
- Siblings who enter placement at/near the same time are placed together (with exceptions).
- No child shall remain in an emergency/temp facility for more than 45 calendar days (exceptions may apply).
- No child under 10 will be placed in a congregate care setting unless the child has exceptional needs that can't be met in a relative or foster family home (other conditions may apply).
- Children shall be placed within their own county or within 50 miles of the home from which they were removed (with exceptions).
- Children, age three and older, shall be provided a dental exam within 90 calendar days of foster care placement and every six months thereafter.
- Children reaching age three in care shall be provided a dental exam within 90 days of his/her third birthday and every six months thereafter.
- Children are placed in the least restrictive setting that meets his/her individual needs as determined by a review of all intake, screening, assessment and prior placement information on the child available at the time of placement.
- DFCS will take all reasonable steps to avoid disruption of appropriate placements and ensure placement stability; if worker has knowledge of disruption possibility, s/he must convene FTM immediately.
- No later than time of placement, DFCS will provide resource parents/facility staff with foster child's current available medical, dental, educational and psychological information (including certain specific information).

---

[1] These MSA requirements are presented in abbreviated form consistent with the description of each requirement in Attachment Two of the Project Schedule for Defendants' Production of Data Reports Required by Appendix C of the Modified Settlement Agreement [hereinafter June 24, 2013 Order], filed June 24, 2013.

**Ex. 2**

The six MSA requirements used to assess whether regions that implemented the Practice Model for at least 12 months tended to meet the applicable regional performance requirements are the following:[1]

- During trial home visit period, child's caseworker or a Family Preservation caseworker meets with child in the home at least twice a month.
- A DFCS caseworker will visit the home of non-therapeutic resource parents, who have at least one foster child residing in the home, at least once a month.
- A DFCS caseworker will visit the home of therapeutic resource parents, who have at least one foster child residing in the home, at least once a month.
- Assigned DFCS caseworker (COR or COS) will meet with child in person and, where age appropriate, alone at least twice a month to assess child's safety and wellbeing. At least one visit during the month will take place in the child's placement.
- Children discharged and reunified in the last year shall have been reunified within 12 months of latest removal.
- Children discharged in last year on finalization of adoption shall have had the adoption finalized within 24 months of latest removal from home.

---

[1] These MSA requirements are presented in abbreviated form consistent with the description of each requirement in Attachment Two of the Project Schedule for Defendants' Production of Data Reports Required by Appendix C of the Modified Settlement Agreement [hereinafter June 24, 2013 Order], filed June 24, 2013.

**Ex. 3**

# Sarah Kaye, PhD

Riverdale Park, MD  20737 • 410.428.8150 • sarah@kayeimplementation.com

## Education

| | |
|---|---|
| 2007 | PhD in Family Studies, University of Maryland, School of Public Health<br>*Dissertation*: "Internalizing and externalizing behaviors of adolescents in kinship and foster care: Findings from the National Survey of Child and Adolescent Well-being (NSCAW)" advised by Sandra Hofferth, PhD |
| 2006 | Graduate Certificate in Policy Analysis, University of Maryland, School of Public Policy |
| 2003 | MA in Sociology, Lehigh University<br>*Thesis*: "Identifying service gaps in residential treatment: A case study of one private child welfare agency" advised by Roy Herrenkohl, PhD |
| 2001 | BA in Health and Human Services, Summa cum Laude<br>State University of New York at Buffalo<br>CONCENTRATION: Community mental health |

## Experience

| | |
|---|---|
| 2011- | *Principal*, Kaye Implementation & Evaluation, LLC |
| 2007-2012 | University of Maryland, Baltimore<br>*Visiting Assistant Professor*, School of Medicine, Division of Child & Adolescent Psychiatry, Innovations Institute (2011-2012)<br>*Research Assistant Professor*, School of Social Work, Ruth H. Young Center for Families and Children (2007-2010)<br>*Director of Research & Evaluation*, Atlantic Coast Child Welfare Implementation Center (2008-2010) |
| 2005-2007 | *Grants Program Coordinator*, Strengthening Rural Maryland Families Grants Program |
| 2006 | *Research Consultant*, Maryland Coalition of Families for Children's Mental Health |
| 2005 | *Child Welfare Research Intern*, The Urban Institute |
| 2004 | *Research to Practice Intern*, Child Welfare League of America |
| 2003-2007 | *Graduate Research Assistant*, University of Maryland Department of Family Studies |
| 1998-2003 | *Research Assistant/Legislative Aide*, Gateway-Longview, Inc. (nonprofit child welfare agency) |
| 1999-2001 | *Volunteer Victim Advocate*, Crisis Services, Inc. (nonprofit mental health service agency) |

**Certifications & Trainings**

2010        Change Management Professional Certification, Prosci Change Management Learning Center

2010        Social Network Analysis, Society for Social Work Research

2010        Geographic Information System (GIS) Analysis, University of Maryland

2010        Implementation Research, Society for Social Work Research

2008        Advanced Qualitative Analysis, Society for Social Work Research

2007        Propensity Score Matching, Society for Social Work Research

2004        Gay, Lesbian, Bisexual, Transgender Ally Training, University of Maryland

1999        Crisis Counselor Paraprofessional Certification, Crisis Services, Inc.

**Honors and Awards**

2005        Outstanding Graduate Student Research Award
            National Council on Family Relations, Association of Councils

2005        Jewell E. Taylor National Fellowship (Most Promising Graduate Student)
            American Association on Family and Consumer Sciences

2004        Outstanding Student/New Professional Award
            National Council on Family Relations, Family Policy Section

**Local and National Service**

2014-2015   Chair, Evaluation & CQI Subcommittee, DC Home Visiting Council

2013-2015   Evaluation & CQI Subcommittee Member, DC Home Visiting Council

2014        Grant Review Panel Chair, USDHHS, ACF, Children's Bureau

2012        Grant Review Panel Chair, USDHHS, ACF, Children's Bureau

2011        Instrument Review Taskforce Member, Seattle Implementation Research Conference

2011        Implementation Science Expert Panel Member, Center for the Application of Prevention
            Technologies (CAPT) Training and Technical Assistance Workgroup, USDHHS, Substance Abuse
            and Mental Health Services Administration (SAMHSA)

2011        "Synthesizer", Implementation Research Group, Global Implementation Conference

**Local and National Service (continued)**

| | |
|---|---|
| 2011 | Grant Review Panel Member, USDHHS, ACF, Children's Bureau |
| 2008-2010 | Chair, National Implementation Center Evaluators Workgroup, USDHHS, ACF, Children's Bureau |
| 2008 | Co-Chair, Quality Assurance Workgroup, Maryland Department of Human Resources Statewide Assessment |
| 2007-2008 | Co-Chair, Maryland Department of Human Resources, Quality Assurance Committee |
| 2007 | Maryland Child and Family Services Review: Stakeholder Interviewer, Frederick County DSS; Case Reviewer, Carroll County & Baltimore City DSS |
| 2005, 2006 | Grant Review Coordinator, Rural Maryland Council, Strengthening Rural Maryland Families Direct Services Grants Program |
| 2005 | Grant Review Panel Member, USDHHS, ACF, Office of Community Services |
| 2004 | Grant Review Panel Member, USDHHS, ACF, Family and Youth Services Bureau |

**Competitive Grant Awards**

| | |
|---|---|
| 2012-2016 | Evaluation of Efforts to Expand Maternal, Infant and Early Childhood Home Visiting (MIECHV) in the District of Columbia<br>$400,000, USDHHS, Health Services Research Administration |
| 2011-2012 | Evaluation of the Systems of Care Expansion Planning Grant<br>USDHHS, Substance Abuse Mental Health Services Association |
| 2009-2014 | Evaluation of the National Resource Center for Child Protective Services<br>$519,290, USDHHS, ACF, Children's Bureau |
| 2008-2013 | Atlantic Coast Child Welfare Implementation Center<br>$8,800,000, USDHHS, ACF, Children's Bureau |
| 2008-2013 | Implementation and Evaluation of Maryland KEEP<br>$1,833,303, USDHHS, ACF, Children's Bureau |
| 2002-2005 | Families United<br>$813,000, USDHHS, Substance Abuse Mental Health Services Association |

**Projects**

<u>Principal Investigator</u>

2015-2016    Evaluation of treatment kinship care using Together Facing the Challenge as part of the Structured Intervention Treatment Foster Care program at the Bair Foundation. Funded by the Annie E. Casey Foundation.

2014-2015    Evaluation of the Total Outcomes Package (TOP) implementation in public child welfare agencies.  Funded by the Annie E. Casey Foundation.

2015    Evaluation of Mississippi Department of Children and Family Services performance in meeting requirements of the Olivia Y. Settlement Agreement.  Findings about medical, dental, mental health, developmental, and educational assessments and services to children in out-of-home care. Funded by the Federal Court Monitor as part of the Olivia Y. Modified Settlement Agreement.

2014-2015    Quantitative analysis and reporting about the progress of Mississippi Department of Children and Family Services toward achieving practice and outcome requirements of the Modified Settlement Agreement.  Funded by the Federal Court Monitor as part of the Olivia Y. Modified Settlement Agreement.

2014    A qualitative assessment of maltreatment in out-of-home care in Mississippi Department of Children and Family Services.  Funded by the Federal Court Monitor as part of the Olivia Y. Settlement Agreement.

2014    Comprehensive needs and resources assessment of child and family services in Prince George's County, Maryland.  Funded by the Prince George's County Department of Family Services, Children, Youth and Families Division.

2012-2013    Developing an implementation science informed national training and technical assistance model to support the implementation of Wendy's Wonderful Kids child-focused adoption recruitment program.  Funded by the Annie E. Casey Foundation.

2012-2013    Assessing the capacity of community-based mental health and substance abuse treatment organizations to deliver integrated behavioral health services to children and adolescents: A pilot of the Dual Diagnosis Capability in Youth Treatment instrument. Funded by USDHHS, SAMHSA, SM-11-008.

2011-2012    Assessing collaboration among Maryland's behavioral health system of care.  Funded by USDHHS, SAMHSA, SM-11-008.

2011-2012    Integrating the CANS assessment and decision support tools into child welfare decision making. Funded by the Annie E. Casey Foundation.

Principal Investigator (cont.)

2011-2012      Evaluating implementation of the CANS algorithm to support caseworker decision making. Funded by Maryland DHR, SSA/CPS-11-500.

Co-Principal Investigator

2012-2016      Evaluating the implementation of evidence-based home visiting programs in the District of Columbia Department of Health: Examining implementation strategies and outcomes.  Funded by USDHHS, HRSA, under contract with Georgetown University. PI: Deborah Perry, PhD

2009-2010      Developing and implementing a technical assistance program in North Carolina Division of Social Services. ACCWIC Implementation project evaluation.  Funded by USDHHS, Children's Bureau, HHS-2008-ACF-ACYF-CO-0058. PI: Diane DePanfilis, PhD.

2009-2010      An organizational/systems approach to strengthening in-home services in Tennessee.  ACCWIC Implementation project evaluation.  Funded by USDHHS, Children's Bureau, HHS-2008-ACF-ACYF-CO-0058. PI: Diane DePanfilis, PhD.

2009-2010      Enhancing youth engagement in Maryland child welfare policy and practice.  ACCWIC Implementation project evaluation.  Funded by USDHHS, Children's Bureau, HHS-2008-ACF-ACYF-CO-0058. PI: Diane DePanfilis, Ph.D.

2009-2010      Assessing and enhancing organizational health and climate in Mississippi child welfare. ACCWIC Implementation project evaluation.  Funded by USDHHS, Children's Bureau, HHS-2008-ACF-ACYF-CO-0058. PI: Diane DePanfilis, PhD.

2009-2010      Evaluating statewide implementation of the Safety Assessment and Management (SAMS) model in West Virginia.  ACCWIC Implementation project evaluation.  Funded by USDHHS, Children's Bureau, HHS-2008-ACF-ACYF-CO-0058. PI: Diane DePanfilis, PhD.

2008-2010      Technical Assistance to support implementation of systems change in child welfare: Evaluation of the Atlantic Coast Child Welfare Implementation Center (ACCWIC).  Funded by USDHHS, Children's Bureau, HHS-2008-ACF-ACYF-CO-0058.  PI: Diane DePanfilis, PhD.

2007-2009      Evaluation of Alabama's Comprehensive Assessment Process.  Mixed method evaluation of demonstration project under contract with the Alabama Department of Human Resources and ACTION for Child Protection.  Funded by USDHHS, Children's Bureau, HHS-2007-ACF-ACYF-CA-0023.  PI: Diane DePanfilis, PhD.

2007-2009      Evaluating the Efficiency and Effectiveness of Child Welfare Services in Maryland.  Evaluation of child welfare performance and quality assurance processes under contract with the Maryland Department of Human Resources. PI: Diane DePanfilis, PhD.

<u>Research Director</u>

2005-2007    Strengthening Rural Maryland Families.  Coordinated competitive grants review process and provided consultation and technical assistance to build grantee capacity in program planning and evaluation.  Funded by the Annie E. Casey Foundation, PI: Bonnie Braun, PhD.

2005-2006    Transition to Fatherhood Research Project.  Mixed method study of father involvement funded by the National Institute for Child Health and Human Development, project number 5-R03-HD-42074-2. PI: Kevin Roy, PhD.

<u>Investigator</u>

2011    Children's Health Insurance Program Reauthorization Act (CHIPRA): Evaluation of Maryland care management entity's implementation of wraparound services for youth with severe behavioral health needs.  Funded by USDHHS, CMS, HHS-2010-CMS-CHIPRA-0002. PI: Sharon H. Stephan, PhD.

2011    Evaluation of Rural Cares System of Care for services to youth with severe mental health needs on Maryland's eastern shore.  Funded by USDHHS, SAMHSA, SM059052.  PI: Terry V. Shaw, PhD.

2011    Evaluation of Maryland Cares System of Care for services to youth with severe mental health needs in Baltimore City.  Funded by USDHHS, SAMHSA, SM058522.  PI: Terry V. Shaw, PhD.

2011    Multi-state evaluation of technical assistance to support the 1915 Residential Treatment Center waiver demonstration project.  Funded by USDHHS, CMS.  PI: Sharon H. Stephan, PhD.

2007    Evaluation of the SAFE Home Study.  Mixed method evaluation of the SAFE home study method in six states under contract with the Consortium of Children.  Funded by USDHHS Children's Bureau, CFDA#93.652.  PI: Richard Barth, PhD.

2007    Achieving Safety and Well-being for Unaccompanied Immigrant Children.  Technical assistance on outcomes measurement and placement and reunification decision making, under contract with Lutheran Immigration and Refugee Services.  PI: Diane DePanfilis, PhD.

2006    Listening and Learning from Families and Transition-age Youth.  Qualitative study conducted as a volunteer for the Maryland Coalition of Families for Children's Mental Health.  PI: Jane Walker, MSW.

2005    Child Welfare Agencies Efforts to Identify, Locate and Involve Nonresident Fathers.  Managed analyzed quantitative database of interviews with child welfare workers with the Urban Institute under contract of USDHHS, Office of the Assistant Secretary for Planning and Evaluation, contract number HHS-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.  PI: Rob Geen, MSW and Karin Malm, MS.

2004    Engaging Unheard Voices in Public Policy.  Qualitative study exploring the challenges and supports influence engagement of rural, low-income citizens in public policy, with funding from the Kettering Foundation.  PI: Bonnie Braun, PhD.

Investigator (cont.)

2003          Graduate Research Practicum.  Assessed the psychometric properties of a new outcomes measurement tool with data collected from children in foster and residential care at Kidspeace, Inc.  PI: Roy Herrenkohl, Ph.D.

**Teaching and Training**

Spring 2014   *SOWK 781 Research Methods for Management and Community Practice*.  Site liaison to Prince George's County Department of Family Services: Needs assessment research methodology, data collection and analysis.

May 2013      *The art and the science of supervision*. Wendy's Wonderful Kids Summit. Workshop developer/presenter.

August 2011   *Fidelity 101: How to develop, validate and use fidelity measures to inform implementation in child welfare.*  National Children's Bureau Evaluation Summit.  Workshop developer/presenter.

June 2011     *Implementation Science for the Non-Scientist*. Maryland Systems of Care Training Institute. Workshop developer/presenter.

Fall 2007     *SOWK 670 Social Work Research*. University of Maryland School of Social Work.  Guest lecturer: state and national policy analysis.

Spring 2003   *SSP 101 Introduction to Sociology and Social Psychology*. Lehigh University. Teaching Assistant.

Fall 2002     *SSP 101 Introduction to Sociology and Social Psychology*. Lehigh University. Teaching Assistant.

**Professional Society Memberships**
2013-present  American Evaluation Association
2006-2011     Society for Social Work and Research
2003-2007     National Council on Family Relations
2003-2007     University of Maryland Council on Family Relations
              Social Action Chair (2003-04), Vice President (2004-05), President (2005-06)

**Publications**

<u>Peer-Reviewed Journal Articles</u>

1. **Kaye, S.**, Perry, D.F., Rabinovitz, L. (in development). Blending implementation theory and local experience to assess the readiness of community-based providers to implement evidence-based home visiting programs.

2. Harburger, D.H., Stephan, S.H., & **Kaye, S**. (2013). Children's mental health system transformation in Maryland: Strategic evolution punctuated by revolutionary episodes. *Journal of Behavioral and Health Services & Research*.

3. **Kaye, S.**, Shaw, T.V., DePanfilis, D., & Rice, K. (2013). Estimating staffing needs for in-home child welfare services with a weighted caseload formula. *Child Welfare*.

4. **Kaye, S.**, DePanfilis, D., Bright, C., & Fisher, C. (2012). Applying implementation drivers to child welfare systems change: Examples from the field. *Journal of Public Child Welfare,* 6(4), 512-530.

5. **Kaye, S.** & Osteen, P.J. (2011). Developing and validating measures for child welfare agencies to self-monitor fidelity to a child safety intervention. *Children and Youth Services Review*. doi:10.1016/j.childyouth.2011.06.020

<u>Technical Reports</u>

1. **Kaye, S.** (under development). Findings from the Period 5 case record review. Report to Office of the Court Monitor.  Washington, DC.

2. **Kaye, S.**, Rabinovitz, L., Perry, D.F., & Long, T. (2014). Foundational training & evaluation: Findings from the DC MIECHV evaluation.  Report to DC Department of Health and the DC Home Visiting Council.  Washington, DC.

3. **Kaye, S.** & Perry, D.F. (2014). Maternal, Infant and Early Childhood Home Visiting in the District of Columbia: Readiness of local implementing agencies to implement Healthy Families America. Report to the DC Department of Health. Washington, DC.

4. **Kaye, S.** & Perry, D.F. (2013). Maternal, Infant and Early Childhood Home Visiting in the District of Columbia: Readiness of community-based providers to adopt evidence-based models. Report to the DC Department of Health. Washington, DC.

5. **Kaye, S.** & DePanfilis, D. (2014). Maltreatment in out-of-home care in Mississippi: An assessment of report prevalence, investigation quality, contributing factors, and remedial strategies. Report to the Office of the Court Monitor. Washington, DC.

6. **Kaye, S.** (2013). *Technical Assistance model for Wendy's Wonderful Kids.* Report to the Dave Thomas Foundation for Adoption. Washington, DC: Kaye Implementation and Evaluation, LLC.

7. **Kaye, S.** & Lardner, M. (2012). *Using the Maryland CANS to support child welfare service planning: Implementation and evaluation of the service intensity algorithm.*  Report to Maryland Department of Human Resources. Baltimore, MD: Innovations Institute, University of Maryland School of Medicine.

Technical Reports (cont)

8. Steward, R., Hrapczynski, K., & **Kaye, S.** (2010). *Results of the case record review: Assessment, planning and service delivery in In-Home Services.* Report to Tennessee Department of Children's Services. Baltimore, MD: Atlantic Coast Child Welfare Implementation Center at the University of Maryland School of Social Work.

9. **Kaye, S.** (2010). Practitioner perspectives on change: Readiness for implementing the Reaching for Excellence and Accountability in Practice (REAP) model. Report to North Carolina Division of Social Services. Baltimore, MD: Atlantic Coast Child Welfare Implementation Center at the University of Maryland School of Social Work.

10. **Kaye, S.** (2010). *Practitioner perspectives on change: Findings from focus groups with North Carolina Technical Assistance teams*. Report to North Carolina Division of Social Services. Baltimore, MD: Atlantic Coast Child Welfare Implementation Center at the University of Maryland School of Social Work.

11. **Kaye, S.** & Steward, R. (2010). *Results of Comprehensive Organizational Health Assessment.* Reports to 15 geographic regions in the Mississippi Department of Human Services. Baltimore, MD: Atlantic Coast Child Welfare Implementation Center at the University of Maryland School of Social Work.

12. Closson, S., & **Kaye, S.** (2009). *Findings from the 2008 Local Supervisory Review.* Annual report to the Maryland Department of Human Resources. Baltimore, MD: Ruth H. Young Center for Families and Children at the University of Maryland School of Social Work.

13. **Kaye, S.** & Morales, J. (2009). *Framework for evaluating systems change in Implementation Projects. Report to USDHHS Children's Bureau.* Baltimore, MD: Atlantic Coast Child Welfare Implementation Center at the University of Maryland School of Social Work.

14. **Kaye, S.** (2009). Assessing the National Implementation Research Network (NIRN) Measures of Implementation Components for evaluating implementation projects. Report to Implementation Center Evaluators Workgroup. Baltimore, MD: Atlantic Coast Child Welfare Implementation Center at the University of Maryland School of Social Work.

15. **Kaye, S.** (2009). *Exploring the use of Goal Attainment Scaling (GAS) in evaluating implementation projects*. Report to Implementation Center Evaluators Workgroup. Baltimore, MD: Atlantic Coast Child Welfare Implementation Center at the University of Maryland School of Social Work.

16. **Kaye, S.**, Fisher, C., Williams, C., & Fry, L. (2009). *SAMS communication and implementation planning with pilot districts*. Report to West Virginia SAMS Implementation Committee. Baltimore, MD: Atlantic Coast Child Welfare Implementation Center at the University of Maryland School of Social Work.

17. Ahn, H., Shaw, T., **Kaye, S.**, & DePanfilis, D. (2009). *Statewide Report of the Maryland Child and Family Services Review. Final report to the Maryland Department of Human Resources*. Baltimore, MD: Ruth H. Young Center for Families and Children at the University of Maryland School of Social Work.

Technical Reports (cont)

18. Gregory, G., & **Kaye, S.** (2009). *"The experience of being a foster parent is invaluable to children" Annual report of the Maryland Foster Parent Survey*. Annual report to the Maryland Department of Human Resources. Baltimore, MD: Ruth H. Young Center for Families and Children at the University of Maryland School of Social Work.

19. **Kaye, S.** (2008). Final Report on the Baltimore City Department of Social Services Maryland Child and Family Services Review.  Report written for the Maryland Department of Human Resources.

20. **Kaye, S.**, White, S., & DePanfilis, D. (2008). *Findings from the 2007 Local Supervisory Review.* Annual report to the Maryland Department of Human Resources.

21. Shaw, T., **Kaye, S.**, & DePanfilis, D. (2008). *Maryland Child Welfare Performance Indicators. 2nd Annual Child Welfare Accountability Report.* Baltimore, MD: Ruth H. Young Center for Families and Children at the University of Maryland School of Social Work.

22. **Kaye, S.**, DePanfilis, D., & Shaw, T. (2008). *Quality Assurance Processes in Maryland Child Welfare. 2nd Annual Child Welfare Accountability Report.* Baltimore, MD: Ruth H. Young Center for Families and Children at the University of Maryland School of Social Work.

23. **Kaye, S.** & DePanfilis, D. (2007). *Maryland Child and Family Service Review progress report.* Report to the USDHHS Children's Bureau.

24. **Kaye, S.** & DePanfilis, D. (2007). Maryland Child and Family Service Review baseline data and proposal for improved child welfare monitoring. Report to the USDHHS Children's Bureau.

25. **Kaye, S.**, Ovwigho, P., Shaw, T.V., & DePanfilis, D. (2007). *Child welfare accountability: Annual report on Maryland child welfare performance indicators*. Annual report to the Maryland Department of Human Resources.

26. **Kaye, S.**, DePanfilis, D. (2007). *Child welfare accountability: Evaluating quality assurance processes in Maryland*. Annual report to the Maryland Department of Human Resources.

27. **Kaye, S.**, Braun, B., Anderson, E. (2005). Under what conditions can, and will, limited resource citizens engage in the deliberative public policy process? Final report to the Kettering Foundation.

Peer Reviewed Presentations

1. **Kaye, S.**, Quick, H., Shaw, T.V., Stephan, S.H. (2012, March). *Who gets in to Wraparound and what do they get out of it?  Examining CME referrals and child welfare outcomes using propensity score matching.*  Poster presentation at the Children's Mental Health Research and Policy Conference. Tampa, FL.

2. **Kaye, S.** (2009, January). Internalizing and externalizing behaviors of kinship and foster care. Paper presentation. Social for Social Work Research annual conference, New Orleans, Louisiana, January 16-18, 2009.

3. DePanfilis, D., **Kaye, S.**, Mols, C., Coppage, S., & Shaw, T. (2008, December). Calculating caseload and staffing needs: In-home services redesign in Maryland. *American Humane Time and Effort: Perspectives on Workload Roundtable*, Santa Fe, New Mexico, December 3-5, 2008.

Peer Reviewed Presentations (cont)

4.  Geddes, A. & **Kaye, S.** (2006). "It's scary out there": The voices of families and youth with mental health needs on transitioning to adulthood. Paper presentation, *Transition Age Youth Conference,* Maryland State Department of Education, Columbia, Maryland.

5.  Roy, K., **Kaye, S.**, & Fitzgerald, M. (2006). Multi-partner parenting as a process: Low-income fathers' perspectives on transitions across family systems. Paper presentation, National Council on Family Relations Annual Conference, Minneapolis, Minnesota.

6.  **Kaye, S.** & Grutzmacher, S. (2006) Discipline socialization among National Council on Family Relations student affiliates. Poster presentation, National Council on Family Relations Annual Conference, Minneapolis, Minnesota.

7.  Roy, K. & **Kaye, S.** (2005). Transitory fatherhood: Longitudinal patterns of involvement for men with children in multiple families. Poster presentation, *Society for the Study of Human Development*.

8.  **Kaye, S.** & Kuvalanka, K. (2005). Evaluating the impact of anti-gay adoption laws on children in the foster care system. Poster presentation, *Congressional Briefing: Linking Family Research to Family Policy*, National Council on Family Relations and American Association of Family and Consumer Sciences, Washington, DC.

9.  **Kaye, S.** & Hofferth, S. (2005). Analyzing the foster care population to inform child welfare policy design. Panel presentation, Association of Public Policy Analysis and Management annual conference, Washington, DC.

10. **Kaye, S.** & Braun, B. (2004). Engaging unheard voices through participatory action research. Presentation at *Crossroads in Community Research* conference.

Invited Presentations

1.  **Kaye, S.** (2015, January). *Developing a research-informed evaluation of Kids Insight dissemination strategies: Summary of literature review.* Presentation to Kids Insight and the Annie E. Casey Foundation. Baltimore, MD.

2.  **Kaye, S.** & Perry, D.F. (2014, September). *Informing professional development for home visitors in the District: Findings from the MIECHV evaluation.* Presentation to the DC Home Visiting Council. Washington, DC.

3.  **Kaye, S.** & Perry, D.F. (2013, October). *Readiness of DC's community-based providers to implement evidence-based home visiting models.  Findings from the MIECHV evaluation: Adoption study phase 1.* Presentation to the DC Home Visiting Council. Washington, DC.

4.  **Kaye, S.** (2012, October). *Developing a national training and technical assistance model to support the implementation of Wendy's Wonderful Kids.* Presentation to the Dave Thomas Foundation for Adoption.  Columbus, OH.

5.  **Kaye, S.** (2011, October). *Competency development trajectories of Wraparound facilitators: A research proposal.* Poster presentation at the Seattle Implementation Research Conference. Seattle, WA.

6.  **Kaye, S.** (2011, August). *Integrated implementation evaluation: Providing relevant data in real time.* Poster presentation at the Global Implementation Conference. Washington, DC.

<u>Invited Presentations (cont)</u>

7. **Kaye, S.** (2010, September). *Safety Assessment Management System (SAMS) fidelity: Findings from year one*. Report to West Virginia Bureau of Children's Services. Baltimore, MD: Atlantic Coast Child Welfare Implementation Center at the University of Maryland School of Social Work.

8. **Kaye, S.** (2010, July). *Framework for individual and organizational change management.* Presentation to North Carolina Division of Social Services. Raleigh, North Carolina.

9. **Kaye, S.** & Fisher, C. (2010, June). Technical assistance to support implementation of systems change. Presentation at the *Atlantic Coast Child Welfare Regional Forum*, Annapolis, Maryland.

10. **Kaye, S.** (2010, May). *Safety Assessment and Management System (SAMS) fidelity workshop*. Presentation to Bureau of Children and Families statewide management meeting. Fairmont, West Virginia.

11. **Kaye, S.** & Potter, (2010, March). *Evaluation collaboration: Lessons from the Implementation Center Evaluators*. Presentation at the National Resource Center Evaluator's Meeting.

12. **Kaye, S.**, & Fisher, C. (2009, September). *Atlantic Coast Child Welfare Implementation Center: Approach and early accomplishments*. Retrieved from www.accwic.org.

13. **Kaye, S.** (2009, March). Using evaluation to inform systems change in child welfare. Presentation at the Atlantic Coast Child Welfare Regional Forum, Atlanta, Georgia.

14. DePanfilis, D., Mols, C., **Kaye, S.**, Shaw, T., & Ayers, D. (2008, October). Improving the efficiency and effectiveness of child welfare services through state, stakeholder, and university collaboration. *Child Welfare Leadership in Action*, Conference sponsored by the Administration for Children and Families, Children's Bureau. Washington, DC, October 20-21, 2008.

15. **Kaye, S.** & Lee, B. (2008, April). *Measuring, documenting and assessing well-being*. Presentation at *Place Matters in Maryland* conference hosted by Maryland Department of Human Resources.

16. **Kaye, S.** & White, C. (2008, April). *Placement matters: Promoting placement stability*. Presentation at *Place Matters in Maryland* conference hosted by Maryland Department of Human Resources.

17. **Kaye, S.**, Shaw, T.V., & Ayer, D. (2008, April). *Using data for program improvement: Quality Assurance technical assistance.* Presentation regional meetings of Maryland Department of Social Services.

18. **Kaye, S.** & Fitzgerald, M. (2005). Substance abuse treatment and child welfare: Systemic change is needed. *Family Focus*, National Council on Family Relations.

**Ex. 4**

October 14, 2015

# Findings from the Period 5 Case Record Review

**Sarah Kaye, PhD**

Expert Consultant    | Office of the Court Monitor

## Table of Contents

Table of Contents..................................................................................................................1

Purpose ...............................................................................................................................2

Executive Summary.............................................................................................................2

Methodology........................................................................................................................9

MSA II.B.3.a. Initial Health Screening ..............................................................................15

MSA II.B.3.b. Comprehensive Health Assessment ..........................................................20

MSA II.B.3.d. Follow-Up Medical Services .......................................................................27

MSA II.B.3.e. Initial Dental Examination and Follow-Up Dental Services ........................29

MSA II.B.3.f. Mental Health Assessment and Follow-Up Mental Health Services............32

MSA II.B.3.g. Developmental Assessment and Follow-Up Developmental Services .................35

MSA II.B.4.a. Therapeutic and Rehabilitative Foster Care Services ................................40

MSA II.B.2.i. Information and Items Provided to Placement Resources............................44

MSA III.B.4.a. Child Welfare Case Records......................................................................48

MSA III.B.6.c. Educational Continuity ..............................................................................51

Appendix A. Case Record Review Instrument

Appendix B. Dr. Moira Szilagyi, Curriculum Vitae

Appendix C. Review Team Members

Appendix D. Dr. Terry Shaw, Curriculum Vitae

Appendix E. Results of the Inter-Rater Reliability Analysis

## Purpose

In July 2014, the Olivia Y. Court Monitor engaged me to coordinate the case record review required by the Period 5 Implementation Plan.[1]  The review, which was conducted on-site at the Mississippi Department of Human Services Division of Family and Children's Services State Office in Jackson, Mississippi during the week of April 13, 2015, addressed specific MSA requirements related to medical, dental and mental health care, education, and case records.

## Executive Summary

The *Period 5 Case Record Review Findings Summary Table* summarizes each of the requirements addressed by the review and the related findings.  The required Period 4 and Period 5 performance levels are set out below.  The sample subject to review was derived from all children who entered foster care between July 1, 2013 and December 31, 2014 – a time period implicating performance during virtually all of Period 4 and roughly the first half of Period 5.[2]

*Period 5 Case Record Review Findings, Summary Table*

| MSA Requirement | Period 4 and Period 5 MSA Requirements | Findings of the Period 5 Case Record Review |
|---|---|---|
| Every child entering foster care shall receive a health screening evaluation from a qualified medical practitioner within 72 hours after placement that is in accordance with the health screening recommended by the American Academy of Pediatrics. (MSA II.B.3.a) | <u>By the end of Implementation Period Four:</u><br>At least 70% of children entering custody during the Period shall receive a health screening evaluation from a qualified medical practitioner within 72 hours after placement that is in accordance with the health screening recommended by the American Academy of Pediatrics.  (MSA II.B.3. j. 1.)<br><br><u>By the end of Implementation Period Five:</u><br>At least 90% of children entering custody during the Period shall receive a health | - 2% of children entering foster care received an initial health screening (IHS) by a qualified medical practitioner within 72 hours that is in accordance with the health screening recommended by AAP.<br><br>- 42% of children had an IHS completed within 72 hours.<br><br>- 50% of IHS completed by qualified medical practitioner.<br><br>- 3% IHS included all recommended AAP components. |

---

[1] Among other activities, in consultation with the Court Monitor 's Office and DFCS managers, I designed the review instrument, developed training materials for the case record review and quality assurance team,  delivered training for the review team, oversaw the data collection and associated quality assurance processes, and analyzed the data collected through the review process.  In collaboration with the Court Monitor, I also consulted with other subject matter experts.

[2]  Period 4, which extended for a 12-month time frame, began on July 7, 2013.  Period 5, which extended for an identical time period, began on July 7, 2014.

*Period 5 Case Record Review Findings, Summary Table*

| MSA Requirement | Period 4 and Period 5 MSA Requirements | Findings of the Period 5 Case Record Review |
|---|---|---|
| | screening evaluation from a qualified medical practitioner within 72 hours after placement that is in accordance with the health screening recommended by the American Academy of Pediatrics.  (MSA II.B.3.k.1.) | |
| Every child entering foster care shall receive a comprehensive health assessment within 30 days of the placement. The assessment shall be in accordance with the recommendations of the American Academy of Pediatrics, except that dental exams shall be governed by Section II.B.3.e of the Modified Settlement Agreement. (MSA II.B.3.b) | By the end of Implementation Period Four: At least 70% of children entering custody during the Period shall receive a comprehensive health assessment consistent with Modified Settlement Agreement requirements within 30 calendar days of entering care. (MSA II.B.3.j.2.)<br><br>By the end of Implementation Period Five: At least 90% of children entering custody during the Period shall receive a comprehensive health assessment consistent with Modified Settlement Agreement requirements within 30 calendar days of entering care. (MSA II.B.3.k.2.) | - 1% of children entering foster care received a comprehensive health assessment (CHA) by a qualified medical practitioner within 30 days of placement that is in accordance with the health assessment recommended by AAP.<br><br>- 57% CHA completed within 30 days.<br><br>- 48% CHA completed by qualified medical practitioner.<br><br>- 2% CHA included all recommended AAP components. |
| All children shall receive periodic medical examinations and all medically necessary follow-up services and treatment throughout the time they are in state custody, in accordance with the time periods recommended by the American Academy of Pediatrics. (MSA II.B.3.d) | By the end of Implementation Period Four: At least 85% of children in custody during the Period shall receive periodic medical examinations and all medically necessary follow-up services and treatment consistent with Modified Settlement Agreement requirements.  (MSA II.B.3.j.3.) | - Periodic medical examinations could not be analyzed due to concerns about data quality.<br><br>- 58% of children with recommended medical follow-up services, treatment and/or equipment were provided with all recommended follow-up. |

*Period 5 Case Record Review Findings, Summary Table*

| MSA Requirement | Period 4 and Period 5 MSA Requirements | Findings of the Period 5 Case Record Review |
|---|---|---|
|  | <u>By the end of Implementation Period Five:</u><br>At least 95% of children in custody during the Period shall receive periodic medical examinations and all medically necessary follow-up services and treatment consistent with Modified Settlement Agreement requirements.  (MSA II.B.3.k.3.) |  |
| Every child three years old and older shall receive a dental examination within 90 calendar days of foster care placement and every six months thereafter.  Every foster child who reaches the age of three in care shall be provided with a dental examination within 90 calendar days of his/her third birthday and every six months thereafter.  Every foster child shall receive all medically necessary dental services.  (MSA II.B.3.e.) | <u>By the end of Implementation Period Four:</u><br>At least 75% of children three years old and older entering custody during the Period or in care and turning three years old during the Period shall receive a dental examination within 90 calendar days of foster care placement or their third birthday, respectively.  (MSA II.B.3.j.4.)<br><br>At least 80% of children in custody during the Period shall receive a dental examination every six months consistent with Modified Settlement Agreement requirements and all medically necessary dental services.  (MSA II.B.3.j.5.)<br><br><u>By the end of Implementation Period Five:</u><br>At least 90% of children three years old and older entering custody during the Period or in care and turning three years old during the Period shall receive a dental examination within 90 calendar days of foster care placement or their third | - 44% of children three or turning three while in care received a dental examination within 90 days of entering custody or their third birthday, and all applicable follow-up dental services.<br><br>- 47% of children three or turning three while in care received a dental examination within 90 days of entering custody or their third birthday.<br><br>- 48% of children three or turning three while in care who needed follow-up dental services received all recommended services.<br><br>- Periodic dental examination data could not be analyzed due to concerns about data quality. |

*Period 5 Case Record Review Findings, Summary Table*

| MSA Requirement | Period 4 and Period 5 MSA Requirements | Findings of the Period 5 Case Record Review |
|---|---|---|
| | birthday, respectively.  (MSA II.B.3.k.4.)<br><br>At least 90% of children in custody during the Period shall receive a dental examination every six months consistent with Modified Settlement Agreement requirements and all medically necessary dental services.  (MSA II.B.3.k.5.) | |
| Every child four years old and older shall receive a mental health assessment by a qualified professional within 30 calendar days of foster care placement.  Every foster child who reaches the age of four in care shall receive a mental health assessment within 30 calendar days of his/her fourth birthday.  Every foster child shall receive recommended mental health services pursuant to his/her assessment.  (MSA II.B.3.f) | <u>By the end of Implementation Period Four</u>:<br>At least 70% of children four years old and older entering custody during the Period or in care and turning four years old during the Period shall receive a mental health assessment by a qualified professional within 30 calendar days of foster care placement or their fourth birthday, respectively.  (MSA II.B.3.j.6.)<br><br>At least 80% of children who received a mental health assessment during the period shall receive all recommended mental health services pursuant to their assessment.  (MSA II.B.3.j.7.)<br><br><u>By the end of Implementation Period Five</u>:<br>At least 90% of children four years old and older entering custody during the Period or in care and turning four years old during the Period shall receive a mental health assessment by a qualified professional within 30 | - 10% of children age four at entry or who turned four while in DFCS custody received a mental health assessment by a qualified professional within 30 days of entry or their fourth birthday, and received all recommended follow-up services.<br><br>- 26% of children aged four at entry or who turned four while in DFCS custody received a mental health assessment within 30 days.<br><br>- 39% of children aged four at entry or who turned four while in DFCS custody received a mental health assessment by a qualified professional.<br><br>- 47% of children aged four at entry or who turned four while in DFCS custody who needed follow-up mental health services received all recommended services. |

*Period 5 Case Record Review Findings, Summary Table*

| MSA Requirement | Period 4 and Period 5 MSA Requirements | Findings of the Period 5 Case Record Review |
|---|---|---|
| | calendar days of foster care placement or their fourth birthday, respectively.  (MSA II.B.3.k.6.)<br><br>At least 90% of children who received a mental health assessment during the period shall receive all recommended mental health services pursuant to their assessment.  (MSA II.B.3.k.7.) | |
| Every foster child ages birth through three shall receive a developmental assessment by a qualified professional within 30 days of foster care placement, and each child older than three shall be provided with a developmental assessment if there are documented factors that indicate such an assessment is warranted. All foster children shall be provided with needed follow-up developmental services. (MSA II.B.3.g) | <u>By the end of Implementation Period Four:</u><br>At least 60% of children in custody ages birth through three during the Period, and older children if factors indicate it is warranted, shall receive a developmental assessment by a qualified professional within 30 calendar days of foster care placement and all needed developmental services.  (MSA II.B.3.j.8.)<br><br><u>By the end of Implementation Period Five:</u><br>At least 80% of children in custody ages birth through three during the Period, and older children if factors indicate it is warranted, shall receive a developmental assessment by a qualified professional within 30 calendar days of foster care placement and all needed developmental services.  (MSA II.B.3.k.8.) | - 17% of children ages birth through three or older if warranted received a developmental assessment by a qualified professional within 30 days of foster care placement, and received all applicable follow-up developmental services.<br><br>- 23% of children ages birth through three or older if warranted received a developmental assessment within 30 days of foster care placement.<br><br>- 17% of children ages birth through three or older if warranted received developmental assessment by qualified professional.<br><br>- 69% of children ages birth through three or older if warranted who needed follow-up developmental services received all recommended services. |

6

*Period 5 Case Record Review Findings, Summary Table*

| MSA Requirement | Period 4 and Period 5 MSA Requirements | Findings of the Period 5 Case Record Review |
|---|---|---|
| Each foster child requiring therapeutic and rehabilitative foster care services because of a diagnosis of significant medical, developmental, emotional, or behavioral problems shall be provided with a treatment plan and shall be provided with these services in accordance with the plan. (MSA II.B.4.a) | By the end of Implementation Period Four: At least 80% of children in custody during the Period requiring therapeutic and/or rehabilitative foster care services because of a diagnosis of significant medical, developmental, emotional, or behavioral problems shall be provided with a treatment plan and services in accordance with their plan.  (MSA II.B.4.c.1.)  By the end of Implementation Period Five: At least 90% of children in custody during the Period requiring therapeutic and/or rehabilitative foster care services because of a diagnosis of significant medical, developmental, emotional, or behavioral problems shall be provided with a treatment plan and services in accordance with their plan.  (MSA II.B.4.d.1.) | - 45% of children with significant medical, developmental, and/or behavioral problems were provided with a treatment plan and all recommended services. |
| No later than at the time of placement, Defendants shall provide resource parents or facility staff with the foster child's currently available medical, dental health, educational, and psychological information, including a copy of the child's Medicaid card. Defendants shall gather and provide to resource parents or facility staff all additional current medical, dental health, educational, and psychological information available from the | By the end of Implementation Period Four: At least 60% of children in DFCS custody placed in a new placement during the Period shall have their currently available medical, dental, educational, and psychological information provided to their resource parents or facility staff no later than at the time of any new placement during the Period.  (MSA II.B.2.q.9.) | - 2% of children's placement resources were provided with all applicable information/items within 15 days of placement.  The MSA specifies that the foster child's "currently available" information shall be provided to placement resources at the time of placement and all additional information shall be provided within 15 days.  It was not possible to determine from the review of electronic or paper case records what information was available at the time of placement. Therefore this analysis is limited to whether applicable |

*Period 5 Case Record Review Findings, Summary Table*

| MSA Requirement | Period 4 and Period 5 MSA Requirements | Findings of the Period 5 Case Record Review |
|---|---|---|
| child's service providers within 15 days of placement. (MSA II.B.2.i) | By the end of Implementation Period Five: At least 80% of children in DFCS custody placed in a new placement during the Period shall have their currently available medical, dental, educational, and psychological information provided to their resource parents or facility staff no later than at the time of any new placement during the Period.  (MSA II.B.2.r.6.) | information was provided within the 15-day timeframe. |
| DFCS caseworkers shall compile, maintain, and keep current complete child welfare case records.  (MSA III.B.4.a ) | Beginning by the date as set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model: At least 90% of child welfare case records in that region will be current and complete.  (MSA III.B.4.b.)  Beginning by 12 months following the date as set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model: At least 95% of child welfare case records in that region will be current and complete.  (MSA III.B.4.c.) | 6% of children statewide had all applicable medical, dental, mental health, and developmental assessments documented in the electronic case record and included a copy in the paper case record. |
| DFCS shall make all reasonable efforts to ensure the continuity of a child's educational experience by keeping the child in a familiar or current school and neighborhood, when this is in the child's best interests and feasible, and by limiting the number of school changes the child experiences.  (MSA III.B.6.c) | As of the date upon which the last region has fully implemented the Practice Model [February2016], performance on these educational requirements shall be measured and required state-wide and shall no longer be measured on a region-by-region basis.  (MSA III.B.6.f.) | 69% of school aged children statewide did not experience school changes or DFCS made reasonable efforts to prevent school changes when in the child's best interests and feasible. |

## Methodology

All of the data used for this evaluation were collected through a review of the documentation in the child's electronic case file stored in MACWIS and the child's paper case file.  The term "case record" is used to include both the electronic and paper case file.  Information was extracted from the case record by a team of reviewers and entered into an automated case record review instrument.  The completed review instrument was reviewed in light of established specifications and approved by a quality assurance reviewer before it was submitted for analysis.  A more detailed description of the components of the methodology used for the review is set out below.

### Review Instrument

The case record review instrument, provided in Appendix A, was developed through a collaborative process involving the Office of the Court Monitor, designated DFCS representatives (including DFCS managers and  consultants from the Center for the Support of Families [CSF]), counsel for both parties, and Dr. Moira Szilagyi, the Monitor's child welfare health care expert.[3]  A draft of the instrument was provided to both parties for comment.  The instrument was further refined on several occasions based on the following:  (1) the feedback received on the draft; (2) the result of a reliability analysis conducted following a pilot review; and (3) the results of a practice case review conducted during the reviewer training.  The instrument was automated using Qualtrics online survey software to collect case review data electronically.[4]

### Review Team

The case record reviewers included 22 DFCS reviewers from the Continuous Quality Improvement Division, including from the Foster Care Review (FCR), Evaluation and Monitoring (EMU), and Safety Review Units.  Quality assurance reviewers included seven supervisors from the Foster Care Review and Evaluation and Monitoring Units, as well as representatives from the Center for the Support of Families and the Office of the Court Monitor.  A complete list of the individuals who served on the review team is provided in Appendix C.

### Sample Selection

The sampling methodology was developed in consultation with Dr. Terry V. Shaw and the Office of the Court Monitor.[5]  Selection of the sample was guided by several objectives.  First, because we wanted to ensure the review explored recent case practice under the MSA, we limited sampling to children who entered foster between July 1, 2013 and December 31, 2014.  Second, because we wanted to ensure children in the sample remained in custody long enough to receive required screenings, assessments and follow up services, we limited the sample to children who remained in custody for at least 90 days.

---

[3] Dr. Szilagyi is a national expert on health care for children in foster care and a principal author of the American Academy of Pediatric Standards for children in foster care that are required by the MSA.   A copy of Dr. Szilagyi's Curriculum Vitae is included as Appendix B.

[4] Reviewers also had access to paper review instruments during the review.  The paper instruments were provided as part of the reviewer training packet and extra copies were available on a table in the room where all case record reviews were conducted.

[5] Dr. Shaw is an Associate Professor at the University of Maryland School of Social Work.  He teaches data-focused child welfare research and child welfare policy in the MSW and PhD programs and has expertise in advanced statistical methods.  A copy of Dr. Shaw's Curriculum Vitae is included as Appendix D.

For the children in the sample, reviewers were instructed to consider all case activity between the date the child entered DFCS custody and February 28, 2015, the period under review ("PUR").

According to data produced by DFCS, there were 4,704 entries into foster care between July 1, 2013 and December 31, 2014.  Nine of these entries were excluded from the sample because the child was reported to be over 18 at the time of entry.  An additional 893 cases were excluded from the sample because the length of time the children were in DFCS custody was less than 90 days.  After these exclusions, the population from which the sample was drawn included 3,802 entries of children ages 18 and younger who entered DFCS custody between July 1, 2013 and December 31, 2014 and remained in custody for 90 days or longer.

The sample size for the case record review was determined in order to review a sufficient number of cases that would result in a margin of error between 5 and 7.5 percent when extrapolating sample estimates to the total target population.[6]  A random sample was drawn from the 3,802 entries that met criteria for review.  An oversample was included to account for potential coding errors that could include cases in the sample that did not meet study criteria.  Additionally, specific age groups were oversampled in order to increase the sample size for requirements that apply only to certain age groups (e.g., all children ages birth to three are required to have a developmental assessment).

The final analysis sample included 321 cases: 198 received a "full review" that included data collection on all applicable elements of the data collection instrument and 123 received a "targeted review" that was limited to age-specific MSA requirements that were included on the instrument.[7]

*Full Review:* Cases that were part of the statewide representative sample were reviewed for all MSA requirements that were the focus of this review.

*Targeted Review:* Cases that were included in the oversampled age categories were only reviewed for applicable, age-specific MSA requirements.

*Table 1. Case Record Review Sample Demographics Table* describes the characteristics of the case record review sample.

- Over one quarter of the sample was from Region VII-W, with the next largest percentages from I-S (14%) and III-S (10%).

- The ages of children at entry into custody ranged from infants (i.e., < one-year old) to 17 year olds.  Just over a quarter of the sample was aged birth to two-years old(26%), 29% were age

---

[6] This margin of error was intended to apply to findings at a statewide level, not a regional level and not findings based on a subpopulation of the sample.

[7] Of the 334 cases identified for inclusion in the sample, 11 were excluded because the length of time between entering custody and the period under review was shorter than 90 days.  Six of the 11 cases were excluded from review because the custody end date was missing in MACWIS at the time the sample was pulled, but at the time of the review, the custody end date indicated that the child was in custody for fewer than 90 days.  (This appears to be the result of delays in data entry into MACWIS.)  Five of the 11 cases were excluded from review because, although their time in custody was longer than 90 days as of the time the sample was pulled, they were not in custody for 90 days before the end of the PUR.  Reviews on two additional cases were lost due to reviewer errors when submitting the electronic review instrument.

three to five-years old, 25% were six to eleven-years old, and 20% were twelve to seventeen-years old.

- Because of the sampling and review methodology, the maximum length of stay in DFCS custody for children included in the sample was 20 months (i.e. a child who entered custody in July 2013 could have been in custody through the end of the data collection period in February 2015); lengths of stay of children in the sample ranged from just over 3 months to just under 20 months.

- One third of the sample exited custody after 90 days, but before the end of the PUR, while two thirds of the sample remained in custody through the end of the PUR.

Table 1 - Case Record Review Sample Demographics

| | Number in Sample | | | Percent of Sample | | |
|---|---|---|---|---|---|---|
| | *Full Review (N=198)* | *Targeted Review (N=123)* | *Full Sample (N=321)* | *Full Review (N=198)* | *Targeted Review (N=123)* | *Full Sample (N=321)* |
| **Number and Percent of Cases from Each Region** | | | | | | |
| I-N | 13 | 11 | 24 | 7% | 9% | 7% |
| I-S | 27 | 19 | 46 | 14% | 15% | 14% |
| II-E | 2 | 1 | 3 | 1% | 1% | 1% |
| II-W | 15 | 8 | 23 | 8% | 7% | 7% |
| III-N | 10 | 7 | 17 | 5% | 6% | 5% |
| III-S | 22 | 10 | 32 | 11% | 8% | 10% |
| IV-N | 6 | 4 | 10 | 3% | 3% | 3% |
| IV-S | 3 | 2 | 5 | 2% | 2% | 2% |
| V-E | 5 | 3 | 8 | 3% | 2% | 2% |
| V-W | 16 | 6 | 22 | 8% | 5% | 7% |
| VI | 17 | 13 | 30 | 9% | 11% | 9% |
| VII-E | 11 | 5 | 16 | 6% | 4% | 5% |
| VII-W | 51 | 34 | 85 | 26% | 28% | 26% |
| **Number and Percent of Children in Each Age Group** | | | | | | |
| Birth-2 years | 51 | 34 | 85 | 26% | 28% | 26% |
| 3-5 years | 44 | 50 | 94 | 22% | 41% | 29% |
| 6-11 years | 59 | 20 | 79 | 30% | 16% | 25% |
| 12-18 years | 44 | 19 | 63 | 22% | 15% | 20% |
| **Number and Percent of Children in Each Age Group Oversampled to Evaluate Age-Specific Assessments/Examinations** | | | | | | |
| Developmental: Birth to 3 at entry into custody | 73 | 79 | 152 | 37% | 64% | 47% |
| Dental: Three and older at entry, or turned 3 in custody | 156 | 93 | 249 | 79% | 76% | 78% |
| Mental Health: Four and older at entry, or turned 4 in custody | 149 | 88 | 237 | 75% | 72% | 74% |
| **Number and Percent of Children's Length of Stay in DFCS Custody** (max 20 months during PUR) | | | | | | |
| Remained in custody until end of PUR | 133 | 68 | 201 | 67% | 55% | 63% |
| 3-6 months | 30 | 18 | 48 | 15% | 15% | 15% |
| 6-9 months | 33 | 11 | 44 | 17% | 9% | 14% |
| 9-12 months | 26 | 21 | 47 | 13% | 17% | 15% |
| 12-18 months | 18 | 8 | 26 | 9% | 7% | 8% |
| Over 18 months | 26 | 10 | 36 | 13% | 8% | 11% |
| Exited custody during PUR | 65 | 55 | 120 | 33% | 45% | 37% |
| 3-6 months | 19 | 12 | 31 | 10% | 10% | 10% |
| 6-9 months | 24 | 17 | 41 | 12% | 14% | 13% |
| 9-12 months | 7 | 15 | 22 | 4% | 12% | 7% |
| 12-18 months | 13 | 8 | 21 | 7% | 7% | 7% |
| Over 18 months | 2 | 3 | 5 | 1% | 2% | 2% |

## Limitations

As a methodological approach, any case record review is limited because quality case record review data rely on thorough and complete documentation of activities in the electronic and/or paper case record. Incomplete case records introduce a substantial source of error in measuring child welfare practice.  In this review, when applicable information was not documented in the case record, it was coded as "no evidence" on the case record review instrument.  If activities occurred in practice that were not documented in the electronic or paper case record, it is possible that the results presented here underestimate the extent to which required case activities were conducted.  However, DFCS policy and the MSA contemplate that staff will document the activities that were subject to the case review in the case record.  DFCS policy requires documentation supporting decisions about interventions or services, and the delivery of services, which includes all medical, dental and mental health records, a description of services provided directly or by referral, and routine documentation of ongoing services (Mississippi DFCS Policy, Section A, §IX.D.2).  There are many important reasons to maintain appropriate documentation standards.  Accordingly, if the required activity was not documented, it cannot be credited in this review.

Another possible source of error is introduced if reviewers do not complete the review instrument as it was designed, and quality assurance reviewers do not identify issues and work with reviewers to correct the identified issues.  In case record reviews, inter-rater reliability, or consistent ratings made by independent reviewers, is critical to producing accurate data. High inter-rater reliability would be indicated if multiple reviewers reviewed the same electronic and paper case record, and completed the review instrument in exactly the same way.   This is explained more fully in the next section of the report.

## Inter-Rater Reliability

Following best practice in case record review methodology, I took several steps to maximize inter-rater reliability, including:

- Piloting the review instrument, conducting inter-rater reliability analysis, collecting feedback from pilot reviewers,[8] and making revisions to streamline the instrument and improve clarity.

- Providing training to the review team on the review instrument, which included discussion of specific items that were identified as having low inter-rater reliability during the pilot analysis.

- Reviewing a practice case during training, conducting a second inter-rater reliability analysis with the full review team, and making additional revisions to the review instrument to improve clarity.

- Providing additional information for reviewers to consider when reviewing medical assessments, diagnoses and recommendations.

- Developing a QA protocol which specifically identified items that had low inter-rater reliability in the pilot and/or training inter-rater reliability analyses.

- Assigning each case record reviewer to a quality assurance team member and conducting a quality assurance review and approval of all completed case record review instruments prior to final submission for analysis.

---

[8] Among the pilot reviewers were representatives from the Office of the Court Monitor, DFCS CQI supervisors, and a representative from CSF.

Inter-rater reliability was assessed during the week of the case record review using the finalized electronic case record review instrument.  A subsample of six cases were randomly selected from the full sample.  Each of the six cases was reviewed by three or four reviewers and their assigned QA person so that all reviewers and QA reviewers were included in the reliability study.  The percent of agreement between reviewers was calculated for each section of the review instrument within each case, and then aggregated across cases.

The purpose of conducting the inter-rater reliability assessment was to determine whether the data were reliably collected across reviewers, and therefore acceptable to be included in analysis of the MSA requirements.  Percent agreement should be as close to 100% as possible; the minimally acceptable level of agreement across reviewers is 80%.  In this evaluation, the total percent agreement for the entire instrument across the subsample was 83.9%, with inter-rater agreement of the six cases ranging from 76.8% to 87.3% across the entire review instrument.  The *Results of Inter-Rater Reliability Analysis* provided in Appendix E lists the percent of agreement for each case, and aggregated across all six cases included in the reliability study.

Results of the inter-rater reliability assessment were used to determine which variables were acceptable for analysis.  When percent agreement for variables used to calculate requirements fell below 80%, data cleaning procedures were used to improve agreement (*e.g.,* MSA II.B.4.a. specific diagnoses were categorized into broader diagnostic categories which greatly increased agreement among reviewers in the reliability subsample).  When data quality concerns could not be addressed, we did not analyze the requirements (*e.g.,* for MSA II.B.3.d. and II.B.d.e. reviewers listed follow-up medical and dental visits in areas of the review instrument that were reserved only for preventative check-ups).

Findings

The findings presented in this report include the percent of applicable cases meeting each MSA requirement.  Several of the requirements subject to the case record review include multiple components.  For requirements with multiple components, the percent of applicable cases meeting each of the components of the requirement are presented along with the percent of cases that meet all of the applicable required components combined.

Each finding includes the number of cases included in the denominator as well as a footnote that describes the specific sample or subsample upon which the finding is based.  A margin of error was calculated for each finding to provide a range of possible values when extrapolating from this sample to the full population.[9]

---

[9] The sample is representative of all entries into out-of-home care, and the sample size was designed to obtain a margin of error between 5% and 7.5%.  However, margin of error calculations are dependent on the size of the sample.  When compared to requirements that are applicable for all children (e.g., initial health screening), requirements that are applicable only to a smaller subpopulation (e.g., assessments that are only required of children in specified age groups) will have a smaller denominator (children of specified ages) and a larger margin of error (more than 7.5%).

## MSA II.B.3.a. Initial Health Screening

### MSA Requirement

Every child entering foster care shall receive an initial health screening evaluation from a qualified medical practitioner within 72 hours after placement that is in accordance with the health screening recommended by the American Academy of Pediatrics.  (MSA II.B.3.a.)

### Operationalization and Measurement

*Timeliness and completion.*  Information about the date of the Initial Health Screening (IHS) was collected from the case record.  As noted above, MSA II.B.3.a. specifies that the IHS must be conducted within 72 hours of placement.  Because data about the time of the assessment were not recorded in the case record, three calendar days was used as a proxy for the 72-hour standard established by this subsection of the MSA.

*Provider qualifications.*  AAP standards define practitioners qualified to complete the IHS as child welfare staff or a designated primary care physician.  For the purposes of this review, qualified medical practitioners were defined as licensed MD or DOs and licensed Pediatric and Family Nurse Practitioners.

Reviewers were asked to list the name of the provider and any other identifying information about the provider who completed the IHS.  Following the onsite review, the Court Monitor's office verified the licensure status of each practitioner in order to determine whether the practitioner was licensed.[10]   In instances in which the identity of the provider could not be determined from the case record,[11]  the provider was coded as "Not enough information to identify practitioner in case file" and counted as "qualifications could not be verified" and did not meet this portion of the MSA requirement.

*IHS in accordance with AAP recommendations.*  The AAP recommends 22 elements of the IHS, which are organized into 5 components. All of the components are applicable to children of all ages, while some of the elements are only applicable to children of certain ages.  For example, there are six elements in the *Growth Parameters* component: height, weight, percentiles, a growth chart with information recorded, Body Mass Index (BMI), and head circumference.   The BMI element is only applicable for children ages 2 and older.  The head circumference element is only applicable to children under age 3.

Reviewers were asked to identify which of the elements were documented on the IHS completed by the medical practitioner.  The completeness of documentation of the components included in the IHS varied widely among practitioners.  For cases with missing documentation, it was not possible to determine whether (1) recommended components were addressed during the IHS, but not documented by the practitioner, or (2) practitioners did not address the recommended components during the IHS.  For the purpose of the case record review, lack of documentation was considered to constitute lack of evidence that the components were addressed.

---

[10] The licensure status of MDs and DOs was verified with the Mississippi Board of Medical Licensure.  The licensure status of nurses was verified directly with the Mississippi Board of Nursing. Pediatric board certifications were verified with the American Board of Pediatrics.

[11] The provider could not be determined in instances where there was no copy of the IHS in the case file or the provider signature was illegible and there was no other identifying information available.

15

*Inter-rater reliability* for the IHS section of the review instrument was 92.1%.[12]

Sample

The sample used to evaluate the IHS includes the statewide representative sample of children who received a full review.  Two children were excluded from the analysis because they were hospitalized for at least the first three days of the custody episode.[13]  Thus, the total sample size used for evaluating performance relative to IHS requirements was 196 children.

Findings Related to Initial Health Screening

MSA II.B.3.a.:   2% of children entering foster care received an IHS by a qualified medical practitioner within 72 hours after placement that was conducted in accordance with the health screening recommended by the American Academy of Pediatrics (AAP).

**Timeliness:  42% of children in the sample had an IHS completed within 72 hours after placement.**

- 40% of children in the sample had an IHS completed after 3 days from placement.
- 17% of children in the sample did not have an IHS documented in the case record.
- The number of days between the date after placement and the date the IHS was completed ranged from 0 to 418 with a mean of 21 and median of 3 days.  90% of IHS were completed within 51 days.

**Qualified Medical Practitioner:  50% of children after placement had an IHS completed by a qualified medical practitioner.**

- 13% of identified practitioners' licensure status could not be verified based on available licensure data.
- 5% of the children in the sample received an IHS performed by a medical practitioner for whom there was no evidence to verify licensure status of identified practitioners.
- 15% of children in the sample had an IHS completed but reviewers could not determine the practitioner who completed the IHS based on documentation in the case record.

**Content of Initial Health Screening: 3% of children entering foster care had an IHS that included all recommended AAP components.**  Analysis was conducted at the component level.  If at least one of the elements in the column on the right were documented on the IHS, then the case received "credit" for having documented the corresponding component in the column on the left.

---

[12] The IHS and CHA were assessed together during the inter-rater reliability assessment because each of the cases with completed IHS and CHA in the reliability subsample were reported to have had the IHS and the CHA completed on the same day.

[13] Five cases indicated that an initial health screening was completed before the child entered DFCS custody.  After reviewing the facts of the five cases, three of the cases were recoded to indicate that the IHS was not completed following entry into custody. Two cases were excluded from analysis because the children were in the hospital for at least the first three days that they were in DFCS custody.

| IHS Component | IHS Elements |
|---|---|
| **Vital signs** | Vital signs |
| | Blood pressure |
| **Growth parameters** | Height |
| | Weight |
| | Percentiles or growth parameters |
| | Body mass index (BMI) (ages 2 and older) |
| | Head circumference (under age 3) |
| **Physical examination** | Physical exam (PE) |
| | Examination of each area of skin |
| | External genitalia inspections |
| | Range of motion examination of all joins (ROM) |
| **Review of child's history** | Review of medical history |
| | Review of developmental and/or educational history |
| | Birth weight or gestational age (under age 2) |
| | Review of systems (standard medical review) (ages 8 and older) |
| **Screening** | Screen for significant developmental delay (under age 5) |
| | Screen for Major depression (ages 5 and older) |
| | Screen for suicidal thoughts (ages 5 and older) |
| | Screen for violent behavior (ages 5 and older) |

The analysis presented in this section counts the total number of applicable elements in each component and across all components.  In section D of *Table 2. MSA II.B.3.a. Initial Health Screening*, below, the columns next to each element present the number of children with the element documented in their IHS (number) next to the number of children in the age group for whom that element was applicable (denominator).  The italicized numbers next to the name of the component include the number of children with at least one of the applicable elements documented on their IHS.

The number of IHS components documented in this sample ranged from zero to five and the number of elements ranged from zero to 19.  Just over one quarter (29%) of children in this sample had half of the recommended elements documented on their IHS.  Over 61% of children in this sample had at least one element of at least half of the recommended components documented on their IHS.

The most frequently documented elements, documented for over half of children entering foster care, included:

- height,
- vital signs,
- blood pressure, and
- weight.

The least frequently documented elements, documented for fewer than 5% of children entering foster care, included:

- screening for significant developmental delay,
- screening for major depression,
- screening for suicidal thoughts, and
- screening for violent behavior.

17

## Table 2 - MSA II.B.3.a. Initial Health Screening

| | Numerator | Denominator | Percent | Margin of Error |
|---|---|---|---|---|
| *Percent of children entering foster care who received a health screening evaluation from a qualified medical practitioner within 72 hours after placement that is in accordance with the health screening recommended by the AAP.[1]* | *3* | *196* | *2%* | *2%* |
| **A. Percent of Children with IHS Completed Within 72 Hours After Placement [2]** | | | | |
| *The number of days until the IHS was completed ranged from 0 to 418, with an average of 21 days and median of 3 days.  90% of IHS were completed within 51 days.* | | | | |
| IHS completed within 72 hours of placement | 83 | 196 | 42% | 7% |
| IHS completed after 72 hours in placement | 79 | 196 | 40% | 7% |
| IHS not completed | 34 | 196 | 17% | 5% |
| **B. Percent of Children with IHS Conducted by a Qualified Medical Practitioner, by Provider Type[3]** | | | | |
| IHS completed by qualified medical practitioner | 98 | 196 | 50% | 7% |
| Licensed MD or DO, Child Abuse Pediatric specialty | 3 | 196 | 2% | 2% |
| Licensed MD or DO, General Pediatric specialty | 31 | 196 | 16% | 5% |
| Licensed MD or DO, no pediatric specialty | 36 | 196 | 18% | 5% |
| Pediatric Nurse Practitioner (RN) | 9 | 196 | 5% | 3% |
| Family Nurse Practitioner (RN) | 19 | 196 | 10% | 4% |
| IHS completed, provider qualifications could not be verified | 64 | 196 | 33% | 7% |
| Not enough information to identify practitioner in case file | 29 | 196 | 15% | 5% |
| No evidence to verify licensure status of identified practitioner | 9 | 196 | 5% | 3% |
| Could not determine qualifications of practitioner based on available licensure data | 26 | 196 | 13% | 5% |
| IHS not completed | 34 | 196 | 17% | 5% |
| **C. Percent of Children With IHS Conducted in Accordance with the Health Screening Components Recommended by the AAP[4]** | | | | |
| 5 recommended AAP components documented on IHS | 6 | 196 | 3% | 2% |
| 4 recommended AAP components documented on IHS | 71 | 196 | 36% | 7% |
| 3 recommended AAP components documented on IHS | 42 | 196 | 21% | 6% |
| 2 recommended AAP components documented on IHS | 18 | 196 | 9% | 4% |
| 1 recommended AAP component documented on IHS | 5 | 196 | 3% | 2% |
| No AAP components documented on IHS | 4 | 196 | 2% | 2% |
| IHS completed, but no copy of IHS found in paper case file | 16 | 196 | 8% | 4% |
| IHS not completed | 34 | 196 | 17% | 5% |
| **D. Percent of Children With IHS Conducted in Accordance with the Health Screening Elements Recommended by the AAP[4]** | | | | |
| All applicable AAP elements documented on IHS | 0 | 196 | 0% | 0% |
| 75-99% of recommended AAP elements documented on IHS | 9 | 196 | 5% | 3% |
| 50-74% of recommended AAP elements documented on IHS | 42 | 196 | 21% | 6% |
| 25-49% of recommended AAP elements documented on IHS | 75 | 196 | 38% | 7% |
| 1-24% of recommended AAP elements documented on IHS | 16 | 196 | 8% | 4% |
| No AAP elements documented on IHS | 4 | 196 | 2% | 2% |
| IHS completed, but no copy of IHS found in paper case file | 16 | 196 | 8% | 4% |
| IHS not completed | 34 | 196 | 17% | 5% |

## Table 2 - MSA II.B.3.a. Initial Health Screening

| | Numerator | Denominator | Percent | Margin of Error |
|---|---|---|---|---|
| **E. Percent of Children by Each AAP Component Documented on the IHS** | | | | |
| *Vital Signs* | *131* | *196* | *67%* | *7%* |
| Vital signs | 123 | 196 | 63% | 7% |
| Blood pressure | 106 | 196 | 54% | 7% |
| *Growth Parameters* | *140* | *196* | *71%* | *6%* |
| Height | 134 | 196 | 68% | 7% |
| Weight | 138 | 196 | 70% | 6% |
| Percentiles or growth parameters | 15 | 196 | 8% | 4% |
| Growth chart with information recorded | 9 | 196 | 5% | 3% |
| Body mass index (BMI) (ages 2 and older) | 61 | 158 | 39% | 8% |
| Head circumference (under age 3) | 18 | 49 | 37% | 13% |
| *Physical Examination* | *119* | *196* | *61%* | *7%* |
| Physical exam (PE) | 105 | 196 | 54% | 7% |
| Examination of each area of skin | 88 | 196 | 45% | 7% |
| External genitalia inspections | 64 | 196 | 33% | 7% |
| Range of motion examination of all joints (ROM) | 38 | 196 | 19% | 6% |
| *Review of Child's History* | *85* | *196* | *43%* | *7%* |
| Review of medical history | 62 | 196 | 32% | 7% |
| Review of developmental and/or educational history | 39 | 196 | 20% | 6% |
| Assessment of chronic conditions | 37 | 196 | 19% | 5% |
| Review of behavior and/or mental health history | 31 | 196 | 16% | 5% |
| Birth weight or gestational age (under age 2) | 8 | 38 | 21% | 13% |
| Review of systems (standard medical review) (ages 8 and older) | 21 | 78 | 27% | 10% |
| *Screening* | *6* | *196* | *3%* | *2%* |
| Screen for significant developmental delay (under age 5) | 4 | 77 | 5% | 5% |
| Screen for major depression (ages 5 and older) | 2 | 119 | 2% | 2% |
| Screen for suicidal thoughts (ages 5 and older) | 2 | 119 | 2% | 2% |
| Screen for violent behavior (ages 6 and older) | 2 | 103 | 2% | 3% |

[1] The sample used to evaluate the IHS includes only the statewide representative sample of children who received a full review. Two children were excluded from the analysis because they were hospitalized for at least the first three days they were in custody, for a total sample size of 196.

[2] MSA II.B.3.a. specifies that IHS must be conducted within 72 hours of placement. Data about the time of the assessment were not available for this review, so the Court Monitor's office used 3 days to evaluate the standard.

[3] AAP standards define professionals qualified to complete IHS as child welfare staff or a designated primary care physician. For the purposes of this review, the Court Monitor's office has defined qualified medical practitioners as licensed MD or DOs and licensed Pediatric and Family Nurse Practitioners.

[4] AAP recommends 22 elements of the IHS, which are organized into 5 components. Some of the elements are only applicable to children in certain age groups. The data presented in this section count the total number of applicable components for each child's age group.

## MSA II.B.3.b. Comprehensive Health Assessment

### MSA Requirement

Every child entering foster care shall receive a comprehensive health assessment within 30 days of the placement. The assessment shall be in accordance with the recommendations of the American Academy of Pediatrics, except that dental exams shall be governed by Section II.B.3.e of the Modified Settlement Agreement. (MSA II.B.3.b.)

### Operationalization and Measurement

*Timeliness and completion.*  Information about the date of the Comprehensive Health Assessment (CHA) was collected from the case record.

*Provider qualifications.*  AAP standards define the categories of medical practitioners qualified to complete the CHA as a pediatric nurse practitioner, physician of child care agency, or a primary care physician.  For the purpose of this review, qualified medical practitioners were defined as licensed MDs or DOs and licensed pediatric and family nurse practitioners.

Reviewers were asked to list the name of the provider and any other identifying information about the provider who completed the CHA.  Following the onsite review, the Court Monitor's office verified the licensure status of each practitioner in order to determine whether the practitioner was licensed.[14]   In instances in which the identity of the provider could not be determined from the case record,[15]  the provider was coded as "Not enough information to identify practitioner in case file" and counted as "qualifications could not be verified" and did not meet this portion of the MSA requirement.

*CHA In accordance with AAP recommendations.*  AAP recommends a CHA that includes 48 elements, which are organized into eight components.  The number of required elements per age group ranged from 32-48.  Like the IHS, the completeness of documentation of components included in the CHA varied.  For cases in which one or more component was not documented in a child's case record, it was not possible to determine whether the component was not included during a CHA or whether the component was completed, but not documented.  In either event, however, reviewers were instructed to record the absence of documentation as "not documented" on the review instrument.

*Inter-rater agreement.* CHA section of the review instrument was 92.1%.[16]

### Sample

The sample used to evaluate the CHA included the statewide representative sample of 198 children who received a full review.  One child was excluded from the analysis because he was hospitalized for the first six weeks he was in custody.  Thus, the sample size was 197.

---

[14] The licensure status of MDs and DOs was verified with the Mississippi Board of Medical Licensure.  The licensure status of nurses was verified directly with the Mississippi Board of Nursing. Pediatric board certifications were verified with the American Board of Pediatrics.

[15] The provider could not be determined in instances where there was no copy of the IHS in the case file or the provider signature was illegible and there was no other identifying information available.

[16] The IHS and CHA were assessed together during the inter-rater reliability assessment because each of the cases with completed IHS and CHA in the reliability subsample were reported to have had the IHS and the CHA completed on the same day.

Findings Related to Comprehensive Health Assessment

---

MSA II.B.3.b.   1% of children entering foster care received a CHA by a qualified medical practitioner within 30 days of placement that was in accordance with the health assessment recommended by the APP.

---

**Timeliness:  57% of children entering foster care received a CHA within 30 days of placement.**

- 13% of children in the sample received a CHA after 30 days in placement.
- 30% of children did not receive a CHA after placement.
- For children with a documented CHA, the number of days between the date the child entered DFCS custody and the date of the CHA ranged from 0 to 418, with an average of 32 days and a median of 5 days.  Among documented CHAs, 90% were completed within 60 days.

**Qualified Medical practitioner:  48% of children entering foster care received a CHA that was conducted by a qualified medical practitioner.**

- For 22% of the children entering foster care, a CHA was completed, but the provider's qualifications could not be verified.  Among this 22 percent:
    - In 14% of cases, there was insufficient information in the case record to identify the practitioner who conducted the CHA**;**
    - In 2% of cases there was no evidence to verify the licensure status of the practitioner identified in the case record;[17]
    - In 6% of cases, the qualifications of the provider could not be determined based on the available licensure data.[18]

**Content of the Comprehensive Health Assessment:  2% of children entering foster care received a CHA which documented all recommended AAP components.**  Analysis was conducted at the component level.  If at least one of the elements in the column on the right were documented on the CHA, then the case received "credit" for having documented the corresponding component in the column on the left.

---

[17] The designation "no evidence to verify the licensure status of the practitioner" was used to identify doctors who were not listed in the roster of licensed physicians in Mississippi.

[18] The designation "qualifications of the provider could not be determine based on the available licensure data" was used to identify nurses for whom there was not an exact match in the available licensure data.  This designation was used rather than "no evidence" because the available nursing licensure data was limited.  Unlike the physician licensure data, the Court Monitor's Office did not have access to the full roster of licensed nurses in Mississippi.

| CHA Component | CHA Elements |
|---|---|
| **Vital signs** | Vital signs<br>Blood pressure |
| **Growth parameters** | Height<br>Weight<br>Percentiles or growth parameters<br>Body mass index (BMI) (ages 2 and older)<br>Head circumference (under age 3) |
| **Physical examination** | Physical exam (PE)<br>Examination of each area of skin<br>External genitalia inspections<br>Range of motion examination of all joints (ROM) |
| **Review of child's history** | Review of medical history<br>Review of developmental and/or educational history<br>Birth weight or gestational age (under age 2)<br>Review of systems (standard medical review) (ages 8 and older)<br>Assessment of chronic conditions<br>Review of child's social history<br>Review of child's immunization records<br>Review of behavior and/or mental health history |
| **Mental health and developmental screening** | Developmental screen using validated instrument (under age 5)<br>Mental health screen using validated instrument (ages 5 and older) |
| **Physical screening** | Hearing screen (ages 4 and older)<br>Vision screen (ages 4 and older)<br>Dental and oral screen |
| **Laboratory screening** | Lead level (ages birth to five)<br>Urinalysis (ages 4 and older)<br>Hemoglobin (HGB), Hematocrit (HCT), complete blood count<br>Purified protein derivative tuberculin (PPD) or quantiferon<br>Rapid plasma reagin (RPR)<br>HIV<br>Hepatitis B surface antigen (HBsAg)<br>Hepatitis C antibody screen<br>Hepatitis panel (includes B and C) |

| CHA Component | CHA Elements |
|---|---|
| **Adolescent care (ages 11 and older)** | Relationships with birth family<br>Relationships with foster family<br>Adjustment to foster care<br>Peer relationships<br>Alcohol, drug or tobacco use<br>Sexual orientation<br>Sexual activity<br>Prevention of sexually transmitted diseases<br>Birth control<br>Nutrition<br>Physical activity (i.e., exercise)<br>School performance<br>Hobbies<br>Educational plan or career plans |

The number of components documented for children in the sample ranged from zero to eight.

- 57% of children received a CHA which documented at least one element of at least half of the recommended AAP components.
- The most frequently documented components, documented for at least half of the children in the sample, included vital signs and a physical exam.
- The least frequently documented elements, documented for fewer than 5% of children in the sample, included:
  - a developmental screen and mental health screen using a validated assessment,
  - Purified Protein Derivative (PPD) tuberculin or quantiferon,
  - rapid plasma reagin (RPR),
  - Hepatitis B surface antigen, Hepatitis C antibody screen, or hepatitis panel (includes A and B),
  - discussion of sexual orientation (for adolescents ages 11 and older),
  - prevention of sexually transmitted diseases (for adolescents ages 11 and older),
  - birth control (for adolescents ages 11 and older),
  - hobbies (for adolescents ages 11 and older), and
  - educational plans or career plans (for adolescents ages 11 and older).

## Table 3 - MSA II.B.3.b. Comprehensive Health Assessment

| | Numerator | Denominator | Percent | Margin of Error |
|---|---|---|---|---|
| *Percent of children entering foster care who received a comprehensive health assessment from a qualified medical practitioner within 30 days of placement that is in accordance with the health screening recommended by the AAP.[1]* | *1* | *197* | *1%* | *1%* |

**A. Percent of Children with CHA  Completed Within 30 Days After Placement**

*Among completed CHAs, the number of days before the CHA was completed ranged from 0 to 418, with an average of 32 days and median of 5 days.  Among completed CHAs, 90% were completed within 60 days.*

| | Numerator | Denominator | Percent | Margin of Error |
|---|---|---|---|---|
| CHA completed within 30 days of placement | 112 | 197 | 57% | 7% |
| CHA completed after 30 days in placement | 25 | 197 | 13% | 5% |
| CHA not completed | 60 | 197 | 30% | 6% |

**B. Percent of Children with CHA Conducted by a Qualified Medical Practitioner, By Provider Type[2]**

| | Numerator | Denominator | Percent | Margin of Error |
|---|---|---|---|---|
| CHA completed by qualified provider | 94 | 197 | 48% | 7% |
| Licensed MD or DO, Child Abuse Pediatric specialty | 5 | 197 | 3% | 2% |
| Licensed MD or DO, General Pediatric specialty | 34 | 197 | 17% | 5% |
| Licensed MD or DO, no pediatric specialty | 27 | 197 | 14% | 5% |
| Pediatric Nurse Practitioner (RN) | 8 | 197 | 4% | 3% |
| Family Nurse Practitioner (RN) | 20 | 197 | 10% | 4% |
| CHA completed, provider qualifications could not be verified | 43 | 197 | 22% | 6% |
| Not enough information to identify practitioner in case file | 28 | 197 | 14% | 5% |
| No evidence to verify licensure status of identified practitioner | 3 | 197 | 2% | 2% |
| Could not determine qualifications of practitioner based on available licensure data | 12 | 197 | 6% | 3% |
| CHA not completed | 60 | 197 | 30% | 6% |

**C. Percent of Children With CHA Conducted in Accordance with the Health Screening Components Recommended by the AAP[3]**

| | Numerator | Denominator | Percent | Margin of Error |
|---|---|---|---|---|
| All recommended AAP components documented on CHA | 4 | 197 | 2% | 2% |
| 8 components (adolescents age 11 and older) | 1 | 52 | 2% | 4% |
| 7 components (children younger than 11) | 3 | 145 | 2% | 2% |
| Some of the recommended AAP components documented on CHA | 121 | 197 | 61% | 7% |
| 7 components (adolescents age 11 and older) | 8 | 52 | 15% | 10% |
| 6 components | 34 | 197 | 17% | 5% |
| 5 components | 41 | 197 | 21% | 6% |
| 4 components | 26 | 197 | 13% | 5% |
| 3 components | 9 | 197 | 5% | 3% |
| 2 components | 2 | 197 | 1% | 1% |
| 1 component | 1 | 197 | 1% | 1% |
| No AAP components documented on CHA | 1 | 197 | 1% | 1% |
| CHA completed, but no copy of CHA found in paper case file | 11 | 197 | 6% | 3% |
| CHA not completed | 60 | 197 | 30% | 6% |

## Table 3 - MSA II.B.3.b. Comprehensive Health Assessment

| | Numerator | Denominator | Percent | Margin of Error |
|---|---|---|---|---|
| **D. Percent of Children With CHA Conducted in Accordance with the Health Screening Elements Recommended by the AAP[3]** | | | | |
| All applicable AAP elements documented on CHA | 0 | 197 | 0% | 0% |
| 75-99% of recommended AAP elements documented on CHA | 4 | 197 | 2% | 2% |
| 50-74% of recommended AAP elements documented on CHA | 24 | 197 | 12% | 5% |
| 25-49% of recommended AAP elements documented on CHA | 72 | 197 | 37% | 7% |
| 1-24% of recommended AAP elements documented on CHA | 25 | 197 | 13% | 5% |
| No AAP elements documented on CHA | 1 | 197 | 1% | 1% |
| CHA completed, but no copy of CHA found in paper case file | 11 | 197 | 6% | 3% |
| CHA not completed | 60 | 197 | 30% | 6% |
| **E. Percent of Children By Each AAP Component and Element Documented on the CHA** | | | | |
| *Vital signs* | *121* | *197* | *61%* | *7%* |
|     Vital signs | 115 | 197 | 58% | 7% |
|     Blood pressure | 99 | 197 | 50% | 7% |
| *Growth parameters* | *125* | *197* | *63%* | *7%* |
|     Head circumference (under age 3) | 20 | 50 | 40% | 14% |
|     Body mass index (BMI) (ages 2 and older) | 60 | 158 | 38% | 8% |
|     Height | 123 | 197 | 62% | 7% |
|     Weight | 122 | 197 | 62% | 7% |
|     Percentiles or growth parameters | 19 | 197 | 10% | 4% |
|     Growth chart with information recorded | 13 | 197 | 7% | 3% |
| *Physical examination* | *114* | *197* | *58%* | *7%* |
|     Physical exam (PE) | 102 | 197 | 52% | 7% |
|     Range of motion examination of all joints (ROM) | 41 | 197 | 21% | 6% |
|     Physical examination of each area of skin | 87 | 197 | 44% | 7% |
|     External genitalia inspections | 68 | 197 | 35% | 7% |
| *Review of history* | *99* | *197* | *50%* | *7%* |
|     Birth weight or gestational age (under age 2) | 9 | 39 | 23% | 13% |
|     Assessment of chronic conditions | 37 | 197 | 19% | 5% |
|     Review of medical history | 70 | 197 | 36% | 7% |
|     Review of behavior and/or mental health history | 37 | 197 | 19% | 5% |
|     Review of developmental and/or educational history | 46 | 197 | 23% | 6% |
|     Review of the child's social history | 66 | 197 | 34% | 7% |
|     Review of the child's immunization records | 57 | 197 | 29% | 6% |
|     Review of systems (standard medical review) (ages 8 and older) | 24 | 78 | 31% | 10% |
| *Physical screening* | *73* | *197* | *37%* | *7%* |
|     Hearing screen (ages 4 and older) | 42 | 125 | 34% | 8% |
|     Vision screen (ages 4 and older) | 52 | 125 | 42% | 9% |
|     Dental and oral screen | 47 | 197 | 24% | 6% |
| *Mental health and developmental screening* | *74* | *197* | *38%* | *7%* |
|     Developmental screen using validated instrument (under age 5) | 6 | 78 | 8% | 6% |
|     Mental health screen using validated instrument (ages 5 and older) | 3 | 119 | 3% | 3% |

Table 3 - MSA II.B.3.b. Comprehensive Health Assessment

| | Numerator | Denominator | Percent | Margin of Error |
|---|---|---|---|---|
| *Laboratory screening* | *74* | *197* | *38%* | *7%* |
| Lead level (ages birth to five) | 13 | 94 | 14% | 7% |
| Urinalysis (ages 4 and older) | 33 | 125 | 26% | 8% |
| Hemoglobin (HGB), Hematocrit (HCT), complete blood count (CBC) | 58 | 197 | 29% | 6% |
| Purified protein derivative tuberculin (PPD) or quantiferon | 5 | 197 | 3% | 2% |
| Rapid plasma regain (RPR) | 6 | 197 | 3% | 2% |
| HIV | 9 | 197 | 5% | 3% |
| Hepatitis B surface antigen (HBsAg) | 8 | 197 | 4% | 3% |
| Hepatitis C antibody screen | 3 | 197 | 2% | 2% |
| Hepatitis panel (includes B and C) | 5 | 197 | 2% | 2% |
| *Adolescent care (ages 11 and older)* | *24* | *52* | *46%* | *14%* |
| Relationships with birth family | 9 | 52 | 17% | 10% |
| Relationships with foster family | 5 | 52 | 10% | 8% |
| Adjustment to foster care | 7 | 52 | 13% | 9% |
| Peer relationships | 5 | 52 | 10% | 8% |
| Alcohol, drug or tobacco use | 12 | 52 | 23% | 11% |
| Sexual orientation | 1 | 52 | 2% | 4% |
| Sexual activity | 10 | 52 | 19% | 11% |
| Prevention of sexually transmitted diseases | 2 | 52 | 4% | 5% |
| Birth control | 4 | 52 | 8% | 7% |
| Nutrition | 11 | 52 | 21% | 11% |
| Physical activity (i.e., exercise) | 6 | 52 | 12% | 9% |
| School performance | 9 | 52 | 17% | 10% |
| Hobbies | 3 | 52 | 6% | 6% |
| Educational plans or career plans | 2 | 52 | 4% | 5% |

[1] The sample used to evaluate the CHA includes only the statewide representative sample of children who received a full review.  One child was excluded from the analysis because he was hospitalized for the first month and a half he was in custody, for a sample size of 197.

[2] AAP standards define medical practitioners qualified to complete the CHA as pediatric nurse practitioners, physician of child care agency, or primary care physician.  For the purpose of this review, qualified medical practitioners are defined as licensed MD or DOs and licensed pediatric and family nurse practitioners.

[3] AAP specifies 46 elements of the CHA, which are organized into 8 components.  Some elements are only applicable to children in certain age groups.  The data presented here include total counts of the applicable age-appropriate AAP components.

[4] The sample selection was designed as a statewide representative sample of entries into DFCS custody.  While the sample is representative of the full population of entries, it is not necessarily representative of specific subgroups of children.  Estimates that are applicable only to a smaller subpopulation, such as the age-specific AAP components on the CHA, will have a smaller denominator and a larger margin of error than other analyses.

## MSA II.B.3.d. Follow-Up Medical Services

### MSA Requirement

All children shall receive periodic medical examinations and all medically necessary follow-up services and treatment throughout the time they are in state custody, in accordance with the time periods recommended by the American Academy of Pediatrics.  (MSA II.B.3.d.)

### Operationalization and Measurement

*Periodic medical examinations.*  Reviewers were asked to enter dates of periodic medical examinations chronologically in the "Periodic Medical Examination" section of the review instrument; however several issues suggested that the data collected by reviewers related to periodic medical examinations was unreliable and unusable.  During the quality assurance process, we found that reviewers were including dates of follow-up medical visits along with well-child check-ups.  During data analysis, over 51% of cases with periodic medical examination data included multiple dates within the same month.  Based on this information, it does not appear that these data were focused solely on periodic medical exams as outlined in the instructions provided to the reviewers and the quality assurance protocol.  At the data analysis stage, it was not possible to distinguish follow-up exams from periodic exams without re-reviewing the primary documentation.  Analyzing the data would likely over-estimate the frequency of periodic medical exams, as well as the percent of children who received periodic medical exams within AAP timeframes.  Therefore, we did not analyze periodic medical examination data, and analysis of this requirement is limited only to follow-up medical services.

*Follow-up medical recommendations.*  MSA II.B.3.d. requires that children receive all "medically necessary" follow-up services and treatment throughout the time that they are in custody.  For the purpose of this review, "medically necessary" medical services were defined as follow-up medical services, treatments and/or equipment that were recommended by a medical professional.  To evaluate follow-up services and treatment, reviewers indicated whether any follow-up medical services, treatments, and/or equipment were recommended for the child to receive during the period under review.  For each recommendation, reviewers indicated whether there was evidence that the recommendation was received by the child, whether receipt was timely, and what barriers prevented the child from receiving services.

*Inter-rater agreement* for medical follow-up data in the inter-rater reliability subsample was 87.5%.

### Sample

The sample used to evaluate whether follow-up medical services, treatments, and/or equipment were received, included 67 of the 198 children in the statewide representative sample (full review) for whom follow up services were recommended.

### Findings Related to Follow Up Medical Services

---

MSA II.B.3.d.   58% of children for whom follow up services, treatment and/or equipment were recommended received all recommended follow-up.

---

**Children who Required Follow Up:  34% of children entering foster care had one or more medical follow-up recommended.**  The number of follow-up medical service, treatment and/or equipment recommendations per child ranged from zero to eight.

**Children who Received Recommended Follow-Up:**

- 18% of children for whom follow up services, treatment and/or equipment was recommended received some of the recommended follow-up.
- 1% did not receive any of the recommended follow-up.
- For 22% percent of the children for whom follow up was recommended, a determination could not be made regarding whether it was received based on the documentation in the case record.

## Table 4 - MSA II.B.3.d. Follow-Up Medical Services

| | Numerator | Denominator | Percent | Margin of Error |
|---|---|---|---|---|
| *Percent of children with medical needs who received all recommended follow-up medical services, treatments, and/or equipment.[1,2,3]* | 39 | 67 | 58% | 12% |
| **Percent of Children With Recommended Follow-Up Medical Services, Treatments and/or Equipment, by Number of Recommendations [4]** | | | | |
| No medical follow-up recommended | 131 | 198 | 66% | 7% |
| At least one medical follow-up recommended | 67 | 198 | 34% | 7% |
| 1 follow-up medical recommendation | 38 | 67 | 57% | 12% |
| 2 follow-up medical recommendations | 14 | 67 | 21% | 10% |
| 3 follow-up medical recommendations | 6 | 67 | 9% | 7% |
| 4 follow-up medical recommendations | 2 | 67 | 3% | 4% |
| 5 follow-up medical recommendations | 3 | 67 | 4% | 5% |
| 6 follow-up medical recommendations | 1 | 67 | 1% | 3% |
| 7 follow-up medical recommendations | 2 | 67 | 3% | 4% |
| 8 follow-up medical recommendations | 1 | 67 | 1% | 3% |
| **Percent of Children Who Received Recommended Follow-Up Medical Services and Treatment** | | | | |
| All recommended medical follow-up was received | 39 | 67 | 58% | 12% |
| Some recommended medical follow-up was received | 12 | 67 | 18% | 9% |
| No recommended medical follow-up was received | 1 | 67 | 1% | 3% |
| Cannot determine whether medical follow-up was received | 15 | 67 | 22% | 10% |

[1] MSA II.B.3.d. requires that children receive periodic medical examinations in accordance with timeframes recommended by the AAP.  The case record review instrument was designed to collect periodic medical examination data to capture the portion of the requirement. However, 51% of the cases with data for these items included multiple dates within the same month.  The Court Monitor's office is concerned that these data were not focused solely on periodic medical exams as outlined in the instructions and quality assurance protocol.  For at least half of cases, dates of follow-up medical services were also included in this section, which made it impossible to distinguish follow-up from periodic exams.  Analyzing the data would likely over-estimate the frequency of periodic medical exams as well as the percent of children who received periodic medical exams within AAP timeframes.

[2] The sample used to evaluate whether follow-up medical services, medications and/or equipment were received, and the full requirement, includes only 67 children in the statewide representative sample (full review) who were recommended to receive medical follow-up.

[3] MSA II.B.3.d. requires that children receive all "medically necessary" follow-up services and treatment throughout the time that they are in custody.  For the purpose of this review, "medically necessary" medical services were defined as follow-up medical services, treatments and/or equipment that were recommended by a medical professional.

[4] The sample used to evaluate whether follow-up medical services, treatments and/or equipment were recommended includes only 198 children in the statewide representative sample (full review).

## MSA II.B.3.e. Initial Dental Examination and Follow-Up Dental Services

### MSA Requirement

MSA II.B.3.e. requires that every child three years old and older shall receive a dental examination within 90 calendar days of foster care placement and every six months thereafter.  Every foster child who reaches the age of three in care shall be provided with a dental examination within 90 calendar days of his/her third birthday and every six months thereafter.  Every foster child shall receive all medically necessary dental services.

### Operationalization and Measurement

*Timeliness and completion of initial dental examination.*  Information about the date of the first dental examination while the child was in DFCS custody was collected from the case record.

*Provider qualifications.*  Reviewers were asked to list the name of the provider and any other identifying information about the provider who completed the initial dental examination.  Following the onsite review, the Court Monitor's office verified the licensure status of each practitioner in order to determine whether the practitioner was licensed.[19]   In instances in which the identity of the provider could not be determined from the case record,[20]  the provider was coded as "Not enough information to identify practitioner in case file" and counted as "qualifications could not be verified" and did not meet this portion of the MSA requirement.

*Periodic dental examinations.*  The data related to periodic dental examinations that was collected raised concerns similar to those described above in the Medical Follow-Up section related to periodic medical examinations.  Data cleaning and analysis revealed that 102 cases included data about periodic dental examinations.  Of those with periodic dental examination data, 51% of cases included multiple dates within the same month.  This likely indicates that follow-up dental services were categorized as periodic dental examinations.  Thus, it is not possible to isolate the periodic examinations because reviewers did not distinguish between periodic examinations and follow-up services when entering the data collected from the case records into the review instrument.  Therefore, evaluation of MSA II.B.3.e. is limited to the initial dental examination and recommended follow-up dental services during the PUR.

*Follow-up dental recommendations.*  MSA II.B.3.e. requires that all foster children receive all medically necessary dental services.  For the purpose of this review, "medically necessary" dental services were operationalized as dental services that are recommended by dental providers.

*Inter-rater agreement* on the initial dental examination items was 91.5%.  Inter-rater agreement on follow-up services was 87.5%.

### Sample

The sample used to evaluate dental examination completion/timeliness includes  156 children ages three and older or turning three in the statewide representative sample (full review) and 93 children in the oversample (targeted review), for a total of 249 applicable cases.

---

[19] The licensure status of dentists was verified with the Mississippi State Board of Dental Examiners.
[20] The provider could not be determined in instances where there was no copy of the dental examination in the case file or the provider signature was illegible and there was no other identifying information available.

The sample used to evaluate follow-up dental services, includes 156 children ages three and older at entry or who turned three while in custody in the statewide representative sample who received the full review.

Findings Related to Initial Dental Examination and Follow-Up Services

MSA II.B.3.e.    44% of children age three or older or turning three while in care received a dental examination within 90 days of entering custody or their third birthday and all applicable follow-up dental services.

**Timeliness:  47% of children age three or older or who turned three while in care received an initial dental examination within 90 days of entering custody or their third birthday.**

- 22% of children age three or older or who turned three while in care received a dental examination after 90 days of entering custody or their third birthday.
- 31% of children age three or older or who turned three while in care did not receive a dental examination at any time during the custody episode.

**13% of children age three or older or who turned three while in care had identified dental needs** that required follow-up dental services.

**Recommended Follow-Up Dental Services:  48% of children age three or older or who turned three while in care with identified dental needs received all recommended follow-up dental services.** Calculations about follow-up dental services have a wide margin of error (21%) because the estimate is based on a very small sample of cases of children three or turning three with identified dental needs (n=21 children).

- Of children age three or older or who turned three while in care had identified dental needs:
  - 48% received all recommended follow-up,
  - 5% received some recommended follow-up,
  - 24% received none of the recommended follow up, and
  - 24% cannot determine from the case record whether follow-up was received.

## Table 5 - MSA II.B.3.e. Initial Dental Examination and Follow-Up Dental Services

| | Numerator | Denominator | Percent | Margin of Error |
|---|---|---|---|---|
| *Percent of children ages three and older entering foster care or turning three while in custody who received a dental examination within 90 days of entry into DFCS custody or their third birthday, and who received all recommended follow-up dental services.[1,2]* | 69 | 156 | 44% | 8% |
| **Percent of Children Three Years and Older at Entry, and Turning Three While in Custody, With Dental Examination Completed Within 90 Days [3]** | | | | |
| Dental exam within 90 days of entry or third birthday | 117 | 249 | 47% | 6% |
| Dental exam after 90 days of entry or third birthday | 56 | 249 | 22% | 5% |
| No dental examination | 76 | 249 | 31% | 6% |
| **Percent of Children with Dental Exam Conducted by Licensed DDS or DMD** | | | | |
| Provider licensed DDS or DMD by the Mississippi State Board of Dental Examiners | 93 | 249 | 37% | 6% |
| Provider licensed with specialty in Pediatrics | 18 | 249 | 7% | 3% |
| No evidence that provider was licensed by the Mississippi State Board of Dental Examiners | 6 | 249 | 2% | 2% |
| Provider could not be determined from case record | 56 | 249 | 22% | 5% |
| No dental exam documented in case record | 76 | 249 | 31% | 6% |
| **Percent of Children With Dental Diagnoses and/or Dental Service Recommendations [4]** | | | | |
| Follow-up dental services recommended | 21 | 156 | 13% | 5% |
| All recommended dental services were received | 10 | 21 | 48% | 21% |
| Some recommended dental services were received | 1 | 21 | 5% | 9% |
| No recommended dental services were not received | 5 | 21 | 24% | 18% |
| Cannot determine whether applicable dental services were received | 5 | 21 | 24% | 18% |
| Dental exam was not completed; follow-up dental services needs are unknown | 41 | 156 | 26% | 7% |
| Dental exam completed, no follow-up dental services recommended | 94 | 156 | 60% | 8% |

[1] MSA II.B.3.e. requires a dental examination for every child three years old or older within 90 days of entry or third birthday and every six months thereafter. The case record review instrument was designed to collect periodic dental examination data to capture the "every six month" portion of the requirement. However, 51% of the cases with data for these items included multiple dates within the same month. The Court Monitor's office is concerned that these data were not focused solely on periodic dental exams as outlined in the instructions and quality assurance protocol. For at least half of cases, dates of follow-up dental services were also included, which made it impossible to distinguish follow-up services from periodic exams during data analysis. Analyzing the data would likely over-estimate the frequency of periodic dental exams as well as the percent of children who received dental exams every six months.

[2] The sample used to evaluate follow-up dental services, and the full requirement, includes only 156 children ages three and older at entry or who turned three while in custody in the statewide representative sample that received a full review.

[3] The sample used to evaluate dental examination completion/timeliness and qualifications of dental practitioners includes 156 children ages three and older or turning three in the statewide representative sample (full review) and 93 children in the oversample (targeted review), for a total of 249 applicable cases. The full analysis is calculated based on the 156 children whose cases received the full review because not all questions necessary for the analysis were reviewed for the oversample; the oversample review focused only on the timeliness and completion of the initial dental assessment.

[4] MSA II.B.3.e. requires that all foster children receive all medically necessary dental services. For the purpose of this review, "medically necessary" dental services were operationalized as dental services recommended by dental providers.

## MSA II.B.3.f. Mental Health Assessment and Follow-Up Mental Health Services

### MSA Requirement

Every child four years old and older shall receive a mental health assessment by a qualified professional within 30 calendar days of foster care placement. Every foster child who reaches the age of four in care shall receive a mental health assessment within 30 calendar days of his/her fourth birthday. Every foster child shall receive recommended mental health services pursuant to his/her assessment. (MSA II.B.3.f.)

### Operationalization and Measurement

*Timeliness and completion of initial mental health assessment.*  Information about the date of the first mental health assessment while the child was in DFCS custody was collected from the case record.

*Qualified professionals.*  The relevant AAP standards recommend that the following categories of providers conduct the assessments: board-certified physicians, licensed psychologists, Nurse Practitioners and certified social workers.  We expanded the definition to also include licensed therapists and counselors.  Therefore, for purposes of this assessment the following categories of providers were considered to be qualified to perform the assessments:

- Licensed PhD or PsyD psychologist
- Licensed and certified Social Worker
- Licensed, MD, Psychiatrist
- Licensed Therapist/Counselor (LPC, PCMHT, CMHT)

Reviewers were asked to list the name of the provider and any other identifying information about the provider who completed the mental health assessment.  Following the onsite review, the Court Monitor's office verified the licensure status of each practitioner in order to determine whether the practitioner was licensed.[21]   In instances in which the identity of the provider could not be determined from the case record,[22]  the provider was coded as "Not enough information to identify practitioner in case file" and counted as "qualifications could not be verified" and did not meet this portion of the MSA requirement.

*Follow-up mental health recommendations.*  MSA II.B.3.f. requires that all foster children receive all recommended follow-up mental health medications and/or services.  Recommended mental health follow-up was recorded based on documentation in the case record.

*Inter-rater agreement* for the mental health assessment was 82.6%.

### Sample

The sample used to evaluate mental health assessment completion/timeliness included 237 children ages four and older or who turned four with 149 of this sum in the statewide representative sample subject to the full review and 88 of this sum in the oversample (targeted review).   The sample used to

---

[21] The licensure status of psychologists was verified with the Mississippi Board of Psychology.  The licensure status of Social Workers was verified with the Mississippi State Board of Examiners for Social Workers and Marriage and Family Therapists.

[22] The provider could not be determined in instances where there was no copy of the mental health assessment in the case file or the provider signature was illegible and there was no other identifying information available.

evaluate follow-up mental health services, included 73 children ages four and older in the statewide representative sample who received a full review and for whom follow up services were recommended.

Findings Related to Mental Health Assessment and Follow-Up Services

---

MSA II.B.3.f.    10% of children age four at the time of entry or who turned four while in DFCS custody received a mental health assessment that was conducted by a qualified professional within 30 calendar days of foster care placement or their fourth birthday, and received all recommended follow-up mental health services.

---

**Timeliness of Assessment:  26% of children age four and older at the time of entry or who turned four while in DFCS custody received a mental health assessment within 30 calendar days.**

- 32% received a mental health assessment after 30 calendar days.
- 42% did not receive a mental health assessment.

**Qualified Professional:   39% of children age four or older at the time of entry or who turned four while in DFCS custody received a mental health assessment by a qualified professional.**

- 2% were completed by a professional who did not meet AAP qualifications.
- 7% did not have sufficient information to verify licensure status of the identified provider.
- 11% were completed by a provider who could not be identified based on information contained in the case record.

**Recommended Mental Health Follow-Up: 49% of children age four at the time of entry or who turned four while in custody had follow-up mental health recommendations documented in their case record.**

**47% of children age four or older at the time of entry or who turned four while in DFCS custody who had recommended follow-up mental health received all recommended services and/or medications.**

- 18% received some recommended services and/or medications
- 8% received no recommended services and/or medication
- 27% could not determine whether the child received recommended services and/or medications.

## Table 6 - MSA II.B.3.f. Mental Health Assessment and Follow-Up Mental Health Services

| | Numerator | Denominator | Percent | Margin of Error |
|---|---|---|---|---|
| *Percent of children ages four and older at the time of entry or turning four while in custody who received a mental health assessment by a qualified professional[1] within 30 days of entry into DFCS custody or their fourth birthday, and who received all recommended follow-up mental health medications and/or services.[2]* | *15* | *149* | 10% | 5% |
| **Percent of Children Who Received a Mental Health Assessment Within 30 Days [3]** | | | | |
| Children aged four at the time of entry or turning four while in custody who received a mental health assessment within 30 days of foster care placement or 30 days of fourth birthday. | 61 | 237 | 26% | 6% |
| Children aged four at the time of entry or turning four while in custody who received a mental health assessment after 30 days of foster care placement or 30 days of fourth birthday. | 77 | 237 | 32% | 6% |
| Children aged four at the time of entry or turning four while in custody who did not receive a mental health assessment. | 99 | 237 | 42% | 6% |
| **Percent of Children with Mental Health Assessment Conducted by a Qualified Professional, by Provider Type** | | | | |
| Mental health assessment completed by qualified provider | 92 | 237 | 39% | 6% |
| Licensed PhD or PsyD, Psychologist | 61 | 237 | 26% | 6% |
| Licensed and Certified Social Worker | 17 | 237 | 7% | 3% |
| Licensed MD, Psychiatrist | 7 | 237 | 3% | 2% |
| Licensed therapist/counselor (LPC, PCMHT, CMHT) | 7 | 237 | 3% | 2% |
| Mental health assessment completed, provider does not meet AAP qualifications | 5 | 237 | 2% | 2% |
| Licensed Social Worker (LSW, LMSW) | 4 | 237 | 2% | 2% |
| Licensed MD or DO, no pediatric specialty | 1 | 237 | 0% | 1% |
| Mental health assessment completed, provider qualifications could not be verified | 41 | 237 | 17% | 5% |
| Not enough information to identify practitioner in case file | 25 | 237 | 11% | 4% |
| No evidence to verify licensure status of identified practitioner | 16 | 237 | 7% | 3% |
| Mental health assessment not completed | 99 | 237 | 42% | 6% |
| **Percent of Children Who Received Recommended Mental Health Services and/or Medications** | | | | |
| Follow-up mental health services and/or medications recommended | 73 | 149 | 49% | 8% |
| All services and/or medications received | 34 | 73 | 47% | 11% |
| Some services and/or medications received | 13 | 73 | 18% | 9% |
| No services and/or medications received | 6 | 73 | 8% | 6% |
| Cannot determine | 20 | 73 | 27% | 10% |
| Mental health assessment was not completed; follow-up mental health needs are unknown | 45 | 149 | 30% | 7% |
| Mental health assessment completed; no follow-up mental health recommendations were documented in the case record | 31 | 149 | 21% | 7% |

[1] AAP standards include board-certified physicians, licensed psychologists, NPs and certified social workers.

[2] The sample used to evaluate follow-up mental health services, and the full requirement, includes 149 children ages four and older in the statewide representative sample that received a full review.

[3] The sample used to evaluate mental health assessment completion/timeliness includes 237 children ages four and older or turning four in the statewide representative sample (full review) and the oversample (targeted review).  The full analysis is calculated based on the 149 children whose cases received the full review because not all questions necessary for the analysis were reviewed for the oversample; the oversample review focused only on the timeliness and completion of the initial mental health assessment.

## MSA II.B.3.g. Developmental Assessment and Follow-Up Developmental Services

### MSA Requirement

Every foster child ages birth through three shall receive a developmental assessment by a qualified professional within 30 days of foster care placement, and each child older than three shall be provided with a developmental assessment if there are documented factors that indicate such an assessment is warranted. All foster children shall be provided with needed follow-up developmental services.  (MSA II.B.g.3.)

### Operationalization and Measurement

*When developmental assessments are warranted for children older than three.*  The Court Monitor's office attempted to locate policy guidance from DFCS about what factors indicate when an assessment is warranted, but DFCS does not have specific policy or practice guidelines that define these factors.  For the purpose of this review, a list of indicators was developed by the medical expert providing consultation on this review.   The list included "major indicators" that, on their own, warrant a developmental assessment, as well as "minor indicators" that, when seen together, warrant a developmental assessment.  If a child over the age of three had one or more major indicator, and/or three or more minor indicators, we determined that the documented factors indicated that a developmental assessment was warranted.

*Major indicators (one warrants developmental assessment)*
- Poor school or pre-school functioning (i.e., learning or behavioral)
- Poor peer relationships

*Minor indicators (three or more warrant developmental assessment)*
- Behaviors not age-appropriate (e.g., withdrawn, excessive tantrums, aggressive behavior, hyperactivity, sleep problems)
- Difficulty with transitions
- Language, motor or social-emotional skills did not appear to be age level
- Engagement in impulsive, potentially dangerous behaviors
- Family history of developmental issues
- School suspensions
- Lack of interest in normal activities
- Lack of empathy

*Timeliness and completion.*  Dates of developmental assessments were collected from case records, along with the provider who completed the developmental assessment.

*Inter-rater agreement* about timeliness and completion of developmental assessments was 93.5%.

*Qualified professional.*  AAP standards list professionals qualified to conduct developmental assessments as board-certified physicians (DO, MD), licensed psychologists (PhD, PsyD), and nurse practitioners (PNP,

FNP).  We expanded the list of qualified professionals to include the following categories of licensed providers:

- MD or DO, Child Abuse Pediatric specialty
- MD or DO, General Pediatric specialty
- MD or DO, Pediatric Critical Care specialty
- MD, Psychiatrist
- PhD or PsyD, Psychologist
- MD or DO, no Pediatric specialty
- Pediatric Nurse Practitioner
- Family Nurse Practitioner

Names and other identifying information concerning the professionals were collected from the case record during the review.  The Court Monitor's office verified the licensure status of all professionals through the Mississippi Board of Medical Licensure, Mississippi Board of Nursing, Mississippi Board of Psychology, and the Mississippi Department of Health–Division of Professional Licensure.  In instances in which the identity of the provider could not be determined from the case record,[23]  the provider was coded as "Not enough information to identify practitioner in case file" and counted as "qualifications could not be verified" and, for purposes of this analysis, were not deemed to meet this portion of the MSA requirement.

### Sample

The sample used to evaluate developmental assessment completion/timeliness included 321 children, with 198 of this sum in the statewide representative sample subject to the full review and 123 of this sum in the oversample (targeted review).   The sample used to evaluate follow-up developmental services included 115 children in the statewide representative sample subject to the full review for whom a developmental assessment was warranted.  73 of the children for whom a developmental assessment was warranted were children ages birth to three, and 42 were older than three.

*Inter-rater agreement* on indicators that a developmental assessment was warranted was 74.0%, which falls below an acceptable threshold of 80% agreement.  Reviewers did not identify the same indicators as one another in five of the six cases in the inter-rater reliability subsample; some reviewers identified one or more indicators when others did not.  Based on these considerations, results about timeliness and completion of developmental assessments are presented separately for (1) children ages birth to three, and (2) children older than three for whom a developmental assessment was warranted.

### Findings

MSA II.B.3.g.     17% of children age birth to three or older than three when warranted received a developmental assessment by a qualified professional within 30 days of foster care placement and received all applicable follow-up developmental services.

---

[23] The provider could not be determined in instances where there was no copy of the developmental assessment in the case file or the provider signature was illegible and there was no other identifying information available.

**Timeliness and completion: 23% of children age birth to three or older than three when warranted received a developmental assessment within 30 days of foster care placement**—including 18% of children birth to three and 35% of children older than three when indicated.

- 27% received a developmental assessment after 30 days of placement—including 28% of children age birth to three and 27% of children older than three when warranted.
- 50% did not receive a developmental assessment—including 54% of children age birth to three and 38% of children older than 3 when warranted.

**Qualified professional: 17% of children age birth to three or older than three when indicated received a developmental assessment from a qualified professional.**

- 5% received a developmental assessment from a provider who did not meet AAP qualifications.
- 28% received a developmental assessment from a provider whose qualifications could not be verified.

**Children with Follow-Up Recommendations:** 14% of children age birth to three or older than three with developmental assessment warranted had developmental service recommendations documented in their case record.

**Follow-Up on Recommendations: 69% of children with follow-up developmental services recommended received all recommended developmental services.**

- 13% received some of the recommended developmental services.
- 13% received none of the recommended developmental services.
- 6% could not determine from the case record whether recommended developmental services were received.

## Table 7 - MSA II.B.3.g. Developmental Assessment and Follow-Up Developmental Services

| | Numerator | Denominator | Percent | Margin of Error |
|---|---|---|---|---|
| *Percent of children ages birth through three, and children older than three with documented factors that indicate a developmental assessment was warranted, who received a developmental assessment by a qualified professional within 30 calendar days of foster care placement, and who received all applicable follow-up developmental services.[1]* | *20* | *115* | 17% | 7% |
| **Percent of Children For Whom Documented Factors Indicated that a Developmental Assessment Was Warranted, by Type of Indicator** (multiple indicators could be identified for each child)[2] | | | | |
| Children for whom developmental assessment was warranted | 204 | 321 | 64% | 5% |
| Children ages birth to 3 at the time of entry into foster care | 152 | 321 | 47% | 5% |
| Children older than 3 with one or more indicators that a developmental assessment was warranted (indicators are not mutually exclusive) | 52 | 321 | 16% | 4% |
| *Major indicators (one warrants developmental assessment)* | | | | |
| Poor school or pre-school functioning (i.e., learning or behavioral) | 46 | 321 | 14% | 4% |
| Poor peer relationships | 19 | 321 | 6% | 3% |
| *Minor indicators (three or more warrant developmental assessment)* | | | | |
| Behaviors not age-appropriate (e.g., withdrawn, excessive tantrums, aggressive behavior, hyperactivity, sleep problems) | 63 | 321 | 20% | 4% |
| Difficulty with transitions | 34 | 321 | 11% | 3% |
| Language, motor or social-emotional skills did not appear to be age level | 28 | 321 | 9% | 3% |
| Engagement in impulsive, potentially dangerous behaviors | 28 | 321 | 9% | 3% |
| Family history of developmental issues | 12 | 321 | 4% | 2% |
| School suspensions | 10 | 321 | 3% | 2% |
| Lack of interest in normal activities | 3 | 321 | 1% | 1% |
| Lack of empathy | 2 | 321 | 1% | 1% |
| Children older than 3 with no indicators that a developmental assessment was warranted | 117 | 321 | 36% | 5% |
| **Percent of Children Who Received Developmental Assessment Within 30 Days of Placement[3]** | | | | |
| Received a developmental assessment within 30 days | 46 | 204 | 23% | 6% |
| Ages birth to three | 28 | 152 | 18% | 6% |
| Older than 3 with indicator assessment was warranted | 18 | 52 | 35% | 13% |
| Received a developmental assessment after 30 days | 56 | 204 | 27% | 6% |
| Ages birth to three | 42 | 152 | 28% | 7% |
| Older than 3 with indicator assessment was warranted | 14 | 52 | 27% | 12% |
| Did not receive a development assessment | 102 | 204 | 50% | 7% |
| Ages birth to three | 82 | 152 | 54% | 8% |
| Older than 3 with indicator assessment was warranted | 20 | 52 | 38% | 13% |

## Table 7 - MSA II.B.3.g. Developmental Assessment and Follow-Up Developmental Services

| | Numerator | Denominator | Percent | Margin of Error |
|---|---|---|---|---|
| **Percent of Children with Developmental Assessment Conducted by a Qualified Professional, by Provider Type** | | | | |
| Developmental assessment completed by qualified provider | 35 | 204 | 17% | 5% |
| Licensed MD or DO, General Pediatric specialty | 12 | 204 | 6% | 3% |
| Licensed MD or DO, no pediatric specialty | 10 | 204 | 5% | 3% |
| Family Nurse Practitioner (RN) | 6 | 204 | 3% | 2% |
| Licensed PhD or PsyD, Psychologist | 3 | 204 | 1% | 2% |
| Pediatric Nurse Practitioner (RN) | 2 | 204 | 1% | 1% |
| Licensed MD or DO, Pediatric Critical Care specialty | 1 | 204 | 0% | 1% |
| Licensed MD, Psychiatrist | 1 | 204 | 0% | 1% |
| Developmental assessment completed by provider that does not meet AAP qualifications | 11 | 204 | 5% | 3% |
| Speech language pathologist | 5 | 204 | 2% | 2% |
| School psychologist, Special Education or Speech teacher | 4 | 204 | 2% | 2% |
| LPN | 1 | 204 | 0% | 1% |
| Licensed Occupational Therapist | 1 | 204 | 0% | 1% |
| Developmental assessment completed, provider qualifications could not be verified | 57 | 204 | 28% | 6% |
| Not enough information to identify practitioner in case file | 44 | 204 | 22% | 6% |
| No information to verify licensure status of identified practitioner | 8 | 204 | 4% | 3% |
| Could not determine qualifications of practitioner based on available licensure data | 5 | 204 | 2% | 2% |
| Developmental assessment not completed | 101 | 204 | 50% | 7% |
| **Percent of Children Who Received Follow-Up Developmental Services to Address Identified Diagnoses and/or Fulfill Developmental Service Recommendations** | | | | |
| Developmental assessment was warranted but not completed; follow-up developmental service needs are unknown | 50 | 115 | 43% | 9% |
| Developmental assessment completed; no developmental follow-up service recommendations were documented in the case record | 49 | 115 | 43% | 9% |
| Developmental follow-up services recommended | 16 | 115 | 14% | 6% |
| All recommended developmental services were received | 11 | 16 | 69% | 23% |
| Some recommended developmental services were received | 2 | 16 | 13% | 16% |
| No recommended developmental services were received | 2 | 16 | 13% | 16% |
| Cannot determine whether developmental services were received | 1 | 16 | 6% | 12% |

[1] The sample used to evaluate follow-up services, and the full requirement, includes 115 children in the statewide representative sample for whom a developmental assessment was warranted (i.e., children ages birth through three and children older than three with documented factors which indicated that a developmental assessment was warranted).

[2] The sample used to evaluate whether the development assessment was warranted includes 198 children in the statewide representative sample (full review) and the oversample of 123 children (targeted review), for a total sample size of 321.

[3] The sample used to evaluate completion/timeliness of developmental assessments and qualification of providers includes 115 children in the statewide representative sample and 89 children in the oversample for whom a developmental assessment was warranted, for a total sample size of 254.

## MSA II.B.4.a. Therapeutic and Rehabilitative Foster Care Services

MSA Requirement

Each foster child requiring therapeutic and rehabilitative foster care services because of a diagnosis of significant medical, developmental, emotional, or behavioral problems shall be provided with a treatment plan and shall be provided with these services in accordance with the plan. (MSA II.B.4.a.)

Operationalization and Measurement

*Significant problems.*  The MSA does not explicitly define "therapeutic and rehabilitative foster care services" or "significant" medical, developmental, emotional or behavioral problems.  For the purpose of this review,

- ▪ "Therapeutic and rehabilitative foster care services" were defined as mental health, developmental, or medical services, treatments and/or equipment recommended to children in foster care with diagnoses of significant problems.

- ▪ "Significant" problems were defined as medical diagnoses or concerns rated as moderate-severe or severe-complex by our medical expert, and/or any mental health or developmental diagnoses.

To measure significant problems, reviewers were asked to identify and record all acute and/or chronic diagnoses or concerns qualitatively from documentation in the case record and then enter it into the review instrument.  Reviewers were asked to note both diagnoses and concerns because we wanted to capture concerns that required follow-up therapeutic and rehabilitative foster care services but may not have had an official diagnosis at the time of the review.  Therefore, the significant problems data include both diagnoses and concerns that were not a diagnosis at the time of the review.

During analysis, all of the qualitative diagnoses and concerns collected by reviewers were then coded by a medical expert on type of diagnosis/concern and severity.  Examples of diagnoses/concerns that fall into each category are provided in the *Diagnostic Categories Table*.  The severity of medical, developmental, and mental health diagnoses/concerns that were considered "significant" for the purpose of this review are shaded grey in the table below.

Diagnostic Categories Table

| Diagnostic category | Severe-complex | Moderate-severe | Minor-moderate |
|---|---|---|---|
| Medical | Failure to thrive | Hep C<br>Rickets | Dermatitis<br>Strep throat |
| Developmental | Autism<br>Severe mental retardation | Developmental delayed | Speech delay<br>Specific learning disability |
| Mental Health | Bipolar w/o psychotic<br>Reactive attachment | Mood disorder<br>Major depressive disorder | Adjustment disorder<br>ADHD |

*Inter-rater agreement.*  Data about diagnoses were the least reliable data collected from case files on the review instrument.  Inter-rater agreement on the diagnosis data was 73.5% across the six cases included in the reliability subsample, and ranged from a low of 23% agreement on one case to 100% agreement on two cases (which had no diagnoses/concerns identified).  In 4 of 6 cases with identified diagnoses/concerns, reviewers did not agree about specific diagnoses.  For example, in one case, all reviewers identified diagnoses/concerns, but none of the reviewers listed the same diagnosis/concern: one listed orthodontic referral, one listed near sightedness, one listed far sightedness.  In another case,

reviewers did not agree on whether the child had any diagnoses/concerns: one reviewer identified nine diagnoses/concerns, one identified two, and another did not identify any.

Inter-rater agreement improved after coding.  For example, the nearsightedness and farsightedness diagnoses were all be categorized as minor-moderate medical diagnoses, none of the issues identified were "significant", therefore coded responses were in agreement.  Inter-rater agreement reached 91.3% across cases for the final analytic categories of whether children had "significant" problems. Nonetheless, analyses that rely on diagnoses should be interpreted with some caution.  It is possible that if a substantial number of reviewers did not record diagnoses/concerns that were documented in the case record, these analyses could under-represent children with significant diagnoses.

An additional data quality concern in this section is that treatment plans and recommended follow-up were not consistently linked by reviewers when completing the review instrument.  In some cases, reviewers noted recommended follow-up in the review instrument but did not identify that a treatment plan was in place.  In other cases, reviewers noted a treatment plan was in place, but did not list specific recommendations and whether recommended follow-up was received.  These data quality concerns further complicate interpretation of these findings.

## Sample

The sample used to evaluate whether children had a significant medical, developmental and/or mental health diagnosis includes all 198 children in the statewide representative sample (full review).  Of the statewide representative sample, 105 had a significant diagnosis that would require a treatment plan and recommended services.

## Findings

---

MSA II.B.4.a.    45% of children with significant medical, developmental, and/or behavioral diagnoses were provided with a treatment plan and all recommended services.

---

**53% of children entering foster care had one or more significant diagnoses.**  The number of diagnoses/concerns per child ranged from one to ten, and could include significant diagnoses in more than one type.  Among children with one or more significant diagnoses, 30% had a significant medical diagnoses, 35% had a developmental diagnosis, and 73% had a mental health diagnosis.[24]

*Among children with a significant medical diagnosis…*

- 75% had a treatment plan for all significant medical diagnoses.
- 44% received all recommended follow-up,
- 53% received some recommended follow-up,
- 3% received no recommended follow-up.

*Among children with a significant developmental diagnosis…*

- 86% had a treatment plan to address all of their developmental diagnoses,
- 43% received all recommended follow-up,
- 14% received some recommended follow-up,

---

[24] These percentages are not mutually exclusive and will not sum to 100% because children could have multiple types of significant diagnoses.

- 3% received no recommended follow-up, and
- 41% had no follow-up developmental recommendations documented.

*Among children with significant mental health diagnosis…*

- 79% had a treatment plan to address all of their mental health diagnoses,
- 42% received all recommended mental health follow-up,
- 14% received some mental health follow-up,
- 8% received no recommended mental health follow-up
- 23% could not determine whether mental health recommendations were received, and
- 13% had no mental health recommendations documented.

## Table 8 - MSA II.B.4.a. Therapeutic and Rehabilitative Foster Care Services

| | Numerator | Denominator | Percent | Margin of Error |
|---|---|---|---|---|
| *Percent of children with significant medical, developmental, and/or mental health diagnoses provided with a treatment plan and recommended services.[1]* | *47* | *105* | 45% | 10% |
| **Percent of Children With Significant Medical, Developmental, and/or Mental Health Diagnoses, by Type of Diagnosis\*** | | | | |
| No significant diagnoses | 93 | 198 | 47% | 7% |
| One or more significant diagnoses (range per child: 1-10 significant diagnoses) | 105 | 198 | 53% | 7% |
| Medical (range per child: 1-10 medical diagnoses) | 32 | 105 | 30% | 9% |
| Developmental (range per child: 1-2 developmental diagnoses) | 37 | 105 | 35% | 9% |
| Mental Health (range per child: 1-7 mental health diagnoses) | 77 | 105 | 73% | 8% |
| **Percent of Children With Treatment Plans to Address All Significant Medical, Developmental, and/or Mental Health Diagnoses\*** | | | | |
| Medical treatment plans | 24 | 32 | 75% | 15% |
| Developmental treatment plans | 32 | 37 | 86% | 11% |
| Mental health treatment plans | 61 | 77 | 79% | 9% |
| **Percent of Children Who Received All Recommended Services to Address Medical, Developmental, and/or Mental Health Diagnoses\*\*** | | | | |
| Medical services | | | | |
| All recommended medical services received | 14 | 32 | 44% | 17% |
| Some recommended medical services received | 17 | 32 | 53% | 17% |
| No recommended medical services received | 1 | 32 | 3% | 6% |
| No medical services recommended | 0 | 32 | 0% | 0% |
| Developmental services | | | | |
| All recommended developmental services received | 16 | 37 | 43% | 16% |
| Some recommended developmental services received | 5 | 37 | 14% | 11% |
| No recommended developmental services received | 1 | 37 | 3% | 5% |
| No developmental services recommended[2] | 15 | 37 | 41% | 16% |
| Mental health services | | | | |
| All recommended mental health services received | 32 | 77 | 42% | 11% |
| Some recommended mental health services received | 11 | 77 | 14% | 8% |
| No recommended mental health services received | 6 | 77 | 8% | 6% |
| Cannot determine whether mental health services received | 18 | 77 | 23% | 9% |
| No mental health services recommended | 10 | 77 | 13% | 8% |

[1] The sample used to evaluate whether children had a significant medical, developmental and/or mental health diagnosis includes all 198 children in the statewide representative sample (full review). Of the statewide representative sample, 105 had a significant diagnosis that would require a treatment plan and recommended services.

[2] Reviewers noted that 32 children had treatment plans for developmental diagnoses, however only 22 children had specific developmental recommendations listed on the review instrument. This discrepancy could be explained by reviewers failing to record developmental services or equipment as recommended follow-up or reviewers identifying developmental treatment plans that did not list specific recommendations for follow-up.

\* Children may have multiple types of significant diagnoses and be considered in more than one type of diagnosis (i.e., medical, developmental, and/or mental health).

\*\* Treatment plans and recommended follow-up were not consistently tied to one another in the review instrument. In some cases, reviewers noted recommended follow-up in the review instrument but did not identify that a treatment plan was in place. In other cases, reviewers noted a treatment plan was in place, but did not list specific recommendations and whether recommended follow-up was received.

## MSA II.B.2.i. Information and Items Provided to Placement Resources

### MSA Requirement

No later than at the time of placement, Defendants shall provide resource parents or facility staff with the foster child's currently available[25] medical, dental health, educational, and psychological information, including a copy of the child's Medicaid card. Defendants shall gather and provide to resource parents or facility staff all additional current medical, dental health, educational, and psychological information available from the child's service providers within 15 days of placement. (MSA II.B.2.i.)

### Operationalization and Measurement

*DFCS-515 Foster Child Information Form.*  DFCS policy requires the DFCS-515 Foster Child Information Form to be provided to placement resources in an effort to share information about the child with the family or facility where the child is being placed.  Utilizing the form as a proxy for information sharing raises concerns because the information included on the form is limited, forms are often not fully complete, and are frequently not signed by the placement resource.  Reviewers identified whether the form was included in the case record and signed by placement resources, as well as the date that the form was signed.  Reviewers were not able to determine: (1) what information was available at the time of placement; (2) whether available information was, in fact, transferred at the time of placement; and (3) what documents were transferred within 15 days of placement based on a review of the primary documentation itself (*i.e.* rather than relying on representations made on the DFCS-515).

*Inter-rater agreement* for the signed form was 94.6%.

*Information and items shared with placement resources.*  Reviewers also identified whether specific pieces of information or relevant items were shared with placement resources.  The list of information/items included in Table 9 was developed from DFCS policy and in consultation with the medical expert. Based on explicit documentation in the case record, reviewers identified the timeframe in which applicable information was provided to the placement resource.  Inter-rater agreement was substantially lower for the information-specific items at 76.7%--primarily because some reviewers selected "Not applicable" for some items when other reviewers selected "No evidence information was provided".

### Sample

The sample used to evaluate this requirement included 198 children in the statewide representative sample of cases that received a full review.  Reviewers identified 10 cases for which children were placed in DFCS custody but not removed from their homes.  DFCS policy does not require caseworkers to provide information about children who are already living with their placement resource at the time that they enter DFCS custody.  This is consistent with the MSA requirement, thus those 10 cases were excluded from this analysis for a final sample of 188 cases.  MSA II.B.2.i. applies to every placement the

---

[25] The MSA specifies that the foster child's "currently available" information shall be provided to placement resources at the time of placement and all additional information shall be provided within 15 days.  It was not possible to determine from the review of electronic or paper case record what information was available at the time of placement. Therefore this analysis is limited to whether applicable information was provided within the required timeframe.

child experiences while in custody.  For the purpose of this review, data collection and analysis was limited only to the child's first placement during the custody episode under review.

Findings

---

MSA II.B.2.i.    2% of children's placement resources were provided with all applicable information/items within 15 days of placement.

---

**There was documented evidence in the case file that DFCS provided all applicable information/items to the 2% of children's placement resources at placement or within 15 days of placement.**  An additional 43% received some, but not all, applicable information/items within 15 days of placement. There was no documented evidence that any applicable information/items were provided to 55% of children's placement resources.

Information/items most frequently (i.e., for at least 20% of applicable cases) documented as provided to placement resources within 15 days of placement included:

- Child's prescribed medication for physical health needs;
- School enrollment information;
- Medicaid or other insurance card;
- Information about child's allergies.

Information/items least frequently (i.e., for fewer than 10% of applicable cases) documented as provided to placement resources within 15 days of placement included:

- Dental information—dental records, name of child's dentist, results of most recent dental exam, child's dental equipment;
- Education information--Child's individualized education plan or 504 plan, most recent report card, ongoing educational services the child is receiving;
- Mental health information--Name of the child's mental health provider, next appointments, special instructions for caregivers or educators;
- Medical – child's medical equipment.

**The DFCS-515 Foster Child Information Form was signed by the resource placement provider to indicate her/his receipt of the information specified in the form within 1 day of placement in 12% of cases, and an additional 9% were signed within 15 days of placement.**  6% were signed after 15 days of placement.  32% were completed in the case file, but not signed by the placement resource.  There was no form found in the case record for 41% of cases reviewed.

## Table 9 - MSA II.B.2.i. Information and Items Provided to Placement Resources

| | Numerator | Denominator | Percent | Margin of Error |
|---|---|---|---|---|
| *Percent of children whose medical, dental health, educational and psychological information was provided to resource parents or facility staff at the time of placement or within 15 days of placement.* [1,2] | *3* | *188* | *2%* | *2%* |
| **Percent of Children with Documented Evidence that DFCS Provided Applicable Medical, Dental Health, Education, and Psychological Information to the Placement Resource at Placement or Within 15 Days of Placement**[3] | | | | |
| 100% of applicable information/items | 3 | 188 | 2% | 2% |
| 75-99% of applicable information/items | 5 | 188 | 3% | 2% |
| 50-74% of applicable information/items | 11 | 188 | 6% | 3% |
| 25-49% of applicable information/items | 22 | 188 | 12% | 5% |
| 1-24% of applicable information/items | 44 | 188 | 23% | 6% |
| No applicable information/items | 103 | 188 | 55% | 7% |
| **Percent of Children with a DFCS-515 Foster Child Information Form Completed and Signed by the Placement Resource to indicate her/his receipt of the information specified in the form** | | | | |
| No Foster Child Information Form documented in case record | 78 | 188 | 41% | 7% |
| Completed but not signed by placement resource | 60 | 188 | 32% | 7% |
| Completed and signed within 1 day of placement | 23 | 188 | 12% | 5% |
| Completed and signed within 15 days of placement | 16 | 188 | 9% | 4% |
| Completed and signed after 15 days of placement | 11 | 188 | 6% | 3% |

[1] The MSA specifies that the foster child's "currently available" information shall be provided to placement resources at the time of placement or within 15 days of placement.  It was not possible to determine from the review of the electronic or paper case record what information was available at the time of placement as required; therefore this analysis is limited to whether applicable information was provided within the required 15-day timeframe.

[2] The sample used to evaluate this requirement included 198 children in the statewide representative sample of cases who received a full review.  Reviewers identified 10 cases for which children were placed in DFCS custody but not removed from their homes.  DFCS policy does not require caseworkers to provide information about children who are already living with their placement resource at the time that they enter DFCS custody.  This is consistent with the MSA requirement, thus those 10 cases have been excluded from this analysis, resulting in a final sample size of 188 cases.

[3] Findings are presented as a percent of applicable information/items for each child.  "MSA II.B.2.i. Information and Items Provided to Placement Resources, by Type of Information/Item" provides additional detail.

## Table 10 - MSA II.B.2.i. Information and Items Provided to Placement Resources, by Type of Information/Item

| | At Placement | Within 15 Days of Placement* | At Any Point During the PUR* | No Evidence Info/Item Was Provided | Total Applicable |
|---|---|---|---|---|---|
| **Health Information Provided to Placement Resource** | | | | | |
| Name of child's primary care physician | 9% | 16% | 38% | 62% | 185 |
| Name of any relevant specialty doctors working with the child | 5% | 13% | 33% | 67% | 135 |
| Child's next appointments | 7% | 17% | 41% | 59% | 179 |
| Medicaid or other insurance card | 11% | 20% | 45% | 55% | 186 |
| Immunization records | 7% | 14% | 35% | 65% | 184 |
| Allergies | 13% | 20% | 38% | 62% | 125 |
| Results of the child's most recent physical exam | 5% | 11% | 35% | 65% | 181 |
| Child's medical equipment | 3% | 6% | 25% | 75% | 64 |
| Child's prescribed medication for medical needs | 14% | 24% | 50% | 50% | 103 |
| **Mental/Behavioral Health Information Provided to Placement Resource** | | | | | |
| Name of child's mental health provider | 2% | 8% | 41% | 59% | 120 |
| Child's next appointments | 3% | 8% | 34% | 66% | 116 |
| Child's prescribed medication for mental/behavioral needs | 6% | 10% | 38% | 62% | 87 |
| Child's diagnoses or description of social/emotional/ behavioral health needs | 7% | 14% | 40% | 60% | 107 |
| Special instructions for caregivers or educators | 5% | 9% | 32% | 68% | 92 |
| **Dental Information Provided to Placement Resource** | | | | | |
| Dental records | 2% | 8% | 21% | 79% | 145 |
| Name of child's dentist | 3% | 5% | 29% | 71% | 146 |
| Results of the child's most recent dental exam | 3% | 4% | 26% | 74% | 144 |
| Child's dental equipment | 0% | 2% | 11% | 89% | 53 |
| **Educational Information Provided to Placement Resource** | | | | | |
| School enrollment information | 14% | 22% | 52% | 48% | 118 |
| Individualized education plan or 504 plan | 0% | 6% | 21% | 79% | 48 |
| Child's most recent report card | 2% | 5% | 25% | 75% | 110 |
| Ongoing educational services child is receiving | 2% | 3% | 23% | 77% | 62 |

*Within 15 days and At Any Point are cumulative percentages.  The percentage reported in the At Any Point column is inclusive of cases whose placement resources received item/information at placement, within 15 days of placement, and at any point after 15 days of placement.

## MSA III.B.4.a. Child Welfare Case Records

### MSA Requirement

DFCS caseworkers shall compile, maintain, and keep current complete child welfare case records. (MSA III.B.4.a.)

### Operationalization and Measurement

*Documentation requirements.* DFCS policy requires that all medical, dental and mental health records are recorded in the case file (Mississippi DFCS Policy, Section A, §IX.D.2.). Interviews we conducted with DFCS leaders familiar with case record documentation requirements noted that each of the assessments subject to our review should be documented in MACWIS and a paper copy should be filed in the paper record. The case record review identified whether each of the screenings, assessments and/or examinations were appropriately documented in MACWIS and in the paper record.

Rather than conducting a complete audit of all required components of child welfare case records, all parties agreed that this review would focus on the components of the case records that are most relevant for the following requirements that were subject to the Period 5 case record review:

- Initial Health Screening,
- Comprehensive Health Assessment,
- Dental Examination,
- Mental Health Assessment, and
- Developmental Assessment.

*Inter-rater agreement* about whether each assessment, screening or examination was documented in the electronic and paper files were: 91.8% for the IHS/CHA, 86.7% for the dental examination, 93.8% for the mental health assessment, and 75.0% for the developmental assessment.

### Sample

The sample used to evaluate MSA III.B.4.a. included all 321 cases reviewed. The number of applicable screenings, assessments and/or examinations considered as part of this review varied for each child based upon their age and whether their case received a full or targeted review.

### Findings

MSA III.B.4.a.    6% of children's required Initial Health Screening, Comprehensive Health Assessment, Dental Examination, Mental Health Assessment, and Developmental Assessment were documented in the electronic case record and compiled in the paper case record.

**6% of children had all applicable screenings, assessments and examinations documented in their electronic and paper case record.** An additional 55% had some, but not all, of the applicable screenings, assessments and examinations documented in the electronic and/or paper file. 39% of children had none of the applicable screenings, assessments and examinations documented in their electronic or paper file.

Of the children who required an initial health screening, 69% were documented in MACWIS and 74% were compiled in the paper file.  81% had an IHS documented in MACWIS or the paper file.

Of the children who required a comprehensive health assessment, 56% were documented in MACWIS and 64% were compiled in the paper file.  71% of children had a CHA documented in MACWIS or the paper file.

Of the children who required a dental examination, 59% were documented in MACWIS and 53% were compiled in the paper file.  68% of children had an initial dental exam documented in MACWIS or the paper file.

Of the children who required a mental health assessment, 34% were documented in MACWIS and 46% were compiled in the paper file.  53% of children had an initial mental health assessment documented in MACWIS or the paper file.

Of the children who required a developmental assessment, 17% were documented in MACWIS and 42% were compiled in the paper file.  44% of children had a developmental assessment documented in MACWIS or the paper file.

## Table 11 - MSA III.B.4.a. Child Welfare Case Records

| | Numerator | Denominator | Percent | Margin of Error |
|---|---|---|---|---|
| *Percent of children whose required Initial Health Screening, Comprehensive Health Assessment, Dental Examination, Mental Health Assessment, and Developmental Assessment were documented in the electronic case record and compiled in the paper case record.[1,2]* | *19* | *321* | *6%* | *3%* |
| **Percent of Children with Applicable Assessments Included in the Case Record [1]** | | | | |
| 100% of applicable assessments in electronic and paper case record | 19 | 321 | 6% | 3% |
| 75-99% of applicable assessments in electronic and paper case record | 18 | 321 | 6% | 3% |
| 50-74% of applicable assessments in electronic and paper case record | 72 | 321 | 22% | 5% |
| 25-49% of applicable assessments in electronic and paper case record | 69 | 321 | 21% | 4% |
| 1-24% of applicable assessments in electronic and paper case record | 19 | 321 | 6% | 3% |
| None of the applicable assessments in electronic and paper case record | 124 | 321 | 39% | 5% |
| **Percent of Children Whose Initial Health Screening Was Included in the Case Record\*** | | | | |
| IHS documented in MACWIS | 135 | 196 | 69% | 6% |
| Copy of IHS compiled in the paper case file | 146 | 196 | 74% | 6% |
| IHS was not completed | 34 | 196 | 17% | 5% |
| **Percent of Children Whose Comprehensive Health Assessment Was Included in the Case Record\*** | | | | |
| CHA documented in MACWIS | 111 | 197 | 56% | 7% |
| Copy of CHA compiled in the paper case file | 126 | 197 | 64% | 7% |
| CHA was not completed | 60 | 197 | 30% | 6% |
| **Percent of Children Whose Dental Examination Was Included in the Case Record\*** | | | | |
| Dental examination documented in MACWIS | 146 | 247 | 59% | 6% |
| Copy of dental examination compiled in the paper case file | 131 | 247 | 53% | 6% |
| Dental exam was not completed | 74 | 247 | 30% | 6% |
| **Percent of Children Whose Mental Health Assessment Was Included in the Case Record\*** | | | | |
| Mental health assessment documented in MACWIS | 81 | 237 | 34% | 6% |
| Copy of mental health assessment compiled in the paper case file | 110 | 237 | 46% | 6% |
| Mental health assessment was not completed | 99 | 237 | 42% | 6% |
| **Percent of Children Whose Developmental Assessment Was Included in the Case Record\*** | | | | |
| Developmental assessment documented in MACWIS | 34 | 204 | 17% | 5% |
| Copy of developmental assessment compiled in the paper case file | 86 | 204 | 42% | 7% |
| Developmental assessment was not completed | 102 | 204 | 50% | 7% |

[1] Findings are presented as a percent of applicable assessments because the number of applicable assessments varies for each child based on the child's age, whether a developmental assessment was warranted, and the type of review the child's case received (i.e., full review or targeted review).

[2] MSA III.B.4.a. requires that DFCS caseworkers shall compile, maintain, and keep current complete child welfare case records. The purpose of this part of the review is to evaluate the completeness of the paper and electronic records of the screenings, assessments, and examinations required in MSA II.B.3.a., II.B.3.b., II.B.3.e., II.B.3.f., and II.B.3.g.

\*The findings presented here are not mutually exclusive and will not sum to 100%.

## MSA III.B.6.c. Educational Continuity

### MSA Requirement

DFCS shall make all reasonable efforts to ensure the continuity of a child's educational experience by keeping the child in a familiar or current school and neighborhood, when this is in the child's best interests and feasible, and by limiting the number of school changes the child experiences. (MSA III.B.6.c.)

### Operationalization and Measurement

*School enrollment and school changes.*  To evaluate this requirement, information was collected about school enrollment and number of school changes, along with the reason for each school change and whether DFCS made all reasonable efforts to prevent each school change.  All school changes were recorded on the review instrument by reviewers, even if the change was in the child's best interests.  During data analysis, "reasonable efforts" to prevent school change were not applicable if the change was to promote the child's educational experience.  For example, if the child changed placements, reasonable efforts to prevent school changes were applicable.  If the child changed schools because the child required a special school environment to meet their educational or behavioral needs, reasonable efforts to prevent school change were not applicable.

*Reasonable efforts.*  We attempted to operationalize "all reasonable efforts" to ensure continuity of educational experience with DFCS policy or practice guides, but no specific practice expectations were described in these DFCS documents.  In the absence of clear guidelines that could be used to develop a checklist or comparable quantitative measure of "reasonable efforts", reviewers summarized efforts qualitatively in narrative form on the review instrument.  If reviewers could not identify documentation in the case record indicating that reasonable efforts were made, the item was coded to indicate that reasonable efforts were not made in that case.

### Sample

The sample used to evaluate MSA III.B.6.c. included the 139 of the 198 children in the  statewide representative sample of cases who were school-aged during the period under review and who received a full review.

### Findings

Nearly half (49%) of the sample of school-aged children experienced one of or more school changes while in DFCS custody—including changes that were intended to improve educational experience for the child and changes that were a result of DFCS involvement.  The most common reason for school change was because the child's placement changed.

---

MSA III.B.6.c.    69% of school-aged children did not experience school changes during DFCS custody or DFCS made all reasonable efforts to maintain a child in a familiar or current school and neighborhood.

---

51% of school-aged children did not experience a change in schools during DFCS custody.  18% of children experienced at least one school change with all reasonable efforts to support educational continuity.  31% of children experienced at least one school change without all reasonable efforts to support educational continuity.

51

## Table 12 - MSA III.B.6.c. Educational Continuity

| | Numerator | Denominator | Percent | Margin of Error |
|---|---|---|---|---|
| *School-aged children without any school changes or DFCS made all reasonable efforts to maintain child in familiar or current school and neighborhood.* [1] | *96* | *139* | *69%* | *8%* |
| **Percent of Children Experiencing One or More School Changes While in DFCS Custody** | | | | |
| Children not school-aged during PUR | 59 | 198 | 30% | 6% |
| School-aged children enrolled in school during PUR | 139 | 198 | 70% | 6% |
| No school changes while in DFCS custody | 71 | 139 | 51% | 8% |
| One or more school changes while in DFCS custody | 68 | 139 | 49% | 8% |
| 1 school change | 39 | 139 | 28% | 7% |
| 2 school changes | 15 | 139 | 11% | 5% |
| 3 school changes | 10 | 139 | 7% | 4% |
| 4 school changes | 2 | 139 | 1% | 2% |
| 5 school changes | 1 | 139 | 1% | 1% |
| 6 school changes | 1 | 139 | 1% | 1% |
| **Percent of School Changes, By Reason** (68 children changed schools 118 times.  Denominator is school changes, not children.) | | | | |
| Child's placement changed | 71 | 118 | 60% | 9% |
| Child required special school environment | 18 | 118 | 15% | 6% |
| Unknown reason for school change | 14 | 118 | 12% | 6% |
| Child completed last grade in enrolled school | 7 | 118 | 6% | 4% |
| Child requested change | 4 | 118 | 3% | 3% |
| Child expelled | 2 | 118 | 2% | 2% |
| School staff recommended change | 1 | 118 | 1% | 2% |
| Foster parent moved | 1 | 118 | 1% | 2% |
| **Percent of Children for Whom DFCS Made All Reasonable Efforts to Maintain Child in Familiar Setting** | | | | |
| No school changes while in DFCS custody | 71 | 139 | 51% | 8% |
| At least one school change with all reasonable efforts to maintain child in familiar or current school and neighborhood, when in the child's best interests and feasible. | 25 | 139 | 18% | 6% |
| At least one school change without all reasonable efforts to maintain child in familiar or current school and neighborhood, when in the child's best interests and feasible. | 43 | 139 | 31% | 8% |

[1] The sample used to evaluate this requirement included 139 school-aged children in the statewide representative sample of cases that received a full review.

# Appendix A. Case Record Review Instrument

# Period 5 Case Record Review Gap Instrument, **April 13-17, 2015**
## Period Under Review (PUR): July 1, 2013 – February 28, 2015

| Review Information | |
|---|---|
| Reviewer | |
| Date reviewer received case (mm/dd/yyyy) | |
| Date reviewer completed review (mm/dd/yyyy) | |
| QA Reviewer | |
| Date QA reviewer received case (mm/dd/yyyy) | |
| Date QA reviewer completed review (mm/dd/yyyy) | |

| Child Demographics | |
|---|---|
| Child's first name | |
| Child ID | |
| Child DOB (mm/dd/yyyy) | |
| Target custody episode start date (mm/dd/yyyy) | |
| Target custody episode end date (mm/dd/yyyy) If the child exited DFCS custody before February 28, 2015 | |
| Child age at start of target custody episode | |
| Child age at end of target custody episode or PUR | |

## Sample Inclusion Criteria

1. Did the child enter DFCS custody between July 1, 2013 and December 31, 2014?
   - o   Yes
   - o   No.  If no, return this case to the review coordinator and request a new case.

2. Was the child over the age of 18 at the target custody start date?
   - o   Yes.  If yes, return this case to the review coordinator and request a new case.
   - o   No.

3. Was the target custody episode shorter than 90 days?
   - o   Yes.  If yes, return this case to the review coordinator and request a new case.
   - o   No.

## Educational Continuity

*Questions about educational continuity refer to all custody episodes and/or placements during the entire period under review:* July 1, 2013 – February 28, 2015.

1. Did the case record indicate that the child was enrolled in school during the period under review (PUR)?  *Reviewers should also include enrollment in Head Start, educational pre-school, GED program, job corps or other educational experiences.*

   o   Yes.  Go to Q3.

   o   No.  Go to Q2.

2. **Skip if Q1 is yes.**  If the child was not enrolled in school during the PUR, specify the reason why the child was not enrolled **and then go to the Initial Health Screening and Comprehensive Health Assessment**.  Check all that apply.

   o   Child was not school aged (i.e., child did not turn 6 years old on or before September 1).

   o   Child was 17 or older and in a job training program or actively seeking employment.

   o   Child was physically, mentally or emotionally incapable of attending school as determined by the appropriate school official based on sufficient medical documentation.

   o   Child was pursuing special education, remedial education, or education for handicapped or physically or mentally disadvantaged children.

   o   Child was being educated in a home instruction program.

   o   Other (specify) _____

3. **Skip if Q1 is no.** If the child was enrolled in school at any time during DFCS custody, was there documentation in the case record that the child changed schools during the period under review?  *If the child was enrolled in school at the time he/she entered custody and the child changed schools when he/she entered care, count that as a school change.  If there are multiple custody episodes during the PUR, count each time the child changes schools during the entire PUR.*

   o   Yes, list number of school changes _____

   o   No changes documented.  **Go to Initial Health Screening and Comprehensive Health Assessment.**

**Responses to questions 4-6 should be recorded in the School Change Grid.**

4.  What was the date of the change in school?
    *This date is intended for reviewer reference only to distinguish between multiple school changes.  It will not be used to calculate timeliness of school enrollment.  If the exact date of the change cannot be determined, enter the first date that there was evidence in the case record that the child had changed schools.  Please list school changes chronologically.*

5.  For each school change, what was the reason documented in the case record for changing schools? (Choose all that apply.)
    - o    a. Child required special school environment to accommodate special needs (e.g., behavior, dyslexia)
    - o    b. Child completed last grade in enrolled school
    - o    c. School staff recommended change
    - o    d. Foster parents recommended change
    - o    e. Child requested change
    - o    f. Foster parent moved
    - o    g. Child's placement changed and placement was not in former school district
    - o    h. Transportation to former school was not feasible
    - o    i. No reason provided in the case record

6.  For each school change, is there documentation in the case record that any efforts were made by DFCS staff or managers to keep the child in a familiar or current school and neighborhood? *Choose yes, no, or not applicable.  Select "Not Applicable" if change was in the child's best interest and a-f is selected in Q5.*

<u>School Change Grid</u>

| 4. Date of School Change (mm/dd/yyyy) | 5. Reason for Change (use letter codes from Q5) | 6. Reasonable Efforts (yes, no, not applicable) |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

7.  When relevant, describe efforts made by DFCS to maintain the child in the same school/neighborhood.  *Note the date of any entries in the case narrative which describe efforts made to keep the child in a familiar or current school and neighborhood.*

## Initial Health Screening and Comprehensive Health Assessment

> *Questions about the initial health screening and comprehensive health assessment refer to the custody episode that began on the identified custody start date.  The custody episode includes all placements (e.g., emergency shelter, foster care, relative) between the date the child entered custody and the date the child exited custody or February 28, 2015 if the child was still in DFCS custody at the end of the review period.*
>
> *The comprehensive health assessment could be a health visit that occurred either at the same time as the initial health screening or sometime after the initial health screening.*

8.  Were an initial health screening and/or comprehensive health assessment documented in the case record after the child entered DFCS custody on the target custody start date?  *If the initial health screening and comprehensive health assessment were completed on different days, select both B and C.*

    o  A.  The initial health screening and comprehensive health assessment were completed on the same day.  Enter date of the combined assessment and go to Q12 _____

    o  B.  An initial health screening was completed separate from the comprehensive health assessment. Enter date of the initial health screening and go to Q9 _____

    o  C.  A comprehensive health assessment was completed separate from the initial health screening.  Enter date of the comprehensive health assessment_____. Go to Q12 but complete Q9-Q11 first if an initial health screening was also completed.

    o  D.  Neither an initial health screening nor a comprehensive health assessment were documented after the custody start date.  Go to Q18.

9.  How was the initial health screening documented in the case record? (Check all that apply.)
    *If a copy of the initial health screening is included in the paper case record, mark it with a post-it and provide it to the case record review coordinator at the conclusion of the case review. In addition, if there is any documentation in the case narrative concerning the initial health screening, provide the date(s) of the notation(s) below.*
    o  Initial health screening listed on Medical Tab in MACWIS
    o  Copy of the initial health screening filed in the case record
    o  Initial health screening noted in case narrative (specify date of notation) _____

10.  Was the name of the provider who completed the initial health screening documented in the case record?  *List the name of the organization and person exactly as shown, including salutation and any initials following the name (e.g., MD, NP, RN).*
    o  Yes (when available, specify name of person and organization) _____
    o  No

4

*Question 11 asks about the content of the initial health screening.  When reviewing this item, reviewers should only identify whether any of the components were documented in the case record.  Reviewers are not responsible for evaluating the quality or completeness of the screening.  During analysis, included components will be evaluated against age-appropriate standards.*

11. **Skip if no copy of the initial health screening is available in the case record.**  Did a copy of the initial health screening indicate whether the following components were addressed during the initial screening? (Check all that apply.)
    - o   No evidence found
    - o   Vital signs (e.g., body temperature, pulse, heart rate, respiratory rate, pain score, blood pressure)
    - o   Physical exam
    - o   Range of motion examination of all joints (ROM)
    - o   External body inspections of skin for signs of acute illness, abuse (unusual bruises, welts, cuts, burns, trauma) and rash suggestive of infestation or contagious illness
    - o   External genitalia inspections for signs of trauma, discharge or obvious abnormality
    - o   Assessment of chronic conditions (e.g., respiratory status if known to have asthma)
    - o   Blood pressure
    - o   Height
    - o   Weight
    - o   Head circumference
    - o   Percentiles or growth parameters
    - o   Body mass index (BMI)
    - o   Growth chart with information recorded
    - o   Birth weight or gestational age
    - o   Review of medical history (e.g., allergies, hospitalizations, medications, equipment)
    - o   Review of developmental and/or educational history
    - o   Review of behavior and/or mental health history
    - o   Review of systems (standard medical review)
    - o   Screen for significant developmental delay
    - o   Screen for major depression
    - o   Screen for suicidal thoughts
    - o   Screen for violent behavior
    - o   Other (specify) _____

12. How was the comprehensive health assessment documented in the case record? (Check all that apply.)  *If a copy of the comprehensive health assessment is included in the paper case record, mark it with a post-it and provide it to the case record review coordinator at the conclusion of the case review. In addition, if there is any documentation in the case narrative concerning the comprehensive health assessment, provide the date of the notation(s) below.*

   o   Comprehensive health assessment listed on Medical Tab in MACWIS

   o   Copy of the comprehensive health assessment filed in the case record

   o   Comprehensive health assessment noted in case narrative, specify date of notation _____

13. Was the name of the provider who completed the comprehensive health assessment documented in the case record? *List the name of the organization and person exactly as shown, including salutation and any initials following the name (e.g., MD, NP, RN).*

   o   Yes (when available, specify name of person and organization) _____

   o   No

14. In addition to the child, was there documentation in the case record that any of the following participants were in attendance during the exam portion of the comprehensive health assessment? (Check all that apply.)

   o   Unable to determine

   o   Foster parent or other caregiver

   o   Health care manager

   o   Case worker

   o   Birth parent

   o   Other (specify) _____

*Questions 15-17 ask about the content of the comprehensive health assessment. When reviewing these items, reviewers should only identify whether any of the components are documented in the case record. Reviewers are not responsible for evaluating the quality or completeness of the assessment.  During analysis, components of the comprehensive health assessment will be evaluated against age-appropriate standards.*

15. **Skip if no copy of the comprehensive health assessment is available in the case record.**  Was there documentation in the case record that the following laboratory tests were ordered or examined in medical records during the comprehensive health assessment? (Check all that apply.)

   o   No evidence found

   o   Hemoglobin (HGB), Hematocrit (HCT), or complete blood count (CBC)

   o   Lead level

   o   Purified protein derivative tuberculin (PPD) or quantiferon

   o   Rapid plasma regain (RPR)

   o   Urinalysis

   o   HIV

   o   Hepatitis B surface antigen (HBsAg)

   o   Hepatitis C antibody screen

   o   Hepatitis panel (includes B and C)

6

16. **Skip if no copy of the comprehensive health assessment is available in the case record.** Was there documentation in the case record that the following components were addressed during the comprehensive health assessment? (Check all that apply.)

- o　No evidence found
- o　Vital signs (e.g., body temperature, pulse, heart rate, respiratory rate, pain score, blood pressure)
- o　Physical exam (PE)
- o　Range of motion examination of all joints (ROM)
- o　Physical examination of each area of skin
- o　External genitalia inspections for signs of trauma, discharge or obvious abnormality
- o　Assessment of chronic conditions (e.g., respiratory status if known to have asthma)
- o　Blood pressure
- o　Height
- o　Weight
- o　Head circumference
- o　Percentiles or growth parameters
- o　Body mass index (BMI)
- o　Growth chart with information recorded
- o　Birth weight or gestational age
- o　Review of the child's medical history
- o　Review of the child's behavioral history
- o　Review of the child's developmental history
- o　Review of the child's social history
- o　Review of the child's immunization records
- o　Review of systems (ROS; i.e., standard medical review)
- o　Human immunodeficiency virus (HIV) risk assessment
- o　Dental and oral screen
- o　Vision screen
- o　Hearing screen
- o　Developmental screen using validated instrument (specify) _____
- o　Mental health screen using validated instrument (specify) _____

17. **Skip if no copy of the comprehensive health assessment is available in the case record.  Skip if child is younger than 11 at the time of the comprehensive health assessment.** For adolescents, was there documentation in the case record that the following topics were addressed during the comprehensive health assessment, either through a written questionnaire or discussion/consultation with the child? (Check all that apply.)　o　No evidence found

- o　Relationships with birth family
- o　Relationships with foster family
- o　Adjustment to foster care
- o　Peer relationships
- o　Alcohol, drug or tobacco use
- o　Sexual orientation
- o　Sexual activity
- o　Sexually transmitted diseases
- o　Birth control
- o　Nutrition
- o　Physical activity (i.e., exercise)
- o　School performance
- o　Hobbies
- o　Educational plans or career plans

7

## Periodic Medical Examinations

18. Following the comprehensive health assessment, did the child receive any well-child care, periodic preventive health care, or annual checkup during the PUR?

   o   Yes.

   o   No. **Go to Dental Examinations.**

19. What were the date(s) of all well-child care, periodic preventive health care, or annual checkup received by the child during the PUR? *Please list dates of examinations chronologically from earliest to most recent.  Mark any well-child check up in the paper file with a post-it and provide it to the case record review coordinator at the conclusion of the case review.  Leave this section blank if there were no medical examinations or encounters during the PUR.  During analysis, frequency of medical examinations will be evaluated against age-appropriate standards and the child's time in custody. Please list medical examinations chronologically.*

| Date(s) of Medical Examination(s) (mm/dd/yyyy) |
| --- |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

## Dental Examinations

**Skip if child was younger than 3 years old during the entire PUR.  Go to Assessment of Mental Health and Developmental Needs.**

20. Is there documentation that the child received one or more dental exams after the child entered DFCS custody on [pre-fill date]? *Include any dental exams during the custody episode within the period under review.*

    o   Yes.  Enter date of the first dental exam completed after the child entered DFCS custody (mm/dd/yyyy) _____

    o   No.  **Go to Assessment of Mental Health and Developmental Needs.**

    o   Not applicable.  Child was younger than three at the time of placement and did not turn three during the PUR.

21. How was the <u>first</u> dental exam during the custody episode documented in the case record? (Check all that apply.)  *If a copy of the dental exam is included in the paper case record, mark it with a post-it and provide it to the case record review coordinator at the conclusion of the case review. In addition, if there is any documentation in the case narrative concerning the dental exam, provide the date of the notation(s) below.*

    o   Date of dental exam listed on Medical Tab in MACWIS

    o   Copy of the dental exam filed in the case record

    o   Dental exam noted in case narrative, specify date _____

22. Was provider who completed the first dental exam documented in the case record? *List the name of the organization and person exactly as shown, including salutation and any initials following the name (e.g., DDS, DMD, RDH).*

    o   Yes (when available, specify name of person and organization) _____

    o   No

23. Following the first dental exam, what were the date(s) for all dental exam(s) during the custody episode beginning on [pre-fill custody start date]? *This question refers to dental exams and routine cleanings.  Follow-up dental services will be recorded in the Follow-Up Treatments and Services section.  Please list dates of dental examinations chronologically from earliest to most recent.*

| Date(s) of Dental Examination(s) (mm/dd/yyyy) |
| --- |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

9

## Assessment of Mental Health and Developmental Needs

*Questions about the mental health and developmental assessments refer to the custody episode that began on the identified custody start date.  The custody episode includes all placements (e.g., emergency shelter, foster care, relative) between the date the child entered custody and the date the child exited custody or February 28, 2015 if the child was still in DFCS custody at the end of the review period.*

24. Were any of the following circumstances present in the case? (Check all that apply.)  *These factors could indicate that a developmental assessment is warranted.*

   - o   Caregiver expressed concern about child's development
   - o   Language, motor or social-emotional skills did not appear to be age level
   - o   Behaviors were not age-appropriate (e.g., withdrawn, excessive tantrums, aggressive behavior, hyperactivity, sleep problems)
   - o   History of premature birth or prenatal drug, alcohol, or tobacco exposure
   - o   History of chronic illness
   - o   Family history of developmental issues
   - o   Family history of educational issues
   - o   Poor school or pre-school functioning (i.e., learning or behavioral)
   - o   School suspensions
   - o   Difficulty with transitions
   - o   Poor peer relationships
   - o   Lack of interest in normal activities
   - o   Lack of empathy
   - o   Engagement in impulsive, potentially dangerous behaviors

**Complete Questions 25-27 for children age 3 and older at the time of entry into custody.**
**If child was younger than 3 years old at the time of entry into custody, skip to Q28.**

<u>Mental Health Assessment</u>

25. Was a mental health assessment documented in the case record after the child entered DFCS custody on [pre-fill date]?  *A referral for mental health assessment is not sufficient.  There must be evidence that the assessment was completed.*

   - o   Yes.  Enter date of the <u>first</u> mental health assessment completed after the child entered DFCS custody (mm/dd/yyyy) _____
   - o   No.  **Go to Q28.**

26. How was the first mental health assessment documented in the case record? (Check all that apply.)  *If a copy of the mental health assessment is included in the paper case record, mark it with a post-it and provide it to the case record review coordinator at the conclusion of the case review. In addition, if there is any documentation in the case narrative concerning the mental health assessment, provide the date of the notation(s) below.*

   - o   Mental health assessment listed on Medical Tab in MACWIS
   - o   Copy of the mental health assessment filed in the case record
   - o   Mental health assessment noted in case narrative, specify date of notation _____

10

27. Was the name of the provider who completed the first mental health assessment documented in the case record? *List the name of the organization and person exactly as shown, including salutation and any initials following the name (e.g., MD, NP, RN).*

   o    Yes (when available, specify name of person and organization) _____

   o    No

## Developmental Assessment

28. Was a developmental assessment documented in the case record after the child entered DFCS custody on [pre-fill date]? (Check all that apply.)  *The developmental assessment could be completed as part of the mental health assessment, the educational assessment, the medical assessment, or as a separate stand alone assessment.  A referral for developmental assessment is not sufficient.  There must be evidence that the assessment was completed.*

   o    A.  A developmental assessment was completed as part of the mental health assessment noted in Q25. **Go to Follow-Up Services and Treatments.**

   o    B.  A developmental assessment was completed as part of an educational assessment. Provide date and **go to Q29**. (mm/dd/yyyy) _____

   o    C.  A developmental assessment was completed as part of a medical assessment. Provide date and **go to Q29**. (mm/dd/yyyy) _____

   o    D.  A developmental assessment was completed separate from the mental health, educational, and medical assessments.  Provide date and **go to Q29**. (mm/dd/yyyy) _____

   o    E.  There is no record of a developmental assessment. **Go to Follow-Up Services and Treatments.**

29. How was the first developmental assessment documented in the case record? (Check all that apply.) *If a copy of the developmental assessment is included in the paper case record, mark it with a post-it and provide it to the case record review coordinator at the conclusion of the case review. In addition, if there is any documentation in the case narrative concerning the developmental assessment, provide the date of the notation(s) below.*

   o    Developmental assessment listed in MACWIS

   o    Copy of the developmental assessment filed in the case record

   o    Developmental assessment noted in case narrative, specify date of notation _____

30. Was the provider who completed the first developmental assessment documented in the case record? *List the name of the organization and person exactly as shown, including salutation and any initials following the name (e.g., MD, NP, RN).*

   o    Yes (when available, specify name of person and organization) _____

   o    No

11

## Follow-Up Services and Treatments

---

*Questions about follow-up services and treatments refer to the custody episode that began on the identified custody start date.  The custody episode includes all placements (e.g., emergency shelter, foster care, relative) between the date the child entered custody and the date the child exited custody or February 28, 2015 if the child was still in DFCS custody at the end of the review period.*

---

31. Was the child placed in a therapeutic or rehabilitative placement setting at any time during the target custody episode?  Check all that apply.
    - o      No therapeutic or rehabilitative placement setting
    - o      Therapeutic foster care
    - o      Group home
    - o      Residential treatment
    - o      Inpatient psychiatric
    - o      Inpatient substance abuse treatment
    - o      Other (specify) _____

32. Did the child have any medical (physical health), dental, developmental, emotional or behavioral diagnoses during the PUR?  *Reviewers should consider diagnoses or concerns identified during the initial health screening, comprehensive health assessment, periodic medical examinations, dental examinations, mental health assessment, and developmental assessment.  Reviewers should include both acute and chronic diagnoses.*
    - o      Yes
    - o      No      **If no, go to Information Provided to Placement Resources.**

Diagnosis

**Responses to questions 33-35 should be recorded in the Diagnosis Grid.**

33. If yes, which diagnoses were identified?  *List each diagnosis separately.  Reviewers should consider diagnoses or concerns identified during the initial health screening, comprehensive health assessment, periodic medical examinations, dental examinations, mental health assessment, and developmental assessment.  Reviewers should include both acute and chronic diagnoses.*

34. Was each diagnosis documented in the Comprehensive Family Assessment?  *Only select "unable to determine" if there is not a copy of the CFA in the case record.*

35. Was a treatment plan documented in the case record for each diagnosis?  *Treatment plans are developed by clinicians to address the child's diagnosis (e.g., medication, counseling), and may be found in a report or noted in the narrative.  If a copy of the treatment plan is included in the paper case record, mark it with a post-it and provide it to the case record review coordinator at the conclusion of the case review.*

Diagnosis Grid

| 33. Diagnosis/concern | 34. Documented in CFA? (Yes, No, Unable to Determine) | 35. Treatment Plan? (Yes, No, Unable to Determine) |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Recommendations

36. During the PUR, were any services, treatments, and/or equipment recommended or prescribed in response to the diagnoses or concerns noted in Q32?  *When answering this question, reviewers should consider both acute and chronic health needs.*

  o    Yes

  o    No      **If no, skip to Information Provided to Placement Resources.**

**Responses to questions 37-40 should be recorded in the Follow-Up Services and Treatments Grid.**

37. What treatments, services, and/or equipment were recommended to be received by the child during the PUR? *List each recommended follow-up separately. Include recommended medications and corrective lenses.*

38. Was there documentation in the case record that each of the recommended treatments, services, and/or equipment were received by the child during the PUR? *Reviewers should consider copies of reports from follow-up appointments, narrative notations that the child attended appointments, and entries in the medical tab in MACWIS as sources of information about follow-up services. Please mark paper copies with a post-it and note dates of entries into MACWIS.*

39. Were treatments, services, and/or equipment received within the timeframes recommended by the referring clinician during the PUR? *When answering this question, reviewers should compare when follow-up treatment, services, and/or equipment were received to the timeframes recommended for follow-up by the referring physician or other clinician. If the referring medical professional did not provide a timeline for follow-up, reviewers should indicate "unable to determine". If recommended treatments, services, and/or equipment are ongoing beyond the PUR, reviewers should consider only the treatments, services, and/or equipment that should have been received during the PUR when determining whether all, some, or none were received.*

40. Did any of the following factors prevent the child from obtaining recommended treatments, services, and/or equipment? (Choose all that apply.)

    a. No reason documented in the case record

    b. Treatment, service, and/or equipment was not available in that DFCS region

    c. No authorized person was available to provide treatment, service, and/or equipment in the DFCS region

    d. Treatment, service, and/or equipment were available but there was a waiting list

    e. Eligibility requirements for the treatment, service, and/or equipment were not met

    f. Treatment, service, and/or equipment were available but no transportation was available to access them

    g. Parent did not consent to treatment, service, and/or equipment

    h. Child did not assent to treatment, service, and/or equipment

    i. Caregiver did not facilitate access; no other arrangements were made

    j. Caseworker did not make any arrangements for the child to receive treatment, service, and/or equipment

    k. The child did not have health insurance

    l. Provider did not accept child's insurance

    m. Medicaid Managed Care provider did not approve treatment, service, and/or equipment

    n. Medicaid eligible, but Medicaid card not yet received or missing (lost or unavailable)

    o. Other (specify) _____

14

Follow-Up Services and Treatments Grid

| 37. Recommended Treatments, Services, and Equipment | 38. Received (all/some/none/ cannot confirm) | 39. Timely (yes/no/unable to determine) | 40. Barriers Use letter codes from Q40 | Source |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

Notes and Considerations

*Some cases may have special circumstances that should be considered when analyzing the data produced from this review instrument. When relevant, describe circumstances in the case that are relevant to the purpose of this review, but are not captured in the review instrument. For example, reviewers might note that Medicaid would not approve an initial or comprehensive examination because the child had one prior to entry into care. Alternative services might have been provided when recommended services were not available.*

# Information Provided to Placement Resources

*Questions about the information provided to placement resources refer only to the first placement in the custody episode that began on the identified custody start date: [date will pre-fill]*

41. Is there a completed DFCS-515 Foster Child Information Form in the child's case record? *See reviewer training handouts for an example of the form.*

   o   Yes

   o   No

42. Did the licensed resource parent, relative, group home or facility representative with whom the child was placed during this placement episode sign the DFCS-515 Foster Child Information Form?

   o   Yes. Specify date form was signed (mm/dd/yyyy) _____

   o   No

*Questions 43-46 refer to information or other items provided to placement resources.  Consider information provided on the Foster Child Information Form and through any other means.  For each category of information or item, indicate whether it was provided to placement resource:*

      (a) At the time of placement

      (b) Within 15 days of placement

      (c) After 15 days of placement

      (d) No evidence provided

      (e) Not applicable

      (f) Provided to placement resource, but unable to determine when

43.  Health Information Provided to Placement Resource

      _____ Name of child's primary care physician

      _____ Name of any relevant specialty doctors working with the child

      _____ Child's next appointments

      _____ Medicaid or other insurance card

      _____ Immunization records

      _____ Allergies

      _____ Results of the child's most recent physical exam

      _____ Child's medical equipment (e.g., eyeglasses, nebulizer, hearing aid)

      _____ Child's prescribed medication for medical (physical health) needs

44.  Mental/Behavioral Health Information Provided to Placement Resource

      _____ Name of child's mental health provider

      _____ Child's next appointments

      _____ Child's prescribed medication for mental/behavioral health needs

      _____ Child's diagnoses or description of social/emotional/behavioral needs

      _____ Special instructions for caregivers or educators

45.  Dental Information Provided to Placement Resource

      _____ Dental records

      _____ Name of child's dentist

      _____ Results of the child's most recent dental exam

      _____ Child's dental equipment (e.g., retainer, mouth guard)

46.  Educational Information Provided to Placement Resource

      _____ School enrollment information (i.e., school and grade)

      _____ Individualized education plan or 504 plan

      _____ Child's most recent report card

      _____ Ongoing educational services child is receiving (e.g., tutoring, classroom setting)

Appendix B. Dr. Moira Szilagyi, Curriculum Vitae

## Academic Focus: Moira A. Szilagyi, MD PhD

My primary academic focus is to promote the health and resiliency of children and adolescents who have experienced significant childhood adversity and trauma, especially those who have been victims of maltreatment. Childhood adversity is perhaps the most compelling health issue facing our nation's children. Children in foster care are the "canary in the coalmine" for childhood trauma, the visible tip of a much larger population of children who touch the child welfare system or endure multiple adversities without ever coming to the attention of child welfare.  In Rochester NY, I developed a strong state and national focus early on because there was such limited knowledge about children in foster care, their health needs, standards for health care, and what worked. In Los Angeles, I hope to build on that work.

**Health Care Delivery and Systems of Care**

From 1999 to 2014, I led a centralized foster care medical home, *Starlight Pediatrics* that became a national model. In 2009, I obtained a $3.1 million NYS HEAL grant to construct a state-of-the-art pediatric clinic that integrates pediatric, mental health, developmental, and dental care and a $1.3 million CDC Translational Grant to implement and disseminate an evidence-based integrated model of care. *Starlight Pediatrics* has served as the template for foster care health in at least 8 other cities/counties across the country. In addition, 3 states and the county of Los Angeles have regionalized similar models.

**Research**

I collaborated with experts from the Department of Pediatrics, Strong Behavioral Health, Mt. Hope Family Center from the U. Rochester, and Monroe County's Departments of Human Services and Public Health, and numerous national colleagues in investigating methods to improve healthcare and health outcomes for children and adolescents in foster care. I have been the senior researcher of the following:

- Developing interventions to systematically screen and manage developmental and mental health problems for children and adolescents in foster care.
- Implementing and evaluating health care standards for children in foster care.
- Translating evidence-based/promising interventions into real-world care of children in foster care: 1)Evidence-based parenting education augmented for foster parents; 2) Mental Health: Trauma-focused Cognitive Behavior Therapy, Interpersonal Psychotherapy for Adolescents and Child Parent Psychotherapy; and, 3) Visitation Coaching, a new model, to enhance parenting by bio-parents.

**Education**

I have mentored more than a dozen pediatric residents, fellows, and other healthcare professionals who now pursue careers serving and studying traumatized children. Nationally, I am a frequent Visiting Professor, Grand Rounds or keynote speaker. In 2009, I was a keynote speaker at the annual *Peds 21 Conference*, the "kick-off" for the AAP's national conference. I authored the leading authoritative healthcare book on foster care (*Fostering Health*) and led the development of the *Healthy Foster Care America* website, a widely used educational resource for professionals and families.

**Policy**

Most of my advocacy work has been at the national level with the American Academy of Pediatrics (AAP).  In 2008, I participated in the AAP's efforts in its collaboration with 37 other national organizations to provide the evidence and policy foundation for the US Congress' passage of the *Fostering Connections to Success and Increasing Adoptions Act*, the most significant child welfare legislation in over a decade. I am currently involved in the Childhood Poverty Task Force of the Academic Pediatrics Association, particularly in developing the strategic plan. I have authored several AAP policy statements and technical reports that set the health agenda for children in foster care.

# Moira Ann Szilagyi, MD, PhD

## Curriculum Vitae

**Business Address**:
Professor of Pediatrics
Division of General Pediatrics
300 Med Plaza Suite 3334
703324
Los Angeles, CA 90095

Phone 310-794-5361
Fax 310-206-4855

**Academic Appointment**
Professor of Pediatrics
Department of Pediatrics, UCLA Medical Center

**Demographic**
Date of Birth:        September 4, 1951
Place of Birth:       Melbourne, Victoria, Australia
Citizenship:          United States of America, 1970

## EDUCATION

| Institution | Degree | Field of Study | Year |
|---|---|---|---|
| Siena College | B.S. | Chemistry | 1974 (Valedictorian, Summa cum laude) |
| University of Rochester | M.S. | Biochemistry | 1979 |
| University of Rochester | Ph.D. | Biochemistry | 1980 |
| University of Rochester | M.D. | Medicine | 1984 |

## POSTDOCTORAL TRAINING

6/84-6/86: Internship in Pediatrics, University of Rochester School of Medicine and Dentistry, Strong Memorial Hospital, Rochester, NY. (Reduced Schedule),

6/86-2/90:  Residency in Pediatrics, University of Rochester School of Medicine and Dentistry, Strong Memorial Hospital, Rochester, NY. (Reduced Schedule)

**Honorary Societies**
1974:  ALPHA  KAPPA  ALPHA

1974:  DELTA EPSILON SIGMA
1978:  Elected to SIGMA XI (National Honor Society in Biochemistry)
2013   American Pediatric Society

## CERTIFICATION AND LICENSURE INFORMATION

| | |
|---|---|
| American Board of Pediatrics | 1990; re-certification 1997, 2004, 2011 (expires 2014). |
| New York State License | 166770-1 |
| DEA | BS0667646 |
| NCS | 1073548897 |

## FACULTY APPOINTMENTS

| | |
|---|---|
| 1990-1998 | Clinical Instructor in Pediatrics, Department of Pediatrics, Strong Memorial Hospital, Rochester, New York |
| 1998-2003 | Clinical Assistant Professor, Department of Pediatrics, University of Rochester, Rochester, New York |
| 2003- | Associate Professor of Pediatrics, Department of Pediatrics, University of Rochester, Rochester New York |
| 2012-2014 | Professor of Pediatrics, Department of Pediatrics, University of Rochester, Rochester New York |
| 2014- | Professor of Pediatrics, Department of Pediatrics, University of California at Los Angeles |

## PROFESSIONAL AND ADMINISTRATIVE APPOINTMENTS

| | |
|---|---|
| 1976-1979 | Adjunct Professor of Chemistry, Nazareth College, Pittsford, NY |
| 1990-1992 | Primary Care Pediatrician in private practice (part-time), Twelve Corners Pediatrics, Rochester NY |
| 1990-1992 | Primary Care Pediatrician, Children's Center (Juvenile Offender Detention; part time), Monroe County Department of Health, Rochester, NY |
| 1990-2014 | Medical Director, *Starlight Pediatrics* (formerly known as Foster Care Pediatrics), Monroe County Department of Health, Rochester, NY |
| 1992-1994 | Founder and Co-director, REACH Program (REACH is the regional referral center for medical evaluation of suspected child abuse and neglect), Department of Pediatrics, Strong Memorial Hospital, Rochester, New York |

| | |
|---|---|
| 1994-2014 | Preceptor, Illness and Continuity Clinics, Pediatric Practice at Strong, Strong Memorial Hospital, Rochester, New York |
| 2015- | Department of Health Services, Clinical faculty, Olive View Medical Center. Clinical Services for children in foster care at the Children's Clinic. |

## MEMBERSHIPS IN PROFESSIONAL ORGANIZATIONS

### National
| | |
|---|---|
| 1990- | Fellow, American Academy of Pediatrics. |
| 1993-1998 | Member, American Professional Society Child Abuse and Neglect. |
| 2006- | Member, Academic Pediatrics Association |
| 2013- | Member, American Pediatric Society |

American Academy of Pediatrics, National Committees
| | |
|---|---|
| 1995-1999 | Section Member, Committee on Child Abuse and Neglect. |
| 2000-2002 | Steering Committee, Provisional Section on Adoption. |
| 2001-2008 | Member, Committee on Early Childhood, Adoption and Dependent Care. |
| 2002-2010 | Steering Committee, Section on Adoption and Foster Care |
| 2003-2005 | Steering Committee, Healthy Foster Care America |
| 2006-2007 | Vice-Chair, Healthy Foster Care America |
| 2006-2010 | Vice-chair, Task Force on Foster Care |
| 2010-2011 | Chair, Section on Adoption and Foster Care |
| 2011- | Chair, Council on Foster Care, Adoption and Kinship Care |
| 2013 | Member, Center on Resiliency |

Academic Pediatric Association Activities
| | |
|---|---|
| 2012- | Member, Childhood Poverty Task Force, Child Abuse SIG |

National Child Traumatic Stress Network
| | |
|---|---|
| 2013- | Liaison from American Academy of Pediatrics |

CAPQUAM, Einstein School of Medicine
| | |
|---|---|
| 2014 | CAPQUAM Faculty, developing measures for NCQA regarding follow-up after discharge from inpatient mental health. |

### State and Local
Child Abuse and Neglect
| | |
|---|---|
| 1995-1998 | Board Member, New York State Professional Society, Child Abuse and Neglect. |

Rochester Pediatric Society
| | |
|---|---|
| 1996 | Secretary-Treasurer, Rochester Pediatric Society. |
| 1997 | Vice-President, Rochester Pediatric Society. |
| 1998 | President, Rochester Pediatric Society |

**Moira Szilagyi, MD, PhD**

American Academy of Pediatrics, Regional and State

| | |
|---|---|
| 1995-2005 | Chair, Committee on Early Childhood, Adoption and Dependent Care, American Academy of Pediatrics, District II, Chapter I. |
| 1995-2005 | Chair, American Academy of Pediatrics District II, New York State, Task Force on Foster Care Health Care |

## HONORS AND AWARDS

| | |
|---|---|
| 1970-1974 | Ford Foundation Scholar. |
| 1974 | Summa Cum Laude, Valedictorian, Siena College. |
| 1975-1978 | National Research Service Award (NCHSR, DHHS). |
| 1979-1980 | Elon Huntington Hooker Fellowship. |
| 1988-1989 | House-officer of the Year, Rochester Pediatric Society. |
| 1988-1989 | Burroughs-Welcome Award, Leadership in Residency. |
| 1992 | National Association of Counties, Award for Foster Care Pediatrics |
| 1998-1999 | Outstanding Clinical Faculty Teaching Award. Awarded by the Pediatric House-Staff at the University of Rochester. |
| 2003 | Child Advocacy Award, from New York Chapter of National Association of Pediatric Nurse Practitioners. |
| 2003 | Ruth A. Lawrence Faculty Service Award. Golisano Children's Hospital at Strong, University of Rochester. |
| 2003 | Making a Difference Award. "For your special gifts of healing, compassion and never-ending commitment to and advocacy for children in foster care." Awarded by Department of Health and Human Services, Monroe County, NY. |
| 2004 | Pediatric Links with the Community Advocacy and Education Award. |
| 2004 | Millie and Richard Brock Pediatric Award.  New York Academy of Medicine. September 19, 2005. |
| 2007 | Health Care Achievement Award.  Rochester Business Journal. |
| 2007 | Award of Merit.  Rochester Academy of Medicine. |
| 2007 | American Professional Society on Abused Children.   Front-line Service Award. |
| 2007 | Calvin C.J. Sia Community Pediatrics Medical Home Leadership and Advocacy Award. Presented   at the American Academy of Pediatrics' Council on Community Pediatrics. October 28, 2007. |
| 2009 | W. Burt Richardson Lifetime Achievement Award, Federation of Social Workers. October 23, 2009. |
| 2011 | Dr. David Satcher Community Health Improvement Award, Senior Faculty Category.  University of Rochester Medical Center.  March 21, 2011.  Awarded for work in reducing health disparities and addressing priority community health needs, especially for children in foster care. |

## ACADEMIC FOCUS

Current and future areas of research, clinical care, educational, and policy activities will focus on improving the health care and health outcomes of children in foster care on the local, state, and national levels. Specific ongoing or planned projects involving children involved with child welfare or at risk for child welfare involvement, including foster care are:

### Research

My over-arching interest is the how pediatricians can be actively involved in meaningful ways in the prevention and amelioration of childhood trauma and toxic stress.

- Medical homes for children in foster care [achieving the standards of quality care]
- Optimizing primary and specialty health care management for children in foster care
- Managing the unique health problems of adolescents aging out of foster care
- Integrating evidence-based, trauma-focused, mental health services into the medical home for children and adolescents in foster care.
- Integrating evidence-based parenting education into foster parent training
- Integrating promising and evidence-based parenting practices into foster care visitation
- Trauma exposure and mental health utilization
- Predictors and prevention of recidivism for children and families involved with protective services
- Building state-level health care systems for children in foster care.
- Identifying families in pediatric settings at risk for child welfare involvement.

### Clinical Care

My clinical work will continue to focus on children in foster care and their broad health needs (physical, emotional, educational, development, and dental).

- Integrating evidence-based mental health, developmental and dental services into the medical home in the care of children and adolescents in foster care
- Implementing evidence-based, trauma-informed parenting education for foster parents of teens
- Providing comprehensive after-care health services for young adults aging out of foster care until age 24 years
- Implementing comprehensive after-care health services for children with complex medical problems adopted from foster care
- Implementing teen peer groups focused on life-skills development and health education
- Providing each child and adolescent in foster care with a "health passport" that can follow them across providers and out of foster care.
- Screening for social determinants of health in pediatric settings.
- Interventions to ameliorate the adverse impact of social determinants of health.

### Education

I am working with the AAP and National Child Traumatic Stress Network on the development of educational materials and the training of pediatricians on childhood trauma, toxic stress and their prevention and amelioration.  We are seeking to develop tiered preventive care materials and

strategies to assist pediatricians with screening and surveillance to identify at risk families and then triage them using a package of interventions to address the needs identified.

- Develop a residency training curriculum in social pediatrics, including child welfare and juvenile justice
- Education of residents about childhood trauma and toxic stress, building resilience and strengthening families.
- Education of primary care pediatricians about childhood trauma and toxic stress, building resilience and strengthening families

**Policy**

- Development of a statewide health care management system for children and adolescents in foster care.
- Expand the education of pediatric, mental health and child welfare professionals in childhood trauma prevention and treatment.
- Allow local commissioners of social services to consent for Early Intervention evaluation and treatment when a legal guardian is unable or unwilling to provide consent.
- Promoting the engagement of pediatric professionals in the development of health care management systems for children in foster care in every state.
- Transforming health care in pediatrics to prevent, identify, and ameliorate childhood trauma and adversity.
- Expand the federal interest in psychotropic medication prescribing to the identification and treatment of trauma for children in foster care.
- Broad expansion of evidence-based interventions with fidelity.


**GRANTS**

Principal Investigator
**Szilagyi M,** Merrill A.  Gaps and overlaps in mental health services for children in foster care. CATCH Planning Grant from the American Academy of Pediatrics, March 1, 1995-February 28, 2006. $10,000.

**Szilagyi M**, Merrill A, Lewis C.  Designing mental health services for children in foster care. Coordinated Care Services, Inc., Rochester NY.  January 1, 1997-December 31, 1997. Supported meetings of interdisciplinary group to develop mental health service model for children in foster care. $3000.

**Szilagyi M**, Jee S.  TIDES: Timely Intervention of Developmental and Emotional Services for Children in Foster Care.  Halcyon Hill Foundation, January 1, 2006-December 31, 2008. $250,000.

Doniger A (Administrative PI), **Szilagyi M (Project PI)**.  Starlight Pediatrics Center.  New York State Education Department, HEAL-6 capital grant.  March 1, 2009-September 30, 2010. $3,027,000.  Capital grant that funded the construction of a new pediatric clinic, teaching and conference space, mental health and developmental assessment rooms, and dental screening space for children and adolescents in foster care.

**Szilagyi M** (Collaborative grant with multiple organizations: Doniger A, Toth S, Lewis C, Manly J, Jewell T, Affronti M, Hightower D, Butt L.)   Healthy Futures for Children in Foster Care:  Translating Evidence into Practice.  Centers for Disease Control, September 1, 2009. Work began June 1, 2010 and continued through May 31, 2013.  $1,338,058.

**Szilagyi M. (**Collaborative grant with three community based organizations:  Driscoll S, Spaull E, Valentine L.) Healthy transitions to adolescence.  Successfully transitioning children to adolescence.  New York State Department of Health, March 1 2013-February 28, 2018.   NYS Award $170,509 annually for 5 years, with 43% match each year.  Total NYS Award: $852,545. Total grant: $1,608, 575.

**Szilagyi M**.  Healthy Transitions:  Successfully Transitioning Youth to Adolescence.  Wilson Foundation Grant. July 2014-June 2015.  $10,000.  Matching funds for NYS STYA grant above.

Co-Investigator
Henrichs M, **Szilagyi MA**.  Peer Support Groups for Children in Foster Care.  American Academy of Pediatrics Healthy Tomorrows Grant, July 1,1991-June 30, 1996.  Collaborative effort among Kids Adjusting Through Support (KATS), Foster Care Pediatrics and the Department of Social Services.  $250,000 awarded; $250,000 matching funds.

Jee S, **Szilagyi M**.  Quality of care in a foster care medical home.  Funded by Pediatric Links with the Community and the Strong Center for Clinical Research.  $11,000 over 18 months. March 1, 2005-March 1, 2006.

Jee S, **Szilagyi M**.  Fostering Connections (Parenting Education for Foster Parents.  Medical Home Models for Children in Foster Care.  New York State Health Foundation. 1/1/10-12/31/11. . $300,141

Szilagyi PG, Halfon N, **Szilagyi M**.  National Children's Study and Children in Out-of-Home Care. 11/01/10-12/31/11.  $147,884.

*Mentor for Faculty Development Awards*
Sandra Jee MD, MPH.  Robert Wood Johnson Faculty Development Award.  Primary  care-based mental health screening for adolescents in foster care. 07/01/07-08/31/10.  4300,000.

## PEER-REVIEWED PUBLICATIONS

- McAnarney ER, Lawrence RA, Riccuti HN, Polley J, **Szilagyi MA**. Interactions of adolescent mothers and their year-old children. *Pediatrics* 78(4):585-590, 1986.
- **Szilagyi MA.** The pediatrician and the child in foster care. *Pediatrics in Review* 18:1-16, 1998.
- Simms MD, Dubowitz H, **Szilagyi MA**. Health care needs of children in the foster care system. *Journal of the Ambulatory Pediatric Association* 106(4):909-918, 2000.

**Moira Szilagyi, MD, PhD**

- Jee SH, Antonucci TC, Aida M, **Szilagyi MA**, Szilagyi P.  Emergency department utilization of children in foster care.  *Ambul Peds* 5:37-41, 2005.
- Jee SH, Barth RP, **Szilagyi MA**, Szilagyi PG, Aida M, Davis MM.  Factors associated with chronic conditions among children in foster care. *J Health Care Poor Underserved*. 2006 May; 17(2):328-41.
- Jee, SH, **Szilagyi M**, Nilsen W, Myoshi T, Fryer E, Toth S, Szilagyi P.  Persistence of posttraumatic stress symptoms among young adolescents in foster care: a national study. *Pediatric Nursing*.  2006.
- Jee SH, Conn KM, Nilsen WJ, **Szilagyi MA**, Forbes-Jones E, and Halterman JS. Learning difficulties among children separated from a parent. A*mbulatory Pediatrics*, 8(3): 2008.
- Jee SH and **Szilagyi MA**. Foster care issues in general pediatrics. *Current Opinions in Pediatrics*. 2008, 20: 724-728.
- Jee SH, Tonniges T, **Szilagyi MA**.  Foster care issues in general pediatrics.  *Current Opinions in Pediatrics.* 2008;20:724-728.
- Jee SH, **Szilagyi MA**, Ovenshire C, Norton A, Conn A-M, Blumkin A, Szilagyi PG. Improved detection of developmental delays among young children in foster care. *Pediatrics*. 2010;125:282-289.
- Jee, S, **Szilagyi M**, Blatt S, Meguid V, Auinger P, Szilagyi P.  Timely identification of mental health problems in two foster care medical homes. *Children and Youth Services Review*. 2010; 32(5):685-690.
- Jee SH, Conn AM, Blumkin A, Szilagyi PG, Baldwin CD, **Szilagyi MA**. Identification of social-emotional problems among young children in foster care, Journal of Child Psychology and Psychiatry. 2010;51:1351-1358.
- **Szilagyi, M**. In the Moment: The hand on the door.  *Academic Pediatrics*. 2011;11:105-106.
- Jee SH, Halterman JS, **Szilagyi MA**, Conn AM, Alpert-Gillis L, Szilagyi PG.  Enhanced detection of social-emotional problems among youth in foster care.  *Academic Pediatrics*. 2011; 11(5):409-413.
- Jee SH, **Szilagyi MA**, Conn AM, Nilsen WJ, Toth S, Baldwin CD, Szilagyi PG. Assessing and validating office-based screening for psychosocial strengths and difficulties among youths in foster care. *Pediatrics*. 2011;127:904-910.
- **Szilagyi**, M.  The pediatric role in the care of children in foster and kinship care. Pediatrics in Rev. 2012;33:456-508.
- Conn A-M, **Szilagyi MA**, Franke TM, Albertin CA, Blumkin AK, & Szilagyi PG. Trends in child protection and out-of-home care. *Pediatrics.* 2013;132:712-719 (doi: 10.1542/peds.2013-0969).
- Conn AM, Calais C, **Szilagyi** MA, Baldwin C, Jee SH.  Youth in out-of-home care: relation of engagement in structured group activities with social and mental health measures. *Children and Youth Services Review, 36,* 201-205.
- Jee SH, Conn AM, Toth S, **Szilagyi** MA, Chin NP. Treatment experiences and expectations in foster care: a qualitative investigation. *Journal of Public Child Welfare*. In press. Publication pending. 2014.
- **Szilagyi M**. Kinship Care. *Academic Pediatr*. 2014;14:543-544.
- Forkey H, **Szilagyi M**.  *Pediatric Clinics of North America*.

**In process**:
.

**Szilagyi, M.** Council on Foster Care, Adoption and Kinship Care. Fostering Healthy Development of Young Children in Foster Care: American Academy of Pediatrics Technical Report. *Pediatrics*. Manuscript in Review.

**Szilagyi MA**, Jee SH, Nilsen WJ, Fryer GE, Miyoshi T, Thomas-Taylor D, Szilagyi PG, Toth ST. Under-utilization of outpatient specialty mental health services among children in foster and kinship care across the US. Manuscript in preparation.

Eleoff SB, Jee SH, **Szilagyi MA**, Sturge-Apple ML, Montes G, Szilagyi PG. Prevalence of adverse childhood experiences among children in kinship care and foster care. Baltimore, MD, May 2009. Manuscript in preparation.

**Szilagyi M**. Council on Foster Care, Adoption and Kinship Care. American Academy of Pediatrics. Policy Statement: Health Care Issues for Children and Adolescents in Foster Care. *Pediatrics*. Submitted for Final Review by American Academy of Pediatrics Board of Directors.

**Szilagyi M**. Council on Foster Care, Adoption and Kinship Care. American Academy of Pediatrics. Technical Report: Health Care Issues for Children and Adolescents in Foster Care. *Pediatrics*. Submitted for Final Review by American Academy of Pediatrics Board of Directors.

Kroening A, **Szilagyi M**. Developmental Issues of Children in Foster Care. *J Develop Behavior Pediatr.* In process.

**Szilagyi M**., Kerker BD, Storfer-Isser A, Stein, RED, Garner A, O'Connor KG, Hoagwood KE, Horwitz SM. Do pediatricians inquire about parental adverse childhood experiences? Manuscript in process.

Conn AM, **Szilagyi MA,** Alpter-Gillis L, Baldwin CD, Jee SH. Mental Health Problems that Mediate Treatment Utilization Among Children in Foster Care. J Child Family Studies. Revised and resubmitted.

Garner AS, Forkey H, **Szilagyi M**. Developmental science and childhood adversity: Will it be "back to the future"? *Academic Pediatr*. Invited and submitted for review.

Stein REK, Storfer-Isser A, Kerker BD, Garner AS, **Szilagyi** M, O'Connor KG, Horwitz SM. Beyond ADHD: How well are we doing? Submitted for review.

Kerker BD, Storfer-Isser A, Stein REK, Garner AS, **Szilagyi** M, O'Connor KG, Hoagwood KE, Horwitz SM. Identifying maternal depression in pediatric primary care: Changes over a decade. Submitted for review.

Horwitz SM,  Storfer-Isser A, Kerker BD, **Szilagyi** M, Garner AS, O'Connor KG, Hoagwood KE, Stein REK.  Barriers to the identification and management of psychosocial problems: Changes over a decade.  Submitted for review.

## EDITORSHIP OF BOOKS

American Academy of Pediatrics, New York State, District II. Committee on Foster Care Health Care. Szilagyi, M. (ed.). *Fostering Health: Health Care for Children in Foster Care.*  New York, 2001.

American Academy of Pediatrics, New York State, District II. Task Force on Health Care for Children in Foster Care. Szilagyi, M. (ed.).  *Fostering Health: Health Care for Children and Adolescents in Foster Care, 2nd ed.*  Chicago,  2005.

## BOOK CHAPTER AUTHORSHIP

1. Szilagyi  PG, **Szilagyi MA**. Hyperlipoprotinemia. In: *Bedside Pediatrics,* Ziai M, Ed. Boston:  Little, Brown & Co., 1983.
2. **Szilagyi  MA**, Szilagyi PG. Foster care. In: *Serving the Underserved - A Residency Education Curriculum,* Bithony MG, et al., 1992.
3. **Szilagyi MA**.  Foster Care and Adoption. In: *Primary Pediatric Care*, Hoekelman RA, Ed., St Louis: Mosby, Inc., 2001.
4. **Szilagyi MA**. Social Issues Affecting Children and Their Families. In: *The Merck Manual of Medical Information*—the *Home Edition*. (2002)
5. **Szilagyi MA**. Foster Care. In: *About CHILDREN: An Authoritative Resource on the State of Childhood Today*.  Cosby AG, Greenberg RE, Southener LH, Wietzman M, eds. Chapter 15:72-75.  2005.
6. Jee SH, **Szilagyi MA**.  Children in Foster Care.  In: *Pediatric Clinical Advisor*, 2nd Ed. Philadelphia, PA: Mosby, Elsevier, 806-807, 2007.  Garfunkel LC, Kaczorowski JM, and Christy C, eds.
7. **Szilagyi M**.  Youth aging out of foster care. In: *Child Welfare 360*. University of Minnesota, School of Social Work.  March 2008.
8. **Szilagyi MA**, Jee SH.  Health Needs for Children in Foster Care. In: *American Academy of Pediatrics Textbook of Pediatric Care* 1st Ed. Elk Grove Village, IL: American Academy of Pediatrics.  2009.  Chapter 57. McInerny TK, Adam HM, Campbell DE, Kamat DM, Kelleher KJ, eds.
9. **Szilagyi MA**.
10. **Szilagyi M**. Foster and Kinship Care. In: *Nelson Textbook of Pediatrics*, 19th  Ed. Elsevier, Philadelphia, PA. Chapter 35. 2014. Kligman RM, Stanton BF, St. Geme JW, Schor NF, Behrman RE, eds.
11. **Szilagyi MA.**  Disabled Children in Foster Care in the United States.   In:  *Disabled Children Living Away from Home*.  Burns, C. ed.  MacKeith Press. London, UK. 2009.
12. Jee SH and **Szilagyi MA**.  Comprehensive health care for children in foster care. In: *Up To Date*, 2008-2011. Available at: www.uptodate.com

13. **Szilagyi M**, Jee S.  Chapter 29 Adolescents in Foster Care. In: *Textbook of Adolescent Health Care*. Fisher MM, Alderman EA, Kreipe RE, Rosenfeld WA (eds).  American Academy of Pediatrics, Elk Grove Village IL, 2011.

14. **Szilagyi MA**.  Foster and Kinship Care. In: *Nelson Textbook of Pediatrics*, 20th Ed. Elsevier, Philadelphia, PA. Chapter 39. 2014. Kliegman RM, Stanton BF, St. Geme JW, Schor NF, Behrman RE, eds.

15. **Szilagyi MA** and Jee SH.  Epidemiology of foster care placement and overview of the foster care system in the United States. In: *Up To Date*, 2008-2014. Available at www.uptodate.com.

16.


## WEBSITE DEVELOPMENT AND EDITORSHIP

*Healthy Foster Care America Website (www.aap.org/fostercare).* American Academy of Pediatrics, Task Force on Foster Care.  2009-2014.  Major content author and worked closely with AAP staff and CAPTUS in website development over 2 years.  Continue to work closely with AAP staff to add and update content.


## ABSTRACTS

1. **Szilagyi MA**, Marinetti GV.  The isolation of rat cardiac myocytes. Presented at the American Biochemical Society Meeting, Toronto, Canada, 1979.

2. **Szilagyi MA**, Szilagyi PG. A population at risk: children in foster care. *AJDC* 146:476, 1992.

3. **Szilagyi MA**, Szilagyi PG, McMahon E, Jennings JA, Campbell L. Foster parents respond to the issues. *Archives of Pediatrics & Adolescent Medicine*, Abstract #139:57, 1993.

4. **Szilagyi MA**, Jee S, Fryer E, Toth S, Nilsen W, Szilagyi P, Myoshi T.  Does trauma exposure predict outpatient mental health utilization by children in foster and kinship care ?  *Pediatric Academic Society Meetings*.  2006.

5. Jee, SH, **Szilagyi M**, Myoshi T, Fryer E, Toth S, Nilsen W, Szilagyi P.   Persistence of posttraumatic stress symptoms among young adolescents in foster care: a national study. At Pediatric Academic Societies' Meeting. 2006. San Francisco, CA.

6. Jee SH, Alpert-Gillis LJ., Girolamo, AM, Blumkin A, and **Szilagyi, MA.**  Behavioral health screening in a primary care foster care clinic.  Symposium presentation. American Psychological Association Annual Meeting. Boston, MA. August 2008.

7. Jee SH, Alpert-Gillis LJ., Girolamo, AM, Blumkin A, and **Szilagyi, MA.**  Behavioral health screening in a primary care foster care clinic.  Symposium presentation. American Psychological Association Annual Meeting. Boston, MA. August 2008.

8. Jee SH, Conn AM, Szilagyi PG, Blumkin A, Baldwin CD, **Szilagyi M.**  Identification of social-emotional problems among young children in foster care. Platform presentation. American Academy of Pediatrics National Conference and Exhibition. San Francisco, CA. (October 2010)

9. Conn AM, **Szilagyi MA**, Franke TM, Albertin C, Blumkin A, Szilagyi PG.  Patterns and prevalence of out-of-home care in the United States. AAP Presidential Plenary Presentation.  Pediatric Academic Societies.  Boston MA. May 2012.

10. Conn AM, **Szilagyi MA**, Blumkin A, Szilagyi P.  Mental health outcomes among child welfare investigated children: In-home versus out-of-home care.  Academic Pediatric Association.  Presidential Plenary Presentation.  Pediatric Academic Societies. Baltimore MD. (May 2013.)

11. Conn AM, Jee SH, **Szilagyi M**, Blumkin A, Baldwin CD, , Szilagyi PG.  Parent Training Effectiveness in Child Welfare.  Platform presentation.  Pediatric Academic Societies.  Vancouver, British Columbia, Canada.  (May 2014)

## OTHER PUBLICATIONS

1. *Doctoral (Ph.D.) Thesis:* **Szilagyi MA**. The Effects of Catecholaminergic Agents on Cardiac Myocyte Lipid Metabolism. University of Rochester, 1979.

2. **Szilagyi MA**.  Medical Issues in Children Adopted out of Foster Care. *Adoption Medical News Letter,* 1998.

## REVIEW ASSIGNMENTS IN PROFESSIONAL JOURNALS

Peer Reviewer for

*Pediatrics in Review*
*Pediatrics*
*Child Abuse and Neglect*
*Academic Pediatrics*

Other Review Assignments
- *American Academy of Pediatrics, Textbook of Pediatrics, multiple chapters*
- *American Bar Association* (materials prepared for Judges and Attorneys on foster care health issues. 2006-present.)

## INTERNATIONAL LECTURESHIPS

Visiting Professor, MacKeith Meetings, Royal Society of Medicine, London, England. Multiply Handicapped Children in Foster Care. March 17-18, 2003.

## NATIONAL LECTURESHIPS AND VISITING PROFESSORSHIPS

1. Visiting Professor, University of Florida at Jacksonville.  Building Systems of Health Care for Children in Foster Care.  Jacksonville, FL. November 1-2, 2001.

2. Visiting Professor.  University of Vermont, Burlington, VT*:*  Fostering Health:  Health Care for Children in Foster Care. October, 2002.

3. Visiting Professor, Foster Care United Services (FOCUS), University of Michigan, Department of Pediatrics, Supported by the American Academy of Pediatrics Section on Community Pediatrics, Mentorship and Technical Assistance Program (MTAP). November 12-13, 2002.

4. Consultant and Speaker, ChildTrends, Consortium on Child Well-being Indicators for Child Welfare Populations, Washington, DC.  Health Care Assessments for Young Children in Foster Care. April 8, 2003.

5. Visiting Professor, University of Massachusetts, Building a Medical Home for Children in Foster Care:  Cross-systems collaboration.  Worcester, MA. November 14, 2003.

6. Visiting Professor and Keynote Speaker.  *Jersey Shore Medical Center, NJ*.  Fostering Health: Children in Foster Care.  April, 2005.

7. Keynote Speaker and Workshop Leader, CARES Institute, Third Annual Statewide Best Practice Symposium:  Meeting the Medical and Mental Health Needs of Children in Foster Care.  University of Medicine and Dentistry New Jersey, Stratford NJ.  March 15, 2007.

8. Keynote Speaker.  Hershey Medical Center. Harrisburg, PA. Medical Homes for Children in Foster Care. November 20, 2009.

9. Visiting Professor.  Montefiore Medical Center.  Health Issues of Children in Foster Care, Medical Homes, Trauma and Children in Foster Care.  January 2010.

10. Visiting Professor.  Milwaukee Children's Hospital.  Health Care for Children in Foster Care:  The Pediatric Medical Home.  Caring for the Traumatized Child. October 2010.

**11.** Visiting Professor.  The Blazey Lecture.  Akron Children's Hospital.  Health Issues for Children in Foster Care.  Research Issues and Children in Foster Care.  The Child Welfare System.  December 2011.


## PRESENTATIONS AT NATIONAL PROFESSIONAL MEETINGS

1. **Szilagyi MA**, Szilagyi PG, Webb T, Ghanizadeh H.  A Population at Risk:  Children in Foster Care.  Presentation at the 32nd Annual Meeting of the Ambulatory Pediatric Association, Baltimore, Maryland, May 4, 1992.

2. **Szilagyi MA**, Henrichs M, McMahon E.  Peer Support Groups for Children in Foster Care.  Presented at the American Academy of Pediatrics Meeting, Spring Session, Washington DC, 1992.

3. **Szilagyi MA**, Szilagyi PG, McMahon E, Jennings JA, Campbell L.  Foster Parents Respond to the Issues.  Poster Presentation at the 1994 APA/SPR/APS Annual Meeting, Seattle, Washington, May 4, 1994.

4. **Szilagyi MA**. Advocacy on Behalf of Children in Foster Care:  Developing Standards for Health Care Delivery. Presented to the Child Abuse Special Interest Group at the APA/SPR/APS Annual Meeting, May 2000.

5. **Szilagyi MA**. A Centralized Primary Care Office for Children in Foster Care: A Model for Health Care Delivery.  Presented at "Panel of Experts in Foster Care", convened by Annie E. Casey Family Foundation and Institute for Health Improvement, Dallas TX, March 2001

6. **Szilagyi MA**, Levitsky S.  Health Care Standards for Children in Foster Care.  Presented at the National Conference and Exhibition, American Academy of Pediatrics, October 2001.

7. **Szilagyi MA**.  Behavioral Disorders in Young Children in Foster Care.  The Infant Child Health Assessment Program, Medical and Health Research Association of New York, Inc., New York, NY.  October, 2002.

8. **Szilagyi MA**. "Health Care Standards for Children in Foster Care". Topic Symposium on Health Care for Children in Foster Care.   Presented at Pediatric Academic Societies Annual Meeting and Exposition, Seattle, WA. May 3, 2003.

9. **Szilagyi MA**, Cournos F.  "Children in Transition:  Health Care for Children in Foster Care."  American Academy of Pediatrics National Conference and Exhibition.  Atlanta, GA.  October 2006.

10. **Szilagyi MA**, Cournos F.  "Children in Transition:  Health Care for Children in Foster Care."  American Academy of Pediatrics National Conference and Exhibition.  San Francisco, CA.  October 2007.

11. **Szilagyi MA**, Springer S.  "Just in Time:  Health Care for Children in Foster Care."  American Academy of Pediatrics National Conference and Exhibition.  Boston, MA.  October 2008.

12. **Szilagyi MA**, Pilkin L.  "Health Issues of Children in Foster Care".   National Association of Child Counselors.  Brooklyn NY.  August 21, 2009.

13. **Szilagyi MA**.  "Healthy Futures:  Ten Things Pediatricians Need to Know about Children in Foster Care.  American Academy of Pediatrics Peds 21 Conference.  Washington, DC.  October 16, 2009.

14. **Szilagyi MA**, Stille Christopher. Making it work: The medical home for children with common chronic conditions.  American Academy of Pediatrics National Conference and Exhibition.  October 2011.

15. Conn AM, Szilagyi M, Franke T, Albertin C, Blumkin A, Szilagyi PG.  Patterns and Prevalence of Out-of-Home Care in the United States**.** American Academy of Pediatrics, Presidential Plenary.  Pediatric Academic Societies.  April 2012.

16. Developmental Behavioral Pediatrics PREP.  Health Issues in Foster Care and Adoption.  Phoenix, AZ.  December 2012.

17. National Child Traumatic Stress Network All-Network Conference.  Trauma- and Resilience-Informed Integrated Care for Youth and Families.  Washington DC. March 2014.

18. National Child Traumatic Stress Network.  Trauma- and Resilience-Informed Integrated Care for Youth and Families. Webinar.  March 25, 2014.

19. Health Care Management for Children and Adolescents in Foster Care.  Presented at Child Abuse Special Interest Group.  Pediatric Academic Societies.  Vancouver, BC, Canada. May 2014.


## PRESENTATIONS AT STATE, REGIONAL OR LOCAL MEETINGS

National Presentations:  Keynotes and Grand Rounds

1. *Upstate Medical Center*, Syracuse, New York: Children in Foster Care. March 1993.

2. *University of Florida at Jacksonville, Jacksonville, FL*:  Health Care for Children in Foster Care. November 2001.

3. *University of Vermont, Burlington, VT:*  Fostering Health:  Health Care for Children in Foster Care. October, 2002.

4. *University of Michigan, Ann Arbor, MI*:  Visiting Professor, Foster Care United Services (FOCUS), Department of Pediatrics, Supported by the American Academy of Pediatrics Section on Community Pediatrics, Mentorship and Technical Assistance Program (MTAP).  .  Included Grand Rounds: Fostering Health:  Children in Foster Care. November 12-13, 2002.

5. *University of Massachusetts, Worcester, MA*.  Visiting Professor, University of Massachusetts, Building a Medical Home for Children in Foster Care:  Cross-systems collaboration.  Worcester, MA..F Included Grand Rounds: Fostering Health: Health Care for Children in Foster Care. November 14, 2003.

6. *Jersey Shore Medical Center, NJ*.  Fostering Health: Children in Foster Care.  April, 2005.

7. *New York University, NY, NY*.  Fostering Health.  Health Care Issues for Children in Foster Care.  September, 2005.

8. *University of Medicine and Dentistry New Jersey, Stratford NJ*.  March 15, 2007.

Keynote Speaker and Workshop Leader, CARES Institute, Third Annual Statewide Best Practice Symposium:  Meeting the Medical and Mental Health Needs of Children in Foster Care.

9. *Hershey Medical Center. Harrisburg, PA.*  Keynote Speaker. Medical Homes for Children in Foster Care. November 20, 2009.

10. *Montefiore Medical Center, Bronx NY.*  Health Issues of Children in Foster Care. January 27, 2010.

11. *Children's Hospital of Milwaukee, Milwaukee, WI.*  Improving Health and Mental Health Outcomes for Children in Foster Care.  October 2010.

12. *Akron Children's Hospital. Akron, OH.*  Fostering Healthy Futures: Health Care for Children and Adolescents in Foster Care. December 2011.

13. *Santa Clara County 30th Child Abuse Council Symposium.*  Top 10 Things Professionals Need to Know about Children in Foster Care.  April 2012.

14. *Santa Clara County 30th Child Abuse Council Symposium.* Traumatized Children: Managing Mental Health Issues in Primary Care.  April 2012.


Grand Rounds, Rochester NY**:**
1.  *Rochester General Hospital*:  Foster Care.  February 1991.

2. *Strong Memorial Hospital:*  A Population in Crisis - Children in Foster Care.  February 1992.

3. *Rochester* General *Hospital:*  Sexual Abuse Evaluation in the Primary Care Setting. October 1995.

4. *Strong Memorial Hospital:*  Healthy Futures for Children in Foster Care. January 2010.

5. *Rochester General Hospital:* Healthy Futures for Children in Foster Care. January 2010.

6. *University of Rochester Medical Center, Department of Preventive Medicine:* Fostering Healthy Futures:  Health Needs of Children in Foster Care. March 2011.

Other Professional Presentations: Rochester NY

1.  Cocaine Effects. Regional Foster Parent Training, November 1991.

2.  Ongoing participation in Foster Parent Training (MAP) Series since 1992.

3.  Children in Transition. University of Rochester, Regional HIV Conference, April 1995.

4. Sexual Abuse Evaluation in the Primary Care Setting. Pediatric Continuity Clinic, Teaching Sessions for Residents. Presented on multiple occasions, 1994, 1996, 1998.

5. Child Abuse. Strong Memorial Hospital, New York State Child Abuse Training. Presented on multiple occasions, 1993, 1994.

6. Adolescents in Foster Care. Leadership Education in Adolescent Health. Presented on multiple occasions, 1998, 1999, 2000, 2001, 2002, 2003.

7. Children in Foster Care:  Medical and Legal Issues.  Panel Discussion. Teaching Day for Neonatology Nursing Staff, 2000.

8. Health Issues for Children in Foster Care.  Training for Family Court Judges. New York State Judicial Commission. Rochester NY.  October 2001.

9. Reactive Attachment Disorder.  10th Annual Perspectives on Adoption and Foster Care Conference: Working Together for Children.  Adoption Resource Network, Inc. November 2001.

10. Impact of Foster Care on the Child. CHILD, Inc. Rochester NY.  December 2000, December 2001

11. Child Abuse. Monroe County Departments of Health and Social Services, New York State Child Abuse Training.  December, 2002.

12. Common Medical Issues in Foster and Adopted Children.  11th Annual Perspectives on Adoption and Foster Care Conference: Working Together for Children.  Adoption Resource Network, Inc. Rochester, NY. November, 2002.

13. Developmental Issues in the Foster Care Population. Center for Developmental Assessment, LEND Program, March 2001, December 2001, January 2003, December 2003, January 2005

Professional Presentations: UCLA, Los Angeles CA.

1. Childhood trauma and Toxic Stress.  Impact on pediatric practice.  Presented to pediatric residents.  February 2015.
2. Childhood trauma and toxic stress: Life-course implications.  Presented to UCLA medical students.  March 2015.

## CONSULTATIONS TO HEALTH, AND SCIENCE AGENCIES

Development of Medical Services and Medical Homes for Children in Foster Care

- Faculty and Consultant, Foster Care Content Expert.  Institute for Health Improvement (IHI) and Annie E. Casey Family Foundation.  *Breakthrough Collaborative on Improving Health Care for Children in Foster Care.* January 2001-September 2002:
- *Coordination, Communication and Collaboration Among Systems for Children in Foster Care*. Presented at Learning Session 1, Boston, MA. September 2001.
- *Access to Health Care Services for Children in Foster Care*. Presented at Learning Session 1, Boston, MA. September, 2001.
- Consultant for Learning Session 1, Foster Care Health Care. Boston, MA.  September, 2001.
- Consultant for Learning Session 2, Foster Care Health Care. Tempe, AZ. November,2001.
- Consultant for Learning Session 3, Foster Care Health Care.  Denver, CO. March, 2002.
- Consulting Expert for *Break-Through Collaborative on Transforming Child Welfare to a Trauma-Informed Culture.* National Child Traumatic Stress Network. Providence, Rhode Island.  June 2012.
- Consultant.  Developing Clinical Related Groups for Children in Foster Care and Maltreated Children.  3 M Company.  December 2011-current.
- Faculty. CAPQUAM.  Follow-up Measures for Children Discharged from Inpatient Mental Health.  Convened by NCQA. 2014.


## PARTICIPATION IN ADVISORY AND HEALTH COUNCILS

<u>Conference on Improving Health Care Services for Children in Foster Care</u>. Consultant. Models of Health Care Delivery for Children in Foster Care. Telaris Conference Center.  Seattle, WA. September, 2005.


<u>Ad hoc Consultation for Program Development: Medical Homes for Children in Foster Care</u>
- University of Colorado at Denver, Sarah Carpenter, MD
- Oklahoma University Health Services Center, Deborah Shropshire, MD
- Upstate Medical Center, Steve Blatt, MD, Vicki Meguid MD
- University of Minnesota, Rachel Burgess MD
- Department of Human Services, Baltimore MD
- University of Southern California, Los Angeles, Janet Arnold-Clark MD.
- Administration for Children's Services, New York, New York, Angel Melendez, MD
- Children's Hospital of Milwaukee, Milwaukee, WI.
- Akron Children's Hospital, Akron, OH.

<u>Mentorship and Training Assistance Program, American Academy of Pediatrics:  2002</u>

<u>Mental Health Consultation</u>
1996-                    Collaboration with Strong Behavioral Health.  Development of mental health intake services for children in foster care.   Partner in Child and Family Plus since 2008.

**Moira Szilagyi, MD, PhD**

| | |
|---|---|
| 2000-2002 | Member.  Mental Health Task Force.  Rochester NY.  Consultant to *Foster Care Mental Health Demonstration Project*. |
| 2000- | Collaboration with Mt. Hope Family Center and Monroe County Department of Social Services.  Mental health outreach for children in foster care.  Development of trauma-focused mental health services for children in foster care.  Introduction of evidence-based parenting interventions for families with children in foster care. |
| 2000-2009 | Collaboration with Winn Family Center.  Development of foster parent mentoring program. |
| 2010-2011 | Schuyler Center for Analysis and Advocacy.  Working group on the prevention of teen pregnancy.  June 2010-June 2011. |
| 2011- | Schuyler Center for Analysis and Advocacy.  Advise on health systems reform in New York State on behalf of Children and Adolescents in Foster Care. December 2010-December 2011. |
| 2011- | Council on Foster Care and Child-Caring Agencies, New York State.  Invited Working Group on Medicaid Re-design and Medicaid Managed Care for Children and Adolescents in Foster Care. |
| 2011- | Clinical Diagnostic Groups for Children and Teens in Foster Care. Collaborative working group that is developing diagnostic parameters in health and mental health for stratifying children in foster care into levels of service need as part of Medicaid Re-Design.  December 2011-current. |
| 2011-2012 | International Working Group.  Member working on Medical and Social Complexity Tool. |
| 2014 | Finger Lakes Health Systems.  Behavioral Health Subcommittee. |

## EDUCATIONAL CONTRIBUTIONS

Mentorship of Trainees and Faculty

*Mentor for Pediatric Residents*
Michelle Jones, MD.
Joeli Hettler, MD.
Cara Kaupp, MD
Robert Humphreys, MD
Sara Eleoff MD

20

**Moira Szilagyi, MD, PhD**

Abigail Kroening, MD.  Mentor for her PLC-CARE project.

*Mentor for Medical Students*
Ingrid Walker
Shanna Yin

*Mentor for Ph.D. Candidates*
Paula Neil, M.S.N., scheduled to finish in 2012
Anne-Marie Conn, M.S., Ph.D., completed August 2011

*Mentor for Fellows*
Adrianne Stith, PhD.  Psychology Fellow, Department of Psychiatry, University of Rochester Medical Center.  Content mentor for mental health assessments for children in foster care.
Sandra Jee, MD, MPH.   General Academic Pediatrics, University of Michigan.  Content mentor on foster care and child welfare.
Heather Paradis, MD.  General Academic Pediatrics, University of Rochester Medical Center.  Content mentor on Parenting.
Sara Eleoff, MD.  General Academic Pediatrics, University of Rochester Medical Center.  Content mentor on foster and kinship care, child welfare, health of special needs children.

*Mentor for Faculty*
<u>Sandra Jee, MD, MPH.</u>  General Pediatrics, University of Rochester Medical Center.  Content mentor on foster care, child welfare, mental health issues of children and teens in foster care, child development, care of children with special health care needs.
For Robert Wood Johnson Award: Primary Care-Base Mental Health Screening for Adolescents in Foster, Care $300,000. 7/1/07-6/31/10 (content mentor).

<u>Wendy Nilsen, Ph.D.</u>  Psychology Faculty, Department of Psychiatry, University of Rochester Medical Center. Content mentor in foster care and child welfare.  K23 Faculty Development Award, 2007-2010.

Elizabeth Barnert, MD.  Assistant Professor of Pediatrics.  University of California at Los Angeles.  Health care for youth transitioning out of juvenile justice.  2014-

Bergen Nelson, MD, MPH.  Assistant Professor of Pediatrics.  University of California at Los Angeles.  Tiered developmental interventions for pediatric practice.  2014-

*Advising Faculty and Fellows at other Institutions*

| Name | Institution | Position | Years |
|------|-------------|----------|-------|
| Sandra Jee, MD., MPH | University of Michigan | Pediatric Fellow | 2002-2005 |
| David Harmon, M.D. | University of Florida | Faculty | 2001-2003 |
| Barbara Frankowski, M.D. | University of Vermont | Faculty | 2002-2004 |
| Linda Sagor, M.D. | University of Massachusetts | Faculty | 2003-2006 |
| Cathleen Balance, M.D. | Jersey Shore Med Ctr | Faculty | 2005-2006 |

21

**Moira Szilagyi, MD, PhD**

| | | | |
|---|---|---|---|
| Abe Bergman, M.D. | University of Washington | Faculty | 2005-2007 |
| Thomas Tonniges, M.D. | Boys Town of America | Medical Director | 2006- |
| Debra Borchers, M.D. | Private Practice Cincinnatti OH | Physician | 2008- |
| Deborah Shropshire, M.D. | University of Oklahoma | Faculty | 2006-2007 |
| Philip Scribano, M.D. | University of Ohio | Faculty | 2008-2009 |
| Anne Armstrong, MD | Columbia University | Faculty | 2010 |
| Kelly Brown, MD | University of Milwaukee | Faculty | 2010-2011 |
| Jennifer Tagashaki, MD | University of Florida At Tampa | Faculty | 2011 |

*Preceptor for residents rotating through PLC-CARE Program*
2000-2010     Introduced residents to high risk children involved with child welfare, including children in foster care, the impact of childhood trauma on health, mental health and developmental outcomes.


## PROFESSIONAL SERVICE ASSIGNMENTS AND RESPONSIBILITIES
*Outpatient ( Work 0.73 FTE)*
> Clinical Care of children and teens in foster care:  0.4  FTE
> Administrative 0.2 FTE  .
> Research: 0.2 FTE.
> Volunteer time for AAP and other organizations 0.1-0.2 FTE.

.

## POLICY AND ADVOCACY

Local
Monroe County, Committee on Child and Adolescent Mental Health; Testimony on the mental health needs of children in foster care, 1997.

Court Improvement Project Team.  Monroe County Family Court.  February 2010-ongoing.

California Community Foundation.  Consortium on Early Childhood Services.  2015.

State
New York State Proposed Daycare Regulation Changes. Testimony on behalf of American Academy of Pediatrics, March 1998, Albany, NY.

New York State Child Care Council, Testimony on behalf of children in foster care with developmental delay, October 1999.

Szilagyi MA, Murov RG, Saccaccio J.  New York State Department of Health.  Foster Care Health Care.  Presented to panel from Department of Health, Office of Children and Family Services, Office of the Budget, Managed Care Office, Governor's Office.  October 1999.

Szilagyi MA. Foster Children with HIV and Clinical Trials.  Testimony on behalf of the American Academy of Pediatrics, NYS, District II.  New York State Legislature's Committee on Children and Families and Committee on Health.  New York, NY.  September, 2005.

<u>National</u>
Szilagyi MA. Foster Children and Clinical Trials.  Testimony on behalf of the American Academy of Pediatrics.  House Ways and Means Subcommittee on Human Resources Hearing. United States House of Representatives. Washington, DC. May, 2005.

Children's Defense Fund.  Consultant on developmental health issues of infants, toddlers and preschool children in foster care as they prepared testimony for Congress on this issue. Washington DC.  2005.

National Association of Social Workers: Social Work Policy Institute.  Children at Risk: Optimizing Health in an Era of Reform.  Represented American Academy of Pediatrics at working group on health policy, November 17, 2011.

American Academy of Pediatrics Legislative Office, Washington DC.  Through my position as co-chair of the AAP's Task Force on Foster Care, worked closely with legislative office staff on developing the language of the health clause of *Fostering Connections and Increasing Adoptions Act of 2008* (P.L.  110-351).  Other advocacy issues that I have been involved with through this office include: making alumni of foster care automatically eligible for Medicaid coverage up to their 26th birthday;  creating minimum uniform federal standards for treatment/therapeutic foster care; increasing transition supports for youth aging out of foster care; developing statewide health systems for children in foster care.

## COMMUNITY SERVICE

| 1970-1974 | Tutor, Higher Educational Opportunities Program. |
| --- | --- |
| 1972-1974 | Volunteer, Big Sister. Big Brothers/Big Sisters of Albany.  Albany, NY. |
| 1974-1979 | Volunteer, Instructor for health-related fields. Career Days for High School Students.  St. John Fisher College, Rochester, NY. |
| 1986-1989 | Volunteer, Primary Care Physician, Corpus Christi Outreach Center. Rochester NY. |
| 1986-1991 | Board of Directors, Twelve Corners Daycare Center, Rochester NY. |
| 1991-1994 | Board of Directors, Kids Adjusting Through Support. Rochester NY. |

| | |
|---|---|
| 1991-1996 | Department of Social Services, Children's Advisory Committee.  Monroe County, NY. |
| 1994-1995 | Regional Task Force to Advise and Redesign Child Protection Services in Monroe County, NY. |
| 1995-2000 | Medical Consultant on Child Abuse. Rochester Society for the Protection and Care of Children, Committee on Legislative Issues.  Rochester, NY. |
| 1998-2001. | CATCH Advisory Board. Mental Health Advisory Panel for Children in Foster Care. |
| 2000 |  Volunteer. Flower City Habitat for Humanity.  Rochester, NY. |
| 2001 | Volunteer, Orphanage Outreach.  Monte Christi Orphanage. Monte Christi, Dominican Republic. |
| 2001-2013 | PLC/CARE Advisory Board (Board of Directors) |
| 2002-2014 | Volunteer, Youth Opportunities Unit of Foster Care.  Mentoring adolescents in or recent graduates of foster care. |
| 2003-2014 | Member, Planning Board for Babies Can't Wait/Adolescents Won't Wait. Developing educational curriculum on foster care issues for judicial, legal and child welfare professionals. |
| 2004-2014 | Member, Committee on Violence, American Academy of Pediatrics, Monroe County Medical Society.   Multidisciplinary team of health professionals reviewing evidence-based approaches to violence prevention. |
| 2002-2014 | Member, Board of Directors, Children's Institute, Rochester NY. |
| 2011-2014 | Advisory Board.  Your Health, Your Body, Your Responsibility: Promoting Healthy Behaviors Among Teens.  Boys Town National Research Hospital. Omaha NE.  2011. |

## Appendix C. Review Team Members

Case Record Review Team Members

**Oversight and Coordination**

| | |
|---|---|
| Sarah Kaye | Consultant, Office of Court Monitor |
| Mia Caras | Office of Court Monitor |
| Stacy Ferraro | Office of Court Monitor |

**Quality Assurance Reviewers**

| | |
|---|---|
| Alice Adair | Foster Care Review Director |
| Eliza Byrne | Center for the Support of Families |
| Mia Caras | Office of Court Monitor |
| Rob Hamrick | Evaluation and Monitoring Director |
| Sandra Panzo | Evaluation and Monitoring Program Admin. Sr. |
| Michael Phillips | Foster Care Review Program Admin. Sr. |
| Billy Williams | Foster Care Review Program Admin. Sr. |

**Case Record Reviewers**

| | |
|---|---|
| Nancy Bills | Evaluation and Monitoring Liaison / 6 |
| Nancy "LuAnn" Butler | Evaluation and Monitoring Liaison / 1-South |
| Velma Carr | Evaluation and Monitoring Liaison / 3-South |
| Olive Cox | Foster Care Reviewer / 1-North |
| Jaworski Davenport | CQI Data Analyst |
| Tom Farley | Evaluation and Monitoring Program Admin. Sr. |
| Tamara Garner | Protection/Prevention Director |
| Bobby "Brad" Green | Foster Care Reviewer / 7-West |
| Kimberly Hampton-Clark | Staff Development - Trainer |
| Hollie Jeffery | Resource Development Director |
| Cynthia Lambert | Evaluation and Monitoring Liaison / 1-North |
| Heather Palculict | Evaluation and Monitoring Liaison / 4-North |
| Candice Quinn | Evaluation and Monitoring Liaison / 5-West |
| Frederick Reeves | Evaluation and Monitoring Liaison / 7-East |
| Lisa Robinson | Evaluation and Monitoring Liaison / 4-South |
| Victoria Seals | Evaluation and Monitoring Liaison / 3-North |
| Deborah Stallworth | Foster Care Reviewer / 7-East |
| Beverly Strong | Foster Care Reviewer / 6 |
| Marco Williams | Evaluation and Monitoring Liaison / 7-West |
| Heather Wright | Foster Care Reviewer / 1-South |
| Jena Young | Evaluation and Monitoring Liaison / 5-East |
| Valerie Yowk-Foster | Program Manager / Safety Review Unit |

**Case Record Review Assistants**

| | |
|---|---|
| Paula Griffin | Evaluation and Monitoring Program Specialist |
| John Porter | Foster Care Review Secretary Principal |

Appendix D. Dr. Terry Shaw, Curriculum Vitae

# Terry V. Shaw

**September 2014**

---

School of Social Work
University of Maryland Baltimore
525 West Redwood Street
Baltimore, MD  21201
(410) 706-3811; fax (410) 706-3133
email: tshaw@ssw.umaryland.edu

## Education

2007        MPH, University of California at Berkeley, Interdisciplinary Program
            *Final Paper:  Permanent exits from foster care:  Informing measures over time*

2006        Ph.D., University of California at Berkeley, School of Social Welfare
            *Dissertation:  Social Workers Knowledge and Attitude toward the Ecological Environment*

1997        MSW, University of Missouri at Columbia

1991        BS, Northeast Missouri State University (Truman State University), Computer
            Science

## Experience in Higher Education

2014 – present        Associate Professor
                      University of Maryland, School of Social Work

2007 – 2014           Assistant Professor
                      University of Maryland, School of Social Work

2001 – 2007           Graduate Student Researcher VII – California Performance Indicators
                      Center for Social Services Research, University of California at Berkeley

2002 – 2003           Graduate Student Researcher V – Bay Area Social Services Consortium
                      Center for Social Services Research, University of California at Berkeley

2002 – 2003           Graduate Student Researcher V – Individual Research Project
                      Dr. Eileen Gambrill, University of California at Berkeley

2000-2001             Lecturer
                      Limestone College Block Program, Columbia, SC

## Teaching

Spring 2014        SOWK 715, Children & Social Service Policy
Fall 2013          SOWK 715, Children & Social Service Policy
Spring 2013        SOWK 715, Children & Social Service Policy

| | |
|---|---|
| Fall 2012 | SOWK 715, Children & Social Service Policy |
| Spring 2012 | SOWK 715, Children & Social Service Policy |
| Fall 2011 | SOWK 715, Children & Social Service Policy |
| Spring 2011 | SOWK 715, Children & Social Service Policy |
| Fall 2010 | SOWK 805, Statistics I, Ph.D. Level |
| Spring 2010 | SOWK 715, Children & Social Service Policy |
| Fall 2009 | SOWK 805, Statistics I, Ph.D. Level |
| Spring 2009 | SOWK 789, Data Analysis for Child Welfare |
| Fall 2008 | SOWK 715, Children & Social Service Policy |
| Spring 2008 | SOWK 789, Data Analysis for Child Welfare |
| | SOWK 898, Independent Study, Ph.D. – Anne LeFevre "Advanced Statistics for Social Work." |
| Fall 2000 | SW350, Social Work Research (bachelors' level course). |
| Fall 2001 | SW350, Social Work Research (bachelors' level course). |

**Guest Lecturer**

| | |
|---|---|
| July, 2011 | SW699, Social Work Practice in Juvenile Justice<br>Instructor:  Charlotte Bright, University of Maryland<br>Topic:  Systems of Care in Child Welfare |
| April, 2007 | SW298, Theories of Social Welfare<br>Instructor:  Jim Midgley, University of California at Berkeley<br>Topic:  Social Development and Ecologism |
| July, 2006 | SW110, Social Work as a Profession<br>Instructor:  Bridgette Lery, University of California at Berkeley<br>Topic:  Ethnic Disproportionality in the Child Welfare System |
| Sept., 2003 | SW296, Practice in Social Work<br>Instructor:  Cathy Ralph, University of California at Berkeley<br>Topic:  The California Child Welfare System Today |
| August, 2000 | SW302, Foundations of Social Welfare<br>Instructor: Celeste Jones, University of South Carolina, Columbia, SC<br>Topic:  Social Work Research options after graduation. |
| August, 2000 | SW747, Management Concepts for Social Workers<br>Instructor: Sarah Cearly, University of South Carolina, Columbia, SC<br>Topic:  Social Work Administration and Working with Grant Projects. |

**Training**

| | |
|---|---|
| March 2012 | MD CARES Care Management Entity Staff Training (Wrap Maryland)<br>Presenters: Quick, H., Shaw, T., Lane, T., & Ahmed-Serkin, A.<br>Topic: MD CARES EDIF/NOMS Refresher Training and Documentation |

December 2011            MD CARES Care Management Entity Staff Training (Wrap Maryland)
                        Presenters: Quick, H., Shaw, T., Lane, T., & Blom, J.
                        Topic: MD CARES EDIF/NOMS Training

December 2011            MD CARES Care Management Entity Staff Training (MD Choices)
                        Presenters: Quick, H., Shaw, T., Lane, T., & Blom, J.
                        Topic: MD CARES EDIF/NOMS Training

March 2011               Rural CARES Care Management Entity Staff Training
                        Presenters: Quick, H., George, P., Shaw, T., Lane, T., & Blom, J.
                        Topic: Rural CARES EDIF/NOMS Training

February 2011            MD CARES Care Management Entity Staff Training
                        Presenters: Quick, H., George, P., Shaw, T., Lane, T., & Blom, J.
                        Topic: MD CARES EDIF/NOMS Training

December 2010            Rural CARES Implementation Training
                        Presenters: Quick, H., & Shaw, T.
                        Topic: Federal and Local Evaluation Efforts

May 2008                 Maryland Child Welfare Accountability Technical Assistance training
                        Presenters: Kaye, S., Shaw, T. & Ayer, D.
                        Topic: Using Data for Program Improvement: Quality Assurance
                        Technical Assistance

March 2008               Maryland Child Welfare Accountability Technical Assistance training
                        Presenters: Kaye, S., Shaw, T. & Ayer, D.
                        Topic: Using Data for Program Improvement: Quality Assurance
                        Technical Assistance

March 2008               Maryland Child Welfare Accountability Technical Assistance training
                        Presenters: Ayer, D., Kaye, S. & Shaw, T.
                        Topic: Local Self-Assessments: A tool for continuous quality
                        improvement

October, 2003            Northern California Children and Family Services Training
                        Academy, University of California Davis Extension. Eureka, CA
                        Presenters:  Shaw, T.
                        Topic:  Using Data to Improve Outcomes for Children and Families:
                        Entry Cohort, Exit Cohort, and Point in Time Data.

**Ph.D. Dissertation Committee Member**

2014-                   Sokho Hong, PhD, Candidate, University of Maryland, School of Social Work.
                        Working Dissertation Title:  Acculturation, Mental Health, and Mental
                        Health Service Use Among Older Adults from Five Asian Ethnic Groups

2012– 2013        Tam Fish, PhD Graduate, University of Maryland, School of Social Work. Working Dissertation Title:  Military Spouses Well-Being

2008– 2011        Anne LeFevre, PhD Graduate, University of Maryland, School of Social Work. Dissertation Title:  Socio-cultural Mechanisms Associated with Posttraumatic Stress Disorder: An Analysis of Latino Veterans

## Experience in Other than Higher Education

1997-2001        Health and Demographic Researcher – Program Coordinator II South Carolina Budget and Control Board, Office of Research and Statistics, Health and Demographics, Columbia, SC.

1996-1997        Project Coordinator, Ryan White Special Projects of National Significance (SPNS) grant.  Missouri Department of Health, Bureau of HIV/AIDS Care and Prevention Services, Jefferson City, MO.

1991-1993        Peace Corps Volunteer – Nepal

                        Instructor - Mathematics (Teacher Education Course) University of Lazimpat Extension, Darchula, Nepal

                        Classroom Teacher in Mathematics, Grades 5, 6, 7, and 9 Patan Village School, Patan, Nepal

## Research Support

**Principal Investigator**

2011-        University of Maryland Interagency Data Collaborative (LINKs).  Funded through Casey and the SSW with collaborative agency partners. Funding: SFY11:  96,000; SFY12: 96,000; SFY13: 96,000; SFY14: 115,000

2010-        Child Welfare Accountability: Efficiency and Effectiveness of Child Welfare Services**.** Maryland Department of Human Resources/Social Services Administration (DHR/SSA). Funding:  7/1/2010 – 6/30/2011, $622,776. Funding:  7/1/2011 – 6/30/2014, $1,786,713. Funding:  7/1/2014 – 6/30/2019, $3,500,000.

2009-2013      Rural Maryland Crisis and At Risk for Escalation diversion Services for children (Rural CARES). SAMHSA, Cooperative Agreements for Comprehensive Community Mental Health Services for Children and Their Families Program. In collaboration with the University of Maryland, School of Medicine, Department of Psychiatry, Division of Child and Adolescent Psychiatry. Developed and lead the implementation of the evaluation plan. – Evaluation budget $1,200,000 over 6 years.

2008-2013   Evaluation of the Maryland Crisis and At Risk for Escalation diversion Services for children (MD CARES). SAMHSA, Cooperative Agreements for Comprehensive Community Mental Health Services for Children and Their Families Program (RFA # SM-08-004). In collaboration with the University of Maryland, School of Medicine, Department of Psychiatry, Division of Child and Adolescent Psychiatry.  Evaluation budget $1,200,000 over 6 years.

2010-2014   Maryland State Council on Child Abuse and Neglect Environmental Scan. Maryland Department of Human Resources (DHR).
Funding:  8/1/2010 – 6/30/2014, $64,000.

2010-2011   Evaluating the Implementation of Family Centered Practice in Maryland. Maryland Department of Human Resources (DHR)
Funding:  7/1/2010 – 6/30/2011, $150,000.

2008–2010   Fostering Safe Choices.  Maryland Department of Human Resources (FIA).
Funding: 9/1/2008 – 9/30/2010, $300,000.

## Co-Principal Investigator

2013-   Maryland Longitudinal Education & Workforce Data Systems (MLDS).  A cooperative project between the Maryland Stated Department of Education (MSDE), the Maryland State Department of Higher Education (MHEC), the Maryland State Department of Labor Licensing and Regulation (DLLR), the University of Maryland School of Social Work (SSW) and the University of Maryland College of Education (COE) to operate the MLDS Data Center. Funding: SFY14:  1.7 million (SSW sub-contract for 350,000).

2008-2010   Child Welfare Accountability: Efficiency and Effectiveness of Child Welfare Services. Maryland Department of Human Resources (DHR).
Funding: 7/1/2009 – 6/30/2010, $622,776.
Funding: 7/1/2008 – 6/30/2009, $622,776.
(Diane DePanfilis – Principal Investigator)

2007-2008   Child Welfare Accountability: Efficiency and Effectiveness of Child Welfare Services. Maryland Higher Education Commission (MHEC).
Funding: 1/1/2007 – 6/30/2008, $433,072.
(Diane DePanfilis – Principal Investigator)

2007 – 2008   ACTION for Child Protection and Alabama Family Services through grant support from the USDHHS, Children's Bureau – Funding Opportunity HHS-2007-ACF-ACYF-CA-0023. Evaluation of Alabama's Implementation of a Family Centered Comprehensive Assessment Process).
Funding:  1/1/2007 – 6/30/2008, $746,205.
(Diane DePanfilis – Principal Investigator)

**Co- Investigator**

2009-2010    Parent Child Foster Care Project. Annie E. Casey Foundation.
             Funding:  10/1/2009 – 6/30/2010, $89,998,
             (Richard Barth – Principal Investigator)

2010-2012    Parent Child Foster Care II Project. Annie E. Casey Foundation.
             (Richard Barth – Principal Investigator)

**Consultant**

2011         Children's Electronic Health Record.
             Funding:  5/2011, $500

2009         California CWS/CMS Sibling Data Analysis.  Casey Family Foundation.
             Funding:  5/1/2009 – 6/30/2009, $1,000.

2009         California CWS/CMS Sibling Data Analysis.  Casey Family Foundation.
             Funding:  5/1/2009 – 6/30/2009, $1,000.

2007         Lutheran Immigration and Refugee Services, Field Coordination Program.
             Outcome-Based Evaluation Development.
             Funding:  9/30/07 – 11/30/07, $8,946.

## Publications

**Articles in Refereed Journals**

dosReis, S., Ming-Hui, T., Goffman, D., Lynch, S., Reeves, G., & **Shaw, T.V.** (2014).  Age-
    related Trends in Psychotropic Medication Use among Very Young Children in Foster
    Care.  *Psychiatric Services in Advance*, doi: 10.1176/appi.ps.201300353

Ahn, H., Osteen, P., O'Connor, J., **Shaw, T.V.**, & Carter, L. (2014).  Developing a Measurement
    of Child Welfare Policy and Practice: Local Supervisory Review Instrument.  *Human
    Services Organizations Management, Leadership & Governance*, 38(1): 29-43.

Ming-Hui, T., dosReis, S., Desai, B., Reeves, G., & **Shaw, T.V.** (2013). Persistent Antipsychotic
    Treatment and the Impact on Outpatient, Inpatient, and Emergency Department Services
    for Youth in Foster Care.  *Pharmacoepidemiology and Drug Safety*, 22(5): 516.

**Shaw, T.V.**, Barth, R., Mattingly, J., Ayer, D. & Berry, S. (2013). Child Welfare Birth Match:
    The Timely Use of Child Welfare Administrative Data to Protect Newborns.  *Journal of
    Public Child Welfare*. 7(2): 217-234.

Kaye, S., **Shaw, T.V.,** DePanfilis, D. & Rice, K. (2012). Estimating Staffing Needs for In-home
    Child Welfare Services with a Weighted Caseload Formula. *Child Welfare, 91(2).*

Michalopoulos, L., Ahn, H., **Shaw, T.V**., & O'Connor, J. (2012). Child Welfare Worker Perception of the Implementation of Family-Centered Practice. *Research on Social Work Practice.*

**Shaw, T.V**., Lee, B. & Wulczyn, F. (2012). "I thought I hated data": Preparing MSW students for data-driven practice. *Journal of Teaching in Social Work, 32(1),* January-March 2012, pp 78-89.

Lee, B., Hwang, J., Socha, K., Pau, T. & **Shaw, T.V.** (2012). Going Home Again: Transitioning Youth to Families after Group Care Placement. *Journal of Child and Family Studies.* DOI: 10.1007/s10826-012-9596-y

Svoboda, D. V., **Shaw, T. V.**, Barth, R. P., & Bright, C. L. (2012). Pregnancy and parenting among youth in foster care: A review. *Children and Youth Services Review, 34*(5), 867-875. doi:10.1016/j.childyouth.2012.01.023

Miller, S., Hayward, A. & **Shaw, T.V.** (2011). Environmental shifts for social work: a principles approach. *International Journal of Social Work*, 21(3). 270-277.

**Shaw, T.V.** & Webster, D. (2011). A matter of time: The importance of tracking reentry into foster care beyond one year after reunification. *Journal of Public Child Welfare*. *5(5),* 501-520

**Shaw, T.V.** (2011). Is social work a green profession? An examination of environmental beliefs. *Journal of Social Work*. Online: http://jsw.sagepub.com/content/early/2011/05/27/1468017311407555

LeFevre, A. & **Shaw, T.V.** (2011). Latino parent involvement and school success: Longitudinal effects of formal and informal support. *Education and Urban Society*. Online: http://eus.sagepub.com/content/early/2011/05/13/0013124511406719

Putnam-Hornstein, E. & **Shaw, T.V**. (2011). Foster care reunification: An exploration of non-linear hierarchical modeling. *Children & Youth Services Review, 33(5),* 705-714.

Lee, B.R., **Shaw, T.V**., Gove, B., & Hwang, J. (2010). Transitioning from group care to family care: Child welfare worker assessments. *Children & Youth Services Review, 32(12), 1770-1777.*

**Shaw, T.V.** (2010). Reunification from foster care: Informing measures over time. *Children & Youth Services Review, 32*(4), 475-481.

**Shaw, T.V**. (2008). An ecological contribution to social welfare theory. *Social Development Issues, 30*(3), 13-26.

**Shaw, T.V.,** Putnam-Honstein, E., Magruder, J., & Needell, B. (2008). Measuring racial disparity in child welfare. *Child Welfare, 87*(2), 23-36.

Magruder, J. & **Shaw, T.V.** (2008). Children ever in care: An examination of cumulative disproportionality. *Child Welfare, 87*(2), 169-188.

**Shaw, T.V.** (2006).  Reentry into the foster care system after reunification. *Children and Youth Services Review, 28,* 1375-1390.

**Shaw, T.V.** (2006b).  Environmental equity and environmental racism. *Perspectives in Social Work – Doctoral Journal, v4*(2), 17-21.

Cosner Berzin, S., De Marco, A., **Shaw T.V.,** Unick, G.J., & Hogan, S.R. (2006). The effect of parental work history and public assistance use on the transition to adulthood.  *Journal of Sociology & Social Welfare, 33*(1), 141-162.

Lery, B., **Shaw, T.** & Magruder, J. (2005). Using administrative child welfare data to identify sibling groups.  *Children and Youth Services Review, 27*, 783-791.

Webster, D., Shlonsky, A., **Shaw, T.** & Brookhart, A. (2005). The ties that bind II: Reunification for siblings in out-of-home care using a statistical technique for examining non-independent observations.  *Children and Youth Services Review, 27,* 765-782.

Probst, JC, Samuels, ME, **Shaw, T,** Hart, G, & Daly, C. (2003). The National Health Service Corps and Medicaid inpatient care: Experience in a southern state. *Southern Medical Journal, 96*, 775-783.

## Book Chapters

Hayward, R. A., Miller, S.E., & **Shaw, T.V.** (2012). Social work education on the environment in contemporary curricula in the USA.  In M. Gray, J. Coates, & T. Hetherington (Eds.), *Environmental Social Work*.  New York, NY. Routledge.

**Shaw, T.V.,** Putnam-Hornstein, E., Magruder, J. & Needell, B.(2011). Measuring racial disparity in child welfare. In D.K. Green, K. Belanger, R.G. McRoy, & L. Bullard (Eds.), *Challenging Racial Disproportionality in Child Welfare: Research, Policy, and Practice.* Washington, D. C.: CWLA Press.

Magruder, J. & **Shaw, T.V.** (2011). Children ever in care: An examination of cumulative disproportionality. In D.K. Green, K. Belanger, R.G. McRoy, & L. Bullard (Eds.), *Challenging Racial Disproportionality in Child Welfare: Research, Policy, and Practice.* Washington, D. C.: CWLA Press.

## Book Reviews

**Shaw, T. V.**  (2006). Ethics for a small planet [Review of the book *Ethics for a small planet:  A communications handbook on the ethical and theological reasons for protecting biodiversity*].  *Social Development Issues, 28*(1)*,* 74-75 (Unattributed).

**Shaw, T. V.**  (2005).  America's environmental report card [Review of the book *America's environmental report card:  Are we making the Grade*].  *Journal of Sociology and Social Welfare, 32*(4), 185-186.

**Shaw, T. V.**  (2005).  Global environmentalism and local politics [Review of the book *Global environmentalism and local politics:  Transnational advocacy networks in Brazil, Ecuador, and India*].  *Journal of Sociology and Social Welfare, 32*(2), 182-184.

**Shaw, T. V.**  (2005). Life support [Review of the book *Life support: the environment and human health*].  *Journal of Sociology and Social Welfare, 30*(4),  206-207. (Unattributed).

**Shaw, T. V.**  (2004).  Synthetic planet [Review of the book *Synthetic planet:  Chemical politics and the hazards of modern life*].  *Social Development Issues*, *26*(2/3), 127-128.  (Unattributed).

**Shaw, T. V.**  (2002). State making and environmental cooperation [Review of the book *State making and environmental cooperation: Linking domestic and international politics in Central Asia*].  *Social Development Issues, 24*(3)*,* 70.  (Unattributed).

**Shaw, T. V.**  (2001). Chronicles from the environmental justice frontline. [Review of the book *Chronicles from the environmental justice frontline*].  *Social Development Issues, 24*(1), 80*.*  (Unattributed).

## Final Reports for Grants and Contracts

**Shaw, T.V.** (2014).  An Environmental Scan of Maryland's Efforts to Prevent Child Maltreatment.  Funded by Maryland Department of Human Resources, Social Services Administration, State Council on Child Abuse and Neglect, Baltimore, MD:  University of Maryland Baltimore, School of Social Work.

Ahn, H., O'Connor, J., Reiman, S. & **Shaw, T.V.** (2012).  *Quality Assurance Processes in Maryland Child Welfare: 6th Annual Child Welfare Accountability Report.*  Funded by Maryland Department of Human Resources, Social Services Administration, Baltimore, MD:  University of Maryland Baltimore, School of Social Work, Ruth H. Young Center for Families and Children.

**Shaw, T.V.**, & Ahn, H. (2012).  *Maryland Child Welfare Performance Indicators: 6th Annual Child Welfare Accountability Report.*  Funded by Maryland Department of Human Resources, Social Services Administration, Baltimore, MD:  University of Maryland Baltimore, School of Social Work, Ruth H. Young Center for Families and Children.

**Shaw, T.V.**, Lardner, M., Hong, M., Rose, T. & Shanahan R. (2012).  *Maryland state council on child abuse and neglect: Environmental scan of child maltreatment prevention*.  Funded by Maryland Department of Human Resources, Social Services Administration, State Council on Child Abuse and Neglect, Baltimore, MD:  University of Maryland Baltimore, School of Social Work, Institute for Innovation and Implementation.

Ahn, H., O'Connor, J., Reiman, S. & **Shaw, T.V.** (2011).  *Quality Assurance Processes in Maryland Child Welfare: 5th Annual Child Welfare Accountability Report.*  Funded by Maryland Department of Human Resources, Social Services Administration, Baltimore, MD:  University of Maryland Baltimore, School of Social Work, Ruth H. Young Center for Families and Children.

Shaw, T.V., & Ahn, H. (2011). *Maryland Child Welfare Performance Indicators: 5th Annual Child Welfare Accountability Report.* Funded by Maryland Department of Human Resources, Social Services Administration, Baltimore, MD: University of Maryland Baltimore, School of Social Work, Ruth H. Young Center for Families and Children.

Ahn, H., O'Connor, J., & Shaw, T.V. (July 2011). Children need love and stability. We wanted to give a child the chance at life. Annual report of the Maryland Foster Parent Survey. Funded by the Maryland Department of Human Resources, Social Services Administration, Baltimore, MD: Ruth H. Young Center for Families and Children at the University of Maryland School of Social Work.

Ahn, H., O'Connor, J., & Shaw, T.V. (July 2011). Local Supervisory Review Instrument. Annual State Data Report: July 01, 2010 - June 30, 2011. Scoring and Interpretation. Funded by the Maryland Department of Human Resources, Social Services Administration, Baltimore, MD: Ruth H. Young Center for Families and Children at the University of Maryland School of Social Work.

Ahn, H., Reiman, S., O'Connor, J., Michalopolos, L., Shaikh, N. & Shaw, T.V. (July 2011). Evaluating the Implementation of Family Centered Practice in Maryland. Funded by the Maryland Department of Human Resources, Social Services Administration, Baltimore, MD: Ruth H. Young Center for Families and Children at the University of Maryland School of Social Work.

Barth, R., Murray, K., Hayward, A., Shaw, T., Melz, H., O'Connor, J. & Dixin, D. (June, 2011). Assessing the Evaluability of the Casey Family Services Parent Child Foster Care Program: Final Report and Recommendations. Funded by Annie E. Casey Foundation and Casey Family Services. : University of Maryland Baltimore, School of Social Work, Ruth H. Young Center for Families and Children.

Ahn, H., Esaki, N., Gregory, G., Melz, H., O'Connor, J., & Shaw, T.V. (2010). *Quality Assurance Processes in Maryland Child Welfare: 4th Annual Child Welfare Accountability Report.* Funded by Maryland Department of Human Resources, Social Services Administration, Baltimore, MD: University of Maryland Baltimore, School of Social Work, Ruth H. Young Center for Families and Children.

Barth, R., Hayward, A., Murray, K., Shaw, T.V., & Melz, H. (2010). Deliverable #3 of Assessinig the Evaluability of the Casey Family Services Parent-Child Foster Care Program. Funded by Casey Family Services: University of Maryland Baltimore, School of Social Work.

Shaw, T.V. (2010). Examination of the Case Information System for the Parent Child Foster Care Program. Funded by Casey Family Services: University of Maryland Baltimore, School of Social Work.

Shaw, T.V., & Ahn, H. (2010). *Maryland Child Welfare Performance Indicators: 4th Annual Child Welfare Accountability Report.* Funded by Maryland Department of Human Resources, Social Services Administration, Baltimore, MD: University of Maryland Baltimore, School of Social Work, Ruth H. Young Center for Families and Children.

**Shaw, T. V.**, Barth, R., Svoboda, D., & Shaikh, N (2010). Fostering Safe Choices. Funded by Maryland Department of Human Resources, Family Investment Administration, Baltimore, MD: University of Maryland Baltimore, School of Social Work, Ruth H. Young Center for Families and Children.

**Shaw, T.V.,** Ahn. H. & DePanfilis, D. (2009). *Maryland Child Welfare Performance Indicators: 3rd Annual Child Welfare Accountability Report* Funded by Maryland Department of Human Resources, Social Services Administration, Baltimore, MD: University of Maryland Baltimore, School of Social Work, Ruth H. Young Center for Families and Children.

DePanfilis, D., Esaki, N., Gregory, G., Hayward, R.A., & **Shaw, T.V.** (2009). *Quality Assurance Processes in Maryland Child Welfare: 3rd Annual Child Welfare Accountability Report*. Funded by Maryland Department of Human Resources, Social Services Administration, Baltimore, MD: University of Maryland Baltimore, School of Social Work, Ruth H. Young Center for Families and Children.

Ahn, H., **Shaw, T.V.**, Kaye, S. & DePanfilis, D. (2009). *Maryland Child and Family Services Review: Final Report*. Funded by Maryland Department of Human Resources, Social Services Administration, Baltimore, MD: University of Maryland Baltimore, School of Social Work, Ruth H. Young Center for Families and Children.

Greeno, E., Kaye, S., **Shaw, T.V**., Hayward, A., Rice, K., Lardner, M. & DePanfilis, D. (2009). *Maryland Statewide Self Assessment*. Funded by Maryland Department of Human Resources, Social Services Administration, Baltimore, MD: University of Maryland Baltimore, School of Social Work, Ruth H. Young Center for Families and Children.

**Shaw, T.V.**, Kaye, S. & DePanfilis, D. (2008). *Maryland Child Welfare Performance Indicators: 2nd Annual Child Welfare Accountability Report* Funded by Maryland Department of Human Resources, Social Services Administration, Baltimore, MD: University of Maryland Baltimore, School of Social Work, Ruth H. Young Center for Families and Children.

Kaye, S., DePanfilis, D. & **Shaw, T.V**. (2008*). Quality Assurance Processes in Maryland Child Welfare: 2nd Annual Child Welfare Accountability Report* Funded by Maryland Department of Human Resources, Social Services Administration, Baltimore, MD: University of Maryland Baltimore, School of Social Work, Ruth H. Young Center for Families and Children.

Faraldi, S.K., Ovwigho, P.C., **Shaw, T.V**., & DePanfilis, D. (2007). *Child Welfare Accountability: Annual report of Maryland performance indicators*. Funded by Maryland Department of Human Resources, Social Services Administration, Baltimore, MD: University of Maryland Baltimore, School of Social Work, Ruth H. Young Center for Families and Children.

Hayward, A., Faraldi, S., **Shaw, T**., & DePanfilis, D. (2007). *Achieving Safety and Well-Being for Unaccompanied Immigrant Children: Recommendations & Resources for LIRS Field Coordination Program*. Funded by Lutheran Immigration Services, Baltimore, MD:

University of Maryland Baltimore, School of Social Work, Ruth H. Young Center for Families and Children.

Chow J, **Shaw T**, Woo T, Lery B, De Marco A, Carnochan M, & Austin M. (November, 2003). "Environmental and Caseload Characteristics of Welfare-to-Work Participants in the San Francisco Bay Area" in *Welfare-to-Work Services in the San Francisco Bay Area: An Exploratory Study of the Perceptions of CalWORKs Participants and Staff*. Funded by the member counties of the Bay Area Social Services Consortium, Berkeley, CA: University of California, Berkeley, Bay Area Social Services Consortium..

Samuels, M., Probst, J., Bailey, W., Corley, E. & **Shaw, T**. (2000). *Assessing the contribution of National Health Service Corps alumni to underserved rural communities and minorities.* Bethesda, MD: Office of Evaluation, Analysis and Research, Bureau of Primary Health Care, Health Resources and Services Administration. Final report, Contract 000-BHPC-0033.

Missouri Department of Health. Missouri Department of Health (August, 1997). *Assessment and Screening Curriculum.* An HIV/AIDS Special Project of National Significance Grant #BRU 900103-03-0).

**Shaw, T** & Dempsey, J. (1997). *Missouri Department of Health Integrated Care Program*. Funded by the Ryan White Special Projects of National Significance Grant #BRU 900103-03-0: Missouri Department of Health (*Internet Slide Presentation:* http://www.TheMeasurementGroup.com/edcpage/missouri.html).

**Publications Under Review/Preparation**

Ahn, H., Osteen, P., **Shaw, T.V.**, & O'Connor, J. (under review). Psychometric Evaluation of the Local Supervisory Review Instrument for Child Welfare Agencies to Improve Practice and Outcomes.

Fish, T., Harrington, D., Bellin, M.H., & **Shaw, T.V.** (under review). Risk of Being Overweight or Obese among Army Spouses: The Impact of Deployment, Distress, and Perceived Social Support

Shaw, T.V., Bright, C., & Sharpe, T. (under review). Child Welfare Outcomes for Youth in Care due to Parental Death or Parental Incarceration.

**Shaw, T.V.**, Farrell, J. & Kolivoski, K. Big Data and the Human Services.

**Shaw, T.V.** & Wails, K. Environmental literacy and the impact on child welfare.

Tai, M., **Shaw, T.V**., & dosReis, S. (under review). Antipsychotics and Placement Stability among Youth with ADHD/Disruptive Behavior Disorders.

**Presentations**

**Refereed Presentations**

**Shaw, T.V.**, Ayer, D., & Carter, L. (2014, August).  *Risks of Reentry in the Foster Care System for Children who Reunified: Can we identify a model that predicts reentry?*   Workshop presented at the National Association of Welfare Research and Statistics, Providence, RI.

**Shaw, T.V.**, Farrell, J., Ayer, D., & Irvine, J. (2014, August).  *Using Linked Administrative Data to Examine Involvement in Child-Serving Systems: Linking information to enhance knowledge, Maryland's multi-agency data collaborative.*   Workshop presented at the National Association of Welfare Research and Statistics, Providence, RI.

**Shaw, T.V.**, (2013, August) *Child Welfare Outcomes for Youth in Care due to Parental Death or Parental Incarceration.* Workshop presented at the National Association of Welfare Research and Statistics, Chicago, IL.

Farrell, J. & **Shaw, T.V.** (2013, June). *Linking Information to Enhance Knowledge:  Maryland's Multi-agency Data Collaborative.*  National Council on Juvenile Justice Data Collaboration

DosReis, S., Zhao, Zhongyuan, McFadden-Coleman, D., Tai, Ming-Hui, & **Shaw, T.V.** (2013, June).  *National Perspective on Monitoring Psychotropic Medications for Youth.*  2013 Systems of Care Training Institute.  Baltimore, MD.

**Shaw, T.V.**, (2012, August) *Birth Match: Using Administrative Data to Identify at Risk Infants.* Workshop presented at the National Association of Welfare Research and Statistics, Baltimore, MD.

**Shaw, T.V.**, & Svoboda, D. (2011, October) *Fostering Safe Choices: Teen Pregnancy Prevention for Youth in Foster Care.* Workshop presented at the Healthy Teen Network conference, Pittsburgh, PA.

Ayer, D. **Shaw, T.V.** & Carter, L. (2011, June). *Place Matters in Maryland: Goals, Outcomes, and Future Directions.*  2011 Maryland System of Care Training Institutes, Outreach to Special Populations: Addressing Disparities and Enhancing Cultural and Linguistic Competence across the Child-Family Serving Systems, Baltimore, MD.

**Shaw, T.V.**, Ahn, H. & Kaye, S. *(*2010, January*) Challenges and Opportunities in Working with Large Scale Datasets.* Workshop presented at the 12th Annual Conference of the Society for Social Work and Research (SSWR), Washington, DC.

Webster, D., Magruder, J. & **Shaw, T.V.** (2009, June).  *Turning the Tide: Using longitudinal data to understand the flow of children through foster care and its effects on permanency.* Paper presented at the 12th National Child Welfare Data and Technology Conference: Making IT Work for Children.  Bethesda, MD.

DePanfilis, D., Kaye, S., **Shaw, T.V.**, Mols, C. & Coppage, S. (2008, December). *Calculating Caseload and Staffing Needs: In-home Service Redesign in Maryland.* American Humane, Time and Effort: Perspectives on Workload Roundtable. Santa Fe, New Mexico.

Ayer, D., & **Shaw, T.V.** (2008, November). *Maryland Child Welfare Research and Evaluation Agenda.* Maryland Association of Resources for Families and Youth, 28th Annual Conference. Ocean City, Maryland.

**Shaw, T.V.**, Hayward, A., & Miller, S. (2008, November). *Social Workers Knowledge and Attitude toward the Natural Environment.* Council on Social Work Education, 54th Annual Program Meeting. *Social Work Policy and Practice: Linking Theory, Methods and Skill.* Philadelphia, PA.

DePanfilis, D., Mols, C., **Shaw, T.V.**, Kaye, S. & Ayers, D. (2008, October). *Improving the Efficiency and Effectiveness of Child Welfare Services through State, Stakeholder, and University Collaboration.* 2008 Policy to Practice Dialog: Child Welfare Leadership in Action, Washington, DC.

**Shaw, T.V.** (2008, January). *Reunification from foster care: Informing measures over time.* Paper presented at the 12th Annual Conference of the Society for Social Work and Research (SSWR), Washington, DC.

Putnam-Hornstein, E. & **Shaw, T.V.** (2008, January). *Foster care reunification: Using hierarchical modeling to account for sibling and county level correlation.* Paper presented at the 12th Annual Conference of the Society for Social Work and Research (SSWR), Washington, DC.

Magruder, J. & **Shaw, T.V.** (2007, October). *Children ever in care: An examination of cumulative disproportionality.* Paper presented at the 53rd Annual Program Meeting of the Council on Social Work Education (CSWE), San Francisco, CA.

Putnam-Hornstein, E., Magruder, J. & **Shaw, T.V.** (2007, October). Measuring, interpreting, and communicating racial disparity in child welfare. Paper presented at the 53rd Annual Program Meeting of the Council on Social Work Education (CSWE), San Francisco, CA.

**Shaw, T.V.**, DePanfilis, D. & Wulczyn, F. (2007, October). *Integrating Data into the Curriculum: Innovations in Child Welfare Research.* Paper presented at the 53rd Annual Program Meeting of the Council on Social Work Education (CSWE), San Francisco, CA.

**Shaw, T.V.** & Magruder, J. (2007, August). *Children ever in care: An examination of cumulative disproportionality.* Paper presented at the 46th Annual National Association of Welfare Research and Statistics (NAWRS) Conference, Charleston, West Virginia.

Needell, B., Putnam-Hornstein, E. **Shaw, T.V.**, & Magruder, J. (2007, July). *Measuring, interpreting and communicating racial disproportionality and disparity in child welfare.* Paper presented at the 10th National Child Welfare Data Conference (Making IT Work), National Resource Center for Child Welfare Data and Technology (NRCCWDT), Washington, DC.

Magruder, J & **Shaw, T.V.** (2007, July). *Children ever in care: An examination of cumulative disproportionality.* Paper presented at the 10th National Child Welfare Data Conference (Making IT Work), National Resource Center for Child Welfare Data and Technology (NRCCWDT), Washington, DC.

**Shaw, T.V.** & Magruder, J. (2007, January). *Children's contact with the child welfare system: A cumulative analysis.* Paper presented at the 11th Annual Conference of the Society for Social Work and Research (SSWR), San Francisco, CA.

Needell, B., Webster, D. & **Shaw, T.V.** (2006, November). *California's child welfare outcome and accountability legislation: Improving performance, and staying the course for system reform.* Paper presented at the 28th Annual Association for Public Policy Analysis and Management (APPAM) Fall Conference, Madison, WI.

**Shaw, T.V.** & Magruder, J. (2006, August). *Children's contact with the child welfare system:  A cumulative analysis.* Paper presented at the 46th Annual National Association of Welfare Research and Statistics (NAWRS) Conference, Jackson, WY.

**Shaw, T.V.** & Webster, D. (2006, August). *Foster care reentry: Going beyond 12 months of follow-up.* Paper presented at the 46th Annual National Association of Welfare Research and Statistics (NAWRS) Conference, Jackson, WY.

Needell, B. & **Shaw, T.V.** (2006, July). *Race/Ethnic disproportionality and disparity in child welfare: New views, new measures.* Paper presented at the 9th National Child Welfare Data Conference, National Resource Center for Child Welfare Data and Technology (NRCCWDT), Washington, DC.

**Shaw, T.V.** & D. Webster (2006, January).  *Foster care reentry – One and two year reentry differentials.* Paper presented at the 10th Annual Conference of the Society for Social Work and Research (SSWR), Austin, TX.

**Shaw, T.V.** (2005, November). *Reentry into the California child welfare system.* Paper presented at the 27th Annual Association for Public Policy Analysis and Management (APPAM) Fall Conference, Washington, DC.

Cross, K & **Shaw, T.** (2005, August). *The advantages and challenges of state/county/university collaboration in developing and analyzing county responses to questions and measures under a California program intended to measure child welfare agency performance.* Paper presented at the 45th Annual National Association for Welfare Research and Statistics (NAWRS) Conference, Madison, WI.

**Shaw, T.** & Webster, D. (2005, August).  *Foster care reentry after reunification – reentry in one or two years – what's the difference?* Paper presented at the 45th Annual National Association for Welfare Research and Statistics (NAWRS) Conference, Madison, WI.

Magruder, J. & **Shaw, T.V.** (2005, August). *Children ever in care.* Paper presented at the 45th Annual National Association for Welfare Research and Statistics (NAWRS) Conference, Madison, WI.

**Shaw, T.** (2005, July).  *Risks for reentry into foster care for children who are reunified.*  Paper presented at the 8th National Child Welfare Data Conference, National Resource Center for Child Welfare Data and Technology (NRCCWDT), Washington, DC.

**Shaw, T.** (2005, July).  *The Multiethnic Placement Act in California.*  Paper presented at the 8th National Child Welfare Data Conference, National Resource Center for Child Welfare Data and Technology (NRCCWDT), Washington, DC.

Needell, B. & **Shaw, T.** (2005, April). *Repeated reports and victimization*. Paper presented at the 15th National Conference on Child Abuse and Neglect Supporting Promising Practices and Positive Outcomes: A Shared Responsibility, Boston, MA.

Lery, B., **Shaw, T.** & Magruder, J. (2005, January). *Using administrative child welfare data to identify sibling groups in foster care.*  Paper presented at the 9th Annual Conference of the Society for Social Work and Research (SSWR), Miami, FL.

**Shaw, T.** (2004, September).  *Risks for reentry into the foster care system for children who reunified*.  Paper presented at the 44th Annual National Association for Welfare Research and Statistics (NAWRS) Conference, Oklahoma City, OK.

Needell, B., **Shaw, T.**, Webster, D. & Brookhart, A. (2004, September). *Recurrence of maltreatment-beyond the national standard.*  Paper presented at the 44th Annual National Association for Welfare Research and Statistics (NAWRS) Conference, Oklahoma City, OK.

Needell, B., Webster, D., **Shaw, T.** & Brookhart, A. (2004, April).  *Recurrence of maltreatment-beyond the national standard.*  Paper presented at the 7th National Child Welfare Data Conference, National Resource Center for Information Technology in Child Welfare, Arlington, VA.

Brookhart , A., **Shaw, T.**, Webster, D. & Shlonsky, A. (2003, July).  *The sibling question: Statistical techniques for examining non-independent observations in child welfare research.*  Paper presented at the 43rd Annual National Association for Welfare Research and Statistics (NAWRS) Conference, San Diego, CA

Wulczyn, F., Courtney, M. Needell, B. & **Shaw, T.** (2003, July).  *California's Outcomes and Accountability System: Composite accountability scores. Baselines and performance targets.*  Paper presented at the 43rd Annual National Association for Welfare Research and Statistics (NAWRS) Conference, San Diego, CA

Needell, B., **Shaw, T.**, Amital, M. (2002, August).  *Ethnicity and child welfare services in California: What are the numbers?*  Paper presented to the 42nd Annual Workshop of the National Association for Welfare Research and Statistics (NAWRS), Albuquerque, NM.

**Shaw, T.** (2000, December).  *Getting the Most from Linked Data.*  Paper presented at the National Association of Health Data Organizations Annual Conference, Washington D.C.

Price, L., Bailey, P. & **Shaw, T.** (2000, September). *Innovative uses of linked data systems from multiple sources for mothers, babies, and children with special health care needs.* Paper presented at the Maternal and Child Health Regional Conference, Chapel Hill, NC.

Mann, H. & **Shaw, T.** (1999, September). *The development and utilization of a statewide integrated data warehouse in South Carolina.* Paper presented at the 3rd Annual Information Technologies for Social Work Practice and Education Conference, Charleston, SC.

**Shaw, T.** (1998, August). *Web Page Design for the Rest of Us- Designing effective web pages for educational use.* Workshop presented at the 2nd Annual Information Technologies for Social Work Practice and Education Conference, Charleston, SC.

## Invited Presentations

Pasquale, F., **Shaw, T.V.** , Hutchings, R., Doshi, P., Grimmelmann, J. (2014, September). *The Promise and Perils of Big Data: Panel discussion.* Dean's Convocation Panel, University of Maryland, Francis King Carey School of Law, Baltimore, MD.

**Shaw, T.V.** (2014, May). *Linking Information to Enhance Knowledge: Maryland's Multi-agency Data Collaborative.* Discovery and Innovation: UMB's Commitment to Health Informatics and Bioimaging. University of Maryland, Baltimore, MD.

**Shaw, T. V.** & Farrell, J. (2014, May). *Linking Information to Enhance Knowledge: Maryland's Multi-agency Data Collaborative.* MLDS Research Series Presentation. University of Maryland, Baltimore, MD.

Iyer, S. & **Shaw, T.V.** (2014, March). *Collaborative Data Partnerships at the University of Maryland, School of Social Work: MLDS and LINKs.* Data Available for Assessing Needs, Outcomes, and Social Determinants of Health and Well-Being. Johns Hopkins: Urban Health Institute, Baltimore, MD.

Ross, C., Worthington, J., Cutuli, JJ, **Shaw, T.V.**, & Vonderharr, S. (2014, January). *Data Analysis for Youth in Foster Care and Aging Out of Foster Care.* Webinar presented to Youth at Risk of Homelessness (YARH) Grantees and Evaluators.

**Shaw, T.V.** (December, 2013). *Risks of Reentry in the Maryland Foster Care System.* Predictive Analytics in Child Serving Systems a meeting hosted by Casey Family Services, Scottsdale, AZ.

Needell, B., Moore, T., & **Shaw, T.V.** (December, 2013). *University State Partnerships in Data Analysis.* Panelist with Needell, B & Moore, T. Predictive Analytics in Child Serving Systems a meeting hosted by Casey Family Services, Scottsdale, AZ.

**Shaw, T.V.** (November, 2013). *Developing LINKS (Linking Information to Enhance Knowledge), Maryland's Multi-agency Data Collaborative.* Actionable Intelligence for Social Policy Conference, Washington DC.

dosReis, S., Desai, B., Tai, M. & **Shaw, T.V.** (2012, October). *Patterns of Concomitant Antipsychotic Usage Among Youth in Foster Care: Issues of Quality of Care Safety.* Pharmacoepidemiology and Drug Safety Seminar, Johns Hopkins Bloomberg School of Public Health.

**Shaw, T.V.** & Carter, L. (2012, June). *Impact of Race on Maryland's Child Welfare System.* New Visions for Permanency:  Looking at Permanency Planning through a New Lens. Linthicum, MD [Presented June 21, 2012].

Ahn, S., Benson, T., **Shaw, T.V.** & Rozef, L. (2011, May).  *Foster Parent Satisfaction Survey.* Ruth H. Young Center for Families and Children, Research Brown Bag.  Baltimore, MD. [Presented May 5, 2011].

Kaye, S., **Shaw, T. V.**  & Ayer, D. (2008, May).  *Using Data for Program Improvement: Quality Assurance Technical Assistance.*  Quality Assurance Technical Assistance presentation.  Charles County, MD. [Presented May 30, 2008].

Ayer, D., & **Shaw, T. V.**  (2008, April).  *Maryland Child Welfare Research and Evaluation Agenda.*  Place Matters in Maryland Conference.  Maritime Center, Linthicum, Maryland. [Presented April 15 and April 17].

Chipungu, S., Smith, B., & **Shaw, T. V.**  (2008, April).  *Culture and Race: How we make screening, assessment, placement, and permanency decisions.*  Place Matters in Maryland Conference.  Maritime Center, Linthicum, Maryland. [Presented April 15 and April 18].

Ayer, D., Kaye, S. & **Shaw, T. V.**  (2008, March).  U*sing data for program improvement: Quality assurance technical assistance.*  Quality Assurance Technical Assistance presentation.  Caroline County, MD. [Presented March 3, 2008].

Magruder, J, Putnam-Hornstein, E., & **Shaw, T.V.** (2008, February). Cumulative racial disparity in child welfare.  Paper presented to the County Welfare Directors Association Children's Services Committee, [Presented February 14, 2008].

DePanfilis, D., Faraldi, S. & **Shaw, T. V.**  (2007, December). *Child welfare accountability: Findings and recommendations.*  Presentation to Maryland Department of Human Resources, Social Services Administration leadership team.

**Shaw, T. V.**  (2007, September).  *Data are your friends:  Using administrative data to make informed decisions.*  Invited Paper presented at the Team Decision Making Groups Conference on Developing Your Family Centered Practice in Child Welfare:  Assessing your Evaluation and Training Needs, Prince George's County, MD.

DePanfilis, D., Hayward, A., **Shaw, T .V.**, & Woodruff, K. (2007, August 22). *Using data to inform your practice: Examples from Chapin Hall's multistate data archive.*  Local Department of Social Services Regional Conference, Baltimore County, Maryland.

DePanfilis, D., Hayward, A., **Shaw, T. V.**, & Woodruff, K. (2007, August 9). *Using data to inform your practice: Examples from Chapin Hall's multistate data archive.*  Local Department of Social Services Regional Conference, Baltimore County, Maryland.

**Shaw, T. V.** (2007, February). *Reentry into the California child welfare system.* Invited presentation to the University of Maryland Baltimore, School of Social Work, Baltimore, MD.

**Shaw, T. V.** (2007, February). *Reentry into the California child welfare system.* Invited presentation to the University of Missouri at Columbia, Columbia, MO.

**Shaw, T. V.** (2006, February). *Reentry into the California child welfare system.* Invited presentation to the Chapin Hall Center for Children, Chicago, IL.

**Shaw, T. V.** (1997, September). *Missouri Department of Health integrated care program.* Poster presented at the Special Projects of National Significance Steering Committee, Washington, DC.

Dempsey, J. & **Shaw, T. V.** (1997, June). *Missouri Department of Health integrated care program.* Paper presented at the 9th Annual Conference on Social Work and AIDS, Los Angeles, CA.

## Refereed Posters

**Shaw, T.V.** & Farrell, J. (2013, June). *Using Multi-Agency Administrative Data to Support Decision-Making.* 2013 Maryland Systems of Care Training Institute. Baltimore, MD.

Svoboda, D. & **Shaw, T.V.** (2009, April). *Young Women in Foster Care Speak About Pregnancy.* Third Annual Conference for the Dissemination of Student Research on Addictions, Infectious Disease, and Public Health, Baltimore, MD.

Hogan, S., Unick, G., **Shaw, T.**, DeMarco, A. & Berzin, S. (2005, January). *The impact of parental public assistance and employment on mental health and substance abuse outcomes for emerging adults.* Poster presented at the 9th Annual Conference of the Society for Social Work and Research (SSWR), Miami, FL.

Berzin, S., DeMarco, A., **Shaw, T.**, Hogan, S. & Unick, G. (2005, January). *The effect of parental work history and public assistance use on the transition to adulthood.* Poster presented at the 9th Annual Conference of the Society for Social Work and Research (SSWR), Miami, FL.

## Professional activities

## Professional Associations

| | |
|---|---|
| 2007-present | Council on Social Work Education |
| 2003-present | Society for Social Work and Research |
| 2005-2008 | Society for the Study of Social Problems |

**Advisory Boards**

| | |
|---|---|
| 2012-present | Maryland Title IVb Advisory Committee |
| 2012-present | Maryland's Alternative Response Advisory Board – Evaluation Sub-Committee |
| 2012-Present | Maryland's Foster Care Court Improvement Program Data Quality Assurance Advisory Board Member |
| 2011-present | National Advisory Committee – Integration of Teen Pregnancy Prevention into State and Local Foster Care Systems |
| 2009-2010 | Positioning Public Child Welfare Guidance, Information Management Subcommittee Member |

**Editorial/Review Boards**

| | |
|---|---|
| 2009-present | Editorial Review Board, Journal of the Society for Social Work and Research |
| 2007-present | Consulting Editor for Statistics, Professional Development: The International Journal of Continuing Social Work Education |
| 2003-present | Statistical Editor, Journal of Social Work Education |
| 2007-present | Reviewer (12 manuscripts), Children and Youth Services Review |
| 2011 | Abstract Reviewer (12 abstracts), Child Welfare Track of the 2011 CSWE Annual Program Meeting |
| 2010 | Abstract Reviewer (12 abstracts), Child Welfare Track of the 2010 CSWE Annual Program Meeting |
| 2009 | Abstract Reviewer (12 abstracts), Child Welfare Track and (8 abstracts) Policy Track of the 2009 CSWE Annual Program Meeting |
| 2008 | Abstract Reviewer (12 abstracts), Child Welfare Track of the 2008 CSWE Annual Program Meeting |

## Service

**University of Maryland Baltimore Service**

| | |
|---|---|
| 2012-Present | University Institutional Review Board Member (Expedited Reviewer) |
| 2009-Present | University Institutional Review Board Member (IRB Panel 5) |
| 2010-2011 | University IT Steering Committee |

**School of Social Work Service**

| | |
|---|---|
| 2013-Present | Dual Degree Program (MSW/MPH) Coordinator |
| 2011-present | School of Social Work Sustainability Committee |
| 2007-present | Research Sequence Committee |
| 2007-present | Ruth H. Young Center for Children and Families Leadership Team |
| 2011-2013 | MSW Program Admissions Committee |
| 2008-2011 | School of Social Work Sustainability Committee (Chair) |
| 2008-2011 | Educational Resources and Informatics Committee (Chair) |
| 2008-2010 | MSW Program Admissions Committee |
| 2007-2008 | Title IV-E Faculty Advisory Committee |
| 2007-2008 | Place Matters in Maryland Conference Planning Committee |

**Community Service**

| | |
|---|---|
| 2010-Present | Maryland's Child Maltreatment Environmental Scan |
| 2010-Present | Courts Catalyzing Change Committee member |
| 2010-Present | Court Commission to Improve Child Welfare |
| 2007- Present | Maryland Department of Human Resources CHESSIE Tiger Team (Maryland CHESSIE data system workgroup) |
| 2009-Present | Maryland Data Collaborative Workgroup (co-chair) |
| 2009-Present | Maryland Evidence Based Practices Workgroup |
| 2009-Present | Maryland AFCARS (Adoption and Foster Care Analysis and Reporting System) Implementation Group |
| 2009-Present | Maryland NCANDS (National Child Abuse and Neglect Data System) Implementation Group |
| 2008-2009 | CFSR Self-Assessment, Safety and Data Workgroup |
| 2008-2009 | Maryland In-Home Services Workgroup |
| 2007-2008 | Department of Juvenile Services Listening Forum (Assistant Facilitator) |
| 2007-2008 | Maryland Alternative Response Committee |
| 2007-2008 | Maryland Team Decision Making Committee |

Appendix E. Results of the Inter-Rater Reliability Analysis

## Results of Inter-Rater Reliability Analysis[1]

| Percent of inter-rater agreement of final case ratings [2] | Aggregate Percent Agreement | Inter-Rater Reliability Case 1 | Inter-Rater Reliability Case 2 | Inter-Rater Reliability Case 3 | Inter-Rater Reliability Case 4 | Inter-Rater Reliability Case 5 | Inter-Rater Reliability Case 6 |
|---|---|---|---|---|---|---|---|
| **Full Instrument** | **83.9%** | **76.8%** | **84.4%** | **84.5%** | **86.8%** | **86.8%** | **87.3%** |
| Demographic/Placement Information | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Educational Continuity | 97.8% | 100% | 80% | 100% | 100.0% | 100% | 100% |
| Initial Health Screening/Comprehensive Health Assessment | 86.8% | 89% | 85% | 88% | 86% | 75% | 100% |
| Completion of Screening and Assessment | 92.1% | 100% | 100% | 75% | 100% | 75% | 100% |
| Documentation of Screening and Assessment | 93.0% | 100% | 93% | 82% | 95% | 75% | |
| Participation in Comprehensive Health Assessment | 81.0% | 75% | 100% | | 80% | | |
| Content of Comprehensive Health Assessment | 85.0% | 89% | 80% | 100% | 81% | | |
| Periodic Medical Examinations | 79.7% | 100% | 95% | 50% | 75% | 64% | 100% |
| Dental Examinations | 91.5% | 91% | 89% | 93% | | | 100% |
| Mental Health Assessment | 86.5% | 73% | | 96% | | | 88% |
| Mental Health Assessment Completion | 82.6% | 43% | | 100% | | | 100% |
| Mental Health Assessment Documentation | 88.2% | 87% | | 95% | | | 81% |
| Developmental Assessment | 80.4% | 83% | 78% | 75% | 81% | 100% | 75% |
| Indicators that Developmental Assessment is Warranted | 74.0% | 75% | 67% | 69% | 75% | 100% | 75% |
| Developmental Assessment Completion | 93.5% | 100% | 100% | 100% | 100% | 100% | 75% |
| Developmental Assessment Documentation | 76.2% | | | | 76% | | |
| Diagnoses/Concerns | 73.5% | 23% | 80% | 80% | 100% | 100% | 75% |
| Follow-Up Treatments, Services and/or Equipment | 87.5% | 86% | 73% | 91% | 100% | 100% | 100% |
| Information Provided to Placement Resource | 78.5% | 56% | 81% | 76% | 85% | 88% | 86% |
| Foster Child Information Form | 94.6% | 100% | 83% | 100% | 100% | 80% | 100% |
| Type of Information Provided | 76.7% | 50% | 80% | 74% | 83% | 89% | 85% |

[1] The sample used to evaluate inter-rater reliability included 6 cases randomly selected from the statewide representative sample.

[2] Final case ratings were derived from case record reviewer ratings after completing quality assurance review by quality assurance reviewers.

**Ex. 5**

## CONFIDENTIAL INDEPENDENT REVIEW OF CHILD DEATH, █

**Conducted by Judith Meltzer, the Center for the Study of Social Policy
Requested by Grace Lopes, Court Monitor, *Olivia Y.***

**November 23, 2015**

---

## I.  Introduction and Methodology

*Purpose of the Review:*

[Minor child] (D.O.B. ███████████) was a nearly ████████████ [young] infant who died [during the first quarter of 2015] in Mississippi on ███████████ while in the custody of the Mississippi Department of Human Services (MDHS), Department of Family and Children's Services (DFCS).  At the time of ██ death, [minor child] was placed with relative resource parents, ███████████████████████████████.

Judith Meltzer from The Center for the Study of Social Policy (CSSP) was asked by Grace Lopes, *Olivia Y.* Court Monitor to independently examine case practice issues raised by the circumstances associated with the death of [minor child] and the Department's actions in response to ██ death. In the course of completing this review, CSSP examined a range of policy and practice issues exposed by this case. CSSP's review examined documents and case notes from the period between ███████ through ███████ related to: the placement processes for [minor child] and [sibling of minor child]; the foster parent approval and licensing processes for [relative resource parents], [foster placement], and [foster placement]; elements of case practice related to the investigation of [biological parents of minor child] alleged neglect after a domestic violence incident; elements of case practice related to the investigation of [minor child's] death; [biological parents'] case plan to pursue reunification with [sibling of minor child]; and other assessments that took place while [minor child] and [sibling of minor child] were in DHS custody.

A draft of the report was provided to officials at DFCS and the final report reflects a consideration of their comments.  The report includes a discussion of key findings from the review and recommendations to improve practice and promote the safety and well-being of children and families involved with DFCS.

*Methodology:*

The report's findings, family genogram and the timeline of the family's involvement with DFCS were developed by CSSP based on its review of the following documents and case records:

- Case file notes governing: 1) the initial child abuse and neglect investigation surrounding the ███████ domestic violence incident at the home of [biological parents of minor child]; and 2) the subsequent removal and placement of [minor child] and ██ [sibling of minor child];
- DFCS records concerning the review and approval of foster homes associated with these children's placement histories between █████████████ and █████████████;
- The DFCS investigative report on the death of [minor child];
- The DFCS  Resource Home Licensure file and contact notes related to resource parents ███████ and █████████████;
- The ███████ and ████████ reports and related DFCS investigations of two separate allegations of maltreatment in care in the [relative] resource home of ███████ and █████████████;
- [Biological mother of minor child's] DCFS case file, including entries regarding the assessment and case planning process with [biological parents of minor child] beginning at the time of the removal of [minor child] and [sibling];
- The DCFS case file for [minor child's sibling];
- Representations made to Grace Lopes, in writing, by DFCS representatives, in response to her questions concerning investigation protocols regarding the deaths of children in custody;
- Documents provided to Grace Lopes by DFCS representatives describing DFCS's resource family approval process;
- Representations made to Grace Lopes, in writing, by DFCS representatives, in response to her inquiries, describing DFCS' roundtable review of the child fatality and the recommendations that derived from the roundtable;
- Mississippi DFCS Policy Manual Section B: Intake and Assessment Policy, Revised 7-22-13;
- Mississippi DFCS Policy Manual Section D: Foster Care Policy, Revised 7-22-13;
- Mississippi DFCS Section F: Licensure Policy, Revised 7-22-13.

It is important to emphasize that creating the genogram and family history as well as developing an understanding of the sequence of events in this case were complicated by the lack of consistent documentation and lack of organization of the case record and case narrative recordings that are maintained by DFCS (see Finding 1, page 13).

The report is organized in the following manner:

2

- Family history and relationships (see Appendix A for complete Family Genogram)
- Chronology of key family members' involvement with DFCS (see Appendix B for a full timeline)
- Specific findings with examples
- Recommendations

## II. Family History and Relationships

[Minor child] was born on ████████████ to parents ████████████ and ████████████. At the time of ██ birth and until ██ placement outside of ██ parents' home ████████████, [minor child] resided in the home of ██ biological parents with ██ older [sibling].[1] Also involved in supporting the family were maternal grandmother, ████████████████████████, maternal-grandfather, ████████ ████████, and [sibling of minor child's] paternal-grandmother, ████████████ (see Figure 1).

**Figure 1:**



---

[1] [Sibling of minor child's] birth father is ████████████. However, [sibling of minor child] considers ████████████ to be ██ father due to ████████ limited involvement in ██ life.

In addition, the family had the support of extended family members including paternal cousins, ███ and ████████, and maternal-cousins, ████████████. ████ and ████ were the relative resource parents for [minor child] from ████████████ to ████ (the date of ████ death). ████████████████ [biological child of relative resource parents] ████████████, was ████████████ at the time. They previously had ████████ miscarriages and their [baby] ████████████, died of SIDS on ████████ ████████████████████. ████████████████ were the relative resource parents for [sibling of minor child] from ████████████ to ████████████ (see Figures 2 & 3).

**Figure 2:**



4

**Figure 3:**



**III.    Chronology  and  Known  Facts  of  DFCS  Family  Involvement  and  Child  Placements[2]**

➢    [Minor child] (D.O.B. ▮▮▮▮▮ – D.O.D. ▮▮▮▮▮):

According to the DFCS case record, [during the first quarter of 2015], ▮▮▮▮▮▮▮▮ the DFCS  on-call  worker  reported  that  she  received  a  call  from  Sergeant ▮▮▮ with  the Police  Department  stating  that  the  police  arrived  at  the  home  of ▮▮▮▮▮ and ▮▮▮ ▮▮▮▮ due  to  a  domestic  violence  incident  during  which  [biological  parents  of  minor  child] ▮▮▮▮▮▮▮▮▮▮▮  became  physical  with  one  another ▮▮▮▮▮ . According  to  the  on-call  worker's  account  of  her conversation  with  Sergeant ▮▮▮ , ▮▮▮▮▮  requested  that  the  police  allow  her mother, ▮▮▮▮▮ , who  was  on  the  scene,  to  take  the  children .  It  is  not clear  from  the  case  record  whether  [minor  child]  was  present  during  the domestic  violence  incident,  although,  based  on  the  narrative  it  appears  likely  that  [minor child]  and  [sibling] ▮▮▮▮▮▮ ,  were  both  present  during  the  incident  that occurred on ▮▮▮▮ .

The  CPS  worker,  FPW ▮▮▮▮▮ ,  went  to  the ▮▮▮▮▮  home  the  next  day, ▮▮▮▮▮ ▮▮ ,  to  investigate  the  report.  [Minor  child]  was  not  in  the  home; ▮  had,  it  seems,  been transported  by  [father]  from  [maternal  grandmother's]  home  to  the  care  of  [a  relative]  during  the morning  [after  the  domestic  violence  incident] ▮▮▮▮▮▮ .  During  the  CPS  response to  the  home,  the  worker  placed  a  call  to  the  police  due  to  feeling  threatened  by  [minor child's  mother].  Law  enforcement  officers  arrived,  and  arrested  [minor  child's  mother]  on ▮▮▮ ▮▮▮  on  a  prior  warrant,  although  the  nature  of  the  prior  warrant  is  not  described  in  the record.  The  CPS  worker  then  spoke  with  [minor  child's  father]  about  a  safety  plan  for  the children.  [Minor  child's  father]  indicated  that  he  wanted  [a  relative]  to  provide  care  for [minor  child].  In  response,  the  worker  then  arranged  to  meet  and  see  [minor  child]  with  [relative]  at a  parking  lot  of  a  Dollar  General  Store  on  the  same  day, ▮▮▮▮▮ .  The  case  notes  do  not indicate  that  the  worker  arranged  for  a  medical  screening,  as  is  required  by  the  MSA  and by  DFCS  policy.  In  fact,  the  notes  indicate  that  the  resource  home  of  [relative]  was  not open  for  placement  given  that  the  family  had  moved  to  a  new  home  and no  Home  Environmental  Checklist  had  been  completed.  [DFCS resource specialist] RS ▮▮▮▮▮▮▮  spoke  with  [relative  resource  parent]  and  [DFCS  caseworker]  FPW ▮▮▮▮▮▮  on ▮▮▮▮  and  informed  them  both  that  [DFCS  resource  specialist] RS ▮▮▮▮▮  would  not  recommend  placement  until  the  home  could  be assessed.  Despite  having  been  provided  with  this  information,  [DFCS  caseworker] FPW ▮▮▮▮▮  still  met  with  the  resource  parents, ▮▮▮▮▮▮▮ ,  in the  Dollar  General  Store  parking  lot  and  observed  [minor  child]  sleeping  in  a  car  seat  "in  the  back of  their  van".   She  did  not  remove  [minor  child] ▮▮  and  seek  to  place  [the  child] ▮▮  in a  licensed  resource  home  at  this  point.   The  relevant  excerpt  from  the  investigation narrative  that  was  entered  in  the  case  record  by  [DFCS  caseworker]  FPW ▮▮▮▮▮  reads:

---

[2] See Appendix B for timeline.

> *[Biological father] stated he wanted [minor child] to go with his [relative]* ▮▮▮▮. *Worker stated she was going to have to place child,* *in DHS custody then arrange to place* ▮▮ *with* ▮▮ *[relative].* *[*▮▮*] called [*▮▮*] to bring* ▮▮. *Worker stated she* *was going to meet up with them at the Dollar General Store. Worker meet* *[sic] up with [relative resource parents]* ▮▮▮▮▮▮ *and [minor child]* ▮▮▮ *at the Dollar General Store.* ▮▮▮▮ *[Minor child] was asleep in* ▮▮ *car* *seat in the back of the van [end of narrative],* ▮▮▮▮▮▮.

[Minor child] was left in placement with [minor child's relative] on ▮▮▮▮▮ and DFCS sought and was granted legal custody by the Youth Court of ▮▮▮▮ County, Mississippi of [minor child] on ▮▮▮▮▮ (retroactive to ▮▮▮▮). However, as noted above, [relative] home was not in compliance with Mississippi DFCS Policy (Section F) at the time of the placement due to no Home Environmental Checklist having been completed on their new home as required (Section F, VI.C.1) In addition, no Home Environmental Checklist had been completed in over six months as required by policy (Section F, VI.A.1). Resource Specialist (RS) ▮▮▮▮▮ informed Family Protection Worker (FPW) ▮▮▮▮▮, Area Social Work Supervisor (ASWS) ▮▮▮▮, and [relative resource parent] of this information on ▮▮▮▮ and scheduled a home visit with [relative resource parent] to complete the required checklist for ▮▮▮▮ as documented in the case record:

> *[Relative resource parent]* ▮▮▮▮ *stated she recently moved and does not* *have the space for [sibling of minor child]* ▮▮▮. *She provided an address of* *[address removed]. Worker* ▮▮▮▮▮ *informed* ▮▮▮▮ *that she would* *not recommend placement at this time until this home could be assessed...* ▮▮ ▮▮▮▮ *handed [sic] the phone to the SW on the scene. The worker identified herself* *as* ▮▮▮. *RS* ▮▮▮▮▮ *explained the case status to FPW* *who stated that* ▮▮▮ *paternal-grandmother was willing to accept both kids* *into her home and placement would be made with her...A call was placed to ASWS* ▮▮▮▮ *at* ▮▮. *RS* ▮▮▮▮▮ *case notes,* ▮▮▮▮▮.

Reportedly, [relative resource parent] fell asleep with [minor child] on ▮▮ arm after ▮▮▮ PM on the evening of ▮▮▮▮ in [relative resource parents'] bed. [Minor child] was nonresponsive when [relative resource parents] awoke at ▮▮▮ AM on ▮▮▮▮, and they reportedly performed CPR and called 911. [Minor child's] official time of death was ▮▮ AM. ▮▮▮▮▮, [relative resource parents'] deceased biological child, had died sleeping in the same bed with [relative resource parents] under similar circumstances on ▮▮▮▮▮ ▮▮▮▮, ▮▮ months earlier. The circumstances related to [the] death underscores the importance of training resource parents to never sleep with an infant in the same bed. While the investigative report affirmatively states that such training was provided to them, DFCS has acknowledged that [the relative resource parents] did not receive the full required training for resource parents.

**Figure 4:**
**Timeline of Events Related to the Care and Custody of [Minor Child]**





➢   [Minor Child's Older Sibling]:

[Minor child's older sibling] became known to DFCS for the second time with the report stemming from the domestic violence incident that occurred between ▇ mother, ▇▇▇ ▇▇▇, and ▇ fictive-father, ▇▇▇▇▇▇, on ▇▇▇▇▇▇. A prior CPS report involving [minor child's older sibling] was made on ▇▇▇▇▇▇ for physical neglect related to smoking marijuana by both ▇ birth parents, ▇▇▇▇▇▇▇▇ (▇ birth father) and ▇▇▇▇▇▇. The report of physical neglect was unsubstantiated and the worker found no evidence that a safety plan was necessary at that time.  By the time of the ▇▇▇▇ ▇▇ incident, ▇▇▇▇▇▇ and ▇▇▇▇▇▇ were separated and [minor child's older sibling] was living with ▇▇ mother and [minor child's biological father] ▇▇▇▇▇.

Prior to the initiation of the CPS investigation that resulted from the domestic violence incident on ▇▇▇▇▇▇, the maternal-grandmother, ▇▇▇▇▇▇▇▇, took physical custody of [minor child's older sibling]. On ▇▇▇▇▇▇ DFCS was granted custody of [minor child's older sibling] ▇▇▇▇▇ and physical custody was transferred to paternal-grandmother, ▇▇▇▇ by the ▇▇▇ County Department of Human Services.

8

[Minor child's older sibling] experienced four DFCS placements within two months after entering care on ███████████. It was difficult to piece together [minor child's older sibling] placement history based on the case record, but it appears that a status hearing was held on ███████████ at which point [the sibling] was removed from [paternal-grandmother's] care due to a request from ███ mother, ███████████. Subsequently, [the sibling] was placed temporarily at the ███████ County Shelter where ███ resided from ███████████ until ███████. ███ was then moved to the home of ███████████ [relatives] ███████████ on ███ ███████████. According to the documentation, [the sibling] resided there until ███████████, when ███ was placed in the non-relative resource home of ███████████. Of note, the placement screen indicates the placement "Exit Date" as the day before the next placement "Enter Date". For example, the "Exit Date" for the ███████ home is ███████████ and the "Enter Date" for the ███████ home is ███████████. This creates a confusion as to where ███████████ slept on the evenings of ███████████ and ███████████. The reasons for three of these placement moves and the placement process itself were not well documented; DFCS protocols for changing a child's placement could not be clearly discerned from the record.

**Figure 5:**
**Timeline of Events Related to the Care and Custody of [Minor Child's Older Sibling]**



➢ ██████████████████████ (birth parents of [minor child]):

████████████ and ████████ are the unmarried parents of [minor child] and were living together at the time of the incident on ██████████. They have a history of domestic violence. [Mother of minor child] is reported to have been diagnosed as bipolar and both adults have arrest histories. The case narratives state that [father of minor child] has spent a total of 10 years institutionalized but do not identify where or for what reason(s). According to the case narratives, ████████████ and ████████ are currently working toward reunification with [sibling of minor child], are participating in regular visitation with ██, and are engaged in couples counseling to improve their communication.

➢ ████████████████ (████████; [relative] resource parents for [minor child]):

████ and ████████ became licensed resource parents in ████████. They are birth parents to ████████ (D.O.B. ████████). Another child, ████████████, died on ████████ at ████████ old due to SIDS. [The child] ████████ died sleeping with parents in their bed. Prior to being licensed, DFCS requires resource home caregivers to complete an array of training modules on childcare and safety, one component of which addresses the dangers of infants sleeping in bed with adults. In response to an inquiry from the Court Monitor, DFCS reported that ████████████████ did not receive the full training required for resource homes before being licensed as resource parents.

Prior to [minor child's] placement with them, ████████████████ served as non-relative resource parents to at least two sets of siblings in ████████. During both of these placements, reports were made to CPS regarding [female resource parent's] capacity to parent the children. The calls were made during the first half of ████████. Regarding the first placement, a ████████ report alleged [female resource parent] used inappropriate discipline with two of the four children placed in her care. [Female resource parent] admitted to forcing one of the [toddlers] ████████████ to squat with ██ arms out as a form of discipline. The oldest [child] in the sibling group alleged that [female resource parent] also ordered the other [toddler] to perform leg lifts, and when [toddler] ██ did not comply, [female resource parent] held up [the toddler's] ██ legs. The oldest [child] ██ had pictures on [a] ██ phone that appear to show [female resource parent] holding up the [toddler's] legs and the other [toddler] squatting, but neither of the pictures were clear enough to definitively identify what actions occurred or where the photos were taken. In the same report, [one of the other siblings] ████████ ████████ stated that [female resource parent] forced ██ to sleep on the floor, but either did not know or could not remember her reasoning for this.

Regarding the second placement, a ████████ report alleged that [female resource parent's] biological [child] ████████████ was biting and choking one of three children (the second set of siblings) who were placed in the home, and that she did not take the necessary steps to ensure the child's safety.

10

[Female resource parent] admitted that ███████ bit one of the foster children while they were fighting over toys, and a DFCS caseworker observed bite marks and scratches on the child's leg. ███████ also allegedly pushed another child off the bed, but the caseworkers did not observe any visible marks or bruises consistent with this allegation. Additional case notes on these investigations were skimpy. The allegations in both reports were unsubstantiated; nonetheless, the foster children were all removed from her care. ███████ ███████ home continued to be open for placements following these two investigations although no other children were placed there up to the time of [minor child's] placement.

In ███████, [relative resource parents for the placement in which minor child died] moved to a new home. DFCS does not appear to have been notified of the move and no assessment or home study of this new home was completed prior to [minor child's] placement in the new home. In ███████, [minor child's female relative resource parent] was fired from her job and convicted of [a criminal offense] █████████████████████ █████████████████████. There is no indication in the record that DFCS was aware of this incident. It is also likely that [female relative resource parent] was, at or around the time of [minor child's] placement, taking an anti-depressant and prescription sleeping pills, but no inquiry was made about her medication regimen, which was revealed during the ███ resource licensure process, or its effect on her. The ███████ case notes of DFCS's investigation state: "After she ███████ lost [her child] ███████ she states she went into a deep depression. She sought medication changes and medication to help her sleep. Showed medication to SI ███ [the DFCS investigator]; Hydroxine for sleep and Venlafaxine an antidepressant."

As noted above, after the domestic violence incident of ███████, [minor child] initially went to stay with ██ grandmother, ███████, and then on the morning of ███████ was taken by ██ father, ███████, to stay with [relative]. [Father] told the caseworker he wanted [the minor child] to be officially placed in [the relatives'] home. Later on ███████, despite information from [DFCS resource specialist] RS ███████ that a Home Environmental Checklist had not been completed on the home, [DFCS caseworker] FPW ███████ left [minor child] in the care of [relatives] after meeting with them in the Dollar General Store parking lot and observing [minor child] sleeping in the back seat of the car. (The vehicle is also referred to as a van in the files.) At the time of [minor child's] placement on ███████ there does not appear to have been any review of the ███ new home or any attempt to update the information on the resource parents' employment, health status or criminal records. Five days later, on ███████, [minor child] was found not breathing while in bed with [relative resource parents], reportedly having fallen asleep on [relative's] arm. DFCS records indicate that the coroner initially suspected [minor child] died from positional asphyxia. The autopsy report, which characterizes the final cause of death as undetermined, indicates that asphyxia could not be ruled out.

11

**Figure 6:**
**Timeline of Events Related to the ███ Resource Home**



## IV.    Findings

CSSP's review identified issues of concern and opportunities for improvement in many areas including:

- The quality and completeness of case record narratives and documentation and the lack of logical organization to the case file make it difficult for a new worker or supervisors or for quality improvement staff to quickly understand the family constellation and history, timeline of events and interventions;

- The lack of comprehensiveness of the investigation process and case narratives, both for the investigation of alleged child abuse and neglect and for the special investigation required in the case of a fatality of a child in custody;

- The quality, comprehensiveness and decision-making process related to the licensing and approval of foster parents;

- The protocols and process followed for the placement of a child(ren) in a foster home;

- The quality and comprehensiveness of child and family assessments;

- The depth and quality of service planning with families; and

- The lack of a comprehensive child fatality review process.

Each of these issues is discussed briefly below with specific examples based on CSSP's review of the corresponding DFCS records:

*Finding #1:*   The quality and completeness of case record narratives and documentation and the lack of logical organization to the case file make it difficult for a new worker or supervisors or for quality improvement staff to quickly understand the family constellation and history, timeline of events and interventions.

A child welfare case record is a foundational document for understanding a child and family's involvement with and progress in addressing the issues that require child welfare intervention. It documents the reasons for child welfare investigation/intervention, the pertinent family and case history and current status. The case record should allow for a clear and complete understanding of the information that the agency uses for decision-making and the range of actions that have been and are taken to assure a child's safety, permanency and well-being.

13

The documentation in the case record should be well-organized so that critical pieces of information can be easily found, and the case record should be updated regularly as new information is learned. This is particularly important in child welfare cases as there are multiple points and actors in decision-making – workers, their supervisors, judges, therapists, to name a few – and there is frequent worker turnover necessitating that a new worker be able to easily and completely understand the history and current status of the case.

Through reviewing the documentation in a case record, a professional who does not have first-hand knowledge of the family should be able to understand the family story; identify family participants; learn the history, current status and plans for the family, and why each decision regarding removal, placement, service implementation and planning has been made. Without complete, clear documentation in a case record – family and child needs may be missed, decisions may be made that could cause emotional or physical harm to the child and family and safety and permanency may be delayed.

CSSP's review of the death of [minor child] ▮▮▮▮▮▮▮ identified issues related to the completeness and quality of the case record documentation in this case. Specifically:

- The reviewers needed to devote considerable time and effort to piece together the family constellation and history from fragments of information in order to understand the family relationships and the history of DFCS's involvement with various family members.
- The investigation narratives outlining the details of the investigation are repetitive, unclear, at times incomprehensible and occasionally inconsistent. When looking at the narrative records, it was difficult to distinguish which narratives resulted from [minor child's biological parent's] initial referral and which narratives were from the investigation after [minor child's] death. The investigation narratives were not in chronological order and many are not dated in the record. There appeared to be a lot of "cutting and pasting" of old information into new entries.
- The narrative documentation frequently does not clearly identify what is being referred to or who is being referenced. For example, the narratives use "grandmother" to refer to both the maternal and paternal grandmothers, making it difficult to follow the series of events and gain a comprehensive understanding of the family history. Similarly, the narrative entries refer to prior events or investigations, sometimes without any information, context, dates or adequate detail.

Examples of incomplete entries, lack of dates for specific entries and inconsistencies in the record include:

> **Example #1**: The "Worker Findings" section of the investigation into [minor child's] death state the following: "During the investigation in [it] was determined

14

the foster parents had been trained and informed on the dangers of SIDS and sleeping in the bed with a foster child." However, the certificates in the licensure approval process materials for the resource home do not indicate that [the relative resource parents] received such training. There is no such evidence of a certificate or confirmation of completion of this training in the record.

**Example #2:** A letter presumably written by [maternal grandmother] accusing caseworker ██████ █████, FPS (caseworker responsible for the investigation that resulted in [minor child and sibling] coming into custody) of serious violations is included in [biological mother's] case file without any context or follow-up. The letter is not dated or titled, but the Bates Stamp reads ██████████.

**Example #3**: Judging from screenshots of the MACWIS database, several important sections of the case records are incomplete or blank. The following sections were photocopied but were incomplete or blank: "Provide Justification/Rationale for Screening and/or Reconsideration Recommendation"; "Safety Assessment Summary"; "Medical Report Summary"; "Evidence Criteria"; "Demographics for [sibling of minor child]"; "Personal Medical Conditions for [sibling of minor child]"; and sections of [sibling of minor child's] "Child Evaluation".

**Example #4**: Case records document several times that ███████, [minor child's] biological father, reports that he is dealing with issues associated with having been institutionalized for ten years, but the reasons for his institutionalization (e.g., incarceration? psychiatric hospitalization?) are never described. The only matter related to possible institutionalization reflected in the case file is a reference to a ████████ arrest, but this cannot be the incident related to the ten-year period of institutionalization because the record indicates that arrest occurred three years prior to his statements.

**Example #5**: The records covering [sibling of minor child's] multiple placements do not fully explain reasons for each placement change. Documentation for each placement "Exit Date" and "Enter Date" create confusion about where [sibling of minor child] spent certain evenings since the "Exit Date" is the day before the "Enter Date" (i.e., ██████ Exit Date from one placement and ███████ Enter Date at the next placement). Based on the placement

log for [sibling of minor child], it is unclear where ███ spent the nights of
███████ 2015, ██████ 2015, and ██████ 2015.

**Example #6**: The contact notes, investigation report and foster parent training documents
are not organized in a coherent manner making it difficult to identify and
locate information. For example, the records are not maintained
chronologically, several records are duplicated and other documents in the
case record are provided without any explanatory information or context
(such as the letter, noted above, that appears to be from [maternal
grandmother] that is inserted in the record in several places but is neither
identified nor dated and never commented upon).

**Example #7**: The case narrative from Special Investigator ("SI") ██████ interview with
[relative resource mother] on ██████████ states that [relative resource
mother] "quit school in the 7th grade", but the DFCS Resource and
Adoptive Home Application indicates she completed 10th grade.

**Example #8**: [Minor child's sibling] and [minor child's] birthdates are switched in
the Youth Court motion to grant DFCS legal custody (dated ██████). In
the ████████████ Youth Court Hearing and Review Summary Report,
the date of [minor child's] death is incorrectly documented as ████████
███.

**Example #9**: In the DFCS "Safe Home Study" application dated ██████████, [relative
resource mother] names her mother as ██████████ in the
"Extended Family Members" section, but she refers to her as
█████████████ in the "Historical Information" section of the
Home Study form.

| | |
|---|---|
| ***Finding #2:*** | The investigations of alleged child abuse and neglect are not comprehensive and do not reflect standards of quality as evidenced from the case narrative and other investigative documentation, both for the initial investigation of alleged child abuse and neglect and for the special investigation required in the case of a child fatality of a child in custody. |

The investigation of alleged child abuse and neglect is the state's critical first response to ensure
the safety of a child or children. It is the entry point for child welfare intervention for both the short
and long-term. In order for workers to fully assess safety and risk and make sound decisions about
whether a child needs to be removed or can safely remain with their caregiver, the investigation

must be timely and comprehensive and must be thoroughly documented. The investigation is the first contact with the family so it is important that as much information is gathered as possible, the family is engaged in the process, and the documentation is clear and comprehensive. During the investigation process, it is critical for workers to understand the family story and history, assess the immediate and ongoing safety and risk factors, and assess the strengths and needs of each family member. In order to complete a quality investigation, workers must respond in a timely manner to reports of suspected child abuse and neglect, review and incorporate any relevant history of CPS involvement, interview all family members independently, speak to as many formal and informal supports as possible, and contact other child and family serving agencies who may or may not have an involvement with the family. The investigator must clearly document all conversations, observations and interactions with the family and extended collaterals.

- The ▮▮▮▮▮▮▮▮ investigation of alleged abuse and neglect based on the domestic violence incident was not of acceptable quality. There were gaps in the assessment of the family and a lack of information gathering that hindered DFCS' ability to understand the family's strengths and needs and to begin planning with the parents to ensure their children's safety and well-being. Specifically, there was inadequate attention to family history during the investigation and no evidence of critical thinking about patterns of behavior or past trauma impacting current behavior.

  **Example #1**: DFCS had no contact with collaterals such as medical professionals, service agencies, and law enforcement officials beyond initial contact at the home on the date of the ▮▮▮▮▮▮▮▮ domestic violence incident. Mississippi DFCS Policy clearly states that following contact with the alleged victim(s), DFCS staff should interview "At least one collateral contact… May include, but not limited to the following: service agencies, doctors, nurses, teachers, law enforcement, neighbors, relatives (not including household members), and others who may have information concerning the health and welfare of the child. If a relative is used as a collateral you must also have a second collateral who is a non-relative" (Mississippi, DFCS Policy Section B p. 29). This policy does not appear to have been followed.

  **Example #2**: Several members of the family including [biological mother], [maternal grandmother], [relative resource mother] and [paternal grandmother] had prior history with DFCS and/or law enforcement according to references in the case narratives. A ▮▮▮▮▮▮▮▮ note by [a DFCS] investigator ▮▮▮▮▮▮▮▮ states: "Maternal grandmother and paternal grandmother both has [sic] history in MACWIS". However, other than briefly alluding to the past investigations, the case

record does not indicate that DFCS workers considered the implications of these past investigations on the current case.

- There were major delays in conducting necessary assessments including medical and forensic exams.

    **Example #1**: It is unclear whether a safety assessment, medical report, or other critical assessments were conducted due to a lack of documentation. Screenshots of the MACWIS investigation report concerning the  [relative resource] home following [minor child's] death are incomplete and mostly empty, such as the following incomplete sub-tabs: "Safety Assessment Summary", "Medical Report Summary", "Evidence Criteria" and "Contributing Factors".

    **Example #2**: [Sibling of minor child] complained of pain near ▇ privates on  but did not have a physical and forensic exam until ▇ by Dr. ▇ of the Children's Safe Center at UMC. The case narrative states that ▇ had a checkup for a stomach virus on ▇ at the ▇ Children's Clinic, where ▇ was also checked. The extent of the exam is unclear, although it may have been superficial and external, considering another part of the narrative states that ▇ Children's Clinic was unequipped to conduct a full forensic exam.

    **Example #3:** [Minor child] never had an initial medical screening within 72 hours of placement as is required by the MSA and DFCS policy. (Mississippi, DFCS Policy Section D, VII.B.7.)

- Based on the documentation in the record, the DFCS investigation initiated upon [minor child's] death only partially met certain requirements established in DFCS policy and did not exhibit quality investigative practice. [Redacted discussion related to non-classmember] In terms of contacting collaterals, DFCS only obtained [minor child's] autopsy records, but did not conduct a thorough review of all circumstances surrounding the death. Mississippi law mandates that autopsies and infant death scene investigations be performed on all suspected SIDS and Sudden Unexpected Infant Death cases and subsequently reported to the State Medical Examiner's office. It is unclear whether an adequate death scene investigation was conducted given the lack of information in the case record. Further, best practices for investigating infant death require reporting additional details such as the mother's pre-natal history, the condition and exact position of the child when discovered, potential airway obstructions when discovered, recent medical history and a list of social and environmental conditions

that could have contributed to the death. The DFCS investigation did not include a request for this information.

**Example #1:** [Minor child's biological parents] claim they took [minor child] to the hospital for breathing issues shortly before ▮ death, but there are no records of the hospital visit in the investigative report related to [the minor child's] death. Further, other than immunization information, there is no medical information included in the case record. This information is critical to the worker's ability to complete a quality investigation given ▮ manner of death. Additionally, [the minor child] should have had an initial health screening within 72 hours of ▮ initial placement following DFCS custody as dictated by policy and the MSA; if ▮ received the health screening, there is no evidence of it in ▮ case file.

---

**Finding #3:**  The records do not reflect appropriate assessment of potential foster parents including comprehensiveness documentation or thoughtful decision-making in the licensing and approval of foster parents.

---

Foster parents are key partners in any well-functioning child welfare system. The recruitment, training and support for foster parents ensures that children who enter the foster care system – and who often have experienced some form of trauma – have all their needs met. Foster parents should complete comprehensive initial training, participate in regular, ongoing training and any other training that the recruitment and licensing teams deem necessary based on the foster parents' history and identified needs. As licensing and foster parent support workers recruit and engage foster parents, it is crucial that they have a full understanding of the history, strengths and needs of potential and current foster parents, and are in regular contact with active foster parents to ensure they receive any necessary support.

*[Relative Resource Parents of Minor Child]:*
The ▮ were approved by DFCS as licensed foster parents in ▮ 2014. Although DFCS technically completed an approval checklist for the ▮ family during the licensure process, the information gained from some of the checklist materials, including the references from informal supports, were largely superficial (most references do not mention the death of their [baby] ▮ or consider whether there was any subsequent emotional distress). Additionally, although the file contained a collection of print-outs (criminal background checks, police records, CPS background checks), there does not appear to have been a comprehensive analysis of the information or documentation that the information had any bearing on DFCS's decision-making

19

regarding the licensure of the ████ home. Other issues raised by the licensing/approval process included:

- There is no evidence of adherence to protocol for updating information related to licensed resource parents (e.g., change in household members, change of address, updated employment or criminal history, updated medical and mental health profiles).

**Example #1**: [Relative resource mother] was convicted [on] ████████ [of a criminal offense]  but this does not seem to have been explored with ████████ nor is it discussed in the ████ Resource Home Licensure File. There is no evidence in the case file of any independent update of a criminal records check or that [relative resource parents] were asked to update their criminal histories. The conviction is mentioned only in the records of the investigation of [minor child's death].

**Example #2**: DFCS was not aware that the ████ [relative] resource family moved in ████  ████ until ████████ despite the policy requirement to complete a Home Environmental Checklist every six months and the most recent one had been completed on ████████, more than six months prior. (Mississippi DFCS Policy, Section F, VI.A.1). When DFCS learned of the move, [a DFCS resource specialist] RS ████████ scheduled a home visit for ████████ and indicated to [relative resource mother] and [a DFCS caseworker] FPW ████████ that she would not recommend placement in the ████████ home until the Home Environmental Checklist was completed. On ████ ██ ████, [the caseworker] FPW ████████ told [the resource specialist] RS ████████ she would not place [minor child] in [relative resource family's] home, however, she later left [minor child] in their care. On ████████, [the resource specialist] RS ████████ visited the ████ home and noted changes/repairs that were needed. There is no indication of whether or not these changes/repairs were necessary for the home to be approved for placement.

**Example #3**: There is no evidence that, prior to [minor child's] placement in the home of [relative resource parents] ████████, DFCS was aware of or explored the two Abuse, Neglect and Exploitation (ANE) intake reports from [mid 2014] ████ in which it was alleged that [relative resource parent] had disciplined foster children in her care inappropriately and had not prevented her biological [child's] ████ biting and choking of another foster child.

20

**Example #4:** There is no evidence that, prior to [minor child] placement in the home of [relative resource parents], DFCS explored or updated information on their prescription drug use or any possible psychological/behavioral factors that may have contraindicated a placement.

- There is no evidence of any individualized needs assessment or services for the foster parents as part of the resource home licensure approval process. In her application to become a foster parent, ███████ self-reported a history of significant depression. She had ██ miscarriages and her first [child] ████████████ died at ███ weeks of age. In the course of the licensure process she reported a "deep depression" after her [child's] ███████ death and was taking an anti-depressant used to treat major depression as well as a different medication for sleep (both of which she may still have been taking at the time [minor child] was placed in her home). However, these significant issues, while noted by [relative resource mother], did not seem to be assessed as part of the approval process.

**Example #1:** Given the death [of relative resource parents' child] ██ months before the foster home approval process, the CPS worker should have acknowledged, discussed, and then documented the decision-making process about licensing the ██████ home. If, after careful consideration, the ██████ were approved as resource parents, they should have received more specialized training and counseling tailored to their specific situation before placing any children in their care. The records do not indicate any SIDS-focused training other than the generic "Child Safety Training" required of all prospective resource parents. Also, DFCS has reported to the Monitor that ████████████ and her husband d i d   n o t   receive the full training prior to licensure as required by policy.

*[Foster placement for minor child's sibling]:*

The licensing and approval process for the ██████ resource home as documented in the case record was haphazard and unclear. The licensing process appears to have been initiated shortly after [minor child's] death. [A DFCS supervisor] ASWS ████████ visited the ██████ home on ████████ –the same day the ██████ submitted permission forms for background checks. There are narrative recordings from that date that the ██████ home was considered inadequate due to uncleanliness, the lack of fire safety equipment, and unsecured firearms. On ██████, the case record indicates [a DFCS caseworker] FPW ██████ visited the ██████ home and noted the firearms were on the top shelf of ██████ and ██████ closet and spoke with ████████ about the need to cover an opening where an old air conditioning unit had been. However, by the following week, the home was cleared for [sibling of minor child's] placement with no explanation in the narrative about whether all the original problems in the home environment were corrected prior to the approval of the home and ██ placement there. Specifically:

21

- There was no evidence that workers followed a protocol for review and final approval of home studies to ensure that all identified concerns had been addressed.

**Example #1**: During the ███████ first home study, conducted ████████████, [a DFCS supervisor] ASWS ██████████ reported that the home was not a suitable placement due to numerous flies, sharp edges in the flooring, the disheveled master bedroom, an exposed gun, and the absence of any fire safety instruments. During the second home study on [seven days later] ███████████, [DFCS caseworker] FPW ████████████ recommended certain improvements, but it is unclear whether they were implemented (such as obtaining fire safety equipment) before the home was approved or [sibling of minor child] was placed there on [one day after the second home study] ███████████. There is also no "Emergency Placement Checklist" ███████████ for the second home visit that is referred to in the record. The next documented home visit on [13 days later] ████████████ indicates the area where the old air conditioning unit was covered but it is unclear when this occurred during the two week period.

*[Paternal Grandmother's Resource home for sibling of minor child]:*
The case records indicate that the licensing/approval process for [paternal grandmother] was unplanned and rushed. [The sibling of the minor child] was placed with [paternal grandmother] on ███████████ as an expedited relative resource placement. It appears that [paternal grandmother] completed the "Resource Home Inquiry Application" on the same day that [sibling of minor child] moved in with her, although [paternal grandmother's] son ███████, along with her live-in boyfriend and live-in sister, did not sign background check authorization forms until █████████████. [DFCS caseworker] FPW ███████████ completed a "Home Environment Checklist" on ███████████, indicating that safety assurances were met, but there are no case notes indicating that [DFCS caseworker] FPW ████████ visited [paternal grandmother's] home on this date. The case notes indicate that on ███████████ [DFCS caseworker] FPW ████████ spoke with [paternal grandmother] at [maternal grandmother's] home, where all three of them discussed the options of placing [sibling of minor child] in [paternal grandmother's] custody or placing ███ in [maternal grandmother's] custody. The next notes in the case record about this placement relate to when [sibling of minor child] was removed from [paternal grandmother's] home on ████████████ after a shelter hearing. The reasons for ███ removal are not clearly stated in the record, although it appears that [sibling's] mother did not want [sibling] ████████████ placed with either grandmother. Specific issues include:

- The DFCS decision process regarding placement of [minor child's sibling] with [paternal grandmother] is not clearly documented.

  **Example #1:** It is unclear whether [DFCS caseworker's] FPW ███████████ expedited assessment of [paternal grandmother's] home as a potential placement fully considered/accounted for the home environment, including [paternal grandmother's] teenage children and their alleged drug abuse (alleged by [maternal grandmother]), and the sleeping arrangements. Since there are no case notes describing the details of the visit to [paternal grandmother's] home, it is impossible to gauge how thoroughly the home was assessed.

---

*Finding #4:*   The records do not reflect adherence to an organized placement process.

---

When a child welfare agency needs to remove a child and place them in care, they need to have and follow clear protocols that ensure the foster parents have sufficient information to guarantee the child's safety, meet all of the child's needs and minimize trauma to the child.

The placement matching must ensure that the home is the right fit for the child, and the foster parents should be provided with the appropriate packet of information (medical screening, medical needs, insurance information, educational needs, therapeutic needs, etc.) to ensure they are best able to support the child while he/she is temporarily in their care. While all of the needed information may not be readily available at the time of placement, basic health information should be gathered and provided to the resource parent immediately upon placement. Additionally, the placement history of a child must be clear and readily accessible to staff and other professionals working with the family so they can best understand the child's transitions, stability and needs.

*[Minor Child]:*
It was not possible from the case record to gain a complete understanding of [minor child's] placement history after the initial domestic violence incident. Although it appears that [maternal grandmother] initially took [minor child] from [biological parents'] house and ██ was then brought to [relatives] home by [biological father] on ████████████, the case narrative does not outline the details of the transfer. Based on the documentation, [DFCS caseworker] FPW ██████████ met [minor child] and [resource parents] at the Dollar General Store parking lot, saw [minor child] sleeping in the car, and let [minor child] remain in their care rather than taking ██ to be medically screened or physically "taking ██" into DHS custody. It is unclear what "taking ██" into DHS custody means in practice in this instance as there is limited

23

documentation in the case record. This is particularly concerning given that [DFCS caseworker] FPW ███████ spoke with [DFCS resource specialist] RS ███ ██████ on ████████ and was informed that [relative resource parents] had moved and their new home had not yet been observed or approved by DFCS.

- There is no evident protocol regarding drop-off/hand-off with foster parents, which is important in all cases, even with a relative caregiver. Such protocol would be expected to include an initial medical screening, an exchange of medical information, an introduction to the home environment, a visitation plan and key information that is pertinent to the child's safety including information on the dangers of co-sleeping with infants.

  **Example #1:** In the investigation narrative dated ████████ that was completed by [DFCS Special Investigator] SI ████, she states that the CPS worker ██████████ neither visited the ████ home nor interviewed the family prior to placing the infant with them because "the resource unit told her the home was fine/ok." As it turns out, the home was in fact not even at the address that had been approved, and one of the resource parents had a new [criminal] conviction ██████████ ██ ██ ████████████.

  **Example #2:** DFCS's placement of [minor child] seems to have been a "drive-by," as the DFCS worker's observation of [minor child] during the initial investigation associated with the domestic violence report occurred in a parking lot when the child was asleep in the back seat of a van. There was one subsequent entry in the case record by [DFCS resource specialist] RS ████████████ of a visit made to the ████ home on ████████████. There was no evidence that at that meeting in the General Dollar Store parking lot on ████████████, the [DFCS caseworker] FPW ██████████ shared information about the infant's needs with [relative resource parents], or addressed any questions regarding the suitability of the placement or the care of [minor child] ██████████. Further, there was no evidence that any necessary documents such as medical insurance information were exchanged or had already been provided by ██████ ██████ biological father at the time he left [minor child] ████████ ████ in their home.

*[Sibling of minor child]*
The records transmitted to the Monitor by DFCS did not afford a complete or clear picture of [the sibling of minor child's] placement history or of the processes that guided decisions about ███ [the sibling's] multiple placements. From the time of [biological parents'] initial domestic violence incident that led to the CPS referral on ████████████ through ████ (the date of ██████ placement with the [non-relative resource] family), [the sibling of minor child] resided in the following homes: [maternal grandparents], [paternal grandparents], the ████ County Shelter, ████████████ [resource home] and ████████████ [resource home] (current placement) - a total of five homes  24

in a three-month period. It was not possible to ascertain from the documents submitted by DFCS the reasons for all of the placement changes and what, if any, steps were taken to address the trauma caused by recent events in [sibling's] ███████████ life and the multiple placement changes. Specific issues include:

- Lack of a complete and clear explanation for placement changes. Reviewers needed to search all records to piece together ██████████ placement history, which is still not entirely clear.

  **Example #1**: The reasons for [sibling of minor child's] placement and length of stay at the ████████ County shelter are unclear, as are the reasons [sibling] ███ was eventually moved from the shelter. The "Placement History" states the "Change Reason" for leaving [paternal grandmother's] custody to be "Other" but this is not explained in the record. The reason for each placement change should be clearly documented in the case record.

- There is no evidence that the protocol regarding receiving the required medical screening within 72 hours of custody was followed for ██████████ [sibling's] initial placement or that appropriate medical follow-up was provided.

  **Example #1**: ████████████ [Minor child's sibling] appears to have had several ailments during [the child's] ███ placements (stomach virus, pain near privates, and a leg injury sustained while placed at the shelter that persisted and kept ███ from walking properly). While ██████████ was seen by a doctor at a medical appointment on ██████████ to address ███ stomach virus, a medical screening did not occur within 72 hours of ███ placement and there was a lackof timely medical follow-up related to ███ ailments. The initial assessment of symptoms occurred at the time of ███ placement at the ████████ County Shelter. ███ only received a comprehensive physical examination (required within 30 days of custody under the MSA and DFCS policy) following a recommendation made at the fatality roundtable, nearly two months after it was indicated appropriate follow-up was necessary.

25

| **Finding #5:** | The Family Assessment and Service Agreement were superficial and fail to address both current and underlying needs |

The workers' ability to assess a family's needs and implement a service agreement is foundational to good case practice and to DFCS' ability to achieve goals of safety, permanency and well-being for children. An assessment of a family must identify the strengths, needs, history and past services, and determine how each factor relates to the behavior concern that led to, or may lead to, the elevated risk of the child. In order to obtain all of this information, it is critical that workers engage the family members as well as formal and informal collaterals. In developing the service agreement with the family, the services must be related to the behavior concerns – indicate what behavior change needs to occur (what success will look like) – as well as how services can build upon the family's existing strengths. Furthermore, the family assessment and service agreement should be updated regularly as new information is gathered and services are completed.

In the case of [minor child], the documented family assessment was superficial because it failed to address the seriousness of [biological parents'] domestic violence issues or [biological mother's] history of domestic violence with multiple partners. Similarly, the Service Agreement of ███████ focuses on generic recommendations such as monthly counseling and stable employment and housing. It does not include specialized services to help the parents manage the trauma of [minor child's] ███████ death or help to curb the violent behavior directed at one another. DFCS records acknowledge that [biological parents] both require better communication skills, but regularly resorting to violence (e.g., ███████) is not only a failure of communication but a fundamental behavioral issue as well. Considering the fact that [biological mother] had previously been taking medication for her mental health diagnosis (the Agency Assessment from the ██████ Youth Court Hearing states "███████ will be seeing a psychiatrist to get back on her bi-polar medication" and the ██████ DHS Investigation Report states "Mother ███████ has been diagnose [sic] with Manic."), it seems that greater attention to her mental health assessment and treatment was warranted. Specifically:

- The case planning does not address ongoing domestic violence issues and does not function as a behavior intervention plan; the case plan does not demonstrate knowledge of domestic violence issues or appropriate services to support change for the victim and perpetrator. [Biological parents] were not supported by DFCS in continuing to access the services that were part of their case plan.

**Example #1**: The Family Service Plan merely states: "follow all recommendation and cooperate," "stable housing and employment" and "make scheduled appointments." The Family Service Plan approved on ███████████ states that the goals are to "learn to talk to each other and not argue" and that neither parent has any known emotional behaviors – which ignores the parents' past history and trivializes the severity of their domestic violence issues.

**Example #2**: On ████████████, [biological mother] spoke with [DFCS caseworker] FPW ██████████████ and indicated she had completed her therapy assessment and [biological father] was in the process of completing his assessment, however, there w e r e challenges in continuing with therapy due to the cost of each session. [DFCS caseworker] FPW ██████████████ did not offer support, guidance or strategies to ensure the parents would be able to participate in therapy in light of the cost restriction. Instead, [DFCS caseworker] FPW ██████████ indicated that the parents would need to participate in therapy if ordered by the court. ████████████ and █████ also participated in parenting/anger management classes but it is unclear if these services supported the necessary behavior changes related to the domestic violence history.

- The case planning does not reflect new information gained from the occurrence of [minor child's] ██████ death and the likely impact of that on ██ [the minor child's] parents.

**Example #1**: The case plan does not comprehensively address [sibling of minor child's] needs to help ██ cope with recent events; nor is there any evidence of the DFCS's interventions or services to ensure safe reunification with ██ parents. The case narratives stress the fact that [biological parents'] domestic violence issues are strictly with each other and do not affect their interactions with the child, but it is inconceivable that such ongoing domestic violence has not had any impact on [sibling of minor child] as ██ [sibling] has likely witnessed episodes of violence, as indicated by reports to DFCS made by [maternal grandmother] that [biological parents] engaged in domestic violence while [sibling of minor child] was present. Given the previous (unsubstantiated) report involving [biological mother's] alleged neglect of [sibling of minor child] and ██ multiple placements, exposure to domestic violence, possible sex abuse as indicated from ██ [sibling's] medical complaints of pain near ███ private areas during ███ interview with [DFCS special investigator] SI ██████ on ███████ (see p. 18 of this report), and the loss of [minor child] ████████, there should have been a greater focus on assessing [sibling of minor child's] ongoing safety and providing services that will ease the reunification process.

27

| *Finding #6:*   There does not appear to have been a formal Fatality Review. |
| --- |

Formal and institutionalized child fatality review protocols and forums are a best practice for reviewing the case practice and system response when a child fatality occurs. These forums – which should be comprised of quality assurance staff and program staff across departments – offer a formal mechanism for identifying system barriers (both in practice and policy) that may have contributed to the circumstances surrounding the fatality or were present in case practice and are a key component of a comprehensive continuous quality improvement (CQI).

- There does not appear to be any systematic way in which the DFCS responds to and reviews cases in which there is a fatality of a child in DCFS's custody. Quality documentation outlining the details of [minor child's] untimely death and identified actions are essential for ongoing work with the family and understanding and addressing gaps in system performance.

  **Example #1**: In response to the Court Monitor's inquiry, DFCS has advised that there was a "mortality roundtable" discussion held on ██████████ (almost ██ months after ██████████ death). When Ms. Lopes asked for details about the roundtable's findings, DFCS responded on ██████████ as follows: "DFCS has advised that there were no documents produced in response to or as a result of the fatality roundtable for ██." Four days after the initial email, in response to the Monitor's continued questions, DFCS provided additional information about the roundtable and indicated that it had identified certain issues (i.e., communication breakdown between frontline workers and licensure/resource workers; inconsistencies and unaddressed red flags in the home study; policy violations regarding on-time medical examination, and policy violations regarding timely placement updates in MACWIS). Based on the information that has been provided to the Court Monitor, it appears that the roundtable did not produce formal recommendations indicating timelines for implementing changes as a result of the findings.

---

*Finding #7:*    **REDACTED – Involves Non-Class Member**

---

**REDACTED**

## V.    Recommendations

There are many areas for improvement in DFCS's practice and policy, as noted throughout this report. Specific and actionable recommendations include:

1. **Implement a comprehensive continuous child fatality review process as a core component of DFCS' quality improvement (CQI) activities.**
   *Any well-functioning child welfare system must have clear CQI processes for assessing practice and policy on an ongoing basis. These processes should include mechanisms for reviewing and learning from child fatalities and insuring that there are clear and workable accountability mechanisms for following-up on substantive recommendations made during child fatality reviews.*

2. **DFCS must implement clear and comprehensive placement protocols.**
   *The placement of a child in a resource home, congregate care setting, or other DFCS placement must include an initial assessment of the child's needs and procedures to make decision about the appropriateness of placement resources. Once a decision is made, DFCS needs to develop and utilize protocols that require sharing this information with the placement provider. A comprehensive placement protocol should require medical screenings before any placement occurs including initial placements and any placement changes. Further, the placement process must delineate roles and responsibilities of social work and placement staff to ensure that placements are made in safe, licensed homes that are in the best interest of the child.*

3. **Engage in cross-agency information sharing.**
   *While DFCS is not the responsible agency to conduct autopsies, there should be clear protocols and mechanisms for sharing information between DFCS and the State Medical Examiner's office when a child in DFCS custody dies. Through its mission, DFCS has an obligation to regularly, through formal, established processes, engage in information*

*sharing with other public agencies including the State Medical Examiner's office, public health agencies, and law enforcement.*

4.    **Improve the case planning process**

*Based on this case review, DFCS has considerable work ahead with staff and their supervisors to ensure the consistent application of its case practice model and the quality of its assessment and case planning processes with families and children.*

5.    **Provide ongoing support to birth parents.**

*Many families involved with child welfare do not have the financial capacity to access quality services. DFCS must work with behavioral health providers to ensure these services are accessible to birth families.*

**Appendix A: Genogram**



**Appendix A (cont.): Genogram**



**Appendix C: Timeline of Events**

