IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

OLIVIA Y., *et al.*                                                                    PLAINTIFFS


v.                                                                    CIVIL ACTION NO. 3:04CV251LN

HALEY BARBOUR, as Governor of the State of Mississippi, *et al.*                 DEFENDANTS


DECLARATION OF MARCIA ROBINSON LOWRY

Marcia Robinson Lowry, an attorney of record in this civil action, makes this declaration under

penalty of perjury and pursuant to 28 U.S.C. § 1746

1.        I am a member of the Bar of New York and admitted to practice in this Court *pro hac*

*vice*. I am lead counsel for the Plaintiff Class in this case along with local counsel, Wayne

Drinkwater, of the firm of Bradley Arant Boult Cummings LLP. I am the Executive Director of

A Better Childhood ("ABC"). I give this Declaration in support of Plaintiffs' Motion For Award

Of Class Counsel's Fees And Expenses.

2.        As demonstrated by my resume, submitted as Attachment A to this Declaration

and incorporated in this Declaration, I graduated from New York University School of

Law in 1969.  I have been an attorney litigating child welfare cases since 1970.  For six

years, I was the Director of the Children's Rights Project of the New York Civil Liberties

Union, where I instituted and directed a program of litigation to reform the New York

City child welfare system.  From 1979 until 1995, I was the Project Director of the

Children's Rights Project of the American Civil Liberties Union ("ACLU"), where I

directed major litigation efforts in jurisdictions throughout the United States designed to

promote major reform of child welfare systems. In 1995, I carried this work over to Children's

Rights, which I founded. I was the Executive Director of Children's Rights until August 2014, at

which time I founded and became Executive Director of ABC.

3.       I have been counsel in approximately 20 class action lawsuits representing

hundreds of thousands of children against systems that have failed to provide lawful child

welfare services including, for example:

- Baby Neal v. Casey, a class action against the Philadelphia child welfare system and the Pennsylvania public welfare department for failure to comply with constitutional standards and applicable federal statutes;

- Brian A. v. Sundquist, a class action against the Tennessee child welfare system concerning violations of foster children's rights under federal and constitutional law;

- Carson P. v. Heineman, a class action against the Nebraska child welfare system concerning violations of foster children's rights under federal and constitutional law;

- Charlie H. v. Whitman, a class action against the New Jersey child welfare system and the state of New Jersey for failure to comply with constitutional standards and applicable federal law;

- D.G. v. Henry, a class action against the Oklahoma child welfare system concerning violations of foster children's rights under federal and constitutional law;

- Dwayne B. v. Granholm, a class action against the Michigan child welfare system concerning violations of foster children's rights under federal and constitutional law;

- E.C. v. Blunt, a class action against the Missouri governor and child welfare officials challenging the facial validity of an adoption assistance law on constitutional and statutory grounds;

- Foster Children Bonnie L. v. Bush, a class action against the Florida child welfare system and the state of Florida concerning violations of foster children's rights under federal and constitutional law;

- G.L. v. Zumwalt, a class action challenging federal statutory and constitutional infirmities within the foster care system in Kansas City, Mo;

- <u>Jeanine B. v. Thompson</u>, a class action against the Milwaukee County child welfare system and state of Wisconsin for failure to comply with local laws, federal statutes, and federal constitutional protections applying to children at risk for placement or in foster care;

- <u>Joseph A. v. New Mexico Dept. of Human Services</u>, a federal statutory and constitutional challenge to the foster care system in the state of New Mexico brought on a class basis;

- <u>Juan F. v. Rell</u>, a class action against the Connecticut social services system, based on failure to comply with constitutional standards and applicable federal statutes;

- <u>Kenny A. v. Perdue</u>, a class action against the Governor of Georgia and other state officials concerning violations of foster children's rights in DeKalb and Fulton Counties, Georgia, under federal and constitutional law;

- <u>LaShawn v. Barry</u>, a class action against the District of Columbia child welfare system for failure to comply with constitutional standards, federal statutes, and applicable District of Columbia law;

- <u>Marisol A. v. Giuliani</u>, a class action against New York City and State, regarding all aspects of New York City's child welfare system, for failure to comply with federal constitutional, federal statutory, state constitutional, state statutory, and state regulatory standards;

- <u>Olivia Y. v. Barbour</u>, this class action against the Mississippi child welfare system concerning violations of foster children's rights under federal and constitutional law;

- <u>Sam M. v. Carcieri</u>, a class action against the Rhode Island child welfare system concerning violations of foster children's rights under federal and constitutional law;

- <u>Sheila A. v. Finney</u>, a class action in state court against the Kansas child welfare system based on violations of state, federal statutory, and federal constitutional law; and

- <u>Wilder v. Sugarman</u>, a challenge to New York's statutory scheme for the provision of foster care services on the grounds of racial and religious discrimination and violation of the establishment and free exercise clauses of the First Amendment.

4.     In addition to my litigation activities in child welfare cases, I have written and spoken extensively on child welfare reform and child welfare litigation. These speaking engagements and publications have included: Fordham Urban Law Journal, "Why Settle When You Can Win: Institutional Reform and Marisol v. Giuliani," Vol. XXVI, May 1999; University of Michigan Journal of Law Reform, "Why Children Still Need a Lawyer," Fall 2007; Speaker/Panelist, St.

John's Journal of Legal Commentary Symposium on Legal Reform and Children's Human Rights (April 9, 1999); Speaker, American Bar Association's 9th National Conference on Children and Law (April 9, 1999); Keynote Speaker, New Jersey Child Placement Review Annual Conference (April 10, 2007); and Panelist, University of Michigan Law School, "Looking Ahead to the Next 30 Years of Child Advocacy" (March 30, 2007). Other publications and professional activities are listed on my resume.

5.      I have also presented testimony before both houses of Congress on child welfare and foster care issues, and in October 1998 I was a recipient of a Foundation for Improvement of Justice Award.

6.      Pursuant to Federal Rule of Civil Procedure 23(h), Plaintiffs request that the Court approve Plaintiffs' motion for fees and expenses incurred during this post-judgment monitoring period. Plaintiffs seek a total of $336,123.81. This includes reimbursement of 960.78 hours expended on this litigation by Plaintiffs' attorneys (875.98 hours) and by paralegals (84.8 hours).

7.      The resumes of Sara Robinson-Glasser, Wayne Drinkwater, Michael Bentley and Stephen Dixon, the other attorneys for whom plaintiffs seek fees for their work on this matter during this billing period, are submitted as attachments to their declarations.[1] Significant time was also spent on the drafting and finalizing of the renewed motion for contempt motion by additional co-counsel in this lawsuit, the law firm of Loeb and Loeb, which is not seeking fees for its *pro bono* work on this litigation. I have worked closely with my co-counsel to ensure that there was no duplication of effort and that we only undertook tasks as reasonably necessary to provide suitable representation to the Plaintiff Class.

---

[1] The resume of Michael Bentley is submitted as an attachment to Wayne Drinkwater's declaration.

