**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION**

OLIVIA Y., *et al*.                                                    PLAINTIFFS


v.                                         CIVIL ACTION NO.  3:04CV251LN


PHIL BRYANT, as Governor of the State of Mississippi, *et al.*          DEFENDANTS

───────────────────────────────────────────

**THE COURT MONITOR'S REPORT PURSUANT TO
THE STIPULATED SECOND REMEDIAL ORDER**

───────────────────────────────────────────

**Table of Contents, Report Narrative,
Index to Exhibits, Appendix: Exhibits 1-35**

**Draft submitted to the parties on October 3, 2016
Final Report Filed on December 6, 2016**

# TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................................3

II.  METHODOLOGY ...............................................................................................4

III.  OVERVIEW OF PROCESS FOR REPORTING AND INVESTIGATING
ALLEGATIONS OF MALTREAMENT OF CHILDREN IN CUSTODY,
AND RELATED LICENSING, QUALITY IMPROVEMENT AND
CORRECTIVE ACTION PROCESSES .................................................................9

    A. Intake Process – Mississippi Centralized Intake ...............................................9
    B. The Special Investigations Unit ......................................................................14
    C. Licensing .........................................................................................................21
    D. Maltreatment in Care ("MIC") Reviews .........................................................24

IV.  DATA RELATING TO MALTREATMENT IN CARE
REPORTS AND INVESTIGATIONS ......................................................................27

    A. Methodology and Data Sources .......................................................................27
    B. Intake Reports and Screening Decisions .........................................................32
        1. Characteristics of Investigations ................................................................36
        2. Investigating Entity ....................................................................................39
        3. Timeliness of Investigations ......................................................................44
        4. Allegation Types, Placements and Substantiation ....................................48
        5. The Maltreatment in Care ("MIC") Review and
          Associated Corrective Action Processes .................................................51

V.  SUMMARY OF FINDINGS FROM CASE RECORD REVIEW .............................55
    A. Summary of Case Record Review Findings: Mississippi
       Centralized Intake ............................................................................................56
    B. Summary of Case Record Review Findings: Screen Out Decisions..............58
    C. Summary of Case Record Review Findings: Investigations...........................61

VI.  RECOMMENDATIONS .......................................................................................70
        1. Update the MDCPS Intake and Assessment Policy....................................71
        2. Revise the Screening and Safety and Risk Assessment Tools.....................72
        3. Quality Improvement Practices Related to Screening Decisions Must be
          Conducted Routinely and Subject to Ongoing Assessment..........................74
        4. Strengthen the MIC Review Process .........................................................75

5.  Improve Systems for Validating Data and Routinely Make Data Relating to Key Indicators Available to Executive Managers ...................... 76

6.  Assess SIU Investigative Training ................................................................ 77

7.  Conduct Staffing Study to Assess MCI Staffing Needs .............................. 78

8.  Make Recordings of Hotline Calls Available to SIU Investigators .............. 78

9.  Establish Clear Processes for Investigations into Allegations of Maltreatment in Care in Facilities .............................................................. 79

10. For Maltreatment in Care Reports Involving Facilities, Work with the Appropriate Licensing Agency ................................................................... 79

VII.    CONCLUSION ........................................................................................................ 79


APPENDIX

Index to Exhibits ........................................................................................... Index-1

Ex. 1 – Ex. 35

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION


OLIVIA Y., *et al*.                                                    PLAINTIFFS


v.                                              CIVIL ACTION NO.  3:04CV251LN


PHIL BRYANT, as Governor of the State of Mississippi, *et al.*          DEFENDANTS

---

**THE COURT MONITOR'S REPORT PURSUANT TO
THE STIPULATED SECOND REMEDIAL ORDER**

---

The Stipulated Second Remedial Order ("SSRO") was approved by the Court on May 19, 2016.  Among other provisions, the SSRO requires the Court Monitor ("Monitor") to complete a validation and review of a random sample of all maltreatment in care reports received by the defendants during the 12-month period ending December 31, 2015, as well as of the screenings, investigations, substantiations and non-substantiations of those reports.[1]  The Order specifies that the purpose of the review is to determine whether the screenings, investigations, substantiations and non-substantiations comport with the requirements of the Modified Settlement Agreement ("MSA")[2] and professional standards.[3]

This report sets forth the Monitor's findings from the validation and review process.  The report was provided to both parties in draft form on October 3, 2016 for review and comment.

---

[1]  Stipulated Second Remedial Order [hereinafter SSRO], filed May 19, 2016 [Dkt. No. 694], ¶5.
[2]  The MSA was approved by the Court on July 6, 2012.
[3]  SSRO ¶5.

Defendants submitted comments on November 28, 2016.  Comments were not submitted by the plaintiffs.  The Monitor has considered all comments in finalizing this report.

The Monitor's assessment identified significant limitations in the intake, investigation, and investigative review processes related to maltreatment in care reports, which implicate the following key areas:

- The quality and appropriateness of screening decisions;
- The quality and completeness of maltreatment in care investigations;
- The consistent implementation and quality of licensing investigations related to maltreatment in care reports; and
- The quality and reliability of safeguard systems intended to detect and correct problems in both the screening and investigative processes.

Some of these limitations no doubt result from or are exacerbated by weaknesses in the agency infrastructure that support the maltreatment in care reporting and investigation processes.  The Monitor found the following shortcomings that should be addressed:

- Ambiguities and inconsistencies in agency policy regarding maltreatment in care investigations and the failure of policy to reflect current practices;
- Screening and assessment tools that do not adequately address the special circumstances presented by maltreatment in care reports and related investigations and which are therefore inadequate to assess safety and risk in a way that assures the safety and well-being of children in the defendants' custody;
- An absence of sufficiently specialized training for the cadre of staff charged with investigating maltreatment in care allegations;
- Failure to implement quality improvement processes in the manner designed and established by policies; and
- Incomplete and inconsistent data systems to track and manage certain aspects of maltreatment in care investigative processes.

During the assessment, the Monitor found evidence of some high quality investigations.  Additionally, as described in the report, there were certain areas of identified strengths in the investigative process, including Hotline workers' practice of eliciting relatively complete information from reporters in a manner consistent with policy.  This is commendable; however, high quality investigative reports were more the exception than the rule.  Equally importantly, in

the context of investigative processes that involve multiple steps, organizational units, and agency staff, the impact of quality work during one step of a process can be attenuated quickly by delay or failure to build on the work of others involved in the investigative process. It is imperative that defendants work to enhance quality and consistency on all steps of the investigative process from intake through investigative reviews, and the defendants report that they are doing so in response to the findings in this report. The Monitor's findings are summarized below.

## I.    __INTRODUCTION__

As detailed below, the Monitor's assessment of whether the screenings, investigations, substantiations and non-substantiations of maltreatment in care reports received by the defendants during the 2015 calendar year comport with MSA requirements and professional standards is based on the following: 1) a qualitative review of the Mississippi Department of Child Protection Services' ("MDCPS")[4] intake and assessment policy and related tools and instruments used in the intake, screening, assessment, investigation and associated quality improvement review and corrective action processes; 2) quantitative analyses of performance data produced by the defendants; and 3) the results of a case record review designed and conducted by the Monitor's office in collaboration with the defendants.

The report is divided into the following substantive sections. Section II addresses the methodology used for the qualitative and quantitative assessments presented in the report. Section III presents an overview of MDCPS administrative processes related to receiving and investigating reports of maltreatment in care and the associated licensing, quality improvement,

---

[4] All references to "MDCPS" also refer to the predecessor entity responsible for child welfare operations during the 2015 calendar year, the Mississippi Department of Human Services, Division of Family and Children's Service [hereinafter MDHS/DFCS].

and corrective action processes.  Section IV details the Monitor's analyses of data produced by the defendants, including key limitations in these data.  Section V summarizes the results of the on-site case record review of random samples of MDCPS case records conducted during September 2016.  Recommended actions are included for the parties' consideration in Section VI.

The appendix to this report contains key documents that support the Monitor's findings, including, of particular note, the following:

- An Assessment of Aspects of Mississippi's Department of Child Protection Services Responses to Maltreatment in Care, September 27, 2016, Center for the Study of Social Policy, included in the appendix as Ex. 2;
- Summary of Data, Maltreatment Reports and Investigations Involving Children in Care, included in the appendix as Ex. 30;
- Summary of Data, Maltreatment in Care Reviews (MIC Reviews) and Related Corrective Action, included in the appendix as Ex. 32;
- Mississippi Centralized Intake (MCI) Reports:  Results of September 2016 Case Record Review, included in the appendix as Ex. 33;
- Screen-Out Reports: Results of September 2016 Case Record Review, included in the appendix as Ex. 34; and
- Intake, Investigation, MIC Review, Licensure: Results of September 2016 Case Record Review, included in the appendix as Ex. 35.

## II.    **METHODOLOGY**

The Monitor's assessment has been informed by interviews conducted by the Monitor and/or her staff with MDCPS managers, staff and/or contractors assigned to oversee or perform duties related to the operation of Mississippi Centralized Intake ("MCI") and the MDCPS Special Investigations ("SIU"), Safety Review ("SRU"), Evaluation and Monitoring ("EMU"), Foster Care Review ("FCR"), Licensing, Professional Development, and MACWIS[5] Units.  The Monitor also interviewed relevant members of the MDCPS executive staff and county

---

[5]  The acronym "MACWIS" refers to the Mississippi Automated Child Welfare Information System, which is the MDCPS electronic case management system.  Certain case records (*e.g.*, court orders, medical records, licensing applications, *etc.*) are maintained in paper case records and not in the electronic record.

caseworkers and/or supervisors who have conducted and/or supervised investigations resulting from reports of maltreatment in care received by the defendants during the 2015 calendar year.

Relevant documents, memoranda, and other records maintained by MDCPS and/or its contractor, Social Work p.r.n., regarding the operation of MCI, have been reviewed and analyzed, including contracts and related outcome/performance reports, recordings of intake reports received by telephone and electronic intake report records ("e-reports"), staffing reports, operating schedules, activity logs, MACWIS downtime logs, call performance reports, quality assurance records, and notifications related to response protocols and policy revisions. The Monitor's office also has reviewed and analyzed data in paper and electronic case records maintained by MDCPS related to the reporting, screening, assessment, and investigation of allegations concerning maltreatment of children in defendants' custody and associated quality assurance, corrective action and licensing records; technical assistance bulletins concerning modifications to MACWIS; staffing lists, on-call schedules, training materials and training records for all staff and managers assigned to the SIU, and screen shots reflecting changes in MACWIS that were instituted during June 2015 in response to the establishment of the SIU; MDCPS policy related to the intake and investigation of reports of maltreatment in care[6] and associated screening, safety and risk assessment tools and instruments; data related to the maltreatment in care review process, including the review protocol and instrument and associated corrective action tracking records generated by the "HEAT" system.[7]

---

[6] Ex. 1, Mississippi, DFCS Policy, Section B: Intake/Assessment Policy, Revised 10-29-15.

[7] The Help Desk Automated Tool, referred to as the "HEAT" system, provides detailed information for tracking service issues related to MDCPS information technology operations. It has been adapted by the defendants to track corrective actions identified through the continuous quality improvement [hereinafter CQI] process. Certain limitations in the effectiveness of this system for promoting timely remedial actions have been addressed in the Monitor's prior reports. *See, e.g., The Court Monitor's Report to the Court Regarding Implementation Period 3 and the June 24, 2013 Order* [hereinafter *May 2014 Report*], filed May 8, 2014 [Dkt. No. 604], at 5, 95-96, 136; *The Court Monitor's Report to the Court Regarding Implementation Period 4* [hereinafter *June 2015 Report*], filed June 15, 2015 [Dkt. No. 655], at 11, 74-79, 84.

As described more specifically herein, the Monitor also has analyzed aggregated data submitted by the defendants both in regular monthly reports issued pursuant to MSA requirements and in custom reports associated with this assessment produced by the defendants in response to the Monitor's requests.  As part of this review, the Monitor has, in certain instances, reviewed, compared and analyzed the data provided by the defendants to assess completeness, accuracy and consistency.  In addition, the Monitor has reviewed and considered professional standards for the conduct of maltreatment in care investigations established by the Child Welfare League of America[8] as well as policies from other jurisdictions with well-regarded maltreatment in care investigative practice.[9]

Moreover, the Monitor retained Judith Meltzer and her team at the Center for the Study of Social Policy ("CSSP"),[10] to conduct a qualitative assessment of MDCPS intake and assessment policies, screening and safety and risk assessment tools and instruments, the maltreatment in care review process, and the training program for SIU staff.  Findings from the qualitative assessment are summarized herein.  The CSSP assessment report is included in the appendix to this report.[11]

The CSSP team partnered with the Monitor to design case review instruments and associated guidelines for use in the case record reviews that assessed the maltreatment in care

---

[8]  *Child Maltreatment in Foster Care*. Washington, DC: Child Welfare League of America, 2003.

[9]  The professional standards relating to maltreatment in care investigations are reflected in the provisions of the MSA that establish requirements for timely initiation and completion of investigations, training and other requirements for investigators completing these investigations and a review process for assessing quality of the investigations.  In addition, the standards were considered in developing the case record review tools and are referenced in the qualitative assessment described below that was conducted by the Monitor's expert consultants. *See infra* note 11.

[10]  Judith Meltzer is the co-director of the Center for the Study of Social Policy in Washington, D.C.  *See* www.cssp.org for additional information related to Ms. Meltzer's qualifications and experience.  Ms. Meltzer is a national expert on child welfare policy and practice and has served as a consultant to the Monitor on other aspects of child welfare practice since Period 1.

[11]  Ex. 2, Center for the Study of Social Policy, An Assessment of Aspects of Mississippi's Department of Child Protection Services Responses to Maltreatment in Care, September 27, 2016.

reporting and investigation process from intake, through screening, assessment, investigation, quality assurance review, corrective action and associated licensure review and status. The case record review employed three random samples. Hotline practice was reviewed through an assessment of 32 maltreatment in care reports that included listening to the audio recording of the telephone call and examining accuracy and completeness in entering information obtained from the reporter into MACWIS.[12] The screen out decision process was evaluated using a separate instrument to review 40 intake reports that were screened out between July 1, 2015 and December 31, 2015. Finally, the investigation and related licensing, quality improvement and corrective action processes were assessed through review of 74 investigations[13] completed during a targeted period agreed upon by the parties.[14]

Structured review instruments with detailed instructions were used for data collection.[15] The instruments were developed by the Monitor and her consultants in consultation with the parties.[16] Final adjustments to the instruments were made after pilot-testing conducted by the Monitor's staff and consultants in collaboration with MDCPS staff. On August 26, 2016, the defendants were notified by the Monitor's Office of the records selected for the random samples. The records were collected by the defendants from MDCPS county offices throughout the state. During the week of September 12, 2016, all records subject to the review were delivered to a

---

[12] This included 28 Hotline calls and four e-reports. This sample was included in the larger sample that examined investigation practice, quality assurance, corrective action and licensure.

[13] The original sample included 76 cases, but two cases were removed from the sample during the review when it was determined that they did not involve maltreatment in care.

[14] At the request of the parties the Monitor limited the number of reports in the sample and drew the sample from reports received between July 1, 2015 and December 31, 2015. Based on the universe of investigations from which the sample was drawn, there was a ten percent margin of error for the findings at the 95 percent confidence level.

[15] The instruments are included in the appendix to this report. *See*, Ex. 3A, Hotline Call Review Instrument; Ex. 3B, Screen Out Decision Instrument; and Ex. 3C, Intake Report, Screening, Assessment, Investigation, Licensure, MIC Review and Corrective Action Instrument.

[16] The parties were afforded an opportunity to review and comment on the instruments, and revisions were undertaken in response to the feedback that was received.

centralized MDCPS office where they were inventoried by a member of the Monitor's staff and an MDCPS employee.

The on-site case record review commenced on September 19, 2016 following a reviewer training session.  A 10-person review team comprised of the Monitor's staff and consultants and MDCPS employees conducted the case review process.[17]  The review process was supervised by a four-person quality assurance ("QA") team comprised of the Monitor's staff and consultants as well as an MDCPS manager with extensive supervisory case review experience.[18]  QA team members checked all data collection instruments for accuracy, completeness and consistency. Inter-rater reliability was assured through detailed written instructions provided to each reviewer as well as QA reviewers who reviewed the answers of multiple reviewers and compared the responses with information found in MACWIS or paper records.

The on-site review was completed on the evening of September 22, 2016.  Thereafter, data collection instruments were coded and analyzed by the Monitor's office.[19]  The Monitor's findings from the case record review are presented in Section V of this report.

---

[17]  The 10-person review team included five reviewers from MDCPS, three reviewers from CSSP, and two reviewers from the Monitor's Office.

[18]  The QA team was comprised of two members of the Monitor's staff, one representative from CSSP, and one MDCPS representative.

[19]  Because of the time constraints inherent in this project, the Monitor augmented her office's data analysis capacity, hiring an additional experienced data analyst with a strong child welfare background to assist with the data analysis.

### III. OVERVIEW OF PROCESS FOR REPORTING AND INVESTIGATING ALLEGATIONS OF MALTREATMENT OF CHILDREN IN CUSTODY, AND RELATED LICENSING, QUALITY IMPROVEMENT AND CORRECTIVE ACTION PROCESSES

The following section summarizes the processes used by MDCPS for the reporting, screening, and investigation of reports involving alleged maltreatment in care. In addition, it includes an overview of the related licensing and post investigatory review processes related to maltreatment in care investigations.

