# IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

OLIVIA Y., by and through her next friend, James D.  Johnson;
JAMISON J., by and through his next friend, Clara Lewis;
DESIREE, RENEE, TYSON, and MONIQUE P., by and through
their next friend, Sylvia Forster; JOHN A., by and through his next
friend, James D.  Johnson; CODY B., by and through his next
friend, Sharon Scott; MARY, TOM, MATTHEW, and DANA W.,
by and through their next friend, Zelatra W.; AND SAM H., by and
through his next friend, Yvette Bullock; on their own behalf and
behalf of all others similarly situated,

                                Plaintiffs.

                                           CIVIL ACTION NO.

v.                                    3:04-CV-251-TSL-FKB

PHIL BRYANT, as Governor of the State of Mississippi;
DONALD TAYLOR, as Executive Director of the Department of
Human Services; AND BILLY MANGOLD, as Director of the
Division of Family and Children's Services,

                                Defendants.

---

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT
## OF THE REMEDY PHASE OF THEIR RENEWED MOTION FOR CONTEMPT
## AND FOR THE APPOINTMENT OF A RECEIVER

# Table of Contents

**Page**

I.  INTRODUCTION ................................................................................................ 1

II. FACTS ............................................................................................................... 3

A.  Agreed Order – Continuing the Hearing on Renewed Motion for Contempt........... 3

B.  2015-2016 – Reorganization Begins................................................................ 4

    1.  Interim Remedial Order ("IRO") – December 22, 2015............................. 4

    2.  Stipulated Second Remedial Order ("SSRO") - May 19, 2016 ................. 5

    3.  Agreed Order for Suspension of Specific Obligations – October 14, 2016.. 6

    4.  Stipulated Third Remedial Order ("STRO") – December 19, 2016............ 6

C.  2017 - STRO – Growth Year ......................................................................... 6

D.  2018 - 2ND Modified Mississippi Settlement Agreement and Reform Plan – January 1, 2018 ............................................................................................ 7

III. DISCUSSION .................................................................................................. 8

A.  The Practical Effects of Defendants' Violation on Mississippi's Children............. 9

B.  Plaintiffs Have Demonstrated – and There Is Again No Genuine Dispute Concerning – The Essential Elements Of Civil Contempt. .................................. 10

    1.  The Element of a Court Order is Satisfied................................................. 11

    2.  The Element of an Order Requiring Certain Conduct in Clear Terms is Satisfied.................................................................................................. 12

    3.  The Element of Non-Compliance is Satisfied. ........................................... 12

    4.  Courts Have Consistently Held State Officials in Contempt in Analogous Circumstances. ...................................................................................... 13

C.  The Court Should Appoint a Receiver to Effectuate the Necessary Remedial Measures. ................................................................................................ 19

    1.  The Dire Circumstances of This Case Warrant the Appointment of a Receiver. ............................................................................................... 20

    2.  Courts in Similar Cases Have Appointed Receivers for Dysfunctional Public Agencies. ..................................................................................... 21

IV. CONCLUSION................................................................................................ 24

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Airlines, Inc. v. Allied Pilots Ass'n,*
   228 F.3d 574 (5th Cir. 2000) ..................................................11

*Aspira of New York, Inc. v. Board of Education of New York,*
   423 F. Supp. 647 (S.D.N.Y. 1976) ...................................18, 19

*Carty v. Farrelly,*
   957 F. Supp. 727 (D.V.I. 1997) ..............................................14

*Cobell v. Babbitt,*
   37 F. Supp. 2d 6 (D.D.C. 1999) ..............................................12

*Dixon v. Barry,*
   967 F. Supp. 535 (D.D.C. 1997) .......................................19, 20

*G.L. v. Zumwalt,*
   No. 77-0242-CV-W-1 (W.D. Mo. Dec. 7, 1992)......................16

*Gates v. Collier,*
   616 F.2d 1268 (5th Cir. 1980) ................................................10

*Ho v. Martin Marietta Corp.,*
   845 F.2d 545 (5th Cir.1988) ...................................................12

*Hutto v. Finney,*
   437 U.S. 678, 57 L. Ed. 2d 523, 98 S. Ct. 2565 (1978)...........10

*Lamar Fin. Corp. v. Adams,*
   918 F.2d 564 (5th Cir.1990) ...................................................10

*LaShawn A. v. Barry,*
   107 F.3d 923 (D.C. Cir. 1996) ................................................14

*LaShawn A. v. Kelly,*
   887 F. Supp. 297 (D.D.C. 1995), aff'd sub nom. LaShawn A. v. Barry, 107
   F.3d 923 (D.C. Cir. 1996) ................................................. *passim*

*Lelsz v. Kavanagh,*
   673 F. Supp. 828 (N.D. Tex. 1987) ...................................11, 14

*Maness v. Meyers,*
   419 U.S. 449, 95 S. Ct. 584, 42 L. Ed. 2d 574 (1975)............10

*McCord v. Maggio,*
   927 F. 2d 844 (5th Cir. 1991) ..................................................13

*Morgan v. McDonough,*
   540 F.2d 527 (1st Cir. 1976) ..................................................19

*Petroleos Mexicanos v. Crawford Enters., Inc.,*
   826 F. 2d 392 (5th Cir. 1987) ..................................................13

*S.E.C. v. AMX International, Inc.,*
   7 F.3d 71 (5th Cir. 1993) ..................................................11, 12

*S.E.C. v. Reynolds,*
   No. 3:08–CV–438–B, 2011 WL 903395 (S.D. Tex. March 16, 2011)...................................11

*Shaw v. Allen,*
   771 F. Supp. 760 (S.D. W. Va. 1990) ..................................................20, 22, 23

*U.S. v. City of Jackson, Miss.,*
   359 F.3d 727 (5th Cir.2004) ..................................................11

*United States v. Alcoa, Inc.,*
   533 F.3d 278 (5th Cir. 2008) ..................................................12

*United States v. City of Jackson,*
   318 F. Supp. 2d 395 (S.D. Miss. 2002)..................................................13, 14

*United States v. Tennessee,*
   925 F. Supp. 1292 (W.D. Tenn. 1995)..................................................12, 13

*United States v. United Mine Workers,*
   330 U.S. 258, 67 S. Ct. 677, 91 L. Ed. 884 (1947) ..................................................22

*Whitcraft v. Brown,*
   570 F.3d 268 (5th Cir. 2009) ..................................................11

## Other Authorities

Fed. R. Civ. P. 66..................................................19

## I.       INTRODUCTION

Plaintiffs – thousands of neglected and abused foster care children in Mississippi – bring this Motion in Support of the Remedy Phase of Their Renewed Motion for Contempt and seek appointment of a receiver for Mississippi's longstanding, dysfunctional child welfare system.

