IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

OLIVIA Y., et al )
                                                )
Plaintiffs                                      )
                                                )
v.                                              )      CIVIL ACTION NO. 3:04cv251 TSL-FKB
                                                )
PHIL BRYANT, as Governor of the                 )
State of Mississippi, *et al.,*                 )
                                                )
Defendants                                      )

---

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
OF RESPONSE AND OBJECTIONS
TO PLAINTIFFS' MOTION FOR RELIEF PURSUANT TO
REMEDY PHASE OF PLAINTIFFS' RENEWED MOTION FOR CONTEMPT
FOR AN EVIDENTIARY HEARING AND FOR THE APPOINTMENT OF A
RECEIVER**

---

Kenya Key Rachal (MSD #99227)
Jake Adams (MSB #101538)
James L. Jones (MSB #3214)
One Eastover Center
100 Vision Drive, Suite 400
Jackson, MS 39211
P. O. Box 14167
Jackson, MS 39236-4167
Telephone: (601) 351-2400
Facsimile: (601) 351-2424

Harold Pizzetta, III
Special Assistant Attorney General
OFFICE OF THE MISSISSIPPI
ATTORNEY GENERAL
P. O. Box 220
Jackson, MS 39205

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................. iii

I.  FACTS ............................................................................................................. 1

    A.  Background ............................................................................................ 1

    B.  Caseloads .............................................................................................. 3

    C.  Caseloads are not on a downward trajectory ......................................... 5

    D.  The Agency's efforts to achieve caseload compliance ........................... 6

        1.  Hiring .......................................................................................... 6

        2.  Retention ..................................................................................... 6

        3.  The budget deficit ...................................................................... 7

        4.  Federal funds .............................................................................. 8

        5.  The 2019 Budget ........................................................................ 9

    E.  Substantial compliance demonstrated .................................................. 10

II.  THE AGENCY HAS ESTABLISHED SUBSTANTIAL COMPLIANCE, MITIGATING CIRCUMSTANCES AND INABILITY TO COMPLY AND SHOULD NOT BE FOUNDS IN CONTEMPT ......................................... 10

    A.  Contempt .............................................................................................. 10

    B.  Mitigating Circumstances and Substantial Compliance ....................... 11

    C.  Inability to Comply .............................................................................. 12

III.  RECEIVERSHIP IS NOT AN APPROPRIATE REMEDY ............................... 14

    A.  No comparison to *Lashawn A* ............................................................. 14

    B.  Receivership should not be employed in this case ................................ 15

    C.  The departure of at-will employees is not contemptable and does not support a finding of contempt ............................... 17

CONCLUSION ........................................................................................................... 19

## TABLE OF AUTHORITIES

**CASES**                                                                 **PAGE(S)**

*Anderson v. Dunn,*
    19 U.S. 204, 231 (1821) .................................................................................16

*Bracco v. Lackner,*
    462 F. Supp. 436, 456 (N.D. Cal. 1978) ...........................................................16

*Chambers v. NASCO, Inc.,*
    501 U.S. 32, 44 (1991) ....................................................................................16

*Combs v. Ryan's Coal Co., Inc.,*
    785 F.2d 970, 984 (11th Cir. 1986) .................................................................11

*Flaksa v. Little River Marine Constr. Co.,*
    389 F.2d 885, 887 (5th Cir.), cert. denied,
    392 U.S. 928, 88 S.Ct. 2287, 20 L.Ed.2d 1387 (1968) ....................................16

*In re Bradley,*
    588 F.3d 254, 265 (5th Cir. 2009) ...................................................................10

*LaShawn A. v. Kelly,*
    887 F. Supp 297 (D.D.C. 1995) .......................................................................14

*Lighthouse Rescue Mission, Inc. v. City of Hattiesburg,*
    2014 U.S. Dist. LEXIS 124157, *5 ..................................................................13

*Lyn-Lea Travel Corp.v. American Airlines, Inc.,*
    283 F.3d 282, 291 (5th Cir. 2002) ...................................................................11

*Netsphere, Inc. v. Baron,*
    703 F.3d 296, 305 (5th Cir. 2012) ...................................................................15

*Reed v. Iowa Marine & Repair Co.,*
    16 F.3d 82, 84 (5th Cir. 1994) .........................................................................16

*Santibanez,*
    105 F.3d at 241-42 ..........................................................................................15

*Shaw v. Allen,*
    771 F. Supp. 760 (S.D.W. Va. 1990) ...........................................................15, 16

*Spallone v. United States,*
    493 U.S. 265, 280 (1990) ............................................................16

*United States v. Bryan,*
    339 U.S. 323, 330 .............................................................11, 13

*United States v. Rylander,*
    460 U.S. 752, 757, 103 S. Ct. 1548, 75 L. Ed. 2d 521 (1983)....................................11, 12

*Whitfield v. Pennington,*
    832 F.2d 909, 914 (5th Cir) ...........................................................11

