# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF MISSISSIPPI NORTHERN DIVISION

**OLIVIA Y.,** *et al.*                                         **PLAINTIFFS**

v.                                             **CIVIL ACTION NO. 3:04CV251LN**

**PHIL BRYANT,**
 as Governor of the State of Mississippi, *et al.*             **DEFENDANTS**

---

## 2nd MODIFIED MISSISSIPPI SETTLEMENT AGREEMENT AND REFORM PLAN

---



# Table of Contents

INTRODUCTION ..................................................................................................................... 1

SYSTEMIC INFRASTRUCTURE STANDARDS ................................................................. 2

1.    Agency Leadership .................................................................................................... 2

    1.1  Worker and Supervisor Qualifications ................................................................ 2

    1.2  Training ................................................................................................................ 2

    1.3  Caseloads ............................................................................................................. 3

    1.4  Continuous Quality Improvement ....................................................................... 4

    1.5  Management Information Systems ....................................................................... 4

    1.6  Data Collection and Reporting ............................................................................ 4

    1.7  Performance Based Contracting .......................................................................... 5

    1.8  Foster Care Maintenance Payments .................................................................... 5

FOSTER CARE SERVICE STANDARDS ............................................................................ 6

2.    Child Safety and Maltreatment in Care .................................................................... 6

3.    Family-Based Placements .......................................................................................... 8

4.    Placement Standards .................................................................................................. 9

5.    Visitation ................................................................................................................. 13

    5.1  Worker Contact and Monitoring ....................................................................... 13

    5.2  Developing and Maintaining Connections ........................................................ 14

6.    Child and Youth Permanency .................................................................................. 16

    6.1  Comprehensive Family Service Plans ............................................................... 16

    6.2  Concurrent Permanency Planning ..................................................................... 17

    6.3  Permanency Case Goals .................................................................................... 17

    6.4  Permanency Reviews ......................................................................................... 21

    6.5  Permanency Performance Indicators ................................................................ 21

7.    Transition to Independent Living ............................................................................ 22

8.    Child Well-Being ..................................................................................................... 24

    8.1  Physical and Mental Health Care ...................................................................... 24

    8.2  Educational Services .......................................................................................... 25

MONITORING ................................................................................................................26
9.      Monitoring ........................................................................................................26
10.     Movement of Commitments to Maintenance Status ...........................................28

ENFORCEMENT AND EXIT ........................................................................................28
11.     Enforcement and Exit .......................................................................................28

ATTORNEY FEES..........................................................................................................29
12.     Attorney Fees....................................................................................................29

## INTRODUCTION

This 2nd Modified Mississippi Settlement Agreement and Reform Plan (the "2nd MSA") shall supersede the Mississippi Settlement Agreement and Reform Plan entered as a Court Order on January 4, 2008 (the "initial Settlement Agreement") [Dkt. No. 459] as well as the Modified Mississippi Settlement Agreement and Reform Plan entered as a Court Order on July 6, 2012, [Dkt. No. 571]. This 2nd MSA shall resolve all remaining claims in the above-captioned case, *Olivia Y. v. Bryant. et al*. Paragraph 1 of the Stipulated Settlement Agreement approved by the Court on June 15, 2007 [Dkt. No. 425] is hereby incorporated into this 2nd MSA.

The United States District Court for the Southern District of Mississippi, Northern Division, shall have continuing jurisdiction to enforce the terms of this 2nd MSA.

The intent of this 2nd MSA, which becomes effective on January 1, 2018, is to set forth and maintain the child welfare infrastructure, standards, and outcomes that Defendants must meet within specified timeframes statewide.

Defendants do not speak for the Mississippi Legislature, which has the power under Mississippi law to determine the appropriations for the state's child welfare programs. However, at least annually after Court approval of this 2nd MSA, and consistent with existing state budgetary practices and legal requirements, Defendants shall request state funds and any federal/special fund authorization sufficient to effect the provisions and outcome measures set forth in this 2nd MSA. In connection with any budget, funding, or allocation request to the executive or legislative branches of state government to the extent that it is anticipated that the funding of critical needs shall be met, in whole or in part, by way of federal fund sources, Defendants shall request federal fund authorization in amounts which are determined to be realizable and consistent with regular budgetary needs assessments. Nothing in this paragraph in any way limits Defendants' obligations under this 2nd MSA.

Such budgetary requests, which shall be provided to the Monitor, shall, among other things, identify for the executive and legislative branches of state government, with sufficient particularity, the known and anticipated costs to the state for the timely implementation of the reforms and outcome measures provided for herein.

Defendants shall take necessary steps to maximize available federal funding opportunities to serve children in the State's custody.

Nothing in this 2nd MSA shall be construed as infringing on the authority of the state courts of Mississippi to exercise their jurisdiction over individual class members. Defendants will not be held accountable for the state courts' exercise of such jurisdiction in any individual case, as long as Defendants requested that the state court exercise its jurisdiction consistent with the requirements of the 2nd MSA in that individual case.

## SYSTEMIC INFRASTRUCTURE STANDARDS

### 1. Agency Leadership

The Mississippi Department of Child Protection Services ("MDCPS") shall maintain a Commissioner of Child Protection Services having responsibility for the oversight and management of the MDCPS. That person shall be qualified by at least a bachelor's degree from an accredited institution of higher learning and ten (10) years' experience in management, public administration, finance, or accounting or a master's or doctoral degree from an accredited institution of higher learning and five (5) years' experience in management, public administration, finance, law, or accounting.    Should the related Mississippi statute that establishes qualifications for the Commissioner change, the revised statute will govern.

### 1.1    Worker and Supervisor Qualifications

*1.1.a.*    MDCPS shall hire caseworkers who have, at minimum, a bachelor's degree in social work or a related human services degree. The Monitor shall review and determine which degrees qualify as related human services degrees.

*1.1.b.*    MDCPS shall hire or promote to the position of caseworker supervisor only persons who have, at minimum, the following qualifications:

> *1.1.b.1.*    A master's degree in social work or a related human services degree and two years of experience working with children and families, preferably in foster care; or

> *1.1.b.2.*    A bachelor's degree in social work or a related human services degree with three years of experience working with children and families, preferably in foster care.

### 1.2    Training

*1.2.a.*    MDCPS shall maintain a Training Unit headed by a qualified director of training.   The Training Unit shall have sufficient staffing, funding, and other resources to assure that comprehensive child welfare training is provided to enable all caseworkers, supervisors, and other child welfare agency employees to comply with the relevant mandates of this 2nd MSA, MDCPS policy, and reasonable professional standards.

*1.2.b.*    MDCPS caseworkers shall receive a minimum of 270 hours of pre-service training, which includes instructional training and supervised field training, and may include E-Learning. Any E-Learning training is subject to the approval of the Monitor. Pre-service training provided during an MDCPS internship or previous employment with MDCPS may be counted towards the pre-service training requirement if that training is substantially similar to the training provided to new hires.

*1.2.c.*    MDCPS caseworker trainees, as part of pre-service training, may be assigned specific tasks or activities in connection with a case that is the primary responsibility of an experienced caseworker and may, under appropriate supervision, be assigned responsibility for a "training caseload" with progressively responsible caseload assignment:

*1.2.c.1.*  Upon successful completion of a competency test, reviewed and approved by the Monitor and administered subsequent to the trainee's fourth week of work, up to five (5) cases may be assigned with supervisor approval.

*1.2.c.2.*  Final caseloads may be assigned after successful completion of pre-service training, all competency-based tests and a satisfactory review by the training team.

*1.2.c.3.*  All competency tests, modifications to competency tests, and the standards for passing competency tests, must be reviewed and approved by the Monitor.

*1.2.d.*  Starting in calendar year 2018, MDCPS caseworkers shall receive a minimum of 20 hours of in-service training, and all supervisors shall receive a minimum of 12 hours of in-service training. Beginning in 2019, MDCPS caseworkers shall receive a minimum of 40 hours of in-service training each year, and all supervisors shall receive a minimum of 24 hours of in-service training each year.

*1.2.e.*  MDCPS caseworker supervisors, within 90 days of hire or promotion, shall receive a minimum of 40 hours of training, directed specifically at the supervision of child welfare caseworkers.

