# IN THE UNITED STATES DISTRICT COURT FOR
# THE SOUTHERN DISTRICT OF MISSISSIPPI
# NORTHERN DIVISION

| | | |
|---|---|---|
| OLIVIA Y., et al | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 3:04cv251 TSL-FKB |
| | ) | |
| PHIL BRYANT, as Governor of the | ) | |
| State of Mississippi, *et al.,* | ) | |
| | ) | |
| Defendants | ) | |

## DEFENDANTS' MEMORANDUM OF AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR RELIEF UNDER SECTION 11.2.A OF THE 2ND MODIFIED SETTLEMENT AGREEMENT AND REFORM PLAN AND RULE 60(b) OF THE FEDERAL RULES OF CIVIL PROCEDURE

### I. INTRODUCTION

The Plaintiffs' contention that Mississippi's child welfare system is now dysfunctional and its management collapsing is demonstrably false. *See* Plaintiffs Memorandum of Law In Support Of The Remedy Phase Of Their Renewed Motion For Contempt And For Appointment Of A Receiver, page 1. [Dkt. No. 740]. Rather, the Mississippi Department of Child Protection Services ("MDCPS") is successfully implementing substantial reforms and achieving improved outcomes for the children in Mississippi's foster care system.[1] For example, MDCPS has all but eliminated overdue investigations.[2] MDCPS has doubled the number of adoptions finalized from fiscal year 2017 to fiscal year 2018.[3] MDCPS has exceeded targets for foster home recruitment

---

[1] Exhibit "A" July 3, 2018 Affidavit of Commissioner Jess H. Dickinson ("Dickinson Affidavit").
[2] Exhibit "B": Overdue Investigations Jan 17-May 18 Graph.
[3] Exhibit "C": 2nd Modified Settlement Agreement ("2nd MSA") Q1 2018 Report to Parties (MDCPS 009822-009850), pg. 6, see also Exhibit "A" Dickinson Affidavit, paragraphs, 13, 14 and 33..

by 150%[4] and eliminated a backlog of relatives awaiting licensure.[5] MDCPS has implemented new contract resources to provide intensive in-home services, which safely maintain children in their homes.[6] And with these resources, as well as the increased adoptions, MDCPS has safely reduced the number of children in foster care by approximately fourteen percent in the past year.[7]

In a May 17, 2011 order, this Court stated that "[i]t is unquestionably true, as plaintiffs have charged, that defendants failed to comply with most of the requirements established by the court-approved Period Two Implementation Plan."[8] In contrast, at the end of 2017, the period under the Stipulated Third Remedial Order ("STRO") that is being challenged here, MDCPS had complied with every requirement of that order except one - a 90% caseworker caseload metric.[9]

In the STRO and 2nd Modified Settlement Agreement and Reform Plan ("2nd MSA"), the parties set an ambitious goal for caseloads: MDCPS would improve the percentage of its caseworkers meeting certain weighted criteria from 31% in September 2016[10] to 90% by December 31, 2017,[11] and maintain 90% compliance for at least 12 continuous months.[12] MDCPS has made substantial progress toward that goal by:

