IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF
MISSISSIPPI NORTHERN DIVISION

OLIVIA Y., by and through her next friend, James D. Johnson;
JAMISON J., by and through his next friend, Clara Lewis;
DESIREE, RENEE, TYSON, and MONIQUE P., by and through
their next friend, Sylvia Forster; JOHN A., by and through his
next friend, James D. Johnson; CODY B., by and through his
next friend, Sharon Scott; MARY, TOM, MATTHEW, and
DANA W., by and through their next friend, Zelatra W.; AND
SAM H., by and through his next friend, Yvette Bullock; on their
own behalf and behalf of all others similarly situated,

                                          Plaintiffs.

                                          CIVIL ACTION NO.
v.                                         3:04-CV-251-TSL-FKB

PHIL BRYANT, as Governor of the State of Mississippi;
DONALD TAYLOR, as Executive Director of the Department
of Human Services; AND BILLY MANGOLD, as Director of
the Division of Family and Children's Services,

                                          Defendants.

---

**PLAINTIFFS' REPLY IN SUPPORT OF
THE REMEDY PHASE OF THEIR RENEWED MOTION FOR
CONTEMPT AND FOR THE APPOINTMENT OF A RECEIVER**

      Plaintiffs submit this reply in support of their renewed motion for contempt and for the appointment of a receiver. *See* Dkt. Nos. 739 and 740.

## I.    INTRODUCTION

      Defendants *concede* non-compliance with the stipulated caseload requirements, but say that non-compliance is excused by (1) their unilateral determination of what constitutes "substantial compliance," and (2) a lack of legislative funding, which they admit occurred *after* they failed to comply with the caseload targets. These excuses do not save Defendants from

violation of the Court's Stipulated Third Remedial Order [Dkt. No. 713] ("STRO"), or from a finding of contempt.

It is undisputed that Defendants failed to meet the caseload performance targets set by the STRO. This recent failure is not a stand-alone event. It must be evaluated in the context of the history of this case, and against a backdrop of failures brought to the Court's attention repeatedly, including three years ago. *See* Plaintiffs' 2015 Renewed Motion for Contempt, for an Evidentiary Hearing and for the Appointment of a Receiver [Dkt. No. 622 ("Renewed Motion for Contempt")] and Memorandum in Support [Dkt. No. 623]. These failures predate the alleged lack of legislative funding that apparently prompted Defendants' Rule 60(b) Motion; they are not a result of that lack of funding.

Moreover, a lack of legislative funding is not a defense to Defendants' non-compliance with unconditional promises made in stipulated court orders. If that were the law, then constitutional rights, and the court orders that enforce such rights, could be routinely circumvented and excused by legislative funding cuts. As a result of Defendants' failure to comply with this fundamental requirement of this Court's Orders, the Court should declare that more than seven years of non-compliance is enough, schedule a hearing if the Court deems that necessary, hold Defendants in contempt, and appoint a receiver.

**II.      ARGUMENT**

  **A. Applicable Civil Contempt Standard**

To justify a finding of civil contempt, a "movant must establish by clear and convincing evidence that (1) a court order was in effect, (2) the order required specified conduct by the respondent, and (3) the respondent failed to comply with the court's order." *McNeal v. Tate Cnty. Sch. Dist.*, 2016 WL 7156554, *9 (N.D. Miss. Dec. 7, 2016) (quoting *Petroleos Mexicanos*

*v. Crawford Enters*., 826 F.2d 392, 401 (5th Cir. 1987)).  Once the movant has shown a prima facie case, the burden falls on the violating party to "show either mitigating circumstances that might cause the district court to withhold the exercise of its contempt power, or substantial compliance with the ... order."  *Id.*

**B. It Is Undisputed That Defendants Violated The STRO By Failing To Comply With The Caseload Requirements.**

The Mississippi Department of Child Protection Services ("the Agency" or "MDCPS"), is—as it has been for many years—understaffed and under-resourced.  As a consequence, caseworkers in Mississippi have historically exercised responsibilities for an excessive number of foster children.  Such high caseloads prevent caseworkers from providing even a minimum level of attention to foster children, lead to high caseworker turnover rates, further diminish the quality of care provided to foster children, and prevent over-worked caseworkers from learning about children who may be living in dangerous conditions in foster homes.  In fact, as reflected in the 2017 Public Catalyst Fourth Quarter Report, the baseline maltreatment in care rate for foster children in Mississippi was 0.68—*twice* the Federal standard of .33.  This figure does not include reports that have been improperly screened out and thus are not counted.  *See* STRO Fourth Quarterly report attached hereto as "Exhibit A."

