# EXHIBIT E

# MDCPS
# Medical Care Review

*Completed in accord with the Stipulated Third Remedial Order in Olivia Y*

October 2017



PUBLIC CATALYST

# Table of Contents

Follow-up Medical Care Case Record Review .................................................................................. 1
    I.   Health Case Record Review Methodology ........................................................................ 1
    II.  MDCPS Healthcare Requirements ..................................................................................... 1
    III. Initial Screenings and Assessments ................................................................................... 3
    IV. Follow-Up Healthcare ......................................................................................................... 5
    V.  Documentation of Healthcare in Child Welfare Case Record ........................................... 7
    VI. Regional Variations in Healthcare ..................................................................................... 7
    VII. Medical Care Gaps .............................................................................................................. 9
    VIII. Baseline and Target Setting .............................................................................................. 10
Appendix A ........................................................................................................................................ 12
Presumptive Eligibility E-Bulletin ...................................................................................................... 12

# Follow-up Medical Care Case Record Review

The Stipulated Third Remedial Order in *Olivia Y.* charged Public Catalyst with completing "*a sample case record review by October 31, 2017, to assess the extent to which follow-up medical care is identified as needed and provided to children who are in the custody of MDCPS.*" (7b1). This report provides the findings from that record review.

## I.  Health Case Record Review Methodology

This review focused on the cohort of 2,919 children who entered Mississippi Department of Child Protection Services (MDCPS) foster care between January 1, 2016 and December 31, 2016 and remained in care for at least six months. A random sample of 340 children who met these criteria, stratified by county, was generated for this review process. A subset of 123 of these children's case records was selected for an on-site case record review. This subset included all the sampled cases from the counties of: Greene, Hancock, Harrison, Jackson, Marion, and Pearl River. A breakdown of the foster care cohort is provided in Figure I.1 and a breakdown of the case review sample is below in Figure I.2. On-site case record data collection was conducted August 22 – 24, 2017. Data collection included recording health information found in MACWIS and in hard copy files for the 123 children subject to the case file review. A survey review instrument developed by the review team was utilized for data collection. A copy of the review instrument is attached as Appendix A.

| Figure I.1 Foster Care Cohort (N=2,919) | | | | Figure I.2 Case Review Sample (N=340) | | | |
|---|---|---|---|---|---|---|---|
| Age | Birth – age 2 | 903 | 31% | Age | Birth – age 2 | 98 | 29% |
| | Ages 3-5 | 485 | 17% | | Ages 3-5 | 66 | 19% |
| | Ages 6-8 | 502 | 17% | | Ages 6-8 | 60 | 18% |
| | Ages 9-11 | 383 | 13% | | Ages 9-11 | 57 | 17% |
| | Ages 12-14 | 336 | 12% | | Ages 12-14 | 34 | 10% |
| | Ages 15-17 | 307 | 11% | | Ages 15-17 | 25 | 7% |
| | Age 18 | 3 | 0% | | Age 18 | 0 | 0% |
| Gender | Female | 1439 | 49% | Gender | Female | 161 | 47% |
| | Male | 1479 | 51% | | Male | 179 | 53% |
| | N/A | 1 | 0% | | N/A | 0 | 0% |
| Region | II-E | 135 | 5% | Region | II-E | 16 | 5% |
| | III-N | 87 | 3% | | III-N | 10 | 3% |
| | III-S | 158 | 5% | | III-S | 18 | 5% |
| | II-W | 104 | 4% | | II-W | 12 | 4% |
| | I-N | 328 | 11% | | I-N | 38 | 11% |
| | I-S | 287 | 10% | | I-S | 33 | 10% |
| | IV-N | 174 | 6% | | IV-N | 20 | 6% |
| | IV-S | 196 | 7% | | IV-S | 23 | 7% |
| | V-E | 255 | 9% | | V-E | 30 | 9% |
| | VI | 215 | 7% | | VI | 25 | 7% |
| | VII-C | 393 | 13% | | VII-C | 46 | 14% |
| | VII-E | 201 | 7% | | VII-E | 24 | 7% |
| | VII-W | 258 | 9% | | VII-W | 30 | 9% |
| | V-W | 128 | 4% | | V-W | 15 | 4% |

