# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
# NORTHERN DIVISION

OLIVIA Y., by and through her next friend, James D. Johnson; JAMISON J., by and through his next friend, Clara Lewis; DESIREE, RENEE, TYSON, and MONIQUE P., by and through their next friend, Sylvia Forster; JOHN A., by and through his next friend, James D. Johnson; CODY B., by and through his next friend, Sharon Scott; MARY, TOM, MATTHEW, and DANA W., by and through their next friend, Zelatra W.; AND SAM H., by and through his next friend, Yvette Bullock; on their own behalf and behalf of all others similarly situated,

                      Plaintiffs,

   v.

PHIL BRYANT, as Governor of the State of Mississippi; DONALD TAYLOR, as Executive Director of the Department of Human Services; AND BILLY MANGOLD, as Director of the Division of Family and Children's Services,

                      Defendants.

CIVIL ACTION NO.
3:04-CV-251-TSL-FKB

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION FOR "RELIEF" UNDER
THE 2ND MODIFIED SETTLEMENT AGREEMENT
AND REFORM PLAN AND FED. R. CIV. P. 60(b)**

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION. ...............................................................................................................1

II. BACKGROUND. ................................................................................................................3

    A. A Decade of Non-Compliance. ..............................................................................3

    B. December 2016: Defendants Agree to Meet the 90% Caseload Requirement by January 1, 2018. .........................................................................5

    C. The MDCPS Suffers Managerial Chaos and Badly Misses the 2017 Caseload Targets. ....................................................................................................6

III. DISCUSSION. .....................................................................................................................8

    A. Modification of a Consent Decree Under Rule 60(b) and the 2nd MSA.................8

    B. Defendants Agreed Not to Seek a Modification of the 2nd MSA Before January 1, 2020. ....................................................................................................10

    C. A Failure by the Legislature to Provide Sufficient Funding Was Contemplated by the Parties and Has Been a Recurring Problem Since 2008........................................................................................................................10

    D. Defendants Submitted No Evidence of Changed Conditions Making Compliance "Substantially More Onerous." ..........................................................13

    E. Defendants Submitted No Evidence That The Caseload Requirements Are "Unworkable"; Their Evidence Shows the Opposite.....................................13

    F. Enforcement of the Caseload Requirements Would Not be "Detrimental to the Public Interest." ......................................................................14

IV. CONCLUSION. .................................................................................................................15

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Cooper v. Noble*,
    33 F.3d 540 (5th Cir. 1994) ...................................................................................................14

*Inmates of Boys' Training School v. Southworth*,
    76 F.R.D. 115 (D.R.I. 1977) ..................................................................................................11

*NLRB v. Harris Teeter Supermarkets*,
    215 F.3d 32 (D.C. Cir. 2000) ...................................................................................................8

*Rozecki v. Gaughan*,
    459 F.2d 6 (1st Cir. 1972) ......................................................................................................11

*Rufo v. Sheriff of Suffolk County*,
    502 U.S. 367, 112 S.Ct. 784, 116 L.Ed. 2d 867 (1992) ................................................. *passim*

*Watson v. City of Memphis*,
    373 U.S. 526, 83 S.Ct. 1314, 10 L.Ed.2d 529 (1963) ........................................................2, 11

*Wyatt v. King*,
    811 F. Supp. 1533 (M.D. Ala.1993) ......................................................................................13

**Other Authorities**

Fed. R. Civ. Proc. 60(b) ......................................................................................................... *passim*

I.     **INTRODUCTION.**

Citing Rule 60(b) and a provision in the operative settlement agreement that the parties agreed would not apply until January 1, 2020, Defendants seek to "modify" that agreement by eliminating indefinitely the caseload requirements that are critical to the proper functioning of all aspects of Mississippi's child welfare system. Defendants seek this relief based solely upon the Legislature's entirely predictable refusal to approve Commissioner Dickinson's belated request for over $133 in funding for fiscal year 2019, $20 million more than Commissioner Chandler had timely requested for the same year. [*See* Dickinson Aff. (Dkt. 754-6), ¶ 29.]

