**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

| | | |
|---|---|---|
| OLIVIA Y., et al | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 3:04cv251 TSL-FKB |
| | ) | |
| PHIL BRYANT, as Governor of the | ) | |
| State of Mississippi, *et al.,* | ) | |
| | ) | |
| Defendants | ) | |

**DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR RELIEF UNDER SECTION
11.2.a. OF THE 2ND MODIFIED
SETTLEMENT AGREEMENT AND REFORM
PLAN AND
RULE 60(b) OF THE FEDERAL RULES OF
CIVIL PROCEDURE**

Defendants submit their Reply in support of their Motion for Relief Under Section 11.2.1.

of the 2nd Modified Settlement Agreement and Reform Plan and Rule 60(b) of the Federal Rules

of Civil Procedure.

**I.      INTRODUCTION.**

It is important to return to the core issue.  The Plaintiffs are demanding that the

Defendants be held in contempt for failing to meet a 90% caseload metric in the Stipulated Third

Remedial Order ("STRO")[1] that was incorporated in the 2nd Mississippi Modified Settlement

Agreement ("2nd MSA").[2]  Both agreements were entered by the Court as Consent Orders.

Plaintiffs further demand that the Court place the Mississippi Department of Child Protection

Services ("MDCPS") in a Receivership of undetermined scope and length of time.

---

[1] Exhibit "I", §5, Defendants' 60(b) Memorandum. [Dkt. No. 756-12].
[2] *Id.* at Exhibit "J", §1.3.a. [Dkt. No. 756-13].

The Defendants failed to meet the 90% metric not as a result of willful disobedience of a court order but as a result of a severe budget crisis in Fiscal Year ("FY") 2018 and continue to fall short of achieving this metric due to the Mississippi Legislature not providing adequate funding to MDCPS for FY 2019.

As a result of these developments, Defendants filed a 60(b) motion seeking relief from compliance with this metric while MDCPS continues to strive to improve caseloads and pursues additional funding. Defendants have also requested that the Court direct Defendants and the Court Monitor, Public Catalyst, to develop a plan to achieve a reasonable level of caseload compliance within the constraints of funding by the Mississippi Legislature.

Plaintiffs' response to these reasonable requests has been to continue to demand a contempt finding and takeover of Mississippi's child welfare system in even more strident terms. This punitive position should be denied and the Rule 60 relief requested should be granted in the exercise of the Court's equitable powers.

The intent of the 2nd MSA was to "set forth and maintain the child welfare infrastructure, standards and outcomes that Defendants must meet with specified time frames statewide." To this end, the STRO sets forth over 50 requirements. Again, the 90% caseload metric is only one of the many requirements. While the caseload metric is important, it should not be treated under the circumstance of this case as a "poison pill" that triggers a contempt order or a takeover of child welfare in Mississippi. Instead, it should be reviewed by the Court under the proper Rule 60(b) standard of review of consent orders in institutional reform litigation. When this is done, it will be clear that a significant change of factual circumstances has occurred such that prospective adherence to the 90% caseload metric is not equitable. Based on these changed circumstances, Defendants should be relieved from compliance with this metric while Defendants work in

2

consultation with Public Catalyst to develop a plan to achieve compliance in the future.  This adjudication is ideally tailored to the significantly changed circumstances MDCPS has experienced.

This result is also a reasonable exercise of the Court's equitable powers because the failure to achieve 90% compliance with a weighted value caseload matrix does not violate the basic purpose of the STRO and the 2nd MSA and the failure to achieve this metric is not in and of itself unconstitutional.

The *Olivia Y* class consists of "all children who are or will be in the legal and/or physical custody of DFCS [the MDCPS predecessor]."[3]  The In-Custody class was certified to address violations of their substantive due process rights.[4]  There is no case authority in any jurisdiction recognizing a substantive due process right to a 90% caseload metric based on a weighted value matrix.  Furthermore, the 2nd MSA does not set forth that the failure to achieve the 90% caseload metric or any other requirement is a *per se* violation of the substantive due process rights of children in Mississippi.  *See Connor B. ex rel. Vigurs v. Patrick*, 774 F.3d 45, 49, 55-56(1st Cir. 2014).

## II.    THE RULE 60 (B) STANDARD OF REVIEW IN INSTITUTIONAL REFORM LITIGATION.

Plaintiffs' review of the legal standards governing a Rule 60(b) motion in institutional reform litigation is incomplete.

