**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

OLIVIA Y., by and through her next friend, James D. Johnson; JAMISON J., by and through his next friend, Clara Lewis; DESIREE, RENEE, TYSON, and MONIQUE P., by and through their next friend, Sylvia Forster; JOHN A., by and through his next friend, James D. Johnson; CODY B., by and through his next friend, Sharon Scott; MARY, TOM, MATTHEW, and DANA W., by and through their next friend, Zelatra W.; AND SAM H., by and through his next friend, Yvette Bullock; on their own behalf and behalf of all others similarly situated,

        Plaintiffs,

 v.

PHIL BRYANT, as Governor of the State of Mississippi; DONALD TAYLOR, as Executive Director of the Department of Human Services; AND BILLY MANGOLD, as Director of the Division of Family and Children's Services,

        Defendants.

CIVIL ACTION NO.
3:04-CV-251-TSL-FKB

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION FOR "RELIEF" UNDER
THE 2ND MODIFIED SETTLEMENT AGREEMENT
AND REFORM PLAN AND FED. R. CIV. P. 60(b)**

I.      **INTRODUCTION.**

Plaintiffs – foster care children in Mississippi – file this supplemental memorandum following completion of the court-ordered additional discovery related to defendants' motion for relief under Rule 60(b).  In that motion, defendants seek permanent relief from the critical requirement that 90% of the state's caseworkers have caseloads that do not exceed specified maximum levels.  These caseload standards were the result of a comprehensive analysis conducted in 2015 by Public Catalyst, a prominent national organization retained with defendants' consent pursuant to the 2015 agreed order. Exhibit A.  [Dep. Ex. #3].[1]  The report stated that the first step in achieving positive outcomes for children and families was to have a competent, trained and resourced child welfare workforce.  "The first order of business must be the creation and implementation of a comprehensive, dynamic plan to achieve manageable caseloads for staff within one year, " Public Catalyst wrote in its 2015 report.

Public Catalyst and the Mississippi Department of Human Services ("MDCPS") (under Commissioner Chandler) then had months of dialogue concerning appropriate caseload standards.  In 2016, Commissioner Chandler submitted a Recruitment, Hiring and Retention Plan (the "RHR Plan") in which MDCPS affirmed that the caseload standards recommended by Public Catalyst were feasible, set forth a plan for achieving them within the stipulated one-year period, and agreed with Public Catalyst that the standards  "will support recruitment and retention of child welfare staff as well as improve the public's confidence in the agency's ability and capacity to keep children safe and strengthen families."[2]

---

[1] Exhibits were numbered sequentially throughout the course of all of the depositions rather than by witness.  Deposition transcripts and depositions exhibits cited in this brief are also attached as exhibits.

[2] Mississippi Department of Child Protection Services, *Recruitment, Hiring and Retention Plan* dated May 25, 2016, p. 1. Exhibit B. [Dep. Ex. #4].

1

MDCPS formally agreed to meet the caseload standards in both the Stipulated Third Remedial Order and in the 2nd Modified Mississippi Settlement Agreement and Reform Plan ("2nd MSA"). [Dkt. 712.] The cost of implementing the caseload targets – acknowledged by defendants to be no more than $7 million per year [November 27, 2018 Cheeseman depo. at 51:11-24; December 20, 2018 Cheeseman depo. at 136: 20-4] has not increased at all since the 2016 agreement. On the contrary, additional discovery indicates that, if anything, the cost of implementation has declined, as defendants claim that the number of children in the state's child welfare system has declined significantly in the last year as a result of clearing a backlog of children awaiting adoption (see discussion below). If this is true, then the cost of the caseworkers needed to comply with the caseload standards is even less than the $7 million figure conceded by defendants.

Notwithstanding these undisputed facts, on July 3, 2018, not ten months after Commissioner Dickinson succeeded Commissioner Chandler at the helm of the MDCPS, defendants filed a motion seeking permanent relief from the caseload standards to which the MDCPS had agreed just eighteen months earlier.

