EXHIBIT A

# Organizational Analysis
## Mississippi Department of Human Services
### Division of Family and Children's Services

November 24, 2015



PUBLIC CATALYST

**EXHIBIT 3**

T. Cheeseman
11/27/18
Ginger H Brooks
CCR, CTR, RPR, RSA

# Contents

Introduction. ................................................................................................................................. 3

The Agreed Order. ......................................................................................................................... 3

Methodology ................................................................................................................................. 5

Demographics. ............................................................................................................................... 6

Recommendations. ........................................................................................................................ 8

The Crossroads ............................................................................................................................. 11

Organization and Structure. ......................................................................................................... 12

Focusing on the Fundamentals .................................................................................................... 15

Caseload Measurements ............................................................................................................... 19

Needs Assessment ......................................................................................................................... 21

Data Collection, Analysis and Performance Management. ........................................................... 23

## Tables

Table 1. Number of Children in Mississippi State Child Welfare Custody ...................................... 6

Table 2. CPI-U Southern Region 2007-2015 .................................................................................. 18

Table 3. State of Mississippi Social Work Salary Comparison ....................................................... 18

Table 4. Proposed Mississippi Caseload Standards. ....................................................................... 21

## Figures

Figure 1. Placement Types of Children in Custody on May 31, 2015 ............................................. 7

Figure 2. Age of Children in Foster Care on July 1, 2014. ............................................................... 8

## Appendices

Appendix A. Selected Findings from Periods 3 and 4 Monitor's Reports ...................................... 28

Appendix B. Mississippi State Public Teacher Salary Schedule. .................................................... 49

Appendix C. CSF Recommendations and MSA Requirements. ....................................................... 50

Appendix D. Estimate of Per-Child Welfare Spending. ................................................................... 61

# Introduction

Acknowledging the desire and need for broader progress by the Mississippi Department of Human Services ("MDHS") pursuant to the Modified Mississippi Settlement Agreement and Reform Plan ("Modified Settlement Agreement") in *Olivia Y. v. Bryant*, Plaintiffs foster children, through their counsel A Better Childhood and Bradley Arant Rose & White LLP, reached an agreement (the "Agreed Order") this summer with Governor Phil Bryant, MDHS and its Division of Family and Children's Services ("DFCS"). The parties' Agreed Order sets forth a period for Public Catalyst to complete an organizational analysis of the Mississippi child welfare system, between July 24, 2015 and November 24, 2015, and make recommendations to the parties as specified in the order. Following an intensive period of inquiry, fact-finding, analysis and discernment, this document serves as Public Catalyst's Final Organizational Analysis Report, setting out recommendations crafted to strengthen Mississippi's ability to achieve substantial and sustainable improvements in its child welfare system.

Foster children represented by attorneys from Children's Rights, Inc., a nonprofit advocacy organization, who are now with A Better Childhood, also a nonprofit advocacy organization, and Bradley Arant Rose & White LLP filed suit in March 2004 in the United States District Court for the Southern District of Mississippi against the Governor of Mississippi, MDHS and DFCS, alleging that Mississippi was not adequately protecting and serving children in its child welfare custody. The parties ultimately reached an agreement embodied in the Mississippi Settlement Agreement and Reform Plan ("Settlement Agreement"), which was approved by the Court on January 4, 2008. The Settlement Agreement included commitments designed to enhance the safety, permanency and well-being of children in the foster care custody of Mississippi.

Since 2008, the federal Court Monitor has consistently reported gaps in MDHS' performance and the federal court has required Mississippi to implement five annual implementation plans, a corrective action plan, a remedial order focused on data integrity, and a remedial order focused on overall performance improvement. The parties renegotiated the Settlement Agreement and the federal court approved a Modified Settlement Agreement ("MSA") in July 2012 that maintained most of the original Settlement Agreement's commitments but sequenced their implementation regionally. The MSA supersedes the initial Settlement Agreement.

## The Agreed Order

The parties stipulated this summer that many of the commitments contained in the MSA had not been met as of July 2015. To establish a corrective path going forward, the Agreed Order

EXHIBIT A

called for an organizational assessment by Public Catalyst, to include:

a.  recommending an optimal DFCS structure, including whether DFCS should be a free-standing agency, its new organizational structure, and to what extent privatization should be utilized;

b.  reviewing and considering the findings and recommendations made in the Court Monitor's Reports on Implementation Periods 3 and 4;

c.  evaluating the areas in which MDHS and/or DFCS have not complied with the Modified Mississippi Settlement Agreement and Reform Plan ("MSA") [Dkt. 571] and recommending steps necessary to achieve substantial compliance;

d.  reviewing the current positions and salary structure in DFCS, and recommending additional positions, if any, necessary for its effective functioning, and salary levels necessary to hire and retain qualified personnel for all DFCS positions, including salary levels for the senior level management team for the Executive Director;

e.  recommending the management and accountability structure within DFCS;

f.  evaluating and analyzing the current caseload measurements in the MSA and determining the most appropriate caseload measurements for workers with dedicated and mixed caseloads;

g.  designing a plan for a needs assessment for services for children in care, their families of origin, and for foster and adoptive families, as well as a process to implement the needs assessment, including timetables;

h.  reviewing at the statewide and regional levels DFCS' data-collection and analysis capacities, as well as its capacity to use data for performance management, and recommending both short and long-term solutions for strengthening each capacity as needed to support substantial compliance with the MSA;

i.  consulting with the Governor regarding the qualifications, level of compensation, and the timing for hiring an Executive Director of DFCS;

j.  recommending qualified candidates to serve as the Executive Director of DFCS; and

k.  working with a representative designated by the Defendants in ongoing discussions concerning the development of the recommendations contemplated herein.

4

EXHIBIT A

## Methodology

In preparation for this Final Organizational Analysis Report, Public Catalyst undertook extensive fact-finding activities between July and November 2015 to understand MDHS' progress implementing commitments in the *Olivia Y.* MSA, and the barriers to success. These activities included meetings and interviews with 126 *Olivia Y.* stakeholders including:

- the federal Court Monitor;
- counsel to the parties;
- members of Governor Bryant's staff;
- members of the Judiciary;
- members of the Mississippi Legislature;
- members of the MDHS and DFCS leadership teams;
- regional DFCS leadership and staff;
- scores of foster parents from across the state;
- staff from the Center for the Support of Families (CSF);
- staff from Chapin Hall;
- child welfare leaders from agencies across Mississippi including:
  - o Apelah;
  - o Baptist Children's Village;
  - o Catholic Charities;
  - o Christians in Action;
  - o Hope Village for Children;
  - o Methodist Children's Home;
  - o Mississippi Children's Home Services;
  - o New Beginnings International Children's and Family Services;
  - o Sally Kate Winters Family Services;
  - o Southern Christian Services for Children and Youth;
  - o Sunny Brook Children's Home;
  - o Two Hundred Million Flowers; and
  - o Youth Villages

Public Catalyst conducted numerous phone interviews with foster parents across Mississippi, selected randomly in a representative sample, to understand their caregiving experience within the Mississippi child welfare system. In addition, Public Catalyst visited MDHS offices in Hinds, Hancock and Harrison Counties. During these office visits, Public Catalyst met with regional leaders and staff to understand the unique challenges and service needs that shape child welfare practices, which vary across the state. To prepare this report, Public Catalyst reviewed

EXHIBIT A

and analyzed wide-ranging administrative documents, as well as extensive aggregate and detail performance data produced by MDHS and the federal Court Monitor including:

- *Olivia Y.* Settlement Agreements, Implementation Plans, Remedial Orders and other court documents;
- Court Monitor Reports and Exhibits;
- DFCS Organization Charts;
- MDHS Weekly Activity Report for August 28, 2015;
- FY2015 & FY2016 MDHS Turnover Worksheets;
- DFCS Staffing Report as of August 31, 2015;
- Mississippi Class Specification Bulletins-Social Services Series;
- DFCS Caseload/Workload Reports;
- Foster Care Placement Data;
- Entry Rates Per 1000 Children (June 30, 2014);
- Likelihood of Re-entry from Exits (June 30, 2014);
- Permanent Exits by Exit Type (June 30, 2014);
- Various reports run from the SQL server, PAD reports and the data dashboard;
- Plan materials related to the new SACWIS;
- Mississippi Child and Family Service Plan 2015-2019;
- Mississippi Foster Care Services Assessments-Final Report-October 13, 2009; and
- MDHS/DFCS Performance Based Contracting Model & Implementation Strategy

All of the data cited in this report was produced by MDHS and shared with Public Catalyst directly or through the federal Court Monitor, unless otherwise noted.

## Demographics

In Mississippi, as of May 31, 2015, there were 4,931 children in state custody. As the following table demonstrates, this number has been steadily increasing over the last two years, and represents an increase of almost 1,000 children over a 23-month period.

Table 1. Number of Children in Mississippi State Child Welfare Custody 2013-2015[1]

| Date | 6/30/13 | 6/30/14 | 5/31/15 |
|---|---|---|---|
| Number of children | 3,936 | 4,497 | 4,931 |

[1] Lopes, Grace. (2015). *Children in Foster Care By Placement Type, By Region One-Day Snapshots, 6/30/13, 6/30/14, and 5/31/15.*

EXHIBIT A

The majority (82 percent) of children in DFCS custody lived in family settings as of May 31, 2015, including with relatives (31 percent), foster families (32 percent), with their own parents (13 percent), in therapeutic foster homes (five percent), and in homes that intend to adopt (one percent). Of children in custody, 545 (11 percent) lived in congregate care settings, including residential treatment facilities, group homes, and emergency shelters. One percent of children were AWOL, less than one percent were placed in independent living, and another six percent resided in other placement settings. [2]

Figure 1. Placement Types of Children in Custody on May 31, 2015 [3]

*n=4,931*



Mississippi data analyzed by Chapin Hall at the University of Chicago [4,5] indicate that as of July 1, 2014, [6] the majority of children in foster care were age 12 or younger (71 percent). The following figure shows a complete breakdown of children in care by age:

---

[2] The category "other" includes children with placement settings listed as Pending (271), non-MDHS contract facility (30), and CPA or interim placement (6).

[3] Lopes, Grace. (2015). *Children in Foster Care By Placement Type, By Region One-Day Snapshots, 6/30/13, 6/30/14, and 5/31/15.*

[4] Chapin Hall at the University of Chicago: Center for State Child Welfare Data. (2015).

[5] This data excludes children placed in-home or who were AWOL.

[6] The data is the most recently available information provided by the federal court monitor to Public Catalyst. The monitor indicated the data is due to be updated by no later than December 2015.

7

EXHIBIT A

Figure 2. Age of Children in Foster Care on July 1, 2014



- 18 & older 4%
- Under 1 6%
- 1 to 5 32%
- 6 to 12 33%
- 13 to 17 25%

With regard to race, 47 percent of children in foster care were White and 47 percent were African-American. Three percent of the population was Hispanic, two percent was of unknown race, and less than one percent was Asian/Pacific Islander or Native American.

## Recommendations

A child welfare system ripe for reform requires equal doses of strategy, forbearance, passion, discipline and an outcome plan that focuses first and foremost on the fundamentals. Following extensive fact-finding and consultation, this report contains recommendations in service to those values. In summary, our recommendations are:

### Organization and Structure

- In the immediate term, we recommend Mississippi convert DFCS into an "in-but-not-of" agency, housed within MDHS but independent of MDHS management and oversight, controlling its own budget, personnel and management information system (MIS)/Information Technology (IT) functions, led by an Executive Director reporting directly to the Governor.[7]

- Pilot a targeted, county-based privatization of child welfare services (excluding child abuse and neglect investigations), beginning with a comprehensive public-private planning initiative of at least 12 months duration in a county or counties where there exists (a) the

---

[7] In a recommended second phase, we suggest the Legislature and the Governor jointly commission staff to create and implement a plan that ultimately makes DFCS a free-standing agency by June 30, 2018, in as cost-efficient a fashion as possible, maximizing resources for implementation of the *Olivia Y.* commitments.

EXHIBIT A

- need to expand and strengthen services for children and families, (b) strong private capacity, and (c) ample public agency leadership support for the collaboration.

- Designate a senior member of the Governor's team to support DFCS, coordinate interagency planning and enhance system collaboration and accountability in furtherance of the *Olivia Y.* commitments for children, youth and families.

- Build a better-resourced DFCS Field Operations team in the State Office to provide the regions more robust and continuous support, guidance and accountability in the agency's main program areas: foster care, adoption and child protective services.

- Create in DFCS a second Deputy Director for Field Operations position to ensure adequate management, supervision and support of the regional directors.

- Move from DFCS Administration to DFCS Field Operations, State Office staff responsible for foster care and adoption program functions.

- In order to better implement the unified, central vision and commitments of DFCS, allocate to each regional director program staff to recruit, license and support foster and adoptive parents adequate to meet the needs of children in the region's custody.

- In order to better implement the unified, central vision and commitments of DFCS, allocate to each regional director adequate administrative staff in the region to support the vast administrative work of the regional director, including human resources, facilities, equipment, data, flexible funds and services.

- To support the streamlining of DFCS' hiring and management of its human capital needs, exempt DFCS from State Personnel Board oversight for a period of at least 36 months.

*Focusing on the Fundamentals*

- Renegotiate the MSA to prioritize key reform efforts on the fundamentals of a strong child welfare system in order to achieve the requirements of *Olivia Y.* This must include the following areas as immediate priorities, and forbearance on other priorities until a stronger organization is in place. Once the fundamentals are in place sustainably in a county, DFCS should proceed to implement core case practice commitments. The fundamentals must include measures to:

  - Increase the availability of family-based placements for children and sharply reduce current reliance on shelter care to better meet their needs for safety, permanency and well-being.

  - Address the need to timely license relative foster parents in order to ensure both child safety and relative support.

EXHIBIT A

9

- Reduce the too-high caseloads for many DFCS staff by developing and implementing a statewide staffing needs analysis based on a new methodology for "mixed" caseloads, followed by an expedited and comprehensive recruitment, hiring, training and retention plan to achieve those caseload standards within 12 months.

- Ensure an adequate number of properly prepared supervisors, consistent with the workload standards described in this report. The parties should expand the eligibility criteria for child welfare supervisors to include staff with a qualifying Bachelor's Degree and an agreed-upon level of experience.

- Raise compensation in DFCS for casework staff in the family protection title series, area social work supervisors and regional directors to enhance recruitment and retention. Given the responsibilities of the regional directors, their compensation should reflect their roles as members of the DFCS senior management team, and they should be paid salaries that are more reflective of their roles. When determining the level of increased compensation for DFCS caseworkers and supervisors, DFCS should use data and information on salary levels being provided to similarly qualified staff in other divisions and agencies within Mississippi.

- Equip caseworkers with the tools they need to keep children safe, specifically smart phones or tablets for field-based investigative work and resource access; and computers for work in DFCS offices.

- Prioritize and focus DFCS data quality, reporting, analysis, and performance management efforts on a limited set of key metrics that can be used to measure and evaluate performance on those initiatives during the first year of a new agreement.

- Strengthen the DFCS - Administrative Office of Courts relationship.

- Work with the Administrative Office of Courts, the Mississippi Legislature and the Governor's Office to support an amendment to Rule 11(b)(2) of the Uniform Rules of Youth Court Practice which will read, "A parent, guardian or custodian of a child is a party to the case. Such includes the Department of Human Services, Division of Family and Children's Services, whenever it is serving as the legal or physical custodian of the child under the Mississippi Youth Court Law."

*Caseload Measurements*

- Preserve the MSA's agreed-upon caseload standards, but abandon the MSA's overly-complex and outdated minutes-based workload methodology for tracking performance in favor of case weighting for mixed caseloads.

EXHIBIT A

*Needs Assessment*

- Given the continuing validity and relevance of the needs assessments previously conducted in connection with *Olivia Y.*, DFCS should target its implementation to the expansion of family-based placements for children in MDHS custody, access to medical, dental and behavioral health services for children, and reunification services for children and families.

- Create and implement a plan to ensure immediate health care coverage for children taken into the child welfare custody of DFCS, and focus MSA requirements on the delivery of core healthcare services to children by Mississippi's available pool of healthcare providers;

- Perform an assessment in counties already served by MDHS' Comprehensive Family Support Services Program to identify remaining gaps in services, in terms of both availability and quality of service.

- In order to facilitate the timely procurement of urgently needed services, exempt DFCS from state contracting regulations that unduly burden and delay the delivery of services.

- Develop and implement a plan to enhance Federal Financial Participation (FFP) in the Mississippi child welfare system through blended funding strategies and federal Title IV-E and Title IV-B maximization.

*Data Collection, Analysis and Performance Management*

- Reach a final determination about the approach to replace MACWIS and implement an Information Technology Governance Structure.

