# Olivia Y., Jamison J., et al. V. Phil Bryant, Donald Taylor, et al.

## Taylor Cheeseman

### November 27, 2018

All depositions & exhibits are available for downloading at
<www.brookscourtreporting.com>
Please call or e-mail depo@brookscourtreporting.com if you need a
**Username** and **Password.**



**Mississippi - Louisiana - Tennessee - New York**
**1-800-245-3376**

EXHIBIT C

Taylor Cheeseman 11/27/2018

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

OLIVIA Y., BY AND THROUGH HER NEXT
FRIEND, JAMES D. JOHNSON; JAMISON J.,
BY AND THROUGH HIS NEXT FRIEND,
CLARA LEWIS; DESIREE, RENEE, TYSON,
AND MONIQUE P., BY AND THROUGH THEIR
NEXT FRIEND, SYLVIA FORSTER; JOHN A.,
BY AND THROUGH HIS NEXT FRIEND,
JAMES D. JOHNSON; CODY B., BY AND
THROUGH HIS NEXT FRIEND, SHARON SCOTT;
MARY, TOM, MATTHEW, AND DANA W., BY AND
THROUGH THEIR NEXT FRIEND, ZELATRA W.;
AND SAM H., BY AND THROUGH HIS NEXT
FRIEND, YVETTE BULLOCK; ON THEIR OWN
BEHALF AND BEHALF OF ALL OTHERS SIMILARLY
SITUATED

                                        PLAINTIFFS
V.              CIVIL ACTION NO. 3:04-CV-251-TSL-FKB
PHIL BRYANT, AS GOVERNOR OF THE STATE OF
MISSISSIPPI; DONALD TAYLOR, AS EXECUTIVE
DIRECTOR OF THE DEPARTMENT OF HUMAN
SERVICES; AND BILLY MANGOLD, AS DIRECTOR
OF THE DIVISION OF FAMILY AND CHILDREN'S
SERVICES

                                        DEFENDANTS

            DEPOSITION OF TAYLOR CHEESEMAN

    Taken at the instance of the Plaintiffs at
Bradley, LLP 188 East Capitol Street, Suite 400
        Jackson, Mississippi, on Tuesday,
    November 27, 2018, beginning at 8:30 a.m.


                REPORTED BY:
        GINGER H. BROOKS, CCR #1165
        CRR, RPR, CRC, CCR, CLR, RSA

Taylor Cheeseman 11/27/2018

```
 1    APPEARANCES:

 2

 3         MARCIA ROBINSON LOWRY, ESQ.
           DAWN J. POST, ESQ.
 4         A Better Childhood, Inc.
           355 Lexington Avenue, Floor 16
 5         New York, New York 10011
           mlowry@abetterchildhood.org
 6         dpost@abetterchildhood.org

 7

                COUNSEL FOR PLAINTIFFS
 8

 9
           J. LAWRENCE JONES, ESQ.
10         KENYA KEY RACHAL, ESQ.
           Baker Donelson
11         100 Vision Drive, Suite 400
           Jackson, Mississippi 39211
12         jjones@bdbc.com
           krachal@bakerdonelson.com
13

14         WILLIAM M. SIMPSON II, ESQ.
           Office of the Governor
15         4500 I-55 North, Suite 278
           Jackson, Mississippi 39211
16         will.simpson@governor.ms.gov

17

                COUNSEL FOR DEFENDANTS
18

19
      ALSO PRESENT:  Earl Scales
20

21

22

23

24

25
```

Taylor Cheeseman 11/27/2018

```
 1                      INDEX
 2   Style and Appearances.......................1
 3   Index.......................................3
 4   Certificate of Deponent  ..................99
 5   Certificate of Court Reporter ...........100
 6                   EXAMINATIONS
 7   Examination By Ms. Lowry ...................5
 8   Examination By Mr. Jones ..................75
 9   Examination By Ms. Lowry ..................94
10                    EXHIBITS
11   Exhibit 1 Budget Request for FY ...........20
12             Ending 6/30/19
13   Exhibit 2 12/15/17 Letter from ............25
14             Dickinson to Davis
15   Exhibit 3 11/24/15 Organizational .........30
16             Analysis
17   Exhibit 4 5/25/16 Recruitment, ............32
18             Hiring and Retention Plan
19   Exhibit 5 12/20/17 Memo from ..............41
20             Cheeseman to Jones
21   Exhibit 6 House Bill No. 1600 .............48
22   Exhibit 7 January 1st, 2018, to June ......55
23             30th, 2018
24   Exhibit 8 12/18/17 E-mail from Davis ......58
25             to Dickinson
```

Taylor Cheeseman 11/27/2018

1    Exhibit 9 Affidavit of Jess ...............62

2            Dickinson

3    Exhibit 10 E-mail String ..................78

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Taylor Cheeseman 11/27/2018

```
 1                    TAYLOR CHEESEMAN,
 2    having been first duly sworn, was examined and
 3    testified as follows:
 4    EXAMINATION BY MS. LOWRY:
 5         Q.    Would you please state your name for the
 6    record?
 7         A.    Taylor Cheeseman.
 8         Q.    Have you ever taken a deposition before
 9    or have been the subject of a deposition?
10         A.    I have not.
11         Q.    Okay.  So if I ask you any questions
12    that you don't understand, please tell me, and I
13    will try to make them clear.
14         A.    Okay.
15         Q.    If you are going to answer something,
16    please make sure to answer verbally.  Don't shake
17    your head, and let's try not to speak over each
18    other as well.
19         A.    Okay.
20         Q.    Any time -- if you want a break at any
21    point during the deposition, just say so,
22    preferably after you've answered a question, and
23    then we can take one, okay?
24         A.    Okay.
25         Q.    Are you currently employed by the
```

Taylor Cheeseman 11/27/2018

```
 1    Mississippi Department of Child Protective
 2    Services?
 3         A.   Yes.
 4         Q.   And in what capacity?
 5         A.   I am Commissioner Dickinson's chief of
 6    staff.
 7         Q.   How long have you had that position?
 8         A.   Since September 15th of last year.
 9         Q.   And before that, what was your job
10    immediately prior to that?
11         A.   My prior employment?
12         Q.   Yes.  Sorry.
13         A.   I was a law clerk for Justice Dickinson
14    at the Supreme Court.
15         Q.   How long were you in that position?
16         A.   Almost five years.
17         Q.   When did Justice Dickinson take his
18    position at MDCPS?
19         A.   I believe September 18th was his first
20    day.
21         Q.   Prior to coming to MDCPS, did you have
22    any involvement with or any meetings about MDCPS?
23         A.   Yes.
24         Q.   And with whom did you have those
25    meetings?
```

Taylor Cheeseman 11/27/2018

1        A.    I had at least two meetings with Kenya
2    Rachal, legal counsel for CPS, to learn about this
3    litigation.  I had a -- meetings with Justice
4    Dickinson, himself, in terms of planning to come
5    over to -- to join CPS.  I attended a KC sponsored
6    conference with Tracy Malone and Kristi Plotner
7    who were then Deputy Commissioners at CPS.
8            Those were the -- the meetings that --
9    that immediately come to mind, and there may have
10   been -- I believe there may have been meetings
11   with -- at least one with Takesha Darby, who was
12   then Deputy Commissioner, about the budget request
13   that had just been filed with the Legislature,
14   because that one of Justice Dickinson's first
15   meetings was to appear before the Joint
16   Legislative Budget Committee.
17           I believe that's a week or two after his
18   first day, so there's at least one meeting about
19   that, and also meeting with Seth Shannon who was
20   my predecessor as chief of staff just to talk
21   about the changing positions with me coming in as
22   chief of staff and what his role would be going
23   forward.
24       Q.    And what was his role going forward?
25       A.    It's kind of a -- he was also an

Taylor Cheeseman 11/27/2018

1    attorney, it's kind of a legal counsel to the
2    commissioner and as an additional advisor to the
3    commissioner, but the more -- Justice Dickinson
4    wanted me for the more traditional chief of staff
5    role.
6        Q.    And the meeting that you had with
7    Takesha Darby, that was before you started your
8    job?
9        A.    I believe there was one before we
10   started.
11       Q.    And who else was at the meeting that you
12   had with Takesha Darby?
13       A.    I don't believe there was anyone other
14   than Justice Dickinson, myself, and Takesha.
15       Q.    And what did you discuss at that
16   meeting?
17       A.    The -- it would have been the FY 2019
18   budget request.  At that point, I believe it had
19   just been filed with the Legislative budget, and
20   was going to be presented to the Joint Legislative
21   Budget Committee, like I said, I think it was a
22   week after Justice Dickinson's first day
23   essentially to prep him for that meeting.
24       Q.    And how long did the meeting last?
25       A.    I don't recall.

Taylor Cheeseman 11/27/2018

```
1         Q.   Okay.  And did you talk at all about the
2    agency's finances at that meeting?
3         A.   In the sense that we were discussing the
4    agency's pending budget request for the next
5    fiscal year.  I don't recall any conversation
6    about finances beyond that budget request at that
7    meeting.
8         Q.   Okay.  So you were discussing the budget
9    request for the '18 or the '19 fiscal year?
10        A.   It would have been for the '19 fiscal
11   year.
12        Q.   Okay.  And then you said you also
13   discussed the budget request for the '20 fiscal
14   year?
15        A.   No.
16        Q.   I didn't understand that.  You were just
17   talking about the '19 budget request?
18        A.   Correct.
19        Q.   Thank you.  Okay.
20             So you started work about September 15.
21        A.   I believe that was my initial start
22   date.
23        Q.   Okay.  And prior to November 15th of
24   2017 -- 2017, were you part of any discussions
25   about the financial situation at MDCPS?
```

Taylor Cheeseman 11/27/2018

```
 1       A.   What do you mean by "financial
 2   situation"?
 3       Q.   Well, I mean the budget, what was being
 4   allocated, how much money you had, how much money
 5   you didn't have, anything to do with the budget?
 6       A.   The -- the budget, to use that word,
 7   conversation that was had when we initially
 8   arrived, dealt primarily with the FY '19 request
 9   which, like I said, Justice Dickinson had to
10   defend at the Joint Legislative Budget Committee
11   hearing shortly thereafter, and with the funding
12   for two particular contracts.
13            There were not -- at least not that I
14   recall specifically, any other major conversations
15   about the budgets.  Those were kind of the two
16   pressing budgetary issues that were presented to
17   us when we arrived.
18       Q.   Okay.  You said there were two
19   contracts.  What were the contracts?
20       A.   The in circle contracts.  There was one
21   with Canopy and one with Youth Villages for
22   intensive in-home services.
23       Q.   Okay.  And were there any discussions
24   about any shortfalls in the '19 budget?
25       A.   The '19 budget?  The --
```

Taylor Cheeseman 11/27/2018

```
 1        Q.   Yes, the one that was coming up before
 2   the Legislature?
 3        A.   No.
 4        Q.   Okay.  That's before November 15th?
 5        A.   Yes, because at that point, the
 6   Legislature had not addressed that budget, so
 7   there wouldn't have been shortfalls to discuss.
 8        Q.   Okay.  And so do you -- did you and/or
 9   Commissioner Dickinson, to your knowledge, have
10   any discussions with anybody about the financial
11   status of the agency and whether there were going
12   to be any difficulties with the budget?  And you
13   referred to another word.  I'm calling it budget,
14   and you've referred to it as something else, so
15   what else do you call it?
16        A.   Are you still talking about the same
17   time frame?
18        Q.   Yes, I'm talking about --
19        A.   The early months when we first arrived?
20        Q.   Yes.
21        A.   The only financial difficulty that was
22   identified, like I said, was the funding of those
23   two contracts, that essentially, they had been
24   procured without funding sources being identified
25   for those contracts.
```

Taylor Cheeseman 11/27/2018

```
 1              Beyond that, though, there were no --
 2    you know, no one came to us before that
 3    November 14th or 15th date when DHS reached out to
 4    us.  Nobody presented any concerns about budgetary
 5    shortfalls.
 6         Q.   Okay.  And then did that change?
 7         A.   Well, on November 14th and
 8    November 15th, I received notice through Kris
 9    Jones, our Deputy Commissioner of Administration,
10    that the Department of Human Services finance
11    staff had informed her that essentially we were
12    burning through our state appropriation too
13    quickly, that it was not going to last through the
14    end of the fiscal year.
15              That was the first notice I received
16    that there was some kind of financial problem for
17    the agency beyond the -- those two contracts that
18    I mentioned.
19         Q.   Okay.  And Kris Jones knew of this
20    because of what?
21         A.   Because the DHS staff reached out to
22    her.  She had a prior relationship with some of
23    the finance staff over at DHS.  They had worked
24    together in another state department, and so they
25    contacted her to kind of give us a head's up.
```

