# Olivia Y., et al. V. Phil Bryant, et al.

## Taylor Cheeseman - (Vol. II)

### December 20, 2018

All depositions & exhibits are available for downloading at
<www.brookscourtreporting.com>
Please call or e-mail depo@brookscourtreporting.com if you need  a
**Username** and **Password.**



**Mississippi - Louisiana - Tennessee - New York**
**1-800-245-3376**

Taylor Cheeseman - (Vol. II) 12/20/2018

IN THE UNITED STATES DISTRICT COURT
FO THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

OLIVIA Y., BY AND THROUGH HER NEXT
FRIEND, JAMES D. JOHNSON; JAMISON J.,
BY AND THROUGH HIS NEXT FRIEND,
CLARA LEWIS; DESIREE, RENEE, TYSON,
AND MONIQUE P., BY AND THROUGH THEIR
NEXT FRIEND, SYLVIA FORSTER; JOHN A.,
BY AND THROUGH HIS NEXT FRIEND,
JAMES D. JOHNSON; CODY B., BY AND
THROUGH HIS NEXT FRIEND, SHARON SCOTT;
MARY, TOM, MATTHEW, AND DANA W., BY AND
THROUGH THEIR NEXT FRIEND, ZELATRA W.;
AND SAM H., BY AND THROUGH HIS NEXT
FRIEND, YVETTE BULLOCK; ON THEIR OWN
BEHALF AND BEHALF OF ALL OTHERS
SIMILARLY SITUATED                      PLAINTIFFS

VS            CIVIL ACTION NO. 3:04-CV-251-TSL-FKB

PHIL BRYANT, AS GOVERNOR OF THE STATE OF
MISSISSIPPI; DONALD TAYLOR, AS EXECUTIVE
DIRECTOR OF THE DEPARTMENT OF HUMAN
SERVICES; AND BILLY MANGOLD, AS DIRECTOR
OF THE DIVISION OF FAMILY AND
CHILDREN'S SERVICES                     DEFENDANTS

*******

VOLUME II
CONTINUED DEPOSITION
OF
TAYLOR CHEESEMAN
taken at Baker Donelson,
100 Vision Drive, Suite 400,
Jackson, Mississippi
on Thursday, December 20, 2018,
beginning at approximately 8:31 a.m.
*************************************
Angela Dawn Dillard, CSR
Certified Shorthand Reporter, #1763

Taylor Cheeseman - (Vol. II) 12/20/2018

```
 1            A P P E A R A N C E S

 2

 3        FOR THE PLAINTIFF VIA TELECONFERENCE:

 4            Marcia Robinson Lowry, Esquire
             mlowry@abetterchildhood.org
 5            Valerie McLaughlin, Esquire
             vmclaughlin@abetterchildhood.org
 6            Dawn J. Post, Esquire
             Dpost@abetterchildhood.org
 7            Anastasia Benedetto, Esquire
             A Better Childhood
 8            355 Lexington Avenue
             Floor 16
 9            New York, New York 10017
             646.795.4456
10

11

12        FOR THE DEFENDANT:

13            James L. Jones, Esquire
             jjones@bdbc.com
14            Kenya Rachal, Esquire
             krachal@bakerdonelson.com
15            Baker Donelson Bearman Caldwell &
             Berkowitz
16            One Eastover Drive
             100 Vision Drive
17            Suite 400
             Jackson, Mississippi 39211
18            601.351.2400

19

20

     ALSO PRESENT VIA TELECONFERENCE:
21
         James McDonald, A Better Childhood
22

23

24

25
```

Taylor Cheeseman - (Vol. II) 12/20/2018

1                    TABLE OF CONTENTS

2                                              PAGE

3   Title Page. . . . . . . . . . . . . . . .101

4   Appearance Page . . . . . . . . . . . . .102

5   Table of Contents . . . . . . . . . . . .103

6   Stipulation Page. . . . . . . . . . . . .104

7           EXAMINATION OF TAYLOR CHEESEMAN

8     BY MS. LOWRY . . . . . . . . . . . 105

9   Signature Page. . . . . . . . . . . . . .141

10  Certificate Page. . . . . . . . . . . . .142

11

12                   EXHIBIT INDEX

13
    23    E-mail regarding deposition        106
14
    24    Budget Request for Fiscal Year Ending 107
15         June 30, 2020

16

17

18

19

20

21

22

23

24

25

Taylor Cheeseman - (Vol. II) 12/20/2018

```
1                    STIPULATION
2
3           It is hereby stipulated and agreed by
4    and between the parties hereto, through their
5    respective attorneys of record, that this
6    deposition may be taken at the time and place
7    hereinbefore set forth, by DAWN DILLARD, Court
8    Reporter and Notary Public, pursuant to the
9    Rules;
10          That the formality of reading and
11   signing is specifically NOT WAIVED;
12          That all objections, except as to the
13   form of the questions and the responsiveness of
14   the answers, are reserved until such time as the
15   deposition, or any part thereof, may be used or
16   sought to be used in evidence.
17                      * * *
18
19
20
21
22
23
24
25
```

Taylor Cheeseman - (Vol. II) 12/20/2018

```
 1                TAYLOR CHEESEMAN,
 2    having first been duly sworn, was examined and
 3    testified as follows:
 4              MS. LOWRY:  Thank you.  So we are here
 5      this morning on supplements through the
 6      deposition of Taylor Cheeseman, which will be
 7      limited in its scope as we've agreed, and we
 8      appreciate your arranging this.
 9              We have some questions that I think are
10    well within the time period that we have set.
11              And we are going to be referring to
12    exhibits previously marked in the earlier
13    depositions.
14                   EXAMINATION
15    BY MS. LOWRY:
16      Q.   So to start with some questions with
17    regard to Exhibit 14, which is the 2020 budget
18    request.
19              MR. JONES:  All right.  if you'll give
20      us just a moment, Ms. Lowry, and I think it
21      would be helpful to mark as the first exhibit,
22      or the next exhibit, in this deposition series
23      the exchange of correspondence between yourself
24      and my partner Kenya Rachal.  I have a copy of
25      it.  It is three e-mails beginning with your
```

