# Olivia Y., Jamison J., et al. V. Phil Bryant, Donald Taylor, et al.

## Jess Dickinson

### November 29, 2018

All depositions & exhibits are available for downloading at
<www.brookscourtreporting.com>
Please call or e-mail depo@brookscourtreporting.com if you need  a
**Username** and **Password.**



**Mississippi - Louisiana - Tennessee - New York**
**1-800-245-3376**

EXHIBIT E

Jess Dickinson 11/29/2018

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

OLIVIA Y., BY AND THROUGH HER NEXT
FRIEND, JAMES D. JOHNSON; JAMISON J.,
BY AND THROUGH HIS NEXT FRIEND,
CLARA LEWIS; DESIREE, RENEE, TYSON,
AND MONIQUE P., BY AND THROUGH THEIR
NEXT FRIEND, SYLVIA FORSTER; JOHN A.,
BY AND THROUGH HIS NEXT FRIEND,
JAMES D. JOHNSON; CODY B., BY AND
THROUGH HIS NEXT FRIEND, SHARON SCOTT;
MARY, TOM, MATTHEW, AND DANA W., BY AND
THROUGH THEIR NEXT FRIEND, ZELATRA W.;
AND SAM H., BY AND THROUGH HIS NEXT
FRIEND, YVETTE BULLOCK; ON THEIR OWN
BEHALF AND BEHALF OF ALL OTHERS SIMILARLY
SITUATED

                                    PLAINTIFFS
V.              CIVIL ACTION NO. 3:04-CV-251-TSL-FKB
PHIL BRYANT, AS GOVERNOR OF THE STATE OF
MISSISSIPPI; DONALD TAYLOR, AS EXECUTIVE
DIRECTOR OF THE DEPARTMENT OF HUMAN
SERVICES; AND BILLY MANGOLD, AS DIRECTOR
OF THE DIVISION OF FAMILY AND CHILDREN'S
SERVICES

                                    DEFENDANTS


DEPOSITION OF JESS DICKINSON


Taken at the instance of the Plaintiffs at
Bradley, LLP 188 East Capitol Street, Suite 400
Jackson, Mississippi, on Thursday,
November 29, 2018, beginning at 12:40 p.m.


REPORTED BY:
GINGER H. BROOKS, CCR #1165
CRR, RPR, CRC, CCR, CLR, RSA

Jess Dickinson 11/29/2018

```
 1    APPEARANCES:

 2

 3         MARCIA ROBINSON LOWRY, ESQ.
           DAWN J. POST, ESQ.
 4         A Better Childhood, Inc.
           355 Lexington Avenue, Floor 16
 5         New York, New York 10011
           mlowry@abetterchildhood.org
 6         dpost@abetterchildhood.org

 7

               COUNSEL FOR PLAINTIFFS
 8

 9
           J. LAWRENCE JONES, ESQ.
10         KENYA KEY RACHAL, ESQ.
           Baker Donelson
11         100 Vision Drive, Suite 400
           Jackson, Mississippi 39211
12         jjones@bdbc.com
           krachal@bakerdonelson.com
13

14
           WILLIAM M. SIMPSON II, ESQ.
15         Office of the Governor
           4500 I-55 North, Suite 278
16         Jackson, Mississippi 39211
           will.simpson@governor.ms.gov

17

18             COUNSEL FOR DEFENDANTS

19

20    ALSO PRESENT:  Earl Scales

21

22

23

24

25
```

Jess Dickinson 11/29/2018

```
 1                    INDEX
 2   Style and Appearances........................1
 3   Index   ....................................3
 4   Certificate of Deponent  .................145
 5   Certificate of Court Reporter ...........146
 6                 EXAMINATIONS
 7   Examination By Ms. Lowry ...................4
 8   Examination By Mr. Jones .................116
 9   Examination By Ms. Lowry .................138
10                  EXHIBITS
11   Exhibit 21 SFY 2019 Operational ...........79
12           Budget Summary
13   Exhibit 22 3/19/18 E-mail from ............92
14           Cheeseman to Graham
15
16
17
18
19
20
21
22
23
24
25
```

Jess Dickinson 11/29/2018

```
 1                      JESS DICKINSON,
 2   having been first duly sworn, was examined and
 3   testified as follows:
 4   EXAMINATION BY MS. LOWRY:
 5        Q.   Would you please state your name for the
 6   record?
 7        A.   Jess Dickinson.
 8        Q.   Are you currently employed by the
 9   Mississippi Department of Child Protective
10   Services?
11        A.   By the State of Mississippi as the
12   commissioner of that agency, yes.
13        Q.   Okay.  How long have you been
14   commissioner?
15        A.   September -- I began September 18, 2017.
16   So I guess your question, to be specific, about 14
17   months.
18        Q.   Okay.  Thank you.
19             And prior to September 18th, 2017, did
20   you ask anyone at the agency about the financial
21   status of MDCPS?
22        A.   I did.
23        Q.   And who was that?
24        A.   I asked Dr. Chandler, Takesha Darby.  I
25   may have had conversations with other deputy
```

Jess Dickinson 11/29/2018

```
 1   commissioners, but the specific conversations that
 2   I remember were with Dr. Chandler and with
 3   Ms. Darby.
 4        Q.   And did you have a meeting with
 5   Dr. Chandler before you took -- before you took
 6   the office?
 7        A.   Many, many.  When the governor appointed
 8   me --
 9        Q.   When did the governor appoint you?
10        A.   September 18th.
11        Q.   So that was the date of the appointment,
12   okay.
13        A.   Yes.
14        Q.   Uh-huh (affirmative response).
15        A.   But it was a few months before that that
16   he had talked with me about it, and the decision
17   was made that I was going to be appointed at that
18   time.
19             And so because I was on the Supreme
20   Court and I was going to be moving to the agency,
21   my work on the court diminished because they
22   didn't assign me any new cases.  And so as I had
23   more time on my -- to devote to learning CPS, I
24   would go over and meet with -- it got to the point
25   that I went over nearly every day.
```

Jess Dickinson 11/29/2018

```
 1              I went over there in early September
 2   through the 18th, and even in late August, I was
 3   at the CPS office a lot.  I don't know.  I can't
 4   tell you how much, but a lot.  So I had many
 5   meetings with David Chandler and Takesha and
 6   others to learn the staff, had many meetings.
 7         Q.   Did you have any meetings with John
 8   Davis?
 9         A.   I did.
10         Q.   When was that roughly, if you don't
11   remember exactly?
12         A.   I don't remember exactly, but it was
13   prior to -- it was prior to September 18, and
14   my -- my sense is it was a couple of weeks maybe,
15   10 days, maybe.  I'm sorry.  I --
16         Q.   That's fine.
17         A.   I don't have the exact date.
18         Q.   And did you have that meeting with John
19   Davis with anyone else in attendance?
20         A.   I don't -- I can't say for sure.  I
21   don't remember.  I don't have a specific memory of
22   anyone else being in the meeting, but there could
23   have been.
24         Q.   But you don't remember David Chandler
25   being in the meeting?
```

Jess Dickinson 11/29/2018

```
 1        A.   Yes, I'm sorry.  I apologize.
 2        Q.   That's okay.
 3        A.   Yes, David Chandler wanted to do --
 4   David Chandler made an effort to introduce me to
 5   the people I'd be working with, and that meeting
 6   was a result of his desire for me to -- him to
 7   introduce me to John Davis and get to know John
 8   Davis.  And so it was David Chandler, John Davis
 9   and me, and I'm not sure if there was anyone else
10   there.
11        Q.   I'd like to direct your attention to
12   Exhibit Number 9.
13        A.   All right.
14        Q.   And the second sentence in paragraph 15,
15   "When I did not receive" --
16        A.   Sorry.  Give me --
17        Q.   Absolutely, sure.
18        A.   Okay.
19        Q.   So this says that you raised the issue
20   about getting an operational budget, and you said,
21   in the paragraph in the second sentence, I was
22   informed -- I'm paraphrasing.
23             I was informed that MDCPS had access to
24   large amounts of federal funds and that sufficient
25   funding for the agency's budget for the balance of
```

Jess Dickinson 11/29/2018

```
 1   the fiscal year would not be a problem.
 2            Who gave you that information?
 3        A.   Dr. Chandler.
 4        Q.   And do you remember what precisely he
 5   said?
 6        A.   Pretty close.  I can get -- I can get
 7   pretty close.  Dr. Chandler said to me in
 8   response -- in response to questions and
 9   discussions that we had had and questions I raised
10   about the budget, my sense was he was -- and I
11   don't want to use the word "irritated," but he
12   didn't want to dwell on it.  And I had been asking
13   for an operational budget.  I was coming -- this
14   was before I went to work there.
15            My concern was to see a budget.  I
16   wanted to know -- because of the way state
17   appropriation works, I wanted to know how much
18   money we had left and what our obligations were.
19   I didn't know what they were.
20            We were -- I'm beginning work there
21   several months into the fiscal year.  I don't know
22   what the budget -- the agency has spent.  I don't
23   know what its obligations are, and so I asked for
24   an operational budget.
25            I could see each line item, what we had
```

Jess Dickinson 11/29/2018

```
1   left, how much money we had to cover that.
2   That -- part of my statutory duty is to make sure
3   that we come within budget.  I have to do that.
4            So I asked for an operational budget --
5   I asked for an operational budget, and
6   Dr. Chandler told me he would get me one.  He
7   didn't over some period of time.  I don't know
8   whether it was two days or five days or something.
9            But I asked -- I asked again, and the
10  second time I asked, he informed me that they --
11  the agency didn't have an operational budget, that
12  because that it was part of DHS, it operated out
13  of DHS's budget, and there was no discrete
14  operational budget for my agency so I could see
15  how much money I've got left for salaries, et
16  cetera.
17           So I had had those conversations with
18  him when we met with John Davis.  Because John
19  Davis was the executive director of DHS, I asked
20  some question of him, whether he -- and I
21  apologize, I don't know the exact words I used,
22  but I asked him something to the effect of, "Do
23  you have any sense of where we are budget-wise?"
24       Q.    And what did he tell you?
25       A.    David Chandler interrupted him and said,
```

Jess Dickinson 11/29/2018

```
 1    "Jess, you need to stop worrying about the budget.
 2    Money is going to be the least of your problems.
 3    You're going to have more money than you can
 4    spend."
 5              Now, that's as close as I can get to
 6    what he said.
 7        Q.   And that was in front of John Davis?
 8        A.   Yes.
 9        Q.   How long did that meeting last, roughly?
10        A.   Say that again.
11        Q.   Sure.  How long did that meeting
12    last, roughly?  I think you heard John Davis
13    characterize it as a meet and greet.
14              So was it more than a meet and greet?
15        A.   I don't know what a meet and greet is in
16    terms of time, but it was that.  It was certainly
17    a chance for me to meet John Davis, but it was
18    not -- it was not 15 minutes.  It was longer than
19    that.
20              We talked about a number of issues and
21    questions.  We talked about the fact that I was
22    coming on -- I would be coming on-board at a time
23    in the transition period.  And so that was
24    discussed in general terms; in general terms, the
25    relationship between the two agencies.
```

Jess Dickinson 11/29/2018

```
 1              I apologize that I can't give you even a
 2    real general -- it was longer -- this is the best
 3    I can do.
 4         Q.   Okay.  That's fine.
 5         A.   It was certainly longer than 15 or 20
 6    minutes, but it wasn't four hours.
 7         Q.   So was it one hour?
 8         A.   Could have been, could have been.
 9         Q.   Okay.  Did you ever get a copy of an
10    operational budget for CPS?
11         A.   There wasn't one.
12         Q.   Okay.
13         A.   So the answer is no.
14         Q.   Okay.  Thank you.
15         A.   Can I back up?
16         Q.   Sure you can.
17         A.   If you're -- and I'm assuming you're
18    asking me about that period of time?
19         Q.   I'm asking about that meeting and before
20    you started work.
21         A.   During that period of time, at that
22    meeting and based on my request for an operational
23    budget, I never got one from anybody who was there
24    at that time.
25         Q.   Okay.  And, at that point, were you
```

Jess Dickinson 11/29/2018

```
 1    provided with any assurances about the agency's
 2    financial stability?
 3         A.   What I was --
 4              MR. JONES:  Which point in time are you
 5         referring to now?
 6              MS. LOWRY:  I'm talking about the time
 7         before he started work.
 8              MR. JONES:  Oh, okay.
 9              THE WITNESS:  I was informed of what I
10         just told you which I -- I viewed to be a
11         statement concerning the agency's financial
12         stability.
13              I was told that -- that there were
14         plenty of federal funds available, and that I
15         was going to have more money than I could
16         spend.  I needed to not worry about the
17         budget, that -- that it was not going to be a
18         problem, and Mr. Davis, and I heard -- I was
19         present in his testimony, and he's exactly
20         correct.
21              The way he responded or the way he
22         commented at the time Dr. Chandler made those
23         statements was we are -- DHS is going to help
24         CPS any way it can.  We are always concerned
25         or -- with CPS, and anything we can do to
```

Jess Dickinson 11/29/2018

```
 1          help you, we're going -- we're going to do
 2          that.
 3               So I don't know if that answers your
 4          question or not, but that's -- that's what
 5          was said to me at that meeting.
 6     Q.   (By Ms. Lowry)  Okay.  And, again, this is
 7     still before you took office, I want to call your
 8     attention to paragraph 16 of your affidavit and to
 9     the last sentence.
10               And the sentence is, "I again discussed
11     the issue with the outgoing administration, and I
12     was informed that the FY 2018 budget the agency had
13     submitted to the Legislature was adequate and that
14     MDCPS would receive all the federal funds needed to
15     cover any shortfall just as it always had in the
16     past."
17               So who were the people or the person in
18     the outgoing administration that informed you?
19     A.   Who informed me in the outgoing
20     administration?
21     Q.   This says, "I discussed the issue with
22     the outgoing administration, and I was informed."
23     So somebody informed.
24               So who is the person that informed and
25     the person with whom -- maybe it's the same
```

Jess Dickinson 11/29/2018

```
 1   person, maybe it's not, with whom you discussed
 2   the issue?
 3        A.   Well, you're -- you're asking the
 4   questions in terms of a person.  It wasn't a
 5   person.  It was persons.  There was Dr. Chandler,
 6   Takesha Darby.  I don't recall anyone else.
 7             I could have had other conversations
 8   with others, but Takesha Darby was the deputy
 9   commissioner of finance, and I was particularly
10   concerned about her view and because there was no
11   operational budget, she was all I had.  I had no
12   numbers.  I had no accounts.
13             It was -- the way state funding works,
14   it's very, very difficult to know where you are
15   unless you have a budget, and I didn't have one,
16   so I asked those questions, and this was the
17   response I got from the two of them.
18        Q.   Okay.  But only one of them was the
19   outgoing administration.  That was David Chandler.
20   I don't think anybody else was outgoing at the
21   time.
22             So were you talking about anybody else,
23   or were you talking about David Chandler?
24        A.   Well, I don't view it that way.
25        Q.   Okay.
```

Jess Dickinson 11/29/2018

```
 1          A.   And I could be in error in the way I
 2   view it, but the way I viewed it was that
 3   Dr. Chandler and his deputy commissioners were the
 4   outgoing administration, and me and my deputy
 5   commissioners and my organizational chart were the
 6   incoming, and the fact that some of those people
 7   were the same is coincidental.  In other words --
 8          Q.   I got it.
 9          A.   Does that make sense?
10          Q.   Yes, it does.  Thank you.  Okay.  That
11   explains that.
12               And who told you that the --
13   specifically, that the FY 2018 budget that the
14   agency had submitted to the Legislature was
15   adequate?
16          A.   Those people.
17          Q.   So Chandler and Darby told you that?
18          A.   Yes.  And, again, I just want to make
19   sure you understand that they were telling me that
20   in the context of my request for a budget and my
21   request for somebody to tell me where does this
22   agency stand?  Where are we dollar-wise?
23               Because the closer you get to the end of
24   a fiscal year, the more drastic a shortfall in
25   money becomes because you don't have many months
```

Jess Dickinson 11/29/2018

1    to make it up, so I'm there in September, and I --
2    I need to know, am I -- am I okay dollar-wise.
3              I wasn't there when they submitted the
4    budget.  I wasn't there when they started spending
5    money in the budget, and so I don't even know how
6    much they've spent.
7              So I'm asking that question, where am I?
8    Are we going to be in trouble?  Am I going to have
9    enough money to finish out this year?  Because
10   nobody's given me a document, and this is what I
11   was told, that the budget that was submitted that
12   I'm operating under, the budget that was submitted
13   by Dr. Chandler's administration, and I heard his
14   testimony, and I think he's probably exactly
15   correct, but that budget is adequate to -- to meet
16   the needs -- the expenditures -- the expected
17   expenditures of the agency.
18        Q.   And were you specifically provided
19   assurances that any deficit would be covered by
20   TANF and SSBG?
21        A.   The assurances that I was -- that were
22   provided to me are the ones I've told you that --
23   that -- that -- when Dr. Chandler made those
24   statements to me -- and you've got to understand,
25   this is a process.  I'm -- I'm here at September,

Jess Dickinson 11/29/2018

1    and I'm being told something, and time is moving

2    along, and I'm having concerns and asking more

3    questions, and so it's not like everything

4    happened at a moment.

5         Q.    Uh-huh (affirmative response).

6         A.    I'm having conversations after I begin

7    my work on September 18th daily with people about

8    where we are trying to understand.

9              And so the two people -- I mean, I

10   don't -- I can't get any more specific than that

11   for you.  The two people -- the only two people

12   that I had access to at that time in my mind, as

13   far as I understood how the agency worked, the

14   only two people I had access to that knew the

15   dollars, that knew the dollar amounts of where the

16   agency stood, were Takesha and Dr. Chandler.

17             And Dr. Chandler -- I didn't know the

18   extent of his knowledge.  I didn't know -- he and

19   I are different people, and I heard his testimony,

20   and I respect the way he operated the agency.

21             He's very different from me.  He was --

22   he depended on the -- as he said, the deputy

23   commissioners, and he didn't get involved in the

24   money.

