IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | | |
|---|---|---|
| OLIVIA Y., et al | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 3:04cv251 TSL-FKB |
| | ) | |
| PHIL BRYANT, as Governor of the | ) | |
| State of Mississippi, *et al.,* | ) | |
| | ) | |
| Defendants | ) | |

## DEFENDANTS' FINAL REPLY IN SUPPORT OF THEIR MOTION FOR RELIEF UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b)

## I.      INTRODUCTION.

After the completion of 12 depositions taken by Plaintiffs of former and current executives of the Mississippi Department of Child Protection Services ("MDCPS"),[1] it is necessary  to return to the foundational issues underlying Defendants' 60(b) Motion, the precise parameters of the Motion, and the reasonable, limited relief Defendants are requesting.

Rather than working cooperatively with Defendants to improve caseloads in Mississippi, Plaintiffs stridently are demanding that this Court hold Defendants in contempt and place MCAPS in a receivership of undefined scope, for an indefinite period, under an unidentified receiver based on MDCPS' inability to meet a fixed weighted value cap and a 90% caseworker caseload compliance cap.  The cap was incorporated in the Stipulated Third Remedial Order

---

[1] The depositions cited by the parties and the wealth of other information and documentation before the Court provide an adequate record for resolution of the 60(b) Motion.  Also, for the convenience of the Court, several exhibits that have previously been docketed will be filed with this Response.

("STRO")[2] and the 2nd Mississippi Modified Settlement Agreement ("2nd MSA"),[3] both of which were entered as Consent Orders.

## A.    The 90% Caseload Cap

The first cap is a mathematical 1.0 time-based standard under a weighted value matrix that takes into consideration 10 different job types/functions. The weights were based on a 2005 study that has not been updated to reflect changed conditions and more current best practices in foster child welfare. The second is a caseload compliance cap. Under the second cap, 90% of all MDCPS caseworkers, adoption workers, and licensure workers[4] were to meet a 1.0 weighted value standard by December 31, 2017. Plaintiffs are basing the Contempt/Receivership Motion on the failure to achieve the 90% compliance cap. As a result, this latter cap, which incorporates the case weight cap, will be described as the "90% Caseload Cap."

Plaintiffs would have the Court treat the 90% Caseload Cap as a red line to take over the provision of child welfare services in Mississippi by an unknown third-party receiver under the Court's direct supervision.[5] The contempt demand is not justified under the relevant factual circumstances. And the more punitive receivership demand summarily assumes, without any supporting evidence, that a receiver could meet the 90% Caseload Cap without any additional appropriation of funds to do so. This relief would be detrimental to the provision of foster care services to children in Mississippi. Strikingly, Plaintiffs offer no evidence of any systemic,

---

[2] Exhibit "A":  STRO, §5. [Dkt. No. 713.].

[3] Exhibit "B":  2nd MSA, §1.3.a.  [Dkt. No. 712].

[4] These workers are often described collectively as frontline workers.

[5] It is passing strange that Plaintiffs contend that the failure to achieve the 90% Caseload Cap is a violation of the constitutional rights of all of the children in the *Olivia Y* class while simultaneously taking the position that it is satisfactory for 10% of the caseworkers to not meet the standard. See Plaintiffs' Supplemental Memorandum: (Pg. 4). [Dkt. No. 837]. Do the children served by the 10% have fewer constitutional rights? Should MDCPS simply move cases to 10% of the frontline workers sufficient to meet the 90% Caseload Cap. Obviously not but this illustrates the perverse nature of a fixed caseload cap since it can always be met by moving cases to a select group.

adverse impact on the children in the *Olivia Y* class based on the failure of MDCPS to achieve the 90% Caseload Cap.

> **B.    M.D. By Stuckenberg v. Abbott**

As a threshold matter, the Fifth Circuit Court of Appeals in the  October 18, 2018 landmark decision *M.D. by Stukenberg v. Abbott*, 907 F.2d 237 (5th Cir. 2018) ("*M.D. v. Abbott*") established as well as clarified the law regarding fixed caseload caps in this federal Court of Appeals Circuit:

1.  Fixed caseload caps are "too blunt a remedy for a complex problem and constitute relief beyond what [is] minimally required to remedy the constitutional violation." *Id.*

2.  "[A] hard cap on caseloads would completely hamstring DFPS's [the Texas foster care agency]  ability to approach caseload distribution in a holistic, nuanced way. *Id*

3.  Hard case load caps would " undoubtedly be destabilizing for all of the parties involved, including the children in DFPS's care." *Id.*

4.  Mandatory caps are not only an extreme remedy, they are imprecise. *Id.*

Based on this reasoning, the Fifth Circuit invalidated and struck down injunctive provisions ordered by the district court that "required" all of the approximately 29,000 caseworkers in Texas to have caseloads within a "fixed cap" range of 14 to 17 cases.  The Court then directed the Texas foster care agency to "establish generally applicable, internal caseload standards [that would serve]  as a rough guide for supervisors who are handling caseload distribution, and they [i.e. these guidelines] should inform DFPS's hiring goals." *Id.*  As a result, based on the real and substantial conflict between governing Fifth Circuit law and the fixed

3

caseload cap requirements in the STRO and the 2nd MSA, this Court should invalidate the 90% Caseload Cap.

In addition, the Court should set aside the 90% Caseload Cap because Defendants failure to achieve the artificial fixed cap standards is due to significantly changed factual circumstances resulting, not from willful disobedience of a court order, but as a result of a potentially crippling State Fiscal Year 2018 funding crisis and the decision of the Mississippi legislature to underfund MDCPS by over $23 million in FY 2019.

In adjudicating and resolving the 60(b) Motion, the Court should also favorably consider MDCPS' reasonable efforts to improve caseloads and significant MDCPS accomplishments and improvements in the provision of foster care services to the children of Mississippi.

In response to the landmark developments in governing Fifth Circuit law relating to fixed caseload caps and the significantly changed financial circumstances, Defendants seek the following limited and reasonable relief:

1. Invalidation of the 90% Caseload Cap;

2. An order directing MDCPS and Public Catalyst, the court-appointed Monitor, to together analyze and study caseloads in Mississippi and recommend to the Court appropriate updated caseload standards and relevant factors that should be used as guidelines to manage future caseloads consistent with governing federal law.[6]

This relief would be a reasonable exercise of the Court's broad equitable powers given the reality that a 90% Caseload Cap is not mandated by the Constitution and the failure to

---

[6] Defendants will continue to report relevant caseload data to Public Catalyst and the Monitor will continue to report to the parties with regard to caseload performance pending review by the Court of updated caseload guideline recommendations.

achieve the Cap does not per se violate the constitutional rights of the members of the *Olivia Y* class.[7]

The 60(b) Motion and the reasonable, limited, and tailored relief requested should be granted.

## II.    THE RULE 60 (B) STANDARD OF REVIEW IN INSTITUTIONAL REFORM LITIGATION REVISITED

Plaintiffs' review of the legal standards governing a 60(b) motion in institutional reform litigation is incomplete.

Rule 60(b)(5) authorizes a party to obtain relief from a judgment or order if, among other things, [applying the judgment or order] is no longer equitable. Modification is authorized if "a significant change either in factual conditions or in law" renders continued enforcement "detrimental to the public interest." *Rufo v . Inmates of Suffolk County Jail*, 502 U.S. 367, 384 (1992). Rule 60(b) serves an important function in institutional reform litigation, particularly when a consent order is the subject the modification. *Id.* at 380.

