# Olivia Y., Jamison J., et al. V. Phil Bryant, Donald Taylor, et al.

## John Davis

### November 29, 2018

All depositions & exhibits are available for downloading at
<www.brookscourtreporting.com>
Please call or e-mail depo@brookscourtreporting.com if you need a
**Username** and **Password.**



**Mississippi - Louisiana - Tennessee - New York**
**1-800-245-3376**



EXHIBIT
E

John Davis 11/29/2018

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

OLIVIA Y., BY AND THROUGH HER NEXT
FRIEND, JAMES D. JOHNSON; JAMISON J.,
BY AND THROUGH HIS NEXT FRIEND,
CLARA LEWIS; DESIREE, RENEE, TYSON,
AND MONIQUE P., BY AND THROUGH THEIR
NEXT FRIEND, SYLVIA FORSTER; JOHN A.,
BY AND THROUGH HIS NEXT FRIEND,
JAMES D. JOHNSON; CODY B., BY AND
THROUGH HIS NEXT FRIEND, SHARON SCOTT;
MARY, TOM, MATTHEW, AND DANA W., BY AND
THROUGH THEIR NEXT FRIEND, ZELATRA W.;
AND SAM H., BY AND THROUGH HIS NEXT
FRIEND, YVETTE BULLOCK; ON THEIR OWN
BEHALF AND BEHALF OF ALL OTHERS SIMILARLY
SITUATED

                                    PLAINTIFFS
V.            CIVIL ACTION NO. 3:04-CV-251-TSL-FKB
PHIL BRYANT, AS GOVERNOR OF THE STATE OF
MISSISSIPPI; DONALD TAYLOR, AS EXECUTIVE
DIRECTOR OF THE DEPARTMENT OF HUMAN
SERVICES; AND BILLY MANGOLD, AS DIRECTOR
OF THE DIVISION OF FAMILY AND CHILDREN'S
SERVICES

                                    DEFENDANTS


                DEPOSITION OF JOHN DAVIS


        Taken at the instance of the Plaintiffs at
    Bradley, LLP 188 East Capitol Street, Suite 400
              Jackson, Mississippi, on Thursday,
          November 29, 2018, beginning at 9:01 a.m.



                    REPORTED BY:
            GINGER H. BROOKS, CCR #1165
            CRR, RPR, CRC, CCR, CLR, RSA

John Davis 11/29/2018

```
 1    APPEARANCES:

 2

 3         MARCIA ROBINSON LOWRY, ESQ.
           DAWN J. POST, ESQ.
 4         A Better Childhood, Inc.
           355 Lexington Avenue, Floor 16
 5         New York, New York 10011
           mlowry@abetterchildhood.org
 6         dpost@abetterchildhood.org

 7

                COUNSEL FOR PLAINTIFFS
 8

 9
           J. LAWRENCE JONES, ESQ.
10         KENYA KEY RACHAL, ESQ.
           Baker Donelson
11         100 Vision Drive, Suite 400
           Jackson, Mississippi 39211
12         jjones@bdbc.com
           krachal@bakerdonelson.com
13

14
           WILLIAM M. SIMPSON II, ESQ.
15         Office of the Governor
           4500 I-55 North, Suite 278
16         Jackson, Mississippi 39211
           will.simpson@governor.ms.gov
17

18              COUNSEL FOR DEFENDANTS

19

20    ALSO PRESENT:  Earl Scales
                      Jess Dickinson
21

22

23

24

25
```

John Davis 11/29/2018

```
 1                    INDEX
 2  Style and Appearances.......................1
 3  Index   ....................................3
 4  Certificate of Deponent  ..................66
 5  Certificate of Court Reporter ............67
 6                 EXAMINATIONS
 7  Examination By Ms. Lowry ..................4
 8  Examination By Mr. Jones ..................53
 9                   EXHIBITS
10  Exhibit 16 9/15/17 Memo to Dickinson ......7
11          from Darby
12  Exhibit 17 Mississippi Today Article ......51
13
14
15
16
17
18
19
20
21
22
23
24
25
```

John Davis 11/29/2018

```
 1                    JOHN DAVIS,
 2   having been first duly sworn, was examined and
 3   testified as follows:
 4   EXAMINATION BY MS. LOWRY:
 5        Q.    Would you state your name for the
 6   record, please?
 7        A.    My name is John Davis, D-A-V-I-S.
 8        Q.    Are you employed by the Department of
 9   Human Services?
10        A.    Yes.
11        Q.    And what is your position?
12        A.    I am currently the Executive Director of
13   the Mississippi Department of Human Services.
14        Q.    And generally how long have you been in
15   that position?
16        A.    This position, three years.
17        Q.    And what position -- did you have a
18   position in state government before that?
19        A.    I have been with the Department of Human
20   Services for 27 years.
21        Q.    What generally are your responsibilities
22   with the Department of Human Services?
23        A.    As executive director, my charge is to
24   ensure that the program areas of the agency as
25   well as the administrative functions are carried
```

John Davis 11/29/2018

1    out.   That is mandated through the state

2    Legislature, appointed by the Governor, confirmed

3    by the Senate.   It is my charge to ensure that

4    those programs run efficiently and effectively.

5        Q.   Are you aware of any historic verbal

6    agreement between MDHS and what's now called

7    MDCPS?

8        A.   Verbal agreement?

9        Q.   With regard to SSBG and TANF funding.

10       A.   From a historical standpoint, those

11   funds, SSBG, and TANF funds, have been used to pay

12   for those services or those fund -- those cost

13   expenditures that meet those requirements for

14   those program areas, TANF, SSBG.

15            In other words, there are requirements

16   within each one of those programs to be met before

17   those dollars can be expended toward an expense.

18       Q.   But it doesn't -- but does it

19   automatically then go to the program if they meet

20   the requirements, or do you have more programs

21   that meet the requirements than you have funding

22   for?

23       A.   There's always more need than there is

24   funding in all areas of the agency.

25       Q.   So is it within your discretion to

John Davis 11/29/2018

```
 1    decide where within the agency those funds go?
 2         A.    Within a certain -- within a certain
 3    limit.  For instance, SSBG, there is a maximum of
 4    30 percent that can be transferred.  TANF, based
 5    on the needs of the TANF -- TANF program has to be
 6    funded first, TANF work program.
 7              Those areas of the program area that are
 8    required to function must be funded prior to any
 9    other funding or any other program being funded
10    through those dollars, but there is discretion in
11    some of those funds, yes.
12         Q.    What -- can you tell me what the total
13    amount of funds for a particular year are that are
14    available under TANF?
15         A.    For?
16         Q.    For anything.  What's the possible --
17         A.    $84 million.
18         Q.    And what's the total pot with regard to
19    SSBG funding?
20         A.    I can't remember the exact amount.  I'm
21    sorry.  I think it's 6 million, but I can verify
22    that.  I don't know that to be exact.
23         Q.    So you have discretion within those
24    limits to provide those funds within your agency;
25    is that right?
```

John Davis 11/29/2018

```
1        A.    Yes.
2        Q.    Okay.  Do you know how much MDHS
3   provided to MDCPS in TANF and SSBG funds in 2015?
4              MR. JONES:  I assume you're referring to
5        fiscal year 2015?
6              MS. LOWRY:  That's correct.  Sorry, yes.
7              THE WITNESS:  I'm sorry, I do not.
8        Q.    (By Ms. Lowry)  Okay.  Let me take a look
9   and --
10       A.    I mean, I wouldn't remember that.
11             (Exhibit 16 marked for identification.)
12       Q.    (By Ms. Lowry)  So I'd like to show you
13  a document, and it is from Takesha Darby to
14  Justice Dickinson, and it is dated September 15th,
15  2017.  And I would like to ask if you have you
16  ever seen the document before?
17       A.    Not that I'm aware of.
18       Q.    Okay.  So this document says that in
19  FY2015, CPS received 4,799,426 from SSBG and
20  25,507,616 in TANF funding from MDHS.
21             Does that seem right to you?
22       A.    Probably so, because it would be around
23  the 30 million total I would think, yeah.
24       Q.    Okay.  And it also says that during '16,
25  CPS received 6,327,405 in funding from SSBG and
```

John Davis 11/29/2018

1    24,884,746 in TANF funding from MDHS.

2              Does that seem accurate?

3        A.    It's within the range, yes, ma'am.

4        Q.    Okay.  And during fiscal '17, it says

5    CPS received 12,300,702 in TANF funding from MDHS.

6              Does that number seem right to you?

7        A.    Yes.

8        Q.    Okay.  What is your understanding as to

9    why less money was provided in '17 than in '16 for

10   the TANF funding?

11       A.    If I remember correctly, it was because

12   CPS had began to budget on their own and did not

13   budget for any additional TANF dollars.

14       Q.    And did they receive any additional TANF

15   dollars beyond the 24 million?

