# Olivia Y., Jamison J., et al. V. Phil Bryant, Donald Taylor, et al.

## David Chandler

### November 29, 2018

All depositions & exhibits are available for downloading at
<www.brookscourtreporting.com>
Please call or e-mail depo@brookscourtreporting.com if you need  a
**Username** and **Password.**



**Mississippi - Louisiana - Tennessee - New York**
**1-800-245-3376**



David Chandler 11/29/2018

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

OLIVIA Y., BY AND THROUGH HER NEXT
FRIEND, JAMES D. JOHNSON; JAMISON J.,
BY AND THROUGH HIS NEXT FRIEND,
CLARA LEWIS; DESIREE, RENEE, TYSON,
AND MONIQUE P., BY AND THROUGH THEIR
NEXT FRIEND, SYLVIA FORSTER; JOHN A.,
BY AND THROUGH HIS NEXT FRIEND,
JAMES D. JOHNSON; CODY B., BY AND
THROUGH HIS NEXT FRIEND, SHARON SCOTT;
MARY, TOM, MATTHEW, AND DANA W., BY AND
THROUGH THEIR NEXT FRIEND, ZELATRA W.;
AND SAM H., BY AND THROUGH HIS NEXT
FRIEND, YVETTE BULLOCK; ON THEIR OWN
BEHALF AND BEHALF OF ALL OTHERS SIMILARLY
SITUATED

                                    PLAINTIFFS
V.              CIVIL ACTION NO. 3:04-CV-251-TSL-FKB
PHIL BRYANT, AS GOVERNOR OF THE STATE OF
MISSISSIPPI; DONALD TAYLOR, AS EXECUTIVE
DIRECTOR OF THE DEPARTMENT OF HUMAN
SERVICES; AND BILLY MANGOLD, AS DIRECTOR
OF THE DIVISION OF FAMILY AND CHILDREN'S
SERVICES

                                    DEFENDANTS


DEPOSITION OF DAVID CHANDLER


Taken at the instance of the Plaintiffs at
Bradley, LLP 188 East Capitol Street, Suite 400
Jackson, Mississippi, on Thursday,
November 29, 2018, beginning at 10:57 a.m.



REPORTED BY:
GINGER H. BROOKS, CCR #1165
CRR, RPR, CRC, CCR, CLR, RSA

David Chandler 11/29/2018

```
 1    APPEARANCES:

 2

 3         MARCIA ROBINSON LOWRY, ESQ.
           DAWN J. POST, ESQ.
 4         A Better Childhood, Inc.
           355 Lexington Avenue, Floor 16
 5         New York, New York 10011
           mlowry@abetterchildhood.org
 6         dpost@abetterchildhood.org

 7

               COUNSEL FOR PLAINTIFFS
 8

 9

           J. LAWRENCE JONES, ESQ.
10         KENYA KEY RACHAL, ESQ.
           Baker Donelson
11         100 Vision Drive, Suite 400
           Jackson, Mississippi 39211
12         jjones@bdbc.com
           krachal@bakerdonelson.com
13

14

           WILLIAM M. SIMPSON II, ESQ.
15         Office of the Governor
           4500 I-55 North, Suite 278
16         Jackson, Mississippi 39211
           will.simpson@governor.ms.gov
17

18             COUNSEL FOR DEFENDANTS

19

20    ALSO PRESENT:   Earl Scales
                       Jess Dickinson
21

22

23

24

25
```

David Chandler 11/29/2018

```
 1                    INDEX
 2   Style and Appearances.......................1
 3   Index   ....................................3
 4   Certificate of Deponent  .................48
 5   Certificate of Court Reporter ............49
 6                  EXAMINATIONS
 7   Examination By Ms. Lowry ..................4
 8   Examination By Ms. Rachal ................44
 9                    EXHIBITS
10   Exhibit 18 5/5/16 Jackson Free Press ......17
11           Article
12   Exhibit 19 3/13/18 Mississippi Today ......30
13           Article
14   Exhibit 20 5/31/18 Mississippi Today ......40
15           Article
16
17
18
19
20
21
22
23
24
25
```

David Chandler 11/29/2018

```
 1                    DAVID CHANDLER,
 2   having been first duly sworn, was examined and
 3   testified as follows:
 4   EXAMINATION BY MS. LOWRY:
 5        Q.   Would you state your name for the
 6   record, please?
 7        A.   David Anthony Chandler.
 8        Q.   Thank you.
 9             Dr. Chandler, have you ever been
10   employed by the Mississippi Department of Child
11   Protective Services?
12        A.   Yes.
13        Q.   And what was your position there?
14        A.   I was the commissioner for Child
15   Protective Services.  Commissioner, I think, was
16   my title.
17        Q.   And for how long were you there?
18        A.   I was there from -- let me think now,
19   December 2016 -- no, I guess December 2015 --
20   December 2015 until September 15th, 2017, I
21   believe.
22        Q.   Okay.  Thank you.
23             What were your goals as commissioner at
24   MDCPS?
25        A.   Okay.  When Governor Bryant approached
```

David Chandler 11/29/2018

```
 1    me about taking the position, we were at the
 2    Supreme Court at -- at an event, and he bumped me
 3    on the elbow and asked me if he could talk with
 4    me, and he asked me, he said, I'm making foster
 5    care, I believe is what he said, a standalone
 6    agency, and I want you to consider serving as the
 7    head of the agency.
 8            And he said there have been some
 9    problems, and we're in some litigation, and I need
10    someone who can get the agency functioning the way
11    I want it to function so that we're properly
12    serving the children.
13            And so that was my objective.  I would
14    not have agreed to take the position if my
15    objective had not been what he stated as his
16    objective.  So my number 1 objective, it almost
17    goes without saying, my number 1 objective was to
18    first make sure that we properly identified all of
19    the children in Mississippi who were in an unsafe
20    situation at home because of either abuse or
21    neglect.
22            And then once they were properly
23    identified, see that that situation was corrected.
24       Q.   And did you have goals with regard to
25    the foster care part of the program as well?
```

David Chandler 11/29/2018

1     A.   Well, sure.  It would be rather
2 counterproductive to remove a child from an
3 unhealthy, unsafe situation and not provide proper
4 foster care.
5     Q.   How did your goals or priorities relate
6 to the Olivia Y. litigation?
7     A.   Well, Olivia Y. was a constant factor
8 there, but it never stood in the way of our
9 primary goals, but obviously, now, Olivia Y.
10 demanded some of my attention.  And what I wanted
11 to make sure that we did in relation to Olivia Y.
12 was any court order that pertained to Child
13 Protection Services, I wanted to make sure that we
14 met all of the requirements of the court order.
15          I mean, court orders are not to be taken
16 lightly, and if -- if a court orders an agency or
17 an individual to do something, then I think it's
18 in the best interest of everyone who is affected
19 by that court order to comply.  And certainly, I
20 think that was certainly one of our goals.
21     Q.   I'd like to ask you if you are familiar
22 with a report that was done by public -- by an
23 organization called Public Catalyst in November of
24 2015 and which has already been marked as
25 Exhibit 3.  I'm sorry.  I'd like to ask you this:

