# Olivia Y., Jamison J., et al. V. Phil Bryant, Donald Taylor, et al.

## Tonya Rogillio

### November 27, 2018

All depositions & exhibits are available for downloading at
<www.brookscourtreporting.com>
Please call or e-mail depo@brookscourtreporting.com if you need a **Username** and **Password**.



Mississippi - Louisiana - Tennessee - New York
1-800-245-3376



EXHIBIT
u

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

OLIVIA Y., BY AND THROUGH HER NEXT
FRIEND, JAMES D. JOHNSON; JAMISON J.,
BY AND THROUGH HIS NEXT FRIEND,
CLARA LEWIS; DESIREE, RENEE, TYSON,
AND MONIQUE P., BY AND THROUGH THEIR
NEXT FRIEND, SYLVIA FORSTER; JOHN A.,
BY AND THROUGH HIS NEXT FRIEND,
JAMES D. JOHNSON; CODY B., BY AND
THROUGH HIS NEXT FRIEND, SHARON SCOTT;
MARY, TOM, MATTHEW, AND DANA W., BY AND
THROUGH THEIR NEXT FRIEND, ZELATRA W.;
AND SAM H., BY AND THROUGH HIS NEXT
FRIEND, YVETTE BULLOCK; ON THEIR OWN
BEHALF AND BEHALF OF ALL OTHERS SIMILARLY
SITUATED
                                              PLAINTIFFS
V.         CIVIL ACTION NO. 3:04-CV-251-TSL-FKB
PHIL BRYANT, AS GOVERNOR OF THE STATE OF
MISSISSIPPI; DONALD TAYLOR, AS EXECUTIVE
DIRECTOR OF THE DEPARTMENT OF HUMAN
SERVICES; AND BILLY MANGOLD, AS DIRECTOR
OF THE DIVISION OF FAMILY AND CHILDREN'S
SERVICES
                                              DEFENDANTS

DEPOSITION OF TONYA ROGILLIO

Taken at the instance of the Plaintiffs at
Bradley, LLP 188 East Capitol Street, Suite 400
Jackson, Mississippi, on Tuesday,
November 27, 2018, beginning at 1:26 p.m.


