# EXHIBIT A



RECEIVED

JUN 10 2019

TOM S. LEE
U.S. DISTRICT JUDGE

# Progress of the Mississippi Department of Child Protection Services

Monitoring Report for *Olivia Y., et al. v. Bryant, et al.*
2ND MODIFIED MISSISSIPPI SETTLEMENT AGREEMENT
AND REFORM PLAN

**REPORT 6**

**JANUARY TO DECEMBER 2018**

**ISSUED JUNE 11, 2019**



**PUBLIC CATALYST**

# CONTENTS

Introduction ................................................................................................................. 3

  Summary of Progress and Challenges ..................................................................... 4

  2018 Summary of Commitments ............................................................................ 7

  Methodology ........................................................................................................ 19

  Demographics ....................................................................................................... 19

  Creation of the Mississippi Department of Child Protection Services ................. 22

  Operational Budget .............................................................................................. 23

1. Systemic Infrastructure Standards ..................................................................... 23

  Department Leadership ....................................................................................... 23

  Staff Qualifications and Training .......................................................................... 24

  Caseloads and Supervision .................................................................................. 27

  Continuous Quality Improvement ....................................................................... 29

  Management Information Systems & Data Reporting .......................................... 30

  Performance Based Contracting .......................................................................... 35

  Foster Care Maintenance Payments .................................................................... 36

2. Child Safety and Maltreatment in Care .............................................................. 37

  Screening Reports of Abuse and Neglect ............................................................ 38

  Investigating Maltreatment in Care ..................................................................... 40

3. Family-Based Placements ................................................................................... 48

4. Placement Standards .......................................................................................... 54

5. Visitation ............................................................................................................ 60

  Worker Contact and Monitoring ......................................................................... 60

  Developing and Maintaining Connections ........................................................... 64

6. Child and Youth Permanency .............................................................................. 64

  Comprehensive Family Service Plans ................................................................... 64

  Concurrent Permanency Planning ....................................................................... 66

  Permanency Case Goals ....................................................................................... 67

  Permanency Reviews ........................................................................................... 71

Permanency Performance Indicators............................................................................................. 73

7. Transition to Independent Living ............................................................................................. 74

8. Child Well-Being......................................................................................................................... 78

Physical and Mental Health Care ............................................................................................ 78

Educational Services.................................................................................................................. 80

## FIGURES

Figure 1. Age of Children in Custody on December 31, 2018 ..................................................... 20
Figure 2. Placement Types of Children in Custody on December 31, 2018.............................. 21
Figure 3. Length of Stay in Care of Children in Custody on December 31, 2018 .................... 21
Figure 4. Percent of Workers Meeting the Caseload Standard, 2018 ...................................... 28
Figure 5. Percent of Caseworker Supervisors Meeting the Supervision Ratio Standard, 2018 ............... 28
Figure 6. Worker-Child Visitation, 2018........................................................................................ 61
Figure 7. Worker-Foster Parent Visitation, 2018 ........................................................................ 63

## TABLES

Table 1. Race of Children in Custody on December 31, 2018....................................................... 20
Table 2. Exits from Care by Exit Type, January 1, 2018 to December 31, 2018.......................... 22
Table 3. Federal Goals for Children in Custody as of December 31, 2018.................................. 22
Table 4. 2nd MSA Caseload Standards by Case Type ..................................................................... 27
Table 5. Current Resource Board Payment Schedule .................................................................. 37
Table 6. ANE Reports by Intake Action, 2018 ............................................................................... 38
Table 7. Licensure Status of Homes, 2018 .................................................................................... 50
Table 8. Non-relative Foster Homes Licensed, 2018 ................................................................... 53
Table 9. Special Needs Board Rates................................................................................................ 55
Table 10. Successive Emergency Shelter Placements, 2018........................................................ 60
Table 11. Worker-Child Visitation Narrative Review, 2018 ......................................................... 61
Table 12. Worker-Parent Visitation Narrative Review, 2018....................................................... 63
Table 13. Permanency Outcome Performance Standards............................................................ 73
Table 14. Youth Receiving Independent Living Skills, 2018 ......................................................... 76

# Introduction

This document serves as the sixth report to the Honorable Tom S. Lee of the United States District Court for the Southern District of Mississippi, Northern Division in the matter of *Olivia Y. v. Bryant*. On December 19, 2016, the State of Mississippi, the Mississippi Department of Child Protection Services (MDCPS) and A Better Childhood, counsel for the plaintiffs, jointly submitted to the court a 2nd Modified Mississippi Settlement Agreement and Reform Plan (the "2nd MSA") that provides a path for improvement of Mississippi's child welfare system. Judge Lee had previously entered as orders of the court the Mississippi Settlement Agreement and Reform Plan on January 4, 2008 (the "Initial Settlement Agreement") and the Modified Mississippi Settlement Agreement and Reform Plan on July 6, 2012. MDCPS is the statewide child welfare agency that provides child protection, abuse prevention and placement services on behalf of the State of Mississippi. A Better Childhood is a national advocacy organization with experience in class action litigation on behalf of children in child welfare systems. Judge Lee entered an order directing implementation of the 2nd MSA following its submission by the parties.

In sum, the 2nd MSA, which became effective on January 1, 2018, sets forth the child welfare infrastructure, standards and outcomes that Mississippi must meet within specific timeframes statewide. Specifically, the 2nd MSA:

- Provides the plaintiff class relief by committing MDCPS to specific improvements in the state's care for vulnerable children, with respect to their safety, permanency, and well-being;

- Requires the implementation of a comprehensive child welfare data and tracking system, with the goal of improving MDCPS' ability to account for and manage its work with vulnerable children;

- Establishes benchmarks and performance standards in order to prevent harm to children in the class; and

- Provides a clear path for MDCPS to exit court supervision after the successful achievement and maintenance of performance standards.

Pursuant to the 2nd MSA, the Court appointed Public Catalyst as the monitor, charged with reporting on MDCPS' progress implementing its commitments. The monitor is responsible for assessing the state's performance under the 2nd MSA. The parties agreed the monitor shall take into account timeliness, appropriateness and quality in reporting on MDCPS' performance. The monitor is required to verify data reports and statistics provided by MDCPS and shall periodically conduct case record and qualitative reviews to monitor, evaluate and validate the state's

performance with respect to the commitments in the 2nd MSA. In evaluating MDCPS' performance, the monitor is not required to draw a conclusion as to whether the Department has achieved or maintained substantial compliance in accordance with Sections 11.2 and 11.3 of the 2nd MSA and has not done so.

The monitor is required to provide a written report to the Court and the parties no less frequently than annually. This is the monitor's first report to the Court under the 2nd MSA and reflects the status of Mississippi's performance as of December 31, 2018. This report includes MDCPS' progress for the entirety of calendar year 2018.

## Summary of Progress and Challenges

Of 113 commitments due in 2018 in the 2nd MSA, the monitor confirmed that MDCPS met required performance standards 37 times and did not do so in at least 35 other areas. The Department did not provide data for an additional 18 commitments, and the monitoring team could not validate quantitative data submitted by MDCPS for another 23 commitments. The 41 commitments for which MDCPS either did not provide data or provided inaccurate data that cannot be validated are listed in the Summary of Commitments and the relevant sections of this report. MDCPS' substantial and ongoing data problems include the manner in which the Department documents and identifies certain data fields, coding errors and performance calculations that are inconsistent with the established rules. These deficits create blind spots that impair MDCPS management's ability to lead the Department and ensure the safety, well-being and permanency of children consistent with the 2nd MSA.

Among the areas where MDCPS showed progress in 2018 are:

- *Staff Qualifications:* MDCPS reported that caseworkers hired in 2018 possessed an approved degree. MDCPS also reported caseworker supervisors appointed during 2018 possessed an approved degree and the requisite years of experience.

- *Training:* During 2018, the MDCPS Office of Professional Development administered staff training and professional development to the workforce. MDCPS reported that the newly hired workers requiring training completed pre-service training during the period and workers hired into their positions late in the period were enrolled in training that ended in the first quarter of 2019. Additionally, all caseworkers and investigators received the required 20 or more in-service training hours and all supervisors received the required 12 or more in-service training hours during 2018. Finally, MDCPS provided information indicating that caseworker supervisors appointed in 2018 met the 90-day requirement for training completion.

- *New Non-relative Homes*: MDCPS licensed 431 new non-relative foster homes in 2018, exceeding the annual target of 400 homes established by the monitor after consultation with the Department.
- *Post-Adoption Services:* MDCPS established a system of statewide post-adoptive services to stabilize and maintain adoptive placements. Adoptive families eligible for adoption subsidies have access to these services which include counseling, crisis intervention, family preservation and stabilization services and peer support.

Among the areas where MDCPS did not meet the identified performance standard are several critical to child safety, including:

- *Caseloads:* The parties agreed MDCPS would build capacity in 2017 to achieve reasonable workload standards by the start of 2018 for at least 90 percent of its caseworkers. The parties negotiated and agreed upon the standards for caseworkers in 2016, but MDCPS did not meet the standard for its staff at any time in 2018. Performance varied between a high of 60 percent in the first quarter of 2018 to a low of 47 percent in the third quarter.

- *Screening Child Maltreatment in Care (MIC)*: MDCPS agreed to ensure that it maintains a statewide system to appropriately receive, screen and investigate reports of child maltreatment, but many features of the system lack adequate quality controls. For example, MDCPS screened out 656 maltreatment reports involving children in custody during 2018. MDCPS reported that the Department's Safety Review Unit (SRU) conducted reviews of 409 of the 656 screened-out MIC reports (62.3 percent) in 2018, although it is required to review them all. SRU determined only one report was inappropriately screened-out and returned it for investigation, but the referral was not subsequently investigated.

- *Investigating Maltreatment in Care*: The monitoring team conducted a qualitative review of all MIC investigations completed by the Special Investigations Unit (SIU) during the first quarter of 2018 where the alleged perpetrator was a non-relative foster parent, relative foster parent, or residential facility staff member. This included 82 investigations involving 153 children. The monitoring team concluded the evidence supported MDCPS' findings in 58 of 82 investigations (70.7 percent). The monitoring team concluded in 14 investigations (17.1 percent) more information was needed in order to draw a proper conclusion. There were ten investigations (12.2 percent) where some or all the allegations were found to be unsubstantiated by MDCPS, but the monitoring team concluded that information presented during the course of the investigation was sufficient to substantiate.

5

- *Reviewing Maltreatment In Care Investigations*: Within 30 calendar days of the completion of any investigation of maltreatment of a child in custody, SRU must review the maltreatment investigation to identify any case practice deficiencies in the investigation and any remedial actions necessary to ensure the safety of the child who is the subject of the investigation, as well as any other children in the home or placement. The monitoring team determined that SRU conducted reviews of only 325 (65.9 percent) of 493 investigations in 2018. The monitoring team reviewed SRU reports for 82 MIC investigations from the first quarter of 2018 and observed that SRU noted case practice deficiencies in 14 of the SRU reports. Specific remedial actions and timeframes to address these deficiencies were not identified in the SRU reports.

- *Maltreatment in Care:* Data provided by MDCPS and verified by the monitoring team indicate that 95 children in MDCPS' custody were victims of abuse or neglect by their caregivers, a rate of child maltreatment that is more than three times the standard agreed upon in the 2nd MSA. MDCPS should have protected at least 68 more children from abuse or neglect in their placements in 2018 in order to meet the agreed upon safety standard.

## 2018 Summary of Commitments

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| STRO 2.a | Complete the creation and implementation of a fully functional child welfare agency, MDCPS, which is independent of, although housed within, the Mississippi Department of Human Services (MDHS), not later than July 1, 2018. | Yes | 22 |
| 2nd MSA Introduction | Defendants shall request state funds and any federal/special fund authorization sufficient to effect the provisions and outcome measures set forth in the 2nd MSA. | Yes | 23 |
| SYSTEMIC INFRASTRUCTURE STANDARDS | | | |
| 1 | MDCPS shall maintain a Commissioner of Child Protection Services having responsibility for the oversight and management of the MDCPS. | Yes | 23 |
| 1.1.a | MDCPS shall hire caseworkers who have, at minimum, a bachelor's degree in social work or a related human services degree. The monitor shall review and determine which degrees qualify as related human services degrees. | Yes | 24 |
| 1.1.b | MDCPS shall hire or promote to the position of caseworker supervisor only persons who have a master's degree in social work or a related human services degree and two years of experience working with children and families, preferably in foster care; or a bachelor's degree in social work or a related human services degree with three years of experience working with children and families, preferably in foster care. | Yes | 24 |
| 1.2.a | MDCPS shall maintain a Training Unit headed by a qualified director of training (see 2nd MSA for full requirements of the Training Unit). | Yes | 25 |
| 1.2.b | MDCPS caseworkers shall receive a minimum of 270 hours of pre-service training, which includes instructional training and supervised field training, and may include E-Learning. Any E-Learning training is subject to the approval of the monitor (see 2nd MSA for more info). | Yes | 25 |
| 1.2.c | MDCPS caseworker trainees, as part of pre-service training, may be assigned specific tasks or activities in connection with a case that is the primary responsibility of an experienced caseworker and may, under appropriate supervision, be assigned responsibility for a "training caseload" with progressively responsible caseload assignment. | Not Applicable | 26 |
| 1.2.d | MDCPS caseworkers shall receive a minimum of 20 hours of in-service training, and all supervisors shall receive a minimum of 12 hours of in-service training. | Yes | 26 |
| 1.2.e | MDCPS caseworker supervisors, within 90 days of hire or promotion, shall receive a minimum of 40 hours of training, directed specifically at the supervision of child welfare caseworkers. | Yes | 26 |
| 1.3.a | 90% of MDCPS caseworkers will have caseloads which do not exceed the caseload standards set forth in the 2nd MSA (pg. 3-4). Individual MDCPS caseworkers with generic caseloads shall not carry a mixed caseload that exceeds 100% capacity as calculated by weights per case type set forth in the 2nd MSA (pg. 3-4). | No | 27 |

| Section | Commitment | Achieved | Report Page |
|---------|-----------|----------|-------------|
| 1.3.b | 85% of MDCPS supervisors shall be responsible for no more than five caseworkers. | No | 28 |
| 1.4.a | By December 1st of each year, MDCPS shall develop an annual Continuous Quality Improvement Plan, which shall be subject to the approval of the monitor after consultation with the parties. | Yes | 29 |
| 1.5.a | MDCPS shall maintain comprehensive information systems that permit: (1) timely access by authorized MDCPS staff to information, including current and historical case documents, to support child safety and continuity of care across placement settings and services; (2) capturing, tracking, and reporting of applicable financial information, quantitative 2nd MSA compliance, longitudinal performance, and child welfare information, including federally required elements; and (3) prompts for workers and supervisors regarding required actions in a child's case and whether they have taken place. | No | 30 |
| 1.6.a | MDCPS shall provide to all county agency staff with child welfare responsibilities access to computer services, word processing, and electronic mail and access to the current management information systems and access to CCWIS, once implemented. | Yes | 33 |
| 1.6.b | Data related to compliance with the 2nd MSA's Foster Care Service Standards will be collected, analyzed and made available, at least quarterly, to MDCPS regional and county staff. | Yes | 33 |
| 1.6.c | MDCPS county staff shall have access to an electronic statewide database of available placement resources. | Yes | 34 |
| 1.7.a | Defendants shall establish, maintain and assess the effectiveness of a performance-based contracting system to evaluate annually contract agency compliance with the terms of the 2nd MSA. Defendants shall take all reasonable steps to ensure contract agency remediation of any identified deficiencies within three months. | Yes | 35 |
| 1.7.b | Prior to MDCPS contracting for case management services for children in custody, MDCPS shall submit for review and approval to the monitor a detailed plan to ensure accountability and provide supervision and oversight of such agencies. | Not Applicable | 35 |
| 1.8.a | Defendants shall ensure that all licensed foster families (regardless of whether they are supervised directly by MDCPS or by private providers, and whether they are kinship or unrelated foster families) receive at least the minimum reimbursement rate for a given level of service as established pursuant to the 2nd MSA. | Yes | 36 |
| 1.8.b | Defendants shall pay to all licensed foster families at least the basic monthly foster care maintenance payments. Every two years thereafter, Defendants shall provide increases in the foster care maintenance payments, based upon the previous year's rate of inflation. | Yes | 36 |

| Section | Commitment | Achieved | Report Page |
|---------|-----------|----------|-------------|
| 1.8.c | Defendants shall deliver to the monitor a written report regarding the adequacy of a proposed schedule of foster care maintenance payments made to foster care providers serving children and the actual cost in the state of Mississippi to provide such care (see 2nd MSA for specific report requirements). Following review of the Defendants' report, the monitor shall establish the rates that Defendants shall then implement. | Yes | 36 |
| **FOSTER CARE SERVICE STANDARDS** | | | |
| 2.1 | MDCPS shall ensure that it maintains a statewide system to appropriately receive, screen and investigate reports of child maltreatment (see 2nd MSA for system requirements). Any extensions of the timeframes set forth in MDCPS policy for the completion of investigations are subject to the review and approval of the monitor. | No | 38, 44 |
| 2.2 | MDCPS shall continue to maintain a special investigations unit whose responsibility is to investigate reports of maltreatment of children in custody. | Yes | 40 |
| 2.2 | The initiation of a special investigation shall not extend beyond 24 hours. | No (97.3%, very close) | 40 |
| 2.3 | MDCPS will develop and implement policies and procedures, subject to the review and approval of the monitor, for the Agency to review all maltreatment in care reports that were screened-out and assess the appropriateness within 24 hours of all screen-out determinations. If the decision to screen-out the report is determined to be inappropriate, MDCPS shall ensure the report is referred for investigation immediately. | No | 39 |
| 2.4 | Upon receipt of a substantiated report of child maltreatment in a contract agency group home or emergency shelter, MDCPS shall, within 30 calendar days, initiate a licensure investigation, that is in addition to and independent of the child protection investigation (see 2nd MSA for investigation requirements). | No | 43 |
| 2.5 | Upon receipt of a report of child maltreatment in a private child placing agency foster home, MDCPS staff will notify the child placing agency, who shall, within 30 calendar days, initiate a licensure investigation that is in addition to and independent of, any child protection investigation (see 2nd MSA for investigation requirements). | No | 43 |
| 2.6 | All allegations of maltreatment of a child in custody shall be investigated by a worker who has received training on intake and investigations processes, policies, and investigation techniques and has no ongoing connection to the foster care case. | No | 40 |
| 2.7 | Within 30 days of the completion of any investigation of maltreatment of a child in custody, as required in Section 2.1, MDCPS shall review the maltreatment investigation (see 2nd MSA for review requirements). | No | 43 |
| 2.8 | MDCPS shall assure that standardized decision-making criteria are used for prioritizing, screening, and assessing all reports of maltreatment of children in MDCPS custody. | No | 39 |

| Section | Commitment | Achieved | Report Page |
|---------|-----------|----------|-------------|
| 2.8.a.1 | By July 1, 2018, at least 90% of maltreatment-in-care investigations will be initiated and completed within 30 days. | Yes | 40 |
| 2.8.b | Any foster child who remains in the same out-of-home placement following an investigation into a report that he or she was maltreated in that placement shall be visited in the placement by an MDCPS caseworker according to the following schedule: 1) Once per week for the first month and twice per month for three months if the investigation is found to be substantiated; or 2) Twice per month in accordance with MDCPS policy if the investigation is found to be unsubstantiated. | No | 42 |
| 2.8.c | When a maltreatment investigation involves a foster or adoptive home, MDCPS shall file a copy of the approved final investigative report, and any recommendations and/or corrective actions MDCPS has deemed necessary, in the case record of the foster child, in the file of the foster or adoptive parents with a copy of the letter of notification to the foster or adoptive parents, and with the Bureau Director for Licensure. MDCPS shall also provide those records to the Youth Court Judge with jurisdiction over the child and, upon request, to the monitor. | MDCPS did not report | 41 |
| 2.8.d | When a maltreatment investigation involves an agency group home, emergency shelter, private child placing agency foster home, or other facility licensed by MDCPS, a copy of the final investigative report shall be filed in the child's case record, with the Director of Congregate Care Licensure, and sent to the licensed provider facility. MDCPS shall provide the report to the Youth Court Judge with jurisdiction over the child and, upon request, to the monitor. | MDCPS did not report | 41 |
| 2.9 | The rate of child abuse and neglect among children in foster care shall not exceed 0.33% per year effective for the period beginning 1/1/18 (see 2nd MSA for full definition of this metric). | No | 47 |
| 3.1 | All foster homes and facilities with children placed who are in the custody of MDCPS shall be timely licensed. | Cannot validate | 48 |
| 3.1 | All foster homes and facilities with children placed who are in the custody of MDCPS shall be subject to the licensure process approved by Public Catalyst on December 31, 2016. | Yes | 48 |
| 3.2.a | No child shall remain in a foster home or facility determined to be unable to meet MDCPS licensing standards, absent an order by a state court with jurisdiction over child custody directing the placement of the child into a specific unlicensed placement. | No | 51 |
| 3.2.b | Safety Issues: If it is determined that an unlicensed foster home or facility is unable to meet MDCPS licensing standards due to a safety issue, Defendants shall take all reasonable efforts to immediately ensure the child's safety and to remove the child, including, if required by the court, seeking an emergency court order. If the child is not in imminent danger, MDCPS shall implement a safety plan and within five calendar days, either cure the licensing deficiency if feasible, or move the child to a licensed foster home or facility, or to an appropriate expedited relative placement, one time only. | Cannot validate | 51 |

