# EXHIBIT B

```
 1      A.   No.
 2      Q.   Has your chief of staff ever run a child
 3 welfare system or worked in a child welfare
 4 system?
 5      A.   That's the same question you asked me
 6 before about him?  Mr. Cheeseman?
 7      Q.   Mr. Cheeseman.
 8      A.   Yeah, I think what I told you was yes,
 9 he has.  He's worked in --
10      Q.   He didn't work in a child welfare
11 system, though, did he?
12      A.   Well, I don't think you can separate the
13 youth court from the child welfare system, and
14 he's worked in the youth court of Rankin County,
15 and the youth court of Hinds County.  And so yes,
16 he has -- he has.
17      Q.   He worked in --
18      A.   He has before -- I'm sure your question
19 is before he came to work at CPS.
20      Q.   That's right.
21      A.   And that's the answer, yes, he has.
22      Q.   And where else has he -- what other
23 child welfare system has he worked at?
24      A.   The ones I just told you.
25      Q.   The youth courts you're talking about?
```

```
 1        A.    Yes.
 2        Q.    Okay.  You did not agree to the second
 3   MSA, did you?
 4        A.    You mean did I sign it?
 5        Q.    Yes.
 6        A.    Was I one of the signatories?  No, I was
 7   not.
 8        Q.    You weren't involved in the discussions,
 9   and you certainly didn't sign it; is that right?
10        A.    That's correct.
11        Q.    And you didn't sign any of the interim
12   or stipulated orders; is that right?
13        A.    That's correct.
14        Q.    And, in fact, you might not have even
15   done that had you been present in this agency; is
16   that right?
17        A.    That's a possibility.
18        Q.    Right.  In fact --
19        A.    If I knew then what I know now, I
20   wouldn't have.
21        Q.    Right, in fact, you don't like the --
22   what you call the rigid fixed standards of the
23   caseload limits, do you?
24        A.    Well, I don't like the phrase, "I don't
25   like them."  I think they're harmful to children.
```

```
 1        Q.   I see.  And do you think that 15 years
 2   of noncompliance in this case is harmful to
 3   children?
 4            MR. JONES:  Object to the form.
 5            THE WITNESS:  Do I think that 15 years
 6        of noncompliance is harmful to children?
 7        Q.   (By Ms. Lowry)  Yeah.  Do you know how old
 8   this litigation is?
 9        A.   I can't answer that question without
10   more specifics.  I need to know what it is you
11   think was harmful to children, and I can either
12   agree with you or not, but when you say 15 years
13   of noncompliance is harmful to children, that's a
14   very general statement.
15        Q.   Do you know that the State has
16   acknowledged noncompliance with regard to the
17   settlement agreement?
18        A.   I do understand what you're asking me.
19   I'm just -- I am not going to get to the place
20   where I agree with you that noncompliance with one
21   provision or another provision of that MSA, per
22   se, translates into harm to children.  I think
23   compliance with the MSA in some respects is
24   harmful to children, so your question is too
25   general for me.
```

```
 1              If you ask me about a specific thing, I
 2   can tell you my opinion of whether it's harmful to
 3   children or not.
 4        Q.   You, in fact, would like this provision
 5   changed, wouldn't you, because it seems too rigid
 6   and fixed as your counsel called it; is that
 7   right?
 8        A.   The reason I would like it changed is
 9   because I believe it's harmful to children.
10        Q.   Okay.  So -- and you would -- what would
11   you substitute for it?
12        A.   I would substitute it for a standard
13   that takes into account the factors that affect
14   the handling of children's cases and the outcomes
15   for those children.  I would look to see if the
16   children are having good outcomes, and I would
17   look to see if the caseworkers are doing their
18   jobs, and there are factors that are indicators of
19   that, and, to me, that's what an agency should be
20   judged on.
21        Q.   So, basically, what you're saying in the
22   motion that's been filed on your behalf with
23   regard to changing a provision of this agreement
24   is that you think it's harmful to children, and
25   you don't like it; is that right?
```

```
 1              MR. JONES:  I object to --
 2              THE WITNESS:  I don't like anything
 3       that's harmful to children.
 4              MR. JONES:  And I object to the form of
 5       the question.  That's not what the motion
 6       states.
 7              MS. LOWRY:  No, that's not, but I can
 8       ask the question anyway.
 9       Q.   (By Ms. Lowry)  Okay.  But you think this
10   is harmful to children?
11       A.   I think that the agency being judged --
12   it's effectiveness being judged on a hard
13   compliance cap in the way that a cap has to be
14   implemented in a child welfare agency is harmful
15   to children.  It is harmful to the care for
16   children.
17       Q.   And so you wouldn't have signed it?  You
18   wouldn't have signed that provision of the
19   agreement, is that --
20       A.   I would not have agreed -- and, again,
21   knowing what I know today, knowing what I know
22   sitting here today, no, ma'am, I would not have
23   agreed for the State to obligate itself in order
24   to comply with the second MSA.  I would not have
25   agreed that the State be judged by a hard cap like
```

```
 1    that 90 percent cap.  I would not.
 2              MS. LOWRY:  All right.  I have nothing
 3        further.
 4                (Time Noted:  4:16 p.m.)
 5                  SIGNATURE/NOT WAIVED
 6
 7    ORIGINAL:  MARCIA ROBINSON LOWRY, ESQ.
 8    COPY:  J. LAWRENCE JONES, ESQ.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```