**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

OLIVIA Y., by and through her next friend, James D.
Johnson; JAMISON J., by and through his next friend,
Clara Lewis; DESIREE, RENEE, TYSON, and MONIQUE
P., by and through their next friend, Sylvia Forster; JOHN
A., by and through his next friend, James D. Johnson;
CODY B., by and through his next friend, Sharon Scott;
MARY, TOM, MATTHEW, and DANA W., by and
through their next friend, Zelatra W.; AND SAM H., by and
through his next friend, Yvette Bullock; on their own behalf
and behalf of all others similarly situated,

Plaintiffs,

    v.

CIVIL ACTION NO.
3:04-CV-251-TSL-FKB

PHIL BRYANT, as Governor of the State of Mississippi;
DONALD TAYLOR, as Executive Director of the
Department of Human Services; AND BILLY MANGOLD,
as Director of the Division of Family and Children's
Services,

Defendants.

**PLAINTIFFS' AMENDED MEMORANDUM OF LAW IN SUPPORT OF AMENDED
MOTION FOR RELIEF PURSUANT TO REMEDY PHASE OF PLAINTIFFS'
RENEWED MOTION FOR CONTEMPT, FOR AN EVIDENTIARY HEARING, AND
<u>FOR THE APPOINTMENT OF A RECEIVER</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

I.    INTRODUCTION ...................................................................................... 1

II.   FACTS ........................................................................................................ 2

    A.  First Motion for Contempt – The Beginning of a Decade of Non-Compliance. ............... 2

    B.  Plaintiffs' Renewed Motion for Contempt. ..................................... 3

    C.  Agreed Order - Continuing the Hearing on Renewed Motion for Contempt. ................... 4

    D.  Interim Remedial Order – Reorganization Begins ............................. 4

        1.  Stipulated Second Remedial Order. ..................................... 5

        2.  Agreed Order for Suspension of Specific Obligations. ................... 6

        3.  Stipulated Third Remedial Order. ....................................... 6

    E.  2017 – A Year of Growth and Administrative Change. ....................... 6

    F.  2nd Modified Mississippi Settlement Agreement and Reform Plan Becomes Effective – Defendants Non-Compliance Persists. ................................ 8

    G.  Defendants' Motion for Relief Under Rule 60(b) – Defendants Seek Relief from Their Agreed-Upon Obligations. ..................................... 9

    H.  Public Catalyst Report 6 – Defendants' Widespread Non-Compliance Continues. ......... 10

III.  DISCUSSION ......................................................................................... 12

    A.  Plaintiffs Have Demonstrated – and There Is Again No Genuine Dispute Concerning – The Essential Elements of Civil Contempt. ..................... 13

        1.  The Element of a Court Order is Satisfied. ................................ 14

        2.  The Element of an Order Requiring Certain Conduct in Clear Terms is Satisfied..... 14

        3.  The Element of Non-Compliance is Satisfied. ......................... 15

        4.  Courts Have Consistently Held State Officials in Contempt in Analogous Circumstances. ............................................. 16

a.   LaShawn A. v. Kelly. ................................................................ 17

b.   G.L. v. Zumwalt. ..................................................................... 19

c.   Aspira of New York, Inc. v. Board of Education of New York. .......... 20

B.   The Practical Effects of Defendants' Violation on Mississippi's Children. .................... 22

1.   Child Safety & Child Well-Being. ................................................... 22

a.   Child Maltreatment in Care. ................................................. 23

b.   Child Well-Being. ............................................................... 25

2.   Data and Management Information Systems. ................................... 26

3.   Caseload Standards. ................................................................. 28

4.   Placement Standards. ............................................................... 30

5.   Child and Youth Permanency. .................................................... 31

C.   The Court Should Appoint a Receiver to Effectuate the Necessary Remedial Measures. 32

1.   The Dire Circumstances of This Case Warrant the Appointment of a Receiver. ........ 33

2.   Courts in Similar Cases Have Appointed Receivers for Dysfunctional Public
Agencies. ............................................................................... 33

a.   LaShawn A. v. Kelly. .......................................................... 33

b.   Shaw v. Allen. .................................................................... 35

IV. CONCLUSION ..................................................................................... 36

CERTIFICATE OF SERVICE ........................................................................ 38

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Airlines, Inc. v. Allied Pilots Ass'n*,
  228 F.3d 574 (5th Cir. 2000) ................................................14

*Aspira of New York, Inc. v. Board of Education of New York*,
  423 F. Supp. 647 (S.D.N.Y. 1976) ..............................20, 21, 22

*Carty v. Farrelly*,
  957 F. Supp. 727 (D.V.I. 1997) ...........................................17

*Cobell v. Babbitt*,
  37 F. Supp. 2d 6 (D.D.C. 1999) ..........................................15

*Dixon v. Barry*,
  967 F. Supp. 535 (D.D.C. 1997) .........................................32

*G.L. v. Zumwalt*,
  No. 77-0242-CV-W-1 (W.D. Mo. Dec. 7, 1992)......................19, 20, 22

*Gates v. Collier*,
  616 F.2d 1268 (5th Cir. 1980) ...........................................13

*Ho v. Martin Marietta Corp.*,
  845 F.2d 545 (5th Cir.1988) .............................................14

*Hutto v. Finney*,
  437 U.S. 678, 57 L. Ed. 2d 523, 98 S. Ct. 2565 (1978)........................13

*Lamar Fin. Corp. Adams*,
  918 F.2d 564 (5th Cir.1990) ............................................13

*LaShawn A. v. Kelly*,
  887 F.Supp. 297, 299-301, 317 (D.D.C. 1995), *aff'd sub nom. LaShawn A. v.
  Kelley*, 107 F.3d 923 (D.C. Cir. 1996)............................................ *passim*

*Lelsz v. Kavanagh*,
  673 F. Supp. 828 (N.D. Tex. 1987) ...............................13, 17

*Maness v. Meyers*,
  419 U.S. 449, 95 S. Ct. 584, 42 L. Ed. 2d 574 (1975)........................13

*McCord v. Maggio*,
  927 F. 2d 844 (5th Cir. 1991) ...........................................16

*Morgan v. McDonough*,
    540 F.2d 527 (1st Cir. 1976) ...................................................................................32

*Petroleos Mexicanos v. Crawford Enters., Inc.*,
    826 F. 2d 392 (5th Cir. 1987) ..................................................................................15

*S.E.C. v. AMX International, Inc.*,
    7 F.3d 71 (5th Cir. 1993) .........................................................................................14

*S.E.C. v. Reynolds*,
    No. 3:08–CV–438–B, 2011 WL 903395 (S.D. Tex. March 16, 2011)....................14

*Shaw v. Allen*,
    771 F. Supp. 760 (S.D. W. Va. 1990) .........................................................32, 35, 36

*U.S. v. City of Jackson, Miss.*,
    359 F.3d 727 (5th Cir.2004) ....................................................................................13

*United States v. Alcoa, Inc.*,
    533 F.3d 278 (5th Cir. 2008) ...................................................................................14

*United States v. City of Jackson*,
    318 F. Supp. 2d 395 (S.D. Miss. 2002)...............................................................15, 17

*United States v. Tennessee*,
    925 F. Supp. 1292 (W.D. Tenn. 1995)................................................................15, 16

*United States v. United Mine Workers*,
    330 U.S. 258, 67 S. Ct. 677, 91 L. Ed. 884 (1947) .................................................35

*Whitcraft v. Brown*,
    570 F.3d 268 (5th Cir. 2009) ...................................................................................13

**Other Authorities**

Fed. R. Civ. P. 60(b) .............................................................................................................9

Fed. R. Civ. P. 66...............................................................................................................32

## I.    INTRODUCTION

Plaintiffs – thousands of neglected and abused foster care children in Mississippi – bring this Motion in Support of the Remedy Phase of Their Renewed Motion for Contempt and seek appointment of a receiver to take control of Mississippi's long-dysfunctional child welfare system. Despite a court order requiring them to comply with a settlement agreement to which they had committed, Defendants have consistently failed to do so. A report recently filed by the court-appointed neutral monitor[1] reveals that Defendants' longstanding non-compliance is not only persistent, but it is also widespread and flagrant.

For the past nine years, Plaintiffs have tried repeatedly to ensure that the state operates a child welfare system that meets constitutional requirements and complies with the standards to which the state itself has agreed. Unfortunately, Plaintiffs have been met with almost a decade of continuing non-compliance. The state's noncompliance is now as routine as a metronome: the state fails to comply with orders to which it earlier agreed; the state issues earnest pledges of compliance, if only it is given another opportunity; another opportunity is extended; compliance never occurs. This process is repeated endlessly.

All of this has occurred against the backdrop of a year – 2017 – during which monitoring of the state's performance was suspended, and Defendants had the assistance of a very well-regarded national technical assistance group, which has devoted countless hours over the last two years to ongoing work with the child welfare system and its officials. But in late 2017, regime change in the Mississippi Department of Child Protection Services ushered in an era of hostility towards the settlement agreement, punctuated by an unwillingness and inability to comply.

