# AFFIDAVIT OF TONYA ROGILLIO

**STATE OF MISSISSIPPI**
**COUNTY OF HINDS**

PERSONALLY CAME and appeared before me, the undersigned authority in and for said county and state, within my jurisdiction, the within named TONYA ROGILLIO, who, having been duly sworn by me, states on oath the following:

1.    My name is Tonya Rogillio.

2.    I am over the age of 21.

3.    I am competent to address the matters set forth below in this Affidavit.

4.    The matters set forth in this Affidavit are based on my personal knowledge and the business records of the Mississippi Department of Child Protection Services ("MDCPS" or "Agency") and its predecessor the Mississippi Department of Human Services Division of Family and Children's Services and are true and correct to the best of my knowledge, information and belief.

5.    I am the Deputy Commissioner of Child Welfare for MDCPS.  I have served in this positon since July 1, 2018.   A true and correct copy of my current resume is attached to this Affidavit as Exhibit "A".

6.    In my role as Deputy Commissioner of Child Welfare, I supervise the Agency's field staff, five Deputy Directors who manage the MDCPS East, West and South Divisions of the State of Mississippi, as well as fourteen Regional Directors, all case workers, adoption workers, licensure workers, and their area and regional supervisors.  In addition, I also supervise the Deputy Directors of Permanency, Licensure, and Prevention Units.

1



7.      I received a Bachelor of Social Work Degree from the University of Southern Mississippi in May 1993 and received a Master of Social Work Degree from the University of Southern Mississippi in May 2012. I am a Licensed Social Worker in the State of Mississippi.

8.      I have over 20 years of experience in the provision of child welfare services. I served as a Social Worker at Walthall County General Hospital from December 1996 to February 1998. I served as a Family Preservation Specialist for the Mississippi Department of Human Services from March 1998 to November 1999. I served as a Long-Term Care Alternatives Social Worker for the Southwest Mississippi Planning and Development District from November 1999 to December 2000. I served as a Co-founder and Forensic Interview Program Coordinator for the Southwest Mississippi Children's Advocacy Center from December 2000 to October 2001. I served as an Area Social Work Supervisor for the Mississippi Department of Human Services from October 2001 to December 2006. I served as a Social Services Regional Director for the Mississippi Department of Human Services from January 2007 to December 2012.

9.      I served as a Bureau Director for Special Investigations for the Mississippi Department of Human Services from January 2014 to May 2016. I served as the Office Director for Field Support Programs for MDCPS from June 2016 to June 2018.

10.     On July 1, 2018, I was selected and promoted to serve as the MDCPS Deputy Commissioner of Child Welfare. This was a newly created position in a statewide MDCPS reorganization.

11.     I am familiar with the Stipulated Third Remedial Order ("STRO") which was entered in December 2016 in the *Olivia Y* litigation. I am also familiar with the 2nd Modified

Settlement Agreement ("2nd MSA") which was entered as a consent order in the *Olivia Y* litigation in December 2016 and which became effective on January 1, 2018.

12.     The following is a summary of the actions MDCPS has taken and is continuing to take to improve caseloads in Mississippi:

a.  Through more efficient management, operations and programs including increased adoptions and the "Safe at Home" initiative that was inaugurated in 2017, MDCPS has reduced the number of children in care from a peak of 6,091 in April 2017, to 4,476 on August 30, 2019.

b.  Increased technology access through the provision of smart phones and tablets.

c.  Intensified recruiting of caseworkers through career job fairs and university recruiting.

d.  More effective workload distribution

e.  Voluntary transfer of caseworkers from counties with a current excess of caseworker to counties with a caseworker need.

f.  More effective and focused caseload management.

g.  Cross-county assignments of cases.

13.     I have also reviewed and summarized recent MDCPS's achievements and improvements.  These achievements and improvements include the following:

a.  Safely reducing the number of children in care by more efficient case management and adoptions.

b.  Virtually eliminating overdue investigations.

c.  Improving the processes and procedures necessary to facilitate adoptions resulting in more than a 100% increase in adoptions from FY 2017 to FY 2018 (302 to 641) with 657 adoptions in FY 2019.

d.  Eliminating the backlog of relatives awaiting licensure.

e.  Implementing new contractual resources to provide in-home services to safely maintain children in their homes.

    f.   Bringing the Rescue 100 foster care recruitment program in house.

    g.   Recruiting and licensing more than 400 new foster homes in 2018, exceeding the target for foster home recruitment by 8%. As of July 31, 2019, MDCPS, has licensed 247 new foster homes.

    h.   Reuniting in FY 2018 more than 2,000 children with their birth families

    i.   In FY 2018 providing intensive in home services to more than 1,400 children.

14.    The rate of maltreatment in care ("MIC") represents the percentage of children who are determined to be victims of child maltreatment while in foster care during a certain period. MDCPS's primary mechanism for preventing MIC is to have and enforce appropriate licensure standards for the foster home and facility placements that care for children in the agency's custody, and to consistently apply those standards. Another preventative measure for MIC is face-to-face contact with foster children and foster parents. By making face to face contact with children and interacting with the foster parents, caseworkers are more likely to identify warning signs and challenges that exist in the placement.

