## AFFIDAVIT OF JAWORSKI DAVENPORT

**STATE OF MISSISSIPPI**
**COUNTY OF HINDS**

    PERSONALLY CAME and appeared before me, the undersigned authority in and for said county and state, within my jurisdiction, the within named JAWORSKI DAVENPORT, who, having been duly sworn by me, states on oath the following:

1. My name is Jaworski Davenport.

2. I am over the age of 21.

3. I am competent to address the matters set forth below in this Affidavit.

4. The matters set forth in this Affidavit are based on my personal knowledge and the business records of the Mississippi Department of Child Protection Services and its predecessor the Mississippi Department of Human Services Division of Family and Children's Services and are true and correct to the best of my knowledge, information and belief.

5. I will reference, in footnotes in my Affidavit, documents previously filed with the Court and exhibits filed with *Defendants' Response to Plaintiffs' Motion for Relief Pursuant to Remedy Phase of Plaintiffs' Renewed Motion for Contempt, for an Evidentiary Hearing, and for the Appointment of a Receiver* (Doc. 754).

6. I am the Deputy Commissioner of Child Safety for the Mississippi Department Child Protection Services. I have served in this position since July 1, 2018.

7. In this role, I supervise three Office Directors who manage respectively the Continuous Quality Improvement Unit, Data and Federal Reporting Unit and Special Projects Unit.



8. Prior to my selection and promotion to my current position of Deputy Commissioner of Child Safety, I served as MDCPS's Deputy Director for Field Operations and Data Analysis under Ms. Tracy Malone.

9. I am a licensed master's level social worker. I have a master's degree in social work and a PhD with emphasis in social work.

10. I have over 16 years of experience working in child welfare. I have worked as a caseworker, child welfare data analyst, as well as lead for state, federal, and court monitor scheduled case record reviews.

## 90% Fixed Caseload Cap Overview

11. I am familiar with the 90% Fixed Caseload Cap incorporated in the STRO and the 2nd MSA.

12. The 90% Fixed Caseworker Caseload Cap has two fixed caps. The first is a mathematical 1.0 time-based cap under a weighted value matrix that takes into consideration ten different service types/functions. The weights were based on a 2005 study. That study has not been updated to reflect changed conditions and more current best practices in child welfare. The second is a caseload compliance cap. Under this second cap, 90% of all MDCPS caseworkers, adoption workers, and licensure workers were to meet the 1.0 weighted value standard by December 31, 2017.

13. Caseload performance under the weighted value system is reported in a Mississippi Performance On Case Load Standards reports based on data for a specific date.[1] The report reflects as a "Met" category the percent of "Overall", and three sub-groups "Frontline" (i.e. traditional caseworkers), "Adoption and Licensure" and SIU (Special Investigation Unit)

---

[1] Defendants' Response to Plaintiffs' 2nd RPD #8 - filed October 19, 2018 - MDCPS 11871-11887

workers that are less than or equal to the 1.0 weighted value standard. These workers are often described collectively as frontline workers. The report also sets forth a percentage compliance for the same groups (Overall, Front Line and Adoption and Licensure workers) for a "Close" category, which is defined as workers with a weighted value greater than 1.0 but less than or equal to 1.2, and an "Over" category for workers greater than 1.2. The Close category is significant because the addition of even a single one of the 10 service types will move a worker with a 1.0 value or less from the Met category to a non-compliance category. The Met and Close combined data is a more realistic and reasonable measure of case worker caseloads in Mississippi.

14. The caseload report also provides a rough estimate of the number of staff needed so that 90% and 100% of caseworkers are compliant. The estimate computes a total for each service type and divide that number into the weighted value of each type to get the number of workers needed to staff all of the work. These numbers are summed across all types and multiplied by .90 and 100 respectively to get the number of staff needed. For additional staff needed, the total staff needed is subtracted from the number of actual workers.

**Historical Caseload Compliance**

15. In keeping with the STRO, in March 2017, Public Catalyst established a baseline regarding caseload using data from September 30, 2016. At that time 31% of MDCPS' frontline caseworkers carried caseloads within the 1.0 Met standard. Another 12% were in the Close category. The combined Met/Close percentage was 43% and the percent of 1.2 or "Over" was 57%.

16. On September 15, 2017, the Met percentage was 50%, a 7% decrease from the prior two weeks' caseload observation, Close was 14%, a 4% increase from the prior two weeks.

