## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

| | | |
|---|---|---|
| OLIVIA Y., et al | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 3:04cv251 TSL-FKB |
| | ) | |
| PHIL BRYANT, as Governor of | ) | |
| the State of Mississippi, et al. | ) | |
| | ) | |
| Defendants | ) | |

---

## DEFENDANTS' MEMORANDUM OF AUTHORITIES IN SUPPORT OF RESPONSE AND OBJECTIONS TO PLAINTIFFS' AMENDED MOTION FOR RELIEF PURSUANT TO REMEDY PHASE OF PLAINTIFFS' RENEWED MOTION FOR CONTEMPT, FOR AN EVIDENTIARY HEARING, AND FOR THE APPOINTMENT OF A RECEIVER

---

Kenya Key Rachal (MSD #99227)
James L. Jones (MSB #3214)
One Eastover Center
100 Vision Drive, Suite 400
Jackson, MS 39211
P. 0. Box 14167
Jackson, MS 39236-4167
Telephone: (601) 351-2400
Facsimile: (601) 351-2424

Harold Pizzetta, III
Special Assistant Attorney General
OFFICE OF THE MISSISSIPPI
ATTORNEY GENERAL
P. 0. Box 220
Jackson, MS 39205

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

I. INTRODUCTION ........................................................................................................... 1

II. BACKGROUND FACTS ............................................................................................... 3

III. LEGAL AUTHORITIES AND ANALYSIS................................................................ 13

    A. Defendants Should Not Be Held In Civil Contempt Due To Impossibility of Performance and Mitigating Circumstances ............................................................................................ 14

    B. A Receiver Should Not Be Appointed to Take Over Foster Care In Mississippi. .............. 19

        1.    Failure To Comply With Court Orders ...................................................................... 20

        2.    Further Efforts To Secure Compliance ...................................................................... 21

        3.    Leadership Is Available To Turn The Tide ................................................................ 24

        4.    MDCPS Has Acted In Good Faith .............................................................................. 24

        5.    MDCPS's Resources Are Not Being Wasted ............................................................ 24

        6.    There Is No Reliable Evidence That A Receiver Would Achieve Compliance With All Of The 2nd MSA Commitments Quickly And Efficiently ............................................. 25

        7.    Appointment Of A Receiver Is Not Warranted Factually, Would Derail MDCPS's Accomplishments And Improvements, And Impede Compliance With The 2nd MSA ........ 27

    C. MDCPS Has Made Significant Progress Since Entry of the 2nd MSA And This Progress Is Continuing In  Many Key Outcome Determinative Areas. .................................................... 28

        1.    MDCPS's Current Leadership Is Sound, Talented And Committed to Compliance With The 2nd MSA ................................................................................................... 28

            a. MDCPS's Current Management Team ....................................................... 28

            b. MDCPS's Management Is Not Unwilling To Comply Or Hostile To The 2nd MSA. 32

        2.    MDCPS's Efforts To Comply With Court Order and the 2nd MSA .......................... 35

            a. Child Safety & Child Well-Being ............................................................... 35

                Rate of Maltreatment in Care ......................................................... 35

                Screening Decisions ...................................................................... 37

                Investigation of Maltreatment in Care ........................................... 39

                Initial Medical Screenings & Comprehensive Medical Examination ........................ 41

            b. Data and Management Information Services ................................................ 42

                Perpetrator & Placement Data ....................................................... 46

                Independent Living Requirements .................................................. 47

            c. Caseload Standards ................................................................................... 48

            d. Placement Standards .................................................................................. 51

                Placing Siblings Together ............................................................... 51

Congregate Care Placement for Children Under Ten ..................................................... 52

Multiple Emergency Placements ..................................................................................... 53

e.  Child and Youth Permanency .......................................................................................... 53

Family Service Plan Development ................................................................................... 53

Timely Administrative Case Reviews ............................................................................. 56

Timely Court Hearings ................................................................................................... 56

3.  MDCPS's accomplishments .................................................................................................. 57

Worker Qualifications and Training ............................................................................... 57

Increasing Services to Keep Mississippi Families Together ......................................... 58

Development of New Non-relative Foster Homes........................................................... 58

Adoptions ....................................................................................................................... 58

Decrease in Number of Children in Custody ................................................................. 59

IV.  CONCLUSION........................................................................................................................... 59

## TABLE OF AUTHORITIES

### CASES

*Aspira of New York, Inc. v Board of Education of New York,*
    423 F. Supp. 647 (S.D. N.Y. 1976) ...............................................................17, 18

*Bracco v. Lackner,*
    462 F. Supp. 436 (N.D. Cal. 1978) .......................................................................22

*Connor ex rel. Vigurs v. Patrick,*
    774 F.3d 45, 52 (2d Cir. 2014) .............................................................................36

*District of Columbia v. Jerry M.,*
    738 A.2d 1206 (D.C. Ct. App. 1999) .......................................................19, 20, 21

*Dixon v. Barry,*
    967 F. Supp. 535 (D.D.C. 1997) ...................................................................20, 24

*Evans v. Fenty,*
    480 F. Supp. 2d 280 (D.D.C. 2007) .....................................................................21

*G.L. v. Zumwalt,*
    No. 77-0242-CV-W-1 (W.D. Mo. Dec. 7, 1992) .................................................17

*Glover v. Johnson,*
    855 F.2d 277 (6th Cir. 1988).................................................................................22

*Green v. City of Montgomery,*
    792 F. Supp. 1238 (M.D. Ala. 1992).....................................................................19

*LaShawn A. v. Kelly,*
    887 F. Supp. 297 (D.D.C. 1995) ....................................................................16, 17

*Lyn-Lea Travel Corp. v. Am. Airlines, Inc.,*
    283 F.3d 282 (5th Cir. 2002).................................................................................14

*M.D. by Stukenberg v. Abbott,*
    907 F.3d 237 (5th Cir. 2018).........................................................................34, 49

*Martin's Herend Imports, Inc. v. Diamond & Gem Trading USA, Co.,*
    112 F.3d 1296 (5th Cir. 1997)...............................................................................14

*Matter of Terrebonne Fuel & Lube, Inc.,*
    108 F.3d 609 (5th Cir. 1997).................................................................................14

*McNeal v. Tate Cty. Sch. Dist.,*
    2016 WL 7156554 (N.D. Miss. Dec. 7, 2016) .................................................15

*Netsphere, Inc. v. Baron,*
    703 F.3d 296 (5th Cir. 2012)...........................................................................19

*Quilling v. Funding Res. Grp.,*
    227 F.3d 231 (5th Cir. 2000)...........................................................................14

*Santibanez v. Weir McMahon & Co.,*
    105 F.3d 234 (5th Cir. 1997)...........................................................................19

*Shaw v. Allen,*
    771 F. Supp. 760 (S.D.W. Va. 1990) ..............................................................22

*Strickland v. Peters,*
    120 F.2d 53 (5th Cir. 1941).............................................................................19

*United States v. Alcoa, Inc.,*
    533 F.3d 278 (5th Cir. 2008)...........................................................................14

*United States v. Rylander,*
    460 U.S. 752, 757, 103 S. Ct. 1548, 1552, 75 L. Ed. 2d 521 (1983) ..................15

*Whitfield v. Pennington,*
    832 F.2d 909 (5th Cir. 1987)...........................................................................15

## **STATUTES**

Miss. Code Ann. § 43-21-105................................................................40, 41
Miss. Code Ann. § 43-26-1 ...................................................................4, 10

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

OLIVIA Y., et al                              )
                                             )
Plaintiffs                                    )
                                             )
v.                                            )     CIVIL ACTION NO. 3:04cv251 TSL-FKB
                                             )
PHIL BRYANT, as Governor of                   )
the State of Mississippi, et al.              )
                                             )
Defendants                                    )

DEFENDANTS' MEMORANDUM OF AUTHORITIES IN SUPPORT OF
RESPONSE AND OBJECTIONS TO PLAINTIFFS' AMENDED
MOTION FOR RELIEF PURSUANT TO REMEDY PHASE OF
PLAINTIFFS' RENEWED MOTION FOR CONTEMPT,
FOR AN EVIDENTIARY HEARING,
AND FOR THE APPOINTMENT OF A RECEIVER

The Defendants submit the following Memorandum of Authorities in response to
Plaintiffs' Amended Contempt/Receiver Motion.

## I. INTRODUCTION

Since the 2nd Modified Settlement Agreement and Reform Plan ("2nd MSA") was signed
in December 2016, Mississippi's child welfare system has experienced dramatic improvement.
While the nation grapples with an increasing foster care population, the Mississippi Department
of Child Protection Services ("MDCPS") has safely reduced the number of children in its
custody by 25% between July 1, 2017, and August 1, 2019.  Equally as important, when the child
welfare community shifted its focus to safely reducing entries into foster care, MDCPS already
had implemented its In-Circle program, which has a 94% success rate in safely maintaining
children in their own homes.  Defs.' Ex. P: 2018 In-Circle.  MDCPS also has achieved
permanency for more of the children who must enter foster care, finalizing more than twice as

many adoptions in State Fiscal Year ("SFY") 2018 as in SFY-2017, and exceeding SFY-2018's performance in SFY-2019. MDCPS has also nearly eliminated overdue investigations while experiencing a year-after-year increase in the number of maltreatment reports it receives and must investigate. MDCPS has made these improvements while averting a financial crisis in SFY-2018 (July 1, 2017 to June 30, 2018) due to an approximately $52 million budget deficit it was required to overcome. Moreover, MDCPS has implemented a comprehensive five year plan for further improvement in its practices and as an agency. Defs.' Ex. AB: 5-Year Strategic Plan.

Despite these marked improvements in Mississippi's child welfare system and clear plans for continued improvement, Plaintiffs demand that the Court hold Defendants in civil contempt for failure to fully comply with the 2nd MSA. Based on their request for contempt, Plaintiffs then seek to force MDCPS into a receivership under an unidentified receiver with "full" but undefined authority to administer Mississippi's foster care system, including "any and all authority previously vested in the Office of Governor or any other executive branch of the government of the state of Mississippi." *See* Pls.' Proposed Order. Plaintiffs request this receiver be appointed for an indefinite period, at an unknown cost, with no assessment of the impact of such a radical remedy on the MDCPS work force or the provision of services to children in the *Olivia Y* class, or any reliable evidence that a receiver would achieve compliance with all of the 2nd MSA's many complex commitments.

While MDCPS has not yet achieved full compliance with the 2nd MSA, it is on a trajectory of improvement that should not be disrupted and derailed. The appointment of a receiver would amount to a complete reset of Mississippi's reform efforts with no evidence whatsoever of success. Given all MDCPS has accomplished, the plans it has for future improvement, and additional state funding that first became available July 1, 2019, MDCPS

2

should be given the time it needs to continue its work towards compliance with the 2nd MSA.

For these reasons and as more fully set forth in this Response, Plaintiffs' Contempt/Receivership Motion should be denied.

## II. BACKGROUND FACTS

MDCPS underwent a leadership change when Commissioner Jess Dickinson replaced Commissioner David Chandler effective September 18, 2017 – three-fourths of the way through calendar year 2017 (the "Capacity Building Year") during which the Stipulated Third Remedial Order ("STRO") allowed MDCPS to strive to build its capacity to achieve compliance with the 2nd MSA's commitments. STRO, ECF No. 713. At this time of leadership change, just over three months remained before the court monitor, Public Catalyst, would begin assessing MDCPS's performance under the 2nd MSA. It is against this backdrop that Defendants now proceed to set forth the facts that have led to the current issues pending before this Court.

### *The Separation of MDCPS and MDHS*

When this litigation was filed in 2004, Mississippi's child welfare system was administered by the Division of Family and Children's Services ("DFCS"), a division of the Mississippi Department of Human Services ("MDHS"). Affidavit of Jess H. Dickinson, ¶7, attached as Ex. AF to Defs.' Resp. ("Dickinson Aff."). In July 2015, this Court ordered the Monitor to provide it with recommendations designed to improve DFCS's performance. Agreed Order, ECF No. 664.

In November 2015, the Monitor recommended that DFCS separate from MDHS. Defs.' Ex. B: Organizational Analysis by PC. On December 22, 2015, the Court entered an Interim Remedial Order ("IRO"), which required that Defendants begin implementing an "in-but-not-of" model placing DFCS within MDHS, but independent of MDHS management and oversight. IRO, ECF No. 671. During that same month, Governor Phil Bryant appointed David Chandler

3

as DFCS's Executive Director.  Dickinson Aff. ¶7.

*Calendar year 2016*

In its 2016 session, the Legislature passed new legislation creating MDCPS as a new state agency, requiring it completely to separate from MDHS no later than June 30, 2018. *See* Miss. Code Ann. § 43-26-1.  Separating from MDHS and creating a new stand-alone state agency was a massive undertaking requiring a substantial commitment of financial and human resources. For example, MDCPS was required to form and staff its own human resources and payroll departments capable of handling personnel issues and payroll for more than 1,400 employees, as well as an information technology department capable of operating and maintaining the Mississippi Automated Child Welfare Information System ("MACWIS") data system, as well as administering the Agency's computer networks for the Agency's 85 offices and over 1,400 employees.  Dickinson Aff. ¶8.

During the same session, DFCS's budget request for SFY-2017 was pending, but the request did not include funding for the separation.  *Id.* at ¶9.  As a result, DFCS submitted a revised budget request, increasing its request for state funds to $132.18 million.  Defs.' Ex. A: SFY-2017 Revised Budget Request. However, the Legislature appropriated only $111.78 million, $20.40 million less than the revised budget request.  Defs.' Ex. C: SFY-2017 Appropriation Bill.  Following the close of the 2016 legislative session, events began unfolding that would lead to a projected $52 million budget deficit in late 2017.

