**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

| | | |
|---|---|---|
| OLIVIA Y., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION NO. 3:04-CV-251-TSL-FKB |
| | ) | |
| v. | ) | |
| | ) | |
| PHIL BRYANT, as Governor of | ) | |
| the State of Mississippi, et al., | ) | |
| | ) | |
| Defendants. | ) | |

---

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
AMENDED MOTION FOR RELIEF PURSUANT TO REMEDY PHASE OF
PLAINTIFFS' RENEWED MOTION FOR CONTEMPT, FOR AN EVIDENTIARY
HEARING, AND FOR THE APPOINTMENT OF A RECEIVER**

---

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................ii

I. INTRODUCTION ............................................................................................................ 1

II. DISCUSSION .................................................................................................................. 4

    A. Defendants' Long History of Non-Compliance................................................. 4

    B. Defendants' Alleged Positive Trajectory is Insufficient to Exempt Them From a Contempt Order. ............................................................................................... 5

    C. Defendants Should Be Held in Civil Contempt. ............................................... 7

        1. Defendants have failed to satisfy their heavy burden of asserting an impossibility or mitigating circumstances defense. .................................... 7

            a. Defendants' difficulties complying with the 2nd MSA are not evidence of impossibility............................................................................ 9

        2. Defendants have failed to identify legally cognizable mitigating circumstances that justify noncompliance. ............................................. 14

    D. Defendants' 10-Year History of Noncompliance Makes the Appointment Of a Receiver Both Proper and Necessary. ............................................................ 15

III. CONCLUSION.............................................................................................................. 19

CERTIFICATE OF SERVICE ............................................................................................ 21

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aspira of N.Y., Inc. v. Bd. of Educ.*,
    423 F. Supp. 647 (S.D.N.Y. 1976) ........................................................................12

*Badgley v. Santacroce*,
    800 F.2d 33 (2d Cir. 1986)....................................................................................12

*Carty v. Farrelly*,
    957 F. Supp. 727 (D.V.I. 1997) ............................................................................15

*Corner v. Hous. Auth. New Orleans*,
    No. 06-10751, 2014 WL 3908592 (E.D. La. Aug. 9, 2014)..................................12

*Costello v. Wainwright*,
    525 F.2d 1239 (5th Cir. 1976) ..............................................................................10

*Eulich v. United States*,
    Civil Action No. 3:99-CV-1842-L, 2004 WL 1844821 (N.D. Tex. Aug. 18,
    2004) .....................................................................................................................11

*Frederick L. v. Dep't of Pub. Welfare of Pa.*,
    422 F.3d 151 (3d Cir. 2005)....................................................................................7

*FTC v. Affordable Media, LLC*,
    179 F.3d 1228 (9th Cir. 1999) ................................................................................8

*Gates v. Collier*,
    501 F.2d 1291 (5th Cir. 1974) ..............................................................................10

*Halderman v. Pennhurst State Sch. & Hosp.*,
    673 F.2d 628 (3d Cir. 1982)..................................................................................10

*Hodgson v. Hotard*,
    436 F.2d 1110 (5th Cir. 1971) ................................................................................8

*Holt v. Sarver*,
    309 F. Supp. 362 (E.D. Ark. 1970)........................................................................13

*Inmates of Boys' Training School v. Southworth*,
    76 F.R.D. 115 (D.R.I. 1977) .................................................................................10

*James v. Frame*,
    No. 92-2513, 1992 WL 352640 (5th Cir. Nov. 23, 1992) ...................................8, 9

*Jim Walter Res., Inc. v. Int'l Union, etc.*,
   609 F.2d 165 (5th Cir. 1980) ........................................................................9, 12

*La. Educ. Asso. v. Richland Par. Sch. Bd.*,
   421 F. Supp. 973 (W.D. La. 1976) ......................................................................9

*LaShawn A. v. Gray*,
   412 F. App'x 315 (D.C. Cir. 2011) ....................................................................18

*LaShawn A. v. Kelly*,
   887 F. Supp. 297 (D.D.C. 1995) ........................................................................18

*LaShawn v. Kelly*,
   144 F.3d 847 (1998) ....................................................................................17, 18

*Lear Siegler Servs. v. Ensil Int'l Corp.*,
   No. SA-05-CA-679-XR, 2011 WL 13174951 (W.D. Tex. Mar. 15, 2011) ...........11

*Lyn-Lea Travel Corp. v. Am. Airlines*,
   283 F.3d 282 (5th Cir. 2002) ..............................................................................8

*M.D. by Strukenberg v. Abbott*,
   907 F.3d 237 (5th Cir. 2018) ............................................................................11

*McGoff v. Rapone*,
   78 F.R.D. 8 (E.D. Pa. 1978) ..............................................................................15

*McNeal v. Tate Cty. Sch. Dist.*,
   No. 2:70-CV-00029-DMB, 2016 WL 7156554 (N.D. Miss. Dec. 7, 2016) .....................14, 15

*Newman v. Alabama*,
   466 F. Supp. 628 (M.D. Ala. 1979) ..............................................................16, 17

*Plata v. Schwarzenegger*,
   No. C01-1351 TEH, 2005 WL 2932253 (N.D. Cal. Oct. 3, 2005) ........................17

*Rhem v. Malcolm*,
   377 F. Supp. 995 (S.D.N.Y. 1974) ....................................................................13

*Rufo v. Inmates of Suffolk Cty. Jail*,
   502 U.S. 367 (1992) ............................................................................................9

*SEC v. Allen*,
   Civil Action No. 3:11-cv-882-O, 2014 WL 99974 (N.D. Tex. Jan. 10, 2014) ...............8, 9

*SEC v. Res. Dev. Int'l LLC*,
   217 F. App'x 296 (5th Cir. 2007) ........................................................................8

