# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

OLIVIA Y., by and through her next friend, James D.
Johnson; JAMISON J., by and through his next friend, Clara
Lewis; DESIREE, RENEE, TYSON, and MONIQUE P., by
and through their next friend, Sylvia Forster; JOHN A., by
and through his next friend, James D. Johnson; CODY B., by
and through his next friend, Sharon Scott; MARY, TOM,
MATTHEW, and DANA W., by and through their next
friend, Zelatra W.; AND SAM H., by and through his next
friend, Yvette Bullock; on their own behalf and behalf of all
others similarly situated,

                                    Plaintiffs,              CIVIL ACTION NO.
                                                             3:04-CV-251-TSL-FKB

            v.

PHIL BRYANT, as Governor of the State of Mississippi;
DONALD TAYLOR, as Executive Director of the
Department of Human Services; AND BILLY MANGOLD,
as Director of the Division of Family and Children's
Services,

                                    Defendants.


**PLAINTIFFS' PROPOSED SUPPLEMENTAL MEMORANDUM OF LAW IN
SUPPORT OF AMENDED MOTION FOR RELIEF PURSUANT TO REMEDY PHASE
OF PLAINTIFFS' RENEWED MOTION FOR CONTEMPT, FOR AN EVIDENTIARY
HEARING, AND FOR THE APPOINTMENT OF A RECEIVER**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

I.    INTRODUCTION ..................................................................................... 1

II.   FACTS ...................................................................................................... 3

    A.  Maltreatment of Children in Care ....................................................... 5

    B.  Child Well-Being ................................................................................. 8

    C.  Caseload Standards .............................................................................. 9

    D.  Placement Standards ........................................................................... 10

    E.  Data and Management Information Systems ....................................... 13

III.  DISCUSSION ........................................................................................... 15

    A.  Defendants' Extensive, Substantial, and Relentless Noncompliance Warrants the Appointment of a Receivership ................................................... 16

    B.  The Court May Enter a Finding of Contempt Without Appointing A Receiver .............. 19

        1.  The Court May Find Contempt and Appoint a Limited Receivership ...................... 19

        2.  The Court May Enter a Finding of Contempt and Impose Fines ............................. 21

        3.  The Court Should, at Minimum, Enter a Finding of Contempt Now ........................ 23

IV.   CONCLUSION .......................................................................................... 23

CERTIFICATE OF SERVICE ........................................................................... 25

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Am. Airlines, Inc. v. Allied Pilots Ass'n*,
   228 F.3d 574 (5th Cir. 2000) ...............................................................16

*Crain v. Bordenkircher*,
   180 W. Va. 246 (1988) ....................................................................18

*Dixon v. Barry*,
   967 F. Supp. 535 (D.D.C. 1997)....................................................16, 17

*Fla. Steel Corp. v. NLRB*,
   648 F.2d 233 (5th Cir. 1981) ..............................................................19

*Gates v. Collier*,
   616 F.2d 1268 (5th Cir. 1980) ...........................................................15

*Hutto v. Finney*,
   437 U.S. 678, 57 L. Ed. 2d 523, 98 S. Ct. 2565 (1978)...................15, 21

*LaShawn A. v. Kelly*,
   887 F.Supp. 297, 299-301, 317 (D.D.C. 1995), *aff'd sub nom. LaShawn A. v.
   Kelley*, 107 F.3d 923 (D.C. Cir. 1996)..............................................20, 21

*Lelsz v. Kavanagh*,
   673 F. Supp. 828 (N.D. Tex. 1987) ....................................................15

*McCord v. Maggio*,
   927 F. 2d 844 (5th Cir. 1991) ............................................................16

*M.D. v. Abbott*,
   No. 2:11-CV-0084 (S.D. Tex. Nov. 7, 2019) .......................................22

*Newman v. Alabama*,
   466 F. Supp. 628 (M.D. Ala. 1979) ...................................................18

*Plata v. Schwarzenegger*,
   No. C01-1351TEH (N.D. Cal. May 10, 2005)...................................18, 20

*Reynolds v. Ala. DOT*,
   84 F. Supp. 2d 1339 (M.D. Ala. 2000) ...............................................22

*Shaw v. Allen*,
   771 F. Supp. 760 (S.D. W. Va. 1990)..........................................16, 18, 19

*Stone v. City & Cty. of S.F.*,
   968 F.2d 850 (9th Cir. 1992) .............................................................22

*United States v. Alcoa, Inc.*,
533 F.3d 278 (5th Cir. 2008) ...............................................................................15

*United States v. City of Jackson*,
318 F. Supp. 2d 395 (S.D. Miss. 2002)..................................................................16

*Whitcraft v. Brown*,
570 F.3d 268 (5th Cir. 2009) ...............................................................................15

**Other Authorities**

Allie Morris,
*Texas Pays $150,000 fine in foster care lawsuit*, SAN ANTONIO EXPRESS-NEWS
(Nov. 13, 2019) ....................................................................................................22

Mississippi Department of Human Services, Division of Family and Children's Services,
Organizational Analysis (Nov. 24, 2015) ............................................................10

Fed. R. Civ. P. 60(b) .....................................................................................................3

## I.     INTRODUCTION[1]

This case has stagnated in this Court for over fifteen years, without resolution or remedy for the vulnerable Mississippi foster children who depend on Defendants for their safety, security, and well-being. For over a decade, Defendants have repeatedly failed to comply with court orders and court-approved settlement agreements alike, which require them to address their unconstitutional treatment of abused and neglected children. Earlier this year, Plaintiffs filed a motion requesting that this Court find Defendants in contempt and appoint a receiver to take the helm of Mississippi's foster care system. Dkt. 850. On December 23, 2019, the court-appointed neutral monitor[2] issued the Progress of the Mississippi Department of Child Protection Services: Interim Monitoring Report for *Olivia Y., et al. v. Bryant, et al.* covering January to June 2019 (the "Interim Report").  In light of this new information, Plaintiffs submit this Supplemental Memorandum in support of their pending Amended Motion for Relief Pursuant to Remedy Phase of Plaintiffs' Renewed Motion for Contempt. [Dkt. 849] ("Amended Renewed Motion"). Plaintiffs renew their request that this Court find Defendants in contempt and appoint a receiver to manage the state's dysfunctional child welfare system, as Defendants have persistently demonstrated they are incapable of managing it themselves. Although Plaintiffs maintain that a full receivership is desperately necessary here, in this memorandum Plaintiffs also propose alternative remedies, should the Court determine that a full receivership is not appropriate at this time.

