# EXHIBIT 3



Report to the Mississippi Legislature

# A Review of the Mississippi Department of Child Protection Services for Fiscal Year 2019



#636
November 19, 2019

**PEER:  The Mississippi Legislature's Oversight Agency**

The Mississippi Legislature created the Joint Legislative Committee on Performance Evaluation and Expenditure Review (PEER Committee) by statute in 1973. A joint committee, the PEER Committee is composed of seven members of the House of Representatives appointed by the Speaker and seven members of the Senate appointed by the Lieutenant Governor. Appointments are made for four-year terms, with one Senator and one Representative appointed from each of the U.S. Congressional Districts and three at-large members appointed from each house. Committee officers are elected by the membership, with officers alternating annually between the two houses. All Committee actions by statute require a majority vote of four Representatives and four Senators voting in the affirmative.

Mississippi's constitution gives the Legislature broad power to conduct examinations and investigations. PEER is authorized by law to review any public entity, including contractors supported in whole or in part by public funds, and to address any issues that may require legislative action. PEER has statutory access to all state and local records and has subpoena power to compel testimony or the production of documents.

PEER provides a variety of services to the Legislature, including program evaluations, economy and efficiency reviews, financial audits, limited scope evaluations, fiscal notes, special investigations, briefings to individual legislators, testimony, and other governmental research and assistance. The Committee identifies inefficiency or ineffectiveness or a failure to accomplish legislative objectives, and makes recommendations for redefinition, redirection, redistribution and/or restructuring of Mississippi government. As directed by and subject to the prior approval of the PEER Committee, the Committee's professional staff executes audit and evaluation projects obtaining information and developing options for consideration by the Committee. The PEER Committee releases reports to the Legislature, Governor, Lieutenant Governor, and the agency examined.

The Committee assigns top priority to written requests from individual legislators and legislative committees. The Committee also considers PEER staff proposals and written requests from state officials and others.

PEER Committee
Post Office Box 1204
Jackson, MS  39215-1204

(Tel.) 601-359-1226
(Fax) 601-359-1420
(Website) www.peer.ms.gov

The Mississippi Legislature

# Joint Committee on Performance Evaluation and Expenditure Review
## PEER Committee



**SENATORS**
LYDIA CHASSANIOL
Vice Chair
KEVIN BLACKWELL
Secretary
TERRY C. BURTON
GARY JACKSON
SAMPSON JACKSON II
CHARLES YOUNGER

**TELEPHONE:**
(601) 359-1226

**FAX:**
(601) 359-1420

**REPRESENTATIVES**
BECKY CURRIE
Chair
RICHARD BENNETT
STEVE HORNE
TIMMY LADNER
MARGARET ELLIS ROGERS
RAY ROGERS
PERCY W. WATSON

**OFFICES:**
Woolfolk Building, Suite 301-A
501 North West Street
Jackson, Mississippi 39201

Post Office Box 1204
Jackson, Mississippi 39215-1204

James A. Barber
Executive Director

www.peer.ms.gov

November 19, 2019

Honorable Phil Bryant, Governor
Honorable Tate Reeves, Lieutenant Governor
Honorable Philip Gunn, Speaker of the House
Members of the Mississippi State Legislature

On November 19, 2019, the PEER Committee authorized release of the report titled *A Review of the Mississippi Department of Child Protection Services for Fiscal Year 2019.*

*Becky Currie*

Representative Becky Currie, Chair

**This report does not recommend increased funding or additional staff.**

## *Table of Contents*

Letter of Transmittal ...................................................................................................................... i

Report Highlights ...................................................................................................................... vii

Introduction .................................................................................................................................. 1
    Authority ................................................................................................................................... 1
    Scope and Purpose .................................................................................................................. 1
    Method ....................................................................................................................................... 2
    Scope Limitation ...................................................................................................................... 2

Background ................................................................................................................................... 4
    Status of MDCPS's Implementation of Recommendations from PEER's Review of the
    Department for FY 2017 and FY 2018 .................................................................................. 4
    Staffing ..................................................................................................................................... 6
    FY 2019 MDCPS Organizational and Administrative Changes ....................................... 7

Sources and Uses of Funding .................................................................................................... 9
    Sources of Funding .................................................................................................................. 9
    Uses of Funds ......................................................................................................................... 10

Caseload Analysis ..................................................................................................................... 14
    Caseload Standards and Compliance Mandates Set Forth in the 2nd MSA .............................. 14
    MDCPS Caseworker Caseload and Caseworker Supervisor Workload Data Problems ......... 16
    Analysis of MDCPS Compliance with Mandates Set Forth in the 2nd MSA .............................. 17
    Caseload Analysis Based on Calculation of Mean FY 2019 Caseload for
        Caseworkers and Workload for Caseworker Supervisors ..................................... 20
    Inequality in the Distribution of Caseworker Caseloads and Caseworker Supervisor
        Workloads ...................................................................................................................... 22

Analysis of Annual MDCPS Turnover Rates ........................................................................ 26
    Calculating Annual Turnover ............................................................................................. 26
    Turnover Rate for Non-caseworker Staff .......................................................................... 26
    Turnover Rates for Caseworkers ........................................................................................ 27
    Estimated Cost of Caseworker Turnover .......................................................................... 28

Development of MDCPS's New Case Management System ................................................. 30
    Problems with MDCPS's Current Case Management System (MACWIS) .................... 30
    Requirement to Develop a New Case Management System (CCWIS) .......................... 31
    History and Current Status of MDCPS's Development of CCWIS ................................ 32

Recommendations ..................................................................................................................... 35

Appendix A:  Brief Update of the *Olivia Y.* Lawsuit ........................................................... 37

Appendix B: MDCPS Budget Programs for FY 2020 ........................................................... 38

Appendix C: MDCPS Regions, by Field Operations Division in FY 2019 .......................... 39

Appendix D: Federal Revenues Received by MDCPS in FY 2019, by Funding Source ..................... 40

Appendix E: Inventory of Child and Family Well-being Intervention Programs Funded
    by MDCPS in FY 2019 .......................................................................................................... 42

Appendix F: FY 2017, FY 2018, and FY 2019 Annual Caseworker Turnover Rates and Average Number of Caseworkers, by County and Region.........................................................................45

Appendix G: Examples of Direct and Indirect Costs of Employee Turnover....................................48

Appendix H: Comprehensive Child Welfare Information System (CCWIS) Requirements Established in 45 CFR Section 1355.52 ..........................................................................49

Agency Response..........................................................................................................................51

*List of Exhibits*

Exhibit 1:  Status of MDCPS's Implementation of PEER's Recommendations Made in its First Annual Review of MDCPS....................................................5

Exhibit 2:  Caseworkers by Type of Work, as of May 1, 2019 ..................................7

Exhibit 3:  MDCPS Revenues, by Funding Source for State Fiscal Years 2017, 2018, and 2019................................................................................ 10

Exhibit 4:  Total MDCPS Expenditures (rounded) for FY 2017, FY 2018, and FY 2019, by Major Object ....................................................................... 11

Exhibit 5:  Caseload Standards per Child Protection Caseworker...................................... 15

Exhibit 6:  Compliance with the 90% Weighted Caseload Mandate for Frontline Caseworkers and Adoption and Licensure Caseworkers and 85% Workload Mandate for Caseworker Supervisors ...................................................... 19

Exhibit 7:  Mean and Dispersion of Caseload for Frontline Caseworkers and Adoption and Licensure Caseworkers and Workload for Caseworker Supervisors........ 21

Exhibit 8:  FY 2019 Mean Weighted Caseload and Days Worked for All Frontline Caseworkers and Adoption and Licensure Caseworkers and Mean Workload and Days Worked for All Caseworker Supervisors ............................................... 24



**PEER**
MISSISSIPPI
Joint Legislative Committee on Performance
Evaluation and Expenditure Review

Joint Legislative Committee on Performance Evaluation and Expenditure Review
## Report Highlights
November 19, 2019

# A Review of the Mississippi Department of Child Protection Services for Fiscal Year 2019

**CONCLUSION: During FY 2019, MDCPS received 90% of its revenues from state general funds and federal funds. Over half of the Department's expenditures were for caseworker and caseworker supervisor salaries and on reimbursements made to foster parents. While MDCPS never met court-order percentage-compliant caseload mandates in FY 2019, the daily mean weighted caseloads were not far from the standards. In FY 2019, the caseworker turnover rate was 26%, a 5% increase over FY 2018. Also, as of May 1, 2019, 25% of MDCPS's positions were vacant. While the settlement agreement requires MDCPS to develop a new case management system, CCWIS, by June 30, 2021, the Department's $28.7 million RFP to develop and deploy the system contains limited documentation supporting needed system design features and associated costs.**

## Background:

The Mississippi Department of Child Protection Services (MDCPS) is the entity responsible for the development, execution, and provision of Mississippi's child welfare services and for ensuring the safety, permanency, and well-being of the state's children and families.

MISS. CODE ANN. Section 43-26-1 (7) (1972) requires PEER to annually review MDCPS's sources and uses of funding, caseloads and annual turnover rates, program effectiveness based on outcome measures, and any other matters deemed pertinent by the PEER Committee. This is PEER's second review of MDCPS, focusing on data from state fiscal year 2019.

## Sources and Uses of Funding

### Revenues

In FY 2019, MDCPS received $195.9 million in total revenues. As shown in the chart, 50% of its total revenues were state general funds and 40% were federal funds.



State Support Special Funds $19.5 Million 10%
Other State Support Special Funds $387,422 0%
Federal Funds $78 Million 40%
State General Funds $98 Million 50%

**Total Revenues $195.9 Million**

Source: PEER analysis of MDCPS revenues provided by the Legislative Budget Office.

### MDCPS Staffing as of May 1, 2019

864 Caseworkers
214 Caseworker Supervisors
184 Other County Staff
205 State Office Staff

1,467 Full-time Employees
487 Vacancies

1,954 Total PINs

### Expenditures

During FY 2019, MDCPS expenditures for salaries, wages, and fringe benefits totaled approximately $80 million (41% of its total expenditures), including $53 million for its caseworkers and caseworker supervisors. MDCPS expended $55 million (28% of its total expenditures) on foster care maintenance payments and provided $35 million (18% of its total expenditures) to child welfare agencies delivering services and programs to Mississippi children and their families.

**Total MDCPS expenditures ($195.9 Million) increased by 4% from FY 2018 to FY 2019.**

### Recommendations for Sources and Uses of Funding:

- MDCPS should estimate and identify expenditures and full-time equivalents by accountability program.
- MDCPS should identify child and family well-being intervention programs to serve Mississippi children and families and ensure that such programs are supported by high-quality research.

**90% of MDCPS caseworkers should have caseloads that do not exceed the 1.0 weighted caseload standard**

**85% of MDCPS caseworker supervisors should supervise no more than 5 caseworkers**

## Caseload Analysis

During FY 2019, MDCPS never met the court-ordered percentage-compliant mandate for its frontline, adoption, and licensure caseworker caseloads, and only complied with the caseworker supervisor workload mandate for a few days during the fiscal year. However, despite low compliance with the percentage-compliant mandates for caseworkers, analysis indicated that the mean daily caseload for caseworkers and workload for caseworker supervisors was not far from the 1.0 weighted caseload standard for caseworkers and the standard number of caseworkers supervised (no more than 5) for caseworker supervisors. Inequality in the distribution of caseworker caseloads and caseworker supervisor workloads is the main reason for the Department's low performance on percentage-compliant mandates.

**Recommendations for Caseload Analysis:**

- MDCPS should implement its written procedures for code documentation, file retention, and data entry processes.
- MDCPS should conduct a new caseload study based on current caseworkers' time and responsibilities to determine the range of time necessary for a caseworker to perform a task in accordance with best practices. MDCPS should establish new standards based on the results of this study.
- Once a new caseload study is established, MDCPS should redistribute caseworker positions so that they more closely match expected caseloads. In addition, MDCPS should consider assigning more cases to caseworkers in bordering counties to better distribute caseloads.
- MDCPS staff should confer with the court monitor and attorneys representing the Plaintiffs in the *Olivia Y.* lawsuit to discuss replacing the percentage-compliant mandates.

## Analysis of Annual MDCPS Turnover Rates

In FY 2019 the annual turnover rate for caseworkers was 26%, a 5% increase over the previous year, while the annual turnover rate for all other staff was 15%, a 2% increase. In addition, nine of MDCPS's fourteen regions and thirty-seven counties had an increase in caseworker turnover from FY 2018 to FY 2019.

**As of May 1, 2019, 25% of MDCPS's positions were vacant. Of their 487 vacant positions, 58% were caseworker and caseworker supervisor positions.**

**Recommendation for the Analysis of Annual MDCPS Turnover Rates:**

- MDCPS should maintain a current list of all licensed social workers in the Department.

## Analysis of Selected MDCPS Outcome Measures

PEER was unable to assess MDCPS's performance measures for FY 2019 because the data were not yet available at the time of this review. PEER plans to include this analysis in its FY 2020 annual review of the Department.

## Development of MDCPS's New Case Management System

**MDCPS anticipates configuration of the new case management system to take 15 to 18 months.**

MDCPS expended at least $3.2 million on staff and technical consultants between 2017 and August 2019 to begin the process of developing a new custom-built case management system (CCWIS) to replace its current outdated system (MACWIS). However, MDCPS has now decided to procure an off-the-shelf system in order to meet its impending court-imposed deadline. MDCPS is on the verge of issuing an RFP to expend up to $28.7 million to develop and deploy this system with limited documentation supporting needed system design features and associated costs.

