# EXHIBIT 1

Case 3:04-cv-00251-HSO-ASH Document 893-1 Filed 06/26/20 Page 2 of 97

# Progress of the
# Mississippi Department of
# Child Protection Services

Monitoring Report for *Olivia Y., et al. v. Bryant, et al.*
2ND MODIFIED MISSISSIPPI SETTLEMENT AGREEMENT
AND REFORM PLAN

**ISSUED JUNE 29, 2020**

**REPORT 7**

**JANUARY TO DECEMBER 2019**



PUBLIC
CATALYST

# CONTENTS

Introduction ................................................................................................................................. 3

Summary of Progress and Challenges ....................................................................................... 4

2019 Summary of Commitments ............................................................................................... 8

Methodology ............................................................................................................................. 21

Demographics ............................................................................................................................ 22

Operational Budget .................................................................................................................. 26

1. Systemic Infrastructure Standards .................................................................................... 26

Department Leadership ........................................................................................................... 26

Staff Qualifications and Training ............................................................................................ 27

Caseloads and Supervision ...................................................................................................... 30

Continuous Quality Improvement .......................................................................................... 33

Management Information Systems & Data Reporting ........................................................... 33

Performance Based Contracting ............................................................................................. 38

Foster Care Maintenance Payments ....................................................................................... 40

2. Child Safety and Maltreatment in Care ............................................................................ 41

Screening Reports of Abuse and Neglect ............................................................................... 41

Investigating Maltreatment in Care ....................................................................................... 44

3. Family-Based Placements .................................................................................................... 53

4. Placement Standards ........................................................................................................... 58

5. Visitation ............................................................................................................................... 65

Worker Contact and Monitoring ............................................................................................. 65

Developing and Maintaining Connections ............................................................................. 67

6. Child and Youth Permanency .............................................................................................. 69

Comprehensive Family Service Plans ..................................................................................... 69

Concurrent Permanency Planning .......................................................................................... 72

Reunification and Trial Home Visitation ................................................................................ 72

Other Permanency Case Goals ................................................................................................ 77

Permanency Reviews ................................................................................................................ 80

Permanency Performance Indicators..................................................................................... 81

7. Transition to Independent Living............................................................................................ 83

8. Child Well-Being....................................................................................................................... 89

Physical and Mental Health Care ............................................................................................ 89

Educational Services................................................................................................................ 93

## FIGURES

Figure 1. Age of Children in Custody on December 31, 2019 ..................................................... 23
Figure 2. Placement Types of Children in Custody on December 31, 2019................................ 24
Figure 3. Length of Stay in Care of Children in Custody on December 31, 2019 ...................... 25
Figure 4. Percent of Workers Meeting the Caseload Standard, 2019 ....................................... 31
Figure 5. Percent of Caseworker Supervisors Meeting the Supervision Ratio Standard, 2019................. 32

## TABLES

Table 1. Race of Children in Custody on December 31, 2019...................................................... 23
Table 2. Exits from Care by Exit Type, January 1, 2019 to December 31, 2019.......................... 25
Table 3. Federal Goals for Children in Custody as of December 31, 2019................................. 26
Table 4. 2nd MSA Caseload Standards by Case Type ................................................................. 31
Table 5. Current Resource Board Payment Schedule ................................................................ 41
Table 6. ANE Reports by Intake Action, 2019 ............................................................................ 42
Table 7. Background Checks for Relative Home Studies, 2019................................................... 56
Table 8. Number of Foster Homes Meeting Licensure Limits, 2019........................................... 59
Table 9. Special Needs Board Rates .......................................................................................... 60
Table 10. Permanency Outcome Performance, FFY2019 ........................................................... 82
Table 11. Youth Receiving Independent Living Skills, 2019 ....................................................... 85
Table 12. Youth Receiving Identification and Essential Documentation, 2019 .......................... 89

# Introduction

This document serves as the seventh annual report[1] to the United States District Court for the Southern District of Mississippi, Northern Division in the matter of *Olivia Y. v. Bryant* and the first report to the Honorable David C. Bramlette, III, recently reassigned to this case. On December 19, 2016, the State of Mississippi, the Mississippi Department of Child Protection Services (MDCPS) and A Better Childhood, counsel for the plaintiffs, jointly submitted to the Court a 2nd Modified Mississippi Settlement Agreement and Reform Plan (the "2nd MSA") that provides a path for improvement of Mississippi's child welfare system. The Court had previously entered as orders of the Court the Mississippi Settlement Agreement and Reform Plan on January 4, 2008 (the "Initial Settlement Agreement") and the Modified Mississippi Settlement Agreement and Reform Plan on July 6, 2012. MDCPS is the statewide child welfare agency that provides child protection, abuse prevention, and placement services on behalf of the State of Mississippi. A Better Childhood is a national advocacy organization with experience in class action litigation on behalf of children in child welfare systems. The Court entered an order directing implementation of the 2nd MSA following its submission by the parties.

In sum, the 2nd MSA, which became effective on January 1, 2018, sets forth the child welfare infrastructure, standards, and outcomes that Mississippi must meet within specific timeframes statewide. Specifically, the 2nd MSA:

- provides the plaintiff class relief by committing MDCPS to specific improvements in the state's care for vulnerable children, with respect to their safety, permanency, and well-being;

- requires the implementation of a comprehensive child welfare data and tracking system, with the goal of improving MDCPS' ability to account for and manage its work with vulnerable children;

- establishes benchmarks and performance standards in order to prevent harm to children in the class; and

- provides a clear path for MDCPS to exit court supervision after the successful achievement and maintenance of performance standards.

Pursuant to the 2nd MSA, the Court appointed Public Catalyst as the monitor, charged with reporting on MDCPS' progress implementing its commitments. The monitor is responsible for assessing the state's performance under the 2nd MSA. The parties agreed the monitor shall

---

[1] The monitoring team filed an *Interim Monitoring Report for Olivia Y., et al. v. Bryant, et al.* with the Court on December 26, 2019 for the period January 1 through June 30, 2019.

consider timeliness, appropriateness, and quality in reporting on MDCPS' performance. The monitor is required to verify data reports and statistics provided by MDCPS and shall periodically conduct case record and qualitative reviews to monitor, evaluate, and validate the state's performance with respect to the commitments in the 2nd MSA. Pursuant to Section 10.1. of the 2nd MSA, performance during the period makes certain commitments eligible to move to the "To Be Maintained" designation, pending agreement of the parties. In evaluating MDCPS' performance, the monitor draws no conclusion of whether the Department has achieved or maintained substantial compliance in accordance with Section 11.3. of this 2nd MSA. The monitor is required to provide a written report to the Court and the parties no less frequently than annually, verifying if MDCPS has or has not met the performance standards and commitments due during the reporting period.

This is the monitor's second annual report to the Court under the 2nd MSA and reflects the status of Mississippi's reform efforts as of December 31, 2019. This report includes MDCPS' progress for the entirety of calendar year 2019.

## Summary of Progress and Challenges

Of 126 commitments due in 2019 in the 2nd MSA, the monitor confirmed that MDCPS met required performance standards 39 times and did not do so in 54 other areas. The monitoring team was unable to determine the performance standard for one commitment. [2] The Department did not provide data for an additional 12 commitments, and the monitoring team cannot validate data and information submitted by MDCPS for another 20 commitments. [3] The 32 commitments for which MDCPS either did not provide data or provided inaccurate data that cannot be validated are listed in the Summary of Commitments and the relevant sections of this report. MDCPS' substantial and ongoing data problems include the manner in which the Department documents and identifies certain data fields, coding errors, and performance calculations that are inconsistent with the established rules. These deficits create blind spots that impair MDCPS management's ability to lead the Department and ensure the safety, well-being, and permanency of children consistent with the 2nd MSA. While MDCPS did not report data for several commitments during the period or the monitoring team was unable to validate data

---

[2] For commitment 6.5.d, the monitoring team determined during 2019 data validation that the data file MDCPS provided during the Stipulated Third Remedial Order period to establish baseline performance did not accurately capture the average and median times from the date on which a child's adoption goal was established to adoption finalization. As baseline performance was used to establish the performance standards for this commitment, the standards need to be revisited before performance can be accurately measured.

[3] There were an additional four commitments for which the monitoring team cannot validate the quantitative data provided by MDCPS. However, due to qualitative reporting, the monitoring team was able to assess MDCPS' performance for these commitments.

MDCPS provided, the Department began producing for some of these same commitments new data for 2020 which the monitoring team is attempting to validate.

Among the areas where MDCPS showed progress in 2019 are:

- *To Be Maintained:* Pursuant to Section 10.1. of the 2nd MSA, when MDCPS performance, as validated by the Monitor, has attained the highest designated performance standard or standards for one 12-month reporting period, as to any eligible section, the applicable commitment can be designated as "To Be Maintained", pending agreement of the parties. Upon designation as "To Be Maintained", the section will not be actively monitored. MDCPS attained the highest designated performance standard for the 2019 reporting period with respect to 13 eligible 2nd MSA sections, including:

    o maintaining a qualified Commissioner of Child Protection Services (1.);

    o hiring caseworkers and supervisors with appropriate degrees and experience (1.1.a., 1.1.b.);

    o maintaining a Training Unit headed by a qualified director (1.2.a.);

    o delivering pre-service, in-service, and supervisory training to staff (1.2.b., 1.2.d., 1.2.e.);

    o providing staff with access to computer services, electronic mail, and the MDCPS management information system, access to data related to compliance with Foster Care Service Standards, and access to a statewide electronic placement resources database (1.6.a., 1.6.b., 1.6.c.);

    o implementing a performance-based contracting system (1.7.a.);

    o providing reimbursement rates to licensed foster families (1.8.a.); and

    o implementing a policy prohibiting cancellation of visits as a form of discipline against children (5.2.c.).

- *New Non-relative Homes*: MDCPS licensed 472 new non-relative foster homes in 2019, exceeding the annual target of 400 homes established by the monitor after consultation with the Department.

- *Post-Adoption Services:* MDCPS administered a system of statewide post-adoptive services to stabilize and maintain adoptive placements. Adoptive families eligible for adoption subsidies have access to these services which include counseling, mental health treatment and crisis intervention, family preservation and stabilization services, and peer support.

- *Federal Permanency Outcomes:* The monitor established interim performance standards for MDCPS to meet for FFY2019 regarding permanency for children entering care in a 12-month period, permanency for children in care for 12-23 months, and permanency for children in care for 24 months or more. The Department achieved the interim performance standard for each of the permanency outcomes during the reporting period.

Among the areas where MDCPS did not meet the identified performance standard are several critical to child safety, including:

- *Caseloads:* The parties negotiated and agreed MDCPS would achieve workload standards for at least 90 percent of its caseworkers. MDCPS did not meet the standard for its staff at any time in 2019. Performance varied between a high of 59 percent in the fourth quarter of 2019 to a low of 48 percent in the third quarter.

- *Screening Child Maltreatment in Care (MIC)*: MDCPS agreed to ensure that it maintains a statewide system to appropriately receive, screen, and investigate reports of child maltreatment, but many features of the system lack adequate quality controls. For example, MDCPS screened out 771 maltreatment reports involving children in custody during 2019. The monitoring team conducted a qualitative review of 200 of these screened out reports and concluded that MDCPS made appropriate screening decisions in 84.5 percent of the referrals. Seven percent of the screened-out reports met MDCPS' criteria for maltreatment and should have been assigned for investigation and 8.5 percent of the referrals did not include enough information to make a screening decision and required additional information prior to making the decision to screen out or accept the report for investigation.

- *Investigating Maltreatment in Care*: The monitoring team conducted a qualitative review of MIC investigations completed by the Special Investigations Unit during 2019. The monitoring team concluded the evidence supported MDCPS' findings 78.5 percent of the time. However, for another 9.5 percent of the investigations where some or all the allegations were found to be unsubstantiated by MDCPS, the monitoring team concluded, based on MDCPS' criteria for maltreatment, that information presented during the course of the investigation was sufficient to render a substantiation.

- *Maltreatment in Care:* Data provided by MDCPS and verified by the monitoring team indicate that 87 children (1.20 percent) in MDCPS' custody were victims of abuse or neglect by their caregivers. This is more than three and a half times the agreed upon rate of maltreatment and MDCPS should have protected at least 63 more children from abuse or neglect in their placement in 2019 in order to meet the agreed upon safety standard.

- *Child Safety during Trial Home Visits:* The monitoring team determined that MDCPS conducted 66 investigations into allegations of abuse or neglect of children during their trial home visits. Sixteen of these investigations, involving 32 child victims, were substantiated for abuse, neglect, or exploitation by the parent or caregiver. The maltreatment of these 32 children during a trial home visit are in addition to the 87 children who were determined to be maltreated in care under the agreed upon safety standard.

- *Transition to Independent Living:* MDCPS agreed to provide youth age 14 years and older with, among other things, an opportunity to create an appropriate Independent Living service plan, access to a range of supportive skills and services for a successful transition to adulthood, and assistance in obtaining and compiling documents they will need after emancipating from foster care. MDCPS conducted qualitative reviews for these commitments and reported 45 percent of youth participated in the creation of an Independent Living service plan, no more than one third of eligible youth received services related to any one Independent Living skill and most services were provided to less than 20 percent of eligible youth, and between zero and 47.6 percent of youth who emancipated from care received relevant documents, as agreed.

## 2019 Summary of Commitments

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| **2nd MSA Introduction** | Defendants shall request state funds and any federal/special fund authorization sufficient to affect the provisions and outcome measures set forth in the 2nd MSA. | Yes | 26 |
| | **SYSTEMIC INFRASTRUCTURE STANDARDS** | | |
| **1.** | MDCPS shall maintain a Commissioner of Child Protection Services having responsibility for the oversight and management of the MDCPS. | Yes | 26 |
| **1.1.a.** | MDCPS shall hire caseworkers who have, at minimum, a bachelor's degree in social work or a related human services degree. The monitor shall review and determine which degrees qualify as related human services degrees. | Yes | 27 |
| **1.1.b.** | MDCPS shall hire or promote to the position of caseworker supervisor only persons who have a master's degree in social work or a related human services degree and two years of experience working with children and families, preferably in foster care; or a bachelor's degree in social work or a related human services degree with three years of experience working with children and families, preferably in foster care. | Yes | 27 |
| **1.2.a.** | MDCPS shall maintain a Training Unit headed by a qualified director of training (see 2nd MSA for full requirements of the Training Unit). | Yes | 28 |
| **1.2.b.** | MDCPS caseworkers shall receive a minimum of 270 hours of pre-service training, which includes instructional training and supervised field training, and may include E-Learning. Any E-Learning training is subject to the approval of the monitor (see 2nd MSA for more info). | Yes | 28 |
| **1.2.c.** | MDCPS caseworker trainees, as part of pre-service training, may be assigned specific tasks or activities in connection with a case that is the primary responsibility of an experienced caseworker and may, under appropriate supervision, be assigned responsibility for a "training caseload" with progressively responsible caseload assignment. | Not applicable | 29 |
| **1.2.d.** | MDCPS caseworkers shall receive a minimum of 40 hours of in-service training, and all supervisors shall receive a minimum of 24 hours of in-service training. | Yes | 29 |
| **1.2.e.** | MDCPS caseworker supervisors, within 90 days of hire or promotion, shall receive a minimum of 40 hours of training, directed specifically at the supervision of child welfare caseworkers. | Yes | 29 |
| **1.3.a.** | 90% of MDCPS caseworkers will have caseloads which do not exceed the caseload standards set forth in the 2nd MSA (pg. 3-4). Individual MDCPS caseworkers with generic caseloads shall not carry a mixed caseload that exceeds 100% capacity as calculated by weights per case type set forth in the 2nd MSA (pg. 3-4). | No | 30 |
| **1.3.b.** | 85% of MDCPS supervisors shall be responsible for no more than five caseworkers. | No | 32 |
| **1.4.a.** | By December 1st of each year, MDCPS shall develop an annual Continuous Quality Improvement Plan, which shall be subject to the approval of the monitor after consultation with the parties. | Yes | 33 |

| Section | Commitment | Achieved | Report Page |
|---------|------------|----------|-------------|
| **1.4.b.** | Upon approval, MDCPS will implement the CQI Plan and will do so with sufficient staff and resources to assess compliance with those provisions of the 2nd MSA that were identified for review in the Plan. The reviews will assess case practice, analyze outcomes, and produce analysis that will be shared with managers and stakeholders to achieve performance improvement. | Yes | 33 |
| **1.5.a.** | MDCPS shall maintain comprehensive information systems that permit: (1) timely access by authorized MDCPS staff to information, including current and historical case documents, to support child safety and continuity of care across placement settings and services; (2) capturing, tracking, and reporting of applicable financial information, quantitative 2nd MSA compliance, longitudinal performance, and child welfare information, including federally required elements; and (3) prompts for workers and supervisors regarding required actions in a child's case and whether they have taken place. | No | 33 |
| **1.6.a.** | MDCPS shall provide to all county agency staff with child welfare responsibilities access to computer services, word processing, and electronic mail and access to the current management information systems and access to CCWIS, once implemented. | Yes | 33 |
| **1.6.b.** | Data related to compliance with the 2nd MSA's Foster Care Service Standards will be collected, analyzed, and made available, at least quarterly, to MDCPS regional and county staff. | Yes | 37 |
| **1.6.c.** | MDCPS county staff shall have access to an electronic statewide database of available placement resources. | Yes | 37 |
| **1.7.a.** | Defendants shall establish, maintain, and assess the effectiveness of a performance-based contracting system to evaluate annually contract agency compliance with the terms of the 2nd MSA. Defendants shall take all reasonable steps to ensure contract agency remediation of any identified deficiencies within three months. | Yes | 38 |
| **1.7.b.** | Prior to MDCPS contracting for case management services for children in custody, MDCPS shall submit for review and approval to the monitor a detailed plan to ensure accountability and provide supervision and oversight of such agencies. | Not applicable | 40 |
| **1.8.a.** | Defendants shall ensure that all licensed foster families (regardless of whether they are supervised directly by MDCPS or by private providers, and whether they are kinship or unrelated foster families) receive at least the minimum reimbursement rate for a given level of service as established pursuant to the 2nd MSA. | Yes | 40 |
| **1.8.b.** | Defendants shall pay to all licensed foster families at least the basic monthly foster care maintenance payments. Every two years thereafter, Defendants shall provide increases in the foster care maintenance payments, based upon the previous year's rate of inflation. | Yes | 41 |

| Section | Commitment | Achieved | Report Page |
|---------|-----------|----------|-------------|
| **1.8.c.** | Defendants shall deliver to the monitor a written report regarding the adequacy of a proposed schedule of foster care maintenance payments made to foster care providers serving children and the actual cost in the state of Mississippi to provide such care (see 2nd MSA for specific report requirements). Following review of the Defendants' report, the monitor shall establish the rates that Defendants shall then implement. | Achieved in 2018 | -- |
| | **CHILD SAFETY AND MALTREATMENT IN CARE** | | |
| **2.1.** | MDCPS shall ensure that it maintains a statewide system to appropriately receive, screen and investigate reports of child maltreatment (see 2nd MSA for system requirements). Any extensions of the timeframes set forth in MDCPS policy for the completion of investigations are subject to the review and approval of the monitor. | No | 41, 49 |
| **2.2.** | MDCPS shall continue to maintain a special investigations unit whose responsibility is to investigate reports of maltreatment of children in custody. | Yes | 44 |
| **2.2.** | The initiation of a special investigation shall not extend beyond 24 hours. | No | 44 |
| **2.3.** | MDCPS will develop and implement policies and procedures, subject to the review and approval of the monitor, for the Agency to review all maltreatment in care reports that were screened-out and assess the appropriateness within 24 hours of all screen-out determinations. If the decision to screen out the report is determined to be inappropriate, MDCPS shall ensure the report is referred for investigation immediately. | No | 43 |
| **2.4.** | Upon receipt of a substantiated report of child maltreatment in a contract agency group home or emergency shelter, MDCPS shall, within 30 calendar days, initiate a licensure investigation, that is in addition to and independent of the child protection investigation (see 2nd MSA for investigation requirements). | No | 45 |
| **2.5.** | Upon receipt of a report of child maltreatment in a private child placing agency foster home, MDCPS staff will notify the child placing agency, who shall, within 30 calendar days, initiate a licensure investigation that is in addition to and independent of, any child protection investigation (see 2nd MSA for investigation requirements). | No | 46 |
| **2.6.** | All allegations of maltreatment of a child in custody shall be investigated by a worker who has received training on intake and investigations processes, policies, and investigation techniques and has no ongoing connection to the foster care case. | Yes | 45 |
| **2.7.** | Within 30 days of the completion of any investigation of maltreatment of a child in custody, as required in Section 2.1, MDCPS shall review the maltreatment investigation (see 2nd MSA for review requirements). | No | 47 |
| **2.8.** | MDCPS shall assure that standardized decision-making criteria are used for prioritizing, screening, and assessing all reports of maltreatment of children in MDCPS' custody. | No | 44 |
| **2.8.a.1.** | By July 1, 2018, at least 90% of maltreatment-in-care investigations will be initiated and completed within 30 days. | Yes | 45 |

| Section | Commitment | Achieved | Report Page |
|---------|-----------|----------|-------------|
| **2.8.b.** | Any foster child who remains in the same out-of-home placement following an investigation into a report that he or she was maltreated in that placement shall be visited in the placement by an MDCPS caseworker according to the following schedule: 1) Once per week for the first month and twice per month for three months if the investigation is found to be substantiated; or 2) Twice per month in accordance with MDCPS policy if the investigation is found to be unsubstantiated. | Cannot validate | 47 |
| **2.8.c.** | When a maltreatment investigation involves a foster or adoptive home, MDCPS shall file a copy of the approved final investigative report, and any recommendations and/or corrective actions MDCPS has deemed necessary, in the case record of the foster child, in the file of the foster or adoptive parents with a copy of the letter of notification to the foster or adoptive parents, and with the Bureau Director for Licensure. MDCPS shall also provide those records to the Youth Court Judge with jurisdiction over the child and, upon request, to the monitor. | No | 48 |
| **2.8.d.** | When a maltreatment investigation involves an agency group home, emergency shelter, private child placing agency foster home, or other facility licensed by MDCPS, a copy of the final investigative report shall be filed in the child's case record, with the Director of Congregate Care Licensure, and sent to the licensed provider facility. MDCPS shall provide the report to the Youth Court Judge with jurisdiction over the child and, upon request, to the monitor. | No | 48 |
| **2.9.** | The rate of child abuse and neglect among children in foster care shall not exceed 0.33% per year effective for the period beginning 1/1/18 (see 2nd MSA for full definition of this metric). | No | 52 |
| | **FAMILY-BASED PLACEMENTS** | | |
| **3.1.** | Nonrelative Foster Homes: All foster homes and facilities with children placed who are in the custody of MDCPS shall be timely licensed. | No | 53 |
| **3.1.** | Relative Foster Homes: All foster homes and facilities with children placed who are in the custody of MDCPS shall be timely licensed. | Cannot validate | 53 |
| **3.1.** | All foster homes and facilities with children placed who are in the custody of MDCPS shall be subject to the licensure process approved by Public Catalyst on December 31, 2016. | Yes | 53 |
| **3.2.a.** | No child shall remain in a foster home or facility determined to be unable to meet MDCPS licensing standards, absent an order by a state court with jurisdiction over child custody directing the placement of the child into a specific unlicensed placement. | No | 53 |