8.      Attachment B to this Declaration is a summary of the total billable hours performed by the lawyers and paralegals on this case through from December 1, 2014-November 30, 2015. Attachment C is a summary of case expenses advanced in this case during this same period. Each compilation has been personally reviewed by myself or senior attorney Sara Robinson-Glasser, and charges have been reduced or written off which I deemed, in the exercise of my billing judgment, excessive or non-compensable.  I believe these summaries to be an accurate and reliable account of the work performed and the compensable expenses incurred by Plaintiffs' counsel and support staff in this case.

9.      During the period covered by this motion for fees, it was the consistent policy and business practice of all counsel and support staff on this case to maintain contemporaneous and specific records of all time worked in a particular case, and for such records to be entered into an online database. Both ABC attorneys and co-counsel who worked on this case kept contemporaneous and specific records of all the work they performed.  I attest that all of the hours submitted in Attachment B were reasonable and necessary in order to furnish adequate representation for the Plaintiffs.

10.      Throughout this billing period, I also made diligent efforts to hold expenses, which must be paid when incurred, to a minimum. The majority of the expenses incurred in connection with this period of litigation were travel expenses. I, along with the other attorneys working on this case, made concerted efforts to minimize the number and cost of trips to Mississippi, as well as the number of attorneys who participated in each trip. The travel to Mississippi during this billing period were necessary to effectively litigate this case and enforce the applicable court orders. Additional reimbursable costs include meals and transportation costs in Mississippi. I

attest that all of the expenses submitted in Attachment C were reasonable and necessary in order to furnish adequate representation for the Plaintiffs.

11.    For purposes of calculating Plaintiffs' fee award for hours worked during the period of December 1, 2014-November 30, 2015, the following rates were used: Marcia Robinson Lowry (ABC) –$475 per hour; Sara Robinson Glasser (ABC) – $350 per hour; Stephen Dixon (of counsel to ABC) –  $300; Wayne Drinkwater (Bradley Arant Rose & White, LLP) –  $420 per hour (2014), $438.75 per hour (2015) ; Michael Bentley (Bradley Arant Rose & White, LLP) – $198.75 per hour (2014), $217.50 per hour (2015); Jeanette Altobelli (paralegal, Bradley Arant Rose & White, LLP) – $131.25 per hour (2014), $153.75 per hour (2015); Claire Feely (paralegal, ABC) –  $130 per hour.  Travel hours for all attorneys were billed at half of these rates.  These rates are reasonable and consistent with the prevailing rates for attorneys of comparable skill, reputation, and experience. *See, e.g.*, *Billing Rates Across the Country,* National Law Journal. January 13, 2014. Available at

http://www.nationallawjournal.com/id=1202636785489/Billing-Rates-Across-the-Country.

12.    The hours spent this billing period were on activities necessitated by Plaintiff's non-compliance with prior orders. The operative settlement agreement in this case is the Modified Settlement Agreement ("MSA"), filed in July 2012. (Dkt. No. 571). The MSA provides for a phased-in schedule of an entire host of remedial measures, which the State was required to implement, concerning among other things, numbers of case workers, their caseloads, visitation requirements and medical care for children in placement. However, defendants did not implement the required measures and in 2014 and 2015, and the court Monitor issued reports for Implementation Periods 3 and 4 which documented significant failures by defendants to achieve the court-ordered requirements set out in the MSA. (Dkt. Nos. 604 and 655 respectively).

6

Faced with the State's massive non-compliance with the MSA and additional information from the Monitor that the State was back-sliding on the few reforms it did achieve, in early 2015, I, along with other Plaintiffs' counsel, drafted Plaintiffs' Renewed Motion for Contempt, for an Evidentiary Hearing and for the Appointment of a Receiver. (Dkt. No. 623). The Renewed Motion was filed in March 2015 (*Id.*), and the hearing for this renewed contempt motion was scheduled for August 10, 2015.

13.     To prepare for this hearing, my co-counsel and I expended a significant numbers of hours responding to discovery requests by defendants, in addition to reviewing and summarizing thousands of pages of documents included in defendants' discovery responses.  I took primary responsibility for working with plaintiffs' expert witness, Dr. Viola Miller, and preparing her for her deposition as well as preparing to depose numerous Mississippi child welfare officials.

14.     The hours expended in preparation for the contempt hearing brought about favorable results for the Plaintiff class. I participated in extensive negotiations with Defendants, which resulted in an Agreed Order Continuing the Evidentiary Hearing, (Dkt. No. 664), which contained the requirement, among others, that the State would hire an expert group to conduct an organizational analysis of the State's child welfare system and make recommendations for beginning to address the State's deficiencies in providing acceptable foster care for plaintiff children. On December 22, 2015, the parties filed the Interim Remedial Order, (Dkt. No. 671) which set forth time requirements for the State to accomplish the first steps toward a new organizational structure for the Division of Family and Children's Services ("DFCS"), hiring of a new DFCS Executive Director and other senior DFCS management officials, to exempt DFCS from state personnel board regulations and from contracting regulations and most importantly, to conduct a desk audit to determine the actual number of cases and workers in the child welfare

system. (*Id.*). The new deadlines for State compliance with the requirements of the Interim Remedial Order were set out over the following six months and the remedy phase of the plaintiffs' Renewed Motion for Contempt was continued to May 15, 2016.

15.     Based on my 40 years of experience in the field of child welfare law and my involvement in numerous similar institutional reform litigations throughout the country, it is my opinion that all of the intensive work done during 2015, including negotiating the Interim Remedial Order and the results achieved so far were extremely important steps towards ensuring that Plaintiff class gets the relief to which they are entitled. The hours expended by myself and my co-counsel in working to advance the plaintiffs' causes were necessary to meet our obligations to the Plaintiff class during this billing period.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 24th day of March 2016 in Chappaqua, New York.

Marcia Robinson Lowry

**ATTACHMENT A**

# MARCIA ROBINSON LOWRY

**1095 Hardscrabble Rd.**
**Chappaqua, N.Y. 10514**
**1 844-422-2425**                                                        **www.ABetterChildhood.org**

*Founder and executive director*
**A Better Childhood**                                                                **2014 – present**
>       Director of a non-profit advocacy organization committed to taking innovative and effective
>       approaches to reform dysfunctional child welfare systems across the country.  Lead counsel in class
>       actions in Mississippi, Oklahoma, New Jersey, the District of Columbia, and New York City, co-lead
>       counsel in ongoing lawsuit in Texas.

*Founder and Executive Director*
**Children's Rights**                                                                      **1995 to 2014**
>       Director of the leading national, non-profit organization fighting for the rights of children in state
>       foster care custody.  Children's Rights protects America's most vulnerable children using policy,
>       public education, and the power of the courts.  Directs class action litigation on behalf of thousands
>       of children nationwide.  Instrumental in promoting and implementing systemic reform of major child
>       welfare systems.  Recognized as a leading advocate for children in legislative and public forums.
>       Assumes all administrative and leadership functions for national organization.

*Director, Children's Rights Project*
**American Civil Liberties Union**                                                         **1979 - 1995**
>       Directed major litigation efforts in jurisdictions throughout the United States designed to promote
>       major reform of child welfare systems.  Identified and implemented project priorities.  Supervised all
>       staff.  Assumed leadership role in all fund raising and public education activities.

*Director, Children's Rights Project*
**New York Civil Liberties Union**                                                         **1973 - 1979**
>       Instituted and directed program of litigation to reform the New York City child welfare system.
>       Coordinated all Project legal, legislative, and public education activities.