#### A. Intake Process – Mississippi Centralized Intake

As required by the MSA, since 2009 MDCPS has maintained a 24-hour centralized child abuse hotline, referred to as Mississippi Centralized Intake ("MCI"), that is intended to receive all calls, and more recently electronic reports ("e-reports"),[20] involving allegations of child abuse, neglect and exploitation.[21] The Hotline services are provided through a contract between the defendants and Social Work, p.r.n.[22] According to Social Work p.r.n. management, as of September 19, 2016, the Hotline employed 21 intake workers who receive calls and e-reports, four CQI reviewers,[23] 11 support staff, two managers and one administrative assistant. All staff must have a Master of Social Work ("MSW") or a Bachelor of Social Work ("BSW") degree

---

[20] Initially intakes were not received electronically; however, a website was later established for processing e-reports. Defendants and MCI management report that the majority of e-reports are made by mandated reporters.
[21] The Hotline also receives reports of alleged abuse, neglect or exploitation of vulnerable adults as well as calls relating to information and referral and case management. *See* Ex. 1, *supra* note 6, §II.C.4 a. Effective, October 1, 2016, the Hotline was no longer expected to receive reports concerning vulnerable adults. As might be anticipated, the transition to a centralized Hotline was not seamless and reports of maltreatment continued to be processed by county offices after MCI was established. Defendants have worked to address this issue and there is little if any current evidence of this phenomenon. *See, e.g.*, *The Court Monitor's Report to the Court Regarding Defendants' Progress Toward Meeting Period 2 Requirements* [hereinafter *September 2010 Report*], filed September 8, 2010 [Dkt. No. 503], at 98, 100-101 and *May 2014 Report* at 142-143, for background information on this matter.
[22] Ex. 4, Modification Number #1 to the Agreement By and Between Mississippi Department of Human Services and Social Work p.r.n., eff. September 14, 2015. The contract modification provides for a one-year term running from September 14, 2015 through September 13, 2016, with three one-year option periods ending on September 13, 2019.
[23] One of the CQI reviewers works as an evening supervisor.

with at least two years experience.  Social Work p.r.n. reported a need for as many as 10 additional intake workers.[24]

Staffing is flexible throughout the day, with higher numbers of staff on duty during high call volume times.  MCI schedules staff across nine overlapping shifts.  Staffing levels are highest during the period of 8:30 a.m. to 6:30 p.m. and lowest during the overnight hours (when two staff are on duty), reportedly in response to historic call patterns.  Managers at Social Work p.r.n. reported that the Hotline typically receives between 950 and 1,000 calls weekly,[25] and substantially fewer weekly e-reports.  E-reports are tracked through a numbering system that automatically generates a sequential number for each report.

Calls to the Hotline are tracked in several ways.  All calls are recorded, and a new recording system (NICE) was implemented in March 2016 to replace an older system (Cybertech) that has been described by MDCPS and MCI managers as outdated.  Managers at MDCPS and Social Work p.r.n. report that the recording quality of telephone calls has improved with the new system.  For each shift, each intake worker also completes a Daily Activity Log[26] on which the worker records each call s/he handled by type, time, duration, county, number of victims and other information.  The Daily Activity Log is primarily used as a quality

---

[24]  At the time the draft version of this report was submitted to the parties, there were multiple staff vacancies for which candidates had been identified by MCI management and which were pending approval by MDCPS.  The Monitor has not assessed the adequacy of the current MCI staffing plan, which is beyond the scope of this assessment.  Nevertheless, a staffing assessment should be conducted.  It appears that data related to call volume (including call volume of reports concerning vulnerable adults), wait times, dropped calls and possibly other key metrics can be generated and ought to be considered in assessing performance and necessary minimum staffing levels. *See, e.g.,* Ex. 5A, Daily and Monthly Call Profiles, DHS Central Intake (showing, among other measures, the percent of answered calls, abandoned calls and relevant durations).

[25]  MCI management reports reflect increases in call volume for the five-month period between April 1, 2016 and August 31, 2016 relative to the same time period in 2015.  *See* Ex. 5B, Comparison of Call Volume, April - August 2015 and 2016, table submitted to the Monitor by MCI management, September 21, 2016.

[26]  Ex. 6, Social Work p.r.n., Daily Activity Log, revised February 2016.

improvement ("QI") tool, where the volume and type of calls are reportedly tallied and cross-checked with other data sources.

According to applicable MDCPS policy and managers at Social Work p.r.n. and MDCPS, each intake worker who receives a telephone call involving possible child abuse, neglect or exploitation manually completes a "Child Abuse Intake Form."[27] The two-page paper form includes 13 sections that guide the worker in collecting key data relating to the alleged child victim and perpetrator as well as a description of the alleged maltreatment. Among the categories of data collected are the following: 1) contact information (names, addresses, phone numbers) for the reporter, alleged child victims, caretaker and possible witnesses; 2) description of the relationship between the alleged child victim(s) and the alleged perpetrator; 3) specifics of the alleged maltreatment; and 4) whether there are any safety concerns for the investigator who will be assigned to the case. Information from the Child Abuse Intake Form, or from the e-report, is subsequently entered into MACWIS by the intake worker.[28] If the allegation purports to involve the maltreatment of a child in custody this information is intended for use by the SIU for screening the report. The case record review assessed the performance of MCI intake workers in implementing this multi-step process.[29]

The intake worker also is required to complete a diligent search of MACWIS and other systems (METTS and Maverics)[30] for every name in the report, including child/ren, caretaker(s)

---

[27] Ex. 7, Social Work p.r.n., Child Abuse Intake Form, revised February 2016.

[28] According to MDCPS management, prior to mid-2015, some intakes of child maltreatment reports were not entered into MACWIS because location information was not available, and MACWIS required location information for a report to be entered. In mid-2015, a "State Office" location option was added which is used when location information is not available, allowing all reports to be entered into MACWIS even when the location is unknown.

[29] For a summary of these findings see infra Section V.A.

[30] METTS is the predecessor case management system that was used before MACWIS for child welfare case records. The intake worker checks this system and MACWIS to determine if any identified victim, caretaker, perpetrator or witness may have had any prior history with the child welfare system. Maverics is the system used by the MDHS Economic Assistance Program. It is checked by the intake worker to obtain identifying information such as the accurate name, address or social security number.

and alleged perpetrator(s).  If any child is identified as a child in custody, the relevant MDCPS policy requires the intake worker to enter the report as a "Resource Report" under the following circumstances: [31]

- If the report of maltreatment, including corporal punishment, by a resource parent is received on a child in custody.
- If a report is received on a child in custody in which alleged maltreatment occurred in the Resource Home.
- If a report is received on a child in custody in which the alleged maltreatment is a result of the Resource Family's actions or inactions.
- If a report of maltreatment is received involving a child in custody placed in a licensed or non-licensed facility.[32]

Pursuant to MDCPS policy, reports involving children in custody are defined as Level 3 reports, which require initiation within 24 hours, and should be "screened in" by MCI as long as the allegations meet the statutory definition of maltreatment.[33]

Effective with changes to MACWIS in June 2015, MACWIS automatically transmits an intake entered as a "Resource Report" to the SIU, which then completes the screening process. MCI staff also send an e-mail to SIU supervisors and the Area Social Work Supervisors ("ASWS") for the county of responsibility alerting them of the intake.  As noted elsewhere in this report,[34] relevant MDCPS policy[35] has not been updated to reflect the establishment of the SIU, which became operational in July 2014, or to reflect related changes in MACWIS that were not implemented until June 2015.  Therefore, it is difficult to track the flow of cases to SIU or the criteria used by SIU to screen cases, as the flow is not consistent with the existing written policy.[36]

---

[31] *See* Ex. 1, *supra* note 6, §II.C.4.b.2.

[32] *Id.*

[33] *Id.* §II.F.2.  MDCPS policy also requires that a report concerning use of corporal punishment on a child in custody should be screened in for investigation.

[34] *See infra* at 71-72.

[35] *See* Ex. 1, *supra* note 6.

[36] As discussed *infra* at 39-44, data reported by defendants indicate a significant percentage of maltreatment in care investigations were not investigated by the SIU during 2015; however, the percentage of investigations that were

Several quality improvement initiatives have been implemented to assess whether MCI's performance meets expected standards and complies with the required processes. Staff from the MDCPS State Office report that they listen to a sample of calls received by the Hotline and critique them using a MCI Customer Service Checklist.[37] MDCPS managers report that the checklist is used to create a MCI feedback form which is provided to the intake worker and his/her supervisor so that areas in need of improvement are identified and performance improvement plans can be developed, if needed.[38] According to MDCPS managers, the audio quality of the call recordings under the previous telephone system made this QI process quite challenging, so in the past, fewer calls were assessed. They report that the implementation of the new telephone system is expected to enhance certain aspects of MDCPS QI activities related to the intake process.[39]

Managers employed by Social Work p.r.n. report that they conduct their own QI reviews of intakes processed by MCI intake workers by listening to telephone calls and reviewing the associated documentation.[40] Social Work p.r.n.'s quality improvement activities include review of the comprehensiveness, quality and accuracy of documentation (including comparing the information entered into MACWIS with the information on the Child Abuse Intake Form), and evaluation of whether the relationship to the victim is accurately established, whether a diligent search was completed, and whether the report includes correct spelling and grammar. In addition, Social Work p.r.n. managers check to ensure the intake was entered into MACWIS

---

investigated by non-SIU investigators was significantly less for the sample of investigations that were subject to the case record review. *See infra* Section V.

[37] *See, e.g.*, Ex. 8, examples of completed MCI Customer Service Checklists, redacted.

[38] Ex. 9, Mississippi Department of Child Protection Services, Division of Family and Children's Services, Mississippi Centralized Intake Feedback Form (the blank form and a redacted version of the completed form are included).

[39] As noted *supra* at 7, the audio recordings associated with a sample of 32 telephone intake reports were assessed during the case record review. The results of the analysis are summarized *infra*, Section V.A.

[40] Ex. 10, Centralized Intake QA Form, revised September 2011.

within 90 minutes as required.[41]  The contractor submits to MDCPS management monthly

reports documenting the number of calls received, number of intakes that were not screened

properly and other data.  An annual report is also submitted to MDCPS management.[42]  The most

recent annual report covers the September 14, 2014 through September 13, 2015 contract year.

One of the specific goals addressed in the annual report is whether Social Work p.r.n. accurately

confirmed the resource home at the time of intake.  A goal for the 2014-2015 contract year was

that 98 percent of cases would have the resource home accurately identified at intake, and Social

Work p.r.n. reported its performance as 99 percent.[43]

### B.  The Special Investigations Unit

Pursuant to MSA requirements,[44] the SIU was established in 2014 with responsibility for,

*inter alia,* investigating all allegations of maltreatment involving a child in custody.[45]  SIU was

initially staffed with one director, hired at the start of 2014, and 13 investigators who began

conducting investigations by early July 2014.  Two direct supervisors for the investigators were

later hired: one in December 2014 and the other in January 2015.  As of the date the draft version

of this report was submitted to the parties, the SIU was staffed by a director, two supervisors and

15 investigators.  SIU supervisors were informed during the week of September 19, 2016 that

---

[41]  A quality assurance report generated through MACWIS on a daily basis tracks each Hotline and e-report, including intake identification number, county, intake worker, date and time of call, and time of entry of intake into MACWIS.  *See* Ex. 11, MACWIS Report No. MWZHOTLD, Mississippi Department of Human Services, Hotline Quality Assurance Report, January 26, 2015 and February 2, 2015, redacted.  Delays in timely entry of intakes into MACWIS are attributed in part to MACWIS log on and connectivity issues.  It is noteworthy that MCI staff process intake reports using the older WYSE terminals, which have contributed to various performance challenges for the defendants in the past.

[42]  Ex. 12, Social Work p.r.n., Annual Report, February 4, 2016, submitted to the Monitor on July 26, 2016.

[43]  *Id.* at 3.  As indicated in Ex. 33, *infra* note 192, the case record review found that the intake worker accurately identified the report as a resource report in 69 percent of the cases in the sample.

[44]  Final Period 4 Implementation Plan [hereinafter Final Period 4 IP], filed January 8, 2014, §III.A.3. & 4.

[45]  SIU also investigates all child fatalities and, until very recently, it was responsible for investigating maltreatment reports involving "near fatalities" – reports in which a physician certifies that a child is in serious or critical condition as a result of maltreatment.  MDCPS managers report that because SIU has not been staffed to handle the volume of these reports, near fatalities of children who are not in custody are now referred to the counties for investigation.  This change in practice warrants reassessment.

three additional SIU investigative positions had been authorized and they reported that recruitment efforts were underway. According to SIU managers, there has been an attempt to ensure that no investigator is assigned to more than six investigations at one time, although at times during 2015 (and also during the current calendar year) assigned investigations have exceeded that number.[46]

At the time the SIU became operational in July 2014, key MACWIS changes necessary to properly track and route child maltreatment reports for investigation by SIU had not been made. Managers report that, as a consequence, intakes involving allegations of maltreatment in care were not consistently forwarded to SIU by MCI intake workers. Instead, consistent with what were the prevailing historical procedures, the intakes were transmitted by MACWIS to the regional directors in the counties. During late 2014 or early 2015, as a "work around" intended to accommodate the need for timely referral to the SIU pending implementation of the necessary changes in MACWIS,[47] when a report of alleged maltreatment in care was received, the MCI intake worker was supposed to e-mail and telephone the SIU; however, MDCPS managers report this did not occur on a consistent basis. It was not until June 13, 2015 that changes were implemented in MACWIS to address this issue.

Pursuant to the modifications to MACWIS, when a report involving alleged maltreatment in care is received, the intake worker is expected to select "resource report" on the MACWIS "screening" page and the SIU is then automatically notified through MACWIS of the intake.[48] Even after the MACWIS change, as a safeguard,[49] MCI intake workers continue to transmit an e-

---

[46] The maximum number of investigations assigned to an investigator at any one specific time was reported to be between seven and eight.

[47] The Monitor could not confirm a precise date for the start of this practice; however, there appeared to be a consensus among interviewees that it began in late 2014 or early 2015.

[48] Ex. 13, MACWIS Technical Assistance Bulletin, May 29, 2015, Issue 24, effective June 13, 2015.

[49] Managers at MCI and MDCPS refer to this as a "double check" to ensure there is appropriate notification.

mail notification routinely to the SIU director and supervisors, and to the ASWS for the county of responsibility. The e-mail to SIU management includes copies of the MACWIS screen shots for the intake report.[50] SIU managers report that the MACWIS changes and e-mail notification protocol have substantially improved the immediate and direct referral of maltreatment in care reports to SIU. Managers estimate that instances of the SIU not being notified of alleged maltreatment in care occur less than once per week.[51] In these instances, they indicate that the failure to provide timely notification to the SIU is attributable to the following, among other reasons: MACWIS is down at the time of intake; child custody status is inaccurately reflected in MACWIS at the time of the intake report; and inaccurate information is provided by the reporter or entered by the intake worker.[52] In the event the report is misdirected to the county for investigation, the county supervisor screening the report may redirect the report to the SIU through MACWIS. In that case, the SIU supervisor would be notified electronically and then be able to review the report and complete the screening.

Once SIU receives a report, SIU supervisors "screen the case" to determine whether to investigate based upon relevant statutes and agency policy. The screening, as required by the MSA,[53] relies on a standardized tool[54] located in MACWIS.[55] Screen out criteria include:

- Duplicate report;
- Inability to locate family;
- Relationship to the child;

---

[50] Ex. 14, example of intake screen shots from MACWIS, redacted.

[51] This is consistent with the findings in the case record review but not the aggregate data reported by defendants. *See infra* at 61-62. Reviewers found that the SIU was notified of the maltreatment in care report in 97 percent of the sample that was subject to review. *See infra* Section V.C. for a discussion of these findings.

[52] See discussion *supra* at 13 regarding QI concerning Hotline performance. The issue of delay in notification to SIU is subject to various QI activities as described above, but appears to be an ongoing concern.

[53] MSA §II.B.1.e.1. (requiring standardized decision-making criteria for prioritizing, screening and assessing all reports of maltreatment, including corporal punishment of children in custody).

[54] Standardization of the tool promotes consistency in screening decisions.

[55] Ex. 15, Intake Screening Tool from MACWIS, redacted.

- Failure of the allegation to satisfy the legal definition of maltreatment.[56]

The content and clarity of the screening tool was assessed by the Monitor's consultants who found that the screening tool is adequate to screen reports for investigation.[57] The Monitor's consultants have made specific recommendations for supplementation of the tool to address MDCPS policy related to corporal punishment. These recommendations also will promote the implementation of the corresponding MSA requirement and should be considered.[58]

According to MDCPS management, all screen out decisions (both those involving reports of maltreatment in care and those involving children who are not in custody) are reviewed for quality and consistency with policy guidelines by MDCPS staff. However, the case record review of screen out decisions refutes the claim that quality reviews were occurring in the period between July 1 and December 31, 2015. Only 35 percent of the reports in the screen out sample were reviewed for quality.

When a QI review is conducted and indicates that the screen out decision may not have met agency standards, the documentation was incorrect or inadequate, or there were other issues related to the screen out decision, MDCPS managers report that an e-mail notification ("screen out alert") is sent to the worker making the screen out decision and his/her respective supervisor. The worker is required to respond to the notification. MDCPS management reports that a log tracking the review and findings related to screen out decisions is maintained. According to MDCPS management, there were no screen out alerts related to SIU screen out decisions in

---

[56] MDCPS policy states that an allegation of corporal punishment involving a child in custody must be screened in and investigated as an ANE report even if it does not meet the statutory definition of maltreatment. The policy provides that if the investigation determines that corporal punishment occurred but there is no injury and the punishment was administered in a reasonable manner, the allegation must be unsubstantiated; however, a policy violation should be found and the matter referred to the licensing specialist for corrective action. *See* Ex. 1, *supra* note 6, §II.F.2.a.