For the past eight years, Plaintiffs have tried repeatedly to ensure that the state operates a child welfare system that meets constitutional standards and complies with the standards to which the state itself has repeatedly agreed.  Unfortunately, Plaintiffs have been met with continuing non-compliance.  The state's noncompliance has by now become as routine as a metronome: the state fails to comply with orders to which it earlier agreed; the state issues earnest pledges of compliance, if only it is given another opportunity; another opportunity is extended; compliance never occurs.  This process is repeated endlessly.  All of this has occurred against the backdrop of a year – 2017 – during which monitoring of the state's performance was suspended; and with the assistance of a very well-regarded national technical assistance group, which has devoted countless hours over the last two years to ongoing work with the child welfare system and its officials.  Even now, more than ten years after originally signing a consent decree in which the state admitted to operating an unconstitutional child welfare system, defendants remain in blatant non-compliance with the most fundamental of requirements: that the agency be adequately staffed with professional caseworkers so that children in the state's custody receive constitutionally adequate care.

And now, the state's entire management structure is collapsing.  Two years ago, under the leadership of Commissioner David Chandler, a strong and competent management team was assembled – the first such team that seemed capable of building the capacity of the Mississippi Department of Child Protective Services to actually serve its children and families.  But with Commissioner Dickinson's succession to the office, that team has now dissolved.  Tracy Malone,

1

the Deputy Commissioner for Child Welfare's has announced her "retirement" effective June 30th.

*See* eBulletin attached hereto as Exhibit A.  Cindy Greer, another critical management team

member, has announced her resignation effective June 15.  Yet another team member, Takesha

Darby, was fired shortly after Commissioner Dickinson took office.  As will be shown at the

hearing on the present motion, it is apparent that Commissioner Dickinson is simply not capable

of operating the agency in such a way to achieve compliance with the Court's requirements.

In 2010, Plaintiffs filed their first motion for contempt as a result of the state's failure to

achieve compliance with the Court's orders.  At that time, the Court declined to hold defendants in

contempt.  For the next four years, Plaintiffs engaged in Herculean efforts to obtain usable data

from the state that would enable Plaintiffs and the Court to determine whether Defendants were

capable of complying or even attempting to comply with the Modified Mississippi Settlement

Agreement and Reform Plan (Dkt. No. 571) (the "MSA") entered by the Court on July 6, 2012.

The then Court-appointed Monitor filed report after report documenting Defendants' continued

failures to comply with the MSA and the Periods 3 – 5 Implementation Plans.

Those failures to achieve MSA compliance were widespread.  The state failed to produce

reliable data – or in many cases, any data at all – on key standards in the MSA;  there was

virtually no reliable information on hiring and worker attrition and no reliable information on

which to determine worker caseloads; there was a lack of information about maltreatment in care

and no information and feedback from the field about remediation steps; and the quality

improvement system was  barely functioning, with no data to demonstrate that it had indeed

improved quality.

In addition, and in an effort to find an alternative to returning to court, Plaintiffs negotiated

a court-ordered remedial plan that was "an alternative at this point to Plaintiffs' filing a motion for

contempt." [Corrected Order Creating Director for Sustainable Transformation and Transformation Team, July 9, 2014, (Dkt. No. 607) ("July 9 Order"), p. 1]. Defendants then failed to comply with a critical term of that order, rendering it a nullity.

All of this demonstrates that if abused and neglected children in Mississippi are *ever* to receive constitutionally adequate care at the hands of the state, it will be only after effective control of the system is placed in the hands of a receiver appointed by the federal court and answerable to the court. Only a court-appointed receiver can bring the state into compliance with this Court's prior orders and the dictates of the Constitution. After full compliance is achieved, this Court can consider a return of the system to the state. At this juncture, a failure to appoint a receiver would amount to judicial acquiescence in the state's continuing failure to meet its legal obligations.

## II.  FACTS

On March 9, 2015, Plaintiffs filed their Renewed Motion for Contempt, for an Evidentiary Hearing and for the Appointment of a Receiver [Dkt. No. 622 ("Renewed Motion for Contempt")] and Memorandum in Support [Dkt. No. 623]. In the Renewed Motion, Plaintiffs detailed the system-wide failures which demonstrated the Mississippi child welfare system's extensive failures, its inability to comply with this Court's Orders and its own endlessly continuing and hollow promises to reform its child welfare system.

### A.  Agreed Order – Continuing the Hearing on Renewed Motion for Contempt

On July 23, 2015, the parties entered the Agreed Order Continuing the Hearing on Plaintiffs' Renewed Motion for Contempt [Dkt. No. 664]("Agreed Order"). In it, Defendants *did not contest that they did not comply* with the MSA or with the Periods 3 and 4 Implementation Plans [Dkt. No. 664]("Agreed Order Continuing the Hearing on Plaintiffs' Renewed Motion for

3

Contempt", p. 4)](emphasis added).[1]  The Agreed Order further provided that Defendants would retain Public Catalyst, a national organization with experience in reforming child welfare systems, to conduct an organizational analysis of its provision of child welfare and foster care services, *Id.* p. 1, and that, if possible, the final organizational analysis report would become the basis of a negotiated court-enforceable remedial order based on Public Catalyst's recommendations.  *Id.*, p. 3.

The Agreed Order provided that in the event of further failure to comply by Defendants, Plaintiffs could immediately invoke the remedy provisions of the pending Renewed Motion for Contempt.  (Agreed Order, p. 4).

Public Catalyst's Organizational Analysis was completed on November 24, 2015 and on December 22, 2015, the parties filed the Interim Remedial Order [Dkt. No. 671, ("IRO")].