## STATUTORY AND CONSTITUTIONAL PROVISIONS

Miss. Code § 27-103-127(g) .............................................................8

Miss. Const. Article 1, §§ 1 and 2.......................................................8

## OTHER AUTHORITIES

12 Charles Alan Wright & Arthur R. Miller,
    *Federal Practice and Procedure § 2983 (3d ed. 2012)* ....................................15

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

OLIVIA Y., et al             )
                                   )
           Plaintiffs      )
                                   )
        v.                )       **CIVIL ACTION NO. 3:04cv251 TSL-FKB**
                                   )
PHIL BRYANT, as Governor of the  )
State of Mississippi, *et al.,*        )
                                 )
           Defendants    )

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
OF THEIR RESPONSE AND OBJECTIONS
TO PLAINTIFFS' MOTION FOR RELIEF PURSUANT TO
REMEDY PHASE OF PLAINTIFFS' RENEWED MOTION FOR CONTEMPT,
FOR AN EVIDENTIARY HEARING AND FOR THE APPOINTMENT OF A RECEIVER**

Defendants respectfully submit this *Memorandum of Law in Support of Response and Objections to Plaintiffs' Motion for Relief Pursuant to Remedy Phase of Plaintiffs' Renewed Motion for Contempt, for an Evidentiary Hearing and for the Appointment of a Receiver.*

**I. FACTS**

**A. BACKGROUND**

More than a decade ago, in 2004, the Plaintiffs filed their Complaint against the State of Mississippi, then Governor Haley Barbour, the Executive Director of the Department of Human Services, and the Director of the Division of Family and Children's Services. As one might expect over the course of a 14-year period that saw two different Governors, several agency administrations, and the creation of a new agency, much has changed with regard to Mississippi's foster care system. The evidence will show that these changes have been positive for Mississippi's children in foster care.

When the *Olivia Y* case was filed fourteen years ago, the Division of Family and Children's Services ("DFCS") operated as a division of the Mississippi Department of Human Services ("MDHS"). DFCS's funding was far below what was needed to adequately staff the state. In 2004, DFCS employed only 263 frontline workers to cover the entire state. (2004 Caseload Analysis, attached to Response as Exhibit "A"). Fortunately, Mississippi's foster care system has come a long way. Indeed, the difference is like that of night and day. Led by Governor Phil Bryant, the state has created a more independent child welfare agency, increased its budget, and significantly increased the number of caseworkers. As of June 15, 2018, the Agency had 837 workers carrying caseloads. (Mississippi Performance on Caseload Standards Report dated June 15, 2018, attached to Response as Exhibit "B").

In May 2016, Governor Bryant signed Senate Bill 2179 establishing the Mississippi Department of Child Protection Services ("the Agency" or "MDPCS") as an independent agency with its commissioner serving as a member of the Governor's cabinet and giving MDCPS its own budget. On December 19, 2016, the Court entered the Stipulated Third Remedial Order [Doc #713, Pg 1] (the "STRO"), in which the Agency was to "engage in a period of capacity building, with the assistance of Public Catalyst." The Court also entered the 2nd Modified Settlement Agreement (the "2nd MSA"), which took effect on January 1, 2018.

As shown by the Monitor's Stipulated Third Remedial Order Fourth Quarterly Report (the "Monitor's Report"), this capacity building period was an overall success. (Monitor's Report, attached to Response as Exhibit "C"). Out of the more than 50 requirements of the STRO, the Agency achieved compliance with all, except one--the caseload metric.

Though Plaintiffs' motion did not mention this fact, it did acknowledge that as recently as 2017 Plaintiffs had observed improvement "that created real hope for the future." [Doc. No. 740, Pg.

2

i1]. In light of the progress certified by the Monitor's Report, the Plaintiffs' hope for the Agency's future is well founded.

The areas in which the Agency complied with the STRO are wide ranging and include among many achievements:

- Strengthening field operations to help further ensure adequate management, supervision, and support of MDCPS staff in the state's regions (Monitor's Report attached to Response as Exhibit "C" at §2.b., and §2.d.);

- Aggressively hiring caseworkers by onboarding 392 direct service workers in 2017 exceeding the required target of 285 workers (*Id.* at §2.c.);

- Successfully training all new hires with a minimum of 270 hours of pre-service training (*Id.* at §4.b.);

- Equipping caseworkers with improved technology so that caseworkers not only received smart phones, but also received tablets to allow them to connect to their office and gain access to resources while workers are on the go providing services to the children they are responsible for (*Id.* at §2.g ); and

- Licensing 469 new foster homes in calendar year 2017, far exceeding the required target of 300 homes set by the Court Monitor. (*Id.* at §6.b.1.)

The substantial gains made by the Agency should not go unrecognized. Indeed, the Agency has made and continues to make very significant progress.