## 1.3   Caseloads

*1.3.a.*  90% of MDCPS caseworkers will have caseloads which do not exceed the caseload standards set forth below.  Individual MDCPS caseworkers with generic caseloads shall not carry a mixed caseload that exceeds 100% capacity as calculated by the following weights per case type:

| Type of Case | Standards | Weight Per Case – 100% Capacity |
|---|---|---|
| Child Protection (Investigations Level 2 and 3) | 14 Investigations | 0.0714 |
| Ongoing Foster Care (Placement Responsibility & Service) | 14 Children | 0.0714 |
| Ongoing Foster Care (Placement County of Responsibility) | | 0.0357 |
| Ongoing Foster Care (Placement County of Service) | | 0.0357 |
| In-Home Cases (Protection Responsibility & Service, Prevention Responsibility & Service and Interstate Compact on the Placement of Children (ICPC)-Incoming) | 17 Families | 0.0588 |
| In-Home Cases (Protection or Prevention County of Responsibility) | | 0.0294 |
| In-Home Cases (Protection or Prevention County of Service) | | 0.0294 |
| Adoption (Adoption County of Service) | 15 Children | 0.0667 |

| Type of Case | Standards | Weight Per Case – 100% Capacity |
|---|---|---|
| New Application Licensing (Resource Inquiry, Interstate Compact on the Placement of Children (ICPC) Application, and Foster Home Study) | 15 Homes | 0.0667 |
| Renewal Licensing (Foster Home Supervision and Foster Home Renewal) | 36 Homes | 0.0278 |

*1.3.b.* 85% of MDCPS supervisors shall be responsible for no more than five (5) caseworkers.

## 1.4 Continuous Quality Improvement

*1.4.a.* By December 1st of each year, MDCPS shall develop an annual Continuous Quality Improvement Plan, which shall be subject to the approval of the Monitor after consultation with the parties.

*1.4.b.* Upon approval, MDCPS will implement the CQI Plan and will do so with sufficient staff and resources to assess compliance with those provisions of the 2nd MSA that were identified for review in the Plan. The reviews will assess case practice, analyze outcomes, and produce analysis that will be shared with managers and stakeholders to achieve performance improvement.

## 1.5 Management Information Systems

*1.5.a.* MDCPS shall maintain comprehensive information systems that permit: (l) timely access by authorized MDCPS staff to information, including current and historical case documents, to support child safety and continuity of care across placement settings and services; (2) capturing, tracking, and reporting of applicable financial information, quantitative 2nd MSA compliance, longitudinal performance, and child welfare information, including federally required elements; and (3) prompts for workers and supervisors regarding required actions in a child's case and whether they have taken place.

*1.5.b.* MDCPS shall have a Comprehensive Child Welfare Information System (CCWIS) appropriate to its size and complexity that shall meet federal requirements by June 30, 2021. Defendants shall take reasonable steps to ensure data quality and verification of the accuracy of data in CCWIS. The CCWIS system shall have the necessary controls to decrease the risk of duplication of data and to reduce the risk of incorrect or invalid data. The system shall provide a visible trail to authorized administrators of all information entered, added, deleted, or modified, and shall have necessary security to protect data integrity. This system shall be audited at least annually to ensure the accuracy and validity of data in the system.

## 1.6 Data Collection and Reporting

*1.6.a.* MDCPS shall provide to all county agency staff with child welfare responsibilities access to computer services, word processing, and electronic mail and access to the current management information systems and to CCWIS, once implemented.

*1.6.b.* Data related to compliance with the 2nd MSA's Foster Care Service Standards will be collected, analyzed, and made available, at least quarterly, to MDCPS regional and county staff.

*1.6.c.* MDCPS county staff shall have access to an electronic statewide database of available placement resources.

**1.7    Performance Based Contracting**

*1.7.a.* Defendants shall establish, maintain and assess the effectiveness of a performance-based contracting system to evaluate annually contract agency compliance with the terms of the 2nd MSA. Defendants shall take all reasonable steps to ensure contract agency remediation of any identified deficiencies within three (3) months. A contract agency's unwillingness to participate in remediation efforts will be grounds for contract termination.

*1.7.b.* Prior to MDCPS contracting for case management services for children in custody, MDCPS shall submit for review and approval to the Monitor a detailed plan to ensure accountability and provide supervision and oversight of such agencies. The plan must ensure compliance with all related provisions of this 2nd MSA.

**1.8    Foster Care Maintenance Payments**

*1.8.a.* Defendants shall ensure that all licensed foster families (regardless of whether they are supervised directly by MDCPS or by private providers, and whether they are kinship or unrelated foster families) receive at least the minimum reimbursement rate for a given level of service as established pursuant to the 2nd MSA.

*1.8.b.* Commencing on the effective date of this 2nd MSA, Defendants shall pay to all licensed foster families at least the basic monthly foster care maintenance payments. Every two years thereafter, Defendants shall provide increases in the foster care maintenance payments, based upon the previous year's rate of inflation.

*1.8.c.* Within a year of court approval of this 2nd MSA, Defendants shall deliver to the Monitor a written report setting forth (l) findings regarding the adequacy of a proposed schedule of foster care maintenance payments made to foster care providers serving children, including children with specialized needs, and facilities providing congregate care in relation to the requirements of 42 U.S.C. § 675(4)(A) and the actual cost in the state of Mississippi to provide such care; and (2) the methodology utilized to determine the actual costs in the state of Mississippi to provide such care. Following review of the Defendants' report, the Monitor shall establish the rates that Defendants shall then implement.

**FOSTER CARE SERVICE STANDARDS**

**2.    Child Safety and Maltreatment in Care**

2.1    MDCPS shall ensure that it maintains a statewide system to appropriately receive, screen and investigate reports of child maltreatment. MDCPS shall ensure its system is adequately staffed and that investigations of all reports are commenced as required by state law and conducted and completed pursuant to policy and regulation. Any extensions of the timeframes set forth in MDCPS policy for the completion of investigations are subject to the review and approval of the Monitor. The Monitor shall periodically review the statewide system for appropriately receiving, screening and investigating reports of child maltreatment.

2.2    MDCPS shall continue to maintain a special investigations unit whose responsibility is to investigate reports of maltreatment of children in custody. The initiation of that investigation shall not extend beyond 24 hours.

2.3    MDCPS will develop and implement policies and procedures, subject to the review and approval of the Monitor, for the Agency to review all maltreatment in care reports that were screened-out and assess the appropriateness within 24 hours of all screen-out determinations. If the decision to screen-out the report is determined to be inappropriate, MDCPS shall ensure the report is referred for investigation immediately.

2.4    Upon receipt of a substantiated report of child maltreatment in a contract agency group home or emergency shelter, MDCPS shall, within 30 calendar days, initiate a licensure investigation, that is in addition to and independent of the child protection investigation. The licensure investigation shall include an on-site inspection by MDCPS of the emergency shelter or group home to determine the contract provider's compliance with MDCPS licensure standards. If the provider is found to be in violation of licensure standards, the provider shall have 10 calendar days to submit a Corrective Action Plan (CAP) with timeframes to rectify the violation and comply with the approved CAP timeframes. If the provider does not comply with the licensure standards based on the approved CAP and timeframes, MDCPS shall revoke the license.

2.5    Upon receipt of a report of child maltreatment in a private child placing agency foster home, MDCPS staff will notify the child placing agency, who shall, within 30 calendar days, initiate a licensure investigation that is in addition to and independent of, any child protection investigation. The licensure investigation shall include an on-site inspection by the child placing agency's staff of the foster home to determine the provider's compliance with licensure standards. If the provider is found to be in violation of licensure standards, the provider shall have 10 calendar days to submit a CAP with timeframes to rectify the violation and comply with the approved CAP timeframes. If the provider does not comply with the licensure standards based on the approved CAP and timeframes, MDCPS shall recommend that the license be revoked.

2.6    All allegations of maltreatment of a child in custody shall be investigated by a worker who has received training on intake and investigations processes, policies, and investigation techniques and has no ongoing connection to the foster care case.