---

[4] Exhibit "D": Stipulated Third Remedial Order Fourth Quarterly Report from Public Catalyst Group (10/1-2017 - 12/31/2017) dated March 29, 2018 ("Public Catalyst Fourth Quarter 2017 Report"), § 6.b.1, *see also* Exhibit "A" Dickinson Affidavit , paragraph 33.
[5] Exhibit "D": Public Catalyst Fourth Quarter 2017 Report §§ 6.a.1.a. and 6.a. 1. c.
[6] Exhibit "E": In-Circle Agreements with Canopy Children's Solutions ("Canopy") and Youth Villages, *see also* Exhibit "A" Dickinson Affidavit , paragraphs 34-36.
[7] Exhibit "F": In Care Over Time Feb. 17-June 18 Graph. *see also* Exhibit "A" Dickinson Affidavit, paragraph 37.
[8] Exhibit "G": May 17, 2011 Order, pg. 4  (Denying Motion for Contempt).
[9] Exhibit "C": Public Catalyst Fourth Quarter 2017 Report. The September 30, 2016 metric is for reference only, see also Exhibit "A" Dickinson Affidavit , paragraph 33..
[10] Exhibit "H": Caseload Target Memos from Public Catalyst (March 31 and April 4, 2017), see also Exhibit "A" Dickinson Affidavit , paragraphs 18-19.
[11] Exhibit "I": STRO [Doc. No. 713], § 5.d.
 The 2nd MSA incorporates in section 1.3 a weighted caseload formula. Under the formula, 90% of all caseworkers must not exceed a maximum weight of 1.0, which is the hypothetical optimal workload capacity.  Specific job functions are assigned certain values or weights. For example, each investigation has a weighted value of .0714, each ongoing foster care case is .0714, each in home case is .00588, each adoption case is .0067, each foster home licensure is .0667, and each foster home licensing case is  .00667 and each renewal .0278.  The Public Catalyst reporting system reflects caseworker who "Met" the 90% standard, which is defined as caseworkers with a weighted caseload of less than 1.0.  However, Public Catalyst also reports a "Close" category, which is defined as caseworkers

- Aggressively hiring caseworkers, onboarding more than 350 in 2017 alone.[13]

- Aggressively improving retention with enhanced training,[14] an employee emotional assistance program,[15] increases in pay,[16] and an additional 26 supervisors in the field.[17]

- Emphasizing caseload management and data driven decision making by supervisory staff in the field.[18]

These efforts have led to a substantial increase in caseload compliance to 61% on December 31, 2017.[19]

MDCPS also has fulfilled its obligation to request necessary funding from the Mississippi Legislature to continue these efforts and move forward towards compliance with a 90% caseload requirement. However, in its 2018 session, the Legislature did not, after balancing all relevant financial constraints, appropriate the necessary funds requested by MDCPS for FY 2019 (July 1, 2018 to June 30, 2019). Specifically, after receiving MDCPS's request for $133,626,9898.78 in state funds,[20] an amount that was necessary to operate the Agency and comply with its

---

with a weighted caseload of greater than 1.0 but less than 1.2 and three other Over categories. Caseload compliance under this system changes daily and is impacted by many variables.

[12] Exhibit "J": 2nd MSA [Dkt. No. 712], §§ 1.3.a and 11.3, *see also* Exhibit "A" Dickinson Affidavit, paragraph 18.
[13] Exhibit "D": Public Catalyst Fourth Quarter 2017 Report , § 2.g., *see also* Exhibit "A" Dickinson Affidavit , paragraph 19.
[14] Exhibit "K": Professional Development Plan for CY2018, (Submitted Dec. 15, 2017, Responsive to 2MSA §§1.2.a -b - MDCPS 005041-005047);  *see also* Exhibit "L" Clarification of Pre-Service Training Materials (MDCPS 00851-008853).
[15] Exhibit "M":  February 2017 MDCPS *Protection Connection.*
[16] Exhibit "N":  December 14, 2017 Pay increases request approval letter from Mississippi State Personnel Board; *see also* Exhibit "O" January 19, 2018 letters from Commissioner Dickinson to FPWI, FPWII, and FPS workers, *see also* Exhibit "A" Dickinson Affidavit , paragraphs 20-22.
[17] Exhibit "P":  Supervisor Hiring Data 2017
[18] Exhibit "Q":  March 26, 2018 Spring 2018 Regional and Bureau Directors Meeting Agenda.
[19] Exhibit "D":  Public Catalyst Fourth Quarter 2017 Report, §5.d.
[20] Exhibit "R":  MDCPS FY 2019 Revised Budget Request Spreadsheet To Mississippi Legislature ("MDCPS FY 2019 Revised Budget Request"), *see also* Exhibit "A" Dickinson Affidavit,  paragraph 29.

obligations in this litigation,[21] the Legislature appropriated only $109,994,298.00, [22] leaving MDCPS $23 million short of its fiscal needs for FY 2019. With this shortfall, MDCPS cannot grow its staff, and without additional staff, MDCPS cannot reach compliance with the 90% caseload requirement.