Pursuant to the STRO, *Defendants agreed that by December 31, 2017, they would be in full compliance with the caseload compliance performance targets established by Public Catalyst*.  As of July 2, 2018, the Agency's performance was at 58% statewide, the same percentage as on March 30, 2018.  The July 2, 2018 Public Catalyst caseload analysis report is attached hereto as "Exhibit B."  Caseworkers either meet the caseload requirement or they do not.  No matter how Defendants attempt to justify that failure, by December 31, 2017, the caseload percentage did not reach the required 90% compliance.  Importantly, the 90%

compliance percentage was a metric *agreed to* by the Defendants, and it is a target that is obviously less than complete 100% compliance. Accordingly, Plaintiffs submit that 90% *is* substantial compliance, and not 58% or even 75%.

### C. Defendants Have Not "Substantially Complied" With The STRO

To prove the defense of "substantial compliance," the contemnor bears the burden of proving that it "took all reasonable steps within [its] power to comply with the court's order." *See McNeal*, 2016 WL 7156554 at *11 (quoting *Mobile Cty. v. Purvis*, 703 F.2d 580 (11th Cir. 1983)). Defendants point to the following three ways in which they have allegedly exhausted all reasonable steps:

> As shown by the Agency's efforts at employee retention, its compliance with each requirement of the STRO other than the caseload metric, and its efforts to obtain sufficient funding from the Legislature, the Agency has taken all reasonable efforts within its power to comply.

*See* Defendant's Memorandum of Law in Support of Response and Objections to Plaintiffs' Motion for Relief Pursuant to Remedy Phase of Plaintiffs' Renewed Motion for Contempt, for an Evidentiary Hearing and for the Appointment of a Receiver ("Defendant's Opposition Brief") at pg. 10 [Dkt. No. 755].

### i. None of Defendants' excuses justify the failure to comply with the caseload metrics.

First, caseworker retention is not a new phenomenon in Mississippi. Defendants made the unconditional promise to be *in full compliance* with the caseload compliance targets by December 31, 2017 with full knowledge of retention problems. In fact, excessive caseloads managed by overworked caseworkers *creates* retention problems. For that very reason, Defendants were admittedly focused on hiring during the first through third quarters of 2017. *See* Opposition Brief at pg. 6. As the Defendants point out, however, soon after Jess Dickinson's

4

appointment, 225 workers departed. *See* Opposition Brief at pg. 6. This mass departure of caseworkers is indicative of underlying problems that exist within the current MDCPS administration, rather than proof that the Agency has taken all reasonable steps to address such problems.

Second, contrary to Defendants' assertion that there are other "wide ranging" areas in which the Agency has complied with the STRO, a closer look at those areas reveals that the Agency has complied with provisions of the STRO that are primarily "capacity building," as opposed to the critical child-related provisions. Aside from eliminating a backlog in licensing relative foster homes,[1] the examples of compliance set forth in Defendants' Opposition Brief include hiring caseworkers (an effort undercut by the Agency's retention problems), improving technology,[2] training new hires, and strengthening field operations. *See* Opposition Brief at pg. 7. Unlike these capacity-building provisions of the STRO, the caseload requirements are key to fulfilling the child-related requirements. Defendants have agreed to fulfill those child-related requirements during 2018.

### ii. The Impact of Non-Compliant Caseloads

Defendants retained Public Catalyst to provide technical assistance to the agency. Public Catalyst conducted an organizational analysis of Mississippi's provision of child welfare and foster care services. *See* Public Catalyst's Organizational Analysis, dated November 24, 2015,

---

[1] Although Defendants eliminated a large backlog of unlicensed homes within required time periods during 2017, compliance has subsequently declined on that measure. *See* MDCPS Report, dated June 7, 2018 at pg. 16, attached hereto as "Exhibit C."