The majority of children in MDCPS custody receive health care services through a Medicaid managed care plan and throughout the STRO period MDCPS leadership collaborated with the MS Division of Medicaid to obtain electronic health care claims data for children in its custody. Such claims data has not historically been available to MDCPS and, as a result, the agency has not been able to systemically track and monitor the provision of health care services to children in its custody. As the health care review approached, a cooperative agreement between MDCPS and the Division of Medicaid was finalized that allowed MDCPS to receive health care claims information for children in its custody. In addition, MDCPS and the Division of Medicaid collaborated to institute presumptive eligibility, effective November 15, 2017, which allows children coming into MDCPS custody to gain immediate medical coverage under Medicaid. A copy of the department's information alert to staff regarding presumptive eligibility is attached as Appendix A.

In order to utilize all available health care information during the review, Public Catalyst requested that MDCPS obtain Medicaid claims information for those children who were included in the original sample of 340 children. Initially, MDCPS was able to obtain this information for 244 of the children in the original sample, which was used for the analysis contained in this review. As Public Catalyst was completing drafting of the report, MDCPS was able to obtain data for the remaining 96 children from the original sample. Due to the timing, the claims data for those 96 children could not be included in the analysis. Nine of the 244 children in the electronic file did not have any Medicaid claims during their time in custody. Data therefore included Medicaid claims during the operative time in care for 235 children. Ninety-two of those 235 children were also subject to the on-site file review. Data analysis in this report therefore includes 92 children for whom Medicaid claims data and child welfare records of healthcare was available, 143 children for whom only Medicaid claims data were available, and 31 children for whom only case file review data was available.

| Figure I.3 Records for Children in Review Sample | |
|---|---|
| Case File Review Only | 31 |
| Medicaid Claims Data Only | 143 |
| Both Case File Review and Medicaid Claims Data | 92 |

The data collected was analyzed to identify:

- The extent to which initial healthcare was provided to children as required by MDCPS policy;
- The extent and types of follow-up healthcare provided to children;
- Any major gaps in initial and follow-up medical care;
- Any major variations in access to healthcare by region; and
- The extent to which healthcare was documented in the child welfare case record (either electronically or in the paper file).

## II.   MDCPS Healthcare Requirements

MDCPS policy[1] requires various kinds of healthcare within certain timeframes for all children who are in its custody. All children are required to have an initial health screening and a comprehensive health

---

[1] Mississippi DFCS Policy, Section D, 7 – 9. Revised 05/24/16, Final Effective 06/23/16.

2

assessment upon entry into care along with any necessary follow-up care. Dental care, mental health care, and developmental assessments are also required for children of certain ages. Figure II.1 below provides an overview of the MDCPS healthcare requirements.

| Figure II.1 MDCPS Healthcare Requirements | | |
|---|---|---|
| | Timeframe | Age |
| Initial health screening | Within 72 hours of custody | All children |
| Comprehensive health assessment | Within 30 calendar days of custody and yearly thereafter | All children |
| Developmental assessment | Within 30 days of foster care placement | Birth – age 3 |
| Mental health assessment | Within 30 calendar days of foster care placement | Ages 4 and older |
| Dental examination | Within 90 calendar days of foster care placement and every 6 months thereafter | Ages 3 and older |
| All medically necessary follow-up | In accordance with the time periods recommended by the American Academy of Pediatrics | All children |

MDCPS medical policy also requires that all children in custody ages birth to 36 months be referred to the First Steps Early Intervention program, through the local Health Department, for assessment and follow-up services as needed. There was no data available in the Medicaid claims data or from the on-site child welfare record review to assess provision of this early intervention service. This analysis therefore does not include early intervention services.