Defendants' claim that the Legislature's refusal to provide all of the funding in the amended request for fiscal year 2019 was "unforeseen" – a critical requirement of any modification of a judgment or consent decree under Rule 60(b) – is rich in irony. The Legislature's failure to provide the requested funding for FY 2019 was consistent with its chronic failures *since 2008* to adequately fund the parties' agreements to reform the child welfare system. Furthermore, the parties acknowledged in 2012 and again in 2016 that the Legislature retains the power to appropriate funds for the child welfare system, but they also agreed that "[n]othing in this paragraph in any way limits Defendants' obligations under this 2nd MSA." [2nd MSA, Dkt. 712], Introduction.] Thus, the parties have always known the obvious fact that the Legislature controls funding, and knowing that, agreed that a failure by the Legislature to provide sufficient resources to implement the parties' agreements would have no effect on Defendants' obligations.

If the Legislature's failure to authorize sufficient remedial funds were a valid reason to "modify" the parties' settlement and cease any further genuine efforts at remedying the Constitutional defects in Mississippi's child welfare system, then the hard-fought settlements in this case – and consent decrees generally – would be illusory. This cannot be, and is not, the

1

law. "Financial constraints may not be used to justify the creation or perpetuation of constitutional violations . . . ." *Rufo v. Sheriff of Suffolk County*, 502 U.S. 367, 392, 112 S.Ct. 784, 116 L.Ed. 2d 867 (1992); *Watson v. City of Memphis,* 373 U.S. 526, 537, 83 S.Ct. 1314, 10 L.Ed.2d 529 (1963) ("it is obvious that vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny them than to afford them").

Even if "unforeseen" circumstances were present here – they are not – Defendants would still need to demonstrate that the caseload requirements have become "substantially more onerous," "unworkable," or that their enforcement would be "detrimental to the public interest." None of these requirements is satisfied. Defendants agreed to the caseload requirements in December 2016, and they have not become more onerous, let alone "substantially" more onerous, in a mere two years. Second, the caseload requirements are not "unworkable". Rather, as Defendants show no more than $7.2 million per year is needed to hire the requisite number of additional workers, while the state's annual budget is $5.6 *billion*, and the governor is a defendant in this lawsuit. Third, and needless to say, enforcement of the caseload requirements would not be "detrimental," but rather beneficial, to the public interest.

The bottom line is that now is *not* the time to give up on the effort to bring Mississippi's child welfare system into Constitutional compliance. The progress made under Commissioner Chandler needs to be consolidated, not reversed. The critical caseload requirements should not be placed on indefinite hold, as Defendants request, but rather Defendants should know that those requirements are critical and should be treated as an urgent budgetary priority which must be met. Defendants' motion should be denied.

## II. BACKGROUND.

### A. A Decade of Non-Compliance.

Plaintiffs' request to place the critical caseload requirements on indefinite hold should be considered in its historical context. The Plaintiffs – neglected and abused foster care children in Mississippi – filed this action asserting that the state was violating their constitutional rights and causing them significant and demonstrable harm. In a 2008 settlement, the state made binding, court-approved commitments – all of which clearly would require significant funds – to thoroughly reform its foster care system. The 2008 settlement required the state to formulate with the Plaintiffs and then implement substantial reform plans, subject to oversight and reporting by a neutral, court-appointed monitor. The settlement created a phased-in series of obligations, agreed to by the state, which would reduce the caseloads of workers, among other reforms needed to produce better outcomes for the children under the state's care.

After widespread non-compliance by the Defendants in Periods 1 and 2, the parties negotiated an interim, court-approved corrective action plan (the "Bridge Plan") in 2009 in an effort to avoid the need to file a contempt motion. Defendants did not comply with the Bridge Plan.

Plaintiffs thereupon sought in 2010 to have Defendants held in contempt for violations of the 2008 settlement and the Period 2 Implementation Plan. The fact of Defendants' violations was not in dispute. In a May 2011 Order, the Court found that "plaintiffs obviously have met their burden to present a prima facie case" of contempt and "[a]s plaintiffs note, defendants' shortcomings in the performance of the duties prescribed by the parties' agreements are in virtually all areas covered by the agreements." [May 17, 2011 Order (Dkt. No. 557), pp. 4, 8.]

Nevertheless, the Court declined to hold Defendants in contempt. Instead, it directed the parties, in consultation with the Monitor, "to establish realistic timelines for the accomplishment of the parties' shared goals and objectives." [May 17, 2011, Order, p. 9.]