Rule 60(b)(5) authorizes a party to obtain relief from a judgment or order if, among other things, [applying the judgment or order] is no longer equitable.  Fed. R. Civ. P. 60(b)(5).  The Rule serves an important function in institutional reform litigation, *Id*. at 380, particularly when a consent order is the subject the modification.

---

[3] March 11, 2005 Memorandum Order and Opinion, page 2. [Dkt. No. 84].
[4] *Id*.

Next, in light of the unique features of institutional reform decrees, the Supreme Court has held that "courts must take a 'flexible approach' to Rule 60(b) motions addressing such decrees." *Horne v. Flores*, 557 U.S. 433, 450 (2009) (quoting *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 381 (1992)).[5]  Under this flexible approach, the basic mandate is to determine whether any change in factual circumstances warrants the relief requested.  This approach is critical here because the 90% caseload metric is not in and of itself mandated by the United States Constitution.

The Supreme Court has recognized that this standard can be met by demonstrating that (1) "changed factual conditions[6] make compliance with the decree substantially more onerous," (2) "a decree proves to be unworkable because of unforeseen obstacles," or (3) "enforcement would be detrimental to the public interest."  *Rufo*, 502 U.S., at 393.  However, the Supreme Court has never held that these are  exclusive tests and the foundational question under Rule 60(b) is whether applying the judgment "is no longer equitable."

Ordinarily modification should not be granted based on events that were "actually anticipated" at the time the consent order is entered into.  *Id.*  However, this is not an absolute prohibition and the Supreme Court has held that Rule 60(b) relief can still be obtained under an agreement entered into in good faith if a party seeking relief establishes a reasonable effort to comply with the decree, although the burden of proof would be "heavy."  *Id.*  Finally, the change in factual circumstances is not required to be unforeseeable.  *Id.*

---

[5] *Accord Plyler v. Evatt*, 846 F.2d 208, 212 (4th Cir.), *cert. denied*, 488 U.S. 897 (1988) (despite "a strict standard for modification of consent decrees between private parties, this standard is inappropriate in institutional reform litigation for 'the unique nature and demands of institutional reform litigation necessitate a more flexible approach to modification'") (citation omitted); *Philadelphia Welfare Rights Organization v. Shapp*, 602 F.2d 1114, 1120-21 (3d Cir. 1979), *cert. denied*, 444 U.S. 1026 (1980) (court has power to modify "complex ongoing remedial [consent] decree").
[6] *New York State Ass'n for Retarded Children, Inc. v. Carey*, 706 F.2d 956 (2d Cir.), cert. denied, 464 U.S. 915, 969 (1983) (In institutional reform litigation . . . judicially-imposed remedies must be open to adaptation when unforeseen obstacles present themselves, to improvement when a better understanding of the problem emerges, and to accommodation of a wider constellation of interests than is presented in the adversarial setting of the courtroom.)

In institutional reform litigation, the flexible standard of review is further heightened because judgments or orders in this area have the effect of dictating state or local budget priorities and, therefore, raise sensitive federalism concerns. *Horne,* 557 U.S., at 448.[7]  Given these constraints and guiding principles, which are bottomed on the allocation of powers within our federal system, deference must be given to "local governmental administrators who have the 'primary responsibility for elucidating, assessing and solving' the problems of institutional reform, to resolve the intricacies of implementing a decree modification." *Rufo*, 502 U.S., at 392.

It is correct that the party seeking relief has the burden of establishing that the changed circumstances warrant relief, *Id.* at 384, but once a party meets that burden a court abuses its discretion, "when it refuses to modify an injunction or consent decree in light of such changes." *Agostini v. Felton*, 521 U.S. 203, 215 1 (1997).

If the moving party meets the burden of establishing that changed circumstances warrant relief, the Court "should determine whether the proposed modification is suitably tailored to the changed circumstance." *Rufo*, 502 U.S., at 393.

Finally, the requisite flexible standard of review for Rule 60(b) motions in institutional reform litigation is critically applicable to the Defendants' request for relief from the 90% caseload metric because such a metric does not defeat the fundamental purpose of the STRO and 2nd MSA.  And although caseloads are an important factor in the provision of child welfare services, the failure to comply with a 90% metric is not a violation of the substantive due process rights of the *Oliva Y* class.

---

[7] *See also, Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 441 (2004)("remedies outlined in consent decrees involving state office holders may improperly derive future officials of their legislative and executive powers.")