Orders entered by the federal court are intended to be binding and cannot be modified in the absence of "changed factual conditions [that] make compliance with the decree substantially more onerous." *Rufo v. Inmates of Suffolk County,* 502 U.S. 367, 384, 112 S.Ct. 784, 116 L.Ed.2d 867 (1992). Defendants claim that the "changed circumstance" is the Legislature's refusal to provide all of the funding requested by MDCPS in its fiscal year 2019 budget. Yet as previously noted, the Legislature has failed for over a decade to provide adequate funding for the proper functioning of the state's child welfare system and for implementation of the consent decrees, and this Court is well aware of the long-standing history of significant non-compliance

in this case. This most recent failure was not only predictable, it was expressly acknowledged as a possibility by the parties in 2012 and again in 2016. [Dkt. 571 at § 1.G; Dkt. 712, Introduction.] Moreover, defendants have readily acknowledged in depositions that appropriations for MDCPS do not contain specifications as to how they should be spent; the commissioner of the agency has the discretion to spend the money as he or she chooses. Exhibit C. [November 27, 2018 Cheeseman depo. at 53:12-25 and at 54:1-9; Exhibit D. December 20, 2018 Cheeseman depo. at 133:15-21.] Commissioner Dickinson clearly stated that, "I have the authority to spend it as I see it appropriate." Exhibit E. [November 29, 2018 Dickinson depo. at 106:25 and 107:1]. Defendants have cited no opinion in which a court relieved a public entity from the terms of a consent decree based on a legislature's failure to provide the funding needed to implement its terms, particularly when the amount of those funds has not increased and the agreement was reached just two years earlier.[3]

Additional discovery has uncovered the true reason for the MDCPS's abrupt about-face in a mere ten months: the new Commissioner and his staff do not want to implement the agreed-upon caseload standards because they (falsely) believe they would require "reshuffling"[4] of children to new caseworkers and are "detrimental" or "harmful" to the children. Commissioner Dickinson went so far as to state that, "I would not have agreed for the State to obligate itself in

---

[3] Moreover, defendants explicitly agreed not to seek modification of the decree in this case until at least January 1, 2020, see 2nd MSA 11.2.a, a dispositive fact which defendants dismiss in passing. [See Dkt. 780 at 10-11].

[4] Following the depositions the Joint Legislative Committee on Performance Evaluation and Expenditure Review (PEER Committee) for the Mississippi Legislature released a report entitled "A Review of the Mississippi Department Child Protection Services for Fiscal Years of Child Protection Services for Fiscal Years 2017 and 2018" which included a letter in response submitted by Commissioner Dickinson. In that letter, Commissioner Dickinson elaborates on his position concerning the caseload standards.

order to comply with the second MSA." [November 29, 2018 Dickinson depo. at 143:22-4]. Defendants have no evidence for these assertions and they are not only contrary to MDCPS's 2016 affirmation of the caseload standards as feasible and desirable, they also ignore the flexibility that Public Catalyst and MDCPS under Commissioner Chandler built into the new standards, principally, the allowance of 10% of caseworkers with non-conforming caseloads and the one-year period for compliance. With these provisions, as the MDCPS affirmed in 2016, far from causing harm, implementation of the caseload standards is the key element in fostering stability, establishing a sound basis on which compliance can be built, and thereby improving the well-being of children in the state's foster care system.

The bottom line is that under Rule 60(b) and the case law construing it, neither a failure of funding by a legislative body nor a mere change of heart by new personnel – particularly new personnel with little or no prior experience administering a child welfare system – is a valid basis for eliminating the caseload targets that MDCPS agreed were feasible and beneficial just two years ago. As the Supreme Court pointedly stated in *Rufo*: "Rule 60(b)(5) provides that a party may obtain relief from a court order when 'it is no longer equitable that the judgment should have prospective application,' not when it is no longer convenient to live with the terms of a consent decree." *Rufo*, 502 U.S. at 383. The motion should be denied.

## II.    DISCUSSION.

As an initial matter, in their reply in support of the motion to modify the consent decree, defendants repeatedly refer to and thereby conflate the pending motions for contempt, for appointment of a receiver, and for modification of the consent decree under Rule 60(b).[5] The

---

[5] For example, on page 13 [Dkt. 780 at 10-11] defendants assert (with no citation to evidence) that placing MDCPS into a receivership would be "detrimental to the public interest." This statement has no relevance to defendants' motion under Rule 60(b).

standards governing a motion for contempt, for appointment of a receiver and for modification of a consent decree are of course entirely different. Defendants' arguments concerning contempt or the appointment of a receiver are simply not relevant to their motion for modification of the consent decree.