## The Crossroads

DFCS finds itself at the crossroads of a sharply rising foster care population, an inadequate number of family-based placements for children, high staff caseloads and a burgeoning number of MSA commitments that appear increasingly out of reach to the parties. The agency's staff morale appears low and many key stakeholders feel outmatched by the forces that propel children and families into involvement with the Mississippi child welfare system. Most DFCS caseworkers and supervisors have gone many years without a raise, and salary stagnation has reportedly contributed to attrition, inhibiting the agency's ability to achieve its full promise. The agency's data analysis capacity is too modest in some key areas. The agency frequently is not treated as a party in the Youth Court proceedings that order children removed from or returned to their birth families, and in a number of regions, DFCS' relationship with the courts is strained.

The most recent data provided by the United States Department of Health and Human Services, Child and Family Services Review (CFSR), revealed that Mississippi needs to embark on a

EXHIBIT A

performance improvement plan to stem the recurrence of child maltreatment, to reduce the frequency with which children move among placements and to achieve faster permanency for children exiting the system between 12 and 23 months. At the same time, the CFSR data indicates that Mississippi meets national standards for performance in the remaining safety and permanency measures.

The agency has embarked on many varied initiatives in an effort to address its challenges, but at this point appears to be at the limits of its capacity to achieve more substantial gains. To achieve the promise of the *Olivia Y.* commitments, DFCS needs three essential shifts to occur: (1) a detailed reform roadmap, agreed upon by the parties, and supported by the Governor, that is squarely focused in its first phase on the fundamentals of a stronger child welfare organization; (2) the resources to hire, train and retain a workforce that is able to provide children and families access to the services they need to exit DFCS involvement and thrive and (3) robust partnerships with the Mississippi Association of Child Care Agencies, other service partners and the courts in support of a shared vision for the child welfare system and its children.

## Organization and Structure

The Agreed Order stipulates Public Catalyst will "recommend... an optimal DFCS structure, including whether DFCS should be a free-standing agency, its new organizational structure, and to what extent privatization should be utilized." Public Catalyst interviewed Mississippi's key child welfare stakeholders, including leaders within both MDHS and DFCS, who described the enormous responsibilities of the larger agency. In addition to DFCS, MDHS includes Divisions for Aging and Adult Services; Community Services; Youth Services; Early Childhood Care and Development; and Family Foundation and Support. The breadth of their organizational horizon prevents MDHS leadership from focusing exclusively on the child welfare system, and they have not consistently been able to prioritize the various needs of DFCS, such as the data, technology, budgetary and personnel imperatives that can launch or stall progress under *Olivia Y.* As part of the Agreed Order, the parties have already agreed that DFCS will be led by an Executive Director reporting directly to the Governor and not to the head of MDHS. To enhance the new DFCS leader's ability to move the agency toward compliance with *Olivia Y.*, (s)he should be empowered with direct oversight of the functions vital to organizational effectiveness (at a minimum, personnel, budget and management information systems (MIS)) and not be accountable in this oversight to MDHS where other priorities necessarily loom and compete.

Some child welfare systems across the United States have reformed as part of larger human services departments, while others could not do so until they were unencumbered and became free-standing. Context is relevant and leadership is vital. The optimal structure allows human

services leaders to maintain their focus on child welfare reform, stay connected to the Governor in an unfiltered, accountable way and access resources adequate for success. Restructuring can be an important ingredient to success, particularly in Mississippi where stakeholders describe competition for resources among MDHS divisions and compelling human services challenges beyond child welfare.

In the case of Mississippi, the virtues of transforming DFCS into a free-standing agency include, among other attractive gains, an ability for the agency's leadership to focus squarely on the dynamic needs of the smaller, more-focused organization as it strides toward the *Olivia Y.* commitments. To optimize the chance for success, restructuring requires an intensive season of planning, including a full review – and often a rewriting – of statutes and regulations governing the agency; an assessment of facility needs and a corresponding plan to meet those needs; and, perhaps most importantly, a thoughtful examination of available resources and then key decision-making about the division and allocation of those resources. This is time-consuming work that ultimately requires the leadership and support of the Legislature. Given the exigencies that now confront the Mississippi child welfare system, we do not believe leadership's precious focus and time should be diverted presently to achieve a permanent separation between MDHS and DFCS. Instead, we recommend a middle path in two segments. In Phase One, we recommend immediately implementing an "in-but-not-of" model that houses DFCS within MDHS in name only, independent of MDHS management and oversight. DFCS would independently prepare and defend its budget request to the Legislature, and independently manage its own budget, personnel and MIS functions, led by an Executive Director reporting directly to the Governor. In Phase Two, over the next 30 months, we recommend the Legislature and the Governor jointly commission staff to create and implement a plan that ultimately makes DFCS a free-standing agency by June 30, 2018, in as cost-efficient a fashion as possible, maximizing resources for implementation of the *Olivia Y.* commitments. Throughout this effort, DFCS is more likely to accomplish the goals set forth in *Olivia Y.* if it is actively supported and monitored by a senior member of the Governor's team who promotes a coordinated approach to interagency planning and system collaboration and accountability.

The Agreed Order requires Public Catalyst to consult with the Governor regarding the qualifications, level of compensation, and the timing for hiring an Executive Director of DFCS and recommend qualified candidates to serve as the Executive Director of DFCS. During this four month period of assessment, we conferred with representatives of the Governor regarding leadership models that have demonstrated a record of success in similar child welfare reform efforts across the country. Those conversations included discussions of candidate qualifications and compensation and were undertaken with a sense of urgency given the vital role DFCS' next leader must play in stewarding the agency to achieve substantial and sustainable reform. We

EXHIBIT A

met with potential candidates for the position of Executive Director, assessed their qualifications and by November 24, 2015, made a recommendation to the Governor.

The state should bolster staffing in the DFCS Field Operations office in order to adequately manage and support the work of staff in the regions. At a minimum, a second Deputy Director position, responsible to supervise regional directors, should be created. The state should move program staff from DFCS Administration to Field Operations and develop DFCS teams, connected to the regions and charged to provide the regions more robust and continuous support, guidance and accountability in the agency's main program areas: foster care, adoption and child protective services.

DFCS regional directors who are charged with administering the child welfare system across Mississippi are currently tasked with a broad array of administrative responsibilities. These tasks attract time and attention away from managing the practices, resources and relationships critical to gains in the child welfare system. Their work is not presently supported by an adequate team of program experts in the State Office; regional directors are often asked to do it all, do it quickly and do it well, with insufficient compensation, guidance and support. That some of them have made meaningful gains toward *Olivia Y.* commitments in their regions is a testament to their passion, hard work and determination. Within DFCS, two additional structural reforms are essential and urgent to better position regional directors to strengthen the system for children and families. The state should allocate foster care and adoption staff to the regional directors, adequate to meet the needs of children in the region. And finally, Mississippi should assign to the regional directors adequate administrative staff in the regions to support the vast administrative work currently underway there, including human resources, facilities, equipment, and access to flexible funds and services.

There are pockets of organizational strength and capacity across Mississippi, present in both the public child welfare system and among its private, community-based agency partners. The breadth and depth of vitality along the public-private continuum varies by region, but the historic collaboration between DFCS and the Mississippi Association of Child Care Agencies provides a rich opportunity for innovation. We believe DFCS should invite its private system partners into a comprehensive planning initiative in 2016 that identifies a county or counties where there exists the need for expanding and strengthening service delivery with both strong private capacity and ample public agency leadership support to pilot a privatization of certain child welfare responsibilities, excluding child abuse and neglect investigations. The pilot's outcomes should be closely monitored against outcomes of an agreed-upon control county and supported, and expanded as its results accord with Mississippi's *Olivia Y.* commitments.

EXHIBIT A

## Focusing on the Fundamentals

The Agreed Order tasks Public Catalyst with "reviewing and considering the findings and recommendations made in the Court Monitor's Reports on Implementation Periods 3 and 4 [and] evaluating the areas in which MDHS and/or DFCS have not complied with the Modified Mississippi Settlement Agreement and Reform Plan… and recommending steps necessary to achieve substantial compliance." The Agreed Order further establishes Public Catalyst's assessment should include "reviewing the current positions and salary structure in DFCS, and recommending additional positions, if any, necessary for its effective functioning, and salary levels necessary to hire and retain qualified personnel for all DFCS positions, including salary levels for the senior level management team for the Executive Director [and] recommending the management and accountability structure within DFCS." According to the Court Monitor, the Period 3 and Period 4 reports contain numerous findings that are both related and unrelated to specific reporting requirements. Public Catalyst has reviewed both reports and all appendices at length, and met with the Court Monitor at her offices in Washington D.C. twice. At Appendix A, we have attached a chart summarizing selected findings contained in the Period 3 and Period 4 reports.

Our experiences strengthening public child welfare systems have been instructive as we considered the numerous MSA requirements measured and discussed at length by the Court Monitor, and the barriers to additional gains by DFCS. As we have written[8]:

> Repairing a public system is like building a house: it begins with the foundation. A sense of urgency is critical to any reform movement, but taking the time to develop a strong infrastructure is the only way to create positive change that endures. We must be urgent about the right things in a sensible order, and too often, we are urgent for outcomes at the expense of the fundamentals that make those outcomes more likely. The road to reform involves a logical sequencing of key initiatives that leaves behind the chaos and disappointment of the old, flawed system in order to travel toward a system that achieves positive outcomes for children and families. New Jersey's revised consent decree embraced this principle, bifurcating the work into two phases: the first phase focused on the fundamentals (e.g., massive efforts in recruiting, hiring, training and mentoring staff and aggressive foster and adoptive home growth). The second phase followed with service expansion and practice model implementation – ultimately leading to improved results. To our surprise, the strength of some of the early work hastened positive results elsewhere. For example, as the net number of foster and adoptive homes in New Jersey increased, caseworkers had better placement options for children, and existing homes became less strained. This led to a lower rate of maltreatment while in care.

We believe it will be important to success in the *Olivia Y.* litigation for the parties to negotiate a new framework for overall system improvement, sequencing organizational reform in two phases. The first phase must put in place the pillars of organizational strength statewide, and

[8] Armstrong, et al. (2012) *New Jersey: A Case Study and Five Essential Lessons For Reform*

the second phase should prominently feature improved outcomes for children and the core strategies the parties agree Mississippi will deploy to achieve these results. We recommend the first phase specifically address the structural framework described in the Organization and Structure section above; end the shortage of licensed family-based placements for children; achieve manageable workloads for DFCS caseworkers and supervisors; provide the workforce with essential tools to help children achieve safety, permanency and well-being; and prioritize data quality, reporting, analysis, and performance management efforts on a limited set of key metrics that can be used to measure and evaluate performance on those initiatives during the first year of a new agreement.

We recognize, drawing on the findings in the court monitor's reports, that some DFCS regions in Mississippi have made progress in implementing the current child welfare practice model and that there is a level of momentum in place that should not be interrupted if possible in order to continue moving toward improved outcomes for children and families. In some of these regions, primarily the earlier implementing regions, there has been a greater degree of staff and leadership stability to promote implementation of the practice model than in other regions. While DFCS' primary efforts should be focused in phase one on ensuring that all of the fundamentals are in place in all of the regions, we also recommend that, where possible and appropriate, the new DFCS leadership identify those regions in which DFCS' staff and contractual resources should be used to maintain and continue the momentum toward improving practice and to support ongoing practice model implementation concurrently with putting the fundamentals in place statewide.

The State of Mississippi and the Plaintiffs agree that child welfare work is challenging. It requires well-trained staff who garner enough experience over time with the help of strong and supportive supervision to make good decisions, form strong relationships with children and families, leverage resources and services, and advocate successfully for good outcomes. It is rewarding work at its best but challenging to do well on a day-to-day basis. Because the learning curve is steep, the ability to find and keep good staff is critical, and reform efforts can be easily and swiftly undermined by high turnover rates among caseload-carrying staff and supervisors. Moreover, because the work is challenging and all of the work is expected to be done under tight time constraints, it is important that caseloads be manageable.

An effective approach to work with staff should mirror a model for how the parties want staff to treat the children and families served by DFCS. The Court Monitor describes a variety of problems with the caseload data reported by Mississippi, but even at face value, the data reveals many staff burdened by workloads in excess of the parties' agreed-upon standards. To achieve positive outcomes for children and families, it is critical that Mississippi have a competent, committed, trained, and resourced child welfare workforce. The first order of

business must be the creation and implementation of a comprehensive, dynamic plan to achieve manageable caseloads for staff within one year. This requires plans be developed and implemented to assess staffing needs sufficient to meet the new workload standards; expedite the process for filling DFCS vacancies; streamline the DFCS hiring process; exempt DFCS from State Personnel Board oversight for three years; expand the number and frequency of training academies for new staff; and address staff attrition and increase caseworker and supervisor retention. We urge DFCS to change the training delivery system quickly, committing that newly hired staff enter training within two weeks. Existing staff can be provided with a focused, organized in-service training menu, the content of which reflects reform priorities with a rational delivery schedule that ensures office coverage.

We recommend DFCS equip its caseworkers with the tools they need to make sound decisions, specifically smart phones or tablets for their extensive field-based investigative work and resource access, and computers for their work in DFCS offices. An enormous amount of time is lost, and worker burnout reportedly accelerated, by the lack of ready access to information, such as available resource homes, and investigative information about child abuse histories. One can never underestimate the impact that working computers, cell phones and other tools have on both morale and service delivery. Strategic, quick wins early in a reform movement can reinvigorate staff and the reform process by allowing momentum to build and maximize precious time and focus for the work of child welfare. Most importantly, caseworkers need strong supervision, and we recommend the first phase of this iterative reform program ensures DFCS has in place an adequate number of properly prepared supervisors, consistent with the workload standards described in the MSA. The parties should expand the eligibility criteria for child welfare supervisors to include staff with a qualifying Bachelor's Degree and an agreed-upon level of experience to expand the pool of experienced child welfare practitioners who are eligible to supervise the agency's casework staff.

The parties stipulated that Public Catalyst should examine salary levels necessary to hire and retain qualified personnel for all DFCS positions. In general, most wages have been stagnant within DFCS for many years. Regional directors are required to manage and lead vast pieces of work with compensation that does not reflect the breadth, depth and importance of their duties. We recommend their compensation be elevated to better reflect their responsibilities. The cost of living component of the Mississippi Variable Compensation Plan has not been funded for at least 11 years. However, DFCS did receive an across-the-board pay raise on July 1, 2007 for SFY2008, which could be considered a cost of living increase. Subsequent increases have only been awarded to a small portion of employees.

As a result, DFCS has been challenged to recruit staff as salaries have remained flat. The following data shows the change in the Consumer Price Index for All Urban Consumers (CPI-U)

EXHIBIT A

for the Southern Region of the United States from July 2007, the last time an across the board pay increase was issued to DFCS employees, to July 2015. Over this eight-year period, the CPI-U increased by 30,148 points or 14.96 percent.[9]

Table 2. CPI-U Southern Region 2007-2015

| Date | CPI-U | Percent change from prior year |
|---|---|---|
| July 2007 | 201.571 | |
| July 2008 | 213.304 | +5.8% |
| July 2009 | 208.819 | -2.1% |
| July 2010 | 210.988 | +1.0% |
| July 2011 | 219.682 | +4.1% |
| July 2012 | 222.667 | +1.4% |
| July 2013 | 227.548 | +2.2% |
| July 2014 | 232.013 | +2.0% |
| July 2015 | 231.719 | -0.1% |

DFCS caseworker salaries are in many instances low relative to other social workers employed by the State of Mississippi in medical, mental health, or psychiatric settings.[10] Starting salaries for these positions are outlined below and compared to DFCS positions with equivalent qualifications:

Table 3. State of Mississippi Social Work Salary Comparison

| Qualifications | Position Title – Other Agency | Salary – Other Agency | Position Title – DFCS | Salary – DFCS |
|---|---|---|---|---|
| BA | - | - | Family Protection Worker I | $23,643.58 |
| BA + 1 year of experience | - | - | Family Protection Worker II | $27,615.55 |
| BSW | Social Worker I | $29,138.72 | Family Protection Specialist | $27,615.55 |
| BSW | Social Worker Inst. | $26,665.30 | Family Protection Specialist | $27,615.55 |
| BSW + 2 years of experience | Social Worker III | $35,257.85 | Family Protection Specialist Senior | $30,049.94 |
| BSW + 4 years of experience | Social Worker IV | $38,783.63 | Family Protection Specialist Advanced | $32,700.43 |

And in Appendix B, we have included the public school teachers' salary schedule in Mississippi, which also stands in stark contrast to the more modest compensation afforded to DFCS

[9] The **Southern Region** includes Alabama, Arkansas, Delaware, District of Columbia, Florida, Georgia, Kentucky, Louisiana, Maryland, Mississippi, North Carolina, Oklahoma, South Carolina, Tennessee, Texas, Virginia, West Virginia. Data is derived from the Bureau of Labor Statistics. Source: http://www.bls.gov/cpi/cpi_dr.htm#2010

[10] All information on government employee salaries and position qualifications is derived from the Mississippi State Personnel Board website: http://agency.governmentjobs.com/mississippi/default.cfm?action=agencyspecs

caseworkers despite the fact that both professions require a Bachelor's Degree and provide essential services and support to children. We recommend that as a component of its overall recruitment and retention plan to achieve manageable workloads for DFCS staff, Mississippi elevate the compensation for the Family Protection Worker and Specialist title series. The agency must be careful to ensure that raises do not have the unintended effect of adversely impacting employees. We became aware during this assessment that a number of DFCS staff qualify for and receive means-tested public benefits, such as subsidized health insurance, because their current wages are so low. A pay raise could render some staff ineligible for those benefits, and if not designed strategically, may be insufficient to outweigh an individual's loss of public aid. During this assessment, DFCS could not quantify the prevalence of its employees receiving public benefits, so we simply offer the caution that a salary increase designed to enhance the agency's recruitment and retention performance should be informed by actual data and avoid to the maximum extent possible unintended consequences.