Taylor Cheeseman 11/27/2018

```
1        Q.   Okay.  And what did you learn about

2   the -- the concern that was being expressed to

3   Kris Jones?

4        A.   Well, at that point, it was just what I

5   said, it was that state funds are being exhausted

6   too quickly.  We were at that point in the middle

7   of November.  State fiscal year begins July 1, so

8   we were less than halfway through the state fiscal

9   year.

10            Our state appropriations are initially

11  given to the agency in two allotments, one-half at

12  the beginning of the fiscal year, one-half on

13  January 1.  So the pressing concern was that that

14  first allotment, the first half was almost

15  exhausted halfway through November or as of the

16  end of October I think was the most up-to-date

17  budget numbers or expenditure numbers that they

18  had..

19            And so the -- that's essentially all I

20  learned on that day, November 14th or

21  November 15th, was that we were out -- we were

22  just about out of our first allotment.  We were

23  going to have to shift state funds from the second

24  allotment to the first half.

25            We were going to have to take from the
```

Taylor Cheeseman 11/27/2018

1    second half of the year to get through the first
2    half -- the end of the first half of the year,
3    which then told me that there was a significant
4    budgetary shortfall.
5            Now, on that day, I didn't know the
6    depths of that shortfall.  There wasn't any kind
7    of, you know, hard and fast calculation of what it
8    was, but that was essentially how I learned that
9    one existed.
10       Q.   Okay.  And what did you do after you
11   learned that?
12       A.   Okay.  So beginning, middle of November,
13   I began working with Takesha Darby, who was then
14   Deputy Commissioner of Finance, at that point to
15   try to figure out how deep that hole went, you
16   know, what was the scope of the projected deficit
17   for fiscal year '18.
18            We -- there were also conversations to
19   kind of -- in, I guess, beginning around the
20   beginning of December to alert appropriate
21   parties.
22            I had a meeting, I believe, on
23   December 5th for -- with some staff from the
24   governor's office to alert them to the situation.
25   There was -- and basically, that was the effort

Taylor Cheeseman 11/27/2018

```
 1   between November 14th and 15th.
 2          And I believe December 15th, which is
 3   the date that Justice Dickinson sent a letter to
 4   John Davis, the Executive Director at the
 5   Department of Human Services, requesting support
 6   in the form of TANF or SSBG funds, which we kind
 7   of saw as one potential solution to the deficit
 8   situation we faced.
 9       Q.   So what -- did you have any
10   conversations prior to the December 15th letter
11   with John Davis?
12       A.   I did not have any prior conversations.
13       Q.   Do you know whether or not Commissioner
14   Dickinson did?
15       A.   The only conversation I know of related
16   to financial matters or related to a budgetary
17   shortfall goes back to those contracts I
18   mentioned.
19       Q.   The --
20       A.   When the two contracts -- the funding
21   concern was raised, when I believe it was Takesha
22   came to us and said these two intensive in-home
23   services contracts were procured, but funding
24   sources were not identified, our first instruction
25   to her was well, number 1, go and look and see if
```

Taylor Cheeseman 11/27/2018

```
 1   we have any funding sources that can pay for those
 2   contracts.
 3            She came back to us and said that we had
 4   the CWS grant and the PSSF grant, two, you know,
 5   smaller federal discretionary grants that could
 6   pay for some of those services but that they would
 7   not cover the entire amounts of the contract.
 8            I believe the two contracts combined
 9   were like $18 million over two years, so
10   $9 million per year in those two grants could
11   cover 5 or 6 million of the 9.
12            So I know at that time -- so this is
13   back, I guess early to mid-October, I believe
14   Justice Dickinson had a phone conversation with
15   John Davis about whether or not he could help
16   provide funding for those contracts, that 2 or
17   $3 million, but as far as I remember, the -- the
18   letter of the 15th was the first -- was the
19   initiation of conversations about DHS's
20   involvement in covering a larger budget deficit.
21       Q.   Okay.  So excuse me.  You said this was
22   about 9 million over two years?
23       A.   18 over two, 9 per year.
24       Q.   I see.  Sorry.  Okay.  And so -- and you
25   had no funding for them, for those two contracts?
```

Taylor Cheeseman 11/27/2018

```
 1        A.    Initially that was the concern, and then
 2   Takesha identified those two federal discretionary
 3   grants which could cover 5 or 6 of the 9 million
 4   per year.
 5        Q.    Okay.  You still had 3 to 5 that was not
 6   funded.
 7        A.    Yeah, something like that.  Three, 4,
 8   something in that nature.  Six of the 9, and I
 9   think the two grants total about 6.  They're about
10   $3 million each, and you have the remaining 3 on
11   the 9.
12        Q.    Okay.  And so you were talking about
13   that.  And you had no other conversations about
14   finances with Takesha Darby?
15        A.    No, I mean, I had ongoing conversations
16   beginning November 14 or 15 about trying to
17   determine what the depth of that deficit was.
18   That was -- that was every day I was walking down
19   the hall and talking to her about that as we tried
20   to work through the numbers.
21             One of the -- the substance of those
22   conversations mostly centered on the fact that
23   there was not, when we arrived, a complete
24   accounting of all of the agency's obli- --
25   financial obligations.
```

Taylor Cheeseman 11/27/2018

1          So it was not as simple as I go to
2    Takesha and say, hey, DHS says we're running out
3    of state funds, how large is our deficit?  She
4    couldn't answer that question at that point.
5          So there was a constant back and forth
6    between Takesha and myself about okay, you know,
7    here's an incomplete accounting of obligations,
8    what's missing?  Okay.
9          We've identified this contract that's
10   missing, or, you know, this contract is budgeted
11   in this amount, but we're not really going to
12   spend that amount.
13         So there was a constant back and forth
14   beginning around November 14th or 15th between
15   Takesha and myself about -- about working through
16   the agency's financial obligations to discover the
17   true depth of the projected deficit.
18       Q.   So what did you discover in addition to
19   those two contracts?
20       A.   What did I discover or --
21       Q.   In terms of obligations for which there
22   was no contract.
23       A.   What we ultimately determined was that
24   we had a projected deficit of approximately
25   $52 million, and that was, I believe, about

Taylor Cheeseman 11/27/2018

```
1    January 7th when we kind of settled on that number
2    as being the projected deficit for FY '18.
3         Q.   And did you have that documented?  I
4    mean, were you looking at papers that she had --
5    that Takesha Darby had which showed you that there
6    were obligations without income to meet the
7    obligations?
8         A.   Obligations without income?
9         Q.   Uh-huh.
10        A.   Are you saying without like, identified
11   funding sources?
12        Q.   Exactly.
13        A.   Sort of.  I mean, that's not exactly
14   right.  The problem is that with a child welfare
15   agency, with, you know, Title IV A funding being
16   the largest component of our funding or ordinarily
17   the largest component of our funding, title IV E
18   reimbursement happens on a cost reimbursement
19   basis, right?
20             You don't claim the funds until you
21   expend the funds, and you go through that constant
22   process with your claiming throughout the year.
23             So it wasn't so much that it was a
24   discovery of other contracts or other things that
25   did not have a particularly identified funding
```

1    source.

2              It was more of a process of Takesha and

3    I working through the contracts, the contracted

4    amounts, working through spending trends to that

5    point in the fiscal year to total up what we

6    expected to spend, the total amount we expected to

7    spend, deducting from that the funds available by

8    using our state fund appropriation as a certain

9    number, and a projection of federal claiming as a

10   portion of expenses, you know, so, in general, for

11   instance, you end up -- we ended up claiming

12   approximately 27 percent of our, you know, our

13   cost to federal funds, right?  So we can project.

14              Do you see what I'm saying?  It's not

15   exactly -- I can't name another thing that was

16   like the in circle contracts and say, here's a

17   contract and it doesn't have a funding source.

18              It was more of a, calculate total

19   expenditures, calculate expected available funds,

20   determine what the difference is between the two.

21        Q.   I'm going to mark this as Exhibit 1 and

22   ask you if you can identify it?

23              (Exhibit 1 marked for identification.)

24              (Off the record.)

25        Q.    (By Ms. Lowry)  Can you identify what

Taylor Cheeseman 11/27/2018

1   this is, what Exhibit 1 is?

2        A.   This is the original FY 2019 budget

3   request filed with the Joint Legislative Budget

4   Office by MDCPS.

5        Q.   Did this budget request take into

6   account income from TANF money?

7        A.   For FY 2019?

8        Q.   Yes.

9        A.   It does not.  In the special fund

10  detail, it has line items for TANF, but in the

11  requested revenue for FY 2019, there is a blank.

12           MR. JONES:  Why don't you identify the

13       page that you're looking at.

14           THE WITNESS:  It's 3-1.

15       Q.   (By Ms. Lowry)  And does it identify

16  funds from the -- and does it identify funds from

17  the Social Security block grant?

18       A.   No, it's the same situation.  Social

19  Services Block Grant is a line item on the special

20  fund detail, but in the requested revenues for FY

21  2019, there is a blank space.

22       Q.   And do you know whether that meant that

23  the budget for fiscal 2019 did not anticipate any

24  funding from those two sources?

25       A.   Yes, that would be the meaning of -- of

Taylor Cheeseman 11/27/2018

1    having those blanks.  The special fund detail is
2    supposed to identify the federal funding sources
3    that you expect to have available with projected
4    amounts, and it does not have projected amounts
5    for those funding sources.  Which --
6         Q.   Do you have --
7         A.   I was going to say, which is consistent
8    with the understanding at the time this was filed
9    that there was no formal commitment of TANF or
10   SSBG funds to MDCPS.
11        Q.   When were you looking -- sorry -- when
12   did you first look at this document?  The one we
13   marked as Exhibit 1?
14        A.   This was the document that I said was
15   the subject of the meeting with Takesha Darby
16   before we began that work with MDCPS, before my
17   official start date.
18        Q.   Did you ask about that?
19        A.   I don't know if we discussed that in
20   that particular meeting.  There were -- there was
21   an ongoing conversation with Takesha about the --
22   the history of that funding, for lack of a better
23   phrase, that -- that historically TANF and SSBG
24   had been used to offset the cost of the -- what
25   was the division of Family and Children Services

Taylor Cheeseman 11/27/2018

1    and is now the Department of Child Protection
2    Services, but there was no formal commitment of
3    those funds going forward.
4        Q.    For '19?
5        A.    Correct.
6        Q.    Do you know when there had been any
7    commitment of those funds in '18?
8        A.    No.   My understanding was that there was
9    also no formal commitment of those funds for
10   fiscal year '18 at that point.
11            Now, it ended up being used in fiscal
12   year '18 after Justice Dickinson's letter and our
13   work with DHS and the governor's office to find a
14   solution for our deficit, but at the time that
15   this was prepared and filed, my understanding was
16   that there was no formal commitment of either
17   funding source to the agency.
18       Q.    And your understanding was based on
19   what?
20       A.    Mostly what I just said, Takesha Darby's
21   descriptions of the history of the use of those
22   funds, but the fact that there had been no formal
23   commitment for those fiscal years.
24       Q.    And did you or Justice Dickinson, to
25   your knowledge, contact the previous commissioner

Taylor Cheeseman 11/27/2018

1   to ask what was up with those funds?

2       A.   Not to my knowledge.  I did not, I can

3   tell you that.  The -- but that was the subject of

4   that call related to the two contracts I mentioned

5   from Justice Dickinson to John Davis, for the

6   3 million on the back end of those contracts that

7   was unfunded, and it was the subject of the

8   December 15th letter to John Davis.

9       Q.   Okay.  So how did it happen that no one

10  called the previous commissioner to find out what

11  was happening with that money?

12      A.   Well, the previous commissioner didn't

13  control that money.  These are grant programs

14  administered by the Department of Human Services.

15           When we had questions about those funds,

16  they were directed to the Department of Human

17  Services, who controls those funds.

18      Q.   Okay.  And so at what point did anyone,

19  to your knowledge, ask John Davis about those

20  funds?

21      A.   Well, the first instance I know of is

22  the phone call from Justice Dickinson to John

23  Davis about the two contracts and asking if

24  funding would be available for the unfunded

25  $3 million portion of those contracts.