Taylor Cheeseman - (Vol. II) 12/20/2018

```
 1     e-mail on December 13th at 1:55.  Ms. Rachal's
 2     answer on December 14th at 1:44.  And your
 3     response stating that is acceptable on December
 4     14 at 12:54.
 5              So I will I ask this to be marked as I
 6     believe it's Exhibit 23.
 7              MS. LOWRY:  That's right.  We can do
 8     that, but I assume that these are setting forth
 9     the terms of this deposition --
10              MR. JONES:  Yes.
11              MS. LOWRY:  -- is that right?
12              MR. JONES:  And it's only the exchange
13     between yourself -- between you and Ms. Rachal.
14              MS. LOWRY:  That's fine.  We have no
15     objection to that.
16         (Exhibit 23 marked for the record.)
17              MS. RACHAL:  Let me add one more
18     thing, Marcia.  You said the FY 2020 budget,
19     and I know it was marked as an exhibit at the
20     earlier deposition.  But after that deposition
21     we provided you with a Bates label version so
22     that we can more easily follow it.  So that's
23     what I have here on site so we may want to have
24     that marked as an additional exhibit.
25              MR. LOWRY:  Okay.  So we can mark that
```

Taylor Cheeseman - (Vol. II) 12/20/2018

```
 1     as --
 2               MR. JONES:  24.
 3          (Exhibit 24 marked for the record.)
 4               MS. LOWRY:  All right.  Are there any
 5     other preliminary matters we need to deal with?
 6               MR. JONES:  No.
 7               MS. LOWRY:  Let me just identify or --
 8               COURT REPORTER:  I did not understand
 9     her.
10               MR. JONES:  Marcia, we had a little --
11     we could not understand you.  Again, you might
12     want to just move a little closer to the
13     microphone and just speak softly and we are a
14     long way off.
15               MS. LOWRY:  Yeah.  So let's just see
16     what we can do.  Okay, is that better?
17               MR. JONES:  Yes.
18               MS. LOWRY:  Okay.  All right.  So we
19     would like to see the documents that you have
20     marked as 23 before that gets finalized.  So
21     can you fax those to us?  No, I'm sorry, can
22     you copy them to us somehow quickly.  I'm sure
23     there won't be a problem but we just want to
24     see them.
25               MR. JONES:  Well, I just gave you the
```

Taylor Cheeseman - (Vol. II) 12/20/2018

```
 1    dates of them but we can stop the deposition
 2    and do that.
 3            MS. LOWRY:  I don't think we need to
 4    stop the deposition.  Perhaps there is someone
 5    you could give them to and we can proceed with
 6    the deposition and then we will see them before
 7    the end of the deposition.
 8            MR. JONES:  Sure, I think that would
 9    be fine.  We'll get someone in here to scan
10    them and send them to you.
11            MS. LOWRY:  Thank you very much.
12    Okay.  Any other preliminary matters?
13            MR. JONES:  No.
14            MS. LOWRY:  Okay.  So just for the
15    purposes of identifying who is in the room, I'd
16    like to just introduce to Valerie McLaughlin on
17    my left.
18            MS. MCLAUGHLIN:  Hi, how are you?
19            MR. LOWRY:  One of the attorneys at
20    ABC.  And to James McDonald on my right, our
21    office manager who is here for tech assistance
22    if we need it, okay?
23            MR. JONES:  Okay.
24            MR. LOWRY:  All right.  So let's go.
25    BY MS. LOWRY:
```

Taylor Cheeseman - (Vol. II) 12/20/2018

```
 1        Q.   So, now I have some questions -- so the
 2   purpose of this deposition is to verify some
 3   points with regard exhibits that became available
 4   subsequent to the deposition.  So I would like to
 5   call your attention, Mr. Cheeseman, to Exhibit 14
 6   now remarked as Exhibit 24, the 2020 budget,
 7   okay?
 8        A.   Yes.
 9        Q.   And -- good, okay, specifically, and I
10   want you to please look at page 21-1?
11        A.   21-1?
12        Q.   Correct.
13        A.   Okay.
14        Q.   All right.  And then it says at --
15             MS. LOWRY:  Where is this at?
16             MS. MCLAUGHLIN:  Right here under
17     salary, wages, and fringe.
18   BY MR. LOWRY:
19        Q.   Okay.  All right.  So I want to direct
20   your attention to the first sentence under
21   salaries, wages, and fringe, which says MDCPS's
22   2020 budget request includes an increase in
23   funding for salaries with no additional requested
24   funds.  And so I call your attention to that.
25             That means that you were not requesting
```

Taylor Cheeseman - (Vol. II) 12/20/2018

1    any additional positions be added in order to

2    comply, and that's positions, in order to comply

3    with the caseload invitations?

4        A.   Correct.  We were not asking for

5    additional positions, just more money to fill

6    existing positions.

7        Q.   Okay, so let me just ask you then, is it

8    possible to have more official or PINS than it is

9    funding for the positions?

10       A.   Yes.  The legislature appropriates PINS,

11   the positions themselves, and the money to fill

12   those positions separately.  And sometimes you do

13   not have enough money to fill all of the

14   positions that you possess as an agency.