25             I'm not that way.  I have a statutory

Jess Dickinson 11/29/2018

```
 1    duty to get involved and make sure I understand
 2    that we're going to be able to meet our budget.
 3    And so I was worried about it.  He thought I
 4    shouldn't be worried about it.
 5         Q.   Okay.  I'd like to call your attention
 6    to Exhibit 2, which is a letter from you to John
 7    Davis.  And in that letter -- this is -- this is
 8    Exhibit 2, a letter dated December 15th, 2017.
 9    You've been there for a while now at this point.
10             And you refer to a meeting that you,
11    "John Davis, David Chandler and I had a meeting to
12    discuss numerous issues, one of which was this
13    agency's budget.
14             When I expressed concerns about the
15    funding for this agency's budget, you and
16    Dr. Chandler explained to me the important role of
17    federal Social Services Block Grant, SSBG, and the
18    Temporary Assistance to Needy Families (TANF)
19    funds, both of which have contributed to the
20    functions for which this agency is responsible."
21             Are you referring then to either the
22    meet and greet or one-on-one or whatever it was
23    meeting that you had with Chandler --
24         A.   Yes.
25         Q.   -- and Davis roughly before you assumed
```

Jess Dickinson 11/29/2018

```
 1   the position; is that right?
 2        A.   Yes.  Yes, ma'am.
 3        Q.   Okay.  And you said that they both
 4   explicitly, or one or both of them, you can
 5   clarify which that is, explicitly told you about
 6   SSBG and TANF?
 7        A.   Yes, those -- those terms came up, those
 8   acronyms came up as in the context of the
 9   discussion of the availability of federal funds.
10        Q.   Okay.  I'd like to direct your attention
11   now to Exhibit 16, which is a memo from Takesha
12   Darby to Justice Dickinson, and it's dated
13   September 15th.
14             Could you take a look at that?
15        A.   I got it.
16        Q.   Okay.  Was this the memorandum you
17   received from commissioner -- Deputy Commissioner
18   Darby?
19        A.   Yes.
20        Q.   And is this the -- let me just.  And is
21   this the memo you were referring to in paragraph
22   16 of Exhibit 9?
23        A.   Paragraph 16?
24        Q.   Yes, 16.
25        A.   Yes, it is.
```

Jess Dickinson 11/29/2018

```
 1        Q.   And this memo says that -- that at the
 2   end of the year, that is at the end of '17, TANF
 3   funds would be available to prevent a deficit.
 4            Do you see that?  Is that right?
 5        A.   Where are you?
 6        Q.   I'm sorry.  On the second page, at the
 7   top of the second page.
 8        A.   The very top?
 9        Q.   That was '17, right.  So this -- did you
10   raise with her or did she raise with you any
11   questions about TANF funding for the '18 -- for
12   the '18 budget, for fiscal year '18?
13        A.   In this memo?
14        Q.   No, in a conversation with you?
15        A.   All right.  Now, I've got to -- I've got
16   to rethink your question.
17        Q.   Sure.
18        A.   Go back.  You're asking me if I --
19        Q.   When you had a conversation with -- I'm
20   sorry, I didn't mean to interrupt you.  I'm just
21   trying to explain.
22        A.   That's all right.  That's okay.
23        Q.   When you had -- did you have any
24   conversation with Takesha Darby about the memo,
25   about the memo that she gave you dated
```

Jess Dickinson 11/29/2018

```
 1   September 15th, 2017?
 2        A.   Yes, I'm -- I had many conversations.
 3        Q.   So in any of those conversations, did
 4   she raise with you the question of TANF funding
 5   for fiscal year '18?
 6        A.   The one that we were in.
 7        Q.   That you were in, yes.
 8        A.   That we were in.
 9        Q.   Yes.
10        A.   I'm not going to say that Takesha raised
11   anything with me.  I raised it with her.
12        Q.   Okay.
13        A.   I would ask her the questions, and she
14   would respond to them, and we had many
15   conversations about the 2018 budget.
16        Q.   Okay.  And so did you raise the question
17   of TANF funding during the fiscal year '18 budget?
18        A.   The whole -- the whole reason for this
19   memo was the 2018 budget.  My concern was -- I had
20   those conversations that I had told you about.  I
21   was informed what I told you I was informed about
22   money not being a problem.
23             I had been very generally told or had
24   been very generally represented to me in that
25   meeting and in other discussions with Takesha
```

Jess Dickinson 11/29/2018

1    Darby, and I'm not going to say Dr. Chandler,

2    because he never really -- he never really got

3    specific with me about dollars.

4            His -- his position was exactly what he

5    testified to, was that I didn't get into all that.

6    I left it up to my deputy commissioners, and so it

7    was left to me to go to the deputy commissioners.

8            So I had many discussions with Takesha

9    Darby about the subject of -- I'm in a -- I'm in a

10   fiscal year right now that I do not understand the

11   numbers.  I need to know the numbers.  I have been

12   told -- this is my conversation with Takesha

13   Darby.

14           I have been told that there will be

15   federal funds available to cover any needs that we

16   have.  How do we know that?  I'm a -- I've been in

17   the legal business for 30 something years.  I've

18   practiced law, been on the Supreme Court.

19           I've got a high respect for contracts

20   and agreements, and I don't have much experience

21   with dealing in large sums of money committed by

22   verbal agreements.

23           How do I know -- this is my thinking

24   process in my discussions with Takesha.  I hope

25   I'm being responsive to your question.

Jess Dickinson 11/29/2018

```
 1        Q.   Yes.  Go ahead.
 2        A.   I'm saying to Takesha and I'm saying to
 3   my chief of staff, Taylor Cheeseman, who -- we
 4   were working daily trying to get a grip on this
 5   budget thing, and understand, today, I know John
 6   Davis for over a year; back then, I didn't know
 7   him.
 8             I didn't know -- I had met him, but I
 9   didn't know him.  And so I'm not trying to say I
10   didn't trust him, it's just that I didn't know
11   him, and all I'm being told is that the Executive
12   Director of DHS is going to give me 10 or 20 or
13   $30 million, that's a big representation -- you
14   get what I'm saying, somebody telling me that.
15             And I'm saying how do I know he's going
16   to do it if I really need it, because I can't --
17   if I end up at the end of this fiscal year, and I
18   say, "Mr. Davis, I need $25 million," and he says,
19   "I'm sorry," I'm the one on the hook.  I'm the one
20   in trouble.  I need to know I'm going to get that
21   money.
22             And so that's when I directed Takesha,
23   give me a memo that gives me the history of what's
24   happened between DHS and CPS because I'm being
25   told there is this availability of funds.
```

Jess Dickinson 11/29/2018

```
 1              How do I know I can depend on that?
 2    That's what I was looking for is something to --
 3    to assure me, my agency and my -- my children were
 4    going to be taken care of.
 5              I didn't want to be left out in the cold
 6    with no money to provide foster homes for these
 7    children.  I needed to know where the money was
 8    coming from.
 9              And so she writes me this memo, and this
10    memo tell us me there's a verbal agreement that
11    they're going to provide the money.  And so that's
12    what I had.  But that's what prompted the memo.
13    That's what prompted her to write me that memo.
14    That's why I asked her for it.
15         Q.   Now, let's take a look at paragraph 16
16    again.
17         A.   Paragraph what?
18         Q.   16, sorry.
19         A.   Of my affidavit?
20         Q.   Yes.
21         A.   Thank you.  15?
22         Q.   16.
23         A.   16.
24         Q.   Yes, sir.
25         A.   Okay.
```

Jess Dickinson 11/29/2018

```
 1        Q.   And that's -- so it was after you
 2   received the memo from Darby that you were -- or
 3   was it before -- that the outgoing administration,
 4   and, as you've explained, that was Darby and
 5   Chandler, and you were then informed that the
 6   budget was adequate, is that right?
 7        A.   Yes.
 8        Q.   And that MDCPS would receive federal
 9   funds needed to cover the shortfall?
10        A.   Understand that -- that sentence you're
11   referring to has two parts to it.
12        Q.   Okay.
13        A.   One part is whether or not we have
14   represented to the Legislature the right amount of
15   money.  In other words, it's one thing to ask the
16   question.  I'm looking at the FY '18 budget, and
17   it says we need X dollars for salaries.
18             Is that what we really need?  Have we --
19   have we submitted a proper budget?  And, number
20   two, am I going to be able to fund it?
21             So that's a two-part question, and I was
22   informed yes, we have submitted the right
23   amount -- this is the number -- this is how much
24   money we need for salaries.  This is how much --
25   this is how much money we need for every line item
```

Jess Dickinson 11/29/2018

```
 1   in the budget.
 2           We have submitted a sufficient budget to
 3   cover the agency's needs, and then yes, we're
 4   going to be able to fund that budget because we
 5   have general fund money from the Legislature.
 6           We have federal funds that we're going
 7   to get that we expect based on historical
 8   experience, and we have this agreement that if
 9   there's a shortfall, we're going to get it from
10   DHS.
11       Q.   Right.
12       A.   So that's a two-part sentence.
13       Q.   Thank you.
14           And that was in September --
15   mid-September, September 15th, in fact, that you
16   got that information.
17       A.   I need --
18       Q.   Sorry, please go on.
19       A.   September 15th is the memo.
20       Q.   That's right.
21       A.   After I got the memo, there were
22   discussions and all of those discussions didn't
23   take place on the 15th.
24           Please understand, that on the 15th is
25   three days before I began work over there.  I'm
```

Jess Dickinson 11/29/2018

```
 1   moving in, I'm meeting people.
 2           There is a very long list of things I
 3   have to do, and so it's in the context of the
 4   movement of time that I'm having all these
 5   conversations about operating the agency.  I've
 6   got a huge field staff.  I've got a -- so I'm
 7   working, doing many things, including trying to
 8   deal with this budget.
 9       Q.   But the budget was a very important
10   issue to you, wasn't it?
11       A.   Hugely important, but I just didn't want
12   you to have the impression that I got the memo and
13   all the discussions I had about the budget
14   occurred on the 15th.  They occurred over time.
15       Q.   Okay.  So how long did it take before
16   you became alarmed about the fiscal situation?
17       A.   One day.
18       Q.   Okay.  So that didn't take a long time?
19       A.   Didn't take long at all.  When you
20   said -- used the word "alarmed."
21       Q.   Okay.
22       A.   When I first learned that all I had to
23   assure me that I had access to, you know, lots of
24   federal dollars, $30 million in federal dollars,
25   all I -- when I learned that all I had to assure
```

Jess Dickinson 11/29/2018

```
 1   me of that was a verbal agreement, that caused a
 2   level of alarm.  I didn't go ballistic.  I didn't
 3   go off the deep end.  I'm new at this.  I'm trying
 4   to understand how it works.
 5              Why wouldn't there be more than a verbal
 6   agreement?  Why wouldn't it be either in some
 7   statute or in some agreement or a memorandum of
 8   understanding?
 9              I'm trying to learn, and so --
10       Q.   Right.  And how long did it take you to
11   learn that you had to do something about this?
12       A.   I can tell you my best memory of the
13   process.  I can't give you dates.  I can't tell
14   you exactly when, but I can tell you that here's
15   the process.  I got Takesha's memo.  That caused
16   me a great deal of concern.
17              I had conversations with various people
18   to try to understand if anybody had access to
19   financial information, I wanted to have in front
20   of me.  I had asked for a budget.  There is no
21   budget.
22              I had asked Takesha and others can
23   anybody tell me exactly where I am?  How much have
24   we spent on salaries so far, how much did we spend
25   on travel so far?
```

Jess Dickinson 11/29/2018

```
 1        Q.    Did you ask for the budget?
 2        A.    Pardon?
 3        Q.    Did you ask for the budget that had been
 4   submitted?
 5        A.    That's different.  I had that.  There
 6   wasn't any problem having the budget submitted to
 7   the Legislature.  What I wanted to know was what
 8   was reality?  What had we spent?
 9              If the Legislature gave us $95 million
10   to spend on salaries -- and I know you understand
11   the Legislature doesn't appropriate money for line
12   items.
13        Q.    Correct.
14        A.    They give you a block amount of money --
15        Q.    Yes.
16        A.    -- and that's your budget.
17              We had represented to the Legislature we
18   had some amount for salaries, I want to say
19   $95 million, I don't know what it was, but
20   whatever it was.
21              So I'm coming in after the fact, and I'm
22   asking the question where are we?  How much have
23   we spent?  How much do we have left?  And a big
24   issue was with contracts.  How much do we have --
25   have we spent on contracts, how much do we have
```

Jess Dickinson 11/29/2018

```
 1   left?
 2            So as I -- as it became more and more
 3   clear to me that I had no source of that
 4   information in my files, in my agency, in my
 5   deputy commissioners, in my finance deputy
 6   commissioner, I had no source of that information.
 7            I had -- I don't think I'm wrong in
 8   saying -- daily conversations with my chief of
 9   staff, Taylor Cheeseman, who I have great respect
10   for and dependence on, he's very smart and very
11   good at what he does.
12            We had constant conversations about how
13   are we going to address this?  How are we going to
14   make sure we know we are -- we are in fiscal good
15   shape and --
16        Q.   So when did you first go to the -- what
17   is it?  Do you deal with the Legislative budget
18   office --
19        A.   Where you're --
20        Q.   When you're putting in a budget and --
21        A.   You're skipping a lot now.
22        Q.   Okay.  So tell me what I'm skipping.
23        A.   I first went to the Legislative budget
24   office after we began looking at the numbers and
25   realizing we had a problem.
```

Jess Dickinson 11/29/2018

```
 1              It was hard -- it was difficult to get
 2    your arms around the enormity of it, but the only
 3    way to do it, the only way to understand where we
 4    were was to make a list of every obligation that
 5    we had.
 6              We've got so many employees, we've got
 7    to pay them for the rest of the year, this is what
 8    we've got to pay them, this is how much travel we
 9    can expect to have to pay them.
10              This is what we are paying in foster
11    homes.  This is how much we can expect to pay.
12    This is how much we expect based on the history to
13    get from the federal government for foster homes.
14    This is how much we're paying all the agencies
15    that we work with, the care facilities, the
16    therapeutic foster homes, all of the different
17    obligations that we had.
18              The only way I knew to do it was I want
19    a list of all of my obligations, every dime that
20    I'm expected to spend from now to the end of the
21    year, and --
22         Q.   By the "end of the year," you mean the
23    fiscal year?
24         A.   Yes, yes.
25         Q.   Okay.
```

Jess Dickinson 11/29/2018

```
1        A.    And I want to know how much -- I want to
2   know how much money we have --
3        Q.    So when --
4        A.    -- to cover those obligations.  That was
5   a process.  That didn't happen in a day.  That was
6   a huge process.
7        Q.    How long did that take?
8        A.    We had dozens, and dozens, and dozens of
9   contracts, and they were all in operation.
10       Q.    Right.
11       A.    And so, you know, you pull a contract,
12  and you look at how -- so we took it line by line,
13  contract by contract, employee by employee, and we
14  put together a budget that said these are our
15  obligations, and we started to examine where --
16  or to try to determine how much money do we have
17  left, how much have we spent.
18             My staff, Taylor, Kris Jones interacted
19  with the finance staff at DHS to determine how
20  much we had left, and, at one point, they informed
21  us of how much we had left in state funds.
22             That put us in a position to predict how
23  much we would be able to draw down in federal
24  funds, and when we did those calculations, I had a
25  meeting with you close in time to this when I --
```

Jess Dickinson 11/29/2018

1    I'm sure it was shocking to you, but our initial

2    calculations were if we spend everything this

3    agency has committed to spend, if we finish out

4    these contracts that we've signed, if we pay the

5    employees that we have hired right now, if we pay

6    all the travel that will have to be paid for these

7    employees, if we pay the rent, if we pay all of

8    the bills that we've got, we're going to be

9    $54 million short.  We're not going to be able to

10   cover these obligations.

11            So we looked harder at it, and we tried

12   to determine, can this be possible?  That -- when

13   we got to that point, that's the answer to your

14   question, that's when I started -- that's when I

15   felt a very strong obligation to contact the

16   chairman of the appropriations committee for

17   the -- for the Senate, for the House of

18   Representatives, other people in the Legislature I

19   knew, because they control the money.

20        Q.   And when was that?

21        A.   I can't tell you.  It was -- it was -- I

22   mean, I -- it was a process.  It was --

23        Q.   When did you contact the people that you

24   knew in the Legislature?

25        A.   I got there September 18.  I'm going to

Jess Dickinson 11/29/2018

```
 1    say within seven or eight weeks, up until late
 2    November, say probably around -- giving you my
 3    best recollection, probably around late November,
 4    early December is when I started making calls
 5    saying, "I'm seeing a problem here, and I need
 6    some help in understanding what my options are."
 7         Q.    And I would like to direct your
 8    attention to paragraph 23 of your affidavit.
 9              And that says, "On November 15, 2017,
10    MDCPS was alerted by members of MDHS's finance
11    staff that MDCPS was running low on its state fund
12    allotment, meaning that without corrective action,
13    we would not have sufficient state funds to
14    complete your FY" -- sorry -- "our FY 2008
15    obligations."
16              So was that the first time you were
17    contacted by somebody external to the agency,
18    because this was MDHS that contacts, according to
19    this paragraph, MDCPS?
20         A.    Yes, this is part of that process.  This
21    is the first time that we got any hard information
22    about where we were.  It fell to us -- the people
23    at DHS had no ability, as far as I know, to
24    analyze the expenditures' side of it.
25              We had to pull our own contracts and add
```

Jess Dickinson 11/29/2018

1    up our own numbers.  This is our obligation.  We
2    had to do that, but I didn't have -- I don't have
3    a checkbook.  I didn't have a way to say this is
4    how much we've spent, this is how much we've got
5    left.
6              That's what I was saying to you earlier,
7    you get an appropriation, and I'm asking for a
8    budget to determine how much has been spent, and I
9    don't have access to one; so I'm saying to my
10   deputy commissioners, they are interacting with
11   the DHS deputy commissioners and finance people
12   over there saying to them, because they put all
13   these numbers in this MAGIC system, and it's the
14   DHS budget.
15             We don't have a separate MDCPS budget in
16   MAGIC.  It's all DHS, so they had to go in there
17   and pull it out.
18        Q.   And this --
19        A.   So they began looking at where we were,
20   and that's what resulted in this contact reporting
21   back to us, "Y'all are burning through too much
22   money."
23        Q.   And this was the first that you knew,
24   other than your general disquiet because you
25   didn't have a budget, this was the first that you

Jess Dickinson 11/29/2018

1    knew of the financial issues with regard to the

2    agency on November 15th?

3         A.    You're using a very general term, that

4    there were "financial issues."  It's the first

5    time that I was contacted with any hard,

6    dependable information that we are in trouble on

7    the funding side of this thing that -- bear in

8    mind, I had already been told -- I was already

9    concerned about am I going to be able to get this

10   federal money that I was -- there was this verbal

11   agreement, I had that in the back of my mind, and

12   that's always concerning me, all along, but in

13   terms of state money, in terms of -- of state

14   appropriation, funds that the Legislature

15   appropriated that I'm having to spend every month

16   to pay my bills, this is the first time anybody

17   provided me any information that, "You're behind,

18   the agency has been spending too much money.