Next, the Supreme Court has held that "courts must take a 'flexible approach' to 60(b) motions addressing [institutional reform] decrees." *Horne v. Flores*, 557 U.S. 433, 450 (2009) (*quoting Rufo,* 502 U.S. at 381(1992)). Under the mandatory flexible standard, courts should take all relevant circumstances into account in determining whether to modify a consent decree. *Bellevue Manor Associates v. U.S.*, 165 F.3d 1249, 1256 (9th Cir. 1999)("the Rufo-Agostini approach allows courts to fulfil their traditional equity role: to take all the circumstances into account in determining whether to modify or vacate … [a] consent decree.").

---

[7] The STRO and the 2nd MSA do not state that the failure to achieve the 90% caseload metric or any other requirement is a violation of the substantive due process rights of children in the *Olivia Y* class. Cf. C*onnor B. ex rel. Vigurs v. Patrick*, 774 F.3d 45, 49, 55-56(1st Cir. 2014).

It is also firmly established in federal law that a significant change or clarification in governing law can warrant revision of a consent decree. In this context, the Supreme Court in *Rufo* set forth three non-exclusive examples of potentially significant changes in federal law:

1. "[O]ne or more of the obligations placed upon the parties has become impermissible under federal law." *Rufo*, 502 U.S. at 388.

2. "[T]he statutory or decisional law has changed to make legal what the decree was designed to prevent." *Id.*

3. "A decision that ***clarifies the law***" has undermined an agreement based on a "misunderstanding of the governing law." *Id.* at 388-390. (Emphasis added).

Importantly, these are not exclusive tests and the fundamental issue is whether the proposed modification is a proper exercise of the court's equitable powers under Rule 60(b). *See e.g.*, *Mackin v. City of Boston*, 969 F.2d 1273, 1278 (1st Cir. 1992).

Finally, while a change or clarification in the law does not automatically open the door for modifying a consent decree it may have precisely that effect when a clear conflict exists between governing federal law and the provisions of a consent decree. *Rufo*, 502 U.S. at 388. Furthermore, in the event of such a conflict, the limits of federalism should be considered and deference should be granted to local state governmental authorities. *Rufo*, 502 U.S. at 592.

In the context of the "changed factual circumstances" prong of the 60(b)(5) standard, the standard can be met by demonstrating that (1) "changed factual conditions make compliance with the decree substantially more onerous," (2) "a decree proves to be unworkable because of unforeseen obstacles," or (3) "enforcement would be detrimental to the public interest." *Rufo*, 502 U.S. at 393. The Supreme Court, however, has never held that these are exclusive grounds and the foundational question is again whether applying the judgment "is no longer equitable."[8]

---

[8] Ordinarily modification would not be granted based on events that were "actually anticipated." *Id.* This is not an absolute prohibition and the Supreme Court has held that 60(b) relief can still be obtained under an agreement

Finally, if the moving party meets the burden of establishing that changed circumstances warrant relief, the Court "should determine whether the proposed modification is suitably tailored to the changed circumstance." *Rufo*, 502 U.S. at 393.

## III.    THE FIFTH CIRCUIT COURT OF APPEALS DECISION IN *M.D. v. ABBOTT*[9]

In *M.D. v. Abbott*, 907 F.3d 237 (5th Cir. 2018), a certified class of minor children in Texas filed suit against the Governor of Texas, the Executive Commissioner of the Texas Health and Human Services Commission, and the Commissioner of the Department of Children and Family Services ("DFPS") seeking injunctive relief. *Id.* at 243. The class included children in the Temporary Management Conservatorship ("TMC"), a non-permanent custody arrangement, and children in the Permanent Managing Conservatorship ("PMC") program, a permanent custody arrangement. *Id.*

The *M.D.* plaintiffs' alleged that the state's foster care system exposed the class members to a serious risk of abuse, neglect, and harm in violation of their substantive rights under the Due Process Clause of the Fourteenth Amendment to the Constitution. *Id.*

Following trial, the district court issued a liability opinion in which it concluded that DFPS' policies and practices with respect to caseloads, monitoring and oversight, placement array, and foster group homes violated the substantive Due Process rights of the class. *Id.* at 246. The Fifth Circuit denied a stay pending an appeal. *Id.* The district court then appointed Special Masters to address specific constitutional issues. *Id.* The Fifth Circuit subsequently denied a Petition for Writ of Mandamus seeking vacation of the appointment of the Special Masters. *Id.*

---

entered into in good faith if the party seeking relief establishes that a reasonable effort has been made to comply with the decree although the burden of proof would be heavy. *Rufo*, 502 U.S. at 392.
[9] Plaintiffs have requested leave of court to further brief *M.D. v. Abbott*. *See* Plaintiffs Supplemental Response: Pg. 9, fn. 9. [Dkt. No. 837]. The request should be denied. Plaintiffs were fully aware of the case. Indeed, in addition to being addressed in Plaintiffs' Supplemental Response, it was discussed in the recent depositions. There was no doubt it was being relied on as governing law in the Fifth Circuit. *See* Taylor Cheeseman Deposition 11/27/2018 ("Cheeseman I")(Pg. 95 Ln. 21 to Pg. 96 Ln. 24). [Dkt. No. 837-3].

After two years of study and analysis, the Special Masters submitted a list of findings and recommendations to the district court. *Id.*

The district court then entered a final order (the "Final Injunction Order") granting an expansive permanent injunction requiring sweeping changes to Texas's foster care system and appointed a Special Monitor. The Final Injunction Order imposed the following permanent mandatory case load cap for full time caseworkers:

> "Effective June 2018, DFPS **shall ensure that the full-time staff**, including supervisors, who provide case management services to children in the PMC class, whether employed by a public or private entity, **have a caseload within or below the range of 14 to 17 children.** Caseloads for staff must be pro-rated for those who are less than full-time. Caseloads for staff who spend part-time in caseload carrying work and part-time in other functions must be pro-rated accordingly. **The caseload range for staff with mixed caseloads**, for example caseworkers serving both PMC and TMC children, **will also be 14 to 17 children's cases**, and each TMC child's case will be afforded the same weight in the caseload calculation as a PMC child." *Id.* at 274. (Emphasis added).

The Texas defendants appealed and the Fifth Circuit granted an administrative stay of the injunction that was converted to a stay pending appeal. *Id.* at 247.

On appeal, the Fifth Circuit, in an opinion by Judge Edith Brown Clement, held that the mandatory case load cap was "invalid."[10] *Id.* at 274. The Court then explained the fundamental flaws and detrimental impact of fixed case load caps in the complex world of child welfare. First, the Court acknowledged that such caps are "too blunt a remedy for a complex problem [and] constitute relief beyond what [is] minimally required to remedy the constitutional violation." *Id.* at 274 (citing *Gates v. Collier*, 501 F.2d at 1291, 1304 (5th Cir. 1974)).