16             MR. JONES:  For what?

17             THE WITNESS:  In '16?

18       Q.    (By Ms. Lowry)  Yes, I'm talking just

19   about FY '16.

20       A.    I don't remember exactly.  I do remember

21   in 2017, there was additional funds given at the

22   end of the year because there was a shortfall.  I

23   don't remember the exact total, though.

24       Q.    Do you know approximately what the total

25   was?

John Davis 11/29/2018

1          A.    I want to say around $13 million, but I

2     don't -- again, I'm not exactly sure.

3          Q.    Okay.  But around 13 million?

4          A.    Yes, ma'am.

5          Q.    Okay.  Thank you very much.

6                And do you know how much money was

7     provided in fiscal year 2018?

8          A.    I do not.  Well, I know based on the

9     shortfall how -- and the deficit appropriation, it

10    was a total of around $40 million.

11         Q.    Was that just TANF money?

12         A.    TANF money was about 30 -- when -- when

13    we -- I need to -- I need to -- I need to caveat

14    here and say TANF money cannot be transferred to

15    them.  TANF dollars can be expended toward --

16    toward those expenses that meet the requirements

17    of TANF.  So the block grant of TANF dollars that

18    come into the Department of Human Services cannot

19    just be arbitrarily block grant back out.  The

20    services that we pay for have to meet one of those

21    four tenets of TANF.

22                When I'm saying this, I'm not saying we

23    just transferred $30 million.  I'm saying there

24    was expenditures that met the requirements that we

25    could use those dollars toward, if that makes

John Davis 11/29/2018

```
 1   sense.
 2        Q.   I think I understand, but let me just
 3   ask you another question about it.
 4            So do they -- does CPS actually bill DHS
 5   and you pay it through TANF funds or is there some
 6   fund set aside by you?
 7        A.   There was no mechanism back during these
 8   years, because the agency had not been set up like
 9   that.  It was one -- if I remember correctly in
10   2017, that's why there was not as much TANF funds
11   transferred because they did not request those
12   expenditures to be matched through TANF dollars.
13            So once we knew that they were going to
14   have a shortfall, and we still had -- under the
15   state legislation had purview to go back in and
16   find those expenditures that would meet the TANF
17   requirements, we went back in, did so, moved the
18   money around so that the TANF dollars could hit
19   rather than the state dollars.
20            That's how come we made it up to the
21   $30 million, if that makes sense.  I'm sorry.
22        Q.   It's complicated.
23        A.   It is complicated.  It's a budgeting
24   issue that most -- most funding -- most agencies
25   don't have to go through, because TANF funds are
```

John Davis 11/29/2018

```
1    very specific, and I know that there was a big
2    deal made out of TANF funds, but TANF funds,
3    there's only -- that's one of the smaller grants
4    in that agency, so as long as those -- and the
5    reason it meets those criteria over on the child
6    protective services side is simply because there
7    is stabilization of the home.
8            That's -- so those social workers, their
9    salaries can be matched 50/50 because they're a
10   part of stabilizing the home.  That's a tenant of
11   TANF.
12           Workforce -- workforce development is a
13   tenant of TANF.  So if there's workforce
14   development within a program area, those funds can
15   be used toward that.
16           So that's kind of what we have to look
17   at in determining if TANF funds can be used.
18       Q.   But -- so again, you have discretion
19   within that 84 million about how much you can send
20   to CPS if it meets the requirements of TANF?
21       A.   Exactly.  That is correct.  That is
22   correct.
23       Q.   Conceivably, you could give them 84 --
24   match 84 million?
25       A.   I could do that, but then I would -- I
```

John Davis 11/29/2018

1    would strip the TANF program.  How do I operate a

2    TANF program with no money?

3        Q.    Right.  It might not be the wisest thing

4    to do, but it's possible to do?

5        A.    Right.  So as an executive director, as

6    any CEO has to make a determination, do you shut

7    down every program, or do you say one program is

8    more important than the other?

9              And, on this side of the house, on the

10   Department of Human Services side, TANF can be

11   used to stabilize the home so a child never comes

12   into foster care.  So if -- if the TANF worker on

13   the DHS side is doing their job, a social worker

14   never has to deal with the family.  Because they

15   can stabilize the home.

16             Education, medical care, transportation,

17   childcare, all of those different things that

18   could perhaps disrupt a home that would cause a

19   social worker to have to get involved can be

20   prevented prior to getting to CPS.

21             So if the more money I spend towards

22   stabilizing the home, the less need there is for a

23   social worker to be involved in the home.

24        Q.    I understand that.

25        A.    I'm sorry.

John Davis 11/29/2018

```
 1        Q.    No, that's very helpful, and thank you
 2   for that.
 3        A.    Yeah.
 4        Q.    But there is still discretion and
 5   probably it would not be a good exercise in
 6   discretion to put all your 84 million in CPS, but
 7   it's legal to do so?
 8        A.    As an agency head, I have a lot of
 9   discretion in a lot of different areas, but my
10   main charge is to make sure that that agency runs
11   at the most efficient level it can.
12        Q.    Okay.  You're aware that Jess Dickinson
13   is the Commissioner of MDCPS, correct?
14        A.    Yes, ma'am.
15        Q.    And at any time prior to the time he
16   took his position in, I believe it was September
17   of 2017, were you in any meetings with
18   Commissioner Dickinson?
19        A.    I don't remember the exact date.  It may
20   have been in September maybe.  It was before -- it
21   was prior to Dr. Chandler -- Chandler leaving --
22   leaving his position.  Justice Dickinson,
23   Dr. Chandler, and I met in Dr. Chandler's office.
24        Q.    Okay.  Was anybody else there?
25        A.    Not to my recollection.  I can't -- it's
```

John Davis 11/29/2018

1    been a while, but I don't think so.  I think it
2    was us three.
3         Q.    Okay.  Do you remember at that meeting
4    discussing TANF and SSBG funding for MDCPS?
5         A.    I remember discussing the entirety of
6    the CPS and the separation, everything from
7    funding to the needs that would be coming, the
8    challenges that would lay ahead in legislation,
9    because we were preparing our Legislative liaisons
10   with some -- some bills that would be necessary to
11   correct some things that were not going well with
12   the transition.
13            And so I remember talking about a lot of
14   different things that day in reference to just
15   running the agency.
16       Q.    And you made some reference to things
17   not running well with the -- with the transition.
18   Can you tell us what you were referring to?
19       A.    Not running well in the sense that
20   legislation that was cross with the purpose of the
21   agency.  For instance, there was legislation that
22   said when the agency separated, they were
23   separated in totality, therefore, I could not -- I
24   could not use TANF funds at all.  There would have
25   be no way to use TANF dollars even to pay for

John Davis 11/29/2018

```
1    those -- those costs that would be associated with
2    TANF eligible funds or TANF eligible expenditures,
3    so we had to get that corrected in order that
4    those TANF dollars could be used to pay for some
5    of those services in CPS or those eligible
6    services in CPS that we could fund.
7         Q.   And you talked about that, and did you
8    reach a resolution on that?
9         A.   No, we -- there was no resolution that
10   day.  It was mainly just a meet and greet.  I had
11   not met Justice Dickinson.  Prior to that, to my
12   knowledge, I had never met him until that date.
13   And so Dr. Chandler had wanted to have that
14   meeting as the transition began so that I would
15   know who he was and we could get to know each
16   other.
17        Q.   And do you -- did you make any
18   assurances to Commissioner Dickinson with regard
19   to TANF funding or SSBG funding?
20        A.   I'm not sure if assurances -- I think
21   maybe probably perhaps -- if I know me well
22   enough, I would have said something to the effect
23   of we are going to be here to support you.  Our
24   job is here to help during the transition.  It
25   benefits us for the transition to go smoothly.
```

John Davis 11/29/2018

 1            The Department of Human Services has

 2    every intention to support whatever we can within

 3    the realm of the regulations and within the realm

 4    of what we can do to make it successful.

 5            I know I would say something like that,

 6    yeah, yeah.

 7        Q.   And is it your recollection or your

 8    thinking about it that you didn't say anything

 9    more specific than that, understanding that what

10    you're saying is something that you think you

11    would have said, not something you precisely did

12    say?

13        A.   Right.  I know I would have assured him

14    that the agency was behind him.

15        Q.   And that's basically what the message

16    was?