David Chandler 11/29/2018

```
 1    Are you familiar with this report?
 2         A.   Well, you know, Marcia, let me say at
 3    first glance, no.  But that doesn't mean that I
 4    have not seen it before.  That's a lot of reading
 5    there.  I doubt that I've ever read that.
 6         Q.   Let me direct your attention to one
 7    particular page --
 8         A.   Okay.
 9         Q.   -- or two pages in the report, pages 16,
10    17.  If you could look at those pages, starting at
11    the bottom of page 16.
12         A.   Where it says, "An effective approach to
13    work with staff..."?
14         Q.   That's right.  And I want to
15    specifically direct your attention to where the
16    paragraph -- in the middle of the paragraph where
17    it says, "To achieve positive outcomes for
18    children and families, it is critical that
19    Mississippi have a competent, committed, trained
20    and resourced child welfare workforce."  And it
21    goes up to the top of 17, "The first order of
22    business must be the creation and implementation
23    of a comprehensive dynamic plan to achieve
24    manageable caseloads for staff within one year."
25         A.   Oh, sure, I understand that, yeah.
```

David Chandler 11/29/2018

```
 1    Those caseload numbers we -- we talked about
 2    constantly, or, you know.
 3         Q.   It says --
 4         A.   You've taken Tracy's deposition, right?
 5         Q.   Yes.
 6         A.   You asked her this?  Maybe I shouldn't
 7    ask you that.
 8              Let me make a bet.  Do you bet?
 9         Q.   Sometimes.
10         A.   I bet you a nickel you can ask Tracy
11    Malone what you just asked me, and she can talk
12    about it for an hour, okay?
13         Q.   I think you're losing the bet.
14              Okay.  But in any case, did you agree
15    with that statement?
16         A.   Well, sure, yes.  I mean -- and let me
17    tell you why.  See, I was a novice at this,
18    really.  I came from a different environment, but
19    early on, I was told -- and it was constantly
20    reinforced by everyone at CPS, I think, that
21    caseloads was the way our productivity or maybe
22    the --
23              (Off the record.)
24              THE WITNESS:  But I mean, you know,
25         that's the way it was measured.  I didn't
```

David Chandler 11/29/2018

```
1         know any other way, and I didn't hear anyone
2         else propose another way.
3         Q.   (By Ms. Lowry)  And were caseloads then
4    important to you?
5         A.   Oh, absolutely, yeah.  I -- I presumed
6    that was the way that the effectiveness of the
7    agency was measured.
8         Q.   Let me direct your attention to the
9    recruit -- 2016 recruitment, hiring and retention
10   plan which has previously been marked as
11   Exhibit 4, which has your name on it.
12        A.   Yeah.
13        Q.   Okay.  And are you familiar with this
14   document?
15        A.   Well, I do remember seeing this before.
16        Q.   Who prepared this document?
17        A.   Oh, my goodness.  Probably that lady --
18   I can't think of her name, but she's the -- she's
19   the -- kind of the public relations person there,
20   and she's also -- or when I was there, she was
21   Tracy's secretary.
22             Most of these data would have come from
23   Tracy and Kristi, I would say, but primarily
24   Tracy, but Tracy would have been talking with her
25   staff, you know, to compile the data.
```

David Chandler 11/29/2018

```
 1        Q.    And this is -- could you describe what
 2    this is?
 3        A.    Can what?
 4        Q.    Can you describe what this document is?
 5        A.    Well, it's our plan pertaining to
 6    recruitment, hiring and retention.
 7        Q.    And did it identify the number of
 8    additional positions you needed?
 9        A.    It will.  We probably thought it did.
10    Whether it actually did, I don't know, but I mean,
11    my name is on it, and I will say that it reflects
12    what I thought was our plan pertaining to
13    recruitment, hiring and retention.  Now, I didn't
14    just make that up.  I got that from Tracy, and
15    Kristi, and probably Cindy, and maybe Takesha.
16        Q.    And did it set out how many additional
17    workers you needed to hire in order to comply with
18    Olivia Y.?
19        A.    Well, I would -- I would say that based
20    on the title on the front that it probably does.
21             MS. RACHAL:  Objection.  Let me note
22        that you're basing your follow-up questions
23        on witness testimony which says probably as
24        opposed to actually.
25             THE WITNESS:  Oh, I wouldn't know,
```

David Chandler 11/29/2018

1          actually.  I'm just going by what's on the
2          title.  Don't ask me to read all that and
3          tell you how relevant and -- and how accurate
4          it is.  I mean, I'm too slow for that.
5          Q.    (By Ms. Lowry)  Do you think it's possible
6     to achieve compliance with the Olivia Y. settlement
7     agreement without increasing caseloads at MDCPS?
8          A.    Without decreasing caseloads?
9          Q.    Increasing caseloads?
10         A.    Increasing caseloads.  Wait, now,
11    what --
12         Q.    I don't mean caseload standards.  I mean
13    the number of workers.
14         A.    Yeah, yeah.  Each worker would have a
15    fewer number of children she was responsible for,
16    in her caseload.
17         Q.    That's right.  Exactly.
18         A.    Yeah.
19         Q.    And do you think that it's possible to
20    comply with Olivia Y. without complying with the
21    recruitment, hiring and retention plan?
22         A.    That probably came -- I'm just guessing
23    now.  Is it okay if I say probably?  You know,
24    you're going to have to cut me a little slack now.
25    I've been away from this for a while, but here's

David Chandler 11/29/2018

1    what I think.  Here's what -- based on that, more

2    than likely, Tracy and Kristi and Lee Ann is the

3    secretary, more than likely, they took numbers

4    from the court order and put a plan together, and

5    this is it.

6              MS. RACHAL:  Same objection.

7              THE WITNESS:  There again, the person --

8         even though it had my name on it, the

9         person -- the people to ask about that are --

10        is 2016, Tracy, Kristi, Cindy and Takesha.

11   Q.   (By Ms. Lowry)  The report provides for

12   you -- for the agency to hire a specific number of

13   additional workers.

14   A.   Yes.

15   Q.   In fact, it calls for 509 additional

16   workers to be hired at that time.