REPORTED BY:
GINGER H. BROOKS, CCR #1165
CRR, RPR, CRC, CCR, CLR, RSA

```
 1    APPEARANCES:
 2
 3         MARCIA ROBINSON LOWRY, ESQ.
           DAWN J. POST, ESQ.
 4         A Better Childhood, Inc.
           355 Lexington Avenue, Floor 16
 5         New York, New York 10011
           mlowry@abetterchildhood.org
 6         dpost@abetterchildhood.org
 7
                COUNSEL FOR PLAINTIFFS
 8
 9
           J. LAWRENCE JONES, ESQ.
10         KENYA KEY RACHAL, ESQ.
           Baker Donelson
11         100 Vision Drive, Suite 400
           Jackson, Mississippi 39211
12         jjones@bdbc.com
           krachal@bakerdonelson.com
13
14
           WILLIAM M. SIMPSON II, ESQ.
15         Office of the Governor
           4500 I-55 North, Suite 278
16         Jackson, Mississippi 39211
           will.simpson@governor.ms.gov
17
18              COUNSEL FOR DEFENDANTS
19
20    ALSO PRESENT:   Earl Scales
21
22
23
24
25
```

```
 1                    INDEX
 2   Style and Appearances......................1
 3   Index     ...............................3
 4   Certificate of Deponent  .................14
 5   Certificate of Court Reporter ............15
 6                 EXAMINATIONS
 7   Examination By Ms. Lowry ..................4
 8   Examination By Ms. Rachal ................12
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                TONYA ROGILLIO,
 2   having been first duly sworn, was examined and
 3   testified as follows:
 4   EXAMINATION BY MS. LOWRY:
 5        Q.   Could you state your name for the
 6   record, please?
 7        A.   Tonya Rogillio.
 8        Q.   And are you employed by MDCPS?
 9        A.   Yes, ma'am.
10        Q.   And what is your position?
11        A.   Deputy Commissioner of child welfare.
12        Q.   How long have you been in that position?
13        A.   Five months, since July 1.
14        Q.   And what position -- well, were you
15   employed by MDCPS before that?
16        A.   Yes.
17        Q.   And what was your position before that?
18        A.   Prior to that, I was the deputy director
19   for field support programs.
20        Q.   And how long were you in that position?
21        A.   Approximately a year.
22        Q.   And were you employed by MDCPS before
23   that?
24        A.   Yes.
25        Q.   How long altogether have you been
```

```
 1   employed by MDCPS?
 2       A.   I started with the agency in 1997, but
 3   I've left twice, so I think I've got a total of 18
 4   years with the agency, with 20 years in child
 5   welfare.
 6       Q.   And how long have you been back for this
 7   episode?
 8            So you were there for five months one
 9   year, and then how much longer than that?
10       A.   Since January of 2014.  Prior to that, I
11   was only gone for a year.  It gets -- gets
12   confusing, but I was regional director from 2006
13   through 2012, and then I was recruited and went to
14   work for the University of Mississippi doing
15   training for the agency when the training was
16   contracted out, so I actually worked for Ole
17   Miss for a year doing training but then came back
18   in 2014 to develop and build the special
19   investigations unit and have been here ever since.
20       Q.   Okay.  What are your responsibilities in
21   your current position?
22       A.   Currently I manage or directly supervise
23   three -- they're title -- their official title is
24   office director, but functionally we refer to them
25   as deputy directors who are over the field, and we
```

```
 1   have the state divided into east, west and south,
 2   so those three directors manage all field -- you
 3   know, the frontline workers is what I'm trying to
 4   get out, all frontline staff.  And then
 5   additionally, I supervise another deputy director
 6   who is over permanency support services.  So I
 7   directly manage four deputy directors.
 8        Q.   Okay.  Do you have any familiarity with
 9   the financial situation of the agency at the
10   current time?
11        A.   Not at a granular level.
12        Q.   Okay.  Are you familiar with the 2015
13   analysis that was done by Public Catalyst?
14             Let me ask you this first.  Are you
15   aware what Public Catalyst is?
16        A.   Yes.
17        Q.   Okay.  And are you familiar with the
18   report they did in 2015?
19        A.   I know they've done a number of reports,
20   so which one, specifically?
21        Q.   The organizational analysis?
22        A.   I'm aware that one was conducted.
23        Q.   Okay.  But you don't remember
24   particularly reading it?
25        A.   No.
```

```
 1      Q.   Okay.  Do you agree that caseloads are
 2 an important consideration when running a child
 3 welfare system?
 4      A.   Yes, I agree they're an important
 5 consideration.
 6      Q.   Okay.  And do you think it's important
 7 to limit the number of cases that workers have?
 8      A.   Yes.
 9      Q.   Do you think there's a number that you
10 can arrive at that caseloads should generally be
11 limited to?
12      A.   I don't think you can come to a hard and
13 fast bright-line number.  I think there's
14 guidelines that need to be considered but then
15 have some flexibility either above or below.
16      Q.   Okay.  And are you familiar with the
17 recruitment, hiring and retention plan that the
18 agency did in 2016, MDCPS I mean?
19      A.   I'm aware that they did one.
20      Q.   Okay.  And do you recall whether it
21 called for the hiring of more workers?
22      A.   I do not.
23      Q.   In your current position, do you have
24 any responsibility for ensuring that caseloads are
25 reasonable for workers?
```

```
 1      A.    Yes.
 2      Q.    And how do you do that?
 3      A.    How do we ensure that they're
 4 reasonable?
 5      Q.    Uh-huh (affirmative response).
 6            First of all, what's a reasonable
 7 caseload for workers?
 8      A.    That's an extremely difficult question
 9 to answer.  There's so many variables that have to
10 be taken into account to come to what's
11 reasonable.
12            I mean, my -- hopefully, we can work
13 with Public Catalyst to -- to develop something
14 and do a new analysis or different analysis and
15 come to some answer on that on what's reasonable.
16      Q.    I see.  And you're aware that Public
17 Catalyst did set a caseload limit and that the MSA
18 has a caseload limit; is that right?
19      A.    I am aware of that, yes.
20      Q.    Right.  But the agency doesn't like it?
21      A.    Those -- the standards that are in the
22 MSA were based on an agency analysis that was done
23 some time ago.  So, so many things have changed
24 and so many things are different that I would like
25 to see a new analysis and something be updated.
```