10

| Section | Commitment | Achieved | Report Page |
|---------|-----------|----------|-------------|
| 3.2.c | Non-safety Issues: If MDCPS determines an unlicensed foster home to be unable to meet MDCPS licensing standards due to a non-safety issue, Defendants shall, within 30 calendar days of that determination, either cure the licensing deficiency if feasible, or move the child to a licensed foster home or facility, or to an appropriate expedited relative placement, one time only. | Cannot validate | 51 |
| 3.3.a | MDCPS, in conjunction with the monitor, shall establish annual statewide and county performance requirements and time periods for new foster home licensure. The monitor will report to the parties MDCPS progress on achieving the performance requirements. The Defendants shall meet the performance requirements, including time periods. | Yes | 53 |
| 3.3.b | MDCPS shall begin to implement the annual plan to recruit and retain additional licensed foster home placements and shall maintain the additional number of total placements, as necessary during the applicability of the 2nd MSA. | No | 53 |
| 4.1/ 4.13.a | By July 1, 2018, 70% of foster homes shall provide care for no more than five children (including foster, biological, and adoptive children) at any given time (see 2nd MSA for allowable exceptions). | Yes | 54 |
| 4.2/ 4.14.a | By July 1, 2018, 60% of children with special needs shall be matched with placement resources that meet their therapeutic and medical needs. | MDCPS did not report | 54 |
| 4.3/ 4.15 | At least 95% of children in MDCPS custody shall be placed in the least restrictive setting that meets their individual needs as determined by a review of all intake, screening, assessment and prior placement information regarding the child available at the time of placement. | Yes | 55 |
| 4.4/ 4.18 | 90% of children who enter MDCPS custody shall be placed within his/her own county or within 50 miles of the home from which he/she was removed unless the child entered custody in Regions II-East, II-West, or V-West or one of the exceptions provided in this 2nd MSA is documented as applying. | Yes | 56 |
| 4.5 | Each child who enters placement from Regions II-East, II-West, and V-West shall be placed within his/her own county or within 75 miles of the home from which he/she was removed (see 2nd MSA for list of approved exceptions). This provision shall be evaluated by the monitor in December 2018 to determine whether the 75-mile exception is still necessary. | Yes | 56 |
| 4.6/ 4.16.a | By July 1, 2018, 60% of siblings entering MDCPS custody at or near the same time shall be placed together (see 2nd MSA for allowable exceptions). If a sibling group is separated at initial placement, the caseworker shall make immediate efforts to locate or recruit a foster family in whose home the siblings can be reunited. These efforts will be documented and maintained in the case file. | Cannot validate | 57 |
| 4.7/ 4.17.a | By July 1, 2018, 60% of children in MDCPS custody with a documented indication that they were subject to a potential or actual placement disruption shall have documented in the child's case record the reasonable steps taken to address placement stability consistent with 2nd MSA requirements. | MDCPS did not report | 57 |

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| 4.8 | No child shall remain overnight in an MDCPS office or other nonresidential facility that provides intake functions. | Yes | 58 |
| 4.9 | No child under 10 years of age shall be placed in a congregate care setting (including group homes and shelters) unless: a) The child has exceptional needs that cannot be met in a licensed foster home; or b) In order to keep a sibling group together for a temporary period, not to exceed 15 days and the RD has granted documented approval for the congregate care placement; or c) To enable a mother and baby to be placed together and there is not an available foster home for both of them. | No | 58 |
| 4.10/ 4.12 | By July 1, 2018, 70% of children will remain in his/her existing placement and not be moved to another placement unless MDCPS specifically documents in the child's case record justifications for that move and the move is approved by a MDCPS supervisor. | No | 59 |
| 4.11 | No child shall be placed in more than one emergency or temporary facility within one episode of foster care, unless an immediate placement move is necessary to protect the safety of the child or of others with documented approval from the RD. | No | 59 |
| 5.1.a.1 | By July 1, 2018, at least 75% of foster children shall have an MDCPS caseworker meet with the child at least two times per month (see 2nd MSA requirements for visits). | No | 60 |
| 5.1.a.1 | By July 1, 2018, at least 75% of foster children shall have at least one visit per month by the caseworker, which takes place in the child's placement. | Cannot validate | 60 |
| 5.1.b.1 | By July 1, 2018, at least 75% of foster children receiving a 90-day trial home visit period shall have an MDCPS caseworker meet with the child in the home at least two times per month. | Cannot validate | 62 |
| 5.1.c.1 | By July 1, 2018, for a least 75% of foster children with a goal of reunification, MDCPS shall meet with the child's parents at least monthly unless the child's parent(s) reside out-of-state or are incarcerated. | Cannot validate | 62 |
| 5.1.d.1 | By July 1, 2018 at least 75% of foster parents with at least one foster child in the home shall have MDCPS visit the home monthly. | No | 63 |
| 5.2.a | MDCPS shall arrange contact for the child with his/her parents and with any siblings not in the same placement within 72 hours of foster care placement unless there are documented reasons why contact should not occur. If a visit cannot be arranged within 72 hours, a telephone call to parents, siblings, or extended family members shall be provided to the child. | No | 64 |
| 5.2.c | MDCPS and its contracting agencies shall implement a policy that prohibits cancellation of visits as a form of discipline against children. | Yes | 64 |
| 6.1.a.1 | By July 1, 2018 at least 75% of Family Service Plans shall be submitted by the caseworker consistent with 2nd MSA requirements, within 30 calendar days of a child's entry into custody. The supervisor shall review the Plan for approval within 15 calendar days. The Family Service Plan shall be considered complete upon documented supervisory review and approval. | No | 64 |

| Section | Commitment | Achieved | Report Page |
|---------|-----------|----------|-------------|
| 6.1.b | In instances in which it is impossible to meet with one or both parents, the service planning process will proceed, notwithstanding the parent's absence. | Yes | 65 |
| 6.1.c.1 | By July 1, 2018, in at least 75% of placement cases in which the whereabouts of one or both parents is unknown, MDCPS shall, within 30 days, institute a diligent search for the parent(s), which shall be documented in the child's case record. | MDCPS did not report | 65 |
| 6.1.d.1 | By July 1, 2018, for at least 75% of foster children who enter custody, permanency plans shall be submitted within 30 calendar days of the child's entry into custody by the caseworker consistent with 2nd MSA requirements. The supervisor shall review the plan for approval within 15 calendar days. The permanency plan shall be considered complete upon documented supervisory review and approval. | No | 65 |
| 6.2.a.1 | At least 95% of children in custody with the goal of reunification shall have case record documentation reflecting active concurrent permanency planning consistent with 2nd MSA requirements. | No | 66 |
| 6.3.a.1.a | By July 1, 2018, at least 75% of foster children with a permanency goal of reunification shall have service plans for their parents that identify those services MDCPS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care and case record documentation that MDCPS made those identified services available directly or through referral. | No | 67 |
| 6.3.a.2 | For a child with a permanency goal of reunification, the child's MDCPS caseworker shall meet with the child's parent(s) with whom the child is to be reunified at least monthly to assess service delivery and achievement of service goals, to keep the family informed and involved in decisions about the child, and to remain current about the family's circumstances. | Cannot validate | 67 |
| 6.3.a.3 | For children with a permanency goal of reunification, the case record shall document opportunities provided to parents in support of reunification. | No | 67 |
| 6.3.a.4 | When a recommendation to reunify a child with his/her family has been made, MDCPS shall develop an after-care plan with the family that identifies the services necessary to ensure that the conditions leading to the child's placement in foster care have been addressed, and that the child's safety and stability will be assured. MDCPS shall take reasonable steps to provide or facilitate access to services necessary to support the child during the trial home visit. | No (97.0%, very close) | 68 |
| 6.3.a.5.a | By July 1, 2018, at least 75% of foster children who are reunified and who were in custody longer than 90 days shall receive a 90-day trial home visit period or have case record documentation reflecting the Youth Court's objection to such a trial home visit. During the trial home visit period, MDCPS shall provide or facilitate access to the services identified in the child's after-care plan, consistent with the 2nd MSA requirements. | Cannot validate | 68 |

13

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| 6.3.a.6 | Before the end of any trial home visit period, MDCPS shall convene a meeting with the child's parents and the child to determine the appropriateness of a final discharge. If final discharge is determined to be appropriate, MDCPS shall make the appropriate application to the Youth Court to be relieved of custody. | No | 68 |
| 6.3.b.1.a | By July 1, 2018, at least 70% of children in custody with the primary permanency goal of adoption shall have an assigned adoption specialist and an adoption plan that identifies the child specific activities that MDCPS will undertake to achieve adoption. | Yes | 69 |
| 6.3.b.2.a | By July 1, 2018, a termination of parental rights referral shall be made on behalf of at least 70% of children who have spent more than 17 of the last 22 months in foster care by the last day of a child's seventeenth month in care, unless an available exception pursuant to the federal Adoption and Safe Families Act ("ASFA") has been documented by MDCPS in the child's case record. | Cannot validate | 69 |
| 6.3.b.3 | MDCPS shall provide to the monitor a report of all TPR referrals made during the monitoring period, the date those TPR referrals were made, and the date the TPR petition was filed with the court. | Yes | 69 |
| 6.3.c | Defendants shall establish and maintain a system of post-adoptive services to stabilize and maintain adoptive placements. Adoptive families eligible for adoption subsidies shall have access to these services, which may include services such as counseling, mental health treatment and crisis intervention, family preservation and stabilization services, and peer support. | Yes | 70 |
| 6.3.d.1 | The permanency goals of durable legal custody and guardianship may be assigned when there are documented efforts in the child's case record to move the child to adoption and documentation of a reasonable basis why it is in the child's best interests not to be considered for adoption. | Cannot validate | 71 |
| 6.3.d.2 | When the permanency goals of durable legal custody and guardianship are assigned to a child under the age of 14 years old or living with a non-relative, MDCPS shall provide to the monitor at the end of each monitoring period, information from the child's case record documenting efforts to move the child to adoption and documentation of a reasonable basis why it is in the child's best interests not to be considered for adoption. | Cannot validate | 71 |
| 6.3.e | If MDCPS concludes, after considering reunification, adoption, durable legal custody and permanent placement with a relative, that these permanency plans are inappropriate or unavailable for a child, MDCPS may assign a permanency goal of APPLA for the child (see 2nd MSA for APPLA requirements). | MDCPS did not report | 71 |
| 6.4.a.1 | By July 1, 2018, at least 80% of foster children who have been in custody for at least six months shall have a timely court or administrative case review consistent with 2nd MSA requirements. | No | 71 |

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| 6.4.b.1 | By July 1, 2018, for at least 80% of foster children who have been in custody for at least 12 months, MDCPS shall make reasonable efforts to have a timely annual court review scheduled consistent with 2nd MSA requirements. | MDCPS did not report | 72 |
| 6.4.c | MDCPS shall review documented exceptions pursuant to ASFA for children who have spent more than 17 of the previous 22 months in foster care during the child's foster care review. | MDCPS did not report | 73 |
| 6.5.a.1 | By July 1, 2018, the monitor will establish the performance standard for the following indicator: Of all children who enter foster care in a 12-month period, what percent discharged to permanency within 12 months of entering foster care? The initial entry cohort for this indicator will be children who entered care between October 1, 2014 and September 30, 2015. | Yes | 73 |
| 6.5.a.2 | By July 1, 2018, the monitor will establish the performance standard for the following indicator: Of all children in foster care on the first day of a 12-month period, which shall commence on October 1st of any given year, who had been in care between 12 and 23 months, the percent of children discharged from foster care to permanency within 12 months of the first day of the 12-month period. The numerator is the number of children in the denominator who discharged from foster care to permanency within 12 months of the first day of the 12-month period. The initial cohort for this indicator will be children in care on the first day of October 1, 2015, who had been in care for 12-23 months as of that day. | Yes | 73 |
| 6.5.a.3 | By July 1, 2018, the monitor will establish the performance standard for the following indicator: Of all children in foster care on the first day of a 12-month period, which shall commence on October 1st of any given year, who had been in care for 24 months or more, the percent of children discharged from foster care to permanency within 12 months of the first day of the 12-month period. The numerator is the number of children in the denominator who discharged from foster care to permanency within 12 months of the first day of the 12-month period. The initial cohort for this indicator will be children in care on the first day of October 1, 2015, who had been in care for 24 months or more as of that day. | Yes | 73 |
| 6.5.c/ 6.5.d | By March 15, 2018, the monitor will establish the performance standards for the following indicator: for all children in the custody of MDCPS who were adopted in FFY2017, the monitor shall validate the average and median lengths of time to adoption finalization for each child from the date on which the child's adoption goal was established. | Yes | 74 |
| 7.1 | MDCPS shall provide each youth transitioning to independence with at least six months' advance notice of the cessation of any health, financial, or other benefits that will occur at the time of transition. | No | 74 |
| 7.2 | Each foster youth age 14 years and older, regardless of his/her permanency plan, shall be provided with an opportunity to participate in the creation of an appropriate Independent Living service plan for a successful transition to adulthood. | MDCPS did not report | 75 |

15

| Section | Commitment | Achieved | Report Page |
|---------|-----------|----------|-------------|
| 7.3 | Each foster youth age 14 years and older shall have access to the range of supportive services necessary to support their preparation for and successful transition to adulthood. MDCPS shall maintain sufficient resources to deliver Independent Living services to all youth described herein. | No | 75 |
| 7.4 | MDCPS shall implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond are enrolled for Medicaid coverage so that their coverage continues without interruption at the time of emancipation. | MDCPS did not report | 76 |
| 7.5 | MDCPS shall implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond receive a start-up stipend of at least $1,000.00 at the time of emancipation, or as soon as practicable thereafter. | No | 76 |
| 7.6 | MDCPS shall implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond have access to a housing resource specialist responsible for assisting the youth obtain an adequate living arrangement. | MDCPS did not report | 77 |
| 7.7 | MDCPS shall continue to implement policies and processes which ensure that youth emancipating from the foster care system at age 18 or beyond receive services and support under the State Educational Training and Vocational (ETV) Program for which they are eligible. | MDCPS did not report | 77 |
| 7.8.a | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: Educational records, such as a high school diploma or general equivalency diploma, and a list of schools attended, when age-appropriate. | Cannot validate | 78 |
| 7.8.b | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: A social security or social insurance number. | Cannot validate | 78 |
| 7.8.c | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: A resume, when work experience can be described. | Cannot validate | 78 |
| 7.8.d | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: A driver's license, when the ability to drive is a goal; if not a driver's license, then a state-issued, photo identification. | Cannot validate | 78 |
| 7.8.e | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: An original or certified copy of the youth's birth certificate. | Cannot validate | 78 |
| 7.8.f | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: Previous placement information. | Cannot validate | 78 |

| Section | Commitment | Achieved | Report Page |
|---------|-----------|----------|-------------|
| 7.8.g | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: Documentation of immigration, citizenship, or naturalization, when applicable. | Cannot validate | 78 |
| 7.8.h | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: Documentation of tribal eligibility or membership. | Cannot validate | 78 |
| 7.8.i | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: Death certificates when parents are deceased. | Cannot validate | 78 |
| 7.8.j | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: A life book or a compilation of personal history and photographs, as appropriate. | Cannot validate | 78 |
| 7.8.k | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: A list of known relatives, with relationships, addresses, telephone numbers, and permissions for contacting involved parties. | Cannot validate | 78 |
| 8.1.a.1 | By July 1, 2018, 70% of children shall have an initial medical screening within 7 days of the child's entry into foster care. | No | 78 |
| 8.1.b.1 | By July 1, 2018, 70% of children shall have an initial EPDST or other comprehensive medical examination within 60 days of the child's entry into foster care. | No | 79 |
| 8.1.c.1 | By July 1, 2018, the monitors in collaboration with MDCPS will establish the performance baseline for periodic and ongoing medical examinations. | Yes | 79 |
| 8.1.c.2 | By July 31, 2018, the monitor will establish performance standards for MDCPS to meet by July 1, 2019. | Yes | 79 |
| 8.1.d.2 | By July 1, 2018, 60% of children shall be provided with practitioner recommended follow-up treatment. | MDCPS did not report | 79 |
| 8.1.e.1 | By July 1, 2018, 60% of children shall have a dental examination within 90 days of the child's entry into foster care. | No | 79 |
| 8.1.f.1 | By July 1, 2018, 75% of children shall have information provided to foster parents or facility staff within 15 days of placement. | MDCPS did not report | 80 |
| 8.1.g | By July 1, 2018, 85% of children shall have their Medicaid information provided to foster parents or facility staff at the time of placement. | MDCPS did not report | 80 |
| 8.2.a | MDCPS shall review the educational record of each child who enters custody for the purpose of identifying the child's general and, if applicable, special educational needs and shall document the child's educational needs within 30 calendar days of his/her entry into foster care. | MDCPS did not report | 80 |
| 8.2.b | MDCPS shall take reasonable steps to ensure that school-age foster children are registered for and attending accredited schools within seven calendar days of initial placement or any placement change, including while placed in shelters or other temporary placements. | MDCPS did not report | 80 |

| Section | Commitment | Achieved | Report Page |
|---------|-----------|----------|-------------|
| 8.2.c.1 | At least 90% of school-age foster children who enter custody shall have their educational records reviewed and their educational needs documented by MDCPS within 30 calendar days of their entry into foster care. | MDCPS did not report | 80 |

## Methodology

To prepare this report, the monitoring team conducted a series of verification activities to evaluate MDCPS' progress implementing its commitments in the 2nd MSA. The monitoring team conducted extensive reviews of thousands of records and other data and information, reviewed and analyzed a wide range of aggregate and detail data produced by MDCPS, and reviewed policies, memos, and other internal information relevant to MDCPS' work during the period. The monitoring team held meetings with the parties pursuant to Section 9.4 of the 2nd MSA; regular meetings with MDCPS leadership and program staff; meetings with management and staff at MDCPS regional and county offices; and meetings with numerous public and private stakeholders. The monitoring team interviewed staff and supervisors across the state and discussed the pace, progress and challenges of the system improvement work. To verify information produced by MDCPS, the monitoring team conducted extensive field-based interviews, cross-data validation and qualitative case record reviews.[1]

## Demographics

MDCPS produced demographic data for the period from January 1, 2018 to December 31, 2018. MDCPS data indicate there were 5,577 children in custody on January 1, 2018 and 4,811 children in custody as of December 31, 2018. During the monitoring period, 2,790 youth were placed in foster care and 3,549 children exited care.[2] MDCPS served 8,287 children during the monitoring period. Young children aged zero to six years made up the largest portion (2,148 or 45 percent). Twenty-six percent of youth (1,252) were 12 to 17 years of age, 25 percent of children (1,229) were seven to 11 years of age and four percent of youth (182) were 18 years and over, as detailed in Figure 1.