---

[1] Hereinafter referred to as the "Monitor" or "Public Catalyst".

Today, more than ten years after originally signing a consent decree in which the state essentially acknowledged operating an unconstitutional child welfare system, and despite Plaintiffs' constant attempts to ensure that Mississippi's children receive adequate care, Defendants remain in blatant non-compliance with the most fundamental of requirements. Indeed, the most recent compliance report produced by the Monitor on June 11, 2019, demonstrates staggering non-compliance with the terms of the settlement agreement.[2] Out of the 113 commitments due in 2018, Defendants failed to comply with at least 35.[3] For an additional 41 commitments — many of which are critical to child safety and well-being — Defendants have no reliable data and know very little about the almost 5,000 children in their care.[4]

All of this demonstrates that if abused and neglected children in Mississippi are *ever* to receive constitutionally adequate care at the hands of the state, it will only be after effective control of the system is placed in the hands of a receiver, appointed by and answerable to the federal court. Only a court-appointed receiver can bring the state into compliance with this Court's prior orders and the dictates of the Constitution.

## II.    FACTS

### A.  First Motion for Contempt – The Beginning of a Decade of Non-Compliance.

In 2010, Plaintiffs filed their first motion for contempt in response to the state's failure to achieve compliance with the Court's orders. At that time, the Court declined to hold defendants in contempt, but asked the parties to renegotiate the time periods in the decree. For the next four years, Plaintiffs engaged in Herculean efforts to obtain usable data from the state that would

---

[2] Progress of the Mississippi Department of Child Protection Services Monitoring Report 6 [Dkt. 845]("Monitoring Report 6"), p. 4. Attached hereto as **Exhibit A**.
[3] *Id.* at 4.
[4] *Id.* at 4, 19.

enable Plaintiffs and the Court to determine whether Defendants were capable of complying or even attempting to comply with the Modified Mississippi Settlement Agreement and Reform Plan [Dkt. No. 571](the "MSA") entered by the Court on July 6, 2012. The then Court-appointed Monitor filed report after report documenting Defendants' continued failure to comply with the MSA and the Periods 3 – 5 Implementation Plans.

Failure to achieve compliance with the MSA was widespread. The state failed to produce reliable data – or in many cases, any data at all – on key standards in the MSA; there was virtually no reliable information on hiring and worker attrition, and no reliable information on which to determine worker caseloads; there was a lack of information about maltreatment in care and no information or feedback from the field about remediation steps; the quality improvement system was barely functioning, with no data to demonstrate that it had indeed improved quality.

In an effort to find an alternative to returning to court, Plaintiffs negotiated a court-ordered remedial plan that was "an alternative at this point to Plaintiffs' filing a motion for contempt." Corrected Order Creating Director for Sustainable Transformation and Transformation Team, July 9, 2014 [Dkt. No. 607]("July 9 Order"), p. 1. Defendants then failed to comply with a critical term of that order, rendering it a nullity.

### B.  Plaintiffs' Renewed Motion for Contempt.

Almost five years later, in 2015, Plaintiffs filed their Renewed Motion for Contempt, for an Evidentiary Hearing and for the Appointment of a Receiver [Dkt. No. 622]("Renewed Motion for Contempt") and Memorandum in Support [Dkt. No. 623]. In the Renewed Motion, Plaintiffs detailed the extensive, system-wide failures which demonstrated the Mississippi child welfare system's inability to comply with this Court's Orders and its own endless and hollow promises to reform its child welfare system.

### C.  Agreed Order - Continuing the Hearing on Renewed Motion for Contempt.

On July 23, 2015, the parties entered the Agreed Order Continuing the Hearing on

Plaintiffs' Renewed Motion for Contempt [Dkt. No. 664]("Agreed Order"). In it, Defendants

*did not contest that they did not comply* with the MSA or with the Periods 3 and 4

Implementation Plans. Agreed Order, at 4 (emphasis added).[5] The Agreed Order further

provided that Defendants would retain Public Catalyst, a national organization with

experience in reforming child welfare systems, to conduct an organizational analysis of its

provision of child welfare and foster care services. *Id.* at 1. If possible, the final organizational

analysis report would become the basis of a negotiated court-enforceable remedial order based

on Public Catalyst's recommendations. *Id.* at 3.

The Agreed Order provided that in the event of further failure to comply by Defendants,

Plaintiffs could immediately invoke the remedy provisions of the pending Renewed Motion

for Contempt. *Id*. at 4.

### D.  Interim Remedial Order – Reorganization Begins.

Public Catalyst's Organizational Analysis was completed on November 24, 2015 and on

December 22, 2015, the parties filed the Interim Remedial Order [Dkt. No. 671]("IRO"). The

IRO, entered in late 2015, provided for the complete administrative reorganization of the

Mississippi Department of Family and Children's Services ("DFCS"). It provided that DFCS

would be organized into a separate stand-alone agency, outside the Mississippi Department of

Human Services and, in an effort to streamline its work with DFCS, it would have its own

salary, hiring and contracting authority. IRO at ¶¶ 1-2. Public Catalyst was directed to conduct

---

[5] Defendants admitted to the factual basis for a legal finding of contempt; moreover, Defendants agreed
they are precluded from arguing that a finding of non-compliance rather than contempt legally precludes
the imposition of a receivership. *Id.* at 5.

a point in time caseload audit based upon weighted caseload standards set forth in their Organizational Analysis. Based on the caseload standards, Defendants would develop a plan to implement the MSA caseload standards as well as a plan for the recruitment, hiring and retention of an adequate number of qualified caseworkers, and supervisors. *Id.* at ¶ 7. Other goals were set for Defendants, including, but not limited to the following:

- by May 1, 2016, DFCS would equip all investigators with smart phones or tablets, *Id.* at ¶ 9a;

- by July 1, 2016, DFCS would provide adequate computers to caseworkers, *Id.* at ¶ 9b;

- by July 1, 2016, DFCS would have a qualified IT director in place, *Id.* at ¶10.

Under the IRO, Public Catalyst would be retained to provide technical assistance to the parties pursuant to the provisions of the Remedial Order so that Defendants could have technical expertise available to them in order to implement the necessary reforms. *Id.* at ¶ 12.

The IRO also provided that the parties would meet on April 1, 2016, to begin re-negotiating the terms of the MSA and the time-table for implementing its provisions. *Id.* at ¶ 14. Finally, the IRO continued the remedy phase of the Motion for Contempt until May 15, 2016. *Id.* at ¶ 15. As with the Agreed Order, the Interim Remedial Order provided that violations would allow Plaintiffs to move forward under Paragraphs 9 and 10 of the Agreed Order. *Id.* at 8.

### 1. Stipulated Second Remedial Order.

The parties continued their negotiations in May 2016, and the Court entered the Stipulated Second Remedial Order ("SSRO") on May 19, 2016. The first major tasks were to determine whether Defendants had met their obligations to complete the administrative reorganization of the agency, including providing software and hardware to caseworkers, beginning their new hiring and training plans and getting better field resources into place. *See* SSRO, [Dkt. No. 694], ¶¶ 2A-L. In addition, Public Catalyst was to conduct a second point-in-

time caseload audit, conduct a validation and review of a random sample of maltreatment in care reports and begin the process of placement licensing review. *Id.* at ¶¶ 4, 5, 7, 8.

### 2.    Agreed Order for Suspension of Specific Obligations.

Since the parties were attempting to renegotiate the MSA, the Agreed Order for Suspension of Specific Obligations [Dkt. No. 702]("Agreed Suspension Order"), entered on October 14, 2016, suspended some data reporting obligations by Defendants under the IRO and the original MSA.

### 3.    Stipulated Third Remedial Order.

The remaining two months of 2016 were spent by the parties renegotiating the provisions of the 2nd MSA [Dkt. No. 712]. On December 19, 2016, the Stipulated Third Remedial Order [Dkt. No. 713]("STRO") was entered. The STRO reconfirmed that Defendants *did not* contest that they were not in compliance with the original MSA, nor did they claim that they had the capacity to comply with its provisions. STRO at 1, ¶ 1. *Importantly, Defendants agreed that by December 31, 2017, they were required to be in full compliance with the caseload compliance performance targets established by Public Catalyst. Id.* at ¶ 5c (emphasis added). That meant that by December 31, 2017, 90 percent of all caseworkers were required to have caseloads below the required caseload targets.

The STRO provided that the remedy phase of the Renewed Motion for Contempt would remain in effect until the 2nd MSA went into effect. *Id.* at ¶¶ 9, 10.