15.    During 2018, MDCPS substantiated 53 separate incidents of MIC, which involved 95 children. Thirteen of these children were based on a single investigation of an emergency shelter that resulted in the shelter director's termination. The rate of MIC was 1.14% in FY-2017 and 1.15% in FY-2018.

16.    Screening and investigating reports of MIC are reactive measures focused on responding to MIC that already has occurred, rather than preventing it from occurring in the first place.

17.    All reports of child maltreatment are received by Mississippi Centralized Intake ("MCI"), a 24-hour hotline operated by a contractor for receiving reports of child maltreatment

from all of Mississippi's 82 counties.   MDCPS will take over operation of MCI on September 14, 2019.

18.    MCI receives thousands of reports of child abuse and neglect each year. In 2018, 36,568 reports were received.

19.    MCI asks each caller a standardized set of questions with the answers to those questions resulting in the report being assigned a particular level of response.

(a) If the report relates to a child not in custody, the report is then sent to the MDCPS office in the county from which the report originates.  A supervisor in the county office then provides a second level of review for the report, applying the same criteria, and makes the final determination about whether the report is assigned for investigation or screened out.

(b) Reports related to children in MDCPS custody are referred to the Special Investigations Unit ("SIU") where they are reviewed initially by one of two SIU Bureau Directors. The Bureau Director decides whether the reports should be assigned for investigation or screened out.

(i) If a Bureau Director determines that the report should be screened out, the evaluation is transferred to the Director of the Continuous Quality Improvement for a third level of review. If the CQI Director also determines that the report should be screened out, the report is transferred to the Safety Review Unit ("SRU") for a fourth level review of the screen out decision.

(ii) After MIC reports are screened in and investigated, the investigations are reviewed and must be approved by the SIU Bureau Director and then again reviewed

for quality assurance by the Continuous Quality Improvement (CQI) Safety Review Unit (SRU).

(iii)  Every report that is forwarded for investigation is assigned to a caseworker even if the child is not in custody which can significantly impact worker caseloads.

20.    Early in 2018, SRU used an online instrument to conduct screen-out reviews. This instrument existed outside the MDCPS database, and the data from the online instrument was lost and could not be recovered.

21.    MDCPS substantiates maltreatment in care only when a foster parent or congregate care facility staff member commits an act that meets the definition of child abuse or neglect under the Mississippi's Youth Court Act.

22.    MDCPS foster-home licensure policy prohibits some acts that Mississippi law does not consider to be child abuse or neglect. Accordingly, some acts that violate MDCPS policy do not fall within Mississippi's definition of child abuse or neglect. For example, corporal punishment does not fall within the definition of child abuse or neglect under Mississippi law, but it violates MDCPS licensure policy.

23.    Because of the distinctions between MDCPS licensure policy and Mississippi law, there are cases where MDCPS does not substantiate abuse or neglect, but MDCPS nevertheless removes children or puts corrective action plans in place because of a licensure violation.

24.    Section 8.1.b of the 2nd MSA requires that all children coming into custody must have a comprehensive medical exam, which includes a mental health examination, within 60 days of entering custody. MDCPS manual reviews of this deliverable have shown that the

quantitative data from MACWIS underreports performance due to inconsistent documentation by MDCPS caseworkers.

25.    MDCPS has worked to close the documentation gap.

(a) One identified source of the problem was that when a foster parent takes a child for a doctor's visit, they do not always communicate that back to the caseworker.  MDCPS has created an online survey for foster parents that allows them to electronically report medical visits for children in MDCPS custody back to MDCPS.

(b) MDCPS has worked extensively with the Mississippi Division of Medicaid to directly access information on medical services for children in custody from their claims data.

(i) In the first iteration of the work with Medicaid, Medicaid provided MDCPS all the claims data related to the children in its custody. However, this work proved ineffective because the procedure codes in the claims data were not useable for MDCPS purposes.

(ii) MDCPS has now provided Medicaid a specific list of the data points it needs, and Medicaid staff are working to develop a way to capture those specific data points. The Governor has supported Medicaid's cooperation with MDCPS to find a solution.

(c) MDCPS's nursing unit has implemented a new manual tracking system for timely visits based on the Health Department's periodicity schedule.

26.    The perpetrator and incident date issues reported by the Monitor in its 2018 report stem largely from the quality of information the MIC hotline receives.  If caller makes a report to the hotline and says that they think the child is in foster care, MCI may record the report that way.  However, a report may will be labeled MIC when it is not because a reporter's information

is inaccurate. Overwhelmingly, these errors go in favor of calling a report MIC when it is not, rather than missing that the report is MIC as Plaintiffs suggest.

27.    The errors related to a reporter's information to MCI do not impede MDCPS's ability to identify the perpetrator because the issue is merely with the report, not the investigation. The correct perpetrator is identified during the investigation, and the case proceeds from there. A manual data validation process corrects the errors as they are identified.