The Met/Close percentage was 64% and the Over percentage was 36%, a 3% increase from the prior two weeks - with only a little over three months remaining before the December 31, 2017 deadline that required 90% of the Agency's caseworkers to carry caseloads within the Met standard.

17. The Caseload report for July 31, 2019 reflects the Met percentage is 55%, Met/Close percentage is 77%, and Over is 23%.

18. Using the baseline set in March 2017 and the most current caseload data, this information establishes the following related to caseload: (1) The Met percentage has increased 77% (31% to 55%); (2) The Close percentage has increased by 83% (12% to 22%); (3) the Met/Close percentage, which is a more accurate reflection of performance, has increased by 79% (43% to 77%); and (4) The Over percentage has decreased by 60% (57% to 23%).



**Data Reporting**

18. MDCPS data reporting staff are vigilantly working with the Monitor to modify or rewrite the coding behind the Agency's data reports to fix the data validation issues identified in the Monitor's report.

19. In November 2018, MDCPS submitted its first annual CQI plan under the 2nd MSA to the Monitor for review. That plan was reviewed by Plaintiffs and the Monitor, subsequently approved by the Monitor, and is being implemented by MDCPS in 2019 as contemplated by Section 1.4 of the 2nd MSA.

20. The CQI plan uses case reviews conducted by MDCPS CQI staff and other units to determine MDCPS's performance on measures that cannot be reported quantitatively by MACWIS. Because the current CQI plan was not approved by the Monitor until April 2019, MDCPS did not report performance for 2018 to the Monitor, for the following Sections as they were included in the CQI plan: 4.2, 4.3, 4.7, 4.10, 5.1.a, 5.1.d, 5.2.a, 5.2.b, 5.2.b.1, 5.2.b.2-4, 5.2.b.3, 5.2.b.4.a-c, 6.1.a, 6.1.c., 6.1.d, 6.2.a, 5.1.c, 6.3.a.1, 6.3.a.2, 6.3.a.3, 6.3.a.4, 6.3.a.6[2], 6.2.b.1, 6.3.b.2, 6.3.b.3, 6.3.d.1, 6.3.d.2, 6.3.e, 6.4.a, 6.4.b, 7.1, 7.2, 7.2, 7.8, 7.8.a, 7.8.b, 7.8.c, 7.8.d, 7.8.e, 7.8.f, 7.8.g, 7.8.h, 7.8.i, 7.8.j, 7.8.k, 8.1.d, 8.1.f, 8.1.g., 8.2.a, 8.2.b, and 8.2.c. MDCPS will report on each of these sections for 2019 and in future years based on the CQI Plan.

21. MDCPS's first annual CQI plan under the 2nd MSA is now in effect, with case reviews ongoing, so that MDCPS will be able to report on provisions that it could not in 2018.

22. In 2018, MDCPS made reasonable efforts to secure a timely court review for at least 80% of the children who had been in custody for 12 months. However, reasonable steps to obtain the hearing is not a quantifiable measure that can be extracted from MACWIS. Rather,

---

[2] 6.3.a.6 was inadvertently left out of the CQI plan. A proposal was submitted to the monitors on July 18, 2019 with a plan to review and report on that provision. MDCPS is awaiting approval.

this is a qualitative measure that must be monitored with a qualitative review. With the monitoring in place under this CQI, MDCPS's performance on this provision has been measured at 87% and 89% for the first and second quarters respectively of 2019.

23. In addition to this qualitative review for measuring timely court reviews, the final report from each foster care review – conducted for every child every six months – is filed with the appropriate youth court. MDCPS has added to that report an option to request a review hearing, ensuring that staff consider whether to request a hearing at least every time a foster care review occurs.

24. Early in 2018, the Safety Review Unit (SRU) used an online instrument to conduct screen-out reviews. This instrument existed outside the MDCPS database, and the data from the online instrument was lost and could not be recovered. This issue was discovered in the middle of 2018, and MDCPS worked with the vendor to try to recover the data, but the vendor was unable to do so. This lost data accounts for most, if not all, of the screen out reviews that could not be documented in 2018. An error was also discovered in the coding of a report that identified SIU investigations for SRU review. This error has been remedied.

FURTHER AFFIANT SAYETH NOT, this the 3 day of September, 2019.

_____
JAWORSKI DAVENPORT

SWORN TO AND SUBSCRIBED BEFORE ME, this the 3 of September, 2019.

My Commission Expires:

5/22/2022

_____
NOTARY PUBLIC

6