On May 25, 2016, in response to a requirement of the IRO, MDCPS completed a Recruitment, Hiring and Retention Plan ("Recruitment Plan") which set forth MDCPS's plan to increase its workforce by more than 500 staff. Despite receiving only $111.78 million in state funds for SFY-2017, the Recruitment Plan stated:

4

> For SFY2017, we have received funding for 255 additional field staff positions. The Agency will use the most current workload data available for budget requests for SFY2018.

Dickinson Aff. ¶10; Defs.' Ex. D: 2016 Recruitment Plan. In response, MDCPS began aggressively hiring new staff in July 2016, which marked the beginning of SFY-2017. Dickinson Aff. ¶10.

In preparation for submitting MDCPS's SFY-2018 budget request, MDCPS analyzed the financial cost of MDCPS's commitment to increase its frontline staff, and the cost of separating MDCPS from MDHS. *Id.* at ¶11. The result of this analysis was set forth in a July 27, 2016, memorandum from Takesha Darby, the MDCPS Deputy Commissioner of Finance. *Id.*; Defs.' Ex. E: 7/27/16 Darby Memo. The memorandum anticipated that funding the additional staff and the separation from MDHS would require a state-fund appropriation of $128.95 million for SFY-2018. *Id.*

Shortly thereafter, MDCPS submitted its SFY-2018 budget request requesting a state appropriation of $113.98 million, which was $14.97 million less than the July 2016 SFY-2018 need projection and an increase over the SFY-2017 appropriation of only $2.20 million. Defs.' Ex. F: SFY-2018 Budget Request.

In December 2016, following the submission of its SFY-2018 Budget Request, MDCPS and Plaintiffs reached two agreements, the STRO and the 2nd MSA. The 2nd MSA's 2018 requirement included 113 performance measures for MDCPS to achieve.

One of the performance requirements of the STRO was that MDCPS had twelve months to increase the percentage of its caseworkers in compliance with the 2nd MSA's weighted value fixed caseload cap from a September 30, 2016, baseline of 31% established by Public Catalyst to 90% by December 31, 2017. Dickinson Aff. ¶14; Defs.' Ex. I: PC 2017 Caseload Performance Targets. To accomplish this ambitious goal, MDCPS immediately needed to start hiring and

training hundreds of new caseworkers, which would require substantial funding that the Agency had not been granted. Dickinson Aff. ¶14.

### The 2017 Mississippi Legislative Session

January 2017 was a pivotal month for MDCPS's financial fate. MDCPS had just signed the 2nd MSA, and the Legislature had just begun its 2017 session. Dickinson Aff. ¶15. January 2017 also began the 12-month Capacity Building Year during which MDCPS was to build its capacity to comply with the 2nd MSA's requirements.

Under these circumstances, if MDCPS had any hope of coming into compliance with the 2nd MSA, it needed the Legislature to appropriate substantial additional funding for MDCPS's SFY-2018 budget, which MDCPS would not begin receiving until half the Capacity Building Year had passed. *Id.* Also, MDCPS was required to operate during the first six months of the Capacity Building Year with the balance left in its SFY-2017 appropriation, which was $20.40 million less than MDCPS had requested ($132.18 - $111.78). *Id.* The Legislature had pending before it MDCPS's SFY-2018 budget request for a state-fund appropriation of $113.98 million, which had been submitted in September 2016, prior to the entry of the 2nd MSA. Defs.' Ex. F: SFY18 Budget Request. This request was $14.97 million ($128.95 - $113.95) less than the July 2016 assessment of the amount the Agency would need to fund the hiring of 500 additional staff and pay the costs associated with the separation of MDCPS from MDHS. Dickinson Aff. ¶15; Defs.' Ex. E: 7/27/16 Darby Memo.

Rather than providing the $113.98 million MDCPS requested, the 2017 Legislature appropriated MDCPS only $97.97 million for SFY-2018, which was a $16.01 million reduction from MDCPS's request, and far short of the amount necessary to come into compliance with the 2nd MSA. Dickinson Aff. ¶ 16; Defs.' Ex. J: SFY-2018 Appropriation Bill. This appropriation

also was $30.98 million ($128.95 - $97.97) less than the July 2016 SFY-2018 need projection. Dickinson Aff. ¶16; Defs.' Ex. E: 7/27/16 Darby Memo.

At this point, MDCPS did not have sufficient funds to proceed with the Comprehensive Child Welfare Information System ("CCWIS") project or the funds to support the necessary additional hiring that was planned. Dickinson Aff. ¶17. Indeed, to operate the Agency with its substantially slashed budget, MDCPS needed immediately to begin planning substantial cuts to its obligations going forward. *Id.* However, in an attempt to comply with the requirements of the 2nd MSA, the Agency moved forward with signing new contracts, hiring staff, funding the separation of MDCPS from MDHS and funding the CCWIS project. *Id.*

It must also be emphasized that while the $97.97 million appropriation represented a $16.01 million ($113.981-$97.97) reduction from MDCPS's SFY-2018 budget request, it represented a far larger cut to MDCPS's overall budget because of the loss in federal matching funds. *Id.* at ¶18. For instance, in the MDCPS memorandum of July 27, 2016, MDCPS documented the need for a budget increase of $26.69 million "of which $16.66 is being requested in State funding and the remaining balance of $10.03 million will be anticipated federal funding." Defs.' Ex. E: 7/27/16 Darby Memo. As another example, because the federal government provides a dollar-for-dollar match for MDCPS's CCWIS project, had the Legislature provided the additional $16 million for CCWIS, the federal government would have matched it with an additional $16 million, providing a total of $32 million. Dickinson Aff. ¶18.

### The 2017 Change in MDCPS Administration

On August 8, 2017, David Chandler announced he was retiring as MDCPS's Commissioner, and Governor Bryant appointed Jess H. Dickinson as MDCPS's new Commissioner. *Id.* at ¶19. When Commissioner Dickinson began his duties on September 18,

2017, almost three months of the fiscal year had passed and much of MDCPS's SFY-2018 budget had been expended. *Id.* Only three months and 12 days remained before the end of the year, which was an important date for two reasons.

First, with respect to caseloads, December 31, 2017, was MDCPS's deadline to raise the percentage of its caseworkers in compliance with the 2nd MSA's fixed caseload caps from 50% when Commissioner Dickinson's tenure began, to 90%. *Id.* at ¶20. Second, January 1, 2018, marked the beginning of the year during which the Monitor was to begin measuring MDCPS's performance for compliance with many of the requirements of the 2nd MSA.

On November 15, 2017, MDHS's finance staff advised MDCPS that it would not have enough state funds to operate the Agency for the balance of the fiscal year. *Id.* at ¶21. Because MDCPS had been operating without a formal operational budget, it conducted an internal investigation to determine the Agency's true financial condition. *Id.* at ¶22. This had to be done by hand, by pulling all MDCPS's outstanding contracts and calculating the remaining work to be done and the cost of that work, all expected salaries, board payments and other obligations, and then calculating the balance in state funds and the amount of expected federal funds to support those obligations. *Id.*

Through the investigation in these early months of Commissioner Dickinson's administration, he discovered that (a) MDCPS had not analyzed and quantified the financial impact of the obligations in the STRO and the 2nd MSA; (b) MDCPS had not developed a formal operational budget and was unable to monitor its cash flow or determine its SFY-2018 financial obligations and available funding; and (c) MDHS had committed its Temporary Assistance for Needy Families ("TANF") and Social Security Block Grant ("SSBG") federal funding to other projects and did not intend to use them for eligible MDCPS expenses, as it had in past years. *Id.*

at ¶23. The juxtaposition of these events, and the increased Capacity Building Year expenses and commitments, placed MDCPS at risk of an imminent, severe financial crisis. *Id.*

Upon conclusion of this process, MDCPS determined that unless the Agency took immediate remedial action, it would accumulate a deficit by the end of SFY-2018 of approximately $52 million. *Id.* at ¶24. Realizing that MDCPS could not overcome a deficit of this magnitude without a combination of additional funds and cuts to expenses, MDCPS began looking for solutions. Soon thereafter, MDCPS developed and implemented the following plan:

- MDCPS cancelled certain contractual obligations to outside contractors that could safely be handled in-house;

- To keep salary costs level, MDCPS limited hiring to replacing departing staff;

- MDCPS placed a hold on CCWIS development;

- Commissioner Dickinson met with the appropriate members of the Legislature to inform them of the Agency's financial crisis and seek additional support through a deficit appropriation;

- MDCPS collaborated with MDHS regarding MDCPS's financial needs and possible remedies, and worked with the Legislature to seek solutions;

- MDCPS requested the Legislature to amend the statute that required MDHS and MDCPS to separate completely so that the two agencies could re-combine back-office operations, and MDCPS could continue to have access to certain federal funds through MDHS; and

- Commissioner Dickinson met with MDHS Executive Director Davis to request financial support by continuing to provide TANF and SSBG funds for qualifying MDCPS programs and expenses. *Id.*

Although Plaintiffs' counsel and the Monitor had been kept advised of these events as they developed, MDCPS formally met with Plaintiffs' counsel on March 1, 2018, to review the financial crisis, the limitation on hiring, the CCWIS delay, submission of a revised budget request for SFY-2019 and the potential impact on the delivery of foster care services. *Id.* at ¶25. On March 8, MDCPS provided Plaintiffs with a written overview and detailed financial analysis of these matters. *Id.*

By March 2018, MDCPS had successfully implemented the steps necessary to avoid the immediate financial crisis. The Legislature had amended Miss. Code Ann. § 43-26-1 to allow MDCPS to remain a sub-agency of MDHS. Consequently, with respect to many of MDCPS's performance requirements under the 2nd MSA, the crisis was far from over. *Id.* CCWIS production needed to resume, and the Agency needed to increase the net number of frontline caseworkers and staff, but it did not have the funds to do either. *Id.* And without increased field staff, many of the 2nd MSA's requirements were not attainable. *Id.* Moreover, MDCPS had little hope of improving these conditions without additional funding because SFY-2019, which was to begin on July 1, 2018, already had been appropriated. *Id.*

### The MDCPS SFY-2019 Budget

In September 2017, MDCPS had requested $113.24 million from the Legislature for its SFY-2019 budget. Defs.' Ex. K: SFY-2019 Budget Request. Realizing that this budget request was far short of the Agency's needs, MDCPS presented an amended budget request for $133.63 million, and on multiple occasions Commissioner Dickinson advised the Legislature, including the Appropriations Committees of both the House and Senate, that the amended budget request was necessary to properly operate the Agency and comply with the requirements of the *Olivia Y* litigation. Dickinson Aff. ¶30.

The Legislature responded by appropriating only $109.99 million for SFY-2019, leaving MDCPS $23.64 million ($133.63 - $109.99) short of its needs. Defs.' Ex. N: SFY-2019 Appropriation Bill; Dickinson Aff. ¶30. As a result, for the balance of 2018, while the Monitor completed its evaluation of MDCPS's performance under the 2nd MSA, the Agency had no additional funds to increase its field staff or support staff in the state office, nor could it resume CCWIS development. Dickinson Aff. ¶30.

***Plaintiffs' Contempt/Receiver Motion Related to the 90% Caseload Cap***
***and Defendants' Rule 60(b) Motion***

On March 5, 2018, Plaintiffs' counsel gave notice of Plaintiffs' intention to file a motion based on the Agency's failure by December 31, 2017, to achieve 90% compliance with the fixed caseload cap. Defs.' Ex. M: Notice of Non-Compliance. Plaintiffs' counsel followed up on May 31, 2018, by filing a motion, asking this court to hold MDCPS in contempt for failure to achieve the 90% caseload cap and to place MDCPS in a receivership. Pls.' Mot. for Contempt, ECF No. 739. After filing the Contempt/Receiver Motion, Plaintiffs' counsel advised the Mississippi media that "she filed the motion for contempt only after the plaintiffs asked Gov. Phil Bryant to replace current head of Child Protection Services, Jess Dickinson, with new leadership." Defs.' Ex. O: Campbell Article – 5/31/18.

On July 3, 2018, Defendants timely responded to the motion. Defs.' Resp. to Mot. for Contempt, ECF No. 754. Also on July 3, 2018, pursuant to Section 11.2.a. of the 2nd MSA, Defendants' filed a Rule 60(b) motion for relief concerning the 2nd MSA's fixed 90% caseload cap. Defs' Mot. to Set Aside, ECF No. 756. Plaintiffs responded, and this Motion still is pending before the Court.

From July 1, 2018 through June 30, 2019, MDCPS's budget had been set, and the lack of additional funding for SFY-2018 required MDCPS to continue its hiring limitation and delay in CCWIS development. Dickinson Aff. ¶33. Nevertheless, even with its limited resources, MDCPS made significant progress.

***The MDCPS SFY-2020 Budget***

On August 10, 2018, MDCPS filed its budget request for SFY-2020 which the Legislature would consider in its 2019 session. MDCPS requested $135.74 million in state funds which, if appropriated, would have provided additional funding for wages and salaries. *Id.* at

11

¶34; Defs.' Ex. Q: SFY-2020 Budget Request.    Commissioner Dickinson also made
presentations to the House and Senate Appropriations Committees to explain the need for
additional funding to properly operate the Agency and comply with the requirements of the 2nd
MSA. Dickinson Aff. ¶34.