*Shaw v. Allen*,
    771 F. Supp. 760 (S.D. W. Va. 1990) ...............................................................................16, 17

*Smith v. Sullivan*,
    611 F.2d 1039 (5th Cir. 1980) ........................................................................................10

*U.S. v. Miss.*,
    No. 3:16-cv-622-CWR-FKB, 2019 WL 4179997 (S.D. Miss. Sep. 3, 2019).......................6, 7

*Watson v. City of Memphis*,
    373 U.S. 526 (1963)........................................................................................................9

*Whitfield v. Pennington*,
    832 F.2d 909 (5th Cir. 1987) ..........................................................................................14

*Wyatt v. Aderrholt*,
    503 F.2d 1305 (5th Cir. 1974) ........................................................................................13

## Other Authorities

Fed. R. Civ. P. 60(b) ..........................................................................................................5

I.    INTRODUCTION

Plaintiffs – thousands of neglected and abused foster care children in Mississippi – ask this Court to find Defendants in contempt of a binding federal court consent decree, after a decade of sustained noncompliance with standards designed to remedy constitutional deficiencies in the state's foster care system. Defendants – the Governor of the State of Mississippi, the Executive Director of the Mississippi Department of Human Services, and the Commissioner of the Mississippi Department of Child Protection Services – insist that contempt is inappropriate because, quite simply, it is not their fault. Defendants advance two conflicting arguments. First, they assert that compliance with the Settlement Agreement[1] is a matter of adequate funding and, through no fault of their own, compliance is "impossible" because the Legislature has not provided them the necessary appropriations. Alternatively, and despite the alleged "impossibility", Defendants declare that they are indeed heading in the right direction and just need more time – though they make no promises as to how much more time.[2] Both arguments fail.

Essentially, Defendants attempt to shift the blame for their extensive failure to comply with the Settlement Agreement[3] onto the Mississippi Legislature, merely because the Legislature appropriated less than the full amount requested.[4] This pivotal assertion is fatally flawed.  The parties acknowledged in 2012[5] and again in 2016 that although "Defendants do not speak for the Mississippi Legislature, which has the power under Mississippi law to

---

[1] The Second Modified Mississippi Settlement Agreement and Reform Plan [Dkt. No. 712] (the "2nd MSA" or the "Settlement Agreement").

[2] Defendants' Memorandum of Authorities in Support of Response and Objections to Plaintiffs' Amended Motion for Relief Pursuant to Remedy Phase of Plaintiffs' Renewed Motion for Contempt, for an Evidentiary Hearing, and for the Appointment of a Receiver [Dkt. No. 858] ("Defs.' Brief") at 15.

[3] *Id.* at 2-3 ("MDCPS should be given the time it needs…").

[4] *Id.* at 4-12.

[5] Modified Mississippi Settlement Agreement and Reform Plan [Dkt. No. 571] (the "MSA") at Section 1.G.

determine the appropriations for the state's child welfare programs…[n]othing in this paragraph in any way limits Defendants' obligations under this 2nd MSA."[6] The parties have always recognized that the Legislature controls funding, and with full knowledge of that fact, agreed that failure of the Legislature to appropriate adequate funds would not absolve Defendants of their obligations. The 2nd MSA has the weight of binding federal law. Defendants' insistence to the contrary is patently disingenuous. If accepted, Defendants' position would lead to an infinite circle of finger-pointing among the branches of Mississippi government, ultimately resulting in impunity for those who are trusted with the weighty responsibility of ensuring that the state provides, at a minimum, constitutionally adequate care to its wards.

Defendants' sixty-page brief offers a litany of excuses and explanations for their failure to comply with at least 35 of the 113 commitments of the Settlement Agreement due in 2018, and their failure to either produce any data at all or provide verifiable data for an additional 41commitments.[7] [8] Defendants' excuses and explanations begin and end with Commissioner Dickinson. Notably, Dickinson is merely one of three Defendants — all of whom wield immense power over the state government — in this action. Glaringly absent from Defendants' brief is any mention of the actions taken by either Governor Bryant or John Davis.[9]

---

[6] 2nd MSA, at Introduction.

[7] In their brief, Defendants suggest that it is unfair of Plaintiffs to hold them accountable for failing to provide or maintain reliable data for 41 provisions of the 2nd MSA that were due in 2018, because the provisions of the 2nd MSA pertaining to establishing a revised computer system are not yet due. *See* Defs.' Brief at 42-43. But, the fact that Defendants' are not required to have fully implemented a Comprehensive Child Welfare Information System ("CCWIS") until June 30, 2021, (2nd MSA, §1.5.b), does not absolve them of their responsibility to provide reliable data on separate commitments that have become due.

[8] Progress of the Mississippi Department of Child Protection Services Monitoring Report 6 [Dkt. No. 845] ("Monitoring Report" or "Monitor's Report), at 4. Attached as Exhibit A [Dkt. No. 849-1] to Plaintiffs' Amended Motion for Relief Pursuant to Remedy Phase of Plaintiffs' Renewed Motion for Contempt, For an Evidentiary Hearing, and For the Appointment of a Receiver ("Plaintiffs' Amended Motion") [Dkt. No. 849].

[9] John Davis was appointed to the position of Executive Director of MDHS by Governor Bryant in 2016. Governor Bryant appointed Christopher Freeze to replace Davis in August 2019.