The new information contained in the Monitor's Interim Report confirms what is, at

---

[1] Plaintiffs' position and the supporting evidence is laid out fully in their Amended Motion for Relief Pursuant to Remedy Phase of Plaintiffs' Renewed Motion for Contempt [Dkt. 849] ("Amended Motion"), accompanying Memorandum of Law in Support [Dkt. 850], and Reply Memorandum of Law in Further Support [Dkt. 864], and are incorporated by reference herein as if fully set forth herein.
[2] Hereinafter referred to as the "Monitor" or "Public Catalyst".

this point, an old story: Defendants remain in violation of the currently operative and court-ordered settlement agreement, the 2nd Modified Mississippi Settlement Agreement and Reform Plan [Dkt. No.712] ("2nd MSA"), entered by the Court only two years ago. Once again, Defendants' noncompliance is widespread and substantial. And, once again, Defendants will suffer no consequences for their noncompliance—unless this Court finds Defendants in contempt and appoints a receiver.

To be clear, Defendants' noncompliance has visceral, human repercussions: this suit was brought back in 2004 because Defendants were depriving Mississippi children of their constitutional rights. At that time, Plaintiffs alleged that Defendants were ignoring reports that children were being physically and sexually abused, starved, neglected, or otherwise maltreated, and left to suffer in dangerous and potentially deadly homes. Dkt. 1 at 23-26. The lawsuit asserted that Defendants denied children in their care and custody access to health services, *id.* at 34-36, placed children in overcrowded, abusive homes, and unnecessarily institutionalized children as young as two. *Id.* at 30-33. Today, 15 years later, a new generation of vulnerable Mississippi children are being deprived of their constitutional rights in the very same ways.

The Monitor's Interim Report also confirms that, contrary to Defendants' empty promises, more time will *not* cure their noncompliance. Indeed, Defendants have not even offered a time by which they will come into compliance. More than a decade has elapsed since Defendants first signed a consent decree, essentially conceding that the Mississippi child welfare system violated the constitutional rights of the children it was bound to protect. Defendants have since entered into countless court-enforceable agreements, and been subject to various court orders, failing to comply with nearly every single one. When Plaintiffs filed

2

their most recent contempt motion in May 2018, *see* Dkt. 739, Defendants' response was to file a motion pursuant to Fed. R. Civ. P. 60(b) requesting relief from their court-ordered obligation to comply with caseload standards—standards Defendants themselves had agreed to only six months before. *See* Dkt. 756. Defendants have clearly demonstrated that if abused and neglected Mississippi children are *ever* to receive constitutionally adequate care, it will not be at Defendants' hands. As such, the state's foster care system must be placed in the hands of a court-appointed receiver. The receiver would be answerable to the Court, which is more than can be said of Defendants, who remain answerable to no one. And after ten years of Defendants' excuses, receivership offers the best chances at finally complying with this Court's prior orders and delivering better outcomes for Mississippi children. Without such a drastic change, all Defendants can honestly promise is that more generations of abused and neglected Mississippi children will needlessly languish in their unconstitutional child welfare system.

## II.    FACTS

Six months ago, the Monitor published its 2018 report, chronicling Defendants' staggering noncompliance with the terms of the court-approved 2nd MSA.[3] Defendants were required to comply with 113 commitments, due in 2018. Defendants not only failed to comply with at least 35 of those commitments, but additionally failed to produce reliable data for another 41, revealing how little they know about the almost 5,000 Mississippi children in their custody and care. Monitor's 2018 Report, at 4, 19. Out of the 113 commitments, Defendants only met the required performance standards for 37. *Id.*

The Interim Report confirms that Defendants' noncompliance has persisted through the

---

[3] Progress of the Mississippi Department of Child Protection Services Monitoring Report 6, at 4 [Dkt. 845]("Monitor's 2018 Report").

first six months of 2019.4 Of the 126 commitments on which the Monitor reported for the first half of 2019, Defendants failed to comply with at least 26. *See* Interim Report. Moreover, the Monitor was additionally unable to validate data provided by Defendants for another 32 commitments. *See id*. Defendants failed to provide the Monitor with any data at all for another 19. *See id*. According to the Interim Report, for the first two quarters of 2019, Defendants failed to comply with the following commitments:

- Caseworker Caseloads – § 1.3.a
- Supervisor Staffing Ratios – § 1.3.b
- Foster Care Service Standards Reporting – § 1.6.b
- Responding to Reports of Abuse and Neglect – § 2.1
- Special Investigations Unit and Maltreatment in Care Investigation Initiation Timeliness – § 2.2
- Maltreatment in Care Screen-Out Reviews – § 2.3
- Licensure Investigations by Child Placing Agencies – § 2.5
- Maltreatment in Care Worker Training – § 2.6
- Maltreatment in Care Investigation Reviews – § 2.7
- Standardized Decision Making – § 2.8
- Timely Licensure of Foster Homes and Facilities – § 3.15
- Unlicensed Foster Homes and Facilities, Safety Issues – § 3.2.b
- Unlicensed Foster Homes and Facilities, Non-Safety Issues – § 3.2.c
- Young Children Placed in Congregate Care Facilities – § 4.9
- Placement Moves – § 4.10
- Placement Moves – § 4.12
- Child-Parent Contacts within 72 Hours of Placement – § 5.2.a
- Family Visitation Plans – § 5.2.b
- Comprehensive Family Service Plans – § 6.1.a.2

---

4 Defendants have provided Plaintiffs with data on 2019 Q3. But, since data issues persist, 2019 Q3 data is not included in this Supplemental Memorandum as the Monitors have not yet validated that data.
5 Defendants failed to comply with both commitments set forth in § 3.1. Interim Report at 9-10.