**Recommendations for the Development of MDCPS's New Case Management System:**

- The State Auditor should conduct an audit of MDCPS's expenditure of $3.2 million on contracts for the development of a custom-built case management system to ensure that all deliverables were produced according to the terms of the contracts.
- The MDCPS Commissioner should direct the Department's staff to develop a detailed business case for the CCWIS project prior to issuing a request for proposal (RFP) to procure the system, and should also direct Department staff to maintain complete and accurate documentation of the procurement process.



**PEER**
MISSISSIPPI
Joint Legislative Committee on Performance
Evaluation and Expenditure Review

**A Review of the Mississippi Department of Child Protection Services for FY 2019 | November 2019**
For more information, contact: (601) 359-1226 | P.O. Box 1204, Jackson, MS 39215-1204
Representative Becky Currie, Chair | James A. Barber, Executive Director

A copy of the full report is available at: www.peer.ms.gov

# A Review of the Mississippi Department of Child Protection Services for Fiscal Year 2019

## Introduction

### Authority

During its 2018 Regular Session, the Mississippi Legislature passed Senate Bill 2675 to amend MISS. CODE ANN. Section 43-26-1 (1972). Among its provisions, this legislation maintained the Department of Child Protection Services as a sub-agency independent of, though housed within, the Mississippi Department of Human Services and added subsection 7 to require the PEER Committee to review annually the programs of the Mississippi Department of Child Protection Services (hereinafter referred to as MDCPS or the Department), beginning with state fiscal year 2017 and each year thereafter.

PEER conducted this review pursuant to the authority granted by MISS. CODE ANN. Sections 5-3-57 et seq. (1972).

### Scope and Purpose

MISS. CODE ANN. Section 43-26-1(7) (1972) requires the PEER Committee to review annually:

- sources and uses of department funding;

- caseloads for social workers for each county or another appropriate geographic area;

- turnover rates of social worker staff by county or other geographic area;

- the effectiveness of any program of the department for which appropriated outcome measures have been established; and,

- any other matters that the PEER Committee considers to be pertinent to the performance of agency programs.

This is PEER's second review of MDCPS. The first review[1] focused on state fiscal years 2017 and 2018. This review focuses on state fiscal year 2019 (July 1, 2018, through June 30, 2019).

---

[1] *A Review of the Mississippi Department of Child Protection Services for Fiscal Years 2017 and 2018 (Report #627),* https://www.peer.ms.gov/Reports/reports/MDCPS-Full.pdf.

## Method

PEER reviewed:

- applicable state and federal laws and regulations;

- *Olivia Y.* lawsuit documents, including recent pleadings regarding enforcement of the 2nd Modified Mississippi Settlement Agreement and Reform Plan (hereinafter referred to as the 2nd MSA) and the court monitor reports. Appendix A on page 37 contains a brief update of the *Olivia Y.* lawsuit.;

- MDCPS administrative and financial records, including:

  – organizational charts and job descriptions,

  – expenditures reported in the state's accounting system, MAGIC,

  – annual reports and other ad hoc reports,

  – contracts, and

  – data related to caseworker caseloads, caseworker supervisor workloads, and caseworker and Department turnover;

- MDCPS employee data maintained by the Mississippi State Personnel Board; and,

- bills appropriating funds to MDCPS for FY 2019 and MDCPS's FY 2021 budget request, which contains actual expenditure data for FY 2019.

PEER also:

- interviewed the private outside counsel for the Department in the *Olivia Y.* lawsuit, the court monitor, and MDCPS staff.

## Scope Limitation

While PEER planned to update its analysis of selected MDCPS outcome measures, FY 2019 performance data was not yet available from the National Data Archive on Child and Abuse and Neglect (NDACAN) at Cornell University at the time of this review. PEER used validated MDCPS performance data from NDACAN in its last review of the Department because MDCPS computer files containing performance data were of too low quality to be useful in evaluation.

In addition, PEER made efforts to rely on performance data analysis presented in the 2019 Court Monitor Report: *Progress of the Mississippi Department of Child Protection Services,* issued on June 11, 2019, but was unable to do so because of the report's inadequate explanation of the methods that the monitor used to reach its conclusions. Specifically, the court monitor's report does not contain:

- documentation sufficient to establish that its samples are representative;

- confidence intervals or measurement-specific confidence levels for those samples; or,

- complete descriptions of data validation methods.

In PEER's follow-up contact with the court monitor to address these concerns, court monitor staff were unable to provide sufficient detail to answer PEER's questions about their evaluative methods.

# Background

**The Mississippi Department of Child Protection Services is the entity responsible for the development, execution, and provision of Mississippi's child welfare services and for ensuring the safety, permanency, and well-being of the state's children and families.**

As described in PEER's previous review of MDCPS (PEER Report #627), which report includes a comprehensive description and history of child protection services in Mississippi, the Department operates as a sub-agency of the Mississippi Department of Human Services (MDHS). Under this organizational arrangement:

- MDHS staff provide administrative support (e.g., payroll, accounts payable and receivable, travel reimbursements, grants management) to MDCPS; and,

- MDCPS staff provide intake services, child protection investigation, foster care, adoption, licensure, prevention, and in-home services to families and children in the state of Mississippi.

This chapter provides a brief update on MDCPS's:

- implementation of recommendations from PEER's FY 2017 and FY 2018 Annual Review of the Department;

- staffing as of May 1, 2019; and,

- changes to its organizational structure, child protection worker job titles and occupational class series, and additional training requirements for caseworkers and caseworker supervisors in FY 2019.

## Status of MDCPS's Implementation of Recommendations from PEER's Review of the Department for FY 2017 and FY 2018

**As of October 22, 2019, MDCPS had fully or partially implemented eight of the eleven recommendations that PEER made in its first annual review of the Department.**

PEER's first MDCPS annual review contained eleven recommendations for the Department to implement. As of October 22, 2019, MDCPS had implemented five recommendations, partially implemented three, and had not implemented three recommendations.

Exhibit 1 on pages 5-6 summarizes each recommendation made in PEER's first annual review, reports the implementation status of each, and describes MDCPS's action taken in regard to implementation of each recommendation and consequences of inaction.

**Exhibit 1: Status of MDCPS's Implementation of PEER's Recommendations Made in its First Annual Review of MDCPS**

| PEER's recommendation to MDCPS | Description of MDCPS action taken as of October 22, 2019 and consequences of inaction |
|---|---|
| **Recommendations implemented** | |
| Consult with Department of Finance and Administration (DFA) to determine the best means to account accurately and completely for MDCPS revenues and expenditures. | During FY 2019, DFA created funds in MAGIC specifically for MDCPS, by which the Department is now able to track its revenues and expenditures separate from MDHS. |
| Work with the Legislative Budget Office (LBO) and the Department of Finance and Administration (DFA) to determine which budget programs to add to the MDCPS budget by FY 2021. | During FY 2019, MDCPS worked with LBO and DFA to create eight new budget programs to take effect in FY 2020. See Appendix B on page 38. |
| Calculate turnover by county and/or region to identify factors that influence turnover and to seek appropriate solutions to reduce turnover. | MDCPS calculated turnover by region in FY 2019. |
| **Recommendations implemented, but with ongoing concerns** | |
| Continue to redistribute caseworker positions so that they more closely match expected caseloads. | Inequality in caseload distribution continues to be a problem for MDCPS. See discussion on pages 20-24. |
| Consider assigning cases to caseworkers in bordering counties to better distribute caseloads. | PEER's analysis of FY 2019 caseload data show that there are still instances where MDCPS could address inequality in caseload distribution by assigning workers to cases in neighboring counties. |
| **Recommendations partially implemented** | |
| Develop and implement written procedures for computer code documentation, file retention, and data entry processes. | While MDCPS has developed a data quality plan, this plan has not been successfully implemented as evidenced by numerous errors in the FY 2019 datasets reviewed by PEER. |
| Ensure the salary ranges of caseworker and caseworker supervisor positions are aligned to the level of duties and responsibilities assigned to positions in each occupational class. | There were no changes to caseworker and caseworker supervisor salaries during FY 2019. However, MDCPS worked with the Mississippi State Personnel Board (MSPB) in FY 2018 and FY 2019 to create a career ladder for caseworker positions and plans to implement the career ladder once funding is available. |
| Confer with the court monitor and attorneys representing the Plaintiffs in the *Olivia Y.* lawsuit to discuss replacing the percentage-compliant mandates (90% for caseworkers and 85% for caseworker supervisors). | MDCPS has filed a motion for relief from the 90% caseworker caseload requirement in the 2nd MSA; however, the motion does not include a replacement standard as recommended by PEER. |
| **Recommendations not implemented** | |
| Estimate and identify expenditures and full-time equivalents (FTEs) by accountability program. | While MDCPS added FY 2020 budget programs, it has not yet begun to estimate expenditures and FTEs at the accountability program level. Information at this level of detail increases accountability for the use of public resources, which is important to legislative oversight as well as to MDCPS staff for monitoring its own effectiveness and making resource allocation decisions. |
| Conduct a new workload study based on current caseworkers' time and responsibilities to determine the range of time necessary for a caseworker to perform a task in accordance with best practices and establish new standards based on the results of the study. | MDCPS has not implemented this recommendation due to the *Olivia Y.* lawsuit, and impending ruling from the Court regarding the plaintiff's request to turn the state's foster care system over to a court-appointed receiver. Regardless of who operates the system, it is critical to the protection of children that individual caseloads not exceed standards that can be managed in accordance with best practices for successful outcomes. |

| Maintain a current list of all licensed social workers in the agency. | MDCPS said in its response to last year's report that it sees no purpose in imposing on its staff the administrative burden of keeping up with which of its staff are licensed social workers. Because licensed social workers are specifically trained to carry out the type of work that MDCPS caseworkers perform and are better prepared to do so,[2] it is important for the Department to know which of its staff are licensed and to develop strategies to increase the percentage of its caseworker staff who are licensed social workers. |

SOURCE: PEER Analysis of information provided by MDCPS.

## Staffing

**As of May 1, 2019, 25% of MDCPS's 1,954 positions were vacant. Of the Department's 487 vacant positions, 58% were caseworkers and caseworker supervisors.**

**MDCPS Staffing as of May 1, 2019**

864 Caseworkers

214 Caseworker Supervisors

184 Other County Staff

205 State Office

1,467 Full-time Employees

487 Vacancies

1,954 Total PINs

As of May 1, 2019, MDCPS had a total of 1,467 filled positions (75% of total PINs) and 487 vacant positions (25% of total PINs). The Department had 205 state office staff (14% of total employees) and 1,262 staff (86% of total employees) working in the 84 county offices (Bolivar and Chickasaw each have an additional county office). Of MDCPS's 487 vacant positions, 230 (47%) were caseworkers and 56 (11%) were caseworker supervisors.

As of May 1, 2019, MDCPS employed 864 caseworkers (approximately 58% of its total workforce). Exhibit 2 on page 7, presents the total number of caseworkers by type of work, i.e., frontline, adoption, and licensure. As shown in the exhibit, 635 (74%) of MDCPS's caseworkers are frontline workers. Frontline workers provide case management services to children and families in the state. 115 (13%) of MDCPS's caseworkers provide licensure services, i.e., recruitment, retention, training, and licensure of foster care parents. 114 (13%) of MDCPS's caseworkers provide adoption services to families who adopt children in the care of the state.

In addition to its caseworkers, as of May 1, 2019, MDCPS employed 214 caseworker supervisors, 12 investigation specialists,[3] and 29 quality assurance coordinators.[4]

---

[2] According to an analysis of the child protective services workforce in Texas, licensed social workers are better able to handle child protection job duties, particularly when violence and neglect are involved because of the additional training and skills learned in bachelor's and master's social work programs.

[3] As part of the Special Investigations Unit, incumbents investigate all allegations of maltreatment of foster children, regardless of placement setting, as well as reports of child fatalities that meet the criteria for investigations.

[4] Quality Assurance Coordinators ensure the coordination of work performed by MDCPS staff through periodic review of case work plans and recorded narratives, and verification that work is conducted in accordance with current laws and regulations.

**Exhibit 2: Caseworkers by Type of Work, as of May 1, 2019**



Licensure
115
13%

Adoption
114
13%

Frontline
635
74%

SOURCE: PEER analysis of employee data provided by MDCPS.

## FY 2019 MDCPS Organizational and Administrative Changes

**In FY 2019, MDCPS added a third field operations division, updated caseworker job titles, and increased the number of in-service training hours required for caseworkers and caseworker supervisors.**

**MDCPS added a third field operations division.**

On June 1, 2018, MDCPS added a third field operations division, which created a new Field Operations Deputy Director position to increase oversight of the Department's caseworkers and caseworker supervisors. See Appendix C on page 39.

**MDCPS updated caseworker job titles to track the duties and responsibilities of each type of caseworker more efficiently.**

On July 19, 2018, the Mississippi State Personnel Board (MSPB) approved the following MDCPS-specific job titles and occupational class series:

- Child and Family Protection Specialist, I through IV (frontline workers);

- Adoption Specialist, I through IV;

- Licensure Specialist, I through IV;

- Investigation Specialist, I through III; and,

- Quality Assurance Coordinator, I through IV.

Previously MDCPS used the DHS – Family Protection Specialist and Family Protection Worker job class series to hire all of its workers,

i.e. frontline, adoption, licensure, investigation, and quality assurance coordinators. By creating the new MDCPS-specific positions, Department staff is better able to track its allocation of workers to different responsibilities, and potential employees are able to better understand the duties of the position in which they are seeking employment.

**MDCPS increased its annual in-service training requirements for both caseworkers and caseworker supervisors as required by the *Olivia Y.* lawsuit.**

Pursuant to the 2nd MSA, as of January 1, 2019, MDCPS increased its annual in-service training requirements for both caseworkers and caseworker supervisors:

- Caseworkers: must receive 40 hours (increased from 20 hours in the previous year) of in-service training.