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| **3.2.b.** | Safety Issues: If it is determined that an unlicensed foster home or facility is unable to meet MDCPS licensing standards due to a safety issue, Defendants shall take all reasonable efforts to immediately ensure the child's safety and to remove the child, including, if required by the court, seeking an emergency court order. If the child is not in imminent danger, MDCPS shall implement a safety plan and within five calendar days, either cure the licensing deficiency if feasible, or move the child to a licensed foster home or facility, or to an appropriate expedited relative placement, one time only. | No | 54 |
| **3.2.c.** | Non-safety Issues: If MDCPS determines an unlicensed foster home to be unable to meet MDCPS licensing standards due to a non-safety issue, Defendants shall, within 30 calendar days of that determination, either cure the licensing deficiency if feasible, or move the child to a licensed foster home or facility, or to an appropriate expedited relative placement, one time only. | No | 54 |
| **3.3.a.** | MDCPS, in conjunction with the monitor, shall establish annual statewide and county performance requirements and time periods for new foster home licensure. The monitor will report to the parties MDCPS progress on achieving the performance requirements. The Defendants shall meet the performance requirements, including time periods. | Yes | 57 |
| **3.3.b.** | MDCPS shall begin to implement the annual plan to recruit and retain additional licensed foster home placements and shall maintain the additional number of total placements, as necessary during the applicability of the 2nd MSA. | Yes | 57 |
| | **PLACEMENT STANDARDS** | | |
| **4.1./ 4.13.a.** | By July 1, 2018, 70% of foster homes shall provide care for no more than five children (including foster, biological, and adoptive children) at any given time (see 2nd MSA for allowable exceptions). | Yes | 58 |
| **4.1./4.13.b.** | By July 1, 2019, 80% of foster homes shall provide care for no more than five children (including foster, biological, and adoptive children) at any given time (see 2nd MSA for allowable exceptions). | Yes | 58 |
| **4.2./4.14.a.** | By July 1, 2018, 60% of children with special needs shall be matched with placement resources that meet their therapeutic and medical needs. | Yes | 58 |
| **4.2./4.14.b.** | By July 1, 2019, 75% of children with special needs shall be matched with placement resources that meet their therapeutic and medical needs. | Yes | 58 |
| **4.3./4.15.** | At least 95% of children in MDCPS' custody shall be placed in the least restrictive setting that meets their individual needs as determined by a review of all intake, screening, assessment and prior placement information regarding the child available at the time of placement. | Yes | 60 |
| **4.4./4.18.** | 90% of children who enter MDCPS' custody shall be placed within his/her own county or within 50 miles of the home from which he/she was removed unless one of the exceptions provided in this 2nd MSA is documented as applying. | Yes | 61 |

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| **4.5./4.19.** | 90% of children who enter MDCPS' custody in Regions II-East, II-West, and V-West shall be placed within his/her own county or within 75 miles of the home from which he/she was removed unless one of the exceptions provided in this 2nd MSA is documented as applying. | No longer required | -- |
| **4.6./4.16.a.** | By July 1, 2018, 60% of siblings entering MDCPS' custody at or near the same time shall be placed together (see 2nd MSA for allowable exceptions). If a sibling group is separated at initial placement, the caseworker shall make immediate efforts to locate or recruit a foster family in whose home the siblings can be reunited. These efforts will be documented and maintained in the case file. | Cannot validate | 62 |
| **4.6./4.16.b.** | By July 1, 2019, 75% of siblings entering MDCPS' custody at or near the same time shall be placed together (see 2nd MSA for allowable exceptions). If a sibling group is separated at initial placement, the caseworker shall make immediate efforts to locate or recruit a foster family in whose home the siblings can be reunited. These efforts will be documented and maintained in the case file. | Cannot validate | 62 |
| **4.7./4.17.a.** | By July 1, 2018, 60% of children in MDCPS' custody with a documented indication that they were subject to a potential or actual placement disruption shall have documented in the child's case record the reasonable steps taken to address placement stability consistent with 2nd MSA requirements. | Cannot validate | 62 |
| **4.7./4.17.b.** | By July 1, 2019, 75% of children in MDCPS' custody with a documented indication that they were subject to a potential or actual placement disruption shall have documented in the child's case record the reasonable steps taken to address placement stability consistent with 2nd MSA requirements. | Cannot validate | 62 |
| **4.8.** | No child shall remain overnight in an MDCPS office or other nonresidential facility that provides intake functions. | Yes | 62 |
| **4.9.** | No child under 10 years of age shall be placed in a congregate care setting (including group homes and shelters) unless: a) The child has exceptional needs that cannot be met in a licensed foster home; or b) In order to keep a sibling group together for a temporary period, not to exceed 15 days and the RD has granted documented approval for the congregate care placement; or c) To enable a mother and baby to be placed together and there is not an available foster home for both of them. | No | 63 |
| **4.10./4.12.a.** | By July 1, 2018, 70% of children will remain in his/her existing placement and not be moved to another placement unless MDCPS specifically documents in the child's case record justifications for that move and the move is approved by a MDCPS supervisor. | No | 64 |
| **4.10./4.12.b.** | By July 1, 2019, 80% of children will remain in his/her existing placement and not be moved to another placement unless MDCPS specifically documents in the child's case record justifications for that move and the move is approved by a MDCPS supervisor. | No | 64 |

| Section | Commitment | Achieved | Report Page |
|---------|-----------|----------|-------------|
| **4.11.** | No child shall be placed in more than one emergency or temporary facility within one episode of foster care, unless an immediate placement move is necessary to protect the safety of the child or of others with documented approval from the RD. | No | 64 |
| | **VISITATION** | | |
| **5.1.a.2.** | By January 1, 2019, at least 90% of foster children shall have an MDCPS caseworker meet with the child at least two times per month (see 2nd MSA requirements for visits). | No | 65 |
| **5.1.a.2.** | By January 1, 2019, at least 90% of foster children shall have at least one visit per month by the caseworker, which takes place in the child's placement. | No | 65 |
| **5.1.b.2.** | By January 1, 2019, at least 90% of foster children receiving a 90-day trial home visit period shall have an MDCPS caseworker meet with the child in the home at least two times per month. | Cannot validate | 66 |
| **5.1.c.2.** | By January 1, 2019, for a least 90% of foster children with a goal of reunification, MDCPS shall meet with the child's parents at least monthly unless the child's parent(s) reside out-of-state or are incarcerated. | No | 66 |
| **5.1.d.2.** | By January 1, 2019 at least 90% of foster parents with at least one foster child in the home shall have MDCPS visit the home monthly. | No | 66 |
| **5.2.a.** | MDCPS shall arrange contact for the child with his/her parents and with any siblings not in the same placement within 72 hours of foster care placement unless there are documented reasons why contact should not occur. If a visit cannot be arranged within 72 hours, a telephone call to parents, siblings, or extended family members shall be provided to the child. | No | 67 |
| **5.2.b.** | For children entering foster care, a visitation plan for the child and his/her family shall be developed as part of the Family Service Plan. The visitation plan shall be developed and regularly updated in collaboration with parents, foster parents, and the child. | No | 68 |
| **5.2.b.1.** | If parental visitation is appropriate, this visitation plan shall include a minimum of two visits per month with the parents, unless the court order in the child's case limits such visits or unless it is documented that a parent failed to make himself or herself available. | No | 68 |
| **5.2.b.1.a.** | By January 1, 2019, 90% of children shall be provided with contacts with their parents consistent with the 2nd MSA requirements. | Did not report | 68 |
| **5.2.b.2.** | The child's visitation plan, regardless of permanency goal, shall include at least monthly visits with any siblings not in the same placement. | No | 68 |
| **5.2.b.2.a./ 5.2.b.3./ 5.2.b.4.** | By January 1, 2019, 80% of children shall be provided with contacts with any siblings in custody not in the same placement consistent with 2nd MSA requirements. | Did not report | 69 |
| **5.2.c.** | MDCPS and its contracting agencies shall implement a policy that prohibits cancellation of visits as a form of discipline against children. | Yes | 69 |

| Section | Commitment | Achieved | Report Page |
|---------|-----------|----------|-------------|
| | **CHILD AND YOUTH PERMANENCY** | | |
| 6.1.a.2. | By January 1, 2019 at least 90% of Family Service Plans shall be submitted by the caseworker consistent with 2nd MSA requirements, within 30 calendar days of a child's entry into custody. The supervisor shall review the Plan for approval within 15 calendar days. The Family Service Plan shall be considered complete upon documented supervisory review and approval. | No | 69 |
| 6.1.b. | In instances in which it is impossible to meet with one or both parents, the service planning process will proceed, notwithstanding the parent's absence. | Did not report | 70 |
| 6.1.c.2. | By January 1, 2019, in at least 90% of placement cases in which the whereabouts of one or both parents is unknown, MDCPS shall, within 30 days, institute a diligent search for the parent(s), which shall be documented in the child's case record. | Cannot validate | 70 |
| 6.1.d.2. | By January 1, 2019, for at least 90% of foster children who enter custody, permanency plans shall be submitted within 30 calendar days of the child's entry into custody by the caseworker consistent with 2nd MSA requirements. The supervisor shall review the plan for approval within 15 calendar days. The permanency plan shall be considered complete upon documented supervisory review and approval. | No | 71 |
| 6.2.a.1. | At least 95% of children in custody with the goal of reunification shall have case record documentation reflecting active concurrent permanency planning consistent with 2nd MSA requirements. | No | 72 |
| 6.3.a.1.b. | By January 1, 2019, at least 90% of foster children with a permanency goal of reunification shall have service plans for their parents that identify those services MDCPS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care and case record documentation that MDCPS made those identified services available directly or through referral. | Did not report | 72 |
| 6.3.a.2. | For a child with a permanency goal of reunification, the child's MDCPS caseworker shall meet with the child's parent(s) with whom the child is to be reunified at least monthly to assess service delivery and achievement of service goals, to keep the family informed and involved in decisions about the child, and to remain current about the family's circumstances. | No | 73 |
| 6.3.a.3. | For children with a permanency goal of reunification, the case record shall document opportunities provided to parents in support of reunification. | Did not report | 73 |
| 6.3.a.4. | When a recommendation to reunify a child with his/her family has been made, MDCPS shall develop an after-care plan with the family that identifies the services necessary to ensure that the conditions leading to the child's placement in foster care have been addressed, and that the child's safety and stability will be assured. MDCPS shall take reasonable steps to provide or facilitate access to services necessary to support the child during the trial home visit. | No | 73 |

15

| Section | Commitment | Achieved | Report Page |
|---------|-----------|----------|-------------|
| **6.3.a.5.b.** | By January 1, 2019, at least 90% of foster children who are reunified and who were in custody longer than 90 days shall receive a 90-day trial home visit period or have case record documentation reflecting the Youth Court's objection to such a trial home visit. During the trial home visit period, MDCPS shall provide or facilitate access to the services identified in the child's after-care plan, consistent with the 2nd MSA requirements. | Cannot validate | 73 |
| **6.3.a.6.** | Before the end of any trial home visit period, MDCPS shall convene a meeting with the child's parents and the child to determine the appropriateness of a final discharge. If final discharge is determined to be appropriate, MDCPS shall make the appropriate application to the Youth Court to be relieved of custody. | Did not report | 77 |
| **6.3.b.1.b.** | By January 1, 2019, at least 90% of children in custody with the primary permanency goal of adoption shall have an assigned adoption specialist and an adoption plan that identifies the child specific activities that MDCPS will undertake to achieve adoption. | No | 77 |
| **6.3.b.2.b.** | By January 1, 2019, a termination of parental rights referral shall be made on behalf of at least 80% of children who have spent more than 17 of the last 22 months in foster care by the last day of a child's seventeenth month in care, unless an available exception pursuant to the federal Adoption and Safe Families Act ("ASFA") has been documented by MDCPS in the child's case record. | No | 77 |
| **6.3.b.3.** | MDCPS shall provide to the monitor a report of all TPR referrals made during the monitoring period, the date those TPR referrals were made, and the date the TPR petition was filed with the court. | Yes | 77 |
| **6.3.c.** | Defendants shall establish and maintain a system of post-adoptive services to stabilize and maintain adoptive placements. Adoptive families eligible for adoption subsidies shall have access to these services, which may include services such as counseling, mental health treatment and crisis intervention, family preservation and stabilization services, and peer support. | Yes | 78 |
| **6.3.d.1.** | The permanency goals of durable legal custody and guardianship may be assigned when there are documented efforts in the child's case record to move the child to adoption and documentation of a reasonable basis why it is in the child's best interests not to be considered for adoption. | Yes | 79 |
| **6.3.d.2.** | When the permanency goals of durable legal custody and guardianship are assigned to a child under the age of 14 years old or living with a non-relative, MDCPS shall provide to the monitor at the end of each monitoring period, information from the child's case record documenting efforts to move the child to adoption and documentation of a reasonable basis why it is in the child's best interests not to be considered for adoption. | Did not report | 79 |

| Section | Commitment | Achieved | Report Page |
|---------|-----------|----------|-------------|
| **6.3.e.** | If MDCPS concludes, after considering reunification, adoption, durable legal custody and permanent placement with a relative, that these permanency plans are inappropriate or unavailable for a child, MDCPS may assign a permanency goal of APPLA for the child (see 2nd MSA for APPLA requirements). | No | 79 |
| **6.4.a.2.** | By January 1, 2019, at least 90% of foster children who have been in custody for at least six months shall have a timely court or administrative case review consistent with 2nd MSA requirements. | No | 80 |
| **6.4.b.2.** | By January 1, 2019, for at least 90% of foster children who have been in custody for at least 12 months, MDCPS shall make reasonable efforts to have a timely annual court review scheduled consistent with 2nd MSA requirements. | Yes | 80 |
| **6.4.c.** | MDCPS shall review documented exceptions pursuant to ASFA for children who have spent more than 17 of the previous 22 months in foster care during the child's foster care review. | Yes | 80 |
| **6.5.a.1.** | Of all children who enter foster care in a 12-month period, the percent who discharged to permanency within 12 months of entering foster care. | Yes | 81 |
| **6.5.a.2.** | Of all children in foster care on the first day of a 12-month period, which shall commence on October 1st of any given year, who had been in care between 12 and 23 months, the percent of children discharged from foster care to permanency within 12 months of the first day of the 12-month period. | Yes | 81 |
| **6.5.a.3.** | Of all children in foster care on the first day of a 12-month period, which shall commence on October 1st of any given year, who had been in care for 24 months or more, the percent of children discharged from foster care to permanency within 12 months of the first day of the 12-month period. | Yes | 81 |
| **6.5.d.** | For all children in the custody of MDCPS who were adopted in FFY2019, the monitor shall validate the average and median lengths of time to adoption finalization for each child from the date on which the child's adoption goal was established. | Unable to determine | 82 |
| | **TRANSITION TO INDEPENDENT LIVING** | | |
| **7.1.** | MDCPS shall provide each youth transitioning to independence with at least six months' advance notice of the cessation of any health, financial, or other benefits that will occur at the time of transition. | Cannot validate | 83 |
| **7.2.** | Each foster youth age 14 years and older, regardless of his/her permanency plan, shall be provided with an opportunity to participate in the creation of an appropriate Independent Living service plan for a successful transition to adulthood. | Cannot validate | 83 |
| **7.3.** | Each foster youth age 14 years and older shall have access to the range of supportive services necessary to support their preparation for and successful transition to adulthood. MDCPS shall maintain sufficient resources to deliver Independent Living services to all youth described herein. | Cannot validate | 84 |

| Section | Commitment | Achieved | Report Page |
|---------|-----------|----------|-------------|
| **7.4.** | MDCPS shall implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond are enrolled for Medicaid coverage so that their coverage continues without interruption at the time of emancipation. | Cannot validate | 85 |
| **7.5.** | MDCPS shall implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond receive a start-up stipend of at least $1,000.00 at the time of emancipation, or as soon as practicable thereafter. | No | 86 |
| **7.6.** | MDCPS shall implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond have access to a housing resource specialist responsible for assisting the youth obtain an adequate living arrangement. | No | 86 |
| **7.7.** | MDCPS shall continue to implement policies and processes which ensure that youth emancipating from the foster care system at age 18 or beyond receive services and support under the State Educational Training and Vocational (ETV) Program for which they are eligible. | Yes | 88 |
| **7.8.a.** | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: Educational records, such as a high school diploma or general equivalency diploma, and a list of schools attended, when age-appropriate. | No | 88 |
| **7.8.b.** | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: A social security or social insurance number. | No | 88 |
| **7.8.c.** | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: A resume, when work experience can be described. | No | 88 |
| **7.8.d.** | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: A driver's license, when the ability to drive is a goal; if not a driver's license, then a state-issued, photo identification. | No | 88 |
| **7.8.e.** | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: An original or certified copy of the youth's birth certificate. | No | 88 |
| **7.8.f.** | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: Previous placement information. | No | 88 |
| **7.8.g.** | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: Documentation of immigration, citizenship, or naturalization, when applicable. | No | 88 |
| **7.8.h.** | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: Documentation of tribal eligibility or membership. | No | 88 |

Case 3:04-cv-00251-HSO-ASH Document 889-1 Filed 06/26/20 Page 22 of 97

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| **7.8.i.** | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: Death certificates when parents are deceased. | No | 88 |
| **7.8.j.** | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: A life book or a compilation of personal history and photographs, as appropriate. | No | 88 |
| **7.8.k.** | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: A list of known relatives, with relationships, addresses, telephone numbers, and permissions for contacting involved parties. | No | 88 |
| | **CHILD WELL-BEING** | | |
| **8.1.a.1.** | By July 1, 2018, 70% of children shall have an initial medical screening within 7 days of the child's entry into foster care. | Cannot validate | 89 |
| **8.1.a.2.** | By July 1, 2019, 80% of children shall have an initial medical screening within 7 days of the child's entry into foster care. | Cannot validate | 89 |
| **8.1.b.1.** | By July 1, 2018, 70% of children shall have an initial EPDST or other comprehensive medical examination within 60 days of the child's entry into foster care. | Cannot validate | 90 |
| **8.1.b.2.** | By July 1, 2019, 80% of children shall have an initial EPDST or other comprehensive medical examination within 60 days of the child's entry into foster care. | Cannot validate | 90 |
| **8.1.c.2.** | By July 1, 2019, 45% of children shall be provided with periodic and on-going medical examinations. | Did not report | 91 |
| **8.1.d.2.** | By July 1, 2018, 60% of children shall be provided with practitioner recommended follow-up treatment. | Did not report | 92 |
| **8.1.d.3.** | By July 1, 2019, 90% of children shall be provided with practitioner recommended follow-up treatment. | Did not report | 92 |
| **8.1.e.1.** | By July 1, 2018, 60% of children shall have a dental examination within 90 days of the child's entry into foster care. | Cannot validate | 92 |
| **8.1.e.2.** | By July 1, 2019, 80% of children shall have a dental examination within 90 days of the child's entry into foster care. | Cannot validate | 92 |
| **8.1.f.1.** | By July 1, 2018, 75% of children shall have the completed foster child information form or other electronic record containing available medical, dental, educational, and psychological information about the child provided to foster parents or facility staff within 15 days of placement. | No | 93 |
| **8.1.f.2.** | By July 1, 2019, 90% of children shall have the completed foster child information form or other electronic record containing available medical, dental, educational, and psychological information about the child provided to foster parents or facility staff within 15 days of placement. | No | 93 |
| **8.1.g.** | By July 1, 2018, 85% of children shall have their Medicaid information provided to foster parents or facility staff at the time of placement. | Did not report | 93 |

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| **8.2.a./8.2.c.1.** | At least 90% of school-age foster children who enter custody shall have their educational records reviewed and their educational needs documented by MDCPS within 30 calendar days of their entry into foster care. | No | 93 |
| **8.2.b.** | MDCPS shall take reasonable steps to ensure that school-age foster children are registered for and attending accredited schools within seven calendar days of initial placement or any placement change, including while placed in shelters or other temporary placements. | Did not report | 94 |
| **8.2.c.** | MDCPS shall make all reasonable efforts to ensure the continuity of a child's educational experience by keeping the child in a familiar or current school and neighborhood, when this is in the child's best interests and feasible, and by limiting the number of school changes the child experiences. | Cannot validate | 94 |

## Methodology

To prepare this report, the monitoring team conducted a series of verification activities to evaluate MDCPS' progress implementing its commitments in the 2nd MSA.  In accordance with Section 9.3., the monitoring team independently verified and analyzed a wide range of aggregate and detail data reports and statistics produced by MDCPS[4], including data related to caseloads and workloads, maltreatment in care, foster home licensure, and federal permanency outcomes. MDCPS also submitted "cohort" data, which identifies children's entries and exits from foster care during the period, the population of children served during the period, and the population of children in care at the beginning and end of the period.

Multiple verifications and data quality checks were performed against the data MDCPS provided. These checks focused on examining problems (e.g., missing data, internal consistency, duplicate records) with any variables used to identify children eligible for the indicator, to calculate derived variables, or measure the outcome. The monitoring team analyzed the information to verify the data quality, assessed the methodology used to compute performance for each metric, and attempted to replicate the performance calculations made by MDCPS. In these efforts, both MDCPS and the monitoring team relied on business rules jointly developed between the monitoring team and MDCPS and insights obtained from prior validation efforts. Problems related to data quality, if discovered, are noted. When possible, the monitoring team shared with MDCPS information about specific records that caused discrepancies or were flagged as a potential data quality issue.

Numerous interviews were  conducted and meetings convened with key MDCPS personnel as needed relative to the data provided. When possible, multiple iterations of analyses were conducted and resubmitted by MDCPS based on the monitoring team's preliminary findings. The final data submitted were then analyzed and the results were compared to those provided by MDCPS.

MDCPS also produced the results of qualitative reviews it conducted of thousands of children's records using MDCPS' Foster Care Review and other qualitative review processes using a statistically significant review sample based on at least a 95 percent confidence level. To verify the information produced by MDCPS, the monitoring team conducted extensive field-based interviews, cross-data validation, and extensive qualitative case record reviews of more than 2,000 children's cases, including many of the same case records MDCPS reviewed to determine performance with a specific commitment, and the findings are included in the relevant sections

---

[4] MDCPS' primary information system is the Mississippi Automated Child Welfare Information System (MACWIS). MDCPS also has ancillary information systems or tracking tools that are not directly connected to MACWIS but may leverage data from it, such as Excel sheets used to track and report on newly licensed and closed homes and resource homes involved in expedited pending relative placements.

of this report. In most instances, the sample sizes for the monitoring team's case record verification reviews were based on a statistically significant sample of cases and methodology based on a 90 percent confidence level.

The monitoring team examined thousands of MDCPS administrative records including organizational charts, employee hiring and training records, financial and budgetary information, performance-based contracts, agency assessment reports and strategic improvement plans, court documents and pleadings associated with this litigation, hundreds of child-level court orders related to placement and permanency of children in MDCPS custody, relevant statutes and regulations, and MDCPS policies and bulletins issued to staff.

The monitoring team held quarterly meetings with the parties pursuant to Section 9.4. of the 2nd MSA, regular meetings with MDCPS leadership and program staff, meetings with management and staff at MDCPS regional and county offices and attended conferences with the Court.

## Demographics

MDCPS produced demographic data for the period from January 1, 2019 to December 31, 2019. MDCPS data indicate there were 4,786 children in custody on January 1, 2019 and 4,235 children in custody as of December 31, 2019. During the monitoring period, 2,501 youth were placed in foster care and 3,055 children exited care.[5] MDCPS served 7,285 children during the monitoring period. Young children aged zero to six years made up the largest portion (1,846 or 44 percent). Twenty-eight percent of youth (1,193) were 12 to 17 years of age, 24 percent of children (1,020) were seven to 11 years of age and four percent of youth (176) were 18 years and over, as detailed in Figure 1.

---

[5] The monitoring team identified 19 children who appear twice in MDCPS' entry cohort data. Each of these children entered foster care more than once during the monitoring period. The monitoring team also identified nine children who appeared twice in the exit cohort. Each of these children exited foster care two times during the monitoring period.

**Figure 1. Age of Children in Custody on December 31, 2019**
*n=4,235*



Ages 18+
176
4%

Ages 12-17
1193
28%

Ages 0-6
1846
44%

Ages 7-11
1020
24%

The population of children in care on December 31, 2019 was approximately evenly split by gender, with 51 percent of children in care male and 49 percent female. Regarding race, the population of children was 56 percent White, 38 percent African American, 0.2 percent Asian, 0.1 percent Native Hawaiian or Pacific Islander, and 0.1 percent Native American. Additionally, three percent of children reported being of mixed race. Three percent of children were identified with Hispanic ethnicity and can be of any race. The race of three percent of children was undetermined.[6]

**Table 1. Race of Children in Custody on December 31, 2019**

| Race | Count | Percent |
|---|---|---|
| White | 2,355 | 56% |
| African American | 1,599 | 38% |
| Unable to Determine | 143 | 3% |
| Mixed Race | 121 | 3% |
| Asian | 8 | 0.2% |
| Native Hawaiian, Pacific Islander | 6 | 0.1% |
| Native American | 3 | 0.1% |
| **Total** | **4,235** | **100%** |
| Hispanic ethnicity and of any race | 126 | 3% |

Note: Percentages may not add up to 100 due to rounding.