*Special Assistant to Commissioner*
**Special Services for Children, New York City Human Resources Administration**            **1972 - 1973**
>       Planned and developed programs and worked on special problems for the Commissioner.

*Reginald Heber Smith Community Law Fellow and General Staff Attorney*                     **1969 - 1972**
**Community Action for Legal Services**
>       General litigation involving such issues as abortion and Medicaid reimbursements, juvenile justice,
>       and civil commitment of children to mental hospitals.  Also responsible for coordination of family
>       law litigation among legal services offices.

*Reporter*                                                                                **1963 - 1966**
**Long Island Press**

*Education*
New York University School of Law, J.D. degree, 1969, cum laude
Northwestern Univ., Evanston, IL, B.S. degree in journalism, 1962
London School of Economics and Political Science, University of London, 1960-61

*Admitted to Practice*
New York State
United States District Courts for the Southern and Eastern Districts of New York, the Eastern District of Kentucky and the Eastern District of Michigan
Court of Appeals for the Second, Third, Fifth, Ninth, Tenth and Eleventh Circuits and for the District of Columbia
Supreme Court of the United States


## Cases

Wilder v. Sugarman, decision reported at 385 F. Supp. 1013 (S.D.N.Y. 1974). Superseded by Wilder v. Bernstein, 499 F.Supp 980 (S.D.N.Y. 1980), 645 F. Supp. 1292 (S.D.N.Y. 1986), 848 F.2d 1338 (2d Cir. 1988), Nos. 94-7322, 94-7324 (2d Cir. Feb. 23, 1995). Challenge to New York's statutory scheme for the provision of foster care services on the grounds of racial and religious discrimination and violation of the establishment and free exercise clauses of the First Amendment. Consent Decree approved, over objections of sectarian agencies, in lengthy opinion prohibiting religious discrimination and the imposition of religious practices on children, and approving extensive monitoring of sectarian child welfare agencies receiving public funds. Attempt to narrow class by excluding children placed with relatives denied by court. Case concluded and principles of settlement agreement incorporated into Marisol A. v. Giuliani, discussed below.

G.L. v. Sherman. In 1983, Children's Rights joined Legal Aid of Western Missouri in a class action aimed at reforming the grossly inadequate child welfare system in Jackson County, Missouri. The federal complaint charges the Missouri Division of Family Services (DFS) with endangering the lives of children in state custody by failing to properly investigate and monitor foster homes. A settlement agreement was reached with Missouri officials in 1983, mandating top-to-bottom reform of the foster care system. After the state repeatedly failed to implement court-ordered reforms, Children's Rights and co-counsel successfully filed a contempt motion against the state and a full trial was held in 1992. A new settlement agreement was reached in 1994, which mandated such improvements as training for foster parents and mandatory criminal history and child abuse checks for prospective foster families. Over the next ten years, with court oversight, DFS successfully implemented all of the reforms required by the consent decree. On February 1, 2006, the court conditionally dismissed the case, court oversight officially ended, and the state agreed to keep in place until 2009 the policies, practices and staff positions created as a result of the lawsuit.

G.L. v. Zumwalt, consent judgment reported at 564 F. Supp. 1030 (W.D. Mo. 1983). Superseded by G.L. v. Stangler, consent judgment reported at 873 F. Supp. 252 (W.D. Mo. 1994), and later reported as GL. v. Sherman. Federal statutory and constitutional challenge to foster care system in Jackson County, Mo. Class certified, motion to dismiss denied. Consent judgment established widespread reforms in screening, training and supervision of foster parents, mandates appropriate treatment and permanency planning for foster children, and provides continuing court jurisdiction for enforcement. Motion for contempt granted December 7, 1992, revised consent decree negotiated, implementation and monitoring plan agreed to, internal receivership created by defendants in an effort to achieve compliance. Plaintiffs worked to enforce and monitor compliance with consent decree, which resulted in substantial improvements to the Kansas City foster care system. On February 2, 2006, the case successfully concluded with the state having complied with the terms of the consent decree. The state agreed to keep in place until July 2009 our policies, practices and positions created by the consent decree.

Joseph A. v. New Mexico Dept. of Human Services, 575 F. Supp. 346 (D.N.M. 1983), vacated and remanded, 69 F. 3d 1081 (10th Cir.1995), and concluded as Joseph A. v. Bolson. Federal statutory and constitutional challenge to foster care system in the state of New Mexico. Class certified, motions to dismiss and for qualified immunity denied. Earlier consent judgment mandated sweeping system-wide reforms involving

worker training and qualifications, caseloads, permanency planning for children, citizen review boards, and monitoring. Consent decree terminated by district court based on finding of substantial compliance with consent decree and denial of contempt motion, but this was reversed by 10th Circuit Court of Appeals. Consent decree reinstated on November 9, 1995, contempt finding recommended by Special Master. Decree renegotiated 1998 to incorporate standards of quality practice, with compliance determined by an expert neutral third party. Case again dismissed, this time on abstention grounds, and was again reinstated by the 10th Circuit. Case then entered a new stage, and the parties agreed on a court-ordered Exit Plan, utilizing external consultants to focus on children whose goal is adoption, to ensure they get adopted on a timely basis. The new Exit Plan required the external consultants to review cases every 60 days to ensure they are progressing towards adoption. Case successfully concluded, with compliance having been reached, in February 2005.

Martin A. v. Gross, 546 N.Y.S.2d 75, 153 A.D.2d 812 (1st Dep't 1989), 677 N.Y.S. 2d 292, 247 A.D. 2d 15 (1st Dep't 1998). Originally brought as a single action, then consisting of six separate lawsuits on behalf of six different families seeking damages for New York City's failure to provide appropriate protective and preventive services. Trial of first case resulted in jury verdict finding that City was negligent in failing to provide safe and adequate foster care for two twins with AIDS. Jury awarded $87,500 in damages. After Court of Appeals decisions authorizing cases to proceed, cases settled for substantial damages.

Sheila A. v. Finney, No. 89-CV-33 (Kan. Dist. Ct., filed Jan. 8, 1989). Class action in state court against Kansas child welfare system based on violations of state, federal statutory and federal constitutional law. Case settled on eve of trial with sweeping consent decree mandatory system-wide reform. Plaintiffs, defendants and a task force of state and national experts negotiated details of compliance monitoring and implementation, which now concluded, with the state substantially complying with the settlement agreement.

LaShawn v. Barry, 762 F. Supp. 959 (D.D.C. 1991), aff'd, 990 F.2d 1319 (D.C. Cir. 1993). Class action against the District of Columbia child welfare system for failure to comply with constitutional standards, federal statutes, and applicable District of Columbia law. Full trial on the merits, decision finding liability on local statutory, federal statutory and constitutional grounds on April 18, 1991. Affirmed on narrower grounds by the Court of Appeals for the D.C. Circuit, April, 1993. System placed in full receivership May 22, 1995, with broad authority to take all necessary steps to ensure implementation. Further appeals are reported at 69 F.3d 556 (D.C. Cir. 1995), vacated and in banc review granted, 74 F.3d 303 (D.C. Cir.) (in banc), aff'd, 107 F.3d 923 (D.C. Cir, 1996), cert. denied, 117 S. Ct. 2431 (1997). Receivership terminated October 2000. Comprehensive Implementation Plan developed April 2003, charting course for full compliance with Court's order by December 31, 2006. Ongoing monitoring activity.