[57] *See* Ex. 2, *supra* note 11, at 6-7.

[58] MSA §II.B.1.c.

2015. This is not consistent with the case record review findings, in which only 78 percent of the cases screened out were deemed appropriate for screen out.[59]

SIU managers report that SIU investigators are assigned to conduct maltreatment in care investigations within an hour or two of the receipt of the MACWIS intake notice. In turn, the investigator is required to notify the county of responsibility of the allegations.[60] Under the MDCPS policy that SIU investigators are expected to follow,[61] if the placement involves a licensed resource home, the investigator is required to contact the appropriate resource worker, who is expected to accompany the investigator to the home.[62] SIU management estimates that resource workers accompany SIU investigators to the resource home more than half the time.[63]

Pursuant to MDCPS policy, face-to-face contact with the child victim by the SIU investigator must be attempted within 24 hours unless a shorter time frame is indicated based upon the allegations.[64] According to interviews with SIU supervisors and staff, investigations assigned to the SIU are, on occasion, initiated by a county worker either because there is an urgent need to interview the child on an expedited basis and an SIU investigator cannot do so, or, less often because an SIU investigator is unavailable.[65]

---

[59] It should be noted that one area that has been identified by the Monitor as needing clarification relates to duplicate reports. According to MDCPS policy, for a report to be considered a duplicate it must involve the same victim, same perpetrator, same incident and same allegation. The case record review found that a number of cases were screened out in instances in which only some of the criteria were met. *See infra* Section V.B.

[60] The SIU maintains weekend and on-call coverage.

[61] As noted previously, MDCPS policy has not been updated to reflect the establishment of the SIU.

[62] *See* Ex. 1, *supra* note 6, §II.F.2.a.3.

[63] Managers estimated that resource workers accompany SIU investigators between 50 and 85 percent of the time at some point during the investigation, albeit not necessarily initially. Findings from the case record review are included *infra* in Section V.C.

[64] *Id.* §II.F.2.a.8. Attempted face-to-face contact under MDCPS policy includes a visit to the child's home and at least one additional visit to daycare, school, or neighbors. *Id.* §II.E.3.

[65] One manager reported that in these instances there is a preference for the caseworker assigned to the child's case to initiate the investigation. This is inconsistent with the express provisions of the MSA, investigative standards and best practices, which specify that investigations into alleged maltreatment in care should be conducted by someone with no connection to the ongoing case. *See* MSA §II.B.1.c.

The SIU investigator is expected to comply with general MDCPS policy related to investigations concerning contact with collateral witnesses, interviews with the child victim(s) and alleged perpetrator(s), observation of the physical environment of the placement and the associated documentation required in MACWIS.  SIU investigators also are expected to refer the child for any necessary specialized evaluation and review any collateral materials such as results of medical or other professional evaluations.  They also are required to complete safety and risk assessments.[66]

MDCPS policy and guidelines related to the use of the safety and risk assessment tool and the quality of the tool were assessed by the Monitor's consultants.[67]  While the Monitor's consultants found that guidance in MDCPS policy regarding how and when to conduct the assessments was adequate, they identified significant limitations in the tool, finding that it is "inadequate to support practices of assessing safety and risk and planning to assure the safety and well-being of children in foster care."[68]  Based on these findings they made several key recommendations which should be considered.

MDCPS policy provides that the investigator's initial assessment of the child victim's risk, safety and well-being should be reported to his/her supervisor[69] and documented in a MACWIS narrative during a "5 day required investigation staffing."[70]  Policy also requires that a completed safety and risk assessment tool must be documented in MACWIS within 25 days.[71]  It should be noted, however, that staff reported that the initial safety assessment was required to be

---

[66] *See* Ex. 1, *supra* note 6, §II.F.2. and Ex 16, Safety and Risk Assessment Tool in MACWIS.
[67] *See* Ex. 2, *supra* note 11, at 8-11, for the assessment of the quality of the safety and risk assessment tools.
[68] *Id*. at 8.
[69] *See* Ex. 1, *supra* note 6, §II.F.2.a.10.c.
[70] *Id.* §II.E.4.a.
[71] *Id.*

completed within seven days and documented in MACWIS within 20 days.[72]  This is an area in which the failure to update policy can be confusing to workers.

During the pendency of a maltreatment investigation, the home or facility should be closed to new placements.[73]  Under the policy, and as confirmed by managers, the decision whether to continue the current placement of a child in custody who is the subject of a maltreatment report rests with the COR[74] worker (or with the COS[75] worker in those cases in which there is a COS worker).[76]  The COR worker is also responsible for notifying the child's parents and the guardian ad litem within 24 hours of the intake report.

SIU investigators are expected to submit completed investigations to their supervisors within 25 days of the intake report[77] and, consistent with MSA timelines, investigations must be completed, *i.e.*, approved by the investigator's supervisor, within 30 days.[78]  Thereafter, the SIU investigator is responsible for sending notification of the investigative findings to the resource family, providing the COR worker with the investigative findings and recommendations, and notifying law enforcement and the District Attorney of the results if the allegations involved felony abuse.

Pursuant to the MSA, investigators are required to receive training in handling maltreatment in care investigations.[79]  Interviews with SIU managers and staff establish that

---

[72] *See* Ex. 1, *supra* note 6, §II.E.4.a.  The policy states that "[d]ocumentation should include results of the safety assessment, addressing any safety, environmental or health issues and protective capacities of the parent/caretaker." *Id*.  *See also infra* Section V.C., for the findings from the case record review regarding completion of the safety narrative and meeting with the supervisor.

[73] The case record review found two instances in which children were placed into placements that were subject to pending investigations.  *See infra* Section V.C.

[74] The acronym "COR" is used to signify the assigned caseworker in the County of Responsibility.

[75] The acronym "COS" is used to signify the assigned caseworker in the County of Service.

[76] It is recognized that in emergency circumstances the investigator may need to act to ensure the immediate safety of the child.

[77] *See* Ex. 1, *supra* note 6, §II.E.5.b.

[78] MSA §II.B.1.e.2.

[79] *Id*. §II.B.1.c.

there is no formal specialized training in which special issues in maltreatment in care investigations or SIU policies and procedures are reviewed with newly assigned SIU investigators.[80]  SIU investigators participated in a multi-day training in interview and interrogation techniques during 2015.  More recently, on September 20, 2016, they participated in an all-day training session that appeared to include an investigative training related to physical and sexual abuse as well as child fatalities.  These sessions are not a substitute for the specialized training contemplated by the MSA.  The Monitor's consultants conducted a preliminary review of certain training afforded to SIU investigators.[81]  They made several observations and recommendations for assessing the quality of the training afforded to SIU staff which should be considered.[82]  As they point out, in assessing staff training needs it will be useful to consider the data collected during the case record review.[83]  Moreover, in light of the establishment of the SIU, the development of clear policy guidelines related to SIU operations is a necessary predicate for implementation of MSA training requirements.

###   C.    Licensing

The MSA requires that a licensing investigation should be completed on any home or facility for which a report of maltreatment in care has been received.[84]  Insofar as resource homes, MDCPS policy specifies that resource workers should accompany the investigator to the

---

[80]  The current MDCPS pre-service training program includes training on maltreatment, assessment and certain investigative practices.  It does not appear to focus on the special issues and considerations associated with maltreatment in care investigations nor does it address policy or procedure related to SIU operations.  Moreover, although all SIU investigators are required to complete 40 hours of in-service training annually, a review of their in-service training records indicates that for the most part SIU investigators have received very little training in maltreatment in care investigations.  According to the records the defendants produced, three SIU investigators received six hours of maltreatment in care investigation training during April 2014, shortly before the SIU became operational in July 2014 with a staff of 13 investigators.  *See* Ex. 17, in-service training records for SIU staff and managers, redacted.

[81]  *See* Ex. 2, *supra* note 11, at 19-21.  They did not have an opportunity to conduct a preliminary review of the training that was conducted on September 20, 2016.

[82]  *Id*. at 20-21.

[83]  These data are summarized *infra* in Section V.C.

[84]  MSA §II.B.1.b.

home to assess for possible policy or licensing violations.[85]  As noted above, while interviews with SIU managers and staff suggest that resource workers accompany the SIU investigator in anywhere from 50 percent to 85 percent of cases, the case record review found that resource workers accompanied investigators in 52 percent of the investigations in the sample.[86]

After the initial safety assessment is completed, MDCPS policy requires the resource specialist and the COR worker to discuss with the resource supervisor whether corrective actions are needed, and if so, to develop an emergency corrective action plan.[87]  Pursuant to the MSA[88] and MDCPS policy,[89] copies of the final investigation report, recommendations, and corrective actions, if any, are required to be filed in the case record of the foster child, the file of the resource home, and copies sent to the Youth Court judge.  The results of the resource home investigation also are required to be entered into MACWIS.[90]

Procedures are somewhat different when the placement involved is a licensed group home, emergency shelter or child placing agency resource home.  The MDCPS licensing division is notified when a maltreatment in care allegation is made, but in most cases the licensing worker does not begin a licensure investigation until the SIU investigation is completed.[91]  Notably, according to a number of MDCPS managers, licensing workers for congregate care facilities do not accompany the investigator on investigations involving

---

[85]  *See* Ex. 1, *supra* note 6, §II.F.2.a.3.
[86]  *See* Ex. 35, *infra* note 201, for a detailed summary of these findings.
[87]  *See* Ex. 1, *supra* note 6, §II.F.2.a.11.
[88]  MSA §II.B.1.e.4.
[89]  Ex. 1, *supra* note 6, §II.F.2.a.14.  The policy also requires submission to the guardian ad litem.
[90]  *See id*. §II.F.2.a.12.
[91]  This practice could be viewed as inconsistent with the MSA and MDCPS policy, which each in relevant part provide:  "*[u]pon receipt* of a report of child maltreatment in a DFCS licensed group home, emergency shelter, child placing agency resource home, DFCS shall undertake a licensure investigation, that is in addition to, and independent of, any child protective investigation, that shall include an on-site inspection of the facility or home to determine the contract provider's compliance with DFCS licensure standards."  (emphasis added).  Ex. 1, *supra* note 6, §II.F.2.b.; MSA §II.B.1.b.

maltreatment in care alleged to involve congregate care facilities.  This is consistent with the findings from the case record review.  According to MDCPS managers, if an SIU investigator identifies a licensing violation during the course of an active investigation, the investigator can request an immediate licensing investigation; however, managers report that this has not occurred during the past year.  Managers also report that if the allegation itself suggests a critical safety issue is present, licensing staff go to the facility immediately and then decide on next steps.  By all accounts, this occurs rarely and is determined on a case-by-case basis.[92]

According to MDCPS policy,[93] licensing investigations should be completed in all cases, even when the allegations in the investigation are not substantiated.  According to MDCPS staff, in general, the licensing worker for a facility will review the SIU report in MACWIS (the licensing worker is notified when it is completed) and then begin the licensing investigation, which includes a visit to the licensed facility generally within seven to 10 days of receipt of the investigation.  Children and staff in the home or facility are interviewed.  The licensing investigation also includes an inspection of the home or facility to assess compliance with licensing standards.  Staff report that any facility provider found to be in violation of a licensing standard is required to submit a corrective action plan ("CAP") within 30 days, and the CAP must include timeframes for resolving the violations.  Pursuant to the MSA and MDCPS policy,[94] the license must be revoked if the licensee fails to fulfill the CAP in the timeframes specified.  It is estimated that the licensing division conducts approximately three to five investigations per month in addition to its regular licensing activities.  MDCPS staff report that regardless of the findings in the maltreatment in care investigation, only rarely are licensing

---

[92] Staff and managers reported that during the last several years there have been a few cases in which a safety plan was put in place during the pendency of the investigation.
[93] See Ex. 1, *supra* note 6, §II.F.2.b.  The policy mirrors MSA requirements.
[94] *Id*. and MSA §II.B.1.b.

violations found in these facilities. They indicate that in the majority of cases, the provider is meeting licensing standards. In fact, at least since January 2015, MDCPS facility licensing staff could not recall a facility being closed due to abuse, neglect or exploitation (although facilities have been closed for other reasons).

MDCPS staff report that copies of the letter indicating the SIU findings, the licensing report (narrative, findings and recommendations if applicable), and the CAP, if applicable, are added to the MDCPS State Office licensing file and sent to the licensed provider. Copies of the licensing report are also maintained in the child's case record and staff report that the Youth Court judge also must be notified.

### D. Maltreatment in Care ("MIC") Reviews

As required by the MSA[95] and MDCPS Policy,[96] the defendants must review all investigations of maltreatment in care to identify any case practice deficiencies or safety issues. These reviews are referred to as maltreatment in care ("MIC") reviews. MIC reviews are completed by an administrative entity within the MDCPS CQI Unit, the Safety Review Unit ("SRU"). The purpose of the MIC review is to identify any remedial actions necessary to ensure the safety of the child who was the subject of the investigation as well as other children in the placement, establish a time frame to implement the remedial actions, and identify any corrective actions necessary to address deficiencies in case practice that were identified or revealed during the investigation.[97] The SRU is also expected to monitor the status of remedial actions to ensure timely initiation.

---

[95] MSA §II.B.1.d.
[96] Ex. 1, *supra* note 6, §II.F.2.b.
[97] Ex. 18, Mississippi Division of Family and Children's Services, DFCS CQI Maltreatment in Care Review Process, at 2.

The SRU has three staff including a supervisor.  Staff are trained in conducting these reviews.  According to MDCPS management, caseloads have varied from a high of 10 reviews conducted weekly in 2015 to about four or five weekly reviews as of mid-2016.  Cases are assigned based on closed investigations identified from MACWIS Report No. MWZ1271, available weekly, with the SRU review triggered by the "findings approved date" (which is the date that the investigation was approved by a supervisor).  According to both the MSA and MDCPS policy, MIC reviews are required to be completed within 30 days after the completion of the investigation.  As described elsewhere in this report, there have been significant issues regarding the timeliness of MIC reviews and at least some of these issues relate to limitations in tracking investigations.[98]

Each MIC review reportedly takes approximately 45 minutes to conduct and is guided by a structured review instrument.[99]  Among the areas reviewed are timeliness of initiation of the investigation, licensure status of the placement, prior allegations of maltreatment, investigation case practices, quality of safety and risk assessments, and licensing related investigations.  The MIC reviews also include evaluation of safety assessments, risk assessments, safety plans and case practice.  SRU staff report that the most common issues identified through the MIC review process concern timeliness of safety and risk assessments and initiation of investigations.

The Monitor's consultants found that the MIC review instrument and the related guidelines and reference guide are adequate, but they identified several issues that warrant consideration.[100]  Moreover, they recommend enhancements to the process for tracking and

---

[98]  As explained *infra* in Section IV, the Monitor identified this as an issue when she discovered that a significant number of investigations did not have MIC reviews.  After the Monitor brought this issue to the attention of the defendants, the reviews were completed.  Defendants determined that the findings approved date was not captured in the data report upon which the SRU was relying to track the completion of investigations, thus some investigations were not identified as ready for MIC reviews.  These investigations among others did not receive a timely review.
[99]  Ex. 19, Safety Review Unit Maltreatment in Care Review Instrument.
[100]  *See* Ex. 2, *supra* note 11, at 12-18.

monitoring corrective action that are likely to promote improvements in both the investigative and corrective action processes.[101]

The SRU staff have four days to complete a MIC review and the SRU supervisor has one day to approve the review or return it to the reviewer for follow up. If safety issues or case practice deficiencies have been identified, these findings are entered into the HEAT ticket tracking system.[102] Safety issues must be addressed by the assigned staff member within five days, and practice issues must be addressed by the identified responsible staff (often a Regional Director or other manager) within 20 days. When an issue has been corrected, the responsible staff must note this in HEAT in order for the HEAT ticket to be closed. Defendants report that CQI staff spot check some of the closed HEAT tickets to ensure the corrective actions are implemented. In order to promote timely corrective action, each week an open HEAT ticket report is circulated to designated executive staff and managers to identify issues and deficiencies that have not been addressed. When safety issues and case practice deficiencies have not been corrected within the required timeframes, the SRU supervisor notifies executive and regional managers.

There have been long-standing issues regarding the timeliness of the corrective action process.[103] Results from the case record review identify key limitations in the content of the MIC reviews that were examined. Although there has been some improvement in the timeliness of the corrective action process, this area continues to be a concern.

---

[101] *Id.*
[102] *See*, *e.g.*, Ex. 20, Mississippi Department of Human Services, Division of Family and Children's Services, Continuous Quality Improvement Corrective Actions, Open Report for SRU as of 6/16/2016, redacted.
[103] The Monitor has reported previously on this issue. *See*, *e.g.*, *May 2014 Report* at 95-96, 136; *June 2015 Report* at 74-79.

IV.    **DATA RELATING TO MALTREATMENT IN CARE**
       **REPORTS AND INVESTIGATIONS**

      This section presents analyses of data produced by defendants related to maltreatment in

care reports received during the period January 1 to December 31, 2015 and related

investigations.  It also describes the Monitor's efforts to test the completeness and accuracy of

these data and certain key limitations in the data.

      **A.  Methodology and Data Sources**

      In addition to a review of the intake processes related to maltreatment in care reports

received during 2015, as part of this assessment the Monitor made substantial efforts to reconcile

data reported by the defendants regarding the universe of related maltreatment in care

investigations.  This was an important exercise in order to define the universe of maltreatment in

care investigations subject to analysis and for potential selection in a case record review.