### B.   2015-2016 – Reorganization Begins

### 1.   Interim Remedial Order ("IRO") – December 22, 2015

The IRO provided for the complete administrative reorganization of the Mississippi Department of Family and Children's Services ("DFCS").  It provided that DFCS would be organized into a separate stand-alone agency, outside the Mississippi Department of Human Services and, in an effort to streamline its work with DFCS, it would have its own salary, hiring and contracting authority. *Id.*, ¶¶ 1-2.  Public Catalyst was directed to conduct a point in time caseload audit based upon weighted caseload standards set forth in their Organizational Analysis and, based on the caseload standards, Defendants would develop a plan to implement the MSA caseload standards as well as a plan for the recruitment, hiring and retention of an adequate

---

[1] Defendants admitted to the factual basis for a legal finding of contempt; moreover, Defendants agreed they are precluded from arguing that a finding of non-compliance rather than contempt legally precludes the imposition of a receivership. *Id.* p. 5

number of qualified caseworkers and supervisors. *Id.*, ¶ 7.  Other goals were set for Defendants, including, but were not limited to the following:

- by May 1, 2016, DFCS would equip all investigators with smart phones or tablets, *Id.* ¶ 9a;

- by July 1, 2016, DFCS would provide adequate computers to caseworkers, *Id.* ¶ 9b;

- by July 1, 2016, DFCS would have a qualified IT director in place, *Id.*  ¶10.

Under the IRO, Public Catalyst would be retained to provide technical assistance to the parties pursuant to the provisions of the Remedial Order so that Defendants could have technical expertise available to them in order to implement the necessary reforms.  *Id.* ¶ 12.

The IRO also provided that the parties would meet on April 1, 2016, to begin re-negotiating the terms of the MSA and the time-table for implementing its provisions.  *Id.*  ¶ 14. Finally, the IRO continued the remedy phase of the Motion for Contempt until May 15, 2016.  *Id.* ¶ 15.  As with the Agreed Order, the Interim Remedial Order provided that violations would allow Plaintiffs to move forward under Paragraphs 9 and 10 of the Agreed Order, (Interim Remedial Order, p. 8).

### 2.    Stipulated Second Remedial Order ("SSRO") - May 19, 2016

The parties continued their negotiations in May 2016.  The first major tasks were to determine whether Defendants had met their obligations to complete the administrative reorganization of the agency, including providing software and hardware to caseworkers, beginning their new hiring and training plans and getting better field resources into place.  *See* Stipulated Second Remedial Order, [Dkt. No. 694, ("SSRO"], ¶¶ 2A-L.  In addition, Public Catalyst was to conduct a second point-in- time caseload audit, conduct a validation and review of

a random sample of maltreatment in care reports and begin the process of placement licensing review. *Id.* ¶¶ 4, 5, 7, 8.

### 3. Agreed Order for Suspension of Specific Obligations – October 14, 2016

Since the parties were attempting to renegotiate the MSA, the Agreed Order for Suspension of Specific Obligations suspended some data reporting obligations by Defendants under the IRO and the original MSA.

### 4. Stipulated Third Remedial Order ("STRO") – December 19, 2016

The remaining two months of 2016 were spent by the parties renegotiating the provisions of the 2nd MSA [Dkt. No. 712]. On December 19, 2016, the Stipulated Third Remedial Order [Dkt. No. 713]("STRO")] was entered. The STRO reconfirmed that Defendants did not contest that they were not in compliance with the original MSA [Dkt. No. 571], nor did they claim that they had the capacity to comply with its provisions [Dkt. No. 713, p. 1¶ 1]. *Importantly, Defendants agreed that by December 31, 2017, they were required to be in full compliance with the caseload compliance performance targets established by Public Catalyst. Id.* ¶ 5c. That meant that by December 31, 2017, 90% of all caseworkers were required to have caseloads which were no larger than the required caseload targets.

The STRO provided that the remedy phase of the Renewed Motion for Contempt would remain in effect until the 2nd MSA went into effect. *See* STRO [Dkt. No. 713] at ¶¶ 9, 10.

### C. 2017 - STRO – Growth Year

2017 was a year of growth for MDCPS. Using the STRO as a blue-print, MDCPS worked to increase its capacity, expanding its staff, improving its training and integrating new computer models into its information management system. It worked with Public Catalyst to

6

improve its licensing, remove its very large backlog of unlicensed foster homes, and began ambitious plans to streamline its county of service and county of responsibility assignments. Although much remained to be done, Plaintiffs and MDCPS senior management saw improvement that created real hope for the future.  However, in August 2017, MDCPS Commissioner Chandler resigned his position due to health issues, and Mississippi Supreme Court Justice Jess Dickinson was appointed to run the agency.  Commissioner Dickinson took office August 8, 2017.

      **D.**     **2018 - 2ND Modified Mississippi Settlement Agreement and Reform Plan – January 1, 2018**

On December 19, 2016, the parties filed the 2nd Modified Mississippi Settlement Agreement and Reform Plan [Dkt. No.712]("2ndMSA], the currently operative Settlement Agreement between the parties. It supersedes the MSA and became effective on January 1, 2018. *Id.* pg. 1.

One of the key provisions of the 2nd MSA is that as of January 1, 2018, Defendants' caseworkers are required to have caseloads which do not exceed 90% of the caseload standards established in the 2nd MSA.  *See* 2nd MSA [Dkt. No. 712] ¶1.3.a.

Paragraph 11.1 of the 2nd MSA provides that from January 1, 2018 through December 31, 2019, Plaintiffs' rights under Paragraph 8 of the STRO will remain in effect for violations of those still-applicable provisions of the STRO and for violations of the 2nd MSA.  In order to proceed with a contempt and receivership request to the Court under these provisions, Plaintiffs are required to notify Defendants in writing of their intent and basis for doing so, and meet and confer in an attempt to resolve the dispute as to Defendants' non-compliance. *Id.* ¶ 11.1, 11.1.d.  Upon a failure of agreement between the parties, Plaintiff can seek a remedial order from the Court pursuant to paragraph 1 of the STRO.  *Id.*

On March 5, 2018, after receiving notice that only 61% of the MDCPS caseworkers had caseloads at the required level at the end of December, Plaintiffs notified Defendants in writing of their non-compliance with the caseload requirements of the STRO and of their intent to seek Court intervention. *See* Notice of Noncompliance attached hereto as Exhibit B.   On March 29, 2018, the parties met in person, but were unsuccessful in resolving the disputed situation.