### B. CASELOADS

While the Plaintiffs' motion attempts to paint a bleak picture of the Agency, in reality, the motion makes only one claim of contempt out of the many requirements of the STRO - that being caseload compliance.

The number of children and services handled at any given time by a caseworker is a measurement used to gauge the amount of time a caseworker can devote to the children assigned to that caseworker. The caseload requirement of the STRO is a statistic impacted by a multitude of constantly changing variables. For example, the addition of only 1 investigation or the assignment of only 1 additional foster care custody case to a caseworker can move the worker from being in the "Met" (compliance) category to being out of compliance.—While a perfectly balanced caseload is ideal, having an additional child on his or her caseload does not mean that a caseworker cannot adequately provide services to the child or children in any given circumstance.

For the Agency to meet the STRO's caseload requirement, 90 percent (90%) of its caseworkers had to comply with the caseload standards by December 31, 2017. On that date, 61% of MDCPS caseworkers were in compliance with the STRO, which of course falls short of the STRO's 90% requirement. However, it is important to note that many of the caseworkers who make up the 39% who were out of compliance were close to being in compliance (*Id. at Attachment 1*). To see the full picture a deeper dive into the numbers is required.

As shown in the Monitor's Report, 61% of the Agency's caseworkers had met the caseload standard. 14% were close. Simple math would show that 75% of Mississippi's caseworkers were either compliant or quite close to being in compliance. (*Id.*) Thus, when compared with the 31% who were in compliance less than two years ago, the Defendants are indeed making progress toward meeting the caseload requirement. (Monitor's Caseload Targets Memo, attached to Response as Exhibit "D").

If the additional assignment of one child can place a caseworker out of compliance, clearly, there is very little margin for error with the caseload standard. One caseworker being delayed in administratively closing a file or a sibling group being assigned to a worker can cause the worker to

4

drop out of compliance. Currently the Agency has approximately 5260 children in custody and in 2017, opened 27,777 investigations. (Affidavit of Jess Dickinson at ¶12, attached to Response as Exhibit "F"). With this volume of children and cases, some latitude should be afforded the Agency as it continues to strive to meet the caseload standard. With more time and more funding, the Agency can achieve caseload compliance.[1]

In light of its massive efforts to improve, the progress the Agency has made in spite of insufficient funding, and its work to continue striving to improve caseloads, Plaintiffs' request for a receivership over Mississippi's foster care system is beyond extreme and should be denied.

### C. CASELOADS ARE NOT ON A DOWNWARD TRAJECTORY

Contrary to the allegations contained in Plaintiffs' motion, the Agency is not on a downward trajectory with regard to caseload compliance. The latest data certified by the Court Monitor reflects that the Agency's caseload compliance is currently at 57%. (Mississippi Performance on Caseload Standards Report, dated June 15, 2018, attached to Response as Exhibit "B"). The June caseload numbers reflect an increase of five percent since the May 15, 2018 caseload standards that Plaintiffs have cited. [Doc #739-5]. This data clearly shows that the Agency is maintaining its performance while it works to obtain more funding.

Despite its financial and staffing challenges, the Agency continues to make progress to improve the lives of children and families. For example, MDCPS has nearly eliminated overdue investigations. (Overdue Investigation Chart, attached to Response as Exhibit "E"). MDCPS has more than doubled the number of adoptions from 302 in FY-2017 to 641 adoptions finalized in FY-2018. (*Dickinson* Aff. at ¶14, attached as Exhibit "F"). The Agency has also enhanced its in-home services to help stabilize families and maintain children safely in their own homes. (*Id.* at ¶37).

---

[1] See the Defendants' Motion for Relief Under Section 11.2.a. of the 2nd Modified Settlement Agreement and Reform Plan and Rule 60(b) of the Federal Rules of Civil Procedure filed contemporaneously with this memorandum.

Additionally the Agency has already met and exceeded the goal set by the Court Monitor of developing 100 new non-relative foster homes for the first 6 months of calendar year 2018. MDCPS has developed over 150 new non-relative foster homes in this period. (Id. at ¶33).

## D. THE AGENCY'S EFFORTS TO ACHIEVE CASELOAD COMPLIANCE

### 1. HIRING

When MDCPS signed the 2nd MSA, it intended to achieve caseload compliance by December 31, 2017. To that end, the Agency aggressively hired caseworkers throughout 2017. The Monitor's Report shows that 75 caseworkers were hired in the 1st Quarter of 2017, 97 caseworkers in the 2nd Quarter, 136 caseworkers in the 3rd Quarter and 59 caseworkers in the 4th Quarter. *(Monitor's Report at Pg. 4, § 2.g attached to Response as Exhibit "C")*. The Agency was in compliance after the Monitor's 3rd Quarter Update. (*Id.* at Pg. 4, §5.b). The Agency also fully complied with the Recruitment, Hiring and Retention Plan approved by the Monitor with the Monitor ultimately concluding that MDCPS had on boarded 392 workers, exceeding the plan's target of 285 workers. (*Id.* at Pg. 4, §2.c.). Clearly, the Agency was targeting full compliance by December 31, 2017, before the budget deficit disrupted its progress.