2.7    Within 30 days of the completion of any investigation of maltreatment of a child in custody, as required in Section 2.1, MDCPS shall review the maltreatment investigation. This review shall:

    2.7.a.    Identify any case practice deficiencies in the investigation and any remedial actions necessary to ensure the safety of the child who is the subject of the investigation, as well as any other children in the home or placement.

    2.7.b.    Identify a timeframe in which any recommended remedial action must take place.

    2.7.c.    Monitor the initiation and completion of the remedial actions regarding individual child safety and case practice.

    2.7.d.    MDCPS shall notify the Area Social Work Supervisor (ASWS), Regional Director (RD), and Director of Field Operations when such remedial actions have not been initiated within five (5) calendar days of identification or timely completed.

2.8    MDCPS shall assure that standardized decision-making criteria are used for prioritizing, screening, and assessing all reports of maltreatment of children in MDCPS custody.

    2.8.a.    All investigations into reports of maltreatment of children in MDCPS custody must be completed within 30 calendar days, including supervisory approval. MDCPS shall assure that such investigations and decisions are based on a full and systematic evaluation of the factors that may place a child in custody at risk.

        2.8.a.1.    By July 1, 2018, at least 90% of maltreatment-in-care investigations will be initiated and completed within 30 days.

    2.8.b.    Any foster child who remains in the same out-of-home placement following an investigation into a report that he or she was maltreated in that placement shall be visited in the placement by an MDCPS caseworker according to the following schedule:

        2.8.b.1.    Once per week for the first month and twice per month for three (3) months if the investigation is found to be substantiated; or

        2.8.b.2.    Twice per month in accordance with MDCPS policy if the investigation is found to be unsubstantiated.

    2.8.c.    When a maltreatment investigation involves a foster or adoptive home, MDCPS shall file a copy of the approved final investigative report, and any recommendations and/or corrective actions MDCPS has deemed necessary, in the case record of the foster child, in the file of the foster or adoptive parents with a copy of the letter of notification to the foster or adoptive parents, and with the Bureau Director for Licensure. MDCPS shall also provide those records to the Youth Court Judge with jurisdiction over the child and, upon request, to the Monitor.

    2.8.d.    When a maltreatment investigation involves an agency group home, emergency shelter, private child placing agency foster home, or other facility licensed by

MDCPS, a copy of the final investigative report shall be filed in the child's case record, with the Director of Congregate Care Licensure, and sent to the licensed provider facility. MDCPS shall provide the report to the Youth Court Judge with jurisdiction over the child and, upon request, to the Monitor.

2.9    The rate of child abuse and neglect among children in foster care shall not exceed 0.33% per year, effective for the period beginning January 1, 2018. The parties adopt the following definition for this metric:

2.9.a.  Of all children in foster care during the period, what percent were victims of substantiated maltreatment by a foster parent or facility staff member. A child is counted as having been maltreated in foster care if the perpetrator of the maltreatment was identified as a foster parent or a residential facility staff member. The numerator shall consist of all children whose maltreatment is substantiated during the period. The denominator shall consist of all children placed in foster care during    the    period.    The    observation    period    is    12    months.

### 3.    Family-Based Placements

3.1    All foster homes and facilities with children placed who are in the custody of MDCPS shall be timely licensed and subject to the licensure process approved by Public Catalyst on December 31, 2016.

3.2    For Unlicensed Placements that Cannot Meet Licensure Standards

3.2.a.  No child shall remain in a foster home or facility determined to be unable to meet MDCPS licensing standards, absent an order by a state court with jurisdiction over child custody directing the placement of the child into a specific unlicensed placement. Defendants shall not be held accountable for a state court's order as long as MDCPS documents that it presented information to the court that the foster home has not met licensing standards, the reasons why the foster home has not and cannot meet licensing standards, and that a licensed foster home or facility is available, or one time only, an appropriate expedited relative placement.

3.2.b.  Safety Issues: If it is determined that an unlicensed foster home or facility is unable to meet MDCPS licensing standards due to a safety issue, Defendants shall take all reasonable efforts to immediately  ensure the child's safety and to remove the child, including, if required by the court, seeking an emergency court order. Defendants shall not be held accountable for the state court's order as long as MDCPS documents that it presented information to the court that the unlicensed foster home or facility has not met licensing standards and that a licensed foster home or facility or an expedited relative placement is available. If the child is not in imminent danger, MDCPS shall implement a safety plan and within five (5) calendar days, either cure the licensing deficiency if feasible, or move the child to a licensed foster home or facility, or to an appropriate expedited relative placement, one time only.

3.2.c.  Non-safety Issues: If MDCPS determines an unlicensed foster home to be unable to meet MDCPS licensing standards due to a non-safety issue, Defendants shall, within

30 calendar days of that determination, either cure the licensing deficiency if feasible, or move the child to a licensed foster home or facility, or to an appropriate expedited relative placement, one time only.

*3.3*    Foster Home Development

*3.3.a.*    MDCPS, in conjunction with the Monitor, shall establish annual statewide and county performance requirements and time periods for new foster home licensure. The Monitor will report to the parties MDCPS progress on achieving the performance requirements. The Defendants shall meet the performance requirements, including time periods.

*3.3.b.*    MDCPS shall begin to implement the annual plan to recruit and retain additional licensed foster home placements and shall maintain the additional number of total placements, as necessary during the applicability of the 2nd MSA.

## 4.    Placement Standards

*4.1*    No foster home shall provide care for more than five (5) children (including foster, biological, and adoptive children) at any given time, in accordance with the following:

*4.1.a.*    Foster homes may provide care for more than three foster children, up to a total of five, only with the documented approval of MDCPS Office of Licensure determining that the foster children can be safely maintained in the foster home.

*4.1.b.*    No more than two children in the foster home may be under the age of two or have therapeutic needs, including the biological and/or adoptive children.

*4.1.c.*    Notwithstanding the above, a sibling group may be placed together in the same foster home in excess of these limits, but only if they are the only children in the home, and only upon written approval by the MDCPS Licensure Director determining that the foster children can be safely maintained in the home.

*4.2*    Children with special needs shall be matched with placement resources that can meet their therapeutic and medical needs. MDCPS shall ensure that each county office has access to resource workers within its region who have the ability to ascertain the placement resources available and their suitability for each particular child needing placement.

*4.3*    Each foster child shall be placed in the least restrictive setting that meets his/her individual needs as determined by a review of all intake, screening, assessment, and prior placement information regarding the child available at the time of placement. In order of consideration, this means: placement with relatives; foster home care within reasonable proximity to the child's home community; resource home care outside of the child's home community; group home care; or institutional care.

*4.4*    Each child who enters placement (from regions other than II-East, II-West, and V-West) shall be placed within his/her own county or within 50 miles of the home from which he/she was removed. This provision shall not apply if:

    *4.4.a.*   The child's needs are so exceptional that they cannot be met by a family or facility within his/her own county or within 50 miles of the home from which he/she was removed;

    *4.4.b.*   The child is placed through the ICPC consistent with its terms;

    *4.4.c.*   The child is appropriately placed with relatives;

    *4.4.d.*   The child, age 14 years or older, is pursuing educational or vocational opportunities;

    *4.4.e.*   The child is ordered to be placed in a child-specific foster care setting by a court [subject to the court order exception in Section 3.2.a]; or

    *4.4.f.*   The child is placed in an adoptive home.

*4.5*    Each child who enters placement from Regions II-East, II-West, and V-West shall be placed within his/her own county or within 75 miles of the home from which he/she was removed. This provision shall not apply if:

    *4.5.a.*   The child's needs are so exceptional that they cannot be met by a family or facility within his/her own county or within 50 miles of the home from which he/she was removed;

    *4.5.b.*   The child is placed through the ICPC consistent with its terms;

    *4.5.c.*   The child is appropriately placed with relatives;

    *4.5.d.*   The child, age 14 years or older, is pursuing educational or vocational opportunities;

    *4.5.e.*   The child is ordered to be placed in a child-specific foster care setting by a court [subject to the court order exception in Section 3.2.a]; or

    *4.5.f.*   The child is placed in an adoptive home.