When the parties negotiated the 2nd MSA, they recognized that the implementation of major reforms to a state child welfare system includes challenges beyond the Defendants' control. To avoid the disruption to those reforms that inevitably would come with an endless cycle of contempt motions for failure to meet any specific requirement or metric in the 2nd MSA unrelated to Defendants' conduct, the parties and the Court approved a provision in the 2nd MSA to allow modifications of Defendants' obligations under such circumstances.

> Section 11.2.a. states:
>
> Defendants may seek a court-ordered modification of any provision of this 2nd MSA pursuant to Rule 60(b) of the Federal Rules of Civil Procedure if significant changes in factual conditions, beyond Defendants' control and not contemplated by the Parties at the time this 2nd MSA was entered into, make the provision unworkable, make compliance substantially more onerous, or make enforcement detrimental to the public interest, and the changed circumstance occurred despite Defendants' reasonable effort to comply with this 2nd MSA.[23]

That relief is now necessary.

Despite MDCPS's challenges with achieving the 90% caseload metric, MDCPS's recent reforms have been a success and outcomes have substantially improved for the children and families MDCPS serves. With the 90% caseload metric now beyond Defendants' control—as a direct consequence of a significant change in factual conditions—equity mandates relief under Section 11.2.a. of the 2nd MSA and Rule 60(b).

---

[21] Exhibit "A" Dickinson Affidavit, paragraph 29, *see also* Exhibit "S" *Foster Care Agency Seeks Money to Meet Mandates*, Emily Wagster Pettus, CLARION LEDGER, March 18, 2018, see also.
[22] Exhibit "T": Mississippi Legislative Budget Office, *Budget Bulletin* Fiscal Year 2019 (Compiled May 1, 2018), see also Exhibit "A" Dickinson Affidavit , paragraph 30.
[23] Exhibit "J": 2nd MSA, §11.2.a.

4

## II. ANALYSIS AND ARGUMENT

**A. Due to an unforeseen, significant change in factual conditions beyond Defendants' control, the caseload requirement of the 2nd MSA has been rendered unworkable and Defendants' may request relief under Rule 60(b).**

Any major reform to a state agency involves many actors, factors, and variables. Some are outside the control of any state agency including MDCPS. The 2nd MSA recognizes this reality.

At its outset, the 2nd MSA acknowledges that the Mississippi Legislature controls the appropriation of funds for all of state government.[24] And Section 11.2.a. permits Defendants to seek a court-ordered modification of the agreement under Rule 60 when (1) a significant change in factual conditions has occurred; (2) the change was beyond Defendants' control; (3) the change was not contemplated by the Parties when the agreement was executed; (4) the change makes the provision unworkable, compliance substantially more onerous, or enforcement detrimental to the public interest; and (5) the change occurred despite Defendants' reasonable efforts towards compliance.[25]

Here, the Legislature's FY 2019 MDCPS appropriation precludes the additional hiring necessary for MDCPS to comply with the 90% caseworker caseload requirement, rendering it unworkable and clearly justifying access to Rule 60 relief.

MDCPS has unquestionably experienced a significant change in factual conditions. Throughout 2017, MDCPS engaged in virtually unlimited hiring.[26] And although, MDCPS's staff grew, it did not reach the staffing levels necessary for compliance with the 90% metric.[27] Then, in late December of 2017, MDCPS's ability to grow its staff was dramatically and

---

[24] Exhibit "J": 2nd MSA, Introduction
[25] Exhibit "J": 2nd MSA, §11.2.a.
[26] Exhibit "U: July 2, 2018 Affidavit of Kris Jones.
[27] Exhibit "A": Dickinson Affidavit, paragraph 19.