[2] It appears that Defendants' commitment to have in place a new computer system by 2020 is now up in the air. This in itself may provide further evidence of non-compliance with agreed-upon requirements. *See id.* at pg. 12.

attached hereto as "Exhibit D." Within that initial assessment, Public Catalyst concluded that caseloads were a "*fundamental*" aspect of Mississippi's child welfare reform efforts and that "[t]he first order of business *must* be the creation and implementation of a comprehensive, dynamic plan to achieve manageable caseloads for staff within one year." *Id.* at 16 – 17 (emphasis added).

The importance of caseload compliance was further evidenced by the October 2017 *Medical Care Review* conducted by Public Catalyst. *See* MDCPC Medical Care Review attached hereto as "Exhibit E" (the "Public Catalyst 2017 Medical Review"). Pursuant to MDCPS policy, all children in its custody are required to have an initial health screening and a comprehensive health assessment upon entry into care, along with necessary follow-up. Caseworkers are charged with ensuring compliance with the requisite medical care. The Public Catalyst 2017 Medical Review includes the following noteworthy findings that highlight the lack of adequate medical care provided to children in MDCPS custody. Of those children included in the Medicaid claims data:

- Only 26% received an initial health screening within the required timeframe;
- Of the 244 children included in the Medicaid claims data, 71 had *no* claims for either an initial health screen or a comprehensive health assessment during their time in custody;
- Only half are receiving timely comprehensive health assessments; up to one-third may not receive any well child care while in custody;
- Only 31% of the 171 children who were age-eligible for the dental care requirement received an initial dental exam in the required timeframe;
- Out of 154 who were age-eligible for mental health assessments, only one Medicaid claim for a mental health assessment was made within the required timeframe. In other

words, less than 1% of children received a mental health assessment within the required timeframe;

- Developmental assessments appeared to be one of the weakest areas of medical care compliance; there were *no* Medicaid claims for developmental assessments within the required timeframe; and,
- 112 children received an initial comprehensive health exam, but only 21% of these received a follow-up comprehensive health exam. Public Catalyst determined that this data suggests a substantial reduction in follow-up well-child care for children who remained in custody beyond one year.

On the surface, Defendants have checked off many of the capacity-building requirements within the STRO. But as they concede, they have yet to reach compliance with provisions that directly impact children, like the caseload compliance failure presently before the Court. Defendants' non-compliant caseloads have been a continuing long-term failure that will continue to impact every other aspect of the child welfare reform efforts. *See e.g., Public Catalyst's Organizational Analysis,* Exhibit D, at 16 ("because the [child welfare] work is challenging and all of the work is expected to be done under tight time constraints, it is important that caseloads be manageable."). Lack of compliance with the caseload limit will inevitably cause a cascading series of other non-compliance issues; and Defendants' failure to meet the caseload limit is therefore the factor that drives Plaintiffs' request that the Court impose a receivership.

The requested relief is appropriate because Defendants have failed to rebut the prima facie showing of civil contempt by proving the defense of "substantial compliance." Defendants have failed to meet the burden of demonstrating that they have taken *all reasonable steps* to excuse non-compliance. *See e.g., Little Tchefuncte River Assoc. v. Artesian Util. Co., Inc.*, 155

F. Supp. 3d 637, 657 (E.D. La. 2015) ("Failure to comply consists of not taking all the reasonable steps within [one's] power to insure compliance with the order.").

### D. The Alleged "Mitigating Circumstances" Pertaining To Legislative Funding Cuts Do Not Justify Non-Compliance

Although there is no exhaustive list of mitigating circumstances which would excuse a violation of a court order, courts have generally considered whether the cause of the violation was "beyond the control of the defendant." *See McNeal*, 2016 WL 7156554 at *10.

Here, Defendants assert that,

> "the Legislature did not appropriate the funds necessary for the Agency to hire the number of caseworkers needed to meet the caseload requirements …. Simply put, the Agency found it had insufficient funds in its FY-2018 budget to achieve a net increase in hiring, and state agencies are prohibited by law from spending money they do not have."