Documentation of medical records in the child's foster care case record is also required by MDCPS policy, which states "The Social Security Act (42 U.S.C. 675 § 475(1)(c)) requires that the child's most recent available medical and educational records for children in custody be maintained in the child's case record."

### III. Initial Screenings and Assessments

#### Initial Screening and Comprehensive Health Assessment

The case file review (n=123) revealed variation in documentation of whether initial health screens and comprehensive health assessments were completed, with a higher rate of timely comprehensive health assessments (41%) and a somewhat lower rate of timely initial health screens (37%). When including well child care outside of the window for the first comprehensive health assessment, 61% of the children in the case file review received a comprehensive health assessment at some point during their time in MDCPS custody.

Medicaid claims data (N=244) revealed that 26% of children (n=64) received an initial health screen within the required timeframe and 50% of children (n=122) received a comprehensive health assessment within the required timeframe. When looking beyond the timeframes required by MDCPS, 71% of children (n=173) were seen for a well care visit (comprehensive health assessment) while in care. Children who did not receive well care within the timeframe required by policy experienced a median wait time of 163 days before seeing a physician for a well care visit. Seventy-one of the children who

3

were included in the Medicaid claims data had no claims for either an initial health screen or a comprehensive health assessment during their time in custody. While there are variations by data source, both sources also reveal that only about one-third of children are receiving timely initial health screening, only half of children in custody are receiving timely comprehensive health assessments, and up to one-third of children may not be in receipt of any well child care while in custody.

| Figure III. 1 Type of Medical Care | Case File Review | Medicaid Claims Data |
|---|---|---|
| Timely Initial Health Screen | 37% | 26% |
| Timely Comprehensive Health Assessment | 41% | 50% |
| Any Comprehensive Health Assessment | 61% | 71% |

## Dental Examination

The case file review found that 21% (n=19) of the 91 children who were age-eligible for the dental care requirement received an initial dental exam in the required timeframe and 59% of age-eligible children (n=54) received a dental exam at any time while in MDCPS custody. This variation is likely explained in large part by regional variations in the provision of dental care discussed in Part VI of this report.

The Medicaid claims data revealed that 53 or 31% of the 171 children who were within the age range that requires a dental examination received a dental examination within the required timeframe. When looking outside of the 90-day required timeframe, 127 or 74% of children received a dental examination. Children who received a dental examination outside of the required timeframe experienced a median wait time of 204 days before receiving dental care.

## Mental Health Assessment

Thirty-one percent (n=24) of 78 children in the case file review who were age-eligible for required mental health assessment had documentation of a mental health assessment within the required timeframe and 74% (n=58) of age-eligible children had documentation of some kind of mental health assessment during MDCPS custody. Fourteen children who met the age requirement for a mental health assessment and were noted as having that assessment during the case file review were also included in the Medicaid data set. However, they had no Medicaid claims for mental health services. Case file reviewers observed that many of the mental health assessments found in the case record were ordered and completed by the court which may explain the absence of Medicaid claims for the vast majority of the mental health assessments.

There were 154 children in the Medicaid data who were age-eligible for mental health assessments. Only one Medicaid claim for a mental health assessment within the required timeframe was found and only 14 claims for mental health assessments outside of the required timeframe. This data therefore revealed that less than 1% of children received a mental health assessment within the required timeframe and only 9% received a mental health assessment at any time. Children who received a mental health assessment outside the required timeframe experienced a median wait time of 278 days for that assessment.

4

Development Assessment

The case file review revealed very few developmental assessments. Timely developmental assessments were noted for 9% (n=3) of the 34 children in the case file review who were age-eligible for a required developmental assessment and 32% (n=11) of age-eligible children's cases included a developmental assessment at some point during custody. Developmental assessment appears to be one of the weakest areas of medical care compliance.