Following the Court's directive, the parties negotiated the Modified Mississippi Settlement Agreement and Reform Plan (the "MSA") and a Period 3 Implementation Plan ("Period 3 Plan"), which the Court approved in July 2012. These agreements reflected a different approach to implementation, relying on regional metrics, a child welfare consulting group that the state had retained for assistance, and extended deadlines for implementation. Notwithstanding this more flexible approach, the Monitor's Report, filed on May 8, 2014, described continuing and widespread violations of the Period 3 Plan and the MSA.

Plaintiffs then entered into further negotiations with the state in lieu of filing another contempt motion. [July 9 Order, p. 1.] These negotiations resulted in an order entered on July 9, 2014 [Dkt. No. 607] "setting forth specific remedial activities and timelines to address Defendants' capacity deficits and to improve performance required by the MSA ... and each of the Implementation Plans incorporated into the MSA ...." [July 9 Order, p. 1.]

This stipulated order, entered by the Court, required Defendants to hire a Director of Sustainable Transformation acceptable to plaintiffs by November 1, 2014. [July 9 Order, pp. 1-3.] Defendants failed to do so.

On March 9, 2015, Plaintiffs filed a Renewed Motion for Contempt, an Evidentiary Hearing and the Appointment of a Receiver [Dkt. No. 622 ("Renewed Motion for Contempt")]. In this motion, Plaintiffs detailed the system-wide failures of the state's child welfare system, the state's seeming inability to comply with this Court's orders and its broken promises to reform the child welfare system. These failures were largely the result of the state's unwillingness to

4

commit adequate funds towards implementation of the agreed-upon reform measures, as well as a failure to create a management structure that could ensure that meaningful reform could be accomplished.

On July 23, 2015, the parties agreed to continue the hearing on the Renewed Motion for Contempt [Dkt. No. 664]("Agreed Order").  Again, Defendants did not dispute that they had not complied with the MSA or with the Periods 3 and 4 Implementation Plans.  The Agreed Order provided that Defendants would retain Public Catalyst, a national organization with substantial experience reforming child welfare systems, to conduct a systemic analysis that would become the basis of a negotiated remedial order.  [*Id.*, pp. 1-3.]  Public Catalyst's analysis was completed on November 24, 2015 and on December 22, 2015, the parties filed an Interim Remedial Order [Dkt. No. 671 ("IRO")].

The IRO provided for the reorganization of the Mississippi Department of Family and Children's Services into a separate stand-alone agency, the Mississippi Department of Child Protection Services ("MDCPS").  To streamline its operations, MDCPS would have its own salary, hiring and contracting authority. [IRO, ¶¶ 1-2.]  Further, Public Catalyst was directed to conduct a caseload audit and Defendants agreed to develop a plan to implement the MSA caseload standards, including new efforts to recruit, hire and retain an adequate number of qualified caseworkers and supervisors. [*Id.*, ¶ 7.]

      **B.**    **December 2016: Defendants Agree to Meet the 90% Caseload Requirement by January 1, 2018.**

In April 2016, the parties began to re-negotiate the terms of the MSA and a time-table for implementing its provisions. [*Id.* ¶ 14.]  On December 19, 2016, the parties filed the 2nd Modified Mississippi Settlement Agreement and Reform Plan [Dkt. No.712 ("2nd MSA)], the currently operative agreement between the parties.  It superseded the MSA and became effective

5

on January 1, 2018.  *[Id., p. 1.]*  One of the key provisions of the 2nd MSA was that by January 1, 2018, 90% of the state's caseworkers were required to have caseloads which did not exceed specified standards.  [2nd MSA (Dkt. No. 712) ¶ 1.3.a.]

Also on December 19, 2016, the Stipulated Third Remedial Order [Dkt. No. 713 ("STRO")] was entered.  During 2017, the state would not be monitored for compliance with a settlement agreement but would only be responsible for a broad range of "capacity-building" activities, embodied in the remedial orders, designed to bring the state to a point at which they could begin compliance with the 2nd MSA in 2018.  As in the 2nd MSA, Defendants agreed that by December 31, 2017, they would be in full compliance with the caseload target levels established by Public Catalyst.  [*Id.* ¶ 5.c.]  That meant that by December 31, 2017, 90% of all caseworkers were required to have caseloads within the caseload targets so they could do the work required by the settlement agreement when their obligations became operative in 2018.