## III.    CASELOAD BACKGROUND FACTS.

The Background Facts relied on by Plaintiffs are also incomplete and inadequate. Prior to and immediately after assuming his position on September 18, 2017, Commissioner Jess H. Dickinson was informed that the budget for FY 2018 was adequate and, as a result, MDCPS had sufficient funding for the Agency's operations for the balance of FY 2018.[8] At the onset of his administration, Commissioner Dickinson learned of the 90% caseload metric and the December 31, 2017 target date.[9] He also learned that MDCPS had been and was engaged in an aggressive campaign to increase its number of caseworkers and improve caseloads.[10] However, its good faith efforts were being impeded by challenges in retention, a nation-wide problem in child welfare.[11]

In response, MDCPS continued to focus on and implement numerous programs designed to increase the hiring, and retention of case workers by aggressively hiring caseworkers,[12] providing enhanced training,[13] increasing the pay of front-line workers,[14] hiring additional field supervisors,[15] and emphasizing caseload management and data driven decision making by

---

[8] Exhibit "A", ¶¶ 15-16, and accompanying text, Defendants 60(b) Memorandum. [Dkt. No. 756-1].

[9] *Id.* at ¶18.  As established in earlier pleadings, under the caseload weighted matrix, 90% of all caseworkers must not exceed a maximum weight of 1.0, which is a hypothetical capacity. *Id.* at Exhibit "D", Mississippi Performance On Caseload Standards, [Dkt., No. 756-4]. The Public Catalyst reporting reflects caseworkers who "Met" the 90% standard, which is defined as caseworkers with a weighted value of less than or equal to 1.0. *Id.* Public Catalyst also reports a "Close" category, which is defined as caseworkers with a weighted value of greater than 1.0 but less than 1.2. *Id.* Compliance under this system is impacted by many variables. In fact, if any additional weighted task is assigned to a 1.0 caseworker, the worker would no longer be in the "Met" category. *Id.* Mississippi Performance On Caseload Standards, [Dkt., No. 756-4]. Any analysis of the caseload metric in the context of this litigation should evaluate the "Met" and "Close" categories together.

[10] *Id.* at ¶19.

[11] During calendar year 2017, MDCPS hired 379 new workers—but during the same period, lost 225 workers. *Id.* These losses occurred throughout 2017 and not simply after Commissioner Dickinson began his administration on September 18, 2017. *Id.*

[12] Exhibit "D", §2.g., and accompanying text, Defendants' 60(b) Memorandum. [Dkt. No. 757].

[13] *Id.* at Exhibit "K".

[14] *Id* at Exhibits "N" and "O".

[15] *Id.* at Exhibit "P".

6

supervisors in order to achieve as high a net increase of caseworkers per month as the Agency could afford.[16]   However, a financial crisis severely restricted this strategy.

In mid-November, 2017, MDCPS was unexpectedly advised that the Agency would not have sufficient funds to fund FY2018 obligations.[17]   MDCPS immediately evaluated the Agency's FY 2018 obligations, obtained the balance of state funds allocated to MDCPS, and calculated the federal funds the Agency reasonably expected to receive for the balance of the fiscal year.[18]   This analysis established that without budget cuts and additional funding, MDCPS would run out of operational funding in April 2018, two months before the end of the fiscal year, and would complete FY 2018 with a deficit of approximately $52 million.[19]   Rather than working with Defendants and Public Catalyst to address the changed circumstances, Plaintiffs opted for a nuclear option and filed a motion for contempt and appointment of a Receiver.

In response, MDCPS consulted with various members of the Legislature, the Mississippi Department of Finance and Administration, the Governor's office, and the Lieutenant Governor with regard to the fiscal crisis.[20]

MDCPS also contacted and coordinated with the Mississippi Department of Human Services ("MDHS") seeking additional federal funding that had not previously been committed to MDCPS.[21]

In the course of these contacts, MDHS and MDCPS determined that completion of the separation of MDCPS from MDHS by the deadline of July 1, 2018, which was required pursuant to legislation enacted in 2016 (Senate Bill 2179), would exacerbate the MDCPS financial crisis

---

[16] *Id. at Exhibit "Q"...*
[17] *Exhibit "A", ¶23,and accompanying text,* Defendants' 60(b) Memorandum.  [Dkt. No. 756-1].
[18] *Id.*
[19] *Id.*
[20] *Id.* at 24.
[21] *Id.*

by mandating duplicative back office support functions and, more importantly, would severely limit MDCPS's access to federal funding through MDHS.[22]

MDCPS proposed legislation to maintain MDCPS as a sub-agency of MDHS but with the MDCPS Commissioner retaining full operational control of the Agency.[23] The bill (Senate Bill 2675) passed and became law and allowed among other things the integration of critical back office functions and continued access by MDCPS to federal funds through MDHS.[24]

Next, under the leadership of Commissioner Dickinson, through budget cuts, a $12 million special deficit appropriation from the Mississippi Legislature and receipt of $44 million in additional funding assistance in federal funds, MDCPS was successful in meeting its FY 2018 obligations.[25] MDCPS, under Commissioner Dickinson's leadership, and professional judgement should be commended for the successful resolution of this crisis.