As previously noted, modification of a consent decree is appropriate only when the movant meets its burden of demonstrating that (a) "changed factual conditions make compliance with the decree substantially more onerous," (b) "a decree proves to be unworkable because of unforeseen obstacles," or (c) "enforcement would be detrimental to the public interest." *Rufo*, 502 U.S. at 384-385. Further, a party seeking the modification of a consent decree must establish that "the proposed modification is suitably tailored to the changed circumstance." *Rufo*, 502 U.S. at 393. The additional discovery taken by plaintiffs confirms that defendants do not and cannot satisfy any of these tests.

A. **Additional Discovery Confirms That Changes in Factual Conditions Since 2016 Have Made Compliance Even *Less* Onerous.**

As previously noted, defendants acknowledged that the cost of compliance with the 2016 caseload standards is $7 million per year, an amount they concede is required to employ a net 240 new caseworkers. [See Dkt. 780, p. 8.] [6] Additional discovery demonstrated that due to changed circumstances claimed by defendants, the current cost of compliance is even less. Specifically, Commissioner Dickinson's Chief of Staff (and former law clerk) Taylor Cheeseman testified at his deposition that "over the past year" there are "almost 1,000" fewer children in the

---

[6] Even this number is in dispute, and the witnesses were not able to provide satisfactory answers as to how or by whom it had been derived. See December 20, 2018 deposition of T. Cheeseman at 112:16-117:8.

custody of the state's child welfare system.[7]  Similarly, in their reply defendants claim that the number of children in foster care has declined by 13.6% "in the last year."  [Dkt. 780, p. 10.]  This is the only evidence of "changed circumstances" before the Court, and it shows that far from making compliance "substantially more onerous," the $7 million figure for compliance with the 2016 caseload standards is even lower than two years ago.

In the face of these facts, defendants can only claim the Legislature's decision not to provide $7 million – out of a total state budget of $5.5 billion – constitutes the "changed circumstances" justifying relief under Rule 60(b).  As previously stated, the Legislature's decision not to provide sufficient funds for the agency overall, if that is what it was, cannot constitute a "changed circumstance" under Rule 60(b) and defendants do not cite any authority in support of this assertion.  And in fact, the uniform testimony from the depositions is that the Legislature provides funding for the agency without specifying how it will be allocated, with the Commissioner retaining the authority to deploy the funding where he chooses.  But if the Legislature's refusal to provide adequate funding provided a basis for modification of the 2nd MSA, then the Legislature would hold an absolute veto over all aspects of the consent decree.  This contention would lead to an absurd result in all institutional reform cases involving consent decrees.

Nor was the Legislature's failure to provide adequate funding in fiscal year 2019 "unforeseen."  As previously noted, since 2008 the Legislature has consistently failed to provide sufficient funds to implement the parties' agreements.  Moreover, as noted previously, in 2012 and 2016 the parties acknowledged the possibility that the Legislature might not provide the funds needed to implement their agreements.  "Ordinarily … modification should not be granted

---

[7] December 20, 2018 Deposition of T. Cheeseman at 117:9-19.

6

where a party relies upon events that actually were anticipated at the time it entered into a decree." *Rufo*, 502 U.S. at 385. In addition, as the Supreme Court stated in *Rufo*, "[f]inancial constraints may not be used to justify the creation or perpetuation of constitutional violations." *Rufo*, 502 U.S. at 392. The court order in this case, the 2nd MSA, was entered to remedy constitutional violations.