The lack of family-based placements for children in the child welfare custody of Mississippi, and the burgeoning number of placements that are not licensed as reported by the Court Monitor, presents a key opportunity for DFCS to focus its efforts in a crucial area, and perhaps the most important service need for children in custody: a safe and loving home. We recommend DFCS build a plan to increase substantially the availability of licensed, family-based placements and curtail the system's reliance on shelters.

Within the first order of business for the new DFCS Executive Director is strengthening the relationship with the Administrative Office of the Courts. In courtrooms across the State, DFCS is not a party and in some settings has no voice, regarding the disposition of children whose lives they are entrusted to protect. Unlike child welfare agencies in most states, DFCS is not treated within most legal processes as an interested party. Children are removed from their parents' custody, or reunified, or adopted, in many instances without initiating action from the agency held responsible by the people of Mississippi for children's safety, permanency and well-being. We recommend the new leader of DFCS work with the Administrative Office of Courts, the Mississippi Legislature and the Governor's Office to support an amendment to Rule 11(b)(2) of the Uniform Rules of Youth Court Practice which will read, "A parent, guardian or custodian of a child is a party to the case. Such includes the Department of Human Services, Division of Family and Children's Services, whenever it is serving as the legal or physical custodian of the child under the Mississippi Youth Court Law."

## Caseload Measurements

The Agreed Order directs Public Catalyst's assessment to encompass "evaluating and analyzing the current caseload measurements in the MSA and determining the most appropriate

EXHIBIT A

caseload measurements for workers with dedicated and mixed caseloads." As of June 30, 2015, according to data and information provided by the Court Monitor, 64 percent of Mississippi's caseworkers had caseloads that met MSA requirements, and 80 percent of Mississippi's supervisors had workloads consistent with the MSA requirement of supervising five or fewer caseworkers.[11] The Court Monitor's analysis of, and concerns about the quality of, caseload data are set forth at length in the most recent reports to the federal court. The data used by the Court Monitor is generated by MDHS using a minutes-based methodology prescribed in the MSA that is overly complex and outdated.

We recommend the parties' maintain the caseload standards established in the MSA. They comport with best practices. However, we recommend the parties agree to replace the minutes-based methodology with a clear weighting formula for staff who carry more than one type of case, commonly referred to as mixed caseloads.

DFCS reports it has the capacity to count most caseloads electronically but it will have to supplement this process through hand-counting and by doing on-going validation of the electronic information. The parties begin with a simple principle – all work counts. The caseload counting process for staff who are assigned 100% of the time to a single role and who work full-time at that role (1.0 full-time equivalent or FTE) is straightforward. Whether the staff and cases are identified electronically or through hand-counting, the measure is the number of staff in each role who meet the standards for that role set forth in Table 4 below.

Caseload rates should be pro-rated for staff who are less than full-time. Caseload rates for staff who spend part-time in caseload carrying or supervisor functions and part-time in other functions should be analyzed as if they are part-time staff and their caseloads pro-rated accordingly.

We recommend that staff with "mixed" caseloads, those who carry more than one type of case, be subject to the weighting formula below. Utilizing the standards set forth in the MSA, each individual case will be assigned a weight and then the weights will be added in order to determine a worker's caseload. Performance should then be evaluated as follows:

---

[11] Lopes, Grace. (2015). *Caseworkers with Dedicated Caseloads Meeting MSA Requirements, By Region One-Day Snapshot 6/30/15; Caseworkers with Mixed Caseloads in Carve Out Counties Meeting MSA Requirements, By Region One-Day Snapshot 6/30/15; Caseworkers with Mixed Caseloads in Non-Carve Out Counties Meeting MSA Requirements, By Region One-Day Snapshot 6/30/15; Supervisors in Carve Out Counties Responsible for Supervising DFCS Caseworkers Meeting MSA Requirements, By Region One-Day Snapshot 6/30/15; Supervisors in Non-Carve Out Counties Responsible for Supervising DFCS Caseworkers Meeting MSA Requirements, By Region One-Day Snapshot 6/30/15.*

EXHIBIT A

- Meet caseload standards
- Over (but close)
  - The caseload total is equal to or less than 1.0 = 100%
- Over
  - The caseload total is above 1.0 and equal to or less than 1.20 = 101 to 120%
  - The caseload total is greater than 1.20 = 121% or more

We recommend the following weighting be applied in the caseload standards:

Table 4. Proposed Mississippi Caseload Standards

| Role | Standards | Weight Per Case - 100% Capacity |
|---|---|---|
| Child Protection Workers | 14 investigations | 0.0714 |
| Ongoing Foster Care Workers | 14 children | 0.0714 |
| In-Home Protection Workers | 17 families | 0.0588 |
| In-Home Dependency/Prevention Workers | 25 families | 0.04 |
| New Application Licensing Workers | 15 homes | 0.0667 |
| Renewal Licensing Workers | 36 homes | 0.0278 |
| Adoption Workers | 9 children | 0.1111 |
| Abuse & Neglect Intake Workers | 118 intakes | 0.0085 |

## Needs Assessment

Public Catalyst was charged to design "a plan for a needs assessment for services for children in care, their families of origin, and for foster and adoptive families, as well as a process to implement the needs assessment, including timetables." Public Catalyst undertook three approaches to gather information and data about Mississippi's identified service needs. First, we reviewed the Mississippi Foster Care Services Assessments completed by the Center for the Support of Families (CSF) in October 2009.[12] Second, we reviewed MDHS' Child and Family Service Plan for FFY 2015-2019, issued on June 27, 2014.[13] Third, we conducted a series of phone interviews with 62 randomly selected foster parents across the State of Mississippi using a standardized tool designed in part to surface gaps in services among substitute caregivers.

[12] The CSF assessments focused on reunification services; medical, dental and mental health services; independent living services; recruitment and retention of resource families and foster care placement assessments; termination of parental rights; and child safety.

[13] MDHS' Child and Family Service Plan is available at the following web address:
http://www.mdhs.state.ms.us/media/270457/Children-and-Family-Services-Plan-2015-2019-REVISED-11-13-14.pdf

EXHIBIT A

CSF's assessments presented a set of findings and recommendations for strategies and activities MDHS should undertake to address service gaps and case practice gaps within six identified areas. We compared CSF's recommendations with all provisions of the MSA discussed by the Court Monitor in the Period 4 report to understand which of CSF's October 2009 recommendations may have been successfully addressed. (See Appendix C detailing recommendations related to services that CSF presented in its assessment reports from 2009 and related MSA provisions tracked by the Court Monitor for Period 4.) This comparative review highlighted existing strengths and challenges within Mississippi's child welfare system, case practices and partnerships.

In general, the existing record of unmet needs is full. There are two exceptions where additional data and information will be important to review and analyze before decisions are made on how to spur progress. First, the dissonance between Mississippi's statewide health care management model and the gaps in service provision described by the Court Monitor leave unresolved the causes of children not receiving the healthcare services detailed in the MSA. We understand that language in the MSA, specifically the inclusion of certain American Academy of Pediatrics provisions, has been interpreted to disqualify numerous healthcare providers, including doctors, from being deemed eligible to provide children and youth qualifying services, and we urge the parties to clarify their intentions and expand the pool of healthcare providers deemed qualified to examine children and ensure their health and well-being. Resource scarcity may be one factor, but we have not learned of robust root cause analysis to understand further why children are not receiving services, and we recommend that DFCS do so. It may be that current policy does not fully support the provision of timely healthcare services to children. As of May 2015, children in Mississippi were placed in at least 659 unlicensed homes. Children who are placed in unlicensed relative homes are not currently made eligible for Medicaid through DFCS. Instead, with the support of a child's caseworker, an unlicensed foster parent must apply for Medicaid through their local Medicaid office. We heard stakeholders describe instances where delays in health coverage were said to have caused delays in services to children. We recommend that the state create and implement a plan to ensure immediate health care coverage for children taken into the child welfare custody of DFCS.

Second, we suggest DFCS perform an assessment in counties already served by MDHS' Comprehensive Family Support Services Program to identify remaining gaps in services, in terms of both availability and quality of service. Like its approach to coordinating and delivering children's healthcare, Mississippi has opted for a statewide approach to family support services. Gaps in service delivery may be a result of model design or resource limitations, or another

EXHIBIT A

reason, and we recommend the state collect additional information to better inform its efforts to meet the needs of children and families.

Our judgment is that the collective record is sufficiently robust to inform the parties' discussions about better meeting the service needs of children and families, and a new statewide needs assessment is unlikely to reveal substantial additional information. The record should be used to shape reform priorities sequenced over time and in concert with DFCS' core strategies for strengthening the system, with particular focus on the development of family-based placements for children in MDHS custody, access to medical, dental and behavioral health services for children, and expansion of reunification and other permanency services for children and families. As part of a phased approach to reform, we recommend Mississippi create and implement a coordinated plan between the State Medicaid Office and DFCS to ensure immediate health care coverage for children placed in the child welfare custody of DFCS, regardless of where they are placed. The expansion of services for children and families cannot proceed with dispatch unless DFCS is temporarily relieved of statewide procurement and contracting regulations that are currently causing lengthy delays for DFCS.

To afford crucial capacity-enhancing initiatives, Mississippi should develop and implement a plan with dedicated staff resources to enhance Federal Financial Participation (FFP) in the child welfare system and operations. This effort should involve blended funding strategies, federal Title IV-E maximization and greater utilization of Medicaid and Title IV-B funds. As Appendix D reflects, public investments in Mississippi's child welfare system, on a relative per-child basis, are the lowest in the nation, and must be augmented to strengthen the state's ability to achieve safety, permanency and well-being for children.

## Data Collection, Analysis and Performance Management

The Agreed Order stipulates that Public Catalyst's assessment will involve "reviewing at the statewide and regional levels DFCS' data-collection and analysis capacities, as well as its capacity to use data for performance management, and recommending both short and long-term solutions for strengthening each capacity as needed to support substantial compliance with the MSA."

The child welfare system finds itself developing and publishing hundreds of regular data reports, using a variety of manual and technical methods, in service to the requirements of the MSA and the imperatives of agency management. But the avalanche of information, some of uncertain validity, has had exactly the opposite of its intended effect: the system in certain areas has not become more accountable; it has stayed unfocused and ignored most of the information. Essential to reform work must be the commitment to manage by data, which

begins with identifying essential data that needs to be tracked, followed by the often painful task of unmasking quality challenges with the data and developing solutions. The state's over-taxed technical and data analysis capacities require the parties peel back certain reporting obligations in the next 12 months and focus the effort.

When determining which measures to use going forward, three inter-connected questions are in order. As we wrote of our public agency leadership experience[14]:

*First*, seeing our staff as data consumers, we considered the pedagogical value of information to drive performance. In other words, we determined what we wanted our staff to view as important, and we worked hard to make data accessible – both conceptually and literally – on all desktops. We also ensured that the data were easy to understand. We used the data to set achievable but aggressive targets that were widely shared and used to celebrate success. Everyone knew how everyone else was doing, and that knowledge encouraged healthy competition and peer-to-peer learning.

*Second*, we considered what managers need to know to navigate the change process. In New Jersey, that included everything from the most basic demographic data on children in placement to office staffing levels, training enrollments, newly licensed foster homes, and child adoptions, among other measures.

*Third*, we considered the data needs of core constituencies whose good will was essential to the success of the reform: the governor, the legislature, advocates, plaintiffs' counsel and the court- appointed monitor. When the list of reports got too long, we did our best to scale back to produce only the core ones. Our chief goal was to create an appetite in our staff for managing by data, not continuing to churn reports for reports' sake.

We recommend DFCS prioritize and focus its data quality, reporting, analysis, and performance management efforts on a limited set of key metrics that can be used to measure and evaluate performance on those initiatives alone. Together the parties should identify key metrics that illustrate DFCS' performance on the foundational initiatives, and identify data reports that demonstrate DFCS' performance on those metrics.

As part of the process of identifying those reports, DFCS should conduct a detailed and granular analysis of the relevant data elements in the existing MACWIS system. This should include an articulation of where the requisite data elements are located in the system and how they are

[14] Armstrong et al. (2012) *New Jersey: A Case Study and Five Essential Lessons For Reform*

EXHIBIT A

used by staff in the regions, specification of which data elements underpin each report and the calculation methodology that each uses, and a clear understanding of how the reports demonstrate DFCS' performance against the prioritized MSA requirements. Given that this approach focuses on the foundational commitments that DFCS will prioritize, many of the reports currently exist.[15] DFCS should focus its data quality efforts on those prioritized reports to validate them exhaustively. It is likely that DFCS will need robust, independent, and external support from entities with expertise in accessing and using quality child welfare data during the first years of this work. DFCS' existing data validation process involves a monthly check to determine whether a report, on its face, appears valid, as well as a periodic full validation of the report against a sample of cases. This process should be enhanced to also include (a) periodic validation of the prioritized reports against practice in the regions, rather than solely comparing the results of the reports to the contents of MACWIS; and (b) rigorous data quality efforts led by agency leadership that ensure accountability for correcting all data quality issues – whether they relate to MACWIS, the reporting tools, data entry, or some other reason – in a timely fashion, including enhanced tracking and reporting on those efforts with regard to aging and other significant factors. We also recommend the parties agree to adjust the reporting schedule to that of the Court Monitor. DFCS now produces data to the Court Monitor monthly, even though the Court Monitor issues comprehensive reports annually. DFCS runs at least 60 reports at the beginning of each month without adequate time for a proper validation process or trend analysis. Too much time is being spent in the production of unreliable data and not nearly enough time or focus is being directed toward data validation and analytic capacity.

When prioritized reports are identified and other reporting obligations are peeled back, DFCS leadership has the opportunity to focus staff on using those reports to drive operational performance. To that end, DFCS leadership will assume executive-level responsibility and ownership to set the tone for all staff that those key measures – and the reports that demonstrate performance on those key measures – reflect the most important work of the Mississippi child welfare system at that time. By making clear that managers and staff at all levels are expected to use these discrete reports as management tools, leadership is best positioned to hold itself and the entire Division accountable to deliver on the prioritized commitments and performance as reflected in those reports.

In support of that initiative, DFCS should reevaluate and reengineer the technical tools that it uses to provide those reports to all staff. DFCS currently posts the full slate of reports that are available on an intranet and in a shared drive folder. There are many and better technical reporting tools available, including those designed for child welfare systems, that will provide

---

[15] We understand a new agreement between the parties on the caseload measurement methodology will require the development of new reports.

regular (as frequently as daily) accessible and interactive reports to allow staff, supervisors, managers, and leadership to assess performance against key metrics. At minimum, DFCS should focus its intranet and public folder to highlight only the prioritized reporting.

The consensus among some internal and external stakeholders is that DFCS has a significant need to enhance its capacity to perform both basic and sophisticated data analysis, as it does not have enough staff with the necessary analytical skills to perform this work. This work, of course, is critical to providing high-level validation of data, to assessing the data to determine whether performance is improving or declining, to determining whether DFCS is complying with the MSA, and to identifying areas to focus improvement efforts. Both MDHS and DFCS indicate that they perform some of this work as part of their CQI efforts, most notably the Evaluation and Monitoring Unit and Foster Care Review Unit. All agree, however, that more capacity would be valuable.

Again with a focus first on the prioritized, foundational reports, the agency should review its existing Chapin Hall contract, scope of work, and deliverables, which have been focused on performance-based contracting, to determine whether the existing scope of work includes longitudinal data analysis that DFCS could use for these purposes or whether it could be expanded to provide that analysis. DFCS should enhance the existing data reporting unit by allocating a handful of positions (three to five to start) and recruiting strong candidates to fill those positions.