Taylor Cheeseman 11/27/2018

```
 1              The second instance is the December 15th
 2    letter from Justice Dickinson to John Davis
 3    requesting that they, essentially, I'm
 4    paraphrasing the letter a bit, but asking that
 5    they live up to their historic levels of spending
 6    of those funds on child welfare work.
 7              And then, you know, there were obviously
 8    then ongoing conversations from that letter
 9    forward determining how we were going to close out
10    fiscal year '18, how much they could make
11    available to us to cover our -- our deficit, and
12    that was an ongoing conversation with -- with the
13    Department of Human Services.
14              (Exhibit 2 marked for identification.)
15         Q.   (By Ms. Lowry)  I would like to show you
16    another letter?
17              MS. LOWRY:  And we will have that marked
18         as Exhibit 2.
19              MR. JONES:  Is this the 12/15 letter?
20              MS. LOWRY:  Yes.
21         Q.   (By Ms. Lowry)  So if you can take a look
22    at it.
23         A.   Okay.
24              MR. JONES:  Just a point of
25         clarification, is the highlighting your
```

Taylor Cheeseman 11/27/2018

```
 1          highlighting or was it produced that way?
 2                MS. LOWRY:  It's my highlighting.
 3                MR. JONES:  Okay.
 4                THE WITNESS:  (Examining.)  Okay.
 5          Q.   (By Ms. Lowry)  And is this the letter you
 6     were referring to?
 7          A.   Yes, this is the December 15th letter
 8     from Justice Dickinson to Mr. Davis.
 9          Q.   Okay.  And did you have any role in
10     drafting this letter?
11          A.   I'm sure I reviewed it or may have
12     proposed language to be included.  I can't recall
13     specifically to what degree.
14          Q.   Okay.  And in this letter -- so you
15     don't remember whether you or Dr. -- Commissioner
16     Dickinson did this -- wrote this letter; is that
17     right?
18          A.   It is -- this may sound funny, comes
19     from five years being his law clerk.  The style is
20     his writing, not my writing, I can tell you that.
21     But I'm sure I was involved in the preparation of
22     the letter.  I just can't tell you to what degree
23     how much of the language is mine.
24          Q.   Okay.  But you saw it before it went
25     out?
```

Taylor Cheeseman 11/27/2018

```
 1        A.    Yes.
 2        Q.    Okay.  All right.  In this letter, there
 3   are questions raised, and one of the things it
 4   says on the second page is the failure to get
 5   extra money -- and this is a quote -- "This also
 6   will prevent us from compliance with numerous
 7   requirements of the Federal Court order in the
 8   Olivia Y. litigation."
 9        A.    Okay.
10        Q.    Okay.  And since you in some way
11   participated in the drafting of this letter, what
12   were you referring to there?  Well, you and
13   Commissioner Dickinson.
14        A.    I'm trying to separate, you know, what I
15   know in hindsight from what I knew at the time the
16   letter was being drafted, but I'm -- I would
17   expect that, first and foremost, we were referring
18   to the fact that with a significant budget
19   deficit, we were going to have to curtail our
20   hiring of caseworkers, which obviously has an
21   impact on our ability to comply with the caseload
22   deliverable and the settlement agreement.
23             There also were implications for the
24   CCWIS project, and while that wasn't a deliverable
25   that was due, but the financial constraints were
```

Taylor Cheeseman 11/27/2018

```
 1    going to curtail work on it for the time being.
 2              Those are the two things that I recall
 3    specifically as being implications of the -- the
 4    funding shortfall on Olivia Y.
 5        Q.   And were there any other issues with
 6    regard to Olivia Y.?
 7        A.   Affected by the funding, by the budget
 8    shortfall?
 9        Q.   Yes; uh-huh (affirmative response).
10        A.   Not -- not that I can say with
11    certainty.  Those are the two I know for sure.
12        Q.   Not that you can say with certainty, but
13    were you concerned about the implications for the
14    operation of the agency?
15        A.   Certainly, in some sense.  I mean,
16    the -- I don't know -- certainly a funding
17    shortfall has a detrimental impact on the agency.
18              There are impacts on, for instance,
19    moral, right?  The staff doesn't like to hear that
20    the agency doesn't have enough money.  There can
21    be impacts on -- although I think this has largely
22    been avoided -- conceivably, at this point, when
23    we were looking at being $52 million short, you
24    could have impacts on the delivery of services.
25              Now, fortunately, I think we were able
```

Taylor Cheeseman 11/27/2018

```
 1    to avoid that with the money that was found to
 2    fill the budget shortfall, but yes -- but
 3    certainly when we were looking at a potential
 4    budget shortfall of $52 million and the prospect
 5    of dealing with that budget shortfall solely with
 6    $52 million in cuts, that would be catastrophic to
 7    the agency.
 8        Q.   What about implications for the services
 9    to children?
10        A.   I would say that if we had -- if we had
11    had to cut our way to a balanced budget, to cut
12    $52 million out of half of a fiscal year, that
13    would have had a catastrophic effect on services.
14    Now, like I said, fortunately, we were able to
15    avoid that.
16        Q.   So the only provisions you were
17    specifically concerned about were the caseload and
18    the CCWIS work; is that right?
19            MR. JONES:  I object to the form of the
20        question.  I don't think that's what he said.
21            MS. LOWRY:  Can he answer?
22            MR. JONES:  Certainly.  I'm not
23        instructing him not to answer.
24            THE WITNESS:  I'm just -- those were the
25        specific Olivia Y. concerns, in terms of
```

Taylor Cheeseman 11/27/2018

```
1          specific concerns about Olivia Y.
2          deliverables, those were the two most obvious
3          or most direct concerns tied to the funding
4          shortfall.
5                  MS. LOWRY:  Let's mark this as
6          Exhibit 3.
7                  (Exhibit 3 marked for identification.)
8          Q.   (By Ms. Lowry)  And let me ask you if you
9      can identify this?
10         A.   (Examining.)  I believe this is a 2015
11     analysis of what was then the Department of Human
12     Services, Child Welfare Services by Public
13     Catalyst.
14         Q.   And have you read this before?
15         A.   Yes.
16         Q.   I'd like to direct your attention to
17     pages 16 and 17 in the report.
18                 And starting at the bottom of page 16 --
19         A.   Okay.
20         Q.   -- it says, "To achieve positive
21     outcomes for children and families, it is critical
22     that Mississippi have a competent, committed,
23     trained and resourced child welfare workforce."
24                 And going up into 17, "The first order
25     of business must be the creation and
```

Taylor Cheeseman 11/27/2018

```
 1    implementation of a comprehensive, dynamic plan to
 2    achieve manageable caseloads for staff within one
 3    year."
 4              And this is in a document dated 2015.
 5              Do you remember that statement?
 6         A.   I mean, I -- not something that I, you
 7    know, have committed to memory, but I certainly
 8    see that it is here.
 9         Q.   Okay.  And do you agree with that
10    statement?
11         A.   Not totally.
12         Q.   I see.  So how else do you provide
13    services without having a competent, committed,
14    trained, resourced child welfare workforce?
15         A.   I agree with that portion of the
16    statement.
17         Q.   So you don't -- do you disagree with the
18    time period?
19         A.   No, I disagree with the -- and not
20    totally, but I think that there is a gross
21    oversimplification in the emphasis on achieving
22    manageable caseloads.
23         Q.   So how do you think there -- where do
24    you disagree in terms of achieving manageable
25    caseloads?
```

Taylor Cheeseman 11/27/2018

```
 1         A.    I don't think -- and, once again, this
 2   is more of a hindsight.  If I'm reading this in
 3   2015, maybe things were different, that was before
 4   my time.
 5              But I don't think that the agency was as
 6   far from manageable caseloads as was believed at
 7   this time, as seen by the fact that positive
 8   outcomes have been achieved on a lot of the
 9   deliverables of the Olivia Y. and in terms of
10   outcomes for kids and families in the system,
11   despite the fact that caseload compliance doesn't
12   reach the levels the settlement agreement says it
13   should.
14              MS. LOWRY:  Let's mark this as
15         Exhibit 4.
16              (Exhibit 4 marked for identification.)
17         Q.   (By Ms. Lowry)  Let me ask you if this
18   is a document, Exhibit 4, is a document you've
19   seen before?
20         A.    I believe I have seen this document
21   before.
22         Q.   Okay.  So this document concludes that
23   there -- that caseload limitations are important
24   and specifies how many additional workers are
25   necessary to just generally sum up what this does,
```

Taylor Cheeseman 11/27/2018

```
 1    and this is written by the Department, itself,
 2    right?
 3         A.    I -- I suppose.  I wasn't involved in
 4    the creation of this document.
 5         Q.    Understood.
 6         A.    I can't speak to where it came from.
 7         Q.    Understood.
 8               I'm just looking at the title page, and
 9    the title page says it was done by David Chandler,
10    Commissioner, Department of Child Protection
11    Services.
12         A.    Yes.
13         Q.    Okay.  So that was the Department's
14    position in 2016 at least; is that right?
15         A.    Correct.
16         Q.    Okay.  So how do you think that services
17    can be provided without an adequate workforce
18    then, without manageable caseloads?
19         A.    I'm not saying that services can
20    provide -- be provided without an adequate
21    workforce.  I disagree with the assessment that
22    there may be an inadequate one.
23         Q.    Okay.  So you think that the current
24    caseload --
25         A.    At least now.  I mean, I can't speak to
```

Taylor Cheeseman 11/27/2018

1    2016 or 2015 because I wasn't around in 2016 or

2    2015, but I -- in terms of delivering positive

3    outcomes, we are seeing positive outcomes in this

4    state with the workforce we have.

5         Q.   So you think that you can start with the

6    workforce you have and move backwards and say the

7    workforce is now adequate because you're getting

8    positive outcomes?

9         A.   I'm saying that I judge a child welfare

10   system by the outcomes it produces.  Now,

11   obviously, a competent workforce is a necessary

12   component in producing those outcomes.  Right now,

13   we're by no means perfect, but our system is

14   producing some really great outcomes.

15        Q.   And this is a system which is now, I

16   think currently, as of last night, at 53 percent

17   compliant with the caseload standards; is that

18   right?

19        A.   Yes.

20        Q.   Okay.  So you think that it's bound to

21   the Department to maintain caseloads at that

22   standard?

23        A.   I think we may have bad caseload

24   standards.

25        Q.   Okay.  So you disagree with the RHR?

Taylor Cheeseman 11/27/2018

```
 1        A.   I -- all I can say is this, like I just
 2   said, I judge a system by its outcomes.  If you're
 3   achieving the outcomes, then obviously the
 4   workforce is capable of doing the work.
 5        Q.   So then is it the case that you don't
 6   think the caseload standards are necessary?
 7        A.   I don't think they're the right measures
 8   of caseloads.
 9        Q.   What do you mean by the "right
10   measures"?
11        A.   I don't think compliance with a strict
12   hard caseload cap is the right way in the child
13   welfare arena to evaluate caseloads.
14             I think, certainly, it is good that we,
15   as an agency, produce caseload data, right, and
16   certainly it is necessary that we know how much
17   work is out there.
18             Certainly it is necessary that as we do,
19   we make hiring decisions based on workload need,
20   right, where there's more work, you need more
21   staff, where there's less work, you need less
22   staff.
23             With that said, the reality, the nuance
24   of child welfare work in the real world is too
25   complex to be reduced to a hard cap.  Every
```

Taylor Cheeseman 11/27/2018

1    caseload -- every caseworker must be below this

2    line.

3              That does not lead to quality

4    management.  In fact, it leads to bad management

5    from a practice perspective because, you know, if

6    strict compliance with a cap is the focus, well,

7    you ignore the complexity -- you are told to

8    ignore the complexities of particular cases.

9              You are told to ignore the capacities

10   of particular workers, right?  You have a

11   particularly exceptional CPS caseworker.  They

12   have the capacity to carry, say, 15 cases instead

13   of the 14 that is the line.

14             It's an inefficiency in terms of

15   management to not give them that 15th case, but

16   because you're dealing with a hard cap, you're

17   obligated to do so.  It's just a -- it's an

18   inartful way to look at caseloads.