15       Q.   Okay.  So does that mean you currently

16   have more PINS positions authorized than you are

17   filling?  When I say you I mean the agency MDCPS.

18       A.   Yes.

19       Q.   Okay.  And does that mean that in 2019

20   there was a gap between the number of PINS you

21   had and how many positions Commissioner Dickinson

22   decided to fill?

23       A.   Yes.  We are in fiscal year '19.  We

24   have more positions than we have filled at this

25   point.

Taylor Cheeseman - (Vol. II) 12/20/2018

```
1       Q.   Okay.  And you believe you have money
2    authorized to fill?
3       A.   Yes.
4       Q.   Okay.  Do you have --
5       A.   Well, I should say money available to
6    fill rather than money authorized to fill.
7       Q.   I don't understand what the distinction
8    is there?
9       A.   Well, we have a lump sum appropriation
10   from the legislature so money is not authorized
11   for a particular purpose.  But we do not possess
12   enough money to fill all of the positions.
13      Q.   Okay.  I think I have it.  Do you have
14   any internal cap related to the hiring freeze?
15   And when I say hiring freeze, I'm referring to
16   the December 2017 memo that you issued related to
17   that freeze that is below the published number of
18   PINS?
19      A.   We do not have a cap on the number of
20   positions that can be filled.  We have limited
21   the amount of money that can be spent on
22   salaries.
23      Q.   Does that amount to a cap?
24      A.   It's a cap on how much can be spent on
25   salaries, yes.
```

Taylor Cheeseman - (Vol. II) 12/20/2018

```
 1        Q.    Okay.  And that's also a cap on the
 2   number of positions that you plan to fill despite
 3   the fact that you have an authorization of a
 4   larger number of PINS positions?
 5        A.    Effectively, yes.  Yes.
 6        Q.    So in the 2020 budget, which is Exhibit
 7   24, you are seeking to rate the funding to hire,
 8   and now looking at 21-1 again --
 9              MS. MCLAUGHLIN:  Here, right here, at
10     the second.
11              MS. LOWRY:  Okay.
12              MS. MCLAUGHLIN:  Enable --
13              MS. LOWRY:  Yeah, got it.
14   BY MS. LOWRY:
15        Q.    So withdraw that.
16              So you are seeking, and are now looking
17   at Exhibit 24 and it's the third sentence under
18   salaries, wages, and fringe, and it says, the
19   current funding request is being made to enable
20   MDCPS to fill additional positions for 108
21   caseworkers, et cetera.
22              So how did -- my question to you is, how
23   did you come up with the numbers 108?
24        A.    The 108 number is based on analysis of
25   workload county by county and staffing county by
```

Taylor Cheeseman - (Vol. II) 12/20/2018

```
 1   county.  Essentially adding up how much work
 2   there is to be done, how many people there are to
 3   do the work, accounting for people that were in
 4   training or in the process of being onboarded at
 5   some point when that calculation was made.  And
 6   that led to a conclusion that 108 additional
 7   caseworkers were necessary.
 8        Q.   And is it your positions that 108 would
 9   satisfy --
10             COURT REPORTER:  Satisfy what?
11        A.   Could you repeat that?  You broke up a
12   little bit?
13   BY MS. LOWRY:
14        Q.   Is it your position that 108 net
15   caseworkers would satisfy the MSA requirement of
16   90 percent of caseworkers that have -- I'm sorry,
17   90 percent of the caseworkers that have to be at
18   the caseload limit?
19        A.   Yes.  When we prepared this 2020
20   request, the data that was provided about
21   caseworker need identified 108 additional
22   caseworkers as the caseworkers needed to comply
23   with the 90 percent requirement.
24             MR. JONES:  At some point.
25   BY MS. LOWRY:
```

Taylor Cheeseman - (Vol. II) 12/20/2018

1      Q.   Now, when did you prepare this 2020
2    budget request?
3      A.   The final version -- let's see, the
4    final version was submitted on August 10, 2018 at
5    4:51 p.m.  That's on the first page of the
6    request.  The process of preparing it took a
7    month and a half, two months, maybe a little more
8    before -- in lead up to that date.
9      Q.   Okay.  So that's when it was submitted,
10   but you had been working on it for about two
11   months prior to the date of submission?
12     A.   Approximately.  I don't know.  I can't
13   remember exactly how long the process took but,
14   yes, two months or so.
15     Q.   Okay.  And when you were preparing the
16   number of caseworkers that you are going to ask
17   for did you refer to the RHR?  And do you know
18   what I'm referring to when I say the RHR?
19     A.   The RHR, is that the 2016 recruiting,
20   hiring, and retention plan?
21     Q.   That's right?
22     A.   Was that referred to in preparing the
23   2020 request?
24     Q.   Correct.
25     A.   Not to my knowledge.  I don't believe

Taylor Cheeseman - (Vol. II) 12/20/2018

```
 1    that anybody preparing the 2020 request referred
 2    to the RHR to guide these numbers.
 3         Q.   Okay.  Did you use the caseload rating
 4    formulas that are contained in the RHR, to your
 5    knowledge?
 6         A.   Well, if I'm not mistaken those are the
 7    same caseload weights that are contained in the
 8    MSA, which is what we tend to refer to.
 9         Q.   Okay.  So who came up with the number of
10    108?
11         A.   Who came up with the number of 108?
12         Q.   Correct.
13         A.   Primarily that was Jaworski Davenport
14    our deputy commissioner of child safety.
15         Q.   And did you check that number in any
16    way?
17         A.   I mean, did I go behind his math?  No, I
18    did not.
19         Q.   Okay.  Do you know what kind of
20    calculations he did to come up with the 108
21    number of positions?
22         A.   Like I said, I know that the process he
23    went through is analyzing the caseload data
24    county by county, comparing that to the staffing
25    numbers county by county.  So total work in
```