19   You're not going to have enough to make it through

20   the rest of the year."  If that --

21        Q.    No, I understand.  So that took you --

22   so that took you almost two months, because you

23   got the Takesha Darby memo on September 15th, and

24   this is now November 15th; is that right?

25        A.    That's probably right, yes.

Jess Dickinson 11/29/2018

```
 1        Q.   So I'd like you to take a look at
 2   Exhibit 17.  And, specifically, on paragraph
 3   one -- it looks like paragraph four, and it's the
 4   sentence that reads, "Dickinson, who took over
 5   following the retirement of the agency's first
 6   executive director, David Chandler, said he became
 7   aware of the discrepancy" --
 8        A.   Please forgive me for interrupting you,
 9   but I'm in the wrong place.  Help me get to where
10   you are.
11        Q.   I think it's paragraph five.
12        A.   What's the first few words?
13        Q.   -- "but the problem" -- "said he became
14   aware of the discrepancy within weeks of joining
15   the agency in September."
16        A.   Yeah, this -- this statement is about a
17   different problem.
18        Q.   Okay.  What problem is this about?
19        A.   It is about the budget submitted to the
20   Legislature.  This whole discussion, and again, I
21   don't know -- I can't tell you what's in the mind
22   of the reporter who wrote all this, but I can tell
23   you what was in my mind as I had these discussions
24   with the Legislature.
25             My concern was that the budgets -- the
```

Jess Dickinson 11/29/2018

```
 1   budget that had been submitted to the Legislature,
 2   overstated expected receipt of federal funds by,
 3   in one place, a hundred million dollars, and --
 4        Q.   Let look -- let's look at the budget.
 5        A.   I mean, that's what this paragraph is
 6   about, it's about the budget.
 7        Q.   Okay.  Exhibit 15?
 8        A.   Okay.
 9        Q.   And so when did you obtain a copy of
10   Exhibit 15?
11        A.   I don't know.  I'm sure it was early,
12   very early, because I was demanding everything
13   available that had numbers on it.
14        Q.   Okay.  So what on this budget told you
15   that there was a problem?
16        A.   What I just said to you, the federal
17   funds.
18        Q.   Can you tell me specifically what are
19   that are on this document?
20        A.   On the first page -- excuse me -- if you
21   move -- if you look down at Roman Numeral II,
22   "Budget to be funded as follows..."
23        Q.   Just a second.
24        A.   Okay.  If you go down -- if you go down
25   to federal funds, what this budget -- what this
```

1    document is doing is it is reporting financial

2    information to the Legislature, and there are

3    three columns there.  The first column where it

4    says "$89,403,444," those are real numbers.

5            That's what the agency is saying to the

6    Legislature, this is what actually happened last

7    year, last fiscal year.

8            These are the real numbers.  We know

9    this is accurate.  That was for FY '16.  It's

10   saying to the Legislature, we are in the middle --

11   this middle column -- we are in the middle of FY

12   '17, so we're going to tell you -- we're going to

13   predict for you where we think we're going to end

14   up this year.

15           And then the third column is saying to

16   the Legislature, this is what we're asking you for

17   for next year.  These are the numbers we predict

18   for next year that support our request for funds

19   in the budget we're submitting.

20       Q.   All right.

21       A.   Okay.  So this is a submission for the

22   FY '18 budget.

23       Q.   Uh-huh (affirmative response).

24       A.   So this is -- this is saying to the

25   Legislature, we actually got $89 million in

Jess Dickinson 11/29/2018

```
1    federal funds last year.  We're predicting we're
2    going to get 197 this year.  That set off alarm
3    bells in my head; I think any reasonable person
4    would.
5             Why in the world if you didn't get but
6    89 million last year, are you predicting you're
7    going to get 197 this year, and you're telling the
8    Legislature you think you're going to get
9    198 million next year, and the budget you're
10   asking for that supports your budget request?  And
11   so, do you see?
12        Q.   So this was the first year --
13        A.   Wait a minute.  I'm going to -- may I
14   answer your question?
15        Q.   Please do; please do.
16        A.   And so when you see that huge disparity
17   in those numbers, that is what led to the
18   statement that I made that you see in this
19   article.
20             This article is saying, "Dickinson told
21   lawmakers that during a phone call this month with
22   John Davis, Director of Department of Human" --
23   "Dickinson was shocked to hear the department
24   would receive nearly 130 million less in federal
25   funds than estimated."  That's the estimate.
```

Jess Dickinson 11/29/2018

```
 1    And -- are you with me?
 2         Q.   Yes.  Just give me just one second.
 3              Do any of these numbers -- are any of
 4    these numbers having to do with the move that the
 5    agency was making to separate with MD- -- MDHS?
 6         A.   All right.  Now, let's -- let me get on
 7    the same page with you, okay?
 8         Q.   So I'm looking --
 9         A.   Because you're moving to a whole
10    different question now.
11         Q.   No, I'm just looking at the numbers here
12    and the years.  So, actual expenses, June 30, 2016
13    is 89,403, estimated expenses, June 30, 2017, and
14    requested for June 30, 2018, we have 89 million,
15    197 million, and 198?
16         A.   I got it.  I'm with you, but --
17         Q.   Okay.  And so there's a big difference,
18    obviously, between '16 and '17, and I'm just
19    wondering whether there's any of that difference
20    is accounted for by the fact that the agency is
21    separating itself from DHS?
22              MR. JONES:  And let me just ask this
23         question because I just couldn't hear you.
24              MS. LOWRY:  I'm sorry.  I have to talk
25         up.
```

Jess Dickinson 11/29/2018

```
 1              MR. JONES:  You're reading across the
 2         federal funds line.
 3              MS. LOWRY:  That's right.
 4              THE WITNESS:  No.
 5         Q.   (By Ms. Lowry)  So that wouldn't have
 6    affected your position?
 7         A.   Well, I'm not going to say it didn't
 8    have any affect on it, but I'm saying to you that
 9    I went back and looked at -- and I know that you
10    and I had a discussion about this in one of our
11    parties' meetings.  I went back and looked -- this
12    is the FY '18 budget.
13              If you look at the FY '17 budget, it did
14    the same thing.  FY '17 budget, when it reported
15    the actual FY '15 numbers and then it estimated
16    what was going to happen in '16, it was the same
17    thing.  It was this huge jump in a number.
18              So this -- this appeared to me to be a
19    process.  It appeared to me to be a method of
20    somebody doing the budgeting process, and it was
21    very concerning to me, because I don't understand
22    why you would tell the Legislature that you are
23    expecting a hundred million dollars more in
24    federal funds than you got last year without some
25    kind of explanation of where that money was coming
```

Jess Dickinson 11/29/2018

```
 1   from, because they don't just give you federal
 2   money, you get federal money when it's matched
 3   with state money.
 4            We didn't have -- in other words, if the
 5   Legislature appropriated a hundred million dollars
 6   last year and $200 million this year, then I
 7   wouldn't have any problem saying we're going to
 8   get an extra hundred million dollars in federal
 9   funds because we've got more money to match it
10   with.
11            But when you've got the same amount --
12   you've got relatively the same amount of state
13   appropriation, which is what you use to match to
14   get federal funds, saying double amount of federal
15   funds, somebody needs to explain to me how that's
16   going to happen, because I don't know -- I
17   couldn't find any source of federal funds that
18   were -- not even John Davis and TANF funds --
19   nothing would make that happen.
20            So this is very concerning to me why
21   these numbers were reporting what they were
22   reporting.
23        Q.   Okay.  So approximately, when did you
24   look at this Exhibit 15 roughly?  Was it within
25   two weeks of taking your position?
```

Jess Dickinson 11/29/2018

```
 1        A.   I'd be guessing to tell you.  I don't
 2   know, Marcia.
 3        Q.   Was it pretty soon after you took the
 4   position?
 5        A.   I just hope you understand that when I
 6   went over there, there were dozens of things I had
 7   to do.
 8        Q.   How important was the funding to you?
 9        A.   It was hugely important.  It was very
10   important, but so was learning the names of my
11   employees and learning where they worked, and
12   learning how my county offices worked, and
13   responding to dozens of crises across the state,
14   and dealing with -- it's just -- it's an enormous
15   undertaking.
16             And so when you ask me when did I first
17   see this, I really -- I don't know.  I know that I
18   asked for -- I asked for financial information,
19   and, at some point, I got this.
20        Q.   Okay.  But that was probably pretty soon
21   after you took office?
22        A.   I can't say that.  When you say "pretty
23   soon" --
24        Q.   Well, what I'm wondering, and let me
25   just tell you what my question is, these might be
```

Jess Dickinson 11/29/2018

```
 1    serious concerns.  I'm just wondering why you
 2    didn't call the state Legislative Budget Office
 3    real quickly, because you don't contact the
 4    Legislative Budget Office until after you get
 5    financial information from MDHS and until after --
 6    after sometime in December -- yeah, beginning of
 7    December.  I'm just wondering.
 8         A.   Because I don't know why I would call
 9    the Legislative Budget Office.  They're not going
10    to help me.  They don't know why my people -- the
11    agency's people did what they did.  The
12    Legislative Budget Office -- my contact with the
13    Legislative Budget Office was to talk to them
14    about the fact that I needed to revise the budget.
15              I called the Legislative Budget Office
16    and asked for a meeting with them because it
17    became very clear to me that what had been
18    requested was not going to be enough money to
19    finish up the fiscal year, and I had to come to
20    some kind of solution to fix it.  I had to get
21    money somewhere.
22              And so the first step to get more money
23    from the Legislature is go to the Legislative
24    Budget Office and say to them, "I'm going -- it
25    looks to me like I'm going to need to request a
```

Jess Dickinson 11/29/2018

```
 1    deficit appropriation, and I know that I need -- I
 2    can't wait until January to do this when the
 3    Legislature comes into session.  I need to make a
 4    case.  I need to explain to y'all why I think I'm
 5    going to end up having to do this."
 6              And so, I called and made that
 7    appointment.  I didn't -- look, I didn't just call
 8    the Legislative Budget Office.  I called the
 9    appropriation chairman and other members of the
10    Legislature.
11              I went to see the Lieutenant Governor.
12    I went everywhere I could go to try to find help
13    in understanding these numbers and understanding
14    where I was and how I was going to solve this
15    crisis, because if I didn't, we were going to run
16    out of money probably sometime in March, and I had
17    zero money to spend, which means we don't have a
18    hiring freeze, we don't have employees, I don't
19    have homes to put children in.  I can't let that
20    happen.
21              And so that -- that's why I called the
22    Legislative Budget Office to try to determine from
23    them what I would need to do to get a deficit
24    appropriation.
25              They're not going to be able to tell me.
```

Jess Dickinson 11/29/2018

```
 1   They couldn't tell me today why these numbers were
 2   reported this way.
 3            Only my people could -- only the people
 4   that were there that wrote this budget could tell
 5   you, and I asked them, and they didn't know.
 6   Except for one explanation, and that was what
 7   Dr. Chandler testified to, and that is -- excuse
 8   me -- what John Davis testified to, and, that is,
 9   that agencies -- that what -- what these numbers
10   represent are requests for spending authority, and
11   so they were asking for spending authority.
12   That's what I was told.
13        Q.   Who did you work with at either MDCPS or
14   externally to help evaluate this budget request?
15        A.   Who did I work with at MDCPS or where?
16        Q.   Or elsewhere to try to evaluate this
17   budget request.
18        A.   I worked with Ms. Darby, I worked with
19   Taylor Cheeseman, I worked with Chip Butler.
20        Q.   Who is Chip Butler, please, and where is
21   he?
22        A.   He's at DHS, and their finance staff,
23   Bridgette, they have a lot of people over there on
24   the finance staff.  We were still part of DHS; in
25   other words, we still had communications and still
```

```
 1   do.
 2            We always have, but I'm -- I'm talking
 3   with everybody who has any connection to the
 4   finance part of the agency to help me try to
 5   understand this.
 6            All during -- all during that process,
 7   all along the way, I'm doing that.  I talked to
 8   you about it.  I talked to everybody about it,
 9   that I'm looking at these numbers, and I don't
10   understand it.
11            I -- I very specifically recall sitting
12   across the table from you and you said the same
13   thing, "I don't understand this," and I responded,
14   "Neither do I."
15            I don't know why this is here, but
16   somebody put it here, and I've got to deal with
17   it.  I'm left to deal with this because I'm the
18   commissioner, and I have to deal with it, so --
19       Q.   So did there come a time when you had a
20   conversation with John Davis about this?
21       A.   This?
22       Q.   I'm sorry.  About the shortfall in the
23   agency?
24       A.   Yes.  Oh, yes, I did.  I sent him a
25   letter, he sent me an e-mail.  We had
```

Jess Dickinson 11/29/2018

 1    conversations.
 2              Now, John Davis is -- the way -- the way
 3    I saw it, was John Davis' part in this process was
 4    providing me that money that -- in other words, if
 5    John Davis had said, "Look, don't worry about it,
 6    I've got -- you're going to be $54 million short,
 7    I've got $54 million, I'm going to plug the hole,"
 8    I wouldn't have worried about it if I knew I was
 9    going to get that money.
10              So yes, I had conversations with John
11    Davis to the extent of, number one, how much money
12    are you going to be able to give me; and, number
13    two, how do I know I'm going to get it?  I had
14    those conversations.  I did.
15        Q.   I'd like to call your attention now to
16    Exhibit 2, which is a letter dated December 15th
17    to John Davis from you.
18        A.   Uh-huh (affirmative response).
19              MR. JONES:  Hold on just a second and
20        let's look at it.
21              THE WITNESS:  Okay.
22        Q.   (By Ms. Lowry)  At what point in this
23    process did you write -- in the process of trying to
24    address the fiscal situation -- did you write this
25    letter?

Jess Dickinson 11/29/2018

```
 1        A.    I wrote this letter right around the
 2   time it's dated.
 3        Q.    Okay.  And in the letter, you say that
 4   this, meaning, "making harsh cuts to crucial areas
 5   of our budget will also prevent us from compliance
 6   with numerous requirements of the federal court
 7   order in the Olivia Y. litigation."
 8        A.    Uh-huh (affirmative response).
 9        Q.    So what were you referring to there?
10        A.    Second page?
11        Q.    Yes, it's the second page, and it's the
12   next to the last paragraph.
13        A.    The two cuts, there were some contract
14   concerns, but the two cuts that I primarily was --
15   was referring to there was the -- the plan that
16   was in place to try to increase our workforce to
17   hire more caseworkers, and the -- and the
18   implementation of or the preparation for and the
19   implementation of the CCWIS system.
20             Those two things were a lot of money,
21   and I needed additional funding in order to be
22   able to proceed along the path that the agency had
23   set.
24             In other words, what I said to you
25   earlier about we sat down and figured out what are
```

Jess Dickinson 11/29/2018

1    the obligations of the agency from now to the end

2    of the fiscal year, that included hiring

3    employees, how many are we committed to hire,

4    how many -- what is the calculation of what I'm

5    going to have to pay in salaries, in travel, in

6    print -- you know, all the things I have to pay

7    for these employees, how much am I going to have

8    to pay these contractors that are on-site working

9    on this CCWIS project to develop this computer

10   system?

11            And what I was saying to John Davis in

12   this letter was, the best I knew how to say it,

13   was unless I can get some money to fund these

14   things, I'm not going to be able to proceed with

15   them, and if I don't proceed with them, this is

16   something we're required to do in the Olivia Y.

17   litigation.

18        Q.   Right.  And this says numerous

19   requirements in the federal court order of the

20   Olivia Y. litigation.  Were there other things you

21   weren't going to be able to do?

22        A.   Numerous may have been my attempt to

23   describe a couple of things in a way that caused

24   him to act.  I can't tell you -- let me think

25   back.

Jess Dickinson 11/29/2018

```
 1              We had -- we had the caseload concern.
 2    I know that what I would have believed was that
 3    without the ability to hire more caseworkers,
 4    there are many metrics in the settlement agreement
 5    that you can't accomplish without caseworkers, not
 6    just the number of cases they have, but they have
 7    to do -- you know, they have to -- they have to
 8    accomplish visits, certain things within certain
 9    time frames.
10              If I don't have enough caseworkers,
11    there are -- if you cut my workforce in half,
12    there are very few things in that settlement
13    agreement we could accomplish, that we could
14    comply with, because I need caseworkers to do
15    that.  I needed to be able to keep hiring
16    caseworkers.  I needed the money to do that.
17         Q.   And yet you didn't get the money, did
18    you?
19         A.   I got some of it.
20         Q.   You didn't get the money for hiring
21    additional caseworkers, did you?
22         A.   No.
23         Q.   Okay.  And with regard to the CCWIS
24    project, that's as I read the materials that I've
25    obtained, it looks like that's been suspended for
```

Jess Dickinson 11/29/2018

```
 1   a year?
 2        A.   It has been put on pause for sure.
 3   We've had to.
 4        Q.   Okay.  So this is something -- I'm going
 5   to ask you to look at a document, and it's
 6   Exhibit 3, Exhibit 3.  And, specifically, I'm
 7   going to ask you to look at pages 16 to -- 16 to
 8   17.
 9        A.   Pages 16 to 17, okay.
10        Q.   Have you ever seen this document before?
11        A.   Yes.
12        Q.   Have you read it?
13        A.   Yes.
14        Q.   Okay.  So I'm looking or asking you to
15   look at the bottom of 16, the top of 17.
16        A.   Okay.
17        Q.   And it says, "To achieve positive
18   outcomes for children and families, it is critical
19   that Mississippi have a competent, committed
20   trained and resourced child welfare workforce.
21   The first order of business must be the creation
22   and implementation of a comprehensive dynamic plan
23   to achieve manageable caseloads for staff within
24   one year."
25             Do you agree with that statement?
```

Jess Dickinson 11/29/2018

```
 1          A.   I do.

 2          Q.   As I understand it, you are at -- you

 3     were either at 48 or 53 percent of compliance with

 4     the caseload standards, 53 percent as of, I think,

 5     November of 2018.

 6               So you're not anywhere near compliance

 7     with the caseload standards.

 8               Would you agree with that?

 9          A.   If -- if by what you mean when you say

10     "caseload standards" is having 90 percent of our

11     caseworkers in compliance --

12          Q.   That's right.

13          A.   -- I would agree with that statement.

14     "Not anywhere near" means that the numbers you are

15     reciting, if they are correct, then that's where

16     they are.

17          Q.   Okay.  So how can you deliver services

18     when the most fundamental thing in the

19     organizational analysis was to bring on additional

20     workers, and you have at least hit a pause button

21     on the requirement to do so?

22               I'm asking you the question.

23          A.   Rephrase -- would you say the question

24     again?

25          Q.   Sure.  How can you deliver services when
```