---

[10] The evidentiary record in *M.D. v. Abbott* with regard to caseload issues in Texas was dramatically different from the record in this Motion. Indeed, the Fifth Circuit accepted the trial court's conclusion that DFPS' policies and practices relating to its caseworkers amounted to structural deficiencies that violated the General Class's Fourteenth Amendment right to be free from an unreasonable risk of harm. *M.D. v. Abbott*, 907 F.3d at 264-265. These structural, systemic deficiencies are not present in Mississippi. Nevertheless, even given the Texas deficiencies, caseload caps were not the solution and the Fifth Circuit made it clear that fixed caps, even when set forth in a range, were detrimental to the foster care system and the children served by the system.

Next, in practical terms, the Court emphasized that "caps would only exacerbate DFPS' staffing crisis in the short term" and would also "generate a deluge of paperwork and force DFPS to rapidly redistribute cases among its caseworkers." *Id.* More importantly, the Court also held that hard caseload caps would "undoubtedly be destabilizing for all of the parties involved, including the children in DFPS's care." *Id.* The Court also emphasized that "[c]aps also fail to account for the fact that two caseloads that each consist of, say 16 children can generate vastly different amounts of work." *Id.* The Court also recognized that "a hard cap on caseloads would completely hamstring DFPS' ability to approach caseload distribution in a holistic, nuanced way. *Id.* In the final analysis, the Court expressly recognized and held that "mandatory caps are not only an extreme remedy, they are imprecise." *Id.*

In light of all of these compelling factors, the Fifth Circuit held that "[a] more flexible method of distributing caseloads that takes into account the complexity of the cases and the experience of the caseworker (and taking into consideration, *inter alia*, a long list of possible factors such as travel distances and language barriers) is, as a general matter, a sound policy." *Id.*

Based on these rulings, DFPS was directed to "**establish generally applicable, internal caseload standards [that would serve] as a rough guide for supervisors who are handling caseload distribution, and they should inform DFPS's hiring goals**." *Id.* (Emphasis added).

The Fifth Circuit remanded the case to the district court for implementation of its decision including the case load rulings. *Id.* After remand, the district court judge, in a November 20, 2018 Order, required DFPS within certain time frames to[11]:

1. Propose and conduct a workload study;[12]

---

[11] Exhibit "C". 11/18/2018 Order: *M.D. v. Abbott.*

2. "[E]stablish internal caseload standards based on the findings of the DFPS workload study, and subject to the Court's approval. The caseload standards that DFPS will establish shall ensure a flexible method of distributing caseloads that takes into account the following non-exhaustive criteria: the complexity of the cases; travel distances; language barriers; and the experience of the caseworker."[13]

3. "[E]nsure that the generally applicable, internal caseload standards that are established are utilized to serve as guidance for supervisors who are handling caseload distribution and that its hiring goals for all staff are informed by the generally applicable, internal caseload standards that are established."[14] *Id.*

Correctly, the district court did not establish any fixed caseload caps or per se penalties for any variances from the case load guidelines and benchmarks.

The Fifth Circuit's comprehensive and well-reasoned opinion makes clear that fixed caseload caps are detrimental to foster care agencies and the children they serve.[15]

## IV.    BACKGROUND FACTS UPDATED.

### A.    MDHS and MDCPS Overview and Separation.

From 1986 to 2016, the Mississippi Department of Human Services' ("MDHS") Division of Family and Children's Services ("DFCS") was responsible for child protection programs and services in the State of Mississippi.

---

[12] Id., (Pgs. 9-10).

[13] Id., (Pg. 9).

[14] *Id.*, (Pg. 10).

[15] MDCPS senior management is in full agreement that fixed caseload caps damage the foster care system and children. See e.g., Jess H. Dickinson 11/29/2018 Deposition ("Dickinson Dickinson")(Pg. 142 Lns. 4-9)(Pg. 142 Ln 21 to Pg. 143 Ln 3)(Pg. 143 Ln 9 -16). [Dkt. No. 837-5]; Cheeseman Deposition I: (Pg. 92 Lns. 3-18). [Dkt. No. 837-3].

During the 2016 Regular Session, the Mississippi Legislature passed Senate Bill 2179 (the "Act"), which created MDCPS as an independent agency within the Executive Branch of Mississippi government.[16] After the Act was signed into law by the Governor, it was codified as MISS. CODE ANN. §43-26-1 (1972). The Act required a phased-in approach to transitioning control of child protection services from MDHS to the new agency beginning with passage of the Act.[17] At that time David Chandler, the Executive Director of DFCS became the first Commissioner of MDCPS. Although the transition began immediately, the full separation was to be completed by July 1, 2018.[18] The complete separation of MDCPS from MDHS was supported by the Plaintiffs in the *Olivia Y* litigation.[19]

Significantly, the complete separation of MDCPS from MDHS was to have the unintended consequence, after separation was completed of preventing MDHS from expending federal funds from the Temporary Assistance To Need Families ("TANF") and Social Security Block Grant ("SSBG") programs for the benefit of MDCPS.[20] These funding sources are critical to the financial stability of MDCPS and had previously been used to fund year-end budget deficits.[21]

As a result of enactment of the separation legislation and the independent agency transition process, MDCPS did not budget in FY 2018 (July 1, 2017 to June 30, 2018)[22] or FY

---

[16] Exhibit "D", Senate Bill 2179.
[17] *Id.*
[18] *Id.*
[19] Exhibit "E" John Davis, Executive Director of MDHS 11/29/2018 Deposition ("Davis Deposition"):(Pg. 60 Lns. 9-11)(Pg. 63 Ln. 19 to Pg. 64 Ln 22). *See also*, STRO, section 2.a. [Dkt. No. 713].
[20] Exhibit "E": Davis Deposition: (Pg. 45 Ln 5 to Pg. 46 Ln. 9)(Pg. 61 Lns. 6-16).
[21] Exhibit "F": 9/15/2017 Takesha Darby Memo to Justice Dickinson Re: Use of SSBG and TANF Funds. Ms. Darby , the former MDCPS Deputy Director for Finance reported the following historic TANF and SSBG funding information: (1) FY 2015: TANF-$25,507,716: SSBG: $4799,426: Total: $30,307142; (2) FY 2016: TANF: $24,884,746: SSBG: $6,327,405: Total: $31,212,151; (3) FY 2017: TANF: $12,12,300,702. Darby did not report SSBC funds received in FY 2017.
[22] Exhibit "G": MDCPS Budget Request For Fiscal Year Ending June 30, 2018 (Pg. 3-1 only).

2019 (July 1, 2018 to June 30, 2019)[23] for receipt of any TANF or SSBG funds from MDHS. Also, as a result of the ongoing transition, MDHS also did not budget for the use of any TANF funds for the benefit of MDCPS for FY 2018 or FY 2019.[24]  Along with significantly increased MDCPS spending on programs and initiatives that benefited children, this was the major contributing factor to the FY 2018 Budget Crisis.[25]

### B.    The FY 2018 Budget Crisis.

In their Supplemental Memorandum, Plaintiffs ignore the unanticipated FY 2018 Budget Crisis and its potentially catastrophic impact on foster care services in Mississippi.