17        A.   Yeah, absolutely.  That was my charge.

18        Q.   Did you see or speak to Justice Jess

19    Dickinson subsequent to that meeting?

20        A.   I'm sure we've met.  I don't remember

21    any -- I know that we had several -- we had one or

22    two staff meetings, but it seems like it was after

23    the letter was sent, and we were trying to

24    determine what -- how we could help as far as

25    funding and those kinds of things, so we met as a

John Davis 11/29/2018

```
 1    group to determine how we could help -- whatever
 2    that meant, not just funding but how the
 3    transition was going, but I don't remember
 4    specific dates or anything like that.  I'm sorry.
 5         Q.   And you said there was a larger meeting.
 6    Who would have been at that meeting, if you
 7    recall?
 8         A.    Individuals like Takesha Darby, my
 9    finance folks, because you do -- during this time,
10    they were still under -- like, for instance, our
11    HR departments, our budgets and accounting
12    departments would have been still closely working
13    with -- with -- so, in other words, we were still
14    a team.  It was not -- it was not completely
15    separated.  So it would have been individuals
16    like -- if I remember correctly, the finance
17    departments, it would have been Justice Dickinson
18    and I, our chiefs of staff, maybe some more
19    deputies.  I'm not sure exactly.
20         Q.   And did that meeting happen just once?
21         A.   Yes.
22         Q.   And do you remember approximately when
23    it was?
24         A.    It would have had to have been December,
25    January, I'm thinking.
```

John Davis 11/29/2018

1    Q.    And during that time, did you make any
2    specific assurances to Commissioner Dickinson with
3    regard to financing?
4    A.    No, because I didn't know where the
5    money was going to come from.  I just knew that it
6    was my charge to make sure -- you have to
7    understand, as a -- being in the agency for 27
8    years, I am not accustomed to ever seeing the
9    agency ask for deficit appropriation.
10            I've never seen that in the Department
11   of Human Services.  So when that possibility came
12   up, it was -- it was a foreign concept to me
13   because my job was to stay within the budget,
14   whatever that means.
15            If it means I have to run vacancies, if
16   it means that I have to -- I have to -- from
17   program standpoints, I have to cut back on
18   contracts, whatever it means, I run within the
19   budget that the Legislature gives me, because
20   that's my charge.
21            And so when we were discussing things
22   like such a large amount that could potentially be
23   outstanding, that would concern me.  I would
24   have -- but my answer would always be, but we'll
25   try to fix it, because that's who I am.

John Davis 11/29/2018

1      Q.    Uh-huh (affirmative response).

2      A.    And so I'm -- probably that day I was

3   saying things like, look, we just need to fix it.

4   We've got to find a way to fix this, because we do

5   not want to go over to the Legislature and say

6   there's a -- we need a deficit appropriation.

7            They determined what the budget was.  It

8   was not what we asked, but they gave us what they

9   determined we needed, and that's what I live

10  within as an agency head.  Have for years.

11     Q.    Okay.  So you would not have said, I'm

12  going to give you X amount or Y amount or anything

13  like that?

14     A.    I wouldn't have -- first of all, I

15  wouldn't have known the exact amount, because at

16  some level, it was -- if I remember correctly, it

17  was a -- a much larger amount than it came down to

18  at the end.

19           It seems like it was like 60, 70,

20  80 million.  I'm just -- you know.  And we got it

21  down to 30 -- 40, then 30, so it was like -- so I

22  wouldn't have known how much to tell them to

23  transfer.

24           I know what I would have told them that

25  we had, and we didn't have anything at that time,

John Davis 11/29/2018

```
 1    because everything had been allocated.
 2              We were in the middle of a budget year.
 3    You can't -- so I would -- I would have had to
 4    stop contracts.  I would have had to terminate
 5    people, but even in the middle of a year, you
 6    wouldn't have saved enough to have amounts of
 7    money to give them, if that makes sense.
 8        Q.    Uh-huh (affirmative response).
 9        A.    So I would have been concerned that we
10    were in the middle of a year asking for a large
11    amount of money to be found, but that doesn't mean
12    it can't be fixed.  It just means I would have
13    been concerned.
14              So I don't remember ever specifically
15    saying I'm going to transfer, you know,
16    $50 million or -- you know.
17        Q.    I want to show you a document previously
18    marked Exhibit 2.
19        A.    Okay.
20        Q.    And this is a letter to you from Jess
21    Dickinson, and it's dated December 15th, 2017.
22        A.    Okay.
23        Q.    And do you know this was apparently
24    after the meeting that was held; is that right?
25    This letter was written?
```

John Davis 11/29/2018

```
 1        A.    I actually think this was prior to the
 2   meeting.  I think this may have been what
 3   precipitated the meeting, because this was
 4   December 15th, this was probably -- probably prior
 5   to.  Yes, I would say prior to.
 6        Q.    So this was prior to the meeting, and
 7   this -- the meeting that took place was the
 8   meeting that you literally referred to when you
 9   had started talking about the meeting, that was
10   with a lot of staff people?
11        A.    Right, right.  You know, I can answer
12   this question.
13        Q.    Go ahead.
14        A.    It had to be -- this letter had to be
15   prior to the meeting, because I sent Justice
16   Dickinson an e-mail in response to this, and we
17   met, because if I remember correctly, I said, I'll
18   give you a -- I'll give you a formal answer to
19   this.  And we met instead of me writing a letter,
20   because we needed to know more details about the
21   need.
22        Q.    Okay.
23        A.    So I'm thinking this had to be -- this
24   had to be prior to.
25        Q.    Okay.  So --
```

John Davis 11/29/2018

```
1              MR. JONES:  Just to clarify the record,
2         Counsel, I'm assuming you're talking about
3         the big meeting that he's just described with
4         multiple people as opposed to the very first
5         meeting?
6              MS. LOWRY:  That's correct.
7              MR. JONES:  That you just said in '18.
8              MS. LOWRY:  That's correct.
9         Q.   (By Ms. Lowry)  In fact, at the end of
10   this letter -- thank you.  Let me show you something
11   that has been -- Exhibit 8 and see if this helps to
12   refresh your recollection.
13              MR. JONES:  Let me look at that just a
14         minute.  Yes, all right.
15              THE WITNESS:  Yes, this is in response
16         to this letter.  Yes.
17         Q.   (By Ms. Lowry)  Okay.  But this also
18   preceded the big meeting you were talking about?
19         A.   Yes, ma'am.
20         Q.   But there was only one meeting, is that
21   right, that you recall?
22         A.   Yes, ma'am.  I'm sure -- I'm sure staff
23   within the agency met.  If you're talking about
24   me?
25         Q.   I'm talking about you.
```

John Davis 11/29/2018

```
 1        A.    Yes, yes.
 2        Q.    When did you first know through any
 3   means that there was a shortfall at MDCPS?
 4        A.    Sometimes after the beginning of the new
 5   fiscal year, there were, I think, maybe our
 6   budgets person told me that it looked as though
 7   they were running short, but I can't remember the
 8   exact month.
 9             It probably would have been October,
10   November and -- but not to the point of being
11   concerned, because we run short every month, I
12   mean, you know, based on -- based on the number of
13   employees we have, based on the number of
14   contracts that are out.
15             So we're always evolving as an agency to
16   ensure -- for instance, there's -- there's
17   divisions who maintain vacancy rates just so that
18   they can maintain funding to run the operations.
19             So -- but the -- the actual big -- I
20   guess the big event that would have alerted me to
21   this kind of shortfall would have been Justice
22   Dickinson's letter to me on the 15th.
23        Q.    So you sort of knew vaguely about it
24   beforehand, but this December 15th letter really
25   let you know about it?
```

John Davis 11/29/2018

1          A.     In context, I'm always aware of the

2     agency needing funding, the agency as a whole, not

3     just CPS.  I mean, because it's a big agency.

4               There's a lot of needs.  There's a lot

5     of -- so budget folks usually don't alert me of

6     anything unless -- I mean, I get -- I get weekly

7     reports, monthly reports, those kinds of things,

8     but I don't ever consider that a problem until

9     they're telling me there's no other way to -- to

10    -- for fund -- to fund those areas.

11               So -- so when I received the letter from

12    Justice Dickinson, my -- if I remember correctly,

13    because you can tell by my e-mail, I'm like, well,

14    wait a minute, we have a budget, and I live within

15    a budget, and if you're needing that kind of

16    money, we would really have to -- we'd really need

17    to look at that because your budget requests --

18    excuse me, not his, maybe Takesha's -- this budget

19    request if I remember correctly did not request

20    any TANF money.