17   A.   Okay.

18             MS. RACHAL:  Object to form.

19             THE WITNESS:  That was May '16.

20   Q.   (By Ms. Lowry)  That's correct.  That's

21   correct.

22   A.   Yeah.  Yeah.

23   Q.   Did you have meetings with counsel for

24   plaintiffs, defendants, your counsel and Public

25   Catalyst during the calendar years 2016 and '17?

David Chandler 11/29/2018

```
 1        A.    Oh, yes.   We -- we met whenever you told
 2    us to.
 3        Q.    And were the meetings focusing on
 4    addressing caseload issues as well as other
 5    things?
 6        A.    Well, other things, but caseload was a
 7    huge part of it all.   That was -- that kind of
 8    seemed to be the driving concept behind
 9    everything.
10        Q.    And who generally was present at these
11    meetings?
12        A.    Well, let's see, now.   I'd usually sit
13    right there, Kenya would sit here, Kristi would
14    sit there, Tracy would sit next, Cindy would sit
15    next to her, Takesha would sit next to her, Seth
16    Shannon would sit down at the end.   Will Simpson
17    was at a number of the meetings.
18        Q.    And who is Will Simpson?
19        A.    Will Simpson is our governor's office
20    liaison.
21        Q.    Okay.  So the governor's office was
22    represented at many of those meetings?
23        A.    Well, as I recall, I would say a good
24    number.
25        Q.    Okay.
```

David Chandler 11/29/2018

```
 1        A.    But now, you'd have to ask Will about
 2    that.
 3        Q.    Okay.
 4        A.    You were always there.  Sara was here.
 5        Q.    Thank you.
 6              When the discussion was held about the
 7    caseload limitations, did the governor or his
 8    representative ever discuss any disagreements with
 9    the caseload limitations that we were dealing
10    with?
11        A.    Not that I know of, but let's put this
12    thing in perspective.  The governor is probably
13    like I am.  This is speculation, but I imagine he
14    can spell caseload, but that might be about all he
15    knows about it, because that was about all I knew
16    about it when I got there, and I still don't
17    understand much about it.
18        Q.    Did you ever have a conversation with
19    the governor or Will Simpson about the caseload
20    limitations in the MSA?
21        A.    Not the caseload limitations, no, but I
22    did talk with the governor some, and I talked with
23    Will anytime I needed to.  You know, if I needed
24    to drop my car off and get the oil changed, I
25    thought I could call Will, and he'd let me ride to
```

David Chandler 11/29/2018

```
 1   the office, that kind of thing, and sometimes we
 2   talked about CPS stuff, too.
 3        Q.   Ultimately, did the governor sign off on
 4   the second MSA?
 5        A.   It's speculation on my part, but I
 6   presume if he didn't, it wouldn't be any such
 7   thing.
 8        Q.   Did there come a time during one of
 9   those meetings when I asked you whether you could
10   assure plaintiffs that there would be no problem
11   getting the necessary funds to lower caseloads as
12   provided in the resource hiring and retention
13   plan?
14        A.   Well, if you say you did, I say you
15   probably did, yeah.  But look, now, am I talking
16   too much?  You know, the money thing, I never did
17   pay much attention to, because here's why.
18   Everyone wanted the agency to succeed, everyone,
19   and everyone that I spoke with in the State of
20   Mississippi assured me that he or she would help
21   in whatever way possible, you know, and that was
22   the -- that was the environment at the time when I
23   was there.  I was confident that the folks who had
24   the money would provide it.
25        Q.   Do you know that there is currently a
```

David Chandler 11/29/2018

```
 1    hiring freeze in effect at the agency?
 2         A.   No.  I guess the only way I'd know that
 3    is if I applied for a job, and I haven't done
 4    that.  Are you -- are you saying --
 5         Q.   I'd like for you to take a look at
 6    Exhibit 5.  That is a document that basically
 7    freezes hiring, and we've had some testimony about
 8    that but basically --
 9              MS. RACHAL:  Objection,
10         characterization.
11              MS. LOWRY:  Thank you.  But I wasn't
12         finished, then you can object.
13         Q.   (By Ms. Lowry)  That basically freezes the
14    hiring limits at the levels that they currently
15    existed as of the date of that memo, which is
16    December 20th, 2017.
17              MS. RACHAL:  Same objection.
18         Q.   (By Ms. Lowry)  Now, at the time that
19    you -- sorry, withdraw that.
20              Do you know what the Legislative
21    appropriation was in FY 2017?
22         A.   No.
23         Q.   Okay.  There was increased funding
24    provided for CPS in 2017.  Just accept that as a
25    fact for the moment.
```

David Chandler 11/29/2018

```
 1        A.    It was what now?

 2        Q.    It was 34.5 million extra to CPS.

 3        A.    Yeah, I remember it -- they gave extra

 4   money one year, yeah.  Well, not extra, but more

 5   than they had given in the past.

 6        Q.    What was the significance of that

 7   increased funding?

 8        A.    Well, $34 million kind of stands by

 9   itself as far as being -- being significant.

10   That -- that was a -- a significant boost in the

11   budget, and I'm sure made a difference in the --

12   the ability of the agency to hire more folks, and

13   presumably if you hire more folks, you do better

14   work.

15             (Exhibit 18 marked for identification.)

16        Q.    (By Ms. Lowry)  I'd like to direct your

17   attention to the paragraph that's on the other

18   side of the page, and that's a statement by you

19   according to the newspaper, "We feel pretty good

20   about being able to attract the new people that we

21   need, but that's only a part of it.  We must train

22   the new employees, Chandler told the committee.

23   One of our great concerns is putting a new

24   employee out in the field who is very well trained

25   and saddling that employee with an insurmountable
```

David Chandler 11/29/2018

```
 1   caseload.  We don't intend to do that."
 2        A.   That's right.
 3        Q.   And that was a quote from you.  Is that
 4   basically an accurate quote?
 5        A.   That's accurate.
 6        Q.   At that point, did you consider the
 7   caseloads unmanageable?
 8        A.   Well, I -- I never considered any aspect
 9   of the agency's responsibilities as unmanageable
10   or unachievable.  You know, it would have been
11   against my nature to do that.
12        Q.   Did you consider the caseloads too high?
13        A.   Well, now, here's -- here's -- here's
14   the way I made my decisions pertaining to the
15   caseloads.  I always asked Tracy if we could
16   achieve them.
17        Q.   And what did you learn from Tracy?
18        A.   Well, Tracy, if she had said no, we
19   can't do that, then I would have let Kenya know,
20   and she would have told you.
21        Q.   But Tracy didn't say no?
22        A.   I know, and specifically now, I don't
23   know where you're headed.  Can I -- can I predict
24   where you're headed and answer the question before
25   you ask it?
```