 1       Q.    So what kinds of things have changed?
 2       A.    Oh, my goodness.  The basic philosophy
 3  of child welfare, national standards of best
 4  practice, the focus that we're seeing more and
 5  more on prevention services, basis -- versus
 6  foster care, the focus on timely permanency.
 7             Lots of things have changed, you know,
 8  in general, in a big macro, but then at a more
 9  micro level, some things have changed within the
10  agency as far as what is required, since that was
11  done in 2005 and 2006 as far as us -- you know, we
12  didn't implement our practice model or start
13  implementation until 2009, 2010, that required
14  some additional steps and more family-centered
15  practice.  Just lots of changes that I would like
16  to see taken into -- into account with a
17  different -- with an analysis of what's a
18  reasonable workload.
19       Q.    I see.  I see.  And do you think it's
20  possible to set a caseload that has a reasonable
21  range in it?
22       A.    I do think that would be possible.
23       Q.    Do you think the caseloads that the
24  agency has now are manageable?
25       A.    That the agency has now?

```
 1        Q.    Uh-huh (affirmative response).
 2        A.    Based on a weighted matrix that we
 3   currently have?
 4        Q.    I just mean do you think -- the agency
 5   now has workers, and the workers have caseloads.
 6        A.    Right.
 7        Q.    Do you think that the caseloads are
 8   reasonable?
 9        A.    Yes.
10        Q.    Okay.
11        A.    And, again, there are so many variables
12   it's really difficult to answer yes or no.
13              MS. LOWRY:  Can we just take a minute?
14              (A short break was taken.)
15        Q.    (By Ms. Lowry)  So we've had testimony
16   from Jaworski Davenport who said that he thought
17   that some memos might have gone out to the field
18   talking to them about closing cases, and he thought
19   that they -- that you might have sent one or more of
20   those.
21              Do you remember sending any memos to the
22   field since you've had your position, your current
23   position?
24        A.    I did.  I sent an -- what we refer to as
25   an E bulletin which is our internal communication
```

```
 1   system regarding caseload management.  I don't
 2   remember if it specifically talked about closing
 3   cases, but it may have.
 4        Q.   Okay.
 5        A.   I'd like to see it.  Do you have a --
 6        Q.   I don't have a copy of it.  I'd like to
 7   see it, too.
 8        A.   Okay.
 9        Q.   So we share that.
10        A.   Yes.
11        Q.   No, I wouldn't ask you questions about
12   something that I didn't have to show you, for
13   sure.  I wouldn't do that.
14        A.   But yes, I did send out an E bulletin
15   regarding caseload management.
16        Q.   Okay.  And do you remember about when it
17   was?
18        A.   I've only been in the job five months.
19   It was probably, I think, September.
20        Q.   Okay.  All right.  So we're just going
21   to -- we'll put this in a letter, but we'll just
22   request that document.  It will be up to your
23   lawyers about producing it for us, not you.  Okay?
24             MS. LOWRY:  All right.  We have no
25        further questions for you.  Thank you so much
```

```
 1        for coming in and thank you for accommodating
 2        our schedule.
 3   EXAMINATION BY MS. RACHAL:
 4        Q.   I do have one question.
 5        A.   Sure.
 6        Q.   What steps has CPS taken to try to meet
 7   that 90 percent caseload compliance cap?
 8        A.   Now, as Marcia mentioned, and
 9   obviously I should have read it before I come,
10   but recruitment and retention -- recruiting
11   workers and retaining workers is, of course, the
12   key to caseload management, so we've taken lots of
13   steps toward effective recruitment.
14             We've had career fairs.  We have spoken
15   at the University, just really trying to recruit
16   a -- a good, robust workforce to meet the caseload
17   standard, and once we get them working for us
18   trying to retain them, we have implemented salary
19   increases.
20             Our frontline workers got a raise,
21   trying to equip them with the most effective
22   technology we can as far as smartphones and
23   tablets.  All of our staff have those.
24             Trying to make sure we have the staff
25   and then workload distribution.  We're really
```

```
 1   doing that in a data-driven manner.
 2              We look at the data on both caseloads
 3   and staffing really on a daily basis from our data
 4   dashboard, focus on data to make sure that we've
 5   got our workload distributed in the most effective
 6   way to try to kind of meet caseloads but still do
 7   that in a way that's not harmful to children and
 8   families or our staff.
 9              MS. RACHAL:  No further questions.
10              MS. LOWRY:  Okay.  Thank you so much.
11                 (Time Noted:  1:41 p.m.)
12                  SIGNATURE/NOT WAIVED
13
14   ORIGINAL:  MARCIA ROBINSON LOWRY, ESQ.
15   COPY:  J. LAWRENCE JONES, ESQ.
16
17
18
19
20
21
22
23
24
25
```