---

[1] The monitoring team conducted extensive qualitative reviews of more than 2,000 children's cases, and the findings are included in the relevant sections of this report. In most instances, the sample sizes for the monitoring team's case record reviews were based on a statistically significant sample of cases and methodology based on a 90 percent confidence level.

[2] The monitoring team identified 31 children who appear twice in MDCPS' entry cohort data. Each of these children entered foster care more than once during the monitoring period. The monitoring team also identified 25 children who appeared twice in the exit cohort. Each of these children exited foster care two times during the monitoring period.

### Figure 1. Age of Children in Custody on December 31, 2018
*n=4,811*



Ages 18+
182
4%

Ages 12-17
1252
26%

Ages 0-6
2148
45%

Ages 7-11
1229
25%

The population of children in care on December 31, 2018 was approximately evenly split by gender, with 51 percent of children in care male and 49 percent female. Regarding race, the population of children was 54 percent White, 37 percent African American, 0.1 percent Asian, 0.1 percent Native Hawaiian or Pacific Islander, and 0.1 percent Native American. Additionally, three percent of children reported being of mixed race. Two percent of children were identified with Hispanic ethnicity and can be of any race. The race of five percent of children was undetermined.[3]

### Table 1. Race of Children in Custody on December 31, 2018

| Race | Count | Percent |
|------|-------|---------|
| White | 2,620 | 54% |
| African American | 1,778 | 37% |
| Unable to Determine | 246 | 5% |
| Mixed Race | 152 | 3% |
| Asian | 6 | 0.1% |
| Native Hawaiian, Pacific Islander | 5 | 0.1% |
| Native American | 4 | 0.1% |
| Total | 4,811 | 100% |
| Hispanic ethnicity and of any race | 92 | 2% |

Note: Percentages may not add up to 100 due to rounding.

---

[3] Children whose race was explicitly marked as 'Unable to Determine' and whose race was not found are combined into the entry for 'Unable to Determine'.

As the following figure demonstrates, 90 percent of children in MDCPS' custody on December 31, 2018 lived in family settings, including foster families (47 percent), with relatives (33 percent), with their own parents (8 percent), in homes that intend to adopt (1 percent), and in homes of unrelated caregivers (0.2 percent). Of children in custody, 425 (9 percent) lived in institutional settings, including residential treatment and other congregate care facilities. Another 13 (0.3 percent) youth resided in Supervised Independent Living placements, which serve youth who are preparing to transition out of care.

**Figure 2. Placement Types of Children in Custody on December 31, 2018**
*n=4,811*

| Placement Type | Count |
|---|---|
| Family Based | 4309 |
| Institutional | 425 |
| Missing Placement Type | 43 |
| Runaway | 21 |
| Independent | 13 |

(bar chart axis: 0, 500, 1000, 1500, 2000, 2500, 3000, 3500, 4000, 4500, 5000)

Of the children in care on December 31, 2018, 40 percent were in care less than one year, while 18 percent were in care for more than three years.

**Figure 3. Length of Stay in Care of Children in Custody on December 31, 2018**
*n=4,811*



| Length of Stay | Count | Percent |
|---|---|---|
| 3-6 years | 357 | 7% |
| 6+ years | 535 | 11% |
| Less than a year | 1901 | 40% |
| 2-3 years | 787 | 16% |
| 1-2 years | 1231 | 26% |

21

**Table 2. Exits from Care by Exit Type, January 1, 2018 to December 31, 2018**

| Exit Type | Count | Percent |
|---|---|---|
| Reunification | 1,968 | 55% |
| Adoption | 617 | 17% |
| Living with other relatives | 453 | 13% |
| Guardianship | 350 | 10% |
| Emancipation | 87 | 2% |
| County of Service Placement Change | 26 | 0.7% |
| Runaway | 26 | 0.7% |
| Transfer to another agency | 13 | 0.4% |
| Death of a child | 9 | 0.3% |
| Total | 3,549 | 100% |

Note: Percentages may not add up to 100 due to rounding.

As the table below demonstrates, of the children in custody on December 31, 2018, half had reunification as a federal goal. For the remaining children, 1,861 (39 percent) had a goal of adoption, 231 (5 percent) had a goal of APPLA, 63 (1 percent) had a goal of durable legal custody or guardianship, and 135 (3 percent) had placement with a relative as a federal goal. There were 139 children (3 percent) with missing federal goal codes.

**Table 3. Federal Goals for Children in Custody as of December 31, 2018**

| Federal Goal | Count | Percent |
|---|---|---|
| Reunification | 2,382 | 50% |
| Adoption | 1,861 | 39% |
| APPLA | 231 | 5% |
| Custody with a relative | 135 | 3% |
| No plan documented (less than 45 days in custody) | 109 | 2% |
| Durable legal custody / guardianship | 63 | 1% |
| No plan documented (no current approved FSP) | 30 | 0.6% |
| Total | 4,811 | 100% |

Note: Percentages may not add up to 100 due to rounding.

## Creation of the Mississippi Department of Child Protection Services

The parties agreed in the Stipulated Third Remedial Order (STRO), approved by the Court on December 19, 2016, that Mississippi would complete the creation and implementation of a fully functional child welfare agency, which is independent of, although housed within, the Mississippi Department of Human Services (MDHS), not later than July 1, 2018. This provision of the STRO remained in effect when the 2nd MSA began on January 1, 2018. On May 13, 2016, Governor Phil Bryant signed legislation (Senate Bill 2179) that created MDCPS, an independent cabinet-level

department, headed by a commissioner, to serve as the state's lead child welfare agency. By creating this new department, the responsibility of child protection was removed from MDHS. The enabling legislation provided for the Commissioner of MDCPS and the Executive Director of MDHS to develop and implement a plan for the orderly transition of MDCPS from the MDHS Office of Family and Children's Services, including the transfer of equipment, records, resources and dedicated child welfare funds and the allocation of shared services. MDCPS determined that the complete separation from MDHS would prevent the two departments from using state-appointed funds as matching funds to draw down certain federal dollars. As such, MDCPS and MDHS requested that the legislature amend Senate Bill 2179 to maintain MDCPS as a sub-agency of MDHS with the Commissioner of MDCPS retaining full operational control of MDCPS. This legislation was passed and on April 13, 2018 Governor Bryant signed the legislation (Senate Bill 2675). Beginning in 2016, the two departments have maintained a series of memoranda of understanding between them with respect to the identification of blended responsibilities and the establishment of guidelines for shared functions, cost reduction, and access to federal funds.

## Operational Budget

The 2nd MSA requires MDCPS to request state funds and any federal/special fund authorization sufficient to effect the provisions and outcome measures set forth in this 2nd MSA. For state fiscal year (SFY) 2018 (July 1, 2017 to June 30, 2018), MDCPS was appropriated $97,969,323 and later requested and received from the Mississippi Legislature an additional $12,000,000 deficit appropriation. During the 2018 Mississippi legislative session, MDCPS requested a state fund appropriation of $133,626,889.78 for SFY2019 (July 1, 2018 to June 30, 2019). This request sought an increase of $23,657,566 from the prior fiscal year's state funding. MDCPS' request for increased funding centered on its desire to hire additional staff to achieve compliance with the caseload requirement in the 2nd MSA, and its need to develop a Comprehensive Child Welfare Information System (CCWIS) data system as required by the 2nd MSA. However, the Mississippi Legislature only appropriated MDCPS $97,994,298 in state general funds and $12,000,000 in state special funds, for a total state funding of $109,994,298, which fell short of MDCPS' request by $23,632,591. MDCPS also received $88,504,053 in federal funds in fiscal year 2018 and estimated receiving $97,371,706 in federal funds in fiscal year 2019.

# 1. Systemic Infrastructure Standards

## Department Leadership

MDCPS committed in the 2nd MSA to maintain a Commissioner of Child Protection Services having responsibility for the oversight and management of the Department. The Commissioner must possess at least a bachelor's degree from an accredited institution of higher learning and ten

23

years' experience in management, public administration, finance, or accounting or a master's or doctoral degree from an accredited institution of higher learning and five years' experience in management, public administration, finance, law, or accounting.

Prior to his appointment, the monitoring team had an opportunity to meet with Commissioner Jess H. Dickinson and review his qualifications for the position. Commissioner Dickinson possesses a Juris Doctorate degree from the University of Mississippi School of Law and had more than 35 years of experience in law, serving both as an attorney and a justice in the Mississippi legal and judiciary systems, respectively. Commissioner Dickinson possesses the requisite qualifications to serve as commissioner of MDCPS.

## Staff Qualifications and Training

MDCPS committed to ensure that staff serving Mississippi's at-risk children and families have appropriate qualifications and receive adequate training.

*Caseworker Qualifications (1.1.a.)*

MDCPS reported 197 caseworkers were hired in 2018. All caseworkers are required to have, at minimum, a bachelor's degree in social work or a related human services field that is approved as a qualifying degree by the monitor.[4] Comparing the reported degrees for all the caseworkers hired in 2018 to the list of qualifying degrees, all the caseworkers possessed an approved degree. The monitoring team also reviewed the paper degrees or official transcripts for a randomly-selected sample of 55 caseworkers hired in 2018 and confirmed that all the caseworkers' degrees in the sample were accurately reported.

*Supervisory Qualifications (1.1.b.)*

In the 2nd MSA, MDCPS agreed that new caseworker supervisors must possess either a master's degree in social work or an approved qualifying human services degree and two years of experience working with children and families or a bachelor's degree in social work or an approved qualifying human services degree with three years of experience working with children and families. MDCPS reported 44 caseworker supervisors were appointed during 2018. The monitoring team compared the reported degrees for all the caseworker supervisors appointed in 2018 to the list of qualifying degrees and reviewed the paper degrees or official transcripts and

---

[4] MDCPS submitted and the monitor approved the following degrees as related human services degrees: Child and Family Studies, Child Development, Counseling, Criminal Justice, Disciplinary Studies, Early Childhood and Family, Education, Education and Human Science, Elementary Education, Family Studies, General Studies, Guidance Education, Interdisciplinary Studies, Marriage and Family Therapy, Nursing, Political Science, Psychology, and Sociology.

job applications for the caseworker supervisors and determined that all the supervisors possessed an approved degree and the requisite years of experience.

*Training Unit (1.2.a.)*

MDCPS committed to maintain a Training Unit headed by a qualified director of training with adequate staffing, funding and resources to assure that comprehensive child welfare training is provided to caseworkers, supervisors and other child welfare employees. The child welfare training should enable staff to comply with the relevant mandates of the 2nd MSA, MDCPS policy, and reasonable professional standards. During 2018, the MDCPS Office of Professional Development (OPD) administered training and professional development in order to prepare MDCPS employees to assume their job responsibilities and enhance their knowledge, skills and abilities. Specifically, OPD delivered pre-service, supervisory and in-service training to Department staff during the period. OPD was led by a senior manager with an advanced degree and nine years of experience as a director of workforce development and a director of professional development in Mississippi's child welfare agency. Unit staff included approximately 35 training coordinators and practice model coaches, along with five supervisors, funded by both state and federal dollars.

*Pre-Service Training (1.2.b.)*

All new MDCPS caseworkers must complete a total of 270 hours of pre-service training, which includes classroom instruction, field instruction, and E-Learning. The pre-service training program offered by MDCPS' OPD exceeds 270 hours of training with a combination of eight alternating weeks of classroom instruction and on-the-job training. During on-the-job training weeks, certain material is delivered through online learning.

MDCPS reported that 132 of the 197 new workers hired in 2018 completed pre-service training during the period. Twenty-six caseworkers previously employed and trained by MDCPS were rehired by the Department and exempt from pre-service training.[5] Ten workers left the Department either before starting or before completing training. One worker hired in November 2018 has been unable to attend training, reportedly due to medical complications and will complete training once medically cleared. The remaining 28 workers were hired into their positions late in the period and were enrolled in training that ended in the first quarter of 2019.

The monitoring team reviewed the four competency exams administered during pre-service training for a randomly-selected sample of 55 caseworkers hired in 2018 and confirmed that 47 caseworkers in the sample achieved a passing score of 70 or higher on each of the four exams

---

[5] Caseworkers and supervisors who have successfully completed MDCPS' current pre-service training are not required to attend training again.

and one caseworker left training before completing any of the competency exams. The remaining seven caseworkers in the sample were rehired, had been previously employed and trained by MDCPS and did not need to again complete pre-service training.

*Training Caseloads (1.2.c.)*

The 2nd MSA allows a trainee to be assigned responsibility for a "training caseload," under appropriate supervision, that gradually increases as the trainee successfully completes pertinent competence-based examinations. MDCPS has elected not to implement training caseloads at this time. MDCPS will notify the monitor before instituting training caseloads so the required competency exams and standards for passing the exams can first be reviewed and approved by the monitor.

*In-Service Training (1.2.d.)*

MDCPS agreed that all caseworkers must complete a minimum of 20 in-service training hours in 2018 and all supervisors must complete a minimum of 12 in-service training hours in 2018. MDCPS provided data to the monitoring team indicating that all 855 caseworkers and investigators received 20 or more in-service training hours and all 258 supervisors received 12 or more in-service training hours during 2018, as required. In-service training covered a wide range of topics such as Comprehensive Addiction and Recovery Act policy, Interstate Compact on the Placement of Children, educational services, human trafficking, staff safety, termination of parental rights, and youth transition support services.

*Supervisor Training (1.2.e.)*

MDCPS committed in the 2nd MSA that caseworker supervisors must complete a minimum of 40 hours of training directed specifically at the supervision of child welfare caseworkers within 90 days of assuming a supervisory position. OPD offers a clinical supervisory training program consisting of 40 hours of classroom training based on identified competencies.

MDCPS provided information indicating that of the 44 caseworker supervisors appointed in the period, 41 supervisors met the 90-day requirement for training completion. One supervisor appointed late in 2018 was pending training at the end of the period; one supervisor left the Department prior to completing training; and one supervisor who had been previously employed and trained by MDCPS, was rehired as a supervisor and exempt from supervisory training. The monitoring team reviewed the competency exam administered at the end of supervisory training for the 41 supervisors who completed training in 2018 and confirmed that all had achieved a passing score of 70 or higher on the competency exam.

## Caseloads and Supervision

*Caseworker Caseloads (1.3.a.)*

The 2nd MSA sets forth caseload standards for staff and supervisors performing critical child welfare functions. The 2nd MSA states that 90 percent of MDCPS caseworkers must have caseloads that do not exceed the caseload standards for each type of case. Individual MDCPS caseworkers who carry a mixed caseload are held to a weighted, pro-rated standard. The table below details the caseload standards for each type of case.

### Table 4. 2nd MSA Caseload Standards by Case Type

| Type of Case | Included Categories | Standards | Weight Per Case – 100% Capacity |
|---|---|---|---|
| Child Protection | Investigations Level 2<br>Investigations Level 3 | 14 Investigations | 0.0714 |
| Ongoing Foster Care | Placement Responsibility & Service | 14 Children | 0.0714 |
| Ongoing Foster Care | Placement County of Responsibility<br>Placement County of Service | | 0.0357 |
| In-Home | Protection Responsibility & Service<br>Prevention Responsibility & Service | 17 Families | 0.0588 |
| In-Home | Protection or Prevention County of Responsibility<br>Protection or Prevention County of Service | | 0.0294 |
| Adoption | Adoption County of Service | 15 Children | 0.0667 |
| New Application Licensing | Resource Inquiry<br>ICPC Application<br>Foster Home Study | 15 Homes | 0.0667 |
| Renewal Licensing | Foster Home Supervision<br>Foster Home Renewal | 36 Homes | 0.0278 |

The parties agreed in the STRO that MDCPS would build capacity in 2017 to meet these standards by the start of 2018. However, as the following chart demonstrates, MDCPS did not meet the 90 percent caseload standard for its staff in any quarter during 2018.

27

**Figure 4. Percent of Workers Meeting the Caseload Standard, 2018**



*Data as of the middle of March, June, September and December    Source: MDCPS Data

*Supervisor Staffing Ratios (1.3.b.)*

In order to ensure appropriate attention and oversight of its staff's work with children and families, MDCPS agreed that 85 percent of supervisors would be responsible for overseeing no more than five caseworkers each.

**Figure 5. Percent of Caseworker Supervisors Meeting the Supervision Ratio Standard, 2018**

*Data as of the end of March, June, September and December    Source: MDCPS Data

28

As the chart above indicates, MDCPS did not meet the caseworker supervisors' workload standard of 85 percent in any quarter during 2018.[6]

*Caseload Verification*

The monitoring team undertook an in-depth review of caseload reporting for the period. From August to November 2018, the monitoring team interviewed casework staff about their workloads in six MDCPS county and regional offices. Interviews included both supervisory and caseload-carrying staff randomly selected by the monitoring team, working in Harrison, Hancock, Hinds, Lee, Lowndes and Jackson counties. Staff members were directed to bring printouts of their caseloads, typically from the previous workday, with them to interviews. The monitoring team reviewed the caseload assignments with the workers and/or their supervisors and inquired whether the printouts represented all their caseload assignments as of that day, which coincided with the date of an official MDCPS caseload count. The monitoring team then compared the workload printouts of these hundreds of cases identified across all the interviews, with MDCPS' official caseload submissions to determine if they aligned.

Based on interviews with 160 caseworkers, 33 supervisors, three deputy directors, and four regional directors in MDCPS, and data analysis involving thousands of cases statewide, the monitoring team concludes the caseload data and information provided by the Department accurately reflects MDCPS' caseload performance.

## Continuous Quality Improvement

*Continuous Quality Improvement Plan (1.4.a.)*

Pursuant to the 2nd MSA, MDCPS is required to develop an annual Continuous Quality Improvement (CQI) Plan by December 1st of each year, which shall be subject to the approval of the monitor after consultation with the parties.

The monitoring team reviewed the initial draft CQI plan for 2019, which was submitted timely by MDCPS on November 15, 2018, and had extensive discussions with MDCPS regarding the planned CQI activities and processes. Based on feedback from the monitoring team, MDCPS submitted updates to both the plan and supporting CQI tools. The monitoring team also shared the CQI plan with plaintiffs' counsel, who provided their feedback.

The monitoring team approved the 2019 CQI Plan for implementation in April 2019, after MDCPS submitted final edits to the Plan. There are several commitments discussed in this report for which MDCPS did not submit evidence of performance. MDCPS indicates the agency intends to

---

[6] At any given time during 2018, between 15 and 20 supervisors also carried caseloads ranging from one to 31 cases.

report its 2019 performance for many of these commitments through implementation of the 2019 CQI plan approved by the monitors.

## Management Information Systems & Data Reporting

*Comprehensive Information Systems and Reporting (1.5.a.)*

The 2nd MSA requires MDCPS to maintain comprehensive information systems that permit: (1) timely access by authorized MDCPS staff to information, including current and historical case documents, to support child safety and continuity of care across placement settings and services; (2) capturing, tracking, and reporting of applicable financial information, quantitative 2nd MSA compliance, longitudinal performance, and child welfare information, including federally required elements; and (3) prompts for workers and supervisors regarding required actions in a child's case and whether they have taken place.

MDCPS' primary information system is the Mississippi Automated Child Welfare Information System (MACWIS). MDCPS also has ancillary information systems or tracking tools that are not directly connected to MACWIS but may leverage data from it, such as Excel sheets used to track resource homes involved in expedited pending relative placements,[7] to track and report on newly licensed and closed homes, and to facilitate and document the results of manual reviews of substantiated reports of maltreatment.

MDCPS reported employees are granted the appropriate level of access to MACWIS as part of the new hire process for caseworkers, supervisors, and identified State Office staff with positions and job responsibilities that require access to the system. A unique MACWIS ID is assigned to new caseworkers typically during the first week of pre-service classroom training. MDCPS reports quarterly to the monitor the MACWIS ID of new caseworkers granted access to the system.