### E.    2017 – A Year of Growth and Administrative Change.

2017 was a year of growth for the Mississippi Department of Child Protection Services ("MDCPS"). Using the STRO as a blue-print, the MDCPS worked to increase its capacity, expanding its staff, improving its training and integrating new computer models into its information management system. The agency worked with Public Catalyst to improve its

licensing, remove its large backlog of unlicensed foster homes, and began ambitious plans to streamline its county of service and county of responsibility assignments. Under the leadership of Commissioner David Chandler, a strong and competent management team was assembled – the first such team that seemed capable of building the capacity of the MDCPS to properly serve its children and families. Although much remained to be done, Plaintiffs and MDCPS senior management saw improvement that created real hope for the future.

However, in August 2017, MDCPS Commissioner Chandler resigned his position, and Mississippi Supreme Court Justice Jess Dickinson was appointed to run the agency. Commissioner Dickinson took office August 8, 2017. Since then, MDCPS' entire management structure has collapsed, and the promising management team assembled under Commissioner Chandler has dissolved.

It is apparent that Commissioner Dickinson is neither willing, nor capable of operating the agency in such a way that achieves compliance with the Court's requirements, as Plaintiffs will show at the hearing on the present motion. In fact, Commissioner Dickinson acknowledged in his deposition that he would not have agreed to the 2nd MSA, or the other interim or stipulated orders, stating that, "[i]f I knew then what I know now, I wouldn't have [agreed to it]." *See* Deposition of Jess Dickinson, at 140, ¶¶ 19-20 and 143, ¶¶ 20-25. [Attached hereto as **Exhibit B**]. In particular, Commissioner Dickinson has vocalized his belief that the agreed-upon caseload standards are both harmful to children and detrimental to the management of the child protection agency. *See* Deposition of Jess Dickinson, at 119, ¶¶ 18-24 and 120, ¶¶ 1-3. [Attached hereto as **Exhibit C**]. Shortly after assuming the office of Commissioner, Dickinson decided to implement an immediate freeze on all new hiring, raises, and promotions – rendering compliance with the caseload provisions of the settlement

agreement difficult, if not impossible. *See* Hiring Freeze Memo dated Dec. 20, 2017.

[Attached hereto as **Exhibit D**]. To date, hiring is still limited to replacing workers who leave

the agency.

> **F.  2nd Modified Mississippi Settlement Agreement and Reform Plan Becomes Effective – Defendants Non-Compliance Persists.**

On December 19, 2016, the parties filed the 2nd Modified Mississippi Settlement

Agreement and Reform Plan [Dkt. No.712] ("2nd MSA"), the currently operative Settlement

Agreement between the parties. It supersedes the MSA and became effective on January 1, 2018.

2nd MSA at 1.

Paragraph 11.1 of the 2nd MSA provides that from January 1, 2018 through December

31, 2019, Plaintiffs' rights under Paragraph 8 of the STRO will remain in effect for violations of

those still-applicable provisions of the STRO and for violations of the 2nd MSA. In order to

proceed with a contempt and receivership request to the Court under these provisions, Plaintiffs

are required to notify Defendants in writing of their intent and basis for doing so and meet and

confer in an attempt to resolve the dispute as to Defendants' non-compliance. *Id.* at  ¶ 11.1,

11.1.d. Upon a failure of agreement between the parties, Plaintiffs can seek a remedial order

from the Court pursuant to Paragraph 1 of the STRO.  *Id.* Plaintiffs have notified Defendants, in

writing, of their continued non-compliance on three separate occasions since March 5, 2018. *See*

Exhibits E, F, G attached hereto. Each time, the parties satisfied their meet and confer

requirement as set forth in Paragraphs 11.1, 11.1.d of the 2nd MSA, but failed to reach a

resolution.

On March 5, 2018, after receiving notice that only 61 percent of the MDCPS caseworkers

had caseloads at the required level[6] at the end of December, Plaintiffs notified Defendants in

---

[6] Monitor's January 2, 2018 Caseload Statistics. [Attached hereto as **Exhibit H**].

writing of their non-compliance with the caseload requirements of the STRO and of their intent to seek Court intervention. *See* March 5, 2018 Notice of Noncompliance. [Attached hereto as **Exhibit E**]. On March 29, 2018, the parties met and conferred in person, but were unsuccessful in resolving the dispute.

On November 13, 2018, Plaintiffs again notified Defendants in writing of their non-compliance with the numerous specific provisions of the STRO and of their intent to seek Court intervention. *See* November 13, 2018 Notice of Non-Compliance. [Attached hereto as **Exhibit F**]. The parties met and conferred in person on December 12, 2018 but were unsuccessful in resolving the dispute.

On March 6, 2019, after receiving notice that only 53 percent of caseworkers had met the caseload standard requirements[7], Plaintiffs yet again notified Defendants in writing of their non-compliance with numerous specific provisions of the STRO. *See* March 6, 2019 Notice of Non-Compliance. [Attached hereto as **Exhibit G**]. On April 5, 2019, the parties met and conferred via videoconference, but were unable to resolve the dispute.

### G. Defendants' Motion for Relief Under Rule 60(b) – Defendants Seek Relief from Their Agreed-Upon Obligations.

Shortly after receiving written notice of their continued non-compliance, Defendants filed a motion for relief under Section 11.2.A of the 2nd MSA and Rule 60(b) of the Federal Rules of Civil Procedure, on July 3, 2018. Defendants seek to be indefinitely relieved of their obligations under the crucially important caseworker caseload requirement, to which they have repeatedly agreed. In their motion, Defendants acknowledge that they are *not in compliance* with this provision. [Dkt. No. 757] at 11.

---

[7] MSA Quarterly Report for Period 10/1/18-12/31/18. [Attached hereto as **Exhibit I**].

**H.  Public Catalyst Report 6 – Defendants' Widespread Non-Compliance Continues.**

On June 11, 2019, Public Catalyst released its Progress of the Mississippi Department of Child Protection Services Monitoring Report 6 ("Monitoring Report 6"). The report details Defendants' continued and widespread non-compliance with the 2nd MSA during the reporting period, January through December 2018 (the "Reporting Period"). Under the 2nd MSA, Defendants were required to reach certain performance standards for 113 commitments in the Reporting Period. Defendants failed to meet performance standards for *at least* thirty-five commitments, many of which are critical to the safety of children in Mississippi. Monitoring Report 6, at 4.  Defendants only met the required performance standards for thirty-seven of these commitments. *Id.* For another forty-one commitments, Defendants either failed to provide the data to the Monitor, or provided inaccurate data that the Monitor was unable to validate. *Id.*

The report detailed Defendants' non-compliance in the following 2nd MSA commitments:

1. Caseworker Caseloads – § 1.3.a.
2. Supervisor Staffing Ratios – § 1.3.b.
3. Comprehensive Information Systems and Reporting – § 1.5.a.
4. Responding to Reports of Abuse and Neglect – § 2.1.
5. Special Investigations Unit and Maltreatment in Care Investigation Initiation Timeliness – § 2.2.
6. Maltreatment in Care Screen-Out Reviews – § 2.3.
7. Licensure Investigations of Emergency Shelters and Group Homes – § 2.4.
8. Licensure Investigations by Child Placing Agencies – § 2.5.
9. Maltreatment in Care Worker Training – § 2.6.
10. Maltreatment in Care Investigation Reviews – § 2.7.
11. Standardized Decision Making – § 2.8.

12. Worker Contacts with Custody Children After a Maltreatment in Care Substantiation – § 2.8.b.

13. Maltreatment of Children in Care – § 2.9.

14. Unlicensed Relative Homes – § 3.2.a.

15. Foster Home Development – § 3.3.b.

16. Young Children Placed in Congregate Care Facilities – § 4.9.

17. Placement Moves – § 4.10.

18. Multiple Emergency Placements – § 4.11.

19. Placement Moves – § 4.12.

20. Caseworker Contact with Foster Children – § 5.1.a.1.

21. Caseworker Contact with Foster Parents – § 5.1.d.1.

22. Child-Parent Contacts within 72 Hours of Placement – § 5.2.a.

23. Comprehensive Family Service Plans – § 6.1.a.1.

24. Permanency Plans – § 6.1.d.1.

25. Concurrent Permanency Planning – § 6.2.a.1.

26. Reunification Case Goal – § 6.3.a.1.a.

27. Reunification Supports for Parents – § 6.3.a.3.

28. After-Care Plans – § 6.3.a.4.

29. Final Discharge – § 6.3.a.6.

30. Permanency Plan Reviews – § 6.4.a.1.

31. Transition to Independent Living, Notification of Cessation of Benefits – § 7.1.

32. Independent Living Services – § 7.3.

33. Independent Living, Start-Up Stipends – § 7.5.

34. Child Well-Being, Initial Medical Screening – § 8.1.a.1.

35. Child Well-Being, Comprehensive Medical Exams – § 8.1.b.1.

36. Child Well-Being, Dental Exams – § 8.1.e.1.

Monitoring resumed at the beginning of 2018 and Defendants have been accountable for their promises for one year. But Defendants remain in clear and unequivocal non-compliance. It is abundantly evident that not only are the constitutional rights of Plaintiff

11

children at stake in this litigation, but their health, safety and very lives are also on the line.