28.    MACWIS has the capacity to correctly document placement IDs because it uses the foster homes it licenses as well as those licensed by private agencies. For an MDCPS-licensed home, MACWIS assigns a single resource ID. For a provider-licensed home, there are actually two MACWIS placement IDs: the provider's (umbrella) and the home's (subordinate). For a provider-licensed home, MACWIS requires that the provider's placement ID be entered, but also allows caseworkers to document the home's ID as well. Sometimes, caseworkers fail to complete the second step of documenting the home's ID.

29.    The failure to document the home's ID along with the provider ID does not affect a worker's access to information about a child or her placement because any caseworker or supervisor can look at a child's record in MACWIS and find the pertinent information. However, a caseworker's failure to enter the second ID does impact aggregate reporting: i.e. reports run from MACWIS can only identify the placement by the provider ID. MDCPS expects that the CCWIS system will eliminate the need to enter two IDs.

30.    While MDCPS makes the required transitional services available to all youth ages fourteen and older, it did experience challenges in providing the documentation to establish that this occurs during 2018. To close this gap, and improve youth involvement in transitional plan development, MDCPS launched a new youth appraisal tool in May 2019.

31.    The youth appraisal is completed by the caseworker and youth during a family team meeting. The results of the appraisal guide the development of the youth's transitional plan.

32.    The youth appraisal will both improve documentation of the services offered to youth and improve performance in youth involvement in case planning.

33.    Even with increased efforts to make services available, some youth will not avail themselves of the services offered.

34.    The Monitor reported it could not validate data related to whether sibling groups who enter custody at or near the same time were being placed together in foster care.  In subsequent conversation between MDCPS and the Monitor, it was determined that an error in coding the report for sibling group placement prevented accurate reporting on this provision.

35.    The inability for the Monitor to validate this data was not an issue of knowing where children are placed – any individual child's record in MACWIS will show their confirmed placement.  This is simply an issue in the way the report was coded, which will be corrected by the end of 2019.

36.    A technical error in the MACWIS data system lost data related to whether children under the age of 10 and placed in congregate care had the required Regional Director approval of the permissible exception to the rule against congregate care placement.  This was corrected as of January 2019.

37.    An initial family service plan cannot be submitted in MACWIS without a permanency goal being selected and a time frame for permanency included. The system will allow a permanency plan to be closed, however, without a new one being established, meaning the plans in question must have had the required elements when they were submitted at the time the child entered custody.

9

38.     MDCPS CQI review data shows that 71% and 73% of family service plans contained the required timeframes and activities in the first and second quarters of 2019, showing higher performance that the Monitor reported for 2018.

39.     To improve practice in the area of family service plans, MDCPS utilizes the Practice Model Learning Cycle (PMLC) – an intensive on-the-job coaching program that teaches MDCPS caseworkers the Mississippi Practice Model, a comprehensive practice guide for child welfare practice that is trauma-informed and family-centric.    Family engagement and involvement in case planning are core elements of the Practice Model.

40.     Two-thirds of MDCPS's regions have completed the PMLC in 2017 and 2018, and the remaining third will finish before the end of 2019.

41.     Once all regions have completed the PMLC, additional targeted PMLC education will be provided to target areas needing improvement. This will improve family involvement in case planning, and the activities to support permanency developed from that involvement.

42.     MDCPS has also assessed the need for improved safety/family needs assessment, a core practice necessary to develop appropriate family service plan goals and activities.   An internal work group at MDCPS has embarked on a process of reviewing MDCPS's current assessment tools and those frequently used by other states to determine whether MDCPS could adopt a more effective tool.   If the group determines that a new tool is not warranted – i.e. MDCPS's current assessments are deemed as reliable as those used in other states – the team will then shift their focus to developing intensive training on the use of existing tools. The improved assessment that results from these efforts also will improve staff's ability to identify safety/risk issues and  the right activities for a child's family service plan that will ensure safety.

43.    MDCPS has rolled out a new case staffing tool for MDCPS supervisors to ensure standardized case staffing practice that will lead to more effective supervision.

44.    The MDCPS foster care review unit within the Office of Continuous Quality Improvement carries out the reviews of a child's permanency plan.  Every six months, every case involving a foster child is subject to a foster care review, which includes a CQI staff person's review of all documentation in the case and a conference with the county staff, child, parents, caregivers, and relevant professionals.

45.    The Monitor's report indicated that MDCPS had not complied with requirement that 80% of foster children who have been in custody for at least six months receive such a review.  This was due to a misunderstanding between MDCPS and the monitor regarding the data MDCPS submitted related to this provision.  Due to the labels affixed to the data, the Monitor and MDCPS had a difference in performance when the conference occurred because of a later completion date.  However, it has since been clarified for the Monitor that the completion date they were referencing related to follow up action from the review, not the review itself, which is the deliverable.  MDCPS correctly reported that it was compliant with this provision in 2018.

FURTHER AFFIANT SAYETH NOT, this the _3_ day of September, 2019.

TONYA ROGILLIO

SWORN TO AND SUBSCRIBED BEFORE ME, this the _3_ of September, 2019.

My Commission Expires:

_5/22/2022_

NOTARY PUBLIC

11