   In response, the Legislature provided MDCPS a state-fund appropriation of $125.71
million, which was $10.03 million less than MDCPS requested, but which exceeded each of its
two preceding fiscal year budget appropriations respectively by $15.74 million and $15.72
million. Defs.' Ex. Y: SFY-2020 Appropriation Bill; Dickinson Aff. ¶35.  With the new funds
available to it effective July 1, 2019, MDCPS lifted the limitation on hiring, and began working
to fill every preservice training class for caseload carrying staff to capacity.  Dickinson Aff. ¶35;
Defs.' Ex. AA: 7/2/19 Cheeseman Memo.  MDCPS also directed that all hiring of caseload
carrying staff be based on caseload data and specific staffing needs, and allowed for the hiring of
one supervisor for every five caseload carrying staff hired, consistent with the 2nd MSA's
required supervisory ratio.  Dickinson Aff. ¶35.  Moreover, MDCPS mandated that non-
caseload carrying positions be backfilled only as they are vacated, and that additional non-
caseload-carrying positions be filled on an as needed basis if approved by MDCPS's executive
management.  Id.  The Agency also ended the CCWIS delay and began working in conjunction
with the Mississippi Department of Information Technology to prepare a request for proposals to
replace its antiquated MACWIS system with a federally compliant CCWIS system by the 2nd
MSA's June 30, 2021 deadline.  Id.

### Plaintiffs' Amended Motion for Contempt and for Appointment of a Receiver related to the Monitors' 2018 Annual Report.

   During calendar year 2018, the Monitor conducted numerous assessments of MDCPS's
compliance with the 113 requirements for 2018, and published the results of those assessments

on June 11, 2019, in the 2018 Annual Report. Defs.' Ex. Z: Progress of the Mississippi Department of Child Protection Services; Monitoring Report for 2nd Modified Mississippi Settlement Agreement ("2018 Monitor's Report"). On November 13, 2018, Plaintiffs' counsel served a notice of non-compliance. Defs.' Ex. R: 11/13/18 Notice. On July 3, 2019, Plaintiffs' filed their Amended Motion for Relief Pursuant to Remedy Phase of Plaintiffs' Renewed Motion for Contempt, for an Evidentiary Hearing, and for the Appointment of a Receiver asking the Court to hold Defendants in contempt for failure to achieve compliance with the requirements of the 2nd MSA, and renewing their request that the Court place MDCPS in a receivership. Pls.' Renewed Mot. for Contempt, ECF No. 849.

## III. LEGAL AUTHORITIES AND ANALYSIS

A careful review of this case establishes that there is no basis for a finding of contempt nor is there a basis for the appointment of a receiver in response to the Contempt/Receiver Motion.

First, the motion is wrong on the law. The law does not support a finding of contempt under these circumstances and Plaintiffs have not – and cannot – satisfy the minimum legal requirements for the appointment of a receiver to take over MDCPS.

Second, it is wrong as to the facts. Plaintiffs endeavor to make MDCPS appear as a dysfunctional government agency. Contrary to Plaintiffs' mischaracterizations of the current state of MDCPS, the current management structure is strong, and MDCPS continues to progress towards compliance with the 2nd MSA, while significant accomplishments continue to accumulate.

### A. Defendants Should Not Be Held In Civil Contempt Due To Impossibility of Performance and Mitigating Circumstances

The Court unquestionably has the discretionary power to enforce a consent order by a finding of civil contempt. *See e.g. United States v. Alcoa, Inc.*, 533 F.3d 278, 286 (5th Cir. 2008) ("district courts … have wide discretion to enforce decrees and to implement remedies."). However, because MDCPS has not had the ability to comply with the 2nd MSA and mitigating circumstances exist, a finding of contempt would not be proper.

The general purpose of a civil contempt sanction is "to coerce the contemnor into compliance with a court order…." *Quilling v. Funding Res. Grp.*, 227 F.3d 231, 234 (5th Cir. 2000) (citing *Lamar Financial Corp. v. Adams*, 918 F.2d 564, 566 (5th Cir.1990)). *See also, Martin's Herend Imports, Inc. v. Diamond & Gem Trading USA, Co.*, 112 F.3d 1296, 1307 (5th Cir. 1997); *Matter of Terrebonne Fuel & Lube, Inc.*, 108 F.3d 609, 612 (5th Cir. 1997). Here, the Plaintiffs assert that the only way to coerce compliance with the 2nd MSA is to hold Defendants in civil contempt and appoint a receiver to take over Mississippi's child welfare system. Pls.' Am. Mem. Br. at 36. In fact, the Plaintiffs explicitly disclaim any request for other relief: "We emphasize that Plaintiffs do not seek the imposition of fines or other punitive measures." Pls.' Am. Mem. Br. at 13. While MDCPS has yet to achieve compliance with all of the provisions of the 2nd MSA, the question before the Court is not whether Defendants are compliant with the agreed order, but whether a finding of civil contempt and appointment of a receiver are appropriate at this juncture.

"A party seeking a civil contempt order must demonstrate, by clear and convincing evidence, '(1) that a court order was in effect, (2) that the order required certain conduct by the respondent, and (3) that the respondent failed to comply with the court's order.'" *Lyn-Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 291 (5th Cir. 2002).

14

Even if each of these elements is met, an alleged contemnor, as a defense to civil contempt, "may assert a *present* inability to comply with the order in question." *United States v. Rylander*, 460 U.S. 752, 757, 103 S. Ct. 1548, 1552, 75 L. Ed. 2d 521 (1983). When considering civil contempt, a court should "not be blind to evidence that compliance is now factually impossible. Where compliance is impossible, neither the moving party nor the court has any reason to proceed with the civil contempt action. It is settled, however, that in raising this defense, the defendant has a burden of production." *Id.*

In addition, an alleged contemnor may show "mitigating circumstances that might cause the district court to withhold the exercise of its contempt power." *Whitfield v. Pennington*, 832 F.2d 909, 914 (5th Cir. 1987). "Although there is no exhaustive list of mitigating circumstances which would excuse a violation of a court order, courts have generally considered whether the cause of the violation was beyond the control of the defendant." *McNeal v. Tate Cty. Sch. Dist.*, 2016 WL 7156554, at *10 (N.D. Miss. Dec. 7, 2016).

As set forth more fully in Section II above, Defendants have established that compliance with the 2nd MSA since its effective date of only 20 months ago has been fiscally impossible. Quite simply, MDCPS has not had sufficient funds to meet all of the complex and demanding 2nd MSA commitments particularly in light of the SFY-2018 fiscal crisis and the massive initial cost of the CCWIS conversion. While MDCPS has repeatedly informed the Legislature, Public Catalyst, and Plaintiffs' counsel of its funding needs, the decision ultimately and exclusively rests with the Mississippi Legislature – a fact acknowledged by Plaintiffs in the 2nd MSA: "Defendants do not speak for the Mississippi Legislature, which has the power under Mississippi law to determine appropriations for the state's child welfare programs." Defs.' Ex. H: 2nd MSA at 1.

The facts clearly show that both defenses to civil contempt above are applicable in this case. First, MDCPS has had an inability to comply with the requirements of the 2nd MSA by virtue of inadequate funding. Second, mitigating circumstances exist in that the lack of adequate funding is beyond the control of Defendants. Defendants respectfully submit that contempt would not be proper in this matter.

Knowing Defendants' inability to comply with the 2nd MSA because of the Legislature's failure to fully fund MDCPS, Plaintiffs assert a finding of contempt is proper because other "[c]ourts have consistently held state officials in contempt in analogous circumstances." Pls.' Am. Mem. Br. at 17. The cases on which Plaintiffs rely are distinguishable from the present case.

First, Plaintiffs rely heavily on *LaShawn A. v. Kelly*, 887 F. Supp. 297 (D.D.C. 1995). The court in *LaShawn* found "the overall situation [in the District's child welfare system was] just as 'dismal' as it was" at the time of the original class certification trial. *Id.* at 314. In reaching that conclusion, the court reviewed ten categories of violations and concluded that the District's child welfare system was "radically out of compliance with the court's orders." *Id.* at 300-11. A review of these categories establishes that *LaShawn* is distinguishable and does not support a civil contempt finding or a creation of a receivership. For example, the court in *LaShawn* noted that "[a]ctivity in th[e] area [of adoption] has nearly ground to a halt . . ." and had "declined to levels that existed before the implementation of the . . . Remedial Order." *Id.* at 300. Defendants in *LaShawn* had also failed to comply with providing necessary administrative supports (e.g., supplies, operable phones) and had failed to satisfy "requirements that all social workers have a current and valid license." *Id.* at 302-03. The defendants were required "to provide an administrative review for all children in care within 180 days of their entering physical and legal custody and every 180 days thereafter." *Id.* at 305. The Court found

16

defendants were not in substantial compliance because they were still "drastically behind." *Id.* The defendants were also required to develop policies and procedures for the issuance of licenses for foster care facilities, but at the time of the hearing, "the defendants [were] not on the verge of fulfilling this requirement even a year after the extended deadline." *Id.* at 307.

Unlike the "dismal" state of affairs in *LaShawn*, focused work in the Permanency Support Services Unit of MDCPS has tremendously decreased processing times for adoptions. In SFY-2018, 647 adoptions were finalized, while 657 adoptions were finalized in Fiscal Year 2019. MDCPS has improved the tools available to its workers, and Public Catalyst has verified that MDCPS has complied with the commitment to provide workers with "access to computer services, word processing and electronic mail; [and] access to the current management information systems." 2018 Monitor's Report at 33. Finally, MDCPS has placed a great focus on increasing the number of family based placements. In 2018, MDCPS licensed 431 new non-relative foster homes, exceeding the annual target of 400 homes established by the Monitor after consultation with the Department. 2018 Monitor's Report at 53.

The second case relied upon by Plaintiffs is *G.L. v. Zumwalt*, No. 77-0242-CV-W-1 (W.D. Mo. Dec. 7, 1992), an unreported case that is unavailable through any legal reference library. However, based on the Plaintiffs' summary, it is simply another fact based contempt case that differs markedly from the case before this Court.

The final case is *Aspira of New York, Inc. v Board of Education of New York*, 423 F. Supp. 647 (S.D. N.Y. 1976). It is also distinguishable. Specifically, the *Aspira* court found the following actions of the Defendants to be compelling:

    1.  They "have neglected to marshal their own resources …"

2. They "demand the results needed from [other] subordinate persons and agencies in order to effectuate the course of action required by the consent decree."

3. They have "allowed deadlines to pass without advance announcements or volunteered explanations, awaiting complaints by the plaintiffs."

4. They "have borne with seeing equanimity long periods of non-performance, inadequate performance, or outright defiance from key constituents."

5. They "have failed to enlist or order the placement of needed and available personnel."

6. They "have displayed an evident sense of nonurgency bordering on indifference …" *Id.* at 654

These failures are a far cry from the actions of the Defendants here after entry of the 2nd MSA, marked by the SFY-2017 capacity building efforts, resolution of the SFY-2018 financial crisis, the effort to obtain additional funding for SFY-2019, the successful effort that has led to a $15.74 million increase in funding for SFY-2020, adoption of a new approach to a CCWIS transition with a projected cost saving of approximately $20 million, lifting of the limitations on hiring with increased caseworker hiring based on the additional SFY-2020 funding as well as the accomplishments, improvements and progress reviewed in Section III.C.

Neither the facts nor the relevant case law support a finding of contempt as to Defendants in this case. Instead, the reliable evidence reflects that MDCPS has not been adequately funded to a level which would allow it to reach the commitments found within the 2nd MSA making it impossible to comply – a mitigating circumstance beyond Defendants' control. Moreover, Plaintiffs' attempt to "analogize" three cases to the present case is misplaced. Defendants respectfully submit that the Court should deny Plaintiffs' request that Defendants be found in

contempt.

### B. A Receiver Should Not Be Appointed to Take Over Foster Care In Mississippi.

Even if, *arguendo*, Plaintiffs could substantiate a claim for contempt, the appointment of a receiver is not an appropriate remedy in this case.

In their Memorandum, Plaintiffs assert the Court has the equitable power to appoint a receiver and also cite to Fed. R. Civ. P. 66 as authority for appointing a receiver. Under Rule 66, "the appointment of a receiver can be sought 'by anyone showing an interest in certain property or a relation to the party in control or ownership thereof such as to justify conservation of the property by a court officer.'" *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012)(*citing Santibanez v. Weir McMahon & Co.*, 105 F.3d 234 (5th Cir. 1997)). A court has "the power to appoint a receiver . . . under Federal Rule of Civil Procedure 66," and such "appointment is in the sound discretion of the court." *Santibanez*, 105 F.3d at 241.

It is well settled, however, that "[t]he appointment of a receiver is an extraordinary remedy, not to be resorted to without necessity." *Strickland v. Peters*, 120 F.2d 53, 56 (5th Cir. 1941); *see also*, *Netsphere*, 703 F.3d at 305 ("Receivership is 'an extraordinary remedy that should be employed with the utmost caution'"); *Green v. City of Montgomery*, 792 F. Supp. 1238, 1273 (M.D. Ala. 1992)(the "extraordinary and intrusive measure" of appointing a receiver was not justified where "the parties [in related cases] have begun the difficult task of developing permanent personnel procedures for the department, and recent litigation concerning some of these procedures reflects that the court and the parties are continuing to address the issue of retaliation"). "Essentially it is the remedy of last resort, and therefore, should be undertaken only when absolutely necessary." *District of Columbia v. Jerry M.*, 738 A.2d 1206, 1213 (D.C. Ct. App. 1999) (*citing LaShawn A., by Moore v. Barry*, 144 F.3d 847, 853 (U.S. App. D.C. 1998)).

19

Further, "[t]he appointment of a receiver must be reasonable under the circumstances. The most significant factor in the propriety of appointing a receiver is whether any other remedy is likely to be successful." *Dixon v. Barry*, 967 F. Supp. 535, 550 (D.D.C. 1997)(citations omitted). In determining whether other remedies are inadequate and receivership remains the only viable option to effectuate compliance with the laws and orders of the court, the court should consider a number of factors including: (1) "whether there were repeated failures to comply with the Court's orders"; (2) whether further efforts to secure compliance would only lead to "confrontation and delay"; (3) whether leadership is available which can "turn the tide within a reasonable time period"; (4) "whether there was bad faith"; (5) "whether resources are being wasted"; and (6) "whether a receiver can provide a quick and efficient remedy." *Jerry M.*, 738 A.2d at 1213.