Defendants' efforts to obfuscate the issues, while certainly Herculean, do not change the facts. Defendants remain in blatant noncompliance with the terms of the Second Modified Mississippi Settlement Agreement and Reform Plan ("2nd MSA").[10] Indeed, in the decade since originally signing a consent decree – in which the state essentially acknowledged operating an unconstitutional child welfare system – Defendants have failed to comply with any of the three settlement agreements in this case.[11]

Defendants insist that this time is different, that their alleged "trajectory of improvement" is not part of the endless cycle of noncompliance and broken promises that has been repeating for more than ten years.[12] However, they fail to provide any convincing evidence to that effect. Instead, Defendants rely primarily on an increased legislative appropriation for FY'2020 and the leadership of Commissioner Dickinson.[13] Even assuming, *arguendo*, that Defendants are on a "trajectory of improvement"[14] the current Governor will only be in office for another four months.[15] After that, the incoming Governor will have the power to appoint new leadership teams at both the Mississippi Department of Human Services ("MDHS") and the Mississippi Department of Child Protection Services ("MDCPS"). The increased funds for FY'20 are, of course, guaranteed only for the fiscal year for which they were appropriated. In other words, the two largest factors upon which Defendants rely have lifespans shorter than one year. There is nothing in their brief to suggest that this trajectory will

---

[10] The 2nd MSA, effective January 1, 2018, is the currently operative settlement agreement between the parties.

[11] The Stipulated Settlement Agreement [Dkt. No. 425] was entered in June 2007; the Mississippi Settlement Agreement and Reform Plan [Dkt. No. 459] was entered in January 2008; the Modified Mississippi Settlement Agreement and Reform Plan ("MSA") [Dkt. No. 571] was entered in July 2012; the Second Modified Mississippi Settlement Agreement and Reform Plan ("2nd MSA") [Dkt. No. 712].

[12] *See* Defs.' Brief at 2, 23.

[13] *See* Defs.' Brief at 28, 51.

[14] It is worth noting that Defendants do not contend they are going to achieve compliance with the terms of the settlement agreement. They merely contend that they are capable of making positive progress. *See* Defs.' Brief at 21 ("Defendants…are making progress towards compliance.").

[15] Governor Bryant's term ends in January 2020, and he is not eligible for reelection.

3

survive beyond the next year, or to suggest that Defendants will not fall back on their claim of "impossibility" if the Legislature fails to appropriate a specified amount of funding for the next fiscal year, as it almost certainly will.[16]

In addition to failing on the merits, if accepted, Defendants' position would lead to absurd results. If the Legislature's failure to appropriate adequate funding was sufficient to constitute a wholesale excuse for Defendants' noncompliance, the state of Mississippi would be free to underfund its child welfare system in perpetuity, and with absolute impunity. Indeed, the failures of one branch of government (the legislature) would prevent another branch (the executive) from being held responsible for operating an unconstitutional public system, rendering third branch (the judiciary) powerless to enforce federal law. This simply cannot be true.

Defendants have had ample opportunities, over the span of a decade, to bring Mississippi's constitutionally inadequate child welfare system into compliance with this Court's binding orders and the dictates of the United States Constitution. They have repeatedly failed to do so. Ten years of second chances is more than enough, particularly when the lives of abused and neglected children hang in the balance.

## II.    DISCUSSION

### A.  Defendants' Long History of Non-Compliance.

While more than ten years have elapsed since the parties entered into their first settlement agreement,[17] one thing has remained constant: Defendants have never achieved compliance. The state's noncompliance follows a predictable pattern: the state fails to comply with orders to which

---

[16] The Legislature's failure to provide the requested funding in FY 2019 was consistent with its chronic failures since 2008 to adequately fund the parties' agreements to reform the child welfare system.
[17] The Stipulated Settlement Agreement was entered in June 2007.

it explicitly agreed; the state claims it is heading in the right direction and issues earnest pledges of compliance – if only it is given more time and another chance; another opportunity is extended; compliance never occurs. The parties now find themselves, yet again, in the midst of a contempt proceeding – a familiar stage for Defendants, who yet again, stick to the script. Two years after the parties signed the 2nd MSA, the most recent compliance report produced by the court-appointed neutral Monitor (the "Monitor") illustrates that Defendants remain in widespread noncompliance. *See* Monitoring Report, at 4. But this time, Defendants' pending motion seeks to have at least one crucial provision – the caseload standards – significantly modified. *See* Defendants' Motion for Relief Under Section 11.2.A of the 2nd Modified Settlement Agreement and Reform Plan and Rule 60(b) of the Federal Rules of Civil Procedure [Dkt. No. 756].

## B. Defendants' Alleged Positive Trajectory is Insufficient to Exempt Them From a Contempt Order.

Defendants insist that this Court should neither find them in contempt, nor appoint a receiver, claiming to be on a "trajectory of improvement". *See* Defs.' Brief, at 28-59. But, the Monitor's report speaks for itself, and in doing so paints a starkly different picture. It does not reflect a system that is making major strides towards compliance.

Defendants first vehemently seek to place blame for noncompliance on anybody but themselves in an attempt to demonstrate "impossibility". Then, Defendants devote a significant portion (approximately 30 pages) of their brief to an alternative, but incompatible, argument – that if it is their fault, they are seeing "improved outcomes" and merely need more time to achieve compliance. *See* Defs.' Brief, at 21. It is hard to fathom how compliance with the terms of the 2nd MSA can be both "impossible" while simultaneously well underway. Nevertheless, in an attempt to convince this Court that they are making progress, Defendants employ a number of creative methods for dressing up the data presented in both the Monitor's Report and their own caseload

data. For example, Defendants insist that while the caseload report for July 31, 2019, shows compliance with the caseload standards established in the 2nd MSA at only 55% — far from the 90% required under the 2nd MSA — they should actually be judged by how much they have improved, which according to their metrics represents an increase of 77% since 2017. *See* Affidavit of Jaworski Davenport, at ¶ 17 [Dkt. No. 857-31]. This assertion is less impressive when considered in light of the fact that Defendants had *agreed* to increase caseload compliance by 190% in this time period.[18] The 2nd MSA represents a painstakingly negotiated settlement agreement – which was renegotiated less than three years ago – that both parties recognized as necessary to bring Mississippi's child welfare system into compliance with the minimum dictates of the United States Constitution. Defendants have not met that bare minimum, and offer no indication that such an achievement is imminently within reach.