4

- Diligent Search for Parents – § 6.1.c.2
- Permanency Plans – § 6.1.d.2
- Concurrent Permanency Planning – § 6.2.a.1
- Adoption Case Goal – § 6.3.b.1.b
- Permanency Plan Reviews – § 6.4.a.2
- Timely Annual Court Reviews – § 6.4.b.2

The Interim Report is also the first time that the Monitor has reported on Defendants' compliance with the 2nd MSA's qualitative requirements. As such, the Interim Report revealed significant and substantial discrepancies between Defendants' compliance with quantitative and qualitative requirements—meaning, for example, that while certain provisions may be completed timely, at least as reported by the state's admittedly deeply flawed computer system, they are not completed adequately. *See e.g.* Interim Report at 7, 16, 17.

The Interim Report reinforces what Plaintiffs have asserted for years: that Defendants are in clear, substantial, and extensive noncompliance with the court-approved settlement agreement that Defendants themselves negotiated and entered into at the end of 2016. Defendants' noncompliance defies this Court's orders and the constitutional rights of thousands of Mississippi children. And while all provisions of the 2nd MSA are crucial, a number of Defendants' failures to comply have specific, direct, and observable consequences for child safety and health—such as Defendants' failed commitments related to caseload standards, which are the foundation of a well-functioning child welfare system, and to investigating and addressing maltreatment in care. As the Interim Report makes clear, Defendants' failure to comply in these crucial areas has persisted throughout the first half of 2019, and in some cases, even worsened.

### A.  Maltreatment of Children in Care

Defendants agreed that the rate of abuse and neglect among children in foster care shall not exceed .33 percent per year. 2nd MSA §2.9. That rate was supposed to ensure children in state custody would be safe from abuse and neglect by their caregivers, a right as fundamental as any in a state child welfare system. In 2018, ninety-five children in MDCPS custody (or 1.15 percent) were victims of abuse or neglect by their caregivers—more than *three times* the agreed-upon rate. Monitor's 2018 Report, at 47. While the Interim Report does not assess Defendants' compliance with this requirement, as Defendants only report the rate of maltreatment in care annually, Defendants' continued failure to meet other maltreatment standards—such as those related to screening, investigations, and reviews of maltreatment in care—strongly suggests that the high rate of maltreatment in care persists in 2019.

First, Defendants committed to maintaining a statewide system for appropriately receiving, prioritizing, screening and investigating reports of child maltreatment. 2nd MSA §2.1. But in 2018, the Monitor noted that "many features of the system lack adequate quality controls." Monitor's 2018 Report, at 5.[6] The Interim Report confirms that for the first two quarters of 2019, Defendants remain in noncompliance with this critical provision. Interim Report at 6.

Second, Defendants committed to reviewing *all* maltreatment in care reports that were screened out to assess the appropriateness of the screening decision within twenty-four hours. 2nd MSA §2.3. But in 2018, only 62.3 percent of screened-out reports were reviewed. Monitor's 2018 Report, at 39. The Interim Report confirms that for the first two quarters of 2019, Defendants' noncompliance with §2.3 persists. In 2019 Q1, 70 percent of screened-out reports were timely reviewed, with that number increasing to 79 percent in Q2. Interim Report at 6. The Interim Report

---

[6] A motion to obtain additional information about the death and serious beating of two toddlers in May of this year, whose case was reported to MDCPS but closed the day before one of the toddlers was killed, remains pending before the Court. Dkt. 865.

also reveals Defendants' continuing inability to produce reliable, accurate data: while according to Defendants, 92 percent of reports were timely reviewed in Q1, the Monitor could only validate performance of 70 percent. *Id.*

Third, the Safety Review Unit ("SRU") must review *all* maltreatment investigations within 30 days of completion of a maltreatment in care investigation to identify any case practice deficiencies and necessary remedial action to ensure the safety of the subject child and others in the placement. 2nd MSA §2.7. Defendants failed to meet this requirement in 2018. Monitor's 2018 Report, at 44. And, as verified in the Interim Report, Defendants also failed to meet this requirement in the first half of 2019. Interim Report at 7.  Further, the Interim Report reveals a noteworthy discrepancy between Defendants' compliance with the qualitative and quantitative components of §2.7. In Q2, for example, 94 percent of reviews were conducted timely, but only 72 percent of reviews met quality standards. *Id.* The Interim Report also indicates that data issues continue, particularly for the qualitative components of this provision. While Defendants reported that for Q1, 100 percent of investigations met quality requirements, the Monitor validated qualitative performance at only 86 percent. *Id.* For Q2, things got worse, with Defendants reporting that 99 percent of investigations met quality requirements, while the Monitor validated qualitative performance at only 72 percent. *Id.*

Finally, the 2nd MSA requires that proper and timely licensure investigations be conducted when children in foster care are maltreated while placed with a private child placing agency. 2nd MSA §2.5. Upon receipt of a substantiated report of child maltreatment in a maltreatment in a private child placing agency foster home, MDCPS staff is required to notify the child placing agency, which must initiate a licensure investigation that is in addition to, and independent of, any child protection investigation, within 30 days. 2nd MSA §2.5. Defendants failed to meet these

7

requirements in 2018. Monitor's 2018 Report, at 43. The Interim Report found that Defendants remained in noncompliance with §2.5 in the first half of 2019, as child placing agencies were not consistently conducting licensure investigations independent of the child protection investigation. Interim Report at 7, n.6.