- Caseworker supervisors: must receive 24 hours (increased from 12 hours in the previous year) of in-service training.

# Sources and Uses of Funding

**MDCPS FY 2019 revenues totaled approximately $195.9 million, a 4% increase from the $187.9 million received in FY 2018. During FY 2019, MDCPS expenditures for salaries totaled approximately $80 million (41% of its total expenditures), including $53 million for its caseworkers and caseworker supervisors. MDCPS provided $35 million (18% of its total expenditures) to child welfare agencies delivering services and programs to Mississippi children and their families.**

This chapter includes discussions of sources and uses of MDCPS funding in FY 2019. As of July 1, 2019, the Department had worked with the Department of Finance and Administration to create funds specific to MDCPS for tracking its revenues and expenditures separate and apart from the Mississippi Department of Human Services.

As anticipated in *Report #627,* MDCPS had a revenue shortfall in FY 2019 due to the use of FY 2019 funds to cover FY 2018 expenses. During the Legislature's 2019 Regular Session, MDCPS requested and received a deficit appropriation of $7.5 million for the purpose of supporting the operations of the Department.

## Sources of Funding

**In FY 2019, 50% of MDCPS's total revenues were state general funds and 40% were federal funds.**

> MDCPS received approximately **$195.9 million** in FY 2019, a **4%** increase from FY 2018.

In FY 2019, MDCPS received approximately $195.9 million in revenues, a 4% increase from the $187.9 million received in FY 2018. Revenues increased in FY 2019, due to the Legislature appropriating additional Capital Expense Funds to MDCPS to support its operations during the fiscal year.

In FY 2019, MDCPS revenues included:

- **$98 million** in state general funds (**50%** of total revenues);
- **$19.5 million**[5] in state support special funds (Capital Expense Fund)[6] (**10%** of total revenues);
- **$387,422** in other state support special funds (**.002%** of total revenues); and,
- **$78 million** in federal funds (**40%** of total revenues).

Exhibit 3 on page 10, presents total MDCPS revenues, by funding source, for state fiscal years 2017, 2018, and 2019.

Appendix D on pages 40-41 provides a description of all federal revenues received by MDCPS, by funding source, in FY 2019.

---

[5] In addition to the $7.5 million deficit appropriation (from the Capital Expense Fund) MDCPS received during the Legislature's 2019 Regular Session, MDCPS also received $12 million in Capital Expense Funds appropriated by the Legislature during its 2018 Regular Session to support the operations of MDCPS for FY 2019.

[6] MISS. CODE ANN. Section 27-103-303(3) (1972) authorizes the following uses for the Capital Expense Fund: capital expense needs, repair and renovation of state-owned properties, and specific expenditures authorized by the Legislature.

**Exhibit 3: MDCPS Revenues by Funding Source for State Fiscal Years 2017, 2018, and 2019**

| Source of funding | FY 2017 | FY 2018 | FY 2019 |
|---|---|---|---|
| State General Funds | $98.3 Million | $97.9 Million | $98 Million |
| Federal Funds | $67.8 Million | $88.5 Million | $78 Million |
| State Support Special Funds | $13.4 Million | None | $19.5 Million |
| Other State Support Special Funds | $2.7 Million | $1.5 Million | $387,422 |
| **Total Revenues** | $182.4 Million | $187.9 Million | $195.9 Million |

Note: Total amounts may not add due to rounding.

SOURCE: PEER analysis of MDCPS's legislative budget requests for FY 2019, FY 2020, and FY 2021.

## Uses of Funds

**In FY 2019, MDCPS expenditures totaled approximately $195.9 million. By major object, MDCPS's largest expenditure was on personal services (44% of total expenditures).**

MDCPS currently has one budget program, Family and Children's Services. However, beginning in FY 2020, MDCPS will track its programs and expenditures by the eight new budget programs discussed in Appendix B on page 38:

- MDCPS – Administration;
- MDCPS – MACWIS;
- MDCPS – CCWIS;
- MDCPS – Trafficking;
- MDCPS – Training;
- MDCPS – Permanency;
- MDCPS – Prevention; and,
- MDCPS – Frontline (i.e., Foster Care).

MDCPS did not estimate its expenditures by accountability program for FY 2019.

**Total MDCPS expenditures increased by 4% from FY 2018 to FY 2019.**

As shown in Exhibit 4 on page 11, in FY 2019, MDCPS expenditures were approximately $195.9 million, an increase of $8 million (4%) from FY 2018. While travel, contractual services, commodities, and capital outlay all decreased from FY 2018 to FY 2019, salaries and wages increased by approximately $1 million and subsidies, loans, and grants increased by $12 million.

**Exhibit 4: Total MDCPS Expenditures (rounded) for FY 2017, FY 2018, and FY 2019, by Major Object**

| Major Object | FY 2017 Expenditures | FY 2018 Expenditures | FY 2019 Expenditures |
|---|---|---|---|
| **Personal Services** | $83 Million | $88 Million | $87 Million |
| **Salaries, wages, and fringe benefits** | $76 Million | $79 Million | $80 Million |
| **Travel** | $7 Million | $9 Million | $7 Million |
| **Contractual Services** | $39 Million | $42 Million | $41 Million |
| **Commodities** | $2 Million | $1 Million | $401,524 |
| **Capital Outlay** | $1.6 Million | $92,401 | $1,190 |
| **Subsidies, Loans, and Grants** | $55.7 Million | $56 Million | $68 Million |
| **Total Expenditures** | **$182.4 Million** | **$187.9 Million** | **$195.9 Million** |

Note: Total amounts may not add due to rounding.

SOURCE: PEER analysis of MDCPS's budget requests for FY 2019, FY 2020, and FY 2021.

**Salaries, wages, and fringe benefits were approximately 92% of total personal services expenditures in FY 2019.**

Forty-four percent of MDCPS's total FY 2019 expenditures were on personal services, i.e., salaries, wages, fringe benefits, and travel.

Total salaries, wages, and fringe benefits were approximately $80 million (92% of total personal services expenditures), including approximately:

- $53 million (66%) for caseworker and caseworker supervisor positions;[

- $17 million (21%) for administrative positions, including state office and field office staff; and,

- $10 million (13%) for other field office staff (excludes administration and caseworkers and caseworker supervisors).

Travel expenditures were approximately $7 million (8% of total personal services expenditures). According to MDCPS staff, the Department incurs a significant expense for travel specifically for its foster care and adoption staff, who are required to conduct investigations of reported allegations of child abuse and/or neglect, visit homes of children in custody, attend court hearings,

and transport children who are in state custody to and from appointments (e.g., medical appointments).

While salaries increased by less than one percent from FY 2018 to FY 2019, travel expenditures decreased by $1.8 million. According to MDCPS staff, the decrease is largely due to successful implementation of Trip Optimizer (mandated by the Department of Finance and Administration for all agencies to compute the least costly means of transportation) and reduction in overnight travel for its staff.

**Foster care maintenance payments made up 81% of total expenditures on subsidies, loans, and grants.**

Thirty-five percent of MDCPS's FY 2019 expenditures were for subsidies, loans, and grants, which include foster care maintenance payments (reimbursements made to foster parents for providing care to children in state custody), county reimbursements for foster care services, and sub-grants provided to child welfare agencies. Foster care maintenance payments made up approximately 81% ($55 million) of total expenditures in this major object.

**A majority of contractual services expenditures were for the care of children in Department custody.**

Contractual services made up 21% of MDCPS expenditures in FY 2019. A majority of contractual service expenditures were for the care of children in Department custody and those considered at risk for custody, including medical services and independent contractors hired to conduct home study services for prospective foster parents to become licensed foster homes. Expenditures in this major object also included but were not limited to the Department's legal fees, development of MDCPS's new case management system,[7] and employee tuition reimbursement and staff training.

**In FY 2019, commodities and capital outlay expenditures decreased by $716,802 (64%).**

In order to pay expenditures to support over 4,800 children in state custody, MDCPS reduced its commodities and capital outlay expenditures by $716,802 (64%), from $1.1 million ($1 million + $92,401) in FY 2018 to $402,714 ($401,524 + $1,190). MDCPS spent less of its revenues on printing, office supplies, educational materials, computer equipment and repair, etc. during FY 2019. Combined, expenditures in these two major objects only made up .21% of MDCPS's total expenditures in FY 2019.

---

[7] A child welfare case management system allows caseworkers to monitor all aspects of their assigned cases, e.g., the client's mental and physical health, family/guardian situations, education and social goals and outcomes, and social determinants of health, such as housing, food security, and family support.

**MDCPS expended approximately $35 million on child welfare agencies providing services to Mississippi children and their families.**

In FY 2019, MDCPS expended approximately $35 million on nineteen child welfare agencies providing services to children and families in Mississippi, including therapeutic foster care, emergency shelter, group home services, and intervention programs.

To determine what specific programs were being provided by these child welfare agencies and funded by MDCPS, PEER conducted an intervention program inventory survey for all child and family well-being programs serving Mississippi children and families, using subgrant and contract information obtained from MDCPS. While eight agencies responded to the survey and provided a list of programs, name of county where program is delivered, number of participants served, and total program expenditures (see Appendix E on pages 42-44), eleven agencies did not respond. Also, of those entities that did respond to the survey, there were significant gaps in the information provided. For these reasons, the expenditures on programs presented in Appendix E do not add up to the total $35 million expended by MDCPS. PEER plans to obtain the missing information for these programs and from agencies not responding to the survey, during its annual review of MDCPS for FY 2020. In addition, PEER plans to match programs to high-quality research as defined in MISS. CODE ANN. Section 27-103-159(1)(a), (1)(c), and (1)(g) (1972).

# Caseload Analysis

**The Mississippi Department of Child Protection Services could improve compliance and efficiency by continuing to redistribute caseworker and caseworker supervisor positions. Progress toward achieving reasonable caseloads for all MDCPS caseworkers would be better measured by tracking mean caseloads and deviations from the mean. Inequality in the distribution of caseworker caseloads and caseworker supervisor workloads is the main reason for the Department's low performance on percentage-compliant mandates.**

This chapter includes discussions of:

- caseload standards and compliance mandates set forth in the 2nd MSA, including PEER's concerns with both;

- MDCPS caseworker caseload and caseworker supervisor workload data problems;

- analysis of MDCPS compliance with mandates set forth in the 2nd MSA;

- caseload analysis based on the calculation of mean FY 2019 caseload for caseworkers and workload for caseworker supervisors; and,

- inequality in the distribution of caseworker caseloads and caseworker supervisor workloads.

While MISS. CODE ANN. Section 43-26-1(7)(b) (1972) requires a review of "caseloads for social workers for each county or another appropriate geographic area," because MDCPS does not track which of its employees are licensed social workers, PEER included all MDCPS workers handling cases in its caseload analysis.

## Caseload Standards and Compliance Mandates Set Forth in the 2nd MSA

**MDCPS's current caseload standards are based on outdated information and do not align with current child welfare practices. The compliance mandates for caseworkers and caseworker supervisors set forth in the 2nd MSA obscure important information about workload and service provisions and encourage inefficient and unequal distribution of labor.**

As discussed in PEER's previous annual review of MDCPS (Report #627), based on a 2005 study of the time needed to complete cases by type, the *Olivia Y.* court monitor developed standards of the maximum number of cases, by type, that a caseworker can reasonably handle.

Exhibit 5 on page 15 presents the caseload standards for child protection caseworkers by type of case. The court monitor mandated that 90% of caseworkers should have a weighted caseload no greater than 1.

**Exhibit 5: Caseload Standards per Child Protection Caseworker**

| Type of Case | Case unit | Standard number of cases | Weight Per Case (100% Capacity) |
|---|---|---|---|
| **Child Protection** (investigations level 2 and 3) | Investigation | 14 | 0.0714 |
| **Ongoing Foster Care** (placement responsibility and service) | Children | 14 | 0.0714 |
| **In-Home Cases** (protection responsibility and service, prevention responsibility and service and Interstate Compact on the Placement of Children (ICPC) - incoming) | Families | 17 | 0.0588 |
| **Adoptions** (adoption county of service) | Children | 15 | 0.0667 |
| **New Application Licensing** (resource inquiry, ICPC application, and foster home study) | Homes | 15 | 0.0667 |
| **Renewal Licensing** (foster home supervision and foster home renewal) | Homes | 36 | 0.0278 |

Note: The weighted caseload for an individual caseworker is calculated by multiplying the number of cases that the worker is assigned by the weight associated with each case type and adding the results together for workers assigned more than one type of case. An individual full-time worker's weighted caseload should be no greater than 1.0 (the weighted caseload standard), which is the estimated average capacity for an individual caseworker.

SOURCE: The 2nd MSA.

The workload standard for caseworker supervisors was derived from the Council on Accreditation's (COA) recommendation that the ratio of frontline caseworker supervisors to caseworkers in child and family services agencies should not exceed 1:5. The court monitor recommended and the parties agreed in the 2nd MSA that 85% of MDCPS caseworker supervisors must comply with this workload standard.

**Since 2005-2006, MDCPS has not conducted a workload study based on current caseworkers' time and responsibilities to determine the range of time necessary for a caseworker to perform a task in accordance with best practices.**

The current caseload standards, which were adopted over thirteen years ago, do not reflect current child welfare practice, which have significantly changed since the Child Welfare League of America (CWLA) conducted its "systems review" of the Mississippi Department of Human Services' Division of Family and Children's Services in 2005-2006. Further, there is inadequate documentation of how the standards currently in use were established. According to the CWLA, any workload analysis must be regularly updated if

an agency is to ensure that its capacity for effective service delivery is maintained. In addition, caseload standards should be carefully compared to facts on the ground, in a fully documented, reproducible process. Attention should be paid to the range of times necessary to perform a task in accordance with best practices, and individual caseloads should be assessed as to where they fall within that range of best practice.