---

[6] Children whose race was explicitly marked as 'Unable to Determine' and whose race was not found are combined into the entry for 'Unable to Determine'.

As the following figure demonstrates, 88 percent of children in MDCPS' custody on December 31, 2019 lived in family settings, including foster families (50 percent), with relatives (28 percent), with their own parents (9 percent), in homes that intend to adopt (0.9 percent), and in homes of unrelated caregivers (0.2 percent). Of children in custody, 420 (10 percent) lived in institutional settings, including residential treatment and other congregate care facilities. Another 13 (0.3 percent) youth resided in Supervised Independent Living placements, which serve youth who are preparing to transition out of care.

**Figure 2. Placement Types of Children in Custody on December 31, 2019**
*n=4,235*



Of the children in care on December 31, 2019, 42 percent were in care less than one year, while 20 percent were in care for more than three years.

**Figure 3. Length of Stay in Care of Children in Custody on December 31, 2019**

*n=4,235*



**Table 2. Exits from Care by Exit Type, January 1, 2019 to December 31, 2019**

| Exit Type | Count | Percent |
|---|---|---|
| Reunification | 1,484 | 49% |
| Adoption | 755 | 25% |
| Living with other relatives | 370 | 12% |
| Guardianship | 306 | 10% |
| Emancipation | 72 | 2% |
| County of Service Placement Change | 41 | 1% |
| Runaway | 15 | 0.5% |
| Transfer to another agency | 7 | 0.2% |
| Death of a child | 5 | 0.2% |
| **Total** | **3,055** | **100%** |

Note: Percentages may not add up to 100 due to rounding.

As Table 3 demonstrates, of the children in custody on December 31, 2019, almost half had reunification as a federal goal. For the remaining children, 1,616 (38 percent) had a goal of adoption, 236 (6 percent) had a goal of APPLA, 36 (0.9 percent) had a goal of durable legal custody or guardianship, and 124 (3 percent) had placement with a relative as a federal goal. There were 159 children (4 percent) with missing federal goal codes.

**Table 3. Federal Goals for Children in Custody as of December 31, 2019**

| Federal Goal | Count | Percent |
|---|---|---|
| Reunification | 2,064 | 49% |
| Adoption | 1,616 | 38% |
| APPLA | 236 | 6% |
| Custody with a relative | 124 | 3% |
| No plan documented (less than 45 days in custody) | 113 | 3% |
| No plan documented (no current approved FSP) | 46 | 1% |
| Durable legal custody / guardianship | 36 | 0.9% |
| **Total** | **4,235** | **100%** |

Note: Percentages may not add up to 100 due to rounding.

## Operational Budget

The 2nd MSA requires MDCPS to request state funds and any federal/special fund authorization sufficient to affect the provisions and outcome measures set forth in this 2nd MSA. For state fiscal year (SFY) 2019 (July 1, 2018 to June 30, 2019), MDCPS was appropriated $97,994,298 in general funds and $12,000,000 in state special funds. MDCPS later requested and received from the Mississippi Legislature an additional $7,500,000 appropriation in state special funds. During the 2019 Mississippi legislative session, MDCPS requested a state fund appropriation of $135,744,859 for SFY2020 (July 1, 2019 to June 30, 2020). This request sought an increase of $18,250,561 from the prior fiscal year's state funding.[7] MDCPS' request for increased funding centered on its desire to hire additional staff to achieve compliance with the caseload requirement in the 2nd MSA, and its need to develop a Comprehensive Child Welfare Information System (CCWIS) data system as required by the 2nd MSA. However, the Mississippi Legislature appropriated MDCPS $110,548,860 in state general funds and $15,157,835 in state special funds, for a total state funding of $125,706,695, which fell short of MDCPS' request by $10,038,164. MDCPS also received $78,018,276 in federal funds in fiscal year 2019 and estimated receiving $118,263,549 in federal funds in fiscal year 2020.

## 1. Systemic Infrastructure Standards

## Department Leadership

MDCPS committed in the 2nd MSA to maintain a Commissioner of Child Protection Services having responsibility for the oversight and management of the Department. The Commissioner must

---

[7] During the 2019 session, HB 980 changed the state fiscal year closeout requirement causing MDCPS to incur 13 months of expenses in SFY2019 and requiring the additional appropriation of $7,500,000. Accordingly, $18,250,561 understates MDCPS' request for increased funding in SFY2020 because this request was for 12 months.

possess at least a bachelor's degree from an accredited institution of higher learning and ten years' experience in management, public administration, finance, or accounting or a master's or doctoral degree from an accredited institution of higher learning and five years' experience in management, public administration, finance, law, or accounting.

As previously reported, Commissioner Dickinson possessed the requisite qualifications to serve as commissioner of MDCPS during the period. *Pursuant to commitment 10.1. of the 2nd MSA, performance during the period makes this commitment eligible to move to the "To Be Maintained" designation, pending agreement of the parties.*

## Staff Qualifications and Training

MDCPS committed to ensure that staff serving Mississippi's at-risk children and families have appropriate qualifications and receive adequate training.

*Caseworker Qualifications (1.1.a.)*

MDCPS reported 232 caseworkers were hired in 2019. All caseworkers are required to have, at minimum, a bachelor's degree in social work or a related human services field that is approved as a qualifying degree by the monitor.[8] Comparing the reported degrees for all the caseworkers hired in 2019 to the list of qualifying degrees, all the caseworkers possessed an approved degree. The monitoring team also reviewed the paper degrees or official transcripts for all caseworkers hired in 2019 and confirmed that the caseworkers' degrees were accurately reported. *Pursuant to commitment 10.1. of the 2nd MSA, performance during the period makes this commitment eligible to move to the "To Be Maintained" designation, pending agreement of the parties.*

*Supervisory Qualifications (1.1.b.)*

In the 2nd MSA, MDCPS agreed that new caseworker supervisors must possess either a master's degree in social work or an approved qualifying human services degree and two years of experience working with children and families or a bachelor's degree in social work or an approved qualifying human services degree with three years of experience working with children and families. MDCPS reported 35 caseworker supervisors were appointed during 2019. The monitoring team compared the reported degrees for all the caseworker supervisors appointed in 2019 to the list of qualifying degrees. The team also reviewed the paper degrees or official transcripts and job applications for the caseworker supervisors and determined that all the supervisors possessed an approved degree and the requisite years of experience. *Pursuant to*

---

[8] In addition to the previously approved related human services degrees (Child and Family Studies, Child Development, Counseling, Criminal Justice, Disciplinary Studies, Early Childhood and Family, Education, Education and Human Science, Elementary Education, Family Studies, General Studies, Guidance Education, Interdisciplinary Studies, Marriage and Family Therapy, Nursing, Political Science, Psychology, and Sociology), the monitoring team reviewed and approved two additional degrees in 2019: Social Services and Educational Psychology.

*commitment 10.1. of the 2nd MSA, performance during the period makes this commitment eligible to move to the "To Be Maintained" designation, pending agreement of the parties.*

*Training Unit (1.2.a.)*

MDCPS committed to maintain a Training Unit headed by a qualified director of training with adequate staffing, funding, and resources to assure that comprehensive child welfare training is provided to caseworkers, supervisors, and other child welfare employees. The child welfare training should enable staff to comply with the relevant mandates of the 2nd MSA, MDCPS policy, and reasonable professional standards. During 2019, the MDCPS Office of Professional Development (OPD) administered training and professional development in order to prepare MDCPS employees to assume their job responsibilities and enhance their knowledge, skills, and abilities. Specifically, OPD delivered pre-service, supervisory, and in-service training to Department staff during the period. OPD was led by a senior manager with an advanced degree and ten years of experience as a director of workforce development and a director of professional development in Mississippi's child welfare agency. Unit staff included approximately 34 training coordinators and practice model coaches, along with five supervisors. Estimated expenses for the unit for FY2020 (July 1, 2019 to June 30, 2020) are approximately $5,000,000. *Pursuant to commitment 10.1. of the 2nd MSA, performance during the period makes this commitment eligible to move to the "To Be Maintained" designation, pending agreement of the parties.*

*Pre-Service Training (1.2.b.)*

All new MDCPS caseworkers must complete a total of 270 hours of pre-service training, which includes classroom instruction, field instruction, and E-Learning. The pre-service training program offered by MDCPS' OPD exceeds 270 hours of training with a combination of eight alternating weeks of classroom instruction and on-the-job training. During on-the-job training weeks, certain material is delivered through online learning.

MDCPS reported that 28 workers who were hired in late 2018 completed pre-service training in the first quarter of 2019. Of the 232 new workers hired in 2019, 156 completed pre-service training during the period. Twenty caseworkers previously employed and trained by MDCPS were rehired by the Department and exempt from pre-service training.[9] Thirteen workers left the Department either before starting or before completing training. The remaining 43 workers were hired into their positions late in the period and were enrolled in training that ended in the first quarter of 2020.

---

[9] Caseworkers and supervisors who have successfully completed MDCPS' current pre-service training are not required to attend training again.

The monitoring team reviewed the four competency exams administered during pre-service training for the 28 caseworkers hired in late 2018 and the 156 caseworkers hired in 2019 who completed training during the period and confirmed that 183 caseworkers achieved a passing score of 70 or higher on each of the four exams and one caseworker did not achieve a passing score on the week eight exam and is no longer employed with the agency. *Pursuant to commitment 10.1. of the 2nd MSA, performance during the period makes this commitment eligible to move to the "To Be Maintained" designation, pending agreement of the parties.*

*Training Caseloads (1.2.c.)*

The 2nd MSA allows a trainee to be assigned responsibility for a "training caseload," under appropriate supervision, that gradually increases as the trainee successfully completes pertinent competence-based examinations. MDCPS has elected not to implement training caseloads at this time. MDCPS will notify the monitor before instituting training caseloads so the required competency exams and standards for passing the exams can first be reviewed and approved by the monitor.

*In-Service Training (1.2.d.)*

MDCPS agreed that all caseworkers must complete a minimum of 40 in-service training hours in 2019 and all supervisors must complete a minimum of 24 in-service training hours in 2019. MDCPS provided data to the monitoring team indicating that 807 caseworkers [10] and investigators received 40 or more in-service training hours and 240 supervisors received 24 or more in-service training hours during 2019, as required. The monitoring team verified for each worker that in-service training covered a wide range of topics such as active listening in the social services field, adoption competency, cultural competence, engaging incarcerated parents, ethics and accountability in child welfare, independent living: youth assessment/appraisal, and youth transition support services education processes. *Pursuant to commitment 10.1. of the 2nd MSA, performance during the period makes this commitment eligible to move to the "To Be Maintained" designation, pending agreement of the parties.*

*Supervisor Training (1.2.e.)*

MDCPS committed in the 2nd MSA that caseworker supervisors must complete a minimum of 40 hours of training directed specifically at the supervision of child welfare caseworkers within 90 days of assuming a supervisory position. OPD offers a clinical supervisory training program consisting of 40 hours of classroom training based on identified competencies.

---

[10] On December 31, 2019, there were 828 caseworkers at MDCPS.

MDCPS provided information indicating that one caseworker supervisor hired late in 2018 completed supervisory training in the first quarter of 2019. Of the 35 caseworker supervisors appointed in the period, 21 supervisors met the 90-day requirement for training completion. Two supervisors appointed late in 2019 were pending training at the end of the period; nine supervisors were promoted in the period, but had completed supervisory training in a prior period and were exempt from completing it again; and three supervisors who had been previously employed and trained by MDCPS, were rehired as a supervisor and exempt from supervisory training. The monitoring team reviewed the competency exam scores for the exam administered at the end of supervisory training for the 22 supervisors who completed training in 2019 and confirmed that all had achieved a passing score of 70 or higher. *Pursuant to commitment 10.1. of the 2nd MSA, performance during the period makes this commitment eligible to move to the "To Be Maintained" designation, pending agreement of the parties.*

## Caseloads and Supervision

*Caseworker Caseloads (1.3.a.)*

The 2nd MSA sets forth caseload standards for caseworkers and supervisors performing child welfare functions. The 2nd MSA states that 90 percent of MDCPS caseworkers must have caseloads that do not exceed the caseload standards for each type of case. Individual MDCPS caseworkers who carry a mixed caseload are held to a weighted, pro-rated standard. Table 4 details the caseload standards for each type of case.

**Table 4. 2nd MSA Caseload Standards by Case Type**

| Type of Case | Included Categories | Standards | Weight Per Case – 100% Capacity |
|---|---|---|---|
| Child Protection | Investigations Level 2<br>Investigations Level 3 | 14 Investigations | 0.0714 |
| Ongoing Foster Care | Placement Responsibility & Service | 14 Children | 0.0714 |
| Ongoing Foster Care | Placement County of Responsibility<br>Placement County of Service | | 0.0357 |
| In-Home | Protection Responsibility & Service<br>Prevention Responsibility & Service | 17 Families | 0.0588 |
| In-Home | Protection or Prevention County of Responsibility<br>Protection or Prevention County of Service | | 0.0294 |
| Adoption | Adoption County of Service | 15 Children | 0.0667 |
| New Application Licensing | Resource Inquiry<br>ICPC Application<br>Foster Home Study | 15 Homes | 0.0667 |
| Renewal Licensing | Foster Home Supervision<br>Foster Home Renewal | 36 Homes | 0.0278 |

As detailed in Figure 4, MDCPS did not meet the 90 percent caseload standard for its staff in any quarter during 2019.

**Figure 4. Percent of Workers Meeting the Caseload Standard, 2019**



*Data as of the end of March, June, September, and December    **Source: MDCPS Data**

31

*Supervisor Staffing Ratios (1.3.b.)*

MDCPS agreed that 85 percent of supervisors would be responsible for overseeing no more than five caseworkers each. As the chart below indicates, MDCPS came close to but did not meet the caseworker supervisors' workload standard of 85 percent in any quarter during 2019.

**Figure 5. Percent of Caseworker Supervisors Meeting the Supervision Ratio Standard, 2019**



*\*Data as of the end of March, June, September, and December*     **Source: MDCPS Data**

*Caseload Verification*

The monitoring team conducted a thorough review of caseload reporting for the period. From September to November 2019, the monitoring team interviewed casework staff about their workloads in six MDCPS county and regional offices. Interviews included both supervisory and caseload-carrying staff randomly selected by the monitoring team, working in Alcorn, DeSoto, Harrison, Jackson, Marshall, and Tippah counties. Staff members were directed to bring printouts of their caseloads, typically from the previous workday, with them to interviews. The monitoring team reviewed the caseload assignments with the workers and/or their supervisors and inquired whether the printouts represented all their caseload assignments as of that day, which coincided with the date of an official MDCPS caseload count. The monitoring team then compared the workload printouts of these thousands of cases identified across all the interviews, with MDCPS' official caseload submission to determine if they aligned.

Based on interviews with 135 caseworkers, 28 supervisors, and data analysis involving thousands of cases statewide, the monitoring team concluded the caseload data and information provided by the Department accurately reflected MDCPS' caseload performance during the period.

# Continuous Quality Improvement

*Continuous Quality Improvement Plan (1.4.a.)*

Pursuant to the 2nd MSA, MDCPS is required to develop an annual Continuous Quality Improvement (CQI) Plan by December 1st of each year, which shall be subject to the approval of the monitor after consultation with the parties.

The monitoring team reviewed the initial draft CQI Plan for 2020, which was submitted timely by MDCPS on November 5, 2019, and had extensive discussions with MDCPS regarding the planned CQI activities and processes. Based on feedback from the monitoring team, MDCPS submitted updates to the Plan, with an accompanying grid, and supporting CQI review and tracking tools. The monitoring team also shared the CQI Plan with plaintiffs' counsel, who provided their feedback. The monitoring team approved the 2020 CQI Plan for implementation on March 27, 2020.

*Continuous Quality Improvement Plan Implementation (1.4.b.)*

MDCPS was required by the 2nd MSA to implement the 2019 CQI Plan, upon approval by the monitors, with sufficient staff and resources to assess compliance with those provisions of the 2nd MSA that were identified for review in the Plan. The reviews must assess case practice, analyze outcomes, and produce analysis that will be shared with managers and stakeholders to achieve performance improvement.

The monitor previously reported, in the 2018 monitoring report, that MDCPS timely submitted its CQI Plan for 2019 and the monitor approved the Plan. MDCPS began implementing the approved 2019 CQI Plan in April 2019. The results of MDCPS' qualitative reviews with respect to 2nd MSA commitments included in the Plan are delineated in the relevant sections of this report.

# Management Information Systems & Data Reporting

*Comprehensive Information Systems and Reporting (1.5.a.)*

The 2nd MSA requires MDCPS to maintain comprehensive information systems that permit: (1) timely access by authorized MDCPS staff to information, including current and historical case documents, to support child safety and continuity of care across placement settings and services; (2) capturing, tracking, and reporting of applicable financial information, quantitative 2nd MSA compliance, longitudinal performance, and child welfare information, including federally required elements; and (3) prompts for workers and supervisors regarding required actions in a child's case and whether they have taken place.

MDCPS' primary information system is the Mississippi Automated Child Welfare Information System (MACWIS). MDCPS also has ancillary information systems or tracking tools that are not directly connected to MACWIS but may leverage data from it, such as Excel sheets used to track resource homes involved in expedited pending relative placements,[11] to track and report on newly licensed and closed homes, and to facilitate and document the results of manual reviews of substantiated reports of maltreatment.

MDCPS reported employees are granted the appropriate level of access to MACWIS as part of the new hire process for caseworkers, supervisors, and identified State Office staff with positions and job responsibilities that require access to the system. A unique MACWIS ID is assigned to new caseworkers typically during the first week of pre-service classroom training. MDCPS reports quarterly to the monitor the MACWIS ID of new caseworkers granted access to the system.

The monitoring team generally has been able to identify children across multiple MACWIS data files to create a timeline of their placement settings and services while in MDCPS custody. MDCPS, however, has been unable to report consistently and reliably from MACWIS current and historical data of children in custody for numerous 2nd MSA commitments as noted below and in the pertinent sections of this report.

MACWIS contains a financial module the monitoring team used to verify that MDCPS was issuing foster care board payments to foster parents consistent with the child's age and placement type. The monitoring team requested and received from MDCPS quarterly data from MACWIS relating to the board rates foster parents were receiving for children during 2019. See Section 1.8.a., below, for details of the monitoring team's review of foster care board rates.

The monitoring team confirmed that MDCPS' responses to various 2nd MSA commitments included many of the required data elements for the National Child Abuse and Neglect Data System (NCANDS) and the Adoption and Foster Care Analysis and Reporting System (AFCARS). MDCPS also provided correspondence from the Administration for Children and Families within the United States Department of Health and Human Services accepting MDCPS' FFY2019 NCANDS Child File and Agency File and its National Youth in Transition Database submissions derived from MDCPS data systems. MDCPS reported that MACWIS users have view-only access of TANF and child support data systems.

The monitoring team received from MDCPS a MACWIS Tickler Types Report listing alert notifications available to staff for actions taken and actions needed.

---

[11] MDCPS refers to unlicensed relative home placements awaiting licensure as expedited pending relative placements.

MDCPS produced data from MACWIS to demonstrate performance on some but not all commitments for the 2nd MSA and to document baseline populations and samples for qualitative reviews. MDCPS also submitted "cohort" data, which identifies children's entries and exits from foster care during the period, the population of children served during the period, and the population of children in care at the beginning and end of the period. The monitoring team analyzed the information to verify the data quality, assessed the methodology used to compute performance for each metric, and attempted to replicate the performance calculations made by MDCPS. In these efforts, both MDCPS and the monitoring team relied on business rules jointly developed between the monitoring team and MDCPS and insights obtained from prior validation efforts.

As noted above, MDCPS is required to capture, track, and report applicable financial information, quantitative 2nd MSA compliance, longitudinal performance, and child welfare information, including federally required elements. MDCPS did not report data on 12 commitments and the monitoring team cannot validate data and information submitted by MDCPS for another 20 commitments.[12] These 32 commitments are delineated in the Summary of Commitments and the relevant sections of this report. Data problems include files missing a substantial number of records for individuals or events applicable to a commitment, files missing a significant amount of data for one or more fields needed to calculate performance, and files provided by MDCPS that the monitoring team was unable to replicate using the established business rules. While MDCPS did not report data for several commitments during the period or the monitoring team was unable to validate data MDCPS provided, the Department began producing new data for 2020 which the monitoring team is attempting to validate.

The monitoring team found significant and recurring data quality problems during the period, including tracking worker visits, measuring trial home visits, and reporting independent living services for youth.

- Tracking worker visits. The monitoring team identified numerous data quality problems that made it impossible to validate certain visitation commitments in the 2nd MSA: Sections 2.8.b. (worker contacts with custody children after a maltreatment substantiation), 5.1.a. (worker contacts with foster children), 5.1.c. and 6.3.a.2. (worker contacts with parents), and 5.1.d. (worker contacts with foster parents). The visits file MDCPS provided was missing job codes for thousands of visits. Only visits from certain types of workers are applicable for these commitments and job codes are needed to identify those workers. The visits file was also missing narrative locations for thousands

_____
[12] There were an additional four commitments for which the monitoring team cannot validate the quantitative data provided by MDCPS. However, due to qualitative reporting, the monitoring team was able to assess MDCPS' performance for these commitments.

of visits. The narrative location is needed to identify whether at least one visit per month occurred in the child's placement, as required. MDCPS indicated that the location field is a required field, so the extent of the missing data suggests an error was made by MDCPS when extracting the data and creating the file. The monitoring team also determined the files submitted by MDCPS do not provide a reliable way to identify the parents with whom a child is to be reunified due to the manner in which the data were tracked. The significant number of missing job codes prevented the monitoring team from verifying that the extracted data report showing completed visits was no longer omitting visits for thousands of individuals, a data problem in 2018 that MDCPS attempted to resolve during the period.

- Measuring trial home visits. The monitoring team is unable to validate Sections 5.1.b. (worker contacts with children on trial home visits) and 6.3.a.5.b. (trial home visits). The monitoring team determined the files submitted by MDCPS do not provide a reliable way to identify trial home visits.[13] As with the other visitation commitments referenced above, the thousands of missing job codes in the visits file MDCPS provided also impacted these commitments. Only visits from certain types of workers are applicable for these commitments and the job code is needed to identify those workers. Likewise, the thousands of missing narrative locations in the visits file MDCPS produced made validation impossible. The narrative location is needed to identify whether at least two visits per month occurred in the child's home, as required. MDCPS indicated that the location field is a required field, so the extent of the missing data suggests an error was made by MDCPS when extracting the data and creating the file.

- Reporting independent living services for youth. The monitoring team identified problems with the consistency and quality of MDCPS' data reporting for several of the Independent Living (IL) services commitments. Due to a lack of complete, accurate, or consistent data and documentation during the period, the monitoring team was unable to validate data for four IL commitments in 2019.

*Staff Resources (1.6.a.)*

Pursuant to the 2nd MSA, MDCPS committed to provide to all its county staff with child welfare responsibilities access to computer services, word processing and electronic mail, access to the current management information systems, and access to a revised modular information system,

---

[13] The monitoring team identified several problems in the data, including the manner in which MDCPS defined the population of children who were placed in trial home visits as well as incorrect identification of the prior placement change reason in some cases. MDCPS' count of children with a trial home visit was not limited to children who had a goal of reunification and was not limited to trial home visits that lasted 90 days or more.

CCWIS, once implemented.[14] MDCPS produced quarterly the names, email addresses, network IDs, MACWIS IDs, and job titles for newly hired workers. Additionally, the monitoring team verified this information during in-person interviews with 163 randomly selected MDCPS staff across Mississippi. *Pursuant to commitment 10.1. of the 2nd MSA, performance during the period makes this commitment eligible to move to the "To Be Maintained" designation, pending agreement of the parties.*

*Staff Access to Data (1.6.b.)*

MDCPS committed to collect, analyze, and make available, at least quarterly, to MDCPS regional and county staff, data related to compliance with the 2nd MSA's Foster Care Service Standards. MDCPS produces Focus on Data reports that are available to all staff and are scheduled to be updated daily. The reports graph county performance and can be downloaded in Excel and PDF formats. The monitoring team confirmed that the Focus on Data reports were generally accessible to staff throughout 2019 but were inaccessible to certain MDCPS staff during the period between March 13, 2019 and July 25, 2019.[15] *Pursuant to commitment 10.1. of the 2nd MSA, performance during the period makes this commitment eligible to move to the "To Be Maintained" designation, pending agreement of the parties.*

*Electronic Placement Database (1.6.c.)*

MDCPS agreed to provide county staff with access to an electronic statewide database of available placement resources. For most of 2019, the Department continued to utilize a Placement Matching Tool that was released to all staff on March 21, 2018 and is a component of CCWIS. The matching tool is designed for use by both frontline workers and licensure staff. A step-by-step training video and instructions are available to staff through MDCPS' SharePoint intranet platform.