Baby Neal v. Casey, 821 F. Supp. 320 (E.D. Pa. 1993), vacated in part, 43 F.3d 48 (3d Cir. 1994). Class action against the Philadelphia child welfare system and the Pennsylvania public welfare department for failure to comply with constitutional standards and applicable federal statutes. Motion to dismiss denied, motion for class action denied, reversed on appeal by Third Circuit Court of Appeals and class certified. Settled in late 1998, with the city, the state and the court system, with city agreeing to be held to generally accepted practices, and disputes to be reviewed by social work expert before being submitted to court. Case successfully concluded in 2000, with defendants having complied with terms of settlement agreements.

Juan F. v. O'Neill, 37 F.3d 874 (2d Cir. 1994), now Juan F. v. Rell. Class action against the Connecticut social services system, based on failure to comply with constitutional standards and applicable federal statutes. Case submitted to binding mediation process, resulting in broad-ranging consent decree and monitoring process in 1991. Court order to enforce various provisions of the decision affirmed by the Second Circuit Court of Appeals in 1994. Subsequently, numerous negotiated resolutions to non-compliance as well as contempt hearings. Plaintiffs' contempt request in 2003 resulted in an unprecedented voluntary handover of express management authority of the system from the state to the federal court monitor. New Exit Plan negotiated

- 3 -

and ordered in 2004 mandating achievement on 22 outcome measures. Management authority returned to the state in 2005. Plaintiffs' assertion of noncompliance in January 2006 resulted in the development of an Action Plan, finalized in March 2007, to improve the state's performance in treatment planning and meeting children's needs. Ongoing implementation and compliance activity.

Jeanine B. v. Thompson, now Jeanine B. V. Walker, 877 F. Supp. 1268 (E.D.N.Y. 1995). Class action against Milwaukee County and state of Wisconsin for failure to comply with local laws, federal statutes and federal constitutional protections for children at risk for placement or in foster care. Class certified, motion to dismiss denied in first decision establishing continued viability of post-Suter federal statutory claims. State of Wisconsin assumed direct responsibility for Milwaukee's child welfare system on January 1, 1998 and began a plan of reform. A later decision in the case was the first to explicitly recognize an additional federal statutory right to timely adoption petitions under the new Adoption and Safe Families Act. A consent decree was entered by the Court in December 2002, which calls for court enforceable benchmarks and outcome measures to be achieved over a three-year period. Ongoing implementation and compliance activity.

Marisol A. v. Giuliani, 95-Civ-10533 (S.D.N.Y. 1995), 126 F.3d 372 (2d Cir. 1997). Class action against New York City and State, regarding all aspects of New York City's child welfare system, for failure to comply with federal constitutional, federal statutory, state constitutional, state statutory and state regulatory standards. Filed on December 13, 1995. Motions to dismiss denied, and class of approximately 100,000 children certified on June 18, 1996, class certification upheld on appeal. On eve of trial, November, 1998, settlement reached with city and state defendants 1) requiring vigorous monitoring of city operation by state agency and 2) creating a panel of experienced national experts to recommend, and assist in necessary reform or, if reforms are not implemented, to become plaintiffs' experts in further court proceedings. Settlement affirmed in Joel A. v. Giuliani, 218 F.3d 132 (2d Cir. 2000). Reforms implemented, court jurisdiction ended over New York City, but extended against state after a finding of non-compliance based on failure to implement statewide computer system.

Jeremy M. and Joanne M. v. Giuliani, 00 Civ. 6498 (RJW) (S.D.N.Y. 2000). Federal lawsuit filed in August 2000 on behalf of five-year-old child held in NYC foster system for two years after legal custody had expired, despite his mother's desire to take him home. Settled with monetary damages for mother and child and with city child welfare agency taking action to end large number of illegal placements.

Brian A. v. Sundquist, , now Brian A. v. Haslam, 149 F. Supp.2d 941 (M.D. Tenn. 2000). Federal civil rights lawsuit filed in May 2000. After the plaintiff children had won a sweeping victory on the legal issues in the case, a federal judge ordered the parties to attempt negotiations to resolve the lawsuit without a trial. After over five months of intense negotiations, an agreement was reached, which imposes unprecedented changes throughout Tennessee's foster care system. The settlement was approved by the federal court in 2001. In November 2003, following the release of a monitoring report identifying significant and widespread non-compliance with the settlement agreement, plaintiffs filed a motion seeking to hold Governor Phil Bredesen and the commissioner of Tennessee's child welfare agency in contempt of court. Resolution of the contempt motion resulted in the replacement of the commissioner, with the state admitting non-compliance and the state's development of a court-enforceable implementation plan with the aid and approval of a panel of national experts. Ongoing compliance and monitoring activities.

Kenny A. v. Perdue, 1:02-cv-1686-MHS, 218 F.R.D. 277 (N.D. Ga. 2003). Class action against Governor of Georgia and other state officials on behalf of all of the approximately 3,000 foster children in Fulton and DeKalb Counties, Georgia (metropolitan Atlanta). Complaint originally filed in state court in June 2002. Case was immediately removed to federal court. Claims asserted under U.S. Constitution, federal statutes and state law. Preliminary injunction sought to close two emergency shelters in Fulton and DeKalb Counties, hearing conducted in November 2002. Preliminary injunction was denied upon Defendants' promise to close shelters, court found "few concrete steps were taken to close the shelters before this lawsuit was filed." 1:02-cv-1686-

MHS, Docket No. 126 (N.D. Ga. Dec. 12, 2002.)  Amended complaint filed in January 2003 seeking to add claim for inadequate foster care maintenance payments under federal statute. Both shelters closed by March of 2003.  Class certification granted and motion to dismiss denied in August 2003. All claims upheld except for claims concerning shelters, which were dismissed as moot.  Case settled.  Ongoing monitoring and compliance activity underway.

Olivia Y. v. Barbour, Civ. Act. No. 3:04CV251LN (S.D. Miss. Filed Mar. 3, 2004).  Federal class action suit charging that the Mississippi Division of Family and Children's Services (DFCS) placed the three thousand children under its care in danger and at risk of harm, and has left many thousands more to fend for themselves in abusive and neglectful homes.  The case was filed on behalf of 12 named plaintiffs - children who have suffered physical and psychological harm while in DFCS custody, or who have been simply abandoned by DFCS despite multiple reports to the agency.  Defendants' motion to dismiss and motion for summary judgment denied.  The state conceded liability in a preliminary settlement agreement approved by the court in June 2007.  A final, comprehensive settlement agreement mandating top to bottom reform of the child welfare system was reached by the parties in October 2007 and signed by the judge on January 4, 2008. Ongoing compliance and monitoring activities.