      Defendants produce the following monthly reports pursuant to MSA requirements, each

of which presents data related to maltreatment in care investigations: MACWIS Report Nos.

MWZ1271D,[104] MWZ1271G,[105] and SBRD06.[106]  The Monitor's office reviewed data from all

three sources in an effort to identify all maltreatment in care investigations stemming from

reports of maltreatment in care that were received in 2015.  None of these reports included

complete data regarding the maltreatment in care investigations and none were wholly accurate

with respect to the identification of maltreatment in care investigations (*i.e.*, some investigations

which are identified as maltreatment in care investigations did not, in fact, involve children in

---

[104]  MACWIS Report No. MWZ1271 is intended to include data on all maltreatment in care investigations open one or more days during the one-month period covered by the report.  Investigations remain on the reports from month-to-month until the month investigative findings are approved.
[105]  MACWIS Report No. MWZ1271G is a permutation of MACWIS Report No. MWZ1271 that is intended to include for each month all and only those maltreatment in care intakes that were opened during the month of the report.
[106]  MACWIS Report No. SBRD06 is intended to include data on all allegations of maltreatment in care, including findings, for rolling 12-month periods.

custody).  Consequently, as more fully explained below, the Monitor has not been able to validate all data provided by the defendants.

During this assessment process, consistent with the Monitor's past practice, the Monitor notified the defendants of the limitations her office identified in defendants' data submissions, providing detailed information regarding data that appeared to be missing from submitted data sets.  In response, the defendants reported that they had identified and had corrected or were in the process of correcting the sources of the data limitations.  Nevertheless, because the types of limitations in data the Monitor identified during the assessment are both long-standing and not uncommon, it will be crucial for the Court to confirm that the defendants' remedial activities have been effective before relying on data that have not been validated.

In order to generate a more complete and accurate list of maltreatment in care investigations related to all maltreatment in care reports received during the 2015 calendar year, the Monitor requested and the defendants created a customized version of MACWIS Report No. MWZ1271.[107]  The Monitor then cross referenced that data against other data sources, including hard copies of completed maltreatment in care investigations and monthly summary data produced by the defendants pursuant to MSA requirements.[108]  Defendants' initial data

---

[107] *See* Ex. 21A, June 13, 2016 e-mails from Grace M. Lopes to Cindy Greer.  Defendants produced two versions of these data, the first on July 7, 2016 and the second on August 25, 2016.

[108] *See* Ex. 21B, Protocol for Accurately Identifying and Producing Maltreatment Investigative Reports to the Court Monitor.  The protocol, which was developed as the result of a collaborative process involving counsel for plaintiffs and defendants, was produced on November 13, 2013 pursuant to §III.A.2. of the Initial Period 4 Implementation Plan.  Defendants were required to implement the protocol because they had failed to accurately identify and produce all maltreatment in care investigations to the Monitor during January 1, 2012 – January 31, 2013.  *See May 2014 Report* at 146-147 for background information related to this matter.  While the protocol has been helpful in improving the defendants' performance, it has not been entirely successful.  During this assessment process, in mid-July 2016, the Monitor's office notified the defendants that 13 completed maltreatment in care investigations from 2015 had been discovered that were not transmitted to the Monitor's office.  *See* Ex. 22, July 14, 2016 e-mail from Mark Jordan to Kenya Rachal.  Shortly thereafter, following additional analyses and discussion with MDCPS staff, the Monitor's office notified the defendants of six additional 2015 investigations that the Monitor had identified that appeared to involve maltreatment in care and that the Monitor had not received.  *See* Ex. 23, July 22, 2016 e-mail from Mark Jordan to Kenya Rachal.  On August 16, 2016, the defendants provided a detailed response, informing the Monitor that five of the investigations did not involve children in custody and producing the balance of the

submission, on July 7, 2016, reflected 731 maltreatment in care investigations conducted in response to intakes received during 2015.  After cross referencing the custom report against secondary data sources and eliminating investigations that involved children who were not in custody that errantly appeared in the data, the Monitor's office identified 680 maltreatment in care investigations conducted in response to intakes that were received during 2015 and, based on that data, selected samples for the case record review.

        In a subsequent data submission from the defendants on August 25, 2016, which the Monitor did not request or anticipate, 757 maltreatment in care investigations were reflected, 26 more than the July 7, 2016 submission.  The Monitor reviewed the 26 and verified that eight investigations involved children who were in custody at the time of the intake report.  Because the case record review and data analysis process was already underway, the Monitor did not include the additional eight maltreatment in care investigations in her sampling universe or data analysis.  Nevertheless, the eight maltreatment in care investigations represent approximately one percent of the universe the Monitor identified for analysis and their exclusion should not materially affect the findings presented herein.

        During the Monitor's review of screen out decisions and during the case record review, the Monitor discovered that some of the 680 investigations identified by the Monitor after her initial reviews and cross referencing of the data contained in custom MACWIS Report No. MWZ1271 involved children who were not in custody.  Specifically, 12 of 86 investigations in the case record review sample were determined to involve children who were not in custody at the time of the alleged maltreatment or involve allegations that did not implicate the resource parent or facility staff.  Projecting this percentage onto the larger universe of 688 investigations

---

missing investigative reports that the Monitor had identified.  *See* Ex. 24, August 16, 2016 e-mail from Kenya Rachal to Mia Caras with attached table, Response to 1271 Questions from CM (08.16.2016).

would suggest that a closer approximation of the number of completed maltreatment in care investigations from reports that were recorded in 2015 was 592.

Due to the extensive discrepancies, inaccuracies, and conflicts in defendants' data, the Monitor cannot report with confidence a precise number of maltreatment in care investigations conducted during 2015. Nevertheless, the methodology employed to identify a universe of 680 investigations was sufficiently inclusive to be used as the basis of a representative case record review sample and an aggregate data analysis that reflects the defendants' performance.

The Monitor's office also assessed whether all maltreatment in care investigations received a QI review, referred to herein as a MIC review, as required by the MSA.[109] In May 2016, before the SSRO was finalized,[110] the Monitor notified the defendants that her office had identified 79 maltreatment in care investigations that were closed during 2015 for which, according to the data the defendants had submitted through required monthly reporting, a MIC review was not conducted.[111] After reviewing the list, the defendants concluded that 13 of the MIC reviews had, in fact, been completed but not reported accurately on the monthly report, eight had been assigned to reviewers but "inadvertently [were] not completed," and 58 were never assigned to be reviewed because of a business process that relied on a weekly version of a

---

[109] MSA §II.B.1.d.

[110] On April 4, 2016, the Monitor's office contacted the defendants to request the reports of the MIC reviews conducted for two specific maltreatment in care investigations. The Monitor's own review of these two investigations had raised certain significant issues, including ongoing safety concerns for the involved children in custody. Defendants reported that a MIC review had not been conducted for one of the cases because the intake number associated with the investigation did not appear on the weekly report, MACWIS Report No. MWZ1271, from the applicable time period, explaining that they had been "experiencing issues" with the weekly reports "for several weeks during the time the intake number should have appeared on the report." Ex. 25, April 4, 2016 e-mail from Alexis Holly to Mia Caras. The MIC review was ultimately assigned to a reviewer and completed. However, in light of the defendants' response to the Monitor's inquiry, the Monitor sought to determine whether all required MIC reviews were being conducted, and identified the 79 investigations closed during 2015 which did not appear to have had an associated MIC review.

[111] See Ex. 26, May 4, 2016 e-mail from Grace M. Lopes to Cindy Greer. The monthly report, MACWIS Report No. MRIP4MRR, is a manual report that is maintained by the MDCPS Safety Review Unit.

data report[112] that, because of a coding error, failed to generate a complete list of completed investigations subject to review.[113] Defendants reported that the coding error was being corrected and that processes would be implemented to ensure all completed investigations were subject to timely MIC reviews.

During the assessment process, the Monitor's office also identified significant limitations in the completeness of the data presented in the new monthly report the defendants began to produce at the end of December 2015 regarding the rate of maltreatment in care, MACWIS Report No. SBRD06,[114] which is used as the basis for reporting required data to the United States Department of Health and Human Services. On May 20, 2016, the Monitor notified the defendants of her findings.[115] Following a review, the defendants concluded that 156 of the 163 investigations identified by the Monitor should have been included on MACWIS Report No. SBRD06, but were errantly excluded due to data entry issues in MACWIS.[116]

As noted above, as part of this review and in addition to the custom version of MACWIS Report No. MWZ1271 referred to above, the Monitor's office requested specific data reports from the defendants related to the intake and investigation of maltreatment in care reports received during the 2015 calendar year.[117] Data requests included reports addressing the following categories of data related to maltreatment in care reports received during the targeted

---

[112] The defendants developed and produced a weekly version of MACWIS Report No. MWZ1271 specifically as a means to promptly identify closed maltreatment in care investigations so they could be assigned to a MIC reviewer in sufficient time to complete the MIC review within the requisite time period following the completion of the investigation.

[113] *See* Ex. 27, June 2, 2016 e-mail from Alexis Holly to Grace M. Lopes with attachments, redacted.

[114] The Monitor has identified and reported previously on limitations in the data the defendants have produced in response to this MSA reporting requirement. *See, e.g., May 2014 Report* at 194-196. The specification for the required data report was modified pursuant to an agreement the parties reached in March 2015 and at the end of December 2015 the defendants began to produce superseding monthly reports dating back to 2013.

[115] *See* Ex. 28, May 20, 2016 e-mail from Grace M. Lopes to Cindy Greer with attached list of 163 maltreatment in care investigations that appeared on MACWIS Report No. MWZ1271D but not on MACWIS Report No. SBRD06, redacted.

[116] *See* Ex. 29A, June 28, 2016 e-mail from Tracy Aynes to Grace M. Lopes with attachment, redacted.

[117] *See, e.g.,* Ex. 29B, July 18, 2016 e-mail from Grace M. Lopes to Cindy Greer.

period: the date the report was received, the date the report was entered into MACWIS, and the date the report was assigned to a worker for investigation; whether the reports were sent directly from MCI to SIU, sent to a county office for investigation from SIU, or sent from a county office to SIU for investigation; and whether a report was screened in or not, and if screened out, the reason for the screen out decision. The Monitor also requested data concerning HEAT tickets entered between January 1 and December 31, 2015 related to maltreatment in care investigations and other relevant quality improvement data.

Throughout the assessment process the defendants cooperated fully with the Monitor's office, working to identify the reasons for the significant data issues that the Monitor identified and to produce data responsive to the Monitor's specific data requests.

Based upon the information the defendants produced in response to these data requests as well as in response to their monthly reporting obligations under the MSA, the Monitor's office completed extensive data analyses to identify strengths, areas in need of improvement, and other trends. The following summarizes the results of those analyses.

**B. Intake Reports and Screening Decisions**

Pursuant to the MSA, all allegations of maltreatment of a child in custody must be investigated by a caseworker who has received training in the investigation of maltreatment in out-of-home placements and has no ongoing connection to the foster care case.[118] Relevant MDCPS policy requires that any report "that meets the statut[ory] and DFCS criteria for maltreatment or is a report of corporal punishment and the identified victim is a foster child"[119]

---

[118] MSA §II.B.1.c. SIU staff have reported that on "rare" occasions, instead of the assigned investigator, the child's COR worker may see the child face-to-face to initiate the investigation when the SIU investigator cannot do so on a timely basis. At least one manager indicated that in these circumstances there is a preference for the child's assigned caseworker to initiate the investigation. As noted above, *supra* note 65, this is not consistent with MSA requirements. *See* MSA §II.B.1.c.

[119] Ex. 1, *supra* note 6, §II.D.2.f.

must be screened in and the investigation must be initiated within 24 hours.[120]  This is consistent with MSA timelines for initiation of maltreatment in care investigations.[121]  As noted above,[122] in 2014, in response to MSA requirements which were crafted to address limitations in the maltreatment in care investigative process,[123] the defendants established the SIU to handle the screening of and investigations into all reports of maltreatment in care.

By way of context, according to monthly data produced by the defendants, as of December 31, 2015 there were a total of 5,148 children in MDCPS custody.  Defendants report that during the 2015 calendar year there were a total of 7,743 unique children in custody for at least one day. In response to the Monitor's requests, the defendants submitted data reporting on the total number of maltreatment reports in 2015 involving children in custody and whether each report was screened in for investigation or screened out.[124]  According to the data provided, in 2015 there were 1,130 intake reports (an average of 94 per month) alleging maltreatment of a child in custody.[125]  Of the total 1,130 reports, 757 (67 percent) were screened in for investigation, and 373 (33 percent) were screened out.[126]  Based on the Monitor's review of the defendants' July 2016 data submission, it appeared that 680 screened in intake reports resulted in a completed investigation and the balance of 77 reports involved children who were not in custody; however, results of the Monitor's subsequent review based on the defendants' August 2016 data submission indicated that an additional eight screened in intake reports involved children in custody, for a total of 688 intakes involving children in custody and 69 intakes involving children who were not in custody.  As noted above, despite initial data cleaning efforts,

---

[120]  *Id.* §II.D.2.
[121]  MSA §II.B.1.e.2.
[122]  *Supra* at 14.
[123]  MSA §II.B.1.e.2.  For background on these issues, *see, e.g.*, *September 2010 Report* at 106-110.
[124]  Defendants produced a data file on August 12, 2016 titled, "Maltreatment ANE Adhoc Report 08082016."
[125]  Ex. 30, Summary of Data, Maltreatment Reports and Investigations Involving Children in Care, Section 1.
[126]  *Id*.

the Monitor discovered through additional review of individual case records during the assessment and case record review process that the cohort of 688 included some number of children who were not in custody at the time of the alleged maltreatment. Nevertheless, as noted above, the magnitude of the data limitations does not appear to be so substantial that it would materially impact the analyses of the aggregate data presented below.

Figure 1 below reflects the relationship between the total number of maltreatment in care reports received during the 2015 calendar year and the number screened out by month.

**Figure 1. Maltreatment Reports Involving Child in Custody (CY2015)**



| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | **Total** | **Average** |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ■ Screened Out | 22 | 18 | 27 | 34 | 35 | 35 | 52 | 35 | 28 | 37 | 21 | 29 | **373** | **31** |
| ■ Screened In | 55 | 62 | 64 | 77 | 64 | 54 | 67 | 74 | 47 | 73 | 52 | 68 | **757** | **63** |
| Total | 77 | 80 | 91 | 111 | 99 | 89 | 119 | 109 | 75 | 110 | 73 | 97 | **1130** | **94** |

The Monitor reported previously that there was an average of nearly 50 maltreatment in care reports screened in per month for the 10-month period for which there was data between January 1 and October 31, 2013.[127] This compares with an average of 64 reports per month during the same 10 months in 2015. The increase may in part be explained by the fact that during the period January 1 through October 31, 2013 there were, on average, 3,976 children in

---

[127] *See June 2015 Report*, App. B, Ex. 23D, Sarah Kaye, Ph.D. and Diane DePanfilis, Ph.D., MSW, Maltreatment in Out-of-Home Care in Mississippi, June 2014 [hereafter Kaye & DePanfilis Report] at 2, 5.

custody whereas during the same 10-month period in 2015 there were on average 4,978 children in custody, a 27 percent increase.[128]

As reflected in Table 1, below, the data produced by the defendants also included the reason documented in MACWIS for the screen out decision. Analyses of the aggregate data indicate that the vast majority of screen out decisions were based on one of two reasons. The most frequently cited reason in 220 screen out decisions (59 percent) was that the report did not involve an abuse, neglect or exploitation allegation.[129] The second most common reason, for 105 of the intakes (28 percent), was that the report constituted a duplicate report.

| Table 1. Number of Screened-Out Intakes by Reason | |
| --- | --- |
| **Reason for Screen-Out** | **Number** |
| ANE Report Not Documented | 220 |
| Duplicate Reports | 105 |
| Out of Home Setting | 18 |
| One Child Injuring Another | 8 |
| Inappropriate Sexual Contact | 6 |
| Misuse of Assistance | 6 |
| Victim 18 Years or Older | 3 |
| Parent's Inappropriate Behavior | 3 |
| Peer Sexual Relations – Child is 16 | 2 |
| Dirty Home or Children | 1 |
| Unable to Locate Child/Family | 1 |
| **Total** | **373** |

The Monitor completed a case record review of a random sample of all screen outs during the period under review in 2015 to evaluate more closely the reasons for the screen out decisions and to determine if cases were being properly screened. The analyses of these data is reported *infra* in Section V.[130]

---

[128]  These figures are based on MACWIS Report No. MWZ0510, which reports one-day monthly population snapshots.

[129]  Ex. 30, *supra* note 125, Section 1.

[130]  *See infra* Section V.B.

1. Characteristics of Investigations

Using the data reported by the defendants regarding completed investigations,[131] the Monitor also analyzed the investigations into maltreatment in care reported during 2015 to identify key characteristics. The Monitor analyzed 680 of the 688 reports[132] of maltreatment in care related to maltreatment occurring in 2015, all of which had approved findings by the date of the analysis. As detailed in Table 2, below, the number of reports for which investigations were completed varied somewhat from month to month, with a high of 70 completed investigations in April 2015 and a low of 39 completed investigations in September 2015, an average of 57 per month.

| Table 2. Number of Completed Investigated Maltreatment in Care Reports by Month of Intake | |
| --- | --- |
| **Month of Intake** | **Total Number of Investigated Maltreatment in Care Reports** |
| January | 53 |
| February | 58 |
| March | 61 |
| April | 70 |
| May | 57 |
| June | 44 |
| July | 57 |
| August | 67 |
| September | 39 |
| October | 66 |
| November | 45 |
| December | 63 |
| **Total** | **680** |
| **Average** | **57** |

---

[131] Customized versions of the MACWIS Report No. MWZ1271 dated July 7, 2016 and August 25, 2016. These data included placement type, type of allegation and findings from the investigation.
[132] As noted above, there were eight additional identified maltreatment in care investigations that were not included in the universe used to draw the sample.