For the reasons which follow, this Court should enter a finding of contempt and appoint a receiver to run Mississippi's child welfare system until compliance with constitutional standards is achieved.  Defendants have repeatedly demonstrated that they either cannot or will not obey this Court's orders.  For more than eight years, since the first contempt application in 2010, plaintiffs have sought to have Defendants make good on their court-ordered promises. Monitoring resumed at the beginning of 2018, defendants are now accountable, and defendants are in clear and unequivocal non-compliance.   It is abundantly clear that it is not only the constitutional rights of Plaintiff children which are at stake in this litigation, it is their health, safety, and very lives.  For those reasons Plaintiffs seek this relief.

## III.   DISCUSSION

Defendants are in violation of both the court-approved STRO [Dkt. No. 713] and the 2nd MSA.  Pursuant to the STRO, Defendants were acquired to "achieve full caseload compliance with the new weighted caseload standards by December 31, 2017."  *See* STRO at pg. 4, §5.d. This requirement was reiterated in the 2nd MSA which mandated that, as of January 1, 2018, Defendants' workers were required to have caseloads which do not exceed 90% of the caseload standards set forth in the 2nd MSA.  *See* 2nd MSA [Dkt. No. 712] at ¶1.3.a.

As reflected in the *undisputed* Monitor's January 2, 2018 Caseload Statistics, Defendants have failed to meet the caseload compliance goal of 90% by the agreed upon December 31, 2017 deadline.  *See* Monitor's January 2, 2018 Caseload Statistics attached hereto

as Exhibit C.  Instead, as of January 2, 2018, MDCPS had a statewide aggregate of approximately 58% of workers meeting the caseload standard.

The downward trajectory in Defendants' performance has continued. The Monitor reported on May 15, 2018, that MDCPS' overall caseload performance has declined from 58% in January 2018, to 52% as of May 2018.  *See* Monitor's March 30, 2018 and May 15, 2018 Caseload Statistics attached hereto as Exhibits D and Exhibit E.   In some regions by May 15, 2018, caseload compliance was as low as 17% (IV-S) and 28% (VII-C).  *See* Exhibit E.  At best, only one region out of 14 reached the required compliance level, III-N, in May, and many others declined.  Defendants clearly are in noncompliance with Section 5.d of the STRO and Section 1.3.a of the 2nd MSA which require a compliance goal of 90%.  Indeed, there has been a complete failure to achieve the caseload requirement – and the situation worsens.

### A.   The Practical Effects of Defendants' Violation on Mississippi's Children.

Caseloads are key to accomplishment of most of the goals in the 2nd Modified Settlement Agreement and STRO.  For example, the ability to timely respond to reports of abuse or neglect of children while in foster care custody, the sufficiency and frequency of caseworker visits to monitor and ensure the safety of children in foster care, and the ability to implement case plans so that children can be timely and safely discharged from foster care are directly impacted by caseloads.  The continuing absence of quality investigations and practices cannot be rectified in an environment in which caseworker caseloads routinely fail to meet the required compliance levels and now are between 54% and 77% in excess of what the MSA requires in some regions.  *See e.g.* Regions I-S, IV-S, VII-C, VII-E, VII-W in Exhibits C, D, and E.

Thus, the Plaintiff Children now again seek to enforce the very constitutional rights to adequate care and protection that are embodied in the agreed upon court orders and settlement

terms.

Notably, the May 2018 analysis chart reflects that a glaringly high 62% of Adoption and Licensing workers are **_over_** the caseload compliance standard. *See* May 15, 2018 Caseload Statistics attached hereto as Exhibit E. This has a particularly devastating impact given that Adoption and Licensing workers are responsible for the successful transition of children out of the foster care system. In addition, the May 15, 2018 analysis chart further highlights the fact that some counties, particularly those in east Mississippi, are in dire need of the protection of the court, **with as low as 17% to 23%** of their workers in compliance with the caseload standard (as compared to the required 90% goal). *See* Exhibit E.

The gap between the STRO and 2nd MSA caseload compliance goal and the actual achieved compliance is enormous. This is not a near miss, or substantial compliance; this is a wholesale failure to meet a fundamental requirement. The caseload compliance requirement is a vital measure by which Defendants can produce better outcomes for children, protect them from harm, and provide necessary services.

**B.     Plaintiffs Have Demonstrated – and There Is Again No Genuine Dispute Concerning – The Essential Elements Of Civil Contempt.**

Contempt proceedings are based upon "the basic proposition that all orders and judgments of courts must be complied with promptly." *Maness v. Meyers*, 419 U.S. 449, 458, 95 S. Ct. 584, 591, 42 L. Ed. 2d 574, 583 (1975). "[F]ederal courts are not reduced to issuing [judgments] against state officers and hoping for compliance*." Gates v. Collier*, 616 F.2d 1268, 1271 (5th Cir. 1980), quoting *Hutto v. Finney*, 437 U.S. 678, 690, 57 L. Ed. 2d 523, 98 S. Ct. 2565 (1978).

The purpose of a civil contempt sanction is "to coerce the contemnor into compliance with a court order, or to compensate another party for the contemnor's violation." *Lamar Fin. Corp. v. Adams*, 918 F.2d 564, 566 (5th Cir.1990). We emphasize that Plaintiffs do not seek the

imposition of fines or other punitive measures.  Rather, plaintiffs only seek through civil

contempt a recognition that Defendants have failed over a period of many years to implement

numerous provisions of orders and implementation plans to which they had agreed, a fact not in

genuine dispute.  Defendants have been given repeated chances to do so, and to avoid the remedy

sought in this motion, but they have still failed to comply.

Contempt is appropriate where a party fails "in meaningful respects to achieve substantial

and diligent compliance with a clear and unambiguous court decree."  *Lelsz v. Kavanagh*, 673 F.