### 2. RETENTION

Retention of caseworkers has been a challenge. Although during calendar year 2017 MDCPS hired 379 workers, during the same period, 225 workers departed. (Dickinson Aff. at ¶19). Soon after Commissioner Dickinson's appointment, he determined that caseworker retention was a tremendous concern that became even more of an issue when the Agency was forced to stop making new hires in December 2017. (Dickinson Aff. at ¶19 and *See* Affidavit of Kris Jones at ¶6, attached as Exhibit "G"). For the Agency to maintain its efforts to comply with caseload requirements, it was critical to address caseworker retention.

6

To help promote caseworker retention, the Agency asked the Mississippi State Personnel Board for increases in pay for frontline caseworkers, and that request was granted on December 14, 2017. As a result of the Commissioner's efforts, caseworkers whose annual pay was approximately $26,000, now receive starting salaries of approximately $30,000.00. (Dickinson Aff. at ¶21 and *See* Announcements of Caseworker Raises, attached to Response as Exhibit "H").

MDCPS took other steps to promote worker retention. It hired twenty-six supervisors in 2017 and is providing supervisors with leadership training focused on strengthening their support of workers and improving case practices through better supervision and quality case staffing. (Supervisor Hiring Data attached to Response as Exhibit "I" and *See* MDCPS and CSF Focus on Strengthening Supervision as a Strategy for Staff Retention, attached to Response as Exhibit "J"). Intensive ongoing coaching is also provided and is specifically designed to stabilize regions identified as needing more in-depth coaching and support. (CSF Focus on Strengthening Supervision as a Strategy for Staff Retention, attached to Response as Exhibit "J"). The agency also instituted an employee assistance program. (Employee Assistance Program Contract "Protection Connection," attached to Response as Exhibit "K"). The Agency's retention efforts appear to be working. Compared to 2017, worker retention has increased with 36 workers departing in the first quarter of 2018, compared to 57 workers departing during the same period in 2017. This represents a 37% decrease in separations. (Dickinson Aff. at ¶21 and *See* Separation Comparison, attached to Response as Exhibit "L").

### 3. THE BUDGET DEFICIT

The Agency's hiring momentum came to a halt in late 2017 when MDHS alerted the Agency that it needed to prematurely draw from its second allotment of state funds to meet its December obligations. (November 15, 2017, email from MDHS attached to Response as Exhibit "M").

Alarmed, Commissioner Dickinson, who had only taken office on September 18, 2017, sought an explanation from former Deputy Commissioner of Finance Takesha Darby and requested a budget showing how much money the Agency had to finish the FY2018 fiscal year, which did not end until June 30, 2018.  (Dickinson Aff. at ¶23)    Darby was unable to provide him with a satisfactory answer.  (*Id.*)  An intensive evaluation by the Commissioner and his staff revealed that, without corrective action, the Agency was facing a $52 million budget deficit.  (*Id.*).

Thus, to comply with State law,[2] MDCPS had no choice but to cut $52 million from its projected FY-2018 spending.  (December 20, 2017 Memo to Kris Jones attached to Response as Exhibit "N").  The Agency cut spending wherever reasonably possible, while alerting the Governor and the Legislature that the Agency needed additional funding to survive the fiscal year.  (Dickinson Aff. at ¶24 and 27.  As a result of the Agency's efforts, MDHS agreed to free federal funds from other obligations, and Commissioner Dickinson sought a $12 million deficit appropriation from the Legislature.  Matching federal funds would cover the remainder of the deficit.  (Letter to Senate Appropriations Committee dated February 6, 2018, attached to Response as Exhibit "O").

### 4. FEDERAL FUNDS

Complicating the budget outlook further, MDHS informed the Agency that it would not be eligible to receive some federal funds as the result of the Agency's full separation from MDHS.  This was an unforeseen consequence of Senate Bill 2179, which had created MDCPS to become a stand-alone independent agency as of July 1, 2018.  What was not contemplated when Senate Bill 2179 was drafted was that a complete separation of the Agency from MDHS, would prevent MDHS and MDCPS from using state-appropriated funds as matching funds to draw down certain federal funds.  That result would have been detrimental to the Agency's budget.

---

[2] See Mississippi Code Annotated §27-103-127(g) and Article I, Sections 1 and 2 of the Mississippi Constitution.