This provision shall be evaluated by the Monitor in December 2018 to determine whether the 75 mile exception is still necessary.

*4.6*    Siblings who enter placement at or near the same time shall be placed together unless: (l) doing so would be harmful to one or more of the siblings; (2) one of the siblings has exceptional needs that can be met only in a specialized program or facility; or (3) the size of the sibling group makes such placement impractical notwithstanding diligent efforts to place the group together. If a sibling group is separated at initial placement, the caseworker shall make immediate efforts to locate or recruit a foster family in whose home the siblings can be reunited.  These efforts will be documented and maintained in the case file.

4.7    Defendants shall take all reasonable steps to avoid the disruption of an appropriate placement and ensure placement stability for children. If there is a documented indication that a placement may disrupt, the caseworker shall immediately take steps to determine the following:

4.7.a.    The cause of the potential disruption;

4.7.b.    Whether the placement is appropriate for the child;

4.7.c.    Whether additional services are necessary to support the placement;

4.7.d.    Whether the child needs another placement; and

4.7.e.    If another placement is necessary, what that placement should be.

These efforts shall be documented in the child's case record.

4.8    No child shall remain overnight in an MDCPS office or other nonresidential facility that provides intake functions.

4.9    No child under 10 years of age shall be placed in a congregate care setting (including group homes and shelters) unless:

4.9.a.    The child has exceptional needs that cannot be met in a licensed foster home; or

4.9.b.    In order to keep a sibling group together for a temporary period, not to exceed 15 days and the RD has granted documented approval for the congregate care placement; or

4.9.c.    To enable a mother and baby to be placed together and there is not an available foster home for both of them.

4.10    No foster child shall be moved from his/her existing placement to another placement unless MDCPS specifically documents in the child's case record justifications for that move and the move is approved by an MDCPS supervisor.

4.11    No child shall be placed in more than one emergency or temporary facility within one episode of foster care, unless an immediate placement move is necessary to protect the safety of the child or of others with documented approval from the RD.

4.12    90% of children shall remain in his/her existing placement and not be moved to another placement unless MDCPS specifically documents in the child's case record justifications for that move and the move is approved by a MDCPS supervisor.

4.12.a.    By July 1, 2018, 70% of children will remain in his/her existing placement according to this section.

*4.12.b.* By July 1, 2019, 80% of children will remain in his/her existing placement according to this section.

*4.12.c.* By July 1, 2020, 90% of children will remain in his/her existing placement according to this section.

*4.13* 95% of foster homes shall provide care to a number of children that is not in excess of five (5) children (including foster, biological, and adoptive children) at any given time. Foster homes may provide care for more than three foster children, up to a total of five, only with the documented approval of MDCPS Office of Licensure determining that the foster children can be safely maintained in the home. No more than two children in the foster home may be under the age of two or have therapeutic needs, including the biological and/or adoptive children. Notwithstanding the above, a sibling group may be placed together in the same foster home in excess of these limits, but only if they are the only children in the home, and only upon written approval by the MDCPS Licensure Director determining that the foster children can be safely maintained in the home.

*4.13.a.* By July 1, 2018, 70% of foster homes will provide care to a number of children not in excess of the 2nd MSA foster home population limitations.

*4.13.b.* By July 1, 2019, 80% of foster homes will provide care to a number of children not in excess of the 2nd MSA foster home population limitations.

*4.13.c.* By July 1, 2020, 95% of foster homes will provide care to a number of children not in excess of the 2nd MSA foster home population limitations.

*4.14* At least 95% of children with special needs shall be matched with placement resources that can meet their therapeutic and medical needs.

*4.14.a.* By July 1, 2018, 60% of children with special needs shall be matched with placement resources that meet their therapeutic and medical needs.

*4.14.b.* By July 1, 2019, 75% of children with special needs shall be matched with placement resources that meet their therapeutic and medical needs.

*4.14.c.* By July 1, 2020, 95% of children with special needs shall be matched with placement resources that meet their therapeutic and medical needs.

*4.15* At least 95% of children in MDCPS custody shall be placed in the least restrictive setting that meets their individual needs consistent with 2nd MSA requirements.

*4.16* At least 90% of siblings who entered MDCPS custody at or near the same time shall be placed together consistent with 2nd MSA requirements.

*4.16.a.* By July 1, 2018, 60% of siblings entering MDCPS custody at or near the same time shall be placed together.

*4.16.b.* By July 1, 2019, 75% of siblings entering MDCPS custody at or near the same time shall be placed together.

*4.16.c.*    By July 1, 2020, 90% of siblings entering MDCPS custody at or near the same time shall be placed together.

*4.17*    At least 90% of children in MDCPS custody with a documented indication that they were subject to a potential or actual placement disruption shall have documented in the child's case record the reasonable steps taken to address placement stability consistent with 2nd MSA requirements:

*4.17.a.*    By July 1, 2018, 60% of children in MDCPS custody with a documented indication that they were subject to a potential or actual placement disruption shall have documented in the child's case record the reasonable steps taken to address placement stability.

*4.17.b.*    By July 1, 2019, 75% of children in MDCPS custody with a documented indication that they were subject to a potential or actual placement disruption shall have documented in the child's case record the reasonable steps taken to address placement stability.

*4.17.c.*    By July 1, 2020, 90% of children in MDCPS custody with a documented indication that they were subject to a potential or actual placement disruption shall have documented in the child's case record the reasonable steps taken to address placement stability.

*4.18*    90% of children who enter MDCPS custody shall be placed within his/her own county or within 50 miles of the home from which he/she was removed unless the child entered custody in Regions II-East, II-West, or V-West or one of the exceptions provided in this 2nd MSA is documented as applying.

*4.19*    90% of children who enter MDCPS custody in Regions II-East, II-West, and V-West shall be placed within his/her own county or within 75 miles of the home from which he/she was removed unless one of the exceptions provided in this 2nd MSA is documented as applying.

## 5.    Visitation

*5.1*    Worker Contact and Monitoring

*5.1.a.*    MDCPS shall meet with the child in person at least twice monthly to assess the child's safety and well-being, service delivery, and achievement of permanency and other service goals. At least one visit per month shall take place in the child's placement.

*5.1.a.1.*    By July 1, 2018 at least 75% of foster children shall have an MDCPS caseworker meet with the child at least two times per month; at least one visit per month shall take place in the child's placement.

*5.1.a.2.*    By January 1, 2019 at least 90% of foster children shall have an MDCPS caseworker meet with the child at least two times per month; at least one visit per month shall take place in the child's placement.

*5.1.b.* During any 90-day trial home visit period, an MDCPS caseworker shall meet with the child in the home at least two times per month.

    *5.1.b.1.* By July 1, 2018 at least 75% of foster children receiving a 90-day trial home visit period shall have an MDCPS caseworker meet with the child in the home at least two times per month.

    *5.1.b.2.* By January 1, 2019 at least 90% of foster children receiving a 90-day trial home visit period shall have an MDCPS caseworker meet with the child in the home at least two times per month.

*5.1.c.* MDCPS shall meet, at least monthly, with the child's parent(s) with whom the child is to be reunified, if the child has a permanency goal of reunification, to discuss progress on the family service plan and the child's well-being, unless the child's parent(s) reside out-of-state or are incarcerated.

    *5.1.c.1.* By July 1, 2018, for at least 75% of foster children with a goal of reunification, MDCPS shall meet with the child's parents at least monthly unless the child's parent(s) reside out-of-state or are incarcerated.

    *5.1.c.2.* By January 1, 2019, for at least 90% of foster children with a goal of reunification, MDCPS shall meet with the child's parents at least monthly unless the child's parent(s) reside out-of-state or are incarcerated.

*5.1.d.* MDCPS shall visit, at least monthly, with foster parents who have one or more foster children residing in their home to assess the child's safety and well-being in the placement and ensure appropriate services are provided.

    *5.1.d.1.* By July 1, 2018, at least 75% of foster parents with at least one foster child in the home shall have MDCPS visit the home monthly.

    *5.1.d.2.* By January 1, 2019, at least 90% of foster parents with at least one foster child in the home shall have MDCPS visit the home monthly.