5

unexpectedly impaired. As part of its efforts to address a projected $52 million budget deficit and the resulting financial crisis, MDCPS had to maintain its staff at current levels until additional funding could be obtained for the following fiscal year.[28]

In response to that crisis and dire need, MDCPS requested increased state funding from the Mississippi Legislature.[29] Specifically, MDCPS informed the Legislature that additional funding was necessary for operational purposes and to comply with *Olivia Y* requirements.[30] For state fiscal year 2018, the Legislature appropriated MDCPS $97,969,323, and it later added a $12 million deficit appropriation, totaling $109,969,323.[31] MDCPS requested $133,626,898.78 for state FY 2019, an increase of $23,657,575.78.[32] In response, the Legislature effectively level funded the Agency with a $97,994,298 general fund appropriation and a $12,000,000 capital expense appropriation.[33]

This significant change in factual circumstances was beyond the Defendants' control. The Mississippi Legislature controls the appropriation of state funds. Article I, Section 1 of the Mississippi Constitution states that "[t]he powers of the government of the State of Mississippi shall be divided into three distinct departments, and each of them confined to a separate magistracy, to-wit: those which are legislative to one, those which are judicial to another, and those which are executive to another."[34] Article I, Section 2 mandates that "[n]o person or collection of persons, being one or belonging to one of these departments, shall exercise any

---

[28] Exhibit "V": December 20, 2017 Taylor Cheeseman Memo to Kris Jones, *see also* Exhibit "A" Dickinson Affidavit, paragraphs 27-32.
[29] Exhibit "R": MDCPS FY 2019 Revised Budget Request.
[30] Exhibit "A" Dickinson Affidavit, paragraph 29, *see also* Exhibit "S" *Foster Care Agency Seeks Money to Meet Mandates*, Emily Wagster Pettus, CLARION LEDGER, March 18, 2018.
[31] Exhibit "W": Mississippi Legislative Budget Office, *Budget Bulletin* Fiscal Year 2018 (Compiled June 23, 2017).
[32] Exhibit "R": MDCPS FY 2019 Revised Budget Request, *see also* Exhibit A, Dickinson Affidavit, paragraph 29.
[33] Exhibit "T": Mississippi Legislative Budget Office, *Budget Bulletin* Fiscal Year 2019 (Compiled May 1, 2018), *see also* Exhibit A, Dickinson Affidavit, paragraph 30.
[34] Miss. Const. Art. I, §1.

power properly belonging to either of the others."[35] "Indeed, 'the Constitution regards the Legislature as the sole repository of power to make appropriations of moneys to be paid out of the state treasury.'"[36]

This significant change in factual circumstances was not contemplated when the parties entered into the 2nd MSA. While the parties were aware that the Legislature might fund MDCPS in an amount less than requested, no one contemplated that MDCPS would experience a major fiscal crisis in FY 2018 and that the Legislature would underfund MDCPS's FY 2019 budget request by $23 million—an amount MDCPS advised the Legislature would be required to comply with the requirements of the 2nd MSA. The parties, therefore, did not contemplate in December 2016 that the Legislature would provide funding that was over $23 million less than the funding necessary to meet operational needs and comply with the 90% caseload metric. For these same reasons, this significant change in factual conditions occurred despite MDCPS's reasonable efforts to comply with the caseload requirement.

Three variables affect caseload compliance: agency staffing, MDCPS's total workload at a given time, and the distribution of work among staff and across the State. As for agency staffing, MDCPS has aggressively sought sufficient funding from the Mississippi Legislature to continue efforts in the coming fiscal year to grow its workforce.[37] This follows MDCPS's year-long efforts in 2017 to grow its workforce with aggressive hiring and intensive efforts to improve retention through enhanced training,[38] an employee emotional assistance program,[39] increases in