*See* Opposition Brief at 11. Defendants have yet to explain how the 2018 and 2019 budgets prevented them from meeting the agreed upon caseload compliance targets by the December 31, *2017* deadline. Defendants are relying upon an *after-the-fact* event to justify a failure that occurred *earlier in time*. This same excuse forms the basis for Defendant's F.R.C.P. 60(b) motion.[3]

Defendants' efforts to secure legislative funding were too little too late. Their very modest effort to increase caseworkers' pay on December 14, 2017, by $4,000, does not justify or excuse the failure to meet the caseload compliance deadline that very same month. *See* Opposition Brief at 7. (And whether or not additional funds were or are appropriated for caseworker *salaries*, Defendants are obligated to comply with the caseload *limits*, as well as with

---

[3] Plaintiffs' Response to Defendants' F.R.C.P. 60(b) Motion will more fully address Defendants' argument that legislative funding cuts are "mitigating circumstances" that prevent compliance with the STRO. *See* Dkt. Nos. 756 and 757.

all other provisions of the 2nd Modified Mississippi Settlement Agreement and Reform Plan "2nd MSA".)  If anything, the last-minute request for additional salary funding appears to be a last-minute band-aid for a problem that was not properly addressed earlier.  The Governor is a Defendant in this action and could have, but did not, make good on the promise he made when he signed this settlement agreement to annually request "state funds and any federal/special fund authorization sufficient to effect the provisions and outcome measures set forth in this 2nd MSA."  Moreover, the Governor's obligation goes beyond simply requesting funds—*i.e.*, initiating the process to request money—it also includes "completion," *i.e.*, seeing the terms of the MSA fulfilled.  And, merely requesting funds is not a panacea:  the MSA specifically provides that nothing in the paragraph that obligates the Governor to request funds "in any way limits defendants' obligations under" the 2nd MSA. *See* Dkt. No. 712 at pg. 1.

Contempt is appropriate in this case in light of Defendants' direct violation of the STRO.  They have not shown "substantial compliance" or "mitigating circumstances" that impacted their ability to meet the December 31, 2017 caseload performance targets.  *See LaShawn A. v. Kelly*, 887 F.Supp. 297, 299-301, 317 (D.D.C. 1995), *aff'd sub nom. LaShawn A. v. Barry*, 107 F.3d 923 (D.C. Cir. 1996) (holding that neither lack of funds nor defendants' good faith was a defense to non-compliance).

### E. Appointment of a Receiver is Necessary in Light of Defendants' History of Non-Compliance

Defendants assert that the departure of at-will employees provides an excuse for their failure to comply with the STRO, and that this a defense to a finding of contempt.  It is not.  There is an important distinction to be made here: the finding of contempt is due to Defendants' *direct violation of the caseload requirements in the STRO*. That said, however, the lack of stability and continuity of key leadership further demonstrates the need for appointment of a

receiver. The important reform work necessary to protect the children of Mississippi cannot succeed without stable and focused leadership. The sudden departure of key leaders who were dedicated to and focused on the required remedial measures is a factor that cannot be ignored.

After more than seven years of non-compliance, Defendants continue to give excuses for their non-compliance. It has become a pattern that continues to erode Mississippi's already-broken child welfare system.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs request that this Court (1) find that defendants are in noncompliance with the STRO and 2nd MSA, hence in contempt of court; (2) appoint a general receiver with full authority to administer Mississippi's child welfare system and to bring it into compliance with the orders of this Court; and (3) grant such other and further relief as this Court deems necessary and proper.

RESPECTFULLY SUBMITTED, this the 20th day of July 2018.

*/s/ Marcia Robinson Lowry*
Marcia Robinson Lowry (*pro hac vice)*
Sara Robinson-Glasser (*pro hac vice*)
A Better Childhood, Inc.
1095 Hardscrabble Road
Chappaqua, NY 10514
Telephone (646) 808-7344
Facsimile: (914) 238-0365
Email: mlowry@abetterchildhood.org
      srglasser@abetterchildhood.org

W. Wayne Drinkwater, Jr. (MBN 6193)
Michael J. Bentley (MBN 102631)
BRADLEY ARANT BOULT CUMMINGS LLP
One Jackson Place, Suite 400
188 East Capitol Street
Jackson, Mississippi 39201
Telephone: (601) 948-8000
Facsimile: (601) 948-3000

10

Email: wdrinkwater@bradley.com
mbentley@bradley.com

Christian Carbone (*pro hac vice*)
LOEB & LOEB LLP
345 Park Avenue
New York, New York 10154
Telephone: (212) 407-4000
Email: ccarbone@loeb.com

*Plaintiffs' Counsel*

# CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will deliver copies to all counsel of record.

*/s/ Marcia Robinson Lowry*
Marcia Robinson Lowry (*pro hac vice*)