There were also very few Medicaid claims for developmental assessments for children within the prescribed age range (N=78). There were no Medicaid claims for developmental assessments within the required timeframe and only eight claims for developmental assessments outside of that timeframe. The Medicaid data revealed that only 10% of children who were required to have a developmental assessment received such an assessment. Those children experienced a median wait time of 274 days for their developmental assessment.

## IV. Follow-Up Healthcare

A need for follow-up healthcare was documented for 21 children who had a documented initial health screen and for 21 children who had a documented comprehensive health assessment as found during the case record review. As shown in Figure IV.1, 67% of those 21 children received follow-up care identified as needed during the initial health screen and 76% of 21 children received follow-up care identified as needed during the comprehensive health assessment.

There were a variety of Medicaid claims for children during their time in custody that reflected a range of medical services provided to many of the children in the Medicaid data set (N=244). Figure IV.2 below summarizes the number and percent of children who received various forms of medical, dental, and mental health care during their time in custody.

Figure IV.1 Follow-Up Care Received when Identified during Initial Screen or Comprehensive Assessment (N=21)

| | |
|---|---|
| Initial Health Screen | 67% |
| Comprehensive Health Assessment | 76% |

Figure IV.2 Medical and Dental Care Reflected In Medicaid Claims (N=244)

| Care Type | Number of Children Receiving Care | Median Number of Encounters per Child | Percent of Children Receiving Care |
|---|---|---|---|
| Well Care | 173 | 2 | 71% |
| Vision | 97 | 1 | 40% |
| Hearing | 67 | 1 | 27% |
| Sick Care | 202 | 4 | 83% |
| Emergency Care | 71 | 1 | 29% |
| Hospital Care | 43 | 1 | 18% |
| Tests and Imaging | 179 | 2 | 73% |
| Dental Care | 154 | 2 | 74% of age-eligible |
| Mental Health | 16 | 1.5 | 11% of age-eligible |

Routine Follow-Up Medical, Dental and Other Care

The case file review provided an opportunity to look closely at the provision of various other kinds of follow-up medical care once a need was identified. This information is based on very small numbers of cases, as the number of children with the need for these kinds of follow-up care documented in the case

file was extremely small. Data that was collected suggests that follow-up medical, dental, and developmental needs may be met somewhat regularly, while needed vision and mental health follow-up may not be occurring with any regularity.

Sixteen out of 21 (76%) children who had a need for follow-up medical care that was documented during a routine medical visit received that follow-up care. In addition, seven of the 15 children (47%) who had a documented need for follow-up dental care received follow-up dental care. While there were only two children in the case file review with a need for follow-up care documented in a developmental assessment, both of those children received the needed follow-up care. However, the two children who had a need for follow-up care documented during a vision exam did not have any documentation of such follow-up having occurred and only one out of the 16 children (6%) with a documented need for follow-up mental health care had documentation of such care having been provided.

Because MDCPS policy requires follow-up comprehensive health exams annually, the Medicaid claims data was analyzed to assess how often children in care longer than one year were seen for mandated follow-up comprehensive health exams. A total of 150 children of the 244 children included in the Medicaid claims data were in care for 365 days or more. Seventy-five percent (n=112) of those children received at least one comprehensive health exam while in care and 25% (n=38) had no Medicaid claim for a comprehensive health exam at any time during their custody period. The Medicaid claims data also revealed a follow-up comprehensive health exam for only 21% (n=24) of the 112 children who received an initial comprehensive health exam. This data suggests a substantial drop off in follow-up well child care for children who remained in custody beyond one year.