At first, the signs were hopeful.  Using the STRO as a blue-print, MDCPS expanded its staff, improved training and integrated new computer models into its information management system.  It worked with Public Catalyst to improve its licensing, remove its large backlog of unlicensed foster homes, and streamline the placement process.  Although much remained to be done, Plaintiffs and MDCPS senior management saw improvement that appeared to warrant a sense of cautious optimism.

### C. **The MDCPS Suffers Managerial Chaos and Badly Misses the 2017 Caseload Targets.**

The optimism was short-lived.  In August 2017, MDCPS Commissioner David Chandler unexpectedly resigned and former Mississippi Supreme Court Justice Jess Dickinson was appointed to run the agency.  Commissioner Dickinson commenced his duties on or about September 18, 2017.  Within a short period of time thereafter,  the management team that had

made much progress under Commissioner Chandler – including Deputy Commissioners for Child Welfare Tracy Malone and Information Technologies Cindy Greer – departed unexpectedly. The state badly missed the promised caseload targets for calendar year 2017 – by January 2018, only 58% of the MDCPS' caseworkers were in compliance with the caseload standard.[1] Worse yet, this key metric is deteriorating. The Monitor reported on May 15, 2018, that just from January to May of 2018 the caseload compliance level declined from 58% to 52%.[2] The Monitor further reported that in some regions, caseload compliance was as low as 17% (IV-S) and 28% (VII-C).[3] Since caseloads are the key to accomplishing most of the goals of the 2nd MSA and the STRO,[4] Defendants' ongoing deficiencies in this critical area will adversely affect every other aspect of the state's precarious child welfare system.[5]

Shortly after taking office, Commissioner Dickinson determined that the MDCPS was in a "fiscal crisis," although it is unclear if he ever discerned either its scope or cause. [*See* Dickinson Aff., ¶ 23.] In any event, Commissioner Chandler had submitted to the Legislature a FY-2019 budget request of approximately $113 million, but Commissioner Dickinson, responding to the "fiscal crisis" he had discovered, submitted a revised request for $133 million. [Dickinson Aff., ¶ 29.][6] Not surprisingly, the Legislature failed to provide funding in the

---

[1] *See* Monitor's January 2, 2018 Caseload Statistics attached as Exhibit "C" to Plaintiffs' pending Renewed Motion for Contempt and for the Appointment of a Receiver (the "2018 Contempt Motion") (Dkt. 740).

[2] *See* Exhs. "D-E" to the 2018 Contempt Motion.

[3] Ex. "E" to the 2018 Contempt Motion.

[4] *See* Plaintiffs' 2018 Contempt Motion (Dkt. 740) at Section III.A. and the Reply in support of that motion ("Reply") (Dkt. 767) at 5-8.

[5] Reply at 7; *see also* Public Catalyst's Org. Analysis, Ex. D at 16.

[6] Plaintiffs are seeking discovery on the funding issue, which defendants have opposed. See Plaintiffs' Motion for Scheduling Conference and For Amended Case Management Order

increased amounts belatedly sought by Commissioner Dickinson. Rather, it provided $110 million for FY 2019 – approximately the sum Commissioner Chandler had requested – resulting in a $23 million "shortfall." [*Id., ¶ 30.*] On this record, Defendants are now asking the Court to relieve MDCPS of the 90% caseload requirement for fiscal year 2019 and for an indeterminate time, indeed indefinitely. [Motion, p. 12.] This request is unsupported by any case law and would be grossly unfair to the children who depend upon the state to fulfill the promises it has continually made since 2008, but with which it has never complied.

## III.   DISCUSSION.[7]

### A.   Modification of a Consent Decree Under Rule 60(b) and the 2nd MSA.

Federal Rule of Civil Procedure 60(b) provides in relevant part:

> On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: … (5) the judgment has been satisfied, released, or discharged … or it is no longer equitable that the judgment have prospective application; or (6) any other reason justifying relief from the operation of the judgment.

The modification of a judgment "'is an extraordinary remedy, as would be any device which allows a party . . . to escape commitments voluntarily made and solemnized by a court decree.'" *NLRB v. Harris Teeter Supermarkets,* 215 F.3d 32, 35 (D.C. Cir. 2000) (citation and quotation marks omitted). Applying Rule 60(b) in the context of institutional reform, the

---

Permitting Limited Discovery; And Respone to Defendants' Objections to Plaintiffs' Proposed Discovery Document (Dkt. 768).