In this same time frame, MDCPS also addressed FY 2019 funding.  The prior MDCPS administration had requested $113,241,063 in state funding for FY 2019.[26]  This budget request had to be amended in order to meet MDCPS's needs for FY 2019.[27]  Accordingly, MDCPS submitted a revised budget request of $133 million and advised the Legislature that the request included funds necessary to comply with *Olivia Y* requirements.[28]  Specifically, the budget included $7 million to fund a projected "net gain" of 20 employees a month, which would double the rate of hiring accomplished during the accelerated hiring period in 2017 and move the Agency forward in reducing overall caseloads.[29]  However, the Legislature appropriated $98

---

[22] *Id.* at 25
[23] *Id.*
[24] Exhibit "A", ¶28.
[25] *Id.* at ¶¶26, 28.
[26] *Id.* at ¶29.
[27] *Id.*
[28] *Id.*
[29] *Id.* at ¶30.

million in general funds and $12 million in special funds, $23 million less than the requested necessary funding.[30]

As a result, of all of these developments, MDCPS was unable to hire the necessary case workers to meet the 90% caseload metric by December 31, 2018, and is unable to do so today until it receives additional funding.[31] However, the Agency is maintaining its current caseworker workforce and is continuing to seek to improve caseload levels.[32] And these efforts must be placed in context under the flexible review standard of review of this 60(b) motion.

MDCPS has made significant progress in caseloads even in light of the major financial obstacles it has faced. In March 2016, Public Catalyst reported that 31% of MDCPS caseworkers complied with the weighted value "Met" standard adopted in the 2nd MSA.[33] By December 31, 2017, 61% of caseworkers achieved the Met category, another 14% achieved the Close standard.[34] Together 75% achieved the Met/Close combined category.[35] Furthermore, contrary to Plaintiffs' assertions, MDCPS is not on a deteriorating trajectory with regard to caseload compliance.[36] Instead, recent August 1, 2018, caseload data certified by Public Catalyst reflects that 57% of caseworkers achieved the Met category, 16% the Close category, and together 73% achieved a Met/Close standard. This is an overall increase of 5% in Met caseload compliance since the May 15, 2018 Met statistic the Plaintiffs cite.[37] And the August 1 data is an overall increase in the Met category of 26% since March 2016.

---

[30] *Id.*
[31] *Id.*
[32] *Id,* See also footnotes *12 -16, supra and accompanying text.*
[33] Exhibit "H", and accompanying text, Defendants' 60(b) Memorandum. [Dkt. No. 756-11].
[34] Exhibit "D", Mississippi Performance On Caseload Standards, Defendants' 60(b) Memorandum. [Dkt. No. 756-11].
[35] *Id.*
[36] Plaintiffs' 60(b) Opposition Memorandum at page 7. [Dkt. No. 772].
[37] Plaintiffs' 60(b) Opposition Memorandum at page 7. [Dkt. No. 772].

Furthermore, and importantly, the 90% metric under the requisite flexible 60(b) standard of review must be analyzed in the larger context of the many recent improvements and successes MDCPS has experienced including:

1. Virtually eliminating overdue investigations.[38]

2. Improving the processes and procedures necessary to facilitate adoptions resulting in over a 100% increase in adoptions from FY 2017 to FY 2018 (302 to 641).[39]

3. Exceeding the target for foster home recruitment by more than 150%.[40]

4. Substantially reducing the backlog of relatives awaiting licensure.[41]

5. Implemented new contractual resources to provide in-home services to maintain children in their homes. [42]

6. Reducing the number of children in foster care by approximately 13.6% in the last year.[43]

7. During 2017, complying with all of the applicable requirements and metrics under the STRO other than the caseload metrics.[44]