Defendants' only response to these contentions is that the 90% caseload standard is not a constitutional requirement. [Dkt. 780 at p. 12.] However, in *Rufo*, the Supreme Court explained that when defendants charged with constitutional violations avoid the risk of litigation by entering into a consent decree, it is irrelevant on a subsequent motion to modify the decree whether the specific conditions involved in the attempted modification were constitutional requirements. *See Rufo*, 502 U.S. at 390, quoting *Plyler v. Evatt*, 924 F.2d 1321, 1327 (4th Cir. 1991) (defendants' assertion "would make necessary … a constitutional decision every time an effort was made either to enforce or modify the decree by judicial action.")[8]

**B.     Additional Discovery Confirms That the Decree Is Not "Unworkable" Due to "Unforeseen Obstacles."**

The second formulation under which modification of a consent decree may be warranted is that "a decree proves to be unworkable because of unforeseen obstacles." *Rufo*, 502 U.S. at 384. As plaintiffs previously noted, caseload standards requiring $7 million (or less) per year are not "unworkable" when the state's budget is $5.5 billion. In addition, there are no "unforeseen"

---

[8] Citing *Rufo*, defendants erroneously suggest that they need only show that they agreed to the caseload standards in good faith and made reasonable efforts to achieve them. [Dkt. 780, pp. 11-12.] In fact, the Supreme Court made clear that the "good faith plus reasonable effort" formulation applies only when "a party anticipated changing conditions that would make performance of the decree more onerous but nevertheless agreed to the decree…." *Rufo*, 502 U.S. at 385. No such facts are present, or claimed to be present, here.

7

obstacles when the only barrier to achievement of the caseload standards is the Legislature's knowing and predictable failure – recurring since 2008 – to provide appropriate funding to the agency.

Additional discovery has further confirmed that the caseload standards to which the MDCPS agreed in 2016 have not suddenly become "unworkable." On the contrary, Chief of Staff Cheeseman testified in his deposition that the annual funds allocated to the MDCPS by the Legislature are in the form of a block grant. [December 20, 2018 Cheeseman depo. at 133:15-21.] Commissioner Dickinson clearly stated that, "I have the authority to spend it as I see it appropriate." [November 29, 2018 Dickinson depo. at 106:25 and 107:1]. As previously noted (and defendants do not dispute), the total annual budget of the MDCPS, including federal funds, is $190-200 million. Thus, the $7 million needed for compliant caseloads constitutes approximately 3.5% of a budget that the Commissioner can use as he sees fit. This further demonstrates that compliance with the caseload standards are not, and never have been, "unworkable."

### C. Additional Discovery Confirms That Enforcement of the Decree Would Not Be Detrimental to the Public Interest.

Modification of a consent decree may be appropriate when enforcement of the decree would be detrimental to the public interest. *Rufo*, 502 U.S. at 384. For example, in *Duran v. Elrod*, 760 F.2d 756, 759-761 (7th Cir. 1985), modification of a decree related to the renovation of a county jail was granted to avoid the pre-trial release of large numbers of persons accused of violent crimes.

Remarkably, additional discovery has revealed that both Commissioner Dickinson and his Chief of Staff Taylor Cheeseman – capable persons but without any significant prior

8

experience in child welfare – believe that even the *flexible* caseload standards required by the 2nd MSA are "detrimental" or "harmful" to children and would require children to be "reshuffled" from one caseworker to another. As seen, precisely the reverse is true – the 2016 caseload standards would ensure the stability of the caseworker base and therefore promote the stability of caseworker-child relationships.

The beliefs of Commissioner Dickinson, Mr. Cheeseman and other staff currently at the MDCPS concerning the "harmful" effects of caseload limitations are now being based upon a recent decision of the Fifth Circuit concerning *hard* caps on caseloads in the Texas child welfare system,[9] even though the decision on which they rely was issued several months after this 60(b) motion had been filed.

Notably, however, in *Rufo* the Supreme Court expressly rejected the petitioner's claim that a recent decision in another case, issued after the consent decree was entered, could serve as a basis for modification of the decree. The Supreme Court emphasized that the petitioner had *agreed* to undertake the obligations contained in the consent decree: "To hold that a clarification in the law automatically opens the door for relitigation of the merits of every affected consent decree would undermine the finality of settlements in institutional reform litigation." *Rufo*, 502 U.S. at 389. Citing *Plyler, supra*, the Supreme Court further noted that to modify a consent decree based on a subsequent decision "would do violence to the obvious intention of the parties that the decretal obligations assumed by the state were not confined to meeting minimal constitutional requirements." *Rufo*, 502 U.S. at 390. Here as well, having decided to avoid the risk of litigation by agreeing to undertake specified obligations, including compliance with the

---

[9] *M.D., et al. v. Abbott, et al.*, U.S. Court of Appeals, Fifth Circuit, Case No. 18-40057, filed October 18, 2018. If defendants assert that this decision is somehow relevant to this motion, plaintiffs reserve the right to respond.