It is critical Mississippi reach a final determination about the approach to replace MACWIS, and implement an Information Technology Governance Structure. The Department is more than a year into a process to replace its current child welfare system of record, MACWIS, with a new system. The State has hired an Independent Verification and Validation vendor to assist with the definition of requirements and the preparation of necessary documents to submit to the federal Administration for Children & Families (ACF) to participate in the Statewide Automated Child Welfare Information System (SACWIS) program, which would provide enhanced federal funds to cover 50 percent of the development costs of a new system. Within the last few months, however, the federal government issued a proposed regulation that would, if adopted, significantly modify the SACWIS program, reducing and changing the federal requirements and renaming it the Comprehensive Child Welfare Information Systems (CCWIS) program. As a result, there is some uncertainty regarding the ultimate requirements that MDHS will be held to in order to receive federal funds. There also appears to be uncertainty within MDHS and DFCS about the agreed-upon approach. DFCS continues to march down a traditional SACWIS path, having identified approximately 2,000 requirements for the new system, with an eye toward seeking CCWIS compliance if the proposed regulation is adopted. Other internal stakeholders indicated that they have not yet been convinced that a transition from MACWIS is even

necessary, as the possibility remains that MACWIS could be upgraded to meet DFCS' needs. And still other stakeholders raised the possibility that the agency should replace the system but not participate in the SACWIS/CCWIS program at all, foregoing the FFP in order to avoid the constraints and uncertainty of participation in favor of a lower-cost system that could be implemented more quickly.

Given this context, it is incumbent upon the State to reach a final decision regarding whether, and if so how, to replace MACWIS. This decision should consider the functional needs of the agency, both for purposes of serving children and families and compliance with the MSA, the total cost of projected systems that would meet those requirements, the time frame to implementation, and the need for FFP weighed against the uncertainty and transaction costs of participating in the SACWIS/CCWIS program, among other relevant factors. This decision should be made by the DFCS Executive Director and senior leadership, with due consideration of the views from all MDHS and DFCS information technology and programmatic leadership. [16]

MDHS and DFCS must assess the existing technical resources within MDHS MIS to identify those that support DFCS. Those that can transition – likely including the team currently supporting the MACWIS application – should do so and become employees pledged fully to DFCS. For those who have shared responsibility for DFCS and the rest of MDHS, the agency and DFCS leadership, with the guidance of the Governor's Office, should identify the necessary IT services that the Department will continue to provide to the new department and specify, through Service Level Agreements, each of those services that will be provided, applicable response times, and any other relevant requirements to minimize the impact of the separation and maintain or even enhance the levels of service currently provided to DFCS. To the maximum extent possible, we recommend DFCS emerge with its own IT services and rely on MDHS for only essential services that cannot be otherwise extracted.

---

[16] Regardless of this decision MDHS and DFCS should nonetheless continue to address the well-documented connectivity and performance challenges with MACWIS raised by staff in the regions and to make any enhancements required by the recommendations included in this assessment. Beyond that, however, MDHS and DFCS should reduce expenditures on MACWIS accordingly.

EXHIBIT A

**Appendix A. Selected Findings from Periods 3 and 4 Monitor's Reports**

| Citation | MSA Requirement | Period 3 (P3) Performance | Period (P4) Performance | Select Monitor's Report Comments |
|---|---|---|---|---|
| MSA II.A.2.a.1 & II.A.2.a.10.a [P4] or II.A.2.a.9.a (P3) | MSA requires by the end of P4 (P3), at least 85% (75%) of caseworkers shall carry caseload that does not exceed MSA requirements. No more than 5% (10%) of caseworkers shall carry a caseload exceeding twice the MSA requirements, and none shall carry a caseload exceeding 3x the MSA requirements. Hancock, Harrison, Hinds, and Jackson Counties are exempt during P3 & 4. | Carve-out counties excluded, but data only available for dedicated caseloads • 79% not exceeding MSA requirements • 8% exceeding 2x MSA requirements • 0% exceeding 3x MSA requirements | Carve-out counties could not be excluded due to how data were submitted • 61% not exceeding MSA requirements • 7% exceeding 2x MSA requirements • 3% exceeding 3x MSA requirements | |
| MSA II.A.2.c.6 & II.A.2.c.6.b [P4] or II.A.2.a.b (P3) | MSA requires by the end of P3 [and thereafter], no more than 10% of supervisors shall be responsible for directly supervising more than five caseworkers. Hancock, Harrison, Hinds, and Jackson Counties are exempt during P4. | Excluding carve-out counties: 16.8% | Excluding carve-out counties: 13% Including carve-out counties: 19% | Requirement not satisfied during either period. Significant issue, data also indicates that during P3, defendants lost 17 more supervisors than they hired. |
| MSA II.A.2.a.9.c | MSA requires by the end of P3, caseworkers shall have access to a supervisor 24 hours a day. | Requirement satisfied | | |
| MSA II.A.2.a.9.d | MSA requires that supervisors will not be assigned primary responsibility for providing direct casework for any cases, unless under the extenuating circumstances exception as described above. | | | Defendants failed to report on this requirement during P3, could not produce accurate data. |
| MSA II.A.2.c.2, II.A.2.c.4 & II.A.2.c.6.b | MSA requires that by the end of P3 [and thereafter] all new caseworkers and supervisors will complete their pre-service training consistent with MSA Requirements. | Caseworkers: 100% Supervisors: 100% | Caseworkers: 100% Supervisors: 100% | DFCS allows non-supervisory staff to complete the caseworker supervisory training and serve in an acting capacity as casework supervisors. |
| MSA II.A.2.c.4 & II.A.2.c.7.a | MSA requires that by the end of P4 all caseworkers shall receive a minimum of 40 hours of structured ongoing in-service training each year, and all supervisors shall receive a minimum of 24 hours of ongoing in-service training each year. | | Caseworkers: 94% Supervisors: 100% | Defendants have established a viable unit and significantly improved the in-service training program. Additional progress needed in regard to monitoring and tracking staff participation in training. |
| MSA II.A.2.c.6.a | MSA requires by the end of P4 all defendants shall establish and maintain a Training Unit, headed by a qualified director of training, with sufficient staffing and resources to provide or contract for the provision of comprehensive child welfare pre-service and in-service training to all caseworkers and supervisors. | | Requirement satisfied | |
| MSA II.A.2.c.6.c | MSA requires by the end of P3, the in-service training curriculum for caseworkers and supervisors will be developed and in-service training will have been initiated. | Requirement satisfied | | Training curriculum has been developed and implemented. Defendants must improve tracking whether staff have satisfied training requirements. |

EXHIBIT A

28

EXHIBIT A

29

| Citation | MSA Requirement | Period 3 (P3) Performance | Period (P4) Performance | Select Monitor's Report Comments |
|---|---|---|---|---|
| MSA II.A.2.c.7.b | MSA requires that supervisory personnel will not be detailed from the field to provide the required pre-service and in-service training. | | | |
| MSA II.A.2.d.2.a | MSA requires by the end of P3, all therapeutic resource parents who have one or more foster children residing in the home shall be visited in the home at least once per month by their private agency caseworker. These visits shall be in addition to the monthly home visit conducted by DFCS. Beginning in P3, all contracts executed between Defendants and private agencies that provide services to foster children shall require that the private caseworker (1) share all relevant and legally disclosable information concerning the foster child; (2) evaluate the foster child's safety, needs, and well-being; and (3) monitor service delivery and the achievement of service goals. DFCS shall require that such visits occur, that they are documented in the child's case record, and that remedial action is taken if such visits are not taking place. | The Monitor's preliminary review of these documents identified limitations in some of the contracts, which the monitor intends to discuss and resolve with the parties in the near future. | | |
| MSA II.A.2.d.2.b | MSA requires that beginning in P3, all contracts executed between Defendants and private agencies that provide protective, preventive, foster care, or adoption case work services shall require the contract agencies to abide by all related terms of the MSA, including, but not limited to, provisions regarding training curricula, minimum training hours, and caseload standards, with the exception that contract agency caseworkers shall not be required to undertake the hours of pre-service training required of DFCS caseworkers that pertain to MACWIS instruction and DFCS-specific workplace procedures. The training requirement of the Modified Settlement Agreement shall apply only to contract agency caseworkers and BB supervisors responsible for making case planning decisions and/or recommendations. | A review of contracts indicates that the terminology identified to satisfy the requirements of this subsection does not require the contract agencies to abide by all related terms of the MSA. | Not satisfied | There is no current evidence of this practice which was once widespread. |

| Citation | MSA Requirement | Period 3 (P3) Performance | Period (P4) Performance | Select Monitor's Report Comments |
|---|---|---|---|---|
| MSA II.A.5.d.1 | MSA requires that the foster care review instrument shall be revised to include reviews for all children placed in therapeutic settings. Identified concerns shall be documented and provided to the Regional Director who oversees the county of responsibility for that child. No child shall remain or be placed in a therapeutic placement where a foster care reviewer has identified concerns, unless a remediation plan is being implemented. | | Not satisfied | The foster care review instrument was not appropriately modified during P4. The instrument does not focus on the required assessment of each child in therapeutic placement in the manner contemplated by this requirement. |
| MSA II.A.7.a | MSA requires that all licensed resource families (regardless of whether they are supervised directly by DFCS or by private providers) receive at least the minimum reimbursement rate for a given level of service as established pursuant to the MSA. | No finding | 98% | Two data reports were produced for this requirement, however only one of the reports was analyzable by the monitors. |
| MSA II.B.1.b & II.B.1.e.5 | MSA requires by the end of P3 [and thereafter], upon receipt of a report of child maltreatment in a group home, emergency shelter, or private child placing agency, DFCS shall undertake an investigation that is in addition to, and independent of, any child protective investigation to determine the contract provider's compliance with DFCS licensure standards. | | 100% | |
| MSA II.B.1.d | MSA requires within 30 days of the completion of any investigation of maltreatment of a child in custody, DFCS shall review the maltreatment investigation in the manner set forth in the MSA. | 98% | Satisfied in Part | The MIC review process was not fully implemented as required during P4. The defendants failed to review all investigations involving children in custody and failed to implement timely corrective action. As of 6/30/14 there were 150 corrective actions identified through the MIC review process that were overdue. It should be noted, the defendants made significant progress on this during P5, at the end of which, 10 corrective actions were overdue. |
| MSA II.B.1.e.2 | MSA requires within 30 days of the completion of any investigation of maltreatment of a child in custody, DFCS shall review the maltreatment investigation in the manner set forth in the MSA. MSA requires by end of P3 [and thereafter], 100% of maltreatment investigations shall be initiated within 24 hours and completed with supervisory approval within 30 days. | 36% | 56% | Requirement not satisfied in either period. Quality of investigations is also a concern. Monitor expects to conduct a systemic evaluation and report on defendants' more recent progress in a forthcoming report. |

EXHIBIT A

| Citation | MSA Requirement | Period 3 (P3) Performance | Period (P4) Performance | Select Monitor's Report Comments |
|---|---|---|---|---|
| MSA II.B.1.e.3 | MSA requires by end of P3 [and thereafter], 100% of children who remain in the same out of home placement following an investigation of maltreatment or corporal punishment in that placement shall be visited by caseworker two times per month for three months after the conclusion of the investigation. | 87.50% | 75% | Requirement not satisfied in either period. This requirement is fundamental to ensuring the safety of children in custody. Performance decreased from P3 to P4. |
| MSA II.B.1.e.4 | MSA requires that when a maltreatment investigation involves a resource home, DFCS shall file a copy of the approved final investigative report in the case record of the foster child, in the file of the foster or adoptive parents, and in the DFCS state office. | No finding | No finding | |
| MSA II.B.1.e.5 | MSA requires that when a maltreatment investigation involves an agency group home, emergency shelter, private child placing agency resource home, or other final investigative report shall be filed in facility licensed by DFCS, a copy of the final investigative report shall be filed in the child's case record, in the DFCS State Office licensing file, and sent to the licensed provider facility. | No finding | No finding | Parties agreed to measure performance for this requirement through a case record review to be conducted during P6. |
| MSA II.B.1.e.6 | MSA requires that for investigations of agency group homes, emergency shelters, and private child placing agency resource homes, DFCS shall undertake a separate investigation of the contract provider's compliance with DFCS licensure standards. | | 100% | Parties agreed to measure performance for this requirement through a case record review to be conducted during P6. |
| MSA II.B.2.a, II.B.2.p.2 | MSA requires by the end of P3 [and thereafter], 100% of children shall be placed or remain in a foster care setting that meets licensure standards consistent with MSA requirements, unless so ordered by the Youth Court over DFCS objection. | 90%, 471 children in placements that do not meet licensure standards | 93%, 482 children in placements that do not meet licensure standards | |
| MSA II.B.2.e & II.B.2.p.11 | MSA requires that by the end of P3, 60% of children with special needs shall be matched with placement resources that can meet their therapeutic and medical needs. | 45% | 96% | Data provided is limited to children with diagnosed developmental and/or mental health disparities. |
| MSA II.B.2.f & II.B.2.q.7 (P4) or II.B.2.p.12 (p3) | MSA requires by the end of P4 [P3], 85% (75%) of children in custody shall be placed in the least restrictive setting that meets their individual needs, consistent with MSA requirements. | 97% | | Requirement not satisfied – data the defendants used to track this requirement did not address the full requirement. Revisions were made in October 2014, after the end of P4. |

EXHIBIT A

| Citation | MSA Requirement | Period 3 (P3) Performance | Period (P4) Performance | Select Monitor's Report Comments |
|---|---|---|---|---|
| MSA II.B.2.g8 & II.B.2.q.11 (P4) or II.B.2.p.16 (P3) | MSA requires that by the end of P4 (P3), at least 90% (85%) of children who entered DFCS custody shall be placed within his/her own county or within 50 miles of the home from which he/she was removed unless one of the exceptions provided in the MSA is documented as applying. | Excluding sibling exception: 94% Including sibling exception: 98% | Excluding sibling exception: 95% Including sibling exception: 99% | |
| MSA II.B.2.h & II.B.2.q.8 (P4) or II.B.2.p.13 (P3) | MSA requires by the end of P4 (P3), 90% (80%) of siblings who entered custody at or near the same time be placed together consistent with MSA requirement. | 85% | 75% | |
| MSA II.B.2.i & II.B.2.q.9 (P4) or II.B.2.p.14 (P3) | MSA requires by the end of P4 (P3), 60% (40%) of children placed in a new placement during the period shall have their currently available medical, dental, educational, and psychological information provided to their resource parents or facility staff no later than at the time of any new placement during the period. | 19% | 20% | Data provided assesses whether information is available within 15 days of placement not at the time of placement. |
| MSA II.B.2.j & II.B.2.p.15 | MSA requires that by the end of P3, at least 35% of children in DFCS custody with a documented indication that they were to be subject to a potential or actual placement disruption during the Period shall receive a meeting to address placement stability consistent with MSA requirements. | 62% | | Data provided do not address this precise requirement. Instead, data assesses whether DFCS took all reasonable steps to avoid placement disruption and ensure stability in placements identified at risk of disruption. |
| MSA II.B.2.k & II.B.2.p.8 | MSA requires by end of P3 and thereafter], no foster children shall remain in an emergency or temporary facility for more than 45 days unless exceptional circumstances and Field Operations Director has granted express written approval. | 24 children | 17 children | |
| MSA II.B.2.m | MSA requires that sibling groups in which one or more of the siblings are under the age of 10 shall not be placed in congregate care settings for more than 45 days. | 13 sibling groups | 17 sibling groups | |
| MSA II.B.2.m & II.B.2.q.7 (P4) or (P3) II.B.2.p.6 | MSA requires by end of P4 (P3), no (no more than 40) children under 10 placed in congregate care unless exceptional needs and/or sibling group member and express written approval by Regional Director. | 11 children | 50 children | |
| MSA II.B.2.p.1 | MSA requires that all foster care settings, including relative placements, shall be screened prior to the initial placement of foster children in accordance with this MSA. | | No finding | Due to limitations in data, parties agreed that the defendants would not report on this item for P4. |