19             So a better practice is to, once again,

20   have accurate caseload data, allow your workload

21   data to guide hiring -- staffing decisions where

22   you hire people, where you transfer people, to

23   have certainly accurate baselines for caseload

24   standards or -- or guidelines for caseload

25   standards in the sense of this is the amount of

Taylor Cheeseman 11/27/2018

1    work that your average caseworker can handle, you
2    don't want supervisors in the field that are
3    making actual case decisions, you certainly don't
4    want them to be just, you know, shooting in the
5    dark.
6            You want to give them some kind of
7    reason baseline, based on time studies, based on,
8    you know, work studies.  But at the end of the
9    day, those need to be flexible standards, because
10   each case -- you can have 10 different foster care
11   cases, and each one of them requires a different
12   amount of time and work because of the
13   complexities of the family, complexities
14   associated with a child's particular needs, and
15   the same thing is true on the side of the
16   caseworkers.
17           You know, each and every one of your
18   caseworkers, while they all may be competent,
19   people have different capacities.  There are
20   exceptional people, and exceptional people's
21   exceptional abilities should be utilized by the
22   agency, and so while caseload standards, caseload
23   guidelines are good, deviation from those
24   standards is necessary based on those ground
25   factors that only a supervisor making case

Taylor Cheeseman 11/27/2018

```
 1   assignments can -- can make.
 2            I mean, there -- it's not reducible to
 3   mathematical certainty, I guess is what I'm
 4   saying.
 5       Q.   Okay.  So then I would take it that you
 6   disagree with the provisions in the STRO and in
 7   the second MSA requiring 90 percent compliance
 8   with caseload standards?
 9       A.   To the extent they function as a hard
10   cap, yes, I do.
11       Q.   And tell me what your background is in
12   child welfare before coming to MDCPS?
13       A.   Well, I'm not a social worker.  I'm a
14   lawyer.  While I was in law school, I worked in
15   two different youth courts in this state actually
16   trying these cases.
17            I both -- had the opportunity to work
18   both on the side of the county prosecutors that
19   present the petitions and pursue an adjudication
20   and on the side of the guardians ad litem
21   representing the child's interest in those cases.
22            While at the Supreme Court, we had a
23   handful of youth court and child welfare-related
24   cases that came up to the court on appeal, so
25   that's the --
```

```
 1        Q.   I see.  So based on -- so I'll withdraw
 2   that.
 3             And do you know whether Commissioner
 4   Dickinson agrees with your position on -- with
 5   regard to those provisions of the settlement
 6   agreement and the STRO?
 7             MR. JONES:  And the specific provision
 8        you're relating to is the 90 percent cap?
 9             MS. LOWRY:  That's it.  That's correct.
10        That's it.
11             THE WITNESS:  I believe he does, but
12        certainly you should ask him.
13        Q.   (By Ms. Lowry)  I will.  I will.  Okay.
14             And so I would gather from that, then,
15   too, that you disagree with what's stated in the
16   recruitment, hiring and retention plan which we have
17   marked as Exhibit 4.  2?  3?  4.  Exhibit 4.
18        A.   What specifically in --
19        Q.   It talks about exactly how many
20   additional workers are necessary to hire in order
21   to come into compliance with the 90 percent
22   caseload cap.
23        A.   Well, I would -- I can't say that I
24   agree or disagree with that.  I mean, that is
25   something that -- necessary staffing levels change
```

Taylor Cheeseman 11/27/2018

```
1    every day.  Cases come in, cases go out.  You
2    know, there are -- so I can't speak to how many
3    caseworkers were necessary on May 25th of 2016 to
4    achieve 90 percent compliance.
5         Q.   Would you disagree with something that
6    was proposed -- that is planned -- was prepared
7    now by MDCPS that calculated these same numbers as
8    of a current time, current date?
9              Do you want me to ask the question --
10        A.   Yeah.  Would you rephrase the question?
11        Q.   So if MDCPS did a new calculation on how
12   many workers were necessary to bring on-board in
13   order to achieve 90 percent of compliance which
14   would have 90 percent, not a hundred percent, but
15   90 percent of workers with caseloads within a
16   limit, particular limit, you would disagree with
17   that?
18        A.   I -- I wouldn't disagree with the
19   numbers, if that's what you're asking.
20        Q.   You would just --
21        A.   I disagree with the deliverable.  I may
22   not -- certainly I wouldn't --
23        Q.   So you would just take it out of the
24   settlement agreement, then, right?
25        A.   That's not up to me, but yes, if it were
```

Taylor Cheeseman 11/27/2018

```
 1   up to me, I would.
 2        Q.   Okay.  Thank you.
 3             MR. JONES:  And again, just for clarity,
 4        you're referring to the 90 percent hard cap?
 5             MS. LOWRY:  That's correct.  That's
 6        correct.  That's all I'm referring to.
 7        Q.   (By Ms. Lowry)  And so were you involved
 8   with Commissioner Dickinson making decisions about
 9   how to allocate the money that had finally been
10   appropriated for MDCPS for fiscal '19?
11        A.   Yes.
12        Q.   And were you involved with the -- I'll
13   withdraw that.
14             MS. LOWRY:  Mark this as Exhibit 5.
15             (Exhibit 5 marked for identification.)
16        Q.   (By Ms. Lowry)  Are you familiar with the
17   document we've marked as Exhibit 5?
18        A.   I am.
19        Q.   Okay.  Let me -- and this talks about a
20   hiring freeze; is that correct?
21        A.   (Examining.)  Yes, I mean -- it's a --
22   well, it does not refer to a hiring freeze.  It
23   refers to a freeze on promotions and raises, and a
24   limitation on hiring to essential personnel and
25   replacing separations.
```

Taylor Cheeseman 11/27/2018

```
 1        Q.   Okay.  So that means that people should
 2   not hire with the exception of "express approval
 3   being granted by Commissioner Dickinson or
 4   myself," and that refers to you?
 5        A.   Correct.
 6        Q.   Okay.  And is that still in effect?
 7        A.   We do not personally approve every hire.
 8   What we have established since this time, the
 9   agency now has a practice on Tuesday of every
10   week, there is a hire -- what we call a hiring
11   priorities meeting.
12             At this meeting, every proposed
13   personnel transaction, a hire or a transfer, is
14   considered by our leadership in the field, up to
15   the level of Deputy Commissioner, so the people
16   that are managing caseload carrying staff, whether
17   it be on the frontline side, the licensure side,
18   the adoption side, and so the hiring decisions are
19   made by that group at that meeting as justified by
20   workload.
21             Now, the limitation to replacing
22   separations from the agency is still in effect,
23   but --
24        Q.   So that means that only people -- only
25   people who have been with -- who have worked for
```

Taylor Cheeseman 11/27/2018

1    the agency and have left can be replaced; is that

2    right?

3         A.    Correct.  We're not growing the total

4    staff.

5         Q.    Okay.  All right.

6         A.    The -- now, that is mostly true, except

7    in the sense that there have been some changes in

8    position.  So, for instance, as we have

9    reorganized kind of the executive leadership of

10   the agency.  We will be hiring a Chief Information

11   Officer.  Uniformly, we had a Deputy Commissioner

12   of IT but --

13        Q.    In terms of caseworkers, this is

14   generally true?

15        A.    Yes, you need a separation to add a

16   caseworker --

17        Q.    So, you can't increase the size of the

18   caseworker staff?

19        A.    Not quite.  You can't increase the cost

20   of the caseworker staff.  Now, if you have -- for

21   instance, hypothetically, you had a separation

22   that in --

23        Q.    "Separation" means somebody leaves?

24        A.    Leaves the agency, could be voluntarily,

25   involuntary, whatever.  Some were terminated, they

Taylor Cheeseman 11/27/2018

```
1   retire, they resign, they transfer to another
2   state agency, whatever the reason for the
3   separation.  Say, for instance, you had a
4   supervisor --
5        Q.   No, you don't have to give me an
6   example.  I understand what that means.  So you
7   can -- if somebody is cheap -- is much cheaper --
8        A.   Exactly.
9        Q.   -- then you can bring in perhaps
10  one-and-a-half people?
11       A.   Exactly.  It's the dollar amount that's
12  stagnant, not the number of people.
13       Q.   What happened to the salary increase
14  that we have heard Commissioner Dickinson talk
15  about at -- in some instances?  What -- is that
16  prohibited as well?
17       A.   No, that occurred.  That was a
18  realignment of base salaries by the state
19  personnel board that took effect I believe it was
20  January 1 of this year.
21       Q.   Okay.  And is that the same increase in
22  salaries that Commissioner Chandler had started?
23       A.   My understanding is that there have
24  actually been two, two separate increases.  This
25  was -- this was precipitated by a recommendation
```

Taylor Cheeseman 11/27/2018

```
 1    from the State Personnel Board.  One of their
 2    functions is that they make -- they study and make
 3    recommendations about what appropriate salary
 4    levels are across state government.
 5             Early, I can't remember exactly when,
 6    but early in our time with the agency, we received
 7    a notice from the State Personnel Board that they
 8    were recommending increases to base salaries
 9    for -- I think for all of our position classes
10    that would have -- these realignments would have
11    been planned to occur on, I guess, July 1 of this
12    year when the start of the new fiscal year.
13             However, Justice Dickinson in an effort,
14    to you know, get a positive impact for the agency
15    as fast as he could, made a request to implement
16    those realignments early, which is what led to
17    them being implemented January 1.
18        Q.    Okay.  And when were they supposed to be
19    put into effect?
20        A.    Would have been -- ordinarily, they
21    would -- the change would occur with the turnover
22    of the state fiscal year.
23        Q.    I see.
24        A.    On July 1.
25        Q.    I see.
```

Taylor Cheeseman 11/27/2018

```
 1         A.    So six months early.
 2         Q.    Okay.  So he put something into effect
 3   six months earlier than it otherwise would have
 4   been --
 5         A.    And it's not necessarily -- the fact
 6   that the recommendation was made was not a
 7   guaran- -- as I understand, I don't work for the
 8   State Personnel Board -- is not a guarantee that
 9   it would have happened on July 1st, but just
10   their -- at that point, their recommendation.
11         Q.    But you expect the workforce to stay at
12   substantially the same size then, with the
13   exception of somebody more expensive leaving and
14   maybe getting some extra income because you can
15   hire somebody less expensive --
16         A.    Correct.
17         Q.    -- is that -- okay.
18               And so when choices had to be made
19   because of the budget, it was pretty easy for you
20   to -- or did you recommend to Commissioner
21   Dickinson that he not put into effect the RHR
22   provision, or how did that actually happen?
23               That is the budget was lower than you
24   expected it to be.
25         A.    Uh-huh (affirmative response).
```

Taylor Cheeseman 11/27/2018

```
 1          Q.   You did not get the money you asked for.
 2          A.   Uh-huh (affirmative response).
 3          Q.   And you had to make some cuts.
 4          A.   Correct.
 5               MR. JONES:  Are you referring now to
 6          fiscal year '19?
 7               MS. LOWRY:  '19.
 8          Q.   (By Ms. Lowry)  And so it must have been
 9     pretty easy, then, to recommend that the RHR not be
10     implemented given your view of it?
11          A.   I don't really have a view of the RHR.
12     I have a view of the deliverable in the
13     litigation.
14          Q.   You don't think that the case
15     limitations are, for the most part, a good idea?
16          A.   Not in the way that they are applied,
17     no, not as a hard cap.
18          Q.   Okay.  Thank you.
19          A.   But that's --
20          Q.   And in fact, for the 2020 budget -- have
21     you -- has the agency yet submitted a budget to,
22     what is it, the Legislative Budget Office?
23          A.   Budget Office?
24          Q.   Yeah.  For 2020?
25          A.   Yes, a request was submitted in
```

Taylor Cheeseman 11/27/2018

```
 1   September or late August.
 2        Q.   And are you asking for sufficient
 3   funding to meet the requirements of Olivia Y. with
 4   regard to caseloads in that budget?
 5        A.   Yes, I believe so.
 6        Q.   So you are try- -- you are seeking to
 7   implement the RHR for 2020?
 8        A.   Until we are relieved of that caseload
 9   obligation, we are seeking sufficient funding to
10   comply with it.
11        Q.   Okay.  I'd like to call your attention
12   to another document, which we will mark as
13   Exhibit 6.
14             (Exhibit 6 marked for identification.)
15        Q.   (By Ms. Lowry)  And I'd like to ask you
16   if you can identify this document?  And I call
17   your attention to section 4, which is on Page 2 of
18   the document.
19        A.   (Examining.)
20        Q.   Okay.  So now you've looked at this, and
21   the section 4 says -- and this is House Bill 1600,
22   and this is for fiscal -- appropriation for fiscal
23   2019.
24             And this says, "In the funds
25   appropriated under the provisions of section 1 of
```

Taylor Cheeseman 11/27/2018

```
 1   this act authorize for expenditure under the
 2   provisions of section 2 of this act, not more than
 3   the amount set forth below shall be expended.
 4   However, notwithstanding any other provisions in
 5   this act, it is the intent of the Legislature that
 6   any amount of funds and positions may be
 7   transferred between the Department of Human
 8   Services and the Department of Child Protection
 9   Services in order to comply with the agreements
10   made by the State of Mississippi with the United
11   States District Court in reference to the Olivia
12   Y. lawsuit."
13           Right?  That's what it says?
14       A.   Yes.
15       Q.   And was that, in fact, complied with?
16   In other words, you -- the agency has not, as I
17   understood it, complied with the section of the
18   second MSA and the STRO that require limited --
19   that require that 90 percent of caseloads should
20   be within a certain limit, which is one of the
21   agreements made by the State of Mississippi with
22   regard to the Olivia Y. lawsuit.
23           So how -- did you seek to have more
24   funds -- more positions transferred from the
25   Department of Human Services so that you could
```

```
 1   comply with that agreement?
 2        A.   We requested $23 million more than they
 3   appropriated in this appropriations bill.
 4        Q.   Right.  But then after the bill
 5   passed -- and this is the bill that went to the
 6   Governor; is that correct?  This House Bill 1600
 7   was sent to the Governor.  On the first page.
 8        A.   Yes.
 9        Q.   Okay.  So the intent of this legislation
10   appears to be compliance with the Olivia Y.
11   lawsuit.
12        A.   Correct.
13        Q.   Okay.  And yet you didn't comply with
14   it.
15        A.   Because they didn't give us enough money
16   to comply.
17        Q.   Okay.  But there were other things you
18   could have cut in the budget, were there not?
19        A.   I don't believe so.
20        Q.   There was nothing else?
21        A.   No.
22        Q.   So your budget was how much ultimately
23   for '19?
24        A.   Approximately $98 million in general
25   funds and a $12 million capital expense
```

Taylor Cheeseman 11/27/2018

```
 1    appropriation.  That's our state funding.
 2         Q.   And what was your total funding?
 3         A.   Probably -- once again, it depends on
 4    IV E, claiming over the course of the year, but
 5    approximately $200 million, $190 million.
 6         Q.   Okay.  And so you -- how much would it
 7    have cost you to come into compliance with the
 8    caseload provisions of the STRO and the second
 9    MSA?  How much extra would it have cost you to
10    come into compliance?
11         A.   The projection that is included into our
12    2020 budget request is an additional $7 million in
13    salaries.
14         Q.   Okay.  And that's add-on.  That's not --
15    I'll withdraw that.
16              That's not the total amount of salaries
17    for caseworkers.  That's just the additional cost
18    of caseworkers?
19         A.   Correct.  That's the additional money
20    needed to hire additional caseworkers and
21    supervisors.
22         Q.   Okay.  And so it's your testimony that
23    there was no place else in the budget you could
24    find $7 million to come into compliance?
25         A.   I believe that everything we can live
```

Taylor Cheeseman 11/27/2018

1  without has been cut.