Taylor Cheeseman - (Vol. II) 12/20/2018

1    county X compared to total number of workers
2    employed in county X.  The same for both front
3    line and the licensure and adoption staffs.
4            He totaled the necessary workers county
5    by county to come to his conclusion that 108
6    additional workers were necessary.
7        Q.   Okay.  So now, are you aware of the fact
8    that Commissioner Dickinson informed the
9    legislature in January of 2018, and this in --
10   this refers to a newspaper article on January of
11   '18, and that is Exhibit 17, are you aware of the
12   fact that Commissioner Dickinson informed the
13   legislature that the agency needed 200
14   caseworkers in order to meet the caseload
15   standards?
16       A.   I believe that I recall that being
17   discussed.
18       Q.   So how did you reconcile the 200 that
19   Commissioner Dickinson thought you needed with
20   the 108 that is listed in this budget request?
21       A.   Well, for one staffing needs, caseload,
22   these are not stagnant things.  These are
23   variable.  Over time they change.  We, Jaworski,
24   who is our expert on data, produced a calculation
25   of the number of workers needed at the time we

Taylor Cheeseman - (Vol. II) 12/20/2018

1    were preparing this request.  So that was the
2    most accurate and up to date data available at
3    that time.
4            So I don't know that there -- I guess I
5    don't understand what is to be reconciled, it's a
6    different point in time using more up-to-date
7    data which produced the need at that point in
8    time.
9        Q.    In your role as chief of staff were you
10   perplexed by the fact that it had declined by
11   almost 100 workers over a six month period?  You
12   said you were working on this for two months
13   beforehand, so that's about a six or eight month
14   period.
15       A.    Well, I was not perplexed.  I mean,
16   we've seen it decline of almost 1,000 children in
17   custody over the past year.  Presumably workloads
18   should be declining because of that, so that's
19   one thing.  So, no, I was not perplexed.
20       Q.    And did you think that that required
21   checking into the math that Mr. Jaworski had used
22   to come up with this 108 number?
23       A.    No.
24       Q.    Were you aware that the 108 number also
25   appeared in Commissioner -- just a minute -- in

Taylor Cheeseman - (Vol. II) 12/20/2018

```
 1    Commissioner Chandler's request for funding in
 2    2017?
 3        A.   No, I don't recall that fact.  I mean,
 4    I've seen the '17 request at some point, but I
 5    don't recall the 108 number.
 6        Q.   And are you aware of the fact that that
 7    money was requested by Commissioner Chandler to
 8    take into account the bringing centralized intake
 9    inhouse?
10        A.   I know that there have been ongoing
11    discussions about the idea of bringing MCI
12    inhouse.  I was aware that at one point PINS were
13    requested to do so, and funding.
14        Q.   But that, you know, is what we call
15    incidentally with 108 in terms of them both being
16    requested by Commissioner Chandler, which led you
17    all to submit a supplemental request, and the 108
18    requested in the 2020 budget request and it's
19    exactly 108.  So did that raise any concerns to
20    you?
21        A.   No.
22        Q.   Do you have the calculation that
23    underlies the request for the 108?
24        A.   Do I have the calculation?
25        Q.   I asked you to --
```

Taylor Cheeseman - (Vol. II) 12/20/2018

```
 1        A.    I --
 2        Q.    Just let me --
 3        A.    Okay.
 4        Q.    -- that.  If I asked you to put your
 5   hands on the calculation that was done to come up
 6   with 108 could you do that?
 7        A.    I was copied on the chain of e-mails
 8   regarding that calculation.  I don't recall if
 9   all the underlying data was attached to it.
10        Q.    But that didn't raise any questions in
11   your mind?
12        A.    No.  Jaworski Davenport is our expert on
13   data, on workload, on all of this, so I trust his
14   calculations.
15        Q.    Okay.  Now, let's look at Exhibit 22,
16   which is a letter from you to Chris Graham, and
17   that says --
18              MR. JONES:  Hold on just a moment.
19     Are you referring to Exhibit 22?
20              MS. LOWRY:  That's what I said, I
21     thought so.
22              MR. JONES:  All right.  Well, we
23     weren't aware that we needed to bring all the
24     exhibits.  We think there should have been --
25     should have given a set notice.  We'll need to
```

Taylor Cheeseman - (Vol. II) 12/20/2018

```
 1    stop and get the exhibits.  We don't have them
 2    in this room.
 3            MS. LOWRY:  Okay.  So what I am doing
 4    in this deposition is trying to clarify the
 5    points that were raised by the production of
 6    some subsequent depositions and productions
 7    during the depositions themselves, and so I --
 8            MR. JONES:  All right.  Is there any
 9    other exhibit you plan to examine him about?
10    We'll make sure it's in here.
11            MS. LOWRY:  Sure.  I am going to
12    examine a couple of newspaper articles.  So one
13    of them -- they are Exhibits -- or I may, 17
14    and Exhibit 21.  And the RHR, which is Exhibit
15    4.
16            MR. JONES:  Exhibit what?
17            MS. LOWRY:  4.
18            MR. JONES:  4.  Is that it?
19            MS. LOWRY:  And perhaps Exhibit 9,
20    which is Commissioner Dickinson's affidavit.
21            MR. JONES:  What was that number?  I
22    didn't hear you.
23            MS. LOWRY:  Sorry, 9.
24            MR. JONES:  9.  All right.  Well, we
25    will go off the record for just a moment and
```