Jess Dickinson 11/29/2018

```
 1    the most fundamental thing in the organizational
 2    analysis was to bring on additional workers, and
 3    you have at least hit a pause button on the
 4    requirement to do so?
 5         A.   How can I deliver services?
 6         Q.   Yes.
 7         A.   I have --
 8         Q.   Let me -- let me amend that.  How can
 9    you deliver adequate services?
10         A.   If our caseworkers are able to handle
11    the caseloads that they are assigned and achieve
12    the proper results, then we are able to do that.
13    If they're not, we're not.
14         Q.   So your opinion, then, is that that
15    requirement is not necessary in the consent
16    agreement?
17         A.   Necessary?  My -- my opinion is that
18    the -- the way it's set up in the settlement
19    agreement, if it's for the purpose of judging
20    whether or not we are delivering adequate services
21    for children, it's not accomplishing that.
22              That is not, in my opinion, the way to
23    do that.  You can't -- you cannot -- let me back
24    up.
25              I do not believe that just because
```

Jess Dickinson 11/29/2018

```
 1   90 percent of our caseworkers would be in
 2   compliance with those standards absolutely mean
 3   we're delivering proper services, and I do not
 4   believe that if we're not in compliance with that
 5   90 percent, we aren't.  I think it depends on
 6   other factors.
 7        Q.   And do you believe that that is a
 8   foundational element in delivering adequate
 9   services?
10        A.   What is a foundational element?
11        Q.   Something that's at the beginning or the
12   base of?
13        A.   Do I believe that -- what is the thing
14   you're asking me about being a foundation --
15        Q.   The caseload limits?
16        A.   Which caseload limits?
17        Q.   The 90 percent compliance.
18        A.   As I said, I think the 90 percent
19   compliance -- the requirement that 90 percent of
20   our caseworkers be in compliance, absolute
21   compliance with that -- those percentages is a
22   very poor way to indicate or judge whether or not
23   we are delivering proper services to the children.
24        Q.   Right.  You have to look at other issues
25   as well, right?
```

Jess Dickinson 11/29/2018

```
 1        A.   You have to look at a lot of things, but

 2   yes.

 3        Q.   And the -- do you -- no, I'll withdraw

 4   that.  Do you agree with -- I'll withdraw that.

 5   Okay.

 6             It is no secret that the Department has

 7   moved to be relieved from the provision in the MSA

 8   requiring 90 percent compliance with the caseload

 9   standard; is that right?

10        A.   Yes.

11        Q.   Okay.  Did you seek a stay of that

12   provision?

13        A.   You'll have to ask our counsel.

14        Q.   Well, are you aware of any other

15   proceedings related to the application to be

16   relieved of that requirement?

17        A.   Other than what?

18        Q.   Anything else that's gone on in court.

19   The Judge hasn't spoken on that issue; is that

20   right?

21        A.   You mean the judge in our case?  No.

22        Q.   Yes, yes, I'm just talking about --

23        A.   No, you're right.  All I'm aware of is

24   the pending litigation in this case that affects

25   my agency.
```

Jess Dickinson 11/29/2018

```
 1        Q.   That's all I'm talking about.
 2        A.   Okay.  Well, I mean, what's your
 3   question now?
 4        Q.   My question is, was there a stay
 5   obtained of the obligation to comply with the
 6   90 percent level on the caseloads?
 7        A.   Not that I'm aware, but again, you need
 8   to ask my counsel.  I no longer practice law.
 9        Q.   Okay.
10        A.   And I'm not aware of one.
11        Q.   Now, you had the opportunity to decide
12   where you were going to make cuts within the
13   agency when you found out what the budget was
14   going to be for the rest of 2017?
15        A.   FY '18.
16        Q.   And FY '18, right?
17        A.   No, I had no ability to do anything
18   about FY '17.
19        Q.   '17, right.
20        A.   I was in the middle of FY '18.
21        Q.   Yes.  Right.  That's absolutely right.
22   You had the opportunity to make decisions about
23   what you were going to cut to comply with the
24   budget the Legislature was going -- had given you?
25        A.   I had the opportunity to decide what to
```

Jess Dickinson 11/29/2018

```
 1    cut -- I had the -- "opportunity" is not the word
 2    I would have chosen.  I had the obligation.  I had
 3    the obligation to bring the budget into line.  I
 4    had to do that.
 5         Q.   And so you chose to eliminate the
 6    caseload requirement; is that right?
 7         A.   No.
 8              MR. JONES:  I object to the form of the
 9         question.
10         Q.   (By Ms. Lowry)  You didn't?
11         A.   And I apologize.  I'm not trying to be
12    difficult.  I don't see those two things as
13    related.
14              What I chose to do was to -- was to
15    implement policy that would bring the budget in
16    line.
17         Q.   And was that an obligation that was
18    greater than the obligation to comply with a
19    Federal Court order?
20         A.   The Federal Court order doesn't tell me
21    how much to cut or not cut with respect to
22    salaries.
23              In other words, I never -- I never made
24    any decision we're not going to comply with the
25    court order.  I made the decision of here's how
```

Jess Dickinson 11/29/2018

1    much money I've got to spend on salaries, and
2    that's what we're going to spend.
3        Q.    And --
4        A.    I certainly --
5        Q.    Please go ahead.
6        A.    I certainly understood that by not
7    pursuing hiring additional people, that was a
8    problem for me, but I didn't have -- it's not --
9    it wasn't a choice.  I didn't have the money to do
10   it, so --
11       Q.    But you had other things you could have
12   cut in the budget, did you not?
13       A.    Well, I don't know what they are.  I
14   don't know what we could have cut that we didn't
15   cut.  We cut a lot of things.  I couldn't -- look,
16   my money is foster homes, care for children.  The
17   great bulk of my money goes to caseworkers, foster
18   homes, therapeutic care and taking care of
19   children.
20       Q.    Let me show you something that has been
21   marked as Exhibit 12 which -- which could you
22   please take a look at?  This is something that is
23   addressed to Chris Graham and signed by Taylor
24   Cheeseman and purports to be the amended 2019
25   budget.

Jess Dickinson 11/29/2018

```
 1        A.    All right.

 2        Q.    Is that what it seems to be to you?

 3        A.    All right.  Give me a minute.

 4        Q.    Sure.

 5        A.    (Examining.)  Yes.  This -- this -- what

 6   I think this is, is the explanation and support

 7   explanation for our -- the revised budget that we

 8   submitted to the Legislature for -- for FY '19 --

 9   for our FY '19 request.

10        Q.    Let me ask you some questions about

11   this.  You have under -- I'm sorry, this is on

12   page 1.  The Bates numbers are on the pages in the

13   bottom right, and it's 011830.  We have 1,904,114

14   under MACWIS support, and you have 11 million on

15   page 11832.

16        A.    You're going way too fast for me.  That

17   first number is what?

18        Q.    1,904,114 -- 114, okay.

19        A.    I don't find it.  1 million --

20        Q.    Just the bold numbers.

21        A.    Oh, okay.  $1.9 million.

22        Q.    For MACWIS support?

23        A.    MACWIS support, yes.

24        Q.    And then I'm asking you to look at

25   CCWIS, and that's on page 11832, and that is 11
```

Jess Dickinson 11/29/2018

```
 1   million 153.
 2            Do you see that?
 3       A.   I do.
 4       Q.   Okay.  And then on --
 5       A.   I got it.
 6       Q.   And then on page 11835, you have
 7   contracts listed, and under "prevention sub
 8   grants," you have a subtotal of 12,515,558.
 9            Do you see that?
10       A.   Yes, I do.
11       Q.   Okay.  So why could none of those items
12   have been cut?
13       A.   Why could they not be cut?
14       Q.   Yes, instead of the development --
15   bringing on of additional staff to meet the
16   caseload numbers.
17       A.   Well, if I -- start with the last one?
18   I don't know what I would do with the children if
19   I cut that one, because this is taking care of
20   children.
21       Q.   But this is a prevention sub grant.
22   This is for services -- as I understand it, this
23   is for services in the home, and you have two
24   items there that are 8 million and 3 million.
25       A.   Right.
```

Jess Dickinson 11/29/2018

```
 1          Q.    And so that -- so I don't know exactly
 2    what that is for, but it's not children in foster
 3    care; is that right?
 4          A.    Well, it would be.
 5          Q.    Perhaps it would, perhaps it wouldn't?
 6          A.    No, there's no perhaps -- no perhaps.
 7    Excuse me, I'm sorry.
 8          Q.    No, please answer.
 9          A.    You don't qualify for that program.
10    These are in home services that a youth court
11    determines this is a child at risk of going into
12    foster care, but because these in home services
13    are available, I'm not going to put him in foster
14    care, I'm going to leave him at home and let the
15    in-CIRCLE contractor work with them in the home.
16          If I don't have an in-CIRCLE contractor
17    available, they're going into foster care.
18          Q.    So they've all been certified as
19    being -- otherwise, they would be going into
20    foster care?
21          A.    Yes, that's how in-CIRCLE works.  That's
22    what it is.  That's the purpose of it is to keep
23    children who otherwise would go into foster care
24    to keep children out of foster care and at home.
25          Q.    I understand that's the purpose of it,
```

Jess Dickinson 11/29/2018

1    but they've all been certified by a state court
2    that otherwise go into foster care?
3         A.    I hope so.  They're supposed to be.
4    Yes, to my understanding, yes.
5         Q.    Now, what about the money that is set
6    aside for CCWIS and MACWIS support that we looked
7    at.
8         A.    I mean what?
9         Q.    We'll go back to it.
10        A.    You asked me did I cut that?
11        Q.    Yes.
12        A.    No.  I met with my IT people.  I know
13   what my obligations are to maintain an information
14   system for the agency.  I don't think it's
15   debatable that if I'm not able -- you would -- you
16   would not like it if we didn't have what meager
17   ability we have right now to provide data and
18   information with the MACWIS system, you would
19   certainly not like that there's no way, because of
20   the fragile condition of MACWIS and our desperate
21   attempt to try to keep it going, there's no way in
22   the world we could not send the money on MACWIS.
23        Q.    Okay.
24        A.    The CCWIS system, you require.  That's
25   part of the settlement agreement.  I have to -- I

Jess Dickinson 11/29/2018

```
 1    have to try to develop CCWIS.
 2         Q.   I thought you said that had been
 3    suspended?
 4         A.   What had been suspended?
 5         Q.   CCWIS.
 6         A.   It has been paused.
 7         Q.   Paused.  I'll accept the word "paused,"
 8    but it's, in fact, not moving forward?
 9         A.   In some respects.  In some respects, it
10    is.  The federal government will fund 50 percent
11    of the development of CCWIS; 50 percent state
12    money, 50 percent federal money.
13             If I don't keep the project alive, if I
14    don't continue to -- to involve the agency in some
15    level of development of CCWIS, then the project
16    does end, and when the project ends, then we are
17    unable to get 50 percent funding, and then instead
18    of CCWIS costing the State $30 million, it costs
19    the State $60 million.
20             And so the only way we can know how much
21    we have to spend on CCWIS, the only way we can
22    know what we have to continue to do is deal with
23    the Children's Bureau, which is part -- as you
24    know, is the Department of Health & Human
25    Services.  They're the ones that tell us what to
```

Jess Dickinson 11/29/2018

1    do.

2            So we have to say to them, can we

3    continue to qualify for our 50 percent -- for our

4    federal match and keep CCWIS alive if we don't

5    bring in contractors and start putting it together

6    right now, but we put it on pause, but we do these

7    things, they have to approve that.

8            So we've dealt with the Children's

9    Bureau for months and months on this, and what

10   we're doing right now, has been approved by them.

11           So no, I can't cut -- I could, yes,

12   if -- if -- if two things happen, and you and I

13   could agree we're going to just take CCWIS out of

14   this settlement agreement, and then I could become

15   convinced we were going to provide adequate care

16   for these children with MACWIS, yeah, we could do

17   it, but neither one of those things have happened

18   yet.

19       Q.   This is $11 million for you to keep

20   investing in efforts that you said had been

21   paused?

22       A.   All right.  Just give me a minute.

23       Q.   I'm just looking at --

24       A.   This is -- this is in March of 2018.  I

25   guess that's when these numbers -- you're

Jess Dickinson 11/29/2018

```
 1   representing -- you handed me an exhibit.
 2        Q.   Yes, it's for the '19 budget, which is
 3   '18 to '19, which is the last fiscal year.
 4        A.   This budget -- I'm sorry.  This backup
 5   documentation and this -- these budget numbers
 6   were developed at a time when we believed it still
 7   possible for us to -- to develop the CCWIS system
 8   and go forward with it with an agile development
 9   model.
10             Do you see what I mean?
11        Q.   This is through the middle of '19.  It's
12   from '18, July 1, '18 through June 30th '19; is
13   that correct?
14        A.   When you say "this is," what do you
15   mean?
16        Q.   I'm sorry.  I'm referring to Exhibit 12.
17        A.   The -- the documentation that's attached
18   to Exhibit 12 is what Taylor Cheeseman says it is
19   in this letter to Chris Graham.  Just give me a
20   second here.
21        Q.   Sure.
22        A.   March the 20th.  The problem I'm having
23   is putting this in time context because we've gone
24   through stages of where the agency is with respect
25   to CCWIS.
```

Jess Dickinson 11/29/2018

```
 1              We've gone from believing we're going to
 2    be able to go forward with an agile development
 3    model and develop the system in-house, which is
 4    what Cindy Greer wanted to do, to realizing they
 5    didn't give us the money when we asked for it, so
 6    we didn't have it, so we had to start moving to
 7    different models to keep it alive.
 8              I'm just trying to get in my head where
 9    we were in this process.  I wish I had known in
10    advance you were going to ask me this, and I could
11    have gone back and figured out where we were.
12              All I know is that the money committed
13    to CCWIS, we should be spending -- if we could --
14    we should be spending $30 million a year, which is
15    15 million in state and 15 in federal funds.  This
16    probably assumes that we wanted to do better or
17    could do better in some way, intended to move
18    forward with that agile development model.
19              A certain amount had already been spent,
20    so this probably is the balance of that
21    $15 million.  I don't know.
22         Q.   But this is $11 million that is budgeted
23    for FY '19, as I understand it, and you're telling
24    me, I think, that you don't know whether this is
25    being spent.  I just want to be clear on this.
```

Jess Dickinson 11/29/2018

```
 1        A.    Well, March the 20th of 2018 is three
 2   months before the FY '18 budget is concluded, so
 3   this has got nothing to do with the budget we were
 4   living with.
 5        Q.    That's right.  This is '19?
 6        A.    This is dealing with what we have asked
 7   the Legislature for, and March the 20th is roughly
 8   10 days before the Legislative session ended.
 9              I'm not sure on March the 20th that we
10   even knew what our appropriation was at that time.
11   I don't know.
12        Q.    But, this is $11 million, arguably not
13   chump change, a significant amount of money for
14   the 2019 budget that you're telling me you don't
15   know is being spent.
16              MR. JONES:  I didn't want to interrupt,
17         but hold on just a moment.  I'm going to
18         object.  It is a budget.  Your questions
19         imply it's a -- it's funding.  It's a budget.
20              MS. LOWRY:  Understood, but this is the
21         '19 funding, and this is money, as far as I
22         can tell, that's not actually being spent.
23        Q.    (By Ms. Lowry)  So my question to the
24   witness is how --
25              MR. JONES:  Same objection.
```

Jess Dickinson 11/29/2018

```
 1        Q.   (By Ms. Lowry)  How much would it cost you
 2   to bring the agency into compliance with the
 3   caseload numbers?
 4             Taylor Cheeseman testified that it was
 5   about $7 million, and I look at this item for
 6   11 million, and it looks to me that you have not
 7   spent this money for '19 or you're not going to
 8   spend the money for '19, and I would like to know
 9   why you didn't choose to spend it to reach
10   compliance with the caseload numbers?
11             MR. JONES:  Let me just have a
12        continuing objection to -- to questions
13        stating why did you not spend money in a
14        projected budget that has nothing to do with
15        the appropriation.
16             MS. LOWRY:  You have your continuing
17        objection.
18             THE WITNESS:  Why didn't we spend it
19        on -- is that what you're asking me, why
20        didn't we spend it on caseworkers?
21        Q.   (By Ms. Lowry)  I'm asking you why you
22   were asking -- basically, why you were asking to be
23   removed from a requirement that you bring your
24   caseloads into compliance with the -- the MSA?
25             That's it.  And that's a simple question.
```

Jess Dickinson 11/29/2018

1              This docu- --

2        A.    When we submitted --

3        Q.    Let me just finish.  This document shows

4   that you've got items in the '19 budget that looks

5   like you're not going to spend, and I want to know

6   why you can't use that money for caseload?

7        A.    We didn't get it.  I mean, I think you

8   know that.  I think you know that we submitted a

9   budget -- a FY '19 budget, and the Legislature cut

10  us short by I forget how many millions of dollars,

11  but we didn't get what we asked for.

12              What we asked for would have allowed us

13  to go forward with the CCWIS projects and with

14  hiring the case workers.  They level funded us;

15  they funded us the same amount they had the year

16  before.  And so, if you're implying I got this

17  amount of money, and I've got it in the bank

18  somewhere, we didn't get this money.

19              This is the 2018 talking about the

20  20- -- FY '19 budget.  And this -- I think -- I

21  think -- I wish you would ask Taylor Cheeseman

22  about this.  He wrote this letter, but I think --

23  I believe this is before we got our budget.  I

24  believe the Legislature is still in session.

25              They hadn't made the appropriation yet,

Jess Dickinson 11/29/2018

```
 1    and I believe what we were trying to determine was
 2    as best we could, what our -- what -- what the
 3    numbers were in our revised budget -- in a revised
 4    budget presentation to make.  You just -- I mean,
 5    I don't know any more than that.
 6          Q.   Okay.  And so can you tell me whether
 7    when you found out what your appropriation was for
 8    year '19, whether you prepared a budget to show
 9    where the money was being allocated?
10          A.   When we got our '19 budget.
11          Q.   This is '19 money, that is '18-'19, and
12    I would like to know what you're spending your
13    money on through '18-'19 once you got the
14    appropriation.
15          A.   We spend our money on what we represent
16    to the Legislature we were going to spend it on.
17          Q.   This is what you represented to the
18    Legislature.  Exhibit 12 is what you represented
19    to the Legislature you were going to spend your
20    money on, and you said you didn't get all of it,
21    so I want to know where you are cutting other than
22    the increase in workers.
23          A.   CCWIS.
24          Q.   You just told me that's on pause.
25          A.   That's what it means.  That's what it
```

Jess Dickinson 11/29/2018

1    means to be on pause.  I'm cutting that money.