Mississippi Supreme Court Justice Jess H. Dickinson became the MDCPS Commissioner on September 18, 2017 following the resignation of the former Commissioner David Chandler. Prior to assuming his position, Dickinson in conducting due diligence with regard to MDCPS operations and funding, was advised by Commissioner Chandler that MDCPS had sufficient funds for its FY 2018 operations and that funding was not a problem.[26]

Commissioner Dickinson determined, however, in the early stages of his administration that MDCPS did not have an operational budget sufficient to determine its projected funding and financial obligations for FY 2018,[27] that neither MDCPS or MDHS had budgeted for the use of federal funds from TANF or SSBG programs for the benefit of MDCPS in FY 2018,[28] that

---

[23] Exhibit "H":  MDCPS Initial Budget Request For Fiscal Year Ending June 30, 2019 (Pg. 3-1 only).    The FY2017, 2018 and 2019 Budget requests were submitted by the Chandler MDCPS administration.
[24] Exhibit "E": Davis Deposition (Pg. 46 Lns. 10-14).
[25] *Id.* (Pg. 57 ln 11 to Pg. 61 Ln 20).
[26] Jess H. Dickinson 11/29/2018 Deposition ("Dickinson Deposition")(Pg. 6 Ln. 7 to Pg. 7 Ln 10)(Pg.  9 Line 17 to Pg. 10 Ln. 8). [Dkt. No. 837-5]; John Davis the Executive Director of DHS also attended the meeting.  Exhibit "I": David Chandler 11/29/2018 Deposition ("Chandler Deposition")(Pg. 15 Ln 8 to Ln 24)(Pg. 45 Ln 11 to Pg. 47 Ln. 8)
[27] Dickinson Deposition: (Pg. 8 Ln. 4 to Pg. 10 Ln 8)(Pg. 11 Lns. 9-11) (Pg. 13 Ln. 21 to Pg. 14 Ln. 17) [Dkt. No. 837-5]; Cheeseman Deposition I (Pg. 85 Lns. 6-14).  [Dkt. No. 837-3].
[28] See Exhibit "G": MDCPS Budget Request For Fiscal Year Ending June 30, 2018) (Pg. 3-1).  *See also* Exhibit "E":  Davis Deposition (Pg. 46. Ln 19 to Pg. 47 Ln. 15)(Pg. 64. Ln. 23 to Pg. 65 Ln. 11).

MDHS had committed TANF and SSBG funding to other projects;[29] and that there was no formal agreement in place for MDHS to provide TANF or SSBG federal funds to MDCPS in the event of FY 2018 year end budget deficit.[30] As a result of the juxtaposition of all of these events, as well as increased program expenses, MDCPS was soon to experience a potentially devastating financial crisis.[31]

On a different front, Commissioner Dickinson also learned of the 90% Caseload Cap and the December 31, 2017 target date[32] and that MDCPS had been engaged in an aggressive campaign to increase its number of caseworkers and improve caseloads.[33] However, MDCPS' good faith efforts were being impeded by many challenges including retention of caseworkers, which is a nation-wide problem in child welfare,[34] and that neither MDCPS or DFCS had ever achieved the 90% compliance cap.

In response to the caseload matters, MDCPS continued to focus on and implement numerous programs designed to increase the hiring, and retention of case workers and improve caseloads.[35] A financial crisis soon severely restricted the success of this strategy.

On November 15, 2017, MDCPS was advised by MDHS that MDCPS would not have sufficient funds to fund FY2018 obligations and would likely run out of funding before the end

---

[29] Dickinson Deposition: (Pg. 21 Ln. 3 to Pg. 24 Ln. 14) [Dkt. No. 837-5; Exhibit "E": Davis Deposition (Pg. 19 Ln. 24 to Pg. 20 Ln. 7).

[30] Dickson Deposition: (Pg. 126 Ln. 19 to Pg. 127 Ln. 1). [Dkt. No. 837-5]; Cheeseman Deposition I: (Pg. 72 Ln. 11 to Pg. 74. Ln 10). [Dkt. No. 837-3].

[31] Exhibit "E": Davis Deposition: (Pg. 59. Ln. 20 to Pg. 61. Ln. 20); Cheeseman Deposition I (Pg. 28 Ln. 12 to Pg. 29 Line 15). [Dkt. No. 837-3].

[32] Jess H. Dickinson 7/3/2018 Affidavit ("Dickinson Affidavit") ¶¶ 18, 19 [Dkt. No. 756-1].

[33] Id. at ¶19.

[34] During calendar year 2017, MDCPS hired 379 new workers—but during the same period, lost 225 workers. Id. These losses occurred throughout 2017 and, contrary to Plaintiffs' assertions, not simply after Commissioner Dickinson began his administration on September 18, 2017. Id. Retention is a problem across all state agencies in Mississippi. See "It is a Crisis: State workers are underpaid, aging and quitting, official says", Clarion Ledger January 22, 2019. (https://www.clarionledger.com/story/news/politics/2019/01/22/msleg-state-worker-turnover-crisis-official-says)

[35] Dickinson Affidavit ¶¶ 18-22. [Dkt. No. 756-1]. See also Exhibit "J": MDCPS 9/7/2017 E Bulletin Re: Workload Standards.

of FY 2018.[36]  As a result of this unanticipated development, MDCPS immediately began to evaluate the Agency's FY 2018 obligations, obtained an updated balance of state funds allocated to MDCPS, and calculated the federal funds the Agency reasonably expected to receive for the balance of the fiscal year.[37]  This analysis established that without budget cuts and additional funding, MDCPS would run out of operational funding in April 2018, two months before the end of the fiscal year June 30, 2018, and would complete FY 2018 with a "projected deficit of approximately $52 million.[38]

In response, MDCPS consulted with various members of the Legislature, the Mississippi Department of Finance and Administration, the Governor's office, and MDHS with regard to the fiscal crisis and additional funding.[39]

MDCPS also put in place hiring policies authorizing the hiring of only essential workers and the backfilling of vacant positions within MDCPS' overall budget for wages and salaries.[40] These policies are still in force today.

In addition, MDCPS and MDHS proposed legislation (Senate Bill 2675) to amend Miss. Code Ann. §43-26-1 (1972) in order to maintain MDCPS as a sub-agency of MDHS but with the MDCPS Commissioner retaining full operational control of the Agency. The bill passed, became law and allowed among other things the integration of critical back office functions and continued access by MDCPS through MDHS of TANF, SSBG, and other federal funds support to pay MDCPS obligations.[41]

---

[36] Exhibit "K": November 14 and 15, 2017 MDHS and MDCPS Emails and attachments.  Cheeseman Deposition I: (Pg.78 Ln. 1 to Pg. 84 Ln. 21) [Dkt. No. [837-3].
[37] Cheeseman Deposition I: (Pg. 85 Ln. 20 to Pg. 88 Ln 9). [Dkt. No. 837-3].
[38] Id. (Pg. 18 Ln. 18 to Pg. 19 Ln. 2)(Pg. 85 Ln. 20 to Pg. 86 Ln. 14). [Dkt. No. 837-3].
[39] Dickson Affidavit ¶24. [Dkt. No. 756-1].
[40] Exhibit "L": 11/20/2017 Memorandum From Kris Jones, MDCPS Commissioner to Taylor Cheeseman, MDCPS Chief of Staff.  See also Cheeseman Deposition I: (Pg. 41 Ln. 14 to Pg. 43 Ln. 4).  [Dkt. No. 837-3]; Taylor Cheeseman 12/20/2018 Deposition ("Cheeseman Deposition II") (Pg. 111, Lns. 13-25).  [Dkt. No. 837-4].
[41] Miss. Code Ann. §43-26-1 (1972).  See also Dickinson Affidavit, ¶28. [Dkt. No. 756-1].