21               So I allocated TANF money based on --

22    you know, I did not have anything to do with their

23    budget preparation that year.  The year prior to,

24    I did, but that year I did not because that was

25    when we were doing the separation, and so Takesha

John Davis 11/29/2018

```
 1    and that group were doing their own budget.
 2              Now, our budget folks would have seen
 3    that, and even during the Legislative session, I
 4    did not -- I did not -- I did not present the
 5    budget for CPS that year.  I was in there, but
 6    Dr. Chandler presented that budget.
 7              MR. JONES:  Just so the record is clear,
 8         would you mind if the witness clarifies he's
 9         speaking about the fiscal year '18.
10              THE WITNESS:  I'm sorry, yes.
11              MS. LOWRY:  Sure.
12              MR. JONES:  Because we've bounced around
13         a lot.  And that's the budget for the period
14         that began 7/1/17, correct?
15              THE WITNESS:  Correct.
16         Q.   (By Mr. Jones)  And would have ended
17    6/30/18.
18         A.   For fiscal year, '18 yes.  So, yes.  I'm
19    sorry.
20         Q.   So until the December 15th letter, you
21    had no idea that there were serious budget issues
22    in MDCPS?
23         A.   Not to the extent he was asking for
24    29 million in TANF and -- excuse me -- yes, almost
25    30 million that he was asking for, I did not
```

John Davis 11/29/2018

```
 1   realize there was that big of a shortfall.
 2        Q.    Okay.  Again, that was in December, and
 3   then the meeting happened subsequently to that; is
 4   that right?
 5        A.    Right, right.
 6        Q.    Approximately a week, two weeks, three
 7   weeks?  Any idea roughly?
 8        A.    I'm sorry, I do not know.  I do not
 9   know.
10        Q.    And then you had the meeting instead of
11   sending him another letter?
12        A.    Yes, ma'am.
13        Q.    Okay.
14        A.    It seemed the right thing to do.  A
15   letter wouldn't have -- because I didn't know how
16   to address that.
17        Q.    And then did you take any additional
18   action after the meeting with regards to funding
19   for CPS?
20        A.    Absolutely.
21        Q.    And what did you do?
22        A.    Our staff started working together to
23   try to identify those -- those things -- those
24   things that would be needed.  We had -- we had --
25   the Legislature would have come back in session in
```

John Davis 11/29/2018

1    January, so we would have been called to -- to --
2    to the chair's office or either to a hearing on
3    our budget request, and so they would continue to
4    work -- they would have continued to work
5    together, and ultimately, the resolution was is
6    because the agencies had not been totally
7    separated out, the legislation to separate out
8    totally would have been for June of that -- that
9    following year, the June of the following December
10   that this letter is written.
11       Q.   June of '18?
12       A.   Yeah, June of '18.  So we could,
13   therefore, go back and find those expenditures
14   that met the TANF requirements and use TANF
15   dollars to plug those holes so that they wouldn't
16   be -- there wouldn't be as big a shortfall.  And
17   so we did, and we did that, and I canceled
18   contracts on the TANF side that were in place,
19   things like Boys and Girls, things like Families
20   First.
21            Things like -- we pulled back a huge
22   amount of dollars to -- from contracts that were
23   meant to -- for preventive services, we had to
24   pull back those dollars to fund the CPS shortfall,
25   and which I did.

John Davis 11/29/2018

```
 1              The problem was, we were January into
 2   it, so six months into fiscal year, you can't --
 3   it would take -- you have to move a mountain to
 4   save that kind of money, to find that kind of
 5   money to -- to do that.  It was already allocated,
 6   you know.
 7        Q.   And so what did you wind up providing to
 8   CPS for the rest of that year?
 9        A.   Well, they found expenditures, I think,
10   up to 30, $31 million that could be -- TANF
11   dollars could be used to pay for those
12   expenditures, and then work with the Legislature
13   to -- to find the additional 11 million that was
14   needed to plug the shortfall that was necessary in
15   CPS.
16              MR. JONES:  And so that I don't
17         interrupt you unnecessarily, let me just add
18         an objection to the form to the extent your
19         questions suggest there is a transfer.  He
20         has explained it's a payment of expenses but
21         not a transfer of funds.
22              MS. LOWRY:  Understood, but thank you.
23              MR. JONES:  Just wait for a question.
24              MS. LOWRY:  One of the things he says --
25         Commissioner Dickinson says in Exhibit 2, the
```

John Davis 11/29/2018

```
 1          December 15th letter, is that -- on the
 2          second page, "This will prevent us from
 3          compliance with numerous" --
 4          A.    I'm sorry.
 5          Q.    -- "inquiring into Federal Court order
 6     in the Olivia Y. litigation."
 7               Did you at the subsequent meeting, the
 8     meeting subsequent to this letter, discuss what
 9     kinds of issues, what kinds of requirements that
10     CPS would not be able to comply with in the Olivia
11     Y. litigation?
12          A.    I don't remember specifics about that
13     particular question.  Oh, no, I don't remember
14     specifics.
15          Q.    But you do recall it started in, what,
16     around January, you were able to provide
17     approximately 30 million, you said in TANF
18     funding?
19          A.    It wasn't -- it wasn't just in January.
20     We had to work the remainder of that year to do
21     that, because those dollars were already allocated
22     to other program areas, so they had to be -- we
23     had to defund program areas -- other program --
24     like, for instance, the TANF program, the TANF
25     work program, employment training program,
```

John Davis 11/29/2018

```
 1    community services, those programs had to be

 2    defunded so we could find the dollars available.

 3            So we had to send out notifications to

 4    contractors and those kinds of things to defund to

 5    have those dollars available, so it was -- it

 6    was -- it took several months.  It took January

 7    through -- probably through the end of the fiscal

 8    year, state fiscal year to get that done.

 9        Q.   And so were you able to fund the TANF

10    dollars retroactively of services that had already

11    been provided?

12        A.   It's not like that.  TANF dollars --

13    during a fiscal year, dollars can be allocated

14    or -- for expenditures that meet the requirements.

15            During that fiscal year, we have the

16    ability to move those dollars around or those

17    funds around to meet the needs.

18            So it's not necessarily funding

19    retroactive services, as much as it is funding

20    eligible services that we were not in tune to

21    until we were -- it was brought to our attention

22    they needed them.

23            For instance, like salaries of

24    employees.  Well, that's not retroactive payment.

25    It's just going back and cost allocating to the
```

John Davis 11/29/2018

```
 1    appropriate funding source.
 2         Q.    Characterizing?
 3         A.    Yes, yes, so it's not --
 4         Q.    So you were able basically to fund
 5    things that had happened earlier in the fiscal
 6    year by that kind of arrangement?
 7         A.    As long as it's in that fiscal year yes,
 8    yes.
 9         Q.    Yes.  All right.
10              MR. JONES:  And, again, this is more for
11         form than anything else.  I would like to
12         note an objection that the fiscal year was
13         not over in his answer or your question
14         implies that they were going back and
15         resolving fiscal year expenses that have been
16         completed.
17              MS. LOWRY:  I didn't understand it that
18         way, but that's fine.
19         Q.   (By Ms. Lowry)  So as I understand it --
20    I would like to call your attention now to
21    Exhibit 9.
22         A.    Okay.  I just need to organize them.
23         Q.    Would you please take a look at
24    paragraphs, and this is the -- an affidavit from
25    Jess Dickinson, and I'd like to call your
```

John Davis 11/29/2018

1    attention specifically to paragraph 26?

2        A.    Okay.

3        Q.    And that paragraph says, "Working with

4    MDHS finance staff, we concluded that if the

5    $12 million deficit appropriation could be

6    obtained from the Legislature, MDHS could leverage

7    those state funds to provide 44 million to apply

8    toward the MDCPS deficit," and he goes on to add

9    another sentence.

10            But is that a correct characterization

11   about what happened with regard to MDHS?

12       A.    Yes.   The -- sounds like I've got my

13   numbers a million or two off, but yes, it -- but

14   the 44 million was the total amount, not

15   12 million in addition to the 44, if I remember

16   correctly, but the statement overall is correct,

17   yes.   (Examining.)   Yes.

18       Q.    So this was for fiscal year -- it's

19   called fiscal year '18, which actually started in

20   '17.

21            What happened with regard to TANF and

22   SSBG money for fiscal year '19?   How much money

23   were you able to -- was MD -- MDHS able to provide

24   or expenses that we were able to cover for MDCPS?