David Chandler 11/29/2018

1      Q.   You can say whatever you want in this
2  deposition.
3           MS. RACHAL:  Counselor, please repeat
4      your question.
5      Q.   (By Ms. Lowry)  My question was, if Tracy
6  said that you couldn't -- I asked you whether you
7  thought the caseloads were unmanageable.
8      A.   Yeah.  And if Tracy said they were
9  manageable, I thought they were manageable.
10     Q.   But she didn't say that; is that
11  correct?
12     A.   I don't remember Tracy ever saying that.
13     Q.   Okay.  There has been reference to a
14  historic verbal agreement for DHS to provide SSBG
15  and TANF funds to CPS.
16     A.   Yeah.
17     Q.   Can you tell what that historic
18  agreement was, verbal agreement?
19     A.   What -- a verbal agreement between John
20  Davis and me?
21     Q.   Yes.
22     A.   You know, I don't remember what it was
23  but now -- you know, let me -- here's the way that
24  thing worked while I was there.
25     Q.   Good.  Tell us.

David Chandler 11/29/2018

1      A.    This is the way it worked.  We were in
2    the business of making sure that every child in an
3    unsafe situation was identified, removed from that
4    situation and placed in a healthy situation, and
5    John Davis, I can tell you, was in the boat with
6    us always, committed.  Now -- now, Kristi
7    sometimes would kind of raise the ire of his
8    deputies, Jacob Black, who's a fine young man and
9    knows -- knows government work extremely well, and
10    then the other young man, I can't remember his
11    name, but the way I know Jacob is, I grew up with
12    his daddy.  He's -- he's a good fellow.  He's from
13    good stock.
14         I could depend on John Davis and Jacob
15    Black, and -- and sometimes when Kristi would
16    maybe get Jacob aggravated, I would call John,
17    but -- but if -- if they were taking care of
18    business, I let them take care of business, you
19    know, and they always came up with the money.  You
20    know, they -- money -- money was not anything that
21    we dwelled on, really.  Really.  Some -- sometimes
22    I think you might be gagging at a gnat -- gnat
23    while you're swallowing a camel, you know, if all
24    you do is look at the dollar amount and look at
25    the number.  We didn't do that.  I never did that,

David Chandler 11/29/2018

```
 1   you know.
 2          Q.   Do you know why in fiscal year 2017
 3   apparently the budget was submitted without any
 4   TANF funds in the budget?  Do you know why that
 5   was?
 6          A.   When now?
 7          Q.   2017, fiscal year 2017.
 8          A.   Before September the 15th?
 9          Q.   I don't know when it was submitted, but
10   it was for the fiscal year 2017 which runs from
11   2017 to 2018.  I'm sorry, no, I was wrong.  It's
12   2018.
13          A.   Yeah.  Well, evidently, that's the
14   budget that was submitted just -- just before I
15   left.
16          Q.   That's right.
17          A.    I figure.  Let me tell you the way that
18   worked.  That year -- the year prior to that, I
19   spent a lot of time with the Legislature telling
20   them what good folks they were because they were,
21   and how much I appreciated their help, because
22   they were helping.
23               And then the next year, I let Kristi
24   handle it all.  I don't even -- I don't even
25   know -- I didn't go to the meetings at the
```

David Chandler 11/29/2018

```
 1    governor's office or -- or anything, I don't
 2    think.  Kristi did all of that.
 3              I think maybe I went to the
 4    Legislature -- I remember going over there one
 5    time that -- that second -- second year and -- and
 6    meeting with the group who meets before you meet
 7    with the budget group, and I don't know what group
 8    that was, but I remember Senator Tollison was in
 9    that group, and you know, he and I talked some.
10              We were friends, but whatever figure was
11    submitted, I will say without equivocation, it was
12    a figure that was sufficient for the agency to
13    meet its goals.  Otherwise, the governor's office
14    and Kristi and Dr. Pugh would never have submitted
15    it.
16         Q.    And that was the budget that was in
17    effect during the time -- at the point at which
18    you left the agency?
19         A.    Yeah.  I would say that.  That's
20    probably right, yeah.
21         Q.    Do you know that after you left the
22    agency, the incoming commissioner, several months
23    later, declared that there was a budget crisis?
24    Are you aware of that?
25         A.    I -- I have heard that.
```

David Chandler 11/29/2018

```
 1        Q.   Yes.  And, in your view, do you
 2   understand what the basis for concluding there was
 3   a budget crisis was?
 4        A.   No.
 5        Q.   There was some discussion in a memo from
 6   Takesha Darby that suggests that money from DHS
 7   would come in toward the end of the year.  Were
 8   you aware of that?
 9        A.   No.  Takesha was -- you know, she was
10   the deputy in charge of finance, but if -- if she
11   said it, you know, it was accurate.
12             Oh, wait now, that memo, she sent it to
13   me?
14        Q.   I'm going to show you that memo, and we
15   can --
16        A.   Yeah.
17        Q.   It's Exhibit 16.
18        A.   She sent it to me?
19        Q.   She sent it to Justice Dickinson?
20        A.   Oh, well, that would be -- I don't --
21   you would have to ask them about that.  Oh,
22   September the 15th, that's -- yeah, that's --
23   that's the day I left, I think.
24             That's probably the first day Jess was
25   formally in charge, I would guess maybe, on the
```

David Chandler 11/29/2018

```
1    15th.  I may have that date wrong, but I think I
2    left September the 15th.
3        Q.   All right.  So what this memo says
4    toward the middle part of the memo, one, two,
5    three, four, five, in the fifth paragraph, it says
6    that, "While advocating for additional funds
7    during the Legislative session, CPS had not
8    anticipated any decreases in SSBG or TANF funding.
9    After the session ended, MDHS received an
10   appropriation bill which specifically outlined the
11   funds and positions appropriated to CPS separate
12   from MDHS.
13            "It was at this time Jacob Black and I
14   had a conversation regarding MDHS pulling back
15   TANF funding to allow CPS to realize its actual
16   budget, that TANF funds would be available at the
17   end of the year to prevent" -- "to prevent a
18   deficit for CPS.  And then at the end" -- this is
19   the last sentence, "At the end of the year, CPS
20   received the $12,300,702 from MDHS, and TANF
21   funding to close out the fiscal year."
22            Were you familiar with those facts?
23            MR. JONES:  Do you mind clarifying if
24       that's fiscal year '17, Counselor?
25            MS. LOWRY:  This is fiscal year '17.
```