Tonya Rogillio 11/27/2018

```
 1              CERTIFICATE OF DEPONENT
 2   DEPONENT:  TONYA ROGILLIO
     DATE:  November 27, 2018
 3   CASE STYLE:  OLIVIA Y., ET AL. vs. PHIL BRYANT, ET
     AL.
 4   ORIGINAL TO:  MARCIA ROBINSON LOWRY, ESQ.
             I, the above-named deponent in the
 5   deposition taken in the herein styled and numbered
     cause, certify that I have examined the deposition
 6   taken on the date above as to the correctness
     thereof, and that after reading said pages, I find
 7   them to contain a full and true transcript of the
     testimony as given by me.
 8           Subject to those corrections listed
     below, if any, I find the transcript to be the
 9   correct testimony I gave at the aforestated time
     and place.
10   Page        Line                Comments
     ____        ____        _____
11   ____        ____        _____
                             _____
12   ____        ____        _____
                             _____
13   ____        ____        _____
                             _____
14   ____        ____        _____
                             _____
15   ____        ____        _____
                             _____
16   ____        ____        _____
                             _____
17   ____        ____        _____
18           This the ____ day of _____, 2018.
19                      .
                                 _____
                                 TONYA ROGILLIO
20   State of Mississippi
     County of _____
21
             Subscribed and sworn to before me, this the
22   _____  day of _____, 2018.
23   My Commission Expires:
24   _____   _____
25                                          Notary Public
```

```
 1              CERTIFICATE OF COURT REPORTER
 2              I, Ginger H. Brooks, Court Reporter and
 3   Notary Public, in and for the State of
 4   Mississippi, hereby certify that the foregoing
 5   contains a true and correct transcript of the
 6   testimony of TONYA ROGILLIO, as taken by me in the
 7   aforementioned matter at the time and place
 8   heretofore stated, as taken by stenotype and later
 9   reduced to typewritten form under my supervision
10   by means of computer-aided transcription.
11              I further certify that under the
12   authority vested in me by the State of Mississippi
13   that the witness was placed under oath by me to
14   truthfully answer all questions in the matter.
15              I further certify that, to the best of
16   my knowledge, I am not in the employ of or related
17   to any party in this matter and have no interest,
18   monetary or otherwise, in the final outcome of
19   this matter.
20              Witness my signature and seal this the
21   6th day of December, 2018.
22
23                         _____
                           GINGER H. BROOKS, #1165
24                         CRR, RPR, CCR
     My Commission Expires:
25   September 18, 2021
```