The monitoring team generally has been able to identify children across multiple MACWIS data files to create a timeline of their placement settings and services while in MDCPS custody. MDCPS, however, has been unable to consistently and reliably report from MACWIS current and historical data of children in custody for numerous 2nd MSA commitments as noted below and in the pertinent sections of this report.

MACWIS contains a financial module the monitoring team used to verify that MDCPS was issuing foster care board payments to foster parents consistent with the child's age and placement type. The monitoring team requested and received from MDCPS data from MACWIS relating to the

---

[7] MDCPS refers to unlicensed relative home placements as expedited pending relative placements.

board rates foster parents were receiving for children on December 31, 2018.[8] See Section 1.8.a., below, for details of the monitoring team's review of foster care board rates.

The monitoring team confirmed that MDCPS' responses to various 2nd MSA commitments included many of the required data elements for the National Child Abuse and Neglect Data System (NCANDS) and the Adoption and Foster Care Analysis and Reporting System (AFCARS). MDCPS also provided correspondence from the Administration for Children and Families within the United States Department of Health and Human Services accepting MDCPS' FFY2018 NCANDS Child File and Agency File and its National Youth in Transition submissions derived from MDCPS data systems. MDCPS reports that MACWIS users have view-only access of TANF and child support data systems.

The monitoring team received from MDCPS a MACWIS Tickler Types Report listing alert notifications available to staff for actions taken and actions needed.

MDCPS produced data from MACWIS to demonstrate performance on some but not all commitments for the 2nd MSA and to document baseline populations and samples for qualitative reviews. MDCPS also submitted "cohort" data, which identifies children's entries and exits from foster care during the period, the population of children served during the period, and the population of children in care at the beginning and end of the period. The monitoring team analyzed the information to verify the data quality, assessed the methodology used to compute performance for each metric, and attempted to replicate the performance calculations made by MDCPS. In these efforts, both MDCPS and the monitoring team relied on business rules jointly developed between the monitoring team and MDCPS and insights obtained from prior validation efforts.[9]

As noted above, MDCPS is required to capture, track and report applicable financial information, quantitative 2nd MSA compliance, longitudinal performance, and child welfare information, including federally required elements. MDCPS did not report data on 18 commitments and the monitoring team cannot validate quantitative data submitted by MDCPS for another 23 commitments. These 41 commitments are delineated in the Summary of Commitments and the relevant sections of this report. Data problems include the manner in which MDCPS documents and identifies certain data fields, coding errors, MDCPS performance calculations that are inconsistent with the established business rules, and data files provided by MDCPS that the monitoring team was unable to replicate using the established business rules.

---

[8] The monitoring team conducted a qualitative review of board rates in MACWIS under commitment 1.8.
[9] Since personnel changes occurred in the MDCPS data unit in March 2018, MDCPS has had more difficulty responding timely and adeptly to inquiries related to data business rules, file creation and performance calculations.

The monitoring team found three significant and recurring data quality problems during the period: measuring maltreatment in care; tracking foster homes; and workers documenting resource identification numbers in MACWIS.

- Measuring maltreatment in care. In validating Section 2.9 (MIC rate, where the perpetrator must be a foster parent or a residential facility staff member), the monitoring team determined and MDCPS confirmed that the perpetrator relationship was incorrect for many reports of maltreatment, and may indicate a foster care provider or a non-foster care provider erroneously. The monitoring team also noted the incident date was not a reliable indicator of when the maltreatment occurred[10] because the incident date was often missing or identical to the report date. To address these issues, MDCPS and the monitoring team conducted a manual review of hundreds of substantiated reports of maltreatment in CY2018 to confirm whether the alleged maltreatment involved a custodial child in care at the time of the maltreatment and whether the perpetrator was a foster care provider. This manual review identified 18 perpetrator relationships needing correction and 24 allegations that clearly involved a custodial child but, according to MACWIS, did not indicate a custodial child was involved and/or were not investigated by the Special Investigations Unit.

- Tracking foster homes. The monitoring team identified numerous data quality problems related to the manual process MDCPS uses for collecting data for Section 3.1. Specifically, there were errors and inconsistencies in the Expedited Placements Master List,[11] such as homes that were "Closed – added in error"; homes where the Resource ID was actually a date; missing Resource IDs; duplicate homes/Resource IDs in a file designed to be unique; Excel cell formulas that reference the incorrect column or value; and the manner in which "Action Taken" reasons are recorded. Likewise, the structure of MDCPS's monthly files related to Section 3.3.b often varied from month to month in terms of format and compilation.

- Workers documenting Resource IDs in MACWIS. In validating Section 4.1 (Foster home licensure limits), the monitoring team discovered that MDCPS excluded on average 137 homes per quarter, mostly therapeutic foster homes, because the Resource ID that identifies the child's placement was for an umbrella child placing agency (CPA) (i.e., not the actual home in which the child is placed ("sub-resource") but instead the CPA that oversees that home). In these instances, the specific household members in the child's

---

[10] An accurate incident date could help determine if the alleged maltreatment occurred during the child's custody episode.

[11] This list includes homes for all unlicensed, expedited relative placements that have been tracked by the Continuous Quality Improvement (CQI)'s Evaluation and Monitoring Unit (EMU) since July 24, 2017, when EMU revised the tracking sheet and process.

placement are not documented in MACWIS. When a child is placed in a setting that is part of an umbrella agency, MACWIS:

a. requires workers to select the umbrella agency but does not require them to select the subordinate resource;

b. does not capture all household members for sub-resources because they do not go through MDCPS' inquiry process where such information is usually collected. The umbrella agency, not MDCPS, licenses its own sub-resources.

In Section 4.1, the monitoring team could not validate performance for placements that did not indicate in MACWIS a Resource ID for the sub-resource home. The Resource ID issue also affected the monitoring team's ability to validate Section 5.1.d.1 related to visits with foster parents, since validation relies on identifying the foster parent associated with the Resource ID which is not possible when the Resource ID represents an umbrella agency.

*Staff Resources (1.6.a.)*

Pursuant to the 2nd MSA, MDCPS committed to provide to all its county staff with child welfare responsibilities access to computer services, word processing and electronic mail; access to the current management information systems; and access to a revised modular information system, CCWIS, once implemented.[12] MDCPS produced a list with 1,177 caseworker and supervisor names, and their respective email addresses, network IDs, MACWIS IDs and job titles. Additionally, MDCPS produced quarterly the names, email addresses, network IDs, MACWIS IDs and job titles for newly hired workers. The monitor verified this information during in-person interviews with 160 randomly-selected MDCPS staff across Mississippi.

*Staff Access to Data (1.6.b.)*

MDCPS committed to collect, analyze and make available, at least quarterly, to MDCPS regional and county staff, data related to compliance with the 2nd MSA's Foster Care Service Standards. MDCPS produces Focus on Data reports that are available to all staff and are scheduled to be updated daily. The reports graph county performance and can be downloaded in Excel and PDF formats. The monitoring team confirmed there are 37 separate reports, covering 23 individual commitments[13] that can be accessed by staff at any time.

---

[12] CCWIS is not required to be implemented until June 30, 2021.
[13] Some 2nd MSA commitments have multiple reports that cover different aspects of the commitment.

*Electronic Placement Database (1.6.c.)*

The 2nd MSA requires that MDCPS county staff have access to an electronic statewide database of available placement resources. MDCPS reports that the Department released a Placement Matching Tool available to all staff on March 21, 2018, which is a component of CCWIS that MDCPS committed to implement by June 30, 2021. The matching tool is designed for use by both frontline workers and licensure staff. A step-by-step training video and instructions are available to staff through MDCPS' SharePoint intranet platform.

The Placement Matching Tool allows workers to search for a suitable placement for a child in custody, pulling basic demographic and address information from MACWIS. A search can be conducted using the child's name or the address of removal. The default search identifies homes within a 50-mile radius of the child's address of removal that have availability for a child of the specified age and gender. There are advanced search options that allow the worker to change the radius distance, search by special needs, and search for resource homes that provide specific types of services. The search results provide contact information for the home and licensure specialist, along with basic information about other children in the home. MDCPS structured the tool to include information as to whether there has been prior abuse and neglect referrals regarding the home, the date of the referrals, and final dispositions. Substantiated referral information is prominently displayed in red. Prior screened-out referrals are also included in the search results for a home.

The monitoring team reviewed the Placement Matching Tool video and instructions, sampled usage of the tool and found it to be a potentially important, viable resource for finding best placements for children. MDCPS indicates there will be future enhancements to the tool, and the monitoring team will undertake additional verification of its functionality in 2019.

## Performance Based Contracting

*Performance Based Contracting (1.7)*

MDCPS committed to establish, maintain and assess the effectiveness of a performance-based contracting system to evaluate annually contract agency compliance with the terms of the 2nd MSA (1.7.a). MDCPS further agreed to take all reasonable steps to ensure contract agency remediation of identified deficiencies within three months. An agency's failure to participate in remediation efforts is grounds for contract termination.

MDCPS reports that for this monitoring period the Department began to implement the new system by transitioning 14 therapeutic foster care, group home and shelter programs to performance-based contracts. Each of these contracts include performance-based outcome standards. Included in the contract's scope of services is the following language that requires agencies to comply with 2nd MSA commitments:

> "Independent contractor will perform and complete in a timely manner and satisfactory manner the services described in the 'Scope of Services' attached hereto as Exhibit A, and the 'Second Modified Mississippi Settlement Agreement Reform Plan,' attached hereto as Exhibit B, and incorporated herein by reference."

During the monitoring period, MDCPS conducted performance evaluations for six of the contracts against the new performance-based standards. MDCPS represents the remaining eight contracts will be evaluated in the next monitoring period. The monitoring team reviewed the 14 contracts and found that performance-based standards are embedded in the contracts relative to service delivery, quality of services delivered and licensing evaluations. The performance-based evaluation process includes case record reviews conducted by MDCPS' performance-based contract unit (PBC) of the following practice areas:

- Initial Strengths and Needs Assessment
- Preserving Connections
- Teaming and Permanency Planning
- Service Provision
- Preparing Youth for Adulthood
- Placement Stability and Discharge Planning
- Caseworker Contact with the Child
- Child Safety

35

PBC and agency staff meet prior to the case record reviews for an entrance conference, complete a tool that ranks the frequency and quality of services provided, complete the review with a description of findings and conduct an exit conference. For any area that is found deficient, MDCPS requires a corrective action plan within three months. During the monitoring period, one agency, evaluated in December 2018, was required to submit a corrective action plan regarding two non-safety issues. This plan was submitted by the contracted agency and accepted by the Department in March 2019.

The 2nd MSA requires that prior to MDCPS contracting for case management services for children in custody, the Department must submit for the monitors' review and approval a detailed plan that ensures accountability, supervision and oversight of such agencies (1.7.b). MDCPS did not contract for case management of children in custody during the monitoring period.

## Foster Care Maintenance Payments

### Licensed Foster Families' Reimbursement Rates (1.8.a.)

MDCPS is required to ensure that all licensed foster families (regardless of whether they are supervised directly by MDCPS or by private providers, and whether they are kinship or unrelated foster families) receive at least the minimum reimbursement rate for a given level of service as established pursuant to the 2nd MSA. The monitoring team reviewed reimbursements for the care of a randomly selected sample of 100 children in licensed regular foster homes and determined that all the homes were paid the proper reimbursement rate for the age of the children in their care in December 2018.

### Foster Care Maintenance Payments (1.8.b.)

As of January 1, 2018, the effective date of the 2nd MSA, MDCPS agreed to pay to all licensed foster families at least the basic monthly foster care maintenance payments. Table 5 contains the current approved basic monthly rates for licensed foster homes. As mentioned above, the monitoring team reviewed a sample of 100 licensed regular foster homes and determined that all the homes were paid the proper reimbursement rate for the age of the children in their care in December 2018.

MDCPS committed to provide increases in the foster care board rate in SFY2020 based on the previous year's rate of inflation, as required by the 2nd MSA.

### Analysis of Rates (1.8.c.)

MDCPS was required to provide to the monitor within a year of court approval of the 2nd MSA (approved December 19, 2016) a written report setting forth (1) findings regarding the adequacy of a proposed schedule of foster care maintenance payments made to foster care providers

serving children, including children with specialized needs, and facilities providing congregate care in relation to the requirements of 42 U.S.C. § 675(4)(A) and the actual cost in the state of Mississippi to provide such care; and (2) the methodology utilized to determine the actual costs in the state of Mississippi to provide such care. Following review of the state's report, the monitor was required to establish the rates that MDCPS must implement. The monitoring team received the required reports timely on September 14, 2017 and reviewed and discussed the contents with MDCPS. The table below displays the current foster care maintenance rates approved by the monitor.

**Table 5. Current Resource Board Payment Schedule**

| Age/Status | Board | Clothing | Allowance | Payment | Daily Per Diem |
|---|---|---|---|---|---|
| 0-8 | $ 586.90 | $ 80 | $ 30 | $ 696.60 | $ 23.23 |
| 9-15 | $ 672.20 | $ 80 | $ 50 | $ 802.20 | $ 26.74 |
| 16-21 | $ 736.60 | $ 80 | $ 60 | $ 876.60 | $ 29.22 |
| Special Needs I | $ 838.60 | $ 80 | ** | $ 918.60 | $ 30.62 |
| Special Needs II | $ 901.30 | $ 80 | ** | $ 981.30 | $ 32.71 |
| Foster Teen Parent | $ 1,323.50 | $ 160 | $ 90 | $ 1,573.50 | $ 52.45 |
| Emergency Shelters | $ 4,412.10 | - | - | $ 4,412.10 | $ 147.07 |
| Regular Group Homes | $ 1,096.60 | $ 80 | ** | $ 1,176.60 | $ 39.22 (all ages) |
| Therapeutic Resource Homes | $ 2,823.10 | $ 80 | ** | $ 2,903.10 | $ 96.77 |
| Therapeutic Group Homes | $ 5,170.00 | $ 80 | ** | $ 5,250.00 | $ 175.00 |
| Related Therapeutic Placement | $ 1,293.70 | $ 80 | ** | $ 1,373.70 | $ 45.79 |

** Personal Allowance is based on the age of the child and is included in the total board payment.

## 2. Child Safety and Maltreatment in Care

In the 2nd MSA, MDCPS committed to maintain a statewide system to appropriately receive, screen and investigate reports of child maltreatment. MDCPS must ensure its system is adequately staffed and that investigations of all reports are commenced as required by state law and conducted and completed pursuant to policy and regulation. The 2nd MSA states that the monitor shall periodically review the statewide system for appropriately receiving, screening and investigating reports of child maltreatment.

37

## Screening Reports of Abuse and Neglect

*Responding to Reports of Abuse and Neglect (2.1)*

Mississippi Centralized Intake (MCI), established by MDCPS in 2009, is charged with receiving, prioritizing and dispatching reports of child maltreatment. Reports to MCI alleging child abuse, neglect, exploitation or risk are forwarded to local MDCPS offices for additional screening and investigation. If a report alleges maltreatment of a child in the state's custody, the information is required to be referred to the centralized Special Investigations Unit (SIU) for handling. MCI received 36,568 alleged abuse, neglect or exploitation (ANE) reports during 2018. Of the ANE reports received, 7,343 reports (20.1 percent) were screened out; 29,223 reports (79.9 percent) were assigned for investigation; and two reports remained in screening at the end of the period.

**Table 6. ANE Reports by Intake Action, 2018**

| Action | Q1 | Q2 | Q3 | Q4 | Year |
|---|---|---|---|---|---|
| Assigned for Investigation | 7,506 | 7,055 | 7,539 | 7,123 | 29,223 |
| Screened Out | 1,683 | 1,880 | 1,931 | 1,849 | 7,343 |
| In Screening | 0 | 0 | 1 | 1 | 2 |
| Total Referrals Received | 9,189 | 8,935 | 9,471 | 8,973 | 36,568 |

The monitoring team conducted a qualitative review of Mississippi's screening process in 2018. The review consisted of 100 randomly selected, screened-out abuse and neglect referrals involving children in MDCPS custody, all from 2018. The monitoring team determined that MDCPS made appropriate screening decisions in 91 of 100 instances. Nine of the referrals met criteria for maltreatment and should have been assigned for CPS investigation pursuant to MDCPS policy. In some instances, the screened-out referrals were forwarded to licensing or the ongoing worker as policy violations. In two instances, MDCPS had classified the reports as "duplicate" reports. To classify a report as a "duplicate" report, it must be determined that the new report involves the same alleged perpetrator(s), the same victim(s), the same types of maltreatment and the same incident as a prior referral. The two reports classified as "duplicate" by MDCPS did not meet these criteria.

Examples of referrals the monitoring team concluded should have been investigated for child abuse and neglect include:

- A referral was made by a nurse practitioner expressing concern that a child's foster family was not making sure she was taking her medications, including Benztropine Mesylate, Abilify and Vyvanse, regularly. The medications were stopped for unknown reasons.

- A 13-year-old foster child alleged that two years ago, in a previous foster home, she was sexually assaulted by her foster mother's teenage son. The foster mother was home at

the time, but she was in the kitchen and the children were in a separate room. The child did not tell anyone about the assault at the time, but afterwards she disclosed the assault during a visit to the doctor. The child also reported that the foster mother would whoop her across the back with a wide extension cord and it made her bleed. MDCPS screened this referral out as a "duplicate report" stating that the allegations were disclosed by the foster child during an open investigation. However, that investigation referenced a different perpetrator and did not document that any of the allegations in this referral were investigated by MDCPS.

*Maltreatment-in-Care Screen-Out Reviews (2.3)*

MDCPS committed to develop and implement policies and procedures, subject to the review and approval of the monitor, for the Department to review all maltreatment in care (MIC) reports that were screened-out and assess the appropriateness within 24 hours of all screen-out determinations. If the decision to screen-out the report is determined to be inappropriate, MDCPS shall ensure the report is referred for investigation timely.

Data provided by MDCPS indicate that 656 MIC reports were screened-out for investigation during 2018. MDCPS reported that the Department's Continuous Quality Improvement's (CQI) Safety Review Unit (SRU) conducted reviews of only 409 of the 656 screened-out MIC reports (62.3 percent) in 2018, though it is required to review all such screen-outs. SRU determined that only one report was inappropriately screened-out and returned it to MCI for investigation. The referral was not subsequently investigated by MDCPS.

*Standardized Decision-Making (2.8)*

The 2nd MSA requires MDCPS to assure that standardized decision-making criteria are used for prioritizing, screening, and assessing all reports of maltreatment of children in MDCPS custody. However, MDCPS has not yet implemented a system to ensure standardized decision-making. When MCI identifies that a foster child is the subject of the maltreatment referral, the unit is required to send it to the SIU. If the SIU supervisor decides to screen-out the referral, the supervisor is required to advise the Director of Field Support Programs who, upon approving the screen-out determination, must notify the SRU of the screen-out. The SIU's screen-out judgments are routinely final. Of the hundreds of screen-outs the SRU reviewed in 2018, data and information from MDCPS indicates there was only one instance where a reversal was recommended by SRU, but as reported earlier, the case was never investigated, and it apparently remained a screen-out.

In those instances where MCI is unaware that the child described in a referral is in foster care, the maltreatment referrals are sent to the 82 counties and the referrals are then subject to review by the Regional Director or his/her designee. The Regional Directors, and their designees,

have the unilateral power in their counties to change the disposition and screen-out the referral. There is no evidence to suggest those judgments, made by different county-based individuals across the state, are subject to rigorous scrutiny by State Office staff or further discussion with MCI staff to establish standardization. In almost every instance, the screen-out judgments of the county staff are final. This broad distribution of responsibility and prerogative to screen out referrals across the state into the counties, and designated down to proxies by certain Regional Directors, undermines standardized decision-making.

## Investigating Maltreatment in Care

*Special Investigations Unit and MIC Investigation Initiation Timeliness (2.2)*

Pursuant to the 2nd MSA, MDCPS is required to continue to maintain a special investigations unit whose responsibility is to investigate reports of maltreatment of children in custody. The initiation of that investigation shall not extend beyond 24 hours.