For the reasons which follow, this Court should enter a finding of contempt and appoint a receiver to run Mississippi's child welfare system until compliance with constitutional standards is achieved. Defendants have repeatedly demonstrated that they either cannot or will not obey this Court's orders. For more than nine years, since the first contempt application in 2010, Plaintiffs have fought to hold Defendants to their court-ordered promises – to no avail.

## III.    DISCUSSION

Defendants are in violation of both the court-approved STRO [Dkt. No. 713] and the 2nd MSA [Dkt. No. 712]. In addition to continued non-compliance with agreed-upon caseload standards, the most recent report produced by the Monitor details *at least* thirty-five substantive commitments that Defendants have failed to achieve. Monitoring Report 6, at 4. For another forty-one commitments, Defendants either failed to provide the data to the Monitor, or provided inaccurate data that the Monitor was unable to validate. *Id.* Indeed, during the Reporting Period Defendants were required to achieve compliance with 113 commitments under the 2nd MSA. *Id.* Instead, Defendants only achieved thirty-seven of these critical commitments. *Id.* Defendants' non-compliance with the 2nd MSA is widespread, blatant and indisputably detrimental to the vulnerable children it is supposed to be protecting. Despite the recent Monitor's report, which describes a much bleaker reality, Defendants have asserted that in 2018, "… our system is producing some really great outcomes." *See* Deposition of Taylor Cheeseman, at 34, ¶¶ 9-14. [Attached hereto as **Exhibit J**]. Thus, the Plaintiff Children now again seek to enforce their constitutional rights to adequate care and protection that are embodied in the agreed-upon court orders and settlement terms.

### A.  Plaintiffs Have Demonstrated – and There Is Again No Genuine Dispute Concerning – The Essential Elements of Civil Contempt.

Contempt proceedings are based upon "the basic proposition that all orders and judgments of courts must be complied with promptly." *Maness v. Meyers*, 419 U.S. 449, 458, 95 S. Ct. 584, 591, 42 L. Ed. 2d 574, 583 (1975). "[F]ederal courts are not reduced to issuing [judgments] against state officers and hoping for compliance*." Gates v. Collier*, 616 F.2d 1268, 1271 (5th Cir. 1980), quoting *Hutto v. Finney*, 437 U.S. 678, 690, 57 L. Ed. 2d 523, 98 S. Ct. 2565 (1978).

The purpose of a civil contempt sanction is "to coerce the contemnor into compliance with a court order, or to compensate another party for the contemnor's violation." *Lamar Fin. Corp. Adams*, 918 F.2d 564, 566 (5th Cir.1990). We emphasize that Plaintiffs do not seek the imposition of fines or other punitive measures. Rather, Plaintiffs seek through civil contempt a recognition that Defendants have failed over a period of many years to implement numerous provisions of orders and implementation plans to which they had agreed, a fact not in genuine dispute. Defendants have been given repeated chances to comply, and to avoid the remedy sought in this motion, but they have still failed to do so.

Contempt is appropriate where a party fails "in meaningful respects to achieve substantial and diligent compliance with a clear and unambiguous court decree." *Lelsz v. Kavanagh*, 673 F. Supp. 828, 839 (N.D. Tex. 1987) (citations and internal quotation marks omitted). The elements of civil contempt are simple and straightforward. To demonstrate civil contempt, a party must establish (1) a court order was in effect; (2) the order required specified conduct by the alleged contemnor; and (3) the alleged contemnor failed to comply with the order. *Whitcraft v. Brown*, 570 F.3d 268, 271-72 (5th Cir. 2009); *U.S. v. City of Jackson, Miss.*, 359 F.3d 727, 731 (5th Cir.2004). To be contemptuous, a failure to comply need not be willful

13

or intentional. Rather, the complainant must simply prove lack of compliance. *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Cir. 2000); *S.E.C. v. Reynolds*, No. 3:08–CV–438–B, 2011 WL 903395, at *3 (S.D. Tex. March 16, 2011). Plaintiffs submit that there is no genuine dispute that each of the elements of civil contempt is satisfied.

### 1. The Element of a Court Order is Satisfied.

The STRO and 2nd MSA were negotiated by the parties and approved by the Court. As this Court noted in its May 2011 order on the first contempt motion, while agreements between parties are in the nature of a contract, "an agreement between litigants ... entered as a judgment of the court ... takes on an added significance," having "attributes both of contracts and of judicial decrees." *S.E.C. v. AMX International, Inc.*, 7 F.3d 71, 75 (5th Cir. 1993) (citations omitted). "Thus, a consent order entered based on the parties' settlement and related agreements is properly enforceable by the court's contempt power." May 2011 Order, p. 5 (n. 1), citing *AMX International*, 7 F.3d at 76.

Accordingly, the contempt power indisputably includes the authority to enforce consent decrees and settlement agreements. *Ho v. Martin Marietta Corp*., 845 F.2d 545, 548 (5th Cir.1988). Indeed, "district courts have the power and ordinarily *must* hold parties to the terms of a consent decree .... [and] have wide discretion to enforce decrees and to implement remedies for decree violations" through declarations of contempt. *United States v. Alcoa, Inc.*, 533 F.3d 278, 286 (5th Cir. 2008) (emphasis added).

### 2. The Element of an Order Requiring Certain Conduct in Clear Terms is Satisfied.

Defendants did not claim in 2010, and cannot claim in good faith today, that the requirements of the STRO and 2nd MSA are ambiguous. The defendants *agreed* to the terms set forth in both documents. A court order is unlikely to be found ambiguous when it was consented

14

to by the contemnor. *Cobell v. Babbitt*, 37 F. Supp. 2d 6, 16 (D.D.C. 1999). As another court observed: "Where a party participates in drafting the relevant order, it does (or is held to have done) so 'with an understanding of what it can necessarily accomplish.'" *United States v. Tennessee*, 925 F. Supp. 1292, 1302 (W.D. Tenn. 1995).

And here, the terms and provisions of the 2nd MSA are explicitly detailed. Many of the standards are specific numerical calculations conducted by the Monitor, in conjunction with Defendants. There is no gray area. Accordingly, there can be no genuine dispute that the defendants have known what they were required to do under the STRO and 2nd MSA.

### 3. The Element of Non-Compliance is Satisfied.

Defendants' extensive failure to comply with the terms of the settlement agreement reflects not only plain and significant violations of critical terms of the 2nd MSA, but also a clear trend towards even more significant non-compliance and disregard for the agreed upon terms of the STRO and 2nd MSA. As in 2010, there is no genuine issue of the Defendants' non-compliance. In addition to failing to meet the agreed-upon standards for at least thirty-five provisions of the 2nd MSA, Defendants either failed to provide required data or provided inaccurate data for an additional forty-one commitments. Monitoring Report 6, at 4. The Monitoring Report 6 details the continued and extensive failure of Defendants to meet their commitments under the 2nd MSA – a continued failure that deprives the vulnerable children in their care of the most basic constitutional rights.

As noted, contempt does not require a showing of willfulness or intent. *Petroleos Mexicanos v. Crawford Enters., Inc.*, 826 F. 2d 392, 401 (5th Cir. 1987). Good faith is not a defense, and "the mere fact that a party may have taken steps toward achieving compliance is not a defense to a contempt charge." *United States v. City of Jackson*, 318 F. Supp. 2d 395, 417, 418

(S.D. Miss. 2002). Furthermore, "lack of funds is not a sufficient justification for neglect of a citizen's constitutional rights." *McCord v. Maggio,* 927 F. 2d 844, 847 (5th Cir. 1991).

Here, the fact that the Defendants agreed to the terms of the STRO and 2nd MSA, then failed to perform, further supports a finding of contempt. "Courts have been particularly unsympathetic to purported excuses for less than substantial compliance where the contemnor has participated in drafting the order against which compliance is measured." *United States v. Tennessee*, 925 F. Supp. at 1302.

### 4. Courts Have Consistently Held State Officials in Contempt in Analogous Circumstances.

In its 2011 order on the first motion by Plaintiffs requesting a finding of contempt, the Court found that it was "unquestionably true" that Defendants had failed to comply with "most of the requirements established by the court-approved Period Two Implementation Plan" and that Plaintiffs had "obviously…met their burden to present a *prima facie* case" of contempt. May 17, 2011 Order [Dkt. No. 557], at 4. The Court nevertheless declined to formally hold the Defendants in contempt due to concerns over whether such a finding would "serve any fruitful purpose." *Id.* at 10. However, now, many years and many admissions of non-compliance later, a finding of contempt would serve the indispensable purpose of compelling compliance to protect the constitutional rights of at-risk children through the appointment of a receiver, discussed *infra*. Defendants have agreed that ongoing non-compliance, particularly at this stage of this case, is essentially the same as an admission of contempt[8] but this Court has never entered a formal finding of contempt. The examples cited

---

[8] Defendants agreed that maltreatment investigations would be initiated within 24 hours of being reported and completed within 30 days, [Dkt. No. 571] p. 17; Defendants agreed that special needs children would be matched with placement resources that can meet their therapeutic and medical needs, *Id.* at 18, Defendants agreed that at least 95percent of siblings who entered DFCS custody at or

below are but a few in the sad and voluminous list of the Defendants' failures to keep their promises. We ask for an order of contempt now so that we can move forward to the issue of appropriate relief for this fundamental and ongoing failure by Defendants to comply.