In their Memorandum supporting their claim for a receiver, Plaintiffs' analysis for the need of a receiver begins and ends with the issue of non-compliance. Plaintiffs cite to *LaShawn A. v. Kelly*, 887 F. Supp. 297 (D.D.C. 1995) and *Shaw v. Allen*, 771 F. Supp. 760, 763 (S.D.W. Va. 1990) to support their conclusion that a receiver is appropriate but offer little analysis of why a receiver is appropriate in this case. Instead, Plaintiffs simply rely on lack of compliance in the past. However, as shown in the cases cited herein, the Court's analysis for the appointment of a receiver should not begin and end with the issue of compliance with previous orders. Instead, the Court must also consider the other relevant factors.

### 1.    *Failure To Comply With Court Orders*

The Court is familiar with the history of the *Olivia Y* litigation and the efforts of different administrations over many years under many different circumstances to meet commitments that in many instances were not achievable in prior orders. Plaintiffs' legal analysis of the necessity of a receivership begins and ends with this factor of failure to comply. "However, some

assessment must be given to the other pertinent factors by which the trial court's exercise of discretion must be guided." *Jerry M.,* 738 A.2d at 1213.

For example, the *Jerry M.* court stated "the factors of leadership availability and bad faith" along with "[w]hether a newly appointed receiver could secure compliance more speedily . . . must be weighed." *Id.* at 1214. The appellate court in *Jerry M.* reversed the appointment of a receiver because "the trial court abused its discretion in appointing a receiver because several important criteria were omitted from the trial court's consideration in this case." *Id.* In doing so, the appellate court found that "[a] proper consideration of **all of the relevant factors**, given the extraordinary nature of the remedy, can lead only to the conclusion that an insufficient basis was shown for the appointment of a receiver under the circumstances existing at the time of the entry of the order." *Id.* (emphasis added); *see also, Evans v. Fenty,* 480 F. Supp. 2d 280, 326 (D.D.C. 2007)(the court denied a request for appointment of a receiver because "[a]lthough it is clear based on the tortured history of this case that there have been repeated failures to comply with the Court's Orders, this determination is in no way determinative of the question whether plaintiffs are correct in their argument that a receivership should be imposed. As is clear from the case law, a host of other considerations bear on this issue . . . .").

### 2.   *Further Efforts To Secure Compliance*

Further efforts to secure compliance, outside of appointing a receiver, will not lead to more confrontation and delay in this case. Unlike *Shaw,* Defendants here are making progress towards compliance. Mississippi's child welfare system is not what it once was. The most important measures of the system – its outcomes – have improved. As detailed throughout this brief, MDCPS has made significant improvements in timely completion of investigations, preventing children's entry into foster care, reducing the foster care population, and finalizing adoptions. As such, Plaintiffs' reliance on *Shaw* is misguided.

The court in *Shaw* found the appointment of a receiver was "both necessary and reasonable." *Shaw*, 771 F. Supp. at 763. In *Shaw*, there had been three contempt proceedings prior to the action at issue. *Id.* Despite the prior contempt proceedings, the defendant jail remained in "substantial noncompliance." *Id.* Because of this history, the court found that "[a]n allowance of additional time, as now requested by the Defendants to purge their contempt, in the Court's opinion would only likely result in additional injunctions or contempt proceedings and would offer little hope of anything other than further confrontations and delays." *Id.* Accordingly, the court in *Shaw* ordered that a receiver be appointed "to achieve compliance". *Id.*

In contrast to *Shaw*, the Sixth Circuit held that a district court abused its discretion in appointing a "virtual receivership" because it was "an excessively intrusive interference in the prerogatives of a state agency that is not supported by evidence of the quality and quantity required for the exercise of such extraordinary federal judicial power." *Glover v. Johnson*, 855 F.2d 277, 285-87 (6th Cir. 1988). Without ruling on the motions for contempt, the district court in *Glover* entered an order appointing an administrator to carry out the court's orders on creating education programs for female prisoners. *Id.* at 281.

The appellate court in *Glover* found the district court's appointment of a "virtual receiver" was inappropriate because the record did "not contain adequate findings of fact . . . that defendants have willfully disobeyed the district court's . . . orders" and the record "strongly suggests that the district court has not attempted to exhaust a number of methods to enforce its order that are less intrusive than placing a portion of the state correctional administration in virtual receivership." *Id.* at 287; *see also*, *Bracco v. Lackner*, 462 F. Supp. 436, 456 (N.D. Cal. 1978)(the court denied the request for a receiver where there was "no reason to conclude that the Department will not obey the Preliminary Injunction.").

22

Providing Defendants with additional time to comply with the commitments found in the 2nd MSA will not result in more of the same. Every single day MDCPS improves as a state child welfare agency. MDCPS has maintained and advanced this improvement since the implementation of the 2nd MSA while surviving a $52 million deficit and sustaining the performance through 19 months of level funding from the Legislature.

Effective July 1, 2019, MDCPS experienced an increase of more than $15 million in state funds which is being put to work hiring additional caseworkers and supervisors and pursuing the development of a CCWIS system. Dickinson Aff. ¶35. Given what this administration has accomplished with the unquestioned financial constraints, it is not futile to give the Agency time to use the additional funding available to it to move forward in complying with the 2nd MSA.

Moreover, hiring caseworkers and developing CCWIS are not the only activities underway to improve the Agency's performance. MDCPS data reporting staff are vigilantly working with the Monitor to modify or rewrite the coding behind the Agency's data reporting to fix the data validation issues identified in the Monitor's report. Affidavit of Dr. Jaworski Davenport, ¶18, attached as Ex. AE to Defs.' Resp. ("Davenport Aff."). Likewise, MDCPS's first annual Continuous Quality Improvement ("CQI") plan under the 2nd MSA is now in effect, with case reviews ongoing, so that MDCPS will be able to report on provisions that it could not in 2018. *Id.* at ¶20. And from a practice perspective, MDCPS has developed a comprehensive improvement plan derived from strategic planning initiatives and federal reviews that occurred throughout 2018 and into 2019. Defs.' Ex. AB: 5-Year Strategic Plan. The Strategic Improvement Plan addresses several crucial measures of success consistent with the mission and philosophy of MDCPS, including: safety, stability, permanency, wellbeing, children in custody, family engagement, complete and accurate assessments, service array, system infrastructure, and

stakeholder collaboration. Defs.' Ex. AB: 5-Year Strategic Plan.

Granting Defendants more time to achieve compliance with the 2nd MSA will not lead to more confrontation and delay.

### 3. *Leadership Is Available To Turn The Tide*

As discussed more fully in Section C. below, every attack the Plaintiffs lodge against the current leadership at MDCPS is not supported by the evidence before the Court. The real record of the MDCPS leadership team supports a conclusion that this is the leadership that can turn the tide. The Agency has improved substantially since the 2nd MSA was signed, and the current leadership has maintained and advanced that improvement in the face of daunting financial obstacles. When the current Commissioner arrived, the Agency was heading towards an unprecedented financial emergency with a $52 million budget deficit. Averting that financial crisis is testament to the leadership team's capabilities. The current leadership team has not only averted that crisis, but has made significant progress in achieving positive outcomes for Mississippi's foster children.

### 4. *MDCPS Has Acted In Good Faith*

There is no evidence that Defendants have acted in bad faith regarding compliance with the 2nd MSA. To the contrary, Defendants have diligently pursued compliance with the agreement. It is true that Defendants have requested relief from the fixed caseload cap, but this fact is not evidence of bad faith.

### 5. *MDCPS's Resources Are Not Being Wasted*

Courts have held that this factor depends on whether "the lack of compliance stems from a poor use of resources, and not a lack of resources," whether Defendants lacked "the necessary mechanisms to utilize properly the funding," and whether Defendants budget "is consistently mismanaged and wasteful of resources." *Dixon*, 967 F. Supp. at 546, 554. There is no evidence

that MDCPS has wasted resources in any manner or, more importantly, that the Agency's use of resources has resulted in the failure to achieve the commitments in the 2nd MSA. The record is clear that the Mississippi Legislature consistently has appropriated less funding than the Agency needed despite being informed that the funding was necessary to comply with the 2nd MSA. It also is clear that the Agency found ways to trim the budget to avoid financial default, while simultaneously maintaining, and in some cases improving, performance under the 2nd MSA's deliverables.

6.    *There Is No Reliable Evidence That A Receiver Would Achieve Compliance With All Of The 2nd MSA Commitments Quickly And Efficiently*

First and foremost, as has been discussed above, Defendants' noncompliance is *not* the result of any bad faith, indifference, incompetence, or mismanagement. MDCPS has diligently pursued compliance and has plans for continued improvement. The Agency's work, however, has been impeded by inadequate funding. Plaintiffs have not identified one single thing that the present leadership has done wrong or that a receiver would do differently. The Plaintiffs make no argument as to how a receiver would bring about compliance. They do not, because they cannot.

The principal case relied on by Plaintiffs, *LaShawn*, shows that the promise of receivership as a solution in this case is illusory. There, the first full receiver appointed by the court in 1995, Jerome Miller, "initially predicted he'd be in and out of District government in 18 months." Julie Wakefield, *A Leaky Receivership* (1997), https://www.washingtoncitypaper. com/news/article/13012390/a-leaky-receivership (last visited Aug. 1, 2019). But by January 1997, roughly eighteen months thereafter, attorney Marcia Robinson Lowry – the lead plaintiffs' attorney there and here – candidly stated "I don't think anybody could say we're seeing any payoff from [the receivership]. We're not. [The new system is] not in place." *Id.*

By June 1997, Mr. Miller had resigned, and the court then appointed a second general

receiver in October 1997. *See LaShawn A. v. Bowser, et al* (Docket Report), No. 1:89-cv-01754, D.D.C., retrieved Aug 2, 2019, ECF No. 667 ("ORDER by Judge Thomas F. Hogan : accepting the resignation of Jerome G. Miller as the District of Columbia Child Welfare Receiver"); ECF No. 685, retrieved Aug 2, 2019 ("ORDER by Judge Thomas F. Hogan : appointing Ernestine Jones as the District of Columbia Child Welfare Receiver . . . ."). In May of 2000, the Subcommittee on the District of Columbia of the Committee on Government Reform in the United States House of Representatives convened "a series of hearings to examine the status of the District of Columbia's agencies overseen by court-appointed receivers." United States. Cong. House. Committee on House Administration. *For Better or Worse? An Examination of the State of the District of Columbia's Child and Family Services Receivership*. May 5, 2000. 106th Cong. 2nd sess. Washington: GPO, 2001, Serial No. 106-199. Testimony before the committee reflected that five years after the creation of the receivership, "under the leadership of Mrs. Ernestine Jones since 1997, the Child and Family Services Agency [had] fail[ed] to meet the required reforms outlined by the court order." *Id.* at 3. The court monitor also testified that while some improvements had been made that overall:

> Clearly, while the agency is on the road to more acceptable practice, it has not yet achieved compliance with the standards of the remedial order. And I won't go into all of the problems—you've heard them today—but too many children still linger in foster care for too long. Too many children and families are split from their siblings. Too many teenagers live in group homes. There aren't enough placement resources. There is a shortage of social workers. There remains a really untenable split between responsibility for abuse and neglect in this system. There are critical resource shortages, particularly substance abuse services, mental health services and housing services. *Id.* at 57.

After five years under two receivers, D.C.'s child welfare system still had failed to achieve the needed improvement. Eventually, after the hearings, an agreement was reached to move on from the receivership. Now, 24 years after a full receivership was implemented, the city's child welfare system still is being monitored by the federal court. See *LaShawn A. et al v.*

*Bowser, et al* (Docket Report), No. 1:89-cv-01754, D.D.C., retrieved Aug 2, 2019. This is the legacy of receivership as a remedy in child welfare litigation.

Finally, Plaintiffs fail to explain why receivership would be more effective in Mississippi than it was in D.C. Nor, do Plaintiffs identify any action that a receiver would take to quickly and efficiently comply with every aspect of the 2nd MSA.

### 7. *Appointment Of A Receiver Is Not Warranted Factually, Would Derail MDCPS's Accomplishments And Improvements, And Impede Compliance With The 2nd MSA.*

As outlined above, the appointment of receiver is not warranted under the applicable law and is not supported by the facts of this case. The *LaShawn* case, heralded by Plaintiffs as having all of the "core elements" of the present case, is a perfect example of what this Court has noted previously, "the installation of a receiver could exacerbate the present situation and create a new set of problems." May 17, 2011 Order, p. 8, fn. 3, ECF No. 557.

The imposition of a receivership for six years in *LaShawn* accomplished very little and the case is still being monitored 24 years after a full receivership was implemented. As the District of Columbia's Child and Family Services Agency came out of receivership in 2001, it was not in as good a position as the current state of MDCPS. MDCPS has already instituted changes beyond those noted by the *LaShawn* Monitor's congressional testimony and by the requirements of the court's Order terminating the receivership. While Plaintiffs insist MDCPS should be found in contempt and that a receiver should be appointed because this case has all of the "core elements" of *LaShawn*, closer scrutiny reveals the contrary. While improvements were noted during the course of the receivership in *LaShawn*, the District of Columbia's child welfare system was so "dismal" and so "radically out of compliance" that any improvement was noticeable in that specific, factual scenario. The noticed improvements during the receivership still brought the District of Columbia's child welfare system only to a level that was still below

where MDCPS is currently. A finding of contempt and appointment of a receiver in this case is not supported by a reliance on *LaShawn*.

### C. MDCPS Has Made Significant Progress Since Entry of the 2nd MSA And This Progress Is Continuing In Many Key Outcome Determinative Areas.