Defendants' claims of incremental progress in limited areas, even if true, do not exempt them from a finding of civil contempt. As the court in *United States v. Mississippi* made clear, a Mississippi public agency's compliance with federal civil rights law depends on the state of the "current…system—the system in effect, not the system Mississippi might create by 2029". *See* [Memorandum Opinion and Order] in *U.S. v. Miss.*, No. 3:16-cv-622-CWR-FKB, 2019 WL 4179997, at *1 (S.D. Miss. Sep. 3, 2019). For the purposes of compliance, the proper inquiry must be whether "the system in effect…falls short of the requirements established by law". *Id.* The court in *United States v. Mississippi* further agreed with the Third Circuit's conclusion that when it comes to civil rights violations, "[g]eneral assurances and good-faith intentions…are simply insufficient guarantors in light of the hardship daily inflected upon…" the individuals that public

---

[18] *See* 2nd MSA, at § 1.3.a ("90% of MDCPS caseworkers will have caseloads which do not exceed the caseload standards set forth below.") Given that 31% of caseworkers at the time of the 2nd MSA in 2016 were compliant, to meet a 90% standard by December 31, 2017—as the 2nd MSA required—Defendants would have had to increase compliance by 190%.

agencies are obligated to serve. *Id.* at *6 (citing *Frederick L. v. Dep't of Pub. Welfare of Pa.*, 422 F.3d 151, 158 (3d Cir. 2005). The Mississippi child welfare system must be evaluated as it is today—not as Defendants swear it will be in the indeterminate future. And the Mississippi child welfare system, today, is constitutionally inadequate, just as it has been constitutionally inadequate for more than a decade. The 2nd MSA, carefully negotiated and agreed upon by both parties, was designed precisely to correct these constitutional deficiencies. Defendants' flagrant noncompliance with that settlement agreement compels a finding of civil contempt.

### C. Defendants Should Be Held in Civil Contempt.

Defendants do not claim to be in compliance with the 2nd MSA, a binding federal court settlement agreement. *See* Defs.' Brief, at 2. They do not even claim to be close to achieving compliance with the 2nd MSA. *Id.* at 1-2 (MDCPS should be given the time it needs to continue its work towards compliance"); *id.* at 13 ("MDCPS continues to progress towards compliance…"); *id.* at 21 ("Defendants…are making progress towards compliance…"). Plaintiffs have demonstrated, and there is no genuine dispute concerning, the essential elements of civil contempt. *See* Plaintiffs' Amended Memorandum of Law in Support of Amended Motion for Relief Pursuant to Remedy Phase of Plaintiffs' Renewed Motion for Contempt, For an Evidentiary Hearing, and For the Appointment of a Receiver ("Plaintiffs' Memo") [Dkt. No. 850], at 13-15. Nonetheless, Defendants insist that a finding of contempt is inappropriate because compliance is "impossible" and mitigating circumstances exist. *See* Defs.' Brief, at 14. Both fail.

#### 1. Defendants have failed to satisfy their heavy burden of asserting an impossibility or mitigating circumstances defense.

Defendants acknowledge, at numerous junctures, that they are currently in noncompliance with the requirements of the 2nd MSA. *Id.* at 2. Defendants also acknowledge that "[a] party seeking a civil contempt order must demonstrate, by clear and convincing evidence, '(1) that a

court order was in effect, (2) that the order required certain conduct by the respondent, and (3) that the respondent failed to comply with the court's order.'" *See Lyn-Lea Travel Corp. v. Am. Airlines*, 283 F.3d 282, 291 (5th Cir. 2002); *see also* Defs.' Brief, at 14. Unquestionably, Plaintiffs are entitled to have the Court enter a civil contempt order.

"Once the elements necessary to support the contempt order [a]re established, the burden properly shift[s] to [Defendants] to prove…the inability to comply". *See James v. Frame*, No. 92-2513, 1992 WL 352640, at *2 (5th Cir. Nov. 23, 1992). The Fifth Circuit has also suggested, as have several other circuit courts, that "the burden on the party asserting an impossibility defense will be particularly high because of the likelihood that any attempted compliance with the court's orders will be merely a charade rather than a good faith effort to comply". *See SEC v. Res. Dev. Int'l LLC*, 217 F. App'x 296, 299 (5th Cir. 2007) (citing *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1241 (9th Cir. 1999)). As such, Plaintiffs are under no obligation to show Defendants' ability to comply. *See Hodgson v. Hotard*, 436 F.2d 1110, 1115 (5th Cir. 1971).

"The mere assertion of present inability is insufficient to avoid a civil contempt finding." *See SEC v. Allen*, Civil Action No. 3:11-cv-882-O, 2014 WL 99974, at *4 (N.D. Tex. Jan. 10, 2014) (internal quotations omitted). "Rather, the alleged contemnor must: (1) explain categorically and in detail why he is unable to [comply] and (2) establish that his inability to [comply] was not self-imposed." *Id.* Defendants undoubtedly spare no detail in their brief. What they provide in quantity, however, does not make up for what they lack in quality. Simply saying so repeatedly does not make it so.

Successful defenses to court orders are rare; tellingly, in asserting their "impossibility" and "mitigating circumstances" defenses, Defendants fail to cite a single case excusing a party from a court order on those grounds. "In contempt proceedings, the basic proposition is that all orders and

judgments of courts must be complied with promptly." *Jim Walter Res., Inc. v. Int'l Union, etc.*, 609 F.2d 165, 168 (5th Cir. 1980) (internal quotations omitted). Defenses to compliance must be viewed as an extraordinary measure against that presumption. *See La. Educ. Asso. v. Richland Par. Sch. Bd.*, 421 F. Supp. 973, 975 (W.D. La. 1976).