Taken together, the Interim Report demonstrates that Defendants are in extensive and substantial noncompliance with provisions of the 2nd MSA specifically intended to protect vulnerable children from abuse and neglect. That failure is not simply a matter of percentage points, but represents actual, real-world suffering endured by Mississippi children. As a result of Defendants' unreliable data and systems, improper investigations, and inadequate reviews, children across the state are being left in dangerous, potentially life-threatening situations. It is not hyperbole to say that Defendants' noncompliance puts children's lives are at risk.

**B.  Child Well-Being**

The 2nd MSA also contains provisions requiring Defendants to ensure that the vulnerable children in their care have access to timely and adequate physical and mental health care. By 2018, 70 percent of children entering foster care were required to receive an initial medical screening within seven days of entering care. 2nd MSA §8.1.a. However, in 2018, only 59.2 percent of children received a timely initial medical examination. Monitor's 2018 Report, at 78. By 2018, 70 percent of children entering foster care were also required to receive a comprehensive medical exam within 60 days of entering care. 2nd MSA §8.1.b. But in 2018, only 51 percent of children received a timely comprehensive medical examination. Monitor's 2018 Report, at 79.

The Interim Report does not include an assessment on this standard because the Monitor has not yet been able to validate the data provided by MDCPS. Interim Report at 26. The qualitative data provided by Defendants for this provision was excluded from the Interim Report

because Defendants failed to conduct their qualitative review in accordance with the agreed-upon methodology. *Id.* at 26, n.28.

### C. Caseload Standards

Caseload standards are essential to ensuring children in foster care receive constitutionally adequate care. Reasonable caseloads are also key to accomplishing most of the 2nd MSA's objectives. Caseloads directly impact a caseworker's ability to timely respond to reports of abuse or neglect. They also determine how often, and how effectively, a caseworker can visit children to monitor their safety and the adequacy of their placement. Caseloads similarly affect a caseworker's ability to implement case plans to meet children's needs. Simply put, a child welfare system cannot function when caseworkers are routinely overburdened with impossibly high caseloads.

A crucial provision of the 2nd MSA requires that 90 percent of caseworkers have caseloads that do not exceed established caseload standards by January 1, 2018. 2nd MSA §1.3.a. Defendants agreed to abide by those standards. But Defendants did not meet the caseload standards at any point during 2018. The closest Defendants came to the 90 percent requirement was 60 percent, and compliance has dropped as low as 47 percent. Monitor's 2018 Report, at 28. The situation has worsened in 2019, according to the Interim Report. Compliance with the caseload standards was 54 percent in Q1 and 57 percent in Q2—with compliance dropping as low as 31 percent in some areas of the state. Interim Report at 3. Moreover, Defendants are unable to say when, or even if, they will ever reach compliance with the 90 percent caseload standard.

Further, the 2019 Report to the Mississippi Legislature[7] by the Joint Legislative Committee on Performance Evaluation and Expenditure Review ("PEER") highlighted Defendants' failure to meet caseload standards, high caseworker turnover, and the large number of vacancies at MDCPS.[8] 2019 PEER Report at vii. According to the PEER Report, in 2019 the caseworker turnover rate was 30 percent, a nine percent increase over 2018. *Id.* The turnover rate increased statewide, as "twelve of MDCPS's fourteen regions and forty-three counties had an increase in caseworker turnover from FY 2018 to FY 2019." *Id.* at viii. As of May 1, 2019, 25 percent of MDCPS' positions were vacant. *Id.* Of the 487 vacancies, 58 percent were caseworkers and caseworker supervisors. *Id.* at 6.

The gap between the caseload compliance requirements of the 2nd MSA and the actual achieved compliance is enormous. This is not a near miss, or substantial compliance; this is a wholesale failure to meet a fundamental requirement to which Defendants had agreed only two years earlier. The caseload compliance requirement is a vital measure by which Defendants can produce better outcomes for children, protect them from harm, and provide necessary services. And yet, Defendants remain unable to say if, or when, they will reach compliance.

### D. Placement Standards

---

[7] Report to the Mississippi Legislature: A Review of the Mississippi Department of Child Protection Services for Fiscal Year 2019 (hereinafter "2019 PEER Report").

[8] One significant factual inaccuracy must be addressed to this Court. The 2019 PEER Report recommends that "MDCPS should conduct a new caseload study based on current caseworkers' time and responsibilities to determine the range of time necessary for a caseworker to perform a task in accordance with best practices. MDCPS should establish new standards based on the results of this study." 2019 PEER Report at viii. But this recommendation is based on an inaccurate assumption: that the current caseload standards are based on a 2005 workload study. *Id.* at 14. In 2015, in determining the appropriateness of caseload standards that would be used for the 2nd MSA, the Monitor reviewed the caseloads standards and determined they were consistent with reasonable child welfare practice and consistent with those in the profession. The Monitor deemed it unnecessary to conduct a new workload study, as it was unlikely to change the standards, which were already consistent with good practice. *See* Mississippi Department of Human Services, Division of Family and Children's Services, Organizational Analysis (Nov. 24, 2015), available at *https://www.mdhs.ms.gov/wp-content/uploads/2018/01/MDHS_DFCS-Final-Organizational-Analysis-Report-2015-11-24.pdf.*

Children removed from their families have already experienced some amount of trauma. Placement standards ensure that children in foster care are not re-traumatized through frequent, unstable placements, but are instead placed in safe, home-like settings suited to their individual needs and which allow them to maintain connections with their families and home communities. Both parties agreed to, and this Court ordered, certain specific placement standards. Defendants remain in noncompliance with a number of those standards, all of which have severe consequences on children's safety, security, and long-term well-being.