**PEER continues to have concerns with the percentage-compliant mandates set forth in the 2nd MSA because they obscure important information and encourage inefficient and unequal distribution of labor.**

The theory behind establishing percentage-compliant mandates is that overloaded workers are less able to deliver quality service. While it is important to know the number and percentage of workers with excessive weighted caseloads and excessive number of caseworkers supervised, it is also important to know the extent to which workloads vary, in either direction, from the reasonable maximum standard. Percent-above-benchmark standards, like the 90% mandate for caseworkers, hide information about the trait being measured. In addition, a percentage-compliant mandate can distort, obscure, and reverse trends over time. When incorporated into public policy, such standards lead to distorted incentives. In this context, the mandates obscure important information about caseworker caseloads and supervisor workloads and service provision and encourage inefficient and unequal distribution of labor.

## MDCPS Caseworker Caseload and Caseworker Supervisor Workload Data Problems

**While MDCPS did ensure all caseworkers had unique worker ID numbers in FY 2019, many of the same caseload and workload data problems observed by PEER in FY 2017 and FY 2018 persisted into FY 2019.**

As in FY 2017 and FY 2018, PEER received data from MDCPS on daily caseloads for frontline, adoption, and licensure caseworkers, and workloads for caseworker supervisors for FY 2019.

In an improvement over previous years, MDCPS's FY 2019 frontline caseworker dataset had reliable and universally available worker ID numbers. The few FY 2019 cases in which ID numbers were associated with more than one name were very likely either typos or last name changes (e.g., following marriage), based on PEER's manual inspection of all such occurrences.

In other respects, MDCPS caseworker caseload and caseworker supervisor workload data presented the same problems as in FY 2017 and FY 2018, including duplicated data, missing data, inconsistent adherence to formatting and naming practices, and internally contradictory data. These are not problems of technological capacity, but of system use. These problems can be fixed at minimal cost by adherence to best practices for data management.

Four points about data quality are of particular relevance to PEER's analysis. First, not all 365 days in the fiscal year are accounted for in any of the datasets. The frontline caseworker dataset contains only 227 days of data; the caseworker supervisor dataset contains 255 days. This year, two different summaries of adoption and licensure caseworkers were provided; one had 188 days of data, the other 255 days. Many missing days are on weekends. Data for weekends and holidays should not be missing because caseworkers still carry caseloads and caseworker supervisors still carry workloads during those times. MDCPS has stated that an automated procedure for recording data on weekends and holidays stopped functioning in 2017. This procedure has either not been fixed or has not been applied.

Second, because of the improvement in worker ID assignment, all analyses of frontline caseworker data for FY 2019 used worker ID numbers as unique worker identifiers. This is a change from the method of analysis used by PEER for FY 2017 and FY 2018, in which format-corrected first name-last name combinations were used as unique identifiers. For this reason, caution should be used in drawing comparisons across years.

Third, the new datasets presenting a breakdown of adoption and licensure caseworkers' caseloads frequently disagreed with the aggregated data on those caseworkers' caseloads. MDCPS provided both breakdown and aggregate data on 39,950 caseworker-days during FY 2019. Of those, the count of cases presented in the breakdown agreed with the count of cases presented in the aggregate on only 25,895 worker-days (65% of the time). The weighted caseload agreed on only 25,180 worker-days (63% of the time). As such, there is inconsistency either in the underlying data or the operational definitions used to create the adoption and licensure caseloads. For this analysis, PEER used aggregated data for consistency with previous years. However, PEER has no assurance that either dataset is correct. Obvious inconsistencies raise the prospect of errors that cannot be detected by automated means.

Fourth, caseworker supervisor data also contain anomalies. Notably, there are 18 caseworker supervisors that, according to the data, never supervised a single caseworker for a single day; one of these supervisors nominally worked all 255 recorded days without supervising a single caseworker. This is not conceptually impossible, but it is at least a cause for closer inspection of primary data.

## Analysis of MDCPS Compliance with Mandates Set Forth in the 2ⁿᵈ MSA

**MDCPS never met the percentage-compliant mandate for its frontline, adoption, and licensure caseworkers during FY 2019. Caseworker supervisors complied with the mandate for a few days during FY 2019.**

The first two graphs presented in Exhibit 6 on page 19 show that the daily percentage of caseworker caseloads in compliance with

the caseload standards never met the 90% compliant mandate in FY 2019 and only met the 90% mandate once during the three-year period of FY 2017 through FY 2019, likely due to an error in the data for that date in FY 2017. As of May 30, 2019, only 55% of MDCPS frontline and adoption and licensure caseworkers had weighted caseloads meeting the 1.0 weighted caseload standard set by the Court pursuant to the *Olivia Y.* lawsuit. The annual trend lines[8] for FY 2019 show frontline caseworkers moving away from compliance with the 90% mandate and adoption and licensure caseworkers moving towards compliance with the 90% mandate.

As shown in the third graph in Exhibit 6, the workloads of caseworker supervisors are close to meeting the 85% compliance mandate set by the Court pursuant to the *Olivia Y.* lawsuit. As of May 30, 2019, 82% of MDCPS caseworker supervisors carried workloads meeting the mandate and during a few days during FY 2019, their workloads met the mandate.

---

[8] The solid blue lines on the graphs represent annual trends, by state fiscal year.

**Exhibit 6: Compliance with the 90% Weighted Caseload Mandate for Frontline Caseworkers and Adoption and Licensure Caseworkers and 85% Workload Mandate for Caseworker Supervisors**







SOURCE: PEER analysis of MDCPS caseworker caseload and caseworker supervisor workload data.

## Caseload Analysis Based on Calculation of Mean FY 2019 Caseload for Caseworkers and Workload for Caseworker Supervisors

**Despite low compliance with the percentage-compliant mandates for caseworkers, analysis indicated that the mean[9] daily caseload for caseworkers and workload for caseworker supervisors for FY 2017 to FY 2019 was not far from the weighted caseload standard for caseworkers and the standard number of caseworkers supervised for caseworker supervisors.**

The solid black line on the first two graphs in Exhibit 7 on page 21 shows the mean daily weighted caseload standard for frontline caseworkers (the first graph) and adoption and licensure caseworkers (the second graph) during the period of FY 2017 through FY 2019. On the third graph, the solid black line shows the mean daily number of caseworkers supervised by caseworker supervisors during the same period. In the first two graphs, the dotted line shows the weighted caseload standard (1.0) for all types of caseworkers, and in the third graph, the dotted line shows the 5.0 workload standard for caseworker supervisors. As was the case in FY 2017 and FY 2018, the FY 2019 mean weighted caseload for all types of caseworkers never varies far from the 1.0 weighted caseload standard. Further, the mean weighted workload for caseworker supervisors is always below the 5.0 workload standard for the period reviewed.

The shaded areas of the three graphs in Exhibit 7 show the dispersion of daily weighted caseloads among individual caseworkers (graphs 1 and 2) and daily number of caseworkers supervised for caseworker supervisors (graph 3). The lighter shading shows the dispersion of all weighted caseloads for caseworkers and workloads for caseworker supervisors. For frontline caseworkers (the first graph) there is wide dispersion, both above and below the standard, in the daily weighted caseloads carried by individual caseworkers. Wide dispersion also exists for the daily number of caseworkers supervised by individual caseworker supervisors. During FY 2019 there were frontline caseworkers carrying caseloads approaching four times the weighted caseload standard while there were caseworker supervisors supervising three times the standard number of caseworkers; i.e., supervising 15 caseworkers instead of the standard workload of 5 caseworkers. On a positive note, the daily dispersion of caseloads for adoption and licensure caseworkers is narrowing towards the standard.

The darker shading on the three graphs in Exhibit 7 shows the dispersion of weighted caseworker caseloads (graphs 1 and 2) and caseworker supervisor workloads falling between the 25th and 75th percentiles. This darker shading shows that 75% of the weighted caseworker caseloads and caseworker supervisor workloads fall into a range fairly close to the mean weighted caseload and workload standard over the three fiscal years reviewed.

---

[9] PEER calculated the mean weighted caseload on a given day by calculating the total weighted caseload for that day and dividing by the number of relevant caseworkers for that day.

**Exhibit 7: Mean and Dispersion of Caseload for Frontline Caseworkers and Adoption and Licensure Caseworkers, and Workload for Caseworker Supervisors**



SOURCE: PEER analysis of MDCPS caseworker caseload and caseworker supervisor workload data.

## Inequality in the Distribution of Caseworker Caseloads and Caseworker Supervisor Workloads

**A review of FY 2019 individual mean weighted caseworker caseloads and caseworker supervisor workloads by the number of days that the individual worked during the fiscal year shows that there is inequality in the distribution of individual caseworker caseloads and caseworker supervisor workloads.**

Another way to analyze MDCPS FY 2019 caseworker caseloads and caseworker supervisor workloads is by taking into consideration the number of days that each worker worked in FY 2019. It is logical that newer employees, presumably represented by those workers with few reported days worked during the fiscal year, would carry smaller caseloads and workloads.

The graphs in Exhibit 8 on page 24 plot every frontline caseworker (the first graph), adoption and licensure caseworker (the second graph), and caseworker supervisor (the third graph) on a graph of their recorded total days worked in FY 2019 (the x axis) and their mean weighted caseload or caseworkers supervised (the y axis) for FY 2019. On these graphs, the black horizontal dotted line represents the weighted caseload standard of 1.0 for caseworkers and the standard number of caseworkers supervised (5.0) for caseworker supervisors. If every caseworker carried exactly the weighted caseload standard and every caseworker supervisor only supervised 5 caseworkers, every dot on the graph would be located exactly on the dotted line in each graph. If every worker carried exactly the weighted caseload standard and workload standard, every dot on the graph would be located exactly on the workload standard line. Dots above the line indicate excessive caseloads for caseworkers and caseworkers supervised for caseworker supervisors and dots below the line indicate caseworker caseloads and caseworker supervisor workloads that are smaller than the standard.

As expected, caseworkers and caseworkers' supervisors with few reported days worked during FY 2019 tend to have caseloads and workloads falling below the dotted line (i.e., smaller caseloads and caseworker supervised). Among every caseworker and caseworker supervisor who worked every recorded day of FY 2019, the mean caseload and number of caseworkers supervised, is highly dispersed. This means there are caseworkers with excessive weighted caseloads, but at the same time there are caseworkers with weighted caseloads approaching zero. The same exist for caseworker supervisors and the number of caseworkers supervised. These graphs show inequality in the distribution of caseworker caseloads and caseworker supervisor workloads.

During PEER's exit conference with MDCPS, Department staff stated that they have been trying to address caseload inequality by assigning caseloads across counties. As evidence of this, MDCPS staff provided a method for calculating caseloads shared across counties for a subset of its frontline caseworkers. For this subset, the method suggests that an average of 2.5% of cases by weight (refer to Exhibit 5 on page 15 for case-weights) crossed county

borders during FY 2019. MDCPS staff did not attempt to document casework across county borders for the remaining subset of cases.

Under the assumptions of MDCPS's method, the Department has been sharing work across county boundaries for some time, for some subset of the population. In fact, the Department was sharing caseloads across counties at a higher rate when PEER's original recommendation to share cases across counties was created. In other words, by MDCPS's method, the progress this fiscal year was backward rather than forward. The purpose of PEER's recommendation was to redistribute excess cases among counties and thus decrease inefficient overloading and underloading. As previously discussed, this has not occurred. The original recommendation did not apply solely to the subset of cases identified by MDCPS's method.

If the business rules employed in MDCPS's method can be documented, then some work occurs across county borders. However, it is neither the case that the practice of sharing work across county boundaries has changed since the original recommendation was made, nor that the underlying issue of the inefficiency in caseload distribution has improved.

**Exhibit 8: FY 2019 Mean Weighted Caseload and Days Worked for All Frontline Caseworkers and Adoption and Licensure Caseworkers and Mean Workload and Days Worked for All Caseworker Supervisors**

Frontline Caseworkers



Adoption and Licensure Caseworkers



Caseworker Supervisors



SOURCE: PEER analysis of MDCPS caseworker caseload and caseworker supervisor workload data.

Caseloads have an impact on caseworkers' performance, and as a result on the well-being of the children in their care. There is some level of caseload beyond which any individual cannot perform adequately. That level need not be the same for any two individuals, but it exists for every individual.

The CWLA analysis discussed on pages 15-16 has been used to establish such a caseload limit for MDCPS. PEER believes this analysis to be empirically inadequate for several reasons, including:

- that it is over thirteen years old and MDCPS staff have stated that ordinary child welfare practice has changed during this time;
- the original study involved data from only nine staff of the Mississippi State Department of Human Services, Division of Family and Children's Services, an inadequate number to support generalizations;
- the original study includes no measures of performance; in other words, it does not establish that the nine individuals were achieving satisfactory outcomes for their cases. It is important, not just to measure typical time to complete a case, but typical time to complete a case with acceptable results.;
- the study does not establish a range of acceptable performance, but sets an unrealistic single numeric boundary for all cases of a given type; and,
- the study inadequately operationalized its methods for deriving expected performance.

As discussed on page 5, PEER has recommended that MDCPS conduct a new caseload study of the range of time necessary for a caseworker to perform a task in accordance with current best practices and establish new caseloads standards based on the results of the study. MDCPS has filed a motion for relief from the 90% caseworker caseload requirement in the 2nd MSA. However, the motion does not include a replacement standard as recommended by PEER.