In early September 2019, MDCPS staff gave the monitoring team an in-person demonstration of the Placement Matching Tool. The monitoring team was informed that county staff can utilize the tool to search by children who are currently in custody or who are entering care. The default search option is to search by address, and this populates a list of homes within a 50-mile radius of the child's removal address or current placement, as well as number of available beds, and the number of children in the home. There are advanced search options that allow the worker to change the radius distance, search by special needs, and search for resource homes that provide specific types of services. The monitoring team verified during in-person interviews with 163

---

[14] CCWIS is not required to be implemented until June 30, 2021.

[15] The monitoring team brought this to the attention of MDCPS on July 24, 2019. MDCPS looked into the issue and reported that the server was not updated and load-balancing was not working properly. MDCPS staff worked to update software drivers and the Focus on Data reports were again accessible on July 25, 2019.

randomly selected MDCPS staff across Mississippi that all had access to the Placement Matching Tool.[16]

MDCPS subsequently reported that from September 26, 2019 through the end of the calendar year, the Placement Matching Tool was unusable due to a coding issue. All staff were directed to utilize the Resource Directory within MACWIS, which contains a listing of available placement resources. The Directory includes filters that allow staff to search for resource homes located within a specific county, within a specific region, within the entire state, and for placements located outside the state. After conducting a search, the results list includes the applicable resources and displays the name of the head of household, the region, the county where the resource worker assigned to the home is located, the number of available slots by gender, the total number of available slots, the current status of the foster home license, and the date the license is set to expire. Staff can then click on a specific home and see the address, contact information for the resource parent(s), any prior maltreatment allegations in the home, the name of the licensure worker, a list of foster children currently placed in the home, and a list of all foster children who have ever been placed in the home. The monitoring team reviewed the MACWIS Resource Directory and determined it to be a suitable alternative in the absence of the CCWIS Placement Matching Tool. *Pursuant to commitment 10.1. of the 2nd MSA, performance during the period makes this commitment eligible to move to the "To Be Maintained" designation, pending agreement of the parties.*

## Performance Based Contracting

*Performance Based Contracting (1.7.)*

MDCPS committed to establish, maintain, and assess the effectiveness of a performance-based contracting system to evaluate annually contract agency compliance with the terms of the 2nd MSA (1.7.a.). MDCPS further agreed to take all reasonable steps to ensure contract agency remediation of identified deficiencies within three months. An agency's failure to participate in remediation efforts is grounds for contract termination.

MDCPS reports that for this monitoring period there were 14 therapeutic foster care, group home, and shelter programs subject to performance-based contracts. Each of these contracts includes performance-based outcome standards. Included in the contract's scope of services is the following language that requires agencies to comply with 2nd MSA commitments:

---

[16] There were a small number of staff during November 2019 interviews who reported not having access to the Placement Matching Tool; however, the monitoring team subsequently determined these staff were either not responsible for the placement of children or were referring to the tool not working at that specific moment in time. All staff had access to the Resource Directory in MACWIS in the absence of the Placement Matching Tool.

"Independent contractor will perform and complete in a timely manner and satisfactory manner the services described in the 'Scope of Services' attached hereto as Exhibit A, and the 'Second Modified Mississippi Settlement Agreement Reform Plan,' attached hereto as Exhibit B, and incorporated herein by reference."

During the monitoring period, MDCPS conducted performance evaluations of 14 contracts against the performance-based standards. The monitoring team reviewed all 14 contracts and found that performance-based standards are embedded in the contracts relative to service delivery, quality of services delivered, and licensing evaluations. The performance-based evaluation process includes case record reviews conducted by MDCPS' performance-based contract unit (PBC) of the following practice areas:

- initial strengths and needs assessment,
- preserving connections,
- teaming and permanency planning,
- service provision,
- preparing youth for adulthood,
- placement stability and discharge planning,
- caseworker contact with the child, and
- child safety.

PBC and agency staff meet prior to the case record reviews for an entrance conference, complete a tool that ranks the frequency and quality of services provided, complete the review with a description of findings, and conduct an exit conference. For any area that is found deficient, MDCPS requires a corrective action plan be implemented and the deficiencies remediated within three months. During the monitoring period, two agencies were required to submit a corrective action plan (CAP). One agency needed to address concerns regarding four of the eight practice areas:

- initial strengths and needs assessment,
- preserving connections,
- teaming and permanency planning, and
- placement stability and discharge planning.

The agency responded in a CAP to each area of concern, including timeframes for undertaking the actions to improve quality of services to the children placed with their agency.

39

The second agency needed to address concerns regarding five of the eight practice areas:

- initial strengths and needs assessment,

- teaming and permanency planning,

- preparing youth for adulthood,

- placement stability and discharge planning, and

- child safety.

The agency responded in a CAP to each area of concern, including timeframes for undertaking the actions to improve quality of services to the children placed with their agency.

*Pursuant to commitment 10.1. of the 2nd MSA, performance during the period makes this commitment eligible to move to the "To Be Maintained" designation, pending agreement of the parties.*

The 2nd MSA requires that prior to MDCPS contracting for case management services for children in custody, the Department must submit for the monitors' review and approval a detailed plan that ensures accountability, supervision, and oversight of such agencies (1.7.b.). MDCPS did not contract for case management of children in custody during the monitoring period.

## Foster Care Maintenance Payments

*Licensed Foster Families' Reimbursement Rates (1.8.a.)*

MDCPS is required to ensure that all licensed foster families (regardless of whether they are supervised directly by MDCPS or by private providers, and whether they are kinship or unrelated foster families) receive at least the minimum reimbursement rate[17] for a given level of service as established pursuant to the 2nd MSA. The monitoring team reviewed reimbursements for the care of a randomly selected sample of 68 children in March 2019, 68 children in June 2019, and 68 children in September 2019 in licensed regular foster homes and determined that all the homes were paid the proper reimbursement rate for the age of the children in their care for those months. *Pursuant to commitment 10.1. of the 2nd MSA, performance during the period makes this commitment eligible to move to the "To Be Maintained" designation, pending agreement of the parties.*

---

[17] The terms reimbursement rates, foster care maintenance payments, and resource board payments are used interchangeably in the 2nd MSA.

*Foster Care Maintenance Payments (1.8.b.)*

As of January 1, 2018, the effective date of the 2nd MSA, MDCPS agreed to pay to all licensed foster families at least the basic monthly foster care maintenance payments. The table below contains the current approved basic monthly rates for licensed foster homes. MDCPS committed to provide increases in the foster care board rate effective January 1, 2020 based on the previous year's rate of inflation, as required by the 2nd MSA.

**Table 5. Current Resource Board Payment Schedule**

| Age/Status | Board | Clothing | Allowance | Payment | Daily Per Diem |
|---|---|---|---|---|---|
| 0-8 | $ 586.90 | $ 80 | $ 30 | $ 696.60 | $ 23.23 |
| 9-15 | $ 672.20 | $ 80 | $ 50 | $ 802.20 | $ 26.74 |
| 16-21 | $ 736.60 | $ 80 | $ 60 | $ 876.60 | $ 29.22 |
| Special Needs I | $ 838.60 | $ 80 | ** | $ 918.60 | $ 30.62 |
| Special Needs II | $ 901.30 | $ 80 | ** | $ 981.30 | $ 32.71 |
| Foster Teen Parent | $ 1,323.50 | $ 160 | $ 90 | $ 1,573.50 | $ 52.45 |
| Emergency Shelters | $ 4,412.10 | - | - | $ 4,412.10 | $ 147.07 |
| Regular Group Homes | $ 1,096.60 | $ 80 | ** | $ 1,176.60 | $ 39.22 (all ages) |
| Therapeutic Resource Homes | $ 2,823.10 | $ 80 | ** | $ 2,903.10 | $ 96.77 |
| Therapeutic Group Homes | $ 5,170.00 | $ 80 | ** | $ 5,250.00 | $ 175.00 |
| Related Therapeutic Placement | $ 1,293.70 | $ 80 | ** | $ 1,373.70 | $ 45.79 |

** Personal Allowance is based on the age of the child and is included in the total board payment.

## 2. Child Safety and Maltreatment in Care

## Screening Reports of Abuse and Neglect

*Responding to Reports of Abuse and Neglect (2.1.)*

Mississippi Centralized Intake (MCI), established by MDCPS in 2009, is charged with receiving, prioritizing, and dispatching reports of child maltreatment. Reports to MCI alleging child abuse, neglect, exploitation, or risk are forwarded to local MDCPS offices for additional screening and investigation. If a report alleges maltreatment of a child in the state's custody, the information is required to be referred to the centralized Special Investigations Unit (SIU) for handling. MCI received 36,606 alleged abuse, neglect, or exploitation (ANE) reports during 2019. Of the ANE reports received, 8,661 reports (23.7 percent) were screened out, 27,939 (76.3 percent) were assigned for investigation, and zero to three reports remained in screening at the end of each respective quarter, for a total of six reports.

**Table 6. ANE Reports by Intake Action, 2019**

| Action | Q1 | Q2 | Q3 | Q4 | Year |
|---|---|---|---|---|---|
| Assigned for Investigation | 7,069 | 6,950 | 7,152 | 6,768 | 27,939 |
| Screened Out | 2,026 | 2,168 | 2,314 | 2,153 | 8,661 |
| In Screening | 2 | 0 | 3 | 1 | 6 |
| **Total Referrals Received** | **9,097** | **9,118** | **9,469** | **8,922** | **36,606** |

The monitoring team conducted a review of Mississippi's screening process in 2019. The review consisted of 200 randomly selected, screened-out abuse and neglect referrals involving children in MDCPS' custody, all from 2019. The monitoring team determined that MDCPS made appropriate screening decisions in 169 (84.5 percent) of 200 instances. Fourteen of the screened-out reports met MDCPS' criteria for maltreatment [18] and should have been assigned for investigation. Seventeen of the referrals did not include enough information to make a screening decision and required additional information prior to making the decision to screen out or accept the report for investigation. The monitoring team noted that many reports originated from MDCPS staff working directly with families, including caseworkers and licensing workers. These workers would likely have detailed information available about the families they are serving. In some of those instances, screening staff did not obtain additional information from these well-informed sources to make better-informed screening decisions.

Examples of screened-out reports that should have been accepted for investigation include:

- A residential facility staff person reported to MCI that a peer told a 17-year-old youth's therapist that the 17-year-old had attempted suicide through both an overdose and hanging himself. The youth had allegedly taken a peer's medication. He had multiple mental health diagnoses.

- A 12-year-old child in foster care reported that his foster mother's biological son, also 12, touched him inappropriately and attempted to initiate further sexual contact. The foster mother did not believe the allegations and stated that the child was making it up so that he could return home.[19]

- A report was received alleging that a foster child, age eight, who resided at a residential school for the blind during the week was seen by a staff member being dragged down the hall by teachers. The child was reportedly screaming and hollering. The child had been

---

[18] In accordance with Section 43-21-105 of the Mississippi Code of 1972 and MDCPS' Intake/Assessment Policy Effective November 11, 2016.

[19] Six months after this report was screened out for investigation, a similar allegation involving another foster child in the home and the 12-year-old biological child was referred and investigated. While unsubstantiated, this investigation resulted in the closure of the foster home.

running into things at school which was unusual. The child had previously suffered a traumatic brain injury, but normally the child could navigate without hitting things. Additionally, it was reported that the foster parent noticed a mark on the child's head; the child stated she hit her head on a pole. The bruise was blue and swollen but the swelling had gone down. The school had not contacted the foster parent. The child told her foster parent a girl at school was mean to her and tortured her. Another girl pushed the child and pulled her hair. The reporter and the foster mother were concerned about the child's safety and supervision at the school.

Examples of reports that required additional information to make a screening decision include:

- Two foster children, ages 12 and seven, were placed in an unrelated foster home. The children were being cared for by the maternal grandmother during a holiday visit. The grandmother admitted she made the children get on their knees on rocks and "popped" the children in the mouth. The grandmother disclosed that the 12-year-old child was "talking back" and the seven-year-old child had cursed at her.

- A child in MDCPS' custody, age three, reported being "whooped" with a belt while on a visit with his father. The child said he was hit hard. The child and his sister were preparing to begin a trial home visit with their father. The reporter did not observe marks or bruises and the child could not say if this occurred more than once.

- Two foster children were recently placed in a congregate care setting. One youth reported that another youth kept asking her to remove her clothing. She complied because she felt pressured and engaged in sexual activity with the other youth. The two residents were subsequently separated.

*Maltreatment-in-Care Screen-Out Reviews (2.3.)*

MDCPS committed to develop and implement policies and procedures, subject to the review and approval of the monitor, for the Department to review all maltreatment in care (MIC) reports that were screened-out and assess the appropriateness within 24 hours of all screen-out determinations. If the decision to screen out the report is determined to be inappropriate, MDCPS shall ensure the report is referred for timely investigation.

The Department's CQI Safety Review Unit (SRU) is charged with reviewing all screened-out MIC reports. Data provided by MDCPS indicate that 771 MIC referrals were screened out for investigation during 2019. Of the 771 screened-out MIC reports, 715 (92.7 percent) were reviewed timely by SRU. Fifty-one referrals were reviewed untimely and five referrals were not reviewed. SRU determined that all 766 referrals reviewed were appropriately screened out. As detailed under 2.1 above, the monitoring team reviewed 200 screened-out referrals alleging

43

maltreatment of children in MDCPS' custody that were reviewed by SRU. The monitoring team found that 31 (15.5 percent) of the 200 referrals were inappropriately screened out.

*Standardized Decision-Making (2.8.)*

The 2nd MSA requires MDCPS to assure that standardized decision-making criteria are used for prioritizing, screening, and assessing all reports of maltreatment of children in MDCPS' custody. However, MDCPS has not yet implemented a system to ensure standardized decision-making. When MCI identifies that a foster child is the subject of the maltreatment referral, the unit is required to send it to the SIU. If the SIU supervisor decides to screen out the referral, the supervisor is required to advise the Director of Field Support Programs who, upon approving the screen-out determination, must notify the SRU of the screen-out. The SIU's screen-out judgments are routinely final. Of the hundreds of screen-outs the SRU reviewed in 2019, data and information from MDCPS indicates there were no instances where a reversal was recommended by SRU.

In those instances where MCI is unaware that the child described in a referral is in foster care, the maltreatment referrals are sent to the 82 counties and the referrals are then subject to review by the Regional Director or her/his designee. The Regional Directors, and their designees, have the unilateral power in their counties to change the disposition and screen out the referral. There is no evidence to suggest those judgments, made by different county-based individuals across the state, are subject to rigorous scrutiny by State Office staff or further discussion with MCI staff to establish standardization.[20] In almost every instance, the screen-out judgments of the county staff are final. This broad distribution of responsibility and prerogative across the state into the counties, and designated down to proxies by certain Regional Directors, undermines standardized decision-making.

## Investigating Maltreatment in Care

*Special Investigations Unit and MIC Investigation Initiation Timeliness (2.2.)*

Pursuant to the 2nd MSA, MDCPS is required to continue to maintain a special investigations unit whose responsibility is to investigate reports of maltreatment of children in custody. The initiation of that investigation shall not extend beyond 24 hours.

MDCPS continued to maintain SIU, charged with investigating reports of maltreatment of children in custody throughout 2019. Data provided by MDCPS indicate that of the 610

---

[20] In three counties that the monitoring team visited in November 2019, staff indicated that all screen-outs also had to be approved by the Deputy Director of Field Operations overseeing the region. This information was not included in MDCPS' memo regarding the Department's screening process submitted to the monitoring team on July 31, 2019, and it is not clear if this process is being followed statewide.

investigations conducted by SIU that were due for approval in 2019, 550 (90.2 percent) were initiated timely.

*MIC Worker Training (2.6.)*

Pursuant to the 2nd MSA, all allegations of maltreatment of a child in custody are to be investigated by a worker who has received training on intake and investigations processes, policies, investigation techniques, and has no ongoing connection to the foster care case. SIU workers receive training on intake policy, investigations into maltreatment in care and facility investigations, in addition to the pre-service training that all workers are required to receive. Ongoing foster care workers do not receive the same level of training.

MDCPS provided investigative training dates for all current SIU staff, who are responsible for conducting MIC investigations. SIU initiated 541 MIC investigations during 2019. Additionally, both MDCPS and the monitoring team identified investigations of MIC that were not completed by SIU. The monitoring team reviewed all 71 investigations with a custodial child victim that were conducted by non-SIU workers to determine if the investigator had an ongoing connection to the foster care case. The monitoring team identified only six instances where an investigation of maltreatment of a child in custody was conducted by a worker with an ongoing connection to the foster care case of one of the alleged victims. MDCPS performance exceeded 99 percent for this commitment.

*MIC Investigation Completion Timeliness (2.8.a.)*

MDCPS committed that at least 90 percent of MIC investigations will be initiated and completed within 30 days. Data provided by MDCPS indicate that of the 610 MIC investigations due for completion in 2019, 552 (90.5 percent) were completed timely. The monitoring team's case record review of 200 MIC investigations confirmed that MDCPS met the performance standard for this commitment during 2019.

*Licensure Investigations of Emergency Shelters and Group Homes (2.4.)*

MDCPS committed to initiate a licensure investigation of contract agency group homes and emergency shelters within 30 calendar days following a substantiated report of child maltreatment. The licensure investigations are required to occur in addition to and independent of child protection investigations and must include an on-site inspection by MDCPS of the group home or emergency shelter to determine the contract provider's compliance with MDCPS' licensure standards. A provider has ten calendar days to submit a corrective action plan (CAP) with timeframes to rectify any identified violation of licensure standards and comply with the approved CAP timeframes. If the provider does not comply with the licensure standards based on the approved CAP and timeframes, MDCPS shall revoke the license.

MDCPS reported there were six substantiated reports of child maltreatment in 2019 relevant to this commitment, all occurring in group homes. The monitoring team reviewed the licensing investigations and supporting documentation provided by MDCPS for these six incidents. Licensing violations were found by MDCPS in all six investigations. The monitoring team verified that on-site inspections were conducted in all investigations and that when MDCPS requested CAPs, they were submitted timely and included timeframes to rectify the violations.

Four of the investigations involved one facility, three of which resulted in citations for staff supervision. In the first case a CAP was implemented to address the identified concerns. With the following two investigations, MDCPS did not request new CAPs or revoke the facility's license as required by the 2nd MSA. However, the timeframe for monitoring the facility's compliance with the original CAP was extended by six months. In the fourth investigation, a staff person was terminated for physical abuse of a resident and again MDCPS did not request a CAP be implemented, as required by the 2nd MSA.

The remaining two investigations involved one other facility. In one instance a CAP was required to address the use of corporal punishment by staff and the failure to report alleged child maltreatment. In the other instance, staff were terminated for maltreatment of residents and the facility was cited for failing to report the incident, but no CAP was requested by MDCPS, as required by the 2nd MSA.

*Licensure Investigations by Child Placing Agencies (2.5.)*

The 2nd MSA requires that upon receipt of a report of child maltreatment in a private child placing agency (CPA) foster home, MDCPS must notify the CPA, which shall within 30 calendar days initiate an independent licensure investigation, including an on-site inspection of the foster home, to determine the provider's compliance with licensure standards. If the foster home provider is found to be in violation of licensure standards, the provider shall have ten calendar days to submit a CAP with timeframes to rectify the violation and comply with the approved plan. MDCPS shall recommend that the foster home license be revoked if the provider does not comply based on the approved CAP and timeframes.

Data and information provided by MDCPS indicate there were 20 reports of maltreatment involving CPA foster homes in 2019. The monitoring team conducted a qualitative review of licensing reports provided by MDCPS for these 20 cases and determined that CPAs were not consistently conducting licensing investigations independent of the child protection investigation, as required by this commitment. Rather, documentation provided to the monitoring team indicated that the licensing investigations were mainly conducted by MDCPS, with supplemental information detailing corrective actions provided by the CPAs when required.

The monitoring team found documentation in only one instance that the CPA conducted a complete licensing investigation independent of MDCPS and the CPS investigation.

Overall, there was documentation in five (25.0 percent) of the 20 licensing investigations that an on-site inspection of the foster home was completed. MDCPS established licensing violations in eight of the investigations. CAPs were required and completed in five instances[21] and the foster home was closed in three instances.

*Worker Contacts with Custody Children after a MIC Substantiation (2.8.b.)*

The 2nd MSA requires that any foster child who remains in the same out-of-home placement following an investigation into a report that he or she was maltreated in that placement shall be visited in the placement by an MDCPS caseworker according to the following schedule:

- Once per week for the first month and twice per month for three months if the investigation is found to be substantiated, or

- twice per month in accordance with MDCPS policy if the investigation is found to be unsubstantiated.

The monitoring team was unable to validate the data for this commitment for the reasons noted in Section 1.5.a.

*MIC Investigation Reviews (2.7.)*

Within 30 calendar days of the completion of any investigation of maltreatment of a child in custody, as required in Section 2.1, MDCPS must review the maltreatment investigation. This review will:

- identify any case practice deficiencies in the investigation and any remedial actions necessary to ensure the safety of the child who is the subject of the investigation, as well as any other children in the home or placement;

- identify a timeframe in which any recommended remedial action must take place; and

- monitor the initiation and completion of the remedial actions regarding individual child safety and case practice.

When any remedial actions have not been initiated or completed timely, MDCPS must notify the supervisor, Regional Director, and Director of Field Operations.

---

[21] In one instance where a CAP was required the documentation provided by MDCPS indicated that a CAP was implemented, but no information was provided on the specific corrective actions required.

Reviews of MIC investigations are completed by the MDCPS Safety Review Unit (SRU). Data provided by MDCPS indicate that 562 investigations were due for review by SRU during 2019. Of these 562 investigations, 547 (97.3 percent) were reviewed timely by SRU. Thirteen investigations were reviewed more than 30 days after the completion of the investigation, and two investigations were not reviewed.

The monitoring team reviewed SRU reports for 174[22] of the 200 MIC investigations evaluated under commitment 2.1. SRU identified case practice deficiencies in nine of the investigations. These included the alleged victim(s) not being seen within 24 hours of intake, alleged perpetrator(s) not being interviewed, safety/risk assessments not being completed adequately, and in two instances SRU indicated they did not agree with the investigation findings. Specific remedial actions and timeframes to address these deficiencies were not identified in the SRU reports. The monitoring team identified case practice deficiencies in 40 investigations. These included alleged victims(s) not being interviewed timely, alleged perpetrator(s) not being interviewed, necessary collateral contacts and information not being obtained before rendering a finding, and in 17 instances the monitoring team, applying MDCPS' criteria for maltreatment, did not agree with the investigation findings.

*Filing of MIC Investigations (2.8.c., 2.8.d.)*

Pursuant to the 2nd MSA, when a MIC investigation involves a foster or adoptive home, MDCPS must file a copy of the approved final investigation report, and any recommendations and/or corrective actions MDCPS has deemed necessary, in the case record of the foster child. The Department must also file a copy of the approved final investigation report, and any recommendations and/or corrective actions MDCPS has deemed necessary in the file of the foster or adoptive parents, along with a copy of the letter of notification to the foster or adoptive parents, and with the Bureau Director for Licensure. MDCPS must also provide those records to the Youth Court Judge with jurisdiction over the child and, upon request, to the monitor (2.8.c.).

Additionally, when a MIC investigation involves an agency group home, emergency shelter, private child placing agency foster home, or other facility licensed by MDCPS, a copy of the final investigative report must be filed in the child's case record, with the Director of Congregate Care Licensure, and sent to the licensed provider facility. MDCPS must also provide the report to the Youth Court Judge with jurisdiction over the child and, upon request, to the monitor (2.8.d.).