Charlie H. v. McGreevey,  83 F. Supp.2d 476 (D.N.J. 2000), now Charlie and Nadine H. v. Christie. Federal class action lawsuit brought against the state of New Jersey charging that the state's child welfare system was poorly managed, overburdened and harming the health and safety of children who depended upon it.  Filed in December 1999, the class was certified in March 2002. In July 2002, over strenuous objections from the defendants, the court ordered that plaintiffs' experts be granted access to over 500 foster children's case files to collect information on harm children were experiencing while in defendants' custody.  In a later decision, the Court ruled that those expert reports could be released to local and national media, again over defendants' objections. In February 2003, the parties entered mediation, and the parties agreed to a wide-ranging settlement in June 2004.  The settlement agreement required the state of New Jersey to undertake a full-scale reform of its foster care system, under the guidance of a panel of independent experts.  Under the agreement, defendants were obligated to implement a reform plan they created with the approval of the expert panel and that requires them to immediately expend an additional 23.8 million dollars to fund new workers, equipment and the recruitment of more foster homes and expend an additional 300 million dollars in the next three years, to undertake emergency measures identified in the agreement as necessary to protect foster children and improve specific and measurable outcomes for children.  State's progress stalled and in December 2005 plaintiffs filed a motion for contempt of the court-ordered settlement.  In July 2006, plaintiffs settled with newly elected administration officials who created a separate children's agency and agreed to far-reaching steps to get reform on track.  Ongoing monitoring and compliance activity underway.

E.C. v. Sherman.  Children's Rights filed this class action in August of 2005, together with a broad coalition of local advocates, when a new Missouri law threatened to cut off critical adoption subsidies for special needs foster children. Children's Rights secured initial temporary orders preventing the law from taking effect until the trial. Shortly thereafter, Children's Rights won class certification so that the case could proceed on behalf of the thousands of children who would be hurt by the new law. Following a federal trial in April of 2006, the plaintiff children won on all legal claims and the court permanently banned the adoption subsidy provisions of Senate Bill 539 from ever taking effect. The defendant — Director of the Missouri Department of Social Services K. Gary Sherman — immediately appealed the ruling, but the appeal was later withdrawn and the permanent ban on Senate Bill 539 remains in place.

Dwayne B. v. Granholm, On August 8, 2006 Children's Rights commenced a class action suit seeking to reform the ailing foster care system in the state of Michigan.  The federal complaint alleges that the state of Michigan violates the constitutional, federal statutory and federal common law rights of children in foster care by failing to provide them with permanent homes on a timely basis, failing to furnish adequate medical, dental and mental health services, failing to provide safe and stable temporary foster homes, and failing to prepare

children who will "age out" of the foster care system at the age of majority to live independently as adults. The complaint further avers that the child welfare system in the state of Michigan is badly understaffed, under-funded and inadequately managed. The state of Michigan operates the nation's 7th largest foster care system with approximately 19,000 abused and neglected children residing in state legal custody. In July 2008, the parties reached a comprehensive settlement agreement, which is set for review and approval by the judge on October 7, 2008.

Sam and Tony M. v Carcieri, now Cassie M. v. Chafee. On June 28, 2007, Children's Rights, together with the Rhode Island Child Advocate and the law firm, Weil, Gotshal & Manges LLM, filed a class action lawsuit to reform the Rhode Island child welfare system on behalf of the 3,000 children in state foster care. The federal complaint alleges that the state of Rhode Island violates the constitutional, federal statutory, and federal common law rights of children in foster care and causes harm to these children by failing to protect them from abuse and neglect while in foster care, placing children in orphanage-like institutions instead of homes, and returning children to their homes when it is unsafe to do so.

D. G. v. Henry, now D.G. v. Yarbrough. On February 13, 2008, Children's Rights, together with the Tulsa law firm Seymour & Graham, international firm Kaye Scholer and other local co-counsel, filed a class action lawsuit to reform the Oklahoma child welfare system on behalf of the more than 10,000 children in state custody. The federal complaint alleges that the state of Oklahoma violates the constitutional rights of the children in its care and causes those children harm by routinely placing them in unsafe, unsupervised, and unstable living situations, where they are frequently subjected to further maltreatment.

S.W. v. City of New York, et al. This lawsuit seeks damages on behalf of ten special needs children who were egregiously abused by their mother, who adopted them between 1988 and 1996 from New York City's child welfare system. Judith Leekin was able to skirt restrictions on the number of foster chilren she could care for by assuming a number of different aliases, any one of which would have been found fraudulent had child welfare officials properly undertaken the background checks necessary to ensure foster children are placed in safe homes. Once Ms. Leekin fraudulently adopted the children, she moved with them to Florida, where she held them captive while she lived lavishly on the adoption subsidy checks she collected from New York City. On July 4, 2007, one of the daughters was found wandering in a St. Petersburg supermarket, leading Florida police to investigate Leekin's house. There they discovered that for over a decade the children had been repeatedly beaten, starved, imprisoned in handcuffs, and denied medical care as well as any access to the outside world. In February 2010 we joined the suit already initiated by our co-counsel in Florida, Colodny, Fass, Talenfeld, Karlinsky & Abate, P.A., against the City of New York, the New York Administration of Children's Services and several independent child welfare agencies that contracted with New York to provide services to the plaintiff children. The suit charges that during the late 1980's and early 1990's, New York City's child welfare system was so grossly mismanaged that it operated with reckless disregard of the children's safety and failed to perform basic monitoring tasks that would have readily uncovered the Leekin fraud.

Connor B. v. Patrick. Citing one of the nation's highest rates of abuse of children in foster care and other persistent and severe problems throughout the Massachusetts child welfare system, Children's Rights and Boston law firm Nutter McClennen & Fish LLP—with the support of advocates and families throughout the state—filed a class action in federal court on April 15, 2010, seeking broad reform on behalf of 8,500 abused and neglected children statewide. The suit charges the state's Department of Children and Families with violating the constitutional rights of children by routinely placing them in dangerous and unstable situations once removed from their parents' care and failing to take necessary actions to meet the legal and moral obligation of the state-run child welfare system to ensure the safety and well-being of children in its custody.

M.D. v. Perry. Citing longstanding and pervasive issues that have caused thousands of children in Texas foster care to spend their childhoods in poorly-supervised institutions while repeatedly moving from one far-

flung place to another, Children's Rights joined the prominent Texas law firms Haynes and Boone, Yetter Coleman, and Canales & Simonson in filing a class action in federal court seeking widespread reform on behalf of approximately 12,000 abused and neglected children in long-term foster care statewide. The suit charges Texas's Department of Family and Protective Services (DFPS) with violating the constitutional rights of children who generally have been in foster care for at least a year by routinely failing either to return them safely to their families or to find them safe, appropriate, and permanent new families — and, therefore, failing to meet its legal obligation to ensure the safety, permanency, and well-being of all children in its custody.

John Doe v. SCDSS. Unacceptably lax policies, combined with officials turning a blind eye to child-on-child assaults at an institution licensed and supervised by the South Carolina Department of Social Services (SCDSS), paved the way for an 11-year-old Abbeville County boy to be attacked and sexually assaulted at the facility in March of 2011. An amended complaint was filed in the Abbeville County Court on May 30, 2013, against the SCDSS. The filing names South Carolina Governor Nikki Haley as a defendant, along with SCDSS Director Lillian Koller, as well as other SCDSS officials and staff at the Boys Home of the South (BHOTS), where the incident occurred. The lawsuit has been brought by two South Carolina law firms and national advocacy organization Children's Rights. The initial complaint in this case was filed on April 1, 2013, in state court in Abbeville County, SC. The newly filed amended complaint adds significant detail and alleges federal civil rights violations on the part of Governor Haley, DSS officials and staff at BHOTS.