As context, according to data published on the Mississippi Department of Human Services website, there were 25,883 reports of child maltreatment investigated statewide in calendar year 2015.[133]  Thus, the reports related to the 680 investigations into maltreatment in care during 2015 constitute less than three percent of all reports of child maltreatment.

According to the data the defendants submitted, Region VII-W had the highest number of investigations into maltreatment in care during 2015, with Regions III-S and VI having the next highest numbers.[134]  Region V-W had the lowest number of investigations.[135]  Table 3, below, shows the regional distribution of maltreatment in care investigations compared to the percentage of the regional distribution of children in custody as of December 31, 2015.

**Table 3.**

| Region | Percentage of Completed Maltreatment in Care Investigations With Intake Dates in 2015 | Percentage of Children in Custody as of 12/31/15 (n=5,148) |
|--------|:---:|:---:|
| VII-W | 17.9% | 20.96% |
| III-S | 12.8% | 16.14% |
| VI | 12.6% | 14.16% |
| I-N | 7.1% | 8.12% |
| III-N | 5.7% | 8.08% |
| I-S | 9.7% | 7.17% |
| VII-E | 7.8% | 6.43% |
| IV-N | 4.0% | 4.39% |
| IV-S | 6.3% | 4.10% |
| II-W | 3.2% | 3.34% |
| V-W | 2.4% | 2.56% |
| V-E | 6.3% | 2.54% |
| II-E | 4.1% | 2.00% |

---

[133]  Mississippi Department of Human Services, Graphic Overview of Program Data, Family and Child Services, June 2016 report, found at http://www.mdhs.state.ms.us/statistics/mdhs-monthly-statistical-reports (last visited 12/1/2016).
[134]  Data reported for the period January 1, 2013 through October 31, 2013, indicate that the regions with the highest number of reports were Regions VII-W, I-S, and III-S.  Kaye & DePanfilis Report at 2, 5.
[135]  *See* Ex. 30, *supra* note 125, Section 5.

Harrison and Hinds Counties[136] had the highest number of investigated reports of maltreatment in care received in 2015, each with 80, almost double that of the next closest county, Jackson,[137] which had 46 investigations.[138]

The 680 investigated reports of maltreatment in care involved a total of 921 unique children in custody; of the 921 children, 160 (17 percent) were determined by the defendants to be victims in at least one substantiated maltreatment allegation. Table 4, below, shows the substantiation patterns relating to maltreatment in care reports, individual allegations, and unique children.

| Table 4. Substantiation Patterns of Maltreatment in Care Intake Reports | | |
|---|---|---|
| **Description** | **Total** | **Substantiated** |
| Total Number of **Unique Reports** Screened-in for investigations involving children in custody | 680 | 120   (18%) |
| Total Number of **Individual Allegations** for 680 Screened-in Reports involving children in custody | 1510 | 192   (13%) |
| Total Number of **Unique Children** Involved in at least One Allegation | 921 | 160   (17%) |

Nearly two-thirds of the maltreatment in care reports (65 percent) received in 2015 involved only one alleged child victim and 85 percent involved two or fewer children.[139] Fifteen percent of the investigated reports of maltreatment in care involved three or more alleged child victims. The total number of alleged child victims among all 680 reports was 1,064.[140] This is outlined in Table 5, below.

---

[136] These counties are in Regions VII-W and III-S, respectively.

[137] Jackson County is in Region VII-E.

[138] *See* Ex. 30, *supra* note 125, Section 5 for related data.

[139] *Id*. Section 4.

[140] A single report can include multiple children and an individual child may be the alleged victim of multiple allegations within a single report. Moreover, an individual child may be the subject of multiple non-duplicative reports. As noted there were 680 total reports involving 921 unique children. Among the 680 reports there were a total of 1,510 allegations (*i.e.,* child-allegations). Finally, counting every child in each investigation one time (*i.e.,* and not once for each allegation) yields a total of 1,064 children (*i.e.,* child-reports).

| Table 5. Number of Alleged Victim Children in Custody | | | |
|---|---|---|---|
| **Number of Alleged Victim Children per Report** | Number of Reports | % of Total (n=680) | Total Number of Children* |
| One Child | 444 | 65% | 444 |
| Two Children | 135 | 20% | 270 |
| Three Children | 66 | 10% | 198 |
| Four Children | 25 | 4% | 100 |
| Five Children | 9 | 1% | 45 |
| Seven Children | 1 | 0% | 7 |
| **Total** | **680** | 100% | **1064** |
| *Average Number of Alleged Victims per Report:* | | ***1.6*** | |

*This number does not reflect unique children and some children were identified in more than one report.

As noted above, the defendants produce a monthly data report regarding the rate of maltreatment in care.  The report includes child-level data on the preceding 12 months regarding all investigations into allegations of maltreatment in care, including the related investigation dispositions.  The data the defendants produced for the period January 1 to December 31, 2015 reflect the number of children in custody with substantiated investigations related to reports received during 2015 to be 38,[141] and not 160 as indicated by the Monitor's analyses of the data provided by the defendants.[142]

2.  Investigating Entity

The data produced by the defendants also included information about the investigating entity, and it indicated that notwithstanding the establishment of the SIU in 2014, county caseworkers continued to conduct investigations related to maltreatment in care reports during the 2015 calendar year.  Initial interview data suggested that between the time the SIU was established in July 2014 and June 2015, MACWIS issues were a significant factor contributing

---

[141]  Ex. 31, Excerpt from MACWIS Report No. SBRD06 for the report period January 1, 2015 to December 31, 2015.
[142]  *See* Ex. 30, *supra* note 125, Section 1.

to county caseworkers conducting maltreatment in care investigations instead of SIU investigators.[143]

In order to examine this issue and determine whether it was resolved after the June 2015 MACWIS changes, the Monitor's office conducted an analysis of the relevant data provided by the defendants. According to one of the customized reports for MACWIS Report No. MWZ1271,[144] of the 680 maltreatment in care investigations associated with reports received during calendar year 2015, 604 (89 percent) were completed by SIU investigators and 76 (11 percent) were completed by county investigators who were not assigned to the SIU.[145] Further analysis revealed that of the 76 investigations into allegations of maltreatment in care completed by the counties, 45 actually involved intake reports received *after* June 13, 2015 when the MACWIS changes were effective. In other words, 59 percent of the reports of maltreatment in care that were investigated by county investigators during 2015 involved intake reports received *after* June 13, 2015.

In order to examine the reasons why SIU investigators did not conduct this cohort of investigations, the Monitor selected a sample and interviewed relevant MDCPS staff for 30 of the 45 investigations (67 percent) conducted by county workers after June 13, 2015.[146] Staff

---

[143] Defendants reported that when the SIU was established various system changes in MACWIS were needed in order for the intakes to be routed automatically through MACWIS to the appropriate SIU managers instead of to the county and regional managers who had been responsible for maltreatment in care investigations prior to the establishment of the SIU. Between July 2014, when the SIU became fully operational, and June 13, 2015, when the MACWIS changes were introduced, the defendants employed various "work arounds" to direct maltreatment in care reports to the SIU, including e-mail notifications to SIU managers, Regional Directors and county Area Social Work Supervisors [hereinafter ASWS]. For a more detailed discussion of this matter, *see supra* 15-16.

[144] MDCPS custom MACWIS Report No. MWZ1271, submitted July 7, 2016. This report was cross referenced with a list of all investigators assigned to the SIU.

[145] *See* Ex. 30, *supra* note 125, Section 2. Two of the 604 investigations conducted by SIU investigators were conducted by SIU supervisors.

[146] The Monitor sought to determine the following: 1) the source of the referral to the county; 2) whether the investigation was properly referred to the county; 3) if referral to the county was inconsistent with MSA requirements, what was the documented reason, if any, for referral to the county; and 4) if the report involved maltreatment of a child in custody, whether the county made efforts to refer the investigation to the SIU.

from the Monitor's office interviewed both SIU investigators and supervisors as well as county

investigative staff and supervisors. In addition, for each of the 30 sampled investigations the

"sufficiency summary" screen[147] in MACWIS was reviewed along with copies of the relevant

investigative reports which are routinely provided to the Monitor's office. Of the 30

investigations in the sample, 15 reports (50 percent) were sent to a county for investigation by

SIU managers and 12 reports (40 percent) were sent to a county for investigation by the MCI

intake worker. The source of the referral to the county could not be determined for the three

remaining investigations in the sample.

The Monitor also examined whether the referrals of the reports to the counties were

appropriate under the MSA and MDCPS policies and protocols. Of the 30 reports investigated

by a county worker that were sampled by the Monitor, it appears that seven were appropriately

referred to the county for investigation: four of the seven reports involved allegations preceding

the child custody date, two involved allegations concerning child victims other than a child in

custody, and one was referred to the county because the information from the reporter was not

sufficient to identify the child or parent at the time of referral.[148] For two additional

investigations in the sample, it was not possible to determine whether the referrals were

appropriate under the MSA and MDCPS policies and procedures based on available data. Based

on data in MACWIS and interview data, it appears that the remaining 21 reports in the sample

should not have been referred to the counties for investigation.

In many instances the documentation in MACWIS relating to the reason for transmission

---

[147] The sufficiency summary screen is a tab in the Screening Report in MACWIS that is completed by SIU supervisors and reflects the decision to screen in or screen out a report.

[148] In this instance, it was later determined that the child was in custody at the time of the allegation and it appears based on interview data, that SIU requested that the county retain the case for investigation because it had already been initiated.

of an intake report to the county for investigation was unclear or inconsistent. For example, there were several instances in which notes entered in the sufficiency screens identified the maltreatment in care report as a "level three" and indicated that "SIU owns the screening," but nonetheless the county investigated the report.[149] The majority of the investigations in the sample that were screened in and sent to the county for investigation included no documented justification in MACWIS for the SIU referral of the case to the county.[150] Moreover, 16 of the 30 investigations investigated in the county were investigated by the caseworker assigned to the child's case. This is inconsistent with MDCPS policy and best practice standards.[151]

For those maltreatment in care reports referred by SIU to the counties for investigation, the county staff who conducted the maltreatment in care investigations and/or their supervisors who were interviewed offered a variety of explanations about why the SIU may have referred the report to the county or may have elected not to conduct the investigation after it had been inappropriately referred to the county. The reasons offered by county staff included the following:

- The allegations were not that serious;
- The child was on a trial home visit;
- The allegation involved a child in a non-licensed relative placement;
- There were workload issues at SIU;
- There was an urgent need for the investigation;[152]
- The county already had an open investigation and the new allegations involved the same child;[153]

---

[149] "Owning" the screening means that SIU, not MCI, will decide whether the report should be screened in for investigation.

[150] Among the 30 intakes reviewed (50 percent) there were also 15 "Level three" cases reflected in MACWIS as children in custody in which the county is noted to "own the screening," a designation which appears inconsistent with MDCPS policy.

[151] Ex. 1, *supra* note 6, §II.F.2.a.2.

[152] This reflects one case in which staff report that the Youth Court Judge ordered an immediate investigation into alleged maltreatment in care and a decision was made that the county could complete the investigation more quickly than SIU.

[153] It could not be determined from the interviews how many of these instances involved "duplicate reports" as defined in MDCPS policy. As noted above, *supra* note 59, according to the policy, a report is a duplicate report if it involves the same alleged perpetrator, same victim, same type of maltreatment, and same incident. *See* Ex. 1, *supra* note 6, §II.D.2.b. Interviewees suggested that in some instances the report was referred to the county even if some

- There was a MACWIS issue that resulted in misdirecting the report.

The Monitor also reviewed the MACWIS intake records for the 11 maltreatment in care intake reports that MCI referred to a county for investigation; however, the Monitor was unable to determine the reason for the referral to the county rather than to SIU. County staff reported that these referrals may have been attributable to the following factors:

- MCI failed to confirm custody status of the child or the status of the alleged perpetrator (*i.e.*, MCI did not check MACWIS thoroughly);
- There were MACWIS system issues;
- The reporter provided too little detail;
- The case was incorrectly coded as Level 2 (several cases) instead of as a Level 3;
- The child custody status was not correct in MACWIS at the time of the intake report.

The county staff who were interviewed reported that in the instances in which they asked about whether the maltreatment in care report should be referred to SIU for investigation, they were generally told by their supervisors to complete the investigation. However, many also stated that there was often e-mail communication between SIU and the applicable Regional Director or the county supervisor about who would be conducting the investigation. According to SIU managers, the counties may investigate maltreatment in care reports that are erroneously transmitted to the counties by MCI. They report that this occurs in instances in which there is a failure by the intake worker to properly identify the child's custody status.[154] In these instances, once the child is identified as a child in custody, a decision is made about whether the county or SIU will handle the investigation. The SIU managers report that the decision is based on consideration of the 30-day deadline for completing investigations and how much of the

but not all criteria were met. This is consistent with the findings from the case record review relating to screen out decisions in which only seven of the 12 reports (58 percent) that were screened out as duplicate reports actually met all four criteria.

[154] The failure to properly identify custody status can be due to multiple reasons, including that the reporter may have provided inadequate or incorrect information to the intake worker to enable proper identification of the child, the failure of the intake worker to confirm the custody status, or the child's correct custody status is not reflected in MACWIS at the time of intake.

43

investigation has been completed by the county worker at the time the child's custody status has been confirmed.

### 3. Timeliness of Investigations

The MSA requires that investigations into alleged maltreatment in care should be initiated within 24 hours[155] and completed within 30 days.[156]  The Monitor reviewed data produced by the defendants[157] concerning the initiation and completion of investigations related to reports of maltreatment in care received during 2015.  The data show that 82 percent of investigations were *both* timely initiated and timely completed.[158]  The data provided also show that performance in timely initiating investigations is better than it is in timely completing investigations, with 91 percent of investigations initiated within 24 hours and 87 percent of investigations completed within 30 days.  The average length of time to complete an investigation was 29 days.[159]  Figure 2 below reflects the percentage of investigations that met the MSA requirement for both timely initiation and completion of maltreatment in care investigations.

---

[155]  MSA §II.B.1.e.2.  Initiation is defined in MDCPS policy to include face-to-face contact or attempted face-to-face contact.  Attempted face-to-face contact requires the investigator to check the child's identified home and one of either the neighbor, school or daycare.  *See* Ex. 1, *supra* note 6, §II.E.3.
[156]  MSA §II.B.1.e.2.
[157]  MDCPS custom MACWIS Report No. MWZ1271, submitted July 7, 2016.
[158]  *See* Ex. 30, *supra* note 125, Section 2.
[159]  *Id.*

**Figure 2. Timeliness of Investigations**



Of particular concern is that 61 of the 680 investigations were not initiated timely, and 88 were not completed timely. The failure to initiate timely investigations in almost 10 percent of reported cases of maltreatment in care raises significant safety concerns for children in the defendants' custody because it means that over 60 children were not seen face-to-face and insufficient attempts were made to see the child face-to-face within 24 hours of the maltreatment report.

Analysis of the data the defendants produced indicates that an SIU investigator is far more likely to initiate an investigation into child maltreatment within 24 hours than is a county investigator (96 percent compared with 51 percent).[160] This underscores the Monitor's concerns about the high number of reports involving children in custody that are being investigated at the county level. Moreover, there is a significant variance in the timeliness of investigation completion between SIU and the counties. The Monitor's analysis indicates that 92 percent of SIU investigations of maltreatment in care reports are closed within 30 days, compared with 43 percent at the county level.[161] The data indicate that SIU investigators met the MSA timeliness standards for both initiation and completion of investigations in 89 percent of maltreatment in

---

[160] *Id.*
[161] *Id.*

45

care investigations during 2015, compared with only 25 percent of investigators at the county level.[162]  This is reflected in Table 6, below.

| Table 6. Timeliness of Investigations by Investigator Type | | | | | | | |
|---|---|---|---|---|---|---|---|
| Investigator Type | Total Number of Reports | Initiated Within 24 Hours and Completed Within 30 Days | | Initiated Within 24 Hours | | Completed Within 30 Days | |
| | | Number | Percent | Number | Percent | Number | Percent |
| SIU Investigator | 602 | 537 | 89% | 580 | 96% | 555 | 92% |
| Non-SIU Investigator | 76 | 19 | 25% | 39 | 51% | 33 | 43% |
| SIU Supervisor | 2 | 1 | 50% | 1 | 50% | 2 | 100% |
| **Grand Total** | **680** | **557** | **82%** | **620** | **91%** | **590** | **87%** |

There are also notable differences in the timely initiation and completion of maltreatment in care investigations based on the region and county in which the alleged maltreatment occurred.  Based upon the data the defendants produced, investigations involving allegations of maltreatment in care in five regions (Regions I-N, II-E, II-W, IV-N and V-E) were both initiated and completed within the required time frames over 90 percent of the time.[163]  The two regions with the highest number of reports (Regions VII-W and III-S) had among the lowest rates for investigations that met both initiation and completion requirements at 70 percent and 79 percent respectively.  Notably, investigations in Region VII-E had the lowest rate of timely initiation and completion at 64 percent, despite having only eight percent of the 2015 maltreatment in care reports originating in the region.[164]  Not surprisingly investigations originating from regions with the lowest reported number of maltreatment allegations were more likely to be initiated and completed timely.[165]

---

[162] *Id.*
[163] *Id.* Section 5.
[164] *Id.*
[165] Regions II-E, II-W and IV-N all had fewer than 30 reports and over 90 percent of investigations related to reports from each region were timely initiated and completed.  *Id.*

Of the 13 MDCPS regions, investigations of reports of maltreatment in care from 10 regions were initiated timely more than 90 percent of the time in 2015; of the three regions that did not meet the 90 percent threshold for timely initiation, all exceeded the 80 percent threshold.[166]  Maltreatment in care investigations stemming from reports from one of the 13 MDCPS regions were closed timely 100 percent of the time in 2015.  Timely closure standards were met 90 percent of the time in eight regions.  In 2015, Regions VII-E and VII-W timely closed maltreatment in care investigations only 66 percent and 77 percent of the time, respectively.[167]  This is reflected in Figure 3, below, which shows the percentage of investigations meeting the MSA requirements for timeliness of initiation and completion of investigations by region where the allegations originated.