Supp. 828, 839 (N.D. Tex. 1987) (citations and internal quotation marks omitted).  The elements

of civil contempt are simple and straightforward.  To demonstrate civil contempt, a party must

establish (1) a court order was in effect; (2) the order required specified conduct by the alleged

contemnor; and (3) the alleged contemnor failed to comply with the order.  *Whitcraft v. Brown*,

570 F.3d 268, 271-72 (5th Cir. 2009); *U.S. v. City of Jackson, Miss.*, 359 F.3d 727, 731 (5th

Cir.2004).  To be contemptuous, a failure to comply need not be willful or intentional. Rather,

the complainant must simply prove lack of compliance.  *Am. Airlines, Inc. v. Allied Pilots Ass'n*,

228 F.3d 574, 581 (5th Cir. 2000); *S.E.C. v. Reynolds*, No. 3:08–CV–438–B, 2011 WL 903395,

at *3 (S.D. Tex. March 16, 2011).  Plaintiffs submit that there is no genuine dispute that each of

the elements of civil contempt is satisfied.

### 1.    The Element of a Court Order is Satisfied.

The STRO and 2nd MSA were negotiated by the parties and approved by the Court.  As

this Court noted in its May 2011 order on the first contempt motion, while agreements between

parties are in the nature of a contract, "an agreement between litigants ...  entered as a judgment

of the court ... takes on an added significance," having "attributes both of contracts and of

judicial decrees."  *S.E.C. v. AMX International, Inc.*, 7 F.3d 71, 75 (5th Cir. 1993) (citations

omitted).  "Thus, a consent order entered based on the parties' settlement and related

agreements is properly enforceable by the court's contempt power." May 2011 Order, p. 5 (n. 1), citing *AMX International*, 7 F.3d at 76.

Accordingly, the contempt power indisputably includes the authority to enforce consent decrees and settlement agreements. *Ho v. Martin Marietta Corp*., 845 F.2d 545, 548 (5th Cir.1988). Indeed, "district courts have the power and ordinarily *must* hold parties to the terms of a consent decree .... [and] have wide discretion to enforce decrees and to implement remedies for decree violations" through declarations of contempt. *United States v. Alcoa, Inc.*, 533 F.3d 278, 286 (5th Cir. 2008) (emphasis added).

### 2.    The Element of an Order Requiring Certain Conduct in Clear Terms is Satisfied.

Defendants did not claim in 2010, and cannot claim in good faith today, that the requirements of the STRO and 2nd MSA are ambiguous. The defendants *agreed* to the terms set forth in both documents. A court order is unlikely to be found ambiguous when it was consented to by the contemnor. *Cobell v. Babbitt*, 37 F. Supp. 2d 6, 16 (D.D.C. 1999). As another court observed: "Where a party participates in drafting the relevant order, it does (or is held to have done) so 'with an understanding of what it can necessarily accomplish.'" *United States v. Tennessee*, 925 F. Supp. 1292, 1302 (W.D. Tenn. 1995).

And here, the required 90% caseload compliance standard is a specific numerical calculation conducted by the Monitor. There is no gray area. Accordingly, there can be no genuine dispute that the defendants have known at all relevant times what they were required to do under Section 5.d of the STRO and Section 1.3.a of the 2nd MSA.

### 3.    The Element of Non-Compliance is Satisfied.

The excessive caseloads reflect not only a plain and significant violation of critical terms of the STRO and 2nd MSA, but a trend towards even more significant noncompliance and

disregard for the agreed upon terms of the STRO and 2nd MSA.  As in 2010, there is no genuine issue of the defendants' non-compliance.  The most recent report and subsequent analyses by the Court-appointed Monitor details the continued failure to meet caseload standards.

As noted, contempt does not require a showing of willfulness or intent.  *Petroleos Mexicanos v. Crawford Enters., Inc*., 826 F. 2d 392, 401 (5th Cir. 1987).  Good faith is not a defense, and "the mere fact that a party may have taken steps toward achieving compliance is not a defense to a contempt charge."  *United States v. City of Jackson*, 318 F. Supp. 2d 395, 417, 418 (S.D. Miss. 2002).  Furthermore, "lack of funds is not a sufficient justification for neglect of a citizen's constitutional rights."  *McCord v. Maggio,* 927 F. 2d 844, 847 (5th Cir. 1991)

Here, the fact that the Defendants agreed to the caseload compliance standard, then failed to perform, further supports a finding of contempt.  "Courts have been particularly unsympathetic to purported excuses for less than substantial compliance where the contemnor has participated in drafting the order against which compliance is measured."  *United States v. Tennessee*, 925 F. Supp. at 1302.

### 4.    Courts Have Consistently Held State Officials in Contempt in Analogous Circumstances.

In its 2011 order on the first motion by plaintiffs requesting a finding of contempt, the Court found that it was "unquestionably true" that defendants had failed to comply with "most of the requirements established by the court-approved Period Two Implementation Plan" and that plaintiffs had "obviously…met their burden to present a *prima facie* case" of contempt. [May 17, 2011 Order, p.4.]  The Court nevertheless, declined to formally hold the defendants in contempt due to concern whether such a finding would "serve any fruitful purpose." [*Id.* at p. 10.].  However, now, many years and many admissions of non-compliance later, a finding of contempt would serve the essential purpose of compelling compliance to protect the

constitutional rights of at-risk children through the appointment of a receiver, discussed *infra*.

Defendants have agreed that ongoing non-compliance, particularly at this stage of this case, is

essentially the same as an admission of contempt[2] but this Court has never entered a formal

finding of contempt.  The examples cited below are but a few in the sad and voluminous list of

the Defendants failures to keep their promises.  We ask for an order of contempt now so that we

can move forward to the issue of appropriate relief for this fundamental and ongoing failure by

Defendants to comply.

Courts have consistently held state officials in contempt in analogous circumstances,

namely, when they have persistently failed over long periods of time to comply with consent

decrees where constitutional rights are at stake.  We discuss three such cases below.[3]

### a.      LaShawn A. v. Kelly.[4]

In *LaShawn A. v. Kelly*, the plaintiffs, a class of "abused and neglected children" residing

in the District of Columbia alleged that the child welfare system in the District of Columbia

failed to provide necessary services and protections.  Following a bench trial in 1991, the Court

---

[2] Defendants agreed that maltreatment investigations would be initiated within 24 hours of being reported and completed within 30 days, [Dkt. No. 571, p. 17, (MSA)]; Defendants agreed that special needs children would be matched with placement resources that can meet their therapeutic and medical needs, *Id.* p. 18, Defendants agreed that at least 95% of siblings who entered DFCS custody at or near the same time would be placed together, *Id.* p. 23, and Defendants agreed that at least 75% of children in custody during a period shall receive periodic medical examinations and all necessary medically necessary follow-up services.  *Id.,* p. 25.  Yet, in each instance, Defendants admitted that they did not comply with any of these agreements. STRO, [Dkt. No. 713, p. 1, ¶ 1].