8

Understanding the dire consequences of losing this federal funding, Commissioner Dickinson, with the cooperation and assistance from the Executive Director of MDHS, immediately sought a repeal of the statutory obligation for MDCPS and MDHS to completely separate by June 30, 2018, thereby allowing MDCPS to maintain access to these and other important federal funds. (Dickinson Aff. at ¶25). Dickinson also recognized that repeal of the statutory provision requiring complete separation and maintaining sub-agency status with MDHS would allow the Agency to share some costs with MDHS, which would also assist with the Agency's budget. Commissioner Dickinson asked the Legislature to amend 2016's Senate Bill 2179 to maintain the Agency as a sub-agency of MDHS, with the Commissioner retaining full operational control of the Agency.    (*Id.*). The Mississippi Legislature agreed and the bill became law, eliminating the requirement for MDCPS to become a totally separate agency. (SB 2675, attached to Response as Exhibit "P").

## 5. THE 2019 BUDGET

After taking painful but necessary steps to shore up the budget to complete the 2018 fiscal year, Commissioner Dickinson's next immediate concern was to address the 2019 budget. He found the FY-2019 budget proposal that had been submitted by the previous MDCPS administration needed to be amended in order to meet the agency's needs going forward into FY-2019. (Dickinson Aff. at ¶29). In an amended FY-2019 budget proposal to the Legislature, Commissioner Dickinson explained the Agency's need for additional funding, which specifically included $91 million for salaries, which would have allowed the Agency to achieve a net gain of 20 additional caseworkers per month, doubling the rate of caseworker hiring accomplished during the rapid growth period of 2017. (Dickinson Aff. at ¶30). The Agency further informed the Legislature that anything less than the amount requested risked causing the Agency to fall out of compliance with its *Olivia Y* obligations. (Dickinson's Letter to Legislature dated February 6, 2019, attached to Response as

9

Exhibit "O").  Despite the Agency's best efforts, the legislative appropriation was $23 million short of the amount MDCPS requested in its amended budget request.  As appropriated, MDCPS's FY-2019  budget will allow the Agency to maintain the status quo in 2019, which means it will have only have enough money to fill vacant positions as they arise and will not allow the Agency to realize a net increase the number of caseworkers.  (Dickinson Aff. at ¶30)  As it currently stands, the budget allocated by the Legislature for FY-2019 will not permit the Agency to meet the caseloads standard of the 2nd MSA in 2019.

## E. SUBSTANTIAL COMPLIANCE DEMONSTRATED

As shown by the Agency's efforts at employee retention, its compliance with each requirement of the STRO other than the caseload metric, and its efforts to obtain sufficient funding from the Legislature, the Agency has taken all reasonable efforts within its power to comply.  The lone measure for which it has not complied - caseloads - is due to insufficient legislative funding.

The Agency has averted additional financial disaster by informing the Legislature that, in order to maximize the receipt of available federal funds, it needed to remain a sub-agency of MDHS, and the Agency is actively engaged in formulating a strategy that will allow it to receive additional federal funding for 2019.  (Id. at ¶25).

## II. THE AGENCY HAS ESTABLISHED SUBSTANTIAL COMPLIANCE, MITIGATING CIRCUMSTANCES AND INABILITY TO COMPLY AND SHOULD NOT BE FOUND IN CONTEMPT

### A. CONTEMPT

The law with regard to civil contempt is firmly established.  "The power to punish for contempt is an inherent power of the federal courts and that it includes the power to punish violations of their own orders." *In re Bradley, 588 F.3d 254, 265 (5th Cir. 2009).* Civil contempt has three elements: (1) a court order is in effect, (2) the order requires certain conduct by the respondent,

and (3) the respondent has failed to comply with the court's order. *Id. at 267*. When seeking a civil contempt order, a movant must show these requirements by clear and convincing evidence. *Lyn-Lea Travel Corp. v. American Airlines, Inc., 283 F.3d 282, 291 (5th Cir. 2002)*.

If a *prima facie* showing of a violation has been made, the burden of production shifts to the alleged contemnor, who may defend the alleged violation on the grounds that he was unable to comply. *United States v. Rylander, 460 U.S. 752, 757, 103 S. Ct. 1548, 75 L. Ed. 2d 521 (1983)*. "Where compliance is impossible, neither the moving party nor the court has any reason to proceed with the civil contempt action. It is settled, however, that in raising this defense, the defendant has a burden of production." *Id*. The burden of production shifts back to movant only upon a sufficient showing by the alleged contemnor. The party seeking to show contempt, therefore, has the burden of proving ability to comply. *Combs v. Ryan's Coal Co., Inc. 785 F2d 970, 984 (11th Cir. 1986)*.

## B. MITIGATING CIRCUMSTANCES AND SUBSTANTIAL COMPLIANCE

The Plaintiffs have demonstrated that the Agency is not in compliance with the caseload requirements of the STRO so the burden now falls on the Agency to show either mitigating circumstances that might cause the district court to withhold the exercise of its contempt power, or substantial compliance with the consent order. See *Whitfield v. Pennington, 832 F.2d 909, 914 (5th Cir)*.

In this case, the Legislature did not appropriate the funds necessary for the Agency to hire the number of caseworkers needed to meet the caseload requirements. This certainly acts as a mitigating circumstance, and the Agency's efforts show it is using all of its resources and power to achieve compliance with the 2nd MSA.