*5.2* Developing and Maintaining Connections

*5.2.a.* MDCPS shall arrange contact for the child with his/her parents and with any siblings not in the same placement within 72 hours of foster care placement unless there are documented reasons why contact should not occur. If a visit cannot be arranged within 72 hours, a telephone call to parents, siblings, or extended family members shall be provided to the child.

*5.2.b.* For children entering foster care, a visitation plan for the child and his/her family shall be developed as part of the Family Service Plan. The visitation plan shall be developed and regularly updated in collaboration with parents, foster parents, and the child.

5.2.b.1.     If parental visitation is appropriate, this visitation plan shall include a minimum of two visits per month with the parents, unless the court order in the child's case limits such visits or unless it is documented that a parent failed to make himself or herself available.

5.2.b.1.a.     By January 1, 2019, 90% of children shall be provided with contacts with their parents consistent with 2nd MSA requirements.

5.2.b.2.     The child's visitation plan, regardless of permanency goal, shall include at least monthly visits with any siblings not in the same placement:

5.2.b.2.a.     By January 1, 2019, 80% of children shall be provided with contacts with any siblings in custody not in the same placement consistent with 2nd MSA requirements.

5.2.b.3.     As long as they are separated, all reasonable efforts shall be made to facilitate twice monthly in-person visits for children six (6) years of age and younger with their siblings in placement. All other children in placements separated from their siblings in placement, shall have at least monthly visits among separated siblings. Siblings shall have interim contact by alternative means such as email, texts, telephone calls, Facetime, and/or Skype.

5.2.b.4.     Exceptions to the sibling visitation requirement are:

5.2.b.4.a.     The child or sibling is placed out of state pursuant to ICPC;

5.2.b.4.b.     The visit may be harmful to one or more of the siblings as determined by the court or documented in the record why the visit would be harmful to one or more of the children;

5.2.b.4.c.     One of the siblings is above the age of 14 and refuses such visits and the reason for such refusal is documented in the case record.

5.2.c.   MDCPS and its contracting agencies shall implement a policy that prohibits cancellation of visits as a form of discipline against children.

6.  **Child and Youth Permanency**

*6.1*    Comprehensive Family Service Plans

*6.1.a.*    Within 45 days of taking a child into custody, MDCPS shall complete a comprehensive Family Service Plan which shall be developed in consultation with (1) the child and the MDCPS caseworker; (2) the child's parents and the MDCPS caseworker; and (3) the foster care provider and the MDCPS caseworker. The Family Service Plan shall address the strengths, needs and services required for both the child and their parent(s); shall be reviewed and approved by the supervisor and shall be maintained in the child's case file.

   *6.1.a.1.*    By July 1, 2018 at least 75% of Family Service Plans shall be submitted by the caseworker consistent with 2nd MSA requirements, within 30 calendar days of a child's entry into custody. The supervisor shall review the Plan for approval within 15 calendar days. The Family Service Plan shall be considered complete upon documented supervisory review and approval.

   *6.1.a.2.*    By January 1, 2019 at least 90% of Family Service Plans shall be submitted by the caseworker consistent with 2nd MSA requirements, within 30 calendar days of the child's entry into custody. The supervisor shall review the Plan for approval the within 15 calendar days. The Family Service Plan shall be considered complete upon documented supervisory review and approval.

*6.1.b.*    In instances in which it is impossible to meet with one or both parents, the service planning process will proceed as described above, notwithstanding the parent's absence.

*6.1.c.*    In those cases in which the whereabouts of one or both parents is unknown, MDCPS shall, within 30 days, institute a diligent search for the parent(s), which shall be documented in the child's case record.

   *6.1.c.1.*    By July 1, 2018 in at least 75% of placement cases in which the whereabouts of one or both parents is unknown MDCPS shall, within 30 days, institute a diligent search for the parent(s), which shall be documented in the child's case record.

   *6.1.c.2.*    By January 1, 2019 in at least 90% of placement cases in which the whereabouts of one or both parents is unknown MDCPS shall, within 30 days, institute a diligent search for the parent(s), which shall be documented in the child's case record.

*6.1.d.*    Within 45 calendar days of the child's initial placement, MDCPS shall complete a permanency plan that specifies the child's permanency goal, a timeframe for achieving permanency, and activities that support permanency.

*6.1.d.1.*    By July 1, 2018 for at least 75% of foster children who enter custody, permanency plans shall be submitted within 30 calendar days of the child's entry into custody by the caseworker consistent with 2nd MSA requirements. The supervisor shall review the plan for approval within 15 calendar days. The permanency plan shall be considered complete upon documented supervisory review and approval.

*6.1.d.2.*    By January 1, 2019 for at least 90% of foster children who enter custody, permanency plans shall be submitted within 30 calendar days of the child's entry into custody by the caseworker consistent with 2nd MSA requirements. The supervisor shall review the plan for approval within 15 calendar days. The permanency plan shall be considered complete upon documented supervisory review and approval.

*6.2*    Concurrent Permanency Planning

*6.2.a.*    For children with the goal of reunification, MDCPS shall begin, within the first six months of the child's entry into care, to engage in concurrent permanency planning.

*6.2.a.1.*    At least 95% of children in custody with the goal of reunification shall have case record documentation reflecting active concurrent permanency planning consistent with 2nd MSA requirements.

*6.3*    Permanency Case Goals

*6.3.a*    Reunification

*6.3.a.1.*    When the child's permanency goal is reunification, MDCPS shall identify in the Family Service Plan and make available, directly or through referral, those services MDCPS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care and to help the parents develop strategies to facilitate permanency for the child. Caseworkers will monitor the provision of services through visits and updating of service plans.

*6.3.a.1.a.*    By July 1, 2018 at least 75% of foster children with a permanency goal of reunification shall have service plans for their parents that identify those services MDCPS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care and case record documentation that MDCPS made those identified services available directly or through referral.

*6.3.a.1.b.*    By January 1, 2019 at least 90% of foster children with a permanency goal of reunification shall have service plans for their parents that identify those services MDCPS deems necessary to address the behaviors or conditions resulting in

the child's placement in foster care and case record documentation that MDCPS made those identified services available directly or through referral.

*6.3.a.2.* For a child with a permanency goal of reunification, the child's MDCPS caseworker shall meet with the child's parent(s) with whom the child is to be reunified at least monthly to assess service delivery and achievement of service goals, to keep the family informed and involved in decisions about the child, and to remain current about the family's circumstances.

*6.3.a.3.* For children with a permanency goal of reunification, the case record shall document opportunities provided to parents in support of reunification.

*6.3.a.4.* When a recommendation to reunify a child with his/her family has been made, MDCPS shall develop an after-care plan with the family that identifies the services necessary to ensure that the conditions leading to the child's placement in foster care have been addressed, and that the child's safety and stability will be assured. MDCPS shall take reasonable steps to provide or facilitate access to services necessary to support the child during the trial home visit.

*6.3.a.5.* For each child who has a permanency goal of reunification and who is in fact returned home for purpose of reunification, MDCPS shall provide, subject to the approval of the Youth Court, such child with a 90-day trial home visit, unless the child had been in custody for less than 90 days. During any trial home visit period, a MDCPS caseworker shall meet with the child in the home at least two times per month.

    *6.3.a.5.a.* By July 1, 2018 at least 75% of foster children who are reunified and who were in custody longer than 90 days shall receive a 90-day trial home visit period or have case record documentation reflecting the Youth Court's objection to such a trial home visit. During the trial home visit period, MDCPS shall provide or facilitate access to the services identified in the child's after-care plan, consistent with the 2nd MSA requirements.

    *6.3.a.5.b.* By January 1, 2019 at least 90% of foster children who are reunified and who were in custody longer than 90 days shall receive a 90-day trial home visit period or have case record documentation reflecting the Youth Court's objection to such a trial home visit. During the trial home visit period, MDCPS shall provide or facilitate access to the services identified in

the child's after-care plan, consistent with the 2nd MSA requirements.