---

[35] Miss. Const. Art. I, §2.
[36] *Clarksdale Mun. Sch. Dist. v. State*, No. 2015-CA-01227-SCT, 13 (Miss. Oct. 19, 2017) (quoting *Colbert v. State*, 86 Miss. 769, 778, 39 So. 65, 67 (1905)) (Maxwell, J., Specially Concurring).
[37] Exhibit "R":  MDCPS FY 2019 Revised Budget Spreadsheet To Mississippi Legislature; *see also* Exhibit "S" *Foster Care Agency Seeks Money to Meet Mandates*, Emily Wagster Pettus, CLARION LEDGER, March 18, 2018, and Exhibit "A" Dickinson Affidavit, paragraph 29.
[38] Exhibits "K":  Professional Development Plan for CY2018  (MDCPS 005041-005047); *see also* Exhibit "L" Clarification of Pre-Service Training Materials, (MDCPS 00851-008853).

pay,[40] and an additional 26 supervisors in the field.[41] MDCPS has also attacked the distribution of work, emphasizing the need for managerial staff in the field to take caseloads into consideration when assigning, and reassigning, cases to workers.[42]

And MDCPS has expanded the resources available to safely maintain children in their own homes, reducing trauma to the children,[43] and improving efficiency in its preparations for termination of parental rights and adoption,[44] thereby reducing the Agency's workload by keeping children out of foster care and more efficiently discharging children to permanency. In other words, since the 2nd MSA was entered into the Defendants have made reasonable efforts to comply with the 90% caseload requirement through a concerted effort to address each variable within the Defendants' control.

But despite these efforts, compliance has not been achieved as a result of the lack of state funds necessary to allow MDCPS to continue efforts to grow its workforce. And without additional staff, MDCPS cannot reach and maintain the 90% caseload metric. Because compliance has been rendered unworkable by an unforeseen, significant change in factual conditions beyond the Defendants' control and despite the Defendants' reasonable efforts at compliance, the Defendants are entitled to Rule 60 relief from the 90% caseworker caseload requirement under Section 11.2.a. of the 2nd MSA.

---

[39] Exhibit "M": February 2017 MDCPS *Protection Connection.*
[40] Exhibit "N": December 14, 2017 Pay increases request approval letter from Mississippi State Personnel Board, *see also* Exhibit "A" Dickinson Affidavit, paragraphs 20-22.
[41] Exhibit "P": Monthly Reports for ASWS hires Jan-Dec 2017.
[42] Exhibit "Q": March 26, 2018 Spring 2018 Regional and Bureau Directors Meeting Agenda, see also Exhibit "A" Dickinson Affidavit, paragraphs 36-37. .
[43] Exhibit "E": In-Circle Agreements with Canopy and Youth Villages; *see also* Exhibit "A" Dickinson Affidavit, paragraphs 34-36.
[44] Exhibit "C": 2nd MSA Q1 2018 Report to Parties (009822-009850), pg. 6; *see also* Exhibit "A" Dickinson Affidavit, paragraphs 13,14 and 33.

**B. The financial circumstances now faced by the Defendants renders the continued enforcement of this obligation inequitable and necessitates relief under Rule 60(b)(5) and/or Rule 60(b)(6).**

Federal Rule of Civil Procedure 60(b)(5) permits relief from a final judgment when "applying it prospectively is no longer equitable" and 60(b)(6) authorizes relief based on "any other reason that justifies relief."[45] A motion for relief under 60(b)(5) or 60(b)(6) must also be filed within a reasonable time.[46]

Rule 60(b)(5) provides an important means for modification or vacation of a judgment or order if "a significant change in either factual conditions or in law" renders continued enforcement "detrimental to the public interest."[47]

Importantly, federal courts must also take a flexible approach to a 60 (b)(5) and (6) motion particularly in institutional reform litigation.[48] This is a lodestar in cases of this nature because the dynamic of institutional reform cases is starkly different from other cases. Indeed, institutional reform cases raise sensitive federalism concerns and have the ability to impact the