MDCPS also requires follow-up dental for children at six-month intervals. The Medicaid claims data was analyzed to assess the extent of this follow-up dental care for children and revealed a similar drop off in the provision of dental care as children remained in care for long periods of time. As Figure IV.3 below illustrates, 171 of the 244 children for whom Medicaid claims data was received entered care at age 3 or older, triggering the dental care requirement. Forty-three of those children received an initial dental exam in the required 90-day timeframe and remained in care long enough to trigger the requirement that they receive dental exams every six months after that initial exam. Sixteen (37%) of those children received the first required six-month follow-up dental exam. Ten of those children continued in care for another six months and were again required to have a dental exam. Medicaid claims data documented a second follow-up dental exam for only two of those 10 children.

| Figure IV.3 Routine Follow-Up Dental Care | | | |
|---|---|---|---|
| Type of dental exam | Children eligible for dental exam | Number of children who received dental exam | Percent of eligible children who received dental exam |
| Initial exam (during first 90 days of care) | 171 | 53 | 31% |
| Second exam (6 months after initial exam) | 43 | 16 | 37% |
| Third exam (6 months after second exam) | 10 | 2 | 20% |

### Sick Follow-Up Care

The average and median number of encounters by care type, as documented in the Medicaid claims data, was analyzed in order to assess the extent to which children were in receipt of follow-up medical care for illness and injury. That analysis revealed that 83% (n=202) of children in the Medicaid claims data received some form of sick care during their time in custody. These children were likely to experience multiple sick follow-up care encounters, with an average of 5.4 sick care encounters per child and a median of 4 sick care encounters per child. This data suggest that once children are in the care of a doctor for illness or injury they often receive follow-up care.

## V.  Documentation of Healthcare in Child Welfare Case Record

The on-site case record review provided the opportunity to assess the extent to which initial and follow-up healthcare was documented both electronically in MACWIS and through records compiled in the hard copy case files. Ten out of the 123 files reviewed contained no documentation of any healthcare, either in MACWIS or in the hard copy case file.

Medical care was documented in 113 child welfare case records. Data revealed that 89% of initial health screens noted by reviewers were documented in MACWIS while 75% of initial health screens were documented in the paper file. That trend reversed regarding documentation of comprehensive health assessments, with 85% of those documented assessments residing in the paper file and 76% of them inside MACWIS. On-site reviewers did note that many of the hard copy files included in the review appeared to have been updated with the required medical information after the specific files had been identified as part of the on-site review process. It is therefore difficult to ascertain the extent to which medical care is being routinely recorded in the hard copy case record of children in care. Given the limited availability of medical care documentation in the children's case files, the reviewers looked to the Medicaid claims data for additional information.

## VI.  Regional Variations in Healthcare

The Medicaid data set (N=244) provided an opportunity to assess regional variations in the provision of medical care for children in MDCPS custody. An analysis of the regional variations in healthcare access for children in care was possible with the data on 235 children with Medicaid claims during their time in custody. Figure VI.1 below illustrates the percentage of children with timely initial health screens by region. There was significant regional variation, with percentages ranging from zero to 55.

### Sick Follow-Up Care

The average and median number of encounters by care type, as documented in the Medicaid claims data, was analyzed in order to assess the extent to which children were in receipt of follow-up medical care for illness and injury. That analysis revealed that 83% (n=202) of children in the Medicaid claims data received some form of sick care during their time in custody. These children were likely to experience multiple sick follow-up care encounters, with an average of 5.4 sick care encounters per child and a median of 4 sick care encounters per child. This data suggest that once children are in the care of a doctor for illness or injury they often receive follow-up care.

### V.   Documentation of Healthcare in Child Welfare Case Record

The on-site case record review provided the opportunity to assess the extent to which initial and follow-up healthcare was documented both electronically in MACWIS and through records compiled in the hard copy case files. Ten out of the 123 files reviewed contained no documentation of any healthcare, either in MACWIS or in the hard copy case file.

Medical care was documented in 113 child welfare case records. Data revealed that 89% of initial health screens noted by reviewers were documented in MACWIS while 75% of initial health screens were documented in the paper file. That trend reversed regarding documentation of comprehensive health assessments, with 85% of those documented assessments residing in the paper file and 76% of them inside MACWIS. On-site reviewers did note that many of the hard copy files included in the review appeared to have been updated with the required medical information after the specific files had been identified as part of the on-site review process. It is therefore difficult to ascertain the extent to which medical care is being routinely recorded in the hard copy case record of children in care. Given the limited availability of medical care documentation in the children's case files, the reviewers looked to the Medicaid claims data for additional information.