[7] Plaintiffs have sought limited discovery from Defendants concerning the contentions on which their Rule 60(b) motion is based. Defendants have refused to provide the information. On July 20, 2018, Plaintiffs filed a motion requesting a scheduling conference, and an amended case management order providing for the limited discovery it seeks (Dkt. 768). Defendants responded to the motion on August 3 (Dkt. 771). Plaintiffs reserve the right to file an amended or supplemental response to Defendants' Rule 60(b) motion should this Court allow in whole or in part the limited discovery requested by Plaintiffs.

Supreme Court in *Rufo v. Sheriff of Suffolk County*, 502 U.S. 367, 384, 112 S.Ct. 784, 116 L.Ed. 2d 867 (1992) held that modification is not warranted merely because "it is no longer convenient to live with the terms of a consent decree." Rather, modification is appropriate only when the movant meets its burden of demonstrating that (a) "changed factual conditions make compliance with the decree substantially more onerous," (b) "a decree proves to be unworkable because of unforeseen obstacles," or (c) "enforcement would be detrimental to the public interest." *Rufo*, 502 U.S. at 384-385. Further, a party seeking the modification of a consent decree must establish "that the proposed modification is suitably tailored to the changed circumstance." *Rufo*, 502 U.S. at 393.

In Section 11.2.a of the 2nd MSA, the parties, incorporating the holding of *Rufo*, agreed as follows:

> Defendants may seek a court-ordered modification of any provision of this 2nd MSA pursuant to Rule 60(b) of the Federal Rules of Civil Procedure if significant changes in factual conditions, beyond Defendants' control and not contemplated by the Parties at the time this 2nd MSA was entered into, make the provision unworkable, make compliance substantially more onerous, or make enforcement detrimental to the public interest, and the changed circumstance occurred despite Defendants' reasonable effort to comply with this 2nd MSA.[8]

As Plaintiffs explain below, Defendants have failed to show any grounds under this provision or *Rufo* for the elimination of the critically important caseload requirements to which the state agreed in 2016.

---

[8] As discussed below, under Section 11.2 of the 2nd MSA, this provision is applicable "[b]eginning January 1, 2020 . . . ."

9

### B. Defendants Agreed Not to Seek a Modification of the 2nd MSA Before January 1, 2020.

As an initial matter, the motion should be denied because Defendants agreed in the 2nd MSA that they would not seek a modification of that agreement before January 1, 2020.

Section 11 of the 2nd MSA is entitled "Enforcement and Exit." Section 11.1 and its subsections concern the Plaintiffs' enforcement rights "[f]rom January 1, 2018 through December 31, 2019." [2nd MSA (Dkt. 712) at § 11.1.] The first sentence of Section 11.2 of the 2nd MSA provides: "Beginning January 1, 2020, the following enforcement standards shall apply." [2nd MSA, § 11.2] Section 11.2.a., quoted above and upon which the Defendants rely in bringing their motion, is a subparagraph of Section 11.2. Accordingly, the parties agreed that the Defendants could not file a motion to modify the 2nd MSA before January 1, 2020.

### C. A Failure by the Legislature to Provide Sufficient Funding Was Contemplated by the Parties and Has Been a Recurring Problem Since 2008.

Defendants' motion is premised on the contention that the Legislature's failure to provide funding in the increased amounts belatedly requested by Commissioner Dickinson for fiscal year 2019 was somehow "unforeseen." In fact, it was entirely predictable and inadequate funding has been a recurring theme since 2008. Indeed, the parties have expressly acknowledged the truism that the Legislature provides funds and that it might not authorize sufficient funds to implement the parties' agreements. The MSA signed by the parties in 2012 provides in the Introduction: "Defendants do not speak for the Mississippi Legislature, which has the power under Mississippi law to determine the appropriations for the state's child welfare programs." [*See* Dkt. 571 at § 1.G.] Knowing this, the parties further agreed in the same paragraph: "Nothing in this paragraph in any way limits Defendants' obligations under this 2nd MSA." [*Id*.] The 2nd MSA contains the same provisions. [*See* 2nd MSA (Dkt. 712), Introduction.] Thus, both in 2012 and again in 2016 the parties well knew – indeed it is difficult to understand the contention that they

10

did not know – that the Legislature might be unwilling to fund Defendants' obligations in the consent decrees, but expressly agreed that in that event, Defendants' obligations are unaffected.