## IV.    ARGUMENT.

## A.    Section 11.2.a. of the 2nd MSA Authorizes The Defendants To File and The Court To Act Upon A Rule 60(b) Motion.

Section 11.2.a. of the 2nd MSA allows Defendants to seek "a court-ordered modification of any provision of the 2nd MSA pursuant to Rule 60(b) of the Federal Rules of Civil Procedure."[45] This right exists independent of any contract provision. And it is not abrogated by the provisions of Section 11.2, which address certain enforcement procedures that are to be followed after January 1, 2020. The fact that the section is set forth numerically as a subsection of Section 11.2 is not determinative and the Plaintiffs have cited no legal authority in support of

---

[38] Exhibit "B", and accompanying text, Defendants' 60(b) Memorandum. [Dkt. No. 756-2].
[39] *Id*. at Exhibit "A", ¶¶ 13, 14, and 33.
[40] *Id*. at Exhibits "A", ¶33 [Dkt. No. 756-1] and Exhibit "D", §6.b. [Dkt. No. 756-4].
[41] *Id*. at Exhibit "D", §§ 6.a.1.a. and 6.a.1.c. [Dkt. No. 756-4].
[42] *Id*. at Exhibit "A", ¶¶ 34-36 [Dkt. No. 756-1]and Exhibit "E" [Dkt. No. 756-5 to 756-8].
[43] *Id* at Exhibit "F",[Dkt. No. 756-9].
[44] *Id*. at Exhibit "D", [Dkt. No.  756-4].
[45] *Id*. at Exhibit "J", [Dkt. No. 756-13].

their contention that the Defendants are restricted by contract from invoking the Court's broad equitable powers under Rule 60(b). Finally, if the intent of the parties was to deprive the Defendants of their right to invoke Rule 60(b) irrespective of changed circumstances, no matter how serious until January 1, 2020, the section would have expressly set forth such a limitation.

**B.  Section 11.3 of the 2nd MSA Does Not Require Compliance With All The Provisions of the MSA As A Condition Precedent To A Rule 60(b) Motion.**

The Plaintiffs also assert that under Section 11.3 of the 2nd MSA, the Defendants must establish as a condition precedent to 60(b) relief from any provision in the 2nd MSA "they have achieved and maintained substantial compliance [with] all of the provisions of this MSA upon 12 continuous months of data that has been verified by the Monitor, prior to the application."[46] This contention is simply wrong. Section 11.3 is applicable only when "Defendants … seek an order dismissing court jurisdiction of this matter…" The Defendants are not requesting relief of this nature.

**C.  Changed Factual Circumstances Exist With Regard To Caseload Compliance.**

When the STRO and the 2nd MSA were agreed upon and entered as Consent Orders, there is no evidence that the parties "actually anticipated" that MDCPS would discover a potentially catastrophic budget deficit in Fiscal Year 2018. *See Rufo*, 502 U.S., at 385. Nor is there any evidence the parties actually anticipated that after discovering and resolving the FY 2018 deficit that the Mississippi Legislature in the very next fiscal year would underfund MDCPS by $23 million after being advised that the additional funding was necessary to comply with requirements in the 2nd MSA. And, even accepting the premise that legislative funding is always uncertain, under governing law 60(b)(5) relief is still appropriate if MDCPS meets the increased burden of showing the 90% compliance metric was entered into in good faith and that

---

[46] Plaintiff's 60(b) Opposition Memorandum at page 11.  [Dkt. No. 772].

it has made reasonable efforts to achieve the metric. *Id.* MDCPS' good faith is clear and as set forth in Section III above it has made more than a reasonable effort to comply with this metric but was unable to do so as a result of unanticipated changed circumstances beyond the Defendants' control.

The Plaintiffs assert that the 60(b) motion should be denied because financial constraints cannot be used to justify creation or perpetuation of constitutional violations, citing *Rufo* and other cases.[47] These authorities are not governing because a 90% caseload metric is not constitutionally required and the failure to achieve the metric due to changed circumstances is, therefore, not a violation of a conceded constitutional right. *See Connor B. ex rel. Vigurs*, 774 F.3d at 57.

Next, in furtherance of the assertion that inadequate funding is not relevant in a Rule 60(b) motion, the Plaintiffs rely on *Inmates of Boys' Training School v. Southworth*, 76 F.R.D. 111, n.2 (D.R.I. 1977). This reliance is misplaced. The specific ruling was that "[a]bsent any other request for modification of the decree monetary considerations are irrelevant where constitutional rights are at stake," and "[a] decree … is not an immutable creature of law imposing its force regardless of circumstances." *Id.* at 119, 124. Here a 60(b) motion is before the Court and a 90% caseload metric is not a constitutional requirement.