9

flexible caseload limitations, the defendants cannot be permitted to re-open the merits of this case on the basis of a subsequent decision in another, different case with a litigated judgment, not a consent decree.

### D. The Defendants' Proposed "Modification" Contains No Specifics, Hence Is Not "Tailored" to Any claimed Defect in the 2nd MSA.

Finally, even assuming there are changed circumstances here – there are not – the relief sought by defendants in no way satisfies the requirement that "the proposed modification is suitably tailored to the changed circumstances." *Rufo*, 502 U.S. at 393. Rather, plaintiffs have framed their relief in the broadest possible terms, as follows:

> [T]he Defendants request that the court relieve MDCPS of the 90% caseload metric for Fiscal Year 2019 (July 1, 2018 to June 30, 2019) and until MDCPS receives sufficient funding from the Mississippi legislature to hire and retain the staff needed to meet a 90% compliance metric….
>
> The Defendants also request general equitable relief including, in the Court's discretion, a directive to Public Catalyst and MDCPS to develop a plan to achieve a reasonable level of caseload compliance within the constraints of funding by the Mississippi Legislature.

[Dkt. 756, pp. 4-5.]

Thus, defendants seek to be indefinitely relieved of the caseload standards to which the MDCPS agreed in 2016, and also request a directive that Public Catalyst and the MDCPS start all over to develop a plan to achieve reasonable caseload levels, but only "within the constraints of funding by the … Legislature." This would put caseload levels at the mercy of the Legislature, which has a consistent history of underfunding the state's child welfare system. If the Legislature were to cut funding levels even further – and it would have no incentive not to – then the parties would have no alternative but to reduce caseworker staffing and thereby increase

caseload levels even further. This upside-down result, when coupled with the recent testimony by Commissioner Dickinson and Chief of Staff Cheeseman that they believe caseload limitations, even "soft" limitations of the type developed by Public Catalyst, are "harmful" for children, would ensure that no meaningful agreement would be reached and therefore reverse the progress made under Commissioner Chandler. Far from "tailoring" the modification to the "changed circumstances," the relief sought by defendants would ultimately remove all of the guardrails that were so painstakingly constructed over the span of a decade.

### III. CONCLUSION.

Modification of caseload standards that MDCPS agreed in 2016 were both feasible and necessary is not "equitable," especially when the only pretext for the "modification" is the Legislature's predictable refusal to provide adequate funding to the agency over-all. The children who depend upon the consent decree deserve better, not a reversion to the prior standard-less morass. For the reasons set forth herein and in the opposition, defendants' motion for "relief" under the 2nd MSA and Rule 60(b) should be denied.

RESPECTFULLY SUBMITTED, this the 31st day of December, 2018.

*/s/ Marcia Robinson Lowry*
Marcia Robinson Lowry (*pro hac vice*)
Sara Robinson-Glasser (*pro hac vice*)
A Better Childhood, Inc.
1095 Hardscrabble Road
Chappaqua, NY  10514
Telephone (646) 808-7344
Facsimile: (914) 238-0365
Email: mlowry@abetterchildhood.org
          srglasser@abetterchildhood.org

        W. Wayne Drinkwater, Jr. (MBN 6193)
        Michael J. Bentley (MBN 102631)
        BRADLEY ARANT BOULT CUMMINGS LLP
        One Jackson Place, Suite 400
        188 East Capitol Street
        Jackson, Mississippi 39201
        Telephone: (601) 948-8000
        Facsimile: (601) 948-3000
        Email: wdrinkwater@babc.com
              mbentley@babc.com

        Christian Carbone (*pro hac vice*)
        LOEB & LOEB LLP
        345 Park Avenue
        New York, New York 10154
        Telephone: (212) 407-4000
        Email: ccarbone@loeb.com

        *Plaintiffs' Counsel*

17219563.3
930057-10001

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 31, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will deliver copies to all counsel of record.

                                         */s/ Marcia Robinson Lowry*
                                         Marcia Robinson Lowry