EXHIBIT A

EXHIBIT A

33

| Citation | MSA Requirement | Period 3 (P3) Performance | Period (P4) Performance | Select Monitor's Report Comments |
|---|---|---|---|---|
| MSA II.B.2.q.1 | MSA requires that DFCS shall ensure that each county office has access to resource workers within its region having the ability to ascertain the placement resources available and their suitability for each particular child needing placement. | | Requirement not satisfied | Interviews with staff and supervisors in several regions indicate that there are an insufficient number of resource workers and availability of appropriate placements is limited. |
| MSA II.B.2.q.3 | MSA requires that no child shall be placed in more than one emergency or temporary facility within one episode of foster care, unless an immediate placement move is necessary to protect the safety of the child or of others as certified in writing by the Regional Director. | No finding | No finding | Monitor was unable to assess performance for this requirement due to data limitations. |
| MSA II.B.2.q.4 | MSA requires that no more than 10% of foster children shall be from his/her existing placement to another foster placement unless DFCS specifically documents in the child's case record justifications for that move and the move is approved by a DFCS supervisor. | No finding | No finding | Due to data limitations, the parties agreed this performance requirement will be assessed through a case record review. |
| MSA II.B.2.q.5 | MSA requires that no more than 20% of resource homes shall provide care to a number of children in excess of the MSA resource home population limitations. | No finding | No finding | The defendants submitted data for this requirement, however due to significant limitations, the monitors were unable to analyze the data. |
| MSA II.B.2.q.6 | MSA requires that at least 85% of children with special needs shall be matched with placement resources that can meet their therapeutic and medical needs. | No finding | No finding | Parties agreed that performance will be measured in a prospective case record review. |
| MSA II.B.2.q.10 | MSA requires that at least 60% of children in DFCS custody with a documented indication that they were subject to an actual placement during the Period shall receive a meeting to address placement stability consistent with MSA requirements. | No finding | No finding | The monitor was unable to analyze the data submitted by the defendants. |
| MSA II.B.2.s.1 & II.B.2.t.1 | MSA requires that at least 90% of the foster children in that region who enter custody or experience a placement change shall be placed in accordance with each of the child placement requirements of Section II.B.2. | No finding | No finding | No data has been produced. The monitor expects to finalize with the parties a plan related to ongoing collection and reporting of these data. |
| MSA II.B.2.a & II.B.3.j.1 (P4) or II.B.3.i.1 (P3) | MSA requires by the end of P4 (P3), 70% (50%) of children entering custody receive a health screening evaluation as recommended by American Academy of Pediatrics from a qualified medical practitioner within 72 hours after placement. | 28% | 27% | Data produced only reports on timeliness of initial health screening evaluation not whether they were conducted by a qualified medical practitioner or in accordance with recommendations by the American Academy of Pediatrics. A case record review was conducted during P5 and will be presented in a forthcoming report. |

EXHIBIT A

34

| Citation | MSA Requirement | Period 3 (P3) Performance | Period (P4) Performance | Select Monitor's Report Comments |
|---|---|---|---|---|
| MSA II.B.3.b & II.B.3.l.2 (P4) or II.B.3.l.2 (P3) | MSA requires by the end of P4 (P3), 70% (50%) of children entering custody receive a comprehensive health assessment within 30 calendar days consistent with MSA requirement. | 34% | 33% | Data produced only reports on timeliness of initial health screening evaluation not whether the assessment was consistent with recommendations by the American Academy of Pediatrics. A case record review was conducted during PS and will be presented in a forthcoming report. |
| MSA II.B.3.d & II.B.3.l.3 | MSA requires by the end of P3, 75% of children in custody shall receive periodic medical examinations and all medically necessary follow-up services and treatment, consistent with MSA requirements. | 63% | | The Monitor has concerns over reliability of the data. The requirement will be addressed in a special case review. |
| MSA II.B.3.e & II.B.3.l.4 (P4) or II.B.3.l.4 (P3) | MSA requires by the end of P4 (P3), 75% (60%) of children three years old and older entering custody or in care and turning three years old during the period shall receive a dental examination within 90 days of placement or their third birthday. | 49% | 55% | Due to data limitations, the parties agreed this performance requirement will be assessed through a PS case record review. Findings will be presented in a forthcoming report. |
| MSA II.B.3.e & II.B.3.l.5 (P4) or II.B.3.l.5 (P3) | MSA requires that by the end of P4 (P3), at least 80% (60%) of children in custody during the period shall receive a dental examination every six months consistent with MSA requirements and all medically necessary dental services. | 54% | 52% | Due to data limitations, the parties agreed this performance requirement will be assessed through a PS case record review. Findings will be presented in a forthcoming report. |
| MSA II.B.3.f & II.B.3.l.6 (P4) or II.B.3.l.6 (P3) | MSA requires that by the end of P4 (P3), 75% (60%) of children three years old and turning three years old during the period or in care and turning four years old during the period shall receive mental health assessment by a qualified professional within 30 calendar days of foster care placement or their fourth birthday, respectively. | 49% | 47% | Data limited to children age 4+ when entering care, does not include children who turned 4 while in care. Due to this limitation, the parties agreed that performance would be assessed through a PS case record review. Findings will be presented in a forthcoming report. |
| MSA II.B.3.g & II.B.3.l.8 | MSA requires that by the end of P4 (P3) at least 70% (50%) of children four years old and older entering custody during the period or in care and turning four years old during the period shall receive a developmental assessment by a qualified professional within 30 days of placement and all needed developmental services. | 7% | No finding | Due to data limitations, the parties agreed this performance requirement will be assessed through a PS case record review. Findings will be presented in a forthcoming report. |
| MSA II.B.3.3 | MSA requires that at least 85% of children in custody during the period shall receive periodic medical examinations and all medically necessary follow-up services and treatment consistent with MSA requirements. | 49% | No finding | Parties agreed to measure performance for this requirement through a PS case record review. Findings from the case record review will be presented in a forthcoming report – however, data indicates that the requirement was not met. |
| MSA II.B.3.l.7 (P4) or II.B.3.l.7 (P3) | MSA requires that at least 80% of children who received a mental health assessment during the period shall receive all recommended mental health services pursuant to their assessment. (Requirement for P3 was 70%) | No finding | No finding | Parties agreed that defendants performance relative to this requirement would be measured through a case record review conducted during PS. |

| Citation | MSA Requirement | Period 3 (P3) Performance | Period (P4) Performance | Select Monitor's Report Comments |
|---|---|---|---|---|
| MSA II.B.3.j.8 (P4) or II.B.3.i.8 (P3) | MSA requires that at least 60% of children in custody ages birth through three during the period, and older children if factors indicate it is warranted, shall receive a developmental assessment by a qualified professional within 30 calendar days of foster care placement and all needed developmental services. (P3 standard 30%) | 7% | No finding | Monitor has concerns over reliability of P3 data. Parties agreed that defendants performance relative to this requirement would be measured conducted during P5. |
| MSA II.B.3.l.1 & II.B.3.m.1 | MSA requires that at least 80% of foster children in that region who enter custody shall receive physical and mental health care in accordance with each of the MSAs. At least 90% of foster children in that region who enter custody shall receive physical and mental health care in accordance with each of the MSA requirements. | | No finding | The monitor plans to work with the parties to resolve how performance related to these requirements will be measured. |
| MSA II.B.4.c.1 | MSA requires that at least 80% of children in custody during the period requiring therapeutic and/or rehabilitative foster care services because of a diagnosis of significant medical, developmental, emotional, or behavioral problems shall be provided with a treatment plan and services in accordance with their plan. | | No finding | Parties agreed that defendants performance relative to this requirement would be measured through a case record review conducted during P5. |
| MSA II.B.4.a & II.B.4.b.1 | MSA requires that by the end of P3, 60% of children requiring therapeutic and/or rehabilitative services because of a diagnosis of significant medical, developmental, emotional, or behavioral problems shall be provided with a treatment plan and services in accordance with their plan. | 66% | | Data provided do not include children with significant medical problems. Additionally, the Monitor has concerns over reliability of the data. Parties agreed that defendants' performance relative to this requirement would be measured through a case record review. |

EXHIBIT A

35

EXHIBIT A

36

| Citation | MSA Requirement | Period 3 (P3) Performance | Period (P4) Performance | Select Monitor's Report Comments |
|---|---|---|---|---|
| MSA II.B.4.e.1 & II.B.4.f.1 | Practice Model: For regions that have fully implemented the practice model, at least 80% of the foster children in that region who are in custody in require therapeutic and/or rehabilitative foster care services because of a diagnosis of significant medical, developmental, emotional or behavioral problems shall be provided with a treatment plan and services during that period in accordance with their plan. | Region V-W - 100%<br>Region III-S - 53%<br>Region I-N - 47%<br>Region IV-N - 84%<br>Region IV-S - 81% | | |
| | For regions that have fully implemented the practice model for at least 12 months, at least 90% of the foster children in that region who are in custody in require therapeutic and/or rehabilitative foster care services because of a diagnosis of significant medical, developmental, emotional or behavioral problems shall be provided with a treatment plan and services during that period in accordance with their plan. | Region I-S - 72%<br>Region II-W - 46% | No finding | Parties agreed that defendants performance relative to this requirement would be measured through a case record review conducted during P5. |
| MSA II.B.5.a & II.B.5.f.1 (P4) or II.B.5.e.1 (P3) | MSA requires by the end of P4 (P3), 80% (60%) of children shall receive documented twice-monthly in person visits by the assigned casework consistent with MSA requirement. | 53% | 67% | Data provided does not address if the child was seen alone if age appropriate, only if visits occurred. |
| MSA II.B.5.b & II.B.5.f.2 (P4) or II.B.5.e.2 (P3) | MSA requires by end of P4 (P3), 60% (40%) of children with a goal of reunification shall have their assigned DFCS caseworker meet monthly with the child's parents, during the period, consistent with MSA requirements, and the visit shall be documented in the case record. | Accurate data not available | 38% | |
| MSA II.B.5.c & II.B.5.f.3 (P4) or II.B.5.e.3 (P3) | MSA requires by the end of P4 (P3), 60% (40%) of therapeutic resource parents have a worker visit the home monthly to share relevant information, evaluate the child's safety, needs, and well-being, and monitor service delivery and achievement of service goals. | 70% content and frequency of visit | 73% content and frequency of visit | |
| MSA II.B.5.c & II.B.5.f.3 (P4) or II.B.5.e.3 (P3) | MSA requires by the end of P4, 60% of non-therapeutic resource parents have a worker visit the home monthly to share relevant information, evaluate the child's safety, needs, and well-being, and monitor service delivery and achievement of service goals. | 45% frequency of visit | 49% frequency of visit | |

EXHIBIT A

37

| Citation | MSA Requirement | Period 3 (P3) Performance | Period (P4) Performance | Select Monitor's Report Comments |
|---|---|---|---|---|
| MSA II.B.5.h.1 & II.B.5.i.1 | Practice Model: For regions that have fully implemented the practice model, at least 70% of children in custody in that region shall have received documented twice-monthly in-person visits by the assigned DFCS caseworker during the preceding 12-month period, consistent with MSA requirements. | Region IV-S - 66%<br>Region V-E - 66%<br>Region III-S - 44%<br>Region I-N - 70%<br>Region IV-N - 65% | Region IV-S - 75%<br>Region V-E - 66%<br>Region III-S - 44%<br>Region I-N - 68%<br>Region IV-N - 65% | |
| | For regions that have fully implemented the practice model for at least 12 months, at least 90% of foster children in custody in that region shall receive documented twice-monthly in-person visits by the assigned DFCS caseworker, consistent with MSA requirements. | Region V-W - 66%<br>Region IV-S - 75% | Region I-S - 85%<br>Region II-W - 75%<br>Region V-W - 64% | |
| MSA II.B.5.h.2 & II.B.5.i.2 | Practice Model: For regions that have fully implemented the practice model, at least 90% of foster children in custody in that region with a goal of reunification shall have had their assigned DFCS caseworker meet monthly with the child's biological parent(s) with whom the child is to be reunified consistent with the MSA requirements, as documented in the child's case record. | Region V-W - 33%<br>Region III-S - 22%<br>Region I-N - 27%<br>Region IV-N - 44%<br>Region IV-S - 26% | Region V-E - 42% | |
| | For regions that have fully implemented the practice model for at least 12 months, at least 90% of foster children in that region with a goal of reunification shall have their assigned DFCS caseworker meet monthly with the child's parent(s) with whom the child is to be reunified, consistent with MSA requirements, as documented in the child's case record. | Region I-S - 62%<br>Region II-W - 45% | | |
| MSA II.B.5.h.3 & II.B.5.i.3 | Practice Model: For regions that have fully implemented the practice model, at least 80% of foster parents in that region with at least one foster child residing in their home during the preceding 12-month period shall have had a DFCS worker visit the home monthly, consistent with MSA requirements, as documented in the children's case records. | | Region III-S – 32% (MACWIS), 60% (PAD)<br>Region I-V – 43% (MACWIS), 97% (PAD)<br>Region II-W – 87% (MACWIS), 77% (PAD)<br>Region IV-S – 68% (MACWIS), 71% (PAD)<br>Region IV-N – 68% (MACWIS), 94% (PAD)<br>Region IV-S – 67% (MACWIS), 73% (PAD)<br>Region V-E – 63% (MACWIS), 90% (PAD)<br>Region V-W – 43% (MACWIS), 100% (PAD) | P4 - Monitor was only able to analyze data in one of the five regions that fully implemented the practice model, and in one of the three regions that had fully implemented the practice model for at least 12 months. |
| | For regions that have fully implemented the practice model for at least 12 months, at least 90% of resource parents in that region with at least one foster child residing in their home shall have a DFCS worker visit the home monthly, consistent with MSA requirements, as documented in the children's case records. | | | |

| Citation | MSA Requirement | Period 3 (P3) Performance | Period (P4) Performance | Select Monitor's Report Comments |
|---|---|---|---|---|
| MSA II.B.6.b.1 | MSA requires that defendants shall hold training sessions for DFCS' Training Unit Staff on the Permanency Values Training and Permanency Skills Training Curricula. | | No finding | Defendants report that this requirement was satisfied. However, the monitor had no opportunity to verify this representation. |
| MSA II.B.6.b.2 | MSA requires that defendants shall conduct permanency roundtables in three additional regions. | | Requirement Satisfied | By P3, 10 of 13 regions had implemented permanency roundtables. By P4, 13 of 13 had implemented. |
| MSA II.B.7.b | MSA requires that defendants shall maintain a process for advising all potential adoptive families, including any resource family caring for a child who has become legally available for adoption, of the availability of adoption subsidies. This notification shall be documented in the child's record, and the family's access to such subsidies shall be facilitated. | | Satisfied in Part | DFCS policy during P4 required the assigned adoption specialist to inform resource families of the possibility of adoption assistance for eligible children; however policy did not require that this be documented in the case record. P5 IP required a revision to DFCS policy to make documentation required. |
| MSA II.B.7.d & II.B.7.e | Practice Model: For regions that have fully implemented the practice model, at least 90% of children in custody in that region with the primary permanency goal of adoption shall have an assigned adoption specialist and an adoption plan with specific activities to achieve adoption, and shall have regular adoption status meetings consistent with the MSA requirements during the period. | No finding | No finding | Defendants have been unable to report on their performance relative to this requirement. Defendants indicated they planned to submit a data report to the monitor by May 31, 2015; however as of June 12, 2015 no report has been submitted. The parties agreed to a case record review for the sections of the requirement that would not be covered in the data report. |
| MSA II.B.7.d & II.B.7.e | For regions that have fully implemented the practice model for at least 12 months, at least 95% of children in custody in that region with the primary permanency goal of adoption shall have an assigned adoption specialist and an adoption plan with specific activities to achieve adoption, and shall receive regular adoption status meetings consistent with the Period. MSA requirements during the Period. | | | |
| MSA II.C.1.a & II.C.1.c.1 (P4) or (P3) II.C.1.b.1 | MSA requires by the end of P4 (P3), at least 75% (60%) of children state-wide in care less than 12 months from the time of latest removal from home shall have had two or fewer placements. | 77% | 79% | |
| MSA II.C.2.a & II.C.2.c.1 (P4) or II.C.2.b.1 (P3) | MSA requires that by the end of P4 (P3), the rate of abuse or maltreatment in care shall not exceed 0.5% (1.00%). | 0.98% | No revised data submitted | Defendants are still working to resolve technical issues regarding the production of revised reports. |