2      Q.   Okay.  And did you at any point, to your

3  knowledge, ask the governor for that extra

4  $7 million?

5      A.   The governor is -- as far as I know, and

6  I -- you know.

7      Q.   I'm just asking what you know.

8      A.   My understanding has always been that he

9  has advocated for us to receive the money that we

10  have requested from the Legislature and from

11  whatever source it may be available.

12      Q.   So did you go running back to the

13  Legislature when you saw this legislation and say

14  but we can't comply, because we can't find

15  $7 million in the budget for the caseloads?

16      A.    I warned them on the front end.  The

17  week before they passed this bill, I told them,

18  that if they did not give us the money we were

19  requesting, that we would not be able to comply.

20      Q.   So this is a provision of the

21  Legislature in which the Legislature expressed its

22  intent, but you are not in compliance with the

23  intent?

24      A.   Can't.  We are not capable of being in

25  compliance.

Taylor Cheeseman 11/27/2018

```
 1        Q.    Because there's not $7 million elsewhere
 2   in the budget that you could have cut that?
 3        A.    That we could live without, no.
 4        Q.    Did you ask the DHS to switch positions
 5   to you so that you could comply?
 6        A.    DHS, before we got to the $23 million
 7   more that we needed in state funds had already
 8   committed the $30 million that they believed they
 9   could commit.  My understanding is that that's
10   what they believe they are capable of committing
11   to us.  That's --
12        Q.    When an appropriate -- the legislative
13   appropriation to CMDCPS was for a lump sum
14   appropriation; is that right?
15        A.    Correct.
16        Q.    And in a lump sum appropriation, things
17   can be moved around by the commissioner; is that
18   correct?
19        A.    Yes, the $7,994,298 can be spent however
20   you would like it to be spent.
21        Q.    Okay.  So the commissioner could have,
22   in fact, had he thought there was not something
23   that was so important as you testified, because
24   you couldn't find $7 million elsewhere, he could
25   have, in fact, decided that something else was
```

Taylor Cheeseman 11/27/2018

1    less important, and this was more important and
2    could have, in fact, funded the RHR?
3            I think that was clear.  I can read it
4    back to you if you would like.
5        A.   You're asking he can spend the money on
6    what he wants to spend the money on?  Is that your
7    question, essentially?
8        Q.   That's a good way of restating it, yes.
9        A.   Yes.
10       Q.   Do you know how much money you -- I'll
11   withdraw that.
12           Did you -- do you know whether the
13   commissioner ever asked the governor to go into
14   the rainy day -- to a fund that's called the
15   "rainy day fund," which is the working cost
16   stabilization reserve to get the money for
17   compliance with the federal court order?
18       A.   I -- I don't know specifically about
19   whether that -- that fund had been discussed, but
20   he has had ongoing conversations with the governor
21   about finding funding for our obligations from
22   whatever source it's available.
23       Q.   Right.  But you thought this one was
24   okay to not focus on?
25       A.   I don't know that he didn't.

Taylor Cheeseman 11/27/2018

```
 1        Q.   Okay.
 2        A.   I'm just saying I don't know that, you
 3   know, that fund was discussed by name.
 4        Q.   Okay.  How much would you say that
 5   Commissioner Dickinson relies on you for advice?
 6        A.   For advice?
 7        Q.   Well, for advice, recommendations with
 8   the agency functioning.
 9        A.   I think he seeks my input on most
10   things.  That's -- if that's what you're asking.
11   I mean, that's --
12             MS. LOWRY:  Let's mark this as
13        Exhibit 7.
14             (Exhibit 7 marked for identification.)
15        Q.   (By Ms. Lowry)  Are you familiar with the
16   document I just showed you?
17        A.   Yes.
18        Q.   Okay.  So this says that it is -- it was
19   headed January 1st, 2018, to June 30th, 2018.
20             Did Commissioner Dickinson submit a
21   revised budget request to the Legislature for the
22   2019 appropriation?
23        A.   Yes.
24        Q.   And is this it?
25        A.   No.
```

Taylor Cheeseman 11/27/2018

```
 1        Q.   So what did it look like?
 2        A.   I mean, it would be similar in the sense
 3   that it would be spreadsheets, but this -- the
 4   document that you've marked Exhibit 7 is one
 5   calculation, and there were many.
 6             As we talked about, there was that
 7   ongoing process between Takesha and myself.  This
 8   is one calculation of the FY 2018 deficit.
 9        Q.   This is not -- this is not an amendment
10   to the budget request?
11        A.   No, that is not what this document is.
12        Q.   Okay.  What did the amendment look like?
13        A.   It was a series of spreadsheets.  There
14   was a cover page that was the state's major budget
15   item categories with a projected cost, a -- and
16   then the projected state and federal fund portions
17   of that cost that then totaled out to the state
18   fund appropriation we believed we needed and
19   addressed the change in that number for the
20   $30 million commitment from DHS, as well as the --
21   I believe there were line item calculations of
22   the -- or not calculations, but line item
23   statements of the contractual obligations that the
24   agency had and the subsidies, loans and grants
25   that the agency has.  But I mean, it was another
```

Taylor Cheeseman 11/27/2018

```
 1    spreadsheet.  It was similar in nature.
 2         Q.   Similar in nature to what, to this
 3    document?
 4         A.   Yes.  The cover page would have been
 5    similar, not -- certainly not identical, but --
 6         Q.   And would it have been for the full
 7    year?
 8         A.   Yes.
 9         Q.   And did it provide for any TANF funding
10    or S- -- SSBG funding?
11         A.   We did not break out TANF versus SSBG,
12    but it reflected the $30 million commitment from
13    DHS that they had made it.
14         Q.   Now, in the letter of December 15, 2017,
15    from Jess Dickinson to John Davis, which we marked
16    as Exhibit 2 -- as Exhibit 2, did you get -- to
17    your knowledge, did Commissioner Dickinson get a
18    response?
19              The end of the letter, it says, "Given
20    this urgency in the impending legislative session,
21    I am respectfully requesting that you please let
22    me know as soon as possible the amount of TANF and
23    SSBG funds you will provide CPS in this fiscal
24    year and the next."
25         A.   I mean, certainly there was a response
```

Taylor Cheeseman 11/27/2018

```
 1    of some form, I believe.  You know, the initial
 2    response from DHS was to the effect that they were
 3    committing to helping and that they would see what
 4    they could do.
 5            That then began a -- this is
 6    December 15th, so probably a month of
 7    conversations -- about how we could cover the
 8    deficit, what they could commit, what they
 9    couldn't commit, and so on and so forth.
10            MR. JONES:  What --
11            MS. LOWRY:  Are we up to 8?
12            (Exhibit 8 marked for identification.)
13        Q.  (By Ms. Lowry)  I'm going to show you
14    something we are marking as Exhibit 8.
15            MR. JONES:  And, again, just for
16        clarity, the highlight is your own?
17            MS. LOWRY:  I'm sorry?
18            MR. JONES:  The highlighting is your
19        own?
20            MS. LOWRY:  That is correct.
21            THE WITNESS:  Uh-huh (affirmative
22        response).
23        Q.  (By Ms. Lowry)  Okay.  So can you identify
24    this document?
25        A.   This is an e-mail from John Davis to
```

```
 1    Jess Dickinson, giving the response I just
 2    described on December 18th.
 3         Q.   Is this the only response to the letter
 4    of December 15, to your knowledge?
 5         A.   Yes.  There are obviously -- like I
 6    said, there were ongoing conversations then.
 7         Q.   There were ongoing conversations between
 8    Jess Dickinson and John Davis?
 9         A.   We had numerous meetings with different
10    staff at DHS and, you know, throughout the second
11    half of December and into January determining
12    what -- or they were working with them to see what
13    they could cover, you know, what funds they could
14    free up, how we got -- how far down the deficit
15    had to be cut before there would be sufficient
16    funds to pay for the remaining obligations.
17              MR. JONES:  And, Counsel, you've made a
18         specific request to determine whether there
19         was a formal response to this document, and
20         we are not aware of any other response.
21              MS. LOWRY:  Okay.
22              MR. JONES:  And I make that statement
23         only because you requested that information
24         in writing in the last few days.
25              MS. LOWRY:  Yes.
```

Taylor Cheeseman 11/27/2018

```
 1            MR. JONES:  I think that's been -- that
 2       information has been provided to you, but
 3       that's our position.
 4            MS. LOWRY:  Okay.  Thank you.
 5       Q.   (By Ms. Lowry)  This letter talks about --
 6   this letter ends with saying, "We will have a formal
 7   written response back" or this email, "We will have
 8   a formal written response back to you concerning
 9   your request for MDHS to provide $20 million no
10   later than 8:00 a.m. Tuesday, December 19th."
11            As far as you know, was there such a
12   response?
13       A.   I -- I don't remember.
14       Q.   Okay.  So I just thank you for your
15   statement, but this indicates there was a formal
16   written response but we haven't received it.
17            MR. JONES:  Well, I think that document
18       states there will be a formal response.  This
19       document is dated December 18, not
20       December 19.  And, again, you've made a
21       request for a formal response on the 19th or
22       a formal response in that time period we're
23       not aware of a formal response document.
24            MS. LOWRY:  As far as you know, there
25       wasn't a formal written response.
```

Taylor Cheeseman 11/27/2018

```
 1            MR. JONES:  That is our position.  We're
 2       not aware of a document that would meet that
 3       description.
 4            MS. LOWRY:  Okay.  I think that's a
 5       "yes."
 6            All right.  Let's take a short break.
 7            (A short break was taken.)
 8       Q.   (By Ms. Lowry)  With regard to
 9  Exhibit 2, I would like to call your attention to
10  the first paragraph of that letter and ask you
11  about a conversation -- if you know -- about a
12  conversation that Jess Dickinson had with John
13  Davis about the important role of SSBG and TANF
14  funding.  And it says, "Both of which
15  traditionally contribute to the functions for
16  which this agency is responsible.  Dr. Chandler
17  assured me that the availability of funds to meet
18  our budgetary request would not be a problem, and
19  you graciously indicated you would take care of
20  this agency because of your strong commitment to
21  child protection."
22            Do you remember any such discussions
23  that Commissioner Dickinson had with David
24  Chandler?
25       A.   One, I was not present for any such
```

Taylor Cheeseman 11/27/2018

```
 1    conversation.  The only recollection I have of
 2    any such meeting was the -- a comment that I've
 3    heard that David Chandler made when Justice
 4    Dickinson asked about the agency's budget, and the
 5    response I've always heard that David Chandler
 6    gave was, "Stop worrying about money.  You're
 7    going to have more money than you know how to
 8    spend."
 9              And that's -- but in terms of a
10    particular discussion of TANF or SSBG, not a word
11    of any.
12        Q.   And you were, yourself, present to hear
13    Chandler say that?
14        A.   No, I was not.
15        Q.   You're just repeating something you
16    heard?
17        A.   Yes, correct.
18        Q.   Okay.  And let me also ask you in --
19              (Exhibit 9 marked for identification.)
20        Q.   (By Ms. Lowry)  This is an affidavit
21    from Jess Dickinson, and I would like to ask you
22    if you're familiar with this affidavit?
23        A.   Yes, I've seen this before.
24        Q.   And did you have anything to do with the
25    drafting of this affidavit?
```