Taylor Cheeseman - (Vol. II) 12/20/2018

```
 1     get a copy of those exhibits.
 2              MS. LOWRY:  Okay.
 3              (A brief recess was taken.)
 4              MS. LOWRY:  Ms. Court Reporter, could
 5     you please tell us how long that break was?
 6              COURT REPORTER:  We went off the
 7     record at 8:53 and we are back on the record at
 8     9:09.
 9              MS. LOWRY:  Thank very much.
10   BY MS. LOWRY:
11     Q.  Now, Mr. Cheeseman, I think that you
12   said that the calculations for the 108 number
13   were done by Mr. Davenport; is that correct?
14     A.  Yes.
15     Q.  Okay.  So I would like to now look at
16   the addition of Mr. Davenport.  And it says on
17   page seven, with -- the budget that is -- sorry,
18   there's a little interchange, then it says,
19   Mr. Jaworski, the agency is preparing a budget to
20   submit to the legislature for increased funding
21   is probably the extent of knowledge I know about
22   it.
23              And then question by me:  Okay, so with
24   regard to -- is the budget that's being prepared
25   now anything that you have any involvement with?
```

Taylor Cheeseman - (Vol. II) 12/20/2018

```
 1            Answer:  No.
 2            And the question is:  Okay.  And is the
 3   budget for the prior fiscal year anything you
 4   have any involvement with?
 5            Answer:  No.
 6            Question:  Okay.  In caseworker
 7   caseloads, including the 90 percent caseload
 8   budget, what knowledge do you have with that?
 9            An objection by Ms. Rachal.
10            And Answer:  I have working knowledge
11   of -- from working through the monitor around
12   submitting the data to calculate or to aggregate
13   caseloads, I have knowledge around field staff's
14   utilization report to manage and inform hiring
15   and the workload.
16            Question by me:  Okay.  And you can now
17   --
18            And answer:  Just that, that's the type
19   of knowledge I have with.
20            And that's where it basically concludes.
21   So with regard -- getting back to the 108 number,
22   is it still your testimony that Mr. Davenport
23   calculated the 108 number?
24       A.   Yes, Jaworski calculated the number of
25   workers needed.  Now, I suspect that what
```

Taylor Cheeseman - (Vol. II) 12/20/2018

```
 1    Jaworski is referring to about the budget is that
 2    he does not actually prepare the budget request
 3    itself or determine how much money is needed to
 4    pay for those workers.  But, yes, Jaworski is the
 5    one who determined that 108 additional
 6    caseworkers were needed to comply with the
 7    caseload requirement.
 8         Q.   Okay.  And when did he do that
 9    approximately?
10         A.   I don't recall the date.  It was
11    sometime in that two or three month period that I
12    referred to in which we were working to prepare
13    this budget request.
14         Q.   All right.  Now, let me call your
15    attention to Exhibit 22.  That was written by you
16    to Chris Graham?
17         A.   Yes.
18         Q.   In that you say, so we have calculated
19    or -- and I'm quoting from the first paragraph
20    toward the end.
21         A.   Uh-huh (affirmative).
22         Q.   "We have calculated our salary number in
23    our revised FY 2019 request based on a return to
24    the progressive efforts in hiring plaintiffs'
25    counsel demands."
```

Taylor Cheeseman - (Vol. II) 12/20/2018

```
 1        A.    I see it.
 2        Q.    And it goes on to say; "We have
 3   calculated our" -- no, no, no, "Our request --
 4   sorry -- to continue, "Our requested increase of
 5   6,746,002 in salaries is based on the net gain of
 6   20 employees per month for each month of the
 7   fiscal year, which we believe is necessary to
 8   bring us into compliance."  You see that?
 9        A.    I see that.
10        Q.    Okay.  So 20 employees per month for
11   each month of the fiscal year would amount to 240
12   additional workers; is that right?
13        A.    That's correct.
14        Q.    Okay.  And where in the budget request
15   does it request for 240 additional workers?
16        A.    In the 2019 budget request?  I don't
17   have --
18        Q.    No, in the '19 or the '20 budget
19   request?
20        A.    The 2019 --
21        Q.    Let me --
22        A.    Sorry, go ahead.
23        Q.    I'm sorry.  Let me just complete my
24   question, I'm sorry to interrupt you.
25              In the 2020 budget request you are
```

Taylor Cheeseman - (Vol. II) 12/20/2018

```
 1   requesting 108 additional workers, right?
 2       A.   Yes, as well as I believe 32 additional
 3   supervisors.
 4            MR. JONES:  34.
 5       A.   34 maybe.  It is 34.
 6   BY MS. LOWRY:
 7       Q.   Okay.  So I'm still trying to understand
 8   how you get 108 workers in 2020 budget request,
 9   which you submitted later in the year, you -- now
10   what we're referring to is done in March and in
11   the summer you start working on the 2020 budget
12   request as you testified, right?
13       A.   Yes.
14       Q.   Okay.  I'm trying to understand the 108
15   workers as opposed to 220 workers?
16       A.   Well, I think there are two pieces to
17   that.  Number one, this is talking about a net
18   gain of 20 employees per month not just
19   caseworkers.  So the comparison is between the
20   108 plus the 34 as compared to this 240.
21            But the other thing is that the 20
22   employees per month that I reference in this
23   e-mail that was built into the 2019 request was
24   not exactly the same calculation that went into
25   the 2020 request.  It was -- we weren't exactly
```