2    I'm not going to spend it because I'm not going to

3    get it.

4         Q.   Okay.  But did you do a new budget based

5    on what the appropriation was?

6         A.   Look, Takesha Darby was my Deputy

7    Commissioner of Finance.  She left, I think, end

8    of January, December, January.  I don't remember

9    what month she left.

10        But I started looking for a new Deputy

11   Commissioner of Finance or a Finance Director or a

12   CFO or somebody -- a position of somebody who

13   could come in and help me do the things that she

14   wasn't able to do.  And so -- and I'm answering

15   your question.

16        So when you asked me did I develop a

17   budget, yes, I did.  I couldn't do it that day,

18   because I had no source of the numbers, but my new

19   Finance Director understands I want a budget, and

20   I'm getting a budget, and I know where -- I know

21   where my money is now.  I didn't know where it was

22   back then.

23        Q.   So did you have a substitute budget that

24   takes into account your appropriation?  Because

25   this --

Jess Dickinson 11/29/2018

```
 1        A.    You mean a substantive budget?
 2              MR. JONES:  Hold on just a second.  Let
 3        me object to the form of the question, and my
 4        objection is that you are misstating what the
 5        document is you're looking at.  A budget
 6        request to the Legislature is not an
 7        operational budget, and it is a misstatement
 8        to this witness.
 9              MS. LOWRY:  Let me restate this.
10        Q.   (By Ms. Lowry)  You received an
11   appropriation from the Legislature for the 2019
12   fiscal year.  And this is a request for funding, and
13   then you got a budget, correct?
14        A.    I did.  And it was, I think, $23 million
15   short.
16        Q.    Okay.
17              MR. JONES:  You mean we've got an
18        appropriation.  You said budget.
19              MS. LOWRY:  No, that's right.  Thank
20        you.
21        Q.   (By Ms. Lowry)  So have you done a budget
22   to show how the money that was appropriated for 2019
23   is going to be spent?
24        A.    Yes.  I mean, we are -- are you asking
25   me how we determine what we're going to cut?
```

Jess Dickinson 11/29/2018

```
 1         Q.    I'm asking you you need -- when you came
 2    in and you quickly -- you came into your position,
 3    you asked for an operating budget.
 4         A.    I did.
 5         Q.    Last year.
 6         A.    I did.
 7         Q.    '17.  You didn't get an operating
 8    budget?
 9         A.    Wasn't one.
10         Q.    I'm now asking you if you have an
11    operating budget after you received your
12    appropriation?
13         A.    Yes, I do.
14         Q.    And so where is that operating budget?
15         A.    You mean physically where is it?
16         Q.    Yes.
17         A.    In our office.  I get one every month.
18         Q.    And is that for the whole year?
19         A.    It doesn't work like that.
20         Q.    I would like to know how you're spending
21    the money over the next year.
22               So if the items in this request
23    appropriation say what you want to spend it on and
24    you didn't get all the money you asked for --
25         A.    Understood.
```

```
 1        Q.   -- I want to know what you're actually
 2   spending the money on during fiscal 2019?
 3        A.   I can give you a very general answer to
 4   that, and it is everything that we intended to
 5   spend it on except CCWIS and additional
 6   caseworkers.
 7             MR. JONES:  Let me state for the record,
 8        we've produced an operational budget to you.
 9             MS. LOWRY:  Where is it?
10             MR. JONES:  I don't have the documents
11        in front of me we produced.  You requested a
12        current operational budget, and we produced
13        an operational budget.
14             MS. RACHAL:  It's identified as such.
15             MR. JONES:  It's not our job --
16             MS. LOWRY:  I'm just asking you where it
17        is.  If you can tell me where it is, that's
18        fine.
19             MR. JONES:  Well, I don't know that we
20        have it.  We produced it to you.  We
21        identified it by Bates number.
22             MS. LOWRY:  I'm not --
23             MR. JONES:  There's no question on the
24        floor, so just wait.
25             MS. LOWRY:  Let's take a break.  It's
```

Jess Dickinson 11/29/2018

```
1        2:20.
2              (A short break was taken.)
3              MS. LOWRY:  We have gone through our
4        documents in the interim, and we do not see
5        an operational budget for 2019.  We did see
6        an operational budget for one month of '19,
7        but we did not see one for all of '19.  So,
8        if you have Bates --
9              MS. RACHAL:  011559.
10             (Off the record.)
11       Q.   (By Ms. Lowry)  So after you obtained the
12   appropriation for 2019, did you procure an
13   operational budget for the following 12 months that
14   contained where you planned to spend the money, and
15   then, perhaps, was updated or not to show where you
16   did spend the money, but that was limited to the
17   what the appropriation was?
18       A.   As quickly as I could.
19       Q.   So you did prepare such a thing?
20       A.   I didn't.
21       Q.   Who did?
22       A.   My CFO.
23       Q.   Okay.  We do not have it, so we would
24   ask that you take a look and let us know what --
25       A.   What do you have?
```

Jess Dickinson 11/29/2018

```
1        Q.   We have a budget that is for
2   August 2018.
3             MR. JONES:  All right.  Can --
4             THE WITNESS:  Can I see what you're
5        talking about?  I don't want you to put words
6        in my mouth.
7             MR. JONES:  Let me state this first,
8        before you look at it.  As counsel, we've
9        produced an operational budget, and the Bates
10       numbers are 11559 through -- make sure I've
11       got the right last page -- 11580.
12            THE WITNESS:  Okay.
13            MR. JONES:  And we have handed a copy of
14       that to the witness.
15       Q.   (By Ms. Lowry)  So do you have a budget
16  that plans out what you're going to expend by month
17  or by year, but that takes care of all of FY 2019
18  based on your appropriation?
19       A.   This budget -- this document right here
20  is what I was looking for.  This tell me my total
21  2019 appropriation.  This is -- this is saying to
22  me I've got $84 million to spend on salaries.
23  This is saying that as of -- as of August 2018, I
24  have spent $13,275,583, and I've got 70 million --
25  70,724,000 left to spend.
```

Jess Dickinson 11/29/2018

```
 1              That's what I was saying to you.  That
 2    is an operational budget.  That tells me what my
 3    appropriation was, what I spent, and what I have
 4    left.
 5         Q.   And does that have a total for 12 months
 6    for each item?  Can you answer my question?
 7         A.   Does this document have a total for 12
 8    months?
 9         Q.   Uh-huh (affirmative response).
10         A.   You mean total of the numbers?
11         Q.   No, I'm sorry.  Let me try to be clear.
12         A.   You're losing me.
13         Q.   I'm sorry.  I'll try to be clear.  So it
14    has the total -- this is -- are we looking at the
15    same document?
16              MR. JONES:  Why don't you mark it so you
17         have what you're asking him about.
18              MS. LOWRY:  We'll do that.
19              (Exhibit 21 marked for identification.)
20              THE WITNESS:  I apologize.  I'm not
21         following you.  I don't know what you're
22         asking.  I don't mean to be difficult.
23         Q.   (By Ms. Lowry)  No, that's fine.  So --
24    excuse me -- we just identified a document that
25    lists a budget of 203,083,223.89.
```

Jess Dickinson 11/29/2018

```
1          A.    That's right.
2          Q.    And this says that you have $84 million
3     in -- allocated for salaries; is that right?
4          A.    Yes.
5          Q.    Okay.  All right.  Thank you.
6                All right.  Are you aware of an
7     Exhibit --
8          A.    Am I done with this?
9          Q.    Yes.  I'd like to refer your attention
10    to Exhibit 5.  This is a memo from -- to Kris
11    Jones from Taylor Cheeseman.  It's dated December
12    20th, 2017, and it is what we have been referring
13    to as the hiring freeze memo.
14                Is that what it looks like to you?
15         A.    I don't agree -- respectfully, I don't
16    agree with the terminology, "hiring freeze,"
17    but --
18         Q.    Let's not characterize it.  Let's just
19    say it's a memo from Taylor Cheeseman saying
20    further -- further -- "Until further notice, no
21    hires may be finalized until express approval has
22    been granted by Commissioner Dickinson or myself."
23                As I understand it, this says that you
24    can replace people who have left, but you can't
25    hire additional people.  Is that your
```

Jess Dickinson 11/29/2018

```
 1    understanding of it?

 2          A.    Of the entire document?

 3          Q.    Yeah.

 4          A.    That's my understanding of that part of

 5    it is that -- yes.

 6          Q.    Is that still in effect?

 7          A.    Yes.

 8          Q.    Do you have any plan for how long you

 9    are going to keep that in effect?

10          A.    Keep in it effect until I get money to

11    hire more people.  I'll have to have money.

12          Q.    Okay.  And in the 2020 budget, are you

13    asking for the money to hire the number of people

14    that are identified in the HRH?  And if you don't

15    know what HRH is, I will tell you.

16                MR. JONES:  And so that I don't

17          interrupt you, we had an objection yesterday

18          about the 2020 budget, and I'll continue that

19          objection.

20                MS. LOWRY:  Fine.

21          Q.    (By Ms. Lowry)  Do you --

22          A.    Marcia, I have not looked at the 2020

23    budget in any kind of detail in a while.  And I'm

24    not sure what you're asking me.  I thought you

25    were going to ask me about the 2019 budget.
```

Jess Dickinson 11/29/2018

```
1        Q.   I was asking you some things about the
2   '19, and now I'm moving on to the 2020 budget.
3        A.   I'm going to have to answer you by
4   saying no.
5        Q.   You should answer me just as best you
6   can.
7        A.   As best I can, you're asking me a
8   question that I don't know the answer to and I'm
9   not prepared to answer that question.
10       Q.   Have you seen the 2020 budget?
11       A.   Certainly.
12       Q.   I would like to direct your attention to
13  the narrative pages.  I'm sorry.  You're finished
14  with that.  Sorry.
15       A.   Okay.
16       Q.   I'd like to direct your attention to a
17  page that's 21-1.
18       A.   All right.  I'm there, 21-1.
19       Q.   Yes.  And are you familiar with what's
20  written on 21-1 through 23 -- 21.2?
21       A.   Am I familiar with it?
22       Q.   Yes.
23       A.   I have been familiar with it.  As I sit
24  here right now, I am -- I certainly don't
25  remember -- this is 300 pages, and so you're going
```

Jess Dickinson 11/29/2018

```
 1    to have to let me read it if you want me to read
 2    it and then answer a question about it.
 3         Q.   Okay.  I don't want you to read 300
 4    pages.  I want you just to look at 21.1 and 21.2,
 5    and I am going to specifically address your
 6    attention to the section that is headed,
 7    "Salaries, wages and fringe."
 8         A.   Okay.  I'll say to you it would help me
 9    if you would tell me the question so I know what
10    to look for.
11         Q.   Okay.  That's fine.
12              So I'll particularly look in the
13    first -- in the first two sentences, and I would
14    like to ask you whether you have asked for the
15    number of workers that you need to comply with the
16    MS -- the second MSA?
17         A.   Yes.
18         Q.   You have?
19         A.   Yes.
20         Q.   Okay.  So it is your position that all
21    you need is 108 additional workers?
22         A.    If that's what this says.
23         Q.   Okay.  And so I'd like -- and so have
24    you looked at the RHR, which is Exhibit 4?
25         A.   Okay.  Yeah, I'm familiar with this.
```

Jess Dickinson 11/29/2018

```
 1         Q.   Okay.  And are you aware that it calls
 2    for 509 additional positions for the agency in
 3    order to come into compliance with the caseload
 4    limits?
 5         A.   What page is that on?  Bottom of page 2,
 6    I think.  I see it.  I can see that as of May
 7    the 25th, 2016, CPS had determined that "509
 8    additional positions were needed to bring
 9    workloads to a manageable level."  That's what it
10    says.
11         Q.   Right.  And the number of positions was
12    285 through '16, and then another -- I don't know
13    what the total number was, the total number.
14              Okay.  So I would like you to look at
15    page 2 which says, "DCPS has determined 509
16    additional positions are needed to bring workloads
17    to a manageable level."
18         A.   That's what it says.
19         Q.   Right.  So how does 108 comport with
20    509?
21              MR. JONES:  And I have an objection, and
22              the objection is based on your use of
23              "positions" as opposed to "hires."
24              They're -- you're mixing apples and oranges.
25         Q.   (By Ms. Lowry)  Go ahead.
```

Jess Dickinson 11/29/2018

```
 1        A.    I do not know how many PINs the agency
 2   had.  I wasn't here.  I wasn't at the agency at
 3   this time.  Here's what I know about this
 4   document.
 5        Q.    Okay.
 6        A.    I know that this was prepared.  I know
 7   it was submitted.  I don't remember when or I was
 8   told that it was submitted to Public Catalyst.  It
 9   was approved.  I know that this document
10   addressed -- it analyzed the agency with respect
11   to the PINs it needed and the -- and the hires it
12   needed.
13            And the math I can't help you with here,
14   but this 509 number I have to believe was the
15   correct number at the time this was written of the
16   number of PINs they needed.
17        Q.    How does that comport with 108 that's in
18   your 2020 budget request?
19        A.    And, I'm sorry, I don't know what you
20   mean when you ask me how does it comport with it.
21        Q.    Okay.  Let me ask it another way.  It
22   says in the 2020 budget request at page 21-1, that
23   you need 108 caseworkers and 34 supervisors, and
24   it doesn't say whether the 108 satisfies the
25   settlement requirement, but it appears -- so I've
```

Jess Dickinson 11/29/2018

```
 1    asked you whether that satisfies the settlement
 2    requirement.  I think your answer was yes, it
 3    does.
 4              So how does 108 compare with 509?
 5        A.   Well, 509 is PINs, and the 108 is
 6    people, and we have enough PINs to allocate to the
 7    number of people we say we need here.
 8        Q.   So I'm sorry.
 9        A.   These are two different -- these are
10    different years and different analyses.
11        Q.   So there's something of a difference
12    because the number of children may have gone down
13    somewhat, but what -- I don't understand --
14        A.   Wait a minute, wait a minute.  Slow
15    down.  I'm sorry.  You're losing me.
16        Q.   Okay.  So as of 2015, which is when --
17    so 2016 was when the recruitment, retention and
18    hiring plan was done.  The number of children in
19    custody has declined somewhat, correct?
20        A.   Correct.
21        Q.   Okay.  So the number may have gone down
22    somewhat from what you needed to comply with the
23    caseload standard?
24              MR. JONES:  And I object to the form of
25         the question.
```

Jess Dickinson 11/29/2018

```
 1        Q.   (By Ms. Lowry)  Okay.  But it says you
 2   needed 509 additional workers; is that right?
 3             MR. JONES:  I object to the form.
 4             THE WITNESS:  PINs.
 5        Q.   (By Ms. Lowry)  Okay.  What's the
 6   difference between a PIN and a person?
 7        A.   PINs are the Legislature's permission to
 8   have a position available, a position open.
 9        Q.   But you don't have to fill it?
10        A.   No.
11        Q.   So you don't have -- in order to comply
12   with the caseload standard, you only have to have
13   positions available, but you don't have to have
14   people in it?
15        A.   No, no, no.  You're mixing up state
16   government with the settlement agreement.
17             The way the state government works is if
18   I want to hire people, I have to have a PIN to
19   assign to them.  If you're an employee, you have a
20   number.  I have to have enough PINs to hire
21   people.
22             At some point agencies have more PINs
23   than they need; at some point when they need to
24   hire, they have fewer PINs than they need.  This
25   document you're asking me about is talking about
```

Jess Dickinson 11/29/2018

```
 1   people, about the people.  This is -- it's
 2   specifically saying we're not requesting any
 3   additional PINs.
 4        Q.   I understand that.
 5        A.   We don't need any more PINs.  We have
 6   the PINs.  We need the money to hire the people.
 7        Q.   And how many people do you have to hire?
 8        A.   When?  Are you talking about as of this
 9   thing that we're --
10        Q.   That's right, as of Exhibit 14.
11        A.   All right.  Give me a minute because
12   this is our 2020 budget request.
13        Q.   That's right.
14        A.   We are predicting in this that as of
15   July 1 beginning FY 2020, that we need 108
16   caseworkers and $4,540,359.96 to pay them with,
17   and 34 supervisors with $1,966,046.94 to pay them
18   with.
19             That's what we're saying here.  That's
20   what we're telling the Legislature we need.
21        Q.   I understand that that's what you're
22   saying, what you're telling the Legislature you
23   need, but the -- as I understand it, the 2016 RHR
24   says you need 509 human beings to fill positions?
25             MR. JONES:  Object to the form of the
```

```
 1        question.
 2             THE WITNESS:  No, it doesn't.
 3             MR. JONES:  That is a complete
 4        misstatement of his testimony.  He's
 5        clarified it two or three times.
 6        Q.  (By Ms. Lowry)  Thank you.  Let's move on
 7   here.
 8             So, why do you not need 509 or some fewer
 9   number?
10        A.  Because we have them.  We have the PINs
11   we need to hire these people.
12        Q.  Do the PINs equate with people?
13        A.  They might, and they might not, just
14   depends on where you are.  If I have a thousand
15   PINs and 800 people employed, they don't equate,
16   because I've got 200 more PINs than I have people,
17   you see.
18        Q.  I understand that.
19        A.  Okay.  So they don't equate.
20        Q.  You're at 50 -- at best, 53 percent
21   caseload compliance with regards to the MSA.
22   That's because you don't have enough workers.  So
23   how does having PINs but no workers accord with
24   the settlement agreement?
25             Let me with -- let me ask that again a
```

Jess Dickinson 11/29/2018

```
 1    different way.
 2              You have -- but let me start with the
 3    point that you have 53 percent compliance as of
 4    November with the caseload numbers.
 5              Is that -- do you agree with that?
 6        A.   I don't know, but I'll take your word
 7    for it.
 8        Q.   Well, you had 48 percent as of the last
 9    point that we have data for, but your counsel has
10    just given us something that show us you're now at
11    53 percent, so I'll take that number.
12              It doesn't -- why does it matter the
13    number of PINs you have if you don't have people
14    in the positions?
15              MR. JONES:  And let me make this
16         objection on the record.
17              MS. LOWRY:  You've already objected, you
18         don't have to object again.
19              MR. JONES:  This is a different
20         objection.
21              MS. LOWRY:  Okay.
22              MR. JONES:  My objection is based on
23         your -- the correct statement is that we have
24         53 percent compliance with a 10 met standard
25         in a weighted value matrix.
```