Next, through substantial MDCPS program cuts,[42] program cuts at MDHS that freed up federal funds, a $12 million special deficit appropriation from the Mississippi Legislature to MDHS and utilization of over $30 million of MDHS TANF funds, the FY 2018 deficit was resolved and MDCPS met its FY 2018 obligations.[43]

## C. FY 2019 State Funding

In this same time frame, MDCPS was forced to address FY 2019 funding. The prior MDCPS administration had requested $113,241,063 in state funding for FY 2019.[44] In light of the FY 2018 Budget Crisis, the request was inadequate and had to be amended in order to meet MDCPS' needs. Accordingly, MDCPS submitted a revised budget request of $133,626,889.78[45] and advised the Legislature that the request included funds necessary to comply with *Olivia Y* requirements.[46] MDCPS also met with Plaintiffs' counsel about the budget crisis and provided Plaintiffs with a full detailed explanation of its Revised Budget Request on March 7, 2018.[47] In response to MDCPS' request, the Legislature appropriated $97,994,295 in general funds and $12,000,000 in special funds, $23,632,591.78 less than the requested necessary funding.[48]

As a result, of all of these developments, MDCPS had to, again, review its operational expenditures and tighten its belt in every area. MDCPS continued to be unable to hire the

---

[42] Cheeseman Deposition I: (Pg. 86 Lns. 17-23). [Dkt. No. 837-3].

[43] Cheeseman Deposition I (Pg. 86 Ln 17 to Pg 88 Ln 20) [Dkt. No. 837-3]; Exhibit "E": Davis Deposition: (Pg. 26 Ln. 17 to Pg. 28 Ln. 15)(Pg 29. Ln. 15 to Pg. 31 Ln. 8); Dickinson Affidavit ¶¶26, 28. [Dkt. No. 756-1].

[44] Exhibit "M": MDCPS Budget Request For Fiscal Year Ending June 30, 2019. Pg. 1 only. Dickinson Affidavit ¶29. [Dkt. No. 756-1].

[45] Exhibit "N": 3/20/2018 Email from Taylor Cheeseman to Chris Graham Mississippi Legislative Budget Office.

[46] At that time, MDCPS estimated that it would need approximately an additional $7 million for wages and salaries to meet the *Olivia Y* caseload requirements. Dickinson Affidavit ¶30. [Dkt. No. 756-1]. This estimate did not use the same methodology as the most current projection set forth in the FY 2020 Budget Request and it was for an earlier date. Cheeseman Deposition II: (Pg. 137 Ln. 7 to Pg. 138 Ln. 23]. [Dkt. No. 837-4]. Caseloads have continued to improve and MDCPS believes will continue to do so.

[47] Exhibit "O": Taylor Cheeseman's 3/7/2018 Narrative Explanation of MDCPS' Revised Fiscal Year 2019 Budget Request. This narrative demonstrates the scope and complexity of the services MDCPS provides to children in Mississippi.

[48] Exhibit P: House Bill 1600: FY 2019 Appropriation.

necessary case workers to meet the 90% Caseload Cap by December 31, 2017, and is unable to do so until it receives additional funding.[49]    However, as will be discussed in more detail in Section IV.F., the Agency is maintaining its current caseworker workforce and is continuing to seek to improve caseload levels.

### D.    FY 2020 State Funding

On August 20, 2018, MDCPS submitted its FY 2020 Budget Request to the Mississippi Legislature seeking State Funding of $135,744,859, which includes a request for an additional $7,024,494 in the category of Wages and Salaries.[50]    The budget also includes a $30,000,000 TANF fund commitment from MDHS to MDCPS.[51]    With the Wages and Salaries increase, MDCPS projected in its budget submission that it could comply over time with *Olivia Y* caseworker requirements by hiring an additional 108 case workers and 34 supervisors at a cost of $6,506,406.90.[52]    The Governor supports the full amount of the MDCPS FY 2020 Budget Request.[53]

### E.    Current Mississippi Caseloads

MDCPS periodically provides caseload data to Public Catalyst.  Public Catalyst, in turn validates the data and creates a Mississippi Performance On Case Load Standards report based on the data for a specific date.[54]    Among other data, the Public Catalyst performance report reflects as a "Met" category the percent of "Overall", "Frontline" (i.e. traditional caseworkers) and "Adoption and Licensure" workers[55] that are less than or equal to the 1.0 weighted value

---

[49] Cheeseman Deposition I: (Pg. 51 Ln. 6 to Pg. 51 Ln. 1)(Pg. 52 Lns. 12-19) [Dkt. No. 837-3].
[50] Exhibit "Q:  MDCPS Budget Request For Fiscal Year Ending June 30, 2020, Pgs. 1, 3-1 and 21-1).
[51] *Id.* (Pg. 3-1).
[52] *Id.* (Pg. 21-1.
[53] Dickinson Deposition: (Pg. 108 Ln. 19 to Pg. 109 Ln. 11).
[54] See Exhibit "R":  Public Catalyst Report on Case Load Standards Report dated December 17, 2017.  This is the most current report.  The data is never static and changes daily.
[55] *Id.*

standard.[56]   In addition, Public Catalyst reports percentage compliance for the same groups (Overall, Front Line and Adoption and Licensure workers) for a "Close" category, which is defined as workers with a weighted value greater than 1.0 but less than or equal to 1.2, and two "Over" categories for workers greater than 1.2.[57]   The Close category is particularly significant because, as the following table demonstrates, the addition of even a single one of the 10 designated job functions will move a worker with a 1.0 value from the Met category to a non-compliance category.

| 1.0 Frontline Worker With The Addition Of One Investigation | | | | |
|---|---|---|---|---|
| Service Type | Standard | Weight | Worker Total (of each service) | |
| Investigation | 14 | 0.0714 | 1 | 0.0714 |
| Placement R&S | 14 | 0.0714 | 14 | 0.9996 |
| Placement COR  (28) | | 0.0357 | | 0 |
| Placement COS (28) | | 0.0357 | | 0 |
| In - Home R&S | 17 | 0.0588 | | 0 |
| In - Home COR (34) | | 0.0294 | | 0 |
| In - Home COS (34) | | 0.0294 | | 0 |
| Adoption COS | 15 | 0.0667 | | 0 |
| New Application Licens | 15 | 0.0667 | | 0 |
| Renewal Licensing | 36 | 0.0278 | | 0 |
| | | Total Worker Workload | | 1.071 |
| COR: County of Residence. | | | | |
| COS: County of Service. | | | | |
| R &S: Residence and Service | | | | |

This demonstrates one of the many flaws in utilizing in the first instance a 1.0 fixed weighted value cap and is a compelling reason consistent with *M.D. v. Abbott* for use of a range of guidelines rather than an rigid cap for the weighted value 1.0 requirement as well as the overall 90% Cap.

---

[56] *Id.*
[57] *Id.*

17

MDCPS has made significant progress in caseloads even in the face of the major unanticipated financial obstacles it has encountered. In March 2016, Public Catalyst reported that overall 31% of MDCPS caseworkers carried caseloads within the 1.0 Met standard.[58] The most current Public Catalyst report dated December 17, 2018 reflects that 57% of caseworkers achieved the Met category.[59] This is a substantial improvement.