25            MR. JONES:   Again, I'll simply object to

John Davis 11/29/2018

1          form, because it implies fiscal year '19 is
2          over, and it does not complete until 6/30 of
3          2019.
4              MS. LOWRY:  Thank you.
5              THE WITNESS:  We have committed -- in
6          the agreement, we've committed to finding
7          expenditures that would meet the criteria of
8          TANF and fund up to $30 million, the same
9          amount that we did to cover the last year,
10          the last fiscal year.
11              But this fiscal year is not over, and I
12          have been trying to watch that, but we won't
13          know until we get to a point where I'm asked
14          for additional or maybe not as much.  I don't
15          know.
16              I would assume more would be needed.
17          But too, for '19, the Governor has requested
18          additional funding in his budget, as has
19          Justice Dickinson so --
20              MR. JONES:  I think you were speaking
21          about fiscal year 2020, were you not?
22              MS. LOWRY:  No, I think it was '19.
23              THE WITNESS:  Hold on just a minute.
24          So, we're in '19.  I'm moving to '20.  I get
25          confused sometimes because we're going back

John Davis 11/29/2018

```
 1          in fiscal years when I'm two years ahead, and
 2          I'm thinking the current budget that was
 3          submitted, there were additional funds
 4          requested from both the Governor and Justice
 5          Dickinson.
 6               For '19, we committed the 30 million.
 7          We have not completed '19, and we will -- and
 8          we will see what they need.  I mean, if
 9          there's a way I can help, I will.
10               MS. LOWRY:  Let me show you -- this is
11          Exhibit 6, and on the second page of
12          Exhibit 6, it says --
13               MR. JONES:  Is this Appropriation Bill
14          1600?
15               MS. LOWRY:  I'm sorry?
16               MR. JONES:  Is this Appropriation Bill
17          1600?
18               MS. LOWRY:  That's correct.
19               THE WITNESS:  Okay.
20          Q.   (By Mr. Jones)  And Section 4 says, "Of
21     the funds appropriated under the provisions of
22     Section 1 of this act and authorized for expenditure
23     under the provisions of Section 2 of this act, not
24     more than the amounts set forth below shall be
25     expended; however, notwithstanding any other
```

John Davis 11/29/2018

```
 1    provision in this act, it is the intent of the
 2    Legislature that any amount of funds and positions
 3    may be transferred between the Department of Human
 4    Services and the Department of Child Protection
 5    Services in order to comply with agreements made by
 6    the State of Mississippi with the United States
 7    District Court in reference to the Olivia Y., et
 8    al., lawsuit."
 9         A.    Uh-huh (affirmative response).
10         Q.    Are you familiar with this provision?
11         A.    I remember it vaguely, because I was
12    part of the legislation, but I have not seen it
13    until you just brought it up.
14         Q.    Okay.  What is your interpretation of
15    this provision?
16         A.    We were -- this came up with the chairs
17    because it was important -- the Legislature
18    thought it was important to try to find
19    efficiencies within both agencies, even though we
20    were going to be separated out.
21              They wanted us to have common HR
22    functions, they wanted us to have common financial
23    functions.  They wanted us to have -- so anything
24    that could overlap or -- and/or be transferred
25    between the departments, I think their intention
```

John Davis 11/29/2018

```
 1   was for us to do that.
 2            There's not a -- it was not mandated,
 3   but they didn't say "shall" or "will" or "can't,"
 4   "must," or all that.  I remember having
 5   conversations with this, because one of the things
 6   that we've run into in the Department of Human
 7   Services is the positions that they're talking
 8   about are specific to the state personnel board,
 9   specific to the job classifications and criteria.
10            So I can transfer an eligibility worker
11   to Justice Dickinson, but it wouldn't help him
12   meet the requirements of having a master's-level
13   social worker handle a case, or I could transfer a
14   case manager from TANF -- the TANF work program,
15   but it would not meet -- and if there's no funding
16   from neither the state or the fed- -- federal
17   government, or I don't have enough state dollars
18   to meet the match for the federal dollars, then
19   the positions are just -- like I say, I'm running
20   at probably a 1500 vacancy rate now in the other
21   departments at that agency just to keep up,
22   because I don't have enough state dollars to match
23   the federal dollars.
24            Q.   What is your overall budget?
25            A.   In my department?
```

John Davis 11/29/2018

```
 1        Q.    In the Department of Human Services?
 2        A.    69 -- $69 million, state dollars.
 3        Q.    What -- you have other dollars that are
 4    brought in through matches, right?
 5        A.    I'm sorry, it's -- I can't answer that
 6    totally, because I would have to -- there's a
 7    caveat here.  I have spending authority for about
 8    $3 billion, 3 billion, 3 billion is the total for
 9    all of the agency plus CPS, and that's because
10    SNAP dollars, there's about a billion dollars a
11    year issued in SNAP dollars.  Those are dollars --
12    those are federal dollars that I don't have access
13    to, we just issue them.
14              But, I have spending authority to spend
15    them, to pull that down, to spend those dollars.
16    So I don't get a billion dollars from the federal
17    government.  We just authorize those benefits to
18    those individuals.
19              Other things -- other areas like
20    childcare.  Childcare, there's a $90 million block
21    grant, just like on the TANF side, there's a
22    childcare block grant, CCBGB.  And so that block
23    grant, I have $90 million allocated to spend
24    toward that.  In each division, there's a
25    different amount, and then based on funding year
```

John Davis 11/29/2018

```
 1   and funding sources and need, for instance, on the
 2   SNAP side, I can spend a billion or I may spend
 3   700 million, depends on -- but I don't have those
 4   extra dollars to spend anywhere else.
 5        Q.    No, I understand that.  But your overall
 6   budget is around 3 billion?
 7        A.    For CPS and DHS.
 8        Q.    Including CPS?
 9        A.    Yes.
10        Q.    Okay.  And did -- when Commissioner
11   Dickinson was having the conversation with you at
12   the meeting in which both MDCPS and DHS staff
13   gathered, was he talking about what consequences
14   the failure to make all -- make the fund -- all
15   the funds that he needed available were
16   consequences that would help with the Olivia Y.
17   lawsuit?
18        A.    I think -- I don't remember
19   specifically, but I think that we always are
20   concerned about making sure that we meet any kind
21   of federal requirements, whether it be through
22   lawsuit or regulation.
23              To answer your question, yes, I'm sure
24   we have all talked about how do we ensure we meet
25   all requirements from all different areas.
```

John Davis 11/29/2018

```
1        Q.    And was it your impression that we --
2              MR. JONES:  And let me just make a
3        statement for the record that will be
4        continuing.  To the extent you're testifying
5        about a specific --
6              MS. LOWRY:  I would like to object to
7        Counsel's continuing interruptions of these
8        questions.  You will have an opportunity to
9        question him yourself.  And if you have
10       statements, you can talk to him and ask him
11       about it.  I'd like you to let me continue
12       with my inquiry.
13             MR. JONES:  State my objection.  My
14       objection is the witness is testifying to
15       things he thinks may have occurred, and your
16       follow-up questions are stated as if he
17       testified that specific subject and testimony
18       took place.
19             MS. LOWRY:  Fine.
20             MR. JONES:  And that's my objection.
21             MS. LOWRY:  Thank you, and let me
22       continue.
23             (Record read.)
24             MS. LOWRY:  So that was my question, I
25       think, and if you could answer that.
```

John Davis 11/29/2018

1          A.    I think what I was saying was we're
2     always concerned about making sure we meet all
3     federal requirements.
4          Q.    (By Ms. Lowry)  Okay.  And did he tell
5     you that explicitly he was planning to -- he was
6     planning to not comply with the caseload
7     requirements of the second -- of the stipulated
8     third remedial order and the MSA?
9          A.    I don't remember that kind of specific
10    information.
11         Q.    Okay.  So he didn't tell you that he was
12    going to impose a hiring freeze on the agency; is
13    that right?
14         A.    Oh, he didn't tell me specifically, but
15    I know I was sitting in a Legislative hearing that
16    he mentioned that would be one of the things he
17    would have to do.  But I -- you know, I remember
18    that.
19         Q.    Okay.  Did you have discretion to tell
20    him what he could do and what he couldn't do if
21    you helped him out with the extra TANF funding?
22         A.    No, we're not -- I'm not in the business
23    to tell him how to run his agency.
24         Q.    Did the fact that he was planning to not
25    comply with the caseload provisions of the

John Davis 11/29/2018

```
1    settlement agreement, trouble you when you heard
2    it?
3         A.   I honestly don't really -- I can't have
4    an opinion on that kind of thing, because that's
5    his agency.  That's not mine.
6         Q.   Right.  So it was his responsibility
7    that he decided that?
8              MR. JONES:  And I'm going to have a
9         continuing objection.  There's been no
10        testimony that he intended to intentionally
11        not comply with -- with any STRO or second
12        MSA requirements.
13             MS. LOWRY:  Okay.  Thank you.
14        Q.   (By Ms. Lowry)  Where are we -- you just
15   answered.  Let's see.  So you don't have an
16   opinion on that.  That was your answer.  Thank
17   you.
18        A.   Because I don't know what his intention
19   was.
20        Q.   Understood.  Thank you.
21             MS. LOWRY:  Thank you.  We would like to
22        take a short break.
23             (A short break was taken.)
24        Q.   (By Ms. Lowry)  During the meeting -- the
25   first meeting that you had with Commissioner
```

John Davis 11/29/2018

1    Dickinson, which you characterized as a meet and

2    greet, in Exhibit 2, Commissioner Dickinson says

3    that, in the first paragraph, Dr. Chandler -- part

4    of the sentence, "Dr. Chandler explained to me the

5    important role of the federal Social Security block

6    grant, SSBG, and temporary assistance to needy

7    families, TANF funds, both of which traditionally

8    have contributed to the functions of this agency."