David Chandler 11/29/2018

```
 1           MR. JONES:  Yes.
 2           THE WITNESS:  I'm not familiar with it,
 3      but -- but again, now, let me tell you.  I
 4      really do want all of this to be in the
 5      proper perspective.  Here's -- here's the way
 6      we worked.  Here's the way we worked.
 7           If that was what CPS needed, then I
 8      never would say anything.  If CPS needed
 9      something different to that, I would call
10      John Davis, and I would say, John, we got
11      this memo from Takesha, but I want you to
12      know that this is what I think we actually
13      need or if -- if it was something that
14      offended him in the memo, I would apologize,
15      I would say you know, you and I are in this
16      thing together, and you know you can depend
17      on me.  I know I can depend on you.  And you
18      know that's the way it was handled, honestly.
19      Q.   (By Ms. Lowry)  And was there ever a time
20   when you had obligations under Olivia Y. that you
21   felt you couldn't meet because of funding?
22      A.   No, no.  But now, Marcia, again,
23   please -- please know, I didn't dwell on them
24   dollars.  I didn't.  It was -- I left that to the
25   deputies, and they handled it.
```

David Chandler 11/29/2018

1        Q.    And did any of the deputies ever come to
2    you and say we can't meet a particular obligation
3    under Olivia Y. because we don't have, for
4    example, enough staffing?
5        A.    Well, sometimes Kristi would come in,
6    and she would say we need more money or we can't
7    do this.  And I would tell her, talk to Jacob and
8    the other young man there, but Jacob was the
9    fellow I knew over there, okay?  And I would tell
10   Kristi, talk to Jacob.  And usually they would get
11   it worked out.
12            And if they didn't, if she came back or
13   if, you know, Will knows this as well as I do,
14   Kristi was very direct.  She did not mince words.
15   She did not waste one second, because she had a
16   lot to do.
17            And -- and Jacob, having grown up up
18   there in the rocky hills of Attala County, you
19   know, sometimes those -- those short, concise
20   little sentences, they -- they offend us, so
21   sometimes Jacob would get a little offended, and
22   then I would call John Davis, you know, honestly.
23            And John is as easygoing and as
24   knowledgeable and as capable as anyone, and as
25   trustworthy and as reliable as anyone I ever

David Chandler 11/29/2018

```
 1    worked with.  You know, I depended on him.  I
 2    could depend on him.
 3         Q.   Were you familiar with the specifics of
 4    budget requests in the years that you were at
 5    MDCPS?
 6         A.   Ask me that one more time.  I should
 7    have worn my hearing aids.
 8         Q.   I'm sorry, but I will speak more loudly
 9    if that will help.  Let me give you that last
10    question.
11              Were you familiar with specifics of
12    budget requests in the years you were at MDCPS?
13         A.   Am I familiar with the specifics?
14         Q.   The specifics.  In other words, if I
15    asked you why you asked for this amount of money
16    as opposed to that amount of money?
17         A.   No, no, don't ask me things like that, I
18    don't know.
19         Q.   Okay.  Who did know?
20         A.   Well, the -- the first year there,
21    the -- the first year -- let me think about the
22    first year now.  Oh, Takesha was there.  Takesha
23    was there, and Takesha and Tracy, Kristi was not,
24    but Cindy, Cindy played a big role in that, and
25    then that other young lady, I can't think of her
```

David Chandler 11/29/2018

```
 1   name, but Kristi replaced her.
 2              That lady did a good job of
 3   understanding the requirements of the agency and
 4   putting a dollar amount on it.  And so they --
 5   they would go with me to the Legislature.
 6              I always carried people with me who were
 7   much more knowledgeable, much more capable than I.
 8   And I would shake the Legislators' hands and tell
 9   them what good folks they were.
10              And when they asked me a question, I'd
11   give the microphone to one of them, see.  But now,
12   they knew every -- I -- I relied on them to know
13   every detail pertaining to the requests.
14              I don't remember the Legislators ever
15   asking us one question that our people did not
16   address directly, concisely, specifically and on
17   point.
18         Q.    So the --
19         A.    Wait, wait, wait.  I've got to get up
20   now.
21         Q.    Okay.  Please do.  You can go.
22              (Off the record.)
23         Q.    (By Ms. Lowry)  Are you able to continue
24   with the deposition?
25         A.    Oh, sure.  Here's what happens.  I
```

David Chandler 11/29/2018

```
 1    have -- I have peripheral neuropathy.  I'll get a
 2    sharp pain sometimes.  I mean, it's not bad, and
 3    it doesn't last three seconds, but it's --
 4              (Off the record.)
 5         Q.   (By Ms. Lowry)  So during the time you
 6    were the commissioner, there were no budget
 7    problems that you had, and the budget was
 8    basically being handled by your deputies?
 9         A.   Yes.
10         Q.   And things were moving along as well as
11    they could, but without any financial
12    difficulties; is that right?  Is that correct?
13         A.   Well, yes, and I think you would agree
14    with that.  As a matter of fact, you did agree
15    with it.  I saw it in the paper.
16         Q.   Then it must be true.
17         A.   Yeah.
18         Q.   So how do you account for the fact that
19    following your retirement, the incoming CPS
20    director stated that MDCPS was facing a big
21    deficit?
22         A.   I don't -- I don't know.  Jess will
23    know, yeah.
24         Q.   Are you aware that Commissioner
25    Dickinson has made the following statements about
```

David Chandler 11/29/2018

```
 1    the 2018 deficit as related to your
 2    administration?
 3              MR. JONES:  Is this another news article
 4         or a document?
 5              MS. LOWRY:  It's a news article.  It's
 6         Exhibit 17.
 7         Q.   (By Ms. Lowry)  This is quoted material, I
 8    repeat, "I have no idea when those numbers came
 9    from, Dickinson told the committee Tuesday."  The
10    date on this article is January 10th, 2018.  "I have
11    no idea how somebody suggested or predicted this.
12              I have asked everybody where those numbers
13    came from, and nobody has any idea where the numbers
14    came from.  As far as I can tell, they're made up."
15         A.   Yeah.
16         Q.   Are you aware that Commissioner
17    Dickinson apparently, according to this article,
18    said that about the budget?
19         A.   Well, that's what it says right there.
20         Q.   Okay.  Let me show you another article.
21              (Exhibit 19 marked for identification.)
22              THE WITNESS:  Have you seen this?  Nice
23         picture.
24         Q.   (By Ms. Lowry)  This article we have
25    marked as Exhibit 19.  At the bottom of page 2, it
```