MDCPS continued to maintain SIU, charged with investigating reports of maltreatment of children in custody throughout 2018. Data provided by MDCPS indicate that of the 527 investigations conducted by SIU that were due for approval in 2018, 513 (97.3 percent) were initiated timely.

*MIC Worker Training (2.6)*

Pursuant to the 2nd MSA, all allegations of maltreatment of a child in custody are to be investigated by a worker who has received training on intake and investigations processes, policies, and investigation techniques and has no ongoing connection to the foster care case.

MDCPS provided investigative training dates for all current SIU staff, who are responsible for conducting MIC investigations. However, both MDCPS and the monitoring team identified investigations of MIC that were not completed by SIU. SIU workers receive training on intake policy, investigations into maltreatment in care and facility investigations, in addition to the pre-service training that all workers receive. Ongoing foster care workers do not receive the same level of training. The monitoring team reviewed all 129 investigations with a custodial child victim that were conducted by non-SIU workers to determine if the investigator had an ongoing connection to the foster care case. The team identified four instances where an investigation of maltreatment of a child in custody was conducted by a worker with an ongoing connection to the foster care case of one of the alleged victims.

*MIC Investigation Completion Timeliness (2.8.a.)*

MDCPS committed that by July 1, 2018, at least 90 percent of MIC investigations will be initiated and completed within 30 days. Data provided by MDCPS indicate that of the 527 MIC

investigations due for completion in 2018, 518 (98.3 percent) were completed timely. The monitoring team's case record review of 82 MIC investigations confirmed that MDCPS met the performance standard for this commitment during 2018.

*Filing of MIC Investigations (2.8.c., 2.8.d.)*

Pursuant to the 2nd MSA, when a MIC investigation involves a foster or adoptive home, MDCPS must file a copy of the approved final investigation report, and any recommendations and/or corrective actions MDCPS has deemed necessary, in the case record of the foster child. The Department must also file a copy of the approved final investigation report, and any recommendations and/or corrective actions MDCPS has deemed necessary in the file of the foster or adoptive parents, along with a copy of the letter of notification to the foster or adoptive parents, and with the Bureau Director for Licensure. MDCPS must also provide those records to the Youth Court Judge with jurisdiction over the child and, upon request, to the monitor (2.8.c).

Additionally, when a MIC investigation involves an agency group home, emergency shelter, private child placing agency foster home, or other facility licensed by MDCPS, a copy of the final investigative report must be filed in the child's case record, with the Director of Congregate Care Licensure, and sent to the licensed provider facility. MDCPS must also provide the report to the Youth Court Judge with jurisdiction over the child and, upon request, to the monitor (2.8.d).

MDCPS did not provide information on its performance for these commitments in 2018.

*Worker Contacts with Custody Children after a MIC Substantiation (2.8.b.)*

The 2nd MSA requires that any foster child who remains in the same out-of-home placement following an investigation into a report that he or she was maltreated in that placement shall be visited in the placement by an MDCPS caseworker according to the following schedule:

- Once per week for the first month and twice per month for three months if the investigation is found to be substantiated, or
- Twice per month in accordance with MDCPS policy if the investigation is found to be unsubstantiated.

The monitoring team was unable to validate the data MDCPS provided for this commitment. The monitoring team was unable to replicate MDCPS' calculations used to create the files and calculate performance. During this process, MDCPS determined that it was incorrectly counting the number of weekly and monthly visits due to what appeared to be a coding error that assigned visits to the subsequent week or month in which they occurred.

During the fourth quarter of 2018, MDCPS reported there were nine foster children who remained in the same out-of-home placement following a substantiated report that he or she

41

was maltreated in that placement. The monitoring team conducted a qualitative review of case notes for these nine children to determine if they had been visited in the placement by an MDCPS caseworker according to the agreed upon schedule. The review indicated that for four of the nine foster children who were reported to have been maltreated and remained in the same placement, the substantiations of maltreatment were for incidents that occurred prior to the child's placement in the foster home and were included in the data by MDCPS erroneously. The substantiated perpetrator was not the foster parent. For the five foster children where the investigation of maltreatment was found to be substantiated in the foster home where they remained, only one foster child received the required visits by a caseworker.

For the five foster children reviewed, there were 23 visits required in the three-month period, based on the date of the substantiation. Sixteen of the 23 visits took place as required and seven visits did not.

*Licensure Investigations of Emergency Shelters and Group Homes (2.4)*

MDCPS committed to initiate a licensure investigation of contract agency group homes and emergency shelters within 30 calendar days following a substantiated report of child maltreatment. The licensure investigations are required to occur in addition to and independent of child protection investigations and must include an on-site inspection by MDCPS of the group home or emergency shelter to determine the contract provider's compliance with MDCPS licensure standards. A provider has 10 calendar days to submit a corrective action plan (CAP) with timeframes to rectify any identified violation of licensure standards and comply with the approved CAP timeframes. If the provider does not comply with the licensure standards based on the approved CAP and timeframes, MDCPS shall revoke the license.

MDCPS reports there were two substantiated reports of child maltreatment in 2018 relevant to this commitment, one in a group home and one in a shelter. In one investigation, MDCPS found no licensure violations; therefore, no CAP was necessary. In the other investigation, a CAP was submitted and approved.

The monitoring team reviewed the two licensure investigations and one CAP. In one investigation, there was an on-site inspection of the facility, but in the other review, the monitoring team was unable to determine whether such an inspection took place, as required. In that same investigation, MDCPS listed the date that licensure staff completed the investigation as being earlier than the date licensure staff even initiated the investigation. The CAP included timeframes and dates to rectify the violations, but the monitoring team was unable to determine whether the facility complied with the licensure standards based on the approved CAP and timeframes. Actions taken by the facility included the termination of multiple staff members, in-service trainings and policy updates.

*Licensure Investigations by Child Placing Agencies (2.5)*

The 2nd MSA requires that upon receipt of a report of child maltreatment in a private child placing agency (CPA) foster home, MDCPS must notify the CPA, which shall within 30 calendar days initiate an independent licensure investigation, including an on-site inspection of the foster home, to determine the provider's compliance with licensure standards. If the foster home provider is found to be in violation of licensure standards, the provider shall have ten calendar days to submit a CAP with timeframes to rectify the violation and comply with the approved plan. MDCPS shall recommend that the foster home license be revoked if the provider does not comply based on the approved CAP and timeframes.

MDCPS identified 21 reports of maltreatment involving CPA foster homes. The monitoring team reviewed the cases to assess whether an independent licensure investigation was initiated consistent with the 2nd MSA requirements. The monitoring team noted several issues during the review, including:

- MDCPS' notification to the CPAs of a report of maltreatment in a CPA foster home was inconsistent, ranging from 0 to 143 days, with a median of 40 days, after the report of maltreatment was made to MCI.

- CPAs did not always complete the required licensure investigation, opting instead, in some instances, to close the home or remove the child without completing the investigation as required.

- On-site inspections were conducted, as required, in connection with just eight of the 15 licensure investigations that were initiated.

- Licensure violations were indicated in eight of the licensure investigations conducted, but only two CAPs were developed in connection with those eight investigations.

*MIC Investigation Reviews (2.7)*

Within 30 calendar days of the completion of any investigation of maltreatment of a child in custody, as required in Section 2.1, MDCPS must review the maltreatment investigation. This review will:

- Identify any case practice deficiencies in the investigation and any remedial actions necessary to ensure the safety of the child who is the subject of the investigation, as well as any other children in the home or placement;

- Identify a timeframe in which any recommended remedial action must take place; and

- Monitor the initiation and completion of the remedial actions regarding individual child safety and case practice.

43

When any remedial actions have not been initiated or completed timely, MDCPS must notify the supervisor, Regional Director and Director of Field Operations.

Reviews of MIC investigations are completed by the MDCPS Safety Review Unit (SRU). MDCPS sent monthly spreadsheets to the monitor detailing the investigations that the SRU reviewed. The monitoring team determined that there should have been 493 investigations reviewed by the SRU during 2018, however SRU conducted reviews of only 325 (65.9 percent) of the investigations.[14]

The monitoring team reviewed SRU reports for the 82 MIC investigations from the first quarter of 2018, evaluated under commitment 2.1. SRU identified case practice deficiencies in 14 reports. These include the alleged victim children not being seen within 24 hours of intake, safety/risk assessments not being completed timely and CAPs not being documented in instances where one was recommended by the investigator. Specific remedial actions and timeframes to address these deficiencies were not identified in the SRU reports.

*Investigating Reports of Abuse and Neglect (2.1)*

The monitoring team conducted a qualitative review of all MIC investigations where the alleged perpetrator was a non-relative foster parent, relative foster parent or residential facility staff member, completed by SIU during the first quarter of 2018. This included 82 investigations involving 153 children. Nine of the 82 investigations, involving 19 children, were substantiated for abuse and/or neglect. The monitoring team's review involved reading Investigation Reports supplemented with information from MACWIS.

The monitoring team found that SIU workers consistently contacted and interviewed alleged victims within 24 hours of the report date and time. The alleged perpetrator and collateral contacts were typically interviewed during the course of the investigation. However, in five instances, MDCPS rendered a finding before forensic interview or drug testing results requested by MDCPS were received. The entire investigation was completed and approved within 30 calendar days of the initial intake report date and time in 80 of the 82 investigations. It appears that some investigations require additional time to complete a thorough assessment of the information gathered before making a finding, but an extension was not requested. The monitoring team also found instances where homes with prior child abuse or neglect substantiations were closed and then re-opened.

---

[14] MDCPS reported that prior to November 8, 2018, the tracking report sent to SRU excluded intakes that did not have an incident date. As a result, SRU did not review at least 161 investigations that the unit was required to assess. MDCPS reports it has implemented a correction so that referrals without incident dates are sent to SRU for review.

The monitoring team concluded the evidence supported MDCPS' findings in 58 of 82 investigations (70.7 percent). The monitoring team concluded in 14 investigations (17.1 percent) more information was needed in order to draw a proper conclusion. There were ten investigations (12.2 percent) where some or all the allegations were found to be unsubstantiated by MDCPS, but the monitoring team concluded that information presented during the course of the investigation was sufficient to substantiate.[15] A few examples include:

- MDCPS unsubstantiated allegations of abuse and neglect after a foster child reported the foster mother had slapped her in the face and pulled her hair. The foster mother made multiple assertions to the investigator that the alleged victim foster child had "put a spell on her without using words," and that the child was "evil," a "devil worshipper" and was "trying to kill her." The foster mother also admitted to pulling the child's hair, hitting her and "cussing" at her. She stated that she was going to "mail the worms in [her] body" to the foster child. Despite such statements from the foster mother, MDCPS left the alleged victim's two younger brothers in the placement and noted no concerns for the children in the home. Further, during the investigation, it became apparent that the foster mother was not ensuring that one of the foster children in the home was taking a prescribed medication. Five months later, the foster mother allegedly choked another foster child in the home, leaving him with a scratch on his neck and bruise on his shoulder. MDCPS found the allegation of physical abuse to be substantiated and the home was subsequently closed to new placements. The first investigation should have been substantiated, and the home should have been closed earlier.

- MDCPS unsubstantiated allegations of child maltreatment after a five-year-old child disclosed that his previous foster mother had put socks in his throat when he was crying and made him squat against the wall as punishment. He alleged that sometimes he was made to do the "wall sits" while in his underwear or naked, and that on at least one occasion, he was made to squat against the wall in a closet. The foster mother admitted to making him squat against the wall but denied ever putting a sock in his throat. The alleged child victim had been removed from the home prior to the investigation at the request of the foster mother, but two other foster children were left in the home. The SIU worker noted in her investigative findings that one of the foster children left in the placement was a similar age to the alleged victim child and that she "may be at risk for similar treatment now that [the alleged victim] is no longer there." The licensing worker met with the foster parents and recommended that a CAP be completed; the home remained open.

---

[15] This includes one investigation where the allegations were found to be substantiated for two foster children but unsubstantiated for another two foster children and one adoptive child in the same home. The monitoring team determined maltreatment should have been substantiated for all five children.

- Allegations of physical neglect were unsubstantiated after a 16-year-old foster child was arrested for breaking into cars and stealing handguns while the foster mother worked the night shift. The foster child allegedly brought the stolen guns and marijuana into the foster home, around the other youth in the home. There was photo evidence of the foster children having access to the guns and marijuana. The foster mother had allowed her 18-year-old son to watch the three foster children (ages 16, 14 and 14) during this time. Prior to this incident, there were supervision concerns regarding the foster mother that resulted in a corrective action plan. A police officer stated to the investigating worker that there is "no way these boys were being properly supervised." The foster home was subsequently closed, and the children were removed based on a lack of supervision, the exposure of the foster child to drugs and guns and admission by the arrested youth that he was sneaking out of the home on a recurring basis.

MDCPS utilizes third-party, contracted agencies to license therapeutic foster homes.[16] There were multiple unsubstantiated investigations that involved these contracted therapeutic foster homes. Examples include:

- In one case where the monitoring team concluded that more information was needed, there were allegations of insufficient food in the home and that the foster mother was waking the children up at 2:00 or 3:00 AM to complete chores. Similar allegations were made against the same foster mother in 2012 by another foster child. It is unclear if the SIU worker noticed this connection before finding the case to be unsubstantiated. The investigation was also completed prior to receiving the results of the forensic interviews MDCPS requested during the investigation. A CAP was completed at the recommendation of the licensing agency, the children were removed, and the home remains open.

- In another case, the foster mother allegedly made a 10-year-old child iron his own clothes, even after he had burned himself on one occasion. The foster mother also admitted to referring to "time out" as "jail," and stated that she would put the children in "jail" for 60 to 90 minutes at a time. The principal of the 10-year-old's school referred to the foster mother as being "not very nurturing." The foster child's younger sister, age 7, also alleged while being interviewed that she had fallen and injured her chin on concrete recently and that it hurt so bad that she did not eat, yet the foster mother allegedly did not take her to the doctor. The therapeutic foster care agency reportedly planned to provide extra support to the foster parent. MDCPS recommended no further intervention.

- In another therapeutic foster home case, an eight-year-old in the home stated that every time he gets in trouble, he gets a "whipping" and that he is afraid of the foster father. A

---

[16] A therapeutic foster home is a resource home licensed and certified to care for children with severe behavioral, emotional and psychological impairment. *MDCPS Section D: Foster Care Policy, Section V.G.3.*

two-year-old in the home slept in the foster parent's bed since he was days old, and the foster father refused to allow anyone to see his bedroom. The foster father also allegedly kissed an 18-year-old foster child in the home on her chest and neck for doing a good job raking leaves. MDCPS found the allegations to be unsubstantiated. The children were removed, and the home was closed.

*Maltreatment of Children in Care (2.9)*

Pursuant to the 2nd MSA, MDCPS agreed that the rate of child abuse and neglect among children in foster care shall not exceed 0.33 percent per year. A child is counted as having been maltreated in foster care if the perpetrator of the maltreatment was identified as a foster parent or a residential facility staff member. This was a federal outcome standard (based on the federal Child and Family Services Review, Round Two) focused on keeping children in foster care safe from abuse and neglect by their caregivers.

Data provided by MDCPS and verified by the monitoring team indicate that 95 children (1.15 percent) in MDCPS' custody were victims of abuse or neglect by their caregivers. MDCPS should have protected at least 68 more children from abuse or neglect in their placements in 2018 in order to meet the agreed upon safety standard. Examples of substantiated abuse and neglect during 2018 include:

- A six-year-old foster child placed in a licensed relative home was alleged to have marks and bruises all over her body. The investigation confirmed that the child was beaten and whipped by her foster mother with a belt, causing significant bruising all over her body. In addition, the child, who was diagnosed with sickle cell, had not been given her medication. The foster mother possessed only an expired medication for the child that was unopened. Physical neglect and physical abuse were substantiated, the child was removed, and the home was closed.

- A nine-year-old in residential care had bruising on his chest and two scratches. He stated that a staff member had punched him in his chest, and another had grabbed him by his shirt and scratched him. Physical abuse was substantiated for the staff person who grabbed the child; she was previously substantiated – twice – for harming children in residential care. The child remained placed at the facility and MDCPS recommended that the staff person no longer have contact with children in CPS custody as this was the employee's third substantiated report.

- A grandmother, recently granted custody of her three-year-old granddaughter, allowed her to spend a few days with her previous foster parents. When she returned from the visit, she was red in the vaginal area, and didn't want to be washed between her legs. When the grandmother spoke with the foster mother about this, she said it was eczema

and to just put cream on it. However, when the grandmother tried to apply the cream, the child would scream. When interviewed, the child gestured to indicate the foster father who she called "daddy" had touched her in her vaginal area. Sexual abuse by her former foster father was substantiated and the home was closed.

- A five-year-old was coming to school for weeks in the same dirty clothes and smelling of urine. He was also hungry and stole food from the teacher's desk. He had scratches on his face and a wound with scabs on the back of his neck. When interviewed, he said that he cried when the other children tell him that he stinks. He said he got the scratches from rough housing with his eight-year-old brother, and the foster father did not put anything on the neck wound to help it to heal. He said he did not brush his teeth because he did not have a brush or paste. The foster father left his 16-year-old daughter to care for the foster children when he worked 12-hour shifts, and sometimes overnight. Physical neglect by the foster father was substantiated, the children were removed, and the home was closed.

- A nine-year-old child with developmental disabilities that caused him to have encopresis and enuresis was residing in a therapeutic foster home. He told his counselor that he was "whooped" by his foster mother with a belt. The older brother, age 11, could hear his brother being hit. There were bruises with a belt buckle pattern on his thighs, according to an examining physician. The foster mother admitted to hitting him for "peeing and pooping," but stated that she only used her hand, not a belt. Physical abuse was substantiated, the child was removed, and the home was closed.

## 3. Family-Based Placements

### Foster Home Licensure (3.1)

In order to ensure that children who are removed from their families due to abuse and neglect are placed in the most appropriate and least restrictive setting, MDCPS agreed to develop a safe array of family-based placement resources. The 2nd MSA requires MDCPS to both recruit and license a target number of non-relative foster families and to ensure that when MDCPS places children with relatives, those homes are timely licensed. MDCPS agreed to utilize the licensure process approved by the monitor when assessing prospective relative and non-relative homes.

The licensure process requires MDCPS to: provide pre-service training for applicants; conduct home visits with the prospective applicants and family members; assess the physical and mental health of applicants; conduct home environment safety checks; obtain references regarding the applicants and complete full background checks that include state and federal fingerprints for all adults in the home. MDCPS is also required to complete a foster home study that synthesizes

information obtained during the home study process and documents the agency's licensure decision. The monitoring team reviewed a randomly selected sample of 20 non-relative foster homes licensed during the monitoring period and found that MDCPS licensed non-relative homes consistent with both the requirements of the approved licensure process and agency licensure standards.

MDCPS agreed to license non-relative homes within 120 days of the prospective foster parent's inquiry regarding foster parenting. For 2018, MDCPS was unable to submit accurate data regarding the timeliness of the licensure process for non-relative foster homes due to inconsistent practice during the period that impacted how timeliness was calculated. In addition, staff inconsistently entered into MACWIS the date of the prospective foster parent's inquiry, making it impossible to validate timeliness in many instances. MDCPS reports it is working to correct these issues.

Consistent with the requirements of the 2nd MSA, MDCPS developed an annual plan to recruit and retain additional licensed foster home placements for calendar year 2018. The monitoring team reviewed the plans utilized by the Department to assist in meeting the statewide 2018 targets and found them to be appropriate for this purpose.

When a child in the custody of MDCPS needs an out-of-home placement, potential relatives are always considered as the first placement resource. MDCPS policy states that "first priority for placement shall be given to a relative when it is suitable and appropriate to do so" and the Department committed to license all unlicensed relative homes with limited exceptions, as described below.