Courts have consistently held state officials in contempt in analogous circumstances, namely, when they have persistently failed over long periods of time to comply with consent decrees where constitutional rights are at stake. We discuss three such cases below.[9]

### a.    LaShawn A. v. Kelly.[10]

In *LaShawn A. v. Kelly*, the plaintiffs, a class of "abused and neglected children" residing in the District of Columbia alleged that the child welfare system in the District of Columbia failed to provide necessary services and protections. Following a bench trial in 1991, the Court found that the plaintiff children were "routinely denied the protections and services that local and federal law require." The parties thereupon negotiated a course of remedial action, including the appointment of a monitor. In August 1991, the Court granted the parties' joint motion for entry of a remedial order and approved an implementation plan. *LaShawn A.*, 887 F. Supp. at 297–299.

In 1992, the plaintiffs filed their first contempt motion, claiming that the defendants

---

near the same time would be placed together, *Id.* at 23, and Defendants agreed that at least 75 percent of children in custody during a period shall receive periodic medical examinations and all necessary medically necessary follow-up services. *Id.* at 25. Yet, in each instance, Defendants admitted that they did not comply with any of these agreements. [Dkt. No. 713] p. 1, ¶ 1.

[9] These are hardly the only such cases. For example, *see also City of Jackson*, 318 F. Supp. 2d at 417-419 (holding City of Jackson in contempt of consent decree prohibiting city from discriminating in housing decisions relative to handicapped persons); *Carty v. Farrelly*, 957 F. Supp. 727, 744 (D.V.I. 1997) (holding governmental officials in contempt for failing to conform with settlement agreement regarding conditions at prison complex); *Lelsz v. Kavanagh*, 673 F. Supp. 828, 831-32, 863-64 (N.D. Tex. 1987) (holding defendants in contempt for failing to comply with settlement agreement governing state institution for mentally retarded persons).

[10] 887 F.Supp. 297, 299-301, 317 (D.D.C. 1995), *aff'd sub nom. LaShawn A. v. Kelly*, 107 F.3d 923 (D.C. Cir. 1996).

were not complying with the plan. Plaintiffs withdrew the motion in 1993 after reaching agreement with defendants for further reforms. In 1994, plaintiffs filed a second contempt motion, again alleging non-compliance, and sought two limited receiverships. The District Court granted the request for the limited receiverships but declined to enter a finding of contempt, even though it found that "contempt may well [have been] justified." *LaShawn A.,* 887 F. Supp. at 299–300.

Plaintiffs filed a third motion for contempt in 1995 based upon continuous and widespread violations by defendants of the Court-approved reforms, as found by the monitor. The Court concluded that the monitor's report and other evidence "showed that the defendants remain in non-compliance with many court-ordered requirements. It is important to note that most of these requirements … have been voluntarily proposed by the defendants." *LaShawn A*., 887 F. Supp. at 300. After detailing defendants' non-compliance in areas such as staffing, training, information systems, quality assurance, licensure, and services, the Court found that "abused and neglected children continue to suffer under these conditions." *Id.* at 300, 314.

The court specifically noted "the critical staffing shortages, the dearth of basic administrative support, the severely delayed installation of the [information system], and the inaction on revenue maximization." *Id.* at 314. Therefore, and emphasizing that civil contempt has no punitive aspect, the Court held the District of Columbia in civil contempt even though the Court noted that it had "repeatedly expressed its reluctance to impose contempt sanctions …" *Id.* at 313–314, 317. The Court explained that it "cannot tolerate widespread non-compliance with its orders…. The pattern of delay and inaction that has characterized this case for the last few years must end now." *Id.* at 317.

Here, the same series of events has occurred. There was an initial motion for contempt in 2010; the court was reluctant to formally find Defendants in contempt even though there was "obviously" widespread non-compliance; Defendants have continued to violate the court-ordered remedial requirements for many years; Plaintiffs filed another motion seeking contempt in 2015, and yet another in 2018, which remains open. [Dkt. No. 713] at 1, ¶ 1. Here, just as in *LaShawn A*., Defendants' repeated failure to comply with the consent orders should allay the Court's initial (and understandable) concern that Defendants had not yet had time to comply with the requirements of the Settlement Agreement and Implementation Plans. For that very reason, the Court explicitly required the parties to renegotiate the applicable remedial steps and the time periods within which the state had to perform them. The parties have done this, but many more years have passed, during which Mississippi's children have been without the benefits and protections required by the Court's orders. Accordingly, the facts now weigh overwhelmingly in favor of a finding of contempt, notwithstanding the concern raised by the Court in its 2011 order of whether contempt would serve a "fruitful purpose." Now it will serve the purpose of allowing the Court to appoint a receiver for Mississippi's languishing child welfare system.

### b.    G.L. v. Zumwalt.[11]

In *G.L. v. Zumwalt*, the plaintiffs – children in the custody of the Jackson County, Missouri office of the Division of Family Services ("DFS") – alleged that DFS's policies and practices violated their constitutional right to be protected from harm while in state custody. December 7, 1992 order ("12/7/92 Order"), at 1. In 1983, the parties settled by entering into a consent decree mandating "comprehensive reform" of Jackson County's foster care system. *Id.* In 1985, plaintiffs filed a motion seeking to hold the defendants in contempt due to their

---

[11] No. 77-0242-CV-W-1 (W.D. Mo. Dec. 7, 1992).

failure to satisfy the requirements of the consent decree. *Id.* In response, the parties entered into a supplemental consent decree.  *Id.*

Thereafter, reports by a three-person monitoring committee found continuing non-compliance with the consent decree. *Id.* at 3. In 1989, plaintiffs served defendants with a notice of non-compliance, which was followed by negotiations from July 1989 to January 1990. *Id.* The parties did not resolve their differences, hence plaintiffs filed a motion in January 1990 to hold the defendants in contempt. *Id.* at 4. In August 1991, plaintiffs filed an additional motion for contempt.  *Id.*

The court held a two-day evidentiary hearing. *Id.* at 4. Among other defenses, the defendants claimed lack of adequate funding by the state legislature. *Id.* The Court, after detailing its findings of non-compliance, including excessive caseloads, understaffing, inadequate foster parent training, and insufficient levels of visits by caseworkers, held the defendants in contempt. *Id.* at 30.

The Court found a continuous and long-standing failure by the defendants to comply with the consent decree: "It is obvious from the statistics cited above that the defendants are not and have not been in compliance with the Consent Decree since they entered into it in 1983." *Id.* at 27. The Court concluded: "It is time to begin the work necessary to make the Consent Decree work and to begin the process to withdraw the Court from having to oversee the DFS Foster Care program." *Id.* at 29.

### c.    Aspira of New York, Inc. v. Board of Education of New York.[12]

In *Aspira*, the plaintiff class, comprised of Hispanic public students in New York City, entered into a consent decree which required the City to provide bilingual education,

---

[12] 423 F. Supp. 647 (S.D.N.Y. 1976).

including the hiring and training of competent staff and the issuance of periodic progress

reports. In December 1975, plaintiffs filed a motion seeking contempt on the grounds that the

defendants were in violation of the 1974 consent decree and two orders issued thereunder.

*Aspira*, 423 F. Supp. at 651. Among other things, plaintiffs alleged that the defendants were

not providing the required services, failed to hire or train the necessary personnel, and failed

to submit the information needed to determine the status of compliance. *Id.* After a lengthy

evidentiary hearing, the Court found the defendants in contempt. *Id.* The Court began by

noting that civil contempt does not suggest willful disobedience:

> The word 'contempt' rings fiercely; if its connotations in law
> included only lay notions like scorn and willful disobedience,
> plaintiffs could not prevail. But the idea in this context includes
> failures in meaningful respects to achieve substantial and diligent
> compliance. In this sufficient sense, the defendants are found to have
> been in contempt, and it has become the court's duty to declare it.

*Aspira*, 423 F. Supp. at 649. The Court then made a finding of contempt based on the following

facts, which bear a striking resemblance to this case:

> Upon the facts disclosed in this proceedings defendants have fallen
> far short of the requisite diligence. They have neglected to marshal
> their own resources…and demand the results needed from
> subordinate persons and agencies in order to effectuate the course of
> action required by the consent decree. They have allowed deadlines
> to pass without advance announcements or volunteered explanations,
> awaiting complaints by the plaintiffs…They have borne with
> seeming equanimity long periods of nonperformance, inadequate
> performance, or outright defiance from key constituents…They have
> tolerated slipshod procedures. They have failed to enlist or order the
> placement of needed and available personnel. They have displayed
> an evident sense of nonurgency bordering on indifference….