Plaintiffs attempt to maneuver away from the relevant law related to both contempt and receivership by making broad, conclusory allegations which are factually inaccurate. Despite Plaintiffs' efforts to paint a dim picture of MDCPS and the current state of child welfare in Mississippi, the current leadership of MDCPS is strong, MDCPS continues to make great efforts towards compliance with the 2nd MSA, and MDCPS is continuing to improve the delivery of child welfare services.

### 1. MDCPS's Current Leadership Is Sound, Talented And Committed to Compliance With The 2nd MSA

Plaintiffs make two completely inaccurate factual claims about MDCPS's current administration, neither of which is supported by the facts: (i) "MDCPS' entire management structure has collapsed, and the promising management team assembled under Commissioner Chandler has dissolved;" (Pls.' Am. Mem. Br. at 7, ECF No. 850) and (ii) the change in leadership at MDCPS in September 2017 "ushered in an era of hostility towards the settlement agreement, punctuated by an unwillingness and inability to comply." *Id.* at 1. These unsubstantiated, derogatory claims are clearly meant to divert attention away from the legal issues which are the basis for their current motion.

### a. MDCPS's Current Management Team

For most of the previous administration, MDCPS had four Deputy Commissioners: Tracy Malone, the Deputy Commissioner of Child Welfare; Kristi Plotner, the Deputy Commissioner of Administration; Takesha Darby, the Deputy Commissioner of Finance; and Cindy Greer, the Deputy Commissioner of Information Technology and CQI. Dickinson Aff. ¶27.

28

While it is true MDCPS now is led by a largely different executive leadership team, Plaintiffs' insinuation that the current leadership team is somehow less qualified than their predecessors is refuted by even a cursory review of the current leadership's qualifications. Titles have changed, as have responsibilities, since September 2017. However, all of the same responsibilities are being held by qualified individuals – namely, Kris Jones, Tonya Rogillio, and Dr. Jaworski Davenport.

Kris Jones replaced Kristi Plotner as Deputy Commissioner of Administration, a position she still occupies today. Affidavit of Kris Jones, ¶6, attached as Ex. AC to Defs.' Resp. ("Jones Aff."). As Deputy Commissioner of Administration, Ms. Jones assumed responsibility for most of Ms. Plotner's responsibilities, including human resources, finance, contracting, procurement, sub-grants, professional development, centralized intake, and information technology. *Id.* at ¶7. Before assuming her current position, Ms. Jones served as Director of Human Resources for MDCPS during the Chandler administration. *Id.* at ¶8. She is a certified public manager, a graduate of the John C. Stennis Institute of Government, and she possesses a Bachelor of Science in Education and a Master of Social Work. *Id.* at ¶9. Ms. Jones has worked in state government for more than 20 years, most of that time with the Mississippi Department of Mental Health ("DMH"). *Id.* at ¶10. At DMH, Ms. Jones held a variety of positions, including Director of the Bureau of Contract Management; Director of the Bureau of Quality Management, Operations, and Standards; Interim Director of the Bureau of Intellectual and Developmental Disabilities; Director of the Division of Disaster Preparedness, and Coordinator of Community Support Programs within the Division of Children/Youth. *Id.*

In June of 2018, MDCPS reorganized its leadership structure. Responsibilities related to information technology were moved under Deputy Commissioner for Administration Kris Jones,

and the position of Deputy Commissioner for Child Safety was created. Dickinson Aff. ¶28.

Tonya Rogillio was named Deputy Commissioner of Child Welfare on July 1, 2018. Affidavit of Tonya Rogillio, ¶5, attached as Ex. AD to Defs.' Resp. ("Rogillio Aff."). In this role, she supervises the Agency's field staff, five Deputy Directors who manage the MDCPS East, West and South Divisions of the State of Mississippi, as well as fourteen Regional Directors, all case workers, adoption workers, licensure workers, and their area and regional supervisors. In addition, she also supervises the Deputy Directors of Permanency, Licensure, and Prevention Units. *Id.* at ¶6. Ms. Rogillio is a licensed social worker who has over twenty years of experience in child and family welfare. *Id.* at ¶7. She holds a Bachelor of Social Work degree and Master of Social Work. *Id.* She has served as a Family Preservation Specialist, Area Social Work Supervisor, Social Services Regional Director, and Bureau Director for Special Investigations MDHS and MDCPS. *Id.* at ¶8-9.

Dr. Jaworski Davenport was selected to fill the newly created position of Deputy Commissioner for Child Safety. Davenport Aff. ¶6. This position assumed responsibilities from both Ms. Malone and Ms. Greer. Dr. Davenport supervises three Office Directors who manage respectively the Continuous Quality Improvement Unit, Data and Federal Reporting Unit and Special Projects Unit. *Id.* at ¶7. Dr. Davenport is a licensed master's level social worker who holds both a master's degree in social work and a PhD with emphasis in social work. *Id.* at ¶9. He spent 16 years working in child welfare and has worked as a caseworker, child welfare data analyst, as well as lead for state, federal, and court monitor scheduled case record reviews. *Id.* at ¶10. Prior to the reorganization, he served as MDCPS's Deputy Director for Field Operations for Data Analysis under Ms. Malone. *Id.* at ¶8.

The current leadership team is just as qualified as those who preceded them – Ms. Jones,

Ms. Rogillio, and Dr. Davenport are all eminently qualified individuals to serve in their respective capacities. Despite the impeccable qualifications of the MDCPS leadership, Plaintiffs claim MDCPS's "entire management structure has collapsed". Turnover and change are inevitable in state government,[1] and MDCPS has been fortunate that such qualified individuals were in the past and today present, willing, and able to step into the leadership roles they now occupy.

Given the foregoing history, Plaintiffs' claims of management collapse and insinuation of the new administration's responsibility for that collapse clearly lack any merit. MDCPS transitioned from the leadership team including Ms. Plotner, Ms. Darby, Ms. Greer, and Ms. Malone to the leadership team that includes Ms. Jones, Ms. Rogillio, and Dr. Davenport.

Moreover, Plaintiffs' assertions that the Agency's performance has dropped off since the transition is refuted by a focused review of the relevant data. For instance, regarding caseload compliance – the deliverable of greatest focus in the Plaintiffs' motions and briefs – average performance has not declined after the leadership change as the Plaintiffs assert, though it has leveled off consistent with the level funding – and therefore level staffing – the Agency

---

[1] **Plotner:** On August 30, 2017, Ms. Plotner was informed by Commissioner Chandler that her job duties would change. Defs.' Ex. U: Plotner Dep. 25:1–3, 15–24. Ms. Plotner even chose to leave the Agency on October 31, 2017, because she felt "[i]t was not what I had originally signed on to do" and that "the new role that I was given would not allow me to do the things that I had aspired to do." *Id.* at 24:10 - 25:15.
**Greer:** Cindy Greer resigned from her position effective June 15, 2018. Defs.' Ex. V: Greer Dep. 10:20–21. She left MDCPS for "personal reasons and to pursue … other plans." *Id.* at 18:21–24. At that time, she had been with MDCPS for nine years, and she was experiencing "burnout [related to] fighting this lawsuit for that many years." *Id.* at 17:21 - 18:3.
**Malone:** Ms. Malone had served with MDCPS or its predecessor for 28 years and retired on June 30, 2018. Defs.' Ex. W: Malone Dep. 4:18, 33:18 - 34:4. Ms. Malone testified in her deposition that she did not leave MDCPS because the management structure "collapsed" or even because she was "discouraged about the direction in which the agency was headed." *Id.* at 34:18–25. In addition, she testified that she did not "leave the agency because of Commissioner Dickinson." *Id.* at 35:13 - 36:12. Further she denied that her departure was a result of concerns about the "morale at the agency." *Id.* at 39:18 - 40:9. Instead, Ms. Malone testified that she decided to retire because it was best for her and her family both professionally and financially after passing an important milestone for purposes of her state retirement. *Id.* at 40:18 - 41:4.

experienced during latter half of SFY-2018 and all SFY-2019.

Similarly, maltreatment in care – another metric at the core of Plaintiffs' argument – remained virtually unchanged: 1.14% in SFY-2017 and 1.15% in SFY-2018. Rogillio Aff. ¶15. Likewise, with adoptions, not only was there no drop off, but performance in SFY-2018 (647 adoptions) and SFY-2019 (657 adoptions) exceeded performance in SFY-2017 (302 adoptions). *Id.* at ¶13. These are but a few examples, but they are instructive. The Plaintiffs have not provided reliable evidence to support their contention that MDCPS has suffered a lapse in performance due to the transition from the Chandler administration to the Dickinson administration.

Instead, faced with a $52 million deficit, the current administration has maintained and furthered previous improvements while having to make immediate cuts to spending to avert a financial crisis and has worked with level funding for 19 of the first 22 months of the administration, including the entire period under review in the 2018 Monitor's Report.

Despite Plaintiffs' attempts to show otherwise, the current administration has presided over the greatest decrease in the history of Mississippi's foster care population, the implementation of a highly successful prevention program, and the greatest annual increase in adoptions in Mississippi's history. Dickinson Aff. ¶29. The ability to maintain and continue improvement while wresting with a financial crisis and level funding shows they are the leadership that can bring about consistent improvement, particularly now that MDCPS has experienced the first increase in funding since the appropriation for SFY-2017 back in May of 2016.

**b. MDCPS's Management Is Not Unwilling To Comply Or Hostile To The 2nd MSA.**

Plaintiffs go one step farther, however, beyond their unsupported allegations that the

current administration is somehow inferior in qualification and ability to the prior one. Plaintiffs also allege this administration has an "unwillingness" to comply with and a "hostility" towards the 2nd MSA.

During his deposition, Commissioner Dickinson testified that knowing what he knows, he would not have agreed to sign the 2nd MSA. Defs.' Ex. X: Dep. of Jess Dickinson 143:17-24. Plaintiffs suggest that this statement establishes that Commissioner Dickinson is unwilling to comply with the 2nd MSA. Pls.' Am. Mem. Br. at 7. They also suggest that MDCPS's decision to limit hiring in the face of a $52 million financial deficit also shows this intent. Pls.' Am. Mem. Br. at 7-8. The deposition testimony does not support this assertion.

Commissioner Dickinson was not a part of the negotiation of the 2nd MSA. Dickinson Dep. 140:8-10. During his deposition, Commissioner Dickinson was asked whether, retrospectively, he would have agreed to sign the 2nd MSA. *Id.* at 140:11-19. His answer was not the wholesale disregard for the agreement Plaintiffs infer. Instead, Commissioner Dickinson voiced his concerns with a particular provision of the Agreement. Specifically, Commissioner Dickinson testified that he disagreed with the inclusion of hard caseload caps in the agreement because he believes such caps are harmful to the children and families served by a child welfare agency. *Id.* at 140:21 – 143:16. He explained that the appropriate way to consider caseload would be "a standard that takes into account the factors that affect the handling of children's cases and the outcomes for those children." *Id.* at 142:12-15.

Commissioner Dickinson's testimony also does not demonstrate animus towards the 2nd MSA as a whole, or unwillingness to comply with its requirements. Instead, it shows reasoned disagreement with one particular provision. Commissioner Dickinson is not alone in holding this view. On October 18, 2018, the Fifth Circuit Court of Appeals in a landmark decision *M.D. by*

33

*Stukenberg v. Abbott*, 907 F.3d 237 (5th Cir. 2018) articulated precisely the same view about hard caseload caps and held that:

1. Fixed caseload caps are "too blunt a remedy for a complex problem and constitute relief beyond what [is] minimally required to remedy the constitutional violation."

2. "[A] hard cap on caseloads would completely hamstring DFPS's [the Texas foster care agency] ability to approach caseload distribution in a holistic, nuanced way.

3. Hard case load caps would "undoubtedly be destabilizing for all of the parties involved, including the children in DFPS's care."

4. "Mandatory caps are not only an extreme remedy, they are imprecise." *Id.* at 274.

The Fifth Circuit then held that the Texas foster care agency should "establish generally applicable, internal caseload standards [that would serve] as a rough guide for supervisors who are handling caseload distribution, and they [these guidelines] should inform DFPS's hiring goals." *Id.* This is precisely the view Commissioner Dickinson expressed in his deposition. In other words, not only does Commissioner Dickinson's testimony fail to show any animus towards the 2nd MSA as Plaintiffs suggest, it also has been held to be the correct view by the Fifth Circuit.

Furthermore, Commissioner Dickinson also testified that "I never made any decision we're not going to comply with the court order." Dickinson Dep. 59:23-25. This testimony was echoed by Commissioner Dickinson's Chief of Staff: "Until we are relieved of that caseload obligation, we are seeking sufficient funding to comply with it." Defs.' Ex. T: Dep. of Cheeseman 48:8-10. There is no evidence that the current MDCPS administration is unwilling to comply with the 2nd MSA. Instead, it is clear the Agency has complied to the best of its ability while navigating the financial challenges and limitations.

2.    *MDCPS's Efforts To Comply With Court Order and the 2nd MSA*

There have been failures to comply with the agreements and consent decrees over the history of the *Olivia Y* litigation. But, the 2018 Court Monitor's report is not accurately viewed as more of the same as the Plaintiffs suggest. Rather, the evidence clearly shows MDCPS has made significant progress and has plans and resources in place that will continue that improvement going forward.

Throughout their brief, Plaintiffs repeatedly cite the Court Monitor's findings without requisite context, and ignore the improvements being made to address and correct deficiencies identified in the annual report. More specifically, Plaintiffs highlight five areas in which they allege the "failure to comply with the 2nd MSA adversely impacts children." Pls.' Am. Mem. Br. at 22. These areas include: 1) Child Safety & Child Well-Being (Child Maltreatment in Care and Child Well-Being); 2) Data and Management Information Services; 3) Caseload Standards; 4) Placement Standards; and 5) Child and Youth Permanency. Within each of these areas, Plaintiffs discuss several provisions of the 2nd MSA.

a.  **Child Safety & Child Well-Being**

The first set of provisions from the 2nd MSA on which Plaintiffs focus are further divided into two categories:  Child Maltreatment in Care and Child Well-Being.  However, within each of these, Plaintiffs more specifically discuss rate of maltreatment in care, screening decisions, investigation of maltreatment in care, and initial medical screenings & comprehensive medical examinations.