### a. Defendants' difficulties complying with the 2nd MSA are not evidence of impossibility.

What Defendants complain of in their brief—struggles with managing funds, communicating their needs to the legislature, and navigating bureaucracies—may make compliance with the order more difficult than it otherwise would be in an ideal world. However, their complaints do not render compliance with the order "factually impossible," as necessary under the law. *See SEC v. Allen*, Civil Action No. 3:11-cv-882-O, 2014 WL 99974, *2 (N.D. Tex. Jan. 10, 2014). Defendants drown their argument with numbers, figures, and dollar signs to distract from the simple truth: their current difficulties with compliance were not unforeseeable, and not the result of anything but their own actions. "Inconvenience and difficulty" do not amount to "impossibility". *See James v. Frame*, No. 92-2513, 1992 WL 352640, *2 (5th Cir. Nov. 23, 1992). "Quite simply," Defendants claim, "MDCPS has not had sufficient funds to meet all the complex and demanding 2nd MSA commitments". *See* Defs.' Brief, at 15. Quite simply, the law does not accept such an excuse.

Indeed, if the Legislature's failure to appropriate sufficient remedial funds were a valid reason to absolve Defendants' of their obligations to remedy the Constitutional defects in Mississippi's child welfare system, the settlement agreement in this case – and consent decrees generally – would be functionally illusory. This cannot possibly be the law. And it is not.

As the Supreme Court observed, "financial constraints may not be used to justify constitutional violations". *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 392 (1992); *Watson*

*v. City of Memphis*, 373 U.S. 526, 537 (1963) ("it is obvious that vindication of conceded constitutional rights cannot be made dependent upon any theory that is less expensive to deny than to afford them"); *see also Inmates of Boys' Training School v. Southworth*, 76 F.R.D. 115, 119 (n.2) (D.R.I. 1977) ("lack of funds cannot excuse noncompliance with the consent decree, for that document is as binding on the parties as a final adjudication on the merits would have been").

"Where state institutions have been operating under unconstitutional conditions and practices, the defenses of fund shortage and the inability of the district court to order appropriations by the state legislature, have been rejected by the federal courts." *Gates v. Collier*, 501 F.2d 1291, 1319 (5th Cir. 1974). Put another way, "inadequate funding will not excuse the perpetuation of unconstitutional conditions". *See Smith v. Sullivan*, 611 F.2d 1039, 1044 (5th Cir. 1980); *Costello v. Wainwright*, 525 F.2d 1239, 1252 (5th Cir. 1976) ("The right of [Plaintiffs] to be secure in their constitutional rights cannot be made dependent upon the action of the state legislature in appropriating additional money"). And yet, this is exactly what Defendants suggest in asking to be excused from compliance with the 2nd MSA due to insufficient funds: that the order to which Defendants explicitly agreed less than three years ago has made it too expensive to provide constitutional services to children in the foster care system.

Ultimately—and as Defendants likely know, for they cite no case law in support of such a proposition—the "impossibility" of compliance with constitutional requirements does not encompass mere "financial impossibility" due to appropriations mishaps. *See Halderman v. Pennhurst State Sch. & Hosp.*, 673 F.2d 628, 638 (3d Cir. 1982) (rejecting defendants' contention "that the appropriations act made performance of the funding obligation 'impossible'" because impossibility involves "literal physical impossibility of compliance").

Further, Defendants are not entitled to assert an impossibility defense when the inability is "self-induced". *Lear Siegler Servs. v. Ensil Int'l Corp.*, No. SA-05-CA-679-XR, 2011 WL 13174951, at *4 (W.D. Tex. Mar. 15, 2011). A defendant who makes "a conscious decision" that results in "the present dilemma" of noncompliance is not excused. *See Eulich v. United States*, Civil Action No. 3:99-CV-1842-L, 2004 WL 1844821, at *3 (N.D. Tex. Aug. 18, 2004). Defendants who "ha[ve] not exhausted other avenues" in order to comply, and who have "failed to exhaust all reasonable efforts to comply" are also not excused. *Id.* Commissioner Dickinson made a conscious choice regarding which areas to fund in light of budgetary shortfall. *See* Affidavit of Jess Dickinson, at ¶ 24 [Dkt. No. 857-32]. Given his open and well-documented disregard for caseload standards,[19] it is unsurprising that compliance with caseload standards was de-funded.[20]

Defendants' experiences with the Mississippi Legislature and the resultant budget woes do not demonstrate the "impossibility" of compliance with the 2nd MSA. One of the Defendants in this action is the Governor of Mississippi himself. Defendants provide no reference to actions taken by Governor Bryant to assist with the appropriation process, nor have they suggested that Governor Bryant did anything at all to push for the additional funding required to comply with the terms of the 2nd MSA, or to seek to find funding outside of the typical appropriation channels. But somehow Defendants suggest that their failure to obtain legislative funds to operate a constitutional and 2nd MSA-compliant public agency means doing so is "impossible". The more reasonable

---

[19] *See* Deposition of Jess Dickinson [Dkt. No. 849-2] at 119, ¶¶ 18-24 and 120, ¶¶ 1-3; *see also* Hiring Freeze Memo dated Dec. 20, 2017 [Dkt. No. 849-4].