Defendants committed to placing 60 percent of siblings who enter foster care around the same time together, except in a limited number of situations. 2nd MSA §4.6, 4.16. Despite the obvious importance of keeping siblings together, in 2018 the Monitor was unable to validate Defendants' compliance, noting significant data issues and inaccuracies. Monitor's 2018 Report, at 57. The Monitor noted many instances where MDCPS identified siblings as being placed together but the children's placement histories indicated that they had never been in the same placement. *Id.* The Monitor remained unable to validate the data provided by MDCPS in the first half of 2019. Interim Report at 12.

The 2nd MSA requires, importantly, that Defendants take all reasonable steps to avoid the disruption of an appropriate placement and ensure placement stability for children. For children subject to an actual or potential placement disruption, Defendants must document the immediate reasonable steps taken to address placement stability. §4.7, 4.17. Despite the clear importance of placement stability for vulnerable children, Defendants did not report on this requirement in 2018. Monitor's 2018 Report, at 11. The Monitor was also unable to validate the information provided by Defendants in the first half of 2019. Interim Report at 12.

To further ensure placement stability, the 2nd MSA requires that children remain in their

11

existing placement and not be moved to another placement unless MDCPS specifically documents in the child's case record justifications for that move and the move is approved by an MDCPS supervisor. 2nd MSA §4.10, 4.12. Defendants were not in compliance with this provision in 2018. Monitor's 2018 Report, at 59. Defendants remained in noncompliance with this provision in Q1, and the Monitor had not been able to validate Defendants' data for Q2 at the time the Interim Report was filed. Interim Report at 13.

Additionally, *no child* under the age of ten is to be placed in a congregate care setting unless an approved exception exists. 2nd MSA §4.9. Defendants failed to comply with this commitment in 2018. Monitor's 2018 Report, at 58. The Interim Report shows that Defendants remained in noncompliance with this provision in the first half of 2019. In Q1, despite the performance standard of 100 percent, Defendants only reached 59 percent compliance. Interim Report at 13. In Q2, compliance increased to 81 percent. *Id*. But Defendants remain far from achieving the required 100 percent compliance. There was also a significant discrepancy between the Q1 performance reported by Defendants and the Q1 performance validated by the Monitor: Defendants reported 94 percent compliance, whereas the Monitor validated compliance at only 59 percent. *Id*.

Caseworker visitation of children is critical to ensuring child safety. Yet for a number of those commitments, the Monitor could not validate data provided by Defendants. For example, the 2nd MSA requires that all children in foster care be visited by a caseworker, in the child's placement, at least once per month. §5.1.a.2. The 2nd MSA also states that children who are sent home on 90-day trial home visits *must* be visited by a caseworker at least two times per month, in the child's home. §5.1.b.2. Similarly, the 2nd MSA states that children who remain in an out-of-home placement following a substantiated investigation into a report of maltreatment in that placement *must* be visited once per week for the first month and twice per month for three months.

§2.8.b. Despite the importance of these provisions, the Monitor remains unable to validate data provided by Defendants. Interim Report at 8, 14.

Again, Defendants' noncompliance results in actual, demonstrable harm to Mississippi children. Siblings are being separated, children's lives are being needlessly uprooted, small children are spending their childhoods in inappropriate institutional settings—and Defendants refuse to be held accountable for their actions. Such wanton noncompliance, and violation of a court order, should be unacceptable.

### E.  Data and Management Information Systems

The 2nd MSA requires the implementation of a comprehensive child welfare data and tracking system that permits timely access to information, including current and historical case documents, to support child safety and continuity of care across placement settings and services with the goal of improving MDCPS' ability to account for and manage its work with vulnerable children. 2nd MSA §1.5. In 2018, the Monitor emphasized "substantial and ongoing" data problems. Monitor's 2018 Report, at 4. While the Interim Report did not assess compliance for this provision because Defendants only report annually, Interim Report at 4, it is readily apparent from the report that Defendants' data system remains woefully inadequate. The 2019 PEER Report also highlights Defendants' data problems, noting that "[w]hile MDCPS has developed a data quality plan, this plan has not been successfully implemented as evidenced by numerous errors in the FY 2019 datasets reviewed by PEER." 2019 PEER Report at 5.

As the Monitor reported in 2018, many of the metrics for which there is no information at all are imperative to child safety and well-being, "creat[ing] blind spots that impair MDCPS management's ability to lead the Department and ensure the safety, well-being and permanency of children consistent with the 2nd MSA." Monitor's 2018 Report, at 4.  Indeed, for 41 of the 113 commitments due in 2018, Defendants either failed to provide data or provided inaccurate data

13

that the Monitor could not validate. *Id.* In the Interim Report, the Monitor was unable to validate data provided by Defendants for at least 32 commitments. *See* Interim Report. For another 19 commitments, Defendants failed to provide any data at all. *See id.* Without access to basic, accurate information about the children for whom it is responsible, it is virtually impossible for Mississippi to provide them constitutionally adequate care.

The data problems identified by the Monitor in 2018 include "the manner in which the Department documents and identifies certain data fields, coding errors and performance calculations that are inconsistent with the established rules." Monitor's 2018 Report, at 4. The Monitor also found deficiencies in MDCPS' primary information system, the Mississippi Automated Child Welfare Information System ("MACWIS"), noting Defendants' inability "to consistently and reliably report from MACWIS current and historical data of children in custody for numerous 2nd MSA commitments." *Id.* at 30. In 2019, MAWCIS remained unreliable. Defendants recently admitted the inaccuracy of their data for a number of provisions, which required Defendants to consult the Monitor and re-code those provisions in MAWCIS. *See e.g.* Interim Report at 23, n.26. The Interim Report also confirmed that, just as in 2018, Defendants still know very little about the children in their care with regard to a significant number of critical settlement agreement provisions.