The practical effect of the Department's unequal distribution of labor among frontline caseworkers, under the assumptions of the CWLA standards, is that the equivalent of over 1,000 children received service from caseworkers with caseloads exceeding the standard nearly every day in FY 2019 (except for one, which is likely an error). Simultaneously, caseworker capacity sufficient to serve more than 1,000 children per day goes unused.

# Analysis of Annual MDCPS Turnover Rates

**In FY 2019 the annual turnover rate for caseworkers was 26%, a 5% increase over the previous year, while the annual turnover rate for all other staff was 15%, a 2% increase.**

This chapter includes discussions of:

- calculating annual turnover;
- turnover rate for non-caseworker staff;
- turnover rates for caseworkers; and,
- estimated cost of caseworker turnover in FY 2019.

It is important to note that while MISS. CODE ANN. Section 43-26-1(7)(c) (1972) requires a review of "turnover rates of social worker staff by county or other geographic area," PEER expanded its review to include all MDCPS workers handling cases because MDCPS does not track which of its employees are licensed social workers.

## Calculating Annual Turnover

**Turnover is the rate at which employees leave positions in an agency.**

**Non-preventable turnover** includes retirement, death, marriage/parenting, returning to school, or spousal job move.

Turnover is defined as the rate at which employees leave positions in an agency. Agencies can review turnover rates to determine employee stability within the entire agency, specific counties, regions, and certain positions. Turnover rate can be calculated by including both preventable and non-preventable turnover or distinguishing between the two.

In order to calculate turnover rates for state fiscal year 2019, PEER requested MDCPS employee data from the Mississippi State Personnel Board for the period of July 1, 2018 to June 30, 2019. PEER calculated turnover by determining the sum of job losses (in which a PIN changes from occupied to vacant) and job changes (in which a PIN changes from being occupied by one person to being occupied by a different person) in a given period, and dividing by the total number of PINs in the same period.

## Turnover Rate for Non-caseworker Staff

**In FY 2019, MDCPS's annual turnover rate for non-caseworker staff increased by 2%.**

The annual turnover rate for non-caseworker positions was **15%** in FY 2019.

The annual turnover rate for all non-caseworker positions increased by 2%, from 13% in FY 2018 to 15% in FY 2019. While it is essential for MDCPS to reduce the turnover rate for its caseworkers, it is also important for the Department to maintain a knowledgeable support staff.

## Turnover Rates for Caseworkers

**In FY 2019, MDCPS's annual turnover rate for caseworkers increased, as did the turnover rate for caseworkers in 37 counties.**

### In FY 2019, MDCPS's annual turnover rate for caseworker positions increased by 5%.

> The annual turnover rate for MDCPS caseworker positions was **26%** in FY 2019.

The annual turnover rate for MDCPS caseworkers increased by 5%, from 21% in FY 2018 to 26% in FY 2019. PEER notes that for the last three years, MDCPS's turnover rate has ranged from 21% to 29%, which is below the reported national average annual turnover rate for child welfare workers. However, it is important to note that as of May 1, 2019, the Department also has a large number of vacancies (25% of total positions), as discussed on page 6.

As reported in PEER's review of the Department for FY 2017 and FY 2018, while the national average annual turnover rate for child welfare workers is 30%, the Annie E. Casey Foundation suggests an optimal turnover rate at or below 10% to 12%. Some agency turnover can be beneficial, if it eliminates low performers, e.g., non-productive staff and/or those not willing to improve. However, high turnover in child welfare agencies, specifically of caseworkers, not only affects the agency but directly affects the children and families who are being served by the child welfare system. Research indicates that developing and maintaining a well-trained, highly skilled workforce to successfully deliver quality services and supports is key to achieving positive outcomes for vulnerable children, youth, and their families.

### Nine of MDCPS's fourteen regions and thirty-seven counties had an increase in caseworker turnover from FY 2018 to FY 2019.

The statewide caseworker turnover rate was greater in FY 2019 than in FY 2018. As shown in Appendix F on pages 45-47, nine of MDCPS's fourteen regions had an increase in caseworker turnover from FY 2018 to FY 2019. As discussed on page 6, as of May 1, 2019, 230 (47%) of MDCPS's vacant positions were caseworkers.

Considering caseworker turnover by county, from FY 2018 to FY 2019, 37 counties experienced an increase in caseworker turnover (see Appendix F on pages 45-47). While the turnover rate for counties with a small number of caseworkers can be significantly impacted by the loss of one caseworker (e.g., Tunica County), some of the counties with 15 or more caseworkers in FY 2018 experienced high turnover in FY 2019, e.g., Desoto County (78%).

During FY 2018 and FY 2019, eleven counties did not experience any caseworker turnover. In addition, Issaquena County, Lawrence County, Franklin County and Jefferson County have not had caseworker turnover in the three years reviewed by PEER.

MDCPS staff stated that the increase in turnover is in part due to the large number of children in state custody and leadership changes in the Department's field offices.

**According to responses submitted on MDCPS's online voluntary employee exit interview survey, the top three reasons employees left the Department in FY 2019 were for other employment (50%), work environment (27%), and dissatisfaction with salary (25%).**

To understand why an employee departs from the agency, MDCPS began conducting online voluntary employee exit interview surveys beginning in August 2017. The online survey includes multiple choice questions regarding training, work duties, supervision and teamwork, salary and benefits, and overall job experience. At the end of the survey, employees can add comments regarding actions MDCPS can take to build a better workplace and any other comments, questions, or concerns.

In FY 2019, 124 departing employees (roughly half of the total number of departing employees) had completed the online survey. Frontline, Field Operations, and Field Support staff made up 91% of the survey respondents. More than half of the departing employees had been with MDCPS for two years or less, with 20% leaving within one year. The top three reported reasons employees left MDCPS were for other employment (50%), work environment (27%), and dissatisfaction with salary (25%).

While the exit survey responses did not reveal departing employees' dissatisfaction with training, quality of supervision, or work-related stress, 44% of respondents reported feeling like they were not valued and appreciated as an employee of MDCPS and 66% of respondents believed that their salary was not appropriate for the position they were exiting.

**MDCPS asserts that funding its career ladder for all caseworker positions will allow the Department to retain experienced staff to provide continuity in services to children and families.**

The Department anticipates reducing turnover by implementing a caseworker career ladder that MSPB approved in FY 2019. In its budget request for FY 2021, MDCPS requested $7.1 million in funding for the implementation of its caseworker career ladder. According to MDCPS staff, implementation of its career ladder will enable the Department to retain experienced caseworkers and supervisors to provide continuity in services to children and families in Mississippi.

## Estimated Cost of Caseworker Turnover

**The Annie E. Casey Foundation reports that the cost to a child welfare agency every time a caseworker leaves ranges from 30% to 200% of the exiting employee's annual salary.**

According to the Annie E. Casey Foundation, the cost to a child welfare agency every time a caseworker leaves ranges from 30% to 200% of the exiting employee's annual salary.[10] The range includes direct and indirect costs of turnover. Direct costs of turnover are the specific measurable expenditures associated with processing the departing employee's separation and the new employee's hiring

---

[10] The average annual salary for MDCPS caseworkers in FY 2019 was $32,064.98.

and training. Indirect costs of turnover include the value of lost productivity, reduced services, and impact on children and families. Indirect costs are more difficult to measure and can also be higher than direct costs.

Appendix G on page 48, provides examples of direct and indirect costs of turnover.

# Development of MDCPS's New Case Management System

**The 2ⁿᵈ MSA requires MDCPS to develop a new case management system by June 30, 2021, only twenty months away from the publication date of this report. While MDCPS expended at least $3.2 million on staff and technical consultants between 2017 and August 2019 to begin the process of developing a new custom-built case management system, MDCPS has now decided to procure an off-the-shelf system in order to meet its impending court-imposed deadline. MDCPS is on the verge of issuing an RFP to expend up to $28.7 million to develop and deploy its off-the-shelf case management system with limited documentation supporting needed system design features and associated costs.**

This chapter includes discussions of:

- problems with MDCPS's current case management system (MACWIS);

- requirement to develop a new case management system (CCWIS); and,

- history and current status of MDCPS's development of CCWIS.

## Problems with MDCPS's Current Case Management System (MACWIS)

**While MDCPS's current case management system, MACWIS, is outdated and needs to be replaced, a new system will not necessarily correct the Department's data problems resulting from errors in data entry and instances of failure to adhere to best practices for data management.**

The Mississippi Automated Child Welfare System (MACWIS), implemented in the mid to late 1990s and considered to be a "legacy" system,[11] is MDCPS's current case management system. Department staff utilize MACWIS to manage and track child abuse and neglect investigations, in-home child protection cases, and children in foster care. MDCPS staff input the status, demographic characteristics, locations, and goals for the placement of every child who is in foster care.

MACWIS is written in a computer language for which programmers are not easy to find, and has an internal structure that makes it difficult to carry out common types of analyses needed by the Department. According to MDCPS staff, MACWIS is at the end of its life cycle, is time-consuming, expensive to maintain, and does not allow for the introduction of new technologies to enable MDCPS staff to effectively manage their work and adapt to constant changes in regulations and requirements.

Over the last eleven years the court monitor in the *Olivia Y.* lawsuit has reported problems with data in MACWIS, including missing data and data that fails validation checks. The most recent court monitor report, released on June 11, 2019, notes that many of these problems intensified after personnel changes in MDCPS's IT

---

[11] A legacy system, in the context of computing, refers to outdated computer systems, programming languages, or applications that are still being used even though upgrades are available.

division in March 2018. PEER also observed that many of the Department's data problems are due to errors in data entry and instances of failure to adhere to best practices for data management.

## Requirement to Develop a New Case Management System (CCWIS)

**The 2nd MSA in the *Olivia Y.* lawsuit requires Mississippi to develop a new case management system, CCWIS, to replace MACWIS by June 30, 2021. The CCWIS project involves a revised set of federal requirements for child protection case management that enable greater flexibility in data entry methods and should reduce the time spent by MDCPS caseworkers on data entry and data management.**

In the 2nd MSA, the Court mandated that MDCPS replace MACWIS with a Comprehensive Child Welfare Information System (CCWIS).[12]

Section 1.5.a of the 2nd MSA states the following:

> *"MDCPS shall maintain comprehensive information systems that permit: (1) timely access by authorized MDCPS staff to information, including current and historical case documents, to support child safety and continuity of care across placement setting and services; (2) capturing, tracking, and reporting of applicable financial information, quantitative 2nd MSA compliance, longitudinal performance, and child welfare information, including federally required elements; and (3) prompts for workers and supervisors regarding actions in a child's case and whether they have taken place.*

In addition, section 1.5.b of the 2nd MSA states that:

> *"MDCPS shall have a Comprehensive Child Welfare Information System (CCWIS) appropriate to its size and complexity that shall meet federal requirements by June 30, 2021. Defendants shall take reasonable steps to ensure data quality and verification of the accuracy of data in CCWIS. The CCWIS system shall have the necessary controls to decrease the risk of duplication of data and to reduce the risk of incorrect or invalid data. The system shall provide a visible trail to authorized administrators of all information entered, added, deleted, or modified, and shall have necessary security to protect data integrity. This system shall be audited at least annually to ensure the accuracy and validity of data in the system."*

The CCWIS project involves a revised set of federal requirements for child protection case management systems that enable greater

---

[12] CCWIS is optional for states receiving Title IV-E federal funds for foster care. As of August 22, 2019, 46 states (including Mississippi), the District of Columbia, and Puerto Rico are in the process of replacing their current child welfare case management systems with CCWIS. These states are in various stages of CCWIS development. The 2nd MSA approved by the Court mandates MDCPS to implement CCWIS.

flexibility in data entry methods, e.g., the ability to import child data stored externally, and thus theoretically reduces data entry and data management workload on personnel, particularly caseworkers and caseworker supervisors. Appendix H on page 49, summarizes the requirements for CCWIS established in 45 CFR Section 1355.52. The regulations require MDCPS to ensure that the costs associated with the system are reasonable and beneficial and that the data maintained in the system is complete, timely, and accurate.

## History and Current Status of MDCPS's Development of CCWIS

**From 2017 to August 2019, MDCPS expended at least $3.2 million to hire IT staff and contract with several consultants to begin the process of developing a new custom-built case management system.   MDCPS subsequently decided to purchase an off-the-shelf case management system. The Department is on the verge of issuing an RFP to expend up to $28.7 million to develop and deploy its new off-the-shelf system with limited documentation supporting needed system design features and associated costs.**

As of August 2019, MDCPS had expended at least $3.2 million on development of the CCWIS project. This includes costs of MDCPS staff ($1.5 million), as well as the costs of consultants ($1.8 million) hired in 2017 to assist MDCPS staff with the development of CCWIS. According to the CCWIS contracts, the technical consultants were hired to:

- perform a systemic assessment of MACWIS and assist with the design and development of CCWIS;
- provide project management;
- establish and administer controls to ensure the quality of deliverables for the area of responsibility;
- develop and maintain a detailed work plan and schedule for the project;
- organize, direct, and coordinate planning and production of all Quality Assurance contract technical services activities;
- monitor project activities to ensure project schedules are met; and,
- provide weekly and monthly status reports on project development.

When PEER requested MDCPS to provide documentation of the deliverables required in the contracts, the MDCPS Commissioner stated in a letter to PEER that:

> *The then Deputy Commissioner for Information Technology and the then Project Director for CCWIS are no longer employed by the agency. Current staff have reviewed their files but have been unable to identify which documents may have been produced by the contractors. If such documents exist, they cannot be readily identified at this time.*

Following an exit conference with PEER for this review, MDCPS staff provided PEER with a set of computerized files purportedly containing the work products of the contractors.  However, it is not

readily apparent from these records that the consultants provided the deliverables required in their contracts.