MDCPS stores investigation reports in MACWIS, which are linked to the child(ren) and provider(s) involved in the report. As of April 19, 2019, upon completion of a MIC investigation, the special

---

[22] Twenty-four of the MIC investigations reviewed by the monitoring team were not due for review by the SRU until 2020. Additionally, there were two MIC investigations the monitoring team reviewed for which the SRU review was due in 2019 but not completed.

investigator mails a copy of the finalized investigation packet to the youth court judge(s) with jurisdiction over the child(ren) involved in the report. MDCPS did not report performance for these commitments until the third quarter of 2019, as part of the MIC investigation review completed by the SRU. The Department reported that 249 (95.0 percent) of the 262 MIC investigations reviewed by SRU in the second half of 2019 documented a date the investigation findings were mailed to the youth court. The monitoring team reviewed a sample of 90 of these cases and confirmed MDCPS' performance for the second half of the year.

*Investigating Reports of Abuse and Neglect (2.1.)*

The monitoring team conducted a qualitative review of a sample of MIC investigations conducted during 2019, alleging ANE of a child in MDCPS' custody. The review included 200 investigations involving 393 alleged child victims. Fifty of the 200 investigations, involving 97 children, were substantiated for abuse and/or neglect. The monitoring team's review involved reading investigation reports supplemented with information documented in MACWIS.

The monitoring team found that SIU workers made face-to-face contact or attempted to make face-to-face contact with child victims within 24 hours of the report date and time in 191 (95.5 percent) of the 200 investigations. The alleged perpetrator and collateral contacts were typically interviewed during the course of the investigation, although in 14 investigations (7.0 percent) at least one of alleged perpetrators was not interviewed and should have been per MDCPS policy. The entire investigation was completed and approved within 30 calendar days of the initial intake report date and time in 183 of the 200 (91.5 percent) investigations. However, the monitoring team found that in cases where investigations were completed timely, additional time was sometimes needed to gather information and complete a thorough assessment. In eight instances, MDCPS rendered a finding before forensic interviews, medical/psychological exams, drug testing results, or information from law enforcement, as requested by MDCPS, were received. Even though MDCPS policy allows for investigators to request extensions when more time is needed to complete an investigation, extensions were not requested in these eight cases.

The monitoring team concluded the evidence supported MDCPS' findings in 163 of 200 investigations (81.5 percent). The monitoring team concluded in 20 investigations (10.0 percent) more information was needed in order to draw a proper conclusion. There were 17 investigations (8.5 percent) where some or all of the allegations were found to be unsubstantiated by MDCPS, but the monitoring team concluded, based on MDCPS' criteria for maltreatment, that

information presented during the course of the investigation was sufficient to render a substantiation.[23] A few examples where allegations should have been substantiated include:

- A foster child, age ten, and adoptive child, age 11, were left home to care for a foster child, age one. He was not changed regularly and had diaper rash. The older children changed his diaper, gave him a bath, and cleaned him with baby wipes because he was always filthy. MDCPS substantiated physical neglect of the one-year-old, but neglect was unsubstantiated for the other two children, who were caregivers for him. In interviews, the children also alleged that the foster mother called them names, cursed at them, "whooped" them with belts, shoes, and other objects, and smoked around them in the home and the car. As a result of this investigation, the 10-year-old was removed from the home. However, the one-year-old remained in the home for two months, and the 11-year-old adopted child and an older adopted youth still remain in the home.

- Physical neglect was unsubstantiated for four children, ages two, five, nine, and ten, who were placed with maternal relatives. They were found to have hair that had not been combed for some time and the home had the following hazardous and unsafe conditions: a gas fireplace without a screen with soot evident; a vase found in the tub in the girls' bathroom that had mold and fungi growing on it; a bathroom sink filled with rocks, toys, and other items, making it unusable; exposed electrical cords in the play area; electrical outlets with no covers; dishes that were unwashed for some time; grass which was quite tall and the worker "did not feel safe walking through"; and items on the porch and ground near the front steps which caused the foster parent to fall recently. There was also a concern about the children's health and whether they were receiving necessary medical care, but no verifying collateral contact with medical professionals was documented. The children remained in this relative home.

- A referral was received indicating that an argument took place between a foster youth, age 18, and his uncle and resource parent. The foster father told the youth to get out of his house, drew his pistol, and said he would shoot him if he came back on his property. The foster mother concurred with his having to leave. This forced the youth to depart on foot late at night and to stay with unknown friends. Several days later he contacted his worker and was placed with another relative prior to his leaving for college. Another concern that was disclosed during the investigation was that several months prior the 18-year-old was admitted to the Intensive Care Unit for an overdose of aspirin. After hospital discharge, he did not receive the recommended mental health or psychotropic medication follow-up, and described being anxious, having night terrors, and difficulty

---

[23] This includes one investigation where the allegations were found to be substantiated for one foster child, but unsubstantiated for another foster child and adoptive child in the home. The monitoring team determined maltreatment should have been substantiated for all three children.

sleeping. His 17-year-old brother, also in custody, disclosed that he had frequent headaches and feared he had a tumor, but was not taken for medical treatment. Abuse or neglect was unsubstantiated and the caregivers were granted durable legal custody of the 17-year-old.

The following are examples of investigations where more information was needed in order to make a proper investigative finding:

- It was alleged that a therapeutic foster mother's boyfriend, alleged to be a convicted felon, resided in the home unbeknownst to the supervising agency. Reportedly, he was abusive and when he became upset with the foster mother, he would not feed the foster child, age two, who had brain damage and required a feeding tube. The foster child was reported by the daycare center to have weight fluctuations, diarrhea, and vomiting. The child's physician was not contacted to determine whether he was receiving adequate care and nourishment via his feeding tube and to rule out neglect. Despite the allegation being unsubstantiated, the agency supervising the home removed the two-year-old six days after the referral was made and closed the home because the foster mother had never disclosed that her boyfriend was residing in the home nor did he have the required background checks.

- A youth, age 17, placed in a group home used a piece of glass to make superficial cuts to her wrist and both thighs and she was admitted to the hospital. She reported that she did so not to harm herself, but so she could escape the facility for a few days. The investigation contained no documentation regarding how and when the child obtained the glass or if a lack of supervision occurred by facility staff on duty at the time the child cut herself. No direct care staff or other residents were interviewed. Maltreatment in care was unsubstantiated.

- Four youth, ages 14, 15, 16, and 16, ran away from the group home where they resided and became involved in sex trafficking. One of the girls reported they were not really being supervised when they ran away. When she was located, she was returned to the group home, only to run away again. The investigator indicated that recent elopements from this facility resulted in "28 or more" investigations. Several of the girls in this referral had a history of sexual abuse, and were exposed to sexually transmitted diseases, HIV, and potential pregnancy during the time they were away from the facility. They also were on multiple medications and then given what they described as laced "weed" by the men who used them for sex. The investigator did not consider or interview facility staff regarding the possible lack of supervision potentially resulting in the girls' elopements. One girl was still missing at the investigation's conclusion.

*Maltreatment of Children in Care (2.9.)*

Pursuant to the 2nd MSA, MDCPS agreed that the rate of child abuse and neglect among children in foster care shall not exceed 0.33 percent per year. A child is counted as having been maltreated in foster care if the perpetrator of the maltreatment was identified as a foster parent or a residential facility staff member. This was a federal outcomes standard (based on the federal Child and Family Services Review, Round Two) focused on keeping children in foster care safe from abuse and neglect by their caregivers.

Data provided by MDCPS and verified by the monitoring team indicate that 87 children (1.20 percent) in MDCPS' custody were victims of abuse or neglect by their caregivers in 2019. This is more than three and a half times the agreed upon rate of maltreatment and MDCPS should have protected at least 63 more children from abuse or neglect in their placement in 2019 in order to meet the agreed upon safety standard. Examples of substantiated abuse and neglect during 2019 include:

- A six-year-old foster child was brought to the school nurse by her teacher due to numerous bruises covering her body and the child having difficulty walking. The investigation confirmed that the bruises were caused by the child's foster parent, who hit her with a paddle and wooden spoon. Physical abuse was substantiated, the foster parent was arrested, and the foster home was closed.

- A 12-year-old residing in residential placement was allegedly punched in the face with a closed fist by a staff member after a verbal altercation. Interviews with witnesses and video surveillance confirmed that the staff member was physically attacking the child and had to be restrained by other staff. Physical abuse was substantiated and the staff member was terminated.

- A two-year-old foster child was admitted to the hospital having seizures. He was placed in the ICU on a breathing machine. Hospital records documented a subdural hematoma on the child's brain that required emergency surgery, a few retinal hemorrhages, a spinal fracture, leaking spinal fluid, and unusual bruising covering his legs, arms, and back. The doctor classified the injuries as nonaccidental and determined they occurred within eight hours of the child's arrival at the hospital. The foster parents gave an insufficient explanation for his injuries. Another foster child in the home stated the children were whipped by the foster father when they got in trouble. Physical abuse and physical neglect were substantiated, all children were removed from the home, and SIU recommended closure of the foster home.

## 3. Family-Based Placements

*Foster Home Licensure (3.1.)*

In order to ensure that children who are removed from their families due to abuse and neglect are placed in the most appropriate and least restrictive setting, MDCPS agreed to develop a safe array of family-based placement resources. The 2nd MSA requires MDCPS to both recruit and license a target number of non-relative foster families and to ensure that when MDCPS places children with relatives, those homes are timely licensed. MDCPS agreed to utilize the licensure process approved by the monitor when assessing prospective relative and non-relative homes.

The licensure process requires MDCPS to: provide pre-service training for applicants; conduct home visits with the prospective applicants and family members; assess the physical and mental health of applicants; conduct home environment safety checks; obtain references regarding the applicants; and complete full background checks that include state and federal fingerprints for all adults in the home. MDCPS is also required to complete a foster home study that synthesizes information obtained during the home study process and documents the agency's licensure decision.

MDCPS agreed to license non-relative homes within 120 days of the prospective foster parent's inquiry regarding foster parenting. For 2019, data provided by MDCPS indicate that 373 (79.0 percent) of 472 homes were licensed timely. The monitoring team reviewed a randomly selected sample of 60 non-relative foster homes licensed during the monitoring period and found that MDCPS licensed non-relative homes consistent with both the requirements of the approved licensure process and agency licensure standards.

The Department agreed to license relative homes within 90 days of a child being placed in a home. The monitoring team was unable to validate the data MDCPS provided on the timeliness of licensing relative homes for 2019, as MDCPS did not include a necessary data file in the Department's fourth quarter submission.

*Unlicensed Placements (3.2.a.)*

MDCPS committed that no child will remain in a foster home or facility determined to be unable to meet licensure standards absent an order by a state court with jurisdiction over the child's custody directing the placement of the child into a specific unlicensed placement. MDCPS is not held accountable for a state court's order as long as MDCPS documents that it presented information to the court that the foster home has not met licensing standards, the reasons why the foster home has not and cannot meet licensing standards, and an explanation that a licensed foster home or facility is available, or one time only, an appropriate expedited relative placement.

MDCPS data shows that during the monitoring period 539 children were placed in court-ordered unlicensed homes and facilities. Sixty-four of those were placements of children in unlicensed shelters and 255 of those were placements of children in unlicensed detention/training schools. Two hundred and twenty children were placed in court-ordered unlicensed family-based placements during the period. MDCPS produced to the monitoring team court orders for 118 (53.6 percent) of the 220 children placed into unlicensed family-based placements during 2019. MDCPS did not consistently produce evidence that the court was advised whether or not it would be safe for a child to remain in a relative home when that home could not be licensed, including the reasons why the home could not be licensed and an explanation that a licensed placement was available.

Additionally, the monitoring team discovered five instances [24] where children were placed overnight in motels or hotels, which are unlicensed nonresidential facilities. The following examples were documented in case records:

- MDCPS placed a 17-year-old youth in a motel for a month and a half and utilized a rotating group of sitters from a sitter service to watch the youth. The Department conducted two separate maltreatment investigations regarding the child's stay at the motel, one while the child was still in the motel, and one subsequent to her removal. In the first investigation, it was alleged that the child had taken a beer from a man staying at the motel, that she had "found" $400 and split it with one of the sitters, and that she was sending inappropriate pictures of herself through social media. The Department removed the child's electronic device from her possession and found allegations of physical neglect to be unsubstantiated. While the investigation was ongoing, the Department removed the child from the motel and placed her in congregate care.

  In the second investigation, the child disclosed that while she was in the motel, she was taken to one of the sitter's homes at night whenever that sitter was on shift. The child reported that while in that home, she had sexual relations with the sitter's 47-year-old uncle "three to four times weekly" and that it was consensual. The Department substantiated allegations of physical neglect and sexual abuse, and the investigating worker noted that this report was forwarded to the local police department, but that law enforcement could not bring charges because 16 years is the age of consent in Mississippi. However, the investigating worker also noted that if an exchange occurred for sex, the age of consent is then 18 years of age. It appears the Department did not follow up on this.

---

[24] Of the five hotel stays, placement lines in MACWIS were labeled: "Own Home – Other Caretaker" (2); "Own Home – Other" (1); "Runaway" (1) ; and one placement line named the actual hotel.

- MDCPS conducted a maltreatment investigation regarding a sitter who was alleged to have left an 18-year-old youth alone while staying at a hotel. The youth invited several minors to her hotel room with whom she had sexual relations. The Department substantiated the allegations.

- The Department removed a 14-year-old youth from an emergency shelter after he was involved in a fight with another resident. The child was arrested and sent to a juvenile detention center for four days. Subsequently, the Department placed the child in a hotel due to "no placements being available." The youth's case record did not note whether a sitter was present during the child's six day stay at the hotel.

*Safety and Non-Safety Issues (3.2.b., 3.2.c.)*

When a child in the custody of MDCPS needs an out-of-home placement, potential relatives are always considered as the first placement resource. MDCPS policy states that "first priority for placement shall be given to a relative when it is suitable and appropriate to do so" and the Department committed to license all unlicensed relative homes with limited exceptions, as described below.

The assessment of a relative's home for potential placement begins when the child's caseworker initiates MDCPS' emergency placement process that includes a pre-placement safety assessment. The child's worker is responsible for walking through the entire home, both inside and outside, to ensure that safety issues do not exist or when safety issues are identified, they are remediated prior to a child's placement. MDCPS must also complete and assess the results of criminal, law enforcement, and child abuse registry background checks prior to approving the placement. After the initial safety process is completed and supervisory staff approve the child's placement, casework staff must make a referral to the regional licensure unit for continuation of the 90-day licensure process.

When MDCPS determines that an unlicensed foster home or facility is unable to meet MDCPS licensing standards due to a safety issue, MDCPS must take all reasonable efforts to immediately ensure the child's safety, including, when necessary, seeking an emergency court order to remove a child. If the child is not in imminent danger, MDCPS must implement a safety plan and within five calendar days, either cure the licensing deficiency if feasible, or move the child to a licensed foster home or facility, or to an appropriate expedited relative placement, one time only.

When MDCPS determines an unlicensed foster home cannot meet licensing standards due to a non-safety issue, the Department must, within 30 calendar days of that determination, either cure the licensing deficiency if feasible, or move the child to a licensed foster home or facility, or to an appropriate expedited relative placement, one time only.

The monitoring team conducted quality reviews of 200 expedited pending relative placements made during 2019. The monitoring team confirmed that MDCPS continued to utilize the licensure process approved by the monitor for relative homes. However, during the reviews, the monitoring team identified lapses by MDCPS in completing the initial background checks prior to the start of a child's placement. Specifically, the monitoring team found that a substantial number of background checks for the primary applicant were being completed after a child was placed in the home. The table below illustrates, of the 200 cases reviewed, the number and percentage of timely background checks.

**Table 7. Background Checks for Relative Home Studies, 2019**

| Background checks for Applicant #1 | Completed Prior to Placement | |
|---|---|---|
| | Count | Percent |
| MACWIS | 107 | 53.5% |
| Internet/Social Media | 105 | 52.5% |
| Local Police Department[25] | 58 | 29.0% |
| Sheriff[25] | 74 | 37.0% |
| Central Registry | 75 | 37.5% |
| Sex Offender | 98 | 49.0% |

Additionally, of the 200 cases reviewed, documentation of the initial home walk-through was missing for 12 placements (6.0 percent) and indicated the walk-through was completed late for 36 placements (18.0 percent).

For 2019, MDCPS submitted to the monitoring team two types of reports monthly: A Safety Issues Report and a Non-Safety Issues Report, both meant to document issues identified during the expedited pending relative initial safety check and home study process. However, the monitoring team found that MDCPS did not consistently utilize these reports to track and monitor resolution of safety and non-safety issues.

Rather, the monitoring team found that MDCPS documents safety and non-safety issues identified during the initial home walk-through and home study process and the resolution of those issues in the final home environment checklist and/or the written foster home study. Examples of safety issues identified by MDCPS are lack of fire extinguishers and carbon monoxide detectors. However, because MDCPS did not consistently utilize the Safety and Non-Safety report tracking system, the monitoring team is unable to evaluate if all those issues were remediated within the timeframes agreed to in the 2nd MSA.

---

[25] The licensing process approved by the monitor requires that either a local police department or sheriff check be completed prior to placement.

The monitoring team, in its expedited pending relative reviews, found additional safety concerns not identified by MDCPS regarding lack of appropriate sleeping arrangements, including safe sleep for young children; agency follow up with prescribing physicians for applicants taking medications for anxiety, depression, and pain; and relatives with lack of minimal household finances that calls into question their ability to care for a child in their home.  Examples are:

- MDCPS staff appropriately had a relative applicant sign a Safe Sleep Education Acknowledgment. However, there was a picture in the home study packet of a newborn child sleeping in a crib with a blanket, something under his head, and bumpers. There was no documentation that this sleeping arrangement was discussed with the applicant and remediated.

- A relative applicant was prescribed 11 medications, including anti-anxiety and antidepressant medications according to the signed medical report. However, the written home study only listed five medications prescribed to the applicant. The licensed medical practitioner who completed the medical form wrote, "patient states she is stressed but controlled without complications." There was no further follow up documented in the home study.

- A relative's financial statement indicated that there was a $333.80 financial deficit each month. The applicant was disabled, unemployed, and received Social Security and Supplemental Security Income. The applicant's disability and financial situation were not discussed in the home study.

*Foster Home Development (3.3.)*

The 2nd MSA provides that MDCPS, in conjunction with the monitor, shall establish annual statewide and county performance targets for developing new foster homes. These targets are to be met during specific time periods as outlined below. For calendar year 2019, the Department conducted a foster home needs assessment to identify the number of available licensed foster homes and determine the number of licensed foster homes needed. The assessment was designed to inform MDCPS' efforts to build capacity over time so that safe and appropriate placement matches could be made. This includes ensuring that children are placed with siblings and in close proximity to their community. Utilizing segments of MDCPS' assessment analysis, as well as child custody data, licensure data, and foster home development and closure data, the monitor established the 2019 new foster home licensure target at 400 homes. The time periods for new home licensure were set at:

- 160 new homes licensed by June 30, 2019

- 285 new homes licensed by September 30, 2019

- 400 new homes by December 31, 2019

During the monitoring period, MDCPS provided to the monitoring team monthly new foster home licensure data. Through ongoing data verification and a sample review of new foster home records, the monitoring team confirmed that MDCPS licensed 472 new foster homes during 2019, exceeding the target of 400 new homes. MDCPS also met both of the interim targets, licensing 206 homes by June 30, 2019 and 331 homes by September 30, 2019.

In order to expand the pool of foster homes available for placement, MDCPS committed to recruit and retain additional licensed foster home placements and maintain the additional number of placements, as necessary during the applicability of the 2nd MSA (3.3.b.). Taking into consideration the new home target and historical foster home closure data, the monitoring team established a net gain target of 100 additional foster homes for 2019.

MDCPS licensed 472 new homes and the monitoring team verified that 310 homes closed during the monitoring period, resulting in a net gain of 162 foster homes. MDCPS surpassed the 2019 net gain target of 100 additional homes.

## 4. Placement Standards

*Foster Home Licensure Limits (4.1., 4.13.)*

MDCPS agreed that no foster home shall provide care for more than five children (including foster, birth, and adoptive children) at any given time, in accordance with the following:

- foster homes may provide care for more than three foster children, up to a total of five, only with the documented approval of MDCPS Office of Licensure determining that the foster children can be safely maintained in the foster home;

- no more than two children in the foster home may be under the age of two or have therapeutic needs, including the biological and/or adoptive children; and

- notwithstanding the above, a sibling group may be placed together in the same foster home in excess of these limits, but only if they are the only children in the home, and only upon written approval by the MDCPS Licensure Director determining that the foster children can be safely maintained in the home.

The parties agreed that by July 1, 2018, MDCPS would meet an interim performance standard of 70 percent for this commitment (4.13.a.), and by July 1, 2019, MDCPS agreed to meet an interim performance standard of 80 percent (4.13.b.). MDCPS provided data for this commitment, which was validated by the monitoring team. MDCPS' performance as of the last day of each month of 2019 is charted below.

**Table 8. Number of Foster Homes Meeting Licensure Limits, 2019[26]**

| Month | Number of foster homes with a child placed | Number of foster homes meeting licensure limits | Percent of foster homes meeting licensure limits |
|---|---|---|---|
| January | 2,068 | 1,927 | 93.2% |
| February | 2,063 | 1,927 | 93.4% |
| March | 2,034 | 1,903 | 93.6% |
| April | 2,031 | 1,897 | 93.4% |
| May | 1,984 | 1,849 | 93.2% |
| June | 1,936 | 1,808 | 93.4% |
| July | 1,908 | 1,776 | 93.1% |
| August | 1,889 | 1,769 | 93.6% |
| September | 1,874 | 1,755 | 93.6% |
| October | 1,882 | 1,758 | 93.4% |
| November | 1,854 | 1,735 | 93.6% |
| December | 1,828 | 1,705 | 93.3% |

The monitoring team conducted a qualitative review of this commitment, through in-person interviews in Mississippi, with a randomly selected group of licensure specialists and discussed a total of 77 homes for which the workers were responsible. All 77 homes met the terms of this commitment.

*Children with Special Needs Placed with Resources Meeting Those Needs (4.2., 4.14.)*

The 2nd MSA states that children with special needs shall be matched with placement resources that can meet their therapeutic and medical needs. MDCPS is to ensure that each county office has access to resource workers within its region who have the ability to ascertain the placement resources available and their suitability for each child who needs placement.

Mississippi Code 43-27-101(f) defines a special needs child as:

> "A child with a variety of handicapping conditions or disabilities, including emotional or severely emotional disorders. These conditions or disabilities present the need for special medical attention, supervision and therapy on a regimented basis."

---

[26] Homes listed in the data as "sub-resources" were included in this calculation but counted as noncompliant as MDCPS cannot report on the number of biological and adoptive children in these homes. The number of these homes at the end of each month ranged from 95 to 116. Additionally, there were a small number of children listed as being placed in "umbrella agencies" or "residential facilities" for whom MDCPS could not report on the specific home they were placed in. These children were excluded from the calculations. The number of these children at the end of each month ranged from 38 to 45.

Children with special needs qualify for three levels of increased foster care board rates determined by the child's needs.

**Table 9. Special Needs Board Rates**

| Level | Definition | Current Board Rate |
|---|---|---|
| Special Needs I | A foster child qualifies for the Special Needs I board payment rate if the child has a mental health or medical diagnosis and applied for SSI and the application is pending or has been denied. | $838.60 |
| Special Needs II | A foster child qualifies for the Special Needs II board payment rate if the child receives SSI. A copy of the SSI letter that states the child is approved must be submitted to Eligibility. | $901.30 |
| Therapeutic | A foster child qualifies for a Therapeutic board payment rate if the child has a DSM-IV Axis I diagnosis. | $1,293.70 - $5,170.00[27] |

The parties agreed by July 1, 2018, 60 percent of children with special needs shall be matched with placement resources that meet their therapeutic and medical needs (4.14.a.). MDCPS evaluated performance for this commitment through the FCR. The Department reviewed a total of 2,979 cases and reported 2,872 (96.4 percent) met the terms of this commitment during the first half of 2019. The monitoring team reviewed a randomly selected sample of placements for 136 children with an identified Special Needs I, Special Needs II, or Therapeutic board rate during the period to assess whether children with special needs were matched with placement resources that met their therapeutic and medical needs. The monitoring team found that 132 (97.1 percent) of the placements met the child's individual, special, therapeutic, and medical needs.