## PROFESSIONAL ACTIVITIES

- Gloria and Stanley Plesent Lecture on Family Law, "The State as a Neglectful Parent," March, 2015, Cardozo Law School
- Speaker, Yale Law School, American Constitution Society Plaintiff's Bar Speaker Series (December 5, 2013)
- Panelist, University of Pennsylvania, "One Child, Many Hands: A multidisciplinary Conference on Child Welfare," (June 13, 2013)
- Panelist, Center for the Study of Social Policy Advisory Group of Improving Child Welfare Outcomes through Class Action Litigation, Boston, MA (January 8, 2013)
- Keynote Speaker, New Jersey Child Placement Review Annual Conference (April 10, 2007)
- Panelist, University of Michigan Law School, "Looking Ahead to the Next 30 Years of Child Advocacy" (March 30, 2007)
- Panelist, University of Pennsylvania, "One Child, Many Hands: A Multidisciplinary Conference on Child Welfare" (June 3, 2005)
- Keynote Speaker, Lawyers' Association for Women, Nashville, TN (November 16, 2004)
- Speaker, Shoulder to Shoulder Sixth Annual Conference, Portland, OR (November 4, 2004)
- Speaker, Juvenile Law Section of the Oregon State Bar, "Race, Class & Culture in Juvenile Court," Portland, OR (April 22, 2004)
- Speaker/Panelist, Cardozo Public Law, Policy, and Ethics Journal Symposium, "Advocating for Change: The Status and Future of America's Child Welfare System 30 Years After CAPTA" (April 19, 2004)
- Recipient, New York University School of Law Public Service Award, April 17, 2004
- Speaker, Amherst College, "The Constitution and the 'Other America' in the Twenty-First Century" (April 2, 2004)
- Speaker, Brooklyn College, "Children and the Law in New York Policy Symposium" (March 11, 2004)
- Speaker/Panelist, Yale Law School 10th Annual Rebellious Lawyering Conference, "Reforming the Foster Care System" (February 21, 2004)
- Speaker, The New Mexico Council on Crime and Delinquency 41st Annual Luncheon, January 23,

2004

- Testimony before the Subcommittee of Human Resources of the Committee on Ways and Means on examining the recent failure to protect child safety, November 6, 2003
- Recipient, Raymond A. Brown, Esq. Social Justice Award from Babyland Family Services, Inc., October 23, 2003
- Panelist, Fordham University School of Law, "Litigation and Social Change: Reflections on the Lost Children of Wilder" (February, 11, 2002)
- Speaker, National Association of Women Judges 23rd Annual Conference (October 7, 2001)
- Speaker, 24th National Children's Law Conference of the National Association of Counsel for Children, "Advocacy for Children and Families: Moving from Sympathy to Empathy," Coronado, CA (October 1, 2001)
- Speaker/Panelist, St. John's Journal of Legal Commentary Symposium on Legal Reform & Children's Human Rights, 4/9/99
- Recipient, Brookwood Commitment to Children Award from Brookwood Child Care Agency, 1999
- Speaker, American Bar Association's 9th National Conference on Children & Law, April 9, 1999
- Recipient, Foundation For Improvement of Justice Award, October, 1998
- Speaker, Loyola University Chicago "Forum on the Child" (Chicago, IL October 13-14, 1997)
- Speaker, Casey Journalism Center, "Rethinking the Blame Game: New Approaches to Covering Child Abuse and Protection" (Baltimore, MD, June 12, 1997)
- Speaker, Child Welfare Legal Services Seminar, Florida State Department: Keynote address and leader of liability workshop for State Department attorneys who represent children. (Orlando, Florida, June 13, 1995)
- Speaker, National Association of Counsel for Children's Law Conference: Address on disposition of class action litigation cases. (Boston, September 16, 1995)
- Speaker, National Council for Crime and Delinquency: Roundtable discussion for media on crisis in child abuse and neglect. (New York City, October 17, 1995)
- Speaker, Casey Journalism Center, "Child Welfare and the Media". (Baltimore, May, 1995)
- Guest Expert, "Troubled Kids", MacNeil/Lehrer Newshour, February 20, 1995
- Testimony, Subcommittee on Human Resources, House Ways and Means Committee and the Early Childhood, Youth and Families Subcommittee, House Economic and Educational Opportunities Committee Concerning Child Care and Child Welfare (February 3, 1995)
- Speaker, "Children and the Justice Systems," Johns Hopkins University (December 1, 1994)
- Keynote Speaker, Child Welfare League of America, "Building a Case With Florida's Families", 6/13/94
- Speaker, The Woman Advocate '94, Prentice Hall Law & Business (March 1994)
- Speaker, "In Whose Best Interests?: Bias in the Family Court System," New York University School of Law Root-Tilden-Snow public policy colloquium (March 8, 1994)
- Panelist, Child Welfare League of America, "Consent Decrees, Court Monitors and Child Welfare Reform in the 1990s" (September 1993)
- Speaker, National Symposium on Child Victimization (May 19, 1992)
- Speaker, American Bar Association's 6th National Conference on Children & Law (April 30, 1992)
- Speaker, "Empowering Families," National Association for Family-Based Services (12/4/91)
- Speaker, "Child Welfare Litigation at the State and Local Level: The Advocate's View" (July 23, 1991)
- Speaker/panelist, "Advocating for Children: Rights and Discrimination, Protection and Paternalism," McGill-Loyola 2nd Annual Comparative Health Law and Policy Conference, (June 1991)
- Testimony, Senate Committee on Ways & Means, Subcommittee on Human Resources, "State of

Nation's Child Welfare System" (May 1991)
- Speaker, ABA Invitational Symposium on Civil and Criminal Liability in Child Welfare Work (May 1990)
- Faculty Member, National Court Appointed Special Advocate Association Ninth Annual National Conference, Children: The Time is Now (April 1990)
- Panelist, Practicing Law Institute seminar, Child Abuse, Neglect, and the Foster Care System (March 1990)
- Speaker, "Developments in Foster Care Law," University of Tennessee and Tennessee Bar Association seminar, Representing Children (December 1989)
- Speaker, New York University School of Law Root-Tilden seminar on children and families (November 1989)
- Speaker, AFSCME Child Welfare Workers Conference General Session, "Working for the Rights of Children," (October 1989)
- Panelist, "State Perspectives on Legal Activities in Child Welfare," National Association of Public Welfare Administrators, Children's Services Administrators Forum, Direction Setting for Child Welfare: The Impact of Litigation on the Delivery System (June 1989)
- Panelist, Practicing Law Institute seminar, The Foster Child: From Abandonment to Adoption (March 1989)
- Speaker, Third National Conference of the Association of Child Advocates (September 1987)
- Speaker, National Conference of State Legislators on the implementation of litigation in child welfare (1986)
- Testimony before the United States Senate Labor and Human Resources Committee on barriers to adoption (1985)
- Speech on litigation strategy at the ABA National Resource Center symposium on children's issues (1985)