---

[166] *Id.* Section 5.

[167] *Id.*  The case record review included questions designed to address the reasons why an investigation may not be initiated timely and why it may not be closed timely.  This data is outlined *infra* in Section V.

**Figure 3. Timeliness of Investigations by Region in which Maltreatment Was Alleged**



4. Allegation Types, Placements and Substantiation

This subsection reports the data on completed investigations by allegation type, placement type and substantiation.

Many of the maltreatment in care reports received during 2015 included multiple types of allegations. Indeed, the 680 reports of maltreatment that were subject to analysis reflected a total of 1,510 individual allegations. Over 90 percent of the reports (621) included at least one allegation of physical abuse or physical neglect; the next most common type of allegation involved emotional abuse or neglect.[168] This analysis is reflected in Table 7, below.

---

[168] *See* Ex. 30, *supra* note 125, Section 3.

| Table 7. Number and Percent of Maltreatment in Care Reports by Allegation Type | | |
|---|---|---|
| Allegation Type | Reports Including Allegation Type | |
| | Number | (n=680)* |
| Emotional Abuse/Neglect | 152 | 22% |
| Exploitation | 4 | 1% |
| Medical Neglect | 38 | 6% |
| Physical Abuse | 342 | 50% |
| Physical Neglect | 397 | 58% |
| Sexual Abuse | 79 | 12% |
| *Physical Abuse and/or Neglect* | *621* | *91%* |
| *\* Maltreatment in care reports frequently involve more than one type of allegation or multiple allegations of the same type involving more than one child victim. The percentages indicate the proportion of the 680 investigated reports that include (but are not necessarily limited to) each individual allegation type.* | | |

Of the 680 investigations, 110 investigations (16 percent) resulted in the substantiation of

at least one allegation.  Of the 1,510 individual allegations, a total of 192 allegations (13 percent)

were substantiated.[169]  As noted above, physical neglect, medical neglect, and emotional

abuse/neglect allegations were far more likely to be substantiated than were physical abuse

allegations with substantiation rates of 18 percent, 17 percent, 13 percent and seven percent,

respectively.[170]  Figure 4 shows the substantiation rate by allegation type.



Figure 4. Substantiation Rate by Allegation Type

- Total (n=1510)  13%
- Sexual Abuse or Exploitation (n=105)  6%
- Physical Neglect (n=662)  18%
- Physical Abuse (n=458)  7%
- Medical Neglect (n=42)  17%
- Emotional Abuse/Neglect (n=243)  13%

---

[169] *Id.*  In comparison, according to the June 2014 assessment conducted by Dr. Kaye and Dr. DePanfilis, there were 488 reports of maltreatment in care received between January 1 and October 31, 2013, 14 percent of which were substantiated.  Kaye & DePanfilis Report at 8.

[170] Notably, there were only 42 allegations involving medical neglect in 2015, but 17 percent were substantiated.

From a regional perspective, the highest rates of substantiation related to reports originating in Regions VII-W and VI, with substantiation rates greater than 20 percent (24 percent in Region VII-W and 23 percent in Region VI).[171]  Regions with the lowest substantiation rates include Region IV-S (seven percent), Region III-N (eight percent) and Region V-E (nine percent).[172]  Harrison, Marion, Alcorn and Stone Counties had the highest substantiation rates (at or over 30 percent); Hancock, Lauderdale, Simpson, Lee, Madison and Washington Counties had the lowest rate of substantiation at under ten percent.[173]  Notably, Madison County did not have a single report received in 2015 that resulted in a finding substantiating maltreatment in care.[174]

The Monitor also analyzed maltreatment in care reports by placement type.  The plurality of maltreatment in care reports investigated in 2015 involved children placed in traditional foster homes (39 percent), with relative licensed homes the next most frequent type of placement (17 percent).[175]  Non-licensed facilities accounted for less than four percent of child placements involved in investigated maltreatment in care reports; that rises to 14 percent if expedited pending relative placements are included in the calculation.[176]  These data are reflected in Table 8, below.

---

[171]  *See* Ex. 30, *supra* note 125, Section 5.
[172]  *Id.*
[173]  *Id.*
[174]  *Id.*
[175]  *Id.* Section 4.
[176]  Additional data related to placement type including substantiation by type of placement, whether the child was removed from the placement during the investigation, and whether licensing action was taken is addressed *infra* in Section V.

| Table 8. Alleged Victim Children by Placement at the Time of the Alleged Maltreatment | | | |
|---|---|---|---|
| **Type of Resource Home at the Time of Report** | | Number of Children | Percent |
| Adoptive Home | | 8 | 0.8% |
| Traditional Foster Home | | 413 | 38.8% |
| Therapeutic Foster Home | | 38 | 3.6% |
| Relative | Licensed Foster Home | 178 | 16.7% |
| | Expedited Pending | 113 | 10.6% |
| | **Not-Licensed** | **24** | **2.3%** |
| Group Home or Residential Facility | | 99 | 9.3% |
| Own Home (Parents/Other Caretaker) | | 137 | 12.9% |
| **Other Non-Licensed Provider** | | **14** | **1.3%** |
| Emergency Shelter | | 14 | 1.3% |
| Other (Acute care, runaway, etc.) | | 26 | 2.4% |
| **Total** | | **1064** | **100%** |

5.   The Maltreatment in Care ("MIC") Review and Associated Corrective Action Processes

As described in more detail above,[177] the MSA requires that the defendants review all investigations involving maltreatment in care within 30 days of the completion of the investigation for the purpose of identifying any case practice deficiencies and any remedial actions necessary to ensure the safety of the child victim and other children in the placement.[178] The MSA also requires that this review, referred to as the MIC review, identify any corrective action that is necessary to address safety issues and case practice deficiencies, which must be remediated within prescribed timelines.[179]  The defendants also are required under the MSA to monitor the initiation and completion of the associated corrective actions.[180]

---

[177]  *See supra* Section III.D.
[178]  MSA §II.B.1.d.
[179]  *Id.*  The Period 3 Implementation Plan [hereinafter Period 3 IP] requires that corrective action for safety issues is initiated within five days and corrective action for case practice deficiencies is initiated within 20 days.  Period 3 IP §§II.C.3.d. & e.
[180]  MSA §II.B.1.d.

In July 2014, in response to MSA requirements, the defendants established a specialized unit, the SRU, to review maltreatment in care investigations, identify all safety issues or case practice deficiencies, and track the corrective action process through the HEAT ticket system.[181] Implementation of these requirements was assessed as part of the September 2016 case record review.[182]  The Monitor's office also reviewed aggregate data derived from the HEAT ticket system that was produced in MDCPS monthly data reports and in response to more specific data requests made by the Monitor as part of this assessment and review process.[183]

According to monthly data reports submitted by the defendants,[184] as depicted graphically below, as of July 31, 2016, of the 680 identified maltreatment in care reports received by MDCPS during 2015, 594 reports (87 percent) had an investigation that was subject to a MIC review, an average of 50 per month.[185]

---

[181] For information about the HEAT system *see supra* note 7.
[182] *See infra* Section V for a presentation of the associated findings.
[183] According to MDCPS managers who were interviewed, the HEAT system does not track the results of all MIC reviews, but only those where a safety or case practice issue is identified.  Although requested by the Monitor, the defendants could not provide data on safety and practice issues identified through reviews of investigations conducted by MDCPS staff assigned to the Foster Care Review [hereinafter FCR] and Evaluation and Monitoring Units [hereinafter EMU].  As incidental to their work in the CQI division, staff assigned to the FCR and EMU Units review investigations and write HEAT tickets related to safety and case practice deficiencies revealed through the investigations.
[184] These data are contained in Manual Report No. MRIP4MRR.
[185] The Monitor's analyses of the MIC review data are included in the appendix to this report as Ex. 32, Summary of Data, Maltreatment in Care Reviews (MIC Reviews) and Related Corrective Action.



As noted above, in May 2016, prior to the defendants' July 2016 data submission regarding maltreatment in care reports received during 2015 and related investigations, the Monitor notified defendants of 79 investigations for which she could not find evidence of a required MIC review.[186]  Defendants acknowledged that 64 of the 79 required MIC reviews had not been conducted.

Of the 594 investigations that were reviewed, the SRU found at least one case practice deficiency or one safety issue in 113 investigations or 19 percent of the 594 investigations that were reviewed.[187]  In 82 of the reviewed investigations (14 percent), a safety issue was identified, and in 67 of the reviewed investigations (11 percent), a case practice deficiency was found.  Both safety issues and case practice deficiencies were found in 36 of the reviewed investigations (32 percent).[188]  This is reflected in Figure 5, below.

---

[186]  The failure to conduct timely MIC reviews and to report accurately on the MIC reviews that are conducted is described *supra* note 110.
[187]  *See* Ex. 32, *supra* note 185, at 1.
[188]  *Id*.

**Figure 5. Type of HEAT Tickets (Safety Issue vs. Case Practice Deficiency)**



As Figure 5 illustrates, data produced by the defendants also indicate that issues identified through the MIC review reflect only partial overlap among investigations with safety issues and case practice deficiencies identified. Put another way, of the reviews which identified an issue or deficit in the investigation, 73 percent involved a safety issue and 59 percent involved a case practice deficiency. There was overlap in 36 of those investigations, or roughly half of each cohort.

The data the defendants produced suggest that those regions with the highest percentage of investigations also resulted in the highest rates of HEAT ticket entries, although not in the exact proportion of and not necessarily consistent with the substantiation rates. Region VII-W had 18 percent of the 2015 investigations into maltreatment in care, and a 21 percent rate of identified issues and deficiencies resulting in HEAT ticket entries. Region VII-E had by far the highest rate of issues and deficiencies identified with 44 percent of all reviewed investigations resulting in at least one HEAT ticket entry. Table 9, below, reflects the number and rate of HEAT tickets by region.

**Table 9.**

| Region | Investigations Reviewed | Investigations With HEAT Tickets | Rate | |
|--------|------------------------|----------------------------------|------|---|
| **Percentage of Investigations With Safety Issues and Case Practice Deficiencies Identified by Region** | | | | |
| **I NORTH** | **46** | **5** | | **11%** |
| I SOUTH | 62 | 10 | | 16% |
| II EAST | 24 | 4 | | 17% |
| II WEST | 20 | 5 | | 25% |
| III NORTH | 31 | 6 | | 19% |
| III SOUTH | 74 | 9 | | 12% |
| IV NORTH | 27 | 4 | | 15% |
| IV SOUTH | 36 | 8 | | 22% |
| V EAST | 39 | 5 | | 13% |
| V WEST | 12 | 4 | | 33% |
| VI | 78 | 13 | | 17% |
| **VII EAST** | **41** | **18** | | **44%** |
| VII WEST | 104 | 22 | | 21% |
| Total | 594 | 113 | | 19% |

## V.    SUMMARY OF FINDINGS FROM CASE RECORD REVIEW

As noted above, the Monitor conducted an on-site case record review during the week of September 19, 2016, which included review of MACWIS records, paper case files, licensing files and records maintained by the Safety Review Unit.  Given the brief interval between the conclusion of the review and the submission of this report, the Monitor is able to provide only a brief summary of the key findings from the three random samples of case records that were subject to review.  However, detailed findings of the case record review are included in the appendix to this report.[189]

---

[189] *See* Exs. 33-35, *infra* notes 192, 196 and 201, respectively.

### A.  Summary of Case Record Review Findings: Mississippi Centralized Intake

The reviewers looked at Hotline practices for 32 randomly selected intake reports received by MCI between July 1, 2015 and December 31, 2015.[190]  The review included listening to the audio recording of 28 calls to the Hotline, reviewing four e-reports, and reviewing the Child Abuse Intake Form and the MACWIS intake report screens that are expected to be completed by the intake worker for each call s/he handles.[191]  As detailed in the appendix, the results of the case review of Hotline practice showed mixed results.[192]

Reviewers noted that the intake worker was appropriate in tone and content during 86 percent of the calls in the sample.  Additionally, in 100 percent of calls the worker provided an opportunity for the reporter to offer additional information at the end of the call.  Reviewers positively commented that intake workers consistently and accurately recapped the information provided by the reporter at the end of each call, noting this best practice was not always followed in other jurisdictions for which they had reviewed Hotline practices.

The case record review also showed, with several exceptions, generally high performance in the practice of the intake worker collecting or attempting to collect key information from the reporter.  In 100 percent of the sample, information about the child victim and a description of the alleged maltreatment were obtained and performance was over 90 percent in several areas, including the following: primary caretaker information (93 percent collected, four percent

---

[190]  The 32 reports were a subsample from the larger sample of 74 investigations reviewed.  The same reviewer who reviewed the investigation also completed the Hotline review.

[191]  Recordings were available for all 28 reports received through calls to the Hotline and copies of each of the four e-reports were also available.  The Child Abuse Intake Forms, which are completed by the intake worker during the call to capture critical information and then used to enter the information into MACWIS, were only available for 15 of the Hotline calls reviewed.  Defendants reported that all Child Abuse Intake Forms prior to September 15, 2015 had been destroyed during a clean-up effort at the Hotline.

[192]  For a detailed analysis of the findings from the Hotline case record review, *see* Ex. 33, Mississippi Centralized Intake (MCI) Reports: Results of September 2016 Case Record Review.

attempted), reporter information (86 percent collected, 14 percent attempted), other household members (79 percent collected, 14 percent attempted), and alleged perpetrator information (96 percent collected, four percent attempted).  Among areas of concern, however, were efforts to obtain the date the alleged victim was last seen by the reporter, which was either obtained or sought in only 61 percent of the audited calls.  Other areas in need of improvement include obtaining information about the physical description and address of the home, which was either obtained or sought in only 83 percent of reports, and whether the reporter discussed the allegations with the alleged perpetrator, which was either obtained or sought in only 72 percent of the reports.

During the call, intake workers manually record information collected on the Child Abuse Intake Form.[193]  Performance declined in almost all areas when the worker transcribed the information obtained from the reporter during the call to the Child Abuse Intake Form.[194]  In over 20 percent of the calls that were reviewed, the following critical information, among other pertinent information, was *not* accurately collected on the Child Abuse Intake Form although it had been provided during the call:

- Physical description/address of the home
- Relative/witness/secondary caretaker information
- Description of maltreatment for each child
- Date the reporter last saw the victim
- Whether reporter discussed allegations with alleged perpetrator(s)
- Alleged perpetrator's response to discussion of allegations

---

[193]  *See* Ex. 7, *supra* note 27, Child Abuse Intake Form.
[194]  *Id*.  The intake worker is expected to use the form to guide the reporter through providing the information specified and to note the answers provided by the reporter on the form.  The completed form is then used as the basis for entering the information into MACWIS.  As previously noted, Child Abuse Intake Forms were not available for any calls prior to September 15, 2015.  According to the defendants these forms were destroyed during a clean-up effort at the Hotline earlier this year.

The failure to be more accurate and comprehensive in completing the Child Abuse Intake Form significantly raises the likelihood that key information will not be entered into MACWIS, which may impact screening and investigative decisions.

As noted above, defendants rely on a practice in which information collected on Child Abuse Intake Forms is subsequently recorded in MACWIS.  The use of this form introduces an additional step where key information collected from the reporter could either be recorded incorrectly in MACWIS or not recorded at all.  Defendants should review this business practice and determine whether the practice is appropriate in light of the findings in the case record review or whether direct data entry of the information into MACWIS during the Hotline call is likely to reduce the error rate.

It is noteworthy that the case record review found that the intake workers performed quite highly in transcribing the information from the Child Abuse Intake Form into MACWIS.  The findings of the case record review suggest that when reported information is reflected in the Child Abuse Intake Form, it is accurately entered into MACWIS and thus it is available to inform the screening decision, and to the investigator for reports screened in for investigation.

### B.  Summary of Case Record Review Findings: Screen Out Decisions

The Monitor also conducted a case record review of a random sample of screen out decisions.  Forty reports of maltreatment in care received between July 1, 2015 and December 31, 2015 which were screened out were reviewed.[195]  As noted above, detailed findings are presented in the appendix to this report.[196]

---

[195]  There were a total of 202 reports screened out during the six-month period under review.  Twenty percent of these screened out reports were randomly selected for review.

[196]  *See* Ex. 34, Screen-Out Reports: Results of September 2016 Case Record Review, for a full analysis of the results of the review of the 40 screen out decisions.

Results from the case record review show that in the sampled screen outs, the screen out reason indicated in MACWIS was "child not being in custody" in five percent of reports, "duplicate report" in 30 percent of reports, report did not involve action of the placement provider or household member in 53 percent of reports, and report did not meet the legal definition of maltreatment in 13 percent of reports. Aggregate data concerning screen out decisions described *supra* in Section IV.B. is only somewhat consistent with these findings. The aggregate data showed that 28 percent of reports were screened out as duplicate reports compared with 30 percent in the sample in the case record review, but 59 percent of the screen out decisions in the aggregate data were based upon an allegation not involving abuse, neglect or exploitation, whereas that cohort constitute only 13 percent in the sample.[197] Some of the difference may be accounted for by the fact the aggregate data provided by defendants did not report data separately on whether the allegation involved actions of the resource parent or placement provider whereas these data were tracked specifically in the case record review.