[3] These are hardly the only such cases.  For example, *see also City of Jackson*, 318 F. Supp. 2d at 417-419 (holding City of Jackson in contempt of consent decree prohibiting city from discriminating in housing decisions relative to handicapped persons); *Carty v. Farrelly*, 957 F. Supp. 727, 744 (D.V.I. 1997) (holding governmental officials in contempt for failing to conform with settlement agreement regarding conditions at prison complex); *Lelsz v. Kavanagh*, 673 F. Supp. 828, 831-32, 863-64 (N.D. Tex. 1987) (holding defendants in contempt for failing to comply with settlement agreement governing state institution for mentally retarded persons).
[4] 887 F.Supp. 297, 299-301, 317 (D.D.C. 1995), *aff'd sub nom.  LaShawn A. v. Barry*, 107 F.3d 923 (D.C. Cir. 1996).

found that the plaintiff children were "routinely denied the protections and services that local and federal law require."  The parties thereupon negotiated a course of remedial action, including the appointment of a monitor.  In August 1991, the Court granted the parties' joint motion for entry of a remedial order and approved an implementation plan.  *LaShawn A.*, 887 F. Supp. at 297–299.

In 1992, the plaintiffs filed their first contempt motion, claiming that the defendants were not complying with the plan.  Plaintiffs withdrew the motion in 1993 after reaching agreement with defendants for further reforms.  In 1994, plaintiffs filed a second contempt motion, again alleging non-compliance, and sought two limited receiverships.  The District Court granted the request for the limited receiverships but declined to enter a finding of contempt even though it found that "contempt may well [have been] justified."  *LaShawn A.,* 887 F. Supp. at 299–300.

Plaintiffs filed a third motion for contempt in 1995 based upon continuous and widespread violations by defendants of the Court-approved reforms, as found by the monitor. The Court concluded that the monitor's report and other evidence "showed that the defendants remain in non-compliance with many court-ordered requirements.  It is important to note that most of these requirements … have been voluntarily proposed by the defendants." *LaShawn A.*, 887 F. Supp. at 300.  After detailing defendants' non-compliance in areas such as staffing, training, information systems, quality assurance, licensure, and services, the Court found that "abused and neglected children continue to suffer under these conditions." *Id*. at 300, 314. The court specifically noted "the critical staffing shortages, the dearth of basic administrative support, the severely delayed installation of the [information system], and the inaction on revenue maximization." *Id*. at 314.  Therefore, and emphasizing that civil contempt has no punitive aspect, the Court held the District of Columbia in civil contempt even though the Court noted that it had "repeatedly expressed its reluctance to impose contempt sanctions …"

*Id*. at 313–314, 317.  The Court explained that it "cannot tolerate widespread non-compliance with its orders…. The pattern of delay and inaction that has characterized this case for the last few years must end now."  *Id*. at 317.

Here, the same series of events has occurred.  There was an initial motion for contempt in 2010; the court was reluctant to formally find Defendants in contempt even though there was "obviously" widespread non-compliance; Defendants have continued to violate the court-ordered remedial requirements for many years; and Plaintiffs filed another motion seeking contempt in 2015, which remains open in its remedial stage.  [Dkt. No. 713,  STRO,  p. 1, ¶ 1].  Here, just as in *LaShawn A*., defendants' longstanding failure to comply with the consent orders, and the interests of vulnerable children in the State's custody, should allay the Court's initial (and understandable) concern that Defendants had not yet had time to comply with the requirements of the Settlement Agreement and Implementation Plans.  For that very reason, the Court explicitly required the parties to renegotiate the applicable remedial steps and the time periods within which the State had to perform them.  The parties have done this, but many more years have now passed during which Mississippi's children have been without the benefits and protections required by the Court's orders.  Accordingly, the facts now weigh overwhelmingly in favor of a finding of contempt, notwithstanding the concern raised by the Court in its 2011 order of whether contempt would serve a "fruitful purpose."  Now it will serve the purpose of allowing the Court to appoint a receiver for this failing child welfare system.

b.      *G.L. v. Zumwalt.*[5]

In *G.L. v. Zumwalt*, the plaintiffs – children in the custody of the Jackson County, Missouri office of the Division of Family Services ("DFS") – alleged that DFS's policies and practices violated their constitutional right to be protected from harm while in state custody. [December 7, 1992 order ("12/7/92 Order"), p. 1.]  In 1983, the parties settled by entering into a consent decree mandating "comprehensive reform" of Jackson County's foster care system. [*Id.*] In 1985, plaintiffs filed a motion seeking to hold the defendants in contempt due to their failure to satisfy the requirements of the consent decree.  [*Id.*]  In response, the parties entered into a supplemental consent decree.  [*Id.*]

Thereafter, reports by a three-person monitoring committee found continuing non-compliance with the consent decree.  [12/7/92 Order, p. 3.]  In 1989, plaintiffs served defendants with a notice of non-compliance, which was followed by negotiations from July 1989 to January 1990.  [*Id.*]  The parties did not resolve their differences, hence plaintiffs filed a motion in January 1990 to hold the defendants in contempt.  [12/7/92 Order, p. 4.]  In August 1991, plaintiffs filed an additional motion for contempt.  [*Id.*]

The court held a two-day evidentiary hearing.  [12/7/92 Order, p. 4.]  Among other defenses, the defendants claimed lack of adequate funding by the state legislature.  [*Id.*]  The Court, after detailing its findings of non-compliance, including excessive caseloads, understaffing, inadequate foster parent training, and insufficient levels of visits by caseworkers, held the defendants in contempt.  [12/7/92 Order, p 30.]

The Court found a continuous and long-standing failure by the defendants to comply

_____

[5] No. 77-0242-CV-W-1 (W.D. Mo. Dec. 7, 1992).

with the consent decree: "It is obvious from the statistics cited above that the defendants are not and have not been in compliance with the Consent Decree since they entered into it in 1983." 12/7/92 Order, p. 27.  The Court concluded: "It is time to begin the work necessary to make the Consent Decree work and to begin the process to withdraw the Court from having to oversee the DFS Foster Care program."  [12/7/92 Order, p. 29.]