As for substantial compliance, the Monitor's Report establishes that the Agency has complied with every requirement of the STRO other than caseloads, and the Agency is not as far from meeting

11

the 90% caseloads requirement as the Plaintiffs would have the Court believe.  These facts show that the Agency is indeed attempting to comply with the 2nd MSA.  Not only has the Agency demonstrated good faith and a ready willingness to try to comply with the STRO, it has also proven substantial compliance with the STRO.

## C. INABILITY TO COMPLY

Even using its best possible efforts, as of December 31, 2017, the Agency was unable to meet the 90% caseload requirement of the STRO.  (Dickinson Aff. at ¶21).  Simply put, the Agency found it had insufficient funds in its FY-2018 budget to achieve a net increase in hiring, and state agencies are prohibited by state law from spending money they do not have.  Thus, the reasons the Agency has been unable to comply with the 90% caseload requirement are outside its control.

As for the 2019 budget, in order to achieve the substantial net increase in caseworkers needed to comply with the caseload standards, the Agency needs $91 million for salaries.  (*Id.* at ¶30).  It requested the amount necessary to fund those salaries from the Legislature for the FY-2019 budget, but the Legislature provided MDCPS $23 million less than it requested, leaving the Agency in a position where it must maintain its staff at current levels, with no net increase to its number of caseworkers.  (*Id.*).  The Agency cannot force the Legislature to give it the funding it needs to meet the caseloads requirement.  Clearly, the Agency is unable to comply with the 90% caseload requirements of the STRO.

"The inability to comply with an order is a defense to civil contempt.  *United States v. Rylander, 460 U.S. 752, 757, 103 S. Ct. 1548, 75 L. Ed. 2d 521 (1983).*  "Where compliance is impossible, neither the moving party nor the court has any reason to proceed with the civil contempt action.  It is settled, however, that in raising this defense, the defendant has a burden of production."

*Id.* as cited by *Lighthouse Rescue Mission, Inc. v. City of Hattiesburg, 2014 U.S. Dist. LEXIS 124157, \*5.*

The Agency has established that compliance with the STRO's caseload standard currently is fiscally impossible. It requested the funding that it needed to comply. (Dickinson Aff. at ¶29). It used both a personal and a public campaign to inform the Legislature, Public Catalyst, plaintiffs' counsel, and the public, why it needed more funding. It met with legislators, MDHS, and the Governor's office to exhaust every avenue to obtain funding. (*Id.* at ¶24). However, the decision regarding Agency state funding ultimately and exclusively rests with the Mississippi Legislature. Plaintiffs are aware of this. The 2nd MSA clearly provides: "Defendants do not speak for the Mississippi Legislature, which has the power under Mississippi law to determine appropriations for the state's child welfare programs." [Doc #712, Pg 4].

"[E]xpenditures approved or authorized by the Legislature for any special fund agency or special funds approved for general fund agency shall constitute a maximum to be expended or encumbered by such agency, and shall not constitute authority to expend or encumber more than the amount of revenue actually collected or otherwise received....The executive head of the state agency shall be liable on his official bond for expenditures or encumbrances which exceed the total amount of the budget or the amount received if receipts are less than the approved budget." *See Miss. Code § 27-103-127(g).*

Since the facts show that the Agency currently is unable to comply with the caseloads requirement by virtue of the budget allocated by the Legislature, Defendants respectfully submit that contempt would not be proper in this matter. See *United States v. Bryan, 339 U.S. 323, 330 (One charged with contempt of court for failure to comply with a court order makes a complete defense by proving that he is unable to comply.)*

### III. RECEIVERSHIP IS NOT AN APPROPRIATE REMEDY

### A. NO COMPARISON TO *LASHAWN A*

The Plaintiffs' request for a receivership relies heavily on *LaShawn A. v. Kelly (887 F. Supp 297 (D.D.C. 1995)*, a case in which the United States District Court for the District of Columbia placed the District of Columbia's child welfare system into a receivership. But a careful reading of that case shows it to be so far off point that it has no place in this discussion of the case at bar. *LaShawn A* in no way supports the appointment of a receiver in this case.

D.C.'s child welfare system was catastrophically out of compliance with almost every major requirement of its consent judgment. In the second paragraph of his memorandum opinion, Judge Thomas F. Hogan wrote that after the Court had entered its finding that D.C.'s foster care system was in violation of federal law and the United States Constitution, "the parties and court-appointed Monitor worked before a backdrop of further legal proceedings to plan and implement reforms which would alleviate the violations. Four years and two mayoral administrations later, however, *many if not most* {emphasis added} of the problems remain." *Id. at 298.*

D.C.'s child welfare system was placed into a receivership because of an overall systematic failure. The Court concluded that D.C.'s child welfare system was "*radically out of compliance* {emphasis added} with the Court's orders (*Id at \*313*), reaching that conclusion after finding non-compliance in all areas of adoption (the court found a virtual stoppage of adoption activity), training for contract agencies, management information systems, administrative reviews, quality assurance, licensing of foster care facilities and foster homes, monitoring and contract review, legal representation and court relationships, revenue maximization, interagency access to services, the family service fund and ten different out-of-home care requirements.