*6.3.a.6.* Before the end of any trial home visit period, MDCPS shall convene a meeting with the child's parents and the child to determine the appropriateness of a final discharge. If final discharge is determined to be appropriate, MDCPS shall make the appropriate application to the Youth Court to be relieved of custody.

*6.3.b.* Adoption

*6.3.b.1.* Children in custody with the primary permanency goal of adoption shall have an assigned adoption specialist and an adoption plan that identifies the child specific activities that MDCPS will undertake to achieve adoption and the timeframes in which the activities will be undertaken.

*6.3.b.1.a.* By July 1, 2018 at least 70% of children in custody with the primary permanency goal of adoption shall have an assigned adoption specialist and an adoption plan that identifies the child-specific activities that MDCPS will undertake to achieve adoption.

*6.3.b.1.b.* By January 1, 2019 at least 90% of children in custody with the primary permanency goal of adoption shall have an assigned adoption specialist and an adoption plan that identifies the child-specific activities that MDCPS will undertake to achieve adoption.

*6.3.b.2.* A termination of parental rights (TPR) referral shall be made on behalf of a child before the child has spent more than 17 of the last 22 months in foster care unless an available exception pursuant to the federal Adoption and Safe Families Act ("ASFA") has been documented by MDCPS in the child's case record. Subsequent to the initial ASFA exception, MDCPS may continue the exception for only one additional six-month period unless continued invocation of the exception is reviewed, approved and documented semi-annually by the RD assigned to the county of responsibility for the child.

*6.3.b.2.a.* By July 1, 2018 a termination of parental rights referral shall be made on behalf of at least 70% of children who have spent 17 of the previous 22 months in foster care by the last day of a child's seventeenth month in care, unless an available exception

pursuant to ASFA has been documented by MDCPS in the child's case record.

*6.3.b.2.b.* By January 1, 2019 a termination of parental rights referral shall be made on behalf of at least 80% of children who have spent 17 of the previous 22 months in foster care by the last day of a child's seventeenth month in care, unless an available exception pursuant to ASFA has been documented by MDCPS in the child's case record.

*6.3.b.2.c.* By January 1, 2020, a termination of parental rights referral shall be made on behalf of at least 90% of children who have spent 17 of the previous 22 months in foster care by the last day of a child's seventeenth month in care, unless an available exception pursuant to ASFA has been documented by MDCPS in the child's case record.

*6.3.b.3.* MDCPS shall provide to the Monitor a report of all TPR referrals made during the monitoring period, the date those TPR referrals were made, and the date the TPR petition was filed with the court.

*6.3.c.* Post-Adoption Services

Defendants shall establish and maintain a system of post-adoptive services to stabilize and maintain adoptive placements. Adoptive families eligible for adoption subsidies shall have access to these services, which may include services such as counseling, mental health treatment and crisis intervention, family preservation and stabilization services, and peer support.

*6.3.d.* Durable Legal Custody and Guardianship

*6.3.d.1.* The permanency goals of durable legal custody and guardianship may be assigned when there are documented efforts in the child's case record to move the child to adoption and documentation of a reasonable basis why it is in the child's best interests not to be considered for adoption.

*6.3.d.2.* When the permanency goals of durable legal custody and guardianship are assigned to a child under the age of 14 years old or living with a non-relative, MDCPS shall provide to the Monitor at the end of each monitoring period, information from the child's case record documenting efforts to move the child to adoption and documentation of a reasonable basis why it is in the child's best interests not to be considered for adoption.

*6.3.e.*  Another Permanent Planned Living Arrangement (APPLA)

If MDCPS concludes, after considering reunification, adoption, durable legal custody, and permanent placement with a relative, that these permanency plans are inappropriate or unavailable for a child, MDCPS may assign a permanency goal of APPLA for the child. In such circumstances, (1) the child must be at least 16 years old and (2) MDCPS must document a compelling reason why this permanency goal is in the best interest of the child.

*6.4*  Permanency Reviews

*6.4.a.*  A child's permanency plan shall be reviewed in a court or administrative case review at least every six months. Foster care reviews shall satisfy this administrative case review requirement. MDCPS will take all reasonable steps, including written notice, to ensure the participation of the child, parents, caregivers, and relevant professionals in court or administrative reviews.

*6.4.a.1.*  By July 1, 2018 at least 80% of foster children who have been in custody for at least six months shall have a timely court or administrative case review consistent with 2nd MSA requirements.

*6.4.a.2.*  By January 1, 2019 at least 90% of foster children who have been in custody for at least six months shall have a timely court or administrative case review consistent with 2nd MSA requirements.

*6.4.b.*  MDCPS will take all reasonable steps to ensure that a court review, which may be called a review, dispositional, or permanency hearing, is held for each child in foster care custody within 12 months of initial placement, and annually thereafter.

*6.4.b.1.*  By July 1, 2018 for at least 80 % of foster children who have been in custody for at least 12 months MDCPS shall make reasonable efforts to have a timely annual court review scheduled consistent with 2nd MSA requirements.

*6.4.b.2.*  By January 1, 2019 for at least 90% of foster children who have been in custody for at least 12 months MDCPS shall make reasonable efforts to have a timely annual court review scheduled consistent with 2nd MSA requirements.

*6.4.c.*  MDCPS shall review documented exceptions pursuant to ASFA for children who have spent more than 17 of the previous 22 months in foster care during the child's foster care review.

*6.5*  Permanency Performance Indicators

*6.5.a.*  By July 1, 2018, the Monitor will establish the performance standards for the following indicators, informed by the certified baseline performance established during the Stipulated Third Remedial Order ("STRO"):

6.5.a.1.   Of all children in foster care on the first day of a 12-month period, which shall commence on October 1st of any given year, the percent of children discharged from foster care to permanency within 12 months. The numerator is the number of children in the denominator who discharged from foster care to permanency within 12 months;

6.5.a.2.   Of all children in foster care on the first day of a 12-month period, which shall commence on October 1st of any given year, the percent of children discharged from foster care to permanency within 13-23 months. The numerator is the number of children in the denominator who discharged from foster care to permanency within 13 -23 months;

6.5.a.3.   Of all children in foster care on the first day of a 12-month period, which shall commence on October 1st of any given year, the percent of children discharged from foster care to permanency in 24 months and more. The numerator is the number of children in the denominator who discharged from foster care to permanency in 24 months and more.

6.5.b.   For all of the foregoing indicators, permanency is defined as: discharges from foster care to reunification with the child's parents or primary caregivers; durable legal custody; guardianship; or adoption. The parties expect the Monitor to establish performance standards that represent a substantial improvement above the certified baseline performance established during the STRO. The standards shall take effect October 1, 2018.

6.5.c.   By March 15, 2018, the Monitor will establish the performance standards for the following indicator, informed by the certified baseline performance established during the STRO.

6.5.d.   For all children in the custody of MDCPS who were adopted in FFY2017, the Monitor shall validate the average and median lengths of time to adoption finalization for each child from the date on which the child's adoption goal was established. The parties expect the Monitor to establish performance standards that represent a substantial improvement above the certified baseline performance established during the STRO. The standards shall take effect October 1, 2018.

## 7.   Transition to Independent Living

7.1   MDCPS shall provide each youth transitioning to independence with at least six (6) months' advance notice of the cessation of any health, financial, or other benefits that will occur at the time of transition.

7.2     Each foster youth age 14 years and older, regardless of his/her permanency plan, shall be provided with an opportunity to participate in the creation of an appropriate Independent Living service plan for a successful transition to adulthood.

7.3     Each foster youth age 14 years and older shall have access to the range of supportive services necessary to support their preparation for and successful transition to adulthood, including Independent Living services eligible for federal reimbursement under the Chaffee program which in part promote employment or remove barriers to employment and MDCPS shall maintain sufficient resources to deliver Independent Living services to all youth described herein.

7.4     MDCPS shall implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond are enrolled for Medicaid coverage so that their coverage continues without interruption at the time of emancipation.

7.5     MDCPS shall implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond receive a start-up stipend of at least $1,000.00 at the time of emancipation, or as soon as practicable thereafter.

7.6     MDCPS shall implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond have access to a housing resource specialist responsible for assisting the youth obtain an adequate living arrangement.