---

[45] Federal Rule of Civil Procedure 60(b) "provides a mechanism by which parties can, in certain situations, obtain relief from a final judgment absent an order from an appellate court." *Boddie v. Ocwen Fed. Bank FSB*, 2018 WL 2224071, at *1–2 (S.D. Miss. May 15, 2018) (quoting *United States v. Fernandez*, 797 F.3d 315, 318 (5th Cir. 2015)). The purpose of Rule 60(b) is to balance the principles of finality and justice in light of all relevant facts. *Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 401 (5th Cir. 1981). As such, the circumstances warranting Rule 60(b) relief "must necessarily be evaluated on a case-by-case basis." *In re Osborne*, 379 F.3d 277, 283 (5th Cir. 2004). "[T]he decision to grant or deny relief under Rule 60(b) lies within the sound discretion of the district court and will be reversed only for abuse of that discretion." *Hesling v. CSX Transp., Inc.,* 396 F.3d 632, 638 (5th Cir. 2005) (quoting *Edwards v. City of Houston,* 78 F.3d 983, 995 (5th Cir. 1996)). Furthermore, the Fifth Circuit has long held that Rule 60(b)(6) "is a grand reservoir of equitable power to do justice in a particular case when relief is not warranted by the preceding clauses." *Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 642–43 (5th Cir. 2005) (quoting *Harrell v. DCS Equip. Leasing Corp.*, 951 F.2d 1453, 1458 (5th Cir.1992)). And Rule 60(b)(6)'s broad language, "any other reason that justifies relief", gives courts the necessary power to vacate judgments in the interest of justice. *Lindy Investments III v. Shakertown 1992 Inc.*, 360 F. App'x 510, 513 (5th Cir. 2010) (citing Harrell, 951 F.2d at 1458).
[46] Fed. R. Civ. Proc. 60(c)(1).
[47] *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 384 (1992). The party requesting 60 (b)(5) relief bears the burden of establishing that changed circumstances justify the requested relief but once the party meets this burden a court abuses its discretion "when it refuses to modify an injunction or consent degree in light of such changes." *Agostini v. Felton*, 521 U.S. 203, 215 (1997).
[48] *Horne v. Flores*, 557 U.S. 433, 448-450 (2009).

exercise of state legislative and executive powers particularly in the context of allocating revenues and resources.[49]

Several factors guide a court's analysis of a request for Rule 60 relief:

> 1) That final judgments should not lightly be disturbed; (2) that the Rule 60(b) motion is not to be used as a substitute for appeal; (3) that the rule should be liberally construed in order to do substantial justice; (4) whether the motion was made within a reasonable time; (5) whether--if the judgement was a default or a dismissal in which there was no consideration of the merits--the interest in deciding cases on the merits outweighs, in the particular case, the interest in the finality of judgments, and there is merit in the movant's claim or defense; (6) whether there are any intervening equities that would make it inequitable to grant relief; and (7) any other factors relevant to the justice of the judgment under attack.[50]

A significant change in factual circumstances has rendered enforcement of a 90% caseworker caseload metric detrimental to the public interest and justifies the equitable relief requested by MDCPS. Moreover, the use of the 90% caseload requirement as the foundation for appointing a receiver to take over the delivery of child welfare services in the State of Mississippi would be manifestly unjust.

The Motion is also not a substitute for an appeal, and the 2nd MSA was not a default or dismissal. Additionally, the Motion is made within a reasonable time. MDCPS's appropriation bill was signed by the Governor April 12, 2018.[51] Since that time, MDCPS has evaluated, and continues to evaluate, every budgetary option at its disposal to find alternative ways to live within its means for FY 2019, which began July 1, 2018, in light of its overall mission to serve children and families in the State of Mississippi.