### VI.   Regional Variations in Healthcare

The Medicaid data set (N=244) provided an opportunity to assess regional variations in the provision of medical care for children in MDCPS custody. An analysis of the regional variations in healthcare access for children in care was possible with the data on 235 children with Medicaid claims during their time in custody. Figure VI.1 below illustrates the percentage of children with timely initial health screens by region. There was significant regional variation, with percentages ranging from zero to 55.



Figure VII.1 Timely Initial Health Screens

An analysis of the percentage of children in the Medicaid claims data set with timely comprehensive health assessments by region also resulted in significant variation as illustrated in Figure VI.2 below. Percentages ranged from 34% up to 83%.



Figure VII.2 Timely Comprehensive Health Assessments

Finally, an analysis of timely dental examinations for children who were old enough to meet the requirement per the MDCPS policy also revealed enormous variation by region, with percentages ranging from zero to 86% as pictured in Figure VI.3 below.



Figure VII.3 Timely Dental Examinations

It was not possible to complete a similar analysis of developmental and mental health assessments given the very small number of those assessments found in the Medicaid data.

## VII. Medical Care Gaps

Three significant gaps in medical care were identified during this review. First, for children who had Medicaid, 29% had no well care Medicaid claims while in custody. Thus, nearly one-third of children who were known to have open Medicaid cases had no routine well child care that was billed for during their time in custody. Given the important role that routine well child care often plays in identifying the need for follow-up medical care, this gap diminishes the ability to identify follow-up medical needs for a substantial portion of children in care.

In addition, the near complete absence of mental health care in the Medicaid claims data is striking, with no mental health assessment claims for 89% of the 154 children who met the age requirement for a mental health assessment. In addition, only 16 of those 154 children (7%) had Medicaid claims for any type of mental healthcare. While one child had claims for seven mental health encounters during his or her time in care, the median number of mental health encounters for those 16 children was only 1.5. This indicates that many of these children saw a mental health professional only once during their time in care. The case file review, however, suggests that many more children are receiving a mental health assessment than can be identified through Medicaid claims, primarily in the form of court-ordered assessments in the context of litigation. Additionally, the rate of follow-up care for children in the case file review with an identified need for mental health follow-up care is very low (6%). This data calls into question the capacity to identify mental health needs among children in care and to then provide a level of ongoing treatment to address any identified needs.

The third significant gap appears to be in the realm of mandatory developmental assessments. The case file review identified 11 children who received a developmental assessment, only three of whom met the required timeframe. Medicaid claims data includes developmental assessments for only an additional eight of the 79 children who met the age requirement for such an assessment. These very small numbers indicate that the bulk of the youngest children in care may not be receiving

developmental assessments that are necessary to identify developmental challenges that are ripe for intervention at an early age.

VIII. Baseline and Target Setting

Pursuant to section 8.1.d.1 of the 2nd Modified Mississippi Settlement Agreement and Reform Plan (2nd MSA), Public Catalyst was charged with establishing the performance baseline for practitioner recommended follow-up treatment by October 31, 2017. In order to do so, Public Catalyst took into consideration the percentage of documented follow-up treatment recommended through well care, sick care, and dental, developmental, and mental health follow-up instances identified in the data. As a result, Public Catalyst establishes the performance baseline for practitioner recommended follow-up treatment as 50%. In addition, pursuant to section 8.1.d.2 of the 2nd MSA, Public Catalyst was charged with establishing an initial performance standard for practitioner recommended follow-up treatment which MDCPS shall meet by July 1, 2018. Public Catalyst establishes the initial performance standard as 60%.