Furthermore, in the 2nd MSA the parties agreed that other than "changed conditions" as described in paragraph 11.2.c. quoted above – and no such those conditions are present here as discussed below – the only way for the state to obtain relief from the provisions of the 2nd MSA was upon "Defendants' showing that they have achieved and maintained substantial compliance [with] all of the provisions of this 2nd MSA based upon 12 continuous months of data that has been verified by the Monitor, prior to the application." [2nd MSA, § 11.3.] Needless to say, Defendants have not made, and cannot make, any such showing.

The claim that a failure by the Legislature to provide adequate funding was "not contemplated" by the parties is also belied by the ten-year course of dealing between the parties. As seen, the state has *repeatedly* failed since 2008 to provide sufficient funding for its child welfare system. However, Defendants never before raised inadequate funding as a defense to their agreed-upon obligations, or as a pretext for the modification of those obligations. Indeed, the Legislature's refusal to provide funding does not, as a matter of law, justify the Constitutional inadequacies of its child welfare system. "Financial constraints may not be used to justify the creation or perpetuation of constitutional violations . . . ." *Rufo*, 502 U.S. at 392; *Watson v. City of Memphis,* 373 U.S. 526, 537, 83 S.Ct. 1314, 10 L.Ed.2d 529 (1963) ("it is obvious that vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny them than to afford them"); *Rozecki v. Gaughan,* 459 F.2d 6, 8 (1st Cir. 1972) ("[t]he obligation of the Respondents to eliminate existing unconstitutionalities does not depend upon what the Legislature may do, or upon what the Governor may do. . . ."); *see also Inmates of Boys' Training School v. Southworth,* 76 F.R.D.

115, 1125 (n.2) (D.R.I. 1977) ("lack of funds cannot excuse non-compliance with the consent decree, for that document is as binding on the parties as a final adjudication on the merits would have been").

Notably, Defendants candidly acknowledge in their motion that "the parties were aware that the Legislature might fund MDCPS in an amount less than requested . . . ." [Motion, p. 7.] This admission further negates any contention that the Legislature's appropriation of insufficient funds for fiscal year 2019 was "unforeseen" or "not contemplated" by the parties.[9] As Defendants concede, the opposite is true.

In sum, the Legislature's latest failure to authorize adequate funding – here in response to the eleventh hour request by Commissioner Dickinson for $20 million more than was previously requested by the MDCPS for the same fiscal year – was not "unforeseen," but rather utterly predictable and part of a pattern that began in 2008. The parties expressly recognized in 2012 and again in 2016 that the Legislature might not provide adequate funding. "Ordinarily … modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree." *Rufo*, 502 U.S. at 385.

---

[9] Defendants suggest a second argument, namely that the "change in factual circumstances" is the "major financial crisis" allegedly experienced by the MDCPS in FY 2018. [Motion, p. 7.] However, this cannot serve as the basis for a modification under Rule 60(b) because Defendants make no showing that the "fiscal crisis" was anything other than an anomalous, one-time event. [*See* Dickenson Aff., ¶¶ 23-26.] On the contrary, they claim that the "crisis" has ended. [*Id.* at ¶ 26.] Hopefully, the Defendants are not suggesting that financial crises will be a recurring feature of the MDCPS under the new management team.

12

### D. Defendants Submitted No Evidence of Changed Conditions Making Compliance "Substantially More Onerous."

As seen, the Legislature's failure to provide the eleventh hour funding requested by Commissioner Dickinson for FY 2019 was not a "changed condition" or "unforeseen" – the Legislature had failed to adequately fund Defendants' obligations since 2008.

Moreover, Defendants have made no showing whatever – nor even made an argument – that compliance with the 90% caseload requirement has become "more onerous," let alone "substantially more onerous," than it was in 2016, only two years ago. Defendants submitted no evidence of the cost to comply in 2016 as compared to the cost of compliance today, and there is no reason to believe there is any significant difference. Thus, Defendants have again failed to carry their burden. *Wyatt v. King*, 811 F. Supp. 1533, 1545 (M.D. Ala.1993) (Rule 60(b) motion denied where defendants submitted no evidence that compliance with the consent decree had become substantially more onerous).

### E. Defendants Submitted No Evidence That The Caseload Requirements Are "Unworkable"; Their Evidence Shows the Opposite.