## D.    Changed Factual Conditions Make Compliance With The 90% Caseload Metric More Onerous.

At this time, compliance with the 90% caseload metric is more onerous. Given the FY 2019 funding MDCPS received from the Mississippi Legislature following the FY 2018 financial crisis, it does not have the funding necessary to hire sufficient caseworkers to achieve a 90% metric and it cannot obviously create an appropriation. This does not mean, however, that

---

[47] Plaintiffs' 60(b) Opposition Memorandum at 11-12. [Dkt. No. 772].

MDCPS is not seeking to improve caseloads. As discussed in section II and in other pleadings, the Agency is diligently doing so.

**E.    Compliance With The 90% Caseload Metric Is Unworkable Due to Unforeseen Obstacles.**

For the same reasons that compliance is more onerous given the changed circumstances, meeting a 90% standard at this time is also unworkable until additional funding is obtained.

**F.    Enforcement of the 90% Caseload Metric Is Detrimental to the Public Interest.**

Again, the 60(b) motion issues must be placed in context. MDCPS spent all of 2017 complying with over 50 applicable requirements in the STRO. It met every applicable standard other than the caseload metrics. And as discussed in Section III, it has also made substantial progress in providing services to the children of Mississippi despite facing a potentially catastrophic financial crisis in 2018 and significant underfunding for FY 2019. Granting the requested 60(b) relief, would also permit a greater focus of Agency resources and funding to the children and families of the state rather than on the managerial demands and fees and costs associated with this litigation. This would serve the public interest. Finally, Plaintiffs' goal of forcing MDCPS into a Receivership based on the failure to achieve this metric with the attendant uncertainties, operational disruptions and unfunded costs is detrimental to the public interest.

**G.    The Modification Is Suitably Tailored To The Changed Circumstances.**

The relief MDCPS seeks is suitably tailored to the changed circumstances reviewed in Section III. The relief is limited to the 90% caseload metric, which cannot be achieved at the present time, and a request for an Order allowing MDCPS to develop a plan with Public Catalyst to achieve this metric in the future. This approach insures that caseloads will continue to be an important focus in this institutional reform litigation and that there is no intention for the relief to be made permanent.

**V.      CONCLUSION.**

The takeover of the MDCPS, an agency that provides a wide range of vital services to thousands of children in Mississippi in a complex foster care system, based on the failure of the Agency to achieve a single caseload metric is a bridge too far.  Although obstacles are a fact of life in the area of child welfare services, MDCPS has made significant progress improvements in the delivery of these services in recent years.  And relief from the 90% caseload metric based on changed circumstances will allow Defendants to devote monetary and managerial resources away from litigation and back to their mission of providing care to the children of Mississippi while working with Public Catalyst to achieve compliance in the future.

RESPECTFULLY SUBMITTED, this the 23rd day of August, 2018.

PHIL BRYANT, as Governor of the State of Mississippi, JESS H. DICKINSON, as Commissioner, Mississippi Department of Child Protection Services, and TRACY MALONE, as Deputy Commissioner of Child Welfare, Mississippi Department of Child Protection Services

By: /s/  James L. Jones

OF COUNSEL:


BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC
Kenya Key Rachal (MSB #99227)
James L. Jones (MSB #3214)
Jake Adams (MSB #101538)
One Eastover Center
100 Vision Drive, Suite 400
Jackson, MS  39211
Telephone:  (601) 351-2400
Facsimile:  (601) 351-2424

Harold E. Pizzetta, III
Assistant Attorney General
OFFICE OF THE MISSISSIPPI ATTORNEY GENERAL
P. O. Box 220
Jackson, MS  39205

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed the foregoing with the Clerk of Court using the ECF system which sent notification of such filing to the following:

Marcia Robinson Lowry (PHV)
Sara Robinson-Glasser (PHV)
Erica Reed (PHV)
A BETTER CHILDHOOD
1095 Hardscrabble Road
Chappaqua, NY  10410

W. Wayne Drinkwater, Jr. (MSB #6193)
Michael J. Bentley (MSB #102631)
BRADLEY, ARANT, ROSE & WHITE, LLP
One Jackson Place
188 E. Capitol St, Ste 400
Jackson, MS  39201

Christian Carbone (PHV)
LOEB & LOEB, LLP
345 Park Avenue
New York, NY  10154


SO CERTIFIED, this the 23rd day of August, 2018.


/s/  James L. Jones