EXHIBIT A

| Citation | MSA Requirement | Period 3 (P3) Performance | Period (P4) Performance | Select Monitor's Report Comments |
|---|---|---|---|---|
| MSA III.A.1.a | MSA requires that no later than the date set forth in Appendix "A" by which a region shall have fully implemented the Practice Model, the CQI system shall measure compliance in that region with the foster care service standard requirements of this MSA and shall ensure remediation of any identified deficiencies. | Satisfied in Part | Satisfied in Part | The CQI system has been utilized to measure compliance with the foster care service standards of the MSA. However, there are substantial gaps in performance for some MSA requirements, and there is evidence that defendants have not fully implemented the corrective actions designed to remediate deficiencies identified through CQI activities. |
| MSA III.B.1.d.1 | Practice Model: For regions that have undergone the Initial Practice Model Implementation Period, all caseworkers assigned to active cases, and their supervisors, will have undergone training on the family team meeting protocols. | Requirement satisfied | Requirement satisfied | All caseworkers and supervisors were required to participate in extensive initial training prior to implementation of the practice model. |
| MSA III.B.1.e.1 & III.B.1.f.1 | Practice Model: For regions that have fully implemented the Practice Model, at least 80% of foster children in that region who enter custody shall have a thorough screening and assessment, consistent with MSA requirements, within 30 calendar days of entering custody. | Region V-W - data unreliable Region III-S - 13% Region I-N - 34% Region IV-N - 82% Region IV-S - 73% | Region III-S – 32% (MACWIS), 60% (PAD) Region I-N – 43% (MACWIS), 71% (PAD) Region IV-N – 68% (MACWIS), 94% (PAD) Region IV-S – 67% (MACWIS), 73% (PAD) Region V-E – 63% (MACWIS), 90% (PAD) | |
| MSA III.B.1.e.1 & III.B.1.f.1 | For regions that have fully implemented the Practice Model, at least 80% of foster children in that region who enter custody shall have a comprehensive family assessment, consistent with MSA requirements, within 30 calendar days of entering custody. | Region I-S - 74% Region II-W - 62% | Region I-S – 80% (MACWIS), 97% (PAD) Region II-W – 87% (MACWIS), 77% (PAD) Region V-W – 43% (MACWIS), 100% (PAD) | |
| MSA III.B.1.e.2 & III.B.1.f.2 | Practice Model: For regions that have fully implemented the Practice Model, at least 80% of placement cases in that region in which the whereabouts of one or both parents is unknown, DFCS shall immediately institute a diligent search for the parent(s), which shall be documented in the child's case record. | No finding | No finding | The Monitor had no finding during P3 & P4 due to data limitations. Defendants were able to produce data for this requirement in May 2015, covering October 2014-March 2015. |
| | For regions that have fully implemented the Practice Model for at least 12 months, at least 90% of placement cases in that region in which the whereabouts of one or both parents is unknown, DFCS shall immediately institute a diligent search for the parent(s), which shall be documented in the child's case record. | | | |

| Citation | MSA Requirement | Period 3 (P3) Performance | Period (P4) Performance | Select Monitor's Report Comments |
|---|---|---|---|---|
| MSA III.B.2.c.1 & III.B.2.d.1 | Practice Model: For regions that have fully implemented the Practice Model, at least 80% of foster children in that region who enter custody shall have a family team meeting and service plans shall be developed for both the child and parents, consistent with MSA requirements, within 30 calendar days of entry into Foster Care. | No finding | No finding | Parties agreed that defendants performance relative to this requirement would be measured through a case record review conducted during P5. |
| MSA III.B.2.c.2 & III.B.2.d.2 | Practice Model: For regions that have fully implemented the Practice Model, at least 80% of foster children in that region who enter custody shall have a family team meeting and service plans within 30 calendar days of any placement or other significant change, consistent with MSA requirements. | Region V-W - 2%<br>Region III-S - 5%<br>Region I-N - 6%<br>Region IV-N - 13%<br>Region IV-S - 10% | Region III-S – 5%<br>Region I-N – 6%<br>Region IV-N – 13%<br>Region IV-S – 10%<br>Region V-E – 22% | |
| MSA III.B.2.c.2 & III.B.2.d.2 | For regions that have fully implemented the Practice Model for at least 12 months, at least 80% of foster children in that region who enter custody shall have family team meetings at least quarterly, and their service plans shall be updated quarterly, as well as within 30 calendar days of a placement change, consistent with MSA requirements. | Region I-S - 33%<br>Region II-W - 19% | Region I-S – 47%<br>Region II-W – 19%<br>Region V-W – 26% | |
| MSA III.B.3.a.6.a & III.B.3.a.7.a | Practice Model: For regions that have fully implemented the Practice Model, at least 90% of foster children in that region who enter custody shall have a permanency plan within 30 calendar days of their entry into care consistent with MSA requirements.<br><br>For regions that have fully implemented the practice model for at least 12 months, at least 95% of foster children in that region who enter custody shall have a permanency plan within 30 calendar days of their entry into care consistent with MSA requirements. | Region V-W - 57% (MACWIS), 36% (PAD)<br>Region III-S - 26% (MACWIS), 14% (PAD)<br>Region IV-N - 28% (MACWIS), 14% (PAD)<br>Region IV-N - 36% (MACWIS), 58% (PAD)<br>Region IV-S - 17% (MACWIS), 44% (PAD)<br>Region II-W - 73% (MACWIS), 82% (PAD) | Region III-S – 28% (MACWIS), 14% (PAD)<br>Region I-N – 30% (MACWIS), 68% (PAD)<br>Region IV-N – 38% (MACWIS), 21% (PAD)<br>Region IV-S – 17% (MACWIS), 58% (PAD)<br>Region V-E – 26% (MACWIS), 26% (PAD)<br>Region I-S – 77% (MACWIS), 68% (PAD)<br>Region II-W – 75% (MACWIS), 82% (PAD)<br>Region V-W – 51% (MACWIS), 39% (PAD) | |

EXHIBIT A

40

41

| Citation | MSA Requirement | Period 3 (P3) Performance | Period (P4) Performance | Select Monitor's Report Comments |
|---|---|---|---|---|
| MSA III.B.3.a.6.b & III.B.3.a.7.b | Practice Model: For regions that have fully implemented the Practice Model, at least 90% of foster children in custody in that region shall have a permanency plan that is consistent with MSA requirements.<br><br>For regions that have fully implemented the practice model for at least 12 months, at least 95% of foster children in custody in that region shall have a permanency plan that is consistent with MSA requirements. | Region V-W - 100%<br>Region I-N - 100%<br>Region III-S - 95%<br>Region IV-N - 93%<br>Region IV-S - 75%<br>Region V-E - 88%<br><br>Region I-S - 100%<br>Region II-W - 100%<br>Region V-W - 80% | Region III-S – 95%<br>Region I-N – 100%<br>Region IV-N – 93%<br>Region IV-S – 75%<br>Region V-E – 88%<br><br>Region I-S – 100%<br>Region II-W – 100%<br>Region V-W – 89% | |
| MSA III.B.3.b.2.a & III.B.3.b.3.a | Practice Model: For regions that have fully implemented the Practice Model, at least 90% of children in custody in that region with the goal of reunification shall have case record documentation reflecting active concurrent permanency planning consistent with MSA requirements.<br><br>For regions that have fully implemented the Practice Model for at least 12 months, at least 95% of children in custody in that region with the goal of reunification shall have case record documentation reflecting active concurrent permanency planning consistent with MSA requirements. | Region V-W - 43%<br>Region III-S - 35%<br>Region I-N - 73%<br>Region IV-N - 50%<br>Region IV-S - 81%<br>Region V-E - 42%<br><br>Region I-S - 79%<br>Region II-W - 91% | Region III-S – 35%<br>Region I-N – 73%<br>Region IV-N – 80%<br>Region IV-S – 81%<br>Region V-E – 42%<br><br>Region I-S – 79%<br>Region II-W – 91%<br>Region V-W – 21% | |
| MSA III.B.3.c.4.a & III.B.3.c.5.a | Practice Model: For regions that have fully implemented the Practice Model, at least 90% of foster children in that region who have been in custody at least six months shall have a timely court or administrative review consistent with MSA requirements.<br><br>For regions that have fully implemented the Practice Model for at least 12 months, at least 95% of foster children in that region who have been in custody at least six months shall have a timely court or administrative review consistent with MSA requirements. | Region V-W - 97%<br>Region III-S - 86%<br>Region I-N - 99%<br>Region IV-N - 97%<br>Region IV-S - 100%<br>Region V-E - 94%<br><br>Region I-S - 98%<br>Region II-W - 100% | Region III-S – 86%<br>Region I-N – 99%<br>Region IV-N – 97%<br>Region IV-S – 100%<br>Region V-E – 94%<br><br>Region I-S – 98%<br>Region II-W – 100%<br>Region V-W – 98% | |

EXHIBIT A

42

| Citation | MSA Requirement | Period 3 (P3) Performance | Period (P4) Performance | Select Monitor's Report Comments |
|---|---|---|---|---|
| MSA III.B.3.c.4.b & III.B.3.c.5.b | Practice Model: For regions that have fully implemented the Practice Model, at least 90% of foster children in that region who have been in custody at least 12 months shall have a timely annual court review consistent with MSA requirements.<br><br>For regions that have fully implemented the Practice Model for at least 12 months, at least 95% of foster children in that region who have been in custody at least 12 months shall have a timely annual court review consistent with MSA requirements. | Region V-W - 94%<br>Region I-N - 87%<br>Region III-S - 39%<br>Region IV-N - 81%<br>Region IV-S - 83%<br><br>Region I-S - 89%<br>Region II-W - 93% | Region III-S - 39%<br>Region I-N - 87%<br>Region IV-N - 81%<br>Region IV-S - 83%<br>Region V-W - 89%<br>Region I-S - 94%<br>Region II-W - 99%<br>Region V-W - 85% | |
| MSA III.B.3.d.4.a & III.B.3.d.5.a | Practice Model: For regions that have fully implemented the Practice Model, at least 80% of foster children in that region with a permanency goal of reunification shall have service plans for their parents that identify those services DFCS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care, and case record documentation the DFCS made those identified services available directly or through referral.<br><br>Practice Model: For regions that have fully implemented the Practice Model, at least 90% of foster children in that region with a permanency goal of reunification shall have service plans for their parents that identify those services DFCS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care and case record documentation that DFCS made those identified services available directly or through referral. | No finding | Region III-S - 49%<br>Region I-N - 70%<br>Region IV-N - 97%<br>Region IV-S - 65%<br>Region V-E - 66%<br><br>Region I-S - 96%<br>Region II-W - 75%<br>Region V-W - 89% | Data not produced on this requirement during P3. |

| Citation | MSA Requirement | Period 3 (P3) Performance | Period (P4) Performance | Select Monitor's Report Comments |
|---|---|---|---|---|
| MSA III.B.3.e.2.a & III.B.3.e.3.a | Practice Model: For regions that have fully implemented the Practice Model, at least 80% of foster children in that region who reach the point at which they have spent 17 of the previous 22 months in foster care shall have a petition to TPR filed on their behalf or an available exception under the federal AFSA documented by the end of their 17th month in care.<br><br>For regions that have fully implemented the Practice Model for at least 12 months, at least 90% of foster children in that region who reach the point at which they have spent 17 of the previous 22 months in foster care shall have a petition to TPR filed on their behalf or an available AFSA exception under the federal AFSA documented by the last day of their 17th month in care. | Region V-W - 76%<br>Region III-S - 87%<br>Region I-N - 94%<br>Region IV-N - 88%<br>Region IV-S - 98%<br>Region IV-E - 92%<br><br>Region I-S - 95%<br>Region II-W - 85% | Region III-S – 87%<br>Region I-N – 94%<br>Region IV-N – 88%<br>Region IV-S – 98%<br>Region IV-E – 92%<br><br>Region I-S – 93%<br>Region II-W – 83%<br>Region V-W – 88% | |
| MSA III.B.3.e.2.b & III.B.3.e.3.b | Practice Model: For regions that have fully implemented the Practice Model, at least 80% of foster children in that region who have spent more than 17 of the previous 22 months in foster care with a TPR petition filed on their behalf or an available exception documented shall have a petition filed or an available exception documented.<br><br>For regions that have fully implemented the Practice Model for at least 12 months, at least 90% of foster children in that region who have spent more than 17 of the previous 22 months in foster care shall have a petition to TPR filed on their behalf or an available AFSA exception documented shall have a petition filed or an available exception documented. | Region V-W - 18%<br>Region III-S - 76%<br>Region I-N - 33%<br>Region IV-N - 60%<br>Region IV-S - 100%<br>Region II-W - 100% | Region III-S – 76%<br>Region I-N – 33%<br>Region IV-N – 60%<br>Region IV-S – 100%<br>Region IV-E – 20%<br>Region V-W – 20% | |
| MSA III.B.4.b.1 & III.B.4.c.1 | Practice Model: For regions that have fully implemented the Practice Model, at least 90% of child welfare case records in that region will be current and complete.<br><br>For regions that have fully implemented the Practice Model for at least 12 months, at least 95% of child welfare case records in that region will be current and complete. | No finding | No finding | Parties agreed that defendants' performance relative to this requirement would be measured through a case record review conducted during P5. |

EXHIBIT A

44

| Citation | MSA Requirement | Period 3 (P3) Performance | Period (P4) Performance | Select Monitor's Report Comments |
|---|---|---|---|---|
| MSA III.B.5.a | MSA requires that for all children entering foster care, a visitation plan for the child and his/her family shall be developed as part of the service plan. This visitation plan shall be developed and regularly updated in collaboration with parents, resource parents, and child. If parental visitation is appropriate based on the above factors, this visitation plan shall include a minimum of two visits per month with the parents (unless a court order in the child's case limits such visits). For all children, regardless of permanency goal, this visitation plan shall include at least one visit per month with any siblings not in the same placement (unless a court order in the child's case limits such visits). | | No finding | Due to data limitations, the Monitor was unable to analyze the defendant's submission. The parties agreed that performance for this requirement would be measured through a P6 case record review. |
| MSA III.B.5.d.1 & III.B.5.e.1 | Practice Model: For regions that have fully implemented the practice model, at least 80% of foster children in that region shall be provided with contacts with their parents and with any siblings not in the same placement consistent with MSA requirements, unless it is documented that a parent or sibling failed to make himself or herself available. For regions that have fully implemented the practice model for at least 12 months, at least 90% of foster children in that region shall be provided with contacts with their parents and with any siblings not in the same placement consistent with MSA requirements, unless it is documented that a parent or sibling failed to make himself or herself available. | Region V-W - 9%<br>Region I-N – 26%<br>Region III-S - 2%<br>Region I-N - 26%<br>Region IV-N - 40%<br>Region IV-S - 13% | Region III-S – 2%<br>Region I-N – 26%<br>Region IV-N – 40%<br>Region IV-S – 13%<br>Region V-E – 16%<br>Region I-S – 40%<br>Region II-W – 29%<br>Region V-W – 31% | |
| MSA III.B.6.c | MSA requires that DFCS shall make all reasonable efforts to ensure the continuity of a child's educational experience by keeping the child in a familiar or current school and neighborhood, when this is in the child's best interests and feasible, and by limiting the number of school changes the child experiences. | | No finding | Due to data limitations, the parties agreed that performance for this requirement would be measured through a P5 case record review. |

| Citation | MSA Requirement | Period 3 (P3) Performance | Period (P4) Performance | Select Monitor's Report Comments |
|---|---|---|---|---|
| MSA III.B.6.d.1 & III.B.6.e.1 | Practice Model: For regions that have fully implemented the practice model, at least 80% of school-age foster children in that region who enter custody shall have their educational records reviewed and their educational needs documented by their DFCS caseworker within 30 calendar days of their entry into foster care. | Region V-W – 69% Region III-S – 20% Region I-N – 28% Region IV-N – 89% Region IV-S – 80% | Region III-S – 20% Region I-N – 28% Region IV-N – 89% Region IV-S – 80% Region V-E – 45% | |
| | For regions that have fully implemented the practice model for at least 12 months, at least 90% of school-age foster children in that region who enter custody shall have their educational records reviewed and their educational needs documented by their DFCS caseworkers within 30 calendar days of their entry into foster care. | Region I-S – 90% Region II-W – 61% | Region I-S – 70% Region II-W – 41% Region V-W – 46% | |
| MSA III.B.6.d.2 & III.B.6.e.2 | Practice Model: For regions that have fully implemented the practice model, at least 80% of school-age foster children in that region who enter custody or are subject to a change in placement move shall be registered for and attending an accredited school within three business days of the initial placement or placement change, including while placed in shelters or other temporary placements, unless delayed by the Youth Court. | Region V-W – 94% Region III-S – 64% Region I-N – 79% Region IV-N – 89% Region IV-S – 83% | Region III-S – 64% Region I-N – 79% Region IV-N – 89% Region IV-S – 83% Region V-E – 80% | |
| | For regions that have fully implemented the practice model for at least 12 month, at least 90% of school-age foster children in that region who enter custody or are subject to a change in placement move shall be registered for and attending an accredited school within three business days of the initial placement or placement change, including while placed in shelters or other temporary placements, unless delayed by the Youth Court. | Region I-S – 79% Region II-W – 26% | Region I-S – 85% Region II-W – 43% Region V-W – 90% | |
| MSA III.B.7.d | The MSA requires that for youth transitioning to independent living, DFCS shall assist youth in obtaining or compiling the following documents and such efforts shall be documented in the child's case record. | | No finding | The parties have agreed defendants' performance for this requirement will be measured through a P6 case record review. |

| Citation | MSA Requirement | Period 3 (P3) Performance | Period (P4) Performance | Select Monitor's Report Comments |
|---|---|---|---|---|
| MSA III.B.7.e.1 & III.B.7.f.1 | Practice Model: For regions that have fully implemented the practice model, at least 90% of foster children in that region who are 14-20 years old shall be provided with Independent Living Services as set forth in their service plan. | Region V-W - 64% (MACWIS), 83% (PAD) | Region III-S - 29% (MACWIS), 53% (PAD) | |
| | | Region III-S - 29% (MACWIS), 53% (PAD) | Region I-N – 40% (MACWIS), 52% (PAD) | |
| | For regions that have fully implemented the practice model for at least 12 months, at least 95% of foster children in that region who are 14-20 years old shall be provided with Independent Living Services as set forth in their service plan during the period. | Region I-N - 39% (MACWIS), 52% (PAD) | Region IV-N - 74% (MACWIS), 75% (PAD) | |
| | | Region IV-N - 74% (MACWIS), 75% (PAD) | Region IV-S - 36% (MACWIS), 78% (PAD) | |
| | | Region IV-S - 36% (MACWIS), 78% (PAD) | Region V-E - 45% (MACWIS), 60% (PAD) | |
| | | Region I-S - 63% (MACWIS), 83% (PAD) | Region I-S – 89% (MACWIS), 81% (PAD) | |
| | | Region II-W - 75% (MACWIS), 87% (PAD) | Region II-W – 70% (MACWIS), 80% (PAD) | |
| | | | Region V-W – 48% (MACWIS), 85% (PAD) | |
| MSA III.B.7.e.2 & III.B.7.f.2 | Practice Model: For regions that have fully implemented the practice model, at least 80% of foster children in that region who are transitioning to independence shall have available an adequate living arrangement, a source of income, health care, independent living stipends, and education and training vouchers. DFCS shall also assist such children in obtaining, prior to transitioning to independent living, the necessary documents and information identified in the COA standard PA-FC 13.06 for emancipating youth. Those efforts shall be documented in the child's case record. | Region V-W - 91% | Region III-S - 60% | |
| | | Region III-S - 60% | Region I-N – 50% | |
| | | Region I-N - 80% | Region IV-N – 100% | |
| | For regions that have fully implemented the practice model for at least 12 months, at least 90% of foster children in that region who are transitioning to independence shall have available an adequate living arrangement, a source of income, health care, independent living stipends, and education and training vouchers. DFCS shall assist such children in obtaining, prior to transitioning to independent living, the necessary documents and information identified in the COA standard PA-FC 13.06 for emancipating youth. Those efforts shall be documented in the child's case record. | Region IV-N - 100% | Region IV-S – 100% | |
| | | Region IV-S - 100% | Region V-E – 33% | |
| | | Region I-S - 44% | Region I-S – 80% | |
| | | Region II-W - 25% | Region II-W – 0% | |
| | | | Region V-W – 67% | |