Taylor Cheeseman 11/27/2018

```
 1          A.    I did not draft it.  I reviewed drafts
 2    of it before it was filed but --
 3          Q.    Who drafted it?
 4          A.    I -- as far as I know, Justice
 5    Dickinson.
 6          Q.    Okay.  So you don't know of anybody else
 7    having drafted it.  So were you the only person to
 8    review it?
 9          A.    I don't believe so.  I believe that
10    several other people probably reviewed it,
11    including legal counsel.
12          Q.    Okay.  But you don't know for sure?
13          A.    I couldn't name every person that saw
14    it.
15          Q.    Okay.  Who are the people that you know
16    who reviewed it, just the ones that you know?
17          A.    Our attorneys, Kenya Rachal.  I don't
18    know about Larry Jones, I believe he may have, but
19    I don't know that for certain, don't recall.
20    Those are what I can say for certain.
21                I would imagine some of the other
22    executive leadership of the agency reviewed it as
23    well.  I believe they did.  I just don't recall
24    specifically.
25          Q.    Okay.  So I'd like to call your
```

Taylor Cheeseman 11/27/2018

```
 1   attention to paragraph 15 of this affidavit, and
 2   that's the second part of the paragraph says,
 3   "When I did not receive the requested budget, I
 4   again raised the issue, and was informed that
 5   MDCPS had access to large amounts of federal
 6   funds, and that sufficient funding for the
 7   agency's balance for" -- "for the agency's
 8   budget -- sorry -- "for the balance of the fiscal
 9   year would not be a problem."
10          And he's talking about the '19 fiscal
11   year, is that correct, as far as you understand
12   it?
13       A.   '18, I believe.
14       Q.   No, I think that -- '18?
15       A.   We were coming into the '18 fiscal year.
16   We were in it when we arrived.
17       Q.   Okay.  All right.  And that was the
18   fiscal year for which you said there would be
19   deficits?
20       A.   Yes, we ended up determining that there
21   was a projected deficit of $52 million.
22       Q.   And you did not participate in Judge --
23   in Commissioner Dickinson's conversation when he
24   was told that there was sufficient funding for the
25   agency's budget for the balance of the fiscal
```

```
 1   year?

 2        A.    No.

 3        Q.    Okay.  And then I want to point your

 4   attention to paragraph 16, "I again discussed the

 5   issue with the outgoing administration, and I was

 6   informed that the FY 2018 budget that the agency

 7   had submitted to the Legislature was adequate and

 8   that MDCPS would receive all the federal funds

 9   needed to cover any shortfall just as it always

10   had in the past."

11             Do you have any knowledge about what

12   that was based on?

13        A.    What what was based on?  The assertion

14   that there were sufficient federal funds?

15        Q.    Yeah.

16        A.    No, I can't say specifically what that

17   was based on, except that -- except to say that it

18   was at least based, in part, on the fact, as I

19   mentioned earlier, that there was not a complete

20   accounting of the agency's obligations.

21             If you don't know everything that you're

22   committed to spend, you obviously are going to

23   underestimate how much funding you think is

24   needed.

25        Q.    Okay.  But you didn't have direct
```

Taylor Cheeseman 11/27/2018

```
 1    knowledge of this statement?
 2          A.    I can't speak to the speakers --
 3          Q.    Yeah.
 4          A.    -- the basis of their knowledge or what
 5    they were --
 6          Q.    Okay.  Now, we talked a little bit about
 7    a salary increase that, in fact, went into -- that
 8    Commissioner Dickinson put into effect -- that
 9    went into effect in January instead of July --
10          A.    Correct.
11          Q.    -- 2018; is that right?
12          A.    Yes.
13          Q.    And was there any discussion of instead
14    using that money to make up the -- to add more
15    caseworkers as required by the STRO and the second
16    MSA?
17          A.    I -- you know, I can't name the date of
18    a specific conversation, but yes, I mean, the --
19    the question of taking that raise off the table
20    once the deficit was discovered was raised and was
21    considered, and the judgment of the agency, which
22    I think is the correct one, was that given the
23    turnover that is constant in child welfare across
24    the country, incentivizing good workers to stay
25    was more impactful for the children and families
```

Taylor Cheeseman 11/27/2018

```
 1    that we serve, and that we did not pay our workers
 2    enough without that raise to incentivize them to
 3    stay with the agency long-term.
 4         Q.   And how much money was involved in that
 5    salary increase?
 6         A.   I want to say the annual cost of the
 7    increase was approximately $3 million.  That's not
 8    in fiscal year '18, obviously, because it was
 9    coming halfway through the year, but on an annual
10    basis, it was approximately a $3 million increase.
11         Q.   So if you had, in fact, used that with
12    regards to the violation of the court order, you
13    could have gotten almost half of the additional
14    workers; is that right?
15         A.   Well, but without the raise, they may
16    not have stayed, and if they stay, you can't grow
17    the total, you know, workforce.
18         Q.   That was a guess, right?  And that was
19    based, in part, on -- and did you weigh in on that
20    decision?
21         A.   Yes.
22         Q.   Okay.  And so your judgment was that was
23    the correct use of the $3 million?
24         A.   Yes.
25         Q.   And did you base that, in part, on the
```

Taylor Cheeseman 11/27/2018

1   fact that you didn't like the caseload provisions
2   of the second MSA and the STRO?
3       A.    No.
4       Q.    It was based on?
5       A.    The fact that the state personnel
6   board -- you know, the basis of their
7   recommendations for realignment is comparison to
8   surrounding states, so essentially what the state
9   personnel board was saying was that our workers
10  were underpaid compared to surrounding states and
11  other alternative employers.
12      Q.    So, in fact, this would have been put
13  into place even if Commissioner Dickinson hadn't
14  supported it in July; is that right?
15      A.    I don't know that that's the case.  I
16  don't know that it isn't, either.
17      Q.    Okay.  And let me ask you again about
18  section 4 in Exhibit 6.  This looks like -- sorry,
19  got it?
20      A.    I have it.
21      Q.    Thank you.
22           This is potentially a prospective
23  requirement, is it not?
24      A.    A -- what is a prospective requirement?
25      Q.    Sorry.  Section 4, only talking about

Taylor Cheeseman 11/27/2018

1    section 4, it is the intent of -- I'm reading now,

2    "It is the intent of the Legislature that any

3    amount of funds and positions may be transferred

4    between the Department of Human Services and the

5    Department of Child Protection Services in order

6    to comply with the agreements made by the State of

7    Mississippi with the United States District Court

8    in reference to the Olivia Y. lawsuit."

9            This -- you had already -- you had tried

10   to get your budget increased.

11           At this point, the budget had been

12   increased whatever little amount it had been, but

13   it hadn't been increased to bring you into

14   compliance.

15           Did you take steps after this was signed

16   by the governor to get positions transferred from

17   the Department of Human Services to comply with

18   the caseload limitations?

19       A.   To get positions transferred?

20       Q.   What do you mean by "positions

21   transferred"?

22           This says, "It is the intent of the

23   Legislature that any amount of funds and positions

24   may be transferred between the Department of Human

25   Services and the Department of Child Protective

Taylor Cheeseman 11/27/2018

```
 1    Services in order to comply with agreements,"
 2    right?
 3         A.   We have sufficient positions.  We don't
 4    have sufficient funding to fill those positions.
 5         Q.   But that's kind of a technicality, isn't
 6    it?
 7              Why do you have -- you have sufficient
 8    positions but you haven't filled them, that's a
 9    noncompliance issue.
10              So did you ask to get the funds
11    transferred so that you could hire people?
12              MR. JONES:  And I object to the form of
13         the question.  You've made a statement, and
14         then asked a question.  I have no problem
15         with him answering your question, but I
16         object to the form of your statement.
17              MS. LOWRY:  Fine.
18              THE WITNESS:  Are you talking about
19         in -- in relationship to the Department of
20         Human Services as this is referencing?
21         Q.   (By Ms. Lowry)  Yes.
22         A.   We -- you know, we are constantly
23    interacting with the Department of Human Services'
24    financial staff, and the understanding from every
25    conversation I have ever had with them is that the
```

Taylor Cheeseman 11/27/2018

```
1    $30 million that they have committed to us for
2    fiscal year '19 is all that they can commit.
3            I can't -- I don't have personal
4    knowledge of that.  I don't manage their finances,
5    but I can tell you that every dollar that we
6    control is devoted -- obviously, is devoted to our
7    child welfare work, and the -- we have a
8    $30 million commitment for this fiscal year from
9    DHS, which, to the best of my knowledge, is the
10   most they could commit to us.
11        Q.  Okay.  So you haven't gone back to them
12   since this bill -- this bill has been signed and
13   asked them for the money to pay for the additional
14   positions?
15            MR. JONES:  I object to the form of the
16        question.  He can certainly answer it.  I
17        don't think that's his testimony.  I think
18        you're misstating it.
19            THE WITNESS:  I mean, I guess I
20        don't quite understand what you're asking.
21        We're --
22            (Record read.)
23            THE WITNESS:  I -- as I've said, we
24        have --
25        Q.  (By Ms. Lowry)  You haven't or you have?
```

Taylor Cheeseman 11/27/2018

```
1        A.   My understanding is they've committed
2   everything they can commit, so I don't, you know,
3   call them every week and say, hey, can you commit
4   some more, because they've told us they have
5   committed everything that they can commit.
6        Q.   Did you review this legislation, and
7   particularly, section 4, after it was signed by
8   the governor?
9        A.   I did.
10        Q.   And when you saw this, did you say, hey,
11   we ought to go get more positions from DHS?
12        A.   Well, my understanding of the --
13        Q.   You were hoping he would say yes, but
14   you didn't ask them?
15        A.   I think you and I have a different
16   understanding of the purpose of subsection -- of
17   section 4 of this bill.  My understanding of the
18   purpose of section 4 of this bill was to give them
19   the authorization to use the money that they had
20   committed to use for us, not to force them to come
21   up with more money on top of the $30 million.
22        Q.   Okay.
23        A.   That this was the mechanism to allow
24   them to use or at least not to -- I shouldn't say
25   to allow them -- to make it clear that from the
```

Taylor Cheeseman 11/27/2018

```
1    Legislature's perspective, that they should be
2    doing that.
3              But, no, if your question is do I keep
4    going back to them and say are you still sure that
5    it's --
6         Q.   I'm asking you, did you at any one time
7    go back to them after this legislation was passed
8    and ask them for the money?
9         A.   I don't know that I have specifically
10   done that, no.
11        Q.   Are you aware of whether there is a
12   verbal agreement between MDHS and MDCPS to
13   transfer funds routinely between MDHS and MDCPS
14   under TANF and SSBG?
15        A.   Not exactly.  I wouldn't phrase things
16   that way.  There is a -- we have an agreement that
17   they have committed to provide $30 million to
18   cover MDCPS's expenditures in the current fiscal
19   year.
20        Q.   Okay.  But are you aware of an ongoing
21   agreement between MDHS and MDCPS?
22        A.   Ongoing when?
23        Q.   As of '17?
24        A.   No.  Like I said, there was a --
25   certainly a history of that happening with the
```

Taylor Cheeseman 11/27/2018

```
 1   Division of Family and Children Services.  My

 2   understanding was that it was the -- you know, the

 3   ordinary practice to do so.

 4            I know -- now, obviously, I wasn't

 5   personally involved and don't know all the details

 6   of this.  I know there was some back and forth

 7   early in the process of separating the two

 8   agencies about whether that was to continue, but

 9   there was no -- when we arrived, there was no

10   formal commitment of those funds.

11        Q.   And for the 2020 budget, have you put

12   in -- I think you said you have not put it, or

13   that is, the agency has not put in any TANF or

14   S -- what's the name?

15            MR. JONES:  SSBG.

16            THE WITNESS:  For 2020?  We have.

17        Q.   (By Ms. Lowry)  You have?

18        A.   Yes, it has.

19        Q.   Okay.

20        A.   It was not included in the '18 request.

21   It has been included in our revised '19 -- it was

22   not in the original '19 that David Chandler and

23   Takesha Darby submitted.  In our revised '19 and

24   in our '20 request, it has been included.

25        Q.   And how much is that?
```

Taylor Cheeseman 11/27/2018

```
 1        A.    That $30 million commitment.

 2        Q.    That they've already given you?

 3        A.    It's not that they've given us.  There

 4  is a commitment for them essentially to but they

 5  don't -- that's another thing, is they are not at

 6  this point transferring the funds to us.  They pay

 7  expenses for us.

 8             I don't -- it's -- you know, their

 9  funding sources, but that makes some difference to

10  them accounting-wise that they do things that way,

11  but yes, there's a commitment in both fiscal -- in

12  the current fiscal year '19 and for fiscal year

13  '20 for them to make that $30 million available to

14  us.

15             MS. LOWRY:  Okay.  The deposition is

16        concluded.  Thank you very much for coming in

17        and testifying.

18             MR. JONES:  I have a few follow-up

19        questions.

20             MS. LOWRY:  Okay.

21  EXAMINATION BY MR. JONES:

22        Q.    Mr. Cheeseman, as you know, I'm Larry

23  Jones.  I represent the defendants in this case.

24  I'd like to ask you certain questions about the

25  matters that were discussed with you by counsel
```