Taylor Cheeseman - (Vol. II) 12/20/2018

```
 1    answering the same question or calculating the
 2    same data point.
 3        Q.    Your number of employees, the net number
 4    of employees, it's level as I understand it
 5    because of the budget freeze at the end of '17.
 6        A.    The salary number is level.
 7        Q.    Understood.  And that mostly represents
 8    number of employees but with some variance
 9    depending on how much the employee got paid; is
10    that right?
11        A.    Correct.
12        Q.    Okay.  So you had a fixed number when
13    you imposed that hiring freeze, a limit on
14    going -- on increasing the net number of
15    employees within the range of salary variations.
16            So, again, I am trying to understand
17    where you got the 108 number?
18        A.    I told you where the 108 came from.
19    That's the calculation of workload county by
20    county and staffing county by county to determine
21    exactly how many caseworkers were needed.
22        Q.    Mr. Davenport did that calculation to
23    the best of your knowledge?
24        A.    Correct.
25        Q.    Now, I'd like to also call your
```

Taylor Cheeseman - (Vol. II) 12/20/2018

1   attention to a statement that is contained in

2   the -- so it's your -- sorry, I withdraw that.

3        Is it your testimony then that you are

4   accurately reflecting the number of new positions

5   that you need based on caseload calculations that

6   are in the RHR and this MSA?

7        A.   You mean based on the caseload weights

8   that are contained in the RHR and the MSA?

9        Q.   Yes, that's correct.

10       A.   Yes.  It's my understanding that the 108

11  additional caseworkers and 34 additional

12  supervisors identified in the 2020 budget request

13  is the precise number of people that we needed to

14  bring the agency into compliance with the

15  caseload metric at that time.

16       Q.   And that the calculation in Exhibit 22

17  of 20 additional workers per month reflects that?

18  How do you reconcile those two numbers?

19       A.   No, I do not think this reflects that

20  precisely.  Like I said, it was a cal -- the

21  number, salary number contained in the 2019

22  request was a calculation of a different type, of

23  a different data point than what has been put

24  into the 2020 request.

25       Q.   I'm seeing that the numbers from the '19

Taylor Cheeseman - (Vol. II) 12/20/2018

1  to the 2020 request are somewhat inconsistent.
2  Do you agree or not?
3      A.   I don't think they reflect the same
4  thing.  I don't think they're meant to reflect
5  the same thing.  They're not inconsistent.
6      Q.   Could you just take a minute and tell me
7  how they reflect the same thing?
8      A.   I said they don't reflect the same
9  thing.  They're identifying two different data
10  points.
11      Q.   And what different data points are they
12  reflecting?
13      A.   So, as I said, about the 2020 request,
14  that is a precise calculation of the number of
15  caseworkers and supervisors needed based on
16  workload data and staffing numbers by county.
17          That is not what was done for the 2019
18  request.  For the 2019 request, if you will
19  recall, the agency was coming into the
20  legislative session in the middle of a newly
21  realized potential budget deficit for that fiscal
22  year.
23          The first month of the session, which is
24  the month of January, was spent attempting to
25  remedy the projected deficit that we had for that

Taylor Cheeseman - (Vol. II) 12/20/2018

1    fiscal year.

2            But one thing that that projected

3    deficit did is alert us to the fact that the 2019

4    request that had been filed before Justice

5    Dickinson arrived was probably not adequate.

6            So in the middle of the legislative

7    session and pressed for time, we set out to

8    update that request to put a more accurate and

9    more sufficient request for state funds in front

10   of the legislature.

11           For the purpose of calculating salary

12   need, what we did there, is that we looked at the

13   agency's kind of hiring in the year preceding

14   this year, so I guess in 2017, as you will recall

15   up until the "hiring freeze" or the limitation to

16   back filling positions, the agency had engaged in

17   pretty much unrestricted hiring.

18           So we looked at how successful the

19   agency had been when it was engaged in

20   unrestricted hiring.  We saw that there was

21   approximately a net gain of 11 total employees

22   per month.  A net gain of about nine front line

23   caseworkers, or caseload carrying staff, per

24   month.  And we said, okay, what is the absolute

25   best that we could expect to do if we went back

Taylor Cheeseman - (Vol. II) 12/20/2018

1    to unrelented hiring.  If we lifted all the
2    constraints and said keep hiring until, you know,
3    we reach compliance and necessary staffing
4    levels.
5          We projected or estimated or, you know,
6    believed that based on the salary realignment
7    that had just gone into effect, and based on just
8    the general work of the agency to try to improve
9    the retention of staff, that the absolute best
10   case scenario that we could foresee was doubling
11   that performance from a net gain of approximately
12   10 employees per month to a net gain of 20
13   employees per month.
14         So, in other words, the 2019
15   calculation, the 20 per month, is not a precise
16   calculation of this is exactly how many people we
17   need.  It was not the this is the bear minimum of
18   people we need to comply.  It was, if we go back
19   to unrestricted hiring as an agency this is the
20   best we believe we can do is gain 20 employees
21   per month.  And that's the number we put in front
22   of the legislature in 2019.
23         Now, like I said, for 2020 we went to a
24   different method.  We went to the -- we attempted
25   to put, and I believe have put, the most exact

Taylor Cheeseman - (Vol. II) 12/20/2018

1    calculation that we could provide before the

2    legislature of the number of caseworkers and

3    supervisors needed.

4        Q.    And that accounts for the almost 100

5    person difference between the '19 number and the

6    '20 number?

7        A.    Yes.

8        Q.    And we're talk about -- I see.  Okay.

9            Now, are you aware that in 2017 the

10   agency asked for funding for 255 positions that

11   were not again allowed filled?

12       A.    That were not what?

13       Q.    Filled.  Filled.

14       A.    I don't specifically recall that about

15   the '17 request.