Jess Dickinson 11/29/2018

```
 1           MS. LOWRY:  You can say it however you
 2      want, but you have 53 percent compliance with
 3      the standard.
 4           MR. JONES:  I'll say it as it is
 5      accurate.
 6           MS. LOWRY:  Okay.
 7           THE WITNESS:  I don't know how to answer
 8      your question any more than to tell you that
 9      our position all along has been we need
10      around $7 million to hire additional
11      caseworkers.  That's exactly what this says,
12      if they gave me $7 million, which I am asking
13      for, I could hire those caseworkers.
14           I have the PINs to put them in, so I'm
15      not asking for more PINs.  If I didn't have
16      enough PINs to put them in, I would ask them
17      for more PINs.
18           Apparent -- I wasn't here, but
19      apparently when this was prepared, they
20      needed 500 PINs, and so they asked for them,
21      but I can't speak to this.  I don't know why
22      they -- let me say it different.  I don't
23      know how they calculated the number of PINs
24      they needed back then.
25           All I'm telling you today is, all I can
```

Jess Dickinson 11/29/2018

```
1          testify about today is, right now today for
2          my FY '20 budget, as best I can remember
3          putting this thing together, these are the
4          numbers that we came up with of the number of
5          people and the amount of money we needed to
6          pay them, and that's what we've been told all
7          along, we need approximately $7 million for
8          caseworkers -- frontline caseworkers and
9          supervisors, and there are the numbers.
10              And I trust my Deputy Commissioner of
11         Administration enough that when she tells me
12         I have the PINs, we have the PINs, so that's
13         why we are saying in here we are not asking
14         for additional PINs.
15              And I'm apologizing to you.  I don't
16         know how to answer it any different from
17         that.
18     Q.   (By Ms. Lowry)  Okay.
19              (Off the record.)
20              MS. LOWRY:  This is Exhibit 22.
21              (Exhibit 22 marked for identification.)
22     Q.   (By Ms. Lowry)  I'd like to call your
23     attention to a document that is from Taylor
24     Cheeseman to Chris Graham, and we have now marked
25     it as Exhibit 22.  And this says the salary number
```

Jess Dickinson 11/29/2018

```
 1    in the revised 2019 request -- we request 20
 2    employees per month which says -- which we believe
 3    is necessary to bring us into compliance.
 4          A.   Yes.
 5          Q.   And so that comes out to 240 workers.
 6    Is that right?
 7          A.   What comes out to 240 workers?
 8          Q.   That is 12 workers -- sorry -- 20
 9    employees per month for each month of the fiscal
10    year, which is 240.  This says, "Our requested
11    increase in salaries is based on a net gain of 20
12    employees per month for each month of the fiscal
13    year."  That's 12?
14          A.   I get you.  I'm just saying this is --
15    this is a discussion and calculation with the FY
16    '19 budget.  There is the FY '20 budget.
17          Q.   But you did not, in fact, hire anybody
18    in net gains of workers during FY '18?
19               MR. JONES:  State that again.
20          Q.   (By Ms. Lowry)  I don't believe you were
21    hiring any workers during FY '18; is that right?
22    Because you are now putting in a request for '20?
23          A.   To make it accurate, we were hiring
24    workers.  We were not increasing the number.
25          Q.   You were not increasing the net?
```

Jess Dickinson 11/29/2018

```
 1          A.    Right.

 2          Q.    So during 2018, you were not increasing

 3   the net at best; is that right?

 4          A.    In 2018?  That's correct.

 5          Q.    So fiscal 2019, sorry, sorry.

 6          A.    Okay.  In fiscal 2019, that is correct.

 7          Q.    So that means, in 2020 at least, this

 8   says you were requesting 240 additional employees

 9   net?

10          A.    What says that?

11          Q.    This document.

12          A.    This?

13          Q.    This document.

14          A.    This document says that's what we

15   need -- that was a calculation for FY '19.

16          Q.    But you weren't -- so what I don't

17   understand is you were not hiring anybody -- no,

18   wrong.  You were not adding to your net numbers,

19   correct?

20          A.    Correct.

21          Q.    And you were not planning to add to your

22   net numbers during FY '19; is that correct?

23          A.    Correct.

24          Q.    But you said in order to achieve

25   compliance, you needed, you said, 240 new net
```

Jess Dickinson 11/29/2018

```
 1    employees.
 2             So why did you not need 2,000 net
 3    employees in the 2020 request?
 4         A.   The calculation for 2020 took into
 5    account where we believe we'll be in 2020.  We
 6    have doubled our adoptions.  We've gone from 300
 7    to 600 adoptions.  There are fewer children in
 8    care.
 9             I don't know how -- what all went into
10    the calculation.  I know that the numbers that
11    were developed for this 2020 budget that we have
12    submitted took into account where the agency was,
13    where we believed it would be for fiscal 2020, and
14    how many caseworkers we would need to comply, and
15    that's what it says, and that's what it does.
16         Q.   Okay.
17         A.   So I --
18         Q.   Who did the calculations to come up with
19    that number?
20         A.   It would have been Kris Jones, Taylor
21    Cheeseman, Lucretia Tribune.
22             You said who did the calculations?
23         Q.   Yes.
24         A.   Those are the people who would have
25    contributed to it, plus numerous other people that
```

Jess Dickinson 11/29/2018

```
 1   would have provided information as to where the
 2   agency is headed.
 3          We have to make an honest calculation of
 4   where we're headed, and you know the numbers in
 5   terms of the reduction of children in care, we
 6   have to take all that into account.
 7          We have to take into account the effect
 8   of the canopy services and all the rest of it, and
 9   we have to be honest with the Legislature and say
10   based on all we know, this is what we think, and
11   this is what we think.
12       Q.   Okay.
13       A.   And I believe we can defend it.
14          MS. LOWRY:  Why don't we take a short
15       break.
16          (A short break was taken.)
17       Q.   (By Ms. Lowry)  Do you recall telling the
18   Mississippi Legislature in January that -- January
19   of '18, that to meet the caseload requirements, you
20   needed to hire 200 caseworkers and 60 supervisors?
21       A.   I don't remember it, but I won't dispute
22   that.  If something says I did it, I probably did.
23       Q.   Okay.  Well, if you look at document
24   number -- Exhibit Number 17.
25       A.   Again, I'll agree a document says it.  I
```

Jess Dickinson 11/29/2018

```
1    don't have any memory of it, but I'm not going to
2    dispute it at all.
3              MR. JONES:  Take a look at it.  This is
4         an article.  It's not a document generated by
5         the agency.  See if I can find it.  I don't
6         want to get it out of order.  What's the
7         cover page?
8              (Off the record.)
9              MR. JONES:  Is there a paragraph you
10        want to refer him to?
11        Q.   (By Ms. Lowry)  It's on page 3 out of 3,
12   and it's paragraph seven.
13        A.   It's on page 3-3.
14        Q.   Uh-huh (affirmative response), 3-3.  And
15   that says, "'To meet those requirements, the
16   agency still needs to hire another 200 caseworkers
17   and 60 supervisors,' Dickinson said Tuesday."
18              So we actually need to continue to add
19   staff if we're going to comply with Olivia Y.; is
20   that right?
21        A.   That's what it says, and I do not
22   disagree with it or dispute it, but I'm just being
23   honest with you.  I don't remember that.  I
24   just --
25        Q.   So how does the 200 workers --
```

Jess Dickinson 11/29/2018

```
 1    additional workers that you need line up with the
 2    108 that you've asked for in the 2020 budget?
 3         A.    It's two different years.
 4         Q.    Well, it's six months away -- no, it's
 5    eight months away from when you said this?
 6              MR. JONES:  What is eight months away?
 7         Q.    (By Ms. Lowry)  Commissioner Dickinson
 8    said this in January of 2018, so it's now 10 months
 9    away from that.
10              MR. JONES:  And fiscal year 2020 starts
11         on -- fiscal year 2020 starts on July 1st of
12         2019.
13              MS. LOWRY:  I understand that, but they
14         haven't hired anybody.  They just --
15              MR. JONES:  That's not your question.
16              THE WITNESS:  Here's my answer.  This
17         document is talking about the submission that
18         we have made for the FY '19 budget.  Right?
19         Q.    (By Ms. Lowry)  Yes.
20         A.    Are you with me?  We haven't even
21    started looking at a FY '20 budget.  This is a FY
22    '19 budget.  These are -- this is no different
23    than what you showed me a few minutes ago.  These
24    are the number -- these are the numbers we had
25    calculated we would need for the FY '19 fiscal
```

Jess Dickinson 11/29/2018

1   year for MDCPS.

2           Six months later, whatever conditions

3   had changed, whatever had happened caused my staff

4   to look at our submission for an FY '20 budget and

5   make a calculation that resulted in this, in the

6   budget submission that we made.

7           I believe they are correct.  If they're

8   not, somebody will have to show me why they're

9   not, but we believe based on the number of

10  children in care and the status of the agency and

11  all the things that have happened, that a

12  different number -- apparently, a different number

13  was needed for FY '20 than for FY '19.

14          I don't know how to answer it any

15  different from that.

16      Q.   Okay.  But you agree there were no net

17  gains for workers in 2019?

18      A.   Yes.

19      Q.   And the difference in the number of

20  workers between what you said you needed in

21  January of 2018 and the number that you said when

22  you submitted your 2020 budget is 92?

23      A.   All right.  So --

24          MR. JONES:  Let me state for the record,

25      this article states.  He has not said he

Jess Dickinson 11/29/2018

```
1          stated that, but a reporter is putting this
2          down in an article.
3                  MS. LOWRY:  All right.  Thank you, but
4          that's not -- well, is that an objection?
5                  MR. JONES:  Yes.
6                  MS. LOWRY:  Okay.  Go ahead.
7                  THE WITNESS:  What's the question?
8          Q.   (By Ms. Lowry)  The question is and the
9      difference in the number of workers between what you
10     said you needed in January of 2018 and the number
11     you said when you submitted your 2020 budget is 92
12     workers; is that right?
13         A.   Well, just to phrase it fairly, the
14     number that we reported to the Legislature we
15     needed for our FY '19 and the number we reported
16     to the Legislature we needed for our FY '20
17     budget, if your math is correct, that's right.
18     There is a difference.
19                  I'm just not going to agree that we are
20     giving two different numbers of the same
21     calculation.  We calculated what we needed for FY
22     '19, and we calculated what we needed for FY '20,
23     and those are not the same numbers and it's not
24     the same calculation.
25         Q.   The only thing that could have changed
```

Jess Dickinson 11/29/2018

1    in that period is the number of children; is that

2    right?

3         A.    No.

4         Q.    What else?

5         A.    We implemented workers going across

6    county lines.  We did a number of things to try to

7    improve our caseload -- everything we could think

8    of.  As a matter of fact, I recall a meeting with

9    you --

10        Q.    So that would affect the number of

11   children in custody and in the services that were

12   covered in the caseloads by the caseload

13   calculation in 2016?

14             MR. JONES:  Let him finish his answer.

15        He just started to answer.

16             THE WITNESS:  And I don't know what you

17        just said, but what I was trying to say was,

18        when I began working there in September, we

19        went through the whole process I've testified

20        about.

21             When all of this came up and it became

22        apparent to us we were not going to get the

23        money for -- for salaries, when that was

24        true, that is why this level hiring decision

25        was made.  It had to be made.

Jess Dickinson 11/29/2018

```
 1              That does not mean at all that we
 2       weren't all along doing everything we could
 3       to comply with that 90 percent requirement.
 4       We've done it all the way up until today.
 5              I can remember, Marcia, sitting across
 6       the table with you at one of our parties'
 7       meetings and saying to you, "If you've got
 8       some suggestions for me of another way I can
 9       improve our caseloads, tell me what they
10       are."
11              I'm trying to hire people across -- the
12       county workers were working only in county
13       offices.  I did a calculation to determine if
14       I had a surplus of workers in one county and
15       a need in another county.
16              I did everything I knew how to do to
17       improve those case numbers.  So it's not
18       accurate to say that the only way to equate a
19       difference in the numbers is just a reduction
20       in children in care.
21       Q.   (By Ms. Lowry)  All right.  So let me ask
22   you this:  Do you know how the number was
23   calculated, the number of additional workers you
24   need?
25              MR. JONES:  Don't guess.
```

Jess Dickinson 11/29/2018

```
 1              THE WITNESS:  I can -- yes, I know how
 2         it was calculated, but I don't know the
 3         particulars of it.
 4              I know the way it was calculated was a
 5         determination of how many workers we needed
 6         based on all the factors that affect the
 7         agency.
 8         Q.   (By Ms. Lowry)  Okay.  And was this
 9    calculation written down?
10         A.   Here.  I mean, what you see in our FY
11    '20 budget.
12         Q.   Well, there's no calculation in the FY
13    '20 budget?
14         A.   You mean like a worksheet where they did
15    the subtraction and addition?
16         Q.   Well, I'd like to see what factors you
17    multiplied, added or subtracted in order to come
18    up with the numbers.  There is a calculation in
19    the 2016 RHR.
20         A.   The only person -- I did not do the
21    calculation.  I am not the Deputy Commissioner of
22    Administration or the Deputy Commissioner of Child
23    Welfare or child safety.
24              They -- they are the people who made
25    that calculation and reported that to me.  And
```

Jess Dickinson 11/29/2018

```
 1    that's what we put in our budget request.  I trust
 2    their numbers to be correct.
 3            Q.   When you started out as the DHS CPS --
 4            A.   MDCPS.
 5            Q.   Oh, I'm sorry.  MDCPS, you decided to
 6    have a chief of staff; is that right?
 7            A.   Yes.
 8            Q.   And you hired Taylor Cheeseman; is that
 9    right?
10            A.   I did.
11            Q.   And does he have a child welfare
12    background?
13            A.   Some.  He did at that time.  He's got a
14    lot more now.
15            Q.   Okay.  What was his child welfare
16    background, as far as you know?
17            A.   He had worked in the -- in two youth
18    courts during his law school career as an extern.
19    He had worked in Rankin County youth court and in
20    Madison -- and in Hinds County youth court.
21                 Hinds County is one of our -- our second
22    largest youth court in terms of number of
23    children.  He had worked in both of those youth
24    courts and --
25            Q.   For how long has he --
```

Jess Dickinson 11/29/2018

1      A.   And he had been a law clerk for me on

2   the Supreme Court for five years, and we, of

3   course, get cases that are appealed from the youth

4   court.

5      Q.   So -- I'm sorry.  Don't mean to

6   interrupt you.

7      A.   As far as I know, that is the extent of

8   his experience in child welfare.

9      Q.   Okay.  Would you consider him an expert

10   in child welfare management?

11      A.   I would consider him an expert in

12   management, and today, I would consider him an

13   expert in child welfare management.  I sure would.

14   I think he probably -- I do.

15      Q.   Okay.  Do you know if he has a master's

16   in social work?

17      A.   No, I do not believe he does.

18      Q.   Do you know if he's worked in any other

19   child welfare agency?

20      A.   I do not know that he has.

21      Q.   As commissioner of the agency, is it

22   within your authority to move money from one area

23   of the budget to another to cover additional

24   expenses if you deem it necessary?

25      A.   Some.  Yes, it's within my discretion to

Jess Dickinson 11/29/2018

```
 1    do -- to do that.
 2         Q.    Okay.
 3         A.    But my --
 4         Q.    I'm sorry.  Don't mean to interrupt.
 5         A.    I was going to say I don't know what
 6    you're asking me.  If you're asking -- just asking
 7    me do I have --
 8         Q.    Authority?
 9         A.    -- authority to do it on occasion?
10         Q.    Yeah.
11         A.    Yes.
12         Q.    Whenever you need to.
13              MR. JONES:  Well, let me object to the
14         form.  He answered on occasion, and your
15         response was whenever you need to.
16              MS. LOWRY:  That's your objection.
17              MR. JONES:  I don't believe he had a
18         chance to answer that question.  My objection
19         is, you misstated what he said.  He said on
20         occasion.  Your response is "whenever you
21         need to," and that was not his testimony.
22              MS. LOWRY:  Thank you.
23              THE WITNESS:  The answer to the question
24         is that I had a budget and some of that money
25         I can spend -- I have the authority to spend
```

Jess Dickinson 11/29/2018

```
 1          it as I see it appropriate.
 2              Some of that money I cannot spend except
 3          one way, because if I did, I'd violate the
 4          law.  So that's why I qualified my answer.
 5          Q.   (By Ms. Lowry)  Do you think it would be
 6      difficult to come into compliance with provisions of
 7      the MSA if the agency remains at 53 percent of
 8      compliance with the caseload standard?
 9          A.   Maybe I misunderstood your question, but
10      if the agency remains at 53 percent of its
11      caseworkers in compliance with the caseload
12      standard and nothing changes, we're, per se, not
13      coming into compliance with --
14              MR. JONES:  Are you saying at some point
15          in the future?
16              MS. LOWRY:  I'm asking him a question,
17          and he answered it.
18          Q.   (By Ms. Lowry)  Have you discussed with
19      Governor Bryant that you do not have sufficient
20      funding to come into compliance with Olivia Y.?
21              MR. JONES:  And let me make one
22          statement to you on the record.  You can
23          answer this question unless that your
24          discussions were in the context of
25          attorney-client -- within the scope of
```

Jess Dickinson 11/29/2018

```
 1          attorney-client privilege due to the presence
 2          of counsel providing legal advice in any of
 3          those discussions.
 4               THE WITNESS:  And the answer is yes,
 5          I've had discussions with him.
 6          Q.   (By Ms. Lowry)  And have you told him that
 7     you were not in compliance with the MSA?
 8          A.   I don't know if I've told him that or if
 9     he already knew it.  I know he -- I know that he
10     is aware of it.
11          Q.   Okay.
12          A.   I just don't want to tell you something
13     that I'm not a hundred percent sure of.  And I
14     know we've had discussions about it.  I just don't
15     know if I'm the one that told him or someone else
16     told him, and we had discussions about it, but if
17     your desire is to know whether he knows about it,
18     yes, he does.
19          Q.   Okay.  And have you asked him for
20     additional funds so that you can come into
21     compliance with the Olivia Y. requirements?
22          A.   Certainly.
23          Q.   And has he responded to you in any way?
24          A.   He responded by submitting a budget this
25     year that fully funds our budget request and
```

Jess Dickinson 11/29/2018

1    supporting it.

2        Q.   He fully funded your budget request?

3        A.   No, I didn't say -- he doesn't have the

4    authority to fund it.  The Legislature funds us,

5    but the Governor submits a budget, and it's the

6    Governor's recommendation, it's his ask, what he's

7    asking the -- just like we do, he submits one, and

8    the budget request he has submitted has asked the

9    Legislature to fully fund us, give us everything

10   we've asked for.  He supports that and he has put

11   that into his budgets.