Equally as important, the most current Public Catalyst report reflects that another 17% achieved the Close standard.[60] Together 74% of Mississippi caseworkers and adoption and licensure workers achieved the Met/Close combined category.[61]

### F.    MDCPS Is Aggressively Seeking To Improve Caseloads.

MDCPS has not retreated from seeking to improve caseloads and has instituted many programs and policies to do so including[62]:

1.  Through more efficient management, operations, and programs, including increased adoptions and the "Safe At Home Program" that was inaugurated in 2017, MDCPS has reduced the number of children in care as of January 19, 2019 to 4867 from a peak of 6091 in April 2017.[63]

2.  Increased caseworker salaries and wages.[64]

3.  Improved technology access through the provision of smart phones and tablets, which has significantly improved case documentation.[65]

4.  Intensified recruiting of caseworkers through career job fairs and university recruiting.[66]

5.  More effective workload distribution.[67]

---

[58] Exhibit "S":  March 31, 2017 ( Updated April 4, 2017)  Memo to Tracy Malone Deputy Commissioner of Child Welfare from Public Catalyst Re:  2017 Caseload Performance Targets.  [Ex. H [Dkt. No. 756].
[59] Exhibit "R".  Public Catalyst Report on Case Load Standards Report dated December 17, 2018.
[60] *Id.*
[61] *Id.*
[62] Exhibit "T":  1/24/19 Affidavit of Tonya Rogillio ("Rogillio Affidavit"), ¶20. *See also* Dickinson Deposition: (Pg. 100 Ln. 25 to Pg. 102 Ln. 20). [Dkt. No. 837-5].
[63] Dickinson Deposition: (Pg. 94 Ln. 24 to Pg. 95. Ln. 8]. [Dkt. No. 837-5].
[64] Exhibit "U":  Tonya Rogillio MDCPS Deputy Commissioner for Child Welfare Deposition 11/27/2018 Deposition ("Rogillio Deposition")(Pg.12 Ln 6. to Pg. 13. Ln 8).
[65] *Id.*
[66] *Id.*

6. Cross-county assignment of cases.[68]

7. Voluntary transfer of caseworkers from counties with a current excess of caseworker to counties with a caseworker need.[69]

8. More effective and focused caseload management.[70]

9. Creation and implementation of a MDCPS Hiring Priority Committee, which meets weekly, and is composed of senior MDCPS executives, to assess caseworker need and make hiring and case assignment decisions.[71]

**G.    The November 27, 2018 PEER Committee Report**.

MISS. CODE ANN. §43-26-1 (7)(1972), as it was amended in 2018 to correct the complete separation of MDCPS from MDHS, also requires the Mississippi Joint Legislative Committee on Performance Evaluation and Peer Review[72] ("PEER") to review the programs of MDCPS on an annual basis beginning with FY 2017.  PEER issued its first report on November 27, 2018.[73] The report addressed only FY 2017 (6/30/2016 to 7/1/2017) and FY 2018 (7/1/2017 to 6/30/2018).[74]

The PEER Report made the following recommendations with regard to caseloads:

[Recommendation] 6.   In order to reduce both overloading and underloading of caseworkers, the Mississippi Department of Child Protection Services should continue to redistribute caseworker positions so that they more closely match expected caseloads. In addition, MDCPS should consider assigning cases to caseworkers in bordering counties to better distribute caseloads.[75]

---

[67] *Id.*; Dickinson Deposition: (Pg. 100 Ln. 8 to Pg. 102 Ln. 20). [Dkt. No. 837-5].
[68] *Id.*, (Pg. 101. Lns. 4-9). [Dkt. No. 837-5].
[69] Dickinson Deposition: (Pg. 100 Ln. 8 to Pg. 102 Ln. 20). [Dkt. No. 837-5].
[70] *Id.* Dickinson Deposition: (Pg. 100 Ln. 8 to Pg. 102 Ln. 20) [Dkt. No. 837-5].
[71] Exhibit "V":  Representative Agendas and Minutes of MDCPS Hiring Priority Committee.  See also Exhibit "T": Rogillio Affidavit ¶20.  As a matter of policy, when a vacancy occurs if the county where the vacancy arises has a mathematical excess of caseworkers measured by the 90% Caseload Cap standards the committee will move and fill the position in a county with a mathematical need.
[72] The Mississippi Legislature created PEER by statute in 1973.  See Miss. Code Ann. §§5-51-1 to 5-3-79(1972).  It is composed of 7 members of the House of Representatives appointed by the Speaker of the House and seven members of the Senate appointed by the Lieutenant Governor.  PEER is authorized by law to review any public entity and to address any issues that may require legislative action..
[73] Exhibit "W": PEER Mississippi A Review of the Mississippi Department of Child Protection Services For Fiscal Years 2017 and 2018:  Cover Page and Recommendations.
[74] *Id.*
[75] *Id.*, (Pgs. 57-58)

[Recommendation] 7.  The Mississippi Department of Child Protection Services should conduct a new workload study based on current caseworkers' time and responsibilities to determine the range of time necessary for a caseworker to perform a task in accordance with best practices.  MDCPS should establish new standards based on the results of this study.[76]

[Recommendation] 8.  The Mississippi Department of Child Protection Services should confer with the court monitor and attorneys representing the Plaintiffs in the Olivia Y. lawsuit to discuss replacing the percentage-compliant mandates (90% for caseworkers and 85% for caseworker supervisors) with mandates based on statistical difference from central tendency and dispersion of caseloads abiding by best practices (as established in Recommendation 7)

With regard to recommendation 6, MDCPS is redistributing caseworker positions to better manage caseloads and is assigning cases to caseworkers across county lines.[77] Recommendations 7 and 8 are entirely consistent with the relief requested in the 60(b) Motion and demonstrate that PEER's staff recognized that caseload standards should be updated and new standards developed that reflect guidelines or benchmarks and not be hard fixed caps.

## H.    Overall MDCPS Accomplishments And Improvements

The request for modification of the 90% Caseload Cap should also take into consideration under the "flexible all circumstances" standard the following MDCPS accomplishments and improvements, which are summarized and updated by Tonya Rogillio, the MDCPS Deputy Commissioner for Child Welfare, in a January 24, 2019 Affidavit:[78]

1.  Reducing the number of children in care by more efficient case management and adoptions.

2.  Virtually eliminating overdue investigations.

3.  Improving the processes and procedures necessary to facilitate adoptions resulting in over a 100% increase in adoptions from FY 2017 to FY 2018 (302 to 641).

4.  Exceeding the target for foster home recruitment for FY 2018 by 8%.

---

[76] *Id.*, (Pg. 58).
[77] *See* footnotes 62 to 71 and accompanying text.
[78] Exhibit "T": Rogillio Affidavit, ¶20.

5.  Substantially reducing the backlog of relatives awaiting licensure.

6.  Implementing new contractual resources to provide in-home services to maintain children in their homes.

7.  Consolidating all MDCPS management staff in a central location at 750 North State Street in Jackson, Mississippi.

8.  Bringing the Rescue 100 foster care recruitment program in-house.

9.  Recruiting and licensing more than 400 new foster homes in 2018.

10. Reuniting, in FY 2018, more than 2000 children with their birth families

11. In FY 2018, providing intensive in-home services to more than 1400 children.

12. Bringing all new hire and staff training in-house.  Under the in-house training program, MDCPS caseworkers annually receive a minimum of 40 hours of in-service training and MDCPS supervisors receive a minimum of 24 hours of in-service training.