9           Now, my question then, "Dr. Chandler

10   assured me that the availability of funds to meet

11   our budgetary requirements would not be a problem,

12   and you graciously indicated that you would take

13   care of this agency because of your strong

14   commitment to child protection."

15          I thought it was your testimony that at

16   that meeting, you explained there would be no TANF

17   funds available.  So I just want to try to reconcile

18   these two statements.

19      A.   I'm sorry, but no, I didn't -- if I

20   remember correctly, I said that I didn't remember

21   specifics.  I remembered it being -- we talked

22   about the agencies as a whole.  My desire to help,

23   commitment to help, whatever I could do within the

24   boundaries that I could.

25          If there were -- if there were

John Davis 11/29/2018

```
 1    expenditures that were TANF eligible, but at that

 2    point, you have to remember -- I'm thinking here

 3    that that was not -- the TANF funds were not

 4    budgeted in their budget, so I would not -- I mean

 5    I would not -- we would have not talked about TANF

 6    funds a whole -- a whole lot I wouldn't think.

 7              I would have -- if -- if he were to --

 8    if he were to ask me -- if Dr. Chandler said that,

 9    again, I don't remember specifically what he was

10    said -- what he said, I would have said something

11    to the effect of, I'm committed to helping your

12    agency be as successful as it can, because your

13    agency's success is my agency's success.

14              And so, but I don't know that we would

15    have gotten into saying there's X number of TANF

16    dollars or no TANF dollars.  I don't think I would

17    have gotten into talking about that at that point.

18         Q.   Understood.  Okay.

19              And so at that meeting, do you have a

20    recollection of Dr. Chandler assuring Jess

21    Dickinson about the availability of funds to meet

22    our budgetary requirements?

23         A.   I have a recollection of Dr. Chandler --

24    meeting with Dr. Chandler multiple times over the

25    time that I spent with him, always -- would always
```

John Davis 11/29/2018

```
 1    tell me, John, you're going to take care of us.
 2    There's always plenty of money.  You've got plenty
 3    of money.  You're going to take care of us.
 4    That's Dr. Chandler.
 5              He would have said that to me -- he's
 6    said that to me multiple, multiple times, and that
 7    was just how he functioned.  He was not -- he was
 8    not honed in -- he was not specific in the budget
 9    area.
10              He would just assume that -- he would
11    have assumed, as he always did when I met with
12    him, that we were just going to take care of them,
13    no matter what that meant.
14              Now, we would never talk specifics about
15    I'm going to give you 30 million or 10 million or
16    5 million.  That's not how he talked.  John, you
17    take care of us now.  I've got these things --
18    I've got an agency to run, you take care of us on
19    the financial side and let me know if there's a
20    problem.
21              So we had budget people that were
22    supposed to tell him if there was a problem and
23    tell me if there was a problem.
24        Q.    So there was no discussion then that you
25    recall about specific amounts of money or about
```

1    the availability of TANF or about the availability

2    of the SSBG?

3         A.   As I recall, no specific amounts were

4    discussed.

5         Q.   Well, was the availability of the TANF

6    funds discussed, because I think you testified

7    that the -- maybe I misunderstood you, that there

8    would have been no way to use TANF funds at all.

9    I'm just looking at your --

10        A.   Oh, based on the legislation.

11        Q.   Yes.

12        A.   The legislation said that once

13   separation occurred -- it had not occurred at that

14   point, so I would have not -- separate -- we were

15   going through transition, separation.  Separation

16   in totality would not have occurred until July of

17   '18.

18             This would have been in '17, so that's

19   how we were able to go back and plug in those TANF

20   dollars for that budget year, for that fiscal year

21   because it had not been separated.  Had it been

22   separated based on the state legislation, had we

23   not corrected that legislation, I could not have

24   helped them with any TANF expenditure, any dollars

25   from TANF.

John Davis 11/29/2018

1             Because the State would have no longer
2    been -- it would have been as -- I can't give TANF
3    money to vocational rehab services, I can't give
4    TANF dollars to Medicaid -- I can't, because
5    there's no tie.  The tie here was child protection
6    services remained in but not of.
7             So they were part of the agency;
8    therefore, I could allocate TANF dollars for their
9    budget, so there's the difference.
10        Q.   I see.  So, but at that point, when you
11   had that meet-and-greet meeting, you had nothing
12   in your budget in TANF to give CPS because you
13   weren't anticipating doing that.
14        A.   Right.
15        Q.   You were then able to go back and do it
16   for that same fiscal year; is that right?
17        A.   By -- by defunding other things that we
18   had allocated the funds for, that's correct.
19        Q.   Okay.  So it wasn't that you couldn't
20   have done it then, you just hadn't done it because
21   you hadn't been asked; is that right?
22        A.   At the time that budget was prepared
23   prior to Justice Dickinson getting there, they had
24   not requested any TANF dollars, if I remember
25   correctly.  I don't have the budget in front of

John Davis 11/29/2018

1    me.

2              I may have, but I don't remember them --

3    as I -- I know they didn't, because this was --

4    this was a sticking point because we had to go

5    back and say, well, you don't ask for any TANF

6    funds.

7              That wasn't Justice Dickinson.  That was

8    the individuals that prepared the budget on their

9    own prior to Justice Dickinson getting there.

10   So -- but I remember there not being any TANF

11   funds requested in their budget.

12       Q.   Okay.  And that's what you were trying

13   to correct?

14       A.    That's how I budget.  Yes.  I budget

15   based on -- I budgeted based on their budget.

16       Q.    Okay.  I think that's helpful.  You said

17   that you could use -- what did you call it, a stay

18   at home kinds of -- preventive workers, which

19   support a family staying together.  You could, in

20   fact, put TANF money into that?

21       A.    One of the tenets of TANF is stable --

22   the money can be used toward stabilizing homes to

23   keep those families together, so yes, I could use

24   funds -- that's why there are certain social

25   workers that I can pay or allocate 50 percent of

John Davis 11/29/2018

```
1     their salaries with those TANF dollars because
2     they are in prevention services.  They're keeping
3     families together, yeah.
4          Q.   Okay.  Have you maxed out for fiscal --
5     fiscal '19 the amount of -- number of preventive
6     workers for whom you could pay part salaries?
7          A.   That's -- I can't -- I can't really
8     answer that question, because I'm not -- I don't
9     keep -- I don't keep track of the number of staff
10    that he had -- Justice Dickinson has, but I will
11    tell you this just from a historical perspective,
12    with the number of individuals they have coming
13    in -- the retention rate -- the turnover rate I
14    should say -- the turnover rate is such that it's
15    a moving target.
16              I mean if -- you could hire a hundred
17    social workers today and have 200 leave next
18    month.  So my allocation is based on what his
19    needs are, and so when you say have you maxed out,
20    I don't know -- I don't know that he's max -- I'm
21    sorry, I'm probably being confusing, but I don't
22    know how to answer that question.
23         Q.   Okay.  Are you capped on the number of
24    preventive workers for whom you could contribute
25    TANF funds?
```

John Davis 11/29/2018

```
 1        A.    I am based on other requirements of that
 2   TANF program.  So there's "X" number of dollars I
 3   can expend toward prevention services or
 4   prevention workers and still meet the needs for
 5   the TANF program, itself.  I mean, we can't
 6   totally neglect the TANF program to support
 7   prevention services.
 8        Q.    Okay.  And have you reached that point?
 9        A.    As far as there are no TANF funds from
10   any fiscal year except current year, and we are
11   running right now -- we are running right now --
12   there are no additional TANF dollars.  I can
13   answer that.
14            There are no additional TANF dollars to
15   be allocated, because they're all allocated.  As a
16   matter of fact, we are concerned -- there's a lack
17   of TANF dollars now, because we have committed all
18   of those dollars to child protection services for
19   their expenditures.  There's no additional dollars
20   now for preventive services.
21            So I've had to cut contracts in
22   prevention services like Families First, Boys and
23   Girls, all these prevention services I'm having to
24   cut so I can meet my obligation to meet the
25   expenditures that we've committed to CPS.
```

John Davis 11/29/2018

```
 1              MR. JONES:  Again, you're referring to
 2         fiscal year '19.
 3              THE WITNESS:  '19, I'm sorry, yes.
 4         We're still in the middle of it.  We're
 5         working through it.
 6         Q.   (By Ms. Lowry)  With regard to Section 4
 7    of Exhibit 6, which is the House Bill number 1600,
 8    have you had any conversations or are you aware of
 9    any of your staff having any conversations with
10    MDCPS with regard to what else can be done to follow
11    the intent of the Legislature to comply with the
12    agreements in Olivia Y. going forward?
13         A.   I have not had any specific
14    conversations, because that was not -- that's not
15    my wheelhouse, but I know that our budget staff, I
16    know and -- have had to have discussions, because
17    that's what they do every day, complying with this
18    legislation, so I would assume that they meet
19    regularly to discuss the budget.
20         Q.   But you don't know specifically?
21         A.   No, ma'am.  Well, no, I don't know
22    specifically.
23         Q.   Let me ask you a question about
24    Exhibit 2.
25         A.   Okay.
```