David Chandler 11/29/2018

```
 1    says, "Dickinson has maintained that he discovered
 2    the problems with CPS within weeks of taking the
 3    agency reins, although he did not inform Legislators
 4    until December.  The previous administration at CPS
 5    was either unaware of the issue or had not informed
 6    lawmakers about the problem, he said."
 7              Are you aware that Justice Dickinson
 8    apparently said that?
 9              MS. RACHAL:  Objection.
10              THE WITNESS:  Well, that's what the
11        words say.
12        Q.   (By Ms. Lowry)  Did Justice Dickinson call
13    you at any point after he took over the agency to
14    ask you what was going on?
15        A.   Let's see now, I think I talked with
16    Jess, if I remember correctly, came to his office
17    two times after he assumed the Commissioner's job,
18    both -- both times at his request, and here's why.
19              I made it clear -- I thought I made it
20    clear, I said it clearly, I know that, I said
21    clearly to Jess, "Call me if you need me.  I'll
22    help you any way I can."  But I didn't impose, you
23    know, because he was the commissioner then, and I
24    didn't want to get in his way, and I didn't want
25    to cause any confusion about anything, but -- but
```

David Chandler 11/29/2018

```
 1    if I remember correctly, he called me on two
 2    occasions, and I went to his office, and we
 3    talked.
 4         Q.    And about when were those occasions?
 5         A.    I don't know the time, but I would -- I
 6    would guess sometime between September and
 7    December, I'm guessing.
 8         Q.    And do you remember what those
 9    conversations were about?
10         A.    Well, the first time, as best I can
11    recall -- and Jess will remember this as well as
12    I, I know.  But the first time we talked, Jess was
13    relaxed and seemed happy, and everything was going
14    reasonably well, and it was just kind of a general
15    conversation.
16              And then the second time, I don't know
17    how much time lapsed, honestly, I don't, but the
18    second time, Jess seemed overwhelmed by maybe the
19    responsibilities, the weight of the office.
20    That's the way I -- that's the way I viewed him.
21              He had a problem with his hip, and he
22    was limping, and he went back and forth from the
23    table in the office to his desk several times, and
24    I, frankly, felt sorry for him.  And I also
25    remembered having that feeling that he seemed to
```

David Chandler 11/29/2018

```
1    be exhibiting a time or two after I was asked to
2    take the job but before I actually came to work.
3            You know, you look at all that stuff,
4    and it -- it can overwhelm you.  But the
5    difference in me and the difference in Jess, see,
6    I had -- I had a longer period of time to think
7    about what a huge responsibility it was before
8    actually being saddled with it, because I -- I
9    took longer to study it, you know, and just learn
10   about it, learn about it, because I knew it was
11   going to be different.
12           I taught school a number of years, and
13   some years, I can't remember how many, but two or
14   three or four or five, I was the special
15   education -- I can't remember what they called it,
16   but I was in charge of the entire district's
17   special education teachers, and -- and, of course,
18   they were responsible for their students, not --
19   not only the low functioning, but the gifted and
20   those groups as well.  And so I knew when you're
21   working with a group of people like that, there's
22   going to be emergencies, and -- and I kind of
23   viewed Jess as feeling that weight on his
24   shoulders, you know.
25       Q.   And what -- do you recall how long you
```

David Chandler 11/29/2018

```
 1    spent at the second meeting?
 2         A.   Well not too long, because I remember
 3    specifically, he said, "I want to know about the
 4    budget, and you're the only one who can help me."
 5    And here's what I thought.  I'm probably the least
 6    likely guy who can help him about the budget.  And
 7    I thought -- I thought, you know, maybe he was --
 8    he was focused on that too much because I -- I
 9    didn't do that.
10              I let -- I let others who understood
11    governmental accounting and all of these federal
12    programs and the way they interact and intermesh,
13    I let others take care of that.
14              It would have overwhelmed me, and if I
15    had that to do over, rather than simply consoling
16    him, I would have -- I would have spoken more
17    directly and told him, you know, don't do that.
18    Let others.
19              If there were people there that he
20    trusted, and if there were not, he needed to get
21    them there.  That's just my opinion.  That's the
22    way I would have done it.
23         Q.   Are you aware that shortly after he --
24    not shortly, but at some point after he took his
25    position he fired the person that you had had
```

David Chandler 11/29/2018

```
 1    dealing with budget issues, Takesha Darby?

 2         A.   Well, now, I had heard.  Now, it's

 3    hearsay.  I can't say it -- if I'm on the stand, I

 4    hope I'm not, but I couldn't say it if I'm on the

 5    stand.  I can say it here.  I heard -- I don't

 6    remember who told me honestly I heard that --

 7              MS. RACHAL:  You're still under oath.

 8              THE WITNESS:  What?

 9              MS. RACHAL:  You're still under oath

10         here.

11              MS. LOWRY:  I think the witness knows

12         that.

13              THE WITNESS:  Yeah.  I heard it.  I'm

14         not sure I heard that he fired her.  I -- I

15         heard that she left, I think.  I can't

16         remember to be honest with you.

17         Q.   (By Ms. Lowry)  And how long had she

18    worked for you?

19         A.   Well, she was the person I chose for

20    that position when I came on.

21         Q.   And so you brought her into the agency?

22         A.   No, she was already there.

23         Q.   I see.

24         A.   And she moved over.

25         Q.   I see.
```

David Chandler 11/29/2018

```
 1        A.    But now, let me tell you one thing.  I'm
 2    going to brag on myself a little bit, all right.
 3             I spent a good number of years, about
 4    10, I spent 10 years or maybe more as a
 5    psychometrist evaluating students' aptitude, their
 6    potential, as well as their motivation and their
 7    general behavior.  I think I'm sort of good at
 8    that.
 9             And I had real good recommendations on
10    Takesha, and I would not recognize it now, but I
11    remember looking at her work experience,
12    background, and I knew I had to have someone who
13    understood that complex governmental accounting.
14    I thought it was Takesha, and I always thought
15    that, you know, the whole time I was there.  She
16    never failed me as far as I know.  She never
17    failed the agency as far as I know.
18             Now, here's one thing about Takesha, she
19    was -- she was a little standoffish.  I think I
20    could tell her that.  You know, she -- she was a
21    little closed, and frankly, I didn't meddle much
22    in the budget, because here's -- here's what I
23    didn't want to happen.  I didn't want to give an
24    appearance, even to Takesha, but especially to
25    the -- to the media and the outside, that I was
```

David Chandler 11/29/2018

1    trying to influence the -- the budgetary decisions

2    in any way without going through the deputies who

3    were responsible for providing the services, like

4    Takesha and Cindy and Kristi.

5              You know, I didn't want to go around

6    them and go and talk to Takesha.  I had one

7    cardinal principle.  I would talk to anybody,

8    media, anybody, you, anybody who wanted to talk, I

9    would -- I would talk to them, but I also wanted

10   the other deputies there when I talked.