The assessment of a relative's home for potential placement begins when the child's caseworker initiates MDCPS' emergency placement process that includes a pre-placement safety assessment. The child's worker is responsible for walking through the entire home, both inside and outside, to ensure that safety issues do not exist or when safety issues are identified, they are remediated prior to a child's placement. MDCPS must also complete and assess the results of criminal, law enforcement and child abuse registry background checks prior to approving the placement. After the initial safety process is completed and supervisory staff approve the child's placement, casework staff must make a referral to the regional licensure unit for continuation of the 90-day licensure process.

MDCPS data shows that 1,318 child placements were made during the monitoring period into 798 unique unlicensed relative homes. The outcomes for licensure of the 798 homes are as follows.

**Table 7. Licensure Status of Homes, 2018**

| Licensure Status | Homes | Percent |
|---|---|---|
| Licensed | 493[17] | 62% |
| Unlicensed | 305 | 38% |
| Total | 798 | 100% |

The monitoring team conducted three separate quality reviews of 106 expedited pending relative placements made during 2018. The monitoring team was able to confirm that MDCPS implemented the licensure process approved by the monitor for relative homes. However, during the reviews, the monitoring team identified lapses by MDCPS in carrying out the initial pre-placement safety assessment process conducted by the child's caseworker. Specifically, the monitoring team found:

- Of the 106 cases reviewed, documentation of the initial home walk-through was missing for three placements and indicated the walk-through was completed late for 21 placements.

- Home study files lacked documentation of some criminal and central registry background checks for adults in 21 homes.

- Inappropriate sleeping arrangements were found in nine homes including: a foster child sleeping in the same bed as the foster parent; a young child sleeping in an unapproved crib; a child sleeping on an air mattress in the living room and a child sleeping on a couch due to a lack of space in the home. In most cases, there was documentation that these issues were resolved at some point during the licensing process.

- The review also surfaced various other safety issues, including relative homes without carbon monoxide detectors, homes with exposed wiring and homes in very poor repair.

MDCPS acknowledged that during the monitoring period, as the new relative home study process was implemented, caseworkers and supervisors were still working to hone their skills in order to fully implement the pre-placement safety process. MDCPS has plans for additional training to ensure that staff consistently comply with and document pre-placement relative home safety requirements. However, for this period MDCPS acknowledged lapses existed in both documentation and timely completion of required initial safety checks as well as timely referrals to licensure staff for the initiation of the relative home study process.

---

[17] Of the 493 licensed homes, 459 (93 percent) were licensed within 90 days of placement.

*Unlicensed Relative Homes (3.2.a.)*

MDCPS committed that no child will remain in a foster home or facility determined to be unable to meet licensure standards absent an order by a state court with jurisdiction over the child's custody directing the placement of the child into a specific unlicensed placement. MDCPS is not held accountable for a state court's order as long as MDCPS documents that it presented information to the court that the foster home has not met licensing standards, the reasons why the foster home has not and cannot meet licensing standards, and an explanation that a licensed foster home or facility is available, or one time only, to an appropriate expedited relative placement.

MDCPS data shows that during the monitoring period 453 children were placed in court-ordered unlicensed homes and facilities. One hundred fifty of those were placements of children in unlicensed shelters.[18] Three hundred three children were placed in court-ordered unlicensed family-based placements during the period. MDCPS produced to the monitoring team court orders for 49 children in expedited pending relative placements that were made during the period but did not produce court orders for the remainder of the court-ordered unlicensed placements.

Further, during the monitoring period MDCPS acknowledged it had not yet implemented consistent protocols to document information MDCPS provided to the court as it agreed to do in the 2nd MSA. Specifically, MDCPS did not produce evidence that it consistently advised the court whether or not it would be safe for a child to remain in the relative home when it could not be licensed, the reasons why the home could not be licensed and an explanation that a licensed placement was available.

*Safety and Non-Safety Issues (3.2.b., 3.2.c.)*

When MDCPS determines that an unlicensed foster home or facility is unable to meet MDCPS licensing standards due to a safety issue, MDCPS must take all reasonable efforts to immediately ensure the child's safety, including, when necessary, seeking an emergency court order to remove a child. If the child is not in imminent danger, MDCPS must implement a safety plan and within five calendar days, either cure the licensing deficiency if feasible, or move the child to a licensed foster home or facility, or to an appropriate expedited relative placement, one time only.

When MDCPS determines an unlicensed foster home cannot meet licensing standards due to a non-safety issue, the Department must, within 30 calendar days of that determination, either

---

[18] One hundred forty-four of the 150 shelter placements were ordered by the Harrison County Court as an alternative to initial non-relative foster home placement.

cure the licensing deficiency if feasible, or move the child to a licensed foster home or facility, or to an appropriate expedited relative placement, one time only.

MDCPS designated the Department's Continuous Quality Improvement Evaluation and Monitoring Unit (EMU) as the responsible entity to track and monitor its performance regarding the 2nd MSA's unlicensed relative home commitments.[19] Each week MDCPS' Data Reporting Unit provided a report to the EMU, which showed children who were placed in unlicensed relative homes. New unlicensed relative homes were assigned to EMU staff who were responsible to: review MACWIS to determine the unlicensed relative's home status; communicate with licensure staff regarding the timelines of the licensure process; follow up with licensure staff regarding any identified safety or non-safety related issue and monitor efforts to ensure timely and appropriate action is taken by licensure and field staff to address those issues. EMU staff utilized the Footprints tracking system to monitor the family's progress to licensure until a determination was made.

MDCPS submitted to the monitoring team beginning in April 2018 two types of reports monthly: A Safety Issues Report and a Non-Safety Issues Report, both regarding expedited pending relative homes. During the course of tracking the licensure process on an expedited pending relative resource placement, the EMU notes in a Footprints tracking system ticket if there is a safety issue or a non-safety issue that is preventing or may prevent the home from being licensed. The Safety Issues Report submitted to the monitoring team had no more than six entries per month. The Non-Safety Issues Report had no more than three entries per month. For instance, both June 2018 reports included six resource homes with safety issues and two with a non-safety issue. Identified safety issues included a hole in the floor of a child's bedroom, children having inappropriate bedding, and a home not having a fire extinguisher or carbon monoxide detector. Both items on the Non-Safety Issues report were duplicate entries, one from a year earlier, June 2017, and the other from the previous month's report that had been previously documented as resolved. The December 2018 report included only two relative homes with safety issues and one with a non-safety issue. MDCPS reported issues that included the lack of a fire extinguisher, inappropriate sleeping arrangements, and beer cans on the ground outside of a home.

The Safety Issues and Non-Safety Issues Reports do not include dates when MDCPS resolved each issue, which prevents the monitoring team from verifying that the licensing deficiencies were resolved within five days or 30 days as required by the 2nd MSA.

---

[19] In late 2018 MDCPS modified the tracking process by designating licensure staff responsible to ensure safety and non-safety issues are addressed.

*Foster Home Development (3.3)*

The 2nd MSA provides that MDCPS, in conjunction with the monitor, shall establish annual statewide and county performance requirements and time periods for new foster home licensure (3.3.a). In order for the first annual performance targets to be set for calendar year 2018, the monitoring team recommended that MDCPS conduct a foster home needs assessment to identify the number of available licensed foster homes and determine the number of licensed foster homes needed. The assessment was designed to inform MDCPS' efforts to build the capacity over time to make safe and appropriate placement matches, and ensure children are placed with their siblings in close proximity to their family and community. Utilizing segments of MDCPS' assessment analysis, as well as child custody data, caseload data, licensure data, and foster home development and closure data, the monitor established the 2018 new foster home licensure target at 400 homes. The time periods for new home licensure were set at:

- 150 new foster homes licensed by June 30, 2018
- 300 new foster homes licensed by September 30, 2018
- 400 new foster homes licensed by December 31, 2018

During the monitoring period, MDCPS provided to the monitoring team monthly new foster home licensure data. Through ongoing data verification and a sample review of new foster home records, the monitoring team confirmed that MDCPS licensed 431 new foster homes during 2018, exceeding the target of 400 new homes. MDCPS exceeded the interim target of 150 new homes developed by June 30, 2018 and slightly missed the September 30, 2018 interim target of 300 new homes.

**Table 8. Non-relative Foster Homes Licensed, 2018**

| Date | Goal for New Unrelated Foster Homes | Total # of New Unrelated Foster Homes Licensed |
|------|-------------------------------------|------------------------------------------------|
| June 30, 2018 | 150 | 173 |
| September 30, 2018 | 300 | 285 |
| December 31, 2018 | 400 | 431 |

In order to expand the pool of foster homes available for placement, MDCPS committed to recruit and retain additional licensed foster home placements and maintain the additional number of total placements, as necessary during the applicability of the 2nd MSA (3.3.b). Taking into consideration the new home target and historical foster home closure data, the monitoring team established a net gain target of 275 additional foster homes for 2018.

MDCPS licensed 431 new homes and the monitoring team verified that 271 homes closed during the monitoring period, resulting in a net gain of 160 foster homes. While MDCPS expanded its

53

pool of foster homes in 2018, the Department did not meet the net gain target of 275 additional foster homes.

## 4. Placement Standards

*Foster Home Licensure Limits (4.1, 4.13)*

MDCPS agreed that no foster home shall provide care for more than five children (including foster, birth, and adoptive children) at any given time, in accordance with the following:

- Foster homes may provide care for more than three foster children, up to a total of five, only with the documented approval of MDCPS Office of Licensure determining that the foster children can be safely maintained in the foster home.

- No more than two children in the foster home may be under the age of two or have therapeutic needs, including the biological and/or adoptive children.

- Notwithstanding the above, a sibling group may be placed together in the same foster home in excess of these limits, but only if they are the only children in the home, and only upon written approval by the MDCPS Licensure Director determining that the foster children can be safely maintained in the home.

The parties agreed that by July 1, 2018, MDCPS would meet an interim performance standard of 70 percent for this commitment. Data provided by MDCPS indicate that as of December 31, 2018, there were 2,056 foster homes in Mississippi with at least one child in placement. Of these 2,056 homes, 1,921 (93.4 percent) met the terms of this commitment. Eighteen homes (0.9 percent) did not meet the requirements of the commitment, and MDCPS was unable to report on 117 homes[20] (5.7 percent).

*Children with Special Needs Placed with Resources Meeting Those Needs (4.2, 4.14)*

The 2nd MSA states that children with special needs shall be matched with placement resources that can meet their therapeutic and medical needs. MDCPS is to ensure that each county office has access to resource workers within its region who have the ability to ascertain the placement resources available and their suitability for each child who needs placement.

Mississippi Code 43-27-101(f) defines a special needs child as:

> "A child with a variety of handicapping conditions or disabilities, including emotional or severely emotional disorders. These conditions or disabilities

---

[20] MDCPS was unable to report on resource homes identified as an umbrella agency or a subordinate resource to an umbrella agency.

present the need for special medical attention, supervision and therapy on a regimented basis."

Children with special needs qualify for increased board rates, divided into the levels Special Needs I, Special Needs II and Therapeutic, depending on the severity of the child's needs.

**Table 9. Special Needs Board Rates**

| Level | Definition | Current Board Rate |
|---|---|---|
| Special Needs I | A foster child qualifies for the Special Needs I board payment rate if the child has a mental health or medical diagnosis and applied for SSI and the application is pending or has been denied. | $838.60 |
| Special Needs II | A foster child qualifies for the Special Needs II board payment rate if the child receives SSI. A copy of the SSI letter that states the child is approved must be submitted to Eligibility. | $901.30 |
| Therapeutic | A foster child qualifies for a Therapeutic board payment rate if the child has a DSM-IV Axis I diagnosis. | $1,293.70 - $5,170.00[21] |

MDCPS reported that at the end of 2018, there were caregivers for 27 children receiving Special Needs I board payments, caregivers for 69 children receiving Special Needs II board payments, and caregivers for 308 children receiving Therapeutic board payments. Children are matched with placements that meet their needs through the Therapeutic Placement Unit, which reviews referrals for children requiring therapeutic placement and matches them to providers with the specific service(s) being requested. The parties agreed that by July 1, 2018, 60 percent of children with special needs would be matched with placement resources that can meet their therapeutic and medical needs. MDCPS did not provide data or an analysis of performance for this commitment for 2018.

*Children Placed in Least Restrictive Setting (4.3, 4.15)*

In the 2nd MSA, MDCPS committed that each foster child shall be placed in the least restrictive setting that meets his/her individual needs as determined by a review of all intake, screening, assessment and prior placement information available at the time of placement. In order of consideration this means: placement with relatives; foster home care within reasonable proximity to the child's home community; foster home care outside of the child's home community; group home care or institutional care. The parties agreed to a 95 percent performance standard for this commitment.

---

[21] Rate varies depending on whether the placement setting is a related therapeutic placement, a therapeutic resource home or a therapeutic group home.

MDCPS reported that as of December 31, 2018, 4,309 of the 4,811 children in custody were placed in family-based settings, the least restrictive placement type. The monitoring team reviewed all the data submitted by MDCPS in support of its performance and undertook validation of a randomly selected sample of case notes and residential services applications for 25 children placed in congregate care programs which are more restrictive placement settings. The monitoring team determined those placements were made appropriately in order to meet the individual child's identified needs.

*Children Placed Within Proximity to Home (4.4, 4.18)*

MDCPS is required to ensure that each child who enters placement (from regions other than II-East, II-West, and V-West) shall be placed within his/her own county or within 50 miles from the home from which he/she was removed, unless:

- The child's needs are so exceptional that they cannot be met by a family or facility within his/her own county or within 50 miles of the home from which he/she was removed;

- The child is placed through the Interstate Compact on the Placement of Children (ICPC) consistent with its terms;

- The child is appropriately placed with relatives;

- The child, age 14 years or older, is pursuing educational or vocational opportunities;

- The child is ordered to be placed in a child-specific foster care setting by a court; or

- The child is placed in an adoptive home.

The parties agreed to a 90 percent performance standard for this commitment. Data provided by MDCPS indicate that, excluding children removed from regions II-E, II-W and V-W, there were 9,888 placements made in 2018. Of these, 9,647 (97.6 percent) met the proximity terms of the 2nd MSA. This includes placements made within 50 miles from the child's home of removal (8,056) and placements that exceeded 50 miles but had an approved exception consistent with the commitment (1,591).

*Children Placed Within Proximity to Home (4.5, 4.19)*

For children who enter placement from Regions II-East, II-West, and V-West, MDCPS committed that no less than 90 percent will be placed within his/her own county or within 75 miles of the home from which he/she was removed. The same exceptions apply, as in Sections 4.4 and 4.18 above, except for the radius distance.

MDCPS is not currently tracking whether placements for children from regions II-E, II-W and V-W are within 75 miles of the home of removal, instead reporting on whether the placements are

within 50 miles or have a valid exception. Data provided by MDCPS indicate that there were 1,690 placements of children from regions II-E, II-W and V-W in 2018. Of these, 1,588 (94.0 percent) were placed within 50 miles of the home of removal (1,112) or had an approved exception consistent with the terms of the commitment (476).

The 2nd MSA also calls for the monitor to evaluate this commitment in December 2018 to determine whether the 75-mile exception for these three regions is still necessary. Given that MDCPS does not currently track whether placements are within 75 miles from the home of removal and the Department is exceeding the standard while evaluating these three regions against the 50-mile rule, the monitor determines that the 75-mile exception for regions II-E, II-W and V-W is not necessary.

*Placing Siblings Together (4.6, 4.16)*

The 2nd MSA requires MDCPS to place siblings together when they enter placement at or near the same time. Exceptions can be made if placing the siblings together would be harmful to one or more of the siblings, one of the siblings has exceptional needs that can only be met in a specialized program or facility or the size of the sibling group makes such placement impractical notwithstanding diligent efforts to place the group together. If a sibling group is separated at initial placement, the caseworker shall make immediate efforts to locate or recruit a foster family in whose home the siblings can be reunited. These efforts must be documented and maintained in the case file. The parties agreed that by July 1, 2018, MDCPS would meet an interim performance standard of 60 percent for this commitment.

The monitoring team is unable to validate the data MDCPS produced for this commitment. During validation, the monitoring team was unable to replicate the detail files MDCPS produced and observed many instances in which MDCPS identified siblings placed together despite the siblings' placement histories showing they were never in the same placement. The monitoring team requested feedback from MDCPS regarding the method used to identify sibling groups but MDCPS was unable to interpret its code (written by a former MDCPS employee) used to identify sibling groups and calculate performance for this commitment.

*Placement Disruptions (4.7, 4.17)*

MDCPS committed to take all reasonable steps to avoid the disruption of an appropriate placement and ensure placement stability for children. If there is a documented indication that a placement may disrupt, the caseworker shall immediately take steps to determine the following:

- The cause of the potential disruption;
- Whether the placement is appropriate for the child;

57

- Whether additional services are necessary to support the placement;
- Whether the child needs another placement; and
- If another placement is necessary, what that placement should be.

These efforts are to be documented in the child's case record. The parties agreed that by July 1, 2018, MDCPS would meet an interim performance standard of 60 percent for this commitment.

MDCPS did not provide a report identifying those children who were moved as a result of a disrupted placement including the cause of the disruption.

*Overnight Stays in an Office or Other Nonresidential Facility (4.8)*

The 2nd MSA requires that no child shall remain overnight in an MDCPS office or other nonresidential facility that provides intake functions. MDCPS reported that this did not occur during calendar year 2018. The monitoring team reviewed thousands of case records in preparation of this report and did not learn of any instance of this occurring in 2018.

*Young Children Placed in Congregate Care Facilities (4.9)*

MDCPS committed that no child under 10 years of age shall be placed in a congregate care setting, including group homes and shelters. Exceptions can be made if:

- the child has exceptional needs that cannot be met in a licensed foster home;
- in order to keep a sibling group together for a temporary period, not to exceed 15 days, and the Regional Director has granted documented approval for the congregate care placement;
- or to enable a mother and baby to be placed together and there is not an available foster home for both of them.

MDCPS reported there were 155 children under the age of ten placed in congregate care settings during 2018. The Department was unable to track and report how many of the 82 children who were placed between January 1, 2018 and July 16, 2018 had an allowable exception approved. Of the 73 children who were placed between July 17, 2018 and December 31, 2018, MDCPS reported that 54 (74.0 percent) had an allowable exception approved.[22]

---

[22] MDCPS implemented corrective action to fix the error in the database which lost required data on Regional Director approvals, allowing the Department to report on performance for July 17, 2018 to December 31, 2018.

*Placement Moves (4.10, 4.12)*

No child is to be moved from his/her existing placement to another placement unless MDCPS specifically documents in the child's case record justifications for that move and an MDCPS supervisor approves the move. The parties agreed that by July 1, 2018, MDCPS would meet an interim performance standard of 70 percent for this commitment.

MDCPS provided data indicating that there were 2,990 placement moves in the third quarter of 2018, which began on July 1, 2018, and 2,793 placement moves in the fourth quarter of 2018. The monitoring team reviewed a randomly selected sample of case notes and approvals for 67 placement moves that occurred in the second half of 2018. Every case the team reviewed listed a reason for the placement change and was approved by a supervisor. However, supervisory approval frequently occurred after the child's placement move. In 27 cases (40.3 percent), approval by the supervisor occurred more than a week after the placement change. Additionally, placement change reasons were often coded as "other" when another reason, such as "placement with a relative" or "trial home placement," would have been more applicable.

*Multiple Emergency Placements (4.11)*

MDCPS agreed to ensure that no child is placed in more than one emergency or temporary facility within one episode of foster care. Exceptions can be made if an immediate placement move is necessary to protect the safety of the child or of others with documented approval from the Regional Director. Data provided by MDCPS indicate that 52 children experienced 66 successive stays in shelter care during 2018. Successive stays were counted as meeting the requirements if there was an exception approved by the Regional Director indicating that the

placement was necessary to protect the safety of the child or of others. MDCPS' performance during each quarter of 2018 is charted below.