*Aspira*, 423 F. Supp. at 649.

The Court noted that although it had been placed in the "delicate and difficult" role of

supervising the performance of state officials, and was reluctant to do so, nonetheless "the

rights of the people under the law, where they are duly brought to issue before the court, must be forthrightly declared and enforced." *Aspira*, 423 F. Supp. at 648.

* * * *

This case has all of the core elements of the *LaShawn A., Zumwalt* and *Aspira* cases. A Plaintiff class, seeking to vindicate constitutional rights, enters into a consent decree with public entity Defendants who fail to perform. The failure continues for an extended period of time. Despite an initial reluctance to hold the public entities in contempt, the Courts in the three cases noted above were ultimately compelled by a duty to uphold the constitutional rights of innocent citizens. As the Court in *Aspira* stated, the rights of citizens "duly brought to issue before the Court, must be forthrightly declared and enforced." When, as here, this calls for a finding of civil contempt, then the Court should no longer hesitate to act, particularly where the action implicates the rights of the most vulnerable of Mississippi's citizens.

### B.  The Practical Effects of Defendants' Violation on Mississippi's Children.

The terms of the 2nd MSA were agreed to by the parties, and ordered by the Court, to ensure that children in Mississippi's foster care system receive constitutionally adequate care. Defendants' extensive failure to comply with the 2nd MSA adversely impacts children in their care in almost every aspect of their lives. While all provisions of the 2nd MSA are crucial, a few of the areas in which Defendants are failing are particularly pivotal in protecting safety and shaping the lives of children in foster care.

### 1.  Child Safety & Child Well-Being.

Defendants' failed commitments in areas such as maltreatment in care, caseload standards, screening child maltreatment in care reports, and investigating and reviewing maltreatment in care investigations are detrimental to overall child safety.

### a.    Child Maltreatment in Care.

Defendants committed that the rate of abuse and neglect among children in foster care shall not exceed .33 percent per year. 2nd MSA §2.9. The agreed-upon rate was a federal outcome standard, which was implemented to keep children in the state's custody safe from their caregivers. However, during the Monitoring Period, ninety-five children in MDCPS custody (or 1.15 percent) were victims of abuse or neglect by their caregivers. Monitoring Report 6, at 47. Therefore, the rate of maltreatment in care in 2018 was more than *three times* the agreed-upon rate. In order to meet the agreed-upon safety standard, MDCPS would have had to protect at least sixty-eight more children from abuse or neglect at the hands of their supposed caregivers. *Id*. The report listed examples of maltreatment in care, which should have been identified and addressed earlier, including:

> "A nine-year-old in residential care had bruising on his chest and two scratches. He stated that a staff member had punched him in his chest, and another had grabbed him by his shirt and scratched him. Physical abuse was substantiated for the staff person who grabbed the child; she was previously substantiated – twice – for harming children in residential care. The child remained placed at the facility and MDCPS recommended that the staff person no longer have contact with children in CPS custody as this was the employee's third substantiated report."

Monitoring Report 6, at 47.

Defendants' non-compliance with provisions of the 2nd MSA designed to help MDCPS achieve maltreatment standards – such as screening, investigations and reviews – undoubtedly contributed to the high rate of maltreatment in care.

First, Defendants committed to maintaining a statewide system for appropriately receiving, prioritizing, screening and investigating reports of child maltreatment. 2nd MSA §2. However, according to the Monitor, "many features of the system lack adequate quality controls." Monitoring Report 6, at 5. Second, Defendants committed to reviewing *all* maltreatment in care reports that were screened-out to assess the appropriateness of the screening

decision within twenty-four hours. 2nd MSA §2.3. However, in 2018 only 62.3 percent of

screened-out reports were reviewed. Monitoring Report 6, at 39. Third, if a report alleges

maltreatment of a child in the states' custody, information must to be referred to Specialized

Investigations Unit ("SIU") for investigation. 2nd MSA §2.2. After a qualitative review of all

maltreatment in care investigations conducted by the SIU in the first quarter of 2018, the Monitor

determined that evidence supported the SIU's findings in only 70.7 percent of investigations.

Monitoring Report 6, at 45. In 12.2 percent of the investigations, the Monitor concluded that

where MDCPS had found an allegation unsubstantiated, the evidence supported substantiation.

*Id.* As a result, children whose safety Defendants were responsible for protecting were left in

homes where they suffered abuse or neglect at the hands of their caregivers, including:

> "MDCPS unsubstantiated allegations of abuse and neglect after a foster child reported the
> foster mother had slapped her in the face and pulled her hair. The foster mother made
> multiple assertions to the investigator that the alleged victim foster child had "put a spell
> on her without using words," and that the child was "evil," a "devil worshipper" and was
> "trying to kill her." The foster mother also admitted to pulling the child's hair, hitting her
> and "cussing" at her. She stated that she was going to "mail the worms in [her] body" to
> the foster child. Despite such statements from the foster mother, MDCPS left the alleged
> victim's two younger brothers in the placement and noted no concerns for the children in
> the home. Further, during the investigation, it became apparent that the foster mother was
> not ensuring that one of the foster children in the home was taking a prescribed
> medication. Five months later, the foster mother allegedly choked another foster child in
> the home, leaving him with a scratch on his neck and bruise on his shoulder. MDCPS
> found the allegation of physical abuse to be substantiated and the home was subsequently
> closed to new placements. The first investigation should have been substantiated, and the
> home should have been closed earlier."

Monitoring Report 6, at 45.

> and,

> "MDCPS unsubstantiated allegations of child maltreatment after a five-year-old child
> disclosed that his previous foster mother had put socks in his throat when he was crying
> and made him squat against the wall as punishment. He alleged that sometimes he was
> made to do the "wall sits" while in his underwear or naked, and that on at least one
> occasion, he was made to squat against the wall in a closet. The foster mother admitted to
> making him squat against the wall but denied ever putting a sock in his throat. The

alleged child victim had been removed from the home prior to the investigation at the request of the foster mother, but two other foster children were left in the home. The SIU worker noted in her investigative findings that one of the foster children left in the placement was a similar age to the alleged victim child and that she 'may be at risk for similar treatment now that [the alleged victim] is no longer there.'"

Monitoring Report 6, at 45.

Finally, within thirty days of completion of a maltreatment in care investigation of a child in custody, the Safety Review Unit ("SRU") must review *all* maltreatment investigations to identify any case practice deficiencies and necessary remedial action to ensure the safety of the subject child and others in the placement. 2nd MSA §2.7. Defendants again failed to meet requirement, reviewing only 65.9 percent of maltreatment investigations in 2018. Monitoring Report 6, at 44. Of the investigations that were reviewed, the SRU identified case practice deficiencies in fourteen reports, but there were no remedial measures identified to rectify the deficiencies. *Id.*

### b.    Child Well-Being.

The 2nd MSA also contains provisions requiring Defendants to ensure that the vulnerable children in their care have access to timely and adequate physical and mental health care. By 2018, 70 percent of children entering foster care were required to receive an initial medical screening within seven days of entering care.[13] 2nd MSA §8.1.a. Data provided by Defendants indicate that only 59.2 percent of children are receiving a timely initial medical examination. Monitoring Report 6, at 78. Further, by 2018, 70 percent of children entering foster care are required to receive a comprehensive medical exam within sixty days of entering care. 2nd MSA

---

[13] This is an escalating provision of the 2nd MSA. By July 1, 2018, 70 percent of children were required to have initial medical screening within seven days of entering care. 2nd MSA, §8.1.a.1. By July 1, 2019, 80 percent of children are required to have initial medical screening within seven days of entering care. 2nd MSA, §8.1.a.2. And by July 1, 2020, 90 percent of children are required to have an initial medical screening within 72 hours of entering care. 2nd MSA, §8.1.a.3.

§8.1.b. The Monitor concluded that only 51 percent of children are receiving a timely comprehensive medical examination. *Id.* at 79.

## 2. Data and Management Information Systems.

The 2nd MSA requires the implementation of a comprehensive child welfare data and tracking system that permits timely access to information, including current and historical case documents, to support child safety and continuity of care across placement settings and services with the goal of improving MDCPS' ability to account for and manage its work with vulnerable children. 2nd MSA §1.5. However, in the Monitoring Report 6, the Monitor emphasized "substantial and ongoing" data problems. Monitoring Report 6, at 4.

Many of the metrics for which no information is available are imperative to child safety and well-being. As the Monitor noted, "these deficits create blind spots that impair MDCPS management's ability to lead the Department and ensure the safety, well-being and permanency of children consistent with the 2nd MSA." *Id.* Indeed, for forty-one of the 113 commitments due in 2018, Defendants either failed to provide data or provided inaccurate data that the Monitor could not validate. *Id.* Without access to basic, accurate information about the children in its care, it is virtually impossible for Mississippi to provide constitutionally adequate care.