*Rate of Maltreatment in Care*

The rate of maltreatment in care ("MIC") represents the percentage of children who are substantiated to be victims of child maltreatment while in foster care during a certain period. 2018 Monitor's Report at 47.  Section 2.9 of the 2nd MSA requires that the annual MIC rate not

exceed 0.33%. *Id.*

In 2018, MDCPS reported that 1.15% or 95 of the 8287 children in custody during the year were substantiated victims of MIC. *Id.* This raw statistic must be placed in context. First, MDCPS successfully protected 98.85% (8192) of 8,287 children from MIC. In *Connor ex rel. Vigurs v. Patrick*, 774 F.3d 45, 52 (2d Cir. 2014), a similar class-action lawsuit regarding the constitutional rights of children in foster care, the United States Court of Appeals for the Second Circuit cited positively that "DCF has consistently and successfully protected about 99% of children in its care from maltreatment" even "[t]hough DCF lags behind other states and national metrics in … the number of children who suffer from maltreatment in foster care." While any episode of maltreatment in care is more than MDCPS would like to see, the Agency has successfully protected a high percentage of the children entrusted to its care from MIC, and the performance Plaintiffs color as a critical failure, the Second Circuit has cited as success.

Second, the primary mechanism at a child welfare agency's disposal for preventing MIC is appropriate licensure standards for the placements – foster homes and facilities – that care for children in the agency's custody, and to apply those standards consistently to each placement licensed. Here, the Monitor has reported that pursuant to Section 3.1 of the 2nd MSA, all facilities and foster homes licensed by MDCPS during 2018 were appropriately licensed under the MDCPS licensure standards approved by the Monitor. 2018 Monitor's Report at 49.

Beyond appropriate application of licensing standards, another preventative measure for MIC is face-to-face contact with foster children and foster parents. By laying eyes on the child and interacting with the foster parents, a caseworker may be able to identify warning signs that challenges exist in the placement. In 2018, MDCPS caseworkers were required to make face-to-face contact twice per month for 75% of all children in custody. *Id.* at 60. Every month in 2018,

MDCPS caseworkers saw between 85% and 92% of all children in custody twice during the month. *Id.* at 61. Likewise, MDCPS was required to have one monthly visit with 75% of foster parents. *Id.* at 63. While not reaching full compliance, each month MDCPS made these visits with between 68% and 75% of foster parents each month in 2018.[2] *Id.*

MDCPS has appropriately licensed its placements, made more than the required visits with foster children, and made most of the required visits with foster parents. These are the actions with the greatest impact on the likelihood of MIC. Finally, it should be noted that the 95 unique children who were substantiated victims of maltreatment in care related to 53 separate incidents, and 13 of these children were based on a single investigation of an emergency shelter that resulted in the shelter director's termination. Rogillio Aff. ¶15. That one incident by itself accounted for half (0.016%) of the entire 0.33%.

The Plaintiffs also assert that the rate of MIC in 2018 was "undoubtedly" tied to deliverables related to screening and investigating reports of MIC, and to reviewing those screening decisions and investigation results. Pls. Am. Mem. Br. at 23. Screening and investigating reports of MIC are reactive measures. They are primarily focused on responding to MIC that already has occurred, not preventing it from occurring in the first place. As discussed, licensing standards and face-to-face contacts with foster children and foster parents are the primary mechanism for preventing MIC. It is not "undoubtedly" true that errors in screening or investigating, or reviewing the results, contributed to the MIC rate.

### Screening Decisions

Section 2.1 of the 2nd MSA requires MDCPS to maintain "a statewide system to

---

[2] In its 2018 annual report, the Monitor reported lower performance than did MDCPS. 2018 Monitor's Report at 63. The reason for this discrepancy was that MDCPS calculated performance based on visits with foster parents by either a MDCPS frontline caseworker or a MDCPS licensure worker. The data provided to the Monitor, however, included only visits by frontline caseworkers. Nothing in the 2nd MSA prohibits counting the visits by licensure workers.

appropriately receive, screen and investigate reports of child maltreatment." It has done so. All reports of child maltreatment are received by Mississippi Centralized Intake ("MCI"). 2018 Monitor's Report at 38. MCI is a 24-hour hotline, operated by a contractor for receiving reports of child maltreatment from all of Mississippi. Rogillio Aff. ¶17. MCI receives thousands of reports of child abuse and neglect each year. In 2018, 36,568 reports were received. *Id.* at ¶18.

For every call MCI receives, a standardized set of questions is asked of the caller. *Id.* at ¶19. The answers to those questions result in the report being assigned a particular level of response. *Id.* If the report relates to a child not in custody, the report is then sent to the MDCPS office in the county from which the report originates. *Id.* A supervisor in the county office then provides a second level of review for the report, applying the same criteria, and makes the final determination about whether the report will be assigned for investigation or screened out. *Id.*[3]

If the report relates to a child in MDCPS custody, however, the same process applies, except that the report is referred to the Special Investigations Unit ("SIU"), not the county office. *Id.* There it is reviewed initially by one of two SIU Bureau Directors who makes the determination of whether the report should be assigned for investigation or screened out. *Id.* If a Bureau Director determines that the report should be screened out, the evaluation is transferred to the Director of the Continuous Quality Improvement for a third level of review. *Id.* If the Director also determines that the report should be screened out, the report is transferred to the Safety Review Unit for a fourth level review of the screen out decision. *Id.* Similarly, if a MIC report is screened in and assigned for investigation, the investigation must be reviewed by both the SIU Bureau Director and the Safety Review Unit. *Id.*

Plaintiffs focus on the fact that the Monitor found that "many features of the system lack

---

[3] Every report that is forwarded for investigation is assigned to a caseworker even if the child is not in custody which can significantly impact worker caseloads. Rogillio Aff. ¶19.

adequate quality control." Pls.' Am. Mem. Br. at 23; 2018 Monitor's Report at 5. To support this finding, the Monitor noted that only 409 of 656 screened out MIC reports and 325 of 493 SIU investigations received SRU reviews. 2018 Monitor's Report at 40, 44. These statistics do not tell the whole story.

Early in 2018, SRU was using an online instrument, which existed outside the MDCPS database, to conduct its screen-out reviews. Davenport Aff. ¶24. Unfortunately, the data was lost. *Id.* When this issue was discovered, MDCPS worked with the vendor to try to recover the data, but the vendor was unable to do so. *Id.* This lost data accounts for most, if not all, of the screen out reviews that could not be documented in 2018. *Id.* MDCPS also discovered an error in the coding of a report that identified SIU investigations for SRU review. *Id.* This error has been remedied. *Id.*

MDCPS does not agree with the Monitor's assessment that this represents a lack of quality controls. MCI screen outs receive four levels of quality control review. MIC investigations receive two levels of quality control review. Errors are present in any system operated by people. But the system includes multiple layers of quality control and is sound.[4]

### *Investigation of Maltreatment in Care*

Plaintiffs raise concerns about the results of some MDCPS MIC investigations. The sole responsibility of MDCPS's Special Investigations Unit is to investigate reports of MIC and child fatalities. The unit's investigators are specially trained in investigation practices and carry the lowest caseloads in the Agency, allowing for maximum attention to every investigation. In 2018, MCI referred 527 reports of alleged maltreatment in care to this unit. 2018 Monitor's Report at

---

[4] In an effort to eliminate some of the human error when report are received and calls are coded for review, MDCPS has had procurement underway to shift MCI from being totally contracted out to a private vendor to an arrangement in which MDCPS directly manages contract call-answering staff. Dickinson Aff. ¶37. This arrangement will give MDCPS more direct control in preventing human error at the Hotline. *Id.* MDCPS will take over operation of MCI on September 14, 2019. Rogillio Aff. ¶17.

40. Nearly every investigation was initiated (97.3%) and completed (98.3%) timely. 2018 Monitor's Report at 40–41. But, in the Monitor's review of 82 investigations conducted in the first quarter of 2018, the Monitor concluded that the evidence supported MDCPS's findings in 70.7% of the investigations. 2018 Monitor's Report at 45.

The findings took two forms. In 17.1% of investigations, the Monitor did not find that MDCPS's findings were incorrect, but instead found that more evidence was needed to reach a conclusion. 2018 Monitor's Report at 45. Only in the other 12.2%, 10 investigations, did the Monitor conclude that the report should not have been unsubstantiated. 2018 Monitor's Report at 45. However, in some instances, MDCPS does not believe the Monitor's conclusions were correct.

First, a general explanation is required about the source of MDCPS's disagreement with the Monitor's findings. In MDCPS's view, the Monitor's findings incorrectly apply Mississippi law and fail to recognize the distinction between child maltreatment and MDCPS foster-home policy violations.

MDCPS only substantiates maltreatment in care when a foster parent or congregate care facility staff member commits an act that is child abuse or neglect under Mississippi's Youth Court Act. Rogillio Aff. ¶21. MDCPS foster-home licensure policy prohibits some acts beyond what Mississippi law considers child abuse or neglect. *Id.* at ¶22. In other words, MDCPS holds its foster parents to a higher standard than the law holds biological parents. One of the main differences deals with corporal punishment. MDCPS licensure policy prohibits corporal punishment of foster children. *Id.* But corporal punishment is not considered child abuse under Mississippi law unless non-accidental injury occurs. "Physical discipline, including spanking, performed on a child by a parent, guardian, or custodian in a reasonable manner shall not be

deemed abuse." Miss. Code Ann. § 43-21-105(m). Some of the Monitor's findings ignore this distinction. Because of this distinction, it must be understood that even where MDCPS did not substantiate child abuse or neglect by the foster parent, action still may be taken to remove the child or put a corrective action plan in place when a licensure violation has been found. Rogillio Aff. ¶23.

### Initial Medical Screenings & Comprehensive Medical Examination

Section 8.1.a. of the 2nd MSA requires all children to have an initial medical examination within 7 days of the child entering custody. In 2018, the performance standard for this deliverable was 70%. 2018 Monitor's Report at 78. MACWIS data showed that 59.2% of children received these visits. *Id.* The Monitor's review of 71 children's records found that 100% of the children had sufficient documentation of the required visit. *Id.* at 79.

Section 8.1.b of the 2nd MSA requires that all children coming into custody have a comprehensive medical exam, which includes a mental health examination, within 60 days of entering custody. During 2018, the performance standard for this deliverable was 70% of children. *Id.* MACWIS data shows that 69.5% of children had these examinations in 2018, meaning MDCPS missed the deliverable 0.5%. *Id.* And MDCPS's manual reviews of this deliverable have shown that the quantitative data from MACWIS actually underreports performance due to inconsistent documentation by MDCPS caseworkers. Rogillio Aff. ¶24.

Plaintiffs state that "only 51% of children are receiving a timely comprehensive medical examination." Pls.' Am. Mem. Br. at 26. This is not true. The statistic comes from the Monitor's qualitative review of only 100 cases. The monitor concluded that only 51% of these cases had sufficient documentation to confirm that a full comprehensive examination occurred. 2018 Monitor's Report at 79.

Furthermore, because MDCPS knows its performance on this provision is underreported due to documentation issues, it has worked to close the documentation gap. Rogillio Aff. ¶25. One identified source of the problem was that when a foster parent takes a child for a doctor's visit, they do not always communicate that back to the caseworker. *Id.* To address this cause, MDCPS created an online survey for foster parents that allows them to electronically report medical visits for children in MDCPS custody back to MDCPS. *Id.*

MDCPS also has worked extensively with the Mississippi Division of Medicaid to directly access information on medical services for children in custody from their claims data. *Id.* Finally, MDCPS's nursing unit has implemented a new manual tracking system for timely visits based on the health department's periodicity schedule. *Id.*

### b. Data and Management Information Services

When the parties negotiated the 2nd MSA, it was understood that MDCPS's data reporting capacity was limited given the age and capabilities of its MACWIS database system. For this reason, the 2nd MSA included several requirements designed to improve MDCPS's data reporting capacity over time. The first and foremost of these requirements was that MDCPS would eventually replace its MACWIS system with a new CCWIS system by June 30, 2021. 2nd MSA at § 1.5.b. Another was that MDCPS would develop an annual continuous quality improvement plan – the first due under the 2nd MSA to the Monitor by December 1, 2018 – that would be implemented to develop qualitative data about MDCPS's practice and performance. *Id.* at § 1.4.a. These provisions were responsive to known data quality and reporting challenges and were not expected to be in place under the 2nd MSA during 2018, the period reviewed by this Monitor's report.

Plaintiffs have now attacked these limitations in MDCPS's ability to report performance for 2018 even though the parties mutually acknowledged inadequacies in the MACWIS system

and the full commitment was not due in 2018. Plaintiffs ignore these facts and engage in gamesmanship, while MDCPS remains on track to fix these issues consistent with the 2nd MSA.