[20] Defendants' reference to *M.D. by Strukenberg v. Abbott*, 907 F.3d 237 (5th Cir. 2018) is irrelevant to instant contempt proceeding. *See* Defs.' Brief at 34. The Court need not decide whether Commissioner Dickinson's critiques of the 2nd MSA's caseload cap provisions are "reasoned" or "correct". *See* Defs.' Brief at 33-34. The merits of any of the 2nd MSA's provisions, for the purposes of a contempt proceeding, are not at issue. If Defendants acknowledge 1) they are bound by the 2nd MSA—which they do, (*see* Defs.' Brief at 1) that caseload caps were a provision of the 2nd MSA—which they do, (*see* Defs. Brief at 33) —and 3) that Defendants are not in compliance with the 2nd MSA's provision on caseload caps—which they are not, (*see* Defs. Brief at 51)—then a contempt finding is appropriate.

conclusion, of course, is that Defendants' budget issues are "self-induced"—the consequence of their own efforts, or lack thereof.

Defendants have failed to show they have "exhausted other avenues" in order to obtain funding and thus comply with the 2nd MSA. Absent from their argument is a description of their normal efforts to obtain the necessary funding, and how their efforts were above and beyond that standard. Courts refuse to find "inability" without these basic showings. *See Corner v. Hous. Auth. New Orleans*, No. 06-10751, 2014 WL 3908592, at *5 (E.D. La. Aug. 9, 2014) (city housing authority "cannot prove an inability to comply with the Consent Decree by simply pointing to its constrained budget" where defendant "was unable to put forth any evidence that it attempted to acquire funding and failed", or that it "unsuccessfully sought" any new funding sources); *see also Aspira of N.Y., Inc. v. Bd. of Educ.*, 423 F. Supp. 647, 654 (S.D.N.Y. 1976) (defendants "have neglected to marshal their own resources, assert their high authority, and demand the results needed from subordinate persons and agencies in order to effectuate the course of action required by the consent decree"). In any event, courts are unsympathetic to contempt defenses predicated on political concerns. *See Jim Walter Res., Inc. v. Int'l Union, etc.*, 609 F.2d 165, 168 (5th Cir. 1980); *see also Badgley v. Santacroce*, 800 F.2d 33, 37 (2d Cir. 1986) (rejecting "impossibility" defense where "compliance is hindered by political difficulties rather than physical impossibilities").

Despite Defendants' repeated and conclusory assertion that compliance with the caseload standards and other requirements of the 2nd MSA was "impossible", the facts demonstrate that *which* programs were cut as a result of budgetary shortfalls was very much a conscious decision made by Commissioner Dickinson. The budgetary appropriations by the Legislature are not line-item. Defendants, particularly Commissioner Dickinson, have wide discretion to decide how to

allocate those funds. Defendants have not demonstrated why they chose to make cuts from specific areas, nor why those cuts could not have been made elsewhere. *See Rhem v. Malcolm*, 377 F. Supp. 995, 999 (S.D.N.Y. 1974) ("The City's decision not to expend the necessary funds represents its determination of the priority to be given to the different items in its budget. However, expenditures not required by the Constitution may not be given priority over those needed to remedy a deprivation of constitutional rights."). "The obligation of the [Defendants] to eliminate existing unconstitutionalities does not depend upon what the Legislature may do, or upon what the Governor may do, or, indeed, upon what [Defendants] may actually be able to accomplish." *Holt v. Sarver*, 309 F. Supp. 362, 385 (E.D. Ark. 1970); *see also Wyatt v. Aderrholt*, 503 F.2d 1305, 1315 (5th Cir. 1974). Ultimately, the responsibility for complying with the 2nd MSA falls on no one but Defendants themselves.

Even if Defendants successfully demonstrated the impossibility of achieving compliance with regard to caseloads or the other provisions of the 2nd MSA, or even if Defendants identified legally cognizable mitigating circumstances that justified noncompliance with regard to caseloads – which they have not – a finding of civil contempt is properly grounded in their failure to comply with the remaining provisions, for which they assert no defense. Here, Defendants are in noncompliance with far more than that, as the Monitor's report has clearly demonstrated. *See* Monitoring Report, at 4.

Defendants' budgetary issues, and resultant cuts made by Commissioner Dickinson, do not constitute "impossibility". Rather, they are the foreseeable consequences of conscious decisions and choices made by Defendants. Defendants cannot now raise those predictable results as an excuse for noncompliance and a defense to civil contempt.

13

### 2. Defendants have failed to identify legally cognizable mitigating circumstances that justify noncompliance.

Defendants' second, but equally doomed, defense rests on the notion that "mitigating circumstances" prevented their compliance with the 2nd MSA. *See* Defs.' Brief, at 15. That the only two cases cited in their argument are, in fact, examples of *failed* "mitigating circumstances" defenses suggests that Defendants themselves have little faith in their position.

As in their "impossibility" defense, the burden of proving the "mitigating circumstances" defense falls on Defendants. *See Whitfield v. Pennington*, 832 F.2d 909, 914 (5th Cir. 1987). And as in their "impossibility" defense, Defendants fail to carry the burden. They regurgitate this Court's instruction in *McNeal v. Tate Cnty. Sch. Dist.* that "[a]lthough there is no exhaustive list of mitigating circumstances which would excuse a violation of a court order, courts have generally considered whether the cause of the violation was beyond the control of the defendant". *See McNeal v. Tate Cty. Sch. Dist.*, No. 2:70-CV-00029-DMB, 2016 WL 7156554, at *10 (N.D. Miss. Dec. 7, 2016). But Defendants put in zero effort to describe what courts consider to be acceptable mitigating circumstances, or how courts interpret whether a violation was "beyond the control of the defendant", or even *which* mitigating circumstances, exactly, they claim justify noncompliance. It should not fall on Plaintiffs, or this Court, to make Defendants' argument for them.