The Interim Report does not indicate any substantial progress has been made in the first half of 2019 in dealing with the state's fundamental data problems. *See* Interim Report. *See also* 2019 PEER Report. Defendants are failing the children in Mississippi's foster care system across the board despite having been given repeated opportunities to address these issues. At this point, it is reasonable to conclude Defendants are both unwilling and unable to bring the system into compliance.

## III.    DISCUSSION

Despite Defendants' outright admission that they are not in compliance with court-ordered agreements requiring improved outcomes for Mississippi foster children, Defendants have never, in this case's long history, been held in contempt. Contempt is appropriate where a party fails "in meaningful respects to achieve substantial and diligent compliance with a clear and unambiguous court decree." *Lelsz v. Kavanagh*, 673 F. Supp. 828, 839 (N.D. Tex. 1987) (citations and internal quotation marks omitted). This Court acknowledged, back in 2011, that "plaintiffs obviously have met their burden to present a prima facie case" for civil contempt. Dkt. 557 at 4. Defendants' ongoing noncompliance means that statement is just as true today. "[F]ederal courts are not reduced to issuing judgments against state officers and hoping for compliance*." Gates v. Collier*, 616 F.2d 1268, 1271 (5th Cir. 1980), quoting *Hutto v. Finney*, 437 U.S. 678, 690, 57 L. Ed. 2d 523, 98 S. Ct. 2565 (1978). Every day Defendants remain in violation of the court-approved 2nd MSA, vulnerable Mississippi children suffer. Entering a finding of civil contempt is not only appropriate but also necessary to prevent further irreparable harm.

As previously demonstrated in Plaintiffs' initial motion for contempt and fully incorporated herein, Defendants' ongoing noncompliance constitutes civil contempt. *See* Dkt. 850 at 17-21. Neither party genuinely disputes that fact. To demonstrate civil contempt, a party must establish: "1) that a court order was in effect, 2) that the order required certain conduct by the respondent, and 3) that the respondent failed to comply with the court's order." *Whitcraft v. Brown*, 570 F.3d 268, 271 (5th Cir. 2009). The 2nd MSA is a court-approved settlement agreement "properly enforceable by the court's contempt power." Dkt. 557 at 5 n.1. *See also United States v. Alcoa, Inc.*, 533 F.3d 278, 286 (5th Cir. 2008) (district courts "must hold parties to the terms of a consent decree" by declaring contempt and implementing remedies). Second, the 2nd MSA undoubtedly requires specific conduct of Defendants, and even includes directives to meet certain standards by

15

numerical measures calculated by the Monitor in conjunction with Defendants. Dkt. 712. And lastly, Defendants have—by their own admission—failed to comply with the 2nd MSA.

Defendants' noncompliance need not be willful or intentional to constitute contempt—Plaintiffs must simply demonstrate Defendants' lack of compliance. *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Cir. 2000). Even Defendants' good faith is no defense to contempt. *United States v. City of Jackson*, 318 F. Supp. 2d 395, 417 (S.D. Miss. 2002) ("the mere fact that a party may have taken steps toward achieving compliance is not a defense to a contempt charge"). Nor is Defendants' lack of funds. *McCord v. Maggio,* 927 F. 2d 844, 847 (5th Cir. 1991) ("lack of funds is not a sufficient justification for neglect of a citizen's constitutional rights"). To be sure, Defendants have no cognizable defense to their decade-long flouting of settlement agreements approved by this Court, which were intended to remedy Defendants' unconstitutional treatment of Mississippi children in their custody and care.

## A. Defendants' Extensive, Substantial, and Relentless Noncompliance Warrants the Appointment of a Receivership

Defendants have caused Mississippi's child welfare system to fail so thoroughly, and for so long—in direct defiance of this Court's orders—that it is both proper and necessary for this Court to appoint a receiver. Plaintiffs have previously expounded the desperate need for a receivership. Dkt. 850 at 32-36. And courts across the country have recognized that "it is abundantly clear that a court may appoint a receiver to force public officials to comply with court orders." *Dixon v. Barry*, 967 F. Supp. 535, 550 (D.D.C. 1997); *see also Shaw v. Allen*, 771 F. Supp. 760, 762 (S.D. W. Va. 1990) ("Where more traditional remedies, such as contempt proceedings or injunctions, are inadequate under the circumstances", a court is "justified…in implementing less common remedies, such as a receivership, so as to achieve compliance with a constitutional mandate.").

16

In determining whether to appoint a receiver, "the court should consider whether there were repeated failures to comply with the Court's orders", "if there is a lack of sufficient leadership to turn the tide within a reasonable time period", and "whether a receiver can provide a quick and efficient remedy." *Dixon*, 967 F. Supp. at 550. In a span of nine years, Defendants have failed to comply with:

1) the Stipulated Settlement Agreement [Dkt. 425] (2007),

2) the Period 1 Implementation Plan [Dkt. 459] (2008),

3) the Mississippi Settlement Agreement & Reform Plan [Dkt. 459] (2008),

4) the Period 2 Implementation Plan [Dkt. 487] (2009),

5) the Bridge Plan [Dkt. 501] (2010),

6) the Modified Mississippi Settlement Agreement & Reform Plan [Dkt. 571] (2012),

7) the Period 3 Implementation Plan [Dkt. 571] (2012),

8) the Period 4 Implementation Plan [Dkt. 590] (2013)

9) the Period 5 Implementation Plan [Dkt. 618] (2014)

10) the July 9th Order [Dkt. 607] (2014),

11) the 2nd Modified Mississippi Settlement Agreement & Reform Plan [Dkt. 712] (2016).