In his letter to PEER, the MDCPS Commissioner stated that the Department determined that, due to budget deficits, funds were not available to continue the services of the CCWIS consultants and their contracts were eventually terminated. During the exit conference, MDCPS staff stated that the Department is taking a different direction with the development of a new case management system and is planning to procure an off-the-shelf system rather than developing a custom-built system in order to meet its impending court-imposed deadline.

MDCPS's previous strategic direction regarding the CCWIS project decreased the Department's control over its own case management system through the choice of non-normalized database software optimized for storing data elements with arbitrary internal structure and no regular relations to other data elements. By ceding control to an external vendor, the Department runs the risk of incurring high future costs for special analyses that the Department could run on its own in a software solution with a more fixed data structure. Available documentation of the new CCWIS project direction contains limited description of the intended software and data structure. As the project proceeds, care should be taken to avoid the kind of problems mentioned above, and more generally to ensure that both the user interface and the data structure itself meet the Department's needs.

During its 2019 Regular Session, the Legislature appropriated an additional $15 million in Capital Expense Funds to MDCPS to defray the expenses for information technology system developments, including the CCWIS project, during FY 2020. In July of 2019, MDCPS presented its business case for CCWIS to the Mississippi Department of Information Technology (ITS) Board. The case as presented contained no explanation for the Department's $28.7 million cost estimate for CCWIS, except for a one-line parenthetical note "Based on other State Procurement." The case included no documentation for the annual cost estimates nor did it present a cost-benefit analysis or discuss other options for consideration. Despite these shortcomings in the business case presented, the ITS Board gave MDCPS approval to create a request for proposals (RFP) for the CCWIS project. MDCPS had not yet released the RFP as of October 22, 2019. The Department anticipates configuration of the new database to take 15 to 18 months and estimated it to have a total life cycle costs of $28.7 million, funded with 50% state funds and 50% federal funds from the Administration for Children and Families, Children's Bureau. PEER notes that the Department only has 20 months before the Court's June 30, 2021 implementation deadline.

**While MACWIS is an outdated system and needs to be replaced, the same problems will exist with CCWIS if MDCPS does not develop a clear plan or document its processes.**

While MACWIS is an outdated system, the vast majority of the issues identified during the course of this review are primarily user issues rather than software issues, e.g., errors with data entry, storage and maintenance, and improper application of business rules. Simply having better practices regarding code documentation, file retention, and data entry would eliminate many of the observed problems. These fixes are neither expensive nor difficult; they are approximately equivalent to having established, written procedures for data entry, code documentation, and such, and then following those procedures. While MDCPS has adopted new data quality policies since PEER's last review, the persistence of data quality problems indicates these policies were not fully implemented in FY 2019. PEER notes that better data handling is vital to the mission of MDCPS, but moving ahead with its development of CCWIS without a clear plan or supporting documentation is not the way to economically achieve this goal as mandated in 45 CFR Section 1355.52(a).

# Recommendations

1. The Mississippi Office of the State Auditor should conduct an audit of the Mississippi Department of Child Protection Services' expenditure of $3.2 million on contracts for the development of a custom-built case management system to ensure that all deliverables were produced according to the terms of the contracts.

2. In order to enhance its accountability for the use of appropriated funds, the Mississippi Department of Child Protection Services (MDCPS) should estimate and identify expenditures and full-time equivalents by accountability program. (PEER Committee staff are available to assist with this effort.)

3. MDCPS should identify child and family well-being intervention programs to serve Mississippi children and families and ensure that such programs are supported by high-quality research, as defined in MISS. CODE ANN. Section 27-103-159(1)(a), (1)(c), and (1)(g), to achieve intended outcome(s). (PEER Committee staff are available to assist with this effort.)

4. With regard to data quality and accuracy issues identified by PEER, MDCPS should implement its written procedures for code documentation, file retention, and data entry processes. The Department should review its data quality assurance procedures periodically and ensure that all relevant employees are trained and demonstrate competency regarding such procedures.

5. MDCPS should conduct a new caseload study based on current caseworkers' time and responsibilities to determine the range of time necessary for a caseworker to perform a task in accordance with best practices. MDCPS should establish new standards based on the results of this study.

   Once this is accomplished, MDCPS should redistribute caseworker positions so that they more closely match expected caseloads. In addition, MDCPS should consider assigning more cases to caseworkers in bordering counties to better distribute caseloads.

6. MDCPS staff should confer with the court monitor and attorneys representing the Plaintiffs in the *Olivia Y.* lawsuit to discuss replacing the percentage-compliant mandates (90% for caseworkers and 85% for caseworker supervisors) with mandates based on statistical difference from central tendency and dispersion of caseloads abiding by best practices (as established in recommendation 5).

7. The MDCPS Commissioner should direct the Department's staff to develop a detailed business case for the CCWIS

project prior to issuing a request for proposal (RFP) to procure the system. The business case should evaluate the technical requirements of the data management system, any implementation alternatives, a detailed cost estimate for the project and a detailed timeline for the development and implementation of the new system. The MDCPS Commissioner should also direct Department staff to maintain complete and accurate documentation of the procurement process.

8. In order to document the professional competency of its frontline, adoption, and licensure staff, MDCPS should maintain a current list of all licensed social workers in the Department.

# Appendix A: Brief Update of the *Olivia Y.* Lawsuit[13]

The 2nd Modified Mississippi Settlement Agreement and Reform Plan came into effect on January 1, 2018, and supersedes the first two settlement agreements in the lawsuit. The new settlement agreement, outlines systemic infrastructure standards, including but not limited to agency leadership, caseworker qualifications, caseload measurements, and data collection and reporting. Additionally, the 2nd MSA sets forth foster care service standards and measures with specific time frames for achieving each measure.

In May 2018, Plaintiffs in the lawsuit filed a contempt motion alleging that MDCPS was not in compliance with the caseload standards and percentage-compliant mandates for caseworkers and caseworker supervisors set forth in the 2nd MSA. Therefore, the Plaintiffs requested that the Court appoint a federal "receiver" to take over Mississippi's foster care system. In response, MDCPS filed a 60(b) motion requesting that the Department be relieved of the caseload requirements.

The Court Monitor Report, *Progress of the Mississippi Department of Child Protection Services,* issued on June 11, 2019, states that MDCPS had only met 37 of the 113 requirements from the 2nd MSA and were unable to provide data for 18 of the requirements. In addition, the Court Monitor could not validate quantitative data submitted by the Department for 23 of the requirements.

At the time of this report, the Court had not yet made a ruling on the Plaintiffs request for receivership.

SOURCE: PEER analysis of *Olivia Y.* court documents.

---

[13] Appendix A on page 59 of *A Review of the Mississippi Department of Child Protection Services for Fiscal Years 2017 and 2018 (Report #627),* https://www.peer.ms.gov/Reports/reports/MDCPS-Full.pdf. contains a brief history of the *Olivia Y.* Lawsuit.

# Appendix B: MDCPS Budget Programs for FY 2020

| Budget Program Name | Description |
|---|---|
| MDCPS – Administration | This budget program includes the following areas within the agency: Commissioner's Office, human resources, federal reporting, policy, finance, eligibility, contracting, centralized intake, continuous quality improvement, and data reporting. This includes all salaries, travel, and contractual expenses associated with these areas. |
| MDCPS – MACWIS | This budget program includes all staff, contracts, and equipment costs utilized to support MDCPS's legacy case management system, MACWIS. |
| MDCPS – CCWIS | This budget program includes all staff, contracts, travel costs, and equipment costs associated with the development of a comprehensive child welfare information system. |
| MDCPS – Trafficking | This budget program is in response to H.B. 571 and H.B. 1652 passed by the Legislature during its 2019 Regular Session to provide MDCPS with funding for coordination and services of children who have been victims of human trafficking. This program has been established to provide for salary and contractual expenses. |
| MDCPS – Training | This budget program includes the training and professional development functions of the agency. This includes all salaries, travel, and contractual expenses associated with professional development and training. |
| MDCPS – Permanency | This budget program includes the areas of adoption and independent living within the agency. This includes all salaries, travel, and contractual expenses associated with in these areas. |
| MDCPS – Prevention | The adoption of the Families First Prevention and Services Act in 2018, shifts the focus of child welfare to a model that highlights the prevention of children from entering foster care through the provision of prevention services to keep families together, safely. This budget program includes salaries, travel, and contractual expenses associated with prevention programs and services. |
| MDCPS – Frontline (i.e., Foster Care) | This budget program includes the following areas within the agency: frontline (caseworkers), field support, foster care board payments, foster care contractual, foster care fund, client services, licensing of foster homes and congregate care settings, special investigations, Interstate Compact on the Placement of Children (ICPC), and contracts for licensure homes studies of potential foster care homes. |

SOURCE: MDCPS.

# Appendix C: MDCPS Regions, by Field Operations Division in FY 2019

*The new Field Operations Division is highlighted in gray.*

| Western Field Operations Division | Eastern Field Operations Division | Southern Field Operations Division |
|---|---|---|
| **Region 2 West:** Coahoma, West and East Bolivar, Sunflower, Washington, Humphreys, Issaquena, Sharkey, Leflore, Carroll, Holmes, Montgomery | **Region 2 East:** DeSoto, Tate, Tunica, Panola, Quitman, Tallahatchie, Yalobusha, Grenada | **Region 6:** Lamar, Forrest, Perry, Stone |
| **Region 3 North:** Yazoo, Madison, Rankin | **Region 1 North:** Marshall, Benton, Tippah, Alcorn, Prentiss, Tishomingo | **Region 7 East:** Greene, George, Jackson |
| **Region 3 South:** Hinds | **Region 1 South:** Lafayette, Union, Pontotoc, Lee, Itawamba, Monroe | **Region 7 Central:** Harrison |
| **Region 5 East:** Copiah, Lincoln, Lawrence, Simpson, Jefferson Davis, Covington, Smith, Marion | **Region 4 North:** Calhoun, East and West Chickasaw, Webster, Clay, Choctaw, Oktibbeha, Lowndes, Attala, Winston, Noxubee | **Region 7 West:** Pearl River, Hancock |
| **Region 5 West:** Warren, Claiborne, Jefferson, Adams, Franklin, Wilkinson, Amite, Pike, Walthall | **Region 4 South:** Leake, Neshoba, Kemper, Scott, Newton, Lauderdale, Wayne | |

SOURCE: MDCPS.

# Appendix D: Federal Revenues Received by MDCPS in FY 2019, by Funding Source

**U.S. Department of Health and Human Services' Administration for Children and Families, Children's Bureau.**

**Adoption and Legal Guardianship Incentives**      $270,098

Recognizes improved performance in helping children and youth in foster care find permanent homes through adoption and legal guardianship.

**Child Abuse Prevention and Treatment Act (CAPTA)**      $60,988

Provides federal funding to states in support of prevention, assessment, investigation, prosecution, and treatment activities.

**Education and Training Voucher (ETV)**      $865,557

Provides resources specifically to meet the education and training needs of youth aging out of foster care.

**Chafee Foster Care Independence Program**      $805,124

Helps current and former foster care youth achieve self-sufficiency. Grants are offered to states and tribes who submit a plan to assist youth in a wide variety of areas designed to support a successful transition to adulthood. Activities and programs include, but are not limited to, help with education, employment, financial management, housing, emotional support and assured connections to caring adults for older youth in foster care.

**Community-based Grants for the Prevention of Child Abuse and**

**Neglect (CBCAP)**      $287,365

Supports community-based efforts to develop, operate, expand, enhance, and coordinate initiatives, programs, and activities to prevent child abuse and neglect and to support the coordination of resources and activities to better strengthen and support families to reduce the likelihood of child abuse and neglect.

**Monthly Caseworker Visit**      $34,415

Funding is intended to improve the quality of caseworker visits with children and families.

**Promoting Safe and Stable Families (PSSF) (Title IV-B, Subpart 2)**      $3,641,819

Provided to develop a coordinated and integrated service system that builds on the strengths of families and communities; emphasize collaborative approaches, early identification of issues and the delivery of prevention, intervention and support services; prevent child abuse and neglect, protect children from further abuse, and promote permanency for children within their own families or with kinship or adoptive families; and strengthen families and remove barriers to child safety, permanency, and well-being.

**Stephanie Tubbs Jones Child Welfare Services (Title IV-B, Subpart 1 of the Social Security Act)**                                   **$3,159,811**

Designed to support services and activities intended to protect and promote the welfare of all children; prevent child abuse, neglect, or exploitation; permit children to remain in their own homes or return to them whenever it is safe and appropriate; promote safety, permanency, and well-being for children in foster care and adoptive families; and provide training to ensure a well-qualified child welfare workforce.

**Title IV-E Foster Care**                                             **$19,962,319**

Provides federal reimbursement to states for the costs of children placed in foster homes or other types of out-of-home care under a court order or voluntary placement agreement. Title IV-E benefits are an individual entitlement for qualified children who have been removed from their homes.

**Title IV-E Adoption Assistance**                                     **$17,166,407**

Funds are available for a one-time payment to assist with the costs of adopting a child as well as for monthly subsidies to adoptive families to assist with the care of the eligible child. Additionally, funds are available for: administrative costs to manage the program; training staff and adoptive parents; adoptive parent recruitment; and other related expenses.

**U.S. Department of Health and Human Services' Administration for Children and Families, Office of Refugee Resettlement.**

**Refugee Social Services Program**                                    **$30,000**

Supports employability services and other services that address barriers to employment.

**Refugee Cash and Medical Assistance Program**                        **$1,734,373**

Provides short-term medical assistance to newly-arriving refugees and other populations who are eligible for ORR benefits.