The parties agreed by July 1, 2019, 75 percent of children with special needs shall be matched with placement resources that meet their therapeutic and medical needs (4.14.b.). During the second half of 2019, MDCPS reviewed a total of 4,475 cases through the FCR and reported 4,390 (98.1 percent) met the terms of this commitment. The monitoring team reviewed a randomly selected sample of placements for 71 children with an identified Special Needs I, Special Needs II, or Therapeutic board rate during the period to assess whether children with special needs were matched with placement resources that met their therapeutic and medical needs. The monitoring team found that 69 (97.1 percent) of the placements met the child's individual, special, therapeutic, and medical needs.

---

[27] Rate varies depending on whether the placement setting is a related therapeutic placement, a therapeutic resource home, or a therapeutic group home.

*Children Placed in Least Restrictive Setting (4.3., 4.15.)*

MDCPS committed that each foster child shall be placed in the least restrictive setting that meets his/her individual needs as determined by a review of all intake, screening, assessment, and prior placement information available at the time of placement. In order of consideration this means placement with relatives, foster home care within reasonable proximity to the child's home community, foster home care outside of the child's home community, group home care, or institutional care. The parties agreed to a 95 percent performance standard for this commitment.

MDCPS evaluated this commitment through the FCR. The Department reviewed a total of 7,454 cases in 2019 and determined that 7,366 (98.8 percent) of cases reviewed met the terms of this commitment. Additionally, data provided by MDCPS indicate that as of December 31, 2019, 3,746 of the 4,235 children in custody were placed in family-based settings, the least restrictive placement type. The monitoring team undertook validation of a randomly selected sample of case narratives and residential services applications for 100 children placed in congregate care programs which are more restrictive placement settings. The monitoring team determined 96 (96.0 percent) of those placements were made appropriately in order to meet the individual child's identified needs.

*Children Placed Within Proximity to Home (4.4., 4.18.)*

MDCPS agreed to ensure that each child who enters placement shall be placed within his/her own county or within 50 miles of the home from which he/she was removed, unless:

- the child's needs are so exceptional that they cannot be met by a family or facility within his/her own county or within 50 miles of the home from which he/she was removed;

- the child is placed through the Interstate Compact on the Placement of Children (ICPC) consistent with its terms;

- the child is appropriately placed with relatives;

- the child, age 14 years or older, is pursuing educational or vocational opportunities;

- the child is ordered to be placed in a child-specific foster care setting by a court; or

- the child is placed in an adoptive home.

The parties agreed to a 90 percent performance standard for this commitment. The monitoring team confirmed that there were 10,495 placements made in 2019. Of these placements, data provided by MDCPS indicate that 10,087 (96.1 percent) met the proximity terms of the 2nd MSA. This includes placements made within 50 miles from the child's home of removal (7,968) and placements that exceeded 50 miles but had an approved exception consistent with the commitment (2,119). The monitoring team reviewed a sample of 204 exceptions MDCPS

61

reported were consistent with the terms of this commitment and found that 193 (94.6 percent) contained sufficient documentation to support the exception decision.

*Placing Siblings Together (4.6., 4.16.)*

The 2nd MSA requires MDCPS to place siblings together when they enter placement at or near the same time. Exceptions can be made if placing the siblings together would be harmful to one or more of the siblings, one of the siblings has exceptional needs that can only be met in a specialized program or facility, or the size of the sibling group makes such placement impractical notwithstanding diligent efforts to place the group together. If a sibling group is separated at initial placement, the caseworker shall make immediate efforts to locate or recruit a foster family in whose home the siblings can be reunited. These efforts must be documented and maintained in the case file. The parties agreed that by July 1, 2018, MDCPS would meet an interim performance standard of 60 percent for this commitment (4.16.a.), and by July 1, 2019, would meet an interim performance standard of 75 percent (4.16.b.).

The monitoring team is unable to validate the data MDCPS produced for this commitment. The sibling-related files MDCPS provided for each quarter appear to have been created using the same method used in 2018, which the monitoring team identified then as problematic. For example, the monitoring team identified many instances in which MDCPS identified siblings placed together despite the siblings' placement histories showing they were never in the same placement.

*Placement Disruptions (4.7., 4.17.)*

MDCPS committed to take all reasonable steps to avoid the disruption of an appropriate placement and ensure placement stability for children. If there is a documented indication that a placement may disrupt, the caseworker shall immediately take steps to determine the following:

- the cause of the potential disruption;

- whether the placement is appropriate for the child;

- whether additional services are necessary to support the placement;

- whether the child needs another placement; and

- if another placement is necessary, what that placement should be.

The efforts made by MDCPS to avoid disruption and to ensure placement stability are required to be documented in the child's case record. The parties agreed that by July 1, 2018, 60 percent of children in MDCPS' custody with a documented indication that they were subject to a potential

62

or actual placement disruption shall have documented in the child's case record the reasonable steps taken to address placement stability consistent with 2nd MSA requirements (4.17.a.). MDCPS reported 317 (63.5 percent) of 499 cases met the terms of this commitment during the period based on children reviewed through the FCR. MDCPS committed to an interim performance standard of 75 percent by July 1, 2019 (4.17.b.). MDCPS reported 584 (71.8 percent) of 813 cases met the terms of this commitment during the period based on children reviewed through the FCR.

The Department identified FCR reviewer errors that included counting placement moves that were not disruptions as disruptions and found instances where the reviewer answered a relevant FCR question incorrectly. MDCPS indicated the agency will work to develop staff performance in order to accurately report the Department's performance moving forward. As such, the monitoring team was unable to validate MDCPS' performance for 2019.

*Overnight Stays in an Office or Other Nonresidential Facility (4.8.)*

MDCPS agreed to ensure that no child shall remain overnight in an MDCPS office or other nonresidential facility that provides intake functions. MDCPS reported that there were no instances in which this occurred during calendar year 2019. The monitoring team interviewed 71 randomly selected caseworkers and supervisors, and all reported that they had not seen or been made aware of any child sleeping overnight in an MDCPS office during 2019. After reviewing thousands of cases throughout the year, the monitoring team did not discover an instance of a child staying overnight in an MDCPS office.

*Young Children Placed in Congregate Care Facilities (4.9.)*

MDCPS committed that no child under 10 years of age shall be placed in a congregate care setting, including group homes and shelters. Exceptions can be made if:

- the child has exceptional needs that cannot be met in a licensed foster home;

- in order to keep a sibling group together for a temporary period, not to exceed 15 days, and the Regional Director has granted documented approval for the congregate care placement; or

- to enable a mother and baby to be placed together and there is not an available foster home for both of them.

MDCPS reported 145 placements of children under age 10 into a congregate care setting during calendar year 2019. The monitoring team determined there were 155 placements[28] involving 118

---

[28] MDCPS included 13 placements (11 children) in hospitals that were not subject to this commitment. In addition, for the first half of 2019, the Department excluded residential treatment placements.

children under age 10 in a congregate care setting during the year. Of the 155 placements between January 1, 2019 and December 31, 2019, the monitoring team found that 107 (69.0 percent) had adequate approval[29] and an allowable exception documented.

*Placement Moves (4.10., 4.12.)*

No child is to be moved from his/her existing placement to another placement unless MDCPS specifically documents in the child's case record justifications for that move and an MDCPS supervisor approves the move. The parties agreed that by July 1, 2018, MDCPS would meet an interim performance standard of 70 percent for this commitment (4.12.a.). MDCPS evaluated performance for this commitment through the FCR. MDCPS reviewed a total of 781 cases and reported 691 (88.5 percent) met the terms of this commitment during the first half of 2019. The monitoring team reviewed a randomly selected sample of case narratives and approvals for 140 children who experienced at least one placement move during the period. The team found that 85 (60.7 percent) of the cases had a documented placement change reason and were approved by a supervisor.[30]

By July 1, 2019, the parties agreed that MDCPS would meet an interim performance standard of 80 percent for this commitment (4.12.b.). MDCPS reviewed a total of 1,446 cases through the FCR and reported 1,292 (89.3 percent) met the terms of this commitment during the second half of 2019. The monitoring team reviewed a randomly selected sample of case narratives and approvals for 114 children who experienced at least one placement move during the period. The team found that 73 (64.0 percent) of the cases had a documented placement change reason and were approved by a supervisor.[30] Additionally, placement change reasons were often coded as "other" when another reason, such as "placement with a relative" or "trial home placement," would have been more applicable.

*Multiple Emergency Placements (4.11.)*

MDCPS agreed to ensure that no child is placed in more than one emergency or temporary facility within one episode of foster care. Exceptions can be made if an immediate placement move is necessary to protect the safety of the child or of others with documented approval from the Regional Director.

Data provided by MDCPS indicate that 56 children experienced multiple stays in shelter care during 2019. MDCPS reported that 35 of the 56 (62.5 percent) children who experienced multiple

---

[29] If the documented reason is for a sibling group, then the placement must be for 15 or fewer days and be approved by an RD. For monitoring purposes, the RD approval must be documented within ten days of placement in order to be considered properly approved.

[30] For monitoring purposes, the supervisory approval must be documented within seven days of placement in order to be considered properly approved.

emergency shelter placements during 2019 met the terms of this commitment. Cases were counted as meeting the requirements if there was an exception approved by the Regional Director indicating that each successive shelter placement was necessary to protect the safety of the child or of others.[31]

The monitoring team reviewed case records for all 56 children placed in an emergency shelter multiple times during the reporting period. Case records for only eight (14.2 percent) of the children contained information supporting the determination that each successive placement was necessary to protect the safety of the child or of others.

## 5. Visitation

### Worker Contact and Monitoring

*Caseworker Contact with Foster Children (5.1.a.)*

The 2nd MSA requires that MDCPS shall meet with the child in person at least twice monthly to assess the child's safety and well-being, service delivery, and achievement of permanency and other service goals. At least one visit per month shall take place in the child's placement. The parties agreed that by January 1, 2019, MDCPS would meet a performance standard of 90 percent for this commitment.

MDCPS reported on this commitment through the FCR and determined that 5,982 (80.3 percent) of 7,454 cases reviewed met the 2nd MSA standards. The monitoring team conducted a qualitative review of visitation case narratives for 136 randomly selected children who were in the custody of MDCPS during the second half of the year and subject to this commitment. The visitation narratives were reviewed to determine if the 2nd MSA requirements to assess safety, well-being, services, permanency, and other service goals were documented. There were 816 worker-child contacts required, of which 474 (58.0 percent) occurred during the period under review. Three hundred and sixty (44.1 percent) of the contacts met the quality standards of the 2nd MSA.

Overall, the monitoring team found that narratives lacked detail about visitation, and at times, any information at all. There were cases where the caseworker documented that the "worker didn't observe marks or bruises on the child" and caseworkers made observations without engaging with the age-appropriate child. There were other cases where the caseworker transported the child to an appointment but did not engage the child, so there was no evidence

---

[31] Emergency placements should be approved by an RD. For monitoring purposes, the RD approval must be documented within ten days of placement in order to be considered adequately approved.

of safety assessment or active planning. Caseworkers listed the child's permanency goal in the case narrative without discussing what MDCPS was doing to achieve the child's permanency goal.

*Caseworker Contact with Children on Trial Home Visits (5.1.b.)*

MDCPS committed that by January 1, 2019, at least 90 percent of foster children on a 90-day THV would be visited by an MDCPS caseworker in the home at least two times each month.

The monitoring team cannot validate the data MDCPS provided for this commitment. For this commitment and another commitment that involves THVs (6.3.a.5.), the monitoring team identified several problems in the data, including the manner in which MDCPS defined the population of children who were placed in THVs and incorrect identification of the prior placement change reason in some cases.

*Caseworker Contact with Parents (5.1.c.)*

MDCPS committed, by January 1, 2019, to meet at least monthly with the parents of no less than 90 percent of foster children with a goal of reunification to discuss progress on the Family Service Plan and the child's well-being. Exceptions include if the child's parent(s) reside out-of-state or are incarcerated.

MDCPS reported on this commitment through the FCR and determined that 2,476 (51.3 percent) of 4,827 cases reviewed met the terms of this commitment. The monitoring team conducted a qualitative review of visitation case narratives for a randomly selected sample of 101 children who were in the custody of MDCPS during the second half of 2019 and subject to this commitment. The monitoring team evaluated if the 2nd MSA requirements for MDCPS to assess progress on the Family Service Plan and the child's well-being were documented. There were 303 worker-parent contacts required, of which 96 (31.7 percent) occurred during the period under review. Seventy-five (24.7 percent) of the contacts met the quality standards of the 2nd MSA. There were narratives that lacked detail and did not address the Family Service Plan or the child's well-being.

*Caseworker Contact with Foster Parents (5.1.d.)*

MDCPS committed that, by January 1, 2019, at least 90 percent of foster parents with at least one foster child in the home must be visited by MDCPS monthly in the home.

MDCPS reported on this commitment through the FCR and determined that 5,246 (71.0 percent) of 7,387 cases reviewed were compliant. The monitoring team conducted a qualitative review of visitation case narratives for 117 randomly selected foster parents with at least one foster child in the home during the second half of the year. The visitation narratives were reviewed to assess the child's safety and well-being in the placement and ensure appropriate services are provided.

66

There were 351 worker-foster parent contacts required, of which 222 (63.2 percent) occurred during the period under review. One hundred and eighty-nine (53.8 percent) of the contacts met the quality standards of the 2nd MSA.

Overall, the monitoring team found that narratives lacked detail about visitation, and at times, any information at all. There were cases where the caseworker never discussed the child's or foster parent's needs. In one case, a foster parent voiced concerns about the foster child's behavior; however, there was no evidence MDCPS conducted a safety assessment or active planning to address the concern.

## Developing and Maintaining Connections

*Child-Parent Contacts within 72 Hours of Placement (5.2.a.)*

The 2nd MSA requires MDCPS to arrange contact for the foster child with his/her parents and with any siblings not in the same placement within 72 hours of foster care placement unless there are documented reasons why contact should not occur. If MDCPS cannot arrange a visit within 72 hours, a telephone call to parents, siblings, or extended family members must be provided to the child.

MDCPS completed a review of children relevant to this commitment in 2019 as part of the FCR. The Department reviewed 1,444 cases and reported 820 (56.8 percent) met the terms of this commitment. In some instances, the Department reviewers recorded inaccurate dates, answered questions incorrectly, and asserted compliance due to "maintaining family connections" when the child was placed with a relative instead of visiting with parents as is required by this commitment.

The monitoring team reviewed the case narratives for 270 children who entered custody in 2019. The team found 21 (7.7 percent) children had a documented reason why a visit should not occur. Of the remaining 249 children reviewed, the team found 57 (22.9 percent) children had a visit with their parent within 72 hours of their removal. In the absence of a 72-hour visit there was no documentation of phone calls between parents and children found in case narratives for the remainder of the 192 children.

The monitoring team reviewed 81 children who had at least one sibling in a separate placement and 15 (18.5 percent) had a visit with their sibling(s) within 72 hours of their removal. In the absence of a 72-hour visit there was no documentation of telephone contact between siblings found in case narratives for the remaining 66 children.

*Family Visitation Plan and Parent Contacts (5.2.b., 5.2.b.1., 5.2.b.1.a.)*

For children entering foster care, a visitation plan for the child and his/her family shall be developed as part of the Family Service Plan. The visitation plan shall be developed and regularly updated in collaboration with parents, foster parents, and the child (5.2.b.).

MDCPS reported on this commitment through the FCR and determined that 2,909 (54.6 percent) of 5,331 cases reviewed met the terms of this commitment. The monitoring team reviewed visitation plans for 272 children who were removed from their parent(s) in the first half of 2019 and were subject to this commitment. There was a visitation plan for the child and his/her family developed as part of the Family Service Plan for 258 (94.9 percent) of the children. The plan was developed in collaboration with the parents in 180 (66.2 percent) of the cases. The foster parents were part of the development in 70 (25.7 percent) of the cases. The plan was developed with both the parents and the foster parents in 68 (25.0 percent) of the cases. In 76 (27.9 percent) of the cases, there was no indication that any person, other than MDCPS staff, was involved in the development of the visitation plan.

If parental visitation is appropriate, this visitation plan shall include a minimum of two visits each month with the parents, unless the court order in the child's case limits such visits or unless it is documented that a parent failed to make himself or herself available for visits (5.2.b.1.).

MDCPS reported on this commitment through the FCR and determined that 2,687 (77.1 percent) of 3,486 cases reviewed met the terms of this commitment. The monitoring team reviewed visitation plans for 136 children and found 101 (74.3 percent) included a minimum of two visits each month with the parents. The Family Service Plan or court order limited such visits in four cases (2.9 percent).

The 2nd MSA requires that by January 1, 2019, 90 percent of children shall be provided with contacts with their parents (5.2.b.1.a.). MDCPS did not submit quantitative data or conduct a qualitative review of parent-child visitation during 2019. Therefore, the monitoring team is unable to assess MDCPS' performance.

*Sibling Contacts (5.2.b.2., 5.2.b.2.a., 5.2.b.3., 5.2.b.4.)*

MDCPS committed that a child's visitation plan, regardless of permanency goal, shall include at least monthly visits with any siblings not in the same placement (5.2.b.2.).

MDCPS reported on this commitment through the FCR and determined that of 2,366 cases reviewed, 925 (39.1 percent) met the terms of this commitment. The monitoring team reviewed visitation plans for 132 children who were in the custody of MDCPS during the second half of 2019 and subject to this commitment. There were visitation plans for the child and his/her siblings developed as part of the Family Service Plan for 89 (67.4 percent) of the children.

68

MDCPS committed, by January 1, 2019, 80 percent of children shall be provided with contact with any siblings in custody not in the same placement consistent with 2nd MSA requirements (5.2.b.2.a.). Requirements include that all reasonable efforts shall be made to facilitate twice monthly in-person visits for children six years of age and younger, while all other children shall have at least monthly visits among separated siblings. Additionally, siblings shall have interim contact by alternative means such as email, texts, telephone calls, Facetime, and/or Skype (5.2.b.3.). Exceptions to the sibling visitation requirement are:

- the child or sibling is placed out-of-state pursuant to ICPC;

- the visit may be harmful to one or more of the siblings as determined by the court or documented in the record why the visit would be harmful to one or more of the children; or

- one of the siblings is above the age of 14 and refuses such visits and the reason for such refusal is documented in the case record (5.2.b.4.).

MDCPS did not submit quantitative data or conduct a qualitative review of sibling visitation during 2019. Therefore, the monitoring team is unable to assess MDCPS' performance.

*Cancellation of Visits (5.2.c.)*

The 2nd MSA requires MDCPS and its contracting agencies to implement a policy that prohibits cancellation of visits as a form of discipline against children. MDCPS reported that the agency continues to abide by a policy established in November 2017 that prohibits the cancellation of visits as a form of discipline for children in custody. MDCPS also includes this requirement in the scope of services for provider contracts. MDCPS reported that there were no instances of the policy being violated in calendar year 2019. In addition, the monitoring team reviewed thousands of case records in preparation of this report and did not learn through the reviews of any instance of cancellation of visits as a form of punishment occurring in 2019. *Pursuant to commitment 10.1. of the 2nd MSA, performance during the period makes this commitment eligible to move to the "To Be Maintained" designation, pending agreement of the parties.*

# 6. Child and Youth Permanency

## Comprehensive Family Service Plans

*Comprehensive Family Service Plans (6.1.a.)*

The 2nd MSA requires that a comprehensive Family Service Plan (FSP) that addresses the strengths, needs, and services required for both the child and their parent(s) shall be completed within 45 days of a child's entry into foster care. In developing the FSP, the MDCPS caseworker

must consult with the child, the child's parents, and the foster care provider. MDCPS committed that by January 1, 2019 at least 90 percent of FSPs will be submitted by the caseworker consistent with 2nd MSA requirements, within 30 calendar days of a child's entry into custody and approved by the supervisor within 15 calendar days. The FSP shall be considered complete upon documented supervisory review and approval.

Data provided by MDCPS indicate there were 2,223 children who entered custody between January 1, 2019 and December 31, 2019 whose 45th day in custody fell during the year. Of the 2,223 FSPs due during the period, 1,313 (59.1 percent) were completed within 30 days of a child's entry into foster care and 2,090 (94.0 percent) were approved within 15 days. A total of 1,676 (75.4 percent) of the 2,223 FSPs due during the period were submitted and approved within 45 days.

MDCPS also reported qualitatively on this commitment through the FCR. The Department reviewed 1,460 cases and reported 643 (44.0 percent) met the terms of this commitment. The monitoring team reviewed a randomly selected sample of 134 initial FSPs completed during the period to assess whether the plans were developed in accordance with 2nd MSA requirements. The monitoring team found that 65 (48.5 percent) of the FSPs in the sample were developed in consultation with the child's parents or the foster care provider. Only 11 of the plans reflected consultation with an age-appropriate child during development of the initial FSP. There is no indication any person was involved, other than MDCPS staff, in the development of 66 (49.3 percent) of the plans. As such, strengths, needs, and services for parents and children could not be evaluated in these instances.

*Parents' Inclusion in Service Planning (6.1.b.)*

The 2nd MSA provides that in instances in which it is impossible to meet with one or both parents, the service planning process will proceed as described above, notwithstanding the parent's absence.

MDCPS did not submit quantitative data or conduct a qualitative review of this commitment during 2019. Therefore, the monitoring team is unable to assess MDCPS' performance.

*Diligent Search for Parents (6.1.c.)*

MDCPS committed that in those cases in which the whereabouts of one or both parents are unknown, MDCPS shall, within 30 days, institute a diligent search for the parent(s) and document the search in the child's case record. MDCPS committed to a performance standard of 90 percent by January 1, 2019.

MDCPS reported on this commitment through the FCR and determined that 324 (21.1 percent) of 1,535 cases reviewed met the terms of this commitment. The FCR findings provided by the Department included multiple cases where MDCPS subsequently indicated "no diligent searches were completed" because the whereabouts of the parent(s) was (were) known despite the initial reviewer noting that the whereabouts of the parent(s) was (were) unknown. MDCPS indicated the agency will work to develop staff performance in order to accurately report the Department's performance moving forward. As such, the monitoring team was unable to validate MDCPS' performance for 2019.

*Permanency Plans (6.1.d.)*

The 2nd MSA requires that within 45 days of a child's initial placement into foster care, MDCPS shall complete a permanency plan that specifies the child's permanency goal, a timeframe for achieving permanency, and activities that support permanency. MDCPS committed that by January 1, 2019 for at least 90 percent of children who enter custody, permanency plans will be submitted within 30 calendar days of a child's entry into custody by the caseworker consistent with 2nd MSA requirements and approved by the supervisor within 15 calendar days. The permanency plan shall be considered complete upon documented supervisory review and approval.

The monitoring team validated there were 2,223 children who entered custody between January 1, 2019 and December 31, 2019 whose 45th day in custody fell during the period. Of the 2,223 permanency plans due during the period, 1,249 (56.2 percent) were completed within 30 days of a child's entry into foster care and 2,107 (94.8 percent) were approved within 15 days. A total of 1,670 (75.1 percent) of the 2,223 permanency plans due during the period were submitted and approved within 45 days.

MDCPS also reported qualitatively on this commitment through the FCR. The Department reviewed 1,460 cases and reported 1,146 (78.5 percent) met the terms of this commitment. The monitoring team reviewed a randomly selected sample of 134 initial FSPs completed during the period to assess whether the FSPs were developed in accordance with the 2nd MSA requirements, inclusive of a permanency plan. The monitoring team found that 130 (97.0 percent) of the FSPs in the sample contained a permanency plan that stated the child's permanency goal, as required. Of the 130 FSPs containing a permanency plan with a stated goal, 128 (98.5 percent) plans included a timeframe for achieving permanency. Of the 134 FSPs reviewed, 89 (66.4 percent) indicated activities that support permanency. A total of 87 (64.9 percent) of the initial FSPs contained a permanency plan that stated the child's permanency goal, a timeframe for achieving permanency, and activities that support permanency.

## Concurrent Permanency Planning

*Concurrent Permanency Planning (6.2.a.)*

MDCPS agreed within the first six months of a child's entry into care, to begin to engage in concurrent permanency planning. MDCPS committed that at least 95 percent of children in custody with the goal of reunification shall have case record documentation reflecting active concurrent permanency planning consistent with 2nd MSA requirements.