## PUBLICATIONS
- "A Powerful Route to Reform or When to Pull the Trigger: The Decision to Litigate," For the Welfare of Children: Lessons Learned from Class Action Litigation, Center for the Study of Social Policy, January 2012
- "Why Children Still Need a Lawyer," University of Michigan Journal of Law Reform, Fall 2007.
- "Putting Teeth into ASFA: The Need for Statutory Minimum Standards," Children and Youth Services Review, 26 (2004), pp. 1021-1031.
- "Why Settle When You Can Win: Institutional Reform and Marisol v. Giuliani," The Fordham Urban Law Journal 1335, 1999
- "We're suing the city for kids' sake," Daily News Op-Ed page, April 1, 1998
- New York Law Journal, The Lawyer's Bookshelf (reviewing Edward Humes, No Matter How Loud I Shout: A Year in the Life of Juvenile Court), May 3, 1996
- "Children Deserve a Family of their Own" in Opinion The Flint Journal, December 19, 1994
- "Fix Foster Care to Fix Crime," Asbury Park Sunday Press, May 29, 1994
- "The Failure of Foster Care" Detroit Free Press, April 7, 1994
- "Foster Kids are put on the Shelf" in Fort Worth Star Telegram, September 5, 1993
- "Class Actions: The Risks Due to Systemic Problems" in Liability in Child Welfare and Protection Work: Risk Management Strategies, ABA Center on Children and the Law, 1991
- "Hugging Them Is Not Enough" in New York Forum, New York Newsday, p. 138, December 19, 1990
- "Justice's Rusted Wheels" in Opinion, Manhattan Lawyer, p. 12, December 5, 1988
- "A Mission Is Not a Home" in New York Forum, New York Newsday, p. 92, June 17, 1988

- "Kids Floating, Kids Drowning" in New York Forum, <u>New York Newsday</u>, p. 66, April 15, 1987
- "Derring-Do in the 1980s: Child Welfare Impact Litigation After the Warren Years," in <u>Family Law Quarterly</u>, Summer, 1986; reprinted in Besharov, <u>Protecting Children from Abuse and Neglect, Policy and Practice</u>, 1988
- "Legal Strategies to Facilitate Adoption of Children in Foster Care," in <u>Foster Children in the Courts</u>, Butterworth Legal Publishers, 1983
- "Individual Rights and the Interstate Placement of Children: From Expediency to Exportation," in <u>Readings in Public Policy</u>, Academy for Contemporary Problems, 1981
- "Children's Rights," in <u>Advocating for Children in the Courts</u>, ABA National Institute, 1979
- "When the Family Breaks Down: Massive and Misapplied Intervention by the State," in Vardin and Brody, <u>Children's Rights: Contemporary Perspectives</u>, Teacher's College Press, 1978
- <u>New York University Law Review</u>, "The Judge v. the Social Worker: Can Arbitrary Decision Making Be Tempered by the Courts," Vol. 52, November, 1977
- <u>The New York Times</u> Op-Ed page, Legal Celling-In of Foster Children, 5/21/76
- <u>Journal of Psychiatry and Law</u>, "Symposium: Children's Rights -- Psychiatry and the Law," Winter, 1975

In 2000, Nina Bernstein highlighted Ms. Lowry's work in New York City with the publication of *The Lost Children of Wilder: An Epic Struggle to Change Foster Care*. This book explores the background and aftermath of the landmark 1973 Wilder lawsuit Ms. Lowry filed against the City of New York's foster care system.

**ATTACHMENT B**

Attorneys' Rates and Hours

| | Hourly Rate | Total Hours | Total Fee |
|---|---|---|---|
| Marcia Lowry, ABC | $475[1] | 373.61 | $163,967.63 |
| Sara Glasser, ABC | $350[2] | 277.02 | $92,144.50 |
| Stephen Dixon | $300[3] | 108.75 | $25,125.00 |
| Wayne Drinkwater, Bradley, Arant | $420 (2014); $438.75 (2015) | 80.40 | $35,264.25 |
| Michael Bentley, Bradley, Arant | $198.75 (2014); $217.50 (2015) | 33.30 | $ 7242.75 |
| Clare Feely, ABC paralegal | $150 | 81.3 | $12,195.00 |
| Jeanette Altobelli, Bradley, Arant paralegal | $131.25 (2014); $153.75 (2015) | 3.5 | $538.13 |
| **Total Hours: Total Fees** | | **957.88** | **$336,477.26** |

---

[1] Fees for legal services by Ms. Lowry were calculated using the rate of $475 per hour; fees for travel time were calculated using the rate of $237.50 per hour, a 50% reduction.

[2] Fees for legal services by Ms. Glasser were calculated using the rate of $350 per hour; fees for travel time were calculated using the rate of $175 per hour, a 50% reduction.

[3] Fees for legal services by Mr. Dixon were calculated using the rate of $300 per hour; fees for travel time were calculated using the rate of $150 per hour, a 50% reduction.

**ATTACHMENT C**

Expenses

| Category | Expense |
|---|---|
| Airfare and ground transportation | $ 6,861.96 |
| Food | $ 549.17 |
| Hotel Accommodations-Jackson Marriott | $ 2,163.09 |
| **Total Expenses:** | **$ 9,574.22** |

**ATTACHMENT D**

**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

**No. 02-5666**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| BRIAN A., by his next friend, BOBBI JEAN BROOKS; TRACY B., by her next friend, PAMELA PALLAS; JACK and CHARLES C., by their next friend, LINDA LLOYD; AMY D., by her next friend, FRANK NOON; DENISE E., by her next friend, LINDA LLOYD; CHARLETTE F., by her next friend, JUANITA VEASY; and TERRY G., by her next friend, CAROL OLDHAM, on their own behalf and on behalf of all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs-Appellees, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE |
| v. | ) ) | |
| GEORGE W. HATTAWAY, Comissioner of the Tennessee Department of Children's Services; DONALD SUNDQUIST, Governor of the State of Tennessee, | ) ) ) ) ) ) | |
| Defendants-Appellants. | ) | |

Before:  MOORE and ROGERS, Circuit Judges; FORESTER, District Judge.[*]

**ROGERS, Circuit Judge**.  The instant case arises out of a class action suit filed against the state of Tennessee on behalf of children in the custody of the Tennessee Department of Children's Services.  The appellees, the plaintiffs below, alleged that Tennessee's foster care system violated the constitutional and statutory rights of the children in its care.  The case was settled, and the

---

[*]The Honorable Karl S. Forester, United States Chief District Judge for the Eastern District of Kentucky, sitting by designation.

*No.  02-5666*
*Brian A.  v.  Hattaway*

settlement agreement explicitly provided that the plaintiffs were prevailing parties and, therefore, entitled to recover attorney fees pursuant to 42 U.S.C. § 1988.  The district court awarded the plaintiffs $1,524.357.99 in fees and expenses.  The defendants below appeal, arguing that the district court abused its discretion in determining the fee award by using an improper hourly rate and by failing to eliminate excessive hours.  We affirm the district court.