There were several notable findings from the case record review involving screen out decisions. First, the screen out decision was deemed to be appropriate in only 78 percent of reports. In 23 percent of reports (or more than one in five screened out reports), the reviewer determined that the report should have been *screened in*. Reviewers found that nine of the 40 reports reviewed, some of which were screened out for more than one reason, met the criteria for investigation and should have been subject to a full investigation.[198]

---

[197]  *See supra* Section IV.B.

[198]  As noted, several of the reports had multiple reasons indicated for why the decision to screen out was in error. The most frequently cited reasons for finding that the screen out decision was in error was that the report did not meet all the criteria of the definition of "duplicate report" followed closely by the reviewers' conclusion that the report in fact met the definition of legal maltreatment and involved action of the resource parent or placement provider.  *See* Ex. 34, *supra* note 196.

Another issue identified through the review of screen out decisions involves duplicate reports. Under MDCPS policy, to meet the definition of "duplicate report" the intake report must involve the same alleged victim, perpetrator, type of alleged maltreatment *and* the same incident; in other words, all four criteria must be the same in the new report. However, the case record review found that only seven of the 12 reports (58 percent) screened out as a duplicate report actually met all four criteria. This raises the question about whether reports designated as duplicate reports in the aggregate data (28 percent) in fact meet all required criteria. Defendants should further evaluate whether reports being screened out as duplicate reports are meeting all four criteria for screen outs and if not, ensure changes are implemented so that all requirements are satisfied before a report is screened out as a duplicate report.

Another significant finding concerned whether the screen out decision was reviewed through the MDCPS QI process. Defendants reported that they review all screen out decisions related to maltreatment in care reports. The case record review found that the decision to screen out a report was reviewed through the QI process in only 35 percent of the reports, and was not reviewed through the QI process in 65 percent of reports in the sample. The case record review found that when the QI process was completed (for 14 out of 40 reports in the sample), there was a very high percentage of reports (93 percent) that were deemed to have been screened out appropriately. In light of the high number of instances in which the reviewer concluded that the screen out decision in the case record review did not meet policy standards, it is critical for defendants to ensure implementation of ongoing and robust QI processes. Further, the QI process should include an appropriate tool to ensure the record fully supports the screen out decision.

### C.  Summary of Case Record Review Findings: Investigations

The Monitor also conducted a case record review of a random sample of maltreatment in care investigations completed between July 1, 2015 and December 31, 2015.[199]  Seventy-four investigations involving 113 unique children were subject to the full review.[200]  At the time of the report of alleged maltreatment, these children were placed in the following categories of placements: 42 percent were in traditional licensed foster homes, nine percent were in therapeutic foster homes, 14 percent were in licensed relative homes, eight percent were in expedited pending relative foster homes, and five percent were in unlicensed relative homes.[201]  In addition, 18 percent were in a residential treatment facility, group home, emergency shelter or placed with some other unlicensed provider.[202]  The vast majority of the intake reports that led to the investigations were made by mandated reporters.[203]  Key preliminary findings of the case record review are summarized below and detailed in the appendix to this report.[204]

Ninety-seven percent of investigations in the sample were conducted by SIU, which is higher than indicated by the aggregate data provided by the defendants for the same period, in which only 89 percent of the investigations (604 of 680) were conducted by SIU.[205]  The SIU alone was notified of the maltreatment in care report in 78 percent of the investigations;  the

---

[199]  As noted above, *supra* note 14, the parties requested that the Monitor target this time period and reduce the number of investigations in the sample.

[200]  A total of 85 investigation reports were reviewed.  Eleven were removed from the sample because review of the record indicated the child was not in custody when the alleged maltreatment was reported to have occurred or the allegations did not involve actions or neglect by a resource parent or facility staff.

[201]  *See* Ex. 30, *supra* note 125, and Ex. 35, Intake, Investigation, MIC Review, Licensure:  Results of September 2016 Case Record Review, for a detailed presentation of the analyses.

[202]  *See* Ex. 35, *supra* note 201, at 1.  Additionally, three percent were in their own home at the time the report was made.  In most of these cases the report was made after the child returned home.

[203]  *Id.*

[204]  *Id.*

[205]  *See* Ex. 30, *supra* note 125.  This variance may be attributable, at least in part, to the Monitor's discovery that some of the 680 investigations included in the aggregate analysis were subsequently determined to involve children who were not in custody.  It would be appropriate for non-SIU investigators to investigate these maltreatment reports.

county and SIU were both notified of the report in 19 percent of the investigations, and the county alone was notified of the report in just three percent of the investigations in the sample.[206]

The prevalence of allegations by type included in the 74 investigations reviewed was largely consistent with allegation type reflected in the aggregate data. Twenty-three percent of allegations in the sample that was reviewed involved emotional abuse/neglect (22 percent in the aggregate data), five percent involved medical neglect (six percent in the aggregate data), 65 percent involved physical abuse (50 percent in the aggregate data), 55 percent involved physical neglect (58 percent in the aggregate data) and 12 percent involved sexual abuse/exploitation (12 percent in the aggregate data). The most common type of allegation that was substantiated in the investigations reviewed in the sample was emotional abuse/neglect, which had an 18 percent substantiation rate. This compares with a 13 percent rate of substantiation of emotional abuse allegations in the aggregate data. The substantiation rate of physical neglect allegations was 18 percent in the aggregate data whereas it was only five percent in the investigations reviewed in the sample.

In five investigations of the 74 investigations in the sample, (seven percent), the MDCPS investigators determined that the facts in the report warranted an immediate response and responded accordingly in all five investigations. In fact, for these five investigations, consistent with MDCPS policy,[207] the average time to initiation was 3 hours and 44 minutes.[208] However, reviewers also found, based upon the information in the intake report, that in seven of the remaining 69 reports (ten percent), an immediate response by the investigator was warranted but

---

[206] *See* Ex. 35, *supra* note 201, at 1.
[207] Under the policy, if allegations in a report suggest the child is in "imminent danger," an immediate response is required. Imminent danger is defined as "clearly observable behavior, or a situation that is actively occurring, is about to occur, or is likely to occur in the present time and would cause serious harm." *See* Ex. 1, *supra* note 6, at §II.E.3. *See also* Ex. 35, *supra* note 201, at 2.
[208] Ex. 35, *supra* note 201, at 2.

not deemed to require an immediate response by the investigator and, in fact, in these cases the investigator did not respond immediately.[209]  While an immediate response would have been required for those reports designated as requiring an immediate response by MDCPS policy and prevailing professional standards, it should be noted that this standard is not incorporated into the MSA, which provides 24 hours to initiate all maltreatment in care investigations.  In two of the seven investigations in which reviewers found an immediate response was needed but not effected, the investigation was not initiated within 24 hours as required by the MSA.

In the investigations in the case record review, 77 percent were both initiated within 24 hours and completed within 30 days, compared with 82 percent in the aggregate data.[210]  The data from the case record review show that only 82 percent of the investigations in the sample were initiated within 24 hours.[211]  This is lower than the findings from the aggregate data provided by defendants, where the data show that 91 percent of the investigations were initiated timely.[212]  Investigations in the case record review sample were closed within 30 days, 92 percent of the time, compared with 87 percent timely closure of investigations reflected in the aggregate data.  Investigations in the case record review with findings of "substantiated" were both timely initiated and closed in 100 percent of sampled cases, while investigations with findings of "unsubstantiated" were both timely initiated and closed in only 74 percent of sampled cases.[213]

The case record review also assessed whether the investigator visited the physical premises where the alleged child victim was living and documented an adequate narrative with

---

[209] *Id.*
[210] *See* Ex. 35, *supra* note 201, at 2, and Ex. 30, *supra* note 125, Section 2.
[211] *See* Ex. 35, *supra* note 201, at 2.  In two cases, the alleged child victim was not seen face-to-face within 24 hours but attempts to see the child face-to-face that meet policy requirements were documented in the record (*i.e.,* attempting to see the child at home and either at school, daycare or neighbors).
[212] Ex. 30, *supra* note 125, Section 2.
[213] Ex. 35, *supra* note 201, at 2.

the appropriate information for determining the child's safety and well-being. The results indicate that the premises were visited 91 percent of the time and that a narrative was completed for only 82 percent of all homes cited in the maltreatment reports.[214] The case record review also showed that 26 of the 74 investigations (35 percent) either did not describe the physical environment or did not adequately address the children's safety and well-being needs in a required narrative.[215]

The reviewers also examined the placement decisions made during the investigation for the cohort of alleged child victims. For 39 percent of the investigations (26 investigations), all alleged child victims remained in the placement during the investigation, and some or all of the alleged child victims were removed 21 percent of the time (14 investigations).[216] In 39 percent of the investigations (26 investigations), the reviewers were unable to determine placement status due to a lack of documentation, a high percentage given the importance of the placement decision.[217] Notably, in 17 percent of the investigations (11 investigations), the reviewer disagreed with the placement decision. Reviewers also disagreed with the decision regarding placement in 15 percent of investigations (4 investigations) in which all children remained in the placement.[218] Two of the investigations in which the reviewer disagreed with the placement decision involved decisions to remove the child victim and four involved investigations in which the child remained in the placement. Comments by the reviewers who disagreed with the

---

[214] *Id.*

[215] *Id.*

[216] *Id.* at 3. Of the 74 investigations reviewed, children had already left the placement by the time the report was received so the placement data reflects children in 66 placements.

[217] In a prior report, the Monitor reviewed the facts surrounding the fatality of a child in custody. One of the findings from the review was that nowhere in the record was there a documented, affirmative decision by MDCPS staff to place the child in the resource home where he died. When the defendants take a child into custody there must be no ambiguity about the decision regarding where to place the child and who made the decision. *See The Court Monitor's Interim Report to the Court Regarding Defendants' Performance During Period 5*, filed January 6, 2016 [Dkt. No. 674], at 84-91.

[218] *See* Ex. 35, *supra* note 201, at 3.

placement decision noted for two investigations that the resource parent had used or allowed use of corporal punishment on more than one occasion and in one of these cases, voiced the intent to use it again. Two other reviewers disagreed with the decisions to permit two children to remain at facilities with high numbers of prior reports and substantiations. Reviewers also identified two instances in which other children were placed into the placement during the pending investigation contrary to best practices and professional standards.

The findings from the case record review concerning safety and risk assessments were mixed. As previously noted, MDCPS policy requires a safety assessment to be completed, staffed with a supervisor and documented in a MACWIS narrative.[219] Of the 74 investigations reviewed, 57 percent included a narrative summarizing a completed safety assessment within seven days of intake,[220] and only 16 percent of the narratives included a summary of the initial safety discussion with the supervisor.[221] The safety and risk assessment tool in MACWIS however, was completed in 96 percent of the investigations. Reviewers identified 12 investigations in which a safety plan was needed, and found that a safety plan was completed in only 58 percent (seven) of those investigations. Only four of the seven investigations in which the safety plan was developed (57 percent) addressed all of the safety issues present.[222] In only five of the 12 investigations in which a safety plan was needed (42 percent) was a safety plan

---

[219] *See* Ex. 1, *supra* note 6, at §II.E.4.
[220] The policy requires that safety should be assessed at the time of the initial contact with the child and that a staffing consultation with the supervisor to discuss safety should be held and documented in MACWIS within five days, but interviews with SIU managers indicated the time frame for consultation with the supervisor and data entry into MACWIS is seven days.
[221] *See* Ex. 35, *supra* note 201, at 4.
[222] *Id.*

developed and implemented in its entirety.[223]  For the completed safety and risk assessments, 82 percent of the investigations had a final risk rating of no/low risk, 15 percent had a final rating of medium risk, and only one percent had a final risk rating of high risk.[224]

Reviewers were asked if they had concerns with the quality of the safety narrative or safety and risk assessment tools completed in the investigations that they reviewed.  In half of the investigations in the sample reviewers expressed a concern with one or both of the safety narratives or safety and risk assessment tool in the investigation.[225]  In many instances the concern was based upon the failure of the investigator to complete the safety narrative at all (32 investigations, or over 40 percent of the investigations reviewed).  In other instances, among other limitations, the reviewers noted that the safety and risk tool may not have addressed all allegations, the allegations or facts were not accurately portrayed, risk factors uncovered during the investigations were not considered in the safety and risk tool, or investigators underestimated the risk of future maltreatment given the resource parents' responses to issues raised during the investigation.

In the investigations reviewed as part of the case record review, one or more allegations of maltreatment were substantiated in 11 percent of investigations (seven percent of allegations), which is slightly lower than evidenced in the aggregate data which reflect that 13 percent of allegations were substantiated (18 percent of investigations).[226]  In 18 percent of the unsubstantiated reports, a policy violation was found.  Reviewers agreed with the decision to substantiate the allegations in seven of eight investigations (87 percent) but agreed with the non-

---

[223] *Id*.
[224] *Id*.  One additional investigation did not have a documented risk rating.
[225] *Id*.
[226] *Id*.  *See also* Ex. 30, *supra* note 125, Section 3.

substantiation decision in only 64 percent of the investigations.[227]  In instances in which reviewers disagreed with the decision, they commented that the investigation did not address inconsistencies in information, interviews were not sufficiently comprehensive, detailed or completed in private, some key collateral contacts were not interviewed, or that all allegations were not addressed in the investigation reports.

Reviewers also were asked to rate the overall quality of the investigation. Reviewers found that the overall quality of the investigation substantially or completely met all key elements of an investigation and were therefore of an acceptable quality in 53 percent of the completed investigations.  Reasons cited by reviewers supporting the acceptable rating for these investigations included that all appropriate collateral contacts were interviewed, that the interviews with the alleged victims, perpetrators and collateral contacts were thorough, and that the resource specialist was working closely with the investigator in many of these cases.  On the other hand, reviewers concluded that 36 percent of the sampled investigations only marginally met quality standards and 11 percent of the investigations did not meet the quality standards at all.[228]  Common themes in investigations identified as lacking quality and failing to meet quality standards included inadequate content in interviews (*e.g.*, investigator did not ask if child felt safe during interviews or did not ask follow-up questions), failure to interview all alleged victims, perpetrators and/or key collateral contacts, poor, inaccurate or incomplete documentation of the interview results or investigatory findings, failure to address past history or other inconsistencies in the report, and finally failure to investigate all allegations contained in the original report or that were identified through the investigation.

Reviewers also examined the licensing activities resulting from the reports of

---

[227] *See* Ex. 35, *supra* note 201, at 5.
[228] *Id*. at 4.

maltreatment in care that were in the sample. There was documented evidence of a completed licensure investigation in only 18 percent (13 investigations) of the investigations that were reviewed.[229] However, the case record review data indicate that the resource specialist/licensing specialist was interviewed by the investigator in 73 percent of the investigations in the sample, and interviews were attempted in an additional 17 percent of the investigations.[230] The data also show that the resource worker accompanied the investigator into the home in 52 percent of investigations involving a resource home.[231] Reviewers noted that when resource specialists went to the home, albeit not always at initiation of the investigation as required, they conducted safety checks, but rarely was there evidence in MACWIS or the paper records of a true licensing inspection. Of the 13 investigations in which evidence of some sort of a licensure investigation was found, two investigations (15 percent) found licensing violations and policy violations were found in ten investigations (77 percent), most often involving use of corporal punishment. Six of the licensing violation findings (46 percent) resulted in a corrective action plan, and seven (54 percent) had no corrective action plan. Data from the case record review show that the corrective action plan was timely implemented in four of the six cases (67 percent). There was no evidence of any license being revoked.[232]

The reviewers also looked at the MIC review process. Ninety-six percent of the investigations reviewed had a MIC review conducted by the SRU, and 85 percent of these reviews were completed within 30 days as required.[233] In the aggregate data, 87 percent of

---

[229]  *Id*. at 5.
[230]  *Id*. at 2. In considering the licensing-related data, it should be noted that MDCPS was not the licensing entity in all investigations reviewed. The Monitor has not had an opportunity to determine the instances in which MDCPS was the licensing entity.
[231]  *Id*. at 5.
[232]  *Id*.
[233]  A total of 11 investigations did not have a timely MIC review. Five of the MIC reviews were completed after six months. *Id*. at 6.

investigations had a MIC review.[234]  The case record review found that one or more safety issues were identified in eight percent of the sampled investigations that had a MIC review (compared with 14 percent in the aggregate data), and case practice deficiencies were identified in 10 percent of the investigations (compared with 11 percent in the aggregate data) that had a MIC review.[235]  However, reviewers found that the MIC reviews failed to identify safety issues in 20 percent of investigations and failed to identify case practice deficiencies in 57 percent of investigations.

The case record reviewers documented a number of themes related to case practice deficiencies that were not identified by the SRU in the MIC review, including the following: interviews with child victims were not thorough and did not address all of the allegations; investigators failed to expand investigations when new allegations were revealed during the investigation process; investigation reports did not always include all information discovered in the investigation process; and the information in the safety and risk assessment was not accurate. Finally, reviewers noted that in some cases the information recorded in the MIC review instrument by the SRU reviewer was not accurate.  For example, there were instances in which investigations were not initiated timely but the SRU reviewer found that initiation was timely.