                    **c.**    ***Aspira of New York, Inc. v. Board of Education of New York.***[6]

In *Aspira*, the plaintiff class, comprised of Hispanic public students in New York City, entered into a consent decree which required the City to provide bilingual education, including the hiring and training of competent staff and the issuance of periodic progress reports.  In December 1975, plaintiffs filed a motion seeking contempt on the grounds that the defendants were in violation of the 1974 consent decree and two orders issued thereunder.  *Aspira*, 423 F. Supp. at 651.  Among other things, plaintiffs alleged that the defendants were not providing the required services, failed to hire or train the necessary personnel, and failed to submit the information needed to determine the status of compliance.  *Id.*  After a lengthy evidentiary hearing, the Court found the defendants in contempt.  *Id.*  The Court began by noting that civil contempt does not suggest willful disobedience:

> The word 'contempt' rings fiercely; if its connotations in law included only lay notions like scorn and willful disobedience, plaintiffs could not prevail.  But the idea in this context includes failures in meaningful respects to achieve substantial and diligent compliance.  In this sufficient sense, the defendants are found to have been in contempt, and it has become the court's duty to declare it.

*Aspira*, 423 F. Supp. at 649.  The Court then made a finding of contempt based on the following facts, which bear a striking resemblance to this case:

---

[6] 423 F. Supp. 647 (S.D.N.Y. 1976).

> Upon the facts disclosed in this proceedings defendants have fallen far short of the requisite diligence.  They have neglected to marshal their own resources…and demand the results needed from subordinate persons and agencies in order to effectuate the course of action required by the consent decree.  They have allowed deadlines to pass without advance announcements or volunteered explanations, awaiting complaints by the plaintiffs…They have borne with seeming equanimity long periods of nonperformance, inadequate performance, or outright defiance from key constituents…They have tolerated slipshod procedures.  They have failed to enlist or order the placement of needed and available personnel.  They have displayed an evident sense of nonurgency bordering on indifference….

*Aspira*, 423 F. Supp. at 649.  The Court noted that although it had been placed in the "delicate and difficult" role of supervising the performance of state officials, and was reluctant to do so, nonetheless "the rights of the people under the law, where they are duly brought to issue before the court, must be forthrightly declared and enforced."  *Aspira*, 423 F. Supp. at 648.

*   *   *   *

This case has all of the core elements of the *LaShawn A., Zumwalt* and *Aspira* cases.  A plaintiff class, seeking to vindicate constitutional rights, enters into a consent decree with public entity defendants who fail to perform.  The failure continues for an extended period of time.  Despite an initial reluctance to hold the public entities in contempt, the Courts in the three cases noted above were ultimately compelled by a duty to uphold the constitutional rights of innocent citizens.  As the Court in *Aspira* stated, the rights of citizens "duly brought to issue before the Court, must be forthrightly declared and enforced."  When, as here, this calls for a finding of civil contempt, then the Court should no longer hesitate to act, particularly where the action implicates the rights of the most vulnerable of Mississippi's citizens.

### C.    The Court Should Appoint a Receiver to Effectuate the Necessary Remedial Measures.

The court's power to effectuate compliance with its orders includes the equitable power

to appoint a receiver. *Morgan v. McDonough*, 540 F.2d 527, 533 (1st Cir. 1976); see also Fed. R. Civ. P. 66. "[I]t is abundantly clear that a court may appoint a receiver to force public officials to comply with court orders." *Dixon v. Barry*, 967 F. Supp. 535, 550 (D.D.C. 1997). "Where more traditional remedies, such as contempt proceedings or injunctions, are inadequate under the circumstances, a court is justified … in implementing less common remedies, such as a receivership, so as to achieve compliance with a constitutional mandate." *Shaw v. Allen*, 771 F. Supp. 760, 762 (S.D. W. Va. 1990).

In determining whether to appoint a receiver, "the court should consider whether there were repeated failures to comply with the Court's orders ... if there is a lack of sufficient leadership to turn the tide within a reasonable time period, whether there was bad faith, whether resources are being wasted [and] ... whether a receiver can provide a quick and efficient remedy." *Dixon*, 967 F. Supp. at 550 (citations omitted). The most significant factor in the decision to appoint a receiver is whether any other remedy is likely to be successful. *Id.*; *Shaw*, 771 F. Supp. at 762.

### 1. The Dire Circumstances of This Case Warrant the Appointment of a Receiver.

In a span of eight years, Defendants have failed to comply with the original Settlement, the Period 1 Plan, the Period 2 Plan, the Bridge Plan, the Modified Settlement Agreement, the Period 3 Plan, the July 9th Order, and now the STRO and the 2nd MSA.

At the evidentiary hearing, plaintiffs expect to prove through testimony from former senior officials at MDCPS that Defendants are headed on a downward trajectory, and that the many improvements made during the past two years have been abandoned by the current administration.

The excessive caseloads, in combination with the instability in senior management, not only demonstrate a trend towards complete noncompliance and disregard for the agreed upon

terms of the 2nd MSA and Court-approved STRO, but further demonstrate the need for a receiver

to intervene to ensure Defendants' future compliance.

### 2.    Courts in Similar Cases Have Appointed Receivers for Dysfunctional Public Agencies.

Federal courts have utilized receivers where public agencies have failed to comply with

consent decrees requiring constitutionally mandated change.  We discuss two exemplar cases

below.

### a.    *LaShawn A. v. Kelly*.

In *LaShawn A. v. Kelly,* 887 F. Supp. 297 (D.D.C.  1995), aff'd sub nom. LaShawn A. v.

Barry, 107 F.3d 923 (D.C. Cir. 1996)discussed previously*,* the District Court in its 1995 ruling

appointed a receiver for the District of Columbia's child welfare system.  As noted, the ruling

followed several years of continued non-compliance by the defendants with the terms of agreed

orders.  *LaShawn A.*, 887 F. Supp.  at 299–300.  In appointing a receiver (who replaced two

previously appointed receivers with limited authority), the District Court rejected the

defendants' contention that a receiver was not needed because "substantial progress" was being

made:

> While it is true that the defendants have made some progress in various areas, the above factual findings show the urgent need for a new, more fundamental approach to change.  Otherwise, each report of incremental progress will be mitigated by regression in another area or future inaction on that first step forward.  Much of the progress originally made is now slipping back into the same tired way of doing business that brought these parties before the Court.