In short, the Court found "widespread noncompliance" with its order. Furthermore, the Court did not believe the D.C. agency was acting or negotiating with the plaintiffs in good faith. The Court was particularly irate that the Mayor of D.C. had introduced a bill that would abolish private rights of action to enforce local statutory responsibilities to care for and protect abused and neglected children in an attempt to remove the Court from the efforts taken on behalf of the children. (*Id.* at 314). Clearly, the circumstances in *LaShawn A.* go far beyond anything alleged in this matter.

Likewise, *Shaw v. Allen* does not make a case for receivership in this matter as it involves wholesale non-compliance wherein the monitor actually told the court that "the McDowell County Jail is in serious non-compliance with *many {emphasis added}* aspects of the...court order." *See Shaw v. Allen, 771 F. Supp. 760 (S.D.W. Va. 1990).*

While widespread non-compliance was found in the cases cited by Plaintiffs, such is clearly not the case in Mississippi, as evidenced in part by the fact that, in their motion, Plaintiffs have cited a single alleged violation of the STRO—the failure to reach required caseload standards—and the Plaintiffs have drastically overreached in making the assertion that a receivership is necessary in Mississippi.

## B. RECEIVERSHIP SHOULD NOT BE EMPLOYED IN THIS CASE

Receivership is "an extraordinary remedy that should be employed with the utmost caution" and is justified only where there is a clear necessity to protect a party's interest in property, legal and less drastic equitable remedies are inadequate, and the benefits of receivership outweigh the burdens on the affected parties. See *12 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2983 (3d ed. 2012)*; see also *Santibanez v. Wier McMahon & Co., 105 F.3d 234241-42 (summarizing factors courts must consider before appointing a receiver)* as cited by *Netsphere, Inc. v. Baron, 703 F.3d 296, 305 (5th Cir. 2012).*

In *LaShawn A*, the court felt that it had no less drastic alternative than placing D.C.'s child welfare agency in receivership. Here, this Court does have an alternative: Give the Agency more time to obtain the funds it needs from the Legislature to meet the caseloads standard.

Federal courts have inherent powers that include the authority to punish for contempt in order to maintain obedience to court orders. *Flaksa v. Little River Marine Constr. Co., 389 F.2d 885, 887 (5th Cir.), cert. denied, 392 U.S. 928, 88 S.Ct. 2287, 20 L.Ed.2d 1387 (1968)*. However, because of the potency of inherent powers, they must be used with great restraint and caution. *Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991)*. Accordingly, the threshold for the use of the inherent power of sanction is high. *Reed v. Iowa Marine & Repair Co., 16 F.3d 82, 84 (5th Cir. 1994)*.

Such powers may be exercised only if essential to preserve the authority of the court and the sanction chosen must employ "'the least possible power adequate to the end proposed.'" *Anderson v. Dunn, 19 U.S. 204, 231 (1821), as quoted in Spallone v. United States, 493 U.S. 265, 280 (1990)*. If there is a reasonable probability that a lesser sanction will have the desired effect, the court must try the less restrictive measure first. *Spallone, 493 U.S. at 280*.

The most significant factor in the decision to appoint a receiver is whether any other remedy is likely to be successful. *Shaw v. Allen, 771 F. Supp. 760, 762 (S.D. W. Va. 1990)*. Again, receivership should be a remedy of last resort. *Bracco v. Lackner, 462 F. Supp. 436, 456 (N. D. Cal. 1978)*. As certified by the Court Monitor, the Agency is in compliance with all of the requirements in the STRO except as to caseload. The dire circumstances alleged by Plaintiffs do not exist. For the reasons that have been explained, the Agency is unable to comply with the caseloads requirement until it is given more funding by the Legislature, but the Agency has demonstrated an intent and willingness to comply if financially able. It also is noteworthy that a receiver without additional

16

funding would be in no different position that the current administration of MDCPS. Therefore, Defendants respectfully suggest that a sanction is neither necessary nor appropriate in this matter.

## C. THE DEPARTURE OF AT-WILL EMPLOYEES IS NOT CONTEMPTABLE AND DOES NOT SUPPORT A FINDING OF CONTEMPT

The Plaintiffs have alleged in their motion that Commissioner Dickinson's leadership is part of their basis for pursuing a motion for contempt and receivership. Pursuant to the terms of the 2nd MSA, this portion of the Plaintiffs' motion is improper and should be stricken by the Court. The 2nd MSA clearly required the Plaintiffs to provided notice in writing of their basis for filing a motion for contempt. Section 11.1.a. of the 2nd MSA specifically requires the Plaintiffs to "Notify the Defendants in writing of their intent and basis for doing so…" prior to filing a motion for contempt. [Doc #712, Pg 31].