7.7     MDCPS shall continue to implement policies and processes which ensure that youth emancipating from the foster care system at age 18 or beyond receive services and support under the State Educational Training and Vocational (ETV) Program for which they are eligible.

7.8     MDCPS shall assist youth in obtaining or compiling the following documents and such efforts shall be documented in the child's case record:

      7.8.a.    Educational records, such as a high school diploma or general equivalency diploma, and a list of schools attended, when age-appropriate.

      7.8.b.    A social security or social insurance number;

      7.8.c.    A resume, when work experience can be described;

      7.8.d.    A driver's license, when the ability to drive is a goal; if not a driver's license, then a state-issued, photo identification;

      7.8.e.    An original or certified copy of the youth's birth certificate;

      7.8.f.    Previous placement information;

      7.8.g.    Documentation of immigration, citizenship, or naturalization, when applicable;

      7.8.h.    Documentation of tribal eligibility or membership;

      7.8.i.    Death certificates when parents are deceased;

      7.8.j.    A life book or a compilation of personal history and photographs, as appropriate; and

      7.8.k.    A list of known relatives, with relationships, addresses, telephone numbers, and permissions for contacting involved parties.

8.    **Child Well-Being**

*8.1*    Physical and Mental Health Care

*8.1.a.*    Children entering foster care shall receive an initial medical screening within 72 hours of entering foster care.

*8.1.a.1.*    By July 1, 2018, 70% of children shall have an initial medical screening within 7 days of the child's entry into foster care.

*8.1.a.2.*    By July 1, 2019, 80% of children shall have an initial medical screening within 7 days of the child's entry into foster care.

*8.1.a.3.*    By July 1, 2020, 90% of children shall have an initial medical screening within 72 hours of the child's entry into foster care.

*8.1.b.*    Children entering foster care shall receive an EPSDT or other comprehensive medical exam within 30 days of entering foster care. If a child has received an EPSDT or other comprehensive medical exam within 72 hours of entering foster care, it will count for both the screening and comprehensive medical examination.

*8.1.b.1.*    By July 1, 2018, 70% of children shall have an initial EPDST or other comprehensive medical examination within 60 days of the child's entry into foster care.

*8.1.b.2.*    By July 1, 2019, 80% of children shall have an initial EPDST or other comprehensive medical examination within 60 days of the child's entry into foster care.

*8.1.b.3.*    By July 1, 2020, 90% of children shall have an initial EPDST or other comprehensive medical examination within 30 days of the child's entry into foster care.

*8.1.c.*    Following an initial EPSDT or other comprehensive medical examination, children shall receive periodic and on-going medical examinations according to the periodicity schedule set forth by the EPSDT program.

*8.1.c.1.*    By July 1, 2018, the Monitors in collaboration with MDCPS will establish the performance baseline for periodic and ongoing medical examinations;

*8.1.c.2.*    By July 31, 2018, the Monitor will establish performance standards for MDCPS to meet by July 1, 2019.

*8.1.c.3.*    By July 1, 2020, 90% of children shall be provided with periodic and on-going medical examinations.

8.1.d.  Practitioner recommended follow-up treatment will be provided to children throughout the time they are in foster care.

    8.1.d.1.  By October 31, 2017, the performance baseline for practitioner recommended follow-up treatment will be established by Public Catalyst as required in the STRO.

    8.1.d.2.  By July 1, 2018, MDCPS shall meet the initial performance standard established by Public Catalyst in the STRO.

    8.1.d.3.  By July 1, 2019, 90% of children shall be provided with practitioner recommended follow up treatment.

8.1.e.  Children in foster care shall receive a dental examination within 90 calendar days of foster care placement unless the child has had an examination within six months of placement, and every six months thereafter if they are age four or older. Foster children who reach the age of four while in foster care shall receive a dental examination within 90 calendar days of his/her fourth birthday, and every six months thereafter. Every foster child shall receive all medically necessary dental services.

    8.1.e.1.  By July 1, 2018, 60% of children shall have a dental examination within 90 days of the child's entry into foster care.

    8.1.e.2.  By July 1, 2019, 80% of children shall have a dental examination within 90 days of the child's entry into foster care.

    8.1.e.3.  By July 1, 2020, 90% of children shall have a dental examination within 90 days of the child's entry into foster care.

8.1.f.  Within 15 days of placement, MDCPS shall provide the foster parents or facility staff with the completed foster child information form or other electronic record containing available medical, dental, educational and psychological information about the child.

    8.1.f.1.  By July 1, 2018, 75% of children shall have information provided to foster parents or facility staff within 15 days of placement.

    8.1.f.2.  By July 1, 2019, 90% of children shall have information provided to foster parents or facility staff within 15 days of placement.

8.1.g.  By July 1, 2018, 85% of children shall have their Medicaid information provided to foster parents or facility staff at the time of placement.

## 8.2  Educational Services

8.2.a.  MDCPS shall review the educational record of each child who enters custody for the purpose of identifying the child's general and, if applicable, special educational needs and

shall document the child's educational needs within 30 calendar days of his/her entry into foster care.

8.2.b.  MDCPS shall take reasonable steps to ensure that school-age foster children are registered for and attending accredited schools within seven (7) calendar days of initial placement or any placement change, including while placed in shelters or other temporary placements.

8.2.c.  MDCPS shall make all reasonable efforts to ensure the continuity of a child's educational experience by keeping the child in a familiar or current school and neighborhood, when this is in the child's best interests and feasible, and by limiting the number of school changes the child experiences.

    8.2.c.1.  At least 90% of school-age foster children who enter custody shall have their educational records reviewed and their educational needs documented by MDCPS within 30 calendar days of their entry into foster care.

## MONITORING

### 9.0    Monitoring

9.1    The Parties agree that Public Catalyst shall be the Monitor of Defendants' compliance with the provisions of this 2nd MSA.

9.2    Neither party, nor any employee or agent of either party, shall have any supervisory authority over the Monitor's activities, reports, findings, or recommendations. The retention of the Monitor shall be conducted solely pursuant to the procedures set forth in this Agreement and shall not be governed by any formal or legal procurement requirements. The Monitor shall have a budget and staff sufficient to allow the Monitor to carry out the responsibilities described in this Agreement, and may contract with such experts or consultants as the Monitor may deem appropriate, in consultation with the parties. The Monitor, and any experts or consultants hired by the Monitor, may initiate and receive ex parte communications with the parties.

9.3    The Monitor's duties shall include to independently verify data reports and statistics provided pursuant to this 2nd MSA. The Monitor shall periodically conduct case record and qualitative reviews to monitor and evaluate the Defendants' performance with respect to the commitments in this 2nd MSA. The Monitor shall also review all plans and documents to be developed and produced by Defendants pursuant to this 2nd MSA and report on Defendants' compliance in implementing the terms of the 2nd MSA. The Monitor shall take into account the timeliness, appropriateness, and quality of the Defendants' performance with respect to the terms of this 2nd MSA.

9.4    The Monitor shall convene the parties no less frequently than quarterly in order for the Defendants to provide a detailed verbal report on the status of Defendants' implementation of the commitments contained in this 2nd MSA. At least one week in advance of these meetings, Defendants will supply the Monitor and Plaintiffs with available data and information with respect to the commitments contained in this 2nd MSA.

9.5     The Monitor shall provide a written report to the Court and the parties no less frequently than annually. The Monitor's reports shall set forth whether the Defendants have met the commitments, performance standards and outcomes contained in this 2nd MSA. In addition, the Monitor's reports shall set forth the steps taken by Defendants, the reasonableness of these efforts, and the adequacy of support for the implementation of these steps; the quality of the work done by Defendants in carrying out those steps; and the extent to which that work is producing the intended effects and/or the likelihood that the work will produce the intended effects. In addition, upon request of either party, the Monitor may issue a report to the Court more frequently than annually evaluating Defendants' performance with respect to any commitment in this 2nd MSA.

9.6     The Monitor will have full access to Defendants' data and data analysis. Defendants shall provide the Monitor with access to all data reports produced in the regular course of business respecting topics covered by this 2nd MSA. Notwithstanding the existence of Defendants' data, data analysis, and reports, however, the Monitor shall have the authority to prepare new reports on all topics covered by this 2nd MSA and to the extent the Monitor deems necessary.