There are also no intervening equities that would mandate denial of relief. In fact, due to the improved outcomes for children in Mississippi's foster care system, the Plaintiffs' interests

---

[49] *See e.g. Frew v. Hawkins*, 540 U.S. 341 (2004).
[50] *Edward H. Bohlin Co., Inc. v. Banning Co., Inc.*, 6 F.3d 350, 356 (5th Cir. 1993) (*citing Seven Elves v. Eskenazi*, 635 F.2d 396, 402 (5th Cir. 1981)).
[51] Exhibit "X":  House Bill 1600, Mississippi Legislature 2018 Regular Session, Signed by Governor April 12, 2018

would be served by the stability that would come with relief from this single statistical measure by allowing MDCPS to focus on programs and matters within its control in order to maintain the ground that has been gained, and move forward with additional improvements and reforms. It is, therefore, clear that Rule 60 relief would do substantial justice, and this interest outweighs the interest in the finality of judgments, especially given the fact that the parties with Court approval contemplated relief under such circumstances in the 2nd MSA.

Again, the parties agreed that MDCPS should attain and maintain 90% caseload compliance, while recognizing that MDCPS must seek and obtain adequate funding to do so. A major fiscal crisis and inadequate state funding beyond the parties' control has thwarted MDCPS's reasonable efforts at compliance. Without the additional funding, MDCPS cannot add the staff necessary to attain the 90% caseload metric and, in light of the substantially improved outcomes children and families are experiencing under MDCPS's reforms, it would be inequitable and unjust to punish MDCPS for not reaching a caseload requirement it cannot currently achieve as a result of factors beyond its control.

### III. CONCLUSION

Because of inadequate funding by the Mississippi Legislature in FY 2018, and the resulting financial crisis, and because of the Legislature's decision to appropriate $23 million less than MDCPS's budget request for FY 2019, and despite extensive and extraordinary efforts to manage its finances and operations and improve caseload compliance, MDCPS does not have the ability to hire and retain the additional caseworkers necessary to meet and maintain a 90% caseload metric until it receives additional funding. These events are significant, unforeseen changes in factual conditions beyond the Defendants' control.

For all of these reasons, the Defendants respectfully request that the Court relieve MDCPS of the 90% caseworker caseload requirement for State Fiscal Year 2019 and until MDCPS receives sufficient funding from the Mississippi Legislature to hire and retain the staff necessary to achieve this target.

Defendants also request general equitable relief including, in the discretion of the Court, a directive to Public Catalyst and MDCPS to develop a plan to achieve compliance with a reasonable level of caseload compliance within the constraints of funding by the Mississippi Legislature.

RESPECTFULLY SUBMITTED, this the 3rd day of July 2018.

> PHIL BRYANT, as Governor of the State of Mississippi, JESS H. DICKINSON, as Commissioner, Mississippi Department of Child Protection Services, and TRACY MALONE, as Deputy Commissioner of Child Welfare, Mississippi Department of Child Protection Services
>
> By: /s/ James L. Jones

OF COUNSEL:

BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC
Kenya Key Rachal (MSB #99227)
James L. Jones (MSB #3214)
Jake Adams (MSB #101538)
One Eastover Center
100 Vision Drive, Suite 400
Jackson, MS  39211
Telephone:  (601) 351-2400
Facsimile:  (601) 351-2424

Harold Pizzetta, III
Special Assistant Attorney General
OFFICE OF THE MISSISSIPPI ATTORNEY GENERAL
P. O. Box 220
Jackson, MS  39205

## CERTIFICATE OF SERVICE

      I hereby certify that I have this day electronically filed the foregoing with the Clerk of Court using the ECF system which sent notification of such filing to the following:

Marcia Robinson Lowry
Sara Robinson-Glasser
A BETTER CHILDHOOD
1095 Hardscrabble Road
Chappaqua, NY  10410

W. Wayne Drinkwater, Jr. (MSB #6193)
Michael J. Bentley (MSB #102631)
BRADLEY, ARANT, ROSE & WHITE, LLP
One Jackson Place
188 E. Capitol St, Ste 400
Jackson, MS  39201

Christian Carbone (pro hac vice)
LOEB & LOEB, LLP
345 Park Avenue
New York, NY  10154

      SO CERTIFIED, this the 3rd day of July 2018.

                                          /s/  James L. Jones