Next, Defendants have not shown, nor do they make any serious argument, that the 90% caseload requirement to which they agreed in 2016 is "unworkable." Rather, they prove precisely the opposite – the requirement was readily achievable at a reasonable cost. Commissioner Dickinson states in his affidavit that he believes compliance would have required hiring a net twenty (20) additional caseworkers per month for one year. [Dickinson Aff., ¶ 30.] He also states that the annual salary per caseworker is $30,000. [*Id.* at ¶ 21.] Therefore, according to Defendants the cost of complying with the 90% caseload requirement would have

13

been not more than $7.2 million. [10]   Since the annual budget of Mississippi for fiscal year 2019 was approximately *$5.5 billion*,[11] Defendants have actually demonstrated that compliance with the 90% caseload requirement, far from being "unworkable," was readily achievable *if* the Legislature had wanted to do so.

As Plaintiffs showed in their 2018 Contempt Motion, Defendants' failure to comply with the 90% caseload requirement for calendar year *2017* could not have been caused by the Legislature's failure to provide sufficient funds for FY 2019, *i.e.,* July 1, 2018 to June 30, 2019. Rather, the state had *already* failed to comply with the caseload well before the commencement of FY 2019. Defendants' focus on the Legislature's appropriation for FY 2019 is a red herring.

In sum, the Defendants made no showing that the caseload requirement to which they agreed in 2016 has somehow become "unworkable." *Cooper v. Noble,* 33 F.3d 540, 543-545 (5th Cir. 1994) (affirming denial of motion under Rule 60(b) where the defendants made no showing that the decree was "unworkable" due to "unforeseen obstacles").

### F.     Enforcement of the Caseload Requirements Would Not be "Detrimental to the Public Interest."

Defendants make no serious argument – there is none – that enforcement of the 90% caseload requirement would be "detrimental to the public interest." On the contrary, to the extent that the "public interest" is implicated by Defendants' motion, full compliance with the caseload requirements would be beneficial (critically so), not detrimental, to the interests of the

---

[10] *See also* Dickinson Aff., ¶ 30 (contending that if MDCPS had $91 million for salaries, rather than $84 million, it could have hired the necessary caseworkers). Moreover, the total budget for the MDCPS, including Federal funds, is $200 million. [Dickinson Aff., ¶ 12.] Defendants have failed to show that $7 million could not have been found within a $200 million budget.

[11] Dickinson Aff., Ex. "T," p. 4/30.

14

thousands of children whose lives and well-being depend upon the proper functioning of Mississippi's child welfare system.[12]

## IV. CONCLUSION.

A legislature's failure or refusal to provide remedial funding is not a defense to the maintenance of an unconstitutional child welfare system. For the reasons set forth above, Defendants' motion should be denied.

RESPECTFULLY SUBMITTED, this the 7th day of August, 2018.

/s/ Marcia Robinson Lowry
Marcia Robinson Lowry (*pro hac vice*)
Sara Robinson-Glasser (*pro hac vice*)
A Better Childhood, Inc.
1095 Hardscrabble Road
Chappaqua, NY  10514
Telephone (646) 808-7344
Facsimile: (914) 238-0365
Email: mlowry@abetterchildhood.org
        srglasser@abetterchildhood.org

W. Wayne Drinkwater, Jr. (MBN 6193)
Michael J. Bentley (MBN 102631)
BRADLEY ARANT BOULT CUMMINGS LLP
One Jackson Place, Suite 400
188 East Capitol Street
Jackson, Mississippi 39201
Telephone: (601) 948-8000
Facsimile: (601) 948-3000
Email: wdrinkwater@bradley.com
        mbentley@bradley.com

---

[12] We further note that Defendants failed to make any genuine effort to "suitably tailor" the requested modification to the allegedly changed circumstances as required by *Rufo*. [Motion at p. 12 (asking Court to direct the development of a "plan" to achieve an unspecified "reasonable level" of caseload compliance).]

> Christian Carbone (*pro hac vice*)
> LOEB & LOEB LLP
> 345 Park Avenue
> New York, New York 10154
> Telephone: (212) 407-4000
> Email: ccarbone@loeb.com
>
> *Plaintiffs' Counsel*

16530559.1
930057-10001

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 7, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will deliver copies to all counsel of record.

*/s/ Marcia Robinson Lowry*