EXHIBIT A

| Citation | MSA Requirement | Period 3 (P3) Performance | Period (P4) Performance | Select Monitor's Report Comments |
|---|---|---|---|---|
| MSA III.B.8.c | MSA requires that before the end of any trial home visit period, there shall be a final family team meeting, which shall include the child's caseworker, the caseworker's supervisor, the child, and to determine the appropriateness of a the relative or parent assuming custody, final discharge. If final discharge is determined to be appropriate, DFCS shall make the appropriate application to the court to be relieved of custody. | | No finding | The parties have agreed defendants' performance for this requirement will be measured through a P6 case record review. |
| MSA III.B.8.d.1 & III.B.8.e.1 | Practice Model: For regions that have fully implemented the practice model, at least 70% of foster children in that region who are reunified and who were in custody longer than 90 days shall receive a 90-day trial home visit period or have case record documentation reflecting the Youth Court's objection to such a trial home visit. During that trial home visit period, the child's caseworker or a Family Preservation caseworker shall meet with the child in the home at least two times per month, and DFCS shall provide or facilitate access to all services identified in the child's after-care plan, consistent with MSA requirements. | Region V-W – 0%<br>Region III-S – 0%<br>Region I-N – 33%<br>Region IV-N- 0%<br>Region IV-S- 43% | Region V-E – 50%<br>Region V-W – 0% | P4 - Monitor was only able to analyze data in one of the five regions that fully implemented the practice model, and in one of the three regions that had fully implemented the practice model for at least 12 months. |
| | For regions that have fully implemented the practice model for at least 12 months, at least 90% of foster children in that region who are reunified and who were in custody longer than 90 days shall receive a 90-day trial home visit period or have case record documentation reflecting the Youth Court's objection to such a trial home visit. During that trial home visit period, the child's caseworker shall meet with the child in the home at least two times per month, and DFCS shall provide or facilitate access to all services identified in the child's after-care plan, consistent with MSA requirements. | Region I-S - 57%<br>Region II-W - 50% | | |

| Citation | MSA Requirement | Period 3 (P3) Performance | Period (P4) Performance | Select Monitor's Report Comments |
|---|---|---|---|---|
| MSA III.C.1.a.1 & III.C.1.b.1 | Practice Model: For regions that have fully implemented the practice model, at least 60% of foster children in that region who are discharged from custody and reunified with their parents or caretakers shall be reunified within 12 months of the latest removal from home.<br><br>For regions that have fully implemented the practice model for at least 12 months, at least 70% of foster children in that region who are discharged from custody and reunified with their parents or caretakers shall be reunified within 12 months of the latest removal from home. | Region V-W - 59%<br>Region III-S - 73%<br>Region I-N - 69%<br>Region IV-N - 50%<br>Region IV-S - 62%<br>Region V-E - 47%<br><br>Region I-S - 55%<br>Region II-W - 44% | Region III-S – 73%<br>Region I-N – 69%<br>Region IV-N – 50%<br>Region IV-S – 62%<br>Region V-E – 47%<br><br>Region I-S – 73%<br>Region II-W – 51%<br>Region V-W – 37% | |
| MSA III.C.2.a.1 & III.C.2.b.1 | Practice Model: For regions that have fully implemented the practice model, at least 25% of foster children in that region who are discharged upon finalization or an adoption shall have had the adoption finalized within 24 months of the latest removal from home.<br><br>For regions that have fully implemented the practice model for at least 12 months, at least 30% of foster children in that region who are discharged upon finalization of an adoption shall have had the adoption finalized within 24 months of the latest removal from home. | Region V-W - 50%<br>Region III-S - 0%<br>Region I-N - 17%<br>Region IV-N - 0%<br>Region IV-S - 8%<br><br>Region I-S - 29%<br>Region II-W - 9% | Region III-S – 0%<br>Region I-N – 17%<br>Region IV-N – 0%<br>Region IV-S – 8%<br>Region V-E – 13%<br><br>Region I-S – 28%<br>Region II-W – 0%<br>Region V-W – 45% | |
| MSA IV | MSA requires that DFCS's foster care services shall be accredited by COA pursuant to COA's relevant management and service standards. | | No finding | A final decision by COA is expected in the next several months; however, it appears MDHS will not be accredited. On 3/26/15 COA's CEO informed DHS that they will not be accredited by the July 2015 deadline due to failure to meet certain MACWIS standards and the "pervasive, ongoing issues with assessment and service planning." |

EXHIBIT A

# Appendix B. Mississippi State Public Teacher Salary Schedule

## FY2015-16 MAEP SALARY SCHEDULE
### MS Code Section 37-19-7

| Yrs. Exp. | Certification Level AAAA | Certification Level AAA | Certification Level AA | Certification Level A |
|---|---|---|---|---|
| 0 | 39,108 | 37,944 | 36,780 | 34,390 |
| 1 | 39,108 | 37,944 | 36,780 | 34,390 |
| 2 | 39,108 | 37,944 | 36,780 | 34,390 |
| Increment for 3-35 yrs | 794 | 727 | 660 | 495 |
| 3 | 39,902 | 38,671 | 37,440 | 34,885 |
| 4 | 40,696 | 39,398 | 38,100 | 35,380 |
| 5 | 41,490 | 40,125 | 38,760 | 35,875 |
| 6 | 42,284 | 40,852 | 39,420 | 36,370 |
| 7 | 43,078 | 41,579 | 40,080 | 36,865 |
| 8 | 43,872 | 42,306 | 40,740 | 37,360 |
| 9 | 44,666 | 43,033 | 41,400 | 37,855 |
| 10 | 45,460 | 43,760 | 42,060 | 38,350 |
| 11 | 46,254 | 44,487 | 42,720 | 38,845 |
| 12 | 47,048 | 45,214 | 43,380 | 39,340 |
| 13 | 47,842 | 45,941 | 44,040 | 39,835 |
| 14 | 48,636 | 46,668 | 44,700 | 40,330 |
| 15 | 49,430 | 47,395 | 45,360 | 40,825 |
| 16 | 50,224 | 48,122 | 46,020 | 41,320 |
| 17 | 51,018 | 48,849 | 46,680 | 41,815 |
| 18 | 51,812 | 49,576 | 47,340 | 42,310 |
| 19 | 52,606 | 50,303 | 48,000 | 42,805 |
| 20 | 53,400 | 51,030 | 48,660 | 43,300 |
| 21 | 54,194 | 51,757 | 49,320 | 43,795 |
| 22 | 54,988 | 52,484 | 49,980 | 44,290 |
| 23 | 55,782 | 53,211 | 50,640 | 44,785 |
| 24 | 56,576 | 53,938 | 51,300 | 45,280 |
| Increment for 25th year | 2,060 | 2,060 | 2,060 | 2,060 |
| 25 | 59,430 | 56,725 | 54,020 | 47,835 |
| 26 | 60,224 | 57,452 | 54,680 | 48,330 |
| 27 | 61,018 | 58,179 | 55,340 | 48,825 |
| 28 | 61,812 | 58,906 | 56,000 | 49,320 |
| 29 | 62,606 | 59,633 | 56,660 | 49,815 |
| 30 | 63,400 | 60,360 | 57,320 | 50,310 |
| 31 | 64,194 | 61,087 | 57,980 | 50,805 |
| 32 | 64,988 | 61,814 | 58,640 | 51,300 |
| 33 | 65,782 | 62,541 | 59,300 | 51,795 |
| 34 | 66,576 | 63,268 | 59,960 | 52,290 |
| 35 & above | 67,370 | 63,995 | 60,620 | 52,785 |

Base = Yrs. Exp. 0–2. Base + Increment = Yrs. Exp. 3–35.

NOTE: Assistant Teachers - $12,500 (MS Code Section 37-21-7(6))

Certification Level A – Bachelor's degree  
Certification Level AA – Master's degree  
Certification Level AAA – Specialist Degree  
Certification Level AAAA – Doctorate Degree

EXHIBIT A

Appendix C. CSF Recommendations and MSA Requirements

Reunification Services

## CSF Recommendations

- To increase the array of services in the State to be used to facilitate and sustain reunification, MDHS can use Federal title IV-B funds to fund in-house staff that provides family preservation and reunification services, some consideration of this approach might be considered in order to supplement the contracted services and increase the availability of services in rural areas of the State. Since these funds are capped, this might mean diverting existing IV-B expenditures, but developing some type of in-house capacity to provide needed reunification services is worth considering as a means of making services available where they are currently unavailable.

- To increase the array of services in the State to be used to facilitate and sustain reunification, we recommend that the capacity of existing contractors to provide reunification-related services be increased statewide. This can be done by increasing funding for these services as well as relaxing some of the program restrictions that now limit the access to these services by families needing reunification services. If the Department wishes to reserve family preservation families for placement prevention and reunification from short-term stays in foster care, we recommend that the expansion of services occur with intensive in-home services.

  To increase the array of services in the State to be used to facilitate and sustain reunification, we recommend that flexible funds be earmarked for use in helping to meet the basic needs of families seeking to reunify with their children in foster care, and/or that procedures for accessing available funds be clarified and simplified.

- We recommend that the State examine services and practices with established records of effectiveness in reunifying children and families timely and appropriately and, where possible, consider replicating some of those "best practices" within the State. For example, we recommend attention to the Model Youth Court program in Forest County as a means of providing services directed toward reunifying very young children in foster care with their families.

- To tailor reunification services to the individualized needs of the families receiving them, we recommend relaxing the requirements for all families to complete standardized programs regardless of their individual circumstances, strengths, and needs.

EXHIBIT A

- To tailor reunification services to the individualized needs of the families receiving them, we recommend adding to the service array the capacity to provide more in-home services to families such as in-home behavioral health interventions as an alternative to office-based mental health counseling, and in-home parent coaching and support as an alternative to standardized parenting classes.

- To tailor reunification services to the individualized needs of the families receiving them, we recommend that the Department's performance-based contracting system, when implemented, support the need for providers to respond flexibly to families' needs with services that reflect their unique strengths and needs in the comprehensive family assessments and case plans.

- To tailor reunification services to the individualized needs of the families receiving them, we recommend strengthening both policy and practice requiring MDHS staff to coordinate case planning and service provision activities with service providers in order to ensure that services match needs, and to monitor the effectiveness of service provision in facilitating and supporting reunification.

- To strengthen policy and training to support improvement in practice with regard to reunification, we recommend strengthened case planning and ISP policy and training that focus on identifying strengths and needs, matching services to needs, brokering for and obtaining needed services, and monitoring the effectiveness of services. This should include the active involvement of service providers in case planning processes whenever appropriate.

## MSA Requirements

- For regions that have fully implemented the Practice Model, at least 80% of foster children in that region with a permanency goal of reunification shall have service plans for their parents that identify those services DFCS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care, and case record documentation that DFCS made those identified services available directly or through referral (MSA III.B.3.d.4.a.).

    o Performance:

        ▪ Region III-S – 49%
        ▪ Region I-N – 70%
        ▪ Region IV-N – 97%
        ▪ Region IV-S – 66%
        ▪ Region V-E – 66%

EXHIBIT A

51

For regions that have fully implemented the Practice Model for at least 12 months, at least 90% of foster children in that region with a permanency goal of reunification shall have service plans for their parents that identify those services DFCS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care and case record documentation that DFCS made those identified services available directly or through referral (MSA III.B.3d.5.a.).

- o Performance:

  - Region I-S – 96%
  - Region II-W – 75%
  - Region V-W – 89%

- For regions that have fully implemented the Practice Model, at least 60% of foster children in that region who are discharged from custody and reunified with their parents or caretakers shall be reunified within 12 months of the latest removal from home (MSA III.C.1.a.1.).

  - o Performance:

    - Region III-S – 73%
    - Region I-N – 69%
    - Region IV-N – 50%
    - Region IV-S – 62%
    - Region V-E – 47%

For regions that have fully implemented the Practice Model for 12 months, at least 70% of foster children in that region who are discharged from custody and reunified with their parents or caretakers shall be reunified within 12 months of the latest removal from home (MSA III.C.1.b.1.).

- o Performance:

  - Region I-S – 55%
  - Region II-W – 44%
  - Region V-W – 42%

## Medical, Dental and Mental Health Services

**CSF Recommendations**

- We recommend that MDHS enter into collaborative agreements with the DMH and the State's Medicaid agency to fund mental health professionals in rural areas of the State that serve children and families served by MDHS. Since most of the families are Medicaid-eligible, we believe that the services they provide would be reimbursable

- through Medicaid and it would immediately increase families' access to mental health services in the State.

- MDHS and MDMH should develop a collaborative program to serve the mental health needs of foster care children statewide, including specialty services, e.g., psychological examinations, treatment for abuse and neglected children and youth, etc. This should include the possibility of hiring qualified mental health professionals to be based in MDHS regional offices to serve counties where the service population is the greatest or where gaps in services are the most prevalent, for example, in many of the rural areas of the State. Programs of this nature can offer a diverse range of services and can be structured to enable Medicaid billing to cover a majority of the staffing and administrative costs. The participation of the State Medicaid Agency should be pursued to explore further creation of these types of innovative programs along with funding arrangements.

- In cooperation with the colleges and universities in the State, MDHS and the State Board of Dental Examiners should intensify efforts to recruit dentists to provide services to children and youth in foster care, as well as to children served in their own homes through MDHS. This effort may be part of a more comprehensive approach to providing health care in rural and underserved areas of the State. A clinic approach that specializes in providing Medicaid-funded dental care to children can offer access that is currently unavailable, and there are models around the country to draw on in designing such a program.

- MDHS should collaborate with the State Medicaid Agency to pursue the possibility of exercising State options that could include an expansion of dental services to include orthodontic care for children and adolescents.

- MDHS should collaborate with DMH and the State Medicaid Agency to establish additional waiver programs to expand its provision of mental health services to children who are placed in foster homes. The MYPAC program is one example of a waiver program that could also serve children residing in foster family homes at risk of entering PRTF's, thereby enabling these youth to receive needed services and remain in the community.

- MDHS should collaborate with the psychology and behavioral science programs of the State's post-secondary systems to explore the possibility of establishing internships and field placements within MDHS, providing opportunities for professional and academic

EXHIBIT A

53

advancement that includes direct services and interventions to children and adolescents in foster care.

- MDHS should incorporate specific measures and review processes within its CQI system to ensure that all initial screenings are conducted within established timeframes.