Taylor Cheeseman 11/27/2018

```
 1    for plaintiffs in this case.

 2         A.   Okay.

 3         Q.   I'll try to be brief.  If you don't

 4    understand my question, please correct me to the

 5    extent I need to do so, I'll ask you questions.

 6              You assumed your position with MDCPS on

 7    September 15th of 2018; is that correct?

 8         A.   2017.

 9         Q.   I'm sorry, '17.  It is hard to keep up

10    with these dates.

11              And Justice Dickinson became

12    commissioner officially on September 18th, 3 days

13    after that, of 2017?

14         A.   Correct.

15         Q.   And there was some preliminary due

16    diligence conversations that you've discussed

17    between Judge Dickinson and the prior

18    administration?

19         A.   Yes.

20         Q.   All right.  And it's your understanding

21    to a certain extent Justice Dickinson was advised

22    by the prior administration that funding for

23    fiscal year 2018 operations would not be an issue?

24         A.   Yes.  The comment I referenced earlier.

25         Q.   Now, is MDCPS a complex organization
```

Taylor Cheeseman 11/27/2018

```
 1   with multiple funding sources?
 2        A.   I believe so.
 3        Q.   All right.  There is state funding?
 4        A.   Correct.
 5        Q.   In the form of general funds?
 6        A.   Yes.
 7        Q.   There can also be, from time to time,
 8   special funding sources from the state?
 9        A.   Correct.
10        Q.   There are certain federal direct funding
11   sources?
12        A.   Correct.
13        Q.   And from time to time, there's
14   historically been the provision of federal funds
15   which have been described as TANF funds and SSBG
16   funds?
17        A.   Correct.
18        Q.   Now, from -- did you and Justice
19   Dickinson and the other members of the management
20   team appoint yourself with the operations and
21   programs and mission of MDCPS after you assumed
22   your positions?
23        A.   Yes.
24        Q.   I want to ask you about an event --
25   well, strike that.
```

Taylor Cheeseman 11/27/2018

```
 1              Were you advised prior to November 15th
 2   of 2017, that there was potentially a very
 3   significant deficit in the funds available to pay
 4   for the operations of CPS and its programs?
 5        A.   If I recall, there was a communication
 6   November 14th and November 15th, but other than
 7   that, no.
 8        Q.   All right.  I'm going to show you those
 9   documents in just a moment, but November 14 --
10        A.   14th and 15th.  Other than what I
11   mentioned earlier about the two particular
12   contracts and the funding for those contracts.
13        Q.   There have been questions I think more
14   in the form of answers for you about that period
15   of time.  Let me just hand you a document that
16   contains multiple e-mails.
17              MR. JONES:  I'm going to have this
18         marked as -- how do you prefer to do this?
19         Just continuous numbers?
20              (Exhibit 10 marked for identification.)
21        Q.   (By Mr. Jones)  Would you mind turning
22   back to -- in this document, to the November 8
23   e-mail, which is timed 2:14 p.m. central standard
24   time?  It's from Bridgette Bell to Chip Butler.
25              Do you see that?
```

Taylor Cheeseman 11/27/2018

```
 1        A.    Yes.
 2        Q.    And those individuals were both MDHS
 3   employees?
 4        A.    Correct.
 5        Q.    And if you follow this flow forward,
 6   the -- Mr. Butler then submitted an e-mail on the
 7   14th, which is some -- and that's not very good --
 8   but about six days later to Kris Jones, who at
 9   that time was an MD, and still is today, CPS
10   employee; is that correct?
11        A.    Correct.
12        Q.    And it forwarded Mr. Ferrell's e-mail,
13   did it not?
14        A.    Yes.
15        Q.    All right.  I'd like you to look at the
16   exhibit to this e-mail for just a moment and ask
17   you certain questions about this.  I'll try to be
18   brief.
19              This document relates to MDHS funding,
20   does it not, use of funds, expenses?
21        A.    Yes, this is tracking expenditures
22   across all of MDHS's divisions, as well as MDCPS.
23        Q.    All right.  And if you look at the third
24   column, that relates to Child Protective Services,
25   does it not?
```

Taylor Cheeseman 11/27/2018

```
 1        A.   Correct.
 2        Q.   You've talked about allotments -- is it
 3   true, sir -- I'm just going to repeat your
 4   testimony rather than provide you information --
 5   that the state funding is provided to MDCPS in two
 6   allotments, one on July 1st, and one on
 7   January 1st?
 8        A.   Yes.
 9        Q.   And, of course, the fiscal year for the
10   state runs from 7/1 of any fiscal year to 6/30 of
11   the next year?
12        A.   Correct.
13        Q.   So at the time this was rendered, you
14   were in fiscal year 2018?
15        A.   Yes.
16        Q.   And a lot of the accounting was -- and
17   expenditure tracking was maintained at DHS and
18   provided to CPS; is that true?
19        A.   Yes.  Well, at that point, you had a --
20   a hybrid.  Financial services had not been
21   completely separated from DHS, so there was both
22   CPS financed that and MDHS financed that that had
23   a hand in CPS's finances.
24        Q.   Continuing on this exhibit, it reflects
25   that the allotment one to CPS was 48,984,661.50.
```

Taylor Cheeseman 11/27/2018

1    Do you see that?

2         A.   Yes, I do.

3         Q.   Does it also track expenditures by

4    certain months after that?

5         A.   Yes.

6         Q.   And it shows expenditures for July,

7    August, September and October?

8         A.   Yes.

9         Q.   Now, if you follow down, it does not

10   show expenditures at that point for November '17

11   or December '17, does it, sir?

12        A.   No, those two months are not covered

13   here.

14        Q.   All right.  So this was a snapshot, if

15   you will, as of 10/17 of 2017?

16        A.   I actually believe this is as of the end

17   of the month.  I believe that's date and year in

18   the left-hand column.

19        Q.   I think you're correct.  So if you go

20   down the -- there was a -- potentially on

21   November 8th at that point, there was a balance in

22   the first allotment of 6,242,645; is that correct?

23        A.   Yes.

24        Q.   However, there were commitments

25   outstanding according to the expenditure records

Taylor Cheeseman 11/27/2018

1    of DHS and MDCPS of 1,663,481.

2              Do you see that?

3        A.   Yes, I see that.

4        Q.   And that left a balance of commitments

5    of approximately, at that point in time,

6    4,579,164?

7        A.   Yes, that's what the spreadsheet

8    reflects.

9        Q.   Now, if you review this spreadsheet

10   closely, you'll see with exception of the very

11   first of the year, MDCPS's expenditures were

12   running somewhere in the $12 million a month

13   range; is that correct?

14       A.   Yes.

15       Q.   All right.  Now, if you track this

16   e-mail series forward -- and I'm not going to

17   reflect every one, but ultimately -- let's do it

18   this way.  Do you see the e-mail at the top which

19   is from Kris Jones to you dated November 15th,

20   2017, at 3:55 p.m.?

21       A.   Yes.

22       Q.   That's the first notice, is it not, to

23   MDCPS of a potential shortfall of funds?

24       A.   Well, except the November 14th e-mail

25   you referenced a moment ago from --

Taylor Cheeseman 11/27/2018

```
1        Q.    I'm sorry, one day earlier?
2        A.    Yes.
3        Q.    That's the first notice to you, written
4   notice?
5        A.    I believe -- I don't recall if the
6   November 14th e-mail was forwarded to me on
7   November 14th or if the 15th was the first I
8   heard, but it was either the 14th or the 15th.
9        Q.    If you look down to Richard Ferrell's
10  e-mail on November 15th at 9:02 p.m. to Virginia
11  Kuhlman.
12             Do you see that?
13       A.    Yes.
14       Q.    Now, this e-mail reflects, does it not,
15  according to the financial -- financial software
16  program, "As of this morning" -- and that's
17  November 15th -- "CPS had $46 million of
18  expenditures and 1,668,397 of commitments."
19             Do you see that language?
20       A.    I do.
21       Q.    Now, this left an allotment balance of
22  only $992,309, did it not, according to this
23  statement?
24       A.    That's what it says, yeah.
25       Q.    And that would have been as of
```

Taylor Cheeseman 11/27/2018

```
 1   November 15th?
 2        A.   Yes.
 3        Q.   Now, the MDCPS still had bills to pay
 4   for the remainder of November and all of December,
 5   did it not?
 6        A.   Yes.
 7        Q.   Now, obviously, without some dramatic
 8   action, MDCPS was not going to be able to pay its
 9   bills even for the first half of fiscal year 2018,
10   was it, sir?
11        A.   No, not without moving funds from the
12   second allotment into the first.
13        Q.   From the second allotment.
14             And that is not its typical standard
15   practice?
16        A.   No.  Your allotments should cover each
17   half of the year.
18        Q.   Did that put you and Justice Dickinson
19   and other CPS management team on notice of a
20   potential very significant and serious shortfall?
21        A.   Yes.
22        Q.   Now, is "shortfall" an accurate term for
23   what we're discussing?  It reflects, does it not,
24   obligations that must be paid without funding
25   sources?
```

Taylor Cheeseman 11/27/2018

```
 1        A.    Yes.

 2        Q.    Sometimes it's referred to as a deficit?

 3        A.    I would say the amount to which our

 4   obligations exceeded our projected available

 5   funding.

 6        Q.    All right.  When you arrived at MDCPS on

 7   9/15 or, actually, when Justice Dickinson arrived

 8   on 9/18 of 2017, did CPS have an accurate

 9   operational budget that would -- could be used

10   during the funding that would reasonably be

11   expected to come in and the expenditures that

12   would be obligations during fiscal year 2018?

13        A.    No.  There was no complete line item

14   accounting of the agency's obligations.

15        Q.    Now, in response to the notifications of

16   November 14th and 15th, did you begin then to

17   assess the extent of this potential deficit and

18   how to address it?

19        A.    Yes.

20        Q.    Now, let me just ask you this generally

21   without going through multiple documents.  The

22   potential amount of that shortfall or deficit was

23   identified at different points in time based on

24   the best information you had?

25        A.    Correct.
```

Taylor Cheeseman 11/27/2018

```
 1        Q.   And one of those points in time you
 2   identified that potential shortfall was
 3   $52 million?
 4        A.   Yes.
 5        Q.   Was that a significant and serious
 6   potential shortfall?
 7        A.   Absolutely.
 8        Q.   All right.  Did Takesha Darby, the
 9   financial officer at that time, in fact, in that
10   same general period of time, estimate that the
11   potential shortfall might be as much as
12   $63 million?
13        A.    I believe that was the -- the highest
14   calculation we ever had.
15        Q.   All right.
16        A.   52 was where we settled.
17        Q.   Now, without focusing on the -- every
18   specific step, did the administration of CPS then
19   take steps to reduce that potential shortfall?
20        A.   Yes.
21        Q.   And did those steps include reducing
22   expenditures where expenditures could be reduced?
23        A.   Yes.
24        Q.   Now, ultimately, did CPS determine that
25   the potential shortfall would be approximately
```

Taylor Cheeseman 11/27/2018

```
 1    $44 million?
 2        A.   Yes, after the -- the cuts that we
 3    identified that could be made, 44 million was the
 4    number that, in our conversations with the
 5    Department of Human Services, that that was the
 6    amount of funding we felt could be identified to
 7    cover obligations, the amount we didn't need to
 8    cut.
 9        Q.   All right.
10        A.   And I should say contingent upon a
11    $12 million deficit appropriation from the
12    Legislature, which we did ultimately receive.
13        Q.   Let me just cut to the bottom line of
14    that.  This was a potential shortfall and funding
15    whereby CPS would not be able to pay its
16    obligations of approximately $44 million at the
17    end of the day?
18        A.   Yes.
19        Q.   And in order to solve that potential
20    shortfall, is it true that CPS requested and
21    received deficit funding appropriation of
22    $12 million?
23        A.   Yes.
24        Q.   And was the balance of the shortfall
25    then taken care of by DHS through the use of funds
```

Taylor Cheeseman 11/27/2018

1    to pay CPS obligations?

2        A.   Yes, they were -- with the deficit

3    appropriation, they were able to cover the $44

4    million.

5        Q.   Through some fairly complicated matching

6    procedures; is that correct?

7        A.   Yes, I can't speak to DHS's internal

8    financial practices, but yes, that's my

9    understanding.