16       Q.    Okay.  In fact, there were 101 positions

17   that apparently -- for which apparently there was

18   money but they were not filled.  Are you aware of

19   that?

20       A.    No.  Like I've said though, money is not

21   appropriated for particular purposes.  It's a

22   lump sum appropriation from the legislature, so

23   there wouldn't have been money appropriated for

24   positions, but.

25       Q.    So the agency's budget was not -- sorry,

Taylor Cheeseman - (Vol. II) 12/20/2018

```
 1   withdraw that.
 2           It's your testimony that the money that
 3   was appropriated for 2017 did not include money
 4   for additional positions?
 5           COURT REPORTER:  You're going to have
 6     to repeat that you cut in and out.
 7   BY MS. LOWRY:
 8       Q.   I'm sorry.  Is it your testimony that
 9   the money that was appropriated for 2017 did not
10   include money for the additional 255 positions?
11       A.   My testimony is that we receive a lump
12   sum appropriation from the legislature so money
13   is not in your appropriations bill for a
14   particular thing.  Now, I can't speak to the
15   legislature's intent of why they gave money.
16       Q.   So that means that if you didn't fill
17   all of those positions what happened to the
18   money?
19           MR. JONES:  And I'm going to object to
20     the form of the question.  He's answered the
21     question, number one, and you're misstating his
22     testimony.
23           MS. LOWRY:  All right.  So can you --
24     I would like the witness to answer the
25     question.
```

Taylor Cheeseman - (Vol. II) 12/20/2018

```
 1        A.   Could you repeat that?
 2   BY MS. LOWRY:
 3        Q.   Sure.  If the money was appropriated for
 4   255 additional positions for fiscal year '17 and
 5   only -- what was the number -- 101 positions were
 6   not filled what happened to the money for that?
 7   Were you saying that that just got absorbed into
 8   the agency?
 9        A.   No, I didn't work for the agency in
10   fiscal year '17, so I can't speak to specifically
11   what they spent it on.
12             But, once again, money is not
13   appropriated by the legislature for a particular
14   purpose or type of expenditure.
15        Q.   So that means that in any year the
16   agency can, in fact, spend the money however it
17   wants to?
18        A.   It's state fund, it's general fund
19   appropriation, yes.  It is a lump sum
20   appropriation that can be spent on, you know,
21   essentially any part of the agency's operations.
22        Q.   I see.  And what kind of limitation is
23   there on caseloads?
24        A.   What kind of limitation is there on
25   caseloads?
```

Taylor Cheeseman - (Vol. II) 12/20/2018

```
 1       Q.   Yes.  Let me withdraw that.
 2            Is there any limitation imposed by the
 3  number of PINS the agency has?
 4       A.   Yes.  You have to have a PIN to hire a
 5  person.
 6       Q.   So if you have a sufficient number -- do
 7  you know how many PINS you have?
 8       A.   Not precisely, it's about 1,900 I
 9  believe.
10       Q.   And would that accommodate hiring an
11  extra 200 people?
12       A.   Yes, I believe so.
13       Q.   Okay.  So basically what you're saying
14  is that as you understand it, the Commissioner
15  had the freedom to hire that additional 200
16  people?
17       A.   Well, he didn't have enough money to do
18  so.
19       Q.   But he did have the legal authority to
20  do so; is that right?
21       A.   If you have a PIN you have the legal
22  authority to hire a person if money is available
23  to do so.
24       Q.   Well, is there that kind of limitation,
25  or he could have moved the money around; could he
```

Taylor Cheeseman - (Vol. II) 12/20/2018

```
 1   not?
 2       A.   What do you mean by move the money
 3   around?
 4       Q.   Decided that some of the money in the
 5   budget that had already been allocated for
 6   positions be actually used to hire more
 7   positions?
 8            MR. JONES:  You know, we're going to
 9       allow you to go a little farther in this but
10       the scope of this deposition is the amended
11       budget request in fiscal year '19 and we have
12       agreed to certain questions relating to the
13       fiscal year 2020 budget.
14            We're not going to simply reopen this
15       deposition on all subjects that you chose not
16       to cover in the first deposition and were
17       prepared to cover then and, in fact, did cover
18       with a number of witness.
19            So at some point I'm going to instruct
20       the witness not to answer if we keep going into
21       matters that were not set forth within the
22       scope of the agreement with regard to his
23       renewed deposition.
24            MS. LOWRY:  Okay, thank you.  We do
25       have documents that we did not have when we
```

Taylor Cheeseman - (Vol. II) 12/20/2018

1     first deposed Mr. Cheeseman and that's what
2     we're limiting this deposition to.  So we'd
3     like to proceed with that.
4   BY MS. LOWRY:
5       Q.   Can you answer that question?
6       A.   If I'm understanding your question
7   correctly, the use of general funds is up to the
8   Commissioner.  It is a lump sum appropriation and
9   he can use that pool of money how he, as the
10  agency head, deems appropriate.
11      Q.   Okay.  So let me ask you this.  You
12  requested close to seven million in the amended
13  2019 budget for an additional 100 (break in
14  audio) caseload requirements, that's referenced
15  in Exhibit 22; is that right?
16      A.   Could you repeat that last part you were
17  breaking up again.
18      Q.   All right.  Let me just ask a new
19  question.
20           You requested about seven million in the
21  amended '19 budget for salaries, or approximately
22  240 additional hires to meet the caseload
23  requirement, right?
24      A.   Correct.
25      Q.   Okay.  And then the 2020 budget request