12       Q.   Have you asked them to go into what's

13   called the "rainy day fund" to support the agency

14   so that you can be in compliance?

15       A.   Marcia, we've had so many discussions

16   about funding and sources.  I don't want to be

17   inaccurate to you.  I know we've had discussions

18   of doing whatever we could to try to -- and I'm

19   going back.

20           I'm assuming you're asking me about our

21   discussions when we discovered the shortfall.  Is

22   that what you're asking me?

23       Q.   Well, I'm asking you generally whether

24   you've had discussions about looking elsewhere for

25   a way to fund the Olivia Y. requirement that's in

Jess Dickinson 11/29/2018

 1    the second MSA that you're not in compliance with?

 2         A.    We have had many discussions about what

 3    we could do to try to acquire that funding.  I

 4    just -- I don't remember specifics, and I mean,

 5    he's the Governor, and I'm a Commissioner, and I

 6    have made my needs known to him, and he's -- he's

 7    got many considerations, and I am not going to

 8    pretend to think for him or to answer for him, but

 9    I know that he -- I've had those discussions.

10         Q.    And have you asked the Legislature to

11    reduce funds from the rainy day fund so that you

12    could fund compliance with -- so that you could

13    achieve compliance with the provision of the MSA?

14         A.    Have I asked the Legislature to do that?

15         Q.    Correct; uh-huh (affirmative response).

16         A.    I don't -- no, I don't know when I've

17    had an opportunity to do that.  I mean, I ask the

18    Legislature to fund me during the Legislative

19    session, and they either do or they don't, and if

20    they don't, they've gone home, and I don't have

21    access to them until the next Legislative session.

22              I've only been to one.  I'll be going to

23    another one this year, and I certainly have asked

24    them to fully fund me this year.

25         Q.    I'd like you to take a look at

Jess Dickinson 11/29/2018

```
 1    Exhibit 6, which is the 6 -- HB1600, FY 2019?
 2         A.   My 2019 budget.  All right.
 3         Q.   And, specifically, I'd like to call your
 4    attention to Section 4, which is, I think, on the
 5    second page.
 6         A.   Okay.
 7         Q.   And specifically the end of Section 4,
 8    which says, "...it is the intent of the
 9    Legislature that any amount of funds and positions
10    may be transferred between the Department of Human
11    Services and the Department of Child Protective
12    Services in order to comply with agreements made
13    by the State of Mississippi with the United States
14    District Court in reference to Olivia Y., et al.
15    lawsuit."
16         A.   Yes.
17         Q.   And have you done anything with regard
18    to that provision, such as talking to the
19    Department of Human Services, other than what
20    you've testified to about this provision?
21              MR. JONES:  In the interest of ending
22         this today, other than what you've testified
23         to, so don't go back through --
24         Q.   (By Ms. Lowry)  I'm not asking --
25         A.   I don't know what I testified to
```

Jess Dickinson 11/29/2018

```
 1   about --
 2        Q.   I'm not asking you to reiterate what
 3   you've testified to.  What is your understanding
 4   of this section, of Section 4?
 5        A.   Generally, the same thing that you heard
 6   from Mr. Davis.  This section -- as my
 7   understanding of this section is that when I got
 8   to the agency, the agency was on track to become a
 9   totally separate agency, meaning that we would
10   have to have all of our own resources, all of our
11   own travel department, and -- and personnel
12   department, and we would be one agency, DHS would
13   be another.  That's what it was on track for.
14             I won't get into the reasons why we
15   decided not to do that because we were headed for
16   a real crisis if that had happened.
17             So when we presented that to the
18   Legislature, during the Legislative session at the
19   committee hearings, and informed them that the
20   decision the Legislature made when they decided to
21   completely separate DHS from CPS was going to
22   cause great financial difficulty if they didn't
23   fix that.
24             My understanding of this section is the
25   Legislature determined we are not going to make
```

Jess Dickinson 11/29/2018

```
 1    them fully separate from DHS.  They're going to be
 2    a part of DHS, in but not of, that language,
 3    they're going to be a part of DHS because there's
 4    no point in CPS having a travel department and DHS
 5    having a travel department.
 6              They can have one travel department, and
 7    they can -- they can -- they can perform those
 8    services for us.  We can pay them for those
 9    services rather than having two separate
10    departments.  That's what had happened to that
11    agency is it started separating out into all these
12    new departments, and so this section just simply
13    meant to me -- I mean, to me it's pretty clear.
14              It simply means that they are giving us
15    permission to work out economies, the economies
16    between the two agencies, so if we can save money
17    by not doing it twice, using the same payroll
18    department to pay our employees, rather than
19    having two payroll departments, this is giving us
20    permission to do that.
21         Q.   Do you have a proper -- a division
22    within your agency, within CPS, that works on
23    federal maximization?
24         A.   On what?
25         Q.   Sorry.  Federal maximization?
```

Jess Dickinson 11/29/2018

```
 1        A.    I don't know --
 2        Q.    I'll explain what I mean.  Are you aware
 3   that you get funds from the federal government
 4   with regards to Section IV-E of the Social
 5   Security Act?
 6        A.    Certainly.
 7        Q.    And are you aware that you have to
 8   qualify for those funds by showing that people --
 9   that families are eligible for IV-E funds?
10        A.    Yes.  The children are eligible.
11        Q.    That's right.  That the children are
12   eligible.
13        A.    Yes, I do -- I'm aware of that.
14        Q.    Okay.  And do you have a division within
15   CPS to make that -- to make those claims?
16        A.    Yes, I do.
17        Q.    And how big is that department?
18        A.    How many employees?
19        Q.    Yes.
20        A.    I would have to guess.
21        Q.    Why don't you guess?
22        A.    I've got 40 compliance -- I mean,
23   because you can't just say it's one -- it's just
24   my 40 complia- -- it's not just my compliance
25   department.  It's my legal department.  I have --
```

Jess Dickinson 11/29/2018

```
 1    I've got a contracts department, a legal
 2    department, a compliance department, and they all
 3    work together on different -- on different aspects
 4    of compliance and maximization of federal funds.
 5              In other words, they -- if you take a
 6    requirement for IV-E funds that deals with the
 7    contract we've signed with some agency who's taken
 8    our children, it might be the contract department,
 9    so I don't have a discrete department at CPS, and
10    they -- that's all they do and nobody else does
11    it.
12              We work together.  My departments work
13    together to -- am I making sense to you --
14        Q.   Yes; uh-huh (affirmative response).
15        A.   -- to work on different aspects of
16    federal funding.
17        Q.   What is your level of claim?  What is
18    your penetration rate?
19        A.   Today?
20        Q.   Yes.
21        A.   Can I get by by saying 30 something
22    percent?  I'm not --
23        Q.   I just want to know what it is.
24        A.   -- sure.  I'm not sure what it is.  And
25    I'd be guessing if I told you I knew exactly what
```

Jess Dickinson 11/29/2018

```
 1   it is, but I don't know.
 2        Q.   So you think it's in the 30s?
 3        A.   I think so.
 4        Q.   Do you know what it was last year?
 5        A.   About the same.  I don't think it's
 6   changed much.  I don't think it's changed very
 7   much.
 8        Q.   And do you know where that stands with
 9   regard to other states?  In other words, is it on
10   the low end, the high end?
11        A.   I think it's on the low end.  I think
12   that it is.
13             MS. LOWRY:  I think we'll take a quick
14        break.
15             (A short break was taken.)
16             MS. LOWRY:  We have no further
17        questions.
18   EXAMINATION BY MR. JONES:
19        Q.   Commissioner Dickinson, as you know, I'm
20   Larry Jones.  I'm one of the attorneys that
21   represents the defendants in this case.
22             Do you mind if I ask you a few brief
23   questions, sir?
24        A.   Not at all.
25        Q.   And I will try to address the subject
```

Jess Dickinson 11/29/2018

```
 1   matters that have been reviewed with you today
 2   without going into an amount of detail that's
 3   already been set forth in the record.
 4             Let's go back to the second MSA for just
 5   a moment.
 6             That document was executed and entered
 7   as a consent order on December 19th of 2016.  Are
 8   you aware of that?
 9        A.   Yes.
10        Q.   You were not commissioner at that time,
11   were you?
12        A.   No.
13        Q.   There's also an STRO that was entered as
14   a consent order on the same date.
15             Are you aware of that?
16        A.   Yes.
17        Q.   As the consent order began?
18        A.   Yes.
19        Q.   And the 90 percent caseload cap that we
20   have discussed today is addressed in both
21   documents, but the applicable document at this
22   moment is the second MSA.
23             Are you aware of that?
24        A.   Yes.
25        Q.   Now, let me just ask about the
```

Jess Dickinson 11/29/2018

```
 1    90 percent fixed cap for just a moment.
 2              It is based on a weighted case value
 3    matrix, isn't it, sir?
 4         A.   Yes.
 5         Q.   And the values on that matrix add up to
 6    1.0?
 7         A.   Yeah.
 8         Q.   And the -- so at the first level of
 9    fixed standard, the standard is 1.0, is it not,
10    the first level of standard?
11         A.   If I understand what you mean by "first
12    level of standard," yes, that's the standard that
13    caseworkers are judged by.
14         Q.   And then the second level of standard is
15    what we've referred to as the 90 percent case
16    worker caseload standard or compliance standard?
17         A.   Number of caseworkers in compliance
18    standard is what I call it.
19         Q.   All right.  We're saying the same thing.
20         A.   Yeah.
21         Q.   And that is a -- the second standard, at
22    least, although I think both of them apply, those
23    are rigid, fixed standards which are being
24    addressed in these depositions in terms of
25    compliance, are they not?
```

Jess Dickinson 11/29/2018

```
 1        A.    Yes.
 2        Q.    You can also determine, based on the --
 3   the caseload metric workers who are in a close
 4   category.
 5              Are you aware of that?
 6        A.    Yes.
 7        Q.    So the first category would be net,
 8   which is 10 and below.
 9        A.    Yes.
10        Q.    And the second category would be greater
11   than 1.0 but less than 1.2?
12        A.    It is.
13        Q.    Are you aware that a worker can have a
14   one point net value, and by simply being assigned
15   one additional investigation would fall into the
16   close category?
17        A.    Yes.
18        Q.    Without going through all of the
19   reasons, because others have discussed this, based
20   on your experience as commissioner and your
21   overall experience, do you believe that the
22   90 percent fixed caseload cap is detrimental to
23   children?
24        A.    I believe it that it can be, yes.
25        Q.    And can it also be detrimental to
```

Jess Dickinson 11/29/2018

```
 1    management of the child protection agency in
 2    Mississippi?
 3         A.   Yes.
 4         Q.   To your knowledge, has child
 5    protection -- has CPS and/or its predecessor, ever
 6    achieved a 90 percent caseload compliance in the
 7    history of the agency?
 8         A.   Not that I know of.
 9         Q.   Did it achieve a 90 percent caseload
10    compliance during David Chandler's tenure?
11         A.   Did not.
12         Q.   Are you aware that the plaintiffs in
13    this case are asking the Court to place this
14    agency in a receivership?
15         A.   Yes.
16         Q.   Would a receivership in your view be
17    detrimental to children in the state of
18    Mississippi?
19         A.   Absolutely.
20         Q.   Child Protective Services at this time
21    is still a part of the DHS, is it not, sir, with
22    independent operational authority?
23         A.   Yes.
24         Q.   So a receivership would actually be
25    taking over a -- an agency that is part of a
```

Jess Dickinson 11/29/2018

```
 1   larger agency, would it not, sir?
 2        A.   Yes.
 3        Q.   Again, your opinion is unequivocal that
 4   that would be detrimental to children and to the
 5   agency?
 6        A.   Yes.
 7        Q.   Now, let's talk just a little bit about
 8   your experience.  You have dwelled on that quite a
 9   lot today.
10             You have started as commissioner on
11   September 18th of 2017?
12        A.   Yes.
13        Q.   And you did several due diligence with
14   regard to that agency prior to that date, did you
15   not?
16        A.   I did.
17        Q.   And as part of that due diligence, you
18   met with John Davis, Executive Director of DHS,
19   and David Chandler, who at the time was the
20   Commissioner of CPS?
21        A.   Yes.
22        Q.   And is it your testimony that you were
23   assured by Mr. Chandler, by David Chandler, that
24   funding would not be a problem for CPS in general
25   terms?
```

Jess Dickinson 11/29/2018

```
 1        A.    That's a general way to express what he
 2    said to me, yes.
 3        Q.    And another way you said was that you
 4    would have all the money you could spend?
 5        A.    No, he said I'd have more.
 6        Q.    More than all the money you could spend.
 7        A.    His statement to me as best I remember
 8    it was, "Stop worrying about money.  You're going
 9    to have more money than you can spend."
10        Q.    Now, when you actually assumed your
11    duties of this complex agency, did you determine
12    whether the agency had an operational budget that
13    would allow you to determine what the remaining
14    expenses for that fiscal year, which is fiscal
15    year '18, would be and what funds would be
16    available to pay those expenses?
17              Did the agency have such a budget?
18        A.    It did not.
19        Q.    And you did many things in order to try
20    and determine that, did you not?
21        A.    I sure did.
22        Q.    Now, on November 14th or 15th of 2017,
23    CPS was advised by executives in the finance
24    department at DHS that it was going to run out of
25    money before December of 2017, wasn't it, sir?
```

Jess Dickinson 11/29/2018

```
 1        A.   We were informed that we were burning
 2   through cash too fast, and that if we didn't do
 3   something, if we didn't make some changes, we
 4   would.
 5        Q.   Well, in fact, you've seen the
 6   memorandum that states that as of November 15th of
 7   2017, there was only $992,000 left in the first
 8   allotment, and expenses for the agency were
 9   running somewhere in the 10 to 12 to $13 million?
10        A.   That's right.
11        Q.   Now, that also meant that the agency
12   would potentially face a very substantial
13   shortfall of funds to pay expenses during the
14   remainder of the fiscal year unless something was
15   done?
16        A.   That's right.
17        Q.   Now, believe me, I don't want to go
18   through all the things that were done, but there
19   was an extensive investigation by the key staff
20   members at the department, weren't there, sir?
21        A.   Yes.
22        Q.   And there were areas identified where
23   expenses could be cut?
24        A.   Yes.
25        Q.   Cuts were made?
```

Jess Dickinson 11/29/2018

```
 1        A.    Yes.
 2        Q.    Other decisions were made with regard to
 3   expenditures of funds that were related to
 4   contracts, and I may be duplicating that.
 5        A.    You are.
 6        Q.    Basically, you identified all of the
 7   cuts that were feasible, didn't you, sir?
 8        A.    We went contract by contract to
 9   determine which could be either reduced or
10   completely cut out, and we, in our best judgment,
11   accomplished that.
12        Q.    All right.  And, at the end of the day,
13   through the efforts, the very significant efforts
14   of you and your staff and others, that potential
15   deficit was reduced to approximately $44 million?
16        A.    That's right.
17        Q.    And the deficit was funded then or
18   resolved in part -- well, resolved totally by a
19   $12 million special appropriation from the
20   Legislature, deficit appropriation, and the
21   contribution of additional funds from DHS to pay
22   CPS expenses?
23        A.    That's right.
24        Q.    And, as a result of that, was there a
25   actual deficit at the year end of fiscal year
```

Jess Dickinson 11/29/2018

```
 1   2018?
 2        A.   No.
 3        Q.   Now, in that same general time period,
 4   you also found that CPS had prepared and submitted
 5   a fiscal year 2019 budget, didn't you, sir?  Had
 6   already done that by the time you arrived?
 7        A.   Yes.
 8        Q.   All right.  It was not finalized, but it
 9   had been submitted?
10        A.   Correct.
11        Q.   Now, at some point in this entire
12   process, moving into 2018, ultimately, CPS revised
13   the budget request to the Legislature, did it not?
14        A.   We did.
15        Q.   And that was not the result of just a
16   few minutes of work.  It was a result of all of
17   this work and coordinated action with both the
18   Legislature and Department of Finance and
19   Administration and all your key staff members; is
20   that true, sir?
21        A.   The preparation of the revised budget?
22        Q.   Yes, sir.
23        A.   That's correct.
24        Q.   Now, the revised budget, I'm going to
25   use general terms, was requesting approximately
```

Jess Dickinson 11/29/2018

1    133 million in state funds?

2         A.    That's right.

3         Q.    Now, that budget also took into

4    consideration a new agreement with DHS to provide

5    $30 million in federal funds, whether it was TANF

6    or otherwise?

7         A.    A memorandum of understanding, they had

8    agreed to provide that to us, assuming we could

9    get the $12 million deficit appropriation, which

10   we did.  All that works together, but yes, they

11   agreed -- they agreed that they would provide us

12   $30 million in funding if we were able to get the

13   deficit appropriation.  We got the deficit

14   appropriation.  They provided the additional

15   $30 million.

16        Q.    All right.  Now, I'm aware of that in

17   fiscal year 2018.

18        A.    Uh-huh (affirmative response).

19        Q.    Now, would it be true, sir, that

20   basically, at the point you arrived as

21   commissioner in September 2018, that there was no

22   binding agreement that you could find or that

23   existed requiring DHS to provide TANF funds or

24   other federal funds to your agency, was there,

25   sir?