## V.    Section 11.2.a. of the 2nd MSA Authorizes Defendants To File, and The Court To Act Upon, A Rule 60(b) Motion.

Section 11.2.a. of the 2nd MSA allows Defendants to seek "a court-ordered modification of any provision of the 2nd MSA pursuant to Rule 60(b)…"[79]  This right is not abrogated by the provisions of Section 11.2, which addresses certain enforcement procedures initiated after January 1, 2020.  Plaintiffs Contempt/Receivership Motion also opened the door for 60(b) relief.

## VI.    Section 11.3 of the 2nd MSA Does Not Require Compliance With <u>All</u> The Provisions of the 2nd MSA As A Condition Precedent To A Rule 60(b) Motion.

It is also not necessary for Defendants to establish that "they have achieved and maintained substantial compliance [with] all of the provisions of this 2nd MSA upon 12 continuous months of data that has been verified by the Monitor, prior to the application."[80]

---

[79] Exhibit "X":  2nd MSA, §11.2 and 11.3 only.
[80] *Id.*

21

Section 11.3 applies only in the event "Defendants … seek an order dismissing court jurisdiction of this matter…"   Defendants are not requesting such relief.

## VII.    Significant Changes In The Governing Law Justify The Rule 60(b) Relief .

The Fifth Circuit decision in *M.D. v. Abbott, 907 F.3d 237(5th Cir. 2018)* is a landmark decision in foster care that is now governing law in this Court.  In this decision, the Fifth Circuit invalidated a district court injunction that required all of the thousands of caseworkers in the state of Texas to meet a fixed 14 to 17 caseload cap. There were no exceptions.  If DFPS failed to do so the agency would obviously have been subject to contempt of court proceedings.  The Fifth Circuit, in this well-reasoned opinion, invalidated the fixed caseload cap injunctive provisions and carefully set forth the rationale for this decision.

In summary, the Court recognized the complexity of foster care and held that the 14 to 17 fixed caseload cap as a matter of fact, policy, and law failed to account for the vastly different work that individual foster children can generate, would exacerbate a staffing crisis in the short term, create a deluge of paperwork, force the redistribution of cases among caseworkers, be destabilizing for the all parties including the children in foster care, was too blunt a remedy for a complex problem, was  an extreme remedy, was an imprecise remedy, and would completely hamstring the Texas foster care agency's ability to approach caseload distribution in a holistic, nuanced way.  *Id.* at 274.

As a result, the Fifth Circuit "invalidated" the rigid, fixed caseload cap and ruled that "[a] more flexible method of distributing caseloads that takes into account the complexity of the cases and the experience of the caseworker and taking into consideration, *inter alia*, a long list of possible factors such as travel distances and language barriers) is, as a general matter, a sound policy." *Id.*

Based on these rulings, the Fifth Circuit ordered DFPS, under the district court's supervision, to "establish generally applicable, internal caseload standards [that would serve]  as a **rough guide** for supervisors who are handling caseload distribution, and they should inform DFPS' hiring goals. *Id.*

Under *M.D. v. Abbott*, fixed caseload caps are impermissible as a matter of policy and law in the Fifth Circuit.  *See Rufo*, 502 U.S. 388.  Requiring MDCPS to adhere to the 90% Caseload Cap and then finding Defendants in contempt as a result of the failure to do so, is fundamentally inequitable under all of the relevant facts and circumstances including MDCPS' good faith efforts to manage and improve caseloads.

Based on the change and clarification in governing law and changed financial circumstances, an order of this Court invalidating the 90% Caseload Cap and directing MDCPS and the Court Monitor to update case load standards in Mississippi and bring a recommendation back to the Court setting forth benchmark guidelines and factors that should be considered in managing caseloads in Mississippi should be entered by the Court.

## VIII.   Significant Changes In Factual Circumstances Justify The Rule 60(b) Relief

When the STRO and the 2nd MSA were agreed upon and entered as Consent Orders, the parties obviously did not "actually anticipate" that MDCPS would discover a potentially catastrophic budget deficit in Fiscal Year 2018.  *See Rufo*, 502 U.S., at 385.  Nor is there any evidence the parties actually anticipated that, after discovering and resolving the FY 2018 deficit, the Mississippi Legislature in the very next fiscal year appropriate over $23 million less than the necessary funding MDCPS requested after being advised that the additional funding was necessary to comply with requirements in the *Olivia Y* litigation.  Furthermore, MDCPS' good faith is clear and as set forth in Section IV. F., the Agency has made more than a reasonable

effort to meet the 90% Caseload Cap but has been unable to do so as a result of unanticipated changed circumstances beyond Defendants' control.

In this context, citing *Rufo* and other cases, Plaintiffs again assert that the 60(b) Motion must be denied because financial constraints are irrelevant because such constraints cannot be used to justify creation or perpetuation of constitutional violations.[81] This is not correct as a matter of law because a 90% Caseload Cap is not constitutionally required and the failure to achieve the metric due to changed circumstances is, therefore, not a violation of a recognized constitutional right. *See Connor B. ex rel. Vigurs*, 774 F.3d at 57 & n. 15. Indeed, there is no case authority in any jurisdiction recognizing a substantive due process right to a 90% caseload compliance cap based on a weighted value matrix.

Furthermore, in order to state a claim for a substantive due process violation relating to case load compliance, the Plaintiffs would be required to demonstrate that: the class members (1) were deprived of a cognizable constitutional right, see *Rios v. City of Del Rio*, 444 F.3d 417, 425 (5th Cir. 2006); (2) the State acted with "deliberate indifference" to the protected right, see *Hernandez v. Tex. Dep't of Protective & Regulatory Servs.*, 380 F. 3d 872, 880 (5th Cir. 2004); and (3) the policies or practices complained of were the direct cause of the constitutional deprivation, see *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). In addition, MDCPS' conduct in failing to achieve the 90% Caseload Cap would have to rise to the level of shocking the conscience of the Court. It cannot be contended in good faith that MDCPS' conduct even approaches these standards.

Finally, the Supreme Court held over 26 years ago that "[While] [f]inancial constraints may not be used to justify the creation or perpetuation of constitutional violations … they are a legitimate concern of governmental defendants in institutional reform litigation and therefore are

---

[81] Plaintiffs' Supplemental Memorandum: (Pg. 7). [Dkt. No. 837].

appropriately considered in tailoring a consent decree modification." *Rufo*, 502 U.S. 392-393.
*See also Jackson v. Los Lunas Cmty. Program*, 880 F.3d 1176, 1194 (10th Cir. 2018).

## IX. Changed Factual Conditions Make Compliance With The 90% Caseload Cap More Onerous.

### A.    Overview and Relevant Financial Circumstances

At this time, compliance with the 90% caseload metric is more onerous.  Given the inadequate FY 2019 funding MDCPS received from the Mississippi Legislature following the FY 2018 financial crisis, the Agency does not have the funding necessary to hire sufficient caseworkers to achieve a 90% metric and it cannot obviously create an appropriation.