John Davis 11/29/2018

1      Q.    And that's the letter from Jess
2    Dickinson.
3            Do you recall the phone conversation
4    that he refers to in the third paragraph of this
5    letter, "Earlier this week, I again contacted you
6    regarding these funds," et cetera?
7            Do you recall that phone conversation?
8      A.    No, ma'am, not specifically.  I -- I do
9    not, but I don't deny it.  I just don't remember
10   it.
11     Q.    Understood.  Understood.
12           MS. LOWRY:  I have no further
13       questions -- but let's mark another exhibit.
14           (Exhibit 17 marked for identification.)
15     Q.    (By Ms. Lowry)  All right.  All right.
16   Toward the bottom of this -- do you want to read it
17   first?
18     A.    (Examining.)  Go ahead.  I'm sorry.
19     Q.    So at the paragraph at the bottom of the
20   first page?
21     A.    Yes, ma'am.
22     Q.    It says, "Dickinson told lawmakers
23   during a phone call that month" -- and that month
24   appears to be September --
25     A.    Okay.

John Davis 11/29/2018

1      Q.    -- "with John Davis, Director of

2   Department of Human Services, Dickinson was

3   shocked to hear that the Department would receive

4   nearly 130 million less in federal funds than

5   estimated."

6           Do you recall having a conversation in

7   September with Justice Dickinson about the fact

8   that there -- that this was the case?

9      A.    Well, I do not because -- and the number

10   is -- the number is just really off, because that

11   130 million, that would have been more than their

12   entire budget.

13           So when -- so I'm -- I'm not disputing

14   what he said.  I am just not sure what that means.

15   The Department would receive nearly 130 million

16   less in federal funds?

17      Q.    That's what it says.

18      A.    The only thing I can think of is on the

19   budget.  I remember the budget -- I think that may

20   be what he was referring to, because on the

21   budget, there was -- there was authorization to

22   spend additional 4E dollars that they didn't have

23   access to but it was -- it was -- it was noted on

24   the budget they were given spending authority to

25   spend it, but it wasn't real money.  So I don't

John Davis 11/29/2018

```
 1    remember specifically -- I don't remember that.
 2         Q.   But you don't remember the conversation
 3    at all, or do you?
 4         A.   I don't, no.
 5         Q.   Okay.
 6         A.   (Examining.)
 7              MS. LOWRY:  I have no further questions
 8         at this point.
 9    EXAMINATION BY MR. JONES:
10         Q.   Mr. Davis, I'm Larry Jones.  I represent
11    the defendants in this case as co-counsel.  I
12    would like to ask you a few questions.
13              First things first, Exhibit 17 is a
14    newspaper -- it's an article, is it not?
15         A.   Yes.
16         Q.   In some media form, whether it's on the
17    Internet or in printed form?
18         A.   Right.
19         Q.   So it's not a transcript of any meeting?
20         A.   No.
21         Q.   You have no specific recollection of the
22    subject matter in the paragraph that counsel
23    referred you to?
24         A.   I do not.
25         Q.   And, as a practical matter, you don't
```

John Davis 11/29/2018

1    believe that's correct because that amount is
2    larger than what?
3          A.    It can -- it could be correct if
4    they're -- if it's false numbers, because that --
5    that would have been more than their budget.
6          Q.    Okay.  Let me turn to something else and
7    see if I can just put this in historical
8    perspective.
9                You're aware of the time period when
10   David Chandler became commissioner of CPS, are you
11   not?
12         A.    I am.
13         Q.    Is that 2015?
14         A.    Right.
15         Q.    And then in April of 2016, the
16   Legislature passed a statute which provided for
17   the complete separation of CPS from DHS with an
18   effective date of July 1st, 2018?
19         A.    That's correct.
20         Q.    The transition period then began for
21   that ultimate separation at some point after the
22   legislation was passed?
23         A.    Immediately, yeah.
24         Q.    Immediately after.
25                And at the time the legislation was

John Davis 11/29/2018

```
 1    passed, obviously, Commissioner Chandler was
 2    commissioner of CPS?
 3         A.   That's correct.
 4         Q.   CPS was part of DHS?
 5         A.   Correct.
 6         Q.   In fact, CPS remained a part of DHS
 7    during the entire period and is still a part of
 8    DHS?
 9         A.   In but not of.
10         Q.   Yes.  And I understand what that means,
11    but it is under the umbrella of DHS with
12    independent operational authority?
13         A.   That's correct.
14         Q.   That's your understanding as well?
15         A.   My understanding.
16         Q.   All right.  The point I was trying to
17    make, poorly, perhaps, is that the -- the complete
18    separation never occurred?
19         A.   No, it hasn't.
20         Q.   All right.  Now --
21         A.   It could not.  Sorry.
22         Q.   And I'm going to get to that, I hope.
23    So we're now moving forward from April of 2016,
24    and the beginning, at some point, of the ultimate
25    transition of a complete separation which never
```

John Davis 11/29/2018

```
 1    occurred.
 2              And during that point, during that
 3    period of time, there was, in fact, the budgeting
 4    process for 2018, was there not?
 5         A.    Yes.
 6         Q.    And the budget was submitted for fiscal
 7    year 2018 by former commissioner David Chandler's
 8    team, was it not?
 9         A.    That's correct.
10         Q.    And the appropriation was granted during
11    the period David Chandler's team was in place in
12    the commission --
13         A.    That's correct.
14         Q.    -- I mean in the department?
15              And we know that Justice Dickinson did
16    not become commissioner until September 18th of
17    2017.
18         A.    I remember it being September, yes.
19         Q.    Okay.  And you've discussed a -- I'm
20    going to say a meeting before September 18th of
21    2017, as a meet and greet with Justice Dickinson?
22         A.    That's correct.
23         Q.    This was the first time you had met him?
24         A.    That's correct.
25         Q.    There were only three people there:
```

John Davis 11/29/2018

```
 1    You, Dickinson, and David Chandler?
 2         A.    That's correct.
 3         Q.    And your testimony today is you did not
 4    recall any specific testimony about precise
 5    amounts of TANF funding that would be available?
 6         A.    I do not.
 7         Q.    Now, as we move forward, a potential
 8    shortfall of funds of a very significant amount
 9    ultimately was discovered?
10         A.    That's correct.
11         Q.    And, in fact, the initial discovery of
12    that potential shortfall, and sometimes we've
13    described it as a "financial crisis," occurred as
14    a result of the transmission of information from
15    DHS to CPS, financial information?
16         A.    That's correct.
17         Q.    Now, we have an actual exhibit, that
18    transfer -- or I mean that notice, excuse me.  Let
19    me look for it just a moment.
20              We -- at least we did at one point.  Let
21    me look one more time.
22              And I'd like to refer you to Exhibit 10.
23    I'm not going to dwell on every part of this
24    Exhibit 10, because I think it speaks for itself.
25    But Exhibit 10 begins with a November 8, 2017,
```

John Davis 11/29/2018

1    2:11 p.m., e-mail from Richard Ferrell to

2    Bridgette Bell?

3        A.   Yes, sir.

4        Q.   Those are both employees in the

5    financial arm of DHS?

6        A.   That's correct.

7        Q.   Now, it ends -- well, it moves forward

8    to November 15th, some number of days later, with

9    a Richard Ferrell to Bridgette Bell subsequent

10   e-mail at 1:27 p.m., does it not?

11       A.   Yes.

12       Q.   And let me just ask you if I am reading

13   this correctly.  According to the MAGIC budget

14   versus commitments table this morning, CPS had

15   $46,303,000 -- 303,954.84 of expenditures and

16   1,688,397.59 of commitments.

17            Did I read that correctly?

18       A.   That's correct.

19       Q.   This results in an allotment balance of

20   992,309.07?

21       A.   Correct.

22       Q.   That was all that was remaining in the

23   allotment account, so to speak, wasn't it, at that

24   point?

25       A.   Yes.

John Davis 11/29/2018

1      Q.    And we were at November 15th of 2017?

2      A.    Correct.

3      Q.    The allotment is intended, is it not,

4   sir, to cover expenses through the end of December

5   of each calendar year?

6      A.    Yes.

7      Q.    He also noted that according to MAGIC,

8   there were additional obligations of $2,704,869 at

9   that time?

10     A.    Yes, that's what it says.

11     Q.    I'll just ask you to assume this,

12   because the document reflects it, but CPS's

13   expenses at that time were running somewhere in

14   the 11, 12, $13 million a month range?