11        Q.   Did you ever have any conversations with

12   Governor Bryant about this case?

13        A.   Well, I'm sure we did.  I don't remember

14   talking specifically, but -- but now, here's

15   what -- here's what -- I'm letting the cat out of

16   the bag a little bit here.

17              My plan was to exit the litigation,

18   Marcia.  And -- and I think I made that clear to

19   the governor, maybe through Will, but -- but I

20   think the governor was expecting that.  I intended

21   to do it.

22        Q.   Expected to come into compliance with

23   the provisions?

24        A.   Yeah, or close, close enough to get out

25   of the litigation.  I thought we could do it.

David Chandler 11/29/2018

```
1        Q.    And when did you expect to do that by?
2        A.    Well, if -- if I had stayed through
3   December and everything had gone as it was going
4   while I was there, and it was some big report due
5   in December, I think, Tracy can tell you that
6   better than I, but December was the date I was
7   kind of looking at having everything in place to
8   ask Kenya to begin to get us out of the
9   litigation.  I wanted to do it by the end of
10  Bryant's term.  I wanted to be out by then.
11       Q.    And how many -- I'm sorry, I'm not from
12  Mississippi.  How long does he have until he is
13  term limited out?
14       A.    His term ends next year.
15       Q.    I see.
16       A.    Next year.  I still hope we can exit it
17  then, hope Jess and them can.
18       Q.    Are you aware that Commissioner
19  Dickinson has moved to be relieved from a part of
20  the judgment with regard to caseload limits?
21       A.    No.
22       Q.    Are you aware that in another article --
23  that's number 19 --
24             MR. JONES:  This is 18.
25       Q.    (By Ms. Lowry)  -- that Commissioner
```

David Chandler 11/29/2018

```
 1    Dickinson says, according to something on page 3 of
 2    the article --
 3              MS. RACHAL:  Counsel, could you please
 4         state which exhibit?  Sorry.
 5              MS. LOWRY:  I'm sorry.  It is
 6         Exhibit 19, and it is on page 3.
 7              MR. JONES:  Is this the same article?
 8              MS. LOWRY:  Uh-huh (affirmative
 9         response).
10         Q.   (By Ms. Lowry)  "But Dickinson said Monday
11    that the deficit has nothing to do with the
12    accusation of noncompliance.  In fact, he said, the
13    agency wasn't on track to comply with the settlement
14    long before the deficit was uncovered, bolstering
15    claims he has made since January that the agency was
16    already in disarray when he came on-board last
17    fall."
18              So are you aware that Commissioner
19    Dickinson had said this in a newspaper article or
20    he's alleged to have said it in a newspaper article?
21         A.   No.  There again, we are two different
22    people, now, really.  We both might -- might look
23    at a coon dog, and I'd see it as one I wanted to
24    own and could do a good job, and Jess -- Jess
25    might -- might not give a dime for that dog.
```

David Chandler 11/29/2018

```
 1        Q.    I'd like to also call your attention
 2   to -- another article which we're going to mark as
 3   Exhibit 20.
 4              (Exhibit 20 marked for identification.)
 5        Q.    (By Ms. Lowry)  I'd like to direct your
 6   attention to page 5 of that article.
 7        A.    Nice picture of Tracy.  Did you see
 8   that?
 9        Q.    Okay.  To the paragraph at the next --
10   second from the bottom of the page, starting in
11   April.  And the paragraph says, "In April,
12   Dickinson told Mississippi Today that 'I have
13   nobody to be able to explain to me how this
14   happened.'
15              His guess, he said, was that the 2018
16   deficit was caused by the agency leadership's
17   attempt to get the Legislature to increase
18   spending authority for the new agency."
19   Continues, "They overrepresented expenses, he
20   said, they overrepresented revenues, but in an
21   attempt to arrive at a correct bottom line, which
22   they never did, Dickinson said in April."  That's
23   what that said.
24              Do you agree with that statement?
25        A.    Well, I agree with two words in it.
```

David Chandler 11/29/2018

```
 1        Q.    What are the two words?

 2        A.    "His guess."

 3        Q.    Okay.  Did he ever ask you about any of

 4   these things that he's quoted as saying in these

 5   articles?

 6        A.    About what now?

 7        Q.    Did you -- did he ever ask you about

 8   these things he's quoted as saying in these

 9   articles?

10        A.    What are the things?

11        Q.    Well, there are several things that I

12   pointed out to you about the fact that there was

13   overrepresentation of expenses,

14   underrepresentation of income, that the

15   information appeared unclear, that the

16   organization was in disarray when he got there.

17             Did he ever say anything to you about

18   those things or say, hey, what a mess you left me

19   with or anything like that?

20        A.    No, he -- he -- he never did.  But now,

21   let me say this, and I'm not sure who will agree

22   with this, but I hope most would.  I was proud and

23   remain proud of the good work we did while I was

24   there.  But I can't take credit for much of it.

25             The people who made the agency what it
```

David Chandler 11/29/2018

1    was was Will Simpson, John Davis, Tracy Malone,

2    Takesha Darby, Kristi Plotner, Cindy Greer and

3    Seth Shannon.

4             All of those people, as a group, I'm

5    telling you now are much -- their sum is much

6    greater than their individual parts, and -- and I

7    mentioned earlier my experience at evaluating

8    folks' potential.  It's more than aptitude.

9             You know, when you have a group of

10   people like that working together, there has to be

11   cohesion, and -- and that group, they -- they

12   referred to themselves, those deputies, as the

13   "Dream Team."

14            They were convinced that they did -- and

15   still are today.  They were convinced, as I was,

16   that they were doing good work for the citizens of

17   this state looking after the children.  And I was

18   convinced of that as well.

19        Q.   And you know that at least the numbers

20   of that "Dream Team" from CPS, almost all of them

21   are now gone?  Do you know that?

22        A.   Well, I'm not sure who remains, but I

23   know some of them are gone.

24        Q.   Certainly the -- most of the deputies

25   are gone, I think all but one.