**Table 10. Successive Emergency Shelter Placements, 2018**

| Quarter | Number of Successive Stays | Number of Approved Successive Stays[23] | Percent of Approved Successive Stays |
|---------|---------------------------|----------------------------------------|--------------------------------------|
| 1 | 8 | 1 | 12.5% |
| 2 | 13 | 0 | 0.0% |
| 3 | 26 | 25 | 96.0% |
| 4 | 19 | 19 | 100.0% |
| Full Year | 66 | 45 | 68.2% |

The monitoring team reviewed all the 45 cases with exceptions in MACWIS. Of the 45, only 13 (28.9 percent) contained information supporting the determination that the placement was needed to ensure the safety of the child or of others.

## 5. Visitation

## Worker Contact and Monitoring

*Caseworker Contact with Foster Children (5.1.a.)*

The 2nd MSA requires that by July 1, 2018, no less than 75 percent of foster children shall have an MDCPS caseworker meet with them at least two times per month. At least one visit per month shall occur in the child's placement.

MDCPS provided data on this commitment for 2018 but did not exclude children on trial home visits (THVs). Children on THVs should be excluded from this commitment because visit requirements for children on THVs, which is measured in 5.1.b, are different from visit requirements for children in out-of-home placements. While all children are required to be visited by a caseworker twice a month, both visits must occur in the home for children on THVs and only one visit must occur in the child's placement for children in out-of-home placements. The monitoring team is able to report for this commitment only the number and percentage of children with at least two visits in each month of 2018. MDCPS was not able to distinguish the children on THVs, making it impossible for the monitoring team to analyze whether the required number of visits occurred in the child's placement.

---

[23] MDCPS reported there were problems with capturing data on exceptions in the first half of 2018, which resulted in low performance in Q1 and Q2.

Regarding children receiving two caseworker visits each month, the Department's performance during every month of 2018 is reflected in the following chart.

**Figure 6. Worker-Child Visitation, 2018**



Source: MDCPS Data

The monitoring team conducted a qualitative review of visitation case notes for 70 randomly selected children who were in the custody of MDCPS during the fourth quarter of the year (October to December 2018) and subject to this commitment. The visitation narratives were reviewed to determine if the 2nd MSA requirements to assess safety, well-being, services, permanency and other service goals were documented. There were 339 contacts required, of which 294 were held. The chart below reflects any documented assessments during those contacts.

**Table 11. Worker-Child Visitation Narrative Review, 2018**

| Visitation Type | # Of contacts held | # Safety Assessed | # Well-being Assessed | # Services Assessed | # Permanency Assessed | # Other service goals Assessed |
|---|---|---|---|---|---|---|
| Worker-Child | 294 | 228 | 282 | 57 | 91 | 17 |

Overall, the monitoring team found that many of the files lacked detail about visitation, and at times, any information at all. For example, in one case, the visitation narratives each month contained the exact same information with the date changed. In another case there were no narratives from July to December 2018, although a supervisory note indicated the caseworker had seen the child each month, but it had not been documented.

*Caseworker Contact with Children on Trial Home Visits (5.1.b.)*

MDCPS committed that by July 1, 2018, at least 75 percent of foster children on a 90-day THV would be visited by an MDCPS caseworker in the home at least two times per month.

The monitoring team cannot validate the data MDCPS provided for this commitment. For this commitment and another commitment that involves THVs (6.3.a.5 – Children with a goal of reunification who reunified should have a 90-day THV), the monitoring team identified several problems with how MDCPS documented THVs and the methods it used to identify them.

*Caseworker Contact with Parents (5.1.c.)*

MDCPS committed, by July 1, 2018, to meet at least monthly with the parents of no less than 75 percent of foster children with a goal of reunification to discuss progress on the family service plan and the child's well-being. Exceptions include if the child's parent(s) reside out-of-state or are incarcerated.

The monitoring team cannot validate the data MDCPS provided for this commitment. The monitoring team identified several problems and raised questions regarding the files and calculations provided by MDCPS. For example, the file from which the final performance was generated appeared to be missing contact information for many parents, for multiple months. The monitoring team requested feedback from MDCPS regarding the method it used to create this file but MDCPS, as of April 2019, was still trying to understand the business rules and code (written by a former MDCPS employee) used to produce the file and calculate performance for this commitment. MDCPS also indicated that its code used to calculate performance was often not selecting the correct permanency plan needed to indicate whether the goal was reunification.

The monitoring team conducted a qualitative review of visitation case notes for a randomly selected sample of 70 children who were in the custody of MDCPS during the fourth quarter of the year (October to December 2018) and subject to this commitment. The monitoring team evaluated if the 2nd MSA requirements for MDCPS to assess progress on the family service plan and the child's well-being were documented. There were 170 worker-parent contacts required, of which 103 were documented. The chart below reflects any documented assessments during those contacts.

**Table 12. Worker-Parent Visitation Narrative Review, 2018**

| Visitation Type | # Of contacts held | # Well-being Assessed | # Family Service Plan Assessed |
|---|---|---|---|
| Worker-Parent | 103 | 47 | 29 |

As with the worker-child contacts discussed above, the monitoring team found that many of the worker-parent visitation narratives lacked detail.

*Caseworker Contact with Foster Parents (5.1.d.)*

MDCPS committed that, by July 1, 2018, at least 75 percent of foster parents with at least one foster child in the home must be visited by MDCPS monthly in the home.

MDCPS provided data for this commitment for 2018, which was analyzed by the monitoring team. The monitoring team calculated slightly lower performance than MDCPS reported.[24] The Department's performance during each month of 2018, as calculated by both MDCPS and the monitoring team, is charted below:

**Figure 7. Worker-Foster Parent Visitation, 2018**



Source: MDCPS Data

---

[24] The monitoring team identified on average 143 homes per month (with a range of 126 to 177) that had a foster child placed in the home for the entire month for which MDCPS did not provide visitation data. The monitoring team included these foster parents in the performance calculations as non-compliant.

63

## Developing and Maintaining Connections

### Child-Parent Contacts within 72 Hours of Placement (5.2.a.)

The 2nd MSA requires MDCPS to arrange contact for the foster child with his/her parents and with any siblings not in the same placement within 72 hours of foster care placement unless there are documented reasons why contact should not occur. If MDCPS cannot arrange a visit within 72 hours, a telephone call to parents, siblings, or extended family members must be provided to the child.

The monitoring team reviewed visitation case notes for 70 children, as detailed in Section 5.1.a. Thirty-two of these children were removed from their parent(s) in the last quarter of 2018 and are subject to this commitment. The team reviewed the case narratives and found four children had a visit with their parent and six children had a visit with their sibling(s) within 72 hours of their removal. In another child's case, a no contact order with the parent was documented. There were no case narratives found documenting a telephone call between the child and parent(s) or sibling(s).

### Cancellation of Visits (5.2.c.)

The 2nd MSA requires MDCPS and its contracting agencies to implement a policy that prohibits cancellation of visits as a form of discipline against children. MDCPS reported that a policy update was issued in November 2017 prohibiting the cancellation of visits as a form of discipline for children in custody. MDCPS provided the monitor with a copy of the policy bulletin to all MDCPS staff and the email sharing the policy update with contracting agencies.

## 6. Child and Youth Permanency

## Comprehensive Family Service Plans

### Comprehensive Family Service Plans (6.1.a.)

The 2nd MSA requires that a comprehensive family service plan (FSP) that addresses the strengths, needs and services required for both the child and their parent(s) shall be completed within 45 days of a child's entry into foster care. In developing the FSP, the MDCPS caseworker must consult with the child, the child's parents and the foster care provider. MDCPS committed that by July 1, 2018 at least 75 percent of FSPs will be submitted by the caseworker consistent with 2nd MSA requirements, within 30 calendar days of a child's entry into custody and approved by the supervisor within 15 calendar days. The FSP shall be considered complete upon documented supervisory review and approval.

Data provided by MDCPS indicate there were 1,072 children who entered custody between July 1, 2018 and December 31, 2018 whose 45th day in custody fell during the year. Of the 1,072 FSPs due during the period, 799 (74.5 percent) were completed within 30 days of a child's entry into foster care and 1,022 (95.3 percent) were approved within 15 days. A total of 929 (86.7 percent) of the 1,072 FSPs due during the period were submitted and approved within 45 days.

The monitoring team reviewed a randomly selected sample of 66 initial FSPs completed during the period to assess whether the plans were developed in accordance with 2nd MSA requirements. The monitoring team found that only 16 (24.2 percent) of the FSPs in the sample indicated the plan was developed in consultation with the child's parents or the foster care provider. None of the plans reflected consultation with an age-appropriate child during development of the initial FSP. As such, strengths, needs and services for parents and children could not be evaluated.

*Parents' Inclusion in Service Planning (6.1.b.)*

The 2nd MSA provides that in instances in which it is impossible to meet with one or both parents, the service planning process will proceed as described above, notwithstanding the parent's absence.

The monitoring team reviewed a randomly selected sample of 66 initial FSPs completed during the period to assess whether the plans were developed in accordance with the 2nd MSA requirements. The monitoring team determined that only three (4.5 percent) of the FSPs in the sample indicated a child's parent could not be found, but service planning proceeded in the parent's absence as required.

*Diligent Search for Parents (6.1.c.)*

MDCPS committed that in those cases in which the whereabouts of one or both parents are unknown, MDCPS shall, within 30 days, institute a diligent search for the parent(s) and document the search in the child's case record. MDCPS committed to an interim performance standard of 75 percent by July 1, 2018.

MDCPS was unable to produce data related to diligent searches for parents for the first three quarters of 2018. The Department began tracking preliminary diligent search data in October 2018, as a pilot.

*Permanency Plans (6.1.d.)*

The 2nd MSA requires that within 45 days of a child's initial placement into foster care, MDCPS shall complete a permanency plan that specifies the child's permanency goal, a timeframe for achieving permanency and activities that support permanency. MDCPS committed that by July 1,

2018 for at least 75 percent of children who enter custody, permanency plans will be submitted within 30 calendar days of a child's entry into custody by the caseworker consistent with 2nd MSA requirements and approved by the supervisor within 15 calendar days. The permanency plan shall be considered complete upon documented supervisory review and approval.

The monitor validated there were 1,072 children who entered custody between July 1, 2018 and December 31, 2018 whose 45th day in custody fell during the period. Of the 1,072 permanency plans due during the period, 773 (72.1 percent) were completed within 30 days of a child's entry into foster care and 1,056 (98.5 percent) were approved within 15 days. A total of 928 (86.6 percent) of the 1,072 permanency plans due during the period were submitted and approved within 45 days.

The monitoring team reviewed a randomly selected sample of 66 initial FSPs completed during the period to assess whether the FSPs were developed in accordance with the 2nd MSA requirements, inclusive of a permanency plan. The monitoring team found that 42 (63.6 percent) of the FSPs in the sample contained a permanency plan that stated the child's permanency goal, as required. Of the 42 FSPs containing a permanency plan with a stated goal, only six (9.1 percent) plans included a timeframe for achieving permanency. Of the 66 FSPs reviewed, 31 (47.0 percent) indicated activities that support permanency.

## Concurrent Permanency Planning

### Concurrent Permanency Planning (6.2.a.)

MDCPS agreed to begin, within the first six months of a child's entry into care, to engage in concurrent permanency planning. MDCPS committed that at least 95 percent of children in custody with the goal of reunification shall have case record documentation reflecting active concurrent permanency planning consistent with 2nd MSA requirements.

MDCPS provided data and summary files for this commitment, but MDCPS' analysis of the data in its summary file was inaccurate. The monitor independently analyzed the data MDCPS provided and determined there were 2,082 children subject to this commitment during the period. Of these 2,082 children with a permanency plan of reunification, all had a concurrent plan assigned at six months.

The monitoring team reviewed FSPs completed during the period for a randomly selected sample of 66 children with a goal of reunification to assess whether the plans included any documentation of a concurrent permanency goal or active concurrent permanency planning. The monitoring team found that all 66 (100.0 percent) of the FSPs in the sample included documentation of a concurrent permanency planning goal, of which only eight (12.1 percent) contained evidence of active concurrent permanency planning.

## Permanency Case Goals

### Reunification (6.3.a.1.)

The 2nd MSA requires when a child's permanency goal is reunification that MDCPS identify in the FSP and make available, directly or through referral, those services MDCPS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care and to help the parents develop strategies to facilitate permanency for the child. Caseworkers must monitor the provision of services through visits and updating of service plans. MDCPS committed to an interim performance standard of 75 percent by July 1, 2018.

The monitoring team reviewed FSPs completed during the period for a randomly selected sample of 66 children with a permanency goal of reunification to assess whether the FSPs were developed in accordance with the 2nd MSA requirements, inclusive of the identification and provision of necessary services. The monitoring team found that 58 (87.9 percent) of the FSPs in the sample identified services MDCPS deemed necessary to address the behaviors or conditions resulting in the child's placement into foster care. Of the FSPs containing identified services, 47 (71.2 percent) of the FSPs included documentation that MDCPS made some or all those identified services available directly or through referral.

### Caseworker Contact with Parents (6.3.a.2.)

MDCPS committed that for a child with a permanency goal of reunification, the child's MDCPS caseworker will meet with the child's parent(s) with whom the child is to be reunified at least monthly to assess service delivery and achievement of service goals, to keep the family informed and involved in decisions about the child, and to remain current about the family's circumstances.

The monitoring team cannot validate the data MDCPS provided for this commitment. The monitoring team identified several problems with the data provided by MDCPS, which are described under Section 5.1.c.

### Reunification Supports for Parents (6.3.a.3.)

MDCPS committed in the 2nd MSA to document in the case record of children with a permanency goal of reunification, opportunities provided to their parents in support of reunification.

The monitoring team reviewed FSPs completed during the period for a randomly selected sample of 66 children with a permanency goal of reunification to determine whether the FSPs contained documentation of opportunities provided to parents in support of reunification. The monitoring team found that 58 (87.9 percent) of the FSPs in the sample identified services MDCPS deemed necessary to address the behaviors or conditions resulting in the child's placement into foster care. Of the FSPs containing identified services, 47 (71.2 percent) of the FSPs included

documentation that MDCPS made some or all those identified services available directly or through referral.

*After-Care Plans (6.3.a.4.)*

The 2nd MSA requires that when a recommendation is made to reunify a child with his or her family, MDCPS must develop an after-care plan that identifies services necessary to ensure that the conditions leading to the child's placement have been addressed, and that the child's safety and stability can be assured. It also requires MDCPS to take reasonable steps to provide or facilitate access to services necessary to support the child during the trial home visits.

The monitoring team reviewed the case records of 66 children where parent(s) had full custody restored during the last quarter of 2018 to determine if the children had after-care plans consistent with the 2nd MSA. Sixty-four of the children (97.0 percent) had an after-care plan, while two children (3.0 percent) did not have an appropriate after-care plan as required by the commitment.

*Trial-Home Visits (6.3.a.5.)*

The 2nd MSA provides that for each child who has a permanency goal of reunification and who is in fact returned home for the purpose of reunification, MDCPS will provide that child with a 90-day THV if the child has been in custody for at least 90 days, subject to the approval of the Youth Court.

MDCPS committed that by July 1, 2018, at least 75 percent of foster children who are reunified and who were in custody longer than 90 days would receive a 90-day THV period or have case record documentation reflecting the Youth Court's objection to such a THV. During the THV, MDCPS must provide or facilitate access to the services in the child's after-care plan, consistent with the 2nd MSA requirements.

The monitoring team cannot validate the data provided by MDCPS for this commitment. MDCPS' count of children with a THV was not limited to children who had a goal of reunification and was not limited to THVs that lasted 90 days or more. Likewise, MDCPS' count of children with a THV with Youth Court approval was not limited to children with a goal of reunification and a THV that lasted 90 days or longer.

*Final Discharge Meeting (6.3.a.6.)*

The 2nd MSA requires that before the end of any THV period, MDCPS will meet with the child's parents and the child to determine the appropriateness of final discharge. If final discharge is

determined to be appropriate, MDCPS shall make the appropriate application to the Youth Court to be relieved of custody.

The monitoring team reviewed the same sample of case records of 66 children where parents had full custody restored during the last quarter of 2018 (see 6.3.a.4, above). Fifty-five children's case records (83.3 percent) had documentation of a final parental discharge meeting, while 11 children's case records (16.7 percent) lacked documentation that MDCPS had a final discharge meeting with the parents. Fifty-eight children's records (87.9 percent) had documentation of a discharge meeting with age appropriate children, or documentation that children who were too young for discussion were seen prior to discharge. Eight children's case records (12.1 percent) lacked documentation that a discharge meeting was held with age appropriate children. Fifty-eight children's records (87.9 percent) had documentation that the appropriate application was made to the Youth Court for relief of custody. In one case MDCPS recommended continued custody because the THV was four days short of 90 days, but the judge denied that recommendation and discharged the children from custody. There were eight children's files (12.1 percent) where documentation was lacking that the appropriate Youth Court relief of custody application was made by MDCPS.

*Adoption (6.3.b.1.)*

The 2nd MSA requires that by July 1, 2018 at least 70 percent of children in custody with the primary permanency goal of adoption shall have an assigned adoption specialist and an adoption plan that identifies the child specific activities that MDCPS will undertake to achieve adoption.

Relative to the adoption specialist, data provided by MDCPS indicate that of the 2,724 children with a goal of adoption during 2018, 2,672 (98.1 percent) had an adoption worker assigned.

MDCPS did not provide information on the number of children with adoption plans. However, the monitoring team reviewed a randomly selected sample of 66 children who had a goal of adoption. All but one (98.5 percent) of the children's case records documented evidence of adoption planning with identified activities undertaken to achieve adoption. In 47 (72.3 percent) of the cases, activities were documented within 60 days of the goal of adoption being assigned. In the remaining 18 cases, activities were documented more than 60 days after the adoption goal was assigned.

*Termination of Parental Rights (6.3.b.2., 6.3.b.3.)*

MDCPS must make a termination of parental rights (TPR) referral before a child has spent more than 17 of the last 22 months in foster care unless an available exception pursuant to the federal Adoption and Safe Families Act ("ASFA") has been documented by MDCPS in the child's case record. Subsequent to the initial ASFA exception, MDCPS may continue the exception for only

one additional six-month period unless continued invocation of the exception is reviewed, approved and documented semi-annually by the Regional Director assigned to the county of responsibility for the child. MDCPS committed to meet an interim standard of 70 percent for this commitment by July 1, 2018 (6.3.b.2).

The monitoring team was unable to validate the data provided by MDCPS for this commitment. MDCPS identified children as being in care for 17 of the past 22 months but whose custody history does not support this. Conversely, MDCPS' file omits hundreds of children who, according to the custody cohort file, were in care for at least 17 of the last 22 months.

The monitoring team reviewed case records for a randomly selected sample of 70 children subject to this commitment and found 43 (61.4 percent) cases met the terms of the 2nd MSA. With respect to these children, MDCPS either made the TPR referral (22), documented an ASFA exception in the electronic record (14) or placed the children in a THV by the last day of a child's seventeenth month in care (7).

MDCPS is required to provide the monitor a report of all TPR referrals made during the monitoring period, the date those TPR referrals were made and the date the petition was filed with the court (6.3.b.3). MDCPS provided this data for 2018.

*Post-Adoption Services (6.3.c.)*

MDCPS committed to establish and maintain a system of post-adoptive services to stabilize and support adoptive placements. MDCPS agreed that adoptive families eligible for adoption subsidies must have access to these services, which may include counseling, mental health treatment and crisis intervention, family preservation and stabilization services and peer support.

MDCPS reported that in SFY2018, the Department expended $1,552,672 for adoption subsidy payments on behalf of 3,327 eligible children. Consistent with its 2nd MSA commitment, MDCPS established a statewide post-adoptive service contract with a child and family service agency to ensure that eligible families have access to a range of post-adoptive services throughout Mississippi. The contract became effective in October 2017 and the provision of post-adoptive services continued throughout the entire monitoring period.[25] The monitoring team reviewed the contract and found the scope of services includes the provision of supportive counseling, mental health treatment and referrals, crisis intervention, family preservation and stabilization services, peer support and respite services consistent with 2nd MSA requirements. During calendar year 2018, MDCPS reported that 1,021 adoptive families throughout Mississippi accessed the aforementioned range of post-adoptive services.