The data problems identified by the Monitor include, "the manner in which the Department documents and identifies certain data fields, coding errors and performance calculations that are inconsistent with the established rules." *Id.* Further, with regard to MDCPS' primary information system, the Mississippi Automated Child Welfare Information System ("MACWIS"), the Monitor found that MDCPS, "has been unable to consistently and reliably report from MACWIS current and historical data of children in custody for numerous 2nd MSA commitments." *Id.* at 30.

The Monitoring Report 6 also identified three significant and recurring data quality problems during its review of the 2018 period, all of which have a direct and detrimental impact on child safety: accurately measuring maltreatment of children in care, tracking foster homes, and workers documenting placement IDs in the MACWIS system. *Id.* at 32. The Monitoring Report 6 identified many maltreatment reports that incorrectly identify the perpetrator relationship and the incident date. *Id.* at 32. Without accurate information about the identity of the abuser or the date of abuse, MDCPS cannot possibly determine if the maltreatment occurred in the child's current placement, which may result in a child being left in a home where they are being abused or neglected. Similarly, when the MACWIS system does not have the capacity for caseworkers to correctly document placement IDs, Mississippi's primary information system is incapable of identifying the specific home in which a child is placed, and the members of that household. *Id.* at 33. As a result, it is not possible to track and evaluate the appropriateness of the placement or whether caseworkers are visiting with foster parents as required.

The Monitoring Report 6 highlights the sobering fact that Defendants know very little about the children in their care with regards to a significant number of critical settlement agreement provisions. Of the 113 commitments due under the 2nd MSA in 2018, Defendants either failed to provide data entirely or provided inaccurate data that the Monitor was unable to validate for 41 commitments. Monitoring Report 6, at 4. All of those 41 commitments are crucial to ensuring that children in MDCPS custody receive constitutionally adequate care. For instance, the Monitor was unable to validate data provided by Defendants for most of the 2nd MSA commitments relating to visitation. Similarly, Defendants know almost nothing about children in custody who are transitioning to independent living. Pursuant to the 2nd MSA, MDCPS is required to provide all youth transitioning to independence with six months' advance notice of

the cessation of any health, financial or other benefits that will occur. 2nd MSA §7.1. In 2018,

139 youths transitioned to independent living. Only 23.7 percent received the required notice of

cessation of their health benefits. Monitoring Report 6, at 74.

Defendants are failing the children in Mississippi's foster care system across the board

and have been for decades. And yet, despite having more than ten years to improve under the

settlement agreement, Defendants are both unwilling and unable to bring the system into

compliance.

### 3.    Caseload Standards.

One of the key provisions of the 2nd MSA is that as of January 1, 2018, 90 percent of

caseworkers are required to have caseloads which do not exceed the caseload standards

established in the 2nd MSA. 2nd MSA §1.3.a. The closest Defendants came to compliance with

this standard in 2018 was 60 percent, with compliance dropping as low as 47 percent.

Monitoring Report 6, at 28. Defendants' noncompliance with the caseload standards is entirely

expected, given Commissioner Dickinson's open disregard of their value. *See* Exhibit B, at 140,

¶¶ 19-20 and 143, ¶¶ 20-25. But, caseload standards are pivotal in ensuring that children in foster

care receive the standard of care to which they are constitutionally entitled.

Pursuant to the STRO, Defendants were required to "achieve full caseload compliance

with the new weighted caseload standards by December 31, 2017." STRO at 4, §5.d. This

requirement was reiterated in the 2nd MSA which mandated that, as of January 1, 2018,

Defendants' workers were required to have caseloads which do not exceed 90 percent of the

caseload standards set forth in the 2nd MSA.  2nd MSA, §1.3.a.

As reflected in the *undisputed* Monitor's January 2, 2018 Caseload Statistics report,

Defendants failed to meet the caseload compliance goal of 90 percent by the agreed upon

December 31, 2017 deadline. *See* Exhibit H. Instead, as of January 2, 2018, MDCPS had a

statewide aggregate of approximately 58 percent of workers meeting the caseload standard. *See* Exhibit H. The downward trajectory in Defendants' performance has continued. The Monitor reported on May 15, 2018, that MDCPS' overall caseload performance has declined from 58 percent in January 2018, to 52 percent in May 2018. *See* Monitor's March 30, 2018 and May 15, 2018 Caseload Statistics. [Attached hereto as **Exhibit K** and **Exhibit L**]. In some regions, by May 15, 2018, caseload compliance was as low as 17 percent (IV-S) and 28 percent (VII-C). *See* Exhibit L. The Monitoring Report 6 shows Defendants' continued inability and unwillingness to comply with the caseload standards. Defendants did not meet the caseload standards at any point during 2018. Indeed, there has been a complete failure to achieve the caseload requirement – and the situation worsens.

Caseloads are key to accomplishment of most of the goals in the 2nd Modified Settlement Agreement and STRO. For example, caseloads directly impact the ability to timely respond to reports of abuse or neglect of children while in foster care custody, the sufficiency and frequency of caseworker visits to monitor and ensure the safety of children in foster care, and the ability to implement case plans so that children can be appropriately and safely discharged from foster care. The continuing absence of quality investigations and practices cannot be rectified in an environment in which caseworkers are routinely overburdened with caseloads above the required levels. Notably, the May 2018 analysis chart reflects that a glaringly high 62 percent of Adoption and Licensing workers are over the caseload compliance standard. *See* Exhibit L. This has a particularly devastating impact given that Adoption and Licensing workers are responsible for the successful transition of children out of the foster care system.

The gap between the STRO and 2nd MSA caseload compliance goal and the actual achieved compliance is enormous. This is not a near miss, or substantial compliance; this is a

wholesale failure to meet a fundamental requirement. The caseload compliance requirement is a vital measure by which Defendants can produce better outcomes for children, protect them from harm, and provide necessary services.

### 4. Placement Standards.

The parties agreed to, and the court ordered, certain placement standards to ensure that children in foster care are placed in safe, home-like settings that are suited to their individual needs and enable them to maintain a connection to their families and home communities. Defendants are in non-compliance with a number of these standards, all of which have a detrimental impact on children's lives and long-term well-being.

In particular, 60 percent of siblings who enter foster care around the same time must be placed together, except in a limited number of situations. 2nd MSA §4.6, 4.16. Despite the obvious importance of keeping siblings together, the data provided by Defendants was inaccurate and the Monitor was unable to validate it, noting significant data issues. Monitoring Report 6, at 57. The Monitor noted many instances in which MDCPS identified siblings as being placed together, but the children's placement histories indicated that they had never been in the same placement. *Id.*

Additionally, *no child* under the age of ten years is to be placed in a congregate care setting unless an approved exceptions exist. 2nd MSA §4.9. Defendants have also failed to comply with this commitment. In 2018, MDCPS placed 155 children under the age of ten in congregate care settings. Monitoring Report 6, at 58. Of the 73 children under age ten placed in congregate care in the second half of 2018, only 54 had an allowable exception. *Id.*

The 2nd MSA also addressed multiple emergency placements, which are extremely harmful, disruptive and traumatic for children. Defendants committed that no child would be placed in more one emergency or temporary facility within one episode of foster care, unless a

limited allowable exception exists. 2nd MSA §4.11. But, in 2018, 52 children experienced 66

successive stays in shelter care. Monitoring Report 6, at 59. Only 45 cases had exceptions noted,

and only 13 contained information supporting a determination that the placement was needed to

ensure safety. *Id.* at 60.

### 5.   Child and Youth Permanency.

Another essential area in which Defendants are failing is planning for child permanency.

The settlement agreement contains provisions designed to help Defendants achieve permanency

goals through proper planning and review. For example, a comprehensive Family Service Plan

("FSP") addressing the strengths, needs, and services required for both the child and their parents

must be completed within 45 days of a child's entry into foster care, for all children. 2nd MSA

§6.1. In creating the FSP, the MDCPS caseworker must consult with the child, the parents, and

the foster care provider. During the Monitoring Period, only 24 percent of FSPs were developed

in consultation with the child's parents or foster parents, as required. None reflected consultation

with age-appropriate children. Therefore, strengths, needs and services for parents and children

could not be evaluated. Monitoring Report 6, at 65.

In addition to FSPs, the 2nd MSA requires that for at least 75 percent of foster children

who enter custody, MDCPS must complete a permanency plan within 45 days, stating a specific

permanency goal. 2nd MSA §6.1.d. However, according to the Monitor, only 63.6 percent of

those sampled contained the required permanency goal. Of those, only 9.1 percent included a

timeframe for permanency, and only 47 percent indicated activities that support permanency.

Monitoring Report 6, at 66. To further ensure that permanency goals are being identified and

attained, the 2nd MSA requires that by 2018, 80 percent of foster children who have been in

custody for at least six months must receive a timely court or administrative review.  2nd MSA

§6.4.a. The Monitor noted significant data issues with this commitment. But, of the 7,756

children who were due for permanency reviews during the period, only 4,546 (58.6 percent) received timely reviews. Monitoring Report 6, at 72. Similarly, at least 80 percent of foster children who have been in custody for at least twelve months must receive annual court case reviews. 2nd MSA §6.4.b. Defendants failed to provide data on whether or not reasonable steps were taken to ensure timely court reviews, but reported that in 2018, only 5-11 percent of eligible foster children received timely court reviews. *Id.* at 73.