Section 1.5.b of the 2nd MSA requires that "MDCPS shall have a Comprehensive Child Welfare Information System (CCWIS) appropriate to its size and complexity that shall meet federal requirements by June 30, 2021." CCWIS is partially funded with 50% federal financial participation rate for the development of modern child welfare data systems meeting certain specifications identified by the federal government. Jones Aff. ¶14. Every CCWIS project must be conducted pursuant to a federally approved advanced planning document (APD). *Id.* The APD sets forth the project plan, system design, and anticipated costs. *Id.*

MDCPS submitted its CCWIS APD to the federal government on February 1, 2017. *Id.* at ¶15. The federal government responded with several requests for additional information and, after receiving that information, approved MDCPS's CCWIS APD on July 7, 2017 for project work through June 30, 2018. *Id.* Under this APD, MDCPS planned to internally build a completely custom-designed CCWIS system, requiring significant investment in programmers and other contract resources. *Id.* This project, initially projected to cost more than $60 million, was to proceed as an iterative process, wherein individual modules – e.g., intake or case management – were completed and rolled out in a tiered process that would proceed up until the 2021 deadline. *Id.*

Once the APD had been submitted, MDCPS began building its capacity, and incurring costs, for the project. *Id.* at ¶16. Programmers and business systems analysts were added to the MDCPS IT staff. *Id.* Contract resources were procured for system design, project management, and programming. *Id.* Procurement also proceeded for the vendors that would begin building the core CCWIS modules in 2018. *Id.*

43

Then, MDCPS experienced the SFY-2018 budget crisis. When the Agency determined that it faced an approximately $52 million deficit in January 2018, full implementation of the CCWIS project was delayed and paused because funds were no longer available to cover the cost of the work. *Id.* at ¶17. However, state staff were able to continue planning for the project's future in anticipation of additional funding to continue the project. *Id.* Because MDCPS received level funding for SFY-2019, CCWIS development work remained on hold. *Id.* at ¶18.

While development work remained on hold during SFY-2019, MDCPS reevaluated its project plan and direction and determined that the most reasonable project direction in terms of cost and risk, and most likely scenario for meeting the litigation deadline, would come from a customizable and configurable system – i.e., development will begin with an already developed and functional case management data system, possibly one specifically designed to meet CCWIS specifications, that is configured to match MDCPS's practice. *Id.* MDCPS's prior project direction increased cost, time, and risk. *Id.* at ¶19. Under the new project plan, the CCWIS development is expected to cost approximately $40 million, two-thirds the cost of the original plan. *Id.*

In response to the SFY-2020 appropriation, MDCPS immediately began the work necessary to get the CCWIS project back on track. *Id.* at ¶20. Specifically, MDCPS has submitted a draft request for proposal to Mississippi's Department of Information Technology Services for review, feedback, and approval. *Id.* This RFP is designed to procure the vendor and system that is the main component of the project. *Id.* MDCPS also has submitted a new APD to the federal government for review and approval. *Id.* at ¶21. MDCPS expects to begin development by the beginning of calendar year 2020, and to meet the litigation deadline of June

30, 2021. *Id.* When the CCWIS system is implemented, many of MDCPS's data reporting issues will be resolved. *Id.*

Likewise, late in 2018, MDCPS submitted its first CQI plan under the 2nd MSA to the Monitor for review. Davenport Aff. ¶19. That plan was reviewed by Plaintiffs and the Monitor, subsequently approved by the Monitor, and implemented by MDCPS in 2019 as contemplated by Section 1.4 of the 2nd MSA. *Id.* The CQI plan uses case reviews conducted by MDCPS CQI staff and other units to determine MDCPS's performance on measures that cannot be reported quantitatively by MACWIS. *Id.* at ¶20. Because the current CQI plan was not approved by the Monitor until April 2019, MDCPS did not report performance for 2018 to the Monitor, for the following Sections as they were included in the CQI plan: 4.2, 4.3, 4.7, 4.10, 5.1.a, 5.1.d, 5.2.a, 5.2.b, 5.2.b.1, 5.2.b.2-4, 5.2.b.3, 5.2.b.4.a-c, 6.1.a, 6.1.c., 6.1.d, 6.2.a, 5.1.c, 6.3.a.1, 6.3.a.2, 6.3.a.3, 6.3.a.4, 6.3.a.6[5], 6.2.b.1, 6.3.b.2, 6.3.b.3, 6.3.d.1, 6.3.d.2, 6.3.e, 6.4.a, 6.4.b, 7.1, 7.2, 7.2, 7.8, 7.8.a, 7.8.b, 7.8.c, 7.8.d, 7.8.e, 7.8.f, 7.8.g, 7.8.h, 7.8.i, 7.8.j, 7.8.k, 8.1.d, 8.1.f, 8.1.g., 8.2.a, 8.2.b, and 8.2.c. MDCPS will report on each of these sections for 2019 and in future years based on the CQI Plan. *Id.*

Finally, some of MDCPS data reporting challenges, and the Monitor's inability to validate certain reports, stemmed from errors the coding used to set up MDCPS's 2nd MSA reporting. Jones Aff. ¶23. The staff who originally coded these reports are no longer employed by MDCPS. *Id.* New data reporting staff has been added, including the former head of data reporting for another state agency in Mississippi. *Id.* The new staff, together with Deputy Commissioner Davenport, have been conducting an intensive analysis, which is ongoing, of the coding and business rules behind each *Olivia Y* report. *Id.* at ¶24. Once their initial analysis was

---

[5] 6.3.a.6 was inadvertently left out of the CQI plan. A proposal was submitted to the monitors on July 18, 2019 with a plan to review and report on that provision. MDCPS is awaiting approval.

completed, initial findings were reported and a meeting was held between MDCPS and the Monitor to discuss the business rules the Monitor will use to validate each report. *Id.* In follow up to that meeting, the MDCPS data reporting team has begun the long work of rewriting each report to ensure that the data generated matches the relevant 2nd MSA deliverable and the Monitor's business rules for data validation. *Id.* This process is expected to last until the end of 2019, but once completed, all data validation issues identified by the Monitor should be rectified. *Id.*

### *Perpetrator & Placement Data*

Aside from the data issues discussed above, Plaintiffs make untrue representations about MDCPS's ability to document and identify data regarding perpetrators of maltreatment and child placements. According to Plaintiffs, "The Period 6 Report identified many maltreatment reports that incorrectly identify the perpetrator relationship and the incident date. Without accurate information about the identity of the abuser or the date of abuse, MDCPS cannot possibly determine if the maltreatment occurred in the child's current placement, which may result in a child being left in a home where they are being abused or neglected." Pls.' Am. Mem. Br. at 27.

The perpetrator and incident date issues stem largely from the quality of information the Hotline receives. Rogillio Aff. ¶26. If a caller makes a report to the Hotline and says that they think the child is in foster care, MCI will record the report that way. *Id.* But sometimes a reporter's information is inaccurate, leading to a report being labeled MIC when it is not. *Id.* Overwhelmingly, these errors go in favor of calling a report MIC when it is not. *Id.*

This does not impede MDCPS's ability to identify the perpetrator. *Id.* at ¶27. The issue here is merely with the report, not the investigation. *Id.* The correct perpetrator is identified during the investigation, and the case proceeds from there. *Id.* Moreover, a manual data

validation process is designed to correct the errors as they are identified. *Id.*

Similarly, Plaintiffs claim that "when the MACWIS system does not have the capacity for caseworkers to correctly identify placement IDs, Mississippi's primary information system is incapable of identifying the specific home in which a child is placed, and the members of that household. As a result, it is not possible to track and evaluate the appropriateness of the placement or whether caseworkers are visiting with foster parents." Pls.' Am. Mem. Br. at 27. This is sheer fabrication.

MACWIS has the capacity to correctly document placement IDs. Rogillio Aff. ¶28. MDCPS uses foster homes it licenses as well as those licensed by private agencies. *Id.* For an MDCPS-licensed home, the system assigns a single resource ID. *Id.* But for a provider-licensed home, there are actually two placement IDs:    the provider's (umbrella) and the home's (subordinate).    *Id.*    The system requires that the provider's placement ID be entered, but also allows caseworkers to document the home's ID as well. *Id.* Sometimes, caseworkers fail to complete the second step.    *Id.*

When they do, it does not affect a worker's access to information about a child or her placement as Plaintiffs alleged.    *Id.* at ¶29. Any caseworker or supervisor can look at a child's record in MACWIS and find the pertinent information. *Id.* A caseworker's failure to enter the second ID does impact aggregate reporting: i.e. reports run from MACWIS can identify the placement only by the provider ID but, again, this does not prevent MDCPS from determining exactly where a child is placed. *Id.* MDCPS anticipates that the new CCWIS system will eliminate the need to enter two IDs.    *Id.*

### *Independent Living Requirements*

MDCPS makes the required transitional services available to all youth ages fourteen and

older. *Id.* at ¶30. During 2018, MDCPS did experience challenges in providing the documentation to establish that this occurs. To close this gap, and improve youth involvement in transitional plan development, MDCPS launched a new youth appraisal tool in May 2019. *Id.* The youth appraisal is completed by the caseworker and youth during a family team meeting. *Id.* at ¶31. The results of the appraisal guide the development of the youth's transitional plan. *Id.* This one intervention will both improve documentation of the services offered to youth and improve performance in youth involvement in case planning. *Id.* at ¶32. Even then, however, it will always be the case that some youth will choose not to participate in the services offered. *Id.* at ¶33.

### c. Caseload Standards

Plaintiffs' place great emphasis in support of both the civil contempt and receiver arguments on the commitment that 90% of MDCPS caseworkers must meet the fixed caseload cap. The 90% caseload cap has two fixed caps. Davenport Aff. ¶12. The first is a mathematical 1.0 time-based cap under a weighted value matrix that takes into consideration 10 different service types/functions. *Id.* The weights were based on a 2005 study which has not been updated to reflect changed conditions and more current best practices in child welfare. *Id.* The second is a caseload compliance cap. *Id.* Under this second cap, 90% of all MDCPS caseworkers, adoption workers, and licensure workers were to meet the 1.0 weighted value standard by December 31, 2017. *Id.* Caseload performance under the weighted value system is reported in the Mississippi Performance On Caseload Standards report. *Id.* at ¶13. The report reflects as a "Met" category the percent of "Overall", and three sub-groups "Frontline" (i.e. traditional caseworkers), "Adoption and Licensure" and SIU (Special Investigation Unit) workers that are less than or equal to the 1.0 weighted value standard. *Id.* These workers are often described collectively as frontline workers. *Id.* The report also sets forth a percentage compliance for the same groups

(Overall, Front Line and Adoption and Licensure workers) for a "Close" category, which is defined as workers with a weighted value greater than 1.0 but less than or equal to 1.2, and an "Over" category for workers greater than 1.2. *Id.* The Close category is significant because the addition of even a single one of the 10 service types will move a worker with a 1.0 value or less from the Met category to a non-compliance category. *Id.* The Met and Close combined data is a more realistic and reasonable measure of case worker caseloads in Mississippi. *Id.*

Plaintiffs' reliance on the fixed caseload cap as a foundation for contempt and a receivership is misplaced. The Fifth Circuit has held that "a hard cap on caseloads would completely hamstring DFPS's [the Texas foster care agency] ability to approach caseload distribution in a holistic, nuanced way" and that they would "undoubtedly be destabilizing for all of the parties involved, including the children in DFPS's care." *Abbott*, 907 F.2d at 274. Hard caps on caseloads represent a bad child welfare management practice, and, therefore, MDCPS's pending Rule 60 motion for relief from that requirement in the 2nd MSA should be granted.

That said, caseload caps and performance must be reviewed in context. Public Catalyst established a baseline regarding caseload using data from September 30, 2016 for the weighted value system: Overall 31% of MDCPS frontline caseworkers carried caseloads within the 1.0 Met standard; another 12% were in the Close category of greater than 1.0 to 1.2; the combined Met/Close percentage was 43%; and the percent above 1.2 or Over was 57%. Davenport Aff. ¶15.

On September 15, 2017, only two days before Commissioner Dickinson assumed his duties on September 17, 2017, with only 3 months and 12 days until the December 31, 2017 deadline, the Met percentage was 50%, Close was 14%, the Met/Close percentage was 64%, and the Over percentage was 36%. *Id.* at ¶16. The caseload report for July 31, 2019 reflects that the

49

Met percentage is 55%, the Close percentage is 22%; Met/Close is 77%, and Over is 23%. *Id.*



Using the September 2016 baseline, and the most current caseload data, this information establishes the following relevant facts related to caseloads:

1. The Met percentage has increased by 77% (31% to 55%).

2. The Close percentage has increased by 83% (12% to 22%).

3. The Met/Close percentage, which is a more accurate reflection of performance, has increased by 79% (43% to 77%).

4. The Over percentage has decreased by 60% (57% to 23%). *Id.* at ¶18.

Also in a concerted effort to improve caseloads, MDCPS has implemented numerous programs designed to improve caseloads by aggressively hiring caseworkers, providing enhanced training, increasing the pay of front-line workers, hiring additional field supervisors, and implementing caseload management and data driven decisions. Dickinson Aff. ¶36.[6] With

---

[6] It is also unquestionably true that many factors impact caseloads that are beyond the control of MDCPS including (1) the number of reports of potential MIC, (2) caseworker retention, (3) caseworker absence for Family Leave or illness, and (4) funding.

the additional $15.74 million in state funding for SFY-2020, the lifting of the hiring limitation, increased case worker hiring, and other programs designed to increase caseworker retention and improve caseloads, the Met, Close and Met/Close percentages will continue to improve and the Over will continue to decline. This does not support a finding of civil contempt or a receivership.

Plaintiffs' accusations that the Agency has not complied with the 90% fixed cap commitment or any other commitment for that matter because of some "animus" towards the agreement on Commissioner Dickinson's part is unfounded. As discussed above, MDCPS has continued its efforts to comply and will continue to do so until relieved of that obligation.

The Mississippi Legislature appropriated increased funding for MDCPS in SFY-2020: July 1, 2019–June 30, 2020. Defs.' Ex. Y: SFY-2020 Appropriation Bill. As a result, for the first time in 19 months, MDCPS was able on July 1, 2019, to return to growing its workforce. It has set aside sufficient funds from its budget increase to return to filling each MDCPS training class. If sufficient qualified individuals can be found, this is estimated to add an average of 18.5 additional caseload carrying staff per month.