While it is clear Defendants have failed to meet the burden of production, let alone of persuasion, a proper legal discussion of the doctrine of "mitigating circumstances" reveals the law does not recognize budget concerns and bureaucracies as "mitigating circumstances" justifying noncompliance with a court order. In *McNeal v. Tate Cty. Sch. Dist.*, for example, defendants cancelled athletics and extracurricular activities at a black-majority high school, in violation of a court-ordered desegregation mandate. *See McNeal v. Tate Cty. Sch. Dist.*, No. 2:70-CV-00029-

14

DMB, 2016 WL 7156554, at *10-12 (N.D. Miss. Dec. 7, 2016). The defendants claimed "mitigating circumstances" excused the violation—that those extracurricular activities were cancelled "to avoid a potential fine", as school district officials were in talks to close the high school, partially due to "the amount of money that [they] were expending there". *Id.* at *10. "The Court," however, "summarily rejects this argument…no mitigating circumstances justify withholding a finding of contempt for the District's violation of the 1970 desegregation order." *Id.*

The logic that organizes the "mitigating circumstances" doctrine bears substantial similarities to the "impossibility" doctrine. "Mitigating circumstances" are rarely financial or political circumstances, and rarely excuse defendants in defiance of court orders protecting constitutional rights. *See, e.g. McGoff v. Rapone*, 78 F.R.D. 8, 31-32 (E.D. Pa. 1978) ("no viable defenses" even where "defendants are the administrators of a large county institution which necessarily needs extensive time to plan for any changes to be implemented"); *Carty v. Farrelly*, 957 F. Supp. 727, 747 (D.V.I. 1997) ("unforeseeable and unbudgeted financial setbacks" is no excuse: "a significant financial crisis does not itself establish a significant change in circumstances").

Not only would a finding of contempt hold Defendants accountable for their failures and advance compliance with the provisions of the 2nd MSA, but after a decade of failed attempts a contempt finding is necessary to allow the Court to do what all parties have agreed is necessary: bring Mississippi's child welfare system into compliance with the dictates of the Constitution.

### D. Defendants' 10-Year History of Noncompliance Makes the Appointment Of a Receiver Both Proper and Necessary.

Plaintiffs, more than anyone, wish the appointment of a receiver were not required in this case—because that would mean Defendants had met their obligations under the 2nd MSA, and the children in Defendants' custody were no longer subject to unconstitutional care. Unfortunately,

Defendants have demonstrated with saddening persistence that they cannot, or will not, comply with that agreement's directives. Every year, it seems, Defendants submit some new story, or some new theory, for why they are still unable to comply with the terms of an agreement they willingly entered, and re-entered. But for the casualties of their noncompliance, the foster children of Mississippi, it is the same old song and dance. For the fifteen years since the complaint in this suit was filed, they remain the ones who suffer from Defendants' excuses.

The excuses must end. "Where more traditional remedies, such as contempt proceedings or injunctions, are inadequate under the circumstances," a court is justified "in implementing less common remedies, such as receivership, so as to achieve compliance with a constitutional mandate." *Shaw v. Allen*, 771 F. Supp. 760, 762 (S.D. W. Va. 1990). Defendants complain that the appointment of a receiver is an "extraordinary" remedy. *See* Defs.' Brief, at 19. But an extraordinary history of noncompliance warrants an extraordinary remedy. Indeed, the children of the Mississippi foster care system suffer extraordinary harm with every year that passes without Defendants' compliance with their obligations under the 2nd MSA and the Constitution.

 As an initial matter, appointment of a receiver does not require finding that Defendants have failed to make *any* steps towards compliance, or *any* progress. *See, e.g. Newman v. Alabama*, 466 F. Supp. 628, 630 (M.D. Ala. 1979) (appointing receiver because "[w]hile some progress has been made, [defendants] ha[ve] not in several critical areas achieved substantial compliance with the Court's orders"). It is not, as Defendants suggest, an either-or proposition; this Court may find evidence of improvement and still decide receivership necessary to achieve compliance with the consent decree.

The law plainly authorizes this Court to appoint a receiver where, as here, Defendants have been in noncompliance for several years, Defendants have been the subject of multiple contempt

proceedings, and Defendants' noncompliance results in the perpetuation of unconstitutional conditions. For example, courts have appointed receivers where public agencies have remained in noncompliance for less time than Defendants have in this case. *See Newman v. Alabama*, 466 F. Supp. 628, 635 (M.D. Ala. 1979) ("Time does not stand still, but the Board of Corrections and the Alabama Prison System have for six years. Their time has now run out.").

Defendants seek to distinguish *Shaw v. Allen*, 771 F. Supp. 760 (S.D. W. Va. 1990), in which a receiver was found "both necessary and reasonable" to ameliorate state officials' noncompliance with orders to operate constitutional prison facilities, by pointing out "[i]n *Shaw*, there had been three contempt proceedings prior to the action at issue." *See* Defs.' Brief, at 22.

Defendants fail to mention, of course, that Plaintiffs filed their first motion for contempt in 2010, and a second in 2015, which was renewed in 2018 when compliance with the caseload provisions of the 2nd MSA still had not been reached. The Monitor released its 2018 Monitoring Report on June 11, 2019 [Dkt. No. 845] prompting Plaintiffs' to amend their Renewed Motion for Contempt by adding an additional 75 provisions with which Defendants were either in noncompliance or lacked verifiable data. *See* Plaintiffs' Amended Motion. Defendants apparently believe two contempt proceedings are fine, but the four in *Shaw* just go too far. And lastly, courts have expressly authorized receiverships where noncompliance perpetuates constitutional violations. *See, e.g. Plata v. Schwarzenegger*, No. C01-1351 TEH, 2005 WL 2932253, at *1 (N.D. Cal. Oct. 3, 2005) ("The Court imposes the drastic but necessary remedy of a Receivership in anticipation that a Receiver can reverse the entrenched paralysis and dysfunction and bring the delivery of health care in California prisons up to constitutional standards.").