It is highly unlikely, to say the least, that yet another order from this Court will affect Defendants' conduct. Indeed, Defendants' downward trajectory shows no signs of stopping. And there is nothing quick or efficient about the status quo, given that Defendants have been offered more than a decade of opportunities to comply with this Court's orders and the Constitution, and have consistently failed to do so. A receivership is undoubtedly the best means of achieving compliance and, as a result, better outcomes for Mississippi children.

As several courts have acknowledged, "receivership is not the most extreme remedy conceivable." *See Plata v. Schwarzenegger*, No. C01-1351TEH, 2005 U.S. Dist. LEXIS 8878, at *23 n.4 (N.D. Cal. May 10, 2005). Courts deciding civil rights actions involving prisoners, in particular, have suggested as a last resort that defendants' failure to remedy unconstitutional conditions could result in the release of prisoners from custody altogether. The court in *Crain v. Bordenkircher*, for example, "fe[lt] compelled to point out that the release sought by the petitioners may be the only remaining alternative to this Court after July 1, 1992, if the conditions of confinement are not remedied." *Crain v. Bordenkircher*, 180 W. Va. 246, 248, 376 S.E.2d 140, 142 (1988). *See also Newman v. Alabama*, 466 F. Supp. 628, 635 (M.D. Ala. 1979) ("failure to comply with the minimum standards set forth in the order would necessitate the closing of several prison facilities…the more reasonable and the more promising approach is the appointment of….[a] receiver for the prison system."); *Plata v. Schwarzenegger*, No. C01-1351 TEH, 2005 U.S. Dist. LEXIS 43796, at *80 (N.D. Cal. Oct. 3, 2005) ("The Court also could consider either closing some institutions or ordering the release of some prisoners (perhaps those who are at highest risk of receiving inadequate medical care, or those who pose the least security risk as a means of general population reduction)"); *Shaw v. Allen*, 771 F. Supp. 760, 763 (S.D. W. Va. 1990) (receivership "is not as drastic and intrusive as the ultimate course of action this Court could, and may yet, effectuate—that of ordering the McDowell County Jail closed.").

While the constitutional harms alleged by prisoners and by foster children bear substantial similarities—both are in a "special relationship" with the state, and therefore dependent upon the state for their safety and security—it is worth noting that certain "last resort" remedies are wholly unavailable to the children protected by this action. The children here cannot simply be released from Defendants' custody if they continue to fail to comply with constitutional mandates. To the

contrary, there are limited alternatives available for the children in Defendants' custody and care even in the face of unconstitutional conditions. In that context, receivership is not an "extreme" remedy at all. It is an appropriate, necessary, and equitable means of ensuring the safety of children entirely at Defendants' mercy, for whom there are very limited options.

### B.  The Court May Enter a Finding of Contempt Without Appointing A Receiver

While a full receivership is wholly warranted and offers the greatest potential for turning around Mississippi's long-dysfunctional child welfare system, Plaintiffs would be remiss to fail to proffer alternatives to this Court. As an alternative to the appointment of a full receivership, this Court may hold Defendants in contempt and appoint only a partial receiver. This Court may also hold Defendants in contempt and impose fines to induce Defendants' compliance. Or, this Court may hold Defendants in contempt now and hold a hearing on the appropriateness of a full receivership. "[T]he only limitation upon the sanctions imposed is that they be remedial or coercive but not penal." *Fla. Steel Corp. v. NLRB*, 648 F.2d 233, 239 (5th Cir. 1981).

Regardless of which specific remedial measures this Court issues, the fact remains: Defendants are in noncompliance with this Court's orders. As Plaintiffs have repeatedly demonstrated—and as the newest data from the Monitor re-confirms—that noncompliance is both severe and sustained. A timely finding of contempt is not only warranted but required to prevent further irreparable harm to abused and neglected Mississippi children.

### 1.  The Court May Find Contempt and Appoint a Limited Receivership

This Court may, as an alternative to Plaintiffs' request for full receivership, hold Defendants in contempt and appoint a limited receivership, addressing first the most critical of Defendants' failures to comply. Other courts have recognized the propriety of such limited receiverships. *See Plata v. Schwarzenegger*, No. C01-1351TEH, 2005 U.S. Dist. LEXIS 8878, at *32 (N.D. Cal. May 10, 2005) (acknowledging potential receivership "would be limited to the area

of health care delivery and the scope of the appointment will not extend beyond that field. The state officials in charge of operating all non-medical aspects of the Department of Corrections will retain their full powers."). This Court may then re-evaluate the propriety of appointing a full receivership in six months. A similar approach was adopted precisely in the child welfare context by the court in *LaShawn A. v. Kelly*, which imposed three limited receiverships until, "when it became clear that the defendants had no plan to comply" with the court's other orders, the court imposed a full receivership. *LaShawn A. v. Kelly*, 887 F. Supp. 297, 300 (D.D.C. 1995).

Here, if the Court decides to hold Defendants in contempt and appoint only limited receiverships, the Court should appoint a receiver with powers limited to those areas most critical to the safety of Mississippi children, where the need for reform is most urgent. Plaintiffs identify two such areas, both with the benefit of being easily divisible from the day-to-day operations of the Mississippi child welfare system: the administration of child protective services, and the state's child welfare information systems.