**U.S. Department of Health and Human Services' Administration for Children and Families, Office of Family Assistance.**

**Temporary Assistance to Needy Families (TANF)**                      **$30,000,000**

Designed to help needy families achieve self-sufficiency. The four purposes of TANF are to: provide assistance to needy families so that children can be cared for in their own homes or in the homes of relatives; end the dependence of needy parents by promoting job preparation, work, and marriage; prevent and reduce the incidence of out-of-wedlock pregnancies; and encourage the formation and maintenance of two-parent families.

**Total Federal Revenues: $78,018,276**

SOURCE: PEER analysis of the MDCPS budget request for FY 2021.

# Appendix E: Inventory of Child and Family Well-being Intervention Programs Funded by MDCPS in FY 2019

| Name of entity delivering the program | County where the program is delivered | Program name | Program description | Program expenditures | Participants served |
|---|---|---|---|---|---|
| Instructional Access, Inc. | Hinds | Technology-based Entrepreneurial Youth Conference | A week-long youth conference providing interactive entrepreneurial workshops where students use technology to learn, explore, design projects, build a business plan, learn how to market their product, film, and edit their project for presentation to a large group. | $177,282.08 | 82 youth and 24 MDCPS staff |
| Apelah | DeSoto, Madison | PRIDE Model of Practice (Therapeutic Foster Care) | A week-long training on providing foster care services utilizing the 2003 edition of alternative ways of interpreting behaviors and interacting with children. | $3,336,598  This includes expenditures funded by MDCPS for all programs offered by Apelah. | 280 |
| Apelah | DeSoto, Madison | Nonviolent Crisis Intervention (Therapeutic Foster Care) | Adults, average age 35, participate in four to eight hours of information to prevent and manage escalating crisis behaviors in oneself. | see PRIDE Model of Practice expenditures above | 280 |
| Apelah | Madison | Youth Mental Health First Aid (Therapeutic Foster Care) | Discussion of skills when interacting with youth experiencing a mental health problem/crisis. | see PRIDE Model of Practice expenditures above | 150 |
| Christians in Action, Inc. | Hinds | Emergency Child Shelter | Services include individual and group therapy, family team meetings, education and enrichment activities, recreation, medical, dental, vision assessments, psychological assessments, crisis management, and independent living skills training. | $324,583 | 92 |
| Hope Village for Children, Inc. | Lauderdale | Therapeutic Group Homes | The agency provides services to group home residents, including providing an individualized treatment plan to monitor the progress toward participant's goals, and providing Trauma Informed Care-EQ2, Mental Health First | $1,080,100 | 48 |

| | | | Aid, and MANDT. In an effort to promote permanency, the agency facilitates and participates in family team meetings and provides residents independent living services. | | |
|---|---|---|---|---|---|
| Hope Village for Children, Inc. | Lauderdale | Therapeutic Transitional Living Homes | Provides therapeutic residential transitional living services to young adults who have lived in the agency's Therapeutic Group Home and are aging out of the foster care system. Participants are taught independent living skills in an effort to help them be successful adults when they leave the agency's care. | $76,650 | 3 |
| Hope Village for Children, Inc. | Lauderdale | Emergency Shelter | Emergency shelters provide short term, 45 days, residential care to Mississippi's abused and neglected foster children who are between the ages of birth through twenty-one. The agency provides individual assessments for every child utilizing Trauma Informed Care (EQ2), Mental Health First Aid, and the Mandt System. Staff facilitates and participates in family team meetings in an effort to provide the best possible outcome for children. | $249,284 | 73 |
| Hope Village for Children, Inc. | Lauderdale | Temporary Transitional Living Program | Provides temporary housing to former and current Mississippi foster children who are now attending college and have no other place to live during the times the college is closed or on holidays. | $76,650 | 6 |
| Mississippi SIDS and Infant Safety Alliance | All counties in Mississippi | Baby Basics Program | Provides education on SIDS/SUID Risk Reduction and Safe Sleep Environments to expectant and new parents, caregivers, professionals, and the general public. Participants receive baby supplies, sleep sacks, and the book, *Caring for Your Baby and Young Child*. | $8,337 | 610 (includes the entire infant safe sleep initiative) |
| Mississippi SIDS and Infant Safety Alliance | All counties in Mississippi | Cribs for Kids Program | Provides a pack 'n play to referred families that cannot afford a safe sleep area for their baby. | $3,517 | See the Baby Basics Program |
| Mississippi SIDS and Infant Safety Alliance | All counties in Mississippi | Safe Sleep Hospital Certification Program | Mississippi SIDS and Infant Safety Alliance visits birthing hospitals and provides them with tools and information to become a Cribs for Kids Safe Sleep Certified Hospital. The program requires safe sleep education be provided to families before they leave the hospital. | $217 | See the Baby Basics Program |

| Mississippi SIDS and Infant Safety Alliance | All counties in Mississippi | Infant Safe Sleep Initiative Marketing and Social Media | Provides safe sleep education through billboards, Facebook, Instagram, newsletters, etc. | $16,391 | See the Baby Basics Program |
|---|---|---|---|---|---|
| Sally Kate Winters Family Services | Clay | Emergency Shelter Program | Provides temporary placement for children and youth from birth to 17 years of age. In addition to basic shelter services for food, clothing, and housing, the program also provides an array of crisis intervention services to assist with safety, well-being, and permanency. Overnight respite services are also offered to provide foster parents a short-term break (1 to 14 days) from the role of parent and caretaker. These services can be used during a crisis with the child or when a family or child would benefit from a short-term separation from one another. Services include room and board; 24-hour supervision, crisis counseling, and recreational activities. | not provided | 91 (46 shelter participants and 45 respite participants) |
| Sunnybrook Children's Home, Inc. | Madison | Residential Program | Group home for abused and neglected children ages 10 to 20 who are either in state custody or privately placed. While in the program, residents attend public school, participate in tutoring and counseling services, learn various job skills, volunteer at various facilities, and participate in many extracurricular activities provided by volunteers and donors. | $240,000 | 23 MDCPS placed children |
| Youth Villages | Statewide | MYPAC | An in-home Medicaid service for youth that provides wraparound services, including care coordination and therapeutic services administered by separate staff members. | Funded by Medicaid | 739 |
| Youth Villages | Hinds, Forrest, Lee, and surrounding counties | In CIRCLE | In CIRCLE provides preservation for youth at risk of removal from their family and reunification for youth returning to their family. | $1,689,341.38 | 238 |

SOURCE:  Survey of Child Welfare Agencies providing programs and services to children and families in Mississippi.

# Appendix F: FY 2017, FY 2018, and FY 2019 Annual Caseworker Turnover Rates[14] and Average Number of Caseworkers,[15] by County and Region

| Region/County | FY 2017 Turnover | FY 2017 Average Number of Caseworkers | FY 2018 Turnover | FY 2018 Average Number of Caseworkers | FY 2019 Turnover | FY 2019 Average Number of Caseworkers |
|---|---|---|---|---|---|---|
| **I-N** | **18%** | **53** | **20%** | **69** | **21%** | **69** |
| Alcorn | 15% | 16 | 16% | 17 | 44% | 15 |
| Benton | 0% | 2 | 0% | 1 | 80% | 1 |
| Marshall | 19% | 9 | 11% | 16 | 15% | 18 |
| Prentiss | 22% | 7 | 26% | 10 | 8% | 10 |
| Tippah | 21% | 11 | 40% | 13 | 19% | 13 |
| Tishomingo | 23% | 7 | 9% | 11 | 8% | 11 |
| **I-S** | **31%** | **90** | **18%** | **99** | **20%** | **88** |
| Itawamba | 28% | 10 | 24% | 11 | 0% | 13 |
| Lafayette | 30% | 9 | 19% | 9 | 12% | 8 |
| Lee | 35% | 27 | 17% | 33 | 29% | 29 |
| Monroe | 40% | 15 | 21% | 13 | 27% | 8 |
| Pontotoc | 11% | 17 | 5% | 18 | 35% | 15 |
| Union | 40% | 15 | 25% | 15 | 6% | 15 |
| **II-E** | **34%** | **57** | **16%** | **64** | **50%** | **56** |
| DeSoto | 22% | 29 | 17% | 31 | 78% | 23 |
| Grenada | 26% | 9 | 0% | 10 | 16% | 10 |
| Panola | 20% | 4 | 63% | 4 | 13% | 6 |
| Quitman | 144% | 1 | 0% | 2 | 48% | 1 |
| Tallahatchie | 46% | 4 | 0% | 4 | 0% | 4 |
| Tate | 86% | 4 | 20% | 4 | 15% | 6 |
| Tunica | 55% | 1 | 0% | 2 | 100% | 2 |
| Yalobusha | 32% | 5 | 16% | 6 | 46% | 4 |
| **II-W** | **33%** | **87** | **18%** | **81** | **18%** | **70** |
| Bolivar | 0% | 9 | 31% | 8 | 29% | 5 |
| Carroll | 0% | 4 | 25% | 4 | 0% | 3 |
| Coahoma | 49% | 7 | 22% | 7 | 13% | 6 |
| Holmes | 17% | 6 | 39% | 6 | 21% | 7 |
| Humphreys | 17% | 5 | 21% | 5 | 25% | 3 |

[14] PEER calculated turnover rates by determining the sum of job losses (in which a PIN changes from occupied to vacant) and job changes (in which a PIN changes from being occupied by one person to being occupied by a different person) in a given period, and dividing by the total number of PINs in the same period. It should be noted that turnover rates cannot be calculated from average number of caseworkers.
[15] PEER calculated the average number of caseworkers as the sum of filled caseworker PINs during a given period of months, divided by the number of months during that period. It should be noted that in PEER's previous review of MDCPS, the "average number of caseworkers" was calculated as the sum of caseworker PINs during a given period of months, divided by the number of months during that period. This previous calculation represented total caseworker PINs rather than filled caseworker PINs and was provided at MDCPS request for context only. In future reports, PEER will report the number of filled caseworker positions rather than the number of positions.

| Region/County | FY 2017 | | FY 2018 | | FY 2019 | |
| | Turnover | Average Number of Caseworkers | Turnover | Average Number of Caseworkers | Turnover | Average Number of Caseworkers |
|---|---|---|---|---|---|---|
| Issaquena | 0% | 1 | 0% | 1 | 0% | 1 |
| Leflore | 52% | 5 | 0% | 5 | 20% | 5 |
| Montgomery | 33% | 6 | 0% | 4 | 32% | 3 |
| Sharkey | 0% | 0 | N/A | N/A | N/A | N/A |
| Sunflower | 26% | 7 | 0% | 8 | 13% | 7 |
| Washington | 44% | 37 | 18% | 33 | 17% | 30 |
| **III-N** | **35%** | **58** | **18%** | **65** | **35%** | **48** |
| Madison | 31% | 9 | 29% | 9 | 27% | 7 |
| Rankin | 35% | 42 | 17% | 47 | 35% | 33 |
| Yazoo | 42% | 7 | 9% | 9 | 43% | 9 |
| **III-S** | **31%** | **77** | **19%** | **73** | **25%** | **65** |
| Hinds | 31% | 77 | 19% | 73 | 25% | 65 |
| **IV-N** | **33%** | **60** | **17%** | **69** | **29%** | **60** |
| Attala | 28% | 7 | 25% | 8 | 46% | 5 |
| Calhoun | 22% | 4 | 22% | 4 | 50% | 4 |
| Chickasaw | 16% | 5 | 16% | 5 | 0% | 5 |
| Choctaw | 86% | 1 | 44% | 2 | 0% | 2 |
| Clay | 21% | 9 | 0% | 8 | 0% | 6 |
| Lowndes | 39% | 15 | 30% | 20 | 34% | 20 |
| Noxubee | 0% | 2 | 0% | 3 | 33% | 3 |
| Oktibbeha | 66% | 7 | 0% | 10 | 37% | 8 |
| Webster | 29% | 3 | 31% | 3 | 31% | 2 |
| Winston | 25% | 7 | 0% | 6 | 29% | 5 |
| **IV-S** | **32%** | **68** | **20%** | **74** | **19%** | **77** |
| Clarke | 0% | 4 | 34% | 5 | 34% | 4 |
| Jasper | 20% | 4 | 0% | 4 | 0% | 4 |
| Jones | 33% | 15 | 10% | 17 | 10% | 18 |
| Kemper | 55% | 1 | 0% | 1 | 0% | 2 |
| Lauderdale | 18% | 20 | 35% | 20 | 24% | 21 |
| Leake | 63% | 3 | 39% | 2 | 24% | 3 |
| Neshoba | 25% | 8 | 0% | 8 | 9% | 10 |
| Newton | 0% | 3 | 21% | 5 | 52% | 3 |
| Scott | 69% | 7 | 20% | 9 | 20% | 9 |
| Wayne | 87% | 4 | 20% | 4 | 23% | 3 |
| **V-E** | **23%** | **59** | **21%** | **59** | **16%** | **54** |
| Copiah | 20% | 9 | 20% | 9 | 26% | 7 |
| Covington | 0% | 4 | 28% | 3 | 0% | 4 |
| Jefferson Davis | 0% | 7 | 15% | 6 | 0% | 6 |
| Lawrence | 0% | 3 | 0% | 3 | 0% | 2 |
| Lincoln | 23% | 11 | 27% | 9 | 9% | 9 |
| Marion | 37% | 16 | 27% | 20 | 17% | 20 |

| | FY 2017 | | FY 2018 | | FY 2019 | |
|---|---|---|---|---|---|---|
| Region/County | Turnover | Average Number of Caseworkers | Turnover | Average Number of Caseworkers | Turnover | Average Number of Caseworkers |
| Simpson | 27% | 8 | 12% | 7 | 29% | 5 |
| Smith | 0% | 2 | 0% | 2 | 50% | 2 |
| **V-W** | **35%** | **57** | **23%** | **62** | **28%** | **52** |
| Adams | 12% | 15 | 6% | 17 | 6% | 16 |
| Amite | 60% | 3 | 28% | 3 | 0% | 2 |
| Claiborne | 36% | 2 | 0% | 2 | 0% | 2 |
| Franklin | 0% | 2 | 0% | 2 | 0% | 3 |
| Jefferson | 0% | 3 | 0% | 3 | 0% | 3 |
| Pike | 59% | 14 | 35% | 13 | 51% | 9 |
| Walthall | 0% | 6 | 0% | 8 | 38% | 6 |
| Warren | 45% | 11 | 54% | 12 | 60% | 9 |
| Wilkinson | 100% | 2 | 0% | 2 | 0% | 3 |
| **VI** | **34%** | **52** | **35%** | **58** | **17%** | **50** |
| Forrest | 28% | 36 | 32% | 36 | 21% | 26 |
| Lamar | 67% | 6 | 56% | 12 | 20% | 12 |
| Perry | 123% | 3 | 56% | 2 | 0% | 4 |
| Stone | 10% | 8 | 11% | 8 | 11% | 8 |
| **VII-C** | **15%** | **89** | **18%** | **104** | **27%** | **103** |
| Harrison | 15% | 89 | 18% | 104 | 27% | 103 |
| **VII-E** | **18%** | **49** | **24%** | **54** | **38%** | **48** |
| George | 20% | 5 | 31% | 5 | 44% | 6 |
| Greene | 41% | 2 | 0% | 2 | 0% | 3 |
| Jackson | 17% | 43 | 24% | 47 | 40% | 40 |
| **VII-W** | **39%** | **59** | **29%** | **59** | **23%** | **48** |
| Hancock | 39% | 43 | 30% | 40 | 17% | 30 |
| Pearl River | 38% | 16 | 28% | 19 | 31% | 19 |
| | | | | | | |
| **Statewide** | **29%** | **915** | **21%** | **992** | **26%** | **886** |