The monitoring team analyzed data provided by MDCPS and determined there were 1,753 children subject to this commitment during the period. Of these 1,753 children with a permanency plan of reunification, 1,752 (99.9 percent) had a concurrent plan assigned at six months. MDCPS reported on the qualitative component of this commitment through the FCR and determined that 2,083 (56.3 percent) of 3,702 cases reviewed had case record documentation reflecting active concurrent permanency planning consistent with 2nd MSA requirements.

The monitoring team reviewed FSPs completed during the period for a randomly selected sample of 173 children with a goal of reunification to assess whether the plans included any documentation of a concurrent permanency goal or active concurrent permanency planning. The monitoring team found that all 173 (100.0 percent) of the FSPs in the sample included documentation of a concurrent permanency planning goal, of which 136 (78.6 percent) contained evidence of active concurrent permanency planning.

## Reunification and Trial Home Visitation

*Reunification (6.3.a.1.)*

The 2nd MSA requires when a child's permanency goal is reunification that MDCPS identify in the FSP and make available, directly or through referral, those services MDCPS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care and to help the parents develop strategies to facilitate permanency for the child. Caseworkers must monitor the provision of services through visits and updating of service plans. MDCPS committed to a performance standard of 90 percent by January 1, 2019.

MDCPS combined data reporting for 6.3.a.1., 6.3.a.2., and 6.3.a.3. in the FCR; however, the FCR question only pertained to 6.3.a.2. MDCPS did not report performance specific to the requirements of 6.3.a.1 for 2019. Therefore, the monitoring team is unable to assess MDCPS' performance. MDCPS has enhanced reporting for the 2020 CQI plan to include a question to assess this commitment.

*Caseworker Contact with Parents (6.3.a.2.)*

For a child with a permanency goal of reunification, MDCPS committed to have the child's caseworker meet with the child's parent(s) with whom the child is to be reunified at least monthly to assess service delivery and achievement of service goals, to keep the family informed and involved in decisions about the child, and to remain current about the family's circumstances. See Section 5.1.c. for this analysis.

*Reunification Supports for Parents (6.3.a.3.)*

MDCPS committed in the 2nd MSA to document in the case record of children with a permanency goal of reunification, opportunities provided to their parents in support of reunification.

MDCPS combined data reporting for 6.3.a.1., 6.3.a.2., and 6.3.a.3. in the FCR; however, the FCR question only pertained to 6.3.a.3. MDCPS did not report performance specific to the requirements of 6.3.a.1 for 2019. Therefore, the monitoring team is unable to assess MDCPS' performance. MDCPS has enhanced reporting for the 2020 CQI plan to include a question to assess this commitment.

*After-Care Plans (6.3.a.4.)*

The 2nd MSA requires that when a recommendation is made to reunify a child with his or her family, MDCPS must develop an after-care plan that identifies services necessary to ensure that the conditions leading to the child's placement have been addressed, and that the child's safety and stability can be assured. MDCPS is also required to take reasonable steps to provide or facilitate access to services necessary to support the child during the trial home visit (THV).

MDCPS reported on this commitment through the FCR and determined that 375 (52.3 percent) of 717 cases reviewed met the terms of this commitment. The monitoring team reviewed the case records of 62 children whose parent(s) had full custody restored in 2019 to determine if the children had after-care plans consistent with the 2nd MSA. Thirty-three of the children (53.2 percent) had an after-care plan developed with the family. Twenty (32.3 percent) of the after-care plans identified and documented reasonable efforts to provide or facilitate access to services necessary to ensure the child's safety and stability during the THV, and that the conditions leading to the child's placement had been addressed.

*Trial Home Visits (6.3.a.5.)*

The 2nd MSA provides that for each child who has a permanency goal of reunification and who is in fact returned home for the purpose of reunification, MDCPS will provide that child with a 90-day THV if the child has been in custody for at least 90 days, subject to the approval of the Youth Court.

MDCPS committed that by January 1, 2019, at least 90 percent of foster children who are reunified and who were in custody longer than 90 days would receive a 90-day THV period or have case record documentation reflecting the Youth Court's objection to such a THV. During the THV, MDCPS must provide or facilitate access to the services in the child's after-care plan, consistent with the 2nd MSA requirements.

MDCPS' count of children with a THV was not limited to children who had a goal of reunification and was not limited to THVs that lasted 90 days or more. Likewise, MDCPS' count of children with a THV with Youth Court approval was not limited to children with a goal of reunification who had a THV that lasted 90 days or longer.

Although MDCPS' data for this commitment cannot be validated, the monitoring team conducted a review of child safety and stability on THVs, which is detailed below.

*Monitoring Team Review of Child Safety and Stability on Trial Home Visits (5.1.b., 6.3.a.4., 6.3.a.6.)*

In order to assess that the child's safety and stability was assured during the THV, as required under Sections 5.1.b. and 6.3.a.4., the monitoring team reviewed caseworker visitation and maltreatment investigations during THVs in 2019.

The monitoring team reviewed the case records of 62 children who had a THV and were reunified with their parents in 2019 to determine if the children had monthly visits with a worker while on a THV, consistent with the 2nd MSA. Thirty (48.4 percent) of the case records had documentation of two visits with a worker in the home each month during which the child's safety and well-being, service delivery, and achievement of permanency and other service goals were assessed.

The monitoring team also reviewed ANE investigations into alleged maltreatment of children during their THVs. MDCPS conducted 66 investigations into allegations of abuse or neglect of children during their THVs. Sixteen of these investigations, involving 32 child victims, were substantiated for abuse, neglect, or exploitation by the parent or caregiver. The maltreatment of these 32 children during a THV is in addition to the 87 children who were determined to be maltreated in care under the CFSR Round 2 definition discussed in Section 2.9. Examples of substantiated and unsubstantiated MIC investigations conducted during children's placements in THVs include:

- A six-year-old child was on a THV with his primary caregiver for seven months. There were two other children, ages two and three, in the home who were not in MDCPS' custody. Allegations were made that the caregiver was using drugs, and that she was unable to meet the basic needs of the children. During the investigation, the children reported sleeping in various homes with unknown adults. School records confirmed that the 6-

year-old was frequently absent or tardy. Interviews with the landlord, school, and daycare staff indicated that the children were frequently dirty, did not have adequate clothing, and they were left in the care of various individuals, who often appeared to be under the influence. The caregiver tested positive for methamphetamines. Physical neglect was substantiated and the 6-year-old was placed back into a relative foster home. The CPS investigator noted concerns that the primary caregiver had not been receiving recommended services relative to substance abuse and domestic violence during the THV period.

- A 17-year-old on a THV was observed with red marks and scratches on her neck, that she reported were the result of being choked by her mother. There was violence in the household, the mother and teenagers often became physically aggressive when angry. The youth's 15-year-old sister had threatened to kill everyone in the home and to beat the younger children, ages ten and one. When the 15-year-old got into a fight with one of her sisters, her mother held her down by her neck, choking her. The mother was substantiated for physical abuse of the two teenagers. The 17-year-old remained in the home with services provided and the 15-year-old was placed in a residential placement for one week before returning home.

- An eight-year-old had been on a THV with his mother for six months. There were three other children in the home, ages ten, six, and five, who were not in MDCPS' custody. Allegations were made that the mother was using drugs and was not providing adequate care for her children. The CPS investigator identified multiple, very serious concerns in the home. These included that the children did not have safe sleep spaces, the home was cluttered with hazardous materials, and the home was infested by insects. The home was described as "deplorable" and "unlivable" by investigators. The children had unmet medical and hygiene needs – including the eight-year-old who had a buildup of wax in his ear obstructing the ear drum. Two of the children not in custody had abnormally high levels of lead in their bloodstream. Additionally, two of the children were exposed to pornography by an adult male. Physical neglect by the mother was substantiated, and the eight-year-old was returned to a relative foster home. The other three children were also taken into MDCPS' custody. The child's caseworker had documented a visit in the home nine days before the referral and did not note any concerns.

- Two children, ages two and four, had been on a THV with their mother for two months. Law Enforcement was called to the home for a domestic violence incident. The stepfather had a knife and attacked the mother who had cuts on her arms and legs. The mother broke the windshield of the family car and cut all four tires. She has an extensive history of mental health challenges but was not taking medication. The investigator described the home as being in "deplorable" condition. In addition, there were small objects

covering the floor that could present a choking hazard for the young children. Physical neglect was substantiated and the children were placed back into a relative foster home.

- Three-year-old autistic twins and their two-year-old sibling had been on a THV with their mother for three months. Allegations were made that a driver almost ran over one of the twins who was standing in the middle of a highway. The mother and two other adults came running out when they heard the commotion. Physical neglect was unsubstantiated. However, in a separate incident during this MIC investigation, the two-year-old was hit by a car, prompting the removal of the children from their mother's care.

- Two children, ages two and four, had been on a THV with their father for three months. The father also cared for two children of his girlfriend, ages two and six, who resided in the home. The children were playing with a lighter and set fire to a pair of underwear on bedding which then caught fire while the father was in his bedroom. The six-year-old child of the girlfriend had bruising on his arms with no explanation. The father had left the children unsupervised on several occasions (including leaving them in the middle of night). He had an extensive history of drug usage including cocaine, methamphetamines, and marijuana. MDCPS reported the father's first drug test during the investigation appeared questionable, but the investigation was closed and allegations unsubstantiated prior to obtaining the results of the second drug test.

Additionally, the monitoring team reviewed case records for 62 children who completed THVs and were discharged from custody to determine if MDCPS convened a meeting with the child's parents and the child to determine the appropriateness of a final discharge. Forty-three children's case records (69.4 percent) had documentation of a final parental discharge meeting with the child's parent(s), while 19 children's case records (30.6 percent) lacked documentation that MDCPS had a final discharge meeting. Eleven children's records had documentation of a discharge meeting with age appropriate children. The monitoring team determined that nine children were too young or not developmentally appropriate for discussion. Fifty-two records (83.9 percent) had documentation that the appropriate application was made to the Youth Court for relief of custody. Ten records (16.1 percent) lacked documentation that MDCPS made the appropriate Youth Court relief of custody application.

If final discharge is determined to be appropriate, MDCPS is required to make the appropriate application to the Youth Court to be relieved of custody. The monitoring team's review found that there was documentation that MDCPS met with all appropriate parties and made an

appropriate application to the Youth Court to be relieved of custody in 34 (54.8 percent) case records.

*Final Discharge Meeting (6.3.a.6.)*

The 2nd MSA requires that before the end of any THV period, MDCPS will meet with the child's parents and the child to determine the appropriateness of final discharge. If final discharge is determined to be appropriate, MDCPS shall make the appropriate application to the Youth Court to be relieved of custody.

MDCPS did not submit quantitative data or conduct a qualitative review of final discharge meetings during 2019. Therefore, the monitoring team is unable to assess MDCPS' performance.

# Other Permanency Case Goals

*Adoption (6.3.b.1.)*

The 2nd MSA requires that by January 1, 2019, at least 90 percent of children in custody with the primary permanency goal of adoption shall have an assigned adoption specialist and an adoption plan that identifies the child-specific activities that MDCPS will undertake to achieve adoption.

Relative to the adoption specialist, the monitoring team confirmed that 2,477 (96.0 percent) of 2,580 children with a permanency goal of adoption had an adoption worker assigned.

MDCPS completed a qualitative review of 1,077 children with a permanency goal of adoption. The Department reported that adoption plans for 1,027 children (95.4 percent) were of good quality. The monitoring team reviewed a randomly selected sample of 271 children from MDCPS' CQI review. All but one (99.6 percent) of the children's case records had an adoption worker assigned. All the cases had an adoption plan and 217 (80.1 percent) of the cases identified the child-specific activities that MDPS will undertake to achieve adoption and timeframes in which the activities will be undertaken.

*Termination of Parental Rights (6.3.b.2., 6.3.b.3.)*

MDCPS must make a termination of parental rights (TPR) referral before a child has spent more than 17 of the last 22 months in foster care unless an available exception pursuant to the federal Adoption and Safe Families Act ("ASFA") has been documented by MDCPS in the child's case record. Subsequent to the initial ASFA exception, MDCPS may continue the exception for only one additional six-month period unless continued invocation of the exception is reviewed, approved, and documented semi-annually by the Regional Director assigned to the county of responsibility for the child. MDCPS committed to meet a standard of 80 percent for this commitment by January 1, 2019. (6.3.b.2.).

Data provided by MDCPS indicate that 1,147 children reached 17 of the last 22 months in custody during 2019. Data indicate 516 (45.0 percent) of these children met the terms of the 2nd MSA, having either a timely TPR referral (258) or a timely documented ASFA exception (258).

MDCPS conducted a qualitative review of the 1,147 children subject to this commitment and determined 770 (67.1 percent) met the terms of the 2nd MSA. With respect to these children, MDCPS either made the TPR referral (313) or had a documented ASFA exception (457).

The monitoring team reviewed case records for a randomly selected sample of 68 children subject to this commitment and found 47 (69.1 percent) cases met the terms of the 2nd MSA. With respect to these children, MDCPS either made the TPR referral (40) or had a documented ASFA exception in the electronic record (7).

MDCPS is required to provide the monitor a report of all TPR referrals made during the monitoring period, the date those TPR referrals were made and the date the petition was filed with the court (6.3.b.3.). MDCPS provided data on TPR referrals for 834 children during 2019.

*Post-Adoption Services (6.3.c.)*

MDCPS committed to establish and maintain a system of post-adoptive services to stabilize and support adoptive placements. MDCPS agreed that adoptive families eligible for adoption subsidies must have access to these services, which may include counseling, mental health treatment and crisis intervention, family preservation and stabilization services, and peer support.

MDCPS reported that in SFY2019, 3,833 children were eligible for and received adoption subsidy payments totaling $15,699,474. Consistent with its 2nd MSA commitment, MDCPS continued to fund a statewide post-adoption service contract with a child and family service agency to ensure that eligible families have access to a range of post-adoption services throughout Mississippi. The contract was in effect throughout the calendar year and the provision of post-adoptive services continued throughout the entire monitoring period.[32] The monitoring team reviewed the contract and found the scope of services includes the provision of supportive counseling, mental health treatment and referrals, crisis intervention, family preservation and stabilization services, peer support, and respite services consistent with 2nd MSA requirements. During calendar year 2019, MDCPS reported that 1,436 adoptive families throughout Mississippi accessed the above-mentioned range of post-adoption services.

---

[32] During the monitoring period MDCPS renewed the post adoption services contract that had been initiated during the previous monitoring period. By doing so post adoption services were continued throughout the entire monitoring period. The value of the renewal contract which extends from October 1, 2019 to September 30, 2020 is $751,479.18.

*Durable Legal Custody and Guardianship (6.3.d.1., 6.3.d.2.)*

The parties agreed that the permanency goals of durable legal custody and guardianship may be assigned when there are documented efforts in the child's case record to move the child to adoption and documentation of a reasonable basis why it is in the child's best interests not to be considered for adoption (6.3.d.1.).

The monitoring team reviewed 51 children with the permanency goal of durable legal custody and guardianship as of the end of the third and fourth quarters of 2019 and found there were documented efforts to move the child to adoption and documentation of a reasonable basis why it was in the child's best interest not to be considered for adoption for 51 (100.0 percent) of the children.[33]

When the permanency goals of durable legal custody and guardianship are assigned to a child under the age of 14 years old or living with a non-relative, MDCPS shall provide to the monitor at the end of each monitoring period, information from the child's case record documenting efforts to move the child to adoption and documentation of a reasonable basis why it is in the child's best interests not to be considered for adoption (6.3.d.2.).

MDCPS did not provide case record information to the monitoring team of all children under the age of 14 or living with a non-relative during the period, who were assigned the permanency goals of durable legal custody or guardianship.[34] Therefore, the monitoring team is unable to determine if MDCPS documented efforts to move a child to adoption or otherwise identified a reasonable basis why it was in a child's best interests not to be considered for adoption.

*Another Planned Permanent Living Arrangement (APPLA) (6.3.e.)*

If MDCPS concludes, after considering reunification, adoption, durable legal custody, and permanent placement with a relative, that these permanency plans are inappropriate or unavailable for a child, MDCPS may assign a permanency goal of APPLA for the child. In such circumstances, MDCPS agreed that, (1) the child must be at least 16 years old and (2) MDCPS must document a compelling reason why this permanency goal is in the best interest of the child.

---

[33] MDCPS completed a review of children with the permanency goal of durable legal custody (6.3.d.1.) as part of the FCR but combined the data with children with a permanency goal of APPLA (6.3.e.). The monitoring team also discovered that some children in the data had permanency goals of neither durable legal custody nor APPLA. Therefore, MDCPS did not accurately report durable legal custody FCR results.

[34] The monitoring team received information relative to a portion of the applicable children as part of the request for 6.3.d.1.

79

The monitoring team reviewed a sample of 136 children with the goal of APPLA in 2019.[35] There was a documented compelling reason why the permanency goal was in the best interest of the child for 108 (79.4 percent) children. The remaining 28 (20.6 percent) children were under the age of 16 years old at the time MDCPS assigned the permanency goal of APPLA, contrary to the 2nd MSA.

## Permanency Reviews

*Permanency Plan Reviews (6.4.a.)*

The 2nd MSA requires that a child's permanency plan be reviewed in a court or administrative case review, which may be a foster care review, at least every six months. MDCPS agreed to take all reasonable steps, including written notice, to ensure the participation of the child, parents, caregivers and relevant professionals in court or administrative reviews. MDCPS committed that by January 1, 2019, at least 90 percent of foster children who have been in custody for at least six months shall have a timely court or administrative case review consistent with 2nd MSA requirements. The monitoring team's analysis of data provided by MDCPS concluded that 6,524 children were due for a permanency plan review during the period, of which 5,713 children (87.6 percent) received a timely review.

MDCPS also reported qualitatively on this commitment through the FCR. The Department reviewed 7,454 children's case records and reported 2,778 (37.3 percent) met the terms of this commitment.[36] The monitoring team reviewed a randomly selected sample of 195 Youth Court Hearing and Review Summary reports completed by MDCPS during the period, for children in custody for at least six months, to assess the participants of the permanency reviews. The monitoring team found evidence in the sample of reports that the foster care reviewer (quality assurance coordinator), social worker (caseworker), and social work supervisor (casework supervisor) were listed as being invited to the permanency review in each of the reports. Parents were listed as invited in 134 (68.7 percent) of the reports. Caregivers were listed as invited in 119 (61.0 percent) of the reports. Foster children were listed as invited in 189 (96.9 percent) of the reports. Guardians-ad-litem were listed as invited in 85 (43.5 percent) of the reports. The summary reports also indicated that a caseworker attended 148 (75.8 percent) of the reviews. Parents (23.5 percent), caregivers (49.2 percent), caseworker supervisors (32.8 percent), and the foster child (13.8 percent) each attended less than half of the permanency reviews.

---

[35] MDCPS completed a review of children with the permanency goal of APPLA (6.3.e.) as part of the FCR but combined the data with children with a permanency goal of durable legal custody (6.3.d.1.). The monitoring team also discovered that some children in the data had permanency goals of neither APPLA nor durable legal custody. Therefore, MDCPS did not accurately report APPLA FCR results.

[36] MDCPS' qualitative performance was based on the reviewer finding evidence that written notice was provided to all relevant parties for the FCR.

*Court Reviews (6.4.b.)*

The 2nd MSA also requires MDCPS to take all reasonable steps to ensure that a court review is held for each child in foster care custody within 12 months of the child's initial placement, and annually thereafter. MDCPS committed that by January 1, 2019, the agency would make reasonable efforts to have a timely annual court review scheduled consistent with 2nd MSA requirements for at least 90 percent of foster children who have been in custody for at least 12 months.

MDCPS evaluated this commitment through the FCR in 2019. The Department reviewed 5,352 cases and reported 4,928 (92.1 percent) met the terms of this commitment. The monitoring team reviewed a sample of 204 children with an annual court review due in 2019. MDCPS provided court orders and additional evidence relative to the reasonable steps taken to ensure that timely court reviews occurred for 187 (91.7 percent) of the children.

*Review of Adoption and Safe Families Act (ASFA) Exceptions (6.4.c.)*

MDCPS committed to review documented exceptions pursuant to ASFA for children who have spent more than 17 of the previous 22 months in foster care during the child's foster care review. MDCPS reported on this commitment through the Permanency Support Unit review process, as described under section 6.3.b.2.

## Permanency Performance Indicators

*Permanency Outcomes (6.5.a.)*

The 2nd MSA requires that beginning with federal fiscal year (FFY) 2019 (October 1, 2018 – September 30, 2019), MDCPS must meet performance standards for three permanency indicators, as established by the monitor. The three indicators, as agreed to by MDCPS and the monitor, are as follows:

- Of all children who enter foster care in a 12-month period, what percent discharged to permanency within 12 months of entering foster care? The entry cohort for this indicator will be children who entered care between October 1, 2017 and September 30, 2018.

- Of all children in foster care on the first day of a 12-month period, which shall commence on October 1st of any given year, who had been in care between 12 and 23 months, the percent of children discharged from foster care to permanency within 12 months of the first day of the 12-month period. The cohort for this indicator will be children in care on the first day of October 1, 2018, who had been in care for 12-23 months as of that day.

- Of all children in foster care on the first day of a 12-month period, which shall commence on October 1st of any given year, who had been in care for 24 months or more, the percent of children discharged from foster care to permanency within 12 months of the first day of the 12-month period. The cohort for this indicator will be children in care on the first day of October 1, 2018, who had been in care for 24 months or more as of that day.

The monitor established interim performance standards for MDCPS to meet for FFY2019 regarding these three indicators. The Department achieved the performance standard for each of the permanency outcomes during the reporting period.

**Table 10. Permanency Outcome Performance, FFY2019**

| 2nd MSA Section | Indicator | FFY2019 Performance Standard | MDCPS' FFY2019 Performance |
|---|---|---|---|
| *6.5.a.1* | Permanency for children entering care in a 12-month period | 43.9% | 44.2% |
| *6.5.a.2* | Permanency for children in care for 12-23 months on the first day of a 12-month period | 34.9% | 37.5% |
| *6.5.a.3* | Permanency for children in care for 24 months or more on the first day of a 12-month period | 31.4% | 37.6% |

The monitoring team reviewed case records for a sample of 186 children MDCPS reported achieved permanency timely during the reporting period, and confirmed MDCPS' performance.

*Adoption Outcomes (6.5.c., 6.5.d.)*

The 2nd MSA requires that beginning with FFY2019 (October 1, 2018 – September 30, 2019), MDCPS must meet adoption performance standards, as established by the monitor. The parties agreed that the adoption performance standards must represent a substantial improvement above the certified baseline performance established under the Stipulated Third Remedial Order (STRO).[37]

The monitor established that for FFY2019, the average length of time from the date on which a child's adoption goal was established to adoption finalization shall be 13.6 months and the median shall be 9.0 months, which, if achieved, demonstrate substantial improvement over the certified baseline. Data provided by MDCPS indicate that in FFY2019, the average length of time

---

[37] The Stipulated Third Remedial Order was entered as an order of the Court on December 19, 2016.

from the date on which a child's adoption goal was established to adoption was 28.1 months and the median was 23 months.

During 2019 data validation, the monitoring team determined that the data file MDCPS provided during the Stipulated Third Remedial Order period to establish baseline performance for this commitment (for children adopted during FFY2016) included the date of the child's most recent adoption plan rather than the date the child was initially assigned a permanency goal of adoption, the date needed to calculate baseline performance. As a result, baseline performance did not accurately capture the average and median times from the date on which a child's adoption goal was established to adoption finalization. This issue will be addressed prior to the issuance of the next annual report.

## 7. Transition to Independent Living

*Notification of Cessation of Benefits (7.1.)*

MDCPS is required to provide each youth transitioning to independence with at least six months advance notice of the cessation of any health, financial, or other benefits that will occur at the time of transition. MDCPS conducted a qualitative review of 49 youth who emancipated from care for this commitment and reported that 45 percent of youth received the required advance notice of cessation of health benefits, 47 percent of youth received the required advance notice of cessation of financial benefits, and 40 percent of youth received the required advance notice of cessation of other benefits. [38] MDCPS was not able to provide the monitoring team documentation needed to validate this data.