*I.  Background*

The plaintiffs initially requested a total of $1,629,327.57 in fees and expenses for the work of two law firms — Children's Rights, Inc.  ("CRI"), located in New York City, and Hollins, Wagster and Yarbrough, a firm located in Nashville, Tennessee.  The fee request was based on hourly rates ranging from $175.00 per hour to $375.000 per hour for the more than 6,900 hours billed.  The defendants objected to the sum requested, arguing that the hourly rates requested were excessive, the number of hours billed was unreasonable, and the expenses billed were unreasonable.  Specifically, the defendants argued that, for work done by CRI attorneys, the plaintiffs improperly requested reimbursement at the prevailing hourly rate for attorneys in New York City rather than the prevailing hourly rate for attorneys in Nashville.  The district court granted the plaintiffs' motion in part and denied it in part.  While the district court explicitly approved the hourly rates sought by the plaintiffs, the court denied the plaintiffs' request for compensation for certain categories of work and expenses.  The district court directed the plaintiffs to file an amended motion for fees and expenses.

No. 02-5666
Brian A.  v.  Hattaway

The plaintiffs filed an amended motion for fees and expenses.  The defendants again objected, and the district court again disallowed certain items.  The district court directed the plaintiffs to file a second amended request for fees and expenses, which the plaintiffs did.  The district court granted the motion and awarded fees and costs to the plaintiffs in the amount of $1,524,357.99.  The defendants filed the instant appeal.

*II. Standard of Review*

A trial court has discretion in making the equitable judgments regarding an award of attorney fees under 42 U.S.C. § 1988.  *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).  A trial court's fee award is entitled to substantial deference due to the trial court's "superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters. . . ." *Hadix v. Johnson*, 65 F.3d 532, 534 (6th Cir. 1995) (quoting *Hensley*, 461 U.S. at 437). Accordingly, an appellate court reviews such awards for abuse of discretion.  *Id*.  An abuse of discretion occurs if the trial court "based its ruling on an erroneous view of the law or a clearly erroneous assessment of the evidence," *Apostolic Pentecostal Church v. Colbert*, 169 F.3d 409, 417 (6th Cir. 1999), or "the reviewing court is firmly convinced that a mistake has been made." *Adcock-Ladd v. Sec'y of the Treasury*, 227 F.3d 343, 349 (6th Cir. 2000).  *See also Bowling v. Pfizer, Inc.*, 102 F.3d 777, 780 (6th Cir. 1996) ("Abuse of discretion is defined as a definite and firm conviction that the trial court committed a clear error of judgment.") (citation omitted).

- 3 -

No. 02-5666
*Brian A. v. Hattaway*

*III. Analysis*

A court's primary concern in a fee case is that the fee awarded be reasonable. *See generally Blum v. Stenson*, 465 U.S. 886, 893 (1984). "A reasonable fee is one that is adequate to attract competent counsel, but . . . [does] not produce windfalls for attorneys." *Hadix v. Johnson*, 65 F.3d 532, 535 (6th Cir. 1995) (internal quotations omitted). The first step in calculating an attorney fee award under 42 U.S.C. § 1988 is to multiply the number of hours reasonably expended on the litigation by the reasonable hourly rate. *Blum*, 465 U.S. at 888; *Adcock-Ladd*, 227 F.3d at 349. The defendants contend that the district court abused its discretion in determining both the number of hours reasonably expended and the reasonable hourly rate.

*A. The district court did not abuse its discretion by awarding attorney fees for CRI attorneys based on out-of-state hourly rates.*

The district court did not abuse its discretion in awarding the hourly rates sought by the plaintiffs. In determining a "reasonable hourly rate," courts typically look to the "prevailing market rate in the relevant community." *Adcock-Ladd*, 227 F.3d at 350 (quoting *Blum*, 465 U.S. at 895). The Sixth Circuit has found that "the 'prevailing market rate' is that rate which lawyers of comparable skill and experience can reasonably expect to command within the venue of the court of record, rather than a foreign counsel's typical charge for work performed within a geographical area wherein he maintains his office and/or normally practices . . . ." *Id.* A court may, however, award a higher hourly rate for an out-of-town specialist if (1) hiring the out-of-town specialist was

- 4 -

No.  02-5666
*Brian A.  v.  Hattaway*

reasonable in the first instance, and (2) if the rates sought by the out-of-town specialist are reasonable

for an attorney of his or her degree of skill, experience, and reputation.  *Hadix*, 65 F.3d at 535.

The defendants do not contend that the rates sought by the CRI attorneys are unreasonable

for attorneys of their degree of skill, experience, or reputation; rather they argue that it was

unreasonable to hire an out-of-town specialist.  The district court noted that it had reviewed both

parties' submissions, and concluded, "With regard to the use of New York billing rates for out-of-

town counsel, the Court finds that the use of an 'out-of-town specialist' was reasonable in the first

instance and that the rates sought by out-of-town specialists are reasonable for an attorney of like

degree and skill, experience and reputation."[1]  The record included declarations by prior Tennessee

Attorneys General, submitted by the defendants, referring to four complex civil rights class actions

brought by Tennessee attorneys.  The plaintiffs submitted affidavits from Tennessee experts in child

and family law, who were familiar with the issues involved in the case and opined that there was no

local attorney or coalition of local attorneys who had the resources, expertise, or willingness to bring

the instant suit.  While an independent review of this record would lead to some disagreement among

members of this panel as to whether it was reasonable to hire out-of-state lawyers at more than

double the local rate, we agree that under the deferential standard we are required to apply, the

---

[1]While the district court was required to provide a "clear and concise explanation of its reasons for the fee award," *Hadix*, 65 F.3d at 535 (citing *Hensley,* 461 U.S. at 437), given the limited evidence before it, the district court's failure to engage in extended analysis of its reasoning did not constitute an abuse of discretion.

No.  02-5666
*Brian A.  v.  Hattaway*

district court did not abuse its discretion in finding that the plaintiffs' decision to hire out-of-town

specialists was reasonable.

*B. The district court did not abuse its discretion in determining the number of compensable hours.*

      The district court also did not abuse its discretion in determining the number of compensable

hours.  The defendants contend that counsel for the plaintiffs exercised poor billing judgment,

because the case was allegedly overstaffed, resulting in inefficiencies and unnecessary duplication

of efforts.  *See Hensley*, 461 U.S. at 434 ("Counsel for the prevailing party should make a good faith

effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary

. . . . Hours that are not properly billed to one's client are not properly billed to one's adversary

pursuant to statutory authority.")  In determining whether a prevailing party used poor billing

judgment, this court "look[s] to see whether the District Court, based on experience and the record

in the case, misapplied the reasonable billing practices of the profession." *Coulter v. Tenn.*, 805 F.2d

146, 151 (6th Cir. 1986).

      The defendants do not object to particular time entries.  Instead, they argue that the overall

time expended by plaintiffs' counsel on various activities was excessive.  When faced with specific

objections, the district court — which was familiar with the case — reviewed the plaintiffs' fee

petition and twice required the plaintiffs to eliminate excessive hours.  While the eliminated hours

constituted only a small percentage of the total hours claimed, absent more specific objections, we

cannot say that the district court abused its discretion in refusing to reduce further the billable hours.

*No. 02-5666*
*Brian A.  v.  Hattaway*

*IV.  Conclusion*

     The judgment of the district court is AFFIRMED.