Similarly, case record reviewers documented safety issues that were not identified by the SRU reviewers during the MIC review.  Among the safety issues that went unidentified were risk or safety ratings that were incongruent with information from the investigation.  MIC reviews also failed to identify several instances in which safety issues were present, the child remained in the same placement, and a safety plan was not put in place.  Additionally, in several investigations, children were not asked by the investigator whether they felt safe, yet this was not

---

[234] Limitations in the aggregate data may account, at least in part, for this discrepancy.  *See supra* note 110.
[235] *See* Ex. 35, *supra* note 201, at 6.

noted in the MIC review.  Another safety issue identified was the frequent use of corporal punishment by resource parents in violation of policy.  This remains a safety concern and MDCPS should consider strategies to address this recurring issue.

The case record review also examined the timeliness of corrective action associated with the MIC review process.  The MSA requires that corrective actions for safety issues must be initiated within five days and within 20 days for case practice deficiencies.[236]  Data from the case record review show that corrective actions relating to safety issues were entered into the HEAT system in five of six cases identified by the MIC review (83 percent), that all five were resolved, and that four of five safety issues (80 percent) were resolved timely.[237]  With respect to corrective actions for case practice deficiencies, data show that corrective actions were completed timely for only two of the seven deficiencies identified.

As noted above, complete summaries of the analyses of all data from the case record reviews addressed in this section are presented in the appendix to this report.[238]

## VI.    <u>RECOMMENDATIONS</u>

The following recommendations are provided for the parties' consideration in an effort to promote progress toward meeting MSA requirements and to improve the overall practice related to investigations into maltreatment in care.  The recommendations are informed by the results of the review and validation processes documented in this report.

---

[236]  Period 3 IP §§II.C.3.d. & e.
[237]  *See* Ex. 35, *supra* note 201, at 6.
[238]  *See* Exs. 33-35, *supra* notes 192, 196 and 201, respectively.

### 1. __Update the MDCPS Intake and Assessment Policy__

The SIU became operational in July 2014.  The evidence shows that the continuing

failure to update the MDCPS Intake and Assessment policy to reflect the establishment of the

SIU as the sole entity charged with screening and investigating reports of maltreatment in care

has created confusion for agency staff and in all likelihood contributed to some of the limitations

in the intake and investigative processes identified by the aggregate data and the adverse findings

from the case record review.[239]  For example, interviews indicate that staff are often unsure of

how to proceed with intake reports presenting unusual facts or nuances.  The data indicate this

has led to misidentifying some reports as involving maltreatment in care when they in fact did

not involve a child in custody or did not involve a resource parent or placement provider.

Inversely, in other cases, the lack of clear applicable policy contributed to some reports involving

maltreatment in care being misidentified as reports not involving maltreatment in care.

Similarly, with regard to other issues, the current MDCPS policy contains conflicting

directions to staff, or offers no direction at all.  The case record review and aggregate data

analysis identified evidence of inconsistency in screen out and substantiation decisions,

misapplication of the criteria for duplicate reports and the incorrect characterization of

allegations as involving maltreatment in care or in resource homes.  A child protection system

must have clear policy, processes and procedures to ensure that investigations into reports of

maltreatment in care are fair, reliable and thorough.  Accordingly, the MDCPS Intake and

Assessment policy should be promptly revised and updated to address comprehensibly and

completely all aspects of investigations into maltreatment in care from intake through the MIC

---

[239]  The Monitor confirmed that drafts of an updated policy had been developed, but defendants reported substantial delays in finalizing the updates.  Evidence from ongoing monitoring regarding this and other policy initiatives indicate that it would be advisable for the defendants to augment the resources allocated to policy development.

review process.  At a minimum, the policy should incorporate all of the requirements of the

MSA[240] and include:[241]

- Specific and clear standards for identifying and defining maltreatment in care (to include use of corporal punishment on children in custody), "resource reports," duplicate reports and other key criteria that are used to identify and screen a report as maltreatment in care;
- Clear processes defining which reports should be assigned to SIU for investigation and the notice requirements for counties and ongoing workers;
- Specific screen out criteria tailored to maltreatment in care reports to ensure all reports are investigated consistent with MSA standards.  The policy should specify the SIU as the entity responsible for making the screen out decisions for and conducting the investigations related to all reports in which maltreatment in care is alleged;
- Specific statements that the requirements for the conduct of investigations, including contacts with collateral contacts and review of records and documents listed elsewhere in the policy, also apply to maltreatment in care investigations;
- A specific description of the responsibilities of the ongoing worker during and after the investigation is concluded, including case record documentation requirements;
- A specific description of the role and responsibilities of the licensing worker and/or resource specialist during and after the investigation, with timeframes and case record documentation requirements;
- A more detailed description of the post investigation MIC review process from review through corrective action, with required timeframes for initiation and corrective action relating to identified issues or deficiencies.

### 2.  <u>Revise the Screening and Safety and Risk Assessment Tools</u>

As noted above, the Monitor's consultants examined key tools and instruments used by

MDCPS during the intake and investigative processes and made recommendations for changes to

the tools based upon best practices and professional standards.[242]  These recommendations,

which should be considered, are outlined below.

---

[240]  The policy incorporates many but not all MSA requirements.  For example, as noted herein, the policy does not address the establishment of the SIU which is reflected in the MSA through specific SIU staffing requirements.  *See* Final Period 4 IP §§III.A.3. & 4.
[241]  In addition, the qualitative review completed by the Monitor's consultants, which is included in the appendix to this report as Ex. 2, *supra* note 11, identifies a number of critical issues in the current policy and includes specific recommendations for changes to the policy that should be addressed.  *Id.* at 2-5.
[242]  *Id.* at 6-11.

First, the Monitor's consultants recommend that defendants modify the screening tool used by SIU to flag all reports involving corporal punishment of a child in custody in order to ensure that all are investigated. Currently, although MDCPS policy provides that cases involving corporal punishment of a child in custody should be screened in, the screening tool does not address this, contributing to the risk that such reports could be missed and screened out.[243]

Second, the Monitor's consultants recommend that the defendants review the current safety and risk assessment tool used by SIU and separate it into two distinct tools: one for safety and one for risk assessment.[244] Defendants should develop and implement a validated, reliable tool to address the safety of children in custody who have been identified as possible victims of maltreatment in care and to clarify how the determination of safe/unsafe is made.[245] The Monitor's consultants also recommend that defendants review the approach to determination of risk, which is now made solely by the investigator, is not automated based upon responses to the questions in the tool, and is conducted without any written guidelines.[246] They point out that assessment of risk in maltreatment in care investigations should consider the strengths and needs of the caretaker – key factors which are not currently accounted for in the MDCPS safety and risk assessment tool.[247]

---

[243] *Id*. at 6-7 for more specific information relating to this recommendation.

[244] As the parties know and as reflected in MDCPS policy, there are crucial distinctions between safety and risk in this context and they cannot be conflated. *See* Ex. 1, *supra* note 6, §II.B. and Ex. 2, *supra* note 11, at 9.

[245] *See* Ex. 2, *supra* note 11, at 8-11 for more specific information relating to this recommendation.

[246] The Monitor's consultants also recommend that the defendants consider practices in other jurisdictions that conduct strength and needs assessments versus family risk assessments. *Id.* at 11.

[247] *Id*. at 8-11 for more specific information relating to this recommendation.

### 3. Quality Improvement Practices Related to Screening Decisions Must be Conducted Routinely and Subject to Ongoing Assessment

In the immediate term, defendants should ensure they are consistently and appropriately implementing the QI process relating to screening decisions. In the longer term, defendants should reassess the existing QI processes related to screening decisions to ensure that these processes are promoting improvements in practice.

The case record review of screen out decisions found that 23 percent of screen out decisions were not adequate and that 65 percent of screen out decisions were not reviewed through defendants' QI process. This raises significant concern and poses a real risk to children in custody for whom maltreatment in care reports have been received. Defendants should immediately and consistently implement a QI process to review all screen out decisions involving maltreatment in care reports. Defendants should consider using a written instrument for this review that addresses the reason for the screen out, whether the MACWIS record supports the decision and whether the policy and definitions were applied correctly.

Defendants should also review the current QI process for screen out decisions to ensure it is capturing the information needed to assess the reasons for screen out decisions and fidelity to the policy. For example, the case record review and analysis of the aggregate data show that many of the reports screened out as duplicate reports were not in fact duplicate reports and that some reports are being improperly directed to the counties for screen out. The QI system used for the review of screen out decisions should be capturing these trends.

Finally, in order to ensure that the QI process is contributing positively to improvement in practices, data from the QI review should be reported at least quarterly to the MDCPS executive leadership and used for ongoing tracking and adjustment. Further, MDCPS should develop indicators to monitor for trends related to screen out decisions. Indicators monitored

could include frequency and timing of new reports of maltreatment in care received subsequent to the screen out decision.

### 4.  **Strengthen the MIC Review Process**

Defendants should enhance the MIC review process by correcting some inconsistencies in the review tool and reference materials to provide clearer guidance to SRU staff conducting the MIC reviews, expanding the type of data being collected through the MIC review process and using data from the process to analyze corrective actions and trends in investigative and casework practice.

Significantly, ongoing monitoring, analyses of the aggregate data and the case record review have all identified key limitations in the MIC review process, including the timeliness and completeness of MIC reviews[248] and the quality of the reviews that are conducted.  In fact, reviewers who examined the results of the MIC reviews completed by the SRU for the sampled cases found that 15 of 71 investigations reviewed by SRU staff had safety issues that were *not* identified during the MIC review, and 42 of the 71 investigations reviewed by SRU staff had case practice deficiencies that were *not* identified by the SRU-conducted review.[249]  The Monitor's consultants identified inconsistencies in the safety review instrument, guidelines and reference guide that may be contributing to the identified gaps and made specific recommendations to address these limitations which should be considered.[250]  In addition,

---

[248] *See, e.g.,* Ex. 32, *supra* note 185.

[249] *See* Ex. 35, *supra* note 201, at 6.  In some cases, the SRU identified one or more issues during the MIC review, but reviewers in the case record review identified other issues in the same investigation that were missed by SRU staff.  The data cited include cases where either no issue was identified as well as cases where one or more issues were identified during the review but others were missed.

[250] The Monitor's consultants have detailed in their report specific areas in which the instrument, guidelines and reference guide are not consistent and have made other specific recommendations for consideration that may enhance the MIC review process.  *See* Ex. 2, *supra* note 11, at 12-18.

defendants should review the training provided to SRU staff to determine if additional training or modifications to the current training regimen are needed.

Defendants also should consider enhancing the tracking and monitoring of MIC review results by conducting detailed analyses of patterns of MIC review findings and the effectiveness of corrective actions and reporting the results on a regular basis. Defendants should identify key data points for collection in order to report quarterly on trends in investigative and casework practice.[251]

### 5. Improve Systems for Validating Data and Routinely Make Data Relating to Key Indicators Available to Executive Managers

The Monitor's assessment also highlighted the ongoing issues concerning the quality of data relating to maltreatment in care. These issues are long-standing and require more effective interventions.

The report describes the difficulties the Monitor had simply establishing a baseline number of completed maltreatment in care investigations during 2015. Defendants produce management reports that are incomplete and at times inconsistent with one another. These data inadequacies are consequential for the safety of children in MDCPS's custody: SRU staff relied on a weekly data report that contained incomplete data, which resulted in some MIC reviews not being conducted until the Monitor brought the issue to defendants' attention. Defendants must prioritize collecting and reporting complete and accurate data related to child safety. Without waiting for an entirely new data collection infrastructure, as a first step defendants can improve

---

[251] By way of example only, data points to consider for monitoring include: number of investigations reviewed by the SRU compared with the total number of maltreatment in care investigations completed and number and percent of maltreatment in care investigations reviewed that fall within one of the following categories: 1) safety issue, distinguishing imminent safety issue from safety issue; 2) practice issue; 3) both; and 4) none. Other key data points for possible monitoring include timeliness of implementation of corrective action against the required timeframes, case practice deficiencies by type and/or worker, and safety issues by type and/or worker. These latter data would allow defendants to determine additional training needs for investigators and ongoing workers.

their data collection processes using resources already available to them. Consistent with the Monitor's prior recommendations, the defendants could begin to cross reference existing data sources they already maintain (*e.g*., MACWIS Report No. MWZ1271, MACWIS Report No. SBRD06, and MACWIS Report No. MRIP4MRR) to improve the quality of their reports. Reconciling existing data sources could help defendants to identify the underlying causes of systemic problems (*e.g*., programming errors), to "clean," or correct errors in or inaccurate data in MACWIS, and to identify opportunities for enhanced staff training to help reduce recurring human-error related data problems. Longer term defendants must assess and invest in improving the MDCPS data management and analysis capacity. Moreover, defendants must continue to cultivate an organizational culture in which data is used on an ongoing basis to assess and improve practice.

## 6. Assess SIU Investigative Training

The Monitor's preliminary review of the training afforded to SIU investigators did not establish that SIU investigators receive the formal, specialized training in SIU policies, procedures and maltreatment in care investigations that is contemplated by the MSA. Defendants should conduct a comprehensive review of the training provided to SIU investigators to ensure it addresses SIU policies, procedures and the unique issues that investigators may encounter in conducting investigations related to maltreatment in care investigations and includes appropriate testing in specialized investigative competencies. This comprehensive assessment should be informed by the results of the case record review.

### 7.  **Conduct Staffing Study to Assess MCI Staffing Needs**

Defendants should consider conducting a staffing study to assess MCI's staffing needs.[252] Data related to call volume, wait times, dropped calls and other key metrics can be generated to assess appropriate staffing levels.  Defendants should also consider including in this study an assessment of the barriers for accurately documenting on the Child Abuse Intake Form all of information collected during the calls, an issue identified in the case record review.  Failure to include in MACWIS all reported information can affect screening decisions by SIU and decision-making by investigators.  Defendants should specifically assess whether data received from reporters should be entered directly into MACWIS rather than captured on the Child Abuse Intake Forms and subsequently transcribed into MACWIS, a process which may increase necessary staffing levels and introduces the possibility of data being recorded inaccurately or lost.

### 8.  **Make Recordings of Hotline Calls Available to SIU Investigators**

The case record review found that the MCI intake worker was generally successful in obtaining critical information from the reporter.  However, reviewers found that not all key information provided by the reporter was entered into MACWIS by the intake worker.[253] Therefore, it was not available to the investigator initiating the investigation.  Reviewers who audited the telephone recordings noted that listening to the Hotline calls helped them assess the quality and credibility of the intake report and would be of benefit to any investigator. Accordingly, the defendants should consider implementing a process by which SIU investigators

---

[252]  As noted above, effective October 1, 2016 the Hotline will no longer process intakes related to vulnerable adults. This may affect the timing of any staffing study defendants elect to undertake but historical data on call volume related to vulnerable adults is available and can be isolated in order to obtain accurate data regarding calls relating to children.

[253]  For example, the case record review found that the address and physical description of the home was provided by the reporter but was not documented on the Child Abuse Intake Form in 20 percent of reports and the date the reporter last saw the alleged victim was not documented in 27 percent of cases.  *See* Ex. 33, *supra* note 192.

are provided with recordings of all Hotline calls concerning allegations of maltreatment in care and required to listen to the recording as part of the investigative process.

### 9. Establish Clear Processes for Investigations into Allegations of Maltreatment in Care in Facilities

Reviewers noted that in most investigations involving alleged maltreatment in care in facilities, investigators did not pursue the investigation once they learned the offending employee had been terminated. However, especially in light of the high number of allegations involving certain facilities, it is imperative that investigators during an investigation review and consider the facilities' hiring and training practices to ensure they are appropriate, implemented as intended and otherwise are not putting children at risk. Defendants should establish specific written protocols for investigations of maltreatment reports involving facilities and conduct related training.

### 10. For Maltreatment in Care Reports Involving Facilities, Work with the Appropriate Licensing Agency

Reviewers found a high number of allegations of maltreatment involving two facilities, including a high number of substantiated allegations. Defendants must establish a protocol for sharing such information with the agencies that license these facilities to ensure children are not put at risk. Further, the defendants should consider a moratorium in placing children in facilities with a track record of multiple substantiated allegations within a prescribed period, working with the Youth Court as needed to achieve this goal.

## VII.    CONCLUSION

The Monitor's assessment identified many significant issues related to maltreatment in care reporting, screening, investigation and quality improvement processes. A number of these issues have been addressed in previous reports. Defendants report that the draft version of this

report has informed current remedial strategies and that they are taking considerable steps to

implement the Monitor's key recommendations.

/ s / Grace M. Lopes
Grace M. Lopes (MBN 45693 *pro hac vice*)
Court Monitor
1220 19th Street, N.W.
Suite 500
Washington, D.C.  20036
(202) 232-8311
gmlopes@oymonitor.org


## CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2016 the Court Monitor's Report Pursuant to the
Stipulated Second Remedial Order was transmitted electronically to the following counsel of
record in this matter:

Kenya Key Rachal
Jake Adams
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
One Eastover Center
100 Vision Center, Suite 400
Jackson, Mississippi  39211

Harold E. Pizzetta, III
Assistant Attorney General
General Civil Division
Carroll Gartin Justice Building
430 High Street
Jackson, MS 39201

W. Wayne Drinkwater, Jr.
Michael J. Bentley
BRADLEY ARANT ROSE & WHITE LLP
188 East Capital Street, Suite 450
Jackson, Mississippi  39201

Marcia Robinson Lowry
Sara Robinson Glasser
A Better Childhood, Inc.
1095 Hardscrabble Road
Chappaqua, NY  10514

Christian D. Carbone
Dan Friedman
LOEB & LOEB LLP
345 Park Ave.
New York, New York  10154


/ s / Grace M. Lopes_____