*LaShawn A.*, 887 F. Supp. at 315.

The District Court also rejected defendants' assertion that a receiver was unnecessary due

to a proposal for a "viable restructuring plan" which the defendants had made in response to the

motion:

Four years ago the Court was told that the defendants had a 'plan' to rebuild the agency.  Now facing contempt and full receivership, the defendants again put forth a proposed solution.  There is no reason to believe this plan has more chance of success than the one the defendants presented at trial and quickly.

Therefore, the Court today imposes a full receivership over the child welfare system for the District of Columbia.

*LaShawn A.*, 887 F. Supp. at 316.

The LaShawn A. case is highly relevant on the issue of a receiver.  This Court has been told for years that the Defendants are on a path to remediation, but as the Monitor's recent statistics show, the caseload requirements have yet to be met, and are steadily declining to the detriment of children in the custody of the MDCPS.  *See* Exhibits C, D, and E.  Here, as in *LaShawn A*.  "[a]bused and neglected children … are not receiving the services and protection which are their desert and legal entitlement." LaShawn A., 887 F. Supp. at 317.[7]

### b.   *Shaw v. Allen*.[8]

In *Shaw*, the plaintiff class, comprised of inmates at the McDowell County Jail in West Virginia filed suit in 1981 alleging violations of their constitutional rights.  In 1983, the court entered an order specifying various actions which the defendants were required to take to comply with constitutional and statutory mandates.  *Shaw*, 771 F. Supp. at 761.

---

[7] In its 2011 order on the first contempt motion in this case, the Court, citing *United States v. United Mine Workers*, 330 U.S. 258, 67 S. Ct. 677, 91 L. Ed. 884 (1947), stated that in considering whether to appoint a receiver, relevant considerations included whether the contempt was willful, and the financial resources of the contemnor.  [May 17, 2011 order, p. 8.]  In fact, in *United Mine Workers* the Supreme Court was considering the propriety of monetary fines that had been imposed on the UMW's president ($10,000), and on the UMW itself ($3.5 million) for initiating a nationwide strike of coal miners in contravention of law.  There was no issue in the case concerning the appointment of a receiver and plaintiffs do not seek monetary fines.  Plaintiffs accordingly contend that *United Mine Workers* is not relevant to whether a receiver should be appointed in this case.

[8] 771 F. Supp. 760 (S.D.W.Va. 1990).

The plaintiffs filed motions seeking contempt in 1985, 1987, 1988 and 1990, contending defendants failed to comply with the 1983 order.  *Shaw*, 771 F. Supp. at 760.  In response to the plaintiffs' 1989 contempt motion, the court found the defendants to be in non-compliance with the 1983 order and appointed a monitor.  *Id.*  In 1989, the monitor reported to the court that "the McDowell County Jail is in serious non-compliance with many aspects of the April 1983 court order."  *Id.*  The court found that the jail "remains in substantial non-compliance with [the 1983] Order" and that conditions in the jail created "health and sanitation hazards to inmates."  *Id*.  Moreover, "the defendants' repeated failure to achieve good faith, substantial compliance with this Court's comprehensive Order as well as Orders entered subsequent thereto has placed them in constant contempt of such Orders which they have failed to purge."  *Shaw*, 771 F. Supp. at 762.

Based on this factual record, the district court found that the appointment of a receiver was necessary:

> [T]he Court is of the opinion that the appointment of a receiver for the McDowell County Jail is both necessary and reasonable.  It has been nearly eight (8) years since the entry of the Court's comprehensive Order and yet the McDowell County Jail still remains in substantial noncompliance.  Throughout the tumultuous history of this case, the Court has exercised restraint attempting to give due deference to McDowell County elected officials' ability to observe and obey the duties and obligations placed upon them by federal and state law.  Such exercise of deference, however, has been unavailing, and it now appears that a more intrusive course of action is warranted.

*Shaw*, 771 F. Supp. at 762.

In sum, more than eight years of non-compliance is enough.  Plaintiffs should not be forced to bring seriatim contempt motions, and it is certainly unclear what remedies, short of receivership, could change the dire circumstances facing Mississippi foster children.  At this

point, given the Monitor's findings and the current state of flux in the agency's leadership, there is no reason to believe that Defendants will function differently in the foreseeable future. Plaintiffs respectfully urge this Court to intervene, to exercise its authority in light of the compelling facts of continuing non-compliance, to find defendants in contempt, and to appoint a receiver to remedy the contempt.   Plaintiffs also request the opportunity to present witnesses before the Court at an evidentiary hearing which Plaintiffs request be scheduled as expeditiously as possible.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs request that this Court find that defendants are in noncompliance with the STRO and 2nd MSA, hence in contempt of court; appoint a general receiver with full authority to administer Mississippi's child welfare system and to bring it into compliance with the orders of this Court; and grant such other and further relief as this Court deems necessary and proper.

RESPECTFULLY SUBMITTED, this the 31st day of May 2018.

*/s/ Marcia Robinson Lowry*
Marcia Robinson Lowry (*pro hac vice*)
Sara Robinson-Glasser (*pro hac vice*)
A Better Childhood, Inc.
1095 Hardscrabble Road
Chappaqua, NY  10514
Telephone (646) 808-7344
Facsimile: (914) 238-0365
Email: mlowry@abetterchildhood.org
          srglasser@abetterchildhood.org

W. Wayne Drinkwater, Jr. (MBN 6193)
Michael J. Bentley (MBN 102631)
BRADLEY ARANT BOULT CUMMINGS LLP
One Jackson Place, Suite 400
188 East Capitol Street
Jackson, Mississippi 39201
Telephone: (601) 948-8000
Facsimile: (601) 948-3000
Email: wdrinkwater@bradley.com
          mbentley@bradley.com

Christian Carbone (*pro hac vice*)
LOEB & LOEB LLP
345 Park Avenue
New York, New York 10154
Telephone: (212) 407-4000
Email: ccarbone@loeb.com

*Plaintiffs' Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 31, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will deliver copies to all counsel of record.

<u>/s/ Marcia Robinson Lowry</u>
Marcia Robinson Lowry (*pro hac vice)*