The only writing that the Plaintiffs delivered to the Defendants was Exhibit B to the Plaintiffs' motion, which only referenced the caseload performance target of the STRO. [Doc #739-2]. Therefore, the allegations regarding Commissioner Dickinson's leadership are improperly before the Court and should be dismissed for the Plaintiffs' failure to comply with the terms of the 2nd MSA. To the extent that the Commissioner's leadership is the basis of the Plaintiffs' motion, that portion should be stricken from consideration.

Setting aside the Plaintiffs' failure to abide by the terms of the 2nd MSA, the only support the Plaintiffs provided for this serious allegation were the departures of at-will employees Tracy Malone, Cindy Greer, and Takesha Darby from their positions as Deputy Commissioners. Neither the STRO nor the 2nd MSA dictates whom the Agency must hire or retain for its Deputy Commissioner positions. Neither the STRO nor the 2nd MSA gives the Plaintiff the authority to decide who should lead the Agency. That authority rests with the Governor of Mississippi.

17

What the Agency can do is see that departed employees are replaced with highly qualified people. That is exactly what Commissioner Dickinson and MDCPS did with the appointment of Tonya Rogillio to the position of Deputy Commissioner for Child Welfare and Dr. Jaworski Davenport as Deputy Commissioner for Child Safety. Rogillio and Davenport assumed their new positions and duties on July 1, 2018.

Deputy Commissioner Rogillio has over twenty years of experience in child and family welfare. She holds both a Bachelor's Degree and a Master's Degree in Social Work and she has worked as a family preservation specialist, social work supervisor, child welfare training coordinator, and most recently as Ms. Malone's Deputy Director for Field Support Programs where she oversaw special investigations, permanency, and other support services. (Resume of Tonya Rogillio attached to Response as Exhibit "Q").

Dr. Jaworski Davenport holds both a Master's Degree in Social Work and a PhD with emphasis on child welfare. He spent 16 years working in child welfare and has worked as a caseworker, child welfare data analyst, as well as lead for state, federal, and court monitor scheduled case record reviews. Most recently, he has worked as MDCPS' Deputy Director for Field Operations for Data Analysis. (C.V. of Dr. Jaworski Davenport attached to Response as Exhibit "R").

Commissioner Dickinson also recruited Lucreta Tribune to replace Takesha Darby. Tribune is highly qualified in state accounting and finance. She holds a master's degree in accountancy, and has served as Chief Auditor for Governor Bryant during his term as Mississippi's State Auditor. (Resume of Lucreta Tribune, attached Response as Exhibit "S").

18

## CONCLUSION

The Agency is unable to comply with the caseload requirement of the STRO due to a shortage of funding from the Legislature. MDCPS and Commissioner Dickinson have made and will continue to make all reasonable efforts to increase the Agency's funding by requesting appropriate funding from the Legislature and by positioning the Agency to receive the maximum amount of federal funds for which it is eligible. Despite its fiscal challenges, MDCPS—as shown by the results of the Monitor's Report—has achieved substantial compliance with the STRO. For all of these reasons, this Court should not find the Agency in contempt of the STRO and should not allow takeover of Mississippi's foster care system by a receiver.

Respectfully submitted, this the 3rd day of July 2018.

> PHIL BRYANT, as Governor of the State of
> Mississippi, JESS H. DICKINSON, as Commissioner,
> Mississippi Department of Child Protection Services,
> and TRACY MALONE, as Deputy Commissioner of
> Child Welfare, Mississippi Department of Child
> Protection Services
>
> By: /s/ Kenya Key Rachal

OF COUNSEL:

BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC
Kenya Key Rachal (MSB #99227)
Jake Adams (MSB #101538)
James L. Jones (MSB #3214)
One Eastover Center
100 Vision Drive, Suite 400
Jackson, MS 39211
Telephone: (601) 351-2400
Facsimile: (601) 351-2424

Harold Pizzetta, III
Special Assistant Attorney General
OFFICE OF THE MISSISSIPPI ATTORNEY GENERAL
P. O. Box 220
Jackson, MS 39205

19

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed the foregoing with the Clerk of Court using the ECF system which sent notification of such filing to the following:

Marcia Robinson Lowry
Sara Robinson-Glasser
A BETTER CHILDHOOD
1095 Hardscrabble Road
Chappaqua, NY 10410

W. Wayne Drinkwater, Jr.
Michael Bentley
BRADLEY ARANT ROSE & WHITE, LLP
One Jackson Place
188 E. Capitol St, Ste 400
Jackson, MS 39201

Christian Carbone (pro hac vice)
LOEB & LOEB, LLP
345 Park Avenue
New York, NY 10154

**SO CERTIFIED**, this the 3rd day of July, 2018.


/s/ Kenya Key Rachal

20