9.7     Defendants agree to provide the Monitor with free and, upon request, private access to all individuals within MDCPS and persons within the Executive Branch of Mississippi state government, as the Monitor chooses; to assist the Monitor in gaining access to other stakeholders in the child welfare system (including but not limited to the staff of contract agencies); and to provide the Monitor with free access to all documents, data, and premises it deems relevant to their work (including but not limited to documents and data from contract agencies and courts). The Monitor agrees to respect the confidentiality of all information related to individually identifiable clients, subject to applicable law or the Confidentiality Order filed August 5, 2004. Defendants shall take no adverse action against individuals or agencies because they shared information with the Monitor pursuant to this 2nd MSA.

9.8     The reports of the Monitor shall be public documents filed with the Court, except that any individually identifying information and any other confidential information protected from disclosure by law shall be redacted or otherwise removed from any public report. Any such information received by the Monitor, unless already public, shall not be made public without Defendants' prior written permission. The Monitor shall provide copies of each of its reports to all named Defendants as well as to the heads of the Mississippi House Public Health and Human Services Committee and Appropriations Committee and Senate Committees on Appropriations and Public Health and Welfare.

9.9     The parties shall have access, through the Monitor, to all information made available to the Monitor, and to all other information related to ensuring compliance with and enforcing this 2nd MSA, subject to the existing confidentiality order in effect in this case. The Monitor may protect the identity of confidential sources of any such information.

9.10    The Monitor may periodically meet privately with the Court concerning issues related to this case, provided the parties are made aware of the occurrence of such a meeting.

*9.11*  If at any point the Monitor can no longer serve, the parties shall agree on another Monitor, if necessary, with input and recommendations from the outgoing Monitor.

**10.    Movement of Commitments to Maintenance Status**

*10.1*  When MDCPS performance, as validated by the Monitor, has attained the highest designated performance standard or standards for one 12-month reporting period, as to any eligible section of this 2nd MSA, the parties agree to conduct good faith discussions at the next scheduled quarterly meeting following the publication of the Monitor's annual report regarding whether that section of this 2nd MSA and can be designated as "To Be Maintained." In the event the parties are unable to reach a unanimous decision whether the section shall be designated as "To Be Maintained," the Monitor shall have the authority to make the designation but only after consultation with the parties and validation by the Monitor that MDCPS performance in that section has attained the highest designated performance standard or standards for 24 months. The sections eligible for designation as "To Be Maintained" exclude: §1.3 Caseloads, §2 Child Safety and Maltreatment in Care, §3 Family-Based Placements, §4 Placement Standards, §6 Child and Youth Permanency and Adoption.

*10.2*  Upon designation as "To Be Maintained", the section will not be actively monitored.  At the Monitor's discretion, the Monitor may request, and MDCPS will supply information and data relating to any section in the "To Be Maintained" classification, including information sufficient to verify the data.  If the information and data demonstrate a significant departure from the section, the Monitor shall move the section back into the main active monitoring section of this 2nd MSA.


**ENFORCEMENT AND EXIT**

*11*    **Enforcement and Exit**

*11.1*  From January 1, 2018 through December 31, 2019, Plaintiffs' rights under paragraph 8 of the STRO will remain in effect for violations of those still applicable provisions of the STRO and for violations of this 2nd MSA, except that during this period, before exercising their rights under this paragraph, Plaintiffs shall:

*11.1.a.*  Notify Defendants in writing of their intent and basis for doing so;

*11.1.b.*  Unless Plaintiffs deem the situation an emergency, and provide support for that assertion, Plaintiffs and Defendants shall first meet with the Monitor during a period not to exceed 30 calendar days and attempt to resolve the open issues. If necessary, and at Plaintiffs' request, the dispute may be resolved with the entry of a specific, additional remedial order to address the issue[s] raised by Plaintiffs.

*11.1.c.*  Plaintiffs agree not to seek relief for isolated or minor violations or for violations related solely to an individual child.

*11.1.d.*  In the absence of agreement by the end of the 30 day period, or the extension of that period for an additional period of no more than 30 days upon the mutual

agreement of the parties, Plaintiffs will seek a remedial order from the court pursuant to paragraph 1 of the STRO.

11.2  Beginning January 1, 2020, the following enforcement standards shall apply. If Plaintiffs believe that Defendants are not in substantial compliance with any provisions of this 2nd MSA, Plaintiffs shall notify the Defendants in writing of the asserted non-compliance and the basis for that assertion.  The parties shall meet with the Monitor as soon as practicable, but no later than 30 calendar days thereafter.  If the parties are unable to reach a resolution with regard to the asserted non-compliance within that 30 day period, or in an additional 30 day period if both parties agree to the extension, Plaintiffs shall have the right to file a motion for contempt with regard to the asserted non-compliance.

11.2.a.  Defendants may seek a court-ordered modification of any provision of this 2nd MSA pursuant to Rule 60(b) of the Federal Rules of Civil Procedure if significant changes in factual conditions, beyond Defendants' control and not contemplated by the Parties at the time this 2nd MSA was entered into, make the provision unworkable, make compliance substantially more onerous, or make enforcement detrimental to the public interest, and the changed circumstance occurred despite Defendants' reasonable effort to comply with this 2nd MSA.

11.2.b.  This 2nd MSA represents the full agreement of the parties and it is the intention of the parties that it be enforced in full.

11.3  Defendants may seek an order dismissing court jurisdiction of this matter and any remedial orders that remain open at the time the application is made, upon Defendants' showing that they have achieved and maintained substantial compliance of all of the provisions of this 2nd MSA based upon 12 continuous months of data that has been verified by the Monitor, prior to the application.

## ATTORNEYS' FEES

### 12  Attorney Fees

12.1  All parties reserve all claims and defenses with respect to all claims for an award of attorneys' fees and litigation expenses for Plaintiffs which claims shall be separately asserted and determined according to a schedule to be fixed by the Court.

#####

**AGREED TO AND APPROVED FOR ENTRY BY: FOR PLAINTIFFS:**

/s/ Marcia Robinson Lowry
Marcia Robinson Lowry (*pro hac vice* MBN 43991)
Sara Robinson-Glasser (*pro hac vice* MBN 47547)
A BETTER CHILDHOOD, INC.
1095 Hardscrabble Road
Chappaqua, NY 10514
Phone: 646.808.7344
Email: mlowry@abetterchildhood.org
        srglasser@abetterchildhood.org

Wayne Drinkwater (MBN 6193)
Michael J. Bentley (MBN 102631)
BRADLEY, ARRANT, BOULT & CUMMINGS, LLP
One Jackson Place, Suite 400
Jackson, MS 39201
Phone:   601.948.8000
Email: wdrinkwater@bradley.com
        mbentley@bradley.com

John Lang (*pro hac vice*  MBN 43987)
Attorney at Law
60 East 42nd Street, Suite 4600
New York, NY 10165
Tel: 212.300.0646
Email: john.lang@attorneylang.com

Christian D. Carbone (*pro hac vice* MBN 43986)
LOEB & LOEB, LLP
345 Park Ave.
New York, NY 10154
Tel:  212.407.4000
Email: ccarbone@loeb.com

**FOR DEFENDANTS:**

/s/_____
Governor Phil Bryant
State of Mississippi

/s/_____
Attorney General Jim Hood
State of Mississippi

**FOR DEFENDANTS:**

/s/ Kenya Key Rachal
Kenya Key Rachal (MBN 99227)
James N. ("Jake") Adams (MBN 101538)
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC
Post Office Box 14167
100 Vision Drive, Suite 400
Jackson, MS 39211
Phone: 601-351-2400
Email:  krachal@bakerdonelson.com

Harold E. Pizzetta, III (MBN 99867)
Assistant Attorney General
General Civil Division
Carroll Gartin Justice Building, 430 High Street
Jackson, MS 39201


SO ORDERED AND ADJUDGED, this the 19th day of December, 2016.



/s/Tom S. Lee_____
DISTRICT JUDGE

31