- MDHS should ensure that its Foster Care Reviews (FCR) include the evaluation of the provision of needed medical services as part of appropriate case planning efforts and timely achievement of case plan goals.

- MDHS should establish both supervisory practices and monitoring processes within its CQI system to ensure that resource parents are provided timely and accurate medical information that enables them to meet the needs of children in their care.

- MDHS should reimburse resource parents for transportation of children to all necessary appointments on behalf of the medical, dental, and mental health needs of children in their care.

## MSA Requirements

- MSA (II.B.2.a & II.B.3.j.1 (P4) or II.B.3.j.1 (P3)) requires by the end of P4 (P3), 70% (50%) of children entering custody receive a health screening evaluation as recommended by American Academy of Pediatrics from a qualified medical practitioner within 72 hours after placement.

  o Performance: 27 percent

  o Monitor's Notes: Data produced only reports on timeliness of initial health screening evaluation not whether they were conducted by a qualified medical practitioner or in accordance with recommendations by the American Academy of Pediatrics. A case record review was conducted during P5 and will be presented in a forthcoming report.

- MSA (II.B.3.b & II.B.3.j.2 (P4) or II.B.3.j.2 (P3)) requires by the end of P4 (P3), 70% (50%) of children entering custody receive a comprehensive health assessment within 30 calendar days consistent with MSA requirement.

  o Performance: 33 percent

  o Monitor's Notes: Data produced only reports on timeliness of initial health screening evaluation not whether the assessment was consistent with recommendations by the American Academy of Pediatrics. A case record review was conducted during P5 and will be presented in a forthcoming report.

EXHIBIT A

- MSA (II.B.3.j.3) requires that at least 85% of children in custody during the Period shall receive periodic medical examinations and all medically necessary follow-up services and treatment consistent with MSA requirements.

  o Performance: No findings

  o Monitor's Notes: Parties agreed to measure performance for this requirement through a P5 case record review. Findings from the case record review will be presented in a forthcoming report – however, data indicates that the requirement was not met.

- MSA (II.B.3.e & II.B.3.j.4 (P4) or II.B.3.j.4 (P3)) requires by the end of P4 (P3), 75% (60%) of children three years old and older entering custody or in care and turning three years old during the Period shall receive a dental examination within 90 days of placement or their third birthday.

  o Performance: 55 percent

  o Monitor's Notes: Due to data limitations, the parties agreed this performance requirement will be assessed through a P5 case record review. Findings will be presented in a forthcoming report.

- MSA requires that by the end of P4 (P3), at least 80% (60%) of children in custody during the Period shall receive a dental examination every six months consistent with MSA requirements and all medically necessary dental services.

  o Performance: 52 percent

  o Monitor's Notes: Due to data limitations, the parties agreed this performance requirement will be assessed through a P5 case record review. Findings will be presented in a forthcoming report.

- MSA (II.B.3.f & II.B.3.j.6 (P4) or II.B.3.j.6 (P3)) requires that by the end of P4 (P3) at least 70% (50%) of children four years old and older entering custody during the Period or in care and turning four years old during the Period shall receive mental health assessment by a qualified professional within 30 calendar days of foster care placement or their fourth birthday, respectively.

  o Performance: 47 percent

  o Monitor's Report: Data limited to children age 4+ when entering care, does not include children who turned 4 while in care. Due to this limitation, the parties agreed that performance would be assessed through a P5 case record review. Findings will be presented in a forthcoming report.

EXHIBIT A

- MSA (II.B.3.j.7 (P4) or II.B.3.i.7 (P3)) requires that at least 80% of children who received a mental health assessment during the period shall receive all recommended mental health services pursuant to their assessment.

  o Performance: No finding

  o Monitor's Notes: Parties agreed that defendants performance relative to this requirement would be measured through a case record review conducted during P5.

- MSA (II.B.3.j.8 (P4) or II.B.3.i.8 (P3)) requires that at least 60% of children in custody ages birth through three during the Period, and older children if factors indicate it is warranted, shall receive a developmental assessment by a qualified professional within 30 calendar days of foster care placement and all needed developmental services.

  o Performance: No finding

  o Monitor's Notes: Monitor has concerns over reliability of P3 data. Parties agreed that defendants performance relative to this requirement would be measured through a case record review conducted during P5.

- MSA (II.B.3.l.1 & II.B.3.m.1) requires that at least 80% of foster children in that region who enter custody shall receive physical and mental health care in accordance with each of the MSAs. At least 90% of foster children in that region who enter custody shall receive physical and mental health care in accordance with each of the MSA requirements.

  o Performance: No finding

  o Monitor's Notes: The monitor plans to work with the parties to resolve how performance related to these requirements will be measured.

- MSA (II.B.4.c.1) requires that at least 80% of children in custody during the period requiring therapeutic and/or rehabilitative foster care services because of a diagnosis of significant medical, developmental, emotional, or behavioral problems shall be provided with a treatment plan and services in accordance with their plan.

  o Performance: No finding

  o Monitor's Notes: Parties agreed that defendants performance relative to this requirement would be measured through a case record review conducted during P5.

- For regions that have fully implemented the practice model, at least 80% of the foster children in that region who are in custody and require therapeutic and/or rehabilitative foster care services because of a diagnosis of significant medical, developmental,

emotional or behavioral problems shall be provided with a treatment plan and services during that period in accordance with their plan (MSA II.B.4.e.1).

For regions that have fully implemented the practice model for at least 12 months, at least 90% of the foster children in that region who are in custody and require therapeutic and/or rehabilitative foster care services because of a diagnosis of significant medical, developmental, emotional or behavioral problems shall be provided with a treatment plan and services during that period in accordance with their plan (MSA II.B.4.f.1).

o   Performance: No finding

o   Monitor's Notes: Parties agreed that defendants performance relative to this requirement would be measured through a case record review conducted during P5.

## Independent Living

**CSF Recommendations**

- The contract for independent living should be substantially modified. The contract should permit and require diversity in the range of IL services provided, rather than requiring a standard curriculum for all youth as the core service. While we recognize the importance of the Life Skills classes, we particularly recommend that a repetition of the classes not be required and that classes be designed and tailored to individual youth's needs, strengths, level of development, and interests.

- The contract for independent living should be substantially modified. We recommend that the contract include the flexibility and requirement to offer a broader range of services that are identified for individual youth through the Ansell-Casey Life Skills Assessment and the MDHS comprehensive strengths and needs assessment (when this is implemented by MDHS).

- We recommend that resource family training be modified to include content on the roles and responsibilities, and the skills needed, of resource families to assist youth in their care work toward independence and transition to adulthood. MDHS should create the expectation that resource parent involvement in IL service delivery and planning is a part of the role of foster parenting for youth.

- Case planning process for youth in care be strengthened. First, there should be one IL and one TL plan for each youth rather than separate plans developed by the contractor and the Department.

- We recommend that MDHS develop and implement communication protocols for the contractor and MDHS staff to meet routinely with the youth to discuss progress toward goals, the effectiveness of services, emerging or changing needs and strengths, and critical issues to the youth's independence such as aftercare planning and needs for services, relationships with family and other individuals, and so forth. All meetings and discussions with the youth should be clearly documented in the MACWIS case file.

- We recommend an increased emphasis and accountability for sharing information between the contractor and MDHS staff, particularly as it relates to sharing the Ansell-Casey Life Skills Assessment and other information that pertains to serving the youth in care.

- MDHS Regional Directors and Area Social Work Supervisors should ensure that direct staff provides health records, appropriate health referrals and relevant information about services/programs to youth exiting care and to parents or guardians at the time of case closure for the purpose of continuity of health care and service delivery. Part of the FCR process might include addressing this issue with resource families since the FCR reviews all cases of children in foster care each six months.

## MSA Requirements

- For regions that have fully implemented the practice model, at least 90% of foster children in that region who are 14-20 years old shall be provided with Independent Living Services as set forth in their service plan (MSA III.B.7.e.1.).

  o Performance:

    ▪ Region III-S – 29% (MACWIS), 53% (PAD)
    ▪ Region I-N – 40% (MACWIS), 52% (PAD)
    ▪ Region IV-N – 74% (MACWIS), 75% (PAD)
    ▪ Region IV-S – 36% (MACWIS), 78% (PAD)
    ▪ Region V-E – 45% (MACWIS), 60% (PAD)

  o Monitor's Notes: Data reported from two different systems MACWIS and PAD

For regions that have fully implemented the practice model for at least 12 months, at least 95% of foster children in that region who are 14-20 years old shall be provided with Independent Living Services as set forth in their service plan during the period (MSA III.B.7.f.1.).

  o Performance:

    ▪ Region I-S – 89% (MACWIS), 81% (PAD)
    ▪ Region II-W – 70% (MACWIS), 80% (PAD)

EXHIBIT A

- The MSA (III.B.7.d) requires that for youth transitioning to independent living, DFCS shall assist youth in obtaining or compiling the following documents and such efforts shall be documented in the child's case record.

  o Performance: **No finding**

  o Monitor's Notes: The parties have agreed defendants' performance for this requirement will be measured through a P6 case record review.

- For regions that have fully implemented the practice model, at least 80% of foster children in that region who are transitioning to independence shall have available an adequate living arrangement, a source of income, health care, independent living stipends, and education and training vouchers. DFCS shall also assist such children in obtaining, prior to transitioning to independent living, the necessary documents and information identified in the COA standard PA-FC 13.06 for emancipating youth. Those efforts shall be documented in the child's case record (MSA III.B.7.e.2).

  o Performance:

    ▪ Region III-S – 60%
    ▪ Region I-N – 50%
    ▪ Region IV-N – 100%
    ▪ Region IV-S – 100%
    ▪ Region V-E – 33%

For regions that have fully implemented the practice model for at least 12 months, at least 90% of foster children in that region who are transitioning to independence shall have available an adequate living arrangement, a source of income, health care, independent living stipends, and education and training vouchers. DFCS shall assist such children in obtaining, prior to transitioning to independent living, the necessary documents and information identified in the COA standard PA-FC 13.06 for emancipating youth. Those efforts shall be documented in the child's case record (MSA III.B.7.f.2).

  o Performance:

    ▪ Region I-S – 80%
    ▪ Region II-W – 0%
    ▪ Region V-W – 67%

    ▪ Region V-W – 48% (MACWIS), 85% (PAD)

  o Monitor's Notes: Data reported from two different systems MACWIS and PAD

EXHIBIT A

**Foster Parent Retention**

## CSF Recommendations

- Ensure that pre-service training for resource families includes a module on the financial aspects of providing foster care, including board payment rates, Medicaid, clothing vouchers and reimbursement processes and transportation reimbursement. A sample travel voucher should be given to new resource parents during this segment.

- Streamline the travel voucher system in State Office to reimburse foster parents, removing any unnecessary points of contact.

- Produce a statewide newsletter to inform all resource families of training opportunities, resources, support groups, new policy, and so forth.

## MSA Requirements

- MSA (II.A.7.a) requires that all licensed resource families (regardless of whether they are supervised directly by DFCS or by private providers) receive at least the minimum reimbursement rate for a given level of service as established pursuant to the MSA.

  o  Performance: 98 percent

  o  Monitor's Notes: Two data reports were produced for this requirement, however only one of the reports was analyzable by the monitors.

- MSA (II.B.2.i & II.B.2.q.9 (P4) or II.B.2.p.14 (P3)) requires by the end of P4 (P3), 60% (40%) of children placed in a new placement during the period shall have their currently available medical, dental, educational, and psychological information provided to their resource parents or facility staff no later than at the time of any new placement during the period.

  o  Performance: 20 percent

  o  Monitor's Notes: Data provided assesses whether information is available within 15 days of placement not at the time of placement.

EXHIBIT A

# Appendix D. Estimate of Per-Child Welfare Spending

- Number of Foster children are based on EOY 2011 / Expenditures are SPY 2012
  http://www.childwelfare/org/policy.org

| State | Expenditure [1] | Number of Foster Children [2] | Expenditure Per Child | Expenditure Change 2010-2012 |
|---|---|---|---|---|
| Alabama | $296,838,862.00 | 5295 | $56,400.00 | 14% |
| Alaska | $67,114,664.00 | 1829 | $36,700.00 | 14% |
| Arizona | $171,126,467.00 | 10,883 | $41,900.00 | 2% |
| Arkansas | $143,344,593.00 | 3733 | $38,360.00 | -1% |
| California | $3,328,400,317.00 | 54,646 | $61,500.00 | 18% |
| Colorado | $417,713,328.00 | 6448 | $64,800.00 | -20% |
| Connecticut | $401,710,040.00 | 5011 | $150,054.00 | -2% |
| Delaware | $34,519,941.00 | 849 | $69,166.00 | 9% |
| Washington DC | $259,854,505.00 | 1879 | $131,129.00 | 7% |
| Florida | $1,007,777,725.00 | 18,769 | $63,661.00 | 2% |
| Georgia | $559,747,881.00 | 7961 | $71,553.00 | -3% |
| Hawaii | | 1172 | | |
| Idaho | $51,187,879.00 | 1394 | $37,824.00 | 1% |
| Illinois | $1,181,935,595.00 | 17041 | $44,961.00 | 8% |
| Indiana | $563,046,417.00 | 10779 | $37,406.00 | 13% |
| Iowa | $205,457,667.00 | 6334 | $46,600.00 | 8% |
| Kansas | $238,731,460.00 | 5853 | $40,700.00 | 8% |
| Kentucky | $309,075,763.00 | 6609 | $74,454.00 | -2% |
| Louisiana | $200,814,490.00 | 4331 | $54,983.00 | 26% |
| Maine | $113,464,127.00 | 1756 | $67,544.00 | -13% |
| Maryland | $543,547,754.00 | 5704 | $95,643.00 | 8% |
| Massachusetts | $379,073,868.00 | 8619 | $64,817.00 | 7% |
| Michigan | $994,414,600.00 | 13,995 | $70,300.00 | 5% |
| Minnesota | $329,721,891.00 | 4995 | $106,041.00 | 8% |
| Mississippi | $115,644,892.00 | 3597 | $31,044.00 | 5% |
| Missouri | $549,304,417.00 | 10631 | $46,735.00 | -3% |
| Montana | $48,988,120.00 | 1064 | $52,316.00 | -4% |
| Nebraska | $217,917,440.00 | 5117 | $42,586.00 | 1% |
| Nevada | $132,157,484.00 | 4634 | $54,619.00 | -38% |
| New Hampshire | $44,349,050.00 | 742 | $67,048.00 | 35% |
| New Jersey | $486,082,727.00 | 6440 | $104,310.00 | 7% |
| New Mexico | $106,310,899.00 | 1959 | $53,014.00 | 1% |
| New York | $3,023,722,310.00 | 24967 | $121,135.00 | 4% |
| North Carolina | $498,413,511.00 | 8621 | $57,343.00 | 2% |
| North Dakota | $60,117,595.00 | 1006 | $59,012.00 | -4% |
| Ohio | $1,115,000,000.00 | 12069 | $92,440.00 | 6% |
| Oklahoma | $254,260,441.00 | 8280 | $31,750.00 | 8% |
| Oregon | $449,077,801.00 | 8471 | $52,539.00 | 6% |
| Pennsylvania | $1,787,024,415.00 | 14773 | $121,072.00 | -14% |
| Rhode Island | $110,835,000.00 | 1856 | $59,742.00 | -14% |
| South Carolina | $224,328,373.00 | 3821 | $58,175.00 | -11% |
| South Dakota | $53,504,151.00 | 1427 | $39,090.00 | 7% |
| Tennessee | $324,180,200.00 | 7847 | $41,447.00 | 4% |
| Texas | $1,283,163,740.00 | 30,129 | $42,587.00 | 11% |
| Utah | $155,138,820.00 | 2701 | $54,697.00 | 12% |
| Vermont | $87,115,000.00 | 1010 | $86,271.00 | 6% |
| Virginia | $386,645,415.00 | 4844 | $140,459.00 | 0% |
| Washington | $509,883,931.00 | 9551 | $53,484.00 | 16% |
| West Virginia | $301,427,715.00 | 4475 | $67,805.00 | 5% |
| Wisconsin | $456,264,127.00 | 6547 | $70,000.00 | 4% |
| Wyoming | $37,351,181.00 | 886 | $42,161.00 | -27% |

## NOTES

[1] Total Welfare Expenditures in SPY 2012 - all Sources

[2] 2011 Foster Care Facts - # of Children in FC at end of 2011
www.adoptionnj.org - data as of 9/30/11;

* The number of foster children shown is at a particular point in time, e.g., last day of the year, while the amounts spent statewide were for all children served in foster care during the year, e.g., all the children who came into foster care and left foster care in addition to those still in care at the end of the year

* The amounts spent statewide are not only for children in foster care. The state total amounts include federal funds from Titles IV-B and IV-E, both of which are used to serve children in protection/prevention cases who are in foster care

EXHIBIT A

61

EXHIBIT A