10       Q.   When Justice Dickinson assumed office,

11   did anyone put him on notice that it might face a

12   potential -- that the department might face a

13   potential deficit that could be as high as

14   $63 million or potentially $44 million?

15       A.   No.

16       Q.   Ultimately there was no deficit in the

17   fiscal year 2018.  CPS paid its bills with --

18   through the process that you've just described

19   generally?

20       A.   Yes.

21       Q.   Should CPS and its administration be --

22   I don't want to use the wrong word -- recognized

23   for the significant effort it took to solve that

24   issue, sir, in your opinion?

25       A.   Yes.

Taylor Cheeseman 11/27/2018

```
 1          Q.   Now, you and Commissioner Dickinson did
 2     not have any role in drafting the budget request
 3     for fiscal year 2018, did you, sir?
 4          A.   No.
 5          Q.   That was in place when you arrived?
 6          A.   We were two-and-a-half months into the
 7     fiscal year when we arrived.
 8          Q.   All right.  And fiscal year -- the
 9     fiscal year 2019 budget request had already been
10     submitted before you assumed your roles; is that
11     correct?
12          A.   Yes, the original budget request had
13     been submitted.
14          Q.   And within days of arriving on the 18th
15     of September, 2017, Justice Dickinson was
16     appearing before the Legislature to discuss,
17     defend, review the fiscal year 2019 budget
18     request.  You've discussed that?
19          A.   Yes.
20          Q.   At the time you began your analysis and
21     assessment, was there -- as counsel opposite has
22     discussed, was there in place an agreement from
23     MDHS to provide a specific amount of TANF or SSBG
24     funding?
25          A.   No, there was no formal commitment of
```

Taylor Cheeseman 11/27/2018

```
 1    SSBG or TANF funds, just a history of them having
 2    done so.
 3         Q.   Was the fiscal year 2018 crisis
 4    anticipated by you and Justice Dickinson when you
 5    assumed your roles?
 6         A.   No.
 7         Q.   Was it foreseeable, sir?
 8         A.   No.
 9         Q.   We are currently in fiscal year 2019,
10    are we not?
11         A.   Yes, we are.
12         Q.   And let me ask you just a few questions
13    about the caseload cap.  You are familiar with
14    that term as I'm using it, are you not?
15         A.   Yes, I am.
16         Q.   Now, the -- the cap is based on a
17    weighted value matrix, isn't it, sir?
18         A.   It is.
19         Q.   Which ultimately has values for
20    certain -- for a number of enumerated tasks?
21         A.   It does.
22         Q.   And those tasks, if added up together,
23    approximate 1.0, does it not?
24         A.   Yes, the 1.0 is the maximum weight to be
25    carried.  That is the cap.
```

Taylor Cheeseman 11/27/2018

1      Q.    In the application of that task, then,
2    it has been measured by number -- well, first of
3    all, it's been measured by compliance to a certain
4    extent with the 1.0 standard, is it not, at the
5    first level of refusal?
6      A.    Yes, each caseworker is measured into
7    whether or not their caseload exceeds the 1.0.
8      Q.    Let me just ask you this conceptually.
9    When a caseworker -- if a caseworker is precisely
10   at 1.0 based on their mixed job functions, and
11   that caseworker receives a single investigation to
12   review, what is the effect on the 1.0 standard?
13     A.    If a worker is at 1.0, a single
14   investigation assigned to them would push them
15   over the standard.
16     Q.    The second level of review under this
17   weighted value system is that all frontline
18   caseworkers, as that term has been refined in
19   these documents, 90 percent of them have to meet
20   the 1.0 standard.
21     A.    Correct.
22     Q.    And that is a fixed rigid cap, is it
23   not?
24          MS. LOWRY:  I would object to the form.
25     You can go on.

Taylor Cheeseman 11/27/2018

```
 1              THE WITNESS:  Yes, there is no
 2        flexibility in the 90 percent.
 3        Q.    (By Mr. Jones)  All right.  And the Fifth
 4   Circuit Court of Appeals has spoken to fixed rigid
 5   caps in the MD Texas class action opinion in recent
 6   months, has it not, sir?
 7        A.    It has.
 8        Q.    And do you agree or disagree with a
 9   90 percent rigid fixed caseworker, caseload cap?
10        A.    I agree, as I've said, with the Fifth
11   Circuit's conclusion that that is bad caseload
12   management, bad practice for child welfare
13   systems.
14        Q.    Is it, in your view, detrimental to
15   children?
16        A.    Absolutely.
17        Q.    Is it detrimental to management?
18        A.    Yes.
19        Q.    Is MDCPS continuing -- sorry, strike
20   that.
21              Is MDCPS in its fiscal year 2020 budget
22   request requesting additional funds to hire
23   caseworkers?
24        A.    It is.
25        Q.    And that budget request has not been
```

Taylor Cheeseman 11/27/2018

```
 1   acted upon at this point, has it?
 2        A.   No.
 3        Q.   Again, let me just ask you this
 4   generally.  In your view from your role as chief
 5   of staff, has -- did MDCPS respond reasonably to
 6   the fiscal year 2018 budget crisis?
 7        A.   It did.
 8        Q.   And we now know from all of the events
 9   that occurred in this case, that ultimately MDCPS
10   requested $133 million from the Legislature for
11   fiscal year 2019?
12        A.   It did.
13        Q.   And the appropriation was approximately
14   $110 million, was it not?
15        A.   That's correct.
16        Q.   And that left a $23 million shortfall
17   from the budget request?
18        A.   That's correct.
19        Q.   Has MDCPS responded reasonably to that
20   shortfall?
21        A.   I believe so.
22        Q.   And let me state for the record, counsel
23   has just pointed this out.  The document I
24   introduced didn't have the Bates numbers on it.  I
25   just didn't get that copied version in my folder
```

Taylor Cheeseman 11/27/2018

```
 1    today, but you have them with Bates numbers?

 2              MS. LOWRY:  Okay.

 3         Q.   (By Mr. Jones)  Isn't it the position of

 4    MDCPS today, sir, that the court in this case should

 5    suspend or invalidate the 90 percent caseload, hard

 6    cap caseload -- caseworker caseload cap?

 7              MS. LOWRY:  I object to that question.

 8         You can answer.

 9              THE WITNESS:  Yes, sir.

10         Q.   (By Mr. Jones)  All right.  Is it the

11    position of CPS that the court in this case should

12    then direct the monitor, Public Catalyst, and MDCPS,

13    and the other defendants, to consult and recommend

14    back to the court appropriate caseload standards

15    consistent with the MD Texas opinion?

16              MS. LOWRY:  I will just object.  I will

17         have a continuing objection to this line of

18         questioning.

19              MR. JONES:  That will be fine.

20         Q.   (By Mr. Jones)  Is that your position,

21    sir?

22         A.   Uh-huh (affirmative response).  That's

23    the way I understand the relief we've requested in

24    our rule of 360 measure.

25    EXAMINATION BY MS. LOWRY:
```

Taylor Cheeseman 11/27/2018

```
 1        Q.   Let me just ask you a few more
 2   questions.
 3             Are you aware of other -- how much --
 4   you answered this before, but I'd just like to ask
 5   you a little bit further.  How much do you know
 6   about child welfare practices, other than having
 7   attended a KC seminar and seen some cases in your
 8   role as a lawyer and clerking for Justice
 9   Dickinson?
10        A.   You mean before I arrived at CPS?
11        Q.   Yes.  Correct.
12        A.   That was the extent of my experience
13   before I arrived at CPS.
14        Q.   Okay.  So your opinions about the value
15   of having a caseload limitation are based on both
16   your previous knowledge of child welfare, which is
17   not extensive, and your time at MDCPS, which is
18   how long?
19        A.   A little more than a year now.
20        Q.   I see.  Fine.
21        A.   And the Fifth Circuit's opinion in the
22   MD case as well.
23        Q.   I see.
24        A.   I mean, I think they've now confirmed
25   that.
```

Taylor Cheeseman 11/27/2018

```
 1        Q.   Right.  Well, that was a litigated
 2   judgment, and this is an agreed upon court order.
 3   Is there a difference between the two?
 4        A.   There's certainly a difference between a
 5   litigated judgment and an agreed upon court order.
 6   I don't think that changes the Court's analysis on
 7   that point.
 8        Q.   Right.  So they were looking at an issue
 9   on best practices, were they not, and found that
10   that was best practices and was not to be allowed.
11   But here you have a judgment that is a combination
12   of best practices and what's required
13   constitutionally.
14            Do you think that makes a difference?
15        A.   I think they said more than that.  The
16   Fifth Circuit's opinion was not simply that the
17   District Court judge could not impose a hard cap.
18   It was that it would have a detrimental impact on
19   family and children to do it, that the -- the
20   managerial dictates that come with a hard caseload
21   cap, the things that it forces you to do as a
22   manager hurt children and families rather than
23   help, not just that it was not constitutionally
24   required but that it's bad.
25        Q.   Was there evidence in the case, to your
```

Taylor Cheeseman 11/27/2018

```
 1    knowledge, that showed that?
 2        A.    I assume there was.  I have not read the
 3    record.
 4        Q.    I see.
 5              Did you read the District Court opinion
 6    below?
 7        A.    Yes.
 8        Q.    And did you see any reference to
 9    evidence that supported the position you're now
10    stating?
11        A.    I -- there was obviously evidence in the
12    sense of the -- the shuffling of cases that was
13    necessary to comply, the limitations on staffing
14    that the State of Texas had.
15        Q.    Oh, really.  You think there was
16    evidence on that issue?
17        A.    The Fifth Circuit cited it, so --
18        Q.    Really?
19        A.    I assume the Fifth Circuit is not making
20    that up.
21        Q.    Right.  Fifth Circuit, I think, probably
22    doesn't make up a lot of things.
23        A.    No, they don't.
24        Q.    Do you teach any law courses?
25        A.    No.
```

Taylor Cheeseman 11/27/2018

```
 1        Q.   Are you someone who is versed in
 2   constitutional law?
 3        A.   I believe I'm relatively well versed in
 4   constitutional law.
 5             MS. LOWRY:  Okay.  I have nothing
 6        further.
 7             MR. JONES:  Nor do I.
 8             (Time Noted:  10:38 a.m.)
 9                SIGNATURE/NOT WAIVED
10
11   ORIGINAL:  MARCIA ROBINSON LOWRY, ESQ.
12   COPY:  J. LAWRENCE JONES, ESQ.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Taylor Cheeseman 11/27/2018

```
 1              CERTIFICATE OF DEPONENT
 2   DEPONENT:  TAYLOR CHEESEMAN
     DATE:  November 27, 2018
 3   CASE STYLE:  OLIVIA Y., ET AL. vs. PHIL BRYANT, ET
     AL.
 4   ORIGINAL TO:  MARCIA ROBINSON LOWRY, Esq.
             I, the above-named deponent in the
 5   deposition taken in the herein styled and numbered
     cause, certify that I have examined the deposition
 6   taken on the date above as to the correctness
     thereof, and that after reading said pages, I find
 7   them to contain a full and true transcript of the
     testimony as given by me.
 8          Subject to those corrections listed
     below, if any, I find the transcript to be the
 9   correct testimony I gave at the aforestated time
     and place.
10   Page     Line                     Comments
     _____    _____        _____
11   _____    _____        _____
     _____    _____        _____
12   _____    _____        _____
     _____    _____        _____
13   _____    _____        _____
     _____    _____        _____
14   _____    _____        _____
     _____    _____        _____
15   _____    _____        _____
     _____    _____        _____
16   _____    _____        _____
     _____    _____        _____
17
18          This the _____ day of _____, 2018.
19                         _____
                           TAYLOR CHEESEMAN
20   State of Mississippi
     County of _____
21
            Subscribed and sworn to before me, this the
22   _____ day of _____, 2018.
23   My Commission Expires:
24   _____    _____
25                                   Notary Public
```

Taylor Cheeseman 11/27/2018

1               CERTIFICATE OF COURT REPORTER

2               I, Ginger H. Brooks, Court Reporter and

3       Notary Public, in and for the State of

4       Mississippi, hereby certify that the foregoing

5       contains a true and correct transcript of the

6       testimony of TAYLOR CHEESEMAN, as taken by me in

7       the aforementioned matter at the time and place

8       heretofore stated, as taken by stenotype and later

9       reduced to typewritten form under my supervision

10      by means of computer-aided transcription.

11              I further certify that under the

12      authority vested in me by the State of Mississippi

13      that the witness was placed under oath by me to

14      truthfully answer all questions in the matter.

15              I further certify that, to the best of

16      my knowledge, I am not in the employ of or related

17      to any party in this matter and have no interest,

18      monetary or otherwise, in the final outcome of

19      this matter.

20              Witness my signature and seal this the

21      6th day of December, 2018.

22

23                              GINGER H. BROOKS, #1165

24                              CRR, RPR, CCR
        My Commission Expires:
25      September 18, 2021