Taylor Cheeseman - (Vol. II) 12/20/2018

1    -- (break in audio) caseloads -- the number of
2    caseworkers you talk about hiring here is about
3    $100 -- 100,000, I'm sorry, 100 less; is that
4    right?
5        A.   Once again, you just broke up in the
6    middle of that second question as well.
7        Q.   Okay.  So let me try it again and I have
8    no control when my sound breaks up.
9             The 2020 budget requests close to seven
10   million staff to meet the caseload requirement
11   and that's for approximately 100 less fewer
12   workers.  And then in the '19 budget you
13   requested seven million for salaries for an
14   additional 240 hires.  Can you explain to me the
15   difference between those two numbers?
16            MR. JONES:  I'm going to object.  It's
17     been asked and answered I think about four
18     times now and I'll let him answer it one
19     additional time.
20       A.   Once again, these are different
21   calculations so the 2019 request was a
22   calculation of need -- or was a calculation of
23   how many -- how large of a net gain in employees
24   that we could expect to see, reasonably expect to
25   see over the course of a year.  And the salary

Taylor Cheeseman - (Vol. II) 12/20/2018

```
 1   number for 2019, the cost of those people was
 2   calculated with just using an average agency
 3   salary.  So the total, you know, agency cost of
 4   salaries divided by the number of employees
 5   because we were not calculating people of a
 6   particular position type.
 7            Whereas for 2020 the calculation is, as
 8   I've said, a specific calculation of how many
 9   caseworkers and supervisors were needed and the
10   cost of those people is calculated by looking to
11   the specific salary and fringe benefit cost of a
12   caseworker position or a supervisor position.
13   BY MS. LOWRY:
14       Q.   And so then it's your testimony that the
15   difference, which amounts to the salary of about
16   100 additional workers, is solely based on the
17   fact that these are calculations using different
18   cost numbers basically?
19       A.   They're different methodologies of
20   calculating the cost.
21       Q.   So those two different methodologies
22   accounts for the difference of about 100 people?
23       A.   Yes.
24       Q.   I see.  Okay.  And let me ask you this,
25   who wrote the narrative for the 2020 budget
```

Taylor Cheeseman - (Vol. II) 12/20/2018

```
 1    request?
 2         A.   Well, there's not one person.  I mean,
 3    it was a -- a variety of people had input and
 4    worked on those narratives, revised those
 5    narratives, you know.
 6         Q.   Who had final sign off on it?
 7         A.   Ultimately it's signed by the
 8    Commissioner before it's submitted to the
 9    legislative budget office.
10         Q.   I understand that ultimately that it's
11    signed off by the Commissioner but who has the
12    final review of the content of the document?  Did
13    you do that in your role as chief of staff?
14         A.   I did review it but, like I said, the
15    final sign off on the budget request is by the
16    Commissioner.
17         Q.   Okay.  But you were convinced that that
18    was an accurate reflection of what the agency
19    wanted and needed?
20         A.   Yes.
21         Q.   All right.
22              MS. LOWRY:  Could we take a quick
23      break please?
24              (A brief recess was taken.)
25              MS. LOWRY:  Let's go back on the
```

Taylor Cheeseman - (Vol. II) 12/20/2018

```
1     record.  Those are all my questions.  Do you

2     have any questions you wish to ask?

3               MR. JONES:  No.

4               MS. LOWRY:  All right, this deposition

5     is concluded.  Thank you very much for your

6     courtesy.  We appreciate it.

7               COURT REPORTER:  Copy?

8               MR. JONES:  Yes.

9

10        (Deposition concluded at 9:36 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Taylor Cheeseman - (Vol. II) 12/20/2018

```
 1              CERTIFICATE OF DEPONENT
 2    DEPONENT:  Taylor Cheeseman
      DATE:  December 20, 2018
 3    CASE STYLE:  Olivia Y., et al VS
                   Phil Bryant, et al
 4
          I, the above-named deponent in the deposition
 5    taken in the herein styled and numbered cause,
      certify that I have examined the deposition taken
 6    on the date above as to the correctness thereof,
      and that after reading said pages, I find them to
 7    contain a full and true transcript of the
      testimony as given by me.
 8        Subject to those corrections listed below, if
      any, I find the transcript to be the correct
 9    testimony I gave at the aforestated time and
      place.
10
      Page    Line               Comments
11
      ____    ____     _____
12
      ____    ____     _____
13
      ____    ____     _____
14
      ____    ____     _____
15
      ____    ____     _____
16
      ____    ____     _____
17
      ____    ____     _____
18
19          This the _____day of _____, 2018.
20                     _____
                              TAYLOR CHEESEMAN
21    State of Mississippi
      County of_____
22
              Subscribed and sworn to before me, this
23    the _____day of_____, 2018.
24    _____      _____
      Notary Public              My Commission Expires
25
```

Taylor Cheeseman - (Vol. II) 12/20/2018

```
 1                    REPORTER'S CERTIFICATE
 2              I, Dawn Dillard, CSR Number 1763,
 3    Certified Reporter, certify:
 4              That the foregoing proceedings were
 5    taken before me at the time and place therein set
 6    forth, at which time the witness was put under
 7    oath by me;
 8              That the testimony by the witness, the
 9    questions propounded, and all objections and
10    statements made at the time of the examination
11    were recorded stenographically by me and were
12    thereafter transcribed;
13              That the foregoing is a true and correct
14    transcript of my shorthand notes so taken.
15              I further certify that I am not a
16    relative or employee of any attorney of the
17    parties, nor financially interested in the
18    action.
19              I declare under penalty of perjury under
20    the laws of Mississippi that the foregoing is
21    true and correct.
22              Dated this the _____day of
23    _____, 20__.
24                           _____
25                           DAWN DILLARD, CSR 1763
```