Jess Dickinson 11/29/2018

```
 1        A.    No.
 2        Q.    Now, as you went into fiscal year 2019,
 3   which I have been discussing, and I don't want to
 4   confuse those two years, ultimately the
 5   Legislature appropriated for fiscal year 2019 at
 6   approximately $110 million?
 7        A.    That's correct.
 8        Q.    And that left a shortfall, if you will,
 9   of approximately $23 million less than the budget
10   request that had been submitted, the revised
11   budget request for fiscal year 2019?
12        A.    That's right.
13        Q.    Now, let me go back to fiscal year 2018
14   deficit, if you don't mind.  If you folks -- I'm
15   having a little trouble hearing.  Let me go back
16   to fiscal year 2018.
17             When you began your assessment after
18   learning of this potential shortfall in fiscal
19   year 2018, isn't it true that the chief financial
20   officer at one point estimated that the shortfall
21   could be as much as $63 million?
22        A.    That's right.
23        Q.    And it was only through cost cuts and
24   other very significant management efforts that
25   that potential shortfall was reduced to
```

Jess Dickinson 11/29/2018

```
 1    $44 million, wasn't it, sir?

 2         A.   That's right.

 3         Q.   Now, just tell me this:  Is CPS

 4    continuing to increase its case worker -- I'm just

 5    going to use compliance standards, increase the

 6    numbers?

 7         A.   If you're asking me are we continuing to

 8    attempt to comply with the requirements in the

 9    MSA, we're doing everything we can to do that.

10         Q.   The 90 percent fixed cap?

11         A.   And the -- what you called -- what did

12    you call it, step one?

13         Q.   And step one.

14         A.   Step one and step two.  We're doing

15    everything we can to comply with both of those

16    requirements.

17         Q.   And the -- the -- strike that.

18              Caseworker compliance, in fact, can be

19    improved by a number of factors, can't it, sir?

20    And I'm just going to ask you about a few of them.

21         A.   Yes.

22         Q.   Number 1, as CPS completes its mission

23    and serves children, oftentimes the number of

24    children in care will be reduced, isn't that true?

25         A.   Total number of children in care?
```

Jess Dickinson 11/29/2018

```
 1        Q.   Yes, sir.
 2        A.   Yes; yes.
 3        Q.   It can be by effective service to
 4   children?
 5        A.   That's right.
 6        Q.   And there is a nationwide emphasis,
 7   including a new federal law on keeping children in
 8   their homes and not removing them from homes and
 9   placing them in foster care, isn't it, sir?
10        A.   Yes.
11        Q.   That can also impact and can help
12   improve caseload client statistic, similar to what
13   we have?
14        A.   It --
15        Q.   Yes or no?
16        A.   Your question is confusing to me.
17        Q.   Okay.  Well, let me rephrase it.
18             We've talked about there are -- in fact,
19   CPS is not stuck at this moment on -- I think the
20   last number was for November that was provided to
21   counsel opposite was 53 percent of the frontline
22   caseworkers meet the 1.0 standard.
23             You're aware of that, aren't you?
24        A.   Uh-huh (affirmative response).
25        Q.   Now, there's no -- there's nothing that
```

Jess Dickinson 11/29/2018

```
 1    says that compliance number cannot increase
 2    through other efforts and other programs by CPS,
 3    is there, sir?
 4         A.   Oh, no.  The opposite is true.
 5         Q.   Okay.  And the opposite depends on a
 6    variety of factors, cross county assignment of
 7    cases --
 8         A.   That's right.
 9         Q.   -- could increase that number.  The
10    movement of cases from caseworkers with higher
11    case numbers to caseworkers with lower case
12    numbers can also accomplish an improvement in that
13    number.
14         A.   It can.
15         Q.   Now, the better management of cases by
16    supervisors in the system can also improve that
17    number as children go out of the foster care
18    system into the plans that have been adopted for
19    them, through adoption, for example?
20         A.   Yes, yes, through adoption.  Yes.
21         Q.   Okay.  Now, so it is not true in any
22    way, is it, sir, that CPS has abandoned any and
23    all attempts to comply with the 90 percent
24    caseload standard?
25         A.   No.
```

Jess Dickinson 11/29/2018

1     Q.   Even though it's a rigid, fixed standard
2  which you don't believe is in the best interest of
3  the agency or children, you haven't abandoned the
4  efforts, have you, sir?
5     A.   We have certainly not abandoned the
6  efforts.
7     Q.   And, in fact, those efforts are
8  continuing through fiscal year 2020 and the budget
9  request that has been submitted to the
10 Legislature, is that true?
11    A.   We specifically included it in that
12 budget in the narrative -- that's our goal, that's
13 what we're trying to do with the money we've
14 requested for caseworkers.
15    Q.   And you're continuing to interact with
16 the governor's office, are you not?
17    A.   Yes.
18    Q.   And you mentioned -- is this a new
19 development, sir, that the Governor in his budget
20 recommendation to the Mississippi Legislature has
21 now recommended that CPS be fully funded?
22    A.   Yes, he has.
23    Q.   Now, these subjects may be not quite in
24 the logical order I prefer, so bear with me.  But
25 anytime there is an assessment of a need for a

Jess Dickinson 11/29/2018

```
 1    number of additional caseworkers and supervisors,
 2    based on any standard, that's a snapshot of that
 3    point in time, isn't it, sir?
 4         A.   It is a snapshot of that exact point in
 5    time if you're making a calculation of how many
 6    caseworkers you need for --
 7         Q.   Purpose?
 8         A.   Yes.
 9         Q.   It doesn't matter what the purpose is.
10    It's a snapshot at that point in time, no matter
11    what standard you're applying?
12         A.   That's right.
13         Q.   Now, and that standard or that snapshot
14    would obviously differ based on different time
15    periods and different circumstances, wouldn't it?
16         A.   Yes, it does.
17         Q.   Now, isn't it true that the hiring and
18    retention plan, which is Exhibit 4 in this case,
19    does not say anywhere in that plan that CPS is
20    required to hire 509 additional caseworkers?
21              MS. LOWRY:  I object.
22         Q.   (By Mr. Jones)  Well, perhaps you could --
23    I'll strike that.  I didn't mean to say it.
24              Does it say that?  You've looked at it
25    today.  Yes or no?
```

Jess Dickinson 11/29/2018

```
 1        A.   I have never seen it.
 2        Q.   Now, and that was a snapshot in May of
 3   2016, was it not?  That's the date of the
 4   document?
 5        A.   I presume so.  Again, I wasn't there
 6   when it was prepared, but I presume that's
 7   correct.
 8        Q.   Over six months before the STRO and
 9   second MSA?
10        A.   Yes.
11        Q.   Now, you were not commissioner when
12   either of those documents were negotiated and
13   entered as consent orders, were you?
14        A.   No.
15        Q.   Just as an observation, based on what
16   you know, would you think that CPS has actually
17   hired hundreds of caseworkers since May of 2016?
18             MS. LOWRY:  Objection.
19             MR. JONES:  We can, of course, provide
20        that data, or we will get that data.  But
21        would that be a fair estimate?
22        A.   It's accurate.
23        Q.   (By Ms. Lowry)  Now, you understand, do
24   you not, sir, that there's a fundamental
25   difference between a budget request and
```

Jess Dickinson 11/29/2018

```
 1    appropriation from the Mississippi Legislature
 2    which is ultimately signed into law by the
 3    governor?
 4         A.   I wish there weren't, but yes, there is
 5    a difference.
 6         Q.   So, consequently, if you put
 7    $100 million in a budget request for any line
 8    item, and the Legislature only appropriated 10 and
 9    the governor approved 10, you would have
10    $10 million, not a hundred million dollars?
11         A.   That's right.
12         Q.   Are you aware of any way to spend what
13    you don't have?
14         A.   I can't spend what's not appropriated
15    and funded.
16         Q.   Do you believe that CPS is -- is --
17    strike that.
18              Do you believe that during your tenure
19    as the commissioner of CPS, there have been a
20    number of accomplishments by the agency in its
21    services to children?
22         A.   I do.
23         Q.   And let me drop back to one question I
24    forgot to ask you, but had the deficit in -- for
25    fiscal year 2018 been $40 million, and there was
```

Jess Dickinson 11/29/2018

1    no resolution of that shortfall, would that have
2    had a catastrophic impact on services to children
3    in Mississippi?
4         A.   All right.  You're asking me if --
5         Q.   If, in fact, at the end of fiscal year
6    2018, there was no resolution of the shortfall,
7    and CPS had $40 million of bills it couldn't pay
8    or 44 million, would that have had a catastrophic
9    impact on children in Mississippi?
10        A.   Well, the effect it would have if we
11   were unable to acquire that money, the effect it
12   would have is we would run out of money at
13   sometime around March.  If we ran out of money, we
14   couldn't operate.
15        Q.   Okay.  You'd just simply cease
16   operations, would you not?
17        A.   Case oper- -- I wouldn't have the money
18   to pay foster homes or agencies or employees or
19   anything.
20        Q.   Okay.  Without dwelling on this, CPS
21   provides a broad umbrella of services to children
22   in Mississippi, does it not, sir?
23        A.   Yes.
24        Q.   And it's not just simply a matter of
25   providing services to children who have been

Jess Dickinson 11/29/2018

```
 1    placed in foster homes in Mississippi, is it?
 2    There are many other types of children in places
 3    where children are being cared for that are not
 4    simply a foster home placement?
 5         A.    There are therapeutic foster homes and
 6    congregate care facilities.  In home services.
 7    There's a lot that we do that is not just putting
 8    a child in foster care, if that's what you mean.
 9    Yes.
10         Q.    Now, is it true, sir, that on a national
11    level in the foster care community, child welfare
12    unit, there's an emphasis on keeping children in
13    their homes?
14         A.    I want to be accurate with my answer.
15    There is an emphasis on keeping children in their
16    homes when it can be done safely.
17         Q.    All right.  Obviously, there's no
18    interest in keeping children in unsafe homes; is
19    there, sir?
20         A.    No.
21         Q.    But there's recognition that there's
22    great value in preserving families; is there not,
23    sir?
24         A.    Yes.
25         Q.    Was a major factor in the potential
```

Jess Dickinson 11/29/2018

```
 1    fiscal year 2018 shortfall the separation mandate
 2    from the Mississippi Legislature, DHS, and CPS?
 3         A.   And --
 4         Q.   And the resulting impact on the
 5    availability of federal funds, specifically, TANF
 6    funds?
 7         A.    Indirectly, yes, but the mandated
 8    separation was a big factor.
 9         Q.   All right.  Now, I'm not talking about
10    the final resolution.  I'm talking about the
11    potential for a shortfall was, in fact, impacted
12    by separation which was to be consummated in July
13    of '18, but which was later reversed by the
14    Legislature?
15         A.   All right.  Now, you --
16         Q.   Let me rephrase the question, then.
17    The -- just one second.
18              Was CPS in the middle of a separation or
19    the transition activities related to a final
20    separation when you became Commissioner?
21         A.   Yes.
22         Q.   And the target date for a complete
23    separation was July 1st of 2018?
24         A.   Yes.
25         Q.   And ultimately, the Legislature amended
```

Jess Dickinson 11/29/2018

```
 1    the legislation and withdrew that requirement for
 2    a total separation?
 3         A.   Yes.
 4              MR. JONES:  That's all I have.
 5    EXAMINATION BY MS. LOWRY:
 6         Q.   I have a few more questions.
 7         A.   Okay.
 8         Q.   Commissioner Dickinson, would you
 9    consider yourself an expert on child welfare?
10         A.   To some degree, yes.
11         Q.   Oh.  You have been Commissioner now for
12    about 14 months; is that right?
13         A.   That's right.
14         Q.   And does that make you an expert in
15    child welfare?
16         A.   To some degree.  I'm not the greatest
17    expert in the world, but I -- I would consider
18    myself an expert to some degree.
19         Q.   And has -- do you have a master's degree
20    in social work?
21         A.   My wife does.
22         Q.   Do you have?
23         A.   I don't.  No.
24         Q.   And have you ever run a child welfare
25    system before or worked in a child welfare system?
```

Jess Dickinson 11/29/2018

```
 1        A.    No.
 2        Q.    Has your chief of staff ever run a child
 3   welfare system or worked in a child welfare
 4   system?
 5        A.    That's the same question you asked me
 6   before about him?  Mr. Cheeseman?
 7        Q.    Mr. Cheeseman.
 8        A.    Yeah, I think what I told you was yes,
 9   he has.  He's worked in --
10        Q.    He didn't work in a child welfare
11   system, though, did he?
12        A.    Well, I don't think you can separate the
13   youth court from the child welfare system, and
14   he's worked in the youth court of Rankin County,
15   and the youth court of Hinds County.  And so yes,
16   he has -- he has.
17        Q.    He worked in --
18        A.    He has before -- I'm sure your question
19   is before he came to work at CPS.
20        Q.    That's right.
21        A.    And that's the answer, yes, he has.
22        Q.    And where else has he -- what other
23   child welfare system has he worked at?
24        A.    The ones I just told you.
25        Q.    The youth courts you're talking about?
```

Jess Dickinson 11/29/2018

```
 1        A.    Yes.
 2        Q.    Okay.  You did not agree to the second
 3   MSA, did you?
 4        A.    You mean did I sign it?
 5        Q.    Yes.
 6        A.    Was I one of the signatories?  No, I was
 7   not.
 8        Q.    You weren't involved in the discussions,
 9   and you certainly didn't sign it; is that right?
10        A.    That's correct.
11        Q.    And you didn't sign any of the interim
12   or stipulated orders; is that right?
13        A.    That's correct.
14        Q.    And, in fact, you might not have even
15   done that had you been present in this agency; is
16   that right?
17        A.    That's a possibility.
18        Q.    Right.  In fact --
19        A.    If I knew then what I know now, I
20   wouldn't have.
21        Q.    Right, in fact, you don't like the --
22   what you call the rigid fixed standards of the
23   caseload limits, do you?
24        A.    Well, I don't like the phrase, "I don't
25   like them."  I think they're harmful to children.
```

Jess Dickinson 11/29/2018

```
 1        Q.   I see.  And do you think that 15 years
 2   of noncompliance in this case is harmful to
 3   children?
 4            MR. JONES:  Object to the form.
 5            THE WITNESS:  Do I think that 15 years
 6        of noncompliance is harmful to children?
 7        Q.   (By Ms. Lowry)  Yeah.  Do you know how old
 8   this litigation is?
 9        A.   I can't answer that question without
10   more specifics.  I need to know what it is you
11   think was harmful to children, and I can either
12   agree with you or not, but when you say 15 years
13   of noncompliance is harmful to children, that's a
14   very general statement.
15        Q.   Do you know that the State has
16   acknowledged noncompliance with regard to the
17   settlement agreement?
18        A.   I do understand what you're asking me.
19   I'm just -- I am not going to get to the place
20   where I agree with you that noncompliance with one
21   provision or another provision of that MSA, per
22   se, translates into harm to children.  I think
23   compliance with the MSA in some respects is
24   harmful to children, so your question is too
25   general for me.
```

Jess Dickinson 11/29/2018

```
 1              If you ask me about a specific thing, I
 2    can tell you my opinion of whether it's harmful to
 3    children or not.
 4         Q.   You, in fact, would like this provision
 5    changed, wouldn't you, because it seems too rigid
 6    and fixed as your counsel called it; is that
 7    right?
 8         A.   The reason I would like it changed is
 9    because I believe it's harmful to children.
10         Q.   Okay.  So -- and you would -- what would
11    you substitute for it?
12         A.    I would substitute it for a standard
13    that takes into account the factors that affect
14    the handling of children's cases and the outcomes
15    for those children.  I would look to see if the
16    children are having good outcomes, and I would
17    look to see if the caseworkers are doing their
18    jobs, and there are factors that are indicators of
19    that, and, to me, that's what an agency should be
20    judged on.
21         Q.   So, basically, what you're saying in the
22    motion that's been filed on your behalf with
23    regard to changing a provision of this agreement
24    is that you think it's harmful to children, and
25    you don't like it; is that right?
```

Jess Dickinson 11/29/2018

```
 1              MR. JONES:  I object to --
 2              THE WITNESS:  I don't like anything
 3         that's harmful to children.
 4              MR. JONES:  And I object to the form of
 5         the question.  That's not what the motion
 6         states.
 7              MS. LOWRY:  No, that's not, but I can
 8         ask the question anyway.
 9         Q.   (By Ms. Lowry)  Okay.  But you think this
10    is harmful to children?
11         A.   I think that the agency being judged --
12    it's effectiveness being judged on a hard
13    compliance cap in the way that a cap has to be
14    implemented in a child welfare agency is harmful
15    to children.  It is harmful to the care for
16    children.
17         Q.   And so you wouldn't have signed it?  You
18    wouldn't have signed that provision of the
19    agreement, is that --
20         A.   I would not have agreed -- and, again,
21    knowing what I know today, knowing what I know
22    sitting here today, no, ma'am, I would not have
23    agreed for the State to obligate itself in order
24    to comply with the second MSA.  I would not have
25    agreed that the State be judged by a hard cap like
```

Jess Dickinson 11/29/2018

```
 1   that 90 percent cap.  I would not.
 2             MS. LOWRY:  All right.  I have nothing
 3        further.
 4                  (Time Noted:  4:16 p.m.)
 5                  SIGNATURE/NOT WAIVED
 6
 7   ORIGINAL:  MARCIA ROBINSON LOWRY, ESQ.
 8   COPY:  J. LAWRENCE JONES, ESQ.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Jess Dickinson 11/29/2018

```
 1              CERTIFICATE OF DEPONENT
 2   DEPONENT:  JESS DICKINSON
     DATE:  November 29, 2018
 3   CASE STYLE:  OLIVIA Y., ET AL. vs. PHIL BRYANT, ET
     AL.
 4   ORIGINAL TO:  MARCIA ROBINSON LOWRY, ESQ.
               I, the above-named deponent in the
 5   deposition taken in the herein styled and numbered
     cause, certify that I have examined the deposition
 6   taken on the date above as to the correctness
     thereof, and that after reading said pages, I find
 7   them to contain a full and true transcript of the
     testimony as given by me.
 8            Subject to those corrections listed
     below, if any, I find the transcript to be the
 9   correct testimony I gave at the aforestated time
     and place.
10   Page      Line                      Comments
     ____      ____      _____
11   ____      ____      _____
     ____      ____      _____
12   ____      ____      _____
     ____      ____      _____
13   ____      ____      _____
     ____      ____      _____
14   ____      ____      _____
     ____      ____      _____
15   ____      ____      _____
     ____      ____      _____
16   ____      ____      _____
     ____      ____      _____
17
18          This the ____ day of _____, 2018.
19                          _____
                            JESS DICKINSON
20   State of Mississippi
     County of _____
21
            Subscribed and sworn to before me, this the
22   _____ day of _____, 2018.
23   My Commission Expires:
24   _____    _____
25                                   Notary Public
```

Jess Dickinson 11/29/2018

```
 1              CERTIFICATE OF COURT REPORTER
 2              I, Ginger H. Brooks, Court Reporter and
 3    Notary Public, in and for the State of
 4    Mississippi, hereby certify that the foregoing
 5    contains a true and correct transcript of the
 6    testimony of JESS DICKINSON, as taken by me in the
 7    aforementioned matter at the time and place
 8    heretofore stated, as taken by stenotype and later
 9    reduced to typewritten form under my supervision
10    by means of computer-aided transcription.
11              I further certify that under the
12    authority vested in me by the State of Mississippi
13    that the witness was placed under oath by me to
14    truthfully answer all questions in the matter.
15              I further certify that, to the best of
16    my knowledge, I am not in the employ of or related
17    to any party in this matter and have no interest,
18    monetary or otherwise, in the final outcome of
19    this matter.
20              Witness my signature and seal this the
21    10th day of December, 2018.
22
23                              _____
                                GINGER H. BROOKS, #1165
24                              CRR, RPR, CCR
      My Commission Expires:
25    September 18, 2021
```