Plaintiffs also assert that an additional $7 million in funding is readily available to MDCPS because the overall state budget is $5.5 billion.[82]  This is the kind of substitution of judicial judgment for the professional judgment "of the public servants that the Supreme Court" prohibits especially in light of the 'sensitive federalism concerns' in institutional reform litigation". *Conner B.  ex re. v. Patrick,* 774 F.3d 45, 57 (1st Cir. 2014).  *See also, Horne,* 557 U.S. at 448 ("Federalism concerns are heightened when … a federal court decree has the effect of dictating state or local budget priorities.").

Moreover, there is no evidence before that Court that this is feasible.  Many state agencies are seeking more funding and State Legislature and Governor face a Herculean task in balancing competing interests with limited funds.  Nevertheless, the Governor forcefully stated in his recent 2020 Budget Recommendation that he fully supports increased funding to MDCPS, its efforts to provide quality services to the children in Mississippi, and its commitment to meeting *Olivia Y* requirements:

---

[82] Plaintiffs' Supplemental Memorandum: (Pg. 7).  [Dkt. No. 837].  Plaintiffs' also asserted in depositions that the funds were readily available from the "Rainy Day" fund or some other unidentified sources.  *See* Dickinson Deposition (Pg. 108 Ln. 19 to Pg.  110. Ln. 24) [Dkt. No. 837-5].

"We must do all we can to protect our most vulnerable Mississippians – our children, particularly those that do not have a stable family. We devote considerable resources to protect our foster children, and it is money well-spent. Since we created the Department of Child Protection Services, we have dramatically improved the lives of the children in the state's care, and we will continue to do so."

"This year the Department of Child Protection Services is requesting an additional $26.15 million in state support, and I recommend the state fully-fund the agency's request."

"Caseloads are a key requirement of the Olivia Y lawsuit. To lower caseloads we need more social workers and supervisors, and this budget increase will allow CPS to hire 108 additional caseworkers and 34 supervisors. Because there is a constant need at the agency for good social workers I am recommending $400,000 of that funding be used to create a program that prepares social work students in Mississippi for public child welfare practice. This program will provide stipends to undergraduate and graduates students enrolled in eligible Bachelor of Social Work (BSW) and Master of Social Work (MSW) degree programs who are interested in employment with the Mississippi Department of Child Protection Services."

Plaintiffs also now assert, without any citation of authority, that the "Onerous" test and the corresponding "Unworkable" test cannot be met because the appropriation by the Mississippi Legislature to MDCPS for every fiscal year is a block grant of funds and the Commissioner of MDCPS can spend the appropriated funds in any manner he chooses.[83] This argument is too simplistic. MDCPS submits a detailed budget to the Mississippi Legislature. The budget is based on the needs of foster children in Mississippi, and the projected cost of all of the programs MDCPS administers and manages. MDCPS made very significant budget cuts in FY 2018 and FY 2019 that are still in force today and, as Commissioner Dickinson testified in his deposition that MDCPS has made reasonable efforts to provide maximum funding for salaries and wages without cutting other programs and services that would adversely affect children.[84] The Agency

---

[83] Plaintiffs' Supplemental Memorandum: (Pg. 8). [Dkt. No. 837.
[84] Dickinson Deposition: (Pg. 59 Ln. 17 to Pg. 60 Ln.19). [Dkt. No. 837-5].

simply does not, at this time, have the approximately $7 million in additional funds to move to Wages and Salaries.[85]

**B.    Compliance With The 90% Caseload Cap Is Unworkable Due to Unforeseen Obstacles.**

For the same reasons that compliance is more onerous given the changed circumstances, meeting a 90% Caseload Cap at this time is also unworkable until additional funding is obtained while MDCPS continues to strive to improve caseloads.

**C.    Enforcement of the 90% Caseload Metric Is Detrimental to the Public Interest.**

It is imperative that the 60(b) motion issues be placed in context and not viewed in isolation.  As discussed in Sections IV. F. and H., MDCPS has also made substantial progress in maintaining and improving caseloads and in providing services to the children of Mississippi despite facing a catastrophic financial crisis in FY 2018 and significant underfunding for FY 2019.  In addition, the most recent Public Catalyst report establishes that the caseloads of 74% of caseworkers were at the Met and Close definitions, which is entirely reasonable given the financial constraints MDCPS faces and the absence of any evidence of harm to the class directly resulting from not achieving the 90% Cap.  Granting the requested 60(b) relief, would permit MDCPS to continue to improve caseloads and move limited funds away from litigation fees and expenses and back to programs supporting foster care children and families of the state.  This would serve the public interest.  Finally, Plaintiffs' goal of having the Court find all Defendants in contempt and then placing the Agency in a receivership with the attendant uncertainties, operational disruptions, and unfunded costs is detrimental to the public interest.  In fact, Plaintiffs have not offered a shred of evidence with regard to how a receivership would increase funding, improve caseloads, or in any manner improve foster care in Mississippi.

---

[85] *Id.* (Pg. 81 Lns. 8-11).

X.      **The Rule 60(b) Relief Sought By Defendants Is Suitably Tailored To The Changes In Governing Law and Factual Circumstances.**

The relief MDCPS seeks is suitably and narrowly tailored to the significant changes in governing law and factual circumstances. MDCPS is not attempting to walk away from the 2nd MSA. Indeed, the relief is limited to the 90% Caseload Cap, which has never been achieved in Mississippi, and is joined with a request for an order directing Public Catalyst, and MDCPS to recommend appropriated guidelines and benchmarks while MDCPS and Public Catalyst continue to monitor caseloads using the current weighted value metrics until the new recommendation is reviewed by the Court. The reasonable relief requested by Defendants is also entirely consistent with the independent recommendations of PEER in its November 27, 2019 report.

XI.     **CONCLUSION.**

The takeover of MDCPS, an agency that provides a wide range of vital services to over 4000 children in Mississippi, based on the failure of the Agency to achieve a fixed 90% Caseload Cap is inequitable, particularly in the absence of any evidence that the *per se* failure to achieve this cap has harmed the foster children in the *Oliva Y* Class. Moreover, a fixed caseload cap creates perverse incentives to manage to a cap rather than to the needs of children; negatively impacts foster care agencies; negatively impacts employee morale and retention; penalizes higher skilled, more efficient caseworkers; and undervalues the specific needs of children in foster care. Consequently, relief from the 90% Caseload Cap based on significant changes in the governing Fifth Circuit law and in factual circumstances, will allow Defendants to turn all their resources from litigation to providing foster care services to the children of Mississippi. This is both reasonable and necessary.

RESPECTFULLY SUBMITTED, this the 30th day of January, 2019.

> PHIL BRYANT, as Governor of the State of Mississippi, JESS H. DICKINSON, as Commissioner, Mississippi Department of Child Protection Services, and TRACY MALONE, as Deputy Commissioner of Child Welfare, Mississippi Department of Child Protection Services

> By: /s/ James L. Jones _____

OF COUNSEL:

BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC
Kenya Key Rachal (MSB #99227)
James L. Jones (MSB #3214)
Jake Adams (MSB #101538)
One Eastover Center
100 Vision Drive, Suite 400
Jackson, MS  39211
Telephone:  (601) 351-2400
Facsimile:   (601) 351-2424

Harold E. Pizzetta, III
Assistant Attorney General
OFFICE OF THE MISSISSIPPI ATTORNEY GENERAL
P. O. Box 220
Jackson, MS  39205