15     A.    Approximately, yes.

16     Q.    Based on your experience with the

17   agency, CPS was going to run out of its allotment

18   before December 31st, was it not, sir?

19     A.    Absolutely.

20     Q.    All right.  And the -- if that

21   expenditure pattern continued, it was potentially

22   facing a very significant shortfall for fiscal

23   year '18?

24     A.    If we would have stayed on that course,

25   yes.

John Davis 11/29/2018

1         Q.    Now, let me just ask you globally the

2    factors that led to that development.

3              First of all, one factor is the

4    legislation requiring a complete separation?

5         A.    Yes, because it created a -- it created

6    additional expenses to be incurred because we were

7    having to hire additional staff to separate out

8    and -- and then staff both departments.

9         Q.    Sir, was that complete separation being

10   advocated by the plaintiffs in this case?

11        A.    To my knowledge, yes.

12        Q.    Okay.  Now, a second factor that led to

13   this potential shortfall was increased

14   expenditures for programs and other services

15   during this period of time?

16        A.    Yes.  The cost to separate out even

17   equipment was causing a tremendous amount of drain

18   on the budget.

19        Q.    And the -- the sheer fact of separation,

20   the movement of people, the duplication of

21   services, and the increased services being

22   provided by CPS were also factors, were they not?

23        A.    Even space allocation.  Space became an

24   issue, the cost of additional space needed.

25        Q.    All right.  Now, all those factors were

John Davis 11/29/2018

1    in place before Commissioner Dickinson assumed his

2    position on September 18th of 2017, were they not,

3    sir?

4         A.   It started -- it started immediately

5    after the legislation to separate.

6         Q.   Now, and the impact of the separation in

7    terms of not allowing your agency to manage TANF

8    funds for the benefit of CPS was also a major

9    factor?

10        A.   Very much so, and nobody recognized that

11   until it was -- until the legislation had passed.

12   We had -- I had brought that to the attention of

13   how are we going to use TANF funds for an agency

14   that would no longer be in our agency.  We cannot

15   use it outside of our agency.

16        Q.   Now, ultimately this financial crisis

17   shortfall was addressed by -- in cooperation by

18   DHS, by CPS, by the governor's office and others,

19   was it not?

20        A.   Yes.

21        Q.   And let me just ask you if this is the

22   bottom line.  DHS was able to make available

23   sufficient funds together with a deficit

24   appropriation of $12 million to prevent a

25   shortfall?

John Davis 11/29/2018

1      A.    That's correct.

2      Q.    For fiscal year 2018?

3      A.    By finding those expenditures that met

4  the TANF requirements, because we had not been

5  completely separated out at that point.

6      Q.    Okay.  And that was a reasonable

7  response to the fiscal year '18 budget crisis, was

8  it not, sir?

9      A.    It was the right -- it was the only

10 response we could do.  It was -- it was what we

11 would do normally.

12     Q.    Okay.  And I think I've asked this

13 question of another witness.  Do you believe CPS's

14 management team under Commissioner Dickinson

15 should be applauded or -- maybe that's the wrong

16 word, not applauded -- but at least recognized for

17 the significant efforts it made to solve that very

18 serious budget crisis?

19     A.    That team came in with a lack of

20 institutional knowledge and has, over these few

21 months, taken the opportunity to educate

22 themselves and understand better.  So we no longer

23 talk in terms of just transferring money over.  We

24 talk in terms of how do we do this within the

25 guidelines of the federal programs.

John Davis 11/29/2018

```
 1              And so yes, "applaud" may not be the
 2    right word, but yes, absolutely.
 3         Q.    "Applaud" is not the right word.
 4         A.    They're learning the difference in
 5    running something in the private world and running
 6    something in the world that we live in.
 7         Q.    And that's a transition that virtually
 8    every administration has moving into the child
 9    welfare field, isn't it, sir?
10         A.    It's not just child welfare, it's every
11    part of our agency, the Department of Human
12    Services.
13         Q.    You've been in human services 28 years?
14         A.    27 in June.
15              MR. JONES:  Okay.  That's all I have.
16              MS. LOWRY:  I have one question -- we'll
17         be right back.
18              (A short break was taken.)
19         Q.    (By Ms. Lowry)  Mr. Davis, you were
20    asked was that complete separation, and you were
21    referring to the separation of MDHS and CPS, was
22    that complete separation being advocated by the
23    plaintiffs in this case, and you responded, to my
24    knowledge, yes.
25              What did you base -- what specific
```

1    knowledge did you base that statement on?

2        A.    Based on the historical knowledge of

3    anyone in the agency knowing that it was the

4    desire to have child protection services as a

5    separate division or department and not under the

6    purview or under the watch of human services.

7        Q.    But I'm asking you specifically about

8    plaintiff's position on that.  What specifically

9    did you know about the fact that it was advocated

10   by the plaintiffs in this case?

11       A.    Just based on what I was told.

12       Q.    By whom?

13       A.    By the former executive director, by the

14   former deputy executive director, and just being

15   in the agency.

16       Q.    Okay.  So rumor had it, basically?

17       A.    Well, it wasn't "rumor had it."  We had

18   staff meetings about it.

19       Q.    And the fact the plaintiffs were

20   advocating for it?

21       A.    Absolutely, that it needed to be

22   separated completely.

23       Q.    Okay.  And then, secondly, you said

24   that -- I think I was confused about your

25   testimony about whether or not you could make TANF

John Davis 11/29/2018

1    funds available during the '17-'18 fiscal year,

2    and I think you testified that you couldn't make

3    funds available, but in fact, the complete

4    separation was not going to take place until the

5    beginning of the '19 fiscal year; isn't that

6    right?

7         A.    I did not say I couldn't.  I said I

8    didn't because it wasn't budgeted.

9         Q.    Right.  That's what I think you were

10   saying.

11        A.    Yes.

12        Q.    But because it wasn't budgeted, you

13   didn't make it available?

14        A.    Absolutely not, because we --

15             MS. LOWRY:  Okay.  Fine.  We have no

16        further questions.

17             (Time Noted:  10:39 a.m.)

18                 SIGNATURE/NOT WAIVED

19

20   ORIGINAL:  MARCIA ROBINSON LOWRY, ESQ.

21   COPY:  J. LAWRENCE JONES, ESQ.

22

23

24

25

John Davis 11/29/2018

```
 1              CERTIFICATE OF DEPONENT
 2   DEPONENT:  JOHN DAVIS
     DATE:  November 29, 2018
 3   CASE STYLE:  OLIVIA Y., ET AL. vs. PHIL BRYANT, ET
     AL.
 4   ORIGINAL TO:  MARCIA ROBINSON LOWRY, ESQ.
             I, the above-named deponent in the
 5   deposition taken in the herein styled and numbered
     cause, certify that I have examined the deposition
 6   taken on the date above as to the correctness
     thereof, and that after reading said pages, I find
 7   them to contain a full and true transcript of the
     testimony as given by me.
 8           Subject to those corrections listed
     below, if any, I find the transcript to be the
 9   correct testimony I gave at the aforestated time
     and place.
10   Page      Line                    Comments
11   _____     _____     _____
12   _____     _____     _____
               _____     _____
13   _____     _____     _____
               _____     _____
14   _____     _____     _____
               _____     _____
15   _____     _____     _____
               _____     _____
16   _____     _____     _____
     _____     _____     _____
17   _____                _____
18        This the ____ day of _____, 2018.
19                              _____
                                JOHN DAVIS
20   State of Mississippi
     County of _____
21
         Subscribed and sworn to before me, this the
22   _____ day of _____, 2018.
23   My Commission Expires:
24   _____   _____
25                                    Notary Public
```

Jackson                  Brooks Court Reporting              Meridian
Gulfport                    1-800-245-3376                New Orleans

John Davis 11/29/2018

```
 1              CERTIFICATE OF COURT REPORTER
 2              I, Ginger H. Brooks, Court Reporter and
 3    Notary Public, in and for the State of
 4    Mississippi, hereby certify that the foregoing
 5    contains a true and correct transcript of the
 6    testimony of JOHN DAVIS, as taken by me in the
 7    aforementioned matter at the time and place
 8    heretofore stated, as taken by stenotype and later
 9    reduced to typewritten form under my supervision
10    by means of computer-aided transcription.
11              I further certify that under the
12    authority vested in me by the State of Mississippi
13    that the witness was placed under oath by me to
14    truthfully answer all questions in the matter.
15              I further certify that, to the best of
16    my knowledge, I am not in the employ of or related
17    to any party in this matter and have no interest,
18    monetary or otherwise, in the final outcome of
19    this matter.
20              Witness my signature and seal this the
21    10th day of December, 2018.
22
23                              _____
                                GINGER H. BROOKS, #1165
24                              CRR, RPR, CCR
      My Commission Expires:
25    September 18, 2021
```