David Chandler 11/29/2018

```
1        A.    Takesha, Cindy, Tracy, Kristi, yeah.

2        Q.    They're all gone.  All right.  You --

3        A.    But now, Will and John Davis remain.

4        Q.    Right.  They don't work for CPS.

5        A.     They don't work for them, but, you know,

6    I could -- I could see them putting the thing back

7    together, if -- if it's apart.

8        Q.    You made a response to some of the

9    things that Jess Dickinson had said in Exhibit 19,

10   and you stated, "The governor had a liaison" --

11   where is that?

12          It's on page 4, and it says, "The

13   governor had a liaison who monitors all CPS

14   activities, including the preparation of the

15   budget.  The liaison reports directly to the

16   governor.  The budget was reviewed and approved by

17   the governor's office.

18          I have talked with every employee who

19   held a management position in my administration,

20   and they unanimously agree that during our entire

21   administration, one, we always met all the

22   requirements of the Federal Court order, and we

23   accomplished this within budget; two, at my

24   departure, we were confident that the foundation

25   we had established would enable CPS to continue
```

David Chandler 11/29/2018

1    meeting all the requirements of the Federal Court
2    order within the budget; three, despite all
3    challenges of the federal litigation, we made sure
4    every single day our focus was on the best
5    interest of every single Mississippi child."
6              Is that an accurate statement?
7        A.    Yes; yes, that's accurate.  I mean, you
8    know, I think it clearly stated the condition of
9    the agency.  But now -- and I don't want to get
10   into a debate over this thing, but, you know, I
11   could have been wrong.  I don't think I was.
12             MS. LOWRY:  Okay.  I think we'll take a
13        break.
14             (A short break was taken.)
15             MS. LOWRY:  I have no further questions
16        for this witness.
17   EXAMINATION BY MS. RACHAL:
18        Q.    I have just a few follow-up questions,
19   Justice Chandler.
20             Is it correct that you left the agency
21   approximately September 15th of 2017?
22        A.    I think that's right.  Now, honestly, I
23   could be wrong with that date, but I think it was
24   September the 15th.
25        Q.    Is it correct that you have no personal

David Chandler 11/29/2018

1    knowledge of what occurred at the agency after you

2    left the agency?

3         A.    Yes, absolutely, that's right.  And let

4    me tell you, you know that one exhibit she took --

5    she showed me that, that memo from Takesha?

6         Q.    Yes.

7         A.    I noticed on the front page, it had

8    Commissioner Dickinson.  On the second page, it

9    had David Chandler.  So I think that's when the

10   transition took place.

11        Q.    Okay.  Is it correct that based on the

12   time that you left the agency, it was your belief

13   that there was sufficient funding available to

14   cover the needs of Olivia Y.?

15        A.    Yes.

16        Q.    And is it correct that you conveyed that

17   belief to Justice Dickinson?

18        A.    Well -- well, now, here's what -- I

19   don't remember specifically saying, "Jess, there

20   are sufficient funds to meet the requirements of

21   Olivia Y." but -- but I certainly conveyed to Jess

22   my belief that funds were sufficient.

23              You know, here's what I may have said.

24   There -- there's plenty of money to do what you

25   need to do, but -- and -- and -- and, you know,

David Chandler 11/29/2018

```
1    plenty to me -- "plenty" to me because of my
2    rather meager upbringing as it relates to
3    finances, not as it relates to any -- anything
4    else, I consider myself a very fortunate person to
5    have grown up like I did with all of the benefits
6    that I had.
7            I had the benefit of working as the
8    janitor at our local bank beginning when I was in
9    the eighth grade, and I was fortunate enough to
10   have that benefit continue until I graduated from
11   high school.
12           And -- and along with that marvelous
13   opportunity came the benefit of walking to the
14   bank one mile every morning before school and
15   cleaning it up and then walking to school.
16           Think -- think of what a marvelous
17   opportunity I had as a child, along with my other
18   seven siblings, to -- to be brought up in a -- in
19   an environment, in an atmosphere like that, I was
20   fortunate.
21           But back then, in my entire life, plenty
22   of money to us might have been having a -- a
23   couple of dollars for the family or having a
24   quarter to eat in the lunch room cafeteria,
25   whereas someone else who grew up differently might
```

David Chandler 11/29/2018

```
 1    look at that figure and think how deprived they
 2    are.
 3              So I always presumed, based on my
 4    background and everything -- everything comes to a
 5    person and is assimilated by that individual based
 6    on his background and other factors, but based on
 7    my background, I always presumed it was plenty of
 8    money.
 9              MS. RACHAL:  I have no further
10        questions.
11              MS. LOWRY:  I have nothing further.  I
12        think the deposition is concluded.
13              MS. RACHAL:  Thank you.
14              (Time Noted:  12:10 p.m.)
15                SIGNATURE/NOT WAIVED
16
17    ORIGINAL:  MARCIA ROBINSON LOWRY, ESQ.
18    COPY:  J. LAWRENCE JONES, ESQ.
19
20
21
22
23
24
25
```

David Chandler 11/29/2018

```
 1              CERTIFICATE OF DEPONENT
 2   DEPONENT:  DAVID CHANDLER
     DATE:  November 29, 2018
 3   CASE STYLE:  OLIVIA Y., ET AL. vs. PHIL BRYANT, ET
     AL.
 4   ORIGINAL TO:  MARCIA ROBINSON LOWRY, ESQ.
                 I, the above-named deponent in the
 5   deposition taken in the herein styled and numbered
     cause, certify that I have examined the deposition
 6   taken on the date above as to the correctness
     thereof, and that after reading said pages, I find
 7   them to contain a full and true transcript of the
     testimony as given by me.
 8              Subject to those corrections listed
     below, if any, I find the transcript to be the
 9   correct testimony I gave at the aforestated time
     and place.
10   Page     Line                    Comments
11   ____     ____     _____
     ____     ____     _____
12   ____     ____     _____
     ____     ____     _____
13   ____     ____     _____
     ____     ____     _____
14   ____     ____     _____
     ____     ____     _____
15   ____     ____     _____
     ____     ____     _____
16   ____     ____     _____
     ____     ____     _____
17   ____
18        This the ____ day of _____, 2018.
19                          _____
                            DAVID CHANDLER
20   State of Mississippi
     County of _____
21
          Subscribed and sworn to before me, this the
22   _____ day of _____, 2018.
23   My Commission Expires:
24   _____    _____
25                                  Notary Public
```

```
1              CERTIFICATE OF COURT REPORTER

2              I, Ginger H. Brooks, Court Reporter and

3    Notary Public, in and for the State of

4    Mississippi, hereby certify that the foregoing

5    contains a true and correct transcript of the

6    testimony of DAVID CHANDLER, as taken by me in the

7    aforementioned matter at the time and place

8    heretofore stated, as taken by stenotype and later

9    reduced to typewritten form under my supervision

10   by means of computer-aided transcription.

11              I further certify that under the

12   authority vested in me by the State of Mississippi

13   that the witness was placed under oath by me to

14   truthfully answer all questions in the matter.

15              I further certify that, to the best of

16   my knowledge, I am not in the employ of or related

17   to any party in this matter and have no interest,

18   monetary or otherwise, in the final outcome of

19   this matter.

20              Witness my signature and seal this the

21   10th day of December, 2018.

22

23                          _____
                            GINGER H. BROOKS, #1165
24                          CRR, RPR, CCR
     My Commission Expires:
25   September 18, 2021
```