---

[25] MDCPS reported that the contract value during the monitoring period for statewide provision of post-adoption services was $751,000.

*Durable Legal Custody and Guardianship (6.3.d.)*

The parties agreed that the permanency goals of durable legal custody and guardianship may be assigned when there are documented efforts in the child's case record to move the child to adoption and documentation of a reasonable basis why it is in the child's best interests not to be considered for adoption. Further, when the permanency goals of durable legal custody and guardianship are assigned to a child under the age of 14 years old or living with a non-relative, MDCPS agreed to provide to the monitoring team information from the child's case record documenting efforts to move the child to adoption and documentation of a reasonable basis why it is in the child's best interests not to be considered for adoption.

MDCPS provided to the monitoring team a data file identifying 63 children who were assigned the permanency goal of durable legal custody or guardianship at the conclusion of the monitoring period. However, the age of the children was not included in the file nor was information provided regarding whether the child was living with a non-relative. Further, MDCPS did not provide case record information to the monitoring team for children under the age of 14 who were assigned the permanency goals of durable legal custody and guardianship or living with a non-relative for the period. Therefore, the monitoring team cannot verify if MDCPS documented efforts to move a child to adoption and of a reasonable basis why it was in a child's best interests not to be considered for adoption.

*Another Planned Permanent Living Arrangement (APPLA) (6.3.e.)*

If MDCPS concludes, after considering reunification, adoption, durable legal custody, and permanent placement with a relative, that these permanency plans are inappropriate or unavailable for a child, MDCPS may assign a permanency goal of APPLA for the child. In such circumstances, MDCPS agreed that, (1) the child must be at least 16 years old and (2) MDCPS must document a compelling reason why this permanency goal is in the best interest of the child.

MDCPS provided a list of all children with a permanency goal of APPLA in 2018, including the age of each child. MDCPS did not provide information on whether there was a documented compelling reason why this permanency goal was in the best interest of each child. Therefore, the monitoring team cannot validate MDCPS' performance for this commitment.

## Permanency Reviews

*Permanency Plan Reviews (6.4.a.)*

The 2nd MSA requires that a child's permanency plan be reviewed in a court or administrative case review, which may be a foster care review, at least every six months. MDCPS agreed to take all reasonable steps, including written notice, to ensure the participation of the child, parents,

caregivers and relevant professionals in court or administrative reviews. MDCPS committed that by July 1, 2018, at least 80 percent of foster children who have been in custody for at least six months shall have a timely court or administrative case review consistent with 2nd MSA requirements.

During validation of the data MDCPS provided for this commitment, the monitoring team discovered that MDCPS did not use the date the permanency plan review was completed to determine when the next review was due and whether the review was administered timely. Instead, MDCPS used the date the review was scheduled in order to determine timeliness of the reviews. The monitoring team requested and MDCPS provided a new data file that included the review completion date for validation. MDCPS' original analysis indicated that 7,983 children were due for a permanency plan review during the period, of which 7,690 children (96.3 percent) received a timely review. The monitoring team's analysis concluded that 7,756 children were due for a permanency plan review during the period, of which 4,546 children (58.6 percent) received a timely review.

The monitoring team reviewed a randomly selected sample of 66 Youth Court Hearing and Review Summary reports completed by MDCPS during the period for children in custody for at least six months to assess the timeliness and participants of the permanency reviews. The monitoring team found evidence in the sample of Youth Court Hearing and Review Summary reports that the foster care reviewer (quality assurance coordinator), social worker (caseworker), social work supervisor (casework supervisor) and the foster child were listed as being invited to the permanency review in each of the reports. Parents were listed as invited in 45 (68.2 percent) of the reports. Guardians ad litem were invited in 34 (51.5 percent) of the reports and other individuals with an unspecified relationship to the child were listed as being invited in 37 (56.1 percent) of the reports. Caregivers and relatives were rarely listed as being invited in the sample.

The summary reports also indicated that quality assurance coordinators participated in each review and a caseworker attended 69.6 percent of the permanency reviews. Occasionally, caregivers (28.7 percent), caseworker supervisors (27.2 percent), the foster child (18.1 percent) and parents (18.1 percent) attended the permanency reviews. Relatives, guardians ad litem and other professionals rarely attended the reviews (less than 10 percent).

*Court Reviews (6.4.b.)*

The 2nd MSA also requires MDCPS to take all reasonable steps to ensure that a court review is held for each child in foster care custody within 12 months of the child's initial placement, and annually thereafter. MDCPS committed that by July 1, 2018, it would make reasonable efforts to have a timely annual court review scheduled consistent with 2nd MSA requirements for at least 80 percent of foster children who have been in custody for at least 12 months.

MDCPS did not provide information relative to the reasonable steps taken to ensure that timely court reviews occurred for each child in foster care custody. In the alternative, MDCPS reported that timely annual court reviews occurred for between 5 and 11 percent of foster children who had been in custody for at least 12 months during the period.

*Review of Adoption and Safe Families Act (ASFA) Exceptions (6.4.c.)*

MDCPS committed to review documented exceptions pursuant to ASFA for children who have spent more than 17 of the previous 22 months in foster care during the child's foster care review. MDCPS did not provide an analysis of its review conducted consistent with this commitment for 2018.

## Permanency Performance Indicators

*Permanency Outcomes (6.5.a.)*

The 2nd MSA requires that by July 1, 2018 the monitor establish performance standards for three permanency[26] indicators, informed by MDCPS' certified baseline performance established during the Stipulated Third Remedial Order (STRO). The standards must represent a substantial improvement above the certified baseline performance. The parties agreed that the standards take effect during Federal Fiscal Year (FFY) 2019 beginning on October 1, 2018.

The monitor analyzed MDCPS' permanency data, took into consideration the certified baseline performance established during the STRO and considered federal Child and Family Service Reviews (CFSR) Round 3 Permanency Standards in establishing the performance standards. As a result, the monitor established interim standards for MDCPS to achieve during FFY2019 and FFY2020. The final performance standard takes effect during FFY2021.

**Table 13. Permanency Outcome Performance Standards**

| 2nd MSA Section | Indicator | STRO Certified Baseline | CFSR Round 3 Performance Targets | FFY2019 Performance Standard | FFY2020 Performance Standard | FFY2021 Performance Standard (Final) |
|---|---|---|---|---|---|---|
| 6.5.a.1. | Permanency for children entering care in a 12-month period (Baseline: October 1, 2014-September 30,2015) | 43.5% | 40.4% | 43.9% | 45.7% | 45.7% |
| 6.5.a.2. | Permanency for children in care for 12-23 months on the first day of a 12-month period (Baseline: October 1, 2015-September 30, 2016) | 33.3% | 41.0% | 34.9% | 38.3% | 41.0% |
| 6.5.a.3. | Permanency for children in care for 24 months or more on the first day of a 12-month period (Baseline: October 1, 2015-September 30, 2016) | 31.1% | 30.3% | 31.4% | 32.7% | 32.7% |

---

[26] Permanency is defined as discharges from foster care to reunification with the child's parents or primary caregivers, durable legal custody, guardianship or adoption.

*Adoption Outcomes (6.5.c., 6.5.d.)*

The 2nd MSA requires that by March 15, 2018 the monitor establish adoption performance standards informed by the certified baseline performance established during the Stipulated Third Remedial Order (STRO). The parties agreed that for all children in the custody of MDCPS who were adopted in FFY2017 the monitor would validate the average and median lengths of time to adoption finalization for each child from the date on which the child's adoption goal was established. The parties agreed that adoption performance standards must represent a substantial improvement above the certified baseline performance established and the performance standards would take effect October 1, 2018.

The monitor certified the baseline performance as an average of 14.8 months and a median of 9.0 months from the date on which a child's adoption goal was established to adoption finalization and established the following performance standards, which, if achieved, demonstrate substantial improvement above the certified baseline:

- In FFY2019, the average length of time from the date on which a child's adoption goal was established to adoption finalization shall be 13.6 months and the median shall be 9.0 months.

- Beginning in FFY2020, the average length of time from the date on which a child's adoption goal was established to adoption finalization shall be 11.8 months and the median shall be 8.8 months.

With the agreement of the parties, the permanency and adoption performance standards took effect during FFY2019, which began on October 1, 2018 and concludes on September 30, 2019. As such, the monitor will report MDCPS' performance relative to the permanency and adoption standards in the next annual 2nd MSA report.

# 7. Transition to Independent Living

## *Notification of Cessation of Benefits (7.1)*

MDCPS is required to provide each youth transitioning to independence with at least six months' advance notice of the cessation of any health, financial, or other benefits that will occur at the time of transition. MDCPS reported that 139 youth transitioned to independence during 2018. Of those young adults, 33 youth (23.7 percent) were given advance notice of the cessation of health benefits, 52 youth (37.4 percent) were given advance notice of the cessation of financial benefits and 45 youth (32.4 percent) were given advance notice of the cessation of other benefits.

*Independent Living Service Plans (7.2)*

MDCPS is required to provide to each foster youth age 14 years or older, regardless of his/her permanency plan, an opportunity to participate in the creation of an appropriate Independent Living service plan for a successful transition to adulthood. The monitoring team requested and received information indicating that during the first half of 2018, January 1st to June 30th, there were 1,780 children age 14 and older in custody. Of those youth, 1,290 (72.5 percent) had a documented Independent Living service plan in MACWIS and 547 youth (30.7 percent) participated in creating the plan. During the second half of 2018, July 1st to December 31st, there were 1,012 children age 14 and older in custody. Of those youth, 828 (81.8 percent) had a documented Independent Living service plan in MACWIS and 141 youth (13.9 percent) participated in creating the plan. However, MDCPS did not submit information indicating whether each foster youth age 14 years or older was provided an opportunity to participate in the creation of an Independent Living service plan.

*Independent Living Services (7.3)*

The 2nd MSA provides that each foster youth age 14 years and older will have access to the range of supportive services necessary to support their preparation for and successful transition to adulthood. This includes Independent Living services eligible for federal reimbursement under the Chaffee program, which in part promotes employment or removes barriers to employment. MDCPS must maintain sufficient resources to deliver these services.

The monitoring team requested and MDCPS submitted data on services provided during the period to youth age 14 and older, including employment, community resources, transportation, communication skills, social development, youth law, money management, self-care, decision making, housing, relationships, daily living skills as well as the number of youth with no skill modules documented. However, MDCPS did not submit information indicating whether each foster youth age 14 years or older had access to these services. MDCPS' performance during each half of 2018 is charted below.

**Table 14. Youth Receiving Independent Living Skills, 2018**

| Skill | January 1, 2018 – June 30, 2018 Youth participants receiving skill modules (N=1781) | | July 1, 2018 – December 31, 2018 Youth participants receiving skill modules (N=1012) | |
|---|---|---|---|---|
| | Count | Percent | Count | Percent |
| Employment | 286 | 16.0% | 240 | 23.7% |
| Community Resources | 232 | 13.0% | 212 | 20.9% |
| Transportation | 216 | 12.1% | 194 | · 19.1% |
| Communication Skills | 286 | 16.0% | 248 | 24.5% |
| Social Development | 258 | 14.4% | 217 | 21.4% |
| Youth Law | 179 | 10.0% | 144 | 14.2% |
| Money Management | 324 | 18.1% | 259 | 25.5% |
| Self-Care | 294 | 16.5% | 264 | 26.0% |
| Decision Making | 346 | 19.4% | 319 | 31.5% |
| Housing | 216 | 12.1% | 198 | 19.5% |
| Relationships | 260 | 14.5% | 263 | 25.9% |
| Daily Living Skills | 252 | 14.1% | 256 | 25.2% |
| No modules documented | 729 | 40.9% | 477 | 47.1% |

*Medical Coverage (7.4)*

The 2nd MSA requires MDCPS to implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond are enrolled for Medicaid coverage so that their coverage continues without interruption at the time of emancipation. MDCPS reported that all youth who emancipated from care during 2018 had Medicaid numbers and were eligible to receive extended Medicaid. Youth are responsible for completing the Extended Medicaid documents to recertify their coverage. MDCPS reported that 83 youth age 18 and over emancipated from foster care in 2018[27] but could not report how many youth were enrolled for Medicaid coverage so that the youth's coverage continued without interruption at the time of emancipation.

*Start-Up Stipends (7.5)*

MDCPS must implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond receive a start-up stipend of at least $1,000.00 at the time of emancipation, or as soon as practicable thereafter.[28] Of the 83 youth identified by MDCPS as being age 18 and over who emancipated from foster care in 2018, 50 (60.2 percent) received a start-up stipend at the time of emancipation or shortly thereafter.

---

[27] The monitoring team identified in the cohort data 87 youth age 18 and over who emancipated from foster care in 2018 as reflected in Table 2.
[28] MDCPS reported that start-up stipends provided during 2018 were $1,500 each.

MDCPS also provided the policy on start-up stipends, which explains, in part, that not every youth who emancipates from care is entitled to a start-up stipend. The policy provides that a start-up stipend is available to youth who leave care after turning age 16 and have participated in Independent Living Program activities. The youth must have been in care for a minimum of six months. Acceptable purchases include any items associated with the establishment of a home such as dishes, cooking utensils, furniture, appliances and other home products. In addition, a youth released from custody at age 17 who has a job may use a portion of the stipend to purchase or repair a car if the vehicle is needed in the youth's job and the youth already has the basic items needed to live independently.

*Housing Resource Specialists (7.6)*

MDCPS is required to implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond have access to a housing resource specialist responsible for assisting the youth to obtain an adequate living arrangement.

MDCPS stated that a housing specialist was available to all youth during 2018. For January through May 2018, Independent Living services were provided through a sub-grant with a private social service agency. Through those services, all youth reportedly had access to a Transition Care Coach who worked with the MDCPS workers to identify any youth who could benefit from Aftercare Services, including apartment placements and/or other appropriate living arrangements. As of June 1, 2018, MDCPS assumed responsibility for administering Independent Living services and all youth had access to both their foster care worker and Transitional Navigators who could assist with obtaining adequate living arrangements through referrals to and coordination with other agencies.

MDCPS did not produce information indicating the number of youth emancipating from care requiring a housing specialist. However, MDCPS reported that of the 83 youth the agency identified who emancipated from care in 2018, 21 (25.3 percent) accessed a housing resource specialist.

*State Educational Training and Vocational (ETV) Program (7.7)*

MDCPS must continue to implement policies and processes which ensure that youth emancipating from the foster care system at age 18 or beyond receive services and support under the State Educational Training and Vocational (ETV) Program for which they are eligible. MDCPS did not submit information on the number of youth eligible for ETV services. However, MDCPS reported that during FFY2018, 98 youth received ETV funds.

*Identification and Essential Documentation (7.8)*

MDCPS committed to assist youth in obtaining or compiling the following documents and such efforts shall be documented in the child's case record:

- Educational records, such as a high school diploma or general equivalency diploma, and a list of schools attended, when age-appropriate;
- A social security or social insurance number;
- A resume, when work experience can be described;
- A driver's license, when the ability to drive is a goal; if not a driver's license, then a state-issued, photo identification;
- An original or certified copy of the youth's birth certificate;
- Previous placement information;
- Documentation of immigration, citizenship, or naturalization, when applicable;
- Documentation of tribal eligibility or membership;
- Death certificates when parents are deceased;
- A life book or a compilation of personal history and photographs, as appropriate; and
- A list of known relatives, with relationships, addresses, telephone numbers, and permissions for contacting involved parties.

The monitoring team cannot validate the data provided by MDCPS for this commitment. Data was provided containing demographic information for 404 youth who were 17 years old and had a plan of APPLA during the first half of the year. However, most of the information regarding these standards for those youth was blank. For the 7.8 measures, MDCPS reported on 76 youth who emancipated from care between January 1, 2018 and June 30, 2018. For measures 7.5 and 7.6, MDCPS reported on only 38 youth who emancipated from care during the first half of 2018.

## 8. Child Well-Being

## Physical and Mental Health Care

### Initial Medical Screenings (8.1.a.)

MDCPS agreed that by July 1, 2018 at least 70 percent of children shall have an initial medical screening within seven days of the child's entry into foster care. Data provided by MDCPS indicate the Department met the standard for a timely initial medical exam in 2018 for only 59.2 percent

of children.[29] The monitoring team reviewed case and medical appointment notes in MACWIS for 71 children identified by MDCPS as having an initial health screening completed within seven days of the child's entry into foster care. All the cases featured notes supporting that an initial medical screening was completed timely.

*Comprehensive Medical Exams (8.1.b.)*

MDCPS agreed that by July 1, 2018, at least 70 percent of children shall have an initial EPSDT or other comprehensive medical examination within 60 days of the child's entry into foster care. MDCPS provided data from MACWIS, which indicate that 69.5 percent of youth received a timely first comprehensive medical exam in 2018. The monitoring team reviewed case and medical appointment notes in MACWIS for 100 children identified by MDCPS as having a comprehensive medical exam completed within 60 days of the child's entry into foster care. In only 51 percent of the cases reviewed, the monitoring team found documentation supporting that a full EPSDT or other comprehensive medical exam, including a mental health screening, was completed timely.

*Periodic and Ongoing Medical Exams (8.1.c.)*

The 2nd MSA requires that following an initial EPSDT or other comprehensive medical examination, children shall receive periodic and on-going medical examinations according to the periodicity schedule set forth by the EPSDT program. The Agreement calls for the monitor to set a performance standard for MDCPS to meet by July 1, 2019. The monitor established a performance standard of 45 percent and will report on MDCPS' performance relative to this commitment in the next annual report.

*Follow-up Treatment (8.1.d.)*

MDCPS agreed that by July 1, 2018, at least 60 percent of children shall receive recommended follow-up treatment throughout the time they are in foster care. MDCPS did not provide data for this commitment for 2018.

*Dental Exams (8.1.e.)*

MDCPS agreed that by July 1, 2018, at least 60 percent of children shall have a dental examination within 90 days of the child's entry into foster care.[30] Data provided by MDCPS indicate that 47.6 percent of youth received a timely initial dental examination in 2018. The monitoring team

---

[29] Data provided by MDCPS excluded all entries except the first for each child in the year from data and calculations for 8.1.a, 8.1.b and 8.1.e.

[30] Exceptions include if the child has had an examination within six months prior to placement or if they are under the age of four. Foster children who reach the age of four while in foster care shall receive a dental examination within 90 calendar days of his/her fourth birthday.

reviewed case and medical appointment notes in MACWIS for 100 children identified by MDCPS, as having a dental exam completed within 90 days of the child's entry into foster care. In 82 percent of the cases reviewed, there were notes supporting that an initial dental exam was completed timely.

*Medical Records (8.1.f.)*

Per the 2nd MSA, MDCPS committed to provide foster parents or facility staff with the completed foster child information form or other electronic record containing available medical, dental, educational and psychological information about the child within 15 days of placement. The parties agreed that by July 1, 2018, MDCPS would meet an interim performance standard of 75 percent for this commitment. MDCPS did not provide data for this commitment for 2018.

*Medicaid Information (8.1.g.)*

MDCPS agreed that by July 1, 2018, 85 percent of children shall have their Medicaid information provided to foster parents or facility staff at the time of placement. MDCPS did not provide data for this commitment for 2018.

## Educational Services

The 2nd MSA requires that MDCPS ensure children receive educational services. Specifically, MDCPS is required to:

- Review the educational record of each child who enters custody for the purpose of identifying the child's general and, if applicable, special educational needs and shall document the child's educational needs within 30 calendar days of his/her entry into foster care (8.2.a.).

- Take reasonable steps to ensure that school-age foster children are registered for and attending accredited schools within seven calendar days of initial placement or any placement change, including while placed in shelters or other temporary placements (8.2.b.).

- Make all reasonable efforts to ensure the continuity of a child's educational experience by keeping the child in a familiar or current school and neighborhood, when this is in the child's best interests and feasible, and by limiting the number of school changes the child experiences (8.2.c.).

MDCPS did not provide data for any of the above referenced educational service commitments for 2018.