### C. The Court Should Appoint a Receiver to Effectuate the Necessary Remedial Measures.

The court's power to effectuate compliance with its orders includes the equitable power to appoint a receiver. *Morgan v. McDonough*, 540 F.2d 527, 533 (1st Cir. 1976); *see also* Fed. R. Civ. P. 66. "[I]t is abundantly clear that a court may appoint a receiver to force public officials to comply with court orders." *Dixon v. Barry*, 967 F. Supp. 535, 550 (D.D.C. 1997). "Where more traditional remedies, such as contempt proceedings or injunctions, are inadequate under the circumstances, a court is justified … in implementing less common remedies, such as a receivership, so as to achieve compliance with a constitutional mandate." *Shaw v. Allen*, 771 F. Supp. 760, 762 (S.D. W. Va. 1990).

In determining whether to appoint a receiver, "the court should consider whether there were repeated failures to comply with the Court's orders ... if there is a lack of sufficient leadership to turn the tide within a reasonable time period, whether there was bad faith, whether resources are being wasted [and] ... whether a receiver can provide a quick and efficient remedy." *Dixon*, 967 F. Supp. at 550 (citations omitted). The most significant factor in the decision to appoint a receiver is whether any other remedy is likely to be successful. *Id.*; *Shaw*, 771 F. Supp. at 762.

1.   **The Dire Circumstances of This Case Warrant the Appointment of a Receiver.**

In a span of nine years, Defendants have failed to comply with the original Settlement, the Period 1 Plan, the Period 2 Plan, the Bridge Plan, the Modified Settlement Agreement, the Period 3 Plan, the July 9th Order, and now the STRO and the 2nd MSA.

At the evidentiary hearing, Plaintiffs expect to prove through testimony that Defendants are headed on a downward trajectory, and that the many improvements made during the past two years have been abandoned by the current administration. The overwhelming and extensive non-compliance demonstrates a trend towards complete noncompliance and utter disregard for the agreed upon terms of the 2nd MSA and Court-approved STRO, and further demonstrate the need for a receiver to intervene to ensure Defendants' future compliance.

2.   **Courts in Similar Cases Have Appointed Receivers for Dysfunctional Public Agencies.**

Federal courts have utilized receivers where public agencies have failed to comply with consent decrees requiring constitutionally mandated change. We discuss two exemplar cases below.

a.   **LaShawn A. v. Kelly.**

In *LaShawn A. v. Kelly,* 887 F. Supp. 297 (D.D.C. 1995), *aff'd sub nom. LaShawn A. v. Barry*, 107 F.3d 923 (D.C. Cir. 1996) discussed previously*,* the District Court in its 1995 ruling appointed a receiver for the District of Columbia's child welfare system. As noted, the ruling followed several years of continued non-compliance by the defendants with the terms of agreed orders. *LaShawn A.*, 887 F. Supp. at 299–300. In appointing a receiver (who replaced two previously appointed receivers with limited authority), the District Court rejected the defendants' contention that a receiver was not needed because "substantial progress" was being made:

>While it is true that the defendants have made some progress in various
>areas, the above factual findings show the urgent need for a new, more
>fundamental approach to change. Otherwise, each report of incremental
>progress will be mitigated by regression in another area or future inaction
>on that first step forward. Much of the progress originally made is now
>slipping back into the same tired way of doing business that brought these
>parties before the Court.

*LaShawn A.*, 887 F. Supp. at 315.

The District Court also rejected defendants' assertion that a receiver was unnecessary due

to a proposal for a "viable restructuring plan" which the defendants had made in response to the

motion:

>Four years ago the Court was told that the defendants had a 'plan' to rebuild
>the agency. Now, facing contempt and full receivership, the defendants
>again put forth a proposed solution. There is no reason to believe this plan
>has more chance of success than the one the defendants presented at trial
>and quickly abandoned.
>
>Therefore, the Court today imposes a full receivership over the child
>welfare system for the District of Columbia.

*LaShawn A.*, 887 F. Supp. at 316.

The *LaShawn A.* case is highly relevant on the issue of a receiver. This Court has been

told for years that the Defendants are on a path to remediation, but as the Monitor's recent

statistics show, the caseload requirements have yet to be met, and are steadily declining to the

detriment of children in the custody of the MDCPS. *See* Exhibits H, I, K and L. Many other

provisions of the 2nd MSA are also not being met, and while the requirements for compliance

are escalating Defendants have not demonstrated any ability to either comply or produce the data

necessary to show compliance. Here, as in *LaShawn A.*, "[a]bused and neglected children … are

not receiving the services and protection which are their desert and legal entitlement." *LaShawn*

*A.*, 887 F. Supp. at 317.[14]

        **b.**    **Shaw v. Allen.[15]**

In *Shaw*, the plaintiff class, comprised of inmates at the McDowell County Jail in West Virginia filed suit in 1981 alleging violations of their constitutional rights. In 1983, the court entered an order specifying various actions which the defendants were required to take to comply with constitutional and statutory mandates. *Shaw*, 771 F. Supp. at 761.

The plaintiffs filed motions seeking contempt in 1985, 1987, 1988 and 1990, contending defendants failed to comply with the 1983 order. *Shaw*, 771 F. Supp. at 760. In response to the plaintiffs' 1989 contempt motion, the court found the defendants to be in non-compliance with the 1983 order and appointed a monitor. *Id.* In 1989, the monitor reported to the court that "the McDowell County Jail is in serious non-compliance with many aspects of the April 1983 court order." *Id.* The court found that the jail "remains in substantial non-compliance with [the 1983] Order" and that conditions in the jail created "health and sanitation hazards to inmates." *Id.* Moreover, "the defendants' repeated failure to achieve good faith, substantial compliance with this Court's comprehensive Order as well as Orders entered subsequent thereto has placed them in constant contempt of such Orders which they have failed to purge." *Shaw*, 771 F. Supp. at 762.

Based on this factual record, the district court found that the appointment of a receiver

---

[14] In its 2011 order on the first contempt motion in this case, the Court, citing *United States v. United Mine Workers*, 330 U.S. 258, 67 S. Ct. 677, 91 L. Ed. 884 (1947), stated that in considering whether to appoint a receiver, relevant considerations included whether the contempt was willful, and the financial resources of the contemnor. [May 17, 2011 Order] at 8. In fact, in *United Mine Workers* the Supreme Court was considering the propriety of monetary fines that had been imposed on the UMW's president ($10,000), and on the UMW itself ($3.5 million) for initiating a nationwide strike of coal miners in contravention of law. There was no issue in the case concerning the appointment of a receiver and plaintiffs do not seek monetary fines. Plaintiffs accordingly contend that *United Mine Workers* is not relevant to whether a receiver should be appointed in this case.

[15] 771 F. Supp. 760 (S.D.W.Va. 1990).

was necessary:

> [T]he Court is of the opinion that the appointment of a receiver for the
> McDowell County Jail is both necessary and reasonable. It has been
> nearly eight (8) years since the entry of the Court's comprehensive Order
> and yet the McDowell County Jail still remains in substantial
> noncompliance. Throughout the tumultuous history of this case, the Court
> has exercised restraint attempting to give due deference to McDowell
> County elected officials' ability to observe and obey the duties and
> obligations placed upon them by federal and state law. Such exercise of
> deference, however, has been unavailing, and it now appears that a more
> intrusive course of action is warranted.

*Shaw*, 771 F. Supp. at 762.

* * * *

In sum, more than nine years of non-compliance is enough. Plaintiffs should not be forced to bring seriatim contempt motions, and it is certainly unclear what remedies, short of receivership, could change the dire circumstances facing Mississippi's foster children. At this point, given the Monitor's findings and the current state of the agency's leadership, there is no reason to believe that Defendants will function differently in the foreseeable future.

Plaintiffs respectfully urge this Court to intervene, to exercise its authority in light of the compelling facts of continuing non-compliance, to find Defendants in contempt, and to appoint a receiver to remedy the contempt. Plaintiffs request an evidentiary hearing be scheduled as expeditiously as possible.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs request that this Court find that Defendants are in noncompliance with the STRO and 2nd MSA, hence in contempt of Court; appoint a general receiver with full authority to administer Mississippi's child welfare system and to bring it into compliance with the orders of this Court; and grant such other and further relief as this Court deems necessary and proper.

RESPECTFULLY SUBMITTED, this the 3rd day of July 2019.

*/s/ Marcia Robinson Lowry*
Marcia Robinson Lowry (*pro hac vice)*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 3rd 2019, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system which will deliver copies to all counsel of record.

*/s/ Marcia Robinson Lowry*
Marcia Robinson Lowry (*pro hac vice*)