### d. Placement Standards

Plaintiffs focus on three main areas within the broader context of placement standards: placing siblings together, congregate care placement, and multiple emergency placements.

#### *Placing Siblings Together*

Sections 4.6 and 4.16 of the 2nd MSA require, subject to certain exceptions, that sibling groups who enter custody at or near the same time be placed together in foster care. In 2018, MDCPS provided data with regard to this commitment from the MACWIS system. However, the Monitor could not validate the data. 2018 Monitor's Report at 57. In subsequent conversation between MDCPS and the Monitor, it was determined that an error in coding the report for sibling

group placement prevented accurate reporting on this provision. Rogillio Aff. ¶34. This is one of the provisions discussed above wherein MDCPS has undertaken to rewrite the coding behind several of its data reports after consulting with the Monitor about the appropriate business rules for those reports. Importantly, this is not an issue of knowing where children are placed. Any individual child's record in MACWIS will show their confirmed placement. *Id.* at ¶35. This is simply an issue in the way the report was coded, which will be corrected by the end of 2019. *Id.*

### *Congregate Care Placement for Children Under Ten*

Section 4.9 of the 2nd MSA provides that a child in care under the age of 10 may not be placed in a congregate care setting unless a documented, approved exception exists. During 2018, only 155 children under age 10 were placed in congregate care settings. 2018 Monitor's Report at 58. Of those, 82 children were placed in congregate care between January 1, 2018 and July 16, 2018. *Id.* A technical error in the MACWIS data system lost all of data related to whether those children had the required Regional Director approval of the permissible exception to the rule against congregate care placement. Rogillio Aff. ¶36. That technical error has been corrected in the system, but it left MDCPS unable to report on those exceptions for the first half of 2018. *Id.*

Between July 17, 2018 and December 31, 2018, 73 children under the age of ten were placed in congregate care. 2018 Monitor's Report at 58. Of those, 54 of the 73 (74%) had documented Regional Director approval of a permissible exception. *Id.* This means there were only 19 confirmed instances of a child under the age of ten being placed in congregate care without an approved exception out of 4,699 children under the age of ten in custody during 2018, or less than one-half of one percent (0.40%).

### Multiple Emergency Placements

Section 4.11 of the 2nd MSA imposes a commitment to ensure that no child is placed in more than one emergency or temporary facility within one episode of foster care unless an immediate placement is necessary to protect the safety of the child or others, and then only with the approval of the Regional Director. During 2018, only 52 out of 8,287 children served in foster care during the year experienced successive stays in emergency or temporary placements. 2018 Monitor's Report at 59. In other words, MDCPS successfully ensured that 99.4% of all children avoided such stays.

For the 52 children that experienced successive stays in emergency or temporary placements, there were 66 separate successive stays. *Id.* at 60. In 45 out of the 66 instances, Regional Directors' approval of a permitted exception was documented, meaning there were only 21 instances of successive stays without the required approval. *Id.* The Monitor, however, concluded that only 13 (28.9%) of the approved exceptions had sufficient support documentation to allow the Monitor to conclude that the Regional Director was correct to approve the exception. *Id.* In other words, the Monitor's report did not conclude that the Regional Director approvals were incorrect decisions, but only that sufficient documentation was not contained in the case record to confirm that they were correct. MDCPS has emphasized, and continues to reinforce, the importance of documentation with its staff.

**e.  Child and Youth Permanency**

Within the broader context of child and youth permanency, Plaintiffs focus on three main areas: family service plan development, timely administrative case reviews, and timely court hearings.

### Family Service Plan Development

Section 6.1 of the 2nd MSA sets forth several commitments relating to family service

plans and permanency planning. Within 45 days of a child entering custody, MDCPS must develop a family service plan in consultation with the child, parent, and foster care provider. MDCPS also must have an established permanency goal and activities to support the pursuit of that permanency outcome. 2018 Monitor's Report at 64. In 2018, 75% of the children entering care had to have a plan submitted within 30 days and approved by the supervisor within 15 days. *Id.* During the period, 74.5% of Plans were submitted to the supervisor timely, 95.3% were approved by the supervisors timely, and in total 86.7% percent of children with plans due had Plans that were timely submitted and approved within the 45-day period, more than the required 75%. *Id.* at 65.

But, using a random sample of 66 permanency plans – only 6.6% of the plans completed during the period – the Monitor assessed the qualitative requirements for the content of those plans. *Id.* This review concluded that only 42 of the 66 or 63.4% expressly documented the child's permanency goal. Again, this requires context. An initial service plan cannot be submitted in MACWIS without a permanency goal being selected because it is a required field in the system. Rogillio Aff. ¶37. Similarly, the Monitor found that only 9.09% documented a time frame for permanency. This, too, must be included for the system to accept an initial plan. *Id.* The system will allow a permanency plan to be closed, however, without a new one being established, meaning the plans in question must have had the required elements when they were submitted at the time the child entered custody, which is the requirement of Section 6.1. *Id.*

The Monitor also concluded that only 47% of the plans reviewed set forth activities that supported permanency. MDCPS CQI review data, however, shows that 71% and 73% of plans contained the required timeframes and activities in the first and second quarters of 2019, showing higher performance than the Monitor reported for 2018. *Id.* at ¶38.

54

Moreover, MDCPS has several ongoing efforts to improve practice in this area. The Practice Model Learning Cycle ("PMLC") is an intensive on-the-job coaching program that teaches MDCPS caseworkers the Mississippi Practice Model, a comprehensive practice guide for child welfare practice that is trauma-informed and family-centric. *Id.* at ¶39. Family engagement and involvement in case planning are core elements of the Practice Model. *Id.* Two-thirds of MDCPS's regions completed the PMLC in 2017 and 2018, and the remaining third will finish before the end of 2019. *Id.* at ¶40. From there, additional targeted PMLC education will be provided to target areas needing improvement. *Id.* at ¶41. This will improve family involvement in case planning, and the activities to support permanency developed from that involvement. *Id.*

Likewise, MDCPS has assessed the need for improved family needs assessment, a core practice necessary to develop appropriate FSP goals and activities. *Id.* at ¶42. To do so, an internal work group has embarked on a process of reviewing MDCPS's current assessment tools and those frequently used by other states to determine whether MDCPS could adopt a more effective tool. *Id.* If the group determines that a new tool is not warranted – i.e. MDCPS's current assessments are deemed as reliable as those used in other states – the team will then shift their focus to developing intensive training on the use of existing tools. *Id.* The improved assessment that results from these efforts also will improve staff's ability to identify the right activities for a child's FSP. *Id.*

MDCPS also has rolled out a new case staffing tool for MDCPS supervisors. *Id.* at ¶43. This tool ensures standardized case staffing practice that will lead to more effective supervision. *Id.* That enhanced supervision will allow MDCPS supervisors to better ensure caseworkers complete all assigned tasks, including family involvement in plan development.

### *Timely Administrative Case Reviews*

Section 6.4.a. of the 2nd MSA requires MDCPS to ensure that "a child's permanency plan be reviewed in a court or administrative hearing at least every six months. Foster care reviews shall satisfy this administrative case review requirement." The MDCPS foster care review unit within the Office of Continuous Quality Improvement carries out these reviews. *Id.* at ¶44. Every six months, every case involving a foster child is subject to a foster care review, which includes a CQI staff person's review of all documentation in the case and a conference with the county staff, child, parents, caregivers, and relevant professionals. *Id.*

During 2018, the 2nd MSA required that 80% of foster children who have been in custody for at least six months receive such a review. MDCPS complied with this requirement. While the Monitor reported this provision as noncompliant, this was due to a misunderstanding between MDCPS and the monitor regarding the data MDCPS submitted related to this provision. *Id.* at ¶45. Due to the labels affixed to the data, the Monitor and MDCPS had a difference in performance when the conference occurred because of a later completion date. *Id.* However, it has since been clarified for the Monitor that the completion date they were referencing related to follow up action from the review, not the review itself, which is the deliverable. *Id.* MDCPS correctly reported that it was compliant with this provision in 2018. *Id.*

### *Timely Court Hearings*

Section 6.4.b of the 2nd MSA requires MDCPS to take all reasonable steps to ensure that a court review is held for each child in foster care custody within 12 months of the initial placement and annually thereafter. It does not, as Plaintiffs state, require that every child "must receive annual court case reviews" as MDCPS obviously does not control the youth court docket, and many factors beyond MDCPS's control impact the ability to achieve an annual court case

review. Pls.' Mem. Br. at 32. In 2018, reasonable efforts to secure a timely review were required for at least 80% of the children who had been in custody for 12 months. Davenport Aff. ¶22.

Reasonable steps to obtain the hearing is not a quantifiable measure that can be extracted from MACWIS. *Id.* Rather, this is a qualitative measure that must be monitored with a qualitative review. *Id.* The 2nd MSA required that MDCPS submit an annual continuous quality improvement plan by December 2018. That plan was submitted and approved by the Court Monitor and went into practice in 2019. *Id.* at ¶21. With that monitoring in place, MDCPS's performance on this provision has been measured at 87% and 89% for the first and second quarters of 2019 respectively. *Id.* at ¶22.

Further, MDCPS has put an additional measure in place to ensure these efforts are made. The final report from each foster care review – conducted for every child every six months – is filed with the appropriate youth court. *Id.* at ¶23. MDCPS has added to that report an option to request a review hearing, helping to ensure that staff consider whether to request a hearing at least every time a foster care review occurs. *Id.*

### 3.    *MDCPS's accomplishments*

MDCPS not only has survived a $52 million financial crisis but, given the consistent historical lack of sufficient funding for MDCPS prior to July 2019, the Agency has made remarkable improvements and has achieved much success in areas which have great influence on Mississippi's child welfare system. In addition to the successes highlighted in Section III.C. above, examples of accomplishments throughout 2018 and 2019 also include:

### *Worker Qualifications and Training*

During 2018, all caseworkers hired by MDCPS possessed an approved degree, and all caseworker supervisors appointed had an approved degree and the requisite years of experience. 2018 Monitor's Report at 24. Once hired, new workers continued to receive extensive training, at

total of 270 hours, before being assigned a caseload. *Id.* at 25.  In addition, in 2018 all other caseworkers and investigators received the required 20 hours or more of in-service training hours. *Id.* at 26.

### *Increasing Services to Keep Mississippi Families Together*

To address the issues in families that cause children to enter MDCPS custody, a focus has been placed on in-home supportive services. More than 1,250 families have received these services through the In-Circle program. These services provide support to families and helps maintain children in their homes safely and avoid the need to enter foster care. The first year under the In-Circle contracts, October 1, 2017-September 30, 2018, 94% of all children in the families receiving prevention or post-reunification services safely remained in their homes. Defs.' Ex. P: 2018 In-Circle Analysis.

### *Development of New Non-relative Foster Homes*

To achieve increased family continuity, MDCPS has placed a great focus on increasing the number of family based placements. In 2018, MDCPS licensed 431 new foster homes, exceeding the annual target of 400 homes established by the Monitor.  As of July 31, 2019, MDCPS, has licensed 247 new foster homes.  Rogillio Aff. ¶13.

### *Adoptions*

Focused work in the Permanency Support Services Unit has tremendously decreased processing times for adoptions. Starting in Spring 2017 in collaboration with Casey Family Programs, MDCPS began Rapid Permanency Reviews in conjunction with the courts to help further increase the speed of adoptions. In SFY-2018, 647 adoptions were finalized, and the Agency finalized 657 adoptions SFY-2019. In addition to those adoptions, over 100 adoptions are pending with attorneys and await only final court action by the judge.  As to older youths

who have historically been more difficult to place in adoptive homes, MDCPS continues to utilize the Heart Gallery Campaign and was successful in matching 8 older youths to adoptive homes so far in 2019.

### Decrease in Number of Children in Custody

Through the efforts that were made in 2018 and continue in 2019, the number of children in MDCPS custody continues to decrease. On July 1, 2017, there were 6,107 children in custody. On that same date in 2018, there were 5,243 children in custody and on July 1, 2019, there were only 4,528 children in MDCPS custody.

## IV.    CONCLUSION

Ultimately, finding the Defendants in civil contempt does nothing to advance compliance with the commitments in the 2nd MSA or improve foster care in Mississippi.  Indeed, contempt is sought only to serve as the flawed foundation for appointment of a receiver.  Appointment of an unidentified receiver to take over  Mississippi's foster care system for an indefinite period, at an unknown cost, without any reliable evidence of the impact of such a radical remedy on the MDCPS work force or the provision of child welfare services, or any indication that a receiver would achieve compliance with all of the 2nd MSA's many complex commitments, rests on an even more flawed foundation.  Moreover, the  history of the receivership in *LaShawn*, which has now been placed before the Court, is the best evidence that a receivership would accomplish nothing and, instead, would derail MDCPS's accomplishments and improvements, and set back foster care in Mississippi for years to come.

For these reasons, and as more fully articulated herein,  Plaintiffs' demand for a contempt finding and to force MDCPS into a receivership should be denied.

RESPECTFULLY SUBMITTED, this the 3rd day of September, 2019.

59

PHIL BRYANT, as Governor of the State of Mississippi, JESS H. DICKINSON, as Commissioner, Mississippi Department of Child Protection Services, and TRACY MALONE, as Deputy Commissioner of Child Welfare, Mississippi Department of Child Protection Services

By: /s/  James L. Jones

OF COUNSEL:

BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC
Kenya Key Rachal (MSB #99227)
James L. Jones (MSB #3214)
One Eastover Center
100 Vision Drive, Suite 400
Jackson, MS  39211
Telephone:  (601) 351-2400
Facsimile:  (601) 351-2424

Harold E. Pizzetta, III
Assistant Attorney General
OFFICE OF THE MISSISSIPPI ATTORNEY GENERAL
P. O. Box 220
Jackson, MS  39205