Additionally, Defendants' attempts to distinguish *LaShawn v. Kelly*, 144 F.3d 847 (1998) from this instant case only underscore their similarities. In *LaShawn*, a District of Columbia federal

17

court ordered a receivership, which was upheld by the Court of Appeals. *See LaShawn A. v. Gray*, 412 F. App'x 315 (D.C. Cir. 2011). The *LaShawn* receivership was ordered just four years after a full trial on the constitutional and statutory violations in the D.C. foster care system. *See LaShawn A. v. Kelly*, 887 F. Supp. 297, 298 (D.D.C. 1995) ("Four years and two mayoral administrations later, however, many if not most of the problems remain. Children are routinely denied the protections and services that local and federal law require. Because all reasonable alternative measures of change have been exhausted, the Court today grants the plaintiffs' motion for contempt and imposition of a full receivership.").

Defendants' description of the court's findings in creating the receivership in *LaShawn*, too, is materially similar to the Monitor's findings in this case from June 11, 2019. Defendants assert *LaShawn* is "distinguishable" because the "categories of violations" in *LaShawn* were categories in which (Defendants claim) MDCPS has made progress—adoptions, "necessary administrative supports (e.g. supplies, operable phones", and licensed social workers. *See* Defs.' Brief, at 16. If anything, however, Defendants prove the situation in Mississippi is more dire than it was in *LaShawn*—among the 35 performance standards Defendants failed to meet, the Monitor notes, "are several critical to child safety", including screening, investigating, and reviewing maltreatment in care cases, and the overall rate of maltreatment of care, which is "more than three times the standard agreed upon in the 2nd MSA". Monitoring Report, at 5-6. Receivership was appropriate and necessary in *LaShawn*, and it is appropriate and necessary here too. Defendants' attempts to distinguish *LaShawn* only confirm this fundamental fact.

More than 12 years have passed since Defendants entered into a settlement agreement with Plaintiffs, promising to create a system that conforms with constitutional standards. Reviewing the Monitor's previous reports, as well as the 2018 Monitoring Report, shows that in those more

than 12 years, few things have changed. Most importantly, MDCPS still cannot accurately measure the degree to which things have changed, as evidenced by the fact that for 41 of the 113 obligations due in 20018, Defendants either failed to provide any data, or provided inaccurate data that could not be verified by the Monitor. *See* Monitoring Report, at 4. Were this the first time Plaintiffs had moved for contempt, the question of appointing a receiver might take on different significance. But it bears repeating that it is now 12 years after Defendants made binding commitments to a federal court to protect its most vulnerable children, commitments which have never been honored. A receivership is the only way of ensuring that the work necessary to reform the Mississippi foster care system, work which should have begun 12 years ago, will finally get underway.

The state has had a decade to turn around its child welfare system, but even when it makes progress, it is not moving fast enough. Every day that Defendants' fail to comply is a day that real children in their custody suffer violations of their Constitutional rights. Plaintiffs urge this court to enter a finding of civil contempt and appoint a receiver to take the helm of Mississippi's child welfare system.

## III.    CONCLUSION

On the last page of their brief, Defendants conclude that "finding [them] in civil contempt does nothing to advance compliance with the commitments in the 2nd MSA or improve foster care in Mississippi". *See* Defs.' Brief, at 59. But that conclusion is rebutted by a fact Defendants themselves acknowledge in one of the first pages of their brief: the receiver—appointed by and answerable to the Court—would be empowered to draw upon "any and all authority previously vested in the Office of the Governor or any other executive branch of the government of the state of Mississippi". *Id.* at 2. As Defendants make abundantly clear in their brief, the Governor, the Executive Director of MDHS, and the Commissioner of MDCPS (all of whom are Defendants in

this action) have failed to coordinate their efforts to ensure compliance with this Court's mandates. A receiver would be unencumbered by political inefficiencies, miscommunications, or bargaining costs.

Defendants insinuate that a receiver with such "full" authorities would inappropriately extend itself into the province of "the Office of Governor or any other executive branch of the government of the state of Mississippi". *See* Defs.' Brief, at 2. But the Governor is a Defendant in this action. So is the Executive Director of the Mississippi Department of Human Services, and the Commissioner of the Mississippi Department of Child Protective Services—who represent two such substantial "executive branch[es] of the government of the state of Mississippi". The executive branch of Mississippi has been a party to this action since its inception, and the powers that would be vested in a receiver are thus already fully within the jurisdiction of this Court.

Defendants' arguments against receivership also oddly ignore the role of the Legislature. Perhaps Defendants are so accustomed to laying the blame for their failing foster care system at the Legislature's feet that they forget their interests are in fact aligned. The Legislature, too, does not want to see Defendants—who represent three agencies of the executive branch—held in contempt of federal court. By finding Defendants in contempt, this Court would provide the Mississippi Legislature with powerful incentives to adequately fund the state's foster care system and to assist Defendants achieve compliance with the 2nd MSA. These are exactly the kind of incentives, unfortunately, Defendants alone have been unable to provide.

For the foregoing reasons, Plaintiffs request that this Court find that Defendants are in noncompliance with the STRO and 2nd MSA, hence in contempt of Court; appoint a general receiver with full authority to administer Mississippi's child welfare system and to bring it into

compliance with the orders of this Court; and grant such other and further relief as this Court deems necessary and proper.

RESPECTFULLY SUBMITTED, this the 10th day of September 2019.

*/s/ Marcia Robinson Lowry*
Marcia Robinson Lowry (*pro hac vice*)


## CERTIFICATE OF SERVICE

I hereby certify that on September 10th, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will deliver copies to all counsel of record.

*/s/ Marcia Robinson Lowry*
Marcia Robinson Lowry (*pro hac vice*)