Plaintiffs have repeatedly pointed out Defendants' substantial noncompliance with provisions approved by this Court related to abuse and neglect investigations. That noncompliance has obvious and serious consequences for the safety of Mississippi children. The administration of child protective services is well-suited to limited receivership, as the functions of investigating and assessing child maltreatment are easily divisible from Defendants' other functions. Given how fundamental the adequate provision of child protective services is to the safety of Mississippi children, if this Court chooses to appoint a limited receivership, it should begin with a receivership tasked with reforming Defendants' inadequate child protective services.

Plaintiffs have also repeatedly pointed out what Defendants themselves routinely demonstrate: that they are in noncompliance with provisions approved by this Court related to data

collection and maintenance. That failure to comply is particularly significant as it impairs the ability of all parties, including the Monitor, to verify and assess Defendants' compliance by various metrics. Indeed, Defendants have never been able to adequately quantify all the information required to measure compliance with this Court's orders. Like the administration of child protective services, Defendants' computerized information system is easily divisible from Defendants' day-to-day operations, making it well-suited for receivership. A compliant information system would, further, enable the Monitor and the parties—and as a result, this Court—to more accurately assess Defendants' compliance with other provisions and orders.[9] Accordingly, if this Court decides to appoint a limited receivership, it should also begin with a receivership tasked with reforming Defendants' inadequate information system.

After appointing those limited receiverships, the Court may then re-assess Defendants' compliance with the parties' agreements after six months to determine whether a full receivership is warranted—as was the approach taken by the court in *LaShawn A. v. Kelly*, 887 F. Supp. 297, 300 (D.D.C. 1995).

### 2. The Court May Enter a Finding of Contempt and Impose Fines

If this Court declines to appoint either a full or limited receivership, it may alternatively find contempt and impose monetary sanctions. The Supreme Court has acknowledged "[c]ivil contempt may also be punished by a remedial fine", noting that "[i]f a state agency refuses to adhere to a court order, a financial penalty may be the most effective means of insuring compliance." *Hutto v. Finney*, 437 U.S. 678, 691 (1978). Defendants in civil rights cases similar to this one have been held in contempt and had such financial penalties levied against them. *See Stone v. City & Cty. of S.F.*, 968 F.2d 850, 853 (9th Cir. 1992) ("district court found the City in

---

[9] Because such a receivership would require coordination with the Children's Bureau and other detailed knowledge, Plaintiffs propose that the Monitor lead that effort.

contempt" and "ordered that the City immediately comply with the consent decree and imposed sanctions of $ 300 per day per inmate for each day…that the City violated the order"); *Reynolds v. Ala. DOT*, 84 F. Supp. 2d 1339, 1351 (M.D. Ala. 2000) (finding defendants in contempt and issuing daily fines until compliance achieved). Very recently, a district court in Texas found child welfare defendants in contempt and imposed a fine of $50,000 a day, increasing to $100,000 a day after one week, "until they follow and satisfy the Court's Order". *M.D. v. Abbott*, No. 2:11-CV-0084, 2019 U.S. Dist. LEXIS 194058, at *4-5 (S.D. Tex. Nov. 7, 2019). Defendants paid $150,000 in fines before certifying their compliance to the court.[10] This Court may, accordingly, find Defendants in contempt and impose such monetary sanctions as it deems sufficient to induce timely compliance.

Plaintiffs have previously advised the Court that they do not seek the imposition of fines, *see* Dkt. 850 at 18, and Plaintiffs understand that Defendants attribute their noncompliance in part to a dearth of funding. But to be sure, that does not render Defendants immune to the remedial imposition of fines, particularly where, as here, Defendants have manifested a decades-long disregard for court-approved settlement agreements designed to protect Mississippi children. Defendants have clearly failed to respond to this Court's orders or settlement agreements approved by this Court. Defendants have repeatedly rejected Plaintiffs' attempts to negotiate. Defendants cannot even promise imminent compliance. But this Court has not, as of yet, imposed on Defendants a financial penalty for their noncompliance. Accordingly, this Court may decide to find Defendants in contempt and impose fines to induce compliance with the parties' settlement agreements.

---

[10] Allie Morris, *Texas Pays $150,000 fine in foster care lawsuit*, SAN ANTONIO EXPRESS-NEWS (Nov. 13, 2019), https://www.expressnews.com/news/local/politics/article/Texas-pays-150-000-fine-in-foster-care-lawsuit-14832087.php.

22

### 3. The Court Should, at Minimum, Enter a Finding of Contempt Now

Neither party disputes the fact that Defendants are in substantial noncompliance with the court-approved STRO and 2nd MSA. Indeed, this Court declared back in 2011 that it was "unquestionably true" that Defendants had failed to comply with "most of the requirements established by the court-approved" agreement and that Plaintiffs "obviously have met their burden to present a prima facie case" for civil contempt. Dkt. 557 at 4. This Court declined to hold Defendants in contempt due to doubts that such a finding would "serve any fruitful purpose." *Id.* at 10. But now, it is just as unquestionably true that without some action from this Court, Defendants will *continue* to fail to comply, leaving the safety of Mississippi children in the balance—just as Defendants have done for the past nine years.

Accordingly, Plaintiffs request that this Court, at minimum, enter a finding of contempt against Defendants and hold a hearing to determine whether Defendants' contempt warrants a full receivership. Such a finding of contempt would, at the very least, convey the gravity of Defendants' noncompliance—which, every day, affects the safety and security of vulnerable Mississippi children—and signal this Court's willingness to exercise its authority in achieving compliance.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs request that this Court find that Defendants in noncompliance with the 2nd MSA, hence in contempt of Court; appoint a general receiver with full authority to administer Mississippi's child welfare system and to bring it into compliance with the orders of this Court; and grant such other and further relief as this Court deems necessary and proper.

RESPECTFULLY SUBMITTED, this the 26th day of December 2019.

*/s/ Marcia Robinson Lowry*
Marcia Robinson Lowry (*pro hac vice*)