Source: PEER analysis of MDCPS employee data provided by MSPB.

# Appendix G: Examples of Direct and Indirect Costs of Employee Turnover

| Direct Costs | Indirect Costs |
|---|---|
| Processing departing employees' paperwork | Productivity differential between the departing employee and the replacement |
| Pay out of any vacation pay, sick pay | Errors due to inexperience |
| Unemployment compensation payments | Lowered morale and productivity of other employees |
| Recruitment activities, including costs of advertising, and job fairs | Financial consequences of slower service resulting in longer placements in out-of-home care |
| Interviews, reference checks and other background checks | Emotional consequences for children and families due to lack of continuity and delays |
| Training, including both formal classroom training and on-the-job training provided by supervisors, coworkers, and mentors | |

SOURCE: CPS Human Resources Services Turnover Toolkit: A Guide to Understanding and Reducing Employee Turnover.

# Appendix H: Comprehensive Child Welfare Information System (CCWIS) Requirements Established in 45 CFR Section 1355.52

**(a)  Efficient, economical, and effective requirement.**

CCWIS must support the efficient, economical, and effective administration of the Title IV-B and Title IV-E plans pursuant to section 474(a)(3)(c)(iv) of the Act by: maintaining all program data required by federal, state, or tribal law or policy, not duplicating system development or software maintenance, and ensuring costs are reasonable and beneficial.

**(b)  CCWIS data requirements.**

CCWIS must maintain data required to support state, federal, or tribal child welfare laws, regulations, policies, practices, reporting requirements, audits, program evaluations, and reviews, including for: ongoing federal child welfare reports, Title IV-E eligibility determinations, authorizations of services, and expenditures under both Title IV-E and IV-B, and the National Child Abuse and Neglect Data System.

**(c)  Reporting requirements.**

CCWIS must use data to generate, or contribute to: required Title IV-B or IV-E federal reports according to applicable formatting and submission requirements; and, reports needed by state or tribal child welfare laws, regulations, policies, practices, reporting requirements, audits, and reviews that support programs and services described in Title IV-B and IV-E.

**(d)  Data quality requirements.**

Data must: meet the most rigorous of the applicable standards for completeness, timeliness, and accuracy; be consistently and uniformly collected; be exchanged and maintained in accordance with confidentiality requirements; support child welfare policies, goals, and practices; and, not be created by default or inappropriately assigned. In addition, agencies must implement and maintain automated functions in CCWIS to regularly monitor CCWIS data quality; alert staff to collect, update, correct, and enter data; prevent the need to re-enter data already captured or exchanged with CCWIS; and generate reports of continuing or unresolved data quality problems.

**(e)  Bi-directional data exchanges.**

Must be able to exchange relevant data with systems: generating financial payments and claims for Title IV-B and IV-E; operated by child welfare contributing agencies that are collecting and using data; calculating one or more components of Title IV-E eligibility determinations; and external to CCWIS used by Title IV-E agency staff to collect CCWIS data. In addition, CCWIS must support one bi-directional data exchange to exchange relevant data, including data that may benefit Title IV-E agencies and data exchange partners in serving clients and improving outcomes.

**(f)  Data exchange standard requirements.**

Must use a single data exchange standard that describes data, definitions, formats, and other specifications upon implementing CCWIS for bi-directional data exchanges between CCWIS and each child welfare contributing agency.

**(g)  Automated eligibility determination requirements.**

A state Title IV-E agency must use the same automated function or the same group of automated functions for all Title IV-E eligibility determinations.

**(h)  Software provision requirement.**

The agency must provide a copy of the agency-owned software that is designed, developed, or installed and associated documentation to the designated federal repository within the Department upon request.

**(i)  Submission requirements.**

Before claiming funding in accordance with CCWIS cost allocation, agencies must submit an Advance Planning Document or a Notice of Intent that includes: a description of how the CCWIS will meet the federal requirements; a list of all automated functions included in CCWIS; and a notation of whether each automated function meets or when implemented will meet the federal requirements, including no duplication.

SOURCE: PEER summary of 45 CFR Section 1355.52.

# Agency Response



**STATE OF MISSISSIPPI**
Phil Bryant, Governor
**DEPARTMENT OF CHILD PROTECTION SERVICES**
Jess H. Dickinson, Commissioner

November 14, 2019

James A. Barber, Executive Director
Performance Evaluation and Expenditure Review Committee
Post Office Box 1204
Jackson, Mississippi 39215-1204

Dear Mr. Barber,

The purpose of this letter is to set forth the Mississippi Department of Child Protection Services' (MDCPS) response to the Performance Evaluation and Expenditure Review Committee's (PEER) state fiscal year 2019 review of MDCPS's operations under Mississippi Code Section 43-26-1. Below is our response to each recommendation.

**1. The Mississippi Office of the State Auditor should conduct an audit of the Mississippi Department of Child Protection Services' expenditure of $3.2 million on contracts for the development of a custom-built case management system to ensure that all deliverables were produced according to the terms of the contracts.**

MDCPS will, of course, cooperate in such an audit if the Office of the State Auditor finds it necessary. That said, as this report recognizes, the contracts and expenditures in question relate to a project plan and direction for CCWIS development that is no longer being pursued by MDCPS and that was initiated by MDCPS staff no longer employed by the Agency. Accordingly, the audit in question will not provide relevant or useful information for the project as it is now being pursued.

**2. In order to enhance its accountability for the use of appropriated funds, the Mississippi Department of Child Protection Services (MDCPS) should estimate and identify expenditures and full-time equivalents by accountability program. (PEER Committee staff are available to assist with this effort.)**

**3. MDCPS should identify child and family well-being intervention programs to serve Mississippi children and families and ensure that such programs are supported by high-quality research, as defined in MISS. CODE ANN. Section 27-103-159(1)(a), (1)(c), and (1)(g), to achieve intended outcome(s). (PEER Committee staff are available to assist with this effort.)**

The purpose of tracking expenditures and FTEs by accountability program and utilizing evidence-based intervention programs supported by high-quality research is to ensure that agencies exercise their discretion regarding the expenditure of public funds in the most cost-effective manner possible. These practices inform spending decisions, allowing agencies to target spending in the most impactful manner *when* discretion exists in the use of the agency's funds. But where the agency has no discretion in how it spends public funds, the utility of these practices is eliminated.

James A. Barber
November 14, 2019
Page Two

The overwhelming majority of MDCPS's spending is not discretionary and is not devoted to intervention programs in the sense contemplated here. Rather, MDCPS expends most of its funding on nondiscretionary expenses like basic room and board for foster children; salaries for caseworkers, supervisors, and support staff; travel; the operation of its current data system; and the court-ordered development of a new data system.

Most services provided to children in MDCPS custody are paid for by Medicaid, not MDCPS. Also, MDCPS's one major source of service-related expenditures—the In-Circle intensive in-home services program—has been tested with standardized assessment before and after service delivery to demonstrate its efficacy and shown a higher that 90% success rate. So, MDCPS believes the purposes of these recommendations are already adequately addressed.

**4. With regard to data quality and accuracy issues identified by PEER, MDCPS should implement its written procedures for code documentation, file retention, and data entry processes. The Department should review its data quality assurance procedures periodically and ensure that all relevant employees are trained and demonstrate competency regarding such procedures.**

MDCPS has over one thousand users with access to its MACWIS system and responsibility for entering data. Each user is provided training on appropriate use of MACWIS in their documentation. Ultimately, MDCPS believes many of PEER's data-related concerns will be addressed by replacing MACWIS. A more user-friendly and intuitive system will improve data entry. Modern systems keep complete logs of all code changes, providing a complete audit of changes.

**5. MDCPS should conduct a new workload study based on current caseworkers' time and responsibilities to determine the range of time necessary for a caseworker to perform a task in accordance with best practices. MDCPS should establish new standards based on the results of this study. Once this is accomplished, MDCPS should redistribute caseworker positions so that they more closely match expected caseloads. In addition, MDCPS should consider assigning more cases to caseworkers in bordering counties to better distribute caseloads.**

MDCPS has requested funding for a new workload study in its FY2021 budget request. That said, MDCPS utilizes case weights included in the Olivia Y settlement agreement, which carries the weight of a court order. MDCPS has a motion pending in the federal court asking to be relieved of the caseload-related obligations in the settlement agreement. But unless that motion is granted, MDCPS will be unable to change the caseload methodology it now utilizes.

As for the cross-county assignment of cases, MDCPS assigns cases across county lines when it is appropriate to do so. The analysis of this report rests on an assumption that an even distribution of cases is always the best distribution of cases. Given that each case, child, family, and caseworker have unique abilities, challenges, needs, and complexity, that assumption is not correct.

**6. MDCPS staff should confer with the court monitor and attorneys representing the Plaintiffs in the Olivia Y. lawsuit to discuss replacing the percentage-compliant mandates (90% for caseworkers and 85% for caseworker supervisors) with mandates based on statistical difference from central tendency and dispersion of caseloads abiding by best practices (as established in recommendation 5).**

As stated above, MDCPS seeks to be relieved of its current caseload obligation through a motion filed with the federal court. The parties are not a position to simply change this obligation. The court must do so.

James A. Barber
November 14, 2019
Page Three

**7. The MDCPS Commissioner should direct the Department's staff to develop a detailed business case for the CCWIS project prior to issuing a request for proposal (RFP) to procure the system. The business case should evaluate the technical requirements of the data management system, any implementation alternatives, a detailed cost estimate for the project and a detailed timeline for the development and implementation of the new system. The MDCPS Commissioner should also direct Department staff to maintain complete and accurate documentation of the procurement process.**

MDCPS's new CCWIS project direction, and the RFP for vendors to develop that system, is being developed in conjunction with both the Mississippi Department of Information Technology Services and the Children's Bureau within the Administration for Children and Families in the United States Department of Health and Human Services. Before that work began, a business case was presented to the Board of ITS, which approved proceeding with the development of the RFP. The core business case for developing the system is that MDCPS has a legal obligation to do so under the settlement agreement in the Olivia Y litigation. MDCPS believes the involvement of those from expertise in both the state and federal government is sufficient to address the concerns contemplated by this recommendation.

**8. In order to document the professional competency of its frontline, adoption, and licensure staff, MDCPS should maintain a current list of all licensed social workers in the agency.**

MDCPS does not believe implementing this recommendation would serve any useful purpose. MDCPS considers social work degrees and social work licenses as preferred qualifications in hiring decisions. This practice addresses the concern raised in this report: growing the proportion of the workforce with these degrees. Keeping a running list of such employees would not change the composition of the workforce in any way.

Moreover, the suggestion that non-social work degree staff lack "professional competency" is incorrect. Every new MDCPS caseworker, whether they have a social work degree or not, receives 270 hours of training specific to child welfare and MDCPS practice. These individuals are well prepared to enter the workforce regardless of their degree.

Sincerely,

Jess Dickinson, Commissioner
Mississippi Department of Child Protection Services

# PEER Committee Staff

**James A. Barber, Executive Director**

Legal and Reapportionment
Ted Booth, General Counsel
Ben Collins
Barton Norfleet

Administration
Alicia Russell-Gilbert
Deborah Hardy
Gale Taylor

Quality Assurance and Reporting
Richard Boada
Tracy Bobo

Performance Evaluation
Lonnie Edgar, Principal Analyst
David Pray, Principal Analyst
Jennifer Sebren, Principal Analyst
Kim Cummins
Matthew Dry
Samuel Hearn
Matthew Holmes
Taylor Mullins
Sarah Williamson
Julie Winkeljohn
Ray Wright

Performance Accountability
Linda Triplett, Director
Kirby Arinder
Debra Monroe-Lax
Meri Clare Ringer