*Independent Living Service Plans (7.2.)*

MDCPS is required to provide each foster youth age 14 years or older, regardless of his/her permanency plan, an opportunity to participate in the creation of an appropriate Independent Living service plan (ILP) for a successful transition to adulthood. MDCPS completed a qualitative review of this commitment during each quarter of 2019 and reported that 45 percent of youth participated in the creation of their Independent Living service plan. [39] The monitoring team cannot validate the data MDCPS provided for this commitment.

---

[38] Initial data provided by MDCPS for the first half of 2019 was poor in quality. Agreement to review this commitment in relation to the cohort of youth who emancipate from care during each quarter was reached with the monitors in September of 2019. The data provided here is therefore limited to that population of youth as reported by MDCPS.

[39] MDCPS also provided additional raw data regarding participation in the creation of ILPs during the first half of the year. However, the monitoring team and MDCPS agreed to use a sampling method for the measure for the second half of the year. MDCPS therefore did not provide the larger set of quantitative data for the second half of the year. This report provides the qualitative review data only for consistency across the entire year.

*Independent Living Services (7.3.)*

The 2nd MSA provides that each foster youth age 14 years and older will have access to the range of supportive services necessary to support their preparation for and successful transition to adulthood. This includes Independent Living services eligible for federal reimbursement under the Chaffee program, which in part promotes employment or removes barriers to employment. MDCPS must maintain sufficient resources to deliver these services.

The monitoring team requested and MDCPS submitted data on services provided during the period to youth age 14 and older, including Independent Living skills services related to employment, community resources, transportation, communication skills, social development, youth law, money management, self-care, decision making, housing, relationships, and daily living skills. MDCPS does not have a standard curriculum in place for these services and is in the process of developing one. As a result, data reported by MDCPS on this commitment reflects a wide range of services that includes informal conversations between youth and MDCPS staff. MDCPS completed a qualitative review during each quarter of 2019 and reported 100 percent performance with this commitment because all of the cases reviewed each quarter "indicated youth (youth with a documented need) were provided assistance with attaining skills identified in their ILP." However, data provided by MDCPS indicates that no more than one third of eligible youth received services related to any one skill and most services were provided to less than 20 percent of eligible youth.

The raw number and percent of youth who were reported as having participated in the various Independent Living skills services for the first three quarters of 2019 is provided in Table 11. MDCPS initially provided an incorrect data set for the fourth quarter and a corrected data set was not provided. The data shown in Table 11 contain many of the same youth included across quarters. It is unclear if the data reflects whether youth ever received the noted independent living service or whether the service was received during the respective quarter. The monitoring team cannot validate this data because of the data quality issues and the lack of a standard curriculum for these services. However, the data provided indicates that a very small proportion of eligible youth received Independent Living skills services in 2019.

84

**Table 11. Youth Receiving Independent Living Skills, 2019**

| Skill | Q1 *Youth participants receiving skill services (N=996)* | | Q2 *Youth participants receiving skill services (N=919)* | | Q3 *Youth participants receiving skill services (N=790)* | |
|---|---|---|---|---|---|---|
| | Count | Percent | Count | Percent | Count | Percent |
| Employment | 180 | 18% | 272 | 30% | 127 | 16% |
| Community Resources | 157 | 16% | 174 | 19% | 80 | 10% |
| Transportation | 150 | 15% | 193 | 21% | 85 | 11% |
| Communication Skills | 198 | 20% | 255 | 28% | 160 | 20% |
| Social Development | 170 | 17% | 214 | 23% | 158 | 20% |
| Youth Law | 112 | 11% | 113 | 12% | 56 | 7% |
| Money Management | 181 | 18% | 225 | 24% | 136 | 17% |
| Self-Care | 193 | 19% | 245 | 27% | 133 | 17% |
| Decision Making | 250 | 25% | 304 | 33% | 156 | 20% |
| Housing | 149 | 15% | 170 | 18% | 96 | 12% |
| Relationships | 186 | 19% | 235 | 26% | 127 | 16% |
| Daily Living Skills | 176 | 18% | 233 | 25% | 144 | 18% |
| No services documented | 603 | 61% | 402 | 44% | 419 | 53% |

*Medical Coverage (7.4.)*

The 2nd MSA requires MDCPS to implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond are enrolled for Medicaid coverage so that their coverage continues without interruption at the time of emancipation. MDCPS provided its Medicaid Coverage policy[40] to the monitoring team. The policy states MDCPS is responsible to ensure that "[c]ontinued Medicaid coverage is certified by the Division of Medicaid in coordination with the DCPS."[41] MDCPS also reported that:

"The (MDCPS) Division of Eligibility transmits a file to Medicaid monthly with the following information: Foster Care Medicaid (Yes or No), Foster Care Medicaid expiration date, Extended Medicaid start date, file transmitted to Medicaid (Yes or No) and type of Medicaid coverage. The automatic file transmission verifies that Medicaid receives the information above electronically each month. There is no way for MDCPS to verify continuation of Medicaid coverage after a youth is released from custody. Transmitting the electronic file ensure [sic] Medicaid is properly notified when a youth has exited custody. Youth who received Foster

---

[40] This policy is contained in section 8.3 of the Youth Transition Support Services Policy that was issued on October 30, 2018.
[41] The policy cross references Part 101 of the Medicaid Administrative Code for instructions on how to apply for continuation of coverage, provides a link to determine Medicaid Region, and includes contact information for the Mississippi Department of Medicaid.

Care Medicaid and exited custody at age 18 are automatically enrolled in Extended Foster Care Medicaid. Youth who were not eligible for Foster Care Medicaid and receive another type of medical coverage while in care are eligible to apply [sic] Extended Foster Care Medicaid when he/she is release[d] to emancipation at age 18."

MDCPS conducted a qualitative review regarding the transmission of files to Medicaid for 34 youth who exited care to emancipation during the second half of 2019 and reported that files had been transmitted to Medicaid for 26 (76.5 percent) of the youth.[42] MDCPS did not provide the monitoring team with any documentation of file transmission to Medicaid so the monitoring team cannot validate this commitment.

*Start-Up Stipends (7.5.)*

MDCPS must implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond receive a start-up stipend of at least $1,000.00 at the time of emancipation, or as soon as practicable thereafter.

MDCPS policy provides that "[a] Start-Up Stipend is available to youth who leave care after turning age sixteen (16) and who have participated in the available ILP activities. The youth must have been in care for a minimum of six (6) months." The policy also allows for youth to apply for this stipend six months prior to or following release from custody.

MDCPS reported on receipt of a start-up stipend for 69 youth who exited custody to emancipation between January 1, 2019 and September 24, 2019. This reporting period allowed for inclusion of any youth who may have received a start-up stipend up to six months following exit from care. MDCPS reported that 54 percent of the 69 youth received a start-up stipend. MDCPS agreed to provide data for this commitment to the monitoring team by April 30, 2020, however, MDCPS did not submit the data timely. As such, the monitoring team did not have adequate time to independently validate the data for this report.

*Housing Resource Specialists (7.6.)*

MDCPS is required to implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond have access to a housing resource specialist responsible for assisting the youth to obtain an adequate living arrangement.

MDCPS reported on qualitative reviews that included review of the youth appraisal and the Youth Transition Support Services referral form process. MDCPS reports 100 percent compliance with

---

[42] MDCPS noted that one file was not transmitted because the youth had Medicaid through SSI and that the remaining files would be timely transmitted to Medicaid.

this measure because all youth reviewed who indicated a need for a housing resource specialist in either of those documents did access a housing resource specialist. However, MDCPS provided data on 34 of the 35 youth who emancipated from care during the second half of 2019 and reported that eight youth indicated a need for a housing resource specialist and only six (75.0 percent) of those youth accessed a housing resource specialist.[43]

The monitoring team conducted a qualitative review of 33 of the 35 youth who emancipated from care during the third and fourth quarters of 2019.[44] This review found that 16 youth needed access to a housing resource specialist and seven (43.8 percent) of those youth accessed support in obtaining housing. There was no evidence that supportive housing services were provided for many youth emancipating from care. However, in these cases the worker documented ongoing comments from youth about their need to find housing prior to their emancipation from care. For example:

- In the case of a youth who emancipated from care on their 21st birthday, the youth appraisal noted a need for housing assistance and the case narrative notes documented the youth's desire for an apartment for several months prior to emancipation. There was no documentation that the youth ever received assistance from MDCPS in finding housing.

- Case narrative notes documented a 17-year-old youth's ongoing desire to live with his brother who resided in another state and the youth's regular inquiry into the progress of the Interstate Compact on the Placement of Children (ICPC) process over several months prior to turning 18. The ICPC process was never completed and the youth ran away from care the day after the youth turned 18.

- In the case of an unaccompanied refugee minor, case narrative notes documented the youth's need for housing for several months prior to emancipation from care, but there was no documentation that the youth ever received assistance from MDCPS in finding housing.

- A youth ran away from MDCPS care, stating multiple times that he/she did not want to return to a foster home or a group home. There were no documented efforts to support the youth in finding housing and the youth was released from custody after being on runaway status for nearly a year.

---

[43] Data quality during the first half of 2019 was poor and the monitoring team and MDCPS agreed to review youth who emancipated from care during each quarter for the second half of 2019.

[44] The review included MACWIS case narratives, Independent Living Services Plans, and any youth appraisals provided to the monitoring team by MDCPS. Files for two youth who emancipated from care during the second half of 2019 were locked. Therefore, the monitoring team reviewed cases of 33 of the 35 youth who emancipated from care in the second half of 2019.

*State Educational Training and Vocational (ETV) Program (7.7.)*

MDCPS must continue to implement policies and processes which ensure that youth emancipating from the foster care system at age 18 or beyond receive services and support under the State Educational Training and Vocational (ETV) Program for which they are eligible. MDCPS reported that 164 youth received an ETV in the 2018/2019 school year. This included 67 youth who were newly determined eligible to participate in the program. This is the largest number of youth served since the beginning of the ETV program. *Pursuant to commitment 10.1. of the 2nd MSA, performance during the period makes this commitment eligible to move to the "To Be Maintained" designation, pending agreement of the parties.*

*Identification and Essential Documentation (7.8.)*

MDCPS committed to assist youth in obtaining or compiling the following documents and such efforts shall be documented in the child's case record:

- educational records, such as a high school diploma or general equivalency diploma, and a list of schools attended, when age-appropriate;

- a social security or social insurance number;

- a resume, when work experience can be described;

- a driver's license, when the ability to drive is a goal; if not a driver's license, then a state-issued photo identification;

- an original or certified copy of the youth's birth certificate;

- previous placement information;

- documentation of immigration, citizenship, or naturalization, when applicable;

- documentation of tribal eligibility or membership;

- death certificates when parents are deceased;

- a life book or compilation of personal history and photographs, as appropriate; and

- a list of known relatives, with relationships, addresses, telephone numbers, and permissions for contacting involved parties.

MDCPS conducted a qualitative review of youth who emancipated from care during each quarter to determine performance for this commitment.[45] The monitoring team conducted a qualitative

---

[45] At times, MDCPS' qualitative review included youth who emancipated from care outside of the period under review. The data in Table 12 reflects only the information provided by MDCPS for youth who emancipated from care during the relevant period.

review of this commitment of 33 of the 35 youth who emancipated from care during the second half of 2019,[46] by reviewing MACWIS and/or a completed youth appraisal. Table 12 details the number and percent of youth for whom the relevant documentation was obtained or compiled as determined in both reviews. Worker documentation of citizenship and immigration and parent death certificates is often absent, raising questions about the reliability of the data for these commitments. It is often not clear if these commitments do or do not apply to specific children.

**Table 12. Youth Receiving Identification and Essential Documentation, 2019**

| Documentation | MDCPS Emancipated youth receiving documentation (N=63) | | Monitor Emancipated youth receiving documentation (N=33) | |
|---|---|---|---|---|
| | Count | Percent | Count | Percent |
| Education Records (7.8.a.) | 26 | 41.3% | 17 | 51.5% |
| Social Security Card (7.8.b.) | 30 | 47.6% | 17 | 51.5% |
| Resume (7.8.c.) | 4 | 6.3% | 4 | 12.9% |
| Driver's License/State ID (7.8.d.) | 17 | 27.0% | 17 | 51.5% |
| Birth Certificate (7.8.e.) | 26 | 41.3% | 14 | 43.8% |
| Previous Placement Information (7.8.f.) | 23 | 36.5% | 8 | 25.9% |
| Citizenship/Immigration Records (7.8.g.) | 2 of 12 | 16.7% | 3 of 19 | 15.8% |
| Tribal Eligibility (7.8.h.) | 2 of 14 | 14.3% | 0 of 1 | 0.0% |
| Parent Death Certificate (7.8.i.) | 0 of 11 | 0.0% | 1 of 5 | 20.0% |
| Life Book/History (7.8.j.) | 18 | 28.6% | 5 | 15.1% |
| Known Relatives List (7.8.k.) | 22 | 34.9% | 13 | 39.4% |

# 8. Child Well-Being

## Physical and Mental Health Care

*Initial Medical Screenings (8.1.a.)*

MDCPS agreed that by July 1, 2018 at least 70 percent of children shall have an initial medical screening within seven days of the child's entry into foster care (8.1.a.1.). MDCPS conducted a quantitative review of 1,050 children with an initial medical screening due in the first half of 2019

---

[46] MDCPS provided a broad set of data on this commitment for the first half of the year and included youth for whom this commitment did not apply during the period under review. The monitoring team and MDCPS agreed, in September of 2019, to include only youth who emancipated from care during the period of review in the reporting and monitoring of this commitment. The data provided here is therefore limited to youth who emancipated from care during the period under review and the validation by the monitoring team includes only youth who emancipated from care during the second half of 2019. Files for two of those youth were locked. Therefore, the monitoring team reviewed cases of 33 youth who emancipated from care in the second half of 2019.

and found that 71 percent of those children received a timely initial medical screening.[47] The monitoring team conducted a quantitative review of 1,151 children with an initial medical screening due in the first half of 2019 and found that 76 percent of those children had documentation of a timely initial medical screening.

MDCPS agreed that by July 1, 2019 at least 80 percent of children shall have an initial medical screening within seven days of the child's entry into foster care (8.1.a.2.). MDCPS conducted a quantitative review of 1,046 youth with an initial medical screening due in the second half of 2019 and found that 72 percent of those children received a timely initial medical screening. The monitoring team conducted a quantitative review of 1,221 children with an initial medical screening due in the second half of 2019 and found that 72 percent of those children had documentation of a timely initial medical screening.

MDCPS conducted a qualitative review of children who entered care during 2019. The qualitative review should have been based on children for whom an initial medical screening was due in 2019 as some children who entered care just prior to 2019 were due for an initial medical screening in 2019. The MDCPS qualitative review is, therefore, invalid. The monitoring team attempted to conduct a qualitative review using quantitative review data of children with an initial medical screening due during the second half of 2019. That qualitative review focused on locating MACWIS documentation of a timely initial medical exam, with some substantive information regarding the health of the child in order to ascertain if the child's medical needs were being met. This review surfaced several problems, including an absence of any substantive documentation regarding the child's health or necessary follow up care, documentation that only reflected travel and did not include any information regarding the health of the child, and the same appointment listed multiple times with different labels. As a result, the monitoring team was not able to validate MDCPS performance on this commitment. The monitoring team will continue to review this commitment qualitatively in 2020 by looking for information on the health needs of children and whether or not those needs have been met.

*Comprehensive Medical Exams (8.1.b.)*

MDCPS agreed that by July 1, 2018 at least 70 percent of children shall have an initial EPSDT or other comprehensive medical examination within 60 days of the child's entry into foster care (8.1.b.1.). MDCPS conducted a quantitative review of 4,516 children who were due for a comprehensive medical exam during the first half of 2019 and found that 71 percent of those children had a timely comprehensive medical exam. The monitoring team conducted a quantitative review of 1,040 children with a comprehensive medical exam due in the first half of

---

[47] MDCPS' quantitative review of all medical commitments (8.1.a., 8.1.b., and 8.1.e.) is based on data pulled from MACWIS on medical appointments entered by workers. Capacity to retrieve this data is dependent on the worker entering in the medical tab the date of service, type of appointment, and doctor seen.

2019 and found that 78 percent of those children had documentation of a timely comprehensive medical exam.

MDCPS agreed that by July 1, 2019 at least 80 percent of children shall have an initial EPSDT or other comprehensive medical examination within 60 days of the child's entry into foster care (8.1.b.2.). MDCPS conducted a quantitative review of 7,634[48] children who were due for a comprehensive medical exam during the second half of 2019 and found that 74 percent of those children received a timely comprehensive medical exam. The monitoring team conducted a quantitative review of 1,128 children with a comprehensive medical exam due in the second half of 2019 and found that 76 percent of those children had documentation of a timely comprehensive medical exam.

MDCPS conducted a qualitative review of children who entered care during 2019. The qualitative review should have been based on children for whom an initial EPSDT or comprehensive medical exam was due in 2019 as some children who entered care prior to 2019 were due for an initial EPSDT or other comprehensive medical exam in 2019. The MDCPS qualitative review is, therefore, invalid. The monitoring team attempted to conduct a qualitative review using quantitative review data of children with an initial EPSDT or comprehensive medical exam due during the second half of 2019. That qualitative review focused on locating MACWIS documentation of a timely initial EPSDT or other comprehensive medical exam, with some substantive information regarding the health of the child in order to ascertain if the child's medical needs were being met. This review surfaced several problems, including an absence of any substantive documentation regarding the child's health or necessary follow up care, documentation that only reflected travel and did not include any information regarding the health of the child, and the same appointment listed multiple times with different labels. As a result, the monitoring team was not able to validate MDCPS performance on this commitment. The monitoring team will continue to review this commitment qualitatively in 2020 by looking for information on the health needs of children and whether or not those needs have been met.

*Periodic and Ongoing Medical Exams (8.1.c.)*

The 2nd MSA requires that following an initial EPSDT or other comprehensive medical examination, children shall receive periodic and on-going medical examinations according to the periodicity schedule set forth by the EPSDT program. The 2nd MSA calls for the monitor to set a performance standard for MDCPS to meet by July 1, 2019. The monitor established a performance standard of 45 percent. MDCPS did not have a process in place to track these exams

---

[48] MDCPS data included children who entered care as early as January 2, 2018 and hundreds of duplicated child records. It is unclear how MDCPS calculated summary performance with this commitment during the period from these data.

for children in custody in 2019 and did not report on this commitment. Therefore, the monitoring team is unable to assess MDCPS' performance.

*Follow-up Treatment (8.1.d.)*

MDCPS agreed that by July 1, 2018 at least 60 percent of children shall receive recommended follow-up treatment throughout the time they are in foster care (8.1.d.2.). MDCPS agreed that by July 1, 2019, 90 percent of children shall receive recommended follow-up treatment throughout the time they are in foster care (8.1.d.3.). MDCPS conducted a qualitative review on follow-up care for children who entered care during 2019. However, MDCPS did not have a process in place to track follow-up care for the rest of children in care in 2019 and did not report on all children subject to this commitment. Therefore, the monitoring team is unable to assess MDCPS' performance.

*Dental Exams (8.1.e.)*

MDCPS agreed that by July 1, 2018 at least 60 percent of children shall have a dental examination within 90 days of the child's entry into foster care (8.1.e.1.).[49] MDCPS conducted a quantitative review of 665 children to determine performance with this commitment and found that 48 percent of those children received a timely initial dental exam. The monitoring team conducted a quantitative review of 645 children with an initial dental exam due in the first half of 2019 and found that 48 percent of those children had documentation of a timely initial dental exam.

MDCPS agreed that by July 1, 2019 at least 80 percent of children shall have a dental examination within 90 days of the child's entry into foster care (8.1.e.2.). MDCPS conducted a quantitative review of 762 children to determine performance with this commitment and found that 51 percent of those children received a timely initial dental exam. The monitoring team conducted a quantitative review of 731 children with an initial dental exam due in the second half of 2019 and found that 52 percent of those children had documentation of a timely initial dental exam.

MDCPS conducted a qualitative review of children who entered care during 2019. The qualitative review should have been based on children for whom an initial dental exam was due in 2019 as some children who entered care prior to 2019 were due for an initial dental exam in 2019. The MDCPS qualitative review is, therefore, invalid. The monitoring team attempted to conduct a qualitative review using quantitative review data of children with an initial dental exam due during the second half of 2019. That qualitative review focused on locating MACWIS documentation of a timely initial dental exam, with some substantive information regarding the

---

[49] Exceptions include if the child has had an examination within six months prior to placement or if they are under the age of four. Foster children who reach the age of four while in foster care shall receive a dental examination within 90 calendar days of his/her fourth birthday.

dental health of the child in order to ascertain if the child's medical needs were being met. This review surfaced several problems, including an absence of any substantive documentation regarding the child's dental health or necessary follow-up care, and documentation that only reflected travel and did not include any information regarding the dental health of the child. As a result, the monitoring team was not able to validate MDCPS performance on this commitment. The monitoring team will continue to review this commitment qualitatively in 2020 by looking for information on the dental health needs of children and whether or not those needs have been met.

*Medical Records (8.1.f.)*

MDCPS committed to provide foster parents or facility staff with the completed foster child information form or other electronic record containing available medical, dental, educational, and psychological information about the child within 15 days of placement. The parties agreed that by July 1, 2018, MDCPS would meet an interim performance standard of 75 percent for this commitment (8.1.f.1.) and that MDCPS would reach a performance standard of 90 percent by July 1, 2019 (8.1.f.2.). MDCPS conducted a qualitative review of this commitment as part of the FCR. MDCPS found documentation in narratives that the caseworker timely provided this information in 25 percent of cases reviewed during the first half of 2019 and in 38 percent of cases reviewed in the second half of 2019. Based on the Department's reported performance, the monitoring team did not independently validate this commitment.

*Medicaid Information (8.1.g.)*

MDCPS agreed that by July 1, 2018, 85 percent of children shall have their Medicaid information provided to foster parents or facility staff at the time of placement. MDCPS combined reporting for 8.1.f. and 8.1.g. in the FCR; however, the FCR question only pertained to 8.1.f. As such, MDCPS did not report performance specific to the requirements of this commitment and the monitoring team is unable to assess MDCPS' performance.

# Educational Services

*Educational Record Review and Need Documentation (8.2.a., 8.2.c.1.)*

MDCPS agreed that at least 90 percent of school-age foster children who enter custody shall have their educational records reviewed and their educational needs documented by MDCPS within 30 calendar days of their entry into foster care. MDCPS reported that educational record reviews were completed for 533 children in 2019.[50] Reporting provided during the first three quarters of the year did not include any indication of how many educational records should have been

---

[50] It is not clear if all of these reviews were completed within 30 days of entry into care, as some data provided by MDCPS indicates that not all of the reviews were timely.

reviewed during the quarter in accordance with this commitment. In the fourth quarter, MDCPS reported that 293 youth entered custody during the period under review and 43 percent of their records were reviewed. Based on the Department's reported performance, the monitoring team did not independently validate this commitment.

*School Enrollment (8.2.b.)*

MDCPS agreed to take reasonable steps to ensure that school-age foster children are registered for and attending accredited schools within seven calendar days of initial placement or any placement change, including while placed in shelters or other temporary placements. MDCPS reported that educational liaisons are available to provide support and follow-up to the child's case worker through the review of the Child Custody Placement Report and provision of Best Interest Determinations (BID) consultations. MDCPS did not report on this commitment as the department is not able to report dates of registration and school attendance following initial placement or placement changes.

*Educational Continuity (8.2.c.)*

MDCPS agreed to make all reasonable efforts to ensure the continuity of a child's educational experience by keeping the child in a familiar or current school and neighborhood, when this is in the child's best interests and feasible, and by limiting the number of school changes the child experiences.

MDCPS reported on the results of a qualitative review of BID consultations conducted with the educational liaisons. These consultations are not required and other BIDs may have been conducted by the case worker without any consultation. However, MDCPS cannot track results of BIDs conducted outside of a consultation. The limited review conducted by MDCPS found that BIDs were conducted with educational liaisons for 860 children in 2019 and 216 (25.1 percent) of those children remained in their school of origin. The monitoring team cannot validate performance for this commitment because MDCPS was not able to provide data on all children for whom BIDs should have been conducted to ensure continuity of educational experience.